Exhibit 27

Confidential - Pursuant to Protective Order

<div align="right">Page 1</div>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

IN RE: JOHNSON &          )
JOHNSON TALCUM POWDER  )
PRODUCTS MARKETING       )
SALES PRACTICES AND      )  MDL 16-2738
PRODUCT LIABILITY         )  (FLW)(LHG)
LITIGATION                 )
_____ )
THIS DOCUMENT            )
PERTAINS TO ALL CASES  )

WEDNESDAY, DECEMBER 19, 2018

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

— — —

Videotaped deposition of Laura Plunkett, Ph.D., DABT, held at the Four Seasons Hotel, 999 North 2nd Street, St. Louis, Missouri, commencing at 9:12 a.m., on the above date, before Carrie A. Campbell, Registered Diplomate Reporter, Certified Realtime Reporter, Illinois, California & Texas Certified Shorthand Reporter, Missouri & Kansas Certified Court Reporter.

— — —

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Confidential - Pursuant to Protective Order

Page 2

```
 1          A P P E A R A N C E S :
 2
 3   BEASLEY, ALLEN, CROW, METHVIN,
     PORTIS & MILES, P.C.
     BY:  TED MEADOWS
 4       Ted.Meadows@BeasleyAllen.com
         RYAN BEATTIE
 5       Ryan.Beattie@BeasleyAllen.com
     218 Commerce Street
 6   Montgomery, Alabama 36104
     (334) 269-2343
 7
 8   ASHCRAFT & GEREL, LLP
     BY:  MICHELLE A. PARFITT
 9       mparfitt@ashcraftlaw.com
     4900 Seminary Road, Suite 650
10   Alexandria, VA 22311
     (703) 931-5500
11
12   LEVIN, PAPANTONIO, THOMAS, MITCHELL,
     RAFFERTY & PROCTOR, P.A.
13   BY:  CHRISTOPHER V. TISI
         ctisi@levinlaw.com
14   316 South Baylen Street, Suite 600
     Pensacola, Florida 32502
15   (850) 435-7000
16
17   GOLOMB & HONIK, P.C.
     BY:  RICHARD GOLOMB
         rgolomb@golombhonik.com
18   1835 Market Street, Suite 2900
     Philadelphia, Pennsylvania 19103
19   (215) 278-4449
     Counsel for Plaintiffs
20
21   KIRKLAND & ELLIS LLP
22   BY:  KIMBERLY OLVEY BRANSCOME
         kimberly.branscome@kirkland.com
         WILLIAM SMITH
23   333 South Hope Street
     Los Angeles, California 90071
24   (213) 680-8370
     Counsel for Defendant Johnson &
25   Johnson
```

Page 3

```
 1   DYKEMA
     BY:  JANE E. BOCKUS
 2       jbockus@dykema.com
         RYAN J. SULLIVAN
 3       rsullivan@dykema.com
     112 East Pecan Street, Suite 1800
 4   San Antonio, Texas 78205
     (210) 554-5500
 5   Counsel for the Defendant Imerys
     Talc America
 6
 7   SEYFARTH SHAW LLP
     BY:  THOMAS T. LOCKE
 8       tlocke@seyfarth.com
     975 F Street, N.W.
 9   Washington, DC 20004
     (202) 463-2400
10   Counsel for Defendant Personal Care
     Products Council
11
12   TUCKER ELLIS LLP
     BY:  CAROLINE M. TINSLEY
13       caroline.tinsley@tuckerellis.com
     100 South Fourth Street, Suite 600
14   St. Louis, Missouri 63102
     (314) 571-4965
15   Counsel for PTI Union, LLC and PTI
     Royston, LLC
16
17
     ALSO PRESENT:
18   KATIE TUCKER, Beasley Allen
19
     V I D E O G R A P H E R :
20   JACOB ARNDT,
     Golkow Litigation Services
21
               - - -
22
23
24
25
```

Page 4

```
 1                   INDEX
 2                                    PAGE
 3   APPEARANCES..............................  2
 4   EXAMINATIONS
 5     BY MS. BRANSCOME.......................   8
 6     BY MS. BOCKUS......................... 287
 7     BY MR. LOCKE.......................... 319
 8
 9               EXHIBITS
10   No.   Description              Page
11   1    Notice of Oral and Videotaped       8
          Deposition of Plaintiffs' Expert
12        and Duces Tecum
13   2    Expert Report of Laura M. Plunkett,  13
          Ph.D., DABT, October 5, 2016
14
15   3    Supplemental Expert Report of Laura  13
          M. Plunkett, Ph.D., DABT, August
16        29, 2018
17   4    Rule 26 Expert Report of Laura M.    13
          Plunkett, Ph.D., DABT, November 16,
18        2018
19   5    "Systematic Review and              16
          Meta-Analysis of the Association
20        between Perineal Use of Talc and
          Risk of Ovarian Cancer," Taher, et
21        al.
22   6    Printout of Health Canada's risk    17
          assessment of talcum powder
23   7    "Ovarian, Fallopian Tube, and       111
          Primary Peritoneal Cancer
24        Prevention (PDQ)-Health
          Professional Version," National
25        Cancer Institute
```

Page 5

```
 1   8    "Weight of Evidence:  General        211
          Principles and Current Applications
 2        at Health Canada"
 3        (Exhibits attached to the deposition.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

Confidential - Pursuant to Protective Order

Page 6

1         VIDEOGRAPHER:  We are now on
2    the record.
3         My name is Jacob Arndt.  I'm a
4    videographer for Golkow Litigation
5    Services.
6         Today's date is December 19,
7    2018, and the time is 9:12 a.m.
8         This deposition is being held
9    in St. Louis, Missouri, In Re: Johnson
10   & Johnson Products Marketing Sales
11   Practices, for the United States
12   District Court for the District of
13   New Jersey.
14        The deponent is Dr. Laura
15   Plunkett.
16        Will counsel please identify
17   themselves?
18        MR. MEADOWS:  Ted Meadows for
19   plaintiffs.
20        MS. PARFITT:  Michelle Parfitt
21   for the plaintiffs.
22        MR. BEATTIE:  Ryan Beattie for
23   plaintiffs.
24        MR. TISI:  Chris Tisi for
25   plaintiffs.

Page 7

1         MR. GOLOMB:  Richard Golomb for
2    plaintiffs.
3         MR. LOCKE:  Tom Locke for the
4    Personal Care Products Council.
5         MS. TINSLEY:  Caroline Tinsley
6    for PTI Union, LLC, and PTI Royston,
7    LLC.
8         MR. SULLIVAN:  Ryan Sullivan
9    for Imerys.
10        MS. BOCKUS:  Jane Bockus for
11   Imerys.
12        MR. SMITH:  William Smith for
13   Johnson & Johnson.
14        MS. BRANSCOME:  Kimberly
15   Branscome for Johnson & Johnson.
16        VIDEOGRAPHER:  Thank you.
17        The court reporter is Carrie
18   Campbell and will now swear in the
19   witness.
20        LAURA PLUNKETT, Ph.D., DABT,
21   of lawful age, having been first duly sworn
22   to tell the truth, the whole truth and
23   nothing but the truth, deposes and says on
24   behalf of the Defendant Johnson & Johnson, as
25   follows:

Page 8

1         DIRECT EXAMINATION
2    QUESTIONS BY MS. BRANSCOME:
3         Q.   All right.  Good morning,
4    Dr. Plunkett.  I introduced myself right
5    before we started, but my name is Kimberly
6    Branscome, and I am here on behalf of Johnson
7    & Johnson.
8         Is it your understanding today
9    that you are giving your deposition for the
10   purpose of a Daubert analysis in the MDL
11   related to Johnson's baby powder?
12        A.   That's my understanding, yes.
13        (Plunkett Exhibit 1 marked for
14   identification.)
15   QUESTIONS BY MS. BRANSCOME:
16        Q.   I want to start by handing you
17   what I will mark as Plunkett Deposition
18   Exhibit 1.
19        Do you recognize the document
20   that I just handed you?
21        A.   Yes.
22        Q.   Okay.  Have you seen this
23   document before?
24        A.   Yes.
25        Q.   All right.  When was this

Page 9

1    document provided to you?
2         A.   Either earlier this -- this
3    week or late last week.  I don't recall if it
4    was Friday or Monday.
5         Q.   Okay.  For the purposes of the
6    record, could you just identify what the
7    document is that I just handed you as
8    Plunkett Deposition Exhibit Number 1?
9         A.   It's a notice of oral and
10   videotaped deposition for myself, dated -- I
11   don't see the date, but probably on the very
12   last -- do you need that or just -- is that
13   enough of an identification?
14        Q.   That's all right.
15        Now, contained within the
16   deposition notice there is a reference to a
17   request for materials that are identified in
18   more detail in Schedule A.
19        Do you see that?
20        A.   Yes.
21        Q.   Have you reviewed Schedule A?
22        A.   Yes.
23        Q.   Did you bring any documents
24   with you in response to the request in
25   Schedule A?

3 (Pages 6 to 9)

Confidential - Pursuant to Protective Order

Page 10

1      A.    The only thing that I believe
2   that I had to bring that had not already been
3   provided was additional billing since the
4   time of my last deposition.
5      Q.    Okay.  And is it my
6   understanding that the documentation related
7   to additional billing that you have done
8   since your prior deposition was produced
9   yesterday at the deposition in the Forrest
10  case?
11     A.    That's correct.
12     Q.    All right.  And the information
13  contained in the documents produced at the
14  Forrest deposition yesterday, do those
15  contain an up-to-date record of the billing
16  that you have submitted for your work in
17  connection with the litigation against
18  Johnson & Johnson?
19     A.    Yes, with the understanding
20  that I haven't submitted a bill for December
21  yet.
22     Q.    Okay.  How much time have you
23  spent working in connection with your
24  opinions in the case against Johnson &
25  Johnson related to its baby powder in the

Page 11

1   month of December?
2      A.    So I'm -- on all the cases that
3   I am involved in that are pending, not just
4   this deposition?
5      Q.    I'll ask first all cases and
6   then we'll narrow it to the deposition.
7      A.    So in all --
8      Q.    I mean to the MDL, I'm sorry.
9      A.    Okay.  So in all cases this
10  month, probably eight hours so far, maybe
11  ten.
12     Q.    Does that include the time that
13  you've spent attending deposition?
14     A.    No, that's not including
15  yesterday's deposition time.  I apologize.  I
16  forgot about that.
17     Q.    And how much of the eight to
18  ten hours that you have spent this month
19  working on these cases against Johnson &
20  Johnson, setting aside the time you spent in
21  deposition yesterday, relate to the MDL
22  specifically?
23     A.    So it will probably be
24  billed -- it will be one bill for the
25  preparation time because the prep overlapped,

Page 12

1   but I'll bill separately for the time I spent
2   yesterday right before the deposition and
3   then at the deposition, so...
4      Q.    What did you do to prepare for
5   your deposition today?
6      A.    I reviewed my reports, the
7   three reports that I filed in the litigation.
8   I had a meeting with attorneys on Monday, and
9   then we had a short meeting yesterday evening
10  because some attorneys arrived that were not
11  here on Monday.
12           And essentially went through
13  some of the documents that -- went through
14  some of the documents that I had cited in the
15  report in certain paragraphs, just to refresh
16  my memory of what they were.  So if you want
17  me to tell you which paragraphs, I can do
18  that.
19     Q.    I will in just a moment.  Okay.
20     A.    Want me to repeat that?  I'm
21  sorry.
22     Q.    That's all right.
23           Dr. Plunkett, you referenced
24  the fact that you reviewed specific
25  paragraphs of your expert reports in

Page 13

1   preparation for today's deposition.
2           Could you identify those
3   paragraphs for me?
4           And it's helpful to you, we can
5   go ahead and mark your three expert reports,
6   if you're referring to all three.
7      A.    I'm going to refer just to the
8   MDL report because that's what we're here to
9   talk about.  I mean, if you want to talk
10  about what I did to get ready for yesterday
11  separately or --
12           MR. MEADOWS:  Might be helpful
13  to go ahead and mark them.
14           MS. BRANSCOME:  Why don't we go
15  ahead and just mark the three reports,
16  and then we can walk through.
17           (Plunkett Exhibits 2, 3 and 4
18  marked for identification.)
19  QUESTIONS BY MS. BRANSCOME:
20     Q.    So, Dr. Plunkett, do you have a
21  copy of your three reports in front of you?
22     A.    Yes, I do.
23     Q.    Do those contain any markings,
24  highlightings or flags?
25     A.    No, they don't.

4 (Pages 10 to 13)

Confidential - Pursuant to Protective Order

Page 14

1      Q.    Okay.  Do you mind if we mark
2    your copies as the official records?
3      A.    No, that's fine.
4      Q.    So we will mark -- well, let's
5    do this in chronological order.  So I am
6    marking as Plunkett Deposition Exhibit
7    Number 2 the expert report of Dr. Plunkett
8    dated October 5, 2016.
9           Could you confirm,
10    Dr. Plunkett, that that's what I marked as
11    Deposition Exhibit Number 2?
12      A.    Yes, it is.
13      Q.    And then we will mark as
14    Deposition Exhibit Number 3 supplemental
15    expert report of Dr. Laura Plunkett dated
16    August 29, 2018.
17           Dr. Plunkett, could you confirm
18    that I marked that as Exhibit Number 3?
19      A.    Yes, that's correct.
20      Q.    And then Exhibit Number 4, we
21    will mark the expert report dated
22    November 16, 2018, by Dr. Plunkett that was
23    produced in the MDL.
24           Could you confirm that I marked
25    that as Deposition Exhibit Number 4?

Page 15

1      A.    Yes, that's correct.
2      Q.    All right.  And so now back to
3    the question of you referenced the fact that
4    you looked at specific paragraphs of your
5    expert report in preparation for today's
6    deposition.  If you could, using Deposition
7    Exhibit Number 4, identify which paragraphs
8    you looked at specifically in preparation for
9    the deposition.
10      A.    So it wasn't the paragraphs.
11    There were certain documents in paragraphs,
12    so that's what I was referring to, so...
13           So starting in paragraph 38
14    where I'm talking about sort of the timeline
15    of information about human health hazards and
16    talc dust.  So I just went back and refreshed
17    on a few of the older papers.
18           I looked again at the patent
19    documents that are cited in the first bullet.
20           I looked again at a paper by
21    Eberl, 1948, which is in the last bullet.
22    The patent documents are also there as well.
23           And that -- so that would be
24    all I pulled in that paragraph.
25           I believe that those documents

Page 16

1    are also cited in paragraph 39 as well, some
2    of those same ones that are...
3           And then in Section 5 of my
4    report where I'm talking about exposure, I
5    looked again at Parmley and Woodruff.  I
6    looked again at Vetner and Iturrulde and Egli
7    and Newton last night.
8           And the only other thing I
9    looked at is not cited in this report because
10    it came out after the report was filed, and
11    that was -- and I did bring a copy of that.
12    That was the risk assessment that was done in
13    Canada.  Some people refer to it as -- by the
14    first author's last name, Taher, T-a-h-e-r.
15    And I may be pronouncing that wrong, but...
16           (Plunkett Exhibit 5 marked for
17           identification.)
18    QUESTIONS BY MS. BRANSCOME:
19      Q.    All right.  And I see that you
20    brought a copy of that document with you.
21    Just for the purposes of the record, let's
22    mark that as Plunkett Deposition Exhibit
23    Number 5.
24           Are there any markings,
25    highlightings or notations on that document?

Page 17

1      A.    No, there's not.
2           And then the other document I
3    looked at that was not cited in the report,
4    there is a printout from the government of
5    Canada website that talks about some
6    statements on talc, and so I printed that out
7    as well.  This was published at the same time
8    that the risk assessment was published.
9           (Plunkett Exhibit 6 marked for
10           identification.)
11    QUESTIONS BY MS. BRANSCOME:
12      Q.    All right.  We'll mark that for
13    purposes of the record as Plunkett Deposition
14    Exhibit Number 6.  We might come back to
15    those documents.
16           So returning briefly to the
17    deposition notice and the requests in
18    Schedule A, the billing information you
19    produced yesterday and then we just discussed
20    additional information with respect to that,
21    are there any other documents that you have
22    in your possession that are responsive to
23    requests identified in Schedule A that have
24    not been produced?
25      A.    I don't believe so, no.

Confidential - Pursuant to Protective Order

Page 18

1   Everything -- I do believe that there were
2   some objections filed to this, so there's
3   some things that I did not provide based on
4   that.
5           Some of the things I don't
6   have, too.  I think you asked for -- maybe
7   you didn't ask for that.  Usually people ask
8   for copies of old depositions, and I don't
9   keep those.  And maybe you didn't ask for
10  that, but that's usually a request.
11          Let me see.
12      Q.   Okay.  Now, you mentioned that
13  you met with attorneys on Monday.  And who
14  was present at that meeting?
15      A.   So on Monday it was
16  Mr. Meadows, sitting here.  Ms. Tucker,
17  Mr. Beattie, were at the meeting on Monday.
18      Q.   All right.  And how long did
19  that meeting last?
20      A.   Probably six hours, I guess,
21  six hours with them, and then I also did some
22  other work on my own, but...
23      Q.   Okay.  And then you mentioned
24  that you had another meeting last night.
25          Who was present at that

Page 19

1   meeting?
2       A.   So that was probably about an
3   hour, and that would have been Mr. Tisi -- or
4   maybe two hours.  Mr. Tisi joined us
5   yesterday afternoon.  And Mr. Golomb, too,
6   I'm sorry.
7       Q.   All right.  Okay.  Now, looking
8   at the three reports that you have produced
9   in the litigation involving Johnson's baby
10  powder, I wanted to get an understanding of
11  how those three reports relate to one
12  another.
13          So you have the first report
14  that you produced that was dated October 5,
15  2016.  I believe that was originally produced
16  in the Uhl case; is that correct?
17      A.   I'm not sure the name of the
18  first case, but it was in the -- some of the
19  St. Louis cases, yes.
20      Q.   All right.  And when did you
21  begin work on that report?
22      A.   You'd have to look at my
23  billing record, which I know was an exhibit
24  to yesterday's deposition.  I believe they
25  started in 2015.

Page 20

1       Q.   All right.  And then you
2   produced a supplemental report earlier this
3   year, on August 29, 2018, and that's been
4   marked as Deposition Exhibit Number 3,
5   correct?
6       A.   Yes.
7       Q.   When did you begin work on the
8   supplemental report that you produced at the
9   end of August in 2018?
10      A.   I want to say -- let's see.  I
11  want to say sometime in the summer.  Maybe as
12  early as May, but I believe May -- May, June
13  time frame of 2018.
14          My billing would reflect that,
15  so, again, we can pull my billing.  And I
16  would have called it preparation of the
17  supplemental report in my billing.
18      Q.   Okay.  Why did you choose to
19  draft a supplemental expert report?
20      A.   So over the time I had worked
21  on different trials here in St. Louis
22  particularly, additional documents that were
23  not cited in my original report became
24  reliance materials based on their
25  presentation at trial.  So there were enough

Page 21

1   of those that I thought it was important to
2   add to the original report with additional
3   documents that I had reviewed over time.
4           Since October of 2016 through,
5   let's say, the summer of 2018, there were a
6   variety of additional documents that I had --
7   I had seen.
8           It was also my understanding
9   that during that time period Johnson &
10  Johnson had provided additional documents
11  that weren't provided or available to me in
12  2016, so additional discovery that was now
13  available to look at.  So some of this is a
14  matter of additional evidence that wasn't
15  available when I wrote my initial -- my
16  initial report.
17      Q.   All right.  Now when you say
18  the additional documents became reliance
19  materials in trial, what do you mean by that?
20      A.   So additional documents that we
21  refer to in trial that I use to support
22  opinions that weren't necessarily
23  specifically cited within the body of my
24  report or described within the body of my
25  report.  They were likely on my larger

Confidential - Pursuant to Protective Order

Page 22

1 reliance list, but they weren't things that
2 were cited.
3        In other words, if you look at
4 my original report in -- when I say the body,
5 the paragraphs.  I always put a reference
6 list and then I'll have Bates numbers.  So
7 during trial, things that were from my larger
8 reliance list that weren't specifically
9 discussed in my report became support for
10 different opinions that -- based on questions
11 at trial.
12      Q.    Okay.  When you say these were
13 documents that "we" refer to at trial, you're
14 referring to yourself and attorneys
15 representing the plaintiffs?
16      A.    Yes, that's correct.
17      Q.    Okay.  And understanding that
18 the purpose of today's deposition is focused
19 specifically on the MDL, then you produced a
20 report specific to the MDL on November 16,
21 2018, that we've marked as Exhibit 4,
22 correct?
23      A.    Yes.
24      Q.    When did you begin work on the
25 report that you produced specifically in the

Page 23

1 MDL?
2      A.    Sometime right after -- I would
3 say early fall of 2018, sometime after
4 this -- the supplemental report was filed.
5 Probably right after that.
6      Q.    Okay.  So is it fair to say
7 that you began work on your MDL report after
8 completing the supplemental expert report
9 that has been marked as Exhibit 3?
10      A.    Yes, that's correct.
11      Q.    Okay.  Who was involved in the
12 drafting of the report that's been identified
13 as Exhibit 4?
14        MR. MEADOWS:  Objection.  Hang
15      on a second.
16        Are you asking about
17      communications between attorneys and
18      Dr. Plunkett?
19 QUESTIONS BY MS. BRANSCOME:
20      Q.    Dr. Plunkett, none of the
21 questions I will ask you here today are
22 intended to elicit information that's
23 protected by the attorney-client privilege.
24        So setting that aside, anything
25 that you understand to be privileged, I can

Page 24

1 ask who the -- who was involved in the
2 drafting of the report that was produced in
3 the MDL?
4        MR. MEADOWS:  Hold on just one
5      second.
6        Ask the question one more time.
7      I want to make sure we're not
8      venturing into attorney work product
9      realm here.
10 QUESTIONS BY MS. BRANSCOME:
11      Q.    Dr. Plunkett, do you consider
12 the report that you have issued in the MDL
13 which is identified as Exhibit 4 to be
14 attorney work product?
15        MR. MEADOWS:  Objection.  Don't
16      answer that.  That calls for a legal
17      conclusion, and at this point I'm
18      going to instruct you not to answer
19      questions about how the report came
20      into be.
21        MS. BRANSCOME:  Are you
22      instructing her to refuse to answer
23      any questions that involve the
24      development of her expert report?
25        MR. MEADOWS:  I'm instructing

Page 25

1      her not to answer your last question.
2 QUESTIONS BY MS. BRANSCOME:
3      Q.    Are you following your
4 attorney's instructions, Dr. Plunkett?
5      A.    Yes.
6        MS. BRANSCOME:  At this point I
7      would like to go off the record,
8      please.
9        VIDEOGRAPHER:  Okay.  We are
10      going off the record at 9:30 a.m.
11        (Off the record at 9:30 a.m.)
12        VIDEOGRAPHER:  We are back on
13      the record at 9:32 a.m.
14 QUESTIONS BY MS. BRANSCOME:
15      Q.    Dr. Plunkett, other than
16 attorneys, if attorneys were involved -- I am
17 not asking questions about that -- were there
18 any individuals who assisted you in preparing
19 the report that has been marked as Exhibit 4?
20      A.    There was no one that actually
21 assisted in writing the report.  I do -- when
22 I did my literature searches, I had my
23 husband help me retrieve articles that I
24 identified for retrieval, but certainly there
25 was no -- he doesn't participate in the

Confidential - Pursuant to Protective Order

Page 26

1    actual review of articles or in drafting of
2    the report.  That's all my work.
3         Q.    Okay.  And when you say that
4    your husband retrieved articles, was this
5    simply -- what information did you provide
6    him in order to enable him to retrieve a
7    particular article?
8         A.    So we use a service in Houston
9    called Loansome Doc, which is affiliated with
10   our local medical library system and also
11   with the National Library of medicine and NIH
12   libraries.  So I give him an online search
13   that I put into a clipboard.  He takes that,
14   makes the request or retrieves -- some of
15   them will be free, and so he'll actually go
16   to the websites for the -- and then put them
17   into a folder for me.
18        So he does that physical part
19   of it through the computer, but he doesn't --
20   he doesn't do the searches or decide which
21   ones to retrieve.  I do that.
22        Q.    Okay.  Did you have any
23   discussions with your husband about the
24   substantive content of the report that's
25   identified as Exhibit 4?

Page 27

1         A.    No.
2         Q.    Does he do any evaluation --
3    for example, if you were to provide him a
4    search and it generates multiple documents by
5    a given author, does he identify additional
6    articles that you might want to consider?
7         A.    Only -- he has done that, but
8    only with the streams of letters to the
9    editor.  So I ask him always if I'm pulling
10   an article.  Happens a lot at the New England
11   Journal of Medicine or some of the other
12   medical journals where there's pretty active
13   letter to the editor correspondence that
14   happens.
15        So I always say to him, "If
16   there's any citation to this through the
17   letter to the editor comments, would you
18   please retrieve those," and so he will do
19   that search to look for that.
20        Q.    Okay.
21        A.    And I'm not sure that that
22   happened in any of these articles, but I'm
23   talking my general process that we use.
24        Q.    Okay.  In terms of the
25   relationship of the three reports that have

Page 28

1    been marked as Exhibits 2, 3 and 4 to each
2    other, what is your -- what is your position
3    with respect to opinions that you have stated
4    or language you have used in Exhibits 2 and 3
5    that may not appear in Exhibit 4?
6         A.    I don't think I understand what
7    your -- what you mean by my position.  Are
8    you asking --
9         MS. PARFITT:  And I'll object
10   to that question.
11        THE WITNESS:  Are you asking me
12   to describe -- I mean, I could
13   describe for you the overlap.  I mean,
14   there's not complete overlap.  Is that
15   what you're asking me or --
16   QUESTIONS BY MS. BRANSCOME:
17        Q.    I am.  Why don't you take a
18   shot at it and then I may narrow my question,
19   but I'm just trying to understand how the
20   reports relate to one another.
21        MR. MEADOWS:  Objection.
22        THE WITNESS:  So they relate to
23   each other, I would say, based on
24   timing first, because obviously the
25   first report was two years ago, and

Page 29

1    then many more documents.  So that's
2    how the 1 and 2 relate -- or Exhibit 2
3    and 3 relate to each other.
4         In the MDL litigation, I was
5    asked to address very specific topics
6    and things because there's a -- it's a
7    different -- I don't know all of them,
8    but there's a different set of experts
9    that work in different litigations.
10        So my role in the MDL, I
11   believe, is set out based on this
12   report, whereas in the original
13   reports I may have had -- I did have a
14   broader role in some of those cases.
15   QUESTIONS BY MS. BRANSCOME:
16        Q.    Okay.  Can you describe for me
17   your understanding of your role in the MDL?
18        A.    It's my understanding that I
19   have been asked to provide opinions related
20   to the -- generally the toxicology of talcum
21   powder products, including all the individual
22   constituents that make up that product; to
23   look historically back in time about what was
24   known and when about the toxic effects of
25   talc and different constituents within talc.

8 (Pages 26 to 29)

Confidential - Pursuant to Protective Order

Page 30

1    And that was sort of the -- that's been --
2    I consider that sort of the meat of what I've
3    been asked to do.
4            But separate from that, another
5    part important part of my testimony or things
6    I was asked to provide was an overview of the
7    regulatory process for cosmetics and then the
8    information that accumulated scientifically,
9    how that related to what a company is
10   required to do under the regulations in order
11   to provide consumers with appropriate
12   information about the safety of the product.
13   So kind of the regulatory opinions, I guess
14   you want to call it, that area.
15           I have sections on that, and I
16   think you can see that by the different
17   sections in my report where I set out
18   different general topics.
19           And then I was also asked to
20   address some of the issues related to how the
21   information on the safety of talc has been
22   disseminated publicly and also based on my
23   review of different internal company
24   documents, both from Johnson & Johnson -- or
25   from Johnson & Johnson, Imerys, as well as

Page 31

1    the PCPC, which is the Personal Care Products
2    Council, formerly known as the CTFA, to look
3    at those interactions and how those companies
4    set about to influence the process around the
5    safety assessment of talc over the years.  So
6    different activities that happened with
7    respect to the ISRTP meetings in the '90s,
8    with respect to the NTP process at different
9    points in time.
10           The CIR process, I think I
11   cover, and I also talk a little bit about
12   IARC, I believe, as well.
13           So the interactions of the
14   industry with the science and then how that
15   science ends up getting described within --
16   either to regulators or to bodies that are
17   reviewing the science related to the
18   products.
19       Q.    You mentioned as one of the
20   categories that you were asked to opine about
21   in the MDL that you were looking to set about
22   the influence that companies may have exerted
23   over the regulatory process or PCPC.
24           When you began that analysis,
25   did you start with the predicate belief that

Page 32

1    the companies had, in fact, influenced the
2    regulators or PCPC?
3            MR. MEADOWS:  Objection.
4            THE WITNESS:  Not in my -- not
5    when I first started this process.  So
6    that is -- those opinions actually go
7    back into my original report.  So
8    that's not something, I don't believe,
9    that was not covered in my original
10   report or even in my supplemental
11   report.  I just have different -- some
12   additional documents that I have
13   reviewed.
14   QUESTIONS BY MS. BRANSCOME:
15       Q.    Okay.
16       A.    And this is something when I
17   first evaluated the case and first started
18   looking at the documents, those are opinions
19   that I had formed based on my review.
20           Certainly by the time I drafted
21   the MDL report, I think if you listened to
22   my -- read my trial testimony, you understand
23   I had those opinions at the time I started
24   writing this report.
25       Q.    Now, what I'd like to

Page 33

1    understand next is, are there -- of the
2    topics that you just identified that you
3    understand that you're offering opinions
4    about in the MDL, which, if any, of those
5    topics are in your view new as compared to
6    the opinions that you have offered that are
7    contained in Exhibits 2 and 3?
8            MS. PARFITT:  Objection.
9            THE WITNESS:  So I don't think
10   any of the MDL opinions are new.
11   QUESTIONS BY MS. BRANSCOME:
12       Q.    Okay.
13       A.    I think that they may have --
14   they may -- they may cite to additional
15   documents that haven't been cited to in the
16   first two reports, but I believe there's a
17   significant overlap even on the documents
18   that are cited.
19       Q.    And you mentioned that your
20   role in the MDL is more narrow than the role
21   you've served in other cases.
22           What topics have you opined
23   about in other cases that you are not
24   intending to opine about in the MDL?
25       A.    So I am not doing general

9 (Pages 30 to 33)

Confidential - Pursuant to Protective Order

Page 34

1   causation in the MDL, although I am indeed
2   providing opinions on certain aspects of the
3   cause and effect relationship such as -- you
4   know, I talk about biologic plausibility,
5   underlying knowledge about different
6   toxicities of the compounds over time, but
7   I'm not doing a full causation analysis in my
8   MDL report, and hopefully you see that when
9   you read the report.
10      Q.   So as you sit here today,
11  Dr. Plunkett, you are not intending to offer
12  the opinion in the MDL that Johnson's baby
13  powder causes ovarian cancer; is that
14  correct?
15      A.   Not in those words.  I think if
16  you read my report, I talk about the
17  fact that Johnson -- it's my opinion that
18  Johnson's baby powder increases the risk of
19  cancer -- ovarian cancer, which is a
20  different assessment than the way you stated
21  it.
22      Q.   All right.  And it is -- as you
23  sit here today, Dr. Plunkett, it is your
24  understanding that you are not being offered
25  to give a, as you termed it, a general

Page 35

1   causation opinion in the MDL, correct?
2       A.   That's my understanding, yes.
3       Q.   Now, you mentioned that the
4   analysis as to whether a substance increases
5   the risk of a particular outcome is different
6   than a causation analysis.
7           Can you explain to me what you
8   meant by that?
9       A.   So I discussed this yesterday
10  in my deposition.  There's -- there's a
11  process called risk assessment.  Sometime --
12  in the area of consumer products you can also
13  refer to it as safety assessment.  And then
14  there's the process of what I call general
15  causation analysis, or full causation
16  analysis.
17          So even though the types of
18  information that are considered may overlap
19  between those two, the outcome or the
20  statements or the -- the way you go about
21  assessing the information is a bit different.
22      Q.   Explain to me how they're
23  different.
24      A.   So in a risk assessment, the
25  process starts with setting out some basic

Page 36

1   principles of, first, is there a hazard, is
2   the first step.  Is there a hazard that would
3   be relevant to human health.
4           Then looking at the data and
5   determining whether that -- that body of data
6   allows you to either quantify risk in some
7   way or to qualitatively shows you that
8   there's a change in risk based on exposure to
9   the product.
10          So your statement may be as
11  simple as there's an increased risk, or you
12  can take data in a risk assessment and do a
13  quantification such as in a -- a cancer risk
14  assessment based on an animal data set.  You
15  might actually calculate a cancer potency
16  factor, for example.  Those kinds of things.
17  That's another application of risk
18  assessment.  Same basic process but focusing
19  just, for example, on one study.
20          My human health risk assessment
21  or safety assessment, like the causation
22  analysis, does look across all kinds of data,
23  but my goal was not to analyze the data under
24  the Hill considerations, which is what I
25  would typically do, in order to go through

Page 37

1   the process of making that final opinion that
2   indeed baby powder -- exposure to baby powder
3   through genital application is a cause of
4   ovarian cancer in women.  That's -- to me,
5   that's a different way to go about thinking
6   about the question that you have to answer.
7           And also the -- some of the
8   data that you evaluate is evaluated a bit
9   differently.  So, for example, in my
10  increase -- in my issue of increased risk, I
11  use the epidemiology as supporting evidence,
12  but I'm really focused on -- on -- more on
13  the underlying sort of the biologic
14  information that we have that identifies
15  hazard and risk.  So looking at the animal
16  data, the exposure potential for the product,
17  and then using that along with what we know
18  with the human experience to characterize
19  risk.
20      Q.   Is there a different level of
21  certainty required to render a causation
22  opinion than to render an opinion that
23  there's an increased risk?
24      A.   I don't know that I'd describe
25  it quite that way but -- because to me it's a

10  (Pages 34 to 37)

Confidential - Pursuant to Protective Order

Page 38

1    different process.  I certainly have to be
2    just as certain about what I say about risk
3    when I do a risk assessment as I do about --
4    as I do when I'm doing a causation analysis.
5         I don't -- maybe you mean
6    something else, so maybe you can -- I mean,
7    I -- I certainly use the same basic standards
8    in my mind, how I weigh evidence to do the
9    different processes, but I go about them in a
10   little bit different way when I do a risk
11   assessment versus -- versus a causation
12   analysis.
13        Q.    In your view, does the strength
14   of the evidence have to be greater in order
15   to determine that an agent causes a disease,
16   for example, than it does simply to say that
17   an agent increases the risk of a particular
18   outcome?
19             MR. MEADOWS:  Objection.
20             THE WITNESS:  I don't think
21   I've ever thought about it that way.
22   I would say to you that strength --
23   the strength of the association is a
24   consideration under Hill that you
25   apply the epidemiology data mainly, so

Page 39

1    that is a different consideration
2    under causation than you do -- as you
3    would do it in a risk assessment.
4         But the strength of the
5    evidence, it's still a judgment based
6    on your experience and training as far
7    as whether or not there is enough
8    information to be able to say that you
9    believe that there is -- enough
10   information to say that the risk is
11   increased based on that exposure and
12   those conditions and whatever the
13   toxicity profile of that compound is.
14   QUESTIONS BY MS. BRANSCOME:
15        Q.    Okay.  We'll get into this more
16   a little bit later, but when you say that a
17   risk is increased, is there a threshold level
18   of increase that you need to see in order to
19   render an opinion in a court of law that an
20   agent increases the risk of a particular
21   outcome?
22             MR. MEADOWS:  Objection.
23             THE WITNESS:  So I need you to
24   define what you mean by threshold.
25   Are you asking me a specific

Page 40

1    statistical test you would apply, or
2    what are you asking?
3    QUESTIONS BY MS. BRANSCOME:
4         Q.    So understanding that for the
5    most part if you're looking at statistical
6    significance, you're looking whether the
7    confidence interval crosses 1.
8         Are you following?
9         A.    Yes, I know that, yeah.
10        Q.    All right.  And so when you're
11   evaluating, though, whether a particular
12   substance, in this case Johnson's baby
13   powder, increases the risk of an outcome,
14   again, in this case ovarian cancer, would it
15   be sufficient for you if that increase was
16   .01 percent, for example?
17             MR. MEADOWS:  Objection.
18             THE WITNESS:  That doesn't make
19   sense to me, an increase of .01
20   percent, but maybe I can answer it
21   this way for you based on what you've
22   laid out there.
23        Certainly when I do a risk
24   assessment and I make it -- if I'm
25   going to make the conclusion that I

Page 41

1    believe that it's my opinion to a
2    reasonable degree of scientific
3    certainty that exposure to baby powder
4    in women increases the risk of cancer,
5    I'm having to rely on -- I do rely on
6    data that allows me to draw
7    conclusions because either there's a
8    statistical significant finding found
9    or the -- there's a consistency among
10   the pattern of the data that shows
11   there's information that fits together
12   consistently.  And maybe -- you want
13   me to explain what I mean by that?
14   No?
15        Whereas I think what you're
16   asking is when an epidemiologist
17   applies -- looks at a body of -- in a
18   causation analysis looks at a body --
19   and I do this, too -- looks at a body
20   of epidemiological studies and you
21   weight the studies, obviously you're
22   weighting the studies differently
23   based on whether they have shown
24   statistical significance or not,
25   right?

11  (Pages 38 to 41)

Confidential - Pursuant to Protective Order

Page 42

1     And it isn't that it's a one to
2  one.  If you have one positive and one
3  negative, that isn't how you may
4  decide to finally weight that
5  evidence, but certainly you have to
6  consider whether or not what was seen
7  or reported is showing you something
8  reliable -- or you can make a
9  statement reliably about whether or
10  not that finding was biologically
11  significant.  And biologically
12  significant would typically be linked
13  to a finding that has statistical
14  significance in an epi study unless
15  the study was not designed to be able
16  to answer the question properly.
17     So -- and I've discussed that a
18  little bit yesterday with Mr. Smith on
19  the issue of power to detect.  So
20  that's something you do consider in
21  epi.
22     But, yes, statistical
23  significance certainly goes into your
24  weight of the evidence there.
25

Page 43

1  QUESTIONS BY MS. BRANSCOME:
2     Q.   Okay.  You talked about you're
3  intending to offer an opinion with respect to
4  what a company is required to do under the
5  regulations; is that correct?
6     A.   Yes.
7     Q.   Okay.  What regulations are you
8  specifically referring to?
9     A.   So cosmetic regulations that
10  exist within -- so it's the entire process as
11  I describe how cosmetic -- what -- are
12  cosmetics subject to regulation by FDA?  Yes.
13  What are the types of things that companies
14  have to do before they're marketed, what does
15  the company have to do once the product is on
16  the market, those kinds of things.
17     Q.   Have you ever worked directly
18  for any regulatory agency?
19     A.   No, I have not.
20     Q.   And suffice it to say you have
21  never been in a decision-making position
22  within a regulatory agency, correct?
23     A.   That's correct, I have not.
24     Q.   Have you ever been in a
25  decision-making position with respect to a

Page 44

1  company evaluating compliance with FDA
2  regulations with respect to cosmetics?
3     A.   Yes.
4     Q.   Okay.  What is your experience
5  with respect to that?
6     A.   So that's -- one of the clients
7  that I currently work for where I am asked to
8  provide input on advertising, promotion and
9  labeling of some of the products and then
10  also some of the ingredients that are being
11  promoted for use to -- to produce cosmetic
12  products.  So it's the idea of providing that
13  advice over my understanding of the
14  regulations what can be said and can't be
15  said about certain ingredients.
16     This company is involved in
17  making both ingredients but also some
18  finished products now based on -- it's a
19  large company that owns a lot of little
20  subsidiaries.
21     Q.   My question, though,
22  Dr. Plunkett, was, have you ever been in a
23  decision-making position for a company
24  evaluating compliance with FDA regulations
25  with respect to cosmetics?

Page 45

1     MS. PARFITT:  Objection.  Asked
2  and answered.
3     THE WITNESS:  So that's what
4  I'm saying.  They're relying on my
5  input to make a decision on what will
6  go in the materials.
7  QUESTIONS BY MS. BRANSCOME:
8     Q.   Do you have decision-making
9  authority within that company or, as you
10  described it, are you providing advice and
11  input?
12     A.   I'm providing advice, but the
13  things I'm advising on are the things that
14  happened.  So in other words, they don't have
15  anybody in the company that understands the
16  process of what they can say.  So I -- I
17  advise them that you need to remove this
18  language or that this is more appropriate
19  language.  They make those changes, and then
20  that is what is done.
21     So I agree, I'm not an employee
22  of that company.  I am a consultant working
23  with the company, but it is a little
24  different than some of the work that I do
25  where I -- what I -- the advice that I'm

12 (Pages 42 to 45)

Confidential - Pursuant to Protective Order

Page 46

1  giving is actually something that I know
2  actually happened. Sometimes you give advice
3  to companies, but it doesn't -- we have no
4  idea whether the company actually follows our
5  advice.
6      Q.    My question is slightly
7  different, Dr. Plunkett.
8          If you were to give advice to
9  the company that you've referenced as having
10  experience with cosmetic regulation
11  compliance that that company chose not to
12  follow, that company has the ability to
13  ignore your advice, correct?
14     A.    Yes, I would imagine that they
15  could do that.
16     Q.    Okay. Have you ever drafted
17  regulations that relate to cosmetics?
18     A.    Actually drafted a regulation?
19  No, I have not.
20     Q.    All right. You reference in
21  your report language out of 21 CFR 740.1, and
22  specifically -- you reference it in a few
23  places. And I can direct you specifically to
24  paragraph 22 in Exhibit 4.
25     A.    Yes. I'm there.

Page 47

1      Q.    All right. And do you see here
2  you have replicated language from 21 CFR
3  740.1 that reads, "The label of a cosmetic
4  product shall bear a warning statement
5  whenever necessary or appropriate to prevent
6  a health hazard that may be associated with
7  the product"?
8          Do you see that?
9      A.    Yes.
10     Q.    And you added emphasis on
11  particular portions of this sentence,
12  correct?
13     A.    Yes, I did that, exactly.
14     Q.    All right. Now there's a
15  clause in this sentence that states,
16  "Whenever necessary or appropriate."
17         Do you see that?
18     A.    Yes.
19     Q.    You did not emphasize that
20  language; is that correct?
21     A.    That's correct, I did not.
22     Q.    What is your understanding
23  as -- what you describe as an FDA regulatory
24  specialist of the meaning of "whenever
25  necessary or appropriate" in 21 CFR 740.1?

Page 48

1      A.    So it's -- first off, you would
2  use the common English language definition.
3  I don't believe that those -- I haven't seen
4  a definition separate within the regulations.
5  Sometimes there will be.
6          So based on that and my
7  experience and the looking into what others
8  have described about this, this is the idea
9  of considering how the product is used, is
10  one of the -- one of the concerns that you
11  have, and whether or not the -- based on how
12  the product is used and how the product is
13  being sold, that in order to prevent a health
14  hazard, a warning hazard -- a warning
15  statement would be needed.
16     Q.    Can you cite to me any language
17  within the regulation or even supporting
18  documentation, a comment, something of that
19  nature, that would define "whenever necessary
20  or appropriate" with respect to how the
21  product is used?
22         MS. PARFITT: Objection.
23         THE WITNESS: I don't think I
24  understand your question.
25         Are you asking me to cite to a

Page 49

1  reference or a part of the regulation
2  where they explain it, or what are you
3  asking me? Guidance document or --
4  QUESTIONS BY MS. BRANSCOME:
5      Q.    Yes. Can you point me to
6  anything other than your personal view of the
7  interpretation of this language that would
8  tie the requirement "whenever necessary or
9  appropriate" to how a product is used?
10         MS. PARFITT: Objection. Form.
11         THE WITNESS: I'll have to go
12  look for you whether there's a
13  guidance that states it that way.
14  This is based on my experience in
15  dealing with the products in the past.
16         I think that's also consistent
17  with what is described, I would say to
18  you, within -- it's consistent -- what
19  I'm describing to you, it's consistent
20  as well with how the CIR standard for
21  safety assessment is done, looking at
22  the issue of the -- of the -- of the
23  use.
24  QUESTIONS BY MS. BRANSCOME:
25     Q.    When you say that you're basing

13 (Pages 46 to 49)

Confidential - Pursuant to Protective Order

Page 50

1  your interpretation of the clause "whenever
2  necessary or appropriate" on your personal
3  experience, can you point me to something
4  specific?
5  　　　MS. PARFITT:  Objection.
6  　　　THE WITNESS:  Are you asking
7  　　me -- are you asking me if I've ever
8  　　had a company that I worked for that
9  　　that particular clause in here was
10  　　extremely important to how we
11  　　interpreted it?  I don't think I can
12  　　point you to that.  I don't recall
13  　　ever having to do that specifically.
14  　　　Or is it something different
15  　　you're asking me?
16  QUESTIONS BY MS. BRANSCOME:
17  　　Q.　Dr. Plunkett, I asked you what
18  your basis was for interpreting the language
19  "whenever necessary or appropriate" means
20  that it's related to how a product is being
21  used, and the answer that you provided was
22  that it was based off of your personal
23  experience.
24  　　　So I'm asking you, what is that
25  personal experience that gives you the basis

Page 51

1  for that specific interpretation?
2  　　　MR. MEADOWS:  Objection.
3  　　　MS. PARFITT:  Objection.
4  　　　THE WITNESS:  So it's in my
5  　　experience in dealing with companies
6  　　that make products and what types of
7  　　warnings are put or not put onto -- or
8  　　not -- or on labeling.  So I don't
9  　　know how else to answer it other than
10  　　that.
11  　　　I can go back and look at the
12  　　guidance documents to see if that is
13  　　described in another way, but I don't
14  　　recall that.
15  QUESTIONS BY MS. BRANSCOME:
16  　　Q.　So as you sit here today,
17  you're not able to provide me either with a
18  third-party document or an independent
19  document interpreting "whenever necessary or
20  appropriate" as you've suggested today, nor
21  can you give me specific example from your
22  personal experience; is that correct?
23  　　　MS. PARFITT:  Objection.
24  　　　THE WITNESS:  Well, I
25  　　certainly -- I'd have to go back and

Page 52

1  look at my documents in order -- the
2  first part of your question, I'd have
3  to go back and look.  Off the top of
4  my head, I can't tell what I would
5  point you to.
6  　　　On the second one, I think I
7  was telling you, is I don't -- I've
8  never -- I don't have a client that
9  I've worked for where that part of the
10  language was the only issue that I had
11  to deal with when I'm looking at
12  whether or not the product needs a
13  warning or not.
14  　　　So typically -- I'm just
15  telling you that when I have looked at
16  labeling for products and looked at
17  the issue of does it need a warning
18  statement, when I'm reading it as
19  "whenever necessary or appropriate,"
20  I'm looking at whether or not the
21  ingredient that I'm concerned about
22  within the product, how that is used
23  or what the exposure pattern would be,
24  route of exposure, how those things
25  might relate to how I would assess the

Page 53

1  safety issue at hand.  And so that's
2  what I'm trying to tell you.
3  QUESTIONS BY MS. BRANSCOME:
4  　　Q.　Okay.  You also have --
5  changing topics a little bit, in this -- in
6  your report marked as Exhibit 4, if you could
7  turn to paragraph 10.
8  　　　On page 7, you state on the
9  first paragraph on page 7, "In other
10  instances I have directed others to perform
11  searches on my behalf," and this is with
12  respect to identifying documents for review
13  in forming your opinions.
14  　　　What did you mean by that?
15  　　A.　So in addition to doing my own
16  searches of the database, sometimes I -- I
17  have called the attorney's office and asked
18  them to -- to do a search for certain things
19  that I'm looking for to add to.  So in other
20  words, I have a document I've identified.
21  I'm looking for other documents like that in
22  the large millions and millions of documents
23  that are available.  And so sometimes I will
24  ask attorneys to do -- to look in the
25  database for other documents like the ones

14 (Pages 50 to 53)

Confidential - Pursuant to Protective Order

Page 54

1 that I've identified.
2      Q.    And without getting into
3 anything that would be -- that would call for
4 information protected by the attorney/client
5 privilege or attorney work product, what
6 percentage of the overall searches for
7 relevant documents from these particular
8 databases that are discussed in paragraph 10
9 would you say that you have done yourself as
10 opposed to directed others to do?
11      A.    Well, initially when I first
12 started searching, those were my own searches
13 exclusively.  I would say that more recently,
14 in the last year, since I haven't added any
15 real new areas but there's new documents that
16 have become available, so anything -- any of
17 the searches probably in the last year that
18 dealt with new discovery that was produced, I
19 would have asked the attorneys to do some of
20 the searching in that for me.  Like I'm
21 looking for documents that are similar to
22 this document that I cited in my original
23 report around this same frame that may be
24 discussing this same topic area.
25            So in the last year I have

Page 55

1 asked them to do that more than I have done
2 it, but initially it was what I did
3 initially.
4      Q.    Okay.  Do you keep any records
5 of the various document searches either that
6 you have performed or you have asked to be
7 performed?
8      A.    No, I don't.  My record would
9 be -- the initial -- the record would have
10 been what I listed in my reliance list for
11 you in the initial report, but since then it
12 would just be what is going to be changing
13 within my reliance list, looking at
14 additional documents.  That's the only way I
15 could identify for you.  That would be my --
16 my trail to know what was new and what was
17 not.
18      Q.    My question is slightly
19 different.  Understanding that you have
20 provided to some extent a record of the
21 documents, my question is:  Do you have any
22 type of record for the nature of the
23 searches, what it was that you set out to
24 identify in the database and how did you go
25 about finding those documents?

Page 56

1      A.    So that might cross over into
2 work product because it's not my database,
3 but I don't know how to answer that.  I mean,
4 I'm sure -- it's very possible that in the
5 database you can track that, but I -- I don't
6 know.
7            MR. MEADOWS:  Okay.
8            THE WITNESS:  I don't have
9      anything saved on my computer that
10      way, but when you go to the database
11      itself, it's possible you could track
12      that.  I just don't have a record on
13      my computer in my office.
14 QUESTIONS BY MS. BRANSCOME:
15      Q.    When you made the decision at
16 some point in time -- it may have been even
17 prior to you issuing your first report --
18 that you wanted to look at company documents,
19 did you set out specific categories of
20 documents that you wanted to review?
21      A.    Not so much categories but key
22 words.  So -- and areas.  I guess areas is
23 what I -- yes, I was focusing, for example,
24 in my initial report on documents that
25 described what was known -- what the company

Page 57

1 was discussing about cancer, ovarian cancer,
2 cancer generally.  So that was a key word
3 used.
4            And then I also was linking
5 that in different searches with different
6 time periods such as the NTP review process
7 and dates.  You can, you know, narrow down by
8 dates or by the CIR process.  Those kinds of
9 things.
10            So I did start with that,
11 trying to understand what -- what is -- what
12 was in the company files or in the files I
13 had access to, the database, that dealt with
14 those kinds of things because those aren't
15 things that I could get to publicly.
16 Obviously in the literature.  So I had to --
17 if I wanted to understand what the company
18 knew, I had to go into their database to find
19 out, you know, what they knew -- what they
20 knew or were discussing over time about the
21 ovarian cancer issue or about asbestos in
22 talc or about CIR process, things like that.
23      Q.    Using the reports that you have
24 produced, Exhibits 2, 3 and 4, really, and
25 the full -- the entirety of the materials

15 (Pages 54 to 57)

Confidential - Pursuant to Protective Order

Page 58

1    that you have produced in the MDL, is there
2    any way that someone reviewing those
3    documents, and those documents alone, could
4    replicate the searches that you have
5    conducted in the company databases?
6          MR. MEADOWS:  Objection.
7          THE WITNESS:  I don't know.
8    That's a good question.  I've never
9    thought about whether you could
10   replicate or not.
11         I mean, I think I've told you
12   what I did.  My strategy was to focus
13   on topic areas.  So I think you
14   might -- by topic areas, if you use
15   the same kinds of topics areas as
16   described, I think you would come up
17   with documents that -- what it focused
18   down to.
19         For example, I also would
20   sometimes, as linking those words, I
21   might put in J&J documents only or
22   Imerys documents only, because the
23   database has a variety -- and the
24   PCPC.  There's some different ways by
25   the Bates numbers that you can

Page 59

1    segregate documents as well.  But I
2    don't know other than that.  That's
3    all I can tell you.
4    QUESTIONS BY MS. BRANSCOME:
5          Q.   You would agree with me that
6    your report does not contain a complete
7    explanation of the process by which you
8    identify company documents to review,
9    correct?
10         A.   I haven't laid out my search
11   structure, that is true.
12         Q.   All right.  Now, the articles
13   that you have listed on your reliance list,
14   have you read each and every one of those
15   articles?
16         A.   Unfortunately, yes, over time I
17   have.  Some of them I have only read parts of
18   them.  For example, if I started reading a
19   document and I felt that it was something I
20   pulled that really wasn't directly on point
21   for an area I'm covering, I may not have read
22   every word, but certainly I have been through
23   each of those, yes.
24         Q.   Are there any articles in your
25   reliance list, that you maintained on your

Page 60

1    reliance list, that you read, but then once
2    you started reading decided weren't relevant
3    to the opinions that you were offering?
4          A.   I would have to look to answer
5    that for you.  I don't know.  If you want me
6    to do that, I'd have to look.
7          Q.   I ask you more as a process
8    matter.
9          A.   Oh.
10         Q.   If you pull an article and you
11   start reading it and you realize that it is
12   not relevant to the opinions that you offered
13   in this case, the example that you just gave,
14   is it something that you would include in
15   your reliance list?
16         A.   Yes, I -- I have given you
17   everything I retrieved.  So if I retrieved
18   it, you would have, yes, absolutely.
19         Q.   Okay.  So it's fair to say of
20   the articles that are on your reliance list,
21   you could not say as you sit here today that
22   you have read each and every word of each and
23   every one of them, correct?
24         A.   That's correct.  And I could
25   probably tell you -- I could give you a

Page 61

1    little guidance in that possibly if I went to
2    my list, I could try to pull some out that I
3    recognize, but that's all I would be able to
4    do for you.
5          Q.   Okay.  How did you go about
6    identifying what articles you wanted to
7    review in forming your opinions in the MDL?
8          A.   So first off, I went back to
9    what I already had.  So my MDL report is a --
10   is a compilation of a lot of material that's
11   in my first few reports.  That was the basis
12   for some of the things that went into it.
13         So I didn't -- I did do,
14   though, a updating on literature searches for
15   the MDL report, looking for anything new, for
16   example, in the area, especially the area of
17   cancer data or reports of dealing with
18   ovarian cancer either -- or any articles
19   dealing with the link between inflammation
20   and cancer, ovarian cancer, generally.
21   That's one of the areas I updated looking at.
22         And then I did -- I don't think
23   I did any large, new searches, however,
24   because honestly the areas covered here are a
25   little narrower than what was covered here.

16  (Pages 58 to 61)

Confidential - Pursuant to Protective Order

Page 62

1    I don't believe that there was any from the
2    published -- the publicly available medical
3    literature.  There wasn't a need to do a
4    whole new area of search.  It was more
5    updating the things that I've done in the
6    past.
7            So it's a real easy search to
8    update because you can just put in talc and
9    cancer and just look at -- get lots, but you
10   can then just start chronologically and look
11   what was published in the last year, for
12   example.
13       Q.   Okay.  Earlier when we were
14   discussing the fact that you in some
15   instances have asked your husband to pull
16   articles, have you maintained any records of
17   the searches that you have done with respect
18   to scientific literature, including the
19   searches that you have asked your husband to
20   do?
21       A.   I have not.  It's possible that
22   there are records on billing from the library
23   that tells you how many I ordered at
24   different times, but that is the only
25   records, because we do have to pay the

Page 63

1    library for the retrieval.
2        Q.   Okay.  And if I understood what
3    you said earlier correctly, you indicated
4    that any article you have ever pulled for
5    review, you have listed on your reliance
6    list; is that correct?
7        A.   Yes.  And when I -- and let's
8    just make sure we're talking about the same
9    thing.
10           So, you know, in my reports I
11   typically have articles cited in the report
12   separate from the reliance list.  So I'm
13   talking about the reliance list, right?
14   Okay.
15           So -- because I do -- I do
16   usually -- I don't know whether I did that in
17   this report, but I typically have a list of
18   articles cited at the back called references,
19   that is, things that you're actually seeing
20   in the report body, and then there should be
21   a separate reliance list sent to you as an
22   appendix.  I don't know what the appendix
23   was.
24       Q.   Well, so then let's clarify
25   that.  So, Dr. Plunkett, when you're

Page 64

1    referring to the reliance list, are you
2    referring to the list of articles that begins
3    on page 40 of Exhibit 4, or is there a
4    separate document?
5        A.   There's a separate document.
6    So it -- that's -- I usually call reliance
7    list the separate document.  I call this
8    references cited.  So I apologize for that
9    confusion.
10           So these, I have read every
11   word.  If it's in my reference list, those
12   are not an issue of not having read every
13   word, and these should all be cited somewhere
14   in the report.
15       Q.   Okay.  If you could turn to
16   paragraph 21 in your initial report.
17       A.   Yes, I'm there.
18       Q.   Okay.  So we're looking at
19   paragraph 21 in Exhibit 2.  This is on
20   page 10.
21           Do you see there is a sentence
22   here that refers to -- it's referring
23   generally to the topic of the ability of talc
24   to migrate from the site of application to
25   the ovaries.

Page 65

1            Do you see that?
2        A.   Yes.
3        Q.   And then the next sentence
4    states, "This issue was discussed by
5    scientific and regulatory bodies that review
6    the toxicokinetics of talc."
7            Do you see that?
8        A.   Yes.
9        Q.   And in parentheses it
10   identified EPA 1992, IARC 2010, and CIR 2013.
11           Do you see that?
12       A.   Yes.
13       Q.   Okay.  And then if you could
14   turn to Exhibit 4, which is your MDL report,
15   at paragraph 43.  It's on page 28.
16           Are you with me?
17       A.   Yes, I am.
18       Q.   You see that the exact same
19   sentence appears -- well, not the exact same.
20   It's been slightly modified to combine the
21   first two sentences.  But here you cite only
22   to EPA 1992 and IARC 2010.
23           Why did you remove CIR 2013?
24       A.   Because of my further
25   evaluation since my initial report in 2016 of

17 (Pages 62 to 65)

Confidential - Pursuant to Protective Order

Page 66

1  the process that was involved in the drafting
2  of the CIR and the actual production of the
3  report.
4       Q.   Is it your position that the
5  migration of talc was not evaluated as part
6  of CIR 2013?
7       A.   No.  That's not my position,
8  no.
9       Q.   Okay.  And so would the
10  sentence that's contained in paragraph 43 in
11  Exhibit 4, which is your MDL report, if you
12  cited to CIR 2013 in the parenthetical there,
13  would that not be an accurate citation?
14       A.   I believe it would not be an
15  accurate citation because I have formed
16  opinions about the reliability of that
17  document at this point in time.
18       So it has to do with -- I'm
19  citing to authorities here that I believe are
20  reliable as far as the discussion that I see,
21  and it's a different -- I have a different
22  opinion now about the CIR report, which I lay
23  out in pretty detail, I think.
24       In fact, if you go to my
25  section following this now in -- you'll

Page 67

1  understand one of the issues I had was the --
2  the difference in the evidence that was
3  actually available once you dig into it a
4  little further versus what they actually
5  reviewed.  That's one of the issues.
6       Q.   And I'll follow up with some
7  more questions about the CIR, but my question
8  here is, the sentence in your report simply
9  states, "The migration of talc internally
10  after perineal application was discussed by
11  scientific and regulatory bodies that review
12  the toxicokinetics of talc."
13       Would it be inaccurate to say
14  that as part of the CIR 2013 process that
15  body did, in fact, discuss the migration of
16  talc internally after perineal application?
17       A.   It is true that they did
18  discuss it.  I just have an issue with the
19  reliability of their findings.
20       Q.   And so you made the decision to
21  just remove it from the citation; is that
22  correct?
23       A.   Yes, at this point -- at this
24  point, at this report, that's exactly right.
25       Q.   All right.  And then I had

Page 68

1  another question.  In paragraph 43, you added
2  two studies from your prior -- that were --
3  that did not appear in your prior report, and
4  it was Gardner 1981 and Edelstam 1997.  This
5  related to animal studies showing that in
6  some species talc can migrate from the lower
7  to the upper genital tract?
8       A.   Yes.
9       Q.   Okay.  Were those studies that
10  you were aware of before drafting your prior
11  reports?
12       A.   I don't know that they -- I
13  can't answer that without looking at my
14  reliance materials for the original report.
15  I did identify additional articles, and
16  there's also additional articles cited here
17  in earlier paragraph 43 that were not cited
18  in my original report as well.  I don't think
19  I had the -- the Kunz article then cited.
20  I'd have to go back and look.
21       So it's possible that they were
22  in my -- when I say my reliance materials, my
23  original report also had a larger list of
24  literature I didn't cite.  So I'd have to
25  look.  I can't tell you whether I had them or

Page 69

1  I did not.
2       Q.   Okay.  With respect to Edelstam
3  1997 study, do you happen to know the title
4  of that article?  Even an approximation would
5  work.
6       A.   It'll be -- should be back
7  here.  Just a second.  If it's not here,
8  that's a mistake.
9       Oh, here it is.  "Retrograde
10  migration of starch in the genital tract of
11  rabbits."
12       Q.   So you are citing that article
13  for the proposition that animal studies have
14  demonstrated that talc can migrate from the
15  lower to upper genital tract?
16       A.   Yes, I'm citing it because it's
17  relevant to the issue of particle migration,
18  which talc is a particle.  So, yes, that's
19  correct.
20       Q.   Okay.  But that study did not
21  specifically deal with talc migration,
22  correct?
23       A.   No.  Well, it -- it's relevant
24  to talc migration, but you're exactly right,
25  they looked at the starch migration, yes.  Or

18 (Pages 66 to 69)

Confidential - Pursuant to Protective Order

Page 70

1 particles that were starch, yes.
2     Q.    We'll cover this in more
3 detail, but is it your opinion that all
4 particles have similar characteristics with
5 respect to their ability to migrate in the
6 genital tract?
7     A.    It's my -- I don't know if I'd
8 state it quite that way.  What I would say is
9 that the evidence shows that particles
10 generally have the ability to move up the
11 reproductive tract in women, yes, and that if
12 a particle is one that is similar to talc or
13 some of the other ones where the information
14 has been collected, I would characterize that
15 as being within that, quote/unquote,
16 relevance of particles.
17          That doesn't mean all
18 particles, but certainly in the ones that I
19 have looked at and the data I've relied upon,
20 there's a variety of different types of
21 particles or substances that have been
22 studied and shown to be able to migrate.
23     Q.    So let's take Edelstam 1997 as
24 an example.
25          Did you do any analysis that

Page 71

1 you can point me to that establishes that
2 starch would have a similar migration pattern
3 as talc?
4     A.    So I would say that the paper
5 itself shows -- talks about the movement of
6 starch, but are you asking something
7 different?
8          Are you asking me have I done a
9 specific analysis of any differences that may
10 occur between the migration pattern of starch
11 and talc?  Is that what you're asking me?
12     Q.    That is what I'm asking you.
13     A.    I certainly didn't do an
14 in-depth analysis of the differences, no, but
15 based upon my review of the literature, I
16 believe that that paper is relevant to the
17 overall question of migration of particulate
18 through the reproductive tract, including
19 particles of talc.
20     Q.    Regardless of whether or not it
21 was an in-depth analysis, can you point me to
22 anything other than just your belief after
23 having read these articles that starch and
24 talc would have similar migratory
25 characteristics in the human or animal

Page 72

1 genital tract?
2          MS. PARFITT:  Objection.
3          THE WITNESS:  Again, I haven't
4 done an in-depth analysis.  I mean, as
5 a toxicologist, there are differences
6 between starch and talc, absolutely.
7 For example, starch would -- I would
8 expect to be more easily solubilized
9 within fluids, and so that could
10 affect the ability of them to actually
11 not migrate as well as a talc
12 particle, which would be less soluble
13 than the starch would be.
14          And there's -- I even --
15 there's a paper I have in here, and I
16 can look for it if you want, that
17 talks about that difference, and it's
18 one of the issues of cornstarch versus
19 talc, on whether or not you would
20 expect to get the long-term chronic
21 responses with the difference between
22 those two substances.
23          So I do think there's
24 difference, absolutely, as
25 toxicologists generally.  And the only

Page 73

1 reason I'm citing this paper is
2 because I'm trying to be complete
3 about people that have looked at this
4 issue.  And certainly it was a study
5 that looked at this issue and talks
6 about the movement.
7          But I wouldn't expect starch
8 and the talc to have the same
9 liabilities, and I also wouldn't
10 expect them to move exactly the same
11 speed maybe.  That's very true.
12 QUESTIONS BY MS. BRANSCOME:
13     Q.    So you would agree with me that
14 Edelstam is not a study demonstrating that
15 talc can migrate from the lower to upper
16 genital tract, correct?
17          MS. PARFITT:  Objection.  Form.
18          THE WITNESS:  I wouldn't say it
19 that way.  What I would say instead is
20 that Edelstam is a study that forms
21 the overall weight of the evidence for
22 the ethics -- for the studies that are
23 available that address the issue of
24 migration, but certainly it is not
25 studying talc.  So I don't disagree

19 (Pages 70 to 73)

Confidential - Pursuant to Protective Order

Page 74

1  with you there.
2      Unfortunately, the majority of
3  the information that I have relied
4  upon, and others such as the FDA in
5  making their statements about
6  migration, is not all directed studies
7  just to talc. It's looking at the
8  issue of particle movement.
9  QUESTIONS BY MS. BRANSCOME:
10     Q.   Now, in terms of doing your
11 risk assessment -- well, let me get back. We
12 covered this earlier, and I want to return to
13 it for a moment. Just to confirm: For your
14 work in the MDL, you did not do a Bradford
15 Hill analysis, correct?
16     A.   I did not sit down and do a
17 Bradford Hill analysis when I started writing
18 this report. I have done a Bradford Hill
19 analysis in the past, which is in my original
20 reports, but I certainly did not redo a
21 Bradford Hill when I sat down to draft my MDL
22 report, that is true.
23     Q.   Okay. Let me be more precise.
24     In the report that you have
25 produced that contains a description of your

Page 75

1  opinions in the MDL, you have not set forth a
2  Bradford Hill analysis in that document which
3  is identified as Exhibit 4, correct?
4      A.   That is true, yes.
5      MS. PARFITT: Objection.
6  QUESTIONS BY MS. BRANSCOME:
7      Q.   And in fact, the paragraph that
8  you -- or paragraphs that you have in your
9  prior reports that reference a Bradford Hill
10 analysis, those have not -- those have
11 actually not been replicated in any form in
12 Exhibit 4, correct?
13     A.   Yes, because, again, it was not
14 my role to do general cause.
15     Q.   Okay. So then when we look at
16 the methodology that you employed in reaching
17 your opinions that are contained here in
18 Exhibit 4, how would you characterize the
19 methodology?
20     A.   As I have in the report. I
21 talk about it being a risk assessment or a
22 safety assessment, that you could use those
23 terms interchangeably here. And then I've
24 also used a weight of the evidence as a tool
25 to go through the different steps of the risk

Page 76

1  assessment.
2      Q.   Okay. What publication would
3  you direct me to that has used the same
4  methodology that you have used to reach your
5  opinions in Exhibit 4?
6      A.   I think I cite you to -- cite
7  you to some of those. You could -- well, the
8  directly relevant one would be looking at the
9  chapter on risk -- toxicology in the
10 reference manual on scientific evidence.
11     You can also go to the NRC
12 report where they -- it lays out the
13 different steps that you use when you kind of
14 break data apart into exposure versus
15 response information.
16     And then I cite to -- there are
17 some guidance documents that I cite to, and
18 this is in paragraph 13. And I'd have to
19 pull them out again to tell you which ones
20 relate to different pieces because some of
21 these are -- some of these documents are
22 specific to only, for example, maybe one part
23 of what I did.
24     But certainly the risk
25 assessment process at IARC is -- they do what

Page 77

1  I call a hazard assessment. They identify
2  hazard and they couldn't quantify risk, but
3  the steps they go through are essentially the
4  same types of steps that I went through as
5  far as gathering data on not just response
6  but also the potential for exposure and how
7  that relates to the response.
8      And then also the data that
9  I've collected on the biologic effects of
10 talc, toxicology of talc, are also discussed
11 within that document as well.
12     Q.   Okay. Focusing specifically on
13 the weight of the evidence tool, as you
14 describe it, is there a particular document
15 or publication that I would go to that could
16 lay out the same process that you used for
17 how you weighted certain pieces of evidence?
18     A.   So the documents that I've
19 cited for you in paragraph 13 talk about what
20 weight of the evidence is generally, but if
21 you read what it is, it's essentially a
22 process that each scientist brings their
23 experience, training and judgment to.
24     So I try to lay out for you in
25 my discussion of the literature my thought

Page 78

1    process as I review each piece of
2    information, and that is what you do as part
3    of weight of the evidence.  You gather all of
4    the relevant information that you can find
5    that address the question you're trying to
6    answer, and since I'm looking at both
7    exposure and response, I gather different
8    pools of information.
9        Q.    You would agree that there are
10   ways to do a weight of the evidence
11   assessment of published literature that
12   assign, for example, quantitative values to
13   particular pieces of evidence, correct?
14       A.    Certain individuals have put
15   together, but there's no one general accepted
16   process that everyone uses.  So I -- that's
17   the issue.  Again, there are certain --
18   certain cases where I've seen that done, and
19   then there are many -- most cases that it's
20   not that's done.
21       Q.    Okay.
22       A.    Another body, by the way, that
23   I -- it's new.  It's not in paragraph 13.  I
24   just want to make sure I tell you that so
25   we're clear.  If you look at the Canadian

Page 79

1    document, they also -- in fact, a lot of what
2    they have, you'll see the same literature
3    described within my assessment as well.
4        Q.    So using the Canadian
5    assessment as an example, for instance, in
6    that assessment there were actually values
7    assigned to particular pieces of literature,
8    correct?
9        A.    Mainly the epidemiological
10   literature, that is true.  Again, but I'm not
11   doing causation, so I didn't approach it that
12   way.
13          But certainly if you look at
14   what I did, it's consistent with that because
15   I talk about the differences between the
16   limitations of a case-control versus a
17   prospective study.  I talk about both the
18   positives and the negatives within the
19   database, but I don't lay it out in a table
20   like they do.  But it's certainly the same
21   basic process.
22          I was actually quite surprised
23   at how similar the database of information
24   that they reviewed was to what I honed in on
25   as well.

Page 80

1        Q.    Okay.  As you were forming your
2    opinions, Dr. Plunkett, about whether or not
3    there is a risk associated with the use of
4    Johnson's baby powder with respect to ovarian
5    cancer, how do you keep track of the pieces
6    of scientific evidence that you have reviewed
7    and the respective weight that you give to
8    them?
9           Presumably you did not read
10   everything in one day, for example?
11       A.    No.  That's correct.  So I
12   typically will -- I typically will save the
13   papers -- when I read the papers, I will
14   often highlight in yellow information that I
15   think is going to -- will be extremely
16   relevant.  I don't put notes on the document.
17   I highlight in yellow on the PDF file to use
18   that to write.
19          And I also start drafting
20   report very early, which then gets
21   overwritten and actually ends up looking like
22   an outline that eventually becomes the
23   report.
24          So one of the ways I keep track
25   of things is I may put a paragraph name that

Page 81

1    I know I'm going to write, such as exposure
2    migration, and then I -- as I'm reading a
3    paper, I'll type in a paper -- the ones that
4    I believe are important to my overall
5    assessment.  So I will do that as I'm -- as
6    I'm going through the evidence.
7           So that's one of the tools I
8    use, but I don't keep notes.  I just kind of
9    use that as a living document that eventually
10   becomes a report.
11       Q.    Do your opinions ever change as
12   you read additional pieces of scientific
13   evidence?
14       A.    Yes, it does.  It may change.
15   And it often -- often the changes, though,
16   are not that I believe -- with the exception
17   of epidemiology.  In other areas.
18   Epidemiology is a little bit different issue
19   when you're reviewing studies.
20          But on toxicology I always
21   start with reviews and regulatory
22   authorities, looking at what others have said
23   generally about the toxicology.  And so even
24   though I may refine opinions differently or I
25   might change, I certainly wouldn't agree to

21 (Pages 78 to 81)

Confidential - Pursuant to Protective Order

Page 82

1    work on a project to start with if my initial
2    reviews on hazard, for example, didn't
3    convince me that I believe that there is a
4    hazard.  But you refine it from there.
5    That's exactly right.
6            So there are cases, however,
7    where I'm asked to work on a project where
8    there is no review or regulatory authority or
9    any kind of assessment over a period of
10   years, and in those cases there are times
11   when I start working on a project and I stop
12   and say, "I can't do this."  Because that
13   happens, yes.
14           So opinions do change sometimes
15   based on review of additional information.
16       Q.    Is there any documentation that
17   you've produced either in your report or
18   otherwise in the MDL that would allow someone
19   reviewing the material to understand the
20   order in which you reviewed materials or the
21   specific weight that you assign them?
22       A.    So order of review, no.  I
23   don't think you would know that other than --
24   you will note order of review if you look at
25   the differences in the literature cited in my

Page 83

1    original report versus in the MDL.
2            So in my original reliance
3    list, if there were documents that weren't
4    there and they're now here, obviously that
5    tells you it was a review.
6            On the issue of a -- of the
7    weight of the evidence process, the only
8    answer I can give you for that is that
9    articles that I believe are -- are reliable,
10   are relevant and are -- those are kind of
11   the -- you look at the reliability of the
12   studies, whether they're peer-reviewed or not
13   or if they have proper controls put into
14   place, things like that, whether or not
15   the -- they're relevant to the question at
16   hand.  That you can get from looking at how I
17   discuss them in the document.  But certainly
18   there's no, like, summary of that.
19           But certainly -- I think you
20   understand -- you should understand when you
21   read my report what weight I'm giving based
22   on how I'm describing those -- those
23   materials.  I mean, it's --
24       Q.    Well, for example, you do have
25   different studies that you've identified in

Page 84

1    your report that have been criticized by
2    others at some point in time, correct?
3        A.    Yes, that's true.
4        Q.    Okay.  Now, in some instances
5    you state that you then give little weight to
6    those studies, correct?
7        A.    Yes.
8        Q.    But in other instances you find
9    the criticized study to be helpful and
10   informative, correct?
11       A.    That's true.  Because, again,
12   judgment -- as anybody does weight of the
13   evidence, different scientists can have
14   different judgment.
15           Mainly, I think, when I look at
16   the differences in that -- in that regard, I
17   think you should pay attention to what the
18   person is.  So as a toxicologist, I may view
19   a certain type of -- piece of data very
20   differently than an epidemiologist may view
21   it, as far as the reliability or the
22   relevance, because we're coming at it from a
23   different training and experience and
24   judgment -- set of judgment on what is
25   important to a toxicologist when I'm talking

Page 85

1    about risk versus how an epidemiologist might
2    talk about risk.
3        Q.    Could two different
4    toxicologists review the same piece of
5    literature and give it very different weight?
6        A.    I don't know about different
7    weight, but they certainly -- I know people
8    come to different conclusions based on their
9    overall assessments.  That happens,
10   definitely.  I mean, there are always going
11   to be individuals that look at things
12   differently.
13           I know in this case there are
14   people -- I've seen defense experts that
15   reports in -- not in the MDL but in other
16   cases, where people disagree with some of my
17   opinions, and I disagree with their opinions.
18   That happens.
19       Q.    Okay.  And so if I were --
20   well, let me just ask something.  You have
21   not provided any sort of quantitative
22   assessment of the weight that you gave
23   different pieces of evidence that you cite in
24   forming your opinions in the MDL, correct?
25           MS. PARFITT:  Objection.

22 (Pages 82 to 85)

Page 86

1    Misstates her testimony.
2         MR. MEADOWS:  Objection.
3         THE WITNESS:  So I don't report
4    for you a table where I quantify that,
5    that is correct, but certainly that
6    is -- because, again, based upon
7    looking at the way that I was trained
8    and the documents that I'm talking --
9    I'm pointing you to to describe how to
10   do weight of the evidence, it is
11   not -- it is not a numerical exercise,
12   how many here, how many there, this
13   one gets 5 points because of this or
14   6 points because of this.
15        It's more an issue, again, of
16   judgment.  It's the idea of looking
17   across all of the available
18   information and determining whether or
19   not, based on that, it's your opinion
20   that there -- that, for example,
21   talc -- talc's toxicity profile
22   includes cancer.  That's one of the
23   judgments -- weight of the evidence
24   judgments you make, for example.
25

Page 87

1    QUESTIONS BY MS. BRANSCOME:
2         Q.    So -- but, Dr. Plunkett, just
3    to be clear, you do not provide a numerical
4    value to the particular pieces of evidence
5    that you have considered as part of your
6    weight of the evidence assessment in the MDL,
7    correct?
8         MS. PARFITT:  Objection.  Form.
9         THE WITNESS:  So I do not
10   provide a numerical value as you see
11   it laid out, for example, in the
12   Canadian table, but certainly I do
13   judge articles that I include in my
14   weight of the evidence based on a
15   system that includes different
16   considerations such as -- like I said,
17   peer-reviewed or not, that makes an
18   issue.
19        Whether or not the study that's
20   being reported is the only one -- the
21   first or is this something that is --
22   that is describing an assessment
23   that's been done by someone else and
24   so you see a repetition or a
25   consistency among the studies that

Page 88

1    you're looking at.
2         The robustness of the data.
3    For example, the NTP GLP quality
4    animal study, very high quality in the
5    weight of the evidence.  And I talked
6    to you about that.  In fact, it --
7    even though people criticize that
8    study, that study is very valuable for
9    looking at biologic changes that are
10   consistent with a carcinogenic
11   mechanism being initiated.
12        So even though you may say that
13   you can't quantify risk from that
14   animal study as far as calculating a
15   cancer potency factor, what you can do
16   is use that study of high quality to
17   make judgments within a weight of the
18   evidence for risk.
19   QUESTIONS BY MS. BRANSCOME:
20        Q.    Dr. Plunkett, you understand I
21   have seven hours today, and I -- while I'm
22   very interested in the answers that you give,
23   if we could just -- we will get to things
24   like NTP when we get there, if you could just
25   attempt to answer the question that I've

Page 89

1    asked.
2         I simply asked the question:
3    Are there numerical values assigned to the
4    particular pieces of evidence that you have
5    considered as part of your weight of the
6    evidence assessment in reaching your opinions
7    in the MDL; yes or no?
8         A.    And I said to you, not in the
9    way that it's done -- I assume you're
10   referring to something like what was done --
11   what's in the Canadian epidemiology table.  I
12   have not done that, no.
13        Q.    Okay.
14        A.    That's exactly right.
15        Q.    Have you provided a qualitative
16   chart, for example, of the evidence that you
17   have considered in forming your opinions in
18   the MDL?
19        MS. PARFITT:  Objection.  Form.
20        THE WITNESS:  I don't know what
21   you mean by qualitative chart.  I
22   certainly have -- I certainly, I
23   believe, have given you qualitative
24   descriptions of my weight within my
25   discussions of each study, yes, I have

23 (Pages 86 to 89)

Confidential - Pursuant to Protective Order

Page 90

1    done that.
2    QUESTIONS BY MS. BRANSCOME:
3        Q.   You mention in response to the
4    prior question that you have a system for
5    weighting the pieces of evidence that you
6    have reviewed.
7            Can you point me to paragraphs
8    in your report marked Exhibit 4 that would
9    outline in detail the system that you used to
10   apply different weight analysis to different
11   pieces of evidence?
12           MS. PARFITT: Objection. Form.
13           THE WITNESS: And I think I
14   answered that, that there's no system
15   written down by anyone. But what
16   there is, instead, is if you read
17   these -- if you read these
18   descriptions of use of weight of the
19   evidence that I've cited in
20   paragraph 13 as well as the discussion
21   of methodology in the Canadian
22   document, that is consistent with what
23   I do. It's the idea that you start
24   with a literature search for
25   peer-reviewed, publicly available

Page 91

1    information. You look at the quality
2    of the studies, the statistically
3    significant findings. Those are all
4    things that are discussed within these
5    documents I'm pointing you to.
6    QUESTIONS BY MS. BRANSCOME:
7        Q.   Now, you --
8        A.   But it's -- it's -- I don't
9    know of anyone who has written down a
10   specific system that applies in all
11   circumstances, no.
12       Q.   Okay. Have you written down a
13   system that applies specifically in this
14   case?
15       A.   I think I have tried to do that
16   for you when I describe what I did.
17       Q.   Okay. You just referenced the
18   fact that your system can be found in the
19   Canadian document.
20           You agree that the Canadian
21   analysis was actually published or produced
22   after you had completed your report in the
23   MDL, correct?
24           MS. PARFITT: Objection. Form.
25           THE WITNESS: Certainly it was

Page 92

1    published afterwards, and what I
2    thought I said to you was that if you
3    look at that document -- it's not in
4    paragraph 13, but if you look at that
5    document, it lays out a process. And
6    I wouldn't call it a system. It's a
7    process. It's a process by which you
8    screen information for relevance to
9    the question being asked and how,
10   then, based on that, you look at
11   characteristics of that information
12   such as -- and I tried to give you
13   some of those.
14           And I've said this before in
15   depositions in these cases. You know,
16   you look at the issue of whether or
17   not the study was peer-reviewed,
18   whether or not there was
19   statistically -- statistical
20   significance or at least statistics
21   applied to the data. What was the
22   quality of the study as far as the
23   size in order to be able to answer the
24   question being asked. Those are the
25   kinds of things that you look at.

Page 93

1            And then also the question --
2    when you're looking at a specific
3    question, you may pull in -- like you
4    asked me about the starch particle.
5    You may pull in things that you give
6    less weight because obviously that's
7    not just talc, that's starch, and you
8    have to consider that. So that is
9    part of the process.
10   QUESTIONS BY MS. BRANSCOME:
11       Q.   Dr. Plunkett, the question I
12   asked you simply was: The paper that you
13   reference that contains some detail about the
14   Canadian analysis, that was published after
15   you completed your report that's marked here
16   as Exhibit 4; is that correct?
17           MR. MEADOWS: Objection.
18           THE WITNESS: Yes, and I
19   believe I answered that at the start.
20   I usually try to answer your question,
21   and then I try to explain further some
22   details I think are important context
23   on my answer.
24   QUESTIONS BY MS. BRANSCOME:
25       Q.   I understand that,

24 (Pages 90 to 93)

Confidential - Pursuant to Protective Order

Page 94

1   Dr. Plunkett.  You have given many
2   depositions.  You understand I can ask you
3   for more detail if that would be helpful to
4   me.
5           If you could, just focus on the
6   question that I asked, and we can explore
7   additional areas if that's something I'm
8   interested in doing.
9           Okay?
10          MR. MEADOWS:  Objection.
11   She's --
12          MS. BOCKUS:  Break?
13          MR. MEADOWS:  After I finish my
14   objection.
15          She's going to answer the
16   question as thoroughly as she feels
17   like she needs to answer the question
18   based on the way you ask it.
19          Want to take a break now?
20          MS. BRANSCOME:  We can go off
21   the record.
22          VIDEOGRAPHER:  We're going off
23   the record at 10:41 a.m.
24      (Off the record at 10:41 a.m.)
25          VIDEOGRAPHER:  We are back on

Page 95

1   the record at 10:56 a.m.
2   QUESTIONS BY MS. BRANSCOME:
3       Q.   All right.  Dr. Plunkett, we
4   started talking a little bit about the CIR
5   analysis that was done in 2013.
6           Am I correct that you no longer
7   consider that reliable?  Is that your
8   opinion?
9       A.   Yes.
10      Q.   Okay.  And you identify in your
11   report marked as Exhibit 4, I believe it's
12   paragraph 56?
13      A.   Yes, that's correct.  And I
14   think I talked about it later on as well, but
15   definitely I do here.
16      Q.   Okay.  And in paragraph 56, you
17   state that the CIR panel failed to account
18   for all the studies that informed on the
19   issue of migration of particles such as talc
20   upwards through the reproductive tract.
21          Is that your opinion?
22      A.   Yes.
23      Q.   Okay.  And then you state that
24   because of that you assign, quote, little
25   weight to the conclusions reached by the CIR

Page 96

1   panel; is that correct?
2       A.   Yes.
3       Q.   And so is it your view that a
4   study or an analysis that reaches a
5   particular conclusion should be assigned
6   little weight if it fails to consider all
7   relevant scientific evidence to the issue
8   that it's evaluating?
9           MS. PARFITT:  Objection.
10          THE WITNESS:  I think it
11          depends on the situation, but that
12          could be the case, yes.  It depends
13          on -- on the -- depends on -- I think
14          it would depend on each case, the
15          question being asked, and what was
16          omitted.  But, yes, I think it could.
17   QUESTIONS BY MS. BRANSCOME:
18      Q.   Okay.  And in this situation
19   you identify -- I believe you claimed that
20   eight human studies were not considered by
21   the CIR 2013 panel; is that correct?
22      A.   Let me look at the number, but
23   that sounds about right.  Yes.
24      Q.   All right.  And returning,
25   actually, to your prior answer, you said that

Page 97

1   the failure to consider all relevant
2   scientific evidence on a topic would lead you
3   to assign little weight to a particular
4   conclusion.  You said that that could happen.
5           Under what circumstances would
6   you assign a conclusion little weight for
7   failing to consider what you consider to be
8   all relevant pieces of scientific literature?
9       A.   Well, I think it depends --
10   well, the reason I specifically addressed
11   that in this case is because that was -- the
12   conclusions about migration is the main
13   reason why the CIR panel then draws
14   additional conclusions later on.
15          So my issue is, migration was
16   key to what -- the decisions they made about
17   the safety issues of talc.  And so in that
18   particular case, this -- this failure to
19   consider all the evidence was extremely
20   important, in my view, and I gave it little
21   weight.
22          There might be a situation
23   where some -- for example, you may only look
24   at six or eight studies, even though there
25   may be dozens out there.  You may have a

25  (Pages 94 to 97)

Confidential - Pursuant to Protective Order

Page 98

1  reason for why you only looked at six or
2  eight, or it may be -- and as a result you
3  may lay that out and, therefore, you may
4  still give weight to conclusions drawn.  Or
5  it may be that the six or eight are --
6  studies that you discuss are not -- the
7  weight is not affected by what you've
8  omitted.
9        I believe that the weight is
10  affected by what is omitted when you look at
11  some of the articles being review articles,
12  which give you an understanding of what was
13  generally accepted within the scientific
14  community when you get to reviews, those
15  kinds of things.  So it really is a
16  case-by-case basis.
17        But certainly I do believe that
18  it is possible that in another circumstance
19  where things are omitted you would come to
20  the same conclusion, that you give those
21  conclusions less weight.
22     Q.    Is there a way, if someone were
23  try to replicate the weighting of particular
24  evidence based upon your process, for them to
25  know whether or not the omission of a

Page 99

1  citation of certain studies means that a
2  study should be given little weight or
3  whether it wouldn't affect the weighting of
4  that scientific article?
5        MS. PARFITT:  Objection.  Form.
6        THE WITNESS:  So I think this
7  is the issue of judgment, training and
8  experiencing that is applied to all
9  such assessments, and this is why
10  different scientists may come to
11  different conclusions.  But certainly
12  it is -- it was important to my
13  assessment on this issue because of
14  the prominent role that the CIR report
15  gives to their conclusions here for
16  why they then drew conclusions about
17  safety.  And so that link was
18  extremely important.
19        MS. BRANSCOME:  Can we pause
20  for just a moment?
21        VIDEOGRAPHER:  We are going off
22  the record at 11:00 a.m.
23        (Off the record at 11:00 a.m.)
24        VIDEOGRAPHER:  We are back on
25  the record at 11:01 a.m.

Page 100

1  QUESTIONS BY MS. BRANSCOME:
2     Q.    Okay.  Of the eight studies
3  that you identify on page 37 of your report
4  that you contend the CIR panel did not
5  account for, do any of those eight studies
6  specifically discuss the migration of talc in
7  human subjects?
8     A.    No, I don't believe they do,
9  but there are a couple of these studies that
10  I found to be extremely important if you want
11  me to explain that to you.
12     Q.    Do you break out in your report
13  in any other paragraphs which of these eight
14  articles you consider to be extremely
15  important?
16        And if you could just point me
17  to paragraph numbers, that's good enough if
18  you have, in fact, broken them out.
19     A.    I have.  I -- this whole
20  section I break -- I talk about each one
21  individually.  So I think you can tell by
22  what I read -- what I'm discussing what I
23  thought was important and informative about
24  each of those.
25     Q.    Do you rank the eight studies

Page 101

1  in any way by their importance to you?
2     A.    Not with any numerical rank,
3  no, but certainly I think I do that for you
4  when I talk about the studies.  I give you an
5  understanding of ones that I think are
6  particularly informative and ones that are
7  not.
8        So, for example, I weight the
9  human data -- I think I tell you that -- more
10  than the animal data because of the
11  differences between the reproductive tracts
12  of humans versus animals generally, upright
13  versus -- upright and habits and things that
14  humans do that relate to insertions in and
15  out of the reproductive tract, I guess is a
16  nice way to describe it, versus an animal,
17  that those can have, and then also the
18  differences between animals and humans in
19  terms of bursal sac around the ovary, those
20  kinds of things.
21        So I do -- that -- I guess that
22  ranking I do give you here.  I tell you that
23  I think these -- I think that the most
24  relevant are going to be the human studies
25  versus the animal studies.

26 (Pages 98 to 101)

Confidential - Pursuant to Protective Order

Page 102

1    Q.   Right.
2         So my question specifically is,
3    where would you point me to in your report to
4    understand the weight that you gave each of
5    these particular eight studies?
6    A.   At my descriptions of those
7    studies and what I describe.  That's all I
8    can tell you.
9    Q.   And I'm just asking,
10   Dr. Plunkett, can you point me in the report
11   to where that discussion takes place?
12   A.   It takes place -- I have a
13   discussion for each study, and I would -- and
14   if you read what I say about each study, I
15   try to go through what the strengths and
16   weaknesses of those studies are.
17        And those -- that would be,
18   let's see -- you want me to give you the
19   starting paragraph?
20   Q.   So, for example, Parmley and
21   Woodruff.  Can you point me to where in your
22   report you discuss Parmley and Woodruff, such
23   that I can understand the weight that you
24   gave that particular study?
25   A.   So the year of it is...

Page 103

1         So I think I discuss it in
2    paragraph 44, and so I describe for you what
3    important information is in there, which is
4    the information that I take as forming part
5    of my weight of the evidence.
6         So one of the most important
7    things is what -- they have a figure they
8    show, and they're showing -- which is one of
9    the unique figures in all of the published
10   literature.  But it talks about the
11   differences between the female reproductive
12   tract and the male reproductive tract, and it
13   shows the actual -- it talks about a
14   discussion of movement from substance in the
15   environment through -- into the vagina, into
16   the fallopian tubes.  So it's a paper that
17   addresses that very specific issue.
18   Q.   So my question to you, though,
19   is, where do you have a discussion of the
20   weight that you give to these particular
21   articles?
22   A.   So the discussion of the weight
23   has to do with the information described.  I
24   don't give them a numerical ranking.  I told
25   you that.

Page 104

1         So what I do is, when I'm
2    discussing about these -- all of these papers
3    here contribute to my weight of the evidence.
4    And if it's a human study, I'm giving those
5    more weight than I'm giving animal studies.
6    And that's described.
7         And then within papers I'm
8    pulling out information that contributes to
9    what I think is important about what the
10   study says, and that -- and the importance of
11   what is described within the study
12   contributes to my weight.
13        And I don't know how else to
14   describe it to you.  That is the process that
15   scientists go through when they evaluate
16   data.
17   Q.   And so my question to you:
18   Earlier you said of these eight studies, some
19   of them were particularly important to you.
20        How would I, using only what's
21   written in your report, understand which of
22   those eight studies was of particular
23   importance to you?
24   A.   So it would have to do with
25   what I discuss about the study.  So I'm

Page 105

1    telling you, when I -- if you look through
2    this entire section, this is the Parmley and
3    Woodruff paper.  It is important because it
4    addresses the specific issue of movement of
5    environmental substances from the outside to
6    the inside.  So I'm giving that importance in
7    my evaluation because of what that author is
8    actually discussing.
9         I don't know how else to
10   describe that.  I apologize.  I mean, to me,
11   weight of the evidence is a process that
12   scientists use bringing their training and
13   experience and judgment, and it's not a
14   numerical process across the board, it just
15   is not, based on the way weight of the
16   evidence is used within science.
17   Q.   Now, Dr. Plunkett, though, you
18   would acknowledge that if you wanted to
19   assign numerical values to the studies, that
20   has been something that has been done by
21   other authors and other authors on whom you
22   rely, correct?
23        MS. PARFITT:  Objection.  Form.
24        THE WITNESS:  I don't believe
25   that's true.  I'll need to look -- I

27 (Pages 102 to 105)

Confidential - Pursuant to Protective Order

Page 106

1    don't believe that's true with respect
2    to the biological information.  I
3    believe it may be true with respect to
4    the epidemiology studies.
5         You want me to look real quick
6    to confirm that?  I can do that really
7    quick, but...
8    QUESTIONS BY MS. BRANSCOME:
9         Q.   I'm simply saying, could you
10   assign a numerical value if you chose to do
11   so?
12        MR. MEADOWS:  Objection.
13   Objection.  Form.
14        THE WITNESS:  And I'm -- what
15   I'm trying to say to you is I think
16   that I -- that there is no one set of
17   rules that you would assign in order
18   to do that for all the types of
19   studies that you weigh.
20        I would agree that I have seen
21   it routinely done -- well, not
22   routinely, but I've seen it done
23   within the epidemiological community
24   when they go through the epi data.
25   But not -- it's not something that

Page 107

1    I've seen done when you talk about
2    weight of the evidence as part of a
3    human health risk assessment.  That is
4    not something that scientists
5    typically do as far as giving
6    numerical rankings.
7    QUESTIONS BY MS. BRANSCOME:
8         Q.   You're familiar with the
9    National Cancer Institute, correct?
10        A.   Yes, I am.
11        Q.   All right.  They are considered
12   to be the nation's leader in cancer research,
13   correct?
14        MS. PARFITT:  Objection to
15   form.
16        THE WITNESS:  The National
17   Cancer Institute?
18        Yes, they are.  I don't know if
19   they're "the" leading, but they're one
20   of the leading, that's true.
21   QUESTIONS BY MS. BRANSCOME:
22        Q.   Okay.  And you're familiar with
23   publications that they issue called physician
24   data queries?
25        A.   Yes, I am.

Page 108

1         Q.   All right.  And you are aware
2    that there is, in fact -- called PDQs,
3    correct?
4         A.   That's the abbreviation, yes.
5         Q.   Right.  And you're aware that
6    the National Cancer Institute has in fact
7    published a PDQ that addresses a potential
8    connection between talc and ovarian cancer,
9    correct?
10        A.   I'm aware of several that have
11   been done over the years, but, yes, I'm aware
12   of that.
13        Q.   And have you reviewed those?
14        A.   Yes, I have.
15        Q.   Are they listed on your
16   reliance list?
17        A.   No, but they're listed within
18   the materials as discussed within my
19   depositions, and I thought -- and my
20   testimony.  I thought that was part of my
21   reliance list.  I believe that it -- it was
22   in my reliance list, is encompassing all of
23   the testimony as well as the actual
24   documents.  Maybe I'm mistaken, but that was
25   my understanding.

Page 109

1         Q.   Okay.  If they are not on your
2    reliance list, should they be?
3         A.   I believe that they are on my
4    reliance list by it having been pointed to as
5    part of the testimony that I have given and
6    the documents that I have relied upon during
7    testimony.
8         Q.   Okay.  And you are aware that
9    they have issued a PDQ that -- on the website
10   as of today, correct?
11        A.   I haven't looked today, so I'm
12   sure -- but I know that -- I don't believe it
13   has been removed, so I believe that there is
14   something there, yes.
15        Q.   All right.  And what is your
16   understanding of the position stated in the
17   PDQ with respect to a possible link between
18   talc and ovarian cancer?
19        A.   So I'd have to look at the one
20   today to tell you what it says, but it's
21   evolved over time and it's changed over time,
22   and I have specific opinions that I've
23   expressed at trial about that issue.
24        Do you want me to go into that
25   details or I mean --

28 (Pages 106 to 109)

Confidential - Pursuant to Protective Order

Page 110

1      Q.   I'm not asking about your
2  opinions about what their position is. I'm
3  simply asking you, Dr. Plunkett, the most
4  recent NCI PDQ that you have reviewed, what
5  is the position that the National Cancer
6  Institute has taken with respect to the
7  relationship between talc and ovarian cancer?
8      A.   So I would want to pull it out
9  to give you the specific statement of their
10 position, but their position has changed such
11 that later in time they've weakened the
12 link -- their statements about the link
13 between ovarian cancer and genital talc use.
14      So it used to be seen as a
15 cause, and now I believe it's not seen as a
16 cause. I don't know the exact language,
17 though. I'd have to look at it as -- maybe
18 risk factor is the better word to use.
19      And I need to look at the most
20 recent one. And that would be the best way.
21 Let's just see what it says.
22      Q.   Okay. 'Cause is it your
23 position as you sit here today that the
24 National Cancer Institute has ever issued a
25 statement that talc causes ovarian cancer?

Page 111

1      A.   I believe it was listed as a
2  risk factor for ovarian cancer in the older
3  PDQs.
4      (Plunkett Exhibit 7 marked for
5      identification.)
6  QUESTIONS BY MS. BRANSCOME:
7      Q.   I do have a copy here. Just
8  for the sake of the record, we will mark this
9  as Plunkett Deposition Exhibit Number 7.
10      Handing a copy to you,
11 Dr. Plunkett, do you recognize the document
12 that I just handed you that's marked as
13 Exhibit 7?
14      MR. LOCKE: What's the date of
15 that?
16      MS. BRANSCOME: This was
17 printed on December 14, 2018.
18      THE WITNESS: It's -- the
19 updated date is June 22, 2018, if that
20 helps.
21      MR. LOCKE: Yes, thank you.
22      THE WITNESS: I have seen this
23 one, yes.
24 QUESTIONS BY MS. BRANSCOME:
25      Q.   All right. And you can review

Page 112

1  any -- whatever portion of this is helpful to
2  you.
3      And then if you could answer my
4  question, Dr. Plunkett, of what is the
5  position as stated in Deposition Exhibit
6  Number 7 of the National Cancer Institute
7  with respect to the relationship between talc
8  and ovarian cancer?
9      A.   So I would be looking at the
10 section on page 12 of 18, and maybe you're
11 looking somewhere else, but that's where they
12 actually talk about perineal talc exposure.
13 And it's under the section where they have
14 now moved into factors with an adequate
15 evidence of an association and they describe
16 it here. So they're calling it an
17 association where the weight of the evidence
18 is not adequate to support that association.
19      Q.   All right. And so the first
20 sentence of the section under perineal talc
21 exposure states, "The weight of the evidence
22 does not support an association between
23 perineal talc exposure and an increased risk
24 of ovarian cancer."
25      Did I read that correctly?

Page 113

1      A.   You did read that correctly.
2      Q.   All right. And it indicates
3  that "results from case-control and cohort
4  studies are inconsistent."
5      Did I read that correctly,
6  Dr. Plunkett?
7      A.   You did.
8      Q.   And the question that I would
9  ask simply is, do you discuss the National
10 Cancer Institute PDQ in the report that
11 you've issued in the MDL, which is identified
12 as Exhibit 4?
13      A.   I don't specifically discuss
14 this document, no, I do not.
15      Q.   Okay. And you understand that
16 the NCI PDQ did a weight of the evidence
17 analysis that followed a formal evidence
18 ranking system, correct?
19      MS. PARFITT: Objection.
20      THE WITNESS: So I -- it's not
21 laid out here, but they do have a
22 process they use.
23      Is that what you're asking me?
24 QUESTIONS BY MS. BRANSCOME:
25      Q.   Yes.

29 (Pages 110 to 113)

Confidential - Pursuant to Protective Order

Page 114

1     A.    Yes.  And again, they're
2  ranking the epidemiological data, and so I
3  understand that that is there, yes.
4     Q.    Now, you've said a few times
5  that you could qualitative -- you could give
6  a quantitative weight to an epidemiological
7  study, somehow suggesting that it is
8  different from other types of studies.
9            What is it about a
10  toxicological study, for example, that would
11  prevent someone from giving a quantitative
12  weight in a weight of the evidence analysis?
13     A.    Because it is just what is
14  typically done and not done.  There are
15  certain practices within the community, what
16  is kind of -- I would say that scientists use
17  routinely, or scientists have used.  Not all
18  scientists give numerical rankings to
19  epidemiological data either, because even
20  within a Bradford Hill assessment, when you
21  use the considerations, there's no
22  requirement for ranking studies in order to
23  meet the requirements of use of that
24  methodology.
25     Q.    Okay.

Page 115

1     A.    But I have seen it done in the
2  epidemiology community, and that is the most
3  common place I see it.  I do not see other
4  toxicologists that are assessing animal
5  studies and in vitro studies doing it that
6  same way.
7            When you do a human health risk
8  assessment, that isn't routine practice to do
9  numerical rankings on studies.
10     Q.    Okay.
11     A.    At least in my experience and
12  in my training, and I was trained in the use
13  of risk assessment by one of the individuals
14  who actually invented the process.
15     Q.    Okay.  Okay.  But do you
16  consider the epidemiological evidence as part
17  of your risk assessment in the MDL?
18     A.    I do, because I'm looking at it
19  in the context of what is out there and
20  what's available.  I don't always have human
21  data when I do risk assessments, but in this
22  one I do.  So I do consider them, yes.
23     Q.    Okay.  Did anything prevent you
24  from doing a quantitative assessment of the
25  weight that you were giving different pieces

Page 116

1  of epidemiological evidence?
2     A.    If by -- you mean prevent, was
3  someone stopping me from doing that, no.  But
4  if you ask what would be standard practice
5  based on my experience, I would not be doing
6  that.
7     Q.    Has anyone -- and I'm not
8  referring in this case to any attorneys.  But
9  has anyone reviewed your -- the weighting
10  that you gave specific pieces of evidence as
11  essentially a form of a peer review process?
12     A.    If by that you mean have I
13  submitted my opinions for publication, no, I
14  have not done that.  Part of -- that's partly
15  driven by my understanding of the evidence
16  that I reviewed, that some of it may not be
17  something that I should be discussing
18  necessarily in a public form outside of the
19  cases I'm working in.
20            But certainly I have not
21  submitted it for publication, if that's what
22  you mean.  No, I have not done that.
23     Q.    Okay.  Has the methodology that
24  you have used in the MDL, has that been --
25  have you submitted any type of analysis using

Page 117

1  that methodology for publication even outside
2  of particularly looking at Johnson's baby
3  powder, for example?
4     A.    Yes, in -- if you look at my
5  publications that describe risk assessments
6  that I have done.  So the one that would come
7  to -- to play that's similar as far as the
8  scope of the weight of the evidence would --
9  at least with the animal and the in vitro
10  studies, would be the paper that I published
11  on copper, looking at the database of copper
12  and identifying points of departure and
13  target organs and risk -- risk issues based
14  on copper use in humans, trying to set a --
15  understand what a safe exposure level could
16  be to copper in water.  And that was
17  published -- that actually was one of the
18  papers that's published with Dr. Krewski, who
19  is one of the authors of this risk assessment
20  in Canada.
21     Q.    And is it your position that
22  you follow the same methodology in what
23  you've reported in the MDL with respect to
24  Johnson's baby powder that you did in your
25  analysis of copper?

Confidential - Pursuant to Protective Order

Page 118

1    A.    Yes, with the process of going
2  through all of the publicly available
3  information, putting it together based on its
4  relevancy and reliability.
5    We did a process where we
6  grouped it based on animal versus human, just
7  like I've done here.  And we call it the
8  bins, but it's the same idea.  I have a bin
9  of human idea, I have a bin of animal data
10 and a bin of in vitro data.  And so, yes, the
11 process was very, very similar.
12   Q.    Okay.  Returning back to some
13 documents that you chose not to cite in your
14 report, you do not discuss in the Gonzales 2016
15 study in your report for the MDL, correct?
16   MS. PARFITT:  Objection.  Form.
17   THE WITNESS:  I'll have to
18     look.  It is not cited in the
19     reference list to my report, that is
20     true.  So that means it would not be
21     mentioned specifically in the body of
22     the report.
23 QUESTIONS BY MS. BRANSCOME:
24   Q.    You're familiar with the
25 Gonzalez 2016 study, correct?

Page 119

1    A.    If you want me to talk about
2  it, you'd have to pull it out for me, but I
3  know the name, yes.
4    Q.    Okay.  And it was looking at an
5  association between the perineal use of talc
6  and ovarian cancer, correct?
7    A.    That, I'd have to look at it to
8  tell you.  I believe it was a human study
9  that would be consistent with that, but I
10 need to pull it out to look at it.
11   Q.    All right.  Do you, as you sit
12 here today, do you know why you did not
13 discuss it in your report?
14   A.    I wasn't doing a full causation
15 analysis in this report, so as a result I'm
16 not trying to characterize every piece of
17 human data.  But I certainly am looking at
18 the consistency across the studies, and
19 that's what I've done.
20   And I mention it here.  I do
21 think I mention here that there are studies
22 that came to different conclusions than the
23 ones that I'm specifically describing.
24   Q.    Okay.  And so why is it that --
25 why is it acceptable for you to choose not to

Page 120

1  include something like the Gonzales 2016
2  study, but yet you will disagree the
3  2013 -- the CIR 2013, you will give it little
4  weight for not discussing particular studies?
5    A.    So that's a very different
6  exercise.  You want me to explain my thinking
7  on that?  I can do that for you, but I
8  believe that's apples and oranges question.
9    My reasons for giving little
10 weight to the CIR overall assessment versus
11 my weight or the assessment I make of an
12 individual piece of data, that's different.
13 And that's what you're describing for me.
14   And I believe Gonzales is in my
15 overall reliance list, so I have read
16 Gonzales.  It is something that I have
17 considered; it's not something that I've
18 cited in my paragraphs.  So it doesn't mean
19 it didn't go into my weight of the evidence,
20 because I do have it and I have reviewed it.
21 I just don't recall the details on it.
22   Q.    Is it your position as you sit
23 here today that you know for sure that the
24 CIR panel did not -- was not aware of or even
25 considered any of the eight studies that you

Page 121

1  contend the omission of which makes it of
2  little weight?
3    MS. PARFITT:  Objection.  Form.
4    THE WITNESS:  I would say I'm
5  99.9 percent sure, based on the
6  process that is -- that goes in.  And
7  if you want me to explain, I'll tell
8  you why I feel that level of surety.
9    You know, I can always say that
10 maybe there was someone that came to
11 the panel that did a search on their
12 own, but that is not what's done.  The
13 individuals that come to the panel are
14 given a body of information provided
15 to them in written form that they
16 review.  So it's not like they -- they
17 have access to anything that isn't
18 cited in the actual report.
19 QUESTIONS BY MS. BRANSCOME:
20   Q.    Okay.  The eight articles that
21 you discuss that are not mentioned in the CIR
22 panel's work, they are publicly available
23 pieces of scientific literature, correct?
24   A.    Yes, which was why it's
25 interesting to me that those were not grabbed

31 (Pages 118 to 121)

Confidential - Pursuant to Protective Order

Page 122

1    and included within -- within the assessment
2    done by the -- by the PCPC's group that
3    handles CIR -- handled the CIR process here.
4         Q.    Okay.  We received just before
5    your deposition, a few days in advance, a
6    list of materials that have been added to
7    your reliance list since you produced your
8    report in this case.
9         Did you provide that list of
10   materials to counsel to -- are you aware of
11   the materials that were identified?
12        A.    Yes, I am.  They're ones that I
13   have reviewed since my report and -- yes,
14   which would have been, I believed, important
15   for you to know about, because obviously you
16   wouldn't know if I hadn't provided that to
17   you, and fair game for you to ask me about.
18        Q.    On that list was contained a
19   number of news articles.
20        A.    Uh-huh.
21        Q.    Are news articles pieces of
22   scientific information that you typically
23   consider in performing a risk assessment?
24        A.    No, they're not part of my risk
25   assessment, but they -- but they were

Page 123

1    relevant to -- they were relevant to my
2    overall assessment of the issue of what the
3    company is doing with regard to public
4    dissemination of information.
5         So it's not the risk assessment
6    part.  It's more on the issue of the -- when
7    I talk about the different influences of the
8    company on public dissemination of
9    information, I went through the different
10   specific issues.  So this would be a specific
11   issue related to a news report that someone
12   comes out with, the Reuters report, and then
13   looking at what the company is saying in
14   addition to that.
15        So it's understanding -- for
16   example, the documents that Reuters
17   discusses, many of those I'm sure I have
18   seen, although I don't have access to -- I
19   wasn't able to go on websites and download
20   everything that they cite.  But certainly
21   they looked familiar, some of the ones I did
22   see.
23        So it's that issue of -- the
24   last part of my report, I think.  Want me to
25   tell you the section?  It would be in the

Page 124

1    section on the role of the industry in
2    Section 7.
3         Q.    Okay.  So the newspaper
4    articles are not something that you are
5    considering as part of your analysis of
6    whether there is a risk of ovarian cancer
7    from Johnson's baby powder, correct?
8         A.    No, that's a separate issue
9    because it's not -- it's not scientific data,
10   per se.
11        Q.    Okay.  All right.  Now, if you
12   could turn to paragraph 31 in your report.
13        Okay.  You discuss the
14   biological effects of talc in this paragraph
15   and in others, correct?
16        A.    Yes, I would call this my
17   introductory paragraph to transition into a
18   specific topic, yes.
19        Q.    Okay.  And you talk here about
20   the structure and size of talc affecting its
21   properties.
22        What do you mean by that?
23        A.    So whether it's fibrous enough,
24   platy, fibrous.  Whether it is particle sizes
25   of less than 10 microns, less than 5 microns,

Page 125

1    greater than 75 microns.  There's
2    different -- certain pieces of literature
3    deal with different size ranges of talc.  The
4    smaller the size range, the more toxic it is,
5    for example, to lung tissue; the more likely
6    it is to be able to move, based upon the
7    size, versus being engulfed by a macrophage
8    if it's a larger particle, things like that.
9         Q.    So focusing specifically on
10   ovarian cancer, what role does size and
11   structure of a talc particle play with
12   respect to a risk of ovarian cancer in your
13   opinion?
14        A.    I don't think I formed a
15   opinion that it has to be a specific size or
16   structure, because the -- my opinions are
17   related to the fact that we have a complex
18   mixture of ingredients within the body
19   powder, and my assessment's been on the
20   overall consumer product, not on any one
21   particular ingredient only within it.
22        So it's the idea of just
23   understanding that size and structure of
24   these particles are general principles that
25   affect toxicology.  So a larger particle or a

32 (Pages 122 to 125)

Confidential - Pursuant to Protective Order

Page 126

```
 1    fibrous particle may have a different tissue
 2    toxicity response than a smaller particle.
 3            So in other words -- I think I
 4    discuss this later in a paragraph about
 5    pleurodesis, the idea that you can get acute
 6    versus chronic inflammation, or respiratory
 7    distress or not.  So it's just this idea of a
 8    general principle that outlines how you would
 9    think about particles generally as a
10    toxicologist.
11       Q.   Well, okay.  So you said that
12    your assessment is based on the overall
13    consumer product.  That would be Johnson's
14    baby powder or SHOWER TO SHOWER®, correct?
15       A.   Yes.
16       Q.   All right.
17       A.   Or Shimmer.  I think that's the
18    other name.  There's a third product.
19       Q.   Okay.  But my question to you
20    is, you actually cite a number of pieces of
21    literature in the section about the alleged
22    toxicity of talc that don't relate to the
23    overall consumer products at issue in this
24    case, correct?
25            MS. PARFITT:  Objection.  Form.
```

Page 127

```
 1            THE WITNESS:  No, I would
 2        disagree with that when you use the
 3        word "relate."  Relate to me means is
 4        it relevant to the assessment, and
 5        they are, even if they're not just on
 6        the finished product.
 7            But if what you mean is that
 8        there are studies that did not test
 9        the consumer product but individual
10        ingredients or -- that is true, yes,
11        but all of that is relevant or relates
12        to the overall risk assessment.
13    QUESTIONS BY MS. BRANSCOME:
14       Q.   Okay.  So given your view that
15    information about the individual constituents
16    is relevant to evaluating the overall
17    toxicity of the ultimate consumer products,
18    then my question to you is:  How does the
19    structure and size of the component talc
20    particles play a role in toxicity with
21    respect to ovarian cancer?
22       A.   Just generally -- it's not
23    just -- well, with respect to ovarian cancer,
24    we start with irritation, inflammation
25    potential.  Size of particles and shape are
```

Page 128

```
 1    known to affect tissue toxicity as far as
 2    adverse events like inflammation and/or
 3    irritation.
 4       Q.   Okay.  So that's -- that's what
 5    I'm trying to understand in more detail.
 6            What is your opinion with
 7    respect to -- let's take size to start with.
 8    Is there a particular size talc particle that
 9    is more or less likely to cause inflammation,
10    in your opinion?
11       A.   It depends whether you're
12    talking about acute or chronic.  I would say
13    for acute inflammation the larger particles,
14    such as some of the particle sizes that are
15    used in the pleurodesis products, are more
16    likely to initiate an acute inflammatory
17    response due to the fact that they're large
18    enough that the body will recognize them with
19    a fairly robust foreign body response.
20       Q.   What is your definition of
21    large?
22       A.   So the literature varies, but
23    certainly particles that are above -- some of
24    the literature talks about particles that are
25    in the range of 25 to 75.  Some of them talk
```

Page 129

```
 1    about larger particles even than that.
 2            It has to do with the fact
 3    that -- this is complicated by the fact that
 4    any consumer product -- or any talc sample
 5    will have a range of sizes because they don't
 6    select for one size.  They select for smaller
 7    than.  So a 200 mesh, a 400 mesh, that has do
 8    with what will filter through.
 9            So pleurodesis, they try to
10    avoid for those products the really small --
11    large amounts of less than 10 because that
12    leads to respiratory distress, whereas many
13    of the consumer talc products are using much
14    smaller, finer particles to get that feel and
15    performance they want from the consumer body
16    powders.
17       Q.   Have you reviewed -- focusing
18    specific on Johnson & Johnson's products,
19    have you reviewed the documents that relate
20    to the specifications for the Johnson's
21    products with respect to the size of the
22    plate particles?
23       A.   I have seen those, yes.  I
24    can't tell you what each of them says without
25    pulling them out, but, yes, that is certainly
```

Confidential - Pursuant to Protective Order

Page 130

1	documents I have seen and relied upon.
2	Q.	Is it consistent with your
3	understanding that it was Johnson & Johnson's
4	intention to select large platy talc
5	particles for its products?
6	MS. PARFITT: Objection to
7	form.
8	QUESTIONS BY MS. BRANSCOME:
9	Q.	Have you seen that in the
10	documents?
11	A.	I don't know that it's
12	described quite that way, but they certainly
13	were doing a 200 mesh selection. So -- for
14	their body powders products. So -- and they
15	were trying -- and they did make attempts to
16	look for sources that were more platy talc
17	than other forms, but that doesn't ensure
18	that everything is platy talc.
19	Q.	Are you familiar with the term
20	"fines"?
21	A.	Yes, generally, but I'm not --
22	but I'm not an expert in the processing of
23	talc as far as how you would go about
24	choosing an ore or a mine. There's others
25	that will be addressing that. That's not my

Page 131

1	area.
2	Q.	What is your understanding of
3	the term "fines"?
4	A.	My understanding of the term
5	"fines" has to be looking for a sample or a
6	group that has been processed such that it
7	has certain characteristics.
8	Other than that, I would refer
9	you to the individuals in litigation that are
10	going to be dealing with the processing.
11	Q.	Okay. Have you taken into
12	account in your analysis in any way the
13	beneficiation process that occurs between the
14	time that the talc is mined and it ends up in
15	one of the consumer products that is relevant
16	to your analysis?
17	MR. MEADOWS: Objection.
18	THE WITNESS: So what do you
19	mean by taking it into account? Am I
20	aware that they have something that's
21	in place for that? Yes.
22	But take into account, what do
23	you mean by that?
24	QUESTIONS BY MS. BRANSCOME:
25	Q.	Are you familiar with the

Page 132

1	effects that beneficiation can have on the
2	level of the component -- the components in
3	talc and what ultimately ends up in one of
4	Johnson & Johnson's consumer products?
5	MR. MEADOWS: Objection.
6	THE WITNESS: So I'm not -- I'm
7	not familiar with all the details, but
8	I am familiar that it is a process
9	they're using to attempt to result in
10	a product that has characteristics
11	that would be desirable for a consumer
12	product.
13	Again, there is my
14	understanding that others are going to
15	be discussing the geology or the
16	processing, and that is not something
17	I'm looking at.
18	The literature as it relates to
19	what has been tested in the public
20	literature in particular, and that
21	would be either an ingredient or a --
22	or a consumer product or a -- they may
23	discuss exposure occupationally to
24	mining or milling, which is -- which
25	is an issue that you can consider when

Page 133

1	you're reviewing that literature as
2	well.
3	QUESTIONS BY MS. BRANSCOME:
4	Q.	Okay. And so when you cite --
5	for example, you have a significant number
6	of -- I'm trying to find the right paragraph.
7	You have a section in your
8	report where you discuss a number of
9	different articles that relate to talc, and
10	in parentheses you identify that the talc
11	source might be cosmetic, it might be
12	industrial, things of that nature, correct?
13	A.	Yes, I do that on purpose
14	because I wanted -- I did look at the
15	literature to understand what they were --
16	what they were -- what type of exposure they
17	were describing.
18	Q.	Okay. And so understanding
19	that some of those products are not
20	representative of what ultimately is in
21	Johnson's baby powder, do you have anything
22	in your report that explains how you did or
23	did not give weight to those particular
24	studies?
25	MS. PARFITT: Objection. Form.

34 (Pages 130 to 133)

Confidential - Pursuant to Protective Order

Page 134

1     THE WITNESS:  Let me look and
2  see what I say.
3     If the question has to do with
4  numerical rankings, no, I did not do
5  that.  But you're asking something
6  else, right, broader than that,
7  correct?
8  QUESTIONS BY MS. BRANSCOME:
9     Q.   The question that I have is,
10  how did -- is there somewhere in this report
11  that I can understand the weight that you
12  assigned to say a study that related to
13  industrial talc as opposed to information
14  about cosmetic talc, for example?
15     MR. MEADOWS:  Objection.
16     THE WITNESS:  So I -- I'm -- I
17  believe I address that.  I don't know
18  it's exactly answering your question,
19  but I lay out for you the
20  characteristics of the literature in
21  paragraph 37, and I point out that the
22  scientific literature varies.
23     And the fact -- and I point --
24  and I admit -- I'm not admitting.  I'm
25  stating the fact that in some cases

Page 135

1  the authors will not describe it
2  specifically as the type of talc, but
3  just talc, whereas -- with no
4  description of purity or state, for
5  example.  But in cases where the
6  literature does, I did consider that
7  in my weight of the evidence.
8     So, for example, when I -- when
9  I lay it out here in these bullets
10  where I'm putting for you tremolite
11  mining industrial grade cosmetic, it
12  certainly is something that I weighed.
13  And obviously as much information as I
14  can get on cosmetic-grade talc is
15  going to be most important in the
16  assessment, but that doesn't mean the
17  other information isn't relevant.
18     You want me to explain why?
19  QUESTIONS BY MS. BRANSCOME:
20     Q.   Well, so, for example, you
21  describe the Dreessen article that related to
22  trimellitic talc that's mined out of
23  New York.
24     You would agree that
25  trimellitic talc from New York is not

Page 136

1  something that ever ended up in Johnson's
2  products, correct?
3     MR. MEADOWS:  Objection.
4     THE WITNESS:  I don't think I
5  can answer that yes or no.  I haven't
6  done an assessment to see whether it
7  ever ended up in the products.  That's
8  a different question.
9     I certainly am aware of the
10  fact that was not a primary source of
11  their talc, that is true.  I do know
12  that.
13     In other words, I don't have
14  records from -- going back from 1894
15  on what the source of their talc was.
16  So I can't tell you over time.
17     What I do know, what's been put
18  into depositions and testimony of
19  company employees more recently, where
20  it's my understanding that the
21  principal sources over the years were
22  either the Vermont mine, the Italian
23  mine or the Chinese mine.  And there
24  were different interruptions in time
25  where different mines were used,

Page 137

1  depending on sourcing.
2  QUESTIONS BY MS. BRANSCOME:
3     Q.   So as part of your expert
4  analysis where you are evaluating articles
5  that relate to different types of talc from
6  different sources of talc, have you done an
7  analysis of how those particular types of
8  talc do or do not relate to what is in the
9  consumer product manufactured by Johnson &
10  Johnson?
11     MS. PARFITT:  Objection.  Form.
12     THE WITNESS:  The first part of
13  your question, again?  I'm sorry.
14     MS. BRANSCOME:  Would you read
15  it back?
16     THE WITNESS:  Could you read it
17  back to me again?  I didn't mean to
18  wander, but the first few words I
19  missed.
20     (Court Reporter read back
21  question.)
22     THE WITNESS:  Okay.  So I
23  certainly did, which is why I'm
24  breaking this out here for you this
25  way.

35 (Pages 134 to 137)

Confidential - Pursuant to Protective Order

Page 138

1    So I am -- I am certainly
2    recognizing, and I analyzed on the
3    paper -- through the papers what type
4    of product, if available, that the
5    data is on.
6        But if you read my report in
7    the process of risk assessment, all of
8    these categories of papers are
9    relevant to telling you something
10   about what talc can do.  And then when
11   you talk about drawing final
12   conclusions, I'm looking for
13   information, if I can, and I have it,
14   that is on point to the product that
15   was sold.
16       So certainly the studies that
17   give me information on cosmetic-grade
18   talc are extremely important to my
19   assessment, and they're ones that I've
20   discussed or we've even used in trial
21   before when we've talked about putting
22   together a timeline.
23       That's what this is about, by
24   the way.  This discussion here, I'm
25   starting to lay out what information

Page 139

1    was available over time, and that's
2    simply what this is.  It's a survey of
3    the literature that talks about
4    adverse effects of talc, and if I can,
5    I separate it into different qualities
6    or purities.
7    QUESTIONS BY MS. BRANSCOME:
8        Q.   Dr. Plunkett, respectfully, I
9    don't believe you answered my question.
10       Can you point me to anywhere in
11   your expert report that's been produced in
12   this MDL where you do an analysis of how the
13   different talc types and sources that you are
14   citing as support for the toxicity of talc
15   generally relate to the products manufactured
16   by Johnson & Johnson?
17       MR. MEADOWS:  Objection.
18       THE WITNESS:  So I don't know
19   how else to answer that but to tell
20   you I think that's what this whole
21   section is about.  I step you
22   through -- I identify different types
23   of evidence.  I identify for you what
24   was tested in those different pieces
25   of evidence, and then I step through

Page 140

1    that to draw conclusions based upon
2    what was available for me to assess.
3    QUESTIONS BY MS. BRANSCOME:
4        Q.   Okay.
5        A.   I don't know how else to answer
6    it for you.  That's what the section is meant
7    to do, and that's why I broke it out that
8    way.  You know, I recognize that there is
9    data on different things.
10       What's interesting about even
11   the data on different things, there's a
12   common mechanism that is involved with the
13   type of tissue toxicity you get, and that's
14   irritation and inflammation.  Regardless of
15   whether it is of a certain grade or not, you
16   get certain types of adverse reactions.  May
17   be a more sustained reaction with a
18   industrial grade versus cosmetic grade, but
19   they all have the capability to produce that
20   type of adverse effect.
21       Q.   Dr. Plunkett, where can you
22   point me to in your report that you discuss
23   the weight that you give studies that relate
24   to talc from New York as opposed to studies
25   that relate to cosmetic talc that ultimately

Page 141

1    ended up in Johnson's baby powder?
2        MS. PARFITT:  Objection.  Form.
3        THE WITNESS:  I've tried to
4    answer that for you.  The weight that
5    I'm giving -- the weight that I'm
6    giving is part of my assessment.  So,
7    again, I don't give numerical
8    rankings.  I've answered that for you.
9    I don't do that.
10       What I instead do is I'm
11   looking at everything that's relevant,
12   everything that's available.  I do
13   categorize it, so I am selecting -- I
14   am identifying or analyzing the
15   information for what it describes.
16   And then if you go further on down, I
17   try to tell you what I think is
18   important about that information.
19       The overall conclusions I'm
20   drawing in the report, though, when I
21   cite to specific studies in the risk
22   assessment, the majority of those
23   studies I believe that I'm citing for
24   you, outside of notice, have to do
25   with -- that's more of a warnings

36 (Pages 138 to 141)

Confidential - Pursuant to Protective Order

Page 142

1    issue -- have to do with the issue of
2    cosmetic talc. Because the human
3    studies are describing cosmetic talc.
4    The NTP studies is a pure talc. Many
5    of the in vitro studies and other
6    animal studies are looking at,
7    quote/unquote, a talc that is not an
8    industrial grade or from a mine that
9    would have -- be looked at in that
10   way. So --
11   QUESTIONS BY MS. BRANSCOME:
12       Q.    You understand that there are
13   different types of cosmetic talc, correct?
14       A.    Yes, I am aware.
15       Q.    And cosmetic talc can be mined
16   from a number of different mines globally,
17   correct?
18       A.    That's correct.
19       Q.    And some of the studies that
20   you cite in your report are testing cosmetic
21   talc from other consumer products, for
22   example, Cashmere Bouquet, correct?
23       A.    Some. The majority of them are
24   not, but I would agree that some do, yes.
25       Q.    Okay. Have you done an

Page 143

1    analysis of how the talc that is used in
2    Cashmere Bouquet, for example, relates to the
3    talc that is used in Johnson's baby powder?
4            Is that an analysis that you
5    have done before relying on that information
6    in your report?
7            MR. MEADOWS: Objection.
8            MS. PARFITT: Objection.
9            THE WITNESS: My analysis -- I
10   did do an analysis to look at what was
11   described, what products are
12   described, but I certainly -- I
13   certainly did not throw out studies
14   that described Cashmere Bouquet
15   because I would -- I still believe as
16   a toxicologist and a risk assessor
17   that those types of products are
18   important to the overall weight of the
19   evidence about the hazard and the
20   risks posed by talc.
21           You know, I just -- I just -- I
22   guess I disagree with you if you're
23   saying they're irrelevant. I don't
24   believe that they are.
25

Page 144

1    QUESTIONS BY MS. BRANSCOME:
2        Q.    I was simply asking: Did you
3    do an analysis that would allow you to
4    compare the ingredients in another product,
5    like consumer Cashmere Bouquet, before you
6    rendered an opinion with respect to Johnson's
7    baby powder based on tests of Cashmere
8    Bouquet? Did you do that analysis?
9            MR. MEADOWS: Objection.
10           THE WITNESS: I do not have
11   access to internal company documents
12   for the manufacturers of Cashmere
13   Bouquet, so I certainly couldn't do
14   the analysis in the same way that I
15   can do it here, where I can identify
16   what Johnson & Johnson and Imerys
17   describe as sources of the talc that
18   was used for the Johnson & Johnson
19   baby powder, without --
20   QUESTIONS BY MS. BRANSCOME:
21       Q.    So you have no way of knowing
22   one way or the other whether that talc is
23   similar, correct?
24           MR. MEADOWS: Objection.
25           MS. PARFITT: Objection.

Page 145

1            THE WITNESS: Well, I think I
2    do know it's similar, if you look on
3    the bottle as far as what is described
4    it being, but if you're asking me --
5    if you're asking did we fingerprint it
6    to only a particular mine, this is the
7    beauty of the data. The data shows
8    that regardless of the type of product
9    you're looking at, there's consistency
10   across the study.
11           So -- but I did not try to
12   segregate out studies that only dealt
13   with Cashmere Bouquet, no, I did not
14   do that.
15   QUESTIONS BY MS. BRANSCOME:
16       Q.    Okay. As you sit here today as
17   a toxicologist, is it your position that
18   industrial-grade talc that might contain up
19   to 70 percent tremolite presents the same
20   level of toxic effect as cosmetic talc that
21   may contain no tremolite or tremolite at a
22   very, very low level?
23           MS. PARFITT: Objection. Form.
24           THE WITNESS: I haven't formed
25   that opinion, no.

37 (Pages 142 to 145)

Confidential - Pursuant to Protective Order

Page 146

1    QUESTIONS BY MS. BRANSCOME:
2        Q.    Okay.  And so have you formed
3    an opinion that I could find in your report
4    that discusses in any way the relative
5    toxicity of different types of talc?
6        A.    That, you may find.  I need to
7    go back and look how I set it out, but I
8    think I -- I talked with you about the
9    difference between fibrous versus platy.  I
10   do discuss that.
11       And I talk about the problems
12   when you have a complex mixture that has
13   added to it things like asbestos and heavy
14   metals, because I talk about the additivity
15   issue that can come to play.  So that -- in
16   other words, increased risk when you have a
17   complex mixture with additional components
18   that all share the same toxic properties as
19   far as target organs or types of effects or
20   mechanisms that are triggered in the body.
21   That's what I point you to.
22       I -- I don't -- that's the only
23   way I can answer that for you, I think, based
24   on what I know I have in here.
25       Q.    Okay.  You talk about the term

Page 147

1    "asbestiform talc."
2        You talk about asbestiform
3    talc.
4        Are you familiar with that?
5        A.    I do mention that in my report,
6    yes.
7        Where are you?
8        Q.    At paragraph 30.  It's on
9    page 19 of your report.
10       A.    Yes, I'm here.
11       Q.    Okay.  And the first sentence
12   in paragraph 30 you state, "In the published
13   medical literature, there is often discussion
14   of talc using terms such as fibrous talc,
15   asbestiform talc, non-asbestiform talc or
16   tremolite."
17       Do you see that?
18       A.    Yes, I do.
19       Q.    Okay.  Is it your opinion that
20   tremolite is a form of talc?
21       A.    So tremolite is a -- is a -- is
22   a type of fiber or a -- tremolite is a -- is
23   a substance or a entity that has been
24   identified as a specific morphology, I guess,
25   identified characteristics of a -- it has

Page 148

1    identified characteristics.
2        There's -- within the
3    asbestos -- the asbestos literature
4    there's -- it's one of the forms -- forms of
5    asbestos that's described.  For example, in
6    IARC, they describe all of the ones that have
7    carcinogenic properties.  It's one of them.
8        Within the literature within
9    Johnson & Johnson's documents, there's
10   tremolite discussed as -- I assume them
11   referring to asbestos tremolite, asbestos in
12   a tremolite characteristic.  I have seen
13   tremolite talc also mentioned in the
14   literature.
15       If you want a specific
16   discussion of each of those, again,
17   there's -- I understand there's experts that
18   are going to describe the distinguishing
19   characteristics of each of those.
20       I'm only setting out this is
21   what I have seen, talked about, in the
22   literature.
23       Q.    So you are not an expert on the
24   differences between fibrous talc, asbestiform
25   talc, non-asbestiform talc and tremolite as

Page 149

1    it relates to toxicity.  Is that your opinion
2    today?
3        A.    No, that's not what I'm saying.
4    I'm saying that if you want me to -- I'm --
5    if you want me to describe the
6    characteristics and the morphology of each of
7    those individually, that's something a
8    geologist would do.
9        But certainly as far as the
10   toxicity assessment I did, each of these
11   types of -- each of these words, I guess, or
12   names have been applied in the literature
13   when they talk about toxicity of talc.  Some
14   of the literature talks about fibrous talc or
15   just -- other literature just talks about
16   talc.  Some of it, for example, the IARC
17   monographs, distinguish between asbestiform
18   talc and non-asbestiform talc in their
19   assessments of the cancer risk.
20       And then tremolite is discussed
21   as a component of talc.  And I have seen
22   papers that talk about tremolite --
23   nontremolite talc or tremolite-containing
24   talc.  That's how you most often see it.
25       So it's the idea that it is a

38 (Pages 146 to 149)

Confidential - Pursuant to Protective Order

Page 150

1  constituent of certain mines that -- and
2  that's my understanding of it.  But if you
3  want -- and they all -- they all certainly do
4  show that the toxicity can be affected,
5  whether it's a fiber or a platy particle.  So
6  tremolite being a fiber would certainly
7  affect my overall assessment of risk.  The
8  more tremolite that you would have would
9  make -- would make it more likely to be
10 reactive in terms of a foreign body response,
11 depending on the size.
12      Q.   What's your basis for saying
13 that?
14      A.   That's based on a fibrous form
15 versus a platy particle form.  That's the
16 issue of -- I have that paragraph where I
17 talk about what macrophages look for, can
18 engulf or not engulf.  So those are all
19 things that are important to a toxicologist
20 to understand exist.
21          But certainly within my
22 assessment I have to include literature from
23 all of those because of the fact that all of
24 those are relevant to the toxicity profile,
25 since I know that the cosmetic baby powders

Page 151

1  and the data I've seen shows detection of
2  something called fibrous talc.
3          I see detection of tremolite
4  within certain samples of baby powder.
5          And then I have just the
6  general category of asbestiform versus
7  non-asbestiform when I consider the way, for
8  example, IARC has reviewed the
9  carcinogenicity.
10         So those are -- those are terms
11 that I'm laying out because I think they are
12 something you need to understand exists in
13 the literature.
14     Q.   Okay.  But I'm trying to
15 understand, not helping me understand the
16 literature.  I'm trying to understand your
17 opinions with respect to toxicity.
18         Is it, for example, your
19 opinion that fibrous talc has the same toxic
20 potential -- let's focus specifically with
21 respect to ovarian cancer -- as tremolite?
22     A.   I haven't formed that opinion,
23 but, again, I would -- my opinion has been
24 formed on the fact that we have complex
25 mixture that includes all of these things.

Page 152

1      Q.   Okay.  And so when you're
2  looking at a complex mixture, you would agree
3  as a toxicologist it would be important to
4  understand the constituent elements of that
5  mixture, correct?
6      A.   Yes, it is important to
7  understand that this is -- what is in the
8  mixture, and that's -- that's part of what I
9  try to do.
10     Q.   Okay.  And it would be
11 important before drawing conclusions from one
12 study that might have different constituent
13 components, it's important to understand the
14 relative toxicity of individual constituent
15 elements, correct?
16     A.   Depends if you can or not.  I
17 mean, there's certain types of studies you
18 can, where in the published literature that's
19 been described.  That's why I'm pointing this
20 out.  It's the idea that within the
21 literature, when you go through, it's
22 important to understand what you can say
23 about the consistency across the literature
24 where maybe different types of talc are
25 discussed.

Page 153

1          And that's what I -- I think I
2  lay out for you.  I tell you there's
3  consistency in certain toxic effects that are
4  seen.  Regardless of the form that you're
5  looking at, talc has certain properties, and
6  all of these things are -- been shown to be
7  in the complex mixture, so I have -- as a
8  result, all of that literature has relevance
9  to at least the hazard part of my assessment,
10 and certainly have relevance to -- when you
11 want to talk about warning and the final risk
12 assessment, they're definitely relevant, but
13 certainly the -- when I go through this
14 process, I am trying to focus as much as I
15 can on a product that is most similar to the
16 one I'm assessing.
17         So obviously that's why --
18 that's one of the reasons I go look at the
19 human data, because the human data is
20 involving a consumer product use, which is
21 what I'm talking about here.
22     Q.   Is it using specifically
23 Johnson's baby powder?
24     A.   Many of them are, yes.
25     Q.   Okay.

39 (Pages 150 to 153)

Confidential - Pursuant to Protective Order

Page 154

1     A.   Based on my understanding of
2  what I see discussed within the literature.
3     Q.   Did you identify in your report
4  specifically which report -- which studies
5  have used a consumer product manufactured by
6  Johnson & Johnson?
7     A.   I haven't laid them out
8  individually, no, but I am aware of
9  discussions of this general issue within some
10 of the documents I've seen, and essentially
11 Johnson's body powders products were the
12 overwhelming share of the market.
13    Q.   But you would agree that
14 studies that did not involve the consumer
15 product manufactured by Johnson & Johnson
16 should be given less weight when analyzing
17 whether or not there are risks associated
18 specifically with Johnson & Johnson's
19 products?
20    MS. PARFITT:  Objection.  Form.
21    MR. MEADOWS:  Objection.
22    THE WITNESS:  It depends on the
23 question being asked within the
24 assessment, the risk assessment.  It
25 really does, I mean, because each of

Page 155

1  these studies brings a piece of
2  evidence to the risk assessment.
3     And so the question is -- for
4  each one, you consider it on a
5  case-by-case basis.  It is possible,
6  yes, that you would give less weight.
7  It's also possible that you would not,
8  dependent upon what you know about
9  that study and how it relates to other
10 studies that are out there.
11 QUESTIONS BY MS. BRANSCOME:
12    Q.   So methodologically, how would
13 I understand from your report marked as
14 Exhibit 4 under what circumstances to give a
15 study that relates to, for example,
16 industrial talc less weight than a study that
17 actually used Johnson's baby powder?
18    MR. MEADOWS:  Objection.
19    THE WITNESS:  Well, I've tried
20 to tell you that.  That's what I said
21 for you.  That's why I am doing it.  I
22 certainly am trying to focus in on
23 studies that deal with the consumer
24 product.
25    But what I find when I look

Page 156

1  across the studies that are dealing
2  with not the consumer product but
3  other descriptions, there is a
4  consistency in the types of effects
5  you see.
6     And since I'm not quantifying
7  the risk but identifying it as being
8  increased or not, in other words, is
9  it more likely than not that someone
10 exposed in this way could be at a risk
11 of ovarian cancer, that's what I'm
12 talking about.
13    So again, it's -- if I was
14 trying to identify differences in
15 cancer potency factors for different
16 types, then, yes, if I had an animal
17 study on each of those, I could
18 compare potency for cancer, but that
19 hasn't been done.
20 QUESTIONS BY MS. BRANSCOME:
21    Q.   Okay.
22    A.   So instead, what I have to do
23 is rely on what is available to me.  And
24 based on my judgment, that's how I review the
25 studies.

Page 157

1     Q.   And so for the opinions that
2  you are offering in the MDL, you agree that
3  you are not quantifying the risk associated
4  with Johnson's baby powder, SHOWER TO SHOWER®
5  or Shimmer with respect to the potential for
6  causing ovarian cancer?
7     MS. PARFITT:  Objection.  Form.
8     THE WITNESS:  In terms of a
9  cancer potency factor, that is true, I
10 am not.  Instead, what I am doing is I
11 am quantifying whether or not I
12 believe that the risk is increased
13 above a background risk.
14    That has to do with -- that's
15 where I bring in, in my risk
16 assessment, the human data, because
17 the human data is showing
18 statistically significant increases in
19 risk in populations using the consumer
20 product.
21    So I have a quantification
22 where I'm using the word "increased,"
23 and I believe to a reasonable degree
24 of medical certainty that indeed the
25 risk is increased.  So I'm quantifying

40 (Pages 154 to 157)

Confidential - Pursuant to Protective Order

Page 158

1  in that way, but I'm not giving it a
2  number.  I'm not saying that the
3  cancer potency factor is such that you
4  increase the risk from one in a
5  million to 10 in a million to 1 in a
6  thousand.  That I have not done
7  because I don't have the data, the
8  studies.  The company has not done
9  studies on each of these to allow me
10  to do that.
11  QUESTIONS BY MS. BRANSCOME:
12  Q.    Okay.  The reference that you
13  made to the human data that you believe shows
14  a statistically increased risk in populations
15  using the consumer product, have -- which --
16  have you identified in your report which of
17  those studies are specifically using a
18  product that was manufactured by Johnson &
19  Johnson?
20  A.    I don't lay that out for my
21  report, I do not, but certainly it is
22  something that for some of the studies I
23  believe you can -- you might be able to get
24  some of that information from.  But certainly
25  I have not laid that out individually in my

Page 159

1  report, no.
2  Q.    And you would agree that for
3  some of those studies there is no information
4  as to the specific type of consumer talc that
5  the individuals who are being studied used,
6  correct?
7  MS. PARFITT:  Objection.  Form.
8  THE WITNESS:  I would agree
9  that in some of those studies they're
10  not saying, but that is why you look
11  at the evidence overall.
12  And what's important to look at
13  in terms of now -- if you wanted to go
14  to Bradford Hill, that's why you look
15  at things such as consistency.  So
16  what do the studies show.  We see a
17  certain level of increased risk across
18  studies, regardless of who did the
19  study or what population was being
20  looked at.
21  So that's the best way I can
22  answer that for you.  That is -- that
23  is part of the -- of the assessment
24  that you look at.
25

Page 160

1  QUESTIONS BY MS. BRANSCOME:
2  Q.    In reaching your opinion in the
3  MDL that there is an increased risk in the
4  background of ovarian cancer from the use of
5  products manufactured by Johnson & Johnson,
6  have you made an attempt to identify
7  specifically which studies, the human studies
8  on which you rely, test or look at people who
9  have used Johnson & Johnson's products?
10  MS. PARFITT:  Objection.  Form.
11  THE WITNESS:  It's my -- my
12  review of the study indicates that I
13  would say for the vast majority of
14  them you cannot do that.
15  But you can take what is
16  reported and look at things such as
17  market share and those kind of things
18  to get an idea of what you believe the
19  exposure would have been.
20  But certainly I have not -- I
21  have not tried to apply some kind of a
22  numerical value to how many people in
23  the study may have used Johnson's baby
24  powder or not, no, that has not been
25  done.  I don't think anybody -- any of

Page 161

1  the bodies that have looked at this
2  have done that.
3  QUESTIONS BY MS. BRANSCOME:
4  Q.    You have not done a market
5  share analysis, correct?
6  A.    No, I've seen this in documents
7  only.  I have not done my own.  There are
8  company documents that talk about their
9  market share.
10  Q.    Okay.  Have you made an attempt
11  to examine the levels of fibrous talc or
12  asbestiform talc that are in different
13  consumer products, aside from Johnson's baby
14  powder or SHOWER TO SHOWER® or Shimmer?
15  A.    So for that are you referring
16  to things such as -- other types of cosmetics
17  like foundations or lipsticks or --
18  Q.    I'll rephrase.
19  Have you made any attempt to
20  examine whether other cosmetic talc body
21  powders have a different percentage of
22  fibrous, or what you refer to as asbestiform
23  talc, from the Johnson & Johnson products?
24  Have you done any analysis to
25  make that comparison one way or the other?

41 (Pages 158 to 161)

Confidential - Pursuant to Protective Order

Page 162

1        MS. PARFITT:  Objection.  Form.
2        THE WITNESS:  I certainly
3    haven't done -- I certainly didn't do
4    a directed analysis to try to
5    determine that, but there is
6    information, I believe, in -- I think
7    if you look at some of Dr. Longo's
8    work, that may be there.
9        And I believe in Dr. Blount's
10   published paper there may be a
11   discussion of the type of powder
12   product used, where she was looking
13   for -- at least for asbestiform --
14   asbestos within the talc.  It may be
15   tremolite as well, but -- if you want
16   me to look, I can do that.  I just
17   don't recall whether -- I think she
18   did talk about sources of the talc,
19   where it came from, so...
20   QUESTIONS BY MS. BRANSCOME:
21       Q.   Okay.  But as you sit here
22   today, you can't point me to any analysis
23   that you did or an analysis that you relied
24   on that would relate different brands of
25   cosmetic talc body powders with respect to

Page 163

1    their constituent components?
2        MS. PARFITT:  Objection.
3    Completely misstates her testimony.
4    She mentioned Dr. Blount.  She
5    mentioned others.
6        THE WITNESS:  So I think what I
7    started with, I said I haven't done a
8    directed analysis to try to determine
9    specifically how this product versus
10   this product versus this product may
11   have looked over time, because I don't
12   have access to a full data to do that.
13       But what I do have is data that
14   has -- I do see published data, for
15   example, Blount and maybe some of the
16   other published studies, that looked
17   at this issue, at least of asbestos
18   presence in talc.  And I believe
19   Dr. Longo also had things that weren't
20   just Johnson's.  I believe he had
21   Cashmere Bouquet, for example, samples
22   in some of the things he looked at.
23       So I can point you to those
24   things that I have reviewed, but I
25   haven't -- there's nowhere in here

Page 164

1    that I state for you that it's my
2    opinion that Cashmere Bouquet has this
3    specific pattern of constituents as
4    compared to Johnson & Johnson's.  No,
5    I have not done that.
6    QUESTIONS BY MS. BRANSCOME:
7        Q.   Okay.  And that would be true
8    for any other brand of cosmetic talc, body
9    powders, Jean Nate, Lily of the Valley, not
10   just Cashmere Bouquet, correct?
11       MS. PARFITT:  Objection.
12       THE WITNESS:  That is correct,
13   I don't have access to that
14   information.
15   QUESTIONS BY MS. BRANSCOME:
16       Q.   Have you done any analysis of
17   the constituent components of talc and how
18   they have changed even within Johnson's --
19   Johnson & Johnson's manufactured products,
20   how the constituents of the consumer products
21   may or may not have changed over time?
22       A.   I've done some of that, yes,
23   and I laid that out, I think, for you, when I
24   talk about the differences in the products
25   that are described within the documents, the

Page 165

1    company documents, from the '70s versus the
2    '80s versus later on, as far as the changes
3    that were made to specifications of the
4    product, for example.  That's something --
5    and I think I've talked about that a bit at
6    trial as well.
7        Q.   Okay.  And is it your view that
8    the risk potential for Johnson & Johnson's
9    manufactured products have changed at all
10   over time with respect to ovarian cancer?
11       MS. PARFITT:  Objection.
12       THE WITNESS:  I have not -- I
13   have not attempted to differentiate a
14   risk potential at only one point in
15   time.
16       What I have done over points of
17   time is looked at the issue of
18   warnings and what should be warned
19   about.
20       But my analysis related to the
21   hazard or the risk assessment of the
22   products is considering all of the
23   available information, which would be
24   all of that information over time.
25

42 (Pages 162 to 165)

Confidential - Pursuant to Protective Order

Page 166

1  QUESTIONS BY MS. BRANSCOME:
2      Q.   Okay.  You talk about, in
3  paragraph 35 primarily -- we'll talk about
4  the fragrance components in more detail, but
5  you talk about the idea of chemicals being a
6  potential irritant.
7          Are you familiar with that?
8      A.   Yes, that's correct.
9      Q.   Is it your position that any
10  product that contains chemicals that could be
11  an irritant should be labeled with a health
12  warning?
13         MS. PARFITT:  Objection.
14         MR. MEADOWS:  Okay.
15         THE WITNESS:  I don't think
16  that's -- no, I don't think I've
17  formed that specific opinion.
18         But the opinion that I think
19  I'm expressing here is that when you
20  have a -- the information that I have,
21  which unfortunately the company hasn't
22  given us percentages or actual levels,
23  instead, what I do as a toxicologist,
24  I look at what is there.  And when I
25  see over a hundred chemicals there,

Page 167

1  that 70 percent of them have been
2  linked as an irritant hazard, there is
3  the issue of toxicological additivity
4  to consider.
5          So certainly as a risk
6  assessor, when I have that many
7  potential sources of irritation as far
8  as chemicals going into a complex
9  mixture, certainly I think I have
10  formed the opinion that I think that
11  is something that needs to be
12  considered when you're talking about
13  providing information to consumers,
14  yes.
15  QUESTIONS BY MS. BRANSCOME:
16      Q.   As a toxicologist, would it be
17  important to you to understand the exact
18  percentages of all of the constituent
19  components of, say, Johnson's baby powder,
20  for example?
21      A.   Are you talking about just the
22  fragrance or are you talking about everything
23  that's in it?
24      Q.   Dr. Plunkett, you referenced
25  the fact that the company has not provided

Page 168

1  you with specific percentages, and so I'm
2  asking you, is that something that as a
3  toxicologist would be important information
4  to you?
5      A.   Depends.  Certainly with the
6  fragrance -- and I'm talking about the
7  conversation about this paragraph is focusing
8  on the fragrance components.
9          So, yes, I mention that it
10  would be nice to know, it would be good to
11  know, if we could, exactly what was in there,
12  because I could quantify the hazard or
13  quantify the risk, actually.  So instead, I
14  have -- I identify it as a hazard, but I
15  can't quantify it without those levels.
16         But does that change -- make a
17  difference in the overall conclusions I draw?
18  No, it doesn't affect the overall conclusions
19  that I have drawn, but it adds that other
20  piece of the puzzle that deals with the fact
21  that we have a complex mixture that have a
22  combination of ingredients that target
23  irritation.
24         And irritation and the
25  potential to produce an inflammatory

Page 169

1  response, in my -- if you've read my report,
2  you understand that I think that's a key
3  factor in increasing the risk for ovarian
4  cancer.
5      Q.   Understanding the percentages
6  of the constituent components, is that
7  limited only to fragrance, or would it also
8  be important to understand the percentages
9  for the heavy metals that you contend are in
10  Johnson's baby powder?
11      A.   So if I was trying to define
12  the hazard of each component, I would
13  certainly want one to know that.  As a
14  result, what I'm doing instead is looking at
15  the complex mixture.  In other words, this is
16  a mixture of all these things.
17         I break out those individual
18  components, or constituents, to tell you
19  about the hazard that is brought to play or
20  the toxicity profiles that exists.  And
21  what's important about that in my overall
22  evaluation of the end product, which is what
23  my risk assessment is based on, the end
24  product, shows that I have multiple
25  components with similar types of effects.

43 (Pages 166 to 169)

Confidential - Pursuant to Protective Order

Page 170

1    And as a toxicologist, when you do that, that
2    affects the conclusion that you can draw
3    about a body of literature.
4        Q.    Okay.  You do understand that
5    there is testing data available about the
6    percentages of the constituent components
7    with respect to heavy metals, et cetera, that
8    have been in Johnson's baby powder over time,
9    correct?
10       A.    There is some information.
11   Unfortunately, the information is not
12   complete as to every lot or every sample, as
13   far as what I have seen.  And also, there's
14   some -- some of the sampling is reported as
15   more of a limit versus an actual
16   quantification.  So it depends upon which --
17   which result, study result or document,
18   you're looking at.
19           There is some there, yes, and
20   that's one of the reasons why I identified
21   these as part of my risk assessment, because
22   I look for a pattern of these metals that are
23   known to carry a hazard and whether or not
24   these are ones I'm seeing detected time and
25   time again.

Page 171

1        Q.    But you made no attempt to
2    quantify the risk with respect to any of
3    those components or use that data in any way,
4    correct?
5            MS. PARFITT:  Objection.  Form.
6            THE WITNESS:  No, I used
7    that -- that data as part of -- my
8    risk assessment as part of my hazard
9    assessment, absolutely.  It's part of
10   the hazard assessment.
11           But as far as quantifying them
12   individually, no.  I am quantifying
13   the risk and looking at the risk of
14   the entire product, not of just one
15   individual component of the product.
16   QUESTIONS BY MS. BRANSCOME:
17       Q.    Well, we already discussed
18   you're not quantifying the risk with respect
19   to the entire product, correct?
20       A.    Well, I'm quantifying it in
21   terms of an increase above background, which
22   I'm not giving you a -- I told you I wasn't
23   giving you a cancer potency factor.  That is
24   true.  That I am not doing.
25           But I am quantifying it by

Page 172

1    using a word such as an increase -- an
2    increased risk.
3            Is that a specific number?  Am
4    I telling you that it's increased by two
5    times or four times or six times?  No.  The
6    data available did not allow us to do that,
7    with the exception of the epidemiological
8    data.  And the epidemiological data can show
9    you that in that piece of evidence there
10   appears to be a 30 percent increased risk
11   above background.
12       Q.    Did you make an attempt to
13   quantify the risk with the data that you had
14   available to you with respect to the final
15   consumer product?
16       A.    I could not, based on the data
17   I had, because I didn't have a
18   well-controlled animal study to be able to
19   pull that out that way.
20           Instead, what I -- in this type
21   of weight of the evidence, you look at what
22   you might be able to quantify based on the
23   human data.  And certainly the human data
24   showing the statistically significant
25   consistent findings across studies for that

Page 173

1    30 percent increased risk, that is part of my
2    overall weight of the evidence for me making
3    the statement the risk is increased.
4            But you'll notice I don't say
5    increased risk of 30 percent, because I don't
6    believe that I can state that with certainty
7    in the way I do a risk assessment.  But
8    certainly as any one individual -- any one
9    individual piece of evidence or any one body,
10   like the epi data, others have made -- other
11   bodies who have looked at the -- talked about
12   the consistency of the increased risk signal
13   in the epi studies as being in the range of
14   30 percent.
15       Q.    Okay.  But you would agree that
16   based on the methodology that you applied in
17   this case, you could not say to a reasonable
18   degree of scientific certainty that there is
19   an increased risk of, for example, 30 percent
20   with respect to use of Johnson's baby powder
21   and ovarian cancer, correct?
22           MR. MEADOWS:  Objection.
23           THE WITNESS:  I have not done
24   that.  And I'm not saying that
25   somebody else couldn't do that.  I

44 (Pages 170 to 173)

Confidential - Pursuant to Protective Order

Page 174

1    have not -- I have not chosen to do
2    that based on my evaluation of the
3    data.
4    QUESTIONS BY MS. BRANSCOME:
5        Q.    And the same would be true if I
6    asked that question and substituted any
7    particular number, a 10 percent increased
8    risk, a 20 percent increased risk, correct?
9            MR. MEADOWS:  Objection.
10           THE WITNESS:  I haven't given a
11       specific number in my final opinions,
12       that is true.
13   QUESTIONS BY MS. BRANSCOME:
14       Q.    Okay.
15       A.    I've tried to explain to you
16   what evidence I do think is there, however.
17       Q.    Now, we've talked about
18   different types of talc that might have
19   different constituent components, but you
20   also look at exposure to talc in an
21   occupational setting.
22           Do you recall that?
23       A.    Some of the studies that I've
24   relied upon, yes, some of them were
25   occupational.

Page 175

1        Q.    Okay.  And you understand that
2    in an occupational setting, you would agree
3    that the exposure, particularly via
4    inhalation, would be much higher than it
5    would be through the use of a consumer
6    product, correct?
7        A.    It depends on the occupation,
8    but, yes.  For example, I would agree a miner
9    would be expected to have that, but there are
10   certain, quote/unquote, occupational studies
11   where the exposure levels that -- for
12   example, there are -- I believe there's at
13   least one study that looked at application of
14   talc powders in -- maybe in a material,
15   coating materials in a factory.  Those kinds
16   of studies would be different than a mining
17   study.
18           But, certainly, yes, I
19   understand that occupational studies, the
20   inhalation exposure is the pathway that would
21   be predominant versus in the consumer body
22   powder use, I'm talking about the predominant
23   exposure pathway in my opinion is going to be
24   through perineal use, even though inhalation
25   exposure can occur.

Page 176

1        Q.    Is it your opinion as you sit
2    here today that someone could develop ovarian
3    cancer through -- exclusively through the
4    inhalation of Johnson's baby powder?
5            MS. PARFITT:  Objection.
6            THE WITNESS:  I haven't formed
7        that opinion at this point in time.
8    QUESTIONS BY MS. BRANSCOME:
9        Q.    Have you done any analysis or
10   can you point me to any analysis in your
11   report that makes a comparison of the
12   exposure levels that might be seen in an
13   occupational setting to what would be seen by
14   a consumer?
15       A.    Are you asking me for a piece
16   of evidence that does that comparison, or is
17   there evidence that allows you to do that
18   comparison?
19       Q.    Have you cited or discussed any
20   of the evidence or done an analysis in any
21   way that would compare exposure levels in an
22   occupational setting to what you would
23   anticipate a consumer using Johnson's baby
24   powder might be exposed to?
25       A.    I don't think I did it as a

Page 177

1    separate analysis, but as part of my analysis
2    I considered evidence that showed -- provided
3    me with such data.  So, for example, if you
4    want, I can point you to a -- I have an
5    inhalation paragraph, I think.
6            Let me look for it real quick.
7    See if I can find it quickly for you.  I
8    don't want to waste your time.
9        Q.    Sure.
10       A.    So there's -- I don't see it
11   cited here, but there's at least one document
12   I reviewed where the company themselves made
13   a comparison, and I have seen that, of
14   inhalation exposure to talc suspended in air
15   with diapering.  Dr. Longo has done a
16   measurement of exposure in air with perineal
17   application of talc.  So I'm aware of those
18   studies.
19           And then I certainly am aware
20   of the fact that those numbers are different,
21   or smaller, than many of the numbers I see
22   reported in some of the occupational studies.
23   But I can't say that's true for all.
24           I would certainly, though, say
25   that if you're just talking inhalation, I

45 (Pages 174 to 177)

Confidential - Pursuant to Protective Order

Page 178

1 certainly would expect a miner or a miller to
2 have a greater potential for inhalation
3 exposure than routine use of the consumer
4 product, with the exception of the studies --
5 the reports of large amounts of exposure in
6 children where the inhalation -- where they
7 were inhaling large amounts of powder.
8         And so that's a different
9 story. That's sort of an acute overdose
10 exposure, I guess, versus the typical daily
11 exposure through occupational or consumer
12 use.
13     Q.    And that raises an interesting
14 question. You discuss health hazards
15 associated with talc being known, and in some
16 cases deaths had been reported.
17         You're aware that those relate
18 to asphyxiation deaths, correct?
19     A.    Or long-term injury to lungs.
20 Maybe not an immediate asphyxiation, but lung
21 damage produced by large amounts -- some of
22 the children would go to the hospital and be
23 sick for a while and then die. So they
24 didn't asphyxiate immediately, right? But
25 some of them did. You're exactly right.

Page 179

1         Both of those things occur, and
2 I address that also in my warning section
3 about the fact that that warning didn't --
4 was not put on the product for a long period
5 of time even though those types of reports
6 were coming in early.
7     Q.    You would agree that that is a
8 completely different biologic mechanism than
9 what you are proposing the biological
10 mechanism is for ovarian cancer to develop
11 with respect to talc use, correct?
12         MR. MEADOWS: Objection.
13         THE WITNESS: I would agree
14 that it's an acute response versus
15 chronic, yes, that I agree with.
16         It's not entirely different in
17 some cases because some of the tissue
18 reactions you saw were indicative of
19 irritation when some of the lung
20 samples were looked at. But
21 certainly, yes, that's acute exposure
22 versus chronic exposure, and I'm
23 focusing on ovarian cancer on chronic
24 exposure scenarios.
25

Page 180

1 QUESTIONS BY MS. BRANSCOME:
2     Q.    Okay. Now, you would agree
3 that -- so let's set aside inhalation.
4         You agree that for talc -- for
5 Johnson's baby powder or another one of
6 Johnson & Johnson's consumer talc products to
7 reach an individual's ovaries, it must pass
8 from the perineum, through the vagina and the
9 cervical canal, move across the uterus -- and
10 again, it's the ciliary motion of the
11 fallopian tubes -- cross the peritoneal space
12 between the fimbriae and ovaries, escape
13 phagocytosis in the peritoneal space, and
14 then attach to the surface of the ovaries,
15 correct?
16         MS. PARFITT: Objection. Form.
17         MR. MEADOWS: Okay.
18         THE WITNESS: If the issue is
19 attaching to the surface, yes.
20 There's also some information
21 indicates the site of attack may be
22 actually at the fallopian tube exit to
23 the peritoneum. But, yes, that's
24 correct, there's been some discussion
25 in the literature on ovarian cancer

Page 181

1 about whether the tumors are arising
2 in the tubes versus the ovaries.
3         But I would agree, I think
4 both -- I think both of those
5 things -- those things -- there is a
6 passage that has to happen, regardless
7 of whether the end point is at the
8 fallopian tube or at the ovary.
9 QUESTIONS BY MS. BRANSCOME:
10     Q.    Okay. Is it your view that the
11 consensus has been reached that ovarian
12 cancer can be caused by talc landing in the
13 fallopian tubes?
14     A.    I haven't formed that opinion,
15 though I do believe this will be discussed by
16 some of the other experts.
17     Q.    Okay. Have you personally
18 conducted any tests or experiments to confirm
19 the theory that talc migrates from
20 application at the perineum to the ovaries?
21     A.    If by that you mean something
22 where I performed a laboratory test myself,
23 no, I have not done that.
24     Q.    As a toxicologist, are you
25 capable of doing that?

46 (Pages 178 to 181)

Confidential - Pursuant to Protective Order

Page 182

1      A.   Yes, I believe if asked I
2  could -- I could attempt to design something
3  to look at that issue.
4      Q.   Okay.
5      A.   But I would argue that I think
6  it doesn't make a lot of sense to revisit
7  based upon what we already know from the
8  scientific literature and the review papers
9  from the gynecological community.  I believe
10 it's -- it's understood that it can migrate.
11     Q.   In your opinion, has an animal
12 model been successfully developed that would
13 allow the testing of talc migration in humans
14 from the perineum to the ovaries?
15     A.   I think I tell that you in my
16 report.  I believe that the human data is the
17 relevant data to look at this issue.
18         So it would be very difficult
19 to design a study to do this based on the
20 typical laboratory species that are used in
21 toxicology testing.  Even -- even the monkeys
22 have issues, and the biggest issues with
23 monkeys is the ethicality of using a monkey
24 to settle -- to address a question that I
25 believe is settled within the gynecological

Page 183

1  and scientific community.
2      Q.   Now, you state in your report
3  that talc that's applied through perineal
4  use -- I believe the term you use --
5  routinely migrates to the ovaries.
6         Is that your opinion?
7      A.   Are you reading from my report?
8         MR. MEADOWS:  To the extent
9  that question is still lingering, I
10 object to it.
11 QUESTIONS BY MS. BRANSCOME:
12     Q.   On paragraph 43 on page 29.
13     A.   So I think as I've stated it,
14 the studies that I have reviewed demonstrate
15 that inert particles routinely move from the
16 lower female reproductive tract up into
17 fallopian tubes and towards the ovaries.
18     Q.   What do you mean by routinely?
19     A.   It's the percentages of
20 movement that are reported in the patients.
21 In other words, if you look at some of the
22 individual studies -- if you want we can pull
23 them out, but, you know, eight of ten
24 patients, nine of ten patients, all the
25 patients showed movement of the particles.

Page 184

1         And then on top of that, you
2  have the review articles that talk about
3  migration of particles in the female
4  reproductive tract and are describing it as
5  an event that is known to occur.  So it's
6  those things weighed together.
7         But certainly routine could be
8  supported by the observations where the
9  majority of the patients in the studies were
10 showing movement of inert particles.
11     Q.   Is it your opinion that every
12 perineal application of cosmetic talc powder
13 results in talc being deposited on the
14 ovaries?
15     A.   I have not formed that opinion,
16 no.
17     Q.   Have you formed an opinion as
18 to with what frequency -- so let's say
19 someone uses a cosmetic talc on a perineal
20 application ten times.  Out of those ten
21 times, have you formed an opinion as to how
22 many of those instances would talc deposit on
23 the ovaries?
24         MS. PARFITT:  Objection.
25         THE WITNESS:  I haven't formed

Page 185

1  an opinion in that particular way, no.
2  I think what I've -- I've tried to
3  describe to you in my report is that I
4  believe it is known that inert
5  particles have the ability to migrate.
6  And based on that, I form the opinion
7  that it's my opinion to a reasonable
8  degree of scientific certainty, which
9  would be a more likely than not
10 standard, that particles of talc would
11 be migrating when women are using them
12 perineally.  But I haven't told you
13 that it has to be a specific number,
14 no.
15 QUESTIONS BY MS. BRANSCOME:
16     Q.   Have you done any analysis to
17 establish over a lifetime use of cosmetic
18 talc where the app -- the perineal
19 application, with what frequency during a
20 lifetime the talc may have been deposited on
21 that individual's ovaries?
22     A.   So I certainly looked for
23 information to allow me to assess that, but
24 unfortunately those kinds of studies would be
25 unethical to do.  Because that would be a

47 (Pages 182 to 185)

Confidential - Pursuant to Protective Order

Page 186

1  matter of sampling women during -- using them
2  and then taking biopsies, and that's
3  something that would be difficult to do.  I
4  would say impossible to get approval to do
5  under human testing guidelines.
6      Q.   Okay.  So it's your opinion
7  that it is possible for talc that is applied
8  through a perineal application to reach the
9  ovaries, but you cannot say with what
10  frequency that occurs?
11      MS. PARFITT:  Objection.  Form.
12  Misstates her testimony.
13      THE WITNESS:  That's not --
14  what I'm telling you is, I think it --
15  that to a reasonable degree of
16  scientific certainty that it migrates,
17  and that would be the standard of more
18  likely than not.  I think it's more
19  likely than not that the talc is
20  reaching the ovaries when people are
21  using it perineally.
22      I did form the opinion -- and
23  I've talked about this at trial and
24  yesterday.  I have formed the opinion
25  that this is a issue of chronic or --

Page 187

1  or use of the products.  In other
2  words, people aren't just using it
3  once, but people are using it -- you
4  can use the word "routinely," as a
5  habit, in their daily life perineally.
6  And that would be consistent with the
7  studies that have been done that have
8  looked at the issue of dose response.
9      And I discuss that in my
10  report, too.
11  QUESTIONS BY MS. BRANSCOME:
12      Q.   Okay.  But you have not made an
13  attempt to quantify, nor have you seen it in
14  the literature, the overall dose of talc that
15  someone might be exposed to in terms of
16  contact with the ovaries throughout their
17  lifetime, chronic use of cosmetic talc?
18      MS. PARFITT:  Objection.  Form.
19      THE WITNESS:  Those -- that's
20  the kinds of studies that have not
21  been done and I believe could not be
22  done based upon ethics of human
23  testing.  But certainly I -- that --
24  that data is not available that I'm
25  aware of.

Page 188

1      MS. BRANSCOME:  Okay.  Can we
2  just go off the record for a second?
3      VIDEOGRAPHER:  We are going off
4  the record at 12:23 p.m.
5      (Off the record at 12:23 p.m.)
6      VIDEOGRAPHER:  We are back on
7  the record at 12:24 p.m.
8  QUESTIONS BY MS. BRANSCOME:
9      Q.   As you sit here today, how
10  would you characterize the biological
11  mechanism by which you claim Johnson's baby
12  powder, their other cosmetic talc products,
13  present a risk of ovarian cancer?
14      A.   So I outline this for you in
15  the MDL report.  I think I have a section
16  on -- let's see if I can -- you want me to
17  tell you where or...
18      So paragraph 65, I think I set
19  out part of this argument or part of this.
20  And then also in paragraph -- I believe in
21  67.
22      Q.   All right.  Well, let me take a
23  step back.
24      Is it your opinion that the
25  biological mechanism by which talc, cosmetic

Page 189

1  talc, can in your view cause ovarian cancer,
2  is that something that has been definitively
3  established?
4      A.   What do you mean by
5  definitively?  I mean, I think -- I believe
6  more likely than not that -- so I believe I
7  have reached a conclusion that I think what
8  the most likely biologically plausible
9  mechanism, but maybe you're ask -- meaning
10  something else.
11      Q.   Okay.  Well, let's start with
12  specifically you discuss a number of
13  different potential mechanisms in your
14  report.  So if you believe you have reached
15  an opinion more likely than not about the
16  specific biological mechanism by which
17  cosmetic talc and specifically Johnson &
18  Johnson's products can cause ovarian cancer,
19  can you describe that for me?
20      A.   So it's a chronic inflammatory
21  process, and so -- but like all compounds,
22  constituents, even drugs that we look at, we
23  don't know each individual step within the
24  molecular mechanism.
25      Instead, what we know is that

48 (Pages 186 to 189)

Confidential - Pursuant to Protective Order

Page 190

1    there are certain components to the process
2    of cancer that are consistent with the
3    effects produced by talc, and we know that
4    talc can produce a chronic inflammatory
5    process.
6              And so that's why I was
7    pointing you to the paragraph 65 and I think
8    67.
9         Q.    Is it your opinion that
10   consensus has been reached in the scientific
11   community that cosmetic talc can cause
12   ovarian cancer through a chronic inflammatory
13   response?
14             MS. PARFITT:  Objection.
15             THE WITNESS:  I don't know that
16        that's exactly the opinion I've
17        formed.
18             Would you like me to -- I could
19        restate what I believe, but I don't
20        think that's exactly how I would state
21        it, no.
22   QUESTIONS BY MS. BRANSCOME:
23        Q.    Okay.  So then yes or no:  Has
24   consensus been reached in the scientific
25   community that cosmetic talc can cause

Page 191

1    ovarian cancer through a chronic inflammatory
2    process?
3         A.    I don't believe I formed the
4    opinion either way, that it's yes or no,
5    because I haven't tried to -- I haven't tried
6    to form the opinion about what the -- in
7    other words, I haven't -- I can't say for
8    every scientist out there.
9              I certainly can tell you what I
10   believe based on what the consensus of
11   science says about mechanisms underlying
12   cancer and the consistency of those
13   mechanisms with talc, and then I have an
14   opinion about what I believe that information
15   says.
16             I do believe my opinions,
17   however, are consistent with some consensus
18   statements, such as the issue on the
19   mechanism is consistent with consensus
20   opinion reached by IARC, where they discuss
21   the inflammatory process as an underlying
22   biologically plausible mechanism that can
23   lead to ovarian cancer.
24             I think it's consistent with
25   the Canadian risk assessment where they

Page 192

1    discuss those issues.
2              I think it's consistent with --
3    I don't know if the ACOG statement goes that
4    far on mechanism, but it does talk about
5    ovarian cancer.  That's a recent statement.
6              And I believe it's consistent
7    with some of the -- I believe my opinions are
8    consistent with some of the opinions reached
9    by others in science, but that's the only way
10   I can answer that for you.
11        Q.    Okay.  Because you have not,
12   one way or the other, done an evaluation of
13   whether or not chronic inflammatory process
14   is a biological mechanism on which the
15   scientific community has reached general
16   consensus with respect to the causation of
17   ovarian cancer; is that correct?
18             MR. MEADOWS:  Objection.
19             THE WITNESS:  I can't tell you
20        that -- I can't tell you that every
21        body that's looked at it, but I have
22        tried to point you to evidence that I
23        believe is consistent with that.
24             For example, the IARC would be
25        a good example of consensus on

Page 193

1    biologic mechanism because they have a
2    whole part of their assessment of
3    non-asbestiform talc and perineal
4    cancer -- of perineal use and ovarian
5    cancer that discusses mechanism.  And
6    that is consistent with what I have
7    said.  So there is a consensus
8    opinion.
9              But I guess what I'm saying to
10   you is I can't tell you that all --
11   all people who have put statements
12   have come to that exact opinion.  But
13   there aren't that many places out
14   there that are addressing that issue
15   as far as the consensus on a
16   mechanism.  There's more statements
17   about the relationship between ovarian
18   cancer and talc use than there are
19   drilling down to what the mechanism
20   must be.
21   QUESTIONS BY MS. BRANSCOME:
22        Q.    Okay.
23        A.    So that's the issue.  It's a
24   little -- it's a little hard to answer that
25   yes or no because of that.

Confidential - Pursuant to Protective Order

Page 194

1      Q.   Okay.  When we talk about the
2   idea of biologic -- a biologically plausible
3   mechanism, what is your understanding of the
4   term "plausible" in that expression?
5      A.   When I use the word
6   "biologically plausible mechanism" or
7   "biologic plausibility," I'm using it
8   consistent with what Bradford Hill uses,
9   that's it's the idea that the evidence that
10  available makes -- the evidence that
11  available supports a pathway where you can go
12  to exposure to response.
13         So in other words, there's a --
14  the biological information is consistent with
15  how we know cancer can develop.  That's the
16  response we're looking at.  And the exposure
17  we're looking at is known to produce those
18  kind of biologic events.
19         So as a result, based upon
20  knowing that there's a consistency between
21  the data that we have on the -- on the
22  exposure and the data that we have on the way
23  cancer can occur, those things -- those
24  things align.  So that makes it biologically
25  plausible that that could occur.

Page 195

1      Q.   But you would agree that
2   biological plausibility suggests that it is a
3   plausible explanation, but it may not have
4   been established as the definitive pathway by
5   which a disease is caused, correct?
6         MS. PARFITT:  Objection.  Form.
7         THE WITNESS:  Well, I would
8      agree that in the discussion of
9      biologic plausibility in the Bradford
10     Hill paper that is true.  But if you
11     look at people's discussion of the use
12     of -- I want to say "biological
13     mechanism" rather than the word
14     "biologic plausibility," because
15     really as a toxicologist I'm trying to
16     understand whether there's a biologic
17     mechanism that makes sense.  Those are
18     words I like to use.  Does it make
19     sense that this exposure could lead to
20     this response.
21         And that involved looking at
22     the mechanistic data or the data on
23     the way toxic responses are produced
24     by talc, and whether or not they align
25     with the types of toxic insults that

Page 196

1      are known to be able to produce,
2      specifically, ovarian cancer.
3   QUESTIONS BY MS. BRANSCOME:
4      Q.   Is it your opinion that IARC,
5   for example, has concluded that the
6   biological mechanism by which talc may cause
7   ovarian cancer is chronic inflammation?
8         MS. PARFITT:  Objection.
9         THE WITNESS:  I don't know that
10     they have used -- they've described it
11     quite that way, but they do describe
12     what they believe is the biologically
13     plausible mechanism.  Because they do
14     organize and use within the
15     definitions of how they describe some
16     things that are consistent with what
17     Bradford Hill uses.
18  QUESTIONS BY MS. BRANSCOME:
19     Q.   Okay.  And obviously you're
20  familiar with the IARC evaluation of talc
21  with respect to the possibility of causing
22  ovarian cancer, correct?
23     A.   Yeah.  If you mean the recent
24  one, yes, the most recent assessment.
25     Q.   Yes.

Page 197

1         And that IARC has in fact
2   classified cosmetic talc not containing
3   asbestos as possibly carcinogenic to humans,
4   correct?
5      A.   It's a possible human
6   carcinogen 2B, that's correct.
7      Q.   Okay.  And if a product is
8   listed in the 2B category, does that
9   necessarily mean the product, in your view,
10  is carcinogenic?
11     A.   Not always, because that comes
12  down to an assessment of -- then you're
13  putting together a -- a risk assessment that
14  looks at -- looks at -- across the
15  information that you have available.  And
16  that may be that -- that the -- the possible
17  is all you can say, or it may be that you
18  believe that the information -- there's
19  enough information there to take it further.
20         Has a possibility -- that's
21  what I said, they do a hazard assessment.
22  They rank things on hazard based on -- on
23  unlikely -- not enough evidence, less -- the
24  possibility, the probability or it's known.
25     Q.   In your opinion, is your

50 (Pages 194 to 197)

Confidential - Pursuant to Protective Order

Page 198

1    characterization of the risk of Johnson's
2    baby powder or talcum powder products with
3    respect to ovarian cancer, are you in the MDL
4    characterizing that risk as a higher level of
5    risk than what IARC characterized it, or do
6    you agree with the 2B characterization of
7    possibly carcinogenic?
8        MS. PARFITT: Objection. Form.
9        THE WITNESS: So I'm not IARC,
10   so I don't try to second-guess there.
11   They have reached a conclusion, and I
12   use that as part of my weight of the
13   evidence. So I haven't formed the
14   opinion they're right or wrong.
15       But I have done a different
16   assessment. My assessment, first off,
17   includes more information than IARC
18   had, so as a result, I have formed the
19   conclusion that I believe that it's
20   more likely than not that exposure
21   to -- perineal exposure to talc body
22   powders increases the risk of ovarian
23   cancer in women who use that product.
24       And I will put the caveat this
25   has to be chronic use or repeated use,

Page 199

1    because I've gone -- I've said that
2    many times.
3        So that -- that is my opinion.
4    So that's a different statement and a
5    different assessment than what IARC
6    does.
7        But -- so I don't disagree with
8    their possible -- I weigh that, but I
9    believe the evidence for the risk
10   assessment shows me that it's more
11   likely than not that this -- this
12   exposure will increase the risk above
13   a background risk for women who are
14   using this product.
15   QUESTIONS BY MS. BRANSCOME:
16       Q.   And how do you define chronic
17   or repeated use?
18       A.   Well, that is variable within
19   the literature. For me, chronic is
20   exposure -- if as a toxicologist, I would
21   typically say chronic use is years of use.
22   It doesn't have to be daily, but it would be
23   years. That's the most common description
24   you see in toxicology, so I would say that's
25   fair. That's a fair assessment of my

Page 200

1    opinion.
2        Q.   Is there a threshold of the use
3    of Johnson & Johnson's talcum powder products
4    below which there is no increased risk, in
5    your opinion, of ovarian cancer?
6        A.   We have not identified that
7    threshold. That's what's missing within
8    the -- the literature that exists today. So
9    I can't tell you whether or not with only a
10   thousand applications over a lifetime that
11   is -- is not enough for every individual or
12   not, but certainly I do believe that the --
13   that the exposure has to be habit, routine,
14   chronic, something that is done maybe not on
15   a daily basis but on a routine basis in a
16   woman's life.
17       So that is consistent, I think,
18   with the literature.
19       MS. BRANSCOME: Okay. We can
20   go off the record.
21       VIDEOGRAPHER: We are going off
22   the record at 12:36 p.m.
23   (Off the record at 12:36 p.m.)
24       VIDEOGRAPHER: We are back on
25   the record at 1:35 p.m.

Page 201

1    QUESTIONS BY MS. BRANSCOME:
2        Q.   Good afternoon again,
3    Dr. Plunkett.
4        A.   Good afternoon.
5        Q.   I want to talk a little bit
6    about the Health Canada assessment.
7        We talked about this before,
8    but this is something that you reviewed after
9    you completed your report which has been
10   marked as Exhibit 4, correct?
11       A.   Yes, and I wanted to tell you,
12   I did not bring all those documents printed.
13   I apologize. So there is a separate Health
14   Canada draft risk assessment that I didn't
15   print.
16       Q.   Okay. So when you're referring
17   to the Health Canada analysis, what document
18   are you specifically referring to?
19       A.   So I'm referring to the -- the
20   combined documents, but there are times when
21   you've asked me questions that I've been
22   referring -- and I tried to say, I believe,
23   Taher.
24       But, yes, some of the questions
25   you asked me when I said Health Canada, I was

Confidential - Pursuant to Protective Order

Page 202

1    talking about the combined documents, which
2    would include their -- I guess it's called a
3    draft risk assessment document, yeah, which
4    refers to this document but is a separate --
5    is their own separate statement.
6        Q.    As you sit here today, what is
7    your understanding of the current position
8    that has been articulated in the collection
9    of documents that you refer to as Health
10   Canada with respect to any potential
11   relationship between cosmetic talc and
12   ovarian cancer?
13       A.    So that's why I did print out
14   the small one, because I think it summarized
15   it. So here, if you look at this Exhibit 6,
16   it makes specific conclusions or draws --
17   makes statements. And essentially it talks
18   about talc being a possible risk of ovarian
19   cancer, but then it gives women specific
20   advice about what to do in order to minimize
21   exposure to the products, and some of that
22   was relevant as well.
23       Just one reason I printed it
24   out, it has to do with either choosing an
25   alternative product or avoiding genital

Page 203

1    exposure to talc.
2        And let me see the exact words
3    that they use, but --
4        Q.    Before you do that, do you
5    agree with the characterization that cosmetic
6    talc presents a possible risk of ovarian
7    cancer?
8        A.    No, I don't think that's my
9    opinion. I think my opinion is stronger than
10   that.
11       But are you talking about my
12   causation analysis opinion or just my risk
13   assessment opinion?
14       Q.    I'm asking about any opinion
15   you intend to offer in the MDL.
16       A.    Okay. So I will not be giving
17   the causation analysis opinion, so that -- I
18   will take that off the table.
19       So I think my opinion is a
20   little stronger because I say that the
21   exposure to the perineal -- the talc by
22   perineal application in women increases the
23   risk. So I'm not saying it's a possible
24   risk. I'm actually -- I believe that it
25   increases the risk. And I do believe that

Page 204

1    there is a association between those two
2    things, the exposure and the response, which
3    is more than a possible association, if you
4    want to use those words.
5        But my assessment that I've
6    done is not exactly the same, for example, as
7    IARC does, which is more of just a hazard
8    assessment.
9        Q.    Right.
10       So I'm focusing my questions
11   now on your risk assessment as compared to
12   the documents that you've supplied us with
13   with respect to Health Canada. And if I
14   understand it correctly, are you stating that
15   your opinion with respect to the relationship
16   between cosmetic talc and ovarian cancer, you
17   believe that it is an association that is
18   stronger than a possible risk; is that
19   correct?
20       A.    Well, I don't say it's a
21   possible risk; I say there is an increased
22   risk. So I think it's a different statement,
23   yes, absolutely.
24       Of course, I'm not Health
25   Canada, so, you know, they have a framework

Page 205

1    upon which they make decisions, and I'm doing
2    an analysis based on what I have done. And
3    so it's not exactly the same, although some
4    of the same documents and information is
5    weighed within -- and then that's when you
6    have the issue of what Health Canada does
7    versus what they rely upon.
8        But this Taher risk assessment
9    is just one piece of information that Health
10   Canada has weighed in their assessment if you
11   read their -- their draft risk assessment.
12       Q.    So the question I have about
13   the Taher risk assessment, earlier you were
14   referring to the fact that you have only seen
15   a quantitative assessment of the weight of
16   particular components of scientific evidence
17   in evaluating epidemiological studies; is
18   that correct?
19       A.    So that's what I typically see,
20   yes. And I don't know that -- I've never
21   seen it. But the typical approach would be
22   to use it there as opposed to using it in the
23   context of a human health risk assessment
24   based on animal in vitro data.
25       Q.    All right. Are you familiar

52 (Pages 202 to 205)

Confidential - Pursuant to Protective Order

Page 206

1  with something called the Klimisch scoring
2  system?
3      A.   I don't know if I am now.
4  You'll need to show me what it is you're
5  referring to.  The name doesn't ring a bell,
6  no.
7      Q.   Okay.  So it's not something
8  that you've used in the past?
9      A.   No, not that I recall using.
10     Q.   All right.
11     A.   Unless it has another name, and
12  that's why I'm asking you.
13     Q.   All right.  So if you have
14  actually -- it's the document in front of you
15  that we've already marked as Deposition
16  Exhibit 5, I believe.
17     A.   Yes.
18     Q.   And that is the Taher study
19  that we were discussing and is cited by the
20  Health Canada risk assessment.
21          If you turn to page 5 -- well,
22  actually beginning on page 4, do you see
23  there is a section entitled "Literature
24  Search and Identification of Relevant
25  Nonhuman Studies"?

Page 207

1          Do you see that?
2      A.   Yes.
3      Q.   And this is related to an
4  analysis that these authors performed on
5  potentially relevant animal and in vitro
6  studies, correct?
7      A.   Yes, that is true.
8      Q.   All right.  And it states here
9  that "all retrieved studies were examined for
10  relevance, reliability and overall quality
11  using the Klimisch scoring system."
12          Do you see that?
13     A.   Yes, I do see that.  So I have
14  seen that before.  I just didn't -- I didn't
15  recall it.
16     Q.   Okay.  And so would you agree
17  that it is possible and in fact has been done
18  in a study that you rely on to apply a
19  quantitative scoring system to animal and in
20  vitro studies, particularly in the context of
21  looking at the relationship between talc and
22  ovarian cancer?
23     A.   Well, I didn't say it was
24  impossible.  I said I don't believe it's
25  routine based on my experience.

Page 208

1          So, yes, if they stated they've
2  done -- we'd have to pull the supplementary
3  materials out, but I recall them doing
4  scoring based on epi studies but not on
5  the -- all of the animal studies that they
6  talk about.  But we can pull it out and look.
7  I could be wrong.
8      Q.   Okay.  Did you review the
9  supplementary material 7, 8 and 9?
10     A.   Yes, I did, and we'd have to
11  pull them out because I don't recall the
12  details.
13     Q.   All right.  We may take a look
14  at those in a minute.
15          It talks about them classifying
16  the animal and in vitro studies into four
17  categories of reliability.
18          Do you see that?
19     A.   Yes.
20     Q.   So did you make any attempt,
21  when you were reviewing the various studies
22  in reaching your opinion about the potential
23  risk of talc in causing ovarian cancer, did
24  you make any attempt to separate out the
25  different pieces of evidence into categories

Page 209

1  of reliability like the authors of this paper
2  have done?
3      A.   I didn't do it exactly the way
4  they did it, but I certainly do do that as
5  part of my screening.
6          I told you one the
7  characteristics or one of the assessments I
8  make is whether I believe the data is
9  reliable data that I can -- that I can use in
10  a weight of the evidence.  So I make a -- and
11  when I talk about reliability, I'm talking
12  then about things such as I mentioned, peer
13  review, whether or not there is statistical
14  analysis, whether or not the study is
15  designed in a way that's consistent with
16  general principles of toxicology, control
17  groups or not control groups.
18          Those kinds of things I do -- I
19  do consider when I am assessing the use of a
20  study or not.
21     Q.   Is it your testimony here today
22  that contained within your report that's
23  marked as Exhibit 4, I could find
24  categorization of reliability of each of the
25  pieces of scientific literature that you have

53 (Pages 206 to 209)

Confidential - Pursuant to Protective Order

Page 210

1    included in your weight of the evidence
2    analysis?  Is that your testimony today?
3        A.    No, that's not what I'm telling
4    you, no.
5        Q.    Okay.  So you would agree that
6    you did not -- first of all, did you develop
7    categories of reliability in which you
8    separated the particular scientific studies
9    into as part of your weight of the evidence
10   analysis?
11       A.    I do look at -- I do categorize
12   studies based upon my assessment of their
13   reliability and their ability to be used to
14   answer the question I'm asking, but I -- I
15   already told you, I didn't do it the way it's
16   set out here.  I didn't have these specific
17   five categories, no.  That's not what I did.
18       Q.    Okay.  Other than the CIR 2013
19   publication, which you have said that you do
20   not find reliable and you assign little
21   weight to it, can you point me to another
22   place in Exhibit 4 where you assign a
23   specific category of weight that you have
24   given to a particular study that you include
25   in your weight of the evidence analysis?

Page 211

1        A.    If what you're asking me is do
2    I make a specific statement next to each
3    study that I discuss about little weight or
4    great weight, no, I don't do that, if that's
5    what you're asking me.
6        Q.    Okay.  As part of the
7    collection of documents that relate to Health
8    Canada that was provided to us as part of
9    your new reliance list, did you review a
10   document entitled weight of the evidence --
11   or "Weight of evidence:  General principles
12   and current applications of Health Canada"?
13       A.    Yes, I've seen that.
14           (Plunkett Exhibit 8 marked for
15   identification.)
16   QUESTIONS BY MS. BRANSCOME:
17       Q.    All right.  We will mark this
18   as Plunkett Deposition Exhibit Number 8.
19           All right.  The document that I
20   just handed you that's marked as Plunkett
21   Deposition Exhibit Number 8, are you familiar
22   with that document, Dr. Plunkett?
23       A.    Yep, I've seen this before.
24       Q.    Is this listed among the new
25   materials that have been added to your

Page 212

1    reliance list?
2        A.    I believe it was, yes.
3        Q.    Okay.  And so for this one I
4    just want to direct your attention to the
5    conclusion section -- well, let me ask you
6    first:  How does this document relate to the
7    collection of documents with respect to
8    Health Canada that you identified as relevant
9    to your opinion?
10       A.    It was one of the materials
11   that they rely upon as they cite.  That's the
12   reason I pulled it.  It was -- I pulled
13   documents that they provided on the website
14   that were cited.
15       Q.    Okay.  And if you could turn to
16   page 11 of that document, there's a
17   conclusion section.  The first sentence of
18   the third paragraph reads, "The given --
19   given the context-specific nature of each
20   risk assessment and the diversity of tools
21   and criteria applicable, transparent
22   documentation of the specific application of
23   the WOE approach is especially important."
24           Did I read that correctly?
25       A.    Yes, you did.

Page 213

1        Q.    And is your understanding of
2    WOE that it is weight of evidence?
3        A.    Yes, that's correct.
4        Q.    Do you agree with this
5    statement?
6        A.    In a regulatory context, I do
7    believe that that is true, because within the
8    regulatory context when they do the risk
9    assessment, there's a need to understand why
10   decisions are made.  So, absolutely, in a
11   regulatory context, I would agree that this
12   kind of transparency is even being adopted by
13   EPA.
14       Q.    And is it your opinion then
15   that a different level of transparency is
16   needed for expert testimony in court?
17       A.    No, that's not what I'm saying.
18   I'm saying that's a different process.  And
19   that's what part of this process is.  It's
20   understanding the ability to provide a dialog
21   about what was done.
22           So as a result, this is
23   something that is common to the work that
24   I've done in the past.  Even in a
25   nonlitigation context with my regulatory

54 (Pages 210 to 213)

Confidential - Pursuant to Protective Order

Page 214

1 clients, doing a risk assessment doesn't
2 necessarily involve the same level of detail
3 that a regulatory -- a regulator would apply
4 to the transparency of the assessment. Not
5 to say that it couldn't be done, but it's
6 just -- I would say it's not necessarily
7 typical.
8      Q.    So this specifically refers to
9 transparent documentation.
10      Do you see that?
11      A.   Yes.
12      Q.    Would you agree that the report
13 that you have produced in the MDL does not
14 have documentation of the specific
15 application of the weight of evidence
16 approach?
17      MS. PARFITT: Objection.
18 Excuse me, objection. Form.
19      THE WITNESS: I disagree to an
20 extent because I did attempt to
21 provide in my report a description of
22 the methods that I used and the
23 resources that I've relied upon for a
24 discussion of how those methods are
25 used.

Page 215

1      And then in addition to that,
2 I've attempted to lay out for you in
3 my report a discussion of the pieces
4 of evidence that I've relied upon,
5 including some -- for some of those --
6 that's one of the reasons I got so
7 detailed in the section on migration
8 and providing you an analysis of each
9 of the papers that I relied upon and
10 what I thought was important within
11 them that led to my -- the formation
12 of my opinions.
13      So I disagree to some extent.
14 QUESTIONS BY MS. BRANSCOME:
15      Q.    Okay. Turning back to what
16 Taher did in classifying different studies
17 into different categories of reliability.
18 Have you done that type of analysis in the
19 past where you have separated out different
20 studies into different categories of weight
21 or reliability as part of an overall
22 analysis?
23      A.   Well, I do that every time I do
24 a weight of the evidence when I separate into
25 categories first based upon the type of

Page 216

1 study. In other words, as I discussed many
2 times in deposition, when you're talking
3 about doing a human health risk assessment,
4 there's certain types of data that are most
5 relevant. I mean, when they use the word
6 "reliable" -- I don't know that many of these
7 studies have the same level of reliability as
8 far as peer review, but they're -- for
9 example, on the issue of migration, it's my
10 opinion that the data from the human studies
11 is a more reliable or relevant source of
12 information. And I've laid out why, because
13 of differences in the anatomy, things like
14 that, with the data.
15      Q.    Are you familiar with the term
16 "binning exercise"?
17      A.   Yes, I am. And that is
18 certainly something that I have used in other
19 aspects of work that I have done.
20      Q.    Did you do a binning exercise
21 in rendering your opinions and what you've
22 provided to us in the context of your
23 opinions in the MDL?
24      A.   Yes, that's the exercise I
25 start with. I'm binning them into human,

Page 217

1 animal, mechanistic, in vitro data. That's
2 the first bins.
3      In fact, in the copper work we
4 did, that's what we did. We separated the
5 data into in vitro/only mechanistic
6 information, animal studies, did we have
7 human studies.
8      And we also looked at
9 studies -- we had a separate bin of exposures
10 like I do. I have studies that just address
11 the issue of exposure potentially.
12      So, yes, it's -- it's
13 consistent with doing that. It's --
14 essentially binning is just separating the
15 information into groups based on what
16 questions those -- those data can answer.
17      Q.    Okay. Have you ever -- do you
18 ever separate them into bins based on the
19 level of weight that you would give a
20 particular study?
21      A.   I do that when I'm analyzing
22 each of the studies within that group or that
23 bin. That's what I do. I give them -- in my
24 weight -- in my analysis, I weigh those
25 studies based upon my judgment on the

55 (Pages 214 to 217)

Confidential - Pursuant to Protective Order

Page 218

1　relevance, the reliability, the power of the
2　study, the statistical analysis that's done,
3　the inclusion in animal studies, in
4　particular, of controls. Those are all parts
5　of that analysis that I do. So, yes, I do do
6　that.
7　　　　And then in -- there have been
8　exercises that I've done in the past with
9　other individuals where we may have taken a
10　yellow sticky note and put down on top of it
11　animal data with exposure information, animal
12　data without exposure information. That's
13　the process that I'm doing when I am looking
14　across the data. I'm separating those pieces
15　of data into groups and what types of
16　questions they can answer.
17　　　　So that is consistent with what
18　I do when I do a weight of analysis approach
19　in the work that I do in both nonlitigation
20　and litigation context.
21　　Q. Okay. But we have no specific
22　documentation of the different ratings that
23　you gave the various pieces of evidence that
24　you included in your weight of the evidence
25　analysis, aside from occasional references to

Page 219

1　giving something less or more weight,
2　correct?
3　　A. Well, I certainly -- I told you
4　I have not given numerical values that you're
5　asking me, but I've attempted to do that when
6　I have described them in groups, when I talk
7　about human versus animal versus in vitro.
8　Because I've already told you, I believe,
9　it's my opinion that certain types of
10　information are more informative than others.
11　And so the more informative it is, the more
12　weight you're giving it in -- obviously in
13　your analysis.
14　　　　But it is a different exercise
15　than what is described here. And here I'm
16　pointing to Exhibit 8. And it's a different
17　exercise, obviously, than what a regulatory
18　body is required to do where they are trying
19　to come up with ways to increase the
20　transparency when no one can go and actually
21　talk to each of the regulators individually
22　to understand what their thinking was.
23　　Q. Okay. Returning to biological
24　mechanism for a minute, why doesn't
25　inflammation generally, including chronic

Page 220

1　inflammation, cause ovarian cancer?
2　　A. Because it doesn't change the
3　phenotype of the cell. It has to -- the --
4　and I discuss that. You have to -- you have
5　to set up a chronic inflammatory process that
6　leads to changes within the cellular
7　phenotype to go from a cell that is -- that
8　is -- is dividing normally to a cell that
9　isn't.
10　　　　So it's -- it's the same issue
11　that you address even in a study in animals.
12　Why do not all animals exposed to -- exposed
13　to a chemical develop tumors. It's the idea
14　that something has to be initiated beyond the
15　exposure or maybe beyond inflammation to lead
16　to the series of events.
17　　　　And so, yes, it's recognized
18　that you can get inflammation, and
19　inflammation can go down the road in becoming
20　a carcinogenic process, or inflammation can
21　no longer -- can stay where it is. It
22　doesn't progress beyond just a chronic
23　inflammatory process.
24　　Q. And so if you had a study that
25　demonstrated that a particular agent causes

Page 221

1　inflammation, you would need more information
2　in order to make the conclusion that that
3　agent can in fact cause cancer, correct?
4　　　　MR. MEADOWS: Objection.
5　　　　THE WITNESS: You would look
6　　for more informative information,
7　　exactly, which is why, when I've
8　　talked about the individual
9　　constituents in the context of
10　　consistency on mechanism for cancer,
11　　I've pointed to documents where that
12　　information has been discussed.
13　　　　So like when I talk about
14　　asbestos or cobalt or I point to
15　　the -- for example, the IARC
16　　assessment where they go through
17　　that -- that discussion of the fact
18　　that there's not just data showing
19　　that a biologically plausible
20　　mechanism may be inflammation, but
21　　there's also data to show that that
22　　can lead to tumor development as well.
23　QUESTIONS BY MS. BRANSCOME:
24　　Q. Okay. How does talc change the
25　phenotype of the ovarian cell?

56 (Pages 218 to 221)

Confidential - Pursuant to Protective Order

Page 222

1    A.    So this is one of the details
2  we don't know, other than generally it's
3  changing the phenotype to go from a normal
4  cell to a tumor cell.  That is being
5  observed.  When you find the presence of the
6  tumor, that is what you're observing.
7    Q.    Does pure talc with no other
8  constituent components, can it change the
9  phenotype of an ovarian cell?
10      MR. MEADOWS:  Objection.
11      THE WITNESS:  So that's a
12  difficult question to answer with
13  certainty because of the fact that I
14  don't believe that we have assurance
15  that any of the studies are done with
16  essentially pure talc.
17      However, in the studies that
18  claim to have been done with pure
19  talc -- for example, the NTP study
20  claims to have been done with pure
21  talc.  So if that is pure talc, truly
22  is, then that study is an example of
23  evidence for the chronic inflammatory
24  process leading to preneoplastic
25  lesions that are setting down the road

Page 223

1  mechanism towards cancer.
2      So there are data out there.
3  The problem you have, I believe, in
4  the literature is whether or not,
5  based on the discussion that is
6  becoming apparent now with sensitivity
7  and ability to take the natural
8  product and actually determine exactly
9  what's in it, that I don't think there
10  is the ability to assure that any --
11  any of these studies with the samples
12  of talc they're using is absolutely,
13  100 percent, only platy talc.  I think
14  there's -- there's some concern about
15  that.  But certainly you will take --
16  you have to take what is discussed
17  within the study as evidence from what
18  they're claiming.
19      So many of the studies say we
20  used asbestos-free talc or platy --
21  pure platy talc and we got a toxic
22  response.
23  QUESTIONS BY MS. BRANSCOME:
24    Q.    Would it be possible to design
25  an experiment -- and now I'm talking about an

Page 224

1  in vitro or an animal experiment -- by which
2  you would expose either cells or animal to
3  talc with different constituent products to
4  identify or separate out the individual
5  effects of the components?  Is that a study
6  that you could design as a toxicologist?
7    A.    I think that would be difficult
8  to do, but I'm not saying impossible to do.
9  And here's the -- there are some very
10  specific considerations you'd have to put
11  into that design.
12      I would argue that some of that
13  is already available, where we have studies
14  that have looked at the dose-response effects
15  for toxicity with cobalt, with chromium, with
16  asbestos.
17      When you get to asbestos and
18  talc, it's more problematic because then the
19  question is what is -- what is it?  What are
20  the specific characteristics in all the
21  different studies of exactly what the
22  asbestos was versus exactly what the talc
23  was.
24      But I think you could attempt
25  to do that, and then the question would be,

Page 225

1  being able to use that data not so much to --
2  not so much to identify a dose response for a
3  certain insult, but to look at the fact --
4  look at potency differences across the
5  compounds.  And then there's the issue of
6  then looking at additivity when you know you
7  have a complex mixture.
8      So that could be done, but,
9  again, it would be difficult to do based on
10  what we know about talc, being able to really
11  know that -- you would have to really be very
12  careful that what it is that you're looking
13  at is -- is not containing any of those
14  things that we unfortunately know co-occur
15  with constituents within the natural product.
16      But no one has done those
17  studies.  I point that out.  I haven't seen
18  that study that you're asking for.  I have
19  not seen somebody do that.
20    Q.    And a study like that would be
21  relevant in evaluating the potency of the
22  individual constituents and what might
23  actually be the driving factor for phenotypic
24  change, correct?
25    A.    Not necessarily.  I would argue

Confidential - Pursuant to Protective Order

Page 226

1  that we already have an answer to that by
2  looking at the data that's been collected on
3  the complex mixture itself. So the issue
4  would be why -- the question is what do you
5  gain by being able to say that we're only
6  pointing to this constituent or that
7  constituent. That isn't what is occurring.
8       What people are exposed to is
9  the complex mixture, not just each one of
10 those individual components. To me this is
11 not a case of asbestos-only exposure. This
12 is a case of exposure to consumer products
13 that are talc that may have within them at
14 any given time -- and data indicates that
15 there are substantial chance that asbestos
16 may be in -- is in certain of these products.
17      But my opinions are not
18 dependent on there being asbestos there at a
19 particular level or copper there -- or, I'm
20 sorry, cobalt there at a particular level
21 because my opinions are based on the
22 observations we have on the complex product
23 as it exists.
24    Q.  And you recognize that
25 different types of talc and different talc

Page 227

1  products have different constituent
2  components in different amounts, correct?
3     A.  Some can. I agree with that.
4  That is true.
5       So if you're being broad, as in
6  pharmaceutical-grade versus industrial-grade
7  or chemical-grade, yeah, because they'll have
8  a purity level assigned.
9       But as far as what the -- what
10 the components are, it isn't always defined
11 even specifically within that.
12    Q.  Okay. And does the presence of
13 oxidative stress in a tissue indicate that
14 cancer will develop in that tissue?
15    A.  Will definitively develop?
16 Not -- I don't think you could say
17 definitively develop, but it's certainly in
18 the biologically plausible mechanism that's
19 been understood to lead to chronic
20 inflammation and also has been linked to
21 cancer.
22      So that's the issue of not
23 necessarily saying it has to be there, but it
24 certainly is something that is observed
25 routinely in cases where carcinogenesis has

Page 228

1  been linked to an inflammatory response.
2  Oxidative stress is often a triggering
3  mechanism.
4     Q.  Does the body have protective
5  mechanisms that limit tissue damage from
6  oxidative stress?
7     A.  Yes, which is why not everybody
8  that's exposed to any particular chemical is
9  going to get cancer. Some people will
10 respond better. Some cells will respond
11 better. Some individuals in a population at
12 one time in their life may respond better.
13    Q.  You would agree that in vitro
14 studies do not account for the body's natural
15 defenses outside of what exists at the
16 cellular level, correct?
17    A.  Depends on the in vitro study
18 that's being done and whether or not there is
19 components added.
20      So I've seen studies done where
21 they take cells and then add extra levels of
22 glutathione to try to protect the cells from
23 certain stressors that could lead to damage,
24 but I agree with you that an isolated cell on
25 its own is a different microenvironment than

Page 229

1  an intact tissue, which is a different
2  environment than an intact animal, which is
3  even different than an intact human being.
4  Yes, they're all -- you look at those levels
5  of evidence or those types of evidence
6  differently, depending upon the end points
7  you're collecting.
8     Q.  And so you would give lower
9  weight to an in vitro study as compared to an
10 in vivo study, for example?
11    A.  Depends on the question you're
12 asking. I would give a lot of weight if the
13 question is what do I know -- if I want to
14 try to understand the biologically plausible
15 mechanism, some of those in vitro studies are
16 some of the most important, because it's the
17 only ones that allow us to answer a question.
18      If the question is higher level
19 about what is the evidence to show that
20 there's an increased risk overall for cancer
21 or a hazard for cancer, then certainly you
22 need to have more than an in vitro study.
23      So as -- so on -- if you want
24 to layer it up, obviously, if all you had was
25 in vitro data, you'd have much less

58 (Pages 226 to 229)

Confidential - Pursuant to Protective Order

Page 230

1  confidence in the conclusions you can draw
2  unless you had some in vivo data.  In vivo
3  data is going to allow you to interpret the
4  in vitro data.
5         So certainly there would be
6  more weight given in that assessment to the
7  fact that you had in vivo data.
8     Q.    And so when you made the
9  statement that, for instance, you always give
10  more weight to human data, is that true, or
11  does that also depend?
12     A.    Well, it depends on whether you
13  have human data.  So if I have human data and
14  I have a doubt, any doubts at all, about
15  whether or not the exposure-response
16  relationship would be affected by the way the
17  animal studies are designed, then, yes, I
18  would give more weight to the human studies.
19         In a case, however, such as
20  inhalation exposure assessments where
21  there -- it's much better, actually, to do an
22  animal study where we can do a dose response
23  across different sizes of particles and
24  actually observe lesions as they develop over
25  time, which is why I love -- I love the NTP

Page 231

1  93 study of interim sacrifices, looking at
2  that issue.  That data is very reliable in
3  order to understand the risk of lung damage
4  as compared to a human study where we don't
5  have those serial time points, doses that are
6  defined tightly.
7         So -- and the relevance between
8  those kinds of initial lung injury in certain
9  animals versus humans match fairly well.
10         That's my problem, though, in
11  the case with the perineal exposure.  I'm
12  saying to you, because of the route of
13  contact -- we need to be able to get it there
14  to the tissue -- the human data is extremely
15  important.
16     Q.    So is it fair to say that in
17  some circumstances animal data gets more
18  weight than human data and in other
19  circumstances human data gets more weight
20  than animal data?  It is circumstance
21  dependent?
22     A.    I would put it a different way.
23  I would say in some cases animal data is
24  weighted in a similar manner to human data.
25  I don't necessarily say it would get more

Page 232

1  weight, but it could if you only had one
2  crappy human study, one really badly designed
3  human study, and I had a GLP quality cancer
4  bioassay then, absolutely.  I mean, IARC does
5  this.  They look at that animal data and say,
6  "This one tells us -- answers the questions
7  we want to answer, and this very poorly
8  designed case series isn't going to allow us
9  to do that."
10         So you could, but I would say
11  it's more the other issue, that you look at
12  animal and human more on an equal basis if
13  the relevance and the extrapolation can be
14  done reliably.
15         And that's the question you
16  have to ask, can I extrapolate from animals
17  to humans in a reliable manner.
18     Q.    Okay.  Would you agree that the
19  response to cosmetic talc can vary depending
20  on tissue type in the body?
21     A.    Yes, I would say that that is
22  true, whether or not there's certain
23  protective barriers in place, for example,
24  yes.
25     Q.    And so in order to draw

Page 233

1  conclusions based on a study of one cell
2  type's reaction to cosmetic talc to another,
3  you would need to understand the differences
4  in similarities between those two cell types,
5  correct?
6         MS. PARFITT:  Objection.
7         THE WITNESS:  It's a different
8  question.  So you were asking me
9  about -- I didn't think you were just
10  asking about cells.  I thought you
11  were asking me about like routes of
12  exposure, dermal versus inhalation.
13  Those things differ.
14         Cell types may or may not.
15  That may or may not be true.  Because
16  if two cells -- two different cell
17  types in the body share similar
18  characteristics as far as the -- for
19  example, if they're both epithelial
20  cells or mesothelial cells, those type
21  of cells you would expect to respond
22  the same way.
23         But I would agree that, for
24  example, a neuronal cell versus a GI
25  cell versus a liver cell, there could

Confidential - Pursuant to Protective Order

Page 234

1    be differences in how they would
2    respond, yes, and so you would -- you
3    would look at those things
4    individually.
5    QUESTIONS BY MS. BRANSCOME:
6       Q.    And so it's important to
7    understand the differences and the
8    similarities between the different cell types
9    before drawing conclusions using studies from
10   different cell types?
11      MS. PARFITT:  Objection.
12      MR. MEADOWS:  Objection.
13      THE WITNESS:  I certainly think
14   you should consider the cell types
15   that are being used and whether or not
16   those cell types are ones that are
17   relevant to your risk assessment
18   question you're asking, yes.
19   QUESTIONS BY MS. BRANSCOME:
20      Q.    Okay.  You would agree as a
21   toxicologist, dose is an important part of a
22   toxicological analysis of an agent, correct?
23      A.    If you're doing risk, yes.  If
24   you're only doing hazard, it may not be as
25   important.  It depends upon the question

Page 235

1    you're asking about hazard.
2       Do you want me to explain?
3       Q.    I do want you to explain the
4    difference between a risk analysis and a
5    hazard analysis.
6       A.    Okay.  So in an initial hazard
7    analysis, if the question is, is there a
8    hazard associated with exposure, let's say,
9    by inhalation, it may not matter whether it
10   was a high dose or a low dose study.  Both of
11   those can identify hazard.
12      Then you ask the question:  Is
13   there a dose-response relationship?  That's
14   the next step beyond hazard.
15      So hazard is -- to me is
16   identifying the end points that you're going
17   to monitor for toxicity, sort of the target
18   organs, those things, and so whether or not
19   there's a dose-response study available, it
20   wouldn't be as important.
21      But certainly when you go to
22   that next step to assess risk, you'd like to
23   be able to see whether or not there is a
24   dose-response relationship in the effect that
25   you're assessing.

Page 236

1       Q.    Okay.  And in your -- in your
2    report, as part of your risk assessment that
3    you did in the MDL -- this is paragraph 12 on
4    page 8.
5       A.    Yes, I'm there.
6       Q.    Okay.  You state about
7    two-thirds of the way down the paragraph that
8    "weight of the evidence methods were critical
9    to defining the literature that identified
10   the hazards of talc exposure as well as
11   defining the dose-response relationship
12   between talc exposure and the risk of adverse
13   health effects."
14      Did I read that correctly?
15      A.    You did.  That's correct.
16      Q.    All right.  Is it your view
17   that in the case you have reached an opinion
18   that defines the dose-response relationship
19   between talc exposure and the risk of ovarian
20   cancer?
21      A.    It depends what you mean by
22   define.  I can tell you what I mean in this
23   sentence, and maybe that would help you.
24      Q.    Dr. Plunkett, it is your
25   report.  And so I am asking you, using your

Page 237

1    own definition of "define," have you rendered
2    an opinion that defines the dose-response
3    relationship between talc exposure and the
4    risk of ovarian cancer?
5       A.    I have formed opinions about
6    the dose-response relationship generally, but
7    unfortunately -- I answered that question for
8    you earlier when you asked me, I think, about
9    is there -- I don't know if you used the word
10   "threshold," but I did.
11      So the available information
12   doesn't allow us to identify an ultimate
13   threshold, for example, in the case of women
14   exposed to talc perineally and their -- and
15   their development of ovarian cancer.
16      Instead, in defining the dose
17   response, what we can do with the data -- and
18   that is what I attempted to do.  This is
19   where you look at defining the dose response
20   in the animal studies, which we can look at,
21   or defining dose response in cell studies,
22   showing that as the dose increases, the
23   hazard and the risk increase.  So risk
24   actually you quantify.  There's a certain
25   response at this dose and a different

60 (Pages 234 to 237)

Confidential - Pursuant to Protective Order

Page 238

1 response at the next dose, or have we
2 plateaued, that the responses are the same as
3 dose increases.
4           So that, I did do that as part
5 of my assessment, trying to define the dose
6 as far as how that linked to the responses in
7 each of the studies I looked at.
8      Q.   You would agree, though, that
9 some studies did not show a dose relationship
10 between talc and ovarian cancer or the
11 clinical signs that were indicative of the
12 potential for development into ovarian
13 cancer, correct?
14           MS. PARFITT:  Objection.
15           THE WITNESS:  If you're talking
16     about the human data; is that what
17     you're referring to?  Or are you
18     talking about all -- any of the data?
19 QUESTIONS BY MS. BRANSCOME:
20      Q.   Any of the data.
21      A.   So I would disagree on the
22 animal data.  I think on the animal data they
23 often -- most of the animal studies I've
24 relied upon have looked at more than one dose
25 or at least looked a no exposure versus a

Page 239

1 dose, and most of them have looked at more
2 than one dose.
3           In the case of the human
4 studies, unfortunately, some of those studies
5 were not designed to be able to define dose.
6 In other words, the questions weren't asked,
7 for example, of the individuals even in the
8 prospective studies.  Some of those
9 included -- did not include the information
10 collected on frequency and duration of use.
11           So if it's not collected,
12 obviously, I don't have it to look at.  And
13 that's one of the limitations of human
14 epidemiological investigations, is that it
15 often is not designed appropriately to look
16 at dose response.
17      Q.   Is it your opinion that there
18 are no studies looking at talc and the risk
19 of ovarian cancer in which the authors of the
20 study have concluded there was no clear
21 pattern of increased risk with dose?
22           MS. PARFITT:  Objection.
23           THE WITNESS:  No, that's not
24     what I've said.  No.  It's very
25     possible that an individual paper

Page 240

1 or -- that they may make a -- an
2 author may make a statement, but I'm
3 talking about looking -- this is
4 weight of the evidence.  I'm looking
5 across.  And I'm saying, across the
6 data, when I look at the human data
7 versus the animal data, for example,
8 versus in vitro studies, the in vitro
9 studies and the animal studies allow
10 you to look at dose response for talc
11 toxicity.
12           The -- even the animal studies
13 allow you to look at dose response for
14 development of precancerous lesions,
15 you're on the way to cancer, for
16 example, in the NTP studies.
17           And then in the human studies,
18 some of those studies are designed
19 such that the authors could draw
20 conclusions about dose response and
21 some are not.
22           Even in some of the studies
23 where they attempted to look at dose
24 response, some of the authors indicate
25 they don't see an effect.  So that is

Page 241

1 true.  And part of that may be driven
2 by the design of the study, the number
3 of individuals in the study, the way
4 that the questions were asked.
5 There's limitations on the way that
6 information is collected.
7           If you want to look at each
8 study, we can, but --
9 QUESTIONS BY MS. BRANSCOME:
10      Q.   So my question to you, whether
11 you agree or disagree with the author's
12 conclusion, is simply that if you look at the
13 overall animal and human studies that you
14 cite in your report or have considered on
15 your reliance list that look at a potential
16 dose-response relationship for talc toxicity,
17 do some of those studies conclude that there
18 is not a dose-response relationship?
19           MS. PARFITT:  Objection.
20           THE WITNESS:  I disagree for
21     talc toxicity, but I would say if
22     you're going to limit it to the issue
23     of the ovarian cancer response, I
24     would agree.  I have seen that in some
25     of the studies.

61 (Pages 238 to 241)

Confidential - Pursuant to Protective Order

Page 242

1      I think talc toxicity, I don't
2    know if anybody has made the
3    comment -- I would doubt it -- that
4    there is no dose response for toxic
5    effects of talc.
6    QUESTIONS BY MS. BRANSCOME:
7      Q.   Okay.  You discuss in your
8    report -- wait a moment.  It's in
9    paragraph 58 on page 38.  And I just want to
10   make sure I understood what you were citing
11   here.
12      In paragraph 58 you state that
13   "It is important to remember that
14   administration of even a single dose of talc
15   in animals has been shown to produce adverse
16   effects locally at the site of the exposure."
17      What are you referring to
18   there?
19      A.   Acute doses.  In other words,
20   in studies that have described installation
21   of a single dose of talc in some form into a
22   tissue, that they are observing adverse
23   responses.
24      An example of that may be
25   the -- I think it's Hamilton.  Is that the

Page 243

1    one where they stilled it into the ovaries
2    with a single dose?
3      Q.   So these are large-dose
4    exposures?
5      A.   Well, not all --
6      Q.   Or are they, I should say?
7      A.   I don't know that they all are,
8    no.  There are -- there are -- I don't think
9    I have attempted to quantify large in this
10   sentence.
11      What I'm stating here is not an
12   issue of large versus small.  It's an issue
13   of the fact that there are toxic effects with
14   single exposures.  And I'm just making the
15   comment -- this has to do with hazard, right?
16   It's the idea even a single dose -- or a
17   single exposure you can get irritant,
18   inflammatory reactions at the site of
19   exposure.  And that's all I'm trying to say.
20   That's why I'm citing as reviewed by EPA.  I
21   believe EPA even makes a very similar
22   statement.
23      Q.   Okay.  Do you take into
24   account -- there are some studies for
25   which -- at least my reading of your report

Page 244

1    is that you give them less weight because you
2    believe that the individuals who conducted
3    the study had been paid by either a company
4    or agencies that had some investment in the
5    outcome of the study; is that correct?
6      A.   Is that my opinion?
7      Q.   Yes.
8      A.   For any particular study,
9    you'll need to show me what you're pointing
10   to.  I do have opinions about some of the
11   work by Drs. Huncharek and Muscat, yes.  I
12   think I address that specifically, and that
13   has -- that's not so much to do with my
14   weight of the evidence; that has more to do
15   with transparency and what was being
16   disseminated to the public and disseminated
17   to the FDA as far as evaluations.
18      That's a different issue than
19   the weight of -- the weight of -- the weight
20   of the evidence assessment for risk.  I think
21   those were separate.
22      Q.   So then I'll ask you that.
23      In doing your weight of the
24   evidence analysis for risk, have you
25   discounted the weight that you've given to

Page 245

1    any particular piece of scientific evidence
2    based off of potential affiliations of the
3    authors?
4      A.   I certainly did with the CIR
5    review document.  I've already told you that.
6    And that's because I have evidence that shows
7    it's not just an affiliation issue, but it's
8    actually -- it's more -- it's more important
9    than that.
10      Q.   Are there any other examples?
11      A.   I think that's the only one
12   right now as I sit here that I can tell you
13   that I had identified as carrying little
14   weight because of an issue of either
15   authorship or input in the way it was
16   described.
17      There are certainly studies
18   within my weight of the evidence evaluation,
19   some of which were performed by industry.  I
20   certainly look at that issue, but unless I
21   have -- have a reason to believe that there's
22   an inherent bias based on something I know,
23   they go into the weight of the evidence
24   without making a correction for that.
25      In many cases that I work in

62 (Pages 242 to 245)

Confidential - Pursuant to Protective Order

Page 246

1  litigation, I will find situations like the
2  situation here with Huncharek and Muscat
3  where I have, for example -- I think this
4  came up in the Risperdal litigation for me.
5  It's the idea that there was a series of
6  papers put out by an individual investigator
7  where documents that I could get access to
8  show me that indeed their analysis was not
9  done by them but it was ghostwritten by
10  somebody else.  So that gives me pause,
11  although I would never have known that unless
12  I had access to internal documents.
13         So initial weight of the
14  evidence I did not discount, but then I
15  went back and had to reevaluate the role
16  those studies played in my overall
17  assessment.
18      Q.   Do you take into account in any
19  way in evaluating the weight of a study if it
20  is conducted by someone who serves as an
21  expert on behalf of the plaintiffs in the
22  active litigation?
23      A.   It would be the same -- same
24  issue.  I certainly consider it as part of
25  what I look at, but just like if they were an

Page 247

1  expert for the defense versus an expert for
2  the plaintiff, you judge that information
3  based on what you know.  And if I don't have
4  information to discount it, I will not
5  discount it.
6         But absolutely, I understand.
7  Just as people we all -- look at some of the
8  things I've published where I have said my
9  work was sponsored by the American Chemistry
10  Council.  You know, people -- that's why you
11  disclose the conflicts.  You put it there so
12  people can weigh it if they want, but it
13  doesn't mean you discount the work
14  automatically.
15         And so I think for any paper,
16  plaintiff, defense, whoever it is that's
17  writing it, you need to consider it based on
18  the information you have.  And if you believe
19  that you have information to indicate that
20  there's some issue with the reliability of
21  the analysis, then absolutely you consider
22  that.
23      Q.   So, for example, when you rely
24  on Dr. Longo's characterization of the
25  constituent components in samples that he has

Page 248

1  tested, that he reports are Johnson's baby
2  powder, did you also consider the work that
3  was done by experts that have been retained
4  on behalf of the defendants to characterize
5  the components of Johnson's baby powder?  Do
6  you give them equal weight?
7      A.   So I haven't seen a variety of
8  the documents that you're talking about,
9  so -- because I have not worked in the
10  litigation cases that have involved asbestos
11  only.  So -- which I think is where those
12  documents are.
13         In the litigation I -- in the
14  litigation I worked in, I am aware of what
15  other experts on both sides have said.  I
16  don't believe I've seen an analysis from a
17  defense expert that is -- that is like
18  Dr. Longo's, at least in the litigation I've
19  worked in.  Certainly I would consider that
20  and look at that if it's available, and I
21  would consider it.
22         I would point out, Dr. Longo's
23  analysis is not the piece of evidence that
24  you start with, though.  You start with what
25  I discuss in the published literature first,

Page 249

1  because there are published documents out
2  there in the literature that describe exactly
3  what Dr. Longo is now describing.
4      Q.   What published documents are
5  those?
6      A.   Those are Dr. Blount's reports
7  in 1991, which is before the litigation came
8  about, is my understanding.
9         There's also -- there's five or
10  six.  I can tell you the paragraph.
11      Q.   For Johnson's baby powder, I
12  would be interested in that, yes.
13      A.   So I -- I'll have to look and
14  see if it's Johnson's baby powder only, but
15  certainly there is other evidence on the
16  issue of asbestos contamination and
17  specifically in talc.
18         So I -- you want me to find the
19  paragraph for you?
20      Q.   Please.  If you think there is
21  published literature documenting asbestos in
22  Johnson's baby powder, I would like to see
23  that.
24      A.   So this is my paragraph 32.
25  And I'd have to pull each of these articles

63 (Pages 246 to 249)

Confidential - Pursuant to Protective Order

Page 250

1  out because I don't recall what each of them
2  says. But I'm pointing to Paoletti, Blount,
3  Mattenklott, Moon, Gordon, Anderson, Rohl,
4  Pooley and Rowlands, Blejer and Arlon,
5  Cralley, Millman.
6          And then I cite -- and then of
7  course the next piece of evidence is there
8  are actually documents from J&J and Imerys
9  that show detection of asbestos or
10  asbestos-like minerals in talc.
11      Q.   As you sit here today, can you
12  identify which of these published articles
13  that you list in paragraph 32 relate to
14  Johnson's baby powder?
15      A.   I would have to pull them to
16  answer that.
17      Q.   Okay.
18      A.   As I sit here, I'd have to pull
19  them. But I would refer you -- I know at
20  least some of them do based on the statement
21  I've made, but...
22      Q.   So you did not make an attempt
23  in this paper to identify which products were
24  being analyzed in these specific articles.
25  It's not indicated on the face of this

Page 251

1  paragraph, correct?
2      A.   I don't tell you on the face,
3  but you if read the sentence I said, "When
4  commercially available, talcum powder
5  products were analyzed, including powders
6  sold by Johnson & Johnson. The data has
7  shown that the powders contained varied
8  levels" -- and I'm saying "fibers," so it's
9  just asbestos -- "including fibers that
10  stated to be asbestos."
11          So to tell you which of those,
12  I'd have to pull them. And I apologize, I
13  didn't bring them all with me.
14      Q.   Have you been provided --
15  you're aware that Dr. Blount's paper does not
16  identify Johnson's baby powder in the face of
17  the article, correct?
18      A.   I believe that's true. You'd
19  have to go to her deposition, I believe,
20  where she's given -- where she discusses what
21  the source of that was, and maybe even a --
22  there may even be a separate document,
23  actually, not a deposition, that was -- that
24  was in the files of Johnson & Johnson that
25  goes along with that, but I'd have to go

Page 252

1  look.
2      Q.   Have you reviewed Dr. Blount's
3  deposition?
4      A.   I have reviewed a -- something
5  by Dr. Blount. Whether it was trial
6  testimony or deposition, I have seen
7  something, yes, that she has said regarding
8  this issue.
9      Q.   To the extent that there is
10  confusion about whether or not a sample
11  tested by Dr. Blount is in fact Johnson's
12  baby powder, would you reduce the weight that
13  you give that particular piece of evidence in
14  evaluating whether asbestos has been present
15  in Johnson's baby powder?
16          MS. PARFITT: Objection. Form.
17          MR. MEADOWS: Objection.
18          THE WITNESS: I don't know
19  reduce the weight because -- because
20  there's -- there are plenty of
21  documents here that talk about that.
22          I would consider it --
23  certainly it would -- it's not so much
24  weight. It's a different bin. We'll
25  call it a bin, a different bin of

Page 253

1  information. There's information on
2  talc powders generally, and then
3  there's some information that's
4  specific to certain body powders.
5          So certainly -- would I pay
6  attention if they identified it? Yes.
7          But in the statement I'm making
8  here, I'm not claiming that every one
9  of these is relating to just the
10  powder sold by Johnson & Johnson.
11  This is across the available
12  information that's public and then
13  also the information that's available
14  in the files of Johnson & Johnson.
15  QUESTIONS BY MS. BRANSCOME:
16      Q.   What is your definition of
17  asbestos?
18      A.   My definition of asbestos is
19  exactly what the different documents describe
20  it typically. It's a fibrous mineral,
21  typically. It occurs in a variety of
22  different forms. Most of the times they'll
23  say "asbestos." Sometimes they'll say
24  "chrysotile." Sometimes they'll say
25  "tremolite." Sometimes they'll say

64 (Pages 250 to 253)

Confidential - Pursuant to Protective Order

Page 254

1    "anthophyllite." Those are the three most
2    common ones I see. But those are all mineral
3    forms of asbestos.
4         So just like IARC puts those
5    all within one bin, I'm putting those all in
6    one bin because they have a similar toxicity
7    profile.
8    Q.   Is it your view that each of
9    the different types of asbestos has the same
10   toxicity profile?
11   A.   They all have the same ability
12   to cause cancer, but they have different
13   potencies. So they do have -- there will be
14   some differences in the dose response and the
15   potency of them, but certainly they've all
16   been linked as being carcinogens by IARC.
17        And I would agree, when you
18   look at their data, there is data and
19   evidence to indicate that.
20   Q.   Which type of asbestos is the
21   most potent?
22   A.   For which end point? For lung
23   cancer? I believe chrysotile is. For other
24   end points, I'd have to go look. I mean,
25   chrysotile is the sharp -- is the sharp --

Page 255

1    the sharded-type structure.
2         But there's data on fibrous --
3    fiber -- the fibrous forms of asbestos
4    rather than the -- or the amphibole forms of
5    asbestos as opposed to chrysotile, which is
6    the serpentine form.
7    Q.   Do you consider yourself an
8    expert in asbestos?
9    A.   Not in --
10        MS. PARFITT: Objection.
11        THE WITNESS: Not the geology
12   of asbestos, no.
13        I have expertise in toxicology
14   as it relates to interpretation of the
15   data related to asbestos. I have
16   never give -- given testimony in a
17   case on asbestos, but it's something
18   I've studied in the past in my work as
19   a toxicologist, not as a testifying
20   expert.
21   QUESTIONS BY MS. BRANSCOME:
22   Q.   What role does your analysis of
23   the possibility that there may be asbestos in
24   Johnson's talcum powder products play in your
25   risk assessment in the MDL?

Page 256

1    A.   Has to do with the fact that we
2    have a complex mixture that has multiple
3    carcinogenic substances.
4         And asbestos is important from
5    the aspect of the way that it has been
6    assessed even by regulatory bodies, the idea
7    that even very low levels of fibers pose a
8    cancer hazard and a cancer risk in
9    individuals have been shown to be
10   carcinogenic.
11        So that's what I'm saying about
12   potency of asbestos is different than potency
13   of some other carcinogens that you might look
14   at. But the importance of it is it's a
15   complex mixture, talc, body powders, a
16   complex mixture that includes constituents
17   that are known human carcinogens as well as
18   some that are -- been ranked other ways by
19   regulatory bodies.
20   Q.   If Johnson's talcum powder
21   products do not contain asbestos, does that
22   change your opinion with respect to the risk
23   they pose with respect to ovarian cancer?
24   A.   No, and I think that was very
25   clear if you looked at my first report. So

Page 257

1    even -- there's -- I don't think in any of my
2    reports I've opined that without looking at
3    the complex mixture that we wouldn't be here.
4         In other words, I have not
5    opined that if it doesn't have -- if it
6    doesn't have asbestos, it's not a risk. I
7    have not opined that, and I don't believe
8    that, because I think there is independent
9    risk for the fact that we have a complex
10   mixture of talc that has been tested and
11   shown to be carcinogenic.
12        It's my opinion, I told you --
13   maybe it wasn't you. I may have told this
14   yesterday, I'm sorry, to Mr. Smith that I
15   believe that there is evidence to show that
16   there is a significant exposure to asbestos
17   based on the data that's been collected.
18        But certainly, you know, in
19   some -- the data has shown that in the assays
20   that have been done or the analyses that have
21   been done that you can't say that talc is
22   asbestos-free.
23   Q.   Well, so --
24   A.   So --
25   Q.   -- the question I have

65 (Pages 254 to 257)

Confidential - Pursuant to Protective Order

Page 258

1    specifically relates to ovarian cancer.
2        Is it your view that through an
3    exposure route that is relevant for ovarian
4    cancer, that the use of Johnson's talcum
5    products involve a substantial exposure to
6    asbestos?
7        A.    I believe based on the use of
8    the products that -- where the data has been
9    collected that there would be a substantial
10   exposure to asbestos, regardless of how
11   you're exposed, perineal -- perineally or by
12   inhalation.
13       Q.    What is your basis for reaching
14   that conclusion?
15       A.    It's looking at the number of
16   fibers that have been detected in the
17   products, in looking at the -- the widespread
18   nature of the presence of asbestos fiber --
19   asbestos in the talcum powder products and
20   the fact that even though it's at a very low
21   level by their -- their level of detection,
22   again, can't be said to be asbestos-free.
23       So regardless of whether it's
24   talc that's being applied perineally or a
25   talc that you're inhaling while you're

Page 259

1    applying it perineally, the fibers are still
2    going to be present within that talc.
3        Q.    Have you or anyone done an
4    analysis of the dose of asbestos to which
5    someone might be exposed perineally?
6        A.    I haven't done a specific
7    calculation, no.
8        Q.    Has anyone done that
9    calculation?
10       MS. PARFITT:  Objection.  Form.
11   QUESTIONS BY MS. BRANSCOME:
12       Q.    That you have seen?
13       MS. PARFITT:  Objection.
14       THE WITNESS:  I'm trying to
15   remember whether I saw that done in
16   any of the documents related to
17   Dr. Longo.
18       I don't know.  I'd have to go
19   look.
20   QUESTIONS BY MS. BRANSCOME:
21       Q.    Okay.  So as you sit here
22   today, can you give an opinion to a
23   scientific degree of certainty, reasonable
24   degree of scientific certainty, that an
25   individual would be exposed to a dose of

Page 260

1    asbestos above background through the
2    perineal use of Johnson's talcum powder
3    products?
4        MR. MEADOWS:  Objection.
5        MS. PARFITT:  Objection.
6        THE WITNESS:  I don't think
7    that's the opinion I have formed to
8    date, but certainly the opinion I have
9    formed is that the data I have seen
10   indicates that you can't separate out
11   talc without asbestos versus talc with
12   asbestos in the information that's
13   been collected.  Because there's --
14   all -- the information that's been
15   collected has shown there's no
16   evidence that asbestos-free talc is
17   available.
18       If by asking that question
19   you're trying to say that it's the
20   asbestos alone that's causing the
21   cancer, that is not my opinion.  So
22   that is when the dose issue would
23   become very important for asbestos.
24   QUESTIONS BY MS. BRANSCOME:
25       Q.    Okay.

Page 261

1        A.    So that's -- so that's a
2    different question I have not answered.
3        Q.    And in reaching your opinion
4    that there is no evidence that asbestos-free
5    talc exists, you have not been provided with
6    the reports by the defense experts, including
7    Dr. Matthew Sanchez, analyzing Johnson's
8    talcum powder products for the presence or
9    absence of asbestos, correct?
10       MS. PARFITT:  Objection.  Form.
11       I think you're aware that the
12   MDL expert reports have not yet been
13   provided to us.
14       MS. BRANSCOME:  Yeah.
15       MS. PARFITT:  I'm just making a
16   point.
17       THE WITNESS:  I have not seen a
18   report by Dr. Sanchez.  I assume I
19   will, because typically after -- later
20   in the litigation, once all experts
21   have been deposed or revealed, I'm
22   usually given defense expert reports
23   and their deposition testimony.  So I
24   expect to see that; I just haven't
25   seen it yet.

66 (Pages 258 to 261)

Confidential - Pursuant to Protective Order

Page 262

```
 1    QUESTIONS BY MS. BRANSCOME:
 2       Q.    And you haven't seen it in any
 3    of the cases in which you've rendered an
 4    opinion, correct, not just the MDL?
 5       A.    Well, none of the cases that I
 6    have worked in have involved the issue of
 7    looking for asbestos exposure.
 8           The cases I have worked on have
 9    been talking about talc exposure that may
10    include asbestos as a constituent, but it
11    wasn't focused on asbestos exposure.
12           So, no, none of the cases I
13    worked on have provided testimony in that
14    area.
15           You understand what I'm saying?
16       Q.    Let me just make it clear.  You
17    have not, in any of the cases in which you
18    have offered opinions with respect to the
19    contents of talc, been provided with an
20    expert report or testimony by Dr. Sanchez
21    about what he did or did not find in
22    Johnson's talcum powder products with respect
23    to asbestos?
24           MS. PARFITT: Objection.  Form.
25           THE WITNESS: So I can't tell
```

Page 263

```
 1    you that I have not.  I don't recall
 2    it.  That's all I can say.  I don't
 3    recall that name.
 4    QUESTIONS BY MS. BRANSCOME:
 5       Q.    It's certainly not something
 6    you discuss in your report, correct?
 7       A.    No, I do not.  And I don't know
 8    that it's in my reliance materials.  That's
 9    why I'd ask you to look there, because if
10    it's in my reliance materials, then I've seen
11    it.
12       Q.    Okay.
13       A.    And I mean big reliance
14    material list, not my reference list.
15       Q.    All right.  With respect to the
16    other potential constituents of talc, have
17    you done any analysis to provide an answer as
18    to how much -- what dose of chromium, for
19    example, an individual might be exposed to
20    through the perineal use of Johnson's talcum
21    powder products over a lifetime?
22       A.    No, and I have -- well, I know
23    it's a separate deposition.  We discussed
24    this yesterday.  No, I have not done a -- a
25    calculation of a potential dose with perineal
```

Page 264

```
 1    application for any of the heavy metals.  So
 2    the three that I've mentioned, no, I have not
 3    done that calculation.
 4       Q.    You would agree, based on your
 5    training and experience as a toxicologist,
 6    that in order for an agent -- and we can talk
 7    specifically about a metal -- to present a
 8    risk of cancer it needs to be bioaccessible,
 9    correct?
10       A.    If by bioaccessible you are not
11    limiting that definition to solubilized into
12    the blood and carried systematically, yes, I
13    would agree with that.  Bioaccessible meaning
14    it has to be in a form that can somehow
15    interact with the tissue, yes, I agree with
16    that.  But it could be as simple as tissue
17    contact versus needing to be solubilized.
18       Q.    Okay.  Is silica bioaccessible?
19       A.    It depends on the form of the
20    silica.  So silica particles can be
21    bioaccessible if inhaled and found on the
22    surface of the lung.  That can cause injury
23    at the site of the lung.  So that's an
24    accessibility to that particular tissue that
25    it contacts.
```

Page 265

```
 1       Q.    We talked earlier -- it's
 2    somewhat related to bioaccessibility, but we
 3    talked about the way in which different
 4    particles might move specifically through the
 5    genital tract in women.
 6           Do you recall that?
 7       A.    Yes.  A general discussion.
 8       Q.    Yes.
 9           And when you testified that
10    starch and talc might not move at the same
11    rate, do you have an opinion as to which
12    might move more quickly through the tract?
13       A.    I haven't formed that opinion,
14    no.
15       Q.    Okay.  And do both talc and
16    starch particles remain in the body for the
17    same length of time?
18       A.    I haven't done an analysis to
19    see if the data tells us what the -- what the
20    differences might be.  I would expect there
21    to be differences, which is what I told you
22    earlier, because I would expect the starch to
23    be able to be solubilized, where I would not
24    necessarily expect the talc to act in that
25    same manner.
```

67 (Pages 262 to 265)

Confidential - Pursuant to Protective Order

Page 266

1      Q.    Is cornstarch capable of
2   causing an inflammatory process?
3      A.    It can.  It is -- but it is --
4   it's a different level of risk for
5   inflammatory responses than is talc, just by
6   its chemical nature.
7      Q.    Have you done an analysis in
8   your report that examines the differences
9   between the inflammatory response that can be
10   triggered by talc as opposed to cornstarch?
11      A.    I haven't analyzed inflammatory
12   response.  Instead, what I've done is done a
13   comparison of what the toxicity -- the
14   differences in the toxicity potential have
15   been described in medical literature, and I
16   cite -- I have a paragraph where I cite to
17   some sources that talk about the differences
18   in the toxicity potential or biocompatibility
19   of starch versus talc.
20      Q.    Now, I had a question about
21   your supplemental report that was marked as
22   Exhibit 3 to the deposition.
23             At paragraph 67...
24      A.    Okay.
25      Q.    You identify here six heavy

Page 267

1   metals - arsenic, chromium, lead, cobalt,
2   cadmium and nickel - that in your
3   supplemental report dated August 29, 2018,
4   you say have been reported across lots of
5   talc powders.
6             Do you see that?
7      A.    Are you in -- now you're in my
8   MDL report or here?
9      Q.    No.
10      A.    Oh, so where are you?  I'm
11   sorry.
12      Q.    Same report.  It's the sentence
13   that begins at the bottom of page 6.
14      A.    Okay.  Hold on.
15             About that they have varied at
16   the levels --
17      Q.    Yes.  So you identify six
18   different types of heavy metals.
19             Do you see that there?
20      A.    Yes, I do.
21      Q.    Okay.  And the question I had
22   for you was that in your report in the MDL,
23   if you look at paragraph 36 --
24      A.    Yes.
25      Q.    -- you identify -- you identify

Page 268

1   only three heavy metals:  chromium, cobalt
2   and nickel.
3             Do you see that?
4      A.    Yes.
5      Q.    Why did you remove three of the
6   heavy metals?
7      A.    It's not so much removing.
8   Those three heavy metals that I focused on in
9   my MDL report are ones that have been talked
10   about with a similar mechanism of action as
11   far as irritation and biologic -- biologic
12   plausibility mechanism being irritation and
13   inflammation.
14             So that's why I focus on those
15   three, which may not -- which is not
16   necessarily the case for some of the others,
17   even though they're also -- have a
18   carcinogenic hazard, pose a risk.
19      Q.    So in your -- as part of your
20   risk assessment that you performed in the
21   MDL, are you offering the opinion that to the
22   extent they exist in any of the Johnson
23   talcum powder products, that arsenic, lead --
24      A.    Cadmium.
25      Q.    -- and cadmium play any role in

Page 269

1   the risk of developing ovarian cancer?
2      A.    That is not an opinion that I
3   would be offering in the MDL.
4      Q.    Okay.  Now, you talk about
5   these heavy metals having been classified by
6   different agencies as either known probable
7   or possible human carcinogens, correct?
8      A.    You're in my MDL report again?
9      Q.    Oh, yes.
10      A.    Okay.  I'm sorry.  Okay.  Let
11   me get there.
12             Yeah, I do have that
13   discussion.  I'm just trying to find it.
14      Q.    Sure.
15      A.    Okay.  Yes, I'm there.
16      Q.    Is it your view, based on your
17   expertise, that because a compound can cause
18   one type of cancer, it can cause all types of
19   cancer?
20      A.    No, not necessarily.  It
21   depends on the -- well, it depends on a
22   couple of things.  It depends on what's been
23   studied.  Have all types of cancer even been
24   studied.  And then it also -- it also depends
25   upon, I believe, the route of exposure as

68 (Pages 266 to 269)

Confidential - Pursuant to Protective Order

Page 270

1    well.  So can it get to where it could cause
2    that, could it distribute there.  And then in
3    addition to that, what data has been
4    collected.  Is there enough data, for
5    example, to show that there's extrapolation
6    from animals to humans in the types of tumors
7    or is it -- or if we have good human data,
8    then we would focus on the types of cancers
9    that you're seeing in humans, for example.
10       Q.   Okay.  But you recognize even
11   where there is complete data some compounds
12   can cause one type of cancer and they are
13   incapable of causing another type, correct?
14       MS. PARFITT:  Objection.  Form.
15       THE WITNESS:  I don't know
16   about incapable, but I would agree
17   that you certainly would see -- you
18   could potentially see different
19   observations.
20       If you're talking about animals
21   versus humans, or are you talking
22   about --
23   QUESTIONS BY MS. BRANSCOME:
24       Q.   If humans.
25       A.   Based on what you had seen in

Page 271

1    the animals; is that what you're asking me?
2        Q.   Yes.
3        A.   Yes.  So, yes, there is not
4    always a one-to-one concordance.  So that's
5    why -- that's why I made the comment that
6    it's important to have some human data or
7    experience, so that you can put in context
8    the data you collected in animals.
9        I would say to you there are
10   certain kinds of tumors in animals, for
11   example, that are shown to be not relevant at
12   all to human risk assessment.  Like four
13   stomach tumors in rats is an example.  I've
14   dealt with that one a lot.
15       Q.   What types of cancer -- type or
16   types of cancer are the basis for the
17   classification of chromium as a known human
18   carcinogen by IARC?
19       A.   So I have to pull it out, but I
20   believe that there may be some GI cancers and
21   maybe some skin cancers, but I'm not sure.
22   I've got it pull it out.  It's been a while
23   since I've looked at it.
24       Q.   Okay.  Have you done an
25   analysis to evaluate whether or not the types

Page 272

1    you can extrapolate with scientific basis
2    from one type of cancer cause to ovarian
3    cancer with respect to the heavy metals
4    specifically?
5        A.   Well, I haven't attempted to
6    that, because I haven't attempted to define a
7    independent risk for each of those metals
8    individually.
9        The issue -- the issue I have
10   with those metals is -- there's a paragraph
11   here where I talk about pathogenesis of
12   carcinogenesis, where I talk about different
13   stages of cancer development and the fact
14   that inflammatory responses may be operating
15   at all those different stages.
16       So the issue is you have
17   potential -- you have compounds that are
18   known to produce cancer or have been shown to
19   have a potential risk of cancer.  They share
20   a similar mechanism to talc, so as a result
21   of that, they factor into your risk
22   assessment as far as there being an exposure
23   to a mixture.
24       But on the issue of ovarian
25   cancer, I'm looking at the data that's been

Page 273

1    collected on talc itself, which would be talc
2    with the constituents that could include the
3    metals.  But certainly I'm not saying that it
4    is -- without the presence of one or the
5    other of these there would be no risk of
6    ovarian cancer.  I'm not saying that either.
7        Q.   So my question is, though, can
8    you point me either to scientific literature
9    directly documenting that these heavy metals
10   can cause ovarian cancer or to scientific
11   literature that enables you to extrapolate
12   from the types of cancer that they are known
13   or believed to cause to ovarian cancer?
14       A.   So I -- on the issue of can I
15   point you to the data on ovarian cancer, I'd
16   have to go back.  I can't answer that without
17   looking at the assessments.
18       But on the other -- second
19   question you asked me, that's the question I
20   was just trying to answer before.  It's the
21   idea that regardless of where the cancer is
22   developing, the fact that these compounds
23   have the ability to stimulate similar toxic
24   responses in tissues could lead to a --
25   setting up a situation where the -- where the

69 (Pages 270 to 273)

Confidential - Pursuant to Protective Order

Page 274

1     tissue is primed for cancer development.
2         Q.    And do you have --
3         A.    And so that --
4         Q.    Sorry.
5         A.    And that has to do with the
6     basic science of carcinogenesis when you look
7     at underlying mechanisms, especially with
8     tissue contact, direct tissue contact, with
9     irritants or inflammatory processes.
10            But I would -- I am not -- I
11    have not formed the opinion, again, that with
12    or without either one of these that I would
13    expect ovarian cancer to be the target.  I'm
14    saying that ovarian cancer risk is increased
15    based on exposure to talc, which includes a
16    variety of constituents.
17        Q.    Okay.  And do you cite anywhere
18    in your report to studies documenting -- I
19    know you said you'd need to go look at them,
20    but I'm asking if it's in your report
21    anywhere a discussion of any studies showing
22    that the particular heavy metals that you
23    cite as potential constituents of Johnson &
24    Johnson's products have been demonstrated to
25    increase a risk for ovarian cancer on their

Page 275

1     own?
2         A.    So, no, I haven't addressed
3     that in my report.  And again, I think that's
4     inconsistent with the way I'm using these
5     data.  But that's fine.  I mean, no, I
6     haven't done a specific assessment of ovarian
7     cancer risk with each of those metals
8     individually.
9         Q.    I would ask the same questions
10    for the different fragrance constituents that
11    you allege in your report are potential
12    carcinogens.
13            Have you done any analysis, and
14    can you point me to any scientific studies
15    that establish that those particular
16    compounds are capable of causing ovarian
17    cancer?
18        A.    No, I haven't done that
19    analysis, but, again, general principles of
20    toxicology and cancer risk assessment, when
21    you look at the presence of multiple --
22    excuse me, multiple carcinogens with similar
23    mechanisms of action, you would assume in
24    your risk assessment that those risks could
25    be additive.

Page 276

1             So, again, that's what I'm
2     pointing to and why I have cited the data.
3         Q.    Now, you talked about -- when
4     we were discussing mechanism, you said that
5     inflammation alone is not necessarily
6     sufficient to cause cancer, correct?
7         A.    Yes, I did.
8         Q.    All right.  Do you have
9     scientific studies that show that any of the
10    heavy metals or the fragrance constituents
11    that you identify as potential carcinogens
12    create -- generate phenotypic changes like
13    you discussed were next for the formation of
14    cancer?
15        A.    I believe that data is
16    available on nickel.  I need to go back and
17    look at chromium and cobalt, but I do believe
18    with nickel you'll find similar data on
19    tissue irritation and inflammatory processes.
20            Nickel is also a sensitizer, so
21    it has interaction with the immune system, so
22    I do believe that for nickel you can find
23    some of that data.
24        Q.    Okay.  But as you sit here
25    today, can you point me into any of that

Page 277

1     that's discussed in your report?
2         A.    No specific discussion other
3     than, again, all -- the IARC -- I'm citing to
4     the IARC assessments, and the IARC
5     assessments for each of those discuss
6     carcinogenesis and a biologically plausible
7     mechanism being linked to the ability of
8     these compounds to induce oxidative stress
9     and/or inflammatory processes.
10        Q.    Okay.  In your opinion, you
11    talk about the mixture of constituents that
12    are involved in talc.
13            Have you done any analysis to
14    look at how the different constituents
15    interact with each other?
16        A.    Well, yes, that's my issue at
17    looking at underlying mechanism.
18            But are you asking me -- I
19    certainly don't have a -- the only studies
20    that I have to rely upon on the interaction
21    of the mixture is the actual studies on the
22    powders themselves, where we know that the
23    powders contain constituents other than just
24    platy talc.
25        Q.    Okay.  And do the constituents

70 (Pages 274 to 277)

Confidential - Pursuant to Protective Order

Page 278

1    need to have the same underlying potential
2    carcinogenic mechanism for them to have an
3    additive effect?
4        A.   By general principles of
5    toxicology, yes, you look at mode -- mode of
6    action or mechanism of action before you
7    apply that additivity principle to the cancer
8    risk assessment.
9        Q.   And so as you sit here, you
10   believe there have been scientific
11   documentation that nickel might operate
12   through the same biological mechanism as you
13   purport talc to operate, but you're not sure
14   about the other heavy metals or the fragrance
15   constituents; is that correct?
16       MS. PARFITT:  Objection.
17       THE WITNESS:  For the fragrance
18   constituents, I'd definitely have to
19   pull because I haven't looked at that
20   individual assessment in a while.
21       For these three, what I do know
22   is that they do share the ability to
23   at least induce oxidative stress.
24       What I can't recall for
25   chromium and for cobalt is whether

Page 279

1    they're taking it the next step from
2    oxidative stress to inflammatory
3    process.  I believe that they do, but
4    I'd have to check, whereas I know
5    nickel has been shown to lead to an
6    inflammatory process after oxidative
7    stress has been induced.
8    QUESTIONS BY MS. BRANSCOME:
9        Q.   And you would agree, even more
10   than requiring an inflammatory process, you
11   would actually have to see that these
12   compounds can generate phenotypic changes,
13   correct?
14       MS. PARFITT:  Objection.
15       THE WITNESS:  Well, we know
16   they do because they've been shown to
17   be carcinogenic.  If you've been shown
18   to be carcinogenic, you've done a
19   phenotypic change in the cell from a
20   normal cell to a cancer cell.
21       So we know they have the
22   capability to induce tumors, or
23   cancer, all three of those, at least
24   in animals if not in humans as well,
25   because two of them are known human.

Page 280

1    So those two -- we'd have human data
2    to show that.
3        But on the issue of cobalt, it
4    may only be -- I need to go back and
5    look, but it may indeed just be animal
6    data.
7    QUESTIONS BY MS. BRANSCOME:
8        Q.   And so your basis for that
9    would be the IARC classification?
10       Is that where I would go to
11   look if I wanted to look at it after this
12   deposition?
13       A.   I'd go to the IARC reviews.
14   I'd go to those three which I believe I have
15   cited down here for you and given you where
16   to go to find them.
17       Q.   Okay.  You discuss in your
18   report -- and if you'd like to reference it,
19   it's paragraph 69 on page 47 -- the concept
20   of genotoxic and nongenotoxic carcinogens.
21       Do you recall that?
22       A.   Yes.
23       Q.   And as you sit here today, is
24   it your opinion that talc is more likely a
25   nongenotoxic carcinogen?

Page 281

1        A.   As the direct insult, yes.  And
2    I would like to -- I would like to point out
3    that in the literature -- the reason I have
4    this paragraph here is because in the
5    literature in the past, in the area of
6    chemicals, it's been -- toxicologists have
7    attempted to put two bins, direct genotoxic
8    insult versus nondirect genotoxic.  It
9    doesn't mean you can't get a genotoxic event
10   after the initiation.
11       So I want to make sure you
12   understand that.  I'm not saying that there
13   is no possibility of this chemical in its --
14   in its process of inducing cancer leading to
15   indirect genotoxicity, but I'm talking about
16   the direct mechanism at the site of the cell.
17       So talc, for example, has been
18   shown to not be genotoxic in cells.  And so
19   that's why I believe, then, when I look at
20   the rest of the data that fits, that it fits
21   the definition of a nongenotoxic carcinogen
22   by its initial mechanisms to induce cancer.
23       Q.   Okay.  And if talc is, in fact,
24   a nongenotoxic carcinogen, it would suggest
25   that there is likely a threshold dose below

71 (Pages 278 to 281)

Confidential - Pursuant to Protective Order

Page 282

1    which it does not have a carcinogenic effect,
2    correct?
3            MS. PARFITT:  Objection.
4            THE WITNESS:  It is possible,
5    and that's the problem.  In order to
6    fully assess that, you would have to
7    have the data to prove it.
8            But that's the assumption.  You
9    assume with nongenotoxic carcinogens
10   that you could identify a level where
11   you wouldn't turn on that indirect
12   mechanism.  So that -- yes, that is
13   true.
14   QUESTIONS BY MS. BRANSCOME:
15       Q.   And you have not been able to
16   identify, nor can you point to, scientific
17   literature that identifies a threshold -- a
18   threshold dose for talc with respect to its
19   carcinogenic potential for ovarian cancer,
20   correct?
21       A.   Not a specific dose, but I
22   think that's why I mentioned to you -- and
23   I -- I think that's why Canada, when you look
24   at their document, they talk about
25   discouraging routine use generally.  So it's

Page 283

1    the issue of what -- single use of a body
2    powder or an occasional use is a different
3    risk assessment than routine use.
4            So if you want to talk about
5    thresholds that way, that's very imprecise,
6    but you could do that.  You can talk about
7    whether or not there -- I do believe there's
8    a different risk profile for one or two uses
9    of talc body powder versus a risk profile of
10   somebody who uses it routinely, because I
11   think that fits that threshold definition.
12   It's the idea that you have limited
13   availability for enough particles to migrate
14   to lead to the tissue toxicity that it cannot
15   be recovered from or repair.
16       Q.   You're familiar with the
17   concept of the precautionary principle,
18   correct?
19       A.   Yes.
20       Q.   All right.  And you understand
21   that Health Canada may have made
22   recommendations with respect to product usage
23   that are purely precautionary, correct?
24           MS. PARFITT:  Objection.  Form.
25           THE WITNESS:  I disagree that's

Page 284

1    what they've done, but is it possible
2    that they would do it?  Any regulatory
3    agency, it's possible they could do
4    it, yes.
5    QUESTIONS BY MS. BRANSCOME:
6        Q.   Do you have any information
7    with respect to Health Canada's
8    decision-making, other than what you have
9    read on the face of the documents?
10       A.   That is all I have to look at
11   is what is provided on the website.
12       Q.   Okay.  And so the statement
13   that you think Health Canada was suggesting a
14   dose threshold by their statement of
15   discouraging routine use, you're basing that
16   entirely on what you read on the piece of
17   paper, correct?
18           MS. PARFITT:  Objection.  Form.
19           THE WITNESS:  Well, that's what
20   they state.  So, yes, I'm -- I am
21   telling you what I see on their
22   website.  If that's what you're asking
23   me, yes, that is true.
24   QUESTIONS BY MS. BRANSCOME:
25       Q.   Okay.  Can you point me --

Page 285

1    well, do you discuss -- have you looked at,
2    as part of your opinion specifically in the
3    MDL, the studies exploring a potential link
4    between asbestos and ovarian cancer?  Just
5    asbestos.
6        A.   Some of the studies, yes, but I
7    have not -- I have not done a separate risk
8    assessment just for asbestos by itself,
9    because I have not assumed that there is
10   asbestos-only exposure.
11           Does that make sense?
12           But I do cite -- for example, I
13   cite to some of the early literature on -- so
14   this -- I guess where this opinion comes in
15   is on hazard and warning.  So in the warnings
16   I talk about when it was known that asbestos
17   was linked with cancer, because the warning
18   standard is not causation proven but the
19   identification of the potential.  And so that
20   is in my report on warnings, but that is not
21   within my discussion of the weight of the
22   evidence for risk assessment of the talc
23   product.
24       Q.   Okay.
25       A.   Does that make sense?

72 (Pages 282 to 285)

Confidential - Pursuant to Protective Order

Page 286

1    Q.   Uh-huh.
2         For example, have you rendered
3    an opinion about what dose of asbestos
4    exposure would be necessary to cause ovarian
5    cancer in an individual?
6         A.   No, I have not formed that
7    opinion at this time.
8         Q.   Okay.  Do you have an opinion
9    about the background level of asbestos to
10   which individuals are exposed with no
11   increased risk of any type of cancer?
12        A.   No, I do not have an opinion.
13   I do believe others do, but I do not.
14        Q.   Okay.  You may have been asked
15   some of these questions before, but I will
16   keep them brief.
17        Have you ever published any
18   articles that state that talc causes ovarian
19   cancer?
20        A.   No, I have not.
21        Q.   Have you ever publicly
22   expressed the opinion that talc increases the
23   risk of ovarian cancer outside of literature?
24        A.   No.  My work has been in the --
25   in the courtroom.

Page 287

1         MS. BRANSCOME:  I think we can
2    take a break.
3         VIDEOGRAPHER:  We are going off
4    the record at 2:57 p.m.
5         (Off the record at 2:57 p.m.)
6         VIDEOGRAPHER:  We are back on
7    the record at 3:13 p.m.
8         MS. BRANSCOME:  Dr. Plunkett, I
9    have no more questions for you on
10   behalf of Johnson & Johnson, subject
11   to your counsel doing a direct of any
12   kind.
13        THE WITNESS:  Sure.  Thank you.
14        EXAMINATION
15   QUESTIONS BY MS. BOCKUS:
16        Q.   Good afternoon, Dr. Plunkett.
17   You and I have met before.  My name is Jane
18   Bockus, and as you know, I represent Imerys
19   in this case.
20        A.   Yes.
21        Q.   Correct?
22        I want to go back to just touch
23   briefly on a couple of issues that have
24   already been addressed.
25        Would you agree that IARC has

Page 288

1    not classified any of the heavy metals that
2    you've identified in your MDL report as
3    carcinogenic to the ovary?
4         A.   So the answer is I'd have to
5    look.  I don't recall that, but I'd have to
6    look to confirm.
7         Q.   Okay.
8         A.   That's the answer I believe I
9    gave a few minutes ago, yes.
10        Q.   So if I look at the IARC
11   website, then I can confirm whether or not
12   they have identified any of those as
13   carcinogenic to the ovary?
14        A.   Not so much the web -- well,
15   the website or the actual documents.  I think
16   I would actually point you to the actual
17   monograph --
18        Q.   To the monograph.
19        A.   -- because there may be
20   evidence in there of ovarian cancer as being
21   seen in studies.  And I'd have to go look.
22        Q.   Okay.  That was not part of
23   your consideration here, correct?
24        A.   So ovarian cancer is part of my
25   consideration, but I didn't -- in this part

Page 289

1    of my evaluation I'm trying to -- trying to
2    describe these metals.  And this is really
3    about mechanism of biologic plausibility and
4    the fact that these two things can go
5    together, and then the concept of additivity
6    is they're on hazard.  The idea if you have a
7    cancer hazard generally and you have similar
8    mode of action, regardless of the tissue, you
9    would be expected to have a potential
10   additive effect when you do a risk
11   assessment.
12        So that's my use of that data,
13   which is why I didn't do a separate ovarian
14   cancer assessment for each of the each
15   constituents but just on powder.
16        Q.   And you discuss that topic on
17   page 47, paragraph 68, of your report,
18   correct, the -- whether there's an additive
19   effect?
20        And you cite to Casarett and
21   Doull.  I don't know if I'm pronouncing those
22   names correctly.
23        A.   I'm sorry, on what page?
24        Q.   I'm on page 47, paragraph 68.
25        A.   Okay.  Sorry.  I should know

73 (Pages 286 to 289)

Confidential - Pursuant to Protective Order

Page 290

1  where it is, but...
2        Okay.  I'm there, yes.  Okay.
3        Yes, I do cite to a chapter in
4  Casarett and Doull, yes.
5        Q.   Okay.  And Casarett and Doull
6  is a resource that you cite to for a couple
7  of different toxicological principles that
8  you discuss in your -- in your report,
9  correct?
10       A.   Yes, because it's one of the
11  most well-recognized textbooks that is used
12  across different either universities or
13  schools or even in regulatory agencies.
14       I would also say I cite EPA
15  2000 there.  I'm not citing just Casarett,
16  but I am citing Casarett as well as an EPA
17  guidance document.
18       Q.   In Casarett and Doull, do they
19  actually discuss talcum powder in Chapter 2,
20  or is it more just the concept of the
21  potential of the effects when you have two
22  different chemicals that you're exposed to at
23  once or three or four?
24       A.   It's the latter.  It's the --
25  because you'll notice the title is

Page 291

1  "Principles of Toxicology," so it's the
2  general chapter teaching principles for risk
3  assessment and toxicology as used in risk
4  assessment.
5        Q.   And whether there is an
6  additive effect of, say, talc and nickel,
7  that's something that an experiment could be
8  designed to study, correct?
9        MS. PARFITT:  Objection.
10       THE WITNESS:  If you're talking
11  generally for cancer and not worried
12  about the issue of ovarian cancer, if
13  you're talking about cancer, like
14  doing an inhalation experiment to look
15  what happens to the lung, that you
16  could do.
17       The problem with the animal
18  studies and ovarian cancer due to
19  perineal exposure is it's very
20  difficult to understand how you design
21  a study to expose the animals that way
22  reliably in the way that humans are
23  exposed.
24       But generally you could
25  study -- you might even be able to do

Page 292

1  a genetically susceptible mouse study
2  to hurry the process along to look at,
3  but you might not be able to do it
4  through perineal exposure.  You might
5  have to do it through another route
6  such as either inhalation or maybe
7  even you could -- you could look at it
8  through intraperitoneal injections,
9  for example.
10  QUESTIONS BY MS. BOCKUS:
11       Q.   Well, and what the textbook
12  talks about is the fact that you need to
13  study it to find out whether the effects are
14  additive, whether the effects are something
15  that multiply the risk, you know, so that the
16  two together are greater than either one
17  alone, or do the effects offset each other
18  and reduce the risk, correct?
19       A.   That is discussed there --
20       MS. PARFITT:  Objection.
21       THE WITNESS:  -- which is why
22  I've cited the EPA document.  Because
23  the EPA document addresses the issue
24  of mixtures, and this is the issue of
25  mode of action.  If you have chemicals

Page 293

1  that you're looking at on the issue of
2  additivity or no effect, you will --
3  you look at that issue of how they're
4  affecting the tissue and underlying
5  mechanism.
6        But the only way to look at the
7  magnitude absolutely of how the risk
8  would change is by doing an
9  experiment.  That is true.
10  QUESTIONS BY MS. BOCKUS:
11       Q.   And to your knowledge, that
12  experiment has never been done; is that
13  correct?
14       A.   I can't guarantee that it's
15  only been done for nickel and talc alone, but
16  I would -- I would state that based on --
17  there are studies out there that have been
18  done where they've used the body powder that
19  we know have metals -- a variety of things
20  within it that are not just platy talc, but
21  those experiments are that kind of data.
22       But as far as gathering
23  dose-response information or teasing out
24  individual components, that is not available.
25       Q.   Do you agree that dose response

74 (Pages 290 to 293)

Confidential - Pursuant to Protective Order

Page 294

1   is the fundamental principle of toxicology
2   that underpins the effects that chemicals can
3   have on living organisms?
4       A.   When you're talking general
5   toxicology, yes, I think it's talked about in
6   the textbook.
7       Q.   And you agree that it is the
8   dose of the chemical and the pattern of
9   exposure that determines whether a chemical
10  produces an adverse effect on an organism,
11  not simply the presence of the chemical?
12      A.   For a typical dose-response
13  relationship for non -- for nongenotoxic
14  events, absolutely, I would agree that is
15  probably true.  And I don't mean nongeno --
16  noncancer events.
17           In the issue of cancer biology,
18  some of those issues don't hold all the time.
19  In other words, there are certain chemicals
20  and certain ways of looking at cancer risk
21  assessment where you can't assume where the
22  threshold is or identify what a safe dose
23  would be.  But certainly I agree on the issue
24  of noncancer risk assessment generally, or
25  general end points of toxicity, that is true.

Page 295

1       Q.   And again, do you agree that in
2   general toxicology the effects that might be
3   reported at high doses will not occur at
4   lower doses if the concentration at the site
5   of action falls below the threshold for
6   toxicity?
7       A.   Yes, that could -- that could
8   be possible, yes.
9       Q.   And do you agree that
10  evidence-based toxicology and epidemiology
11  dictates that the dose of the chemical is the
12  critical factor when examining the risk posed
13  by a chemical, not just its presence even in
14  the human body?
15      A.   I would say that's generally
16  true, yes, which is why I have attempted to
17  look at the dose-response relationship as
18  well as the prevalence of the contact.
19      Q.   And with regard to the human
20  studies that you cite, would you agree that
21  none of the studies that you cite in your
22  report that have to do with migration of
23  particles within the genital tract of the
24  female involve applications to the perineum
25  or outside of the genital tract?

Page 296

1       A.   That is true with the exception
2   of Parmley and Woodruff, which addresses this
3   issue of --
4           MS. PARFITT:  Objection.
5           THE WITNESS:  Talks about the
6   issue of exposure from the outside to
7   the inside.
8           But the data that is collected
9   with the different studies they have
10  deposited at some point -- at some
11  position within the vagina, that is
12  true.
13  QUESTIONS BY MS. BOCKUS:
14      Q.   And that is not how talc is
15  deposited in women who use it regularly in
16  their daily routine, correct?
17          MS. PARFITT:  Objection.
18  Misstates the evidence.
19          THE WITNESS:  So I would say
20  that depends on what women are doing.
21  Perineal application, for example,
22  application on the underwear, can lead
23  to contact of the vaginal opening
24  depending on the woman.
25          For example, a woman who has

Page 297

1   a -- had many children has a tract
2   that is stretched.  There, indeed, you
3   can have more direct contact than you
4   can with a very tight -- so I would
5   say it depends on the woman and it
6   depends on the situation.
7           But I do think it's generally
8   accepted, based on my review of the
9   literature, that there is the
10  opportunity for exposure internally
11  from perineal application.
12  QUESTIONS BY MS. BOCKUS:
13      Q.   And if I understand what you
14  testified to earlier today and yesterday, you
15  don't have any data that would advise on --
16  out of the talc that is deposited in the
17  underwear, what percentage of it makes it
18  into the reproductive tract?
19      A.   That's the data that's missing,
20  that is true.  And unfortunately, no one has
21  done a study.  It would be -- if there was a
22  way to do that, it would be interesting to do
23  that.  I just don't see how you design that
24  study, especially knowing the hazard of talc
25  at this point.  I think that would be a

75 (Pages 294 to 297)

Confidential - Pursuant to Protective Order

Page 298

1  difficult study to get approval for.
2      Q.    And do you have an opinion as
3  to whether it is even correct that each day
4  that a woman uses talc in her underwear, that
5  some of the talc makes its way to the ovary?
6          MS. PARFITT:  Objection.  Form.
7          THE WITNESS:  Have I -- can I
8      quantify that?
9          No, I haven't quantified it.  I
10     think I got asked that earlier.  I
11     can't quantify the amount that gets
12     there.  Or, I'm sorry, I may have
13     misheard the start of your question.
14     I apologize.
15 QUESTIONS BY MS. BOCKUS:
16     Q.    Yeah, I'm really asking:  Do
17 you have an opinion as to whether it happens
18 every single time a woman applies talc to her
19 perineal area?  Does some of that talc make
20 it to her ovary?
21         MR. MEADOWS:  Objection.
22         MS. PARFITT:  Objection.
23         THE WITNESS:  I don't think I
24     stated it quite that way, but
25     certainly I think the opportunity is

Page 299

1  there with every application.  And of
2  course it would depend upon the amount
3  of time that the contact may be in
4  place.  But the opportunity is there.
5          So, for example, if you applied
6  it to your underwear and 30 minutes
7  later you go to the bathroom, it's
8  very possible that you will have wiped
9  away, and so that that application may
10 have taken an opportunity away.  But I
11 do believe that the opportunity is
12 there based on the literature I have
13 seen.
14         And so I haven't formed the
15 opinion, though, that it's absolutely
16 every time.  My opinion, I think, is
17 based on the fact that I believe that
18 there is data to indicate that
19 exposure occurs, and that with
20 routine, continual habit, sort of a
21 habit exposure, that indeed that there
22 was some migration that occurs.
23 QUESTIONS BY MS. BOCKUS:
24     Q.    And is it fair to say that you
25 don't have an opinion as to whether that

Page 300

1  migration occurs every day, once a week, once
2  a month?
3          MS. PARFITT:  Objection.  Form.
4          THE WITNESS:  I haven't
5      formulated my point -- my opinion
6      quite that way; however, I do believe
7      that it is something that is going to
8      happen routinely with exposure.  I do
9      believe that migration is something
10     that is going on routinely with
11     application.
12         So with applications, I do
13     believe that that is, but I can't tell
14     you that this amount has migrated on
15     this particular day with this
16     particular application, no.  That --
17     the data that we have collected is not
18     there to allow us to do that.
19 QUESTIONS BY MS. BOCKUS:
20     Q.    How do you define the word
21 "routinely" as you're using it in that
22 answer?
23     A.    So that would be the idea of
24 repeated exposures, you know, within a week,
25 within a month, within a year.  So not --

Page 301

1  routine to me would not be -- would not be
2  applying it once a month one month, waiting
3  six months, doing it again, and then not
4  doing it until the next year.
5          Again, it's the idea -- some
6  people may -- routine may be during the hot
7  season of the year, they're routinely getting
8  daily exposures when it's warm, and during
9  the cold weather not applying.  But then the
10 next year doing -- that's a routine for them
11 and their habits based on their pattern of
12 exposure.
13         Again, we know that talc, when
14 it -- when it migrates and gets into the
15 body, we have data to show that it is -- it
16 is able to persist in the body.  The fact
17 that you may have not been exposed for three
18 months because it was cold doesn't mean that
19 you -- that that changes the fact that you're
20 still at risk with additional exposures the
21 next -- the next time that habit
22 becomes -- comes into place.
23         So I think there's multiple
24 exposure patterns that are possible, but when
25 I use routine, it's something that people are

Confidential - Pursuant to Protective Order

Page 302

1    doing throughout their -- a period of their
2    life.  And so it would be something that
3    happens either on a weekly basis for a good
4    part of the year.  I haven't defined it with
5    a particular number, though, no.
6        Q.    And my question had to do with
7    out of the number of times a given woman --
8    or an average woman uses talc, what
9    percentage of the time does talc make its way
10   into her reproductive tract?
11       A.    So I don't think that
12   anybody -- anybody can point to a piece of
13   data that tells you that, but, again, it's
14   based upon the anatomy, I would expect there
15   to be the potential each time it's applied.
16            And on your question on
17   routine, when I'm talking routine, I'm
18   looking at not just frequency but also
19   duration.  So when I'm talking about dose,
20   it's the fact that they do it on a repeated
21   basis for a number of -- a period of years as
22   well.
23            That's what the data shows in
24   the human studies.  It's not something,
25   again, that may have been done routinely for

Page 303

1    one year, but it does appear to be something
2    that's done more -- longer term than that.
3            But we can't give a number.  We
4    have no threshold.  We don't know exactly
5    what that minimum number is.
6        Q.    Do you think that the minimum
7    number is greater than a year?
8            MS. PARFITT:  Objection.  Form.
9            THE WITNESS:  I haven't formed
10   that opinion, no.
11   QUESTIONS BY MS. BOCKUS:
12       Q.    Do you think it's greater than
13   a month?
14            MR. MEADOWS:  Objection.
15            THE WITNESS:  Greater than a
16   month?
17   QUESTIONS BY MS. BOCKUS:
18       Q.    Yes.
19       A.    One month in their life?
20       Q.    One month in their life, where
21   they're using it every day for a month.
22       A.    So I haven't formed that
23   opinion at this point in time, but I'd say
24   it's more likely to occur when you do it more
25   than a month.  But I haven't formed an

Page 304

1    opinion on a set number, no.  I can't --
2    can't point you a specific number.
3            I'm not doing case-specific, so
4    I've not looked at any of those pieces of
5    information for any given plaintiff.
6        Q.    And I'm just trying to get the
7    threshold.
8        A.    Uh-huh.
9        Q.    As I understand it, that is
10   part of a toxicological evaluation, is the
11   threshold below which there's not an issue.
12            So I think you've said you
13   don't know if it's less than a year, but you
14   think it's more likely than not that it's
15   greater than one month.
16            MR. MEADOWS:  Objection.
17   QUESTIONS BY MS. BOCKUS:
18       Q.    Is that fair?
19       A.    No, that's not exactly what I'm
20   saying.  I'm saying we don't know the
21   threshold.  So as a result, I'm not of the
22   opinion that it absolutely can't -- it only
23   has to be this long.
24            What I'm saying to you is per
25   general principles of toxicology and based on

Page 305

1    the human data that we have, it indicates
2    that it's more frequent than just one month,
3    but I can't tell you that it's absolutely not
4    possible.
5            That's where -- I do think when
6    you're talking about those kinds of patterns,
7    that's a case-specific issue for individuals,
8    because I think that would have to be
9    considered for each individual.  But
10   certainly as a toxicologist, I'm using the
11   words "routine," "repeated," "longer
12   duration," "chronic exposure."  And when I
13   defined "chronic" earlier, I talked about
14   years of exposure versus just one month.
15            That would be consistent with
16   what I have said, yes, but I'm not -- I -- I
17   certainly don't want to rule out that there
18   couldn't be somebody out there that could
19   show something different, because it may very
20   well be that there are people that you can
21   identify with the presence of talc in their
22   ovaries and all of their other case-specific
23   things that could -- could make that pattern
24   a -- make someone be able to draw a
25   case-specific, reliable conclusion.

77 (Pages 302 to 305)

Confidential - Pursuant to Protective Order

Page 306

1         But that's not my role.  I
2    don't do case-specific.
3         Q.    And I am simply trying to get
4    the parameters of your opinions with regard
5    to the amount of talc use one would need to
6    have before you would feel comfortable --
7    well, that in your opinion would be
8    sufficient to create a toxic environment.
9             MR. MEADOWS:  Objection.
10            THE WITNESS:  Well, that's a
11        different question.  So toxic
12        environment could be with a much
13        shorter time exposure, okay?
14   QUESTIONS BY MS. BOCKUS:
15        Q.    Right.
16        A.    So but if you're talking
17   about -- the opinion that I have formed has
18   to do with an increased risk of ovarian
19   cancer.  So with that opinion, that's the
20   description, I believe, I was giving this
21   morning.  It's the idea that the data that
22   I've seen indicates that my opinion that
23   perineal use of talc body powder products
24   increases your risk for ovarian cancer above
25   that background level that you know exists.

Page 307

1         That opinion is based on data
2    that is -- is -- the supporting data would
3    indicate that it has to be a habit, routine,
4    a chronic exposure.  And so as a
5    toxicologist, I've tried to put that in
6    context.
7         I don't know what else to tell
8    you.  That's the opinions I have formed to
9    date.
10        Q.    A chronic -- a habit, routine,
11   a chronic exposure for years?
12        A.    Well, chronic --
13            MR. MEADOWS:  Objection.
14            THE WITNESS:  -- is defined as
15        years, typically, by a toxicologist,
16        and so that's what I -- that's what I
17        told you.
18   QUESTIONS BY MS. BOCKUS:
19        Q.    Shifting to your regulatory
20   opinions, you would agree that Imerys is a
21   raw material supplier to J&J; is that
22   correct?
23            MR. MEADOWS:  Objection.
24            THE WITNESS:  I would call them
25        an ingredient supplier, yes.

Page 308

1    QUESTIONS BY MS. BOCKUS:
2         Q.    Okay.  An ingredient supplier.
3         And you agree that Imerys does
4    not sell any products to the general public,
5    correct?
6             MR. MEADOWS:  Objection.
7             THE WITNESS:  I don't know
8        that's definitely true, but I'm not
9        aware that they do.
10   QUESTIONS BY MS. BOCKUS:
11        Q.    And what Imerys supplies to
12   Johnson & Johnson is not a finished cosmetic
13   that is ready to be sold on the market,
14   correct?
15            MR. MEADOWS:  Objection.
16            MS. PARFITT:  Objection.
17            THE WITNESS:  I don't know that
18        I can answer that except in the
19        context of Johnson & Johnson's baby
20        powder, SHOWER TO SHOWER® and Shimmer,
21        it's my understanding that Johnson &
22        Johnson mixes -- has some fragrance
23        added to the talc.
24            I don't believe Imerys does
25        that, but I don't know for sure.

Page 309

1         So based on what I know -- I'm
2    telling you what I know, and I would
3    call them, again, an ingredient
4    supplier, and I would call Johnson &
5    Johnson a cosmetic manufacturer.
6         Does that answer the question?
7    QUESTIONS BY MS. BOCKUS:
8         Q.    It does.
9         Would you agree that the
10   minerals that you have identified in your
11   report, that the documents that you have
12   seen, would classify their -- to the extent
13   that they are ever in the powder, that
14   they're trace ingredients?
15            MS. PARFITT:  Objection.
16            MR. MEADOWS:  Objection.
17            THE WITNESS:  So which
18        ingredients are you referring to?
19            So some of the metals, no, are
20        not trace ingredients.
21            Are you talking about the --
22        are you talking about the -- like the
23        presence of tremolite or the presence
24        of chrysotile --
25

Confidential - Pursuant to Protective Order

Page 310

1  QUESTIONS BY MS. BOCKUS:
2      Q.  No.  No, I'm sorry.  I'm
3  talking about the three metals that you
4  identify in your report.  Those are trace
5  elements that are -- that are sometimes
6  detected in the studies of the -- of the
7  talc.
8          MR. MEADOWS:  Objection.
9          THE WITNESS:  It's not how I
10  would say it.  I would say they're
11  heavy metal components that are
12  naturally occurring within the product
13  that are sometimes -- sometimes
14  detectable at levels that are reported
15  as trace based on the detection limit
16  within the analysis, but at other
17  times they're not listed as trace.
18  They're actually listed with a
19  specific amount.
20          So that's what -- how I would
21  define what I call trace.  Usually
22  that's how it will be reported in the
23  lab, trace, which means below the
24  limit of quantification, but it's
25  there.  You're detecting it.

Page 311

1          I would agree that -- that
2  there are other descriptions of heavy
3  metals in the heavy metal literature
4  that talk about trace amounts being
5  found in -- naturally occurring in
6  food, for example, and I agree that
7  that does occur.  But in the case of
8  this product, we actually have
9  often -- we actually have a -- a limit
10  that is set for acceptability in the
11  specification.
12          And so I would think it's more
13  proper to call it a level of the heavy
14  metal that is allowable by the purity
15  specifications set by the product.
16  And sometimes those levels may be
17  above, and most of the times those
18  levels are below, which is why it's
19  cleared.  Because I've seen some
20  analyses where different products may
21  have been, I guess, turned away or
22  considered not acceptable based on the
23  analysis of certain types of minerals
24  or metals.
25

Page 312

1  QUESTIONS BY MS. BOCKUS:
2      Q.  Have you seen any studies where
3  women's blood has reflected the presence of
4  nickel or cobalt or chromium?
5          MR. MEADOWS:  Objection.
6  QUESTIONS BY MS. BOCKUS:
7      Q.  Who are parts of these
8  studies -- these ovarian cancer studies?
9          MR. MEADOWS:  Objection.
10          THE WITNESS:  The
11  epidemiological literature you're
12  asking me?
13  QUESTIONS BY MS. BOCKUS:
14      Q.  Yes, ma'am.
15      A.  It's possible in the Nurses'
16  Health Study that we can go to that, because
17  I know they do collect some heavy metal
18  levels.  I've done that for other clients on
19  other issues.
20          Most of the others, I doubt
21  that we have heavy metal levels in blood.
22  But certainly there are levels of heavy metal
23  in blood, especially things like lead, for
24  example, that we have very limited capacity
25  to eliminate.

Page 313

1          So whether or not you carry
2  around a significant body burden of a heavy
3  metal in your blood is somewhat driven by the
4  exposure pattern you get.  It's something
5  that's commonly -- or can you excrete it
6  quickly or not.  So...
7      Q.  And are you familiar with any
8  studies that have suggested that the use of
9  body powders leads to a heavy burden of
10  nickel, chromium or cobalt in the blood?
11      A.  So I have not seen such
12  analysis done, no, I have not.
13      Q.  In paragraph 67 of your report,
14  which is on page 46 -- I'm sorry, on -- oh,
15  I'm sorry.  Paragraph 64, I apologize.
16      A.  No.  No, that's fine.
17      Q.  It's on page 44.
18          You cite to two abstracts --
19      A.  Yes.
20      Q.  -- one by Fletcher and one by
21  Fletcher and Saed.
22          Do you consider these abstracts
23  to be reliable sources of data?
24      A.  They're not as reliable at all
25  as a peer-reviewed article.  So there's a

79 (Pages 310 to 313)

Confidential - Pursuant to Protective Order

Page 314

1  difference in the weight you give an
2  abstract, absolutely.
3        However, knowing the papers
4  that Dr. Saed has actually published in the
5  peer-reviewed literature, I have -- I have
6  mentioned them in here because I do believe
7  that they are -- they are pieces of
8  information that are highly relevant to some
9  of the issues raised in other cellular
10 studies, and so that's why they're here.  But
11 certainly I do not give them the same weight
12 as in my assessment of overall risk.
13       And I would say that I had the
14 same opinions on risk before I had these
15 studies.  Because in my original reports,
16 obviously, I have gone further than risk and
17 talked about cause, and I didn't have the
18 Fletcher studies.
19       The Fletcher studies are more
20 on the issue of biologic plausibility and
21 mechanism versus being important
22 underpinnings, for example, for a hazard
23 assessment.
24    Q.   Is there any way that someone
25 reading your report could tell that you

Page 315

1  attribute less weight to the abstracts by
2  Saed and Fletcher just by reading your
3  report?
4        MR. MEADOWS:  Objection.
5        THE WITNESS:  I don't know if
6  they could or not.  Hopefully they
7  would based upon where they appear in
8  the report.  They're not cited a lot
9  of other places, but they certainly
10 are cited.
11       So that's why I'm here today,
12 though.  You're asking me these
13 questions; I'm telling you.  That's
14 how I look at these studies.  That's
15 all I can say.
16       I haven't -- I haven't,
17 certainly, as I've told you, given
18 things numerical weight throughout my
19 report.
20 QUESTIONS BY MS. BOCKUS:
21    Q.   Looking at paragraph 118...
22       Well, when you were preparing
23 your report, were you careful with the
24 language that you used in it to be precise
25 and accurate?

Page 316

1     A.   I attempted to do that.  I
2  can't tell you there isn't something in
3  here I've missed.  But, yes, I read this
4  report six or seven times before I finalized
5  it, trying to make sure that the language I
6  was using was an accurate reflection of the
7  opinion I'm expressing.
8        But it's possible, if you want
9  to point to something that you want to ask me
10 about, I can tell you whether or not that was
11 something that I would change.
12    Q.   So on page 77, paragraph 118 in
13 the middle of it, you say, "Based on the
14 knowledge available by the 1950s, talc body
15 powders manufactured and sold by Imerys and
16 Johnson & Johnson."
17       And that's the question that I
18 have for you.
19    A.   I see what you're saying.
20    Q.   Was Imerys selling anything to
21 Johnson & Johnson in the 1950s?
22       MR. MEADOWS:  Objection.
23       THE WITNESS:  I'm thinking.
24 It's possible they did not.  That may
25 be true.

Page 317

1  QUESTIONS BY MS. BOCKUS:
2     Q.   Well, and actually --
3     A.   You know what?  When I wrote
4  this sentence, I assumed that they did, but
5  if that is not true, then certainly this
6  sentence should be just Johnson & Johnson.
7     Q.   Well, earlier in your report,
8  in a footnote you indicate that Imerys began
9  supplying talc to Johnson & Johnson in 1989
10 or the late 1980s.
11       Do you remember making that
12 notation?
13    A.   So let me look.  So if that's
14 an inconsistency, then that should change.
15 Let me look.
16    Q.   And that's all I want to know,
17 if it's an inconsistency, should it change.
18    A.   If it is an inconsistency --
19 certainly if Imerys was not selling talc to
20 Johnson & Johnson in 19 -- the 1950s, then --
21 then certainly Johnson & Johnson's products
22 would not -- would not be affected by Imerys'
23 activity.
24       However, if Imerys is selling
25 talc to anyone that makes a consumer product

Confidential - Pursuant to Protective Order

Page 318

1  in the 1950s, then -- or a precursor company
2  to Imerys is making talc that's selling for
3  body powder to somebody other than Johnson &
4  Johnson, then that opinion would still hold.
5       So -- but I certainly agree, I
6  think I -- you're right, I think I have a
7  statement about the link between the two in
8  '89.  So in that case, then certainly the --
9  the link here would be related to Johnson &
10  Johnson's products.
11      Q.   Okay.  Yeah.
12      A.   Whether or not -- if they
13  weren't sourced from Imerys, then that's a
14  separate duty on a product, not this product.
15      Q.   If you look on the bottom of
16  page 7, I think you'll see the footnote I was
17  referencing.
18      And with regard to your last
19  answer, you don't have any information as to
20  whether Imerys existed and, if it did,
21  what -- who its customers were in 1950s,
22  correct?
23      A.   I don't believe I do, no.
24      MS. BOCKUS:  I think that's all
25  that I have.  Thank you.

Page 319

1       MR. LOCKE:  I've got a few
2  questions.
3       EXAMINATION
4  QUESTIONS BY MR. LOCKE:
5       Q.   Doctor, my name's Tom Locke.  I
6  represent the Personal Care Products Council.
7  We met a couple of times before, I think.
8       A.   I apologize, I don't recall
9  your name at least.  The face looked
10  familiar, though.  I apologize.
11      Q.   I try to maintain a low
12  profile.
13      I have relatively few
14  questions.  I wanted to ask you overall about
15  your opinion.
16      Would you agree that reasonable
17  scientists can disagree with your opinion
18  that talc increases the risk of ovarian
19  cancer?
20      A.   I'd say I wouldn't say it quite
21  that way.  I'd say that I agree that
22  scientists can disagree on conclusions they
23  draw, depending on the -- depending on the
24  way that they have assessed.
25      So certainly based on a

Page 320

1  complete assessment the way I did, then I
2  would agree that other people could come to a
3  different conclusion, absolutely.
4       So I think it depends what you
5  mean by "reasonable scientist."  But I would
6  agree that individuals can look at the same
7  body of data and, based on their judgment and
8  experience, based on looking at that same
9  body of data, could come to a different
10  conclusion, yes.  That's true.
11      Q.   You've been involved in this
12  talc litigation for at least a couple of
13  years, right?
14      A.   Yes.
15      Q.   And you know that various
16  defendants have offered experts who disagree
17  with your conclusions, right?
18      A.   Some of my conclusions, yes.  I
19  don't know that there is somebody that's in
20  the litigation that does exactly what I do
21  across all the opinions I've expressed, but,
22  yes, certain parts of my opinions there are
23  other experts I'm aware of, yes.
24      Q.   Well, they -- you're aware that
25  there are defense experts who disagree with

Page 321

1  your opinion that talc increases the risk of
2  ovarian cancer; is that correct?
3       A.   Yes, I -- I am aware of that
4  fact.
5       Q.   And in your review of the
6  records that go back or the scientific
7  materials that go back 35 years or more,
8  you've seen that there's disagreement
9  regarding that issue; is that correct?
10      A.   So what documents are you
11  referring to?  Are you asking me about a
12  specific -- just the published medical
13  literature?  Are you asking about documents
14  like internal company documents, reviews by
15  others?  What are you asking me about?
16      Q.   Well, let's focus on the
17  published medical literature.
18      There are scientists who have
19  disagreed with your opinion; is that correct?
20      MS. PARFITT:  Objection.
21      THE WITNESS:  I'm not aware of
22  a paper in the published medical
23  literature that has done the exact
24  assessment I have done.
25      So I am aware of the fact,

81 (Pages 318 to 321)

Confidential - Pursuant to Protective Order

Page 322

1   however, that there are individual
2   papers by scientists that, for
3   example, have concluded that there is
4   no association between exposure to
5   talc perineally and ovarian cancer,
6   yes. Individual papers, I am aware of
7   that, but that's different than what I
8   have done.
9   QUESTIONS BY MR. LOCKE:
10      Q.   Let me just ask you about what
11  you were requested to do on behalf of
12  plaintiff's counsel.
13          Plaintiff's counsel asked you
14  to provide opinions related to the human
15  health hazards posed by exposure to talcum
16  powder products and how those hazards relate
17  to the regulatory requirements for marketing
18  cosmetic ingredients and cosmetic products in
19  the United States; is that correct?
20          MR. MEADOWS:  Objection.
21          THE WITNESS:  I didn't write
22      that, but that sounds like an accurate
23      reflection of what -- what we -- what
24      I have done at least in parts of my
25      report, yes.

Page 323

1   QUESTIONS BY MR. LOCKE:
2       Q.   Well, if you look at your
3   report, I think you go to part where you were
4   asked to provide -- and I just pulled it from
5   what you said.
6       A.   So I did write it, I apologize.
7   It didn't sound like me.
8       Q.   It started with "to provide
9   opinions related to the human health hazards"
10  and so forth, so I just wanted to make sure
11  we're clear on that.
12      A.   Sure.
13      Q.   So does that sound right in
14  terms of what you were asked to do?
15      A.   I said I -- certainly those are
16  the kinds of things that I was definitely
17  asked to do.  I was asked to do two basic --
18  two basic things, which was having to do with
19  toxicology and risk assessment, and then a
20  separate issue related to regulatory
21  concerns.
22          So, yes, those are the two
23  basic, I guess, buckets of information and
24  documents that I reviewed and opinions I've
25  expressed, and I think that's consistent with

Page 324

1   what I've been doing in the litigation.
2       Q.   Okay.  As to that second
3   bucket, the US regulatory requirements for
4   marketing cosmetic ingredients and products,
5   that's not relevant to the scientific
6   question whether talc may cause ovarian
7   cancer; am I right?
8       A.   No.  I disagree with that based
9   on the fact that a company that markets a
10  cosmetic product is required to do a safety
11  assessment.  And if in that safety assessment
12  issues relate to cancer or ovarian cancer and
13  the use of talc, then those two things are
14  related.
15          But I would agree that -- that
16  doing a risk assessment like I've done is a
17  separate issue from doing a safety assessment
18  for a product, because there's actually even
19  a lesser standard for an issue of looking at
20  a safety assessment for a product versus
21  actually forming the opinion that there is an
22  increased risk of cancer with exposure to
23  talc.
24      Q.   Now, did IARC in 2006, did it
25  look at the US regulatory process in

Page 325

1   considering whether talc may cause ovarian
2   cancer?
3           MR. MEADOWS:  Objection.
4           THE WITNESS:  I don't think I
5       understand what you mean.  It's not a
6       US regulatory process, no, if that's
7       what you're asking me.
8           They have a -- they have a
9       discussion of what the products are,
10      which is part of the way they're sold.
11      But I don't think they're discussing
12      the duty of a company under the
13      regulatory process, no, that's a
14      separate issue.
15  QUESTIONS BY MR. LOCKE:
16      Q.   So their analysis of whether
17  talc may cause ovarian cancer, that's
18  different than the analysis of whether a
19  company may have a duty, whatever that duty
20  may be?
21          MR. MEADOWS:  Objection.
22          THE WITNESS:  It's a different
23      process, absolutely.  IARC is a
24      separate, independent body that does
25      an assessment looking at the issue of

82 (Pages 322 to 325)

Confidential - Pursuant to Protective Order

Page 326

1    cancer hazard and looking at whether
2    or not there is sufficient evidence to
3    categorize that hazard, whereas a duty
4    of a company under the regulatory
5    situation is broader than just cancer
6    hazard; it's a whole different thing.
7    It's what you do internally before you
8    market a product.  Totally different.
9          And so certainly when I --
10   that's why I have separate sections in
11   my report, and that's why I even
12   have -- I've had discussions about the
13   difference between the regulatory
14   standard for warning versus the
15   assessment of risk that may be
16   required in order to start to produce
17   a -- identify a association or an
18   increased risk or even if you did a
19   causation analysis.  Totally different
20   type of exercise.
21   QUESTIONS BY MR. LOCKE:
22      Q.    Do you first, in that exercise,
23   look at the scientific issue of whether talc
24   may cause ovarian cancer?
25      A.    Are you asking me in either of

Page 327

1    these exercises?
2       Q.    Well, let's say when you're
3    getting to -- you mentioned the duty to warn.
4    So if you're looking at the duty to warn, do
5    you first have to look at does talc cause
6    ovarian cancer?
7          MR. MEADOWS:  Objection.
8          THE WITNESS:  That's not the
9    question you asked.  No.  I would
10   argue, based on the regulations, if
11   you look at the standard, the question
12   is, is there evidence to indicate that
13   there is a chance, there is a
14   potential -- not that it does, but is
15   there a potential for that type of
16   hazard to be posed to consumers who
17   use the product.
18         It's a possibility versus being
19   a -- I'm taking it beyond possibility
20   when I'm doing my assessment for
21   increased risk.  And I talked about
22   that this morning, and I can't
23   remember her last name.  The
24   Johnson -- I apologize.  But I -- with
25   Johnson & Johnson.  I talked about

Page 328

1    this is a different assessment and
2    different standard.  It's a much lower
3    standard on cosmetics for what needs
4    to be done as far as warning.
5          Now, when a company comes and
6    initiates a safety assessment on their
7    product, before they even think about
8    what am I going to warn, they should
9    be doing a comprehensive assessment of
10   safety based on what's available
11   publicly, knowing what others have
12   reported and then what data they've
13   collected.
14         If they don't have data at all
15   on the safety of the product, then the
16   product has to say that.  We don't
17   know.  We do not know if this product
18   is safe.  And that's one of the things
19   that is allowed under FDA -- under FDA
20   regulations as well.
21         But essentially some -- some
22   assessment must be done to understand
23   from the perspective of the company
24   that this product is safe for
25   consumers to use as -- under the

Page 329

1    directions of use.
2          So in the case of this, it
3    would be a body powder being used on
4    the body surface but also perineally
5    because -- because that was an
6    exposure pattern that was understood.
7    QUESTIONS BY MR. LOCKE:
8       Q.    Okay.  You described two
9    different buckets.  They're independent
10   assessments; is that correct?
11         MR. MEADOWS:  Objection.
12         THE WITNESS:  Initially that's
13   where I started, and now I'm talking
14   two different duties.  There's a duty
15   to warn, but there's first a duty to
16   collect information before you market
17   it.  It's your premarket safety
18   assessment.
19   QUESTIONS BY MR. LOCKE:
20      Q.    Okay.  I'm not actually talking
21   about the manufacturer's duty.  I wanted to
22   just first address your scientific analysis.
23         That's a separate question that
24   led you to your opinion on the -- your
25   opinion that talc increases the risk of

83 (Pages 326 to 329)

Confidential - Pursuant to Protective Order

Page 330

1  ovarian cancer, correct?
2      MR. MEADOWS:  Objection.
3      THE WITNESS:  Yes, that's what
4  I described.  And I thought you were
5  talking about duty of the company, and
6  so I apologize.  I didn't mean to go
7  off on a tangent.
8      If you want to focus just on
9  the risk assessment -- is that what
10 you want to do? -- that's what I'm
11 doing.
12 QUESTIONS BY MR. LOCKE:
13     Q.   No, I just want to understand,
14 those are two different things, though,
15 right?
16     A.   Those are two different --
17 those are two different tasks that I
18 undertook, yes.  I undertook a risk
19 assessment task to form opinions based on
20 what I can say about risk, and then I
21 separately -- and I had done this earlier on
22 the issue of warnings, looking at what do we
23 know about the product and whether or not --
24 and when did we know it, and what should
25 consumers have been warned about based on the

Page 331

1  safety information that was available over
2  time.
3      Q.   The risk assessment task,
4  that's what you mean by your analysis that
5  talc increases the risk of ovarian cancer?
6      A.   That's correct.
7      Q.   You could have stopped at that,
8  but then you performed an additional task; is
9  that right?
10     A.   Well, actually, no, because the
11 first task I actually started with was the
12 regulatory task.  When I first started
13 getting involved in the litigation very --
14 before I wrote my first report, one of the
15 first things I was looking at was the issue
16 of the duty of the manufacturer to provide
17 warnings.
18     And then after that, I expanded
19 that role to be an inclusion as well of a
20 causation analysis.
21     And then now I'm not doing a
22 full causation analysis in this litigation,
23 but I'm using essentially some of the same
24 information to provide you with a description
25 of a -- a health risk assessment, which was

Page 332

1  also sort of -- that's a piece along the way
2  to doing a causation analysis, but it's not
3  the same.
4      Q.   Your opinion regarding the
5  FDA's responsibilities and functions, that's
6  not related to your opinion that talc may
7  cause an increased risk in ovarian cancer; is
8  that correct?
9      MR. MEADOWS:  Objection.
10     THE WITNESS:  I don't think
11 that's true the way you're asking that
12 question, because I don't know how you
13 divorce the fact that as a -- in a
14 regulatory assessment, if I identify
15 cancer hazard, I have identified a
16 duty to warn.  That's certainly
17 something that should be warned about
18 when I understand that there's not
19 only the potential, but I believe
20 there's an increased risk.
21     But I would agree with you that
22 in my report, I'm laying out for you
23 even different bodies of information
24 that -- as I step through it.
25     Does that make sense to you?

Page 333

1  QUESTIONS BY MR. LOCKE:
2      Q.   Not really.
3      A.   I'm sorry.
4      Q.   I'm talking about your
5  scientific analysis here, not your regulatory
6  analysis.
7      To do your scientific analysis,
8  you looked at scientific materials, right?
9      A.   Yes, but I do the same thing
10 for my regulatory analysis.  That's why I'm
11 confused.  I -- to me they are connected.
12     But I would agree with you, I
13 had an analysis.  Let's just talk about that,
14 my analysis on risk assessment and my
15 opinions that I've expressed.  Those are laid
16 out in a separate section of my report,
17 absolutely.  So we could talk about that if
18 you'd like.
19     Q.   Well, I just want to
20 understand, and I think I do now, that's a
21 separate issue from your regulatory opinion?
22     A.   It's not a separate issue.
23 That's where I'm having trouble with your
24 language.
25     It's a separate task because,

84 (Pages 330 to 333)

Confidential - Pursuant to Protective Order

Page 334

1    for example, I may have only been asked, but
2    I wasn't, to just describe whether or not, as
3    a human risk assessor and toxicologist, there
4    is a hazard or a risk posed by the product,
5    and I could stop there.
6            But I was asked, based on --
7    based on my experience working in the area of
8    regulatory toxicology but also on regulatory
9    issues for clients where I give advice, I was
10   asked to look at how does that scientific
11   information impact what the company should be
12   doing.
13           And so that's -- that's why I'm
14   saying you can't divorce them, because the
15   warning issue I'm talking about is intimately
16   tied into the human health risk assessment
17   results.
18       Q.   So do you consider yourself
19   primarily here as a warning expert?
20           MR. MEADOWS:  Objection.
21           THE WITNESS:  I consider that
22   one of my roles, yes, absolutely.
23           It depends upon how individual
24   cases, individual attorneys, will --
25   will ask -- decide to use me.  For

Page 335

1    example, I have been used in one trial
2    to only talk about the toxicology.
3    Other times, I've talked about
4    toxicology as well as regulatory
5    issues.  So I think it just depends on
6    the case.
7            In the MDL, I am prepared,
8    however, to come to talk at a trial on
9    the regulatory system that guides
10   cosmetics as well as provide opinions
11   that talk about what are the hazards
12   of talc, what is the toxicology of
13   talc, what do -- how can you be
14   exposed to talc, that migration issue,
15   and then my opinions about whether or
16   not I believe that there is an
17   increased risk of ovarian cancer.
18           So I would be -- be prepared to
19   talk about both of those things.
20   That's why I said I do think I'm a
21   little different than some of the
22   other experts that you may encounter,
23   for example, in the defense side,
24   where someone may just do regulatory
25   or somebody may just do toxicology.

Page 336

1            But I practice in both those areas in
2    my consulting practice and in my
3    experience.
4    QUESTIONS BY MR. LOCKE:
5        Q.   Let me ask you a few questions
6    about your cosmetic ingredient review
7    statements, CIR.
8            We can agree to call it that,
9    right?
10       A.   Yes, that's fine.
11       Q.   In parts of your report, you
12   cite the CIR as an authoritative source on
13   cosmetic ingredients; is that correct?
14       A.   So where are you looking at,
15   the background information on the CIR?
16           Yes, they certainly are a
17   source of information that FDA relies upon as
18   far as assessments, yes, that's true.
19       Q.   Well, and on page -- or
20   paragraph 35, page 23, you cite to the CIR
21   on, for example, chemicals purportedly in
22   cosmetics.  You have a footnote there.
23       A.   So --
24       Q.   I believe it's footnote 31.
25       A.   Yes, I have looked at -- looked

Page 337

1    at the CIR as a source of information because
2    many of the chemicals, many of the
3    ingredients within the fragrance of Johnson &
4    Johnson, the only available information may
5    be found within the CIR that's publicly
6    available.
7        Q.   And you rely on the report of
8    Dr. Cralley; is that correct?
9            MR. MEADOWS:  Objection.
10           MS. PARFITT:  Objection.
11   QUESTIONS BY MR. LOCKE:
12       Q.   You reference Appendix D to
13   your report.  I believe if you stay on the
14   same page you'll see that, the same
15   paragraph.
16       A.   I wouldn't say I rely on the
17   report of Dr. Cralley because I form my
18   opinions independent of Dr. Cralley, but
19   certainly his -- I believe if you go to his
20   reports, his report is supportive of my
21   opinions in this area.
22       Q.   Did you read his report?
23       A.   I have read it now, but I did
24   not read it before I -- before I formed my
25   opinions in this particular paragraph, yes.

Confidential - Pursuant to Protective Order

Page 338

1    Q.   I'm a little confused because
2  you're citing to his report.
3         You read it or you didn't read
4  it before you wrote this paragraph?
5    A.   I read it before I wrote the
6  paragraph.  I didn't read it before I had
7  formed the opinion.  Do you understand what
8  I'm saying?
9         I did my review of the irritant
10 chemicals independently before I looked at
11 Dr. Cralley's report.  So I had formed the
12 opinion that -- of the chemicals I had
13 searched for that this is what I identified.
14 And that's what this is talking about, right?
15        I'm saying here that of the
16 more than 100 chemicals included, over
17 70 percent are compounds linked with some
18 level of irritant hazard.  That was done on
19 my own.
20        Then, if you go to look at
21 Dr. Cralley's report, I cite it here because
22 it's consistent.  That is, his report
23 provides support additionally for the
24 statement I'm making.
25        So I'm not relying on his

Page 339

1  conclusions to make my opinion, but it's
2  certainly -- I am citing it here as it being
3  a piece of evidence that is consistent with
4  my opinions.
5    Q.   Sorry, I seem to have messed up
6  my microphone.  I'll try to hold it for a
7  little bit then.
8         Do you disagree with
9  Dr. Cralley's report?
10   A.   I have not formed an opinion
11 that I agree or disagree.  He -- with his --
12 I believe he has information that is
13 consistent with the opinion I'm expressing in
14 the sentence, however.
15   Q.   And do you know that
16 Dr. Cralley repeatedly cites to the CIR as an
17 authoritative source regarding cosmetic
18 ingredients?
19   A.   I don't know that he uses that
20 exact language, but he does cite to it, yes,
21 in his report.  Certainly he does.
22   Q.   More than 20 times, right?
23   A.   That, I have not counted.  I
24 can't tell you that.  But he does, just like
25 I do, as a source of information when there

Page 340

1  is no other source available.
2    Q.   Okay.  In your report you state
3  that the CIR process is administered
4  independent of the FDA.
5         But the FDA is on the CIR
6  steering committee; is that correct?
7    A.   That is correct.
8    Q.   You don't mention that in your
9  report, although you mention others who were
10 on the CIR steering committee, correct?
11   A.   Yes, there's a paragraph where
12 I talk about others, yes.
13   Q.   But you don't mention that the
14 FDA is on the steering committee?
15   A.   I believe I -- I believe I've
16 been asked that question before, and I said
17 yes, but certainly in this report I don't
18 believe I state that, that is true.
19   Q.   CIR solicits input from the
20 public; is that correct?
21        MS. PARFITT:  Objection.
22        THE WITNESS:  I would say they
23        solicit input from industry, yes.
24 QUESTIONS BY MR. LOCKE:
25   Q.   Well --

Page 341

1    A.   But they -- and they do have a
2  public comment period, which is mainly input
3  from industry.
4         But I agree that they do -- and
5  if what you're referring to is a public
6  comment period, yes, there is that for the
7  documents.
8    Q.   You can go on the website and
9  see what ingredients CIR is going to review,
10 right?
11   A.   Yes, you can.
12   Q.   Have you done that?
13   A.   Yes, I've done it many times
14 before.
15   Q.   Okay.  And did you submit
16 comments on talc in 2012?
17   A.   No, I did not.
18   Q.   Okay.  You could -- the public
19 can submit comments many times during the
20 process of an ingredient review; is that
21 correct?
22   A.   There are different --
23 different stages of the draft document.  Is
24 that what you're asking me?  Yes, that can be
25 done.

86 (Pages 338 to 341)

Confidential - Pursuant to Protective Order

Page 342

1      Q.    Well, even before it's a draft,
2   CIR is soliciting information about the
3   ingredient to include in the initial
4   materials provided to the expert panel; isn't
5   that correct?
6      A.    Technically I believe that is
7   true, but I would disagree that that is
8   something that happens routinely.  But I
9   would agree that -- I would say technically
10  you may be -- that is something that could
11  occur, yes, but that is not the situation,
12  for example, in the case of talc.
13     Q.    Why not?
14     A.    Based upon what I have seen
15  described as how the review was done, and
16  that has to do with the testimony of
17  different -- or different documents that I've
18  reviewed and the testimony of individuals
19  related to this document.
20     Q.    Well, Dr. Cramer could have
21  submitted comments to the CIR regarding talc,
22  couldn't he?
23     MR. MEADOWS:  Objection.
24     MS. PARFITT:  Objection.
25     THE WITNESS:  You'd have to ask

Page 343

1   Dr. Cramer if he was aware that they
2   were reviewing it.  I can't answer
3   that for Dr. Cramer.
4        But if he was aware of it,
5   certainly -- if you're aware of the
6   process going on and the timing of it,
7   certainly you can submit comments.
8   I'm not disagreeing with you on that.
9   That is true.
10  QUESTIONS BY MR. LOCKE:
11     Q.    CIR publishes in advance what
12  it's going to review; isn't that correct?
13     A.    What is coming up for review?
14     Q.    Yes.
15     A.    Yes, things that are proposed
16  for the next meeting, yes, that's true.
17     Q.    And you could submit comments
18  to the first draft of the CIR report; isn't
19  that correct?
20     A.    I would agree that that is
21  possible to happen, yes.
22     Q.    And you can submit comments
23  before the final report is drafted, correct?
24     A.    Yes, as long as it's still in
25  draft form, yes, those comments can be

Page 344

1   submitted.
2      Q.    And CIR meetings are open to
3   the public, right?
4      A.    That is true, they are open to
5   the public, but in my experience it -- they
6   are not meetings that are heavily attended by
7   the public but indeed are -- tend to be
8   meetings attended by industry stakeholders
9   within the ingredients that are being
10  reviewed.
11     Q.    You know Mr. Steinberg here.
12  He was a plaintiff's expert for a while?
13     A.    I don't know him personally,
14  but I know his name and I know he was a
15  plaintiff's expert, yes.
16     Q.    You know he attended the talc
17  meeting, right?
18     A.    Yes, I believe he was working
19  with indus -- he works with industry, so I
20  believe indeed he did attend that meeting.
21     Q.    You're not claiming he was
22  working with any industry member regarding
23  talc, are you?
24     A.    That's not what I stated.  I
25  know he's a consultant to the cosmetic

Page 345

1   industry, so it doesn't surprise me.  And I
2   believe he lives in the area, so it doesn't
3   surprise me that he attended.
4        I haven't spoken to him about
5   any of that, though, so I have no specific
6   details of that.
7      Q.    Transcripts of the meeting are
8   available to the public, right?
9      A.    You can download the
10  transcripts, yes.
11     Q.    They're on the website?
12     A.    That's what I said.  You can
13  download.  I'm sorry.
14     Q.    Okay.
15     A.    Yes, you can download them from
16  the website.
17     Q.    Did you submit comments to the
18  CIR regarding talc?
19     A.    No, I did not.
20     Q.    Why not?
21     A.    I wasn't aware of the process
22  that was going on in the draft form at the
23  time.
24     Q.    Why is that?
25     A.    I was not following the CIR for

87 (Pages 342 to 345)

Page 346

1    talc at that particular time.  I have a lot
2    of other clients and a lot of other issues
3    that go on on a routine basis, and I -- I
4    literally would not have time to follow every
5    assessment they do, considering that they do
6    thousands of chemicals.
7        Q.    Did you know of the CIR prior
8    to your retention by plaintiff's counsel?
9        A.    Yes.  In fact, I -- one of the
10   journals that I receive, International
11   Journal of Toxicology, maybe, publishes many
12   of their safety assessments.  So I certainly
13   am, yes.
14           I was aware -- when I was at
15   Eviron, I was aware of the existence of CIR.
16       Q.    Have you ever provided prior to
17   this litigation -- and by "this litigation" I
18   mean any aspect of the talc litigation -- an
19   expert opinion on cosmetics' ingredients?
20       A.    You're asking me in any other
21   litigation on a cosmetic ingredient?
22           I'm thinking back to the cases
23   I've worked on.  Not as a -- not as a
24   testifying expert.
25           At Eviron, though, we worked on

Page 347

1    litigation involving cosmetic ingredients,
2    thought I was not the testifying expert.
3        Q.    In your report you talk about
4    the percentage of -- or the number of
5    ingredients that the CIR listed as unsafe.
6           Do you recall that?
7        A.    Yes.  I mean, if you want me to
8    verify the number, I need to go there.  But,
9    yes.
10       Q.    You don't mention that CIR has
11   put limitations on approximately 50 percent
12   of the ingredients that it has reviewed, do
13   you?
14       A.    I don't mention that, but they
15   do.  They have -- they have -- when they have
16   a statement about safety, they will -- they
17   will often talk about the limitations from
18   the safe use based on either concentration or
19   even maybe route of exposure, that is true.
20       Q.    Why don't you do that?  Why
21   didn't you include that in your report?
22       A.    No particular reason.  I mean,
23   the point I'm trying to make is really the
24   workload that's going on here and the
25   impossibility of the task of providing the

Page 348

1    same level of review of any of these
2    ingredients as can be provided -- as was
3    provided by the IARC.
4           And so, again, that's one of
5    the comparisons I'm doing.  I'm talking about
6    the difference in the time, the effort, the
7    difference in the independence of the
8    reviews.  And so that -- when I'm talking
9    about, those numbers, that's what I'm
10   focusing on.  I'm focusing on the fact that
11   you have so many reviews in a very short
12   period of time, with a one-expert panel, it's
13   impossible for that level of analysis and
14   review to be anywhere near what IARC panels
15   do, and also nowhere near the level of review
16   that I have done based on the number of
17   documents that I have analyzed and looked at.
18   So it's a different type of review.
19       Q.    Let me ask you a few questions
20   because you have criticized the panel.
21           You would agree with that,
22   correct?
23       A.    Yes.  Oh, absolutely.  This
24   particular analysis I have.  I have made some
25   general criticisms of the overall process,

Page 349

1    and then I made some specific criticisms of
2    this particular review.
3        Q.    And one of your criticisms is
4    that the CIR -- I think you said two CIR
5    expert panelists had conflicts of interest;
6    is that correct?
7        A.    Yes, that -- they did, that
8    were not -- that were not -- I believe not
9    understood even by Dr. Andersen at that time.
10   I think these are things brought up to him
11   that he was not aware of.
12       Q.    All right.  Now, you read his
13   testimony in one of the trials in California,
14   right?
15       A.    Yes, that's the -- in fact,
16   that's the source of the information where
17   I'm citing to those names of those
18   individuals.  I think I refer to that, his
19   trial testimony.
20       Q.    And didn't he, though, say,
21   well, he didn't view it as a conflict of
22   interest because the money wasn't going to
23   them personally, it was going to their
24   organizations?
25       A.    He did make that statement,

Confidential - Pursuant to Protective Order

Page 350

1    yes.
2         Q.    And you disagree with that
3    statement?
4         A.    I don't -- I mean, his
5    testimony is what it is.
6              Are you asking me do I disagree
7    that that's a conflict of interest?
8              I disagree that you shouldn't
9    disclose that as a potential conflict in the
10   documents that are produced, just like I do
11   when I write an article and I disclose that
12   I've had funding.  I don't say what the
13   funding specifically paid for, but I've had
14   funding or support from this industry
15   individual or that industry individual.
16   It's -- it's something that just is about
17   transparency.
18        Q.    So when you write articles, you
19   say that you've been paid a lot of money by
20   plaintiffs' lawyers?
21            MR. MEADOWS:  Objection.
22            MS. PARFITT:  Objection.
23            THE WITNESS:  Well, I haven't
24        written an article that overlaps with
25        an issue that I've addressed in

Page 351

1         plaintiffs' litigation, but I
2    certainly have given my conflict of
3    interest statements that relate to the
4    issue in the article.
5              I do that -- I've done that
6    with -- on my work -- several of my --
7    several of my assessments talking
8    about risks of pesticides.  I've done
9    it with the work that I've done that
10   that's been sort of, I guess,
11   policy-type work on behalf of the
12   American Chemistry Council.
13             So absolutely I do.
14   QUESTIONS BY MR. LOCKE:
15        Q.    Okay.  You don't think it's
16   relevant that you receive 50 percent of your
17   money solely from plaintiffs' products
18   liability lawyers?
19            MR. MEADOWS:  Objection.
20            MS. PARFITT:  Objection.  Form.
21            THE WITNESS:  If it has nothing
22        to do with the issue that I'm
23        addressing in the paper, no, I do not
24        think that.
25             But when you're accepting money

Page 352

1    from an industry or a company that has
2    to do with the issue you're looking
3    at, yes, a conflict -- a conflict of
4    interest absolutely needs to be
5    described.
6    QUESTIONS BY MR. LOCKE:
7         Q.    And that would -- well, let me
8    just ask you:  You're not an ethicist, are
9    you?
10        A.    No, I'm not trained as an
11   ethicist.
12        Q.    And you're not a lawyer, are
13   you?
14        A.    Well, no, but I have passed the
15   patent bar, but I'm not trained as a lawyer.
16        Q.    That doesn't make you an
17   ethicist, right?
18        A.    No, it does not.
19        Q.    Okay.  Let's talk about one of
20   the people you criticized, Dr. Wilma
21   Bergfeld.
22             Did you know she was the first
23   woman who was the president -- to be the
24   president of the American Academy of
25   Dermatology?

Page 353

1         A.    No, I don't know her
2    personally, so, no, I did not know that.
3         Q.    Did you investigate her at all
4    when you criticized her?
5         A.    I wasn't criticizing her, I was
6    criticizing the CIR process for failing to
7    disclose the conflicts of interest of
8    individuals that were involved in their
9    assessment.
10             I certainly am not giving
11   personal criticism to either of those
12   individuals.
13        Q.    You would agree that the
14   American Academy of Dermatology is a
15   reputable organization?
16        A.    I haven't formed an opinion one
17   way or the other; however, I'm aware of them,
18   and certainly I know individuals that are
19   members of it, yes.
20        Q.    Are those individuals reputable
21   people?
22            MS. PARFITT:  Objection.
23            THE WITNESS:  They are people
24        that practice medicine that certainly
25        I would go see.  I mean, you're asking

89 (Pages 350 to 353)

Confidential - Pursuant to Protective Order

Page 354

1     me if I formed a very specific opinion
2     about them as individuals, and I
3     haven't done that.
4     QUESTIONS BY MR. LOCKE:
5         Q.   Do you have any reason to
6     believe that the American Academy of
7     Dermatology is disreputable?
8         A.   No.  Again, I haven't formed an
9     opinion one way or the other.  I'm aware of
10    the organization, and it certainly is one
11    that is -- has within its members a number of
12    people that I know that practice in
13    dermatology.
14        Q.   Did you know that Dr. Bergfeld
15    was the first woman to be president of the
16    Cleveland Academy of Medicine?
17        A.   To the what?  What was the
18    first word?
19        Q.   Cleveland Academy of Medicine?
20        A.   No.  Again, I'm not aware of
21    her CV specifically, other than what may have
22    been discussed -- it's possible her -- I know
23    her affiliation will be listed in some of the
24    documents as to where she is today, but I do
25    not know her CV and her history.

Page 355

1         Q.   Are you aware that she was the
2     first president -- or she was a president of
3     the American Society of Dermatopathology?
4         A.   No.  Same thing.  If I'm not
5     aware of her CV, I wouldn't know that.
6         Q.   How about that she was the
7     former chair to the FDA's drug -- FDA's
8     Dermatology and Ophthalmology Advisory
9     Committee?
10        A.   Same answer.  I don't know her
11    CV, so I have no knowledge.
12        Q.   Is it your opinion that
13    Dr. Bergfeld was not qualified to chair the
14    CIR panel that considered talc?
15        A.   I don't think I formed that
16    specific opinion.  Instead, what I have --
17    the opinions I formed relate to the overall
18    makeup of the panel that failed to include
19    individuals with expertise that were -- that
20    are really key to assessing the safety of
21    talc.  And that had to do with the issues of,
22    as I discuss it, epidemiology -- oh, I'm
23    sorry, I think I need to put this back --
24    period -- sorry.  In the area of epidemiology
25    is one that I talked about it specifically,

Page 356

1     and also gynecological -- gynecological
2     sciences on the issue of migration.
3         Q.   You're not a epidemiologist,
4     are you?
5         A.   Not by training.  It's a tool I
6     use all the time, but I'm not an
7     epidemiologist by training.
8         Q.   And panel members on the CIR,
9     they might have used the same tool that
10    you're using to form your opinion about talc,
11    correct?
12            MR. MEADOWS:  Objection.
13            THE WITNESS:  Based on what
14    I've reviewed from the minutes and the
15    write-up, I would disagree that that
16    is -- they have done -- they've used
17    the tools in the same way I have.  I
18    disagree with that.
19    QUESTIONS BY MR. LOCKE:
20        Q.   No, but I'm saying their
21    epidemiology could be the same background
22    that you have.  You haven't reviewed who they
23    are, so you really don't really know.
24            MR. MEADOWS:  Objection.
25            THE WITNESS:  Well, I do

Page 357

1     know -- I do know Dr. Klaassen, who I
2     believe was on the panel as a
3     toxicologist.  He is not somebody
4     that -- he is not somebody that I
5     understand does a significant amount
6     of evaluation in risk assessment for
7     epidemiological studies.  He has done
8     some of that, yes, I agree, but it's
9     different training than mine.
10    QUESTIONS BY MR. LOCKE:
11        Q.   You're better qualified than he
12    is?
13        A.   No, that's not what I'm saying.
14    I'm saying it's different background.
15            The question that I heard you
16    ask me, I believe, was directed towards the
17    differences in my background versus somebody
18    else's.
19            And I'm saying that I'm not
20    aware that he has the same background I do,
21    but there is not -- there was not somebody on
22    the panel that had specific expertise and
23    analysis of epidemiological studies as an
24    epidemiologist.  And I think that's important
25    in this case where you're analyzing in a

90 (Pages 354 to 357)

Confidential - Pursuant to Protective Order

Page 358

1  causation analysis a wide variety of studies.
2  So I do think it's important.
3      Q.   You're not a gynecological
4  oncologist, are you?
5      A.   No, I'm not. But again, that
6  would have been an important expertise to
7  have on the panel when --
8      Q.   And yet you formed your opinion
9  with --
10         MR. MEADOWS: Hold on.
11         MR. LOCKE: No. No. Go ahead.
12         You can ask follow-up questions
13  if you want.
14         MR. MEADOWS: You're
15  interrupting her.
16         MR. LOCKE: Well, I've got a
17  limited amount of time, and I've got
18  to keep moving.
19         MR. MEADOWS: Well --
20         MR. LOCKE: They're very long
21  answers to questions that I'm not
22  asking. So I -- you follow up if you
23  would like with your questions, but I
24  got to keep moving.
25         MR. MEADOWS: Well, I'm sorry,

Page 359

1  but you're not going to be allowed to
2  interrupt her.
3         MR. LOCKE: Okay. Then we'll
4  go longer. If she's going to answer
5  questions I'm not asking, then I need
6  to go -- I need to be able to go
7  longer.
8         MR. MEADOWS: You're not going
9  to be allowed to interrupt her.
10         That's just the bottom line.
11  QUESTIONS BY MR. LOCKE:
12      Q.   You're not a gynecological
13  oncologist, right?
14      A.   I'm not trained as a
15  gynecologic oncologist, that is true.
16      Q.   You're not a medical doctor,
17  correct?
18      A.   I am not a physician, that is
19  correct.
20      Q.   Let's talk about the citizens
21  petition.
22         The FDA frequently seeks
23  scientific information from cosmetic
24  manufacturers; is that correct?
25      A.   First part of the question?

Page 360

1  I'm sorry.
2      Q.   The FDA frequently seeks
3  information, scientific information, from
4  cosmetic manufacturers; is that correct?
5      A.   I don't understand what you
6  mean by "frequently seeks." They rely on
7  cosmetic manufacturers to do their own safety
8  assessments.
9         Is that what you're referring
10  to?
11      Q.   Well, they ask PCPC to comment
12  on scientific issues, correct?
13      A.   Yes, I would agree that that
14  interaction has happened, but that's not
15  where the responsibility lies. But I agree,
16  they have.
17      Q.   I'm not asking about
18  responsibility. I'm asking: Has the FDA
19  asked cosmetic manufacturers for scientific
20  information?
21      A.   Yes, they have in this case. I
22  discuss some of that, yes.
23      Q.   And they do that frequently,
24  right? Not just in this case, but generally?
25      A.   I can't answer that for all

Page 361

1  situations. I have seen it happen before,
2  yes.
3      Q.   The FDA asked, for example, for
4  then CTFA to cosponsor the 1994 workshop on
5  talc, correct?
6      A.   Yes, they did.
7      Q.   The FDA knew that the report
8  prepared by Dr. Huncharek and Dr. Muscat was
9  based on PCPC's retention of those
10  consultants, correct?
11      A.   So what are you -- what time
12  period are you talking about?
13      Q.   Well, now, there was only one
14  time that Drs. Huncharek and Muscat submitted
15  a report to the FDA regarding talc, correct?
16      A.   So I need to look to confirm
17  that. Which time period are you talking
18  about?
19      Q.   2009. Citizens petition.
20      A.   Oh, that is true. In the
21  citizens petition, that is true, yes. But
22  I -- but...
23      Q.   I mean, it says in the letter,
24  "We're submitting a report written by Drs.
25  Huncharek and Muscat," correct?

91 (Pages 358 to 361)

Confidential - Pursuant to Protective Order

Page 362

1      A.   In the cover letter from the
2  CRE?
3      Q.   From -- not CRE, from PCPC.
4      A.   Okay.  So let -- I need to -- I
5  need to refresh my memory on the way the
6  submissions were made.  I apologize.
7           Do you remember which paragraph
8  that you're referring to?
9      Q.   Well, it's throughout your
10  report you're talking about the citizens
11  petition.
12     A.   So it's my recollection, based
13  upon the documents that I have seen, that it
14  was not a transparent process at all times
15  that Drs. Huncharek and Muscat were being
16  identified as independent consultants and
17  were not ones that were being actually paid
18  by the industry for some of the work that
19  they did.  And I think that's discussed in my
20  report.
21     Q.   Well, let's break that down.
22     A.   If you want me to confirm the
23  issue of the 2009 -- if you will point me to
24  where you say I discuss this, I will confirm
25  that or not.

Page 363

1      Q.   Well, let me break it down.
2           Citizens petition submitted in
3  2008, right?
4      A.   Well, there were two:  one in
5  1994 and another -- I'm sorry, 1992, and
6  another in 2008.
7      Q.   Well, there are actually
8  several more than that, but let's just focus
9  on the 2008.
10          In 2008, a citizens petition
11  was submitted?
12     A.   Yes, that is true.
13     Q.   And PCPC responded to that
14  citizens petition in 2009, correct?
15     A.   They submitted answers.  Is
16  that what you're asking me?  Yes, they did.
17     Q.   Yes.
18          And that was a cover letter,
19  correct?
20     A.   A cover letter -- that's all it
21  was was a cover letter?
22     Q.   Well, attached to the cover
23  letter was a report from Drs. Huncharek and
24  Muscat?
25     A.   Yes, that is true.

Page 364

1      Q.   And you're not aware of any
2  other document indicating that PCPC ever
3  hired Drs. Huncharek or Muscat?
4      A.   So that's where I'll need to go
5  back and look at the documents, because --
6  that I have discussed.  So I need to find
7  that on my paragraph.
8           If you want to go off the
9  record for a minute so I don't waste your
10  time, I will look.
11     Q.   Sure.
12     A.   It's up to you.  Or we can stay
13  on the record.
14          MR. LOCKE:  I'm fine going off.
15          VIDEOGRAPHER:  We are going off
16      the record at 4:23 p.m.
17      (Off the record at 4:23 p.m.)
18          VIDEOGRAPHER:  We are back on
19      the record at 4:25 p.m.
20  QUESTIONS BY MR. LOCKE:
21     Q.   The question I asked:  Are you
22  aware of any other document indicating that
23  PCPC ever hired Dr. Huncharek and Muscat
24  other than for the 2009 response or
25  submission to the citizens petition?

Page 365

1      A.   I would have to pull this
2  document, but in paragraph 90 I make a
3  statement:  A 2005 response written by
4  Dr. Muscat says -- this is not '09, this is
5  2005, and Dr. Huncharek critiqued the work of
6  Dr. Cramer, who also failed to disclose the
7  financial relation -- I'll start over.
8           Okay.  So I'm sorry to repeat
9  myself, but there was a little noise.
10          You asked 2009.  So the other
11  time period I have in my report in
12  paragraph 90 talks about 2005, but I'd have
13  to pull this document.
14          But I am citing to the
15  deposition of Dr. Loretz, who was a PCPC
16  employee, so I think I would need to pull
17  this in order to confirm.
18          But I see depositions of her
19  and Dr. Nicholson as talking about them
20  failing to disclose the financial
21  relationship between their work and industry.
22     Q.   So if Dr. Loretz did not
23  testify that PCPC had retained Drs. Huncharek
24  and Muscat in 2005, you'd have no other
25  evidence?

92 (Pages 362 to 365)

Confidential - Pursuant to Protective Order

Page 366

1     A.    I can't answer that
2  definitively, but this is what I would point
3  you to.  So I'd have to pull these documents
4  to confirm, but I have -- both paragraphs 89
5  and 90 address these general issues for you,
6  but I think that's the sentence and the
7  documents that I think would be relevant.
8  But I'd have to pull them to fully answer
9  your question.
10    Q.    The reason I ask the question
11 is because you frequently say "the cosmetics
12 industry" without identifying a party or a
13 person.  And -- well, I'll just leave it at
14 that.
15    A.    And I guess the reason I'm
16 saying I need to -- I'm questioning that it
17 doesn't have to do with PCPC is because I am
18 citing to a deposition of their employee.  So
19 I need to -- I would -- to affirm it, though,
20 I'd need to -- I don't want to say that
21 100 percent the answer to your question is
22 this is the evidence, but I believe that I
23 would need to go here to confirm one way or
24 the other.  But certainly I would -- this
25 raises suspicion about that for me.

Page 367

1     Q.    You have no evidence that PCPC
2  ever retained the Center for Regulatory
3  Effectiveness; is that correct?
4     A.    I believe my evidence is hiring
5  through Imerys, but let me look to make sure
6  that is true.
7     Q.    Why don't you look at page --
8  or I'm sorry, paragraph 95, page 63.
9     A.    That's where I am.  That's
10 where I am, so let me read what I have here
11 because it's been a while since I've read
12 this paragraph.
13       So the question is, do I have
14 in evidence this paragraph that PCPC directly
15 hired the CRE?
16       No, that is not provided by
17 this paragraph.
18    Q.    Okay.
19    A.    However, in this paragraph,
20 based on these documents that I'm seeing and
21 I'm -- my memory of what is discussed,
22 certainly I believe PCPC would have been
23 aware of the interaction of CRE at these time
24 points when I'm talking about this event --
25 these events.

Page 368

1     Q.    What evidence do you have of
2  that?
3     A.    Based upon the close
4  interaction between PCPC, Imerys and Johnson
5  & Johnson these time periods when
6  different actions were being taken to comment
7  or to submit information on behalf of
8  industry.
9     Q.    Do you have a single document
10 you can point to or is that an assumption?
11    A.    That is something I seem to
12 remember based on my review of these
13 documents, but if you need a document, I
14 would have to -- have to go and look for it.
15    Q.    Sitting here today, you can't
16 recall?
17    A.    I can't give you a specific
18 document as I sit here today, no.
19       MR. LOCKE:  I have no further
20 questions.
21       MR. MEADOWS:  Yeah, short
22 break.  Maybe we're done, maybe we're
23 not.
24       VIDEOGRAPHER:  We are going off
25 the record at 4:30 p.m.

Page 369

1       (Off the record at 4:30 p.m.)
2       VIDEOGRAPHER:  We are back on
3  the record at 4:45 p.m.
4       CROSS-EXAMINATION
5  QUESTIONS BY MS. PARFITT:
6     Q.    All right.  Dr. Plunkett, good
7  afternoon.  I know it's been a long day.
8       Dr. Plunkett, you were asked
9  throughout the course of the day about
10 different constituents which are part of the
11 talcum powder products.
12       Do you recall those questions?
13    A.    Yes.
14    Q.    All right.  If -- without going
15 through each and every one of different
16 constituents that we've talked about that are
17 contained or could be contained in the talcum
18 powder products, if they are present, do
19 those various constituents present and
20 provide biologically plausible evidence that
21 talcum powder products can increase the risk
22 of ovarian cancer?
23       MS. BOCKUS:  Object to the
24 form.
25       THE WITNESS:  Yes, which is --

93 (Pages 366 to 369)

Confidential - Pursuant to Protective Order

Page 370

1    I think I have a couple of paragraphs
2    where I talk about that issue.  It has
3    to do -- there's other information as
4    well, but that is a key piece of that
5    information.  And I focused on mode of
6    action and additivity.  That's on
7    mechanism, biologic plausibility.
8          So the fact that you have a
9    variety of constituents that have a
10   known cancer hazard that share a mode
11   of action, that increases your
12   confidence in the biologic
13   plausibility of that relationship
14   between ovarian cancer and exposure to
15   talc body powders, yes.
16         MS. PARFITT:  Thank you.  I
17   have no further questions.  Thank you
18   very much, Dr. Plunkett.  And a happy
19   holiday to you.
20         THE WITNESS:  Thank you.
21         MS. BRANSCOME:  I have no
22   questions.
23         MS. BOCKUS:  No questions.
24         VIDEOGRAPHER:  The time now is
25   4:47 p.m.  This concludes the

Page 371

1    deposition, and we are going off the
2    record.
3    (Deposition concluded at 4:47 p.m.)
4          – – – – – – –

Page 372

1          CERTIFICATE
2
3          I, CARRIE A. CAMPBELL, Registered
   Diplomate Reporter, Certified Realtime
4    Reporter and Certified Shorthand Reporter, do
   hereby certify that prior to the commencement
5    of the examination, Laura Plunkett, Ph.D.,
   DABT was duly sworn by me to testify to the
6    truth, the whole truth and nothing but the
   truth.
7
          I DO FURTHER CERTIFY that the
8    foregoing is a verbatim transcript of the
   testimony as taken stenographically by and
9    before me at the time, place and on the date
   hereinbefore set forth, to the best of my
10   ability.
11         I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney
12   nor counsel of any of the parties to this
   action, and that I am neither a relative nor
13   employee of such attorney or counsel, and
   that I am not financially interested in the
14   action.
15
16
17   _____
     CARRIE A. CAMPBELL,
18   NCRA Registered Diplomate Reporter
     Certified Realtime Reporter
19   California Certified Shorthand
     Reporter #13921
20   Missouri Certified Court Reporter #859
     Illinois Certified Shorthand Reporter
21   #084-004229
     Texas Certified Shorthand Reporter #9328
22   Kansas Certified Court Reporter #1715
     Notary Public
23
     Dated:  12/20/18
24
25

Page 373

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4    carefully and make any necessary corrections.
5    You should state the reason in the
6    appropriate space on the errata sheet for any
7    corrections that are made.
8          After doing so, please sign the
9    errata sheet and date it.  You are signing
10   same subject to the changes you have noted on
11   the errata sheet, which will be attached to
12   your deposition.
13         It is imperative that you return
14   the original errata sheet to the deposing
15   attorney within thirty (30) days of receipt
16   of the deposition transcript by you.  If you
17   fail to do so, the deposition transcript may
18   be deemed to be accurate and may be used in
19   court.
20
21
22
23
24
25

94 (Pages 370 to 373)

Confidential - Pursuant to Protective Order

---

Page 374

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
 3
 4         I,_____, do
      hereby certify that I have read the foregoing
 5    pages and that the same is a correct
      transcription of the answers given by me to
 6    the questions therein propounded, except for
      the corrections or changes in form or
 7    substance, if any, noted in the attached
      Errata Sheet.
 8
 9
10
11
12
      _____
      Laura Plunkett, Ph.D., DABT       DATE
13
14
15    Subscribed and sworn to before me this
16    _____ day of _____, 20 _____.
17    My commission expires: _____
18
19    Notary Public
20
21
22
23
24
25
```

---

Page 376

```
 1          _ _ _ _ _ _ _
          LAWYER'S NOTES
 2          _ _ _ _ _ _ _
 3    PAGE  LINE
 4    ____  ____  _____
 5    ____  ____  _____
 6    ____  ____  _____
 7    ____  ____  _____
 8    ____  ____  _____
 9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24    ____  ____  _____
25
```

---

Page 375

```
 1          _ _ _ _ _ _ _
             ERRATA
 2          _ _ _ _ _ _ _
 3    PAGE  LINE  CHANGE/REASON
 4    ____  ____  _____
 5    ____  ____  _____
 6    ____  ____  _____
 7    ____  ____  _____
 8    ____  ____  _____
 9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24    ____  ____  _____
25
```

Confidential - Pursuant to Protective Order

**A**

**a.m** 1:15 6:7
25:10,11,13
94:23,24 95:1
99:22,23,25
**abbreviation**
108:4
**ability** 46:12
64:23 70:5,10
72:10 185:5
210:13 213:20
223:7,10
254:11 273:23
277:7 278:22
372:10
**able** 39:8 42:15
51:17 61:3
70:22 92:23
123:19 125:6
158:23 172:18
172:22 196:1
225:1,10 226:5
231:13 235:23
239:5 265:23
282:15 291:25
292:3 301:16
305:24 359:6
**absence** 261:9
**absolutely** 60:18
72:6,24 171:9
204:23 213:10
223:12 232:4
247:6,21 293:7
294:14 299:15
304:22 305:3
314:2 320:3
325:23 333:17
334:22 348:23
351:13 352:4
**abstract** 314:2
**abstracts** 313:18
313:22 315:1
**Academy**
352:24 353:14
354:6,16,19
**acceptability**

311:10
**acceptable**
119:25 311:22
**accepted** 78:15
98:13 297:8
**accepting**
351:25
**access** 57:13
121:17 123:18
144:11 163:12
164:13 246:7
246:12
**accessibility**
264:24
**account** 95:17
100:5 131:12
131:19,22
228:14 243:24
246:18
**accumulated**
30:8
**accurate** 66:13
66:15 315:25
316:6 322:22
373:18
**acknowledge**
105:18
**ACKNOWLE...**
374:1
**ACOG** 192:3
**act** 265:24
**action** 268:10
275:23 278:6,6
289:8 292:25
295:5 370:6,11
372:12,14
**actions** 368:6
**active** 27:12
246:22
**activities** 31:6
**activity** 317:23
**actual** 26:1 66:2
103:13 108:23
121:18 166:22
170:15 277:21
288:15,16
**acute** 126:5

128:12,13,16
178:9 179:14
179:21 242:19
**add** 21:2 53:19
228:21
**added** 47:10
54:14 68:1
122:6 146:13
211:25 228:19
308:23
**addition** 53:15
123:14 215:1
270:3
**additional** 10:3
10:7 17:20
20:22 21:2,6
21:10,12,14,18
21:20 27:5
32:12 33:14
55:14 68:15,16
81:12 82:15
94:7 97:14
146:17 301:20
331:8
**additionally**
338:23
**additive** 275:25
278:3 289:10
289:18 291:6
292:14
**additivity**
146:14 167:3
225:6 278:7
289:5 293:2
370:6
**address** 29:5
30:20 73:23
78:5 134:17
179:2 182:24
217:10 220:11
244:12 329:22
366:5
**addressed** 97:10
275:2 287:24
350:25
**addresses**
103:17 105:4

108:7 292:23
296:2
**addressing**
130:25 193:14
351:23
**adds** 168:19
**adequate** 112:14
112:18
**administered**
340:3
**administration**
242:14
**admit** 134:24
**admitting**
134:24
**adopted** 213:12
**advance** 122:5
343:11
**adverse** 128:2
139:4 140:16
140:20 236:12
242:15,22
294:10
**advertising** 44:8
**advice** 44:13
45:10,12,25
46:2,5,8,13
202:20 334:9
**advise** 45:17
297:15
**advising** 45:13
**Advisory** 355:8
**affect** 72:10 99:3
125:25 128:1
150:7 168:18
**affiliated** 26:9
**affiliation** 245:7
354:23
**affiliations**
245:2
**affirm** 366:19
**afternoon** 19:5
201:2,4 287:16
369:7
**age** 7:21
**agencies** 244:4
269:6 290:13

**agency** 43:18,22
284:3
**agent** 38:15,17
39:20 220:25
221:3 234:22
264:6
**ago** 28:25 288:9
**agree** 45:21 59:5
73:13 78:9
81:25 91:20
106:20 135:24
142:24 152:2
154:13 157:2
159:2,8 173:15
175:2,8 179:7
179:13,15
180:2,4 181:3
195:1,8 198:6
203:5 207:16
210:5 213:4,11
214:12 227:3
228:13,24
232:18 233:23
234:20 238:8
241:11,24
254:17 264:4
264:13,15
270:16 279:9
287:25 293:25
294:7,14,23
295:1,9,20
307:20 308:3
309:9 311:1,6
318:5 319:16
319:21 320:2,6
324:15 332:21
333:12 336:8
339:11 341:4
342:9 343:20
348:21 353:13
357:8 360:13
360:15
**ahead** 13:5,13
13:15 358:11
**air** 177:14,16
**al** 4:20
**Alabama** 2:6

Confidential - Pursuant to Protective Order

**Alexandria** 2:10
**align** 194:24
    195:24
**allege** 275:11
**alleged** 126:21
**Allen** 2:2 3:18
**allow** 82:18
    144:3 158:9
    172:6 182:13
    185:23 229:17
    230:3 232:8
    237:12 240:9
    240:13 300:18
**allowable**
    311:14
**allowed** 328:19
    359:1,9
**allows** 36:6 41:6
    176:17
**alternative**
    202:25
**America** 3:5
**American** 247:9
    351:12 352:24
    353:14 354:6
    355:3
**amount** 298:11
    299:2 300:14
    306:5 310:19
    357:5 358:17
**amounts** 129:11
    178:5,7,21
    227:2 311:4
**amphibole**
    255:4
**analyses** 257:20
    311:20
**analysis** 8:10
    31:24 34:7
    35:4,6,15,16
    36:22 38:4,12
    41:18 70:25
    71:9,14,21
    72:4 74:15,17
    74:19 75:2,10
    90:10 91:21
    93:14 95:5

96:4 113:17
114:12 116:25
117:25 119:15
124:5 131:12
131:16 137:4,7
139:12 143:1,4
143:9,10 144:3
144:8,14 161:5
161:24 162:4
162:22,23
163:8 164:16
165:20 176:9
176:10,20
177:1,1 185:16
201:17 203:12
203:17 205:2
207:4 209:14
210:2,10,25
215:8,18,22
217:24 218:2,5
218:18,25
219:13 234:22
235:4,5,7
244:24 246:8
247:21 248:16
248:23 255:22
259:4 263:17
265:18 266:7
271:25 275:13
275:19 277:13
310:16 311:23
313:12 325:16
325:18 326:19
329:22 331:4
331:20,22
332:2 333:5,6
333:7,10,13,14
348:13,24
357:23 358:1
**analyze** 36:23
**analyzed** 138:2
250:24 251:5
266:11 348:17
**analyzing**
141:14 154:16
217:21 261:7
357:25

**anatomy** 216:13
    302:14
**and/or** 128:2
    277:9
**Andersen** 349:9
**Anderson** 250:3
**Angeles** 2:23
**animal** 36:14
    37:15 68:5
    69:13 71:25
    88:4,14 101:10
    101:16,25
    104:5 115:4
    117:9 118:6,9
    142:6 156:16
    172:18 182:11
    205:24 207:5
    207:19 208:5
    208:16 217:1,6
    218:3,11,11
    219:7 224:1,2
    229:2 230:17
    230:22 231:17
    231:20,23
    232:5,12
    237:20 238:22
    238:22,23
    240:7,9,12
    241:13 280:5
    291:17
**animals** 101:12
    101:18 220:11
    220:12 231:9
    232:16 242:15
    270:6,20 271:1
    271:8,10
    279:24 291:21
**answer** 24:16,18
    24:22 25:1
    37:6 40:20
    42:16 50:21
    51:9 56:3 60:4
    68:13 78:6
    83:8 88:25
    92:23 93:20,23
    94:15,17 96:25
    112:3 136:5

139:19 140:5
141:4 146:23
159:22 192:10
193:24 210:14
217:16 218:16
222:12 226:1
229:17 232:7
250:16 263:17
273:16,20
288:4,8 300:22
308:18 309:6
318:19 343:2
355:10 359:4
360:25 366:1,8
366:21
**answered** 45:2
    90:14 93:19
    139:9 141:8
    237:7 261:2
**answering**
    134:18
**answers** 88:22
    232:6 358:21
    374:5
**anthophyllite**
    254:1
**anticipate**
    176:23
**Antonio** 3:4
**anybody** 45:15
    84:12 160:25
    242:2 302:12
    302:12
**apart** 76:14
**apologize** 11:15
    64:8 105:10
    201:13 251:12
    298:14 313:15
    319:8,10 323:6
    327:24 330:6
    362:6
**app** 185:18
**apparent** 223:6
**appear** 28:5
    68:3 303:1
    315:7
**APPEARAN...**

4:3
**appears** 65:19
    172:10
**appendix** 63:22
    63:22 337:12
**apples** 120:8
**applicable**
    212:21
**application**
    36:17 37:3
    64:24 67:10,16
    175:13 177:17
    181:20 184:12
    184:20 185:19
    186:8 203:22
    212:22 214:15
    264:1 296:21
    296:22 297:11
    299:1,9 300:11
    300:16
**applications** 5:1
    200:10 211:12
    295:24 300:12
**applied** 92:21
    99:8 149:12
    173:16 183:3
    186:7 258:24
    299:5 302:15
**applies** 41:17
    91:10,13
    298:18
**apply** 38:25 40:1
    90:10 160:21
    207:18 214:3
    278:7
**applying** 259:1
    301:2,9
**approach** 79:11
    205:21 212:23
    214:16 218:18
**appropriate**
    30:11 45:18
    47:5,16,25
    48:20 49:9
    50:2,19 51:20
    52:19 373:6
**appropriately**

Confidential - Pursuant to Protective Order

239:15
approval 186:4
298:1
approximately
347:11
approximation
69:4
area 30:14 35:12
54:24 59:21
61:16,16 62:4
131:1 262:14
281:5 298:19
334:7 337:21
345:2 355:24
areas 54:15
56:22,22 58:13
58:14,15 61:21
61:24 81:17
94:7 336:1
argue 182:5
224:12 225:25
327:10
argument
188:19
arising 181:1
Arlon 250:4
Arndt 3:20 6:3
arrived 12:10
arsenic 267:1
268:23
article 26:7
27:10 60:10
63:4 68:19
69:4,12 99:4
135:21 251:17
313:25 350:11
350:24 351:4
articles 25:23
26:1,4 27:6,22
59:12,15,24
60:20 61:6,18
62:16 63:11,18
64:2 68:15,16
71:23 83:9
87:13 98:11,11
100:14 103:21
121:20 122:19

122:21 124:4
133:9 137:4
184:2 249:25
250:12,24
286:18 350:18
articulated
202:8
asbestiform
147:1,2,15
148:24 149:17
151:6 161:12
161:22 162:13
asbestos 57:21
146:13 148:3,3
148:5,11,11
162:14 163:17
197:3 221:14
224:16,17,22
226:15,18
248:10 249:16
249:21 250:9
251:9,10
252:14 253:17
253:18,23
254:3,9,20
255:3,5,8,12
255:15,17,23
256:4,12,21
257:6,16 258:6
258:10,18,19
259:4 260:1,11
260:12,20,23
261:9 262:7,10
262:11,23
285:4,5,8,16
286:3,9
asbestos-free
223:20 257:22
258:22 260:16
261:4
asbestos-like
250:10
asbestos-only
226:11 285:10
ASHCRAFT
2:8
aside 11:20

23:24 161:13
180:3 218:25
asked 18:6 29:5
29:19 30:3,6
30:19 31:20
44:7 45:1
50:17 53:17
54:19 55:1,6
62:15,19 82:7
89:1,2 92:9,24
93:4,12 94:6
96:15 154:23
174:6 182:1
201:21,25
237:8 239:6
241:4 273:19
286:14 298:10
322:13 323:4
323:14,17,17
327:9 334:1,6
334:10 340:16
360:19 361:3
364:21 365:10
369:8
asking 23:16
25:17 28:8,11
28:15 39:25
40:2 41:16
48:25 49:3
50:6,7,15,24
71:6,8,11,12
102:9 110:1,3
113:23 134:5
144:2 145:4,5
168:2 176:15
203:14 206:12
210:14 211:1,5
219:5 225:18
229:12 233:8
233:10,11
234:18 235:1
236:25 260:18
271:1 274:20
277:18 284:22
298:16 312:12
315:12 321:11
321:13,15

325:7 326:25
332:11 341:24
346:20 350:6
353:25 358:22
359:5 360:17
360:18 363:16
aspect 256:5
346:18
aspects 34:2
216:19
asphyxiate
178:24
asphyxiation
178:18,20
assays 257:19
assess 52:25
140:2 185:23
235:22 282:6
assessed 256:6
319:24
assessing 35:21
115:4 153:16
209:19 235:25
355:20
assessment 4:22
16:12 17:8
31:5 34:20
35:11,13,24
36:12,14,18,20
36:21 38:3,11
39:3 40:24
49:21 74:11
75:21,22 76:1
76:25 77:1
78:11 79:3,5,6
81:5 82:9
85:22 87:6,22
89:6 99:13
107:3 114:20
115:8,13,17,24
117:19 120:10
120:11 122:1
122:23,25
123:2,5 126:12
127:4,12
135:16 136:6
138:7,19 141:6

141:22 149:10
150:7,22 153:9
153:12 154:24
154:24 155:2
157:16 159:23
165:21 169:23
170:21 171:8,9
171:10 173:7
191:25 193:2
196:24 197:12
197:13,21
198:16,16
199:5,10,25
201:6,14 202:3
203:13 204:5,8
204:11 205:8
205:10,11,13
205:15,23
206:20 210:12
212:20 213:9
214:1,4 216:3
221:16 230:6
234:17 236:2
238:5 244:20
246:17 255:25
268:20 271:12
272:22 275:6
275:20,24
278:8,20 283:3
285:8,22
289:11,14
291:3,4 294:21
294:24 314:12
314:23 320:1
321:24 323:19
324:11,11,16
324:17,20
325:25 326:15
327:20 328:1,6
328:9,22
329:18 330:9
330:19 331:3
331:25 332:14
333:14 334:16
346:5 353:9
357:6
assessment's

Confidential - Pursuant to Protective Order

**assessments**
85:9 99:9
115:21 117:5
149:19 209:7
230:20 273:17
277:4,5 329:10
336:18 346:12
351:7 360:8
**assessor** 143:16
167:6 334:3
**assign** 78:12
82:21 95:24
97:3,6 105:19
106:10,17
210:20,22
**assigned** 79:7
89:3 96:5
134:12 227:8
**assisted** 25:18
25:21
**associated** 47:6
80:3 154:17
157:3 178:15
235:8
**association** 4:19
38:23 112:15
112:17,18,22
119:5 204:1,3
204:17 322:4
326:17
**assume** 89:9
148:10 261:18
275:23 282:9
294:21
**assumed** 285:9
317:4
**assumption**
282:8 368:10
**assurance**
222:14
**assure** 223:10
**attach** 180:14
**attached** 5:3
363:22 373:11
374:7
**attaching**
180:19

**attack** 180:21
**attempt** 88:25
132:9 160:6
161:10,19
171:1 172:12
182:2 187:13
208:20,24
214:20 224:24
250:22
**attempted**
165:13 215:2
219:5 237:18
240:23 243:9
272:5,6 281:7
295:16 316:1
**attempts** 130:15
**attend** 344:20
**attended** 344:6
344:8,16 345:3
**attending** 11:13
**attention** 84:17
212:4 253:6
**attorney** 24:8,14
54:5 372:11,13
373:15
**attorney's** 25:4
53:17
**attorney-client**
23:23
**attorney/client**
54:4
**attorneys** 12:8
12:10 18:13
22:14 23:17
25:16,16 53:24
54:19 116:8
334:24
**attribute** 315:1
**August** 4:15
14:16 20:3,9
267:3
**author** 27:5
105:7 240:2
**author's** 16:14
241:11
**authoritative**
336:12 339:17

**authorities**
66:19 81:22
**authority** 45:9
82:8
**authors** 105:21
105:21 117:19
135:1 207:4
209:1 239:19
240:19,24
245:3
**authorship**
245:15
**automatically**
247:14
**availability**
283:13
**available** 21:11
21:13,15 53:23
54:16 62:2
67:3 73:23
86:17 90:25
115:20 118:2
121:22 138:4
139:1 140:2
141:12 156:23
165:23 170:5
172:6,14
187:24 194:10
194:11 197:15
224:13 235:19
237:11 248:20
251:4 253:11
253:13 260:17
276:16 293:24
316:14 328:10
331:1 337:4,6
340:1 345:8
**average** 302:8
**avoid** 129:10
**avoiding** 202:25
**aware** 68:10
108:1,5,10,11
109:8 120:24
122:10 131:20
136:9 142:14
154:8 177:17
177:19 178:17

187:25 248:14
251:15 261:11
308:9 320:23
320:24 321:3
321:21,25
322:6 343:1,4
343:5 345:21
346:14,15
349:11 353:17
354:9,20 355:1
355:5 357:20
364:1,22
367:23

___

**B**

**baby** 8:11 10:25
19:9 34:12,18
37:2,2 40:12
41:3 80:4
117:2,24 124:7
126:14 133:21
141:1 143:3
144:7,19
150:25 151:4
153:23 155:17
157:4 160:23
161:13 167:19
169:10 170:8
173:20 176:4
176:23 180:5
188:11 198:2
248:1,5 249:11
249:14,22
250:14 251:16
252:12,15
308:19
**back** 15:2,16
17:14 25:12
29:23 32:7
51:11,25 52:3
61:8 63:18
68:20 69:6
74:11 94:25
99:24 118:12
136:14 137:15
137:17,20
146:7 188:6,23

200:24 215:15
246:15 273:16
276:16 280:4
287:6,22 321:6
321:7 346:22
355:23 364:5
364:18 369:2
**background**
157:13 160:4
171:21 172:11
199:13 260:1
286:9 306:25
336:15 356:21
357:14,17,20
**badly** 232:2
**bar** 352:15
**barriers** 232:23
**based** 18:3
20:24 22:10
28:23 29:11
30:22 32:19
36:8,14 39:5
39:11 40:21
41:23 44:18
48:6,11 49:14
50:22 71:15
82:15 83:21
85:8 86:6,19
87:14 92:10
94:18 98:24
105:15 116:5
117:13 118:3,6
121:5 125:6
126:12 140:1
144:7 146:23
150:14 154:1
156:24 169:23
172:16,22
173:16 174:2
182:7,19 185:6
187:22 191:10
194:19 197:22
205:2,24
207:25 208:4
210:12 215:25
217:15,18,25
223:5 225:9

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 101 of 1525 PageID: 62247
Confidential - Pursuant to Protective Order

Page 381

226:21 233:1
245:2,22 247:3
247:17 250:20
257:17 258:7
264:4 269:16
270:25 274:15
293:16 297:8
299:12,17
301:11 302:14
304:25 307:1
309:1 310:15
311:22 315:7
316:13 319:25
320:7,8 324:8
327:10 328:10
330:19,25
334:6,7 342:14
347:18 348:16
356:13 361:9
362:12 367:20
368:3,12
**basic** 35:25
36:18 38:7
79:21 274:6
323:17,18,23
**basing** 49:25
284:15
**basis** 50:18,25
61:11 98:16
150:12 155:5
200:15,15
232:12 258:13
271:16 272:1
280:8 302:3,21
346:3
**Bates** 22:6 58:25
**bathroom** 299:7
**Baylen** 2:14
**bear** 47:4
**Beasley** 2:2 3:18
**Beattie** 2:4 6:22
6:22 18:17
**beauty** 145:7
**becoming**
220:19 223:6
**began** 23:7
31:24 317:8

**beginning**
206:22
**begins** 64:2
**behalf** 7:24 8:6
53:11 246:21
248:4 287:10
322:11 351:11
368:7
**belief** 31:25
71:22
**believe** 10:1
15:25 17:25
18:1 19:15,24
20:12 29:11
31:12 32:8
33:16 39:9
41:1 48:3 62:1
66:14,19 71:16
81:4,16 82:3
83:9 89:23
93:19 95:11
96:19 98:9,17
100:8 105:24
106:1,3 108:21
109:3,12,13
110:15 111:1
119:8 120:8,14
134:17 139:9
141:23 143:15
143:24 157:12
157:23 158:13
158:23 160:18
162:6,9 163:18
163:20 173:6
175:12 181:15
182:1,9,16,25
183:4 185:4
187:21 188:20
189:5,6,14
190:19 191:3
191:10,14,16
192:6,7,23
196:12 197:18
198:19 199:9
200:12 201:22
203:24,25

204:17 206:16
207:24 209:8
212:2 213:7
219:8 222:14
223:3 243:21
244:2 245:21
247:18 248:16
251:18,19
254:23 257:7
257:15 258:7
269:25 271:20
276:15,17,22
278:10 279:3
280:14 281:19
283:7 286:13
288:8 299:11
299:17 300:6,9
300:13 306:20
308:24 314:6
318:23 332:19
335:16 336:24
337:13,19
339:12 340:15
340:15,18
342:6 344:18
344:20 345:2
349:8 354:6
357:2,16
366:22 367:4
367:22
**believed** 122:14
273:13
**bell** 206:5
**beneficiation**
131:13 132:1
**Bergfeld** 352:21
354:14 355:13
**best** 110:20
159:21 372:9
**better** 110:18
228:10,11,12
230:21 357:11
**beyond** 220:14
220:15,22
235:14 327:19
**bias** 245:22
**big** 263:13

**biggest** 182:22
**bill** 10:20 11:24
12:1
**billed** 11:24
**billing** 10:3,7,15
17:18 19:23
20:14,15,17
62:22
**bin** 118:8,9,10
217:9,23
252:24,25,25
254:5,6
**binning** 216:15
216:20,25
217:14
**bins** 118:8 217:2
217:18 281:7
**bioaccessibility**
265:2
**bioaccessible**
264:8,10,13,18
264:21
**bioassay** 232:4
**biocompatibil...**
266:18
**biologic** 34:4
37:13 77:9
88:9 179:8
193:1 194:2,7
194:18 195:9
195:14,16
268:11,11
289:3 314:20
370:7,12
**biological** 106:2
124:14 179:9
188:10,25
189:16 192:14
194:14 195:2
195:12 196:6
219:23 278:12
**biologically**
42:10,11 189:8
191:22 194:2,6
194:24 196:12
221:19 227:18
229:14 277:6

369:20
**biology** 294:17
**biopsies** 186:2
**bit** 31:11 35:21
37:8 38:10
39:16 42:18
53:5 81:18
95:4 165:5
201:5 339:7
**Blejer** 250:4
**blood** 264:12
312:3,21,23
313:3,10
**Blount** 163:4,15
250:2 252:5,11
**Blount's** 162:9
249:6 251:15
252:2
**board** 105:14
**Bockus** 3:1 4:6
7:10,10 94:12
287:15,18
292:10 293:10
296:13 297:12
298:15 299:23
300:19 303:11
303:17 304:17
306:14 307:18
308:1,10 309:7
310:1 312:1,6
312:13 315:20
317:1 318:24
369:23 370:23
**bodies** 31:16
65:5 67:11
161:1 173:11
256:6,19
332:23
**body** 21:23,24
22:4 36:5
41:17,18,19
63:20 67:15
78:22 118:21
121:14 125:18
128:18,19
129:15 130:14
146:20 150:10

Confidential - Pursuant to Protective Order

154:11 161:20
162:25 164:8
170:3 173:9
175:21 192:21
198:21 219:18
228:4 232:20
233:17 253:4
256:15 265:16
283:1,9 293:18
295:14 301:15
301:16 306:23
313:2,9 316:14
318:3 320:7,9
325:24 329:3,4
370:15
**body's** 228:14
**bottle** 145:3
**bottom** 267:13
318:15 359:10
**Bouquet** 142:22
143:2,14 144:5
144:8,13
145:13 163:21
164:2,10
**Bradford** 74:14
74:17,18,21
75:2,9 114:20
159:14 194:8
195:9 196:17
**brand** 164:8
**brands** 162:24
**Branscome** 2:21
4:5 7:14,15 8:2
8:6,15 13:14
13:19 16:18
17:11 23:19
24:10,21 25:2
25:6,14 28:16
29:15 32:14
33:11 39:14
40:3 43:1 45:7
49:4,24 50:16
51:15 53:3
56:14 59:4
73:12 74:9
75:6 87:1
88:19 90:2

91:6 93:10,24
94:20 95:2
96:17 99:19
100:1 106:8
107:7,21 111:6
111:16,24
113:24 118:23
121:19 127:13
130:8 131:24
133:3 134:8
135:19 137:2
137:14 139:7
140:3 142:11
144:1,20
145:15 146:1
155:11 156:20
158:11 160:1
161:3 162:20
164:6,15 166:1
167:15 171:16
174:4,13 176:8
180:1 181:9
183:11 185:15
187:11 188:1,8
190:22 193:21
196:3,18
199:15 200:19
201:1 211:16
215:14 221:23
223:23 234:5
234:19 238:19
241:9 242:6
253:15 255:21
259:11,20
260:24 261:14
262:1 263:4
270:23 279:8
280:7 282:14
284:5,24 287:1
287:8 370:21
**break** 76:14
94:12,19
100:12,20
169:17 287:2
362:21 363:1
368:22
**breaking** 137:24

**brief** 286:16
**briefly** 17:16
287:23
**bring** 9:23 10:2
16:11 157:15
201:12 251:13
**bringing** 105:12
**brings** 77:22
155:1
**broad** 227:5
**broader** 29:14
134:6 326:5
**broke** 140:7
**broken** 100:18
**brought** 16:20
169:19 349:10
**bucket** 324:3
**buckets** 323:23
329:9
**bullet** 15:19,21
**bullets** 135:9
**burden** 313:2,9
**bursal** 101:19

**C**

**C** 2:1
**cadmium** 267:2
268:24,25
**calculate** 36:15
**calculating**
88:14
**calculation**
259:7,9 263:25
264:3
**California** 1:18
2:23 349:13
372:19
**call** 30:14 35:14
54:3 64:6,7
77:1 92:6
118:7 124:16
252:25 307:24
309:3,4 310:21
311:13 336:8
**called** 20:16
26:9 35:11
53:17 63:18

107:23 108:2
151:2 202:2
206:1
**calling** 112:16
**calls** 24:16
**Campbell** 1:16
7:18 372:3,17
**Canada** 5:2
16:13 17:5
117:20 201:6
201:14,17,25
202:10 204:13
204:25 205:6
205:10 206:20
211:8,12 212:8
282:23 283:21
284:13
**Canada's** 4:21
284:7
**Canadian** 78:25
79:4 87:12
89:11 90:21
91:19,20 93:14
191:25
**canal** 180:9
**cancer** 4:20,23
4:25 34:13,19
34:19 36:13,15
37:4 40:14
41:4 57:1,1,2
57:21 61:17,18
61:20,20 62:9
80:5 86:22
88:15 107:9,12
107:17 108:6,8
109:18 110:5,7
110:13,24,25
111:2 112:6,8
112:24 113:10
119:6 124:6
125:10,12
127:21,23
149:19 151:21
156:11,15,18
157:6,9 158:3
160:4 165:10
169:4 171:23

173:21 176:3
179:10,23
180:25 181:12
188:13 189:1
189:18 190:2
190:12 191:1
191:12,23
192:5,17 193:4
193:5,18
194:15,23
196:2,7,22
198:3,23 200:5
202:12,19
203:7 204:16
207:22 208:23
220:1 221:3,10
223:1 227:14
227:21 228:9
229:20,21
232:3 236:20
237:4,15
238:10,13
239:19 240:15
241:23 254:12
254:23 256:8,8
256:23 258:1,4
260:21 264:8
269:1,18,19,23
270:12 271:15
271:16 272:2,3
272:13,18,19
272:25 273:6
273:10,12,13
273:15,21
274:1,13,14,25
275:7,17,20
276:6,14 278:7
279:20,23
281:14,22
282:19 285:4
285:17 286:5
286:11,19,23
288:20,24
289:7,14
291:11,12,13
291:18 294:17
294:20 306:19

306:24 312:8
319:19 321:2
322:5 324:7,12
324:12,22
325:2,17 326:1
326:5,24 327:6
330:1 331:5
332:7,15
335:17 369:22
370:10,14
**cancers** 270:8
271:20,21
**capability**
140:19 279:22
**capable** 181:25
266:1 275:16
**capacity** 312:24
**carcinogen**
197:6 271:18
280:25 281:21
281:24
**carcinogenesis**
227:25 272:12
274:6 277:6
**carcinogenic**
88:10 148:7
197:3,10 198:7
220:20 256:3
256:10 257:11
268:18 278:2
279:17,18
282:1,19 288:3
288:13
**carcinogenicity**
151:9
**carcinogens**
254:16 256:13
256:17 269:7
275:12,22
276:11 280:20
282:9
**Care** 3:10 7:4
31:1 319:6
**careful** 225:12
315:23
**carefully** 373:4
**Caroline** 3:12

7:5
**caroline.tinsle...**
3:13
**Carrie** 1:16 7:17
372:3,17
**carried** 264:12
**carry** 170:23
313:1
**carrying** 245:13
**Casarett** 289:20
290:4,5,15,16
290:18
**case** 10:10,24
19:16,18 32:17
40:12,14 60:13
85:13 91:14
96:12,14 97:11
97:18 116:8
122:8 126:24
173:17 226:11
226:12 230:19
231:11 232:8
236:17 237:13
239:3 255:17
268:16 287:19
311:7 318:8
329:2 335:6
342:12 357:25
360:21,24
**case-by-case**
98:16 155:5
**case-control**
79:16 113:3
**case-specific**
304:3 305:7,22
305:25 306:2
**cases** 1:7 11:2,5
11:9,19 19:19
29:14 33:21,23
78:18,19 82:6
82:10 85:16
92:15 116:19
134:25 135:5
178:16 179:17
227:25 231:23
245:25 248:10
262:3,5,8,12

262:17 334:24
346:22
**Cashmere**
142:22 143:2
143:14 144:5,7
144:12 145:13
163:21 164:2
164:10
**categories** 31:20
56:19,21 138:8
208:17,25
210:7,17
215:17,20,25
**categorization**
209:24
**categorize**
141:13 210:11
326:3
**category** 151:6
197:8 210:23
**causation** 34:1,7
35:1,6,15,15
36:21 37:21
38:4,11 39:2
41:18 79:11
119:14 192:16
203:12,17
285:18 326:19
331:20,22
332:2 358:1
**cause** 34:3 37:3
75:14 110:15
110:16,22
128:9 189:1,18
190:11,25
196:6 220:1
221:3 254:12
264:22 269:17
269:18 270:1
270:12 272:2
273:10,13
276:6 286:4
314:17 324:6
325:1,17
326:24 327:5
332:7
**caused** 181:12

195:5
**causes** 34:13
38:15 110:25
220:25 286:18
**causing** 157:6
196:21 208:23
260:20 266:2
270:13 275:16
**caveat** 198:24
**cell** 220:3,7,8
221:25 222:4,4
222:9 228:24
233:1,4,14,16
233:24,25,25
234:8,10,14,16
237:21 279:19
279:20,20
281:16
**cells** 224:2
228:10,21,22
233:10,16,20
233:20,21
281:18
**cellular** 220:6
228:16 314:9
**Center** 367:2
**certain** 12:15
15:11 34:2
38:2 44:15
53:18 77:17
78:14,17,18
84:19 99:1
114:15 125:2
131:7 140:15
140:16 150:1
151:4 152:17
153:3,5 159:17
175:10 190:1
216:4 219:9
225:3 226:16
228:23 231:8
232:22 237:24
253:4 271:10
294:19,20
311:23 320:22
**certainly** 25:24
32:20 38:1,7

40:23 42:5,23
51:25 59:22
70:18 71:13
73:4,24 74:20
76:24 79:13,20
81:25 83:17,19
85:7 86:5
87:12 89:22,22
91:25 98:17
99:11 101:3
116:20 119:17
123:20 128:23
129:25 130:12
135:12 136:9
137:23 138:1
138:16 143:12
143:13 144:13
149:9 150:3,6
150:21 153:10
153:13 155:22
158:21,24
160:20 162:2,3
167:5,9 168:5
169:13 172:23
173:8 175:18
177:19,24
178:1 179:21
184:7 185:22
187:23 191:9
200:12 209:4
216:18 219:3
223:15 227:17
227:24 229:21
230:5 234:13
235:21 245:4
245:17,20
246:24 248:19
249:15 252:23
253:5 254:15
257:18 260:8
263:5 270:17
273:3 277:19
294:23 298:25
305:10,17
312:22 314:11
315:9,17 317:5
317:19,21

Confidential - Pursuant to Protective Order

318:5,8 319:25
323:15 326:9
332:16 336:16
337:19 339:2
339:21 340:17
343:5,7 346:12
351:2 353:10
353:18,24
354:10 366:24
367:22
**certainty** 37:21
  41:3 157:24
  173:6,18 185:8
  186:16 222:13
  259:23,24
**CERTIFICA...**
  372:1
**Certified** 1:17
  1:19,20 372:3
  372:4,18,19,20
  372:20,21,22
**certify** 372:4,7
  372:11 374:4
**cervical** 180:9
**cetera** 170:7
**CFR** 46:21 47:2
  47:25
**chair** 355:7,13
**chance** 226:15
  327:13
**change** 36:8
  81:11,14,25
  82:14 168:16
  220:2 221:24
  222:8 225:24
  256:22 279:19
  293:8 316:11
  317:14,17
**CHANGE/RE...**
  375:3
**changed** 109:21
  110:10 164:18
  164:21 165:9
**changes** 45:19
  81:15 88:9
  165:2 220:6
  276:12 279:12

301:19 373:10
  374:6
**changing** 53:5
  55:12 222:3
**chapter** 76:9
  290:3,19 291:2
**characteristic**
  148:12
**characteristics**
  70:4 71:25
  92:11 131:7
  132:10 134:20
  147:25 148:1
  148:19 149:6
  209:7 224:20
  233:18
**characterizati...**
  198:1,6 203:5
  247:24
**characterize**
  37:18 70:14
  75:18 119:16
  188:10 248:4
**characterized**
  198:5
**characterizing**
  198:4
**chart** 89:16,21
**check** 279:4
**chemical** 220:13
  228:8 266:6
  281:13 294:8,9
  294:11 295:11
  295:13
**chemical-grade**
  227:7
**chemicals** 166:5
  166:10,25
  167:8 281:6
  290:22 292:25
  294:2,19
  336:21 337:2
  338:10,12,16
  346:6
**Chemistry**
  247:9 351:12
**children** 178:6

178:22 297:1
**Chinese** 136:23
**choose** 20:18
  119:25
**choosing** 130:24
  202:24
**chose** 46:11
  106:10 118:13
**chosen** 174:1
**Chris** 6:24
**CHRISTOPH...**
  2:13
**chromium**
  224:15 263:18
  267:1 268:1
  271:17 276:17
  278:25 312:4
  313:10
**chronic** 72:20
  126:6 128:12
  179:15,22,23
  186:25 187:17
  189:20 190:4
  190:12 191:1
  192:13 196:7
  198:25 199:16
  199:19,21
  200:14 219:25
  220:5,22
  222:23 227:19
  305:12,13
  307:4,10,11,12
**chronological**
  14:5
**chronologically**
  62:10
**chrysotile**
  253:24 254:23
  254:25 255:5
  309:24
**ciliary** 180:10
**CIR** 31:10 49:20
  57:8,22 65:10
  65:23 66:2,6
  66:12,22 67:7
  67:14 95:4,17
  95:25 96:21

97:13 99:14
  100:4 120:3,10
  120:24 121:21
  122:3,3 210:18
  245:4 336:7,12
  336:15,20
  337:1,5 339:16
  340:3,5,10,19
  341:9 342:2,21
  343:11,18
  344:2 345:18
  345:25 346:7
  346:15 347:5
  347:10 349:4,4
  353:6 355:14
  356:8
**circumstance**
  98:18 231:20
**circumstances**
  91:11 97:5
  155:14 231:17
  231:19
**citation** 27:16
  66:13,15 67:21
  99:1
**cite** 33:14 48:16
  48:25 65:21
  68:24 76:6,6
  76:16,17 85:23
  118:13 123:20
  126:20 133:4
  141:21 142:20
  212:11 241:14
  250:6 266:16
  266:16 274:17
  274:23 285:12
  285:13 289:20
  290:3,6,14
  295:20,21
  313:18 336:12
  336:20 338:21
  339:20
**cited** 12:14
  15:19 16:1,9
  17:3 20:23
  21:23 22:2
  33:15,18 54:22

63:11,18 64:8
  64:13 66:12
  68:16,17,19
  77:19 82:25
  90:19 118:18
  120:18 121:18
  176:19 177:11
  206:19 212:14
  276:2 280:15
  292:22 315:8
  315:10
**cites** 339:16
**citing** 66:19
  69:12,16 73:1
  139:14 141:23
  242:10 243:20
  277:3 290:15
  290:16 338:2
  339:2 349:17
  365:14 366:18
**citizens** 359:20
  361:19,21
  362:10 363:2
  363:10,14
  364:25
**claim** 188:11
  222:18
**claimed** 96:19
**claiming** 223:18
  253:8 344:21
**claims** 222:20
**clarify** 63:24
**classification**
  271:17 280:9
**classified** 197:2
  269:5 288:1
**classify** 309:12
**classifying**
  208:15 215:16
**clause** 47:15
  50:1,9
**clear** 78:25 87:3
  239:20 256:25
  262:16 323:11
**cleared** 311:19
**Cleveland**
  354:16,19

client 52:8
clients 44:6
    214:1 312:18
    334:9 346:2
clinical 238:11
clipboard 26:13
close 368:3
co-occur 225:14
coating 175:15
cobalt 221:14
    224:15 226:20
    267:1 268:1
    276:17 278:25
    280:3 312:4
    313:10
cohort 113:3
cold 301:9,18
collect 312:17
    329:16
collected 70:14
    77:9 226:2
    239:10,11
    241:6 257:17
    258:9 260:13
    260:15 270:4
    271:8 273:1
    296:8 300:17
    328:13
collecting 229:7
collection 202:8
    211:7 212:7
combination
    168:22
combine 65:20
combined
    201:20 202:1
come 17:14
    58:16 85:8
    98:19 99:10
    117:6 121:13
    146:15 193:12
    219:19 320:2,9
    335:8
comes 123:12
    197:11 285:14
    301:22 328:5
comfortable

306:6
coming 84:22
    179:6 343:13
commencement
    372:4
commencing
    1:15
comment 48:18
    242:3 243:15
    271:5 341:2,6
    360:11 368:6
comments 27:17
    341:16,19
    342:21 343:7
    343:17,22,25
    345:17 363:15
Commerce 2:5
commercially
    251:4
commission
    374:17
committee
    340:6,10,14
    355:9
common 48:2
    115:3 140:12
    199:23 213:23
    254:2
commonly
    313:5
communicatio...
    23:17
community
    98:14 106:23
    114:15 115:2
    182:9 183:1
    190:11,25
    192:15
companies 31:3
    31:22 32:1
    43:13 46:3
    51:5
company 30:9
    30:23 43:4,15
    44:1,16,19,23
    45:9,15,22,23
    46:4,9,11,12

50:8 56:18,25
    57:12,17 58:5
    59:8 123:3,8
    123:13 136:19
    144:11 158:8
    161:8 165:1
    166:21 167:25
    177:12 244:3
    318:1 321:14
    324:9 325:12
    325:19 326:4
    328:5,23 330:5
    334:11 352:1
compare 144:4
    156:18 176:21
compared 33:5
    164:4 204:11
    229:9 231:4
comparison
    161:25 176:11
    176:16,18
    177:13 266:13
comparisons
    348:5
compilation
    61:10
complete 28:14
    59:6 73:2
    170:12 270:11
    320:1
completed 91:22
    93:15 201:9
completely
    163:3 179:8
completing 23:8
complex 125:17
    146:12,17
    151:24 152:2
    153:7 167:8
    168:21 169:15
    225:7 226:3,9
    226:22 256:2
    256:15,16
    257:3,9
compliance 44:1
    44:24 46:11
complicated

129:3
component
    127:19 132:2
    149:21 169:12
    171:15
components
    132:2 146:17
    152:13 163:1
    164:17 166:4
    167:19 168:8
    169:6,18,25
    170:6 171:3
    174:19 190:1
    205:16 222:8
    224:5 226:10
    227:2,10
    228:19 247:25
    248:5 293:24
    310:11
compound
    39:13 269:17
compounds 34:6
    189:21 225:5
    270:11 272:17
    273:22 275:16
    277:8 279:12
    338:17
comprehensive
    328:9
computer 26:19
    56:9,13
concentration
    295:4 347:18
concept 280:19
    283:17 289:5
    290:20
concern 223:14
concerned 52:21
concerns 48:10
    323:21
conclude 241:17
concluded 196:5
    239:20 322:3
    371:3
concludes
    370:25
conclusion

24:17 40:25
    96:5 97:4,6
    98:20 170:2
    189:7 198:11
    198:19 212:5
    212:17 221:2
    241:12 258:14
    305:25 320:3
    320:10
conclusions 41:7
    85:8 95:25
    97:12,14 98:4
    98:21 99:11,15
    99:16 119:22
    138:12 140:1
    141:19 152:11
    168:17,18
    202:16 230:1
    233:1 234:9
    240:20 319:22
    320:17,18
    339:1
concordance
    271:4
conditions 39:12
conducted 58:5
    181:18 244:2
    246:20
confidence 40:7
    230:1 370:12
CONFIDENT...
    1:9
confirm 14:9,17
    14:24 74:13
    106:6 181:18
    288:6,11
    361:16 362:22
    362:24 365:17
    366:4,23
conflict 349:21
    350:7,9 351:2
    352:3,3
conflicts 247:11
    349:5 353:7
confused 333:11
    338:1
confusion 64:9

Confidential - Pursuant to Protective Order

252:10
connected
  333:11
connection
  10:17,23 108:8
consensus
  181:11 190:10
  190:24 191:10
  191:17,19
  192:16,25
  193:7,15
consider 24:11
  27:6 30:2 42:6
  42:20 93:8
  95:7 96:6 97:1
  97:7,7,19
  100:14 115:16
  115:22 122:23
  132:25 135:6
  151:7 155:4
  167:4 209:19
  234:14 246:24
  247:17,21
  248:2,19,21
  252:22 255:7
  313:22 334:18
  334:21
consideration
  38:24 39:1
  288:23,25
considerations
  36:24 87:16
  114:21 224:10
considered
  35:18 87:5
  89:5,17 96:20
  107:11 120:17
  120:25 167:12
  177:2 241:14
  305:9 311:22
  355:14
considering
  48:9 124:5
  165:22 325:1
  346:5
consistency 41:9
  87:25 119:18

145:9 152:23
153:3 156:4
159:15 173:12
191:12 194:20
221:10
consistent 49:16
  49:18,19 79:14
  88:10 90:22
  119:9 130:2
  172:25 187:6
  190:2 191:17
  191:19,24
  192:2,6,8,23
  193:6 194:8,14
  196:16 200:17
  209:15 217:13
  218:17 305:15
  323:25 338:22
  339:3,13
consistently
  41:12
constituent
  150:1 152:4,12
  152:14 163:1
  164:17 167:18
  169:6 170:6
  174:19 222:8
  224:3 226:6,7
  227:1 247:25
  262:10
constituents
  29:22,25
  127:15 164:3
  164:20 169:18
  189:22 221:9
  225:15,22
  256:16 263:16
  273:2 274:16
  274:23 275:10
  276:10 277:11
  277:14,23,25
  278:15,18
  289:15 369:10
  369:16,19
  370:9
consultant
  45:22 344:25

consultants
  361:10 362:16
consulting 336:2
consumer 35:12
  125:20 126:13
  126:23 127:9
  127:17 129:4
  129:13,15
  131:15 132:4
  132:11,22
  137:9 142:21
  144:5 153:20
  154:5,14
  155:23 156:2
  157:19 158:15
  159:4 161:13
  164:20 172:15
  175:5,21
  176:14,23
  178:3,11 180:6
  226:12 317:25
consumers
  30:11 167:13
  327:16 328:25
  330:25
contact 187:16
  231:13 264:17
  274:8,8 295:18
  296:23 297:3
  299:3
contacts 264:25
contain 10:15
  13:23 59:6
  145:18,21
  256:21 277:23
contained 9:15
  10:13 33:7
  66:10 75:17
  122:18 209:22
  251:7 369:17
  369:17
containing
  197:2 225:13
contains 74:25
  93:13 166:10
contamination
  249:16

contend 100:4
  121:1 169:9
content 26:24
contents 262:19
context 93:22
  115:19 205:23
  207:20 213:6,8
  213:11,25
  216:22 218:20
  221:9 271:7
  307:6 308:19
context-specific
  212:19
continual
  299:20
contribute
  104:3
contributes
  104:8,12
control 209:16
  209:17
controls 83:13
  218:4
conversation
  168:7
convince 82:3
copies 14:2 18:8
copper 117:11
  117:11,14,16
  117:25 217:3
  226:19
copy 13:21
  16:11,20 111:7
  111:10
cornstarch
  72:18 266:1,10
correct 10:11
  14:19 15:1
  19:16 20:5
  22:16,22 23:10
  34:14 35:1
  43:5,22,23
  46:13 47:12,20
  47:21 51:22
  59:9 60:23,24
  63:6 67:22
  69:19,22 73:16

74:15 75:3,12
78:13 79:8
80:11 84:2,6
84:10 85:24
86:5 87:7
91:23 93:16
95:6,13 96:1
96:21 105:22
107:9,13 108:3
108:9 109:10
113:18 118:15
118:25 119:6
121:23 124:7
124:15 126:14
126:24 133:12
134:7 136:2
142:13,17,18
142:22 144:23
152:5,15 159:6
161:5 164:10
164:12 166:8
170:9 171:4,19
173:21 174:8
175:6 178:18
179:11 180:15
180:24 192:17
195:5 196:22
197:4,6 201:10
204:19 205:18
207:6 213:3
219:2 221:3
225:24 227:2
228:16 233:5
234:22 236:15
238:13 244:5
251:1,17 261:9
262:4 263:6
264:9 269:7
270:13 276:6
278:15 279:13
282:2,20
283:18,23
284:17 287:21
288:23 289:18
290:9 291:8
292:18 293:13
296:16 298:3

Confidential - Pursuant to Protective Order

307:22 308:5
308:14 318:22
321:2,9,19
322:19 329:10
330:1 331:6
332:8 336:13
337:8 340:6,7
340:10,20
341:21 342:5
343:12,19,23
348:22 349:6
356:11 359:17
359:19,24
360:4,12 361:5
361:10,15,25
363:14,19
367:3 374:5
**correction**
245:24
**corrections**
373:4,7 374:6
**correctly** 63:3
112:25 113:1,5
204:14 212:24
236:14 289:22
**correspondence**
27:13
**cosmetic** 43:9,11
44:11 46:10
47:3 133:11
134:14 135:11
140:18,25
142:2,3,13,15
142:20 145:20
150:25 161:20
162:25 164:8
184:12,19
185:17 187:17
188:12,25
189:17 190:11
190:25 197:2
202:11 203:5
204:16 232:19
233:2 308:12
309:5 322:18
322:18 324:4
324:10 336:6

336:13 339:17
344:25 346:21
347:1 359:23
360:4,7,19
**cosmetic-grade**
135:14 138:17
**cosmetics** 30:7
43:12 44:2,25
46:17 161:16
328:3 335:10
336:22 366:11
**cosmetics'**
346:19
**cosponsor** 361:4
**Council** 3:10 7:4
31:2 247:10
319:6 351:12
**counsel** 2:19,24
3:5,10,15 6:16
122:10 287:11
322:12,13
346:8 372:12
372:13
**counted** 339:23
**couple** 100:9
269:22 287:23
290:6 319:7
320:12 370:1
**course** 204:24
250:7 299:2
369:9
**court** 1:1,20
6:12 7:17
39:19 137:20
213:16 372:20
372:22 373:19
**courtroom**
286:25
**cover** 31:11 70:2
362:1 363:18
363:20,21,22
**covered** 32:9
61:24,25 74:12
**covering** 59:21
**Cralley** 250:5
337:8,17,18
339:16

**Cralley's** 338:11
338:21 339:9
**Cramer** 342:20
343:1,3 365:6
**crappy** 232:2
**CRE** 362:2,3
367:15,23
**create** 276:12
306:8
**criteria** 212:21
**critical** 236:8
295:12
**criticism** 353:11
**criticisms**
348:25 349:1,3
**criticize** 88:7
**criticized** 84:1,9
348:20 352:20
353:4
**criticizing** 353:5
353:6
**critiqued** 365:5
**cross** 56:1
180:11
**CROSS-EXA...**
369:4
**crosses** 40:7
**CROW** 2:2
**CTFA** 31:2
361:4
**ctisi@levinla...**
2:13
**current** 5:1
202:7 211:12
**currently** 44:7
**customers**
318:21
**CV** 354:21,25
355:5,11

_____
**D**
_____

**D** 3:19 337:12
**DABT** 1:13 4:13
4:15,17 7:20
372:5 374:12
**daily** 178:10
187:5 199:22

200:15 296:16
301:8
**damage** 178:21
228:5,23 231:3
**data** 36:4,5,12
36:14,22,23
37:8,16 38:25
41:6,10 61:17
70:19 76:14
77:5,8 84:19
88:2 92:21
101:9,10
104:16 106:24
107:24 114:2
114:19 115:21
118:9,10
119:17 120:12
124:9 138:5
140:9,11 145:7
145:7 151:1
153:19,19
157:16,17
158:7,13
163:12,13,14
170:5 171:3,7
172:6,8,8,13
172:16,23,23
173:10 174:3
177:3 182:16
182:17 187:24
194:21,22
195:22,22
205:24 209:8,9
216:4,10,14
217:1,5,16
218:11,12,14
218:15 221:18
221:21 223:2
225:1 226:2,14
229:25 230:2,3
230:4,7,10,13
230:13 231:2
231:14,17,18
231:19,20,23
231:24 232:5
237:17 238:16
238:18,20,22

238:22 240:6,6
240:7 251:6
254:18,18
255:2,15
257:17,19
258:8 260:9
265:19 270:3,4
270:7,11 271:6
271:8 272:25
273:15 275:5
276:2,15,18,23
280:1,6 281:20
282:7 289:12
293:21 296:8
297:15,19
299:18 300:17
301:15 302:13
302:23 305:1
306:21 307:1,2
313:23 320:7,9
328:12,14
**database** 53:16
53:25 55:24
56:2,5,10
57:13,18 58:23
79:19,23
117:11
**databases** 54:8
58:5
**date** 1:16 6:6
9:11 111:14,19
260:8 307:9
372:9 373:9
374:12
**dated** 9:10 14:8
14:15,21 19:14
267:3 372:23
**dates** 57:7,8
**Daubert** 8:10
**day** 80:10 298:3
300:1,15
303:21 369:7,9
374:16
**days** 122:5
373:15
**DC** 3:9
**deal** 52:11 69:21

Confidential - Pursuant to Protective Order

125:3 155:23

**dealing** 49:15
51:5 61:17,19
131:10 156:1

**deals** 168:20

**dealt** 54:18
57:13 145:12
271:14

**deaths** 178:16
178:18

**December** 1:8
6:6 10:20 11:1
111:17

**decide** 26:20
42:4 334:25

**decided** 60:2

**decision** 45:5
56:15 67:20

**decision-maki...**
43:21,25 44:23
45:8 284:8

**decisions** 97:16
205:1 213:10

**deemed** 373:18

**Defendant** 2:24
3:5,10 7:24

**defendants**
248:4 320:16

**defense** 85:14
247:1,16
248:17 261:6
261:22 320:25
335:23

**defenses** 228:15

**define** 39:24
48:19 169:11
199:16 236:22
237:1 238:5
239:5 272:6
300:20 310:21

**defined** 227:10
231:6 302:4
305:13 307:14

**defines** 236:18
237:2

**defining** 236:9
236:11 237:16

237:19,21

**definitely** 85:10
95:15 153:12
278:18 308:8
323:16

**definition** 48:2,4
128:20 237:1
253:16,18
264:11 281:21
283:11

**definitions**
196:15

**definitive** 195:4

**definitively**
189:2,5 227:15
227:17 366:2

**degree** 41:2
157:23 173:18
185:8 186:15
259:23,24

**demonstrate**
183:14

**demonstrated**
69:14 220:25
274:24

**demonstrating**
73:14

**departure**
117:12

**depend** 96:14
230:11 299:2

**dependent**
155:8 226:18
231:21

**depending**
137:1 150:11
229:6 232:19
296:24 319:23
319:23

**depends** 96:11
96:12,13 97:9
128:11 152:16
154:22 168:5
170:16 175:7
228:17 229:11
230:12 234:25
236:21 264:19

269:21,21,22
269:24 296:20
297:5,6 320:4
334:23 335:5

**deponent** 6:14
374:1

**deposed** 261:21

**deposes** 7:23

**deposing** 373:14

**deposit** 184:22

**deposited**
184:13 185:20
296:10,15
297:16

**deposition** 1:12
4:11 5:3 6:8
8:9,17 9:8,10
9:16 10:4,8,9
10:14 11:4,6
11:13,15,21
12:2,3,5 13:1
14:6,11,14,25
15:6,6,9 16:22
17:13,17 19:24
20:4 22:18
35:10 111:9
112:5 122:5
206:15 211:18
211:21 216:2
251:19,23
252:3,6 261:23
263:23 266:22
280:12 365:15
366:18 371:1,3
373:3,12,16,17

**depositions** 18:8
92:15 94:2
108:19 136:18
365:18

**deps@golkow...**
1:22

**dermal** 233:12

**dermatology**
352:25 353:14
354:7,13 355:8

**Dermatopath...**
355:3

**describe** 28:12
28:13 29:16
37:24 43:11
47:23 77:14
86:9 91:16
101:16 102:7
103:2 104:14
105:10 112:15
117:5 135:1,21
144:17 148:6
148:18 149:5
185:3 189:19
196:11,15
249:2 253:19
289:2 334:2

**described** 21:24
31:15 45:10
48:8 49:17
51:13 56:25
58:16 79:3
103:23 104:6
104:11 130:12
143:11,12,14
145:3 148:5
152:19 164:25
196:10 219:6
219:15 242:20
245:16 266:15
329:8 330:4
342:15 352:5

**describes**
141:15

**describing**
49:19 83:22
87:22 119:23
120:13 133:17
142:3 184:4
249:3

**description** 4:10
74:25 135:4
199:23 214:21
306:20 331:24

**descriptions**
89:24 90:18
102:6 156:3
311:2

**design** 182:2,19

223:24 224:6
224:11 241:2
291:20 297:23

**designed** 42:15
209:15 230:17
232:2,8 239:5
239:15 240:18
291:8

**desirable** 132:11

**detail** 9:18 66:23
70:3 90:9
93:13 94:3
128:5 166:4
214:2

**detailed** 215:7

**details** 93:22
109:25 120:21
132:7 208:12
222:1 345:6

**detect** 42:19

**detectable**
310:14

**detected** 170:24
258:16 310:6

**detecting** 310:25

**detection** 151:1
151:3 250:9
258:21 310:15

**determine** 38:15
162:5 163:8
223:8

**determines**
294:9

**determining**
36:5 86:18

**develop** 176:2
179:10 194:15
210:6 220:13
227:14,15,17
230:24

**developed**
182:12

**developing**
269:1 273:22

**development**
24:24 221:22
237:15 238:12

Golkow Litigation Services - 877.370.DEPS

Confidential - Pursuant to Protective Order

240:14 272:13
274:1
**dialog** 213:20
**diapering**
177:15
**dictates** 295:11
**die** 178:23
**differ** 233:13
**difference** 67:2
72:17,21,24
146:9 168:17
235:4 314:1
326:13 348:6,7
**differences** 71:9
71:14 72:5
79:15 82:25
84:16 101:11
101:18 103:11
148:24 156:14
164:24 216:13
225:4 233:3
234:1,7 254:14
265:20,21
266:8,14,17
357:17
**different** 20:21
22:10 29:7,8,9
29:25 30:16,18
30:23 31:6,8
32:11 34:5,20
35:5,21,23
37:5,20 38:1,9
38:10 39:1
45:24 46:7
50:14 55:19
57:5,5 58:24
62:24 66:21,21
70:20 71:7
75:25 76:13,20
78:7 81:18
83:25 84:13,14
84:23 85:3,5,6
85:8,23 87:15
90:10,10 99:10
99:11 114:8
115:25 119:22
120:5,12 123:7

123:9 125:2,3
126:1 133:9
136:8,24,25
137:5,6 139:5
139:13,22,24
140:9,11
142:13,16
146:5 152:12
152:24 156:15
161:12,21
162:24 174:18
174:19 175:16
177:20 178:8
179:8,16
189:13 198:15
199:4,5 204:22
208:25 213:15
213:18 215:16
215:17,19,20
218:22 219:14
219:16 224:3
224:21 226:25
226:25 227:1,2
228:25 229:1,3
230:23 231:22
233:7,16 234:8
234:10 237:25
244:18 252:24
252:25 253:19
253:22 254:9
254:12 256:12
261:2 265:3
266:4 267:18
269:6 270:18
272:12,15
275:10 277:14
283:2,8 290:7
290:12,22
296:9 305:19
306:11 311:20
320:3,9 322:7
325:18,22
326:6,8,19
328:1,2 329:9
329:14 330:14
330:16,17
332:23 335:21

341:22,23
342:17,17
348:18 357:9
357:14 368:6
369:10,15
**differentiate**
165:13
**differently** 37:9
41:22 81:24
84:20 85:12
229:6
**difficult** 182:18
186:3 222:12
224:7 225:9
291:20 298:1
**dig** 67:3
**Diplomate** 1:17
372:3,18
**direct** 8:1 46:23
76:3 212:4
274:8 281:1,7
281:16 287:11
297:3
**directed** 53:10
54:10 74:6
162:4 163:8
357:16
**directions** 329:1
**directly** 43:17
59:20 76:8
273:9 367:14
**disagree** 73:25
85:16,17 120:2
127:2 143:22
199:7 214:19
215:13 238:21
241:11,20
283:25 319:17
319:22 320:16
320:25 324:8
339:8,11 342:7
350:2,6,8
356:15,18
**disagreed**
321:19
**disagreeing**
343:8

**disagreement**
321:8
**disclose** 247:11
350:9,11 353:7
365:6,20
**discount** 246:14
247:4,5,13
**discounted**
244:25
**discouraging**
282:25 284:15
**discovery** 21:12
54:18
**discuss** 67:15,18
83:17 98:6
100:6 102:22
103:1 104:25
113:9,13
118:14 119:13
121:21 124:13
126:4 132:23
133:8 140:22
146:10 178:14
187:9 189:12
191:20 192:1
211:3 220:4
242:7 248:25
263:6 277:5
280:17 285:1
289:16 290:8
290:19 355:22
360:22 362:24
**discussed** 17:19
22:9 35:9
42:17 54:8
65:4 67:10
77:10 91:4
108:18 138:20
148:10 149:20
152:25 154:2
171:17 176:19
181:15 216:1
221:12 223:16
263:23 276:13
277:1 292:19
354:22 362:19
364:6 367:21

**discusses** 123:17
146:4 193:5
251:20
**discussing** 54:24
57:1,20 62:14
100:22 104:2
105:8 116:17
120:4 132:15
206:19 276:4
325:11
**discussion** 66:20
77:25 90:20
102:11,13
103:14,19,22
138:24 147:13
148:16 162:11
180:24 195:8
195:11 214:24
215:3 221:17
223:5 265:7
269:13 274:21
277:2 285:21
325:9
**discussions**
26:23 89:25
154:9 326:12
**disease** 38:15
195:5
**disreputable**
354:7
**disseminated**
30:22 244:16
244:16
**dissemination**
123:4,8
**distinguish**
149:17
**distinguishing**
148:18
**distress** 126:7
129:12
**distribute** 270:2
**District** 1:1,1
6:12,12
**diversity** 212:20
**dividing** 220:8
**divorce** 332:13

Confidential - Pursuant to Protective Order

334:14
**Doc** 26:9
**doctor** 319:5
  359:16
**document** 1:6
  8:19,23 9:1,7
  16:20,25 17:2
  49:3 51:18,19
  53:20 54:22
  55:5 59:19
  64:4,5,7 66:17
  75:2 77:11,14
  79:1 80:16
  81:9 83:17
  90:22 91:19
  92:3,5 111:11
  113:14 170:17
  177:11 201:17
  202:3,4 206:14
  211:10,19,22
  212:6,16 245:5
  251:22 282:24
  290:17 292:22
  292:23 341:23
  342:19 364:2
  364:22 365:2
  365:13 368:9
  368:13,18
**documentation**
  10:6 48:18
  82:16 212:22
  214:9,14
  218:22 278:11
**documenting**
  249:21 273:9
  274:18
**documents** 9:23
  10:13 12:13,14
  15:11,19,22,25
  17:15,21 20:22
  21:3,6,10,18
  21:20 22:13
  27:4 29:1
  30:24 32:12,18
  33:15,17 51:12
  52:1 53:12,21
  53:22,25 54:7

54:15,21 55:14
55:21,25 56:18
56:20,24 58:3
58:3,17,21,22
59:1,8 76:17
76:21 77:18
83:3 86:8 91:5
108:24 109:6
118:13 123:16
129:19 130:1
130:10 144:11
148:9 154:10
161:6,8 164:25
165:1 201:12
201:20 202:1,9
204:12 205:4
211:7 212:7,13
221:11 246:7
246:12 248:8
248:12 249:1,4
250:8 252:21
253:19 259:16
284:9 288:15
309:11 321:10
321:13,14
323:24 341:7
342:17 348:17
350:10 354:24
362:13 364:5
366:3,7 367:20
368:13
**doing** 33:25 34:7
  38:4 53:15
  74:10 79:11
  94:8 115:5,24
  116:3,5 119:14
  123:3 130:13
  155:21 157:10
  169:14 171:24
  181:25 205:1
  208:3 214:1
  216:3 217:13
  218:13 234:23
  234:24 244:23
  287:11 291:14
  293:8 296:20
  301:3,4,10

302:1 304:3
324:1,16,17
327:20 328:9
330:11 331:21
332:2 334:12
348:5 373:8
**dose** 187:8,14
  225:2 230:22
  234:21 235:10
  235:10 237:16
  237:19,21,22
  237:25 238:1,3
  238:5,9,24
  239:1,2,5,16
  239:21 240:10
  240:13,20,23
  242:4,14,21
  243:2,16
  254:14 259:4
  259:25 260:22
  263:18,25
  281:25 282:18
  282:21 284:14
  286:3 293:25
  294:8,22
  295:11 302:19
**dose-response**
  224:14 235:13
  235:19,24
  236:11,18
  237:2,6 241:16
  241:18 293:23
  294:12 295:17
**doses** 231:5
  242:19 295:3,4
**doubt** 230:14
  242:3 312:20
**doubts** 230:14
**Doull** 289:21
  290:4,5,18
**download**
  123:19 345:9
  345:13,15
**dozens** 97:25
**Dr** 6:14 8:4
  12:23 13:20
  14:7,10,15,17

14:22 23:18,20
24:11 25:4,15
34:11,23 44:22
46:7 50:17
63:25 80:2
87:2 88:20
93:11 94:1
95:3 102:10
105:17 110:3
111:11 112:4
113:6 117:18
139:8 140:21
162:7,9 163:4
163:19 167:24
177:15 201:3
211:22 236:24
247:24 248:18
248:22 249:3,6
251:15 252:2,5
252:11 259:17
261:7,18
262:20 287:8
287:16 314:4
337:8,17,18
338:11,21
339:9,16
342:20 343:1,3
349:9 352:20
354:14 355:13
357:1 361:8,8
364:23 365:4,5
365:6,15,19,22
369:6,8 370:18
**draft** 20:19
  74:21 201:14
  202:3 205:11
  341:23 342:1
  343:18,25
  345:22
**drafted** 32:20
  46:16,18
  343:23
**drafting** 23:12
  24:2 26:1 66:1
  68:10 80:19
**draw** 41:6 140:1
  168:17 170:2

230:1 232:25
240:19 305:24
319:23
**drawing** 138:11
  141:20 152:11
  234:9
**drawn** 98:4
  168:19
**draws** 97:13
  202:16
**Dreessen** 135:21
**drew** 99:16
**drilling** 193:19
**driven** 116:15
  241:1 313:3
**driving** 225:23
**Drs** 244:11
  361:14,24
  362:15 363:23
  364:3 365:23
**drug** 355:7
**drugs** 189:22
**Duces** 4:12
**due** 128:17
  291:18
**duly** 7:21 372:5
**duration** 239:10
  302:19 305:12
**dust** 15:16
**duties** 329:14
**duty** 318:14
  325:12,19,19
  326:3 327:3,4
  329:14,15,21
  330:5 331:16
  332:16
**DYKEMA** 3:1

**E**

**E** 2:1,1 3:1,19
  3:19
**earlier** 9:2 20:2
  62:13 63:3
  68:17 74:12
  104:18 205:13
  237:8 265:1,22
  297:14 298:10

Confidential - Pursuant to Protective Order

Page 391

305:13 317:7 330:21
**early** 20:12 23:3 80:20 179:6 285:13
**easily** 72:8
**East** 3:3
**easy** 62:7
**Eberl** 15:21
**Edelstam** 68:4 69:2 70:23 73:14,20
**editor** 27:9,13 27:17
**effect** 34:3 140:20 145:20 235:24 240:25 278:3 282:1 289:10,19 291:6 293:2 294:10
**Effectiveness** 367:3
**effects** 29:24 77:9 124:14 132:1 139:4 146:19 153:3 156:4 169:25 190:3 224:5,14 236:13 242:5 242:16 243:13 290:21 292:13 292:14,17 294:2 295:2
**effort** 348:6
**Egli** 16:6
**eight** 11:10,17 96:20 97:24 98:2,5 100:2,5 100:13,25 102:5 104:18 104:22 120:25 121:20 183:23
**either** 9:2 31:16 36:6 41:7 51:17 55:5 61:18 82:17

114:19 132:21 136:22 191:4 202:24 224:2 244:3 245:14 269:6 273:6,8 274:12 290:12 292:6,16 302:3 326:25 347:18 353:11
**elements** 152:4 152:15 310:5
**elicit** 23:22
**eliminate** 312:25
**ELLIS** 2:21 3:12
**else's** 357:18
**emphasis** 47:10
**emphasize** 47:19
**employed** 75:16
**employee** 45:21 365:16 366:18 372:11,13
**employees** 136:19
**enable** 26:6
**enables** 273:11
**encompassing** 108:22
**encounter** 335:22
**ended** 136:1,7 141:1
**ends** 31:15 80:21 131:14 132:3
**England** 27:10
**English** 48:2
**engulf** 150:18,18
**engulfed** 125:7
**ensure** 130:17
**entire** 43:10 105:2 171:14 171:19
**entirely** 179:16 284:16

**entirety** 57:25
**entitled** 206:23 211:10
**entity** 147:23
**environment** 103:15 229:2 306:8,12
**environmental** 105:5
**EPA** 65:10,22 213:13 243:20 243:21 290:14 290:16 292:22 292:23
**epi** 42:14,21 106:24 173:10 173:13 208:4
**epidemiological** 41:20 79:9 106:23 114:2,6 114:19 115:16 116:1 172:7,8 205:17 239:14 312:11 357:7 357:23
**epidemiologist** 41:16 84:20 85:1 356:3,7 357:24
**epidemiology** 37:11 38:25 81:17,18 89:11 106:4 115:2 295:10 355:22 355:24 356:21
**epithelial** 233:19
**equal** 232:12 248:6
**errata** 373:6,9 373:11,14 374:7 375:1
**escape** 180:12
**especially** 61:16 212:23 274:7 297:24 312:23
**essentially** 12:12

77:3,21 116:11 154:10 202:17 217:14 222:16 328:21 331:23
**establish** 185:17 275:15
**established** 189:3 195:4
**establishes** 71:1
**et** 4:20 170:7
**ethicality** 182:23
**ethicist** 352:8,11 352:17
**ethics** 73:22 187:22
**evaluate** 37:8 104:15 271:25
**evaluated** 32:17 37:8 66:5
**evaluating** 40:11 44:1,24 96:8 127:16 137:4 205:17 225:21 246:19 252:14
**evaluation** 27:2 65:25 105:7 169:22 174:2 192:12 196:20 245:18 289:1 304:10 357:6
**evaluations** 244:17
**evening** 12:9
**event** 184:5 281:9 367:24
**events** 128:2 194:18 220:16 294:14,16 367:25
**eventually** 80:22 81:9
**everybody** 228:7
**evidence** 5:1 21:14 37:11

38:8,14 39:5 42:5,24 67:2 70:9 73:21 75:24 76:10 77:13,17,20 78:3,10,13 80:6 81:6,13 83:7 84:13 85:23 86:10,23 87:4,6,14 88:5 88:18 89:4,6 89:16 90:5,11 90:19 96:7 97:2,19 98:24 103:5 104:3 105:11,16 107:2 112:15 112:17,21 113:16,17 114:12 115:16 116:1,10,15 117:8 120:19 135:7 139:23 139:25 143:19 155:2 159:11 172:9,21 173:2 173:9 174:16 176:16,17,20 177:2 192:22 194:9,10 197:23 198:13 199:9 205:16 208:25 209:10 210:1,9,25 211:10,11 213:2 214:15 215:4,24 218:23,24 222:23 223:17 229:5,5,19 236:8 240:4 244:14,20,24 245:1,6,18,23 246:14 248:23 249:15 250:7 252:13 254:19 257:15 260:16

Confidential - Pursuant to Protective Order

261:4 285:22
288:20 296:18
326:2 327:12
339:3 365:25
366:22 367:1,4
367:14 368:1
369:20
**evidence-based**
295:10
**Eviron** 346:15
346:25
**evolved** 109:21
**exact** 65:18,19
110:16 167:17
193:12 203:2
321:23 339:20
**exactly** 47:13
67:24 69:24
73:10 82:5
89:14 134:18
168:11 178:25
190:16,20
204:6 205:3
209:3 221:7
223:8 224:21
224:22 249:2
253:19 303:4
304:19 320:20
**examination** 8:1
287:14 319:3
372:5
**EXAMINATI...**
4:4
**examine** 161:11
161:20
**examined** 207:9
**examines** 266:8
**examining**
295:12
**example** 27:3
36:16,19 37:9
38:16 40:16
51:21 56:23
58:19 59:18
60:13 61:16
62:12 70:24
72:7 76:22

78:12 79:5
80:10 82:2
83:24 86:20,24
87:11 88:3
89:16 97:23
101:8 102:20
114:10 117:3
123:16 125:5
133:5 134:14
135:5,8,20
142:22 143:2
148:5 149:16
151:8,18
155:15 163:15
163:21 165:4
167:20 173:19
175:8,12 177:3
192:24,25
196:5 204:6
216:9 221:15
222:19,22
229:10 232:23
233:19,24
237:13 239:7
240:7,16
242:24 246:3
247:23 263:19
270:5,9 271:11
271:13 281:17
285:12 286:2
292:9 296:21
296:25 299:5
311:6 312:24
314:22 322:3
334:1 335:1,23
336:21 342:12
361:3
**examples**
245:10
**exception** 81:16
172:7 178:4
296:1
**exclusively**
54:13 176:3
**excrete** 313:5
**excuse** 214:18
275:22

**exercise** 86:11
120:6 216:16
216:20,24
219:14,17
326:20,22
**exercises** 218:8
327:1
**exerted** 31:22
**exhibit** 8:13,18
9:8 14:6,11,14
14:18,20,25
15:7 16:16,22
17:9,14 19:23
20:4 22:21
23:9,13 24:13
25:19 26:25
28:5 29:2
46:24 53:6
64:3,19 65:14
66:11 75:3,12
75:18 76:5
90:8 93:16
95:11 111:4,9
111:13 112:5
113:12 155:14
201:10 202:15
206:16 209:23
210:22 211:14
211:18,21
219:16 266:22
**Exhibits** 4:9 5:3
13:17 28:1,4
33:7 57:24
**exist** 43:10
150:20 268:22
**existed** 318:20
**existence** 346:15
**exists** 151:12
169:20 200:8
226:23 228:15
261:5 306:25
**exit** 180:22
**expanded**
331:18
**expect** 72:8,20
73:7,10 178:1
233:21 261:24

265:20,22,24
274:13 302:14
**expected** 175:9
289:9
**experience**
37:18 39:6
44:4 46:10
48:7 49:14
50:3,23,25
51:5,22 77:23
84:23 105:13
115:11 116:5
207:25 264:5
271:7 320:8
334:7 336:3
344:5
**experiencing**
99:8
**experiment**
223:25 224:1
291:7,14 293:9
293:12
**experiments**
181:18 293:21
**expert** 4:11,13
4:14,16 12:25
13:5 14:7,15
14:21 15:5
20:19 23:8
24:24 130:22
137:3 139:11
148:23 213:16
246:21 247:1,1
248:17 255:8
255:20 261:12
261:22 262:20
334:19 342:4
344:12,15
346:19,24
347:2 349:5
**expertise** 255:13
269:17 355:19
357:22 358:6
**experts** 29:8
85:14 148:17
181:16 248:3
248:15 261:6

261:20 320:16
320:23,25
335:22
**expires** 374:17
**explain** 35:7,22
41:13 49:2
93:21 100:11
120:6 121:7
135:18 174:15
235:2,3
**explains** 133:22
**explanation**
59:7 195:3
**explore** 94:6
**exploring** 285:3
**expose** 224:2
291:21
**exposed** 156:10
176:24 187:15
220:12,12
226:8 228:8
237:14 258:11
259:5,25
263:19 286:10
290:22 291:23
301:17 335:14
**exposure** 16:4
36:8 37:2,16
39:11 41:3
52:23,24 76:14
77:6 78:7 81:1
112:12,21,23
117:15 132:23
133:16 160:19
174:20 175:3
175:11,20,23
175:25 176:12
176:21 177:14
177:16 178:3,5
178:10,11
179:21,22,24
194:12,16,22
195:19 198:20
198:21 199:12
199:20 200:13
202:21 203:1
203:21 204:2

Confidential - Pursuant to Protective Order

217:11 218:11
218:12 220:15
226:11,12
230:20 231:11
233:12 235:8
236:10,12,19
237:3 238:25
242:16 243:17
243:19 257:16
258:3,5,10
262:7,9,11
269:25 272:22
274:15 285:10
286:4 291:19
292:4 294:9
296:6 297:10
299:19,21
300:8 301:12
301:24 305:12
305:14 306:13
307:4,11 313:4
322:4,15
324:22 329:6
347:19 370:14
**exposure-resp...**
230:15
**exposures** 217:9
243:4,14
300:24 301:8
301:20
**expressed**
109:23 286:22
320:21 323:25
333:15
**expressing**
166:19 316:7
339:13
**expression**
194:4
**extent** 55:20
183:8 214:20
215:13 252:9
268:22 309:12
**extra** 228:21
**extrapolate**
232:16 272:1
273:11

**extrapolation**
232:13 270:5
**extremely** 50:10
80:15 97:19
99:18 100:10
100:14 138:18
231:14

——————
**F**
F 3:8
**face** 250:25
251:2,16 284:9
319:9
**fact** 12:24 15:3
32:1 34:17
62:14 66:24
67:15 75:7
79:1 88:6
91:18 100:18
108:2,6 125:17
128:17 129:2,3
134:23,25
136:10 150:23
151:24 167:25
168:20 177:20
179:3 197:1
205:14 207:17
217:3 221:3,17
222:13 225:3
230:7 243:13
252:11 256:1
257:9 258:20
272:13 273:22
281:23 289:4
292:12 299:17
301:16,19
302:20 321:4
321:25 324:9
332:13 346:9
348:10 349:15
370:8
**factor** 36:16
88:15 110:18
111:2 157:9
158:3 169:3
171:23 225:23
272:21 295:12

**factors** 112:14
156:15
**factory** 175:15
**fail** 373:17
**failed** 95:17
355:18 365:6
**failing** 97:7
353:6 365:20
**fails** 96:6
**failure** 97:1,18
**fair** 23:6 60:19
122:17 199:25
199:25 231:16
299:24 304:18
**fairly** 128:19
231:9
**fall** 23:3
**fallopian** 4:23
103:16 180:11
180:22 181:8
181:13 183:17
**falls** 295:5
**familiar** 107:8
107:22 118:24
123:21 130:19
131:25 132:7,8
147:4 166:7
196:20 205:25
211:21 216:15
283:16 313:7
319:10
**far** 11:10 39:6
66:20 77:5
84:21 88:14
92:22 107:5
117:7 128:1
130:23 145:3
146:19 149:9
165:2 167:7
170:13 171:11
192:4 193:15
216:8 227:9
233:18 238:6
244:17 268:11
272:22 293:22
328:4 336:18
**fax** 1:22

**FDA** 43:12 44:1
44:24 47:23
74:4 244:17
328:19,19
336:17 340:4,5
340:14 359:22
360:2,18 361:3
361:7,15
**FDA's** 332:5
355:7,7
**feel** 121:8
129:14 306:6
**feels** 94:16
**felt** 59:19
**female** 103:11
183:16 184:3
295:24
**fiber** 147:22
150:5,6 255:3
258:18
**fibers** 251:8,9
256:7 258:16
259:1
**fibrous** 124:23
124:24 126:1
146:9 147:14
148:24 149:14
150:14 151:2
151:19 161:11
161:22 253:20
255:2,3
**figure** 103:7
**figures** 103:9
**file** 80:17
**filed** 12:7 16:10
18:2 23:4
**files** 57:12,12
251:24 253:14
**filter** 129:8
**fimbriae** 180:12
**final** 37:1
138:11 153:11
172:14 174:11
343:23
**finalized** 316:4
**finally** 42:4
**financial** 365:7

365:20
**financially**
372:13
**find** 57:18 78:4
84:8 133:6
146:3,6 155:25
177:7 209:23
210:20 222:5
246:1 249:18
262:21 269:13
276:18,22
280:16 292:13
364:6
**finding** 41:8
42:10,13 55:25
**findings** 67:19
91:3 172:25
**fine** 14:3 275:5
313:16 336:10
364:14
**finer** 129:14
**fines** 130:20
131:3,5
**fingerprint**
145:5
**finish** 94:13
**finished** 44:18
127:6 308:12
**first** 7:21 11:5
15:19 16:14
19:13,18 28:24
28:25 32:5,17
32:17 33:16
36:1,2 48:1
52:2 53:9
54:11 56:17
61:8,11 65:21
87:21 112:19
137:12,18
147:11 198:16
210:6 212:6,17
215:25 217:2
248:25 256:25
326:22 327:5
329:15,22
331:11,12,14
331:15 343:18

Confidential - Pursuant to Protective Order

352:22 354:15
354:18 355:2
359:25
**fits** 41:11 281:20
281:20 283:11
**five** 210:17
249:9
**flags** 13:24
**Fletcher** 313:20
313:21 314:18
314:19 315:2
**Florida** 2:14
**fluids** 72:9
**FLW** 1:5
**focus** 58:12 94:5
151:20 153:14
155:22 268:14
270:8 321:16
330:8 363:8
**focused** 22:18
37:12 58:17
262:11 268:8
370:5
**focusing** 36:18
56:23 77:12
125:9 129:17
168:7 179:23
204:10 348:10
348:10
**folder** 26:17
**follow** 46:12
67:6 117:22
346:4 358:22
**follow-up**
358:12
**followed** 113:17
**following** 25:3
40:8 66:25
345:25
**follows** 7:25
46:4
**food** 311:6
**footnote** 317:8
318:16 336:22
336:24
**foregoing** 372:8
374:4

**foreign** 128:19
150:10
**forgot** 11:16
**form** 49:10
73:17 75:11
87:8 89:19
90:12 91:24
99:5 105:23
106:13 107:15
116:11,18
118:16 121:3
121:15 126:25
130:7 133:25
137:11 141:2
145:23 147:20
150:14,15
153:4 154:20
157:7 159:7
160:10 162:1
171:5 180:16
185:6 186:11
186:22 187:18
191:6 195:6
198:8 214:18
242:21 252:16
255:6 259:10
261:10 262:24
264:14,19
270:14 283:24
284:18 298:6
300:3 303:8
330:19 337:17
343:25 345:22
351:20 356:10
369:24 374:6
**formal** 113:17
**formation**
215:11 276:13
**formed** 32:19
66:15 125:14
145:24 146:2
151:22,24
166:17 167:10
176:6 181:14
184:15,17,21
184:25 186:24
190:17 191:3

198:13,18
237:5 260:7,9
265:13 274:11
286:6 299:14
303:9,22,25
306:17 307:8
337:24 338:7
338:11 339:10
353:16 354:1,8
355:15,17
358:8
**former** 355:7
**formerly** 31:2
**forming** 53:13
61:7 80:1
85:24 89:17
103:4 324:21
**forms** 73:20
130:17 148:4,4
253:22 254:3
255:3,4
**formulated**
300:5
**Forrest** 10:9,14
**forth** 75:1
323:10 372:9
**found** 41:8
91:18 100:10
264:21 311:5
337:5
**foundations**
161:17
**four** 1:13 172:5
208:16 271:12
290:23
**Fourth** 3:13
**fragrance** 166:4
167:22 168:6,8
169:7 275:10
276:10 278:14
278:17 308:22
337:3
**frame** 20:13
54:23
**framework**
204:25
**free** 26:15

**frequency**
184:18 185:19
186:10 239:10
302:18
**frequent** 305:2
**frequently**
359:22 360:2,6
360:23 366:11
**Friday** 9:4
**front** 13:21
206:14
**full** 34:7 35:15
57:25 119:14
163:12 331:22
**fully** 282:6
366:8
**functions** 332:5
**fundamental**
294:1
**funding** 350:12
350:13,14
**further** 65:24
67:4 93:21
141:16 197:19
314:16 368:19
370:17 372:7
372:11

---

## G

**G** 3:19
**gain** 226:5
**game** 122:17
**Gardner** 68:4
**gather** 78:3,7
**gathering** 77:5
293:22
**general** 5:1
27:23 30:18
33:25 34:25
35:14 75:14
78:15 125:24
126:8 151:6
154:9 192:15
209:16 211:11
265:7 275:19
278:4 291:2
294:4,25 295:2

304:25 308:4
348:25 366:5
**generally** 29:20
57:2 61:20
64:23 70:10
72:25 77:20
81:23 98:13
101:12 126:9
127:22 130:21
139:15 219:25
222:2 237:6
253:2 282:25
289:7 291:11
291:24 294:24
295:15 297:7
360:24
**generate** 276:12
279:12
**generates** 27:4
**genetically**
292:1
**genital** 37:3 68:7
69:10,15 70:6
72:1 73:16
110:13 202:25
265:5 295:23
295:25
**genotoxic**
280:20 281:7,8
281:9,18
**genotoxicity**
281:15
**geologist** 149:8
**geology** 132:15
255:11
**GEREL** 2:8
**getting** 31:15
54:2 301:7
327:3 331:13
**ghostwritten**
246:9
**GI** 233:24
271:20
**give** 26:12 34:25
46:2,8 51:21
60:25 80:7
83:8 84:5 85:5

Confidential - Pursuant to Protective Order

88:22 92:12
93:5 98:4,12
98:20 101:4,22
102:18 103:20
103:24 110:9
114:5,18 120:3
133:23 138:17
140:23 141:7
155:6,14
217:19,23
229:8,12 230:9
230:18 244:1
248:6 252:13
255:16 259:22
303:3 314:1,11
334:9 368:17
**given** 27:5 60:16
89:23 94:1
99:2 109:5
121:14 127:14
154:16 166:22
174:10 210:24
212:18,19
219:4 226:14
230:6 244:25
251:20 255:16
261:22 280:15
302:7 304:5
315:17 351:2
374:5
**gives** 50:25
99:15 202:19
246:10
**giving** 8:9 46:1
83:21 104:4,5
105:6 107:5
114:11 115:25
120:9 141:5,6
158:1 171:22
171:23 203:16
219:1,12
306:20 353:10
**globally** 142:16
**GLP** 88:3 232:3
**glutathione**
228:22
**go** 13:5,13,14

25:7 26:15
32:6 35:20
36:25 37:5
38:9 45:6
49:11 51:11,25
52:3 55:24
56:10 57:18
61:5 66:24
68:20 75:25
76:11 77:3,15
94:20 102:15
104:15 106:24
109:24 120:19
123:19 130:23
141:16 146:7
152:21 153:13
159:13 178:22
188:2 194:11
200:20 219:20
220:7,19
221:16 222:3
235:21 245:23
251:19,25
254:24 259:18
273:16 274:19
276:16 280:4
280:10,13,14
280:16 287:22
288:21 289:4
299:7 312:16
321:6,7 323:3
330:6 337:19
338:20 341:8
346:3 347:8
353:25 358:11
359:4,6,6
364:4,8 366:23
368:14
**goal** 36:23
**goes** 42:23 121:6
192:3 251:25
**going** 13:7 24:18
25:10 40:25
55:12 80:15
81:1,6 85:10
94:15,22 99:21
101:24 118:1

131:10 132:14
135:15 136:14
148:18 167:8
175:23 188:3
200:21 228:9
230:3 232:8
235:16 241:22
259:2 287:3
300:7,10 328:8
341:9 343:6,12
345:22 347:24
349:22,23
359:1,4,8
364:14,15
368:24 369:14
371:1
**Golkow** 1:21
3:20 6:4
**Golomb** 2:16,17
7:1,1 19:5
**Gonzales** 118:14
120:1,14,16
**Gonzalez** 118:25
**good** 8:3 58:8
100:17 168:10
192:25 201:2,4
270:7 287:16
302:3 369:6
**Gordon** 250:3
**government**
17:4
**grabbed** 121:25
**grade** 135:11
140:15,18,18
142:8
**great** 211:4
**greater** 38:14
125:1 178:2
292:16 303:7
303:12,15
304:15
**group** 122:2
131:6 217:22
**grouped** 118:6
**groups** 209:17
209:17 217:15
218:15 219:6

**guarantee**
293:14
**guess** 18:20
30:13 56:22
101:15,21
143:22 147:24
149:11 178:10
193:9 202:2
285:14 311:21
323:23 351:10
366:15
**guidance** 49:3
49:13 51:12
61:1 76:17
290:17
**guidelines** 186:5
**guides** 335:9
**gynecologic**
359:15
**gynecological**
182:9,25 356:1
356:1 358:3
359:12

---

## H

**H** 3:19
**habit** 187:5
200:13 299:20
299:21 301:21
307:3,10
**habits** 101:13
301:11
**Hamilton**
242:25
**hand** 53:1 83:16
**handed** 8:20 9:7
111:12 211:20
**handing** 8:16
111:10
**handled** 122:3
**handles** 122:3
**Hang** 23:14
**happen** 69:3
97:4 181:6
300:8 343:21
361:1
**happened** 27:22

31:6 45:14
46:2 360:14
**happens** 27:10
27:14 82:13
85:9,18 291:15
298:17 302:3
342:8
**happy** 370:18
**hard** 193:24
**hazard** 36:1,2
37:15 47:6
48:14,14 77:1
77:2 82:2,4
143:19 153:9
165:21 167:2
168:12,14
169:12,19
170:23 171:8
171:10 197:21
197:22 204:7
229:21 234:24
235:1,5,6,8,11
235:14,15
237:23 243:15
256:8 268:18
285:15 289:6,7
297:24 314:22
326:1,3,6
327:16 332:15
334:4 338:18
370:10
**hazards** 15:15
178:14 236:10
322:15,16
323:9 335:11
**he'll** 26:15
**head** 52:4
**health** 4:21 5:2
15:15 36:3,20
47:6 48:13
107:3 115:7
166:11 178:14
201:6,13,17,25
202:9 204:13
204:24 205:6,9
205:23 206:20
211:7,12 212:8

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 116 of 1525 PageID: 62262
Confidential - Pursuant to Protective Order

Page 396

216:3 236:13
283:21 284:7
284:13 312:16
322:15 323:9
331:25 334:16
**heard** 357:15
**heavily** 344:6
**heavy** 146:13
169:9 170:7
264:1 266:25
267:18 268:1,6
268:8 269:5
272:3 273:9
274:22 276:10
278:14 288:1
310:11 311:2,3
311:13 312:17
312:21,22
313:2,9
**held** 1:13 6:8
**help** 25:23
236:23
**helpful** 13:4,12
84:9 94:3
112:1
**helping** 151:15
**helps** 111:20
**hereinbefore**
372:9
**high** 88:4,16
235:10 295:3
**higher** 175:4
198:4 229:18
**highlight** 80:14
80:17
**highlightings**
13:24 16:25
**highly** 314:8
**Hill** 36:24 38:24
74:15,17,18,21
75:2,9 114:20
159:14 194:8
195:10 196:17
**hired** 364:3,23
367:15
**hiring** 367:4
**historically**

29:23
**history** 354:25
**hold** 24:4 267:14
294:18 318:4
339:6 358:10
**holiday** 370:19
**honed** 79:24
**honestly** 61:24
**HONIK** 2:16
**Hope** 2:23
**hopefully** 34:8
315:6
**hospital** 178:22
**hot** 301:6
**Hotel** 1:14
**hour** 19:3
**hours** 11:10,18
18:20,21 19:4
88:21
**Houston** 26:8
**human** 15:15
36:3,20 37:18
71:25 96:20
100:7 101:9,24
104:4 107:3
115:7,20 118:6
118:9 119:8,17
142:2 153:19
153:19 157:16
157:17 158:13
160:7 172:23
172:23 182:16
186:5 187:22
197:5 205:23
216:3,10,25
217:7 219:7
229:3 230:10
230:13,13,18
231:4,14,18,19
231:24 232:2,3
232:12 238:16
239:3,13 240:6
240:17 241:13
256:17 269:7
270:7 271:6,12
271:17 279:25
280:1 295:14

295:19 302:24
305:1 322:14
323:9 334:3,16
**humans** 101:12
101:14,18
117:14 182:13
197:3 231:9
232:17 270:6,9
270:21,24
279:24 291:22
**Huncharek**
244:11 246:2
361:8,14,25
362:15 363:23
364:3,23 365:5
365:23
**hundred** 166:25
**hurry** 292:2
**husband** 25:23
26:4,23 62:15
62:19

I

**IARC** 31:12
65:10,22 76:25
148:6 149:16
151:8 191:20
192:24 196:4
196:20 197:1
198:5,9,17
199:5 204:7
221:15 232:4
254:4,16
271:18 277:3,4
277:4 280:9,13
287:25 288:10
324:24 325:23
348:3,14
**idea** 44:12 46:4
48:8 86:16
90:23 118:8,9
125:22 126:5,7
149:25 152:20
160:18 166:5
194:2,9 220:13
243:16 246:5
256:6 273:21

283:12 289:6
300:23 301:5
306:21
**identification**
8:14 9:13
13:18 16:17
17:10 111:5
206:24 211:15
285:19
**identified** 9:17
17:23 23:12
24:13 25:24
26:25 33:2
53:20 54:1
65:10 75:3
83:25 113:11
122:11 147:24
147:25 148:1
158:16 170:20
200:6 212:8
236:9 245:13
253:6 288:2,12
309:10 332:15
338:13 362:16
**identifies** 37:14
282:17
**identify** 6:16 9:6
13:2 15:7 27:5
55:15,24 59:8
68:15 77:1
95:10 96:19
100:3 133:10
139:22,23
144:15 154:3
156:14 160:6
168:14 224:4
225:2 235:11
237:12 250:12
250:23 251:16
266:25 267:17
267:25,25
276:11 282:10
282:16 294:22
305:21 310:4
326:17 332:14
**identifying**
53:12 61:6

117:12 141:14
156:7 235:16
366:12
**ignore** 46:13
**Illinois** 1:18
372:20
**imagine** 46:14
**Imerys** 3:5 7:9
7:11 30:25
58:22 144:16
250:8 287:18
307:20 308:3
308:11,24
316:15,20
317:8,19,24
318:2,13,20
367:5 368:4
**Imerys'** 317:22
**immediate**
178:20
**immediately**
178:24
**immune** 276:21
**impact** 334:11
**imperative**
373:13
**importance**
101:1 104:10
104:23 105:6
256:14
**important** 21:1
30:5 50:10
81:4 84:25
93:22 97:20
99:12,18
100:10,15,23
103:3,6 104:9
104:19 105:3
122:14 135:15
138:18 141:18
143:18 150:19
152:3,6,11,13
152:22 159:12
167:17 168:3
169:8,21
212:23 215:10
229:16 231:15

Confidential - Pursuant to Protective Order

234:6,21,25
235:20 242:13
245:8 256:4
260:23 271:6
314:21 357:24
358:2,6
**impossibility**
347:25
**impossible**
186:4 207:24
224:8 348:13
**imprecise** 283:5
**in-depth** 71:14
71:21 72:4
**inaccurate**
67:13
**incapable**
270:13,16
**include** 11:12
60:14 87:13
120:1 150:22
202:2 210:24
239:9 262:10
273:2 342:3
347:21 355:18
**included** 122:1
210:1 218:24
239:9 338:16
**includes** 86:22
87:15 151:25
198:17 256:16
274:15
**including** 11:14
29:21 62:18
71:18 215:5
219:25 251:5,9
261:6
**inclusion** 218:3
331:19
**inconsistency**
317:14,17,18
**inconsistent**
113:4 275:4
**increase** 37:10
39:18 40:15,19
158:4 171:21
172:1 199:12

219:19 237:23
274:25 369:21
**increased** 36:11
37:10,23 39:11
39:17 112:23
146:16 156:8
157:12,22,25
158:14 159:17
160:3 172:2,4
172:10 173:1,3
173:5,12,19
174:7,8 200:4
204:21 229:20
239:21 274:14
286:11 306:18
324:22 326:18
327:21 332:7
332:20 335:17
**increases** 34:18
35:4 38:17
39:20 40:13
41:4 157:18
198:22 203:22
203:25 237:22
238:3 286:22
306:24 319:18
321:1 329:25
331:5 370:11
**increasing** 169:3
**independence**
348:7
**independent**
51:18 257:8
272:7 325:24
329:9 337:18
340:4 362:16
**independently**
338:10
**INDEX** 4:1
**indicate** 227:13
240:24 247:19
254:19 299:18
307:3 317:8
327:12
**indicated** 63:3
250:25
**indicates** 113:2

160:12 180:21
226:14 260:10
305:1 306:22
**indicating** 364:2
364:22
**indicative**
179:18 238:11
**indirect** 281:15
282:11
**individual** 29:21
120:12 127:9
127:15 152:14
169:17 171:15
173:8,9 183:22
189:23 200:11
221:8 224:4
225:22 226:10
239:25 246:6
259:25 263:19
278:20 286:5
293:24 305:9
322:1,6 334:23
334:24 350:15
350:15
**individual's**
180:7 185:21
**individually**
100:21 149:7
154:8 158:25
171:12 219:21
234:4 272:8
275:8
**individuals**
25:18 78:14
85:11 115:13
121:13 131:9
159:5 218:9
228:11 239:7
241:3 244:2
256:9 286:10
305:7 320:6
342:18 349:18
353:8,12,18,20
354:2 355:19
**induce** 277:8
278:23 279:22
281:22

**induced** 279:7
**inducing** 281:14
**indus** 344:19
**industrial**
133:12 134:13
135:11 140:18
142:8 155:16
**industrial-gra...**
145:18 227:6
**industry** 31:14
124:1 245:19
340:23 341:3
344:8,19,22
345:1 350:14
350:15 352:1
362:18 365:21
366:12 368:8
**inert** 183:15
184:10 185:4
**inflammation**
61:19 126:6
127:24 128:2,9
128:13 140:14
196:7 219:25
220:1,15,18,19
220:20 221:1
221:20 227:20
268:13 276:5
**inflammatory**
128:16 168:25
189:20 190:4
190:12 191:1
191:21 192:13
220:5,23
222:23 228:1
243:18 266:2,5
266:9,11
272:14 274:9
276:19 277:9
279:2,6,10
**influence** 31:4
31:22
**influenced** 32:1
**influences** 123:7
**information**
10:12 15:15
17:18,20 23:22

26:5 30:8,12
30:21 35:18,21
37:14 39:8,10
41:11 54:4
70:13 74:3
76:15 78:2,4,8
79:23 80:14
82:15 86:18
91:1 92:8,11
103:3,4,23
104:8 106:2
118:3 121:14
122:22 123:4,9
127:15 134:13
135:13,17
138:13,17,25
141:15,18
143:5 158:24
159:3 162:6
164:14 165:23
165:24 166:20
167:13 168:3
170:10,11
180:20 185:23
191:14 194:14
197:15,18,19
198:17 205:4,9
216:12 217:6
217:15 218:11
218:12 219:10
221:1,6,12
237:11 239:9
241:6 247:2,4
247:18,19
253:1,1,3,12
253:13 260:12
260:14 284:6
293:23 304:5
314:8 318:19
323:23 329:16
331:1,24
332:23 334:11
336:15,17
337:1,4 339:12
339:25 342:2
349:16 359:23
360:3,3,20

Confidential - Pursuant to Protective Order

368:7 370:3,5
**informative**
  84:10 100:23
  101:6 219:10
  219:11 221:6
**informed** 95:18
**ingredient** 52:21
  125:21 132:21
  307:25 308:2
  309:3 336:6
  341:20 342:3
  346:21
**ingredients**
  44:10,15,17
  125:18 127:10
  144:4 168:22
  309:14,18,20
  322:18 324:4
  336:13 337:3
  339:18 341:9
  344:9 346:19
  347:1,5,12
  348:2
**inhalation** 175:4
  175:20,24
  176:4 177:5,14
  177:25 178:2,6
  180:3 230:20
  233:12 235:9
  258:12 291:14
  292:6
**inhaled** 264:21
**inhaling** 178:7
  258:25
**inherent** 245:22
**initial** 21:15,16
  55:9,11 56:24
  64:16 65:25
  82:1 231:8
  235:6 246:13
  281:22 342:3
**initially** 54:11
  55:2,3 329:12
**initiate** 128:16
**initiated** 88:11
  220:14
**initiates** 328:6

**initiation** 281:10
**injections** 292:8
**injury** 178:19
  231:8 264:22
**input** 44:8 45:5
  45:11 245:15
  340:19,23
  341:2
**insertions**
  101:14
**inside** 105:6
  296:7
**installation**
  242:20
**instance** 79:5
  230:9
**instances** 53:10
  62:15 84:4,8
  184:22
**Institute** 4:25
  107:9,17 108:6
  110:6,24 112:6
  113:10
**instruct** 24:18
**instructing**
  24:22,25
**instructions**
  25:4 373:1
**insult** 225:3
  281:1,8
**insults** 195:25
**intact** 229:1,2,3
**intend** 203:15
**intended** 23:22
**intending** 33:24
  34:11 43:3
**intention** 130:4
**interact** 264:15
  277:15
**interaction**
  276:21 277:20
  360:14 367:23
  368:4
**interactions**
  31:3,13
**interchangeably**
  75:23

**interest** 349:5
  349:22 350:7
  351:3 352:4
  353:7
**interested** 88:22
  94:8 249:12
  372:13
**interesting**
  121:25 140:10
  178:13 297:22
**interim** 231:1
**internal** 30:23
  144:11 246:12
  321:14
**internally** 67:9
  67:16 297:10
  326:7
**International**
  346:10
**interpret** 230:3
**interpretation**
  49:7 50:1 51:1
  255:14
**interpreted**
  50:11
**interpreting**
  50:18 51:19
**interrupt** 359:2
  359:9
**interrupting**
  358:15
**interruptions**
  136:24
**interval** 40:7
**intimately**
  334:15
**intraperitoneal**
  292:8
**introduced** 8:4
**introductory**
  124:17
**invented** 115:14
**investigate**
  353:3
**investigations**
  239:14
**investigator**

246:6
**investment**
  244:4
**involve** 24:23
  154:14 214:2
  258:5 295:24
**involved** 11:3
  23:11 24:1
  25:16 44:16
  66:1 140:12
  195:21 248:10
  262:6 277:12
  320:11 331:13
  353:8
**involving** 19:9
  153:20 347:1
**irrelevant**
  143:23
**irritant** 166:6,11
  167:2 243:17
  338:9,18
**irritants** 274:9
**irritation**
  127:24 128:3
  140:14 167:7
  168:23,24
  179:19 268:11
  268:12 276:19
**isolated** 228:24
**ISRTP** 31:7
**issue** 37:10
  42:19 49:22
  52:10,17 53:1
  57:21 64:12
  65:4 67:18
  69:17 73:4,5
  73:23 74:8
  78:17 81:18
  83:6 86:15
  87:18 92:16
  95:19 96:7
  97:15 99:7,13
  103:17 105:4
  107:23 109:23
  123:2,6,11,23
  124:8 126:23
  132:25 142:1,1

146:15 150:16
  154:9 163:17
  165:17 167:3
  180:18 182:3
  182:17 186:25
  187:8 191:18
  193:14,23
  205:6 216:9
  217:11 220:10
  225:5 226:3
  227:22 231:2
  232:11 241:22
  243:12,12
  244:18 245:7
  245:14,20
  246:24 247:20
  249:16 252:8
  260:22 262:6
  272:9,9,16,24
  273:14 277:16
  280:3 283:1
  291:12 292:23
  292:24 293:1,3
  294:17,23
  296:3,6 304:11
  305:7 314:20
  321:9 323:20
  324:17,19
  325:14,25
  326:23 330:22
  331:15 333:21
  333:22 334:15
  335:14 350:25
  351:4,22 352:2
  356:2 362:23
  370:2
**issued** 24:12
  109:9 110:24
  113:11
**issues** 30:20
  67:1,5 72:18
  97:17 117:13
  123:10 182:22
  182:22 192:1
  287:23 294:18
  312:19 314:9
  324:12 334:9

Confidential - Pursuant to Protective Order

335:5 346:2
355:21 360:12
366:5
**issuing** 56:17
**It'll** 69:6
**Italian** 136:22
**Iturrulde** 16:6

**J**

**J** 3:2
**J&J** 58:21 250:8
307:21
**Jacob** 3:20 6:3
**Jane** 3:1 7:10
287:17
**jbockus@dyk...**
3:2
**Jean** 164:9
**Jersey** 1:1 6:13
**Johnson** 1:3,3
2:24,25 6:9,10
7:13,13,15,15
7:24,24 8:6,7
10:18,18,24,25
11:19,20 21:9
21:10 30:24,24
30:25,25 34:17
129:18 130:3
132:4 137:9,10
139:16,16
144:16,16,18
144:18 148:9
154:6,6,15,15
154:18 158:18
158:19 160:5,5
160:9 161:23
161:23 164:4
164:19 165:8
180:6 189:17
200:3 251:6,6
251:24,24
253:10,10,14
253:14 268:22
274:23 287:10
287:10 308:12
308:12,19,21
308:22 309:4,5

316:16,16,21
316:21 317:6,6
317:9,9,20,20
317:21 318:3,4
318:9 327:24
327:25,25
337:3,4 368:4
368:5
**Johnson's** 8:11
19:9 34:12,18
40:12 80:4
117:2,24 124:7
126:13 129:18
129:20 130:3
132:4 133:21
136:1 141:1
143:3 144:6
148:9 153:23
154:11,18
155:17 157:4
160:9,23
161:13 163:20
164:4,18,19
165:8 167:19
169:10 170:8
173:20 176:4
176:23 180:5,6
188:11 189:18
198:1 200:3
248:1,5 249:11
249:14,22
250:14 251:16
252:11,15
255:24 256:20
258:4 260:2
261:7 262:22
263:20 274:24
308:19 317:21
318:10
**joined** 19:4
**Journal** 27:11
346:11
**journals** 27:12
346:10
**judge** 87:13
247:2
**judgment** 39:5

77:23 84:12,14
84:24,24 86:16
99:7 105:13
156:24 217:25
320:7
**judgments**
86:23,24 88:17
**June** 20:12
111:19

**K**

**Kansas** 1:20
372:22
**KATIE** 3:18
**keep** 18:9 55:4
80:5,24 81:8
286:16 358:18
358:24
**key** 56:21 57:2
97:16 169:2
355:20 370:4
**Kimberly** 2:21
7:14 8:5
**kimberly.bra...**
2:22
**kind** 30:13
76:13 81:8
82:9 83:10
114:16 160:17
160:21 194:18
213:12 287:12
293:21
**kinds** 36:16,22
43:16 57:8,14
58:15 92:25
98:15 101:20
175:15 185:24
187:20 209:18
231:8 271:10
305:6 323:16
**KIRKLAND**
2:21
**Klaassen** 357:1
**Klimisch** 206:1
207:11
**knew** 57:18,19
57:20 361:7

**know** 19:23 29:7
34:4 37:17,24
40:9 46:1 51:9
55:16 56:3,6
57:7,19 58:7
59:2 60:5
63:10,16,22
68:12 69:3
70:7 81:1
82:23 85:6,7
85:13 89:20
91:9 92:15
98:25 104:13
105:9 107:18
109:12 110:16
119:3,12
120:23 121:9
122:15,16
130:11 134:17
136:11,17
139:18 140:5,8
143:21 145:2
146:24 150:25
155:8 168:10
168:11 169:13
182:7 183:23
189:23,25
190:3,15 192:3
194:15 196:9
204:25 205:20
206:3 216:6
222:2 225:6,10
225:11,14
229:13 237:9
242:2 243:7
245:22 247:3
247:10 250:19
252:18 257:18
259:18 263:7
263:22 270:15
274:19 277:22
278:21 279:4
279:15,21
287:18 289:21
289:25 292:15
293:19 300:24
301:13 303:4

304:13,20
306:25 307:7
308:7,17,25
309:1,2 312:17
315:5 317:3,16
320:15,19
328:17,17
330:23,24
332:12 339:15
339:19 344:11
344:13,14,14
344:16,25
346:7 352:22
353:1,2,18
354:12,14,22
354:25 355:5
355:10 356:23
357:1,1 369:7
**knowing** 144:21
194:20 297:24
314:3 328:11
**knowledge** 34:5
293:11 316:14
355:11
**known** 29:24
31:2 56:25
128:1 170:23
178:15 184:5
185:4 194:17
196:1 197:24
246:11 256:17
269:6 271:17
272:18 273:12
279:25 285:16
370:10
**Krewski** 117:18
**Kunz** 68:19

**L**

**lab** 310:23
**label** 47:3
**labeled** 166:11
**labeling** 44:9
51:8 52:16
**laboratory**
181:22 182:20
**laid** 40:22 59:10

Confidential - Pursuant to Protective Order

87:11 113:21
154:7 158:25
164:23 216:12
333:15
**landing** 181:12
**language** 28:4
45:18,19 46:21
47:2,20 48:2
48:16 49:7
50:18 52:10
110:16 315:24
316:5 333:24
339:20
**large** 44:19
53:22 61:23
128:17,21
129:11 130:4
178:5,7,21
243:9,12
**large-dose** 243:3
**larger** 21:25
22:7 68:23
125:8,25
128:13 129:1
**late** 9:3 317:10
**Laura** 1:12 4:13
4:14,16 6:14
7:20 14:15
372:5 374:12
**law** 39:19
**lawful** 7:21
**lawyer** 352:12
352:15
**LAWYER'S**
376:1
**lawyers** 350:20
351:18
**lay** 66:22 77:16
77:24 79:19
98:3 134:19
135:9 138:25
153:2 158:20
215:2
**layer** 229:24
**laying** 151:11
332:22
**lays** 76:12 92:5

**lead** 97:2 191:23
195:19 220:15
221:22 227:19
228:23 267:1
268:23 273:24
279:5 283:14
296:22 312:23
**leader** 107:12
**leading** 107:19
107:20 222:24
281:14
**leads** 129:12
220:6 313:9
**leave** 366:13
**led** 215:11
329:24
**legal** 24:16
**length** 265:17
**lesions** 222:25
230:24 240:14
**lesser** 324:19
**let's** 14:4 16:21
20:10 21:5
63:7,24 70:23
102:18 110:21
128:7 151:20
180:3 184:18
188:16 189:11
235:8 321:16
327:2 333:13
352:19 359:20
362:21 363:8
**letter** 27:13,17
361:23 362:1
363:18,20,21
363:23
**letters** 27:8
**level** 37:20
39:17 117:15
121:8 132:2
145:20,22
159:17 198:4
213:15 214:2
216:7 217:19
226:19,20
227:8 228:16
229:18 258:21

258:21 266:4
282:10 286:9
306:25 311:13
338:18 348:1
348:13,15
**levels** 161:11
166:22 168:15
175:11 176:12
176:21 228:21
229:4 251:8
256:7 267:16
310:14 311:16
311:18 312:18
312:21,22
**LEVIN** 2:12
**LHG** 1:5
**liabilities** 73:9
**liability** 1:5
351:18
**libraries** 26:12
**library** 26:10,11
62:22 63:1
**lies** 360:15
**life** 187:5 200:16
228:12 302:2
303:19,20
**lifetime** 185:17
185:20 187:17
200:10 263:21
**Lily** 164:9
**limit** 170:15
228:5 241:22
310:15,24
311:9
**limitations**
79:16 239:13
241:5 347:11
347:17
**limited** 169:7
283:12 312:24
358:17
**limiting** 264:11
**line** 359:10
375:3 376:3
**lingering** 183:9
**link** 61:19 99:17
109:17 110:12

110:12 285:3
318:7,9
**linked** 42:12
167:2 227:20
228:1 238:6
254:16 277:7
285:17 338:17
**linking** 57:4
58:20
**lipsticks** 161:17
**list** 22:1,6,8
55:10,13 59:13
59:25 60:1,15
60:20 61:2
63:6,12,13,17
63:21 64:1,2,7
64:11 68:23
83:3 108:16,21
108:22 109:2,4
118:19 120:15
122:6,7,9,18
211:9 212:1
241:15 250:13
263:14,14
**listed** 55:10
59:13 63:5
108:15,17
111:1 197:8
211:24 310:17
310:18 347:5
354:23
**listened** 32:21
**literally** 346:4
**literature** 25:22
57:16 61:14
62:3,18 68:24
71:15 77:25
78:11 79:2,7
79:10 82:25
85:5 90:24
97:8 103:10
121:23 125:2
126:21 128:22
128:24 132:18
132:20 133:1
133:15 134:20
134:22 135:6

139:3 147:13
148:3,8,14,22
149:12,14,15
150:22 151:13
151:16 152:18
152:21,23
153:8 154:2
170:3 180:25
182:8 187:14
199:19 200:8
200:18 206:23
209:25 223:4
236:9 248:25
249:2,21
266:15 273:8
273:11 281:3,5
282:17 285:13
286:23 297:9
299:12 311:3
312:11 314:5
321:13,17,23
**litigation** 1:5,21
3:20 6:4 10:17
12:7 19:9 29:4
131:9 218:20
246:1,4,22
248:10,13,14
248:18 249:7
261:20 320:12
320:20 324:1
331:13,22
346:17,17,18
346:21 347:1
351:1
**litigations** 29:9
**little** 31:11
38:10 39:16
42:18 44:19
45:23 53:5
61:1,25 67:4
81:18 84:5
95:4,24 96:6
97:3,6,20 99:2
120:3,9 121:2
193:24,24
201:5 203:20
210:20 211:3

Case 3:16-md-02738-MAS-RLS Document 9886-12 Filed 05/29/19 Page 121 of 1525 PageID: 62267
Confidential - Pursuant to Protective Order

Page 401

245:13 335:21
338:1 339:7
365:9
**liver** 233:25
**lives** 345:2
**living** 81:9 294:3
**LLC** 3:15,15 7:6
7:7
**LLP** 2:8,21 3:7
3:12
**Loansome** 26:9
**local** 26:10
**locally** 242:16
**Locke** 3:7 4:7
7:3,3 111:14
111:21 319:1,4
319:5 322:9
323:1 325:15
326:21 329:7
329:19 330:12
333:1 336:4
337:11 340:24
343:10 351:14
352:6 354:4
356:19 357:10
358:11,16,20
359:3,11
364:14,20
368:19
**long** 18:18 179:4
304:23 343:24
358:20 369:7
**long-term** 72:20
178:19
**longer** 95:6
220:21 303:2
305:11 359:4,7
**Longo** 163:19
177:15 249:3
259:17
**Longo's** 162:7
247:24 248:18
248:22
**look** 19:22 21:13
22:3 27:19
29:23 31:2
36:22 49:12

51:11 52:1,3
53:24 56:18
60:4,6 62:9,10
68:20,25 72:16
75:15 78:25
79:13 82:24
83:11 84:15
85:11 91:1
92:3,4,10,16
92:25 96:22
97:23 98:10
105:1,25 106:5
109:19 110:17
110:19 117:4
118:18 119:7
119:10 130:16
133:14 134:1
143:10 145:2
146:7 150:17
153:18 155:25
159:10,12,14
159:24 160:8
160:16 162:7
162:16 166:24
170:22 172:21
174:20 177:6
182:3,17
183:21 189:22
195:11 202:15
208:6,13
210:11 221:5
225:3,4 229:4
232:5,11 234:3
237:19,20
239:12,15
240:6,10,13,23
241:7,12,15
245:20 246:25
247:7 248:20
249:13 252:1
254:18,24
256:13 259:19
263:9 267:23
274:6,19
275:21 276:17
277:14 278:5
280:5,11,11

281:19 282:23
284:10 288:5,6
288:10,21
291:14 292:2,7
293:3,6 295:17
315:14 317:13
317:15 318:15
320:6 323:2
324:25 326:23
327:5,11
334:10 338:20
361:16 364:5
364:10 367:5,7
368:14
**looked** 15:4,8,18
15:20 16:5,6,9
17:3 52:15,16
69:25 70:19
73:3,5 98:1
109:11 123:21
142:9 159:20
161:1 163:11
163:16,22
165:17 173:11
175:13 179:20
185:22 187:8
192:21 217:8
224:14 238:7
238:24,25
239:1 256:25
271:23 278:19
285:1 304:4
319:9 333:8
336:25,25
338:10 348:17
**looking** 19:7
31:21 32:18
36:4 37:15
40:5,6 48:7
49:21 52:11,20
53:19,21 54:21
55:13 61:15,21
64:18 68:13
74:7 76:8 78:6
80:21 81:22
83:16 86:7,16
88:1,9 93:2

112:9,11
115:18 117:2
117:11 119:4
119:17 123:13
131:5 132:17
138:12 141:11
142:6 145:9
152:2 153:5
162:12 169:14
170:18 171:13
194:16,17
195:21 207:21
218:13 225:6
225:12 226:2
231:1 239:18
240:3,4 257:2
258:15,17
262:7 272:25
273:17 277:17
293:1 294:20
302:18 315:21
320:8 324:19
325:25 326:1
327:4 330:22
331:15 336:14
352:2
**looks** 41:17,18
41:19 197:14
197:14
**Loretz** 365:15
365:22
**Los** 2:23
**lot** 27:10 44:19
61:10 79:1
170:12 182:6
229:12 271:14
315:8 346:1,2
350:19
**lots** 62:9 267:4
**Louis** 1:15 3:14
6:9 19:19
20:21
**love** 230:25,25
**low** 145:22
235:10 256:7
258:20 319:11
**lower** 68:6 69:15

73:15 183:16
229:8 295:4
328:2
**lung** 125:5
178:20 179:19
231:3,8 254:22
264:22,23
291:15
**lungs** 178:19

**M**

**M** 3:12 4:13,15
4:16
**ma'am** 312:14
**macrophage**
125:7
**macrophages**
150:17
**magnitude**
293:7
**main** 97:12
**maintain** 319:11
**maintained**
59:25 62:16
**majority** 74:2
141:22 142:23
160:13 184:9
**makeup** 355:18
**making** 37:1
44:17 74:5
173:2 243:14
245:24 253:7
261:15 317:11
318:2 338:24
**male** 103:12
**manner** 231:24
232:17 265:25
**manual** 76:10
**manufactured**
137:9 139:15
154:5,15
158:18 160:5
164:19 165:9
316:15
**manufacturer**
309:5 331:16
**manufacturer's**

Confidential - Pursuant to Protective Order

329:21
**manufacturers**
  144:12 359:24
  360:4,7,19
**mark** 8:17 13:5
  13:13,15 14:1
  14:4,13,21
  16:22 17:12
  111:8 211:17
**marked** 8:13
  13:18 14:10,18
  14:24 16:16
  17:9 20:4
  22:21 23:9
  25:19 28:1
  53:6 90:8
  93:15 95:11
  111:4,12
  155:13 201:10
  206:15 209:23
  211:14,20
  266:21
**market** 2:18
  43:16 154:12
  160:17 161:4,9
  308:13 326:8
  329:16
**marketed** 43:14
**marketing** 1:4
  6:10 322:17
  324:4
**markets** 324:9
**marking** 14:6
**markings** 13:23
  16:24
**match** 231:9
**material** 61:10
  82:19 175:14
  208:9 263:14
  307:21
**materials** 9:17
  20:24 21:19
  45:6 57:25
  68:14,22 82:20
  83:23 108:18
  122:6,10,11
  175:15 208:3

211:25 212:10
  263:8,10 321:7
  333:8 342:4
**Mattenklott**
  250:3
**matter** 21:14
  60:8 186:1
  235:9
**Matthew** 261:7
**MDL** 1:4 8:10
  11:8,21 13:8
  14:23 22:19,20
  23:1,7 24:3,12
  29:4,10,17
  31:21 32:21
  33:4,10,20,24
  34:1,8,12 35:1
  58:1 61:7,9,15
  65:14 66:11
  74:14,21 75:1
  82:18 83:1
  85:15,24 87:6
  89:7,18 91:23
  113:11 115:17
  116:24 117:23
  118:15 139:12
  157:2 160:3
  188:15 198:3
  203:15 214:13
  216:23 236:3
  255:25 261:12
  262:4 267:8,22
  268:9,21 269:3
  269:8 285:3
  288:2 335:7
**Meadows** 2:3
  6:18,18 13:12
  18:16 23:14
  24:4,15,25
  28:21 32:3
  38:19 39:22
  40:17 51:2
  56:7 58:6 86:2
  93:17 94:10,13
  106:12 131:17
  132:5 134:15
  136:3 139:17

143:7 144:9,24
  154:21 155:18
  166:14 173:22
  174:9 179:12
  180:17 183:8
  192:18 221:4
  222:10 234:12
  252:17 260:4
  298:21 303:14
  304:16 306:9
  307:13,23
  308:6,15
  309:16 310:8
  312:5,9 315:4
  316:22 322:20
  325:3,21 327:7
  329:11 330:2
  332:9 334:20
  337:9 342:23
  350:21 351:19
  356:12,24
  358:10,14,19
  358:25 359:8
  368:21
**mean** 11:8 13:9
  21:19 28:7,12
  28:13 38:5,6
  39:24 41:13
  53:14 56:3
  58:11 70:17
  72:4 83:23
  85:10 89:21
  105:10 109:25
  116:2,12,22
  120:18 124:22
  127:7 131:19
  131:23 135:16
  137:17 152:17
  154:25 181:21
  183:18 189:4,5
  196:23 197:9
  216:5 232:4
  236:21,22
  247:13 254:24
  263:13 275:5
  281:9 294:15
  301:18 320:5

325:5 330:6
  331:4 346:18
  347:7,22 350:4
  353:25 360:6
  361:23
**meaning** 47:24
  189:9 264:13
**means** 50:19
  99:1 118:20
  127:3 310:23
**meant** 35:8
  140:6
**measurement**
  177:16
**meat** 30:2
**mechanism**
  88:11 140:12
  179:8,10
  188:11,25
  189:9,16,24
  191:19,22
  192:4,14 193:1
  193:5,16,19
  194:3,6 195:13
  195:17 196:6
  196:13 219:24
  221:10,20
  223:1 227:18
  228:3 229:15
  268:10,12
  272:20 276:4
  277:7,17 278:2
  278:6,12
  281:16 282:12
  289:3 293:5
  314:21 370:7
**mechanisms**
  146:20 189:13
  191:11,13
  228:5 274:7
  275:23 281:22
**mechanistic**
  195:22 217:1,5
**medical** 26:10
  27:12 62:2
  147:13 157:24
  266:15 321:12

321:17,22
  359:16
**medicine** 26:11
  27:11 353:24
  354:16,19
**meet** 114:23
**meeting** 12:8,9
  18:14,17,19,24
  19:1 343:16
  344:17,20
  345:7
**meetings** 31:7
  344:2,6,8
**member** 344:22
**members**
  353:19 354:11
  356:8
**memory** 12:16
  362:5 367:21
**mention** 90:3
  119:20,21
  147:5 168:9
  340:8,9,13
  347:10,14
**mentioned**
  18:12,23 31:19
  33:19 35:3
  118:21 121:21
  148:13 163:4,5
  209:12 264:2
  282:22 314:6
  327:3
**mesh** 129:7,7
  130:13
**mesothelial**
  233:20
**messed** 339:5
**met** 18:13
  287:17 319:7
**Meta-Analysis**
  4:19
**metal** 264:7
  310:11 311:3
  311:14 312:17
  312:21,22
  313:3
**metals** 146:14

264:1 267:1,18
268:1,6,8
269:5 272:3,7
272:10 273:3,9
274:22 275:7
276:10 278:14
288:1 289:2
293:19 309:19
310:3 311:3,24
methodologic...
155:12
methodology
75:16,19 76:4
90:21 114:24
116:23 117:1
117:22 173:16
methods 214:22
214:24 236:8
METHVIN 2:2
Michelle 2:8
6:20
microenviron...
228:25
microns 124:25
124:25 125:1
microphone
339:6
middle 316:13
migrate 64:24
68:6 69:14
70:5,22 72:11
73:15 182:10
185:5 283:13
migrated 300:14
migrates 181:19
183:6 186:16
301:14
migrating
185:11
migration 66:5
67:9,15 69:10
69:17,21,24,25
71:2,10,17
73:24 74:6
81:2 95:19
97:12,15 100:6
182:13 184:3

215:7 216:9
295:22 299:22
300:1,9 335:14
356:2
migratory 71:24
MILES 2:3
miller 178:1
milling 132:24
million 158:5,5
millions 53:22
53:22
Millman 250:5
mind 14:1 38:8
mine 130:24
136:22,23,23
142:8 145:6
357:9
mined 131:14
135:22 142:15
miner 175:8
178:1
mineral 253:20
254:2
minerals 250:10
309:10 311:23
mines 136:25
142:16 150:1
minimize
202:20
minimum 303:5
303:6
mining 132:24
135:11 175:16
minute 208:14
219:24 364:9
minutes 288:9
299:6 356:14
misheard
298:13
missed 137:19
316:3
missing 200:7
297:19
Missouri 1:15
1:19 3:14 6:9
372:20
misstates 86:1

163:3 186:12
296:18
mistake 69:8
mistaken 108:24
MITCHELL
2:12
mixes 308:22
mixture 125:18
146:12,17
151:25 152:2,5
152:8 153:7
167:9 168:21
169:15,16
225:7 226:3,9
256:2,15,16
257:3,10
272:23 277:11
277:21
mixtures 292:24
mode 278:5,5
289:8 292:25
370:5,10
model 182:12
modified 65:20
molecular
189:24
moment 12:19
74:13 99:20
242:8
Monday 9:4
12:8,11 18:13
18:15,17
money 349:22
350:19 351:17
351:25
monitor 235:17
monkey 182:23
monkeys 182:21
182:23
monograph
288:17,18
monographs
149:17
Montgomery
2:6
month 11:1,10
11:18 300:2,25

301:2,2 303:13
303:16,19,20
303:21,25
304:15 305:2
305:14
months 301:3,18
Moon 250:3
morning 8:3
306:21 327:22
morphology
147:24 149:6
motion 180:10
mouse 292:1
move 70:10
73:10 125:6
180:9 183:15
265:4,10,12
moved 112:14
movement 71:5
73:6 74:8
103:14 105:4
183:20,25
184:10
moving 358:18
358:24
mparfitt@ash...
2:9
multiple 27:4
169:24 256:2
275:21,22
301:23
multiply 292:15
Muscat 244:11
246:2 361:8,14
361:25 362:15
363:24 364:3
364:23 365:4
365:24

_____
N
_____

N 2:1
N.W 3:8
name 6:3 8:5
16:14 19:17
80:25 119:3
126:18 206:5
206:11 263:3

287:17 319:9
327:23 344:14
name's 319:5
names 149:12
289:22 349:17
narrow 11:6
28:18 33:20
57:7
narrower 61:25
Nate 164:9
nation's 107:12
National 4:24
26:11 107:9,16
108:6 110:5,24
112:6 113:9
natural 223:7
225:15 228:14
naturally
310:12 311:5
nature 48:19
55:22 133:12
212:19 258:18
266:6
NCI 110:4
113:16
NCRA 372:18
near 348:14,15
necessarily
21:22 116:18
197:9 214:2,6
225:25 227:23
231:25 265:24
268:16 269:20
276:5
necessary 47:5
47:16,25 48:19
49:8 50:2,19
51:19 52:19
286:4 373:4
need 9:12 39:18
39:23 45:17
52:17 62:3
105:25 110:19
119:10 146:6
151:12 206:4
213:9 221:1
229:22 231:13

233:3 244:9
247:17 274:19
276:16 278:1
280:4 292:12
306:5 347:8
355:23 359:5,6
361:16 362:4,5
364:4,6 365:16
366:16,19,20
366:23 368:13
**needed** 48:15
213:16
**needing** 264:17
**needs** 52:12
94:17 167:11
264:8 328:3
352:4
**negative** 42:3
**negatives** 79:18
**neither** 372:11
372:12
**neuronal** 233:24
**never** 43:21 52:8
58:8 205:20
246:11 255:16
293:12
**new** 1:1 6:13
27:10 33:5,10
54:15,15,18
55:16 61:15,23
62:4 78:23
135:23,25
140:24 211:9
211:24
**news** 122:19,21
123:11
**newspaper**
124:3
**Newton** 16:7
**nice** 101:16
168:10
**Nicholson**
365:19
**nickel** 267:2
268:2 276:16
276:18,20,22
278:11 279:5

291:6 293:15
312:4 313:10
**night** 16:7 18:24
**NIH** 26:11
**nine** 183:24
**noise** 365:9
**non** 294:13
**non-asbestifor...**
147:15 148:25
149:18 151:7
193:3
**noncancer**
294:16,24
**nondirect** 281:8
**nongeno** 294:15
**nongenotoxic**
280:20,25
281:21,24
282:9 294:13
**Nonhuman**
206:25
**nonlitigation**
213:25 218:19
**nontremolite**
149:23
**normal** 222:3
279:20
**normally** 220:8
**North** 1:14
**Notary** 372:22
374:19
**notation** 317:12
**notations** 16:25
**note** 82:24
218:10
**noted** 373:10
374:7
**notes** 80:16 81:8
376:1
**notice** 4:11 9:9
9:16 17:17
141:24 173:4
290:25
**November** 4:17
14:22 22:20
**NRC** 76:11
**NTP** 31:8 57:6

88:3,24 142:4
222:19 230:25
240:16
**number** 9:8 14:7
14:11,14,18,20
14:25 15:7
16:23 17:14
20:4 96:22
111:9 112:6
122:19 126:20
133:5,8 142:16
158:2 172:3
174:7,11
185:13 189:12
211:18,21
241:2 258:15
302:5,7,21
303:3,5,7
304:1,2 347:4
347:8 348:16
354:11
**numbers** 22:6
58:25 100:17
177:20,21
348:9
**numerical** 86:11
87:3,10 89:3
101:2 103:24
105:14,19
106:10 107:6
114:18 115:9
134:4 141:7
160:22 219:4
315:18
**Nurses'** 312:15

──────────
**O**

**O** 3:19
**object** 28:9
183:10 369:23
**objection** 23:14
24:15 28:21
32:3 33:8
38:19 39:22
40:17 45:1
48:22 49:10
50:5 51:2,3,23

58:6 72:2
73:17 75:5
85:25 86:2
87:8 89:19
90:12 91:24
93:17 94:10,14
96:9 99:5
105:23 106:12
106:13 107:14
113:19 118:16
121:3 126:25
130:6 131:17
132:5 133:25
134:15 136:3
137:11 139:17
141:2 143:7,8
144:9,24,25
145:23 154:20
154:21 155:18
157:7 159:7
160:10 162:1
163:2 164:11
165:11 166:13
171:5 173:22
174:9 176:5
179:12 180:16
184:24 186:11
187:18 190:14
192:18 195:6
196:8 198:8
214:17,18
221:4 222:10
233:6 234:11
234:12 238:14
239:22 241:19
252:16,17
255:10 259:10
259:13 260:4,5
261:10 262:24
270:14 278:16
279:14 282:3
283:24 284:18
291:9 292:20
296:4,17 298:6
298:21,22
300:3 303:8,14
304:16 306:9

307:13,23
308:6,15,16
309:15,16
310:8 312:5,9
315:4 316:22
321:20 322:20
325:3,21 327:7
329:11 330:2
332:9 334:20
337:9,10
340:21 342:23
342:24 350:21
350:22 351:19
351:20 353:22
356:12,24
**objections** 18:2
**observations**
184:8 226:22
270:19
**observe** 230:24
**observed** 222:5
227:24
**observing** 222:6
242:22
**obviously** 28:24
41:21 57:16
83:4 93:6
122:15 135:13
153:17 196:19
219:12,17
229:24 239:12
314:16
**occasional**
218:25 283:2
**occupation**
175:7
**occupational**
174:21,25
175:2,10,19
176:13,22
177:22 178:11
**occupationally**
132:23
**occur** 71:10
175:25 179:1
184:5 194:23
194:25 295:3

Confidential - Pursuant to Protective Order

303:24 311:7
342:11
**occurring** 226:7
310:12 311:5
**occurs** 131:13
186:10 253:21
299:19,22
300:1
**October** 4:13
14:8 19:14
21:4
**offer** 34:11 43:3
203:15
**offered** 33:6
34:24 60:12
262:18 320:16
**offering** 33:3
60:3 157:2
268:21 269:3
**office** 53:17
56:13
**official** 14:2
**offset** 292:17
**oh** 60:9 69:9
267:10 269:9
313:14 348:23
355:22 361:20
**okay** 8:22 9:5
10:5,22 11:9
12:19 14:1
18:12,23 19:7
20:18 22:12,17
23:6,11 25:9
26:3,22 27:20
27:24 29:16
32:15 33:12
39:15 43:2,7
44:4 46:16
53:4 55:4 56:7
60:19 61:5
62:13 63:2,14
64:15,18 65:13
66:9 68:9 69:2
69:20 74:23
75:15 76:2
77:12 78:21
80:1 84:4

85:19 89:13
91:12,17 94:9
95:10,16,23
96:18 100:2
107:22 109:1,8
110:22 113:15
114:25 115:10
115:15,15,23
116:23 118:12
119:4,24
121:20 122:4
124:3,11,13,19
126:11,19
127:14 128:4
131:11 133:4
133:18 137:22
140:4 142:25
145:16 146:2
146:25 147:11
147:19 151:14
152:1,10
153:25 156:21
158:12 161:10
162:21 164:7
165:7 166:2,14
170:4 173:15
174:14 175:1
180:2,17
181:10,17
182:4 186:6
187:12 188:1
189:11 190:23
192:11 193:22
194:1 196:19
197:7 200:19
201:16 203:16
206:7 207:16
208:8 210:5,18
211:6 212:3,15
215:15 217:17
218:21 219:23
221:24 227:12
232:18 234:20
235:6 236:1,6
242:7 243:23
250:17 259:21
260:25 263:12

264:18 265:15
266:24 267:14
267:21 269:4
269:10,10,15
270:10 271:24
274:17 276:24
277:10,25
280:17 281:23
284:12,25
285:24 286:8
286:14 288:7
288:22 289:25
290:2,2,5
306:13 308:2
318:11 324:2
329:8,20 340:2
341:15,18
345:14 351:15
352:19 359:3
362:4 365:8
367:18
**old** 18:8
**older** 15:17
111:2
**OLVEY** 2:21
**omission** 98:25
121:1
**omitted** 96:16
98:8,10,19
**once** 43:15 60:1
67:3 187:3
261:20 290:23
300:1,1 301:2
**oncologist** 358:4
359:13,15
**one-expert**
348:12
**one-to-one**
271:4
**ones** 16:2 26:21
53:25 70:13,18
76:19 81:3
101:5,6 119:23
122:12 123:21
138:19 148:6
170:24 229:17
234:16 254:2

268:9 362:17
**online** 26:12
**open** 344:2,4
**opening** 296:23
**operate** 278:11
278:13
**operating**
272:14
**Ophthalmology**
355:8
**opine** 31:20
33:24
**opined** 33:22
257:2,5,7
**opinion** 34:12
34:17 35:1
37:1,22,22
39:19 41:1
43:3 66:22
70:3 86:19
95:8,21 125:13
125:15 128:6
128:10 144:6
145:25 146:3
147:19 149:1
151:19,22,23
160:2 164:2
166:17,18
167:10 175:23
176:1,7 181:14
182:11 183:6
184:11,15,17
184:21 185:1,6
185:7 186:6,22
186:24 188:24
189:15 190:9
190:16 191:4,6
191:14,20
193:8,12 196:4
197:25 198:14
199:3 200:1,5
203:9,9,12,13
203:14,17,19
204:15 208:22
212:9 213:14
216:10 219:9
236:17 237:2

239:17 244:6
256:22 257:12
259:22 260:7,8
260:21 261:3
262:4 265:11
265:13 268:21
269:2 274:11
277:10 280:24
285:2,14 286:3
286:7,8,12,22
298:2,17
299:15,16,25
300:5 303:10
303:23 304:1
304:22 306:7
306:17,19,22
307:1 316:7
318:4 319:15
319:17 321:1
321:19 324:21
329:24,25
332:4,6 333:21
338:7,12 339:1
339:10,13
346:19 353:16
354:1,9 355:12
355:16 356:10
358:8
**opinions** 10:24
21:22 22:10
28:3 29:19
30:13 32:6,18
32:23 33:3,6
33:10 34:2
53:13 60:3,12
61:7 66:16
75:1,17 76:5
80:2 81:11,24
82:14 85:17,17
85:24 89:6,17
109:22 110:2
116:13 125:16
151:17 157:1
174:11 191:16
192:7,8 215:12
216:21,23
226:17,21

Confidential - Pursuant to Protective Order

237:5 244:10
262:18 306:4
307:8,20
314:14 320:21
320:22 322:14
323:9,24
330:19 333:15
335:10,15
337:18,21,25
339:4 355:17
**opportunity**
297:10 298:25
299:4,10,11
**opposed** 54:10
134:13 140:24
205:22 255:5
266:10
**oral** 4:11 9:9
**oranges** 120:8
**order** 1:9 14:5
26:6 30:10
36:25 38:14
39:18 48:13
52:1 82:20,22
82:24 92:23
106:17 114:22
202:20 221:2
231:3 232:25
264:6 282:5
326:16 365:17
**ordered** 62:23
**ore** 130:24
**organism**
294:10
**organisms** 294:3
**organization**
353:15 354:10
**organizations**
349:24
**organize** 196:14
**organs** 117:13
146:19 235:18
**original** 20:23
21:2 22:4
29:12 32:7,9
54:22 68:14,18
68:23 74:19

83:1,2 314:15
373:14
**originally** 19:15
**outcome** 35:5,19
38:18 39:21
40:13 244:5
**outline** 80:22
90:9 188:14
**outlines** 126:8
**outside** 105:5
116:18 117:1
141:24 228:15
286:23 295:25
296:6
**ovarian** 4:20,23
34:13,19 37:4
40:14 57:1,21
61:18,20 80:4
108:8 109:18
110:7,13,25
111:2 112:8,24
119:6 124:6
125:10,12
127:21,23
151:21 156:11
157:6 160:4
165:10 169:3
173:21 176:2
179:10,23
180:25 181:11
188:13 189:1
189:18 190:12
191:1,23 192:5
192:17 193:4
193:17 196:2,7
196:22 198:3
198:22 200:5
202:12,18
203:6 204:16
207:22 208:23
220:1 221:25
222:9 236:19
237:4,15
238:10,12
239:19 241:23
256:23 258:1,3
269:1 272:2,24

273:6,10,13,15
274:13,14,25
275:6,16
282:19 285:4
286:4,18,23
288:20,24
289:13 291:12
291:18 306:18
306:24 312:8
319:18 321:2
322:5 324:6,12
325:1,17
326:24 327:6
330:1 331:5
332:7 335:17
369:22 370:14
**ovaries** 64:25
180:7,12,14
181:2,20
182:14 183:5
183:17 184:14
184:23 185:21
186:9,20
187:16 243:1
305:22
**ovary** 101:19
181:8 288:3,13
298:5,20
**overall** 54:6
71:17 73:21
81:4 85:9
120:10,15
123:2 125:20
126:12,23
127:12,16
141:19 143:18
150:7 159:11
168:17,18
169:21 173:2
187:14 207:10
215:21 229:20
241:13 246:16
314:12 319:14
348:25 355:17
**overdose** 178:9
**overlap** 28:13
28:14 33:17

35:18
**overlapped**
11:25
**overlaps** 350:24
**overview** 30:6
**overwhelming**
154:12
**overwritten**
80:21
**owns** 44:19
**oxidative** 227:13
228:2,6 277:8
278:23 279:2,6

―――――――――
**P**
**P** 2:1,1 3:19
**P.A** 2:12
**P.C** 2:3,16
**p.m** 188:4,5,7
200:22,23,25
287:4,5,7
364:16,17,19
368:25 369:1,3
370:25 371:3
**page** 4:2,10 53:8
53:9 64:3,20
65:15 100:3
112:10 147:9
183:12 206:21
206:22 212:16
236:4 242:9
267:13 280:19
289:17,23,24
313:14,17
316:12 318:16
336:19,20
337:14 367:7,8
375:3 376:3
**pages** 374:5
**paid** 244:3
350:13,19
362:17
**panel** 95:17 96:1
96:21 97:13
100:4 120:24
121:11,13
342:4 348:12

348:20 355:14
355:18 356:8
357:2,22 358:7
**panel's** 121:22
**panelists** 349:5
**panels** 348:14
**Paoletti** 250:2
**PAPANTONIO**
2:12
**paper** 15:20
71:4,16 72:15
73:1 81:3,3
93:12 103:16
105:3 117:10
138:3 162:10
195:10 209:1
239:25 247:15
250:23 251:15
284:17 321:22
351:23
**papers** 15:17
80:13,13 104:2
104:7 117:18
138:3,8 149:22
182:8 215:9
246:6 314:3
322:2,6
**paragraph**
15:13,24 16:1
46:24 53:7,9
54:8 64:16,19
65:15 66:10
68:1,17 75:7
76:18 77:19
78:23 80:25
90:20 92:4
95:12,16
100:17 102:19
103:2 124:12
124:14,17
126:4 133:6
134:21 147:8
147:12 150:16
166:3 168:7
177:5 183:12
188:18,20
190:7 212:18

236:3,7 242:9
242:12 249:10
249:19,24
250:13 251:1
266:16,23
267:23 272:10
280:19 281:4
289:17,24
313:13,15
315:21 316:12
336:20 337:15
337:25 338:4,6
340:11 362:7
364:7 365:2,12
367:8,12,14,17
367:19
**paragraphs**
12:15,17,25
13:3 15:4,7,10
15:11 22:5
75:8 90:7
100:13 120:18
366:4 370:1
**parameters**
306:4
**parentheses**
65:9 133:10
**parenthetical**
66:12
**Parfitt** 2:8 6:20
6:20 28:9 33:8
45:1 48:22
49:10 50:5
51:3,23 72:2
73:17 75:5
85:25 87:8
89:19 90:12
91:24 96:9
99:5 105:23
107:14 113:19
118:16 121:3
126:25 130:6
133:25 137:11
141:2 143:8
144:25 145:23
154:20 157:7
159:7 160:10

162:1 163:2
164:11 165:11
166:13 171:5
176:5 180:16
184:24 186:11
187:18 190:14
195:6 196:8
198:8 214:17
233:6 234:11
238:14 239:22
241:19 252:16
255:10 259:10
259:13 260:5
261:10,15
262:24 270:14
278:16 279:14
282:3 283:24
284:18 291:9
292:20 296:4
296:17 298:6
298:22 300:3
303:8 308:16
309:15 321:20
337:10 340:21
342:24 350:22
351:20 353:22
369:5 370:16
**Parmley** 16:5
102:20,22
105:2 296:2
**part** 26:18 30:5
30:5 40:5 49:1
52:2,9 66:5
67:14 76:22
78:2 87:5 89:5
93:9 103:4
107:2 108:20
109:5 115:16
116:14 122:24
123:6,24 124:5
137:3,12 141:6
152:8 153:9
159:23 170:21
171:7,8,9
173:1 177:1
188:19,19
193:2 198:12

209:5 210:9
211:6,8 213:19
215:21 234:21
236:2 238:4
241:1 246:24
268:19 285:2
288:22,24,25
302:4 304:10
323:3 325:10
359:25 369:10
**participate**
25:25
**particle** 69:17
69:18 70:12
72:12 74:8
93:4 124:24
125:8,11,25
126:1,2 128:8
128:14 150:5
150:15
**particles** 70:1,4
70:9,16,18,21
71:19 95:19
125:24 126:9
127:20,25
128:13,23,24
129:1,14,22
130:5 183:15
183:25 184:3
184:10 185:5
185:10 230:23
264:20 265:4
265:16 283:13
295:23
**particular** 26:7
35:5 38:17
39:20 40:11
47:11 50:9
54:7 77:14
78:13 79:7
87:4 89:4 96:5
97:3,18 98:23
102:5,24
103:20 104:22
120:4 125:21
128:8 132:20
133:23 137:7

145:6 174:7
185:1 205:16
210:8,24
217:20 218:4
220:25 226:19
226:20 228:8
244:8 245:1
252:13 264:24
274:22 275:15
300:15,16
302:5 337:25
346:1 347:22
348:24 349:2
**particularly**
20:22 101:6
104:19 117:2
175:3 207:20
**particulate**
71:17
**parties** 372:12
**partly** 116:14
**parts** 59:17
218:4 312:7
320:22 322:24
336:11
**party** 366:12
**pass** 180:7
**passage** 181:6
**passed** 352:14
**patent** 15:18,22
352:15
**pathogenesis**
272:11
**pathway** 175:20
175:23 194:11
195:4
**patients** 183:20
183:24,24,25
184:9
**pattern** 41:10
52:23 71:2,10
164:3 170:22
239:21 294:8
301:11 305:23
313:4 329:6
**patterns** 301:24
305:6

**pause** 99:19
246:10
**pay** 62:25 84:17
253:5
**PCPC** 31:1,23
32:2 58:24
360:11 362:3
363:13 364:2
364:23 365:15
365:23 366:17
367:1,14,22
368:4
**PCPC's** 122:2
361:9
**PDF** 80:17
**PDQ** 108:7
109:9,17 110:4
113:10,16
**PDQ)-Health**
4:24
**PDQs** 108:2
111:3
**Pecan** 3:3
**peer** 116:11
209:12 216:8
**peer-reviewed**
83:12 87:17
90:25 92:17
313:25 314:5
**pending** 11:3
**Pennsylvania**
2:18
**Pensacola** 2:14
**people** 16:13
18:7 73:3 85:7
85:14,16 88:7
160:8,22
186:20 187:2,3
193:11 226:8
228:9 247:7,10
247:12 301:6
301:25 305:20
320:2 352:20
353:21,23
354:12
**people's** 195:11
**percent** 40:16

Confidential - Pursuant to Protective Order

40:20 121:5
145:19 167:1
172:10 173:1,5
173:14,19
174:7,8 223:13
338:17 347:11
351:16 366:21
**percentage** 54:6
161:21 297:17
302:9 347:4
**percentages**
166:22 167:18
168:1 169:5,8
170:6 183:19
**perform** 53:10
**performance**
129:15
**performed** 55:6
55:7 181:22
207:4 245:19
268:20 331:8
**performing**
122:23
**perineal** 4:19
67:10,16
112:12,20,23
119:5 175:24
177:16 183:3
184:12,19
185:18 186:8
193:3,4 198:21
203:21,22
231:11 258:11
260:2 263:20
263:25 291:19
292:4 296:21
297:11 298:19
306:23
**perineally**
185:12 186:21
187:5 237:14
258:11,24
259:1,5 322:5
329:4
**perineum** 180:8
181:20 182:14
295:24

**period** 21:9 82:9
179:4 302:1,21
341:2,6 348:12
355:24 361:12
361:17 365:11
**periods** 57:6
368:5
**peritoneal** 4:23
180:11,13
**peritoneum**
180:23
**persist** 301:16
**person** 84:18
366:13
**personal** 3:10
7:4 31:1 49:6
50:2,22,25
51:22 319:6
353:11
**personally**
181:17 344:13
349:23 353:2
**perspective**
328:23
**PERTAINS** 1:7
**pesticides** 351:8
**petition** 359:21
361:19,21
362:11 363:2
363:10,14
364:25
**ph** 1:22
**Ph.D** 1:13 4:13
4:15,17 7:20
372:5 374:12
**phagocytosis**
180:13
**pharmaceutic...**
227:6
**phenotype**
220:3,7 221:25
222:3,9
**phenotypic**
225:23 276:12
279:12,19
**Philadelphia**
2:18

**physical** 26:18
**physician**
107:23 359:18
**piece** 78:1 84:19
85:4 119:16
120:12 155:1
168:20 172:9
173:9 176:15
205:9 245:1
248:23 250:7
252:13 284:16
302:12 332:1
339:3 370:4
**pieces** 76:20
77:17 78:13
79:7 80:5
81:12 85:23
87:4 89:4 90:5
90:11 97:8
115:25 116:10
121:23 122:21
125:2 126:20
139:24 208:25
209:25 215:3
218:14,23
304:4 314:7
**place** 83:14
102:11,12
115:3 131:21
210:22 232:23
299:4 301:22
372:9
**places** 46:23
193:13 315:9
**plaintiff** 247:2
247:16 304:5
**plaintiff's**
322:12,13
344:12,15
346:8
**plaintiffs** 2:19
6:19,21,23,25
7:2 22:15
246:21
**plaintiffs'** 4:11
350:20 351:1
351:17

**plate** 129:22
**plateaued** 238:2
**platy** 124:24
130:4,16,18
146:9 150:5,15
223:13,20,21
277:24 293:20
**plausibility** 34:4
194:7 195:2,9
195:14 268:12
289:3 314:20
370:7,13
**plausible** 189:8
191:22 194:2,4
194:6,25 195:3
196:13 221:19
227:18 229:14
277:6 369:20
**play** 117:7
125:11 127:20
146:15 169:19
255:24 268:25
**played** 246:16
**please** 6:16 25:8
27:18 249:20
373:3,8
**plenty** 252:20
**pleurodesis**
126:5 128:15
129:9
**Plunkett** 1:13
4:13,15,17
6:15 7:20 8:4
8:13,17 9:8
12:23 13:17,20
14:6,7,10,15
14:17,22 16:16
16:22 17:9,13
23:18,20 24:11
25:4,15 34:11
34:23 44:22
46:7 50:17
63:25 80:2
87:2 88:20
93:11 94:1
95:3 102:10
105:17 110:3

111:4,9,11
112:4 113:6
139:8 140:21
167:24 201:3
211:14,18,20
211:22 236:24
287:8,16 369:6
369:8 370:18
372:5 374:12
**point** 24:17 25:6
49:5 50:3,12
52:5 56:16
59:20 66:17
67:23,24 71:1
71:21 84:2
90:7 100:16
102:3,10,21
134:21,23
138:14 139:10
140:22 146:21
162:22 163:23
165:14 176:7
176:10 177:4
181:7 192:22
210:21 221:14
225:17 248:22
254:22 261:16
273:8,15
275:14 276:25
281:2 282:16
284:25 288:16
296:10 297:25
300:5 302:12
303:23 304:2
316:9 347:23
362:23 366:2
368:10
**pointed** 109:4
221:11
**pointing** 86:9
91:5 152:19
190:7 219:16
226:6 244:9
250:2 276:2
**points** 31:9
86:13,14
117:12 165:16

229:6 231:5
235:16 254:24
294:25 367:24
**policy-type**
351:11
**Pooley** 250:4
**pools** 78:8
**poorly** 232:7
**population**
159:19 228:11
**populations**
157:19 158:14
**portion** 112:1
**portions** 47:11
**PORTIS** 2:3
**pose** 256:7,23
268:18
**posed** 143:20
295:12 322:15
327:16 334:4
**position** 28:2,7
43:21,25 44:23
66:4,7 109:16
110:2,5,10,10
110:23 112:5
117:21 120:22
145:17 166:9
202:7 296:11
**positive** 42:2
**positives** 79:18
**possession** 17:22
**possibility**
196:21 197:20
197:24 255:23
281:13 327:18
327:19
**possible** 56:4,11
62:21 68:21
98:18 109:17
155:5,7 186:7
197:5,16 199:8
202:18 203:6
203:23 204:3
204:18,21
207:17 223:24
239:25 269:7
282:4 284:1,3

295:8 299:8
301:24 305:4
312:15 316:8
316:24 343:21
354:22
**possibly** 61:1
197:3 198:7
**potencies**
254:13
**potency** 36:15
88:15 156:15
156:18 157:9
158:3 171:23
225:4,21
254:15 256:12
256:12
**potent** 254:21
**potential** 37:16
77:6 108:7
127:25 151:20
157:5 165:8,14
166:6 167:7
168:25 178:2
189:13 202:10
208:22 238:12
241:15 245:2
263:16,25
266:14,18
272:17,19
274:23 275:11
276:11 278:1
282:19 285:3
285:19 289:9
290:21 302:15
327:14,15
332:19 350:9
**potentially**
207:5 217:11
270:18
**powder** 1:3 4:22
8:11 10:25
19:10 29:21
34:13,18 37:2
37:2 40:13
41:3 80:4
117:3,24 124:7
125:19 126:14

133:21 141:1
143:3 144:7,19
151:4 153:23
155:17 157:4
160:24 161:14
162:11 167:19
169:10 170:8
173:20 175:22
176:4,24 178:7
180:5 184:12
188:12 198:2,2
200:3 248:2,5
249:11,14,22
250:14 251:4
251:16 252:12
252:15 253:10
255:24 256:20
258:19 260:2
261:8 262:22
263:21 268:23
283:2,9 289:15
290:19 293:18
306:23 308:20
309:13 318:3
322:16 329:3
369:11,18,21
**powders** 129:16
130:14 150:25
154:11 161:21
162:25 164:9
175:14 198:22
251:5,7 253:2
253:4 256:15
267:5 277:22
277:23 313:9
316:15 370:15
**power** 42:19
218:1
**practice** 115:8
116:4 336:1,2
353:24 354:12
**practices** 1:4
6:11 114:15
**precancerous**
240:14
**precautionary**
283:17,23

**precise** 74:23
315:24
**precursor** 318:1
**predicate** 31:25
**predominant**
175:21,22
**premarket**
329:17
**preneoplastic**
222:24
**prep** 11:25
**preparation**
11:25 13:1
15:5,8 20:16
**prepare** 12:4
**prepared** 335:7
335:18 361:8
**preparing** 25:18
315:22
**presence** 163:18
222:5 227:12
258:18 261:8
273:4 275:21
294:11 295:13
305:21 309:23
309:23 312:3
**present** 3:17
18:14,25
188:13 252:14
259:2 264:7
369:18,19
**presentation**
20:25
**presents** 145:19
203:6
**president**
352:23,24
354:15 355:2,2
**Presumably**
80:9
**pretty** 27:12
66:23
**prevalence**
295:18
**prevent** 47:5
48:13 114:11
115:23 116:2

**Prevention** 4:24
**primarily** 166:3
334:19
**primary** 4:23
136:10
**primed** 274:1
**principal** 136:21
**principle** 126:8
278:7 283:17
294:1
**principles** 5:1
36:1 125:24
209:16 211:11
275:19 278:4
290:7 291:1,2
304:25
**print** 201:15
202:13
**printed** 17:6
111:17 201:12
202:23
**printout** 4:21
17:4
**prior** 10:8 56:17
68:2,3,10 75:9
90:4 96:25
346:7,16 372:4
**privilege** 23:23
54:5
**privileged** 23:25
**probability**
197:24
**probable** 269:6
**probably** 9:11
11:10,23 18:20
19:2 23:5
54:17 60:25
294:15
**problem** 223:3
231:10 282:5
291:17
**problematic**
224:18
**problems**
146:11
**process** 27:23
30:7 31:4,8,10

Confidential - Pursuant to Protective Order

31:23 32:5
35:11,14,25
36:18 37:1
38:1 43:10
45:16 57:6,8
57:22 59:7
60:7 66:1
67:14 76:25
77:16,22 78:1
78:16 79:21
83:7 92:5,7,7
93:9 98:24
104:14 105:11
105:14 113:22
115:14 116:11
118:1,5,11
121:6 122:3
131:13 132:8
138:7 153:14
189:21 190:1,5
191:2,21
192:13 213:18
213:19 218:13
220:5,20,23
222:24 266:2
279:3,6,10
281:14 292:2
324:25 325:6
325:13,23
340:3 341:20
343:6 345:21
348:25 353:6
362:14
**processed** 131:6
**processes** 38:9
274:9 276:19
277:9
**processing**
130:22 131:10
132:16
**PROCTOR**
2:12
**produce** 44:11
140:19 168:25
190:4 194:17
196:1 242:15
272:18 326:16

**produced** 10:8
10:13 14:23
17:19,24 19:8
19:14,15 20:2
20:8 22:19,25
24:2 54:18
57:24 58:1
74:25 82:17
91:21 122:7
139:11 178:21
190:3 195:23
214:13 350:10
**produces** 294:10
**product** 1:5 24:8
24:14 29:22
30:12 36:9
37:16 43:15
47:4,7 48:9,12
48:12,21 49:9
50:20 52:12,22
54:5 56:2
125:20 126:13
126:18 127:6,9
129:4 132:10
132:12,22
137:9 138:4,14
144:4 145:8
153:15,20
154:5,15
155:24 156:2
157:20 158:15
158:18 162:12
163:9,10,10
165:4 166:10
169:22,24
171:14,15,19
172:15 175:6
178:4 179:4
197:7,9 198:23
199:14 202:25
223:8 225:15
226:22 283:22
285:23 310:12
311:8,15
317:25 318:14
318:14 324:10
324:18,20

326:8 327:17
328:7,15,16,17
328:24 330:23
334:4
**production** 66:2
**products** 1:4
3:10 6:10 7:4
29:21 31:1,18
35:12 44:9,12
44:18 49:15
51:6 52:16
126:23 127:17
128:15 129:10
129:13,18,21
130:5,14
131:15 132:4
133:19 136:2,7
139:15 142:21
143:11,17
154:11,19
160:5,9 161:13
161:23 164:19
164:20,24
165:9,22 180:6
187:1 188:12
189:18 198:2
200:3 202:21
224:3 226:12
226:16 227:1
250:23 251:5
255:24 256:21
258:5,8,17,19
260:3 261:8
262:22 263:21
268:23 274:24
306:23 308:4
311:20 317:21
318:10 319:6
322:16,18
324:4 325:9
351:17 369:11
369:18,21
**Professional**
4:24
**profile** 39:13
86:21 150:24
254:7,10 283:8

283:9 319:12
**profiles** 169:20
**progress** 220:22
**project** 82:1,7
82:11
**prominent**
99:14
**promoted** 44:11
**promotion** 44:8
**pronouncing**
16:15 289:21
**proper** 83:13
311:13
**properly** 42:16
**properties**
124:21 146:18
148:7 153:5
**proposed**
343:15
**proposing** 179:9
**proposition**
69:13
**propounded**
374:6
**prospective**
79:17 239:8
**protect** 228:22
**protected** 23:23
54:4
**protective** 1:9
228:4 232:23
**prove** 282:7
**proven** 285:18
**provide** 18:3
26:5 27:3
29:19 30:6,11
44:8 51:17
87:3,10 122:9
213:20 214:21
263:17 322:14
323:4,8 331:16
331:24 335:10
369:20
**provided** 9:1
10:3 21:10,11
50:21 55:20
85:21 89:15

121:14 122:16
167:25 177:2
211:8 212:13
216:22 251:14
261:5,13
262:13,19
284:11 342:4
346:16 348:2,3
367:16
**provides** 338:23
**providing** 34:2
44:12 45:10,12
167:13 215:8
347:25
**PTI** 3:15,15 7:6
7:6
**public** 116:18
123:3,8 132:19
244:16 253:12
308:4 340:20
341:2,5,18
344:3,5,7
345:8 372:22
374:19
**publication** 76:2
77:15 116:13
116:21 117:1
210:19
**publications**
107:23 117:5
**publicly** 30:22
57:15 62:2
90:25 118:2
121:22 286:21
328:11 337:5
**published** 17:7,8
62:2,11 78:11
91:21 92:1
93:14 103:9
108:7 117:10
117:17,18
147:12 152:18
162:10 163:14
163:16 247:8
248:25 249:1,4
249:21 250:12
286:17 314:4

Confidential - Pursuant to Protective Order

321:12,17,22
**publishes** 343:11 346:11
**pull** 20:15 60:10
61:2 62:15
76:19 93:3,5
110:8 119:2,10
172:19 183:22
208:2,6,11
249:25 250:15
250:18 251:12
271:19,22
278:19 365:1
365:13,16
366:3,8
**pulled** 15:24
59:20 63:4
212:12,12
323:4
**pulling** 27:9
104:8 129:25
**pure** 142:4
222:7,16,18,20
222:21 223:21
**purely** 283:23
**purities** 139:6
**purity** 135:4
227:8 311:14
**purport** 278:13
**purportedly** 336:21
**purpose** 8:10
22:18 133:13
**purposes** 9:5
16:21 17:13
**PURSUANT** 1:9
**put** 22:5 26:13
26:16 51:7,7
58:21 62:8
78:14 80:16,25
83:13 136:17
179:4 193:11
198:24 218:10
224:10 231:22
246:6 247:11
271:7 281:7
307:5 347:11

355:23
**puts** 254:4
**putting** 118:3
135:10 138:21
197:13 254:5
**puzzle** 168:20

**Q**

**qualified** 355:13
357:11
**qualitative**
89:15,21,23
114:5
**qualitatively**
36:7
**qualities** 139:5
**quality** 88:3,4
88:16 91:1
92:22 207:10
232:3
**quantification**
36:13 157:21
170:16 310:24
**quantified** 298:9
**quantify** 36:6
77:2 86:4
88:13 168:12
168:13,15
171:2 172:13
172:22 187:13
237:24 243:9
298:8,11
**quantifying**
156:6 157:3,11
157:25 171:11
171:12,18,20
171:25
**quantitative**
78:12 85:21
114:6,11
115:24 205:15
207:19
**queries** 107:24
**question** 15:3
24:6 25:1
28:10,18 37:6
42:16 44:21

46:6 48:24
52:2 55:18,21
58:8 67:7 68:1
71:17 78:5
83:15 88:25
89:2 90:4 92:9
92:24 93:1,3
93:11,20 94:6
94:16,17 96:15
102:2 103:18
104:17 112:4
113:8 120:8
126:19 127:18
134:3,9,18
136:8 137:13
137:21 139:9
154:23 155:3
174:6 178:14
182:24 183:9
205:12 210:14
222:12 224:19
224:25 226:4
229:11,13,17
229:18 232:15
233:8 234:18
234:25 235:7
235:12 237:7
241:10 257:25
260:18 261:2
266:20 267:21
273:7,19,19
298:13 302:6
302:16 306:11
309:6 316:17
324:6 327:9,11
329:23 332:12
340:16 357:15
359:25 364:21
366:9,10,21
367:13
**questioning**
366:16
**questions** 8:2,15
13:19 16:18
17:11 22:10
23:19,21 24:10
24:19,23 25:2

25:14,17 28:16
29:15 32:14
33:11 39:14
40:3 43:1 45:7
49:4,24 50:16
51:15 53:3
56:14 59:4
67:7 73:12
74:9 75:6 87:1
88:19 90:2
91:6 93:10,24
95:2 96:17
100:1 106:8
107:7,21 111:6
111:24 113:24
118:23 121:19
127:13 130:8
131:24 133:3
134:8 135:19
137:2 139:7
140:3 142:11
144:1,20
145:15 146:1
155:11 156:20
158:11 160:1
161:3 162:20
164:6,15 166:1
167:15 171:16
174:4,13 176:8
180:1 181:9
183:11 185:15
187:11 188:8
190:22 193:21
196:3,18
199:15 201:1
201:21,24
204:10 211:16
215:14 217:16
218:16 221:23
223:23 232:6
234:5,19
238:19 239:6
241:4,9 242:6
253:15 255:21
259:11,20
260:24 262:1
263:4 270:23

275:9 279:8
280:7 282:14
284:5,24
286:15 287:9
287:15 292:10
293:10 296:13
297:12 298:15
299:23 300:19
303:11,17
304:17 306:14
307:18 308:1
308:10 309:7
310:1 312:1,6
312:13 315:13
315:20 317:1
319:2,4,14
322:9 323:1
325:15 326:21
329:7,19
330:12 333:1
336:4,5 337:11
340:24 343:10
348:19 351:14
352:6 354:4
356:19 357:10
358:12,21,23
359:5,11
364:20 368:20
369:5,12
370:17,22,23
374:6
**quick** 106:5,7
177:6
**quickly** 177:7
265:12 313:6
**quite** 37:25 70:8
79:22 130:12
196:11 298:24
300:6 319:20
**quote** 95:24
**quote/unquote**
70:15 142:7
175:10

**R**

**R** 2:1 3:19,19
**rabbits** 69:11

Confidential - Pursuant to Protective Order

**RAFFERTY**
2:12
**raised** 314:9
**raises** 178:13
366:25
**range** 125:4
128:25 129:5
173:13
**ranges** 125:3
**rank** 100:25
101:2 197:22
**ranked** 256:18
**ranking** 101:22
103:24 113:18
114:2,22
**rankings** 107:6
114:18 115:9
134:4 141:8
**rate** 265:11
**ratings** 218:22
**rats** 271:13
**raw** 307:21
**reach** 76:4 180:7
186:8
**reached** 95:25
181:11 189:7
189:14 190:10
190:24 191:20
192:8,15
198:11 236:17
**reaches** 96:4
**reaching** 75:16
89:6 160:2
186:20 208:22
258:13 261:3
**reaction** 140:17
233:2
**reactions** 140:16
179:18 243:18
**reactive** 150:10
**read** 32:22 34:9
34:16 59:14,17
59:21 60:1,22
64:10,12 71:23
77:21 80:9,13
81:12 83:21
90:16,17

100:22 102:14
112:25 113:1,5
120:15 137:14
137:16,20
138:6 169:1
205:11 212:24
236:14 251:3
284:9,16 316:3
337:22,23,24
338:3,3,5,6
349:12 367:10
367:11 373:3
374:4
**reading** 52:18
59:18 60:2,11
81:2 183:7
243:25 314:25
315:2
**reads** 47:3
212:18
**ready** 13:10
308:13
**real** 54:15 62:7
106:5 177:6
**realize** 60:11
**really** 37:12
57:24 59:20
98:15 106:6
129:10 154:25
195:15 225:10
225:11 232:2
289:2 298:16
333:2 347:23
355:20 356:23
356:23
**realm** 24:9
**Realtime** 1:18
372:3,18
**reason** 73:1
97:10,13 98:1
202:23 212:12
245:21 281:3
347:22 354:5
366:10,15
373:5
**reasonable** 41:2
157:23 173:17

185:7 186:15
259:23 319:16
320:5
**reasons** 120:9
153:18 170:20
215:6
**recall** 9:3 50:12
51:14 120:21
162:17 174:22
206:9 207:15
208:3,11 250:1
263:1,3 265:6
278:24 280:21
288:5 319:8
347:6 368:16
369:12
**receipt** 373:15
**receive** 346:10
351:16
**received** 122:4
**recognize** 8:19
61:3 111:11
128:18 140:8
226:24 270:10
**recognized**
220:17
**recognizing**
138:2
**recollection**
362:12
**recommendat...**
283:22
**record** 6:2 9:6
10:15 16:21
17:13 19:23
25:7,10,11,13
55:8,9,20,22
56:12 94:21,23
94:24 95:1
99:22,23,25
111:8 188:2,4
188:5,7 200:20
200:22,23,25
287:4,5,7
364:9,13,16,17
364:19 368:25
369:1,3 371:2

**records** 14:2
55:4 62:16,22
62:25 136:14
321:6
**recovered**
283:15
**redo** 74:20
**reduce** 252:12
252:19 292:18
**reevaluate**
246:15
**refer** 13:7 16:13
21:21 22:13
35:13 131:8
161:22 202:9
250:19 349:18
**reference** 9:16
22:5 46:20,22
49:1 64:11
75:9 76:10
93:13 118:19
158:12 263:14
280:18 337:12
**referenced**
12:23 15:3
46:9 91:17
167:24
**references** 63:18
64:8 218:25
**referencing**
318:17
**referring** 13:6
15:12 22:14
43:8 64:1,2,22
89:10 116:8
148:11 161:15
201:16,18,19
201:22 205:14
206:5 238:17
242:17 309:18
321:11 341:5
360:9 362:8
**refers** 64:22
202:4 214:8
**refine** 81:24
82:4
**reflect** 20:14

**reflected** 312:3
**reflection** 316:6
322:23
**refresh** 12:15
362:5
**refreshed** 15:16
**refuse** 24:22
**regard** 84:16
123:3 295:19
306:4 318:18
**regarding** 252:7
321:9 332:4
339:17 342:21
344:22 345:18
361:15
**regardless** 71:20
140:14 145:8
153:4 159:18
181:6 258:10
258:23 273:21
289:8
**Registered** 1:17
372:3,18
**regularly**
296:15
**regulation** 43:12
46:10,18 48:17
49:1
**regulations**
30:10 43:5,7,9
44:2,14,24
46:17 48:4
327:10 328:20
**regulator** 214:3
**regulators** 31:16
32:2 219:21
**regulatory** 30:7
30:13 31:23
43:18,22 47:23
65:5 67:11
81:21 82:8
213:6,8,11,25
214:3 219:17
256:6,19 284:2
290:13 307:19
322:17 323:20
324:3,25 325:6

Confidential - Pursuant to Protective Order

325:13 326:4
326:13 331:12
332:14 333:5
333:10,21
334:8,8 335:4
335:9,24 367:2
**relate** 11:21
19:11 28:20,22
29:2,3 46:17
52:25 76:20
101:14 126:22
127:3,3 129:19
133:9 137:5,8
139:15 140:23
140:25 162:24
178:17 211:7
212:6 250:13
322:16 324:12
351:3 355:17
**related** 8:11
10:6,25 29:19
30:9,20 31:17
50:20 68:5
123:11 125:17
134:12 135:21
165:20 207:3
255:15 259:16
265:2 318:9
322:14 323:9
323:20 324:14
332:6 342:19
**relates** 77:7
127:11 132:18
143:2 149:1
155:9,15
255:14 258:1
**relating** 253:9
**relation** 365:7
**relationship**
27:25 34:3
110:7 112:7
193:17 202:11
204:15 207:21
230:16 235:13
235:24 236:11
236:18 237:3,6
238:9 241:16

241:18 294:13
295:17 365:21
370:13
**relative** 146:4
152:14 372:11
372:12
**relatively**
319:13
**relevance** 70:16
84:22 92:8
153:8,10
207:10 218:1
231:7 232:13
**relevancy** 118:4
**relevant** 36:3
54:7 60:2,12
69:17,23 71:16
76:8 78:4
80:16 83:10,15
96:7 97:1,8
101:24 123:1,1
127:4,11,16
131:15 135:17
138:9 141:11
150:24 153:12
182:17 202:22
206:24 207:5
212:8 216:5,11
225:21 234:17
258:3 271:11
314:8 324:5
351:16 366:7
**reliability** 66:16
67:19 83:11
84:21 118:4
207:10 208:17
209:1,11,24
210:7,13
215:17,21
216:7 218:1
247:20
**reliable** 42:8
66:20 83:9
95:7 209:9
210:20 216:6
216:11 231:2
232:17 305:25

313:23,24
**reliably** 42:9
232:14 291:22
**reliance** 20:24
21:18 22:1,8
55:10,13 59:13
59:25 60:1,15
60:20 63:5,12
63:13,21 64:1
64:6 68:14,22
83:2 108:16,21
108:22 109:2,4
120:15 122:7
211:9 212:1
241:15 263:8
263:10,13
**relied** 70:19
74:3 109:6
130:1 162:23
174:24 214:23
215:4,9 238:24
**relies** 336:17
**rely** 41:5,5
105:22 156:23
160:8 205:7
207:18 212:11
247:23 277:20
337:7,16 360:6
**relying** 45:4
143:5 338:25
**remain** 265:16
**remember**
242:13 259:15
317:11 327:23
362:7 368:12
**remove** 45:17
65:23 67:21
268:5
**removed** 109:13
**removing** 268:7
**render** 37:21,22
39:19
**rendered** 144:6
237:1 262:3
286:2
**rendering**
216:21

**repair** 283:15
**repeat** 12:20
365:8
**repeated** 198:25
199:17 300:24
302:20 305:11
**repeatedly**
339:16
**repetition** 87:24
**rephrase** 161:18
**replicate** 58:4
58:10 98:23
**replicated** 47:2
75:11
**report** 4:13,14
4:16 12:15
13:8 14:7,15
14:21 15:5
16:4,9,10 17:3
19:13,21 20:2
20:8,17,19,23
21:2,16,24,25
22:4,9,20,25
23:4,7,8,12
24:2,12,19,24
25:19,21 26:2
26:24 28:25
29:12 30:17
32:7,10,11,21
32:24 34:8,9
34:16 46:21
53:6 54:23
55:11 56:17,24
59:6 61:9,15
63:11,17,20
64:14,16 65:14
65:25 66:3,11
66:22 67:8,24
68:3,14,18,23
74:18,22,24
75:20 76:12
80:20,23 81:10
82:17 83:1,21
84:1 86:3 90:8
91:22 93:15
95:11 99:14
100:3,12 102:3

102:10,22
104:21 113:10
118:14,15,19
118:22 119:13
119:15 121:18
122:8,13
123:11,12,24
124:12 133:8
133:22 134:10
138:6 139:11
140:22 141:20
142:20 143:6
146:3 147:5,9
154:3,4 155:13
158:16,21
159:1 169:1
176:11 182:16
183:2,7 185:3
187:10 188:15
189:14 201:9
209:22 214:12
214:21 215:3
236:2,25
241:14 242:8
243:25 256:25
261:18 262:20
263:6 266:8,21
267:3,8,12,22
268:9 269:8
274:18,20
275:3,11 277:1
280:18 285:20
288:2 289:17
290:8 295:22
309:11 310:4
313:13 314:25
315:3,8,19,23
316:4 317:7
322:25 323:3
326:11 331:14
332:22 333:16
336:11 337:7
337:13,17,20
337:22 338:2
338:11,21,22
339:9,21 340:2
340:9,17

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 134 of 1525 PageID: 62280
Confidential - Pursuant to Protective Order

Page 414

343:18,23
347:3,21 361:7
361:15,24
362:10,20
363:23 365:11
**reported** 42:7
87:20 117:23
160:16 170:14
177:22 178:16
183:20 267:4
295:3 310:14
310:22 328:12
**reporter** 1:17,18
1:19,20 7:17
137:20 372:3,4
372:4,18,18,19
372:20,20,21
372:22
**reports** 12:6,7
12:25 13:5,15
13:21 19:8,11
27:25 28:20
29:13 33:16
57:23 61:11,17
63:10 68:11
74:20 75:9
85:15 178:5
179:5 248:1
249:6 257:2
261:6,12,22
314:15 337:20
**represent**
287:18 319:6
**representative**
133:20
**representing**
22:15
**reproductive**
70:11 71:18
95:20 101:11
101:15 103:11
103:12 183:16
184:4 297:18
302:10
**reputable**
353:15,20
**request** 9:17,24

18:10 26:14
**requested**
322:11
**requests** 17:17
17:23
**required** 30:10
37:21 43:4
219:18 324:10
326:16
**requirement**
49:8 114:22
**requirements**
114:23 322:17
324:3
**requiring**
279:10
**research** 107:12
**resource** 290:6
**resources**
214:23
**respect** 17:20
28:3 31:7,8
43:3,25 44:2,5
44:25 48:20
53:12 62:17
69:2 70:5 80:4
106:1,3 109:17
110:6 112:7
117:23 125:12
127:21,23
128:7 129:21
144:6 151:17
151:21 157:5
162:25 165:10
170:7 171:2,18
172:14 173:20
179:11 192:16
196:21 198:3
202:10 204:13
204:15 212:7
256:22,23
262:18,22
263:15 272:3
282:18 283:22
284:7
**respectfully**
139:8

**respective** 80:7
**respiratory**
126:6 129:12
**respond** 228:10
228:10,12
233:21 234:2
**responded**
363:13
**response** 9:24
76:15 77:5,7
78:7 90:3
126:2 128:17
128:19 150:10
169:1 179:14
187:8 190:13
194:12,16
195:20 204:2
223:22 225:2
228:1 230:22
232:19 237:17
237:19,21,25
238:1 239:16
240:10,13,20
240:24 241:23
242:4 254:14
266:9,12
293:25 364:24
365:3
**responses** 72:21
195:23 238:2,6
242:23 266:5
272:14 273:24
**responsibilities**
332:5
**responsibility**
360:15,18
**responsive**
17:22
**rest** 281:20
**restate** 190:19
**result** 98:2
119:15 132:9
153:8 169:14
170:17,17
194:19 198:18
213:22 272:20
304:21

**results** 113:3
184:13 334:17
**retained** 248:3
365:23 367:2
**retention** 346:8
361:9
**retrieval** 25:24
63:1
**retrieve** 25:23
26:6,21 27:18
**retrieved** 26:4
60:17,17 207:9
**retrieves** 26:14
**Retrograde** 69:9
**return** 74:12
373:13
**returning** 17:16
96:24 118:12
219:23
**Reuters** 123:12
123:16
**revealed** 261:21
**review** 4:18 26:1
30:23 32:19
53:12 56:20
57:6 59:8 61:7
63:5 65:5
67:11 71:15
78:1 82:8,15
82:22,24 83:5
85:4 98:11
111:25 116:11
121:16 156:24
160:12 182:8
184:2 208:8
209:13 211:9
216:8 245:5
297:8 321:5
336:6 338:9
341:9,20
342:15 343:12
343:13 348:1
348:14,15,18
349:2 368:12
**reviewed** 9:21
12:6,24 21:3
32:13 67:5

79:24 80:6
82:20 90:6
108:13 110:4
116:9,16
120:20 122:13
129:17,19
151:8 163:24
177:12 183:14
201:8 243:20
252:2,4 323:24
342:18 344:10
347:12 356:14
356:22
**reviewing** 31:17
58:2 81:19
82:19 133:1
208:21 343:2
**reviews** 81:21
82:2 98:14
280:13 321:14
348:8,11
**revisit** 182:6
**rgolomb@gol...**
2:17
**Richard** 2:17
7:1
**right** 8:3,4,25
9:14 10:12
12:2,22 15:2
16:19 17:12
18:18 19:7,20
20:1 21:17
23:2,5 34:22
40:10 41:25
46:20 47:1,14
59:12 63:13
67:24,25 69:24
82:5 89:14
95:3 96:23,24
102:1 107:11
108:1,5 109:15
111:25 112:19
113:2 119:11
124:11 126:16
133:6 134:6
178:24,25
188:22 198:14

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 135 of 1525 PageID: 62281
Confidential - Pursuant to Protective Order

Page 415

204:9 205:25 206:10,13 207:8 208:13 211:17,19 236:16 243:15 245:12 263:15 276:8 283:20 306:15 318:6 320:13,17 323:13 324:7 330:15 331:9 333:8 336:9 338:14 339:22 341:10 344:3 344:17 345:8 349:12,14 352:17 359:13 360:24 363:3 369:6,14

ring 206:5

risk 4:20,21 16:12 17:8 34:18 35:5,11 35:24 36:6,8 36:11,12,13,17 36:20 37:10,15 37:19,23 38:2 38:3,10,17 39:3,10,17,20 40:13,23 41:4 74:11 75:21,25 76:9,24 77:2 80:3 85:1,2 88:13,18 107:3 110:18 111:2 112:23 115:7 115:13,17,21 117:5,13,13,19 122:23,24 123:5 124:6 125:12 127:12 138:7 141:21 143:16 146:16 149:19 150:7 153:11 154:24 155:2 156:7,10 157:3,12,13,15

157:19,25 158:4,14 159:17 160:3 165:8,14,21 167:5 168:13 169:3,23 170:21 171:2,8 171:13,13,18 172:2,10,13 173:1,3,5,7,12 173:19 174:8,8 188:13 191:25 197:13 198:1,4 198:5,22 199:9 199:12,13 200:4 201:14 202:3,18 203:6 203:12,23,24 203:25 204:11 204:18,21,22 205:8,11,13,23 206:20 208:23 212:20 213:8 214:1 216:3 229:20 231:3 234:17,23 235:4,22 236:2 236:12,19 237:4,23,23 239:18,21 244:20,24 255:25 256:8 256:22 257:6,9 264:8 266:4 268:18,20 269:1 271:12 272:7,19,21 273:5 274:14 274:25 275:7 275:20,24 278:8 283:3,8 283:9 285:7,22 286:11,23 289:10 291:2,3 292:15,18 293:7 294:20 294:24 295:12

301:20 306:18 306:24 314:12 314:14,16 319:18 321:1 323:19 324:16 324:22 326:15 326:18 327:21 329:25 330:9 330:18,20 331:3,5,25 332:7,20 333:14 334:3,4 334:16 335:17 357:6 369:21

risks 143:20 154:17 275:24 351:8

Risperdal 246:4

road 2:9 220:19 222:25

robust 128:19

robustness 88:2

Rohl 250:3

role 29:10,14,17 33:20,20 75:14 99:14 124:1 125:10 127:20 246:15 255:22 268:25 306:1 331:19

roles 334:22

route 52:24 231:12 258:3 269:25 292:5 347:19

routes 233:11

routine 115:8 178:3 184:7 200:13,15 207:25 282:25 283:3 284:15 296:16 299:20 301:1,6,10,25 302:17,17 305:11 307:3 307:10 346:3

routinely 106:21

106:22 114:17 183:5,15,18 187:4 227:25 283:10 300:8 300:10,21 301:7 302:25 342:8

Rowlands 250:4

Royston 3:15 7:6

rsullivan@dy... 3:3

rule 4:16 305:17

rules 106:17

Ryan 2:4 3:2 6:22 7:8

Ryan.Beattie... 2:5

―――――――
S
―――――――

S 2:1

sac 101:19

sacrifices 231:1

Saed 313:21 314:4 315:2

safe 117:15 294:22 328:18 328:24 347:18

safety 30:12,21 31:5 35:13 36:21 49:21 53:1 75:22 97:17 99:17 324:10,11,17 324:20 328:6 328:10,15 329:17 331:1 346:12 347:16 355:20 360:7

sake 111:8

Sales 1:4 6:10

sample 129:4 131:5 170:12 252:10

samples 151:4 163:21 179:20 223:11 247:25

sampling 170:14 186:1

San 3:4

Sanchez 261:7 261:18 262:20

sat 74:21

save 80:12

saved 56:9

saw 179:18 259:15

saying 45:4 106:9 123:13 143:23 149:3,4 150:12 158:2 159:10 173:24 193:9 203:23 213:17,18 224:8 227:23 231:12 240:5 251:8 256:11 262:15 273:3,6 274:14 281:12 304:20,20,24 316:19 334:14 338:8,15 356:20 357:13 357:14,19 366:16

says 7:23 104:10 109:20 110:21 129:24 191:11 191:15 250:2 361:23 365:4

scenarios 179:24

Schedule 9:18 9:21,25 17:18 17:23

schools 290:13

science 31:14,15 31:17 105:16 191:11 192:9 274:6

sciences 356:2

scientific 41:2 62:18 65:5 67:11 76:10

Confidential - Pursuant to Protective Order

80:6 81:12
96:7 97:2,8
98:13 99:4
121:23 122:22
124:9 134:22
173:18 182:8
183:1 185:8
186:16 190:10
190:24 192:15
205:16 209:25
210:8 245:1
259:23,24
272:1 273:8,10
275:14 276:9
278:10 282:16
321:6 324:5
326:23 329:22
333:5,7,8
334:10 359:23
360:3,12,19
**scientifically**
30:8
**scientist** 77:22
191:8 320:5
**scientists** 84:13
99:10 104:15
105:12 107:4
114:16,17,18
319:17,22
321:18 322:2
**scope** 117:8
**scoring** 206:1
207:11,19
208:4
**screen** 92:8
**screening** 209:5
**se** 124:10
**search** 26:12
27:4,19 53:18
59:10 62:4,7
90:24 121:11
206:24
**searched** 338:13
**searches** 25:22
26:20 53:11,16
54:6,12,17
55:5,23 57:5

58:4 61:14,23
62:17,19
**searching** 54:12
54:20
**season** 301:7
**Seasons** 1:14
**second** 23:15
24:5 52:6 69:7
188:2 273:18
324:2
**second-guess**
198:10
**section** 16:3
66:25 100:20
105:2 112:10
112:13,20
123:25 124:1,2
126:21 133:7
139:21 140:6
179:2 188:15
206:23 212:5
212:17 215:7
333:16
**sections** 30:15
30:17 326:10
**see** 9:11,19
16:19 18:11
20:10 30:16
34:8 39:18
47:1,8,17
51:12 64:21
65:1,7,11,18
66:20 79:2
87:10,24
102:18 110:21
115:3,3 123:22
134:2 136:6
147:17 149:24
151:3 154:2
156:5 159:16
163:14 166:25
177:7,10,21
188:16 199:24
203:2 205:19
206:22 207:1
207:12,13
208:18 214:10

235:23 240:25
249:14,22
254:2 261:24
265:19 267:6
267:19 268:3
270:17,18
279:11 284:21
297:23 316:19
318:16 337:14
341:9 353:25
365:18
**seeing** 63:19
170:24 270:9
367:20
**seeks** 359:22
360:2,6
**seen** 8:22 21:7
42:6 48:3
78:18 85:14
106:20,22
107:1 110:14
110:15 111:22
115:1 123:18
129:23 130:1,9
148:12,21
149:21 151:1
153:4 154:10
161:6 170:13
176:12,13
177:13 187:13
205:14,21
207:14 211:13
211:23 225:17
225:19 228:20
241:24 248:7
248:16 252:6
259:12 260:9
261:17,25
262:2 263:10
270:25 288:21
299:13 306:22
309:12 311:19
312:2 313:11
321:8 342:14
361:1 362:13
**segregate** 59:1
145:12

**select** 129:6,6
130:4
**selecting** 141:13
**selection** 130:13
**sell** 308:4
**selling** 316:20
317:19,24
318:2
**Seminary** 2:9
**sense** 40:19
182:6 195:17
195:19 285:11
285:25 332:25
**sensitivity** 223:6
**sensitizer**
276:20
**sent** 63:21
**sentence** 47:11
47:15 64:21
65:3,19 66:10
67:8 112:20
147:11 212:17
236:23 243:10
251:3 267:12
317:4,6 339:14
366:6
**sentences** 65:21
**separate** 30:4
48:4 63:12,21
64:4,5,7 124:8
139:5 177:1
201:13 202:4,5
208:24 215:24
217:9,18 224:4
244:21 251:22
260:10 263:23
285:7 289:13
318:14 323:20
324:17 325:14
325:24 326:10
329:23 333:16
333:21,22,25
**separated** 210:8
215:19 217:4
**separately** 12:1
13:11 330:21
**separating**

217:14 218:14
**serial** 231:5
**series** 220:16
232:8 246:5
**serpentine**
255:6
**served** 33:21
**serves** 246:20
**service** 26:8
**Services** 1:21
3:20 6:5
**set** 29:8,11
30:17 31:4,21
36:14 55:23
56:19 75:1
84:24 106:16
117:14 146:7
180:3 188:18
210:16 220:5
304:1 311:10
311:15 372:9
**setting** 11:20
23:24 35:25
148:20 174:21
175:2 176:13
176:22 222:25
273:25
**settle** 182:24
**settled** 182:25
**seven** 88:21
316:4
**SEYFARTH** 3:7
**shape** 127:25
**sharded-type**
255:1
**share** 146:18
154:12 160:17
161:5,9 233:17
272:19 278:22
370:10
**sharp** 254:25,25
**SHAW** 3:7
**sheet** 373:6,9,11
373:14 374:7
**Shifting** 307:19
**Shimmer**
126:17 157:5

Confidential - Pursuant to Protective Order

**short** 12:9
348:11 368:21
**shorter** 306:13
**Shorthand** 1:19
372:4,19,20,21
**shot** 28:18
**show** 103:8
150:4 159:16
172:8 206:4
221:21 229:19
238:9 244:9
246:8 250:9
257:15 270:5
276:9 280:2
301:15 305:19
**showed** 177:2
183:25
**SHOWER**
126:14,14
157:4,4 161:14
161:14 308:20
308:20
**showing** 42:7
68:5 103:8
157:17 172:24
184:10 221:18
237:22 274:21
**shown** 41:23
70:22 153:6
242:15 251:7
256:9 257:11
257:19 260:15
271:11 272:18
279:5,16,17
281:18
**shows** 36:7
41:10 70:9
71:5 103:13
145:7 151:1
158:13 169:24
199:10 245:6
302:23
**sick** 178:23
**side** 335:23
**sides** 248:15
**sign** 373:8

**signal** 173:12
**significance**
40:6 41:24
42:14,23 92:20
**significant**
33:17 41:8
42:11,12 91:3
133:5 157:18
172:24 257:16
313:2 357:5
**signing** 373:9
**signs** 238:11
**silica** 264:18,20
264:20
**similar** 54:21
70:4,12 71:2
71:24 79:23
117:7 118:11
144:23 145:2
153:15 169:25
231:24 233:17
243:21 254:6
268:10 272:20
273:23 275:22
276:18 289:7
**similarities**
233:4 234:8
**simple** 36:11
264:16
**simply** 26:5
38:16 67:8
89:2 93:12
106:9 110:3
113:9 139:2
144:2 241:12
294:11 306:3
**single** 242:14,21
243:2,14,16,17
283:1 298:18
368:9
**sit** 34:10,23
51:16 60:21
74:16 110:23
119:11 120:22
145:16 162:21
176:1 188:9
202:6 245:12

250:11,18
259:21 276:24
278:9 280:23
368:18
**site** 64:24
180:21 242:16
243:18 264:23
281:16 295:4
**sitting** 18:16
368:15
**situation** 96:11
96:18 97:22
246:2 273:25
297:6 326:5
342:11
**situations** 246:1
361:1
**six** 18:20,21
97:24 98:1,5
172:5 249:10
266:25 267:17
301:3 316:4
**size** 92:23
124:20 125:3,4
125:7,10,15,23
127:19,25
128:7,8 129:6
129:21 150:11
**sizes** 124:24
128:14 129:5
230:23
**skin** 271:21
**slightly** 46:6
55:18 65:20
**small** 129:10
202:14 243:12
**smaller** 125:4
126:2 129:6,14
177:21
**Smith** 2:22 7:12
7:12 42:18
257:14
**Society** 355:3
**sold** 48:13
138:15 251:6
253:10 308:13
316:15 325:10

**solely** 351:17
**solicit** 340:23
**soliciting** 342:2
**solicits** 340:19
**solubilized** 72:8
264:11,17
265:23
**soluble** 72:12
**somebody**
173:25 225:19
246:10 283:10
305:18 318:3
320:19 335:25
357:3,4,17,21
**somewhat** 265:2
313:3
**sorry** 11:8 12:21
19:6 137:13
226:20 257:14
267:11 269:10
274:4 289:23
289:25 298:12
310:2 313:14
313:15 333:3
339:5 345:13
355:23,24
358:25 360:1
363:5 365:8
367:8
**sort** 15:14 30:1
30:2 37:13
85:21 178:9
235:17 299:20
332:1 351:10
**sound** 323:7,13
**sounds** 96:23
322:22
**source** 133:11
136:10,15
216:11 251:21
336:12,17
337:1 339:17
339:25 340:1
349:16
**sourced** 318:13
**sources** 130:16
136:21 137:6

139:13 144:17
162:18 167:7
266:17 313:23
**sourcing** 137:1
**South** 2:14,23
3:13
**space** 180:11,13
373:6
**specialist** 47:24
**species** 68:6
182:20
**specific** 12:24
15:4 22:20
29:5 39:25
50:4 51:1,21
71:19 71:9
76:22 82:21
91:10 93:2
103:17 105:4
109:22 110:9
116:10 123:10
123:10 124:18
125:15 129:18
141:21 147:24
148:15 159:4
164:3 166:17
168:1 172:3
174:11 185:13
189:16 202:16
202:19 210:16
210:23 211:2
212:22 214:14
218:21 224:10
224:20 250:24
253:4 259:6
275:6 277:2
282:21 304:2
310:19 321:12
345:5 349:1
354:1 355:16
357:22 368:17
**specifically**
11:22 15:8
21:23 22:8,19
22:25 43:8
46:22,23 50:13
69:21 77:12

**signal** 173:12

---

**Golkow Litigation Services - 877.370.DEPS**

Confidential - Pursuant to Protective Order

91:13 97:10
100:6 102:2
113:13 118:21
119:23 125:9
135:2 151:20
153:22 154:4
154:18 158:17
160:7 163:9
189:12,17
196:2 201:18
214:8 227:11
244:12 249:17
258:1 264:7
265:4 272:4
285:2 350:13
354:21 355:25
**specification**
311:11
**specifications**
129:20 165:3
311:15
**speed** 73:11
**spent** 10:23
11:13,18,20
12:1
**spoken** 345:4
**sponsored** 247:9
**St** 1:14 3:14 6:9
19:19 20:21
**stages** 272:13,15
341:23
**stakeholders**
344:8
**standard** 49:20
116:4 185:10
186:17 285:18
324:19 326:14
327:11 328:2,3
**standards** 38:7
**starch** 69:10,25
70:1 71:2,6,10
71:23 72:6,7
72:13 73:7
93:4,7 265:10
265:16,22
266:19
**start** 8:16 31:25

57:10 60:11
62:10 80:19
81:21 82:1,11
90:23 93:19
127:24 128:7
189:11 216:25
248:24,24
298:13 326:16
365:7
**started** 8:5
19:25 32:5,17
32:23 54:12
59:18 60:2
74:17 95:4
163:7 323:8
329:13 331:11
331:12
**starting** 15:13
102:19 138:25
**starts** 35:25
**state** 53:8 70:8
84:5 95:17,23
135:4 147:12
164:1 173:6
183:2 190:20
236:6 242:12
284:20 286:18
293:16 340:2
340:18 373:5
**stated** 28:3
34:20 109:16
112:5 183:13
208:1 251:10
298:24 344:24
**statement** 36:10
42:9 47:4
48:15 52:18
110:9,25 173:3
192:3,5 199:4
202:5 204:22
211:2 213:5
230:9 240:2
243:22 250:20
253:7 284:12
284:14 318:7
338:24 347:16
349:25 350:3

365:3
**statements** 17:6
35:20 74:5
110:12 191:18
193:11,16
202:17 336:7
351:3
**states** 1:1 6:11
47:15 49:13
65:4 67:9
112:21 207:8
322:19
**stating** 134:25
204:14 243:11
**statistical** 40:1,5
41:8,24 42:13
42:22 92:19
209:13 218:2
**statistically** 91:2
92:19 157:18
158:14 172:24
**statistics** 92:20
**stay** 220:21
337:13 364:12
**steering** 340:6
340:10,14
**Steinberg**
344:11
**stenographica...**
372:8
**step** 36:2 139:21
139:25 188:23
189:23 235:14
235:22 279:1
332:24
**steps** 75:25
76:13 77:3,4
**sticky** 218:10
**stilled** 243:1
**stimulate**
273:23
**stomach** 271:13
**stop** 82:11 334:5
**stopped** 331:7
**stopping** 116:3
**story** 178:9
**strategy** 58:12

**streams** 27:8
**Street** 1:14 2:5
2:14,18,23 3:3
3:8,13
**strength** 38:13
38:22,23 39:4
**strengths**
102:15
**stress** 227:13
228:2,6 277:8
278:23 279:2,7
**stressors** 228:23
**stretched** 297:2
**stronger** 203:9
203:20 204:18
**structure** 59:11
124:20 125:11
125:16,23
127:19 255:1
**studied** 70:22
159:5 255:18
269:23,24
**studies** 41:20,21
41:22 68:2,5,9
69:13 73:22
74:6 81:19
83:12,25 84:6
87:25 91:2
95:18 96:20
97:24 98:6
99:1 100:2,5,9
100:25 101:4
101:24,25
102:5,7,16
104:5,18,22
105:19 106:4
106:19 113:4
114:8,22 115:5
115:5,9 117:10
119:18,21
120:4,25 127:8
133:24 138:16
140:23,24
141:21,23
142:3,4,5,6,19
143:13 145:12
152:17 154:4

154:14 155:1
155:10,23
156:1,25 158:8
158:9,17,22
159:3,9,16,18
160:7,7 163:16
172:25 173:13
174:23 175:10
175:16,19
177:18,22
178:4 183:14
183:22 184:9
185:24 187:7
187:20 205:17
206:25 207:6,9
207:20 208:4,5
208:16,21
210:8,12
215:16,20
216:7,10 217:6
217:7,9,10,22
217:25 218:3
222:15,17
223:11,19
224:13,21
225:17 228:14
228:20 229:15
230:17,18
234:9 237:20
237:21 238:7,9
238:23 239:4,4
239:8,18 240:8
240:9,9,12,16
240:17,18,22
241:13,17,25
242:20 243:24
245:17 246:16
274:18,21
275:14 276:9
277:19,21
285:3,6 288:21
291:18 293:17
295:20,21
296:9 302:24
310:6 312:2,8
312:8 313:8
314:10,15,18

Confidential - Pursuant to Protective Order

Page 419

314:19 315:14
357:7,23 358:1
**study** 36:19
42:14,15 69:3
69:20 73:4,14
73:20 79:17
84:9 87:19
88:4,8,8,14,16
89:25 92:17,22
96:4 99:2
102:13,14,24
104:4,10,11,25
114:7,10
118:15,25
119:8 120:2
134:12 145:10
152:12 155:9
155:15,16
156:17 159:19
160:12,23
170:17 172:18
175:13,17
182:19 206:18
207:18 209:14
209:20 210:24
211:3 216:1
217:20 218:2
220:11,24
222:19,22
223:17 224:5
225:18,20
228:17 229:9
229:10,22
230:22 231:1,4
232:2,3 233:1
235:10,19
239:20 241:2,3
241:8 244:3,5
244:8 246:19
291:8,21,25
292:1,13
297:21,24
298:1 312:16
**studying** 73:25
**subject** 43:12
287:10 373:10
**subjects** 100:7

**submission**
364:25
**submissions**
362:6
**submit** 341:15
341:19 343:7
343:17,22
345:17 368:7
**submitted** 10:16
10:20 116:13
116:21,25
342:21 344:1
361:14 363:2
363:11,15
**submitting**
361:24
**Subscribed**
374:15
**subsidiaries**
44:20
**substance** 35:4
40:12 103:14
147:23 374:7
**substances**
70:21 72:22
105:5 256:3
**substantial**
226:15 258:5,9
**substantive**
26:24
**substituted**
174:6
**successfully**
182:12
**suffice** 43:20
**sufficient** 40:15
276:6 306:8
326:2
**suggest** 281:24
**suggested** 51:20
313:8
**suggesting**
114:7 284:13
**suggests** 195:2
**Suite** 2:9,14,18
3:3,13
**Sullivan** 3:2 7:8

7:8
**summarized**
202:14
**summary** 83:18
**summer** 20:11
21:5
**supplemental**
4:14 14:14
20:2,8,17,19
23:4,8 32:10
266:21 267:3
**supplementary**
208:2,9
**supplied** 204:12
**supplier** 307:21
307:25 308:2
309:4
**supplies** 308:11
**supplying** 317:9
**support** 21:21
22:9 112:18,22
139:14 338:23
350:14
**supported** 184:8
**supporting**
37:11 48:17
307:2
**supportive**
337:20
**supports** 194:11
**sure** 19:17 24:7
27:21 56:4
63:8 78:24
109:12 120:23
121:5 123:17
177:9 242:10
269:14 271:21
278:13 281:11
287:13 308:25
316:5 323:10
323:12 364:11
367:5
**surety** 121:8
**surface** 180:14
180:19 264:22
329:4
**surprise** 345:1,3

**surprised** 79:22
**survey** 139:2
**susceptible**
292:1
**suspended**
177:14
**suspicion**
366:25
**sustained**
140:17
**swear** 7:18
**sworn** 7:21
372:5 374:15
**system** 26:10
87:15 90:4,9
90:14 91:10,13
91:18 92:6
113:18 206:2
207:11,19
276:21 335:9
**Systematic** 4:18
**systematically**
264:12

───────

**T**

**T** 3:7
**T-a-h-e-r** 16:14
**table** 79:19 86:4
87:12 89:11
203:18
**Taher** 4:20
16:14 201:23
205:8,13
206:18 215:16
**take** 28:17 36:12
70:23 94:19
103:4 128:7
131:22 160:15
188:22 197:19
203:18 208:13
223:7,15,16
228:21 243:23
246:18 287:2
**taken** 110:6
131:11 218:9
299:10 368:6
372:8

**takes** 26:13
102:11,12
**talc** 3:5 4:19
15:16 17:6
29:25,25 30:21
31:5 57:22
62:8 64:23
65:6 66:5 67:9
67:12,16 68:6
69:14,18,21,24
70:12 71:3,11
71:19,24 72:6
72:11,19 73:8
73:15,25 74:7
77:10,10 86:21
93:7 95:19
97:17 100:6
108:8 109:18
110:7,13,25
112:7,12,20,23
119:5 124:14
124:20 125:3
125:11 126:22
127:19 128:8
129:4,13 130:4
130:16,18,23
131:14 132:3
133:9,10
134:13,14
135:2,3,14,22
135:25 136:11
136:15 137:5,6
137:8 138:10
138:18 139:4
139:13,14
140:24,25
142:2,3,4,7,13
142:15,21
143:1,3,20
144:17,22
145:18,20
146:5 147:1,3
147:14,14,15
147:15,20
148:13,24,25
148:25 149:13
149:14,16,18

Confidential - Pursuant to Protective Order

149:18,21,23
149:24 151:2
151:19 152:24
153:5 155:16
159:4 161:11
161:12,20,23
162:14,18,25
163:18 164:8
164:17 174:18
174:20 175:14
177:14,17
178:15 179:11
180:4,6 181:12
181:19 182:13
183:3 184:12
184:13,19,22
185:10,18,20
186:7,19
187:14,17
188:12,25
189:1,17 190:3
190:4,11,25
191:13 193:3
193:18 195:24
196:6,20 197:2
198:21 202:11
202:18 203:1,6
203:21 204:16
207:21 208:23
221:24 222:7
222:16,19,21
222:21 223:12
223:13,20,21
224:3,18,22
225:10 226:13
226:25,25
232:19 233:2
236:10,12,19
237:3,14
238:10 239:18
240:10 241:16
241:21 242:1,5
242:14,21
249:17 250:10
253:2 256:15
257:10,21
258:24,25

259:2 260:11
260:11,16
261:5 262:9,19
263:16 265:10
265:15,24
266:5,10,19
267:5 272:20
273:1,1 274:15
277:12,24
278:13 280:24
281:17,23
282:18 283:9
285:22 286:18
286:22 291:6
293:15,20
296:14 297:16
297:24 298:4,5
298:18,19
301:13 302:8,9
305:21 306:5
306:23 308:23
310:7 316:14
317:9,19,25
318:2 319:18
320:12 321:1
322:5 324:6,13
324:23 325:1
325:17 326:23
327:5 329:25
331:5 332:6
335:12,13,14
341:16 342:12
342:21 344:16
344:23 345:18
346:1,18
355:14,21
356:10 361:5
361:15 370:15
**talc's** 86:21
**talcum** 1:3 4:22
29:20 198:2
200:3 251:4
255:24 256:20
258:4,19 260:2
261:8 262:22
263:20 268:23
290:19 322:15

369:11,17,21
**talk** 13:9,9
31:11 34:4,16
75:21 77:19
79:15,17 85:2
100:20 101:4
107:1 112:12
119:1 123:7
124:19 128:25
138:11 146:11
146:14,25
147:2 149:13
149:22 150:17
153:11 161:8
162:18 164:24
166:2,3,5
184:2 192:4
194:1 201:5
208:6 209:11
219:6,21
221:13 252:21
264:6 266:17
269:4 272:11
272:12 277:11
282:24 283:4,6
285:16 311:4
333:13,17
335:2,8,11,19
340:12 347:3
347:17 352:19
359:20 370:2
**talked** 43:2 88:5
95:14 138:21
146:8 148:21
165:5 173:11
174:17 186:23
201:7 221:8
265:1,3 268:9
276:3 294:5
305:13 314:17
327:21,25
335:3 355:25
369:16
**talking** 15:14
16:4 27:23
63:8,13 84:25
86:8 95:4

128:12 153:21
156:12 167:12
167:21,22
168:6 175:22
177:25 202:1
203:11 209:11
216:2 223:25
238:15,18
240:3 248:8
262:9 270:20
270:21 281:15
291:10,13
294:4 302:17
302:19 305:6
306:16 309:21
309:22 310:3
329:13,20
330:5 333:4
334:15 338:14
348:5,8 351:7
361:12,17
362:10 365:19
367:24
**talks** 17:5 71:5
72:17 73:5
103:10,13
128:24 139:3
149:14,15
202:17 208:15
292:12 296:5
365:12
**tangent** 330:7
**target** 117:13
146:19 168:22
235:17 274:13
**task** 330:19
331:3,8,11,12
333:25 347:25
**tasks** 330:17
**teaching** 291:2
**teasing** 293:23
**technically**
342:6,9
**Tecum** 4:12
**Ted** 2:3 6:18
**Ted.Meadows...**
2:4

**tell** 7:22 12:17
52:4 53:2 59:3
60:25 68:25
76:19 78:24
100:21 101:9
101:22 102:8
109:20 119:8
121:7 123:25
129:24 136:16
139:19 141:17
153:2 155:20
169:18 182:15
188:17 191:9
192:19,20
193:10 200:9
201:11 236:22
245:12 249:10
251:2,11
262:25 300:13
305:3 307:7
314:25 316:2
316:10 339:24
**telling** 52:7,15
105:1 138:9
172:4 186:14
210:3 284:21
309:2 315:13
**tells** 62:23 83:5
232:6 265:19
302:13
**ten** 11:11,18
183:23,24
184:20,20
**tend** 344:7
**term** 130:19
131:3,4 146:25
183:4 194:4
216:15 303:2
**termed** 34:25
**terms** 27:24
74:10 75:23
101:19 147:14
150:10 151:10
157:8 159:13
171:21 187:15
323:14
**test** 40:1 127:8

Confidential - Pursuant to Protective Order

160:8 181:22
**tested** 132:19
139:24 248:1
252:11 257:10
**testified** 265:9
297:14
**testify** 365:23
372:5
**testifying**
255:19 346:24
347:2
**testimony** 30:5
32:22 86:1
108:20,23
109:5,7 136:18
163:3 186:12
209:21 210:2
213:16 252:6
255:16 261:23
262:13,20
342:16,18
349:13,19
350:5 372:8
**testing** 142:20
170:5 182:13
182:21 186:5
187:23
**tests** 144:7
181:18
**Texas** 1:19 3:4
372:21
**textbook** 292:11
294:6
**textbooks**
290:11
**thank** 7:16
111:21 287:13
318:25 370:16
370:17,20
**theory** 181:19
**thing** 10:1 16:8
63:9 326:6
333:9 355:4
**things** 18:3,5
22:1,7 29:6
30:5 36:16
43:13,16 45:13

45:13 52:24
53:18 57:9,14
57:15,22 61:12
62:5 63:19
80:25 83:14
85:11 88:23
91:4 92:25
93:5 98:15,19
101:13,20
103:7 125:8
133:12 140:9
140:11 146:13
150:19 151:25
153:6 159:15
160:16,17
161:16 163:19
163:22,24
169:16 179:1
181:5,5 184:6
194:23,24
196:16 197:22
204:2 209:12
209:18 216:13
225:14 233:13
234:3 235:18
247:8 269:22
289:4 293:19
305:23 312:23
315:18 323:16
323:18 324:13
328:18 330:14
331:15 335:19
343:15 349:10
**think** 18:6 28:6
30:16 31:10
32:21 33:9,13
34:15 38:20
41:15 48:23
49:16 50:11
52:6 58:11,13
58:16 61:22
66:23 68:18
72:23 76:6
80:15 82:23
83:19 84:15,17
90:13 91:15
93:22 95:14

96:10,13,16
97:9 99:6
100:21 101:3,5
101:9,23,23
103:1 104:9
106:15 119:21
123:24 125:14
126:3,9,17
136:4 139:20
141:17 145:1
146:8,23
151:11 153:1
160:25 162:6
162:17 163:6
164:23 165:5
166:15,16,18
167:9,10 169:2
174:16 176:25
177:5 181:3,4
182:5,15
183:13 185:2
186:14,18
188:15,18
189:5,7 190:7
190:20 191:24
192:2 200:17
202:14 203:8,9
203:19 204:22
223:9,13 224:7
224:24 227:16
233:9 234:13
237:8 238:22
242:1,25 243:8
244:12,20
245:11 246:3
247:15 248:11
249:20 256:24
257:1,8 260:6
261:11 275:3
282:22,23
283:11 284:13
287:1 288:15
294:5 297:7,25
298:10,23,25
299:16 301:23
302:11 303:6
303:12 304:12

304:14 305:5,8
311:12 318:6,6
318:16,24
319:7 320:4
323:3,25 325:4
325:11 328:7
332:10 333:20
335:5,20 349:4
349:10,18
351:15,24
355:15,23
357:24 358:2
362:19 365:16
366:6,7 370:1
**thinking** 37:5
120:6 219:22
316:23 346:22
**third** 126:18
212:18
**third-party**
51:18
**thirty** 373:15
**THOMAS** 2:12
3:7
**thoroughly**
94:16
**thought** 21:1
38:21 58:9
77:25 92:2
100:23 108:19
108:20 215:10
233:10 330:4
347:2
**thousand** 158:6
200:10
**thousands** 346:6
**three** 12:7 13:5
13:6,15,21
19:8,11 27:25
254:1 264:2
268:1,5,8,15
278:21 279:23
280:14 290:23
301:17 310:3
**threshold** 39:17
39:24 200:2,7
237:10,13

281:25 282:17
282:18 283:11
284:14 294:22
295:5 303:4
304:7,11,21
**thresholds**
283:5
**throw** 143:13
**tie** 49:8
**tied** 334:16
**tight** 297:4
**tightly** 231:6
**time** 6:7 10:4,22
11:12,15,20,25
12:1 17:7
20:13,20 21:3
21:9 24:6
29:23 31:9
32:20,23 34:6
56:16 57:6,20
59:16 66:17
84:2 109:21,21
110:11 131:14
136:16,24
139:1 163:11
164:21 165:10
165:15,17,24
170:8,24,25
176:7 177:8
179:5 215:23
226:14 228:12
230:25 231:5
265:17 286:7
294:18 298:18
299:3,16
301:21 302:9
302:15 303:23
306:13 331:2
345:23 346:1,4
348:6,12 349:9
356:6 358:17
361:11,14,17
364:10 365:11
367:23 368:5
370:24 372:9
**timeline** 15:14
138:22

Golkow Litigation Services - 877.370.DEPS

Confidential - Pursuant to Protective Order

times 62:24
82:10 114:4
172:5,5,5
184:20,21
199:2 201:20
216:2 253:22
302:7 310:17
311:17 316:4
319:7 339:22
341:13,19
362:14
timing 28:24
343:6
Tinsley 3:12 7:5
7:5
Tisi 2:13 6:24,24
19:3,4
tissue 125:5
126:1 128:1
140:13 179:17
227:13,14
228:5 229:1
231:14 232:20
242:22 264:15
264:16,24
274:1,8,8
276:19 283:14
289:8 293:4
tissues 273:24
title 69:3 290:25
tlocke@seyfar...
3:8
today 8:8 12:5
23:21 34:10,23
51:16,20 60:21
88:21 109:10
109:11,20
110:23 119:12
120:23 145:16
149:2 162:22
176:2 188:9
200:8 202:6
209:21 210:2
250:11 259:22
276:25 280:23
297:14 315:11
354:24 368:15

368:18
today's 6:6 13:1
15:5 22:18
told 58:11
103:24 171:22
185:12 209:6
210:15 219:3,8
245:5 257:12
257:13 265:21
307:17 315:17
Tom 7:3 319:5
tool 75:24 77:13
356:5,9
tools 81:7
212:20 356:17
top 52:3 184:1
218:10
topic 54:24
58:13,14 64:23
97:2 124:18
289:16
topics 29:5
30:18 33:2,5
33:22 53:5
58:15
Totally 326:8,19
touch 287:22
toxic 29:24
125:4 145:20
146:18 151:19
153:3 195:23
195:25 223:21
242:4 243:13
273:23 306:8
306:11
toxicities 34:6
toxicity 39:13
86:21 126:2,22
127:17,20
128:1 139:14
140:13 146:5
149:1,10,13
150:4,24
151:17 152:14
169:20 224:15
235:17 240:11
241:16,21

242:1 254:6,10
266:13,14,18
283:14 294:25
295:6
toxicokinetics
65:6 67:12
toxicological
114:10 167:3
234:22 290:7
304:10
toxicologist 72:5
84:18,25
126:10 143:16
145:17 150:19
152:3 166:23
167:16 168:3
170:1 181:24
195:15 199:20
224:6 234:21
255:19 264:5
305:10 307:5
307:15 334:3
357:3
toxicologists
72:25 85:4
115:4 281:6
toxicology 29:20
76:9 77:10
81:20,23
125:25 182:21
199:24 209:16
255:13 275:20
278:5 291:1,3
294:1,5 295:2
295:10 304:25
323:19 334:8
335:2,4,12,25
346:11
trace 309:14,20
310:4,15,17,21
310:23 311:4
track 56:5,11
80:5,24
tract 68:7 69:10
69:15 70:6,11
71:18 72:1
73:16 95:20

101:15 103:12
103:12 183:16
184:4 265:5,12
295:23,25
297:1,18
302:10
tracts 101:11
trail 55:16
trained 86:7
115:12 352:10
352:15 359:14
training 39:6
77:23 84:23
99:7 105:12
115:12 264:5
356:5,7 357:9
transcript 372:8
373:16,17
transcription
374:5
transcripts
345:7,10
transition
124:17
transparency
213:12,15
214:4 219:20
244:15 350:17
transparent
212:21 214:9
362:14
tremolite 135:10
145:19,21,21
147:16,20,21
147:22 148:10
148:11,12,13
148:25 149:20
149:22 150:6,8
151:3,21
162:15 253:25
309:23
tremolite-cont...
149:23
trial 20:25 21:19
21:21 22:7,11
22:13 32:22
109:23 138:20

165:6 186:23
252:5 335:1,8
349:19
trials 20:21
335:3 349:13
tried 91:15
92:12 141:3
155:19 160:21
174:15 185:2
191:5,5 192:22
201:22 307:5
triggered
146:20 266:10
triggering 228:2
trimellitic
135:22,25
trouble 333:23
true 59:11 67:17
73:11 74:22
75:4 79:10
84:3,11 105:25
106:1,3 107:20
118:20 127:10
136:11 157:9
164:7 171:24
174:5,12
177:23 195:10
207:7 213:7
227:4 230:10
232:22 233:15
241:1 251:18
282:13 284:23
293:9 294:15
294:25 295:16
296:1,12
297:20 308:8
316:25 317:5
320:10 332:11
336:18 340:18
342:7 343:9,16
344:4 347:19
359:15 361:20
361:21 363:12
363:25 367:6
truly 222:21
truth 7:22,22,23
372:6,6,6

Confidential - Pursuant to Protective Order

**try** 61:2 77:24
  93:20,21 98:23
  102:15 129:9
  141:17 145:11
  152:9 162:4
  163:8 198:10
  228:22 229:14
  319:11 339:6
**trying** 28:19
  53:2 57:11
  73:2 78:5
  106:15 117:14
  119:16 128:5
  130:15 133:6
  151:14,16
  153:14 155:22
  156:14 169:11
  195:15 219:18
  238:5 243:19
  259:14 260:19
  269:13 273:20
  289:1,1 304:6
  306:3 316:5
  347:23
**tube** 4:23 180:22
  181:8
**tubes** 103:16
  180:11 181:2
  181:13 183:17
**Tucker** 3:12,18
  18:16
**tumor** 221:22
  222:4,6
**tumors** 181:1
  220:13 270:6
  271:10,13
  279:22
**turn** 53:7 64:15
  65:14 124:12
  206:21 212:15
  282:11
**turned** 311:21
**Turning** 215:15
**two** 19:4 28:25
  33:16 35:19
  65:21 68:2
  72:22 85:3

172:4 204:1
  233:4,16,16
  279:25 280:1
  281:7 283:8
  289:4 290:21
  292:16 313:18
  318:7 323:17
  323:18,22
  324:13 329:8
  329:14 330:14
  330:16,17
  349:4 363:4
**two-thirds**
  236:7
**type** 55:22 81:3
  84:19 116:25
  133:16 135:2
  138:3 140:13
  140:20 145:8
  147:22 159:4
  162:11 172:20
  215:18,25
  232:20 233:20
  254:20 269:18
  270:12,13
  271:15 272:2
  286:11 326:20
  327:15 348:18
**type's** 233:2
**types** 35:17
  43:13 51:6
  70:20 77:4
  106:18 114:8
  137:5,7 139:13
  139:22 140:16
  142:13 143:17
  146:5,19
  149:11 152:17
  152:24 156:4
  156:16 161:16
  169:25 174:18
  179:5 195:25
  216:4 218:15
  219:9 226:25
  229:5 233:4,14
  233:17 234:8
  234:10,14,16

254:9 267:18
  269:18,23
  270:6,8 271:15
  271:16,25
  273:12 311:23
**typical** 178:10
  182:20 205:21
  214:7 294:12
**typically** 36:25
  42:12 52:14
  63:11,17 80:12
  80:12 107:5
  114:14 122:22
  199:21 205:19
  253:20,21
  261:19 307:15

---

**U**

**Uh-huh** 122:20
  286:1 304:8
**Uhl** 19:16
**ultimate** 127:17
  237:12
**ultimately** 132:3
  133:20 140:25
**underlying** 34:5
  37:13 191:11
  191:21 274:7
  277:17 278:1
  293:4
**underpinnings**
  314:22
**underpins** 294:2
**understand**
  23:25 28:6,19
  32:22 33:1,3
  48:24 57:11,17
  67:1 82:19
  83:20,20 88:20
  93:25 94:2
  102:4,23
  104:21 113:15
  114:3 117:15
  128:5 133:15
  134:11 142:12
  148:17 150:20
  151:12,15,15

151:16 152:4,7
  152:13,22
  155:13 167:17
  169:2,8 170:4
  175:1,19
  195:16 204:14
  213:9 219:22
  229:14 231:3
  233:3 234:7
  247:6 262:15
  281:12 283:20
  291:20 297:13
  304:9 325:5
  328:22 330:13
  332:18 333:20
  338:7 357:5
  360:5
**understanding**
  8:8,12 10:6,19
  19:10 21:8
  22:17 29:17,18
  34:24 35:2
  40:4 44:13
  47:22 55:19
  98:12 101:5
  108:25 109:16
  116:15 123:15
  125:23 130:3
  131:2,4 132:14
  133:18 136:20
  150:2 154:1
  169:5 194:3
  202:7 213:1,20
  249:8 308:21
**understands**
  45:15
**understood** 63:2
  182:10 227:19
  242:10 329:6
  349:9
**undertook**
  330:18,18
**underwear**
  296:22 297:17
  298:4 299:6
**unethical**
  185:25

**unfortunately**
  59:16 74:2
  166:21 170:11
  185:24 225:14
  237:7 239:4
  297:20
**Union** 3:15 7:6
**unique** 103:9
**United** 1:1 6:11
  322:19
**universities**
  290:12
**unsafe** 347:5
**up-to-date**
  10:15
**update** 62:8
**updated** 61:21
  111:19
**updating** 61:14
  62:5
**upper** 68:7
  69:15 73:15
**upright** 101:12
  101:13
**upwards** 95:20
**usage** 283:22
**use** 4:19 21:21
  26:8 27:23
  37:11 38:7
  44:11 48:2
  49:23 58:14
  75:22 76:13
  80:3,17 81:8,9
  88:16 90:18
  105:12 110:13
  110:18 113:22
  114:16,21,23
  115:12 117:14
  119:5 127:2
  153:20 160:4
  171:3 173:20
  175:5,22,24
  178:3,12
  179:11 183:4,4
  185:17 187:1,4
  187:17 193:4
  193:18 194:5

Confidential - Pursuant to Protective Order

195:11,18
196:14 198:12
198:23,25,25
199:17,21,21
200:2 203:3
204:4 205:22
209:9,19 216:5
225:1 239:10
258:4,7 260:2
263:20 282:25
283:1,2,3
284:15 289:12
296:15 301:25
306:5,23 313:8
324:13 327:17
328:25 329:1
334:25 347:18
356:6
**uses** 78:16
184:19 194:8
196:17 283:8
283:10 298:4
302:8 339:19
**usually** 18:7,10
63:16 64:6
93:20 261:22
310:21
**uterus** 180:9

—————
**V**
—————
**V** 2:13 3:19
**VA** 2:10
**vagina** 103:15
180:8 296:11
**vaginal** 296:23
**Valley** 164:9
**valuable** 88:8
**value** 87:4,10
106:10 160:22
**values** 78:12
79:6 89:3
105:19 219:4
**variable** 199:18
**varied** 251:7
267:15
**varies** 128:22
134:22

**variety** 21:6
58:23 70:20
248:7 253:21
274:16 293:19
358:1 370:9
**various** 55:5
208:21 218:23
320:15 369:19
**vary** 232:19
**vast** 160:13
**venturing** 24:8
**verbatim** 372:8
**verify** 347:8
**Vermont** 136:22
**Version** 4:24
**versus** 38:11,11
67:4 72:18
76:14 79:16
83:1 85:1
101:12,13,16
101:25 118:6
120:10 125:7
126:6 140:18
146:9 150:15
151:6 163:9,10
165:1,2 170:15
175:21 178:10
179:14,22
181:2 205:7
219:7,7 224:22
227:6 231:9
233:12,24,25
238:25 240:7,8
243:12 247:1
260:11 264:17
266:19 270:21
281:8 283:9
305:14 314:21
324:20 326:14
327:18 357:17
**Vetner** 16:6
**videographer**
6:1,4 7:16 25:9
25:12 94:22,25
99:21,24 188:3
188:6 200:21
200:24 287:3,6

364:15,18
368:24 369:2
370:24
**videotaped** 1:12
4:11 9:10
**view** 33:5 38:13
49:6 84:18,20
96:3 97:20
127:14 165:7
181:10 189:1
197:9 236:16
254:8 258:2
269:16 349:21
**vitro** 115:5
117:9 118:10
142:5 205:24
207:5,20
208:16 217:1
219:7 224:1
228:13,17
229:9,15,22,25
230:4 240:8,8
**vitro/only** 217:5
**vivo** 229:10
230:2,2,7

—————
**W**
—————
**wait** 242:8
**waiting** 301:2
**walk** 13:16
**wander** 137:18
**want** 8:16 12:16
12:20 13:9
20:10,11 24:7
27:6 30:14
41:12 60:5
72:16 74:12
78:24 94:19
100:10 102:18
106:5 109:24
110:8 119:1
120:6 121:7
123:24 129:15
135:18 148:15
149:4,5 150:3
153:11 162:15
169:13 177:4,8

183:22 188:16
195:12 201:5
204:4 212:4
229:13,23
232:7 235:2,3
241:7 242:9
247:12 249:18
281:11 283:4
287:22 305:17
316:8,9 317:16
330:8,10,13
333:19 347:7
358:13 362:22
364:8 366:20
**wanted** 19:10
56:18,20 57:17
61:6 105:18
133:14 159:13
201:11 280:11
319:14 323:10
329:21
**warm** 301:8
**warn** 327:3,4
328:8 329:15
332:16
**warned** 165:18
330:25 332:17
**warning** 47:4
48:14,14 52:13
52:17 153:11
166:12 179:2,3
285:15,17
326:14 328:4
334:15,19
**warnings** 51:7
141:25 165:18
285:15,20
330:22 331:17
**Washington** 3:9
**wasn't** 15:10
21:14 59:20
62:3 119:14
123:19 171:22
257:13 262:11
334:2 345:21
349:22 353:5
**waste** 177:8

364:9
**water** 117:16
**way** 34:20 35:20
36:7 37:5,25
38:10,21 40:21
49:13 51:13
55:14 56:10
72:10 78:8
73:19 78:22
79:12 86:7
89:9 94:18
98:22 101:1,16
105:15 110:20
115:6 130:12
131:12 137:25
138:24 140:8
142:10 144:14
144:21,22
146:4,23 151:7
156:10 158:1
159:21 161:25
171:3 172:19
173:7 176:21
185:1 191:4
192:9,12
194:22 195:23
196:11 209:3
209:15 210:15
230:16 231:22
233:22 236:7
240:15 241:3,5
245:15 246:19
256:5 265:3
275:4 283:5
291:21,22
293:6 297:22
298:5,24 300:6
302:9 314:24
319:21,24
320:1 325:10
332:1,11
353:17 354:9
356:17 362:5
366:23
**ways** 58:24
78:10 80:24
219:19 256:18

Confidential - Pursuant to Protective Order

| | | | | |
|---|---|---|---|---|
| 294:20 | 87:6,14 88:5 | 90:5 98:23 | 160:11 162:2 | **women** 37:4 |
| **we'll** 11:6 17:12 | 88:17 89:5,24 | 99:3 116:9 | 163:6 164:12 | 41:4 70:11 |
| 39:15 70:2 | 90:10,18 93:6 | **well-controlled** | 165:12 166:15 | 185:11 186:1 |
| 166:3 252:24 | 95:25 96:6 | 172:18 | 171:6 173:23 | 198:23 199:13 |
| 359:3 | 97:3,6,21 98:4 | **well-recognized** | 174:10 176:6 | 202:19 203:22 |
| **we're** 13:8 24:7 | 98:7,9,21 99:2 | 290:11 | 179:13 180:18 | 237:13 265:5 |
| 63:8 64:18 | 101:8 102:4,23 | **went** 12:12,13 | 184:25 186:13 | 296:15,20 |
| 78:25 84:22 | 103:5,20,22 | 15:16 61:1,8 | 187:19 190:15 | **women's** 312:3 |
| 94:22 194:16 | 104:3,5,12 | 61:12 77:4 | 192:19 195:7 | **Woodruff** 16:5 |
| 194:17 226:5 | 105:11,15 | 123:9 246:15 | 196:9 198:9 | 102:21,22 |
| 323:11 361:24 | 107:2 112:17 | **weren't** 21:11 | 214:19 221:5 | 105:3 296:2 |
| 368:22,22 | 112:21 113:16 | 21:22 22:1,8 | 222:11 233:7 | **word** 57:2 59:22 |
| **we've** 22:21 | 114:6,12,12 | 60:2 83:3 | 234:13 238:15 | 60:22 64:11,13 |
| 138:20,21 | 115:25 117:8 | 163:19 239:6 | 239:23 241:20 | 110:18 127:3 |
| 174:17 206:15 | 120:4,10,11,19 | 318:13 | 252:18 255:11 | 157:22 172:1 |
| 369:16 | 121:2 133:23 | **wide** 358:1 | 259:14 260:6 | 187:4 194:5 |
| **weak** 17:2 | 134:11 135:7 | **widespread** | 261:17 262:25 | 195:13 216:5 |
| **weakened** | 140:23 141:4,5 | 258:17 | 270:15 278:17 | 237:9 300:20 |
| 110:11 | 143:18 154:16 | **William** 2:22 | 279:15 282:4 | 354:18 |
| **weaknesses** | 155:6,16 | 7:12 | 283:25 284:19 | **words** 22:3 |
| 102:16 | 172:21 173:2 | **Wilma** 352:20 | 287:13 291:10 | 34:15 45:14 |
| **weather** 301:9 | 198:12 205:15 | **wiped** 299:8 | 292:21 296:5 | 53:20 56:22 |
| **web** 288:14 | 209:10 210:1,9 | **witness** 7:19 | 296:19 298:7 | 58:20 126:3 |
| **website** 17:5 | 210:21,23,25 | 28:11,22 32:4 | 298:23 300:4 | 136:13 137:18 |
| 109:9 212:13 | 211:3,4,10,11 | 33:9 38:20 | 303:9,15 | 146:16 149:11 |
| 284:11,22 | 213:2 214:15 | 39:23 40:18 | 306:10 307:14 | 156:8 169:15 |
| 288:11,15 | 215:20,24 | 45:3 48:23 | 307:24 308:7 | 183:21 187:2 |
| 341:8 345:11 | 217:19,24 | 49:11 50:6 | 308:17 309:17 | 191:7 194:13 |
| 345:16 | 218:18,24 | 51:4,24 56:8 | 310:9 312:10 | 195:18 203:2 |
| **websites** 26:16 | 219:1,12 229:9 | 58:7 72:3 | 315:5 316:23 | 204:4 216:1 |
| 123:19 | 229:12 230:6 | 73:18 86:3 | 321:21 322:21 | 239:6 242:19 |
| **WEDNESDAY** | 230:10,18 | 87:9 89:20 | 325:4,22 327:8 | 257:4 294:19 |
| 1:8 | 231:18,19 | 90:13 91:25 | 329:12 330:3 | 305:11 |
| **week** 9:3,3 | 232:1 236:8 | 93:18 96:10 | 332:10 334:22 | **work** 10:16 |
| 300:1,24 | 240:4 244:1,14 | 99:6 105:24 | 340:22 342:25 | 18:22 19:21 |
| **weekly** 302:3 | 244:19,19,19 | 106:14 107:16 | 350:23 351:21 | 20:7 22:24 |
| **weigh** 38:8 | 244:23,25 | 111:18,22 | 353:23 356:13 | 23:7 24:8,14 |
| 106:19 199:8 | 245:14,18,23 | 113:20 118:17 | 356:25 369:25 | 26:2 29:9 44:7 |
| 217:24 247:12 | 246:13,19 | 121:4 127:1 | 370:20 373:1 | 45:24 54:5 |
| **weighed** 135:12 | 248:6 252:12 | 131:18 132:6 | **WOE** 212:23 | 56:2 69:5 |
| 184:6 205:5,10 | 252:19,24 | 134:1,16 136:4 | 213:2 | 74:14 82:1,7 |
| **weight** 5:1 41:21 | 285:21 314:1 | 137:12,16,22 | **woman** 296:24 | 121:22 162:8 |
| 42:4,24 73:21 | 314:11 315:1 | 139:18 141:3 | 296:25 297:5 | 213:23 216:19 |
| 75:24 77:13,20 | 315:18 | 143:9 144:10 | 298:4,18 302:7 | 217:3 218:19 |
| 78:3,10 80:7 | **weighted** 77:17 | 145:1,24 | 302:8 352:23 | 244:11 245:25 |
| 82:21 83:7,21 | 231:24 | 154:22 155:19 | 354:15 | 247:9,13 248:2 |
| 84:5,12 85:5,7 | **weighting** 41:22 | 157:8 159:8 | **woman's** 200:16 | 255:18 286:24 |
| 85:22 86:10,23 | | | | |

Confidential - Pursuant to Protective Order

Page 426

351:6,9,11
362:18 365:5
365:21
**worked** 20:20
43:17 50:8
52:9 248:9,14
248:19 262:6,8
262:13 346:23
346:25
**working** 10:23
11:19 45:22
82:11 116:19
334:7 344:18
344:22
**workload**
347:24
**works** 344:19
**workshop** 361:4
**worried** 291:11
**wouldn't** 73:7,9
73:18 81:25
92:6 99:3
122:16 235:20
257:3 282:11
319:20 337:16
355:5
**write** 80:18 81:1
322:21 323:6
350:11,18
**write-up** 356:15
**writing** 25:21
32:24 74:17
247:17
**written** 90:15
91:9,12 104:21
121:15 350:24
361:24 365:3
**wrong** 16:15
198:14 208:7
**wrote** 21:15
317:3 331:14
338:4,5

———————
**X**
———————

———————
**Y**
———————
**yeah** 40:9

196:23 202:3
227:7 261:14
269:12 298:16
318:11 368:21
**year** 20:3 54:14
54:17,25 62:11
102:25 300:25
301:4,7,10
302:4 303:1,7
304:13
**years** 28:25 31:5
82:10 108:11
136:21 199:21
199:23 302:21
305:14 307:11
307:15 320:13
321:7
**yellow** 80:14,17
218:10
**Yep** 211:23
**yesterday** 10:9
10:14 11:21
12:2,9 13:10
17:19 19:5
35:9 42:18
186:24 257:14
263:24 297:14
**yesterday's**
11:15 19:24
**York** 135:23,25
140:24

———————
**Z**
———————

———————
**0**
———————
**01** 40:16,19
**084-004229**
372:21
**09** 365:4

———————
**1**
———————
**1** 4:11 8:13,18
9:8 29:2 40:7
158:5
**1:35** 200:25
**10** 53:7 54:8
64:20 124:25

129:11 158:5
174:7
**10:41** 94:23,24
**10:56** 95:1
**100** 3:13 223:13
338:16 366:21
**11** 212:16
**11:00** 99:22,23
**11:01** 99:25
**111** 4:23
**112** 3:3
**118** 315:21
316:12
**12** 112:10 236:3
**12/20/18** 372:23
**12:23** 188:4,5
**12:24** 188:7
**12:36** 200:22,23
**13** 4:13,14,16
76:18 77:19
78:23 90:20
92:4
**13921** 372:19
**14** 111:17
**16** 4:17,18 14:22
22:20
**16-2738** 1:4
**17** 4:21
**1715** 372:22
**18** 112:10
**1800** 3:3
**1835** 2:18
**1894** 136:14
**19** 1:8 6:6 147:9
317:20
**19103** 2:18
**1948** 15:21
**1950s** 316:14,21
317:20 318:1
318:21
**1980s** 317:10
**1981** 68:4
**1989** 317:9
**1991** 249:7
**1992** 65:10,22
363:5
**1994** 361:4

363:5
**1997** 68:4 69:3
70:23

———————
**2**
———————
**2** 4:3,13 13:17
14:7,11 28:1,4
29:2,2 33:7
57:24 64:19
290:19
**2:57** 287:4,5
**20** 174:8 339:22
374:16
**200** 129:7
130:13
**2000** 290:15
**20004** 3:9
**2005** 365:3,5,12
365:24
**2006** 324:24
**2008** 363:3,6,9
363:10
**2009** 361:19
362:23 363:14
364:24 365:10
**2010** 65:10,22
**2012** 341:16
**2013** 65:10,23
66:6,12 67:14
95:5 96:21
120:3,3 210:18
**2015** 19:25
**2016** 4:13 14:8
19:15 21:4,12
65:25 118:14
118:25 120:1
**2018** 1:8 4:15,17
6:7 14:16,22
20:3,9,13 21:5
22:21 23:3
111:17,19
267:3
**202** 3:9
**21** 46:21 47:2,25
64:16,19
**210** 3:4
**211** 5:1

**213** 2:24
**215** 2:19
**218** 2:5
**22** 46:24 111:19
**22311** 2:10
**23** 336:20
**25** 128:25
**26** 4:16
**269-2343** 2:6
**278-4449** 2:19
**28** 65:15
**287** 4:6
**29** 4:15 14:16
20:3 183:12
267:3
**2900** 2:18
**2B** 197:6,8
198:6
**2nd** 1:14

———————
**3**
———————
**3** 4:14 13:17
14:14,18 20:4
23:9 28:1,4
29:3 33:7
57:24 266:22
**3:13** 287:7
**30** 147:8,12
172:10 173:1,5
173:14,19
299:6 373:15
**31** 124:12
336:24
**314** 3:14
**316** 2:14
**319** 4:7
**32** 249:24
250:13
**32502** 2:14
**333** 2:23
**334** 2:6
**35** 166:3 321:7
336:20
**36** 267:23
**36104** 2:6
**37** 100:3 134:21
**38** 15:13 242:9

Confidential - Pursuant to Protective Order

**39** 16:1

**4**

**4** 4:16 13:17
14:20,25 15:7
22:21 23:13
24:13 25:19
26:25 28:1,5
46:24 53:6
57:24 64:3
65:14 66:11
75:3,12,18
76:5 90:8
93:16 95:11
113:12 155:14
201:10 206:22
209:23 210:22
**4:23** 364:16,17
**4:25** 364:19
**4:30** 368:25
369:1
**4:45** 369:3
**4:47** 370:25
371:3
**40** 64:3
**400** 129:7
**43** 65:15 66:10
68:1,17 183:12
**435-7000** 2:15
**44** 103:2 313:17
**46** 313:14
**463-2400** 3:9
**47** 280:19
289:17,24
**4900** 2:9

**5**

**5** 4:13,18 14:8
16:3,16,23
19:14 86:13
124:25 206:16
206:21
**50** 347:11
351:16
**554-5500** 3:4
**56** 95:12,16
**571-4965** 3:14

**58** 242:9,12

**6**

**6** 4:21 17:9,14
86:14 202:15
267:13
**600** 2:14 3:13
**63** 367:8
**63102** 3:14
**64** 313:15
**65** 188:18 190:7
**650** 2:9
**67** 188:21 190:8
266:23 313:13
**68** 289:17,24
**680-8370** 2:24
**69** 280:19

**7**

**7** 4:23 53:8,9
111:4,9,13
112:6 124:2
208:9 318:16
**70** 145:19 167:1
338:17
**703** 2:10
**70s** 165:1
**740.1** 46:21 47:3
47:25
**75** 125:1 128:25
**77** 316:12
**78205** 3:4

**8**

**8** 4:5,11 5:1
208:9 211:14
211:18,21
219:16 236:4
**80s** 165:2
**850** 2:15
**859** 372:20
**877.370.3377**
1:22
**89** 318:8 366:4

**9**

**9** 208:9

**9:12** 1:15 6:7
**9:30** 25:10,11
**9:32** 25:13
**90** 365:2,12
366:5
**90071** 2:23
**90s** 31:7
**917.591.5672**
1:22
**93** 231:1
**931-5500** 2:10
**9328** 372:21
**95** 367:8
**975** 3:8
**99.9** 121:5
**999** 1:14

Exhibit 28

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL NO. 16-2738 (FLW) (LHG) |
| *THIS DOCUMENT RELATES TO ALL CASES* | |

**RULE 26 EXPERT REPORT OF**
**DR. GHASSAN M. SAED**

Date:   November 16, 2018

_____

Dr. Ghassan M. Saed

1

**Molecular basis for the association of talcum powder use with increased risk of ovarian cancer.**

Dr. Ghassan M. Saed

Department of Obstetrics and Gynecology, Wayne State University School of Medicine and Department of Gynecologic Oncology, Karmanos Cancer Institute, Detroit, MI


Dr. Ghassan M. Saed,

Associate Professor of Gynecologic Oncology

Director of Ovarian Cancer Biology Research

Departments of Obstetrics and Gynecology and Oncology

Member of Tumor Biology and Microenvironment Program

Karmanos Cancer Institute

Wayne State University School of Medicine

Detroit, MI 48201

(313) 577-5433 Office phone

(313) 577-8544 Office fax

(313) 577-1302 Lab phone

gsaed@med.wayne.edu

**Qualifications**

In this report, I describe the role of oxidative stress in the pathogenesis and behavior of ovarian cancer, as well as describe the biological effects of talcum powder on normal ovarian and fallopian tube cells, macrophages, and ovarian cancer cells.

I am an Associate Professor with tenure at Wayne State University in Detroit, Michigan, where I am Director of Ovarian Cancer Research. I am a faculty member in the Departments of Obstetrics & Gynecology, Cell Biology, and Anatomy & Physiology at Wayne State School of Medicine. I am also a Member of the Karmanos Cancer Institute, Molecular Biology and Genetics Program.

I received a Ph.D. in Molecular Biology at the University of Essex, Colchester, England in 1986. My postgraduate training included a Fellowship in Immunopathology at the University of Michigan, Ann Arbor from 1992-1993 and a Fellowship in Molecular Biology at the Henry Ford Hospital in Detroit, Michigan from 1988-1990. I joined the faculty at Wayne State School of Medicine in 1998.

My laboratory investigates the role of oxidative stress in the pathogenesis of ovarian cancer. This concentration arose from my original research that focused on the molecular mechanisms involved in the pathogenesis of tissue fibrosis and the need to compare the effects of oxidative stress on a malignant overgrowth versus a benign overgrowth, specifically postoperative adhesions.

My research in ovarian cancer has resulted in the identification of biomarkers for assessing the progression and metastasis of ovarian cancer. The major outcome of my work with fibrosis and postoperative adhesions, in addition to the development of the ex-vivo model for adgestiosn, was the development and characterization of the adhesion phenotype in cell culture. Additionally,

the cell culture system was used to test the hypothesis that hypoxia is the trigger for the development of postoperative adhesions.

I have taught numerous undergraduate, graduate, medical students, residents, and fellows. Many of these have received research awards, published important papers, and accepted prestigious academic faculty positions. I have been the recipient of national and international grants and contracts from organizations including the American Association for Cancer Research (AACR), NIH/NICHD, U.S. Department of Defense, the Ovarian Cancer Research Fund Alliance, the Michigan Ovarian Cancer Alliance, and other ovarian cancer foundations. I have been a prolific publisher and presenter at scientific meetings. I have been an author on 136 original studies published in peer-reviewed journals with additional review articles, and book chapters. Recently, I published a review article in the journal, Gynecologic Oncology titled, "Updates of the role of oxidative stress in the pathogenesis of ovarian cancer" and a textbook chapter titled "New insights into the Pathogenesis of Ovarian Cancer: Oxidative Stress" summarizing my research in this area. My CV is attached as Exhibit A. In addition to the references included in this report, the materials I reviewed are attached as Exhibit B. My fees and prior testimony are attached as Exhibit C.

**Ovarian cancer**

Ovarian cancer is the most lethal gynecologic malignancy and ranks fifth in cancer deaths among women diagnosed with cancer[1]. Epithelial ovarian cancer (EOC) has long been considered a heterogeneous disease with respect to histopathology, molecular biology, and clinical outcome[1,2]. It comprises at least five distinct histological subtypes, the most common and well-studied being high-grade serous ovarian cancer. In the last decade, researchers have proposed the theory that many ovarian cancers arise from the distal fallopian tubes. For this reason, as well as the similarities in pathogenesis, presentation, treatment, and prognosis, fallopian tube, ovarian, and

peritoneal cancer are generally treated as a single entity. Although surgical techniques and treatments have advanced over the years, the prognosis of EOC remains poor, with a 5-year survival rate of 50% in advanced stage [2]. This is largely due to the lack of early warning symptoms and screening methods, and the development of chemoresistance [1,2]. Ovarian cancer is known to be associated with germline mutations in the BRCA1 or BRCA2 genes, but with a rate of only 20-40%, suggesting the presence of other unknown mutations in other predisposition genes [3]. Additional genetic variations including single nucleotide polymorphisms (SNPs) have been described to act as low to moderate penetrant alleles that contribute to ovarian cancer risk [3,4]. Non-synonymous SNPs substitute encoded amino acids in proteins and are more likely to alter the structure, function, and interaction of the protein [4]. The pathophysiology of EOC is not fully understood but has been strongly associated with inflammation and the resultant oxidative stress[5].

**Oxidative stress**

Homeostasis, the balance between the production and elimination of oxidants, is maintained by mechanisms involving oxidants and antioxidant enzymes and molecules. If this balance is altered, it leads to an enhanced state of oxidative stress that alters key biomolecules and cells of living organism [5]. Oxidant molecules are divided into two main groups; oxygen-derived or nitrogen-containing molecules. Oxygen-derived molecules, also known as reactive oxygen species (ROS), include free radicals such as hydroxyl ($HO^\bullet$), superoxide ($O_2^{\bullet-}$), peroxyl ($RO_2^\bullet$), and alkoxyl ($RO^\bullet$), as well as oxidizing agents such as hydrogen peroxide ($H_2O_2$), hypochlorous acid (HOCl), ozone ($O_3$), and singlet oxygen ($^1O_2$) that can be converted to radicals [5,6]. Nitrogen containing oxidants, also known as reactive nitrogen species (RNS), are derived from nitric oxide (NO) that is produced in the mitochondria in response to hypoxia [5]. Exposure to inflammation, infection, carcinogens, and toxicants are major sources of ROS and RNS, *in vivo* [5-8]. Additionally,

RNS and ROS can be produced by various enzymes including cytochrome P450, lipoxygenase, cyclooxygenase, nicotinamide adenine dinucleotide phosphate (NAD(P)H) oxidase complex, xanthine oxidase (XO), and peroxisomes (Figure 1) [5,7,9].

To maintain the redox balance, ROS and RNS are neutralized by various important enzyme systems including superoxide dismutase (SOD), catalase (CAT), glutathione S-transferase (GST), glutathione (GSH), thioredoxin coupled with thioredoxin reductase, glutaredoxin, glutathione peroxidase (GPX), and glutathione reductase (GSR) [6]. Superoxide dismutase is known to convert $O_2^{\bullet-}$ to $H_2O_2$, which is then converted to water by CAT. Glutathione S-transferase is involved in detoxification of carcinogens and xenobiotics by catalyzing their conjugation to GSH that will aid in expulsion from the cell [6]. Indeed, the GSH-to-oxidized-GSH (GSH/GSSG) ratio is a good indicator of cellular redox buffering capacity [10,11]. Under enhanced oxidative stress, the GSH/GSSG complex is known to stimulate the activity of the GS-X-MRP1 efflux pump, which removes toxins from cells. This mechanism has been investigated in the development of resistance to chemotherapeutic drugs [10,11].

**Ovarian Cancer Cells Manifest a Persistent Pro-Oxidant State**

Recent evidence demonstrates that oxidative stress is a critical factor in the initiation and development of several cancers, including ovarian cancer [12,13]. Consistently, it has been reported that ovarian cancer patients manifest significantly decreased levels of antioxidants and higher levels of oxidants [12-17]. An enhanced redox state, resulting from increased expression of key pro-oxidant enzymes and decreased expression of antioxidant enzymes, has been extensively described in epithelial ovarian cancer (EOC) [16-18]. My laboratory has previously reported that MPO, a hemoprotein present solely in myeloid cells that acts as a powerful oxidant, and iNOS, a key pro-oxidant enzyme, are highly expressed and co-localized to the same cell in EOC cells [17]. These two

6

enzymes, MPO and iNOS, work together to inhibit apoptosis, a hallmark of ovarian cancer cells. Apoptosis, or programmed cell death, refers to the normal and controlled death of cells. Myeloperoxidase acts as powerful oxidant enzyme in EOC cells through the utilization of nitric oxide (NO) produced by iNOS as a one-electron substrate generating $NO^+$, a labile nitrosylating species[19-21]. My laboratory was the first to report that MPO was expressed by EOC cells and tissues[17]. Silencing MPO gene expression utilizing MPO specific siRNA induced apoptosis in EOC cells through a mechanism that involved the S-nitrosylation of caspase-3 by MPO[17]. Additionally, there is compelling evidence that MPO serves as a source of free iron under oxidative stress, where both $NO^+$ and superoxide are elevated[19]. Iron reacts with hydrogen peroxide ($H_2O_2$) and catalyzes the generation of highly reactive hydroxy radical ($HO^\bullet$), thereby increasing oxidative stress, which in turn increases free iron concentrations by the Fenton and Haber–Weiss reaction[19,21]. Additionally, my laboratory has highlighted the potential benefits of the combination of serum MPO and free iron as biomarkers for early detection and prognosis of ovarian cancer[14]. EOC cells are also characterized by enhanced expression of NAD(P)H oxidase, a potent oxidant enzyme that is known to be the major source of $O_2^{\bullet-}$ in the cell. Such high levels of $O_2^{\bullet-}$ combined with significantly high levels of NO generates peroxynitrite, another powerful nitrosylation and nitration agent, which modifies proteins and DNA structure and function in cells [22].

A reliable screening and detection method based on molecular profiles for ovarian cancer has not yet been developed because the disease exhibits a wide range of morphological, clinical and genetic variations during its progression. The search for non-invasive, cost-effective ovarian cancer biomarker tests has been ongoing for many years. Immunizations of mice with ovarian cancer cells has led to hybridoma validation by ELISA, while flow cytometry analysis permitted the discovery of cancer antigen (CA)-125 (the only marker currently used in clinical practice) and

7

mesothelin [23]. Furthermore, the screening of an array of 21,500 unknown ovarian cDNAs hybridized with labeled first-strand cDNA from ten ovarian tumors and six normal tissues led to the discovery of human epididymis protein 4 (HE4) [24]. Most interestingly, HE4 is overexpressed in 93% of serous and 100% of endometrioid EOCs, and in 50% of clear cell carcinomas, but not in mucinous ovarian carcinomas [25]. Thus, HE4 was identified as one of the most useful biomarkers for ovarian cancer, although it lacked tissue-specificity [24,26-28]. Secreted HE4 high levels were also detected in the serum of ovarian cancer patients [29]. Additionally, combining CA-125 and HE4 is a more accurate predictor of malignancy than either alone [30-32]. The discovery of MPO expression in ovarian EOC cells and tissues was surprising, as it is only expressed by cells of myeloid origin. Intriguingly, my laboratory has previously reported that the combination of serum MPO and free iron may serve as biomarkers for early detection of ovarian cancer [14].

**Common Polymorphisms in Redox Enzymes are Associated with Ovarian Cancer**.

A single nucleotide polymorphism (SNP) occurs as a result of gene point mutations with an estimated frequency of at least one in every 1000 base pairs that are selectively maintained and distributed in populations throughout the human genome [33]. An association between common SNPs in oxidative DNA repair genes and redox genes with human cancer susceptibility has been established [7]. Common SNPs in the redox enzymes are known to be strongly associated with an altered enzymatic activity in these enzymes, and helps explain the enhanced redox state that has been linked to several malignancies, including ovarian cancer [12,16]. Additionally, it helps explain the observation of significantly decreased apoptosis and increased survival of EOC cells [17]. It is therefore critical to determine the exact effect of common SNPs in various redox enzymes on all process involved in the development of the oncogenic phenotype [34-37]. Such studies can be linked to other studies focusing on determining the effects of genes involved in carcinogen metabolism

8

(detoxification and/or activation), redox enzymes, and DNA repair pathways[36]. Numerous SNPs associated with change of function have been identified in antioxidant enzymes including *CAT*, *GPX1*, *GSR*, and *SOD2* [35,37]. Additionally, the association between genetic polymorphisms in genes with anti-tumor activity and those involved in the cell cycle has been reported in ovarian cancer [38,39]. Recently, several genetic variations have been identified in genome-wide association studies (GWAS), and were found to act as low to moderate penetrant alleles, which contribute to ovarian cancer risk, as well as other diseases [4,40].

There is now an association of specific SNPs in key oxidant and anti-oxidant enzymes that impact increased risk of ovarian cancer and/or overall survival of patients with ovarian cancer [34,35]. A common SNP that reduced CAT activity (rs1001179) was utilized as a significant predictor of death when present in ovarian cancer patients and was also associated with increased risk for breast cancer [34,35,37,41]. This SNP is also linked to increased risk, survival, and response to adjuvant treatment of cancer patients, including ovarian [34,42].  Another common SNP that reduced CYBA activity (rs4673) was also reported to be associated with an increased risk for ovarian cancer [34,35]. The mutant genotype of the *CYBA* gene has been shown to both decrease and increase activity of the protein, thereby altering the generation of $O_2^{\bullet-}$ [34,35]. Moreover, functionally distinct *MPO* polymorphisms, such as (rs2333227) have been linked to relative increased risk for development of ovarian cancer as well as other cancers [34,35,43]. Additional SNPs that influenced the risk of EOC have been successfully identified from the GWAS studies including rs3814113 (located at 9p22, near BNC2), rs2072590 (located at 2q31, which contains a family of HOX genes), rs2665390 (located at 3q25, intronic to TIPARP), rs10088218 (located at 8q24, 700 kb downstream of MYC), rs8170 (located at 19p13, near MERIT40), and rs9303542 (located at 17q21, intronic to SKAP1)

9

[34,35]. Thus, the genetic component of increased ovarian cancer risk may be attributed to SNPs that result in point mutations in the redox genes and potentially other genes [44].

**Chemoresistance is Associated with Point Mutations in Key Redox Enzymes in EOC cells**

To date, the acquisition of chemoresistance in ovarian cancer is being investigated. The enhanced oxidant state reported in chemoresistant EOC cells is likely linked to point mutations in key redox enzymes [35]. Chemoresistant EOC cells manifested increased levels of CAT, GPX, and iNOS and decreased levels of GSR, SOD, and NAD(P)H oxidase as compared to their sensitive counterparts [35]. Interestingly, chemoresistant EOC cells, and not their sensitive counterparts, manifested specific point mutations that corresponded to known functional SNPs, in key redox enzymes including *SOD2* (rs4880), *NOS2* (rs2297518), and *CYBA* (rs4673) [45]. However, altered enzymatic activity for CAT and GSR observed in chemoresistant EOC cells did not correspond to the specific SNP of interest in those enzymes, indicating involvement of other possible functional SNPs for those enzymes [35]. Coincidently, chemotherapy treatment induced point mutations that happen to correspond to known functional SNPs in key oxidant enzymes subsequently led to the acquisition of chemoresistance by EOC cells. Indeed, the induction of specific point mutations in *SOD2* or *GPX1* in sensitive EOC cells resulted in a decrease in the sensitivity to chemotherapy of these cells [35]. In fact, the addition of *SOD* to sensitive EOC cells during chemotherapy treatment synergistically increased the efficacy to chemotherapy [35].

Alternatively, the observed nucleotide switch in response to chemotherapy in EOC cells may be the result of nucleotide substitution, a process that includes transitions, replacement of one purine by the other or that of one pyrimidine by the other, or transversions, replacement of a purine by a pyrimidine or vice versa [35]. Actually, hydroxyl radicals are known to react with DNA causing the formation of many pyrimidine and purine-derived lesions [35]. The oxidative damage to 8-Oxo-

10

2'-deoxyguanosine, a major product of DNA oxidation, induces genetic alterations in oncogenes and tumor suppressor genes that have been involved in tumor initiation and progression [35]. A GC to TA transversion has been reported in the *ras* oncogene and the *p53* tumor suppressor gene in several cancers. However, the GC to TA transversion is not unique to hydroxy-2'-deoxyguanosine, as CC to TT substitutions have been identified as signature mutations for oxidants and free radicals [35]. Moreover, the observed nucleotide switch in response to chemotherapy in EOC cells can be due to the fact that acquisition of chemoresistance generates an entirely different population of cells with a distinct genotype. Hence, chemotherapy kills the bulk of the tumor cells leaving a subtype of cancer cells with ability for repair and renewal, known as cancer stem cells (CSCs) [35]. Indeed, cancer stem cells have been isolated from various types of cancer including leukemia, breast, brain, pancreatic, prostate, ovary and colon [35]. Interestingly, CSC populations were present in cultures of SKOV-3 EOC cells and have been shown to be chemoresistant in nature [35].

**Talcum powder and increased risk of ovarian cancer**

Talcum powder is made from talc, a mineral containing mainly of the elements magnesium, silicon, and oxygen. In its natural form, some talc contains asbestos. Talc and asbestos are both silicate minerals; the carcinogenic effects of asbestos have been extensively studied and documented in the medical literature [46,47]. Asbestos fibers in the lung initiate an inflammatory and scarring process, and it has been proposed that ground talc, as a foreign body, initiates a similar inflammatory response and it has been proposed that ground talc, as a foreign body, might initiate an inflammatory response [48,47]. There has been concern about a possible link between talcum powder usage in the genital and ovarian cancer, as well as lung cancer in workers exposed to talc in an occupational setting [49].  Studies that exposed lab animals (rats, mice, and hamsters) to asbestos-free talcum powder in various ways have had mixed results, with some showing tumor

11

formation and others finding only inflammation [50,51]. The International Agency for Research on Cancer (IARC) is part of the World Health Organization (WHO). Its major goal is to identify causes of cancer. Based on limited evidence from human studies of a link to ovarian cancer, IARC classified the perineal (genital) use of talc-based body powder (not containing asbestiform fibers) as "possibly carcinogenic to humans." (Group 2b) [88]. Talcum powder containing asbestos and fibrous talc are both considered carcinogenic (Group 1) by IARC [89].

The association between perineal talc powder dusting and ovarian cancer has been studied in at least 25 case-control studies, three cohort studies, six meta-analyses and one pooled study [73]. Although the cohort studies individually did not show a statistically significant increased risk of ovarian cancer with talcum powder usage, the case-control studies overall and the meta-analyses show a consistent and significant increased risk. This risk is estimated to be 30-40%. The studies have shown conflicting results regarding the presence of a dose-response, largely due to the failure of many studies to obtain necessary information on the frequency and duration of usage and the inherent challenge of quantifying actual exposure. Although migration/transport of particles through the genital tract is universally accepted and the inflammatory nature of talcum powder consistently demonstrated, the exact mechanism for carcinogenesis had not been conclusively elucidated. For these reasons, there has been some reluctance in the scientific community to accept talcum powder as a causative risk factor for the development of ovarian cancer. The most recent meta-analysis, reported by Penninkilampi and Eslick in 2017, found that any perineal talc use was associated with a statistically significant increased risk of ovarian cancer (OR = 1.31). More than 3600 lifetime applications (OR = 1.42) were slightly more associated with ovarian cancer than <3600 (OR = 1.32). An association with ever use of talc was found in case–control studies (OR = 1.35), but not cohort studies (OR = 1.06). However, cohort studies found an association between

talc use and invasive serous type ovarian cancer (OR = 1.25), the most common and most lethal subtype. In the opinion of the authors, meta-analysis is the highest level of evidence in this setting because of the need for a large number of cases and long-term follow-up in a relatively rare form of cancer with a lengthy latency period. The authors of this meta-analysis suggested that cellular injury, oxidative stress, and local increase in inflammatory mediators might be the mechanism by which talcum powder promotes carcinogensis, but that this mechanism was unclear. They recognized the "substantial need for further research on a potential mechanism by which ovarian cancer may be caused by talc, as this will allow a causal relationship to be established or rejected with more certainty" [73].

In addition to epidemiological studies, the claim that regular use of talcum powder for perineal hygiene purpose is associated with an increased risk of ovarian cancer is based on several reports confirming the presence of talc particles in the ovaries and other parts of the female reproductive tract as well as in lymphatic vessels and tissues of the pelvis [45,75]. Henderson first reported the presence of talc particles in ovaries in 1971. A study by Cramer, et al has reported the presence of talc in pelvic lymph nodes of a woman with ovarian cancer who used talc daily for 30 years[45]. The ability of talc particles to migrate through the genital tract to the distal fallopian tube and ovaries is well accepted [45,75].

It has been suggested that the associations between perineal talc dusting and ovarian cancer might be explained by the induction of ANTI-MUC1 antibodies [57]. Additionally, in a previous study by Shukla et.al., whereby human mesothelial cells (LP9/TERT-1) were exposed to low and high (15 and 75 mm2/cm2 dish) equal surface area concentrations of nonfibrous talc for 8 or 24 hours, the authors found that nonfibrous talc at low concentrations to cause an increase in the

expression of Activating Transcription Factor 3 (ATF3) at 8 hours and no changes at 24 hours, whereas expression levels of 30 genes were elevated at 8 hours at high talc concentrations [78].

My laboratory undertook research to determine whether or not there was a molecular basis for the observed association between talcum powder and ovarian cancer. If a biological effect was demonstrated, we hoped to define the mechanism in detail. Issues like this one, relating to the pathogenesis of ovarian cancer and the relationship between inflammation and other pathological conditions in the female reproductive system as well as cancer, have been the focus of my laboratory for many years.

**Findings from recent research from our laboratory relating to the effects of talcum powder exposure *in vitro***

The following is a description of the methodology used:

*Cell Lines:* Ovarian cancer cells: SKOV-3 (ATCC), A2780 (Sigma Aldrich), and TOV112D (a kind gift from Gen Sheng Wu at Wayne State University, Detroit, MI) [25]. Normal cell lines: human macrophage cells (EL-1, ATCC), human primary normal ovarian epithelial cells (Cell Biologics), Human Ovarian Epithelial Cells (HOSEpiC, ScienCell Research Laboratories, Inc.) immortalized human fallopian tube secretory epithelial cells (FT33-shp53-R24C, Applied Biological Materials). All cells were grown in media and conditions following manufacturer's protocol. EL-1 cells were grown in IMDM media (ATCC) supplemented with 0.1 mM hypoxanthine and 0.1 mM thymidine solution (H-T, ATCC) and 0.05mM β-mercaptoethanol. SKOV-3 EOC cells were grown in HyClone McCoy's 5A medium (Fisher Scientific), A2780 EOC cells were grown in HyClone RPMI-1640 (Fisher Scientific), and both TOV112D EOC cells were grown in MCDB105 (Cell Applications) and Medium 199 (Fisher Scientific) (1:1). All media was supplemented with fetal bovine serum (FBS, Innovative Research) and penicillin/streptomycin

14

(Fisher Scientific), per their manufacturer specifications. Human primary normal ovarian epithelial cells were grown in Complete Human Epithelial Cell Medium (Cell Biologics).

*Treatment of cells*: Talcum powder (Fisher Scientific, Catalog #T4-500, Lot#166820) or Johnson's Baby Powder (Johnson & Johnson, #30027477, Lot#13717RA) was dissolved in DMSO (Sigma Aldrich) at a concentration of 500 mg in 10 ml and was filtered with a 0.2 μm syringe filter (Corning). Sterile DMSO was used as a control for all treatments. Cells were seeded in 100 mm cell culture dishes (3 x $10^6$) and were treated 24 hours later with 0, 5, 20, or 100 μg/ml of talc for 48 hours. Cell pellets were collected for RNA, DNA, and protein extraction. Cell culture media was collected for CA-125 analysis by ELISA.

*Real time RT-PCR:* Total RNA was extracted from all cells using the RNeasy Mini Kit (Qiagen) according to the protocol provided by the manufacturer. Measurement of the amount of RNA in each sample was performed using a Nanodrop Spectrophotometer (Thermo Fisher Scientific). A 20 μL cDNA reaction volume containing 0.5 μg RNA was prepared using the SuperScript VILO Master Mix Kit (Life Technologies), as described by the manufacturer's protocol. Optimal oligonucleotide primer pairs were selected for each target using Beacon Designer (Premier Biosoft, Inc., Table 1). Quantitative RT-PCR was performed using the EXPRESS SYBR Green ER qPCR Supermix Kit (Life Technologies) and the Cepheid 1.2f Detection System as previously described[24]. Standards with known concentrations and lengths were designed specifically for β-actin (79 bp), CAT (105 bp), iNOS (89 bp), GSR (103 bp), GPX1 (100 bp), MPO (79 bp), and SOD3 (84 bp), allowing for construction of a standard curve using a 10-fold dilution series[26]. A specific standard for each gene allows for absolute quantification of the gene in number of copies, which can then be expressed per microgram of RNA. All samples

were normalized to the housekeeping gene, β-actin. A final melting curve analysis was performed to demonstrate specificity of the PCR product.

*Protein Detection:* Cell pellets were lysed utilizing cell lysis buffer (20 mM Tris-HCl (pH 7.5), 150 mM NaCl, 1 mM Na2EDTA, 1 mM EGTA, 1% Triton, 2.5 sodium pyrophosphate, 1 mM beta-glycerophosphate, 1 mM Na3VO4, 1 μg/ml leupeptin) containing a cocktail of protease inhibitors. Samples were centrifuged at 13000 rpm for 10 minutes at 4°C. Total protein concentration of cell lysates from control and talc-treated cells was measured with the Pierce BCA Protein Assay Kit (Thermo Scientific, Rockford, Illinois) per the manufacturer's protocol.

*Detection of protein/activity by ELISA:* ELISA kits for each target were purchased and used according to the manufacturer's protocol. The following ELISA kits were purchased from Cayman Chemical, Ann Arbor, MI: CAT, SOD3, GSR, GPX1, and MPO. Nitrite ($NO_2^-$)/nitrate ($NO_3^-$) were determined spectrophotometrically by measuring their absorbance at 210 nm after separation by HPLC with standard $NO_2^-/NO_3^-$ as previously reported[19]. The analysis was performed by a HPLC system (Shimadzu Scientific Instruments, Inc.) including a LC-10ADV pump, frc-10A injector and DGU-14A degasser. Nitrite/nitrate were detected using an RF-10 XL fluorescence detector with 210 nm excitation and 440 nm emission. CA-125 protein levels were measured in cell media by ELISA from Ray Biotech according to the manufacturer's protocol.

*TaqMan® SNP Genotyping Assay:* DNA was isolated utilizing the EZ1 DNA Tissue Kit (Qiagen Valencia, CA) for EOC cells according the manufacturer's protocols. The TaqMan® SNP Genotyping Assay Set (Applied Biosystems, Carlsbad, CA) (NCBI dbSNP genome build 37, MAF source 1000 genomes) were used to genotype the SNPs described in Table 1. The Applied Genomics Technology Center (AGTC, Wayne State University, Detroit, MI) performed these

16

assays. Analysis was done utilizing the QuantStudioTM 12 K Flex Real-Time PCR System (Applied Biosystems).

*Statistical Analysis*: Normality was examined using the Kolmogorov-Smirnov test and by visual inspection of quantile-quantile plots. Because most of the data were not normally distributed, differences in distributions were examined using the Kruskal-Wallis test. Generalized linear models were fit to examine pairwise differences in estimated least squares mean expression values by exposure to 0, 5, 20 or 100 ug/ml of Talc. We used the Tukey-Kramer adjustment for multiple comparisons, and the regression models were fit using log2 transformed analyte expression values after adding a numeric constant '1' to meet model assumptions while avoiding negative transformed values. P-values below 0.05 are statistically significant.

*Research Findings*: Recent studies from our laboratory have shown conclusively that talcum powder alter key redox and inflammatory markers, enhance cell proliferation, and inhibit apoptosis in EOC cells, which are hallmarks of ovarian cancer. More importantly, this effect is also manifested by talcum powder in normal cells, including surface ovarian epithelium, fallopian tube, and macrophages. Oxidative stress has been implicated in the pathogenesis of ovarian cancer, specifically, by increased expression of several key pro-oxidant enzymes such as iNOS, MPO, and NAD(P)H oxidase in EOC tissues and cells as compared to normal cells indicating an enhanced redox state, as we have recently demonstrated [19]. This redox state is further enhanced in chemoresistant EOC cells  as evident by a further increase in iNOS and $NO_2^-/NO_3^-$ and a decrease in GSR levels, suggesting a shift towards a pro-oxidant state [19]. Antioxidant enzymes, key regulators of cellular redox balance, are differentially expressed in various cancers, including ovarian [19,79]. Specifically, GPX expression is reduced in prostate, bladder, and estrogen receptor negative breast cancer cell lines as well as in cancerous tissues from the kidney. However, GPX

activity is increased in cancerous tissues from breast [79]. Glutathione reductase levels, on the other hand, are elevated in lung cancer, although differentially expressed in breast and kidney cancerous tissues [5,80]. Similarly, CAT was decreased in breast, bladder, and lung cancer while increased in brain cancer [81-83]. Superoxide dismutase is expressed in lung, colorectal, gastric ovarian, and breast cancer, while decreased activity and expression have been reported in colorectal carcinomas and pancreatic cancer cells [83-86]. Collectively, this differential expression of antioxidants demonstrates the unique and complex redox microenvironment in cancer. Glutathione reductase is a flavoprotein that catalyzes the NADPH-dependent reduction of oxidized glutathione (GSSG) to GSH. This enzyme is essential for the GSH redox cycle which maintains adequate levels of reduced cellular GSH. A high GSH/GSSG ratio is essential for protection against oxidative stress. Treatment with talc significantly reduced GSR in normal and cancer cells, altering the redox balance. Likewise, GPX is an enzyme that detoxifies reactive electrophilic intermediates and thus plays an important role in protecting cells from cytotoxic and carcinogenic agents. Overexpression of GPX is triggered by exogenous chemical agents and reactive oxygen species, and is thus thought to represent an adaptive response to stress [80]. Treatment of normal and cancer cells with talc significantly reduced GPX, which compromised the overall cell response to stress.

We have previously reported that EOC cells manifest increased cell proliferations and decreased apoptosis [19]. Consistent with these findings, recent studies from my laboratory have shown that talc enhances cell proliferation and induces an inhibition in apoptosis in EOC cells, but more importantly in normal cells, suggesting talc is a stimulus to the development of the oncogenic phenotype. We also previously reported a cross-talk between iNOS and MPO in ovarian cancer which contributed to the lower apoptosis observed in ovarian cancer cells [17,19]. Collectively, we now have substantial evidence demonstrating that altered oxidative stress may play a role in

18

maintaining the oncogenic phenotype of EOC cells. Treatment of normal or ovarian cancer cells with talc resulted in a significant increase in MPO and iNOS, supporting the role of talc in the enhancement of a pro-oxidant state that is a major cause in the development and maintenance of the oncogenic phenotype.

Furthermore, CA-125, which exists as a membrane-bound and secreted protein in epithelial ovarian cancer cells, has been established as a biomarker for disease progression and response to treatment [2]. CA-125 expression was significantly increased from nearly undetectable levels in controls to values approaching clinical significance (35 U/ml in postmenopausal women[87]) in talc treated cell lines without the physiologic effects on the tumor microenvironment one would expect to be present in the human body, highlighting the implications of the pro-oxidant states caused by talc alone.

To elucidate the mechanism by which talc alters the redox balance to favor a pro-oxidant state not only in ovarian cancer cells, but more importantly in normal cells, my laboratory examined selected known gene mutations in key oxidant and antioxidant enzymes. These mutations correspond to specific SNPs that are known to be associated with altered enzymatic activity and increased cancer risk [34,35]. Results show that the *CAT* SNP (rs769217) which results in decreased enzymatic activity was induced in all normal cell lines tested and in TOV112D EOC lines. However, the *CAT* mutation was not detected in A2780 or SKOV-3 cell lines. Nevertheless, our results confirm a decrease in CAT expression and enzymatic activity in all talc treated cells, indicating the existence of other *CAT* SNPs. However, the *SOD3* (rs2536512) and *GSR* (rs8190955) SNP genotypes were not detected in any cell line, yet SOD3 and GSR activity and expression were decreased in all talc treated cells, again suggesting the presence of other SNPs. Our results have also shown that all cells, except for HOSEpiC cells, manifest the SNP genotype

of *GPX1* (C/T) before talc treatment. Intriguingly, talc treatment reversed this SNP genotype to the normal genotype. Consistent with this finding, it has previously been reported that acquisition of chemoresistance by ovarian cancer cells is associated with a switch from the *GPX1* SNP genotype to the normal *GPX1* genotype [35]. It is not understood why a *GPX1* SNP genotype predominates in untreated normal and ovarian cancer cells. Additionally, our results showed that talc treatment was associated with a genotype switch from common C/C genotype in *NOS2* in untreated cells to T/T, the SNP genotype, in talc treated cells, except in A2780 and TOV112D. Nevertheless, our results confirm an increase in iNOS expression and enzymatic activity in all talc treated cells, again suggesting the existence of other *NOS2* SNPs. Collectively, these findings demonstrate that talc treatment induced gene point mutations that happen to correspond to SNPs in locations with functional effects, thus altering overall redox balance for the initiation and development of ovarian cancer. Future studies examining such SNPs are important to fully elucidate a genotype switch mechanism induced by talc exposure.

In summary, this research clearly demonstrates that talcum powder induces inflammation and alters the redox balance favoring a pro-oxidant state in normal and EOC cells. This study has shown a dose-dependent significant increase in key pro-oxidants, iNOS, $NO_2^-/NO_3^-$, and MPO and a concomitant decrease in key antioxidant enzymes, CAT, SOD, GPX, and GSR, in all talc treated cells (both normal and ovarian cancer) compared to their controls. Additionally, there was a significant increase in CA-125 levels in all the talc treated cells compared to their controls, except in macrophages (which do not produce CA-125). The mechanism by which talc alters the cellular redox and inflammatory balance involves the induction of specific mutations in key oxidant and antioxidant enzymes that correlate with alterations in their activities. The fact that these mutations

happen to correspond to known SNPs of these enzymes indicate a genetic predisposition to developing ovarian cancer with genital talcum powder exposure.

**Summary of opinions**

These opinions are made to a reasonable degree of scientific certainty and are based on my experience, training, and expertise, as well as a knowledge of the relevant scientific literature and my previous and ongoing research.

1. Johnson's Baby Powder elicits an inflammatory response in normal ovarian and tubal cells and in ovarian cancer cells that can result in the development and the progression of ovarian cancer.

2. This pro-carcinogenic process involves oxidative stress, alteration of the redox environment by increasing oxidant enzymes and decreasing anti-oxidant enzymes, promotion of cell proliferation, inhibition of apoptosis, and induction of specific genetic mutations.

3. Johnson's Baby Powder exposure results in elevation of CA-125, a clinically relevant biomarker for ovarian cancer, in normal and ovarian cancer cells.

4. The molecular effects resulting from Johnson's Baby Powder exposure exhibit a clear dose-response pattern.

5. In my opinion, based on established molecular mechanisms for the pathogenesis of ovarian cancer (as evidenced in the peer-reviewed scientific literature and my previously published research) and my *in vitro* experiments, Johnson's Baby Powder exposure can cause ovarian cancer.

6. In my opinion, based on established molecular mechanisms that influence the progression and chemoresistance associated with ovarian cancer (as evidenced in the peer-reviewed

21

scientific literature and my previously published research) and my *in vitro* experiments,

Johnson's Baby Powder exposure worsens the prognosis for patients with ovarian cancer.

I reserve the right to amend or supplement this report as new information becomes available.

22

## References

1.   Berek, J.S., *et al.* [Epithelial ovarian cancer (advanced stage): consensus conference (1998)]. *Gynecol Obstet Fertil* **28**, 576-583 (2000).

2.   Jelovac, D. & Armstrong, D.K. Recent progress in the diagnosis and treatment of ovarian cancer. *CA Cancer J Clin* **61**, 183-203 (2011).

3.   Prat, J., Ribe, A. & Gallardo, A. Hereditary ovarian cancer. *Hum Pathol* **36**, 861-870 (2005).

4.   Ramus, S.J., *et al.* Consortium analysis of 7 candidate SNPs for ovarian cancer. *Int J Cancer* **123**, 380-388 (2008).

5.   Reuter, S., Gupta, S.C., Chaturvedi, M.M. & Aggarwal, B.B. Oxidative stress, inflammation, and cancer: how are they linked? *Free Radic Biol Med* **49**, 1603-1616 (2010).

6.   Lei, X.G., *et al.* Paradoxical Roles of Antioxidant Enzymes: Basic Mechanisms and Health Implications. *Physiol Rev* **96**, 307-364 (2016).

7.   Klaunig, J.E., Kamendulis, L.M. & Hocevar, B.A. Oxidative stress and oxidative damage in carcinogenesis. *Toxicologic pathology* **38**, 96-109 (2010).

8.   Coussens, L.M. & Werb, Z. Inflammation and cancer. *Nature* **420**, 860-867 (2002).

9.   Fruehauf, J.P. & Meyskens, F.L., Jr. Reactive oxygen species: a breath of life or death? *Clin Cancer Res* **13**, 789-794 (2007).

10.  Circu, M.L. & Aw, T.Y. Glutathione and modulation of cell apoptosis. *Biochimica et biophysica acta* **1823**, 1767-1777 (2012).

11.  Ishikawa, T. & Ali-Osman, F. Glutathione-associated cis-diamminedichloroplatinum(II) metabolism and ATP-dependent efflux from leukemia cells. Molecular characterization of

23

glutathione-platinum complex and its biological significance. *J Biol Chem* **268**, 20116-20125 (1993).

12. Saed, G.M., Fletcher, N.M., Jiang, Z.L., Abu-Soud, H.M. & Diamond, M.P. Dichloroacetate induces apoptosis of epithelial ovarian cancer cells through a mechanism involving modulation of oxidative stress. *Reproductive sciences* **18**, 1253-1261 (2011).

13. Senthil, K., Aranganathan, S. & Nalini, N. Evidence of oxidative stress in the circulation of ovarian cancer patients. *Clin Chim Acta* **339**, 27-32 (2004).

14. Fletcher, N.M.*, et al.* Myeloperoxidase and free iron levels: potential biomarkers for early detection and prognosis of ovarian cancer. *Cancer Biomark* **10**, 267-275 (2011).

15. Hileman, E.O., Liu, J., Albitar, M., Keating, M.J. & Huang, P. Intrinsic oxidative stress in cancer cells: a biochemical basis for therapeutic selectivity. *Cancer Chemother Pharmacol* **53**, 209-219 (2004).

16. Jiang, Z.*, et al.* Modulation of redox signaling promotes apoptosis in epithelial ovarian cancer cells. *Gynecologic oncology* **122**, 418-423 (2011).

17. Saed, G.M.*, et al.* Myeloperoxidase serves as a redox switch that regulates apoptosis in epithelial ovarian cancer. *Gynecologic oncology* **116**, 276-281 (2010).

18. Malone, J.M., Saed, G.M., Diamond, M.P., Sokol, R.J. & Munkarah, A.R. The effects of the inhibition of inducible nitric oxide synthase on angiogenesis of epithelial ovarian cancer. *Am J Obstet Gynecol* **194**, 1110-1116; discussion 1116-1118 (2006).

19. Saed, G.M., Diamond, M.P. & Fletcher, N.M. Updates of the role of oxidative stress in the pathogenesis of ovarian cancer. *Gynecologic oncology* (2017).

20. Galijasevic, S., Saed, G.M., Hazen, S.L. & Abu-Soud, H.M. Myeloperoxidase metabolizes thiocyanate in a reaction driven by nitric oxide. *Biochemistry* **45**, 1255-1262 (2006).

21. Galijasevic, S.*, et al.* Myeloperoxidase interaction with peroxynitrite: chloride deficiency and heme depletion. *Free Radic Biol Med* **47**, 431-439 (2009).

22. Habib, S. & Ali, A. Biochemistry of nitric oxide. *Indian J Clin Biochem* **26**, 3-17 (2011).

23. Sasaroli, D., Coukos, G. & Scholler, N. Beyond CA125: the coming of age of ovarian cancer biomarkers. Are we there yet? *Biomark Med* **3**, 275-288 (2009).

24. Schummer, M.*, et al.* Comparative hybridization of an array of 21,500 ovarian cDNAs for the discovery of genes overexpressed in ovarian carcinomas. *Gene* **238**, 375-385 (1999).

25. Drapkin, R.*, et al.* Human epididymis protein 4 (HE4) is a secreted glycoprotein that is overexpressed by serous and endometrioid ovarian carcinomas. *Cancer Res* **65**, 2162-2169 (2005).

26. Galgano, M.T., Hampton, G.M. & Frierson, H.F., Jr. Comprehensive analysis of HE4 expression in normal and malignant human tissues. *Mod Pathol* **19**, 847-853 (2006).

27. Gilks, C.B., Vanderhyden, B.C., Zhu, S., van de Rijn, M. & Longacre, T.A. Distinction between serous tumors of low malignant potential and serous carcinomas based on global mRNA expression profiling. *Gynecologic oncology* **96**, 684-694 (2005).

28. Hough, C.D.*, et al.* Large-scale serial analysis of gene expression reveals genes differentially expressed in ovarian cancer. *Cancer Res* **60**, 6281-6287 (2000).

29. Bouchard, D., Morisset, D., Bourbonnais, Y. & Tremblay, G.M. Proteins with whey-acidic-protein motifs and cancer. *Lancet Oncol* **7**, 167-174 (2006).

30. Rosen, D.G.*, et al.* Potential markers that complement expression of CA125 in epithelial ovarian cancer. *Gynecologic oncology* **99**, 267-277 (2005).

31. Scholler, N.*, et al.* Bead-based ELISA for validation of ovarian cancer early detection markers. *Clin Cancer Res* **12**, 2117-2124 (2006).

32.  Moore, R.G., *et al.* The use of multiple novel tumor biomarkers for the detection of ovarian carcinoma in patients with a pelvic mass. *Gynecologic oncology* **108**, 402-408 (2008).

33.  Erichsen, H.C. & Chanock, S.J. SNPs in cancer research and treatment. *Br J Cancer* **90**, 747-751 (2004).

34.  Belotte, J., *et al.* A Single Nucleotide Polymorphism in Catalase Is Strongly Associated with Ovarian Cancer Survival. *PloS one* **10**, e0135739 (2015).

35.  Fletcher, N.M., *et al.* Specific point mutations in key redox enzymes are associated with chemoresistance in epithelial ovarian cancer. *Free Radic Biol Med* **102**, 122-132 (2016).

36.  Klaunig, J.E., Wang, Z., Pu, X. & Zhou, S. Oxidative stress and oxidative damage in chemical carcinogenesis. *Toxicol Appl Pharmacol* **254**, 86-99 (2011).

37.  Forsberg, L., Lyrenas, L., de Faire, U. & Morgenstern, R. A common functional C-T substitution polymorphism in the promoter region of the human catalase gene influences transcription factor binding, reporter gene transcription and is correlated to blood catalase levels. *Free Radic Biol Med* **30**, 500-505 (2001).

38.  Goode, E.L., *et al.* Candidate gene analysis using imputed genotypes: cell cycle single-nucleotide polymorphisms and ovarian cancer risk. *Cancer epidemiology, biomarkers & prevention : a publication of the American Association for Cancer Research, cosponsored by the American Society of Preventive Oncology* **18**, 935-944 (2009).

39.  Notaridou, M., *et al.* Common alleles in candidate susceptibility genes associated with risk and development of epithelial ovarian cancer. *Int J Cancer* **128**, 2063-2074 (2011).

40.  Savas, S., Schmidt, S., Jarjanazi, H. & Ozcelik, H. Functional nsSNPs from carcinogenesis-related genes expressed in breast tissue: potential breast cancer risk alleles and their distribution across human populations. *Hum Genomics* **2**, 287-296 (2006).

26

41.  Quick, S.K., *et al.* Effect modification by catalase genotype suggests a role for oxidative stress in the association of hormone replacement therapy with postmenopausal breast cancer risk. *Cancer epidemiology, biomarkers & prevention : a publication of the American Association for Cancer Research, cosponsored by the American Society of Preventive Oncology* **17**, 1082-1087 (2008).

42.  Didziapetriene, J., Bublevic, J., Smailyte, G., Kazbariene, B. & Stukas, R. Significance of blood serum catalase activity and malondialdehyde level for survival prognosis of ovarian cancer patients. *Medicina* **50**, 204-208 (2014).

43.  Castillo-Tong, D.C., *et al.* Association of myeloperoxidase with ovarian cancer. *Tumour biology : the journal of the International Society for Oncodevelopmental Biology and Medicine* **35**, 141-148 (2014).

44.  Sellers, T.A., *et al.* Association of single nucleotide polymorphisms in glycosylation genes with risk of epithelial ovarian cancer. *Cancer epidemiology, biomarkers & prevention : a publication of the American Association for Cancer Research, cosponsored by the American Society of Preventive Oncology* **17**, 397-404 (2008).

45.  Saed, G.M., Diamond, M.P. & Fletcher, N.M. Updates of the role of oxidative stress in the pathogenesis of ovarian cancer. *Gynecologic oncology* **145**, 595-602 (2017).

46.  Haegens, A., *et al.* Asbestos-induced lung inflammation and epithelial cell proliferation are altered in myeloperoxidase-null mice. *Cancer Res* **65**, 9670-9677 (2005).

47.  Muscat, J.E. & Huncharek, M.S. Perineal talc use and ovarian cancer: a critical review. *Eur J Cancer Prev* **17**, 139-146 (2008).

48.  Ness, R.B. & Cottreau, C. Possible role of ovarian epithelial inflammation in ovarian cancer. *J Natl Cancer Inst* **91**, 1459-1467 (1999).

49. Karageorgi, S., Gates, M.A., Hankinson, S.E. & De Vivo, I. Perineal use of talcum powder and endometrial cancer risk. *Cancer epidemiology, biomarkers & prevention : a publication of the American Association for Cancer Research, cosponsored by the American Society of Preventive Oncology* **19**, 1269-1275 (2010).

50. Graham, J. & Graham, R. Ovarian cancer and asbestos. *Environ Res* **1**, 115-128 (1967).

51. Langseth, H. & Kjærheim, K. Ovarian cancer and occupational exposure among pulp and paper employees in Norway. *Scandinavian Journal of Work, Environment & Health* **30**, 356-361 (2004).

52. Booth, M., Beral, V. & Smith, P. Risk factors for ovarian cancer: a case-control study. *Br J Cancer* **60**, 592-598 (1989).

53. Chang, S. & Risch, H.A. Perineal talc exposure and risk of ovarian carcinoma. *Cancer* **79**, 2396-2401 (1997).

54. Chen, Y., *et al.* Risk factors for epithelial ovarian cancer in Beijing, China. *Int J Epidemiol* **21**, 23-29 (1992).

55. Cook, L.S., Kamb, M.L. & Weiss, N.S. Perineal powder exposure and the risk of ovarian cancer. *American journal of epidemiology* **145**, 459-465 (1997).

56. Cramer, D.W., *et al.* Genital talc exposure and risk of ovarian cancer. *Int J Cancer* **81**, 351-356 (1999).

57. Cramer, D.W., *et al.* Conditions associated with antibodies against the tumor-associated antigen MUC1 and their relationship to risk for ovarian cancer. *Cancer epidemiology, biomarkers & prevention : a publication of the American Association for Cancer Research, cosponsored by the American Society of Preventive Oncology* **14**, 1125-1131 (2005).

58.   Cramer, D.W., Welch, W.R., Scully, R.E. & Wojciechowski, C.A. Ovarian cancer and talc: a case-control study. *Cancer* **50**, 372-376 (1982).

59.   Endo-Capron, S., Renier, A., Janson, X., Kheuang, L. & Jaurand, M.C. In vitro response of rat pleural mesothelial cells to talc samples in genotoxicity assays (sister chromatid exchanges and DNA repair). *Toxicol In Vitro* **7**, 7-14 (1993).

60.   Ferrer, J., Villarino, M.A., Tura, J.M., Traveria, A. & Light, R.W. Talc preparations used for pleurodesis vary markedly from one preparation to another. *Chest* **119**, 1901-1905 (2001).

61.   Gertig, D.M.*, et al.* Prospective study of talc use and ovarian cancer. *J Natl Cancer Inst* **92**, 249-252 (2000).

62.   Harlow, B.L. & Weiss, N.S. A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc. *American journal of epidemiology* **130**, 390-394 (1989).

63.   Mills, P.K., Riordan, D.G., Cress, R.D. & Young, H.A. Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. *Int J Cancer* **112**, 458-464 (2004).

64.   Ness, R.B.*, et al.* Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. *Epidemiology* **11**, 111-117 (2000).

65.   Purdie, D.*, et al.* Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study. Survey of Women's Health Study Group. *Int J Cancer* **62**, 678-684 (1995).

66.   Rosenblatt, K.A., Mathews, W.A., Daling, J.R., Voigt, L.F. & Malone, K. Characteristics of women who use perineal powders. *Obstet Gynecol* **92**, 753-756 (1998).

67. Tzonou, A., *et al.* Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer. *Int J Cancer* **55**, 408-410 (1993).

68. Whittemore, A.S., *et al.* Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. *American journal of epidemiology* **128**, 1228-1240 (1988).

69. Wong, C., Hempling, R.E., Piver, M.S., Natarajan, N. & Mettlin, C.J. Perineal talc exposure and subsequent epithelial ovarian cancer: a case-control study. *Obstet Gynecol* **93**, 372-376 (1999).

70. Harlow, B.L., Cramer, D.W., Bell, D.A. & Welch, W.R. Perineal exposure to talc and ovarian cancer risk. *Obstet Gynecol* **80**, 19-26 (1992).

71. Hankinson, S.E., *et al.* Tubal ligation, hysterectomy, and risk of ovarian cancer. A prospective study. *JAMA* **270**, 2813-2818 (1993).

72. Terry, K.L., *et al.* Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. *Cancer Prev Res (Phila)* **6**, 811-821 (2013).

73. Penninkilampi, R. & Eslick, G.D. Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis. *Epidemiology* **29**, 41-49 (2018).

74. Reid, B.M., Permuth, J.B. & Sellers, T.A. Epidemiology of ovarian cancer: a review. *Cancer Biol Med* **14**, 9-32 (2017).

75. Kunz, G., *et al.* The uterine peristaltic pump. Normal and impeded sperm transport within the female genital tract. *Adv Exp Med Biol* **424**, 267-277 (1997).

76. Leyendecker, G., *et al.* Uterine peristaltic activity and the development of endometriosis. *Ann N Y Acad Sci* **1034**, 338-355 (2004).

77.  Zervomanolakis, I., *et al.* Physiology of upward transport in the human female genital tract. *Ann N Y Acad Sci* **1101**, 1-20 (2007).

78.  Shukla, A., *et al.* Alterations in gene expression in human mesothelial cells correlate with mineral pathogenicity. *Am J Respir Cell Mol Biol* **41**, 114-123 (2009).

79.  Brigelius-Flohe, R. & Kipp, A. Glutathione peroxidases in different stages of carcinogenesis. *Biochimica et biophysica acta* **1790**, 1555-1568 (2009).

80.  Sun, Y. Free radicals, antioxidant enzymes, and carcinogenesis. *Free Radic Biol Med* **8**, 583-599 (1990).

81.  Popov, B., Gadjeva, V., Valkanov, P., Popova, S. & Tolekova, A. Lipid peroxidation, superoxide dismutase and catalase activities in brain tumor tissues. *Arch Physiol Biochem* **111**, 455-459 (2003).

82.  Ray, G., *et al.* Lipid peroxidation, free radical production and antioxidant status in breast cancer. *Breast Cancer Res Treat* **59**, 163-170 (2000).

83.  Chung-man Ho, J., Zheng, S., Comhair, S.A., Farver, C. & Erzurum, S.C. Differential expression of manganese superoxide dismutase and catalase in lung cancer. *Cancer Res* **61**, 8578-8585 (2001).

84.  Radenkovic, S., *et al.* Lactate dehydrogenase, catalase, and superoxide dismutase in tumor tissue of breast cancer patients in respect to mammographic findings. *Cell Biochem Biophys* **66**, 287-295 (2013).

85.  Hu, Y., *et al.* Mitochondrial manganese-superoxide dismutase expression in ovarian cancer: role in cell proliferation and response to oxidative stress. *J Biol Chem* **280**, 39485-39492 (2005).

86. Svensk, A.M., Soini, Y., Paakko, P., Hiravikoski, P. & Kinnula, V.L. Differential expression of superoxide dismutases in lung cancer. *Am J Clin Pathol* **122**, 395-404 (2004).

87. Scholler, N. & Urban, N. CA125 in ovarian cancer. *Biomark Med* **1**, 513-523 (2007).

88. IARC Working Group on the Evaluation of Carcinogenic Risks to Humans. "IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Volume 93 Carbon Black, Titanium Dioxide, and Talc." IARC Monographs on the Evaluation of Carcinogenic Risks to Humans / World Health Organization, International Agency for Research on Cancer 93 (2010): 1–413.

89. IARC. "IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Volume 100C," 2012.

# Exhibit 29

Ghassan Saed, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

IN RE:  JOHNSON & JOHNSON TALCUM

POWDER PRODUCTS MARKETING, SALES

PRACTICES, AND PRODUCTS

LIABILITY LITIGATION          MDL NO: 16-2738(FLW)(LHG)

_____/

THIS DOCUMENT RELATES TO

ALL CASES

_____/

PAGE 1 TO 343

         The Videotaped Deposition of GHASSAN SAED, PH.D.,

         Taken at 1 Park Avenue,

         Detroit, Michigan,

         Commencing at 9:15 a.m.,

         Wednesday, January 23, 2019,

         Before Laurel A. Frogner, RMR, CRR, CSR-2495.

Ghassan Saed, Ph.D.

| | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | BEASLEY ALLEN LAW FIRM |
| 4 | BY:  P. LEIGH O'DELL, ESQ. and |
| 5 | MARGARET M. THOMPSON, MD, JD |
| 6 | 218 Commerce Street |
| 7 | P.O. Box 4160 |
| 8 | Montgomery, Alabama 36103 |
| 9 | 334-269-2343 |
| 10 | leigh.odell@beasleyallen.com |
| 11 | Margaret.Thompson@BeasleyAllen.com |
| 12 |     Appearing on behalf of the Plaintiffs |
| 13 | |
| 14 | |
| 15 | ASHCRAFT & GEREL, LLP |
| 16 | BY:  MICHELLE A. PARFITT, ESQ. |
| 17 | 4900 Seminary Road |
| 18 | Alexandria, Virginia 22311 |
| 19 | 703-931-5500 |
| 20 | mparfitt@ashcraftlaw.com |
| 21 |     Appearing on behalf of the Plaintiffs |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 4 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | RESTAINO LAW LLC |
| 4 | BY:  JOHN M. RESTAINO, JR., ESQ. |
| 5 | 130 Forest Street |
| 6 | Denver, Colorado 80220 |
| 7 | 303-839-8000 |
| 8 | JRestaino@RestainoLLC.com |
| 9 |     Appearing on behalf of the Plaintiffs |
| 10 | |
| 11 | |
| 12 | SHOOK, HARDY & BACON, LLP |
| 13 | BY:  MARK C. HEGARTY, ESQ. |
| 14 | 2555 Grand Boulevard |
| 15 | Kansas City, Missouri 64108 |
| 16 | 816-474-6550 |
| 17 | mhegarty@shb.com |
| 18 |     Appearing on behalf of the Defendant Johnson & Johnson |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 3 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | NAPOLI SHKOLNIK PLLC |
| 4 | BY:  ALASTAIR J.M. FINDEIS, ESQ. |
| 5 | 400 Broadhollow Road, Suite 305 |
| 6 | Melville, New York 11747 |
| 7 | 631-224-113 |
| 8 | afindeis@napolilaw.com |
| 9 |     Appearing on behalf of the Plaintiffs |
| 10 | |
| 11 | |
| 12 | WILENTZ, GOLDMAN & SPITZER, P.A. |
| 13 | BY:  DANIEL R. LAPINSKI, ESQ. |
| 14 | 90 Woodbridge Center Drive |
| 15 | Suite 900, Box 10 |
| 16 | Woodbridge, New Jersey 07095 |
| 17 | 732-855-6066 |
| 18 | dlapinski@wilentz.com |
| 19 |     Appearing on behalf of the Plaintiffs |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 5 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP |
| 4 | BY:  GEOFFREY M. WYATT, ESQ. |
| 5 | 1440 New York Avenue N.W. |
| 6 | Washington, D.C. 20005 |
| 7 | 202-371-7008 |
| 8 | geoffrey.wyatt@skadden.com |
| 9 |     Appearing on behalf of the Defendant Johnson & Johnson |
| 10 | |
| 11 | |
| 12 | GORDON & REES SCULLY MANSUKHANI, LLP |
| 13 | BY:  MICHAEL R. KLATT, ESQ. |
| 14 | 816 Congress Avenue, Suite 1510 |
| 15 | Austin, Texas 78701 |
| 16 | 512-391-0197 |
| 17 |     Appearing on behalf of the Defendant Imerys Talc America |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

2 (Pages 2 to 5)

Ghassan Saed, Ph.D.

| Page 6 | |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | COUGHLIN DUFFY LLP |
| 4 | BY: JONATHAN F. DONATH, ESQ. |
| 5 | 350 Mount Kemble Avenue |
| 6 | P.O. Box 1917 |
| 7 | Morristown, New Jersey 07962 |
| 8 | 973-267-0058 |
| 9 | jdonath@coughlinduffy.com |
| 10 | Appearing on behalf of the Defendant Imerys Talc America |
| 11 | |
| 12 | |
| 13 | TUCKER ELLIS |
| 14 | BY: JAMES W. MIZGALA, ESQ. |
| 15 | 233 South Wacker Drive |
| 16 | Chicago, Illinois 60606 |
| 17 | 312-624-6300 |
| 18 | James.mizgala@tuckerellis.com |
| 19 | Appearing on behalf of the Defendant PTI |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| Page 7 | |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | SEYFARTH SHAW LLP |
| 4 | BY: THOMAS T. LOCKE, ESQ. |
| 5 | 975 F Street, N.W. |
| 6 | Washington, D.C. 20004 |
| 7 | 202-463-2400 |
| 8 | tlocke@seyfarth.com |
| 9 | Appearing on behalf of the Defendant PCPC |
| 10 | |
| 11 | ALSO PRESENT: Marc Myers, Videographer |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | * * * * * * * |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| Page 8 | | |
|---|---|---|
| 1 | TABLE OF CONTENTS | |
| 2 | Witness | Page |
| 3 | EXAMINATION BY MR. HEGARTY | 17 |
| 4 | EXAMINATION BY MR. KLATT | 283 |
| 5 | RE-EXAMINATION BY MR. HEGARTY | 316 |
| 6 | EXAMINATION BY MS. ODELL | 319 |
| 7 | RE-EXAMINATION BY MR. HEGARTY | 328 |
| 8 | RE-EXAMINATION BY MR. KLATT | 337 |
| 9 | EXAMINATION BY MR. LOCKE | 339 |
| 10 | | |
| 11 | | |
| 12 | INDEX TO EXHIBITS | |
| 13 | (Exhibits attached to transcript) | |
| 14 | | |
| 15 | Exhibit | Page |
| 16 | SAED DEPOSITION EXHIBIT NUMBER 1, COPY OF NOTEBOOK | 13 |
| 17 | BATES SAED000001 - SAED000097, WAS MARKED BY THE | |
| 18 | REPORTER FOR IDENTIFICATION | |
| 19 | | |
| 20 | SAED DEPOSITION EXHIBIT NUMBER 2, LAB NOTEBOOK, | 13 |
| 21 | (Retained by Witness) WAS MARKED BY THE REPORTER | |
| 22 | FOR IDENTIFICATION | |
| 23 | | |
| 24 | | |
| 25 | | |

| Page 9 | | |
|---|---|---|
| 1 | SAED DEPOSITION EXHIBIT NUMBER 3, LAB NOTEBOOK, | 14 |
| 2 | (Retained by Witness) WAS MARKED BY THE REPORTER | |
| 3 | FOR IDENTIFICATION | |
| 4 | | |
| 5 | SAED DEPOSITION EXHIBIT NUMBER 4, INVOICES, WAS | 22 |
| 6 | MARKED BY THE REPORTER FOR IDENTIFICATION | |
| 7 | | |
| 8 | SAED DEPOSITION EXHIBIT NUMBER 5, DECEMBER 18, | 35 |
| 9 | 2018 DOCUMENT, WAS MARKED BY THE REPORTER FOR | |
| 10 | IDENTIFICATION | |
| 11 | | |
| 12 | SAED DEPOSITION EXHIBIT NUMBER 6, COPY OF CHECK | 40 |
| 13 | DATED 11/2/2017 FOR $15,000, WAS MARKED BY THE | |
| 14 | REPORTER FOR IDENTIFICATION | |
| 15 | | |
| 16 | SAED DEPOSITION EXHIBIT NUMBER 7, MOLECULAR BASIS | 42 |
| 17 | SUPPORTING THE ASSOCIATION OF TALCUM POWDER USE | |
| 18 | WITH INCREASED RISK OF OVARIAN CANCER, WAS MARKED | |
| 19 | BY THE REPORTER FOR IDENTIFICATION | |
| 20 | | |
| 21 | SAED DEPOSITION EXHIBIT NUMBER 8, MOLECULAR BASIS | 45 |
| 22 | SUPPORTING THE ASSOCIATION OF TALCUM POWDER USE | |
| 23 | WITH INCREASED RISK OF OVARIAN CANCER, WAS MARKED | |
| 24 | BY THE REPORTER FOR IDENTIFICATION | |
| 25 | | |

3 (Pages 6 to 9)

Ghassan Saed, Ph.D.

| Page 10 | |
|---|---|
| 1 | SAED DEPOSITION EXHIBIT NUMBER 10, INDEX FOR LAB       78 |
| 2 | NOTEBOOK, WAS MARKED BY THE REPORTER FOR |
| 3 | IDENTIFICATION |
| 4 | |
| 5 | SAED DEPOSITION EXHIBIT NUMBER 9, PILOT STUDY,       84 |
| 6 | WAS MARKED BY THE REPORTER FOR IDENTIFICATION |
| 7 | |
| 8 | SAED DEPOSITION EXHIBIT NUMBER 11, NOTEBOOKS,       132 |
| 9 | WAS MARKED BY THE REPORTER FOR IDENTIFICATION |
| 10 | |
| 11 | SAED DEPOSITION EXHIBIT NUMBER 12,       151 |
| 12 | SAGE PUBLISHING DOCUMENT, |
| 13 | WAS MARKED BY THE REPORTER FOR IDENTIFICATION |
| 14 | |
| 15 | SAED DEPOSITION EXHIBIT NUMBER 13,       157 |
| 16 | SAGE PUBLISHING DOCUMENT, |
| 17 | WAS MARKED BY THE REPORTER FOR IDENTIFICATION |
| 18 | |
| 19 | SAED DEPOSITION EXHIBIT NUMBER 14,       161 |
| 20 | COPY OF LETTER FROM REPRODUCTIVE SCIENCES, |
| 21 | WAS MARKED BY THE REPORTER FOR IDENTIFICATION |
| 22 | |
| 23 | SAED DEPOSITION EXHIBIT NUMBER 15, JANUARY 14,       173 |
| 24 | 2019 E-MAIL, WAS MARKED BY THE REPORTER FOR |
| 25 | IDENTIFICATION |

| Page 11 | |
|---|---|
| 1 | SAED DEPOSITION EXHIBIT NUMBER 16, EXPERT REPORT,       175 |
| 2 | WAS MARKED BY THE REPORTER FOR IDENTIFICATION |
| 3 | |
| 4 | SAED DEPOSITION EXHIBIT NUMBER 17, RESEARCH       214 |
| 5 | ARTICLE, WAS MARKED BY THE REPORTER FOR |
| 6 | IDENTIFICATION |
| 7 | |
| 8 | SAED DEPOSITION EXHIBIT NUMBER 18, CURRICULUM       278 |
| 9 | VITAE, WAS MARKED BY THE REPORTER FOR |
| 10 | IDENTIFICATION |
| 11 | |
| 12 | SAED DEPOSITION EXHIBIT NUMBER 19, ABSTRACT       315 |
| 13 | SUBMITTED TO SGO, WAS MARKED BY THE REPORTER FOR |
| 14 | IDENTIFICATION |
| 15 | |
| 16 | SAED DEPOSITION EXHIBIT NUMBER 20, ABSTRACT,       316 |
| 17 | WAS MARKED BY THE REPORTER FOR IDENTIFICATION |
| 18 | |
| 19 | SAED DEPOSITION EXHIBIT NUMBER 21, ABSTRACT       317 |
| 20 | FROM SRI, WAS MARKED BY THE REPORTER FOR |
| 21 | IDENTIFICATION |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| Page 12 | |
|---|---|
| 1 | Detroit, Michigan |
| 2 | Wednesday, January 23, 2019 |
| 3 | About 9:15 a.m. |
| 4 | THE VIDEOGRAPHER:  We are now on the record. |
| 5 | My name is Marc Myers.  I'm the videographer for Golkow |
| 6 | Litigation Services.  Today's date is January 23rd, |
| 7 | 2019.  The time is now 9:15 a.m.  This video deposition |
| 8 | is being held in Detroit, Michigan in regards to the |
| 9 | Johnson & Johnson Talcum Powder Products Marketing, |
| 10 | Sales Practices, and Products Liability Litigation, |
| 11 | pending in the United States District Court for the |
| 12 | District of New Jersey. |
| 13 | The deponent is Dr. Ghassan Saed.  And |
| 14 | counsel will be noted on the stenographic record.  And |
| 15 | will the court reporter please swear in the witness. |
| 16 | DR. GHASSAN SAED, |
| 17 | having first been duly sworn, was examined and |
| 18 | testified on his oath as follows: |
| 19 | MR. HEGARTY:  Before we begin with |
| 20 | questioning Dr. Saed, I want to make a note on the |
| 21 | record with regard to materials that were produced to |
| 22 | us this morning by counsel for Plaintiffs.  Those |
| 23 | materials included the original lab notebook for |
| 24 | presumably the study that Dr. Saed did that's reported |
| 25 | in a manuscript that we were provided as well in |

| Page 13 | |
|---|---|
| 1 | advance, and it's our understanding that we were to |
| 2 | have copies of the notebook provided to us in advance |
| 3 | of the deposition.  We were provided with what we |
| 4 | believe to be that notebook that I'm marking as Exhibit |
| 5 | Number 1. |
| 6 | SAED DEPOSITION EXHIBIT NUMBER 1, |
| 7 | COPY OF NOTEBOOK BATES SAED000001 - SAED000097, |
| 8 | WAS MARKED BY THE REPORTER |
| 9 | FOR IDENTIFICATION |
| 10 | MR. HEGARTY:  That notebook -- those notebook |
| 11 | pages begin on Page 30 and go through Page 124 as noted |
| 12 | in handwriting on the pages.  They are Bates Numbered 1 |
| 13 | through 97. |
| 14 | SAED DEPOSITION EXHIBIT NUMBER 2, |
| 15 | LAB NOTEBOOK, (Retained by Witness) |
| 16 | WAS MARKED BY THE REPORTER |
| 17 | FOR IDENTIFICATION |
| 18 | MR. HEGARTY:  The lab notebook we've been |
| 19 | provided this morning, which I will designate for |
| 20 | purposes of the record as Exhibit Number 2, because we |
| 21 | were told that we were not to mark on it and that Dr. |
| 22 | Saed would retain it, but the lab notebook provided is |
| 23 | Exhibit Number 2, includes Pages 1 through 29 which we |
| 24 | were not provided in advance of the deposition.  We |
| 25 | believe those pages should have been provided along |

4 (Pages 10 to 13)

Ghassan Saed, Ph.D.

Page 14

1    with the other pages pursuant to Judge Pisano's order
2    and pursuant to our Notice of Deposition. Not having
3    those pages in advance prejudices our right to have a
4    full and complete opportunity to discuss the lab
5    notebook with Dr. Saed during his deposition, and we
6    object to its production here this morning and
7    certainly reserve our right to seek additional time
8    with Dr. Saed as well as any other remedies that we
9    might be entitled to for what we believe to be an
10   untimely production.
11         Also, I will note for purposes of the record
12   that we received this morning as well another lab
13   notebook that is purported to be a notebook covering an
14   additional set of tests that Dr. Saed did with Fisher
15   Scientific Talc, and make note that there's a reference
16   in the manuscript that we were provided testing done on
17   Fisher Scientific talc. We'll designate for purposes
18   of the record this notebook is Exhibit Number 3.
19         SAED DEPOSITION EXHIBIT NUMBER 3,
20         LAB NOTEBOOK, (Retained by Witness)
21         WAS MARKED BY THE REPORTER
22         FOR IDENTIFICATION
23         MR. HEGARTY: This notebook was not provided
24   nor -- in advance of the deposition nor were any pages
25   of this notebook provided in advance of the deposition.

Page 15

1    We have not had an opportunity to review it to know
2    whether this is pertinent to the manuscript that we'll
3    talk about here today, but also believe that this is
4    likely to also fall within the scope of Judge Pisano's
5    order and certainly within the scope of the Notice of
6    Deposition that we had made. So we also object to
7    its -- the timeliness of the production of this
8    notebook and, again, we reserve all rights for whatever
9    remedies are appropriate due to this late production.
10         MR. KLATT: Imerys Talc America joins in what
11   Mr. Hegarty said. And can we have the agreement we've
12   had that one objection is good for all?
13         MS. O'DELL: Yes.
14         MR. KLATT: All defendants join.
15         MS. O'DELL: So on behalf of the steering
16   committee, let me state that Judge Pisano's order
17   related to the specific -- a specific Notice of
18   Deposition that requested documents regarding the
19   underlying data and study that was reported in Dr.
20   Saed's manuscript as well as his expert report. That
21   was the subject of the order. Those materials were
22   provided in compliance with Judge Pisano's order.
23   There was a second general notice that asked for other
24   talc studies. The additional talc study that's noted
25   in the lab book Exhibit 2 was not a part of Judge --

Page 16

1    excuse me, was not a part of Dr. Saed's manuscript.
2          MR. HEGARTY: I marked it as Exhibit 3, the
3    other lab notebook.
4          MS. O'DELL: I'm referring to Exhibit 2, the
5    initial lab --
6          MR. HEGARTY: Okay, I'm sorry, I thought you
7    were referring to the second one.
8          MS. O'DELL: I was not.
9          MR. HEGARTY: I'm sorry to interrupt.
10         MS. O'DELL: I'm pretty sure you are not
11   sorry you interrupted me, but Exhibit 2 is the lab
12   notebook I'm referring to, and the study that is the
13   basis of the objection was not a part of the manuscript
14   or the report.
15         Secondly, Exhibit 3 includes a separate and
16   distinct set of data for a Fisher talc study, and we
17   have provided that today, it was published in an
18   abstract and we provided that today in compliance with
19   the second notice of deposition. So the plaintiff's
20   position is we have provided everything the Judge
21   ordered, everything that's required as part of the
22   notice, and we'll oppose any motion to extend the
23   deposition and keep it open.
24         MR. HEGARTY: I do have a question. You're
25   saying that the lab notebook we designated as Exhibit

Page 17

1    Number 2 for which you provided copies is not related
2    to the manuscript that's titled Molecular Basis
3    Supporting the Association of Talcum Powder Use With
4    Increased Risk of Ovarian Cancer?
5          MS. O'DELL: That's not what I said. What I
6    said is the portion of the lab notebook Exhibit 2,
7    which you referred to as Pages 1 through 29, are not
8    reported in the manuscript or the report, the expert
9    report in this matter, and, therefore, they were not
10   subject Judge Pisano's previous ruling, so that's the
11   distinction that I'm making. These are materials that
12   were made available to you today and you have full
13   opportunity TO ask Dr. Saed questions about it.
14         MR. HEGARTY: I understand.
15   EXAMINATION BY MR. HEGARTY:
16   Q. Good morning, Dr. Saed.
17   A. Good morning.
18   Q. Would you -- strike that. My name is Mark Hegarty. I
19   represent the Johnson & Johnson defendants in this
20   matter. Would you please state your full name for the
21   record, please.
22   A. Ghassan Saed.
23   Q. Who is your current employer, Dr. Saed?
24   A. Wayne State University Medical School.
25   Q. What is your title?

5 (Pages 14 to 17)

Ghassan Saed, Ph.D.

| Page 18 | Page 20 |
|---|---|

**Page 18**

1  A.  Wayne State University Medical School.
2  Q.  What is your title there?
3  A.  Associate professor.
4  Q.  How long have you held that position?
5  A.  Eight years about, I'm not --
6  Q.  Do you also have a separate personal consulting
7      business for purposes of litigation?
8  A.  DS Biotech, it's a consulting company.
9  Q.  Are there any other employees or owners or other
10     individuals involved in DS Biotech besides you?
11 A.  No.
12 Q.  Is your son in any way involved in that business?
13 A.  Just doing some paperwork.
14 Q.  Do you do any business through DS Biotech besides
15     expert witness consulting for litigation?
16 A.  We do consulting for scientific testing for
17     universities, for investigators, we design experiments,
18     we help them write manuscripts.
19 Q.  You said for other investigators or universities.  Do
20     you do any business with any companies?
21 A.  I do, yes.
22 Q.  Can you name a company with whom you do business?
23 A.  Temple Pharmaceuticals.
24 Q.  How long has DS Biotech been in business?
25 A.  2006.

**Page 20**

1  BY MR. HEGARTY:
2  Q.  What portion of the fees have you not been paid --
3  A.  So we --
4  Q.  -- through DS Biotech?
5  A.  So we have to deduct expenses and everything.
6  Q.  Can you approximate the expenses you have had to deduct
7      from the fees you've --
8  A.  I haven't done it for this year yet.
9  Q.  Do you have any other sources of income besides your
10     work at Wayne State and through DS Biotech?
11 A.  No.
12 Q.  What are you charging Plaintiff's Counsel in this
13     litigation for your work?
14 A.  $600 an hour.
15 Q.  Do you have different rates for deposition or trial
16     testimony?
17 A.  Do I have different rate?
18 Q.  Sure.  The rate you just quoted me was per hour, $600
19     per hour.  Do you have a different per-hour rate if
20     you're being deposed or if you're going to trial?
21 A.  Oh, no.
22 Q.  You have obligations at Wayne State University to
23     disclose financial arrangements --
24 A.  Yes.
25 Q.  -- is that correct?  Have you disclosed your financial

| Page 19 | Page 21 |
|---|---|

**Page 19**

1  Q.  Are you currently named as an expert witness in any
2      other litigation besides this one?
3  A.  No.
4  Q.  Have the fees that you have generated in connection
5      with your work on this case been directed to DS
6      Biotech?
7  A.  Been directed?
8  Q.  Well, have the fees that you have generated for your
9      work on this case been paid to DS Biotech?
10 A.  Yes.
11 Q.  Do you receive all of the income from those fees?
12 A.  Through DS Biotech?
13 Q.  Yes.
14 A.  Yes, after I submit taxes and all that.
15 Q.  But you essentially receive the fees even though they
16     were directed to DS Biotech, correct?
17 A.  Correct, the company received it, yes.
18 Q.  Then you have been -- you were paid by the company,
19     correct?
20 A.  Yes.
21 Q.  Were you -- have you been paid by the company the same
22     amount to which the fees generated?
23     MS. O'DELL:  Object to the form.
24     THE WITNESS:  Yeah, I am -- the answer is no.
25

**Page 21**

1      arrangement --
2  A.  Yes.
3  Q.  -- to Wayne State with regard to your work with
4      Plaintiff's Counsel in this case?
5  A.  Yes.
6  Q.  When did you make that disclosure?
7  A.  Every year there's a deadline to receive -- to
8      submit a form which shows consultation efforts, and for
9      2018 that was submitted 10 days ago.
10 Q.  Who did you identify to whom you were consulting with
11     with regard to that disclosure for purposes of this
12     litigation?
13 A.  DS Biotech and Beasley Allen.
14 Q.  You prepared a report in this case, correct?
15 A.  (Nods head.)
16 Q.  Yes?
17 A.  Did I prepare a report?  Yes.
18 Q.  Did anyone outside of the lawyers for the plaintiffs in
19     this case assist you in any way with that report?
20 A.  No.
21 Q.  Do you know how much you have been paid through the
22     present date for your work in this litigation?
23 A.  Yes.
24 Q.  How much?
25 A.  Approximately 260, something like that.

6 (Pages 18 to 21)

Ghassan Saed, Ph.D.

Page 22

1   Q.  260,000?
2   A.  Yes, about that, maybe a little bit less, I don't know,
3        I can't remember the exact number.
4            SAED DEPOSITION EXHIBIT NUMBER 4,
5            INVOICES,
6            WAS MARKED BY THE REPORTER
7            FOR IDENTIFICATION
8   BY MR. HEGARTY:
9   Q.  I'm marking as Exhibit Number 4, Dr. Saed, copies of
10       invoices that we were provided in advance of the
11       deposition.  Would you look at Exhibit Number 4, and
12       tell me whether those are copies of all the invoices
13       you have generated for purposes of your work in this
14       case?
15  A.  Yeah, they look fine to me.
16  Q.  The last invoice we were provided is dated November 16,
17       2018, that's the issue date.  Have you prepared any
18       additional invoices since that date?
19  A.  No.
20  Q.  Have you spent additional time on this case for which
21       you intend to prepare an invoice --
22  A.  Yes.
23  Q.  -- since that date?
24  A.  Yes.
25  Q.  How much additional time have you spent that you have

Page 23

1        not yet invoiced?
2   A.  Approximately 100, 110 hours.
3   Q.  The invoices show that they were issued by DS Biotech,
4        that's the company we talked about earlier, is that
5        correct?
6   A.  Yes.
7   Q.  There are no other employees of DS Biotech besides
8        yourself, is that correct?
9   A.  And help from my son, paperwork part-time.
10  Q.  Is he a paid employee?
11  A.  No.
12  Q.  The first page of Exhibit Number 4 with an issue date
13       of the invoice 10-30-2017 includes just a single word
14       in the description Consulting with no corresponding
15       date.  What is the date of the first consulting entry
16       that you have listed on the first page of Exhibit
17       Number 4?
18  A.  10-30, so what's the -- I'm sorry.
19  Q.  Let me ask, Exhibit Number 4, the first page refers to
20       an invoice of $20,400 at a unit price of $600, so there
21       would be several hours, you spent several hours doing
22       something that generated that invoice, correct?
23  A.  Yes.
24  Q.  When did that something start?  When is the first time
25       that you spent anytime on this matter on behalf of

Page 24

1        Beasley Allen?
2   A.  So I started October, maybe 1st of October, maybe
3        before that, I can't remember the exact date.
4   Q.  What is your best estimate?
5   A.  I would say end of September.
6   Q.  So the first invoice -- I'm sorry, go ahead.
7   A.  Go ahead.
8   Q.  So the first invoice on Exhibit Number 4 would reflect
9        the time you spent from approximately the end of
10       September through October 30th, 2017, correct?
11  A.  Correct.
12  Q.  Can you describe for me with regard to the first
13       invoice the type of work that you did between the
14       first -- between the end of September and the date of
15       this first invoice?
16  A.  Sure.  So this was time for meetings, meeting with them
17       and reviewing literature basically.
18  Q.  You said meeting with them.  Who is "them"?
19  A.  With Beasley Allen.
20  Q.  Which attorneys from Beasley Allen did you meet with?
21  A.  Dr. Thompson, Mrs. --
22           MS. O'DELL:  O'Dell.
23           THE WITNESS:  -- O'Dell and Jennifer --
24       what's her last name?
25

Page 25

1   BY MR. HEGARTY:
2   Q.  Do you recall the date of your first contact by Beasley
3        Allen?
4   A.  Around middle of August.
5   Q.  How was that contact made?
6   A.  A phone call.
7   Q.  A phone call to you?
8   A.  Yes.
9   Q.  Who called you?
10  A.  Dr. Thompson.
11  Q.  Did you know Dr. Thompson before the call?
12  A.  No.
13  Q.  Apart from -- or strike that.  What did she tell you
14       when she first called you?
15  A.  She told me that they would like to meet with me to
16       discuss the possibility of acting as a witness expert
17       in ovarian cancer inflammation and oxidative stress.
18  Q.  Did you agree to serve as a retained expert on behalf
19       of Beasley Allen at that first call?
20  A.  No.
21  Q.  What else were you told by Miss Thompson during that
22       phone call?
23  A.  We just basically talked about setting a meeting and we
24       did.
25  Q.  You said that she told you that they would like to meet

7  (Pages 22 to 25)

Ghassan Saed, Ph.D.

Page 26

```
 1    with you to discuss the possibility of acting as a
 2    witness, expert witness on cancer inflammation and
 3    oxidative stress.  Was there a reference during that
 4    call to talc exposure?
 5    A.  No.
 6    Q.  So talc was not brought up --
 7    A.  In the conversation, no.
 8    Q.  -- in the first call.  Was the fact that they were
 9    representing clients or that they were wanting to talk
10    to you in connection with a litigation, was that
11    discussed?
12    A.  In the phone call, no.
13    Q.  Did she identify herself as a lawyer?
14    A.  Yes, and the firm.
15    Q.  What was your understanding as far as why a lawyer from
16    Beasley Allen would want to talk to you about
17    inflammation and oxidative stress?
18    A.  Because -- so, oh, so you're telling me if she told me
19    she is the lawyer on behalf of the defendants, I mean
20    the plaintiffs in ovarian cancer cases and talc?
21    Q.  Yes.
22    A.  She, yes, she identified herself as such.
23    Q.  So you understood that the --
24    A.  Yes.
25    Q.  -- consulting that you would be doing would be with
```

Page 27

```
 1    regard to in some way to talc, correct?
 2            MS. O'DELL:  Object to the form.
 3            THE WITNESS:  No.  I was asked to serve as a
 4    witness expert in my specialty, which is what we did
 5    and what I do for the last 30 years, ovarian cancer,
 6    oxidative stress, and inflammation.
 7    BY MR. HEGARTY:
 8    Q.  As of the time of that phone call, your specialty was
 9    not talc, correct?
10    A.  My specialty is anything that induces inflammation and
11    oxidative stress that is linked to ovarian cancer.
12    Q.  But at the time of that first call you had done no
13    studies involving talc, correct?
14    A.  No, no studies, but I was really interested in it
15    because of the media reports that's going at the time.
16    Q.  And at the time of that first call you had done no
17    analysis of the medical literature with regard to talc
18    and ovarian cancer, correct?
19            MS. O'DELL:  Objection.
20            THE WITNESS:  Not correct.
21    BY MR. HEGARTY:
22    Q.  What analysis of the medical literature had you done
23    with regard to talc and ovarian cancer prior to the
24    call from Miss Thompson?
25            MS. O'DELL:  Doctor, if you'll give me just a
```

Page 28

```
 1    moment after Mark's question so I can object if I need
 2    to.
 3            THE WITNESS:  Oh, I'm sorry.
 4            MS. O'DELL:  Thank you.
 5            THE WITNESS:  Where are we now?
 6    BY MR. HEGARTY:
 7    Q.  Yes, I said -- my question was what analysis of the
 8    medical literature had you done with regard to talc and
 9    ovarian cancer prior to the call from Miss Thompson?
10    A.  Reading the literature.
11    Q.  What literature had you read?
12    A.  I read the epidemiology studies, I read some of the
13    molecular studies, I read what's in the news, I read
14    everything, I listened to the news, that's my interest,
15    it's ovarian cancer and inflammation.
16    Q.  What epidemiologic studies had you read prior to the
17    call from Miss Thompson?
18    A.  I read -- the exact one?
19    Q.  Yes.
20    A.  I can't remember exact one, but I read several studies.
21    Q.  Can you identify the names of any studies, whether by
22    author or study name, that you had read prior to the
23    call from Miss Thompson?
24            MS. O'DELL:  Object and asked and answered.
25            THE WITNESS:  Yeah.  I mean I can look it up
```

Page 29

```
 1    for you, but the cohort study is what I read, and I
 2    read some other studies.  I can't remember exactly.
 3    BY MR. HEGARTY:
 4    Q.  When in relation to the call from Miss Thompson had you
 5    read the medical literature you just described?
 6    A.  Sorry, I missed that.
 7    Q.  When in relation to the call from Miss Thompson in
 8    August of 2017 had you read the literature you just
 9    talked about, the epi studies, the molecular studies?
10    A.  Yeah, it's over the past year prior.
11    Q.  What was it that prompted you to review those materials
12    in the first place?
13    A.  The media reports.
14    Q.  What media reports?
15    A.  People talking about the risk of ovarian cancer and
16    talc powder use, it was all over the place.
17    Q.  As of the time that Miss Thompson called, you had done
18    no studies yourself involving talc, correct?
19    A.  Lab studies?
20    Q.  Lab studies.
21    A.  No.
22    Q.  You had done no other study besides reading the
23    literature, correct?
24            MS. O'DELL:  Objection to form.
25            THE WITNESS:  Other studies related to talc?
```

8 (Pages 26 to 29)

Ghassan Saed, Ph.D.

Page 30

1  BY MR. HEGARTY:
2  Q.  Correct.
3  A.  I didn't do any studies related to -- lab studies
4      related to talc before that, yes.
5  Q.  And as of the time that Miss Thompson called you, had
6      you formed any opinions with regard to talc and ovarian
7      cancer?
8  A.  Formed an opinion?
9  Q.  Yes, as to whether there's a causal link between talc
10     and ovarian cancer?
11 A.  It's always my opinion that anything that causes
12     inflammation, redox imbalance, is linked to increased
13     risk of ovarian cancer.  This is the core of my work.
14 Q.  So it's always been your opinion that anything that
15     causes inflammation will cause ovarian cancer?
16        MS. O'DELL:  Object to the form.
17        You may answer.
18        THE WITNESS:  No.  I said that anything that
19     induces inflammation, alter the redox balance is
20     potential for increasing risk of ovarian cancer, yes.
21 BY MR. HEGARTY:
22 Q.  As of the time that Miss Thompson called you, what
23     medical studies reported that talc altered the redox
24     balance leading to inflammation?
25 A.  There was one study of Shukla, I think, and they

Page 31

1      measured the effect of -- they measured the reactive
2      oxygen species especially dihydrogen peroxide H2O2, and
3      they found a dose response effect when exposure to
4      talc.
5  Q.  From that one study you came to the opinion that --
6  A.  No.
7  Q.  -- talc use causes redox imbalance that leads to
8      inflammation that leads to ovarian cancer?
9        MS. O'DELL:  Object to the form.
10        THE WITNESS:  No.  What I said that my
11     interest is inflammation and redox balance and
12     imbalance and reactive oxygen species, so anything that
13     able at the cellular level to alter this, manipulate
14     this, is a candidate, is a potential risk to ovarian
15     cancer.
16 BY MR. HEGARTY:
17 Q.  As of the time that Miss Thompson called you, had you
18     come to the opinion that talc used by women did alter
19     the redox balance?
20        MS. O'DELL:  Objection, asked and answered.
21        You may answer.
22        THE WITNESS:  Repeat the question, please.
23 BY MR. HEGARTY:
24 Q.  Sure.  As of the time that you received the call from
25     Miss Thompson, what opinion did you have with regard to

Page 32

1      talc and ovarian cancer?
2  A.  That talc is a potential inducer of inflammation, and
3      it induces and increases risk of ovarian cancer.
4  Q.  Those opinions came from your review -- from the media
5      reports and your review of the literature you
6      described?
7  A.  Uh-huh.
8  Q.  Is that correct?
9  A.  Correct.
10 Q.  With regard to the invoices we marked as Exhibit
11     Number 4, do these reflect only your time spent in this
12     case?
13 A.  Correct.
14 Q.  Are you able to break down from these invoices the
15     amount of hours you spent reviewing literature?
16 A.  From the first one?
17 Q.  From the first one through the end.
18 A.  The answer is no, because I always review literature,
19     this is my job, that's what I do for a living, I review
20     literature every single day.
21 Q.  After being contacted by Miss Thompson, did you review
22     literature with regard to this subject area, talc and
23     ovarian cancer, that you had not reviewed before?
24 A.  Yes.
25 Q.  Are you able to break down from these invoices the

Page 33

1      amount of time you spent writing your expert report?
2  A.  There is actually one that actually state -- no, no,
3      where is it?  I thought there was one saying expert
4      report.  I can identify it, yes.
5  Q.  You can't identify it?
6  A.  I can, just give me one second.  Yes, it's this one.
7  Q.  The very last one?
8  A.  Yes.
9  Q.  Does the very last one represent the amount of time you
10     spent writing your report?
11 A.  Correct.
12 Q.  Are you able to break down from the invoices the amount
13     of time you spent talking with lawyers for Beasley
14     Allen?
15 A.  No.
16 Q.  You prepared a manuscript which we'll talk about today
17     that has been submitted to the Journal for Reproductive
18     Sciences entitled Molecular Basis Supporting the
19     Association of Talcum Powder Use With Increased Risk of
20     Ovarian Cancer.  Are you familiar with that?
21 A.  Yes.
22 Q.  Did you bill the time you spent preparing that
23     manuscript to lawyers for Beasley Allen?
24 A.  For this one?  Yes.
25 Q.  Is that reflected in these invoices?

9 (Pages 30 to 33)

Ghassan Saed, Ph.D.

Page 34

1  A.  Yes.
2  Q.  Are you able to tell me how much time you spent
3     preparing that manuscript that's reflected in the
4     invoices we marked as Exhibit Number 4?
5  A.  Exactly, no.
6  Q.  Can you approximate it in any way?
7  A.  Yes.
8  Q.  What's your approximation?
9  A.  I would say about 60 to 70 hours.
10  Q.  There are other authors on that paper, correct?
11  A.  Correct.
12  Q.  Did you bill their time to Beasley Allen for their work
13     on the manuscript?
14  A.  No.
15  Q.  How was their time paid for?
16  A.  So some of them are, if you look at the names, some of
17     them are the department chair, Dr. Morris, and this is
18     an academic institution, we don't bill for the time of
19     consultants or coworkers or co-authors.  The research
20     technicians was paid from my lab, and Amy Harper is a
21     fellow, OB-GYN oncology fellow, and they're paid for
22     fellowships through the department, so we don't bill
23     for their time.
24  Q.  I'm marking as Exhibit Number 5 -- I'm sorry, go ahead.
25  A.  Go ahead.

Page 35

1  Q.  You were saying something.
2  A.  I said the only time billed to this from the manuscript
3     is my time.
4  Q.  I'm marking this as Exhibit Number 5, a copy of another
5     document we were provided in advance of the deposition.
6        SAED DEPOSITION EXHIBIT NUMBER 5,
7        DECEMBER 18, 2018 DOCUMENT,
8        WAS MARKED BY THE REPORTER
9        FOR IDENTIFICATION
10  BY MR. HEGARTY:
11  Q.  Can you tell me what Exhibit Number 5 is?
12  A.  So this is the cost of this project since the beginning
13     till now from my lab from my side.
14  Q.  This listing of costs was sent to you by a Sharon Pepe?
15  A.  The contract -- the grants and contract manager, yes.
16  Q.  Who is that?
17  A.  The financial manager of our department, grants and
18     contract.
19  Q.  How did she come to send you this document on
20     December 18, 2018?
21  A.  How come?
22  Q.  Yes.
23  A.  I asked her.  Every year they give us a budget balance
24     of each account that we have.
25  Q.  Why did you ask her to send you the accounting of the

Page 36

1     costs for your talc project that she did on
2     December 18, 2018?
3  A.  I always ask for all my projects accounts.
4  Q.  Where is the documentation or accounting of the time
5     you spent, the lab supplies, the equipment, services,
6     isn't there a separate list that breaks down the hours
7     or the costs for personnel time and lab supplies,
8     equipment, services?
9        MS. O'DELL:  Objection.
10        THE WITNESS:  Yeah, so the question is these
11     numbers came from breakdown of expenses, receipts.  We
12     do have receipts for all the expenses from the lab.
13  BY MR. HEGARTY:
14  Q.  Do you have receipts for, that document all the time
15     that is under the heading personnel?
16  A.  So the only personnel that's paid was Dr. Fletcher and
17     part-time my research assistant, medical student Ira,
18     she was paid part-time, but full-time salary was paid
19     for Nicole from this budget.
20  Q.  Who paid --
21  A.  That's included in what they call indirect.
22  Q.  Let me finish, Doctor, who paid for Ira and Nicole's
23     time?
24  A.  My lab.
25  Q.  When you say your lab, you're talking about your lab at

Page 37

1     Wayne State?
2  A.  Yes.
3  Q.  And where did the funds come from that your lab could
4     use to pay Ira and Nicole?
5  A.  I have discretion funding for my lab.
6  Q.  I'm sorry?
7  A.  I have funds available for me to my lab.
8  Q.  Who provides those funds?
9  A.  The department.
10  Q.  So the department paid for Ira's and Nicole's time to
11     work on this talc project?
12  A.  Correct.
13  Q.  The total listed there is $94,957.  How much of that
14     went to Ira and Nicole?
15  A.  Most of that went to Nicole, I can't remember exact,
16     but most of that went to Nicole because she was a
17     full-time post doc at the time.
18  Q.  Do you know where the department received the funds
19     that were used to pay Ira and Nicole?
20        MS. O'DELL:  Object to the form.
21        THE WITNESS:  I missed that.
22  BY MR. HEGARTY:
23  Q.  Sure.  I think you said the department paid for Ira's
24     and Nicole's time.  From where did the department get
25     the funds they used to pay for Ira and Nicole's time?

10 (Pages 34 to 37)

Ghassan Saed, Ph.D.

Page 38

1   A.  Let me explain that.  So I get fund from the department
2       in the form of an account, and the personnel is billed
3       into this account.
4   Q.  So where did the funds come from that you get access
5       to?
6   A.  From the department.
7   Q.  And where does the department get them from?
8   A.  Ask them, I don't know.  They have fund for scientists
9       to do, develop.
10  Q.  Who would have the receipts of all the expenses and the
11      costs associated with this project?
12  A.  Sharon.
13  Q.  She notes that the costs listed are for your talc
14      project from October 1, 2017.  Is that the date on
15      which the talc project started incurring expenses?
16  A.  I think so, yes.
17  Q.  The document notes that this does not include your
18      effort costs.  What does that mean?
19  A.  My salary.
20  Q.  Your salary at Wayne State?
21  A.  Yes.
22  Q.  So you were paid a salary at Wayne State but you were
23      also paid by Beasley Allen to do this talc project,
24      correct?
25          MS. O'DELL:  Object to the form.

Page 39

1          THE WITNESS:  I was paid as a consultant for
2       my time.
3   BY MR. HEGARTY:
4   Q.  Now, all the work that you did on the talc project was
5       paid for in an hourly way by Beasley Allen, correct?
6   A.  No.
7   Q.  What time that you spent on the talc project was not
8       paid for by Beasley Allen?
9   A.  It's the time I spent in the lab doing my duties.
10  Q.  The time you spent in the lab doing your duties on this
11      project?
12  A.  On this project, on other projects, too.
13  Q.  So there was time you spent on the talc project that
14      you did not bill to Beasley Allen?
15  A.  Correct.
16  Q.  How did you divide that, the time that you did bill
17      Beasley Allen for on the talc project and the time you
18      didn't?
19  A.  So the time I work for extra, additional work, I billed
20      them, like overtime, I worked Saturdays, I worked
21      weekends, I write, I read.
22  Q.  Can you estimate the amount of time that you spent on
23      the talc project that you did not bill Beasley Allen?
24  A.  Hour, hours you're talking?
25  Q.  By hours.

Page 40

1   A.  I can't.  I didn't -- I never thought about it like
2       that.
3   Q.  Does Exhibit Number 5 capture all of the personnel, lab
4       supplies, equipment, services, costs for this project?
5   A.  From my lab, yes.
6   Q.  Have there been any such costs incurred since
7       December 18, 2018?
8   A.  What's the last date here?  Since what's the --
9   Q.  Since the date of this document, have there been
10      additional costs incurred for the talc project?
11  A.  No.
12  Q.  Dr. Saed, we were also provided today with what I'm
13      marking as Exhibit Number 6.
14          SAED DEPOSITION EXHIBIT NUMBER 6,
15          COPY OF CHECK DATED 11/2/2017 FOR $15,000,
16          WAS MARKED BY THE REPORTER
17          FOR IDENTIFICATION
18  BY MR. HEGARTY:
19  Q.  Would you please identify for me what Exhibit Number 6
20      is.
21  A.  This is a retainer check for my consulting work.
22  Q.  Did you ask for a retainer in connection with your
23      consulting work or did they offer to provide that to
24      you?
25  A.  I can't remember.

Page 41

1   Q.  With regard to the invoices and the retainer, have you
2       been paid for all the invoices?
3   A.  I have been paid for these invoices, yes.
4   Q.  So with regard to the amount of the check, that was
5       $15,000, correct?
6   A.  The retainer check?  Yes.
7   Q.  Yes, and the date of the invoice is October 19, 2017?
8   A.  Which invoice?
9          MS. O'DELL:  Object to the form.
10          THE WITNESS:  Which invoice?
11  BY MR. HEGARTY:
12  Q.  Well, there's an invoice date listed at the bottom of
13      the check of October 19, 2017.  Do you see that?
14          MS. O'DELL:  I would just state for the
15      record that there are no additional invoices, that that
16      is my belief that data was put in by our Accounting
17      Department when the request was made, so there's no
18      invoice that has not been disclosed if that's --
19          MR. HEGARTY:  That was going to be my next
20      question.
21          The date of the check is November 2nd, 2017,
22      correct?
23          THE WITNESS:  Correct.
24  BY MR. HEGARTY:
25  Q.  And all these funds went to you, correct?

11 (Pages 38 to 41)

Ghassan Saed, Ph.D.

Page 42

1    A.  The 15,000?
2    Q.  Yes.
3    A.  Yes.
4        SAED DEPOSITION EXHIBIT NUMBER 7,
5        MOLECULAR BASIS SUPPORTING THE ASSOCIATION OF
6        TALCUM POWDER USE WITH INCREASED RISK OF OVARIAN
7        CANCER, WAS MARKED BY THE REPORTER
8        FOR IDENTIFICATION
9    BY MR. HEGARTY:
10   Q.  I'm going to mark next as Exhibit Number 7 a copy of a
11       manuscript we've been provided, which I referenced
12       earlier, the manuscript that I marked as Exhibit
13       Number 7 is entitled Molecular Basis Supporting the
14       Association of Talcum Powder Use With Increased Risk of
15       Ovarian Cancer.  Do you see what I'm referring to,
16       Doctor?
17   A.  Yes.
18   Q.  First of all, is this the current version of the paper
19       you submitted to Reproductive Sciences?
20   A.  Yes.
21   Q.  Do you have prior drafts of this paper in your office
22       or in your possession?
23   A.  Do I have drafts?
24   Q.  Correct.
25   A.  Like --

Page 43

1    Q.  Well, let me explain.  Go to the very last page of
2        Exhibit Number 7.
3    A.  Okay.
4    Q.  Very last page.
5    A.  Okay.
6    Q.  There's an e-mail there.
7    A.  Oh.
8    Q.  Of December 26, 2018, which would indicate that you
9        submitted the paper in advance of that date, yet on the
10       first page of Exhibit Number 7 it reports the date
11       submitted by the author of January 3rd, 2019.  So there
12       must have been a prior manuscript submitted to
13       Reproductive Sciences before Exhibit Number 7, correct?
14   A.  Hold on.  I need to digest this.  Can you repeat that,
15       please?
16   Q.  Sure.
17   A.  What are we talking about?
18   Q.  The e-mail that you're looking at is dated December 26,
19       2018, correct?
20   A.  Yes.
21   Q.  That e-mail refers to a manuscript you had submitted,
22       which would have been submitted before that date,
23       correct?
24   A.  Yes.
25   Q.  The first page of Exhibit Number 7 in the date

Page 44

1        submitted by the author section says January 3rd, 2019,
2        which is after December 26, 2018.  So my question is
3        where is the manuscript that was submitted before
4        December 26, 2018?
5    A.  Okay.  So when you submit a manuscript, they return
6        they usually give you some corrections or editing to
7        do, and then you do the editing, and then you resubmit
8        the manuscript, so I have both copies.  Are you
9        interested to see the one that went to revision versus
10       the one after revision?
11   Q.  You have the copy that you initially sent to
12       Reproductive Sciences which is the one referred to in
13       the e-mail of December 26, 2018?
14   A.  Sure.
15   Q.  Are there only two drafts of the manuscript, the one
16       you submitted prior to December 26, 2018 and the one we
17       marked as Exhibit Number 7?
18   A.  For Reproductive Science, yes.
19   Q.  Have you made any revisions to the document that we
20       have marked as Exhibit Number 7?
21   A.  Let's see if I remember, so this is the first -- which
22       one is this, okay, because there is one original that
23       we submitted.
24   Q.  Correct.
25   A.  Went to review, the reviewer asked for some

Page 45

1        modification, I did it and resubmit it.
2    Q.  Is Exhibit Number -- I'm sorry, go ahead.
3    A.  So this, I can't remember is this the most recent one
4        or not.
5    Q.  Did you bring a copy today?
6    A.  I have a copy.
7    Q.  You brought a copy from your office?
8    A.  Yeah, this is a copy from my office.
9    Q.  May I see it, please?
10   A.  Yes.
11       SAED DEPOSITION EXHIBIT NUMBER 8,
12       MOLECULAR BASIS SUPPORTING THE ASSOCIATION OF
13       TALCUM POWDER USE WITH INCREASED RISK OF OVARIAN
14       CANCER,
15       WAS MARKED BY THE REPORTER
16       FOR IDENTIFICATION
17   BY MR. HEGARTY:
18   Q.  I'm going to mark as Exhibit Number 8 a copy of the
19       article or manuscript that Dr. Saed just provided to
20       me.  At least the cover page contains the same date
21       submitted by the author date.  Would you look at the
22       two Exhibit Number 7 and Exhibit Number 8, and tell me
23       whether they are the same?
24   A.  Yeah, it looks the same to me.
25   Q.  So have there been any additional revisions to the

12  (Pages 42 to 45)

Ghassan Saed, Ph.D.

Page 46

1    manuscript that we've marked as 7 and 8?
2    A.  No.  We revised it according to the reviewer's comment
3    and resubmitted it, and then it was officially
4    accepted.
5    Q.  Did you submit the manuscript to any other journals?
6    A.  Prior to this?
7    Q.  Prior to this.
8    A.  Yes.
9    Q.  What journals did you submit to?
10   A.  OB-GYN Oncology.
11   Q.  When did you submit the manuscript to OB-GYN Oncology?
12   A.  I'm not good on dates.
13   Q.  You submitted it before --
14   A.  Prior.
15   Q.  Prior to submitting it to Reproductive Sciences?
16   A.  Correct.
17   Q.  Are you able to estimate when you completed the
18   manuscript such that it could be submitted to a
19   journal?
20   A.  I would say -- what's the date now -- September,
21   October, September maybe around.
22   Q.  Did you get a response from OB-GYN Oncology to your
23   submission?
24   A.  I did.
25   Q.  What was their response?

Page 47

1    A.  That I needed to do in vivo, additional in vivo animal
2    experiments.
3    Q.  That you needed to do additional in vivo animal
4    experiments before they would agree to publish your
5    paper; is that correct?
6    A.  No, they -- usually the basis of their rejection, this
7    is a review of comment, not the editor request, so
8    comments you can do, you can agree with or you can
9    disagree with.  So I always publish papers and I'm very
10   familiar with this process.  So there's a distinction
11   between editor's opinion and reviewer's comment.  So
12   reviewer comments, they're not bound -- I'm not bound
13   to their comments.  I may agree with them and I may
14   disagree with them.  So the reviewer -- the editor,
15   they usually, their policy, they use it based on
16   reviewer's comment, that's part of the concentration,
17   the other part will be the how many -- the volume, how
18   many they receive and priority for the articles to be
19   published.
20   Q.  So as to the chronology, you completed a draft of your
21   manuscript that we marked as Exhibit Number 7 and 8,
22   you submitted that manuscript initially to OB-GYN
23   Oncology --
24   A.  Correct.
25   Q.  -- in the September 2018 time frame?

Page 48

1    A.  Correct.
2    Q.  They, based on correspondence with you, sent that paper
3    to peer reviewers, correct?
4    A.  Correct.
5    Q.  How many peer reviewers did they send it to?
6    A.  I don't know.
7    Q.  How many comments back from peer reviewers did you
8    receive, just by peer reviewer number?
9    A.  I know, but I'm trying to remember, maybe one or two, I
10   can't remember, I think two.
11   Q.  You mentioned one of the comments was --
12   A.  But two that they commented.  So usually they send it
13   to more.  If they have no comments, they don't include
14   them.
15   Q.  One of the reviewers commented that you needed to do
16   additional in vivo animal studies to show the same
17   effect that you reported in cell cultures that you did,
18   correct?
19        MS. O'DELL:  Object to form.
20        THE WITNESS:  No.
21   BY MR. HEGARTY:
22   Q.  What did he say or she say?
23   A.  It was said that this is very exciting work,
24   interesting work, has a biological relevance, it would
25   be interesting to see if this can be shown in vivo.

Page 49

1    Q.  Do you remember anything else that was said in those
2    comments besides what you provided to us this morning?
3    A.  Yeah, they like it, they love my work.
4    Q.  Anything else you can recall from the comments?
5    A.  No, this is positive and it's good data that they need
6    to -- complimented with.
7    Q.  So with regard to the comments, then what -- strike
8    that.  OB-GYN Oncology rejected your paper, correct?
9    A.  They said that -- yeah, they said that we don't want --
10   priority at this time.
11   Q.  Did they say why they rejected your paper?
12   A.  They say we have lot of papers received by the journal
13   and it's not a priority right now.
14   Q.  Do you have all the documents of your submission to
15   OB-GYN Oncology and their -- the comments and other
16   documents that you received back in connection with
17   that submission?
18        MS. O'DELL:  Object to the form.
19   BY MR. HEGARTY:
20   Q.  Yes?
21   A.  I want to see -- what's the question?  Sorry.
22   Q.  Sure.  Do you have the documentation, all the documents
23   of your submission to OB-GYN Oncology and their
24   response back?
25   A.  You mean the manuscript?

13 (Pages 46 to 49)

Ghassan Saed, Ph.D.

Page 50

1   Q.  The manuscript, your cover letter, the letter back, the
2       comments, the comments you received back, do you have
3       all that material?
4   A.  Yes.
5   Q.  Is that back in your office?
6   A.  It's in my office, yes.  You talking about manuscript,
7       right?
8   Q.  Well, the manuscript and the reviewer comments.
9   A.  And the reviewer comments, yes.
10  Q.  You chose not to do or try to replicate your results in
11      an in vivo animal model, correct?
12  A.  No, it's not correct, I didn't choose, I just don't
13      have the time to do it and the money.
14  Q.  Did you submit your manuscript to any other journals
15      besides OB-GYN Oncology and Reproductive Sciences?
16  A.  No.
17  Q.  How did you choose to submit your journal first to
18      OB-GYN Oncology?  Why did you choose that journal?
19  A.  Those, the OB-GYN Oncology and Reproductive Sciences
20      are the major societies for our specialty, and most
21      readers -- OB-GYN readers read those two manuscripts, I
22      mean journals.
23  Q.  Of your specialty, which specialty is that?
24  A.  Like our -- like in the field of OB-GYN research.
25  Q.  And what resource do you have that Reproductive

Page 51

1       Sciences is a journal that most in your specialty
2       review or read?
3           MS. O'DELL:  Object to the form.
4           THE WITNESS:  I mean do I have a number?  Or
5       you mean the source where I got that from?
6   BY MR. HEGARTY:
7   Q.  Yeah, where did you get that from?
8   A.  From my experience with them for the last 25 years.
9   Q.  Have you published in that journal before?
10  A.  Yes.
11  Q.  Have you published in OB-GYN Oncology before?
12  A.  Yes.
13  Q.  Is there such a thing as something called an impact
14      factor of a journal?
15  A.  Correct.
16  Q.  Do you know what the impact factor is of Reproductive
17      Sciences?
18  A.  About 3, 2.8 something.
19  Q.  How about OB-GYN Oncology?
20  A.  4, the upper 5, the upper 4, 5, 4.6, 5 maybe.
21  Q.  We were also, as we talked earlier, provided with the
22      original lab notebook that -- in connection with the
23      article that you have submitted to Reproductive
24      Sciences and that you submitted to OB-GYN Oncology.  Is
25      what we've designated as Exhibit Number 2 all of the --

Page 52

1       does it represent all the work that you did that went
2       into the paper we marked as Exhibit Number 7?
3           MS. O'DELL:  Object to the form.
4           THE WITNESS:  So, yeah, so this part starting
5       here, from here all the way to the end, that represents
6       everything in the manuscript.
7   BY MR. HEGARTY:
8   Q.  You're pointing to 30?
9   A.  From here, yes.
10          MS. O'DELL:  To the end.
11          THE WITNESS:  To the end.
12  BY MR. HEGARTY:
13  Q.  What is contained in Pages 1 through 29?
14  A.  This is like preliminary trials that we were running,
15      testing, so forth, the talc.
16  Q.  Do Pages 1 through 29 represent activities as part of
17      the work that generated the results contained on
18      Pages 30 thereafter?
19  A.  No.
20  Q.  What does it represent, then?
21  A.  It's a trial, it's a pilot experiment to tune-up the
22      technique.
23  Q.  When did this -- this pilot experiment goes back, at
24      least based on the date of the notebook, to 10-15-17?
25  A.  Correct.

Page 53

1   Q.  Is it -- do you always do pilot experiments before you
2       do an experiment like this?
3   A.  Sure.
4   Q.  Why do you always do a pilot experiment?
5   A.  You need to figure out the right conditions, right
6       concentration, the right incubation time.
7   Q.  And how does a pilot study provide that information?
8   A.  I don't understand what you mean.
9   Q.  How does a pilot study provide you with information to
10      know you're using the right conditions, the right
11      concentration?
12  A.  So when you use a concentration of 1,000 microgram per
13      ml and it kills your cells, you know it's toxic, you
14      should go lower.
15  Q.  Is that what you did here?
16  A.  Yes.
17  Q.  Do you do any other testing like that to determine the
18      parameters of your later tests?
19  A.  Sorry, I don't understand.
20  Q.  Well the test you just described is sort of that it, it
21      sort of set an upper limit of where you could go before
22      you kill the cells, right?
23          MS. O'DELL:  Object.
24          THE WITNESS:  Just an example, I'm giving you
25      an example.

14 (Pages 50 to 53)

Ghassan Saed, Ph.D.

| Page 54 | Page 56 |
|---|---|

**Page 54**

BY MR. HEGARTY:

1 BY MR. HEGARTY:
2 Q. An example. Do you recall anything specific that you
3 did in the pilot study that helped you define the
4 parameters of the later study that you did?
5 A. Other than the dose, most of the technology and the
6 methods that we used, it's really standard in our
7 laboratory, we have published them, we -- and not just
8 us, it's standard accepted technology everywhere in
9 this field.
10 Q. And how did the pilot study that's reflected in Exhibit
11 Number 2 inform you as to the studies -- study that you
12 did that are reflected in the rest of the pages?
13 A. Yes, so basically we looked at the dose here and this
14 pilot study showing that the initial dose was high and
15 it was like 500 microgram per ml to a thousand, that's
16 how we started, and we figured out that this dose
17 killed the cells and induced some toxicity, so this is
18 why we learned from this, and then we turned up the
19 CA-125 assay, this is turning up the assay to see how
20 much you need to use. Is it from the media? Is it
21 from the cell? You need to set up all this, and this
22 is done in here, and it's described, it's not hidden,
23 it's all over, it's all here. But we determined
24 basically the dose, and we figured out what is toxic to
25 the cells.

**Page 56**

1 BY MR. HEGARTY:
2 Q. Are you confident that it was one or the other?
3 A. Yes.
4 Q. The lab notebook that we've been provided marked as
5 Exhibit Number 2 has a first date of 10-15-17. Is that
6 the first date that there was any lab work done either
7 in the pilot study or the later study?
8 A. No.
9 Q. What is the earliest date of work?
10 A. May I have this?
11 Q. Yeah, I'm handing you Exhibit Number 3.
12 A. So the first work that we did with talc, 9-26.
13 Q. Dr. Saed referred to Exhibit Number 3 and pointed me to
14 a page that's dated 9-26. First of all, what is
15 represented or contained in Exhibit Number 3, this lab
16 notebook?
17 A. So this part, okay, so I have to indicate something, we
18 share lab notebook, we use them for -- so not
19 necessarily one lab notebook for one project. So, for
20 example, the first part of this lab notebook --
21     MS. O'DELL: Which is Exhibit 3.
22     THE WITNESS: -- which is Exhibit 3, looking
23 at the effect of a dipeptide on adhesion markers, and
24 then we continued with talc, so sometimes we mix up,
25 like we don't necessarily use one project for one lab

| Page 55 | Page 57 |
|---|---|

**Page 55**

1 Q. How did you come to start with the 500 milligram per
2 milliliter dose?
3 A. So we read in the literature prior experiments people
4 did from 5 all the way to 1,000, and I found the paper
5 after we did -- we thought first initial experiment we
6 will hit the cells with high concentration, see what
7 happened, and then titrate it down, but then we found
8 it's toxic effect on the cells so -- and then I came
9 across a paper where they used these small doses that
10 they found biological effect with, and they used 5, 20
11 and 100 and up to 500, so I chose the lower range,
12 which is 5, 20, and 100 for my study.
13 Q. What paper was that?
14 A. That was -- do you have that paper -- --
15 Q. Is that the Buz'Zard paper?
16 A. Let me see, do you have the Buz'Zard --
17     MS. O'DELL: It's right in your notebook
18 there, Doctor.
19     THE WITNESS: Where do I find it now here?
20     MS. O'DELL: You might look in your
21 references of your report.
22     THE WITNESS: Right.
23     MS. O'DELL: And then we can go from there.
24     THE WITNESS: I think it's Buz'Zard or
25 Shukla, one or the other, I can't remember.

**Page 57**

1 notebook, okay. So this part of the notebook --
2 BY MR. HEGARTY:
3 Q. The first part?
4 A. The first part is for the different study. This part
5 where we started the actual work with talc.
6 Q. When you -- you started referencing the pages, this
7 part, then what does this part represent being done?
8 A. This part was an experiment that we did exposing cells,
9 ovarian cancer cells, to talc, Fisher, and look at
10 oxidative stress markers. We used three ovarian cancer
11 cell lines, and we used macrophages of normal
12 epithelial cells. And the result of this work was
13 submitted to Society of Reproductive Investigation
14 meeting that was held last year March, yes, last year
15 in San Diego, and you can see all the way down, this is
16 the poster that resulted from this work.
17 Q. The poster you pointed to is on Page 63?
18 A. Yes.
19 Q. Was there a pilot study done before doing this
20 experiment?
21 A. So this is a pilot study.
22 Q. So the study that we are looking at dated -- with the
23 start date of 9-26-2017 --
24 A. Right.
25 Q. -- you consider that to be a pilot study?

15 (Pages 54 to 57)

Ghassan Saed, Ph.D.

| Page 58 | Page 60 |
|---|---|
| 1  A. This is a -- we have many pilot studies. It depends on | 1  call from Miss Thompson, you would have still done |
| 2  what marker you're doing the pilot study for. So | 2  these studies? |
| 3  there's a pilot study for CA-125. There is a pilot | 3  A. Correct. |
| 4  study for the dose. There is a pilot study for cells. | 4  Q. Were the studies in the works at the time that Miss |
| 5  So this is a pilot study. | 5  Thompson called you? |
| 6  Q. In the other notebook you went from a pilot study to | 6  A. I was reviewing literature only. |
| 7  doing a subsequent study. | 7  Q. You had not thought about doing actual laboratory |
| 8  A. Correct. | 8  studies before Miss Thompson had called you involving |
| 9  Q. Did you do that with this pilot study? | 9  talc? |
| 10  A. No, this is only done with -- this is a preliminary | 10  A. I planned it before she called me. |
| 11  study that we did, and we only tested mRNA levels of | 11  Q. You had actually planned to do laboratory studies? |
| 12  some oxidative stress markers. The other study that | 12  A. Correct. |
| 13  you're referring to with the manuscript, this is a | 13  Q. Do you have any documentation of that plan? |
| 14  comprehensive study that looked at every fold of gene | 14  A. No. |
| 15  expression from mRNA to DNA to ELISA to activity of | 15  Q. Did you talk with anyone and tell them that your plan |
| 16  proteins, everything. This is just simply a pilot | 16  was to do studies involving talc before you were called |
| 17  experiment looking at, yes, there is an effect, no, | 17  by Miss Thompson? |
| 18  there is not an effect, and, yes, there is an effect, | 18  A. We always discussed talking about looking at any |
| 19  so we published it. | 19  substance that induces inflammation and oxidative |
| 20  Q. The first date of any study that you did with talc is | 20  stress. So we always talk in the lab and with |
| 21  September 26, 2017? | 21  colleagues about any substance. Talc was brought up, |
| 22  A. Correct. | 22  yes. |
| 23  Q. Who is involved in the study that we looked at in | 23  Q. To whom did you speak with about talc and doing an |
| 24  Exhibit Number 3 whose begin date was September 26, | 24  experiment about talc before you received a call from |
| 25  2017? | 25  Miss Thompson? |

| Page 59 | Page 61 |
|---|---|
| 1  A. That's Nicole King and Ira, and myself. | 1  A. I discussed with Nicole. |
| 2  Q. What prompted you to do this initial study? | 2  Q. When was that discussion? |
| 3  A. My lab interest is ovarian cancer and oxidative stress, | 3  A. I can't remember dates, but we always discussed markers |
| 4  we talked about that, I answered that, the media and, | 4  of oxidative stress. |
| 5  you know, what's going on, and this is the core of my | 5  Q. Well, you said that you always talk in the lab and with |
| 6  lab specialty is looking at oxidative stress markers, | 6  colleagues about any substance. Talc was brought up. |
| 7  inflammation, and ovarian cancer. | 7  A. Correct. |
| 8  Q. Is it your testimony that this study with the start | 8  Q. What substances had you tested in your lab with regard |
| 9  date of 9-26-2017 was not prompted by your call with | 9  to oxidative stress before your study about talc? |
| 10  Miss Thompson? | 10  A. We go backwards, we go looking at reducing oxidative |
| 11        MS. O'DELL: Object to the call. | 11  stress and looking at mechanisms, or manipulating |
| 12        THE WITNESS: Was not prompted? | 12  alteration of oxidative stress, like, for example, we |
| 13  BY MR. HEGARTY: | 13  did the work where we added a scavenger of Superoxide |
| 14  Q. Yes. | 14  dismutase, which is a very powerful oxidant, and we |
| 15        MS. O'DELL: Object to the form. | 15  looked at inducing apoptosis in ovarian cancer cells. |
| 16  BY MR. HEGARTY: | 16  We're looking at intervention, changing the cell redox |
| 17  Q. In other words, you would not have done this study or | 17  balance, alteration of that balance, it is given, it's |
| 18  the study for which you have submitted a manuscript to | 18  accepted in the literature and in our world that cancer |
| 19  Reproductive Sciences if Miss Thompson had not called | 19  cells and ovarian cancer cells included, they all have |
| 20  you, correct? | 20  characterized by a pro-oxidant state that is given, |
| 21        MS. O'DELL: Object to the form. | 21  it's known. So we don't need to show a substance that |
| 22        THE WITNESS: No, I was always interested in | 22  induces further that oxidative stress. We are looking |
| 23  doing this. | 23  for attenuating and modulating that oxidative stress |
| 24  BY MR. HEGARTY: | 24  and see the effect, the downstream effect. We have |
| 25  Q. So it's your testimony that if you had not gotten a | 25  done that, we have published that with looking at SRNA |

16 (Pages 58 to 61)

Ghassan Saed, Ph.D.

**Page 62**

1      to shut down proteins, knock down proteins, we did it
2      for myeloperoxidase, we did it for ionase, we did it
3      for SOD so.
4  Q.  But prior to the call you received from Miss Thompson,
5      you had never tested any particulate or exposed cells
6      to any particulate and looked for oxidative stress,
7      correct?
8  A.  No, not correct. I used hypoxia, induced hypoxia and
9      look at normal cells.
10  Q.  What particles did you apply to cells in that study?
11  A.  Hypoxia.
12  Q.  What's hypoxia?
13  A.  It is the creation of a hypoxic micro environment into
14      the cells. This can be in vivo induced by infection,
15      by wound, by many other factors that do that.
16  Q.  Let me clarify my question, then. My question is what
17      environmental particles that are not generated in vivo
18      had you ever applied to cells and culture prior to the
19      call from Miss Thompson?
20  A.  That we published? I don't -- like a given particle
21      you're talking about?
22  Q.  Correct.
23  A.  No, I don't have any, I never done anything like that.
24  Q.  What studies had you actually planned on doing with
25      talc before your call -- before the call came from Miss

**Page 63**

1      Thompson? Had you actually formed the framework of a
2      study?
3  A.  No, I was just thinking about the overall, it would be
4      interesting to see if this is -- this will induce
5      inflammation in our cells, and if it does, then it
6      should be linked to the risk of ovarian cancer, so
7      thinking, just talking about it.
8  Q.  With regard to the manuscript that -- strike that.
9      With regard to the tests that were part of the
10      manuscript, those tests were done in connection with
11      your communications with Beasley Allen, correct?
12  A.  Those tests?
13  Q.  Yes.
14  A.  What do you mean by communication?
15      MS. O'DELL: Object to form.
16  BY MR. HEGARTY:
17  Q.  Well, you talked with Beasley Allen about doing those
18      tests, correct, before you did them?
19      MS. O'DELL: Object to form.
20      THE WITNESS: No, I was planning to do them,
21      anyways.
22  BY MR. HEGARTY:
23  Q.  You just said, though, before the call you had not done
24      anything formal or even --
25  A.  Yeah, I said --

**Page 64**

1  Q.  -- informal about putting a test together, correct?
2  A.  I said I was planning to do this.
3  Q.  Okay.
4  A.  I had a plan to do this.
5  Q.  Okay. What was your plan?
6  A.  This is the plan -- the plan -- okay, this is important
7      to know, that I have this set up ready in my lab, ready
8      to go. We have all the technology for all these
9      markers. So it is not hard just to add -- so when I
10      plan, it means I -- we had used the setup that I
11      already have in my laboratory, that's what I -- in my
12      plan.
13  Q.  But you had not done anything to further that plan?
14  A.  Physically, no.
15  Q.  Let me finish, you had not done anything to further
16      that plan until after the call came from Miss Thompson,
17      correct?
18  A.  Correct.
19  Q.  Did you discuss at all the makeup of the study or what
20      you were going to do with the study or the methods of
21      the study with Beasley Allen before you did them?
22  A.  No.
23  Q.  Did you have any discussions at all with attorneys for
24      Beasley Allen about the concept of the study, the
25      methods of the study, the protocol of the study, how

**Page 65**

1      the study was going to be done, anything like that?
2      MS. O'DELL: Let me just stop you right
3      there. I think when you're talking about conversations
4      you -- you're talking about after the time that he's
5      been engaged by Beasley Allen and those discussions
6      would be protected by the privilege. I'm going to
7      instruct the witness not to answer.
8      MR. HEGARTY: Well, my questions are related
9      solely to the manuscript, the testing in the manuscript
10      that has been submitted to Reproductive Sciences. So
11      is it your position that all the communications you had
12      with regard to the tests done for purposes of the
13      publication Reproductive Sciences and the writing of
14      the article, submission of the article, are protected
15      by the consulting privilege?
16      MS. O'DELL: Well, and as you know, the
17      substance of the manuscript largely is Dr. Saed's
18      expert report, and the work that he did in terms of
19      consulting was paid for by Beasley Allen and he was
20      doing that as a part of the consulting arrangement.
21      So, yes, to the degree he had conversations with the
22      lawyers, we're going to -- I'm going to instruct him
23      not to answer.
24      MR. HEGARTY: I'm not going to argue with
25      you. I just want to make sure I'm interesting that

17 (Pages 62 to 65)

Ghassan Saed, Ph.D.

Page 66

1    that's -- that your objection extends to any question
2    that I would ask with regard to communications with
3    Beasley Allen or attorneys for the plaintiffs with
4    regard to the creation of the study, the setup of the
5    study, the protocol of the study, doing the study,
6    writing the manuscript.
7        MS. O'DELL:  That was not, your question's a
8    little bit different than what you just described.  You
9    can ask your questions, there may be some that are
10   appropriate and some not, but as regard the question
11   that's on the table, I think that's inappropriate and
12   I've instructed him not to answer.
13   BY MR. HEGARTY:
14   Q.  Dr. Saed, did you have any discussions with any
15      attorneys for Beasley Allen regarding the pilot study
16      that we talked about in Exhibit Number 3?
17   A.  What's Exhibit Number 3?
18   Q.  The one -- the study that's dated 9-26-2007.
19        MS. O'DELL:  Objection, vague.
20        THE WITNESS:  Again, okay, here is my answer.
21   No one has interfered with the design of the study, how
22   the study should be done, what assay should be applied,
23   what method of analysis should be performed, the
24   writing of the results, the analysis of the results,
25   this is my world, this is my specialty.  No one

Page 67

1    interfered with that.
2    BY MR. HEGARTY:
3    Q.  I appreciate that.  That was not my question.  My
4       question was simply did you have any discussions with
5       attorneys for Beasley Allen or attorneys for plaintiffs
6       in this case with regard to conducting the pilot study
7       that's in Exhibit Number 3 with the start date of
8       9-26-2017?
9    A.  They know that I'm doing this.
10   Q.  Did they know that you were doing it at the time that
11      you were doing it?
12   A.  At this time?
13   Q.  Yes.
14   A.  Yes.
15   Q.  Did you have discussions in advance of doing that study
16      with them?
17   A.  I actually designed this whole thing.  So when they
18      approached me and I got -- you know, I told them this
19      is what I'm going to do, this is what I have in mind,
20      we have all this setup in my lab and I want to do it,
21      and I did it.
22   Q.  Did they provide to you any suggestions on how to do
23      this study?
24   A.  They don't know nothing about this.
25   Q.  Who paid for the pilot study that's reported in Exhibit

Page 68

1    Number --
2    A.  My lab.
3    Q.  Sorry let me finish.
4    A.  We already talked.
5    Q.  Who paid for the pilot study that's reported in Exhibit
6       Number 3?
7        MS. O'DELL:  Object to the form, to the
8    degree it's vague.
9        MR. HEGARTY:  You can answer.
10       THE WITNESS:  We discussed this, right?
11   BY MR. HEGARTY:
12   Q.  Now, the before questions, at least I thought, were
13      limited to the lab costs for -- and personnel costs for
14      the study in exhibit -- in the first notebook, Number
15      2.  Did those lab costs reflected in that exhibit,
16      which is Exhibit Number 5, also cover the pilot study
17      that's in notebook that we marked as Exhibit Number 3?
18   A.  The answer, my lab is paid for -- paid for all the
19      studies that we did.
20   Q.  The --
21   A.  Yeah, you can go back five days later.
22   Q.  Exhibit Number 5 reports the costs of the talc project
23      dated from October 1st, 2017.  This pilot study began
24      on September 26, 2017 correct?
25   A.  Correct.

Page 69

1    Q.  Is it your testimony that the costs of the pilot study
2       are included in what's listed in Exhibit Number 5?
3        MS. O'DELL:  Object to the form.
4        THE WITNESS:  We started the -- culturing the
5    cells, so the idea -- are you talking about the actual
6    money?  We started -- yes, it is included there.
7    BY MR. HEGARTY:
8    Q.  You shook your head.  I want to make sure I got it on
9       the record.
10   A.  Yes.
11   Q.  So the costs for the pilot study in Exhibit Number 3
12      that began on September 26, 2017, are contained in
13      Exhibit Number 5?
14   A.  Correct.  It takes three weeks to get the cells up and
15      going.
16        MR. HEGARTY:  Want to take a break?  We've
17   been going for about an hour and 20 minutes.  Take a
18   break.
19        THE VIDEOGRAPHER:  Going off the record at
20   10:32 a.m.
21        (A short recess was taken.)
22        THE VIDEOGRAPHER:  We're back on the record
23   at 10:51 a.m.
24   BY MR. HEGARTY:
25   Q.  Dr. Saed, when we left off, we were talking about any

18  (Pages 66 to 69)

Ghassan Saed, Ph.D.

Page 70

1    communication you had with Beasley Allen or other
2    attorneys for the plaintiffs with regard to the
3    experiments that you did or the preparation of the
4    manuscript that you've submitted to Reproductive
5    Sciences.  Over the course of the time that you did the
6    experiments, that you did the writing, that you
7    submitted to Reproductive Sciences, OB-GYN Oncology,
8    did you exchange any e-mails or letters with attorneys
9    for Beasley Allen or the plaintiffs with regard to the
10   testing, the writing, the submission of the manuscript?
11          MS. O'DELL:  Objection to form.
12          THE WITNESS:  Can you please repeat the
13   question, clarify what you --
14   BY MR. HEGARTY:
15   Q.  Sure.  Well, during the time that you were doing the
16   testing that we've been talking about?
17   A.  Experiments.
18   Q.  -- that's reflected in the lab notebooks, you call them
19   experiments, in the time that you wrote the paper that
20   you first submitted to OB-GYN Oncology and then later
21   to Reproductive Sciences.  Did you have communications
22   with attorneys for Beasley Allen or any plaintiff in
23   this litigation regarding the experiments or regarding
24   the writing of the article or regarding the submission
25   of the article to journals?

Page 71

1    A.  No.
2    Q.  Did you have any telephone calls or meetings during
3    the -- about the experiments or the writing of the
4    manuscript for the journals or the submission of the
5    journals with attorneys for Beasley Allen or any
6    plaintiff in this litigation?
7          MS. O'DELL:  Objection to the form.
8          THE WITNESS:  No.
9          MS. O'DELL:  I was just going to instruct you
10   to the degree that you're asking him about subjects
11   that were discussed in meetings with attorneys for the
12   plaintiff, don't discuss those, the subject matter
13   because those, they're not entitled to know those
14   discussions, so to the degree you can answer your
15   questions outside those parameters, you may.
16          THE WITNESS:  My answer was no for any
17   discussion related to the design of the experiments,
18   the results of the work, the submission to the journal,
19   which journal to submit to, writing the manuscript, all
20   that work I know the answer was no to that work.
21   BY MR. HEGARTY:
22   Q.  So as to everything you just described, you had no
23   discussions with the attorneys for Beasley Allen or any
24   plaintiffs in this case about anything dealing with
25   experiments, the design, the protocol the writing of

Page 72

1    the manuscript, the submission of the manuscript; is
2    that correct?
3          MS. O'DELL:  Object to the form.
4    BY MR. HEGARTY:
5    Q.  You can answer.
6    A.  I said -- I answered you.  I said I did not discuss the
7    design of the experiments, the results of the
8    experiments, where to submit it, how to analyze the
9    data, all this work I did myself.
10   Q.  Understood.  I'm not asking if they provided input on
11   how to do it or how to write it or where to send it.
12   I'm asking if you had discussions with any attorney for
13   Beasley Allen or any other attorney for Plaintiff over
14   the course of doing all this work about what you were
15   doing?
16   A.  I still don't understand discussion, what does the
17   discussion mean?
18   Q.  Well, discussion means a phone call, an in-person
19   meeting, an e-.mail?
20   A.  Oh.
21   Q.  Any communication that talks about what you're doing.
22          MS. O'DELL:  Excuse me, you may answer the
23   question whether calls or meetings occurred, you may
24   answer that yes or no, but you cannot divulge the
25   discussions or the topics that were included in those

Page 73

1    discussions.
2          THE WITNESS:  Yes, so calls, we did calls.
3    BY MR. HEGARTY:
4    Q.  And what were the -- what did you discuss with the
5    attorneys for Beasley Allen or the plaintiffs during
6    those calls with regard to the experiments you were
7    doing or the writing of the manuscript or the
8    submission of the journal?
9          MS. O'DELL:  I'm going to instruct you not to
10   answer that question.
11          MR. HEGARTY:  We object to that instruction
12   and believe that that is an inappropriate objection and
13   instruction that's not covered by the consultant
14   privilege, but we're not going to decide it here,
15   understand that, but I just want to make it clear on
16   the record that we don't agree that your objection
17   covers the kind of communications that I asked the
18   doctor.
19          MS. O'DELL:  Well, the privilege covers
20   communications, whether written or verbal, in person or
21   on the telephone, during Dr. Saed's consulting
22   relationship with the plaintiffs and that's what you've
23   asked him and that's what I'm objecting to.
24          MR. HEGARTY:  I understand the objection.  We
25   don't agree with the objection.

19 (Pages 70 to 73)

Ghassan Saed, Ph.D.

Page 74

1    MS. O'DELL:  I want to make sure the record
2  is clear.
3    MR. HEGARTY:  And I'm making for the record
4  that we don't agree with the objection and dispute the
5  propriety of it and object to you instructing the
6  doctor not to respond.  With regard to this -- the work
7  we've been talking about, the pilot study with talc,
8  that's reflected in the -- and the other studies with
9  talc that's reflected in the two notebooks, have you
10  prepared any other manuscripts related to those
11  experiments that you intend to submit to any journal?
12    THE WITNESS:  Other than submitted abstracts
13  to different meetings, no.
14  BY MR. HEGARTY:
15  Q.  Have you prepared abstracts or do you intend to prepare
16  abstracts or have you submitted abstracts regarding the
17  work reflected in the two notebooks that have not yet
18  been disseminated?
19  A.  Disseminated means --
20    MS. O'DELL:  Object to form.
21  BY MR. HEGARTY:
22  Q.  Well, as we're going to look at here today, there are
23  some abstracts where you describe the work that you're
24  doing, the experiments that you did.  Do you currently
25  have in the works any abstracts that have not yet been

Page 75

1  published or provided to anyone?
2    MS. O'DELL:  Object to the form.
3  BY MR. HEGARTY:
4  Q.  Do you understand the question?
5  A.  Not really.
6  Q.  Well, do you currently have any abstracts that you're
7  working on that you intend to submit?
8  A.  Now I understood.  In relation to --
9  Q.  The experiments --
10  A.  In relation to the talc project?
11  Q.  Correct.
12  A.  The answer is no.
13  Q.  Do you have any other written work in process relating
14  to the talc experiments that you intend to either turn
15  into an abstract or turn into a journal article?
16  A.  I was asked to write an editorial to one of the
17  journals and I am planning to do that.
18  Q.  Who asked you to write an editorial to a journal?
19  A.  The journal.
20  Q.  What journal?
21  A.  OB-GYN, let me see, I can find the exact name for you,
22  which I'm planning to do.  It's an open access journal
23  obstetrics and gynecology it's in my CV somewhere --
24  trying to find it for you -- where is it -- this is my
25  updated CV?

Page 76

1    MS. O'DELL:  This is not your updated CV
2  actually, this is the one --
3    THE WITNESS:  I can find it for you.  It's an
4  obstetrics and gynecology online, open access online.
5  BY MR. HEGARTY:
6  Q.  Who within -- for that publication asked you to write
7  an editorial?
8  A.  The editorial office.
9  Q.  And when did that request come in?
10  A.  I think two weeks ago.
11  Q.  And editorial on what?
12  A.  On talc and oxidative stress.
13  Q.  Have you started writing it?
14  A.  Not yet.
15  Q.  Do you intend to do so?
16  A.  Yes.
17  Q.  Did they give you a date --
18  A.  No.
19  Q.  -- for submission?
20    MS. O'DELL:  Let him finish his question,
21  please, Doctor.
22  BY MR. HEGARTY:
23  Q.  Did they give you a date for providing -- did they give
24  you a date for providing the editorial?
25  A.  No.

Page 77

1  Q.  Is the editorial going to be in response to a journal
2  article or another publication?
3  A.  It is in response to the published abstracts that I did
4  online.
5  Q.  And with regard to the open access publication, is that
6  a publication that's only available on the internet?
7  A.  Open access, yes.
8  Q.  Is that a publication which you have to pay to have
9  your materials published on the internet?
10  A.  All open access journals you have to pay, yes.
11  Q.  You will have to pay to have your editorial published?
12  A.  Yes.
13  Q.  How much does that cost?
14  A.  Not too much like, 3, $400.
15    MR. LOCKE:  Could we ask the witness to speak
16  up.
17    MS. O'DELL:  They don't have access to a
18  speaker, so they're just listening to you over there,
19  so if you could raise your voice.
20    THE WITNESS:  4, $500, 400 to 500 -- where is
21  that --
22    MS. O'DELL:  That's okay.
23    MR. HEGARTY:  We're past that question,
24  Doctor.
25    THE WITNESS:  Thank you.

20  (Pages 74 to 77)

Ghassan Saed, Ph.D.

Page 78

BY MR. HEGARTY:
1   Q.  We were provided some additional materials this morning
2       that I wanted to make sure I mark for the record and
3       follow up on a few things in those materials.  I'm
4       going to mark as Exhibit Number 10 what was represented
5       to us today to be the index for the lab notebook that
6       we marked as Exhibit Number 2, that's the notebook that
7       has the experiments in it that went into your
8       manuscript.
9               SAED DEPOSITION EXHIBIT NUMBER 10,
10              INDEX FOR LAB NOTEBOOK,
11              WAS MARKED BY THE REPORTER
12              FOR IDENTIFICATION
13  BY MR. HEGARTY:
14  Q.  And I'll show you -- make sure we have the right lab
15      note --
16              MR. LAPINSKI:  Counsel, is there an Exhibit 9
17      marked?
18              MR. HEGARTY:  Oh, I skipped over Exhibit 9.
19      I'll go back to it.
20              THE WITNESS:  So this and this.
21  BY MR. HEGARTY:
22  Q.  Yes, you looked at Exhibit 2 compared to Exhibit 10.
23      Is that the index to Exhibit 2?
24  A.  Yes.

Page 79

1   Q.  With regard to the index there, on the index, Doctor,
2       Exhibit 10, the pages after 21 you jump to 31.  What
3       happened to Pages 22 to 29 -- I'm sorry, 22 to 30?
4               MS. O'DELL:  I'm sorry, are you referring to
5       Exhibit 10 or --
6               MR. HEGARTY:  Yes, Exhibit 10, the pages go
7       20-21, then jump to 31-32, and my question is where are
8       Pages 22 to 30?
9               THE WITNESS:  22, you said?
10  BY MR. HEGARTY:
11  Q.  Yes.
12  A.  22, 23, 24, 29.  Oh, so there's -- yeah, you talking
13      about the tore apart?
14  Q.  We'll get to that part in a second.  First of all, why
15      aren't Pages 22 to 29 listed in the index or at least a
16      portion of those?
17              MS. O'DELL:  Object to the form.
18              THE WITNESS:  31 -- 21 -- 21, 31, what
19      happened, 21, yeah, there is nothing after that, right?
20  BY MR. HEGARTY:
21  Q.  Well, on Exhibit Number 10 it jumps from 21 to 31, and
22      where are the nine or ten pages in between those?
23  A.  Yeah, that's what I'm talking about, those are -- you
24      want me to answer for the missing pages?
25  Q.  Well, I'll get to that first but --

Page 80

1   A.  That's the answer.
2   Q.  Let me look at the notebook.  There are pages --
3       there's 21 and then there is a 22, 23, and a 24 that's
4       not referenced in the index.  Why is that?
5   A.  Because those are figures.  They could be referenced.
6   Q.  But they have page numbers on them.
7   A.  Sure.
8   Q.  And you otherwise list page numbers here that are also
9       just pages that contained figures, correct?
10  A.  Correct.
11  Q.  Why are these pages not referenced in the index?
12  A.  I don't know.
13  Q.  There are also --
14  A.  Maybe --
15  Q.  I'm sorry.
16  A.  Maybe -- we have it, we labeled it.
17  Q.  But they're not included in the index.
18  A.  Maybe just missed here.
19  Q.  There are also a number of pages that have been cut out
20      of Exhibit Number 2 that -- where the pages go from 24
21      to 29, and there are clearly pages in between that
22      appear to have either been cut out by a razor or by
23      some other cutting instrument.  First of all, what was
24      on those pages?
25  A.  Okay, so as I mentioned earlier, we do not specify one

Page 81

1       lab notebook to a specific study.  So my research
2       technician by a mistake added a different project here,
3       and because this is talc, there is a litigation and
4       lawyers and all that, we had to remove it and we have
5       to specialize in that lab notebook just for this work.
6   Q.  What other project was represented or documented in
7       those pages that were removed from this lab notebook?
8   A.  It's a different project than talc.
9   Q.  What was the project or what is the project?
10              MS. O'DELL:  You mean the subject matter?
11  BY MR. HEGARTY:
12  Q.  The subject matter.
13  A.  The same, reactive oxygen species, inflammation in
14      ovarian cancer.
15  Q.  What are you looking at in that other project?
16  A.  I can't remember, but I can find out.
17  Q.  Does it involve exposure to any environmental
18      particulate?
19  A.  No.
20  Q.  Do you know when the pages that we've been talking
21      about were removed from this lab notebook?
22  A.  I don't remember.
23  Q.  Were you aware that they had been removed?
24  A.  Yes.
25  Q.  Have you ever in your experiences in conducting a lab

21 (Pages 78 to 81)

Ghassan Saed, Ph.D.

Page 82

1      cut out pages of a lab notebook?
2   A.  Have I ever done that?  No.
3   Q.  That's not good laboratory practice, is it?
4          MS. O'DELL:  Objection to form.
5          THE WITNESS:  Yes, I -- the reason I told
6      you, I just told you the reason why we did that.
7   BY MR. HEGARTY:
8   Q.  But my question is that's not proper laboratory
9      practice to cut out pages of a lab book, is it?
10         MS. O'DELL:  Object to the form.
11         THE WITNESS:  We didn't cut the notes from
12     them, we just wanted to keep the talc study separate.
13  BY MR. HEGARTY:
14  Q.  Understood, but I'm talking about good laboratory
15     practices, and good laboratory practices don't sanction
16     or allow for you to cut out pages of a laboratory
17     notebook, do they?
18         MS. O'DELL:  Object to the form.
19         THE WITNESS:  We, as you can see, we're not
20     hiding it.
21  BY MR. HEGARTY:
22  Q.  I'm not asking if you're hiding it.  I'm asking you, do
23     you -- is it your testimony that cutting lab -- cutting
24     pages out of a lab notebook is consistent with good
25     laboratory practice?

Page 83

1          MS. O'DELL:  Object to the form.
2          THE WITNESS:  I didn't say that.
3   BY MR. HEGARTY:
4   Q.  You agree it's not consistent with good laboratory
5      practice, don't you?
6          MS. O'DELL:  Object to the form.
7          THE WITNESS:  I don't agree.
8   BY MR. HEGARTY:
9   Q.  You don't agree with what?
10  A.  Okay, I told you the reason why we removed those pages.
11  Q.  Did you instruct someone to cut those pages out of this
12     notebook?
13  A.  My lab research assistant was doing different project.
14     She was writing it here in the middle of this lab
15     notebook.  I asked her let's remove it, continue so we
16     can keep this lab notebook independent.
17  Q.  But the other lab notebook you prepared you left in the
18     pages of the other project, you didn't cut those out,
19     correct?
20  A.  No, because this was a preliminary results and that was
21     continued, not in the middle, it was continued, so we
22     only used like few pages from the book.
23  Q.  The lab notebooks contain on the outside, at least one
24     of them, Nicole King Talc Study, do you see that?
25  A.  I do.

Page 84

1   Q.  And Nicole King again is who?
2   A.  My research post doc.
3   Q.  Then on the other lab notebook that contained -- that
4      was on Exhibit 2.  Exhibit 3 on the outside is
5      something called Temple 1.  What does that mean?
6   A.  That's a project that we did for Temple Pharmaceutical
7      in our lab.
8   Q.  That's a project that's -- that's the project that's in
9      the first part of the lab notebook?
10  A.  Correct.
11         SAED DEPOSITION EXHIBIT NUMBER 9,
12         PILOT STUDY,
13         WAS MARKED BY THE REPORTER
14         FOR IDENTIFICATION
15  BY MR. HEGARTY:
16  Q.  Also provided today, which I'll mark as Exhibit
17     Number 9, are copies of what I believe to be the pilot
18     study that's contained in Exhibit Number 3.  Would you
19     look at Exhibit Number 9 and compare to Exhibit
20     Number 3, and tell me whether Exhibit Number 9 are the
21     pages copied from Exhibit Number 3, the pilot project
22     we talked about earlier along with the index?
23  A.  Yes.
24  Q.  On the first page of -- or strike that.  On Page 1 of
25     Exhibit Number 2 there's a statement at the very

Page 85

1      beginning that says tried to dissolve talc Fisher 74 --
2      or Fisher T4-500 lot numbers 166820 in Johnson &
3      Johnson Baby Powder.  Do you see that reference?  Do
4      you see where I'm reading?
5   A.  You're reading wrong.  What is in?
6   Q.  In.
7   A.  That's not in.
8   Q.  What is that word?
9   A.  That's or.
10  Q.  Or Johnson's Baby Powder, okay, and it says it won't
11     completely dissolve.  What does that mean?
12  A.  It won't completely dissolve.
13  Q.  What was the extent of its -- that it dissolved?
14  A.  Partial.
15         MS. O'DELL:  Object to form.
16         THE WITNESS:  Yeah, so, okay, so you need to
17     know the percentage of how much it's dissolved?
18  BY MR. HEGARTY:
19  Q.  How much is dissolved as reflected in Page 1.
20  A.  Nothing dissolved.
21  Q.  Whose handwriting is on Page 1?
22  A.  This is Nicole I think, I think.
23  Q.  Whose handwriting is throughout Exhibit Number 2?
24  A.  This?
25  Q.  Throughout the exhibit.

22 (Pages 82 to 85)

Ghassan Saed, Ph.D.

Page 86

1    A.  Some Nicole, some others, my research assistant.
2    Q.  Who else's handwriting besides Nicole's are in Exhibit
3        Number 2?
4    A.  My research assistant.
5    Q.  Who is that?
6    A.  Flory, her name is Flory, Flory Rong, I think she's
7        part of the authors, yes, her name is, okay, this is
8        the right -- correction, Fan Rong.
9            MS. O'DELL:  How do you spell that?
10           THE WITNESS:  It's here, F-a-n and then
11       R-o-n-g.
12   BY MR. HEGARTY:
13   Q.  Isn't it Rong Fan, Doctor?
14   A.  Rong Fan?  The first name is --
15   Q.  First name is Rong, right?
16   A.  I think it's the other way around, I'm not expert on
17       names.
18   Q.  Who is Mr. Rong?
19   A.  Mrs.
20   Q.  Mrs. Rong who is that?
21   A.  She is my research assistant.
22   Q.  How long has she been your research assistant?
23   A.  From I believe the beginning of '18.
24   Q.  But you don't know her name?
25   A.  I know her name, Flory, we call her Flory.

Page 87

1    Q.  What's her full name?
2    A.  This is her full name, how she officially write, it's
3        on the paper.
4    Q.  And is it -- according to you, is her name Fan Rong?
5    A.  I call her Flory.
6    Q.  Do you know her name?
7    A.  That's her name.
8    Q.  And how do you pronounce it?
9    A.  Rong Fan, I never called her with this name.
10   Q.  Who else's handwriting is contained in Exhibit
11       Number 2?
12   A.  Some would be mine.
13   Q.  Who else?
14   A.  That's it.
15   Q.  Were all the entries in Exhibit Number 2 prepared at
16       the time that the work was done?
17   A.  No.
18   Q.  When you say no, does that mean that there was work
19       done and then the -- later on entries were made in the
20       lab notebook?
21   A.  Correct.
22   Q.  How much later -- strike that.  If the entries have a
23       certain date on them, does that mean that they were
24       entered on that date or the work was done on that date?
25   A.  Work was done on that date.

Page 88

1    Q.  Does that mean there could be instances where work was
2        done on that date but then entered later in the lab
3        notebook?
4    A.  Okay, so let me explain how we do this.  So we run our
5        experiments and we have everything, as you see here,
6        electronically, and we -- it's a matter of -- practice
7        of cutting and pasting it in the lab notebook, but
8        everything is done in electronically.
9    Q.  When was this lab notebook, Exhibit Number 2, prepared?
10   A.  I don't know, exact dates?
11   Q.  Correct.
12   A.  I don't know, I can't remember.
13   Q.  Well, the date -- the dates run from 10-15-17 to --
14   A.  All the way to --
15   Q.  All the way to --
16   A.  -- October.
17   Q.  -- October or so of 2018.  So was this notebook
18       prepared over that entire period of time?
19   A.  Yes.
20   Q.  It wasn't prepared, put together in its entirety four
21       weeks ago?
22   A.  Some of it was, yes.
23   Q.  What portions were put together four weeks ago?
24   A.  I think the one related to the last portion.
25   Q.  Can you point to me the pages that were put together in

Page 89

1        the last month or so?
2    A.  I can't really exactly remember, but the last, I would
3        say, the statistical part for sure.
4    Q.  Starting on what page?
5    A.  I'm trying to find it.  So starting on Page 114, this
6        is the statistics of the study, all the way to 19 --
7        122, 124, so all the way to the end, which is 124.
8        This part, it's created by or done by a
9        biostatistician, and this is all you can see
10       electronics, so we just cut and pasted there.
11   Q.  So if you go to Page 114, that has a date of October 6,
12       2018.  Is it your testimony that this was not prepared
13       on that date but was prepared later and then back dated
14       to say October 6, 2018?
15           MS. O'DELL:  Object to the form, misstates
16       his testimony.
17   BY MR. HEGARTY:
18   Q.  You can answer.
19           MS. O'DELL:  If you understand the question.
20           THE WITNESS:  What's the question?
21   BY MR. HEGARTY:
22   Q.  Sure.  You see the date at the top of that page of
23       October 6, 2018, correct?
24   A.  Correct.
25   Q.  Was this page prepared on that date or was it prepared

23  (Pages 86 to 89)

Ghassan Saed, Ph.D.

Page 90

1    at a time later than that but dated October 6, 2018?
2         MS. O'DELL: Object to the form.
3         THE WITNESS: Okay, so this -- I can't
4    remember when we did the statistics, but this date
5    reflects when the statistics was actually done.
6    BY MR. HEGARTY:
7    Q.  So in this instance, the statistics were done on
8        October 6, 2018, but was the page prepared later than
9        that after October 6, 2018?
10   A.  The pages, yes.
11   Q.  With regard to other entries in the notebook that have
12       dates, can you tell whether those pages were created on
13       the date listed on the page or were they created later
14       but backdated to the date the work occurred?
15        MS. O'DELL: Objection to form.
16        THE WITNESS: Yeah, so, again, we do the
17       experiment, sometimes it takes a week or two to write
18       it in the notebook because we have the data
19       electronically, so I cannot tell you the exact date
20       when they were put in.
21   BY MR. HEGARTY:
22   Q.  All the data that is reflected in Exhibit Number 2 is
23       kept in electronic format?
24   A.  Yes.
25   Q.  Does that electronic format still exist?

Page 91

1    A.  Yes.
2    Q.  Is the data in that electronic format all dated and is
3        the date the date the data was generated?
4         MS. O'DELL: Objection to form.
5    BY MR. HEGARTY:
6    Q.  You're pointing to an example.
7    A.  An example.
8    Q.  What page is that on?
9    A.  June 19.
10   Q.  What page is that on, Doctor?
11   A.  This is Page -- oh, no, that's -- which page was
12       this --
13   Q.  It's in the lower right-hand corner.
14   A.  I just noticed -- no, it's this one.  Like, for
15       example, if you find the dates that are here, these
16       dates reflect the time we did the experiment.
17   Q.  Can you stop at a page and give me an example?
18   A.  I'm trying to find one.  So this is February --
19       Page 73, if you look here, it says February -- so
20       small, February 20th, is that --
21   Q.  Yes, 2018.
22   A.  Right.  So that's the date, and that's the date that is
23       this experiment performed.
24   Q.  With regard to the experiments that you did for your
25       manuscript, did those experiments begin in

Page 92

1        January 2018, and I'll direct you to Page --
2    A.  51.
3    Q.  Page 53.
4    A.  Of this notebook?
5    Q.  Of the notebook.
6    A.  So one more time, the question.
7    Q.  Turn to Page 53 of Exhibit Number 2.
8    A.  53?
9    Q.  Yes.
10   A.  Okay.
11   Q.  There's a couple dates at the top of January 3rd, 2018
12       and, also, do you see January 7, 2018 at the top?
13        MS. O'DELL: Excuse me, Mark, what Bates
14       Number?
15        MR. HEGARTY: I'm looking at -- I'm using the
16       page numbers in the lower right-hand corner.
17        THE WITNESS: 53?
18   BY MR. HEGARTY:
19   Q.  53.
20   A.  On this date?
21   Q.  Yes, 1-7-18.  What I'm trying to find out is when was
22       the first date that you did --
23        MS. O'DELL: What's the Bates Number on the
24       document?
25        MR. HEGARTY: The Bates Number is 25.

Page 93

1         MS. O'DELL: Okay.
2    BY MR. HEGARTY:
3    Q.  When is the first date that you started the -- when did
4        you start the experiments that you then report in your
5        manuscript?
6    A.  It says right there, January 3rd we seeded the cells,
7        started the experiment.
8    Q.  If you go to Page 2 using the Bates -- let me switch
9        you over to the Bates Numbers because that's what I had
10       to work from.
11   A.  Okay.
12   Q.  Let me show you Exhibit Number 1, that's a copy of the
13       notebook that we've been looking at, Exhibit Number 2.
14   A.  Okay.  Page 2?
15   Q.  Look at Page 2 of Bates Number --
16        MS. O'DELL: When he says Bates Number, he's
17       referring to the very small number to the right-hand
18       side that's been -- yes --
19        THE WITNESS: Where does it say Page 2?  Oh,
20       sorry, okay.  Page 2?
21   BY MR. HEGARTY:
22   Q.  Yes, and that has a date of January 24, 2018?
23   A.  Yes.
24   Q.  Do you see that?
25   A.  Yes.

24 (Pages 90 to 93)

Ghassan Saed, Ph.D.

Page 94

1   Q.   Then if you go through the next several pages through
2        to Page 23 by Bates Number --
3   A.   Yes.
4   Q.   -- that's dated March 2nd, 2018.  Do you see that?
5   A.   Yes.
6   Q.   Then if you go to Page 25, I'm sorry, if you go to
7        Page 53 --
8   A.   It's January 7.
9   Q.   Well, then you go Page 25 you see January 7, which is
10       not in the same order.  So the book doesn't appear to
11       be in chronologic order, is that correct?
12  A.   Okay, let me answer this.  Here is the answer.  So we
13       have sections, this is a PCR section, we left some
14       pages blank, next section is ELISA section, because
15       we're doing the experiments simultaneously, so we
16       wanted to separate each section, so the PCR section we
17       created, we designated certain pages, and then we have
18       ELISA section, and then we have other sections.  So
19       every time we do the experiment, we add to the section.
20       That's why the dates are not in chronological order.
21  Q.   Okay.  If you look at Bates Number 78, Doctor, that
22       page is dated June 29, 2018?
23  A.   This one?
24  Q.   Yes.
25  A.   Yes.

Page 95

1   Q.   See that date?
2   A.   I imagine it better if I see the notebook.
3   Q.   Then if you turn over to Bates 86.
4   A.   86.  86 that's a different section.
5   Q.   Okay.  There's a date on there of September 4, 2018,
6        looked like there was a break between June 29th and
7        September 4.
8   A.   Look at the original here, see that's a section, it's a
9        different section.
10  Q.   To the extent that there are periods of time where
11       there is no activity going on, that there might be a
12       month between data entries, does that mean that there's
13       no work going on at that time?
14  A.   No, no, no, we do simultaneously different, like we do
15       PCR, we do ELISA, we do proliferation, all that
16       studies, and we divided this notebook into sections,
17       and as we go, we added to the corresponding section, so
18       you can -- yeah.
19  Q.   And were all the graphs in the notebook provided at a
20       later time or were they provided at the time they were
21       created?
22            MS. O'DELL:  Objection to form.
23            THE WITNESS:  Yeah, I don't really understand
24       the question.
25

Page 96

1   BY MR. HEGARTY:
2   Q.   Sure.  As we just looked at, the graphs are all -- and
3        tables and charts are all dated, correct?
4   A.   Correct.
5   Q.   Were they added to the notebook at the time they were
6        created or were they added later?
7   A.   Which graph you referring to?
8   Q.   Any of the tables where the -- that have been pasted
9        in, were they pasted in at the time they were created
10       or later?
11            MS. O'DELL:  Object to the form, asked and
12       answered.
13            THE WITNESS:  So you are saying if this graph
14       was created the same time that --
15  BY MR. HEGARTY:
16  Q.   We're looking at Page 87, and you're pointing to a
17       graph, and my question is with regard to the graph, was
18       it pasted in the notebook on the day it was generated?
19            MS. O'DELL:  Objection, asked and answered.
20            THE WITNESS:  I really can't remember, but we
21       have this electronically.
22  BY MR. HEGARTY:
23  Q.   Doctor, if you go to Page 4, Bates Number 4, which
24       corresponds to Page 33 of the notebook --
25  A.   This?

Page 97

1   Q.   -- there appears to be a reference on Page 33 that
2        says go to Page 35.  Do you see that?
3   A.   Okay.
4   Q.   How can you know to go to Page 35 when you're on
5        Page 33 and 35 is not yet created?
6   A.   Oh, okay, good question.  So this is established
7        protocol, we do this -- this is not like the first time
8        we're doing this, this is done repeatedly over years
9        and years and years  with different publication.  This
10       is the setup how we write it, so this is like something
11       we predicting to happen, this we already know, that's
12       the protocol, we just sticking it here.
13  Q.   You're anticipating that when you prepare -- strike
14       that.  When you prepared Page 33, you're anticipating
15       that you were going to --
16  A.   Discuss it.
17  Q.   -- discuss it in Page 35?
18  A.   Yes.
19  Q.   Are the page numbers that you've added at the bottom in
20       handwriting, are those made in the beginning of the
21       work or are they added as you go?  In other words, do
22       you start with a notebook that's blank and then just
23       simply number the pages before you start the work or
24       you do it after the fact?
25  A.   We do it both ways, I don't remember.

25 (Pages 94 to 97)

Ghassan Saed, Ph.D.

Page 98

1  Q.  There's -- the writing I pointed to is in blue ink
2     versus the other writing, which is in black ink.  Was
3     that blue ink added at the time that 33 was created or
4     was it added later?
5  A.  I don't remember.
6  Q.  Do you know whose handwriting --
7  A.  Yeah, this is Rong -- what's her name, Mrs. Rong.
8  Q.  Okay.  If you look again back at Page 4 of the Bates
9     Stamped copy.
10 A.  Page 4.
11 Q.  That's Exhibit Number 1.
12 A.  Same page, 4?  That's 4.
13 Q.  Same Page 4, which is Page 33 of the lab notebook,
14    okay?
15 A.  Same page.
16 Q.  There is a portion of that notebook page that is whited
17    out, correct, and written over?
18 A.  Yeah, I see that.
19 Q.  What was whited out?
20 A.  (Shrugs shoulders.)
21 Q.  Do you know?
22 A.  I don't know.  Again, this is an established procedure
23    that had been published with several, 100 papers over.
24 Q.  Well, what established procedure can you cite me to
25    that says that it's proper laboratory practice to white

Page 99

1     out information and then write over it?
2         MS. O'DELL:  Object to the form.
3         THE WITNESS:  If you like write something
4     like a mistake or a typo and you write it over.
5  BY MR. HEGARTY:
6  Q.  Can you cite for me any --
7  A.  Cite?
8  Q.  -- published guidelines or laboratory methods that say
9     that that's a proper approach to preparing a lab
10    notebook?
11        MS. O'DELL:  Objection to form.
12        THE WITNESS:  Yeah, umm, what we did here I
13    think -- this is her handwriting and --
14        MS. O'DELL:  When you say "her," who are you
15    referring to?
16        THE WITNESS:  Rong, Mrs. Rong, so nothing
17    really that alarmed me or directed my attention to
18    anything.  She wrote what she supposed to write.  Maybe
19    she did a mistake.
20 BY MR. HEGARTY:
21 Q.  Doctor, would you ever in preparing a lab notebook
22    white out information that's been written in a lab
23    notebook and then write over it?
24        MS. O'DELL:  Object to the form.
25        THE WITNESS:  Typically I don't do that, no.

Page 100

1  BY MR. HEGARTY:
2  Q.  That's not proper laboratory practice, is it?
3  A.  No.  What I said is really simple.  She probably did a
4     mistake and then she whited out and wrote over it.
5  Q.  Proper laboratory practice is to line through it so the
6     information that was there is still visible, and then
7     include the data somewhere else so everything is
8     transparent, correct?
9         MS. O'DELL:  Object to the form.
10        THE WITNESS:  The information that she whited
11    out has nothing to do with the results or anything.
12    This is just describing an established methodology that
13    is published in all of our papers.
14        MR. KLATT:  Objection, form, unresponsive.
15        MR. HEGARTY:  Understood, but the proper
16    laboratory practice would be to line through it so it
17    could still be visible, and then add the corrected or
18    additional information, correct?
19        MS. O'DELL:  Object to the form.
20        THE WITNESS:  My response, as I told you,
21    this is something that she probably misspelled or
22    mistake she did, she thought she was doing something,
23    writing something, she wrote different, you know, we're
24    doing different experiment different time, same times.
25        MR. KLATT:  Objection, form, nonresponsive.

Page 101

1  BY MR. HEGARTY:
2  Q.  Doctor, listen to my question.  The proper laboratory
3     practice would be to line through what she whited over
4     so that it would still be visible, and then add
5     whatever other information she wanted to add to this
6     page, correct?
7  A.  If it's related to data.
8  Q.  So this is not proper, this whiting out is not proper
9     laboratory practice, correct?
10        MS. O'DELL:  Let him finish his question, and
11    give me a moment to object.  Object to the form.
12        You may answer if you remember his question.
13        THE WITNESS:  What I am trying to tell you,
14    if it's something to do with data it is not proper to
15    do, but this is -- this even shouldn't be in the
16    notebook, we can reference that, it is something that
17    we do in our laboratory so we can be detailed, it's
18    about the procedure, the method, which is already
19    published.
20 BY MR. HEGARTY:
21 Q.  But good laboratory practice --
22 A.  It has nothing to do --
23 Q.  Let me finish, Doctor -- good laboratory practice,
24    whether it's data or otherwise, dictates that you not
25    white out any information that's put in a lab notebook;

26 (Pages 98 to 101)

Ghassan Saed, Ph.D.

Page 102

1    rather, you're to line through it so it's still
2    visible, correct?
3            MS. O'DELL:  Object to the form.
4            THE WITNESS:  I just told you what I feel.
5    This is an established method, it's nothing to do with
6    the data, this is just describing standard methodology,
7    with it or without it, doesn't change anything.
8    BY MR. HEGARTY:
9    Q.  So are you okay or fine with the whiting out of
10   information in this lab notebook as was done here?
11           MS. O'DELL:  Objection to the form.
12           THE WITNESS:  What I'm -- am I fine with
13   that?
14   BY MR. HEGARTY:
15   Q.  Yes.
16   A.  I prefer that does not happen, but it happened and she
17   did it, but that doesn't change anything.
18   Q.  Above that whited out area there's an arrow pointing to
19   100 milligrams talc, after the arrow it says Johnson
20   Baby Powder.  Do you see where I'm referring to,
21   Doctor?
22   A.  Yes.
23   Q.  Whose handwriting is that?
24   A.  I think it's Flory.
25   Q.  Was that information added later than the time this

Page 103

1    page was prepared?
2    A.  No.
3    Q.  Can you tell when that information was added to Page 33
4    or Bates Number Page 4?
5            MS. O'DELL:  Objection to the form.
6            THE WITNESS:  When we prepared the page.
7    BY MR. HEGARTY:
8    Q.  Why was it added in a way that put it out of order and
9    had to have a line directing it to another part of the
10   page?
11   A.  That's what we did.
12   Q.  Why was it not included there in the first place?
13           MS. O'DELL:  Objection, asked and answered.
14   BY MR. HEGARTY:
15   Q.  You don't know?
16   A.  I don't know.
17   Q.  If you look next at Bates Stamp Page 25, which is
18   Page 53 of the lab notebook, there is another portion
19   that has been whited out and written over.  Do you see
20   that?
21   A.  Yes, I see it.
22   Q.  What was whited out?
23   A.  I don't know.
24   Q.  Something was whited out and the name Johnson & Johnson
25   number 30027477 lot number 13717RA was written over

Page 104

1    that.  Do you see that?
2    A.  I do.
3    Q.  Whose handwriting is reflected by the addition of
4    Johnson & Johnson, et cetera?
5    A.  I think it's Flory, Rong.
6    Q.  What was under -- what did she write over?
7    A.  I don't know, I wasn't there when she wrote this, but
8    when I looked at it I confirmed that this is what we
9    did.
10   Q.  Well, did she write over Fisher Scientific talc?
11   A.  Could be.
12   Q.  But did you actually test Fisher Scientific talc
13   instead of Johnson & Johnson and then alter the lab
14   notebook?
15           MS. O'DELL:  Objection, form.
16           THE WITNESS:  We actually did both.
17   BY MR. HEGARTY:
18   Q.  You agree it's not proper practice, as reflected here,
19   to white out information in a lab notebook where it
20   can't be read and then write over it, correct?
21           MS. O'DELL:  Objection to form.
22           THE WITNESS:  You keep asking me the same
23   question.  I'm answering you the same way.  She did the
24   mistakes, to the best of her ability that's what she
25   thought she will do, and I left it because I don't want

Page 105

1    to change it.
2    BY MR. HEGARTY:
3    Q.  Did you talk to her about the propriety of whiting out
4    data?
5    A.  Yes, I did.
6    Q.  What did you tell her?
7    A.  I said we should not white out just write underneath
8    it.
9    Q.  When did you have that discussion with her?
10   A.  After I saw this.
11   Q.  When did you see it?
12   A.  I think -- I don't remember.
13   Q.  Did you see it in the last two weeks?
14   A.  No, no, no, way before.
15   Q.  Is it proper methodology for creating -- for doing
16   experiments and creating a lab book to white -- start
17   over.  Is it proper methodology in doing experiments
18   like this in creating the lab book that corresponds
19   with those experiments to white out information and
20   then write over it?
21           MS. O'DELL:  Objection to form.
22   BY MR. HEGARTY:
23   Q.  In your opinion?
24           MS. O'DELL:  Objection to form.
25           THE WITNESS:  So I just told you we did

27 (Pages 102 to 105)

Ghassan Saed, Ph.D.

Page 106

1    not -- with the information that is here is accurate,
2    we voluntarily did that.
3    BY MR. HEGARTY:
4    Q.  I'm not asking you if the information is accurate with
5        my question. My question is, is it proper methodology
6        in doing experiments like this and in creating the lab
7        notebook that corresponds to those experiments to white
8        out information and write over it, in your opinion?
9            MS. O'DELL:  Object to the form.
10           THE WITNESS:  I mean it's -- in my personal
11       opinion?
12   BY MR. HEGARTY:
13   Q.  Correct.
14   A.  I think if you report that this is what actually
15       happened and a mistake happened and this is, to her
16       knowledge, this is the best way to handle it, she
17       handled it.
18   Q.  So you consider the --
19   A.  And I talked to her about it and --
20   Q.  Do you consider the way she handled it to be proper
21       laboratory methodology?
22   A.  That's why I told you, I talked to her about it so I
23       don't.
24   Q.  May I see the notebook?
25   A.  Sure.

Page 107

1    Q.  Doctor, I'm looking at Page 102 of the notebook,
2        Exhibit Number 2, which is Bates 78. If you want to
3        look at it --
4    A.  Okay, yes, I see it.
5    Q.  -- either in Exhibit 1 or Exhibit 2. There appears to
6        be something that has been covered over by the table
7        that's been pasted there because I see some handwriting
8        on the far right-hand column, and I don't want to pull
9        that up, but what is under that table or that chart?
10   A.  The answer is I don't know. But I'll find out. It's a
11       description of the method.
12   Q.  I just want to note for the record that the doctor is
13       pulling the table up and --
14   A.  Yeah.
15   Q.  Okay.
16   A.  Do you want to see what's written under?
17   Q.  Yes.
18   A.  Okay. I want to see, also. Okay. So this is just the
19       oligonucleotide primers and the cyclin for the PCR,
20       this is very standard protocol that you don't need to
21       even show it, it's a methodology, so it doesn't really
22       need to even show that.
23   Q.  So, in your opinion, is it proper laboratory practice
24       in creating a lab book to cover up information that's
25       included in a lab book by a table or a chart?

Page 108

1            MS. O'DELL:  Object to form.
2            THE WITNESS:  I didn't cover it, I just
3        showed it to you.
4    BY MR. HEGARTY:
5    Q.  I'm talking about in the creation of a lab book,
6        though, is it considered proper methodology to take a
7        printout from a test and paste over text in the lab
8        notebook?
9            MS. O'DELL:  Object to the form.
10           THE WITNESS:  I just told you. So my answer
11       is the information that she decided to hide this that
12       you're talking about is an established methodology in
13       my lab that doesn't even need to be here. She chose
14       to just -- over it for a space limitation, that's all,
15       but it's not hidden, you can see it.
16   BY MR. HEGARTY:
17   Q.  Thank you.
18   A.  If we hide it, we can -- we don't have to have it
19       there.
20   Q.  That information, though, was not photocopied and
21       provided to us in advance of the deposition, correct?
22   A.  What information?
23   Q.  The information that was covered by that chart.
24           MS. O'DELL:  Object to the form.
25           THE WITNESS:  I know, I see, there is no

Page 109

1    information covered by that chart, that is not needed
2    to be there.
3    BY MR. HEGARTY:
4    Q.  But there is information that's been covered, correct?
5            MS. O'DELL:  Object to the form.
6            THE WITNESS:  I answered, I said there is not
7    relevant information that is covered, intentionally
8    covered.
9    BY MR. HEGARTY:
10   Q.  Over on Page 103 of Exhibit Number 2, Bates Number 79,
11   there is another or other words that have been whited
12   out. What are those other words?
13           MS. O'DELL:  Object to the form.
14           THE WITNESS:  I mean I can read the word.
15   BY MR. HEGARTY:
16   Q.  What is the word?
17   A.  It says sample something.
18   Q.  Why was that whited out?
19   A.  Maybe it doesn't belong here.
20   Q.  Do you know why it was whited out?
21   A.  I think it doesn't belong here.
22   Q.  Who whited it out?
23   A.  Flory.
24   Q.  Is that whiteout okay to you in terms of doing a
25   proper -- having a proper methodology for preparing a

28 (Pages 106 to 109)

Ghassan Saed, Ph.D.

Page 110

1  lab notebook?
2        MS. O'DELL:  Objection to the form.
3        THE WITNESS:  I prefer without it but it's
4  what it is.
5  BY MR. HEGARTY:
6  Q.  Doctor, would you look at Exhibit Number 1 at Bates
7  Stamp 57, please.
8  A.  Exhibit Number -- this is --
9  Q.  Yes, what you have in front of you.
10  A.  57?
11  Q.  Correct.  That corresponds to Page 84 of the lab
12  notebook.  There is now in the lab notebook a table
13  that is pasted there that appears to have been removed
14  from the page that we received that was photocopied and
15  is part of Exhibit Number 1.  Can you explain why our
16  copy does not include that table?
17        MS. O'DELL:  Object to the form.
18        THE WITNESS:  No idea.
19  BY MR. HEGARTY:
20  Q.  Okay.
21  A.  But it's here.
22  Q.  Well, do you know what else --
23  A.  This is this.
24  Q.  Do you know what other charts were removed from the
25  copy that we received?

Page 111

1  A.  No one removed anything.
2        MS. O'DELL:  Excuse me, when you say this is
3  this, I don't know that that's clear on the record
4  because you're pointing to the notebook.
5        THE WITNESS:  This is the results and this is
6  the graph from the results.
7  BY MR. HEGARTY:
8  Q.  Well, can you explain to us if this page was copied and
9  included in Exhibit Number 1, why this chart is not in
10  Exhibit Number 1?
11  A.  No idea.
12  Q.  You agree that --
13  A.  When we scanned it probably didn't show up, I don't
14  know.
15  Q.  Well, you would agree that it would had to have been
16  removed, correct; otherwise it would appear on the
17  paper?
18  A.  I don't agree.
19  Q.  Well, you can tell on the copy that there are places
20  there that look like where tape had appeared, correct?
21        MS. O'DELL:  Object to the form.
22        THE WITNESS:  So same thing here, tape
23  appeared and it's there.
24  BY MR. HEGARTY:
25  Q.  Did you instruct -- strike that.  Did you instruct

Page 112

1  someone to copy this notebook?
2  A.  To scan the notebook.
3  Q.  Who did you instruct to do that?
4  A.  Flory, my research assistant.
5  Q.  And did you instruct her to remove this table on
6  Page 84?
7  A.  Absolutely not.
8  Q.  Do you know why it's not there?
9  A.  No idea, but the marks of this one are showing, and the
10  graph is showing, so this should show up, I don't know
11  why it's not showing up.
12  Q.  I'm going to direct you to Bates Stamp Page 62.
13  A.  Same thing.
14  Q.  Which is -- which corresponds to handwritten Page
15  Number 87, there again is a chart --
16  A.  You referring to this one or this one?
17  Q.  I'm referring to 87, there again in the copy portion at
18  the upper part of the page there is a table or a chart
19  that is not included in the copy we've been given.  Do
20  you know why that is the case?
21        MS. O'DELL:  Objection to the form.
22        THE WITNESS:  So I think this is probably
23  technical through scanning, I have no idea the answer
24  is.
25

Page 113

1  BY MR. HEGARTY:
2  Q.  Then under --
3  A.  But we do have all the data.
4  Q.  Under that table there appears to be some very vague
5  what appears to be handwriting.  Can you explain what
6  that is?  That again is on Bates Stamp 62, Page 87 of
7  the original lab notebook.
8  A.  I don't know what that is.
9  Q.  Doctor, is this lab notebook typical of the lab
10  notebooks you generate for all the experiments you've
11  conducted?
12        MS. O'DELL:  Object to the form.
13        THE WITNESS:  What do you mean by typical?
14  BY MR. HEGARTY:
15  Q.  Well, is this -- the things we've talked about here
16  this morning, would those same things appear in all the
17  lab notebooks that you prepare as part of your
18  experiments?
19        MS. O'DELL:  Object to the form.
20        THE WITNESS:  So for -- most of our
21  experiments are documented in a lab notebook like this.
22  BY MR. HEGARTY:
23  Q.  Do most of your experiments -- strike that -- do most
24  of the notebooks of your experiments have whiteout in
25  them?

29  (Pages 110 to 113)

Ghassan Saed, Ph.D.

Page 114

1   A.  Oh, that's what you're saying?
2   Q.  Yes.
3   A.  No.
4   Q.  Have you ever seen one of your other notebooks for your
5       lab experiments have whiteout in them and handwriting
6       over that whiteout?
7   A.  It's not a general practice.  The answer is I don't
8       remember.
9   Q.  Does your lab have standard operating procedures for
10      how a lab notebook is to be prepared?
11          MS. O'DELL:  Objection to the form.
12          THE WITNESS:  So from who?  From our own lab?
13  BY MR. HEGARTY:
14  Q.  Correct.
15  A.  So this is the procedure that we follow for our lab.
16  Q.  Do you have any written standards on how you are to
17      prepare a lab notebook?
18  A.  No.
19  Q.  Do you instruct those within your lab on how to prepare
20      a lab notebook based on any published methods for
21      preparing a lab notebook?
22  A.  So most of our work nowadays -- in the past we used to
23      do a lot of lab notebooks, but most of the work that we
24      do right now, most of it is electronically, and just to
25      keep a record in case something happened to electronic

Page 115

1       version, we print it and paste it in the lab notebook.
2       So in the past we used to take more precautions for lab
3       notebooks, but these days because of this electronic
4       facilities and help, we just print it and paste it
5       there.
6   Q.  Did you instruct those who prepared the lab notebooks
7       that we've been looking at here today on how to prepare
8       laboratory notebooks?  Did that instruction come from
9       you?
10  A.  Yes.
11  Q.  Was that instruction based on any published standards
12      in the literature for how to prepare a lab notebook?
13  A.  That was based on what I've been told since 1983.
14  Q.  Where were you taught that in 1983?
15  A.  I did my Ph.D. in molecular biology.
16  Q.  Where was that?
17  A.  Where?
18  Q.  Yes.
19  A.  England.
20  Q.  What school in England?
21  A.  University of Essex.
22  Q.  You learned at the University of Essex on how to
23      prepare a laboratory notebook?
24  A.  Sure.
25  Q.  You used that training to instruct those who prepared

Page 116

1       the laboratory notebooks we've been looking at today on
2       how to prepare lab notebooks, correct?
3   A.  I instruct the lady who did this, yes, how to prepare
4       lab notebook.
5   Q.  Did you ever instruct her about what to do in the case
6       of needing to correct information that has been written
7       in the lab notebook?
8   A.  Yes, she actually knows that because on, I already
9       instruct her not to do the whiteout, she did it
10      anyways, but her defense was, oh, I am only doing it on
11      words that we already -- on procedures that is not even
12      supposed to be there, it's like a normal practice
13      procedure that we have done many times.
14  Q.  Doctor, if you would turn over to Bates Stamp 25 in
15      Exhibit Number 1, which is Page 53 in the notebook.
16  A.  ELISA.
17  Q.  Under the -- in the section on the upper part of the
18      page there appears to be documentation of adding talc
19      to the cells; is that correct?
20  A.  Where do you see that?  Cells were seeded, density --
21  Q.  Can I look at it, Doctor?
22  A.  Treat with --
23  Q.  This part of the notebook, what is described where
24      you're talking about X1 X2 X3?
25  A.  Okay.  These are the dilution of talc that we used, 5

Page 117

1       micrograms, 20 micrograms, and 100 micrograms.  These
2       are the three doses that we used, and this is how we
3       got them.
4   Q.  With these doses are you adding DMSO?
5   A.  The talc was dissolved in DMSO.
6   Q.  Does the lab notebook show how much DMSO was used for
7       each sample?
8   A.  How much DMSO?  Yeah.
9   Q.  Yes.  Where is that?
10  A.  Let me see.  So you -- where is it -- it's
11      50 milligrams per ml, so one ml, that's the initial
12      concentration, 50 milligrams of the talc with one ml of
13      the DMSO.
14  Q.  Did the amount of DMSO increase with the increasing
15      doses of talc?
16  A.  No, no, no, no, okay, let me explain this.
17          MS. O'DELL:  What page were you referring to,
18      Doctor?
19  BY MR. HEGARTY:
20  Q.  Thank you.
21  A.  The first page.
22  Q.  What's that page number?
23  A.  1.
24  Q.  Page 1, okay.
25  A.  So let me explain this.  So we prepare a stock solution

30 (Pages 114 to 117)

Ghassan Saed, Ph.D.

|  | Page 118 |
|---|---|
| 1 | of the talc powder plus DMSO, the solvent, which is |
| 2 | 50 milligrams per ml, you can upscale it, downscale it, |
| 3 | from there we dilute, as you can see here, it says the |
| 4 | exact delusions, and it says X1 times 10 to the 4th |
| 5 | microgram per ml, that's what you want to get, and |
| 6 | that's 15 ml times 5 micrograms per ml, that's the |
| 7 | concentration desired, and then you take -- this will |
| 8 | tell you how much volume you add to the cells.  So we |
| 9 | added 2.35 microliters that correspond to 5 micrograms |
| 10 | per ml, 10 microliters corresponded to 20, and so on, |
| 11 | 50 corresponded to that, and then the untreated cells |
| 12 | got that DMSO alone. |
| 13 | MS. O'DELL:  What page -- |
| 14 | BY MR. HEGARTY: |
| 15 | Q.  The DMSO at 2.5, 10, and 50? |
| 16 | A.  DMSO. |
| 17 | Q.  DMSO at 2.5, 10, and 50? |
| 18 | MS. O'DELL:  Excuse me, what page are you |
| 19 | referring to? |
| 20 | THE WITNESS:  This Page 53 right here. |
| 21 | No, so the DMSO has no concentration.  The |
| 22 | DMSO is the solvent where you dilute, dissolve the |
| 23 | talc. |
| 24 | BY MR. HEGARTY: |
| 25 | Q.  My question is -- was, though, with regard to the |

|  | Page 119 |
|---|---|
| 1 | controls -- |
| 2 | A.  Volumes, you use volumes. |
| 3 | Q.  -- did you, for each level of talc applied to the |
| 4 | cells, for the corresponding controls did you also |
| 5 | apply DMSO? |
| 6 | A.  Yes. |
| 7 | Q.  At what volume? |
| 8 | A.  It's 2.5, 10, and 50. |
| 9 | Q.  Of DMSO alone? |
| 10 | A.  Correct. |
| 11 | Q.  If you turn over to Page 55, I'm sorry, 53 in the lab |
| 12 | notebook, which is Bates Stamped 27 in the copy |
| 13 | version, Page 53. |
| 14 | A.  This one?  Same page? |
| 15 | Q.  55, Page 55 of the lab notebook, which is Bates Stamped |
| 16 | 27. |
| 17 | A.  Okay. |
| 18 | Q.  Is this -- does this page describe the BCA protein |
| 19 | detection assay? |
| 20 | A.  Correct. |
| 21 | Q.  And does the assay work by measuring the amount of |
| 22 | color change, that is, the more color change you |
| 23 | detect, the greater the response it indicates? |
| 24 | A.  Are you saying it's a colorimetric assay? |
| 25 | Q.  Well, I'm not sure.  I can ask it in a different way. |

|  | Page 120 |
|---|---|
| 1 | Does the assay work by you measuring the amount of |
| 2 | color change? |
| 3 | MS. O'DELL:  Object to the form. |
| 4 | THE WITNESS:  The answer -- I just answered |
| 5 | you. |
| 6 | BY MR. HEGARTY: |
| 7 | Q.  Which is? |
| 8 | A.  Are you referring to -- |
| 9 | Q.  Well, explain how it works with regard to color. |
| 10 | A.  Okay, oh, I would love to, I'll be very happy to do |
| 11 | that.  Okay, so this is measuring the optical density |
| 12 | of the concentration of the protein that is correlated |
| 13 | to the -- how much protein is there.  You measure the |
| 14 | optical density absorbance at 5, 62 nanometer, and you |
| 15 | construct a standard curve from BSA, and the standard |
| 16 | curve is known concentration, and it tells you when |
| 17 | it -- where is the absorption and what's the slope of |
| 18 | the line, and that helps you extrapolate the unknown |
| 19 | samples from your standard curve. |
| 20 | Q.  So is -- |
| 21 | A.  It is a colorimetric assay. |
| 22 | Q.  It's measuring a color change, correct? |
| 23 | A.  No. |
| 24 | Q.  When you say colorimetric assay, what do you mean? |
| 25 | A.  It's extension coefficient, it measures BSA at specific |

|  | Page 121 |
|---|---|
| 1 | wavelength. |
| 2 | Q.  And what did you do to validate that the assay would |
| 3 | work with the presence of talc? |
| 4 | A.  What assay? |
| 5 | Q.  This assay. |
| 6 | A.  This assay is not for talc, this assay is a standard |
| 7 | curve to measure -- to use a standard for -- so we can |
| 8 | apply the same amount of protein for each sample. |
| 9 | Q.  But you are using -- you are measuring the samples |
| 10 | after they've been -- after talc has been applied, |
| 11 | correct? |
| 12 | A.  We are measuring each like, for example, okay -- |
| 13 | MS. O'DELL:  Refer to a specific page. |
| 14 | THE WITNESS:  Let's say, for example, |
| 15 | catalase, so we are measuring catalase, but to measure |
| 16 | catalase, you need to compare between samples, right? |
| 17 | You need to compare between treated versus untreated. |
| 18 | How are you -- how can you determine that you have the |
| 19 | same amount of protein?  What if you have more protein |
| 20 | here than here?  The results is not accurate.  So we |
| 21 | use BSA as a standard to measure and standardize all |
| 22 | the samples to the same amount of protein, so the |
| 23 | comparison would be -- the comparison would be |
| 24 | accurate. |
| 25 | |

31 (Pages 118 to 121)

Ghassan Saed, Ph.D.

Page 122

1   BY MR. HEGARTY:
2   Q.  How did you rule out the possibility that the color
3      change or the wavelength change was due to the talc
4      particles themselves as opposed to any effect they were
5      having?
6          MS. O'DELL:  Object to the form.
7          THE WITNESS:  Yeah, so we use the same cell
8      line, we split the cells, we grow the cells, some cells
9      get the talcum powder, the same cells, the other
10     aliquot get no talcum powder, we extract proteins, we
11     correct for the differences in the extraction of
12     proteins, and then we run catalase, for example.
13  BY MR. HEGARTY:
14  Q.  Within the proteins extracted, would there still be
15     talc particles?
16  A.  No, no.
17  Q.  How do you know there are not talc particles?
18  A.  Because these are total proteins.  You extract
19     proteins.  There is a process of extraction of
20     proteins.  You wash off all the media, you precipitate
21     the cells, you lyse the cells, you extract proteins.
22  Q.  How many times did you repeat the experiment you just
23     described for catalase?
24  A.  So all this work from January 24th till the end of this
25     work, it's done in triplicate.

Page 123

1   Q.  What does being done in triplicate mean?
2   A.  Every experiment is done in triplicate.
3   Q.  Explain that to me.
4   A.  Okay.  So, for example, if you look at, see how --
5   Q.  What are you looking at?
6   A.  For example, 56, if you look at 56, look at the table.
7          MS. O'DELL:  Give us just a minute to get
8      there.
9   Q.  Okay, go ahead.
10  A.  You have the table?
11  Q.  Yes.
12  A.  Okay.  If you look at the table it says -- this
13     particular ovarian cancer cell line, TOV-112-C, you
14     have C, you have 5 microgram, you have 20 micrograms,
15     and you have 100 microgram, you see them?  And you can
16     see OD1, OD2, OD3, blank, blank, blank, so triplicate,
17     three times.  The blank three times, the experiment
18     three times, and subtract from the blank and do the
19     calculation.
20  Q.  You're measuring the same protein extracted three
21     times?
22          MS. O'DELL:  Object to the form.
23  BY MR. HEGARTY:
24  Q.  Is that correct?
25

Page 124

1   A.  I am not measuring the protein, I'm measuring catalase.
2   Q.  You're measuring the catalase.
3   A.  Catalase and control cells versus treated cells, okay,
4      in triplicates.
5   Q.  So you measure it once using the same sample, you
6      measure the same sample two more times?
7   A.  Okay, oh, now I understand your question, okay.  So
8      this triplicate is for the assay, so we did one, two,
9      three, four, five, six cell lines in triplicate each
10     time point.
11  Q.  When you say in triplicate, does that mean you have
12     three sets of petri dishes or are you doing one set of
13     petri dishes and you're doing the test three times?
14          MS. O'DELL:  Objection.
15          THE WITNESS:  So it is -- this one here is
16     one set of petri dish, and it's done in triplicate for
17     each time point.
18  BY MR. HEGARTY:
19  Q.  So you didn't -- for each cell line you didn't have
20     three --
21  A.  Independent.
22  Q.  -- independent cultures and then test each independent
23     culture against the others.  You had one independent
24     culture you tested three times?
25          MS. O'DELL:  Object to the form.

Page 125

1   BY MR. HEGARTY:
2   Q.  Is that correct?
3          MS. O'DELL:  If you need to read his
4      question, it was confusing.
5          THE WITNESS:  Independent cultures, what does
6      that mean?
7   BY MR. HEGARTY:
8   Q.  Well, I tried to use your word.
9   A.  I know.
10  Q.  Did you have for each cell line three separate petri
11     dishes, three petri dishes, so you ran the experiment
12     essentially three times for each cell line or did you
13     have one petri dish with a cell line in it, extract the
14     catalase, and run that extraction three times?
15  A.  No, no, no.  How can you -- okay, I'm confused now.
16     Okay, so how can you have one petri dish and you
17     extract three time points of treatment?
18  Q.  I'm not asking you --
19  A.  So we have three, we have three, we have actually four,
20     one, two, three, four, four independent culture dishes
21     for each treatment.
22  Q.  Correct.
23  A.  That is done in triplicate.
24  Q.  And what you say in triplicate, that means you're
25     taking the extraction and you're testing it three

32 (Pages 122 to 125)

Ghassan Saed, Ph.D.

| Page 126 | Page 128 |
|---|---|

**Page 126**

1    times, the same extraction.
2  A. For each time point.
3  Q. For each time point.
4  A. Yes.
5  Q. You don't have petri dishes that have the same cells in
6    it for three separate petri dishes, then doing the
7    extractions for each of those three petri dishes, do
8    you follow my question?
9  A. Yeah, I follow the question.
10      MS. O'DELL: Objection.
11      THE WITNESS: You cannot do that because then
12    you have to do triplicate of triplicate.
13  BY MR. HEGARTY:
14  Q. Exactly.
15  A. Have I done that?
16  Q. Yes.
17  A. No.
18  Q. Okay. That was my question.
19  A. Not for this assay.
20  Q. Have you ever done assays like that where you've had --
21  A. Yes.
22  Q. -- multiple?
23      MS. O'DELL: Let him finish.
24  BY MR. HEGARTY:
25  Q. Have you done assays like that where you've used the

**Page 127**

1    same cell line in three different dishes and done the
2    triplicate, triplicate, triplicate off of each dish?
3      MS. O'DELL: Object to the form.
4      THE WITNESS: Okay, so in the past I have
5    done -- this is a very important question, it is always
6    raised when we submit our data to be considered for
7    publication, they will say did you do a real triplicate
8    or a triplicate of the assay. So the answer is we have
9    done that in the past, and in our system here there is
10    no difference between -- because catalase have been
11    done in our lab, we published with it, it is a standard
12    protocol in our lab, and we never have -- we test it
13    for intra-assay variation triplicates, and that was not
14    the case. Did we test that? Yes, we did, but not for
15    talc treatment per se, because these are established
16    protocols in our lab, we already know and we learn from
17    them, so you don't really need to do a triplicate of a
18    triplicate of a triplicate.
19  BY MR. HEGARTY:
20  Q. Thank you. On Page 26 of the Bates Stamp document
21    Number 1, which is after --
22      MS. O'DELL: 54 of the lab.
23      MR. HEGARTY: Is it 54 of the lab notebook?
24    Because I can't -- my page doesn't have a handwritten
25    number.

**Page 128**

1      MS. O'DELL: So you wanted 26 of the Bates,
2    and that's at the bottom left corner 54.
3      THE WITNESS: This?
4  BY MR. HEGARTY:
5  Q. Yes. Your sample ID for -- your sample IDs run from
6    356 to 386, is that right?
7  A. So let me understand your question. Are these numbers
8    in serial number?
9  Q. Are these the sample ID numbers of your tests?
10  A. Okay, so the sample ID correspond to each specimen,
11    yes, each cells.
12  Q. And those sample IDs run in chronologic order from 356
13    to 386?
14  A. No, they're missing. For example, there is 60 -- where
15    is it -- actually, 84, 85, yes, they are.
16  Q. So you're right, they jump from 371 to 379, do you see
17    that?
18  A. Yeah.
19  Q. Why is that?
20  A. Because, you see, these are already, these cells were
21    treated in different times, so that's why they get
22    different IDs.
23  Q. Okay.
24  A. This is a lot of work. You can't do it in one time.
25  Q. What type of test is -- or strike that. Then if you

**Page 129**

1    turn over to Page 69 of Exhibit Number 1, which, again,
2    my copy doesn't have a handwritten page number on it.
3      MR. LAPINSKI: Counsel, just to confirm, when
4    you refer to page numbers, you're referring to the
5    Bates Numbers, correct?
6      MR. HEGARTY: In this case I'm referring to
7    Page 69 in Exhibit Number 1, which is the Bates Number.
8      MS. O'DELL: Well, and to be -- I think in
9    the lower right-hand corner of your page that's 94, and
10    that's what was produced so --
11      MR. HEGARTY: If you go to Page 94, then,
12    Doctor.
13  BY MR. HEGARTY:
14  Q. It should be this.
15  A. Yes.
16  Q. Are those the same sample numbers that we looked at in
17    the prior -- on the prior page?
18  A. What page was it? Sorry.
19  Q. That was Page 54.
20  A. Yes.
21  Q. Do those refer to the same samples?
22  A. Yes.
23  Q. If you turn next, then, to page Bates Number 76 Exhibit
24    Number 1, Page 100 in the laboratory notebook, there
25    are -- do you see what I'm referring you to, Doctor,

33 (Pages 126 to 129)

Ghassan Saed, Ph.D.

| | Page 130 |
|---|---|
| 1 | Page 100? |
| 2 | A. Yes. |
| 3 | Q. There are again sample numbers listed there. Are those |
| 4 | for a different test? |
| 5 | A. This is for different test, this is Caspase-3 activity. |
| 6 | Q. Are you using the same sample numbers as in the |
| 7 | previous test? |
| 8 | A. It should indicate here, so 368, 369, 370, so the |
| 9 | answer is yes, some of them, the numbers that |
| 10 | correspond they are -- let me see, hold on, let me just |
| 11 | make sure. So this is for ELISA, we did the normal -- |
| 12 | so the answer is yes. |
| 13 | Q. If you're using the same numbers for different tests, |
| 14 | how are you able to keep those straight? |
| 15 | MS. O'DELL: Objection, form. |
| 16 | THE WITNESS: Okay. So let me explain this. |
| 17 | So here, this is the sample ID, the treated cells. |
| 18 | BY MR. HEGARTY: |
| 19 | Q. That's on Page -- |
| 20 | A. 54. |
| 21 | Q. Okay. |
| 22 | A. So this is the sample ID, and this is what are they, |
| 23 | what each cell line definition. Now, this was |
| 24 | subjected to isolation of protein, okay, and we use |
| 25 | BSA, as we discussed, as a standard, then you isolate |

| | Page 131 |
|---|---|
| 1 | the total protein from it, now you can do what we did, |
| 2 | we can do catalase, we can do SOD, we can do different |
| 3 | markers from total proteins. Caspase-3 is included. |
| 4 | Q. Got you, okay thank you. I'm probably going into a |
| 5 | different section that's going to take a while if you |
| 6 | want to take a break now or keep going. |
| 7 | MS. O'DELL: It's 12:15, Doctor, would you |
| 8 | like a short break for lunch or what's your preference? |
| 9 | THE WITNESS: Yes. |
| 10 | MR. HEGARTY: Let's go off the record. |
| 11 | THE VIDEOGRAPHER: Going off the record at |
| 12 | 12:16 p.m. |
| 13 | (A recess was taken.) |
| 14 | THE VIDEOGRAPHER: We are back on the record |
| 15 | at 1:26 p.m. |
| 16 | BY MR. HEGARTY: |
| 17 | Q. Doctor, you brought with you a notebook that appears to |
| 18 | contain articles and perhaps a number of other |
| 19 | documents. What is in the notebook that you have in |
| 20 | front of you? |
| 21 | A. So I have my report that I submitted, my CV, and my |
| 22 | references. |
| 23 | Q. I'll mark that notebook as Exhibit Number 11. |
| 24 | |
| 25 | |

| | Page 132 |
|---|---|
| 1 | SAED DEPOSITION EXHIBIT NUMBER 11, |
| 2 | NOTEBOOKS, |
| 3 | WAS MARKED BY THE REPORTER |
| 4 | FOR IDENTIFICATION |
| 5 | BY MR. HEGARTY: |
| 6 | Q. So Exhibit Number 11 is the notebook you brought with |
| 7 | you to the deposition here today? |
| 8 | A. This, yes. |
| 9 | MS. O'DELL: There are actually two parts. |
| 10 | BY MR. HEGARTY: |
| 11 | Q. There are two parts. Where is the other part? |
| 12 | MS. O'DELL: It's right here. |
| 13 | BY MR. HEGARTY: |
| 14 | Q. Both parts of the notebook contain what? |
| 15 | A. So references 86 continued 89. |
| 16 | Q. Did you compile Exhibit Number 11? Did you put that |
| 17 | together? |
| 18 | A. Number 11 we're talking about? Sorry. |
| 19 | Q. Number 11 are both notebooks. |
| 20 | A. Yes. |
| 21 | Q. Did you choose the articles to put in Exhibit |
| 22 | Number 11? |
| 23 | A. My references from the articles, yes. |
| 24 | MS. O'DELL: Just I think there's some lack |
| 25 | of clarity. You chose the articles. Did you copy the |

| | Page 133 |
|---|---|
| 1 | pages? |
| 2 | THE WITNESS: No. |
| 3 | BY MR. HEGARTY: |
| 4 | Q. Did you put the notebooks together yourself? |
| 5 | A. No. |
| 6 | Q. Do you know who put the notebooks together? |
| 7 | MS. O'DELL: Objection, it's a little vague. |
| 8 | THE WITNESS: You guys did it. |
| 9 | BY MR. HEGARTY: |
| 10 | Q. Counsel for Plaintiffs put the notebooks together? |
| 11 | A. What do you call them, sorry? |
| 12 | Q. Counsel for Plaintiffs put the notebooks -- |
| 13 | A. Yes, sorry, I'm just having -- I thought that I put the |
| 14 | references together, yes. |
| 15 | Q. I want to talk in more detail about Exhibit Number 7. |
| 16 | That's your manuscript. |
| 17 | A. Okay. |
| 18 | Q. When did the writing process begin for Exhibit 7? And |
| 19 | this goes back to the original version that you |
| 20 | submitted to -- |
| 21 | A. Yes. |
| 22 | Q. -- OB-GYN Oncology. |
| 23 | A. September I think. |
| 24 | Q. Do you know approximately when in September? |
| 25 | A. I can't remember. |

34 (Pages 130 to 133)

Ghassan Saed, Ph.D.

---

Page 134

1  Q. Dr. Fletcher is identified as the lead author. How did
2     that come about?
3  A. She is not the lead author.
4  Q. Who is the lead author?
5  A. I am.
6  Q. The reason I thought she was lead author is on the
7     second page of Exhibit Number 7 after the title she's
8     the first author listed.
9  A. That's -- lead author is the corresponding author,
10    that's me.
11 Q. What was the involvement of -- strike that. What was
12    Dr. Fletcher's involvement in the preparation of this
13    article?
14 A. So for the articles, she helped in doing the -- on this
15    article or experiments, the whole thing, or just this
16    article?
17 Q. Just on the article.
18 A. Okay, so her role was basically reading after me make
19    sure that the methods are what we really used, typos
20    and like help read proofing.
21 Q. What was Dr. Harper's involvement in preparation of the
22    manuscript?
23 A. Analysis of data, interpretation of data, she's a
24    clinical OB-GYN oncologist.
25 Q. What was Dr. -- or, I'm sorry, what was Ira Memaj?

---

Page 135

1  A. Ira Memaj was a medical student that helped also in
2     looking for the grammar and proofreading mostly.
3  Q. What was Rong Fan's involvement?
4  A. Same thing. Now, the authors that are here, not
5     necessarily because they participated in writing the
6     manuscript, but they own the authorship because they
7     participated in the work that created the manuscript.
8  Q. What was Robert Morris's -- Dr. Robert Morris's --
9  A. Dr. Morris is the OB-GYN Oncology chief, and he helped
10    in also editing the manuscript and help interpretation
11    of data clinically.
12 Q. Who prepared the original manuscript? Who was the
13    author?
14 A. I did.
15 Q. Did anyone help you write the original manuscript?
16 A. No.
17 Q. Did anyone in any way contribute to the manuscript
18    besides those individuals listed in Exhibit Number 7?
19 A. No.
20 Q. Over on Page 12 in the Acknowledgments section there's
21    a notation thanking Imaan Singh.
22 A. Yes, she was a medical student.
23 Q. What did Imaan Singh do?
24 A. She helped in running some experiments for us.
25 Q. Anyone else assist in any way in the preparation of the

---

Page 136

1     article besides those we talked about?
2  A. No, so she -- that's why she's in the acknowledgment,
3     not in the authorship, because she was repeating
4     experiments.
5  Q. In connection with the experiments that you conducted
6     that went into preparing or that led to preparing of
7     this manuscript, did you prepare a proposal to request
8     funding of the experiments?
9        MS. O'DELL: Object to the form.
10       THE WITNESS: I created a budget so to see
11    how much this will cost me.
12 BY MR. HEGARTY:
13 Q. When you seek funding from NIH, for example, or another
14    organization, you have to prepare a formal grant
15    request where you set out and provide certain
16    information describing what you intend to do and how
17    much it's going to cost, correct?
18 A. For NIH?
19 Q. Yes.
20 A. Yes.
21 Q. Did you prepare any kind of grant request in connection
22    with the experiments that went into preparing this
23    manuscript?
24       MS. O'DELL: Object to the form, other than
25    he's testified to.

---

Page 137

1        THE WITNESS: The answer is no.
2  BY MR. HEGARTY:
3  Q. Did you submit the budget you created to anybody?
4  A. Official funding agencies, no.
5  Q. Did you provide the budget to Counsel for Plaintiffs,
6     Beasley Allen?
7  A. I can't remember.
8  Q. Do you still have a copy of the budget?
9  A. I do.
10 Q. Did you prepare any type of protocol or outline in
11    advance of the experiments describing the methods or
12    goals of the experiments?
13 A. In writing?
14 Q. In writing.
15 A. I don't remember.
16 Q. Is that something that's commonly done -- or strike
17    that. Is that something you commonly do in your work
18    in connection with doing studies that then go into a
19    journal article?
20       MS. O'DELL: Object to the form.
21       THE WITNESS: So the way I do this, this
22    is -- again, this is routinely done in our lab, and we
23    ran a pilot experiment using PCR, using single dose,
24    and when we saw the data and we saw that there's a
25    biological effect, then we had a plan of what to do,

---

35 (Pages 134 to 137)

Ghassan Saed, Ph.D.

| Page 138 | Page 140 |
|---|---|
| 1    and which is the whole study. | 1    BY MR. HEGARTY: |
| 2    BY MR. HEGARTY: | 2    Q. So tell me again what meetings this -- |
| 3    Q. Do you prepare that plan in writing? | 3    A. SRI. |
| 4    A. In writing? | 4    Q. -- testing was presented. |
| 5    Q. Yes. | 5    A. SRI March 2018, and then if I recall correctly, ASRM |
| 6    A. I really don't need to because it's the technology | 6      October -- |
| 7      again, it is all applied in our laboratory, and we are | 7      MS. O'DELL: ASRM, is that what you're |
| 8      testing the markers that we been extensively publishing | 8    saying? |
| 9      on and testing through our lab. | 9      THE WITNESS: No, it wasn't ASRM. I forgot |
| 10    Q. For any articles that you have published in scientific | 10    which the other one -- SGO, SGO, I forgot where I |
| 11      journals, have you ever prepared an outline or protocol | 11    submitted, sorry, but I did submit two abstracts and I |
| 12      describing what you're going to do before you actually | 12    presented them in national meetings, SRI for sure was |
| 13      do the experiments? | 13    March -- I believe it was SGO. |
| 14      MS. O'DELL: Object to the form. | 14      MS. O'DELL: For the record, Doctor, what |
| 15      THE WITNESS: Yeah, so, again, I'm just | 15    does SGO stand for? |
| 16    trying to explain to you that the methodology is in | 16      THE WITNESS: Society of Gynecology and |
| 17    place, it's in the lab, it's been published, it's been | 17    Oncology. |
| 18    referenced, and we test the same markers over and over, | 18    BY MR. HEGARTY: |
| 19    so there is no need to every time write this down. | 19    Q. In March of 2018? |
| 20    BY MR. HEGARTY: | 20    A. The SRI meeting, yes, that was the preliminary study. |
| 21    Q. But have you ever prepared in connection with a journal | 21    Q. The lab notebook you provided includes entries for work |
| 22      article you're going to hopefully write after doing | 22      that occurred after March 2018, correct? |
| 23      experiments an outline or an overview or a summary of | 23    A. Correct. |
| 24      what you're going to do before you then go on and do | 24    Q. What did you then present in March of 2018? |
| 25      it? | 25    A. We presented the work that we did preliminary just to |

| Page 139 | Page 141 |
|---|---|
| 1    A. We write the methodology. | 1    show the effect on using just PCR. |
| 2    Q. So you have written methodologies for what you're going | 2    Q. Did you discuss the contents of the manuscript, Exhibit |
| 3      to do before you actually start the experiments? | 3      Number 7, with anyone besides the authors during the |
| 4      MS. O'DELL: Object to the form, that's not | 4      time it was being written? |
| 5    what he said. | 5    A. No. |
| 6      THE WITNESS: Not this experiment. | 6    Q. Did you discuss the contents of the manuscript during |
| 7    BY MR. HEGARTY: | 7      the time it was being written with attorneys for |
| 8    Q. On other occasions you have done that? | 8      Beasley Allen or any other Plaintiff's Counsel in this |
| 9    A. Yes. | 9      case? |
| 10    Q. On other occasions when you have published articles in | 10      MS. O'DELL: Don't discuss -- I'm going to |
| 11      scientific and medical journals? | 11    instruct you not to answer that question. |
| 12    A. Not all the times, no. | 12    BY MR. HEGARTY: |
| 13    Q. When is it that you do prepare an outline or protocol? | 13    Q. Doctor, if you would turn to -- |
| 14    A. When it is something that is not routinely daily test | 14      UNIDENTIFIED ATTORNEY: Excuse me, was that a |
| 15      that is performed in our laboratory, something | 15    yes or no question? You're instructing him not to |
| 16      different. | 16    answer whether he discussed the contents? |
| 17    Q. Did you discuss the results of the testing or the | 17      MS. O'DELL: Well, the question presupposes |
| 18      experiments with anyone outside of the authors on the | 18    the subject matter of the discussion and that's the -- |
| 19      manuscript? | 19    so I'm going to instruct him not to answer the |
| 20      MS. O'DELL: Objection to form. | 20    question. |
| 21      THE WITNESS: Yes, so the answer -- I'm | 21    BY MR. HEGARTY: |
| 22    sorry, that wasn't the answer. This part of this work | 22    Q. Doctor, would you turn to Page 12 of Exhibit 7, please. |
| 23    was accepted and presented at national meetings, was | 23      Did you prepare the Conflict of Interest section on |
| 24    presented at SRI, presented at ASRM, and it was open | 24      Page 12? |
| 25    for everybody to discuss. | 25    A. Yes. |

Ghassan Saed, Ph.D.

| Page 142 | Page 144 |
|---|---|
| 1 Q. For whom did you act as a consultant for a fee? | 1 A. No reason, I could add this -- |
| 2 A. Beasley Allen. | 2 Q. You say in the disclosure that you acted as a |
| 3 Q. Why didn't you disclose Beasley Allen in this Conflict | 3 consultant regarding this topic for a fee. What was |
| 4 of Interest disclosure? | 4 the fee? |
| 5 A. The name you mean? | 5 A. What was the fee? |
| 6 Q. Yes. | 6 Q. Yes. |
| 7 A. Just add the name? I didn't do it. | 7 A. I think $600 an hour. |
| 8 Q. At the time you prepared this manuscript, you were | 8 Q. Was the fee the total amount you gave us for your |
| 9 acting as a consultant for Beasley Allen in litigation | 9 invoices at the beginning of the deposition? |
| 10 involving the topic of this paper, correct? | 10 A. Yes. No? |
| 11 A. Correct. | 11 MS. O'DELL: Sorry, I was going to object, it |
| 12 Q. But you didn't identify that in the Conflict of | 12 was a little unclear, but I think you understood his |
| 13 Interest disclosure that you were acting as a | 13 question. |
| 14 consultant in litigation involving this topic for a | 14 BY MR. HEGARTY: |
| 15 fee, correct? | 15 Q. Doctor, don't you agree that anyone reading this |
| 16 MS. O'DELL: Objection to form. | 16 article should know that you are a paid expert for |
| 17 THE WITNESS: The journal, this is sufficient | 17 lawyers who have a financial interest in this subject |
| 18 language for the journal. | 18 area? |
| 19 BY MR. HEGARTY: | 19 MS. O'DELL: Object to the form. |
| 20 Q. But you did not disclose that you were acting as a | 20 THE WITNESS: Again, my response would be I |
| 21 consultant in litigation involving this topic, correct? | 21 put the conflict of interest that I'm acting as a |
| 22 MS. O'DELL: Objection to form. | 22 consultant on this topic. |
| 23 THE WITNESS: This is what I disclosed. | 23 BY MR. HEGARTY: |
| 24 BY MR. HEGARTY: | 24 Q. Don't you think the -- |
| 25 Q. At the time you prepared this disclosure, you were | 25 |

| Page 143 | Page 145 |
|---|---|
| 1 acting as a consultant -- strike that. At the time | 1 A. -- for a fee. |
| 2 that you prepared this conflict of interest, you were | 2 Q. Don't you think the potential readers of this article |
| 3 acting as a named testifying expert in the | 3 are entitled to know that you are using this article to |
| 4 litigation -- in the talc litigation for plaintiffs | 4 profit on this topic? |
| 5 lawyers, correct? | 5 MS. O'DELL: Objection to form. |
| 6 A. Is that the same question? Yes. | 6 THE WITNESS: This is the language that is |
| 7 Q. So at the time that you prepared this disclosure, you | 7 requested by the journal. |
| 8 were not just a consultant, you were a testifying | 8 BY MR. HEGARTY: |
| 9 expert witness in litigation, correct? | 9 Q. Don't you think that anyone reading this article would |
| 10 MS. O'DELL: Objection to form. | 10 want to know that you have a financial interest in this |
| 11 THE WITNESS: As far as I know, I'm a | 11 topic? |
| 12 consultant, witness expert to consult in this matter, | 12 A. It says clearly fee, for a fee. |
| 13 yes. | 13 Q. You don't identify, though, the area of this topic in |
| 14 BY MR. HEGARTY: | 14 which you're consulting, correct? |
| 15 Q. You did not disclose this relationship in the | 15 MS. O'DELL: Objection to form. |
| 16 acknowledgment, that is, this relationship that you | 16 THE WITNESS: So for the reader of this, our |
| 17 were a designated testifying expert in litigation | 17 readers, it's enough to say I'm a consultant for a fee |
| 18 involving talc and ovarian cancer, correct? | 18 on this topic. |
| 19 A. The language that I wrote here was sufficient by the | 19 BY MR. HEGARTY: |
| 20 journal. | 20 Q. You are getting paid in this litigation to testify on |
| 21 MR. KLATT: Objection, nonresponsive. | 21 behalf of plaintiffs, correct? |
| 22 BY MR. HEGARTY: | 22 A. Yes. |
| 23 Q. Why didn't you disclose in this acknowledgment that you | 23 Q. Your testimony is supported by the manuscript, by |
| 24 were a designated expert on behalf of plaintiffs in | 24 Exhibit Number 7, correct? |
| 25 litigation involving talc and ovarian cancer? | 25 MS. O'DELL: Objection to form. |

37 (Pages 142 to 145)

Ghassan Saed, Ph.D.

| Page 146 | Page 148 |
|---|---|
| 1       THE WITNESS: It's -- part of it is in the | 1  BY MR. HEGARTY: |
| 2   manuscript and part of it is not. | 2  Q. The rest of the conflict of interest disclosure says |
| 3  BY MR. HEGARTY: | 3   that no other -- the authors declare -- the other |
| 4  Q. You stand to benefit financially to the extent | 4   authors declare there are no conflicts of interest; do |
| 5   Plaintiff's Counsel use your article successfully in | 5   you see that? |
| 6   this litigation, correct? | 6  A. I do. |
| 7       MS. O'DELL: Object to the form. | 7  Q. So did any of the other authors consult on this topic |
| 8       THE WITNESS: I didn't understand the | 8   for a fee, to your knowledge? |
| 9   question. | 9  A. To my knowledge, no. |
| 10  BY MR. HEGARTY: | 10  Q. Were the other authors on this manuscript aware of your |
| 11  Q. You stand to benefit financially to the extent that | 11   relationship with the attorneys for Beasley Allen in |
| 12   Plaintiff's Counsel use your article in this | 12   this litigation? |
| 13   litigation, correct? | 13  A. Yes, they are. |
| 14       MS. O'DELL: Object to the form. | 14  Q. How were they made aware of it? |
| 15       THE WITNESS: Can you -- I know but I don't | 15  A. I made them aware of it. |
| 16   understand what you really want to say. | 16  Q. When did you make them aware of it? |
| 17  BY MR. HEGARTY: | 17  A. When we started this whole thing. |
| 18  Q. You stand to benefit financially, make more money by | 18  Q. What did you tell them? |
| 19   Plaintiff's Counsel using your article in this | 19  A. I tell them I'm acting as a -- what do you call it -- a |
| 20   litigation, correct? | 20   witness expert in this litigation. |
| 21       MS. O'DELL: Object to the form. | 21  Q. Did you -- have you told them that you've been |
| 22       THE WITNESS: No, I'm not aware, how they | 22   designated to testify as an expert witness in this |
| 23   going to make more money by using this? | 23   litigation? |
| 24  BY MR. HEGARTY: | 24       MS. O'DELL: Objection, asked and answered. |
| 25  Q. Well, they will continue to use you as an expert | 25       THE WITNESS: I just said -- shared with them |

| Page 147 | Page 149 |
|---|---|
| 1   witness in all the cases to the extent they are | 1   that I was selected to be an expert witness in this |
| 2   successful in using your article, correct? | 2   topic. |
| 3       MS. O'DELL: Object to the form. | 3  BY MR. HEGARTY: |
| 4       THE WITNESS: So they can use whatever they | 4  Q. And you told them that before you started the |
| 5   want. This is my research and my lab. These are the | 5   experiments? |
| 6   results that I stand for. | 6  A. About, yeah. |
| 7  BY MR. HEGARTY: | 7  Q. You are the senior author on this paper, correct? |
| 8  Q. Do you think they would pay you to testify in this | 8  A. Correct. |
| 9   litigation if your results were different in your | 9  Q. Do you in any way supervise or do you in any way |
| 10   article? | 10   supervise any of the work of the other authors? |
| 11       MS. O'DELL: Object to the form. | 11  A. All the work that is in this manuscript is done under |
| 12       THE WITNESS: This work, negative results or | 12   my hundred percent supervision. |
| 13   positive results, both are results, so they're paying | 13  Q. How about generally, do you supervise any of the other |
| 14   for my time to consult. Whether it's positive or | 14   authors? |
| 15   negative to them doesn't matter. | 15  A. I do. |
| 16  BY MR. HEGARTY: | 16  Q. Do they report to you? |
| 17  Q. Well, when you said you're acting as a consultant | 17  A. Yes. |
| 18   regarding this topic, what is this topic? Is it | 18  Q. Which ones report directly to you? |
| 19   inflammation and cancer? Is it antioxidants? Is it | 19  A. So Nicole King, Ira, Amy, and that's about all the |
| 20   talc? How is the reader supposed to know? | 20   authors here. |
| 21       MS. O'DELL: Object to the form. | 21  Q. Are you a resource for grant funding for things that |
| 22       THE WITNESS: If you read -- the reader will | 22   they work on? |
| 23   read the title, which says Molecular Basis Supporting | 23       MS. O'DELL: Object to the form. |
| 24   the Association of Talcum Powder Use With Increased | 24       THE WITNESS: Am I a resource? |
| 25   Risk of Ovarian Cancer; very clear topic. | 25   |

38 (Pages 146 to 149)

Ghassan Saed, Ph.D.

Page 150

1  BY MR. HEGARTY:
2  Q. Yes. Do they work on studies that you have received
3     funding for?
4  A. No.
5  Q. Do they otherwise work for you -- let me strike that.
6     Do they work for you -- have they done work for you
7     outside of the work on this manuscript?
8  A. Some of them --
9            MS. O'DELL: Object to form.
10           THE WITNESS: Some of them did.
11 BY MR. HEGARTY:
12 Q. Do some of them still work for you?
13 A. Yes.
14 Q. Which of the authors still work for you?
15           MS. O'DELL: Object to the form.
16           THE WITNESS: Work for me or work with me?
17 BY MR. HEGARTY:
18 Q. Work for you.
19 A. Work for me?
20           MS. O'DELL: Object to the form.
21           THE WITNESS: So what's work for me means?
22    I'm their supervisor?
23 BY MR. HEGARTY:
24 Q. Yes.
25 A. I'm paying their salary?

Page 151

1  Q. You're their supervisor. Are you their supervisor?
2  A. Yes, I'm supervisor of Rong Fan, she is my research
3     technician or assistant. I am the Fellow Director for
4     the fellowship of Amy Harper. And let's see who's
5     here, Ira's no longer with us, she went to medical
6     school in New York.
7  Q. Do you prepare evaluations for -- have you prepared
8     evaluations for any of the authors on this paper?
9  A. Previously?
10 Q. Previously.
11 A. Nicole Fletcher.
12 Q. Any others?
13 A. Yearly evaluation because she was a post doc in my lab,
14    and this year I will prepare one for Rong.
15 Q. Reproductive Sciences is -- Reproductive Sciences is
16    published by SAGE Publications, correct?
17 A. I don't know, they keep, they switch different
18    publishers.
19           SAED DEPOSITION EXHIBIT NUMBER 12,
20           SAGE PUBLISHING DOCUMENT,
21           WAS MARKED BY THE REPORTER
22           FOR IDENTIFICATION
23 BY MR. HEGARTY:
24 Q. I'm going to mark as Exhibit Number 12 a printout from
25    the SAGE Publications website, it's printed out on

Page 152

1  January 16, 2019. Do you see where it lists SAGE
2  Publications, underneath that Reproductive Sciences?
3  A. This here?
4  Q. Yes, at the top. SAGE and Reproductive Sciences.
5  A. Yes.
6  Q. Reproductive Sciences is a journal that has accepted
7     your article for publication, correct?
8  A. Yes.
9  Q. This exhibit identifies the editorial policies, peer
10    review policies, and other policies of this
11    publication. Are you familiar with all of these
12    policies?
13           MS. O'DELL: Object to the form.
14           THE WITNESS: Some.
15 BY MR. HEGARTY:
16 Q. Would you turn over to Page 5, sorry, Page 3 of 10.
17    Under the section Funding, it states that to comply
18    with the guidance for research funders, authors, and
19    publishers issued by the Research Information Network,
20    RS additionally requires all authors to acknowledge
21    their funding in a consistent fashion under a separate
22    heading. Do you see that?
23 A. Yes.
24 Q. Where in your acknowledgment do you acknowledge the
25    source of your funding?

Page 153

1  A. Okay, so this is -- this only applies to agencies that
2     require this. So, for example, I got NIH grant, I got
3     funding from NIH, I have to disclose funding from NIH.
4     If there is no funding, if it's internal funding, you
5     don't have to do that.
6  Q. Where does that standard -- where is that standard in
7     this document?
8  A. This is -- I have published in this journal for the
9     last 20 years. This is the protocol that we use.
10 Q. Can you cite for me any anything that came from SAGE
11    Publications saying that that's an appropriate reading
12    of the funding requirements?
13           MS. O'DELL: Object to the form.
14           THE WITNESS: I already told you we published
15    with SRI for several years, and my understanding that
16    if the agency, the funding agency requests that you
17    should add their name to the funding part of it, then
18    you should do that. If it's no funding -- departmental
19    is not considered funding, that's a burden actually,
20    it's not funding.
21 BY MR. HEGARTY:
22 Q. If you look under the section Declaration of
23    Conflicting Interests, you see the last paragraph of
24    that section before For More Information, it reads any
25    commercial or financial involvements that might

39 (Pages 150 to 153)

Ghassan Saed, Ph.D.

Page 154

1    represent an appearance of a conflict of interest need
2    to be additionally disclosed in the covering letter
3    accompanying your article to assist the editor in
4    evaluating whether sufficient disclosure has been made
5    within the Declaration of Conflicting Interests
6    provided in the article.  Do you see where I'm reading?
7    A.  Yes.
8    Q.  Did you provide such a cover letter to the editor of
9    Reproductive Sciences identifying your consulting
10   relationship with Beasley Allen?
11   A.  Okay, so when you go to the website Reproductive
12   Sciences and you try to upload your manuscript to be
13   considered for review on publication, there are forms
14   that -- pages that you go through, and each page you
15   have to answer the question before it allows you to
16   proceed.  So one of the pages was conflict of interest,
17   and they, at that level they just want to know if you
18   have a conflict of interest, you say "yes" or "no."
19   And then later on in the manuscript you identify the
20   conflict of interest if there is any.
21   Q.  When you were asked if you had a conflict of interest
22   how did you respond?
23   A.  Yes.
24   Q.  Then you went to the next page that that would lead you
25   to, and that's where you prepared --

Page 155

1    A.  Your manuscript.
2    Q.  -- the Acknowledgment Section, correct?
3    A.  No.
4    Q.  Sorry, the Conflict of Interest Section.
5    A.  No, no.  Okay, so you write -- this is part of the
6    format of the manuscript, the acknowledgment, the
7    conflict of interest, that's the setup.  Like how it
8    says abstract, key words, introduction, methods, all
9    that, this is part of the format, so this has to be in
10   the manuscript, we upload to them.
11   Q.  What did you type in on that online form when you said
12   yes to having a conflict of interest and then it
13   directed you to another --
14   A.  There is no other form, they direct you to upload your
15   manuscript.  They accepted your yes answer, and then
16   they allow you to proceed.  If you don't answer, you
17   are not allowed to proceed.
18   Q.  Exhibit Number 12 also says in the paragraph that I
19   read to you that in addition to what you just
20   described, that you need to include such a disclosure
21   in the cover letter accompanying your article.  First
22   of all, did you send a cover letter with your article?
23   A.  I can't remember if it was required.
24   Q.  If you sent a cover letter, do you still have a copy of
25   that cover letter?

Page 156

1    A.  If I did, yes.
2    Q.  If you sent a cover letter, do you recall if you
3    provided information about the conflict of interest you
4    disclosed in your paper or manuscript?
5    MS. O'DELL:  Object to the form.
6    THE WITNESS:  Yeah, if I provided the cover
7    letter, will there be a conflict of interest in the
8    cover letter?
9    BY MR. HEGARTY:
10   Q.  Yes.  Do you recall if you described the conflict of
11   interest in your cover letter as required under the
12   SAGE Publishing guidelines, Exhibit Number 12?
13   MS. O'DELL:  Objection to form.
14   THE WITNESS:  Yes, so in our practice I have
15   been publishing with this particular journal and other
16   journals, I never seen a cover letter saying that we
17   have a conflict of interest.  It's not a practice of
18   talking to the editor and tell them that this is
19   what --
20   BY MR. HEGARTY:
21   Q.  In any of your prior publications have you ever
22   disclosed a conflict of interest?
23   A.  Yes.
24   Q.  And do you recall an example of when you disclosed a
25   conflict of interest?

Page 157

1    A.  When?
2    Q.  Yes.  Do you recall an example of when you disclosed a
3    conflict of interest?
4    A.  Every manuscript you submit you have to disclose a
5    conflict of interest, whether it's yes or no, you have
6    to.
7    Q.  Well, let me ask it a different way.  Have you ever
8    included a conflict of interest statement like the one
9    in your manuscript in any prior publication of yours?
10   A.  Very rare, because I never consult -- I don't consult
11   usually in this caliber, but colleagues, co-authors
12   have done that, and there are co-authors in my
13   publications.  Everybody has to disclose.
14   SAED DEPOSITION EXHIBIT NUMBER 13,
15   SAGE PUBLISHING DOCUMENT,
16   WAS MARKED BY THE REPORTER
17   FOR IDENTIFICATION
18   BY MR. HEGARTY:
19   Q.  We'll mark as Exhibit 13 another printout from the SAGE
20   Publications website on the ethics and responsibility
21   of authors.  Would you look at Exhibit 13, Doctor.
22   A.  Yes.
23   Q.  Under the section Authors, it says authors should
24   ensure that, and go down several bullet points where it
25   reads any real or apparent conflicting or competing

40 (Pages 154 to 157)

Ghassan Saed, Ph.D.

| Page 158 | Page 160 |
|---|---|
| 1   interest is clearly stated on submission of their | 1      The first paragraph of the letter makes |
| 2   paper. (This would include funding assistance). Do | 2   reference to comments of the reviewers being included |
| 3   you see that? | 3   at the bottom of this letter, and we'll get to those |
| 4   A. Where do you -- where is this -- | 4   comments, but you did receive comments back from |
| 5   Q. It's the bullet point, second to last bullet point at | 5   reviewers of this article, correct? |
| 6   the very bottom of the page. | 6      THE WITNESS: This is the only thing I |
| 7   A. Yes. | 7   received. |
| 8   Q. So this is saying that any -- an author should ensure | 8   BY MR. HEGARTY: |
| 9   that any real or apparent conflicting or competing | 9   Q. Did you eventually receive comments back from reviewers |
| 10   interest is clearly stated on submission of their | 10   of the article? |
| 11   paper. (This would include funding assistance). Do | 11   A. This is the only letter I received. |
| 12   you see where I'm reading? | 12   Q. In addition to the letter, you did receive comments |
| 13   A. Yes. | 13   from authors of the -- I'm sorry -- from reviewers of |
| 14   Q. And is it your contention that you did that in this | 14   the manuscript, correct? |
| 15   manuscript? | 15      MS. O'DELL: Objection, asked and answered. |
| 16   A. I did. | 16      THE WITNESS: Is this the whole -- |
| 17   Q. You did not disclose in this manuscript that you | 17   BY MR. HEGARTY: |
| 18   received funding for this paper by attorneys in | 18   Q. Let me mark as Exhibit 14 -- |
| 19   litigation, did you? | 19   A. Is this the whole letter? |
| 20   A. I did, yes, I said consulting for a fee. | 20      MS. O'DELL: I think it's two pages. |
| 21   Q. Where do you make reference to consulting for a fee in | 21      THE WITNESS: It's two pages? This is the |
| 22   litigation? | 22   whole e-mail? |
| 23   A. That's my -- | 23 |
| 24      MS. O'DELL: Objection to form. | 24 |
| 25      THE WITNESS: That's my understanding. | 25 |

| Page 159 | Page 161 |
|---|---|
| 1   BY MR. HEGARTY: | 1      SAED DEPOSITION EXHIBIT NUMBER 14, |
| 2   Q. You chose to use the words you set out in the Conflict | 2      COPY OF LETTER FROM REPRODUCTIVE SCIENCES, |
| 3   of Interest Section, correct? | 3      WAS MARKED BY THE REPORTER |
| 4   A. Yes. | 4      FOR IDENTIFICATION |
| 5   Q. You agree that your relationship as a consultant does | 5   BY MR. HEGARTY: |
| 6   present a conflict of interest? | 6   Q. I'm going to mark as Exhibit 14 in addition to what we |
| 7      MS. O'DELL: Object to the form. | 7   had received in connection with that manuscript, but |
| 8      THE WITNESS: My relationship? | 8   this is the letter with the reviewer comments included. |
| 9   BY MR. HEGARTY: | 9   A. Yeah, this is all I received. |
| 10   Q. Yes, as a consultant does present a conflict of | 10   Q. Is Exhibit Number 14 a copy of the letter with the |
| 11   interest, which is why you included a Conflict of | 11   reviewer comments at the end? |
| 12   Interest Statement, correct? | 12   A. Okay, this is all I received. |
| 13      MS. O'DELL: Object to the form. | 13   Q. When you say this, you're talking about -- |
| 14      THE WITNESS: We keep going back the same | 14   A. The letter. |
| 15   circles. What's the question? | 15   Q. -- number 14? |
| 16   BY MR. HEGARTY: | 16   A. Yeah, the e-mail. |
| 17   Q. You agree that your relationship with attorneys for | 17   Q. The next paragraph in that e-mail, the second paragraph |
| 18   Beasley Allen presents a conflict of interest that you | 18   says that the reviewers have recommended publication |
| 19   needed to disclose? | 19   but also suggest some minor revisions to your |
| 20   A. I disclosed that, yes. | 20   manuscript. Therefore, I invite you to respond to the |
| 21   Q. If you would look at the letter on the very back page | 21   viewer's comments and revise your manuscript. Do you |
| 22   again of Exhibit Number 7. | 22   see where I'm reading? |
| 23      MS. O'DELL: Is the intent of the exhibit to | 23   A. Yes. |
| 24   include all of the communications or just this one? | 24   Q. Did you respond to the reviewer's comments? |
| 25      MR. HEGARTY: Start with this one. | 25   A. Yes. |

Ghassan Saed, Ph.D.

Page 162

1  Q.  Did you respond to reviewer's comments via e-mail?
2  A.  No, you can't do that.
3  Q.  How did you respond to viewer's comments?
4  A.  So you have to log in to Manuscript Central, you have
5      to go to Revised Manuscript, and you have to include
6      highlighted changes in the revised manuscript, and then
7      you have to submit that to the reviewer one more time.
8  Q.  And did you do that in this case?
9  A.  Yes.
10  Q.  Do you still have a copy of the highlighted copy of the
11      revisions that you submitted to the reviewers?
12  A.  Yes, and, also, it's in the website for the journal.
13  Q.  If you look down at Paragraph 6 of Exhibit 14, it reads
14      when submitting your revised manuscript, you will be
15      able to respond to the comments made by the reviewers
16      in the space provided.  So is there actually a space
17      provided where you can actually communicate with the
18      reviewers?
19  A.  (Witness shakes head from side to side.) You can't
20      communicate with the reviewers.
21  Q.  Is there any way to respond?
22  A.  I don't know who they are, yes, you have to write your
23      response but to the editor, not to the reviewer.  I
24      don't know who is the reviewer.
25  Q.  So did you write a response to the comments to the

Page 163

1      editor?
2  A.  Correct.
3  Q.  And do you still have a copy of that response?
4  A.  It's uploaded in the manuscript center, and I do have a
5      copy, yes.
6  Q.  With regard to the reviewer comments, if you look at
7      the second page of Exhibit 14, the first sentence under
8      Comments and Suggestions, it reads what is the
9      mechanism by which the ovary and not the vagina, the
10      cervix, or the endometrium are susceptible to talc
11      effects?  Do you see where I'm reading?
12  A.  Yes, sorry.
13  Q.  Did you include any explanation in your revised
14      manuscript to explain the mechanism by which the ovary
15      and not the vagina and the cervix and the endometrium
16      are susceptible talc effects?
17  A.  It was in the letter and response to the reviewer, to
18      the editor, yes, it was in the form that you submit.
19  Q.  Did you revise your manuscript to include such a
20      discussion about the mechanism by which the ovary and
21      not the vagina, the cervix, or the endometrium are
22      susceptible to talc effects?
23  A.  I believe I did, I added three sentences to clarify
24      that.
25  Q.  Where in your manuscript are those three sentences?

Page 164

1  A.  I don't know, I don't know because they -- you write
2      them, you write them in a space online, and they
3      incorporate them into the manuscript if they agree with
4      it, maybe disagree.  So they send it to the reviewer,
5      and the reviewer will decide, okay, I like this
6      explanation, add it to the manuscript, or this
7      explanation is already in the manuscript, which I
8      recall I said to the reviewer, to the editor.
9  Q.  You recall saying to the editor that this -- as to this
10      comment, it was already in the manuscript?
11  A.  Yes, I said this has been addressed in this section of
12      manuscript; however, this is what we believe the
13      molecular mechanism is all about.  And he sent it to
14      the reviewer, and the reviewer will say I agree, go
15      ahead, accept, or I disagree, I think they should edit,
16      or we don't like the whole comment.
17  Q.  Do you still have a copy of your response to this
18      reviewer's comment?
19  A.  Again, this is done on the website.
20  Q.  Is that comment still on the website, to your
21      knowledge?
22  A.  I don't know, but I can find it.
23  Q.  Well, what is the mechanism by which the ovary, and not
24      the vagina, the cervix, or the endometrium are
25      susceptible to talc effects, in your opinion?

Page 165

1  A.  So, in my opinion, that talcum powder, talcum particles
2      go -- transfer, it's an open access for genital use.
3      When they use it for genital use, it goes into the
4      ovaries and incorporate into the tissues, and this
5      continuously induce chronic inflammation that is linked
6      strongly and actually the cause of ovarian cancer.  Why
7      other tissues don't get it, there are more than one
8      explanation to that if you'd like to hear it.
9  Q.  Well, yeah, because I want to know what you believe to
10      be the difference in the ovary versus the other organs.
11  A.  Yes.  First, cancer is a tissue specific like cervical
12      cancer, HPV so -- Second is the area in the uterus is
13      full of secretion, and there is a dilution factor that
14      kick everything out, whereas if it make it -- if the
15      particles makes it to the ovaries, they sit there
16      indefinitely.
17  Q.  Anything else?
18  A.  For now.
19  Q.  What about the -- you mentioned, though, the uterus.
20      What about the vagina and cervix?
21  A.  What about --
22  Q.  Why is the ovary affected and not the vagina and
23      cervix?
24  A.  Shall I repeat that, my answer?
25  Q.  Is it the same reason in your opinion?

42 (Pages 162 to 165)

Ghassan Saed, Ph.D.

Page 166

1  A.  It's the wash, it's the dilution factor, it's the
2     excretion, it's always excretions, but ovaries are not.
3  Q.  And is that opinion somewhere in Exhibit Number 7?  You
4     said it already is in the section.  In what section is
5     that concept?
6  A.  So the peristaltic travel of the talcum particles into
7     the ovary has been actually discussed somewhere.
8  Q.  That's over at the bottom of Page 8.  Is that the
9     portion of the paper that you say already addresses
10    this comment?
11 A.  Yes, part of it.
12 Q.  Where else in the manuscript do you address this
13    comment by one of the reviewers?
14 A.  I think this is sufficient, in my opinion, to show
15    evidence that there is a transfer of the particles from
16    the vagina and uterus area and fallopian tube into the
17    ovaries, that's substantial.
18 Q.  The next comment reads what do the authors believe is
19    the determining factor for the increased sensitivity of
20    the epithelial ovarian cells to talc?  You see where
21    I'm reading?
22 A.  Where is that?  Where is it?
23 Q.  In the second comment that begins --
24 A.  Oh, the determining factor.
25 Q.  What is -- the second comment is what do the authors

Page 167

1     believe is the determining factor for the increased
2     sensitivity of the epithelial ovarian cells to talc?
3     How did you respond to that comment?
4  A.  This is the core of the actual, the whole manuscript,
5     is about chronic inflammation and its link to ovarian
6     cancer.
7  Q.  Did you revise your manuscript in response to this
8     reviewer comment?
9  A.  Yes.
10 Q.  How did you revise the transcript -- I'm sorry -- the
11    manuscript in response to this reviewer comment?
12 A.  So we took the last part, we cut some words out, it
13    says wordy --
14 Q.  I'm not talking about that comment yet.
15 A.  Which comment?
16 Q.  The determining factor comment.
17 A.  I told you, you don't need necessarily to agree with
18    the reviewer comment, you just put it in the -- there's
19    a box when you go online, and you just say we believe
20    that the manuscript is all about why ovarian cancer are
21    sensitive to inflammation.
22 Q.  Is that how you responded to this reviewer comment?
23 A.  Yes.
24 Q.  So what is your opinion as to what you believe the
25    determining factor is for the increased sensitivity of

Page 168

1     the epithelial ovarian cells to talc?
2  A.  Chronic inflammation.
3  Q.  And how is chronic inflammation -- strike that --
4     how are epithelial ovarian cells, how do they have
5     increased sensitivity to chronic inflammation?
6  A.  So this is what actually made them in the first place.
7     It's the fact that they are exposed to continuously
8     over time with talcum particles, and that created a
9     chronic inflammation that actually transformed those
10    cells and caused the cells to go, the epithelial
11    ovarian cells to go cancerous with time.
12 Q.  So, in your opinion, for purposes of your biologic
13    mechanism for talc causing ovarian cancer, talc must
14    reach the ovary, correct?
15         MS. O'DELL:  Object to the form.
16         THE WITNESS:  Not necessarily.
17 BY MR. HEGARTY:
18 Q.  Well, the processes you just described all involve talc
19    reaching the ovary, correct?
20 A.  No.  I said any environment that create chronic
21    inflammation to the ovaries, epithelial ovarian cells,
22    normal ones, can or are known to develop this signature
23    of pro-oxidant state.  We have published that in
24    several manuscripts.
25 Q.  So, in your opinion, where must talc go to cause the

Page 169

1     inflammation that you say can cause ovarian cancer?
2         MS. O'DELL:  Objection to form.
3         THE WITNESS:  Yeah, so I don't know, but what
4     I'm saying is the genital use of talcum powder expose
5     the genital tract, the reproductive tract to chronic
6     inflammation that, according to our 30 years of
7     studies, is linked and the cause of ovarian cancer.
8  BY MR. HEGARTY:
9  Q.  Well, where in the genital tract must the chronic
10    inflammation occur to cause ovarian cancer?
11 A.  If the environment is chronic and it has chronic
12    inflammation -- so preferred will be -- the first thing
13    will be actual contact, which would be in the ovaries,
14    second would be fallopian tube, and there are many
15    studies now indicating that the source of epithelial
16    ovarian cancer come from fallopian tube, and fallopian
17    tube is very close to the uterus and that close to the
18    cervix and vagina, so that's an open access in the
19    body.
20 Q.  So you mentioned -- as far as where the chronic
21    inflammation must consider, you mentioned the ovary and
22    the fallopian tube.  Is there any other organ in the
23    reproductive tract that you believe if it becomes
24    inflamed due to talc can lead to ovarian cancer?
25         MS. O'DELL:  Object to the form.

43 (Pages 166 to 169)

Ghassan Saed, Ph.D.

Page 170

1    THE WITNESS:  Yeah, I -- no, I understood
2    your question, but I disagree, that's not what I said.
3    BY MR. HEGARTY:
4    Q.  What did you say?
5    A.  No.  So what I said is the use of talcum powder allows
6    talcum particles, according to our research, we added
7    the particles to the cells, the cells showed
8    inflammatory response.  So we expect if the talcum
9    powder enter the genital area, go to -- and I said I,
10   you know, organized them for you, so the most effect
11   will be if they are in the ovary, and we already have
12   evidence, and not just us, every -- all the world know
13   now, that acute inflammation does not cause cancer, is
14   not linked to cancer, it may initiate cancer, but
15   chronic inflammation is the real trigger for cancer in
16   general and ovarian cancer.  And we have shown that all
17   these redox balance is altered in ovarian cancer.
18   So the first impact, the highest impact will be if the
19   particle is in the ovary, and this has been reported by
20   some people, and the second or less degree, less impact
21   or longer time, maybe it's the same impact but it's a
22   longer time probably, all this need to be further
23   studied, is in the fallopian tube, and then who knows
24   what it does to uterus and cervical area.
25   Q.  Well, I thought you said when you responded to the

Page 171

1    question, the comment that said the mechanism which the
2    ovary and not the vagina, the cervix, or the
3    endometrium are susceptible, that this washing keeps
4    those organs from being susceptible.  So the
5    endometrium is in the uterus, correct?
6    MS. O'DELL:  Object to the form.
7    THE WITNESS:  Okay.  So the question here
8    they are asking about mechanisms in the ovaries, so
9    that's what I responded to.
10   BY MR. HEGARTY:
11   Q.  Well, do you consider the endometrium to be a
12   susceptible organ to talc in the sense that it can
13   cause inflammation that can lead to ovarian cancer?
14   A.  Probably.
15   Q.  Can you cite for me any published scientific or medical
16   article reporting inflammation of the ovaries or
17   inflammation of the fallopian tubes or the endometrium
18   in women using talc?
19   MS. O'DELL:  Object to the form.
20   THE WITNESS:  So can I report articles for
21   you?
22   BY MR. HEGARTY:
23   Q.  Yes.
24   A.  There are -- are you talking about gynecological
25   studies that link the use of -- in women to ovarian

Page 172

1    cancer risk?
2    Q.  Question is very specific.  Can you cite for me any
3    published literature reporting finding chronic
4    inflammation in the presence of talc in the fallopian
5    tubes or ovaries or the endometrium in women using
6    talc?
7    MS. O'DELL:  Objection to the form.
8    Epidemiological studies is what the doctor asked you to
9    clarify.  Is that what you meant?
10   THE WITNESS:  Do you --
11   BY MR. HEGARTY:
12   Q.  I don't think -- I'm not talking about epidemiologic
13   studies.  I'm talking about can you cite for me any
14   studies that report finding inflamed tissue in the
15   presence of talc in women using talc on the perineum?
16   MS. O'DELL:  Object to the form.
17   THE WITNESS:  So your question is any
18   manuscript, any papers, any papers that cite or discuss
19   the presence of inflamed tissues in response to woman
20   using talcum powder.
21   BY MR. HEGARTY:
22   Q.  Correct.
23   A.  And my answer to you is I don't know any references.
24   What I do know, that there are lots of epidemiological
25   studies that link woman who uses talcum powder are at

Page 173

1    increased risk of developing ovarian cancer.  That is
2    in the literature everywhere.  There are some few
3    molecular work also indicating that this also can cause
4    inflammation, oxidative stress, it's out in there.
5    There are some other molecular works that also shows
6    that there is actually gene expression differential,
7    gene expression in exposure to talc, and this is
8    really -- I mean this powder, this particle cause
9    biological changes to the cell, so I am not surprised
10   if it does the same inside the genital tract.
11   Q.  The next comment in Exhibit Number 14 says the
12   manuscript is wordy and would benefit from an attentive
13   reduction, do you see that?
14   A.  I did.
15   Q.  How did you respond to that comment?
16   A.  I agreed, and I shaped some words unnecessary
17   references that we have established methodology that we
18   don't need to do, to have.
19   SAED DEPOSITION EXHIBIT NUMBER 15,
20   JANUARY 14, 2019 E-MAIL,
21   WAS MARKED BY THE REPORTER
22   FOR IDENTIFICATION
23   BY MR. HEGARTY:
24   Q.  I want to next mark as Exhibit 15 another reviewer
25   comment that we were provided.  Do you recognize

44 (Pages 170 to 173)

Ghassan Saed, Ph.D.

| Page 174 | Page 176 |
|---|---|
| 1  Exhibit 15? | 1  BY MR. HEGARTY: |
| 2  A. This is an e-mail from the editor. | 2  Q. I'm going to mark as Exhibit Number 16 a copy of the |
| 3  Q. Yes. | 3  expert report for you we were provided in this case. |
| 4  A. Yes, saying that they accepted the manuscript. | 4  Is Exhibit Number 16 your expert report in this case? |
| 5  Q. This is dated January 14, 2019, correct? | 5  A. Yes. |
| 6  A. Okay. | 6  Q. There are large portions of the manuscript that are |
| 7  Q. Is that right? | 7  identical to your report, correct? |
| 8  A. Yes, it says so. | 8  A. I don't know about large, but based on it, yes. |
| 9  Q. Then again it -- strike that. Below it says Reviewer: | 9  Q. Which was prepared first, the manuscript or the report? |
| 10  1, correct? | 10  A. This is November, and the manuscript was September, so |
| 11  A. Yes. | 11  the manuscript was first. |
| 12  Q. Comments to the author. Well done. | 12  Q. Did you conduct the experiments that are described in |
| 13  A. Yes. | 13  the manuscript for Beasley Allen? |
| 14  Q. Was there only one reviewer for purposes of your paper? | 14  A. Say that again, please. |
| 15  A. Yes, Reviewer: 1. | 15  Q. Did you conduct the experiments that are in the |
| 16  Q. In what I marked as Exhibit Number 15 is Reviewer 1's | 16  manuscript for Beasley Allen? |
| 17  comment after you made changes to your paper? | 17  MS. O'DELL: Object to the form. |
| 18  A. Correct. | 18  THE WITNESS: The experiment I did, I did it |
| 19  Q. So the peer review for this article had one reviewer, | 19  in my lab for me. |
| 20  correct? | 20  BY MR. HEGARTY: |
| 21  A. No, I don't know. | 21  Q. Was the work that you did on -- in conducting the |
| 22  Q. Did you get comments back from any other reviewer? | 22  experiments and doing the manuscript independent of |
| 23  A. I review comments, I review manuscripts for many | 23  Beasley Allen or any counsel for Plaintiffs? |
| 24  journals. If you have no comments or if you have good | 24  MS. O'DELL: Object to the form. |
| 25  comments, I don't need to show them. | 25  THE WITNESS: The work that I did in the lab, |

| Page 175 | Page 177 |
|---|---|
| 1  Q. Do you know how many reviewers -- | 1  no one has any interference in how it's designed, what |
| 2  A. No knowledge. | 2  the method should be used, how to analyze the data, how |
| 3  Q. Let me finish -- do you know how many reviewers | 3  to write the manuscript, all that is all mine. |
| 4  Reproductive Sciences had for your manuscript? | 4  UNIDENTIFIED ATTORNEY: Objection, |
| 5  A. No. | 5  nonresponsive. |
| 6  MR. HEGARTY: Let's go off the record real | 6  BY MR. HEGARTY: |
| 7  quick. I need to take just a quick break and we'll be | 7  Q. Going back to my question, was the experiment you |
| 8  right back. | 8  conducted and the manuscript that you wrote independent |
| 9  THE VIDEOGRAPHER: Going off the record at | 9  of your work with Beasley Allen in this litigation? |
| 10  2:23 p.m. | 10  MS. O'DELL: Objection to the form. |
| 11  (A short recess was taken.) | 11  THE WITNESS: So I was paid for my time as a |
| 12  THE VIDEOGRAPHER: We're back on the record | 12  consultant, but this work was funded by my lab. |
| 13  at 2:28 p.m. | 13  BY MR. HEGARTY: |
| 14  BY MR. HEGARTY: | 14  Q. But going back to the experiments that you did and the |
| 15  Q. Dr. Saed, are there any other communications between | 15  manuscript that you wrote, were those separate -- was |
| 16  you and the editors of Reproductive Sciences that we've | 16  that a separate piece of work than what you're doing |
| 17  not talked about today? | 17  with Beasley Allen? |
| 18  A. Not that I'm aware of. | 18  MS. O'DELL: Object to the form, asked and |
| 19  Q. Do you know when your article is supposed to be | 19  answered. |
| 20  published? | 20  THE WITNESS: Separate means -- what do you |
| 21  A. I don't know. | 21  mean by separate? |
| 22  SAED DEPOSITION EXHIBIT NUMBER 16, | 22  BY MR. HEGARTY: |
| 23  EXPERT REPORT, | 23  Q. Separate means unrelated. |
| 24  WAS MARKED BY THE REPORTER | 24  MS. O'DELL: Object to the form. |
| 25  FOR IDENTIFICATION | 25  THE WITNESS: Yeah, we're -- I'm hired as a |

45 (Pages 174 to 177)

Ghassan Saed, Ph.D.

| Page 178 |
|---|

1    witness expert in talc, ovarian cancer and oxidative
2    stress, and I am doing work in my lab related to the
3    consulting that what I'm doing with Beasley Allen.
4    BY MR. HEGARTY:
5    Q.  So was the work that you did in doing the tests and
6         preparing the manuscript independent of your
7         relationship with Beasley Allen?
8              MS. O'DELL:  Objection, asked and answered.
9              THE WITNESS:  I still don't understand the
10       independent type.
11   BY MR. HEGARTY:
12   Q.  Well, was it done --
13   A.  Can you reformat the question, please.
14   Q.  Well, was that work separate and unrelated to your work
15       with Beasley Allen?
16             MS. O'DELL:  Object to the form.
17             THE WITNESS:  It was separate, not -- it is
18       related, so I don't know about what separate means, but
19       it is related, yes, but in what caliber it's related,
20       that's what I want to emphasize.  They have no saying
21       in any of the work that has been done here.
22   BY MR. HEGARTY:
23   Q.  Would you have done this same work if you were not a
24       consultant for Beasley Allen?
25             MS. O'DELL:  Object to the form.

| Page 179 |
|---|

1              THE WITNESS:  I would have done the same type
2         of rigorous testing because this is my primary focus of
3         my laboratory, and anything that is related to
4         inflammation, oxidative stress, and ovarian cancer, it
5         is what we like to do in our lab.
6    BY MR. HEGARTY:
7    Q.  Your experiments involved Johnson's Baby Powder,
8         correct?
9    A.  Correct.
10   Q.  Where did you purchase the Johnson's Baby Powder that
11       you used?
12   A.  Walgreen across the street.
13   Q.  Why did you choose to use Johnson's Baby Powder in your
14       experiment?
15   A.  Because I want to see if the use of baby powder, talcum
16       powder, has any biological effect on ovarian cancer
17       cells.
18   Q.  Why did you choose the Johnson's Baby Powder brand?
19   A.  I chose Johnson & Johnson baby powder and I chose
20       Fisher.
21   Q.  Why did you choose the Johnson Baby Powder brand versus
22       another brand of talcum powder product?
23   A.  I chose Fisher.
24   Q.  Why did you choose Johnson's Baby Powder over another
25       commercially available baby powder?

| Page 180 |
|---|

1    A.  Because the whole news and the whole media is all about
2         Johnson & Johnson product.
3    Q.  Did you choose Johnson's Baby Powder because that
4         product is in this litigation?
5    A.  Not in this litigation, but for me, because of the
6         media and all these reports that I've been reading and
7         the association of woman using Johnson & Johnson Baby
8         Powder with increased risk of ovarian cancer.
9    Q.  Within your lab notebooks, where are the tests that you
10       conducted with Fisher Scientific talcum powder?
11   A.  I can show it to you.
12   Q.  Okay.  You're looking at Exhibit Number 2, the lab
13       notebook for the experiments reflected in your --
14             MS. O'DELL:  I think it's Exhibit 3.
15             THE WITNESS:  That's Fisher.
16   BY MR. HEGARTY:
17   Q.  I'm sorry.  So Exhibit Number 3, which is the lab
18       notebook for the pilot study involved Fisher --
19   A.  Correct.
20   Q.  -- talc?
21   A.  Talc.
22   Q.  The only talc tested as reflected in Exhibit Number 2
23       is Johnson & Johnson, Johnson's Baby Powder?
24   A.  This one here, initially we used both, and then we
25       stopped using Fisher and we continued using Johnson &

| Page 181 |
|---|

1         Johnson.
2    Q.  Is there any reference in -- to testing Fisher talcum
3         powder in Exhibit Number 2?
4    A.  I can't remember.
5    Q.  Well, the first page of your -- strike that.
6              MS. O'DELL:  Just for the record, can we note
7         the page it's turned to in Exhibit 3, what page is
8         that, in the lab notebook?
9              THE WITNESS:  Okay.
10             MS. O'DELL:  What page is it turned to?
11             MR. HEGARTY:  It's now on Pages 38 and 39.
12             MS. O'DELL:  Okay.
13   BY MR. HEGARTY:
14   Q.  If you look at Page 5 of your manuscript.
15   A.  Methodology?
16   Q.  Not of your report, your manuscript, that's Exhibit 7.
17   A.  Page 5.
18   Q.  Page 5.
19   A.  Okay.
20   Q.  At the top you say Treatment of cells.  Talcum powder
21       (Fisher Scientific, Catalog #T4-500, Lot#166820) or
22       baby powder, then referencing Johnson & Johnson, was
23       dissolved in DMSO, et cetera.  Do you see where I'm
24       reading?
25   A.  Yes.

Ghassan Saed, Ph.D.

Page 182

1  Q.  Where in your manuscript do you report the results from
2      your tests done on Fisher Scientific talcum powder?
3  A.  We didn't.  This is for the previous abstracts that we
4      used which is this.
5  Q.  So none of the data reported in your manuscript was
6      data from experiments involving Fisher Scientific
7      talcum powder?
8  A.  In this manuscript, all the data here, as far as I
9      remember, they're all done with Johnson & Johnson.
10 Q.  Did you run the exact same tests that you report in
11     your manuscript with Fisher Scientific talcum powder?
12 A.  No, we only did this with Fisher, which is PCR.
13         MS. O'DELL:  And what are you pointing to,
14     Doctor, just so the record --
15         THE WITNESS:  Which is the preliminary
16     studies that we used to publish for our SRI abstract
17     which was presented March of 2018.  There was only one
18     component, which is PCR, and some few fact -- and some
19     few markers.  This is -- this was not an extensive and
20     comprehensive study as the one described here.  This is
21     just preliminary to show there is an effect or there is
22     no effect.
23 BY MR. HEGARTY:
24 Q.  What prooxidant or anti-oxidant --
25         MS. O'DELL:  It's confusing because you're

Page 183

1      saying this, but you're referring to Exhibit 3, the
2      study in Exhibit 3.
3          THE WITNESS:  This is Exhibit 3?
4          MS. O'DELL:  Yes.
5          MR. FINDEIS:  Which page of the exhibit?
6          THE WITNESS:  3 is --
7          MR. FINDEIS:  It's open to which page --
8          THE WITNESS:  So this is Exhibit 3, Page 38
9      onward.
10 BY MR. HEGARTY:
11 Q.  Which pro-oxidant and anti-oxidant enzyme did you look
12     at involving Fisher Scientific talcum powder?
13 A.  So they are all listed here.  I'll tell you in one
14     second.  Catalase.
15         MS. O'DELL:  What page?
16         THE WITNESS:  Page 47, catalase GSR, GPX,
17     GST, MPO, nitric oxide, SOD3.
18 BY MR. HEGARTY:
19 Q.  And you say you only ran --
20 A.  PCR.
21 Q.  And what test did you do beyond PCR with Johnson's Baby
22     Powder?
23 A.  Sorry, I just want to make sure that they're all here,
24     okay.  So, sorry, what's the question?
25 Q.  What tests did you do besides PCR with Johnson's Baby

Page 184

1      Powder?
2  A.  Okay.  So I'm now referring to this, what's this --
3  Q.  Exhibit 2.
4  A.  Exhibit 2 and I did --
5          MS. O'DELL:  Page --
6          THE WITNESS:  Here sections PCR, I did ELISA.
7          MS. O'DELL:  What page does ELISA begin on?
8          THE WITNESS:  53.
9          MS. O'DELL:  Okay.
10         THE WITNESS:  I did -- all labeled here what
11     we did.  SNP analysis --
12         MS. O'DELL:  What page?  Starts --
13         THE WITNESS:  102.
14         MS. O'DELL:  Okay.
15         THE WITNESS:  I did MTT.
16         MS. O'DELL:  What page?
17         THE WITNESS:  106.  And statistics final.  So
18     that's all done with J & J Baby Powder.
19 BY MR. HEGARTY:
20 Q.  Does Exhibit Number 3 contain all the data of your PCR
21     tests for Fisher Scientific talcum powder?
22 A.  Sorry, one more time, please.
23 Q.  Does Exhibit 3 contain all of the data of your
24     PCR tests for Fisher Scientific talcum powder?
25 A.  That we reported this abstract at SRI, yes.

Page 185

1  Q.  In your manuscript you report the enzyme data after 72
2      hours.
3  A.  Enzyme?
4  Q.  I'm sorry, the protein data after 72 hours.
5  A.  No, I didn't.
6  Q.  What did you report after 72 hours?
7  A.  The effect of treatment after 72 hours.  That's totally
8      different.
9  Q.  Why did you choose 72 hours?
10 A.  It was from a previous paper, one of those two, 72
11     hours, they did 48 hours, 72 hours, and I picked 72
12     because there is data showing very similar, I can't
13     remember the reference of it.
14 Q.  In your report you describe the results of your tests
15     only up to 48 hours, correct?
16 A.  Where is it, my report --
17 Q.  Over on Page 14.
18 A.  Page 14.
19 Q.  In the section Treatment of Cells.
20 A.  Where does it say that?  Here?  Treatment of cells.
21     Yeah, this is not accurate, 72 hours, this is a typo.
22 Q.  So you're saying that the reference to 48 hours in
23     Exhibit Number -- what is that marked as, your report?
24         MS. O'DELL:  16.
25 BY MR. HEGARTY:

47 (Pages 182 to 185)

Ghassan Saed, Ph.D.

Page 186

1   Q. 16, so you're saying that the reference to 48 hours in
2      Exhibit Number 16 is incorrect and it should be 72
3      hours?
4   A. Correct, because we did all the work with 72 hours.
5   Q. Did you try other durations that are not reported in
6      your report or manuscript?
7   A. No.
8   Q. At the bottom of Page 8 of your manuscript, Exhibit 7.
9   A. Exhibit 7, that's Exhibit 8, oh, I have two, two
10     manuscripts.
11  Q. 7 and 8 are identical.
12  A. Okay.
13  Q. Bottom of Page 7.
14  A. Page 7.
15  Q. You made reference to this before to citing to
16     something called the peristaltic pump; do you see that?
17  A. Page 7.
18  Q. Page 8.
19  A. Oh, sorry, Page 8, I heard 7, sorry.  The last
20     sentence.
21  Q. Yes, second to the last line.
22  A. Feature of uterus, yes.
23  Q. That reference is not in your expert report.
24  A. This is my paper, okay.  So let's see.
25  Q. Right, but my question is that the reference to the

Page 187

1      peristaltic pump is nowhere in Exhibit Number 16, your
2      expert report.  Why did you not include that in your
3      expert report?
4   A. Is it not included?  I don't know, I trust you.
5         MS. O'DELL: Take a look.
6         THE WITNESS: Let me take a look.  So Number
7      8 is -- this is the manuscript, where are the
8      references?  So do I have the references here?
9   BY MR. HEGARTY:
10  Q. I'll represent, Doctor, that it's not in there.  Do you
11     recall when you came across a reference to this phrase
12     the peristaltic pump?
13        MS. O'DELL: Objection to the form.
14        THE WITNESS: Okay, sorry.
15  BY MR. HEGARTY:
16  Q. Yes, you do you recall when in the writing process for
17     your manuscript you came across a reference to this
18     thing called a peristaltic pump?
19        MS. O'DELL: Objection to form.
20        THE WITNESS: If I recall where I read this
21     manuscript, this reference?
22  BY MR. HEGARTY:
23  Q. Yes, and when.
24  A. No, I don't remember.
25  Q. Were you -- strike that.  You made references at that

Page 188

1      part of your manuscript to 8 through 10.  Did counsel
2      for Beasley Allen provide those references to you?
3   A. Absolutely not.
4   Q. So is it your testimony that you came up with -- that
5      you decided on your own to make reference to the
6      peristaltic pump in your manuscript?
7   A. This is not I decide on my own.  This is like a
8      collective reading of my reading throughout the whole
9      literature.  It's not just -- so the hypothesis that we
10     have been trying to address for the last 30 years of my
11     lab is how -- what's the trigger, what's the initiator
12     for ovarian cancer, and there are many hypotheses out
13     there, and one of the hypotheses is that something come
14     through the genital tract.
15  Q. If you turn to Page 9 in your manuscript, you in the
16     first sentence of the second paragraph, you say in this
17     study, we have shown beyond doubt that talc alters key
18     redox and inflammatory markers, et cetera.  Do you see
19     what I'm reading?
20  A. Yes.
21  Q. Have you ever used the phrase "beyond doubt" before in
22     any published article of yours?
23  A. I believe I did.
24  Q. Can you cite for me one where you use that phrase?
25  A. Not now.

Page 189

1   Q. It's true, though, that whatever you found and reported
2      in your article was under the conditions of your
3      experiment, correct?
4         MS. O'DELL: Object to the form.
5         THE WITNESS: Can you --
6   BY MR. HEGARTY:
7   Q. Everything you describe in this manuscript occurred
8      under the conditions of your experiments, correct?
9         MS. O'DELL: Object to the form.
10        THE WITNESS: So occurred means -- okay, so
11     my response to this, all the experiments that has been
12     performed here, they were performed according to the
13     standard protocols that we have extensively published
14     with.
15  BY MR. HEGARTY:
16  Q. The statement that you make there is based on the
17     results of your cell studies, correct?
18  A. My cell studies, yes.
19  Q. It's not based on any data from in vivo studies,
20     correct?
21        MS. O'DELL: Objection, form.
22        THE WITNESS: There is no need.
23  BY MR. HEGARTY:
24  Q. That's not my question.  My question is those
25     statements are not based on any in vivo data, correct?

48 (Pages 186 to 189)

Ghassan Saed, Ph.D.

Page 190

1   MS. O'DELL: Object to the form.
2   THE WITNESS: So those, again, those results,
3   the result, no, this is -- this is what we have shown
4   in this manuscript, that's not my opinion of the whole
5   situation. So this -- the basis of the sentence is --
6   came from the results, the experiments that we did that
7   we described here.
8   BY MR. HEGARTY:
9   Q.  Those results have not been shown in any in vivo
10      situation, whether it's human or animal, correct?
11      MS. O'DELL: Object to the form.
12      THE WITNESS: Similar outcome have been shown
13   in -- before, yes.
14   BY MR. HEGARTY:
15   Q.  Well, cite for me the published articles reporting the
16      same results that you got in an in vivo model?
17      MS. O'DELL: Objection, form.
18      THE WITNESS: There was no any in vivo
19   studies done at the molecular level. This is -- my
20   study was the first comprehensive study that actually
21   does that.
22   BY MR. HEGARTY:
23   Q.  What you found was in cell cultures.
24   A.  These are ovarian cancer cells from patients.
25   Q.  These are not ovarian cancer cells -- these are not

Page 191

1   normal ovarian cancer cells, correct?
2   A.  Some are, yes.
3   Q.  Well, they've been immortalized, correct?
4   A.  The normal variance they have been immortalized.
5   They're sold as such.
6   Q.  The data that you report in your manuscript has never
7      been reported in an in vivo situation, correct?
8      MS. O'DELL: Object to the form.
9      THE WITNESS: So, again, using -- I have seen
10   reports in vivo in animals that have shown the
11   association of the talc with inflammation, yes.
12   BY MR. HEGARTY:
13   Q.  I'm talking about the very results that you report in
14      your study --
15   A.  I don't think anybody did them.
16      MS. O'DELL: Let him finish.
17      MR. HEGARTY: Let me finish the question.
18      MS. O'DELL: Let me object.
19   BY MR. HEGARTY:
20   Q.  You cannot cite to any published literature showing the
21      same results that you found in your cell studies in any
22      in vivo model, animal or human, correct?
23      MS. O'DELL: Object to the form.
24      THE WITNESS: I have seen in animals, yes.
25

Page 192

1   BY MR. HEGARTY:
2   Q.  What published literature reports finding the same
3      things you report in this study in an animal model?
4   A.  Not the same things, similar things.
5   Q.  I'm asking --
6   A.  Same exact?
7   Q.  I'm asking can you cite for me any published literature
8      reporting the same findings that you report in this
9      article in an in vivo model?
10      MS. O'DELL: Object to the form.
11      THE WITNESS: Again, I repeat the same thing,
12   I say I have seen work that has been done in vivo using
13   animals, different type of animals, that show an
14   association of talcum powder to increased risk of
15   ovarian cancer. My work that has been done here in
16   cell lines is not many laboratory have done this in
17   ovarian cancer because this is our specialty, this is
18   what we do. So we don't have -- part of it is done
19   probably like oxidative stress as collective like, for
20   example, some manuscripts, they measure hydrogen
21   peroxide as a marker of oxidative stress, so for
22   experts in oxidative stress, you need to do more than
23   just that. So I have seen in animals where there are
24   some biological effects in vivo.
25

Page 193

1   BY MR. HEGARTY:
2   Q.  I'm talking about the biological effects you report in
3      your manuscript.
4   A.  Which include some of this.
5   Q.  What literature can you cite for me that has shown
6      these same biological effects in an in vivo model?
7      MS. O'DELL: Object to the form.
8   BY MR. HEGARTY:
9   Q.  The same biological effects you report in your
10      manuscript.
11      MS. O'DELL: Object to the form, asked and
12   answered.
13      THE WITNESS: I guess I'm not understanding
14   the question because, again, these are cell lines from
15   ovarian cancer patients, and doing work with cell lines
16   is the closest you can get to in vivo. If there is
17   work that has been done to depict all the work I have
18   done here, this is none, to my knowledge, but there are
19   reports that clearly indicates an in vivo effect.
20   BY MR. HEGARTY:
21   Q.  What reports are you referring to?
22   A.  Animal studies.
23   Q.  Cite for me the author or name of the animal studies
24      you're referring to.
25      MR. DONATH: Move to strike, nonresponsive.

49 (Pages 190 to 193)

Ghassan Saed, Ph.D.

Page 194

1    THE WITNESS: So, yeah, I think I referenced
2    some animal studies work here. Let's see. This is the
3    manuscript? I'm trying to find references. Yes.
4    Where is that paper? I can't remember this. I know
5    it's in the report. Yeah, it's right here, sorry. I
6    know I referenced it here.
7    BY MR. HEGARTY:
8    Q. How much more time do you need, Doctor?
9    A. It's been a while, so I need to find out exactly where
10   this is, but I know it's here. So it is some cited in
11   reference 50, but that's not the author -- that's not
12   the original reference, this is a cross-reference.
13   Q. You said cited in 50?
14   A. Number 50, but that's a cross-reference, if I recall
15   correctly.
16   Q. You need more time?
17   A. I do. I'm trying to look for it.
18   Q. Let's go off the record.
19   THE VIDEOGRAPHER: Going off the record at
20   2:57 p.m.
21   (An off-the-record discussion was held.)
22   THE VIDEOGRAPHER: Back on the record at 2:59
23   p.m.
24   BY MR. HEGARTY:
25   Q. Doctor, when we went off the record momentarily you

Page 195

1    were going through your references in your report to
2    identify any in vivo animal models that you claim show
3    the same results that you report in your manuscript.
4    Can you cite for us the publications that you contend
5    show the same results as your manuscript in an animal
6    model?
7    MS. O'DELL: Object to the form.
8    You may answer.
9    THE WITNESS: So I am responding that I read
10   in some references and reviews that there was an in
11   vivo animal studies that showed association of talcum
12   powder use with increased risk of ovarian cancer in
13   animal models, and the reference for that is in the NTP
14   studies.
15   BY MR. HEGARTY:
16   Q. That study did not measure the pro-oxidant and
17   anti-oxidant markers that you measure in your study,
18   correct?
19   A. They talk about oxidative stress in general,
20   inflammation in general.
21   Q. But they don't -- that study doesn't measure the
22   pro-oxidant or anti-oxidant markers that you report in
23   your study, correct?
24   A. That study, no.
25   Q. The NTP study concerned findings in the lungs of the

Page 196

1    rats and mice, not the ovaries, correct?
2    A. No, it was summarize a review of everything, the actual
3    study, yes.
4    Q. The NTP didn't look at ovarian cancer, correct?
5    A. I'm not sure. I read from that study that they have
6    summary, summary, and somewhere there I read that there
7    was in vivo association of the talcum powder use with
8    ovarian cancer. So that's called reference reference.
9    Q. Your report --
10   A. May I add something? I also read it somewhere else, I
11   cannot remember right now.
12   Q. Your report in your manuscript say that you in your
13   experiments found genotype switches at 72 hours; is
14   that correct?
15   A. Genotype switches, what are you referring to?
16   MS. O'DELL: What page?
17   BY MR. HEGARTY:
18   Q. You report in your manuscript.
19   A. Which particular --
20   Q. Well, let me ask you about your manuscript. Did your
21   manuscript report genotype switches at 72 hours?
22   A. The effect of talcum 72 hours induced SNP in genetic
23   mutations.
24   Q. And do you claim that those genetic mutations occurred
25   in all cells treated with talc, in your experiments?

Page 197

1    A. There is a table actually that summarize the results,
2    and it doesn't show it with all markers, so we can
3    refer to it, so if you look, for example --
4    MS. O'DELL: What figure?
5    THE WITNESS: The figure Table 2, if you look
6    at GSR, GSR no effect, SOD3 no effect, catalase there
7    is an effect in some cells, not others, you can see
8    that A2780 has no effect, the talc treatment.
9    BY MR. HEGARTY:
10   Q. But with regard to the cells that it did have an
11   effect, SKOV-3, for example, with regard to --
12   A. SKOV with regard to catalase, for example, has no
13   effect.
14   Q. With regard to --
15   A. TOV112 with catalase there is an effect.
16   Q. And was that effect in all the cells tested with talc?
17   MS. O'DELL: Object to the form.
18   THE WITNESS: I don't understand your
19   question.
20   BY MR. HEGARTY:
21   Q. Well, don't you -- do you contend that those genotype
22   changes occurred in all cells treated with talc?
23   A. I didn't say that.
24   Q. Did that happen?
25   A. No. What I'm saying is if you treat the cell line,

50 (Pages 194 to 197)

Ghassan Saed, Ph.D.

| Page 198 | Page 200 |
|---|---|
| 1  okay, TOV112, with talc for 72 hours, there will be an<br>2  increase, an acquisition of this mutation. Now, you're<br>3  asking if I determined whether all cells in that<br>4  population got this mutation.<br>5 Q. Correct.<br>6 A. The answer is I don't know.<br>7 Q. Are you able to determine the quantity of cells -- let<br>8  me back up. How many cells are in the culture?<br>9 A. Yeah, so this is DNA extracted from 1 million cells<br>10  treated with 100 microgram per ml of talcum powder.<br>11  Now, there is another way you can quantitate if we need<br>12  to proceed further with this.<br>13 Q. Are you able to estimate the volume of cells that this<br>14  genotype switch occurred in?<br>15    MS. O'DELL: Object to the form.<br>16    THE WITNESS: The volume?<br>17 BY MR. HEGARTY:<br>18 Q. Yes, the number.<br>19    MS. O'DELL: Object to form.<br>20    THE WITNESS: I just said, no, we can't.<br>21  This technique will tell you yes or no, doesn't tell<br>22  you how much -- how many, sorry.<br>23 BY MR. HEGARTY:<br>24 Q. So would it tell you, yes, if it -- (coughing in<br>25  room) -- only one of the 1 ml cells? | 1 Q. What do you mean when you say induces significant<br>2  changes? What does that mean, what does the word<br>3  significant there mean?<br>4 A. Got you. So this means marginal change, it's not --<br>5  here the words does not imply statistically significant<br>6  is that you're referring to, although the results were<br>7  statistically significant, this is referring to the<br>8  magnitude.<br>9 Q. And how do you define -- how did you define the<br>10  magnitude as significant?<br>11 A. You don't, many readers assume significant is<br>12  statistically significant.<br>13 Q. Was the choice of the word significant a subjective<br>14  word choice by you?<br>15 A. I chose this word because it applies that there is a<br>16  significant effect which I know it is.<br>17 Q. And when you say significant effect, what do you mean?<br>18 A. I mean both marginal and statistically significant.<br>19 Q. What does it mean to have a marginal effect?<br>20 A. Marked like, for example, it is not like 1 versus 1.35,<br>21  it is 1 versus 3, that's mean marginal.<br>22 Q. You say about the middle of that paragraph that in all<br>23  talc treated cells, do you see where I'm reading?<br>24 A. Yes.<br>25 Q. There was a significant dose-dependent increase in |

| Page 199 | Page 201 |
|---|---|
| 1    MS. O'DELL: Object to the form.<br>2    THE WITNESS: Again, this is not<br>3  quantitative. This will tell you if there is a<br>4  mutation or there is no mutation.<br>5 BY MR. HEGARTY:<br>6 Q. Without regard to the number of cells the mutation<br>7  occurred in?<br>8    MS. O'DELL: Objection to the form.<br>9    THE WITNESS: Okay. I will repeat myself<br>10  again. This is -- this technique will tell you if<br>11  there is population of cells that acquired this<br>12  genotype.<br>13 BY MR. HEGARTY:<br>14 Q. Does it tell you the number of such a population?<br>15 A. I just said no.<br>16 Q. If you look at Page 2 of your abstract, I'm sorry, your<br>17  manuscript, the abstract, looking at the Abstract<br>18  Section, second line towards the end, you say here<br>19  we've demonstrated that talc induces significant<br>20  changes in key redox enzymes and enhances the<br>21  pro-oxidant state in normal and EOC cells.<br>22 A. Where are you reading? Sorry.<br>23 Q. The second line, towards the end of the second line.<br>24 A. Towards the end of the second line -- here, yes, I see<br>25  it I see it. | 1  pro-oxidants iNOS, nitrate/nitrite, and MPO with a<br>2  concomitant decrease in anti-oxidants CAT, SOD, GSR,<br>3  and GPX. Do you see where I'm reading?<br>4 A. Yes.<br>5 Q. What do you mean when you use the phrase significant<br>6  there?<br>7 A. It is indicated by the P value, so once you have the P<br>8  value, that's -- indicates statistically significant.<br>9 Q. And when you say an increase and a decrease as compared<br>10  to what?<br>11 A. To untreated. It says all talc treated cells.<br>12 Q. There is no data that correlates your findings and your<br>13  experiments to ovarian cancer risk in humans, correct?<br>14    MS. O'DELL: Objection, form.<br>15    THE WITNESS: One more time, please.<br>16 BY MR. HEGARTY:<br>17 Q. Sure. There is no data that correlates your findings<br>18  in this manuscript to ovarian cancer risk in women,<br>19  correct?<br>20    MS. O'DELL: Objection to form.<br>21    THE WITNESS: So my data explain, explain and<br>22  actually classify and characterize epithelial ovarian<br>23  cancer cells to have a pro-oxidant state, and we were<br>24  the first lab to actually demonstrate that epithelial<br>25  ovarian cancer cells manifest a pro-oxidant state by |

Ghassan Saed, Ph.D.

Page 202

1  increasing in these pro-oxidants that we have here and
2  decreasing the anti-oxidant that we studied.  So this
3  is a -- I have written a review article about this, I
4  have written a book chapter about this, this is the
5  major focus of my lab is to characterize the ovarian
6  cancer cells as a pro-oxidant, that they manifest a
7  pro-oxidant state and we characterize it.
8  BY MR. HEGARTY:
9  Q.  There is no data showing that these increases or
10  decreases increase the risk of ovarian cancer in women,
11  correct?
12         MS. O'DELL:  Objection to form.
13         THE WITNESS:  Okay, so there are data that --
14  recent data that showing, for example, I'll give you an
15  example, myeloperoxidase is a marker of inflammation.
16  My lab was the first lab in the entire world to report
17  that myeloperoxidase is expressed by epithelial ovarian
18  cancer cells, although this marker is only supposed to
19  be a myeloid marker, which is a blood marker, a blood
20  cells marker, not a nonmyeloid.  Several reports later
21  they confirm my finding, and not only that, other labs
22  have just -- they reported that the SNP that we use
23  here, it is correlated with increased risk of ovarian
24  cancer, that's reported.  That's number one.
25         Another example, SOD, catalase, those two

Page 203

1  enzymes and one more -- okay, but for those two, I know
2  for a fact that their SNPs has also been reported to be
3  associated with increased risk of ovarian cancer in
4  human, so that's for the genotype.
5         For the markers, there are several studies in
6  the literature that talk about alteration of oxidative
7  stress and inflammation in ovarian cancer.  Our lab,
8  other labs have published, repeatedly published this,
9  so this is, as far as I'm concerned, this is a fact for
10  me, we have documented this, others documented this,
11  and to confirm my work with a report from a different
12  lab saying there is this myeloperoxidase SNP minus
13  463AA correlates with increased risk of ovarian cancer,
14  and we have this to be the genotype that changes in
15  talc powder, that's incredible to me.
16  BY MR. HEGARTY:
17  Q.  Identify the SNPs that you report in your manuscript
18  that have been shown to have reached genome wide
19  significance of association with ovarian cancer.
20  A.  Risk.
21         MS. O'DELL:  Object to form.
22         THE WITNESS:  Risk, so the minus, the same
23  SNP that we use here, minus 63, 463, which is the MPO
24  SNP, this SNP is recognized to be associated with
25  increased risk of ovarian cancer in a human.

Page 204

1  BY MR. HEGARTY:
2  Q.  And that's been recognized to be associated in a genome
3  wide significantly way?
4         MS. O'DELL:  Object to the form.
5         THE WITNESS:  I don't know what you mean by
6  genome wide.
7  BY MR. HEGARTY:
8  Q.  Well, you're familiar with what the --
9  A.  SNP is --
10  Q.  -- GWAS --
11  A.  Yes.
12  Q.  -- the GWAS study is, correct?  Are you familiar with
13  that?
14         MS. O'DELL:  Would you repeat the question?
15  I couldn't hear it.
16  BY MR. HEGARTY:
17  Q.  I asked him if he's familiar with what GWAS is.
18  A.  Yes.
19  Q.  What is it?
20  A.  It's the genome wide association where they list all
21  the SNPs and their frequency of occurrence and their
22  what they call it -- frequency of occurrence in general
23  population.
24  Q.  And what SNPs in your manuscript have been associated
25  by the GWAS studies with ovarian cancer?

Page 205

1  A.  So this, okay, we're mixing up two things.  I need to
2  clarify this.  So the GWAS, they identify the SNP.
3  Then investigators after the SNP has been identified by
4  the GWAS, they pick that SNP and they say, hmm, there's
5  a lab that published that myeloperoxidase is -- minus --
6  in epithelial ovarian cancer where it's not supposed to
7  be there, well, let's do this study where we see if
8  this SNP is indeed associated with increased risk of
9  ovarian cancer.  So that's not part of the GWAS study.
10  They use the GWAS study information like I did it.
11  Q.  That's not my question, Doctor.  My question is which
12  of the SNPs that you report in your manuscript have
13  been shown to be associated with ovarian cancer by the
14  GWAS studies?
15         MS. O'DELL:  Objection to form.
16         THE WITNESS:  I just said what I have to say.
17  BY MR. HEGARTY:
18  Q.  Well, none of the SNPs that you referred to in your
19  manuscript have been identified by the GWAS studies as
20  being associated with ovarian cancer risk, correct?
21         MS. O'DELL:  Object to the form.
22         THE WITNESS:  No, it's not correct because I
23  repeat again, the GWAS have no responsibility to tell
24  you, they don't do studies looking at association.
25  They just list SNP and prevalence in general

52 (Pages 202 to 205)

Ghassan Saed, Ph.D.

Page 206

1    population, very clear.
2    BY MR. HEGARTY:
3    Q.  So it's your contention that the GWAS, the genome wide
4       significance of association doesn't list SNPs that are
5       associated with ovarian cancer?
6            MS. O'DELL:  Object to the form.
7            THE WITNESS:  What I'm saying is, to my
8       understanding, GWAS is an information bank where you go
9       and you say, okay, there is -- there exists a catalase
10      SNP, which is this SNP, this specific sequence that is
11      present in .01 percent of general population.  Above
12      that will be characterized as risk factor.  So now in
13      the GWAS they identified the MPO SNP, the catalase SNP,
14      the SOD SNP, all SNPs that it's like an information
15      bank where you go to to find your information and then
16      you go and study them.  I study them, others study
17      them, different labs can study them, but they do it for
18      us.  It's like the gene sequencing bank, it's the same
19      thing, same concept, protein sequence bank.  I don't
20      need necessarily to go and sequence the whole thing to
21      understand, it's already sequenced for me.
22   BY MR. HEGARTY:
23   Q.  What does it mean for a SNP to reach genome wide
24      significance?
25   A.  So there is a cutoff that they have in their website to

Page 207

1    each based on epidemiological studies that there is
2    association, if it increased over this level, it could
3    be associated with diseases.
4    Q.  Which of the SNPs that you reference in your manuscript
5    have been associated with ovarian cancer, in other
6    words, which have reached genome wide significance?
7         MS. O'DELL:  Object to the form.
8         THE WITNESS:  I can answer this.  I know for
9    a fact it's catalase, not only ovarian but also in
10   breast cancer, and they are twins.
11   BY MR. HEGARTY:
12   Q.  Any others?
13   A.  I'm not -- I can't remember the actual -- for me, the
14   GWAS was an information bank where I get my -- the
15   information I need to perform the studies, like me and
16   others in the same situation.
17   Q.  Cite for me any published literature that is
18   associated -- that has shown a clinical significant
19   association between the SNPs that you reference in your
20   paper and ovarian cancer.
21   A.  I'm sorry, one more time.
22        MS. O'DELL:  Object to the form.
23   BY MR. HEGARTY:
24   Q.  Identify for me any published literature that shows a
25   statistically significant association between the SNPs

Page 208

1    you reference in your manuscript and ovarian cancer.
2         MS. O'DELL:  Object to the form.
3         THE WITNESS:  So I'm not -- I am objecting to
4    the word statistically significant, but I can identify
5    several studies that, for example, looking at catalase
6    SNP and its association with increased risk of ovarian
7    cancer, myeloperoxidase SNP and its association with
8    increased risk of ovarian cancer, there was one more
9    I'm skipping, and so those two were definitely there.
10   BY MR. HEGARTY:
11   Q.  Why do you object to my use of the phrase statistical
12      significance?
13   A.  Because I am not sure if they did -- they did molecular
14      study or they did a different type of study, so I'm
15      just, you know, not familiar with the epidemiological
16      studies that they performed.
17   Q.  Well, cite for me any studies that show, as you say, an
18      association between MPO or CAT and ovarian cancer.
19           MS. O'DELL:  Object to the form.
20           THE WITNESS:  MPO?
21   BY MR. HEGARTY:
22   Q.  Yes.
23   A.  The MPO SNP?
24   Q.  Yes.
25   A.  That's what we're talking about?

Page 209

1    Q.  Yes.
2    A.  Yes, I can cite.
3    Q.  Cite for me a study.
4    A.  I don't remember it now, but there is study.
5    Q.  Did you cite it in your manuscript?
6    A.  I believe so.  Let's talk -- let's see about where we
7       talk about SNP.  Okay, were the first to do this --
8       sorry -- I would be very happy to provide you with
9       these references that I mentioned, MPO and catalase and
10      the SNP in ovarian cancer.
11   Q.  Can you cite for me here today any studies associating
12      catalase or MPO with ovarian cancer?
13           MS. O'DELL:  Object to the form.  You mean
14      the SNP?
15           THE WITNESS:  I can't remember where I put
16      it.
17   BY MR. HEGARTY:
18   Q.  How much time do you need to look, Doctor?
19   A.  See, I write this every day so I get so overwhelmed.
20   Q.  Let's go off the record.
21   A.  So we're looking for catalase SNP for --
22           MS. O'DELL:  Stay on, if you're -- do you
23      need more time, Doctor, or are you --
24           THE WITNESS:  I'm trying to find it in my --
25           MR. HEGARTY:  Let's go off the record.

53 (Pages 206 to 209)

Ghassan Saed, Ph.D.

| Page 210 |
| --- |

1    THE WITNESS:  I mean I may not even reference
2    it here so I don't know.
3    THE VIDEOGRAPHER:  Going off the record at
4    3:23 p.m.
5    (An off-the-record discussion was held.)
6    THE VIDEOGRAPHER:  We're back on the record
7    at 3:26 p.m.
8    BY MR. HEGARTY:
9    Q.  Doctor, when we went off the record I asked you for any
10    studies associating catalase or MPO with ovarian
11    cancer.  You've had a chance to look for such studies,
12    and what is your response?
13    A.  So there's one study by Olson, et al., that was
14    published in Gynecology Oncology 2004.
15    Q.  How do you spell his first name?
16    A.  O-l-s-o-n, and it's looking at SOD and MPO SNP.  There
17    is an increased risk of ovarian cancer.  I couldn't
18    find the catalase one, but it is there, I can search
19    for it, it is hundred percent there.  There is another
20    one looking at Superoxide dismutase published in JBC
21    Journal by Yumin, et al.
22    Q.  How do you spell that?
23    A.  Y-u-m-i-m, Hu, H-u.  And there is one more which is
24    about catalase if you -- SNP.
25    Q.  What is the date of the Yumin article?

| Page 211 |
| --- |

1    A.  What's the data?
2    Q.  What's the date?
3    A.  Oh, the date, I'm sorry.  Can I look?
4    Q.  Yes.
5    A.  So the date was 2005.
6    Q.  And then you believe there's an article that associates
7    catalase to ovarian cancer?
8    A.  Yes.
9    Q.  You can't recall that article sitting here today?
10    A.  I have it here, it's Catalase Nucleotide SNP Strongly
11    Associated With Ovarian Cancer, this is by -- from our
12    lab and from another lab, also.
13    Q.  What is the -- who is the first author?
14    A.  From my lab?
15    Q.  Well, you said --
16    A.  This second one, the second one is by -- so this is our
17    paper, and there's one here.
18    Q.  When you say our paper, who's the lead author?
19    A.  Okay.  Can I just tell you the paper?  So this is
20    published in -- it says The Effect of Catalase SNP and
21    Susceptibility to Ovarian Cancer, and this is by --
22    published in -- doesn't -- it's in 2017, and it doesn't
23    tell me the journal, Journal of Obstetrics and
24    Gynecology, Volume 38, 2018, Issue 4.
25    And going back to your previous question, I

| Page 212 |
| --- |

1    am -- if you define lead author as corresponding author
2    or first author?
3    Q.  First author.
4    A.  Is Dr. Belotte, he was an M.D., Ph.D. trained in my
5    laboratory.  I was his Ph.D. advisor.
6    Q.  What year?  What is the year of the article?
7    A.  Oh, sorry, 2015.
8    Q.  What is the name of the article?
9    A.  Single Nucleotide Polymorphism in Catalase is Strongly
10    Associated With Ovarian Cancer Survival.
11    Q.  So that article doesn't have anything to do with
12    ovarian cancer initiation, correct?
13    MS. O'DELL:  Object to the form.
14    THE WITNESS:  Is that another question?
15    BY MR. HEGARTY:
16    Q.  Yes.
17    A.  Saying --
18    Q.  In that article, it associated catalase with ovarian
19    cancer survival, correct?
20    A.  Uh-huh.
21    Q.  It didn't associate catalase with causing ovarian
22    cancer, correct?
23    MS. O'DELL:  Object to the form.
24    THE WITNESS:  So in this article what we did,
25    we actually, this is -- we identified the SNP and

| Page 213 |
| --- |

1    catalase that others also identified, and we looked at
2    the presence of the SNP in chemoresistance versus
3    sensitive looking at different parameters, and we
4    actually reversed the SNP using the CRISPR editing,
5    gene editing, and we induced apoptosis, so there was
6    like a survival mechanism.
7    BY MR. HEGARTY:
8    Q.  Doctor, the article you actually cite and which you
9    included as an author found that with regard to the
10    seven selected SNP study, no association -- you found
11    no association with ovarian cancer risk, correct?
12    MS. O'DELL:  Object to the form.
13    THE WITNESS:  Which article you talking
14    about?
15    BY MR. HEGARTY:
16    Q.  The article with the lead author Belotte, Belotte.
17    A.  Jimmy Belotte, okay, what about it?
18    Q.  Your article looked at CAT, CYBA, GPX1, GSR, MnSOD,
19    MPO, and NOS2, correct?
20    A.  Yes.
21    Q.  You found doing the same kind of testing you did here
22    that none of those SNPs was associated with ovarian
23    cancer risk, correct?
24    MS. O'DELL:  Object to the form.
25    THE WITNESS:  No.

Ghassan Saed, Ph.D.

Page 214

1     MS. O'DELL: Excuse me. Object to the form.
2  If you need to see the paper --
3     THE WITNESS: Yeah, it's been a while but --
4     MS. O'DELL: If you need to see the paper.
5  SAED DEPOSITION EXHIBIT NUMBER 17,
6     RESEARCH ARTICLE,
7     WAS MARKED BY THE REPORTER
8     FOR IDENTIFICATION
9  BY MR. HEGARTY:
10  Q.  I marked as Exhibit 17 the paper.
11  A.  Very good.
12  Q.  Show me in that paper where you found an association
13     with the listed SNPs and ovarian cancer risk.
14  A.  Okay.  So there is no -- this study we looked at, this
15     particular SNP and catalase that we found, the other we
16     found that they are not associated with survival, so
17     this study was basically looking at survival of ovarian
18     cancer.  So this is not a study meant to study risk.
19     MR. KLATT: Objection, nonresponsive.
20  BY MR. HEGARTY:
21  Q.  If you look over at Page 11 of your manuscript.
22     MS. O'DELL: Which page --
23     MR. HEGARTY: It's Exhibit 7.
24     MS. O'DELL: Well, he just has one manuscript
25     in his hand.  Do you know where we are, Doctor?

Page 215

1     THE WITNESS: Page 11 --
2  BY MR. HEGARTY:
3  Q.  Yes, Page 11.  The first sentence of the third
4     paragraph beginning To Elucidate the Mechanism, do you
5     see that?
6  A.  Yes.
7  Q.  You state later in that sentence, we have examined
8     selected known gene mutations corresponding to SNPs
9     known to be associated with altered enzymatic activity
10     and increased cancer risk.  Do you see where I'm
11     reading?
12  A.  To elucidate the mechanism, that paragraph?
13  Q.  Yes.
14  A.  Okay.
15  Q.  And at the end of that sentence you cite Reference 28.
16  A.  Okay.
17  Q.  And Reference 28 is that Belotte article, correct?
18  A.  28 is Belotte, yes.
19  Q.  Can you hand me the Belotte article back, please.
20  A.  (Witness complied.)
21  Q.  In the Belotte article you say of the seven selected
22     SNPs studied, no association with ovarian cancer risk
23     was found.  That's what you found, correct, Doctor?
24     MS. O'DELL: Objection to form.  If you need
25     to see Belotte -- do you have another copy, Mike, or is

Page 216

1  that it?  And it's also in your notebook at 34 if you
2  both need it so.
3     THE WITNESS: Can I look at it?
4  BY MR. HEGARTY:
5  Q.  Yes, go ahead and look at 34.
6  A.  I can't remember if we did the same SNP in both
7     studies, so I just want to make sure that we did that,
8     because there are several SNPs for the same enzyme
9     reported in the GWAS.
10  Q.  How long will it take you to look at -- you did the
11     same SNPs in the Belotte article as you did here?
12  A.  I have to look at the accession numbers and compare
13     them.
14  Q.  Well, we'll maybe get to that, but my question goes
15     back to your reference on Page --
16     MS. O'DELL: 34.
17     MR. HEGARTY: Your reference to that article
18     on Page 11 of your manuscript, you quote that article
19     as saying that you examined several selected known gene
20     mutations corresponding to SNPs known to be associated
21     with altered enzyme activity and increased cancer risk.
22     What part of that Belotte article shows that the SNPs
23     that you examined are associated with increased cancer
24     risk?
25     THE WITNESS: So if you look at the table,

Page 217

1     Page 3, Dr. Belotte's article, there is a table here
2     that lists what is the SNP, what is the mean allele
3     frequency occurrence, the chromosomal equation, and if
4     it is known nucleotide switch, and the effect of
5     activity.  So there are SNPs that affect activity of
6     the enzymes, and if they do, they are, according to our
7     findings, they are associated with anything that alters
8     oxidative stress to the pro-oxidant state can
9     contribute to increased risk.
10  BY MR. HEGARTY:
11  Q.  But you in your paper, Exhibit 17, say that the SNPs
12     you studied showed no association with ovarian cancer
13     risk, correct?
14  A.  Which one?
15  Q.  The Belotte paper.
16  A.  Oh, keep saying what paper.
17  Q.  You look at the abstract.
18  A.  So, again, we're looking at specific SNPs.
19  Q.  Correct.
20  A.  Right, so --
21  Q.  And in the specific --
22  A.  Some of the SNPs that we looked at when we did this
23     study, they were associated with survival of ovarian
24     cancer, that's what we tested.
25  Q.  None of the SNPs --

Ghassan Saed, Ph.D.

|  | Page 218 |
|---|---|
| 1 | MR. KLATT: Nonresponsive. |
| 2 | BY MR. HEGARTY: |
| 3 | Q. Doctor, you also examined whether the SNPs reported in |
| 4 | this study were associated with ovarian cancer risk, |
| 5 | correct, not just survival? |
| 6 | MS. O'DELL: Objection, form. |
| 7 | THE WITNESS: Give me a moment to see, to |
| 8 | refresh my memory. This is 2015, so I need to remember |
| 9 | what we did. I have done many work. |
| 10 | BY MR. HEGARTY: |
| 11 | Q. How much time do you need to study that article? |
| 12 | A. Just -- okay, so in this study we only did survival, |
| 13 | the Jimmy Belotte study, this is my -- yeah, so this |
| 14 | here we only did analysis of survival. |
| 15 | Q. Doctor, if you turn over to Page 6 of that article at |
| 16 | the very bottom, third from -- third line from the |
| 17 | bottom, you write that currently we demonstrated that |
| 18 | there is no association between the selected SNPs and |
| 19 | risk of developing ovarian cancer, citing Table 2, |
| 20 | those are your words, correct? |
| 21 | A. Yeah, Table 2 is, let's see -- |
| 22 | MS. O'DELL: What were you reading? |
| 23 | MR. HEGARTY: The bottom of Page 6 of 12. |
| 24 | THE WITNESS: Yeah, I see that. |
| 25 | |

|  | Page 219 |
|---|---|
| 1 | BY MR. HEGARTY: |
| 2 | Q. Doctor, is it your testimony that in this study you did |
| 3 | not investigate whether the SNPs listed in Table 2 were |
| 4 | associated with ovarian cancer risk? |
| 5 | MS. O'DELL: Object to the form. |
| 6 | THE WITNESS: Let me just look at this, |
| 7 | sorry. |
| 8 | MR. HEGARTY: Let's go off the record. |
| 9 | MS. O'DELL: He's just looking at the table. |
| 10 | Ask him a question, he's entitled -- |
| 11 | MR. HEGARTY: Let's go off the record. |
| 12 | MS. O'DELL: No, we're not. |
| 13 | MR. HEGARTY: We're going off the record. |
| 14 | MS. O'DELL: No, we're not. |
| 15 | MR. KLATT: We're going to call Judge Pisano. |
| 16 | MS. O'DELL: Wait a minute. Let me speak. |
| 17 | If you ask the doctor about his manuscript, he is not |
| 18 | required to have put to memory every word and table in |
| 19 | the manuscript. If you ask him about something, he is |
| 20 | entitled to look at it and reply completely. And to |
| 21 | somehow suggest if he takes more than 15 seconds we're |
| 22 | going off the record, that's ridiculous. |
| 23 | MR. KLATT: It's every single time he's asked |
| 24 | a question, he wants to look something up. This is |
| 25 | slow walking the deposition, we're not going to put up |

|  | Page 220 |
|---|---|
| 1 | with it. |
| 2 | MS. O'DELL: It is not. |
| 3 | MR. KLATT: He's perfectly entitled to look |
| 4 | things up to answer them, but it doesn't count against |
| 5 | our time. |
| 6 | MS. O'DELL: He's not looking things up. |
| 7 | He's looking at the exhibit that had been placed before |
| 8 | him. |
| 9 | THE COURT REPORTER: Excuse me -- |
| 10 | (Simultaneous crosstalk.) |
| 11 | MS. O'DELL: We are on the record. |
| 12 | And, Doctor, if you are prepared to respond |
| 13 | to the question, you may do so. If you need a minute, |
| 14 | let us know that. |
| 15 | BY MR. HEGARTY: |
| 16 | Q. How much time do you need to review the article, |
| 17 | Doctor? |
| 18 | A. I'm just asking you, please, where do you see in Table |
| 19 | 2. |
| 20 | Q. I'm referring to your words at the bottom of Page 6 |
| 21 | that's referring over to Table 2, and I'm asking you is |
| 22 | it your testimony that you did not investigate the |
| 23 | association in this paper between these SNPs and |
| 24 | ovarian cancer risk, is that your testimony? |
| 25 | MS. O'DELL: Are you quoting a sentence? |

|  | Page 221 |
|---|---|
| 1 | What sentence are you referring to? |
| 2 | MR. HEGARTY: I'm not -- you're not taking |
| 3 | this deposition of me. I'll let my question stand. |
| 4 | MS. O'DELL: Object to the form of the |
| 5 | question, it's unclear. If there's a specific sentence |
| 6 | you're referring to in the manuscript, you said bottom |
| 7 | of Page 6, so if there's something you're referring to, |
| 8 | I'd ask you direct the witness to it. |
| 9 | BY MR. HEGARTY: |
| 10 | Q. Can you answer my question, Doctor? |
| 11 | MS. O'DELL: Object to the form. |
| 12 | THE WITNESS: Where is the -- can you |
| 13 | please -- |
| 14 | BY MR. HEGARTY: |
| 15 | Q. Bottom of Page 6 for the second time. |
| 16 | A. Yes. |
| 17 | Q. I'm reading this to you, it says currently we |
| 18 | demonstrated that there is no association between the |
| 19 | selected SNPs and risk of developing ovarian cancer, |
| 20 | Table 2. Do you see that? |
| 21 | A. Yes. |
| 22 | Q. Is it your testimony that this article did not |
| 23 | investigate an association between the selected SNPs |
| 24 | and ovarian cancer risk? |
| 25 | A. In this study that we did with this number of people |

56 (Pages 218 to 221)

Ghassan Saed, Ph.D.

Page 222

1    that we looked at, we found, okay, that the only
2    catalase SNP is associated with ovarian cancer
3    survival, none of the other SNPs were associated from
4    these patients to increased risk of ovarian cancer.
5    Q.  Right.
6    A.  We only did 143, I believe, 94.
7    Q.  So the sentence that I read to you on Page 11 of your
8        manuscript it's citation 28 is wrong, correct?
9            MS. O'DELL:  Objection to form.
10           THE WITNESS:  What's the citation?
11   BY MR. HEGARTY:
12   Q.  Well, you support the sentence that says we have
13       examined selected known gene mutations corresponding to
14       SNPs known to be associated with altered enzymatic
15       activity and increased ovarian cancer risk citing 28.
16       28 doesn't support a finding that the SNPs you tested
17       show increased ovarian cancer risk, correct?
18           MS. O'DELL:  Object to the form.
19           THE WITNESS:  What we -- again, this --
20       what -- the SNPs that we are used here in this study,
21       they were used in response to test the effect of talc
22       treatment, talcum powder treatment to the genetic -- to
23       the specific genetic mutations.  Now, we link survival
24       to risk, so, for example, if you look, most of our
25       hypothesis --

Page 223

1    BY MR. HEGARTY:
2    Q.  I object to it's nonresponsive.  Doctor, you're not
3        answering my question.  I'm going to withdraw the
4        question.
5            MS. O'DELL:  Don't cut him off if he's
6        finishing --
7            MR. HEGARTY:  He's not finishing, he's
8        answering something else.
9            MS. O'DELL:  He's trying to answer your
10       question.
11           MR. HEGARTY:  I withdrew the question.
12           Listen to my question, Doctor.  Does the
13       Belotte paper show that the SNPs you looked at are
14       associated with increased cancer risk?
15           THE WITNESS:  Ovarian cancer risk.
16   BY MR. HEGARTY:
17   Q.  Ovarian cancer risk.
18   A.  So what I'm trying to tell you, according to this
19       paper, we only tested limited number of patients.
20   Q.  Listen to my question.
21   A.  And I'm not sure, I'm answering, trying to answer.
22   Q.  You're not answering the question.  I'm going to
23       withdraw the question.
24   A.  Can I finish?
25   Q.  I'm going to withdraw the question.  I'm going to

Page 224

1        answer it again.
2            MS. O'DELL:  You can go ahead and finish.
3        Stop interrupting.
4            THE COURT REPORTER:  I cannot take
5        everybody --
6            MS. O'DELL:  Here's my objection.  The
7        witness is being interrupted while he's trying to
8        respond to the question, and so if there's a question
9        pending the doctor is trying to answer, you cannot
10       interrupt him.
11           MR. HEGARTY:  Well, the record's going to
12       speak for itself as far as his nonresponsiveness to my
13       question.
14           MS. O'DELL:  Were you finished with your
15       answer?
16           MR. HEGARTY:  I withdrew the question.
17           MS. O'DELL:  Were you finished with your
18       answer?
19           THE WITNESS:  So what I'm trying to tell you,
20       I cannot remember that we did the same exact SNP in
21       Jimmy Belotte study and this study.
22   BY MR. HEGARTY:
23   Q.  That was not my question.  My question is specific to
24       this study.
25   A.  To the Jimmy Belotte study.

Page 225

1    Q.  Correct.
2    A.  Yes.
3    Q.  And reading from your study in the abstract, starting
4        on the third line it says we sought to evaluate the
5        association of SNPs in key oxidant and anti-oxidant
6        enzymes with increased risk in survival in epithelial
7        ovarian cancer.  So you agree in this study that you
8        looked at certain specific SNPs with regard to
9        increased risk of ovarian cancer, correct?
10   A.  Those SNPs, yes.
11   Q.  You found from your study that those SNPs were not
12       associated with increased ovarian cancer risk, correct?
13   A.  Correct.
14           MS. O'DELL:  Object to the form.
15           THE WITNESS:  Correct.
16   BY MR. HEGARTY:
17   Q.  Can you cite for me any study that has shown the SNPs
18       you report, you discuss in your manuscript to occur in
19       women using talc?
20           MS. O'DELL:  Object to the form.
21           THE WITNESS:  That the SNP that we used in
22       this study --
23   BY MR. HEGARTY:
24   Q.  In the manuscript.
25   A.  In the manuscript, any of these SNPs has been

57 (Pages 222 to 225)

Ghassan Saed, Ph.D.

Page 226

1      associated with woman using talc?
2   Q.   Correct.
3   A.   I don't know.
4   Q.   Can you report -- can you cite for me any studies
5      showing the enzyme activity that you report to have
6      occurred with application of talc use to be in women
7      using talc?
8          MS. O'DELL:  Object to the form.
9          THE WITNESS:  So if other people have done
10      the same work that I did with samples from woman who
11      got ovarian cancer and they used talc?
12   BY MR. HEGARTY:
13   Q.   Can you cite for me any study showing your findings as
14      to decrease in the expression of anti-oxidant enzymes
15      and the increased expression in pro-oxidant enzymes in
16      women using talc?
17          MS. O'DELL:  Object to the form.
18          THE WITNESS:  I can cite to you several
19      studies that have indicated the pro-oxidant state and
20      the anti-oxidant state in several human, animal, in
21      vitro studies of cells with ovarian cancer.
22   BY MR. HEGARTY:
23   Q.   That's not my question.  My question, Doctor, is can
24      you cite for me any studies showing your findings as to
25      decrease in the expression of anti-oxidants and the

Page 227

1      increase expression of pro-oxidants in women using talc
2      on their bodies?
3          MS. O'DELL:  Object to the form.
4          THE WITNESS:  I don't know.
5   BY MR. HEGARTY:
6   Q.   Can you cite for me any study showing the results --
7      showing any of the results in your manuscript to
8      occur -- to have occurred in women applying talc to
9      their bodies?
10          MS. O'DELL:  Object to the form.
11          THE WITNESS:  So let's go back.  I have --
12      this is important.  Good question.  My answer is
13      simple.  The fact that you -- that talc has been shown
14      to elicit a molecular response, that is same response
15      that you get in the pro-oxidant state that has been
16      published by many people in ovarian cancer, that is, to
17      my understanding, link talcum powder to increased risk
18      of ovarian cancer.
19   BY MR. HEGARTY:
20   Q.   Object as nonresponsive.  Listen to my question,
21      Doctor.  My question is can you cite for me any studies
22      showing the findings you report in your manuscript or
23      in your expert report in this case to have occurred or
24      been reported in women using talc on their bodies?
25          MS. O'DELL:  Object to the form.

Page 228

1          THE WITNESS:  So other than the similarities
2      in the mechanism, direct link with woman who use
3      specific talc on that day, I don't know.
4   BY MR. HEGARTY:
5   Q.   Let's take a break.
6          THE VIDEOGRAPHER:  We're going off the record
7      at 3:49 p.m.
8          (A short recess was taken.)
9          THE VIDEOGRAPHER:  We're back on the record
10      at 4:05 p.m.
11   BY MR. HEGARTY:
12   Q.   Doctor, in looking at your manuscript again Page 13,
13      I'm sorry, in looking at your report, sorry, Page 13,
14      you describe the cell lines that you use for purposes
15      of your experiments, is that correct?
16   A.   In the cell lines section?
17   Q.   Yes.
18   A.   Yes.
19   Q.   Which of those cell lines -- strike that.  What sub
20      type of ovarian cancer are these cells?
21   A.   Sorry.  Unknown.
22   Q.   You don't know whether they're high grade, serous,
23      endometrioid, mucinous, clear cell?
24          MS. O'DELL:  Object to the form.
25          THE WITNESS:  When we purchased these cell

Page 229

1      lines from ATCC, they have described them where they
2      isolated from and what's the patient and all that, but
3      I can't remember exactly which one is which.
4   BY MR. HEGARTY:
5   Q.   So are any of these cell lines or have any of these
6      cell lines been qualified as high grade serous ovarian
7      cancer cell lines?
8          MS. O'DELL:  Object to the form.
9          THE WITNESS:  I can't remember.
10   BY MR. HEGARTY:
11   Q.   You say that your experiments used what you call --
12      well, you say immortalized human fallopian tube
13      epithelial cells FT33, is that right?
14   A.   FT33, yes.
15   Q.   Those, as you note in your paper, are immortalized cell
16      lines, correct?
17   A.   Correct.
18   Q.   And such cell lines are considered abnormal or
19      precancerous, isn't that correct?
20   A.   Not necessarily.
21   Q.   Well, they were modified to essentially live forever,
22      correct?
23   A.   No, it's not correct.
24   Q.   Well --
25   A.   They're modified so they can be consistent.

Page 230

Q. But normal cells are not immortalized cells, correct?
A. Correct.
Q. And to immortalize a cell, you have to fundamentally change the cell, correct?
A. Not correct.
Q. Well, you typically have to induce something like the SV40 DNA tumor virus, correct?
A. Correct.
Q. And that alters the makeup of the cells, correct?
A. Not necessarily.
Q. Well, it essentially shuts off, for example, the P53 cell, P53 marker, correct?
A. Oncogene.
Q. Oncogene, correct? And these cells carry essentially a functional equivalent of four critical oncogenes, oncogenic mutations in tumor suppression pathways that have been implicated in ovarian carcinogenesis, correct?
A. Let me explain to you, I have been conducting research all my career using primary cultures of cells established from -- fresh from patient tissues as well as immortalized cell lines. The problem with using primary cultures, the results cannot be reproduced, because if you passage the cells, they change their phenotype with passages, so researcher agreed upon this

Page 231

is the best utility that you have in vitro, that you can use immortalized cell lines, at least they are all -- their machinery of gene expression is controlled and it's consistent and reproducible with passages.
Q. Did you do anything to correlate the cell lines you used to, for example, serous ovarian cancer cells in vivo?
MS. O'DELL: Object to the form.
THE WITNESS: Yeah, so from patients, this is our -- my next interest to do, to go -- I have extensive experience and expertise in isolating primary cultures at zero passages from patients' tissues, blood, and the fluid, and it is in my mind to do further testing of talcum powder and see if we can reproduce the effect on those cells.
BY MR. HEGARTY:
Q. When you say those cells, what do you mean?
A. The primary freshly established cells from different histotypes of ovarian cancer.
Q. Did you do anything --
A. Because this is not available commercially.
Q. Did you do anything to establish that the cell lines you were looking at are, for example, high grade serious ovarian cancer cell lines?
MS. O'DELL: Object to the form.

Page 232

THE WITNESS: So, again, I said one of the cell lines, I can't remember which, is from high grade, high serous grade. The others are not clearly identified by the ATCC information provided. But that was not my point of my research. My point of my research is to see does talcum powder induces or alter oxidative stress markers that we know and we have published in several documents that is associated with ovarian cancer.
BY MR. HEGARTY:
Q. Can you cite for me any data showing that the concentrations of exposure that you used in your experiments are similar or the same as would be occurring in women using talc on the perineum?
A. I can't tell you that.
Q. Can you cite for me any data that shows that the level of concentration of talc that you used in your cell studies has ever occurred in women applying talc to their bodies?
MS. O'DELL: Object to the form.
THE WITNESS: My response to this is I consider, according to my studies, I consider talc powder to be carcinogenic, and in my understanding of biology of cancer, there is no minimum threshold beyond which you are protected from developing cancer. Every

Page 233

time you're exposed to the insult. It's like radiation, it is a accumulative, it is registered in your body; that's my opinion.
BY MR. HEGARTY:
Q. So your opinion is that one particle of talc is enough to cause inflammation to lead to ovarian cancer?
A. I did not say that.
Q. Well, how much talc must there be introduced in vivo to cause ovarian cancer?
A. I don't know.
Q. At what -- strike that. What data shows that a woman using talc will have the same level of talc exposure to her ovarian cells or fallopian tube cells as you used in your experiments?
MS. O'DELL: Object to the form.
THE WITNESS: So when you want to test the effect of any substance in the biology of the body, you always start with cell cultures, cell lines, so this is pretty accepted standard. Now, the amount of exposure in cell lines, because it's direct and it is an isolated environment, it is definitely not -- does not correlate with the in vivo and how much you will get with that exposure. The answer is I don't know how much a woman need to be exposed and for how long to develop ovarian cancer in response to talcum powder

Ghassan Saed, Ph.D.

Page 234

1    use. But what I do know, talcum powder induces -- is a
2    carcinogenic and induces similar response to the
3    profile that we see in pro-oxidant state that we
4    extensively characterize in studies in ovarian cancer
5    in our laboratory and others.
6  BY MR. HEGARTY:
7    Q.  It induces -- talc induces a similar response to the
8       profile that you see in pro-oxidant state in the cell
9       cultures that you experimented, correct, experimented
10      with, correct?
11          MS. O'DELL:  Object to the form.
12          THE WITNESS:  We and others have reported,
13      for example, there was a report showing that patients
14      with ovarian cancer, their blood is contain high levels
15      of pro-oxidants, so that's an indication that ovarian
16      cancer -- as a result of getting ovarian cancer your
17      blood is -- have high levels of oxidants that we
18      characterized.  And there are many other studies that
19      have shown that -- in vivo that there is an association
20      between oxidative stress and the risk of developing
21      ovarian cancer.
22  BY MR. HEGARTY:
23    Q.  But none of those studies have shown those effects in
24       women using talc, correct?
25    A.  I don't know.

Page 235

1    Q.  You don't know of any such studies?
2    A.  I don't know if those studies included in their
3       population women that who have used talc or not.
4    Q.  You can't site for me any studies that have shown the
5       levels of pro-oxidant or anti-oxidant states that you
6       report in your papers in women using talc, correct?
7          MS. O'DELL:  Object to the form.
8          THE WITNESS:  I just answered you.
9  BY MR. HEGARTY:
10   Q.  And the answer is no?
11   A.  No, no, I just -- my previous answer is the same.
12   Q.  Which is what?
13   A.  Which I said oxidative -- there have been shown that in
14      the blood of a woman with ovarian cancer, there is an
15      elevated levels of oxidants, and we're saying that if
16      talcum powder induces oxidative stress, alter oxidative
17      levels and redox balance by increasing oxidants and
18      decreasing anti-oxidants, according to our data, that
19      is an indication that it is doing -- manifesting the
20      pathogenesis of ovarian cancer.
21   Q.  The studies you're referring to --
22          MR. KLATT:  Objection, nonresponsive.
23  BY MR. HEGARTY:
24   Q.  The studies you're referring to have been reported to
25      have occurred in women with ovarian cancer, correct?

Page 236

1    A.  The blood of woman with ovarian cancer.
2    Q.  No studies have reported those same results in the
3       blood of women who do not have ovarian cancer but are
4       using talc on their bodies, correct?
5    A.  One more time.
6          MS. O'DELL:  Object to the form.
7  BY MR. HEGARTY:
8    Q.  No studies have reported those same results in the
9       blood of women who do not have ovarian cancer that are
10      using talc on their bodies, correct?
11   A.  I don't know.
12   Q.  When you say you don't know, what do you mean?
13   A.  I don't know if there are studies.  So you talking --
14      are you referring to the study -- I'm only referring to
15      patients with ovarian cancer, blood, their blood have
16      high oxidants.  Now, if normal, talk about normal
17      people with normal woman with no ovarian cancer, they
18      have -- I don't know, if they use talc they will have
19      higher level of oxidants, maybe that's something we
20      need to do.
21   Q.  You don't know -- you're not aware of any data showing
22      high oxidant levels in women using talc who do not have
23      ovarian cancer?
24   A.  I would be very much interested to do it.
25   Q.  You're not aware of any such studies?

Page 237

1    A.  No.
2    Q.  Can you can cite for me anyone in the scientific
3       community who has accepted that talcum powder causes
4       ovarian cancer by the mechanism that you refer to in
5       your report?
6    A.  Give names?
7    Q.  Yes.
8    A.  The co-authors of my manuscript.
9    Q.  Anyone else?
10   A.  I'm not aware, this is a very recent study.
11   Q.  Is it your testimony that the scientific community has
12      accepted your opinion as establishing the causal
13      mechanism between talc and ovarian cancer?
14          MS. O'DELL:  Object to the form.
15          THE WITNESS:  My opinion is not out there
16      yet, it's -- this is -- the manuscript is still under
17      press, it's in press so it's not really out for the
18      readers.
19  BY MR. HEGARTY:
20   Q.  You agree that the medical community has not generally
21      accepted that talc use causes ovarian cancer?
22          MS. O'DELL:  Object to the form.
23          THE WITNESS:  That they accept --
24  BY MR. HEGARTY:
25   Q.  Yes.

60  (Pages 234 to 237)

Ghassan Saed, Ph.D.

Page 238

1    A.  Which community you talking about?
2    Q.  Well, I'm talking about the medical community.
3    A.  The doctors?
4    Q.  Doctors.
5    A.  Researchers?
6    Q.  Researchers.
7        MS. O'DELL:  Object to the form.
8    BY MR. HEGARTY:
9    Q.  You agree that the medical community, doctors and
10       researchers, have not generally accepted that talc use
11       causes ovarian cancer?
12           MS. O'DELL:  Object to the form.
13           THE WITNESS:  I don't know, I really don't
14       know if they do or not.
15   BY MR. HEGARTY:
16   Q.  You include in your report, in particular in the
17       summary of your report over on Page 20, in Paragraphs 5
18       and 6 that use of Johnson's Baby Powder can cause
19       ovarian cancer, and in Paragraph 6 can worsen the
20       prognosis of patients with ovarian cancer, correct?
21   A.  Correct.
22   Q.  By what methodology did you use to come to those
23       opinions?
24   A.  Okay.  So I have to distinguish between opinions versus
25       conclusion from results.  So here I cite my personal

Page 239

1        opinion.  Now, my personal opinion is based on my data
2        that I got here.  The data that I tested, my
3        methodology that I used, and the results of this study
4        strongly divert -- pushed my opinion towards this.
5    Q.  My question is a little bit different, Doctor.  By what
6        published methodology did you use to reach your
7        causation opinions in this case?
8            MS. O'DELL:  Objection, asked and answered.
9    BY MR. HEGARTY:
10   Q.  For example, are you familiar with the Bradford Hill
11       factors or criteria?
12   A.  Okay, so are you referring to epidemiological studies?
13   Q.  No, let me back up.  Have you ever heard of the
14       Bradford Hill factors?
15   A.  No.
16   Q.  Is there -- can you cite for me any published
17       methodology that you used to look at the data, look at
18       your experiments, and come to the opinions that you set
19       out in the summary of your report?
20   A.  Yes.  I just said to you that based on my results and
21       my previous finding, previous publications with other
22       publications from other laboratories, that all agreed
23       that a factor that causes inflammation and alter these
24       signature factors, the signature for reactive oxygen
25       species the way it does it for -- that simulates

Page 240

1        ovarian cancer is in a hypothesis is a cause and
2        effect.  My opinion is based on that.
3    Q.  Are the methods that you used to reach those opinions
4        published anywhere?
5    A.  The method that we used to do -- to test the effect of
6        talcum powder on reactive oxygen species, oxidative
7        stress, and inflammation is very basic methodology --
8        let me finish, please -- basic methodology that is
9        known since early 70s or even mid 70s, some of it,
10       ELISA is a very well method, very standard method, we
11       and others use this all the time.  PCR is another well
12       established method.  Every single study now you see PCR
13       all over the places.  So what the methodology that we
14       employed here is really standard methodology, and I'm
15       really surprised that this work that has not been done
16       till now.
17   Q.  Are your opinions based solely on the experiments that
18       you did that are set out in your manuscript?
19           MS. O'DELL:  Object to the form.
20           THE WITNESS:  My opinion is based on the data
21       from this manuscript and this work that I did and,
22       also, in published literature that identify the
23       pattern, the signature of pro-oxidants in ovarian
24       cancer.
25

Page 241

1    BY MR. HEGARTY:
2    Q.  The opinions that you set out in Paragraphs 5 and 6
3        have never been published in the peer-reviewed
4        literature, correct?
5    A.  My opinion?
6            MS. O'DELL:  Object to the form.
7    BY MR. HEGARTY:
8    Q.  Yes.  The opinions in Paragraphs 5 and 6 have never
9        been published in the peer-reviewed literature,
10       correct?
11           MS. O'DELL:  Object to the form.
12           THE WITNESS:  I don't understand published
13       means.
14   BY MR. HEGARTY:
15   Q.  Well, published in peer-reviewed literature.
16   A.  As what, as manuscript?
17   Q.  In any format.  You have never set out the opinions in
18       Paragraphs 5 and 6 in any public --
19   A.  So I read this somewhere else?
20   Q.  Somewhere else.
21   A.  I never read this somewhere else.
22   Q.  So you have never provided your opinions to any of your
23       peers in any published article, correct?
24           MS. O'DELL:  Object to the form.
25           THE WITNESS:  That's very general.  What do

61 (Pages 238 to 241)

Ghassan Saed, Ph.D.

Page 242

1    you mean?
2  BY MR. HEGARTY:
3    Q.  Well, my question is the opinions you said in
4       Paragraphs 5 and 6 have never been published anywhere,
5       correct?
6           MS. O'DELL:  Object to the form.
7           THE WITNESS:  No.  What I'm saying is these
8       are my own, my own opinion, my own writing, writing.
9       If someone stole this and published it, I'm not aware
10      of that, but this is my language, my words, my opinion,
11      and this is based, as I told you and as I mentioned, on
12      my data and the results of this study as well as what
13      is known for the strong link of ovarian cancer and
14      oxidative stress.
15  BY MR. HEGARTY:
16     Q.  Listen to my question.  You have never published the
17      opinions of yours set out in Paragraphs 5 and 6 of your
18      report, correct?
19          MS. O'DELL:  Object to the form.
20          THE WITNESS:  I have published that ovarian
21      cancer is characterized and ovarian cancer cells
22      manifest a pro-oxidant state, I have published that --
23  BY MR. HEGARTY:
24     Q.  Nowhere have you --
25     A.  -- that can lead to a mechanism to identify --

Page 243

1       actually, we did identify a pathogenesis, a mechanism
2       that involves these specific pro-oxidants to be unique
3       mechanism of survival in ovarian cancer.
4     Q.  Nowhere have you published in any literature that talc
5       use can cause ovarian cancer, correct?
6     A.  Previous to this study?
7     Q.  This study -- your report has not been published,
8       correct?
9     A.  No.
10    Q.  It's not been peer reviewed, correct?
11    A.  No, my report?  No.
12    Q.  What you say in your report that Johnson's Baby Powder
13      exposure can cause ovarian cancer has never been
14      published in the medical literature, correct?
15          MS. O'DELL:  Object to the form.
16          THE WITNESS:  My report has not published
17      yet.
18  BY MR. HEGARTY:
19    Q.  The opinions in your report that talcum powder exposure
20      can cause ovarian cancer have never been published,
21      correct?
22          MS. O'DELL:  Object to the form, by him or
23      others?
24          THE WITNESS:  Okay.  By me?
25

Page 244

1  BY MR. HEGARTY:
2     Q.  By you.
3     A.  My opinion?
4     Q.  Yes.
5     A.  Has never been -- I never said this before, this
6       study --
7     Q.  Correct.
8     A.  -- is that what you're saying?
9     Q.  Before your report.
10    A.  About specifically talc and ovarian cancer?
11    Q.  Yes.
12    A.  Yes.
13    Q.  And you never said in any other writing that use of
14      baby powder worsens the prognosis for patients with
15      ovarian cancer?
16    A.  I didn't write about this subject prior to starting
17      these experiments.
18    Q.  Even in your manuscript, you don't include the opinion
19      that talcum powder use causes ovarian cancer, correct?
20    A.  You cannot include opinions in manuscripts.
21    Q.  That's not my question.  My question is that your
22      manuscript does not include your opinion that talcum
23      powder use causes ovarian cancer, correct?
24    A.  I answered you.
25          MS. O'DELL:  Object to the form.

Page 245

1  BY MR. HEGARTY:
2     Q.  Am I correct?
3           MS. O'DELL:  Object to the form.
4           THE WITNESS:  Excuse me, one more time.  I
5       said in manuscripts you are not allowed to publish to
6       draw opinions, in manuscripts you're allowed to draw
7       conclusions, so conclusions are different than
8       opinions.  Conclusions are based solely on the results.
9       Opinions, you can say it, if you say it, then if they
10      accept it, it's fine, but opinions are based on not
11      just the study but your opinion in it, too, based on
12      your expertise.
13  BY MR. HEGARTY:
14    Q.  Move to strike as nonresponsive.  Doctor, listen to my
15      question.
16    A.  I'm trying.
17    Q.  Your manuscript does not include your opinion that baby
18      powder exposure can cause ovarian cancer, you don't say
19      that in your manuscript, correct?
20          MS. O'DELL:  Object to the form.
21          THE WITNESS:  I have to look in my
22      manuscript.
23  BY MR. HEGARTY:
24    Q.  Doctor, you can't tell me sitting here today --
25    A.  I'm sorry, I can't remember everything I wrote.

Ghassan Saed, Ph.D.

Page 246

1  Q.  Listen to my question.
2  A.  Okay.
3  Q.  Does your manuscript say that Johnson's Baby Powder
4      exposure can cause ovarian cancer?
5  A.  In this specific language?
6  Q.  Yes.
7  A.  I have to look.
8  Q.  Okay.  How about do you have to look --
9  A.  Because you're asking me -- it's not fair, you're
10     asking me for a specific language, and I am saying, I'm
11     answering back saying that my opinion, it does.  Based
12     on the results in my manuscript, I concluded that it
13     will -- it has increased risk of ovarian cancer, yes,
14     somewhere.  I have to read.  That's what I'm saying.  I
15     don't remember where I did that.
16 Q.  Okay.
17 A.  I have to go and refer to the manuscript.  Is that
18     fair?
19 Q.  In Paragraph 6, what do you mean when you say Johnson's
20     Baby Powder worsens the prognosis for patients
21     with ovarian cancer?
22 A.  Oh, we're still here?  I'm sorry, where --
23 Q.  Paragraph 6 in your report.
24 A.  Oh, my report now?
25 Q.  On Page 21.

Page 247

1  A.  21?
2  Q.  Yes.
3  A.  Okay, yes, so same, same discussion.
4  Q.  Listen to my question.  My question is what do you mean
5      that Johnson's Baby Powder exposure worsens the
6      prognosis for patients with ovarian cancer?
7  A.  Can I answer?
8  Q.  Yes.
9  A.  Okay.  So based on our results here, we have shown that
10     there is a dose response effect of talcum powder on
11     these key markers of oxidative stress.  That's my
12     answer.
13 Q.  And how do those key -- strike that.
14 A.  Dose response.
15 Q.  What is the measure that you apply for worsening the
16     prognosis of ovarian cancer?
17 A.  Is increasing redox balance -- reactive oxygen species,
18     tilting the balance, adding more inflammatory markers
19     with time with exposure.
20 Q.  You make reference in your paper to CA-125, when I say
21     your paper I'm talking about your report and in your
22     manuscript, correct?
23 A.  Correct.
24 Q.  No studies have correlated CA-125 levels with ovarian
25     cancer risk, correct?

Page 248

1  A.  What I know is CA-125 is accepted, it's the only
2      accepted marker because that's the only one available,
3      although not specific to ovarian cancer, but we use it
4      for preliminary following up treatment and diagnosis.
5      You can, you know, I can defer to a clinician to answer
6      more about that, but what I know is that it is not
7      specific to ovarian cancer, endometriosis can increase
8      levels of CA-125, some other inflammatory can do that.
9  Q.  Doctor, listen to my question.  My question was that no
10     studies have correlated CA-125 levels with ovarian
11     cancer risk, correct?
12     MS. O'DELL:  Object to the form.
13     THE WITNESS:  Again, I told you, I'm not an
14     expert in CA-125 and its clinical utility.  What I'm
15     trying to tell you is that CA-125 is a marker that
16     clinician, OB-GYN oncologist, use to help them diagnose
17     and follow up the effect of -- the efficacy of
18     treatment.  Now, this molecule is a marker of
19     inflammation, and we and our results shows clearly that
20     talcum powder can induce this inflammatory marker that
21     has been clinically used by clinicians to help them
22     diagnose and, more importantly, follow up the efficacy
23     of treatment.
24 BY MR. HEGARTY:
25 Q.  Dr. Listen, to my question.  I'll ask a different

Page 249

1      question.  CA-125 is used only in monitoring disease
2      progress in women who have ovarian cancer, correct?
3  A.  I don't know if that's the only use of it.
4  Q.  It's not used to diagnose ovarian cancer, correct?
5  A.  I don't know.  I'm not a clinician.  I really don't
6      know.
7  Q.  It's not used to determine the cause of ovarian cancer,
8      is it?
9  A.  I don't know, you can ask.  I defer these questions to
10     a physician, OB-GYN oncologist who can answer you.  I
11     am a biological chemist, I'm molecular biologist.  I
12     will answer you within my expertise.
13 Q.  CA-125 is not used to determine whether women have an
14     inflammatory process going on in their bodies, correct?
15     MS. O'DELL:  Object to the form.
16     THE WITNESS:  If the levels of CA-125 is
17     increased in a woman, my understanding, this is a
18     strong indication to an inflammatory process going on,
19     yes.
20 BY MR. HEGARTY:
21 Q.  You're talking about in women who have ovarian cancer?
22 A.  It is also increased in women with, yes, with ovarian
23     cancer.
24 Q.  CA-125 is not used to diagnose whether inflammation is
25     going on in women who do not have ovarian cancer?

63 (Pages 246 to 249)

Ghassan Saed, Ph.D.

Page 250

1    MS. O'DELL: Object to the form.
2    THE WITNESS: Ask the OB-GYN oncologist.
3  BY MR. HEGARTY:
4  Q.  If you look at your manuscript over at Table 2.
5  A.  Okay.
6  Q.  What is the mechanism by which talc causes the SNP
7      changes or switches you report in this table?
8  A.  Do I know the mechanism that does that?
9  Q.  Yes.
10  A.  Precisely, no, but we have previously published a
11      report showing that development of chemoresistance,
12      which is an ovarian cancer -- ovarian cancer disease
13      that is characterized by even further enhancement of
14      oxidative stress, we have published that is associated
15      with these SNPs. So the precise mechanism I'm
16      proposing that according to my understanding is that
17      the higher the oxidative stress level, the more chances
18      that you induce these switches, these mutations.
19  Q.  Can you cite for me any published data showing these
20      same or similar type of switches in cells that have
21      been exposed to any other substance, whether it's a
22      carcinogen or otherwise?
23  A.  If there is any other substance that induces mutations?
24  Q.  That induces the kinds of mutations that you report
25      here.

Page 251

1  A.  In the literature, there are several, many substance
2      that have been associated with certain mutations in the
3      DNA, yes.
4  Q.  Well, let me ask it a different way. Can you cite for
5      me any substance that has been shown to cause -- or
6      strike that, let me back up. Is it your testimony that
7      what you're reporting here -- that you're reporting
8      here that talc causes mutations in DNA in 72 hours?
9      MS. O'DELL: Object to form.
10      THE WITNESS: My results indicates that if
11      you treat cells with talcum powder for 72 hours and
12      look for whatever showed positive here, some showed
13      negative, that there is an induction of this specific
14      mutation in response to the treatment of talc.
15  BY MR. HEGARTY:
16  Q.  Can you cite for me any other substance that's ever
17      been reported to cause these kinds of mutations after
18      72 hours of treatment in cell cultures?
19  A.  I cannot recall now. I'm sure I can find them. There
20      are many in the literature, by the way, but I am citing
21      you specifically my work that I have done in my
22      laboratory that was shown that when oxidative stresses
23      further -- increased and enhanced, we develop some of
24      these mutations, cell would acquire these mutations in
25      certain key pro-oxidants and anti-oxidant enzymes that

Page 252

1      results in further inhibition of apoptosis and increase
2      of survival -- apoptosis, cell death, cell death.
3  Q.  Doctor, listen to my question. Can you cite for me any
4      other substances that have ever been reported to cause
5      these kinds of mutations after 72 hours of treatment in
6      cell cultures?
7  A.  I cannot recall now.
8  Q.  The cell cultures you used are at high oxygen levels,
9      are at high oxygen levels than in vivo, correct?
10  A.  I don't understand the question.
11  Q.  Well, the cell cultures that you use for purpose of
12      your experiments are at higher oxygen levels than these
13      cells would experience in vivo, correct?
14  A.  You mean the whole world of researcher used?
15  Q.  No, that the cell lines that you used --
16  A.  The whole world of researcher used, same 20 percent
17      oxygen in CO2, okay, it's the same exact standard
18      protocol all over the research field. I never heard
19      that there's anyone culturing cancer cells in a
20      different environment than -- we have done many work
21      looking at the effect of hypoxia and hyperoxia on the
22      expression of these markers in normal cells. We have
23      done several, I have published several publications.
24      Let me help you with this information.
25  Q.  Let me withdraw the question, Doctor. You're going on

Page 253

1      not answering my question.
2  A.  I'm trying.
3  Q.  No, you're not answering my question.
4  A.  I'm answering what I understood.
5  Q.  The tests you conducted, the experiments you conducted
6      are higher oxygen levels than cells are exposed to in
7      vivo, correct?
8  A.  I'm trying to -- no, it's not, I'm trying to explain it
9      to you.
10  Q.  They're not higher levels?
11  A.  What do you mean by in vivo? In blood?
12  Q.  Cells inside the body.
13  A.  It's PO20, it's the same.
14  Q.  So the oxygen levels of the cells in the body are at
15      the same level as the oxygen levels of the cells in
16      your cell --
17      MS. O'DELL: Objection.
18      THE WITNESS: No, I said the oxygen levels in
19      the circulation in vivo is the same as the oxygen level
20      in the media where we culture cells. This is where we
21      get it from, not from a dream, we got it from there.
22      Now, if you're referring to the oxygen levels that
23      cells are exposed to in tissues --
24  BY MR. HEGARTY:
25  Q.  Yes.

64 (Pages 250 to 253)

Ghassan Saed, Ph.D.

Page 254

1   A.  Nobody knows that.  There's only one single report that
2       says in a physiology book where I was a student at that
3       time, they're saying 6 percent, 5 to 6 percent.  But
4       that is inside the tissues without the circulation.
5       Now, you have to remember all cells get food from
6       circulation, so you will have eventually enough oxygen
7       that you're getting for.  So this is within my
8       expertise, I've done many, many work on this.
9   Q.  The glucose levels in your cell cultures are also
10      higher than what the cells would experience in the
11      body, correct?
12  A.  The glucose level that we use in the media, again, is
13      standard with all of any researcher on the face of this
14      earth use.  It is standard accepted levels.  So if you
15      are trying to make that what we use is different than
16      in vivo, it could be, but this is what agreed upon in
17      the research community.
18  Q.  Move to strike as nonresponsive.  Listen to my
19      question, Doctor.  Are the glucose levels in cell
20      cultures that you performed for purposes of your
21      experiments higher than the glucose levels of the cells
22      inside the body?
23          MS. O'DELL:  Objection, form, asked and
24      answered.
25          THE WITNESS:  I don't know.

Page 255

1   BY MR. HEGARTY:
2   Q.  Aren't the cells that you experiment with in a
3       hyperglycemic state?
4   A.  I just told I don't know.
5   Q.  Can high glucose levels cause an increase in reactive
6       oxygen species?
7   A.  Okay, so --
8   Q.  Can they or can't they?
9          MS. O'DELL:  He gets to -- you asked the
10      question, he --
11          THE WITNESS:  There is no yes or no answer.
12  BY MR. HEGARTY:
13  Q.  Okay.  I withdraw the question.
14  A.  If you are trying to take me to say "yes" or "no" to
15      something that I have explanation for, I think you
16      should just listen to my explanation.  I am actually --
17      this field, this field is my field, and I will tell
18      you, okay, I'll tell you that the cancer cells are --
19      their metabolism is different than normal cells because
20      their uptake, their uptake of glucose, they don't go in
21      aerobic metabolism, they go anaerobic metabolism, so it
22      doesn't matter how much glucose you give them, it
23      doesn't really.
24  Q.  If you look over on Page -- Figure 6 of your
25      manuscript, why do your normal cell lines -- strike

Page 256

1       that -- why do your control cell lines have such high
2       levels of Caspase?
3   A.  So it is known, as we have previously published and all
4       other researcher who was interested in this, that
5       cancer cells have almost shut down their apoptosis,
6       because they have to increase their survival.  So when
7       you compare apoptosis of any cancer cell from any type,
8       okay, you will find their apoptosis is way, way lower
9       than normal cells.  Normal cells, they have -- they
10      divide, they die, they reproduce, all the times.
11      Cancer cells don't like to die, they love to survive,
12      so their apoptotic pathways are not normal.
13  Q.  So then what you're reporting here are as to control
14      cells, controls in ovarian cancer cells?
15  A.  No, no.  The controls here are macrophages, it's normal
16      ovarian epithelial, and fallopian tube epithelial.
17  Q.  Why are your -- the Caspase levels higher in your
18      controls than in your talc treated cells?
19  A.  Maybe I missed the question.  I just answered that,
20      right?
21  Q.  Well, I don't think you answered my question.
22  A.  Well, let me try to understand what you want.
23  Q.  Well, the Figure 6 shows that the controls have higher
24      levels of Caspase-3 than the talc treated cells,
25      correct?

Page 257

1          MS. O'DELL:  Object to the form.  Do you need
2       to see that in color, Doctor?  Would that help?
3          THE WITNESS:  Yes, please.
4          MS. O'DELL:  (Handing.)
5          THE WITNESS:  So here, the control cells, so
6       let's look at the normal cells -- okay, the normal
7       cells -- well, that's the whole idea, the whole
8       objective of this research, the whole point, that if
9       you treat with talcum powder, talcum powder induces --
10      enhances oxidative stress that stimulate apoptosis
11      pathways and shut them down, inhibit them.  So in the
12      treated -- in the treated, they should be lower than
13      the untreated.
14  BY MR. HEGARTY:
15  Q.  What are the normal Caspase levels in a normal cell?
16  A.  It's different for different cell types, but normal
17      cell types, normal cells always have way higher
18      apoptosis than cancer cells.  This is well known
19      phenomenon.
20  Q.  At the levels you report in Figure 6?
21  A.  It depends on the cells, again, I said, it depends on
22      the cell type.  So maybe other people in their work,
23      they have different response.  But it is accepted that
24      is cancer cells, all cancer cells, no exception, have
25      lower, way lower apoptosis than normal cells.  I

65 (Pages 254 to 257)

Ghassan Saed, Ph.D.

Page 258

1    published previously that lower apoptosis in cancer
2    cells is due to overexpression of nitric oxide
3    synthase, which is a pro-oxidant, and myeloperoxidase,
4    which is another pro-oxidant, and they work together to
5    nitrisolate Caspase-3, that's what we're measuring
6    here, and shutting down its activity and its apoptosis.
7    Q.  The type of SNP changes that you report in your
8        manuscript can be detected by Sanger sequencing,
9        correct?
10   A.  Now, that's -- we're moving from this?
11   Q.  Yes.
12   A.  Okay, sorry, I thought we were still here.
13   Q.  Different question.
14   A.  Okay.  Give me a --
15   Q.  Can you answer my question?
16   A.  What's the question?
17   Q.  The type of SNP changes that you report in your
18       manuscript can be detected by Sanger sequencing,
19       correct?
20   A.  Yes.
21   Q.  Did you use this method?
22   A.  No.
23   Q.  Have you ever used Sanger sequencing to detect changes
24       in SNPs or to analyze SNPs?
25   A.  You mean gene mutations?

Page 259

1    Q.  Gene mutations, yes.
2    A.  So the answer is nowadays no one does this from the
3        research community.  There are core facilities, labs
4        that you send to.  You don't need -- I don't believe
5        people will in their laboratories that sit down and do
6        experiments that takes forever.  They just rather send
7        it to this lab, we have -- every university have this,
8        we have a core facility that you can send to, and then
9        they will do it for you and they will give you the
10       results, so you don't need to do it yourself.
11   Q.  Is Sanger sequencing considered more accurate than
12       TaqMan?
13   A.  Pretty much I think they are the same level.
14   Q.  And you said you have used Sanger sequencing before?
15   A.  No, personally no.
16   Q.  What is the mechanism by which the SNP change, as you
17       say, talc induces cause the redox changes that you
18       report in your study?
19   A.  So talcum powder treatment increase, induces the
20       specific mutations that are associated with altering
21       the activity of the redox, the key oxidant enzymes that
22       the results will be altering the oxidated balance.
23   Q.  And what studies show that?
24   A.  This study.
25   Q.  What studies besides your study, your manuscript?

Page 260

1    A.  I believe we have published a different study with the
2        same subject.  You want me to look for it?
3    Q.  Not right now.
4    A.  Okay, but we did publish that before.
5    Q.  Did you measure changes in peroxide levels as part of
6        your experiment?
7    A.  Excuse me, one more time.
8    Q.  Did you measure changes in peroxide levels as part of
9        your experiments?
10   A.  What is peroxide level?
11   Q.  Hydrogen peroxide level.
12   A.  Oh, H2O2?
13   Q.  Yes.
14   A.  Indirectly, yes.
15   Q.  When you sat indirectly, what do you mean?
16   A.  Because it's the substrate for an enzyme, so it's an
17       enzymatic reaction.
18   Q.  Did you find any changes in hydrogen peroxide levels in
19       the talc treated cells?
20   A.  We didn't measure the actual H2O2 levels in these
21       cells.  We did measure the catalase activity that turns
22       H2O2 to H2O, which is the turnover.
23   Q.  Have you ever measured hydrogen peroxide levels in
24       these types of studies?
25   A.  Have I measured -- H2O2, I don't think so, directly,

Page 261

1    directly H2O2 levels, no.
2    Q.  You've referred earlier to the fact that you have
3        published abstracts that have talked about the results
4        of the experiments we've marked as -- let me start
5        again.  You mentioned earlier that you published the
6        results of the experiments documented in lab notebooks
7        marked as Exhibits 2 and 3 in the past, correct?
8            MS. O'DELL:  Object to the form.
9    BY MR. HEGARTY:
10   Q.  You didn't get that question?
11   A.  No.
12   Q.  You mentioned you had published the results of your
13       experiments that we've been talking about here today in
14       abstracts, correct?
15   A.  There was an SRI abstract that I presented at the SRI
16       meeting March of '18, last year, that was reflected or
17       involved this initial work that we did with Fisher with
18       PCR.
19   Q.  And you also presented at an SGO meeting, correct?
20   A.  I believe I did.
21   Q.  In either case did you disclose that you were a
22       consultant for plaintiffs counsel in litigation,
23       correct?
24   A.  When you submit the abstract, they will not let you
25       proceed until you -- yes, the answer is yes.

66 (Pages 258 to 261)

Ghassan Saed, Ph.D.

Page 262

1   Q.  The answer is that you did disclose?
2   A.  I did disclose, yes.
3   Q.  It's not included -- the disclosure's not included in
4       the abstracts, correct.
5   A.  They don't have it like that, no.
6   Q.  When you presented the abstracts, did this involve
7       standing there in front of a poster?
8   A.  Yes.
9   Q.  And did people come up and talk to you about your
10      posters?
11  A.  Yes.
12  Q.  Did you identify yourself as an expert in litigation
13      involving talc and ovarian cancer?
14          MS. O'DELL:  Object to the form.
15          THE WITNESS:  No one asked me.
16  BY MR. HEGARTY:
17  Q.  Did you tell them that you were?
18  A.  I didn't volunteer anything.
19  Q.  Have you provided your opinions in this case to anyone
20      outside of plaintiff's counsel or your colleagues on
21      the manuscript?
22          MS. O'DELL:  Object to the form.
23          THE WITNESS:  So you just asked me if I
24      discussed this with people that I presented to in the
25      whole meeting.

Page 263

1   BY MR. HEGARTY:
2   Q.  Well, let me ask it a different way because I can see
3       where you're confused.  We talked about your opinions
4       that talc can cause ovarian cancer.
5   A.  Oh, so we're going back here now?
6   Q.  Yes, we're going back to your opinions.
7   A.  Okay.
8   Q.  Have you ever told anyone at the medical school, at
9       Wayne State Medical School that talc use can cause
10      ovarian cancer?
11  A.  I don't recall.
12  Q.  Have you ever told anyone at Wayne State School of
13      Medicine that talc use can worsen the prognosis of
14      ovarian cancer?
15  A.  Again, I don't recall.  I don't remember.
16  Q.  Can you tell for me, when you say you can't recall
17      having had a discussion with anyone --
18  A.  I can't remember that I said that.
19  Q.  Can you cite for me anyone that you've spoken with at
20      the Wayne State School of Medicine where you've told
21      them your opinions that talc use can cause ovarian
22      cancer or can worsen ovarian cancer?
23  A.  Other than the co-authors of this study?
24  Q.  Yes.
25  A.  I haven't talked to anyone, in my school, to be

Page 264

1       specific.
2   Q.  Are your opinions in this case premised on talc
3       containing asbestos?
4   A.  (Witness shakes head from side to side.) I don't know,
5       no, my opinion has nothing to do with that.
6   Q.  Are your opinions in any way based on talc having heavy
7       metals in them?
8   A.  No.
9   Q.  Is it your opinion that talc without asbestos or
10      without any other constituents can cause ovarian
11      cancer?
12  A.  The one that I got in this bottle from J & J, yes.
13  Q.  Is it your opinion, Doctor, that your studies or your
14      experiments show that talc increases cellular
15      proliferation and decreases apoptosis?
16  A.  I'm sorry, one more time, one more time.
17  Q.  Sure.  Is it your opinions or is it your opinion that
18      talc use increases cellular proliferation and decreases
19      apoptosis in normal ovarian cells?
20  A.  My finding clearly indicates that if you treat cells
21      with talcum powder, the results of this treatment is a
22      dose response increase in proliferation and decrease in
23      apoptosis, yes.
24  Q.  In normal ovarian cells?
25  A.  In normal and in cancer cells.

Page 265

1   Q.  Cell proliferation does not mean cancer, correct?
2   A.  Cell -- increase in cell proliferation beyond normal is
3       a highlight of cancer cells.
4   Q.  There is cell proliferation in normal cells in the
5       absence of cancer, correct?
6   A.  So good question.  So cell -- normal cells in response
7       to agents can be temporally transit induces their
8       proliferation, but they come back.  Cancer cells don't
9       come back.  They will proliferate forever.
10  Q.  But you agree that cell proliferation does not equate
11      to cancer?
12  A.  Okay, I am answering you.  According to my knowledge,
13      transit, transit or let's say temporary or initial
14      induction of proliferation, it is a normal response of
15      all normal cells to agents.  If this response
16      continues, now, this is a hallmark of cancer.  It is
17      indication that this cell is going that route.
18  Q.  In the tests you conducted, the results would be
19      considered an acute response to talc, correct?
20          MS. O'DELL:  Object to the form.
21          THE WITNESS:  Yes, I understand.  In cell
22      culture you cannot distinguish between acute response
23      versus chronic response.  In cell culture you cannot do
24      that.  So in cell culture it is a response.
25  Q.  That you cannot say would occur in a chronic way?

Ghassan Saed, Ph.D.

Page 266

1      MS. O'DELL: Objection.
2      THE WITNESS: I don't know if this -- okay,
3  here's the question, so the answer is you expose cells,
4  talcum powder, cells go crazy and they increase their
5  proliferation. If they don't come back, so that's the
6  response to the acute, if they don't come back and
7  there is talcum powder particles in there, and they
8  keep provoking the inflammation, that irritant goes into
9  chronic inflammation. I'm trying to think of
10 simulation to in vivo, but in cell culture you cannot
11 tell.
12 BY MR. HEGARTY:
13 Q.  Can you cite for me any studies showing increase in
14    cell proliferation in the presence of talc in vivo?
15     MS. O'DELL: Objection, form.
16     THE WITNESS: Very complicated question,
17 break it down for me, please.
18 BY MR. HEGARTY:
19 Q.  I don't know if I can break it down. Can you cite for
20    me any study showing an increase in cell proliferation
21    in the presence of talc in women using talc?
22 A.  How would you measure --
23     MS. O'DELL: Objection.
24     THE WITNESS: How would you measure cell
25 proliferation in woman?

Page 267

1  BY MR. HEGARTY:
2  Q.  Well, I'm asking you if you're aware of any such
3     studies?
4  A.  I'm answering. I said how would you measure that? I'm
5     not aware, I don't know.
6  Q.  Are you aware of any studies showing a decrease in
7     apoptosis in the cells of women using talc?
8  A.  Again, these studies only done in cell culture. You
9     cannot do this in vivo. This has to be isolated from
10    the woman of ovarian cancer who use talc, who didn't
11    use talc, and then you look at their cells in culture
12    to determine those parameters. You cannot determine
13    those in vivo. Although there are pathology they can
14    do, they can do proliferation markers like KI67, it's
15    been done, it's all over, there are indications, but
16    they cannot do this in vivo. This has been done in
17    tissues. With woman, yes, you can do it, but to do
18    that you have to isolate the cells and then look at the
19    cell response.
20 Q.  Are there any studies showing that an increase in cell
21    proliferation, as you showed in your experiments, is
22    associated with an increase in ovarian cancer risk?
23     MS. O'DELL: Object to the form.
24     THE WITNESS: There are several studies that
25 shows that enhanced proliferation and reduce with

Page 268

1  contaminant decrease in apoptosis is a hallmark of
2  ovarian cancer.
3  BY MR. HEGARTY:
4  Q.  Not my question, Doctor. My question was are there any
5     studies showing that an increase in cell proliferation,
6     as you showed in your experiments, is associated with
7     an increase in ovarian cancer risk?
8      MS. O'DELL: Object to the form, asked and
9  answered.
10     THE WITNESS: Okay, so you're asking if there
11 are reports showing that there is the increased
12 proliferation is associated with increased cancer risk?
13 BY MR. HEGARTY:
14 Q.  Correct.
15 A.  Okay, again, I'm answering, the answer is I don't know
16    because I believe that you cannot measure proliferation
17    in vivo.
18 Q.  Are there any studies showing that a decrease in
19    apoptosis, as you showed in your experiments, is
20    associated with an increase in ovarian cancer risk?
21 A.  So I would respond the same way. I would say, again,
22    these -- to determine apoptosis, you have to isolate
23    the cells from the patient outside and do cell culture
24    and look into that, so I'm not aware.
25 Q.  Are there any studies showing either an increase in

Page 269

1  cell proliferation or a decrease in apoptosis as you
2  have shown in your report in women using talc?
3      MS. O'DELL: Object to the form.
4      THE WITNESS: I'm not aware of that.
5      MR. HEGARTY: Why don't we take a break, go
6  off the record. I need to converse with counsel for
7  Imerys about how much time that he needs for his
8  questioning.
9      MS. O'DELL: Okay.
10     THE VIDEOGRAPHER: Going off the record at
11 5:04 p.m.
12     (A short recess was taken.)
13     THE VIDEOGRAPHER: We're back on the record at
14 5:26 p.m.
15 BY MR. HEGARTY:
16 Q.  Doctor, in your cell experiments, how did you control
17    for cross-contamination?
18     MS. O'DELL: I'm sorry, I didn't hear, for
19 cross-contamination?
20     MR. HEGARTY: Yes.
21     THE WITNESS: Cross-contamination, so cross-
22 contamination from each -- from the cells that I used?
23 BY MR. HEGARTY:
24 Q.  How did you control to keep from mixing up of samples?
25     MS. O'DELL: Object to the form.

68 (Pages 266 to 269)

Ghassan Saed, Ph.D.

---

Page 270

1    THE WITNESS: I'm not sure that I understood
2    your question. Are you referring to mixing the two
3    cell lines, for example?
4    BY MR. HEGARTY:
5    Q. Yes.
6    A. With each other?
7    Q. Correct.
8    A. That's not possible.
9    Q. Why is that not possible?
10   A. Because each cell line is done in one experiment
11   treatment with all the doses on its own.
12   Q. What about mixing normal cells with the -- I'm sorry,
13   how about mixing control cells with the treated cells,
14   is that possible?
15   A. What do you mean by control cells, not treated?
16   Q. Not treated?
17   A. So, also, that's not possible because you -- we divide,
18   we grow the cells, one lot, one lot of cells, and then
19   we aliquot, we put 1 million cells here, 1 ml cells
20   here, and then we separate them and give the different
21   doses for each cell lines. And the -- this thing, the
22   treatment was repeated for PCR for RNA, for protein for
23   ELISA, for proliferation assays, it's not possible
24   that there is a mix between treated and untreated.
25   Q. Do you know what positive and negative controls are in

---

Page 271

1    cell studies?
2    A. I do.
3    Q. You did not use positive and negative controls in your
4    cell studies, correct?
5    A. Not correct.
6    Q. Well, I'm going to define positive controls as applying
7    a known cancer causing substance to the cells. Is that
8    your understanding of positive control?
9    A. Not in these studies.
10   Q. I'm talking about generally.
11   A. Generally a positive control that something that you
12   know it's there and you're looking for it.
13   Q. What is in general terms a negative control?
14   A. A negative control, something you're not looking for,
15   it is not there.
16   Q. Well --
17   A. So there is negative negative and there is positive
18   positive.
19   Q. Did you do any of your tests -- I'm sorry, did you do
20   any of your experiments using any substances known to
21   be a carcinogen?
22   A. One more time. I will answer you. The answer is no,
23   okay, but you're referring to -- so there are two
24   different controls, negative and positive for the
25   target, and negative and positive for the treatment.

---

Page 272

1    There's two different controls, okay. We did negative
2    and positive for the treatment, so this is with talc,
3    this is with no talc. For the markers, for the
4    markers, we have standards that with serial dilution
5    tells you exactly how much you expect to get in there.
6    Q. Did you use a negative control in your cell studies
7    with a known inert substance?
8         MS. O'DELL: Object to the form.
9         THE WITNESS: That's not a negative control
10   to me, it does not apply to my study. The only
11   negative control that applies to my study is talc with
12   no talc.
13   BY MR. HEGARTY:
14   Q. How can you rule out in your studies that any
15   particulate you added to the cell cultures would cause
16   the same thing?
17   A. Again, we tested several fold. So our study does not
18   qualify for a positive positive control that you're
19   referring to or a negative negative control.
20   Q. How are you able to rule out that glass beads wouldn't
21   cause the same --
22   A. Glass beads?
23   Q. -- effect? How are you able to rule out that some
24   inert part, other part -- strike that. How would you
25   rule out that any particle wouldn't cause the same

---

Page 273

1    effect that you saw in your studies?
2    A. Very simple, the untreated didn't show that.
3    Q. Well, how do you rule out that the treated cells would
4    react the same way regardless of what you put on them?
5    In other words, if you put -- how did you rule out that
6    any particle would not cause the same thing if you
7    mixed it with DMSO and applied it to talc?
8    A. Yeah, so we did DMSO control.
9         MS. O'DELL: Object to the form.
10        THE WITNESS: So we did -- took the talc,
11   mixed it with DMSO, took the DMSO, treat the cells with
12   DMSO alone and with DMSO and talc. So if the effect
13   was due to DMSO, you would see the response in the
14   untreated cells.
15   BY MR. HEGARTY:
16   Q. Would cornstarch cause the same result?
17   A. I did not test it.
18   Q. How can you rule out that cornstarch wouldn't do the
19   same thing if applied to cells?
20        MS. O'DELL: Object to the form.
21        THE WITNESS: I didn't rule anything, I did
22   not test it.
23   BY MR. HEGARTY:
24   Q. Does cornstarch cause cancer?
25   A. I did not test it.

---

69 (Pages 270 to 273)

Ghassan Saed, Ph.D.

| Page 274 | Page 276 |
|---|---|

**Page 274**

1  Q.  Well, in your opinion, does --
2  A.  In my opinion?
3  Q.  Yes.
4  A.  From my information?  I don't think so.
5  Q.  Could you have tested cornstarch in the same way you
6      tested talc?
7  A.  Could I have?
8  Q.  Yes.
9  A.  I can use my methodology to test that, yes, of course.
10 Q.  And are you able to say that no other particle exposed
11     in the same way that you would expose cells with talc
12     would not have caused the same result?
13        MS. O'DELL:  Object to the form.
14        THE WITNESS:  I already answered.
15 BY MR. HEGARTY:
16 Q.  Okay, I'm saying that in this study, the way this
17     study's designed to look at the effect with talc,
18     without talc, if you are looking at one marker only,
19     then maybe we should consider more, but we're looking
20     at several markers at several levels.  So we're looking
21     at mRNA DNA mRNA protein activity, several levels here.
22 Q.  But you cannot say that cornstarch wouldn't do the same
23     thing as talc did in your experiments?
24 A.  I did not study cornstarch, so I cannot tell you.
25

**Page 276**

1  A.  I didn't say I did not agree.  I said I am not -- I
2      don't have any molecular data in my laboratory to
3      support the direct effect of talcum powder on my
4      markers that I studied in my lab, and I would like to
5      do that.
6  Q.  When in relation to the first call that you had with
7      Miss Thompson did you agree to serve as a consultant
8      for Beasley Allen?
9  A.  I think it was like October sometime.
10 Q.  And in between the time of the first call and October,
11     did you have any additional calls with anyone from --
12 A.  We had the meeting September 7, if I remember.
13 Q.  At the time of that meeting, had you agreed to serve as
14     a consultant for Beasley Allen?
15 A.  I agreed in principle to serve as a consultant for what
16     I am an expert in, which is oxidative stress and
17     ovarian cancer, and I promised to run data, do some
18     work, because I wanted to find out if there is
19     molecular evidence to support the effect of talcum
20     powder on the markers that I study, which are the
21     markers of risk of ovarian cancer.
22 Q.  And you agreed to serve as a consultant, at least as to
23     oxidative stress and ovarian cancer, as of the time of
24     the meeting in September?
25        MS. O'DELL:  Object as to form.

| Page 275 | Page 277 |
|---|---|

**Page 275**

1  Q.  We talked earlier at the beginning of the deposition
2      about you receiving a call from Miss Thompson, correct?
3  A.  Yes.
4  Q.  Do you know how she came to call you in the first
5      place?
6  A.  From according to her?
7  Q.  Yes.
8  A.  Or according to me?
9  Q.  Well, what is your understanding as to why she
10     initiated that initial call, how she came to get your
11     name?
12 A.  She found me on what do you call it -- Med Web, because
13     I had published this review article in this very
14     prestigious journal called OB-GYN Oncology.  Want to
15     let me finish?
16        MS. O'DELL:  Yes, you may finish.
17 BY MR. HEGARTY:
18 Q.  Are you finished?
19 A.  No.
20 Q.  How much more is there?
21 A.  Okay --
22        MS. O'DELL:  You may finish, Doctor.
23 BY MR. HEGARTY:
24 Q.  You mentioned that you did not agree to serve as a
25     consultant at the time of the first call, correct?

**Page 277**

1        THE WITNESS:  I agreed to serve as a
2  consultant for oxidative stress and ovarian cancer in
3  actually the first phone call.
4  BY MR. HEGARTY:
5  Q.  With regard to your work in this litigation, have you
6      reviewed any of the expert reports of any other experts
7      designated by plaintiffs?
8  A.  Barely I remember one or two, just briefly.  I don't
9      even remember names.
10 Q.  Have you reviewed, for purposes of your opinions in
11     this case, anything that you did not bring with you
12     here today?
13 A.  Good question, no.
14 Q.  Are there any necessary changes to your expert report?
15 A.  As --
16 Q.  As you sit here today.
17 A.  As of now today, no.
18 Q.  Have you ever had your deposition taken before?
19 A.  No.
20 Q.  Have you ever been designated to serve as an expert
21     witness in any lawsuit?
22 A.  No.
23 Q.  You are not a medical doctor, correct?
24 A.  No.
25 Q.  You brought with you a copy of your updated CV; is that

70 (Pages 274 to 277)

Ghassan Saed, Ph.D.

| Page 278 |
| --- |

1      correct?
2   A. Correct.
3   Q. Yes. I'm going to mark this Exhibit Number 18.
4          SAED DEPOSITION EXHIBIT NUMBER 18,
5          CURRICULUM VITAE,
6          WAS MARKED BY THE REPORTER
7          FOR IDENTIFICATION
8   BY MR. HEGARTY:
9   Q. The CV you brought with you today, is that your current
10     curriculum vitae?
11  A. Yes.
12  Q. Okay. Thank you. You don't treat ovarian cancer
13     patients, correct?
14  A. I am not an M.D., I'm not a medical doctor.
15  Q. Do you teach any courses?
16  A. In the university, yes.
17  Q. What courses do you teach?
18  A. They are listed here in my CV.
19  Q. Listed in your CV?
20  A. Yes.
21  Q. Do you teach medical students?
22  A. I do.
23  Q. Those would be listed in your CV?
24  A. Everything I teach is listed here.
25  Q. What percentage of your time is spent teaching?

| Page 279 |
| --- |

1   A. Okay, so we have two types of teaching in our
2      institution they consider teaching. We have formal
3      courses and then we have hands-on teaching, which is
4      required for our residency program and fellowship
5      program. I do more of the hands-on for the medical
6      doctors for our residents and fellows in the
7      department, then I help them write their thesis, design
8      their experiments, do the work, so that's my primary --
9      I spend almost significant time. I can't tell you
10     exactly what I spend on that part, but I do.
11  Q. Have you applied to be a full professor at Wayne State
12     University?
13  A. No.
14  Q. Why not?
15  A. Applying for a full professor at our institution
16     requires current NIH NCI only funding, which is very
17     hard to get these days.
18  Q. Is it your opinion that talc induces chemoresistance?
19  A. Talc induces chemoresistance -- so we -- I have not
20     tested that, so this needs to be tested.
21  Q. In connection with developing and setting out your
22     opinions in this case, did you review all of the animal
23     literature looking at talc and ovarian cancer?
24  A. All of the literature, no.
25  Q. Did you review all of the cell studies looking at talc

| Page 280 |
| --- |

1      and ovarian cancer for purposes of developing your
2      opinions in this case?
3   A. To my best knowledge, yes, only like three papers out
4      there.
5   Q. I'm sorry?
6   A. There are only like three papers out there that I can
7      remember.
8   Q. Did you do a search yourself for literature concerning
9      talc and ovarian cancer?
10  A. Yes.
11  Q. What search engines or tools did you use?
12  A. I used what I always use, the PopMed.
13  Q. You say in your report that an enhanced redox state has
14     been described with epithelial ovarian cancer.
15  A. I'm sorry, one more time.
16  Q. Is it your opinion that an enhanced redox state has
17     been described in patients with epithelial ovarian
18     cancer?
19  A. With ovarian cancer patients, yes.
20  Q. And enhanced redox state has been described with other
21     types of cancer, too, correct? It's not unique to
22     ovarian cancer?
23  A. Okay, I don't know about other cancer, that's not my --
24     what I do. What I do, what I talk about, what I work
25     with is ovarian cancer. So we did work in my lab only

| Page 281 |
| --- |

1      with ovarian cancer and these markers.
2   Q. Has an enhanced redox state been described with other
3      diseases besides cancer?
4   A. One more time, please.
5          MS. O'DELL: Object to form.
6   BY MR. HEGARTY:
7   Q. Has an enhanced redox state been described with
8      diseases other than cancer?
9   A. I don't know.
10  Q. You have done research looking at that pathogenesis of
11     tissue fibrosis, correct?
12  A. Correct.
13  Q. Tissue fibrosis does not increase the risk of
14     developing cancer, correct?
15  A. Not correct.
16  Q. So it's your opinion that having -- that fibrosis
17     increases the risk of cancer?
18  A. Not correct, that's not my opinion.
19  Q. What is your opinion with regard to the relationship
20     between fibrosis and cancer?
21  A. Good, I like that question. So initially when I
22     started all this work, I was interested in tissue
23     fibrosis and, in particular, keloids, hypertrophic
24     scars, postoperative adhesions development, and
25     fibroids, endometriosis, trying to answer one question

71 (Pages 278 to 281)

Ghassan Saed, Ph.D.

Page 282

1    in my mind, which is -- which started this whole focus
2    of work, why, how come we have an overgrowth that is --
3    has similar pathogenesis, yet it's not malignant, for
4    example, fibroids, they're benign tumors, they're
5    tumors, they're benign, what is the difference between
6    what makes this tumor benign versus malignant?  So this
7    is my focus and my long-term interest in my life is to
8    figure out why is this overgrowth that has oxidative
9    stress, high this, high this, high this, but it's not
10   malignant, fibroids, possibility of adhesions, keloids,
11   although some keloids develop -- some fibrosis
12   development of cancer, and endometriosis, for example.
13   So that's the question that I'm really interested in.
14   So that's why we look everything in comparison.  I have
15   published in here and I have published in here
16   extensively.
17   Q.  You have published that fibrosis causes cancer?
18   A.  No, I have published that the process of fibrosis is
19   very similar to the process of oncogenesis.
20   Q.  Does fibrosis cause cancer?
21            MS. O'DELL:  Object to form.
22            THE WITNESS:  In some cases it may.
23   BY MR. HEGARTY:
24   Q.  Give me an example of a type of fibrosis that can cause
25   cancer.

Page 283

1    A.  Keloids, fibroblastoma can develop, endometriosis can
2    induce maybe ovarian cancer, there's a link between the
3    two.
4    Q.  Do postoperative adhesions cause cancer?
5    A.  We don't know.
6    Q.  Doctor, I'm going to rest for a moment and let my
7    colleague representing Imerys ask you some questions as
8    well.
9    EXAMINATION BY MR. KLATT:
10   Q.  Hello, Dr. Saed.  My name is Mike Klatt and I represent
11   Imerys Talc America in this case.  Have you ever heard
12   of Imerys Talc America before today?
13   A.  Heard on the news, yes.
14   Q.  I'm sorry?
15   A.  Heard about it, yes.
16   Q.  What do you know about Imerys?
17   A.  I know that very small thing, mining company.
18   Q.  How did you learn that?
19   A.  From the news.
20   Q.  You said just a minute ago that we don't know whether
21   postoperative intra-abdominal adhesions cause cancer;
22   is that true?
23   A.  I am not aware --
24            MS. O'DELL:  Object to the form.
25            THE WITNESS:  -- that incidence of

Page 284

1    postoperative adhesions development may develop into
2    cancer.  I'm not aware of that.
3    BY MR. KLATT:
4    Q.  You're not aware of any evidence of that, is that what
5    you're saying?
6    A.  I'm not aware of a certain -- a specific situation
7    where a patient developed postoperative adhesions, that
8    postoperative adhesions causes some type of cancer
9    somewhere.
10   Q.  I'm going to skip around just to follow up on some
11   stuff that Mr. Hegarty brought up during the day.  You
12   mentioned your company DS Biotech this morning.  What
13   does DS stand for?
14   A.  A name I chose.
15   Q.  The D and the S don't stand for anything in particular?
16   A.  Oh, sorry, I missed the question.  So D is Diamond Saed
17   Biotech, that's my partner, used to be long time ago.
18   Q.  You had a partner named Diamond?
19   A.  Michael Diamond.  When we first initiated this, we
20   started it, but then he moved up from my institution to
21   his institution, and then I acquired the whole company.
22   Q.  So Dr. Diamond -- is it a Dr. Diamond?
23   A.  Dr. Diamond, yes.
24   Q.  He has no affiliation with DS Biotech any longer, is
25   that true?

Page 285

1    A.  No, for the last even seven, eight years.
2    Q.  When's the last time you had an NIH NCI grant?
3    A.  It should be in my CV, really bad memory, although I
4    should remember such a great thing.  You want me to
5    look for it?
6    Q.  How long's it going to take you?
7    A.  I don't know, I have to look in my list of grants --
8    when was it, when was it -- do you want me to
9    approximate?
10   Q.  Sure.
11   A.  NIH -- I think it's 2005 -- pending, submitted --
12   previously funded, okay, here we go.  So I was part of
13   the -- I was co-principal investigator in the Wayne
14   State University partnership to promote diversity for
15   reproductive sciences, that was 3,020,000 something.  I
16   was a co-investigator with Dr. Michael Diamond as a
17   principal investigator to this Wayne State Clinical
18   Translational Science Award.
19   Q.  What year is the question?
20   A.  So there are many, 2015, 2012, 2012, 2012, this was the
21   major one where I was the principal investigator
22   looking for adhesions and the role of hypoxia, and that
23   was 2012.
24   Q.  What level NIH grant was that?
25   A.  That's an RO1.

Ghassan Saed, Ph.D.

## Page 286

1  Q.  Can ovulation cause the DNA damage that results in
2      ovarian cancer?
3  A.  You are asking my opinion?
4  Q.  Yes.
5  A.  Or my -- based on science?
6  Q.  Well, I hope your opinion's based on science, but what
7      is your opinion?
8  A.  Okay.  So ovulation theory has been there for a long
9      time, and I don't know if there is a link between
10     ovulation and damage to DNA particular to that.
11 Q.  Is ovulation an inflammatory event?
12 A.  It is.
13 Q.  And in a woman that has a normal reproductive life,
14     that can occur 2, 400 times in her lifetime, correct?
15 A.  I am not a reproductive scientist.
16 Q.  You don't know?
17 A.  I don't know.
18 Q.  Woman that has a 40-year reproductive life times 12?
19 A.  I do know that.
20 Q.  That's 480 ovulatory cycles, correct?
21 A.  If you say so, I don't know.
22 Q.  You don't know about this?
23 A.  I do know --
24         MS. O'DELL:  Object to the form.
25         THE WITNESS:  Excuse me, okay, I am not --

## Page 287

1      again, I am not a reproductive scientist, so I know as
2      much as anybody knows, like ovulation, yes, I do know
3      about it, I know about the ovulation theory, I know
4      that ovulation is cause of inflammation, I do know all
5      that.
6  BY MR. HEGARTY:
7  Q.  And is it your opinion, as a scientist who studied in
8      the field you studied, that ovulation can cause ovarian
9      cancer?
10 A.  I don't know, it needs to be tested.
11 Q.  Even though it's an inflammatory event that occurs
12     every month, correct?
13 A.  Maybe that's a natural inflammatory response.
14 Q.  But you don't know, one way or the other, correct?
15 A.  Yeah, there's a big difference between a naturally-
16     induced inflammatory response versus an external
17     exogenous induced inflammation.
18 Q.  Certainly you're aware it's the opinion of many in the
19     field that incessant ovulation does cause ovarian
20     cancer, correct.
21 A.  That was just a theory.
22 Q.  I'm sorry?
23 A.  A theory.
24 Q.  And certainly ovarian cancer risk is directly related
25     to number of lifetime ovulations, correct?

## Page 288

1  A.  Not correct.
2  Q.  You don't know that?
3          MS. O'DELL:  Object to the form.
4          THE WITNESS:  It's a theory; I just answered
5      you.
6  BY MR. KLATT:
7  Q.  Are you aware of the data that lifetime ovulations is
8      directly related to ovarian cancer risk?
9          MS. O'DELL:  Object to the form.
10         THE WITNESS:  So do you mean that there are
11     data out there that is showing a direct link to normal
12     ovulation process and the development -- increased risk
13     of getting ovarian cancer?
14 BY MR. KLATT:
15 Q.  Thank you.
16         MR. LAPINSKI:  Doctor, was that an answer or
17     a question?
18         THE WITNESS:  That was a question to you.
19 BY MR. KLATT:
20 Q.  Well, I'm asking the questions, you're giving me the
21     answers.  Are you aware of data that increased number
22     of lifetime ovulations increases ovarian cancer risk?
23         MS. O'DELL:  Object to the form.
24         THE WITNESS:  And then I answered you, I
25     answered you, if you mean that you're looking for

## Page 289

1      specific data that linking normal ovulation to
2      inflammation that causes or increases the risk of
3      ovarian cancer, is that what you mean?
4  BY MR. KLATT:
5  Q.  I'm simply asking you if you're aware of data that
6      number of lifetime or of ovulations correlates with
7      increased ovarian cancer risk; that's all I'm asking.
8  A.  My answer again, I'm aware that this is a theory, and I
9      don't know if it's based on data.
10 Q.  Is the mechanism that causes post-surgical adhesions
11     the same mechanism that you think can result in ovarian
12     cancer?
13 A.  No, they have similarities but not the same.
14 Q.  Can oxidative stress be induced by low vitamin E?
15 A.  I don't know.
16 Q.  Can oxidative stress be induced by low vitamin C?
17 A.  I don't know.
18 Q.  Can oxidative stress be induced by low uric acid?
19 A.  We never tested that.
20 Q.  Can oxidative stress be induced by albumin levels?
21 A.  We never tested that.
22 Q.  You said you'd never given a deposition before,
23     correct?
24 A.  Correct.
25 Q.  And you've also never testified in a court before, is

73 (Pages 286 to 289)

Ghassan Saed, Ph.D.

Page 290

1    that right?
2    A. Correct.
3    Q. Early this morning you said that high, very high doses
4        of talc were toxic to cells. What did you mean by
5        that?
6    A. We tried 1,000 micrograms per ml, 1,000 micrograms per
7        ml, induced toxicity, so decreased viability, yes.
8    Q. How are you defining toxicity at this time?
9    A. Decreases cell viability.
10   Q. Does that mean decrease in cell number?
11   A. No, I said cell viability.
12   Q. What does that mean?
13   A. Death.
14   Q. Okay.
15   A. Okay.
16   Q. Do you agree with me that CA-125 levels can be
17       increased or elevated by pregnancy?
18   A. I don't know this information.
19   Q. Can CA-125 levels be increased during the menstrual
20       period?
21   A. I am not an OB-GYN oncologist, I am not an expert in
22       this. I defer this to a clinician.
23   Q. Can CA-125 levels be increased by women who have
24       uterine fibroids?
25   A. Again, I gave you my answer.

Page 291

1    Q. Can CA-125 be increased by coronary heart disease?
2    A. I don't know.
3    Q. Can you look at Exhibit Number 1, please, which I
4        believe is the copy of your lab book.
5    A. Lab report, okay.
6    Q. And I'm going to -- does your copy have the Bates
7        Numbers down on the right-hand corner?
8            MS. O'DELL: He's looking at the actual lab
9    notebook.
10           MR. KLATT: Is it Bates Numbered?
11           MS. O'DELL: Not the lab notebook, no. We
12   have not made markings on this.
13           MR. KLATT: Do you have a copy of Exhibit 1?
14   Let's make sure we're referring --
15           MS. O'DELL: I think that may be yours, and,
16   Mike, if you wouldn't mind directing us to the page
17   number that's written on the actual book itself.
18           MR. KLATT: Yeah, I'll give both the Bates
19   number and the page number.
20           MS. O'DELL: That would be good.
21   BY MR. KLATT:
22   Q. Are you looking now at Exhibit 1, Doctor?
23   A. Yes.
24   Q. And it's a copy of the lab notebook, correct?
25   A. Yes.

Page 292

1    Q. And in the lower right-hand corner there's two page
2        numbers. One's a stamped page number that we call a
3        Bates Number, and the other is a handwritten page
4        number, correct?
5    A. This and this? Yes.
6            MS. O'DELL: Yes.
7    BY MR. KLATT:
8    Q. When were those handwritten page numbers added to the
9        lab book?
10   A. I don't know.
11   Q. Because we had gotten a black and white copy of the lab
12       book, and there were no page numbers on it, so were
13       they added recently?
14   A. No, definitely not. They should have them, you should
15       have them in your black, white and black.
16   Q. Would you look at Exhibit 1 handwritten Page 31 Bates
17       Number, and I'll just say the last two Bates Numbers
18       02.
19   A. Page 2, you said?
20   Q. Yes, Page 02 is the stamp number and Page 31 --
21   A. Yes.
22   Q. -- is the handwritten number.
23   A. I'm looking at it.
24   Q. Down at the bottom it says cells doubled in one day.
25       What's that referring to?

Page 293

1    A. Okay, so when you culture the cells, you want to get --
2        cells divide and they double, so you want to have them
3        in the stage -- that's just a notation that the cell
4        doubled so we can start the experiment.
5    Q. And so were these cells doubling each day?
6    A. No, no, not necessarily. This is just to follow up the
7        progress of cell growth. And then we take from that 1
8        million cells, and then we start, because the space for
9        the cell is very important, so if they don't double in
10       one day, it means that the space is not good and they
11       are overcrowded, so now we split them. So this is an
12       indication that they're ready for us so we can use.
13   Q. Did you try to measure cell proliferation in the
14       presence of talc by BRDU incorporation?
15   A. What is PRDU?
16   Q. BRDU incorporation, are you familiar with that method?
17   A. BRDU? I've never heard of that.
18   Q. What about Ki-67, did you use that method --
19   A. No.
20   Q. -- in your experiments to measure cell proliferation?
21   A. As I stated earlier, Ki-67 is used by pathologists
22       mainly or researchers in tissue sections.
23   Q. My question is did you use it in this --
24   A. No.
25   Q. -- experiment? Did you try to count cells to measure

74 (Pages 290 to 293)

Ghassan Saed, Ph.D.

Page 294

1    proliferation using a hemocytometer?
2    A.  Okay, for cell proliferation we use MTT assay, that's
3        even more accurate than what you're referring to, but
4        we always count cells with hemocytometer to start with
5        1 million cells, this is how we start.
6    Q.  But did you try to measure cell proliferation in your
7        experiments by using a hemocytometer in cell counting?
8    A.  Cell proliferation cannot be measured by cell count.
9    Q.  Would you agree with me that MTT is not the optimal
10       method to measure cell proliferation?
11   A.  It is one of the best methods we have tested.
12   Q.  It simply measures cell metabolism, doesn't it?
13   A.  It measures the -- it differentiates between cells,
14       cells that incorporate the dye versus cells that it
15       doesn't incorporate the dye, which means it
16       differentiates between viable cells and proliferative
17       cells.
18   Q.  And if you increase the metabolism of a certain number
19       of cells, that will increase the dye level even if you
20       don't have a greater number of cells?
21   A.  I don't know about metabolism that you're throwing in
22       here.
23   Q.  You don't know about that?
24   A.  No.
25   Q.  Can you look again, referring to Exhibit 1, and I'm

Page 295

1        referring to the Bates Stamped page that ends in -- the
2        stamp number is 03 and the handwritten Page 32.
3    A.  Yes.
4    Q.  And there's a list there of sample IDs, is that
5        correct?
6    A.  Correct.
7    Q.  And are those the cell lines that you tested in your
8        experiments?
9    A.  Yes, in this experiment.
10   Q.  And I want to make sure I understand, for each sample
11       ID, let's just take the first one Sample ID 356, the
12       EL1 untreated, so would that sample represent one plate
13       of those cells?
14   A.  The 356?
15   Q.  Right?
16   A.  It represents an aliquot of normal macrophages with no
17       treatment with talc.
18   Q.  And is it one plate of cells?
19   A.  It could be one if we need or two or three or four,
20       depends on --
21   Q.  What was it in this case?
22   A.  Any sample that carry this number is a normal
23       macrophages, you can have it in one plate, two plates,
24       five plates, 10 plates.
25   Q.  And what did you have it in your experiment?

Page 296

1    A.  Oh, that's a different question.  I thought you were
2        talking about the sample ID refers to what.  That's my
3        answer.
4    Q.  I'm talking about in your experiment.
5    A.  In my experiment, we took like, for example, normal
6        macrophages from one plate, and we divided that into
7        two.  One plate got treatment, the other plate no
8        treatment.  And then we continue, we isolated RNA.
9    Q.  So for, for example, let's take Sample ID 357, EL1 5
10       micrograms of talc?
11   A.  Yes.
12   Q.  That was on one plate?
13   A.  Okay, let me explain this one more time.  So you
14       take -- this is the stock samples, we call it 356,
15       okay.  We split that into -- we take -- we can --
16       that's why when you said one plate, it's not true,
17       because we take one, two, three, four plates, okay, so
18       each plate will get the treatment like 5 micrograms, 20
19       micrograms, 100 micrograms.
20   Q.  I understand that.  I'm just talking about Sample 357?
21   A.  357 is 1 million cells of macrophages treated with 5
22       microgram per ml of talc.
23   Q.  And it was one plate?
24   A.  1 million cells, one plate.
25   Q.  And then from that you took mRNA, correct?

Page 297

1    A.  Correct.
2    Q.  And then from the mRNA from that one plate of cells,
3        you took -- or created CDNA, correct?
4    A.  Correct.
5    Q.  And then at the end of the day, you measured that CDNA
6        three separate times, correct?
7    A.  Correct.
8    Q.  And from the process I just described, that all
9        originated for 357 from that one plate that was treated
10       with 5 micrograms of talc, correct?
11   A.  One plate, yes.
12   Q.  And did you do that for each of the cell lines listed
13       Samples 356 through 386?
14   A.  Yes, let me explain something here.  So we --
15   Q.  That's all I needed.
16   A.  Okay.  Can I explain something?
17   Q.  Sure.
18   A.  So I know what you're referring to that this is called
19       N = 1, but we have even better and more precise way of
20       measuring this very old method of doing it.  We chose
21       to do instead of repeat the same one three times, so
22       N = 3, we actually chose three different normal cells
23       and three different ovarian cancer cells, and that is
24       more powerful than using the same one three times.
25   Q.  Okay.

75  (Pages 294 to 297)

Ghassan Saed, Ph.D.

|  | Page 298 |
|---|---|

1     MR. LOCKE:  Can I just make an objection.
2  Those are the kind of answers that your counsel can ask
3  you the question so you can give an explanation.  All
4  of the defendants don't have time to question you, so
5  "yes" or "no" would be helpful, particularly at this
6  point where we're really running out of time.
7     MS. O'DELL:  Well, he's been asking specific
8  questions about plates, and for it not to be clear, and
9  he needs to -- he needs to give a responsive answer.
10     MR. LOCKE:  We're wasting time.
11  BY MR. KLATT:
12  Q.  What I want to know is for 357 and all the sample IDs
13  listed here, there was one individual plate for each
14  sample ID treated with a certain level of talc,
15  correct?
16  A.  Correct.
17  Q.  Easy, Doctor.
18  A.  Thank you.
19  Q.  Gene expression, measuring gene expression is not the
20  same thing as measuring gene mutations, correct?
21  A.  Gene expression refers to mRNA levels that is reflected
22  in protein levels.
23  Q.  Gene expression is something that occurs all the time
24  in our bodies every day, correct?
25  A.  Correct.

|  | Page 299 |
|---|---|

1  Q.  It's how we live as people, right?
2  A.  Yes.
3  Q.  If we didn't have gene expression, we'd be dead?
4  A.  I don't know why you're saying that.
5  Q.  Is it true?
6  A.  Of course.
7  Q.  You would agree with me that a reactive oxygen species,
8  and can we call that ROS for short, Doctor?
9  A.  Yes, I'm thinking, reactive oxygen and reactive
10  nitrogen species, let's call them oxidants.
11  Q.  I'm sorry?
12  A.  Oxidants.
13  Q.  Oxidants?  Well, what if I'm specifically asking about
14  ROS, reactive oxygen --
15  A.  You can, it depends on which one you would specify I
16  would answer, yes.
17  Q.  Okay.  So if I say ROS, can we agree I'm talking about
18  reactive oxygen species?
19  A.  Yes.  Which one, though?  You have to tell me.
20  Q.  As a category.
21  A.  Okay, keep going.
22  Q.  ROS aren't the same thing as inflammation, correct?
23  A.  Not correct.
24  Q.  ROS are a part of normal cell physiology, correct?
25  A.  Normal levels of ROS found in cells, yes.

|  | Page 300 |
|---|---|

1  Q.  The major source of ROS comes from inside the cells
2  from mitochondria, correct?
3  A.  Not accurate answer, no.
4  Q.  Can you distinguish between ROS produced inside the
5  mitochondria of the cell from ROS produced outside the
6  cell?
7  A.  There are some enzymes that are produced from the
8  mitochondria like SOD in different forms, and there are
9  SODs that are produced from the membrane of the cell
10  and the cytoplasm, so it depends.
11  Q.  Do you agree that the persistent generation of cellular
12  ROS is a consequence of aging?
13  A.  I didn't study aging.
14  Q.  You haven't said that before?
15  A.  That --
16  Q.  The persistent generation of cellular ROS is a
17  consequence of aging.
18  A.  I don't remember.  Aging of the cells or aging of
19  people?
20  Q.  Aging of people.
21  A.  I don't remember I said that.
22  Q.  You didn't sequence the DNA in your studies to
23  determine mutations, correct?  You only used the SNP
24  gene assay?
25  A.  I used the SNP gene assay, yes.

|  | Page 301 |
|---|---|

1  Q.  You realize the same company that made the SNP gene
2  assay that you used also makes a gene mutation assay?
3  A.  No, I'm not aware of that.
4  Q.  You're not aware of that?
5  A.  No.
6  Q.  But so, therefore, you did not use that company's gene
7  mutation assay in your experiments, correct?
8     MS. O'DELL:  Object to the form.
9     THE WITNESS:  I used the core facility at our
10  institutions, and this is what they ran and this is
11  what I have.
12  BY MR. KLATT:
13  Q.  So you did not use the gene mutation assay made by the
14  same company that makes the SNP assay that you used in
15  your studies, correct?
16     MS. O'DELL:  Object to the form.
17     THE WITNESS:  The core facility ordered the
18  kits, and they are the one who choose which company to
19  buy it from.  I have no influence in that.
20  BY MR. KLATT:
21  Q.  So was the core facility the one that decided to use
22  the SNP assay rather than the gene mutation assay or
23  was that your decision?
24  A.  That was what is available in the core facility, and I
25  said I want to use it.

76 (Pages 298 to 301)

Ghassan Saed, Ph.D.

Page 302

1  Q.  But you were unaware that the same company that makes
2     the SNP assay also makes a gene mutation assay; is that
3     true?
4        MS. O'DELL:  Object to the form.
5        THE WITNESS:  I don't even know what company
6     you're talking about.
7  BY MR. KLATT:
8  Q.  Do you know what company made the SNP assay?
9  A.  The core facility ordered the SNP kit, they just give
10    you -- I'm interested in doing the SNP mutation and
11    this is what we run, so please run these samples for
12    me.
13 Q.  Did you ask them not to use a gene mutation assay?
14 A.  Not to use?  I didn't ask them, no.
15 Q.  Would you agree with me that the determination of the
16    redox state of a cell is determined by far more enzymes
17    and proteins and substances than just the ones you
18    looked at in your talc studies?
19       MS. O'DELL:  Object to the form.
20       THE WITNESS:  We -- in my studies we looked
21    at there are many enzymes, but we're looking at key
22    enzymes that control the redox balance.
23 BY MR. KLATT:
24 Q.  Object, nonresponsive.  Do you agree with me that redox
25    balance in cells is controlled by far more enzymes,

Page 303

1     proteins, and substances than you looked at in your
2     talc studies?
3        MS. O'DELL:  Object to the form.
4        THE WITNESS:  And I answered.  I said
5     these -- the one we looked at are the main, there are
6     others, but they're not major players.  Those are, the
7     one we studied are the major contributor to the overall
8     pro-oxidant state of the cell.
9  BY MR. KLATT:
10 Q.  And some of those enzymes in some cancers are pro-
11    tumorigenic and some of those same enzymes in other
12    cancers are anti-tumorigenic, correct?
13 A.  I'm not aware of that.
14 Q.  You haven't said that before?
15 A.  Said that exact word?  No.
16 Q.  Do you recall ever saying this:  Decreasing oxidative
17    stress and increased SOD promotes apoptosis in the
18    cancer cell lines studied, but multiple other studies
19    performed using other cell lines have shown the
20    opposite, that decreased SOD can promote apoptosis?
21       MS. O'DELL:  Object to the form.
22       THE WITNESS:  So this -- I said that?  Or you
23    took this from my --
24 BY MR. KLATT:
25 Q.  I'm asking if you recall saying that?

Page 304

1  A.  Saying it, I don't recall saying it.
2  Q.  Do you recall writing it?
3  A.  Maybe, but that does not agree with what you just said,
4     what you read.
5  Q.  Can oxidative stress both promote apoptosis and promote
6     cell survival?
7  A.  Oxidative stress is a balance, so it's not just simple
8     process.  So the outcome of this balance promote
9     proliferation, promote survival, and decrease
10    apoptosis.
11 Q.  Can oxidative stress be both pro-tumorigenic and
12    anti-tumorigenic?
13 A.  You mean marker, some certain markers of oxidative
14    stress?  Is that what you're referring to?
15 Q.  Sure.
16 A.  Certain markers of oxidative stress can have -- can
17    induce tumors and can inhibit tumor, I'm not really
18    aware of that.
19 Q.  Are you aware of any study case report or case series
20    that says that women that use talc in the external
21    genital area have increased fibrosis or adhesions
22    anywhere in their reproductive tract?
23       MS. O'DELL:  Object to the form.
24       THE WITNESS:  Have I -- am I aware of people
25    use talcum powder is linked to development of

Page 305

1     possibility of adhesions?
2  BY MR. KLATT:
3  Q.  I'm asking you a very specific question.  Are you aware
4     of any articles in the medical or scientific
5     literature, any case studies, any case reports of women
6     who used external talc having increased adhesions,
7     fibrosis, granulomas anywhere in their reproductive
8     tract?
9        MS. O'DELL:  Object to the form.
10       THE WITNESS:  What do you mean by external?
11 BY MR. KLATT:
12 Q.  What does external mean to you?
13 A.  I'm asking you.
14 Q.  I'm asking the questions, Doctor.
15 A.  Okay, I understand, I just want to clarify.
16 Q.  Do you understand what external talc application means?
17       MS. O'DELL:  You didn't say that, you just
18    said external, so, anyway.
19       If you understand his question, answer the
20    question or define what you mean.
21 BY MR. KLATT:
22 Q.  Let me ask the question again.  Are you aware of any
23    study in the medical or scientific literature, case
24    report, that shows that external genital application of
25    talc results in increased fibrosis, granulomas, or

77 (Pages 302 to 305)

Ghassan Saed, Ph.D.

| Page 306 | Page 308 |
|---|---|
| 1   adhesions anywhere inside the female reproductive | 1   look and see if I have any other notes. |
| 2   tract? | 2   THE VIDEOGRAPHER:  Going off the record at |
| 3   MS. O'DELL:  Object to the form. | 3   6:18 p.m. |
| 4   THE WITNESS:  I'm not aware. | 4   (An off-the-record discussion was held.) |
| 5   BY MR. KLATT: | 5   THE VIDEOGRAPHER:  Back on the record at 6:19 |
| 6   Q.  Are you aware that according to studies, anywhere from | 6   p.m. |
| 7   30 to 50 percent of U.S. women have used talc in the | 7   BY MR. KLATT: |
| 8   external genital area? | 8   Q.  Doctor, in your PCR studies, did you normalize for |
| 9   A.  I'm sorry, say that again, sorry. | 9   actin? |
| 10  Q.  Are you aware from studies that anywhere from 30 to 50 | 10  A.  Yes. |
| 11  percent of U.S. women have used talcum powder in the | 11  Q.  And how did you do that? |
| 12  external genital area? | 12  A.  So we did PCR for beta-actin. |
| 13  A.  I'm not sure about the number. | 13  Q.  And where is that indicated in your lab -- |
| 14  Q.  Are you aware of any epidemic of granulomas, fibrosis, | 14  A.  It is page -- every experiment we did with PCR we ran |
| 15  or adhesions in women who use externally applied | 15  beta-actin, and if you go to Page -- what's this page |
| 16  genital talc? | 16  here -- |
| 17  MS. O'DELL:  Object to the form. | 17  MS. O'DELL:  What's the ending Bates Number |
| 18  THE WITNESS:  I don't know if -- I don't know | 18  on there? |
| 19  if any relation between talc powder use and adhesions. | 19  BY MR. KLATT: |
| 20  BY MR. KLATT: | 20  Q.  There may be a Bates Number in the lower right hand |
| 21  Q.  Is there a way to measure the redox state directly | 21  corner. |
| 22  inside of cells? | 22  A.  10. |
| 23  A.  Very difficult. | 23  Q.  Okay.  I'm with you. |
| 24  Q.  Can it be done? | 24  A.  Are you there? |
| 25  A.  The data will not be very reliable. | 25  Q.  Yes. |

| Page 307 | Page 309 |
|---|---|
| 1   Q.  Is there a method to do that? | 1   A.  It's even cut off from here, I don't know why.  But you |
| 2   A.  You can measure H2O2, you can measure nitrosylation, | 2   see the standard curve? |
| 3   degree of nitrosylation of protein, we have done that | 3   Q.  Yes. |
| 4   with Caspase-3 and S-nitrosylation of Caspase-3 as a | 4   A.  Okay, so what we do here, we do a realtime RT-PCR where |
| 5   measure of how the level of antioxidants.  The accurate | 5   we design a small oligo that is flanked by the primers, |
| 6   way to measure it is to measure the key players | 6   and we order that to be synthesized, and we know the |
| 7   together to have the complete picture. | 7   concentration, we dilute it down, and we create a |
| 8   Q.  Those two methods that you just named, did you use | 8   standard curve, and we use this standard curve to |
| 9   those in any of your talc studies? | 9   extrapolate the results and normalize for our level of |
| 10  A.  What methods? | 10  mRNA with the treatment. |
| 11  Q.  The methods you just listed for me which were a way to | 11  Q.  Can I ask you a question.  On Page 10, that indicates |
| 12  directly measure the redox state of cells. | 12  raw data, correct? |
| 13  A.  Measuring all markers?  Oh, the other method, yes, they | 13  A.  Page 10? |
| 14  are listed here. | 14  Q.  The page you were just looking at. |
| 15  Q.  Did you use those? | 15  A.  I just want to see, it's not clear here.  I just want |
| 16  A.  I'm sorry, I'm missing you.  Am I use ever in my lab or | 16  to see what page is this here.  I'm with you. |
| 17  in this study? | 17  MS. O'DELL:  What's the question, Mike? |
| 18  Q.  In the talc studies. | 18  BY MR. KLATT: |
| 19  A.  The S-nitrosylation of Caspase-3, we did not use in | 19  Q.  Looking at Page 10 on Exhibit 1, and I'm not talking |
| 20  this study. | 20  about the lab page number, I'm talking about the Bates |
| 21  Q.  And there was one other method that you mentioned. | 21  Number, if you look for Sample 356, you see to the |
| 22  A.  The H2O2. | 22  right there's numbers 285995.18, 273439.209? |
| 23  Q.  Did you use that method in your talc -- | 23  A.  Uh-huh. |
| 24  A.  No, we used it for catalase activity indirectly. | 24  Q.  And 409589.891? |
| 25  Q.  Can we go off the record for a second.  I just need to | 25  A.  Correct. |

Ghassan Saed, Ph.D.

<table>
<tr><td>

Page 310

1   Q. If you turn to the next page, those numbers are
2      replicated for Sample 356.
3   A. What next page?
4   Q. The very next page in the --
5   A. Here?
6   Q. Yeah.
7   A. Okay. Where are they? 356, this is copies per
8      micrograms of CDNA.
9   Q. And that corresponds to those numbers, those same three
10     numbers on the previous page, correct?
11   A. So this is the copy number, 28274095, yeah, I see
12     they're the same.
13   Q. But for the 357 sample, the numbers don't correspond
14     between those two pages, correct?
15   A. Correct.
16   Q. And can you explain why?
17   A. So that's why we normalize, because you will have
18     different copy numbers all the time, so we normalize
19     it.
20   Q. Can you go to the next page, which would be notebook
21     page -- handwritten Page 39 and Bates Number 11.
22   A. 39? I'm still on the same page, right?
23      MS. O'DELL: That's where we were I thought,
24     unless I was confused about your question.
25   BY MR. KLATT:

</td><td>

Page 312

1   A. Yeah. Is it Page 41?
2      MS. O'DELL: You're on Page 11?
3      MR. KLATT: Correct.
4      MS. O'DELL: So I think it's this page.
5      THE WITNESS: Oh. Isn't it this page?
6      MS. O'DELL: No, I think it's back, if I'm
7   not mistaken.
8      THE WITNESS: Oh, here. We were on this
9   page, right?
10   BY MR. KLATT:
11   Q. I'm confused because you're looking at the real lab
12     notebook and I'm looking at --
13   A. No, no, no, we were on the same page. I thought you
14     asked me to go to a different page. I see that column.
15   Q. Just so we're on the same wavelength --
16   A. I see it.
17   Q. -- I'm referring to Page 11 Bates Number, correct?
18   A. Picogram per microgram for RNA.
19   Q. Right.
20   A. 4.58, the first number.
21   Q. 4.58?
22   A. Uh-huh.
23   Q. Right, and if you go -- that whole column's full of
24     numbers, correct?
25   A. This column, yes.

</td></tr>
<tr><td>

Page 311

1   Q. Well, Bates Number -- my Bates Number's cut off, excuse
2     me, my handwritten number's cut off so I'm going to the
3     Bates Number, which is 11.
4      MS. O'DELL: Okay, it's Page --
5      THE WITNESS: The next page.
6   BY MR. KLATT:
7   Q. Okay. And do you see the column toward the right
8     called picograms per microgram of RNA?
9   A. Where is that?
10   Q. The third column from the right-hand side.
11   A. On Page -- in this page, right?
12   Q. Page 11, Bates Stamped Page 11.
13   A. This is the page, okay, this is the page. So you're
14     looking at microgram?
15   Q. Picograms per microgram per RNA, do you see that
16     column?
17   A. I see copies per microgram for RNA, I see copies per
18     microgram for RNA, thintogram (sic) per microgram for
19     RNA. Is what you're looking at?
20   Q. I'm looking right here, picograms per micrograms RNA
21     the third column from the right.
22   A. 1, 2, 3, that's called thintogram (sic).
23   Q. And what's the first number in that column?
24   A. 125. Is that what you're looking at?
25   Q. I think we're not looking in the same place.

</td><td>

Page 313

1   Q. And then to the right of that you have an average,
2     correct?
3   A. Yes.
4   Q. Sometimes you average two of the three numbers,
5     sometimes you average all three numbers.
6   A. Correct.
7   Q. Why do you only average two of the three numbers
8     sometimes?
9   A. If we have outlier, really high, different.
10   Q. And what's your criteria for throwing out an outlier?
11   A. So if you have 4.5, 4.3, and 6.5, that's an outlier.
12   Q. What's your threshold for classifying something as an
13     outlier to not include it in your calculations?
14   A. So if the two numbers match, the closer they match and
15     the higher the outlier is is what we determine.
16   Q. So do you always throw out the outlier of the three
17     values?
18   A. Not always, not necessarily.
19   Q. So I'm just trying to figure what's your criteria
20     for --
21   A. So if they are like, for example, close like, for
22     example, here, if we don't know that it is an outlier,
23     like, for example, here, 3.6, 4.3, 3.2, it's very hard
24     to determine an outlier, but if you have 6 and 6 and 7,
25     it is not hard.

</td></tr>
</table>

79 (Pages 310 to 313)

Ghassan Saed, Ph.D.

Page 314

1  Q.  Do you have a certain numerical criteria that you use
2      to classify something as an outlier that you're going
3      to exclude from your calculations?
4  A.  I just told you.
5  Q.  What's the numerical value?
6  A.  I don't have a numerical value.
7  Q.  You just eyeball it?
8          MS. O'DELL:  Object to the form.
9          THE WITNESS:  No, no, no, no, please, so I
10     just said that if the two numbers, okay, agrees very
11     close, the closer the two numbers together and the more
12     further is the other number, that is considered an
13     outlier to me.
14         BY MR. KLATT:
15  Q.  But, again, you don't have any numerical formula that
16     you follow to make that determination, correct?
17         MS. O'DELL:  Object to the form.
18         THE WITNESS:  I told you what I follow.
19  BY MR. KLATT:
20  Q.  When it's close together, you exclude the third one.
21     When it's further apart, you --
22  A.  I did not say that.
23         MS. O'DELL:  Object to the form.
24  BY MR. KLATT:
25  Q.  Then please explain numerically how you make the

Page 315

1      decision to exclude one of the three values --
2  A.  Okay.
3  Q.  -- or include it.
4  A.  One more time.  So if the two number -- we have three
5      numbers, right, three values.  If two of the three
6      values are very close, the closer they are together,
7      and they are more further from the third one, that
8      third one qualifies for outlier.
9  Q.  How close do the two have to be to exclude the third?
10  A.  Very close, have to be very close.
11  Q.  Numerically how --
12  A.  I don't know, I don't have a numerical value.
13  Q.  That's all the questions I have, Doctor.
14         MR. HEGARTY:  How much time do we have left?
15         THE VIDEOGRAPHER:  Two minutes left.
16         MS. O'DELL:  Do you have questions?
17         MR. LOCKE:  I do have a few.
18         MS. O'DELL:  You've got two minutes.
19         MR. LOCKE:  I know you've got some, too.
20         MR. HEGARTY:  I do.
21         MR. LOCKE:  Go ahead, Mark.
22  SAED DEPOSITION EXHIBIT NUMBER 19,
23         ABSTRACT SUBMITTED TO SGO,
24         WAS MARKED BY THE REPORTER
25         FOR IDENTIFICATION

Page 316

1
2          RE-EXAMINATION BY MR. HEGARTY:
3  Q.  Doctor, I'm showing you what I'm marking as Exhibit 19.
4      Do you recognize Exhibit 19?
5  A.  It looks like the abstract we submitted to SGO.
6  Q.  This abstract in the middle refers to testing done at
7      48 hours; is that correct?
8  A.  48 hours is a typo everywhere you see it, I acknowledge
9      that.
10  Q.  So you reported 48 hours in this abstract to SGO?
11  A.  Correct.  It is wrong.  All the work that I did it's 72
12     hours.
13         SAED DEPOSITION EXHIBIT NUMBER 20,
14         ABSTRACT,
15         WAS MARKED BY THE REPORTER
16         FOR IDENTIFICATION
17  BY MR. HEGARTY:
18  Q.  I'm going to mark as Exhibit Number 20 another abstract
19     of yours; is that correct?
20  A.  Where is it -- talcum powder -- where was this?
21  Q.  Do you recognize this abstract?
22  A.  March 2018, okay.
23  Q.  In the middle you report treating cells at 0, 200, and
24     500 micrograms per milliliter; is that correct?
25  A.  Yes, that was the initial study that we did.

Page 317

1  Q.  And that data is reflected in the notebooks we looked
2      at?
3  A.  It's here, yes.
4          MR. KLATT:  Which notebook?
5          MS. O'DELL:  Exhibit 3.
6          SAED DEPOSITION EXHIBIT NUMBER 21,
7          ABSTRACT FROM SRI,
8          WAS MARKED BY THE REPORTER
9          FOR IDENTIFICATION
10  BY MR. HEGARTY:
11  Q.  I'm going to mark next as Exhibit Number 21 another
12     abstract of yours from SRI; is that correct?
13  A.  SRI, March 16, this one is -- what is the title --
14     yeah, talcum powder -- yes.
15  Q.  In the method section you report treating cells with
16     1,000 micrograms per milliliter of talc; is that
17     correct?
18  A.  That's a typo that's 100.
19  Q.  That's another mistake?
20  A.  Yes, it's 100.
21         MS. O'DELL:  I think your time's gone.
22         MR. HEGARTY:  Okay.  Well, we --
23         THE WITNESS:  And all those are the
24     preliminary that we did.
25         MR. HEGARTY:  We have request for several

80 (Pages 314 to 317)

Ghassan Saed, Ph.D.

Page 318

1   documents to be produced, so we can go on the record
2   before we finish the deposition.  And then, also, we
3   reserve the right, as we indicated at the beginning of
4   the deposition, to seek additional time because of the
5   late productions and, also, because of the
6   nonresponsive nature Dr. Saed has been throughout the
7   deposition.
8       MS. O'DELL:  I think the objection for one
9   was objection for all, I think you made that rule,
10  Mike, but I'm glad you put -- we're going to go off the
11  record, and I may have a few questions for Dr. Saed.
12  Before I do, I will say I think to state that Dr. Saed
13  has not been responsive in his answers today is a
14  misstate.  The record and his testimony will be
15  reflective that he was attempting to respond to the
16  questions, very difficult technical questions, and so
17  he's attempted to do his best, and as we said before,
18  we've complied with all the orders of the Court and the
19  Notice of Deposition, and we'll oppose efforts at this
20  point for any additional time with him.  So let's go
21  off the record.
22      MR. HEGARTY:  And to the extent that you
23  don't have any additional questions, I just want to go
24  back on the record and make a note of the additional
25  documents we want from Dr. Saed.  We can do it now or

Page 319

1   we can do it at the end.
2       MS. O'DELL:  Why don't we wait until the end.
3       MR. HEGARTY:  Okay.
4       THE VIDEOGRAPHER:  Going off the record at
5   6:32 p.m.
6       (A short recess was taken.)
7       THE VIDEOGRAPHER:  We're back on the record
8   at 6:56 p.m.
9   EXAMINATION BY MS. O'DELL:
10  Q.  Doctor, I wanted to follow up on a few questions.
11  First, when you were acting as a consultant, you
12  referred to yourself as a consultant a number of times
13  today, was it your understanding as a consultant you
14  were also an expert witness?
15  A.  Yes.
16  Q.  And so during all the time that you were conducting the
17  studies that you testified to today, that you were
18  preparing certain publications, you were working as an
19  expert witness?
20      MR. KLATT:  Objection, leading.
21  BY MS. O'DELL:
22  Q.  Were you working during that time period as an expert
23  witness?
24  A.  Yes.
25  Q.  Okay.  Let me see if I can direct you back to --

Page 320

1   actually, maybe I should do it this way, I apologize.
2   If you would, let me hand to you what was marked as the
3   lab notebook for your -- the experiments that were done
4   to and reported on in your manuscript and your report,
5   Exhibit 1.  Do you see those?
6   A.  Yes.
7   Q.  And if you turn to I think it was Page 57, Bates Number
8   57 -- make sure I'm at the right page.  Let me know
9   when you get there, Doctor.
10  A.  57?
11  Q.  Uh-huh.
12  A.  This page?
13  Q.  Maybe I wrote the page down -- oh, yeah, it's actually
14  84 in -- it's 57 in there and it's 84 in your main lab
15  notebook.  You recall a number of questions about or
16  two questions at least that I recall, and it refers to
17  Page 84 in Exhibit 2 that corresponds to Bates Number
18  57 of Exhibit 1, do you recall that, and there was --
19  you were asked about a missing data table --
20  A.  Correct.
21  Q.  -- that did not make it into the scanned version.
22  A.  Correct.
23  Q.  Is the data contained in the table on Page 57 of the
24  scanned -- excuse me -- 84 of the lab notebook
25  contained in the figure below?

Page 321

1   A.  Yes.
2   Q.  And was that figure included in the version that was
3   provided to defense counsel?
4   A.  Yes.
5   Q.  Okay.  I've got one more situation like this.  If
6   you'll turn to page -- let me get it -- it's 62 at the
7   Bates Stamp Number version, Exhibit 1, and for the lab
8   notebook it's Page 87.
9   A.  Yes.
10  Q.  And I think in this instance there was a table on
11  Page 87 of the lab notebook that was not scanned in the
12  electronic version.  Is the data that's contained in
13  the table on Page 87 also in the figure that was
14  produced to Defendants?
15      MR. HEGARTY:  Objection, form.  You can
16  answer.
17      THE WITNESS:  Yes.
18  BY MS. O'DELL:
19  Q.  You were also asked a series of questions about your
20  manuscript and the use of the word marginal.  Do you
21  recall that discussion?
22  A.  Yes.
23  Q.  What did you intend by the use of the word marginal?
24  A.  I meant marked increase, marked difference.
25  Q.  Okay.  Let me change directions with you.  We got your

Ghassan Saed, Ph.D.

Page 322

1    notebook that's been marked or two notebooks that have
2    been marked Exhibit 11, and does that contain your
3    expert report in this case as well as the references
4    noted in your expert report?
5    A.  Correct.
6    Q.  And do you have any changes that you would like to make
7        in your expert report?
8    A.  Yes, I do.
9    Q.  Okay.
10   A.  So I think during that note there were some references
11       that were mislabeled, so I would like to --
12   Q.  Tell us what page you're on.
13   A.  Page 10, I'd like to add -- where it says 49, I would
14       like to add 51 there.
15   Q.  And when you say 51, do go --
16   A.  Reference number 51.
17   Q.  Okay.
18   A.  Okay.  And next page, Page 11, where it says 50 on the
19       top of the page, first line, I'd like to add the NTP
20       study 1993.
21   Q.  Okay.
22   A.  And on Page 12, I'd like to remove 4575.
23   Q.  Okay.  And where is that on Page 12?
24   A.  On the middle paragraph.
25   Q.  All right.

Page 323

1            MR. HEGARTY:  I'm sorry, we're not getting
2    realtime.
3            MS. O'DELL:  Let's go off the record.  Do you
4    need that or can we move on?
5            MR. HEGARTY:  No, I need it.  I just wanted
6    to see what he just said, and I can't, I obviously
7    can't see it so --
8            MS. O'DELL:  Off the record.
9            THE VIDEOGRAPHER:  Going off the record at
10   7:03 p.m.
11           (An off-the-record discussion was held.)
12           THE VIDEOGRAPHER:  We're back on the record
13   at 7:05 p.m.
14   BY MS. O'DELL:
15   Q.  You may continue, Doctor.
16   A.  Yes.  So the Page 12, the middle paragraph, I would
17       like to delete references 4575 from the whole
18       paragraph, they don't belong there.
19   Q.  Okay.
20   A.  That's it.
21   Q.  Anything else?  Okay.  Doctor, do in vitro models
22       reliably predict the pathogenicity of potentially
23       harmful particulates or other carcinogens in humans?
24           MR. HEGARTY:  Objection, form.
25           THE WITNESS:  Yes.

Page 324

1    BY MS. O'DELL:
2    Q.  You were asked a number of questions about your
3        manuscript today.  In your manuscript you state that
4        your findings provide a molecular mechanism for linking
5        genital talcum powder use to increased ovarian cancer
6        risk?
7    A.  Yes.
8    Q.  And does that statement relate to the pathogenesis of
9        ovarian cancer?
10   A.  Yes.
11   Q.  Does pathogenesis refer to the molecular mechanism that
12       results in the development of a disease?
13   A.  Yes.
14   Q.  Also, in relation to your manuscript, has your
15       manuscript been peer reviewed and accepted for
16       publication?
17   A.  Yes.
18   Q.  Is the use of immortalized cells in laboratory research
19       generally accepted in your field?
20   A.  Yes.
21           MR. HEGARTY:  Objection, form.
22   BY MS. O'DELL:
23   Q.  Is it widely accepted?
24           MR. HEGARTY:  Objection, form.
25           THE WITNESS:  Yes.

Page 325

1    BY MS. O'DELL:
2    Q.  Is it a generally accepted practice for researchers in
3        your field to correlate findings from immortalized
4        cells to in vivo application in humans?
5    A.  Yes.
6    Q.  In terms of the studies that you have conducted on
7        talc, you mentioned that you use multiple types --
8        multiple lines of each type of cell; do you recall
9        that?
10   A.  Yes.
11   Q.  How many lines of or types of ovarian cells did you
12       use?
13   A.  Three different ovarian cancer cell lines and three
14       different normal cell lines.
15   Q.  And what's the reason for doing that?
16   A.  The reason is to get a rebox finding to show that it is
17       not repeated three times but the finding is reproduced
18       from three different normal or three different ovarian.
19   Q.  And could another scientist with your expertise in and
20       background in research, could they replicate the
21       studies that you've conducted?
22   A.  Yes.
23   Q.  In terms of the outcomes for oxidative stress and
24       inflammation that you saw demonstrated in your studies,
25       are there any alternative explanations for those

82 (Pages 322 to 325)

Ghassan Saed, Ph.D.

Page 326

1    results?
2            MR. HEGARTY:  Objection, form.
3            THE WITNESS:  That talcum powder induces
4    inflammation that leads to increased risk of ovarian
5    cancer.
6    BY MS. O'DELL:
7    Q.  Are there any other alternative explanations other than
8        the presence of talc treating a cell?
9    A.  This is a direct experiment showing isolated effect.
10   Q.  Based on your academic training and years of experience
11       studying ovarian cancer, does the cause and effect
12       observed in your studies make sense?
13           MR. HEGARTY:  Objection, form.
14           THE WITNESS:  It does.
15   BY MS. O'DELL:
16   Q.  In terms of the particular data that you evaluated, I
17       want to ask you to take a look at I think it was Bates
18       Number Page 11 of Exhibit 1, and you were asked some
19       questions about occasions when you averaged two
20       findings?
21   A.  Outliers.
22   Q.  Yes.  So address the outliers --
23   A.  Yeah, so what I forgot to say that when I was asked
24       by -- this whole statistics, I did not touch.  This was
25       done by a professional, by a statistician, and the

Page 327

1    results, his finding is in the section in the notebook.
2    He determined everything.
3    Q.  Would you have published your results even if they had
4        shown there was no biological effect?
5            MR. HEGARTY:  Objection, form.
6            THE WITNESS:  Of course.
7    BY MS. O'DELL:
8    Q.  Is it a standard cell culture technique generally
9        accepted in your field to split the cell culture right
10       after the cells have -- (coughing in room) -- in a
11       24-hour period?
12   A.  It is.
13   Q.  Is it a standard cell culture technique that's
14       generally accepted in your field to start experiments
15       right after splitting the cells?
16   A.  Cells have to reach confluency and then you split them,
17       yes.
18   Q.  And it's generally accepted to begin your experiments
19       right after that point?
20   A.  Correct.
21           MS. O'DELL:  Nothing further.
22           How long was that?
23           THE VIDEOGRAPHER:  14 minutes.
24           MR. HEGARTY:  Give me a second.
25

Page 328

1    RE-EXAMINATION BY MR. HEGARTY:
2    Q.  Doctor, in connection with your work in this
3        litigation, did the lawyers for Plaintiff provide you
4        with any medical or scientific literature?
5    A.  No.
6    Q.  So none of the materials we marked as Exhibit Number 11
7        were provided by Counsel for Plaintiffs?
8            MS. O'DELL:  Object to the form.
9            THE WITNESS:  Yeah, this was copied and
10       provided by them, the references I made.
11   BY MR. HEGARTY:
12   Q.  In connection with you -- strike that.  In connection
13       with any other testing you have done involving cell
14       cultures, have you ever served as an expert witness or
15       a consultant in litigation involving the same topic of
16       those experiments?
17           MS. O'DELL:  Object to the form.
18           THE WITNESS:  I never served, as I stated, as
19       an expert witness in any litigation.
20   BY MR. HEGARTY:
21   Q.  In connection with any experimental testing you've done
22       involving cell cultures, have you ever served as a paid
23       expert for plaintiffs lawyers on the same topic for
24       which you were doing those experiments?
25           MS. O'DELL:  Object to the form.

Page 329

1            THE WITNESS:  Have I been hired by and paid
2    for by another?  I'm sorry --
3    BY MR. HEGARTY:
4    Q.  Other lawyers at the same time you were doing cell
5        culture tests involving the same topic that you were
6        consulting with them on.
7            MS. O'DELL:  Object to the form.
8            THE WITNESS:  No.
9    BY MR. HEGARTY:
10   Q.  You said in response to counsel's question that when
11       you used the word marginal, you meant marked.  What
12       is -- where is a written definition for marked?
13   A.  Marked.
14   Q.  I think I said that, but where is a published standard
15       for what marked means?
16   A.  This is marked is to me, but we can go the
17       statistically significance.  To me, when you have an
18       increase of 1 versus 6 fold, that's a marked increase.
19   Q.  Is there a written standard for what constitutes a
20       marked increase?
21   A.  No.
22           MS. O'DELL:  Object to the form.
23   BY MR. HEGARTY:
24   Q.  When I asked you not long ago if you had any revisions
25       to your expert report, you answered no.  Do you recall

83 (Pages 326 to 329)

Ghassan Saed, Ph.D.

Page 330

1 telling me that?
2        MS. O'DELL: I don't recall the question
3    being asked.
4 BY MR. HEGARTY:
5 Q. I did ask. I asked you, Doctor, didn't I, if you had
6    any -- if you needed to revise in any way your report.
7    Do you recall me asking that?
8        MS. O'DELL: Object to the form.
9        THE WITNESS: Probably I forgot that those
10   references need to be done.
11 BY MR. HEGARTY:
12 Q. When did this revelation come to you?
13 A. I mean I don't --
14       MS. O'DELL: Object to the form.
15       THE WITNESS: I'm not sure, we've been
16   through many, many, many questions, so I don't really
17   remember be accurately.
18 BY MR. HEGARTY:
19 Q. Well, I asked that you question about --
20 A. Make you did, I'm not denying, maybe you did, but I'm
21   saying there are too many things that we're covering
22   today in very small time.
23 Q. Well, did you discover the need to make those revisions
24   before today?
25 A. Yes, they actually they were marked in my -- with my

Page 331

1    handwriting, this is my handwriting, they were marked
2    with my handwriting.
3 Q. When did you make those handwritten marks?
4 A. Last night, I was reviewing this, and I -- what I
5    understood maybe your question as if I want to make
6    something to the text, but this is like probably the
7    end notes without the references.
8 Q. Did you meet with counsel for Plaintiffs yesterday?
9 A. Did I meet with -- yes, I did.
10 Q. For how long?
11 A. I can't remember, three, four hours, five hours, I
12   don't know.
13 Q. From when to when?
14 A. When was it, 10 maybe to 2, 3.
15 Q. Who did you meet with?
16 A. The three -- Leigh, Margaret, John, right, and who
17   else -- I think that's it right, I don't remember,
18   Leigh, Margaret, John, and Dan.
19 Q. At any point in time during your consultation with
20   Plaintiff's Counsel, have you met with any other
21   lawyers that you've not identified here today?
22 A. Have I met at any point?
23 Q. At any point.
24 A. I met Allison, right?
25 Q. Any others who we haven't talked about?

Page 332

1 A. What's the name of the lady I met today --
2        MS. O'DELL: Michelle.
3        THE WITNESS: Michelle, I just met her today.
4    Sorry, I'm not good at names.
5        MS. O'DELL: Alastair.
6        THE WITNESS: And Alastair, we met today.
7 BY MR. HEGARTY:
8 Q. You testified a moment ago that an in vitro model
9    reliably predicts that, I think, pathogenesis of
10   potentially harmful particles and other carcinogens --
11   let me back up and find that testimony -- you said
12   do -- you agreed with the question that in vitro models
13   reliably predict the pathogenesis of potentially
14   harmful particulates or other carcinogens in humans.
15   Do you recall agreeing with that statement?
16 A. Yes.
17 Q. What data does it take for an in vitro model to
18   reliably predict the carcinogenicity of a particle?
19 A. What data?
20 Q. Is it your testimony that in vitro models by themselves
21   reliably predict the carcinogenicity of a particle to a
22   human?
23 A. Yes.
24       MS. O'DELL: Object to the form.
25       THE WITNESS: They do.

Page 333

1 BY MR. HEGARTY:
2 Q. Cite for me an instance when a carcinogen has been
3    identified in humans based solely on an in vitro model.
4 A. I can't remember.
5 Q. When have you ever classified a substance as a
6    carcinogen based on the result in an in vitro model?
7 A. In vitro model is a good predictor to determine whether
8    a substance is carcinogenic or not, if the same effect
9    is replicated in vivo.
10 Q. You did not replicate your results in an in vivo model,
11   correct?
12 A. Not yet.
13 Q. You were asked with regard to your experimental results
14   whether there was any other alternative explanation for
15   the results. What did you do to rule out alternative
16   explanations for the results that you found in your
17   testing?
18 A. Because treatment without talc did not induce it, we're
19   doing a comparison, very simple comparison with and
20   without, and with did this, without, this didn't do.
21 Q. You claim that your test results show that talc
22   increases the risk of ovarian cancer. How did you show
23   by your test results that talc increases the risk --
24   I'm sorry -- yeah, increases the risk of ovarian
25   cancer?

84 (Pages 330 to 333)

Ghassan Saed, Ph.D.

Page 334

1  A.  One more time, please.
2  Q.  How do you remember test results show that talc
3     increases the risk of ovarian cancer?
4  A.  By showing that the treatment with talcum powder
5     induces the same oxidative oxidant and anti-oxidant
6     profile that we observe in epithelial ovarian cancer
7     cells.
8  Q.  But no study has shown those results in women using
9     cosmetic talc, correct?
10         MS. O'DELL:  Object to the form.
11         THE WITNESS:  So you're saying there's no
12     studies out there showing woman using the talc powder
13     have increased any of these markers?
14 BY MR. HEGARTY:
15 Q.  Correct.
16 A.  I think you asked me the same question before.
17 Q.  Let me ask it a different way, if you -- I already
18     asked you the same question.  How do you go from your
19     test results to concluding there's an increased risk of
20     cancer with applying talc to the body?
21         MS. O'DELL:  Object to the form.
22         THE WITNESS:  Again, as I stated, the
23     treatment of ovarian cancer cells, three different
24     ovarian cancer cell lines and three different normal
25     cells with talcum powder induces a profile of oxidative

Page 335

1     stress that we in our lab have extensively published
2     and characterized for ovarian cancer cells.
3  BY MR. HEGARTY:
4  Q.  You characterized that state in ovarian cancer cells,
5     correct?
6         MS. O'DELL:  I'm sorry --
7         THE WITNESS:  State?
8  BY MR. HEGARTY:
9  Q.  Well, the pro-oxidant and anti-oxidant state, you've
10     characterized that to exist in ovarian cancer cells,
11     correct?
12 A.  We characterized that there is an enhanced pro-oxidant
13     state in -- that manifest in ovarian cancer cells, yes.
14 Q.  You've not done any studies showing pro-oxidant or
15     decreased anti-oxidant state in normal ovarian cancer
16     cells, correct?
17         MS. O'DELL:  Object to the form.
18         THE WITNESS:  Normal ovarian cancer?
19 BY MR. HEGARTY:
20 Q.  Yes.  I'm sorry -- you have not shown a pro-oxidative
21     or anti-oxidative state in normal ovarian cells?
22 A.  In response to what?
23 Q.  In response to anything.
24         MS. O'DELL:  Object to the form.
25         THE WITNESS:  That's a very vague question.

Page 336

1     I don't understand what you're trying to do, seriously.
2  BY MR. HEGARTY:
3  Q.  Well, have you ever reported finding a pro-oxidative or
4     an anti-oxidative state in normal ovarian cells?
5         MS. O'DELL:  Object to the form.
6         THE WITNESS:  As compared to what?
7  BY MR. HEGARTY:
8  Q.  As compared to nothing.
9  A.  How you not compare to nothing?
10 Q.  Right.
11 A.  So we comparing ovarian cancer to normal cells.
12 Q.  My question is simply in normal cells, have you ever
13     found pro-oxidative or anti-oxidative state?
14 A.  We found -- okay, maybe I know what you want me to say.
15     So there are the players, the key oxidants and key
16     anti-oxidants, they are expressed in all cells
17     including normal.  Now, the amount of -- the degree of
18     expression, that what gets screwed up and altered when
19     you develop -- you start -- cells start developing that
20     oncogenesis phenotype.
21 Q.  I need to leave Mr. Klatt a minute or two.  You
22     mentioned that you would still have published your
23     article if you found no biologic effect.  Do you recall
24     answering that question?
25 A.  Correct.

Page 337

1  Q.  Is it your belief that anyone would publish your paper
2     if you showed no biologic effect?
3         MS. O'DELL:  Object to the form.
4         THE WITNESS:  Anyone not me, you talking
5     about me?
6  BY MR. HEGARTY:
7  Q.  Yes, any publisher.
8  A.  That it would be published, yes, I would consider this
9     a very positive and very negative, same thing.
10 Q.  But do you think a journal would publish --
11 A.  Absolutely, it's a finding.
12 Q.  What is that based on?
13 A.  It's a finding.
14 Q.  Have you ever approached a journal and had them publish
15     an article on a negative finding?
16 A.  I don't know what you call negative.
17 Q.  Well, showing no biologic --
18 A.  That's not negative, that's a huge finding.
19 Q.  Okay.  All right.
20         You have questions, Mike?  Go ahead.
21     RE-EXAMINATION BY MR. KLATT:
22 Q.  Dr. Saed, are you aware that a plaintiff's expert named
23     John Godlesky has tested dozens of women's ovarian,
24     reproductive, and peritoneal tissue, and found many,
25     many nontalc particles, foreign particles in that

85 (Pages 334 to 337)

Ghassan Saed, Ph.D.

| Page 338 | Page 340 |
|---|---|

**Page 338**

1  tissue; are you aware of that?
2  A.  No.
3  Q.  If you tested those other foreign particles that aren't
4      talc in the same test that you tested talc, could you
5      get the same results?
6          MS. O'DELL:  Object to the form.
7          THE WITNESS:  I didn't test them.
8  BY MR. KLATT:
9  Q.  But is it possible that if you tested them, you could
10     get the same results?
11 A.  If I didn't test them, I will not give you an answer.
12 Q.  I'm sorry?
13 A.  I did not test them.
14 Q.  So you have no idea whether any other foreign particle
15     other than talc would result in the same findings you
16     found for talc, correct?
17         MS. O'DELL:  Object to the form.
18 BY MR. KLATT:
19 Q.  Because you haven't done the test.
20 A.  When I test, I will tell you.
21 Q.  So you can't give us any information on what any other
22     particles other than talc would do under the tests that
23     you -- let me finish -- the tests that you submitted
24     talc to, correct?
25         MS. O'DELL:  Object to the form.

**Page 339**

1          THE WITNESS:  I only can give you information
2  to the experiments that I did and --
3  BY MR. KLATT:
4  Q.  And you didn't do any tests on any foreign particles
5      other than talc, correct?
6  A.  Correct.
7  Q.  And has all your testing on talc been paid for by the
8      Beasley Allen firm?
9          MS. O'DELL:  Object to the form.
10         THE WITNESS:  My time?
11 BY MR. KLATT:
12 Q.  Well, the testing, yeah, the time that you spent
13     testing talc.
14         MS. O'DELL:  Object to the form.
15         THE WITNESS:  No, testing is not -- what are
16 you trying to -- we already discussed this.  Time, they
17 paid for my time for consultation, I paid for the
18 expenses from the lab.  We already talked about that.
19         MR. KLATT:  Okay.  Anybody else?
20         MR. LOCKE:  Yeah.  Are you finished?
21         MR. KLATT:  Yes.
22     EXAMINATION BY MR. LOCKE:
23 Q.  I just want to clarify for you, Doctor --
24         MS. O'DELL:  You've got 20 seconds.
25         MR. LOCKE:  Okay, well, I'm going to ask as

**Page 340**

1  many questions as I can in 20 seconds.  You're the
2  first expert to reach the conclusions that you have in
3  your report, is that correct?
4          MS. O'DELL:  Object to the form.
5          THE WITNESS:  That were looking at the
6  molecular mechanism and molecular effect of talcum
7  powder?
8  BY MR. LOCKE:
9  Q.  Right.
10 A.  I wasn't the first one.
11 Q.  Who did it before?
12 A.  Was Shukla and there was the -- what was the other guy
13     name, I can't remember names, but there were two or
14     three papers that look at molecular mechanisms,
15     molecular effects.
16 Q.  Okay.
17         MS. O'DELL:  I'm sorry, time's up.
18         MR. LOCKE:  I'm going to still object to not
19 being able to ask a couple quick questions here.
20         MS. O'DELL:  Tom, I'm sorry, I mean this
21 is between --
22         MR. LOCKE:  You're cutting me off.
23         MS. O'DELL:  I've tried to be very
24 accommodating, but this is between you and your
25 co-counsel.

**Page 341**

1          MR. LOCKE:  No, it's really not.
2          MS. O'DELL:  Yes, it is, it is.
3          MR. LOCKE:  Okay.  We'll be back with this
4  witness.
5          MR. HEGARTY:  Do you have anything further?
6          MS. O'DELL:  I have nothing further.
7          MR. HEGARTY:  I just want to put on the
8  record several document requests, and I certainly don't
9  expect you to agree to them right now.
10         We would like copies of Dr. Saed's prior
11 drafts of his manuscript; copies of any correspondence
12 with OB-GYN Oncology and its reviewers, whether it's in
13 his possession or maintained on a website; any cover
14 letters accompanying submissions of the manuscript to
15 either OB-GYN Oncology or Reproductive Sciences; all
16 communications with Dr. Saed, between Dr. Saed and
17 Beasley Allen and other plaintiffs lawyers with regard
18 to his manuscript; and the budget that Dr. Saed
19 prepared for his manuscript; as well as all accounting
20 documents, invoices, or other original documents that
21 memorialize the expenses, costs, et cetera, hours
22 worked on the manuscript that we -- that are reported
23 in Exhibit Number 5.
24         MS. O'DELL:  You're referring to the budget
25 officer at Wayne State?

86 (Pages 338 to 341)

Ghassan Saed, Ph.D.

Page 342

```
1        MR. HEGARTY:  Correct, and the documents that
2    Sharon Pepe used to put together the numbers that are
3    reported in that exhibit.  And those are at least the
4    document requests that I can think of right now, but we
5    reserve the right to go back and look at the transcript
6    to see if there are any additional requests, and we
7    will make them in a timely manner.
8        MS. O'DELL:  We will be happy to meet and
9    confer on all of those items, some of which we might
10   work an agreement out, some of which we might need some
11   assistance by the Court.
12       THE VIDEOGRAPHER:  This concludes the
13   deposition.  We're going off the record at 7:29 p.m.
14       (The deposition was concluded at 7:29 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

```
1        - - - - - -
         E R R A T A
2        - - - - - -
3    PAGE  LINE  CHANGE
4    ____  ____  _____
5      REASON:  _____
6    ____  ____  _____
7      REASON:  _____
8    ____  ____  _____
9      REASON:  _____
10   ____  ____  _____
11     REASON:  _____
12   ____  ____  _____
13     REASON:  _____
14   ____  ____  _____
15     REASON:  _____
16   ____  ____  _____
17     REASON:  _____
18   ____  ____  _____
19     REASON:  _____
20   ____  ____  _____
21     REASON:  _____
22   ____  ____  _____
23     REASON:  _____
24   ____  ____  _____
25     REASON:  _____
```

Page 343

```
1            CERTIFICATE OF NOTARY
2
3    STATE OF MICHIGAN        )
4                            ) SS
5    COUNTY OF OAKLAND        )
6        I, Laurel A. Frogner, Certified Shorthand
7    Reporter, a Notary Public in and for the above county
8    and state, do hereby certify that the above deposition
9    was taken before me at the time and place hereinbefore
10   set forth; that the witness was by me first duly sworn
11   to testify to the truth, and nothing but the truth,
12   that the foregoing questions asked and answers made by
13   the witness were duly recorded by me stenographically
14   and reduced to computer transcription; that this is a
15   true, full and correct transcript of my stenographic
16   notes so taken; and that I am not related to, nor of
17   counsel to any party, nor interested in the event of
18   this cause.
19
20
21        Laurel A. Frogner, CSR-2495, RMR, CRR
22        Notary Public,
23        Oakland County, Michigan
24        My Commission expires:  4-22-2022
25
```

```
1        ACKNOWLEDGMENT OF DEPONENT
2
3    I,_____, do
     hereby certify that I have read the
     foregoing pages, and that the same
4    is a correct transcription of the answers
     given by me to the questions therein
5    propounded, except for the corrections or
     changes in form or substance, if any,
6    noted in the attached Errata Sheet.
7
     _____
8    Ghassan Saed, Ph.D.     DATE
9
10
11
12
13
14
15   Subscribed and sworn
     to before me this
     _____ day of _____, 20_____.
16
     My commission expires:_____
17
18   _____
     Notary Public
19
20
21
22
23
24
25
```

Ghassan Saed, Ph.D.

| A |
|---|

**ability**
104:24
**able**
31:13 32:14,25
33:12 34:2 46:17
130:14 162:15
198:7,13 272:20
272:23 274:10
340:19
**abnormal**
229:18
**absence**
265:5
**Absolutely**
112:7 188:3 337:11
**absorbance**
120:14
**absorption**
120:17
**abstract**
11:12,16,19 16:18
75:15 155:8
182:16 184:25
199:16,17,17
217:17 225:3
261:15,24 315:23
316:5,6,10,14,18
316:21 317:7,12
**abstracts**
74:12,15,16,16,23
74:25 75:6 77:3
140:11 182:3
261:3,14 262:4,6
**academic**
34:18 326:10
**accept**
164:15 237:23
245:10
**accepted**
46:4 54:8 61:18
139:23 152:6
155:15 174:4
233:19 237:3,12
237:21 238:10
248:1,2 254:14

257:23 324:15,19
324:23 325:2
327:9,14,18
**access**
38:4 75:22 76:4
77:5,7,10,17
165:2 169:18
**accession**
216:12
**accommodating**
340:24
**accompanying**
154:3 155:21
341:14
**account**
35:24 38:2,3
**accounting**
35:25 36:4 41:16
341:19
**accounts**
36:3
**accumulative**
233:2
**accurate**
106:1,4 121:20,24
185:21 259:11
294:3 300:3 307:5
**accurately**
330:17
**acid**
289:18
**acknowledge**
152:20,24 316:8
**acknowledgment**
136:2 143:16,23
152:24 155:2,6
345:1
**Acknowledgments**
135:20
**acquire**
251:24
**acquired**
199:11 284:21
**acquisition**
198:2
**act**

142:1
**acted**
144:2
**actin**
308:9
**acting**
25:16 26:1 142:9
142:13,20 143:1,3
144:21 147:17
148:19 319:11
**activities**
52:16
**activity**
58:15 95:11 130:5
215:9 216:21
217:5,5 222:15
226:5 258:6
259:21 260:21
274:22 307:24
**actual**
57:5 60:7 69:5
167:4 169:13
196:2 207:13
260:20 291:8,17
**acute**
170:13 265:19,22
266:6
**add**
64:9 94:19 100:17
101:4,5 118:8
142:7 144:1
153:17 164:6
196:10 322:13,14
322:19
**added**
61:13 81:2 95:17
96:5,6 97:19,21
98:3,4 102:25
103:3,8 118:9
163:23 170:6
272:15 292:8,13
**adding**
116:18 117:4
247:18
**addition**
104:3 155:19

160:12 161:6
**additional**
14:7,14 15:24
22:18,20,25 39:19
40:10 41:15 45:25
47:1,3 48:16 78:2
100:18 276:11
318:4,20,23,24
342:6
**additionally**
152:20 154:2
**address**
166:12 188:10
326:22
**addressed**
164:11
**addresses**
166:9
**adhesion**
56:23
**adhesions**
281:24 282:10
283:4,21 284:1,7
284:8 285:22
289:10 304:21
305:1,6 306:1,15
306:19
**advance**
13:1,2,24 14:3,24
14:25 22:10 35:5
43:9 67:15 108:21
137:11
**advisor**
212:5
**aerobic**
255:21
**affect**
217:5
**affiliation**
284:24
**afindeis@napolil...**
3:8
**agencies**
137:4 153:1
**agency**
153:16,16

**agents**
265:7,15
**aging**
300:12,13,17,18,18
300:20
**ago**
21:9 76:10 88:21
88:23 283:20
284:17 329:24
332:8
**agree**
25:18 47:4,8,13
73:16,25 74:4
83:4,7,9 104:18
111:12,15,18
144:15 159:5,17
164:3,14 167:17
225:7 237:20
238:9 265:10
275:24 276:1,7
290:16 294:9
299:7,17 300:11
302:15,24 304:3
341:9
**agreed**
173:16 230:25
239:22 254:16
276:13,15,22
277:1 332:12
**agreeing**
332:15
**agreement**
15:11 342:10
**agrees**
314:10
**ahead**
24:6,7 34:24,25
45:2 123:9 164:15
216:5 224:2
315:21 337:20
**al**
210:13,21
**Alabama**
2:8
**alarmed**
99:17

Ghassan Saed, Ph.D.

Alastair
3:4 332:5,6
albumin
289:20
Alexandria
2:18
aliquot
122:10 270:19
295:16
allele
217:2
Allen
2:3 21:13 24:1,19
24:20 25:3,19
26:16 33:14,23
34:12 38:23 39:5
39:8,14,17,23
63:11,17 64:21,24
65:5,19 66:3,15
67:5 70:1,9,22
71:5,23 72:13
73:5 137:6 141:8
142:2,3,9 148:11
154:10 159:18
176:13,16,23
177:9,17 178:3,7
178:15,24 188:2
276:8,14 339:8
341:17
Allison
331:24
allow
82:16 155:16
allowed
155:17 245:5,6
allows
154:15 170:5
alter
30:19 31:13,18
104:13 232:6
235:16 239:23
alteration
61:12,17 203:6
altered
30:23 170:17 215:9
216:21 222:14

336:18
altering
259:20,22
alternative
325:25 326:7
333:14,15
alters
188:17 217:7 230:9
America
5:17 6:10 15:10
283:11,12
amount
19:22 32:15 33:1,9
33:12 39:22 41:4
117:14 119:21
120:1 121:8,19,22
144:8 233:19
336:17
Amy
34:20 149:19 151:4
anaerobic
255:21
analysis
27:17,22 28:7
66:23,24 134:23
184:11 218:14
analyze
72:8 177:2 258:24
animal
47:1,3 48:16 50:11
190:10 191:22
192:3 193:22,23
194:2 195:2,5,11
195:13 226:20
279:22
animals
191:10,24 192:13
192:13,23
answer
19:24 30:17 31:21
32:18 65:7,23
66:12,20 68:9,18
71:14,16,20 72:5
72:22,24 73:10
75:12 79:24 80:1
89:18 94:12,12

101:12 107:10
108:10 112:23
114:7 120:4 127:8
130:9,12 137:1
139:21,22 141:11
141:16,19 154:15
155:15,16 165:24
172:23 195:8
198:6 207:8 220:4
221:10 223:9,21
224:1,9,15,18
227:12 233:23
235:10,11 247:7
247:12 248:5
249:10,12 255:11
258:15 259:2
261:25 262:1
266:3 268:15
271:22,22 274:16
281:25 288:16
289:8 290:25
296:3 298:9
299:16 300:3
305:19 321:16
338:11
answered
28:24 31:20 59:4
72:6 96:12,19
103:13 109:6
120:4 148:24
160:15 177:19
178:8 193:12
235:8 239:8
244:24 254:24
256:19,21 268:9
274:14 288:4,24
288:25 303:4
329:25
answering
104:23 223:3,8,21
223:22 246:11
253:1,3,4 265:12
267:4 268:15
336:24
answers
288:21 298:2

318:13 343:12
345:4
anticipating
97:13,14
antioxidants
147:19 307:5
anti-oxidant
182:24 183:11
195:17,22 202:2
225:5 226:14,20
235:5 251:25
334:5 335:9,15
anti-oxidants
201:2 226:25
235:18 336:16
anti-oxidative
335:21 336:4,13
anti-tumorigenic
303:12 304:12
anybody
137:3 191:15 287:2
339:19
anytime
23:25
anyway
305:18
anyways
63:21 116:10
apart
25:13 79:13 314:21
apologize
320:1
apoptosis
61:15 213:5 252:1
252:2 256:5,7,8
257:10,18,25
258:1,6 264:15,19
264:23 267:7
268:1,19,22 269:1
303:17,20 304:5
304:10
apoptotic
256:12
apparent
157:25 158:9
appear

80:22 94:10 111:16
113:16
appearance
154:1
APPEARANCES
2:1 3:1 4:1 5:1 6:1
7:1
appeared
111:20,23
Appearing
2:12,21 3:9,19 4:9
4:18 5:9,17 6:10
6:19 7:9
appears
97:1 107:5 110:13
113:4,5 116:18
131:17
application
226:6 305:16,24
325:4
applied
62:18 66:22 119:3
121:10 138:7
273:7,19 279:11
306:15
applies
153:1 200:15
272:11
apply
62:10 119:5 121:8
247:15 272:10
applying
227:8 232:18 271:6
279:15 334:20
appreciate
67:3
approach
99:9
approached
67:18 337:14
appropriate
15:9 66:10 153:11
approximate
20:6 34:6 285:9
approximately
21:25 23:2 24:9

133:24
**approximation**
34:8
**area**
32:22 102:18
144:18 145:13
165:12 166:16
170:9,24 304:21
306:8,12
**argue**
65:24
**ARPS**
5:3
**arrangement**
21:1 65:20
**arrangements**
20:23
**arrow**
102:18,19
**article**
11:5 45:19 51:23
65:14,14 70:24,25
75:15 77:2 134:13
134:15,16,17
136:1,8 137:19
138:22 144:16
145:2,3,9 146:5
146:12,19 147:2
147:10 152:7
154:3,6 155:21,22
160:5,10 171:16
174:19 175:19
188:22 189:2
192:9 202:3
210:25 211:6,9
212:6,8,11,18,24
213:8,13,16,18
214:6 215:17,19
215:21 216:11,17
216:18,22 217:1
218:11,15 220:16
221:22 241:23
275:13 336:23
337:15
**articles**
47:18 131:18

132:21,23,25
134:14 138:10
139:10 171:20
190:15 305:4
**asbestos**
264:3,9
**ASHCRAFT**
2:15
**asked**
15:23 27:3 28:24
31:20 35:23 44:25
73:17,23 75:16,18
76:6 83:15 96:11
96:19 103:13
148:24 154:21
160:15 172:8
177:18 178:8
193:11 204:17
210:9 219:23
239:8 254:23
255:9 262:15,23
268:8 312:14
320:19 321:19
324:2 326:18,23
329:24 330:3,5,19
333:13 334:16,18
343:12
**asking**
71:10 72:10,12
82:22,22 104:22
106:4 125:18
171:8 192:5,7
198:3 220:18,21
246:9,10 267:2
268:10 286:3
288:20 289:5,7
298:7 299:13
303:25 305:3,13
305:14 330:7
**ASRM**
139:24 140:5,7,9
**assay**
54:19,19 66:22
119:19,21,24
120:1,21,24 121:2
121:4,5,6,6 124:8

126:19 127:8
294:2 300:24,25
301:2,2,7,13,14
301:22,22 302:2,2
302:8,13
**assays**
126:20,25 270:23
**assist**
21:19 135:25 154:3
**assistance**
158:2,11 342:11
**assistant**
36:17 83:13 86:1,4
86:21,22 112:4
151:3
**associate**
18:3 212:21
**associated**
38:11 203:3,24
204:2,24 205:8,13
205:20 206:5
207:3,5,18 211:11
212:10,18 213:22
214:16 215:9
216:20,23 217:7
217:23 218:4
219:4 222:2,3,14
223:14 225:12
226:1 232:8
250:14 251:2
259:20 267:22
268:6,12,20
**associates**
211:6
**associating**
209:11 210:10
**association**
9:17,22 17:3 33:19
42:5,14 45:12
147:24 180:7
191:11 192:14
195:11 196:7
203:19 204:20
205:24 206:4
207:2,19,25 208:6
208:7,18 213:10

213:11 214:12
215:22 217:12
218:18 220:23
221:18,23 225:5
234:19
**assume**
200:11
**ATCC**
229:1 232:4
**attached**
8:13 345:6
**attempted**
318:17
**attempting**
318:15
**attention**
99:17
**attentive**
173:12
**attenuating**
61:23
**attorney**
72:12,13 141:14
177:4
**attorneys**
24:20 64:23 66:3
66:15 67:5,5 70:2
70:8,22 71:5,11
71:23 73:5 141:7
148:11 158:18
159:17
**August**
25:4 29:8
**Austin**
5:15
**author**
28:22 43:11 44:1
45:21 134:1,3,4,6
134:8,9,9 135:13
149:7 158:8
174:12 193:23
194:11 211:13,18
212:1,1,2,3 213:9
213:16
**authors**
34:10 86:7 135:4

139:18 141:3
148:3,4,7,10
149:10,14,20
150:14 151:8
152:18,20 157:21
157:23,23 160:13
166:18,25
**authorship**
135:6 136:3
**available**
17:12 37:7 77:6
179:25 231:21
248:2 301:24
**Avenue**
1:16 5:5,14 6:5
**average**
313:1,4,5,7
**averaged**
326:19
**Award**
285:18
**aware**
81:23 146:22
148:10,14,15,16
175:18 236:21,25
237:10 242:9
267:2,5,6 268:24
269:4 283:23
284:2,4,6 287:18
288:7,21 289:5,8
301:3,4 303:13
304:18,19,24
305:3,22 306:4,6
306:10,14 337:22
338:1
**a.m**
1:18 12:3,7 69:20
69:23
**A2780**
197:8

---

**B**

**baby**
85:3,10 102:20
179:7,10,13,15,18
179:19,21,24,25

Ghassan Saed, Ph.D.

180:3,7,23 181:22
183:21,25 184:18
238:18 243:12
244:14 245:17
246:3,20 247:5
**back**
48:7 49:16,24 50:1
50:2,5 52:23
68:21 69:22 78:20
89:13 98:8 131:14
133:19 159:14,21
160:4,9 174:22
175:8,12 177:7,14
194:22 198:8
210:6 211:25
215:19 216:15
227:11 228:9
239:13 246:11
251:6 263:5,6
265:8,9 266:5,6
269:13 308:5
312:6 318:24
319:7,25 323:12
332:11 341:3
342:5
**backdated**
90:14
**background**
325:20
**backwards**
61:10
**BACON**
4:12
**bad**
285:3
**balance**
30:19,24 31:11,19
35:23 61:17,17
170:17 235:17
247:17,18 259:22
302:22,25 304:7,8
**bank**
206:8,15,18,19
207:14
**Barely**
277:8

**based**
47:15 48:2 52:24
114:20 115:11,13
176:8 189:16,19
189:25 207:1
239:1,20 240:2,17
240:20 242:11
245:8,10,11
246:11 247:9
264:6 286:5,6
289:9 326:10
333:3,6 337:12
**basic**
240:7,8
**basically**
24:17 25:23 54:13
54:24 134:18
214:17
**basis**
9:16,21 16:13 17:2
33:18 42:5,13
45:12 47:6 147:23
190:5
**Bates**
8:17 13:7,12 92:13
92:23,25 93:8,9
93:15,16 94:2,21
95:3 96:23 98:8
103:4,17 107:2
109:10 110:6
112:12 113:6
116:14 119:12,15
127:20 128:1
129:5,7,23 291:6
291:10,18 292:3
292:16,17 295:1
308:17,20 309:20
310:21 311:1,1,3
311:12 312:17
320:7,17 321:7
326:17
**BCA**
119:18
**beads**
272:20,22
**Beasley**

2:3 21:13 24:1,19
24:20 25:2,19
26:16 33:13,23
34:12 38:23 39:5
39:8,14,17,23
63:11,17 64:21,24
65:5,19 66:3,15
67:5 70:1,9,22
71:5,23 72:13
73:5 137:6 141:8
142:2,3,9 148:11
154:10 159:18
176:13,16,23
177:9,17 178:3,7
178:15,24 188:2
276:8,14 339:8
341:17
**began**
68:23 69:12
**beginning**
35:12 85:1 86:23
97:20 144:9 215:4
275:1 318:3
**begins**
166:23
**behalf**
2:12,21 3:9,19 4:9
4:18 5:9,17 6:10
6:19 7:9 15:15
23:25 25:18 26:19
143:24 145:21
**belief**
41:16 337:1
**believe**
13:4,25 14:9 15:3
73:12 84:17 86:23
140:13 163:23
164:12 165:9
166:18 167:1,19
167:24 169:23
188:23 209:6
211:6 222:6 259:4
260:1 261:20
268:16 291:4
**belong**
109:19,21 323:18

**Belotte**
212:4 213:16,16,17
215:17,18,19,21
215:25 216:11,22
217:15 218:13
223:13 224:21,25
**Belotte's**
217:1
**benefit**
146:4,11,18 173:12
**benign**
282:4,5,6
**best**
24:4 104:24 106:16
231:1 280:3
294:11 318:17
**beta-actin**
308:12,15
**better**
95:2 297:19
**beyond**
183:21 188:17,21
232:24 265:2
**big**
287:15
**bill**
33:22 34:12,18,22
39:14,16,23
**billed**
35:2 38:2 39:19
**biologic**
168:12 336:23
337:2,17
**biological**
48:24 55:10 137:25
173:9 179:16
192:24 193:2,6,9
249:11 327:4
**biologist**
249:11
**biology**
115:15 232:24
233:17
**biostatistician**
89:9
**Biotech**

18:8,10,14,24 19:6
19:9,12,16 20:4
20:10 21:13 23:3
23:7 284:12,17,24
**bit**
22:2 66:8 239:5
**black**
98:2 292:11,15,15
**blank**
94:14 97:22 123:16
123:16,16,17,18
**blood**
202:19,19 231:13
234:14,17 235:14
236:1,3,9,15,15
253:11
**blue**
98:1,3
**bodies**
227:2,9,24 232:19
236:4,10 249:14
298:24
**body**
169:19 233:3,17
253:12,14 254:11
254:22 334:20
**book**
15:25 82:9 83:22
94:10 105:16,18
107:24,25 108:5
202:4 254:2 291:4
291:17 292:9,12
**bottle**
264:12
**bottom**
41:12 97:19 128:2
158:6 160:3 166:8
186:8,13 218:16
218:17,23 220:20
221:6,15 292:24
**Boulevard**
4:14
**bound**
47:12,12
**box**
2:7 3:15 6:6 167:19

**Bradford**
239:10,14
**brand**
179:18,21,22
**BRDU**
293:14,16,17
**break**
32:14,25 33:12
69:16,18 95:6
131:6,8 175:7
228:5 266:17,19
269:5
**breakdown**
36:11
**breaks**
36:6
**breast**
207:10
**briefly**
277:8
**bring**
45:5 277:11
**Broadhollow**
3:5
**brought**
26:6 45:7 60:21
61:6 131:17 132:6
277:25 278:9
284:11
**BSA**
120:15,25 121:21
130:25
**budget**
35:23 36:19 136:10
137:3,5,8 341:18
341:24
**bullet**
157:24 158:5,5
**burden**
153:19
**business**
18:7,12,14,20,22
18:24
**buy**
301:19
**Buz'Zard**

55:15,16,24

---

**C**

**C**
4:13 123:14 289:16
**calculation**
123:19
**calculations**
313:13 314:3
**caliber**
157:11 178:19
**call**
25:6,7,11,19,22
26:4,8,12 27:8,12
27:16,24 28:9,17
28:23 29:4,7
31:24 36:21 59:9
59:11 60:1,24
62:4,19,25,25
63:23 64:16 70:18
72:18 86:25 87:5
133:11 148:19
204:22 219:15
229:11 275:2,4,10
275:12,25 276:6
276:10 277:3
292:2 296:14
299:8,10 337:16
**called**
25:9,14 29:17 30:5
30:22 31:17 51:13
59:19 60:5,8,10
60:16 84:5 87:9
186:16 187:18
196:8 275:14
297:18 311:8,22
**calls**
71:2 72:23 73:2,2,6
276:11
**cancer**
9:18,23 17:4 25:17
26:2,20 27:5,11
27:18,23 28:9,15
29:15 30:7,10,13
30:15,20 31:8,15
32:1,3,23 33:20

42:7,15 45:14
57:9,10 59:3,7
61:15,18,19 63:6
81:14 123:13
143:18,25 147:19
147:25 165:6,11
165:12 167:6,20
168:13 169:1,7,10
169:16,24 170:13
170:14,14,15,16
170:17 171:13
172:1 173:1 178:1
179:4,16 180:8
188:12 190:24,25
191:1 192:15,17
193:15 195:12
196:4,8 201:13,18
201:23,25 202:6
202:10,18,24
203:3,7,13,19,25
204:25 205:6,9,13
205:20 206:5
207:5,10,20 208:1
208:7,8,18 209:10
209:12 210:11,17
211:7,11,21
212:10,12,19,22
213:11,23 214:13
214:18 215:10,22
216:21,23 217:12
217:24 218:4,19
219:4 220:24
221:19,24 222:2,4
222:15,17 223:14
223:15,17 225:7,9
225:12 226:11,21
227:16,18 228:20
229:7 231:6,19,24
232:9,24,25 233:6
233:9,25 234:4,14
234:16,16,21
235:14,20,25
236:1,3,9,15,17
236:23 237:4,13
237:21 238:11,19
238:20 240:1,24

242:13,21,21
243:3,5,13,20
244:10,15,19,23
245:18 246:4,13
246:21 247:6,16
247:25 248:3,7,11
249:2,4,7,21,23
249:25 250:12,12
252:19 255:18
256:5,7,11,14
257:18,24,24
258:1 262:13
263:4,10,14,22,22
264:11,25 265:1,3
265:5,8,11,16
267:10,22 268:2,7
268:12,20 271:7
273:24 276:17,21
276:23 277:2
278:12 279:23
280:1,9,14,18,19
280:21,22,23,25
281:1,3,8,14,17
281:20 282:12,17
282:20,25 283:2,4
283:21 284:2,8
286:2 287:9,20,24
288:8,13,22 289:3
289:7,12 297:23
303:18 324:5,9
325:13 326:5,11
333:22,25 334:3,6
334:20,23,24
335:2,4,10,13,15
335:18 336:11
**cancerous**
168:11
**cancers**
303:10,12
**candidate**
31:14
**capture**
40:3
**carcinogen**
250:22 271:21
333:2,6

**carcinogenesis**
230:17
**carcinogenic**
232:23 234:2 333:8
**carcinogenicity**
332:18,21
**carcinogens**
323:23 332:10,14
**career**
230:20
**carry**
230:14 295:22
**case**
19:5,9 21:4,14,19
22:14,20 32:12
67:6 71:24 112:20
114:25 116:5
127:14 129:6
141:9 162:8 176:3
176:4 227:23
239:7 261:21
262:19 264:2
277:11 279:22
280:2 283:11
295:21 304:19,19
305:5,5,23 322:3
**cases**
1:11 26:20 147:1
282:22
**Caspase**
256:2,17 257:15
**Caspase-3**
130:5 131:3 256:24
258:5 307:4,4,19
**CAT**
201:2 208:18
213:18
**catalase**
121:15,15,16
122:12,23 124:1,2
124:3 125:14
127:10 131:2
183:14,16 197:6
197:12,15 202:25
206:9,13 207:9
208:5 209:9,12,21

Ghassan Saed, Ph.D.

210:10,18,24
211:7,10,20 212:9
212:18,21 213:1
214:15 222:2
260:21 307:24
**Catalog**
181:21
**category**
299:20
**causal**
30:9 237:12
**causation**
239:7
**cause**
30:15 165:6 168:25
169:1,7,10 170:13
171:13 173:3,8
233:6,9 238:18
240:1 243:5,13,20
245:18 246:4
249:7 251:5,17
252:4 255:5
259:17 263:4,9,21
264:10 272:15,21
272:25 273:6,16
273:24 282:20,24
283:4,21 286:1
287:4,8,19 326:11
343:18
**caused**
168:10 274:12
**causes**
30:11,15 31:7
237:3,21 238:11
239:23 244:19,23
250:6 251:8
282:17 284:8
289:2,10
**causing**
168:13 212:21
271:7
**CA-125**
54:19 58:3 247:20
247:24 248:1,8,10
248:14,15 249:1
249:13,16,24

290:16,19,23
291:1
**CDNA**
297:3,5 310:8
**cell**
48:17 54:21 57:11
61:16 122:7
123:13 124:9,19
125:10,12,13
127:1 130:23
173:9 189:17,18
190:23 191:21
192:16 193:14,15
197:25 228:14,16
228:19,23,25
229:5,6,7,15,18
230:3,4,12,22
231:2,5,22,24
232:2,17 233:18
233:18,20 234:8
251:18,24 252:2,2
252:6,8,11,15
253:16 254:9,19
255:25 256:1,7
257:15,16,17,22
265:1,2,2,4,6,10
265:17,21,23,24
266:10,14,20,24
267:8,19,20 268:5
268:23 269:1,16
270:3,10,21 271:1
271:4 272:6,15
279:25 290:9,10
290:11 293:3,7,9
293:13,20 294:2,6
294:7,8,8,10,12
295:7 297:12
299:24 300:5,6,9
302:16 303:8,18
303:19 304:6
325:8,13,14 326:8
327:8,9,13 328:13
328:22 329:4
334:24
**cells**
53:13,22 54:17,25

55:6,8 57:8,9,12
58:4 61:15,19,19
62:5,9,10,14,18
63:5 69:5,14 93:6
116:19,20 118:8
118:11 119:4
122:8,8,8,9,21,21
124:3,3 126:5
128:11,20 130:17
166:20 167:2
168:1,4,10,10,11
168:21 170:7,7,17
179:17 181:20
185:19,20 190:24
190:25 191:1
196:25 197:7,10
197:16,22 198:3,7
198:8,9,13,25
199:6,11,21
200:23 201:11,23
201:25 202:6,18
202:20 226:21
228:20 229:13
230:1,1,9,14,20
230:24 231:6,15
231:17,18 233:13
233:13 242:21
250:20 251:11
252:13,19,22
253:6,12,14,15,20
253:23 254:5,10
254:21 255:2,18
255:19 256:5,9,9
256:11,14,14,18
256:24 257:5,6,7
257:17,18,21,24
257:24,25 258:2
260:19,21 264:19
264:20,24,25
265:3,4,6,8,15
266:3,4 267:7,11
267:18 268:23
269:22 270:12,13
270:13,15,18,18
270:19,19 271:7
273:3,11,14,19

274:11 290:4
292:24 293:1,2,5
293:8,25 294:4,5
294:13,14,14,16
294:17,19,20
295:13,18 296:21
296:24 297:2,22
297:23 299:25
300:1,18 302:25
306:22 307:12
316:23 317:15
324:18 325:4,11
327:10,15,16
334:7,23,25 335:2
335:4,10,13,16,21
336:4,11,12,16,19
**cellular**
31:13 264:14,18
300:11,16
**center**
3:14 163:4
**Central**
162:4
**certain**
87:23 94:17 136:15
225:8 251:2,25
284:6 294:18
298:14 304:13,16
314:1 319:18
**certainly**
14:7 15:5 287:18
287:24 341:8
**CERTIFICATE**
343:1
**Certified**
343:6
**certify**
343:8 345:3
**cervical**
165:11 170:24
**cervix**
163:10,15,21
164:24 165:20,23
169:18 171:2
**cetera**
104:4 181:23

188:18 341:21
**chair**
34:17
**chance**
210:11
**chances**
250:17
**change**
102:7,17 105:1
119:22,22 120:2
120:22 122:3,3
200:4 230:4,24
259:16 321:25
344:3
**changes**
162:6 173:9 174:17
197:22 199:20
200:2 203:14
250:7 258:7,17,23
259:17 260:5,8,18
277:14 322:6
345:5
**changing**
61:16
**chapter**
202:4
**characterize**
201:22 202:5,7
234:4
**characterized**
61:20 206:12
234:18 242:21
250:13 335:2,4,10
335:12
**charging**
20:12
**chart**
107:9,25 108:23
109:1 111:9
112:15,18
**charts**
96:3 110:24
**check**
9:12 40:15,21 41:4
41:6,13,21
**chemist**

249:11
**chemoresistance**
213:2 250:11
279:18,19
**Chicago**
6:16
**chief**
135:9
**choice**
200:13,14
**choose**
50:12,17,18 132:21
179:13,18,21,24
180:3 185:9
301:18
**chose**
50:10 55:11 108:13
132:25 159:2
179:19,19,23
200:15 284:14
297:20,22
**chromosomal**
217:3
**chronic**
165:5 167:5 168:2
168:3,5,9,20
169:5,9,11,11,20
170:15 172:3
265:23,25 266:9
**chronologic**
94:11 128:12
**chronological**
94:20
**chronology**
47:20
**circles**
159:15
**circulation**
253:19 254:4,6
**citation**
222:8,10
**cite**
98:24 99:6,7
153:10 171:15
172:2,13,18
188:24 190:15

191:20 192:7
193:5,23 195:4
207:17 208:17
209:2,3,5,11
213:8 215:15
225:17 226:4,13
226:18,24 227:6
227:21 232:11,16
237:2 238:25
239:16 250:19
251:4,16 252:3
263:19 266:13,19
333:2
**cited**
194:10,13
**citing**
186:15 218:19
222:15 251:20
**City**
4:15
**claim**
195:2 196:24
333:21
**clarify**
62:16 70:13 163:23
172:9 205:2
305:15 339:23
**clarity**
132:25
**classified**
333:5
**classify**
201:22 314:2
**classifying**
313:12
**clear**
73:15 74:2 111:3
147:25 206:1
228:23 298:8
309:15
**clearly**
80:21 145:12 158:1
158:10 193:19
232:3 248:19
264:20
**clients**

26:9
**clinical**
134:24 207:18
248:14 285:17
**clinically**
135:11 248:21
**clinician**
248:5,16 249:5
290:22
**clinicians**
248:21
**close**
169:17,17 313:21
314:11,20 315:6,9
315:10,10
**closer**
313:14 314:11
315:6
**closest**
193:16
**coefficient**
120:25
**cohort**
29:1
**colleague**
283:7
**colleagues**
60:21 61:6 157:11
262:20
**collective**
188:8 192:19
**color**
119:22,22 120:2,9
120:22 122:2
257:2
**Colorado**
4:6
**colorimetric**
119:24 120:21,24
**column**
107:8 311:7,10,16
311:21,23 312:14
312:25
**column's**
312:23
**come**

31:18 35:19,21
37:3 38:4 55:1
76:9 115:8 134:2
169:16 188:13
238:22 239:18
262:9 265:8,9
266:5,6 282:2
330:12
**comes**
300:1
**Commencing**
1:18
**comment**
46:2 47:7,11,16
164:10,16,18,20
166:10,13,18,23
166:25 167:3,8,11
167:14,15,16,18
167:22 171:1
173:11,15,25
174:17
**commented**
48:12,15
**comments**
47:8,12,13 48:7,11
48:13 49:2,4,7,15
50:2,2,8,9 160:2,4
160:4,9,12 161:8
161:11,21,24
162:1,3,15,25
163:6,8 174:12,22
174:23,24,25
**Commerce**
2:6
**commercial**
153:25
**commercially**
179:25 231:21
**commission**
343:24 345:16
**committee**
15:16
**commonly**
137:16,17
**communicate**
162:17,20

**communication**
63:14 70:1 72:21
**communications**
63:11 65:11 66:2
70:21 73:17,20
159:24 175:15
341:16
**community**
237:3,11,20 238:1
238:2,9 254:17
259:3
**companies**
18:20
**company**
18:8,22 19:17,18
19:21 23:4 283:17
284:12,21 301:1
301:14,18 302:1,5
302:8
**company's**
301:6
**compare**
84:19 121:16,17
216:12 256:7
336:9
**compared**
78:23 201:9 336:6
336:8
**comparing**
336:11
**comparison**
121:23,23 282:14
333:19,19
**competing**
157:25 158:9
**compile**
132:16
**complete**
14:4 307:7
**completed**
46:17 47:20
**completely**
85:11,12 219:20
**compliance**
15:22 16:18
**complicated**

Ghassan Saed, Ph.D.

266:16
**complied**
215:20 318:18
**complimented**
49:6
**comply**
152:17
**component**
182:18
**comprehensive**
58:14 182:20
  190:20
**computer**
343:14
**concentration**
47:16 53:6,11,12
  55:6 117:12 118:7
  118:21 120:12,16
  232:17 309:7
**concentrations**
232:12
**concept**
64:24 166:5 206:19
**concerned**
195:25 203:9
**concerning**
280:8
**concluded**
246:12 342:14
**concludes**
342:12
**concluding**
334:19
**conclusion**
238:25
**conclusions**
245:7,7,8 340:2
**concomitant**
201:2
**conditions**
53:5,10 189:2,8
**conduct**
176:12,15
**conducted**
113:11 136:5 177:8
  180:10 253:5,5

265:18 325:6,21
**conducting**
67:6 81:25 176:21
  230:19 319:16
**confer**
342:9
**confident**
56:2
**confirm**
129:3 202:21
  203:11
**confirmed**
104:8
**conflict**
141:23 142:3,12
  143:2 144:21
  148:2 154:1,16,18
  154:20,21 155:4,7
  155:12 156:3,7,10
  156:17,22,25
  157:3,5,8 159:2,6
  159:10,11,18
**conflicting**
153:23 154:5
  157:25 158:9
**conflicts**
148:4
**confluency**
327:16
**confused**
125:15 263:3
  310:24 312:11
**confusing**
125:4 182:25
**Congress**
5:14
**connection**
19:4 26:10 40:22
  49:16 51:22 63:10
  136:5,21 137:18
  138:21 161:7
  279:21 328:2,12
  328:12,21
**consequence**
300:12,17
**consider**

57:25 106:18,20
  169:21 171:11
  232:22,22 274:20
  279:2 337:8
**considered**
108:6 127:6 153:19
  154:13 229:18
  259:11 265:19
  314:12
**consistent**
82:24 83:4 152:21
  229:25 231:4
**constituents**
264:10
**constitutes**
329:19
**construct**
120:15
**consult**
143:12 147:14
  148:7 157:10,10
**consultant**
39:1 73:13 142:1,9
  142:14,21 143:1,8
  143:12 144:3,22
  145:17 147:17
  159:5,10 177:12
  178:24 261:22
  275:25 276:7,14
  276:15,22 277:2
  319:11,12,13
  328:15
**consultants**
34:19
**consultation**
21:8 331:19 339:17
**consulting**
18:6,8,15,16 21:10
  23:14,15 26:25
  40:21,23 65:15,19
  65:20 73:21
  145:14 154:9
  158:20,21 178:3
  329:6
**contact**
25:2,5 169:13

contacted
32:21
**contain**
83:23 131:18
  132:14 184:20,23
  234:14 322:2
**contained**
52:13,17 56:15
  69:12 80:9 84:3
  84:18 87:10
  320:23,25 321:12
**containing**
264:3
**contains**
45:20
**contaminant**
268:1
**contamination**
269:22
**contend**
195:4 197:21
**contention**
158:14 206:3
**contents**
8:1 141:2,6,16
**continue**
83:15 146:25 296:8
  323:15
**continued**
3:1 4:1 5:1 6:1 7:1
  56:24 83:21,21
  132:15 180:25
**continues**
265:16
**continuously**
165:5 168:7
**contract**
35:15,15,18
**contribute**
135:17 217:9
**contributor**
303:7
**control**
124:3 256:1,13
  257:5 269:16,24
  270:13,15 271:8

271:11,13,14
  272:6,9,11,18,19
  273:8 302:22
**controlled**
231:3 302:25
**controls**
119:1,4 256:14,15
  256:18,23 270:25
  271:3,6,24 272:1
**conversation**
26:7
**conversations**
65:3,21
**converse**
269:6
**copied**
84:21 111:8 328:9
**copies**
13:2 17:1 22:9,12
  44:8 84:17 310:7
  311:17,17 341:10
  341:11
**copy**
8:16 9:12 10:20
  13:7 35:4 40:15
  42:10 44:11 45:5
  45:6,7,8,18 93:12
  98:9 110:16,25
  111:19 112:1,17
  112:19 119:12
  129:2 132:25
  137:8 155:24
  161:2,10 162:10
  162:10 163:3,5
  164:17 176:2
  215:25 277:25
  291:4,6,13,24
  292:11 310:11,18
**core**
30:13 59:5 167:4
  259:3,8 301:9,17
  301:21,24 302:9
**corner**
91:13 92:16 128:2
  129:9 291:7 292:1
  308:21

Ghassan Saed, Ph.D.

Page 354

cornstarch
273:16,18,24 274:5
274:23,25
coronary
291:1
correct
19:16,17,19 20:25
21:14 23:5,8,22
24:10,11 27:1,9
27:13,18,20 29:18
29:23 30:2 32:8,9
32:13 33:11 34:10
34:11 37:12 38:24
39:5,15 41:5,22
41:23,25 42:24
43:13,19,23 44:24
46:16 47:5,24
48:1,3,4,18 49:8
50:11,12 51:15
52:25 58:8,22
59:20 60:3,12
61:7 62:7,8,22
63:11,18 64:1,17
64:18 68:24,25
69:14 72:2 75:11
80:9,10 83:19
84:10 87:21 88:11
89:23,24 94:11
96:3,4 98:17
100:8,18 101:6,9
102:2 104:20
106:13 108:21
109:4 110:11
111:16,20 114:14
116:2,6,19 119:10
119:20 120:22
121:11 122:11
123:24 125:2,22
129:5 136:17
140:22,23 142:10
142:11,15,21
143:5,9,18 145:14
145:21,24 146:6
146:13,20 147:2
149:7,8 151:16
152:7 155:2 159:3

159:12 160:5,14
163:2 168:14,19
171:5 172:22
174:5,10,18,20
176:7 179:8,9
180:19 185:15
186:4 189:3,8,17
189:20,25 190:10
191:1,3,7,22
195:18,23 196:1,4
196:14 198:5
201:13,19 202:11
204:12 205:20,22
212:12,19,22
213:11,19,23
215:17,23 217:13
217:19 218:5,20
222:8,17 225:1,9
225:12,13,15
226:2 228:15
229:16,17,19,22
229:23 230:1,2,4
230:5,7,8,9,12,14
230:18 234:9,10
234:24 235:6,25
236:4,10 238:20
238:21 241:4,10
241:23 242:5,18
243:5,8,10,14,21
244:7,19,23 245:2
245:19 247:22,23
247:25 248:11
249:2,4,14 252:9
252:13 253:7
254:11 256:25
258:9,19 261:7,14
261:19,23 262:4
265:1,5,19 268:14
270:7 271:4,5
275:2,25 277:23
278:1,2,13 280:21
281:11,12,14,15
281:18 286:14,20
287:12,14,20,25
288:1 289:23,24
290:2 291:24

292:4 295:5,6
296:25 297:1,3,4
297:6,7,10 298:15
298:16,20,24,25
299:22,23,24
300:2,23 301:7,15
303:12 309:12,25
310:10,14,15
312:3,17,24 313:2
313:6 314:16
316:7,11,19,24
317:12,17 320:20
320:22 322:5
327:20 333:11
334:9,15 335:5,11
335:16 336:25
338:16,24 339:5,6
340:3 342:1
343:15 345:4
corrected
100:17
correction
86:8
corrections
44:6 345:5
correctly
140:5 194:15
correlate
231:5 233:22 325:3
correlated
120:12 202:23
247:24 248:10
correlates
201:12,17 203:13
289:6
correspond
118:9 128:10
130:10 310:13
corresponded
118:10,11
correspondence
48:2 341:11
corresponding
23:14 95:17 119:4
134:9 212:1 215:8
216:20 222:13

corresponds
96:24 105:18 106:7
110:11 112:14
310:9 320:17
cosmetic
334:9
cost
35:12 77:13 136:11
136:17
costs
35:14 36:1,7 38:11
38:13,18 40:4,6
40:10 68:13,13,15
68:22 69:1,11
341:21
coughing
198:24 327:10
COUGHLIN
6:3
counsel
12:14,22 20:12
21:4 78:17 129:3
133:10,12 137:5
141:8 146:5,12,19
176:23 188:1
261:22 262:20
269:6 298:2 321:3
328:7 331:8,20
343:17
counsel's
329:10
count
220:4 293:25 294:4
294:8
counting
294:7
county
343:5,7,23
couple
92:11 340:19
course
70:5 72:14 274:9
299:6 327:6
courses
278:15,17 279:3
court

corresponds
1:1 12:11,15 220:9
224:4 289:25
318:18 342:11
cover
45:20 50:1 68:16
107:24 108:2
154:8 155:21,22
155:24,25 156:2,6
156:8,11,16
341:13
covered
73:13 107:6 108:23
109:1,4,7,8
covering
14:13 154:2 330:21
covers
73:17,19
coworkers
34:19
co-authors
34:19 157:11,12
237:8 263:23
co-counsel
340:25
co-investigator
285:16
co-principal
285:13
CO2
252:17
crazy
266:4
create
168:20 309:7
created
89:8 90:12,13
94:17 95:21 96:6
96:9,14 97:5 98:3
135:7 136:10
137:3 168:8 297:3
creating
105:15,16,18 106:6
107:24
creation
62:13 66:4 108:5
CRISPR

213:4
**criteria**
239:11 313:10,19
314:1
**critical**
230:15
**cross**
269:21
**crosstalk**
220:10
**cross-contaminat...**
269:17,19,21
**cross-reference**
194:12,14
**CRR**
1:20 343:21
**CSR-2495**
1:20 343:21
**culture**
62:18 124:23,24
125:20 198:8
253:20 265:22,23
265:24 266:10
267:8,11 268:23
293:1 327:8,9,13
329:5
**cultures**
48:17 124:22 125:5
190:23 230:20,23
231:12 233:18
234:9 251:18
252:6,8,11 254:9
254:20 272:15
328:14,22
**culturing**
69:4 252:19
**current**
17:23 42:18 278:9
279:16
**currently**
19:1 74:24 75:6
218:17 221:17
**curriculum**
11:8 278:5,10
**curve**
120:15,16,19 121:7

**cut**
80:19,22 82:1,9,11
82:16 83:11,18
89:10 167:12
223:5 309:1 311:1
311:2
**cutoff**
206:25
**cutting**
80:23 82:23,23
88:7 340:22
**CV**
75:23,25 76:1
131:21 277:25
278:9,18,19,23
285:3
**CYBA**
213:18
**cycles**
286:20
**cyclin**
107:19
**cytoplasm**
300:10

— **D** —

**D**
284:15,16
**daily**
139:14
**damage**
286:1,10
**Dan**
331:18
**DANIEL**
3:13
**data**
15:19 16:16 41:16
49:5 72:9 90:18
90:22 91:2,3
95:12 100:7 101:7
101:14,24 102:6
105:4 113:3 127:6
134:23,23 135:11
137:24 177:2

182:5,6,8 184:20
184:23 185:1,4,12
189:19,25 191:6
201:12,17,21
202:9,13,14 211:1
232:11,16 233:11
235:18 236:21
239:1,2,17 240:20
242:12 250:19
276:2,17 288:7,11
288:21 289:1,5,9
306:25 309:12
317:1 320:19,23
321:12 326:16
332:17,19
**date**
12:6 21:22 22:17
22:18,23 23:12,15
23:15 24:3,14
25:2 38:14 40:8,9
41:7,12,21 43:9
43:10,22,25 45:20
45:21 46:20 52:24
56:5,6,9 57:23
58:20,24 59:9
67:7 76:17,23,24
87:23,24,24,25
88:2,13 89:11,13
89:22,25 90:4,13
90:14,19 91:3,3
91:22,22 92:20,22
93:3,22 95:1,5
210:25 211:2,3,5
345:8
**dated**
9:13 22:16 40:15
43:18 56:14 57:22
66:18 68:23 89:13
90:1 91:2 94:4,22
96:3 174:5
**dates**
46:12 61:3 88:10
88:13 90:12 91:15
91:16 92:11 94:20
**day**
32:20 96:18 209:19

228:3 284:11
292:24 293:5,10
297:5 298:24
345:15
**days**
21:9 68:21 115:3
279:17
**dead**
299:3
**deadline**
21:7
**dealing**
71:24
**death**
252:2,2 290:13
**December**
9:8 35:7,20 36:2
40:7 43:8,18 44:2
44:4,13,16
**decide**
73:14 164:5 188:7
**decided**
108:11 188:5
301:21
**decision**
301:23 315:1
**Declaration**
153:22 154:5
**declare**
148:3,4
**decrease**
201:2,9 226:14,25
264:22 267:6
268:1,18 269:1
290:10 304:9
**decreased**
290:7 303:20
335:15
**decreases**
202:10 264:15,18
290:9
**decreasing**
202:2 235:18
303:16
**deduct**
20:5,6

**Defendant**
4:18 5:9,17 6:10,19
7:9
**defendants**
15:14 17:19 26:19
298:4 321:14
**defense**
116:10 321:3
**defer**
248:5 249:9 290:22
**define**
54:3 200:9,9 212:1
271:6 305:20
**defining**
290:8
**definitely**
208:9 233:21
292:14
**definition**
130:23 329:12
**degree**
65:21 68:8 71:10
71:14 170:20
307:3 336:17
**delete**
323:17
**delusions**
118:4
**demonstrate**
201:24
**demonstrated**
199:19 218:17
221:18 325:24
**density**
116:20 120:11,14
**Denver**
4:6
**denying**
330:20
**department**
34:17,22 35:17
37:9,10,18,23,24
38:1,6,7 41:17
279:7
**departmental**
153:18

Ghassan Saed, Ph.D.

**depends**
58:1 257:21,21
295:20 299:15
300:10
**depict**
193:17
**deponent**
12:13 345:1
**deposed**
20:20
**deposition**
1:15 8:16,20 9:1,5
9:8,12,16,21 10:1
10:5,8,11,15,19
10:23 11:1,4,8,12
11:16,19 12:7
13:3,6,14,24 14:2
14:5,19,24,25
15:6,18 16:19,23
20:15 22:4,11
35:5,6 40:14 42:4
45:11 78:10 84:11
108:21 132:1,7
144:9 151:19
157:14 161:1
173:19 175:22
214:5 219:25
221:3 275:1
277:18 278:4
289:22 315:22
316:13 317:6
318:2,4,7,19
342:13,14 343:8
**describe**
24:12 74:23 119:18
185:14 189:7
228:14
**described**
29:5 32:6 53:20
54:22 66:8 71:22
116:23 122:23
155:20 156:10
168:18 176:12
182:20 190:7
229:1 280:14,17
280:20 281:2,7

297:8
**describing**
100:12 102:6
136:16 137:11
138:12
**description**
23:14 107:11
**design**
18:17 66:21 71:17
71:25 72:7 279:7
309:5
**designate**
13:19 14:17
**designated**
16:25 51:25 94:17
143:17,24 148:22
277:7,20
**designed**
67:17 177:1 274:18
**desired**
118:7
**detail**
133:15
**detailed**
101:17
**detect**
119:23 258:23
**detected**
258:8,18
**detection**
119:19
**determination**
302:15 314:16
**determine**
53:17 121:18 198:7
249:7,13 267:12
267:12 268:22
300:23 313:15,24
333:7
**determined**
54:23 198:3 302:16
327:2
**determining**
166:19,24 167:1,16
167:25
**Detroit**

1:17 12:1,8
**develop**
38:9 168:22 233:25
251:23 282:11
283:1 284:1
336:19
**developed**
284:7
**developing**
173:1 218:19
221:19 232:25
234:20 279:21
280:1 281:14
336:19
**development**
250:11 281:24
282:12 284:1
288:12 304:25
324:12
**diagnose**
248:16,22 249:4,24
**diagnosis**
248:4
**Diamond**
284:16,18,19,22,22
284:23 285:16
**dictates**
101:24
**die**
256:10,11
**Diego**
57:15
**difference**
127:10 165:10
282:5 287:15
321:24
**differences**
122:11
**different**
20:15,17,19 57:4
66:8 74:13 81:2,8
83:13 95:4,9,14
97:9 100:23,24,24
119:25 127:1
128:21,22 130:4,5
130:13 131:2,5

139:16 147:9
151:17 157:7
185:8 192:13
203:11 206:17
208:14 213:3
231:18 239:5
245:7 248:25
251:4 252:20
254:15 255:19
257:16,16,23
258:13 260:1
263:2 270:20
271:24 272:1
296:1 297:22,23
300:8 310:18
312:14 313:9
325:13,14,18,18
334:17,23,24
**differential**
173:6
**differentiates**
294:13,16
**difficult**
306:23 318:16
**digest**
43:14
**dihydrogen**
31:2
**dilute**
118:3,22 309:7
**dilution**
116:25 165:13
166:1 272:4
**dipeptide**
56:23
**direct**
92:1 112:12 155:14
221:8 228:2
233:20 276:3
288:11 319:25
326:9
**directed**
19:5,7,16 99:17
155:13
**directing**
103:9 291:16

**directions**
321:25
**directly**
149:18 260:25
261:1 287:24
288:8 306:21
307:12
**Director**
151:3
**disagree**
47:9,14 164:4,15
170:2
**disclose**
20:23 142:3,20
143:15,23 153:3
157:4,13 158:17
159:19 261:21
262:1,2
**disclosed**
20:25 41:18 142:23
154:2 156:4,22,24
157:2 159:20
**disclosure**
21:6,11 142:4,13
142:25 143:7
144:2 148:2 154:4
155:20
**disclosure's**
262:3
**discover**
330:23
**discretion**
37:5
**discuss**
14:4 25:16 26:1
64:19 71:12 72:6
73:4 97:16,17
139:17,25 141:2,6
141:10 172:18
225:18
**discussed**
26:11 60:18 61:1,3
68:10 71:11
130:25 141:16
166:7 262:24
339:16

**discussion**
61:2 71:17 72:16
72:17,18 105:9
141:18 163:20
194:21 210:5
247:3 263:17
308:4 321:21
323:11
**discussions**
64:23 65:5 66:14
67:4,15 71:14,23
72:12,25 73:1
**disease**
249:1 250:12 291:1
324:12
**diseases**
207:3 281:3,8
**dish**
124:16 125:13,16
127:2
**dishes**
124:12,13 125:11
125:11,20 126:5,6
126:7 127:1
**dismutase**
61:14 210:20
**dispute**
74:4
**disseminated**
74:18,19
**dissolve**
85:1,11,12 118:22
**dissolved**
85:13,17,19,20
117:5 181:23
**distinct**
16:16
**distinction**
17:11 47:10
**distinguish**
238:24 265:22
300:4
**District**
1:1,2 12:11,12
**diversity**
285:14

**divert**
239:4
**divide**
39:16 256:10
270:17 293:2
**divided**
95:16 296:6
**divulge**
72:24
**dlapinski@wilen...**
3:18
**DMSO**
117:4,5,6,8,13,14
118:1,12,15,16,17
118:21,22 119:5,9
181:23 273:7,8,11
273:11,12,12,13
**DNA**
58:15 198:9 230:7
251:3,8 274:22
286:1,10 300:22
**doc**
37:17 84:2 151:13
**doctor**
27:25 36:22 42:16
55:18 73:18 74:6
76:21 77:24 79:1
86:13 91:10 94:21
96:23 99:21 101:2
101:23 102:21
107:1,12 110:6
113:9 116:14,21
117:18 129:12,25
131:7,17 140:14
141:13,22 144:15
157:21 172:8
182:14 187:10
194:8,25 205:11
209:18,23 210:9
213:8 214:25
215:23 218:3,15
219:2,17 220:12
220:17 221:10
223:2,12 224:9
226:23 227:21
228:12 239:5

245:14,24 248:9
252:3,25 254:19
257:2 264:13
268:4 269:16
275:22 277:23
278:14 283:6
288:16 291:22
298:17 299:8
305:14 308:8
315:13 316:3
319:10 320:9
323:15,21 328:2
330:5 339:23
**doctors**
238:3,4,9 279:6
**document**
1:10 9:9 10:12,16
35:5,7,19 36:14
38:17 40:9 44:19
92:24 127:20
151:20 153:7
157:15 341:8
342:4
**documentation**
36:4 49:22 60:13
116:18
**documented**
81:6 113:21 203:10
203:10 261:6
**documents**
15:18 49:14,16,22
131:19 232:8
318:1,25 341:20
341:20 342:1
**doing**
18:13 23:21 26:25
39:9,10 57:19
58:2,7 59:23 60:7
60:23 62:24 63:17
65:20 66:5 67:9
67:10,11,15 70:15
72:14,15,21 73:7
74:24 83:13 94:15
97:8 100:22,24
105:15,17 106:6
109:24 116:10

124:12,13 126:6
134:14 137:18
138:22 176:22
177:16 178:2,3,5
193:15 213:21
235:19 297:20
302:10 325:15
328:24 329:4
333:19
**DONATH**
6:4 193:25
**dose**
31:3 54:5,13,14,16
54:24 55:2 58:4
137:23 247:10,14
264:22
**doses**
55:9 117:2,4,15
270:11,21 290:3
**dose-dependent**
200:25
**double**
293:2,9
**doubled**
292:24 293:4
**doubling**
293:5
**doubt**
188:17,21
**downscale**
118:2
**downstream**
61:24
**dozens**
337:23
**Dr**
12:13,16,20,24
13:21 14:5,8,14
15:19 16:1 17:13
17:16,23 22:9
24:21 25:10,11
34:17 36:16 40:12
45:19 56:13 65:17
66:14 69:25 73:21
134:1,12,21,25
135:8,9 175:15

212:4 217:1
248:25 283:10
284:22,22,23
285:16 318:6,11
318:12,25 337:22
341:10,16,16,18
**draft**
47:20
**drafts**
42:21,23 44:15
341:11
**draw**
245:6,6
**dream**
253:21
**Drive**
3:14 6:15
**DS**
18:8,10,14,24 19:5
19:9,12,16 20:4
20:10 21:13 23:3
23:7 284:12,13,24
**due**
15:9 122:3 169:24
258:2 273:13
**DUFFY**
6:3
**duly**
12:17 343:10,13
**durations**
186:5
**duties**
39:9,10
**dye**
294:14,15,19
**D.C**
5:6 7:6

---

**E**

**e**
72:19 289:14 344:1
**earlier**
23:4 42:12 51:21
80:25 84:22 261:2
261:5 275:1
293:21

earliest
56:9
early
240:9 290:3
earth
254:14
Easy
298:17
edit
164:15
editing
44:6,7 135:10
213:4,5
editor
47:7,14 154:3,8
156:18 162:23
163:1,18 164:8,9
174:2
editorial
75:16,18 76:7,8,11
76:24 77:1,11
152:9
editors
175:16
editor's
47:11
effect
31:1,3 48:17 55:8
55:10 56:23 58:17
58:18,18 61:24,24
122:4 137:25
141:1 170:10
179:16 182:21,22
185:7 193:19
196:22 197:6,6,7
197:8,11,13,15,16
200:16,17,19
211:20 217:4
222:21 231:15
233:17 240:2,5
247:10 248:17
252:21 272:23
273:1,12 274:18
276:3,19 326:9,11
327:4 333:8
336:23 337:2

340:6
effects
163:11,16,22
164:25 192:24
193:2,6,9 234:23
340:15
efficacy
248:17,22
effort
38:18
efforts
21:8 318:19
eight
18:5 285:1
either
56:6 75:14 80:22
107:5 261:21
268:25 341:15
electronic
90:23,25 91:2
114:25 115:3
321:12
electronically
88:6,8 90:19 96:21
114:24
electronics
89:10
elevated
235:15 290:17
elicit
227:14
ELISA
58:15 94:14,18
95:15 116:16
130:11 184:6,7
240:10 270:23
ELLIS
6:13
else's
86:2 87:10
elucidate
215:4,12
EL1
295:12 296:9
emphasize
178:20

employed
240:14
employee
23:10
employees
18:9 23:7
employer
17:23
endometrioid
228:23
endometriosis
248:7 281:25
282:12 283:1
endometrium
163:10,15,21
164:24 171:3,5,11
171:17 172:5
ends
295:1
engaged
65:5
engines
280:11
England
115:19,20
enhanced
251:23 267:25
280:13,16,20
281:2,7 335:12
enhancement
250:13
enhances
199:20 257:10
ensure
157:24 158:8
enter
170:9
entered
87:24 88:2
entire
88:18 202:16
entirety
88:20
entitled
14:9 33:18 42:13
71:13 145:3

219:10,20 220:3
entries
87:15,19,22 90:11
95:12 140:21
entry
23:15
environment
62:13 168:20
169:11 233:21
252:20
environmental
62:17 81:17
enzymatic
215:9 222:14
260:17
enzyme
183:11 185:1,3
216:8,21 226:5
260:16
enzymes
199:20 203:1 217:6
225:6 226:14,15
251:25 259:21
300:7 302:16,21
302:22,25 303:10
303:11
EOC
199:21
epi
29:9
epidemic
306:14
epidemiologic
28:16 172:12
epidemiological
172:8,24 207:1
208:15 239:12
epidemiology
28:12
epithelial
57:12 166:20 167:2
168:1,4,10,21
169:15 201:22,24
202:17 205:6
225:6 229:13
256:16,16 280:14

280:17 334:6
equate
265:10
equation
217:3
equipment
36:5,8 40:4
equivalent
230:15
Errata
345:6
especially
31:2
ESQ
2:4,16 3:4,13 4:4
4:13 5:4,13 6:4,14
7:4
essentially
19:15 125:12
229:21 230:11,14
Essex
115:21,22
establish
231:22
established
97:6 98:22,24
100:12 102:5
108:12 127:15
173:17 230:21
231:18 240:12
establishing
237:12
estimate
24:4 39:22 46:17
198:13
et
104:4 181:23
188:18 210:13,21
341:21
ethics
157:20
evaluate
225:4
evaluated
326:16
evaluating

Ghassan Saed, Ph.D.

154:4
**evaluation**
151:13
**evaluations**
151:7,8
**event**
286:11 287:11
343:17
**eventually**
160:9 254:6
**everybody**
139:25 157:13
224:5
**evidence**
166:15 170:12
276:19 284:4
**exact**
22:3 24:3 28:18,20
37:15 75:21 88:10
90:19 118:4
182:10 192:6
224:20 252:17
303:15
**exactly**
29:2 34:5 89:2
126:14 194:9
229:3 272:5
279:10
**EXAMINATION**
8:3,4,6,9 17:15
283:9 319:9
339:22
**examined**
12:17 215:7 216:19
216:23 218:3
222:13
**example**
53:24,25 54:2
56:20 61:12 91:6
91:7,15,17 121:12
121:14 122:12
123:4,6 128:14
136:13 153:2
156:24 157:2
192:20 197:3,11
197:12 200:20

202:14,15,25
208:5 222:24
230:11 231:6,23
234:13 239:10
270:3 282:4,12,24
296:5,9 313:21,22
313:23
**exception**
257:24
**exchange**
70:8
**exciting**
48:23
**exclude**
314:3,20 315:1,9
**excretion**
166:2
**excretions**
166:2
**excuse**
16:1 72:22 92:13
111:2 118:18
141:14 214:1
220:9 245:4 260:7
286:25 311:1
320:24
**exhibit**
8:15,16,20 9:1,5,8
9:12,16,21 10:1,5
10:8,11,15,19,23
11:1,4,8,12,16,19
13:4,6,14,20,23
14:18,19 15:25
16:2,4,11,15,25
17:6 22:4,9,11
23:12,16,19 24:8
32:10 34:4,24
35:4,6,11 40:3,13
40:14,19 42:4,10
42:12 43:2,10,13
43:25 44:17,20
45:2,11,18,22,22
47:21 51:25 52:2
54:10 56:5,11,13
56:15,21,22 58:24
66:16,17 67:7,25

68:5,14,15,16,17
68:22 69:2,11,13
78:5,7,10,17,19
78:23,23,24 79:2
79:5,6,21 80:20
84:4,4,11,16,18
84:19,19,20,21,25
85:23,25 86:2
87:10,15 88:9
90:22 92:7 93:12
93:13 98:11 107:2
107:5,5 109:10
110:6,8,15 111:9
111:10 116:15
129:1,7,23 131:23
132:1,6,16,21
133:15,18 134:7
135:18 141:2,22
145:24 151:19,24
152:9 155:18
156:12 157:14,19
157:21 159:22,23
160:18 161:1,6,10
162:13 163:7
166:3 173:11,19
173:24 174:1,16
175:22 176:2,4
180:12,14,17,22
181:3,7,16 183:1
183:2,3,5,8 184:3
184:4,20,23
185:23 186:2,8,9
186:9 187:1 214:5
214:10,23 217:11
220:7 278:3,4
291:3,13,22
292:16 294:25
309:19 315:22
316:3,4,13,18
317:5,6,11 320:5
320:17,18 321:7
322:2 326:18
328:6 341:23
342:3
**Exhibits**
8:12,13 261:7

**exist**
90:25 335:10
**exists**
206:9
**exogenous**
287:17
**expect**
170:8 272:5 341:9
**expenses**
20:5,6 36:11,12
38:10,15 339:18
341:21
**experience**
51:8 231:11 252:13
254:10 326:10
**experiences**
81:25
**experiment**
52:21,23 53:2,4
55:5 57:8,20
58:17 60:24 90:17
91:16,23 93:7
94:19 100:24
122:22 123:2,17
125:11 137:23
139:6 176:18
177:7 179:14
189:3 255:2 260:6
270:10 293:4,25
295:9,25 296:4,5
308:14 326:9
**experimental**
328:21 333:13
**experimented**
234:9,9
**experiments**
18:17 47:2,4 53:1
55:3 70:3,6,17,19
70:23 71:3,17,25
72:7,8 73:6 74:11
74:24 75:9,14
78:8 88:5 91:24
91:25 93:4 94:15
105:16,17,19
106:6,7 113:10,18
113:21,23,24

114:5 134:15
135:24 136:4,5,8
136:22 137:11,12
138:13,23 139:3
139:18 149:5
176:12,15,22
177:14 179:7
180:13 182:6
189:8,11 190:6
196:13,25 201:13
228:15 229:11
232:13 233:14
239:18 240:17
244:17 252:12
253:5 254:21
259:6 260:9 261:4
261:6,13 264:14
267:21 268:6,19
269:16 271:20
274:24 279:8
293:20 294:7
295:8 301:7 320:3
327:14,18 328:16
328:24 339:2
**expert**
11:1 15:20 17:8
18:15 19:1 25:16
25:18 26:2 27:4
33:1,3 65:18
86:16 143:3,9,12
143:17,24 144:16
146:25 148:20,22
149:1 175:23
176:3,4 178:1
186:23 187:2,3
227:23 248:14
262:12 276:16
277:6,14,20
290:21 319:14,19
319:22 322:3,4,7
328:14,19,23
329:25 337:22
340:2
**expertise**
231:11 245:12
249:12 254:8

325:19
**experts**
192:22 277:6
**expires**
343:24 345:16
**explain**
38:1 43:1 88:4
110:15 111:8
113:5 117:16,25
120:9 123:3
130:16 138:16
163:14 201:21,21
230:19 253:8
296:13 297:14,16
310:16 314:25
**explanation**
163:13 164:6,7
165:8 255:15,16
298:3 333:14
**explanations**
325:25 326:7
333:16
**expose**
169:4 266:3 274:11
**exposed**
62:5 168:7 233:1
233:24 250:21
253:6,23 274:10
**exposing**
57:8
**exposure**
26:4 31:3 81:17
173:7 232:12
233:12,19,23
243:13,19 245:18
246:4,20 247:5,19
**expressed**
202:17 336:16
**expression**
58:15 173:6,7
226:14,15,25
227:1 231:3
252:22 298:19,19
298:21,23 299:3
336:18
**extend**

16:22
**extends**
66:1
**extension**
120:25
**extensive**
182:19 231:11
**extensively**
138:8 189:13 234:4
282:16 335:1
**extent**
85:13 95:10 146:4
146:11 147:1
318:22
**external**
287:16 304:20
305:6,10,12,16,18
305:24 306:8,12
**externally**
306:15
**extra**
39:19
**extract**
122:10,18,21
125:13,17
**extracted**
122:14 123:20
198:9
**extraction**
122:11,19 125:14
125:25 126:1
**extractions**
126:7
**extrapolate**
120:18 309:9
**eyeball**
314:7
**e-mail**
10:24 43:6,18,21
44:13 160:22
161:16,17 162:1
173:20 174:2
**e-mails**
70:8

─────────────
**F**
─────────────

**F**
6:4 7:5
**face**
254:13
**facilities**
115:4 259:3
**facility**
259:8 301:9,17,21
301:24 302:9
**fact**
26:8 97:24 168:7
182:18 203:2,9
207:9 227:13
261:2
**factor**
51:14,16 165:13
166:1,19,24 167:1
167:16,25 206:12
239:23
**factors**
62:15 239:11,14,24
**fair**
246:9,18
**fall**
15:4
**fallopian**
166:16 169:14,16
169:16,22 170:23
171:17 172:4
229:12 233:13
256:16
**familiar**
33:20 47:10 152:11
204:8,12,17
208:15 239:10
293:16
**Fan**
86:8,13,14 87:4,9
151:2
**Fan's**
135:3
**far**
26:15 107:8 143:11
169:20 182:8
203:9 224:12
302:16,25

**fashion**
152:21
**Feature**
186:22
**February**
91:18,19,20
**fee**
142:1,15 144:3,4,5
144:8 145:1,12,12
145:17 148:8
158:20,21
**feel**
102:4
**fees**
19:4,8,11,15,22
20:2,7
**fellow**
34:21,21 151:3
**fellows**
279:6
**fellowship**
151:4 279:4
**fellowships**
34:22
**female**
306:1
**fibroblastoma**
283:1
**fibroids**
281:25 282:4,10
290:24
**fibrosis**
281:11,13,16,20,23
282:11,17,18,20
282:24 304:21
305:7,25 306:14
**field**
50:24 54:9 252:18
255:17,17,17
287:8,19 324:19
325:3 327:9,14
**figure**
53:5 197:4,5
255:24 256:23
257:20 282:8
313:19 320:25

321:2,13
**figured**
54:16,24
**figures**
80:5,9
**final**
184:17
**financial**
20:23,25 35:17
144:17 145:10
153:25
**financially**
146:4,11,18
**find**
55:19 75:21,24
76:3 81:16 89:5
91:15,18 92:21
107:10 164:22
194:3,9 206:15
209:24 210:18
251:19 256:8
260:18 276:18
332:11
**FINDEIS**
3:4 183:5,7
**finding**
172:3,14 192:2
202:21 222:16
239:21 264:20
325:16,17 327:1
336:3 337:11,13
337:15,18
**findings**
192:8 195:25
201:12,17 217:7
226:13,24 227:22
324:4 325:3
326:20 338:15
**fine**
22:15 102:9,12
245:10
**finish**
36:22 64:15 68:3
76:20 101:10,23
126:23 175:3
191:16,17 223:24

Ghassan Saed, Ph.D.

224:2 240:8
275:15,16,22
318:2 338:23
**finished**
224:14,17 275:18
339:20
**finishing**
223:6,7
**firm**
2:3 26:14 339:8
**first**
12:17 23:12,15,16
23:19,24 24:6,8
24:12,14,15 25:2
25:14,19 26:8
27:12,16 29:12
32:16,17 42:18
43:10,25 44:21
50:17 55:5 56:5,6
56:12,14,20 57:3
57:4 58:20 68:14
70:20 79:14,25
80:23 84:9,24
86:14,15 92:22
93:3 97:7 103:12
117:21 134:8
155:21 160:1
163:7 165:11
168:6 169:12
170:18 176:9,11
181:5 188:16
190:20 201:24
202:16 209:7
210:15 211:13
212:2,3 215:3
275:4,25 276:6,10
277:3 284:19
295:11 311:23
312:20 319:11
322:19 340:2,10
343:10
**Fisher**
14:14,17 16:16
57:9 85:1,2
104:10,12 179:20
179:23 180:10,15

180:18,25 181:2
181:21 182:2,6,11
182:12 183:12
184:21,24 261:17
**five**
68:21 124:9 295:24
331:11
**flanked**
309:5
**Fletcher**
36:16 134:1 151:11
**Fletcher's**
134:12
**FLOM**
5:3
**Flory**
86:6,6,6,25,25 87:5
102:24 104:5
109:23 112:4
**fluid**
231:13
**focus**
179:2 202:5 282:1
282:7
**fold**
58:14 272:17
329:18
**follow**
78:4 114:15 126:8
126:9 248:17,22
284:10 293:6
314:16,18 319:10
**following**
248:4
**follows**
12:18
**food**
254:5
**foregoing**
343:12 345:3
**foreign**
337:25 338:3,14
339:4
**Forest**
4:5
**forever**

229:21 259:6 265:9
**forgot**
140:9,10 326:23
330:9
**form**
19:23 21:8 27:2
29:24 30:16 31:9
37:20 38:2,25
41:9 48:19 49:18
51:3 52:3 59:15
59:21 63:15,19
68:7 69:3 70:11
71:7 72:3 74:20
75:2 79:17 82:4
82:10,18 83:1,6
85:15 89:15 90:2
90:15 91:4 95:22
96:11 99:2,11,24
100:9,14,19,25
101:11 102:3,11
103:5 104:15,21
105:21,24 106:9
108:1,9,24 109:5
109:13 110:2,17
111:21 112:21
113:12,19 114:11
120:3 122:6
123:22 124:25
127:3 130:15
136:9,24 137:20
138:14 139:4,20
142:16,22 143:10
144:19 145:5,15
145:25 146:7,14
146:21 147:3,11
147:21 149:23
150:9,15,20
152:13 153:13
155:11,14 156:5
156:13 158:24
159:7,13 163:18
168:15 169:2,25
171:6,19 172:7,16
176:17,24 177:10
177:18,24 178:16
178:25 187:13,19

189:4,9,21 190:1
190:11,17 191:8
191:23 192:10
193:7,11 195:7
197:17 198:15,19
199:1,8 201:14,20
202:12 203:21
204:4 205:15,21
206:6 207:7,22
208:2,19 209:13
212:13,23 213:12
213:24 214:1
215:24 218:6
219:5 221:4,11
222:9,18 225:14
225:20 226:8,17
227:3,10,25
228:24 229:8
231:8,25 232:20
233:15 234:11
235:7 236:6
237:14,22 238:7
238:12 240:19
241:6,11,24 242:6
242:19 243:15,22
244:25 245:3,20
248:12 249:15
250:1 251:9
254:23 257:1
261:8 262:14,22
265:20 266:15
267:23 268:8
269:3,25 272:8
273:9,20 274:13
276:25 281:5
282:21 283:24
286:24 288:3,9,23
301:8,16 302:4,19
303:3,21 304:23
305:9 306:3,17
314:8,17,23
321:15 323:24
324:21,24 326:2
326:13 327:5
328:8,17,25 329:7
329:22 330:8,14

332:24 334:10,21
335:17,24 336:5
337:3 338:6,17,25
339:9,14 340:4
345:5
**formal**
63:24 136:14 279:2
**format**
90:23,25 91:2
155:6,9 241:17
**formed**
30:6,8 63:1
**forms**
154:13 300:8
**formula**
314:15
**forth**
52:15 343:10
**found**
31:3 55:4,7,10
189:1 190:23
191:21 196:13
213:9,10,21
214:12,15,16
215:23,23 222:1
225:11 275:12
299:25 333:16
336:13,14,23
337:24 338:16
**four**
88:20,23 124:9
125:19,20,20
230:15 295:19
296:17 331:11
**frame**
47:25
**framework**
63:1
**frequency**
204:21,22 217:3
**fresh**
230:21
**freshly**
231:18
**Frogner**
1:20 343:6,21

Ghassan Saed, Ph.D.

**front**
110:9 131:20 262:7
**FT33**
229:13,14
**full**
14:4 17:12,20 87:1
87:2 165:13
279:11,15 312:23
343:15
**full-time**
36:18 37:17
**functional**
230:15
**fund**
38:1,8
**fundamentally**
230:3
**funded**
177:12 285:12
**funders**
152:18
**funding**
37:5 136:8,13
137:4 149:21
150:3 152:17,21
152:25 153:3,3,4
153:4,12,16,17,18
153:19,20 158:2
158:11,18 279:16
**funds**
37:3,7,8,18,25 38:4
41:25
**further**
61:22 64:13,15
170:22 198:12
231:14 250:13
251:23 252:1
314:12,21 315:7
327:21 341:5,6
**F-a-n**
86:10

————— **G** —————
**gene**
58:14 173:6,7
206:18 213:5

215:8 216:19
222:13 231:3
258:25 259:1
298:19,19,20,21
298:23 299:3
300:24,25 301:1,2
301:6,13,22 302:2
302:13
**general**
15:23 114:7 170:16
195:19,20 204:22
205:25 206:11
241:25 271:13
**generally**
149:13 237:20
238:10 271:10,11
324:19 325:2
327:8,14,18
**generate**
113:10
**generated**
19:4,8,22 22:13
23:22 52:17 62:17
91:3 96:18
**generation**
300:11,16
**genetic**
196:22,24 222:22
222:23
**genital**
165:2,3 169:4,5,9
170:9 173:10
188:14 304:21
305:24 306:8,12
306:16 324:5
**genome**
203:18 204:2,6,20
206:3,23 207:6
**genotype**
196:13,15,21
197:21 198:14
199:12 203:4,14
**GEOFFREY**
5:4
**geoffrey.wyatt@...**
5:8

**GEREL**
2:15
**getting**
145:20 234:16
254:7 288:13
323:1
**Ghassan**
1:15 12:13,16
17:22 345:8
**give**
27:25 33:6 35:23
44:6 76:17,23,23
91:17 101:11
123:7 202:14
218:7 237:6
255:22 258:14
259:9 270:20
282:24 291:18
298:3,9 302:9
327:24 338:11,21
339:1
**given**
61:17,20 62:20
112:19 289:22
345:4
**giving**
53:24 288:20
**glad**
318:10
**glass**
272:20,22
**glucose**
254:9,12,19,21
255:5,20,22
**go**
13:11 24:6,7 34:24
34:25 43:1 45:2
53:14,21 55:23
61:10,10 64:8
68:21 78:20 79:6
80:20 89:11 93:8
94:1,6,6,9 95:17
96:23 97:2,4,21
123:9 129:11
131:10 137:18
138:24 154:11,14

157:24 162:5
164:14 165:2
167:19 168:10,11
168:25 170:9
175:6 194:18
206:8,15,16,20
209:20,25 216:5
219:8,11 224:2
227:11 231:10
246:17 255:20,21
266:4 269:5
285:12 307:25
308:15 310:20
312:14,23 315:21
318:1,10,20,23
322:15 323:3
329:16 334:18
337:20 342:5
**goals**
137:12
**Godlesky**
337:23
**goes**
52:23 133:19 165:3
216:14 266:8
**going**
20:20 27:15 41:19
42:10 45:18 59:5
64:20 65:1,6,22
65:22,24 67:19
69:15,17,19 71:9
73:9,14 74:22
77:1 78:5 95:11
95:13 97:15
112:12 131:4,5,6
131:11 136:17
138:12,22,24
139:2 141:10,19
144:11 146:23
151:24 159:14
161:6 175:9 176:2
177:7,14 194:19
195:1 210:3
211:25 219:13,15
219:22,25 223:3
223:22,25,25

224:11 228:6
249:14,18,25
252:25 263:5,6
265:17 269:10
271:6 278:3 283:6
284:10 285:6
291:6 299:21
308:2 311:2 314:2
316:18 317:11
318:10 319:4
323:9 339:25
340:18 342:13
**GOLDMAN**
3:12
**Golkow**
12:5
**good**
15:12 17:16,17
46:12 49:5 82:3
82:14,15,24 83:4
97:6 101:21,23
174:24 214:11
227:12 265:6
277:13 281:21
291:20 293:10
332:4 333:7
**GORDON**
5:12
**gotten**
59:25 292:11
**GPX**
183:16 201:3
**GPX1**
213:18
**grade**
228:22 229:6
231:23 232:2,3
**grammar**
135:2
**Grand**
4:14
**grant**
136:14,21 149:21
153:2 285:2,24
**grants**
35:15,17 285:7

granulomas
305:7,25 306:14
graph
96:7,13,17,17
111:6 112:10
graphs
95:19 96:2
great
285:4
greater
119:23 294:20
grow
122:8 270:18
growth
293:7
GSR
183:16 197:6,6
201:2 213:18
GST
183:17
guess
193:13
guidance
152:18
guidelines
99:8 156:12
guy
340:12
guys
133:8
GWAS
204:10,12,17,25
205:2,4,9,10,14
205:19,23 206:3,8
206:13 207:14
216:9
gynecological
171:24
gynecology
75:23 76:4 140:16
210:14 211:24

H
hallmark
265:16 268:1
hand

214:25 215:19
308:20 320:2
handing
56:11 257:4
handle
106:16
handled
106:17,20
hands-on
279:3,5
handwriting
13:12 85:21,23
86:2 87:10 97:20
98:6 99:13 102:23
104:3 107:7 113:5
114:5 331:1,1,2
handwritten
112:14 127:24
129:2 292:3,8,16
292:22 295:2
310:21 311:2
331:3
happen
97:11 102:16
197:24
happened
55:7 79:3,19
102:16 106:15,15
114:25
happy
120:10 209:8 342:8
hard
64:9 279:17 313:23
313:25
HARDY
4:12
harmful
323:23 332:10,14
Harper
34:20 151:4
Harper's
134:21
head
21:15 69:8 162:19
264:4
heading

36:15 152:22
hear
165:8 204:15
269:18
heard
186:19 239:13
252:18 283:11,13
283:15 293:17
heart
291:1
heavy
264:6
Hegarty
4:13 8:3,5,7 12:19
13:10,18 14:23
15:11 16:2,6,9,24
17:14,15,18 20:1
22:8 25:1 27:7,21
28:6 29:3 30:1,21
31:16,23 35:10
36:13 37:22 39:3
40:18 41:11,19,24
42:9 45:17 48:21
49:19 51:6 52:7
52:12 54:1 56:1
57:2 59:13,16,24
63:16,22 65:8,24
66:13 67:2 68:9
68:11 69:7,16,24
70:14 71:21 72:4
73:3,11,24 74:3
74:14,21 75:3
76:5,22 77:23
78:1,14,19,22
79:6,10,20 81:11
82:7,13,21 83:3,8
84:15 85:18 86:12
89:17,21 90:6,21
91:5 92:15,18,25
93:2,21 96:1,15
96:22 99:5,20
100:1,15 101:1,20
102:8,14 103:7,14
104:17 105:2,22
106:3,12 108:4,16
109:3,9,15 110:5

110:19 111:7,24
113:1,14,22
114:13 117:19
118:14,24 120:6
122:1,13 123:23
124:18 125:1,7
126:13,24 127:19
127:23 128:4
129:6,11,13
130:18 131:10,16
132:5,10,13 133:3
133:9 136:12
137:2 138:2,20
139:7 140:1,18
141:12,21 142:19
142:24 143:14,22
144:14,23 145:8
145:19 146:3,10
146:17,24 147:7
147:16 148:1
149:3 150:1,11,17
150:23 151:23
152:15 153:21
156:9,20 157:18
159:1,9,16,25
160:8,17 161:5
168:17 169:8
170:3 171:10,22
172:11,21 173:23
175:6,14 176:1,20
177:6,13,22 178:4
178:11,22 179:6
180:16 181:11,13
182:23 183:10,18
184:19 185:25
187:9,15,22 189:6
189:15,23 190:8
190:14,22 191:12
191:17,19 192:1
193:1,8,20 194:7
194:24 195:15
196:17 197:9,20
198:17,23 199:5
199:13 201:16
202:8 203:16
204:1,7,16 205:17

206:2,22 207:11
207:23 208:10,21
209:17,25 210:8
212:15 213:7,15
214:9,20,23 215:2
216:4,17 217:10
218:2,10,23 219:1
219:8,11,13
220:15 221:2,9,14
222:11 223:1,7,11
223:16 224:11,16
224:22 225:16,23
226:12,22 227:5
227:19 228:4,11
229:4,10 231:16
232:10 233:4
234:6,22 235:9,23
236:7 237:19,24
238:8,15 239:9
241:1,7,14 242:2
242:15,23 243:18
244:1 245:1,13,23
248:24 249:20
250:3 251:15
253:24 255:1,12
257:14 261:9
262:16 263:1
266:12,18 267:1
268:3,13 269:5,15
269:20,23 270:4
272:13 273:15,23
274:15 275:17,23
277:4 278:8 281:6
282:23 284:11
287:6 315:14,20
316:2,17 317:10
317:22,25 318:22
319:3 321:15
323:1,5,24 324:21
324:24 326:2,13
327:5,24 328:1,11
328:20 329:3,9,23
330:4,11,18 332:7
333:1 334:14
335:3,8,19 336:2
336:7 337:6 341:5

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 287 of 1525 PageID: 62433
Ghassan Saed, Ph.D.

Page 364

341:7 342:1
**held**
12:8 18:4 57:14
  194:21 210:5
  308:4 323:11
**Hello**
283:10
**help**
18:18 23:9 115:4
  134:20 135:10,15
  248:16,21 252:24
  257:2 279:7
**helped**
54:3 134:14 135:1
  135:9,24
**helpful**
298:5
**helps**
120:18
**hemocytometer**
294:1,4,7
**hereinbefore**
343:9
**hidden**
54:22 108:15
**hide**
108:11,18
**hiding**
82:20,22
**high**
54:14 55:6 228:22
  229:6 231:23
  232:2,3 234:14,17
  236:16,22 252:8,9
  255:5 256:1 282:9
  282:9,9 290:3,3
  313:9
**higher**
236:19 250:17
  252:12 253:6,10
  254:10,21 256:17
  256:23 257:17
  313:15
**highest**
170:18
**highlight**

265:3
**highlighted**
162:6,10
**Hill**
239:10,14
**hired**
177:25 329:1
**histotypes**
231:19
**hit**
55:6
**hmm**
205:4
**hold**
43:14 130:10
**hope**
286:6
**hopefully**
138:22
**hour**
20:14,18,19 39:24
  69:17 144:7
**hourly**
39:5
**hours**
23:2,21,21 32:15
  34:9 36:6 39:24
  39:25 185:2,4,6,7
  185:9,11,11,11,15
  185:21,22 186:1,3
  186:4 196:13,21
  196:22 198:1
  251:8,11,18 252:5
  316:7,8,10,12
  331:11,11 341:21
**HPV**
165:12
**Hu**
210:23
**huge**
337:18
**human**
190:10 191:22
  203:4,25 226:20
  229:12 332:22
**humans**

201:13 323:23
  325:4 332:14
  333:3
**hundred**
149:12 210:19
**hydrogen**
192:20 260:11,18
  260:23
**hyperglycemic**
255:3
**hyperoxia**
252:21
**hypertrophic**
281:23
**hypotheses**
188:12,13
**hypothesis**
188:9 222:25 240:1
**hypoxia**
62:8,8,11,12
  252:21 285:22
**hypoxic**
62:13
**H-u**
210:23
**H2O**
260:22
**H2O2**
31:2 260:12,20,22
  260:25 261:1
  307:2,22

___

**I**

**ID**
128:5,9,10 130:17
  130:22 295:11,11
  296:2,9 298:14
**idea**
69:5 110:18 111:11
  112:9,23 257:7
  338:14
**identical**
176:7 186:11
**IDENTIFICATI...**
8:18,22 9:3,6,10,14
  9:19,24 10:3,6,9

10:13,17,21,25
  11:2,6,10,14,17
  11:21 13:9,17
  14:22 22:7 35:9
  40:17 42:8 45:16
  78:13 84:14 132:4
  151:22 157:17
  161:4 173:22
  175:25 214:8
  278:7 315:25
  316:16 317:9
**identified**
26:22 134:1 205:3
  205:19 206:13
  212:25 213:1
  232:4 331:21
  333:3
**identifies**
152:9
**identify**
21:10 26:13 28:21
  33:4,5 40:19
  142:12 145:13
  154:19 195:2
  203:17 205:2
  207:24 208:4
  240:22 242:25
  243:1 262:12
**identifying**
154:9
**IDs**
128:5,12,22 295:4
  298:12
**Illinois**
6:16
**Imaan**
135:21,23
**imagine**
95:2
**imbalance**
30:12 31:7,12
**Imerys**
5:17 6:10 15:10
  269:7 283:7,11,12
  283:16
**immortalize**

230:3
**immortalized**
191:3,4 229:12,15
  230:1,22 231:2
  324:18 325:3
**impact**
51:13,16 170:18,18
  170:20,21
**implicated**
230:17
**imply**
200:5
**important**
64:6 127:5 227:12
  293:9
**importantly**
248:22
**inappropriate**
66:11 73:12
**incessant**
287:19
**incidence**
283:25
**include**
38:17 48:13 100:7
  110:16 155:20
  158:2,11 159:24
  162:5 163:13,19
  187:2 193:4
  238:16 244:18,20
  244:22 245:17
  313:13 315:3
**included**
12:23 36:21 61:19
  69:2,6 72:25
  80:17 103:12
  107:25 111:9
  112:19 131:3
  157:8 159:11
  160:2 161:8 187:4
  213:9 235:2 262:3
  262:3 321:2
**includes**
13:23 16:15 23:13
  140:21
**including**

336:17
**income**
19:11 20:9
**incorporate**
164:3 165:4 294:14
294:15
**incorporation**
293:14,16
**incorrect**
186:2
**increase**
117:14 198:2
200:25 201:9
202:10 227:1
248:7 252:1 255:5
256:6 259:19
264:22 265:2
266:4,13,20
267:20,22 268:5,7
268:20,25 281:13
294:18,19 321:24
329:18,20
**increased**
9:18,23 17:4 30:12
33:19 42:6,14
45:13 147:24
166:19 167:1,25
168:5 173:1 180:8
192:14 195:12
202:23 203:3,13
203:25 205:8
207:2 208:6,8
210:17 215:10
216:21,23 217:9
222:4,15,17
223:14 225:6,9,12
226:15 227:17
246:13 249:17,22
251:23 268:11,12
288:12,21 289:7
290:17,19,23
291:1 303:17
304:21 305:6,25
324:5 326:4
334:13,19
**increases**

32:3 202:9 264:14
264:18 281:17
288:22 289:2
333:22,23,24
334:3
**increasing**
30:20 117:14 202:1
235:17 247:17
**incredible**
203:15
**incubation**
53:6
**incurred**
40:6,10
**incurring**
38:15
**indefinitely**
165:16
**independent**
83:16 124:21,22,22
124:23 125:5,20
176:22 177:8
178:6,10
**index**
8:12 10:1 78:6,11
78:24 79:1,1,15
80:4,11,17 84:22
**indicate**
43:8 56:17 130:8
**indicated**
201:7 226:19
308:13 318:3
**indicates**
119:23 193:19
201:8 251:10
264:20 309:11
**indicating**
169:15 173:3
**indication**
234:15 235:19
249:18 265:17
293:12
**indications**
267:15
**indirect**
36:21

**indirectly**
260:14,15 307:24
**individual**
298:13
**individuals**
18:10 135:18
**induce**
63:4 165:5 230:6
248:20 250:18
283:2 304:17
333:18
**induced**
54:17 62:8,14
196:22 213:5
287:16,17 289:14
289:16,18,20
290:7
**inducer**
32:2
**induces**
27:10 30:19 32:3
60:19 61:22
199:19 200:1
232:6 234:1,2,7,7
235:16 250:23,24
257:9 259:17,19
265:7 279:18,19
326:3 334:5,25
**inducing**
61:15
**induction**
251:13 265:14
**inert**
272:7,24
**infection**
62:14
**inflamed**
169:24 172:14,19
**inflammation**
25:17 26:2,17 27:6
27:10 28:15 30:12
30:15,19,24 31:8
31:11 32:2 59:7
60:19 63:5 81:13
147:19 165:5
167:5,21 168:2,3

168:5,9,21 169:1
169:6,10,12,21
170:13,15 171:13
171:16,17 172:4
173:4 179:4
191:11 195:20
202:15 203:7
233:6 239:23
240:7 248:19
249:24 266:8,9
287:4,17 289:2
299:22 325:24
326:4
**inflammatory**
170:8 188:18
247:18 248:8,20
249:14,18 286:11
287:11,13,16
**influence**
301:19
**inform**
54:11
**informal**
64:1
**information**
53:7,9 99:1,22
100:6,10,18 101:5
101:25 102:10,25
103:3 104:19
105:19 106:1,4,8
107:24 108:11,20
108:22,23 109:1,4
109:7 116:6
136:16 152:19
153:24 156:3
205:10 206:8,14
206:15 207:14,15
232:4 252:24
274:4 290:18
338:21 339:1
**inhibit**
257:11 304:17
**inhibition**
252:1
**initial**
16:5 54:14 55:5

59:2 117:11
261:17 265:13
275:10 316:25
**initially**
44:11 47:22 180:24
281:21
**initiate**
170:14
**initiated**
275:10 284:19
**initiation**
212:12
**initiator**
188:11
**ink**
98:1,2,3
**iNOS**
201:1
**input**
72:10
**inside**
173:10 253:12
254:4,22 300:1,4
306:1,22
**instance**
90:7 321:10 333:2
**instances**
88:1
**institution**
34:18 279:2,15
284:20,21
**institutions**
301:10
**instruct**
65:7,22 71:9 73:9
83:11 111:25,25
112:3,5 114:19
115:6,25 116:3,5
116:9 141:11,19
**instructed**
66:12
**instructing**
74:5 141:15
**instruction**
73:11,13 115:8,11
**instrument**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 289 of 1525 PageID: 62435
Ghassan Saed, Ph.D.

Page 366

80:23
**insult**
233:1
**intend**
22:21 74:11,15
75:7,14 76:15
136:16 321:23
**intent**
159:23
**intentionally**
109:7
**interest**
28:14 31:11 59:3
141:23 142:4,13
143:2 144:17,21
145:10 148:2,4
154:1,16,18,20,21
155:4,7,12 156:3
156:7,11,17,22,25
157:3,5,8 158:1
158:10 159:3,6,11
159:12,18 231:10
282:7
**interested**
27:14 44:9 59:22
236:24 256:4
281:22 282:13
302:10 343:17
**interesting**
48:24,25 63:4
65:25
**Interests**
153:23 154:5
**interfered**
66:21 67:1
**interference**
177:1
**internal**
153:4
**internet**
77:6,9
**interpretation**
134:23 135:10
**interrupt**
16:9 224:10
**interrupted**

16:11 224:7
**interrupting**
224:3
**intervention**
61:16
**intra-abdominal**
283:21
**intra-assay**
127:13
**introduced**
233:8
**introduction**
155:8
**investigate**
219:3 220:22
221:23
**Investigation**
57:13
**investigator**
285:13,17,21
**investigators**
18:17,19 205:3
**invite**
161:20
**invoice**
22:16,21 23:13,20
23:22 24:6,8,13
24:15 41:7,8,10
41:12,18
**invoiced**
23:1
**invoices**
9:5 22:5,10,12,18
23:3 32:10,14,25
33:12,25 34:4
41:1,2,3,15 144:9
341:20
**involve**
81:17 168:18 262:6
**involved**
18:10,12 58:23
179:7 180:18
261:17
**involvement**
134:11,12,21 135:3
**involvements**

153:25
**involves**
243:2
**involving**
27:13 29:18 60:8
60:16 142:10,14
142:21 143:18,25
182:6 183:12
262:13 328:13,15
328:22 329:5
**in-person**
72:18
**ionase**
62:2
**Ira**
36:17,22 37:4,14
37:19,25 59:1
134:25 135:1
149:19
**Ira's**
37:10,23 151:5
**isolate**
130:25 267:18
268:22
**isolated**
229:2 233:21 267:9
296:8 326:9
**isolating**
231:11
**isolation**
130:24
**issue**
22:17 23:12 211:24
**issued**
23:3 152:19
**items**
342:9

---

**J**

**J**
184:18,18 264:12
264:12
**JAMES**
6:14
**James.mizgala@...**
6:18

**January**
1:19 10:23 12:2,6
43:11 44:1 92:1
92:11,12 93:6,22
94:8,9 122:24
152:1 173:20
174:5
**JBC**
210:20
**JD**
2:5
**jdonath@coughl...**
6:9
**Jennifer**
24:23
**Jersey**
1:2 3:16 6:7 12:12
**Jimmy**
213:17 218:13
224:21,25
**job**
32:19
**John**
4:4 331:16,18
337:23
**Johnson**
1:4,4 4:18,18 5:9,9
12:9,9 17:19,19
85:2,3 102:19
103:24,24 104:4,4
104:13,13 179:19
179:19,21 180:2,2
180:7,7,23,23,25
181:1,22,22 182:9
182:9
**Johnson's**
85:10 179:7,10,13
179:18,24 180:3
180:23 183:21,25
238:18 243:12
246:3,19 247:5
**join**
15:14
**joins**
15:10
**JONATHAN**

6:4
**journal**
33:17 46:19 49:12
50:17,18 51:1,9
51:14 71:18,19
73:8 74:11 75:15
75:18,19,20,22
77:1 137:19
138:21 142:17,18
143:20 145:7
152:6 153:8
156:15 162:12
210:21 211:23,23
275:14 337:10,14
**journals**
46:5,9 50:14,22
70:25 71:4,5
75:17 77:10
138:11 139:11
156:16 174:24
**JR**
4:4
**JRestaino@Rest...**
4:8
**Judge**
14:1 15:4,16,22,25
16:20 17:10
219:15
**jump**
79:2,7 128:16
**jumps**
79:21
**June**
91:9 94:22 95:6
**J.M**
3:4

---

**K**

**Kansas**
4:15
**keep**
16:23 82:12 83:16
104:22 114:25
130:14 131:6
151:17 159:14
217:16 266:8

Ghassan Saed, Ph.D.

269:24 299:21
**keeps**
171:3
**keloids**
281:23 282:10,11
283:1
**Kemble**
6:5
**kept**
90:23
**key**
155:8 188:17
199:20 225:5
247:11,13 251:25
259:21 302:21
307:6 336:15,15
**kick**
165:14
**kill**
53:22
**killed**
54:17
**kills**
53:13
**kind**
73:17 136:21
213:21 298:2
**kinds**
250:24 251:17
252:5
**King**
59:1 83:24 84:1
149:19
**kit**
302:9
**kits**
301:18
**Ki-67**
293:18,21
**KI67**
267:14
**Klatt**
5:13 8:4,8 15:10,14
100:14,25 143:21
214:19 218:1
219:15,23 220:3

235:22 283:9,10
284:3 288:6,14,19
289:4 291:10,13
291:18,21 292:7
298:11 301:12,20
302:7,23 303:9,24
305:2,11,21 306:5
306:20 308:7,19
309:18 310:25
311:6 312:3,10
314:14,19,24
317:4 319:20
336:21 337:21
338:8,18 339:3,11
339:19,21
**knock**
62:1
**know**
15:1 21:21 22:2
25:11 37:18 38:8
48:6,9 51:16
53:10,13 59:5
64:7 65:16 67:9
67:10,18,24 71:13
71:20 80:12 81:20
85:17 86:24,25
87:6 88:10,12
97:4,11 98:6,21
98:22 100:23
103:15,16,23
104:7 107:10
108:25 109:20
110:22,24 111:3
111:14 112:8,10
112:20 113:8
122:17 125:9
127:16 133:6,24
143:11 144:16
145:3,10 146:15
147:20 151:17
154:17 162:22,24
164:1,1,22 165:9
169:3 170:10,12
172:23,24 174:21
175:1,3,19,21
176:8 178:18

187:4 194:4,6,10
198:6 200:16
203:1 204:5 207:8
208:15 210:2
214:25 220:14
226:3 227:4 228:3
228:22 232:7
233:10,23 234:1
234:25 235:1,2
236:11,12,13,18
236:21 238:13,14
248:1,5,6 249:3,5
249:6,9 250:8
254:25 255:4
264:4 266:2,19
267:5 268:15
270:25 271:12
275:4 280:23
281:9 283:5,16,17
283:20 285:7
286:9,16,17,19,21
286:22,23 287:1,2
287:2,3,3,4,10,14
288:2 289:9,15,17
290:18 291:2
292:10 294:21,23
297:18 298:12
299:4 302:5,8
306:18,18 309:1,6
313:22 315:12,19
320:8 331:12
336:14 337:16
**knowledge**
106:16 148:8,9
164:21 175:2
193:18 265:12
280:3
**known**
61:21 120:16
168:22 215:8,9
216:19,20 217:4
222:13,14 240:9
242:13 256:3
257:18 271:7,20
272:7
**knows**

116:8 170:23 254:1

——————

**L**

**lab**
8:20 9:1 10:1 12:23
13:15,18,22 14:4
14:12,20 15:25
16:3,5,11,25 17:6
29:19,20 30:3
34:20 35:13 36:5
36:7,12,24,25,25
37:3,5,7 39:9,10
40:3,5 51:22 56:4
56:6,15,18,19,20
56:25 59:3,6
60:20 61:5,8 64:7
67:20 68:2,13,15
68:18 70:18 78:6
78:11,15 81:1,5,7
81:21,25 82:1,9
82:23,24 83:13,14
83:16,17,23 84:3
84:7,9 87:20 88:2
88:7,9 98:13 99:9
99:21,22 101:25
102:10 103:18
104:13,19 105:16
105:18 106:6
107:24,25 108:5,7
108:13 110:1,11
110:12 113:7,9,9
113:17,21 114:5,9
114:10,12,15,17
114:19,20,21,23
115:1,2,6,12
116:2,4,7 117:6
119:11,15 127:11
127:12,16,22,23
137:22 138:9,17
140:21 147:5
151:13 176:19,25
177:12 178:2
179:5 180:9,12,17
181:8 188:11
201:24 202:5,16
202:16 203:7,12

205:5 211:12,12
211:14 259:7
261:6 276:4
280:25 291:4,5,8
291:11,24 292:9
292:11 307:16
308:13 309:20
312:11 320:3,14
320:24 321:7,11
335:1 339:18
**labeled**
80:16 184:10
**laboratories**
239:22 259:5
**laboratory**
54:7 60:7,11 64:11
82:3,8,14,15,16
82:25 83:4 98:25
99:8 100:2,5,16
101:2,9,17,21,23
106:21 107:23
115:8,23 116:1
129:24 138:7
139:15 179:3
192:16 212:5
234:5 251:22
276:2 324:18
**labs**
202:21 203:8
206:17 259:3
**lack**
132:24
**lady**
116:3 332:1
**language**
142:18 143:19
145:6 242:10
246:5,10
**LAPINSKI**
3:13 78:17 129:3
288:16
**large**
176:6,8
**largely**
65:17
**late**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 291 of 1525 PageID: 62437
Ghassan Saed, Ph.D.

Page 368

15:9 318:5
**Laurel**
1:20 343:6,21
**LAW**
2:3 4:3
**lawsuit**
277:21
**lawyer**
26:13,15,19
**lawyers**
21:18 33:13,23
   65:22 81:4 143:5
   144:17 328:3,23
   329:4 331:21
   341:17
**lead**
134:1,3,4,6,9
   154:24 169:24
   171:13 211:18
   212:1 213:16
   233:6 242:25
**leading**
30:24 319:20
**leads**
31:7,8 326:4
**learn**
127:16 283:18
**learned**
54:18 115:22
**leave**
336:21
**led**
136:6
**left**
69:25 83:17 94:13
   104:25 128:2
   315:14,15
**Leigh**
2:4 331:16,18
**leigh.odell@beas...**
2:10
**letter**
10:20 50:1,1 154:2
   154:8 155:21,22
   155:24,25 156:2,7
   156:8,11,16

159:21 160:1,3,11
160:12,19 161:2,8
161:10,14 163:17
**letters**
70:8 341:14
**let's**
44:21 83:15 121:14
   131:10 151:4
   175:6 186:24
   194:2,18 205:7
   209:6,6,20,25
   218:21 219:8,11
   227:11 228:5
   257:6 265:13
   291:14 295:11
   296:9 299:10
   318:20 323:3
**level**
31:13 119:3 154:17
   190:19 207:2
   232:16 233:12
   236:19 250:17
   253:15,19 254:12
   259:13 260:10,11
   285:24 294:19
   298:14 307:5
   309:9
**levels**
58:11 234:14,17
   235:5,15,17
   236:22 247:24
   248:8,10 249:16
   252:8,9,12 253:6
   253:10,14,15,18
   253:22 254:9,14
   254:19,21 255:5
   256:2,17,24
   257:15,20 260:5,8
   260:18,20,23
   261:1 274:21,22
   289:20 290:16,19
   290:23 298:21,22
   299:25
**Liability**
1:7 12:10
**life**

282:7 286:13,18
**lifetime**
286:14 287:25
   288:7,22 289:6
**limit**
53:21
**limitation**
108:14
**limited**
68:13 223:19
**line**
100:5,16 101:3
   102:1 103:9
   120:18 122:8
   123:13 124:19
   125:10,12,13
   127:1 130:23
   186:21 197:25
   199:18,23,23,24
   218:16 225:4
   270:10 322:19
   344:3
**lines**
57:11 124:9 192:16
   193:14,15 228:14
   228:16,19 229:1,5
   229:6,7,16,18
   230:22 231:2,5,22
   231:24 232:2
   233:18,20 252:15
   255:25 256:1
   270:3,21 295:7
   297:12 303:18,19
   325:8,11,13,14
   334:24
**link**
30:9 167:5 171:25
   172:25 222:23
   227:17 228:2
   242:13 283:2
   286:9 288:11
**linked**
27:11 30:12 63:6
   165:5 169:7
   170:14 304:25
**linking**

289:1 324:4
**list**
36:6 80:8 204:20
   205:25 206:4
   285:7 295:4
**listed**
23:16 37:13 38:13
   41:12 69:2 79:15
   90:13 130:3 134:8
   135:18 183:13
   214:13 219:3
   278:18,19,23,24
   297:12 298:13
   307:11,14
**listen**
101:2 223:12,20
   227:20 242:16
   245:14 246:1
   247:4 248:9,25
   252:3 254:18
   255:16
**listened**
28:14
**listening**
77:18
**listing**
35:14
**lists**
152:1 217:2
**literature**
24:17 27:17,22
   28:8,10,11 29:5,8
   29:23 32:5,15,18
   32:20,22 55:3
   60:6 61:18 115:12
   172:3 173:2 188:9
   191:20 192:2,7
   193:5 203:6
   207:17,24 240:22
   241:4,9,15 243:4
   243:14 251:1,20
   279:23,24 280:8
   305:5,23 328:4
**litigation**
1:7 12:6,10 18:7,15
   19:2 20:13 21:12

21:22 26:10 70:23
71:6 81:3 142:9
142:14,21 143:4,4
143:9,17,25
145:20 146:6,13
146:20 147:9
148:12,20,23
158:19,22 177:9
180:4,5 261:22
262:12 277:5
328:3,15,19
**little**
22:2 66:8 133:7
   144:12 239:5
**live**
229:21 299:1
**living**
32:19
**LLC**
4:3
**LLP**
2:15 4:12 5:3,12
   6:3 7:3
**LOCKE**
7:4 8:9 77:15 298:1
   298:10 315:17,19
   315:21 339:20,22
   339:25 340:8,18
   340:22 341:1,3
**log**
162:4
**long**
18:4,24 86:22
   216:10 233:24
   284:17 286:8
   327:22 329:24
   331:10
**longer**
151:5 170:21,22
   284:24
**long's**
285:6
**long-term**
282:7
**look**
22:11,15 28:25

34:16 45:21 55:20
57:9 62:9 74:22
80:2 84:19 91:19
93:15 94:21 95:8
98:8 103:17 107:3
110:6 111:20
116:21 123:4,6,6
123:12 153:22
157:21 159:21
162:13 163:6
181:14 183:11
187:5,6 194:17
196:4 197:3,5
199:16 209:18
210:11 211:3
214:21 216:3,5,10
216:12,25 217:17
219:6,20,24 220:3
222:24 239:17,17
245:21 246:7,8
250:4 251:12
255:24 257:6
260:2 267:11,18
268:24 274:18
282:14 285:5,7
291:3 292:16
294:25 308:1
309:21 326:17
340:14 342:5
**looked**
54:13 58:14,23
61:15 62:6 78:23
95:6 96:2 104:8
129:16 213:1,18
214:14 217:22
222:1 223:13
225:8 302:18,20
303:1,5 317:1
**looking**
43:18 56:22 57:22
58:17 59:6 60:18
61:10,11,16,22,25
81:15 92:15 93:13
96:16 107:1 115:7
116:1 123:5 135:2
180:12 199:17

205:24 208:5
209:21 210:16,20
213:3 214:17
217:18 219:9
220:6,7 228:12,13
231:23 252:21
271:12,14 274:19
274:20,21 279:23
279:25 281:10
285:22 288:25
291:8,22 292:23
302:21 309:14,19
311:14,19,20,24
311:25 312:11,12
340:5
**looks**
45:24 316:5
**lot**
49:12 85:2 103:25
114:23 128:24
270:18,18
**lots**
172:24
**Lot#166820**
181:21
**love**
49:3 120:10 256:11
**low**
289:14,16,18
**lower**
53:14 55:11 91:13
92:16 129:9 256:8
257:12,25,25
258:1 292:1
308:20
**lunch**
131:8
**lungs**
195:25
**lyse**
122:21

**M**

**M**
2:5 4:4 5:4
**machinery**

231:3
**macrophages**
57:11 256:15
295:16,23 296:6
296:21
**magnitude**
200:8,10
**mail**
72:19
**main**
303:5 320:14
**maintained**
341:13
**major**
50:20 202:5 285:21
300:1 303:6,7
**makeup**
64:19 230:9
**making**
17:11 74:3
**malignant**
282:3,6,10
**manager**
35:15,17
**manifest**
201:25 202:6
242:22 335:13
**manifesting**
235:19
**manipulate**
31:13
**manipulating**
61:11
**manner**
342:7
**MANSUKHANI**
5:12
**manuscript**
12:25 14:16 15:2
15:20 16:1,13
17:2,8 33:16,23
34:3,13 35:2
42:11,12 43:12,21
44:3,5,8,15 45:19
46:1,5,11,18
47:21,22 49:25

50:1,6,8,14 52:6
58:13 59:18 63:8
63:10 65:9,9,17
66:6 70:4,10 71:4
71:19 72:1,1 73:7
78:9 91:25 93:5
133:16 134:22
135:6,7,10,12,15
135:17 136:7,23
139:19 141:2,6
142:8 145:23
146:2 148:10
149:11 150:7
154:12,19 155:1,6
155:10,15 156:4
157:4,9 158:15,17
160:14 161:7,20
161:21 162:4,5,6
162:14 163:4,14
163:19,25 164:3,6
164:7,10,12
166:12 167:4,7,11
167:20 172:18
173:12 174:4
175:4 176:6,9,10
176:11,13,16,22
177:3,8,15 178:6
181:14,16 182:1,5
182:8,11 185:1
186:6,8 187:7,17
187:21 188:1,6,15
189:7 190:4 191:6
193:3,10 194:3
195:3,5 196:12,18
196:20,21 199:17
201:18 203:17
204:24 205:12,19
207:4 208:1 209:5
214:21,24 216:18
219:17,19 221:6
222:8 225:18,24
225:25 227:7,22
228:12 237:8,16
240:18,21 241:16
244:18,22 245:17
245:19,22 246:3

246:12,17 247:22
250:4 255:25
258:8,18 259:25
262:21 320:4
321:20 324:3,3,14
324:15 341:11,14
341:18,19,22
**manuscripts**
18:18 50:21 74:10
168:24 174:23
186:10 192:20
244:20 245:5,6
**Marc**
7:11 12:5
**March**
57:14 94:4 140:5
140:13,19,22,24
182:17 261:16
316:22 317:13
**Margaret**
2:5 331:16,18
**Margaret.Thom...**
2:11
**marginal**
200:4,18,19,21
321:20,23 329:11
**mark**
4:13 13:21 17:18
42:10 45:18 78:3
78:5 84:16 92:13
131:23 151:24
157:19 160:18
161:6 173:24
176:2 278:3
315:21 316:18
317:11
**marked**
8:17,21 9:2,6,9,13
9:18,23 10:2,6,9
10:13,17,21,24
11:2,5,9,13,17,20
13:8,16 14:21
16:2 22:6 32:10
34:4 35:8 40:16
42:7,12 44:17,20
45:15 46:1 47:21

52:2 56:4 68:17
78:7,12,18 84:13
132:3 151:21
157:16 161:3
173:21 174:16
175:24 185:23
200:20 214:7,10
261:4,7 278:6
315:24 316:15
317:8 320:2
321:24,24 322:1,2
328:6 329:11,12
329:13,15,16,18
329:20 330:25
331:1
**marker**
58:2 192:21 202:15
202:18,19,19,20
230:12 248:2,15
248:18,20 274:19
304:13
**markers**
56:23 57:10 58:12
59:6 61:3 64:9
131:3 138:8,18
182:19 188:18
195:17,22 197:2
203:5 232:7
247:11,18 252:22
267:14 272:3,4
274:21 276:4,20
276:21 281:1
304:13,16 307:13
334:13
**Marketing**
1:5 12:9
**marking**
13:4 22:9 34:24
35:4 40:13 316:3
**markings**
291:12
**marks**
112:9 331:3
**Mark's**
28:1
**match**

313:14,14
**material**
50:3
**materials**
12:21,23 15:21
17:11 29:11 77:9
78:2,4 328:6
**matter**
17:9,20 23:25
71:12 81:10,12
88:6 141:18
143:12 147:15
255:22
**MD**
2:5
**MDL**
1:7
**MEAGHER**
5:3
**mean**
26:19 28:25 38:18
49:25 50:22 51:4
51:5 53:8 63:14
72:17 81:10 84:5
85:11 87:18,23
88:1 95:12 106:10
109:14 113:13
120:24 123:1
124:11 125:6
142:5 173:8
177:21 200:1,2,3
200:17,18,19,21
201:5 204:5
206:23 209:13
210:1 217:2
231:17 236:12
242:1 246:19
247:4 252:14
253:11 258:25
260:15 265:1
270:15 288:10,25
289:3 290:4,10,12
304:13 305:10,12
305:20 330:13
340:20
**means**

64:10 72:18 74:19
125:24 150:21
177:20,23 178:18
189:10 200:4
241:13 293:10
294:15 305:16
329:15
**meant**
172:9 214:18
321:24 329:11
**measure**
120:13 121:7,15,21
124:5,6 192:20
195:16,17,21
247:15 260:5,8,20
260:21 266:22,24
267:4 268:16
293:13,20,25
294:6,10 306:21
307:2,2,5,6,6,12
**measured**
31:1,1 260:23,25
294:8 297:5
**measures**
120:25 294:12,13
**measuring**
119:21 120:1,11,22
121:9,12,15
123:20 124:1,1,2
258:5 297:20
298:19,20 307:13
**mechanism**
163:9,14,20 164:13
164:23 168:13
171:1 213:6 215:4
215:12 228:2
237:4,13 242:25
243:1,3 250:6,8
250:15 259:16
289:10,11 324:4
324:11 340:6
**mechanisms**
61:11 171:8 340:14
**Med**
275:12
**media**

27:15 29:13,14
32:4 54:20 59:4
122:20 180:1,6
253:20 254:12
**medical**
17:24 18:1 27:17
27:22 28:8 29:5
30:23 36:17 135:1
135:22 139:11
151:5 171:15
237:20 238:2,9
243:14 263:8,9
277:23 278:14,21
279:5 305:4,23
328:4
**Medicine**
263:13,20
**meet**
24:20 25:15,25
331:8,9,15 342:8
**meeting**
24:16,18 25:23
57:14 72:19
140:20 261:16,19
262:25 276:12,13
276:24
**meetings**
24:16 71:2,11
72:23 74:13
139:23 140:2,12
**Melville**
3:6
**Memaj**
134:25 135:1
**membrane**
300:9
**memorialize**
341:21
**memory**
218:8 219:18 285:3
**menstrual**
290:19
**mentioned**
48:11 80:25 165:19
169:20,21 209:9
242:11 261:5,12

275:24 284:12
307:21 325:7
336:22
**met**
331:20,22,24 332:1
332:3,6
**metabolism**
255:19,21,21
294:12,18,21
**metals**
264:7
**method**
66:23 101:18 102:5
107:11 177:2
240:5,10,10,12
258:21 293:16,18
294:10 297:20
307:1,13,21,23
317:15
**methodologies**
139:2
**methodology**
100:12 102:6
105:15,17 106:5
106:21 107:21
108:6,12 109:25
138:16 139:1
173:17 181:15
238:22 239:3,6,17
240:7,8,13,14
274:9
**methods**
54:6 64:20,25 99:8
114:20 134:19
137:11 155:8
240:3 294:11
307:8,10,11
**mhegarty@shb.c...**
4:17
**mice**
196:1
**Michael**
5:13 284:19 285:16
**Michelle**
2:16 332:2,3
**Michigan**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 294 of 1525 PageID: 62440
Ghassan Saed, Ph.D.

Page 371

1:17 12:1,8 343:3
343:23
**micro**
62:13
**microgram**
53:12 54:15 118:5
123:14,15 198:10
296:22 311:8,14
311:15,17,18,18
312:18
**micrograms**
117:1,1,1 118:6,9
123:14 290:6,6
296:10,18,19,19
297:10 310:8
311:20 316:24
317:16
**microliters**
118:9,10
**mid**
240:9
**middle**
25:4 83:14,21
200:22 316:6,23
322:24 323:16
**Mike**
215:25 283:10
291:16 309:17
318:10 337:20
**milligram**
55:1
**milligrams**
102:19 117:11,12
118:2
**milliliter**
55:2 316:24 317:16
**million**
198:9 270:19 293:8
294:5 296:21,24
**mind**
67:19 231:13 282:1
291:16
**mine**
87:12 177:3
**minimum**
232:24

**mining**
283:17
**minor**
161:19
**minus**
203:12,22,23
**minute**
123:7 219:16
220:13 283:20
336:21
**minutes**
69:17 315:15,18
327:23
**mislabeled**
322:11
**missed**
29:6 37:21 80:18
256:19 284:16
**missing**
79:24 128:14
307:16 320:19
**Missouri**
4:15
**misspelled**
100:21
**misstate**
318:14
**misstates**
89:15
**mistake**
81:2 99:4,19 100:4
100:22 106:15
317:19
**mistaken**
312:7
**mistakes**
104:24
**mitochondria**
300:2,5,8
**mix**
56:24 270:24
**mixed**
273:7,11
**mixing**
205:1 269:24 270:2
270:12,13

**MIZGALA**
6:14
**ml**
53:13 54:15 117:11
117:11,12 118:2,5
118:6,6,10 198:10
198:25 270:19
290:6,7 296:22
**MnSOD**
213:18
**model**
50:11 190:16
191:22 192:3,9
193:6 195:6 332:8
332:17 333:3,6,7
333:10
**models**
195:2,13 323:21
332:12,20
**modification**
45:1
**modified**
229:21,25
**modulating**
61:23
**molecular**
9:16,21 17:2 28:13
29:9 33:18 42:5
42:13 45:12
115:15 147:23
164:13 173:3,5
190:19 208:13
227:14 249:11
276:2,19 324:4,11
340:6,6,14,15
**molecule**
248:18
**moment**
28:1 101:11 218:7
283:6 332:8
**momentarily**
194:25
**money**
50:13 69:6 146:18
146:23
**monitoring**

249:1
**Montgomery**
2:8
**month**
89:1 95:12 287:12
**morning**
12:22 13:19 14:6
14:12 17:16,17
49:2 78:2 113:16
284:12 290:3
**Morris**
34:17 135:9
**Morristown**
6:7
**Morris's**
135:8,8
**motion**
16:22
**Mount**
6:5
**move**
193:25 245:14
254:18 323:4
**moved**
284:20
**moving**
258:10
**mparfitt@ashcra...**
2:20
**MPO**
183:17 201:1
203:23 206:13
208:18,20,23
209:9,12 210:10
210:16 213:19
**mRNA**
58:11,15 274:22,22
296:25 297:2
298:21 309:10
**MTT**
184:15 294:2,9
**mucinous**
228:23
**multiple**
126:22 303:18
325:7,8

**mutation**
198:2,4 199:4,4,6
251:14 301:2,7,13
301:22 302:2,10
302:13
**mutations**
196:23,24 215:8
216:20 222:13,23
230:16 250:18,23
250:24 251:2,8,17
251:24,24 252:5
258:25 259:1,20
298:20 300:23
**myeloid**
202:19
**myeloperoxidase**
62:2 202:15,17
203:12 205:5
208:7 258:3
**Myers**
7:11 12:5
**M.D**
212:4 278:14

---

**N**

**N**
297:19,22
**name**
12:5 17:18,20
18:22 24:24 28:22
75:21 86:6,7,14
86:15,24,25 87:1
87:2,4,6,7,9 98:7
103:24 142:5,7
153:17 193:23
210:15 212:8
275:11 283:10
284:14 332:1
340:13
**named**
19:1 143:3 284:18
307:8 337:22
**names**
28:21 34:16 86:17
237:6 277:9 332:4
340:13

nanometer
120:14
NAPOLI
3:3
national
139:23 140:12
natural
287:13
naturally
287:15
nature
318:6
NCI
279:16 285:2
necessarily
56:19,25 135:5
167:17 168:16
206:20 229:20
230:10 293:6
313:18
necessary
277:14
need
28:1 43:14 49:5
53:5 54:20,21
61:21 85:16
107:20,22 108:13
121:16,17 125:3
127:17 138:6,19
154:1 155:20
167:17 170:22
173:18 174:25
175:7 189:22
192:22 194:8,9,16
198:11 205:1
206:20 207:15
209:18,23 214:2,4
215:24 216:2
218:8,11 220:13
220:16 233:24
236:20 257:1
259:4,10 269:6
295:19 307:25
323:4,5 330:10,23
336:21 342:10
needed

47:1,3 48:15 109:1
159:19 297:15
330:6
needing
116:6
needs
269:7 279:20
287:10 298:9,9
negative
147:12,15 251:13
270:25 271:3,13
271:14,17,17,24
271:25 272:1,6,9
272:11,19,19
337:9,15,16,18
Network
152:19
never
40:1 62:5,23 87:9
127:12 156:16
157:10 191:6
241:3,8,17,21,22
242:4,16 243:13
243:20 244:5,5,13
252:18 289:19,21
289:22,25 293:17
328:18
New
1:2 3:6,16 5:5 6:7
12:12 151:6
news
28:13,14 180:1
283:13,19
Nicole
36:19 37:4,14,15
37:16,19 59:1
61:1 83:24 84:1
85:22 86:1 149:19
151:11
Nicole's
36:22 37:10,24,25
86:2
night
331:4
NIH
136:13,18 153:2,3

153:3 279:16
285:2,11,24
nine
79:22
nitrate/nitrite
201:1
nitric
183:17 258:2
nitrisolate
258:5
nitrogen
299:10
nitrosylation
307:2,3
Nods
21:15
nonmyeloid
202:20
nonresponsive
100:25 143:21
177:5 193:25
214:19 218:1
223:2 227:20
235:22 245:14
254:18 302:24
318:6
nonresponsiveness
224:12
nontalc
337:25
normal
57:11 62:9 116:12
130:11 168:22
191:1,4 199:21
230:1 236:16,16
236:17 252:22
255:19,25 256:9,9
256:12,15 257:6,6
257:15,15,16,17
257:25 264:19,24
264:25 265:2,4,6
265:14,15 270:12
286:13 288:11
289:1 295:16,22
296:5 297:22
299:24,25 325:14

325:18 334:24
335:15,18,21
336:4,11,12,17
normalize
308:8 309:9 310:17
310:18
NOS2
213:19
Notary
343:1,7,22 345:18
notation
135:21 293:3
note
12:20 14:11,15
78:16 107:12
181:6 229:15
318:24 322:10
notebook
8:16,20 9:1 10:2
12:23 13:2,4,7,10
13:10,15,18,22
14:5,13,13,18,20
14:23,25 15:8
16:3,12,25 17:6
51:22 52:24 55:17
56:4,16,18,19,20
57:1,1 58:6 68:14
68:17 78:6,7,11
80:2 81:1,5,7,21
82:1,17,24 83:12
83:15,16,17 84:3
84:9 87:20 88:3,7
88:9,17 90:11,18
92:4,5 93:13 95:2
95:16,19 96:5,18
96:24 97:22 98:13
98:16 99:10,21,23
101:16,25 102:10
103:18 104:14,19
106:7,24 107:1
108:8 110:1,12,12
111:4 112:1,2
113:7,9,21 114:10
114:17,20,21
115:1,12,23 116:4
116:7,15,23 117:6

119:12,15 127:23
129:24 131:17,19
131:23 132:6,14
140:21 180:13,18
181:8 216:1 291:9
291:11,24 310:20
312:12 317:4
320:3,15,24 321:8
321:11 322:1
327:1
notebooks
10:8 70:18 74:9,17
83:23 113:10,17
113:24 114:4,23
115:3,6,8 116:1,2
132:2,19 133:4,6
133:10,12 180:9
261:6 317:1 322:1
noted
12:14 13:11 15:24
322:4 345:6
notes
38:13,17 82:11
308:1 331:7
343:16
notice
14:2 15:5,17,23
16:19,22 318:19
noticed
91:14
November
22:16 41:21 176:10
nowadays
114:22 259:2
NTP
195:13,25 196:4
322:19
nucleotide
211:10 212:9 217:4
number
8:16,20 9:1,5,8,12
9:16,21 10:1,5,8
10:11,15,19,23
11:1,4,8,12,16,19
13:5,6,14,20,23
14:18,19 17:1

22:3,4,9,11 23:12
23:17,19 24:8
32:11 34:4,24
35:4,6,11 40:3,13
40:14,19 42:4,10
42:13 43:2,10,13
43:25 44:17,20
45:2,11,18,22,22
47:21 48:8 51:4
51:25 52:2 54:11
56:5,11,13,15
58:24 66:16,17
67:7 68:1,6,14,16
68:17,22 69:2,11
69:13 78:5,7,10
79:21 80:19,20
84:11,17,18,19,20
84:20,21,25 85:23
86:3 87:11,15
88:9 90:22 92:7
92:14,23,25 93:12
93:13,15,16,17
94:2,21 96:23
97:23 98:11 103:4
103:25,25 107:2
109:10,10 110:6,8
110:15 111:9,10
112:15 116:15
117:22 127:21,25
128:8 129:1,2,7,7
129:23,24 131:18
131:23 132:1,6,16
132:18,19,22
133:15 134:7
135:18 141:3
145:24 151:19,24
155:18 156:12
157:14 159:22
161:1,10,15 166:3
173:11,19 174:16
175:22 176:2,4
180:12,17,22
181:3 184:20,23
185:23 186:2
187:1,6 194:14
198:18 199:6,14

202:24 214:5
221:25 223:19
278:3,4 287:25
288:21 289:6
290:10 291:3,17
291:19,19 292:2,3
292:4,17,20,22
294:18,20 295:2
295:22 306:13
308:17,20 309:20
309:21 310:11,21
311:1,3,23 312:17
312:20 314:12
315:4,22 316:13
316:18 317:6,11
319:12 320:7,15
320:17 321:7
322:16 324:2
326:18 328:6
341:23
**Numbered**
13:12 291:10
**numbers**
36:11 80:6,8 85:2
92:16 93:9 97:19
128:7,9 129:4,5
129:16 130:3,6,9
130:13 216:12
291:7 292:2,8,12
292:17 309:22
310:1,9,10,13,18
312:24 313:4,5,7
313:14 314:10,11
315:5 342:2
**number's**
311:1,2
**numerical**
314:1,5,6,15
315:12
**numerically**
314:25 315:11
**N.W**
5:5 7:5

――――――――

**O**

**Oakland**

343:5,23
**oath**
12:18
**object**
14:6 15:6 19:23
27:2 28:1,24
30:16 31:9 37:20
38:25 41:9 48:19
49:18 51:3 52:3
53:23 59:11,15,21
63:15,19 68:7
69:3 72:3 73:11
74:5,20 75:2
79:17 82:10,18
83:1,6 85:15
89:15 90:2 96:11
99:2,24 100:9,19
101:11,11 102:3
106:9 108:1,9,24
109:5,13 110:17
111:21 113:12,19
120:3 122:6
123:22 124:25
127:3 136:9,24
137:20 138:14
139:4 144:11,19
146:7,14,21 147:3
147:11,21 149:23
150:9,15,20
152:13 153:13
156:5 159:7,13
168:15 169:25
171:6,19 172:16
176:17,24 177:18
177:24 178:16,25
189:4,9 190:1,11
191:8,18,23
192:10 193:7,11
195:7 197:17
198:15,19 199:1
203:21 204:4
205:21 206:6
207:7,22 208:2,11
208:19 209:13
212:13,23 213:12
213:24 214:1

219:5 221:4,11
222:18 223:2
225:14,20 226:8
226:17 227:3,10
227:20,25 228:24
229:8 231:8,25
232:20 233:15
234:11 235:7
236:6 237:14,22
238:7,12 240:19
241:6,11,24 242:6
242:19 243:15,22
244:25 245:3,20
248:12 249:15
250:1 251:9 257:1
261:8 262:14,22
265:20 267:23
268:8 269:3,25
272:8 273:9,20
274:13 276:25
281:5 282:21
283:24 286:24
288:3,9,23 301:8
301:16 302:4,19
302:24 303:3,21
304:23 305:9
306:3,17 314:8,17
314:23 328:8,17
328:25 329:7,22
330:8,14 332:24
334:10,21 335:17
335:24 336:5
337:3 338:6,17,25
339:9,14 340:4,18
**objecting**
73:23 208:3
**objection**
15:12 16:13 27:19
29:24 31:20 36:9
66:1,19 70:11
71:7 73:12,16,24
73:25 74:4 82:4
90:15 91:4 95:22
96:19 99:11
100:14,25 102:11
103:5,13 104:15

104:21 105:21,24
110:2 112:21
114:11 124:14
126:10 130:15
133:7 139:20
142:16,22 143:10
143:21 145:5,15
145:25 148:24
156:13 158:24
160:15 169:2
172:7 177:4,10
178:8 187:13,19
189:21 190:17
199:8 201:14,20
202:12 205:15
214:19 215:24
218:6 222:9 224:6
235:22 239:8
253:17 254:23
266:1,15,23 298:1
318:8,9 319:20
321:15 323:24
324:21,24 326:2
326:13 327:5
**objective**
257:8
**obligations**
20:22
**observe**
334:6
**observed**
326:12
**obstetrics**
75:23 76:4 211:23
**obviously**
323:6
**OB-GYN**
34:21 46:10,11,22
47:22 49:8,15,23
50:15,18,19,21,24
51:11,19,24 70:7
70:20 75:21
133:22 134:24
135:9 248:16
249:10 250:2
275:14 290:21

Ghassan Saed, Ph.D.

Page 374

341:12,15
occasions
139:8,10 326:19
occur
169:10 225:18
227:8 265:25
286:14
occurred
72:23 90:14 140:22
189:7,10 196:24
197:22 198:14
199:7 226:6 227:8
227:23 232:18
235:25
occurrence
204:21,22 217:3
occurring
232:14
occurs
287:11 298:23
October
24:2,2,10 38:14
41:7,13 46:21
68:23 88:16,17
89:11,14,23 90:1
90:8,9 140:6
276:9,10
OD1
123:16
OD2
123:16
OD3
123:16
offer
40:23
office
42:21 45:7,8 50:5,6
76:8
officer
341:25
Official
137:4
officially
46:3 87:2
off-the-record
194:21 210:5 308:4

323:11
oh
20:21 26:18 28:3
43:7 72:20 78:19
79:12 91:11 93:19
97:6 114:1 116:10
120:10 124:7
166:24 186:9,19
211:3 212:7
217:16 246:22,24
260:12 263:5
284:16 296:1
307:13 312:5,8
320:13
okay
16:6 43:3,5 44:5,22
56:17 57:1 64:3,5
64:6 66:20 77:22
80:25 83:10 85:10
85:16 86:7 88:4
90:3 92:10 93:1
93:11,14,20 94:12
94:21 95:5 97:3,6
98:8,14 102:9
107:4,15,18,18
109:24 110:20
116:25 117:16,24
119:17 120:10,11
121:12 123:4,9,12
124:3,7,7 125:15
125:16 126:18
127:4 128:10,23
130:16,21,24
131:4 133:17
134:18 153:1
154:11 155:5
161:12 164:5
171:7 174:6
180:12 181:9,12
181:19 183:24
184:2,9,14 186:12
186:24 187:14
189:10 198:1
199:9 202:13
203:1 205:1 206:9
209:7 211:19

213:17 214:14
215:14,16 218:12
222:1 238:24
239:12 243:24
246:2,8,16 247:3
247:9 250:5
252:17 255:7,13
255:18 256:8
257:6 258:12,14
260:4 263:7
265:12 266:2
268:10,15 269:9
271:23 272:1
274:17 275:21
278:12 279:1
280:23 285:12
286:8,25 290:14
290:15 291:5
293:1 294:2
296:13,15,17
297:16,25 299:17
299:21 305:15
308:23 309:4
310:7 311:4,7,13
314:10 315:2
316:22 317:22
319:3,25 321:5,25
322:9,17,18,21,23
323:19,21 336:14
337:19 339:19,25
340:16 341:3
old
297:20
oligo
309:5
oligonucleotide
107:19
Olson
210:13
once
124:5 201:7
Oncogene
230:13,14
oncogenes
230:15
oncogenesis

282:19 336:20
oncogenic
230:16
oncologist
134:24 248:16
249:10 250:2
290:21
oncology
34:21 46:10,11,22
47:23 49:8,15,23
50:15,18,19 51:11
51:19,24 70:7,20
133:22 135:9
140:17 210:14
275:14 341:12,15
ones
149:18 168:22
302:17
One's
292:2
online
76:4,4 77:4 155:11
164:2 167:19
onward
183:9
open
16:23 75:22 76:4
77:5,7,10 139:24
165:2 169:18
183:7
operating
114:9
opinion
30:8,11,14 31:5,18
31:25 47:11
105:23 106:8,11
107:23 164:25
165:1,25 166:3,14
167:24 168:12,25
190:4 233:3,5
237:12,15 239:1,1
239:4 240:2,20
241:5 242:8,10
244:3,18,22
245:11,17 246:11
264:5,9,13,17

274:1,2 279:18
280:16 281:16,18
281:19 286:3,7
287:7,18
opinions
30:6 32:4 238:23
238:24 239:7,18
240:3,17 241:2,8
241:17,22 242:3
242:17 243:19
244:20 245:6,8,9
245:10 262:19
263:3,6,21 264:2
264:6,17 277:10
279:22 280:2
opinion's
286:6
opportunity
14:4 15:1 17:13
oppose
16:22 318:19
opposed
122:4
opposite
303:20
optical
120:11,14
optimal
294:9
order
14:1 15:5,16,21,22
94:10,11,20 103:8
128:12 309:6
ordered
16:21 301:17 302:9
orders
318:18
organ
169:22 171:12
organization
136:14
organized
170:10
organs
165:10 171:4
original

12:23 44:22 51:22
95:8 113:7 133:19
135:12,15 194:12
341:20
**originated**
297:9
**outcome**
190:12 304:8
**outcomes**
325:23
**outlier**
313:9,10,11,13,15
313:16,22,24
314:2,13 315:8
**outliers**
326:21,22
**outline**
137:10 138:11,23
139:13
**outside**
21:18 71:15 83:23
84:4 139:18 150:7
262:20 268:23
300:5
**ovarian**
9:18,23 17:4 25:17
26:20 27:5,11,18
27:23 28:9,15
29:15 30:6,10,13
30:15,20 31:8,14
32:1,3,23 33:20
42:6,15 45:13
57:9,10 59:3,7
61:15,19 63:6
81:14 123:13
143:18,25 147:25
165:6 166:20
167:2,5,20 168:1
168:4,11,13,21
169:1,7,10,16,24
170:16,17 171:13
171:25 173:1
178:1 179:4,16
180:8 188:12
190:24,25 191:1
192:15,17 193:15

195:12 196:4,8
201:13,18,22,25
202:5,10,17,23
203:3,7,13,19,25
204:25 205:5,6,9
205:13,20 206:5
207:5,9,20 208:1
208:6,8,18 209:10
209:12 210:10,17
211:7,11,21
212:10,12,18,21
213:11,22 214:13
214:17 215:22
217:12,23 218:4
218:19 219:4
220:24 221:19,24
222:2,4,15,17
223:15,17 225:7,9
225:12 226:11,21
227:16,18 228:20
229:6 230:17
231:6,19,24 232:9
233:6,9,13,25
234:4,14,15,16,21
235:14,20,25
236:1,3,9,15,17
236:23 237:4,13
237:21 238:11,19
238:20 240:1,23
242:13,20,21
243:3,5,13,20
244:10,15,19,23
245:18 246:4,13
246:21 247:6,16
247:24 248:3,7,10
249:2,4,7,21,22
249:25 250:12,12
256:14,16 262:13
263:4,10,14,21,22
264:10,19,24
267:10,22 268:2,7
268:20 276:17,21
276:23 277:2
278:12 279:23
280:1,9,14,17,19
280:22,25 281:1

283:2 286:2 287:8
287:19,24 288:8
288:13,22 289:3,7
289:11 297:23
324:5,9 325:11,13
325:18 326:4,11
333:22,24 334:3,6
334:23,24 335:2,4
335:10,13,15,18
335:21 336:4,11
337:23
**ovaries**
165:4,15 166:2,17
168:21 169:13
171:8,16 172:5
196:1
**ovary**
163:9,14,20 164:23
165:10,22 166:7
168:14,19 169:21
170:11,19 171:2
**overall**
63:3 303:7
**overcrowded**
293:11
**overexpression**
258:2
**overgrowth**
282:2,8
**overtime**
39:20
**overview**
138:23
**overwhelmed**
209:19
**ovulation**
286:1,8,10,11
287:2,3,4,8,19
288:12 289:1
**ovulations**
287:25 288:7,22
289:6
**ovulatory**
286:20
**owners**
18:9

**oxidant**
61:14 225:5 236:22
259:21 334:5
**oxidants**
234:17 235:15,17
236:16,19 299:10
299:12,13 336:15
**oxidated**
259:22
**oxidative**
25:17 26:3,17 27:6
27:11 57:10 58:12
59:3,6 60:19 61:4
61:9,10,12,22,23
62:6 76:12 173:4
178:1 179:4
192:19,21,22
195:19 203:6
217:8 232:7
234:20 235:13,16
235:16 240:6
242:14 247:11
250:14,17 251:22
257:10 276:16,23
277:2 282:8
289:14,16,18,20
303:16 304:5,7,11
304:13,16 325:23
334:5,25
**oxide**
183:17 258:2
**oxygen**
31:2,12 81:13
239:24 240:6
247:17 252:8,9,12
252:17 253:6,14
253:15,18,19,22
254:6 255:6 299:7
299:9,14,18
**O'Dell**
2:4 8:6 15:13,15
16:4,8,10 17:5
19:23 24:22,22,23
27:2,19,25 28:4
28:24 29:24 30:16
31:9,20 36:9

37:20 38:25 41:9
41:14 48:19 49:18
51:3 52:3,10
53:23 55:17,20,23
56:21 59:11,15,21
63:15,19 65:2,16
66:7,19 68:7 69:3
70:11 71:7,9 72:3
72:22 73:9,19
74:1,20 75:2 76:1
76:20 77:17,22
79:4,17 81:10
82:4,10,18 83:1,6
85:15 86:9 89:15
89:19 90:2,15
91:4 92:13,23
93:1,16 95:22
96:11,19 99:2,11
99:14,24 100:9,19
101:10 102:3,11
103:5,13 104:15
104:21 105:21,24
106:9 108:1,9,24
109:5,13 110:2,17
111:2,21 112:21
113:12,19 114:11
117:17 118:13,18
120:3 121:13
122:6 123:7,22
124:14,25 125:3
126:10,23 127:3
127:22 128:1
129:8 130:15
131:7 132:9,12,24
133:7 136:9,24
137:20 138:14
139:4,20 140:7,14
141:10,17 142:16
142:22 143:10
144:11,19 145:5
145:15,25 146:7
146:14,21 147:3
147:11,21 148:24
149:23 150:9,15
150:20 152:13
153:13 156:5,13

Ghassan Saed, Ph.D.

158:24 159:7,13
159:23 160:15,20
168:15 169:2,25
171:6,19 172:7,16
176:17,24 177:10
177:18,24 178:8
178:16,25 180:14
181:6,10,12
182:13,25 183:4
183:15 184:5,7,9
184:12,14,16
185:24 187:5,13
187:19 189:4,9,21
190:1,11,17 191:8
191:16,18,23
192:10 193:7,11
195:7 196:16
197:4,17 198:15
198:19 199:1,8
201:14,20 202:12
203:21 204:4,14
205:15,21 206:6
207:7,22 208:2,19
209:13,22 212:13
212:23 213:12,24
214:1,4,22,24
215:24 216:16
218:6,22 219:5,9
219:12,14,16
220:2,6,11,25
221:4,11 222:9,18
223:5,9 224:2,6
224:14,17 225:14
225:20 226:8,17
227:3,10,25
228:24 229:8
231:8,25 232:20
233:15 234:11
235:7 236:6
237:14,22 238:7
238:12 239:8
240:19 241:6,11
241:24 242:6,19
243:15,22 244:25
245:3,20 248:12
249:15 250:1

251:9 253:17
254:23 255:9
257:1,4 261:8
262:14,22 265:20
266:1,15,23
267:23 268:8
269:3,9,18,25
272:8 273:9,20
274:13 275:16,22
276:25 281:5
282:21 283:24
286:24 288:3,9,23
291:8,11,15,20
292:6 298:7 301:8
301:16 302:4,19
303:3,21 304:23
305:9,17 306:3,17
308:17 309:17
310:23 311:4
312:2,4,6 314:8
314:17,23 315:16
315:18 317:5,21
318:8 319:2,9,21
321:18 323:3,8,14
324:1,22 325:1
326:6,15 327:7,21
328:8,17,25 329:7
329:22 330:2,8,14
332:2,5,24 334:10
334:21 335:6,17
335:24 336:5
337:3 338:6,17,25
339:9,14,24 340:4
340:17,20,23
341:2,6,24 342:8
**O-l-s-o-n**
210:16

_____

**P**
**P**
2:4 201:7,7
**page**
1:13 8:2,15 13:11
13:11 23:12,16,19
43:1,4,10,25
45:20 56:14 57:17

80:6,8 84:24,24
85:19,21 89:4,5
89:11,22,25 90:8
90:13 91:8,10,11
91:11,17,19 92:1
92:3,7,16 93:8,14
93:15,19,20 94:2
94:6,7,9,22 96:16
96:23,24 97:1,2,4
97:5,14,17,19
98:8,10,12,13,13
98:15,16 101:6
103:1,3,4,6,10,17
103:18 107:1
109:10 110:11,14
111:8 112:6,12,14
112:18 113:6
116:15,18 117:17
117:21,22,24
118:13,18,20
119:11,13,14,15
119:18 121:13
127:20,24 129:1,2
129:4,7,9,11,17
129:18,19,23,24
130:1,19 134:7
135:20 141:22,24
152:16,16 154:14
154:24 158:6
159:21 163:7
166:8 181:5,7,7
181:10,14,17,18
183:5,7,8,15,16
184:5,7,12,16
185:17,18 186:8
186:13,14,17,18
186:19 188:15
196:16 199:16
214:21,22 215:1,3
216:15,18 217:1
218:15,23 220:20
221:7,15 222:7
228:12,13 238:17
246:25 255:24
291:16,19 292:1,2
292:3,8,12,16,19

292:20,20 295:1,2
308:14,15,15
309:11,13,14,16
309:19,20 310:1,3
310:4,10,20,21,21
310:22 311:4,5,11
311:11,12,12,13
311:13 312:1,2,4
312:5,9,13,14,17
320:7,8,12,13,17
320:23 321:6,8,11
321:13 322:12,13
322:18,18,19,22
322:23 323:16
326:18 344:3
**pages**
13:11,12,23,25
14:1,3,24 17:7
52:13,16,18 54:12
57:6 79:2,3,6,8,15
79:22,24 80:2,9
80:11,19,20,21,24
81:7,20 82:1,9,16
82:24 83:10,11,18
83:22 84:21 88:25
90:10,12 94:1,14
94:17 97:23 133:1
154:14,16 160:20
160:21 181:11
310:14 345:3
**paid**
19:9,18,21 20:2
21:21 23:10 34:15
34:20,21 36:16,18
36:18,20,22 37:10
37:23 38:22,23
39:1,5,8 41:2,3
65:19 67:25 68:5
68:18,18 144:16
145:20 177:11
328:22 329:1
339:7,17,17
**paper**
34:10 42:18,21
43:9 47:5 48:2
49:8,11 52:2 55:4

55:9,13,14,15
70:19 87:3 111:17
142:10 149:7
151:8 156:4 158:2
158:11,18 166:9
174:14,17 185:10
186:24 194:4
207:20 211:17,18
211:19 214:2,4,10
214:12 217:11,15
217:16 220:23
223:13,19 229:15
247:20,21 337:1
**papers**
47:9 49:12 98:23
100:13 172:18,18
235:6 280:3,6
340:14
**paperwork**
18:13 23:9
**paragraph**
153:23 155:18
160:1 161:17,17
162:13 188:16
200:22 215:4,12
238:19 246:19,23
322:24 323:16,18
**Paragraphs**
238:17 241:2,8,18
242:4,17
**parameters**
53:18 54:4 71:15
213:3 267:12
**PARFITT**
2:16
**Park**
1:16
**part**
15:25 16:1,13,21
47:16,17 52:4,16
56:17,20 57:1,3,4
57:4,7,7,8 63:9
65:20 79:14 84:9
86:7 89:3,8 103:9
110:15 112:18
113:17 116:17,23

Ghassan Saed, Ph.D.

132:11 139:22
146:1,2 153:17
155:5,9 166:11
167:12 188:1
192:18 205:9
216:22 260:5,8
272:24,24 279:10
285:12 299:24
**Partial**
85:14
**participated**
135:5,7
**particle**
62:20 170:19 173:8
233:5 272:25
273:6 274:10
332:18,21 338:14
**particles**
62:10,17 122:4,15
122:17 165:1,15
166:6,15 168:8
170:6,7 266:7
332:10 337:25,25
338:3,22 339:4
**particular**
123:13 156:15
196:19 214:15
238:16 281:23
284:15 286:10
326:16
**particularly**
298:5
**particulate**
62:5,6 81:18
272:15
**particulates**
323:23 332:14
**partner**
284:17,18
**partnership**
285:14
**parts**
132:9,11,14
**party**
343:17
**part-time**

23:9 36:17,18
**passage**
230:24
**passages**
230:25 231:4,12
**paste**
108:7 115:1,4
**pasted**
89:10 96:8,9,18
107:7 110:13
**pasting**
88:7
**pathogenesis**
235:20 243:1
281:10 282:3
324:8,11 332:9,13
**pathogenicity**
323:22
**pathologists**
293:21
**pathology**
267:13
**pathways**
230:16 256:12
257:11
**patient**
229:2 230:21
268:23 284:7
**patients**
190:24 193:15
222:4 223:19
231:9,12 234:13
236:15 238:20
244:14 246:20
247:6 278:13
280:17,19
**pattern**
240:23
**pay**
37:4,19,25 77:8,10
77:11 147:8
**paying**
147:13 150:25
**PCPC**
7:9
**PCR**

94:13,16 95:15
107:19 137:23
141:1 182:12,18
183:20,21,25
184:6,20,24
240:11,12 261:18
270:22 308:8,12
308:14
**peer**
48:3,5,7,8 152:9
174:19 243:10
324:15
**peers**
241:23
**peer-reviewed**
241:3,9,15
**pending**
12:11 224:9 285:11
**people**
29:15 55:3 170:20
221:25 226:9
227:16 236:17
257:22 259:5
262:9,24 299:1
300:19,20 304:24
**Pepe**
35:14 342:2
**percent**
149:12 206:11
210:19 252:16
254:3,3 306:7,11
**percentage**
85:17 278:25
**perfectly**
220:3
**perform**
207:15
**performed**
66:23 91:23 139:15
189:12,12 208:16
254:20 303:19
**perineum**
172:15 232:14
**period**
88:18 290:20
319:22 327:11

**periods**
95:10
**peristaltic**
166:6 186:16 187:1
187:12,18 188:6
**peritoneal**
337:24
**peroxide**
31:2 192:21 260:5
260:8,10,11,18,23
**persistent**
300:11,16
**person**
73:20
**personal**
18:6 106:10 238:25
239:1
**personally**
259:15
**personnel**
36:7,15,16 38:2
40:3 68:13
**pertinent**
15:2
**per-hour**
20:19
**petri**
124:12,13,16
125:10,11,13,16
126:5,6,7
**Pharmaceutical**
84:6
**Pharmaceuticals**
18:23
**phenomenon**
257:19
**phenotype**
230:25 336:20
**phone**
25:6,7,22 26:12
27:8 72:18 277:3
**photocopied**
108:20 110:14
**phrase**
187:11 188:21,24
201:5 208:11

**Physically**
64:14
**physician**
249:10
**physiology**
254:2 299:24
**Ph.D**
1:15 115:15 212:4
212:5 345:8
**pick**
205:4
**picked**
185:11
**Picogram**
312:18
**picograms**
311:8,15,20
**picture**
307:7
**piece**
177:16
**pilot**
10:5 52:21,23 53:1
53:4,7,9 54:3,10
54:14 56:7 57:19
57:21,25 58:1,2,3
58:3,4,5,6,9,16
66:15 67:6,25
68:5,16,23 69:1
69:11 74:7 84:12
84:17,21 137:23
180:18
**Pisano**
219:15
**Pisano's**
14:1 15:4,16,22
17:10
**place**
29:12,16 103:12
138:17 168:6
275:5 311:25
343:9
**placed**
220:7
**places**
111:19 240:13

Ghassan Saed, Ph.D.

**plaintiff**
70:22 71:6,12
 72:13 328:3
**plaintiffs**
2:12,21 3:9,19 4:9
 12:22 21:18 26:20
 66:3 67:5 70:2,9
 71:24 73:5,22
 133:10,12 137:5
 143:4,24 145:21
 176:23 261:22
 277:7 328:7,23
 331:8 341:17
**plaintiff's**
16:19 20:12 21:4
 141:8 146:5,12,19
 262:20 331:20
 337:22
**plan**
60:13,15 64:4,5,6,6
 64:10,12,13,16
 137:25 138:3
**planned**
60:10,11 62:24
**planning**
63:20 64:2 75:17
 75:22
**plate**
295:12,18,23 296:6
 296:7,7,12,16,18
 296:23,24 297:2,9
 297:11 298:13
**plates**
295:23,24,24
 296:17 298:8
**players**
303:6 307:6 336:15
**please**
12:15 17:20,21
 31:22 40:19 43:15
 45:9 70:12 76:21
 110:7 141:22
 176:14 178:13
 184:22 201:15
 215:19 220:18
 221:13 240:8

257:3 266:17
 281:4 291:3
 302:11 314:9,25
 334:1
**PLLC**
3:3
**plus**
118:1
**point**
88:25 124:10,17
 126:2,3 158:5,5
 232:5,5 257:8
 298:6 318:20
 327:19 331:19,22
 331:23
**pointed**
56:13 57:17 98:1
**pointing**
52:8 91:6 96:16
 102:18 111:4
 182:13
**points**
125:17 157:24
**policies**
152:9,10,10,12
**policy**
47:15
**Polymorphism**
212:9
**PopMed**
280:12
**population**
198:4 199:11,14
 204:23 206:1,11
 235:3
**portion**
17:6 20:2 79:16
 88:24 98:16
 103:18 112:17
 166:9
**portions**
88:23 176:6
**position**
16:20 18:4 65:11
**positive**
49:5 147:13,14

251:12 270:25
 271:3,6,8,11,17
 271:18,24,25
 272:2,18,18 337:9
**possession**
42:22 341:13
**possibility**
25:16 26:1 122:2
 282:10 305:1
**possible**
270:8,9,14,17,23
 338:9
**post**
37:17 84:2 151:13
**poster**
57:16,17 262:7
**posters**
262:10
**postoperative**
281:24 283:4,21
 284:1,7,8
**post-surgical**
289:10
**potential**
30:20 31:14 32:2
 145:2
**potentially**
323:22 332:10,13
**powder**
1:5 9:17,22 12:9
 17:3 29:16 33:19
 42:6,14 45:13
 85:3,10 102:20
 118:1 122:9,10
 147:24 165:1
 169:4 170:5,9
 172:20,25 173:8
 179:7,10,13,15,16
 179:18,19,21,22
 179:24,25 180:3,8
 180:10,23 181:3
 181:20,22 182:2,7
 182:11 183:12,22
 184:1,18,21,24
 192:14 195:12
 196:7 198:10

203:15 222:22
 227:17 231:14
 232:6,23 233:25
 234:1 235:16
 237:3 238:18
 240:6 243:12,19
 244:14,19,23
 245:18 246:3,20
 247:5,10 248:20
 251:11 257:9,9
 259:19 264:21
 266:4,7 276:3,20
 304:25 306:11,19
 316:20 317:14
 324:5 326:3 334:4
 334:12,25 340:7
**powerful**
61:14 297:24
**PO20**
253:13
**practice**
82:3,9,25 83:5 88:6
 98:25 100:2,5,16
 101:3,9,21,23
 104:18 107:23
 114:7 116:12
 156:14,17 325:2
**practices**
1:6 12:10 82:15,15
**PRDU**
293:15
**precancerous**
229:19
**precautions**
115:2
**precipitate**
122:20
**precise**
250:15 297:19
**Precisely**
250:10
**predict**
323:22 332:13,18
 332:21
**predicting**
97:11

**predictor**
333:7
**predicts**
332:9
**prefer**
102:16 110:3
**preference**
131:8
**preferred**
169:12
**pregnancy**
290:17
**prejudices**
14:3
**preliminary**
52:14 58:10 83:20
 140:20,25 182:15
 182:21 248:4
 317:24
**premised**
264:2
**preparation**
70:3 134:12,21
 135:25
**prepare**
21:17 22:21 74:15
 97:13 113:17
 114:17,19 115:7
 115:12,23 116:2,3
 117:25 136:7,14
 136:21 137:10
 138:3 139:13
 141:23 151:7,14
**prepared**
21:14 22:17 33:16
 74:10,15 83:17
 87:15 88:9,18,20
 89:12,13,25,25
 90:8 97:14 103:1
 103:6 114:10
 115:6,25 135:12
 138:11,21 142:8
 142:25 143:2,7
 151:7 154:25
 176:9 220:12
 341:19

Ghassan Saed, Ph.D.

**preparing**
33:22 34:3 99:9,21
109:25 114:21
136:6,6,22 178:6
319:18
**presence**
121:3 172:4,15,19
213:2 266:14,21
293:14 326:8
**present**
7:11 21:22 140:24
159:6,10 206:11
**presented**
139:23,24,24 140:4
140:12,25 182:17
261:15,19 262:6
262:24
**presents**
159:18
**press**
237:17,17
**prestigious**
275:14
**presumably**
12:24
**presupposes**
141:17
**pretty**
16:10 233:19
259:13
**prevalence**
205:25
**previous**
17:10 130:7 182:3
185:10 211:25
235:11 239:21,21
243:6 310:10
**previously**
151:9,10 250:10
256:3 258:1
285:12
**price**
23:20
**primary**
179:2 230:20,23
231:11,18 279:8

**primers**
107:19 309:5
**principal**
285:17,21
**principle**
276:15
**print**
115:1,4
**printed**
151:25
**printout**
108:7 151:24
157:19
**prior**
27:23 28:9,16,22
29:10 42:21 43:12
44:16 46:6,7,14
46:15 55:3 62:4
62:18 129:17,17
156:21 157:9
244:16 341:10
**priority**
47:18 49:10,13
**privilege**
65:6,15 73:14,19
**pro**
303:10
**probably**
100:3,21 111:13
112:22 131:4
170:22 171:14
192:19 330:9
331:6
**problem**
230:22
**procedure**
98:22,24 101:18
114:15 116:13
**procedures**
114:9 116:11
**proceed**
154:16 155:16,17
198:12 261:25
**process**
47:10 75:13 122:19
133:18 187:16

249:14,18 282:18
282:19 288:12
297:8 304:8
**processes**
168:18
**produced**
12:21 129:10 300:4
300:5,7,9 318:1
321:14
**product**
179:22 180:2,4
**production**
14:6,10 15:7,9
**productions**
318:5
**Products**
1:5,6 12:9,10
**professional**
326:25
**professor**
18:3 279:11,15
**profile**
234:3,8 334:6,25
**profit**
145:4
**prognosis**
238:20 244:14
246:20 247:6,16
263:13
**program**
279:4,5
**progress**
249:2 293:7
**project**
35:12 36:1 37:11
38:11,14,15,23
39:4,7,11,12,13
39:17,23 40:4,10
56:19,25 68:22
75:10 81:2,6,8,9,9
81:15 83:13,18
84:6,8,8,21
**projects**
36:3 39:12
**proliferate**
265:9

**proliferation**
95:15 264:15,18,22
265:1,2,4,8,10,14
266:5,14,20,25
267:14,21,25
268:5,12,16 269:1
270:23 293:13,20
294:1,2,6,8,10
304:9
**proliferative**
294:16
**promised**
276:17
**promote**
285:14 303:20
304:5,5,8,9
**promotes**
303:17
**prompted**
29:11 59:2,9,12
**pronounce**
87:8
**proofing**
134:20
**proofreading**
135:2
**prooxidant**
182:24
**proper**
82:8 98:25 99:9
100:2,5,15 101:2
101:8,8,14 104:18
105:15,17 106:5
106:20 107:23
108:6 109:25,25
**proposal**
136:7
**proposing**
250:16
**propounded**
345:5
**propriety**
74:5 105:3
**protected**
65:6,14 232:25
**protein**

119:18 120:12,13
121:8,19,19,22
123:20 124:1
130:24 131:1
185:4 206:19
270:22 274:22
298:22 307:3
**proteins**
58:16 62:1,1
122:10,12,14,18
122:19,20,21
131:3 302:17
303:1
**protocol**
64:25 66:5 71:25
97:7,12 107:20
127:12 137:10
138:11 139:13
153:9 252:18
**protocols**
127:16 189:13
**provide**
40:23 53:7,9 67:22
136:15 137:5
154:8 188:2 209:8
324:4 328:3
**provided**
12:25 13:2,3,19,22
13:24,25 14:16,23
14:25 15:22 16:17
16:18,20 17:1
22:10,16 35:5
40:12 42:11 45:19
49:2 51:21 56:4
72:10 75:1 78:2
84:16 95:19,20
108:21 140:21
154:6 156:3,6
162:16,17 173:25
176:3 232:4
241:22 262:19
321:3 328:7,10
**provides**
37:8
**providing**
76:23,24

Ghassan Saed, Ph.D.

**provoking**
266:8
**pro-oxidant**
61:20 168:23
183:11 195:16,22
199:21 201:23,25
202:6,7 217:8
226:15,19 227:15
234:3,8 235:5
242:22 258:3,4
303:8 335:9,12,14
**pro-oxidants**
201:1 202:1 227:1
234:15 240:23
243:2 251:25
**pro-oxidative**
335:20 336:3,13
**pro-tumorigenic**
304:11
**PTI**
6:19
**public**
241:18 343:7,22
345:18
**publication**
65:13 76:6 77:2,5,6
77:8 97:9 127:7
152:7,11 154:13
157:9 161:18
324:16
**publications**
151:16,25 152:2
153:11 156:21
157:13,20 195:4
239:21,22 252:23
319:18
**publish**
47:4,9 182:16
245:5 260:4 337:1
337:10,14
**published**
16:17 47:19 51:9
51:11 54:7 58:19
61:25 62:20 75:1
77:3,9,11 98:23
99:8 100:13

101:19 114:20
115:11 127:11
138:10,17 139:10
151:16 153:8,14
168:23 171:15
172:3 175:20
188:22 189:13
190:15 191:20
192:2,7 203:8,8
205:5 207:17,24
210:14,20 211:20
211:22 227:16
232:8 239:6,16
240:4,22 241:3,9
241:12,15,23
242:4,9,16,20,22
243:4,7,14,16,20
250:10,14,19
252:23 256:3
258:1 260:1 261:3
261:5,12 275:13
282:15,15,17,18
327:3 329:14
335:1 336:22
337:8
**publisher**
337:7
**publishers**
151:18 152:19
**publishing**
10:12,16 138:8
151:20 156:12,15
157:15
**pull**
107:8
**pulling**
107:13
**pump**
186:16 187:1,12,18
188:6
**purchase**
179:10
**purchased**
228:25
**purported**
14:13

**purpose**
252:11
**purposes**
13:20 14:11,17
18:7 21:11 22:13
65:12 168:12
174:14 228:14
254:20 277:10
280:1
**pursuant**
14:1,2
**pushed**
239:4
**put**
41:16 88:20,23,25
90:20 101:25
103:8 132:16,21
133:4,6,10,12,13
144:21 167:18
209:15 219:18,25
270:19 273:4,5
318:10 341:7
342:2
**putting**
64:1
**P.A**
3:12
**p.m**
131:12,15 175:10
175:13 194:20,23
210:4,7 228:7,10
269:11,14 308:3,6
319:5,8 323:10,13
342:13,14
**P.O**
2:7 6:6
**P53**
230:11,12

**Q**

**qualified**
229:6
**qualifies**
315:8
**qualify**
272:18

**quantitate**
198:11
**quantitative**
199:3
**quantity**
198:7
**question**
16:24 28:1,7 31:22
36:10 41:20 44:2
49:21 62:16,16
66:1,10 67:3,4
70:13 72:23 73:10
75:4 76:20 77:23
79:7 82:8 89:19
89:20 92:6 95:24
96:17 97:6 101:2
101:10,12 104:23
106:5,5 118:25
124:7 125:4 126:8
126:9,18 127:5
128:7 141:11,15
141:17,20 143:6
144:13 146:9
154:15 159:15
170:2 171:1,7
172:2,17 177:7
178:13 183:24
186:25 189:24,24
191:17 193:14
197:19 204:14
205:11,11 211:25
212:14 216:14
219:10,24 220:13
221:3,5,10 223:3
223:4,10,11,12,20
223:22,23,25
224:8,8,13,16,23
224:23 226:23,23
227:12,20,21
239:5 242:3,16
244:21,21 245:15
246:1 247:4,4
248:9,9,25 249:1
252:3,10,25 253:1
253:3 254:19
255:10,13 256:19

256:21 258:13,15
258:16 261:10
265:6 266:3,16
268:4,4 270:2
277:13 281:21,25
282:13 284:16
285:19 288:17,18
293:23 296:1
298:3,4 305:3,19
305:20,22 309:11
309:17 310:24
329:10 330:2,19
331:5 332:12
334:16,18 335:25
336:12,24
**questioning**
12:20 269:8
**questions**
17:13 65:8 66:9
68:12 71:15 249:9
283:7 288:20
298:8 305:14
315:13,16 318:11
318:16,16,23
319:10 320:15,16
321:19 324:2
326:19 330:16
337:20 340:1,19
343:12 345:4
**question's**
66:7
**quick**
175:7,7 340:19
**quote**
216:18
**quoted**
20:18
**quoting**
220:25

**R**

**R**
3:13 5:13 344:1,1
**radiation**
233:2
**raise**

77:19
**raised**
127:6
**ran**
125:11 137:23
183:19 301:10
308:14
**range**
55:11
**rare**
157:10
**rate**
20:17,18,19
**rates**
20:15
**rats**
196:1
**raw**
309:12
**razor**
80:22
**reach**
168:14 206:23
239:6 240:3
327:16 340:2
**reached**
203:18 207:6
**reaching**
168:19
**react**
273:4
**reaction**
260:17
**reactive**
31:1,12 81:13
239:24 240:6
247:17 255:5
299:7,9,9,14,18
**read**
28:11,12,12,13,13
28:16,18,20,22
29:1,2,5,8 39:21
50:21 51:2 55:3
104:20 109:14
125:3 134:20
147:22,23 155:19

187:20 195:9
196:5,6,10 222:7
241:19,21 246:14
304:4 345:3
**reader**
145:16 147:20,22
**readers**
50:21,21 145:2,17
200:11 237:18
**reading**
28:10 29:22 85:4,5
134:18 144:15
145:9 153:11
154:6 158:12
161:22 163:11
166:21 180:6
181:24 188:8,8,19
199:22 200:23
201:3 215:11
218:22 221:17
225:3
**reads**
153:24 157:25
162:13 163:8
166:18
**ready**
64:7,7 293:12
**real**
127:7 157:25 158:9
170:15 175:6
312:11
**realize**
301:1
**really**
27:14 54:6 75:5
89:2 95:23 96:20
99:17 100:3
107:21 127:17
134:19 138:6
146:16 173:8
237:17 238:13
240:14,15 249:5
255:23 282:13
285:3 298:6
304:17 313:9
330:16 341:1

**realtime**
309:4 323:2
**reason**
82:5,6 83:10 134:6
144:1 165:25
325:15,16 344:5,7
344:9,11,13,15,17
344:19,21,23,25
**rebox**
325:16
**recall**
25:2 49:4 54:2
140:5 156:2,10,24
157:2 164:8,9
187:11,16,20
194:14 211:9
251:19 252:7
263:11,15,16
303:16,25 304:1,2
320:15,16,18
321:21 325:8
329:25 330:2,7
332:15 336:23
**receipts**
36:11,12,14 38:10
**receive**
19:11,15 21:7
47:18 48:8 160:4
160:9,12
**received**
14:12 19:17 31:24
37:18 49:12,16
50:2 60:24 62:4
110:14,25 150:2
158:18 160:7,11
161:7,9,12
**receiving**
275:2
**recess**
69:21 131:13
175:11 228:8
269:12 319:6
**recognize**
173:25 316:4,21
**recognized**
203:24 204:2

**recommended**
161:18
**record**
12:4,14,21 13:20
14:11,18 17:21
41:15 69:9,19,22
73:16 74:1,3 78:3
107:12 111:3
114:25 131:10,11
131:14 140:14
175:6,9,12 181:6
182:14 194:18,19
194:22,25 209:20
209:25 210:3,6,9
219:8,11,13,22
220:11 228:6,9
269:6,10,13
307:25 308:2,5
318:1,11,14,21,24
319:4,7 323:3,8,9
323:12 341:8
342:13
**recorded**
343:13
**record's**
224:11
**redox**
30:12,19,23 31:7
31:11,19 61:16
170:17 188:18
199:20 235:17
247:17 259:17,21
280:13,16,20
281:2,7 302:16,22
302:24 306:21
307:12
**reduce**
267:25
**reduced**
343:14
**reducing**
61:10
**reduction**
173:13
**REES**
5:12

**refer**
121:13 129:4,21
197:3 237:4
246:17 324:11
**reference**
14:15 26:3 85:3
97:1 101:16
158:21 160:2
181:2 185:13,22
186:1,15,23,25
187:11,17,21
188:5 194:11,12
195:13 196:8,8
207:4,19 208:1
210:1 215:15,17
216:15,17 247:20
322:16
**referenced**
42:11 80:4,5,11
138:18 194:1,6
**references**
55:21 131:22
132:15,23 133:14
172:23 173:17
187:8,8,25 188:2
194:3 195:1,10
209:9 322:3,10
323:17 328:10
330:10 331:7
**referencing**
57:6 181:22
**referred**
17:7 44:12 56:13
205:18 261:2
319:12
**referring**
16:4,7,12 42:15
58:13 79:4 93:17
96:7 99:15 102:20
112:16,17 117:17
118:19 120:8
129:4,6,25 183:1
184:2 193:21,24
196:15 200:6,7
220:20,21 221:1,6
221:7 235:21,24

Ghassan Saed, Ph.D.

236:14,14 239:12
253:22 270:2
271:23 272:19
291:14 292:25
294:3,25 295:1
297:18 304:14
312:17 341:24
**refers**
23:19 43:21 296:2
298:21 316:6
320:16
**reflect**
24:8 32:11 91:16
**reflected**
33:25 34:3 54:10
54:12 68:15 70:18
74:8,9,17 85:19
90:22 104:3,18
180:13,22 261:16
298:21 317:1
**reflective**
318:15
**reflects**
90:5
**reformat**
178:13
**refresh**
218:8
**regard**
12:21 21:3,11
24:12 27:1,17,23
28:8 30:6 31:25
32:10,22 41:1,4
49:7 61:8 63:8,9
65:12 66:2,4,10
67:6 70:2,9 73:6
74:6 77:5 79:1
90:11 91:24 96:17
118:25 120:9
163:6 197:10,11
197:12,14 199:6
213:9 225:8 277:5
281:19 333:13
341:17
**regarding**
15:18 66:15 70:23

70:23,24 74:16
144:3 147:18
**regardless**
273:4
**regards**
12:8
**registered**
233:2
**rejected**
49:8,11
**rejection**
47:6
**relate**
324:8
**related**
15:17 17:1 29:25
30:3,4 65:8 71:17
74:10 88:24 101:7
178:2,18,19,19
179:3 287:24
288:8 343:16
**RELATES**
1:10
**relating**
75:13
**relation**
29:4,7 75:8,10
276:6 306:19
324:14
**relationship**
73:22 143:15,16
148:11 154:10
159:5,8,17 178:7
281:19
**relevance**
48:24
**relevant**
109:7
**reliable**
306:25
**reliably**
323:22 332:9,13,18
332:21
**remedies**
14:8 15:9
**remember**

22:3 24:3 28:20
29:2 37:15 40:25
44:21 45:3 48:9
48:10 49:1 55:25
61:3 81:16,22
88:12 89:2 90:4
96:20 97:25 98:5
101:12 105:12
114:8 133:25
137:7,15 155:23
181:4 182:9
185:13 187:24
194:4 196:11
207:13 209:4,15
216:6 218:8
224:20 229:3,9
232:2 245:25
246:15 254:5
263:15,18 276:12
277:8,9 280:7
285:4 300:18,21
330:17 331:11,17
333:4 334:2
340:13
**remove**
81:4 83:15 112:5
322:22
**removed**
81:7,21,23 83:10
110:13,24 111:1
111:16
**repeat**
31:22 43:14 70:12
122:22 165:24
192:11 199:9
204:14 205:23
297:21
**repeated**
270:22 325:17
**repeatedly**
97:8 203:8
**repeating**
136:3
**replicate**
50:10 325:20
333:10

**replicated**
310:2 333:9
**reply**
219:20
**report**
11:1 15:20 16:14
17:8,9 21:14,17
21:19 33:1,4,10
55:21 65:18 93:4
106:14 131:21
149:16,18 171:20
172:14 175:23
176:3,4,7,9
181:16 182:1,10
185:1,6,14,16,23
186:6,23 187:2,3
191:6,13 192:3,8
193:2,9 194:5
195:1,3,22 196:9
196:12,18,21
202:16 203:11,17
205:12 225:18
226:4,5 227:22,23
228:13 234:13
235:6 237:5
238:16,17 239:19
242:18 243:7,11
243:12,16,19
244:9 246:23,24
247:21 250:7,11
250:24 254:1
257:20 258:7,17
259:18 269:2
277:14 280:13
291:5 304:19
305:24 316:23
317:15 320:4
322:3,4,7 329:25
330:6 340:3
**reported**
12:24 15:19 17:8
30:23 48:17 67:25
68:5 170:19 182:5
184:25 186:5
189:1 191:7
202:22,24 203:2

216:9 218:3
227:24 234:12
235:24 236:2,8
251:17 252:4
316:10 320:4
336:3 341:22
342:3
**reporter**
8:18,21 9:2,6,9,14
9:19,24 10:2,6,9
10:13,17,21,24
11:2,5,9,13,17,20
12:15 13:8,16
14:21 22:6 35:8
40:16 42:7 45:15
78:12 84:13 132:3
151:21 157:16
161:3 173:21
175:24 214:7
220:9 224:4 278:6
315:24 316:15
317:8 343:7
**reporting**
171:16 172:3
190:15 192:8
251:7,7 256:13
**reports**
27:15 29:13,14
32:5 43:10 68:22
180:6 191:10
192:2 193:19,21
202:20 268:11
277:6 305:5
**represent**
17:19 33:9 52:1,16
52:20 57:7 154:1
187:10 283:10
295:12
**represented**
56:15 78:5 81:6
**representing**
26:9 283:7
**represents**
52:5 295:16
**reproduce**
231:15 256:10

Ghassan Saed, Ph.D.

**reproduced**
230:23 325:17
**reproducible**
231:4
**reproductive**
10:20 33:17 42:19
43:13 44:12,18
46:15 50:15,19,25
51:16,23 57:13
59:19 65:10,13
70:4,7,21 151:15
151:15 152:2,4,6
154:9,11 161:2
169:5,23 175:4,16
285:15 286:13,15
286:18 287:1
304:22 305:7
306:1 337:24
341:15
**request**
41:17 47:7 76:9
136:7,15,21
317:25
**requested**
15:18 145:7
**requests**
153:16 341:8 342:4
342:6
**require**
153:2
**required**
16:21 155:23
156:11 219:18
279:4
**requirements**
153:12
**requires**
152:20 279:16
**research**
11:4 34:19 36:17
50:24 81:1 83:13
84:2 86:1,4,21,22
112:4 147:5 151:2
152:18,19 170:6
214:6 230:19
232:5,6 252:18

254:17 257:8
259:3 281:10
324:18 325:20
**researcher**
230:25 252:14,16
254:13 256:4
**researchers**
238:5,6,10 293:22
325:2
**reserve**
14:7 15:8 318:3
342:5
**residency**
279:4
**residents**
279:6
**resource**
50:25 149:21,24
**respond**
74:6 154:22 161:20
161:24 162:1,3,15
162:21 167:3
173:15 220:12
224:8 268:21
318:15
**responded**
167:22 170:25
171:9
**responding**
195:9
**response**
31:3 46:22,25
49:24 77:1,3
100:20 119:23
144:20 162:23,25
163:3,17 164:17
167:7,11 170:8
172:19 189:11
210:12 222:21
227:14,14 232:21
233:25 234:2,7
247:10,14 251:14
257:23 264:22
265:6,14,15,19,22
265:23,24 266:6
267:19 273:13

287:13,16 329:10
335:22,23
**responsibility**
157:20 205:23
**responsive**
298:9 318:13
**rest**
54:12 148:2 283:6
**RESTAINO**
4:3,4
**resubmit**
44:7 45:1
**resubmitted**
46:3
**result**
57:12 190:3 234:16
273:16 274:12
289:11 333:6
338:15
**resulted**
57:16
**results**
50:10 52:17 66:24
66:24 71:18 72:7
83:20 100:11
111:5,6 121:20
139:17 147:6,9,12
147:13,13 182:1
185:14 189:17
190:2,6,9,16
191:13,21 195:3,5
197:1 200:6 227:6
227:7 230:23
236:2,8 238:25
239:3,20 242:12
245:8 246:12
247:9 248:19
251:10 252:1
259:10,22 261:3,6
261:12 264:21
265:18 286:1
305:25 309:9
324:12 326:1
327:1,3 333:10,13
333:15,16,21,23
334:2,8,19 338:5

338:10
**retain**
13:22
**retained**
8:21 9:2 13:15
14:20 25:18
**retainer**
40:21,22 41:1,6
**return**
44:5
**revelation**
330:12
**reversed**
213:4
**review**
15:1 29:11 32:4,5
32:18,19,21 44:25
47:7 51:2 152:10
154:13 174:19,23
174:23 196:2
202:3 220:16
275:13 279:22,25
**reviewed**
32:23 243:10 277:6
277:10 324:15
**reviewer**
44:25 47:12,14
48:8 50:8,9 161:8
161:11 162:7,23
162:24 163:6,17
164:4,5,8,14,14
167:8,11,18,22
173:24 174:9,14
174:15,16,19,22
**reviewers**
48:3,5,7,15 160:2,5
160:9,13 161:18
162:11,15,18,20
166:13 175:1,3
341:12
**reviewer's**
46:2 47:11,16
161:24 162:1
164:18
**reviewing**
24:17 32:15 60:6

331:4
**reviews**
195:10
**revise**
161:21 163:19
167:7,10 330:6
**revised**
46:2 162:5,6,14
163:13
**revision**
44:9,10
**revisions**
44:19 45:25 161:19
162:11 329:24
330:23
**RE-EXAMINAT...**
8:5,7,8 316:2 328:1
337:21
**ridiculous**
219:22
**right**
14:3,7 49:13 50:7
53:5,5,6,10,10,22
55:17,22 57:24
65:2 68:10 78:15
79:19 86:8,15
91:22 93:6 114:24
118:20 121:16
128:6,16 132:12
174:7 175:8
186:25 194:5
196:11 217:20
222:5 229:13
256:20 260:3
290:1 295:15
299:1 308:20
309:22 310:22
311:7,11,20,21
312:9,19,23 313:1
315:5 318:3 320:8
322:25 327:9,15
327:19 331:16,17
331:24 336:10
337:19 340:9
341:9 342:4,5
**rights**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 307 of 1525 PageID: 62453
Ghassan Saed, Ph.D.

Page 384

15:8
**right-hand**
91:13 92:16 93:17
107:8 129:9 291:7
292:1 311:10
**rigorous**
179:2
**risk**
9:18,23 17:4 29:15
30:13,20 31:14
32:3 33:19 42:6
42:14 45:13 63:6
147:25 172:1
173:1 180:8
192:14 195:12
201:13,18 202:10
202:23 203:3,13
203:20,22,25
205:8,20 206:12
208:6,8 210:17
213:11,23 214:13
214:18 215:10,22
216:21,24 217:9
217:13 218:4,19
219:4 220:24
221:19,24 222:4
222:15,17,24
223:14,15,17
225:6,9,12 227:17
234:20 246:13
247:25 248:11
267:22 268:7,12
268:20 276:21
281:13,17 287:24
288:8,12,22 289:2
289:7 324:6 326:4
333:22,23,24
334:3,19
**RMR**
1:20 343:21
**RNA**
270:22 296:8 311:8
311:15,17,18,19
311:20 312:18
**Road**
2:17 3:5

**Robert**
135:8,8
**role**
134:18 285:22
**Rong**
86:6,8,13,14,15,18
86:20 87:4,9 98:7
98:7 99:16,16
104:5 135:3 151:2
151:14
**room**
198:25 327:10
**ROS**
299:8,14,17,22,24
299:25 300:1,4,5
300:12,16
**route**
265:17
**routinely**
137:22 139:14
**RO1**
285:25
**RS**
152:20
**RT-PCR**
309:4
**rule**
122:2 272:14,20,23
272:25 273:3,5,18
273:21 318:9
333:15
**ruling**
17:10
**run**
88:4,13 122:12
125:14 128:5,12
182:10 276:17
302:11,11
**running**
52:14 135:24 298:6
**R-o-n-g**
86:11

―――――――――――
S
―――――――――――
**S**
284:15

**Saed**
1:15 8:16,20 9:1,5
9:8,12,16,21 10:1
10:5,8,11,15,19
10:23 11:1,4,8,12
11:16,19 12:13,16
12:20,24 13:6,14
13:22 14:5,8,14
14:19 17:13,16,22
17:23 22:4,9 35:6
40:12,14 42:4
45:11,19 56:13
66:14 69:25 78:10
84:11 132:1
151:19 157:14
161:1 173:19
175:15,22 214:5
278:4 283:10
284:16 315:22
316:13 317:6
318:6,11,12,25
337:22 341:16,16
341:18 345:8
**Saed's**
15:20 16:1 65:17
73:21 341:10
**SAED000001**
8:17 13:7
**SAED000097**
8:17 13:7
**SAGE**
10:12,16 151:16,20
151:25 152:1,4
153:10 156:12
157:15,19
**salary**
36:18 38:19,20,22
150:25
**Sales**
1:5 12:10
**sample**
109:17 117:7 121:8
124:5,6 128:5,5,9
128:10,12 129:16
130:3,6,17,22
295:4,10,11,12,22

296:2,9,20 298:12
298:14 309:21
310:2,13
**samples**
120:19 121:9,16,22
129:21 226:10
269:24 296:14
297:13 302:11
**San**
57:15
**sanction**
82:15
**Sanger**
258:8,18,23 259:11
259:14
**sat**
260:15
**Saturdays**
39:20
**saw**
105:10 137:24,24
273:1 325:24
**saying**
16:25 33:3 35:1
96:13 114:1
119:24 140:8
153:11 156:16
158:8 164:9 169:4
174:4 178:20
183:1 185:22
186:1 197:25
203:12 206:7
212:17 216:19
217:16 235:15
242:7 244:8
246:10,11,14
254:3 274:17
284:5 299:4
303:16,25 304:1,1
330:21 334:11
**says**
44:1 85:1,10 91:19
93:6,16 97:2
98:25 102:19
109:17 118:3,4
123:12 145:12

147:23 148:2
155:8,18 157:23
161:18 167:13
173:11 174:8,9
201:11 211:20
221:17 222:12
225:4 254:2
292:24 304:20
322:13,18
**scan**
112:2
**scanned**
111:13 320:21,24
321:11
**scanning**
112:23
**scars**
281:24
**scavenger**
61:13
**school**
17:24 18:1 115:20
151:6 263:8,9,12
263:20,25
**science**
44:18 285:18 286:5
286:6
**sciences**
10:20 33:18 42:19
43:13 44:12 46:15
50:15,19 51:1,17
51:24 59:19 65:10
65:13 70:5,7,21
151:15,15 152:2,4
152:6 154:9,12
161:2 175:4,16
285:15 341:15
**scientific**
14:15,17 18:16
104:10,12 138:10
139:11 171:15
180:10 181:21
182:2,6,11 183:12
184:21,24 237:2
237:11 305:4,23
328:4

Ghassan Saed, Ph.D.

scientist
286:15 287:1,7
  325:19
scientists
38:8
scope
15:4,5
screwed
336:18
SCULLY
5:12
se
127:15
search
210:18 280:8,11
second
15:23 16:7,19 33:6
  79:14 134:7 158:5
  161:17 163:7
  165:12 166:23,25
  169:14 170:20
  183:14 186:21
  188:16 199:18,23
  199:23,24 211:16
  211:16 221:15
  307:25 327:24
Secondly
16:15
seconds
219:21 339:24
  340:1
secretion
165:13
section
44:1 94:13,14,14
  94:16,16,18,19
  95:4,8,9,17
  116:17 131:5
  135:20 141:23
  152:17 153:22,24
  155:2,4 157:23
  159:3 164:11
  166:4,4 185:19
  199:18 228:16
  317:15 327:1
sections

94:13,18 95:16
  184:6 293:22
see
41:13 42:15 44:9
  44:21 45:9 48:25
  49:21 54:19 55:6
  55:16 57:15 61:24
  63:4 75:21 82:19
  83:24 85:3,4 88:5
  89:9,22 92:12
  93:24 94:4,9 95:1
  95:2,8 97:2 98:18
  102:20 103:19,21
  104:1 105:11,13
  106:24 107:4,7,16
  107:18 108:15,25
  116:20 117:10
  118:3 123:4,15,16
  128:16,20 129:25
  130:10 136:10
  148:5 151:4 152:1
  152:22 153:23
  154:6 158:3,12
  161:22 163:11
  166:20 173:13
  179:15 181:23
  186:16,24 188:18
  194:2 197:7
  199:24,25 200:23
  201:3 205:7 209:6
  209:19 214:2,4
  215:5,10,25 218:7
  218:21,24 220:18
  221:20 231:14
  232:6 234:3,8
  240:12 257:2
  263:2 273:13
  308:1 309:2,15,16
  309:21 310:11
  311:7,15,17,17
  312:14,16 316:8
  319:25 320:5
  323:6,7 342:6
seeded
93:6 116:20
seek

14:7 136:13 318:4
seen
114:4 156:16 191:9
  191:24 192:12,23
selected
149:1 213:10 215:8
  215:21 216:19
  218:18 221:19,23
  222:13
Seminary
2:17
send
35:19,25 48:5,12
  72:11 155:22
  164:4 259:4,6,8
senior
149:7
sense
171:12 326:12
sensitive
167:21 213:3
sensitivity
166:19 167:2,25
  168:5
sent
35:14 44:11 48:2
  155:24 156:2
  164:13
sentence
163:7 186:20
  188:16 190:5
  215:3,7,15 220:25
  221:1,5 222:7,12
sentences
163:23,25
separate
16:15 18:6 36:6
  82:12 94:16
  125:10 126:6
  152:21 177:15,16
  177:20,21,23
  178:14,17,18
  270:20 297:6
September
24:5,10,14 46:20
  46:21 47:25 58:21

58:24 68:24 69:12
  95:5,7 133:23,24
  176:10 276:12,24
sequence
206:10,19,20
  300:22
sequenced
206:21
sequencing
206:18 258:8,18,23
  259:11,14
serial
128:8 272:4
series
304:19 321:19
serious
231:24
seriously
336:1
serous
228:22 229:6 231:6
  232:3
serve
25:18 27:3 275:24
  276:7,13,15,22
  277:1,20
served
328:14,18,22
services
12:6 36:5,8 40:4
set
14:14 16:16 53:21
  54:21 64:7 124:12
  124:16 136:15
  159:2 239:18
  240:18 241:2,17
  242:17 343:10
sets
124:12
setting
25:23 279:21
setup
64:10 66:4 67:20
  97:10 155:7
seven
213:10 215:21

285:1
SEYFARTH
7:3
SGO
11:13 140:10,10,13
  140:15 261:19
  315:23 316:5,10
shakes
162:19 264:4
shaped
173:16
share
56:18
shared
148:25
Sharon
35:14 38:12 342:2
SHAW
7:3
Sheet
345:6
SHKOLNIK
3:3
shook
4:12 69:8
short
69:21 131:8 175:11
  228:8 269:12
  299:8 319:6
Shorthand
343:6
shoulders
98:20
show
23:3 48:16 61:21
  78:15 93:12
  107:21,22 111:13
  112:10 117:6
  141:1 166:14
  174:25 180:11
  182:21 192:13
  195:2,5 197:2
  208:17 214:12
  222:17 223:13
  259:23 264:14
  273:2 325:16

Ghassan Saed, Ph.D.

333:21,22 334:2
**showed**
108:3 170:7 195:11
217:12 251:12,12
267:21 268:6,19
337:2
**showing**
54:14 112:9,10,11
185:12 191:20
202:9,14 226:5,13
226:24 227:6,7,22
232:11 234:13
236:21 250:11,19
266:13,20 267:6
267:20 268:5,11
268:18,25 288:11
316:3 326:9 334:4
334:12 335:14
337:17
**shown**
48:25 170:16
188:17 190:3,9,12
191:10 193:5
203:18 205:13
207:18 225:17
227:13 234:19,23
235:4,13 247:9
251:5,22 269:2
303:19 327:4
334:8 335:20
**shows**
21:8 173:5 207:24
216:22 232:16
233:11 248:19
256:23 267:25
305:24
**Shrugs**
98:20
**Shukla**
30:25 55:25 340:12
**shut**
62:1 256:5 257:11
**shuts**
230:11
**shutting**
258:6

**sic**
311:18,22
**side**
35:13 93:18 162:19
162:19 264:4,4
311:10
**signature**
168:22 239:24,24
240:23
**significance**
203:19 206:4,24
207:6 208:12
329:17
**significant**
199:19 200:1,3,5,7
200:10,11,12,13
200:16,17,18,25
201:5,8 207:18,25
208:4 279:9
**significantly**
204:3
**similar**
185:12 190:12
192:4 232:13
234:2,7 250:20
282:3,19
**similarities**
228:1 289:13
**simple**
100:3 227:13 273:2
304:7 333:19
**simply**
58:16 67:4 97:23
289:5 294:12
336:12
**simulates**
239:25
**simulation**
266:10
**Simultaneous**
220:10
**simultaneously**
94:15 95:14
**Singh**
135:21,23
**single**

23:13 32:20 137:23
212:9 219:23
240:12 254:1
**sit**
165:15 259:5
277:16
**site**
235:4
**sitting**
211:9 245:24
**situation**
190:5,10 191:7
207:16 284:6
321:5
**six**
124:9
**SKADDEN**
5:3
**skip**
284:10
**skipped**
78:19
**skipping**
208:9
**SKOV**
197:12
**SKOV-3**
197:11
**SLATE**
5:3
**slope**
120:17
**slow**
219:25
**small**
55:9 91:20 93:17
283:17 309:5
330:22
**SNP**
184:11 196:22
202:22 203:12,23
203:24,24 204:9
205:2,3,4,8,25
206:10,10,13,13
206:14,23 208:6,7
208:23 209:7,10

209:14,21 210:16
210:24 211:10,20
212:25 213:2,4,10
214:15 216:6
217:2 222:2
224:20 225:21
250:6 258:7,17
259:16 300:23,25
301:1,14,22 302:2
302:8,9,10
**SNPs**
203:2,17 204:21,24
205:12,18 206:4
206:14 207:4,19
207:25 213:22
214:13 215:8,22
216:8,11,20,22
217:5,11,18,22,25
218:3,18 219:3
220:23 221:19,23
222:3,14,16,20
223:13 225:5,8,10
225:11,17,25
250:15 258:24,24
**societies**
50:20
**Society**
57:13 140:16
**SOD**
62:3 131:2 201:2
202:25 206:14
210:16 300:8
303:17,20
**SODs**
300:9
**SOD3**
183:17 197:6
**sold**
191:5
**solely**
65:9 240:17 245:8
333:3
**solution**
117:25
**solvent**
118:1,22

**son**
18:12 23:9
**sorry**
16:6,9,11 23:18
24:6 28:3 29:6
34:24 37:6 45:2
49:21 53:19 68:3
79:3,4 80:15
93:20 94:6 119:11
129:18 132:18
133:11,13 134:25
139:22 140:11
144:11 152:16
155:4 160:13
163:12 167:10
180:17 183:23,24
184:22 185:4
186:19,19 187:14
194:5 198:22
199:16,22 207:21
209:8 211:3 212:7
219:7 228:13,13
228:21 245:25
246:22 258:12
264:16 269:18
270:12 271:19
280:5,15 283:14
284:16 287:22
299:11 306:9,9
307:16 323:1
329:2 332:4
333:24 335:6,20
338:12 340:17,20
**sort**
53:20,21
**sought**
225:4
**source**
51:5 152:25 169:15
300:1
**sources**
20:9
**South**
6:15
**space**
108:14 162:16,16

164:2 293:8,10
**speak**
60:23 77:15 219:16
224:12
**speaker**
77:18
**specialize**
81:5
**specialty**
27:4,8,10 50:20,23
50:23 51:1 59:6
66:25 192:17
**species**
31:2,12 81:13
239:25 240:6
247:17 255:6
299:7,10,18
**specific**
15:17,17 54:2 81:1
120:25 121:13
165:11 172:2
206:10 217:18,21
221:5 222:23
224:23 225:8
228:3 243:2 246:5
246:10 248:3,7
251:13 259:20
264:1 284:6 289:1
298:7 305:3
**specifically**
244:10 251:21
299:13
**specify**
80:25 299:15
**specimen**
128:10
**spell**
86:9 210:15,22
**spend**
279:9,10
**spent**
22:20,25 23:21,25
24:9 32:11,15
33:1,10,13,22
34:2 36:5 39:7,9
39:10,13,22

278:25 339:12
**SPITZER**
3:12
**split**
122:8 293:11
296:15 327:9,16
**splitting**
327:15
**spoken**
263:19
**SRI**
11:20 139:24 140:3
140:5,12,20
153:15 182:16
184:25 261:15,15
317:7,12,13
**SRNA**
61:25
**SS**
343:4
**stage**
293:3
**stamp**
103:17 110:7
112:12 113:6
116:14 127:20
292:20 295:2
321:7
**stamped**
98:9 119:12,15
292:2 295:1
311:12
**stand**
140:15 146:4,11,18
147:6 221:3
284:13,15
**standard**
54:6,8 102:6
107:20 114:9
120:15,15,19
121:6,7,21 127:11
130:25 153:6,6
189:13 233:19
240:10,14 252:17
254:13,14 309:2,8
309:8 327:8,13

329:14,19
**standardize**
121:21
**standards**
114:16 115:11
272:4
**standing**
262:7
**start**
23:24 55:1 57:23
59:8 67:7 93:4
97:22,23 105:16
139:3 159:25
233:18 261:4
293:4,8 294:4,5
327:14 336:19,19
**started**
24:2 38:15 54:16
57:5,6 69:4,6
76:13 93:3,7
148:17 149:4
281:22 282:1
284:20
**starting**
52:4 89:4,5 225:3
244:16
**Starts**
184:12
**state**
15:16 17:20,24
18:1 20:10,22
21:3 33:2 37:1
38:20,22 41:14
61:20 168:23
199:21 201:23,25
202:7 215:7 217:8
226:19,20 227:15
234:3,8 242:22
255:3 263:9,12,20
279:11 280:13,16
280:20 281:2,7
285:14,17 302:16
303:8 306:21
307:12 318:12
324:3 335:4,7,9
335:13,15,21

336:4,13 341:25
343:3,8
**stated**
158:1,10 293:21
328:18 334:22
**statement**
84:25 157:8 159:12
189:16 324:8
332:15
**statements**
189:25
**states**
1:1 12:11 152:17
235:5
**statistical**
89:3 208:11
**statistically**
200:5,7,12,18
201:8 207:25
208:4 329:17
**statistician**
326:25
**statistics**
89:6 90:4,5,7
184:17 326:24
**Stay**
209:22
**steering**
15:15
**stenographic**
12:14 343:15
**stenographically**
343:13
**sticking**
97:12
**stimulate**
257:10
**stock**
117:25 296:14
**stole**
242:9
**stop**
65:2 91:17 224:3
**stopped**
180:25
**straight**

130:14
**street**
2:6 4:5 7:5 179:12
**stress**
25:17 26:3,17 27:6
27:11 57:10 58:12
59:3,6 60:20 61:4
61:9,11,12,22,23
62:6 76:12 173:4
178:2 179:4
192:19,21,22
195:19 203:7
217:8 232:7
234:20 235:16
240:7 242:14
247:11 250:14,17
257:10 276:16,23
277:2 282:9
289:14,16,18,20
303:17 304:5,7,11
304:14,16 325:23
335:1
**stresses**
251:22
**strike**
17:18 25:13 49:7
63:8 84:24 87:22
97:13 111:25
113:23 128:25
134:11 137:16
143:1 150:5 168:3
174:9 181:5
187:25 193:25
228:19 233:11
245:14 247:13
251:6 254:18
255:25 272:24
328:12
**strong**
242:13 249:18
**strongly**
165:6 211:10 212:9
239:4
**student**
36:17 135:1,22
254:2

Ghassan Saed, Ph.D.

**students**
278:21
**studied**
170:23 202:2
  215:22 217:12
  276:4 287:7,8
  303:7,18
**studies**
15:24 27:13,14
  28:12,13,16,20,21
  29:2,9,9,18,19,20
  29:25 30:3,3,23
  48:16 54:11 58:1
  60:2,4,8,11,16
  62:24 68:19 74:8
  95:16 137:18
  150:2 169:7,15
  171:25 172:8,13
  172:14,25 182:16
  189:17,18,19
  190:19 191:21
  193:22,23 194:2
  195:11,14 203:5
  204:25 205:14,19
  205:24 207:1,15
  208:5,16,17
  209:11 210:10,11
  216:7 226:4,19,21
  226:24 227:21
  232:18,22 234:4
  234:18,23 235:1,2
  235:4,21,24 236:2
  236:8,13,25
  239:12 247:24
  248:10 259:23,25
  260:24 264:13
  266:13 267:3,6,8
  267:20,24 268:5
  268:18,25 271:1,4
  271:9 272:6,14
  273:1 279:25
  300:22 301:15
  302:18,20 303:2
  303:18 305:5
  306:6,10 307:9,18
  308:8 319:17

325:6,21,24
326:12 334:12
335:14
**study**
10:5 12:24 15:19
  15:24 16:12,16
  28:22 29:1,22
  30:25 31:5 53:7,9
  54:3,4,10,11,14
  55:12 56:7,7 57:4
  57:19,21,22,25
  58:2,3,4,4,5,6,7,9
  58:11,12,14,20,23
  59:2,8,17,18 61:9
  62:10 63:2 64:19
  64:20,21,24,25,25
  65:1 66:4,5,5,5,15
  66:18,21,22 67:6
  67:15,23,25 68:5
  68:14,16,23 69:1
  69:11 74:7 81:1
  82:12 83:24 84:12
  84:18 89:6 138:1
  140:20 180:18
  182:20 183:2
  188:17 190:20,20
  191:14 192:3
  195:16,17,21,23
  195:24,25 196:3,5
  204:12 205:7,9,10
  206:16,16,16,17
  208:14,14 209:3,4
  210:13 213:10
  214:14,17,18,18
  217:23 218:4,11
  218:12,13 219:2
  221:25 222:20
  224:21,21,24,25
  225:3,7,11,17,22
  226:13 227:6
  236:14 237:10
  239:3 240:12
  242:12 243:6,7
  244:6 245:11
  259:18,24,25
  260:1 263:23

266:20 272:10,11
272:17 274:17,25
276:20 300:13
304:19 305:23
307:17,20 316:25
322:20 334:8
**studying**
326:11
**study's**
274:18
**stuff**
284:11
**sub**
228:19
**subject**
15:21 17:10 32:22
  71:12 81:10,12
  141:18 144:17
  244:16 260:2
**subjected**
130:24
**subjective**
200:13
**subjects**
71:10
**submission**
46:23 49:14,17,23
  65:14 70:10,24
  71:4,18 72:1 73:8
  76:19 158:1,10
**submissions**
341:14
**submit**
19:14 21:8 44:5
  46:5,9,11 50:14
  50:17 71:19 72:8
  74:11 75:7 127:6
  137:3 140:11
  157:4 162:7
  163:18 261:24
**submitted**
11:13 21:9 33:17
  42:19 43:9,11,12
  43:21,22 44:1,3
  44:16,23 45:21
  46:13,18 47:22

51:23,24 57:13
59:18 65:10 70:4
  70:7,20 74:12,16
  131:21 133:20
  140:11 162:11
  285:11 315:23
  316:5 338:23
**submitting**
46:15 162:14
**Subscribed**
345:14
**subsequent**
58:7
**substance**
60:19,21 61:6,21
  65:17 233:17
  250:21,23 251:1,5
  251:16 271:7
  272:7 333:5,8
  345:5
**substances**
61:8 252:4 271:20
  302:17 303:1
**substantial**
166:17
**substrate**
260:16
**subtract**
123:18
**successful**
147:2
**successfully**
146:5
**sufficient**
142:17 143:19
  154:4 166:14
**suggest**
161:19 219:21
**suggestions**
67:22 163:8
**Suite**
3:5,15 5:14
**summarize**
196:2 197:1
**summary**
138:23 196:6,6

238:17 239:19
**Superoxide**
61:13 210:20
**supervise**
149:9,10,13
**supervision**
149:12
**supervisor**
150:22 151:1,1,2
**supplies**
36:5,7 40:4
**support**
222:12,16 276:3,19
**supported**
145:23
**Supporting**
9:17,22 17:3 33:18
  42:5,13 45:12
  147:23
**supposed**
99:18 116:12
  147:20 175:19
  202:18 205:6
**suppression**
230:16
**sure**
16:10 20:18 24:16
  31:24 37:23 43:16
  44:14 49:22 53:3
  65:25 69:8 70:15
  74:1 78:3,15 80:7
  89:3,22 96:2
  106:25 115:24
  119:25 130:11
  134:19 140:12
  183:23 196:5
  201:17 208:13
  216:7 223:21
  251:19 264:17
  270:1 285:10
  291:14 295:10
  297:17 304:15
  306:13 320:8
  330:15
**surprised**
173:9 240:15

**survival**
212:10,19 213:6
   214:16,17 217:23
   218:5,12,14 222:3
   222:23 225:6
   243:3 252:2 256:6
   304:6,9
**survive**
256:11
**Susceptibility**
211:21
**susceptible**
163:10,16,22
   164:25 171:3,4,12
**SV40**
230:7
**swear**
12:15
**switch**
93:8 151:17 198:14
   217:4
**switches**
196:13,15,21 250:7
   250:18,20
**sworn**
12:17 343:10
   345:14
**synthase**
258:3
**synthesized**
309:6
**system**
127:9
**S-nitrosylation**
307:4,19

———————

**T**

**T**
7:4 344:1
**table**
8:1 66:11 107:6,9
   107:13,25 110:12
   110:16 112:5,18
   113:4 123:6,10,12
   197:1,5 216:25
   217:1 218:19,21

219:3,9,18 220:18
220:21 221:20
250:4,7 320:19,23
321:10,13
**tables**
96:3,8
**take**
69:16,17 108:6
   115:2 118:7 131:5
   131:6 175:7 187:5
   187:6 216:10
   224:4 228:5
   255:14 269:5
   285:6 293:7
   295:11 296:9,14
   296:15,17 326:17
   332:17
**taken**
1:16 69:21 131:13
   175:11 228:8
   269:12 277:18
   319:6 343:9,16
**takes**
69:14 90:17 219:21
   259:6
**talc**
5:17 6:10 14:15,17
   15:10,24,24 16:16
   26:4,6,20 27:1,9
   27:13,17,23 28:8
   29:16,18,25 30:4
   30:6,9,23 31:4,7
   31:18 32:1,2,22
   36:1 37:11 38:13
   38:15,23 39:4,7
   39:13,17,23 40:10
   52:15 56:12,24
   57:5,9 58:20 60:9
   60:16,21,23,24
   61:6,9 62:25
   68:22 74:7,9
   75:10,14 76:12
   81:3,8 82:12
   83:24 85:1 102:19
   104:10,12 116:18
   116:25 117:5,12

117:15 118:1,23
119:3 121:3,6,10
122:3,15,17
127:15 143:4,18
143:25 147:20
163:10,16,22
164:25 166:20
167:2 168:1,13,13
168:18,25 169:24
171:12,18 172:4,6
172:15,15 173:7
178:1 180:20,21
180:22 188:17
191:11 196:25
197:8,16,22 198:1
199:19 200:23
201:11 203:15
222:21 225:19
226:1,6,7,11,16
227:1,8,13,24
228:3 232:14,17
232:18,22 233:5,8
233:12,12 234:7
234:24 235:3,6
236:4,10,18,22
237:13,21 238:10
243:4 244:10
250:6 251:8,14
256:18,24 259:17
260:19 262:13
263:4,9,13,21
264:2,6,9,14,18
265:19 266:14,21
266:21 267:7,10
267:11 269:2
272:2,3,11,12
273:7,10,12 274:6
274:11,18,19,24
279:18,19,23,25
280:9 283:11,12
290:4 293:14
295:17 296:10,22
297:10 298:14
302:18 303:2
304:20 305:6,16
305:25 306:7,16

306:19 307:9,18
307:23 317:16
325:7 326:8
333:18,21,23
334:2,9,12,20
338:4,4,15,16,22
338:24 339:5,7,13
**talcum**
1:4 9:17,22 12:9
   17:3 33:19 42:6
   42:14 45:13 122:9
   122:10 147:24
   165:1,1 166:6
   168:8 169:4 170:5
   170:6,8 172:20,25
   179:15,22 180:10
   181:2,20 182:2,7
   182:11 183:12
   184:21,24 192:14
   195:11 196:7,22
   198:10 222:22
   227:17 231:14
   232:6 233:25
   234:1 235:16
   237:3 240:6
   243:19 244:19,22
   247:10 248:20
   251:11 257:9,9
   259:19 264:21
   266:4,7 276:3,19
   304:25 306:11
   316:20 317:14
   324:5 326:3 334:4
   334:25 340:6
**talk**
15:3 26:9,16 33:16
   60:15,20 61:5
   105:3 133:15
   195:19 203:6
   209:6,7 236:16
   262:9 280:24
**talked**
23:4 25:23 29:9
   51:21 59:4 63:17
   66:16 68:4 84:22
   106:19,22 113:15

136:1 175:17
261:3 263:3,25
275:1 331:25
339:18
**talking**
29:15 33:13 36:25
   39:24 43:17 50:6
   60:18 62:21 63:7
   65:3,4 69:5,25
   70:16 74:7 79:12
   79:23 81:20 82:14
   108:5,12 116:24
   132:18 156:18
   161:13 167:14
   171:24 172:12,13
   191:13 193:2
   208:25 213:13
   236:13 238:1,2
   247:21 249:21
   261:13 271:10
   296:2,4,20 299:17
   302:6 309:19,20
   337:4
**talks**
72:21
**tape**
111:20,22
**TaqMan**
259:12
**target**
271:25
**taught**
115:14
**taxes**
19:14
**teach**
278:15,17,21,24
**teaching**
278:25 279:1,2,3
**technical**
112:23 318:16
**technician**
81:2 151:3
**technicians**
34:20
**technique**

Ghassan Saed, Ph.D.

52:22 198:21
199:10 327:8,13
**technology**
54:5,8 64:8 138:6
**telephone**
71:2 73:21
**tell**
22:12 25:13 34:2
35:11 45:22 60:15
84:20 90:12,19
101:13 103:3
105:6 111:19
118:8 140:2
148:18,19 156:18
183:13 198:21,21
198:24 199:3,10
199:14 205:23
211:19,23 223:18
224:19 232:15
245:24 248:15
255:17,18 262:17
263:16 266:11
274:25 279:9
299:19 322:12
338:20
**telling**
26:18 330:1
**tells**
120:16 272:5
**Temple**
18:23 84:5,6
**temporally**
265:7
**temporary**
265:13
**ten**
79:22
**terms**
65:18 109:24
271:13 325:6,23
326:16
**test**
53:20 64:1 104:12
108:7 124:13,22
127:12,14 128:25
130:4,5,7 138:18

139:14 183:21
222:21 233:16
240:5 273:17,22
273:25 274:9
333:21,23 334:2
334:19 338:4,7,11
338:13,19,20
**tested**
58:11 61:8 62:5
124:24 180:22
197:16 217:24
222:16 223:19
239:2 272:17
274:5,6 279:20,20
287:10 289:19,21
294:11 295:7
337:23 338:3,4,9
**testified**
12:18 136:25
289:25 319:17
332:8
**testify**
145:20 147:8
148:22 343:11
**testifying**
143:3,8,17
**testimony**
20:16 59:8,25 69:1
82:23 89:12,16
145:23 188:4
219:2 220:22,24
221:22 237:11
251:6 318:14
332:11,20
**testing**
14:16 18:16 52:15
53:17 65:9 70:10
70:16 125:25
138:8,9 139:17
140:4 179:2 181:2
213:21 231:14
316:6 328:13,21
333:17 339:7,12
339:13,15
**tests**
14:14 53:18 63:9

63:10,12,18 65:12
128:9 130:13
178:5 180:9 182:2
182:10 183:25
184:21,24 185:14
253:5 265:18
271:19 329:5
338:22,23 339:4
**Texas**
5:15
**text**
108:7 331:6
**thank**
28:4 77:25 108:17
117:20 127:20
131:4 278:12
288:15 298:18
**thanking**
135:21
**theory**
286:8 287:3,21,23
288:4 289:8
**thesis**
279:7
**thing**
51:13 67:17 111:22
112:13 134:15
135:4 148:17
160:6 169:12
187:18 192:11
206:19,20 270:21
272:16 273:6,19
274:24 283:17
285:4 298:20
299:22 337:9
**things**
78:4 113:15,16
149:21 192:3,4,4
205:1 220:4,6
330:21
**think**
30:25 37:23 38:16
48:10 55:24 65:3
66:11 76:10 85:22
85:22 86:6,16
88:24 99:13

102:24 104:5
105:12 106:14
109:21 112:22
129:8 132:24
133:23 144:7,12
144:24 145:2,9
147:8 160:20
164:15 166:14
172:12 180:14
191:15 194:1
255:15 256:21
259:13 260:25
266:9 274:4 276:9
285:11 289:11
291:15 311:25
312:4,6 317:21
318:8,9,12 320:7
321:10 322:10
326:17 329:14
331:17 332:9
334:16 337:10
342:4
**thinking**
63:3,7 299:9
**thintogram**
311:18,22
**third**
215:3 218:16,16
225:4 311:10,21
314:20 315:7,8,9
**THOMAS**
7:4
**Thompson**
2:5 24:21 25:10,11
25:21 27:24 28:9
28:17,23 29:4,7
29:17 30:5,22
31:17,25 32:21
59:10,19 60:1,5,8
60:17,25 62:4,19
63:1 64:16 275:2
276:7
**thought**
16:6 33:3 40:1 55:5
60:7 68:12 100:22
104:25 133:13

134:6 170:25
258:12 296:1
310:23 312:13
**thousand**
54:15
**three**
57:10 69:14 117:2
123:17,17,18,20
124:9,12,13,20,24
125:10,11,12,14
125:17,19,19,20
125:25 126:6,7
127:1 163:23,25
280:3,6 295:19
296:17 297:6,21
297:22,23,24
310:9 313:4,5,7
313:16 315:1,4,5
315:5 325:13,13
325:17,18,18
331:11,16 334:23
334:24 340:14
**threshold**
232:24 313:12
**throw**
313:16
**throwing**
294:21 313:10
**till**
35:13 122:24
240:16
**tilting**
247:18
**time**
12:7 14:7 22:20,25
23:24 24:9,16
27:8,12,15,16
29:17 30:5,22
31:17,24 32:11
33:1,9,13,22 34:2
34:12,15,18,23
35:2,3 36:4,7,14
36:23 37:10,17,24
37:25 39:2,7,9,10
39:13,16,17,19,22
47:25 49:10 50:13

53:6 60:4 65:4
67:10,12 70:5,15
70:19 87:16 88:18
90:1 91:16 92:6
94:19 95:10,13,20
95:20 96:5,9,14
97:7 98:3 100:24
102:25 124:10,17
125:17 126:2,3
128:24 138:19
141:4,7 142:8,25
143:1,7 147:14
162:7 168:8,11
170:21,22 177:11
184:22 194:8,16
201:15 207:21
209:18,23 218:11
219:23 220:5,16
221:15 233:1
236:5 240:11
245:4 247:19
254:3 260:7
264:16,16 269:7
271:22 275:25
276:10,13,23
278:25 279:9
280:15 281:4
284:17 285:2
286:9 290:8
296:13 298:4,6,10
298:23 310:18
315:4,14 318:4,20
319:16,22 329:4
330:22 331:19
334:1 339:10,12
339:16,17 343:9
**timeliness**
15:7
**timely**
342:7
**times**
100:24 116:13
118:4,6 122:22
123:17,17,18,21
124:6,13,24
125:12,14 126:1

128:21 139:12
256:10 286:14,18
297:6,21,24
319:12 325:17
**time's**
317:21 340:17
**tissue**
165:11 172:14
281:11,13,22
293:22 337:24
338:1
**tissues**
165:4,7 172:19
230:21 231:12
253:23 254:4
267:17
**title**
17:25 18:2 134:7
147:23 317:13
**titled**
17:2
**titrate**
55:7
**tlocke@seyfarth....**
7:8
**today**
15:3 16:17,18
17:12 33:16 40:12
45:5 74:22 78:6
84:16 115:7 116:1
132:7 175:17
209:11 211:9
245:24 261:13
277:12,16,17
278:9 283:12
318:13 319:13,17
324:3 330:22,24
331:21 332:1,3,6
**Today's**
12:6
**told**
13:21 25:15,21,25
26:18 67:18 82:5
82:6 83:10 100:20
102:4 105:25
106:22 108:10

115:13 148:21
149:4 153:14
167:17 242:11
248:13 255:4
263:8,12,20 314:4
314:18
**Tom**
340:20
**tools**
280:11
**top**
89:22 92:11,12
152:4 181:20
322:19
**topic**
142:10,14,21 144:3
144:22 145:4,11
145:13,18 147:18
147:18,25 148:7
149:2 328:15,23
329:5
**topics**
72:25
**tore**
79:1
**total**
37:13 122:18 131:1
131:3 144:8
**totally**
185:7
**touch**
326:24
**TOV-112-C**
123:13
**TOV112**
197:15 198:1
**toxic**
53:13 54:24 55:8
290:4
**toxicity**
54:17 290:7,8
**tract**
169:5,5,9,23
173:10 188:14
304:22 305:8
306:2

**trained**
212:4
**training**
115:25 326:10
**transcript**
8:13 167:10 342:5
343:15
**transcription**
343:14 345:4
**transfer**
165:2 166:15
**transformed**
168:9
**transit**
265:7,13,13 266:8
**Translational**
285:18
**transparent**
100:8
**travel**
166:6
**treat**
116:22 197:25
251:11 257:9
264:20 273:11
278:12
**treated**
121:17 124:3
128:21 130:17
196:25 197:22
198:10 200:23
201:11 256:18,24
257:12,12 260:19
270:13,15,16,24
273:3 296:21
297:9 298:14
**treating**
316:23 317:15
326:8
**treatment**
125:17,21 127:15
181:20 185:7,19
185:20 197:8
222:22,22 248:4
248:18,23 251:14
251:18 252:5

259:19 264:21
270:11,22 271:25
272:2 295:17
296:7,8,18 309:10
333:18 334:4,23
**trial**
20:15,20 52:21
**trials**
52:14
**tried**
85:1 125:8 290:6
340:23
**trigger**
170:15 188:11
**triplicate**
122:25 123:1,2,16
124:8,9,11,16
125:23,24 126:12
126:12 127:2,2,2
127:7,8,17,18,18
**triplicates**
124:4 127:13
**true**
189:1 283:22
284:25 296:16
299:5 302:3
343:15
**trust**
187:4
**truth**
343:11,11
**try**
50:10 154:12 186:5
256:22 293:13,25
294:6
**trying**
48:9 75:24 89:5
91:18 92:21
101:13 138:16
188:10 194:3,17
209:24 223:9,18
223:21 224:7,9,19
245:16 248:15
253:2,8,8 254:15
255:14 266:9
281:25 313:19

336:1 339:16
**tube**
166:16 169:14,16
    169:17,22 170:23
    229:12 233:13
    256:16
**tubes**
171:17 172:5
**TUCKER**
6:13
**tumor**
230:7,16 282:6
    304:17
**tumorigenic**
303:11
**tumors**
282:4,5 304:17
**tune-up**
52:21
**turn**
75:14,15 92:7 95:3
    116:14 119:11
    129:1,23 141:13
    141:22 152:16
    188:15 218:15
    310:1 320:7 321:6
**turned**
54:18 181:7,10
**turning**
54:19
**turnover**
260:22
**turns**
260:21
**twins**
207:10
**two**
44:15 45:22 48:9
    48:10,12 50:21
    74:9,17 76:10
    90:17 105:13
    124:6,8 125:20
    132:9,11 140:11
    160:20,21 185:10
    186:9,9 202:25
    203:1 205:1 208:9

270:2 271:23
272:1 277:8 279:1
283:3 292:1,17
295:19,23 296:7
296:17 307:8
310:14 313:4,7,14
314:10,11 315:4,5
315:9,15,18
320:16 322:1
326:19 336:21
340:13
**type**
24:13 128:25
    137:10 155:11
    178:10 179:1
    192:13 208:14
    228:20 250:20
    256:7 257:22
    258:7,17 282:24
    284:8 325:8
**types**
257:16,17 260:24
    279:1 280:21
    325:7,11
**typical**
113:9,13
**typically**
99:25 230:6
**typo**
99:4 185:21 316:8
    317:18
**typos**
134:19
**T4-500**
85:2 181:21

_____

**U**

**Uh-huh**
32:7 212:20 309:23
    312:22 320:11
**umm**
99:12
**unaware**
302:1
**unclear**
144:12 221:5

**underlying**
15:19
**underneath**
105:7 152:2
**understand**
17:14 53:8,19
    72:16 73:15,24
    75:4 89:19 95:23
    124:7 128:7 146:8
    146:16 178:9
    197:18 206:21
    241:12 252:10
    256:22 265:21
    295:10 296:20
    305:15,16,19
    336:1
**understanding**
13:1 26:15 153:15
    158:25 193:13
    206:8 227:17
    232:23 249:17
    250:16 271:8
    275:9 319:13
**understood**
26:23 72:10 75:8
    82:14 100:15
    144:12 170:1
    253:4 270:1 331:5
**UNIDENTIFIED**
141:14 177:4
**unique**
243:2 280:21
**unit**
23:20
**United**
1:1 12:11
**universities**
18:17,19
**university**
17:24 18:1 20:22
    115:21,22 259:7
    278:16 279:12
    285:14
**unknown**
120:18 228:21
**unnecessary**

173:16
**unrelated**
177:23 178:14
**unresponsive**
100:14
**untimely**
14:10
**untreated**
118:11 121:17
    201:11 257:13
    270:24 273:2,14
    295:12
**updated**
75:25 76:1 277:25
**upload**
154:12 155:10,14
**uploaded**
163:4
**upper**
51:20,20 53:21
    112:18 116:17
**upscale**
118:2
**uptake**
255:20,20
**uric**
289:18
**use**
9:17,22 17:3 29:16
    31:7 33:19 37:4
    42:6,14 45:13
    47:15 53:12 54:20
    56:18,25 119:2
    121:7,21 122:7
    125:8 130:24
    146:5,12,25 147:4
    147:24 153:9
    159:2 165:2,3,3
    169:4 170:5
    171:25 179:13,15
    188:24 195:12
    196:7 201:5
    202:22 203:23
    205:10 208:11
    226:6 228:2,14
    231:2 234:1

236:18 237:21
238:10,18,22
239:6 240:11
243:5 244:13,19
244:23 248:3,16
249:3 252:11
254:12,14,15
258:21 263:9,13
263:21 264:18
267:10,11 271:3
272:6 274:9
280:11,12 293:12
293:18,23 294:2
301:6,13,21,25
302:13,14 304:20
304:25 306:15,19
307:8,15,16,19,23
309:8 314:1
321:20,23 324:5
324:18 325:7,12
**uses**
172:25
**usually**
44:6 47:6,15 48:12
    157:11
**uterine**
290:24
**uterus**
165:12,19 166:16
    169:17 170:24
    171:5 186:22
**utility**
231:1 248:14
**U.S**
306:7,11

_____

**V**

**vagina**
163:9,15,21 164:24
    165:20,22 166:16
    169:18 171:2
**vague**
66:19 68:8 113:4
    133:7 335:25
**validate**
121:2

Ghassan Saed, Ph.D.

**value**
201:7,8 314:5,6
315:12
**values**
313:17 315:1,5,6
**variance**
191:4
**variation**
127:13
**verbal**
73:20
**version**
42:18 115:1 119:13
133:19 320:21
321:2,7,12
**versus**
44:9 98:2 121:17
124:3 165:10
179:21 200:20,21
213:2 238:24
265:23 282:6
287:16 294:14
329:18
**viability**
290:7,9,11
**viable**
294:16
**video**
12:7
**videographer**
7:11 12:4,5 69:19
69:22 131:11,14
175:9,12 194:19
194:22 210:3,6
228:6,9 269:10,13
308:2,5 315:15
319:4,7 323:9,12
327:23 342:12
**Videotaped**
1:15
**viewer's**
161:21 162:3
**Virginia**
2:18
**virus**
230:7

**visible**
100:6,17 101:4
102:2
**vitae**
11:9 278:5,10
**vitamin**
289:14,16
**vitro**
226:21 231:1
323:21 332:8,12
332:17,20 333:3,6
333:7
**vivo**
47:1,1,3 48:16,25
50:11 62:14,17
189:19,25 190:9
190:16,18 191:7
191:10,22 192:9
192:12,24 193:6
193:16,19 195:2
195:11 196:7
231:7 233:8,22
234:19 252:9,13
253:7,11,19
254:16 266:10,14
267:9,13,16
268:17 325:4
333:9,10
**voice**
77:19
**volume**
47:17 118:8 119:7
198:13,16 211:24
**volumes**
119:2,2
**voluntarily**
106:2
**volunteer**
262:18

———————
**W**
———————
**W**
6:14
**Wacker**
6:15
**wait**

219:16 319:2
**Walgreen**
179:12
**walking**
219:25
**want**
12:20 26:16 49:9
49:21 65:25 67:20
69:8,16 73:15
74:1 79:24 104:25
107:2,8,12,16,18
118:5 131:6
133:15 145:10
146:16 147:5
154:17 165:9
173:24 178:20
179:15 183:23
216:7 233:16
256:22 260:2
275:14 285:4,8
293:1,2 295:10
298:12 301:25
305:15 309:15,15
318:23,25 326:17
331:5 336:14
339:23 341:7
**wanted**
78:3 82:12 94:16
101:5 128:1
276:18 319:10
323:5
**wanting**
26:9
**wants**
219:24
**wash**
122:20 166:1
**washing**
171:3
**Washington**
5:6 7:6
**wasn't**
88:20 104:7 139:22
140:9 340:10
**wasting**
298:10

**wavelength**
121:1 122:3 312:15
**way**
18:12 21:19 27:1
34:6 39:5 52:5
55:4 57:15 86:16
88:14,15 89:6,7
103:8 104:23
105:14 106:16,20
119:25 135:17,25
137:21 149:9,9
157:7 162:21
198:11 204:3
239:25 251:4,20
256:8,8 257:17,25
263:2 264:6
265:25 268:21
273:4 274:5,11,17
287:14 297:19
306:21 307:6,11
320:1 330:6
334:17
**Wayne**
17:24 18:1 20:10
20:22 21:3 37:1
38:20,22 263:9,12
263:20 279:11
285:13,17 341:25
**ways**
97:25
**Web**
275:12
**website**
151:25 154:11
157:20 162:12
164:19,20 206:25
341:13
**Wednesday**
1:19 12:2
**week**
90:17
**weekends**
39:21
**weeks**
69:14 76:10 88:21
88:23 105:13

**went**
37:14,15,16 41:25
44:9,25 52:1 58:6
78:8 136:6,22
151:5 154:24
194:25 210:9
**we'll**
14:17 15:2 16:22
33:16 79:14
157:19 160:3
175:7 216:14
318:19 341:3
**we're**
61:16 65:22 69:22
73:14 74:22 77:23
82:19 94:15 96:16
97:8 100:23
132:18 175:12
177:25 205:1
208:25 209:21
210:6 217:18
219:12,13,14,15
219:21,25 228:6,9
235:15 246:22
258:5,10 263:5,6
269:13 274:20,21
291:14 298:6,10
302:21 311:25
312:15 318:10
319:7 323:1,12
330:21 333:18
342:13
**we've**
13:18 15:11 42:11
46:1 51:25 56:4
69:16 70:16 74:7
81:20 93:13
112:19 113:15
115:7 116:1
175:16 199:19
261:4,13 318:18
330:15
**When's**
285:2
**white**
98:25 99:22 101:25

| | | | | |
|---|---|---|---|---|
| 104:19 105:7,16 | 93:19 95:23 96:13 | 198:16,20 199:2,9 | 332:25 334:11,22 | **work** |
| 105:19 106:7 | 96:20 99:3,12,16 | 201:15,21 202:13 | 335:7,18,25 336:6 | 19:5,9 20:10,13 |
| 292:11,15 | 99:25 100:10,20 | 203:22 204:5 | 337:4 338:7 339:1 | 21:3,22 22:13 |
| **whited** | 101:13 102:4,12 | 205:16,22 206:7 | 339:10,15 340:5 | 24:13 30:13 34:12 |
| 98:16,19 100:4,10 | 103:6 104:16,22 | 207:8 208:3,20 | 341:4 343:10,13 | 37:11 39:4,19,19 |
| 101:3 102:18 | 105:25 106:10 | 209:15,24 210:1 | **woman** | 40:21,23 48:23,24 |
| 103:19,22,24 | 108:2,10,25 109:6 | 212:14,24 213:13 | 172:19,25 180:7 | 49:3 52:1,17 56:6 |
| 109:11,18,20,22 | 109:14 110:3,18 | 213:25 214:3 | 226:1,10 228:2 | 56:9,12 57:5,12 |
| **whiteout** | 111:5,22 112:22 | 215:1,20 216:3,25 | 233:11,24 235:14 | 57:16 61:13 65:18 |
| 109:24 113:24 | 113:13,20 114:12 | 218:7,24 219:6 | 236:1,17 249:17 | 71:18,20,20 72:9 |
| 114:5,6 116:9 | 118:20 120:4 | 221:8,12 222:10 | 266:25 267:10,17 | 72:14 74:6,17,23 |
| **whiting** | 121:14 122:7 | 222:19 223:15 | 286:13,18 334:12 | 75:13 81:5 87:16 |
| 101:8 102:9 105:3 | 124:15 125:5 | 224:7,19 225:15 | **women** | 87:18,24,25 88:1 |
| **wide** | 126:11 127:4 | 225:21 226:9,18 | 31:18 171:18,25 | 90:14 93:10 95:13 |
| 203:18 204:3,6,20 | 128:3 130:16 | 227:4,11 228:1,25 | 172:5,15 201:18 | 97:21,23 114:22 |
| 206:3,23 207:6 | 131:9 133:2,8 | 229:9 231:9 232:1 | 202:10 225:19 | 114:23 119:21 |
| **widely** | 136:10 137:1,21 | 232:21 233:16 | 226:6,16 227:1,8 | 120:1 121:3 |
| 324:23 | 138:15 139:6,21 | 234:12 235:8 | 227:24 232:14,18 | 122:24,25 128:24 |
| **WILENTZ** | 140:9,16 142:17 | 237:15,23 238:13 | 234:24 235:3,6,25 | 135:7 137:17 |
| 3:12 | 142:23 143:9,11 | 240:20 241:12,25 | 236:3,9,22 249:2 | 139:22 140:21,25 |
| **withdraw** | 143:12 144:20 | 242:7,20 243:16 | 249:13,21,22,25 | 147:12 149:10,11 |
| 223:3,23,25 252:25 | 145:6,16 146:1,8 | 243:24 245:4,21 | 266:21 267:7 | 149:22 150:2,5,6 |
| 255:13 | 146:15,22 147:1,4 | 248:13 249:16 | 269:2 290:23 | 150:6,7,12,14,16 |
| **withdrew** | 147:12,22 148:20 | 250:2 251:10 | 304:20 305:5 | 150:16,18,19,21 |
| 223:11 224:16 | 148:22,25 149:1 | 253:18 254:25 | 306:7,11,15 334:8 | 173:3 176:21,25 |
| **witness** | 149:24 150:10,16 | 255:11 257:3,5 | **women's** | 177:9,12,16 178:2 |
| 8:2,21 9:2 12:15 | 150:21 152:14 | 262:15,23 264:4 | 337:23 | 178:5,14,14,21,23 |
| 13:15 14:20 18:15 | 153:14 156:6,14 | 265:21 266:2,16 | **Woodbridge** | 186:4 192:12,15 |
| 19:1,24 24:23 | 158:25 159:8,14 | 266:24 267:24 | 3:14,16 | 193:15,17,17 |
| 25:16 26:2,2 27:3 | 160:6,16,21 | 268:10 269:4,21 | **word** | 194:2 203:11 |
| 27:4,20 28:3,5,25 | 162:19 168:16 | 270:1 272:9 | 23:13 85:8 109:14 | 218:9 226:10 |
| 29:25 30:18 31:10 | 169:3 170:1 171:7 | 273:10,21 274:14 | 109:16 125:8 | 240:15,21 251:21 |
| 31:22 36:10 37:21 | 171:20 172:10,17 | 277:1,21 282:22 | 200:2,13,14,15 | 252:20 254:8 |
| 39:1 41:10,23 | 176:18,25 177:11 | 283:25 286:25 | 208:4 219:18 | 257:22 258:4 |
| 48:20 51:4 52:4 | 177:20,25 178:1,9 | 288:4,10,18,24 | 303:15 321:20,23 | 261:17 276:18 |
| 52:11 53:24 55:19 | 178:17 179:1 | 301:9,17 302:5,20 | 329:11 | 277:5 279:8 |
| 55:22,24 56:22 | 180:15 181:9 | 303:4,22 304:24 | **words** | 280:24,25 281:22 |
| 59:12,22 63:20 | 182:15 183:3,6,8 | 305:10 306:4,18 | 59:17 97:21 109:11 | 282:2 316:11 |
| 65:7 66:20 68:10 | 183:16 184:6,8,10 | 311:5 312:5,8 | 109:12 116:11 | 328:2 342:10 |
| 69:4 70:12 71:8 | 184:13,15,17 | 314:9,18 317:23 | 155:8 159:2 | **worked** |
| 71:16 73:2 74:12 | 187:6,14,20 189:5 | 319:14,19,23 | 167:12 173:16 | 39:20,20 341:22 |
| 76:3 77:15,20,25 | 189:10,22 190:2 | 321:17 323:25 | 200:5 207:6 | **working** |
| 78:21 79:9,18 | 190:12,18 191:9 | 324:25 326:3,14 | 218:20 220:20 | 75:7 319:18,22 |
| 82:5,11,19 83:2,7 | 191:24 192:11 | 327:6 328:9,14,18 | 242:10 273:5 | **works** |
| 85:16 86:10 89:20 | 193:13 194:1 | 328:19 329:1,8 | **wordy** | 60:4 74:25 120:9 |
| 90:3,16 92:17 | 195:9 197:5,18 | 330:9,15 332:3,6 | 167:13 173:12 | 173:5 |

**world**
61:18 66:25 170:12
202:16 252:14,16
**worsen**
238:19 263:13,22
**worsening**
247:15
**worsens**
244:14 246:20
247:5
**wouldn't**
272:20,25 273:18
274:23 291:16
**wound**
62:15
**write**
18:18 39:21 72:11
75:16,18 76:6
87:2 90:17 97:10
99:1,3,4,18,23
104:6,10,20 105:7
105:20 106:8
135:15 138:19,22
139:1 155:5
162:22,25 164:1,2
177:3 209:19
218:17 244:16
279:7
**writing**
33:1,10 65:13 66:6
66:24 70:6,10,24
71:3,19,25 73:7
76:13 83:14 98:1
98:2 100:23
133:18 135:5
137:13,14 138:3,4
187:16 242:8,8
244:13 304:2
**written**
73:20 75:13 98:17
99:22 103:19,25
107:16 114:16
116:6 139:2 141:4
141:7 202:3,4
291:17 329:12,19
**wrong**

85:5 222:8 316:11
**wrote**
70:19 99:18 100:4
100:23 104:7
143:19 177:8,15
245:25 320:13
**WYATT**
5:4

―――――― **X** ――――――
**X1**
116:24 118:4
**X2**
116:24
**X3**
116:24

―――――― **Y** ――――――
**yeah**
19:24 22:15 28:25
29:10 36:10 45:8
45:24 49:3,9 51:7
52:4 56:11 63:25
68:21 79:12,19,23
85:16 90:16 95:18
95:23 98:7,18
99:12 107:14
117:8 122:7 126:9
128:18 138:15
149:6 156:6 161:9
161:16 165:9
169:3 170:1
177:25 185:21
194:1,5 198:9
214:3 218:13,21
218:24 231:9
273:8 287:15
291:18 310:6,11
312:1 317:14
320:13 326:23
328:9 333:24
339:12,20
**year**
20:8 21:7 29:10
35:23 57:14,14
151:14 212:6,6

261:16 285:19
**Yearly**
151:13
**years**
18:5 27:5 51:8 97:8
97:9,9 153:9,15
169:6 188:10
285:1 326:10
**yesterday**
331:8
**York**
3:6 5:5 151:6
**Yumin**
210:21,25
**Y-u-m-i-m**
210:23

―――――― **Z** ――――――
**zero**
231:12

―――――― **$** ――――――
**$15,000**
9:13 40:15 41:5
**$20,400**
23:20
**$400**
77:14
**$500**
77:20
**$600**
20:14,18 23:20
144:7
**$94,957**
37:13

―――――― **0** ――――――
**0**
316:23
**01**
206:11
**02**
292:18,20
**03**
295:2
**07095**
3:16

**07962**
6:7

―――――― **1** ――――――
**1**
1:13,16 8:16 13:5,6
13:12,23 17:7
38:14 52:13,16
84:5,24 85:19,21
93:12 98:11 107:5
110:6,15 111:9,10
116:15 117:23,24
127:21 129:1,7,24
174:10,15 198:9
198:25 200:20,21
270:19,19 291:3
291:13,22 292:16
293:7 294:5,25
296:21,24 297:19
309:19 311:22
320:5,18 321:7
326:18 329:18
**1st**
24:2 68:23
**1's**
174:16
**1,000**
53:12 55:4 290:6,6
317:16
**1-7-18**
92:21
**1.35**
200:20
**1:26**
131:15
**10**
3:15 10:1 21:9 78:5
78:10,23 79:2,5,6
79:21 118:4,10,15
118:17 119:8
152:16 188:1
295:24 308:22
309:11,13,19
322:13 331:14
**10-15-17**
52:24 56:5 88:13

**10-30**
23:18
**10-30-2017**
23:13
**10:32**
69:20
**10:51**
69:23
**100**
23:2 55:11,12
98:23 102:19
117:1 123:15
129:24 130:1
198:10 296:15
317:18,20
**102**
107:1 184:13
**103**
109:10
**106**
184:17
**11**
10:8 131:23 132:1
132:6,16,18,19,22
214:21 215:1,3
216:18 222:7
310:21 311:3,12
311:12 312:2,17
322:2,18 326:18
328:6
**11/2/2017**
9:13 40:15
**110**
23:2
**114**
89:5,11
**11747**
3:6
**12**
10:11 135:20
141:22,24 151:19
151:24 155:18
156:12 218:23
286:18 322:22,23
323:16
**12:15**

Ghassan Saed, Ph.D.

**131:**7
**12:16**
131:12
**122**
89:7
**124**
13:11 89:7,7
**125**
311:24
**13**
8:16,20 10:15
  157:14,19,21
  228:12,13
**130**
4:5
**132**
10:8
**13717RA**
103:25
**14**
9:1 10:19,23
  160:18 161:1,6,10
  161:15 162:13
  163:7 173:11,20
  174:5 185:17,18
  327:23
**143**
222:6
**1440**
5:5
**15**
10:23 118:6 173:19
  173:24 174:1,16
  219:21
**15,000**
42:1
**151**
10:11
**1510**
5:14
**157**
10:15
**16**
11:1 22:16 152:1
  175:22 176:2,4
  185:24 186:1,2

187:1 317:13
**16-2738(FLW)(L....**
1:7
**161**
10:19
**166820**
85:2
**17**
8:3 11:4 214:5,10
  217:11
**173**
10:23
**175**
11:1
**18**
9:8 11:8 35:7,20
  36:2 40:7 86:23
  261:16 278:3,4
**19**
11:12 41:7,13 89:6
  91:9 315:22 316:3
  316:4
**1917**
6:6
**1983**
115:13,14
**1993**
322:20
_____
      **2**
**2**
8:20 13:14,20,23
  15:25 16:4,11
  17:1,6 51:25
  54:11 56:5 68:15
  78:7,23,24 80:20
  84:4,25 85:23
  86:3 87:11,15
  88:9 90:22 92:7
  93:8,13,14,15,19
  93:20 107:2,5
  109:10 180:12,22
  181:3 184:3,4
  197:5 199:16
  218:19,21 219:3
  220:19,21 221:20

250:4 261:7
286:14 292:19
311:22 320:17
331:14
**2nd**
41:21 94:4
**2.35**
118:9
**2.5**
118:15,17 119:8
**2.8**
51:18
**2:23**
175:10
**2:28**
175:13
**2:57**
194:20
**2:59**
194:22
**20**
11:16 55:10,12
  69:17 117:1
  118:10 123:14
  153:9 238:17
  252:16 296:18
  316:13,18 339:24
  340:1 345:15
**20th**
91:20
**20-21**
79:7
**200**
316:23
**20004**
7:6
**20005**
5:6
**2004**
210:14
**2005**
211:5 285:11
**2006**
18:25
**2012**
285:20,20,20,23

**2015**
212:7 218:8 285:20
**2017**
24:10 29:8 38:14
  41:7,13,21 58:21
  58:25 68:23,24
  69:12 211:22
**2018**
9:9 21:9 22:17 35:7
  35:20 36:2 40:7
  43:8,19 44:2,4,13
  44:16 47:25 88:17
  89:12,14,23 90:1
  90:8,9 91:21 92:1
  92:11,12 93:22
  94:4,22 95:5
  140:5,19,22,24
  182:17 211:24
  316:22
**2019**
1:19 10:24 12:2,7
  43:11 44:1 152:1
  173:20 174:5
**202-371-7008**
5:7
**202-463-2400**
7:7
**21**
11:19 79:2,18,18
  79:19,21 80:3
  246:25 247:1
  317:6,11
**214**
11:4
**218**
2:6
**22**
9:5 79:3,3,8,9,12
  79:15 80:3
**22311**
2:18
**23**
1:19 12:2 79:12
  80:3 94:2
**23rd**
12:6

**233**
6:15
**24**
79:12 80:3,20
  93:22
**24th**
122:24
**24-hour**
327:11
**25**
51:8 92:25 94:6,9
  103:17 116:14
**2555**
4:14
**26**
43:8,18 44:2,4,13
  44:16 58:21,24
  68:24 69:12
  127:20 128:1
**260**
21:25
**260,000**
22:1
**27**
119:12,16
**273439.209**
309:22
**278**
11:8
**28**
215:15,17,18 222:8
  222:15,16
**28274095**
310:11
**283**
8:4
**285995.18**
309:22
**29**
13:23 17:7 52:13
  52:16 79:3,12,15
  80:21 94:22
**29th**
95:6
_____
      **3**

Ghassan Saed, Ph.D.

**3**
9:1 14:18,19 16:2
16:15 51:18 56:11
56:13,15,21,22
58:24 66:16,17
67:7 68:6,17
69:11 77:14 84:4
84:18,20,21
152:16 180:14,17
181:7 183:1,2,3,6
183:8 184:20,23
200:21 217:1
261:7 297:22
311:22 317:5
331:14
**3rd**
43:11 44:1 92:11
93:6
**3,020,000**
285:15
**3.2**
313:23
**3.6**
313:23
**3:23**
210:4
**3:26**
210:7
**3:49**
228:7
**30**
13:11 27:5 52:8,18
79:3,8 169:6
188:10 306:7,10
**30th**
24:10
**30027477**
103:25
**303-839-8000**
4:7
**305**
3:5
**31**
79:2,18,18,21
292:16,20
**31-32**

79:7
**312-624-6300**
6:17
**315**
11:12
**316**
8:5 11:16
**317**
11:19
**319**
8:6
**32**
295:2
**328**
8:7
**33**
96:24 97:1,5,14
98:3,13 103:3
**334-269-2343**
2:9
**337**
8:8
**339**
8:9
**34**
216:1,5,16
**343**
1:13
**35**
9:8 97:2,4,5,17
**350**
6:5
**356**
128:6,12 295:11,14
296:14 297:13
309:21 310:2,7
**357**
296:9,20,21 297:9
298:12 310:13
**36103**
2:8
**368**
130:8
**369**
130:8
**370**

130:8
**371**
128:16
**379**
128:16
**38**
181:11 183:8
211:24
**386**
128:6,13 297:13
**39**
181:11 310:21,22

_____

**4**

**4**
9:5 22:4,9,11 23:12
23:17,19 24:8
32:11 34:4 51:20
51:20 77:20 95:5
95:7 96:23,23
98:8,10,12,12,13
103:4 211:24
**4th**
118:4
**4-22-2022**
343:24
**4.3**
313:11,23
**4.5**
313:11
**4.58**
312:20,21
**4.6**
51:20
**4:05**
228:10
**40**
9:12
**40-year**
286:18
**400**
3:5 77:20 286:14
**409589.891**
309:24
**41**
312:1

**4160**
2:7
**42**
9:16
**45**
9:21
**4575**
322:22 323:17
**463**
203:23
**463AA**
203:13
**47**
183:16
**48**
185:11,15,22 186:1
316:7,8,10
**480**
286:20
**49**
322:13
**4900**
2:17

_____

**5**

**5**
9:8 34:24 35:4,6,11
40:3 51:20,20,20
55:4,10,12 68:16
68:22 69:2,13
116:25 118:6,9
120:14 123:14
152:16 181:14,17
181:18 238:17
241:2,8,18 242:4
242:17 254:3
296:9,18,21
297:10 341:23
**5:04**
269:11
**5:26**
269:14
**50**
117:11,12 118:2,11
118:15,17 119:8
194:11,13,14

306:7,10 322:18
**500**
54:15 55:1,11
77:20 316:24
**51**
92:2 322:14,15,16
**512-391-0197**
5:16
**53**
92:3,7,8,17,19 94:7
103:18 116:15
118:20 119:11,13
184:8
**54**
127:22,23 128:2
129:19 130:20
**55**
119:11,15,15
**56**
123:6,6
**57**
110:7,10 320:7,8
320:10,14,18,23

_____

**6**

**6**
9:12 40:13,14,19
89:11,14,23 90:1
90:8,9 162:13
218:15,23 220:20
221:7,15 238:18
238:19 241:2,8,18
242:4,17 246:19
246:23 254:3,3
255:24 256:23
257:20 313:24,24
329:18
**6.5**
313:11
**6:18**
308:3
**6:19**
308:5
**6:32**
319:5
**6:56**

Ghassan Saed, Ph.D.

319:8
**60**
34:9 128:14
**60606**
6:16
**62**
112:12 113:6
120:14 321:6
**63**
57:17 203:23
**631-224-113**
3:7
**64108**
4:15
**69**
129:1,7

---
**7**

**7**
9:16 42:4,10,13
43:2,10,13,25
44:17,20 45:22
46:1 47:21 52:2
92:12 94:8,9
133:15,18 134:7
135:18 141:3,22
145:24 159:22
166:3 181:16
186:8,9,11,13,14
186:17,19 214:23
276:12 313:24
**7:03**
323:10
**7:05**
323:13
**7:29**
342:13,14
**70**
34:9
**70s**
240:9,9
**703-931-5500**
2:19
**72**
185:1,4,6,7,9,10,11
185:11,21 186:2,4

196:13,21,22
198:1 251:8,11,18
252:5 316:11
**73**
91:19
**732-855-6066**
3:17
**74**
85:1
**76**
129:23
**78**
10:1 94:21 107:2
**78701**
5:15
**79**
109:10

---
**8**

**8**
9:21 45:11,18,22
46:1 47:21 166:8
186:8,9,11,18,19
187:7 188:1
**80220**
4:6
**816**
5:14
**816-474-6550**
4:16
**84**
10:5 110:11 112:6
128:15 320:14,14
320:17,24
**85**
128:15
**86**
95:3,4,4 132:15
**87**
96:16 112:15,17
113:6 321:8,11,13
**89**
132:15

---
**9**

**9**

10:5 78:17,19
84:11,17,19,20
188:15
**9-26**
56:12,14
**9-26-2007**
66:18
**9-26-2017**
57:23 59:9 67:8
**9:15**
1:18 12:3,7
**90**
3:14
**900**
3:15
**94**
129:9,11 222:6
**97**
13:13
**973-267-0058**
6:8
**975**
7:5

Exhibit 30

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION**<br><br>*THIS DOCUMENT RELATES TO ALL CASES* | **MDL NO. 16-2738 (FLW) (LHG)** |

**RULE 26 EXPERT REPORT OF
JACK SIEMIATYCKI MSc, PhD**

Date:   November 16, 2018

_____
Jack Siemiatycki MSc, PhD

# EXPERT REPORT OF JACK SIEMIATYCKI MSc, PhD

## On

# TALCUM POWDER USE AND OVARIAN CANCER

Jack Siemiatycki, MSc, PhD, FCAHS

106 Columbia Avenue

Westmount, Quebec, Canada

November 16, 2018

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

**TABLE OF CONTENTS**

**1.    My mandate** ........................................................................................................... 1

**2.    My credentials, expertise and experience** .......................................................... 1

**3.    Overview of my methodology** ............................................................................... 4

**4.    The science of epidemiology** ................................................................................. 5

*4.1    Some basic measures and notions used in epidemiology* ........................................ 6
*4.2    Bradford Hill "guidelines"* ..................................................................................... 18

**5.    Epidemiologic evidence regarding talc and ovarian cancer** .......................... 23

*5.1    IARC review and evaluation of talcum powder products* ....................................... 23
*5.2    Information consulted for the present review* ......................................................... 25
*5.3    My methodology for this review* ............................................................................. 26

5.3.1    Selecting studies for review ........................................................................... 26

5.3.2    What were women exposed to in body powders? ........................................... 29

5.3.3    Routes of exposure ......................................................................................... 31

5.3.4    Questionnaire items on use of talc powders .................................................. 32

5.3.5    Metrics of exposure ........................................................................................ 33

**6.    My meta-analyses regarding talcum powder products and ovarian cancer: data included and results** ................................................................................................................ 33

*6.1    Features of the studies* ............................................................................................ 33
*6.2    Association between binary variable talc powdering and all types of ovarian cancer combined – data and results* .......................................................................................................... 34

6.2.1    Individual studies and results on binary exposure variable ........................... 34

6.2.2    Strategy for Main analysis and sensitivity analyses ...................................... 35

6.2.3    Results of meta-analyses on binary exposure variable for all ovarian cancers ............ 38

6.2.4    Other contemporaneous meta-analyses on binary exposure variable for all ovarian cancers39

*6.3    Dose-response – cumulative exposure, duration and frequency* ............................. 42
*6.4    Subtypes of ovarian cancer - in particular, serous invasive tumors* ...................... 45
*6.5    Conclusion from meta-analyses and dose-response considerations* ........................ 47

**7.    Misconceptions and possible biases** ................................................................. 47

*7.1    Some prominent misconceptions in reviewing the evidence* ................................... 48
*7.2    Alternative explanations - Biases and errors* ......................................................... 53

7.2.1    Bias due to non-response or non-participation ............................................... 53

7.2.2    Recall or reporting bias ................................................................................. 54

7.2.3    Non-differential (or random) error in recall or reporting of exposure to powders ........... 55

7.2.4    Short follow-up periods for disease ascertainment ........................................ 57

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

    7.2.5   Diagnostic error ........................................................................................... 57

    7.2.6   Initiation of powdering as a result of ovarian cancer ............................. 58

    7.2.7   Confounding ................................................................................................ 59

    7.2.8   Publication bias .......................................................................................... 60

    7.2.9   Summary comments regarding biases and errors ................................... 61

**8.**      **Bradford Hill guidelines applied to talc and ovarian cancer** ........................ **61**

**9.**      **Contrast with IARC Monograph and other reviews** ....................................... **67**

**10.**      **Conclusion** .......................................................................................................... **69**

**11.**      **Tables** ................................................................................................................. **70**

**12.**      **Figures** ............................................................................................................... **90**

**13.**      **Appendix A** ......................................................................................................... **94**

**14.**      **Appendix B** ....................................................................................................... **103**

**15.**      **Appendix C** ....................................................................................................... **107**

**16.**      **References** ......................................................................................................... **109**

**Bibliography Part A: Documents available in the Public Domain** ........................ **110**

**Bibliography – Part B: Documents not available in the Public Domain** ............... **127**

**17.**      **Curriculum Vitae – Jack Siemiatycki** .......................................................... **141**

## 1.    My mandate

I have been retained to assess the epidemiologic evidence regarding the **general causation** between perineal (or genital) use of talcum powder products and risk of ovarian cancer. The question is: "Can application of talcum powder products in the perineal region cause ovarian cancer?"

All of my opinions in this report are stated to a reasonable degree of scientific certainty.

## 2.    My credentials, expertise and experience

I am a tenured Professor of epidemiology at the University of Montreal and an Adjunct Professor of epidemiology at McGill University in Montreal. I have received prestigious national research awards in Canada, such as National Health Scientist Salary Award, Medical Research Council Distinguished Scientist Award, Canada Research Chair in Environment and Cancer and, currently, I hold the Guzzo-Cancer Research Society Chair in Environment and Cancer. I am an elected fellow of the Canadian Academy of Health Sciences. I was awarded a lifetime achievement award by the Canadian Society for Epidemiology and Biostatistics, the premier professional organisation in our discipline.

Trained in statistics and in epidemiology, I have devoted most of my research career to investigating links between environmental, occupational and lifestyle factors and various types of cancer. My research has been both substantive – namely, looking at particular factors and their possible relationship to particular cancers - and methodological – namely, exploring how to evaluate and enhance the validity of epidemiologic research through various prisms: study design, data collection methods and statistical analysis. Of my approximately 250 research publications, about one quarter would be considered to have methodological focus.

I have held various leadership positions, including the elected presidency of the Canadian Society for Epidemiology and Biostatistics, and elected membership on the Board of the American College of Epidemiology.   I have been invited to serve on over 160 Boards, Scientific Councils and Expert Panels for a host of governments, universities or research agencies. Examples include: Board of Directors of the Canadian National Cancer Institute, member of expert panel tasked with recommending priorities for action under the

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

Canadian Environmental Protection Act, member of external peer review panel of the Epidemiology branch of the US National Cancer Institute (NCI), member of two different expert advisory bodies to research projects at the NCI, consulted by President Clinton's Cancer panel, member of external peer review panel for the Helmholtz German national medical research agency, Chair of the Scientific Council of the largest prospective study of causes of cancer being conducted in France, and others of that nature.

I have been associate editor of the American Journal of Epidemiology and the International Journal of Environmental Health. In addition, I have served as reviewer for about 20 journals. I have served as a chair and as a member of grant review panels for major Canadian scientific funding agencies.

My research programme has been well funded by Canadian funding agencies for over 35 years. I have conducted research and published on the carcinogenicity of a large number of agents in the occupational environment (e.g. asbestos, silica, welding fumes) and in the general environment (e.g. smoke from wood stoves, urban air pollution) and lifestyle factors (e.g. smoking, alcohol, use of cell phones).

I have taught and supervised epidemiology students and many of my former trainees are now faculty members in universities around the world.

I have had a long association with the International Agency for Research on Cancer (IARC). IARC is the premier institution in the world for cancer epidemiology and for environment and cancer research. It has several mandates, including the organisation and compilation of standardised high quality data on cancer incidence around the world, the conduct of original research, and the evaluation of the carcinogenicity of different agents with which humans come into contact. The latter is achieved through a process that involves identifying chemical or physical agents for evaluation, convening specially selected international expert panels that are mandated to review all pertinent evidence on the topic and write a thorough review culminating in an evaluation of whether the agent(s) are human carcinogens. Since the inception of this program in 1971, there have been about 120 meetings held and approximately 1100 agents have been evaluated.

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

A particular point of pride for me is that over the years, research results from my team have been cited as part of the information base on 69 of the 1100 agents that have been evaluated, probably making my team the most cited epidemiology team in the history of the IARC Monograph program.

My association with IARC began when I did a post-doctoral fellowship there in 1977-79. Over the intervening years I have collaborated with scientists at IARC on various research projects. I was a member of the 18-member Scientific Council of IARC from 2006 to 2010 including two years as elected Chairman of the Council. The Scientific Council oversees all of the scientific activities at IARC; its members are named by the member states of IARC. I have been invited to sit on IARC Monograph international expert panels for 5 of the 60 panels convened in the past 25 years. One of the IARC Monograph panels of which I was a member was tasked with evaluating: "Carbon black, titanium dioxide and non-asbestiform talc." Out of the 16 invited experts who participated in the meeting as members of the Working Group, I was selected to chair the meeting.

Subsequent to the IARC meeting and the report of the meeting, a small subgroup of members of the IARC Working Group, of which I was a member, conducted and published a meta-analysis of the results of the studies that had been available to the IARC Working Group (Langseth, 2008)

Although I have not personally produced original data collection studies on the topic, I am well qualified to review the epidemiologic evidence. I have participated in two published reviews of the issue. The methodologic expertise and analytical skills required to critically review and evaluate such evidence is generic to the vast area of environmental epidemiology of cancer. I am routinely asked by journals and grant agencies to provide expert opinions on topics for which I have not produced original data collection studies, but that are within the purview of my expertise. The invitation by IARC to chair the meeting at which talc was evaluated is testimony to the fact that my competence and expertise in this matter are internationally recognized by peers. I do not claim expertise in various adjoining domains that inform this issue, including physiology, pathology, clinical oncology, experimental toxicology, geology and mineral chemistry. However, I do have the

16 November 2018                                                              3

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

expertise and skill to assimilate information that is provided by experts in these areas. I have previously submitted a report on my review of the evidence regarding talcum powder products and ovarian cancer in October 2016.

I have previously served as an expert witness for plaintiffs in one U.S. court case, and that was a talc litigation in Los Angeles in 2017. (Eva Echeverria, BC628228, Johnson and Johnson Talcum Powder Cases, CA JCCP No. 4872), and I testified that the genital use of talcum powder products can cause ovarian cancer.

I have served as an expert witness in two Canadian court cases, neither having to do with talc or hygiene powders or ovarian cancer. One case dealt with a class action lawsuit on behalf of a town in Canada adjoining a Canadian military base where there had allegedly been a spill of trichloroethylene that seeped into the water table of the town. The residents claimed that the contamination had caused cases of cancer. I was an expert for the defence, the Canadian government, and I testified in 2012. (Province of Quebec Superior Court file 200-06-000038-037).

The other case was a class action on behalf of Quebec residents who contracted cancer and had been smokers, claiming that the tobacco companies were responsible for their diseases. I was an expert for the plaintiffs and I testified in 2014. (Province of Quebec Superior Court file 500-06-000076-980).

In my work as an expert for legal cases, my time is billed at the rate of $450 per hour for research, report preparation, communications with counsel, participation in depositions, and testimony in court.

## 3.    Overview of my methodology

The basis of my opinions derive from my education, training, experience, research and what is accepted within the community of leading scientists practicing in the field of epidemiology. My opinions are based on my review of the relevant materials, published in the scientific literature and/or produced in this case; including internal company documents, as well as relevant depositions, reports and testimony in the talcum powder product litigation. To reach my conclusions, I have employed the same scientific

methodology and rigor that I use in my research, in my publications and in the consulting and advising that I carry out on behalf of governments, public health agencies and research institutes. This includes a review of the relevant published literature, expert judgment to assess the quality and meaning of the various studies that were reviewed, and syntheses of the available evidence and any other pertinent medical and scientific evidence of which I am aware. The methods I used to derive and present my opinions are those used in general in the assessment of causal relations in medicine and public health, and more specifically in epidemiology. The methods are based on the experience and insight I have accumulated over 40 years of research, consulting, reviewing and student supervision, from discussions and interactions with leading epidemiologists, service on multiple IARC panels, and from reading evolving ideas in the scientific literature, including such seminal works as Bradford Hill's (Hill 1965) writings on assessing causality.

My opinions may be further supplemented and refined, subject to results that may come from further medical and scientific study and research and the continued review of additional information and discovery materials produced in this litigation.

## 4.    The science of epidemiology

This section is designed to provide a non-specialist reader with information and definitions about epidemiology and biostatistics that are needed to understand the basis of my evaluation on talcum powder products and ovarian cancer. I do not present in this section the actual data and evidence regarding talcum powder products and ovarian cancer.

Epidemiology is the science of occurrence of diseases in human populations. It is concerned with the patterns of disease occurrence and also with identifying the factors that influence disease occurrence. These two sets of concerns are sometimes referred to respectively as descriptive epidemiology and analytic epidemiology. The first addresses such issues as the incidence of the disease in different geographic areas, in different time periods, or at different ages and sexes. The second addresses more focused questions on the specific environmental and/or lifestyle and/or genetic factors that might influence the incidence of disease.

The word "epidemiology" has the same etymologic roots as the word "epidemic", which signifies that, initially, epidemiology grew out of the study of epidemics. Such epidemics were often of a microbial origin (e.g. viruses, bacteria, parasites). But increasingly in the 19th and especially in the 20th century, it became clear that the etiology (i.e. causation) of chronic diseases such as cancer could also be elucidated by studying their patterns of occurrence.

While there were many studies carried out in the early to mid-20th century that we would now qualify as epidemiological in nature, the discipline of epidemiology and its methods started to become formalized in the 1950's and 1960's. There are now departments of epidemiology in most large universities that have health science research and teaching activities and there are many national and international societies of epidemiology.

Epidemiology is characterized by its mainly observational and non-experimental approaches. It is a discipline that is not primarily based in the laboratory; rather it is based in society. That is the source of its strength, and its weakness. Because it deals with people in the reality of their lives, it is the most pertinent approach to understanding the links between people's lifestyles and environments and their health and disease. However, because it is based in society, it by necessity confronts the extreme complexity of human lifestyles, environments and diseases. And because we cannot experiment with people's lives, we cannot control the conditions in which people are exposed. The methods of epidemiologic research are complex and differ from study to study. Statistical methods play an important role in trying to tease out the role of different variables and in determining whether the observed results may be attributable to chance, to bias or to real effects of putative risk factors.  It is usually necessary to assemble evidence from several data-collection studies on a given topic before being able to draw inferences about causality.

### 4.1   Some basic measures and notions used in epidemiology

In this section I will review a number of concepts that need to be understood in order to properly understand my review of the evidence regarding talc powder and ovarian cancer. It is intended for readers who may not be expert in epidemiology. In this section I will not necessarily tie the concepts and definitions to the talc-ovarian cancer issue; that part will

be left for later. For now, I am simply introducing the non-epidemiologist reader to terminology and concepts with which she/he may not be very familiar.

**Prevalence of disease**. The prevalence of a disease refers to the proportion of a population who are living with the disease at any given point in time.

**Incidence of disease**. The incidence of a disease refers to the proportion of a population who are newly diagnosed with the disease during a certain period of time. The bridge between incidence rate and prevalence rate is the average duration of the disease, or how long people live with it before they are cured or pass away. In fact, while incidence and prevalence are foundational concepts in epidemiology, it is only incidence that figures prominently in the evaluation of carcinogenicity of talc.

**Risk of disease**. The risk of disease is a term that can refer to incidence or prevalence. The meaning should be clear from the context in which it is used. For studies of cancer, it almost always refers to incidence of disease. This is the way I will use the term in this report.

**"Cause" of disease.**  A cause of a disease is any agent or characteristic (environmental, lifestyle or genetic) that increases the probability of getting the disease or it may simply advance or hasten the onset of the disease. It may act alone or it may act in concert with other factors over a lifetime to cause the disease.  It may act immediately (e.g., cyanide as a cause of poisoning; lack of seat belt use as a cause of car accident mortality) or it may take many years for the effect to become manifest (e.g., lack of physical activity as a cause of obesity).  There may be many different causes for the same disease. (See explanation of Multifactorial Etiology below.)

**Risk factor.**  As defined in the Dictionary of Epidemiology (Last 2001), a risk factor is an aspect of personal behavior or life-style, an environmental exposure, or an inborn or inherited characteristic, that, on the basis of epidemiologic evidence, is known to be associated with a health-related condition. The term *risk factor* is used rather loosely and depending on the context it can refer to a factor that directly causes a disease or a factor that is a strong marker for the proximal cause of the disease. As it is often used, I will

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

mainly use the term "risk factor" as a synonym for the noun "cause" of the disease.  (eg. "Smoking is a risk factor for lung cancer.")

**Association**.  As defined in the Dictionary of Epidemiology (Last 2001), association refers to the degree of statistical dependence between two or more events or variables. Events are said to be associated when they occur more frequently together than one would expect by chance. Association does not necessarily imply a causal relationship.

**Risk among unexposed (R$_u$)** refers to the risk of disease among persons who are not (or were not) exposed to the agent under investigation. In this case, it would refer to the risk of getting ovarian cancer among women who *have never* used talc in the perineal region.

**Risk among exposed (R$_e$)** refers to the risk of disease among persons who are (or were) exposed to the agent under investigation. In this case, it would refer to the risk of getting ovarian cancer among women who *have* used talc in the perineal region.

**Relative Risk:** RR = R$_e$/R$_u$ = Risk among exposed/Risk among unexposed

When RR > 1.0, it indicates that exposure to the agent increases the risk of developing the disease.  When RR < 1.0, it indicates that exposure to the agent prevents the disease.

When RR = 1.0, it indicates that the exposure to the agent has no bearing on the risk of getting the disease.

**95% Confidence interval (95% CI).** This refers to the precision of an estimate of a parameter. When we estimate the 95% CI for the RR, we are approximately saying that we are 95% certain that the true parameter underlying the study is within these limits.  (The true interpretation is more subtle.)

**Statistical significance of an association**: Statistical significance is a measure of the departure of a set of data from some null hypothesis. Most commonly in epidemiology, the null hypothesis would state that there is no association between a factor and a disease. The null hypothesis can be operationalized in different ways, such as that the RR = 1.0, or that there is no trend between the degree of exposure and the RR. Once a study is conducted, the results can be compared with the expected results based on the null hypothesis, and the discrepancy from the null hypothesis is measurable with probabilities.  This is done

Report on talcum powder use and ovarian cancer                          Jack Siemiatycki

either by computing a p-value or a confidence interval. If the p-value is very small or the confidence interval does not include the null value, then we say that an observed association between the putative risk factor and the disease is unlikely to be due to chance alone.

It is important to note that while statistical significance is a tool for assessing whether an observed association is attributable to chance alone, it is not a very effective tool for establishing the absence of an association. That is, the absence of statistical significance is not tantamount to proof of the absence of an association. The absence of statistical significance can be due to the true absence of an association, but it can also be due to the study not having sufficient statistical power or to bias or confounding in the research methods. Furthermore, it should be noted that the conventional dichotomization of results as "statistically significant" or not, based on a particular cutpoint on the p-value scale (eg. p = 0.05), is a gross simplification. The compatibility of the data with the null hypothesis of no association is in truth on a continuous scale and the dichotomization is arbitrary and potentially misleading, especially when the observed p-value is close to the arbitrary cutpoint.

In practice, epidemiologists have been moving away from using and reporting p-values and statistical significance, as it has become clear that the main contribution of an individual study is to provide an estimate of the relative risk and its range of plausible values, embodied in a confidence interval.

**Cohort studies and case-control studies:**  Epidemiologic research projects can take many different forms. The two most common types of analytic epidemiologic studies are cohort studies and case-control studies. (Rothman, Greenland, & Lash 2008)

In a cohort study, it is typical to enrol a large number of subjects, determine which ones are or have been exposed to the factor of interest (e.g., talc) and follow them for some period of time to evaluate whether those who were exposed subsequently experienced different disease rates from those who were not exposed.

In a case-control study, by contrast, we start with people who have the disease under study (e.g. ovarian cancer) and a set of controls who do not have the disease, and we collect data

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

to determine whether the cases and the controls had different histories of exposure to the factor under study (e.g. talc).

It may be said that a cohort study proceeds from the cause to the effect, whereas a case-control study starts from the effect and backtracks to the cause. There are many variants on these basic designs. These descriptions of these types of study are somewhat simplified.

It is sometimes claimed that a prospective cohort design produces more valid and reliable RR estimates than a case-control study. But this is incorrect as a generalization. The validity and reliability are not determined by the overall architecture of the study, but rather by the specifics of the study, including how the study subjects were assembled, the nature of the variables under study (exposure, disease, confounders), exactly how the information was collected, the statistical power, and so on. There may be many reasons why a particular case-control study is more valid than a particular cohort study.

**Relative Risk (RR) and Odds Ratio (OR).**  The cohort study design leads naturally to the estimation of risk of disease among exposed, and risk of disease among unexposed, and then to the ratio of those two, which is the RR.  In case-control studies, because of the way the study samples are selected, it is impossible to estimate the risk of disease or the ratio of the two risks, $R_e/R_u$.  However, under certain conditions which are well met in studies of cancer, it is possible to estimate an approximation of the RR.  This is called the odds ratio, referred to as OR.  In the rest of this report, I will consider evidence obtained from both cohort studies and case-control studies, and I will refer to the findings of these studies as RRs, even if technically speaking, the results from case-control studies are ORs.

**Bias, confounding, effect modification.**  The aim in an epidemiologic investigation of a putative risk factor is to derive an accurate estimate of the RR between exposure to the agent and the disease at issue. Because the investigator does not control the conditions in which people live and are exposed to different agents and their willingness to participate in research, there are many potential sources of distortion in epidemiologic research. While there are many sources of distortion, they can be bundled into a few large families of sources of distortion.

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

___

*Bias* refers to a systematic distortion in study findings, resulting from the way the study was designed or the way the data are collected.  Specific examples of types of bias will be discussed below as they pertain to talc and ovarian cancer.

*Confounding* is sometimes considered to be a type of bias, and sometimes it is considered a type of distortion on its own. This is merely a semantic distinction. Confounding refers to the situation where the association under study between factor F and disease D is distorted because there is a third factor X which happens to be correlated with F and which is a cause of disease D. For instance if we want to study the association between occupational exposure to talc in mines (factor F) and lung cancer (disease D), we need to be mindful of whether cigarette smoking (factor X) is more common in talc miners than in the rest of the population. Confounding differs from other types of bias in that it depends on relationships among different variables in the population, rather than characteristics of the study design and data collection.

*Effect modification* refers to the phenomenon whereby a given factor has a different effect in one sub-population than in another. If we study the association between that factor and the disease in the entire population without distinguishing the two sub-populations, we might end up with an estimate of the association that does not convey accurately the association in either sub-population. For instance, if it were the case that a certain genetic characteristic G increases the risk of pre-menopausal ovarian cancer but has no impact on post-menopausal ovarian cancer, then a study of the association between G and ovarian cancer that does not discriminate by menopausal status, would find an RR result somewhere between the null value among post-menopausal women and the true RR value among pre-menopausal women. Depending on the proportions of pre- and post-menopausal women in the sample, the overall RR might be so close to the null, that we might erroneously conclude that there is no association at all. In this example, it might actually be quite simple to detect the effect modification, since age is always recorded and menopausal status is usually recorded and investigators are sensitized to the possible effect modification of female cancers by hormonal status. Other potential effect modifiers may not be so easily available and they might not be on the radar screens of investigators. Effect modification can in some unusual circumstances completely wipe out a true causal

___

16 November 2018                                                                            11

Report on talcum powder use and ovarian cancer                         Jack Siemiatycki

association (as when the agent causes cancer in some people but prevents cancer in others!). But generally, if there is a causal effect of the agent in one stratum of the population and no association in another stratum, and if we fail to stratify the population according to the effect modifier, it will have the effect of producing an overall RR that is lower than it truly is in the sensitive stratum and higher than it truly is in the insensitive stratum.

Effect modification is closely related to and sometimes synonymous with interaction or synergism.

***Publication bias*** refers to the tendency for some evidence never to "see the light of day". Namely, when results are "negative" or "null", it may be that investigators never bother to submit them for publication, or alternatively that editors refuse to publish them. This happens, most likely, when the hypothesis under study is not particularly topical or controversial, and when the study is small.

In this section I have briefly outlined some potential sources of distortion of a typical epidemiologic study. I have done this in a high-level generic way. Below, after presenting results of my review of pertinent literature on powders and ovarian cancer I will return to commenting on the possible impact of such distortions in this body of literature.

### Exposure variable and exposure metric

An ***exposure variable*** can be anything that can influence the occurrence or outcome of disease. The term is used for such disparate entities as external components of what we eat, drink, breathe, hear or see and microbiological organisms, chemicals or forms of radiation.

Depending on the nature of the variable, information on an exposure variable can often be ascertained from epidemiologic study participants by questioning them. This is the case for variables like cigarette smoking or use of talc powders. For some variables, like exposure to a virus or to specific air pollutants or occupational chemicals, it is usually necessary to invoke more intensive data collection methods to ascertain exposure.

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

An **exposure metric** signifies a way of defining a variable for statistical analysis. The simplest metric is a binary variable: exposed or unexposed. For most exposure variables, like exposure to talc powder, there can be a very wide range of degree of exposure. And it is pertinent to create more nuanced exposure metrics that take into account the degree of exposure that different people have experienced, metrics such as duration of exposure, intensity or frequency of exposure and even cumulative measures of exposure over long periods of time.

**Measurement error**. Whenever we are measuring a variable in an epidemiologic study, be it smoking, or weight, or socio-economic status, or blood pressure, or any other variable, it is virtually inevitable that there will be some degree of error in the measurement. There are ways of collecting data that make them more or less likely to involve error, but it is almost impossible to ensure that variables are measured with perfect validity and precision. Even such a variable as the diagnosis of ovarian cancer is subject to differences of opinion among pathologists and oncologists and the presence or absence and the histologic type of tumour is not a guaranteed 100% perfect diagnosis. The ascertainment of the lifetime history of talc exposure by means of an interview with a woman in middle age or later in life is certainly susceptible to the caprices of memory and the way the questions are formulated may influence the validity of respondents' reports of lifetime exposure patterns. It is likely that habits that were performed regularly are more reliably recalled than activities that were sporadic or that only occurred many decades earlier. Similar issues arise for all other variables collected in such studies. We refer to measurement error as random (or non-differential) if the degree of measurement error does not differ between cases and controls in case-control studies or between exposed and unexposed in cohort studies. As a general rule of thumb, it can be asserted that random (or non-differential) measurement error has a predictable distorting effect on the RR. Namely, while there are some rather obscure exceptions, non-differential measurement error tends to attenuate the RR towards the null value of 1.0, and the more measurement error, the greater the attenuation. A full explanation for why this is so is quite technical and can be found in advanced epidemiology textbooks, such as Rothman, Greenland and Lash 2008. A very simple explanation is that the presence of measurement error in assigning exposed vs

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

unexposed status leads to dilution of both the exposed group and the unexposed group. That is, the ostensible exposed group (i.e. the folks who will be labelled as exposed based on the study data collection) will contain some folks who are truly unexposed and the ostensible unexposed group will contain some folks who are truly exposed. If there really is a difference in risk between the true exposed group and the true unexposed group, this difference will be watered down by the inadvertent inclusion in each group of folks who are really in the opposite group. An analogy is the cross-contamination of two cans of paint. Suppose we have a can of pure white paint and a can of pure red paint. Suppose we have a way of quantifying the difference in color tone between the two paints. Then suppose we take some spoonfuls from the red can and pour them into the white can, and likewise take a few spoonfuls of the white paint and pour them into the red can. Now the color contrast between the two cans has been attenuated. The color contrast in this example is like the relative risk in an epidemiological study which has been attenuated because the exposed and unexposed groups have been cross-contaminated.

**Dose-response.** It is important not only to assess whether there is an association between a variable and a disease when the variable is defined in a binary (exposed vs unexposed) way, but also when the variable is defined in a quantitative or semi-quantitative way. When we analyse the risk as a function of the degree or duration or intensity of exposure, we refer to this as a dose-response (or exposure-response) analysis. The example of the smoking and lung cancer is instructive about the value of different metrics, though it cannot be assumed that all risk factors act the same way. Studies using the binary metric for smoking (smoker/non-smoker) have been very consistent and persuasive in demonstrating an association between smoking and lung cancer. Further, when data are collected and analysed regarding the degree of smoking, it becomes clear that there is a monotonic dose-response relationship. That is, the more smoking, the higher the risk. And the quantitative metric that manifests the strongest association with lung cancer is the cumulative amount smoked over the lifetime. This is perfectly logical. Since the cumulative exposure metric embodies information on duration and on intensity, it can hardly be less predictive of risk than either of the dimensions alone.

16 November 2018                                                              14

Report on talcum powder use and ovarian cancer          Jack Siemiatycki

We cannot assume that there is a universal form of a dose-response relationship for every true causal relationship. Most commonly, in toxicology and epidemiology, the relationship between exposure and risk is monotonic; that is, as one increases, so does the other. This can include linear relationships (i.e. where a straight line on a graph describes the relationship) or exponential or many other curvilinear forms. It is also possible that there may be a threshold effect (the risk only becomes apparent after a certain level of effective exposure) or some other non-standard relationship.

Both the qualitative metrics (ever/never) and quantitative metrics (a lot of use compared with a little use) are valid and useful metrics.

**Sample size** refers to the number of participants in the study. As a generalization, large studies produce more statistically stable and precise estimates than small studies. In fact the stability of estimates or precision of estimates is not a simple function of the number of participants, or subjects, in a study. The precision of estimates depends, among other things, on the type of epidemiologic design.

In a case-control study the main determinants are the numbers of cases and controls and the prevalence of exposure in the two groups; in a cohort study the main determinants are the numbers of participants, prevalence of exposure, and the incidence of the disease of interest over the period of follow-up in the exposed and unexposed groups.

There is sometimes confusion about the notion of sample size when we compare cohort studies with case-control studies. The operational aspect of an epidemiologic study of cancer that most influences the precision of an estimate of RR is not the total number of participants; rather, it is the smaller number between the number of exposed cases of disease and the number of unexposed cases. In a typical prospective cohort study, one might need to enroll 100,000 participants in order to end up with a certain number of cases (say, 500 cases) of the disease of interest (e.g. ovarian cancer). In a case-control design we might only need to enroll around 500 cases and 1500 controls to achieve the same statistical power as would be achieved by a cohort study of 100,000. The formal justification for this assertion is quite mathematical, and has to do with the fact that a sample of a population can give very accurate estimates of the characteristics of an entire

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

population. Thus, the simple comparison of 100,000 participants in a cohort study and 2,000 participants in a case-control study is in no way a valid marker for the relative statistical power of the two hypothetical studies.  There are admittedly other advantages and disadvantages of the cohort vs the case-control design, and reviewers should consider the various aspects before deciding on the relative weight to give to the results of the different studies. But it is definitely not appropriate to merely compare the numbers of participants as an indicator of study validity.

While precision is based on multiple factors and different ones in case-control and cohort studies, there is a parameter which embodies the different factors quite well, and which is common to both case-control and cohort studies, namely, the number of exposed cases. For this reason, in laying out the various study results below, in addition to the relative risk estimates and their confidence intervals, I will show the numbers of exposed cases.

While it may affect the precision of estimates of RR, the size of the study does not in itself systematically affect the estimates of RR. That is, it is not the case that small studies produce systematically exaggerated RR estimates or systematically low RR estimates. However small studies can produce more wildly divergent RR estimates than large ones, in either direction, towards the null or away from the null.

**<u>Meta-analysis and pooled analysis:</u>** There are two distinct ways that evidence from multiple studies can be combined to derive a new overall statistical summary or synthesis of those studies, a meta-analysis and a pooled analysis.  A meta-analysis uses the published results from each study and averages those results using some optimal weighting procedures.  In order to implement a meta-analysis it is necessary to find all relevant studies on a topic that have published results in a fairly standardized way.  The statistical algorithms typically used to average the results from different studies also provide statistics that evaluate how heterogeneous are the results from the different studies. The interpretation of such heterogeneity statistics is not straightforward. If the results from different studies are homogeneous, it adds to the confidence in the meta-estimate. If they are heterogeneous, it may indicate that the association is really different in different populations, or that there are some methodological characteristics of the different studies

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

that have influenced the results in different ways. Unless a significant methodological flaw can be identified that has caused the heterogeneity, the best overall estimate remains the meta-estimate.

A pooled analysis is one in which the investigator gets access not only to the published results from different studies, but rather to the individual data of every person in the studies. The latter is harder to achieve because it requires high buy-in and input from the investigators of the original studies; a meta-analysis is much easier to organise. Because a pooled analysis allows for standardization in the definition of variables and statistical models, it can be a more powerful means of summarizing data than the original studies themselves.

**Multifactorial etiology of disease**.  Chronic diseases such as cancer are multifactorial in two distinct ways.  On the one hand, each case of disease results from the unfortunate conjuncture of a combination of factors (these might include for example, genetic predisposition, diet, environmental pollutant, occupational exposure, medical intervention, viral infection, lifestyle habits, etc.) which combine over a lifetime to initiate and promote development of the disease. In this sense, each of the factors that are part of the combination for that person was a necessary contributor to the disease process, although it was not sufficient on its own to provoke the disease. Despite the fact that none of the factors were sufficient to produce the disease on their own, each of the contributory factors may be considered to be a cause of the disease.  The disease would not have arisen if any of the contributory factors had been absent.  This is one meaning of the multifactorial etiology of disease.

The second meaning is that the combination of factors that induce cancer in one person may not be the same as the combination that induces cancer in another person. Indeed, at the population level, there may be many combinations of causal factors for the same disease. Some factors may be common to different combinations. For example, it may be that in one case of lung cancer, the combination of factors included genetics, exposure to air pollution, exposure to radon in the home, and smoking; while in another person, the

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

combination of factors included genetics, insufficient dietary consumption of anti-oxidants like carotene, exposure to asbestos, and smoking.

**Some characteristics of carcinogens and epidemiologic research on cancer:**  The following characteristics of most known carcinogens provide a framework for some of the thinking behind the design and interpretation of epidemiologic studies of cancer.

- There is typically a long induction period between exposure to a carcinogen and appearance of the disease.  Thus, if a study has not allowed for a sufficient passage of time between the exposure and the disease, the result may report that there is no risk, where in fact there is a risk, but insufficient time has elapsed to make the risk visible.

- There is variability in the carcinogenic potency of different carcinogenic agents; some induce much greater relative risks than others.

- For any given carcinogen, the degree of risk due to exposure generally increases as the exposure level increases, but the shape of the dose-response curve may differ from one carcinogen to another.

- Most known human carcinogens were first discovered as such either by means of astute observation of a clinician noticing a cluster of cases among people who shared a common characteristic (such as working in a particular workplace) or by means of epidemiological research. In most cases, there was no known mechanism to explain the association at the time. Where the mechanisms have been elucidated, they were usually discovered subsequent to the epidemiologic demonstration of a causal relationship. (Siemiatycki 2014)

## 4.2   Bradford Hill "guidelines"

Because of the complexities of epidemiologic research, there has been some concern with how epidemiologic evidence should be used to draw causal inferences. Various authors have written about the types of information that might be considered in assessing whether a body of evidence demonstrates a causal relationship. A set of guidelines, developed in the context of the Surgeon-General's Report on Smoking and Health (1964) and authored by

Report on talcum powder use and ovarian cancer                              Jack Siemiatycki

Bradford Hill in 1965, has achieved a wide consensus in the epidemiologic community as a pedagogical guide.  Hill himself referred to these guidelines as "aspects" or "features" or "characteristics" of an association, and warned against treating them as "hard-and-fast rules of evidence that must be obeyed". (Hill, 1965) He deliberately avoided referring to them as "criteria."

Since Hill wrote those thoughts at the beginning of the era of modern epidemiology, without the benefit of decades of practical experience in the way those thoughts were taken up, and how they applied to issues other than smoking and cancer, it is understandable that the practice of evaluation of causality has evolved. A first observation, often overlooked, is that Hill took as a starting point for his writings that chance had been considered as an explanation for the smoking-cancer association and determined to be unlikely. In the historic context of 1964-1965 and the debates around smoking and cancer, this was a reasonable assumption to make, but for any other putative associations, this must be considered. Over the years, respected authors have paraphrased and updated these aspects in various ways, and this will undoubtedly continue. For instance, leading textbooks of epidemiology as well as the Reference Guide on Epidemiology of the Manual on Scientific Evidence (2011) all have different formulations of Hill's guidelines.

In the light of 50 years of practical experience after these guidelines were written, and based on my practical experience of evaluating causality in many forums and on many topics, I would paraphrase (and modernize) Hill's guidelines as follows:

Strength of the association: This can be measured by different parameters, but for cancer studies it is usually measured by the magnitude of the relative risk or odds ratio.

Statistical significance of the association: While this guideline was not explicitly listed by Hill, it is nonetheless in practice an implicit and distinct consideration in assessing causality.  If the estimated RR is quite high, indicating a strong association, but is based on a very small study with low precision, this might be solely due to statistical variability. (For instance, when we flip a balanced coin 10 times, we do not always end up with 5 heads and 5 tails. Sometimes, by chance, we may end up with 6 heads and 4 tails. Does this prove that the coin was not balanced?) Evaluating the role of statistical chance as a possible

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

___

explanation of the observed association is important. As explained above, the absence of statistical significance is not strong evidence of an absence of a real relationship.

Dose-response relation: If the relative risk increases when the exposure increases, it enhances the likelihood that the observed association is really causal. There are some counter-examples however where the effect is only observed after a threshold of exposure has been crossed. There are various ways to assess whether there is a dose-response relation. Hill pointed out that the main challenge is to establish reliable and measurable quantification of exposure. In studies of lifestyle habits like use of talcum powder products, the most common way is to estimate the RR in increasing categories of exposure metrics such as duration (years) of usage, or intensity of usage (frequency per day or per week or per month), or cumulative amount of usage (a combination of duration and frequency).

Absence of bias: There are many forms of bias that can infiltrate an epidemiologic study. It enhances the likelihood of a true causal association if we can confidently exclude all the plausible sources of bias explanations for the observed findings. This guideline can also be considered as a component of a guideline to consider other possible explanations for the association.

Temporality: It is clear that the exposure should precede the outcome (i.e. the disease). To ascertain whether the cancer was a result of the exposure or the exposure occurred after the cancer onset seems like a simple thing, but sometimes it can be difficult to ascertain with certainty.

Cessation of exposure: It would add to the credibility of the association if it had been demonstrated that subjects who cease exposure to the agent experience reduced risks of disease compared with those who continue to be exposed. In practice this is an extremely difficult characteristic to demonstrate, partly because of the difficulty or even ethical impossibility of changing people's habits for scientific experimentation purposes. But occasionally there may be a "natural experiment" wherein large numbers of people cease their exposure and the effects can subsequently be measured in an epidemiologic fashion.

Specificity of the association: It was believed that individual risk factors have specific pathological effects, and Hill posited that if we observe that a given agent is associated with

___

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

---

many different pathologies, it increases the likelihood that these are somehow spurious observations, resting on some type of bias in the studies of that agent. In reality, this Hill characteristic has fallen out of usage in the intervening years with the demonstration that some agents can indeed provoke multiple different pathologies. Examples include cigarette smoking, ionizing radiation and asbestos fibers.

Consistency of findings between studies (or replication of findings): Because epidemiologic research is susceptible to errors from random variability and from different kinds of study biases, before accepting the apparent association as a generalized phenomenon, it is important to see that similar results are replicated in different studies. When these different studies also encompass different study populations in different communities, it enhances the generalizability of the inferences. Generally speaking, the observation of consistent results in different studies adds to the credibility of an inference that there really is a causal relationship.

Coherence with other types of evidence: In the case of tobacco and cancer, it was seen that the historic trend in lung cancer mortality rates in the US and UK followed quite closely the national trends in consumption of tobacco, with a 20 year lag. This was interpreted by Hill as corroboration of the results observed in case-control and cohort studies. Epidemiologic evidence of coherence could conceivably take many forms, and the opportunity to assess coherence is something that is specific to the factor under investigation. Assessment of coherence with historic mortality trends would only be possible in the case of a factor whose exposure in the population changed quite dramatically over time in a way that can be documented, and for which the attributable fraction of the disease due to that factor is very high. This was the "perfect storm" of circumstances that allowed for an assessment of the tobacco-lung cancer association by means of time trend correlations.

Analogy: Hill reasoned that if a factor is somehow similar to another factor that has already been shown to be a risk factor for the disease, then it increases the plausibility of a similar impact due to that putative factor. This is such a vague guideline, with no clear implementation suggestions, that it is not often referred to and rarely implemented.

---

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

Biologic plausibility: This guideline can encompass many dimensions of information, including physiology (can the agent or its metabolites reach the organ?), animal carcinogenesis (does the agent produce tumours in experimental animals?), cell studies that reveal mechanistic data, and other biologic information on the toxicology of the agent.

Implementing Hill's guidelines: As Hill himself insisted, sophisticated users of these guidelines do not use them as a formal checklist. He summarized his views as follows:

> « What I do not believe … is that we can usefully lay down some hard-and-fast rules of evidence that must be obeyed before we accept cause and effect. None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a *sine qua non*. What they can do, with greater or less strength, is to help us to make up our minds on the fundamental question - is there any other way of explaining the set of facts before us, is there any other answer equally, or more, likely than cause and effect? »

The authors of the Reference Guide on Epidemiology of the Manual on Scientific Evidence (2011) clearly stated that Hill's guidelines are not formal criteria, but rather are more in the nature of a memory aid to help us review the evidence about any given causal association. They stated it this way: "There is no formula or algorithm that can be used to assess whether a causal inference is appropriate based on these guidelines."

I have served on many panels to review evidence of causality on one topic or another, including on several IARC Monograph panels that reviewed evidence of carcinogenicity. The IARC process, like the others I have participated in, does not use the Hill guidelines in any rigid formal way. The ideas embodied in Hill's guidelines permeate our thinking about how to evaluate causality, but the operationalization of these guidelines is specific to the problem and to the expert making these determinations. Thus any suggestion that Hill's "aspects" or "features" or "characteristics" of an association should be used as a formal checklist of criteria is simplistic and wrong. To do so would contradict the opinions of experienced epidemiologists, the Manual on Scientific Evidence, and Bradford Hill himself.

Report on talcum powder use and ovarian cancer                          Jack Siemiatycki

In this section, I have laid out and explained the Bradford Hill guidelines in a generic way. Below, in section 8, I will consider how these apply in the context of the talcum powder – ovarian cancer issue.

## 5.    Epidemiologic evidence regarding talc and ovarian cancer

Following some reports in the early 1980's that raised questions about a possible link between use of cosmetic talc powder by women and the risk of ovarian cancer, there were several epidemiologic studies on the topic. By the early 2000's the issue was garnering some attention in the scientific community. The International Agency for Research on Cancer, the premier agency for evaluation of carcinogens, decided to conduct a review of the issue in 2006. Following that review, there have been further studies conducted on the topic.

In the context of a legal action, my mandate is to review all relevant scientific evidence available to date, in order to provide the court with my opinion regarding the link between talc powder exposure and ovarian cancer. The methodology I employed is the same one I have used in my career as an internationally recognized researcher.

### *5.1   IARC review and evaluation of talcum powder products*

As mentioned above in Section 2, the International Agency for Research on Cancer (IARC) is the premier institution in the world for cancer epidemiology and for environment and cancer research. One of its mandates is the evaluation of the carcinogenicity of different agents with which humans come into contact, and this mandate is carried out by the Monograph Programme of IARC. This is achieved through a process that involves identifying chemical or physical agents for evaluation, convening specially selected international expert panels that are mandated to review all pertinent evidence on the topic and write a thorough review culminating in an evaluation of whether the agent(s) are human carcinogens.

In February 2006, there was such an IARC Monograph meeting to evaluate some agents, including talc. The IARC Working Group comprised 16 highly respected and recognized scientists from around the world; I was asked to Chair the Working Group. We reviewed all

16 November 2018                                                                    23

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

the evidence that was available up to that point in time. This certainly included epidemiologic evidence, but it also included evidence from experimental toxicology, physiology, molecular biology and other domains. The IARC Monograph programme has a formal system for classifying agents. The Working Group must classify an agent into one of the following categories:

1      Carcinogen

2A     Probable carcinogen

2B     Possible carcinogen

3      Not classifiable

4      Not carcinogen

After reviewing the evidence, the panel concluded that talc was a "possible carcinogen", based primarily on evidence regarding the association between dusting powders and ovarian cancer. Here is the definition of this category from the IARC Monograph:

> "Group 2B: The agent is possibly carcinogenic to humans.
>
> This category is used for agents for which there is *limited evidence of carcinogenicity* in humans and less than *sufficient evidence of carcinogenicity* in experimental animals."

This 2B categorization was based on the panel's decision that there was "limited evidence of carcinogenicity in humans", which is in turn defined by IARC as follows:

> "Limited evidence of carcinogenicity in humans: A positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence."

Subsequent to the completion of the IARC Monograph on talc, a subgroup of the epidemiologists who were on the IARC Working Group, including myself, reviewed the evidence again, but with a view to producing a meta-analysis of the results from the most informative studies conducted to that time. This resulted in the paper by Langseth et al. (2008). This paper was not an IARC publication.

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

## 5.2    *Information consulted for the present review*

In preparation for formulating my current opinions on this topic I assessed, researched, reviewed and consulted a large number of documents, including, but not limited to: all original epidemiological studies published on this topic, all meta-analyses and opinion pieces, experimental toxicology, molecular biology, mechanistic studies, and the IARC Monograph on talc which reviewed all informative studies that had been published before 2006. I was given access to and also reviewed the various expert reports and depositions that have been submitted in various talc cases, either on behalf of the Plaintiff or Defendant, and various internal company documents obtained in discovery.

I systematically reviewed the lists of references of all relevant studies referenced in the IARC report as well as in various meta-analyses and in all recent articles on the topic to identify yet more relevant publications on talc and cancer.

Because some studies have been published in multiple papers and because some papers have included reports on multiple studies, there is not a one-to-one relationship between studies and published papers.

Additionally, I considered evidence regarding the toxicology of talc by reviewing the toxicology evaluation conducted by the IARC Working Group, the summary of talc's putative toxicology referenced in various scientific publications, and the expert reports of various scientific/medical experts in this case.

The central focus of my review is on the epidemiologic evidence.

A complete listing of the documents I consulted, as well as references cited explicitly in this report, is provided in the Bibliography. The Bibliography is in two Parts; Part A comprises all the publications and reports that can be found in publicly available scientific literature. Part B comprises company documents or documents from reports or testimonies of experts.

### 5.3   My methodology for this review

**Table 1** lists the steps I undertook to accomplish my mandate.

#### 5.3.1   Selecting studies for review

To aid in the present assessment of whether or not there is a causal relationship between talcum powder exposure and ovarian cancer, I carried out an up-to-date review of the scientific literature, primarily the epidemiologic literature, concerning the association between use of talc powder and risk of ovarian cancer.  This involved meta-analyses to estimate the effect of having ever used perineal powdering, and an assessment of evidence regarding dose-response.

The first task was to find the relevant publications and to set out the distinct pieces of epidemiologic evidence, namely the results of different studies. Based on a number of reviews on the topic of talc and ovarian cancer, including the IARC report, I systematically went through the reference lists to identify all publications that seemed to contain results on the topic. I further conducted a Pubmed search and this did not produce any new informative publications that had not already been identified.  In preparation of the meta-analysis, I eliminated from consideration papers that were outside the bounds of what a meta-analysis should contain (i.e. eliminate review articles, commentaries, meta-analyses, and articles that do not really pertain to the issue of perineal talc and ovarian cancer). From the 40 publications that remained, namely those that contained original results on the association between powdering and ovarian cancer, I extracted all results showing RRs between talc powdering and ovarian cancer, and I had these results put into a Filemaker database. This was a value-free exercise. I made no judgement at that stage about relevance or quality of the study or the published results. It was only an attempt to lay out in one "place" the whole of the evidence and to prepare for subsequent analyses. There were over 730 results in this database. On average each publication contained about 18 different RR results of various aspects of talc powder exposure and various types of ovarian cancer. Some contained fewer and some contained many more. (For instance, one study publication contained 180 results, with varying types of ovarian cancer and varying definitions of exposure to powdering.)

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

In deciding which results to include in a meta-analysis I had to respect the following principles:

-   The results have to pertain to the issue of risk of ovarian cancer in relation to use of talc-based powders.

-   Where there are sufficient numbers of results to support meta-analyses, there can be meta-analyses for different types of ovarian cancer, and for different routes of exposure to talc-powders.

-   In each meta-analysis, each study should only provide one result, so as to avoid double-counting evidence.

-   The decision about inclusion of a study should in no way be influenced by whether or not a particular study demonstrated high risks or low risks.

While these seem like simple principles to respect, there were complicating features of the scientific literature:

-   Some studies were reported in multiple publications, sometimes the same study subjects were analysed and reported in different ways and sometimes different subsets of the study population were included in different publications. Sometimes the authors fail to clearly enunciate how the data used in one of their papers overlaps with data used in another of their papers from the same study.

-   Different studies used different questions about powder use in their questionnaires, and sometimes the same study reported results by different ways of asking about or defining exposure.

-   A given study may have presented one result or many results, each addressing a different definition of the talc exposure variable and different way of grouping the ovarian cancer cases.

-   Different studies dealt differently with the histologic sub-types of ovarian cancer, sometimes grouping them all, or sometimes separating them, or sometimes reporting both grouped and separate results for different sub-types.

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

- Different studies used different metrics for analysing powder exposure and estimating its corresponding RR.

- Different studies dealt differently with the challenge of adjusting powder-related risks for possible confounding by other factors.

Decisions had to be made regarding which types of exposure to consider, which types of ovarian cancer to consider, which metrics of exposure to consider and which studies and publications to consider. It is necessary to be rigorous in making such decisions ahead of time, rather than "cherry-picking" results from different studies that appear to support one theory or another.

**Appendix Table A1** provides a list of those 40 publicly available publications that have included some original results that might pertain to the association between powdering and ovarian cancer. **Appendix Table A1** shows which publications were included and which papers were excluded from my meta-analyses. For each of the 14 excluded papers, the table also shows the reason. Some papers were excluded because the results did not pertain to ovarian cancer and powdering in the perineal region. Some papers were excluded because the results presented therein were subsumed by a subsequent publication by the same research team or as part of a pooled analysis of multiple studies. Notwithstanding my intention to identify all unique studies and to extract a best "bottom line" result from each study, the nature of the studies and how they were analysed and reported led to many judgement calls. It must be acknowledged that there can be differences of opinion among equally competent and equally well-motivated scientists in how to choose among the different publications and the different results within publications.

Fortuitously, and unbeknownst to me at the time, two other sets of investigators (Berge et al 2018; Penninkilampi et al 2018) carried out separate meta-analyses on this topic at about the same time as I was carrying out mine, and this gives an opportunity to do some cross-comparison of different reviews and meta-analyses. I will comment on these after presenting the results of my meta-analyses.

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

---

### 5.3.2   What were women exposed to in body powders?

Talc has been the main ingredient of body powders used by women over the past century. "Talc particles are normally plate-like. When viewed under the microscope in bulk samples or on air filters, they may appear to be fibers … Talc may also form as true mineral fibers that are asbestiform; asbestiform describes the pattern of growth of a mineral that is referred to as a 'habit'. Asbestiform talc fibers are very long and thin."(IARC 2010)  The structure of platy talc is characterized by a hexagonal sheet arrangement of silicon-oxygen tetrahedral groups in a common plane which creates a double-sheeted structure.  These sheets are easily separated which accounts for the "silky" or "smooth" feel of talcum powder products (IARC, 2010).  As a mined mineral, the precise chemical and physical characteristics of talc are in part determined by the particular geological formations from which it is extracted. The local conditions can also produce "impurities" in the extracted talc including asbestos, quartz and various metals. It is claimed that cosmetic talcum powder products normally contain >98% talc (Zazenski *et al.*, 1995) but the purity may have been lower in the past. (IARC 2010) When I refer to talc or talcum powder products in this report, I am referring to commercially available talcum powder products and all constituent elements contained in those products.

Asbestos is a commercial term that comprises six minerals that occur in the asbestiform habit: actinolite, anthophyllite, chrysotile, grunerite, riebeckite and tremolite. Similarly to talc, these six minerals can occur in a non-asbestiform habit. Some types of asbestos are found in the same geological formations as talc.(IARC 2010)

By the 1970's it was reported that asbestos fibers were found in commercial talcum powder (Cralley 1968; Rohl 1976), though there was some doubt expressed regarding the quantification of the exposure and the ability to discriminate between asbestiform and non-asbestiform talc.  (Krause 1977; IARC 2010) The talc industry was constrained to remove asbestos from talcum powder products. Representatives of the industry have claimed that talcum powders were free of asbestos fibers since the 1980's (Hopkins 2018; Pier 2018), but this assertion has increasingly come under doubt as number of labs have

---

16 November 2018                                                                     29

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

reported finding asbestos fibers in talcum powder products. (Blount 1991; Paoletti 1984; Gordon 2014; Longo et al 2017; Longo et al 2018; Blount deposition 2018; Pier deposition 2018)  These various studies that have reported finding asbestos in historic talcum powder samples have been challenged by other reports that failed to find meaningful amounts of asbestos in historic talcum powder samples. (CIR 2013; Anderson 2017)  These various findings and opinions are somewhat complicated by the fact that both talc and asbestos have varied chemical and physical characteristics and various methods can be used to measure them.

What is clear is that asbestos, and all forms thereof, has been evaluated to be carcinogenic. It has long been recognized that inhalation of asbestos carries with it a risk of lung cancer and of mesothelioma, a cancer of the lining of the lungs, as well as larynx cancer. What has only recently been recognized is that women who are exposed to asbestos experience an excess risk of ovarian cancer. (Straif 2009; IARC 2012) This conclusion was based on five studies; a subsequent meta-analysis reported that the RR of ovarian cancer among asbestos-exposed women was a highly statistically significant 1.77 (1.37-2.28).(Camargo 2011)  The route of exposure that generates risk of ovarian cancer among women exposed to asbestos is not clear, but inhalation and migration of asbestos particles to the ovaries has been proposed as a credible biologically plausible mechanism. (Miserocchi 2008)

Among the metals detected in talcum powder products are some which are recognized carcinogens, namely nickel and chromium. It is not known how widespread was the "contamination" of talcum powder products by these metals and how high were the concentrations in the entire commercial production of talcum powder products of the past several decades, and how these exposures measure up to exposures that may cause cancer. However, evidence that asbestos and some other known carcinogens have been detected in some commercial cosmetic talcum powder products and credible mechanisms that such particles can translocate to the ovaries is an important consideration in deriving an opinion on biological plausibility, and I will consider it below in my section on biological plausibility of a causal link between talcum powder products and ovarian cancer.

Alternative formulations of baby powder include cornstarch formulations, which have become available in the past 30 years. It was possible for women to purchase and use cornstarch products or talcum powder products. Most epidemiological studies have not tried to ascertain whether the women in their studies used talc-based or cornstarch-based formulations and many women may have been unaware of the composition of the powders they used at different times.  It is impossible to ascertain with certainty from most of the publications whether the reported epidemiologic results pertain to talc-based powders or cornstarch-based powders or both. Those studies that did report results for cornstarch had few women self-reporting use of cornstarch and the risk estimates were rather imprecise and unstable. For those studies that did report separately the findings for talc-based and cornstarch-based formulations, I used the results for talc-based powders. For those that did not make such distinction, I used the results combining all types of powders as reported. If it turns out that there is an increased risk associated with talc but not with cornstarch, the inability to discriminate the two in statistical analyses would have the effect of diluting the estimates of risk due to talc. That is, the RR estimates would be attenuated.

### 5.3.3   Routes of exposure

Some studies reported results based on particular ways of using the powders, such as on feet or perineal use or use after bathing or use on sanitary napkins or use on diaphragms or use by male partners, and so on.  And many studies just reported results for all routes of perineal exposure combined. For my Main analyses, I aimed to use the reported results pertaining to all types of perineal use combined. Where the results were reported for individual routes of exposure rather than all perineal use combined, I identified the one that came closest to powdering in the perineal area from all routes.

The number of studies providing results pertaining to any of those specific routes of exposure was much less than the number providing evidence for all routes combined and insufficient to provide reliable meta-analysis results for route-specific estimates of RR. Among the route-specific reports, the one that had most often reported RR results was exposure from dusting of sanitary napkins. I will conduct a separate meta-analysis regarding the risk of ovarian cancer in relation to use of powder on sanitary napkins.

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

### 5.3.4   Questionnaire items on use of talc powders

In the case of exposure to cosmetic talc powder, the most common and realistic way of ascertaining exposure has been to question women. But there are many ways this can be done, and indeed many types of questionnaires have been used. A very simple format that has been used is to ask a question such as "have you ever used powders in your genital area?" But, the validity of the response would be enhanced if the question is framed in a more specific manner, so long as the respondent can be expected to know the answer to the more specific question. One possibility would be: "have you ever used powders that contained talc on your genital area more than once a week for at least 6 months of your life? This would include powdering your genital area directly or powdering your underwear or powdering your diaphragm or powdering your sanitary napkin." There are scores of ways such questions can be asked, and there has been variability in the methods of questioning among the different studies of powder use and ovarian cancer.  In most studies, the questionnaire question about Ever Use was actually about Ever Regular Use, not Ever Occasional Use.

Among women who used powders, there can be an enormous range of usage from a few occasions in a lifetime to profuse daily usage. Among the many dimensions of talcum powder exposure that might influence the risk of cancer are the following: manner in which the talc was applied, age at which exposure began; if it ended, age at which it ended and years since it ended, frequency of use per day, week or per month, multiple applications including to genitals, undergarments, sanitary napkins, etc., and whether and how that varied at different ages. Some studies have used a single simple question, while others have used scores of questions to get at the lifetime history and many facets of powder use.

While I believe there are quality differences between the different studies in the way talc powder data have been collected, I have refrained from imposing my judgement about the quality of the questionnaire data on the selection of studies to include in meta-analyses.

Report on talcum powder use and ovarian cancer                              Jack Siemiatycki

### 5.3.5   Metrics of exposure

I used the reported results for the binary metric Ever Regular Use vs Never Regular Use, given the limitations of the available data, and using the investigators' decisions about how best to measure this. While this may seem like a simple tactic to implement, some studies were reported in such a way that in fact I had to make "judgement calls" about which of the reported results came closest to the desired metric.

For "dose-response" assessment, I used three pertinent metrics of exposure: duration (years), intensity/frequency (uses per day, week or per month), and cumulative number of applications, measured sometimes in absolute numbers or sometimes in quantiles. Of the three, the most meaningful is the cumulative number of applications.

## 6.   My meta-analyses regarding talcum powder products and ovarian cancer: data included and results

### 6.1   Features of the studies

Following the exclusions indicated in Appendix Table A1, **Appendix Table A2** shows the studies that ended up being included in one or more of my meta-analyses, and brief descriptions of administrative and contextual features of each study. **Appendix Table A3** shows, for the same studies, some information about the talcum powder exposure variable and the covariates used by the authors in their control for confounding.

Appendix Table A2 shows that most studies were conducted in the USA. All but three were case-control studies and of the case-control studies, all but four used some type of population control series. Most studies had fieldwork data collection in the 1970's and 1980's; only a few studies started data collection after 2000. Table 3 shows for each study what exposure variable I was able to use to approach the notion of Ever exposed regularly to talc powder in the perineal region. Different studies had different questions in the questionnaire and different studies reported different variables. The questionnaires usually elicited lifetime use that was more than very sporadic, with terms like "regular" use. Only the Gonzalez 2016 study failed to ask about lifetime exposure before the interview; they asked about usage only in the preceding 12 months.  The Gates 2010 study

asked about use of talc up to 1982 but not afterwards. Some studies asked separately about different routes of exposure and then rolled them together in statistical analyses, while some rolled all routes of exposure together in their questioning. The term that I show in Appendix Table A3 is the term that the authors reported in their publication of results; it is sometimes rather cryptic. Appendix Table A3 also shows which variables that the authors reported having used as adjustment variables. Sometimes these are variables that were explicitly included in final statistical models, and sometimes these were dealt with in a more indirect way such as a staged analysis in which a screening is conducted using a change-in-estimate procedure.

All meta-analyses were conducted using the well-known package Comprehensive Meta-Analysis Version 3. (Borenstein, M., Hedges, L., Higgins, J., & Rothstein, H.  Biostat, Englewood, NJ 2013;  https://www.meta-analysis.com/index.php?cart=BFZW2135997

## 6.2   Association between binary variable talc powdering and all types of ovarian cancer combined – data and results

### 6.2.1   Individual studies and results on binary exposure variable

**Table 2** shows RR results, as well as the corresponding 95% confidence intervals, for each informative study included in the Main meta-analysis or in any sensitivity analyses. (I will explain this distinction below.) As I explained in Section 4.1, the single number which reflects quite well the statistical strength of a study, be it case-control or cohort, is the number of exposed cases, and I have included this parameter in Table 2.  Table 2 shows the RR reported in each study by Ever (regular) use of powder in the perineal region (all routes of perineal exposure including direct powdering on genital area, on sanitary napkins, on underwear and on diaphragms). The table shows results for all types of ovarian cancer combined.

Before conducting any meta-analyses, we can peruse the results in Table 2 to observe certain patterns.

Of the 33 RR results shown in Table 2, two are below 1.0, one equals 1.0, and 30 are greater than 1.0. On the null hypothesis that there is no true association between powdering with

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

talc and ovarian cancer, we would expect as many of the RR estimates to be above 1.0 as to be below 1.0. The observed distribution (2 below and 30 above) is clearly and strongly in defiance of the null hypothesis. Further if we rank the RR estimates from lowest to highest, the median value, the one in the middle, would be 1.34.

This informal analysis does not take into account that the 33 estimates in Table 2 are not strictly independent of each other. There are various ways to carve out independent sets of results from this list of results in Table 2, and the meta-analyses will be designed to do that. But no matter how the studies are configured, it will be found that one or two of the RR estimates are below 1.0 and somewhere between 20 and 26 are above 1.0. Such an imbalance cannot be due to chance.

### 6.2.2   Strategy for Main analysis and sensitivity analyses

An investigator typically has in mind a strategy for analysing and presenting the results. There may be some judgement or assumptions involved in deciding on the strategy. The investigator may wish to see how the results would be affected if other judgements or assumptions were made. In other words, how robust are the results to alternative judgements and assumptions. Such alternative analyses are referred to as *sensitivity analyses*.

There were several dilemmas in selection of studies and results to include in the meta-analysis. I made decisions in each case that I believe provides the best basis for a meta-analysis. But in deference to other possible decisions that might have been made, I conducted some sensitivity analyses as well. I list what the dilemmas were and which options were selected for Main analyses and for sensitivity analyses.

*a. Terry 2013 and Wu 2015.*  The Terry 2013 paper brought together data from 8 different research teams. Some of those teams had previously published their results on talc and ovarian cancer and some had not. Normally, a pooled analysis would take precedence over the individual component studies. In this case, however, there were complicating factors. The Los Angeles component study of Terry 2013 (Wu, Pike and colleagues) was conducted in stages and the Terry 2013 pooled analysis only had access to the early stage. Subsequently, Wu and colleagues carried on with their data collection, and published a

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

more complete set of results from their study in Wu 2015. The Terry 2013 paper contained 208 exposed cases from the Los Angeles study, whereas the Wu 2015 paper contained 701 exposed cases. In the entire Terry 2013 paper there were 2600 exposed cases. Ideally, we would wish to exclude from the 2600 exposed cases in the Terry 2013 paper, the 208 exposed cases that came from the early Los Angeles data. But that information was not available. Thus there is an 8% overlap between the exposed cases in the Terry 2013 paper and those in the Wu 2015 paper.

I adopted the following strategy. For the Main analysis, I included both Terry 2013 and Wu 2015. The 8% overlap of exposed cases is unfortunate but I believe its impact would be trivial, and in any case we will have some empirical evidence of its impact from a sensitivity analysis.

I conducted sensitivity analyses using a different strategy. The Terry 2013 paper contained a table in which the individual results of the 8 component studies were reported. I used the results as reported there for 6 of the 8 component studies, for which the Terry paper contained the latest results. For the Los Angeles study I used the result reported in Wu 2015 which was much more complete than the L.A. study result in Terry 2013. The eighth study was the study of Cramer that was one of the components of Terry 2013 but that was also reported subsequently in Cramer 2016. It is not clear whether the Cramer 2016 paper contains more up to date data than the corresponding component in Terry 2013, but it possibly does.

To summarize, the Main analysis contained pooled result from Terry 2013 and the result from Wu 2015. There were sensitivity analyses that dropped the pooled result from Terry 2013, but included the (apparent) latest published result for each of the 8 components.

*b. Nurses Health Study*. This cohort study was initiated in 1976 and was not a study of talcum powder products and ovarian cancer . The study involved a wide-ranging annual questionnaire which inquired about many health related issues.  In 1982 there was a very succinct question about use of body powders. The cohort has been followed-up to ascertain the occurrence of cancers (or other diseases). There was a publication that contained results on talc and ovarian cancer from this study in 2000 (Gertig 2000); later, after more

years of follow-up there were two further papers presenting results on talc and ovarian cancer (Gates 2008 and Gates 2010). Clearly the Gertig result did not belong in my meta-analysis, since it was subsumed by subsequent analyses, but the choice between the Gates 2008 and Gates 2010 was not so obvious. Gates 2008 was based on a nested analysis of a subset of the cohort that probably entailed better control for confounding. Gates 2010 was based on the entire cohort and thus on a much larger sample size. The two RR estimates from the Gates papers are quite different from one another (RR=1.24 in Gates 2008 and RR=1.06 in Gates 2010). It is not clear whether the difference in results is due to the different design and analytic procedures used in the two papers. The authors did not comment on the inconsistent results.

My Main analysis included Gates 2010 but not Gates 2008. Some sensitivity analyses contained Gates 2008, but not Gates 2010.

It should be noted that whereas I did not use the Gertig paper results in the meta-analysis of Ever / Never Use of talcum powder products, I did use some dose-response results from Gertig because subsequent publications from the Nurses' Health Study did not present such results.

*c. Schildkraut (2016)*.  This was a case-control study of ovarian cancer among African American women. The fieldwork and interviewing was carried out from 2010 to 2015. The authors speculated that publicity surrounding two class action lawsuits on talc and ovarian cancer in 2014 may have subsequently induced bias in the validity of reporting of talc exposure. Consequently, in their analysis and report, they presented two sets of results, one for all women in the study, and another for those interviewed before 2014. It is impossible for me to evaluate the validity of the speculation, as it was for the authors. Consequently I will use the results from the entire sample and those from the pre-2014 sample.  I refer to the entire Schildkraut study result as Schildkraut A and the pre-publicity result as Schildkraut B.

The Main analysis contained Schildkraut A. Some sensitivity analyses contained Schildkraut B.

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

*d. Shushan (1996).* This ovarian cancer case-control study, conducted in Israel, reported results on talc and ovarian cancer, but the report was quite cryptic regarding the data collection and the talc exposure variable.

The Main analysis excluded Shushan 1996. Some sensitivity analyses included Shushan 1996.

### 6.2.3   Results of meta-analyses on binary exposure variable for all ovarian cancers

Figure 1 shows the printout from the Comprehensive Meta-analysis (CMA) package for the Main meta-analysis for the association between ever regular use of talc powder in the genital area and all types of ovarian cancer combined. 21 RR results were used in the Main meta-analysis, but the Terry 2013 study represents 8 different study teams and 10 distinct studies. In the forest plot, I have ordered the studies in increasing magnitude of the RR estimate. It can be seen that only one study produced an RR estimate to the left of the null value of 1.0, while 19 studies produced an RR estimate to the right of the null value of 1.0.

The meta-estimate of RR is 1.28 with a 95% confidence limit from 1.19 to 1.38. The p-value is too small to register in 2 digits. This is a very highly statistically significant result. The probability of this result being attributable to chance is vanishingly small.

The 21 RR estimates in this Main meta-analysis had a fairly low p-value for heterogeneity, 0.07, but it was not statistically significant. This means that there was considerable variation in RR results across the studies, but this might have been due to chance. That there is significant variation in RR estimates is not surprising. The different studies were conducted among different populations, using different methodologies. It would be surprising if there was no variation.  It is nevertheless true that in the current state of knowledge the best estimate of RR is the meta-estimate of 1.28.

Table 3 shows the results of the Main meta-analysis again and contrasts it with the results of seven sensitivity analyses that embody alternative plausible strategies for selecting studies and selecting results within studies. These alternative strategies had almost no effect. The meta-estimates of RR varied in a narrow range from 1.26 to 1.30. Even the lowest of these would lead to the conclusion that there is a highly significant association.

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

It can be affirmed, quite confidently, that the apparent overall elevated risk for women who had ever used such powders is not an artefact of chance variation. This conclusion is not new. It has been stated by the authors of previous meta-analyses. However, I believe this conclusion is based on the most current and reliable data now available.

From a statistical point of view, each of the studies listed in Table 2, except for one or two outliers, shows a 95% confidence interval that overlaps substantially with the confidence interval of the meta-RR estimate (1.19 – 1.38).  Further, the majority of the study-specific confidence intervals (including 2 of the 3 cohort studies) include the overall meta RR of 1.28. This shows that there are few if any studies that are not compatible with the overall RR estimate.

### 6.2.4   Other contemporaneous meta-analyses on binary exposure variable for all ovarian cancers

I started to conduct my meta-analyses in 2015 and revised it in 2018. Towards the end of my analyses, I discovered that two other teams of researchers were carrying out meta-analyses on the same topic at almost the same time. The simultaneous and independent conduct of these three meta-analyses provides a unique opportunity to cross-validate the methodologies and results. (I knew nothing about the two others and I assume they did not know either about mine or the other meta-analysis.) It is sometimes portrayed that meta-analysis is a fairly automated procedure which should produce identical results irrespective of who carries it out. This is far from true.

Even before the statistical part of the meta-analysis is conducted, the author of a meta-analysis has to assemble all of the relevant data. That usually consists of two steps: identifying all informative studies on the topic and identifying the relevant result from each study to include in the meta-analysis. There are many ways to do these steps, and it is not surprising that different, equally competent, investigators may make different decisions about how to identify the studies and how to identify the most relevant results. This is particularly true in the area of observational epidemiology research, as opposed to clinical trials research.  Research designs and methods of conduct and reporting are much more standardized in clinical trials research than they are in observational epidemiology. In the

area of research on talc and ovarian cancer (which is observational) there are many opportunities for judgement of the author of the meta-analysis to come into play, and in section 5.3.1 I have listed some of the decisions that I made, in the way I managed the selection of studies.

The two other meta-analyses were conducted by Berge et al (2018) and by Penninkilampi et al (2018). They conducted rather different search procedures than I did. Since I had already participated in the IARC review and the Langseth 2008 paper, I already had a head start on collecting the relevant scientific literature.  **Appendix B** shows a 3-way comparison of the studies that were included in the meta-analyses by the three authors, and the data from each study that were judged to be most relevant by each author.

As a generalization, it can be seen that the three synchronous meta-analyses identified more or less the same studies and that in general they extracted the same result from each study; but this was not always the case. For my own meta-analysis, I was comforted to note that there was no study that was identified by one of the other meta-analyses that I had missed in my search of the literature (Appendix Table A1).

One of the main points of discordance in procedure was how the three analyses dealt with the Terry 2013 study. Namely, in my Main analysis I used the result of the pooled Ever/Never RR that was quoted by the Terry study, and dropped from consideration the various component studies of the Terry analysis. By contrast, the two others (Berge and Penninkilampi) adopted the strategy of using the results of the individual component studies rather than the overall pooled result. Berge 2018 used the results of the individual component studies as reported by Terry 2013, for most component studies, but for two component studies they used results that were reported in publications that gave results with additional cases. Penninkilampi 2018 also used individual component study results rather than the Terry 2013 pooled result. There are trade-offs between these different approaches. I prefer to use the Terry 2013 pooled result for two reasons. First, a pooled analysis with a standard set of covariates and a standard statistical model is considered superior to a meta-analysis of the components study results. Second, each publication tends to show a variety of results, and the author of the meta-analysis has to choose a

Report on talcum powder use and ovarian cancer                           Jack Siemiatycki

"best" one to represent the "bottom line" from each study. In the Terry pooled analysis, it was the investigators of the original studies, who were also co-authors of the pooled analysis, who chose which would be the "best" result to represent the study, and this in my opinion is more reliable than outside authors making that decision.

**Table 4** shows the meta-RR results from each of the three meta-analyses. Notwithstanding the differences in choices and strategies of the three meta-analyses, the meta-RR results are quite similar, ranging from 1.22 (1.13 – 1.30) in the Berge analysis, to 1.28 (1.19 – 1.38) in my analysis, to 1.31 (1.24-1.39) in the Penninkilampi analysis. These three sets of results are really quite close to each other.

The methodology I used is sound and reliable and consistent with the high standards of my discipline. The strategy and decisions I made in relation to the studies selected and the data abstracted from each informative study is consistent with that methodology I use in my professional practice, and that has earned me recognitions and honors throughout the world.

The results shown in Table 4, are in the same "ballpark" as the meta-analysis previously conducted by Langseth 2008 and they are based on a larger pool of accumulated publications. This indicates that recent evidence is consistent with older evidence and reinforces the consistency of the evidence.

### 6.2.5   Meta-analysis on powdering of sanitary napkins

Tables 2-4 pertain to RRs for the combination of all routes of exposure to the perineum, including direct dusting and dusting on sanitary napkins, diaphragms, underwear, and condoms. When such an exposure variable was not provided in the paper, I used the one that came closest, with priority to dusting on the body directly. Most studies did not report RR results for every route of exposure separately. For the studies that did so, the numbers exposed were much lower than for all routes combined and there was limited statistical power in those analyses. Of the different routes, the dusting on sanitary napkins was generally the most commonly reported route apart from direct dusting. Consequently I assembled the data pertaining to dusting on sanitary napkins and conducted a meta-analysis of those results.

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

**Table 5** shows both the individual studies that had results on sanitary napkin dusting and the meta-analysis result for those studies. The meta-RR was 1.08 (95%CI 0.89 - 1.31), heterogeneity p=0.09. Given the overlap between the confidence intervals between this meta-RR estimate for sanitary napkin powdering and the meta-RR for powdering the perineal area via any route (1.28; 95%CI 1.19 - 1.38), it cannot be affirmed that the result for sanitary napkins is statistically significantly lower than the meta-RR results in Table 3 for all routes of exposure; but the tendency is in that direction.

Berge 2018 and Penninkilampi 2018 also meta-analysed the data on use of powder on sanitary napkins. By contrast with my results, Berge 2018 reported an RR of 1.00 (95% CI 0.84-1.16) and Penninkilampi 2018 reported an RR of 1.15 (95% CI 0.94-1.41). Since their publications do not make it clear which studies and which results were used in these analyses, I cannot see easily what explains the discordance among the three meta-analyses for sanitary napkins powdering. In any case, it certainly appears that the RR was lower for application to sanitary napkins than it was for general perineal application. The interpretation of this finding is not self-evident.  The different routes of exposure may entail very different frequency of exposure. For instance, whereas use of powders on sanitary napkins might involve exposure on only a few days per month, regular use on the perineal region often involves daily or near daily application. I am unaware of any evidence that would address the question of whether regular use on sanitary napkins leads to greater or lesser delivery of talc particles to the portal to the ovary than does regular powdering on the perineal region.

In any case, irrespective of the evidence regarding sanitary napkin exposure, the results in Tables 2 and 3 clearly show an association between exposure to talc in the perineal region and risk of ovarian cancer.

### 6.3   Dose-response – cumulative exposure, duration and frequency

An important part of the evaluation of causality is to determine whether the results display any kind of dose-response pattern. Tables 6 to 8 show results for various quantitative metrics of exposure.

Report on talcum powder use and ovarian cancer                              Jack Siemiatycki

*Trends by cumulative exposure:* **Table 6** shows results from five publications that presented results based on a cumulative amount metric. Four of the studies were based on counts of numbers of powderings, while the Cook 1997 result was based on counts of the number of days on which powdering occurred. As can be seen by perusing the column of numbers of exposed cases, the Terry 2013 results dwarf the others in terms of the statistical information they contain. The Schildkraut study, with about one-tenth as many subjects as the Terry study, nevertheless has as many subjects as the other three studies combined. The relative statistical power of the different studies is also manifested in the width of the confidence intervals.

The evaluation of the statistical significance of a trend is not a methodologically straightforward endeavour. Of particular concern is the question of whether or not the test for trend among subjects in different "dose" categories should include or exclude the unexposed category.  My view is that it depends on whether or not the study results for Ever/Never exposure are part of the buffet of results presented by the authors. Namely, if the only result presented is a dose-response analysis, then it is appropriate to include the unexposed category as part of the study results. If the Ever/Never result is presented and then a dose-response analysis is conducted, it is preferable to maintain statistical independence of the two analyses by excluding the baseline unexposed category from the dose-response analyses. I will interpret the data from these studies in light of this interpretation of trend tests.

The three smallest studies in Table 6 show no evidence of a dose-response pattern. However, the estimates are so imprecise, as evidenced by the very wide confidence intervals, that they are virtually uninformative regarding the presence or the absence of dose-response.

When looking at the Terry 2013 results, which assemble data from eight teams and 10 studies, the confidence limits are much tighter and the estimates of RR much more precise. The p-value for trend (excluding the unexposed group) is 0.17. Nevertheless, with a reference value of RR=1.0 among unexposed, and with point estimates of RR in four quartiles of cumulative exposure of 1.14, 1.23. 1.22, and 1.32, these results are certainly

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

___

compatible with the presence of an underlying dose-response relationship. Note that the absence of statistical significance of the trend among the four exposed subsets is not equivalent to the demonstration of an absence of dose-response.  Similarly, the Schildkraut 2016 study results, while based on only two lifetime cumulative "dose" categories with point estimates of 1.16 and 1.67, are also compatible with a dose-response pattern.

*Trends by duration of exposure:* **Table 7** shows the results of those studies that presented RRs by duration of use. The Terry 2013 pooled analysis did not report results by duration of use; however, some of its constituent studies did so and are included here. The numbers in each of the duration categories in each of these studies is quite small, and consequently the RR estimates are very imprecise, with wide confidence intervals. The categorisation of duration differed quite a bit among the studies and it is not easy to compare results between studies. There is no indication of a dose-response relationship in these results. Though, the wide confidence intervals make it impossible to affirm that there is evidence against dose-response. Further, the largest study showing results by duration of use, Wu 2015, did find a significant increase in risk with increasing duration.

*Trends by intensity of exposure:* **Table 8** shows results of those studies that reported by intensity (i.e. frequency) of usage. This ignores duration of usage. Like the results in Table 7, the results in individual studies are based on rather small numbers and they entail imprecise estimates of RR. Also like Table 7, the pattern of results is equivocal. There is no clear evidence for or against an underlying dose-response.

The Berge 2018 paper also looked at dose-response. They only looked at trends by duration of usage and frequency of usage, analogous to my Tables 7 and 8. However they actually fitted continuous variable models and found that there were significant trends in risk by duration and by frequency of exposure. They did not examine trends by cumulative exposure, and in particular they did not use the results from the Terry 2013 pooled analysis, which in my view is the most informative evidence available on dose-response.

Penninkilampi 2018 looked at risk according to long duration of usage and found no trend. They also looked at cumulative exposure with total number of applications, and they reported a slightly higher RR for women with greater than 3600 applications (RR=1.42)

___

16 November 2018                                                              44

Report on talcum powder use and ovarian cancer                          Jack Siemiatycki

compared with women who had fewer than 3600 applications (RR=1.32). I cannot determine from the paper which studies were included in this analysis and in particular whether the pooled Terry 2013 dataset was included. While the Terry 2013 and Penninkilampi 2018 papers both contained some results on dose-response, they are not included in Tables 6-8 because they are not original data collection studies; like mine, their's is a review of other studies which are contained in Tables 6-8.As indicated above, all other things being equal, the best metric of the three quantitative ones is the cumulative exposure metric, and that is the one that happens to provide the most statistically reliable data. Thus, the evidence from Table 6 overrides the weaker evidence from Tables 7 and 8. The evidence from the Terry 2013 paper is the most important piece of evidence we have on dose-response.  The evidence from the Terry 2013 paper is compatible with the presence of a dose-response relationship between use of powder and ovarian cancer.

### 6.4   Subtypes of ovarian cancer - in particular, serous invasive tumors

Most studies that provide results on RR between talc powder and ovarian cancer provide results for all types of ovarian cancer combined.  Less than half of the published studies have also provided results of the associations between talc powder exposure and various subtypes of ovarian cancer.

To the extent that talc exposure might have different effects on different subtypes of ovarian cancer, there would be a clear advantage to segregating the evidence by type of ovarian cancer and evaluating the evidence for each subtype. The serous-invasive subgroup comprises over half of all cases, and the rest are split among several other histology-behaviour subgroups (mucinous, endometroid, clear cell, others, and these can be further subdivided by invasive or borderline).  Those latter subgroups entail very small numbers each and barely provide enough data, in most studies, to produce informative risk estimates. In those studies, where results were presented by histologic-behaviour subgroups, it is my judgement that there is no strong consistent pattern indicating that one subtype has higher risk than another. Of course, there is variability in point estimates of RR, but on the one hand the variability in RR estimates between ovarian cancer subtypes within studies is not greater than would be expected from chance variability (mostly, the

Report on talcum powder use and ovarian cancer                                   Jack Siemiatycki

confidence limits overlap considerably), and on the other hand, from study to study, it is not always the same subtype that seems to have the highest or lowest relative risks.

In the largest assembly of cases subdivided by histologic subtype, the Terry 2013 pooled analysis, the results by subtype were as follows:

- Serous: n=1197; RR=1.24(1.13-1.35)

- mucinous: n=94; RR=1.06 (0.82-1.36)

- endometroid: n=304; RR=1.20 (1.03-1.40)

- clear cell: n=187; RR=1.26 (1.04-1.52).

Other than serous invasive tumors, there is no other subtype for which there are sufficient numbers of studies and sufficiently precise estimates of RR in each study to provide reliable estimates of the overall RR. While the results for endometroid and clear cell tumors show risks that are closely aligned with those for serous tumors, the result for mucinous tumors are so imprecise, because of the very small numbers of such tumors, that the estimated RR of 1.06 is very unreliable.

Consequently, and because there were multiple studies apart from Terry 2013 that presented results for serous tumors, I decided to conduct a meta-analysis for serous/invasive ovarian cancers, but not for other subgroups. The meta-analysis on serous invasive tumors will indirectly inform us also about the relative risks for other types of ovarian cancer. Namely, if the RR for serous invasive tumors is similar to that for all ovarian tumors, it will imply that the risks for other types (the complement of serous invasive tumors) will not be very different from the overall RR. If the RR for serous invasive tumors is much greater than that for all ovarian tumors, it will imply that the risks for other types (the complement of serous invasive tumors) are lower than the overall RR. Similarly, if the RR for serous invasive tumors is much lower than that for all ovarian tumors, it will

Report on talcum powder use and ovarian cancer                      Jack Siemiatycki

imply that the risks for other types (the complement of serous invasive tumors) are higher than that for all ovarian cancer.

Table 9 shows all the studies that reported results concerning the link between talc exposure and serous/invasive tumors. There were 8 informative studies, including Terry 2013, which carried by far the most statistical weight. The meta-RR estimate for serous/invasive tumours was 1.25 (1.1.15- 1.36).  This is very similar to meta-RR for all ovarian tumors, albeit based on a smaller number of informative studies. Thus there is no persuasive evidence in these studies, taken as a whole that the effect of talc differs by histologic subtype of epithelial ovarian cancer. That is, with such a tiny difference in RRs between that for all ovarian cancers combined and that for serous invasive ovarian cancers, it can be safely inferred that the RR for other types of ovarian cancer (the complement of serous invasive) would not be far from the overall RR of 1.28.

### 6.5   Conclusion from meta-analyses and dose-response considerations

**My opinion, based on up-to-date data and meta-analyses, is that the RR between ever perineal use of talcum powder products and ovarian cancer (all types combined) is 1.28 (95%CI 1.19-1.38). This result is highly statistically significant.**

We can rule out random variability as a possible explanation for the apparent excess risks.

Further, the examination of results according to the "amount" of exposure, and notably the cumulative exposure variable used by Terry 2013, shows that the higher the exposure, the higher the risk.

Such a pattern of findings can have only two possible explanations: it must be the result of some sort of bias or confounder that operated in multiple studies or it must be the result of a real causal association.

### 7.    Misconceptions and possible biases

In reaching my opinions, I have objectively looked at the data and scientific literature and considered the points of view of others who do not share the conclusions I have reached. There are generally two sources of disagreement: misconceptions of epidemiologic or

16 November 2018                                                              47

statistical concepts which I address below in Section 7.1 and professional judgement of the likelihood of errors and biases in the various epidemiological studies, which I address in Section 7.2.


### 7.1    Some prominent misconceptions in reviewing the evidence

Table 10 lists some prominent misconceptions, and I will address them here.

*Misconception: "Cohort studies are more valid and informative than case-control studies."*

As can be seen in Table 2, the case-control studies tended to produce higher RR estimates than the cohort studies. It has sometimes been claimed that cohort studies are more valid than case-control studies. There is no theoretical or practical reason why such a blanket assertion should be universally true. There are many factors that influence the validity of a particular result in a particular study and it cannot be reduced to any simplistic assertion that cohort studies are more valid than case-control studies, or vice versa. In the next section, I will go through a number of potential sources of distortion of results from epidemiologic studies, and I showed that some of them might occur in cohort studies, some in case-control studies, and some in both.  Some of these distortions very likely occurred in some or all of these studies that provide data on talc and ovarian cancer. On balance, I believe the results of each of these case-control studies concerning female use of powders and ovarian cancer are credible, and perhaps more so (for reasons given in section 7.2), than the analogous results of each of these cohort studies.

*Misconception: "Hospital-based case-control studies are more valid and informative than population-based case-control studies."*

In a case-control study, the design objective is to define a study base, or a population base, in which the cases might occur, and to identify representative samples of cases and of controls in that study base. The purpose of a control group is to provide an estimate of the prevalence of exposure to the factor under study in the base population that gave rise to the cases. In many instances, the best source of controls for case-control studies is a population list of some sort. But sometimes using a population list is not feasible or

Report on talcum powder use and ovarian cancer                          Jack Siemiatycki

desirable, and an alternative can be to select controls from among hospital patients with conditions other than ovarian cancer. This was done in some of the ovarian cancer case-control studies.

The most common generalization made by epidemiologists is that population-based case-control studies are more valid than hospital-based case-control studies. In fact, neither this nor the opposite statement that I articulated as a Misconception, is universally correct. Validity of a case-control study depends on the specific design features and circumstances of the study.

It is possible that some types of hospital controls have patterns of usage of powders that are different from those of women in the general population, either because the powders are actually causally associated with the diseases that those women have or because their disease or condition that led them to be hospitalised induces some women to take up the use of such powders. If such a mechanism was present in a hospital-based case-control study, it would likely lead to an artificially attenuated RR, not an artificially inflated RR.

*Misconception: "Counting the number of statistically significant results is a valid way of assessing consistency of results among multiple studies."*

This misconception betrays a lack of understanding of statistical significance. As can be seen in Table 2, several of the individual studies listed in my meta-analysis did not find a statistically significant increase in RR. This has been cited by some as evidence that there is no real causal link.

In fact, meta-analysis is a method that was developed precisely because counting significant results is an invalid way of synthesising knowledge. Namely, a result from a single study may fail to achieve statistical significance either because there is no risk in that study, or because the statistical power of the study was limited. Meta-analysis was developed in order to combine evidence from multiple studies that may be under-powered on their own, but when combined show an effect that might be statistically significant. The meta-analysis cannot conjure a statistically significant meta-RR if the individual study RRs do not systematically lean in the direction of an excess risk, and they do so in the area of talc and ovarian cancer to a degree that cannot be explained by random fluctuation.

16 November 2018                                                                              49

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

*Misconception: "You cannot prove causality with an RR less than 2.0."*

There is nothing in epidemiologic theory or practice that justifies such a statement. Indeed, this assertion about an RR $\geq$ 2.0 threshold does not exist in epidemiology. There are many well-established causal relations where the RR is less than 2.0. Table 11 lists a number of such examples. In clinical medicine also, it is very common to strive to find therapies that reduce the risk of death from some disease by as little as 10%, and several such discoveries are well documented and have been integrated in medical practice, even though the change in risk is small.

*Misconception: "If a product has been used for a long time it must be safe."*

It has been argued that since talc powder has been used for many decades by millions of women (and men and children), it has stood the test of time and should be considered safe. This is a specious argument.

Most agents in our environment or in our lifestyle which are now considered dangerous were used for decades or centuries without falling under a cloud of suspicion. These include such factors as cigarette smoking (many cancers and cardiovascular disease), asbestos (lung cancer), sunlight (skin cancer), ingesting very hot liquids (esophageal cancer), and many others.

*Misconception: "Government agencies provide the most reliable and authoritative statements regarding the lack of carcinogenicity of talc."*

Various national and international agencies have websites which list carcinogens. Examples are: National Cancer Institute (NCI), National Toxicology Program Report on Carcinogens (NTP-RoC), International Agency for Research on Cancer (IARC). It can be argued that these agencies, which undoubtedly have scientific credibility, would not put on their websites information that is out of date or invalid. However, that claim is false.

IARC has a rigorous evaluation process which is considered quite authoritative throughout the world, including in the U.S. But the evaluation is carried out at a certain point in time. The last time talc was evaluated by IARC was in 2006. Based on the evidence available then, the panel rated talc as a "possible" carcinogen. Additional evidence has been accumulated

and come to light since then, but there has not been a new evaluation by IARC. (There are potentially thousands of agents to evaluate, and IARC has resources to only evaluate a few each year. Thus they cannot keep re-evaluating the same ones as soon as new evidence is published.)

NTP-RoC is a congressionally-mandated program whereby the agency is obligated to periodically publish lists of known and suspected carcinogens. Unlike IARC, it appears that the people who make the decisions are internal RoC scientists, rather than external experts, with advice from outside experts. Also unlike IARC, the biennial reports only contain listings of those agents that have been deemed to be definite or likely carcinogens, so there does not seem to be a statutory listing of all agents that have been considered. From the minutes of a meeting of the Board of Scientific Counsellors of NTP held in 2000, it appears that the issue was deferred. I am not aware that the RoC has conducted a subsequent review of talc; although, when renominated in 2004, NTP deferred to IARC.

NCI provides a website for doctors where they indicate for each type of cancer, what are the known risk factors. Based upon my understanding, they do not carry out a rigorous evaluation along the lines of the IARC evaluations or even the NTP evaluations. It is a rather superficial process compared with the IARC process and it depends on the existing knowledge of the committee members which in a short time opines about possible associations between each of the scores of cancer types and scores of potential risk factors. This is not to argue that the members of these committees are less expert than the members of the IARC committees, but the NCI committee members have a short time (apart from their main jobs) to review hundreds of possible factor-cancer associations, whereas the IARC committee members have weeks to review just a few.

Scientists and public health agencies regularly consult the IARC evaluations and those of the NTP. The NCI website for doctors is not considered an up-to-date and cutting edge source of information. This is, of course, no reflection on the gravitas of the NCI as a whole, which has much more invested in its original research mission than in its website for doctors.

Report on talcum powder use and ovarian cancer                              Jack Siemiatycki

There are other organizations which may put some information about causes of cancer on their websites.  Importantly, I have not seen any agency or organization, including the FDA, that conducted a rigorous evaluation of the epidemiologic and non-epidemiologic studies like we did at IARC in 2006.


*Misconception:* "*A biological mechanism must be proven before we can establish causality*"

There are innumerable examples in medical history of discoveries of risk factors or treatments that did not require knowledge of the mechanisms of pathogenesis in order to determine causality.  I have compiled a few such examples from medical history and show them in **Appendix C**.

Very often, the initial suggestion was met with scepticism from the vantage point of biologic plausibility. In fact, very seldom have the essential features of biologic plausibility been worked out by the time the epidemiology has convincingly demonstrated that the association is causal. This can be asserted for the early discoveries such as the cancer causing effects of certain chemicals in dye production facilities, certain metals in various heavy industry facilities, certain emissions of combustion of fossil fuels, ionising radiation, and even cigarette smoking. In most of these examples, it was decades after the epidemiologic evidence became convincing that credible mechanistic theories were proven; though, for some, the biologic mechanisms remain unknown.

Indeed in the guidelines of the IARC Monographs, it is stated that if there is "sufficient" evidence of a risk of cancer from epidemiologic studies, then irrespective of the evidence from animal experimentation and other biologic evidence, the agent in question should be considered a Group 1 carcinogenic agent. My point here is that the demonstration of a proven biologic mechanism is not a prerequisite for demonstrating that an agent is a human carcinogen. Reliable empirical epidemiologic evidence of an association is a sufficient basis for demonstrating causality; the presence of a credible biologic mechanism enhances the degree of proof, though that often lags decades behind the general recognition of causality, as exemplified by the examples in Appendix C.

It is not my opinion that we should ignore or set aside consideration of biologic plausibility. As Hill (1965) indicated in outlining the thought process for establishing causality, biologic plausibility is one of the dimensions to be considered. But, he also cautioned that, "this is a feature I am convinced we cannot demand". Thus, as I have done in other contexts in regard to other putative carcinogens, I am able to draw causal inferences about talc irrespective of whether a causal mechanism has been proven.

*Misconception: "Bradford Hill criteria comprise a checklist of necessary conditions"*

As I explained in section 4.2, the "aspects" that Hill listed are not "criteria" and they are not necessary. This point has been made and is widely accepted by epidemiologists. The list of "aspects" in Hill's original paper have been rephrased and reworked in many textbooks and by most agencies that refer to them. They provide a framework and not a checklist.

### 7.2    Alternative explanations - Biases and errors

Before inferring that the strong statistical evidence that use of powder in the perineal area by women is associated with ovarian cancer may represent a causal relationship, I considered alternative explanations for these observations. In this section I will consider a number of potential sources of distortion of the risk estimates, under various rubrics. Some of the potential sources of distortion are unique to cohort studies, some are unique to case-control studies, and some can affect both types.

#### 7.2.1    Bias due to non-response or non-participation

This is a potential source of bias in case-control studies.

Among all potential cases and controls who meet the study's eligibility criteria, some participate and some don't. The most common reasons for non-participation are: refusal; inability of the researchers to contact the person because they moved or are too sick or died or are otherwise unavailable; if access to the subject is via the treating physician or medical staff, there could be obstacles at that level. If the factor under study, hygiene powder use, is correlated with the likelihood of participation and if the participation rate is low, this could lead to biased estimates of RR. Such bias could artificially inflate or deflate the RR depending on how the various variables are related to each other. If response rates

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

are low, say below 70%, and differential both by case-control status and by exposed – non-exposed status, this could lead to biased RR estimates. For such a bias to explain the outcomes seen, it would require quite strong associations between likelihood of participation and powder use, and quite strong differences in such associations between cases and controls.  In my opinion, it is very unlikely in the context of these studies that response rate differentials would be great enough to induce such large bias.

### 7.2.2   Recall or reporting bias

This is a potential source of bias in case-control studies.

Because the exposure history is collected retrospectively, it is subject to both non-differential recall errors (see below), and to recall or reporting bias between cases and controls. Cases and controls may have different motivation and proclivities to recall and report use of powders. If it were true that cases had a greater tendency to over-report powdering history or if controls had a greater tendency to under-report powdering, then this would lead to an artefactual exaggeration of the RR.

There are a few possible causes of such differential reporting. First, it might be hypothesized that there is a general tendency for cases in case-control studies to acknowledge behaviours or exposures with much greater frequency than controls just because they are more invested in the research than are controls. They may wrack their brains during the interview to find instances of the queried behaviour or exposure that controls don't pay much attention to during the interview, because the controls just "want to get the interview over with". If this were the case, we would systematically see elevated RRs from case-control studies for all manner of variables in all kinds of studies. But in my experience, this does not occur. (I have conducted many case-control studies, each study eliciting information on many lifestyle factors and exposures. It has not been the case that cases systematically report more exposures than controls.)  Furthermore, and more pointedly, if such a phenomenon were operative in these case-control studies of ovarian cancer, we would see elevated RRs when women were questioned about the use of powders on other parts of their bodies than the perineal area. In fact, several studies did ask such questions. In the Terry 2013 analyses, based on very large numbers of women, the

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

overall RR for ever use of hygiene powder on non-genital areas of the body was 0.98 (0.89-1.07), in stark contrast to the analogous result for genital use of 1.24 (1.16-1.33). In other words, when questioned about powdering in non-genital areas, controls were as likely to say "yes" as cases. Clearly there was no tendency for cases to indiscriminately report exposures more frequently than controls.

A second possible reason for such a situation to arise is if there was widespread knowledge about powdering being under suspicion for ovarian cancer. In such a situation women who have heard about this might internalize the notion that powdering may have caused their cancer, and they might ruminate with such intensity on the notion that they might imagine that they had used powders at some point in the past. But for most of the period of data collection in these studies, there was very little public discussion of a possible linkage between powdering and ovarian cancer and I doubt if more than a handful of the thousands of women interviewed in these studies would have heard of such a hypothesis before being interviewed.

In my opinion recall bias is not likely to have produced the kinds of RRs we see in these studies.

### 7.2.3   Non-differential (or random) error in recall or reporting of exposure to powders

This is a potential source of bias that would affect both case-control and cohort studies, but not exactly in the same ways.

Reporting past history of activities and exposures is always subject to some degree of error; it can result from ambiguity or misunderstanding of the questions, failures of memory, or inattention. And this is certainly true for history of powdering. If such error is non-differential (i.e. equally present for cases and controls in the case-control context) it has an effect on RR estimates that is rather predictable. Namely, as I explained above, it has the effect of artifactually decreasing the RR. The degree of attenuation is roughly proportional to the degree of error or misclassification. If there really is a causal association between powdering and ovarian cancer, then we can be rather certain that the true RR is higher than what we can see in the various studies that have reported RRs.

16 November 2018                                                                              55

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

Furthermore, we might make some reasonable inferences about the impact of reporting error on dose-response trends as well as on the overall RR. It is reasonable to surmise that the amount of reporting error is quite a bit higher for the details of past usage (duration of usage, intensity and frequency of past usage) than it is for the simple fact of usage. That is, there is less error in a woman's report of whether or not she ever used powders on a regular basis than in her report of the details of the usage, even if powdering behaviour may be a relatively stable habit. The consequence of this is that the RR based on ever/never usage (Table 2) is less subject to artefactual attenuation than the RRs based on categorizing the duration or intensity or cumulative amount of usage (Tables 6-8). This is a possible explanation of why there has been a much clearer signal of elevated RR for ever/never usage than there has been for dose-response.

There is likely to be more measurement error of exposure to powders in cohort studies than in case-control studies, for several reasons. First, because the cohort study questionnaires attempted to broach topics that could be relevant to many types of cancer and indeed many diseases, the questions posed in the cohort study questionnaires about talc powder use tended to be much briefer and probably less effective at eliciting valid information than the questionnaires used in case-control studies of ovarian cancer.  For instance, the cohort studies did not elicit information on timing or duration of past usage, and one of the cohort studies did not even attempt to elicit information about use of talcum powder products over 12 months before the interview.  Second, whereas a case-control design involves a woman looking backwards over her life from the time of incident cancer onset and thereby addressing the entire relevant period of potential exposure, the woman in a cohort study reports on her past usage as of a certain point in her life, but there may be 10-20 years subsequent in which her habits could have changed, and of which the cohort study has no knowledge. The women in the cohort studies were "locked into" their exposure category at baseline of the cohort study. If there were women who in fact started using powders after the baseline, they would be incorrectly labelled as non-users. And, if there were indeed a risk associated with use of talc powders, the risk estimate would be diluted by the incorrect inclusion of users among non-users.  Accordingly, the longer such subjects are followed, the more likely such misclassification is to occur.

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

The age at which information is collected is a relevant consideration. In most case-control studies, the mean age of the study subjects was between 50 and 60. In the NHS cohort study the mean age at baseline questionnaire was around 40 and in the WHI it was over 60. In each study, women were asked about their past history of powder usage. Clearly the WHI women had a further stretch of time to consider than the women of the NHS and even of the case-control studies.

A particular form of measurement error may well have occurred in the Gonzalez 2016 study and produced even more attenuation of RR estimates. Namely, in their brief questionnaire on talc exposure, the question was formulated to ask women about their use of powders in the 12 months preceding the interview. While exposure to talc over the past 12 months may be correlated with exposure over the entire etiologically relevant period, which might go back decades in the life of the woman, the correlation is probably weak, and this is another source of measurement error.

### 7.2.4   Short follow-up periods for disease ascertainment

This is a potential source of bias that would affect cohort studies.

In a cohort study, if the period of follow-up after baseline is relatively short; and if the latency period between exposure and cancer is long, the excess risk may not be detectable because cases that would occur after long latency have not had time to occur. If this did occur, it would lead to an artificially low RR estimate.

This could have been an issue in the initial publication from the NHS, the Gertig 2000 paper. As of the Gates 2008 and Gates 2010 analyses of the NHS, the follow-up period was probably long enough and this bias should have abated. For the WHI study it was likely an issue in the Houghton 2014 paper, and it would remain so until there is much longer follow-up. It would also be an issue in the Gonzalez 2016 paper from the Sister Study, which had only 6 years of follow-up after exposure was ascertained.

### 7.2.5   Diagnostic error

This is a potential source of bias that would affect both case-control and cohort studies, but not exactly in the same ways.

16 November 2018                                                                57

Report on talcum powder use and ovarian cancer                         Jack Siemiatycki

The diagnosis of cancer is never error-free. And details of histology and staging are even more error-prone. Further, there are trends in diagnostic criteria and methods over time, as well as in the terminology and classifications used. So what we observe in these various studies of ovarian cancer represents imperfect estimates of true biologic/pathologic status. The impact of such "errors" is mainly the same as exposure measurement error, namely it would tend to artificially reduce RR estimates. Since most case-control studies start from hospital-based cancer diagnoses as the point of entry, they usually have reasonably valid diagnostic information.

In general, cohort studies tend to be more vulnerable to this source of error and bias, because disease diagnosis information is often obtained from sub-optimal sources, such as the information provided by the study subject or her family, or information obtained from death certificates. In the three cohort studies included in the meta-analysis, there were high quality verifications of diagnostic information that had been provided by the women or their families. But such verification may not be as reliable as information coming straight from hospital pathology or oncology services. I expect that this was not a major issue here, but to the extent that it did operate, it too would have led to some additional attenuation of RR estimates, as I explained above.

### 7.2.6   Initiation of powdering as a result of ovarian cancer

This is a potential source of bias that would affect case-control studies.

It has been speculated that women with early symptoms of ovarian cancer might take up the use of powders to help with relief of their symptoms. If so they might report that they used powders before their cancer was diagnosed and this could artificially inflate the RRs. While the women are usually questioned about the period before their cancer was diagnosed, there could be some "telescoping" so that women who start dusting after diagnosis respond in the affirmative to the questionnaire.

In the same vein, it has been speculated that treatment for ovarian cancer might produce side effects that could be relieved by powdering. And again, it might be posited that women ignore the instruction to refer the exposure question to the time before the onset of the cancer.

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

If the early symptoms of ovarian cancer provoke some women to start dusting the perineum to relieve some of the discomfort, or if the treatment provokes women to start dusting, this would lead to an artefactual excess RR.

I have not found any empirical evidence to support this hypothesis.

In the few datasets I have seen which describe the age distribution of initiation of powdering, there were very few patients who started in the year or two before diagnosis of the cancer. I am inclined to believe that it is virtually a non-issue, and that if it operated at all, it would only have operated on a handful of the thousands of women who were part of the various case-control studies.

### 7.2.7   Confounding

This is a potential source of bias that would affect both case-control and cohort studies.

If women who use powders are also more likely to be exposed to other risk factors for ovarian cancer, then it might distort the relationship between powdering and OC. The direction and the degree of distortion (bias) that would be induced depends on two components, a) the true association between the confounder and ovarian cancer, and b) the association between the confounder and dusting behaviour. Thus, depending on the direction of these two component associations, the confounding can result in artificially decreased or increased RRs. Typically, the degree of confounding is much lower than the strength of the association between the confounder and ovarian cancer. In order for a confounder to induce an artificial RR of 1.25 for dusting, it would have to have an RR much greater than 1.25 with ovarian cancer and a fairly strong correlation with dusting behaviour. Given that the main studies have controlled for the main risk factors, I consider it unlikely that this operates. Table 1 shows the covariates that were controlled for in each study, and while there is some variability between studies in the list of covariates, the main known potential confounders (age, BMI or weight, parity) have been controlled for in almost all studies. It should be noted that while smoking is a well-established risk factor for many types of cancer, it is not a risk factor for ovarian cancer; thus, there is no need to control for smoking status in studies of ovarian cancer.

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

A thorough and reliable investigation of potential confounders was conducted by Cramer (2016); in the large database of New England-based studies, they explored the potential confounding effect of a host of personal characteristics including demographic, reproductive, hormonal, comorbidities, activities, and exposures. None of the covariates that they explored had any meaningful confounding effect on the association between talc and ovarian cancer.

### 7.2.8   Publication bias

This is a potential source of bias that would affect case-control and cohort studies.

This refers to the tendency for some evidence never to "see the light of day". Namely, when results are "negative" or "null", it may be that investigators never bother to submit them for publication, or alternatively, that editors refuse to publish them. This happens, most likely, when the hypothesis under study is not particularly topical or controversial, and when the study is small. In the talc-ovarian cancer literature this would have been more likely in the pre-2000 era when there was much less scientific interest in the hypothesis linking talc to ovarian cancer. As a sensitivity analysis, I conducted a meta-analysis on the subset of studies in Table 2 that had at least 20 exposed cases. That is, I eliminated the studies from that stratum of the universe of studies that were most susceptible to publication bias.  The resulting meta-RR was almost identical to those shown in Table 4.  Because this has been a somewhat controversial topic in epidemiologic circles over the past 20 years, I doubt if there were large important studies with null findings on talc-ovarian cancer that went unpublished.

In their meta-analyses, Berge 2018 and Pennikilampi 2018 both showed funnel plots of the results. These are meant to detect so-called publication bias. Both of those analyses concluded that there was no publication bias.

In summary, I consider that the observed association between talc and ovarian cancer is not an artefact due to publication bias.

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

### 7.2.9   Summary comments regarding biases and errors

While the results of epidemiologic studies strongly supports the hypothesis of an association between perineal use of powders and risk of ovarian cancer, we must be wary of potential sources of error and bias that can distort an association before concluding that this association is causal. I have therefore gone through the plausible sources and types of error and bias that could potentially explain the positive association seen across the relevant studies to ascertain how likely it is that each such type was actually operative and, if so, what the nature of the impact may have been. These evaluations are based on my professional opinion as an epidemiologist having conducted, reviewed, and evaluated many hundreds if not thousands of epidemiologic studies.

Of the various types of error listed, some could artificially inflate the RR estimates and some could artificially decrease the RR estimates. Some are likely to have occurred and some are unlikely to have occurred. The one that certainly occurred and that has a non-trivial attenuating effect on RRs is random exposure misclassification (section 7.2.3). As explained above, if there is a true association, then the true RR is almost certainly greater than the estimates seen in these studies and in the resulting meta-analyses. Other types of error and bias that are highly likely to have occurred are the two that are specific to cohort studies. Namely, the Nurses' Health Study papers (Gates 2008 and Gates 2010) almost certainly suffered from an attenuated RR estimate because of the compromised reference category of "unexposed" while the Women's Health Initiative paper (Houghton 2014) and the Sister Study paper (Gonzalez 2016) almost certainly suffered from a too short follow-up period (section 7.2.4).  In my opinion, the occurrence and the possible impact of other listed types of bias and error are more speculative, and less likely.

Consequently, in my opinion, the observed association between talcum powder products and ovarian cancer is unlikely to be explained by any methodological problems with the studies.

## 8.   Bradford Hill guidelines applied to talc and ovarian cancer

The Reference Guide on Epidemiology of the Manual on Scientific Evidence (2011) states: "There is no formula or algorithm that can be used to assess whether a causal inference is

16 November 2018                                                                                     61

appropriate based on these guidelines." These guidelines are simply aspects that might be considered in assessing causality. I will give my assessment of how the evidence regarding talcum powder products and ovarian cancer fit into those aspects. I will use the version listed in the Reference Manual on Scientific Evidence. While there is no objective basis or scientific precedent or "scientific jurisprudence" for quantification or weighting of the various "aspects", to help the reader to understand the relevance that I attached to each "aspect" in my evaluation, I will provide an informal ranking of the importance that I attach to each aspect, in the specific context of the assessment of causality of evidence regarding talcum powder products and ovarian cancer. I will list the aspects in descending order of importance that I attach to them.

My opinions are briefly summarized in **Table 12**.

### *Highly important aspects in my weighting*

There is a set of B-H aspects that are utterly inter-related and cannot be disassociated one from the other. In combination, they represent the most important aspect to consider in evaluation of causality of talcum powder for ovarian cancer. These include strength of association, dose-response, consideration of biases, and consistency of findings.

<u>Strength of the association</u>. This can embody both the magnitude of the RR and its statistical significance. The meta-RR estimate is 1.28.  That means that the best estimate from the epidemiologic literature is that women who regularly used talcum powder products in the genital area had 28% higher risk of ovarian cancer than women who did not use such powders. As I illustrate in Table 11 with a few examples, this RR is in line with many well-recognized risk factors for cancer and other diseases. For example, it is well accepted now that people living in an urban neighborhood in which the air is highly polluted with particulate matter have between 5% and 10% excess risk of lung cancer compared with people living in a less polluted urban neighborhood. Also, it is well accepted now that workers exposed to a solvent called trichloroethylene have about a 40% higher risk of kidney cancer compared with workers not exposed to trichloroethylene. Thus, the 28% increase of ovarian cancer for women who used talcum powders is in line with many recognized risk factors. This increased risk as manifested by the meta-RR is highly

Report on talcum powder use and ovarian cancer                          Jack Siemiatycki

statistically significant.  (Note that the statistical significance of individual studies is irrelevant to the consideration of causality; it is the totality of evidence embodied in the meta-analysis that counts.) Such a high and significant meta-RR could not have occurred by chance. This is a very important factor in how I view the evidence of causality, and it supports causality.

Dose-response relationship.  If the relative risk increases when the exposure increases, it enhances the likelihood that the observed association is really causal. In studies of lifestyle habits like use of talcum powder products, the most common way is to estimate the RR in increasing categories of exposure metrics such as duration (years) of usage, or intensity of usage (frequency per day or per week or per month), or cumulative amount of usage (a combination of duration and frequency). The most sensitive of these metrics is the cumulative amount. I evaluated the published studies reported on risks according to the different metrics. By far, the most important set of results on dose-response is that from the Terry 2013 pooled analysis of 10 studies using the cumulative exposure metric. And, the next most important from a statistical weight point of view is that from Schildkraut 2016. In both of those studies, there is a clear indication of increasing risk with increasing cumulative exposure.  Since the statistical power to detect a trend is less than the power to detect an overall risk, it is not surprising that the p-value for trend does not attain the conventional 0.05 level, but it remains true that these studies support a dose-response. This is an important consideration in my assessment of causality, and the evidence on dose-response that our IARC committee had available in 2006 was much less persuasive than the evidence available now.

Consideration of alternative explanations - absence of bias. There are many potential sources of bias in observational research, including in epidemiology. It is important to consider the presence of bias in each study performed or reviewed in an evaluation of causality.  The possibility of bias is so multifaceted that it is impossible to reliably assign an explicit score to the likelihood of bias in a study or in a body of studies. It is also important to understand that identifying a potential source of bias is not tantamount to identifying the presence of bias. In section 7.2, I have reviewed the potential role of several types of biases and errors

Report on talcum powder use and ovarian cancer                          Jack Siemiatycki

that can bedevil such research. I concluded there that none of those factors would cause the apparent associations.

<u>Consistency of findings between studies (or replication of findings).</u>  Because epidemiologic research is susceptible to errors from random variability and from different kinds of study biases, before accepting the apparent association as a generalized phenomenon, it is important to see that similar results are replicated in different studies. When these different studies also encompass different study populations in different communities, it enhances the generalizability of the inferences. Generally speaking, the observation of consistent results in different studies adds to the credibility of an inference that there really is a causal relationship. In my review of the published epidemiological studies and meta-analysis, I am impressed by the consistently elevated risk across studies. Almost all of the 30 or so studies have produced an RR greater than the null (neutral) value of 1.0. If there really were no association between talcum powder use and ovarian cancer, we would expect to see as many RRs lower than 1.0 as higher than 1.0. The pattern we see is like flipping a coin 30 times and getting a heads 28 or 29 times. The individual study RRs are not all necessarily statistically significant, but that is irrelevant because most individual studies did not have sufficient statistical power to detect RR in the range of 1.2-1.4. It is the statistical significance of the meta-RR, representing the combined evidence that has the requisite power, and that excess RR is highly statistically significant. I place great weight upon this evidence of causality and, here, believe it to be amongst the most important findings.

***Moderately important aspects in my weighting***

<u>Temporal relationship.</u>  Exposure should be seen to have preceded disease. It is almost a logical truism. This is the only aspect that Bradford Hill considered to be necessary. In all of the studies I reviewed, the information elicited about talc exposure concerned the time period before cancer onset. Since it is so obviously important, the reader may wonder why I place lesser weight on this aspect. It is simply because the presence of this condition of temporality is so obvious in these studies.

<u>Biological plausibility (coherence with existing knowledge).</u>  It is both conventional and natural to consider whether any putative association is biologically plausible. The notion of

16 November 2018                                                                                        64

biological plausibility is multi-facetted. In the case of talcum powder products and ovarian cancer, it can include such issues as: how such powders have been used, female anatomy and physiology, toxico-kinetics and toxicology of talc, in vitro and in vivo mechanisms of carcinogenesis, and others.

The first thing to note about this aspect that Bradford Hill listed is that it is called "biological plausibility", not "biological proof". That is, there was never any implication that a determination of causality should rest on a demonstrated proven biological mechanism. Hill was always reserved about this aspect, stating that it was not an essential prerequisite to establishing causality. As I have mentioned above, it has been common in the history of medicine and epidemiology for the elaboration of a validated biological mechanism to come much later than the discovery and demonstration of a causal association. Appendix C gives a handful of such examples but there are scores more.

Insofar as the issue of talcum powder products and ovarian cancer is concerned, there is evidence to support a few biologically plausible mechanisms.  First of all, there are two possible routes that talcum powder products can take to reach the ovaries. There is published evidence that talcum powder products (and its constituents and contaminants) that are applied to the vaginal area can migrate from there to the fallopian tubes and ovaries (Venter 1979; Henderson 1986; Heller 1996) or to pelvic lymph nodes. (Cramer 2007)  In addition, as has been hypothesisized and partially demonstrated in the discussion of asbestos and ovarian cancer, such particles might reach the ovaries via inhalation and translocation. (Miserocchi 2008; IARC 2012) Once the particles reach the ovaries, carcinogenesis can be triggered by the inflammation engendered by the particles. (Ness 1999; Ness 2000) There is considerable evidence that inflammation is an important mechanism for carcinogenesis (Coussens and Werb 2002; Grivennikov 2010). Alternative plausible mechanisms of carcinogenicity include talc induced oxidative stress (Buz'Zard 2007; Saed 2017; Fletcher 2018), and genotoxicity (Shukla 2009).

The evidence that commercial cosmetic talcum powder products have been shown to contain asbestos, fibrous talc, and heavy metals (Blount 1991; Paoletti 1984; Longo et al 2017, Crowley report 2018) provides a reasonable basis for hypothesizing that these

Report on talcum powder use and ovarian cancer                           Jack Siemiatycki

chemicals may contribute to the carcinogenicity of the talcum powder products. Asbestos is a well-known carcinogen, as are chromium and nickel compounds. It is plausible that any of these, in contact with the ovaries, can be carcinogenic.

The fact that there are credible biologically plausible mechanisms by which talcum powder products can reach the upper genital tract causing an inflammatory response, along with the presence of asbestos fibres and other carcinogens is an important consideration in support of my opinion that the genital use of talcum powder products can cause ovarian cancer.

### *Aspects of lesser importance in my weighting*

Cessation of exposure.  It is rare that there is valid evidence available to assess the impact of cessation of exposure in an observational study. In the studies on talcum powder and ovarian cancer, there is no evidence one way or the other concerning the effect of cessation of exposure. This aspect is not applicable and I place almost no weight on it.

Specificity of the association.  This aspect is premised on the notion that an agent-disease association is more likely to reflect a causal association if the agent is not also associated with other diseases. In the 1960's, this seemed like a reasonable argument. In light of evidence from the past 60 years, this argument is no longer made and this aspect has fallen out of usage with the demonstration that some agents can indeed provoke multiple different pathologies. Examples include cigarette smoking, ionizing radiation and asbestos fibers.

So, I do not place much stock in this aspect. However, if I did, I would have to say that genital exposure to talc is associated with ovarian cancer and no other morbidity, which supports the 'specificity' of the relationship."

Analogy

Hill argued that if the agent is similar to another agent that has been shown to be a cause of the disease, then the agent under investigation is more likely to be a cause. The fact that exposure to asbestos fibers can cause cancers in lung, larynx mesothelial tissue and ovaries (IARC 2012) can indicate that, by analogy, talc, which is similar in some respects, might be

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

able to induce carcinogenesis. Thus, there is an argument for an analogy between talc and asbestos. While this aspect supports causality in Hill's framework, I consider it much less important an aspect than the ones listed above.

Coherence with other types of knowledge: Coherence with other knowledge can encompass a multitude of possibilities.  This aspect is both vague and very open-ended, with no real operational instruction on how to use it. Hill gave an example in his paper, but the example was only applicable to tobacco and lung cancer. This is an aspect that, if it can be demonstrated, can enhance the likelihood of causality, but its absence cannot detract from causality. I don't consider it to have much weight in this context.


## 9.    Contrast with IARC Monograph and other reviews

The 2006 IARC Monograph meeting, which I chaired, found that a causal relationship was "possible" between perineal talc powder exposure and ovarian cancer.  I concurred with that evaluation.

It is now my professional opinion, based on the totality of the evidence that, to a reasonable degree of scientific certainty, the causal relationship between perineal talc powder exposure and ovarian cancer is "probable. "

What has changed in the years since the IARC review?

The RR estimates in Table 2 are remarkably consistent in showing a highly statistically significant excess risk. The number of published study results and scientific literature addressing the epidemiology, toxicology, molecular biology, and mechanistic studies has increased since 2006, and the evidence of excess risk has been consistently demonstrated across the past three decades.

The various possible biases that are on the table remain substantially similar to the ones that were considered by the IARC panel. At the time, we were not convinced that the apparent excess risk could be explained by those potential biases or confounding.  As stated above, my review of the relevant studies and potential biases has led me to conclude that bias does not explain the consistent increased risks seen across the credible studies.

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

There is important new information with regard to the issue of dose-response. Contrary to the impression that the IARC panel had of a total absence of dose-response, and even a possible trend in the opposite direction, the results of three recent publications, Terry 2013 and Schildkraut 2016, using cumulative exposure metrics, and Wu 2015 using duration of exposure, all demonstrate a clear compatibility with a dose-response relationship. The recent meta-analysis of Berge 2018 supports the presence of dose-response in both duration and frequency of use. The most convincing of these is the Terry 2013 pooled analysis, which assembled a larger dataset than all other attempts to assess dose-response combined. Clearly, earlier reviews could not have integrated the results from these recent studies.

It is my opinion, based upon the above the data, there is evidence of a dose-response relationship. Penninkilampi 2018 has recently expressed a similar opinion.

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

## 10.   Conclusion

The totality of evidence demonstrates that perineal or genital use of talcum powder products is associated with ovarian cancer. Based on contemporary data, my estimated RR between ever perineal use of talc powder products and ovarian cancer (all types combined) is 1.28 (95%CI 1.19-1.38).  The body of epidemiologic evidence is remarkably consistent in demonstrating an excess risk. The evidence summarized in Table 6 is compatible with the presence of a dose-response relationship between cumulative exposure to talcum powder products and ovarian cancer. There are various potential sources of bias in these studies, some of which could have inflated the true RR estimate and some of which would have deflated the true RR estimate. Apart from random measurement error, which is inevitable in such studies and which tends to deflate the RR estimates, there is no certainty that the other potential biases were in fact operative and to what degree. It is my opinion, however, that neither bias nor confounding explains the consistent positive association seen across studies.  Additionally, there are biologically plausible mechanisms by which talcum powder products can cause ovarian cancer.

Based on the totality of the evidence, it is my opinion, to a reasonable degree of scientific certainty, that the perineal use of talcum powder products can cause ovarian cancer. Given the seriousness of ovarian cancer and its associated morbidity, this causal risk represents an important public health issue.

Report on talcum powder use and ovarian cancer                      Jack Siemiatycki

## 11.   Tables

Report on talcum powder use and ovarian cancer                                                    Jack Siemiatycki

Table 1. Steps in my evaluation of general causation between talcum powder product use and ovarian cancer

1.    Identify all epidemiology study papers that present results on talc and Ovarian Cancer.

2.    Extract all RR results from every paper into a database.

3.    Determine which of the papers and results present truly independent relevant results.

4.    Extract from each study the RR for Ever/Never use of talc in the genital area in relation to OC risk.

5.    Conduct a Meta-analysis.

6.    Examine the evidence about a possible dose-response relationship.

7.    Consider issues of bias, confounding and other sources of error in the various studies.

8.    Consider relevant opinion pieces, review articles, and agency reports.

9.    Consider opinions from experts regarding possible biological mechanisms.

10.    Consider all relevant aspects of association to infer causation.

11.    Write report.

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

Table 2. Relative risk estimates between ever regular use of talcum powders products[1] in the perineal area and ovarian cancer[2], from various studies used in the Main Meta-analysis or in one or more of seven sensitivity analyses

| Author | Included in Main meta-analysis | All tumours | | | |
| | | Number exposed cases | RR[3] | 95% CI[4] | |
| --- | --- | --- | --- | --- | --- |
| Booth 1989 | ☐ | 141 | 1.29 | 0.92 | 1.80 |
| Chen, 1992 | ☐ | 7 | 3.9 | 0.91 | 10.6 |
| Cook 1997 | ☐ | 159 | 1.5 | 1.1 | 2.0 |
| Cramer 1982 | ☐ | 60 | 1.55 | 0.98 | 2.47 |
| Cramer 2016 | | 642 | 1.33 | 1.16 | 1.52 |
| Gates 2008 | | 57 | 1.24 | 0.83 | 1.83 |
| Gates 2010 | ☐ | 231[5] | 1.06 | 0.89 | 1.28 |
| Godard 1998 | ☐ | 18 | 2.49 | 0.94 | 6.58 |
| Gonzalez 2016 | ☐ | 17 | 0.73 | 0.44 | 1.2 |
| Harlow 1989 | ☐ | 49 | 1.1 | 0.7 | 2.1 |
| Harlow 1992 | ☐ | 114 | 1.5 | 1.0 | 2.1 |
| Hartge 1983 | ☐ | 7 | 2.5 | 0.7 | 10.0 |

Report on talcum powder use and ovarian cancer                              Jack Siemiatycki

| Author | Included in Main meta-analysis | All tumours | | | |
|---|---|---|---|---|---|
| | | Number exposed cases | RR[3] | 95% CI[4] | |
| Houghton 2014 | ☐ | 181 | 1.12 | 0.92 | 1.36 |
| Mills 2004 | ☐ | 106 | 1.37 | 1.02 | 1.85 |
| Ness 2000 | ☐ | 161 | 1.5 | 1.1 | 2.0 |
| Purdie 1995 | ☐ | 467 | 1.27 | 1.04 | 1.54 |
| Rosenblatt 1992 | ☐ | 22 | 1.7 | 0.7 | 3.9 |
| Schildkraut 2016 A[5] | ☐ | 248 | 1.44 | 1.11 | 1.86 |
| Schildkraut 2016 B[5] | | 128 | 1.19 | 0.87 | 1.63 |
| Shushan 1996 | | 21 | 1.97 | 1.06 | 3.66 |
| Terry 2013 | ☐ | 2600 | 1.24 | 1.15 | 1.33 |
| Terry-AUS 2013 | | 705 | 1.13 | 0.92 | 1.38 |
| Terry-DOV 2013 | | 272 | 1.13 | 0.93 | 1.36 |
| Terry-HAW 2013 | | 74 | 0.99 | 0.70 | 1.41 |
| Terry-HOP 2013 | | 194 | 1.34 | 1.07 | 1.67 |
| Terry-NCO 2013 | | 195 | 1.37 | 1.05 | 1.80 |
| Terry-NEC 2013 | | 755 | 1.28 | 1.12 | 1.47 |
| Terry-SON 2013 | | 197 | 1.35 | 1.03 | 1.76 |

16 November 2018                                                                                  73

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

| Author | Included in Main meta-analysis | All tumours | | | |
| --- | --- | --- | --- | --- | --- |
| | | Number exposed cases | RR[3] | 95% CI[4] | |
| Terry-USC 2013 | | 208 | 1.36 | 1.06 | 1.74 |
| Tzonou 1993 | ☐ | 6 | 1.05 | 0.28 | 3.98 |
| Whittemore 1988 | ☐ | 67 | 1.36 | 0.91 | 2.04 |
| Wong 1999 | ☐ | 157 | 1.0 | 0.8 | 1.3 |
| Wu 2015 | ☐ | 701 | 1.46 | 1.27 | 1.69 |

1.  In all of these studies the exposure was defined as ever use of powder in the perineal area. In most studies it was further explicitly indicated that the use was regular.

2.  In this table we report the result for all types of ovarian cancer combined. With the exception of the Harlow 1989 study that was restricted to borderline tumours, we have assumed that all studies included both borderline and invasive tumours, although this was not always clear in the publications.

3.  RR or OR.

4.  The confidence intervals are the ones reported by the authors of the respective studies. However in its implementation procedures, the Comprehensive Meta-analysis package recomputes them to be symmetric around the point estimate, on a log scale. Consequently, in the printout of the forest plot of meta-analyses, the printed confidence interval is not always identical to the one shown in this table.

5.  Estimated based on Table 1 of Gates 2010.

6.  The Schildkraut 2016 case-control study presented two sets of results that both have some legitimacy for the present purpose. Schildkraut 2016A shows the results for all subjects who were interviewed in the study from 2010-2015. Schildkraut2016B shows the results for those subjects who were interviewed before 2014, and who, according to the authors, were not susceptible to having been tainted by publicity from a class action suit.

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

Table 3. Main meta-analysis and sensitivity analyses conducted on the association between ever regular use of talcum powder products in the perineal area and ovarian cancer (all types combined).

| Studies in meta-analysis | N* | RR-estimate | | | | Heterogeneity | |
|---|---|---|---|---|---|---|---|
| | | Meta-RR | 95% CI | | p-value | I² | p-value |
| *Main Meta-Analysis - list in Figure 1 Forest plot* | 21 | 1.28 | 1.19 | 1.38 | 0.00 | 32.9 | 0.07 |
| *Sensitivity analyses* | | | | | | | |
| Substitute Gates 2008 for Gates 2010 | 21 | 1.30 | 1.21 | 1.40 | 0.00 | 22.9 | 0.16 |
| Substitute Schildkraut B for Schildkraut A | 21 | 1.27 | 1.17 | 1.37 | 0.00 | 30.8 | 0.08 |
| Add Shushan | 22 | 1.29 | 1.19 | 1.39 | 0.00 | 33.8 | 0.06 |
| Substitute List A** for Terry | 27 | 1.27 | 1.19 | 1.35 | 0.00 | 26.2 | 0.10 |
| Substitute List A for Terry and Gates 2008 for Gates 2010 | 27 | 1.29 | 1.21 | 1.37 | 0.00 | 16.6 | 0.22 |
| Substitute List A for Terry and Schildkraut B for Schildkraut A | 27 | 1.26 | 1.18 | 1.34 | 0.00 | 24.5 | 0.12 |
| Substitute List A for Terry and add Shushan | 28 | 1.28 | 1.20 | 1.36 | 0.00 | 27.4 | 0.09 |

*N:        Number of RRs that went into the meta-analysis. This is not synonymous with the number of studies because some RRs (e.g. Terry 2013, Cramer 2016) embody multiple studies.

**List A studies:    Cramer 2016; Wu 2015; Terry-Aus 2013; Terry-DOV 2013; Terry-Haw 2013; Terry-HOP 2013; Terry-NCO 2013; Terry SON 2013

Jack Siemiatycki

Table 4. Comparison of results of three contemporaneous and independent meta-analyses of the association between ever regular use of talcum powder products in the perineal area and ovarian cancer.

| Meta-analysis author | N* | Meta-RR | 95% CI | Heterogeneity p-value |
|---|---|---|---|---|
| Siemiatycki 2018 | 21 | 1.28 | 1.19-1.38 | 0.07 |
| Berge 2018 | 27 | 1.22 | 1.13-1.30 | 0.02 |
| Penninkilompi 2018 | 26 | 1.35 | 1.24-1.39 | 0.31 |

\* Number of published RR estimates that went into the meta-analysis. This does not necessarily correspond to the number of studies, since, for example, the Terry 2013 pooled estimate used in the Siemiatycki meta-analysis embodied 10 studies.

Report on talcum powder use and ovarian cancer                                      Jack Siemiatycki

Table 5. Relative risk estimates between ever regular use of talcum powder products on sanitary napkins and ovarian cancer, and results of meta-analysis.

| Author | Number exposed cases | RR[1] | 95% CI[2] | |
|---|---|---|---|---|
| Chang 1997 | 51 | 1.26 | 0.81 | 1.96 |
| Cook 1997 | 38 | 0.9 | 0.5 | 1.5 |
| Cramer 1999 | 20 | 1.45 | 0.68 | 3.09 |
| Gertig 2000 | 32 | 0.89 | 0.61 | 1.28 |
| Harlow 1989 | 8 | 2.6 | 0.9 | 22.4[2] |
| Harlow 1992 | 9 | 1.1 | 0.4 | 2.8 |
| Houghton 2014 | 93 | 0.95 | 0.76 | 1.20 |
| Ness 2000 | 77 | 1.6 | 1.1 | 2.3 |
| Rosenblatt 1992 | 21 | 4.8 | 1.3 | 17.8 |
| Rosenblatt 2011 | 55 | 0.82 | 0.58 | 1.16 |
| Whittemore 1988 | 5 | 0.62 | 0.21 | 1.80 |
| Wong 1999 | 13 | 0.9 | 0.4 | 2.0 |
| **Meta-analysis** | | **1.08** | **0.89** | **1.31** |
| | | | **p-value for heterogeneity = 0.09** | |

1.   RR or OR.
2.   The confidence intervals are the ones reported by the authors of the respective studies. However in its implementation procedures, the Comprehensive Meta-analysis package recomputes them to be symmetric around the point estimate, on a log scale. Consequently, in the printout of the forest plot of meta-analyses, the printed confidence interval is not always identical to the one shown in this table.

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

Table 6. Relative risk estimates between subgroups defined by cumulative exposure measures[1] and ovarian cancer[2], from various studies.

| Author | Cumulative applications[3] | Number exposed cases | RR[4] | 95% C.I. | |
|---|---|---|---|---|---|
| Cook 1997[4] | < 2000 | 20 | 1.8 | 0.9 | 3.5 |
| | 2001-5000 | 24 | 1.6 | 0.9 | 2.9 |
| | 5001-10000 | 21 | 1.2 | 0.6 | 2.4 |
| | >10000 | 28 | 1.8 | 0.9 | 3.4 |
| Harlow 1992 | <1000 | 18 | 1.3 | 0.7 | 2.7 |
| | 1000-10000 | 54 | 1.5 | 0.9 | 2.4 |
| | >10000 | 42 | 1.8 | 1.0 | 3.0 |
| Mills 2004 | Quartile 1 | 18 | 1.0 | 0.6 | 1.8 |
| | Quartile 2 | 28 | 1.8 | 1.1 | 3.0 |
| | Quartile 3 | 34 | 1.7 | 1.1 | 2.7 |
| | Quartile 4 | 20 | 1.1 | 0.6 | 1.8 |
| | 10000+ | 18 | 0.87 | 0.48 | 1.57 |
| Schildkraut 2016 | ≤3600 | 92 | 1.16 | 0.83 | 1.63 |
| | >3600 | 152 | 1.67 | 1.23 | 2.26 |
| Terry 2013[5] | Quartile 1 | 534 | 1.14 | 1.00 | 1.31 |
| | Quartile 2 | 541 | 1.23 | 1.08 | 1.41 |
| | Quartile 3 | 542 | 1.22 | 1.07 | 1.40 |
| | Quartile 4 | 586 | 1.32 | 1.16 | 1.52 |

1.  These were all studies that collected information on perineal use of hygiene powders in such a way as to allow construction of a cumulative measure. All of these were case control studies.

2.  In this table we report the result for all types of ovarian cancer combined, as reported by the authors.

3.  For the Cook study the metric was the number of days on which the woman had ever applied the powder. For the other studies the metric is based on an estimate of the total number of applications.

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

4.      RR or OR.

5.      This study was based on a pooling of studies from 8 teams. Two of the teams (Cramer 2016 and Rosenblatt 2011) published separate analyses of risk by cumulative number of applications. But these are not shown here because they are rendered redundant by the Terry 2013 pooled results.

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

Table 7. Relative risk estimates between subgroups defined by duration of use[1] and ovarian cancer[2], from various studies.

| Author | Duration of use | Number exposed cases | RR[4] | 95% C.I. | |
|---|---|---|---|---|---|
| Chang 1997 | <30 | 60 | 1.7 | 1.1 | 2.6 |
| | 30-40 | 71 | 1.4 | 1.0 | 2.2 |
| | >40 | 41 | 0.9 | 0.5 | 1.4 |
| Cramer 1999 | <20 years | 55 | 1.9 | 1.2 | 3.0 |
| | 20-30 years | 32 | 1.3 | 0.8 | 2.3 |
| | >30 years | 59 | 1.4 | 0.9 | 2.3 |
| Cramer 2016 | < 8 years of use | 133 | 1.31 | 1.03 | 1.68 |
| | 8-19 years of use | 126 | 1.31 | 1.02 | 1.68 |
| | 20-35 years of use | 147 | 1.35 | 1.07 | 1.70 |
| | >35 years of use | 129 | 1.33 | 1.03 | 1.71 |
| Harlow 1992 | <10 years | 14 | 1.2 | 0.5 | 2.6 |
| | 10-29 years | 49 | 1.6 | 1.0 | 2.7 |
| | > 30 years | 51 | 1.6 | 1.0 | 2.7 |
| Houghton 2014 | <9 years | 135 | 1.09 | 0.88 | 1.36 |
| | 10+ years | 97 | 1.02 | 0.80 | 1.30 |
| Ness 2000 | <1 year | 17 | 2.0 | 1.0 | 4.0 |
| | 1-4 years | 76 | 1.6 | 1.1 | 2.3 |
| | 5-9 years | 40 | 1.1 | 0.8 | 1.9 |
| | >10 years | 233 | 1.2 | 1.0 | 1.5 |
| Mills 2004 | <3 years | 18 | 1.0 | 0.6 | 1.8 |
| | 4-12 years | 32 | 1.9 | 1.2 | 3.0 |
| | 13-30 years | 29 | 1.5 | 0.9 | 2.3 |
| | >30 years | 21 | 1.2 | 0.7 | 2.1 |

Report on talcum powder use and ovarian cancer                                      Jack Siemiatycki

| Author | Duration of use | Number exposed cases | RR[4] | 95% C.I. | |
|---|---|---|---|---|---|
| Rosenblatt 2011 | 1-9 years | 33 | 1.39 | 0.85 | 2.28 |
| | 10-19 years | 29 | 1.46 | 0.87 | 2.45 |
| | 20-34 years | 30 | 1.28 | 0.78 | 2.10 |
| | 35+ years | 19 | 0.91 | 0.51 | 1.62 |
| Schildkraut 2016 | ≤20 years | 101 | 1.33 | 0.95 | 1.86 |
| | >20 years | 144 | 1.52 | 1.11 | 2.07 |
| Whittemore 1988 | 1-9 years | 34 | 1.6 | 1.0 | 2.6 |
| | 10+ | 50 | 1.1 | 0.7 | 1.7 |
| Wong 1999 | 1-9 years | 39 | 0.9 | 0.6 | 1.5 |
| | 10-19 years | 49 | 1.4 | 0.9 | 2.2 |
| | >20 years | 101 | 0.9 | 0.6 | 1.2 |
| Wu 2015 | Per 5 years of exposure | 1273 | 1.14 | 1.09 | 1.20 |

1. These were all studies that collected information on perineal use of hygiene powders in such a way as to allow construction of a measure of duration.

2. In this table we report the result for all types of ovarian cancer combined, as reported by the authors.

3. Years of case ascertainment or follow-up: For case-control studies this indicates the years in which cases were ascertained and data collected; for cohort studies it indicates the years of enrolment and follow-up.

4. RR or OR.

16 November 2018                                                                        82

Report on talcum powder use and ovarian cancer                                        Jack Siemiatycki

Table 8. Relative risk estimates between subgroups defined by measures of frequency of use[1] and ovarian cancer[2], from various studies.

| Author | Frequency of use | Number exposed cases | RR[4] | 95% C.I. | |
|---|---|---|---|---|---|
| Booth 1989 | Rarely | 6 | 0.9 | 0.3 | 2.4 |
| | Monthly | 7 | 0.7 | 0.3 | 1.8 |
| | Weekly | 57 | 2.0 | 1.3 | 3.4 |
| | Daily | 71 | 1.3 | 0.8 | 1.9 |
| Chang 1997 | <10 per month | 76 | 1.8 | 1.2 | 2.7 |
| | 10-25 per month | 54 | 1.1 | 0.7 | 1.7 |
| | Per 10 applications per month | | 0.9 | 0.7 | 1.1 |
| Cramer 1999 | <30 per month | 64 | 2.2 | 1.4 | 3.6 |
| | 30-39 per month | 59 | 1.7 | 0.8 | 1.8 |
| | ≥40 per month | 23 | 1.7 | 0.8 | 3.1 |
| Cramer 2016 | 1-7 days per month | 220 | 1.17 | 0.96 | 1.44 |
| | 8-29 days per month | 110 | 1.37 | 1.05 | 1.78 |
| | >30 days per month | 205 | 1.46 | 1.20 | 1.78 |
| Gates 2008 | <1 per week | 18 | 0.98 | 0.54 | 1.79 |
| | 1-6 per week | 22 | 1.01 | 0.57 | 1.79 |
| | Daily | 35 | 1.44 | 0.88 | 2.37 |
| Harlow 1992 | <5 per month | 32 | 1.5 | 0.8 | 2.7 |
| | 5-29 per month | 24 | 1.2 | 0.6 | 2.2 |
| | ≥30 per month | 58 | 1.8 | 1.1 | 3.0 |

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

| Author | Frequency of use | Number exposed cases | RR[4] | 95% C.I. | |
|--------|------------------|---------------------|-------|----------|---|
| Mills 2004 | <1 per week | 34 | 1.3 | 0.9 | 2.1 |
| | 1-3 per week | 31 | 1.6 | 0.7 | 1.8 |
| | 4-7 per week | 41 | 1.7 | 1.1 | 2.6 |
| Schildkraut 2016 | <Daily | 88 | 1.12 | 0.80 | 1.58 |
| | Daily | 158 | 1.71 | 1.26 | 2.33 |
| Whittemore 1988 | 1-20 per month | 41 | 1.3 | 0.8 | 2.0 |
| | >20 per month | 44 | 1.5 | 0.9 | 2.2 |

1. These were all studies that collected information on perineal use of hygiene powders in such a way as to allow construction of a measure of frequency of use.

2. In this table we report the result for all types of ovarian cancer combined, as reported by the authors.

3. Years of case ascertainment or follow-up: For case-control studies this indicates the years in which cases were ascertained and data collected; for cohort studies it indicates the years of enrolment and follow-up.

4. RR or OR

Table 9. Relative risk estimates between ever regular use of talcum powder products[1] in the perineal area and invasive serous ovarian cancer, from various studies.

| Author | Number exposed cases | RR[2] | 95% CI[3] | |
|--------|---------------------|-------|-----------|---|
| Cook 1997 | 71 | 1.7 | 1.1 | 2.5 |
| Gates 2010 | 131[4] | 1.06 | 0.84 | 1.35 |
| Harlow 1992 | 60 | 1.4 | 0.9 | 2.2 |
| Houghton 2014 | 105 | 1.13 | 0.84 | 1.51 |
| Mills 2004 | 42 | 1.77 | 1.12 | 2.81 |
| Schildkraut 2016 | 165 | 1.38 | 1.03 | 1.85 |
| Terry 2013 | 1197 | 1.24 | 1.13 | 1.35 |
| Wong 1999 | 136 | 1.2 | 0.7 | 2.1 |
| **Meta-analysis** | | **1.25** | **1.15** | **1.36** |

p-value for heterogeneity 0.06

1. In all of these studies the exposure was defined as ever use of powder in the perineal area. In most studies it was further explicitly indicated that the use was regular.
2. RR or OR.
3. The confidence intervals are the ones reported by the authors of the respective studies. However in its implementation procedures, the Comprehensive Meta-analysis package recomputes them to be symmetric around the point estimate, on a log scale. Consequently, in the printout of the forest plot of meta-analyses, the printed confidence interval is not always identical to the one shown in this table.
4. Estimated based on Table 1 of Gates 2010.

Report on talcum powder use and ovarian cancer                                          Jack Siemiatycki

Table 10. Some major misconceptions in reviewing evidence on talc and ovarian cancer

1.      Cohort studies are more valid and informative than case-control studies.

2.      Hospital-based case-control studies are more valid and informative than the population-based case-control studies.

3.      Counting the number of "statistically significant" results is a valid way of assessing the consistency of results among multiple studies.

4.      If a product has been used for a long time, it must be safe

5.      You cannot prove causality with an RR less than 2.0.

6.      Government agencies provide a reliable up-to-date source of scientific information.

7.      A biological mechanism must be proven before we can establish causality

8.      Bradford-Hill "aspects" represent a recipe list of necessary ingredients.

Table 11. Selected examples of some of the recognized causal associations that have RR less than 2.0

| Agent | Disease | Approximate RR |
|---|---|---|
| Urban air pollution | Lung cancer | 1.09[1] |
| Trichloroethylene | Kidney cancer | 1.32[2] |
| Diesel engine emissions | Lung cancer | 1.42[3] |
| Benzene | Leukemia | 1.72[4] |
| Domestic radon gas | Lung cancer | 1.29[5] |
| Second hand cigarette smoke | Lung cancer | 1.64 |
| Intermittent intense sun exposure | Melanoma of the skin | 1.61[6] |
| Estrogen-progestin menopausal therapy | Breast cancer | 1.59[7] |

[1] Hamra GB, Guha N, Cohen A, et al (2014). Outdoor Particulate Matter Exposure and Lung Cancer: A Systematic Review and Meta-Analysis, *Environ Health Perspect* 122:906-911.

[2] Karami S, Lan Q, Rothman N, et al (2012). Occupational trichloroethylene exposure and kidney cancer risk: a meta-analysis. *Occupational and Environmental Medicine* 69:858-867.

[3] Mahjub H, Sadri G (2006). Meta-analysis of case-referent studies of specific environmental or occupational pollutants on lung cancer. *Indian Journal of Cancer* 43(4):169-173.

[4] Khalade A, Jaakkola MS, Pukkala E, Jaakkola JJ (2010). Exposure to benzene at work and the risk of leukemia: a systematic review and meta-analysis. *Environmental Health* 9(31):1-8.

[5] Zhang Z-L, Sun J, Dong J-Y, et al (2012). Residential Radon and Lung Cancer Risk: An Updated Meta-analysis of Case-control Studies. *Asian Pac J Cancer Prev* 13:2459-2465.

[6] Gandini S, Sera F, Cattaruzza MS, et al (2004). Meta-analysis of risk factors for cutaneous melanoma: II. Sun exposure. *European Journal of Cancer* 41:45-60.

[7] Kim S, Ko Y, Lee HJ, Lim J (2018). Menopausal hormone therapy and the risk of breast cancer by histological type and race: a meta-analysis of randomized controlled trials and cohort studies. *Breast Cancer Research and Treatment* 170(3):667-675.

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

| | | |
|---|---|---|
| Cigarette smoking | Cardiovascular disease | 1.6[8] |
| Physically inactive (compared with physically active) [9] | Hypertension | 1.19 |
| | Diabetes | 1.12 |
| Low fruit and vegetable diet | Cardiovascular disease | 1.09[10] |

---

[8] Doll R, Peto R, Boreham J, Sutherland I (2004). Mortality in relation to smoking: 50 years' observations on British male doctors, *British Medical Journal*, 328(7455):1519.

[9] Carnethon MR, Gidding SS, Nehgme R, Sidney S, Jacobs, Jr DR, Liu K (2003). Cardiorespiratory Fitness in Young Adulthood and the Development of Cardiovascular Disease Risk Factors. *JAMA*, 290(23):3092–3100

[10] Aune D, Giovannucci E, Boffetta P, Fadnes L, Keum N, Norat T, Greenwood D, Riboli E, Vatten L, Tonstad S (2017). Fruit and vegetable intake and the risk of cardiovascular disease, total cancer and all-cause mortality – a systematic review and dose-response meta-analysis of prospective studies, International Journal of Epidemiology 43(3):1029-1056. (This RR estimate is computed from the reciprocal of the High fruit and vegetable variable that was reported by the authors. That is, 1/0.92).

Table 12. Bradford Hill aspects in relation to perineal talc exposure and ovarian cancer

| Aspect | Brief comment | Weight in evaluating causality |
|---|---|---|
| Strength of the association | There are stronger associations and there are weaker associations | High |
| Dose response relationship | Reasonably clear increase in risk with increasing exposure | High |
| Consideration of alternative explanations – absence of bias | Yes considered, and none is compelling | High |
| Replication of the findings | Very strong, almost all studies support association | High |
| Temporal relationship | Exposure preceded disease in all studies | Moderate |
| Biological plausibility | There are plausible mechanisms | Moderate |
| Cessation of exposure | Not applicable. | Less |
| Specificity of the association | Yes, talc is not associated with a multitude of diseases | Less |
| Coherence with other knowledge | Could be similar to asbestos carcinogenicity | Less |
| Analogy | | Less |

Jack Siemiatycki

**12.   Figures**

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

---

Figure 1. Meta-analysis of relative risk of ovarian cancer (all types combined) among women who regularly used talc powder in the perineal area, based on all informative studies, studies ordered by magnitude of RR.

| Model | Study name | Risk ratio | Lower limit | Upper limit | p-Value | Relative risk and 95% CI | Relative weight |
|---|---|---|---|---|---|---|---|
| | Gonzalez 2016 | 0,73 | 0,44 | 1,21 | 0,22 | | 2,05 |
| | Wong 1999 | 1,00 | 0,78 | 1,27 | 1,00 | | 6,50 |
| | Tzonou 1993 | 1,05 | 0,28 | 3,96 | 0,94 | | 0,32 |
| | Gates 2010 | 1,06 | 0,88 | 1,27 | 0,53 | | 9,17 |
| | Harlow 1989 | 1,10 | 0,64 | 1,91 | 0,73 | | 1,74 |
| | Houghton 2014 | 1,12 | 0,92 | 1,36 | 0,26 | | 8,48 |
| | Terry 2013 | 1,24 | 1,15 | 1,33 | 0,00 | | 16,37 |
| | Purdie 1995 | 1,27 | 1,04 | 1,55 | 0,02 | | 8,43 |
| | Booth 1989 | 1,29 | 0,92 | 1,80 | 0,14 | | 4,05 |
| | Whittemore 1988 | 1,36 | 0,91 | 2,04 | 0,14 | | 3,00 |
| | Mills 2004 | 1,37 | 1,02 | 1,85 | 0,04 | | 4,87 |
| | Schildkraut 2016 A | 1,44 | 1,11 | 1,86 | 0,01 | | 5,98 |
| | Wu 2015 | 1,46 | 1,27 | 1,68 | 0,00 | | 11,46 |
| | Cook 1997 | 1,50 | 1,11 | 2,02 | 0,01 | | 4,84 |
| | Harlow 1992 | 1,50 | 1,04 | 2,17 | 0,03 | | 3,45 |
| | Ness 2000 | 1,50 | 1,11 | 2,02 | 0,01 | | 4,84 |
| | Cramer 1982 | 1,55 | 0,98 | 2,46 | 0,06 | | 2,37 |
| | Rosenblatt 1992 | 1,70 | 0,72 | 4,01 | 0,23 | | 0,75 |
| | Godard 1998 | 2,49 | 0,94 | 6,59 | 0,07 | | 0,59 |
| | Hartge 1983 | 2,50 | 0,66 | 9,45 | 0,18 | | 0,32 |
| | Chen, 1992 | 3,90 | 1,14 | 13,31 | 0,03 | | 0,38 |
| Random | | 1,28 | 1,19 | 1,38 | 0,00 | | |

| Model | Number Studies | Point estimate | Lower limit | Upper limit | Z-value | P-value | Q-value | df (Q) | P-value | I-squared | Tau Squared | Standard Error | Variance | Tau |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Effect size and 95% interval | | | Test of null (2-Tail) | | Heterogeneity | | | | Tau-squared | | | |
| Fixed | 21 | 1,264 | 1,204 | 1,327 | 9,474 | 0,000 | 29,813 | 20 | 0,073 | 32,916 | 0,008 | 0,008 | 0,000 | 0,088 |
| Random effects | 21 | 1,280 | 1,186 | 1,381 | 6,364 | 0,000 | | | | | | | | |

---

16 November 2018                                                                      91

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

Figure 2. Meta-analysis of relative risk of ovarian cancer (all types combined) among women who regularly used talcum powder products on sanitary napkins, based on all informative studies.

| Model | Study name | Statistics for each study | | | | Odds ratio and 95% CI | Weight (Random) |
|---|---|---|---|---|---|---|---|
| | | Odds ratio | Lower limit | Upper limit | p-Value | | Relative weight |
| | Chang 1997 | 1,26 | 0,81 | 1,96 | 0,31 | | 11,14 |
| | Cook 1997 | 0,90 | 0,52 | 1,56 | 0,71 | | 8,47 |
| | Cramer 1999 | 1,45 | 0,68 | 3,09 | 0,34 | | 5,26 |
| | Gertig 2000 | 0,89 | 0,61 | 1,29 | 0,54 | | 13,44 |
| | Harlow 1989 | 2,60 | 0,53 | 12,74 | 0,24 | | 1,41 |
| | Harlow 1992 | 1,10 | 0,42 | 2,91 | 0,85 | | 3,45 |
| | Houghton 2014 | 0,95 | 0,76 | 1,19 | 0,66 | | 19,32 |
| | Ness 2000 | 1,60 | 1,11 | 2,31 | 0,01 | | 13,50 |
| | Rosenblatt 1992 | 4,80 | 1,30 | 17,76 | 0,02 | | 2,03 |
| | Rosenblatt 2011 | 0,82 | 0,58 | 1,16 | 0,26 | | 14,32 |
| | Whittemore 1988 | 0,62 | 0,21 | 1,82 | 0,38 | | 2,90 |
| | Wong 1999 | 0,90 | 0,40 | 2,01 | 0,80 | | 4,76 |
| Random | | 1,08 | 0,89 | 1,31 | 0,45 | | |

| Model | | Effect size and 95% interval | | | Test of null (2-Tail) | | Heterogeneity | | | Tau-squared | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Model | Number Studies | Point estimate | Lower limit | Upper limit | Z-value | P-value | Q-value | df (Q) | P-value | I-squared | Tau Squared | Standard Error | Variance | Tau |
| Fixed | 12 | 1,041 | 0,911 | 1,189 | 0,591 | 0,554 | 17,614 | 11 | 0,091 | 37,551 | 0,037 | 0,045 | 0,002 | 0,193 |
| Random effects | 12 | 1,078 | 0,888 | 1,309 | 0,763 | 0,445 | | | | | | | | |

Report on talcum powder use and ovarian cancer                                        Jack Siemiatycki

Figure 3. Meta-analysis of relative risk of invasive serous ovarian cancer among women who regularly used talcum powder products in the perineal area, based on all informative studies

| Model | Study name | Statistics for each study | | | | Relative risk and 95% CI | Weight (Random) |
|---|---|---|---|---|---|---|---|
| | | Risk ratio | Lower limit | Upper limit | p-Value | | Relative weight |
| | Cook 1997 | 1,70 | 1,13 | 2,56 | 0,01 | | 4,13 |
| | Gates 2010 | 1,06 | 0,84 | 1,34 | 0,63 | | 11,79 |
| | Harlow 1992 | 1,40 | 0,90 | 2,19 | 0,14 | | 3,49 |
| | Houghton 2014 | 1,13 | 0,84 | 1,52 | 0,41 | | 7,90 |
| | Mills 2004 | 1,77 | 1,12 | 2,80 | 0,01 | | 3,30 |
| | Schildkraut 2016 | 1,38 | 1,03 | 1,85 | 0,03 | | 7,92 |
| | Terry 2013 | 1,24 | 1,13 | 1,36 | 0,00 | | 59,13 |
| | Wong 1999 | 1,20 | 0,69 | 2,08 | 0,52 | | 2,33 |
| Random | | 1,25 | 1,15 | 1,36 | 0,00 | | |

| Model | | | Effect size and 95% interval | | | Test of null (2-Tail) | | Heterogeneity | | | | Tau-squared | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Model | Number Studies | Point estimate | Lower limit | Upper limit | | Z-value | P-value | Q-value | df (Q) | P-value | I-squared | Tau Squared | Standard Error | Variance | Tau |
| Fixed | 8 | 1,250 | 1,161 | 1,345 | | 5,963 | 0,000 | 7,401 | 7 | 0,388 | 5,422 | 0,001 | 0,011 | 0,000 | 0,033 |
| Random effects | 8 | 1,254 | 1,152 | 1,364 | | 5,249 | 0,000 | | | | | | | | |

Report on talcum powder use and ovarian cancer                                                Jack Siemiatycki

## 13.  Appendix A

Appendix Table A1. Papers that contain some results on the association between exposure to perineal talc and ovarian cancer, and whether the paper was included in my meta-analyses of the binary Ever/Never exposed variable

| Author | Included/excluded | Reasons for exclusion |
| --- | --- | --- |
| Booth 1989 | Core Inclusion | |
| Chang 1997 | Core Inclusion | |
| Chen 1992 | Core Inclusion | |
| Cook 1997 | Core Inclusion | |
| Cramer 1982 | Core Inclusion | |
| Cramer 1995 | Excluded | Included in Terry 2013 and in Cramer 2016 |
| Cramer 1999 | Excluded | Included in Terry 2013 and in Cramer 2016 |
| Cramer 2005 | Excluded | Included in Terry 2013 and in Cramer 2016 |
| Cramer 2016 | Excluded when Terry 2013 is included | Considerable overlap between this and the Terry 2013 NEC component |
| Eltabbakh 1998 | Excluded | Cases were peritoneal cancer and controls were ovarian cancer |
| Gates 2008[2-] | Included in one sensitivity analysis | Overlap with Gates 2010 |

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

| Author | Included/excluded | Reasons for exclusion |
| --- | --- | --- |
| Gates 2010[2] | Included in all analyses except one sensitivity analysis | This may be a more complete analysis than Gates 2008, but the degree of overlap is unclear. |
| Gertig 2000 | Excluded | Subsumed in Gates 2008 and Gates 2010 |
| Godard 1998 | Core inclusion | |
| Gonzalez 2016 | Core inclusion | |
| Green 1997 | Excluded | This appears to be an analysis of a subset of the subjects in Purdie 1995 |
| Hankinson 1993 | Excluded | Numerical results were not presented. |
| Harlow 1989 | Core inclusion | |
| Harlow 1992 | Core inclusion | |
| Hartge 1983 | Core inclusion | |
| Houghton 2014 | Core inclusion | |
| Jordan 2007 | Excluded | Benign tumours only |
| Kurta 2012 | Excluded | Included in Terry 2013 |
| Langseth 2004 | Excluded | Not based on perineal application of cosmetic powder. |
| Lo-Ciganic 2012 | Excluded | Same study as Kurta 2012 and included in Terry 2013. |
| Merrit 2008 | Excluded | Included in Terry 2013 |

16 November 2018                                                                              95

Report on talcum powder use and ovarian cancer                                      Jack Siemiatycki

| Author | Included/excluded | Reasons for exclusion |
| --- | --- | --- |
| Mills 2004 | Core inclusion | |
| Moorman 2009 | Excluded | Included in Terry 2013 |
| Pike 2004 | Excluded | Included in Terry 2013 |
| Purdie 1995 | Core inclusion | |
| Ness 2000 | Core inclusion | |
| Rosenblatt 1992 | Core inclusion | |
| Rosenblatt 2011 | Core inclusion | |
| Schildkraut 2016 | Core inclusion | |
| Shushan 1996 | Included in sensitivity analysis | Unclear on how they obtained data on talc exposure or what the route of exposure was |
| Terry 2013 | Included in Main analysis, but replaced by component studies in sensitivity analyses | |
| Tzonou 1983 | Core inclusion | |
| Whittemore 1988 | Core inclusion | |
| Wong 1999 | Core inclusion | |
| Wu 2015 | Core inclusion | |

16 November 2018

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

Appendix Table A2. Some administrative and contextual information on the studies used in the following tables

| Author | Study location | Years of case ascertainment/ follow-up[1] | Type of study |
|--------|----------------|------------------------------------------|---------------|
| Booth 1989 | London, Oxford UK | 1978-1983 | Case-control; Hospital controls |
| Chen 1992 | Beijing Cancer Registry | 1984-1986 | Case-control; Population controls |
| Cook 1997 | Washington State | 1986-1988 | Case-control; Population controls |
| Cramer 1982 | Boston | 1978-1981 | Case-control; Population controls |
| Cramer 2016 | New England | 1992-2008 | Case-control; Population controls |
| Gates 2008[2,] | USA – NHS study | 1976-2004 | Case-control nested in Cohort (US nurses) |
| Gates 2010[2] | USA – pooled 2 cohorts of nurses NHS and NHSII | 1976-2004 1989-2005 | Cohort (US Nurses) |
| Godard 1998 | Montreal, Canada | 1995-1996 | Case-control; Population controls |
| Gonzalez 2016 | Puerto Rico and 11 States USA | 2003-2014 | Cohort |
| Harlow 1989 | Washington State | 1980-1985 | Case-control; Population controls |
| Harlow 1992 | Boston | 1984-1987 | Case-control; Population controls |

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

| Author | Study location | Years of case ascertainment/ follow-up[1] | Type of study |
|---|---|---|---|
| Hartge 1983 | Washington, DC | 1974-77 | Case-control; Population controls |
| Houghton 2014 | USA | 1993-2012 | Cohort (WHI) |
| Mills 2004 | California | 2000-2001 | Case-control; Population controls |
| Ness 2000 | Pennsylvania, New Jersey, Delaware | 1994-1998 | Case-control; Population controls |
| Purdie 1995 | Australia | 1990-1993 | Case-control; Population controls |
| Rosenblatt 1992 | Baltimore | 1981-1985 | Case-control; Hospital controls |
| Schildkraut 2016 | USA | 2010-2015 | Case-control; Population controls |
| Shushan 1996 | Israel | 1990-1993 | Case-control Population controls |
| Terry 2013 | Pooled 8 studies: USA & Australia | 1984-2008 | Case-control; Population controls |
| Terry-AUS 2013 | Australia | 2002-2006 | Case-control Population controls |
| Terry – DOV[3] 2013 | Washington State | 2002-2009 | Case-control Population controls |
| Terry – HAW 2013 | Hawaii | 1993-2008 | Case-control Population controls |

Report on talcum powder use and ovarian cancer                                                    Jack Siemiatycki

| Author | Study location | Years of case ascertainment/ follow-up[1] | Type of study |
|--------|---------------|-------------------------------------------|---------------|
| Terry – HOP 2013 | Pennsylvania, Ohio, Western NY State | 2003-2008 | Case-control Population controls |
| Terry – NCO 2013 | North Carolina | 1999-2008 | Case-control Population controls |
| Terry – NEC 2013 | Massachusetts, New Hampshire | 1992-2006 | Case-control Population controls |
| Terry – SON 2013 | Southern Ontario | 1989-1992 | Case-control Population controls |
| Terry – USC 2013 | Los Angeles County | 1992-1998 | Case-control Population controls |
| Tzonou 1983 | Athens | 1989-1991 | Case-control; Controls – hospital visitors |
| Whittemore 1988 | San Francisco | 1983-1985 | Case-control; Hospital & population controls |
| Wong 1999 | Buffalo | 1982-1992 | Case-control; Hospital controls |
| Wu 2015 | Los Angeles County | 1992-2008 | Case-control; Population controls |

1. Years of case ascertainment or follow-up: For case-control studies this indicates the years in which cases were ascertained and data collected; for cohort studies it indicates the years of enrolment and follow-up.
2. The Gates 2008 and Gates 2010 papers are both derived from the U.S. Nurses Cohort. The latter represent results for all cases diagnosed up to 2006 and analysed in the cohort framework. The former represents results for a sub-set of cases that were selected for a nested c-c analysis. The number of exposed cases was not given in the Gates 2010 paper.
3. Terry – DOV 2013: the information in Terry 2013 is updated information included in Rosenblatt 2011.

Report on talcum powder use and ovarian cancer                                      Jack Siemiatycki

Appendix Table A3. Covariates used in the analyses and exposure variables in the studies used in the following tables.

| Author | Exposure variable selected | Covariates used in analysis |
|---|---|---|
| Booth 1989 | At least monthly use | Since the authors did not present results for "ever" exposed, I calculated the OR from crude numbers in their tables. Therefore the OR presented is a crude one. However, results presented in Table 7 adjusted for age and social class |
| Chen 1992 | Dusting perineum or lower abdomen > 3 months | Education |
| Cook 1997 | Lifetime perineal application | Age |
| Cramer 1982 | Any use as dusting powder and/or on sanitary napkins | Parity; menopausal status |
| Cramer 2016 | Any talc use | Age; study center (MA, NH); BMI; primary relative with breast or ovarian cancer; parity; OC use; tubal ligation |
| Gates 2008[1.] | Regular genital talc use (1 per week or more) | Age; $OC^2$ use; parity; BMI; post-menopausal hormone use |
| Gates 2010[1] | Regular genital talc use (1 per week or more) | Age; BMI; physical activity; smoking; family history of breast or ovarian ca; OC use; tubal ligation; hysterectomy; age menopause; estrogen use |
| Godard 1998 | Ever use of talc on perineum | Age; reproductive factors; OC use; tubal ligation; alcohol use; breast and abdominal surgery |
| Gonzalez 2016 | Talc use in the past 12 months | Race; body mass index; parity; duration of oral contraceptive use; baseline menopause status; and patency |

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

| Author | Exposure variable selected | Covariates used in analysis |
| --- | --- | --- |
| Harlow 1989 | Any genital talc use | Age; county; parity; OC use |
| Harlow 1992 | Any genital talc use | Age; county; parity; marital status; education; religion; weight; use of sanitary napkins; douching |
| Hartge 1983 | Any genital talc use | Race; age; gravidity |
| Houghton 2014 | Combined use: longest duration of use among the applications to genitals, sanitary napkins and diaphragms | Age; race; OC use; HRT[3] use; family history of ovarian ca; age at last birth; BMI; smoking; tubal ligation; parity |
| Mills 2004 | Ever use of talcum powder in genital area | Age; race/ethnicity; OC use; breast-feeding |
| Ness 2000 | Genital rectal talc use | Age; parity; family history of ovarian ca; |
| Purdie 1995 | Ever used talc in perineal region | Age; parity; duration of OC use; education; BMI; smoking; family history of ovarian ca |
| Rosenblatt 1992 | Ever use of bath talc | Number of live births |
| Schildkraut 2016 | Regular use of talc, cornstarch, baby or deodorising powder – at least once a month for 6 months | Age at diagnosis/interview; study site; education; tubal ligation; parity; BMI duration of OC use first degree family history of breast or ovarian cancer; and interview year |
| Shushan 1996 | Talc use – never, seldom, moderate, a lot | Crude OR |

Report on talcum powder use and ovarian cancer                                          Jack Siemiatycki

| Author | Exposure variable selected | Covariates used in analysis |
| --- | --- | --- |
| Terry 2013 – all components of the pooled analysis | Genital powder use | Age; OC use; parity; BMI; tubal ligation; ethnicity; race; tubal ligation; hysterectomy; breastfeeding |
| Tzonou 1983 | Ever use of talc in perineal region | Age; years of schooling; weight before onset of the disease; age at menarche; menopausal status and age at menopause; parity and age at first birth; tobacco smoking; coffee drinking; consumption of alcoholic beverages; hair dyeing; use of analgesics and tranquilizers/hypnotics |
| Whittemore 1988 | Talcum powder used on any two of perineum, sanitary pads and diaphragm | Age; race; hospital; parity |
| Wong 1999 | Ever use of talc on genital region or thighs | Age; income; education; geographic location; OC use; smoking; family history of ovarian ca; age at menarche; menopausal status; tubal ligation or hysterectomy |
| Wu 2015 | Genital talc use >1 year | Age; race/ethnicity; interviewer; reproductive variables; sociodemographic variables; medical history; hormonal variables; BMI. |

1.  The Gates 2008 and Gates 2010 papers are both derived from the U.S. Nurses Cohort. The latter represent results for all cases diagnosed up to 2006 and analysed in the cohort framework. The former represents results for a sub-set of cases that were selected for a nested c-c analysis. The number of exposed cases was not given in the Gates 2010 paper.

2.  OC: oral contraceptive

3.  HRT: hormone replacement therapy

## 14. Appendix B

Comparison of studies used and results extracted from articles referenced in three different meta-analyses.*

| Penninkilampi 2018 Study / RR(95%CI) | Berge 2018 Study / RR(95%CI) | Siemiatycki 2018 Study / RR(95%CI) |
|---|---|---|
| Booth 1989 1.30 (0.94-1.80) | ***Booth 1989 1.29 (0.92 - 1.80)*** | ***Booth 1989 1.29 (0.92 - 1.80)*** |
| Chang 1997 1.42 (1.08 – 1.86) | Chang 1997 1.35 (1.03 – 1.76) | |
| Chen, 1992 3.90 (1.43 – 10.60) | ***Chen, 1992 3.90 (0.91 - 10.60)*** | ***Chen, 1992 3.90 (0.91 - 10.60)*** |
| ***Cook 1997 1.50 (1.11 – 2.02)*** | ***Cook 1997 1.50 (1.10 - 2.00)*** | ***Cook 1997 1.50 (1.10 - 2.00)*** |
| Cramer 1982 1.60 (1.21 – 2.12) | ***Cramer 1982 1.92 (1.27 - 2.89)*** | ***Cramer 1982 1.92 (1.27 - 2.89)*** |
| Cramer 2016 1.42 (1.03 – 1.95 | Cramer 2016 1.32 (1.14 - 1.50) | Cramer 2016 1.33 (1.16 – 1.52) |
| | | Gates 2008 1.24 (0.83 - 1.83) |
| | ***Gates 2010 1.06 (0.89 - 1.28)*** | ***Gates 2010 1.06 (0.89 - 1.28)*** |
| Gertig 2000 1.09 (0.86 – 1.38) | | |

Report on talcum powder use and ovarian cancer                                      Jack Siemiatycki

| Penninkilampi 2018 Study / RR(95%CI) | Berge 2018 Study / RR(95%CI) | Siemiatycki 2018 Study / RR(95%CI) |
|---|---|---|
| *Godard 1998* *2.49 (0.94 - 6.58)* | *Godard 1998* *2.49 (0.94 - 6.58)* | *Godard 1998* *2.49 (0.94 - 6.58)* |
| *Gonzalez 2016* *0.73 (0.44 - 1.20)* | *Gonzalez 2016* *0.73 (0.44 - 1.20)* | *Gonzalez 2016* *0.73 (0.44 - 1.20)* |
| | Goodman 2008 0.99 (0.7 - 1.41) | |
| Green 1997 1.30 (1.06 – 1.60) | | |
| Harlow 1989 1.10 (0.58 – 2.10) | *Harlow 1989* *1.10 (0.70 - 2.10)* | *Harlow 1989* *1.10 (0.70 – 2.10)* |
| | *Harlow 1992* *1.50 (1.00 - 2.10)* | *Harlow 1992* *1.50 (1.00 - 2.10)* |
| *Hartge 1983* *2.50 (0.66 – 9.45)* | *Hartge 1983* *2.50 (0.70 - 10.00)* | Hartge 1983 0.70 (0.40 - 1.10) |
| *Houghton 2014* *1.12 (0.92 – 1.36)* | Houghton 2014 1.06 (0.87 - 1.28) | *Houghton 2014* *1.12 (0.92 – 1.36)* |
| Kurta 2012 1.40 (1.16 – 1.69) | | |
| | Lo-Ciganic 2012 1.34 (1.07 - 1.66) | |

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

| Penninkilampi 2018 | Berge 2018 | Siemiatycki 2018 |
| Study / RR(95%CI) | Study / RR(95%CI) | Study / RR(95%CI) |
| --- | --- | --- |
| Merritt 2008<br>1.17 (1.01 – 1.36) | Merritt 2008<br>1.13 (0.92 - 1.38) | |
| *Mills 2004*<br>*1.37 (1.02 - 1.85)* | *Mills 2004*<br>*1.37 (1.02 - 1.85)* | *Mills 2004*<br>*1.37 (1.02 - 1.85)* |
| | Moorman 2009<br>1.37 (1.05 - 1.8) | |
| *Ness 2000*<br>*1.50 (1.10 - 2.02)* | *Ness 2000*<br>*1.50 (1.10 - 2.00)* | *Ness 2000*<br>*1.50 (1.10 - 2.00)* |
| *Purdie 1995*<br>*1.27 (1.04 - 1.54)* | *Purdie 1995*<br>*1.27 (1.04 - 1.54)* | *Purdie 1995*<br>*1.27 (1.04 - 1.54)* |
| Rosenblatt 1992<br>1.70 (0.72 – 4.01) | *Rosenblatt 1992*<br>*1.70 (0.70 - 3.90)* | *Rosenblatt 1992*<br>*1.70 (0.70 - 3.90)* |
| Rosenblatt 2011<br>1.27 (0.97 – 1.66) | Rosenblatt 2011<br>1.13 (0.93 - 1.36) | |
| *Schildkraut 2016*<br>*1.44 (1.11 - 1.86)* | *Schildkraut 2016*<br>*1.44 (1.11 - 1.86)* | *Schildkraut 2016 A*<br>*1.44 (1.11 - 1.86)* |
| | | Schildkraut 2016 B<br>1.19 (0.87 - 1.63) |
| Shushan 1996<br>2.00 (1.11 – 3.60) | | Shushan 1996<br>1.97 (1.06 – 3.66) |

16 November 2018                                                                                              105

Report on talcum powder use and ovarian cancer                                      Jack Siemiatycki

| Penninkilampi 2018<br>Study / RR(95%CI) | Berge 2018<br>Study / RR(95%CI) | Siemiatycki 2018<br>Study / RR(95%CI) |
|---|---|---|
|  |  | Terry 2013<br>1.24 (1.15 - 1.33) |
| *Tzonou 1993*<br>*1.05 (0.28 - 3.96)* | *Tzonou 1993*<br>*1.05 (0.28 - 3.98)* | *Tzonou 1993*<br>*1.05 (0.28 - 3.98)* |
| Whittemore 1988<br>1.40 (0.98 – 2.00) | *Whittemore 1988*<br>*1.36 (0.91 - 2.04)* | *Whittemore 1988*<br>*1.36 (0.91 - 2.04)* |
| Wong 1999<br>0.92 (0.24 – 3.57) | *Wong 1999*<br>*1.00 (0.80 - 1.30)* | *Wong 1999*<br>*1.00 (0.80 - 1.30)* |
| Wu 2015<br>1.32 (1.14 – 1.52) | *Wu 2015*<br>*1.46 (1.27 - 1.69)* | *Wu 2015*<br>*1.46 (1.27 - 1.69)* |

- * When two or three of the meta-analyses extracted the identical results from the source paper, it is indicated with italic characters.

16 November 2018                                                                        106

## 15.   Appendix C

Examples of historic discoveries made on the basis of empirical observation of an association, without the existence of a validated biological mechanism of action.

- Jenner (18th century) discovered that smallpox could be prevented by "vaccinating" people. This was based on observation of the effect of exposure to cowpox. He had no idea about viruses or the biology of smallpox. He only knew that the "association" he observed between vaccination and the prevention of smallpox was so strong as to convince him it was causal. Millions of lives were saved as a result.

- Snow (19th century) discovered that cholera was caused by something in the water supply. He did not know what the pathogen was or how it produced the disease, but he showed with sufficient epidemiologic proof that drinking water from a polluted source produced much higher rates than drinking water from a clean source. Despite the ignorance of biological mechanisms, the public health authorities acted on his findings and thereby greatly reduced the incidence of cholera.

- Rheumatic fever and rheumatic heart disease were quite common causes of disease and death, striking relatively young people. For many decades it was recognized that there was an association between infection with the streptococcus bacterium and rheumatic heart disease, but it was not understood how the bacterium could have such an effect. The lack of understanding of the biological mechanisms did not get in the way of prevention of rheumatic heart disease by preventing and treating streptococcus infection.

- In the 1930's and 1940's, it was noticed that communities with high natural levels of fluoride in the water had much lower levels of dental caries than communities with low fluoride levels. Additional observational research confirmed the clear causal relationship and this led to extensive use of fluoride in various ways to reduce dental disease. But, all this occurred

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

___

before the mechanisms by which fluoride acted on teeth were understood. And, indeed the mechanisms are still not fully understood.

- In the late 1940's and early 1950's, evidence was accumulating that cigarette smokers had higher rates of lung cancer than non-smokers. This "association" was ridiculed at the time, among other reasons, because there was no proven biological mechanism. Attempts to replicate smoking-related lung cancer incidence in laboratory animals were largely unsuccessful. Nor was there a deep understanding of the cellular processes that allow the inhalation of cigarette smoke to culminate in a tumor. Scores of studies later and many decades later, the outlines of a credible biological mechanism began to emerge. The absence of a proven biological mechanism did not hinder the US Surgeon General and other national bodies from concluding that there was a causal link as early as the 1960's.

- Many chemicals have been found to be carcinogenic as a result of epidemiologic studies among workers. Examples of these are asbestos, silica, nickel compounds, chromium compounds, benzene, and others. Some of these discoveries go back to the first half of the 20th century, and, for most of them, many decades passed between the time they were recognized as carcinogens, on the basis of epidemiologic associations, and the elaboration of credible mechanisms of how they induce cancer. (Siemiatycki 2015)  Most known carcinogens were first discovered empirically by medical doctors or epidemiologists, usually as part of large data collection activities or just plain astute observation on the part of medical doctors.

___

16 November 2018

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

**16.   References**

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

**Bibliography Part A: Documents available in the Public Domain**

Anderson E, P Sheehan, R Kalmes, J Griffin (2017). Assessment of health risk from historical use of cosmetic talcum powder, *Risk Analysis* 37(5):918-929.

Aune D, Giovannucci E, Boffetta P, Fadnes L, Keum N, Norat T, Greenwood D, Riboli E, Vatten L, Tonstad S (2017). Fruit and vegetable intake and the risk of cardiovascular disease, total cancer and all-cause mortality – a systematic review and dose-response meta-analysis of prospective studies, *International Journal of Epidemiology* 43(3):1029-1056.

Begg, March (2018). Cause and association: missing the forest for the trees. *American Journal of Public Health (AJPH)* Vol 108, No.5.

Berge, Mundt, Luu and Boffetta (2017, published 2018). Genital use of talc and risk of ovarian cancer: a meta-analysis. *The European Journal of Cancer Prevention* 27(3): 248-257.

Booth, M., V. Beral and P. Smith (1989). Risk factors for ovarian cancer: a case-control study. *British Journal of Cancer* 60(4): 592-598.

Blount A. (1991). Amphibole content of cosmetic and pharmaceutical talcs, *Environmental Health Perspectives*, 94:225-230.

Boffetta, Hayes, Satori, et al. (2016) Mouthwash use and cancer of the head and neck: a pooled analysis from the International Head and Neck Cancer Epidemiology Consortium. *The European Journal of Cancer Prevention 25(4): 344-8.*

Boorman G, J Seely (1995). The lack of ovarian effect of lifetime talc exposure in F344/N rats and B6C3F1 mice, *Regulatory Toxicology and Pharmacology* 21:242-243.

Booth, M., V. Beral and P. Smith (1989). Risk factors for ovarian cancer: a case-control study. *British Journal of Cancer* 60(4): 592-598.

Bunderson-Schelvan M, J Pfau, R Crouch, A Holian (2011). Nonpulmonary outcomes of asbestos exposure, *Journal of Toxicology and Environmental Health, Part B* 14:122-152.

Buz'Zard, Lau (2007). Pycnogenol reduces talc-induced neoplastic transformation in human ovarian cell cultures. *Phytotherapy Research  Journal* 21(6):579-86.

Camargo M, L Stayner, K Straif, M Reina, U Al-Alem, P Demers, P Landrigan (2011). Occupational exposure to asbestos and ovarian cancer: a meta-analysis, Environ Health Perspect 119:1211–1217.Carnethon MR, Gidding SS, Nehgme R, Sidney S, Jacobs, Jr DR, Liu K (2003). Cardiorespiratory Fitness in Young Adulthood and the Development of Cardiovascular Disease Risk Factors. *JAMA*, 290(23):3092–3100.

Carr CJ (1995). Talc: Consumer Uses and Health Perspectives, *Regulatory Toxicology and Pharmacology* 21:211-215.

Cerhan, J., Z. Fredericksen, A. Wang, T. Habermann, N. Kay, W. Macon, J. Cunningham, T. Shanafelt, S. Answell, T. Call, T. Witzig, S. Slager, M. Liebow (2011). Design and validity of a clinic-based case-control study on the molecular epidemiology of lymphoma. *International Journal of Molecular Epidemiology and Genetics* 2(2): 95-113.

Chang, S. and H. A. Risch (1997). Perineal talc exposure and risk of ovarian carcinoma. *Cancer* 79(12): 2396-2401.

Chen, Y., P. C. Wu, J. H. Lang, W. J. Ge, P. Hartge and L. A. Brinton (1992). Risk factors for epithelial ovarian cancer in Beijing, China. *International Journal of Epidemiology* 21(1): 23-29.

CIR (2013). *Safety Assessment of Talc as Used in Cosmetics*. Washington, D.C., CIR (Cosmetic Ingredient Review).

Cook, L. S., M. L. Kamb and N. S. Weiss (1997). Perineal powder exposure and the risk of ovarian cancer. *American Journal of Epidemiology* 145(5): 459-465.

Coussens, L. M. and Z. Werb (2002). Inflammation and cancer. *Nature* 420(6917): 860-867.

Cralley L, M Key, D Groth, W Lainhart, R Ligo. (1968). Fibrous and mineral content of cosmetic talcum products, *American Industrial Hygiene Association Journal*, 29(4):350-354.

Cramer, D. W. (2015). Opinion on the Relationship between Ovarian Cancer and Cosmetic Talc Powder Use: Causality and Relevance to the Case of Michael Blaes OBO Shawn Blaes. Civil Action Number 4:14-cv-00213. Unpublished report.

Cramer, D. W., R. F. Liberman, L. Titus-Ernstoff, W. R. Welch, E. R. Greenberg, J. A. Baron and B. L. Harlow (1999). Genital talc exposure and risk of ovarian cancer. *International Journal of Cancer* 81(3): 351-356.

Cramer, D. W., L. Titus-Ernstoff, J. R. McKolanis, W. R. Welch, A. F. Vitonis, R. S. Berkowitz and O. J. Finn (2005). Conditions Associated with Antibodies Against the Tumor-Associated Antigen MUC1 and Their Relationship to Risk for Ovarian Cancer. *Cancer Epidemiology, Biomarkers & Prevention* 14(5): 1125-1131.

Cramer, D. W., A. F. Vitonis, K. L. Terry, W. R. Welch and L. J. Titus (2016). The Association Between Talc Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US States. *Epidemiology* 27(3): 334-346.

Cramer, D. W., W. R. Welch, R. S. Berkowitz and J. J. Godleski (2007). Presence of talc in pelvic lymph nodes of a woman with ovarian cancer and long-term genital exposure to cosmetic talc. *Obstetrics & Gynecology* 110(2 Part 2): 498-501.

Cramer, D. W., W. R. Welch, R. E. Scully and C. A. Wojciechowski (1982). Ovarian cancer and talc: a case-control study. *Cancer* 50(2): 372-376.

Cramer, D. W. and H. Xu (1995). Epidemiologic evidence for uterine growth factors in the pathogenesis of ovarian cancer. *Annals of Epidemiology* 5(4): 310-314.

Current Intelligence Bulletin 62  (Rev/ 4/2011)- Asbestos fibers and other elongate mineral particles: state of the science and roadmap for research. *National Institute for Occupational Safety and Health (NIOSH)* DHHS (NIOSH) Publication No. 2011-159

Dement, Shuler, Zumwalde (1972). "Fiber exposure during use of baby powders" *National Institute for Occupational Safety and Health*, IWS 36-6: 1-13.

Doll R, Peto R, Boreham J, Sutherland I (2004). Mortality in relation to smoking: 50 years' observations on British male doctors, *British Medical Journal*, 328(7455):1519.

Egli G, M. Newton (1961). The transport of carbon particles in the human female reproductive tract, *Fertility and Sterility* 12(April):151-55.

Eltabbakh, G. H., M. S. Piver, N. Natarajan and C. J. Mettlin (1998). Epidemiologic differences between women with extraovarian primary peritoneal carcinoma and women with epithelial ovarian cancer. *Obstetrics & Gynecology* 91(2): 254-259.

Fedak K, A. Bernal, Z Capshaw, S Gross (2015). Applying the Bradford Hill criteria in the 21st Century: How data integration has changed causal inference in molecular epidemiology, *Emerging Themes in Epidemiology* 12(14) https://doi.org/10.1186/s12982-015-0037-14

Federal Judicial Center and National Research Council of the National Academies (2011). *Reference Manual on Scientific Evidence, Third Edition*. Washington, D.C., The National Academies Press.

Federal Register (2016). Banned Devices; Powdered Surgeon's Gloves; Patient Examination Gloves, and Absorbable Powder for Lubricating a Surgeon Glove – powdered gloves. *Food and Drug Administration 81FR 91722*.

Fletcher N, J Belotte, M Saed, I Memaj, M Diamond, R Morris, G Saed (2016). Specific point mutations in key redox enzymes are associated with chemoresistance in epithelial ovarian cancer, *Free Radical Biology and Medicine*, 102:122-132.

Fletcher N, I Memaj, G Saed (2018). Talcum powder enhances oxidative stress in ovarian cancer cells – Abstract, Reproductive Sciences, 25(Supp. 1):214A.

Fletcher N, G. Saed (2018). Talcum powder enhances cancer antigen 125 levels in ovarian cancer cells – Abstract, Society for Reproductive Investigation 65th Annual Scientific Meeting, LB-044.

Fiume, M., I. Boyer, W. Bergfeld, D. Belsito, R. Hill, C. Klaassen, D. Liebler, J. Marks, Jr., R. Shank. T. Slaga, P. Synder, F.A. Andersen (2015). Safety Assessment of Talc as Used in Cosmetics. *International Journal of Toxicology* 34(Supplement I): 66S-129S.

Folkins A, E Jarboe, J Hecht, M Muto and C Crum (2018). "Chapter 24 – Assessing pelvic epithelial cancer risk and intercepting early malignancy." In *Diagnostic Gynecologic*

*and Obstetric Pathology (Third Edition)*, 844-64. Philadelphia: Content Repository Only! https://doi.org/10.1016/B978-0-323-44732-4.00024-8.

Gandini S, Sera F, Cattaruzza MS, et al (2004). Meta-analysis of risk factors for cutaneous melanoma: II. Sun exposure. *European Journal of Cancer* 41:45-60.

Gates, M. A., B. A. Rosner, J. L. Hecht and S. S. Tworoger (2010). Risk factors for epithelial ovarian cancer by histologic subtype. *American Journal of Epidemiology* 171(1): 45-53.

Gates, M. A., S. S. Tworoger, K. L. Terry, I. De Vivo, D. J. Hunter, S. E. Hankinson and D. W. Cramer (2009). Breast cancer susceptibility alleles and ovarian cancer risk in 2 study populations. *International Journal of Cancer* 124(3): 729-733.

Gates, M. A., S. S. Tworoger, K. L. Terry, L. Titus-Ernstoff, B. Rosner, I. De Vivo, D. W. Cramer and S. E. Hankinson (2008). Talc use, variants of the GSTM1, GSTT1, and NAT2 genes, and risk of epithelial ovarian cancer. *Cancer Epidemiology, Biomarkers & Prevention* 17(9): 2436-2444.

Gertig, D. M., D. J. Hunter, D. W. Cramer, G. A. Colditz, F. E. Speizer, W. C. Willett and S. E. Hankinson (2000). Prospective study of talc use and ovarian cancer. *Journal of the National Cancer Institute* 92(3): 249-252.

Gloyne S (1935). Two cases of squamous carcinoma of the lung occurring in asbestosis, *Tubercle* (17)1: 5-10.

Godard, B., W. D. Foulkes, D. Provencher, J. S. Brunet, P. N. Tonin, A. M. Mes-Masson, S. A. Narod and P. Ghadirian (1998). Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study. *American Journal of Obstetrics & Gynecology* 179(2): 403-410.

Gonzalez, N. L., K. M. O'Brien, A. A. D'Aloisio, D. P. Sandler and C. R. Weinberg (2016). Douching, Talc Use, and Risk of Ovarian Cancer. *Epidemiology* 20: 20.

Goodman, M. T., G. Lurie, P. J. Thompson, K. E. McDuffie and M. E. Carney (2008). Association of two common single-nucleotide polymorphisms in the CYP19A1 locus and ovarian cancer risk. *Endocrine-Related Cancer* 15(4): 1055-1060.

Gordon R, S Fitzgerald, and J Millette (2014). Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women, *International Journal of Occupational and Environmental Health*, 20(4): 318-332.

Green, A., D. Purdie, C. Bain, V. Siskind, P. Russell, M. Quinn and B. Ward (1997). Tubal sterilisation, hysterectomy and decreased risk of ovarian cancer. Survey of Women's Health Study Group. *International Journal of Cancer* 71(6): 948-951.

Grivennikov, S. I., F. R. Greten and M. Karin (2010). Immunity, inflammation, and cancer. *Cell* 140(6): 883-899.

Gross, A. J. and P. H. Berg (1995). A meta-analytical approach examining the potential relationship between talc exposure and ovarian cancer. *Journal of Exposure Analysis & Environmental Epidemiology* 5(2): 181-195.

Hamilton T, H Fox H, C Buckley CH, W Henderson, K Griffiths. Effects of talc on the rat ovary. British journal of experimental pathology. 1984;65(1):101-6Hamra GB, Guha N, Cohen A, et al (2014). Outdoor Particulate Matter Exposure and Lung Cancer: A Systematic Review and Meta-Analysis, *Environ Health Perspect* 122:906-911.

Hankinson, S. E., D. J. Hunter, G. A. Colditz, W. C. Willett, M. J. Stampfer, B. Rosner, C. H. Hennekens and F. E. Speizer (1993). Tubal ligation, hysterectomy, and risk of ovarian cancer. A prospective study. *JAMA* 270(23): 2813-2818.

Harlow, B. L., D. W. Cramer, D. A. Bell and W. R. Welch (1992). Perineal exposure to talc and ovarian cancer risk. *Obstetrics & Gynecology* 80(1): 19-26.

Harlow, B. L. and N. S. Weiss (1989). A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc. *American Journal of Epidemiology* 130(2): 390-394.

Harper A, G Saed (2018). Talc induces a pro-oxidant state in normal and ovarian cancer cells through gene point mutations in key redox enzymes - Abstract, *Society of Gynecologic Oncology*, *in press*.

Hartge, P., R. Hoover, L. P. Lesher and L. McGowan (1983). Talc and ovarian cancer. *JAMA* 250(14): 1844.

Heath, David. (2016) "Philip Morris uses chemical industry consultants to perpetuate 'light cigarette' myth" – https://www.publicintegrity.org/2016/05/04/19618/philip-morris-uses-chemical-industry-consultants-perpetuate-light-cigarette-myth

Heller, D. S., C. Westhoff, R. E. Gordon and N. Katz (1996). The relationship between perineal cosmetic talc usage and ovarian talc particle burden. *American Journal of Obstetrics & Gynecology* 174(5): 1507-1510.

Hernan (2018).  The C-Word: scientific euphemisms do not improve causal inference from observational data. *The American Journal of Public Health* (AJPH) Vol 108, No.5: 616-619

Henderson, W. J., T. C. Hamilton and K. Griffiths (1979). Talc in normal and malignant ovarian tissue. *Lancet* 1(8114): 499.

Henderson, W. J., C. A. Joslin, A. C. Turnbull and K. Griffiths (1971). Talc and carcinoma of the ovary and cervix. *Journal of Obstetrics & Gynaecology British Commonwealth* 78(3): 266-272.

Henderson, W.J., T.C. Hamilton, M.S. Baylis, C.G. Pierrepoint, K. Griffiths (1986). The demonstration of the migration of talc from the vagina and posterior uterus to the ovary in the rat, *Environmental Research* 40:247-250.

Hill, A. B. (1965). The environment and disease: association or causation? *Proceedings of the Royal Society of Medicine* 58: 295-300.

Houghton, S. C., K. W. Reeves, S. E. Hankinson, L. Crawford, D. Lane, J. Wactawski-Wende, C. A. Thomson, J. K. Ockene and S. R. Sturgeon (2014). Perineal powder use and risk of ovarian cancer. *Journal of the National Cancer Institute* 106(9).

Huncharek, M., J. F. Geschwind and B. Kupelnick (2003). Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies. *Anticancer Research* 23(2C): 1955-1960.

Huncharek, M. and J. Muscat (2011). Perineal talc use and ovarian cancer risk: a case study of scientific standards in environmental epidemiology. *European Journal of Cancer Prevention* 20(6): 501-507.

Huncharek, M., J. Muscat, A. Onitilo and B. Kupelnick (2007). Use of cosmetic talc on contraceptive diaphragms and risk of ovarian cancer: a meta-analysis of nine observational studies. *European Journal of Cancer Prevention* 16(5): 422-429.

IARC Monograph 1-42 (1972-1987) - Evaluation of the Carcinogenic risk of chemicals to humans. *International Agency for Research on Cancer/World Health Organization*, WHO Press.

IARC (1996). *Mechanisms of mineral fibre carcinogenesis. Publication No, 140*. Kane AB, Boffeta P, Saracci R, Wilbourn JD, *IARC Scientific*

IARC (2010). *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Vol. 93. Carbon black, titanium dioxide, and talc*. Lyon, IARC (International Agency for Research on Cancer).

IARC (2011). *IARC Monographs on Design and validity of a clinic base control-study on the molecular epidemiology of lymphoma, Vol. 93*. James R. Cerhan, Zachary S. Fredericksen, Alice H Wang, Thomas M. Habermann, Neil E. Kay, William R. Macon, Julie M. Cunningham, Tait D. Shanfelt, Stephen M. Answell, Thimothy G. Call, Thomas E. Witzig, Susan L. Slager, Mark Liebow, IARC (International Agency for Research on Cancer).

IARC - Monograph Vol. 100C (2012)- Arsenic, Metals Fibres, and Dusts: A review of human carcinogens. Lyon, *International Agency for Research on Cancer/World Health Organization.*

Ioannidis J (2005). Why most published research findings are false, *PLos Med*, 2(8):e124.

Ioannidis J (2015). Exposure-wide epidemiology: revisiting Bradford Hill, *Statistics in Medicine*

Jordan, S. J., A. C. Green, D. C. Whiteman, P. M. Webb and Australian Ovarian Cancer Study Group (2007). Risk factors for benign serous and mucinous epithelial ovarian tumors. *Obstetrics & Gynecology* 109(3): 647-654.

Karami S, Lan Q, Rothman N, et al (2012). Occupational trichloroethylene exposure and kidney cancer risk: a meta-analysis. Occupational and Environmental Medicine 69:858-867.

Kasper CS, Chandler PJ, Jr. Possible morbidity in women from talc on condoms. JAMA. 1995;273(11):846-7.

Khalade A, Jaakkola MS, Pukkala E, Jaakkola JJ (2010). Exposure to benzene at work and the risk of leukemia: a systematic review and meta-analysis. Environmental Health 9(31):1-8.

Kim S, Ko Y, Lee HJ, Lim J (2018). Menopausal hormone therapy and the risk of breast cancer by histological type and race: a meta-analysis of randomized controlled trials and cohort studies. Breast Cancer Research and Treatment 170(3):667-675.

Krause J (1977). Mineralogical characterization of cosmetic talc products, Journal of Toxicology and Environmental Health 2(5):1223-1226.Kurta, M. L., K. B. Moysich, J. L. Weissfeld, A. O. Youk, C. H. Bunker, R. P. Edwards, F. Modugno, R. B. Ness and B. Diergaarde (2012). Use of fertility drugs and risk of ovarian cancer: results from a U.S.-based case-control study. *Cancer Epidemiology, Biomarkers & Prevention* 21(8): 1282-1292.

Langseth, H., S. E. Hankinson, J. Siemiatycki and E. Weiderpass (2008). Perineal use of talc and risk of ovarian cancer. *Journal of Epidemiology & Community Health* 62(4): 358-360.

Langseth, H. and K. Kjaerheim (2004). Ovarian cancer and occupational exposure among pulp and paper employees in Norway. *Scandinavian Journal of Work, Environment & Health* 30(5): 356-361.

Last, J. M. (2001). *A Dictionary of Epidemiology, Fourth Edition*. Oxford, Oxford University Press.

Levin."Baby powder battles: Johnson & Johnson internal documents reveal asbestos worries" - https://www.fairwarning.org/2018/01/talc-documents-reveal/print

Licaj, Jacobsen, Selmer et al. (2017. Smoking and risk of ovarian cancer by histological subtypes: an analysis among 300,000 Norwegian women. *British Journal of Cancer* 116(2): 270-276

Lo-Ciganic, W. H., J. C. Zgibor, C. H. Bunker, K. B. Moysich, R. P. Edwards and R. B. Ness (2012). Aspirin, nonaspirin nonsteroidal anti-inflammatory drugs, or acetaminophen and risk of ovarian cancer. *Epidemiology* 23(2): 311-319.

Lockey J (1981). Nonasbestos fibrous minerals, *Clinics in Chest Medicine* 2(2):203-218.

Lundin, Dossus, Clendenen, Krogh, Grankvist, Wulff, Sieri, Arlsan, Lenner, Berrino, Hallmans, Zeleniuch-Jacquotte, Toniolo, Lukanova (2009). C-reactive protein and ovarian cancer: a prospective study nested in three cohorts (Sweden, USA, Italy). Caner Causes & Control: CCC 20(7):1151-1159.

Lunet, N., and A. Azevedo (2009). Letter to the Editor: On the comparability of population-based and hospital-based case-control studies. *Gaceta Sanitaria* 23(6): 564-567.

Mahjub H, Sadri G (2006). Meta-analysis of case-referent studies of specific environmental or occupational pollutants on lung cancer. *Indian Journal of Cancer* 43(4):169-173.

Mallen, Townsend, Tworoger (2018). Risk factors for ovarian carcinoma. *Hematology/Oncology Clinics of North America*. 32(6):891-902.

Masi, A. (1965). Potential uses and limitations of hospital data in epidemiologic research. *American Journal of Public Health* 55(5): 658-667.

Mattenklott (2007). Asbestos in talc powders and soapstone – the present state . *Staub, Reinhaltung der Luft Journal* 67(7):287-292.

Mayer D, C Kasper, P Chandler (1995). To the Editor: Talc and Condoms and reply, JAMA 274(16):1269.

Merritt, M. A., A. C. Green, C. M. Nagle, P. M. Webb, Australian Cancer Study (Ovarian Cancer) and Australian Ovarian Cancer Study Group (2008). Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer. *International Journal of Cancer* 122(1): 170-176.

Mills, P. K., D. G. Riordan, R. D. Cress and H. A. Young (2004). Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. *International Journal of Cancer* 112(3): 458-464.

Miserocchi G, G Sancini, F Mantegazza, G Chiappino (2008). Translocation pathways for inhaled asbestos fibers, *Environmental Health* 7:4 doi: 10.1186/1476-069X-7-4.

Moller P, P Danielsen, K Jantsen, M Roursgaard & S Loft (2013). Oxidatively damaged DNA in animals exposed to particles, Critical Reviews in Toxicology, 43:2, 96-118.

Moller, Jacobsen et al (2010). Role of oxidative damage in toxicity of particulates, Free Radical Researchm 44:1, 1-46.

Moon M, J Park, B Choi, S Park, D Kim, Y Chung, N Hisanaga, I Yu (2011). Risk assessment of baby powder exposure through inhalation. *Official Journal of Korean Society of Toxicology,* 27(3): 137-147.

Moorman, P. G., R. T. Palmieri, L. Akushevich, A. Berchuck and J. M. Schildkraut (2009). Ovarian cancer risk factors in African-American and white women. *American Journal of Epidemiology* 170(5): 598-606.

Muscat J.E., Huncharek M (2008). Perineal Talc Use and Ovarian Cancer: A Critical Review. *European J Cancer Prevention* 17:139-146.

Narod S (2016). Talc and ovarian cancer. *Gynecologic Oncology* 141(3):410-12. https//doi.org/10.1016/j.ygyno.2016.04.011.

Ness, R. B. and C. Cottreau (1999). Possible role of ovarian epithelial inflammation in ovarian cancer. *Journal of the National Cancer Institute* 91(17): 1459-1467.

Ness, R. B., J. A. Grisso, C. Cottreau, J. Klapper, R. Vergona, J. E. Wheeler, M. Morgan and J. J. Schlesselman (2000). Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. *Epidemiology* 11(2): 111-117.

Ness, Roberta  (2015)– Does talc exposure cause ovarian cancer?:IGCS-0015 Ovarian Cancer. *International Journal of Gynecological Cancer: Official Journal of the International Gynecological Cancer Society*, 25 Suppl. 1:51

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

---

Neupane, B., S. Walter, P. Krueger, M. Loeb (2010). Community controls were preferred to hospital controls in a case-control study where the cases are derived from the hospital. *Journal of Clinical Epidemiology* 63(8): 926-931.

Paoletti, Caiazza, et al (1984). Evaluation by electron microscopy techniques of asbestos contamination in industrial, cosmetic, and pharmaceutical talcs. *Regulatory Toxicology and Pharmacology* 4(3):222-35.

Park, Schildkraut, et al. (2018) Benign gynecologic conditions are associated with ovarian cancer risk in African-American women: a case-control study. *Cancer Causes & Control* Vol. 29, Issue 11, pp 1081-1091.

Peeples, Lynne (2014) "Hidden source of industry influence threatens toxic chemical regulations" – https://huffingtonpost.com/2014/09/18/industry-toxic-chemicals-funding-conflicts-of-interest_n_5837968.html

Pennikilampi R, G Eslick (2018). Perineal talc use and ovarian cancer: a systematic review and meta-analysis, *Epidemology*, 29:41-49.

Petitti, D. B. (2000). *Meta-Analysis, Decision Analysis, and Cost-Effectiveness Analysis*. New York, Oxford University Press.

Pike, M. C., C. L. Pearce, R. Peters, W. Cozen, P. Wan and A. H. Wu (2004). Hormonal factors and the risk of invasive ovarian cancer: a population-based case-control study. *Fertility & Sterility* 82(1): 186-195.

Purdie, D., A. Green, C. Bain, V. Siskind, B. Ward, N. Hacker, M. Quinn, G. Wright, P. Russell and B. Susil (1995). Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study. Survey of Women's Health Study Group. *International Journal of Cancer* 62(6): 678-684.

Reid, Permuth, Sellers (2017). *Epidemiology of ovarian cancer: a review. Cancer Biology and Medicine* 14(1): 9-32.

VL Roggli, PC Pratt (1983). Numbers of asbestos bodies on iron-stained tissue sections in relation to asbestos body counts in lung tissue digest. *Human Pathology Journal* 14(4): 355-61.

---

16 November 2018                                                                 121

VL Roggli, PC Pratt. AR Brody(1986). Asbestos content of lung tissue in asbestos associated diseases: a study of 110 cases. *British Journal of Industrial Medicine* 43(1): 18-28.

Rohl A (1974). Asbestos in Talc, *Environmental Health Perspectives*, 9:129-132.

Rohl A, A. Langer, J. Selikoff, A. Tordini, R. Klimentidis (1976). Consumer talcums and powders: mineral and chemical characterization. *Journal of Toxicology and Environmental Health* 2(2):255-84.

Rosenblatt, K. A., W. A. Mathews, J. R. Daling, L. F. Voigt and K. Malone (1998). Characteristics of women who use perineal powders. *Obstetrics & Gynecology* 92(5): 753-756.

Rosenblatt, K. A., M. Szklo and N. B. Rosenshein (1992). Mineral fiber exposure and the development of ovarian cancer. *Gynecologic Oncology* 45(1): 20-25.

Rosenblatt, K. A., N. S. Weiss, K. L. Cushing-Haugen, K. G. Wicklund and M. A. Rossing (2011). Genital powder exposure and the risk of epithelial ovarian cancer. *Cancer Causes & Control* 22(5): 737-742.

Ross, Malcom (1974)Geology, asbestos and health. *The National Institute of Environmental Health Sciences* 9:123-124

Rothan, Pastides, Samet (2000). Interpretation of epidemiologic studies on Talc and Ovarian Cancer.

Rothman, K. J. and S. Greenland (1998). *Modern Epidemiology, Second Edition*. Philadelphia, Lippincott-Raven Publishers.

Rothman, K., Greenland, S., & Lash, TL. (2008). *Modern Epidemiology, 3rd Edition*. Philadelphia, PA: Lippincott Williams & Wilkins.

Ruano-Ravina, A., M. Perez-Rios, J. Barros-Dios (2008). Population-based versus hospital-based controls: are they comparable? *Gaceta Sanitaria* 22(6): 609-613.

Saed G, R Morris, N Fletcher (2018). *New insights into the pathogenesis of ovarian cancer-oxidative stress, Ovarian Cancer – From Pathogenesis to Treatment*, Ch. 4, 83-110, IntechOpen.

Saed G, M Diamond, N Fletcher (2017). Updates of the role of oxidative stress in the pathogenesis of ovarian cancer, *Gynecologic Oncology*, 145:595-602.

Schildkraut, J. M., S. E. Abbott, A. J. Alberg, E. V. Bandera, J. S. Barnholtz-Sloan, M. L. Bondy, M. L. Cote, E. Funkhouser, L. C. Peres, E. S. Peters, A. G. Schwartz, P. Terry, S. Crankshaw, F. Camacho, F. Wang and P. G. Moorman (2016). Association between Body Powder Use and Ovarian Cancer: the African American Cancer Epidemiology Study (AACES). *Cancer Epidemiology, Biomarkers & Prevention* 12: 12.

Shukla A, M MacPherson, J Hillegass, M Ramos-Nino, V Alexeeva, P Vacek, J Bond, H Pass, C Steele, B Mossman (2009). Alterations in gene expression in human mesothelial cells correlated with mineral pathogenicity, *American Journal of Respiratory Cell and Molecular Biology*, 41:114-123.

Shushan, A., O. Paltiel, J. Iscovich, U. Elchalal, T. Peretz and J. G. Schenker (1996). Human menopausal gonadotropin and the risk of epithelial ovarian cancer. *Fertility & Sterility* 65(1): 13-18.

Siemiatycki J. Historical overview of occupational cancer research and control.  In Occupational Cancers. Eds S Anttila, P Boffetta, K Straif. Springer Press: 1-20, 2014.

Sjosten A, H Ellis, G Edelstam (2004). Retrograde migration of glove powder in the human female genital tract, *Human Reproduction* 19(4):991-995.

Smith, Guyton, Gibbons, et al. (2016). Key characteristics of carcinogens as a basis for organizing data on mechanisms of carcinogenesis. *Environmental Health Perspectives* 124(6):713-21

Steiling W, Almeida JF, Assaf Vandecasteele H, Gilpin S, Kawamoto T, O'Keeffe L, Pappa G, Rettinger K, Rothe H, Bowden AM (2018) Principles for the safety evaluation of cosmetic powders, *Toxicology Letters*, 297, 8-18.

Straif K, Benbrahim-Tallaa L, Baan R, Grosse Y, Secretan B, El Ghissassi F, Bouvard V,Guha N, Freeman C, Galichet L, Cogliano V; WHO International Agency for Research on Cancer Monograph Working Group (2009). A review of human carcinogens - Part C: metals, arsenic, dusts and fibres, Lanet Oncology 10(5):453-454. Suzuki Y, N

Kohyama (1991). Translocation of inhaled asbestos fibers from the lung to other tissue, *American Journal of Industrial Medicine* 19(6):701-704.

Terry, K. L., S. Karageorgi, Y. B. Shvetsov, M. A. Merritt, G. Lurie, P. J. Thompson, M. E. Carney, R. P. Weber, L. Akushevich, W. H. Lo-Ciganic, K. Cushing-Haugen, W. Sieh, K. Moysich, J. A. Doherty, C. M. Nagle, A. Berchuck, C. L. Pearce, M. Pike, R. B. Ness, P. M. Webb, M. A. Rossing, J. Schildkraut, H. Risch and M. T. Goodman (2013). Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls. *Cancer Prevention Research* 6(8): 811-821.

Trabert G, E Poole, E White, K Visvanathan, H Adami, G Anderson, T Brasky et al. (2018). Analgesic use and ovarian cancer risk: an analysis in the Ovarian Cancer Cohort Consortium, Journal of the National Cancer Institute 111(2) https://doi.org/10.1093/jnci/djy100.

Tung, Goodman, Wu, et al. (2005) Reproductive factors and epithelial ovarian cancer risk by histologic type: a multi-ethnic case-control study. *American Journal of Epidemiology* 161(4):321-9.

Tung, Wilkes, Wu, et al. (2003). Effect of anovulation factors on pre-and postmenopausal ovarian cancer risk: revisiting the incessant ovulation hypothesis. *American Journal of Epidemiology* 158(7): 629-38

Tzonou, A., A. Polychronopoulou, C. C. Hsieh, A. Rebelakos, A. Karakatsani and D. Trichopoulos (1993). Hair Dyes, Analgesics, Tranquilizers and Perineal Talc Application as Risk Factors for Ovarian Cancer. *International Journal of Cancer* 55(3): 408-410.

U.S. Department of Health, E., and Welfare, (1964). *Smoking and Health: Report of the Advisory Committee to the Surgeon General of the Public Health Service*. Washington, D.C., U.S. Department of Health, Education, and Welfare.

Van Gosen B, H Lowers, S Sutley, and C. Gent (2004). Using the geologic setting of talc deposits as an indicator of amphibole asbestos content, *Environmental Geology*, 45 (7):920-939.

Venter, P. F. and M. Iturralde (1979). Migration of a particulate radioactive tracer from the vagina to the peritoneal cavity and ovaries. *South African Medical Journal* 55(23): 917-919.

Virta, Robert L. (1985). The phrase relationship of talc and amphiboles in a fibrous talc sample. *Vol. 8923* of the *U.S. Dept. of the Interior, Bureau of Mines– Science.*

Weed, D. L. (2000). Epidemiologic evidence and causal inference. *Hematological & Oncological Clinics of North America* 14(4): 797-807, viii.

Wehner A, A Hall, R Weller, E Lepel, R Schirmer (1985). Do particles translocate from the vagina to the oviducts and beyond? *Fd Chem. Toxic.* 23(3) :367-372.

Werner I (1982). Presence of asbestos in talc samples, *Atemschutzinformationen*, 21:5-7.

Wentzensen, N. and S. Wacholder (2014). Talc use and ovarian cancer: epidemiology between a rock and a hard place. *Journal of the National Cancer Institute* 106(9).

Whittemore, A. S., M. L. Wu, R. S. Paffenbarger, Jr., D. L. Sarles, J. B. Kampert, S. Grosser, D. L. Jung, S. Ballon and M. Hendrickson (1988). Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. *American Journal of Epidemiology* 128(6): 1228-1240.

Whysner, J. and M. Mohan (2000). Perineal application of talc and cornstarch powders: evaluation of ovarian cancer risk. *American Journal of Obstetrics & Gynecology* 182(3): 720-724.

Wong, C., R. E. Hempling, M. S. Piver, N. Natarajan and C. J. Mettlin (1999). Perineal talc exposure and subsequent epithelial ovarian cancer: a case-control study. *Obstetrics & Gynecology* 93(3): 372-376.

Wu, A. H., C. L. Pearce, et al. (2009). Markers of inflammation and risk of ovarian cancer in Los Angeles County. *International Journal of Cancer* 124(6): 1409-1415.

Wu AH, CL Pearce, CC Tseng, MC Pike (2015). African-Americans and Hispanics remain at lower risk of ovarian cancer than non-hispanic whites after considering nongenetic

risk factors and oophorectomy rates, *Cancer Epidemiol Biomarkers Prev* 24(7):1094-1100.

Wu S, W Zhu, P Thompson, Y Hannun (2018) Evaluating intrinsic and non-intrinsic cancer risk factors, *Nature Communications* 9(1):3490.

Zazenski R, W Ashton, D Briggs, M Chudkowski, J Kelse, L MacEachern, E McCarthy, M Nordhauser, M Roddy, N Teetsel, A Wells, S Gettings (1995). Talc: Occurrence, characterization and consumer applications, *Regulatory Toxicology and Pharmacology* 21:218-229.

Zhang Z-L, Sun J, Dong J-Y, et al (2012). Residential Radon and Lung Cancer Risk: An Updated Meta-analysis of Case-control Studies. *Asian Pac J Cancer Prev* 13:2459-2465.

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

**Bibliography – Part B: Documents not available in the Public Domain**

IMERYS044612

IMERYS049952-56

IMERYS051371-72

IMERYS051442

IMERYS089960

IMERYS091279-80

IMERYS111220

IMERYS126092-97

IMERYS138505-11

IMERYS179122-23

IMERYS210136-37

IMERYS219720-22

IMERYS239864

IMERYS2419940-04

IMERYS242050

IMERYS274896

IMERYS284935-37

IMERYS288001-04

IMERYS288590-91

IMERYS303801

IMERYS322241-42

IMERYS342524-25

IMERYS422289-90

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

IMERYS442232-33

IMERYS500801

IMERYS-A_0001304-09

IMERYS-A_0011817

IMERYS-A_0011964-65

IMERYS-A_0021921-29

IMERYS-A_0024367

IMERYS-MDL-AB_0005560-86

JNJ000000119-22

JNJ000000523-36

JNJ000000636-38

JNJ000000697

JNJ000000704

JNJ000000935-36

JNJ000003914-15

JNJ000003969-72

JNJ000003987-95

JNJ000004113-24

JNJ000004152-56

JNJ000004183

JNJ000004225-30

JNJ000004518-21

JNJ000004541-42

JNJ000004545-46

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

JNJ000004641-42

JNJ000004712-16

JNJ000006201-02

JNJ000008945-9277

JNJ000010808

JNJ000011704-08

JNJ000013664-65

JNJ000015750-52

JNJ000015753-54

JNJ000015770-72

JNJ000016645-46

JNJ000020397

JNJ00002073337

JNJ000021035

JNJ000021093-94

JNJ000022040-42

JNJ000023355-56

JNJ000024462-63

JNJ000024495-500

JNJ000024568

JNJ000251888-90

JNJ000261010-27

JNJ000029640-41

JNJ000035173-231

Report on talcum powder use and ovarian cancer                          Jack Siemiatycki

JNJ000036440-42

JNJ000040596-97

JNJ000058760-64

JNJ000065616-19

JNJ000075792-94

JNJ000085127-39

JNJ000085448-60

JNJ000087166-230

JNJ000092918-20

JNJ000093405

JNJ000093406-97

JNJ000175138

JNJ000221838-49

JNJ000223499

JNJ000224655-93

JNJ000238435-39

JNJ000239388

JNJ000232996-3002

JNJ000246437

JNJ000248615-16

JNJ000251888-90

JNJ000257999

JNJ000261010-27

JNJ000260833-35

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

JNJ000278435-39

JNJ000290508-28

JNJ000298951-52

JNJ000326106-25

JNJ000342731-34

JNJ000346841

JNJ000348778-80

JNJ000367403-56

JNJ000368573

JNJ000375563

JNJ000375919

JNJ000376096

JNJ000381975-76

JNJ000383680-82

JNJ000383898

JNJ000384724-28

JNJ000384731-37

JNJ000384773

JNJ000385452

JNJ000388419

JNJ000389973-74

JNJ000391191

JNJ000391530

JNJ000394463-JNJ000394467

JNJ000404446-47

JNJ000404486-88

JNJ000405501-53

JNJ000411712-15

JNJ000418480

JNJ000457407-10

JNJ000637879-81

JNJ000526231-6676

J&J-0007797

JNJAZ55_000000904-948

JNJAZ55_000003357

JNJAZ55_000005743-48

JNJAZ55_000005957-66

JMJAZ55_00006089-091

JANJAZ55_000008177-78

JNJAZ55_000008893-8902

JNJAZ55_000012423-30

JNJAZ55_000015127-286

JNJMX68_000003728-29

JNJMX68_000004646-47

JNJMX68_000004996-5044

JNJMX68_000006792

JNJMX68_000008982-9004

JNJMX68_000011720-25

JNJMX68_000012858

JNJMX68_000012745-49

JNJMX68_000013019-20

JNJMX68_000013464-66

JNJMX68_000017401-43

JNJMX68_000019698-99

JNJN000294462

JNJNL61_000000134-36

JNJNL61_000002666-73

JNJNL61_000006431-32

JNJNL61_000008084-89

JNJNL61_000014431-37

JNJNL61_000020359

JNJNL61_000029410-36

JNJNL61_000052427

JNJNL61_000061857

JNJNL61_000063473

JNJNL61_000064366-67

JNJNL61_000079334-35

JNJTALC000716827-45

LUZ000250

LUZ000566-67

LUZ001017-22

LUZ001298-1303

Report on talcum powder use and ovarian cancer                              Jack Siemiatycki

LUZ001326-27

LUZ001441-44

LUZ001719-20

LUZ001873-76

LUZ002733-51

LUZ003202-03

LUZ003204

LUZ003264-67

LUZ004656-65

LUZ005090-91

LUZ005109-10

LUZ005118

LUZ006056

LUZ006507-09

LUZ010145-48

LUZ011817

LUZ011963

LUZ011964-65

LUZ012006-18

LUZ012031-32

LUZ012732-33

LUZ012863-64

LUZ012865-66

LUZ013053-55

LUZ013093

LUZ013094-95

LUZ013367-87

LUZ015111-12

LUZ015663

LUZ020182-86

LUZ021921-29

LUZ022044-50

LUZ022207-08

LUZ023843-35

MBS-CRE Production of Documents 000240-41

PCPC0017629

PCPC0052415

WCD000254-55

After your doctor or health care provider prescribes your ORTHO Diaphragm, 1998. (JANSSEN000056-65)

Agenda:  NTP Board of Scientific Counselors Report on Carcinogens (RoC) Subcommittee Meeting

Annie Yessian Report - Echeverria

*Berg v. Johnson & Johnson*, Final Jury Instructions

*Berg v. Johnson & Johnson*, Judgment

*Berg v. Johnson & Johnson*, Verdict Form October 4, 2013

California State Cosmetics Program from the California Dept of Public Health - Occupational health Branch - Chemicals known or suspected to cause cancer or reproductive toxicity (P-31)

California Safe Cosmetics Act 2005

*Carl v. J&J; Balderrama v. J&J* - Defendants Johnson & Johnson, Johnson & Johnson Consumer Inc., and Imerys Talc America, Inc's joint memorandum of law in support of their motion to exclude plaintiffs' experts' general causation opinions

Cancer Prevention Coalition – November 17, 1994 Citizen's Petition to FDA seeking carcinogenic labelling on all cosmetic talc products

Cancer Prevention Coalition – May 13, 2008 Citizen's Petition to FDA seeking a cancer warning on cosmetic talc products

Cesario, S - Powerpoint "Feminine hygiene product use and the risk of ovarian cancer"

Committee on the State of the Science in Ovarian Cancer Research; Board on Health Care Services; Institute of Medicine; National Academies of Sciences, Engineering, and Medicine. Ovarian Cancers: Evolving Paradigms in Research and Care

Cesario, Sandra. PTT-Feminine hygiene product use and the risk of ovarian cancer (*Unpublished*).

Crowley M. (November 12, 2018) Rule 26 report of Michael M. Crowley, PhD regarding the fragrance chemical constituents in Johnson & Johnson Talcum Powder Products

Daniel Cramer Report - Echeverria

Daniel Cramer Supplemental Report - Echeverria

David Steinberg, expert report

David Steinberg, FRAPS Exhibit 14: Statement of Michael M. Landa, J.D.

David Steinberg, CV

David Steinberg publications list

David Steinberg signed verification Di Saia, P. J. (2015). Letter to Kathleen A. Frazier. Unpublished letter.

Defense Expert Reports from Blaes Case: DeSesso; Hoel; Di Saia; Muscat; Hopkins

Deposition Exhibit of John Hopkins – 28 (November 5, 2018)

Report on talcum powder use and ovarian cancer                    Jack Siemiatycki

Deposition Exhibit of Julie Pier – 47 (September 13, 2018)

Deposition Transcript of Alice Blount, *Ingham v. Johnson & Johnson, et al.* (April 13, 2018)

Deposition Transcript & Exhibits - Julie Pier, MDL No. 2738 (September 12 – 13, 2018)

Deposition transcript, 10/19/2012 - John Hopkins

Deposition Transcript & Exhibits - John Hopkins, MDL No. 2738 (Aug. 16 – 17, 2018, Oct. 17, 2018, Nov. 5, 2018)

Deposition Transcript & Exhibits - Joshua Muscat, MDL No. 2738 (Sept. 25, 2018)

Deposition Transcript & Exhibits - Linda Loretz, MDL No. 2738 (July 17, 2018, Oct. 1 – 2, 2018)

Deposition Transcript & Exhibits - Robert Glenn, MDL No. 2738 (Oct. 18, 2018)

D. L. Longo, R. C. Young. Cosmetic talc and ovarian cancer (1979)

D. L. Longo, R. C. Young. Letter to the Editor:  Cosmetic talc and ovarian cancer (1979)

Educational Report of Thomas Dydek

Excerpts from S. Sharma Deposition

Expert Report of Laura M. Plunkett, PhD, DABT – Oct. 5, 2016

Expert Report of Jack Siemiatycki, MSc, PhD – Oct. 4, 2016

Fair warning TalcDoc 5 - Exhibit 113 (JNJNL91_000022019)

Fair warning TalcDoc 15

FDA Authority Over Cosmetics April 6, 2015

FDA Response to Citizen's Petition re: Docket Numbers 94P-0420 and FDA-2008-P-0309-00001/CP

Federal Register – 81 FR 91722 – Banned Devices – Powdered Gloves

*Fox v. Johnson & Johnson*, Trial Transcript

Godleski, J. J. (2015). Letter to R. Allen Smith, Jr. Unpublished letter.

John J. Godleski, M.D. - Expert Report from Blaes Case

John Godleski Report - Echeverria

John Godleski Supplemental Report - Echeverria

Hopkins, J. (2015). Letter to Gene M. Williams. Unpublished letter.

Johnson's Baby Powder - website, product description

Kemp Hearing Transcript - Douglas Weed

Longo, Rigler, Egeland. MAS Project 14-1852: Below the Waist Application of Johnson & Johnson Baby Powder, September 2017

Longo, Rigler - Analysis of Johnson & Johnson Baby Powder & Valiant Shower to Shower talc products for amphibole (tremolite) asbestos, August 2017

Longo, Rigler - Analysis Report MAS Project #14-1683 Johnson's Baby Powder Sample Set, April 2017

Longo, Rigler - TEM Analysis of historical 1978 Johnson's Baby Powder Sample for amphibole asbestos, February 2018

Longo, Rigler – Expert Report In re: Talcum Power Prod. Liab. Litig., MDL No. 2738 (November 14, 2018).

"Making it up as he goes along: Paolo Boffetta, Italian Epidemiologist, distorts power line health risks" - https://microwavenews.com/news-center/boffetta-post-truth.

Material Safety Data Sheet from Luzenac America, Inc.; Version 45.0, updated 6/18/08 (Group 1)

Material Safety Data Sheet from Luzenac America, Inc. (Group 3)

Material Safety Data Sheet from Luzenac America, Inc.; Version 2.0, updated 2/26/09 (Group CAN)

Material Safety Data Sheet from Luzenac America, Inc. (Group 1)

MBS Invoices – December 2007, April 2012, May 2013, July 2013, December 20013, January 2015, March 2015

MSDS Sheet, Version 2.0

Muscat, J. E. (2015). Report on the Relationship between Hygienic Use of Talc and the Risk of Ovarian Cancer. Unpublished report.

NPR Article Johnson & Johnson Pledges to Purge Controversial Chemicals April 16, 2015

Ness, R. B. (2015). Report on the question of whether genital talc use causes ovarian cancer. Unpublished report.

Ness, R. Expert Report - Jacqueline Fox

Ness, R. Commentary "A plaintiff's witness in the baby powder case"

NTP "The Report on Carcinogens Tenth Edition - Factsheet"

Omiecinski, C. J. (2015). Opinion on the Relationship Between Chronic Perineal/Genital Exposures to Cosmetic Talc and Ovarian Cancers: Mechanistic Aspects and Biological Plausibility Unpublished report.

Osann, K. (2016). Report on Perineal Talc Exposure and Risk of Ovarian Cancer. Unpublished report.

Personal Care Products Council Letter – July 21, 2009 to FDA re: Comments to FDA Citizen's Petition to the Commissioner of the Food and Drug Administration Seeking a Cancer Warning on Talc Products

Photographs of Johnson's Baby Powder

Photographs of Shower to Shower

Riham Sheble, Shabina Khatri. DOHA News - Johnson's baby powder of Qatar shelvees after US cancer lawsuit verdict

Roe. Controversy: Cosmetic tlac and ovarian cancer (1979)

Rosenthal, G. J. (2015). Opinion on Relationships Between the Toxicology of Cosmetic Talc and the Pathogenesis of Ovarian Cancer. Unpublished report.

Rosenthal, G - Expert Report from Blaes Case: "Opinion on Relationships Between the Toxicology of Cosmetic Talc and the Pathogenesis of Ovarian Cancer"

Report on talcum powder use and ovarian cancer                                         Jack Siemiatycki

Rothman, Pastides, Samet. (2000) Interpretation of epidemiologic studies on talc and ovarian cancer

*Slemp v. Johnson & Johnson, et al.*, Trial Transcript

Summary Minutes of the NTP Board of Scientific Counselors Report on Carcinogens (RoC) Subcommittee Meeting

Talc Removed from 12th RoC- The Rose Sheet October 24, 2005

WHMIS Classification for Talc, non fibrous - CNESST; CAS Number: 14807-96-6

Weed, Douglas. A Report Regarding General Causation and an Evaluation of the Reliability and Validity of the Plaintiffs' Experts' Reports Designated for the Plaintiff, Lori Oules (Feb. 1, 2017)

Report on talcum powder use and ovarian cancer                                    Jack Siemiatycki

**17.   Curriculum Vitae – Jack Siemiatycki**

# CURRICULUM VITAE

## Jack Siemiatycki

**TABLE OF CONTENTS**

STATISTICAL SUMMARY OF SELECTED ACCOMPLISHMENTS .................................................2
GENERAL INFORMATION.............................................................................................................3
EDUCATION.....................................................................................................................................3
CURRENT ACADEMIC APPOINTMENTS.....................................................................................3
PREVIOUS ACADEMIC APPOINTMENTS AND WORK EXPERIENCE....................................3
SIGNIFICANT INTERNAL ADMINISTRATIVE APPOINTMENTS.............................................3
SIGNIFICANT INSTITUTIONAL COMMITTEES..........................................................................4
CURRENT MAJOR EXTERNAL BOARDS, SCIENTIFIC COMMITTEES (INVITED)...............4
PAST MAJOR EXTERNAL BOARDS, SCIENTIFIC COMMITTEES, CONSULTATIONS (INVITED) .........4
OTHER SIGNIFICANT EXTERNAL CONSULTATIONS (INVITED).........................................6
HONOURS .........................................................................................................................................9
GRANT REVIEW, JOURNAL REVIEW AND PERSONNEL REVIEW ........................................9
    Associate Editor...........................................................................................................................9
    Contributing Editor......................................................................................................................9
    Chairman of grant review panels.................................................................................................9
    Member of grant review panels....................................................................................................9
    External referee for tenure or promotion of personnel in other institutions ...............................9
THESES ...........................................................................................................................................10
ARTICLES PUBLISHED PEER REVIEW ......................................................................................10
BOOK CHAPTERS (invited) AND IARC MONOGRAPHS...........................................................23
PUBLICATIONS WITHOUT PEER REVIEW, OTHER SCIENTIFIC REPORTS .........................24
BOOK...............................................................................................................................................27
ARTISTIC WORKS..........................................................................................................................27
SCIENTIFIC PRESENTATIONS - INVITED .................................................................................27
SCIENTIFIC PRESENTATIONS - OFFERED AND ACCEPTED .................................................35
GRANTS AND CONTRACTS RECEIVED .....................................................................................46

## STATISTICAL SUMMARY OF SELECTED ACCOMPLISHMENTS

| | |
|---|---:|
| Publications in peer-reviewed journals | 245 |
| Book chapters, IARC Monographs | 20 |
| Other publications, reports | 42 |
| Book (authored) | 1 |
| | |
| Invited presentations | 173 |
| Conference presentations, posters, abstracts : offered and accepted | 181 |
| | |
| Grants received as P.I. (number) | 36 |
| Grants received as P.I. ($) | $15.4M |
| Grants received as co-investigator (number) | 59 |
| Grants received as co-investigator ($) | $27.9M |
| | |
| | |
| | |
| H-factor (google scholar) | 64 |
| | |
| Instances of participation on expert panels, committees, boards of directors, at invitation of governments or public health agencies or research agencies or universities | 126 |
| | |
| Grant review panels or referee for external institution or journal editorial boards | 65 |
| | |
| Honours | several |

Curriculum Vitae                                                                                          Jack Siemiatycki

## GENERAL INFORMATION

**Work address**

Université de Montréal

Research Center of CHUM

850 rue St Denis, Montréal, QC, Canada H2W 1V1

Tel:      (514) 890-8166

Fax:     (514) 412-7106

E-mail: j.siemiatycki@uMontréal.ca

## EDUCATION

1967      B.Sc. (mathematics); McGill University
1970      M.Sc. (mathematical statistics); McGill University
1976      Ph.D. (epidemiology and medical statistics); McGill University
1977      Post-doctoral (cancer epidemiology); International Agency for Research on Cancer, Lyon

## CURRENT ACADEMIC APPOINTMENTS

Professor, Department of Social and Preventive Medicine, Université de Montréal (since 2001)

Cancer Research Society-Guzzo Research Chair in Environment and Cancer, Université de Montréal (since November 2007)

Adjunct Professor, Department of Epidemiology, Biostatistics and Occupational Health, McGill University. (since 1979)

Fellow, Canadian Academy of Health Sciences (since 2008)

## PREVIOUS ACADEMIC APPOINTMENTS AND WORK EXPERIENCE

1967-71      Research Fellow; Department of Epidemiology and Health, McGill University.
1970-72      Research Director; Pointe St. Charles Community Clinic, Montréal.
1978           Consultant; International Agency for Research on Cancer, Lyon.
1978-2001   Assistant, then Associate (1979), then full Professor (1983):
                   Epidemiology Research Center, Institut Armand-Frappier, Laval, Québec.
1982-1986   Associate member, McGill Cancer Center, McGill University.
1996-1997   Visiting Scientist. International Agency for Research on Cancer, Lyon.
2001-2015   Canada Research Chair (Tier 1), Université de Montréal (resigned 2011).
2003-2009   Affiliate Scientist. McLaughlin Centre for Pop'n Health Risk Assessment, Univ of Ottawa.

## SIGNIFICANT INTERNAL ADMINISTRATIVE APPOINTMENTS

1982-86      Director, Équipe associée de l'Institut de Recherche en Santé et Sécurité du Travail sur les cancers professionnels (affiliated research team of the Quebec Institute for Occupational Health and Safety on Occupational Cancer).
1988-91      Director, Epidemiology Research Center, Institut Armand-Frappier.
1990-98      Director, Équipe prioritaire de recherche en épidémiologie environmentale du FRSQ. (Priority research team in environmental epidemiology).
1998-2001   Member, Governing Council (Conseil d'administration). Institut national de la recherche scientifique, Université du Québec.
2000-2007   Coordinator. Program of Research in Environmental Epidemiology of Cancer (PREECAN), a national program funded by the National Cancer Institute of Canada.
2002-2005   Associate Director for Population Health Sciences, Research Center of the University of Montréal Hospital Center.

| | |
|---|---|
| 2006-2007 | Director, Epidemiology program, PhD public health, Université de Montréal. |
| 2006-2014 | Director, Axe risques à la santé (Health Risks Division). Centre de recherche du Centre hospitalier de l'Université de Montréal. |

## SIGNIFICANT INSTITUTIONAL COMMITTEES

| | |
|---|---|
| 1979-80 | Member of faculty committee to negotiate a collective agreement with the Institut Armand-Frappier administration. |
| 1982-92 | Member, Research Council. Institut Armand-Frappier. |
| 1998-2001 | Member, Institutional advisory council. Institut Armand-Frappier. Institut national de la recherche scientifique |
| 2002-2006 | Comité de direction. Centre de recherche du CHUM |
| 2002-2017 | Member, Various committees of the Dept Med Soc et Preventive, including Promotions, and Recruitment. |
| 2006-2009 | Member, Various committees established to set up a new School of Public Health at l'Université de Montréal |
| 2006-2014 | Comité Scientifique de la Recherche du CHUM. |

## CURRENT MAJOR EXTERNAL BOARDS, SCIENTIFIC COMMITTEES (INVITED)

1. Chair of Scientific Advisory Committee of CONSTANCES, a large prospective cohort established in France, under aegis of INSERM, Ministère de la Santé, and other agencies. Since 2011.
2. Member of Comité national d'épidémiologie en cancérologie. Ministère de la Santé et des Services sociaux, Quebec. Since 2014.
3. Member, Advisory committee to Directors of Cartagene, a Quebec population cohort.

## PAST MAJOR EXTERNAL BOARDS, SCIENTIFIC COMMITTEES, CONSULTATIONS (INVITED)

1. Expert consultative committee to Commission de la santé et sécurité du travail du Québec on the epidemiologic function of the CSST. 1979-80.
2. President of Organizing Committee of Annual Congress of Quebec Public Health Association, Montréal. 1982.
3. Consultative committee of International Agency for Research on Cancer on feasibility of SEARCH programme. 1982.
4. Canadian representative. International Joint Commission (U.S. and Canada) Committee on the Assessment of Human Health Effects of Great Lakes Water Quality. 1982-89.
5. Task Force on Chemicals in the Environment and Human Reproduction Effects in New Brunswick. 1983-85.
6. Chairman and organizer of international workshop sponsored by International Agency for Research on Cancer, Lyon, on use of job exposure information in cancer case-control studies. 1984.
7. Quebec Government Consultative Committee on Alachlor. 1985-86.
8. Chairman and organizer of the International Joint Commission Workshop on the Role of Epidemiology in Assessing the Effects of Great Lakes Water Quality on Human Health, Scarborough, March 1988. 1986-88.
9. Priority Substances Advisory Panel. Panel established under terms of Canadian Environmental Protection Act by Health and Welfare Canada. 1988.
10. Working Group on Electromagnetic Fields under auspices of Health Effects Institute. 1991.
11. Consultative Committee on Environment-related Cancer Surveillance, LCDC, Health and Welfare Canada. 1993-1996.
12. Consultative Committee on an Investigation of Lung Cancer and Environmental Tobacco Smoke, Environmental Health Directorate, Health Canada. 1994-1995.
13. Working Group on Evaluation of Carcinogenicity of Carbon Black, Printing Trades and Various Substances. Monograph Programme. International Agency for Res. on Cancer, Lyon, 1995.

14. Working Group on Human Cancer Risks associated with Chrysotile Asbestos. World Health Organization (IPCS) Geneva, June 1995.

15. Secretariat on Evaluation of Chemopreventive Effect of Aspirin and Other NSAIDS for Cancer. International Agency for Res. on Cancer, Lyon, Apr. 1997.

16. Chair. Symposium on Health Risks of Water Disinfection By-products. Convened by Health Canada. Ottawa. May 1997.

17. Working Group. Meeting on Species-specificity in response to carcinogens. Monograph Programme. International Agency for Res. on Cancer, Lyon, Nov. 1997.

18. Board of Directors. Canadian Society for Epidemiology and Biostatistics. 1997-1999.

19. Working Group. Evaluation of Carcinogenicity of Various Industrial Substances. Monograph Programme. International Agency for Res. on Cancer, Lyon, Feb. 1998.

20. Canadian Coalition on Cancer Surveillance. 1997-2002.

21. External site review panel. U.S. National Cancer Institute Epidemiology Branch. June 1999.

22. Organizing Committee for Medical Research Council Workshop on Privacy of Health Data. 1999-2000.

23. Organizing Committee, EPI2001. Joint North American Congress of Canadian Society for Epidemiology and Biostatistics, Society for Epidemiologic Research, American Public Health Association (Epid) and American College of Epidemiology, Toronto, 14 – 16 June 2001. 1999-2001.

24. Coordinator of national initiative of the public health community to provide guidance on the structures and functioning of the new Canadian Institutes of Health Research. 1999-2000.

25. Organizing Committee. World Congress of the International Epidemiological Association, Montréal, 18-22 August 2002. 2001-2002.

26. President. Canadian Society for Epidemiology and Biostatistics. 2001-2003. Member of Board. 1997-1999.

27. Working Group. Evaluation of Carcinogenicity of Various Substances. Monograph Programme. International Agency for Res. on Cancer, Lyon, 2003.

28. Jury of Consensus Conference on risks and benefits of vaccination for hepatitis B. For Minister of Health of France. Organized by INSERM and ANAES. Paris 2003.

29. Public Advisory Panel. Vinyl Council of Canada. 1998-2004.

30. Advisory Panel. U.S. National Cancer Institute Brain Tumor Study. 1998-2003.

31. Scientific Advisory Committee. Boeing/UAW Workers' Health Studies. 1999-2005.

32. Institute Advisory Board. Canadian Institutes for Health Research – Institute of Circulatory and Respiratory Health. 2001-2005.

33. National Occupational Research Agenda (NORA). Joint consultative committee for US National Cancer Institute and US National Institute for Occupational Safety and Health. 2002-2005.

34. Canadian Cancer Surveillance Alliance. Consultative committee of Health Canada, Canadian Cancer Society, Provincial Cancer Registries, Statistics Canada. 2002-2003.

35. Co-president. Organizing Committee of Joint SER-CSEB Congress, Toronto 27-30 June 2005. (2004-2005).

36. Chair. Monograph Program Meeting. International Agency for Research on Cancer (WHO), France. February 2006.

37. Advisory Committee on Research Ethics and Databanks. Quebec Health Research Council (FRSQ). 2003-2011.

38. Board of Directors. American College of Epidemiology. 2003-2006.

39. Board of Directors. National Cancer Institute of Canada. 2003-2007.

40. Member Scientific Council International Agency for Research on Cancer (WHO). Lyon, France 2005-2009.

41. Elected Chair. Scientific Council International Agency for Research on Cancer (WHO). Lyon, France 2008-2009.

42. Scientific Advisory Council Canadian Partnership Against Cancer 2007-2009.

43. Advisory Committee. Occupational Cancer Research Centre of Ontario. Since 2009.

44. Working Group on Cancer Prevention, CPAC, 2007-2010.

45.  Subgroup Chair and Working Group Member. Evaluation of Carcinogenicity of Non-Ionizing Radiation, Radiofrequency Electromagnetic Fields. Monograph Programme. International Agency for Research on Cancer, Lyon May 2011.

46.  Member of Scientific Advisory Board of Bordeaux cancer research center SIRIC-BRIO, Bordeaux France. Since 2013.

47.  Member of external review panel. Helmholtz Center Munich Research Institute. Germany. July 2011.

48.  Conseil Scientifique de l'Institut de Recherche en Santé Publique (IReSP). Under aegis of INSERM and Ministère de la Santé, France. 2004-2009.

49.  Adviser and expert witness for legal team conducting a major class action lawsuit against the Canadian tobacco industry. 2007-2014.

## OTHER SIGNIFICANT EXTERNAL CONSULTATIONS (INVITED)

1.  Consultation with Quebec Ministry of Justice regarding compensation for homeowners who were advised to use formaldehyde-base home insulation - 1983.

2.  Invited participant. Workshop convened by the Science Council of Canada on the future of Epidemiology in Canada, Ottawa - 1985.

3.  Consultation with Government of Alberta regarding the evaluation of a report alleging significant health impact in the environment of a sour-gas plant - 1985.

4.  Consultation with Quebec Ministry of Environment regarding health effects of residency near an abandoned toxic waste site in LaSalle, Quebec - 1987.

5.  Invited participant. Workshop convened by Canadian Public Health Association, Environment Canada and Health and Welfare Canada on Environmental Impact Assessment, Ottawa - 1987.

6.  Invited participant. Annual workshops convened by Health Protection Branch of Health and Welfare Canada to discuss the role of Canada in the SEARCH programme of the International Agency for Research on Cancer, Ottawa - 1987-1989.

7.  Consultation with Quebec Cree Band Council regarding a research proposal to study developmental effects of consuming fish with high mercury levels - 1989.

8.  Invited participant. Workshop convened by Ontario Industrial Disease Standards Panel on the use of epidemiologic data in workers' compensation, Toronto - December 1989.

9.  Invited participant. Workshop convened by National Academy of Sciences (U.S.) on Carcinogenicity of Complex Mixtures, Tucson, Arizona - Jan 1990.

10.  Invited participant. Workshop convened by Laboratory Centers for Disease Control, Health and Welfare Canada on Multiple Chemical Sensitivities, Ottawa - May 1990

11.  Member of expert advisory panel to the pan-Canadian case-control study of electromagnetic fields and childhood leukemia. Sponsored by Canadian Electrical Assoc, EPRI (U.S.A.), Health and Welfare Canada. 1990-1996.

12.  Organizer of Workshop to Plan a Pan-North American Case-control Study of Lung Cancer. Sponsored by Health and Welfare Canada. Toronto. March 1991.

13.  Invited participant. Workshop convened by Environmental Health Directorate of Health and Welfare Canada, on Environmental Epidemiology in Canada. Ottawa. March 1992

14.  Invited participant. Workshop convened by Harvard Center for Risk Analysis on implementing a new type of risk assessment. Maryland. April 1992.

15.  Member of Technical Advisory Panel for epidemiology studies of foundry workers - CIIT. Research Triangle Park, N.C. Feb. 1993

16.  Consultant to Health Effects Institute - Asbestos Research, on Options for Characterizing Worker Activities in Buildings, Boston. Feb. 1993.

17.  Advisory panel to Laboratory Centers for Disease Control, Health and Welfare Canada, on Environmental Epidemiology under the Green Plan. March 1993.

18.  Member of External Advisory Committee. Champlain Adirondack Biosphere Environmental Health Sciences Center, University of Vermont. 1993.

19.  Consultant to Michigan Cancer Foundation on a variety of epidemiologic studies. 1993-1996.

Curriculum Vitae                                                                          Jack Siemiatycki

20. Invited to address President Clinton's Panel on Cancer regarding priorities in cancer research. Bethesda, MD. April 1994.

21. Invited participant. Science and Technology Review Consultation. Government of Canada. Montréal. September 1994.

22. Invited participant. Strategic planning workshop to reduce Environmental Tobacco Smoking exposure. Laboratory Centre for Disease Control. Health Canada. Oct 1995.

23. Invited participant. Meeting to establish new priorities for funding. National Health Research and Development Programme of Canada. Montréal. Feb 1996.

24. Chair Scientific Advisory Committee for the Dalhousie University study of health effects of environmental and occupational pollution in the area of the Sydney, Nova Scotia steel industry. 1996.

25. Member of two Ministerial missions of the Quebec and Canadian governments to France to discuss with French experts the risks associated with low level exposure to chrysotile asbestos. Paris. Oct 1996.

26. Chair. Meeting of collaborators of European network of studies on lung cancer and smoking.

27. International Agency for Res. on Cancer, Lyon. June 1997.

28. Member of Canadian scientific delegation to United Kingdom to discuss with British experts the risk associated with low level exposure to chrysotile asbestos. London, Sept. 1997.

29. Symposium chair. Workshop to discuss methods of predicting numbers of cases of mesothelioma to be expected in various countries. Paris. Dec. 1997.

30. Invited participant and subgroup reporter. Peer Review on Hazard Assessment and Dose-Response Characterization for the Carcinogenicity of Formaldehyde by the Route of Inhalation. Health Canada and U.S. EPA. Ottawa. March 1998.

31. Co-chair. Workshop to explore the feasibility of an international collaborative study on use of cellular phones and risk of cancer. International Agency for Research on Cancer. Lyon. Feb 1999.

32. Panellist. Consensus Meeting for a Proposed Integrated National Health Surveillance Network. Health Canada. 1999.

33. Invited participant. Medical Research Council Summit Meeting on the new Canadian Institutes of Health Research. Toronto. June, 1999.

34. Invited participant. Planning group for an Institute of Population Health Research in CIHR. Jul-Dec 1999.

35. Invited speaker. Workshop for a Canadian Institute for Genetics Research. May 2000.

36. Invited participant. Workshop to explore the use of prospective cohorts to investigate gene-environment interactions in cancer etiology. National Cancer Institute. Rockville, MD. May 2000.

37. Invited participant. Founding meeting of Canadian Association for Workplace Safety and Health. Montréal. Jan 2001.

38. Invited participant. Workshop to advise Canadian Foundation for Innovation on its role in supporting population health research in Canada. Toronto, Feb 2001.

39. Invited participant. Consultative committee to advise Cancer Care Ontario on priorities in environmental cancer. April 2001.

40. Invited participant. Workshop on national priorities in cancer research. Institute for Cancer Research. CIHR. Toronto. May 2001.

41. Invited participant. Delphi process to advise Canadian Institutes of Health Research on priorities in cancer research. October-December 2001.

42. Invited participant. Delphi process to advise Cancer Care Ontario on priorities in cancer prevention. November-April 2002.

43. Session Chair. NIOSH workshop "Applying New Biotechnologies to the Study of Occupational Cancer", Washington, D.C. May 2002.

44. Member of Advisory Panel. U.S. National Cancer Inst. Study of a Cohort of Chinese Workers Exposed to Benzene. 2002- .

45. Invited participant. Delphi process to advise Cancer Care Ontario on priorities in cancer prevention. November-April 2002.

46. Session Chair. NIOSH workshop "Applying New Biotechnologies to the Study of Occupational Cancer", Washington, D.C. May 2002.

47. Organizer and Session Chair. International Epidemiological Association Meeting. Occupation and Health. Montréal. August, 2002.

48. Co-Organizer and Session Chair. Epidemiological Association Meeting. Asbestos and mesothelioma. Montréal. August, 2002.

49. Session Chair. Epidemiological Association Meeting. Environment and Health. Montréal Aug, 2002.

50. Invited participant. CIHR National Forum to devise a National Research Programme for Environmental Health. Ottawa. Sept 2002.

51. Invited participant. CIHR national forum on privacy of health data. Ottawa, November, 2002.

52. Member. Environmental and Occupational Carcinogens Advisory Group. Canadian Cancer Society. 2002 - 2004.

53. Participant. Meeting to discuss the establishment of a prospective childhood cohort in Canada. CIHR-IPPH. March 2004.

54. Member of working group on national cohort project. National Cancer Research Initiative. January-June 2004.

55. Member of advisory group on development of IDEES, Université de Montréal. January-June 2004.

56. Member, ad-hoc group to explore the feasibility of a Canadian cohort on cancer and chronic disease. 2004-2008.

57. Invited participant. Workshop to discuss the enhancement of population health research in Canada. CIHR-IPPH. June 2004.

58. Invited participant. Workshop on occupational cancer surveillance. Occupational Cancer Research & Surveillance Project (Cancer Care Ontario and the Ontario Workplace Safety & Insurance Board). February 2005.

59. Invited participant. Workshop on long-term large-scale cohorts. CIHR, December 2005.

60. Member. Advisory Scientific Committee. IBM – University of Alabama project on health of IBM manufacturing plant workers. 2006 - 2008.

61. Advisor and meeting participant. Ontario Workplace Safety and Insurance Board. Recommendations on how to develop occupational cancer research in Ontario. Toronto, 2005.

62. Invited participant. Workshop to estimate the burden of occupational cancer in the United Kingdom. UK Health and Safety Executive. Manchester. June 2006.

63. Advisory Committee to British Energy Networks Association. Workshop on the Future Needs of Electro-magnetic Fields Occupational Studies in the Electric Utility Industry. Edinburgh. September 2006.

64. Advisory Committee. IARC Monograph Programme Planning of Special Volume 100. Lyon. September 2006.

65. Grant Review Panel. IVRSP. Paris. September 2006.

66. Advisory Committee to CCRA and ICR (CIHR) on the nature of a national cohort platform. Toronto, September 2006.

67. Invited participant. Comité d'éthique de la recherche de la faculté de médecine (CERFM) : Discussion d'un projet soumis pour la création d'une banque de données et de matériaux biologiques (Research Ethics Committee of the Faculty of Medicine: Review of a submitted project to create a bank of data and biologic samples). Université de Montréal. March 2007.

68. Invited participant. Workshop to Design and Implement the Ontario Cohort Consortium Research Platform. Toronto. June 2007.

69. Invited participant. Canadian Cancer Research Agencies. Strategic Planning Consultation in Montréal. May 2009.

70. Invited participant. IARC-NORA workshop to identify gaps of knowledge on occupational carcinogens, Lyon. June 2009.

71. Consultant. State of the science workshop: evaluation of epidemiological data consistency for application in regulatory risk assessment. US EPA and Johns Hopkins School of Public Health. Baltimore. September 2010.

72. Consultant. World Health Organisation. Re-evaluation of Risk Assessments related to DDT exposure. Geneva. November 2010.

Curriculum Vitae                                                                    Jack Siemiatycki

73.    Invited participant. WHO workshop to develop international guidelines for control of environmental carcinogens. Asturias. March 2011.

74.    Session Chair. Discovering occupational carcinogens. Congress of Epidemiology. Montréal June 2011.

75.    Invited co-organiser. Symposium of Environment and Cancer. Canadian Cancer Research Conference. Toronto. November 2011.

76.    Invited organiser and Chair. Symposium on Cellphones and Cancer. American Association for Cancer Research. Chicago, April 2012.

77.    Member Scientific Program Committee for the 2013 Canadian Cancer Research Conference, Toronto. November 2013.

78.    Member of Advisory Committee to National Cancer Institute (U.S.) study on carcinogenicity of diesel emissions. 2017.


**HONOURS**

1.    Biographee in various Who's Who in America versions. Since 1982
2.    Perron-Desrosiers Prize. Granted by the Governing Council of the Institut Armand-Frappier. 1985.
3.    Invited to give the annual Elizabeth Stern Memorial Lecture in U.C.L.A. School of Public Health. 1985.
4.    National Health Scholar. National Health Research and Development Programme of Canada. 1988-1998.
5.    Visiting Scientist Award. International Agency for Research on Cancer, Lyon. 1996-97.
6.    Prix d'excellence. Institut national de la recherche scientifique. Université du Québec. 1999.
7.    Distinguished Scientist Award. Medical Research Council, Canada. 1999-2004.
8.    Canada Research Chair in Environmental Epidemiology and Population Health. 2001-2015.
9.    Distinguished Scientist Lecturer. US National Cancer Institute. Division of Cancer Epidemiology and Genetics. 2006.
10.   Cancer Research Society–Guzzo Chair in Environment and Cancer. Since 2007.
11.   Fellow Canadian Academy of Health Sciences. Since 2008.
12.   Geoffrey R Howe Distinguished Contributions Award, Canadian Society for Epidemiology & Biostatistics. 2011.
13.   Ranked top Canadian public health researcher in terms of research productivity by Jarvey et al. 2012.


**GRANT REVIEW, JOURNAL REVIEW AND PERSONNEL REVIEW**

Associate Editor

American Journal of Epidemiology (1989-1998)

International Journal of Environmental Health (1991- )

Contributing Editor

Journal of Public Health Policy (1982-87)

American Journal of Industrial Medicine (1996- )

The Open Epidemiology Journal (2007- )

Chairman of grant review panels

National Health Research and Development Programme. Canada. (1990-94)

National Cancer Institute of Canada (1994-1995)

Member of grant review panels

40 times

External referee for tenure or promotion of personnel in other institutions

15 times

## THESES

1. Siemiatycki J. "Space-time clustering: finding the distribution of a correlation-type statistic". M.Sc. thesis, McGill University, 1971.

2. Siemiatycki J. "Evaluation of strategies for household health surveys". Ph.D. thesis, McGill University, 1976.

## ARTICLES PUBLISHED PEER REVIEW

1. Thurlbeck WM, Horowitz I, Siemiatycki J, Dunnill MS, Maisel JC, Pratt P, et al. Intra- and inter-observer variations in the assessment of emphysema. Archives of Environmental Health. 1969;18:646-59.

2. Becklake MR, Fournier-Massey G, McDonald JC, Siemiatycki J, Rossiter CE. Lung function in relation to chest radiographic changes in Quebec asbestos workers. Bulletin de Physio-Pathologie Respiratoire. 1970;6:637-59.

3. McDonald JC, McDonald AD, Gibbs GW, Siemiatycki J, Rossiter CE. Mortality in the chrysotile asbestos mines and mills of Quebec. Archives of Environmental Health. 1971;22:677-86.

4. Siemiatycki J, McDonald AD. Neural tube defects in Quebec: a search for evidence of `clustering' in time and place. British Journal of Preventive and Social Medicine. 1972;26:10-4.

5. Siemiatycki J. Mantel's space-time clustering statistic: computing higher moments and a comparison of various data transforms. Journal of Statistical Computation & Simulation. 1978;7:13-31.

6. Siemiatycki J. A comparison of mail, telephone, and home interview strategies for household health surveys. American Journal of Public Health. 1979;69(3):238-45.

7. Siemiatycki J, Brubaker G, Geser A. Space-time clustering of Burkitt's lymphoma in east Africa: analysis of recent data and a new look at old data. International Journal of Cancer. 1980;25:197-203.

8. Siemiatycki J, Richardson L. Statut socio-économique et utilisation des services de santé à Montréal. L'Actualité Economique. 1980(Avril-Juin):194-210.

9. Siemiatycki J, Richardson L, Pless IB. Equality in medical care under national health insurance in Montréal. New England Journal of Medicine. 1980;303:10-5.

10. Colle E, Siemiatycki J, West R, Belmonte MM, Crepeau MP, Poirier R, et al. Incidence of juvenile onset diabetes in Montréal - demonstration of ethnic differences and socio-economic class differences. Journal of Chronic Diseases. 1981;34(12):611-6.

11. Siemiatycki J, Day NE, Fabry J, Cooper JA. Discovering carcinogens in the occupational environment: a novel epidemiologic approach. Journal of the National Cancer Institute. 1981;66(2):217-25.

12. Siemiatycki J, Thomas DC. Biological models and statistical interactions: an example from multistage carcinogenesis. International Journal of Epidemiology. 1981;10(4):383-7.

13. Siemiatycki JA, Richardson LJ. Le défi prioritaire en santé communautaire : Élargir notre vision pour atteindre nos véritables objectifs. L'Union Médicale du Canada. 1981;110:1008-12.

14. Pampalon R, Siemiatycki J, Blanchet M. Pollution environnementale par l'amiante et santé publique au Québec [Environmental asbestos pollution and public health in Quebec]. L'Union Medicale du Canada. 1982;111(5):475-82, 87-89.

15. Siemiatycki J, Gérin M, Richardson L, Hubert J, Kemper H. Preliminary report of an exposure-based, case-control monitoring system for discovering occupational carcinogens. Teratogenesis, Carcinogenesis, and Mutagenesis. 1982;2:169-77.

16. *Baumgarten M, Siemiatycki J, Gibbs GW. Validity of work histories obtained by interview for epidemiologic purposes. American Journal of Epidemiology. 1983;118(4):583-91.

17. Hours M, Fabry J, Siemiatycki J, Francois R. Diabète insulino-dépendant juvénile. Étude descriptive dans le département du Rhône. Revue d'épidémiologie et de santé publique. 1984;32:107-12.

18. Siemiatycki J, Campbell S. Nonresponse bias and early versus all responders in mail and telephone surveys. American Journal of Epidemiology. 1984;120(2):291-301.

19. Siemiatycki J, Campbell S, Richardson L, Aubert D. Quality of response in different population groups in mail and telephone surveys. American Journal of Epidemiology. 1984;120(2):302-14.

20. *Dewar RAD, Siemiatycki J. A program for point and interval calculation of odds ratios and attributable risks from unmatched case-control data. International Journal of Bio-Medical Computing. 1985;16:183-90.

21. Gérin M, Siemiatycki J, Kemper H, Bégin D. Obtaining occupational exposure histories in epidemiologic case-control studies. Journal of Occupational Medicine. 1985;27(6):420-6.

22. Siemiatycki J. Long-term funding for epidemiologic research. Journal of Chronic Diseases. 1985;38(3):211-2.

23. Thomas DC, Siemiatycki J, Dewar R, Robins J, Goldberg M, Armstrong BG. The problem of multiple inference in studies designed to generate hypotheses. American Journal of Epidemiology. 1985;122(6):1080-95.

24. Gérin M, Siemiatycki J, Bégin D, Kemper H, Lakhani R, Nadon L, et al. Dépistage épidémiologique des facteurs cancérogènes de l'environnement de travail montréalais: un premier bilan. Travail et Santé. 1986;2(3):S42-S6.

25. *Goldberg MS, Siemiatycki J, Gérin M. Inter-rater agreement in assessing occupational exposure in a case-control study. British Journal of Industrial Medicine. 1986;43:667-76.

26. Siemiatycki J, Colle E, Aubert D, Campbell S, Belmonte MM. The distribution of type I (insulin-dependent) diabetes mellitus by age, sex, secular trend, seasonality, time clusters, and space-time clusters: evidence from Montréal, 1971-1983. American Journal of Epidemiology. 1986;124(4):545-60.

27. Siemiatycki J, Richardson L, Gérin M, Goldberg M, Dewar R, Désy M, et al. Associations between several sites of cancer and nine organic dusts: results from an hypothesis-generating case-control study in Montréal, 1979-1983. American Journal of Epidemiology. 1986;123(2):235-49.

28. Thomas DC, Goldberg M, Dewar R, Siemiatycki J. Statistical methods for relating several exposure factors to several diseases in case-heterogeneity studies. Statistics in Medicine. 1986;5:49-60.

29. *Guay D, Siemiatycki J. Historic cohort study in Montréal's fur industry. American Journal of Industrial Medicine. 1987;12:181-93.

30. Siemiatycki J, Dewar R, Nadon L, Gérin M, Richardson L, Wacholder S. Associations between several sites of cancer and twelve petroleum-derived liquids. Results from a case-referent study in Montréal. Scandinavian Journal of Work, Environment and Health. 1987;13:493-504.

31. Siemiatycki J, Wacholder S, Richardson L, Dewar R, Gérin M. Discovering carcinogens in the occupational environment: methods of data collection and analysis of a large case-referent monitoring system. Scandinavian Journal of Work, Environment and Health. 1987;13:486-92.

32. Diabetes Epidemiology Research International Group. Geographic patterns of childhood insulin-dependent diabetes mellitus. Diabetes. 1988;37:1113-9.

33. Siemiatycki J. Epidemiologic approaches to evaluation of carcinogens. In: Living in a Chemical World. Annals of the New York Academy of Sciences. 1988;534:395-9.

34. Siemiatycki J, Colle E, Campbell S, Dewar R, Aubert D, Belmonte MM. Incidence of IDDM in Montréal by ethnic group and by social class and comparisons with ethnic groups living elsewhere. Diabetes. 1988;37(8):1096-102.

35. Siemiatycki J, Gérin M, Stewart P, Nadon L, Dewar R, Richardson L. Associations between several sites of cancer and ten types of exhaust and combustion products. Results from a case-referent study in Montréal. Scandinavian Journal of Work, Environment and Health. 1988;14:79-90.

36. Siemiatycki J, Wacholder S, Dewar R, Cardis E, Greenwood C, Richardson L. Degree of confounding bias related to smoking, ethnic group, and socioecomomic status in estimates of the associations between occupation and cancer. Journal of Occupational Medicine. 1988;30(8):617-25.

37. Siemiatycki J, Wacholder S, Dewar R, Wald L, Bégin D, Richardson L, et al. Smoking and degree of occupational exposure: are internal analyses in cohort studies likely to be confounded by smoking status? American Journal of Industrial Medicine. 1988;13:59-69.

38. Gérin M, Siemiatycki J, Nadon L, Dewar R, Krewski D. Cancer risks due to occupational exposure to formaldehyde: results of a multi-site case-control study in Montréal. International Journal of Cancer. 1989;44:53-8.

39. Siemiatycki J. Friendly control bias. Journal of Clinical Epidemiology. 1989;42(7):687-8.

40. Siemiatycki J, Colle E, Campbell S, Dewar RAD, Belmonte MM. Case-control study of IDDM. Diabetes Care. 1989;12(3):209-16.

41. Siemiatycki J, Dewar R, Lakhani R, Nadon L, Richardson L, Gerin M. Cancer risks associated with 10 inorganic dusts: results from a case-control study in Montréal. American Journal of Industrial Medicine. 1989;16(5):547-67.

42. Siemiatycki J, Dewar R, Richardson L. Costs and statistical power associated with five methods of collecting occupation exposure information for population-based case-control studies. American Journal of Epidemiology. 1989;130(6):1236-46.

43. Diabetes Epidemiology Research International Group. Secular trends in incidence of childhood IDDM in 10 countries. Diabetes. 1990;39:858-64.

44. Hours M, Siemiatycki J, Fabry J, Francois R. [Time clustering and temporospatial regrouping study of cases of juvenile diabetes in the district of Rhône (1960-1980)]. Revue d'épidémiologie et de santé publique. 1990;38(4):287-95.

45. Terracini B, Siemiatycki J, Richardson L. Cancer incidence and risk factors among Montréal residents of Italian origin. International Journal of Epidemiology. 1990;19(3):491-7.

46. *Dewar R, Siemiatycki J, Gérin M. Loss of statistical power associated with the use of a job-exposure matrix in occupational case-control studies. Applied Occupational & Environmental Hygiene. 1991;6:508-15.

47. Gérin M, Siemiatycki J. The occupational questionnaire in retrospective epidemiologic studies: recent approaches in community-based studies. Applied Occupational & Environmental Hygiene. 1991;6(6):495-501.

48. Payment P, Franco E, Richardson L, Siemiatycki J. Gastrointestinal health effects associated with the consumption of drinking water produced by point-of-use domestic reverse-osmosis filtration units. Applied and Environmental Microbiology. 1991;57(4):945-8.

49. Payment P, Richardson L, Siemiatycki J, Dewar R, Edwardes M, Franco E. A randomized trial to evaluate the risk of gastrointestinal disease due to consumption of drinking water meeting current microbiological standards. American Journal of Public Health. 1991;81(6):703-8.

50. Bégin D, Gérin M, de Guire L, Siemiatycki J, Adib G. Étude sur la validité des matrices emploi-exposition multisectorielles en hygiène industrielle. Revue de médecine du travail. 1992;XIX:74-9.

51. Soskolne CL, Jhangri GS, Siemiatycki J, Lakhani R, Dewar R, Burch JD, et al. Occupational exposure to sulfuric acid in southern Ontario, Canada, in association with laryngeal cancer. Scandinavian Journal of Work, Environment and Health. 1992;18(4):225-32.

52. Ursin G, Aragaki CC, Paganini-Hill A, Siemiatycki J, Thompson WD, Haile RW. Oral contraceptives and premenopausal bilateral breast cancer: a case-control study. Epidemiology. 1992;3(5):414-9.

53. Payment P, Franco E, Siemiatycki J. Absence of relationship between health effects due to tap water consumption and drinking water quality parameters. Water Science & Technology. 1993;27(3/4):137-43.

54. Siemiatycki J. Problems and priorities in epidemiologic research on human health effects related to wiring code and electric and magnetic fields. Environmental Health Perspectives. 1993;101(Suppl. 4):135-41.

55. Case BW, Dufresne A, Fraser R, Siemiatycki J, Perrault G, Takahashi K. Decoding occupational history from total lung particulate analysis: Concordance between physico-chemical analysis and occupational histories. Annals of Occupational Hygiene. 1994;38(Supplement 1):469-82.

56. Korner-Bitensky N, Wood-Dauphinee S, Siemiatycki J, Shapiro S, Becker R. Health-related information postdischarge: telephone versus face-to-face interviewing. Archives of Physical Medicine and Rehabilitation. 1994;75(12):1287-96.

57.   Siemiatycki J, Dewar R, Krewski D, Desy M, Richardson L, Franco E. Are the apparent effects of cigarette smoking on lung and bladder cancers due to uncontrolled confounding by occupational exposures? Epidemiology. 1994;5(1):57-65.

58.   Siemiatycki J, Dewar R, Nadon L, Gérin M. Occupational risk factors for bladder cancer: results from a case-control study in Montréal, Quebec, Canada. American Journal of Epidemiology. 1994;140(12):1061-80.

59.   Takahashi K, Case BW, Dufresne A, Fraser R, Higashi T, Siemiatycki J. Relation between lung asbestos fibre burden and exposure indices based on job history. Occupational & Environmental Medicine. 1994;51(7):461-9.

60.   Case BW, Dufresne A, Richardson L, Siemiatycki J, Takahashi K. Lung-retained dose following occupational exposure to silica. Applied Occupational & Environmental Hygiene. 1995;10(12):1031-6.

61.   Nadon L, Siemiatycki J, Dewar R, Krewski D, Gerin M. Cancer risk due to occupational exposure to polycyclic aromatic hydrocarbons. American Journal of Industrial Medicine. 1995;28(3):303-24.

62.   Siemiatycki J. Future etiologic research in occupational cancer. Environmental Health Perspectives. 1995;103 (Suppl 8):209-15.

63.   Siemiatycki J, Krewski D, Franco E, Kaiserman M. Associations between cigarette smoking and each of 21 types of cancer: a multi-site case-control study. International Journal of Epidemiology. 1995;24(3):504-14.

64.   Upfal M, Divine G, Siemiatycki J. Design issues in studies of radon and lung cancer: implications of the joint effect of smoking and radon. Environmental Health Perspectives. 1995;103(1):58-63.

65.   Ursin G, Paganini-Hill A, Siemiatycki J, Thompson WD, Haile RW. Early adult body weight, body mass index, and premenopausal bilateral breast cancer: data from a case-control study. Breast Cancer Research and Treatment. 1995;33(1):75-82.

66.   Aronson KJ, Siemiatycki J, Dewar R, Gerin M. Occupational risk factors for prostate cancer: results from a case-control study in Montréal, Quebec, Canada. American Journal of Epidemiology. 1996;143(4):363-73.

67.   *Fritschi L, Siemiatycki J. Melanoma and occupation: results of a case-control study. Occupational & Environmental Medicine. 1996;53(3):168-73.

68.   *Fritschi L, Siemiatycki J. Lymphoma, myeloma and occupation: results of a case-control study. International Journal of Cancer. 1996;67(4):498-503.

69.   *Fritschi L, Siemiatycki J, Richardson L. Self-assessed versus expert-assessed occupational exposures. American Journal of Epidemiology. 1996;144(5):521-7.

70.   Haile RW, Witte JS, Ursin G, Siemiatycki J, Bertolli J, Thompson WD, et al. A case-control study of reproductive variables, alcohol, and smoking in premenopausal bilateral breast cancer. Breast Cancer Research and Treatment. 1996;37(1):49-56.

71.   *Parent ME, Siemiatycki J, Renaud G. Case-control study of exposure to carbon black in the occupational setting and risk of lung cancer. American Journal of Industrial Medicine. 1996;30(3):285-92.

72.   Siemiatycki J. Exposure assessment in community-based studies of occupational cancer. Occupational Hygiene. 1996;3:41-58.

73.   *Parent ME, Siemiatycki J, Menzies R, *Fritschi L, Colle E. Bacille Calmette-Guerin vaccination and incidence of IDDM in Montréal, Canada. Diabetes Care. 1997;20(5):767-72.

74.   Payment P, Siemiatycki J, Richardson L, Renaud G, Franco E, Prévost M. A prospective epidemiological study of gastrointestinal health effects due to the consumption of drinking water. International Journal of Environmental Health Research. 1997;7:5-31.

75.   Siemiatycki J, *Fritschi L, Nadon L, Gerin M. Reliability of an expert rating procedure for retrospective assessment of occupational exposures in community-based case-control studies. American Journal of Industrial Medicine. 1997;31(3):280-6.

76.   Witte JS, Ursin G, Siemiatycki J, Thompson WD, Paganinihill A, Haile RW. Diet and premenopausal bilateral breast cancer - a case-control study. Breast Cancer Research and Treatment. 1997;42(3):243-51.

77.   Boffetta P, Burdorf A, Goldberg M, Merler E, Siemiatycki J. Towards the coordination of European research on the carcinogenic effects of asbestos. Scandinavian Journal of Work, Environment and Health. 1998;24(4):312-7.

78.   *Camus M, Siemiatycki J, Meek B. Nonoccupational exposure to chrysotile asbestos and the risk of lung cancer. New England Journal of Medicine. 1998;338(22):1565-71.

79.   Gerin M, Siemiatycki J, Desy M, Krewski D. Associations between several sites of cancer and occupational exposure to benzene, toluene, xylene, and styrene - results of a case-control study in Montréal. American Journal of Industrial Medicine. 1998;34(2):144-56.

80.   Hu SW, Hertz-Picciotto I, Siemiatycki J. When to be skeptical of negative studies: pitpalls in evaluating occupational risks using population-based case-control studies. Canadian Journal of Public Health Revue Canadienne de Sante Publique. 1998;90(2):138-42.

81.   *Parent ME, Siemiatycki J, Fritschi L. Occupational exposures and gastric cancer. Epidemiology. 1998;9(1):48-55.

82.   Siemiatycki J, Boffetta P. Invited commentary - is it possible to investigate the quantitative relation between asbestos and mesothelioma in a community-based study? American Journal of Epidemiology. 1998;148(2):143-7.

83.   Stewart PA, Stewart WF, Siemiatycki J, Heineman EF, Dosemeci M. Questionnaires for collecting detailed occupational information for community-based case control studies. American Industrial Hygiene Association Journal. 1998;59(1):39-44.

84.   Goldberg MS, Siemiatycki J, Dewar R, Desy M, Riberdy H. Risks of developing cancer relative to living near a municipal solid waste landfill site in Montréal, Quebec, Canada. Archives of Environmental Health. 1999;54(4):291-6.

85.   *Dumas S, Parent ME, Siemiatycki J, Brisson J. Rectal cancer and occupational risk factors: A hypothesis-generating, exposure-based case-control study. International Journal of Cancer. 2000;87(6):874-9.

86.   Parent ME, Hua Y, Siemiatycki J. Occupational risk factors for renal cell carcinoma in Montréal. American Journal of Industrial Medicine. 2000;38(6):609-18.

87.   Parent ME, Siemiatycki J, Fritschi L. Workplace exposures and oesophageal cancer. Occupational & Environmental Medicine. 2000;57(5):325-34.

88.   Pohlabeln H, Boffetta P, Ahrens W, Merletti F, Agudo A, Benhamou E, ….Siemiatycki J, et al. Occupational risks for lung cancer among nonsmokers. Epidemiology. 2000;11(5):532-8.

89.   Weston TL, Aronson KJ, Siemiatycki J, Howe GR, Nadon L. Cancer mortality among males in relation to exposures assessed through a job-exposure matrix. International Journal of Occupational and Environmental Health. 2000;6(3):194-202.

90.   Boffetta P, Gaborieau V, Nadon L, Parent MF, Weiderpass E, Siemiatycki J. Exposure to titanium dioxide and risk of lung cancer in a population-based study from Montréal. Scandinavian Journal of Work, Environment and Health. 2001;27(4):227-32.

91.   Goldberg MS, Parent ME, Siemiatycki J, Desy M, Nadon L, Richardson L, et al. A case-control study of the relationship between the risk of colon cancer in men and exposures to occupational agents. American Journal of Industrial Medicine. 2001;39(6):531-46.

92.   Parent ME, Siemiatycki J. Occupation and prostate cancer. Epidemiologic Reviews. 2001;23(1):138-43.

93.   *Sharpe CR, Siemiatycki J. Joint effects of smoking and body mass index on prostate cancer risk. Epidemiology. 2001;12(5):546-51.

94.   *Sharpe CR, Siemiatycki J. Case-control study of alcohol consumption and prostate cancer risk in Montréal, Canada. Cancer Causes and Control. 2001;12(7):589-98.

95.   *Sharpe CR, Siemiatycki J, Parent MB. Activities and exposures during leisure and prostate cancer risk. Cancer Epidemiology, Biomarkers and Prevention. 2001;10(8):855-60.

96.   Siemiatycki J. Should Canadian health care professionals support the call for a worldwide ban on asbestos? Canadian Medical Association Journal. 2001;164(4):495-7.

97. Camus M, Siemiatycki J, Case BW, Désy M, Richardson L, Campbell S. Risk of mesothelioma among women living near chrysotile mines versus US EPA asbestos risk model: preliminary findings. Annals of Occupational Hygiene. 2002;46(Suppl 1):95-8.

98. Case BW, Camus M, Richardson L, Parent M, Désy M, Siemiatycki J. Preliminary findings for pleural mesothelioma among women in the Québec chrysotile mining regions. Annals of Occupational Hygiene. 2002;46(Suppl 1):128-31.

99. Leffondré K, Abrahamowicz M, Siemiatycki J, *Rachet B. Modeling smoking history: a comparison of different approaches. American Journal of Epidemiology. 2002;156(9):813-23.

100. *Sharpe CR, Siemiatycki J. Consumption of non-alcoholic beverages and prostate cancer risk. European Journal of Cancer Prevention. 2002;11(5):497-501.

101. *Sharpe CR, Siemiatycki J, *Rachet B. Effects of alcohol consumption on the risk of colorectal cancer among men by anatomical subsite (Canada). Cancer Causes and Control. 2002;13(5):483-91.

102. *Sharpe CR, Siemiatycki JA, *Rachet BP. The effects of smoking on the risk of colorectal cancer. Diseases of the Colon and Rectum. 2002;45(8):1041-50.

103. Siemiatycki J. Commentary: Epidemiology on the side of the angels. International Journal of Epidemiology. 2002;31(5):1027-9.

104. Fritschi L, Nadon L, Benke G, Lakhani R, Latreille B, Parent ME,  …Siemiatycki J. Validation of expert assessment of occupational exposures. American Journal of Industrial Medicine. 2003;43(5):519-22.

105. Krewski D, Burnett RT, Goldberg MS, Abrahamowicz M, Siemiatycki J, Jerrett M, et al. Rejoinder: Reanalsis of the Harvard Six Cities Study and American Cancer Society study of particulate air pollution and mortality. Journal of Toxicology & Environmental Health Part A. 2003;66(16-19):1715-22.

106. Krewski D, Burnett RT, Goldberg MS, Hoover BK, Siemiatycki J, Jerrett M, et al. Overview of the reanalysis of the Harvard Six Cities Study and American Cancer Society Study of particulate air pollution and mortality. Journal of Toxicology & Environmental Health Part A. 2003;66(16-19):1507-51.

107. Leffondré K, Abrahamowicz M, Siemiatycki J. Evaluation of Cox's model and logistic regression for matched case-control data with time-dependent covariates: a simulation study. Statistics in Medicine. 2003;22(24):3781-94.

108. Leffondré K, Abrahamowicz M, Siemiatycki J, Rachet B. Re: Modeling smoking history: a comparison of different approaches. American Journal of Epidemiology. 2003;158(4):393-4.

109. Rachet B, Abrahamowicz M, Sasco AJ, Siemiatycki J. Estimating the distribution of lag in the effect of short-term exposures and interventions: adaptation of a non-parametric regression spline model. Statistics in Medicine. 2003;22(14):2335-63.

110. Siemiatycki J, Krewski D, Shi Y, Goldberg MS, Nadon L, Lakhani R. Controlling for potential confounding by occupational exposures. Journal of Toxicology & Environmental Health Part A. 2003;66(16-19):1591-603.

111. Rachet B, Siemiatycki J, Abrahamowicz M, Leffondré K. A flexible modeling approach to estimating the component effects of smoking behavior on lung cancer. Journal of Clinical Epidemiology. 2004;57(10):1076-85.

112. Siemiatycki J, Richardson L, Straif K, Latreille B, Lakhani R, Campbell S, et al. Listing occupational carcinogens; see errata: 113 (2); A 89. Environmental Health Perspectives. 2004;112(15):1447-59.

113. Toraason M, Albertini R, Bayard S, Bigbee W, Blair A, Boffetta P, … Siemiatycki J, et al. Applying new biotechnologies to the study of occupational cancer - A workshop summary. Environmental Health Perspectives. 2004;112(4):413-6.

114. Krewski D, Burnett RT, Goldberg MS, Hoover K, Siemiatycki J, Abrahamowicz M, White WH. Validation of the Harvard Six Cities Study of particulate air pollution and mortality. N Engl J Med. 2004;350(2):198-9.

115. Infante-Rivard C, Siemiatycki J, Lakhani R, Nadon L. Maternal exposure to occupational solvents and childhood leukemia. Environmental Health Perspectives. 2005;113(6):787-92.

116. Krewski D, Burnett RT, Goldberg M, Hoover K, Siemiatycki J, Abrahamowicz M, et al. Reanalysis of the Harvard Six Cities Study, part II: sensitivity analysis. Inhalation Toxicology. 2005;17(7-8):343-53.

117. Krewski D, Burnett RT, Goldberg M, Hoover K, Siemiatycki J, Abrahamowicz M, et al. Reanalysis of the Harvard Six Cities Study, part I: validation and replication. Inhalation Toxicology. 2005;17(7-8):335-42.

118. *Rousseau MC, Parent ME, Siemiatycki J. Comparison of self-reported height and weight by cancer type among men from Montréal, Canada. European Journal of Cancer Prevention. 2005;14(5):431-8.

119. *Rousseau MC, Straif K, Siemiatycki J. IARC carcinogen update. Environmental Health Perspectives. 2005;113(9):A580-A1.

120. Siemiatycki J. Synthesizing the lifetime history of smoking. Cancer Epidemiology, Biomarkers and Prevention. 2005;14(10):2294-5.

121. Siemiatycki J. Opportunités et défis en épidémiologie environnementale. Bulletin d'Information en Santé environnementale. 2005;16(5):3.

122. Straif K, Cardis E, Boffeta P, Rousseau MC, Siemiatycki J. ELF MFs: Straif et al. respond. Environmental Health Perspectives. 2005;113(11):A727.

123. Baan R, Straif K, Grosse Y, Secretan W, El Ghissassi F, Cogliano V, WHO IARC Monograph Working Group. Carcinogenicity of carbon black, titanium dioxide, and talc. Lancet Oncology. 2006;7(4):295-6.

124. *Benedetti A, Parent ME, Siemiatycki J. Consumption of alcoholic beverages and risk of lung cancer: results from two case-control studies in Montréal, Canada. Cancer Causes and Control. 2006;17(4):469-80.

125. Leffondré K, Abrahamowicz M, Xiao Y, Siemiatycki J. Modelling smoking history using a comprehensive smoking index: application to lung cancer. Statistics in Medicine. 2006;25(24):4132-46.

126. *Ramanakumar AV, Parent ME, Menzies D, Siemiatycki J. Risk of lung cancer following nonmalignant respiratory conditions: evidence from two case-control studies in Montréal, Canada. Lung Cancer. 2006;53(1):5-12.

127. *Rousseau MC, Parent ME, Pollak MN, Siemiatycki J. Diabetes mellitus and cancer risk in a population-based case-control study among men from Montréal, Canada. International Journal of Cancer. 2006;118(8):2105-9.

128. Cardis E, Richardson L, Deltour I, Armstrong B, Feychting M, Johansen C, … Siemiatycki J, et al. The INTERPHONE study: design, epidemiological methods, and description of the study population. European Journal of Epidemiology. 2007;22(9):647-64.

129. Parent ME, Rousseau MC, Boffetta P, Cohen A, Siemiatycki J. Exposure to diesel and gasoline engine emissions and the risk of lung cancer. American Journal of Epidemiology. 2007;165(1):53-62.

130. *Ramanakumar AV, Parent ME, Siemiatycki J. Risk of lung cancer from residential heating and cooking fuels in Montréal, Canada. American Journal of Epidemiology. 2007;165(6):634-42.

131. Rousseau MC, Parent ME, Nadon L, Latreille B, Siemiatycki J. Occupational exposure to lead compounds and risk of cancer among men: a population-based case-control study. American Journal of Epidemiology. 2007;166(9):1005-14.

132. Siemiatycki J. Investigating cancer risks related to asbestos and other occupational carcinogens. Occupational & Environmental Medicine. 2007;64(8):500-1.

133. Langseth H, Hankinson SE, Siemiatycki J, Weiderpass E. Perineal use of talc and risk of ovarian cancer. Journal of Epidemiology and Community Health. 2008;62(4):358-60.

134. *Pintos J, Parent ME, Rousseau MC, Case BW, Siemiatycki J. Occupational exposure to asbestos and man-made vitreous fibers, and risk of lung cancer: Evidence from two case-control studies in Montréal, Canada. Journal of Occupational and Environmental Medicine. 2008;50(11):1273-81.

135. *Ramanakumar AV, Nadon L, Siemiatycki J. Exposures in painting related occupations and risk of selected cancers: Results from a case-control study in Montréal. American Journal of Industrial Medicine. 2008;51(6):419-27.

136. *Ramanakumar AV, Parent ME, Latreille B, Siemiatycki J. Risk of lung cancer following exposure to carbon black, titanium dioxide and talc: results from two case-control studies in Montréal. International Journal of Cancer. 2008;122(1):183-9.

137. Rousseau MC, Parent M-É, Nadon L, Latreille B, Siemiatycki J. Re: Occupational exposure to lead compounds and risk of cancer among men: a population-based case-control study. American Journal of Epidemiology. 2008;168(10):1217-8.

138. *Benedetti A, Parent ME, Siemiatycki J. Lifetime consumption of alcoholic beverages and risk of 13 types of cancer in men: Results from a case-control study in Montréal. Cancer Detection and Prevention. 2009;32(5-6):352-62.

139. Koushik A, Parent ME, Siemiatycki J. Characteristics of menstruation and pregnancy and the risk of lung cancer in women. International Journal of Cancer. 2009;125(10):2428-33.

140. Parent ME, Désy M, Siemiatycki J. Does exposure to agricultural chemicals increase the risk of prostate cancer among farmers? Mcgill Journal of Medicine. 2009;12(1):70-7.

141. Pintos J, Parent ME, Case BW, Rousseau MC, Siemiatycki J. Risk of mesothelioma and occupational exposure to asbestos and man-made vitreous fibers: evidence from two case-control studies in Montréal, Canada. Journal of Occupational and Environmental Medicine. 2009;51(10):1177-84.

142. Straif K, Benbrahim-Tallaa L, Baan R, Grosse Y, Secretan B, El Ghissassi F, WHO IARC Monograph Working Group. A review of human carcinogens--part C: metals, arsenic, dusts, and fibres. Lancet Oncology. 2009;10(5):453-4.

143. Vrijheid M, Armstrong BK, Bedard D, Brown J, Deltour I, Iavarone I, … Richardson L, … Siemiatycki J, et al. Recall bias in the assessment of exposure to mobile phones. Journal of Exposure Science & Environmental Epidemiology. 2009;19(4):369-81.

144. Vrijheid M, Richardson L, Armstrong BK, Auvinen A, Berg G, Carroll M, … Siemiatycki J, et al. Quantifying the impact of selection bias caused by nonparticipation in a case-control study of mobile phone use. Annals of Epidemiology. 2009;19(1):33-41.

145. *Beveridge R, Pintos J, Parent ME, Asselin J, Siemiatycki J. Lung cancer risk associated with occupational exposure to nickel, chromium VI, and cadmium in two population-based case-control studies in Montréal. American Journal of Industrial Medicine. 2010;53(5):476-85.

146. El-Zein M, Parent ME, Ka K, Siemiatycki J, St-Pierre Y, Rousseau MC. History of asthma or eczema and cancer risk among men: a population-based case-control study in Montréal, Quebec, Canada. Annals of Allergy, Asthma, and Immunology. 2010;104(5):378-84.

147. Leffondre K, Wynant W, Cao ZR, Abrahamowicz M, Heinze G, Siemiatycki J. A weighted Cox model for modelling time-dependent exposures in the analysis of case-control studies. Statistics in Medicine. 2010;29(7-8 Special Issue SI):839-50.

148. *Momoli F, Abrahamowicz M, Parent ME, Krewski D, Siemiatycki J. Analysis of multiple exposures: an empirical comparison of results from conventional and semi-bayes modeling strategies. Epidemiology. 2010;21(1):144-51.

149. The INTERPHONE Study Group. Brain tumour risk in relation to mobile telephone use: results of the INTERPHONE international case-control study. International Journal of Epidemiology. 2010;39(3):675-94.

150. *Vida S, Pintos J, Parent ME, Lavoué J, Siemiatycki J. Occupational exposure to silica and lung cancer: pooled analysis of two case-control studies in Montréal, Canada. Cancer Epidemiology, Biomarkers and Prevention. 2010;19(6):1602-11.

151. Ward EM, Schulte PA, Straif K, Hopf NB, Caldwell JC, Carreon T, … Siemiatyccki J, et al. Research recommendations for selected IARC-classified agents. Environmental Health Perspectives. 2010;118(10):1355-62.

152. Baan R, Grosse Y, Lauby-Secretan B, El Ghissassi F, Bouvard V, Benbrahim-Tallaa L, IARC Monoraph Working Group. Carcinogenicity of radiofrequency electromagnetic fields. Lancet Oncology. 2011;12(7):624-6.

Curriculum Vitae                                                                                      Jack Siemiatycki

153. Nkosi TM, Parent ME, Siemiatycki J, Pintos J, Rousseau MC. Comparison of indicators of material circumstances in the context of an epidemiological study. BMC Medical Research Methodology. 2011;11:108.

154. Olsson AC, Gustavsson P, Kromhout H, Peters S, Vermeulen R, Bruske I, … Siemiatycki J, Pintos J, et al. Exposure to diesel motor exhaust and lung cancer risk in a pooled analysis from case-control studies in Europe and Canada. American Journal of Respiratory and Critical Care Medicine. 2011;183(7):941-8.

155. Olsson AC, Vermeulen R, Kromhout H, Peters S, Gustavsson P, Bruske I, Siemiatycki J, Pesch B, Bruning T. Rejoinder to Commentary on Exposure to diesel motor exhaust and lung cancer by Bunn and Hesterberg. American Journal of Respiratory and Critical Care Medicine. 2011;184: 2010-2011.

156. Parent ME, Rousseau MC, El-Zein M, Latreille B, Desy M, Siemiatycki J. Occupational and recreational physical activity during adult life and the risk of cancer among men. Cancer Epidemiology. 2011;35(2):151-9.

157. *Ramanakumar AV, Parent ME, Richardson L, Siemiatycki J. Exposures in painting-related occupations and risk of lung cancer among men: results from two case-control studies in Montréal. Occupational & Environmental Medicine. 2011;68(1):44-51.

158. Soskolne CL, Jhangri GS, Scott HM, Brenner DR, Siemiatycki J, Lakhani R, et al. A population-based case-control study of occupational exposure to acids and the risk of lung cancer: evidence for specificity of association. International Journal of Occupational and Environmental Health. 2011;17(1):1-8.

159. *Christensen KY, Naidu A, Parent ME, Pintos J, Abrahamowicz M, Siemiatycki J, et al. The risk of lung cancer related to dietary intake of flavonoids. Nutrition & Cancer-An International Journal. 2012;64(7):964-74.

160. Labreche F, Case BW, Ostiguy G, Chalaoui J, Camus M, Siemiatycki J. Pleural mesothelioma surveillance: validity of cases from a tumour registry. Canadian Respiratory Journal. 2012;19(2):103-7.

161. Lavoué J, Pintos J, Van Tongeren M, Kincl L, Richardson L, Kauppinen T, … Siemiatycki J. Comparison of exposure estimates in the Finnish job-exposure matrix FINJEM with a JEM derived from expert assessments performed in Montréal. Occupational & Environmental Medicine. 2012;69(7):465-71.

162. Nadalin V, Kreiger N, Parent ME, Salmoni A, Sass-Kortsak A, Siemiatycki J, et al. Prostate cancer and occupational whole-body vibration exposure. Annals of Occupational Hygiene. 2012;56(8):968-74.

163. Nkosi TM, Parent ME, Siemiatycki J, Rousseau MC. Socioeconomic position and lung cancer risk: how important is the modeling of smoking? Epidemiology. 2012;23(3):377-85.

164. Olsson A, Vermeulen R, Kromhout H, Peters S, Gustavsson P, Bruske I, Siemiatycki J, et al. The impact of selection bias due to increasing response rates among population controls in occupational case-control studies: response. American Journal of Respiratory and Critical Care Medicine. 2012;185(1):106-7.

165. Parent ME, El-Zein M, Rousseau MC, Pintos J, Siemiatycki J. Night work and the risk of cancer among men. American Journal of Epidemiology. 2012;176(9):751-9.

166. Parent ME, El-Zein M, Rousseau MC, Pintos J, Siemiatycki J. Parent et al. Respond to "shift work and cancer". American Journal of Epidemiology. 2012;176(9):764-5.

167. Pesch B, Kendzia B, Gustavsson P, Jockel KH, Johnen G, Pohlabeln H, … Siemiatycki J, et al. Cigarette smoking and lung cancer-relative risk estimates for the major histological types from a pooled analysis of case-control studies. International Journal of Cancer. 2012;131(5):1210-9.

168. Peters S, Kromhout H, Olsson AC, Wichmann HE, Bruske I, Consonni D, … Siemiatycki J, et al. Occupational exposure to organic dust increases lung cancer risk in the general population. Thorax. 2012;67(2):111-6.

169. Pintos J, Parent ME, Richardson L, Siemiatycki J. Occupational exposure to diesel engine emissions and risk of lung cancer: evidence from two case-control studies in Montréal, Canada. Occupational & Environmental Medicine. 2012;69(11):787-92.

170. *Vallières E, Pintos J, Lavoué J, Parent ME, Rachet B, Siemiatycki J. Exposure to welding fumes increases lung cancer risk among light smokers but not among heavy smokers: evidence from two case-control studies in Montréal. Cancer Medicine. 2012;1(1):47-58.

171. *Al-Zoughool M, Pintos J, Richardson L, Parent ME, Ghadirian P, Krewski D. Exposure to environmental tobacco smoke (ETS) and risk of lung cancer in Montréal: a case-control. Environmental Health. 2013;12(112):1-8.

172. Behrens T, Kendzia B, Treppmann T, Olsson A, Jockel KH, Gustavsson P, … Siemiatycki J, et al. Lung cancer risk among bakers, pastry cooks and confectionary makers: the SYNERGY study. Occupational & Environmental Medicine. 2013;70(11):810-4.

173. *Christensen KY, *Vizcaya D, Richardson H, Lavoué J, Aronson K, Siemiatycki J. Risk of selected cancers due to occupational exposure to chlorinated solvents in a case-control study in Montréal. Journal of Occupational and Environmental Medicine. 2013;55(2):198-208.

174. El-Zein M, Parent ME, Nicolau B, Koushik A, Siemiatycki J, Rousseau MC. Body mass index, lifetime smoking intensity and lung cancer risk. International Journal of Cancer. 2013;133(7):1721-31.

175. Kendzia B, Behrens T, Jockel KH, Siemiatycki J, Kromhout H, Vermeulen R, et al. Welding and lung cancer in a pooled analysis of case-control studies. American Journal of Epidemiology. 2013;178(10):1513-25.

176. *Lacourt A, Cardis E, Pintos J, Richardson L, Kincl L, Benke G, et al. INTEROCC case-control study: lack of association between glioma tumors and occupational exposure to selected combustion products, dusts and other chemical agents - art. no. 340. BMC Public Health. 2013;13(340):12.

177. *Mahboubi A, Koushik A, Siemiatycki J, Lavoué J, Rousseau MC. Assessment of the effect of occupational exposure to formaldehyde on the risk of lung cancer in two Canadian population-based case-control studies. Scandinavian Journal of Work, Environment and Health. 2013;39(4):401-10.

178. Olsson AC, Xu YW, Schuz J, Vlaanderen J, Kromhout H, Vermeulen R, … Siemiatycki J, Richardson L, et al. Lung cancer risk among hairdressers: a pooled analysis of case-control studies conducted between 1985 and 2010. American Journal of Epidemiology. 2013;178(9):1355-65.

179. Turner MC, Krewski D, Armstrong BK, Chetrit A, Giles GG, Hours M, … Siemiatycki J, et al. Allergy and brain tumors in the INTERPHONE study: pooled results from Australia, Canada, France, Israel, and New Zealand. Cancer Causes and Control. 2013;24(5):949-60.

180. van Tongeren M, Kincl L, Richardson L, Benke G, Figuerola J, Kauppinen T, … Lavoué J, ... The INTEROCC Study Group. Assessing occupational exposure to chemicals in an international epidemiological study of brain tumours. Annals of Occupational Hygiene. 2013;57(5):610-26.

181. *Vizcaya D, *Christensen KY, Lavoué J, Siemiatycki J. Risk of lung cancer associated with six types of chlorinated solvents: results from two case-control studies in Montréal, Canada. Occupational & Environmental Medicine. 2013;70(2):81-5.

182. *Wynant W, Siemiatycki J, Parent ME, Rousseau MC. Occupational exposure to lead and lung cancer: results from two case-control studies in Montréal, Canada. Occupational & Environmental Medicine. 2013;70(3):164-70.

183. Parent ME, El-Zein M, Rousseau MC, Pintos J, Siemiatycki J. Re: "night work and the risk of cancer among men" reply. American Journal of Epidemiology. 2013;177(10):1166-7.

184. El-Zein M, Parent ME, Siemiatycki J, Rousseau MC. History of allergic diseases and lung cancer risk. Annals of Allergy, Asthma, and Immunology. 2014;112(3):230-6.

185. McLean D, Fleming S, Turner MC, Kincl L, Richardson L, Benke G, … Siemiatycki J, et al. Occupational solvent exposure and risk of meningioma: results from the INTEROCC multicentre case-control study. Occupational & Environmental Medicine. 2014;71(4):253-8.

186. Siemiatycki J, Karp I, Sylvestre MP, Pintos J. Estimating the proportion of cases of lung cancer legally attributable to smoking: a novel approach for class actions against the tobacco industry. American Journal of Public Health. 2014;104(8):e60-e6.

187. Turner MC, Benke G, Bowman JD, Figuerola J, Fleming S, Hours M, … Richardson L, … Siemiatycki J, et al. Occupational exposure to extremely low-frequency magnetic fields and brain tumor risks in the INTEROCC study. Cancer Epidemiology, Biomarkers and Prevention. 2014;23(9):1863-72.

188.  \*Vida S, Richardson L, Cardis E, Krewski D, McBride M, Parent ME, … Siemiatycki J. Brain tumours and cigarette smoking: analysis of the INTERPHONE Canada case-control study. Environmental Health. 2014;13:55.

189.  Vlaanderen J, Portengen L, Schuz J, Olsson A, Pesch B, Kendzia B, … Siemiatycki J, et al. Effect modification of the association of cumulative exposure and cancer risk by intensity of exposure and time since exposure cessation: a flexible method applied to cigarette smoking and lung cancer in the SYNERGY study. American Journal of Epidemiology. 2014;179(3):290-8.

190.  Denholm R, Schuz J, Straif K, Stucker I, Jockel KH, Brenner DR, … Siemiatycki J, et al. Is previous respiratory disease a risk factor for lung cancer? American Journal of Respiratory and Critical Care Medicine. 2014;190(5):549-59.

191.  Vila J,  Bowman JD, Kincl L, Conover DL, van Tongeren M, Figuerola J, Richardson L, Cardis E and INTEROCC Study Group. Development of a source-based approach to assessing occupational exposure to electromagnetic fields in the INTEROCC study [abstract]. Occupational & Environmental Medicine. 2014;71 (Suppl 1): A35-A36.

192.  Bigert C, Gustavsson P, Straif K, Pesch B, Bruning T, Kendzia B, … Siemiatycki J, et al. Lung cancer risk among cooks when accounting for tobacco smoking: a pooled analysis of case-control studies from Europe, Canada, New Zealand, and China. Journal of Occupational and Environmental Medicine. 2015;57(2):202-9.

193.  \*Vallières E, Pintos J, Parent ME, Siemiatycki J. Occupational exposure to wood dust and risk of lung cancer in two population-based case-control studies in Montréal, Canada. Environmental Health. 2015;14(1):1-9.

194.  \*Christensen K Y, Lavoué J, Rousseau M-C, Siemiatycki J. Lack of a protective effect of cotton dust on risk of lung cancer: evidence from two population-based case-control studies. BMC Cancer. 2015;15: 212.

195.  Consonni D, De Matteis S, Pesatori AC, Bertazzi PA, Olsson AC, Kromhout H, … Siemiatycki J, et al. Lung cancer risk among bricklayers in a pooled analysis of case-control studies. International Journal of Cancer. 2015;136(2):360-71.

196.  Pearce NE, Blair A, Vineis P, Ahrens W, Andersen A, Anto JM, … Siemiatycki J, et al. IARC Monographs: 40 Years of Evaluating Carcinogenic Hazards to Humans. Environ Health Perspect 2015;(6):507-14.

197.  Pesch B, Kendzia B, Hauptmann K, Van Gelder R, Stamm R, … Siemiatycki J, Lavoué J, Jöckel KH, Brüning T. Airborne exposure to inhalable hexavalent chromium in welders and other occupations: Estimates from the German MEGA database. International journal of hygiene and environmental health. 2015;218(5):500-06.

198.  Taeger D, Pesch B, Kendzia B, Behrens T, … Siemiatycki J, et al. Lung Cancer among Coal Miners, Ore Miners and Quarrymen - Smoking-adjusted Risk Estimates from the Synergy Pooled Analysis of Case-Control Studies. Scandinavian Journal of Work, Environment and Health. 2015;July.

199.  \*Lacourt A, Lavoué J, Pintos J, Siemiatycki J. Lung cancer risk in the construction industry: results from two case-control studies in Montréal. BMC Public Health. 2015;15:941. doi: 10.1186/s12889-015-2237-9.

200.  \*Liu  A, Abrahamowicz M, Siemiatycki J. Conditions for confounding of interactions. Pharmacoepidemiology & Drug Safety. 2015;25(3):287-296.

201.  Bigert C, Gustavsson P, Straif K, Taeger D, Pesch B, Kendzia B, … Siemiatycki J, Lavoué J, et al. Lung cancer risk among firefighters when accounting for tobacco smoking – preliminary results from a pooled analysis of case-control studies from Europe, Canada, New Zealand and China. Journal of Occupational and Environmental Medicine. Sep 2016, 73 (Suppl 1) A128; DOI: 10.1136/oemed-2016-103951.350

202.  Vila J, Bowman JD, Richardson L, Kincl L, Conover DL, McLean D, Mann S, Vecchia P, van Tongeren M, Cardis E and INTEROCC Study Group. A Source-based Measurement Database for Occupational Exposure Assessment of Electromagnetic Fields in the INTEROCC Study: A Literature Review Approach. Annals of Occupational Hygiene. 2016;60(2):184-204. doi:10.1093/annhyg/mev076

203.  \* Kirkham TL, Siemiatycki J, Labreche F, Lavoué J. Impact of aggregating exposure information from cases and controls when building a population-based job-exposure matrix from past expert evaluations. Occupational & Environmental Medicine. 2016;73(7):474-481. doi:10.1136/oemed-2014-102690

204. Karp I, Sylvestre MP, Abrahamowicz M, Leffondre K, Siemiatycki J. Bridging the etiologic and prognostic outlooks in individualized assessment of absolute risk of an illness: application in lung cancer. European Journal of Epidemiology. 2016;1-9. doi 10.1007/s10654-016-0180-4.

205. *Carrier M, Apparicio P, Kestens Y, Ségin A-M, Pham H, Crouse D, Siemiatycki J. Application of a global environmental equity index in Montréal: diagnostic and further implications. Annals of the American Association of Geographers. 2016;106(6),1268-1285.

206. Behrens T, Gross I, Siemiatycki J, Conway D.I, Olsson A, Stücker I, et al. Occupational prestige, social mobility and the association with lung cancer in men. BMC Cancer. 2016;16:395. doi: 10.1186/s12885-016-2432-9

207. Vila J, Bowman JD,  Figuerola J, Moriña O, Kincl L, Richardson L, Cardis E, and the INTEROCC Study Group, on behalf of the CREAL. Development of a source-exposure matrix for occupational exposure assessment of electromagnetic fields in the INTEROCC study. Journal of Exposure Science and Environmental Epidemiology. 2016;Nov 9. doi:10.1038/jes.2016.60.

208. Turner M, Sadetzki S, Langer CE, Villegas R, … Parent ME, Richardson L, Siemiatycki J, et al. Investigation of bias related to differences between case and control interview dates in five INTERPHONE countries. Annals of Epidemiology. 2016;26:827-832.

209. *Pasquet R, Karp I, Siemiatycki J, Koushik A. The consumption of coffee and black tea and the risk of lung cancer. Annals of Epidemiology. 2016;26:757-763.e2.

210. Grell K, Frederiksen K, Schuz J, Cardis E, Armstrong B, Siemiatycki J,  et al. The Intracranial Distribution of Gliomas in Relation to Exposure From Mobile Phones: Analyses From the INTERPHONE Study. American Journal of Epidemiology. 2016;184:818-828.

211. Sadetzki S, Turner MC, Figuerola J, … Parent ML, Richardson L, Siemiatycki J, et al. Occupational exposure to metals and risk for meningioma: a multinational case-control study. Journal of Neuro-Oncology. 2016;130(3):505-515.

212. Bigert C, Gustavsson P, Straif K, Taeger D, ..., Siemiatycki J, et al. Lung Cancer Among Firefighters: Smoking-Adjusted Risk Estimates in a Pooled Analysis of Case-Control Studies. Journal of Occupational Environmental Medicine. 2016;58(11):1137-43.

213. Zeng F, Lerro C, Lavoué J, Huang H, Siemiatycki J, Zhao N, et al. Occupational exposure to pesticides and other biocides and risk of thyroid cancer. Occupational Environmental Medicine. 2017 Feb 15:oemed-2016.

214. Kendzia B, Pesch B, Koppisch D, Van Gelder R, Pitzke K, … Siemiatycki J, Lavoué J, et al. Modelling of occupational exposure to inhalable nickel compounds. Journal of Exposure Science and Environmental Epidemiology. 2017 Jul;27(4):427-433. doi: 10.1038/jes.2016.80.

215. Shareck M, Rousseau MC, Koushik A, Siemiatycki J, Parent ME. Inverse association between dietary intake of selected carotenoids and vitamin C and risk of lung cancer. Frontiers in Oncology. 2017Feb 27;7:23 doi: 10.3389/fonc.2017.00023.

216. Olsson AC, Vermeulen R, Schüz J, Kromhout H, Pesch B, … Siemiatycki J, Parent ME, et al. Exposure-Response Analyses of Asbestos and Lung Cancer Subtypes in a Pooled Analysis of Case-Control Studies. Epidemiology. 2017 Mar;28(2):288-299.

217. Oraby T, Sivaganesan S, Bowman JD, Kincl L, Richardson L, McBride M, Siemiatycki J, Cardis E, Krewski D. Berkson error adjustment and other exposure surrogates in occupational case-control studies, with application to the Canadian INTEROCC study. Journal of Exposure Science and Environmental Epidemiology, March 29 2017; doi: 10.1038/jes.2017.2. Advance online publication

218. Blanc-Lapierre A, Rousseau MC, Weiss D, El-Zein M, Siemiatycki J, Parent ME. Lifetime report of perceived stress at work and risk of cancer among men: a case-control study in Montréal, Canada. Preventive Medicine. 2017 Mar 31;96:28-35.

219. *Xu M, Richardson L, Campbell S, Pintos J, Siemiatycki J. Patterns and trends in quality of response rate reporting in case-control studies of cancer. Journal of Epidemiological Research; 2017 Mar 31;3(2):13.

220. *Ho V, Parent ME, Pintos J, Abrahamowicz M, … Gauvin L, Siemiatycki J, Koushik A. Physical activity and lung cancer risk in men and women. Cancer Causes and Control. 2017 Apr;28(4):309-318.

221. Fehringer G, Brenner DR, … Siemiatycki J, Koushik A, … Olsson A, Straif K, Hung RJ, et al. Alcohol and Lung Cancer Risk Among Never Smokers: A Pooled Analysis from the International Lung Cancer Consortium and the SYNERGY Study. International Journal of Cancer. 2017 May 1;140(9):1976-1984.

222. Koushik A, Grundy A, … Mes-Masson AM, Parent MP, Provencher D, Richardson L, Siemiatycki J. Hormonal and reproductive factors and the risk of ovarian cancer. Cancer Causes Control. May 2017;28(5):393-403.

223. Auger N, Siemiatycki J, Bilodeau-Bertrand M, Healy-Profitós J, Kosatsky T. Ambient Temperature and Risk of Preeclampsia: Biased association? Paediatric and Perinatal Epidemiology. 2017 May 2;31(4):251-384.

224. Turner M, ... Parent M-E, ... Richardson L, Siemiatycki J, et al. Interactions between occupational exposure to extremely low frequency magnetic fields and chemicals for brain tumor risk in the INTEROCC study. Occupational Environmental Medicine. 2017 June 9.

225. Ben Khedher S, Neri M, Papadopoulos A, Christiani DC, Diao N, … Koushik A, Siemiatycki J, et al. Menstrual and reproductive factors and lung cancer risk: a pooled analysis from the International Lung Cancer consortium. International Journal of Cancer. 2017 Jul 15;141(2):309-323. doi: 10.1002/ijc.30750.

226. Parent M-É, Turner M, Lavoué J,… Richardson L, Benke G,… Siemiatycki J, van Tongeren M, Cardis E. Lifetime occupational exposure to metals and welding fumes, and risk of glioma: a 7-country population-based case-control study. Environmental Health. 2017 Aug 25;16(1):90.

227. Benke G,Turner MC, Fleming S, Figuerola J,… Richardson L,… Parent ME, Sadetzki S, Siemiatycki J, et al. Occupational solvent exposure and risk of glioma in the INTEROCC study. British Journal of Cancer. 2017 Oct 10;117(8):1246-1254. doi: 10.1038/bjc.2017.285.

228. El Zoghbi M, Salameh P, Stücker I, Paris C, Pairon JC,… Siemiatycki J,… Lacourt A. Phenotypes of Lung Cancer and Statistical Interactions between Tobacco Smoking and Occupational Exposure to Asbestos and Crystalline Silica from a Large Case-only Study: The CaProMat Study. Lung Cancer. 2017;112(Oct):140-155.

229. Momoli F, Siemiatycki J, McBride M, Parent MÉ, Richardson L, Bédard D, et al. Probabilistic Multiple-Bias Modelling Applied to the Canadian Data From the Interphone Study of Mobile Phone Use and Risk of Glioma, Meningioma, Acoustic Neuroma, and Parotid Gland Tumors. American Journal of Epidemiology. 2017 October;186(7):885-893. doi.org/10.1093/aje/kwx157.

230. El Zoghbi M, Salameh P, Stücker I, Paris C, Pairon JC,… Siemiatycki J,… Lacourt A. Prevalence of occupational exposure to asbestos and crystalline silica according to phenotypes of lung cancer from the CaProMat study: A case-only study. American Journal of Industrial Medicine. 2018 January;61(1):85-99. 10.1002/ajim.22765.

231. Burstyn I, Gustafson P, Pintos J, Lavoué J, Siemiatycki J. Correction of odds ratios in case-control studies for exposure misclassification with partial knowledge of the degree of agreement among experts who assessed exposures. Occupational Environmental Medicine. 2018 Feb(2):155-159. doi: 10.1136/oemed-2017-104609.

232. McElvenny DM, ... Parent ME, ... Richardson L, Siemiatycki J, et al. The INTEROCC case-control study: risk of meningioma and occupational exposure to selected combustion products, dusts and other chemical agents. Occupational Environmental Medicine. 2017 December 13;75:12–22.

233. *Xu M, Siemiatycki J, Lavoué J, Pasquet R, Pintos J,  Rousseau M.C, Richardson L, Ho V. Occupational exposures to leaded and unleaded gasoline engine emissions and lung cancer risk.  Occupational and Environmental Medicine. 2018; 75(4):303-309.

234. Hovanec J, Siemiatycki J, Conway DI, Olsson A, Stücker I, Guida F, et al. (2018) Lung cancer and socioeconomic status in a pooled analysis of case-control studies. PLoS ONE. 2018 February 20. 13(2): e0192999. doi.org/10.1371/journal.pone.0192999.

235. Behrens T, Hovanec J, Siemiatycki J, et al. 1232 Lung cancer and occupational social status: the synergy study. Occupational Environmental Medicine. 2018;75(Suppl 2):A1–A650.

236. *Warden H, Richardson H, Richardson L, Siemiatycki J, Ho V. Associations between occupational exposure to benzene, toluene and xylene and risk of lung cancer in Montréal Occup Environ Med Published Online First: 15 May 2018. doi: 10.1136/oemed-2017-104987

Curriculum Vitae                                                      Jack Siemiatycki

237. *Rémen T, Richardson L, Pilorget C, Palmer G, Siemiatycki J, Lavoué J. Development of a coding and crosswalk tool for occupations and industries. Annals of Work Exposures and Health. June 15 2018. doi.org/10.1093/annweh/wxy052.

238. *Sauvé JF, Siemiatycki J,… Richardson L, Pintos J,…*Rémen T, *Pasquet R,… Lavoué J. Development of and selected performance characteristics of CANJEM, a general population job exposure matrix based on past expert assessments of exposure. Annals of Work Exposures and Health. 12 June 2018. doi.org/10.1093/annweh/wxy044.

239. *Xu M, Richardson L, Campbell S, Pintos J, Siemiatycki J. Response rates in case-control studies of cancer by era of fieldwork and by characteristics of study design. Annals of Epidemiology. 2018 June;28(6):385-391.

240. Wiernik E, Czernichow S,… Limosin F,… Zins M, Siemiatycki J, Goldberg M, et al. Cardiovascular risk goes up as your mood goes down: interaction of depression and socioeconomic status in determination of cardiovascular risk in the CONSTANCES cohort. International Journal of Cardiology. 2018 1 July; 262: 99-105.

241. Siemiatycki J & Lavoué J. Availability of a New Job-Exposure Matrix (CANJEM) for Epidemiologic and Occupational Medicine Purposes. J Occupational Environmental Medicine. 2018 July;60(7):e324-e328

242. Vila J, Turner M, Gracia-Lavedan E,… Richardson L,… Siemiatycki J, van Tongeren M, Cardis E. Occupational exposure to high-frequency electromagnetic fields and brain tumour risk in the INTEROCC study: An individualized assessment approach. Environment International. 2018 October;119:353-365. [Epub ahead of print]

243. Nicolau B, Arekunnath Madathil S, Castonguay G, Rousseau MC, Parent ME, & Siemiatycki J. Shared social mechanisms underlying the risk of nine cancers: A life course study. International Journal of Cancer. 2018 July 7.

244. *Lacourt A, Labrèche F, Goldberg M, Siemiatycki J, Lavoué J. Agreement in Occupational Exposures Between Men and Women Using Retrospective Assessments by Expert Coders. Annals of Work Exposure and Health. 2018 August 16.

245. Brenner DR, Fehringer G, Zhang ZF,… Siemiatycki J, Koushik A,…Straif K. Alcohol consumption and lung cancer risk: A pooled analysis from the International Lung Cancer Consortium and the SYNERGY study. Cancer Epidemiology. 2018. In press.


* First author was under supervision of J. Siemiatycki when this work was carried out.


## BOOK CHAPTERS (invited) AND IARC MONOGRAPHS

1.  Siemiatycki, J, Gérin M, Hubert J. Exposure-based case control approach to discovering occupational carcinogens: preliminary findings. Banbury Report 9. Quantification of Occupational Cancer. Eds Peto R, Schneiderman M. Cold Spring Harbor, Cold Spring Harbor Laboratory: 471-483, 1981.

2.  Siemiatycki, J. Discovering occupational carcinogens with epidemiologic data. In Chemical Mutagenesis, Human Population Monitoring, and Genetic Risk Assessment. eds. K. C. Bora, G. R. Douglas and E. R. Nestmann. New York, Elsevier Biomedical Press: 99-105, 1982.

3.  Gerin M, Siemiatycki J, Richardson L, Pellerin J, Lakhani R, Dewar R. Nickel and cancer associations from a multicancer occupation exposure case-referent study: preliminary findings. In Nickel in the Human Environment. Eds F. W. Sunderman, Jr. Lyon, International Agency for Research on Cancer: 105-115., 1984.

4.  Siemiatycki J. An epidemiologic approach to discovering occupational carcinogens by obtaining better information on occupational exposures. In: Recent Advances in Occupational Health. Ed. MJ Harrington, Churchill Livingstone Vol. 2, pp. 143-157, 1984.

5.  Siemiatycki J. Discovering occupational carcinogens in population-based case-control studies: Review of findings from an exposure-based approach and a methodologic comparison of alternative data collection

strategies. In: Occupational Cancer Epidemiology, Ed. P Band, Springer-Verlag Press. Berlin. 25-38, 1990.

6.  Krewski, D, Siemiatycki J, Nadon L, Dewar R, and Gérin M. Cancer risks due to occupational exposure to polycyclic aromatic hydrocarbons: a preliminary report. In Genetic Toxicology of Complex Mixtures. Eds M.D. Waters, F.B. Daniel, J.Lewtas, M.M. Moore and S. Newnow. New York, Plenum Press: 343-352, 1990.

7.  Siemiatycki, J., M. Gérin, R. Dewar, R. Lakhani, D. Bégin and L. Richardson. Silica and cancer associations from a multicancer occupational exposure case-referent study. In Occupational Exposure to Silica and Cancer Risk. Eds L. Simonato, A. C. Fletcher, R. Saracci and T. L. Thomas. Lyon, International Agency for Research on Cancer: 29-42, 1990.

8.  IARC Working Group (21 co-authors) (1991). IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Vol. 52. Chlorinated drinking-water; chlorination by-products; some other halogenated compounds; cobalt and cobalt compounds. Lyon, IARC (International Agency for Research on Cancer).

9.  Siemiatycki, J.  Risk factors for cancer in the occupational environment and relevant epidemiological study methods. In Introduction to Environmental Epidemiology. Eds E. Talbott and G. Craun. Boca Raton, Lewis Publishers: 99-122, 1995.

10. IARC Working Group (17 co-authors) (1996). IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Vol. 65. Printing processes and printing inks, carbon black and some nitro compounds. Lyon, IARC (International Agency for Research on Cancer).

11. Siemiatycki J. Job-exposure matrices. In: Encyclopedia of Biostatistics, eds P Armitage and T Colton. Wiley, 1998.

12. Siemiatycki J. Job-exposure matrices. In: Encyclopedia of Epidemiologic Methods, eds. MH Gail and J Benichou. Wiley, 2000.

13. Siemiatycki J, Richardson L, Boffetta P. Occupation. In: Cancer Epidemiology and Prevention, 3rd Ed, eds. D Schottenfeld and J Fraumeni, Oxford University Press, 2006.

14. IARC Monograph Working Group. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Vol. 93 - Carbon black, titanium dioxide and non-asbestiform talc, IARC (International Agency for Research on Cancer), Lyon, 2009.

15. Siemiatycki J. Les règles, les pratiques et les préjugés des comités d'éthique vont réduire notre capacité à prévenir les maladies et à sauver des vies in La malréglementation, Une éthique de la recherche est-elle possible et à quelles conditions? Sous la direction de Michèle S. Jean et Pierre Trudel. Les Presses de l'Université de Montréal 2010.

16. IARC (2010). IARC Technical Publication No. 42: Identification of research needs to resolve the carcinogenicity of high-priority IARC carcinogens. http://monographs.iarc.fr/ENG/Publications/techrep42/index.php

17. IARC Monograph Working Group. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Vol. 100 – A review of human carcinogens, part C: metals, arsenic, dusts and fibres, IARC (International Agency for Research on Cancer), Lyon, 2012.

18. IARC Monograph Working Group. IARC Monographs on Evaluation of Carcinogenic Risks to Humans Vol. 102 – Radio Frequency Fields 2011, IARC (International Agency for Research on Cancer), Lyon, 2013.

19. Siemiatycki J. Occupational exposures, Chapter 2.6. In IARC World Cancer Report. Eds B Stewart, C Wild. Lyon 2013.

20. Siemiatycki J. Historical overview of occupational cancer research and control.  In Occupational Cancers. Eds S Anttila, P Boffetta, K Straif. Springer Press: 1-20, 2014.

## PUBLICATIONS WITHOUT PEER REVIEW, OTHER SCIENTIFIC REPORTS

1.  Rossiter CE, Bristol LJ, Cartier PH, Gibbs GW, Gilson JC, Grainger TR, Siemiatycki J, Sluis-Cremer GK, McDonald JC. Dust exposure and radiographic appearances in Quebec asbestos workers. XVI International Congress on Occupational Health, Tokyo: 205-206, 1969.

2.  Siemiatycki J. Living conditions and health - with special reference to low income areas of Montréal. Report submitted to the Pointe St-Charles Community Clinic, 42 pp, 1972.

3.   Siemiatycki J. The distribution of disease. Canadian Dimension. 1975.

4.   Siemiatycki J, Richardson L. Les facteurs socio-économiques et l'utilisation des services de santé à Montréal: document de travail. Submitted to the Ministère des Affaires sociales, 1979.

5.   Siemiatycki J, Richardson L. Les corrélatifs sociaux de la morbidité tels qu'ils ressortent d'une enquête sur la santé menée à Montréal: rapport préliminaire. Submitted to the Ministère des Affaires sociales, 1979.

6.   Siemiatycki J. Les facteurs qui déterminent la consommation de médicaments obtenus par prescription et les facteurs associés aux affections chroniques: rapport préliminaire. Submitted to the Ministère des Affaires sociales, 1979.

7.   Groupe d'étude de la fonction épidémiologique. (Aubry F, Drouin L, Ducharme G, Fredette JM, Lance JM, Siemiatycki J.) La fonction épidémiologique à la Commission de Santé et Sécurité au travail. Submitted to the Direction des Programmes et Normes, Commission de Santé et Sécurité au Travail, Québec, 1980.

8.   Siemiatycki J. An exposure-based case-control method for discovering occupational carcinogens. Chronic Diseases in Canada, 1:21-24, 1980.

9.   Siemiatycki J, Richardson L. Les corrélatifs sociaux de la morbidité tels qu'ils ressortent d'une enquête sur la santé à Montréal. Submitted to the Ministère des Affaires Sociales, 1981.

10.  Siemiatycki J. La consommation de médicaments à Montréal selon les facteurs démographiques, économiques, et ethniques. Submitted to the Ministère des Affaires Sociales, 1981.

11.  Siemiatycki J. Mortality in the general population in asbestos mining areas. Proceedings of the World Symposium on Asbestos, Montréal, 337-348, 1982.

12.  Price P, Gerin M, Siemiatycki J. An annotated bibliography of sources of information on occupational exposures. pp.78, 1982.

13.  Gerin M, Siemiatycki J, Kemper H, Laroche L, Millet C. Translating job histories into histories of occupational exposure for epidemiologic purpose. Proceedings of the Medical Research Council Symposium on Job Exposure Matrices, Southampton, Scientific Report No 2, 78-82, 1983.

14.  Siemiatycki J, Gerin M, Nadon L, Goldberg M, Richardson L. L'exposition professionnelle au formaldéhyde et le risque de cancer. Submitted to the Institut de recherche en santé et sécurité du travail, 18 pp, 1983.

15.  Task Force on Chemicals in the Environment and Human Reproductive Problems in New Brunswick. Second Report. Submitted to the Department of Health of New Brunswick. 249 pp, January 1984.

16.  Siemiatycki J. Evaluation des estimations actuelles concernant l'exposition professionnelle aux cancérogènes chimiques. Submitted to the Commission de la santé et sécurité au travail du Québec, 87 pages. October 1984.

17.  Task Force on Chemicals in the Environment and Human Reproductive Problems in New Brunswick. Final Report submitted to the Department of Health of New Brunswick. 269 pp, March 1985.

18.  Siemiatycki J, Richardson L. Expanding the vision of public health: new ways to meet old objectives. Health Promotion 24(2):10-12, 1985.

19.  Task Force on Health Risks of Alachlor (A.J. Nantel, J.L. Benedetti, J.P. Farand, M. Pagé, J.C. Panisset, J. Siemiatycki, C. Viau). Report submitted to the Government of Quebec, 1986.

20.  Siemiatycki J. Determining which workplace exposures may be carcinogenic: report on a novel epidemiologic approach. At The Centre. Canadian Centre for Occupational Health and Safety. Vol. IX, no. 5, pp. 9-10, November 1986.

21.  Gerin M, Siemiatycki J. Assessment of exposure to multiple agents in the workplace. Proceedings of the Workshop on Methodology of Assessment of Occupational Exposures in the Context of Epidemiological Detection of Cancer Risks. Eds. D. Hemon, M. Goldberg, pp. 99-108, 1989.

22.  Siemiatycki J, Gerin M, Nadon L, Dewar R. Risk of cancer due to occupational exposure to formaldehyde in a wide range of occupations and industries. Final report. Submitted under contract no. 1674 to the Health Protection Branch, Health and Welfare Canada, 78 pages, May 1988.

23.  Siemiatycki J. Epidemiological evidence in evaluating carcinogenicity of occupational exposures. IARC Int. Tech. Report no. 88/002, IARC, Lyon, Dec, pp. 49-59, 1988.

24.  IARC Working Group. Report of an IARC Working Group to review the approaches and processes used to evaluate the carcinogenicity of mixtures and groups of chemicals. IARC Int. Tech. Report no. 88/002, IARC, Lyon, Dec. 1988.

25.  Siemiatycki J, Nadon L, Dewar R, Gerin M, Armstrong B, Richardson L. Risk of cancer due to occupational exposure to polynuclear aromatic hydrocarbons in a wide range of occupations and industries: Final report. Submitted under contract no. 1984 to the Health Protection Branch, Health and Welfare Canada, 162 pages, May 1989.

26.  Siemiatycki J, Lakhani R, Gerin M, Dewar R, Richardson L. Risk of cancer due to exposure to benzene, toluene, and xylene in a wide range of occupations and industries: Final report. Submitted under contract no. 2025 to the Health Protection Branch, Health and Welfare Canada, 235 pages, June 1989.

27.  Siemiatycki J, Franco E, Dewar R, Desy M. Risk of cancer due to cigarette smoking - results of a multi-site case-control study. Report submitted under contract no. 2069 to the Health Protection Branch, Health and Welfare Canada, 23 pages, March 1990.

28.  Siemiatycki J. Review of findings from a registry-like database designed to discover occupational carcinogens. Proceedings of the Workshop on Indicators of Environmental Health. Waterloo Institute for Risk Research and Health and Welfare Canada. 1990.

29.  Camus M, Siemiatycki J. Cancer risks associated with non-occupational exposure to chrysotile asbestos. Report submitted under contract no. 064SS.H4078-1-C339. 1991.

30.  Siemiatycki J. Toxic Waste Sites And Human Health: Feasibility of Epidemiologic Studies Using the Canadian Unified Toxic Waste Sites Database. Contract No. 3136. 1992.

31.  *Nadon L, Siemiatycki J, Richardson L. Dépistage épidémiologique de cancérogènes en milieu de travail et son implication sur la santé environnementale. Bulletin d'Information en Santé environnementale, Volume 4, number 3, May/June 1993.

32.  Gerin M, deGuire L, Siemiatycki J. Étude sur la validité des matrices emploi-exposition multisectorielles en hygiène industrielle. IRSST, Montréal, 1995.

33.  Goldberg M, Farant JP, Simon P, Siemiatycki J, Armstrong B, Drouin L. A health survey of persons living near the Miron Quarry Sanitary Landfill Site. Montréal, Phase 1 (NHRDP: 502-6605-4342). July 1996.

34.  Siemiatycki J, Camus M, Case BW. Non-occupational exposure to Quebec chrysotile asbestos and risk of cancer. Montréal, NHRDP Report No. 6605-3533-53. April 1996.

35.  Mills CJ, Bull R, Cantor KP, Reif J, Hrudey SE, Huston P and an Expert Working Group: Health risks of drinking water chlorination byproducts: report of an expert working group. Chronic Diseases in Canada. 1998.

36.  Krewski D, Burnett R, Goldberg M, Hoover K, Siemiatycki J, et al. Reanalysis of the Harvard Six-City Study and the American Cancer Society Study of Air Pollution and Mortality: Validation and Replication. Health Effects Institute, Cambridge MA, 2000.

37.  Krewski D, Burnett R, Goldberg M, Hoover K, Siemiatycki J, et al.  Reanalysis of the Harvard Six-City Study and the American Cancer Society Study of Air Pollution and Mortality: Sensitivity Analyses. Health Effects Institute, Cambridge MA, 2000.

38.  Payment J, Siemiatycki J, Richardson L, Renaud G, Franco E, Prevost M. An epidemiological study of gastrointestinal health effects of drinking water. American Water Works Assoc.103 pp. 2000.

39.  Raynault M-F, Dussault C, Bartlett G, Deschenes M, Fortin S, Giroux M, Godard B, Jean MS, Mes-Masson A-M, Siemiatycki J, Vachon M-H. Rapport final du groupe-conseil sur l'Encadrement des banques de données et des banques de matériel biologique à des fins de recherche en santé. Fonds de la recherche en santé du Québec (FRSQ), Montréal, Québec.  8 December 2006.

40.  Raynault M-F, Dussault C, Bartlett G, Deschenes M, Fortin S, Giroux M, Godard B, Jean MS, Mes-Masson A-M, Siemiatycki J, Vachon M-H. Sommaire du rapport final du groupe-conseil sur l'Encadrement des banques de données et des banques de matériel biologique à des fins de recherche en santé. Fonds de la recherche en santé du Québec (FRSQ), Montréal, Québec.  8 December 2006.

41.  Raynault M-F, Dussault C, Bartlett G, Deschenes M, Fortin S, Giroux M, Godard B, Jean MS, Mes-Masson A-M, Siemiatycki J, Vachon M-H. Reconnaître la valeur sociale de la recherche dans le respect

Curriculum Vitae                                                                        Jack Siemiatycki

de la personne : Banques de données et banques de matériel biologique - Pour un nouveau cadre éthique et légal. Fonds de la recherche en santé du Québec (FRSQ), Montréal, Quebec. May 2007.

42.  Siemiatycki J. Estimating the amount of environmental health research being funded by national funding agencies in Canada. Report submitted under contract no. 4500156045 to Health Canada (Environmental and Occupational Toxicology & Environmental Health Sciences Bureau), 40 pages. August 2007.

## BOOK

1.  Siemiatycki J. Risk Factors for Cancer in the Workplace. CRC Press, Boca Raton, 1991, 310 pp.
    Chap 1. Siemiatycki J. Epidemiologic approaches to discovering occupational carcinogens
    Chap 2. Siemiatycki J, Richardson L. Case-control design and fieldwork methods.
    Chap 3. Siemiatycki J. Nadon L, Lakhani R, Begin D, Gerin M. Exposure assessment.
    Chap 4. Siemiatycki J. Statistical methods.
    Chap 5. Siemiatycki J, Gérin M, Dewar R, Nadon L, Lakhani R, Begin D, Richardson L. Associations between occupational circumstances and cancer
    Chap 6. Siemiatycki J. Interpretation of findings.

## ARTISTIC WORKS

1.  Siemiatycki J, Slodovnick A. The Hockey Card. Illustrated by Doris Barrette. Lobster Press, Montréal, 2002, 32 pp.
2.  Siemiatycki J, Slodovnick A. La carte de hockey. Illustrated by Doris Barrette. Translated by Christiane Duchesne. Lobster Press, Montréal, 2002, 32 pp.
3.  Siemiatycki J, Slodovnick A. The Baseball Card. Illustrated by Laura Watson. Lobster Press, Montréal, 2005, 32 pp.
4.  Siemiatycki J, Slodovnick A. La Estampa de béisbol. Illustrated by Laura Watson. Translated. Lobster Press, Montréal, 2005, 32 pp.

## SCIENTIFIC PRESENTATIONS - INVITED

1.  Siemiatycki J. Monitoring the occupational environment for carcinogens: a pilot study in Montréal. Working Environment and Health Seminar, McGill University, Department of Epidemiology, September 1978.
2.  Siemiatycki J, Richardson L. Le défi prioritaire en santé communautaire: la protection et l'amélioration de l'environnement. Association pour la santé publique du Québec, Montréal, Quebec, October 1979.
3.  Siemiatycki J. Occupational carcinogenesis. Séminaire départemental, Direction générale de la protection de la santé, Santé et Bien-être Social Canada, Ottawa, January 1981.
4.  Siemiatycki J. An overview of problems in identifying occupational carcinogens. Canadian Labour Congress Meeting on Occupational Cancer, Montréal, February 1981.
5.  Siemiatycki J. Feasibility of an exposure-based case-control approach to discovering occupational carcinogens: preliminary findings. Cold Springs Harbor Conference on Quantification of Occupational Cancer, Cold Springs Harbor, New York, March 1981.
6.  Siemiatycki J. Dépistage des facteurs cancérigènes dans les milieux professionnels montréalais. Séminaire départemental, Département de médecine du travail et d'hygiène du milieu, Université de Montréal, Montréal, Quebec,March 1981.
7.  Siemiatycki J. Surveillance program for occupationally related cancer. Société de Toxicologie du Canada, Montréal, Quebec, December 1981.
8.  Gérin, J, Siemiatycki J. Translating job histories into histories of occupational exposure in an interview-based case-control Study. Medical Research Council Symposium on Job-Exposure Matrices, Southampton, England, April 1982.
9.  Siemiatycki J. Rapporteur's report. Medical Research Council Symposium on Job-Exposure Matrices, Southampton, England, April 1982.
10. Siemiatycki J. Mortality in the general population in Quebec's asbestos mining areas. World Symposium on Asbestos, Montréal, May 1982.

Curriculum Vitae                                                                          Jack Siemiatycki

11.  Siemiatycki J. Occupational cancer epidemiology. McGill Department of Epidemiology seminar series, Montréal, Quebec, October 1982.

12.  Siemiatycki J. Rapport d'une étude pilote qui vise à découvrir des agents cancérogènes de l'environnement professionnel. Institut Armand-Frappier, Laval, Quebec, October 1982.

13.  Siemiatycki J, Richardson L, Gérin M. Discovering occupational carcinogens by an exposure-based case-control approach: feasibility and pilot study results. American Public Health Association Meeting, Montréal, Quebec, November 1982.

14.  Siemiatycki J. Discovering occupational carcinogens by means of a novel exposure-based case-control approach. U.S. National Institute of Occupational Safety and Health seminar series. Cincinnati. November 1982.

15.  Siemiatycki J. Dépistage des facteurs cancérigènes dans le milieu professionnel montréalais - rapport d'une étude pilote. Conférence-midi de l'Institut de recherche en santé et sécurité au travail, Montréal, Quebec, December 1982.

16.  Siemiatycki J. Rapport d'une étude qui vise à découvrir des agents cancérigènes dans l'environnement professionnel. Conférence départementale, Université de Sherbrooke, Sherbrooke, Quebec, February 1983.

17.  Siemiatycki J. Contribution of epidemiology to discovery of occupational carcinogens: case-control study in the Montréal area. Seminar Series, Lady Davis Institute, Jewish General Hospital, Montréal, March 1983.

18.  Siemiatycki J. Hospital-based studies of environmental causes of cancer. Seminar series, McGill Cancer Centre and Montréal General Hospital, March 1983.

19.  Siemiatycki J. Analyse préliminaire d'une enquête cas-témoins sur les expositions professionnelles et le cancer, INRS-Santé, Paris, France, April 1983.

20.  Siemiatycki J. Découvrir les cancérigènes professionnels par des méthodes épidémiologiques. Congrès de l'ACFAS, Trois-Rivières, Quebec, May 1983.

21.  Siemiatycki J. Surveillance of occupational cancer. University of Ottawa Special Course in Environmental Epidemiology, Ottawa, October 1983.

22.  Gérin M, Richardson L, Siemiatycki J. Obtaining job exposure histories based on interview and expert assessment. Job Exposure Assessment Meeting. International Agency for Research on Cancer, Lyon, France, February 1984.

23.  Siemiatycki J. Associations between bladder cancer and coffee and cigarette consumption: preliminary results of a case-control study. Environmental Risk Factors in Bladder Cancer Symposium, Lyon, February 1984.

24.  Siemiatycki J. Preliminary results of an occupational cancer monitoring program. Kellogg Center Seminar Series. Montréal General Hospital, April 1984.

25.  Siemiatycki J. Nickel, chromium and cancer: preliminary results from a case-control study. School of Occupational Health. McGill University, Montréal, April 1984.

26.  Siemiatycki J. Les premiers résultats d'une stratégie épidémiologique visant à découvrir des produits cancérigènes dans l'environnement industriel. Micro-hebdo, Institut Armand-Frappier, May 1984.

27.  Siemiatycki J. Cancer mortality in a general population highly exposed to asbestos. CAN-AM Chemical Congress. Montréal, June 1984.

28.  Siemiatycki J. Some occupational and non-occupational risk factors for cancer: results from a multi-site case-control study in Montréal. Special seminar. Health Protection Branch of Health and Welfare Canada, January 1985.

29.  Siemiatycki J. Premiers résultats d'un système de surveillance en épidémilogie visant à découvrir des agents cancérogènes dans le milieu industriel. Micro-Hebdo-Actualités, Institut Armand-Frappier, Laval, February 1985.

30.  Siemiatycki J. Discovering environmental carcinogens. Elizabeth Stern Memorial Lecture. U.C.L.A. School of Public Health, Los Angeles, California, May 1985.

31.  Siemiatycki J. Cancer surveillance. International Conference on Environmental and Occupational Significance of Industrial Carcinogens, Bologna, Italy, October 1985.

32.  Siemiatycki J. Overview of an epidemiologic case-control approach to discovering occupational carcinogens. Special seminar. Health Department of Torino and Epidemiology Department of University of Torino, Torino, Italy, October 1985.

33.  Siemiatycki J. Epidemiology of juvenile-onset diabetes in Montréal. Special lecture to Association of endocrinologists of Rhone-Alpes Region of France, Lyon, October 1985.

34.  Siemiatycki J. Cancer risks associated with exposure to organic dusts. Special seminar. International Agency for Research on Cancer, Lyon, October 1985.

35.  Siemiatycki J. Organic dusts and cancer. School of Occupational Health Seminar Series, McGill University, December 1985.

36.  Gérin, M, Siemiatycki J, Richardson L, Begin, D, Kemper, H, Lakhani, R, Nadon L. Associations entre cancer et exposition professionnelle à diverses substances. Résultats d'une étude épidémiologique à Montréal. Association pour l'hygiène industrielle au Québec, VIII Congrès, City of Québec, Quebec, May 1986.

37.  Siemiatycki J. Synthèse des résultats d'un système de surveillance épidémiologique des expositions professionnelles cancérogènes,  Université Laval, May 1986.

38.  Siemiatycki J. L'analyse des données appliquée à la santé et à la sécurité du travail. Symposium sur l'analyse de données, IRSST, Montréal, October 1986.

39.  Siemiatycki J. An overview of epidemiologic contributions to the discovery of occupational carcinogens. Society of Toxicology of Canada, Montréal. December 1986.

40.  Siemiatycki J, Wacholder, S, Dewar R, Begin, D, Richardson L, Rosenman, K, Gerin M. Smoking and degree of occupational exposure: are internal analyses likely to be confounded by smoking status? Symposium on Smoking in Occupational Cancer Studies. National Cancer Institute, Washington, December 1986.

41.  Siemiatycki J. Petroleum-derived liquids and cancer risk: findings from a case-control study. McGill University, Department of Epidemiology, April 1987.

42.  Siemiatycki J. Methods and findings from a case-control study of insulin-dependent diabetes mellitus in Montréal. Montréal Children's Hospital, May 1987.

43.  Colle, E, Siemiatycki J. Epidemiologic and immunologic evidence concerning the etiology of insulin-dependent diabetes.  Institut Armand-Frappier, May 1987.

44.  Siemiatycki J. The role of epidemiology in environmental impact assessment. Symposium on Health in Environmental Impact Assessment. Canadian Public Health Association and Environment Canada, Ottawa, May 1987.

45.  Siemiatycki J. Methods and results of a monitoring system for occupational carcinogens. Johns Hopkins University School of Public Health Seminar, Baltimore, Maryland, October 1987.

46.  Siemiatycki J. Cancer risks associated with petroleum-derived liquids and combustion products. National Cancer Institute, Occupational Studies Section, Bethesda, Maryland, October 1987.

47.  Gerin M, Siemiatycki J. Assessment of exposure to multiple agents in the workplace - experience from a population-based case-control study in Montréal. Workshop of European Economic Community on Methods of Assessment of Occupational Exposures for Epidemiologic Detection of Cancer Risks, Paris, February 1988.

48.  Siemiatycki J. Overview of epidemiologic tasks. International Joint Commission Workshop on the Role of Epidemiology in Assessing the Effects of Great Lakes Water Quality on Human Health. Toronto, March 1988.

49.  Siemiatycki J. Results of an exposure-based case-control study of occupational carcinogens. Ontario Cancer Treatment and Research Foundation, Toronto, April 1988.

50.  Siemiatycki J. Methodology of cancer case-control studies. Special Lecture Series in McGill Summer Program in Epidemiology, Montréal, May 1988.

51.  Siemiatycki J. Costs and benefits of various approaches to estimating occupational cancer risks in case-control studies. Symposium on Occupational Cancer Epidemiology. Vancouver, June 1988.

52.  Richardson L.R, Siemiatycki J, Dewar R. How well does a job exposure matrix reflect the exposure assessment of individually coded job histories? Workshop on job exposure matrices held at INSERM, Paris, October 1988.

53. Siemiatycki J. Methodologic issues in an exposure-based case-control study for discovering occupational carcinogens. Medical Research Council, Biostatistics Unit, Cambridge, England, December 1988.

54. Siemiatycki J. A synthesis of findings from an occupational cancer case-control study. Invited seminar in Department of Epidemiology, School of Public Health, University of North Carolina. Chapel Hill, North Carolina, April 1989.

55. Siemiatycki J. Methodologic problems in assessing exposure status for case-control studies. National Cancer Institute Seminar, Silver Spring, Maryland. April 1989.

56. Siemiatycki J. Environmental causes of cancer. McGill Cancer Center Public Lecture Series, Montréal. May 1989.

57. Siemiatycki J. Approches épidémiologiques dans l'investigation des facteurs cancérogènes. Summer course in community health, Université Laval, City of Québec, Quebec, June 1989.

58. Krewski, D, Siemiatycki J, Nadon L, Dewar R, Gerin M. Cancer risks due to occupational exposure to PAH's. International Conference on Genetic Toxicology of Complex Mixtures, Washington, District of Columbia, September 1989.

59. Siemiatycki J. Discovering environmental carcinogens by means of a case-control methodology. Dalhousie University, Faculty of Medicine seminar, December 1989.

60. Siemiatycki J. Using epidemiologic evidence in compensation of industrial disease. Special workshop of Industrial Disease Standards Panel of Ontario, Toronto, December 1989.

61. Siemiatycki J. Epidemiologic approaches to evaluating the carcinogenicity of complex mixtures. Workshop on carcinogenicity of Complex Mixtures. National Academy of Sciences of the U.S.A., Tucson, January 1990.

62. Siemiatycki J. Review of findings from a registry-like database designed to discover occupational carcinogens. Workshop on Indicators of Environmental Health. Waterloo Institute for Risk Research and Health and Welfare Canada, Ottawa, March 1990.

63. Siemiatycki J. Findings from an occupational cancer case-control study. Invited seminar in Department of Clinical Epidemiology, Royal Victoria Hospital. Montréal, March 1990.

64. Siemiatycki J. Effect of exposure strategies on risk estimates and statistical power. International Workshop on Retrospective Exposure Assessment for Occupational Epidemiologic Studies, Leesburg, Virginia, March 1990.

65. Siemiatycki J. Discovering environmental carcinogens: an epidemiologic perspective. Invited seminar in Department of Epidemiology, School of Public Health, University of North Carolina. Chapel Hill, North Carolina, March 1990.

66. Siemiatycki J. Discovering environmental carcinogens: review of an epidemiologic surveillance project. Invited seminar in Occupational & Environmental Health Unit, University of Toronto, Toronto, April 1990.

67. Siemiatycki J. Environnement et cancer: une perspective épidémiologique. 58th Association canadienne française pour l'avancement des sciences. Colloque santé et environnement, City of Québec, Quebec, April 1990.

68. Payment P, Richardson L, Edwards M, Franco E, Siemiatycki J. Drinking water related illness: an epidemiological study. Second International Biennial Water Quality Symposium: Microbiological Aspects, Vina Del Mar, Chile, August 1990.

69. Siemiatycki J. Occupational cancer. Seminar series of Laboratory Centre for Disease Control, Health and Welfare Canada, Ottawa, March 1991.

70. Siemiatycki J. A decade of searching for occupational carcinogens: methods and results of a case-control study. Seminar series of the Division of Clinical Epidemiology, Montréal General Hospital, Montréal, March 1991.

71. Siemiatycki J. Detecting occupational carcinogens using epidemiologic methods: results and their interpretation. McGill University, Department of Epidemiology and Biostatistics, Summer Lecture Series, Montréal, June 1991.

72. Siemiatycki J. Overview of results of an occupational cancer monitoring study. School of Public Health, University of California at Berkeley, Berkeley, October 1991.

Curriculum Vitae                                                                                      Jack Siemiatycki

73.  Siemiatycki J. Discussant of paper on Mortality of oil refinery and distribution workers. International Symposium on the Health Effects of Gasoline, Miami, November 1991.

74.  Begin, D, Gerin M, De Guire L, Siemiatycki J, Adib G, Fournier C. Étude sur la validité des matrices emploi-exposition multisectorielles en hygiène industrielle. Scientific Committee on Computing in Occupational and Environmental Health, III International Workshop, Paris, November 1991.

75.  Siemiatycki J. Cancer et travail : connaissances actuelles, approches antérieures et nouvelles. Colloque de l'Association des médecins du travail du Québec, Montréal. June 1992.

76.  Siemiatycki J. Risques de cancers reliés aux expositions chimiques en milieu de travail: résultats d'une étude épidémiologique à Montréal. IRSST, Montréal, November 1992.

77.  Siemiatycki J. Carcinogens in the occupational environment. Invited seminar in School of Public Health, University of North Carolina, Chapel Hill, North Carolina. December 1992.

78.  Siemiatycki J. Discussant of invited seminar on risk assessment. School of Occupation Health, McGill University, March 1993.

79.  Siemiatycki J. Are the effects of smoking on lung and bladder cancer confounded by occupational carcinogens? Invited seminar given at the Michigan Cancer Foundation, Detroit and at the University of Michigan, Ann Arbor, May 1993.

80.  Siemiatycki J. Are the apparent effects of cigarette smoking on lung and bladder cancers due to uncontrolled confounding by occupational exposures?  McGill University, Department of Epidemiology and Biostatistics, Montréal, December, 1993.

81.  Siemiatycki J. Occupational causes of cancer. President's Cancer Panel Meeting on Avoidable Causes of Cancer, Bethesda, April 1994.

82.  Siemiatycki J. Retrospective exposure assessment in community-based studies. Conference on Retrospective assessment of occupational exposures in epidemiology, IARC, Lyon, April 1994.

83.  Siemiatycki J. Are the apparent effects of cigarette smoking on lung and bladder cancers due to uncontrolled confounding by occupational exposures? Department of Human Oncology, University of Torino, Torino, Italy, April 1994.

84.  Siemiatycki J. Risque de cancer dû au tabagisme. Département de médecine sociale et préventive, Université Laval, Québec, May 1994.

85.  Siemiatycki J. Registry studies of bladder cancer. NCI Workshop on Occupational Exposures and Urogenital Cancers, Rockville, May 1994.

86.  Siemiatycki J. Facteurs de risques environnementaux pour le cancer: une perspective épidémiologique. Atelier sur la recherche en cancer, Université du Québec à Rimouski, April 1995.

87.  Camus M, Siemiatycki J. Non-occupational exposure to asbestos: how to assess dose and risk. McGill University, Department of Epidemiology and Biostatistics. Montréal, May 1995.

88.  Siemiatycki J. Occupational carcinogens in Montréal. Seminar - International Agency for Research on Cancer, Lyon, France, June 1995.

89.  Siemiatycki J. Occupational causes of cancer: findings from a large scale case-control study of occupational cancer. Department of Medical Informatics, Biometry and Epidemiology, University of Essen, Essen, Germany, July 1995.

90.  Siemiatycki J. Assessing occupational exposures in community based epidemiological studies. Bremen Institute for Preventive and Social Medicine, Bremen, Germany, July 1995.

91.  Case, B, Camus M, Richardson L, Siemiatycki J. Ascertainment of mesothelioma among Québec women from 1970 to 1990. Special Symposium on Mesothelioma, IRSST, Montréal, August 1995.

92.  Siemiatycki, J. Une nouvelle approche épidémiologique pour le dépistage de cancérogènes en milieu de travail. Club de recherches cliniques du Québec, Bromont, Quebec, September 1995.

93.  Siemiatycki J. Occupational causes of cancer: findings from a large scale case-control study of occupational cancer. Special seminar. School of Public Health, Univ. of Michigan, Ann Arbor, Michigan, June 1996.

94.  Siemiatycki J. An empirical evaluation of the magnitude of confounding bias. Statistical Society of Canada, Waterloo, June 1996.

95. Siemiatycki J. Occupational exposures and cancer risk: recent results and methodological insights from a population-based case-control study in Montréal. Department of Epidemiology & Biostatistics, McGill University. October, 1996.

96. Siemiatycki J. Utilités et limites des études épidémiologiques dans l'évaluation des risques environnementaux. ACFAS, City of Québec, Quebec, May 1998.

97. Siemiatycki J. International collaboration in cancer epidemiology. Society for Epidemiology Research, Chicago, June 1998.

98. Siemiatycki J. Accuracy of the EPA risk assessment model for predicting the risk of lung cancer at environmental levels of asbestos exposure.  National Cancer Institute, Rockville, Maryland, March 1999.

99. Siemiatycki J. Risk of lung cancer at environmental levels of asbestos exposure. University of Toronto, Toronto, September 1999.

100. Siemiatycki J. Estimating risks due to low level exposures. Society for Epidemiology Research, Seattle, June 2000.

101. Siemiatycki J. Debater on the proposition that research is a top priority in occupational cancer prevention. Preventive Oncology Seminar, Cancer Care Ontario, Toronto, April 2001.

102. Rachet B, Siemiatycki J, Abrahamowicz M, Leffondre K. Various aspects of smoking behavior on lung cancer risk: a flexible modeling approach. National Cancer Institute, Bethesda, May 2001.

103. Siemiatycki J. Challenges to epidemiology and challenges to Canadian epidemiologists. National Student Conference of Epidemiology, Toronto, June, 2001.

104. Siemiatycki J. President's address. Congress of Epidemiology, Toronto, June, 2001.

105. Siemiatycki J. Découvrir les cancérigènes dans l'environnement: bilan des activités de recherche passées et perspectives d'avenir. Département de médecine sociale et préventive, Université de Montréal, October 2001.

106. Siemiatycki J. Risque de cancer chez les femmes résidantes des villes des mines d'amiante québécoises: Évaluation du risque attribuable à des « faibles » niveaux d'expositions et validation de la méthode d'évaluation de risque (« risk assessment ») du E.P.A. Département de santé environnementale, Université de Montréal, October 2001.

107. Rachet B, Siemiatycki J, Leffondre K, Abrahamowicz M. Relations dose-réponse entre la fumée de cigarette et le cancer pulmonaire à partir d'une étude cas-témoins à Montréal : Estimations utilisant une modélisation flexible. Congrès INRS-Institut Armand-Frappier, Sainte-Adèle, Quebec, November 2001.

108. Siemiatycki J, Camus M, Case B, Desy M, Parent, M.-É. Risque de cancer chez les résidantes des villes de l'amiante au Québec: Évaluation du risque attribuable à des « faibles » niveaux d'expositions et validation de la méthode d'évaluation de risque de l'E.P.A. Symposium sur l'amiante d'Institut national de santé publique du Québec, Montréal, December 2001.

109. Laplante O, Parent M.-É, Siemiatycki J. Risque de mésothéliome et de cancer du poumon associé à l'exposition professionnelle aux fibres d'amiante, Montréal 1979-85. Symposium de l'Institut national de santé publique du Québec, Montréal, December 2001.

110. Siemiatycki J. Occupational causes of cancer: overview of the contribution of a study in Montréal, Research Day at Dept of Epidemiology and Community Medicine, University of Ottawa, April 2002.

111. Siemiatycki J. Biostatistical problems in epidemiologic case-control studies. Statistical Society of Canada, Hamilton, Ontario, May 2002.

112. Leffondre K, Abrahamowicz M, Siemiatycki J. Definition of risk sets for Cox's analysis of case-control data with time-varying exposures: A simulation study. Intended Society for Clinical Biostatistics (ISCB). Dijon, France, September 2002.

113. Siemiatycki J. Occupational causes of cancer. CCERN and Health Canada Research Workshop, Montebello, Quebec. October 2002.

114. Siemiatycki J. Occupational causes of cancer. Departmental seminar, McGill University, Montréal. November 2002.

115. Siemiatycki J. Facteurs environnementaux dans l'étiologie du cancer. Retraite annuelle du centre de recherche du CHUM, St-Sauveur, Quebec. November 2002.

116. Siemiatycki J. Environmental and occupational causes of cancer. Seminar. Cancer Care Ontario, Toronto, February 2003.

117. Siemiatycki J. The state of epidemiology in Canada. Plenary address. CSEB Student Congress, Halifax, Nova Scotia, June 2003.

118. Siemiatycki J. Occupational cancer epidemiology: the evolving big picture. Distinguished Scientist Lecture, Division of Cancer Epidemiology and Genetics, National Cancer Institute, Rockville MD, October 2003.

119. Siemiatycki J. Challenges in cancer epidemiology. Meeting of the Institute Advisory Board of Institute for Cancer Research, CIHR, Montréal, June 2004.

120. Siemiatycki J. Keynote address. Occupation and cancer. International Association of Cancer Registries, Beijing, September 2004.

121. Siemiatycki J. Which cancers are most important, what are the associated occupational situations and which confounders are involved? Burden of Cancer Epidemiologic Workshops, Health and Safety Executive. Manchester, UK, November 2004.

122. Siemiatycki J. Occupational causes of cancer. New Strategies for Recognizing and Preventing Occupational Disease, Canadian Center for Occupational Health and Safety, Toronto, March 2005.

123. Siemiatycki J. Occupational causes of cancer. The Respiratory Epidemiology & Clinical Research Unit, Montréal Chest Institute, Montréal, March 2005.

124. Siemiatycki J. Environnement et cancer : quels sont les risques? Les Belles Soirées public lecture series, Université de Montréal, Montréal, April 2005.

125. Siemiatycki J. An overview of environmental, occupational & lifestyle causes of lung cancer. Cancer Axis, McGill University Hospital Centre Research Institute, Montréal, June 2005.

126. Siemiatycki J. Les règles des comités d'éthique vont amputer notre capacité de prévenir des maladies et sauver des vies. Réunion de FRSQ sur les banques de données et des matières biologiques, Montréal, June 2005.

127. Siemiatycki J. Introductory comments. Joint Meeting of the Canadian Society for Epidemiology and Biostatistics and the Society for Epidemiologic Research, Toronto, June 2005.

128. Siemiatycki J. The burden of occupational cancer on workers and on society. Joint Meeting of the Canadian Society for Epidemiology and Biostatistics and the Society for Epidemiologic Research, Toronto, June 2005.

129. Siemiatycki J. Revue des expositions professionnelles associées au cancer (Review of occupational exposures associated with cancer): pre-conference training session. Environnement et santé. Congrès international de l'Association des Épidémiologistes de Langue Française (ADELF), City of Québec, Quebec, September 2005.

130. Siemiatycki J. Opening session. Environnement et santé. Congrès international de l'Association des Épidémiologistes de Langue Française (ADELF), City of Québec, Quebec, September 2005.

131. Siemiatycki J. Impact de l'environnement et du milieu de travail sur le cancer : connaissances récentes. 9es Journées annuelles de santé publique (JASP), City of Québec, Quebec, November 2005.

132. Siemiatycki J. La recherche épidémiologique sur le cancer. Canadian Cancer Society - 2005 Annual Conference, City of Québec, Quebec, November 2005.

133. Siemiatycki J. Occupational EMF exposure and risk of cancer – methodological considerations. Workshop on the Future Needs of Electro-magnetic Fields Occupational Studies in the Electric Utility Industry, Edinburgh, September 2006.

134. Siemiatycki J. What is known about the modifiable causes of cancer and why we will not learn much more: Reflections on the decline of epidemiology as a tool to elucidate disease etiology. Department of Epidemiology, Biostatistics & Occupational Health, McGill University, Montréal, October 2006.

135. Siemiatycki J. Keynote Speaker. Environmental causes of cancer. 28th Annual Meeting of the International Association of Cancer Registries, Goiania, Brazil, November 2006.

136. Parent M.-E, Rousseau M.-C, Siemiatycki J, Boffetta P, Cohen A. Using the workplace as a window to study the role of diesen and gasoline engine emissions in lung cancer developpement. Invited abstract submitted to the Eleventh International Congress of Toxicology, Montréal, Quebec, July 2007.

137. Siemiatycki J. Keynote Speaker. The future of occupational epidemiology? 19th International Conference on Epidemiology in Occupational Health (EPICOH 2007), Banff, October 2007. Occup. Environ. Med. 2007 Dec; 64:46.

138. Siemiatycki J. Relationship between environmental risks and health of seniors. Workshop on Seniors' Health and the environment. Health Canada, Ottawa, February 2008.

139. Siemiatycki J. Freedom of research - is it threatening or threatened? Conference of Institutional Review Boards of Quebec, (4e Journées d'étude des CER), City of Québec, Quebec, October 2008.

140. Siemiatycki J. Cancer and Environment – Annual University of Montréal Medical Faculty Assembly, Montréal, December 2008.

141. Siemiatycki J. Impact de l'environnement et du milieu de travail sur les risques de cancer : méthodologie de recherche et résultats. Conférence en santé publique, Université Laval, May 2009.

142. Siemiatycki J. CIHR and Epidemiologic Research. CSEB, Ottawa, May 2009.

143. Siemiatycki J. Mode de vie, milieu de vie: les causes modifiables du cancer. (Lifestyles and environment: modifiable causes of cancer). Keynote address. Conference nationale pour vaincre le cancer, Montréal April 2010.

144. Siemiatycki J. Montréal case-control studies on occupation and cancer. Presentation for II International Course on occupational cancer. Instituto Nacional de Cancerologia, Bogota, Colombia, August 2010.

145. Siemiatycki J. Modifiable causes of cancer and estimates of attributable fractions. Presentation for II International Course on occupational cancer, Instituto Nacional de Cancerologia, Bogota, Colombia, August 2010.

146. Siemiatycki J. Asbestos and cancer in Quebec: a presentation of studies in three populations. Presentation for II International Course on occupational cancer. Instituto Nacional de Cancerologia, Bogota, Colombia, August 2010.

147. Siemiatycki J. An overview of recognized environmental and lifestyle causes of cancer, and their contribution to the overall burden of cancer. International Congress of Pathophysiology, Montréal, September 2010.

148. Siemiatycki J. Les causes modifiables du cancer (Lifestyles and environment: modifiable causes of cancer). Conference annuelle de la Société du cancer du Canada, division Québec, November 2010.

149. Siemiatiycki J. Alison McDonald's research on the impact of Medicare in Québec. Department of Epidemiology and Biostatistics, McGill University, Montréal, Quebec, May 2011.

150. Siemiatycki J. An overview of environmental causes of cancer. Special Symposium to honour Nobel Prize winner CRCHUM, Montréal, Quebec, June 2011.

151. Siemiatycki J. Review of IARC evaluation on cellphones and cancer. Congress of Epidemiology, Montréal, Quebec, June 2011.

152. Siemiatycki J. L'évidence concernant les risques de cancer liés à l'utilisation du téléphone cellulaire. Institut national de santé publique du Québec, October 2011.

153. Siemiatycki J. Do cellphones cause brain cancer? Canadian Cancer Research Conference, Toronto, November 2011.

154. Siemiatycki J. Do cellphones cause brain cancer? Canadian Center for Architecture. Public science lecture series, Montréal, Quebec, January 2012.

155. Siemiatycki J. Do cellphones cause brain cancer? McGill University Department of Epidemiology lecture series, Montréal, Quebec, March 2012.

156. Siemiatycki J. L'environnement et le risque de cancer. Table ronde. Conference annuelle de la Coalition Cancer, Montréal, Quebec, March 2012.

157. Siemiatycki J. An Overview of Modifiable Risk Factors for Cancer. CHUM Department of Medicine, Montréal, Quebec, March 2012.

158. Siemiatycki J. Do cell phones cause brain cancer? The epidemiologic evidence. Grand Rounds, St-Mary's Hospital, Montréal, Quebec, September 2012.

159. Siemiatycki J. The epidemiology of cell phones and brain cancer. Centre hospitalier universitaire Vaudois, Lausanne, Suisse, October 2012

160. Siemiatycki J. Occupational causes of cancer. Annual meeting of Occupational & Environmental Medical Association of Canada, Montréal, Quebec, September 2013.

161. Siemiatycki J. Fraction of lung cancer that is legally attributable to smoking: a novel parameter. ISPED, Bordeaux, France, November 2013.

162.  Siemiatycki J. Some challenges in environmental cancer research. Boston University School of Public Health, Boston, Massachusetts, February 2014.

163.  Siemiatycki J. Les causes modifiables du cancer: le cancer peut être évité. Symposium de La Fondation Sauve Ta Peau, Montréal, Quebec, September 2014.

164.  Siemiatycki J. Using epidemiologic research to combat the tobacco industry. BIPS, Bremen, Germany, September 2015.

165.  Siemiatycki J. Insights into the use of epidemiologic data in a class action lawsuit against the tobacco industry. CRCHUM division seminar, Montréal, Quebec, September 2015.

166.  Siemiatycki J. Development of a methodology to estimate legally attributable fraction of lung cancer attributable to cigarette smoking. McGill Univ Dept of Epidemiology, Montréal, Quebec, October 2015.

167.  Siemiatycki J. Using epidemiologic research to combat the tobacco industry. SIRIC-BRIO Cancer Centre. Bordeaux, France, November 2015.

168.  Siemiatycki J. Do cell phones cause brain cancer? The epidemiologic evidence. Dept of Medicine, CHUM, Montréal, Québec, November 2015.

169.  Siemiatycki J. Occupation and cancer. Conference for the 50th Anniversary of IARC, Lyon, June 2016.

170.  Siemiatycki J. Contribution of epidemiology to knowledge on occupational risk factors for cancer. 34e Congrès national de Médecine et Santé au Travail, Paris, France, June 2016.

171.  Siemiatycki J. The influence of JC McDonald on the evolution of epidemiology in Canada. Symposium in honour of JC McDonald. McGill Univ., Montréal, Quebec, May 2017.

172.  Siemiatycki J. A survey of knowledge on occupational causes of cancer. Keynote address. International Association of Cancer Registries, Utrecht, Netherlands, October 2017.

173.  Siemiatycki J. La preuve statistique au tribunal : recours collectif en situation d'incertitude. Café-statistique de la Société de statisticiens français de la région parisienne, Paris, France, May 2018.

## SCIENTIFIC PRESENTATIONS - OFFERED AND ACCEPTED

1.  Siemiatycki J. Comparison of mail, telephone and home interview methods for health surveys. International Epidemiologic Association Meeting. Puerto Rico. August 1977.

2.  Siemiatycki J, Day NE, Fabry J, Cooper, JA. Identification d'agents cancérigènes dans le milieu de travail: un nouveau système épidémiologique de monitoring. Deuxième conférence internationale sur la science des systèmes dans le domaine de la santé. Montréal, July 1980.

3.  Siemiatycki J, Richardson L, Pless B. Equality in Medical Care under National Health Insurance in Montréal. Deuxième conférence internationale sur la science des systèmes dans le domaine de la santé. Montréal, July 1980.

4.  Siemiatycki J. Discovering occupational carcinogens. International Symposium on Chemical Mutagenisis, Human Population Monitoring and Genetic Risk Assessment. Ottawa. October 1980.

5.  Siemiatycki J, Richardson L, Gerin M. Discovering occupational carcinogens by a substance-based case-control approach-fieldwork considerations. International Epidemiologic Association Meeting. Edinburgh. August 1981.

6.  Siemiatycki J, Colle E, West R, Belmonte M. Space-time clustering of juvenile-onset diabetes in Montréal. International Epidemiologic Association Meeting. Edinburgh. August 1981.

7.  Siemiatycki J, Gerin M, Richardson L. Discovering occupational carcinogens by an exposure-based case-control approach: exposure assessment aspects. Second International Symposium on Epidemiology in Occupational Health. Montréal, August 1982.

8.  Siemiatycki J, Gerin M, Lakhani R, Dewar R, Pellerin J, Richardson L. Nickel and ancer associations from a multicancer occupation exposure case-referent study. Symposium on Nickel in the Environment. Lyon, March 1983.

9.  Gerin M, Siemiatycki J. La traduction des histoires professionnelles en histoires d'expositions chimiques: un défi pour l'hygiéniste du travail. Congrès de l'Association pour l'hygiène industrielle du Québec. Quebec, May 1983.

10.  Siemiatycki J, Colle E, Campbell S, Belmonte M. Preliminary analysis of a case-control study of Type I diabetes mellitus. Baltimore, June 1985.

11.   Siemiatycki J, Richardson L, Gerin M, Goldberg M, Dewar R. Associations between nine sites of cancer and nine organic dusts: results from a hypothesis-generating case-control study in Montréal. Society for Epidemiologic Research. Chapel Hill, North Carolina, June 1985.

12.   Richardson L, Siemiatycki J, Gerin M, Goldberg, M, Dewar R, Desy M, Campbell S, Wacholder S. Associations between several sites of cancer and nine organic dusts: results from a case-control study. Fourth International Symposium on Epidemiology in Occupational Health. Como, Italy, September 1985.

13.   Richardson L, Siemiatycki J. Case-control study methods: when to interview subjects and non-response bias. Fourth International Symposium on Epidemiology in Occupational Health. Como, Italy, September 1985.

14.   Soskolne C, Jhangri G, Checkoway, Risch H, Siemiatycki J, et al.  Sulphuric acid exposure in laryngeal cancer: induction and latency estimates from a lagged exposure window analysis.  XII Scientific Meeting of the International Epidemiology Assoc. Los Angeles, August, 1990.

15.   Payment P, Richardson L, Edwardes M, Franco E, Siemiatycki J. (1989). Gastrointestinal illness and drinking water: a prospective epidemiological study. 57th Conjoint Meeting on Infectious Diseases (CACMID), Montréal, 25-29 November 1989, Résumé C-30.

16.   Payment P, Richardson L, Edwardes M, Franco E, Siemiatycki J. (1990). Drinking water related gastrointestinal illnesses. 1990 Annual Meeting of the American Society for Microbiology, Anaheim California, 13-17 May 1990.

17.   Payment P, Richardson L, Edwardes M, Franco E, Siemiatycki J. (1990). A prospective epidemiological study of drinking water related gastrointestinal illnesses. International Association on water Pollution Research and Control, Health Related Water Microbiology Group, Tubingen, West Germany, 1-6 April 1990.

18.   Case BA, Dufresne A, Siemiatycki J, Fraser R. Decoding occupational history from total lung particulate analysis. II: A comparative study. Brit. Occ. Hyg. Soc.; Seventh International Symposium on Inhaled Particles, Edinburgh, September 1991, S4.5.

19.   Suarez-Almazor M, Soskolne C, Fung K, Jhangri G, Burch D, Howe G, Miller A, Siemiatycki J, Lakhani R, Dewar R. Choice of summary worklife exposure measures in the estimation of risk: an empirical assessment. Canadian Epidemiology Symposium. Edmonton. May. 1991.

20.   Siemiatycki J, Nadon L, Dewar R. Cancer risks due to occupational exposure to polycyclic aromatic hydrocarbons. 8th International Symposium on Epidemiology in Occupational Health, Paris, France, September 1991.

21.   Bourbonnais R, Siemiatycki J. Socioeconomic variables and cancer risk. Canadian Society for Epidemiology and Biostatistics. Edmonton, May 1991.

22.   Gerin M, Begin D, Siemiatycki J, Dewar R. Study on the validity of the NOES job-exposure matrix using industrial hygiene measurements obtained in Montréal. Conference on Retrospective Assessment of Occupational Exposure. IARC Lyon. April 1994.

23.   *Camus M, Siemiatycki J. Estimating past asbestos fiber levels in the general population of asbestos mining towns in Quebec. International Society Environmental Epidemiology, Research Triangle Park, N.C. Sept. 1994.

24.   Goldberg MS, Dewar R, Siemiatycki J. Confounding and other design issues in cancer incidence studies of hazardous waste sites. Canadian Society for Epidemiology and Biostatistics. St-John's, Newfoundland, Aug 1995.

25.   Goldberg MS, Dewar R, Siemiatycki J. Confounding and other design issues in cancer incidence studies of hazardous waste sites. International Society for Environmental Epideemiology. Noordwijkerhout, Netherlands, Aug, 1995.

26.   Case BW, Camus M, Siemiatycki J. Trends in Pathologic Diagnosis of Malignant Mesothelioma among Quebec Women 1970-1990. Royal College of Medicine. Montréal. Sept. 1995.

27.   Aronson KJ, Siemiatycki J. Dewar R, Gerin M. Occupational Risk Factors for Prostate Cancer. Canadian Society for Epidemiology and Biostatistics, St-John's, Newfoundland, Aug 1995.

28.   *Camus M, Siemiatycki J. The Estimation of Past Asbestos Fiber Levels in Quebec Asbestos Mining Towns from 1900 to 1984. Canadian Society for Epidemiology & Biostatistics, St-John's, Newfoundland, Aug 1995.

29. \*Camus M, Siemiatycki J, Dewar R. Non-Occupational Asbestos Exposure and Risk of lung Cancer in the Female Population of Asbestos-Mining Towns: Implications for Risk Assessments. Canadian Society for Epidemiology and Biostatistics Meeting, St-John's, Newfoundland, Aug 1995.

30. Payment P, Franco E, Siemiatycki J, Richardson L, Renaud G, Prevost M. Epidemiology studies of tap-water related gastrointestinal illnesses. Water Quality Technology Conference, New Orleans, Nov. 1995.

31. \*Fritschi L, Siemiatycki J. Self-assessed versus expert-assessed occupational exposures. Canadian Society for Epidemiology and Biostatistics Meeting, St Johns, Newfoundland, Aug 1995.

32. Payment P, Siemiatycki J, Richardson L, Renaud G. Épidémiologie des maladies gastro-intestinales et respiratoires: incidence, fraction attribuable à l'eau et coûts pour la société. ACFAS, Montréal, May 1996.

33. \*Fritschi L, Parent M-É, Siemiatycki J. Gastric cancer and occupation. Australasian Epidemiological Association, Victoria, Australia. July 1996.

34. \*Camus M, Case BW, Siemiatycki J. Risk assessment for women living in chrysotile mining towns.1: Environmental exposure assessment. Fourth International Mesothelioma Conference, Philadelphia, May 1997.

35. Case BW, Camus M, Siemiatycki J. Risk assessment for women living in chrysotile mining towns.2: Mesothelioma: observed vs. predicted. Fourth International Mesothelioma Conference, Philadelphia, May 1997.

36. \*Camus M, Siemiatycki J. Cancer risks due to non-occupational asbestos exposure. Can. Soc. for Epidemiol. & Biostat. London, Ontario, May 1997.

37. Weston TL, Aronson KJ, Howe GR, Nadon L, Siemiatycki J. Cancer mortality risk in a cohort of working men. Canadian Society for Epidemiology and Biostatistics, London, Ontario, May 1997.

38. \*Parent M-É, Siemiatycki J, Menzies L, Fritschi L, Colle E. Can Bacille-Calmette Guérin vaccination prevent insulin-dependent diabetes mellitus (IDDM)? Canadian Society for Epidemiology and Biostatistics, London, Ontario, May 1997.

39. Wolf, S, Siemiatycki J, Beyersmann, D, Jockel, K. H. A case-control study of lung cancer - performance of a job-exposure matrix for cadmium, chromium, nickel, and stainless steel dust. Internat. Epidemiol. Assoc. European Region Meeting. Munster, Germany, Sept. 1997.

40. \*Parent, M.E. Siemiatycki J. Exposition professionnelle aux émissions d'essence et de diesel, et cancer du poumon. ACFAS, Quebec, May 1998.

41. \*Parent M-É, Siemiatycki J, Boffetta P. Occupational exposure to gasoline and diesel engine emissions and lung cancer. Soc. Epid. Res, Chicago, June 1998.

42. \*Parent M-É, Siemiatycki J, Boffetta P, Cohen A. Occupational exposure to gasoline and diesel exhausts and lung cancer. Inter. Soc. Environ. Epid, Boston, August 1998.

43. \*Parent M-É, Siemiatycki J, Boffetta P, Cohen A. Gasoline and diesel engine emissions in the workplace and lung cancer. PREMUS-ISEOH '98, Helsinki, Finland, Sept. 1998.

44. Leffondre K, Abrahamowicz M, Rachet B, Siemiatycki J. Modeling smoking history: A comparison of different approaches. Congress of Epidemiology, Toronto, June 2001.

45. Fritschi L, Nadon L, Benke G, Lakhani R, Latreille B, Parent M-É, Siemiatycki J. Validation of expert assessment of occupational exposures X2001 – Occupational Exposure Assessment for Epidemiology and Practice, Gothenburg, Sweden, June 2001.

46. Parent M-É, Siemiatycki J, Desy M. Case-control study of occupational exposures and risk of prostate cancer among farmers. Case-control study of occupational exposures and risk of prostate cancer among farmers, Toronto, June 2001.

47. Siemiatycki J, Camus M, Parent M-É, Richardson L, Desy M, Case BW. Case-control study of pleural mesothelioma among women in Quebec chrysotile mining regions. Inhaled Particles IX (BOHS), Cambridge, United Kingdom, September 2001.

48. Jockel K-H, Wolf S, Ahrens W, Jahn I, Pohlabeln H, Beyersmann D, Siemiatycki J. Cadmium as a human lung carcinogen. Jahrestagung der Deutschen Arbeitsgemeinschaft fur Epidemiologie (DAE) [Annual convention of the German epidemiology working group], Garmisch-Partenkirchen, Germany, September 2001.

49.   Leffondre K, Abrahamowicz M, Siemiatycki J. Comparison of Cox's model versus logistic regression for case-control data with time-varying exposure: a simulation study. Annual Meeting of the Statistical Society of Canada (SSC). Hamilton, Ontario. May 2002.

50.   Parent M-É, Siemiatycki J, Desy M. Association between Alcohol Consumption and Each of 23 Types of Cancer in Men. Soc. Epid. Res, Palm Desert, California, June 2002.

51.   Leffondre K, Abrahamowicz M, Siemiatycki J. Comparison of Cox's model versus logistic regression for case-control data with time-varying exposure: a simulation study. Society for Epidemiologic Research (SER), Palm Desert, California, June 2002.

52.   Rachet B, Parent M-É, Siemiatycki J. Welding Fumes and Lung Cancer: A Case-Control Study, Soc. Epidemiol. Res, Palm Desert, California, June 2002.

53.   Rachet B, Abrahamowicz M, Sasco A, Siemiatycki J. Flexible estimation of the distribution of lag in the effects of exposures and interventions. 34th Annual SER Meeting. Palm Desert, California. June 2002.

54.   Abrahamowicz M, Mackenzie T, Leffondre K, Du Berger R, Siemiatycki J. Joint modeling of time-dependent and non-linear effects of continuous predictors in survival analysis, with application to re-assess the impact of intensity of past smoking on the risks of lung cancer in ex-smokers. 17th International Workshop on Statistical Modeling, Chania, Greece, July 2002.

55.   Parent M-É, Siemiatycki J, Desy M. Exposure to chemical agents during leisure activities and risk of non-Hodgkin's lymphoma. Inter. Epidemiology Association, Montréal, August 2002.

56.   Leffondre K, Abrahamowicz M, Siemiatycki J. Comparison of Cox's model versus logistic regression for case-control data with time-varying exposure: a simulation study. International Epidemiological Association (IEA), World Congress of Epidemiology, Montréal, Québec, August 2002

57.   Rachet B, Siemiatycki J, Leffondre K, Abrahamowicz M. Exposure-response relationships between cigarette smoking and male lung cancer from a case-control study in Montréal: generalized additive model approach. International Epidemiology Association (IEA) XVI World Congress of Epidemiology. Montréal, Québec. August 2002.

58.   Parent M-É, Rousseau M-C, Siemiatycki J, Desy M. Body mass index and male cancer incidence at twelve different sites. Body mass index and male cancer incidence at twelve different sites. Halifax, Nova Scotia, June 2003.

59.   Desautels N, Siemiatycki J, Parent M.E. Association between lifetime consumption of coffee, tea, and soft drinks, and incidence of eleven types of cancer: a case-control study. CSEB 2003 Biennial Meeting. Halifax, Nova Scotia, June 2003.

60.   Parent M-É, Siemiatycki J, Desy M. Association between beta-carotene intake and risk of cancer at several sites. Society for Epidemiologic Research, Atlanta, Georgia, June 2003.

61.   Parent M-É, Siemiatycki J, Laplante O, Desy M. Risk of lung cancer and mesothelioma associated with occupational exposure to Asbestos: A population-based case-control study in Montréal, Canada. International Society for Environmental Epidemiology, Perth, Australia, September 2003.

62.   Parent M-É, Siemiatycki J, Laplante O, Désy M. Occupational exposure to asbestos and risk of lung cancer and mesothelioma: results from a population-based-case-control study in Montréal. CARWH Conference. Montréal, Québec, October 2003.

63.   Parent M-É, Siemiatycki J, Latreille B, Désy M. Lifetime Occupational Physical Activity and Prostate Cancer Risk. Society for Epidemiologic Research. Salt Lake City, Utah, June 2004.

64.   Parent M-É, Rousseau M.C, Siemiatycki J, Boffetta P, Cohen A. Contrasting evidence when using hospital or population controls: the example of the association between exposure to gasoline and diesel exhaust, and lung cancer. 16th conference of the International Society for Environmental Epidemiology (ISEE). New York City, August 2004.

65.   De Guire L, Lebel G, Gingras S, Levesque B, Camus M, Provencher S, Case B, Langlois A, Laplante O, Siemiatycki J, Lajoie P. Epidemiology of Asbestos-related diseases in Québec, Canada. EPICOH 2004. Melbourne, Australia, October 2004.

66.   Richardson H, Aronson K, Parent M-É, Siemiatycki J. Risk of cancer due to occupational exposure to six types of chlorinated hydrocarbons. EPICOH, Melbourne, Australia, October 2004.

67. De Guire L, Lebel G, Gingras S, Levesque B, Camus M, Provencher S, Case B, Langlois A, Laplante O, Siemiatycki J, Lajoie P. Épidémiologie des maladies reliées à l'exposition à l'amiante au Québec. Board Meeting, Canadian Association of University Teachers. Ottawa, November 2004.

68. Rousseau M-C, Parent M-É, Siemiatycki J. Occupational exposure to lead and risk of cancer in a population-based case-control study from Montréal, Canada. Canadian Association for Research on Work and Health, Vancouver, May 2005.

69. Parent M-É, Rousseau M-C, Siemiatycki J, Desy, M. Using proxy respondents when assessing occupational circumstances in a case-control study of cancer: For better or for worse? Canadian Association for Research on Work and Health, Vancouver, May 2005.

70. *Momoli F, Siemiatycki J, Parent M-É, Abrahamowicz M. Semi-Bayes modeling in a study of lung cancer and multiple occupational chemicals: Comparison of results for five suspected lung carcinogens. Canadian Association for Research on Work and Health, Vancouver, May 2005.

71. *Momoli F, Siemiatycki J, Parent M-É, Abrahamowicz M. Semi-Bayes models: An empirical comparison of modeling approaches in a study of lung cancer and occupational chemicals. Joint Meeting of the Canadian Society for Epidemiology and Biostatistics and the Society for Epidemiologic Research, Toronto, June 2005.

72. Rousseau M-C, Camus M, Case B, Siemiatycki J. Incidence of pleural mesothelioma among women in Québec, 1970-1989: A comparison between asbestos mining and non-mining areas. Joint Meeting of the Canadian Society for Epidemiology and Biostatistics and the Society for Epidemiologic Research, Toronto, June 2005.

73. Leffondre K, Abrahamowicz M, Siemiatycki J. Modeling smoking history using an overall indicator of exposure. Joint Meeting of the Canadian Society for Epidemiology and Biostatistics and the Society for Epidemiologic Research, Toronto, June 2005.

74. Parent M-É, Siemiatycki J, Latreille B, Desy M. Is occupational physical activity associated with cancer risk among men? Joint Meeting of the Canadian Society for Epidemiology and Biostatistics and the Society for Epidemiologic Research, Toronto, June 2005.

75. *Ramanakumar AV, Parent M-É, Menzies R, Camus M, Siemiatycki J. Previous history of lung disease and risk of lung cancer in Montréal. Joint Meeting of the Canadian Society for Epidemiology and Biostatistics and the Society for Epidemiologic Research, Toronto, June 2005.

76. *Benedetti A, Parent M-É, Siemiatycki J. Alcohol consumption and lung cancer risk in two case-control studies in Montréal, Canada. Joint Meeting of the Canadian Society for Epidemiology and Biostatistics and the Society for Epidemiologic Research, Toronto, June 2005.

77. Leffondre K, Abrahamowicz M, Siemiatycki J. Modeling smoking history using an overall indicator of exposure. 26th Annual Conference of the International Society for Clinical Biostatistics (ISCB), Szeged, Hungary, August 2005.

78. Rousseau M.-C, Parent M-É, Siemiatycki J. Exposition professionnelle au plomb et risque de cancer : Étude de cas-témoin basée sur la population de Montréal, Qc. Environnement et santé : Congrès international de l'Association des épidémiologistes de langue française (ADELF), Québec, September 2005.

79. *Ramanakumar AV, Parent M-É, Siemiatycki J. Residential fuel exposures and risk factors for lung cancer: Evidence from two population-based case-control studies in Montréal. Spring Colloquium: Environmental Health Research Network (RRSE), Montréal, May 2006.

80. Sharek M, Rousseau M-C, Siemiatycki J, Parent M-É. Antioxydants et prévention du cancer du poumon : où en sommes-nous? Spring Colloquium: Environmental Health Research Network (RRSE), Montréal, May 2006.

81. Parent M-É, Shareck M, Désy M, Rousseau M-C, Siemiatycki J. Night Work and Risk of Prostate and Colon Cancers. Second North American Congress of Epidemiology, Seattle, June 2006.

82. Rousseau M-C, Parent M-É, Siemiatycki J. Exposure to lead compounds, occupation, and risk of cancer. Second North American Congress of Epidemiology, Seattle, June 2006.

83. *Ramanakumar AV, Parent M-É, Siemiatycki J. Risk of lung cancer from traditional heating and cooking fuels in Montréal. 2006 American Association for Cancer Research (AACR) International Conference on Frontiers in Cancer Prevention Research, Boston, November 2006.

84.   Shareck M, Rousseau M-C, Siemiatycki J, Parent M-E. Antioxydants et prévention du cancer du poumon: où en sommes-nous? Second Conference of the Association des étudiantes et étudiants en Santé Publique de l'Université de Montréal, Montréal, February 2007.

85.   *Liu A, Abrahamowicz M, Siemiatycki J. Selected Methodological Issues in Testing and Estimating Sex Interactions with Multi-dimensional Exposures: a Simulation Study. 3rd Annual GENESIS (Gender and Sex Determinants of Cardio-vascular Disease: From Bench to Beyond) Montréal Meeting, Montréal, March 8-9, 2007.

86.   *Ramanakumar AV, Parent M-É, Siemiatycki J. Exposure to painting-related occupations and risk of lung cancer: results from two case-control studies in Montréal. Oral presentation, Canadian Society for Epidemiology and Biostatistics, Calgary, May 2007.

87.   Parent M-É, Rousseau M-C, Pintos J, Nicolau B, Désy M, Siemiatycki J. Are men reporting a history of anxiety, depression or insomnia at increased risk of cancer? Annual Meeting of the Canadian Society for Epidemiology and Biostatistics, Calgary, May 2007.

88.   *Pintos J, Parent M-É, Rousseau M-C, Siemiatycki J. Risk of mesothelioma associated with occupational exposure to asbestos: Evidence from two case-control studies in Montréal, Canada. Annual Meeting of the Canadian Society for Epidemiology and Biostatistics, Calgary, May 2007.

89.   Shareck M, Rousseau M-C, Siemiatycki J, Parent M-É. Dietary antioxidants intake and risk of lung cancer: A population-based case-control study. Poster presentation, 2007 CSEB Student Conference, Calgary, Alberta, May 2007.

90.   Shareck M, Rousseau M-C, Siemiatycki J, Parent M-É. Dietary antioxidants intake and risk of lung cancer: a population-based case-control study. Poster presentation, Spring 2007 Conference of the Environmental Health Research Network (RRSE-FRSQ), Montréal, May, 2007.

91.   Parent M-É, Rousseau M-C, Pintos J, Nicolau B, Désy M, Siemiatycki J. Is there a link between stress at work and cancer risk? Annual Meeting of the Society for Epidemiologic Research, Boston, June 2007. American Journal of Epidemiology 2007;165(11)Suppl:S3.

92.   Nicolau B, Parent M-É, Rousseau M-C, Désy M Siemiatycki J. Childhood socioeconomic position in relation to cancer: evidence from a Canadian population based case-control study. Annual Meeting of the Society for Epidemiologic Research, Boston, June 2007. American Journal of Epidemiology 2007;165(11)Suppl:S77.

93.   *Pintos J, Parent M-É, Rousseau M-C, Siemiatycki J. Occupational Exposure to Asbestos and Man-Made Vitreous Fibers, and Risk of Lung Cancer: evidence from two case-control studies in Montréal, Canada. Annual Meeting of the Society for Epidemiologic Research, Boston, June 2007. American Journal of Epidemiology 2007; 165(11) Suppl: S102.

94.   Rousseau M-C, Parent M-É, Desy M, Siemiatycki J. History of allergic disease and risk of cancer. Annual Meeting of the Society for Epidemiologic Research, Boston, June 2007. American Journal of Epidemiology 2007;165(11)Suppl:S100.

95.   *Momoli F, Parent M-É, Abrahamowicz M, Nadon L, Lakhani, Latreille B, Krewski D, Siemiatycki J. Lung cancer risk from selected occupational chemicals. Annual Meeting of the Society for Epidemiologic Research, Boston, June 2007. American Journal of Epidemiology 2007; 165(11)Suppl:S102.

96.   *Momoli F, Parent M-É, Abrahamowicz M, Nadon L, Lakhani, Latreille B, Krewski D, Siemiatycki J. Lung cancer risk from selected occupational chemicals. Annual Meeting of the Society for Epidemiologic Research, Boston, June 2007. American Journal of Epidemiology 2007; 165(11) Suppl: S102.

97.   *Liu A, Abrahamowicz M, Siemiatycki J. Testing and estimating interactions with multi-dimensional exposures: A simulation study. 28th Annual Conference of the International Society for Clinical Biostatistics, Alexandroupolis, Greece, July-August 2007.

98.   Parent M-E, Rousseau M-C, Siemiatycki J, Goldberg M, Aprikian F, Saad F, Karakiewicz P. Main determinants of response rates in a large population-based case-control study of environmental, lifestyle and genetic factors, and prostate cancer in Montréal, Canada. Making Connections: A Canadian Cancer Research Conference, Toronto, November 15-17, 2007.

99.   *Liu A, Abrahamowicz M, Siemiatycki J. Testing and estimating interactions with multi-dimensional exposures: A simulation study. 10e Congrès annuel des étudiants, stagiaires et résidents du centre de recherche du CHUM. Montréal, December 18, 2007.

100. Shareck M, Rousseau M-C, Siemiatycki J, Parent M-É. Fruit and vegetables, and risk of lung cancer, by smoking intensity. Society for Epidemiologic Research, Chicago, June 2008.

101. Parent M-É, Siemiatycki J, Goldberg M, Désy M. Birth weight, obesity during childhood, adolescence and adulthood, and prostate cancer - Preliminary data from the PROTEuS study. Society for Epidemiologic Research, Chicago, June 2008. American Journal of Epidemiology 2008 ; 167 (Suppl.): S62

102. Leffondré K, Wynant W, Cao Z, Siemiatycki J. A comprehensive smoking index to model smoking history in cancer studies. Society for Epidemiologic Research, Chicago, June 2008.

103. *Beveridge R, Pintos J, Parent M-É, Asselin J, Siemiatycki J. Risk of lung cancer after occupational exposure to cadmium, chromium VI, and nickel. Society for Epidemiologic Research, Chicago, June 2008.

104. *Liu A, Abrahamowicz M, Siemiatycki J. Methodological challenges in testing and estimating interactions with multi-dimensional exposures. Society for Epidemiologic Research, Chicago, June 2008.

105. Leffondré K, Wynant W, Cao Z, Abrahamowicz M, Siemiatycki J. A weighted Cox model for case-control data with time-dependent exposures. 29th Annual Conference of the International Society for Clinical Biostatistics, Copenhagen, August 17-21, 2008.

106. Koushik A, Parent M-É, Siemiatycki J. Characteristics of menstruation and pregnancy and the risk of lung cancer in women. 6th Annual American Association for Cancer Research, Frontiers in Cancer Prevention Research Meeting, Philadelphia, November 16-19 - 2008

107. Olsson A.C., Gustavsson P, Kromhout H, Siemiatycki J, et al. Pooled Analyses on Diesel Motor Exhaust and Lung Cancer in Europe and Canada. Poster presentation. 29th ICOH International Congress on Occupational Health, Cape Town, South Africa, March 2009.

108. Shareck M, Rousseau M-C, Siemiatycki J, Parent M-É. Dietary Intake of Antioxidants and Risk of Four Histological Subtypes of Lung Cancer: a Population Based Case-Control Study. Oral presentation at the Canadian Society for Epidemiology and Biostatistics (CSEB) and Association of Public Health Epidemiologists in Ontario (APHEO) Joint Conference, Ottawa, Ont. May 2009

109. Nkosi MT, Rousseau M-C, Parent M-É, Siemiatycki J. Comparison of indicators of financial situation in the context of an epidemioological study. Poster presentation at the Canadian Society for Epidemiology and Biostatistics (CSEB) and Association of Public Health Epidemiologists in Ontario (APHEO) Joint Conference, Ottawa Ont, May 2009.

110. Nkosi MT, Rousseau M-C, Parent M-É, Siemiatycki J. Studying socio-economic status and lung cancer risk; How important Is the modelling of smoking? Poster presentation at the Canadian Society for Epidemiology and Biostatistics (CSEB) Student Conference, Ottawa Ont, May 2009.

111. Rousseau M-C Parent M-E, Nicolau B, Koushik A, Siemiatycki J. Body mass index and lung cancer risk in a population-based case-control study from Montréal, Canada. Poster presentation at the 42nd Annual Meeting of the Society for Epidemiological Research (SER) Meeting Anaheim Ca, June 23-26 2009.

112. *Pintos J, Parent M-E, Siemiatycki J. Occupational exposure to diesel engine emissions and risk of lung cancer; evidence from case-control study in Montréal. Oral presentation. 42nd Annual Meeting of the Society for Epidemiologic Research Meeting (SER), Anaheim, June 23-26 2009.

113. *Perron S, Jacques L, Siemiatycki J, Ducharme F. Home multifaceted environmental interventions to improve asthma control: A systematic review. 137th Annual Meeting of the American Public Health Association (APHA), November 7-11 2009, Philadelphia, PA.

114. *Wynant W, Siemiatycki J, Parent M-E, Rousseau M-C. Exposition professionnelle au plomb et risque de cancer du poumon. Présentation orale, Congrès Armand Frappier, Bromont (Qc), Novembre 2009.

115. Kâ K, El-Zein M, Parent M-É, Siemiatycki J, St-Pierre Y, Rousseau M-C. Antécédent médical d'asthme ou d'eczéma et risque de cancer: une étude cas-témoins à base populationnelle. Présentation orale, Congrès Armand Frappier, Bromont (Qc), Novembre 2009.

116. Soskolne CL, Jhangri GS, Scott HM, Brenner DR, Siemiatycki J, Lakhani RA, Gérin M, Dewar R, Miller AB, Risch H. A population based case-control study of occupational exposure to acids and the risk of lung cancer: evidence for specificity with laryngeal cancer. Poster presentation at INSIGHTS'09, School of Public Health, University of Alberta, Edmonton, Alberta, November 12 2009.

117.  *Pintos J, Lavoué L, Van Tongeren M, Kauppinen T, Richardson L, Sleeuwenhoek A, Lakhani R, Cardis E, Siemiatycki J. Comparison of exposure estimates in FINJEM with expert-based assessments performed in Montréal. Part I: Exposure prevalence. Oral presentation. Epidemiology in Occupational Health (EPICOH), Taipei, April 2010.

118.  Lavoué J, Pintos J, Van Tongeren M, Kauppinen T, Richardson L, Sleeuwenhoek A, Lakhani R, Cardis E, Siemiatycki J. Comparison of exposure estimates in FINJEM with expert-based assessments performed in Montréal. Part II: Exposure levels. Oral presentation. Epidemiology in Occupational Health (EPICOH), Taipei, April 2010.

119.  *Christensen KY, Naidu A, Parent M-E, Pintos J, Siemiatycki J, Koushik A. The risk of lung cancer related to dietary intake of flavonoids. Annual Meeting of the Society for Epidemiologic Research (SER), Seattle, Washington, June 2010.

120.  *Wynant W, Siemiatycki J, Parent M-E, Rousseau M.C. Occupational exposure to lead compounds and lung cancer. SER, Seattle, June 2010.

121.  *Liu A, Abrahamowicz M,   Siemiatycki J. Methodological challenges in testing and estimating interactions with multi-dimensional exposures. Annual Meeting of the Society for Epidemiologic Research (SER), Seattle, June 2010.

122.  Rousseau M-C, Conus F, Parent M-É, Siemiatycki J. History of allergic diseases and risk of lung cancer. Poster présentation. Third North American Congress of Epidemiology, Montréal, June 2011. Am. J. Epidemiol. (2011) 173 (suppl 11):S29.

123.  Leffondré K, Wynant W, Cao Z, Siemiatycki J. A comprehensive smoking index to model smoking history in cancer studies. Poster présentation. Third North American Congress of Epidemiology, Montréal, June 2011. Am. J. Epidemiol. (2011) 173 (suppl 11):S29.

124.  *Liu A, Abrahamowicz M, Siemiatycki J. When Interaction Estimates in Logistic Regression are Confounded? Oral presentation. Third North American Congress of Epidemiology, Montréal, June 2011. Am. J. Epidemiol. (2011) 173 (suppl 11):S29.

125.  *Vallières É, Siemiatycki J, Lavoué J, Pintos J, Parent M-E. Risk of lung cancer after exposure to welding fumes in two population-based case-control studies. Poster presentation. Third North American Congress of Epidemiology, Montréal, June 2011. Am. J. Epidemiol. (2011) 173 (suppl 11):S29.

126.  *Mahboubi A, Koushik A Siemiatycki J, Lavoué J, Rousseau M-C. Occupational exposure to formaldehyde and risk of lung cancer. Poster presentation Third North American Congress of Epidemiology, Montréal, June 2011. Am. J. Epidemiol. (2011) 173 (suppl 11):762-S.

127.  *Mahboubi A, Abrahamowicz M, Siemiatycki J. Simulation study of multiple logistic regression estimates for multiple correlated exposures measured with errors. Poster presentation. Third North American Congress of Epidemiology, Montréal, June 2011. Am. J. Epidemiol. (2011) 173 (suppl 11):S29.

128.  *Al-Zoughool M, Pintos J, Richardson L, Parent M-É, Ghadirian P, Krewski D, Siemiatycki J. Exposure to environmental tobacco smoke and risk of lung cancer: evidence from a case-control study in Montréal, Canada. Poster presentation. Third North American Congress of Epidemiology, Montréal, Quebec, Canada, June 2011. Am. J. Epidemiol. (2011) 173 (suppl 11):S29.

129.  El-Zein M, Parent M-É, Nicolau B, Koushik A, Siemiatycki J, Rousseau M-C. Smoking, body mass index and lung cancer risk. Poster presentation. Third North American Congress of Epidemiology, Montréal, Quebec, Canada, June 2011. Am. J. Epidemiol. (2011) 173 (suppl 11):S29.

130.  Karp I, Abrahamowicz M, Leffondré K. Siemiatycki J. Development of a method for assessment of risk of lung cancer. Poster presentation. Third North American Congress of Epidemiology, Montréal, Quebec, June 2011. Am. J. Epidemiol. (2011) 173 (suppl 11):S29.

131.  Momoli F, Parent M-E, Siemiatycki J, Platt R, Richardson L, et al. A probabilistic multiple-bias model applied to a study of mobile phone use and risk of glioma. Third North American Congress of Epidemiology, Montréal, Quebec, June 2011. Am. J. Epidemiol. (2011) 173 (suppl 11):S29.

132.  Siemiatycki J, Richardson L, Kincl L, Schlaefer K, Cardis E. Oral presentation. INTEROCC Study: Social Class and The Risk of Glioma Brain Tumours. International Society for Environmental Epidemiology (ISEE), Barcelona, Spain, September 2011.

Curriculum Vitae                                                                                          Jack Siemiatycki

133. Siemiatycki J, Richardson L, Kincl L, Schlaefer K, Cardis E. Oral presentation. INTEROCC Study: Social Class and The Risk of Meningioma Brain Tumours. International Society for Environmental Epidemiology (ISEE), Barcelona, Spain, September 2011.

134. Kendzia B, Pesch B, Jöckel K.-H, Kromhout H, Straif K, Brüning T, on behalf of the SYNERGY Working Group. Lung cancer risks of welding in a pooled analysis of case-control studies. Oral presentation. 7th International Conference on Science of Exposure Assessment (X2012), Edinburg, Scotland, July 2012.

135. Olsson A.C, Vlaanderen J, Vermeulen R, Kromhout H, Pesch B, Straif Kurt on behalf of the SYNERGY study Group. Improved risk estimation through advanced exposure modelling in community-based studies: the example of occupational asbestos exposure in the SYNERGY project. Oral presentation. 7th International Conference on Science of Exposure Assessment (X2012), Edinburgh, Scotland, July 2012.

136. *Lacourt A, Lavoué J, Labrèche F, Siemiatycki J. Gender differences in occupational exposures assessed by experts in a community based-case control study of lung cancer. Oral presentation 7th International Conference on the Science of Exposure Control (X2012), Edinburgh, Scotland, July 2012.

137. *Pasquet R, Karp I, Siemiatyck J, Koushik A. Intake of black tea and coffee and the risk of lung cancer. E-poster. UICC World Cancer Congress, Montréal, Quebec, 27-30 August 2012.

138. *Vallières E, Siemiatycki J, Lavoué J, Pintos J, Parent M-E. Risk of three histological types of lung cancer after exposure to welding fumes. Poster presentation, UICC World Cancer Congress, Montréal, Quebec, 27-30 August 2012.

139. *Rivera M, *Vizcaya D, Pintos J, Abrahamowics M, Siemiatycki J. Association between exposure to engine emissions and lung cancer. 23rd International Conference on Epidemiology in Occupational Health (EPICOH), Utrecht, Netherlands, 18-21 June 2013.

140. *Vizcaya D, Lavoué J, Bégin D, Pintos J., Richardson L, *Rivera M, Siemiatycki J. Risk of eight types of cancer and cleaning-related exposures in a case-control study. 23rd International Conference on Epidemiology in Occupational Health (EPICOH), Utrecht, Netherlands, 18-21 June 2013.

141. *Vizcaya D, Lavoué J, Pintos J, Richardson L, Siemiatycki J. Lung cancer and cleaning-related exposures: results from two case-control studies. 23rd International Conference on Epidemiology in Occupational Health (EPICOH), Utrecht, Netherlands, 18-21 June 2013.

142. Turner M-C, Benke G, Bowman J, et al.  Occupational exposure to extremely low frequency magnetic fields and brain tumour risks in the INTEROCC study. Environment and Health – Joint meeting of the International Society for Environmental Epidemiology (ISEE), the International Society for Exposure Sciences (ISES) and the International Society for Indoor Air Quality (ISIAQ), Basel, Switzerland, 19-23 August 2013.

143. Lavoué J, Labrèche F, Richardson L, Goldberg M, Parent M-E, Siemiatycki J. CANJEM: a general population job exposure matrix based on past expert assessments of exposure to over 250 agents. 24th International Conference on Epidemiology in Occupational Health (EPICOH), Chicago, Illinois, 24-27 June 2014. [abstract] Occupational & Environmental Medicine. 2014;71 (Suppl 1):A48.

144. *Ho V, Parent M-E, Pintos J, Abrahamowicz M, Gauvin L. Siemiatycki J, Koushik A. Lifetime occupational physical activity and lung cancer risk. 17ème Congrès des étudiants, stagiaires et résidents du CRCHUM, Montréal, Quebec, December 2014.

145. Turner M C, Sadetzki S, Eastman Langer C, Figuerola J, Armstrong BK, Chetrit A, Giles GG, Krewski D, Hours M, McBride /ML, Parent M-E, Richardson L, Siemiatycki J, Woodward A, Cardis E. Impact of case:control matching strategies on associations between cellular telephone use and glioma risk in the INTERPHONE study. International Society for Environmental Epidemiology (ISEE), Seattle, Washington, 25 August 2014.

146. *Dutczak H, Siemiatycki J, Koushik A. Exposure to stressful life events and lung cancer risk. 10ème Colloque Annuel de l'Association des Étudiantes et Étudiant en Santé Publique de l'Université de Montréal, Quebec, February 2015.

147. *Xu M, Richardson L, Campbell S, Siemiatycki J. Trends and Characteristics of Response Rates in Case-Control Studies of Cancer. 10ème Colloque Annuel de l'Association des Étudiantes et Étudiant en Santé Publique de l'Université de Montréal, Montréal, Quebec, February 2015.

148.    *Pasquet R, Cardis E, Richardson L, Lavoué J, Siemiatycki J, Koushik A. L'association entre l'exposition occupationnelle aux métaux et le cancer du cerveau. 10ème Colloque Annuel de l'Association des Étudiantes et Étudiant en Santé Publique de l'Université de Montréal, Montréal, Quebec, February 2015.

149.    *Dutczak H, Siemiatycki J, Koushik A. Stressful life events and lung cancer risk. Canadian Society for Epidemiology and Biosatistics (CSEB), Mississauga, Ontario, 1-4 June 2015.

150.    *Pasquet R, Cardis E, Richardson L, Lavoué J, Siemiatycki J, Koushik A. The association between occupational exposure to metals and metalloids and brain cancer risk. Canadian Society for Epidemiology and Biosatistics (CSEB), Mississauga, Ontario, 1-4 June 2015.

151.    *Xu M, Richardson L, Campbell S, Siemiatycki J. Trends and Characteristics of Response Rates in Case-Control Studies of Cancer. Canadian Society for Epidemiology and Biosatistics (CSEB), Mississauga, Ontario, 1-4 June 2015.

152.    Behrens T, Groß I, Siemiatycki J, Conway D, Jöckel K-H, Olsson A, Kromhout H, Straif K, Schüz J, Hovanec J, Kendzia B, Pesch B, Brüning T. Niedriges berufliches Prestige, soziale Mobilität und Lungenkrebs – die SYNERGY-Studie. German Epidemiology Association (DGEpi), Potsdam, Germany, September 2015.

153.    *Carrier M, Kestens Y, Siemiatycki J. Nuisances environnementales et risques pour la santé. AQTR, Montréal, Quebec, 15 September 2015.

154.    *Sauvé JF, Siemiatycki J, Labrèche F, Lavoué J. Development of the CANJEM job exposure matrix: Bayesian modelling of occupational exposures assigned by experts to over 30000 jobs spanning 1920-2005. The International Society of Exposure Science (ISES), Henderson, Nevada, 18-22 October 2015.

155.    Vila J, Bowman JD, Richardson L, Kincl L, Conover D, van Tongeren M, Mann S, Vecchia P, McLean D, Cardis E, on behalf of the INTEROCC Study Group. Assessing cumulative exposures to electromagnetic fields: From source-based measurements to individual lifetime exposure estimates. The International Society of Exposure Science (ISES) Henderson, Nevada, 18-22 October 2015.

156.    *Karumanchi S, Hatsopoulou M, Richardson L, Siemiatycki J. Methodology for exposure assessment for UFPs in the Grand Montréal Region. Oral presentation. 11th Annual Symposium of the Student Association in Public Health at the Université de Montréal (AÉÉSPUM), Montréal, Quebec, 9 February 2016.

157.    *Carrier M, Apparicio P, Kestens Y, Séguin AM, Pham H, Crouse D, Siemiatycki J. Application of a global environmental equity index in Montréal: diagnostic and further implications, AAG, San Francisco, California, 30 March 2016.

158.    *Carrier M, Apparicio P, Kestens Y, Séguin A-M, Pham H, Crouse D, Siemiatycki J. Application d'un indice d'équité environnementale à Montréal: établissement d'un diagnostic pour cibler les secteurs et les groupes les plus vulnérables, ACFAS, Montréal, Quebec, 11 May 2016.

159.    *Carrier M, Kestens Y, Crouse D, Siemiatycki J.  Lung cancer and exposure to Nitrogen Dioxide and Traffic in Montréal, World Conference on Transport Research, Shanghai, China, 10 July 2016.

160.    *Xu M, Richardson L, Campbell S, Pintos J, Siemiatycki J. Patterns and trends in quality of response rate reporting in case-control studies of cancer. 18th Congress of Students, Interns and Residents of CRCHUM, Montréal, Quebec, 4 May 2016.

161.    *Xu M, Richardson L, Campbell S, Pintos J, Siemiatycki J. Time trends and study design determinants of response rates in case-control studies of cancer. 18th Congress of Students, Interns and Residents of CRCHUM, Montréal, Quebec, 4 May 2016.

162.    *Karumanchi S, Hatsopoulou M, Richardson L, Thierry B, Goldberg M, Siemiatycki J. Land use regression model of UFPs in the Grand Montréal Region. Oral presentation. Canadian Society for Epidemiology and Biostatistics, Winnipeg, Manitoba, 8-10 June 2016.

163.    *Xu M, Richardson L, Campbell S, Pintos J, Siemiatycki J. Subject response rates in case-control studies of cancer: quality of reporting, time trends, and study design determinants. Epidemiology Congress of the Americas, Miami, Florida, 21-24 June 2016.

164.    *Rémen T, Siemiatycki J, Lavoué J. Impact of inter-coder differences in occupation and industry classification coding on exposure estimates obtained via job-exposure matrix: example of gasoline engine

Curriculum Vitae                                                                                      Jack Siemiatycki

emissions in CANJEM. Oral presentation. 25th EPICOH - Epidemiology in Occupation Health Conference, Barcelona, Spain, 4-7 September 2016.

165. *Sauvé JF, Lavoué J, Siemiatycki J, Parent ME. Evaluation of a hybrid expert approach for retrospective assessment of occupational exposures in a population-based study of prostate cancer in Montréal, Canada. Oral presentation. 25th EPICOH - Epidemiology in Occupation Health Conference, Barcelona, Spain, 4-7 September 2016.

166. *Pasquet R, Cardis E, Richardson L, Lavoué J, Siemiatycki J, Koushik A. The association between occupational exposure to metals and metalloids and brain cancer risk. 25th EPICOH - Epidemiology in Occupation Health Conference, Barcelona, Spain, 4-7 September 2016.

167. Russ D, Rémen T, Ho KY, Chow WH, Davis F, Hofmann J, Huang H, Purdue M, Schwartz K, Siemiatycki J, Zhang Y, Silverman D, Johnson C, Lavoué J, Friesen M. Recommendations for prioritizing expert review of free-text job descriptions that underwent computer-based coding using the SOCcer algorithm. 25th EPICOH - Epidemiology in Occupation Health Conference, Barcelona, Spain, 4-7 September 2016.

168. *Sauvé JF, Labrèche F, Richardson L, Goldberg MS, Parent MÉ, Siemiatycki J, Lavoué J. Development of the CANJEM Canadian general-population job-exposure matrix from past expert evaluations. Oral presentation. Canadian Association for Research on Work and Health (CARWH) conference, Toronto, Ontario, October 2016.

169. *Rémen T, Siemiatycki J, Lavoué J, Verner MA. Impact of inter-coder differences in occupation and industry classification coding on exposure estimates obtained via job-exposure matrix: example of gasoline engine emissions in CANJEM. Poster. International Society of Exposure Science (ISES) 2016 Annual Meeting, Utrecht, Netherlands, 9-13 October 2016.

170. Grundy A, Ho V, Parent ME, Siemiatycki J, Koushik A. Lifetime recreational moderate-to-vigorous physical activity and the risk of ovarian cancer by subtype. Poster presentation. 2016 American Institute for Cancer Research (AICR) Research Conference, North Bethesda, Maryland,14-16 November 2016.

171. Grundy A, Ho V, Parent ME, Siemiatycki J, Koushik A. The impact of menopausal status on the association between moderate-to-vigorous physical activity among participants in the Prevention of OVArian Cancer in Quebec (PROVAQ) study. Oral Presentation. Canadian Society for Epidemiology and Biostatistics 2017 Biennal Conference, Banff, Alberta, 1 June 2017

172. Bowman JD, Vila J, Richardson L, Kincl L, Cardis E on behalf of the INTEROCC Study Group. Occupational Exposures to Radio-frequency Electric Fields Assessed for the INTEROCC Study of Brain Cancer. Oral presentation.  American Industrial Hygiene Association conference, Seattle, Washington, 4-7 June 2017.

173. *Karumanchi S, Siemiatycki J, Hatzopoulou M. Some challenges in measuring ultra-fine particles and developing a land use regression model. Oral presentation. Canadian Society for Epidemiology and Biostatistics (CSEB) 2017 Biennal Conference, Banff, Alberta, 30 May 2017.

174. *Sauvé JF, Davies HW, Parent MÉ, Peters CE, Siemiatycki J, Sylvestre MP, Lavoué J. Development of quantitative estimates of wood dust exposure in a Canadian general population job-exposure matrix based on past expert assessments. 26th Conference on Epidemiology in Occupational Health (EPICOH 2017), Edinburgh, Scotland, August 2017.

175. Ho V, Xu M, Pintos J, Lavoué J, Abrahamowicz M, Rousseau M.C, Richardson L, Siemiatycki J. Occupational exposures to leaded and unleaded gasoline engine emissions and lung cancer risk. Canadian Cancer Research Conference, Vancouver, British Columbia, 5-7 November 2017.

176. Lequy E, Siemiatycki J, Leblond S, et al. Moss biomonitoring as an alternative to assess exposure to atmospheric metals in environmental epidemiology: the example of the bramm network and the gazel cohort. Poster. SEE Young 2018, Early Career Researchers Conference on Environmental Epidemiology – Together for a Healthy Environment, Freising, Germany, 19–20 March 2018. Occup Environ Med 2018;75:A27.

177. Ho V, Parent MÉ, Lavoué J, Zhu Y, Siemiatycki J, Koushik A. Gender Differences in Occupational Physical Activity. Oral presentation. ISES-ISEE 2018 Joint Annual Meeting, Ottawa, Ontario. 26-30 August 2018.

178. *Xu M, Ho V, Siemiatycki J. Association between occupational exposure to textile fibre dusts and lung cancer in a population-based case-control study in Montréal: a preliminary analysis comparing results from three analytical methods. Oral presentation. ISES-ISEE 2018 Joint Annual Meeting, Ottawa, Ontario, 26-30 August 2018.

179. Zhu Y, Lavoué J, Parent MÉ, Siemiatcyki J, Koushik A, Ho V. Occupational Physical Activity and Lung Cancer Risk among Participants of the Alberta's Tomorrow Project. Poster. ISES-ISEE 2018 Joint Annual Meeting, Ottawa, Ontario, 26-30 August 2018.

180. *Karumanchi S, Siemiatycki J, Richardson L, Hatzopoulou M. Estimating exposure to Ultrafine Particles in the Greater Montreal Area among case-control study subjects: Comparison of classical land use regression model with a model based on Bayesian principles - Proposal. Poster. ISES-ISEE 2018 Joint Annual Meeting, Ottawa, Ontario, 26-30 August 2018.

181. van Tongeren M, Dirkx E, Lavoué J, Siemiatycki J, Ho V. Assessment of Occupational Exposure to Endocrine Disrupting Agents. Poster. ISES-ISEE 2018 Joint Annual Meeting, Ottawa, Ontario, 26-30 August 2018.

\* First author was under supervision of J. Siemiatycki when this work was carried out

## GRANTS AND CONTRACTS RECEIVED

1. Comparison of three methods for conducting household health surveys; Nat. Health Res & Devel. Prog. (NHRDP); $27,000; 1974-76.

2. Pilot study of a case-control monitoring system for discovering occupational carcinogens; Conseil de la recherche en santé (CRSQ); $80,000; 1978-1980.

3. Établissement du jeune chercheur; CRSQ; $15,000; 1979-80.

4. Analyse de santé auprès de 1600 ménages montréalais; Ministère des affaires sociales (MAS); $12,708; 1980

5. Dépistage des facteurs cancérigènes de l'environnement professionnel montréalais: étude pilote; Commission des accidents du travail; $59,093 ; 1980-82.

6. Registry of patients with Juvenile Onset Diabetes in Québec; NHRDP; $35,478*; 1980-85; (P.I. Dr E. Colle).

7. Secondary analysis of a health survey in Montréal: methodologic issues and comparison of morbidity and health care utilization between social groups; NHRDP-H&W Can.; $15,000; 1981-82.

8. Exposure-based case-control approach to discovering occupational carcinogens; NHRDP-H&W Can.; $129,258; 1981-83.

9. An exposure-based case-control approach to discovering occupational carcinogens; NCIC; $131,842; 1981-83.

10. Variation in sex ratios of cancer between geographic areas; NCIC; $3,227; 1982-84.

11. Équipe associée en épidémiologie des cancers professionnels (Team grant); Institut de la recherche en santé et sécurité du travail (IRSST); $1 120,000; 1982-85.

12. Formaldehyde et cancer; IRSST; $9,500; 1983.

13. Retrospective cohort study in the Montréal fur industry; IRSST; $34,019; 1983-85.

14. Statistical analysis of a case-control study designed to discover occupational carcinogens; NHRDP-H&W Can.; $484,022; 1985-87.

15. Completion of chemical coding of exposures in a case-control study designed to discover occupational carcinogens; IRSST; $102,180; 1986.

16. Risks of cancer due to exposure to asbestos in a range of occupations; IRDA; $61,206; 1986-87.

17. Biological estimation of exposure: a tissue registry for the identification and quantification of occupational carcinogens; NCIC; $3,500*; 1986-87; (P.I. Dr B. Case)

18. Development of a proposal to study cancer risk and non-occupational exposure to asbestos; H&W Can.; $29,500; 1987-88.

19. Evaluation of cancer risk and occupational exposure to formaldehyde; H&W Can.; $30,000; 1987-88.

20. A genetic-epidemiologic study of breast cancer; NIH-NCI; $90,945(US)*; 1987-92; (P.I. Dr. R. Haile).

21. Scholar award; NHRDP-H&W Can.; $298,689; 1987-93.

22. An intervention trial to assess the risks of gastro-intestinal illness associated with consumption of treated tap water; NHRDP; $225,000*; 1987-89; (P.I. Dr P. Payment).

23. Evaluation of cancer risk and occupational exposure to polycyclic aromatic hydrocarbons; H&W Can.; $29,500; 1988-89.

24. Evaluation of cancer risk and occupational exposure to benzene, toluene and xylene; H&W Can, $40,000; 1988-89.

25. Health risks due to chrysotile asbestos in the non-occupational environment: a workshop to evaluate a research protocol; H&W Can, $20,000; 1988-89.

26. A population-based, case-control study of occupational exposure to sulphuric acid and the development of laryngeal cancer: an augmented secondary data analysis; NHRDP; $11,120*; 1988-89; (P.I. Dr. C. Soskolne).

27. Mortality due to asbestos in the general environment of the Quebec mining areas; H&W Can.; $130,000; 1989-90.

28. A case-control approach to discovering occupational carcinogens: an analysis of data; NHRDP; $55,508; 1989-90.

29. Continued analysis of a large case control study of many types of cancer: occupational and non-occupational risk factors; NHRDP; $463,827 1988-1992

30. Risk of cancer due to cigarette smoking - results of a multi-site case-control study; H&W Can.; $30,000; 1989-90.

31. Étude sur la validité de matrice emploi-expositions multisectorielles; IRSST; $18,207*; 1990-1992; (P.I. Dr. M. Gérin).

32. Équipe en épidémiologie environnementale (Team grant in environmental epidemiology) ; Fonds de recherche en santé du Québec; $526,297; 1990-1994.

33. Leukemia in children due to parental occupational exposures; NHRDP; $108,000*; 1990-1994; (P.I. Dr Claire Infante-Rivard).

34. Risk of cancer due to exposure to chlorinated solvents - results of a multi-site case-control study; H & W Can.; $30,000; 1991-92.

35. Non-occupational exposure to Quebec chrysotile asbestos and risk of cancer retrospective assessment of exposure; H & W Can.; $60,000; 1991-92.

36. Feasibility of epidemiologic methods to investigate health outcomes near waste sites; H & W Canada; $33,000; 1991-92

37. A pilot study to evaluate the prevalence of hip arthritis in the Montréal urban setting, and an evaluation of methods of recruitment of a population aged 65+; Montréal General Hospital Clinical Epidemiology; $15,000*; 1991-92; (P.I. Dr. J. Esdaile).

38. Non-occupational exposure to Quebec chrysotile asbestos and risk of cancer; mesothelioma ascertainment; NHRDP; $164,000; 1991-95.

39. Multivariate Regression Analyses of Occupational Risk Factors for Several Types of Cancers; NHRDP; $128,827; 1992-96.

40. Development of a Job-Exposure Matrix for Use in Epidemiologic Case-Control Studies of Occupational Risk Factors; NHRDP; $85,003; 1992-95.

41. A prospective epidemiological study of gastrointestinal health effects due to consumption of drinking water. E.P.A. (US)/ NHRDP/ Nat. Water Res. Inst.; $300,000*; 1993-95. (P.I.: Dr. P. Payment)

42. A population-based, case-control study of occupational exposure to acidifying agents and the development of lung cancer: an augmented, secondary data analysis. NHRDP; $72,220*; 1993-1995. (P.I. Dr. C. Soskolne).

43. Scholar award; NHRDP-Health Canada; $126,990; 1993-95.

44. Équipe en épidémiologie environnementale (Team grant in environmental epidemiology) ; Fonds de recherche en santé du Québec; $242,652; 1994-1998.

45. Examen pathologique de cas présumés de mésothéliome recensés chez les femmes depuis 1970 dans des hôpitaux du québec. Health and Welfare Canada. $30,000. 1994.

46.  Cohort Study of a Ten Percent Sample of the Canadian Labour Force. NHRDP; $12,000*; 1994-97. (P.I. Dr. K. Aronson)

47.  A health survey of persons living near the Miron Quarry Sanitary Landfill site, Montréal: a pilot study. NHRDP; $88,931 ; 1994-95. (P.I. Dr. M. Goldberg)

48.  Occurrence of pathogenic microorganisms in water from St Laurent hydrological basin. FRSQ/ NHRDP & St Laurent Vision 2000; 1995-97. (P.I. P Payment)

49.  Case-control study of lung cancer and environmental tobacco smoke; Health Canada; $544,344; 1995-1997.

50.  Case-control study of lung cancer and occupational exposures: NHRDP; $840,000.; 1995–1998.

51.  Occupational exposure to solvents and risk of breast cancer; National Cancer Institute of Canada; $300,000*; 1995-1997. (P.I.: M Goldberg).

52.  Scholar Award; NHRDP-Health Canada; $263,329, 1995-1998.

53.  Reanalysis of US data relating general mortality to air pollution; Health Effects Institute; 1998-2000 (P.I. D Krewski)

54.  A case-control study of occupational risk factors for lung cancer; Medical Research Council of Canada; $554,757, 1998-2001

55.  Évaluation du risque de cancer du poumon et de mésothéliome associé à l'exposition à l'amiante chez les travailleurs de la région montréalaise; Ministère de la Santé et des Services sociaux; $12,000. 1998.

56.  Feasibility of a case-control study of the association between cell phone use and brain, salivary gland cancer and acoustic neurinoma. International Agency for Research on Cancer; $12,000, 1998.

57.  Inorganic particulate retained dose markers in lung cancer and mesothelioma. CIHR (P.I. Bruce Case) $66,096. 1999-2003

58.  Distinguished Scientist Award, Medical Research Council of Canada; $330,000; 1999-2004.

59.  Évaluation du risque de mésothéliome associé à l'exposition à l'amiante chez les femmes de la région minière; Ministère de la Santé et des Services sociaux; $27,500. 1999-2000.

60.  Program of research in environmental epidemiology of cancer (a national program to enhance capacity to conduct research) PREECAN; National Cancer Inst of Canada; $1,000,000; 2000-2004.

61.  Designing a national research agenda in environmental epidemiology of cancer. Medical Research Council of Canada Opportunities Program; $40,000; 2000-2001.

62.  Multi-centric case-control study of cell phone use and cancer risk in Montréal. CIHR; $500,000; 2000-2004.

63.  Trainee award for: Bernard Rachet, Post-doctoral fellow. PREECAN – NCIC; $46,750; 2001-2003.

64.  Cardiogene: a consortium to explore the gene-environment paradigm of major cardiovascular disorders in human and animal models. Canadian Institutes of Health Research, (P.I. P. Hamet) $2,632,272; 2001-2007.

65.  Canada Research Chair in Environmental Epidemiology. Federal CRC program. $1,400,000; 2001-2008.

66.  Installation of CRC. Canadian Foundation for Innovation. $312,000; 2002-2004.

67.  Occupational and lifestyle factors in the etiology of prostate cancer, and establishing a platform for studying susceptibility biomarkers (Part 1). Canadian Cancer Society, Prostate Cancer Research Initiative, National Cancer Institute of Canada, (P.I. M-É Parent) $947,360; 2002-2007.

68.  Center for research on environmental etiology of cancer. For the application process. Centre Hospitalier de l'Université de Montréal (CHUM); $7,000; 2002-2003.

69.  Traffic-related air pollution and socioeconomic gradients in the incidence of cancer. CIHR, (P.I. M Goldberg) $497,000; 2004-2007.

70.  Development and validation of new statistical methods for modeling intermediate events in survival analysis. CIHR, (P.I. M Abrahamowicz) $68,250; 2004-2005.

71.  New survival analytic methods for time-dependent exposures in case-control studies, with applications to cancer. CIHR (P.I. K Leffondré) $52,791; 2004-2007.

72.  Trainee award for: Venkata Ramana Kumar, Post-doctoral fellow. PREECAN – NCIC; $66,000; 2004-2007.

73. Environmental Cancer Research Team. Development grant for the preparation of the full team grant application. CIHR (P.I. J. Siemiatycki) $9,500; 2005-2006.

74. Trainee award for: Franco Momoli, PhD student. PREECAN – NCIC; $25,600; 2005-2006.

75. Occupational and selected non-occupational risk factors for lung cancer: Analysis of a case-control study in Montréal. CIHR (co-P.I.'s: J Siemiatycki & M-É Parent) $1,920,447; 1999.2011.

76. Development and evaluation of a cost-effective approach for retrospective assessment of occupational exposures in population-based studies (pilot study). Canadian Cancer Etiology Research Network - NCIC (P.I. M-É Parent) $35,000; 2006-2007.

77. Trainee award for: Aihua Liu, PhD student. PREECAN – NCIC; $12,600; 2006-2007.

78. Prostate cancer and occupational whole body vibration. Ontario Workplace Insurance Board: Research Advisory Council; Solutions for Workplace Change (P.I. J Purdham); $140,480; 2006-2008.

79. Guzzo-SRC Chair in Environment and Cancer. Cancer Research Society, $1,285,000; 2007-2020.

80. INTEROCC: Occupational exposures and brain cancer. NIH (P.I. E Cardis: To support the analysis of the occupational component of an international case-control study involving 13 countries and coordinated at the International Agency for Research on Cancer of the WHO [France]); $1,626,757 US; 2008-2010.

81. Development and validation of a lung cancer risk prediction model. NCIC (P.I. I Karp); $102,099; 2008-2010.

82. Occupational and lifestyle factors in the etiology of prostate cancer, and establishing a platform for studying susceptibility biomarkers (Part 2). NCIC (P.I.: M-É Parent); $756,000; 2008-2011.

83. Preparation and development of an epidemiological study of modifiable and genetic factors associated with ovarian cancer risk (pilot project). Ovarian Cancer Canada (P.I.: A Koushik); $28,330; 2008-2009.

84. SYNERGY - Pooled analysis of case-control studies on the joint effects of occupational carcinogens in the development of lung cancer: Montréal component. German Statutory Accident Insurance (DGUV) (P.I.: A Koushik); $119,177; 2008-2010.

85. The risk of lung cancer related to occupational and recreation physical activity and to dietary intake of flavonoids. Canadian Cancer Research Society. (P.I.: A Koushik); $208,317; 2009-2012.

86. A case-control study of modifiable and genetic factors associated with the risk of ovarian cancer. Canadian Cancer Society Research Institute (P.I: A Koushik); $498,997; 2010- 2013.

87. Occupational and selected nonoccupational risk factors for lung cancer: analysis of a case-control study in Montréal. CIHR (P.I: J Siemiatycki, M-É Parent); $850,620; 2011-2015.

88. Quebec Research Program for Prostate Cancer Prevention. Cancer Research Society (P.I.: M-É. Parent, P Karakiewics) $4,728,203; 2011-2015.

89. Extreme weather and maternal-child health: targeting future impacts of climate change. CIHR. (P.I.: N Auger) $85,333;  2015-2019.

90. Development of an instrument for assessing occupational exposures in cancer case-control studies and its application to cancers of lung, brain, ovary. Cancer Research Society- Programme GRePEC (Groupe de recherche et de prévention en environnement-cancer). (P.I.: J Siemiatycki, M Pollak) $2,510,890; 2011-2018.

91. Occupational physical activity and lung cancer. (P.I.: V Ho, A Koushik).CIHR. $75,000. 2017-2018.

92. Analyses of existing Canadian cohorts and databases related to occupational physical activity and lung cancer risk. CIHR. (P.I.: V Ho, A Koushik) $74,989; 2017-2018.

93. The role of lifestyle factors in ovarian cancer prognosis. Department of Defence – Ovarian Cancer Research Program. (P.I.: A Koushik) $216,458 USD (est. $293, 000 CAD); 2015-2017. Extended August 2018.

94. Occupational Exposure to Endocrine Disrupting Chemicals and Colorectal Cancer risk. CIHR (P.I.: V Ho, J Siemiatycki) $252,450; 2018-2021.

95. Occupational exposures of women: improvement of an existing job exposure matrix to provide gender-specific estimations of exposure. IRSST. (P.I.: V Ho) $491,484; 2018-2021.

Exhibit 31

**Research report**

# Perineal use of talc and risk of ovarian cancer

H Langseth,[1] S E Hankinson,[2] J Siemiatycki,[3] E Weiderpass[1,4,5]

[1] The Cancer Registry of Norway, Institute of population-based Cancer Research, Oslo, Norway; [2] Channing Laboratory, Department of Medicine, Brigham and Women's Hospital and Harvard Medical School, Boston, MA, USA; [3] Department of Social and Preventive Medicine, University of Montreal, Montreal, Canada; [4] Department of Medical Epidemiology and Biostatistics, Karolinska Institutet, Stockholm, Sweden; [5] Samfundet Folkhälsan, Helsinki, Finland

Correspondence to:
E Weiderpass, The Cancer Registry of Norway, 0310 Oslo, Norway; eliwei@ki.se

Accepted 15 October 2007

**ABSTRACT**
Ovarian cancer is one of the most common gynaecological neoplasms, especially in industrialised countries. The aetiology of the disease is not well understood, except that inherited mutations in the breast cancer genes BRCA-1 and BRCA-2 account for up to 10% of all cases,[1] and child-bearing, oral contraceptive use and breast-feeding reduce the risk.[2] Some environmental exposures, notably talc and asbestos, have been suspected as ovarian carcinogens.

Talc refers to both mineral talc and industrial products that contain mineral talc. Mineral talc occurs naturally in many regions of the world and is valued for its softness, platyness, and ability to absorb organic matter. Mineral talc occurs naturally in a platy (flat) form, but may also occur as asbestiform fibres, which describes its physical form and does not imply the presence of asbestos. The purer forms (approximately 90% mineral talc) are used for cosmetic and hygiene products including baby powders and feminine hygiene products. Perineal use of cosmetic talc is a common practice in the United Kingdom, North America, Australia and some other countries. To our knowledge accurate estimates of prevalence of use of cosmetic talc are not available. However, the use for female hygiene of body powders, baby powders, talcum powders and deodorising powder, most of which contain cosmetic talc in varying amounts, has been reported to be as high as 50% in some countries.[3]

From pathological studies it is known that particles and fibres that enter the body can migrate to distant organs. For instance, asbestos fibres have been found in ovaries from women exposed to asbestos.[4 5] Analogously, following perineal application, talc particles can migrate from the vagina to the peritoneal cavity and ovaries.[6] A majority of women experience retrograde menstruation[7]; this suggests a mechanism by which talc particles can travel through the female reproductive tract to the ovaries. Furthermore, epidemiological studies have shown decreased risks of ovarian cancer after tubal ligation and/or hysterectomy, suggesting that removing a pathway by which carcinogenic substances can reach the ovaries reduces the risk.[8 9]

The association between talc use in the perineal region and ovarian cancer was investigated in one cohort study,[10] and 20 case-control studies.[11–30] In the cohort study, arguably the strongest study because of its partly prospective ascertainment of exposure, there was no association between cosmetic talc use and risk of all subtypes of ovarian cancer combined. The various case-control studies provided indications of either a significant excess risk (10 studies) or non-significant excess risk or

null (10 studies), with odds ratios (ORs) ranging from 1.0 to 3.9. None of the studies reported relative risks below 1.0. The population-based case-control studies,[11 15–17 20–26 28–30] included studies with 112–824 ovarian cancer cases, and had odds ratios ranging from 1.1 to 3.9 (fig 1). The hospital-based case control studies[12–14 18 19 27] included studies with 77–462 cases, and reported odds ratios between 1.0 and 2.5. Pooled odds ratios were calculated by fixed effects model. As shown in figure 1 pooled ORs were 1.40, 1.12 and 1.35 for population-based, hospital-based and all case control studies combined, respectively. Some studies[13 14 22 23 26 28] tried to assess exposure-response associations, in terms of frequency of use or length of use in years but found no clear trend.

Methodological factors such as recall bias should always be considered in case-control studies. It could have been a problem had there been widespread publicity about the possible association between use of body powder and cancer. The International Agency for Research on Cancer (IARC) working group considers that there has not been widespread public concern about this issue and therefore considers it unlikely that such a bias could explain the consistent findings. Another source of recall bias could result from the fact that women with the cancer tend to remember or over-report their use of body powder. The influence of this type of recall bias cannot be ruled out.

Eight of the population-based case-control studies[11 16 22–24 26 28 29] were identified, by the IARC working group as being most informative in terms of size of the studies, whether the studies were population-based, participation rates and adjustments of confounding variables. The selected studies included at least 188 cases and had participation rates ranging from 60% to 75%. Among these eight studies, the prevalence of perineal use of talc-based body powder among controls ranged from 16% to 52%. The relative risks of ovarian cancer among body powder users were homogeneous across this set of eight studies, each of which indicated a 30–60% increase in risk. Among the other 12 case-control studies, most also reported relative risks of this magnitude or higher.

Information on talc use in infancy is generally insufficient in the case-control studies. However, in one study the exposure to baby powder was reported by 42.2% of the cases and 40.5% of the controls.[15] In several of the other studies patients were asked about age at first use of perineal talc, as an indicator for use in infancy or other periods of life.

Only four case-control studies[16 23 29 30] and one cohort study[10] provided results by histological type. In four of these studies, in particular the cohort study, there were hints of higher risks of serous tumours related to talc exposure.



**Figure 1** Results from case-control studies contributing data on perineal talc use and ovarian cancer. Results are presented as odds ratios (ORs) and their corresponding confidence intervals (95% CIs) and represented by squares and lines, respectively. Results are separated in 14 population-based and six hospital-based case-control studies. Pooled ORs for all population-based studies combined and all hospital-based studies combined are given. OR pooling by fixed effect models (Mantel-Haenszel method).

Before 1976, talc was to some extent contaminated with asbestos, so that the early studies relating talc to ovarian cancer may have been confounded by the asbestos.[31] However, the association between talc exposure and ovarian cancer is as strong in recent studies,[28 29] as in earlier ones, diminishing the likelihood that all these results are influenced by contamination of talc by asbestos.

To summarise the evidence in favour of an association, a very large number of studies have found that women who used talc experienced excess risks of ovarian cancer; some results were statistically significant and some were not. There was some indication in the cohort study of an increase in serous tumours. The evidence of talc migrating to the ovaries lends credibility to such a possible association. The main epidemiological evidence against the association is the absence of clear exposure-response associations in most studies, as well as the absence of an overall excess risk in the cohort study.

On balance, the epidemiological evidence suggests that use of cosmetic talc in the perineal area may be associated with ovarian cancer risk. The mechanism of carcinogenicity may be related to inflammation.[32]

The carcinogenicity of non-asbestiform talc was assessed by a monograph working group at IARC in 2006.[33] After considering biases and possible confounding factors, the IARC working group concluded that the epidemiological studies provided limited evidence for the carcinogenicity of perineal use of talc-based body powder, and classified this use as possibly carcinogenic to human beings (that is, group 2B).[34]

## PROPOSAL: TO RESEARCH COMMUNITY

The current body of experimental and epidemiological evidence is insufficient to establish a causal association between perineal use of talc and ovarian cancer risk. Experimental research is needed to better characterise deposition, retention and clearance of talc to evaluate the ovarian carcinogenicity of talc.

The majority of the epidemiological studies carried out so far have been among American women. It would be instructive to seek evidence in other countries where perineal use of talc has been common.

While there has been some efforts to measure the degree of use, these have mainly been measured simply as the reported years of use. It is possible that the ostensible lack of exposure response trends is the result of crudeness of the exposure metric used. Therefore, it is important that future studies, irrespective of study design, devote some effort to better assessment of exposure. The use of body powders should be assessed both in terms of calendar time and age of the subject. Subjects should be asked about lifetime use, including age at initial use (infancy, childhood, teenager years, adulthood), age at which they stopped using such powders, gaps in the lifetime period of use

**Research report**

## What this study adds

▶ Epidemiological evidence suggests that use of cosmetic talc in the perineal area may be associated with ovarian cancer risk. The IARC has classified this use of talc as possibly carcinogenic to human beings (group 2B).

▶ The mechanism of carcinogenicity may be related to inflammation. This paper focus on the high degree of consistency in the studies accomplished so far, and what should be the focus in future studies.

and frequency and nature of use (daily, during certain seasons of the year, only while menstruating). Another important question is whether the use of body powder was before or after tubal ligation or hysterectomy.

Individuals' answers to questions about use of brand names over time may be unreliable, and therefore, in future studies, investigators should try to ascertain, either from government or industry sources, the composition of the powders used in different time periods by different brand names and, in particular, to ascertain whether the exposure may have included some contamination by asbestos and also whether the exposure was to talc or a non-talc product. Statistical analyses should attempt to assess risk separately for the categories of powders: talc containing asbestos, talc not containing asbestos, non-talc product. Further, exposure metrics should take into account the age, duration and intensity of exposure. As well as analyses for all ovarian tumours combined, there should, if possible, be analyses by histological subtype and by invasiveness of the tumour.

While it would not be reasonable to envisage establishing a costly long-term prospective cohort study just to study this association, any long-term cohort study that is being set up to study cancer among women should collect information about talc use if the study is being conducted in a country where such use has been widespread.

In summary, future studies should focus on seeking evidence in talc-exposed female populations worldwide, collecting reliable information on age at initial use of body powder, exposure assessments and dose response associations.

**Acknowledgements:** The work reported in this paper was initiated while SH, JS and EW were part of an IARC Monographs Working Group of the International Agency for Research on Cancer, Lyon, France.

**Funding:** This study was financed by the Cancer Registry of Norway.

**Competing interests:** None.

## REFERENCES

1. **Lux MP,** Fasching PA, Beckmann MW. Hereditary breast and ovarian cancer: review and future perspectives. *J Mol Med* 2006;**84**:16–28.
2. **Persson I.** Estrogens in the causation of breast, endometrial and ovarian cancers—evidence and hypotheses from epidemiological findings. *J Steroid Biochem Mol Biol* 2000;**74**:357–64.
3. **International Agency for Research on Cancer.** *IARC monographs on the evaluation of carcinogenic risks to human, Vol 93, Carbon black, titanium dioxide, and non-asbestiform talc.* Geneva: WHO (in press).
4. **Heller DS,** Gordon RE, Westhoff C, et al. Asbestos exposure and ovarian fiber burden. *Am J Ind Med* 1996;**29**:435–9.
5. **Langseth H,** Johansen BV, Nesland JM, et al. Asbestos fibers in ovarian tissue from Norwegian pulp and paper workers. *Int J Gynecol Cancer* 2007;**17**:44–9.
6. **Venter PF.** Ovarian epithelial cancer and chemical carcinogenesis. *Gynecol Oncol* 1981;**12**:281–5.
7. **Olive DL,** Schwartz LB. Endometriosis. *N Engl J Med* 1993;**328**:1759–69.
8. **Rosenblatt KA,** Thomas DB. Reduced risk of ovarian cancer in women with a tubal ligation or hysterectomy. the World Health Organization Collaborative Study of Neoplasia and Steroid Contraceptives. *Cancer Epidemiol Biomarkers Prev* 1996;**5**:933–5.
9. **Tortolero-Luna G,** Mitchell MF. The epidemiology of ovarian cancer. *J Cell Biochem Suppl* 1995;**23**:200–7.
10. **Gertig DM,** Hunter DJ, Cramer DW, et al. Prospective study of talc use and ovarian cancer. *J Natl Cancer Inst* 2000;**92**:249–52.
11. **Cramer DW,** Welch WR, Scully RE, et al. Ovarian cancer and talc: a case-control study. *Cancer* 1982;**50**:372–6.
12. **Hartge P,** Hoover R, Lesher LP, et al. Talc and ovarian cancer. *JAMA* 1983;**250**:1844.
13. **Whittemore AS,** Wu ML, Paffenbarger RS Jr, et al. Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. *Am J Epidemiol* 1988;**128**:1228–40.
14. **Booth M,** Beral V, Smith P. Risk factors for ovarian cancer: a case-control study. *Br J Cancer* 1989;**60**:592–8.
15. **Harlow BL,** Weiss NS. A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc. *Am J Epidemiol* 1989;**130**:390–4.
16. **Harlow BL,** Cramer DW, Bell DA, et al. Perineal exposure to talc and ovarian cancer risk. *Obstet Gynecol* 1992;**80**:19–26.
17. **Chen Y,** Wu PC, Lang JH, et al. Risk factors for epithelial ovarian cancer in Beijing, China. *Int J Epidemiol* 1992;**21**:23–9.
18. **Rosenblatt KA,** Szklo M, Rosenshein NB. Mineral fiber exposure and the development of ovarian cancer. *Gynecol Oncol* 1992;**45**:20–5.
19. **Tzonou A,** Polychronopoulou A, Hsieh CC, et al. Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer. *Int J Cancer* 1993;**55**:408–10.
20. **Cramer DW,** Xu H. Epidemiologic evidence for uterine growth factors in the pathogenesis of ovarian cancer. *Ann Epidemiol* 1995;**5**:310–4.
21. **Purdie D,** Green A, Bain C, et al. Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study. Survey of Women's Health Study Group. *Int J Cancer* 1995;**62**:678–84.
22. **Chang S,** Risch HA. Perineal talc exposure and risk of ovarian carcinoma. *Cancer* 1997;**79**:2396–401.
23. **Cook LS,** Kamb ML, Weiss NS. Perineal powder exposure and the risk of ovarian cancer. *Am J Epidemiol* 1997;**145**:459–65.
24. **Green A,** Purdie D, Bain C, et al. Tubal sterilisation, hysterectomy and decreased risk of ovarian cancer. Survey of Women's Health Study Group. *Int J Cancer* 1997;**71**:948–51.
25. **Godard B,** Foulkes WD, Provencher D, et al. Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study. *Am J Obstet Gynecol* 1998;**179**:403–10.
26. **Cramer DW.** Perineal talc exposure and subsequent epithelial ovarian cancer: a case-control study. *Obstet Gynecol* 1999;**94**:160–1.
27. **Wong C,** Hempling RE, Piver MS, et al. Perineal talc exposure and subsequent epithelial ovarian cancer: a case-control study. *Obstet Gynecol* 1999;**93**:372–6.
28. **Ness RB,** Grisso JA, Cottreau C, et al. Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. *Epidemiology* 2000;**11**:111–7.
29. **Mills PK,** Riordan DG, Cress RD, et al. Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. *Int J Cancer* 2004;**112**:458–64.
30. **Jordan SJ,** Green AC, Whiteman DC, et al. Risk factors for benign serous and mucinous epithelial ovarian tumors. *Obstet Gynecol* 2007;**109**:647–54.
31. **Harlow BL,** Hartge PA. A review of perineal talc exposure and risk of ovarian cancer. *Regul Toxicol Pharmacol* 1995;**21**:254–60.
32. **Ness RB,** Cottreau C. Possible role of ovarian epithelial inflammation in ovarian cancer. *J Natl Cancer Inst* 1999;**91**:1459–67.
33. **International Agency for Research on Cancer.** *Preamble to the IARC monographs on the evaluation of carcinogenic risks to humans. 93.* Lyon: IARC
34. **Baan R,** Straif K, Grosse Y, et al. Carcinogenicity of carbon black, titanium dioxide, and talc. *Lancet Oncol* 2006;**7**:295–6.

Exhibit 32

Jack Siemiatycki, Ph.D.

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY


----------------------------x

IN RE JOHNSON & JOHNSON          ) MDL No.

TALCUM POWDER PRODUCTS           ) 16-2738 (FLW)(LHG)

MARKETING SALES PRACTICES,       )

AND PRODUCTS LIABILITY           )

LITIGATION                       )

                                 )

THIS DOCUMENT RELATES TO         )

ALL CASES                        )

----------------------------x




VIDEOTAPED DEPOSITION OF

JACK SIEMIATYCKI, Ph.D.

MONTREAL, CANADA

THURSDAY, JANUARY 31, 2019

9:49 A.M.




Reported by: Leslie A. Todd

Jack Siemiatycki, Ph.D.

Page 2

1    Deposition of JACK SIEMIATYCKI, Ph.D., held at
2    the offices of:
3
4
5       CHUM Research Center
6       Montreal, Canada
7
8
9
10
11
12    Pursuant to notice, before Leslie Anne Todd,
13    Court Reporter and Notary Public in and for the
14    District of Columbia, who officiated in
15    administering the oath to the witness.
16
17
18
19
20
21
22
23
24
25

Page 4

1    APPEARANCES (Continued):
2
3       RICHARD GOLOMB, ESQUIRE
4       GOLOMB & HONIK, LLP
5       1835 Market Street
6       Suite 2900
7       Philadelphia, Pennsylvania 19103
8       (215) 278-4449
9       rgolomb@golombhonik.com
10    ON BEHALF OF THE JOHNSON & JOHNSON DEFENDANTS:
11       KIMBERLY OLVEY BRANSCOME, ESQUIRE
12       KIRKLAND & ELLIS LLP
13       333 South Hope Street
14       Los Angeles, California 90071
15       (213) 680-8370
16       kimberly.branscome@kirkland.com
17       JESSICA BRENNAN, ESQUIRE
18       DRINKER BIDDLE & REATH LLP
19       600 Campus Drive
20       Florham Park, New Jersey 07932
21       (973) 540-1000
22       jessica.brennan@dbr.com
23
24
25

Page 3

1       A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFFS:
4       CHRISTOPHER V. TISI, ESQUIRE
5       LEVIN PAPANTONIO, LLP
6       316 South Baylen Street
7       Pensacola, Florida 32502
8       (850) 435-7184
9       ctisi@levinlaw.com
10       MICHELLE A. PARFITT, ESQUIRE
11       ASHCRAFT & GEREL, LLP
12       4900 Seminary Road, Suite 650
13       Alexandria, Virginia 22311
14       (703) 997-1774
15       MParfitt@ashcraftlaw.com
16       ALASTAIR J.M. FINDEIS, ESQUIRE
17       NAPOLI SHKOLNIK, PLLC
18       360 Lexington Avenue
19       11th Floor
20       New York, New York 10017
21       (212) 397-1000
22
23
24
25

Page 5

1    APPEARANCES (Continued):
2
3    ON BEHALF OF THE PCPC:
4       RENEE APPEL, ESQUIRE (Telephonically)
5       SEYFARTH SHAW LLP
6       975 F Street, N.W.
7       Washington, DC 20004
8       (202) 828-5371
9       rappel@seyfarth.com
10    ON BEHALF OF THE IMERYS DEFENDANTS:
11       MICHAEL R. KLATT, ESQUIRE
12       GORDON & REES SCULLY MANSUKHANI, LLP
13       816 Congress Avenue, Suite 1510
14       Austin, Texas 78701
15       (512) 391-0183
16       mklatt@grsm.com
17    ON BEHALF OF PTI:
18       CAROLINE M. TINSLEY, ESQUIRE (for PTI)
19       TUCKER ELLIS, LLP
20       100 South 4th Street, Suite 600
21       St. Louis, Missouri 63102
22       (314) 571-4965
23       caroline.tinsley@tuckerellis.com
24    ALSO PRESENT:
25       FABIO DEFELICE (Videographer)

2 (Pages 2 to 5)

Jack Siemiatycki, Ph.D.

Page 6

```
 1         C O N T E N T S
 2  EXAMINATION OF JACK SIEMIATYCKI, Ph.D.      PAGE
 3    By Ms. Branscome            9, 322
 4    By Mr. Klatt              274, 336
 5    By Ms. Parfitt              290
 6
 7          E X H I B I T S
 8       (Attached to transcript)
 9  SIEMIATYCKI DEPOSITION EXHIBITS       PAGE
10   No. 1   Notice of Oral and Videotaped
11      Deposition of Jack Siemiatycki
12      and Duces Tecum (not attached)    15
13   No. 2   Plaintiffs' Steering Committee's
14      Response and Objections to the
15      Notice of Oral and Videotaped
16      Deposition of Jack Siemiatycki
17      and Duces Tecum         16
18   No. 3   Addendum to Expert Report of
19      Jack Siemiatycki, MSc, PhD, on
20      Talcum Powder Use and Ovarian
21      Cancer             17
22   No. 4   Binder containing various studies   43
23   No. 5   Binder containing original
24      epidemiological studies     46
25   No. 6   Binder containing meta-analyses   46
```

Page 7

```
 1      E X H I B I T S (Continued)
 2       (Attached to transcript)
 3  SIEMIATYCKI DEPOSITION EXHIBITS       PAGE
 4   No. 7   JS EpiTech Inc. bill for
 5      Professional Services, August 9 -
 6      November 16, 2018       46
 7   No. 8   JS EpiTech Inc. bill for
 8      Professional Services, July 1 -
 9      August 2, 2018          48
10   No. 9   Report of Jack Siemiatycki dated
11      October 4th, 2016 (not attached)   58
12   No. 10   Expert Report of Jack Siemiatycki
13      Msc, PhDn Talcum Powder Use and
14      Ovarian Cancer (not attached)    61
15   No. 11   Expert Report of Jack Siemiatycki
16      MSc, PhD on Talcum Powder Use and
17      Ovarian Cancer (with handwritten
18      notations)           110
19   No. 12   Berge 2012 report (not attached)   194
20   No. 13   Schildkraut report (not attached)   214
21   No. 14   Anita Koushik information from
22      Environepi website       278
23   No. 15   Pages from Environepi website
24      discussing Group Research Topics   285
25
```

Page 8

```
 1      E X H I B I T S (Continued)
 2       (Attached to transcript)
 3  SIEMIATYCKI DEPOSITION EXHIBITS       PAGE
 4   No. 16   Excerpt from the book entitled
 5      Risk Factors For Cancer in the
 6      Workplace by Dr. Jack Siemiatycki
 7      (Not attached)          309
 8   No. 17   Article entitled "Degree of
 9      Confounding Bias Related to
10      Smoking, Ethnic Group, and
11      Socioeconomic Status in Estimates
12      of the Associations Between
13      Occupation and Cancer," Journal of
14      Occupation Medicine/Volume 30
15      No. 8/August 1988       317
16
17
18
19
20
21
22
23
24
25
```

Page 9

```
 1          P R O C E E D I N G S
 2         - - - - - - - - - - - - - - - - - -
 3        THE VIDEOGRAPHER:  Good morning.  We're
 4  now on the record.  My name is Fabio DeFelice.
 5  I'm the videographer for Golkow Litigation
 6  Services.  Today's date is January 31st of 2019.
 7  The time is 9:49 a.m.
 8        This video deposition is being held at
 9  the CHUM Research Center in Montreal, Canada, in
10  the matter In Re:  Johnson & Johnson Talcum Powder
11  Products in the United States District Court for
12  the Eastern District of New Jersey.  The case
13  number is 16-2738.
14        The deponent is Jack Siemiatycki, Ph.D.
15        The counsel will be noted on the
16  stenographic record.  The court reporter is Leslie
17  Todd, and will now swear in the witness.
18        JACK SIEMIATYCKI, Ph.D.,
19      and having been first duly sworn,
20      was examined and testified as follows:
21         DIRECT EXAMINATION
22  BY MS. BRANSCOME:
23   Q   Good morning, Dr. Siemiatycki.
24   A   Good morning.  Nice to meet you.
25   Q   We met just before the deposition
```

3  (Pages 6 to 9)

Jack Siemiatycki, Ph.D.

Page 10

1  started, but my name is Kimberly Branscome, and I
2  am here to ask you questions today on behalf of
3  Johnson & Johnson.
4        Is that all right?
5     A   Thank you.  Yes.
6     Q   All right.  We are taking your
7  deposition today in the case of In Re:  Johnson &
8  Johnson Talc Litigation, MDL.
9        Is it your understanding that you have
10 been designated as a testifying expert in that
11 case?
12    A   Yes.
13    Q   When were you first contacted about
14 serving as an expert witness in the MDL
15 litigation?
16    A   I believe it was in the spring or summer
17 of 2018, but I'm not positive about that.
18    Q   Who contacted you?
19    A   Ms. Parfitt.
20    Q   Have you communicated with any other
21 lawyers regarding your work on the talc MDL?
22    A   I've had a couple of meetings with
23 Ms. Parfitt and her colleagues that she works
24 with.
25    Q   Can you identify the individuals with

Page 11

1  whom you have met in addition to Ms. Parfitt?
2     A   Yes, there are two, and they are here
3  present.  Chris Tisi and Alastair --
4        MR. FINDEIS:  Findeis.
5        THE WITNESS:  Say that again.
6        MS. PARFITT:  Findeis.
7        THE WITNESS:  And that's -- thank you.
8  BY MS. BRANSCOME:
9     Q   How many meetings have you had to
10 prepare for your expert opinions in the MDL?
11    A   One yesterday and one about a month --
12 about three weeks ago.
13    Q   Where did those meetings take place?
14    A   Here.
15    Q   And by "here," do you mean in Montreal?
16    A   In Montreal, yes.
17    Q   How long did each meeting last?
18    A   Yesterday's was about four, five hours
19 maybe.  Four or five hours.  And the earlier one,
20 I guess all told, about ten hours maybe.
21    Q   Did the ten-hour meeting take place over
22 one day?
23    A   Over two days.
24    Q   In addition to the attorneys that you
25 just identified for the record and yourself, was

Page 12

1  anyone else present at those meetings?
2     A   No.
3     Q   You didn't have anyone from your team,
4  for example, present?
5     A   No.
6        MS. PARFITT:  Objection.  Form.
7  BY MS. BRANSCOME:
8     Q   What did you do to prepare for your
9  deposition today?
10    A   Do you mean from the beginning of my
11 involvement in the MDL case back last summer or do
12 you mean just in the last few days?
13    Q   Let's take it more broadly.
14        What have you done to develop your
15 opinions in this case, and then specifically to
16 prepare for your deposition?
17    A   I reviewed -- I rereviewed the
18 literature about talc and ovarian cancer,
19 scientific literature.  I evaluated it, I wrote a
20 report about it.  And in the last few days, I went
21 over all of the -- not all, but a lot of the
22 material that I had gone through initially and
23 just clarified for myself, looked for any issues
24 that I had missed the first time around, things
25 like that.

Page 13

1     Q   As part of your review of materials in
2  preparation for today, did you identify anything
3  in your review that changed the opinions that you
4  have offered in the expert report in the MDL?
5     A   No.  Those opinions remain valid.
6     Q   When you say that you rereviewed the
7  scientific literature in preparation for the
8  development of your opinions in the MDL, what did
9  you mean by "rereviewed"?
10    A   Well, I had reviewed -- I've reviewed
11 evidence around talc and ovarian cancer on a few
12 different occasions.  The first time was in 2006
13 when I was on an international review committee on
14 the topic.  Then in 2015, '16, '17, in preparation
15 for another litigation regarding talc and ovarian
16 cancer.  Then in the summer/fall of 2018, in
17 preparation for writing a report that was
18 submitted for this case.  And then in the last
19 week or two, roughly speaking, I went over all of
20 that.  So I refer to that as a rereview.
21    Q   Have you ever discussed your deposition
22 with any of -- of the other experts designated by
23 the plaintiffs in the MDL?
24    A   No, I haven't.
25    Q   Have you discussed your expert opinions

4  (Pages 10 to 13)

Jack Siemiatycki, Ph.D.

Page 14

1  with any of the other experts designated by the
2  plaintiffs in the MDL?
3       A   No, I haven't.
4       Q   Are you aware of the list of experts
5  that have been designated by the plaintiffs in the
6  MDL?
7       A   I'm aware of at least some of them.  I'm
8  not sure if I'm aware of all of them, but I'm
9  aware of some of them.
10      Q   Who specifically are you aware of?
11      A   Singh, McTiernan, Laura Plunkett.  And
12  there are a few more, and I could look it up.
13      Q   I'd like to start by just marking the
14  deposition notice for your deposition as
15  Exhibit 1.
16          Dr. Siemiatycki, you will see two large
17  binders over there in front of you.  This will be
18  tab 1.
19          So I'd like --
20      A   I see it.
21      Q   I'd like to mark for identification
22  the document behind tab 1, which is
23  Dr. Siemiatycki's deposition notice as Exhibit 1
24  to this deposition.
25          MS. PARFITT:  Do you want to give me --

Page 15

1           Do you want me to just mark them?  Will
2  that help you, instead of reaching across the
3  table?  It's up to you.  I can put the stickers on
4  it.
5           (A discussion was held off the record.)
6           (Exhibit No. 1 was marked for
7           identification.)
8  BY MS. BRANSCOME:
9       Q   Dr. Siemiatycki, are you familiar with
10  the document that we have just marked as
11  deposition Exhibit 1?
12      A   I've seen something like this.  I'm --
13  not reading through it, I'm not sure if it's
14  exactly the same document that I have seen before,
15  but I guess this is kind of the standard format of
16  notice that is sent to experts ahead of time.  So
17  I've seen -- I've seen that.
18      Q   Do you understand that what has been
19  marked as Exhibit 1, which is the notice for your
20  deposition, requests that you bring certain
21  documents with you to this deposition?
22      A   Yes.
23      Q   All right.  And just for completeness
24  and at the request of plaintiffs' counsel, I will
25  also mark as Exhibit 2 the general objections to

Page 16

1  your deposition that were submitted by plaintiffs'
2  counsel in the MDL.  And this one we actually will
3  need to mark a copy, because it's not in your
4  binder.
5           (Exhibit No. 2 was marked for
6           identification.)
7           MS. BRANSCOME:  Do you have an extra
8  copy, Michelle?
9           MS. PARFITT:  I do.  Not a worry.  I got
10  it.
11  BY MS. BRANSCOME:
12      Q   Dr. Siemiatycki, have you ever seen the
13  document that has been marked as Exhibit 2, which
14  is the plaintiffs' general objections to your
15  deposition notice?
16      A   I'm not sure.
17          MS. PARFITT:  I will represent for the
18  record that's not been provided to
19  Dr. Siemiatycki.
20  BY MS. BRANSCOME:
21      Q   All right.  So if you could,
22  Dr. Siemiatycki, did you bring any materials with
23  you today to the deposition?
24      A   Yes, I brought a lot of documents, just
25  in case.

Page 17

1       Q   Can you identify for me, and we can
2  start with a general category first, if that's
3  helpful, the materials that you brought with you
4  today to your deposition?
5       A   Well, I brought my report.  I brought an
6  addendum to my report, which I think has been
7  provided to you.
8           MS. PARFITT:  Yes, that was the table.
9           THE WITNESS:  It's a long -- it's a set
10  of --
11          MS. PARFITT:  I have a copy of that if
12  you wish to have it marked.  Do you want it -- if
13  you give me a number, I will put it on this one.
14  BY MS. BRANSCOME:
15      Q   Let's see.  Yeah, let's go ahead and
16  mark the addendum to your expert report as
17  Exhibit 3.
18          (Exhibit No. 3 was marked for
19          identification.)
20  BY MS. BRANSCOME:
21      Q   Dr. Siemiatycki, could you just confirm
22  for the record that what we have marked as
23  Exhibit 3 is in fact the complete addendum to your
24  MDL expert report?
25      A   I -- I believe it is.  I believe it is.

5 (Pages 14 to 17)

Jack Siemiatycki, Ph.D.

Page 18

1    Q   What else did you bring with you today?
2    A   I'm not sure if this is the right time
3  to mention it, but there were a couple of -- in
4  the past few days I picked up a couple of typos in
5  my report, and I've hand scribbled them on my
6  copy, and I can tell you about those very quickly,
7  but I'm not sure if this is now the right time for
8  this or later.
9    Q   I will ask you about any corrections
10  that you have, but it is good to know that the
11  report you brought with you has some handwriting
12  on it, so we will make sure to mark that copy.
13    A   Okay.
14    Q   What else did you bring with you today?
15    A   I brought -- well, I brought three
16  binders of material that were part of the -- the
17  references to my report.
18    MS. PARFITT:  And if I may, I provided
19  counsel in advance of the deposition a thumb drive
20  that contains all of Dr. Siemiatycki's report but
21  also the references related to that report.
22    THE WITNESS:  I brought a couple of
23  binders -- well, more than a couple.  It looks
24  like five binders of different documents that I
25  thought might be useful in answering questions

Page 19

1  that you might ask.  So it was -- I was just
2  speculating on the types of questions you might
3  ask and brought documents that might help to
4  answer or to support arguments or statements that
5  I would make.  I brought five --
6    MS. PARFITT:  You can get --
7    THE WITNESS:  -- which --
8    MS. PARFITT:  -- the texts --
9    THE WITNESS:  The textbooks.  I brought
10  five books with me, again in the same spirit that
11  things might come up that it would be helpful to
12  refer to material in these books.  One -- should I
13  tell you what they are?
14  BY MS. BRANSCOME:
15    Q   If you would, please, identify each of
16  the books --
17    A   Okay.
18    Q   -- for the record, and we will return to
19  the eight binders that you just mentioned.
20    A   One is a book called Risk Factors for
21  Cancer in the Workplace.  And it's a book that I
22  wrote 30 years ago about occupational causes of
23  cancer.
24    The other one -- the next one is the
25  monograph of IARC, which is the International

Page 20

1  Agency for Research on Cancer, of the meeting held
2  in Lyon in 2006.  The book was published in 2010,
3  and it contains an evaluation of talc
4  carcinogenicity as of 2006.
5    The next one is a textbook of
6  epidemiology that is probably considered the most
7  respected one in the field at this point, authored
8  by Rothman, T -- R-O-T-H-M-A-N, Greenland,
9  G-R-E-E-N-L-A-N-D, and Lash, L-A-S-H.
10    MR. KLATT:  Dr. Siemiatycki, is there a
11  particular edition or is there --
12    THE WITNESS:  Oh, yeah.  Yeah, this one
13  is third edition.  Thank you.
14    The fourth one is kind of a handbook
15  called Dictionary of Epidemiology, edited by
16  Porta, P-O-R-T-A, which is kind of a very basic
17  book of definitions.
18    And the fifth one is called An
19  Introduction to Meta-Analysis.  The first author
20  is Borenstein, B-O-R-E-N-S-T-E-I-N.
21  BY MS. BRANSCOME:
22    Q   All right.  Focusing first on the books
23  that you brought with you, why did you bring with
24  you a book about Risk Factors --
25    A   For cancer.

Page 21

1    Q   -- for Cancer in the Workplace?
2    A   Because it has -- in that book I -- I
3  described my research.  I described the research
4  findings from my projects in this area.  I also
5  described the process of conducting epidemiologic
6  research and drawing inferences from epidemiologic
7  data, and how -- what are the considerations that
8  would be used in drawing inferences from
9  epidemiologic data for cancer causation.  And I
10  thought this might come up during the day.
11    Q   Do the methodological principles that
12  you outline in your book, Risk Factors for Cancer
13  in the Workplace, are those still current in your
14  view today?
15    A   Yes.
16    Q   And why specifically did you want to
17  have this book available to you during your
18  deposition?
19    A   In case any of the statements that I've
20  made in my report about evaluating causation and
21  how epidemiology is used for evaluating causation
22  are challenged.  And specifically, I was
23  anticipating that there may be challenges to the
24  fact that my approach to this question might be
25  new and just sort of concocted in the context of

6 (Pages 18 to 21)

Jack Siemiatycki, Ph.D.

Page 22

1  the litigation, and I wanted to show that in my
2  own sort of intellectual history, these ideas have
3  been there forever but certainly for the last 30
4  years, and that these are commonly held views.
5      Q   Are there specific chapters within the
6  book that you brought with you that you would
7  direct someone to to gain information about the
8  methodology that you applied in the MDL?
9          MS. PARFITT:  Objection.  Form.
10         THE WITNESS:  I'm sorry.  Could you
11  repeat the question?
12  BY MS. BRANSCOME:
13     Q   Understanding that what you brought with
14  you --
15     A   Yes.
16     Q   -- is a complete book --
17     A   Yes.
18     Q   -- are there specific chapters that you
19  contend contain an explanation of the methodology
20  that is similar to what you have applied in your
21  analysis in the MDL?
22         MS. PARFITT:  Objection.  Form, broad.
23         THE WITNESS:  So I would say there are
24  two chapters that have relevance to the issue at
25  hand.  The last chapter contains a discussion of

Page 23

1  causality and how to use epidemiology in the
2  process of determining causality.
3          The first -- the second chapter contains
4  information -- excuse me, I think it's the second
5  chapter -- contains information about different
6  epidemiologic research designs, and it's a
7  discussion of case-controlled studies, cohort
8  studies, and other types of epidemiologic designs
9  and their relative advantages and disadvantages.
10  BY MS. BRANSCOME:
11     Q   Is there a description of the
12  methodology that you have applied in your analysis
13  in the MDL that is directly described in the book
14  that you just referenced?
15         MS. PARFITT:  Objection.  Form.
16         THE WITNESS:  I'm not sure what you mean
17  by "directly," and I'm not sure what you mean by
18  "methodology."
19  BY MS. BRANSCOME:
20     Q   Did you apply a specific methodology in
21  reaching your opinions here in the MDL?
22     A   What do you mean by "a specific
23  methodology"?
24     Q   Did you -- did you use a methodology in
25  forming your opinions --

Page 24

1      A   Yeah.
2      Q   -- in the MDL?
3      A   I -- yes, I -- I collected as much
4  information, data from different research studies
5  as possible.  I evaluated those studies.  I
6  ordered them according to the types of evidence
7  that they provide.  I tried to synthesize the
8  evidence in particular in the basket of
9  epidemiologic research on the topic.  And I
10  juxtaposed the information from epidemiologic
11  evidence with evidence derived from other domains
12  which are provided by other experts.  And I made a
13  professional judgment about how all of that fits
14  with different ways of understanding the
15  relationship between perennial use of talc and the
16  risk of ovarian cancer.
17     Q   Is the methodology that you just
18  described that you used in forming your opinions
19  in the MDL described in the textbook that you
20  brought with you about risk factors in the
21  workplace?
22     A   It is implicit.  It is implicit in the
23  work of epidemiologists, and it's implicit in the
24  way we synthesize information.  So, in
25  epidemiologic practice, the role of -- there's no

Page 25

1  cookbook recipe in how you start the day and
2  finish the day.  You collect data.  You use your
3  best judgment about how to synthesize and
4  integrate it.  And I guess it comes under the
5  rubric of weight of evidence.  You look at all of
6  the evidence, and you (weigh it according to your
7  professional judgment.
8          And most of the agencies that have any
9  policies or statements about synthesizing
10  information will talk about collecting
11  information, evaluating it, weighing it, and
12  making a judgment about it.
13     Q   If someone were reviewing just your
14  report in the MDL, would they be able to replicate
15  the weight that you gave different pieces of
16  evidence that you considered?
17     A   The synthesis of scientific information
18  is not an automated process.  It can't be done by
19  a robot.  And in every description of how such
20  evidence is synthesized and integrated, the final
21  step always involves professional judgment, and as
22  it should, because there are too many moving parts
23  in all of this to be able to, a priori, set up an
24  algorithm that allows you to automate and arrive
25  at some score that tells you, yes or no, this

7 (Pages 22 to 25)

Jack Siemiatycki, Ph.D.

Page 26

1  agent is dangerous or not dangerous or something
2  like that.
3       So in line with everything I've done in
4  my career, everything that I've been involved with
5  in international and national agencies, whether
6  it's USNCI or the World Health Organization or
7  other agencies, the process depends critically on
8  judgment of the people who are making the
9  decisions or who are making the evaluations.
10     Q   Respectfully, Dr. Siemiatycki, that was
11 not my question.
12      My question was, could someone by
13 reviewing the report that you have provided in the
14 MDL replicate your analysis in the sense that they
15 would understand the weight that you gave to each
16 piece of evidence you considered?
17     A   I think to a considerable extent I've
18 given fairly explicit information in the report on
19 all of the components of information that I used
20 and the relative weight, but -- not in a
21 quantitative way, but the relative importance that
22 I attribute to different parts of the evidence
23 package.
24     Q   You did not do any type of scoring
25 system, for example, in considering the various

Page 27

1  underlying studies that you evaluated.  Is that
2  fair?
3      A   No -- no, I did not, because I don't
4  consider that a valid procedure.
5      Q   Why is that not a valid procedure?
6      A   Because I don't think epidemiologic
7  studies can be summarized in single-digit scores.
8  There are too many different aspects of a study,
9  and any attempt to do so, I think is flawed and --
10     Q   Why is the attempt to assigning a score,
11 single digit or otherwise, a flawed methodology?
12     A   Because there are so many -- a study can
13 be good in one dimension, mediocre in a third,
14 excellent in a fourth, bad in a fifth, so-so in a
15 sixth, and so on.
16      There are so many dimensions of a study,
17 and each one of them can be rated.  And that's --
18 that is something that I do do.  I evaluate
19 everything from participation rate to the
20 population, to the way the study was carried out, to
21 the way the questions were asked in the
22 questionnaire, to the way the information from the
23 questionnaire was -- was coded and categorized, to
24 the way the design of the -- whether its case
25 controlled or otherwise, how the subjects were

Page 28

1  selected, when they were selected, when they were
2  followed up, how -- all of these things may have a
3  different score, and you may have a hundred
4  dimensions to evaluate on each study.  And nobody
5  has come up with a -- a usable, useful,
6  replicatable method for integrating all of this.
7  There have been some attempts and there are some
8  scoring systems out there.  The fact that there
9  are scoring -- that someone has published a
10 scoring system, and that even a committee has,
11 does not mean that it's valid.
12      But I -- my professional opinion, and
13 that of I think many other people -- because
14 typically studies are not scored in this way.
15 That's -- when people review evidence.  Or if
16 they -- anyway, typically they are not, and my
17 feeling is that there is no valid way really of
18 doing it.
19      But the -- in order to sort of complete
20 the answer to I think what's behind your question
21 of why I didn't do such a thing in my report with
22 all of the studies is that I adopted early on -- I
23 made a decision early on to avoid excluding
24 studies from my analysis based on my opinion about
25 the quality of the study.  This is a decision that

Page 29

1  other meta-analyses have also made implicitly.  I
2  don't know if they've made it explicitly, but
3  there are no studies that have -- as far as I
4  know, there are no meta-analyses that have
5  literally excluded studies on the basis of quality
6  or -- or done a systematic attempt to do this.
7       And I made a decision early on that if I
8  tried to -- if I went down the road of eliminating
9  some studies from my analysis, this would be
10 criticized as some form of cherry-picking, and in
11 an attempt to avoid that criticism, I decided I
12 would include all pieces of evidence,
13 notwithstanding my opinion of the overall quality
14 of the study.
15     Q   Okay.  Dr. Siemiatycki, that was a very
16 long answer, but I will try to unpack a few --
17     A   Yes.
18     Q   -- portions of that.
19      So you would agree that in order for a
20 methodology to be valid, it has to be a process
21 that can be replicated?
22      MS. PARFITT:  Objection.  Form.
23      THE WITNESS:  What do you mean by
24 "replicated"?  You mean that someone else
25 following exactly the same steps and the -- making

8 (Pages 26 to 29)

Jack Siemiatycki, Ph.D.

Page 30

1  the same assumptions as the -- the person who did
2  the analysis would be able to end up with the same
3  statistical estimates at the end?  Is that what
4  you mean?  Or do you mean that they would make the
5  same judgments?
6  BY MS. BRANSCOME:
7    Q   Well, Dr. Siemiatycki, you indicated one
8  of the reasons why you don't agree with using a
9  quantitative point system was that a methodology
10  had not been developed that was, I believe you
11  said, useful, usable and replicable.
12      What did you mean by the word
13  "replicable" when you used it in your own answer?
14    A   Did I use the word "replicable" in that
15  sentence?  Can I -- can I read that?  (Peruses
16  monitor.)
17      I'm not sure what I had in mind with the
18  use -- the word -- yes, you can produce a
19  replicable system, but it doesn't mean that it's
20  valid.  So useful and usable, yes.  I don't think
21  that there is one that would capture, for
22  observational epidemiology, the -- all of the
23  components that are necessary really to tease out
24  good and/or bad studies.
25  BY MS. BRANSCOME:

Page 31

1    Q   My question to you, though,
2  Dr. Siemiatycki, is that, is it important for a
3  methodology to be replicable?
4    A   It is important -- the most important is
5  for it to be valid.  The replicability is an issue
6  that involves judgment.  Different scientists may
7  have different judgments about the value of
8  different components of evidence.  That diversity
9  of judgment is not a bad thing, and there's no
10  benefit to science in forcing everyone to have the
11  same judgment within some scoring system.
12      So science progresses from collection of
13  data and from different scientists evaluating the
14  data, and from the same information base different
15  scientists can make different judgments about it,
16  and in that sense, the final evaluations are not
17  necessarily replicable because different
18  scientists can make different judgments.
19      But they are understandable.  You need
20  the different processes to be sufficiently
21  understandable that different readers and so on of
22  reports can understand how you came to the
23  conclusions.
24    Q   And so it is important to be able to
25  understand what weight a particular scientist is

Page 32

1  giving to the pieces of evidence that he or she is
2  considering in reaching their ultimate conclusion.
3  Is that fair?
4      MS. PARFITT:  Objection.  Form.
5      THE WITNESS:  It depends what you mean
6  by "weight."  If you mean by "weight" a
7  quantitative number, then, no, that's not
8  necessary.
9      If you mean sort of a heuristic,
10  qualitative understanding of the relative
11  importance of different components of evidence,
12  then I would say yes.  It's important to know what
13  played into a -- a reviewer's opinion.
14  BY MS. BRANSCOME:
15    Q   You also indicated that you do in fact
16  rate studies.  What did you mean by that?
17    A   Sorry.  Can we read back where I said
18  that?  I -- (peruses monitor.)
19      I haven't found it, but I -- I think I
20  meant it as a synonym for evaluate.  I think I
21  meant I evaluate different studies.
22    Q   Okay.  If I could direct your
23  attention --
24    A   Yes.
25    Q   -- to pages -- page 19, lines 6

Page 33

1  through 8.
2    A   Of -- 19 of -- of what?
3    Q   Of the transcript that's --
4    A   Okay.
5    Q   -- in front of you, which understanding
6  is just a rough, but if you want to review your
7  answer.
8    A   Sure.  (Peruses document.)
9      Yes, here by "rated," I meant evaluated.
10    Q   Did you rank the different pieces of
11  evidence that you considered in forming your
12  opinion with respect to talc and the risk of
13  ovarian cancer?
14    A   I -- I've never done that in the
15  hundreds and hundreds of evaluations I've carried
16  out, nor in this one do I actually put a score on
17  different components of -- of a study.  Yeah.
18    Q   My question is slightly different,
19  Dr. Siemiatycki.
20      It's ranking them relative to each
21  other.  So whether or not you're assigning a
22  specific quantitative number to the study, do you
23  evaluate this is, for instance, the most important
24  study and this is the least important study on a
25  particular topic?

9 (Pages 30 to 33)

Jack Siemiatycki, Ph.D.

Page 34

1    MS. PARFITT: Objection. Form.
2    THE WITNESS: You mean overall or in --
3 in each dimension that the -- that a study is
4 comprised of?
5 BY MS. BRANSCOME:
6    Q    Did you do any type of ranking of that
7 nature, be it in a subtopic or overall?
8    A    Not -- not explicitly, no.
9    Q    You mentioned at the -- at the end of
10 your answer that you made a decision not to
11 exclude studies because you would not want to face
12 the criticism of cherry-picking; is that correct?
13    A    Yes, I said that.
14    Q    What is your understanding of the
15 criticism of cherry-picking?
16    A    My understanding is that one would --
17 one might look at a body of evidence, have a
18 preconceived notion about the topic, the
19 hypothesis under consideration, and use those
20 studies that support that hypothesis and discard
21 the other ones in some way.
22    Q    Is that good science, in your opinion?
23    A    No, that's not good science.
24    Q    Why not?
25    A    Because it doesn't produce an objective

Page 35

1 portrait of reality.
2    Q    If a scientist were to selectively
3 identify studies that were supportive of his or
4 her preconceived notion, would you consider that
5 analysis to be a valid one?
6    MS. PARFITT: Objection. Form.
7    THE WITNESS: Do you mean -- just -- I'm
8 just trying to parse your question. You said if a
9 scientist were to identify studies that were
10 supportive, et cetera, but also that were in
11 opposition or to exclude ones that are in
12 opposition?
13 BY MS. BRANSCOME:
14    Q    Fair enough.
15    So referring back to the scenario that
16 you have described as cherry- picking --
17    A    Yes.
18    Q    -- if a scientist were to engage in
19 cherry-picking, would you consider the ultimate
20 conclusion that that scientist reached with
21 respect to causation or increased risk of an agent
22 to be a valid one?
23    A    It should be suspect --
24    MS. PARFITT: Objection. Form.
25    THE WITNESS: It would be a suspect

Page 36

1 conclusion.
2 BY MS. BRANSCOME:
3    Q    When I asked you the question of whether
4 or not the methodology you applied here in forming
5 your opinion in the MDL is contained in the book
6 that you wrote about Risk Factors for Cancer in
7 the Workplace, you said it was implicit.
8    Is that methodology explicitly described
9 in that textbook or any of the other textbooks you
10 brought with you today?
11    A    I'm not sure that the methodology -- you
12 know, I think it -- the collection of data, the
13 evaluation of data, the judgment about the
14 collection of data is a part of the scientific
15 method, and it is so engrained and implicit in
16 epidemiology and in other sciences that you don't
17 really need to -- and scientists don't write in
18 their books or in their -- unless they're talking
19 to first-year students -- talk about this. It's
20 so elementary that those aspects are not really
21 described. One goes further in describing
22 specific methodologies that would pertain to the
23 topic under consideration.
24    Q    Are there different ways to perform a
25 meta-analysis?

Page 37

1    A    Yes.
2    Q    Okay. Did the method that you chosen in
3 developing your meta-analysis, is that explicitly
4 described in any of the materials you either
5 brought here with you today or of which you are
6 aware in the scientific community?
7    A    So it partly depends what you mean by "a
8 meta-analysis." And in my lexicon, meta-analysis
9 is a statistical procedure for summarizing a body
10 of -- a set of results from individual studies.
11 And that procedure is pretty standard -- has been
12 pretty standard since the 1980s and 1990s, and
13 there are some refinements since then.
14    Sorry, I may have lost the thread of
15 your question.
16    Q    If I were to try to look at a piece of
17 scientific literature, be it in a book or an
18 article, to find a published description of the
19 method that you used to perform your meta-analysis
20 in the MDL, where would I look?
21    A    The meta-analysis was conducted using a
22 software that is well known, that is commercially
23 available, and I think everyone would recognize
24 the validity of the statistical procedures under
25 those -- under that.

10  (Pages 34 to 37)

Jack Siemiatycki, Ph.D.

Page 38

1       If you're asking about which -- you
2   know, there are decisions to be made about which
3   studies to include, about which results from
4   studies to include, and all of that sort of thing,
5   which is not strictly part of the statistics of
6   meta-analysis, it's sort of the step before
7   meta-analysis, and that part is utterly unique to
8   each situation.
9       So if you're doing a meta-analysis of
10  clinical trials that have all been designed
11  basically in an identical way for an
12  antihypertensive medication, and whether the study
13  is done in Australia or California or Canada, the
14  design is pretty standard, and a lot of it can
15  be -- you can -- and you end up basically with a
16  single result from the study, what is the impact
17  on blood pressure -- the average impact on blood
18  pressure among people who use it who were given
19  the drug, the experimental group versus a
20  comparison group, et cetera, that is one type of
21  preparation for a meta-analysis.
22      If you're dealing with observational
23  epidemiology, as we are in the case of ovarian
24  cancer, and some of the particularities of the
25  literature in this domain, there are a lot of

Page 39

1   decisions that need to be made in the run-up to
2   the meta-analysis.
3       Q   So in the situation where you are
4   dealing with observational epidemiology, would it
5   be fair to say that you are applying unique
6   judgment in the selection of the studies that you
7   include in your meta-analysis and, more
8   specifically, what data from those studies you
9   include.
10      MS. PARFITT: Objection. Form.
11      THE WITNESS: Any meta-analysis in this
12  area would absolutely need to apply professional
13  judgments to those things.
14  BY MS. BRANSCOME:
15      Q   Okay.
16      A   Mine included and every -- everyone
17  else's included.
18      Q   All right. So, Dr. Siemiatycki, getting
19  back to the materials that you brought with you
20  today, you mentioned that you brought three
21  binders of scientific literature. Was that
22  correct?
23      A   Three binders of the references to my
24  report.
25      Q   Okay. So that's what I wanted to

Page 40

1   clarify.
2       So the three -- the three binders that
3   you referred to as sort of this first set of
4   materials, are those all references that are
5   identified specifically in your report from the
6   MDL?
7       A   Yes, I believe so. And just to be
8   clear, when I was sent this material from the
9   lawyers' office, it arrived in four binders. I'm
10  not sure if you received the same four binders. I
11  have re- -- I've taken some things out of there,
12  so I have three binders of those things. Just --
13  I don't know if there's confusion just between the
14  three and four, but...
15      Q   What did you remove from the set of
16  materials that you were provided by plaintiffs'
17  counsel?
18      A   I removed the IARC reports, which I have
19  in books, so I didn't need to carry around
20  hundreds and hundreds of pages extra.
21      I removed some other -- there was
22  another report with, you know, thousands of --
23  hundreds or -- at least of pages where I thought
24  the relevant material was in -- contained in about
25  20 pages. So I kept -- in material that I carry

Page 41

1   around, I kept the 20 pages and put the rest away
2   in a box.
3       Q   Do you remember which document that was?
4       A   If you give me a minute, I'll try to
5   recreate that.
6       Q   We can check that at the break if you
7   want --
8       A   Yeah. Sure, sure.
9       Q   -- to identify that document.
10      So then you -- you spoke about an
11  additional five binders --
12      A   Yeah.
13      Q   -- that you brought with you that
14  contain documents that might help you answer
15  questions during the deposition.
16      Can you describe the contents of those
17  five binders. I'm trying to avoid marking all of
18  these as exhibits.
19      A   Yeah. Please.
20      Okay. Let me just reach down and look
21  at their covers.
22      Yeah, so one contains the recent
23  manuscript of a study by Taher, et al., a Canadian
24  meta-analysis of the issue, plus -- let me see if
25  there's anything else in there. I -- I think

11 (Pages 38 to 41)

Jack Siemiatycki, Ph.D.

Page 42

1  that's it.  It's such a -- such a big report with
2  all the appendices and so on, that it takes up a
3  whole binder.
4          Another one, a smaller one, contains the
5  meta -- the main meta-analyses that have been done
6  in this area, apart from the Taher one.  So the
7  Berge, Penninkilampi, a few other older ones,
8  Langseth and some of the older ones.
9      Q   Are those materials that are in the set
10  of meta-analysis, the second binder, if you will,
11  are they replicated also in the other set of three
12  binders that you brought with you?
13     A   Yes, they are.
14     Q   Okay.
15     A   Yes, they are.
16         Sorry.  There's -- there's another one
17  in -- like that which contains all of the original
18  epidemiology studies that I used or that were
19  available to be used in the meta-analysis.  And I
20  had this binder in my previous -- in the previous
21  case that I testified on, and I thought I -- I'd
22  like to have one binder here just of the
23  epidemiology studies because the thick binders,
24  it's harder for me to find articles, so it would
25  be easier for me to find them in this binder.  So

Page 43

1  all of these are in the big binders.
2          And there's another one with Health
3  Canada weight of evidence guidelines.  Also
4  guidelines from a European agency on weight of
5  evidence and evaluation.  I think there might be
6  something from FDA about that, and also some of
7  the information regarding agency -- what agencies
8  have put on their websites, if anything, about
9  talc, which would include the National Cancer
10  Institute and some other agencies.
11         So these are mainly -- well, partly
12  printouts from websites.  Partly the Canadian Risk
13  Management scope for talc published very recently
14  from the Canadian Department of Health.  And this
15  sort of information.  Not -- not all of those are
16  in the thick binders.
17     Q   Are all of the documents in the binder
18  that you are holding there, which I think is your
19  fifth binder, are all of those documents
20  identified within your report or in your reference
21  materials?
22     A   No.
23     Q   I would like to mark that binder as
24  Exhibit 4.
25         (Exhibit No. 4 was marked for

Page 44

1      identification.)
2  BY MS. BRANSCOME:
3      Q   Now, Dr. Siemiatycki, with the exception
4  of a copy of your report, which you previously
5  testified has some handwritten annotations on it,
6  do any of the other materials that you brought
7  with you today have any notes, handwritten or
8  typed, or highlighting or any other form of
9  annotation?
10     A   Yes.  The -- the epidemiology studies
11  and probably the meta-analyses, the previous
12  meta-analyses.  I -- I tend to scribble notes when
13  I'm reading an article on the side, so some of
14  those may very well have scribbled notes on -- in
15  the margins or things underlined.
16     Q   Dealing first with the binder of the
17  original epidemiological studies that you said you
18  had at a prior deposition, have you annotated that
19  in any way since you brought that to another
20  deposition?
21     A   Since today?  Sorry.
22         MS. BRANSCOME:  Michelle, perhaps you
23  could help me.
24         MS. PARFITT:  Sure.  Yeah, absolutely.
25         MS. BRANSCOME:  Has that specific binder

Page 45

1  been marked as an exhibit at a prior deposition?
2          MS. PARFITT:  Let me see which one.
3          Ms. Branscome, I don't want to
4  represent -- and I would tell you that these were
5  all the studies that he's had over the course of
6  the last few years.  I can't imagine it wasn't
7  asked for in prior depositions, but I can't -- I
8  can't represent --
9          MS. BRANSCOME:  Okay.
10         MS. PARFITT:  -- one way or another.  I
11  really can't.
12         MS. BRANSCOME:  Let's go ahead.  I would
13  like to mark the binder --
14         MS. PARFITT:  I will tell you this --
15  maybe I can.  There are pink numbers, number 10,
16  number 14, which suggest to me that they might
17  have been referenced in a deposition at one point
18  in time as an exhibit.
19         THE WITNESS:  Not -- some of them, but
20  not all of them, have those numbers.
21         MS. PARFITT:  Okay.
22         THE WITNESS:  They also have numbers in
23  the corner of my -- my team's personal filing
24  system of articles, so things like that.
25         MS. BRANSCOME:  Out of an abundance of

12  (Pages 42 to 45)

Jack Siemiatycki, Ph.D.

Page 46

1  caution, we will mark the binder that has been
2  described as containing the original
3  epidemiological studies as Exhibit 5, and the
4  binder that contains the meta-analyses as
5  Exhibit 6.
6            (Exhibit Nos. 5 and 6 were marked
7            for identification.)
8  BY MS. BRANSCOME:
9       Q    Did you bring anything else with you to
10  the deposition today?
11      A    Cell phone, glasses, et cetera, but no.
12      Q    I was provided before the deposition
13  began with a single piece of paper that I
14  understand to be a bill for professional services.
15           If we could mark a copy of that as
16  Exhibit 7.
17           MS. BRANSCOME:  Michelle, I don't know
18  if you have an extra copy.
19           MS. PARFITT:  I do.
20           (Exhibit No. 7 was marked for
21           identification.)
22           MS. PARFITT:  I have additional copies
23  for counsel, if you would like.
24           MS. BRANSCOME:  I think we passed one
25  around.

Page 47

1  BY MS. BRANSCOME:
2       Q    Dr. Siemiatycki, do you recognize the
3  document that's been placed in front of you that's
4  been marked as Exhibit 7?
5       A    Yes, I do.
6       Q    And could you describe for the record
7  what this document is.
8       A    It's a bill for services that I sent to
9  Ms. Parfitt dated November 18, 2018, in which I
10  billed for work done between August and November
11  2018 on the MDL case.
12      Q    Is it correct that this is a bill that
13  covers 56 hours that you billed in connection with
14  your work on this case in the month of July
15  through August 2nd, 2018?
16      A    Sorry, do -- July?  Is this the same --
17           MS. PARFITT:  August.  I have August to
18  November.
19           THE WITNESS:  Do you have a bill labeled
20  July?
21           MS. PARFITT:  We have July to August,
22  and here's the August --
23  BY MS. BRANSCOME:
24      Q    Sorry, we had different pieces of paper,
25  Dr. Siemiatycki.

Page 48

1       A    Okay.
2       Q    So why don't we mark as Exhibit 8 the
3  bill for professional services that covers the
4  month of July.
5            (Exhibit No. 8 was marked for
6            identification.)
7            MS. PARFITT:  Sure.  I don't have extras
8  of those.  Does anyone have a clamp?  If I could
9  have one of those?  Thank you.
10           MR. TISI:  Number 7, for the record, is
11  the one that goes to November.
12           MS. BRANSCOME:  We'll -- we'll clear it
13  up.
14           MR. TISI:  Thank you.
15           THE WITNESS:  Got it.
16  BY MS. BRANSCOME:
17      Q    So, Dr. Siemiatycki, you have two
18  exhibits in front of you there, an Exhibit 7 and
19  an Exhibit 8.
20           Do they both contain bills for
21  professional services for the work that you have
22  done in connection with this litigation?
23      A    Yes, they do.
24      Q    And what has been marked as Exhibit 7
25  covers a work period of August 9th through

Page 49

1  November 16th, 2018, during which you billed 136
2  hours; is that correct?
3       A    That's correct.
4       Q    And then Exhibit 8 covers the period of
5  time July 1st through August 2nd, 2018, over which
6  you billed 56 hours; is that correct?
7       A    That's correct.
8       Q    And you bill for your time at $450 an
9  hour, correct?
10      A    That's correct.
11      Q    Do the two bills for professional
12  services that have been marked as Exhibits 7 and 8
13  contain any time for work done by others at your
14  direction?
15      A    They contain work that has been done by
16  a couple of -- by one research assistant, and I
17  make an arrangement with her to reimburse her for
18  her time.  So it's -- it's covered in these, yes.
19      Q    Okay.  And so how is your research
20  assistant's time billed to plaintiffs' counsel?
21      A    It's not billed.  I -- I adjust the
22  billable hours to reflect the time that she works
23  for me.
24      Q    So if I was looking at Exhibit 7 and
25  Exhibit 8, how much in terms of hours of this

13 (Pages 46 to 49)

Jack Siemiatycki, Ph.D.

Page 50

1    reflects your personal time?
2        A    Between 95 percent and 98 percent,
3    almost all of it.
4        Q    And do the two exhibits that you have in
5    front of you there, Exhibit 7 and Exhibit 8, does
6    that cover all of the work that you have done in
7    connection with forming your opinions in this
8    case, meaning the MDL?
9        A    In forming the opinions for the report,
10   yes.
11       Q    These bills do not include time that you
12   spent preparing for today's deposition, correct?
13       A    That's correct.
14       Q    About how much time have you spent
15   preparing for today's deposition?
16       A    I would say the time since November 18,
17   which is referenced here, to today, there were
18   actually two components.  One was preparing for
19   the deposition.  Another was a bit of a flurry of
20   activity in December, I think it was, when a
21   couple of reports from Health Canada and from
22   the Taher group were published, and I reviewed and
23   tried to think about that information as well.
24           So just to be as precise as possible, I
25   just want to make that clear.  It's not -- it

Page 51

1    wasn't only preparation.  But I -- I guess we're
2    talking about a couple of weeks' work in -- since
3    November, but between six and ten days maybe,
4    something in that ballpark.
5        Q    And how would -- what would that be in
6    terms of hours?
7        A    Between 40 and 60 hours or -- subject to
8    revision, I could -- I could look that up.
9        Q    Have you billed plaintiffs' counsel for
10   that time yet?
11       A    No, I haven't.
12       Q    Presumably you will be billing them for
13   the time you spend here today during your
14   deposition as well, correct?
15       A    I -- I presume so as well.
16       Q    You referenced a flurry of activity in
17   December related to the Health Canada information
18   becoming public.
19           Did you produce or generate any type of
20   written work product in connection with your
21   review of those materials?
22       A    No, I didn't.
23       Q    Did you take any notes while reviewing
24   the materials that came out in December -- around
25   December 2018 related to the Taher manuscript and

Page 52

1    paper and the Health Canada statement?
2        A    No, I didn't.
3        Q    Did you annotate any of the materials
4    that you reviewed?
5        A    I'm -- I'm not sure.  I typically have a
6    pen in my hand when I'm reading, so I couldn't say
7    that I never underlined anything or -- I just
8    don't recall making any -- and I don't know that I
9    could find -- if I did look at it in December, I'm
10   not sure I could find that copy because I -- I
11   tend to print things over when -- and I -- there
12   was nothing written that I wanted to retain.  I
13   didn't write anything that I have used or -- yeah.
14           MS. BRANSCOME:  We've been going for a
15   little over an hour.  Is now a good time to take a
16   break?
17           THE WITNESS:  It's a great time.
18           THE VIDEOGRAPHER:  We are going off the
19   record at 10:55 a.m.
20           (Recess.)
21           THE VIDEOGRAPHER:  This begins disc
22   number 2 in the deposition of Jack Siemiatycki.
23   We're going back on the record at 11:15 a.m.
24   BY MS. BRANSCOME:
25       Q    Before we took the break,

Page 53

1    Dr. Siemiatycki, we were looking at the two bills
2    for professional services that have been marked as
3    Exhibit 7 and Exhibit 8.
4           And so in addition to the 56 hours that
5    are on Exhibit 8, the 136 hours on Exhibit 7, and
6    the approximately 40 to 60 hours you have spent
7    since mid-November of 2018, how much time have you
8    spent in connection with your opinions across all
9    talc litigation?
10          MS. PARFITT:  Objection to form.
11          THE WITNESS:  Including the previous
12   case that I was involved in, you're saying?
13   BY MS. BRANSCOME:
14       Q    Yes.
15       A    Whew.  I -- four to six weeks maybe
16   or -- I spent, I think, nearly two weeks in LA
17   while that case was going on, so that's one big
18   block of time.  And then I -- at least a month
19   full time, the equivalent of, before that.  But,
20   I'm sorry, I can't be more precise.
21       Q    What would that be in terms of hours?
22       A    Hours.  Let's say eight hours a day --
23   30, 40 -- 400 hours plus or minus 200.
24       Q    So a range of between 200 and 600 hours,
25   do you think?

14  (Pages 50 to 53)

Jack Siemiatycki, Ph.D.

Page 54

1      MS. PARFITT:  Object.
2      THE WITNESS:  It would be more than 200
3  for sure.  So -- to the best of my recollection,
4  it might be between 400 and 600.  But...
5  BY MS. BRANSCOME:
6      Q   How much have you billed to date for all
7  of the work you've done in connection with talc
8  litigation?
9      A   Well, I -- I don't remember.
10     MS. PARFITT:  Don't guess.
11     THE WITNESS:  I don't remember a total.
12  BY MS. BRANSCOME:
13     Q   Do you charge $450 per hour for all
14  types of work that you have done in connection
15  with the talc litigation?
16     A   Yes, I do.
17     Q   Do the fees that you charge in
18  connection with your work as an expert witness in
19  the talc litigation go directly to you personally?
20     A   Yes, they do.  Well, they go to a
21  corporation that -- that I control, as you see in
22  the bills.
23     Q   Do you pay anyone else for the -- using
24  the funds that the corporation has received for
25  the expert work you've done in connection with the

Page 55

1  talc litigation?
2      MS. PARFITT:  Objection.  Form.
3      THE WITNESS:  Yes, when I ask someone to
4  do some specific tasks, I pay them for that.
5  BY MS. BRANSCOME:
6      Q   And are the fees that you pay to other
7  individuals for tasks that they do in support of
8  your work, do those fees get billed to plaintiffs'
9  counsel?
10     A   No, they don't.
11     Q   Can you give me an approximation of how
12  much you have paid to others from the fees you
13  have billed to plaintiffs' counsel?
14     A   In MDL or in total?
15     Q   In all of the talc litigation.
16     A   My guesstimate would be that it's in the
17  order of 2 or 3 or 4 percent -- maybe 2 percent of
18  the total that I've billed.
19     Q   So it's fair to say that approximately
20  96 to 98 percent of all the fees that have been
21  billed to plaintiffs' counsel for your work as an
22  expert in the talc litigation will come to you
23  personally?
24     A   Yes.
25     Q   What percent of your professional time

Page 56

1  do you currently spend performing work in
2  connection with litigation?
3      A   By presently, can you give me a time
4  frame?  You don't mean today, I presume.  When you
5  say -- do you mean in the last year?  In the last
6  10 years?
7      Q   Let's say over -- over the past 12
8  months, what percent of your professional time was
9  spent performing work in connection with
10  litigation?
11     A   Ten to 20 percent ballpark.
12     Q   And has that percentage of time spent on
13  work in connection with litigation changed over
14  the past five years, for example?
15     A   Yes, it's very variable depending on
16  requests for participation in litigation.  So in
17  the past five years, my main contact with
18  litigation has been in the ovarian cancer cases,
19  but at -- around five years ago, I was also
20  working on two other cases in Canada.
21     Sorry, what was the question?
22     Q   Sure.  How -- I'll ask a new one.
23     How has the percentage of time that --
24     A   Oh, oh.
25     Q   -- you spend in connection with work

Page 57

1  done related to litigation changed?
2      A   Any litigation, right?
3      Q   Yes.
4      A   Or -- or talc litigation?
5      Q   I'll start with all litigation.
6      A   So it's -- as I said, it's very variable
7  from month to month.  And -- and -- I mean, I
8  guess over the past five years, it has kind of
9  averaged out at about 10 percent of my time, 10 to
10  20 percent of my time.
11     Q   And over the past two years, has all of
12  the litigation work you've been doing, has that
13  been exclusively focused on talc?
14     A   Yes.
15     Q   The report that -- sorry, the report you
16  prepared in connection with the MDL is not the
17  first expert report you have generated with
18  respect to a potential link between talc and
19  ovarian cancer, correct?
20     A   That's correct.
21     Q   You produced a report in connection with
22  the talcum powder litigation dated October 4th,
23  2016, correct?
24     A   That's correct.
25     Q   If you could turn in your binder there

15  (Pages 54 to 57)

Jack Siemiatycki, Ph.D.

Page 58

1  to tab 2.
2      A   In this big binder?
3      Q   Yes, please.
4          Is the document behind tab 2 your expert
5  report dated October 4th, 2016, that related to
6  the talcum powder litigation?
7      A   Yes, it is.
8          MS. BRANSCOME:  I would like to mark
9  that as Exhibit 9.
10         (Exhibit No. 9 was marked for
11         identification.)
12 BY MS. BRANSCOME:
13     Q   The report marked as Exhibit 9 was not
14 drafted for a particular case; is that correct?
15     A   I -- I -- I'd have to defer -- I'm not
16 exactly sure sometimes whether these reports refer
17 to a specific case or not.
18     Q   Okay.  Let me do it this way:  What was
19 the question that you were attempting to answer in
20 the report that has been marked as Exhibit 9?
21     A   So the question was the generic question
22 of whether there is a causal relationship between
23 use of talcum powder products and ovarian cancer.
24     Q   And specifically, the report marked as
25 Exhibit 9, were you looking specifically at

Page 59

1  perineal or genital use of talc?
2      A   That was the focus, yes.
3      Q   Did your 2016 report address any cancer
4  risk associated with the inhalation of talc?
5      A   Not that I recall.  It certainly wasn't
6  a focus.  There may have been some reason to
7  allude to that issue, but I can't recall that
8  it -- that there was.
9      Q   Okay.  You had your deposition taken on
10 December 15th and 16th, 2016, correct?
11     A   I believe so.
12     Q   And that deposition was for two specific
13 cases, the Oules and the Daniels case, correct?
14     A   I guess so.  But again, I -- that --
15 I'm -- I don't recall exactly which cases.
16     Q   You also have testified at trial in a
17 case involving allegations about Johnson's Baby
18 Powder, correct?
19     A   That's correct.
20     Q   And that was the Echeverria case?
21     A   Yes, it was.
22     Q   And you testified in trial in August of
23 2017, correct?
24     A   Correct.
25     Q   You did not issue an expert report

Page 60

1  specific to the Echeverria case, correct?
2      A   Correct.
3      Q   So the expert report that described the
4  opinions that you were offering in that case is
5  the one that we have just marked as Exhibit 9.  Is
6  that fair?
7          MS. PARFITT:  Objection.  Form.
8          THE WITNESS:  I -- I'm -- I'm hesitating
9  because I'm not sure what the significance of the
10 phrase "the expert report that you offered" is.  I
11 didn't -- I didn't in a sense offer this report
12 for -- at that trial.  I testified at that trial,
13 and they had this expert report available to them.
14 BY MS. BRANSCOME:
15     Q   Okay.  Let me ask it this way:  You
16 generated an expert report specific to the MDL,
17 correct?
18     A   Yes.
19     Q   And we are going to look at that --
20     A   Yes.
21     Q   -- but that is a report that is dated at
22 some point in 2018, correct?
23     A   Correct.
24     Q   Did you generate an expert report at any
25 time in between the expert report that you

Page 61

1  generated there in October 2016 and the expert
2  report you have supplied that's dated November
3  2018?
4      A   No, I did not.
5      Q   All right.  So if I may, I would like to
6  actually mark your copy of your 2018 report.  And
7  that will be marked as Exhibit 10, if you have
8  that in front of you.
9          (Exhibit No. 10 was marked for
10         identification.)
11         (Counsel conferring.)
12 BY MS. BRANSCOME:
13     Q   To be clear, for the record, I'm marking
14 as Exhibit 10 your MDL expert report, but it is
15 your copy.
16     A   Yes.
17     Q   Okay.  And as I understand it, the copy
18 that you brought with you here today that's now
19 been marked as Exhibit 10 contains some
20 corrections.  Is that -- is that fair?
21     A   Yes.
22     Q   Could you please walk me through the
23 corrections that you have made to your 2018 MDL
24 report that has been marked as deposition
25 Exhibit 10.

16  (Pages 58 to 61)

Jack Siemiatycki, Ph.D.

Page 62

1      A   Yes.  So the first is on page 47.  And
2   in the first full paragraph that begins with
3   "Table 9," on the fourth line --
4      Q   Let me pause you there for a moment,
5   Dr. Siemiatycki.  Are we both looking at page 47?
6      A   Now, I -- I'm not sure whether I printed
7   this in a way that is not -- does not correspond
8   to the version that you have.  I'm sorry.  I
9   printed this just for my own use, so I didn't --
10      Q   No, looking at it, it looks similar.
11      A   Oh, okay.
12      Q   So why don't you direct me to the
13   specific correction.  I thought you were referring
14   to the image of Table 9.
15          MS. PARFITT:  No, no.  I think we're
16   all on the same -- it's the same one you have --
17          THE WITNESS:  Okay.
18          MS. PARFITT:  -- on your thumb drives.
19          THE WITNESS:  Okay.
20   BY MS. BRANSCOME:
21      Q   All right, we'll start again.  So,
22   Dr. Siemiatycki, if you could identify for me the
23   corrections that you are making to your MDL report
24   from November 2018.
25      A   Right.  So on page 47, the first full

Page 63

1   paragraph, the fourth line, there are some
2   numbers.  It says "1.25," and then in parentheses,
3   there is a 1.0 that was really a literal typo.
4   Someone's -- my fingers were too heavy, and the
5   one -- the first 1.0 should be dropped, and so the
6   correct number is 1.15 to 1.36.  Okay?
7          The next one -- I'm sorry.  Oh, the next
8   one is on page 45, so a couple of pages earlier,
9   in the second line -- are you with me? -- the
10   sentence that begins "While the Terry 2013."  It
11   should be the Berge -- "While the Berge" -- the
12   first Terry -- I'm just thinking out loud again.
13   Whether in fact the Terry was the correct --
14   anyway, yesterday when I was correcting this
15   quickly, I thought that it -- that I had
16   miswritten "Terry 2013" in that sentence and that
17   it should have been Berge 2018.
18          Do you mind if I look at this again at
19   lunchtime and just verify which I was referring
20   to?  I'm now confusing myself about that.
21      Q   Not a problem.  We can come back to that
22   after -- either the next break or the lunch break.
23      A   And that -- those are the only
24   corrections I picked up as I was going through it.
25      Q   I noticed as you were flipping through

Page 64

1   your copy of your report that there were other
2   handwritten annotations.
3      A   Yeah.
4      Q   Can you please walk me through -- unless
5   it's voluminous, in which case we can do it after
6   a break -- any notations that you have made in
7   your copy of your MDL report.
8      A   It's not voluminous.  I didn't make
9   many.  One is on page 49.  And in the middle of
10   the page in italics, there is a misconception
11   counting, et cetera, and just before that, I was
12   talking about hospital-based studies and
13   population-based studies.  So the section that
14   begins on page 48 is about hospital-based versus
15   general population-based studies.  And I made a
16   note to myself after that -- at the end of that
17   section, also --
18          I mean, do you want me to quote what I
19   wrote?
20      Q   Yes, please.
21      A   Sure.  I said:  "Also the basin for
22   hospital controls may differ from the basin for
23   cases."
24      Q   And what did you mean by that?
25      A   So, you're familiar with the idea, a

Page 65

1   hospital-based study?  There are actually
2   different types of hospital-based studies, which
3   is something that has not come out in, really, in
4   any of the discussion of this literature.
5          But one of the problems with hospital-
6   based studies is that when you choose a control
7   group, let's say for a series of ovarian cancer
8   cases from a given hospital, and you go to a
9   different ward in that hospital to look for
10   controls who are not -- don't have ovarian
11   cancer -- the reasons for referral and the --
12   pattern of patients coming to hospitals differs
13   for different diseases.  So serious -- it
14   generally is the case that serious diseases in
15   specialized hospitals tend to come from a wider
16   geographic and social area than cases of traffic
17   accident injuries or things that are treated in
18   general hospitals more easily.
19          And if you just take a series of cases
20   of ovarian cancer and go to the emergency
21   department to choose controls or you go to the GI
22   surgery department where they do appendectomies
23   routinely or something like that, you're picking
24   up populations who are quite different.
25          And this is one of the disadvantages of

17 (Pages 62 to 65)

Jack Siemiatycki, Ph.D.

Page 66

1 a hospital-based control strategy, and it's one of
2 the reasons why, in general, epidemiologists favor
3 population-based studies rather than hospital --
4 case control studies, population-based case
5 control studies, rather than hospital-based case
6 control studies, because the cases and the
7 controls -- one of the requisites in a case
8 control design is that the patients -- the cases
9 and the controls should represent the same study
10 base, the same basin of people who if they were
11 cases with the disease in question, ovarian
12 cancer, this is where they would end up, and all
13 of them would end up there.
14      Q   Are there any studies that were relevant
15 to your analysis for your MDL report that you
16 think this particular criticism that you have just
17 explained applies to?
18      A   I'm not sure.  I didn't examine them
19 from that point of view.
20          In this section of my report, it was
21 kind of a generic discussion of the issue of -- of
22 the merits of hospital-based versus population-
23 based studies.
24      Q   Okay.  Do you have any other annotations
25 that you made in your copy of your MDL report?

Page 67

1      A   At the bottom of that same page, 49, I
2 wrote, quote, "Borenstein."  And right now I'm --
3 oh, yes.  So this misconception about counting the
4 number of statistically significant results as a
5 valid way of assessing consistency of results
6 among different studies is a basic flaw in the
7 conduct and interpretation of how to review a
8 series of studies.
9          It's well known.  I've known and I --
10 said it in my report that this is absolutely not
11 the way to synthesize evidence from multiple
12 studies, to count the number of significant ones.
13 And in addition to me saying it and many others, I
14 thought that I could -- if you asked me questions
15 about it or challenged my opinion on that score, I
16 could quote the textbook on meta-analysis, which
17 gives some good examples of why that's wrong.
18      MS. PARFITT:  Let's stop here for a
19 minute --
20      MS. BRANSCOME:  If we could go off the
21 record.
22      MS. PARFITT:  -- and go off the record.
23      THE VIDEOGRAPHER:  We're going off the
24 record at 11:39 a.m.
25          (Pause.)

Page 68

1          THE VIDEOGRAPHER:  We're going back on
2 the record at 11:41 a.m.
3 BY MS. BRANSCOME:
4      Q   Do you have any other annotations there
5 with you on your copy of your report?
6      A   No.  I have one other green sticky on
7 page 67, but there's nothing written on that page,
8 and I don't remember why I put that sticky there.
9      Q   Okay.  The report that we just marked as
10 Exhibit 10, does that define the scope of your
11 opinions in the MDL?
12      A   The scope of my opinions.  It defines my
13 opinions, yes.
14      Q   Does it contain all of the opinions that
15 you intend to offer at any trial or hearing in the
16 MDL?
17      A   I mean, I guess if I'm asked a question
18 that veers off from something I said in my report,
19 and I address the question, would that be
20 considered going off -- you know, offering an
21 opinion that is not in my report?
22          It's just that -- I'm just not sure
23 about the technicality of your question.  I mean,
24 I will offer -- I will answer questions even if
25 they lead off the content of my report.

Page 69

1      Q   As you sit here today --
2      A   Yes.
3      Q   -- does the report that has been marked
4 as Exhibit 10 contain all of the opinions that you
5 have formed as of today about which you would
6 intend to testify at trial or a hearing on this
7 matter?
8      A   I -- I believe so.
9      Q   What was the question that you were
10 asked to answer in connection with the report you
11 generated in 2018?
12      A   I guess I -- I'll just refer back to
13 what it says in the report:  "Can application of
14 talcum powder products in the perineal region
15 cause ovarian cancer?"
16      Q   Is that question different from the
17 question you were answering in your 2016 report?
18      A   I -- I don't see them as different.
19      Q   You would agree with me, though, that
20 there are differences between the report that you
21 produced in November 2018 and the report that you
22 produced in October 2016?
23      MS. PARFITT:  Objection.  Form.  Vague.
24      THE WITNESS:  Yes, there are some
25 differences.

18 (Pages 66 to 69)

Jack Siemiatycki, Ph.D.

Page 70

1  BY MS. BRANSCOME:
2      Q   When you began drafting the report
3  that's been marked there as Exhibit 10, your MDL
4  report, did you begin by using your 2016 report as
5  an initial draft?
6      A   Yes.  But I also had some ideas about
7  new things that I would want to do.  Sort of
8  coming out of the Echeverria experience, I
9  realized that there were -- there were a couple of
10  errors in that -- my original report that I wanted
11  to correct.  There were ways of doing the analyses
12  that, on reflection, I thought were not optimal
13  and that I could improve on, even if I anticipated
14  that the bottom line results would not change
15  much.  But when I came to actually drafting the
16  text, I certainly used the previous report as a
17  primary source for revising -- for -- for drafting
18  the new one.
19      Q   You mentioned that you wanted to make
20  some modifications because there were things in
21  the 2016 report that were either not optimal or
22  were errors.
23          Were any of the modifications that you
24  made done at the suggestion of plaintiffs'
25  counsel?

Page 71

1          MS. PARFITT:  Objection.
2          THE WITNESS:  No.
3  BY MS. BRANSCOME:
4      Q   So any of the changes that you made
5  between your 2016 report and the MDL report in
6  2018, were those all at your own prompting?
7      A   Yes.
8          MS. PARFITT:  Objection.  Form.
9          THE WITNESS:  Yes.
10  BY MS. BRANSCOME:
11      Q   Did you work in the same computer file
12  to draft the 2018 report from start to finish?
13          MS. PARFITT:  Objection.  Form.
14          THE WITNESS:  You're -- you're referring
15  to the text, not the statistical analyses, which
16  were done in a separate -- I mean, they -- they --
17  the statistical analyses were based on the
18  addendum that I presented to you, and those are
19  kept on a FileMaker software, which is not on my
20  personal computer, but that my assistant has
21  access to.
22          But as far as the text is concerned --
23  yeah, I think it was the same computer, but I've
24  changed computers since then, so I'm just
25  hesitating because I'm trying to think of the time

Page 72

1  sequence, and I use both of them now but in
2  different places.
3          But -- so is your question, is it
4  exactly the same computer that all the files were
5  kept on or -- is that the sense of your question?
6  BY MS. BRANSCOME:
7      Q   How about I ask it this way:  Can you
8  describe for me the process by which you drafted
9  your 2018 report that's been marked as Exhibit 10?
10      A   So I guess there were two parallel
11  things going on, or maybe more.  One was to do
12  some reanalyses of the statistical meta-analysis.
13  And so that I initiated at a certain point
14  between -- probably in 2018.
15          At the same time, and I'm not sure if
16  this was after or before the statistical analyses
17  were started, I looked at the old draft.  I
18  reviewed what was there, what I thought were
19  weaknesses in the way of expressing things or
20  things that could be brought to the report that
21  would enhance the clarity or the force of the --
22  the exposition, and I started redrafting.  So I'm
23  not sure if that answers your question.
24      Q   Did you personally type the words that
25  are contained in Exhibit 10?

Page 73

1      A   All -- maybe all of them, and maybe
2  there were some paragraphs that I handwrote
3  because I was on a plane or a train, and when I
4  got back to the office, I asked someone to type up
5  that paragraph or two.  But basically it was done
6  by me.
7      Q   And did you save draft versions along
8  the way?
9          MS. PARFITT:  Objection.  Form.
10          THE WITNESS:  Not really.  Not --
11  certainly not systematically.  I didn't save any
12  reason to save discarded versions of things.
13  Yeah.
14  BY MS. BRANSCOME:
15      Q   Did you conduct a new literature review
16  in connection with the 2018 report?
17      A   I knew that I had all of the literature
18  that was pertinent and published as of 2016.
19  Updating what was available was partly done by
20  asking my research assistant to do a PubMed search
21  of anything new on the topic; asking the lawyers
22  if they had come across anything new in the past
23  year; my own antenna of knowing a lot of
24  epidemiologists and people who work in this area,
25  whether they are aware of anything.  So sort of an

19 (Pages 70 to 73)

Jack Siemiatycki, Ph.D.

Page 74

1    informal updating process from many branches.
2        Q    Did plaintiffs' counsel provide you with
3    studies that had come out since you had generated
4    your 2016 report?
5        A    I think they sort of pointed me to a
6    couple of things that I didn't have at the time.
7    I think one was the Penninkilampi review.
8            We're talking about the epidemiology
9    literature or everything?  Because the
10   epidemiology literature I was pretty much in
11   control of through my networks and my people and
12   so on.
13           The stuff that I asked counsel to help
14   with was identifying literature in the areas of
15   toxicology, composition of talcum powder products,
16   mechanistic research that would bear on the issue.
17   So I asked them if they would provide me any new
18   data that they had available on those topics.
19       Q    Do you consider yourself an expert in
20   toxicology?
21       A    No.  I'm sufficiently familiar to be
22   able to integrate the expertise of -- of real
23   experts.
24       Q    Do you consider yourself an expert on
25   the composition of talc?

Page 75

1        A    No.
2        Q    And do you consider yourself an expert
3    on potential biological mechanisms of the
4    development of ovarian cancer?
5        A    No.
6        Q    Other than being aware of the opinions
7    of others in those particular fields, are you
8    offering any expert opinions in toxicology, the
9    composition of talc, or the biological mechanism
10   by which ovarian cancer may develop?
11       A    I'm --
12           MS. PARFITT:  Objection.  Form.
13           Go ahead.
14           THE WITNESS:  I'm -- I reviewed the
15   information that I was provided, and I took note
16   of the types of evidence that are available in
17   those domains, and I used it mainly in thinking
18   about biological plausibility of the association.
19   It -- those areas of evidence did not in any way
20   influence my opinions about the strength and
21   consistency and so on of the epidemiological
22   evidence.
23   BY MS. BRANSCOME:
24       Q    Did you -- oh, before I forget, what is
25   the name of the software that you used to do the

Page 76

1    statistical analysis for your meta-analysis?
2        A    It's -- I think it's called
3    Meta-Analysis, but -- it's called Comprehensive
4    Meta-Analysis, Version 3.  It's listed in my
5    report on page 34.
6        Q    And is that the only software that you
7    used to perform the statistical analyses in your
8    report?
9        A    It's the only software that I used to
10   perform the meta-analyses.  Are there any other --
11   I'm just trying to think if there are any other
12   analyses in the report besides meta-analyses or
13   statistical.
14           There were a couple of studies, and I --
15   I couldn't point them out just this minute, that
16   did not provide full information allowing -- that
17   didn't provide full information on odds ratios or
18   relative risks in a format that was useful for the
19   meta-analysis.  And -- but they did provide the
20   numbers of cases and controls who were exposed and
21   unexposed.  And that would typically -- I think in
22   at least one instance, maybe two, but at least one
23   instance, there was a situation where they
24   provided odds ratio estimates in different
25   categories of usage of talc or either different

Page 77

1    durations or different amounts used per day or
2    something like that, but didn't summarize that in
3    an overall ever-used-it-at-all versus
4    never-used-it, which was what I was looking to use
5    in the meta-analysis.
6            And I think in those -- in that
7    instance, I did almost a hand calculation.
8    Because it's pretty straightforward how you do
9    this, just re- -- picking the numbers in their
10   tables and recalculating the overall odds ratio.
11           But this is a few years ago, and I --
12   I -- I would have to go back and review that, but
13   it was -- I think in the other meta-analyses,
14   Berge and Penninkilampi, which were carried out
15   completely independently of mine, and I didn't
16   know about theirs, I think they had to do
17   something similar and arrived at the same answers.
18           So -- but, no, I mean there was no -- no
19   other statistical package used.  That kind of
20   calculation can be done by hand.
21       Q    How would -- how would I, if I'm looking
22   at your report, identify which studies you
23   actually calculated the odds ratio or relative
24   risk that you input into your meta-analyses?
25       A    I -- I -- I'd have to look at it at

20  (Pages 74 to 77)

Jack Siemiatycki, Ph.D.

Page 78

1  lunchtime, if you don't mind, and see if there was
2  one.
3        There was one.  I don't know if that was
4  retained in the end or if -- I'm sorry.  It's --
5     Q   When you say you don't know if a study
6  was retained in the end, are there studies that
7  you considered including in your meta-analysis and
8  ultimately did not?
9     A   Only if they didn't provide evidence on
10 the relationship between talcum powder used in the
11 perineal area and ovarian cancer.
12    Q   All right.  If you wouldn't mind looking
13 at that at lunch, we will come back --
14    A   Yes.  Thank you.
15    Q   -- to that after the lunch break.
16       THE WITNESS:  Someone make a note for
17 me.
18 BY MS. BRANSCOME:
19    Q   Did you --
20       MS. PARFITT:  Yes, a note.
21 BY MS. BRANSCOME:
22    Q   Did you personally conduct the
23 meta-analysis that was performed as part of your
24 2018 report?
25    A   No, I did not do the --

Page 79

1     Q   Who did that?
2     A   My student.
3     Q   And what is your student's name?
4     A   Mengting, M-E-N-G-T-I-N-G, Xu, X-U.
5     Q   And -- and what are -- is it Mr. or
6  Dr. Xu?
7     A   It's -- she's a Ph.D. student at the
8  moment.  She will be a doctor.
9     Q   What are her qualifications for
10 conducting a meta-analysis?
11    A   She is very skilled at statistical
12 analyses and at -- at computer packages.  I'm not
13 sure if she's taken a course in meta-analysis
14 specifically, but it's not rocket science to do
15 that with a package like the one we have.
16    Q   Did you verify that the meta-analysis
17 was performed correctly using the software?
18    A   I looked at the results in various ways
19 to assure myself that everything looked good.  By
20 looking good, I mean that there was internal
21 coherence, like she carried out many different
22 meta-analyses under different conditions and --
23 not different conditions, but including some
24 studies and excluding studies -- these are called
25 sensitivity analyses -- and the pattern of results

Page 80

1  from one to another was perfectly in line with
2  what I would expect.
3        Furthermore, the results that we
4  obtained are almost identical to the results that
5  others have independently obtained doing
6  meta-analyses on these topics using basically the
7  same studies.  Sometimes the difference of --
8  minor differences of which result from each study
9  they selected, but basically the results are so
10 similar that I'm confident that there was no
11 glitch.
12    Q   Did you save the results of these
13 sensitivity analyses?
14    A   Do you mean the output from the computer
15 software for each one?  Is that what you're --
16    Q   Is there any way from the materials that
17 you have produced in connection with your report
18 for someone to replicate the sensitivity analyses
19 that you performed?
20       MS. PARFITT:  Objection.  Form.
21       THE WITNESS:  Well -- I reproduced in
22 the report a few plots of -- that come straight
23 out of the program.  So for those, it's absolutely
24 replicatable.  Anybody can then go to the package
25 and put -- punch in the same input, and they'll --

Page 81

1  they'll get the same output.  For the -- I didn't
2  do that for every single sensitivity analysis,
3  just for economy -- to save the reader the burden
4  of that.  But I'm pretty sure -- I'm pretty sure
5  that Mengting kept files of each of those
6  analyses.
7  BY MS. BRANSCOME:
8     Q   Did anyone else -- you mentioned a
9  research assistant helped you with PubMed
10 searches.  Who was the research assistant?
11    A   She's a woman, who was with me for 30
12 years or so, who was basically the bibliographic
13 expert in our team and helped people find articles
14 and do things necessary, like PubMed searches and
15 so on.  So she -- while she was here -- she
16 retired a year or so ago.  While she was here, I
17 asked her to look at the ovarian cancer/talc
18 thing, and she dug out some -- she found some
19 articles for me.
20    Q   Is that Sally Campbell?
21    A   Yes, it is.
22    Q   Okay.  After Ms. Campbell retired, did
23 anyone else help you perform literature searches?
24    A   Not in a routine way for sure.  If I
25 wanted to find a specific article that I knew

21 (Pages 78 to 81)

Jack Siemiatycki, Ph.D.

Page 82

1   about, I would typically ask my student Mengting
2   to dig it out and print it for me.
3        Q   So in addition to Ms. Campbell and
4   Ms. Xu --
5        A   Xu, yes.
6        Q   -- did anyone else help prepare the
7   materials that are in your 2018 report?
8        A   Yes.  So I have another research
9   assistant who's been with me even longer than
10  Sally Campbell, who retired a month ago, and her
11  name is Lesley Richardson.  And she set up and
12  maintained the database system in which we
13  integrated all of the results that are in that
14  addendum that I provided you, and that involved
15  reviewing each article and taking every single
16  result and plugging it into this software.
17       Q   Did Ms. Richardson exercise any of her
18  own judgment in selecting which data to include in
19  the meta-analyses?
20       A   The instruction was to extract
21  everything.  Simple instructions can become
22  difficult in operation.  And some of the
23  frustration in this area and some of the reason
24  why there is some variability in which studies and
25  which results are included in different

Page 83

1   meta-analyses occur because authors are sometimes
2   cryptic about what they say about their data and
3   their results.  And specifically things like what
4   kind of talc use a certain table describes is not
5   always perfectly clear.
6            And so she would need to make a judgment
7   sometimes as to whether this result pertained to
8   all use of talc in the perineal area or only
9   powdering, excluding sanitary napkins or other --
10  sometimes it -- there's ambiguity in the write-up
11  of these things that therefore requires --
12  required some judgment on her part.  And several
13  of these things she would ask my opinion about,
14  and we would discuss it and say, Well, it looks
15  like this or it looks like that, and let's go with
16  this interpretation.
17       Q   Okay.  And at the end of the day,
18  despite receiving help from others in developing
19  your 2018 report, do you personally stand behind
20  everything that is in the report?
21       A   Yes.  Barring more typos.  I know that
22  every time I look at anything I've ever written
23  or, you know, things that are expressed not in the
24  most clear way.  But, yes, I stand behind
25  everything.

Page 84

1        Q   Okay.  And you mentioned reviewing the
2   materials that came out in connection with Health
3   Canada and the Taher manuscript, and we'll talk
4   about that in more detail, but did anything you
5   reviewed since the production of your 2018 report,
6   has any of that changed your opinions or any of
7   the information that is contained in your MDL
8   report?
9        A   It doesn't really change anything.  I
10  would say that the Health Canada report reinforces
11  the notion that this issue is becoming a front
12  burner issue for public health agencies.  But
13  it -- since I didn't explicitly address that
14  question in my report, I would say it doesn't
15  change anything that's in my report.
16       Q   Do you intend to offer expert opinions
17  about the different positions of the different
18  public agencies and the relative importance of a
19  potential connection between talc and ovarian
20  cancer?
21       MS. PARFITT:  Objection.  Form.
22       THE WITNESS:  Did I intend -- while
23  writing my report, do you mean, to make -- no.  I
24  don't think that those agencies and those
25  positions necessarily reflect the most up-to-date

Page 85

1   science, and I think the most up-to-date science
2   is in the science community through publications
3   and so on, and public health policies tend to lag
4   behind scientific knowledge.
5   BY MS. BRANSCOME:
6        Q   Are there instances where public health
7   policies are more conservative than the scientific
8   literature out of sort of a principle of
9   precaution?
10       MS. PARFITT:  Objection.  Form.
11       THE WITNESS:  Sorry, I'm not sure I
12  understand the question.
13  BY MS. BRANSCOME:
14       Q   Sure.
15           Are there examples where the public
16  health policy is actually, for instance, more
17  protective than the science might support because
18  the public health agency is exercising an
19  abundance of caution?
20       MS. PARFITT:  Objection.  Form.
21       THE WITNESS:  I -- I believe so.  I
22  mean, I've not done any kind of survey of how
23  public health policy in, you know, Sweden over
24  Argentina or everywhere -- you're talking about
25  generally in the world public health or are you

22  (Pages 82 to 85)

Jack Siemiatycki, Ph.D.

Page 86

1  talking about United States or -- but I -- I
2  imagine there are instances like that, and I think
3  there is a strand in public health to be
4  precautionary in developing policies. But I'm not
5  sure it's universal. I just don't know.
6  BY MS. BRANSCOME:
7      Q   You have a References section in your
8  report. It begins at page 109, if you need to
9  refer to it.
10         How did you maintain all of the
11  documents that are identified under that list?
12  It's quite voluminous.
13     A   So let me --
14     Q   And by that, I mean did you keep hard
15  copies? Do you keep electronic copies?
16     A   Okay. So the first thing I'll point out
17  is that I deliberately didn't call it a reference
18  section. You'll see that it's called a
19  Bibliography.
20     Q   Could you turn to page 109 in your
21  report.
22     A   That -- that's where I am.
23     Q   Could you turn to the page right before
24  that.
25     A   Oh. Ah, yes, I see that.

Page 87

1      Q   What is the page -- you have that as
2  page 108?
3      A   Yes, I have that page with the word
4  "References" on page 108. Section 16.
5      Q   Perhaps we could check at the break. My
6  page numbering got off of yours at some point.
7      A   Okay.
8      Q   But in any event, you do have a
9  Section 16 that's titled "References," correct?
10     A   Yes. Yes, I do. I do.
11         Okay. My -- my conscious volition was
12  to call this a bibliography, and the word
13  "references" got in -- into the heading of this
14  section.
15         And the reason for that distinction is
16  that I have not -- not everything that is listed
17  is referred to in the text of my report. So
18  technically speaking, a reference section should
19  be those materials that you refer to in your
20  report. And this is not what I have here. And
21  that's why I -- consciously I wanted to call this
22  a bibliography, and somehow the word "references"
23  got -- when they -- when we were compiling it --
24  anyways.
25     Q   Okay. So my question again --

Page 88

1      A   So, yeah, yeah.
2      Q   -- Dr. Siemiatycki, is how -- how do you
3  maintain all of the documents that are listed in
4  your reference section? Do you main hard copies?
5  Do you keep electronic copies?
6      A   It's a bit of a mix and match of
7  electronic and hard copies. And these are all the
8  materials that were collected over the years, you
9  know, I would say from the beginning of my
10  involvement in the previous trial and so on, that
11  concern talc and ovarian cancer, including
12  materials that were provided by the lawyers and
13  materials that we found.
14         I prefer to work with paper -- I prefer
15  to read paper, but at a certain point, that gets
16  overwhelming, and the material -- I can't tell you
17  right now for sure that everything here is -- that
18  I have it electronically in a file or that I have
19  it in paper.
20     Q   There are different sections of your
21  References section. You have Bibliography Part A,
22  B, so on and so forth. Who made the decision of
23  which articles or documents fell into which of
24  the -- of each category?
25     A   I -- I guess I made it, but it was

Page 89

1  pretty self-evident. The material in Part A is
2  material that is generally publicly available.
3  It's easy to identify that. And the materials in
4  Part B is material that is not publicly available.
5  And all of that came from the lawyers, I think.
6      Q   So that was going to be one of my
7  questions. Did all of the materials identified in
8  Bibliography Part B come to you from plaintiffs'
9  counsel?
10     A   Okay. So let me look through this
11  quickly.
12         MS. PARFITT:  Mm-hmm. Go ahead.
13         THE WITNESS:  (Peruses document.)
14  I think so. I -- I think all of it came
15  from plaintiffs' counsel.
16  BY MS. BRANSCOME:
17     Q   I'm not going to ask you about all of
18  these, but I noticed on page, at least in my copy,
19  135, maybe 134 on yours, there's reference to the
20  Berg v. Johnson & Johnson case.
21         Do you see that?
22     A   Yes, I see that.
23     Q   What relevance is it to you as an
24  epidemiologist evaluating the potential risk of
25  ovarian cancer from perineal use of talc to look

23 (Pages 86 to 89)

Jack Siemiatycki, Ph.D.

Page 90

```
 1   at the final jury instructions, judgment, and
 2   verdict form from the Berg case?
 3       A   I'm not sure.  I relied on plaintiffs'
 4   counsel to decide what they thought it would be
 5   pertinent for me to be aware of.  So these were
 6   documents that they thought would be pertinent for
 7   me to -- to be aware of, and I can't say why, and
 8   I don't remember -- frankly, I don't remember
 9   these documents.
10       Q   As a scientist, do you typically
11   consider jury instructions in forming an opinion
12   with respect to risk of the use of a product in
13   epidemiology?
14           MS. PARFITT:  Objection.
15           THE WITNESS:  Outside of a legal -- no,
16   we wouldn't have access to it or -- no, it never
17   comes up.
18   BY MS. BRANSCOME:
19       Q   As you sit here today, can you come up
20   with any reason why the jury instructions in a
21   case would be relevant to you in evaluating the
22   question you were asked to answer, which is
23   whether or not there is a risk of ovarian cancer
24   from the perineal use of talc?
25           MS. PARFITT:  Objection.  Form.
```

Page 91

```
 1           THE WITNESS:  You're asking me to
 2   speculate as to why plaintiffs' counsel would have
 3   sent this to me?
 4   BY MS. BRANSCOME:
 5       Q   I'm asking --
 6       A   Is that what you're asking?
 7       Q   I'm asking if you, as the scientist
 8   whose name is on this expert report, can you think
 9   of any reason why that would be informative to you
10   as a scientist?
11       A   If I had it in front of me, I might
12   recognize something in there that would make it
13   relevant.  But I -- I don't know what is typically
14   in such jury instructions.  I don't know how --
15   what the sweep is of those things.  I'm just not
16   sure.  So I -- I can't answer the question.
17       Q   As you sit here today, do you recall
18   reading the final jury instructions from Berg --
19       A   I don't --
20       Q   -- v. Johnson & Johnson?
21       A   I don't actually recall reading it.
22       Q   Okay.  So is there any way for someone
23   reviewing your report to identify within the
24   reference section, Part B, which of these
25   documents you, Dr. Siemiatycki, found relevant and
```

Page 92

```
 1   informative of your opinions?
 2       A   No.  There's no way for anyone else to
 3   know that.
 4       Q   Okay.  Did you ask plaintiffs' counsel
 5   for specific company documents, using that term
 6   loosely, to refer to documents that are kept
 7   internally within the various companies at issue
 8   in this litigation?
 9       A   I asked to be sent any information they
10   had about the composition of talcum powder
11   products, historically as well as currently, but
12   actually mainly historic -- I was mainly
13   interested to know what was the history of the
14   composition of talcum powder products.
15           And so many of these materials that they
16   sent me -- and I can't tell you which ones because
17   I don't identify them with these obscure numbers,
18   they don't mean anything to me -- but some of them
19   dealt with internal company documents or internal
20   reports that discussed different types of talc --
21   of powdering products, whether talc products or
22   cornstarch products in different eras, when they
23   started and when, what the market share was in
24   different eras.  So I was interested in that to
25   get a sense of what were the women exposed to who
```

Page 93

```
 1   were part of these epidemiologic studies.
 2       Q   Do you rely on any of the information
 3   that you obtained from documents in Part B of your
 4   reference list as a basis for forming your expert
 5   opinion in the MDL?
 6       A   No.  No.
 7       Q   Have you viewed any of the deposition
 8   transcripts of the depositions that have been
 9   taken in the MDL?
10       A   I have looked at a few of them.
11       Q   And which deposition transcripts have
12   you reviewed?
13       A   Plunkett, McTiernan, is it?  And Singh.
14   Not fully -- not the entire transcripts, but
15   portions thereof.  Blount.  I've seen excerpts
16   from, is it, Hopkins?  And a table from Pier, but
17   not the full text.  I didn't review the full text
18   -- transcript.  There may be one or two more, and
19   I can't recall right now.
20       Q   Okay.  Focussing specifically on the
21   expert deposition transcripts from the MDL, did
22   you ask specifically for Drs. Plunkett, McTiernan
23   and Singh's deposition transcripts?
24       A   I didn't know who the other experts
25   were, so I didn't ask for them by name.  And I
```

24 (Pages 90 to 93)

Jack Siemiatycki, Ph.D.

Page 94

1   think that I asked if they could share with me
2   transcripts of depositions and reports.  So I also
3   had some of the reports from those experts.  I'm
4   not sure I had all of them but at least some of
5   them.
6        Q   Well, what materials had you reviewed
7   with respect to other experts in the MDL before
8   you completed your report that we've marked as
9   Exhibit 10?
10       A   None.  All of what I've just described
11  was after I completed my report.
12       Q   Did you rely on the work or opinions of
13  any other expert witnesses in forming your own
14  opinions in the MDL?
15       A   No, I don't think I did.
16       Q   So understanding that more depositions
17  have been taken than just Drs. Plunkett, McTiernan
18  and Singh, what specifically was your request to
19  plaintiffs' counsel for which deposition
20  transcripts you would like to see?
21       MS. PARFITT: Objection. Asked and
22  answered, form.
23       THE WITNESS: I'm not sure if my request
24  was to see the ones that they thought were most
25  relevant to -- to me or whether I specifically

Page 95

1   said the epidemiology ones, but I think probably
2   the former, because they sent me, for example,
3   Dr. Plunkett, who is not an epidemiologist.  Yeah.
4   BY MS. BRANSCOME:
5        Q   Which expert reports have you reviewed
6   that are from the MDL?
7        A   I looked at the Plunkett report.  I
8   think I looked at the Singh and the McTiernan
9   report.  But just dipping into it, not -- not
10  reading it fully.  Yeah.
11       Q   Any other reports?
12       A   Not that I recall offhand.
13       Q   Okay.  The Blount transcript, the
14  Hopkins transcript, and the table from Julie
15  Pier's deposition, were those items that were
16  provided to you by plaintiffs' counsel?
17       A   Yes.
18       Q   Did you request them specifically or
19  were they simply given to you?
20       MS. PARFITT: Objection. Form.
21       THE WITNESS: I requested them to
22  provide me with information that would help me to
23  understand the issue.  And one of the issues that
24  has come up in the past few months was the issue
25  of asbestos in talcum powder products, and I think

Page 96

1   I specifically asked at some point to be provided
2   with information that would inform on the presence
3   of asbestos fibers in talcum powder products.
4   BY MS. BRANSCOME:
5        Q   Did you review that material before
6   completing your MDL report?
7        MS. PARFITT: Do you understand the
8   question?
9        THE WITNESS: Yeah.
10       Yes, I think I did look at that before
11  completing my report.
12  BY MS. BRANSCOME:
13       Q   When you say the asbestos is an issue
14  that has come up in the last few months, what do
15  you mean by that?
16       A   Well, my understanding back in 2016,
17  '17, was that while asbestos had been detected in
18  talcum powder products as far back as the '70s --
19  1970s, there was an industry directive or promise
20  or instruction that they would somehow get rid of
21  the problem of asbestos contamination.
22       Q   And what was your basis for that
23  understanding?
24       A   I guess things I've read, and possibly
25  in some of the company documents, possibly in

Page 97

1   publications.  I think there have been various
2   publications that have said so that have -- and I
3   can't right now point to those, but that for the
4   last 10 or 20 years have said that asbestos
5   contamination may have a problem up to the
6   1970s, but that the industry has basically managed
7   to eliminate that contamination.  So I've read
8   that, and it seemed to be repeated often enough
9   that I came to take it as a fact.
10       And then I received some -- I guess I
11  received some reports from plaintiffs' counsel of
12  some new studies carried out more recently in
13  the -- by Longo and his team, and some others, put
14  in question whether asbestos fibers were present
15  in talcum powder products.  And so this caused me
16  to revisit that whole thing.
17       My opinions offered in 2016, '17, about
18  talc and ovarian cancer were premised on the
19  assumption that whereas there may have been some
20  contamination up to the 1970s, it was basically a
21  nonissue after the 1970s.  So the opinions I
22  expressed in -- in 2016, '17, were independent of
23  any hypotheses about asbestos in talc.
24       When I saw the reports from Longo and
25  maybe others in the fall -- I think it was in the

25 (Pages 94 to 97)

Jack Siemiatycki, Ph.D.

Page 98

1    fall of 2018, I specifically asked counsel to
2    provide me with other information that they had,
3    and I made a point of saying, you know, Are there
4    studies that contradict these -- is there evidence
5    that contradicts these evidence -- these claims of
6    asbestos contamination? And they sent me some
7    material at that point.
8       Q   Okay. The work that Dr. Longo had
9    conducted with respect to analyzing talcum powder
10   products, to your knowledge, has that ever been
11   published?
12      A   I'm not sure. I -- to my knowledge, no,
13   but maybe it has been. I don't know.
14      Q   Okay. What were you -- when you
15   referred to the study that Dr. Longo conducted,
16   what -- are you referring to the work that he has
17   done in connection with litigation on behalf of
18   plaintiffs' counsel?
19      A   I'm referring to a few reports that I
20   think are dated or -- not -- 2017, 2018. I guess
21   they're connected to litigation, but I'm -- I'm
22   not absolutely certain of that. But those are --
23   that's what I'm referring to.
24      Q   Separate and apart from your role as an
25   expert witness, when you're evaluating a

Page 99

1    scientific question, do you typically consult
2    expert reports that are generated for purposes of
3    litigation?
4          MS. PARFITT: Objection. Form.
5          THE WITNESS: I would -- if I had
6    access -- I mean, usually we don't know about such
7    reports if we're not in the litigation process.
8    So it's a hypothetical question, I guess. It --
9    it just doesn't come up in reality that I would be
10   looking at carcinogenicity of diesel engine
11   emissions, and I would have access to reports
12   produced in litigation that are not published.
13   I -- I don't know that I -- I wouldn't have access
14   to such information unless I was part of the
15   litigation. But...
16   BY MS. BRANSCOME:
17      Q   Okay. When you're evaluating scientific
18   literature, do you place a different amount of
19   weight on a study that has been peer reviewed as
20   compared to one that has not?
21      A   Yes, it's one of the considerations.
22      Q   Okay. And --
23      A   There -- there are many considerations
24   that I weigh, including my knowledge of and
25   evaluation of the skill and reputation and quality

Page 100

1    of the investigators. I know many of the people
2    in the area that I work in, and I can -- I mean
3    have a gut feeling about the quality of their
4    work.
5       Q   Do you know anything about Dr. Longo's
6    qualifications such that you could render an
7    opinion about the quality of his work?
8       A   It's in a different area than mine, so
9    the answer is I -- I couldn't render an opinion
10   about it.
11      Q   When you asked for evidence that might
12   contradict the work that Dr. Longo had done in
13   connection with litigation, what specifically were
14   you provided by plaintiffs' counsel?
15      A   I'm sorry, without digging around and
16   looking at e-mail exchanges, offhand I can't tell
17   you. I was provided with a batch of -- of
18   documents. I can't remember how many were on one
19   side or the other side. I remember there -- well,
20   in my report I refer to a few pieces of evidence
21   that -- yes. So -- can I -- well, on page 30 in
22   my copy --
23      Q   Okay.
24         MS. PARFITT: Why don't you give the
25   category, the title.

Page 101

1          THE WITNESS: Oh, the -- so it's in
2    Section 5.3.2, "What were women exposed to in body
3    powders?"
4    BY MS. BRANSCOME:
5       Q   Were you provided, for example, with the
6    expert reports generated by the expert retained by
7    Johnson & Johnson and Imerys to rebut Dr. Longo's
8    report?
9       A   Can you give me the author's name or --
10      Q   Sure. Were you provided any reports by
11   Dr. Matthew Sanchez?
12      A   I don't recall. I don't recall that.
13      Q   Are you offering an expert opinion about
14   the contents of any of the talcum powder products
15   sold or manufactured by Johnson & Johnson?
16      A   I only take note of what has been
17   provided in the various documents I have access
18   to.
19      Q   What does that mean?
20      A   It means -- can I read the sentence?
21   Basically, I think it summarizes what I mean. And
22   I'll start -- so I'll start on the sentence that
23   on my copy is on the bottom of page 29, still in
24   that Section 5.3.2.
25         "So representatives of the industry have

26 (Pages 98 to 101)

Jack Siemiatycki, Ph.D.

Page 102

1  claimed that talcum powders were free of asbestos
2  fibers since the 1980s" -- and there are a couple
3  of references there --
4       MS. PARFITT:  Read them.
5       THE WITNESS:  "Hopkins 2018, Pier 2018.
6       -- "but this assertion has increasingly
7  come under doubt as a number of labs have reported
8  finding asbestos fibers in talcum powder
9  products."  And it references Blount, '91;
10  Paoletti, '84; Gordon, 2014; Longo, et al., 2017
11  and 2018; Blount deposition, 2018; Pier
12  deposition, 2018.
13       "These various studies that have
14  reported finding asbestos in historic talcum
15  powder samples have been challenged by other
16  reports that failed to find meaningful amounts of
17  asbestos in historic talcum powder samples."  And
18  the two citations are CIR 2013 and Anderson 2017.
19  BY MS. BRANSCOME:
20       Q   So what I'm trying to understand,
21  Dr. Siemiatycki, is what role this information
22  plays in your opinions, if any.
23       A   Not much.  You know, I would say that
24  the -- my opinions about the association are
25  driven by the strength and consistency of the

Page 103

1  epidemiologic evidence.  And this information
2  about asbestos contamination of talcum powder
3  products would be capable of moving the dial in
4  the direction of increasing my belief that there
5  is a causal assoc- -- a causal relationship, if it
6  is demonstrated that there were in fact asbestos
7  fibers contaminating.
8       So if it is shown that they are present,
9  that would increase my level of belief.  If it is
10  not shown, if it is not demonstrated, it would not
11  detract from my finding based on the epidemiologic
12  evidence.  It could move the dial in one
13  direction.  It wouldn't move the dial in another,
14  because there -- there are different conceivable
15  ways that talcum powder products could increase
16  the risk of ovarian cancer.  This is one.  I'm not
17  capable of adjudicating whether this one is
18  correct or not.
19       Q   So as you sit here today,
20  Dr. Siemiatycki, do you have an opinion to a
21  reasonable degree of scientific certainty that
22  there are in fact contaminants like asbestos or
23  heavy metals in Johnson & Johnson's talcum powder
24  products?
25       MS. PARFITT:  Objection.  Form.  Asked

Page 104

1  and answered.
2       THE WITNESS:  You know, I would say the
3  sentences that I read summarize my opinion on that
4  question.
5  BY MS. BRANSCOME:
6       Q   So in your opinion, is it -- is it a
7  question for debate in the scientific community at
8  the moment?
9       MS. PARFITT:  Objection.  Form.
10  Misstates his testimony.
11       THE WITNESS:  It's not an area in which
12  I feel confident to pronounce that the issue has
13  been resolved or not.
14       MS. BRANSCOME:  Is now a good time for a
15  break?  I don't now how long --
16       MR. TISI:  We've been going about an
17  hour and 25 minutes.
18       MS. PARFITT:  We have lunch at 1:00, and
19  I don't think it's here.
20       (A discussion was held off the record.)
21       MS. BRANSCOME:  We can go off the
22  record.
23       THE VIDEOGRAPHER:  This ends disc number
24  in the deposition of Jack Siemiatycki.  We're
25  going off the record at 12:42 p.m.

Page 105

1       (Lunch recess.)
2       THE VIDEOGRAPHER:  This begins disc
3  number 3 in the deposition of Jack Siemiatycki.
4  We're going back on the record at 1:46 p.m.
5  BY MS. BRANSCOME:
6       Q   Good afternoon, Dr. Siemiatycki.
7       Did you have a chance to look at the
8  various subjects we were going to return to after
9  the lunch break?
10       A   I did.
11       Q   Okay.  So we'll take them one at a time.
12       A   Yes, please.
13       Q   Let's start first with, did you identify
14  the document that you had been provided by
15  plaintiffs' counsel that you said you took out all
16  but about 20 pages that you found relevant?
17       A   Right.  So I -- I think I mentioned the
18  IARC monographs as being two of them, and I think
19  the third one was the Reference Manual on
20  Scientific Evidence.  There was a huge pack of
21  pages that were sent to me, and I took out most of
22  them, but I retained some that I thought were
23  relevant.
24       Q   What portions of the Reference Manual on
25  Scientific Evidence did you retain?

27 (Pages 102 to 105)

Jack Siemiatycki, Ph.D.

Page 106

1    A   I think it was the Epidemiology section
2  and maybe the Statistics section.
3    Q   All right.  During the break, you were
4  also going to check which of the epidemiological
5  studies that you included in your meta-analysis.
6       Did you or someone at your direction
7  independently calculate an odds ratio or relative
8  risk figure that was not published in the report
9  itself?
10   A   Sorry, what?  That was not published in
11  the original report.  So I'm not sure.  The answer
12  is in the time I had available, I couldn't really
13  identify anything like that, and I'm not sure if
14  that occurred at all, and it -- the impact of
15  that, if -- if it had occurred, would have been
16  negligible.
17   Q   If --
18   A   It would have meant -- I'm sorry.  It
19  would have meant that most likely I added -- I put
20  together a two-by-two table by aggregating across
21  two or three or four levels of exposure.  If -- if
22  it had happened, I think that's what would have
23  happened.  And the impact of that would be to
24  produce an odds ratio estimate that is not
25  adjusted for the covariates that they adjusted for

Page 107

1  in their analysis by the categories of dose or
2  whatever they adjusted for.
3    Q   Is there any way by examining your 2018
4  report and the addendum that an outside reader
5  could determine which studies, if any, were
6  subject to this independent calculation?
7    A   So the one thing I didn't check during
8  the break was whether there's a note in the
9  addendum, and it would take me a while, I'd have
10  to go through each study and see if there's any
11  notation in the margin that would indicate that
12  this was done.  So I -- I -- I'm not sure of the
13  answer to your question.
14   Q   If an adjustment like that or an
15  independent calculation had been done, would it be
16  your expectation that a notation would have been
17  made in the addendum?
18   A   Yes.  Yes.
19   Q   All right.  Did you look at anything
20  else over the lunch break?
21   A   Well, we looked to see -- the page --
22  pagination discrepancy between the different
23  versions, and I think Ms. Parfitt could fill you
24  in on -- or maybe she has.  I don't know.
25       MS. PARFITT:  No.  No, I haven't.  I

Page 108

1  think what it is, we've got the signature page on
2  the one report, and then the one he has in his
3  binder appears to not have a signature page on it,
4  and the font seems to be -- when the signature
5  page was put in, the font was slightly larger,
6  which sort of throws off the page numbers.  Same
7  report.
8       MS. BRANSCOME:  So what I would --
9       MS. PARFITT:  Single --
10      MS. BRANSCOME:  -- request so that we
11  keep the record clean going forward and not every
12  question has to say page 108 in mine and page 107
13  in your copy is that we actually mark the version
14  of the report that has been produced to us as
15  Exhibit 11 -- well, let me just, Ms. Parfitt,
16  would you be comfortable marking his copy as
17  Exhibit 11 and switching them and putting the new
18  clean copy as Exhibit 10?  I'm only thinking that
19  there are many prior questions --
20      MS. PARFITT:  Sure, I'm fine with that.
21      MS. BRANSCOME:  -- that refer to his
22  report --
23      MS. PARFITT:  As long as his --
24      MS. BRANSCOME:  -- as Exhibit 10.
25      MS. PARFITT:  Yeah, and just so the

Page 109

1  record is clear, and what appears to have happened
2  is there was a signature page that was put on the
3  report to represent the matter was filed in the
4  United States District Court, the District of New
5  Jersey, in light of the prior report that was in a
6  state court, and that has thrown off not only the
7  page numbers but I think even it might have been a
8  different font.
9       Sure, so we will put on --
10      THE WITNESS:  So do you want to modify
11  the -- this?
12      MS. PARFITT:  Sure.  I think what we're
13  going to do is the one that Dr. Siemiatycki has
14  brought will be now Exhibit 11, and the one that's
15  in -- on the thumb drive and --
16      MS. BRANSCOME:  It is tab 3 in the
17  binder in front of you will be the correct
18  Exhibit 10.
19      MS. PARFITT:  And this will be
20  Exhibit 11.
21      MR. TISI:  And Exhibit 11 will be his
22  copy, the one that he brought.
23      MS. PARFITT:  And this will be 3 -- 3,
24  correct?
25      MS. BRANSCOME:  11 -- I mean 10.  It's

28 (Pages 106 to 109)

Jack Siemiatycki, Ph.D.

Page 110

1  tab 3.
2          MS. PARFITT:  11 -- 10.  Tab 3, correct.
3          (Exhibit No. 11 was marked for
4          identification.)
5  BY MS. BRANSCOME:
6      Q   So, Dr. Siemiatycki, can you confirm
7  that Exhibit 10 is a complete copy of your report
8  that was submitted in the MDL?  It is a clean copy
9  and does not contain any annotations.
10     A   Yes.
11     Q   Can you also confirm that what we have
12 now marked as Exhibit 11 is the copy of your MDL
13 report that you brought with you here today?  It
14 does contain handwritten annotations and the page
15 numbers are just slightly misaligned.
16     A   Yes.
17     Q   Okay.  So if you could, in Exhibit --
18 oh, there was one other --
19     A   There was one other, and -- and there's
20 another -- yet another one that I -- a correction
21 to be made, a small one.
22         So do you want to point out what that --
23     Q   Yes.  So, Dr. Siemiatycki, do you have
24 any corrections that you would like to make to
25 your report at this time?

Page 111

1      A   So the one outstanding one that we had
2  highlighted -- or we've gone through the three of
3  them.
4          MS. PARFITT:  45.
5          THE WITNESS:  Have we --
6          MS. PARFITT:  No, 45.  Page --
7          MR. TISI:  No, 47.  45.
8          MS. PARFITT:  Page 45.  Excuse me, it's
9  47.
10         THE WITNESS:  Oh, yes, that -- the
11 question of whether that sentence should refer to
12 Berge or Terry on that page.  It's Berge 2018, not
13 Terry.  I was right the first time.
14         MS. PARFITT:  Oh, and it is page 45,
15 just for the record.  It is not 47.  That was the
16 first correction is on page 45.
17         THE WITNESS:  In this version.
18 BY MS. BRANSCOME:
19     Q   So just to be clear, Dr. Siemiatycki, on
20 the third line of page 45 of Exhibit 10, the
21 reference to Terry 2013 in the sentence beginning
22 with the word "while" should in fact be Berge
23 2018?
24     A   Yes.
25     Q   Do you have any other corrections you

Page 112

1  would like to make at this time?
2      A   Yes.  I'd like to make one -- oh, yes.
3  Well, page 72 in this version.
4          MS. PARFITT:  Just refer to the exhibit
5  number, so 11.
6          THE WITNESS:  Exhibit 11, page 72,
7  Table 2.  Table 2 of the report.
8  BY MS. BRANSCOME:
9      Q   What is the correction you would like to
10 make?
11     A   The correction is -- there's a column
12 called "Included in main meta-analysis," and I
13 think in your copy, as in mine in this version,
14 there are a bunch question marks.  In the
15 original Word document that I submitted, these
16 were not question marks.  They were tick marks,
17 checkmarks.  And somehow in the translation of
18 Word to PDF, this -- the tick mark -- the tick
19 marks got changed to these funny little question
20 marks.  So they should all be tick marks.
21     Q   Are there any other corrections you
22 would like to make to your report?
23     A   Not that I'm aware of at this time.
24     Q   Okay.  So if you could turn to
25 Exhibit 10 -- which is in front of you there -- if

Page 113

1  you could turn to your Conclusion section.  It
2  should be on page 69.
3      A   Yes.
4      Q   You state in the second paragraph below
5  the Conclusion section that:  "Based on the
6  totality of the evidence, it is my opinion to a
7  reasonable degree of scientific certainty that the
8  perineal use of talcum powder products can cause
9  ovarian cancer."
10         First, did I read that correctly?
11     A   Yes, you did.
12     Q   Does that conclusion accurately
13 summarize your opinion in this case as to whether
14 or not perineal use of talcum powder can cause
15 ovarian cancer?
16     A   Yes, it does.
17     Q   You state that your opinion is to a
18 reasonable degree of scientific certainty,
19 correct?
20     A   Correct.
21     Q   Is that a phrase that you have ever used
22 in a scientific publication?
23     A   I don't think so.
24     Q   Why did you use it here?
25     A   I've seen this phrase used in all of the

29 (Pages 110 to 113)

Jack Siemiatycki, Ph.D.

---

Page 114

1  expert opinions in the legal cases that I've seen,
2  and I inferred that it's a -- a formula that is
3  de rigueur in legal communications for this sort
4  of thing.
5      Q   When you say "to a reasonable degree of
6  scientific certainty," what do you mean by that
7  phrase?
8      A   So my -- you know, I think somewhere
9  else in the document, I -- I phrase it in a way
10 that I'm comfortable with, which is a way that
11 also is sort of derivative from my understanding
12 of legal jargon and precedence.  I think that it's
13 more likely than not that there is a causal
14 relationship.
15     Q   You anticipated where I was going with
16 my question.  Do those two sentences mean anything
17 different to you?
18     A   No.
19     Q   What is your understanding of "more
20 likely than not"?
21     A   From a strictly mathematical point of
22 view, it implies that I feel that there's greater
23 than 50 percent probability that this thesis is
24 true.  And I wouldn't put a more quantitative
25 meaning onto it.

---

Page 115

1      Q   Is your opinion that perineal use of
2  talcum powder products can cause ovarian cancer,
3  is it specific to a single brand or manufacturer
4  of talcum powder?
5      A   No, it isn't.
6      Q   Why not?
7      A   Because as I understand it, the
8  epidemiologic evidence that supports the thesis of
9  a causal relationship is derived from evidence
10 among women who used all types of talcum powder
11 products that were available in their consumer
12 area of purchase of these products.  And whatever
13 was the frequency distribution of different
14 manufacturers and types of powdering that were
15 available in the consumer -- various consumer
16 markets were the types that lead to the overall
17 inference about causality, and there's no way for
18 me to parse out which particular manufacturer
19 would have been more or less responsible for any
20 of this.
21     Q   If in fact, and we're just talking
22 hypothetically, the biological mechanism by which
23 some talcum powder products can cause ovarian
24 cancer is related to a contaminant in that talcum
25 powder product, does the epidemiological evidence

---

Page 116

1  that exists today enable a scientist to parse that
2  out?
3          MS. PARFITT:  Objection.  Form.
4          THE WITNESS:  I'm not sure I understand
5  the premise of the question, the "if" part.
6  BY MS. BRANSCOME:
7      Q   Okay.  So if the biological mechanism by
8  which a talcum powder product can cause ovarian
9  cancer is because of a particular contaminant in
10 that talcum powder product, but that contaminant
11 does not exist in all talcum powder products,
12 would the epidemiological evidence that exists
13 today allow you to see that distinction?
14         MS. PARFITT:  Objection.  Form.
15         THE WITNESS:  The epidemiologic evidence
16 as -- as it exists today would not allow one to
17 parse out anything about the particular
18 manufacturer, the particular product, if I
19 understand your question correctly.
20 BY MS. BRANSCOME:
21     Q   And so therefore, the epidemiological
22 evidence as it exists today does not have a level
23 of detail by which someone reviewing that data
24 could determine if there were different
25 contaminants present in different talcum powder

---

Page 117

1  products that were used by individuals who
2  developed ovarian cancer --
3          MS. PARFITT:  Objection.  Form.
4  BY MS. BRANSCOME:
5      Q   -- correct?
6          MS. PARFITT:  Objection.  Form.
7          THE WITNESS:  May I read the --
8          MS. PARFITT:  Yes, you can.
9  BY MS. BRANSCOME:
10     Q   Of course.
11     A   Just to make sure I understand.
12 (Peruses document.)
13         So I -- I don't think that the
14 epidemiological evidence would allow you to
15 attribute causality to a specific type or -- or
16 not.  If one knew -- if part of your hypothetical
17 is the knowledge of what the constituents were of
18 different products used in different markets, and
19 the biological mechanism has been established to a
20 high degree of certainty, there might be some room
21 for making inferences about this.  But that seems
22 like a tenuous possibility.
23     Q   But you agree that the current
24 epidemiological evidence as it exists does not
25 enable someone to distinguish between brands of

---

30 (Pages 114 to 117)

Jack Siemiatycki, Ph.D.

Page 118

1   cosmetic talc products, for example?
2         MS. PARFITT: Objection. Form.
3         THE WITNESS: I don't think it does.
4   BY MS. BRANSCOME:
5      Q   Does -- is your opinion that perineal
6   use of talcum powder products can cause ovarian
7   cancer, is that limited to talcum powder products
8   manufactured during a certain time period?
9      A   The evidence as it exists today pertains
10  to products manufactured over half a century,
11  roughly speaking, so I don't think that there's
12  any way to link it to products manufactured in a
13  particular time period.
14         In -- in answer to that question,
15  actually, and to the previous one, hypothetically,
16  one might imagine looking at the different
17  study -- the 30-odd studies that have been carried
18  out in different communities and different cities
19  and different countries, and if one could obtain
20  reliable, reasonably precise and time relevant
21  information on market shares of products in
22  different markets at different times, that could
23  give a first approximation of whether certain
24  company products are more closely linked to the
25  excesses that are seen in the epidemiological

Page 119

1   studies.
2      Q   The application, though, of a market
3   share analysis to the users of talcum powder
4   products, if you're looking at causality, would
5   require that the individuals who developed ovarian
6   cancer had purchased their talcum powder according
7   to the market share, correct?
8         MS. PARFITT: Objection. Form.
9         THE WITNESS: Approximately, yes.
10  BY MS. BRANSCOME:
11     Q   So, for example, if one type of talcum
12  powder product or one time period of talcum powder
13  product is the only type that actually causes
14  ovarian cancer, so all of the positives were
15  derived from those users, you -- you could not
16  determine that simply by applying market share,
17  for example?
18         MS. PARFITT: Objection. Form.
19         THE WITNESS: That -- that's true,
20  except in the circumstance that market share were
21  very, very high in most of the communities that
22  have been investigated. So if one company
23  produced 90 percent or 85 percent or something of
24  the product in a certain area -- that was consumed
25  in a certain area, and there's an excess risk of

Page 120

1   ovarian cancer in that area, it would be
2   improbable that the product of that company were
3   not part of the responsibility, but one of the
4   companies that produced 5 or 10 percent of the
5   market share.
6   BY MS. BRANSCOME:
7      Q   Okay. But as you sit here today, based
8   on the analysis that you have done, you are not
9   able to draw an opinion specifically about an
10  increased risk of ovarian cancer that is tied to a
11  particular brand or a particular time period,
12  correct?
13         MS. PARFITT: Objection. Form.
14         THE WITNESS: That's correct, in part
15  because I don't have data on market share at
16  different times and in different places.
17  BY MS. BRANSCOME:
18     Q   Okay. In forming your opinion that
19  perineal talc use can cause ovarian cancer, did
20  you reach an opinion about how much talcum powder
21  is needed to cause ovarian cancer?
22     A   No.
23     Q   Is there an amount of talcum powder that
24  can be used perineally without increasing a risk
25  for ovarian cancer?

Page 121

1      A   So let me go back to the previous
2   question, and clarify what do you mean by amount?
3   Do you mean like the amount in grams? The amount
4   in number of applications? The amount in number
5   of day -- days on which the powder is applied?
6   These are all different metrics of exposure, and
7   the answer might depend on what kind of -- you
8   know, we're starting with these studies. There
9   are now some hints about the dose-response
10  relationship and what kind of levels of exposure
11  in terms of number of applications in use,
12  observable excess risks.
13     Q   So let me ask it this way: Did you
14  calculate how much talcum powder is needed to
15  cause ovarian cancer in any of the forms, be it
16  frequency of application, the amount in grams that
17  was used?
18     A   I--
19         MS. PARFITT: Objection. Form.
20         THE WITNESS: I did not carry out such a
21  calculation. I'm -- my emphasis was on
22  determining whether there's a dose-response
23  relationship. Going beyond that might involve
24  trying to quantify the dose-response relationship
25  to the extent of determining what the shape of

31 (Pages 118 to 121)

Jack Siemiatycki, Ph.D.

Page 122

1  such a relationship is and how the curve looks,
2  whether there's a threshold effect, and so on.
3  But I don't think there's enough data now to be
4  able to make such estimates.
5  BY MS. BRANSCOME:
6      Q   Can you rule out the possibility that
7  there is a threshold below which perineal use of
8  talc presents no risk of ovary -- of ovarian
9  cancer?
10         MS. PARFITT: Objection. Form.
11         THE WITNESS: No, I -- I don't think --
12  I can't, and I don't think it's possible to do
13  that with most carcinogens. It's -- it's an
14  extremely difficult and controversial issue of how
15  to detect sort of a minimum level of exposure
16  produces a carcinogenic effect.
17  BY MS. BRANSCOME:
18      Q   In your view, has a dose-response
19  relationship for the perineal application of talc
20  and the development of ovarian cancer been
21  established in the scientific literature?
22      A   My view is that the data are certainly
23  compatible with the notion of a dose-response
24  relationship. It -- it trends in that direction
25  of that conclusion. It's not definitive yet.

Page 123

1  It's not definitive. But I believe the bulk of
2  the evidence, especially from the Terry study and
3  partly from, I think it's the, Schildkraut study,
4  which are the most powerful ones for that
5  question, but certainly the Terry study is by far
6  the most important one, does tend to indicate
7  dose-response relationship.
8      Q   Is the data that exists today also
9  compatible with no dose-response relationship?
10         MS. PARFITT: Objection. Form.
11         THE WITNESS: Yes. It could be -- in
12  other words, it could be a chance finding. Is --
13  that's what you're saying. I think it's unlikely,
14  but it's -- it can't be ruled out.
15  BY MS. BRANSCOME:
16      Q   Are you offering an expert opinion that
17  the inhalation of talc increases or presents any
18  risk of ovarian cancer?
19      A   I -- I don't have an opinion on -- on
20  that. No.
21      Q   Aside from your participation in the
22  IARC panel in 2006 and the Langseth article on
23  2008, has all of your work on talc and ovarian
24  cancer been in connection with litigation?
25      A   On talc and -- sorry, work on talc and

Page 124

1  ovarian cancer, is that the question? Almost.
2  But the one qualification I would make in
3  answering that question is that I have a colleague
4  who started working with -- in my academic
5  department about 12 years ago, and she was
6  interested in ovarian cancer as a topic of
7  research, and she wanted to organize a case-
8  control study of ovarian cancer in relation to
9  various factors, and she asked me to kind of
10  mentor her -- she was just starting out -- mentor
11  her in getting grants, in setting up the study,
12  and this sort of thing, and this is what I did
13  with her.
14         So I worked on grant applications with
15  her on some aspects of setting up her study, and
16  that has been going on now for -- I don't know --
17  I think since 2010 maybe that she started. So --
18  but that has not -- I've been what we call a
19  coinvestigator on that project, not a principal
20  investigator.
21         But apart from that, the next stage in
22  my involvement with talc and ovarian cancer was in
23  the litigation.
24      Q   What is your colleague's name?
25      A   Anita Koushik.

Page 125

1      Q   If you had to give me your best
2  estimate, how many hours total have you spent
3  assisting her with the case-control study?
4         MS. PARFITT: Objection. Form,
5  misstates his testimony.
6         THE WITNESS: It's very hard to answer
7  that. I mean, ten years ago discussions over
8  coffee about studies and how to write grant
9  applications and reviewing and revising and so on.
10  I -- I don't -- not a trivial amount and not an
11  overwhelming amount.
12  BY MS. BRANSCOME:
13      Q   When was the last time that you spent
14  hours in connection with that case-control study?
15         MS. PARFITT: Objection. Form.
16         THE WITNESS: There was a manuscript
17  that came -- a publication that came from that
18  study. It was -- the study was only completed in
19  the field, the data collection, around two years
20  ago, and spending a year cleaning data and so on,
21  and then starting to analyze it.
22         And there was an analysis of
23  reproductive and hormonal factors in relation to
24  ovarian cancer, and I helped her review and revise
25  that manuscript. That would have been a year and

32 (Pages 122 to 125)

Jack Siemiatycki, Ph.D.

Page 126

1   a half ago or so, and I don't know, maybe I spent
2   three or four days on it at the time.
3   BY MS. BRANSCOME:
4       Q   Did that study reach any conclusions
5   with respect to a potential link between perineal
6   use of talc and ovarian cancer?
7       A   The talc information was collected in
8   the questionnaire and has not yet been analyzed.
9       Q   Other than what we just discussed with
10  respect to the case-control study and then your
11  work in connection with the IARC panel and the
12  Langseth paper, have you ever done any original
13  research on the association between perineal
14  talcum powder use and ovarian cancer?
15      A   No.  No, I haven't.
16          It's common -- it's common for me to be
17  asked to review information on which I have not
18  directly worked.  You know, topics.  You know, I
19  recently was asked by the government of France to
20  evaluate a problem of possible cancer risks
21  related to a pesticide that's used in the banana
22  industry in Guadeloupe and Martinique.  I've never
23  studied that pesticide and I've never been to
24  Martinique.  But the kind of expertise that I have
25  can be applied to studying different sorts of

Page 127

1   problems.
2       Q   You have not published the meta-analyses
3   that you -- meta-analysis you performed in
4   connection with the MDL, have you?
5       A   No, I haven't.
6       Q   Have you ever published in any peer-
7   reviewed article the opinion that the perineal use
8   of talcum powder can cause ovarian cancer?
9       A   I -- I've never had occasion to opine
10  about this in any publication, and one doesn't
11  just announce to the New England Journal of
12  Medicine that you want to, you know, write an
13  article about opining about something like this.
14  There has to be some sort of platform basis of
15  research evaluation and so on.
16          And my involvement in this case might
17  lead to such a publication, but in the past I
18  would have not -- I had no reason to publish or to
19  try to publish such an opinion.
20      Q   But you had formed an opinion with
21  respect to the perineal use of talcum powder and
22  an increased risk of ovarian cancer at the time
23  that you published your report in October of 2016.
24          And by "published," I mean within the
25  litigation context, correct?

Page 128

1       A   That's correct.
2       Q   Have you done anything since 2016 to
3   publicly announce your view that the perineal use
4   of talc can cause ovarian cancer?
5       A   No, I've not had really an opportunity.
6   And in a way the -- the publication by Berge,
7   which appeared as a -- after I completed my
8   meta-analyses, and they -- they kind of beat me to
9   the punch with one type of publication output that
10  I might have produced.  So I'm thinking about
11  different ways of communicating my results and my
12  opinions, but mainly my results.
13          I mean, the other part of the answer
14  to -- another part of the answer to your question
15  is that I'm not particularly a fan of individual
16  scientists going into press with opinions before
17  some sort of consensus starts to appear.  I mean,
18  you can -- you can publish hypotheses and ideas,
19  but proclaiming conclusions is something that
20  should come later in the scientific process.  I
21  mean, I -- I think it's best if IARC or an agency
22  like IARC would take on that role, and that would
23  be my hope actually.
24      Q   In your opinion, has consensus formed
25  that peri- -- perineal use of talc can cause

Page 129

1   ovarian cancer?
2       A   I think among people who have reviewed
3   the evidence who -- sort of competent scientists
4   who have reviewed the evidence, I think there's
5   starting to be a ground swell of consensus about
6   it.  You know, I've never done a survey, so I
7   can't say if it's majority or minority.
8          If your denominator is all medical
9   researchers, then the answer is, well, most of
10  them have never heard of this issue, so it's
11  not -- they wouldn't be susceptible to holding
12  such an opinion.  But among the people who have
13  reviewed, are familiar with the issues, I think
14  there's certainly a much higher level of
15  receptivity to this thesis than there was ten
16  years ago.
17      Q   Has a consensus been reached that
18  perineal use of talc probably causes ovarian
19  cancer?
20          MS. PARFITT:  Objection.  Asked and
21  answered.  Form.
22          THE WITNESS:  I can't answer that
23  question.  I -- it's too -- are you trying to make
24  the distinction between probably and -- I -- so --
25  BY MS. BRANSCOME:

33 (Pages 126 to 129)

Jack Siemiatycki, Ph.D.

Page 130

1    Q   Well, what do you understand the phrase
2  "can cause ovarian cancer" to mean?
3    A   Well, it's a synonym with "is a risk
4  factor for" or -- that's how I understand it.
5    Q   All right.  And is that in your mind the
6  same as "it probably causes cancer"?
7        MS. PARFITT: Objection.  Form.
8        THE WITNESS: "It probably can cause,"
9  is that what you said, or "probably does cause"?
10  BY MS. BRANSCOME:
11    Q   Probably does cause.
12    A   So I don't think any risk factor can be
13  described as -- in a way with the wording "does
14  cause."  You know, smoking does not cause lung
15  cancer.  It can cause lung cancer when there's a
16  constellation of other favorable circumstances.
17  You know, this is part of multifactorial causation
18  of disease.  So, you know, each factor in itself
19  is not the cause, but it's part of a constellation
20  of factors that together can cause the disease.
21  So each of them can cause the disease.
22    Q   So -- you -- you state in your report
23  that -- let me see if I can get the exact
24  language.
25        And perhaps you can get me there more

Page 131

1  quickly.  You talk about that now you would give a
2  different rating under the IARC standard.
3        Ah, here we go.  Page 67 in your 2018
4  report.  You state: "It is now my professional
5  opinion based on the totality of the evidence,
6  that to a reasonable degree of scientific
7  certainty, the causal relationship between
8  perineal talc powder exposure and ovarian cancer
9  is," quote, "probable."
10        Did I read that correctly?
11    A   You did.
12    Q   Do you hold that opinion?
13    A   Yes, I do.
14    Q   What do you mean when you say a "causal
15  relationship between perineal talc powder exposure
16  and ovarian cancer is," quote, "probable"?
17    A   I mean it's more likely than not.
18    Q   Okay.  Has a consensus been reached in
19  the scientific community, understanding we're
20  looking at those who have an interest in this
21  issue, been reached that the causal relationship
22  between perineal talc powder and ovarian cancer is
23  probable?
24        MS. PARFITT: Objection.  Form, asked
25  and answered.

Page 132

1        THE WITNESS: I don't know -- I haven't
2  carried out a survey among people.  I don't know
3  whether a consensus has been reached.  I don't
4  know what proportion of that community would
5  subscribe to this point of view or not.
6  BY MS. BRANSCOME:
7    Q   Okay.  Setting aside conducting a survey
8  of individuals in the scientific community, would
9  you say that the scientific literature reflects a
10  consensus that the causal relationship between
11  perineal talc powder exposure and ovarian cancer
12  is probable?
13        MS. PARFITT: Objection.  Form.
14        THE WITNESS: I think the scientific
15  literature supports that conclusion.  I'm not sure
16  that it reflects it.
17        So there's kind of a lag period between
18  the production of research findings and the
19  consens- -- a consensus building around it and
20  being expressed in print.  You know, if we take
21  sort of the classic smoking and lung cancer
22  historical example, evidence was accumulating
23  rapidly in the 1950s.  There were several studies
24  through the 1950s and early 1960s, and it was only
25  in 1964, so many years after some of this evidence

Page 133

1  had been published and been accepted by many
2  scientists, but rejected by others -- there was
3  still controversy around it -- that the Surgeon
4  General's report reflected and created a
5  consensus.
6  BY MS. BRANSCOME:
7    Q   So in early 2019, are we still in the
8  lag period or the period in which the production
9  of research findings is still behind consensus
10  building in the literature?
11        MS. PARFITT: Objection.  Form,
12  misstates his testimony.
13        THE WITNESS: Does that mean I should
14  answer or --
15        MS. PARFITT: I'm objecting.  I said it
16  misstates your prior testimony.
17        THE WITNESS: Okay.  Sorry.  Let me read
18  the question again. (Peruses monitor.)
19        So I can't point to hallmark
20  publications analogous to the Surgeon General's
21  report for smoking and lung cancer that would
22  reflect such a bend in the road kind of general
23  perception of the talc ovarian cancer issue.  It
24  doesn't mean that the evidence isn't there, but
25  the process of recognizing and generalizing and so

34 (Pages 130 to 133)

Jack Siemiatycki, Ph.D.

Page 134

1    on is not -- has not been achieved yet.
2    BY MS. BRANSCOME:
3        Q    Okay.  Have you ever given a lecture,
4    either to students or to other scientists, in
5    which you have presented your view that the
6    perineal use of talcum powder can cause ovarian
7    cancer?
8        A    I have to my students -- I mean to the
9    students in my department.  I teach epidemiologic
10   methods.  I don't teach about ovarian cancer.  I
11   don't teach about talc.  That's not what I'm paid
12   to do.  I'm paid to teach about the methodology
13   and the conduct of -- and the interpretation of
14   epidemiologic -- and I've used the talc/ovarian
15   cancer as an example and walked my students
16   through the evidence.  So, yes, I have.
17       Q    When did you start teaching that as part
18   of your epidemiological methods course?
19       A    Probably two years ago.  As soon as I
20   started gathering the information and synthesizing
21   it, so two -- two or three years ago.
22       Q    Other than presenting to your students
23   your analysis of talc and ovarian cancer as an
24   illustration of an epidemiological method, have
25   you presented your opinion that perineal use of

Page 135

1    talcum powder can cause ovarian cancer in any
2    other context outside of litigation?
3        A    No, I haven't.
4        Q    Have you spoken with other scientists
5    about the issue of whether perineal use of talcum
6    powder can cause ovarian cancer?  Setting aside
7    your students.
8        A    Yeah.  Yes, I've spoken to -- to
9    colleagues, friends over -- over coffee, over
10   drinks at conferences, you know, what are you up
11   to, what are you doing, and then describe my
12   involvement in this case.  And then we dig a
13   little further into, Well, what -- what do you
14   think, and so on.  So I -- I have discussed it in
15   that kind of format.
16       Q    Have you ever spoken with any of the
17   authors on any of the papers that you cite in your
18   report about the potential link between perineal
19   use of talc and ovarian cancer?
20       A    I don't think so.  I can quickly scroll
21   through the list to see if anything jogs my --
22   yeah -- no, let me --
23       Q    If you can do that quickly, we could do
24   it now, or we can save that for the next break.
25       A    It will take just three minutes, I

Page 136

1    think.  (Peruses document.)
2        Q    Okay.
3        A    No, I've never spoken to any of them
4    about -- I -- I crossed paths with Dr. Cramer in
5    Los Angeles for a -- you know, we were in the same
6    hotel.  He was leaving, I was coming, that sort of
7    thing, but I don't think we had any substantive
8    discussion, and I can't -- I know some of the
9    others, but I've never spoken to them about this
10   issue.
11       Q    Do you know personally or professionally
12   any of the other plaintiffs' experts in the MDL?
13       A    No, I don't.
14       Q    You were chair of the working group --
15   the IARC Working Group that published the
16   monograph on talc in 2006 -- or, well, that met in
17   2006, and then was subsequently published in 2010,
18   correct?
19       A    That's correct.
20       Q    And there were roughly 20 members of
21   that working group?
22       A    I think so.
23       Q    In 2006, you agreed with the IARC
24   classification of, quote, "possible" describing
25   the relationship between perineal talc use and

Page 137

1    ovarian cancer, correct?
2            MS. PARFITT:  Objection.  Form.
3            THE WITNESS:  That's correct.  I could
4    read the exact wording of what "to be" means, but
5    that's the gist of it.
6    BY MS. BRANSCOME:
7        Q    Okay.  IARC has not changed its
8    clarification of talc, and specifically with
9    respect to the peri- -- perineal use of talc since
10   it published the 2010 monograph, correct?
11       A    Technically correct, but actually,
12   what -- the correct statement is IARC has not
13   evaluated talc since 2006 -- has not reevaluated.
14   So there are no changes made to IARC evaluations
15   except through a formal complete reevaluation, and
16   there has not been a formal complete reevaluation
17   of talc since the 2006 meeting.  So there's no
18   opportunity for IARC to change anything in one
19   direction or another failing another complete
20   evaluation.
21       Q    What, if you know, can initiate a formal
22   complete evaluation of a constituent like talc?
23       A    Well, it comes I think from different
24   sources.  I'm not entirely certain.  I know that
25   there is now a public process whereby public

35 (Pages 134 to 137)

Jack Siemiatycki, Ph.D.

Page 138

1   parties can write to the monograph program and
2   make suggestions for chemicals to be evaluated.
3   There are -- they get requests from governments.
4   They get requests from groups of scientists.  They
5   have their own internal scientific staff that has
6   its antenna out for different problems that arise,
7   and they generally have sort of a five-year
8   program of agents that they are going to evaluate
9   in every -- in the next five-year period.
10          These things are not quick and easy to
11  organize, and so there's a lot of lead time.
12  There's a lot of, in a way, competition for agents
13  to get onto the list to be evaluated.  There are a
14  lot of interested parties that would like the
15  agent that they are exposed to or the "et cetera"
16  to be evaluated.  So the exact mechanics of how
17  they make decisions, I haven't been involved in
18  that process, but that's, roughly speaking, how
19  it's done.
20      Q   Have you ever submitted a request to
21  IARC for them to conduct a complete evaluation of
22  talc?
23      A   Have I ever?
24      Q   Have you since the publication of the
25  monograph in 2010 submitted a request to IARC for

Page 139

1   them to conduct another complete evaluation of
2   talc?
3       A   I had a quick word with the director of
4   the monograph program a few months ago, and I
5   suggested it might be time for that.  But I'm
6   intending to submit a more formal request along
7   those lines.  So...
8       Q   Okay.  Who -- who specifically did you
9   speak with a few months ago?
10      A   The director of the monograph program is
11  Kurt Straif, S-T-R-A-I-F.
12      Q   And how did you have occasion to be
13  speaking with the director?
14      A   We're acquaintances, and I met him at a
15  conference in August, I saw him when I was in Lyon
16  in November at a meeting that he organized.  So
17  I've seen him a few times in the last six months.
18      Q   When did you have this conversation with
19  the director?
20      A   I think it was in the summer.
21      Q   So the summer of 2018?
22      A   Yeah.
23      Q   And what specifically did you discuss
24  with him?
25      A   I -- I think it might have been a one

Page 140

1   sentence -- you know, in the context of a
2   conversation about many things, as we do when we
3   catch up when we meet.  What -- you know, what's
4   on the agenda for the monograph program?  By the
5   way, I think talc might be an interesting thing to
6   put on a list for you to consider.  And probably
7   the conversation ended -- that part of the
8   conversation ended and moved on to other things.
9   But...
10          MR. KLATT:  Should we take a break?
11          MS. BRANSCOME:  I understand the noise,
12  but I -- I don't know that Dr. Siemiatycki was
13  finished with his answer.
14          MS. PARFITT:  We'll keep going.  I
15  didn't -- I was trying to keep a clean record for
16  you.  That's fine.  Keep going.
17          MS. BRANSCOME:  Well, we -- we can
18  pause.  I just was trying to let him finish his
19  answer.
20          MS. PARFITT:  We'll keep it paused here
21  on the screen.  Just a little bit more activity.
22          THE VIDEOGRAPHER:  We will pause for a
23  second.  We're going off the record, 2:41 a.m. --
24  p.m.
25          (Pause.)

Page 141

1           THE VIDEOGRAPHER:  We're going back on
2   the record at 2:43 p.m.
3   BY MS. BRANSCOME:
4       Q   When you spoke with the director of the
5   monograph program for IARC last summer, did you
6   inform him that you have been serving as an expert
7   witness on behalf of plaintiffs in litigation
8   involving talcum powder products and the claim
9   that they cause ovarian cancer?
10      A   I'm not sure if I told him at that time,
11  but I certainly have told him since then.
12      Q   When you were talking to him about the
13  possibility of including talc in a formal,
14  complete evaluation subsequent to the one that was
15  done in 2006 and published in 2010, did you tell
16  him anything about your opinions with respect to
17  the likelihood that perineal use of talc can cause
18  ovarian cancer?
19      A   I don't think I did.
20      Q   What did he say about -- if anything,
21  about conducting a formal evaluation of talc?
22      A   I -- I can't remember if he said
23  anything about it.
24      Q   Have you had any conversations with him
25  other than the conversation you had last summer

36 (Pages 138 to 141)

Jack Siemiatycki, Ph.D.

Page 142

1  about IARC conducting another examination of talc
2  and its potential carcino- -- carcinogenicity --
3  whoops, butchered that one -- about it's ability
4  to cause cancer?
5      A   No.  I don't think I did.
6      Q   Now, you said you have an -- you have
7  the intention to submit something formal to IARC;
8  is that correct?
9      A   Yes.  I've been thinking about it, and
10  I -- when I have time, I'll look into the process.
11     Q   What specifically would you request that
12  IARC do at this time with respect to talc?
13     A   Carry out an evaluation like they did in
14  2006 but with up-to-date data.
15     Q   What data specifically do you think an
16  IARC Working Group would need to consider that was
17  not available in 2006?  What are the key pieces of
18  data that you think should be considered by a
19  working group?
20     A   So from an epidemiological database
21  point of view, there have been a number of
22  publications, as you know, since 2006, including
23  some cohort studies, various case-control studies,
24  various meta-analyses, a pooled analysis from the
25  Terry group.  All of that information bears on the

Page 143

1  evaluation of cancer risk.  It -- it may or may
2  not change the view of a working group vis-à-vis
3  the view held by the 2006 working group, but
4  there's enough new information there that it could
5  potentially change points of view.
6          And in the mechanism area, I understand
7  that there has been additional work on various
8  possible areas of -- concerning the migration of
9  particles around the body and how this might
10  influence the -- the biological plausibility of
11  such a -- a process.  The possible role, roles of
12  inflammation or oxidative stress.  There have been
13  developments -- there are new publications in
14  those areas that might influence a new working
15  group or a working group looking at it with new
16  eyes.
17          For all of those reasons, I think it
18  would be timely, and in any case, if a decision
19  were made today to do this, such a meeting would
20  probably not be held before 2022 or 2023 at the
21  earliest.  They have a horizon of priorities that
22  they're working on.  So -- and by then, there
23  would likely be additional work that would be
24  available.
25          So it's an area where I think there is

Page 144

1  sufficient growth in the information base that
2  would justify it.  And the question is whether
3  there are other priorities -- that they have
4  things with even higher priorities for them to
5  look at.
6      Q   We agree the perineal use of talc
7  currently is classified by IARC as a Group 2B
8  chemical, correct?
9      A   Correct.
10     Q   So the classification or the definition
11  of a Group 2A chemical still applies when there is
12  limited evidence of carcinogenicity in humans and
13  then sufficient evidence of carcinogenicity in
14  experimental animals, correct?
15     A   Yes.
16     Q   Has there been developments in the
17  experimental animal data since the IARC Working
18  Group evaluated the risks associated with the
19  perineal use of talc in 2006?
20     A   I'm not aware whether there has been.
21  I -- it does not spring to mind.  I can't think of
22  any examples.
23     Q   Now, I noticed in your report you have a
24  description, it's on page 24, of the different
25  categories that IARC might rate a chemical.

Page 145

1          Do you see where I am?
2      A   Yes, I see where you are.
3      Q   Okay.  And there's a rating system that
4  IARC uses that ranges from 1 to 4, correct?
5      A   Yes.
6      Q   That -- you have indicated here on
7  page 24 on your report that number 4 is not a
8  carcinogen.  Is that accurate?  Is that an
9  accurate description of category 4?
10     A   The wording is longer than that, but
11  this is my potted version of what that longer
12  version means.
13     Q   The actual definition is that it is
14  probably not carcinogenic, correct?
15     A   Correct.
16         MS. BRANSCOME:  Would now be a good time
17  for a break?
18         MS. PARFITT:  I think so.  We can take a
19  break.  Thank you.
20         THE VIDEOGRAPHER:  We are going off the
21  record at 2:51 p.m.
22         (Recess.)
23         THE VIDEOGRAPHER:  This is the beginning
24  disc number 4 in the deposition of Jack
25  Siemiatycki.  We're going back on the record at

37 (Pages 142 to 145)

Jack Siemiatycki, Ph.D.

Page 146

1    3:27 p.m.
2    BY MS. BRANSCOME:
3        Q   Good afternoon, again, Dr. Siemiatycki.
4        A   Hi.
5        Q   Do you still agree with the IARC
6    characterization that the case-control studies
7    evaluating a potential connection between perineal
8    talc powder exposure and ovarian cancer are
9    unusually consistent?
10       A   Unusually -- they're very consistent.
11   I'm not sure I would choose the word "unusually."
12   Sometimes when 20 people write a document,
13   everyone doesn't agree with every word, but they
14   are very consistent.
15       Q   Do you agree with the IARC determination
16   that the excess in risk in those case-control
17   studies is, quote, modest?
18       A   That the what, the increase in risk?
19       Q   Or the excess of risk.
20       A   Yeah, the -- I mean, the terminology
21   around strength of association -- weak, modest,
22   strong, very strong, medium, et cetera -- it
23   doesn't have -- there are no regulations. There's
24   no epidemiologic handbook that says if a relative
25   risk is in this range, you call it weak or

Page 147

1    moderate and so on and so forth.
2        So the term "moderate" -- actually, the
3    terminology around strength of associations was
4    probably most influenced by the smoking and lung
5    cancer situation in the '50s and '60s where there
6    were relative risks of ten approximately, ten
7    times as high of risk for smokers as for
8    nonsmokers of getting lung cancer, and that was
9    considered a benchmark for strong associations.
10   And it was not known then whether most carcinogens
11   would fall -- most carcinogens that would be
12   discovered later than that era would fall into the
13   category, you know, of relative risks, around ten
14   or around five or around two or whatever.
15       So the -- the use of the terms "strong,"
16   "medium," "weak" has kind of been -- what's the
17   word? -- benchmarked, I guess, by the smoking-lung
18   cancer association.  And things that --
19   subsequently relative risks that were less than in
20   that order of magnitude of ten or so where people
21   didn't refer to them as strong because they were
22   not as strong as smoking and lung cancer.
23       It has subsequently turned out that the
24   level of relative risk for smoking and lung cancer
25   is exceptional among known carcinogens, and that

Page 148

1    this -- there are not many that have such high
2    relative risks.
3        I'm just giving you a bit of background
4    because the terminology is controversial, and I
5    know it plays into the case of how we -- how we
6    characterize the associations around talc and
7    ovarian cancer.
8        There are a lot of associations that are
9    much less than -- with relative risks much lower
10   than ten that are very well accepted as being
11   causal associations.  And so the idea that
12   associations have to be, quote/un- -- quote,
13   strong in the sense that the smoking-lung cancer
14   association was strong is not really tenable any
15   more.  There are so many -- most known carcinogens
16   don't have such strong -- don't have such high
17   relative risks.  So where you draw the line
18   between strong, moderate, weak, and so on, is a
19   kind of -- is a vague notion.
20       If you're asking me how I would
21   characterize it or how it's characterized -- I'm
22   not sure whether you want to go -- to ask how I
23   would characterize it or how it's characterized by
24   other people or --
25       Q   So, respectfully, Dr. Siemiatycki, my

Page 149

1    question was, do you agree with the IARC
2    classification of the increase in risk as, quote,
3    modest?
4        A   So there was no such classification.  It
5    was a word used in a sentence, I guess.  There
6    is -- they never classified the association as
7    being strong, weak, moderate or whatever.  It was
8    part of a narrative about the -- the body of
9    evidence.
10       Do I agree that -- yeah, I would use
11   that term today.
12       I'm sorry if I digressed from your
13   question.
14       Q   You would agree that the point estimate
15   of the meta-analysis that you conducted in 2018
16   that's contained in your report marked Exhibit 10
17   is actually lower than the point estimate that was
18   reported in the Langseth 2008 study, correct?
19       A   That's correct.
20       Q   And the Langseth 2008 paper, the
21   meta-analysis that you and your coauthors
22   conducted resulted in a 1.35 relative risk,
23   correct?
24       A   That's correct.
25       Q   And in Exhibit 10, your report in the

38 (Pages 146 to 149)

Jack Siemiatycki, Ph.D.

Page 150

1    MDL, the relative risk point for your 2018
2    meta-analysis is 1.28, correct?
3         A   In the 2018 -- yes, that's correct.
4         Q   Is it your opinion -- well, let me just
5    ask you, what classification should perineal use
6    of talc get with respect to ovarian cancer under
7    the IARC scale?
8         MS. PARFITT:  Objection.  Form.
9         THE WITNESS:  I -- I'm very reluctant to
10   answer that question because it takes a lot of
11   input from different disciplines to produce an
12   IARC evaluation and then IARC classification.  And
13   I feel it's presumptuous for any one person from
14   one discipline to take on that function.
15        What I can say is that in this
16   situation, the epidemiologic evidence alone is
17   sufficient to make the -- make me think that it's
18   more likely than not that there is a causal
19   association.  How that proposition would feed into
20   an IARC evaluation is something that would -- that
21   a multidisciplinary group would need to work out,
22   but I think there's at least enough evidence to
23   say it's more likely than not.
24   BY MS. BRANSCOME:
25        Q   Because you would agree that a work --

Page 151

1    an IARC Working Group, for example, if a former --
2    formal evaluation was done on talc, in order to
3    classify talc as say a Group 2A, that working
4    group would need to consider multiple lines of
5    evidence, correct?
6         MS. PARFITT:  Objection.  Form.
7         THE WITNESS:  That's correct.
8    BY MS. BRANSCOME:
9         Q   And simply the determination, if it were
10   the case that the epidemiological evidence might
11   support the conclusion that perineal use of talc
12   more likely than not can cause ovarian cancer,
13   would not by itself be sufficient for a Group 2A
14   rating.  Is that fair?
15        MS. PARFITT:  Objection.  Form.
16        THE WITNESS:  The IARC classification
17   was developed in the 1970s.  It was not developed
18   in order to fit into a template that can be used
19   in the courtroom.  So terms like "more likely than
20   not" or, you know, whatever terminology would be
21   used in a courtroom around this sort of thing does
22   not fit perfectly on the IARC classification
23   scale.
24        I understand why courts use IARC
25   evaluations as an input to understanding

Page 152

1    causality, but it's not a one-to-one kind of
2    relationship.
3         Now I've lost the thread.  I'm sorry.
4    BY MS. BRANSCOME:
5         Q   That's okay.  I'm going to ask you the
6    question again.
7         Simply the fact that the epidemiological
8    evidence --
9         A   Yeah.
10        Q   -- may support a conclusion that more
11   likely than not perineal talc use can cause
12   ovarian cancer, that fact alone is not sufficient
13   to result in a Group 2A classification of a
14   chemical under IARC.
15        MS. PARFITT:  Objection.  Form.
16   BY MS. BRANSCOME:
17        Q   Is that fair?
18        A   It's fair -- in principle, it's a fair
19   statement.  My feeling is that if that occurred in
20   a meeting, and if -- you know, in an IARC Working
21   Group, the group is subdivided into four
22   subgroups:  Initially, an epidemiology group,
23   animal experimentation group, other biological
24   mechanisms, and then expose -- an exposure group.
25        If the epidemiology group came back, had

Page 153

1    a feeling that there likely -- it was more likely
2    than not that there is a causal association, they
3    have the prerogative to categorize the evidence as
4    being sufficient or limited.  And it's not clear
5    how they would categorize the epidemiologic
6    evidence.  That would feed into the final
7    evaluation.
8         Q   So you would say, as you sit here today,
9    based on what you know about the epidemiological
10   evidence with respect to the perineal use of talc
11   and ovarian cancer, it's not clear whether that
12   would satisfy the criteria for sufficient evidence
13   of carcinogenicity.  Is that fair?
14        MS. PARFITT:  Objection.  Misstates his
15   testimony.
16        THE WITNESS:  For -- for a particular
17   working group.  Because the other particularity of
18   the IARC process, as with other -- from high level
19   scientific processes, is that it depends a lot on
20   scientific judgment.  There's -- there are
21   guidelines for how to combine animal evidence and
22   basic biology evidence in epidemiology, but all of
23   these guidelines are just models of how the final
24   evaluation might be determined.
25        Each working group is sovereign and can

39 (Pages 150 to 153)

Jack Siemiatycki, Ph.D.

Page 154

1  take the entire body of evidence and make a
2  decision outside the -- the template -- the -- the
3  typical template. So a working group could look
4  at the evidence and decide is it Group 1, it's
5  Group 2B, Group 2A, based on the totality of
6  evidence.
7      In general, if the epidemiology is
8  convincing, it would be Group 1 or Group 2A if
9  it's convincing but not -- or let's say if it's --
10  if it indicates a risk but it's not definitive.
11  BY MS. BRANSCOME:
12      Q   So you would say if the epidemiology
13  indicates a risk but is not definitive, you think
14  there's a possibility a chemical would be
15  classified as Group 1?
16      MS. PARFITT: Objection. Form.
17      THE WITNESS: It depends how close to
18  definitive it is. So if the feeling of the group
19  is that it's almost certain on the basis of
20  epidemiologic evidence, then they could classify
21  it as Group 1, and they would classify the
22  epidemiologic evidence as sufficient in that case.
23  BY MS. BRANSCOME:
24      Q   Okay. On the scale of definitiveness,
25  where would you place the evidence of the perineal

Page 155

1  use of talc and ovarian cancer as of today?
2      A   Based on the epidemiologic evidence.
3      Q   Correct.
4      A   I -- I go back to more likely than not.
5  Not -- not definite, but more likely than not.
6      Q   Is it possible to have a situation where
7  the epidemiological evidence is supportive of a
8  causal association, but the group working on
9  biological mechanism determines that there isn't a
10  sufficient mechanism by which that chemical could
11  have caused that outcome?
12      A   That can happen.
13      Q   And what would the explanation for an
14  inconsistency like that be?
15      A   It would require quite a high level of
16  understanding of the mechanistic evidence.
17      So -- I -- I don't know if it has
18  happened, so I'm -- I'm trying to think through
19  memory whether I can think of any examples. I'm
20  not sure that it has happened.
21      THE VIDEOGRAPHER: Excuse me, Counsel.
22  The microphone just fell.
23      THE WITNESS: Oh, I'm sorry.
24      MS. BRANSCOME: That's okay. You just
25  knocked off your microphone.

Page 156

1      (A discussion was held off the record.)
2  BY MS. BRANSCOME:
3      Q   Do you remember what you were answering
4  or should we --
5      A   I prefer if -- I'm sorry. If you could
6  ask again and --
7      Q   Let me ask it a different way. Is it
8  possible for a confounding variable to essentially
9  infect all of the epidemiology on a particular --
10  looking at a particular causal relationship?
11      MS. PARFITT: Objection. Form.
12      THE WITNESS: It is possible.
13  BY MS. BRANSCOME:
14      Q   Okay. If that were to happen and you
15  see evidence in the epidemiology that shows a
16  consistent increase in risk but there's the
17  potential for a confounding variable, would it be
18  important to look at the potential biological
19  mechanism to see whether or not the agent might be
20  causing the outcome?
21      A   So the confounding factor is -- is a
22  factor that could be captured in epidemiologic
23  studies but hasn't been. Is that what you are
24  alluding to? And the biologic -- but the biologic
25  mechanism that you're referring to would involve

Page 157

1  that confounding factor or is this -- are you --
2  are you confounding "confounding" with -- with
3  biologic mechanism issues?
4      Q   Okay. Let me -- let me give you a
5  specific hypothetical.
6      A   Yes.
7      Q   Okay. So let's say hypothetically, for
8  example, recall bias --
9      A   Okay.
10      Q   -- affects the epidemiology related to
11  looking at the causal relationship, and whether
12  you agree with it or not, but we'll just say
13  hypothetically that affected the epidemiology of
14  talc use and ovarian cancer.
15      A   Can I just interrupt for a
16  terminological thing? So typically we don't refer
17  to recall bias as a confounding factor.
18      Q   Ah.
19      A   We refer to it as a bias, a type of
20  bias, but -- you know, that's just technical, but
21  for the record, if we're going to be discussing
22  this further.
23      Q   I appreciate the clarification.
24      A   Thank you.
25      Q   Well, first of all, let me just ask you,

40 (Pages 154 to 157)

Jack Siemiatycki, Ph.D.

Page 158

1   is recall bias something that could affect the
2   reliability of conclusions drawn from
3   epidemiological studies that rely on recall to
4   define exposure to the agent?
5       A   Yes, it could, hypothetically.
6       Q   Okay.  Is recall bias something that
7   potentially could affect the epidemiological
8   studies of the perineal use of talc?
9       A   Yes, theoretically, it could.
10      Q   Okay.  In situations where there is a
11  potential bias or a confounding variable that has
12  not been identified, how should epidemiological
13  evidence be evaluated in comparison to the other
14  categories of evidence that are considered, for
15  example, by an IARC Working Group?
16      A   Well, these things would typically be
17  evaluated in a -- a nonquantitative way.  You
18  can't really quantify what is the potential impact
19  of a confounder that you don't know about or that
20  you haven't measured.  It's kind of a theoretical
21  thing.
22          And the same with -- with recall bias
23  where there could be some evidence about it.  And
24  certainly when I reviewed the evidence on this
25  topic, the possibility of recall bias was one of

Page 159

1   the main stumbling blocks to arriving at an
2   opinion, as it was for the IARC panel in 2006.
3   You know, we are all aware of that hypothetical
4   possibility, and we think about whether something
5   of that magnitude -- something like that could
6   artifactually generate an appearance of a relative
7   risk.
8           My own way of dealing with that was to
9   look at the phenomenon of recall bias from the
10  perspective of both my own research, which has
11  mainly involved case-control studies, some cohort
12  studies but mainly case-control studies, and
13  research that I've read about, experienced,
14  reviewed for journals, et cetera.
15          And if the phenomenon of recall bias
16  were sort of a general across-the-board phenomenon
17  that infects and in a way discredits all
18  case-control studies -- interviewing cases, people
19  who are sick people, interviewing people who are
20  well and comparing the responses -- if this were
21  an inherent systemic problem, what we would
22  observe in general would be a plethora of fake
23  excess risks.  Because almost everything you would
24  ask people about, whether it's smoking, alcohol
25  consumption, physical activity, diet, workplace

Page 160

1   exposures, all -- you know, environmental things
2   that they've been exposed to, et cetera, there --
3   there's no reason why exposure to talc would be
4   the one item in epidemiologic questionnaires that
5   would provoke recall bias where nothing else does.
6           So if it's a part of a general
7   phenomenon, this recall bias, which is certainly a
8   hypothetical possibility, we would see that most
9   of the associations that were tested in case-
10  control studies would be found to be high risks,
11  maybe significantly high risks.
12          That's not what we observed.  That's not
13  what I've observed in my research.  I have
14  estimated -- and in the book that I showed this
15  morning, there are literally thousands of odds
16  ratio estimates in there.  But in all of my
17  research on over nearly four decades, I've
18  published a lot of evidence, and I can show some
19  examples, where there's no difference between
20  cases and controls because there is no effect,
21  there's no causal association between the two
22  things, and the case -- although people were --
23  cases were asked about, let's say, alcohol
24  consumption, and controls were asked about alcohol
25  consumptions, the cases didn't overreport.  They

Page 161

1   didn't say, Oh, well, they want to know if this
2   caused my cancer, and therefore I'm going to tell
3   them, yes, I consumed a lot of beer and wine and
4   so on, or smoking or whatever.
5           So we don't see this as a general
6   phenomenon that people overreport -- that cases
7   overreport compared to controls.
8       Q   Have you looked at the phenomenon of
9   recall bias specifically when the agent being
10  investigated is part of public wide -- wide scale
11  litigation?
12          MS. PARFITT:  Object to form.
13          THE WITNESS:  So I haven't personally --
14  let me just think if any of my research has
15  involved situations analogous to that.
16          Yes.  Cell phones and brain cancer.  So
17  I was involved in a large cell phone and brain
18  cancer study, and we asked cases about their use
19  of cell phones, and we asked controls about their
20  use of cell phones.  And while the interpretation
21  of the results of the study were somewhat
22  controversial, there was no generalized phenomenon
23  of cases reporting more cell phone use than
24  controls in that particular study.
25          So that -- I can't think of another

41 (Pages 158 to 161)

Jack Siemiatycki, Ph.D.

Page 162

1  example in my career of sort of one of these
2  generally suspected things. I mean, I've studied
3  a lot of occupational exposures, but those tend to
4  be more obscure, and people don't, you know, have
5  the same visceral reaction maybe to were you
6  exposed to formaldehyde or benzene or this or
7  that.
8  BY MS. BRANSCOME:
9      Q   For purposes of your meta-analysis, you
10  looked at the binary question of ever having used
11  talc and never having used talc, correct?
12      A   Among other -- not only that, but that
13  in addition to, yeah.
14      Q   Yes. For example, you were not -- your
15  data isn't stratified based off of having used it
16  to a certain degree of frequency, correct?
17      A   The -- the meta-analysis, no.
18      Q   Okay.
19      A   I -- I looked at dose-response
20  information within the studies that provided it,
21  but I didn't do any meta-analyses of the -- of the
22  dose-response data.
23      Q   Okay. So I -- I asked you sort of the
24  broad question about what has changed in the
25  scientific literature with respect to perineal use

Page 163

1  of talc since the 2006 IARC Working Group, but I
2  want to point you now sort of specific to what you
3  say in your report and ask you some more detailed
4  questions about what's changed.
5      So if you could turn to page 67 of
6  Exhibit 10 there.
7      A   Yes.
8      Q   Sorry, just one moment. My pencil has
9  died on me. Just give me one second. All right.
10     All right. So you have a Section 9 here
11  that says: "Contrast with IARC monograph and
12  other reviews." Do you see that?
13     A   I do.
14     Q   All right. And you asked the question
15  in your report: "What has changed in the years
16  since the IARC review?" Correct?
17     A   Correct.
18     Q   All right. And you talk about
19  additional studies and scientific literature
20  addressing a variety of topics, including
21  epidemiology, toxicology, molecular biology and
22  mechanistic studies; is that correct?
23     A   Sorry, are -- you're saying that I
24  referred to those domains?
25     Q   Yes.

Page 164

1      A   Yeah.
2      Q   Are those areas in which you contend
3  there is developments in the scientific literature
4  that is relevant to the question of the connection
5  between perineal use of talc and ovarian cancer?
6      A   Yes.
7      Q   Okay. So I just wanted to talk to you
8  about which of those categories you are
9  independently offering an expert opinion as
10  opposed to you are deferring to others. Does that
11  make sense?
12     A   Yes.
13     Q   All right. So you are offering an
14  expert opinion about developments in the
15  epidemiology, correct?
16     A   Correct.
17     Q   Are you testifying as an expert in
18  developments in the scientific literature with
19  respect to toxicology?
20     A   No.
21     Q   Are you testifying as an expert with
22  respect to developments in the scientific
23  literature in molecular biology?
24     A   No. I -- I'm aware that there have been
25  some publications since 2006 in that domain, but

Page 165

1  I'm not offering an opinion about those.
2      Q   Are you offering an opinion with respect
3  to the biological mechanism by which the perineal
4  use of talc may or may not cause ovarian cancer?
5      A   Not an opinion. Again, I'm -- I'm
6  acknowledging that there is new evidence, and I
7  mention some of that, yes.
8      Q   But as an expert, you're not here to
9  opine on the strengths and weaknesses of that
10  evidence or how it might be weighted against other
11  evidence that's in the field related to biological
12  mechanism; is that fair?
13     MS. PARFITT: Objection. Form.
14     THE WITNESS: That's correct.
15  BY MS. BRANSCOME:
16     Q   Okay. Now, you state in your report
17  that: "The various possible biases" -- this is
18  still on page 67 -- "that are on the table remain
19  substantially similar to the ones that were
20  considered by the IARC panel." Correct?
21     A   Correct, I said that.
22     Q   Okay. What are the various possible
23  biases that you refer to there?
24     A   Well, I -- I'd have to go back to the
25  IARC 2006 report to give you a full answer, but I

42 (Pages 162 to 165)

Jack Siemiatycki, Ph.D.

| Page 166 |
| --- |

1  guess the main things that were highlighted at the
2  time were measurement error, how to assess
3  exposure to talc, and what the impact of
4  measurement error might be on the estimates,
5  recall bias and the possible impact that that
6  might have.
7      Q    What do you mean by "measurement error"?
8      A    Measurement error is closely related to
9  recall bias, but it's not the same thing.
10  Measurement -- recall bias refers to differences
11  between cases and controls in the way they
12  respond.  Measurement error refers to inaccurate
13  recall and reporting, irrespective of whether
14  there are cases and controls.  There can be
15  exactly the same degree of error in -- in recall
16  between cases and controls.
17      So it's not differential.  It's not --
18  it's not a recall bias between the two groups.
19  But if there's error, if some people report high
20  use, and in fact they had medium use and all --
21  all this sort of thing, that impacts the estimates
22  of relative risk -- even though those errors are
23  the same in the cases and controls, that impacts
24  the estimates of relative risk, and that generally
25  impacts it in the direction of attenuating the

| Page 167 |
| --- |

1  relative risk estimates, lowering them from what
2  they really are.
3      So that's one error -- one type of error
4  that is -- that permeates epidemiology and that is
5  present, and that we have to be conscious of and
6  try to evaluate.
7      Q    Could there be measurement error related
8  to misdiagnoses?
9      A    Yes.
10      Q    And if there was misdiagnoses in the
11  sense that someone was diagnosed with ovarian
12  cancer but in fact had a different form of cancer,
13  that could actually result in an artificially
14  inflated relative risk, correct?
15      MS. PARFITT: Objection.  Form.
16      THE WITNESS: So that kind of error in
17  diagnosis has subtly different meaning in the
18  context of a case-control study and a cohort
19  study.  And if -- if you want, I'll -- I could try
20  to answer your question in -- in each context.
21  BY MS. BRANSCOME:
22      Q    Okay.
23      A    So it has an effect in both contexts,
24  but it's a slightly different effect.
25      So in the context of a cohort study, if

| Page 168 |
| --- |

1  there is error in diagnose -- I guess you -- what
2  you're alluding to -- let me make sure, you're
3  alluding to possible misdiagnosis between
4  mesothelioma and ovarian cancer.  Is that where
5  you're going?
6      Q    That -- that is one possibility, yes.
7      A    So in the case of a -- in this situation
8  of a cohort study, following up a group of women,
9  some of them really get mesotheliomas that are not
10  linked to talc exposure, but those women are
11  classified as ovarian cancers erroneously.
12  They -- that error would have the effect of
13  reducing the apparent risk compared to the real
14  risk of talc and ovarian cancer.  In that context,
15  it would have that effect.
16      In the context of a case-control study,
17  where you start with a group of women who have
18  been diagnosed with ovarian cancer but in truth
19  some of them had peritoneal mesotheliomas, and you
20  compare them to controls, the women who -- and
21  assuming that talc has no effect on peritoneal
22  mesothelioma, which is another assumption to make,
23  but -- but assuming that talc has no effect on ovarian
24  cancer, just for the sake of argument, lumping in
25  the mesotheliomas with the ovarian cancer cases

| Page 169 |
| --- |

1  would again create a reduction in the estimate of
2  relative risk.
3      So in both situations -- I would have to
4  work it out on a pad of paper, but I think in both
5  cases -- and I did write something about this in
6  my report, so if you don't --
7      Q    Feel free to take a look.  Sure.
8      A    -- mind.  Thinking out loud in the
9  middle of a deposition is sometimes harder than
10  thinking out loud at home.  (Peruses document.)
11      So I'm looking at page 57,
12  Section 7.2.5, at the bottom of the page and then
13  going on to the next page, and see if what I said
14  then is -- corresponds roughly to what I just
15  said.
16      I think basically it -- it agrees with
17  what I just said.  Basically the effect would be
18  to attenuate estimates in this situation.
19      Q    So we discussed -- of the various
20  possible biases that might affect the
21  epidemiology, we talked about measurement error,
22  recall bias, diagnostic error.
23      Are there any other potential biases
24  that should be considered when evaluating the
25  epidemiology on the use of talc peritoneally?

Jack Siemiatycki, Ph.D.

Page 170

1      A   Yes.  So I -- I did list a bunch of
2   possible biases in my report.  And one of them --
3   if you don't mind, I'll just go through the titles
4   of the different things that -- starting on
5   page 53.
6          Bias due to nonresponse or
7   nonparticipation.  If you carry out a case-control
8   study, and you get -- you identify a group of a
9   hundred women who are cases, and you ask them to
10  participate and only 50 agree to participate, and
11  the ones who agree to participate happen to be the
12  only ones who used talcum powder, and the other 50
13  that you don't know about never used it, that
14  would be a problem.  And -- but it also depends
15  what happens among the controls.  Among the
16  controls, do you get the same nonresponse bias?
17  So there's a -- that is one possible bias in
18  case-control studies.
19         The second one I listed was recall or
20  reporting bias that we've discussed.
21         The third one is what I call
22  nondifferential or random error, which we
23  discussed.  It's error in reporting that is equal
24  in cases and controls, but it has an impact on
25  relative risk estimates.

Page 171

1          The fourth one, which we haven't
2   discussed, has to do -- it's mainly a problem for
3   cohort studies.  And if you carry out a cohort
4   study of -- focused on cancer, and you collect
5   information about exposure, and then follow them
6   for two years to find out how many of them got
7   cancer, and whether there is a difference between
8   the people who were exposed and the people who are
9   not exposed, well, that would be pretty hopeless
10  because it takes more than two years for cancers
11  to develop and be diagnosed.  So short follow-up
12  periods in cohort studies would be a source of
13  bias in cohort studies.
14         Diagnostic errors, we've just discussed.
15         Initiation of powdering as a result of
16  ovarian cancer, is it possible that some women
17  who -- that there is a statistical association
18  between powdering and ovarian cancer, but it's
19  because the women who get ovarian cancer in the
20  early stages, to relieve symptoms or to deal with
21  discomfort start to use powdering.  And so that is
22  a potential bias.
23         Confounding is the next category, and
24  that's -- it's a huge category of potential
25  distortion that is a little bit different from the

Page 172

1   other biases.  And this is why I corrected you at
2   the beginning when we were talking about
3   confounding and bias.  I mean it's not -- I'm not
4   criticizing you in any way for this.  It's --
5   there is terminological gray zones in
6   epidemiology, so it's not always clear.  But --
7      Q   Would it be fair to describe a
8   confounding variable in the context of ovarian
9   cancer as something that as of now is unknown that
10  makes a particular individual more likely to
11  develop ovarian cancer that also, for whatever
12  reason, makes them more likely to use talcum
13  powder?
14     A   Yes.  That would be a correct
15  interpretation of "confounding."
16     Q   And that is something that should be
17  taken into account in evaluating the epidemi- --
18  epidemiological literature, correct?
19     A   That's correct.
20     Q   And you would agree that the scientific
21  community at large has not yet understood all of
22  the potential factors that might contribute to a
23  susceptibility to develop ovarian cancer, correct?
24     MS. PARFITT:  Objection.  Form.
25     THE WITNESS:  Sorry, I -- I was hearing

Page 173

1   two things with my two ears.
2      MS. PARFITT:  Sorry.
3      THE WITNESS:  Can you repeat the last
4   part?
5   BY MS. BRANSCOME:
6      Q   Yeah.  You would agree that all of the
7   factors that might make someone susceptible to
8   developing ovarian cancer are not currently known.
9      A   That's correct.
10         So are -- are you -- are you getting at
11  the potential impact of confounding as -- from
12  unknown factors as something that hasn't been
13  properly evaluated or that is part of this
14  picture?
15     Q   I am simply asking you --
16     A   Yes.
17     Q   -- questions about your opinions.
18     A   Yes, yeah.
19     Q   But you agree that the possibility of an
20  unknown confounding variable is something that, as
21  an epidemiologist, you would at least consider
22  when looking at the strength of association
23  established by epidemiological studies, correct?
24     A   I would consider it, and I've considered
25  it in the context of this literature, and in my

44 (Pages 170 to 173)

Jack Siemiatycki, Ph.D.

Page 174

1  opinion, it's unlikely that any confounding factor
2  or factors would create the pattern of results
3  that we see.
4         And if I could give you one piece of
5  evidence about why I -- you know, that illustrates
6  why I think that.  A confounding factor can only
7  bias the result by a certain amount; not as strong
8  as its own relationship to the risk factor.
9         So if there's a risk fact- -- if the
10 relative risk that we see around 1.3 -- ballpark,
11 let's for the sake of argument say 1.3 -- is due
12 to a confounding factor, that confounding factor
13 would have to have an association with ovarian
14 cancer much strong -- stronger than 1.3, but much
15 stronger than 1.3.
16        And I can -- just to illustrate that, I
17 actually have a publication -- I think I gave you
18 a copy of that publication of mine that
19 illustrates my own research on occupational causes
20 of cancer --
21        THE VIDEOGRAPHER:  Sorry.
22        THE WITNESS:  Am I again disconnected?
23 Okay.  When I get excited...
24        Yes, that's the one.  If I could --
25        MS. PARFITT:  Make a copy.

Page 175

1         THE WITNESS:  Do you have any copies?
2         MS. PARFITT:  I'm looking to see.
3         THE WITNESS:  So -- well, if I could
4  just read a couple of sentences from the abstract
5  of this, I'll tell you what this is about.  It's
6  a study of --
7  BY MS. BRANSCOME:
8         Q   Could you, please, Dr. Siemiatycki,
9  identify for me --
10        A   Oh.
11        Q   -- what is the paper from which you are
12 reading.
13        A   Yes.  This is a paper called "Degree of
14 confounding bias related to smoking, ethnic group,
15 and socioeconomic status in estimates of the
16 associations between occupation and cancer."
17        Q   Is this something that you cite to or
18 reference anywhere in the report that you
19 submitted in the MDL?
20        A   It's only in my CV, which is I think
21 part of the record.
22        Q   What led you to specially identifying
23 this article, which you seem to have handy today
24 here at the deposition?
25        A   Because I was thinking about how to

Page 176

1  illustrate the potential impact of confounding in
2  this issue of ovarian cancer and talc, and what --
3  to explain why I believe that the excess risks
4  that we observe are unlikely to be explained by
5  confounding.
6         Q   Okay.  You would agree, though, that if
7  there was a confounding variable that had a
8  relationship with, in this case, ovarian cancer
9  that was stronger than 1.3, it could explain an
10 increase of 1.3 associated with the use of talc if
11 it was similarly connected to the use of talcum
12 powder products --
13        MS. PARFITT:  Objection.  Form.
14 BY MS. BRANSCOME:
15        Q   -- correct?
16        MS. PARFITT:  Objection.  Form.
17        THE WITNESS:  Well, one of the points
18 that I want to illustrate is that not only would
19 it have to be stronger than 1.3, it would have to
20 be a lot stronger than 1.3.
21 BY MS. BRANSCOME:
22        Q   How strong would it need to be?
23        MS. PARFITT:  Objection.  Form.
24        THE WITNESS:  I'll answer that by -- by
25 showing you what -- what we found when we were

Page 177

1  examining the associations between different
2  occupations and lung cancer.
3         So occupation and lung cancer, there are
4  some true associations there, as you probably
5  know, but -- and we collected information about
6  people's occupations.  We also collected
7  information about their smoking history, their
8  socioeconomic status, their ethnicity and so on.
9  A lot of factors.
10        But the most important part of this was
11 looking at the association between lung cancer and
12 smoking and -- lung cancer and occupation.  We
13 chose I think 15 occupations, estimated the odds
14 ratios for 15 different associations between
15 occupations and lung cancer, and we controlled for
16 smoking or we didn't control for smoking.  We
17 compared the results when you control for smoking
18 and when you don't compare -- control for smoking.
19 BY MS. BRANSCOME:
20        Q   Respectfully, Dr. Siemiatycki, I only
21 have seven hours to ask you questions.
22        A   Okay.
23        Q   Your -- your -- counsel for the
24 plaintiffs can ask you to fully explain other
25 research that you've done.

45 (Pages 174 to 177)

Jack Siemiatycki, Ph.D.

1     A   Okay.
2     Q   It sounds very interesting.
3     A   Thank you.
4     Q   But my question to you is, in your
5   opinion, how strong would an association have to
6   be with a confounding variable in order to play a
7   significant role in a 1.3 relative risk?
8     A   My --
9         MS. PARFITT:  Objection.  Form.
10        THE WITNESS:  -- guess, it would have to
11   be in the order of 3 to 5.  Because it also
12   depends on the association between a talc
13   powdering behavior and this unknown confounder.
14   BY MS. BRANSCOME:
15    Q   Okay.  Are there limitations to
16   performing a meta-analysis?
17        MR. TISI:  Do you want to mark that or
18   no?
19        MS. BRANSCOME:  No.
20        THE WITNESS:  Are there --
21   BY MS. BRANSCOME:
22    Q   -- limitations to performing a
23   meta-analysis?
24    A   I -- I'm not sure what -- like --
25    Q   I believe you referenced earlier that

1   you teach a class on epidemiological
2   methodologies; is that correct?
3     A   Yes.
4     Q   Okay.  So presumably, when you teach a
5   class you discuss the strengths and the
6   limitations of different types of analyses.  Fair?
7     A   It comes into the course, yes.
8     Q   Okay.  So in the context of looking at
9   the strengths and the weaknesses of different
10   types of analyses, are there any weaknesses or
11   limitations to a meta-analysis?
12    A   Weakness, okay.  Because the word
13   "limitation" doesn't always mean weaknesses.
14        Meta-analysis depends on having reliable
15   data.  So the basic studies that you use and the
16   basic data that you use in a meta-analysis has to
17   be sufficiently reliable to support a good
18   meta-analysis.
19        The data have to be sufficiently
20   comparable in nature.  So putting apples and
21   oranges and grapes into the same meta-analysis
22   would be a problem.  Different kinds of apples,
23   yes, but different -- et cetera.  So you have to
24   be careful that you're really measuring the same
25   thing, have the same outcomes.

1         In -- one of the differences between --
2   as I mentioned earlier, between -- some types of
3   meta-analyses are carried out on clinical trials,
4   in fact, I would say the bulk of meta-analysis is
5   conducted in clinical trials research where the
6   research protocols are really very standardized
7   from one study to another, and that enhances the
8   ability to make inferences from the results of a
9   meta-analysis.
10        In observational epidemiology, this
11   isn't true.  We have very different kinds of study
12   design and problems that arise in different
13   studies, and this leads in itself to variability
14   and heterogeneity.  And it is sometimes imagined
15   that heterogeneity is a reflection -- some sort of
16   a reflection of different risks in different
17   populations or something like that.  It's mainly
18   -- it's at least in part a reflection of the fact
19   that different study designs and different -- just
20   not just the overall architecture of the design,
21   but the implementation, how people were
22   interviewed, what the questions were and so on,
23   influences the results of a study.  That varies
24   from study to study, and that creates
25   heterogeneity.  So --

1     Q   Does heterogeneity -- do you want
2   heterogeneity in a meta-analysis?  Is it a good
3   thing or does it weaken the meta-analysis?
4     A   It depends on the purpose of the
5   meta-analysis.  So some meta-analyses have as one
6   of their objectives to identify populations in
7   which the effect of the drug or the -- whatever
8   you're studying is different from one population
9   to another.  That is a situation where you want to
10   identify heterogeneity, and you want to try to
11   target heterogeneity and the different
12   populations, different studies, the different
13   methods of administering medication, or whatever
14   the differences are between studies.
15        In observational epidemiology, it's
16   rarely the case that heterogeneity -- that a
17   formal evaluation of heterogeneity is -- is useful
18   or actionable.  Usually the bottom line result
19   doesn't change.  For example, there are
20   meta-analyses of smoking and lung cancer where the
21   meta-analysis demonstrates heterogeneity of the
22   results.  The results are always between a
23   relative risk of 5 or 6 and a relative risk of 10
24   or 12.
25        Now, for the question of -- for the

46 (Pages 178 to 181)

Jack Siemiatycki, Ph.D.

Page 182

1  qualitative question does smoking cause lung
2  cancer, it really doesn't matter if the relative
3  risk is 5 or 12.  So that heterogeneity has
4  absolutely no bearing on the question that is
5  being asked, and the best answer ignore -- would
6  ignore heterogeneity.  It doesn't really matter.
7       If you're trying to find out in which
8  populations does smoking have a greater impact,
9  then you might want to say, Okay, let's -- which
10  are the populations where the relative risks were
11  5 and which are populations where the relative
12  risks are 12?  Can we identify differences between
13  it?  Are they different countries, different
14  ethnic groups, and so on and so forth.
15       So it's a longwinded answer, and I'm not
16  sure if that gets to the question that you were
17  asking.
18       Q   Well, you said in your report -- and
19  it's on page 17, if you want to look at it -- you
20  stated -- it's at the top of the page.
21       A   Yes.
22       Q   "Unless a significant methodological
23  flaw can be identified that has caused the
24  heterogeneity, the best overall estimate remains
25  the meta-estimate."

Page 183

1       Did I read that correctly?
2       A   Yeah.  I guess we should read the
3  beginning of the sentence just to -- oh, yes.  Oh,
4  yes, I see.  Sorry.  Yes, I agree with you.
5       Q   So what is the basis for that statement?
6       A   The basis is that it's correct.  Are you
7  offering an alternative to this that I should
8  consider?
9       Q   Is there -- I guess my question is, is
10  it -- is it correct because you think it is
11  correct?  Or can you point me to something that
12  would support that principle and explain it more
13  fully?
14       A   I -- I haven't looked for any
15  documentary evidence that this has been written up
16  in this way anywhere.  I've been interpreting
17  meta-analyses in this way, and I believe this to
18  be true.
19       Q   Okay.  So we talked about a few
20  different things that you articulated as potential
21  weaknesses to a meta-analysis.  Are there any
22  other weaknesses to a meta-analysis?
23       A   Possibly.  Are there any that you can
24  identify?  I will be happy to -- you know, I'm
25  just -- to meta-analysis as a concept, I think one

Page 184

1  of the weaknesses is that it is sometimes
2  fetishized, and that people put too much -- you
3  know, have sort of a magical belief in the value
4  of meta-analysis result, which is not justified.
5  Often the results of certain critical studies are
6  as valuable or more valuable than those of a
7  meta-analysis, especially when -- especially in
8  observational epidemiology when it's hard to
9  really identify all of the parameters that
10  influence the quality of a study.
11       And so determining what studies to
12  include and which data from each study to include
13  is tricky.  It requires judgment.  Those judgments
14  can be wrong.  They can be contested.  Sometimes
15  one very good study is as powerful, but -- it's
16  part of -- a meta-analysis is part of a package of
17  information that I would look at in evaluating the
18  risks.
19       Q   Okay.  You mentioned the concept that a
20  scientific judgment needs to be used in
21  determining what studies and, more specifically,
22  what data within those studies to include in a
23  meta-analysis, correct?
24       A   That's correct.
25       Q   And you would agree that -- and I

Page 185

1  believe you just referenced it -- that there can
2  be errors in judgment in determining what studies
3  to include or not include or what data to include
4  or not include, correct?
5       A   I --
6       MS. PARFITT:  Objection.  Form.
7       THE WITNESS:  I would not characterize
8  these things as errors in judgment.  There can be
9  differences in judgment that are legitimate
10  that -- where people, equally well motivated and
11  well trained and experienced, can arrive at
12  different judgments on some of these things.
13  BY MS. BRANSCOME:
14       Q   Did you have a specific methodology that
15  you used in determining which relative risk or
16  odds ratio to include from each of the studies
17  that you include in your meta-analysis?
18       A   Carefully reading the study, carefully
19  reading the tables and the reports of what is in
20  the paper, understanding what is there, and then
21  making a determination on that basis.
22       Q   And those were, to use your words,
23  quote, judgment calls; is that fair?
24       A   Yes.
25       Q   Okay.

47 (Pages 182 to 185)

Jack Siemiatycki, Ph.D.

Page 186

1    A    There is no alternative to judgment in
2  science.
3    Q    The meta-analysis in your MDL report is
4  different than the meta-analysis in your 2016
5  report; is that correct?
6    A    The bottom line result, you're saying?
7  Well, yes, but also in the 2016 report, I
8  presented I think eight different estimates,
9  depending on scenarios of which studies to include
10 and which result from which studies to include,
11 because there were some borderline judgments where
12 I thought the best thing would be just -- just
13 provide all of the different options.
14        In 2018, I adopted a different strategy.
15 I thought, well, the best service I can provide
16 the court is to give my best estimate of which
17 studies and which data to include, and then to
18 provide a set of alternatives that I call
19 sensitivity analyses.  So that's one difference
20 between the two reports.
21   Q    Okay.
22   A    But there were some differences in which
23 studies were included and which result in which
24 studies were included from the one to the other.
25   Q    Well, let me start at the very basic

Page 187

1  level.  Are there any studies that are included in
2  your 2018 meta-analysis that were not available at
3  the time that you did your 2016 meta-analysis?
4    A    I don't think so.
5    Q    Okay.  So you mention that you made some
6  changes to which studies you included and even
7  within that, some of your numbers are slightly
8  different.
9        Can you explain to me what changes you
10 made with respect to which studies to include?
11   A    So somewhere I did the side-by-side
12 comparison, and I don't think I have -- I don't
13 think I have that with me.  So it would take me a
14 bit of time to just compare the two and see how --
15 how they compare.
16   Q    So you generated actually a side-by-side
17 comparison of your 2016 meta-analysis and your
18 2018 meta-analysis?
19   A    Well, of -- of the studies that went
20 into them.  Well, generated is a kind of a
21 highfalutin word.  I listed on a piece of paper,
22 and then I -- beside it I listed the other ones.
23 So I'm pretty sure I did that at some point just
24 to make sure.  If I didn't do it on paper, I did
25 it in my mind.  I wanted to know, you know, what

Page 188

1  is the difference doing it this way or doing it
2  that way.
3    Q    Okay.
4    A    But it's largely overlapped.  I mean,
5  I'll look at it and see if I can quickly recognize
6  which studies might have been --
7    Q    Well, I can point you --
8    A    Okay.  If you've done it, that's great.
9    Q    Yeah.  So you included Green 1997 in
10 your 2016 meta-analysis, correct?
11   A    Yes.
12   Q    And you did not include Green 1997 in
13 your 2018 meta-analysis, correct?
14   A    Correct.
15   Q    Why did you -- did including Green 1997
16 in your earlier report, do you consider that to be
17 a flaw?
18        MS. PARFITT:  Objection to form.
19        THE WITNESS:  I don't consider any of
20 these things flaws.  They were judgment calls, and
21 I -- actually, in that case, I learned in between
22 some information that I didn't know in 2016 that
23 made that decision the right one.
24 BY MS. BRANSCOME:
25   Q    What information did you learn?

Page 189

1    A    Well, a case-control study was carried
2  out in Australia by a team that involved Green and
3  Purdie, and the publication in 1995, I think it
4  was, described their analysis -- sorry, do you
5  want me to stop while you're --
6    Q    Keep going.
7    A    The paper in Purdie 1995, I think it is,
8  described the association between talc and ovarian
9  cancer.  I had that in my database.
10        And I also had -- a couple of years
11 later, there was a paper by Green that was not
12 focused on talc.  It was focused on risks that
13 were related to -- other -- well, to other
14 gynecological issues in relation to ovarian
15 cancer.  But in there she -- in the text, not in
16 any table but in the text, she provided a result
17 on talc and ovarian cancer.
18        Because that paper was published in
19 2000 -- 1997, the Green, et al., paper, I
20 assumed that that was an extension of the 2000 --
21 of the data that was used for the 1995 paper, and
22 that it actually included more information and
23 more up-to-date information than the 1995 paper
24 published two years earlier.  I had some doubts
25 about that.  But that was the decision I made in

48 (Pages 186 to 189)

Jack Siemiatycki, Ph.D.

Page 190

1  2016. In general, when there were different
2  reports from the same study at different
3  intervals, I took the most recent one as being the
4  more definitive one.
5      When I started analyzing for the 2018
6  report, I had lingering -- I remained with the
7  lingering doubts about the Green study -- the
8  Green report and whether it actually was an
9  updated version of the talc results from 2016 --
10 from my 2016 report.
11     And I wrote to Adele Green, who I know
12 as an acquaintance, not well but enough to write
13 and say, You know, what's going on with these --
14 what was going on with these two papers? Is it
15 the fact that the result -- which one has the most
16 definitive result on talc and ovarian cancer, the
17 earlier one or the more recent one? And she wrote
18 back and said, The earlier one does. That the
19 later one -- and I can't remember the exact
20 explanation, but it had to do with some cases
21 being dropped because of reasons having nothing to
22 do with talc but having to do with other
23 hypotheses that she was examining.
24     So in any case, the two results are
25 identical. So it makes no difference. But that

Page 191

1  is, in answer to your question, why did it change,
2  it wasn't capricious issues. It wasn't wrong. It
3  was the right thing to do.
4      Q   Did you retain copies of the e-mail
5  correspondence that you had with Green?
6      A   I imagine that I did, but I -- this
7  would have been eight months ago maybe or
8  something.
9      Q   Would it be fair to say that you relied
10 on Green's representation of which dataset was
11 more fulsome in determining what to use in your
12 2018 metadata?
13     A   Yes.
14     Q   And that was something she communicated
15 to you by e-mail, correct?
16     A   That's right.
17     MS. BRANSCOME: We can meet and confer
18 about this offline, but we would request
19 production of those e-mails.
20     MS. PARFITT: We'll take it under
21 advisement. Thank you.
22     MS. BRANSCOME: Okay.
23 BY MS. BRANSCOME:
24     Q   Do you agree that in terms of the trend
25 for relative risk, with the addition of newer

Page 192

1  studies over time, the relative risk for the
2  association between peritoneal use of -- I mean
3  perineal use of talc and the development of
4  ovarian cancer has actually gone down?
5      MS. PARFITT: Objection. Form.
6      THE WITNESS: I -- I haven't evaluated
7  that, and I have no reason to agree or disagree
8  with it. If you want me to spend a bit of time
9  looking to see if I can --
10 BY MS. BRANSCOME:
11     Q   Well, for example --
12     A   -- confirm or --
13     Q   You are familiar with the Berge 2018
14 paper, correct?
15     A   Yeah, yeah.
16     Q   And the authors in that paper said: "We
17 confirm the trend toward lower overall risk
18 estimates as more evidence accumulated."
19     MS. PARFITT: Can we get that article in
20 front of him?
21     MS. BRANSCOME: Of course.
22     MS. PARFITT: Thank you.
23     MS. BRANSCOME: It is tab 48.
24     (A discussion was held off the record.)
25     MS. PARFITT: It's tab 18?

Page 193

1      THE WITNESS: Tab 48?
2  BY MS. BRANSCOME:
3      Q   Tab 48.
4      A   I don't have a tab 48.
5      Q   It may be in your second binder.
6      A   Oh.
7      MS. PARFITT: I will take this one out.
8  And I'll take this one for you.
9      THE WITNESS: Thank you.
10     MS. PARFITT: Of course.
11     THE WITNESS: Thank you.
12 BY MS. BRANSCOME:
13     Q   Dr. Siemiatycki, are you familiar with
14 the article that is located there behind tab 48?
15     A   Yes, I am.
16     Q   Berge is the lead author on this
17 publication titled "Genital use of talc and risk
18 of ovarian cancer: A meta-analysis." Correct?
19     A   Yes, correct.
20     Q   I believe earlier you said that Berge
21 "beat you to the punch" might have been the phrase
22 that you used.
23     What did you mean by that?
24     A   If this had never appeared, I might have
25 worked on a manuscript to submit for publication

49 (Pages 190 to 193)

Jack Siemiatycki, Ph.D.

Page 194

1  on my meta-analysis before today, sometime in the
2  past.
3      Q   Do you rely on Berge 2018?
4          MS. BRANSCOME:  Let's go ahead and mark
5  that actually as Exhibit 12.
6          (Exhibit No. 12 was marked for
7          identification.)
8          MR. TISI:  How long have we been going?
9  How long have we been going?
10         MS. BRANSCOME:  Just under five hours.
11         MR. TISI:  No, how long have we been
12  going on this one?
13         MS. BRANSCOME:  We can take a break
14  if -- do you need a break?
15         MR. TISI:  I'm just asking.
16         MS. PARFITT:  Do you want a break?
17         THE WITNESS:  No, let's finish -- let's
18  finish with this.
19         MS. PARFITT:  Okay.
20         (A discussion was held off the record.)
21  BY MS. BRANSCOME:
22     Q   Do you rely in forming your opinions on
23  this case on the Berge article that we just marked
24  as Exhibit 12?
25     A   I formed my opinions before knowing

Page 195

1  about this article.
2      Q   Do you believe that the Berge 2018 study
3  supports the conclusions that you have reached in
4  your own meta-analysis?
5      A   Yes, I think it does.
6      Q   In what way?
7      A   Well, let me preface that also by saying
8  that there's been a bit of a -- a history to this
9  article of -- I thought the publication -- there
10  was a version published in 2017, which I thought
11  was the definitive version that I've always kept
12  in my binders as the Berge article, and it's only
13  very recently that I actually came upon this
14  particular version, which is not greatly changed
15  from the 2017 but slightly changed, and I haven't
16  fully digested the small changes that have been
17  made.
18     Q   If you could -- sorry for the multiple
19  binders, but if you want to look at your first
20  binder, tab 13, we can see if that's the paper
21  that you previously had reviewed as the Berge
22  paper.
23     A   I -- I don't mind answering questions in
24  relation to this version.  Just -- I just wanted
25  to point out that there are a couple of things

Page 196

1  here that I'm -- I haven't fully integrated into
2  my evaluation of this paper.  But I know what's in
3  it.  I know what's the other one.  I know what's
4  in this one.
5      Q   Okay.  So back to my question,
6  Dr. Siemiatycki.
7      A   Yeah.
8      Q   You stated that you believe that the
9  Berge 2018 study supports the conclusions that you
10  have reached in this litigation, and my question
11  to you was, what do you mean by that?
12     A   Well, it supports it in a few ways.
13  One -- and from my point of view, the most
14  important one, but probably not for anyone else --
15  is that they carried out a search of the
16  literature using a much more intensive and -- a
17  much more intensive procedure than I had.  I had
18  full confidence in the procedure that I had used,
19  but it was not as long, as lengthy, as costly, et
20  cetera, et cetera, as what -- and the bottom line
21  was that they didn't find any papers -- relevant
22  papers that I hadn't found.  So I was very
23  reassured by this.
24         The second thing is that the bottom line
25  meta-analysis result -- well, no, the second thing

Page 197

1  is that the actual results that they chose from
2  the different studies were very similar in most
3  cases to the ones I had chosen from the different
4  study.  So there was a degree of corroboration
5  there that I was happy about.
6         They adopted a different strategy in one
7  important respect, and that concerned how to deal
8  with the Terry paper and the various components of
9  the Terry paper.  And with all due respect to this
10  team, I don't think that there -- theirs was in
11  error.  I prefer my approach that maintained the
12  integrity of the pooled analysis, which has some
13  advantages.  But there's -- you know, I wouldn't
14  expect any large differences on the bottom line
15  estimates from their strategy or my strategy.  And
16  the bottom line results were very similar.
17         They -- also in the previous version,
18  their evaluation of dose-response was, in my view,
19  deficient in not devoting adequate weight to what
20  I think is the most important evidence around
21  dose-response in this area, which is the Terry
22  pooled analysis.  They focused on studies which
23  provided results by duration of exposure and by
24  frequency of exposure.  And I think it's the
25  combination of those two which is the most

50 (Pages 194 to 197)

Jack Siemiatycki, Ph.D.

Page 198

1  important metric.
2       And the fact that the Terry analysis was
3  able to combine an enormous dataset for evaluating
4  dose-response, much greater than any of the
5  studies looking at duration or any of the studies
6  looking at frequency, meant that in my view they
7  missed an opportunity to properly evaluate
8  dose-response by cumulative exposure.
9       I note very recently that they have --
10  they've now used a different statistical procedure
11  for evaluating dose-response by duration and
12  frequency, which is embodied in their Table 3,
13  which I don't fully understand.  It seemed -- this
14  was the new part of this study, which I haven't --
15  I looked quickly in the method section to see a
16  description of exactly what they did, and I
17  couldn't find it, but I don't deny that it's
18  somewhere in the article.  I just haven't had time
19  to properly evaluate that part of it.
20      Q   As you sit here today, do you have any
21  criticisms of the statistical analysis that they
22  performed?
23      A   All of it?  You're referring to all of
24  it?  Well, I --
25          MS. PARFITT:  Objection.  Form.

Page 199

1          THE WITNESS:  I note that their bottom
2  line meta-relative risk is lower than the one that
3  I estimated.  And I'm not sure why that is.  To me
4  the -- the difference in -- the minor differences
5  in the studies included or excluded is not
6  sufficient to explain that, and I wonder if it's
7  software issue, of them having used a different
8  software for meta-analysis than I used.  But it's
9  not a criticism necessarily.  I just note this
10  discrepancy.
11  BY MS. BRANSCOME:
12      Q   Are there any studies that you included
13  in your meta-analysis in 2018 that the Berge
14  authors failed to consider that you think they
15  should have included?
16      A   So I'll go back to my report, because I
17  do have a table outlining that in my report.
18          MS. PARFITT:  You want your report?
19          THE WITNESS:  Yeah, my report, back to
20  my report.
21          MS. PARFITT:  Let me get you that.
22  BY MS. BRANSCOME:
23      Q   And we'll take a break after we finish
24  this paper.
25      A   Thank you.

Page 200

1          That's 2016.  Okay.
2      Q   Dr. Siemiatycki, if you could just
3  identify for the record where you're looking so I
4  can follow along and the record reflects it.
5      A   Right.  I'm looking in my report of 2018
6  in the appendix, page 103, Appendix B.
7      Q   So looking at Appendix B, which also
8  helpfully compares Penninkilampi as well, are
9  there studies specifically focused on the Berge
10  2018 that in your opinion the authors should have
11  included in their meta-analysis?
12          MS. PARFITT:  Objection.  Form.
13          THE WITNESS:  Okay.  Well, just
14  following this table, I see that Gates 2008 was in
15  my report, but not in theirs.  Now, it wasn't in
16  my main analysis; it was in one of my sensitivity
17  analyses.  So I have no -- my main analysis and
18  their main analysis concurred about Gates.
19          The next one that I see that was in my
20  analysis but not in theirs was what I call
21  Schildkraut B.  And Schildkraut B, for the record,
22  is -- there's no such study, but I've named it
23  Schildkraut B.  It's the result of the analysis of
24  the Schildkraut study of cases that were
25  interviewed before 2014, I think it was.

Page 201

1  BY MS. BRANSCOME:
2      Q   And we will discuss that in more detail,
3  but do you consider it an error for the Berge
4  authors to just have taken the Schildkraut 2016
5  data as a whole?
6      A   No, I don't consider it an error.  In
7  fact, I used it -- not in my main analysis but in
8  one of my sensitivity analyses.
9          The same with Shushan.  So Shushan '96
10  was in my -- one of my sensitivity analyses, not
11  in my main analysis, and they did not include it
12  in their main analysis.  So we agreed on the main
13  analyses there.
14          Terry, I included in mine, and they
15  didn't include Terry.  They included the component
16  parts of Terry.
17          So there was no -- there was no study
18  that was in my main analysis that was not in
19  theirs.
20      Q   Okay.  And looking quickly back at the
21  Berge article, coming full circle to the question
22  that I started with, if you could look on page 253
23  of that paper.
24          MS. PARFITT:  Yes, 253.
25  BY MS. BRANSCOME:

51 (Pages 198 to 201)

Jack Siemiatycki, Ph.D.

Page 202

1      Q   Under the Discussion section, do you see
2   where I am?
3      A   Yes, I do.
4      Q   All right.  The second paragraph under
5   Discussion from the Berge paper states:  "This
6   meta-analysis suggests that genital powder use is
7   associated with a small increased risk of
8   developing ovarian cancer.  However, this positive
9   association appears to be limited to the serous
10   histological type and to case-control studies."
11      Did I read that correctly?
12      A   You read it correctly.
13      Q   It continues on:  "This estimate is
14   somewhat lower than that of previous
15   meta-analysis," and in parentheses, it refers
16   specifically to Huncharek and Langseth, colon, "In
17   our cumulative meta-analysis, we confirmed the
18   trend toward lower overall risk estimates as more
19   evidence accumulated."
20      First, did I read that correctly?
21      A   You read it correctly.
22      Q   Do you have any basis to disagree with
23   the statement by the Berge authors in this
24   paragraph in the Discussion section?
25      MS. PARFITT:  Objection.  Form.

Page 203

1      THE WITNESS:  So there are a few
2   statements in this paragraph, not just one.
3      Do you want me to take them one by one?
4   BY MS. BRANSCOME:
5      Q   Sure.
6      A   So whether "the positive association
7   appears to be limited to the serous histological
8   type," I have some problem with that.  I -- I was
9   looking in their publication for which studies --
10   let me just see if I can -- which studies provided
11   evidence on serous type, and I couldn't find that.
12      In my -- in my analysis, the evidence
13   that I was able to -- to compile that's in this
14   addendum and meta-analyze showed an approximately
15   similar meta-relative risk between serous and all
16   ovarian cancers.
17      So there is no -- I found no evidence
18   that this -- that there was a particular peak of
19   risk for serous types compared to other types.
20      Q   As you sit here today --
21      MS. PARFITT:  Are you done -- are you
22   done with your -- is that --
23      THE WITNESS:  Yeah, for -- for that
24   point on serous, yes.
25      MS. PARFITT:  Thank you.

Page 204

1   BY MS. BRANSCOME:
2      Q   Based on the evidence that's available
3   today, do you think there is strong enough
4   epidemiological evidence to reach a conclusion
5   about the association between talc -- genital talc
6   use and other specific subtypes of ovarian cancer?
7      A   I think it becomes very fragile to draw
8   inferences about other types.  And in the absence
9   of reliable evidence about other types, you know,
10   especially those that have a smaller fraction of
11   all ovarian cancers than serous type, I think the
12   prudent thing to do is to consider that all
13   ovarian cancers are affected the same way.
14      The same way as with -- we do with lung
15   cancer and smoking and histologic types of lung
16   cancer.  While there is some variability in the
17   degree of relative risk between smoking and
18   adenocarcinoma or squamous cell carcinoma or other
19   types, small cell, large cell, for lung cancer,
20   there is some variability in the degree of
21   relative risk.  Generally speaking, we say smoking
22   causes cancer.  Smoking causes all kinds of --
23   causes lung cancer, all kinds of lung cancer.
24      Q   Are you qualified to evaluate the
25   reasonableness of making an extrapolation from one

Page 205

1   subtype of ovarian cancer to all types of ovarian
2   cancer in terms of what is biologically plausible?
3      MS. PARFITT:  Objection to form.
4      THE WITNESS:  My inferences would be
5   based on the statistical and epidemiological
6   evidence, and if there is biological,
7   physiological evidence that would indicate that
8   talcum powder is more likely to influence one type
9   of ovarian cancer than another, I would be
10   absolutely open to that interpretation.
11   BY MS. BRANSCOME:
12      Q   All right.  So moving along in that
13   paragraph, are there --
14      A   Okay.
15      Q   -- any other sentences or portions of
16   sentences with which you disagree?
17      A   So, the statement about case-control
18   studies and whether the positive association is
19   limited to case-control studies is -- is a bit
20   contentious.  And I understand very well that the
21   evidence does not -- if we only had the cohort
22   studies, if that's all the evidence that existed,
23   it would be fair to say that that evidence does
24   not argue for an association with -- between
25   ovarian cancer and -- so I would -- I'm not -- I

52  (Pages 202 to 205)

Jack Siemiatycki, Ph.D.

Page 206

1    guess if I were writing this, I would qualify it
2    somehow, and -- no, I think I'll just leave --
3    leave that there, and you may have follow-up
4    questions about the case-control/cohort
5    comparison.
6        Q   Is there anything else in this paragraph
7    in the Discussion section of Berge 2018 with which
8    you disagree?
9        MS. PARFITT:  And can you refer him to
10   the left-hand side of the discussion or the
11   entire --
12       MS. BRANSCOME:  The second full
13   paragraph in the Discussion section.
14       MS. PARFITT:  Which starts with "An
15   important."
16       THE WITNESS:  So I -- I think what --
17   BY MS. BRANSCOME:
18       Q   No, it begins with "This meta-analysis
19   suggests."
20       A   Yeah.  Yeah.
21           So your question -- the question is
22   about that sentence that says:  "This estimate is
23   somewhat lower.  In our cumulative meta-analysis,
24   we confirmed the trend towards lower," da, da, da,
25   and that refers I guess specifically to Figure 4

Page 207

1    on the following page.
2        Certainly the confidence intervals, if
3    you look at the confidence intervals of the
4    meta-estimates in that Figure 4, from 1988 through
5    2016, everything is embedded in everything.  So
6    from the point of view of statistical variability,
7    it would be difficult to argue that there is a
8    real statistical -- statistically meaningful
9    difference between the trendline from -- through
10   that whole period.
11       There is a tendency by eye for a
12   decline.  I don't know in their paper, in the text
13   whether they've characterized the decline with any
14   regression coefficients or not.  I don't remember.
15   It seems to me like a rather weak trend to make a
16   big point about.  So I wouldn't disagree with
17   the -- the point they're making, but I think it's
18   not strongly supported.  There isn't a strong
19   trend downwards in this line, in this figure.
20       Q   So you would agree with the authors that
21   there is a downward trend in the risk assessment
22   over time as more evidence accumulated, but you
23   might disagree with them about the strength of
24   that trend.  Is that fair?
25       MS. PARFITT:  Objection.  Form,

Page 208

1    misstates his testimony.
2        THE WITNESS:  It requires looking at
3    which studies were included in each of these
4    meta-analyses, and which results were chosen by
5    the meta-analysis people who did these
6    meta-analyses from each paper.  The meta-analysis
7    is somewhat sensitive to which studies are
8    selected and -- so the same study might have been
9    selected in the 2004 meta-analysis as in the 2016,
10   but they chose -- they decided to choose an
11   estimate from -- a result from that paper that
12   they thought was the most reasonable one and
13   that's different.
14       So one would have to do side-by-side
15   comparisons of which studies were included and
16   which results before concluding that this is
17   because of a downward trend.  You also need to
18   know when the data were collected.
19       You know, I'm not sure if the -- if you
20   are implying or if they are implying that -- you
21   know, I -- a declining trend, if there is one, in
22   meta-analyses -- these are the years of the
23   meta-analysis, not the years that women were
24   exposed.  So there's no implication -- direct
25   implication here that the risks to women are

Page 209

1    declining over time.  So if it's only the fact
2    that meta-analyses carried out at different points
3    in time showed very slightly different results, I
4    don't find that a noteworthy observation.  But...
5    BY MS. BRANSCOME:
6        Q   And you agree that meta-analyses are
7    sensitive to the judgments applied by the authors
8    of those studies, correct?
9        A   Yes, they are, but to -- to a degree.  I
10   mean you have to weigh the -- the degree of
11   bias -- or not the bias, but the -- the influence
12   of particular decisions that you might make.
13       I've done an analysis looking at what
14   happens when you include or exclude studies, and
15   you could exclude any study from my meta-analysis
16   and you'd find the same result.  So if any of
17   these studies in my meta-analysis are completely
18   wrong, if they were completely invented, if the
19   women were never actually interviewed but the
20   investigator just wrote a paper on a Sunday
21   afternoon, and you're suspicious that this study
22   was -- or badly -- whatever, if you take any one
23   of these studies and take it out of the mix, it
24   wouldn't affect the meta-relative risk.
25       MS. BRANSCOME:  Okay.  I think this is a

53 (Pages 206 to 209)

Jack Siemiatycki, Ph.D.

| Page 210 | Page 212 |
|---|---|
| 1 good place to take a break. | 1    Q   But if it's your preference to look at |
| 2        MS. PARFITT:  Very good.  Thank you. | 2  the paper now, it is tab 15. |
| 3        THE VIDEOGRAPHER:  We're going off the | 3    A   It's in this binder, I think. |
| 4  record at 5:07 p.m. | 4        MS. PARFITT:  Here it is.  Thank you. |
| 5        (Recess.) | 5        THE WITNESS:  Thank you. |
| 6        THE VIDEOGRAPHER:  This begins disc | 6        Okay.  The -- so one includes all -- |
| 7  number 5 in the deposition of Jack Siemiatycki. | 7  Schildkraut A includes all of the cases |
| 8  We're going back on the record at 5:36 p.m. | 8  interviewed the whole period, and the |
| 9  BY MS. BRANSCOME: | 9  Schildkraut B includes cases after 2014, but I'm |
| 10    Q   One of the decisions that you had to | 10 not sure if it includes 2014.  But... |
| 11 make in conducting your meta-analysis was how to | 11 BY MS. BRANSCOME: |
| 12 treat the Schildkraut 2006 study, correct? | 12    Q   Let me ask a clarification on that one, |
| 13    A   2000 -- | 13 Dr. Siemiatycki. |
| 14    Q   -- '16. | 14        Schildkraut 2016-B shows results for |
| 15    A   Thank you.  Yes. | 15 individuals interviewed before 2014, correct? |
| 16    Q   Okay.  For purposes of your | 16    A   I'm sorry, which one, B?  Schildkraut B? |
| 17 meta-analysis, you divided Schildkraut 2016 into | 17    Q   Schildkraut 2016-B. |
| 18 two sets of results, correct? | 18    A   B. |
| 19    A   "Divided" isn't quite the right word. | 19    Q   I believe you just stated after, so I -- |
| 20    Q   How would you describe it? | 20    A   I see.  Okay. |
| 21    A   Because they're not separate, one | 21    Q   -- wanted to seek clarification there. |
| 22 includes the other. | 22    A   Okay.  Yeah, I'm -- |
| 23    Q   Okay. | 23    Q   If it's helpful -- |
| 24    A   So just the word "divided" -- I'm not | 24    A   It's late in the day.  Let me -- |
| 25 sure what the right word is, but there were two | 25    Q   Sure.  If it's helpful to you to |

| Page 211 | Page 213 |
|---|---|
| 1  sets of results reported, and I used both sets of | 1  reference in your report, you discuss your |
| 2  results.  One is embedded -- one set is embedded | 2  separation of Schildkraut on page 74, Note 6. |
| 3  in the other. | 3    A   That's why I wanted my report in a small |
| 4    Q   So correct me if I'm wrong, Schildkraut | 4  binder, rather than -- before 2014, yes. |
| 5  2016-A shows results from all subjects who were | 5    Q   And the reason you divided -- |
| 6  interviewed in the study from 2010 through 2015. | 6  separated the study into those two groups, one |
| 7  Schildkraut 2016-B is a subset of that that | 7  which is inclusive of the other, is to account for |
| 8  includes the results for subjects who were | 8  the possibility that publicity surrounding two |
| 9  interviewed before 2014, correct? | 9  class action lawsuits on talc and ovarian cancer |
| 10        MS. PARFITT:  And, Counsel, if we could | 10 in 2014 may have induced bias in the validity of |
| 11 get Schildkraut in front of him, would that be all | 11 reporting talc exposure; is that correct? |
| 12 right? | 12    A   That's correct. |
| 13        MS. BRANSCOME:  Sure. | 13    Q   Okay.  But in your main meta-analysis |
| 14 BY MS. BRANSCOME: | 14 you use Schildkraut A, which includes all subjects |
| 15    Q   If you need to reference it -- | 15 interviewed from 2010 to 2015, correct? |
| 16        MS. PARFITT:  Sure. | 16    A   That's correct. |
| 17 BY MS. BRANSCOME: | 17    Q   When you substituted Schildkraut B, |
| 18    Q   -- to answer my questions, certainly. | 18 which included only subjects interviewed before |
| 19    A   If you're going -- yes, I think you're | 19 2014, for Schildkraut A, all subjects interviewed |
| 20 right in what you said, but if you want me to look | 20 from 2010 to 2015, the relative risk estimate for |
| 21 at specific results in the paper, maybe I should | 21 the meta-analysis goes down, correct? |
| 22 have it in front of me. | 22    A   Yes.  From 1.28 to 1.27. |
| 23    Q   I was going to direct you there when we | 23        MS. BRANSCOME:  If we could mark |
| 24 got to those questions. | 24 Schildkraut as Exhibit 13. |
| 25    A   Okay. | 25        THE WITNESS:  There's a label here |

Jack Siemiatycki, Ph.D.

<table>
<tr><td>

Page 214

1 already.
2      MS. PARFITT:  There is.  I will go ahead
3 and just -- you don't care -- there's a defense
4 label of 1436.  Can I go ahead and put the exhibit
5 over top of it?  Does it matter to you?  Okay.
6 This will be 13.
7      (Exhibit No. 13 was marked for
8        identification.)
9 BY MS. BRANSCOME:
10     Q    All right.  If you could,
11 Dr. Siemiatycki, please turn to Table 2, which is
12 on page 1414 of Exhibit 13.
13     A    I see it.
14     Q    Before doing that, can you just simply
15 confirm that Exhibit 13 is in fact the Schildkraut
16 study?
17     A    Yes, it is.
18     Q    And we see in Table 2 that there is a
19 category for interview date less than 2014, and
20 then another category for interview date greater
21 than 2014.  Correct?
22     A    Yes, I see that.
23     Q    All right.  And we see that there are
24 odds ratios for any genital use for both of these
25 categories, correct?

</td><td>

Page 216

1      A    Yes, that's correct.
2      Q    All right.  And the -- those are for the
3 cases, meaning individuals who had been diagnosed
4 or reported as diagnosed with ovarian cancer,
5 correct?
6      A    Correct.
7      Q    And if you compare that against the
8 controls, 34 percent is the reported number for
9 women without ovarian cancer who reported any
10 genital use of talcum powder that were interviewed
11 before 2014, correct?
12     A    That's correct.
13     Q    And if we look at those same
14 percentages for the individuals who were
15 interviewed after 2014, the percentage of cases,
16 meaning individuals who have been diagnosed or
17 reported as diagnosed with ovarian cancer who
18 claim to have used talc genitally at any point in
19 time, goes up to 51.5 percent compared to a
20 control of 34.4 percent, correct?
21     A    That's correct.
22     Q    All right.  And so if we compare
23 individuals interviewed before 2014 who have been
24 diagnosed or reported as diagnosed with ovarian
25 cancer to those individuals in the same category

</td></tr>
<tr><td>

Page 215

1      A    Yes, I see that.
2      Q    And the odds ratio for any genital use
3 for individuals who were interviewed after 2014 is
4 higher than the odds ratio for any genital use for
5 those individuals who were interviewed before
6 2014, correct?
7      A    That's correct.
8      Q    And it also shows the number of
9 individuals that fell in those respective
10 categories, correct?
11     A    Yes, correct.
12     Q    And so just simply looking at the
13 reported data, the percentage of women with --
14 with ovarian cancer who reported any genital use
15 of talc who were interviewed before 2014 was
16 36.5 percent, correct?
17     A    Can you run that by me again?  Show me
18 where the --
19     Q    Sure.
20     A    So interview date before 2014, any
21 genital use, the percentage 36.5, number 128, is
22 that what --
23     Q    Yes.
24     A    -- you are looking at?  Okay.
25     Q    Was that correct?

</td><td>

Page 217

1 who were interviewed after 2014, you see at least
2 a 12 percent increase in those figures; is that
3 correct?
4      A    12 percent representing which -- which
5 two numbers?
6      Q    Representing the difference between the
7 cases who reported genital use of talcum powder --
8      A    The 36.5?
9      Q    -- as compared to the 51.5 percent.
10     A    So you -- you said it's 12 percent?  I
11 think it's like 14 percent.
12     Q    It is.
13     A    Okay.
14     Q    That is correct.
15      But if you do the same comparison for
16 the control group, you don't see a similar
17 increase or a similar difference in the reporting
18 percentages for individuals interviewed before
19 2014 as after 2014, correct?
20     A    That's correct.
21     Q    Okay.  Are those results compatible with
22 the existence of recall bias for individuals
23 interviewed after 2014?
24     A    I would say they are compatible with
25 recall bias.

</td></tr>
</table>

55 (Pages 214 to 217)

Jack Siemiatycki, Ph.D.

Page 218

1    Q   Okay.  Was litigation-related recall
2  bias considered by IARC as a possible bias that
3  could explain the association between perineal
4  talc use and ovarian cancer?
5    A   In 2006?
6    Q   Correct.
7    A   I -- I can't remember verbatim the
8  discussions, and I can't remember a discussion of
9  litigation-related impact on response bias.  I
10  doubt if there would have been any at that time,
11  but -- and I don't recall any discussion of it.
12    Q   And at least the Schildkraut authors are
13  identifying 2014 as a significant year with
14  respect to widespread knowledge of lawsuits
15  involving talcum powder and a claim of ovarian
16  cancer --
17    MS. PARFITT:  Objection.  Form.
18  BY MS. BRANSCOME:
19    Q   -- correct?
20    MS. PARFITT:  Objection.  Form.
21    THE WITNESS:  I -- if you may, I think
22  what they refer to is localized publicity, not
23  widespread publicity.
24  BY MS. BRANSCOME:
25    Q   If you can, can you refer me to the

Page 219

1  language in the paper that references that.
2    A   So I see a mention of it in the -- on
3  page 1412, second column, last paragraph, about
4  seven or eight lines from the bottom, the sentence
5  beginning:  "Two class action lawsuits were filed
6  in 2014 concerning possible carcinogenic effects
7  of body powder, which may have influenced recall."
8    Now, there's a reference there, but the
9  reference doesn't indicate where those class
10  actions were.  And now I'm going to look in the
11  Discussion section to see if there's any
12  indication.  If anyone knows whether there is or
13  if there is not -- I haven't looked for this
14  specifically.  I just have a vague memory of them
15  referring to localized publicity, but... (peruses
16  document.)
17    Well, in my very quick scanning, I don't
18  see reference to these being local.  You people
19  might know whether these two lawsuits that they
20  refer to in the Reference section, whether they
21  were local in this area.  And this is North
22  Carolina, is it?
23    Q   Well, so that's -- that's a question I
24  have for you, Dr. Siemiatycki.  On page 1412, the
25  paragraph -- the last full paragraph on the second

Page 220

1  column seems to suggest that data was collected
2  from a number --
3    A   Oh.
4    Q   -- of different states across the United
5  States, correct?
6    A   Correct.  Correct.
7    Q   And so at least based on your review as
8  you sit here today, the authors do not seem to
9  have limited the potential effect of publicity of
10  the class action lawsuits to a precise region,
11  correct?
12    A   That seems to be the case.
13    Q   Okay.
14    A   Yes.
15    Q   And so your understanding or your
16  testimony earlier that the publicity was only
17  localized, you're not able to point me to anything
18  in the article to support that, correct?
19    A   That's correct.
20    Q   And in fact, in the two portions of the
21  Schildkraut article that discuss the publicity,
22  there is no specific reference to it being limited
23  to an area, correct?
24    MS. PARFITT:  Objection.  Form.
25    THE WITNESS:  In the two -- sorry.

Page 221

1  BY MS. BRANSCOME:
2    Q   So there's one discussion of the
3  potential public -- the potential effect of
4  publicity, which is on page 1412.
5    A   Yeah.
6    Q   And then there is a second discussion of
7  it on page 1416 --
8    A   Yes.
9    Q   -- in the Discussion section, and
10  neither of those two sections talk about awareness
11  of the class action lawsuits being limited to a
12  specific geographic region, correct?
13    A   That's correct.
14    Q   In fact, the language that the authors
15  use is a heightened awareness of the exposure as a
16  result of two recent class action lawsuits, and
17  they discuss just publicity, correct?
18    A   Yes, I think so.
19    Q   Okay.  Are you relying --
20    A   In that second paragraph in the
21  discussion, the authors seem to discount the --
22  the recall bias hypothesis or to minimize it, and
23  I -- I -- I don't support -- or the opposite of
24  what they're saying.  I just note that they don't
25  seem to be enthusiastic about that hypothesis that

56 (Pages 218 to 221)

Jack Siemiatycki, Ph.D.

Page 222

1    it's strictly due to response bias.
2          But go ahead and --
3          Q   The authors do recognize, though, that
4    there is a possibility of recall bias may have
5    caused some inflation of the odds ratios, correct?
6          A   Yes.
7          MS. PARFITT:  Wait, that's part --
8    that's part of the sentence.  Objection.
9          THE WITNESS:  Yeah.  Yeah.
10   BY MS. BRANSCOME:
11         Q   Are you relying on Penninkilampi 2018
12   for your opinions in this litigation?
13         A   My opinions were informed before I knew
14   about that article.
15         Q   Do you believe that the Penninkilampi
16   2018 study supports your conclusions in this
17   litigation?
18         A   It's consistent with my conclusions.  A
19   little bit like Berge, the fact that they didn't
20   pick up any studies that I hadn't -- that I had
21   not picked up reassures me that there was nothing
22   amiss in my search of the literature.
23         There were some differences in which
24   studies they included in their meta-analysis and
25   which data.  I'm happy with the decisions -- the

Page 223

1    judgments I had made about it.  So there are some
2    minor variations there.  But essentially they
3    found the same thing that I found, because we're
4    all working with the same data.
5          Q   Okay.  Did you do an independent
6    verification that the data Penninkilampi reports
7    in his article is indeed accurate?
8          MS. PARFITT:  Objection.  Form.
9          THE WITNESS:  By the data, you mean the
10   results that he put into his meta-analysis?
11   BY MS. BRANSCOME:
12         Q   For example, did you look at the
13   reported data in the tables in the Penninkilampi
14   article and compare it to the underlying studies
15   to see if they matched?
16         A   I don't recall doing that comparison.
17   I'm not sure why I would want to.
18         Q   If there were errors in the reporting of
19   any of the odds ratios or confidence intervals in
20   the Penninkilampi 2018 paper, would that call into
21   reliability the meta-analysis, in your opinion?
22         MS. PARFITT:  Objection.  Form.
23         THE WITNESS:  It depends on the nature
24   of the errors.  If there was one decimal point
25   typo sort of thing, it would have absolutely no

Page 224

1    impact on the bottom line result.  Some errors
2    might have large effects, so it would depend what
3    the errors were.
4          But since his studies were mostly the
5    same as the ones I had used and the same ones that
6    Berge had used, and since the results that he had
7    taken out of those studies were mostly the same
8    ones I had taken out and that Berge had taken out,
9    I fully expected his bottom line meta-analysis to
10   produce the same results.
11   BY MS. BRANSCOME:
12         Q   The Penninkilampi study does not
13   consider or include the Gates 2010 cohort study,
14   correct?
15         A   Correct.
16         Q   Do you think Gates 2010 - and if you
17   would prefer to refer to Penninkilampi, it is
18   tab 20.
19         A   Yeah.
20         Q   In your opinion, is --
21         MS. PARFITT:  I have a clean one right
22   here with the -- if we use two books, we can do it
23   to save time, but --
24         THE WITNESS:  Sorry?
25         MS. PARFITT:  Do you want that?

Page 225

1          THE WITNESS:  No.  I'm actually looking
2    for my copy of the Gates 2010.
3          You're going to ask me about his use
4    of -- Gates 2010?
5    BY MS. BRANSCOME:
6          Q   I was simply just going to ask you, is
7    Gates 2010 a significant study, in your opinion,
8    to leave out of a meta-analysis on this topic?
9          MS. PARFITT:  Objection.  Form.
10         THE WITNESS:  A significant study.
11   It -- in my view there are flaws with that study,
12   but there are flaws with many epidemiologic
13   studies.  It's not -- that's not a reason to
14   exclude them.  I would include it but take note of
15   the flaws, including the fact that their reference
16   category for their odds ratios for their relative
17   risk estimates was not an unexposed group, but it
18   was a group that combined women who had never used
19   talc with women who had used it occasionally.
20   BY MS. BRANSCOME:
21         Q   Are there any other errors in the Gates
22   2010 study?  And if you'd like to refer to it --
23         MS. PARFITT:  Thank you.
24         THE WITNESS:  Okay.  Let me find my copy
25   of -- yeah, here we are -- Gates 2010.

57 (Pages 222 to 225)

Jack Siemiatycki, Ph.D.

Page 226

1    Well, yes, there are some flaws with it,
2  but they're related to the fact that this builds
3  on the Nurses' Health Study, which is a good and
4  well deservedly recognized, good prospective
5  cohort study which focused on many factors in
6  women's lives, including predominantly nutritional
7  reproductive, hormonal factors, and all kinds of
8  diseases, all heart disease, diabetes, et cetera,
9  et cetera.  There have been hundreds and hundreds
10  of publications that have come out of it.
11    Their collect- -- the collection of talc
12  information in the Nurses' Health Study was very
13  weak.  The questionnaire was conducted in 1982.
14  It was part of a biannual follow-up mailed
15  questionnaire.  The question itself and the
16  structure of the question itself I find very weak
17  from the point of view of designing questions for
18  questionnaires.  I mean, I -- I could read it into
19  the record, but it's in the -- it's in the -- it's
20  quoted in the Gertig paper, and it's actually --
21  I've seen that page of the questionnaire, and
22  it's -- I find it ambiguous as to how women would
23  answer that question.
24    And it's only one question for that
25  point in time.  There was never any follow-up.  So

Page 227

1  between 1982 and 2007 or so, when the follow-up of
2  the -- for the Gates analysis ended, they had no
3  idea whether women were exposed -- whether women
4  who had been exposed in 1982 were in exactly the
5  same exposure category in 1990, in 2000, in 2005
6  and so on.  They made the assumption that women's
7  exposure status was stable for 25 years.  And so
8  that's a major weakness of the analysis of talc
9  and ovarian cancer in -- from this study.
10  BY MS. BRANSCOME:
11    Q   So in your view, was it proper for the
12  Penninkilampi authors to leave Gates 2010 out of
13  their meta-analysis?
14    A   That's not what I said.  That's not what
15  I said.
16    I -- I think to go down the road of
17  making value judgments about each of these studies
18  and including them or not including them would end
19  up in the need for many days of deposition and
20  cross-examination, because each of those -- any
21  decision about any study can be argued umpteen
22  ways.  And that's why I took the decision early on
23  not to make exclusions based on my judgment of the
24  quality of the study.
25    Q   Do you personally know any of the

Page 228

1  authors of the Penninkilampi 2018 publication?
2    A   No, I don't.
3    Q   Do you know or have any information
4  about the source or sources of funding for the
5  Penninkilampi article?
6    A   No, I don't, no.  I -- I would add,
7  though, that the inclusion or exclusion of Gates
8  2010 probably didn't affect the bottom line result
9  of their meta-analysis by more than 0.01 decimal
10  point of the odds ratio.
11    Q   But did they publish any type of
12  sensitivity analysis that would let you
13  specifically draw that conclusion?
14    A   Well, I -- I have done one myself where
15  I dropped each of the studies in order to see what
16  would be the impact if that study had been
17  dropped.  And there's hardly -- no study has more
18  than a 1 decimal -- you know, 0.01 decimal point
19  on the odds ratio.
20    So we could argue about the merits of
21  any of these studies or demerits, but the impact
22  of including them or excluding an individual study
23  is pretty minimal.
24    Q   Shushan 1996 is one of the studies you
25  did not include in your main meta-analysis,

Page 229

1  correct?
2    A   Correct.
3    Q   And you reported that you did not
4  include it because the report was quite cryptic
5  regarding the data collection and the talc
6  exposure variable, correct?
7    A   That's correct.
8    Q   What did you mean by the report was
9  quite cryptic regarding the data collection?
10    A   So I have to take a couple of minutes to
11  review that -- to look at that paper to answer
12  your question.
13    Well, so the first thing that strikes
14  me -- and I haven't read the description of how
15  they collected the data.  The first thing that
16  strikes me is they have a table, Table 2 on
17  page 15, with some information about these various
18  variables, including talc exposure.  And the two
19  categories of talc exposure that they describe in
20  this table, one is called "Never - seldom," and
21  the other one is called "Moderate - a lot."  I
22  don't know what that means.  So that's one
23  element -- how they present it and how they
24  analyze the data.
25    But I think actually how they collected

58 (Pages 226 to 229)

Jack Siemiatycki, Ph.D.

Page 230

1   the data also led me to describe the -- the
2   information on exposure as being cryptic.
3       Q   Okay.  Are you familiar with the 2018
4   paper by Mohamed Taher and others entitled "The
5   systematic review and meta-analysis:  The
6   association between perineal use of talc and risk
7   of ovarian cancer"?
8       A   Yes, I am.
9       Q   Okay.  Have you read the Taher 2018
10  manuscript?
11      A   Yes.  I haven't read all the appendices,
12  but I basically read enough that I know what's in
13  it.
14      Q   Did you have access to the Taher 2018
15  article before it was published?
16      A   I don't think it's been published.
17      Q   How did you get access to the Taher
18  manuscript and the appendices?
19      A   I heard about -- I first heard about the
20  Canadian Department of Health advisory, or
21  whatever the word is, about talc and ovarian
22  cancer in the public media.  And I -- I think in
23  the news report that I saw, there was a reference
24  to Taher -- the Taher paper.  That's how I first
25  learned about something by them.

Page 231

1           And I wrote to Ms. Parfitt -- I sent a
2   message to Ms. Parfitt asking her if she knows
3   anything about this and has that information, and
4   she wrote back, I think, and said, No, I thought
5   you might have -- know something about it and have
6   information.
7           MS. PARFITT:  And -- and,
8   Dr. Siemiatycki, you're not to discuss --
9           THE WITNESS:  Okay.
10          MS. PARFITT:  -- discuss our
11  communications.
12          THE WITNESS:  Okay.
13          Subsequently, Ms. Parfitt sent me the
14  Taher paper.
15  BY MS. BRANSCOME:
16      Q   And when -- when did you first request
17  the Taher paper and appendices from Ms. Parfitt?
18      A   I think in December 2018.
19      Q   When were you provided with the Taher
20  manuscript and the appendices and supplemental
21  tables?
22      A   Within a few days after that.
23      Q   Do you know personally any of the
24  authors on the Taher manuscript?
25      A   I know one of them.

Page 232

1       Q   Which author do you know?
2       A   Daniel Krewski.
3       Q   You have published many papers with, is
4   it, Dr. Krewski?
5       A   Yes.
6       Q   Is that correct?
7       A   Yes.  Yes, it is.
8       Q   How many papers have you published with
9   him?
10      A   I'll look at my CV and count.
11      Q   Would it be fair to say over 20?
12      A   Oh, I would be surprised if it was that
13  high.  But if you've counted, I won't contradict
14  what you -- what you say.
15      Q   Let's do it this way:  Would all of the
16  papers that you have coauthored with Dr. Krewski
17  be listed on your CV?
18      A   Yes.
19      Q   Have you discussed your opinion on talc
20  and ovary -- ovarian cancer with Dr. Krewski?
21      A   No.
22      Q   Have you discussed your opinion on talc
23  and ovarian cancer with any of the authors of the
24  Taher manuscript?
25      A   No.

Page 233

1       Q   Have you spoken to or otherwise
2   communicated with Dr. Krewski about your
3   involvement as an expert in this litigation?
4       A   No, I haven't.
5       Q   Do you know if the Taher manuscript has
6   been accepted for publication?
7       A   I don't know if it's been submitted for
8   publication.
9       Q   Do you know anything about the source or
10  sources of funding for the Taher 2018 manuscript?
11      A   I don't have any privileged information
12  about that, but I seem to recall in the manuscript
13  they're saying something about funding from Health
14  Canada.
15      Q   Is it fair to say that your knowledge
16  with respect to the source or sources of funding
17  of the Taher manuscript is limited to what is
18  written in the manuscript itself?
19      A   Yes.
20      Q   Did you attend the National Cancer
21  Institute directors meeting held in Lyon, France,
22  on July 11th through 13th, 2018?
23      A   No, I did not.
24      Q   Now, the Taher 2018 manuscript contains
25  a meta-analysis, correct?

Jack Siemiatycki, Ph.D.

Page 234

1    A   Correct.
2    Q   And Taher 2018 calculates an overall
3  relative risk of 1.28, correct?
4        MS. PARFITT:  If we could just get that
5  in front of him.
6        MS. BRANSCOME:  Oh, of course.
7        MS. PARFITT:  Do you have your copy?  I
8  appreciate that.
9        MS. BRANSCOME:  It is tab --
10       MS. PARFITT:  I think he may have it as
11  well and --
12       THE WITNESS:  I have it --
13       MS. PARFITT:  Make that a little easier
14  and more quicker.
15       MR. TISI:  Do you want to mark it?
16       MS. BRANSCOME:  We have already marked
17  Dr. Siemiatycki's binder.
18       MR. TISI:  Okay.  We can --
19       MS. BRANSCOME:  I believe that contains
20  the -- the manuscript and the exhibits.
21       MS. PARFITT:  And that is binder 6,
22  Exhibit 6.
23       MR. TISI:  You said binder, going with
24  his or the one --
25       MS. PARFITT:  Exhibit 6.

Page 235

1        MS. BRANSCOME:  Exhibit 6 is
2  Dr. Siemiatycki's copy of the Taher manuscript
3  with the appendices and supplemental tables.
4  BY MS. BRANSCOME:
5    Q   Is that correct?
6    A   That's correct.
7        MR. TISI:  And that's in his binder,
8  Exhibit 6.
9        THE WITNESS:  I don't -- I didn't bring
10  the supplemental tables and appendices with me.
11  BY MS. BRANSCOME:
12   Q   Okay.  So could you just describe for
13  the record the contents of Exhibit 6.  It is
14  marked, but just so that I can follow along.
15   A   This document?
16       MR. TISI:  No, the whole thing.
17       THE WITNESS:  Oh, the whole -- the whole
18  thing.  It contains various meta-analyses, so the
19  Berge, Penninkilampi, Huncharek, just the meta --
20  main meta-analyses that have been done.
21       MS. PARFITT:  And, Counsel --
22       THE WITNESS:  Langseth.
23       MS. PARFITT:  Right.
24       -- in light of the fact he has his in
25  front of him, Exhibit 6, is there a corresponding

Page 236

1  one in the binders you gave him?  That may help.
2        MS. BRANSCOME:  It's tab 31.
3        MS. PARFITT:  Thank you.
4        Tab 31.  I appreciate that.
5        No, you can keep yours.
6        THE WITNESS:  Okay.
7        MS. PARFITT:  There you go, just for the
8  record.  Okay.  Thank you.
9  BY MS. BRANSCOME:
10   Q   So my question to you, Dr. Siemiatycki,
11  is Taher 2018 calculates an overall relative risk
12  of 1.28.  Is that correct?
13   A   That's what it says in the abstract,
14  yes.
15   Q   And the confidence interval that they
16  report is 1.2 to 1.37, correct?
17   A   Yes.
18   Q   So the overall relative risk as well as
19  the confidence interval reported in the Taher 2018
20  paper is very similar to the overall relative risk
21  and confidence interval that you report in your
22  analysis for the MDL, correct?
23   A   That's correct.  Which is not
24  surprising.
25   Q   And if you could turn to page 49 of the

Page 237

1  Taher paper.  You see the Conclusion section?
2    A   Yes.
3    Q   The authors of the Taher paper state in
4  the Conclusion section:  "Consistent with previous
5  evaluations, the IARC in 2010 and subsequent
6  evaluations by individual investigators, the
7  present comprehensive evaluation of all currently
8  available relevant data indicates that perineal
9  exposure to talc powder is a possible cause of
10  ovarian cancer in humans."
11       First, did I read that correctly?
12   A   Yes.
13   Q   Okay.  Do you agree first that the Taher
14  2018 paper represents a comprehensive evaluation
15  of all currently available relevant data?
16   A   Yes.  I haven't -- I haven't done the
17  same comparison between which studies and which
18  data points from each study they used compared to
19  the ones that I've used.  I did that for the Berge
20  and for the Penninkilampi, comparing theirs with
21  mine.  I haven't done that for theirs.  So I -- I
22  assume that they used basically the same studies
23  and the same results from each study.
24       But, you know, to answer -- I'm quite
25  sure that they did this comprehensive evaluation

60 (Pages 234 to 237)

Jack Siemiatycki, Ph.D.

Page 238

1    of all currently available, but to answer that
2    strictly, I would want to do a comparison of the
3    two. But I'm willing to accept.
4        Q    Okay. And we see here even in this
5    sentence that we just read that there's a
6    reference there to the IARC publication in 2010.
7    We've already discussed that, correct?
8        A    Yes.
9        Q    And then there's a reference to
10   subsequent evaluations by individual
11   investigators, and there's a reference there to
12   articles or studies 3, 5 and 69. Do you see that?
13       A    I see that.
14       Q    And looking at the reference pages,
15   beginning on page 51, would you agree that
16   reference 3 is the Berge analysis, this citation
17   is 2017, correct?
18       A    Correct.
19       Q    Five is Penninkilampi, correct?
20       A    Correct.
21       Q    And the last reference, which is 69, is
22   to the Terry meta-analysis. Do you see that?
23       A    Terry is not a meta-analysis. It's a
24   pooled analysis. But I see that, yes.
25       Q    Okay. So the reference in the Taher

Page 239

1    manuscript to reference 69 is to the Terry pooled
2    analysis from 2013, correct?
3        A    Correct.
4        Q    And so you agree that at least the Taher
5    authors considered the Berge, Penninkilampi, and
6    Terry studies.
7        MS. PARFITT: Objection. Form.
8        THE WITNESS: Were aware of. I'm not
9    sure what you mean by considered. They -- they
10   referenced it. I don't know that they considered
11   it in their -- I don't imagine that there's any
12   place in their statistical analysis where they
13   introduced data from any of those papers. They're
14   just acknowledging that those other meta-analyses
15   found the same thing that they found.
16   BY MS. BRANSCOME:
17       Q    So perhaps we have a different
18   understanding of the word "considered."
19       A    Okay.
20       Q    Would you agree that a fair reading of
21   their Conclusion paragraph would indicate that the
22   Taher authors were first aware --
23       A    Yes.
24       Q    -- of Terry, Berge and Penninkilampi?
25       A    Yes.

Page 240

1        Q    And that they examined those studies
2    closely enough at least to reach the conclusion in
3    their own mind that their results were consistent
4    with those findings.
5        MS. PARFITT: Objection. Form.
6        THE WITNESS: Yes.
7    BY MS. BRANSCOME:
8        Q    Are there any scientific publications
9    that were available to you during your review in
10   connection with your formation of opinions in the
11   MDL that were not available to the authors of the
12   Taher manuscript?
13       MS. PARFITT: Objection. Form.
14       THE WITNESS: So are you talking about
15   the meta-analysis that -- are you talking about
16   studies that went into meta-analysis or are you
17   talking about the, you know, 200 or 300 references
18   in my bibliography?
19   BY MS. BRANSCOME:
20       Q    Fair enough.
21       Are there any studies that you included
22   in your meta-analysis that, at least to your
23   knowledge, were available to you and were not
24   available to the Taher authors?
25       MS. PARFITT: Objection. Form.

Page 241

1        THE WITNESS: Oh, they would have been
2    available because all of my -- the studies I used
3    are in publicly available literature, and I'm sure
4    they were available.
5    BY MS. BRANSCOME:
6        Q    Okay. Do you have any criticisms of the
7    Taher 2018 meta-analysis?
8        A    I haven't evaluated it closely enough
9    to -- to formulate criticisms or praise or --
10       Q    Now, you testified earlier that there
11   was a flurry of activity in December surrounding
12   the information from Health Canada and the Taher
13   manuscript.
14       Is there a reason why you have not
15   reviewed the Taher manuscript in detail and formed
16   an opinion about whether you agree or disagree
17   with its analysis?
18       MS. PARFITT: Objection. Fully
19   misstates his testimony. Form.
20       THE WITNESS: I -- I thought that it
21   would have absolutely no bearing on the results
22   and the opinions that I expressed in my report,
23   plus I didn't have time to do such a review. And
24   so the combination of those two things made it a
25   simple decision not to devote precious time and

61 (Pages 238 to 241)

Jack Siemiatycki, Ph.D.

Page 242

1    effort to a -- a futile activity.
2         I'm not uninterested in what they did or
3    what they found, but I can predict pretty quickly
4    what they did and what they found, and I -- I know
5    the studies that they reviewed, that they had
6    access to. There's nothing that they would find
7    that I wouldn't be able to predict.
8         MS. BRANSCOME: Okay.
9         Now may be a good time to take a break.
10        MS. PARFITT: Sure. Okay. Very good.
11        MS. BRANSCOME: Let's go off the record.
12        MR. TISI: Are we switching examiners
13   too?
14        MS. BRANSCOME: I don't know. That's
15   why --
16        MS. PARFITT: Oh, fair enough. Fair
17   enough.
18        THE VIDEOGRAPHER: We're going off the
19   record at 6:22 p.m.
20        (Recess.)
21        THE VIDEOGRAPHER: This begins disc
22   number 5 in the deposition of Jack Siemiatycki.
23   We are going back on the record at 6:40 p.m.
24   BY MS. BRANSCOME:
25        Q   So, Dr. Siemiatycki, if you could open

Page 243

1    back up to the Taher manuscript again. I believe
2    it's in your binder that's been marked as
3    Exhibit 6, and specifically, if you could go to
4    Figure 3 on page 39.
5         Have you looked at Figure 3 from the
6    Taher 2018 manuscript before now?
7         A   No, I haven't. I may have glanced at it
8    going through it, but I haven't examined it.
9         Q   Did you look at anything in the Taher
10   manuscript to support your opinion that there is
11   at least evidence compatible with the dose-
12   response relationship between perineal use of talc
13   and ovarian cancer?
14        A   I didn't look for that in this paper.
15        Q   If you could look at page 25 of the
16   Taher paper.
17        Do you see here that the authors of the
18   Taher manuscript describe the summary of evidence
19   for each of the Hill criteria of causation? Do
20   you see that?
21        A   I see that.
22        Q   And you are familiar with the Hill --
23   the Hill criteria of causation, correct?
24        A   I'm familiar with what they call the
25   Hill criteria and what some people call the Hill

Page 244

1    criteria, but which are not criteria and shouldn't
2    be called criteria.
3         Q   Understanding that you have specific
4    views about the appropriateness and application of
5    it, you are at least familiar with what is
6    sometimes referred to as a Bradford Hill analysis
7    or the Hill criteria, correct?
8         A   I don't -- again, the phrase "Bradford
9    Hill analysis" doesn't mean anything. I don't
10   think you would find that phrase in any
11   epidemiology or statistics textbook.
12        Q   Are you saying as you sit here today,
13   Dr. Siemiatycki, you've never heard of the Hill
14   criteria?
15        MS. PARFITT: Objection. Misstates his
16   testimony.
17        THE WITNESS: No, I've heard of it, and
18   I'm saying that it's a misnomer. And so I'd
19   prefer if the correct terminology is used when --
20   if you're asking me questions about it.
21   BY MS. BRANSCOME:
22        Q   The authors of the Taher manuscript use
23   the term "Hill criteria" --
24        A   Yes.
25        Q   -- in their Table 2, correct?

Page 245

1         A   Yes, they do.
2         Q   And there is a discussion under the --
3    what they refer to as a criterion for strength of
4    association, correct?
5         A   Yes.
6         Q   And the Taher authors report that out of
7    30 epidi- -- epidil- -- epidemiological studies --
8    it's late in the day -- six reported positive
9    association of statistical significance with a
10   risk value, relative risk or odds ratio of 1.5 or
11   greater.
12        Is that description of the
13   epidemiological studies accurate?
14        A   I don't know. I haven't counted. I
15   haven't done that kind of counting, which is
16   irrelevant and wrong from a statistical and
17   epidemiological point of view to do it. So I
18   haven't done it, and I can't confirm that there
19   are six that report odds ratios greater than 1.5.
20   I could do that if you want me to. I can look
21   through studies and see.
22        But there's no -- there's no scientific
23   purpose in doing that. It's a meaningless piece
24   of information.
25        Q   Would you criticize the Taher authors

62 (Pages 242 to 245)

Jack Siemiatycki, Ph.D.

Page 246

1    for their discussion of the Hill criteria?
2        A    Yes.
3        Q    And you have explained your criticisms
4    about the Hill criteria in both your trial
5    testimony and in your prior deposition testimony,
6    correct?
7        A    I can't remember the details, but I -- I
8    guess if I was asked about it, I explained what I
9    thought about it.
10        My criticism -- I'm not sure what you
11    mean by my criticisms of the term or of the
12    concepts that the paper that Hill wrote in 1965,
13    the ways -- the umpteen different ways that other
14    people have interpreted it.  What -- what are you
15    referring to when you say I criticized?  What did
16    I criticize?
17        Q    Have your views with respect to the use
18    and application of the so-called Hill criterion
19    changed since you testified in the Echeverria
20    trial?
21        MS. PARFITT:  Objection.  Form.
22        THE WITNESS:  They -- they haven't
23    changed in 40 years.
24    BY MS. BRANSCOME:
25        Q    Okay.  Thank you.

Page 247

1        Now, we have just discussed three
2    meta-analyses:  The Berge meta-analyses, the
3    Penninkilampi meta-analyses, and the Taher
4    meta-analyses.  Correct?
5        A    Yes.
6        Q    Would you agree that none of the authors
7    of those three meta-analyses concluded that talc
8    was a probable cause of ovarian cancer?
9        MS. PARFITT:  Objection.  Form.
10        THE WITNESS:  The purpose of those
11    meta-analyses was to estimate the meta-estimate of
12    relative risk.  In terms of the conclusion about
13    probable causation, I think they all commented on
14    it in their discussions.
15        And can you specify your question again,
16    whether they concluded that it was a probable
17    cause?
18    BY MS. BRANSCOME:
19        Q    Correct.
20        A    I'd have to look at the way they -- what
21    conclusions they drew, I'd have to look at that.
22        Q    Okay.  If we could look at the Berge
23    paper, which should be tab --
24        A    Let me see, I think I have the latest
25    issue of the Berge paper.

Page 248

1        Q    48 in my binder, but I don't know if you
2    have a copy in yours, which might be faster.
3        A    No, this -- I have the -- I have the
4    current Berge paper.  So...
5        Q    At page 9, I believe.
6        Well, that's confusing to say page 9.
7        A    Okay, I see that.
8        Q    Okay.  In reviewing the conclusion that
9    the Berge authors reached, would -- did the Berge
10    authors conclude that genital talc use was a
11    probable cause of ovarian cancer?
12        A    They did not indicate that they
13    concluded that.
14        Q    Okay.  And same for the Penninkilampi
15    study.
16        MS. PARFITT:  Had you finished?  Had you
17    finished your statement.
18        THE WITNESS:  Not quite.
19        There's a difference between the
20    findings of a study and the inferences that are
21    drawn from those findings.  So the findings of
22    their meta-analyses and the findings of the
23    Penninkilampi meta-analyses and findings of the
24    Taher meta-analyses are the same as my findings.
25    All four agree on the findings.

Page 249

1        Interpreting and making inferences is a
2    whole other bailiwick, a whole other activity, and
3    they don't -- didn't conclude in this section that
4    it's a probable cause.  From the same evidence, I
5    do conclude that it's a probable cause.
6    BY MS. BRANSCOME:
7        Q    Right.  And the same is true for the
8    Penninkilampi officer -- authors, correct?
9        A    Sorry, I have to go through it.
10    (Peruses document.)
11        I don't really agree with your
12    statement.  I don't think they conclude that it's
13    probable or not probable.  I don't see -- can you
14    point me to a statement that would imply that it's
15    not -- that they think it's not probable?
16        Q    Do the authors of the Penninkilampi
17    paper use the phrase, quote, suggestive of a
18    causal association, in the Conclusion section?
19        A    Yes, they do.
20        Q    Okay.  Would you say that "suggestive of
21    a causal association" is equivalent to probable
22    causation?
23        MS. PARFITT:  Objection.  Form.
24        THE WITNESS:  That's a semantic
25    question, and how different people and different

63 (Pages 246 to 249)

Jack Siemiatycki, Ph.D.

Page 250

1  cultures -- and I think these people are
2  Australians -- how Australians tend to use the
3  word "suggestive."  I -- I don't read this in a
4  way as to suggest that they don't think it's
5  probable.
6  BY MS. BRANSCOME:
7      Q   So you don't know from reviewing the
8  Conclusion section one way or the other whether
9  the Penninkilampi authors view perineal use of
10 talc as a probable cause of ovarian cancer.
11     MS. PARFITT:  Objection.  Form,
12 misstates his testimony.
13         Just answer the question.
14     THE WITNESS:  Yes, that's right, I -- I
15 don't.
16 BY MS. BRANSCOME:
17     Q   Okay.  And as we just looked at in the
18 Taher manuscript, the Taher authors describe that
19 the data indicates perineal exposure to talc
20 powder is a possible cause of ovarian cancer in
21 humans, correct?
22         And if you need the reference, it's
23 page 49.
24     A   That's correct.
25         Possible does not preclude probable, by

Page 251

1  the way.  I'm not -- I'm not assume- -- are you
2  assuming that they had in mind the IARC
3  classification system and that these two
4  categories are mutually exclusive?
5      Q   My question to you, Dr. Siemiatycki, is
6  did any of the authors of the three other
7  meta-analyses, Berge, Penninkilampi or Taher,
8  conclude in their papers that perineal talc use is
9  a probable cause of ovarian cancer?
10     MS. PARFITT:  Objection.  Form.  Asked
11 and answered.
12     THE WITNESS:  They did not use that
13 word.  But I would not infer that they don't think
14 it's a probable cause from the write-up of
15 their -- from their write-up.  It is possible that
16 they consider the description of this as a --
17 where is the word "possible"?  Is that in the
18 Conclusion?
19 BY MS. BRANSCOME:
20     Q   It is.
21     A   Oh, yeah, possible cause.
22         You know, they are -- I mean, I can't
23 speak for them because I haven't spoken to any of
24 them about this, but I don't think they're
25 speaking to a legal audience.  And the word

Page 252

1  "possible" here can cover a range of possibilities
2  that includes probable.
3          So if something is possible, that means
4  it could happen, and in their view or in some of
5  their -- those authors' view, the possibility or
6  the probability of -- of such a thing happening
7  might be greater than 50 percent, and they might
8  still describe it as a possible cause of ovarian
9  cancer.
10     Q   You would be --
11     MR. KLATT:  Object.  Nonresponsive.
12 Sorry.
13 BY MS. BRANSCOME:
14     Q   You would be purely speculating to opine
15 that the Taher authors, for example, when they
16 used the term "possible" to describe the
17 association, they actually meant probable,
18 correct?
19     MS. PARFITT:  Objection.  Form.
20     THE WITNESS:  I didn't say they -- they
21 actually -- I meant -- I said that it could
22 include probable.
23          And so you are -- the sense of your
24 question is to suppose or assume that their use of
25 the word "possible" excludes the concept of

Page 253

1  probable, that they did not think it's -- because
2  they used the word "possible," they absolutely
3  denied that it's probable.  And I -- that's what
4  I'm disagreeing with.
5  BY MS. BRANSCOME:
6      Q   Where I'm coming from is not relevant to
7  the question that I'm asking, Dr. Siemiatycki.
8  The question that I'm asking you is, do any of the
9  authors of the three meta-analyses that we just
10 reviewed, Berge, Penninkilampi, and Taher,
11 describe in their papers the association between
12 perineal use of talc and ovarian cancer as a
13 probable causal association?
14     MS. PARFITT:  Objection.  Form.
15 BY MS. BRANSCOME:
16     Q   Do any of them use that term?
17     MS. PARFITT:  Objection.  Form.
18     THE WITNESS:  None of them use that
19 term, but that doesn't preclude that they -- some
20 of them believe it is probable.
21     MR. KLATT:  Object.  Nonresponsive.
22 BY MS. BRANSCOME:
23     Q   You have no basis for concluding or even
24 suggesting that any of these authors have the
25 opinion that it is a probable causal association

64 (Pages 250 to 253)

Jack Siemiatycki, Ph.D.

Page 254

1  other than speculating based off of what you're
2  reading on the page, correct?
3         MS. PARFITT: Objection. Form.
4         THE WITNESS: Correct. Nor do I have
5  any basis for assuming that they don't think it's
6  probable on the basis of what I read.
7  BY MS. BRANSCOME:
8     Q   When you write scientific manuscripts,
9  Dr. Siemiatycki, are you careful about your word
10 choice, particularly in your conclusion section?
11        MS. PARFITT: Objection. Form.
12        THE WITNESS: I try to be. I try to be.
13 BY MS. BRANSCOME:
14    Q   Okay. If you could turn to tab 33 in
15 your binder.
16        Are you familiar with the document that
17 is located behind tab 33 in your binder there?
18    A   I -- I think so. I -- mine had a
19 different cover page when I printed it off, but
20 that's fine. I'm -- I assume it's the same one
21 I -- I had.
22        MR. TISI: It's not. It's not.
23        MS. PARFITT: What are you referring to?
24        MR. TISI: The draft article is not --
25        MS. PARFITT: Yeah, I know that.

Page 255

1         THE WITNESS: Is it the Draft Screening
2  Assessment?
3         MR. TISI: No, that's not the same.
4         THE WITNESS: No?
5         MR. TISI: It's not.
6         MS. PARFITT: Do you have a copy of
7  yours?
8         THE WITNESS: Yeah.
9         MS. BRANSCOME: Can we go off the record
10 while we figure this out?
11        MS. PARFITT: Sure, that would be fine.
12        THE VIDEOGRAPHER: We're going off the
13 record at 6:58 p.m.
14        (Pause in the proceedings.)
15        THE VIDEOGRAPHER: We're back on the
16 record at 7:01 p.m.
17 BY MS. BRANSCOME:
18    Q   Dr. Siemiatycki, you have a document in
19 front of you that is labeled a "Draft Screening
20 Assessment" dated December 2018; is that correct?
21    A   Yes, I do.
22    Q   And this is a screening assessment by
23 the Environment and Climate Change Canada, Health
24 Canada, correct?
25    A   It's a branch of Health Canada or a

Page 256

1  bureau or division. I'm not quite sure.
2     Q   Okay. And the document that you're
3  looking at there is contained within a binder that
4  we have previously marked as Exhibit 4, correct?
5     A   Correct.
6     Q   All right. Is this an item -- is this
7  an item.
8         Is this Draft Screening Assessment a
9  document that you considered in forming your
10 opinions in this case?
11    A   No, it isn't.
12    Q   Why not?
13    A   Because I was only aware of it a month
14 or -- a month and a half or two months after I
15 completed my report, and two years after I formed
16 the main part of my opinion.
17    Q   How did you obtain a copy of the Draft
18 Screening Assessment by Health Canada?
19    A   I think that this was on the internet.
20 I think I --
21        THE WITNESS: Yeah, some other -- there
22 should be a light button that we can press.
23        Excuse me. Excuse me, just maybe off
24 the record for a second.
25        (A discussion was held off the record.)

Page 257

1         THE VIDEOGRAPHER: We are going off the
2  record at 7:03 p.m.
3         (Pause in the proceedings.)
4         THE VIDEOGRAPHER: We are back on the
5  record at 7:03 p.m.
6  BY MS. BRANSCOME:
7     Q   Dr. Siemiatycki, we paused because the
8  lights turned off, but my question to you is, how
9  did you obtain a copy of the Draft Screening
10 Assessment by Health Canada?
11    A   Either it was sent to me by Ms. Parfitt
12 or her staff, or I found it on the internet. And
13 I can't quite remember now.
14    Q   Do you remember when you first obtained
15 a copy of the Draft Screening Assessment?
16    A   My guess is just before I went on
17 vacation for Christmas and New Years. So it would
18 have been mid -- mid to -- mid-December, I guess,
19 something like that.
20    Q   Are you familiar with the process by
21 which draft screening assessments are generated by
22 Health Canada?
23    A   No, not really. I was involved with
24 this department of Health Canada 30 years ago, and
25 I haven't been involved since. I don't know how

65 (Pages 254 to 257)

Jack Siemiatycki, Ph.D.

Page 258

1    they function really to produce these evaluations
2    and reports.
3        Q    Did you have any involvement, even
4    tangentially, in the development of the Draft
5    Screening Assessment by Health Canada?
6        A    No.
7        Q    Were you ever asked to consult on any of
8    the content that ultimately ended up in the Draft
9    Screening Assessment?
10       A    No, I wasn't.
11       Q    Were you ever contacted about
12    potentially being involved in a Draft Screening
13    Assessment of talc for Health Canada?
14       A    No. Never.
15       Q    You are aware that this is in fact a
16    draft assessment by Health Canada, correct?
17           MS. PARFITT: Objection. Form.
18           THE WITNESS: I see that's what it says
19    on the cover page.
20    BY MS. BRANSCOME:
21       Q    Are you aware of what further steps in
22    the process must be taken before the draft
23    assessment is potentially accepted or modified?
24           MS. PARFITT: Objection. Form.
25           THE WITNESS: I'm not familiar with the

Page 259

1    details, no.
2    BY MS. BRANSCOME:
3        Q    What are you familiar with, if not the
4    details?
5        A    I remember seeing that there's a public
6    consultation opportunity, and -- so I guess there
7    will be a period of time during which they will
8    accept public recommendations and comments. And I
9    don't know if it's the same committee that will
10    then review all of that or a committee that's
11    higher up on the administrative pecking order. I
12    don't -- I don't know what happens internally.
13       Q    Do you intend to submit anything for
14    the -- during the public comment period?
15       A    I -- yeah, I hope to do so. I hope to
16    do so.
17       Q    What specifically do you intend to
18    submit?
19       A    I'm not sure yet. I -- I would probably
20    submit an opinion supporting the notion that
21    perineal use of talc is more likely than not
22    related to ovarian cancer.
23       Q    In your submission, do you intend to
24    disclose your role in litigation involving talcum
25    powder products?

Page 260

1        A    Yes.
2        Q    Do you believe --
3        A    If I make such a submission, yes.
4        Q    Why -- well, first of all, do you think
5    it's important to disclose your involvement in the
6    litigation if you were to submit something for
7    public comment?
8        A    Yes, I think it is.
9        Q    And why is that?
10       A    Because there's a potential conflict of
11    interest, and they should know about it.
12       Q    Would you also notify IARC of your role
13    in litigation involving talcum powder products if
14    you submitted something to them to suggest that a
15    formal evaluation of talc be conducted?
16       A    Yes, I would.
17       Q    Is that for the same reason?
18       A    Yes, it is.
19       Q    Is the Draft Screening Assessment the
20    type of material that you think it is reliable to
21    base an expert opinion on?
22           MS. PARFITT: Objection. Form.
23           THE WITNESS: An expert opinion about
24    what?
25    BY MS. BRANSCOME:

Page 261

1        Q    About the potential relationship between
2    talc and ovarian cancer.
3            MS. PARFITT: Objection. Form.
4            THE WITNESS: Are you asking if it would
5    influence my opinion on the issue or --
6    BY MS. BRANSCOME:
7        Q    So under- -- understanding that the
8    Draft Screening Assessment came out after you had
9    formed your opinion, I'm asking you that if that
10    had not been the case, if it had come out while
11    you were still forming your expert opinion, is
12    this something that you would rely on?
13       A    I would take cognizance of it, and I'm
14    not sure whether it would persuade me in one
15    direction or another on the strength of the
16    evidence, but it -- it would certainly give me --
17    increase my comfort level to draw inferences to
18    see what inferences other people draw. I won't
19    necessarily follow their opinions, but I find it
20    useful to know what inferences they would draw
21    from it.
22       Q    Is a Draft Screening Assessment the type
23    of report or publication that you see cited in
24    published scientific literature?
25           MS. PARFITT: Objection. Form.

66 (Pages 258 to 261)

Jack Siemiatycki, Ph.D.

Page 262

1       THE WITNESS: Not -- not -- in
2   scientific literature, not so much, no.
3   BY MS. BRANSCOME:
4       Q   The draft assessment -- first of all,
5   are you familiar with the proposal with respect to
6   talc that's contained in the draft assessment?
7       A   Which proposal are you referring to?
8       Q   I could refer you specifically to
9   page --
10      MR. TISI: I spilled coffee on it too.
11  Sorry.  You get what you get.
12  BY MS. BRANSCOME:
13      Q   -- on page 29.
14      A   The Conclusion section?
15      Q   Yes.  Have you reviewed this before?
16      A   I -- I might have looked at it quickly.
17  But let me -- let me review it -- let me read it
18  now.  (Peruses document.)
19          You know, it refers to the fit of the --
20  their findings and conclusions with various
21  articles of law in the Canadian Environmental
22  Protection Act.  I would have to know what those
23  articles of law are that this conforms to, that
24  these sentences purportedly conform to.  I -- I
25  have no reason to doubt what they say, but I -- I

Page 263

1   can't confirm.
2       Q   So as you sit here today, are you
3   capable or prepared to offer an opinion as to how
4   the conclusions in the Draft Screening Assessment
5   relate to other pieces of literature that we've
6   discussed today?
7       MS. PARFITT: Objection.  Form.
8       THE WITNESS: How they relate to -- or
9   whether they're concordant with other pieces?
10  It's difficult for me to say without studying this
11  document more and seeing what the conformity is
12  with the Canadian pieces of legislation that they
13  refer to.  So I -- I can't -- I can't give you
14  much more than that.
15  BY MS. BRANSCOME:
16      Q   So as you sit here today, could you --
17  do you have an opinion as to how the proposal in
18  the Draft Screening Assessment with respect to
19  talc relates to the current IARC classification of
20  talc?
21      MS. PARFITT: Objection.  Form.
22      THE WITNESS: By proposal, you mean the
23  conclusion?
24      MS. PARFITT: The entire document.
25      THE WITNESS: You're -- you're

Page 264

1   describing the conclusion as a proposal?  Or --
2   yeah.
3   BY MS. BRANSCOME:
4       Q   Focusing specifically on the second
5   paragraph where it says: "It is proposed to
6   conclude that talc meets the criteria under
7   paragraph 64(c) of CEPA as it is entering or may
8   enter the environment in a quantity or
9   concentration or under conditions that constitute
10  or may constitute a danger in Canada to human life
11  or health."
12      MS. PARFITT: Objection.  Form.
13      THE WITNESS: It's not a way of
14  describing scientific evidence that I'm intimately
15  familiar with.  So I would need to review this
16  document in more detail and be aware of the
17  paragraph 64(c) of the CEPA.
18  BY MS. BRANSCOME:
19      Q   And that is not something you --
20      A   So I'm not --
21      Q   -- have done as of today?
22      A   It's not something I base -- today I
23  couldn't say I agree with this or I don't agree
24  with this.
25      Q   Okay.  And so this is not -- the Draft

Page 265

1   Screening Assessment by Health Canada is not
2   something that you are relying upon in any way in
3   offering your expert opinions in this case; is
4   that correct?
5       MS. PARFITT: Objection.  Form,
6   misstates his testimony.
7       THE WITNESS: No.  As I said, I didn't
8   rely on this to form my opinion.
9   BY MS. BRANSCOME:
10      Q   Okay.
11      MS. BRANSCOME: Could we go off the
12  record just briefly?
13      MS. PARFITT: Of course.
14      THE VIDEOGRAPHER: We're going off the
15  record at 7:15 p.m.
16      (Pause in the proceedings.)
17      THE VIDEOGRAPHER: We're back on the
18  record at 7:16 p.m.
19  BY MS. BRANSCOME:
20      Q   Dr. Siemiatycki, can you describe -- can
21  you identify for me specifically the pieces of
22  evidence that you would cite to in support of your
23  opinion that there is evidence consistent with a
24  dose-response relationship that was not considered
25  by the IARC 2006 working group?

67 (Pages 262 to 265)

Jack Siemiatycki, Ph.D.

Page 266

1    A  Can --
2    Q  And I'm just looking for an
3  identification of the papers.
4    A  Let me just dig out -- I keep hiding
5  things from myself.
6    MS. PARFITT:  Okay.
7    THE WITNESS:  Oh, there.
8    The primary pieces of evidence -- the
9  primary piece of evidence is the analysis carried
10  out in the Terry, et al., paper where they
11  combined ten different studies from eight
12  different research teams.  They had by far the
13  largest sample size of any conglomeration of
14  studies ever conducted, enough to properly
15  evaluate dose-response.  And that's one of them.
16    The second one is the Schildkraut study,
17  which is much smaller than the Terry study in
18  terms of numbers.
19    And the third -- a third one, which was
20  not part of the evidence that influenced my
21  evaluation, is the latest version of the Berge
22  paper which has some dose-response results in a
23  table whose origin I don't completely understand,
24  but ostensibly it gives dose-response trends that
25  are significant and meaningful for duration and

Page 267

1  frequency of exposure.  But I would put less
2  weight on that until I fully understand what --
3  how they derived those estimates.
4  BY MS. BRANSCOME:
5    Q  Okay.  So the pieces of evidence that
6  you would cite to in support of the idea that
7  there has been a development that is supportive of
8  a dose-response relationship between perineal talc
9  and ovarian cancer since the IARC classification
10  of talc as a 2B would be the Terry, the
11  Schildkraut, and potentially the Berge analysis;
12  is that correct?
13    MS. PARFITT:  Objection --
14    THE WITNESS:  Yes.
15    MS. PARFITT:  -- to the reference of
16  "potentially the Berge."  Form.
17  BY MS. BRANSCOME:
18    Q  You did not rely in any way on the
19  analysis in the Berge 2018 paper for your
20  conclusion that there is evidence compatible with
21  a dose-response relationship between perineal talc
22  use and ovarian cancer, correct?
23    A  That's correct.
24    Q  Okay.  So looking first at the Terry
25  2013 paper.  This is tab 14 or you're welcome to

Page 268

1  use your own copy if that's more convenient.
2    A  Yep.  There we go.  Okay.
3    Q  Did the authors of the Terry 2013 paper,
4  did they conclude in their manuscript that they
5  had observed a statistically significant dose-
6  response relationship between the perineal use of
7  talc and ovarian cancer?
8    A  They reported two different ways of
9  calculating the statistical significance of a
10  trend.  One of them was significant, and the other
11  was formal, in terms of the conventional 0.05
12  statistical significance level, was not
13  significant at that level.
14    Q  And in fact in the abstract, the authors
15  of the Terry paper state that:  "Among genital
16  powder users, we observed no significant trend,
17  p equals 0.17, in risk with increasing number of
18  lifetime applications," in parentheses, "assessed
19  in quartiles."
20    Did I read that correctly?
21    A  That's correct.
22    Q  Okay.  Now, in your 2016 report --
23    A  Yeah.
24    Q  -- you had the statement that:  "The
25  appropriate statistical test for trend is one that

Page 269

1  excludes the baseline unexposed category."
2    Do you remember having that sentence in
3  your 2016 report?
4    A  I remember the -- the idea being there,
5  yes.
6    Q  Okay.  And you would agree that if you
7  apply that statistical test for trend, meaning you
8  exclude the baseline unexposed category, the Terry
9  2013 paper does not demonstrate a dose-response
10  relationship, correct?
11    MS. PARFITT:  Objection.
12    THE WITNESS:  No.
13    MS. PARFITT:  Misstates testimony.
14    THE WITNESS:  So I would not conclude --
15  I would say that it demonstrates dose-response,
16  but not at a statistical -- at a 0.05 statistical
17  significance level.
18    And I would also -- I can't remember the
19  wording and the context in the 2016 report that
20  you're referring to, but I would imagine that I
21  preceded that statement with some mention of the
22  fact that it depends if you are using the overall
23  risk among all exposed people compared to
24  unexposed people as a complementary piece of
25  information.

68 (Pages 266 to 269)

Jack Siemiatycki, Ph.D.

Page 270

1     And it's only in the context when you
2  are using the -- all the exposed compared to all
3  the unexposed, and at the same time carrying out
4  an analysis of the different levels of exposure,
5  that including the unexposed among the -- in that
6  trend analysis becomes overlapping information
7  with the overall -- the significance of the
8  overall estimate.
9  BY MS. BRANSCOME:
10    Q   Okay.
11    A   This -- I'm not quite finished.  Sorry.
12        So -- and because I don't want you to
13  think that I believe or believed that on its own
14  there is no evidence of dose-response.  There is
15  evidence of dose-response in the Terry analysis.
16  The choice of which p-value to report on the trend
17  analysis depends completely on how one combines
18  that information with the ever exposed/never
19  exposed information and the p-value for that.
20  That when we want completely independent and
21  separate strands of evidence to corroborate each
22  other, then it's appropriate to exclude the
23  unexposed from the p-value computation.
24        When you are using -- when you are not
25  using the binary exposed/unexposed as part of the

Page 271

1  package of information to demonstrate causation,
2  then the correct p-value is the one that includes
3  the unexposed.  So it depends how you use these
4  things.
5        If I didn't qualify that statement that
6  you read before, then I was in error.
7    Q   If you did not have the Terry 2013
8  study --
9    A   Yes.
10    Q   -- set that aside for a moment, you did
11  not have that data, would it still be your opinion
12  that the perineal use of talc probably causes
13  ovarian cancer?
14    A   So --
15        MS. PARFITT:  Objection.  Form.
16        THE WITNESS:  So just to be clear what
17  the hypothetical supposition is, so the Terry
18  paper doesn't exist, but the studies underlying
19  the Terry paper still do exist, correct?  Or they
20  don't exist either?
21        So there are ten studies underlying the
22  Terry reanalysis.  Is your hypothetical question
23  about the possibility that none of those studies
24  existed or that they existed, but nobody actually
25  put them together to combine an analysis?  What

Page 272

1  are you positing?
2  BY MS. BRANSCOME:
3    Q   Of those ten studies, which, if any of
4  them, postdate 2006?  Do you know?
5    A   Most of them do.  I would say -- I think
6  the only one -- ones that were published before
7  2006 were a study by Chang and one or two of the
8  components of Cramer's studies.  I think the rest
9  were all published post-2006.
10    Q   Okay.  Did you independently do an
11  analysis of the potential dose-response
12  relationship of perineal talc use and ovarian
13  cancer?
14        MS. PARFITT:  Objection.  Form.
15        THE WITNESS:  By "independently," you
16  mean trying to replicate the Terry analysis?  No.
17  I don't see why I would be motivated to do
18  something that someone else has already done.
19  BY MS. BRANSCOME:
20    Q   Okay.  So you are relying on the data as
21  reported by Terry 2013 that you consider to be
22  evidence in support of a dose-response
23  relationship, correct?
24    A   That's correct.
25    Q   Okay.  But the authors themselves do not

Page 273

1  conclude that there has been a statistically
2  significant dose-response relationship established
3  for the perineal use of talc and ovarian cancer,
4  correct?
5        MS. PARFITT:  Objection.  Form,
6  misstates the evidence.
7        THE WITNESS:  I -- I didn't review what
8  they concluded in the Discussion section.  If you
9  want, I could review that.  And I -- I don't
10  remember what -- what kind of narrative inferences
11  they made about it.
12  BY MS. BRANSCOME:
13    Q   Okay.
14    A   You're asking me to confirm that they
15  didn't conclude, so I would want -- their data in
16  my mind indicates dose-response.  How they
17  interpret it -- as I said before, they're two
18  separate things, the production of findings from
19  research and the interpretation of those findings.
20        I am as capable of interpreting -- they
21  aren't as capable of interpreting my findings from
22  my studies as I am or they are as capable -- they
23  have the right to.  I have the right to interpret
24  their findings.  It's a different activity
25  producing findings and then interpreting them.  So

69 (Pages 270 to 273)

Jack Siemiatycki, Ph.D.

|  | Page 274 |
|---|---|

1  how they interpreted their findings, I don't quite
2  remember exactly what they said about it.
3      Q   Okay.
4          MS. BRANSCOME:  I am going to pass to
5  counsel for Imerys at this time.
6          MR. KLATT:  Can we go off the record for
7  just a couple of minutes?  Let me get organized.
8          THE VIDEOGRAPHER:  We are going off the
9  record at 7:31 p.m.
10         (Pause in the proceedings.)
11         THE VIDEOGRAPHER:  We are going back on
12 the record at 7:32 p.m.
13         DIRECT EXAMINATION
14 BY MR. KLATT:
15     Q   Good afternoon -- good evening,
16 Dr. Siemiatycki.
17     A   Good evening.  How are you?
18     Q   I'm Mike Klatt.  I represent Imerys Talc
19 America in this case.
20     I don't know if you recall or not, but
21 you and I had met about two years ago when you
22 were giving a deposition in the Oules and Swan
23 cases.  Do you recall that?
24     A   I do recall that.
25     Q   Okay.

|  | Page 275 |
|---|---|

1      A   Very fondly.
2      Q   Thank you.
3          I just have a few questions for you, and
4  I want to go back and just make sure the record is
5  clear on something.
6          Your testimony is you've had no contact
7  or communications whatsoever with anyone with
8  Health Canada regarding talc; is that correct?
9      A   That's correct.
10     Q   And you've had no contact or
11 communications whatsoever with Dr. Krewski or
12 anyone else who's an author of the Taher
13 meta-analysis regarding talc?
14     A   That's correct.
15     Q   That's correct.  Okay.
16         A minute ago I believe you told
17 Ms. Branscome that if you continued to interact
18 with IARC or have contact with Health Canada
19 regarding the issue of talc and ovarian cancer,
20 it's incumbent upon you to have a conflict of
21 interest disclosure, correct?
22     A   Yes.  I said that.
23     Q   And you would agree with me it would be
24 important in evaluating any potential bias you
25 have for the people at Health Canada and the

|  | Page 276 |
|---|---|

1  people at IARC and the public generally to know
2  that you had been a retained and paid expert by
3  plaintiffs' counsel in the talc ovarian cancer
4  litigation; is that correct?
5      A   Sir, can you -- I think I already said
6  that, but could you repeat?  Maybe I'm
7  misunderstanding.
8      Q   Yes.  I'm just saying such a conflict of
9  interest disclosure on your part, it would be
10 important to disclose not merely that you had been
11 a consultant or merely that you had been involved
12 in litigation involving ovarian cancer, but it
13 would be important to specifically disclose that
14 you had been a retained and paid expert by
15 plaintiffs' counsel in the talc/ovarian cancer
16 litigation.  Correct?
17         MS. PARFITT:  Objection.  Form, asked
18 and answered.
19         THE WITNESS:  I -- I'm not sure I
20 understand the distinction between this last
21 affirmation and the one before.  I -- yes, it --
22 BY MR. KLATT:
23     Q   Well, we've had -- we've had other
24 conflict of interest disclosures, and I put that
25 in quotes, where people said that they had been a

|  | Page 277 |
|---|---|

1  consultant, period.  That wouldn't be sufficient,
2  would it?
3      A   I would --
4          MS. PARFITT:  Objection.  Form.
5          THE WITNESS:  I would not do that.
6  BY MR. KLATT:
7      Q   And we've had people say, I've been
8  involved as an expert in ovarian cancer
9  litigation.  That wouldn't be sufficient either,
10 correct?
11         MS. PARFITT:  Objection.  Form.
12         THE WITNESS:  I would not do that.
13 BY MR. KLATT:
14     Q   What you would do is you would say, I
15 have been a retained and paid expert by
16 plaintiffs' counsel in the talc/ovarian cancer
17 lawsuits, or something essentially equivalent to
18 that.
19     A   I -- I would say something essentially
20 equivalent.  It's quite possible that if there was
21 a submission to a journal, for example, or a
22 manuscript, the journal may have a formulaic way
23 of expressing that.  So...
24     Q   But wouldn't it be important to the
25 readers to know which side of the litigation you

70 (Pages 274 to 277)

Jack Siemiatycki, Ph.D.

Page 278

1 had been on in evaluating your bias?
2          MS. PARFITT:  Objection.  Form, asked
3  and answered.
4          THE WITNESS:  I -- I would -- I would
5  disclose the nature of my involvement.
6  BY MR. KLATT:
7      Q   Including which side?
8      A   Including which side I was consulting
9  for.
10     Q   Okay.
11         MR. KLATT:  Can we mark this as the next
12  exhibit?
13         MS. PARFITT:  14.
14         (Exhibit No. 14 was marked for
15          identification.)
16  BY MR. KLATT:
17     Q   Dr. Siemiatycki, you said earlier that
18  you worked with Dr. Koushik; is that correct?
19     A   Yes.
20     Q   And what is your professional
21  relationship with Dr. Koushik?
22     A   We are members of the same academic
23  department.  We are down the hall from each other.
24  Our offices are nearby each other.  We have worked
25  together on various projects.

Page 279

1      Q   For how long?
2      A   Ten -- 10 or 12 years now.
3      Q   And she's very well educated, correct?
4          MS. PARFITT:  Objection.
5          THE WITNESS:  I'm not sure what you mean
6  by that.  She has a --
7  BY MR. KLATT:
8      Q   Well, she has a Bachelor --
9      A   She has a --
10     Q   -- of Science in pharmacology from the
11  University of Alberta.
12     A   Correct.
13     Q   She has a Master's in community health
14  and epidemiological from Queen's University in
15  Kingston, Ontario?
16     A   Uh-huh.
17     Q   She has a Ph.D. in epidemiology from --
18  in epidemiology and biostatistics from McGill
19  University here in Montreal, correct?
20     A   Correct.
21     Q   And she's had a postdoctoral fellowship
22  at Harvard in the U.S., correct?
23     A   Correct.
24     Q   And she is the principal investigator of
25  the Prevention of Ovarian Cancer in Quebec, the

Page 280

1  PROVAQ study, correct?
2      A   Correct.
3      Q   And that's the study she is working on
4  with you, correct?
5      A   More I'm working on with her, but she's
6  the lead on that.
7      Q   And with the help of others in your
8  group as well --
9      A   With the help of others, yes.
10     Q   -- correct?
11         And what I've handed you --
12         MR. KLATT:  And what was the exhibit
13  number?
14         MR. TISI:  14.
15  BY MR. KLATT:
16     Q   Exhibit 14 is Dr. Koushik's web pages
17  from the Environ Epi website.  You're familiar
18  with that website, correct?
19     A   Yes, I am.
20     Q   And you'll turn to the back page of the
21  exhibit, the final page, and you will see it's
22  copyrighted 2019, correct?
23     A   Correct.
24     Q   And let's just see what Dr. Koushik says
25  about her research on the first page.  She says:

Page 281

1  "My research program focuses on the epidemiology
2  of ovarian and lung cancers."  Correct?
3      A   Mm-hmm, yes.
4      Q   "Ovarian cancer is by far the most
5  deadly of all gynecologic cancer.  Most patients
6  are diagnosed at advanced stages, leading to the
7  poor prognosis, and we are currently limited in
8  our ability to detect disease early."  Correct?
9      A   Correct.
10     Q   She says:  "There is overwhelming
11  evidence that healthy lifestyle choices can reduce
12  the risk of several cancers.  However, we do not
13  yet know of any effective ways to prevent the
14  onset of ovarian cancer."
15         Would you agree with that?
16         MS. PARFITT:  Objection.  Form.
17         THE WITNESS:  I'm sorry, I'm trying to
18  think of what this sentence really means.  It's
19  kind of a -- it's kind of a stock sentence that is
20  used in -- by epidemiologists when they're looking
21  for funding and trying to convince funders that
22  we don't know a lot, and therefore they need to
23  give us money.  So I can imagine part of this is
24  cut-and-pasted from that sort of document.
25  BY MR. KLATT:

71 (Pages 278 to 281)

Jack Siemiatycki, Ph.D.

Page 282

1      Q   Well, what it means is --
2      MS. PARFITT: Wait, wait. Please let
3  him finish.
4  BY MR. KLATT:
5      Q   Go ahead.
6      MS. PARFITT: Thanks, Mike.
7      THE WITNESS: There are some risk
8  factors that are well established for -- for
9  ovarian cancer, which Anita is very well aware of,
10 genetic and certain reproductive and hormonal
11 factors.
12     The evidence on talc is accumulating,
13 and in my view is sufficient. Anita has not
14 reviewed that evidence. And --
15 BY MR. KLATT:
16     Q   Have you talked to Dr. Koushik at all
17 about your involvement in the talc ovarian cancer
18 litigation?
19     A   She's aware that I'm involved in this.
20     Q   Well, let's go on to see what she says
21 here.
22     After saying: "However, we do not yet
23 know of any effective ways to prevent the onset of
24 ovarian cancer," she says, "the evidence on some
25 lifestyle factors, such as alcohol intake,

Page 283

1  physical activity, and smoking, is suggestive but
2  currently remains unclear." Correct?
3      A   Correct.
4      Q   She doesn't say one word about talc,
5  does she?
6      A   No.
7      MS. PARFITT: Objection. Form.
8      THE WITNESS: Not here, no.
9  BY MR. KLATT:
10     Q   And then she goes on to say: "More
11 research is greatly needed, especially in light of
12 recent discoveries that demonstrate that ovarian
13 cancer is a heterogeneous disease." She says: "I
14 am the principal investigator of the Prevention of
15 Ovarian Cancer in Quebec, PROVAQ study, a
16 population-based case-control study conducted in
17 2011, 2016."
18     And one of the things she's evaluating
19 in that study is talc, correct?
20     A   Correct.
21     Q   "This study provides" -- and I'm reading
22 on -- "This study provides a rich data source for
23 the study of multiple hypotheses on lifestyle
24 factors and ovarian cancer. Current projects
25 focus on associations with shift work, caffeine

Page 284

1  intake, and recreational physical activity."
2  Correct?
3      A   Correct.
4      Q   She doesn't say a word about talc there,
5  does she?
6      MS. PARFITT: Objection. Form.
7      THE WITNESS: She doesn't there because
8  she hasn't started those analyses yet. She has
9  started analyses -- or her -- with students on
10 those other factors.
11 BY MR. KLATT:
12     Q   And then flipping over to the next page,
13 Dr. Koushik says: "Healthy lifestyle choices may
14 also positively impact the health of ovarian
15 cancer survivors. Indeed, until we know how to
16 prevent ovarian cancers from occurring in the
17 first place, cancer control through tertiary
18 prevention aimed at improving prognosis and
19 quality of life among those diagnosed is
20 critical." Correct?
21     A   Correct.
22     Q   And again, no mention at all of talc,
23 correct?
24     MS. PARFITT: Objection. Form.
25     THE WITNESS: Correct.

Page 285

1      MR. KLATT: Let's mark that.
2      MS. PARFITT: This is now 15.
3      MR. KLATT: Have we marked that?
4      MS. PARFITT: I just now did. I was
5  looking for the stickers. I'm going to get one --
6  here they are.
7      THE WITNESS: I have a different cover.
8      MS. PARFITT: It's a different one.
9  That's yours.
10     THE WITNESS: Oh.
11     MS. PARFITT: This is different, this is
12 a new item. Let me just put an exhibit on this
13 one.
14     (Exhibit No. 15 was marked for
15     identification.)
16     MS. PARFITT: Thank you.
17     Okay. You're done with this. And he's
18 just showing you this one.
19     Do we have an extra copy, Mike, or is
20 this it?
21     MR. KLATT: I've got an extra copy if
22 you need it.
23     MS. PARFITT: Okay, that would be great.
24 I will give him that one. Thank you very much.
25 BY MR. KLATT:

72  (Pages 282 to 285)

Jack Siemiatycki, Ph.D.

Page 286

1      Q   So, Dr. Siemiatycki, I'm now showing you
2   what we marked as exhibit -- what?
3          MS. PARFITT:  15.
4          MR. KLATT:  15?
5          MS. PARFITT:  Yes.
6   BY MR. KLATT:
7      Q   And it's from the Environ Epi website,
8   your website, and it's the web pages discussing
9   group research topics, correct?
10     A   I -- I have to tell you I don't look at
11  this website, and I haven't actually constituted
12  it. It's my secretary or my assistant who does
13  this. So I'm looking at it afresh to see what's
14  there. Yeah.
15     Q   Okay. Let's -- let's turn to the very
16  back page, and again the copyright is 2019.
17  That's this year, correct?
18     A   Yeah. Yes.
19     Q   And then if you will flip over to --
20  let's see. Well, let's start -- let's see.
21         Go first page, second page, third
22  page -- the fourth page, there's a discussion
23  there of the PROVAQ study of Dr. Koushik that we
24  just talked about, correct?
25     A   Yes.

Page 287

1      Q   And the topic says:  "Prevention of
2   Ovarian Cancer in Quebec, the PROVAQ study, a
3   case-control study of modifiable and genetic
4   factors associated with the risk of ovarian
5   cancer."  Correct?
6      A   I see that.
7      Q   And it says Anita Koushik, that's
8   Dr. Koushik, who we've just been talking about,
9   and it says Jack Siemiatycki. That's you,
10  correct?
11     A   That's right.
12     Q   And then it goes on to describe what the
13  PROVAQ study is, and it says -- and I'll skip the
14  first few sentences -- it says:  "Primary
15  prevention thus offers the most promising approach
16  to reducing the morbidity and mortality associated
17  with this deadly disease. Established preventive
18  factors for ovarian cancer include high parity,
19  long duration of lactation, oral contraceptive
20  use, and tubal ligation."  Correct?
21     A   That's what it says.
22     Q   Talc is not included in that list of
23  established preventive factors, is it?
24     A   It's not listed there, no.
25     Q   "However, the ability to modify these

Page 288

1   reproductive factors is limited. There is
2   suggestive evidence that modifiable factors in the
3   vitamin D pathway, (sun exposure, diet), and
4   inflammation pathway (antiinflammatory medication
5   use, talc use for feminine hygiene) may play a
6   role in ovarian cancer risk, though this research
7   has been limited by small sample sizes, crude
8   exposure measurement and lack of control for
9   important confounders." Correct?
10     A   That's what it says.
11     Q   Did I read that correctly?
12     A   Yes, you did.
13     Q   So on this public website, your
14  Environmental Epi website, Dr. Jack Siemiatycki
15  doesn't say talc use causes ovarian cancer,
16  correct?
17         MS. PARFITT:  Objection. Form.
18         THE WITNESS:  I don't say anything on
19  that website.
20  BY MR. KLATT:
21     Q   Well, you -- your group doesn't say talc
22  causes ovarian cancer, does it?
23         MR. TISI:  Objection. Form.
24         THE WITNESS:  In my opinion, this was
25  created somewhere around 2009, 2010, 2012, in that

Page 289

1   ballpark. This feels to me like a cut and paste
2   from the grant application of 2009 or 2010 that
3   hasn't been changed.
4          There's not really a lot of motivation
5   for us to -- besides just sort of putting our
6   names and faces up there, our institution asks us
7   to put something on this institutional website
8   for a researcher. I haven't -- I've never looked
9   at this.
10  BY MR. KLATT:
11     Q   You or your organization --
12         MS. PARFITT:  Wait. Mike -- Mike,
13  excuse me, I think we're done.
14         THE WITNESS:  I've never contributed to
15  this or looked at it.
16         MS. PARFITT:  No, no, Mike,
17  unfortunately, your time is up.
18         MR. KLATT:  You've --
19         MS. PARFITT:  Mike, no more questions.
20  I have a few questions. I think we're --
21         MR. KLATT:  Are we -- are we done?
22         THE VIDEOGRAPHER:  Yes.
23         MR. KLATT:  All right.
24         MS. PARFITT:  Thank you. I do have a
25  few.

73 (Pages 286 to 289)

Jack Siemiatycki, Ph.D.

Page 290

1    Dr. Siemiatycki, I'm going to stay right
2  over here for a moment, okay?  And we can get
3  through this.  Okay?
4    MR. KLATT:  Here, I'll give this back to
5  you.
6    THE WITNESS:  Hi.
7    MS. PARFITT:  Tell me when you are
8  ready.
9    THE WITNESS:  Who are you?
10    MS. PARFITT:  I know.
11    MR. TISI:  Are we back on?  Are we back
12  on?
13    THE VIDEOGRAPHER:  I didn't stop.
14  Sorry, I --
15    MR. TISI:  Oh, I thought we were off.
16    MS. PARFITT:  Okay.  We didn't -- we
17  didn't know that.
18    CROSS-EXAMINATION
19  BY MS. PARFITT:
20    Q   Dr. Siemiatycki, good evening --
21    Okay.  Dr. Siemiatycki, good evening.  I
22  know it's been a long day, and I have a few
23  questions, and I will be wrapping -- or jumping
24  around a bit, so hopefully try and keep pace with
25  me, and I'll try and speak slowly and -- so that

Page 291

1  we can move through the remainder of your
2  deposition.
3    Dr. Siemiatycki, do you have an opinion
4  as to whether the elimination of talcum powder use
5  in the genital area is a lifestyle activity that
6  is modifiable?
7    If you need me to ask the question
8  again, I'm happy to.
9    A   Yeah, I'm trying to think of how the
10  word "modifiable" is used.
11    Q   Is it preventable?  Is the use of talcum
12  powder products in the genital area a preventable
13  activity?
14    A   Yes.
15    MS. BRANSCOME: Objection.
16  BY MS. PARFITT:
17    Q   All right.  Thank you.
18    All right.  You were asked some
19  questions about the Taher article.  You remember
20  that?
21    A   Yes.
22    Q   All right.  And is it your understanding
23  that the Taher article is a meta-analysis that was
24  formed as part of the Health Canada
25  recommendation?

Page 292

1    MS. BRANSCOME:  Objection.
2    THE WITNESS:  I think it was ordered --
3  it was contracted in order to underpin the Health
4  Canada evaluation.  That's my --
5  BY MS. PARFITT:
6    Q   All right.  Now, it was not the only
7  study or research that was conducted by Health
8  Canada; is that correct?  It was the meta-analysis
9  that was conducted by them.
10    MS. BRANSCOME:  Objection.
11    THE WITNESS:  Sorry, I -- what --
12  BY MS. PARFITT:
13    Q   The Taher study --
14    A   Study.
15    Q   -- is a meta-analysis; is that correct?
16    A   Yes.  Yes.
17    Q   All right.  And the Taher meta-analysis
18  was one part of the information that formulated
19  part of the Health Canada draft assessment?
20    A   That's my understanding, yes.
21    Q   All right.  Now, Daniel Krewski, you
22  indicated, was one of the authors of the Taher
23  paper.
24    A   Yes.  He's listed.
25    Q   And I believe you testified that you

Page 293

1  know Daniel Krewski.
2    A   Yes, I do.
3    Q   And I believe Mr. Klatt asked you
4  whether or not you had reached out or perhaps
5  Ms. Branscome asked you whether or not you have
6  had any communication with anyone, verbal, oral,
7  written, that had anything to do with Health
8  Canada.  Do you remember that?
9    A   Yes, I do remember.
10    Q   All right.  And it's been many hours,
11  but it was my understanding in response to that
12  question, you did indicate that you had sent an
13  e-mail to Daniel Krewski; is that correct?
14    MS. BRANSCOME:  Objection.
15    THE WITNESS:  I don't remember saying
16  that.
17  BY MS. PARFITT:
18    Q   Okay, let me ask you.  Have you ever
19  reached out to any member or author of the Taher
20  meta-analysis?
21    A   I -- when I learned about it, I sent an
22  e-mail to Dan Krewski asking if this report was
23  intended for publication; and if so, when it would
24  appear, and I haven't -- I didn't have any
25  response.

74 (Pages 290 to 293)

Jack Siemiatycki, Ph.D.

Page 294

1    Q   All right.  So you have had no
2  communication with any of the authors of the Taher
3  study or any of the members of Health Canada?
4    A   No.
5    Q   Okay.  Now, you were asked some
6  questions with regard to the Schildkraut study in
7  particular.  Now, what I'd like you to do is, if
8  you can get that in front of you, and I believe
9  it's part of the documentation in your binder,
10  number 4.
11       And what I'd ask you to also do, if you
12  will, is pull out your paper, your Terry paper --
13  your copy of the Terry paper, and maybe we'll go
14  there first.
15    A   Terry?
16    Q   If you get the Terry.  Do you have the
17  Terry in front of you?
18    A   Yeah, I've got it in front of me, yes.
19    Q   Okay.  Now, Ms. Branscome asked you and
20  referred you to the abstract of the Terry paper.
21  Do you recall that --
22    A   Yes.
23    Q   -- examination?
24    A   Yes.
25    Q   And I believe she focused your attention

Page 295

1  on the very last sentence of the Terry paper, the
2  next to last sentence which started with "Among
3  genital powder users."
4       Do you see that?
5    A   I see that.
6    Q   All right.  And she asked you whether or
7  not indeed the abstract section of the Terry paper
8  said: "Among genital powder users, we observed no
9  significant trend, p equals 0.17, in risk with
10  increasing numbers of lifetime applications
11  (assessed in quartiles)."
12    A   I see that.
13    Q   All right.  You've had an opportunity to
14  read this --
15    A   I've read it --
16    Q   -- article?
17    A   -- several times over the last three
18  years.
19    Q   All right.  Let me direct your attention
20  to the actual paper, and specifically to -- not
21  the abstract of the paper but to the section
22  that's entitled -- I believe it's the Discussion
23  section and it's over on page 817.
24    A   Yes.
25    Q   All right.  Do you have that in front of

Page 296

1  you?
2    A   Yes, I do.
3    Q   And I believe it's a continuation of the
4  Results section --
5    A   Yes.
6    Q   -- which starts on 815 and continues all
7  the way over to the end of the document.  Do you
8  see that?
9    A   I do.
10    Q   All right.  And specifically about
11  halfway down on page 817 of the Results section of
12  the Terry paper, what did the authors find as it
13  pertains to whether or not there is evidence
14  demonstrating dose-response as it relates to
15  genital powder use and ovarian cancer?
16    A   So are you referring to the sentence
17  that begins "Although a significant increase"?
18    Q   Correct.
19    A   Or before that?
20    Q   Whatever you need to read, but I was
21  specifically --
22    A   Okay.
23    Q   -- referring to the "although."  And you
24  can read that paragraph, please.
25    A   Okay.  So I'll start at the beginning of

Page 297

1  that paragraph.
2    Q   Please, if you will.
3    A   Read out loud?
4    Q   If you will.
5    A   "We evaluated cumulative genital powder
6  exposure as a composite variable of frequency and
7  duration of use.  We have observed similar
8  increased risks of all nonmucinous subtypes of
9  epithelial ovarian cancer combined across
10  quartiles of genital powder compared with nonuse."
11  The OR in the first quartile is 1.18 with
12  confidence intervals.  In the second quartile, it
13  was 1.22.  In the third quartile, it's 1.22.  And
14  the fourth quartile it's 1.37.
15       I didn't read the confidence intervals.
16    Q   Are the confidence intervals for the
17  quartiles you just discussed all statistically
18  significant?
19    A   Yes, they are.
20    Q   All right.  Please continue.
21    A   "Although a significant increase in risk
22  with an increasing number of genital powder
23  applications was found for nonmucinous epithelial
24  ovarian cancer when nonusers were included in the
25  analysis with a p-value that's extremely small,"

75 (Pages 294 to 297)

Jack Siemiatycki, Ph.D.

Page 298

1 highly significant, "no trend in cumulative use
2 was evident in analyses restricted to ever users
3 of genital powder for trend .17. Taken together,
4 these observations suggest that the significant
5 trend test largely reflects the comparison of ever
6 regular use with never use."
7 Q Okay, and if you would stop there.
8 What is the significance of the findings
9 of the authors in that paragraph you just read as
10 it pertains to whether or not this study shows a
11 dose-response increase?
12 A Well, so my interpretation is that
13 overall there is, for users compared to nonusers,
14 a highly significant trend, and four -- among the
15 four - there are four quartiles, and there is a
16 fifth group called nonusers -- they have a
17 relative risk of 1.0. And in those five groups,
18 the relative risk -- the relative risk estimates
19 go from 1.0 to 1.18 to 1.22, 1.22, 1.3,
20 something, 7. Those five values indicate to me a
21 tendency of increasing risk with increasing
22 exposure. Whether it is -- whether there's formal
23 proof of that in a -- from a statistical
24 significance point of view is a secondary issue as
25 to compared with whether the data are compatible

Page 299

1 with dose-response.
2 So as you may recall, in the IARC 2006
3 evaluation and in -- I guess in the Langseth
4 paper, I think we indicated that we were very
5 concerned about the consistency of increased
6 risks, but found no evidence of dose-response, and
7 that held back any inference that the
8 categorization should be greater than a 2B.
9 The findings from Terry turn on its head
10 the assumptions that were made at IARC that there
11 was no evidence of dose-response. Now there is
12 evidence of dose-response, whether or not it's
13 significant by one test or another test.
14 Q All right. Thank you.
15 All right. Let me direct your
16 attention, if I may, to the Health Canada
17 document, specifically the Draft Screening
18 Assessment dated December 2018. Again, I believe
19 it's in your notebook 4.
20 A 6 -- yeah. Yes.
21 Q All right.
22 A Okay, I have it.
23 Q Now -- now --
24 A Sorry, the Taher or the Draft Screening
25 Assessment?

Page 300

1 Q The Draft Screening Assessment, right.
2 A Yes.
3 Q Okay. And specifically, let me direct
4 your attention to Roman number -- Roman numeral
5 III of that document.
6 A Yes.
7 Q Okay.
8 MS. BRANSCOME: Michelle, would you mind
9 helping me follow along?
10 MS. PARFITT: Oh, I'm sure.
11 MR. TISI: I can give you my copy.
12 MS. PARFITT: Sure. Absolutely.
13 MR. KLATT: You may want those.
14 MS. BRANSCOME: Thank you. What page
15 are we on?
16 MS. PARFITT: Counsel, I'm on Roman
17 numeral III.
18 MS. BRANSCOME: Oh, the page -- I had a
19 section number that I couldn't find --
20 MS. PARFITT: No. At the bottom it has
21 a Roman numeral III.
22 BY MS. PARFITT:
23 Q Dr. Siemiatycki, referring you to the --
24 first, second, third -- fourth full paragraph of
25 the Draft Screening Assessment, the fourth full --

Page 301

1 A Begins with "full"?
2 Q No, it begins with "The meta-analysis."
3 A "The meta-analysis." Yep.
4 Q Correct.
5 Would you please -- does it state: "The
6 meta-analysis of the" -- am I reading this
7 correctly?
8 "The meta-analysis of the available
9 human studies in the peer-reviewed literature
10 indicate a consistent and statistically
11 significant positive association between perineal
12 exposure to talc and ovarian cancer."
13 Did I read that correctly?
14 A Yes, you did.
15 Q All right. Is that your opinion,
16 Dr. Siemiatycki, based upon your review of the
17 totality of the literature on talc powder --
18 talcum powder use and ovarian cancer in the
19 genital area?
20 A Yes, it is.
21 Q All right. It goes on to say: "Further
22 available data are indicative of a causal effect."
23 Did I read that correctly?
24 A Yes, you did.
25 Q All right. Is it your opinion based

76 (Pages 298 to 301)

Jack Siemiatycki, Ph.D.

Page 302

1  upon the totality of not only the epidemiological
2  data and findings but mechanistic data, animal and
3  in vivo data, that indeed the data is indicative
4  of a causal effect?
5          MS. BRANSCOME:  Objection.
6          MR. KLATT:  Objection.  Form.
7          THE WITNESS:  I believe it is more
8  likely than not that there is a causal
9  relationship between exposure to talc powder and
10  ovarian cancer.  And if those two sentences are
11  taken to be equivalent, then I agree with the
12  sentence.
13  BY MS. PARFITT:
14      Q   Well, let me ask you this,
15  Dr. Siemiatycki:  You've read the draft
16  assessment, and do you have -- is it fair to say
17  that the methodology that the authors performed
18  throughout the course of this particular draft
19  assessment is the same type of methodology that
20  you have performed for purposes of preparing your
21  report and offering the opinions that you have and
22  will continue to offer the court in -- in the
23  litigation involving talcum powder use and ovarian
24  cancer?
25          MS. BRANSCOME:  Objection.

Page 303

1          THE WITNESS:  The authors of this report
2  I think include a group -- a multidisciplinary
3  group, including toxicologists and possibly
4  environmental scientists.  I'm not familiar with
5  them, so I can't say for sure.  And in that sense,
6  they cover a broader disciplinary background than
7  I cover myself.  So in that sense, they have a
8  broader scope to evaluate the totality of the
9  evidence than I have.
10         Their evaluation of the epidemiologic
11  evidence seems in line with my own, and I have no
12  reason to doubt the validity of their toxicologic
13  analyses of the evidence.
14  BY MS. PARFITT:
15      Q   All right.  Dr. Siemiatycki,
16  specifically let me refer you to page 15, and it's
17  entitled "Perineal Exposure to Talc."  And let me
18  know when you get there.
19      A   Yes, I'm there.
20      Q   All right.  Based upon your review of
21  that section beginning on page 15, and I believe
22  it goes all the way through page 21, are you able
23  to -- do you have a sense as to the methodology
24  again that the authors of the draft assessment
25  employed in order to arrive at their causal

Page 304

1  assessment?
2          MS. BRANSCOME:  Objection.
3          THE WITNESS:  When you say
4  "methodology" --
5  BY MS. PARFITT:
6      Q   Mm-hmm.
7      A   -- I'm not sure if you're referring to
8  sort of high level methodology like collecting
9  original data, evaluating it, weighing it, and
10  making inferences on the basis of that data.
11  BY MS. PARFITT:
12      Q   What I'm asking is, did the authors
13  perform a Bradford Hill-like causality assessment
14  in the performance of their study entitled Draft
15  Screening Assessment?
16         MR. KLATT:  Objection.  Form.
17         THE WITNESS:  You're saying in the pages
18  between 15 and --
19  BY MS. PARFITT:
20      Q   Correct.  I'll shorten it by --
21      A   -- 21?
22      Q   Correct.  Correct.
23         And if I can refer your attention to or
24  direct you to page 20.
25      A   They commented on various considerations

Page 305

1  that Bradford Hill mentioned in his article.
2      Q   And which ones did they provide
3  information and findings on?
4      A   They commented on the strength of the
5  association, on consistency, specificity,
6  temporality, biological gradient, biological
7  plausibility, and coherence.
8      Q   And what did the authors conclude --
9  after looking at the various Bradford Hill
10  factors, what did they conclude in that last
11  paragraph of their Bradford Hill assessment?
12      A   "Suggests a small but consistent
13  statistically significant positive association
14  between ovarian cancer and perineal exposure to
15  talc.  Further available data are indicative of a
16  causal effect."
17         Is it -- is that what you're referring
18  to?
19      Q   Yes.  And do you agree with the authors
20  of the draft report of December 2018, when they
21  conclude that:  "The most recent meta-analysis
22  detailed, Taher 2018, and consistent with the Hill
23  criteria suggest a small but consistent
24  statistically significant positive association
25  between ovarian cancer and perineal exposure to

77 (Pages 302 to 305)

Jack Siemiatycki, Ph.D.

| Page 306 |
|---|
| 1   talc. Further available data are indicative of a |
| 2   causal effect"? |
| 3      A   Yes. |
| 4         MR. KLATT: Objection to form. |
| 5   BY MS. PARFITT: |
| 6      Q   Thank you. All right. |
| 7         Let me ask a couple other questions, and |
| 8   I need you -- if you will, can you reach over |
| 9   there, I believe it was exhibit number -- do you |
| 10   see your book on occupational diseases? I think |
| 11   it's under -- there you go. Okay. |
| 12         Okay. Now, you were asked many hours |
| 13   ago some questions regarding the book Risk Factors |
| 14   for Cancer in the Workplace. |
| 15         Do you recall that? |
| 16      A   Yes, I do. |
| 17      Q   All right. And that is indeed a book |
| 18   that was authored by you, Jack Siemiatycki, |
| 19   correct? |
| 20      A   Correct. |
| 21      Q   All right. And I believe you were asked |
| 22   whether there was anything in your book that |
| 23   described the methodology that you have employed |
| 24   over the course, and I believe you said the last |
| 25   four decades or almost four decades. |

| Page 307 |
|---|
| 1         Do you recall those questions? |
| 2      A   Yes, I do. |
| 3         MS. BRANSCOME: Objection. |
| 4   BY MS. PARFITT: |
| 5      Q   All right. Where in that book, if there |
| 6   is something in that book, does it describe the |
| 7   methodology that you have employed over the course |
| 8   of the last four decades that you still employ |
| 9   today in your analysis and opinions and findings |
| 10   in the talcum powder product litigation and |
| 11   ovarian cancer? |
| 12         MS. BRANSCOME: Object to form. |
| 13         THE WITNESS: I'm looking for -- well, I |
| 14   guess the main thing I would -- I would summarize |
| 15   that -- |
| 16   BY MS. PARFITT: |
| 17      Q   And could you tell us for the record -- |
| 18      A   Yes. |
| 19      Q   -- Dr. Siemiatycki, where you are? |
| 20      A   Where I'm reading? |
| 21      Q   Yes, please. |
| 22      A   Thank you. I'm looking at page 298 in |
| 23   this book, and I -- did you provide a copy of that |
| 24   chapter? |
| 25         MR. TISI: Doctor, you have copies -- |

| Page 308 |
|---|
| 1   you have copies in that binder that you had |
| 2   printed out. |
| 3         MS. BRANSCOME: May I have a copy if he |
| 4   is going to read from it? |
| 5         MS. PARFITT: Absolutely. And I thought |
| 6   we had -- do you have any copies in there? |
| 7         THE WITNESS: Oh, for this -- |
| 8         MS. PARFITT: No. |
| 9         MR. TISI: It wasn't marked. It was in |
| 10   the stuff you printed out. |
| 11         MS. PARFITT: I think I've got one here. |
| 12         (A discussion was held off the record.) |
| 13         MS. PARFITT: Ms. Branscome, here you |
| 14   go. Here's copies. |
| 15         And let's have this marked as now |
| 16   exhibit -- I'm not sure what we're up to. |
| 17         MR. TISI: We're up to 18. 18. |
| 18         MS. PARFITT: 18. Okay. |
| 19         And for the record, we are marking the |
| 20   face sheet of the book Risk Factors for Cancer in |
| 21   the Workplace by Jack Siemiatycki, and |
| 22   specifically the table -- |
| 23         MS. BRENNAN: I have 16. |
| 24         MR. TISI: No, because he marked -- |
| 25         MS. BRENNAN: Yeah, 14 -- |

| Page 309 |
|---|
| 1         MR. KLATT: Actually, it should be 16. |
| 2         MS. PARFITT: 16? Thank you. 16. |
| 3         All right. We are now marking as |
| 4   Exhibit 16 the book entitled Risk Factors for |
| 5   Cancer in the Workplace by Dr. Jack Siemiatycki, |
| 6   which specifically includes the table of contents, |
| 7   Chapter 7, "Interpretation of Findings," pages 297 |
| 8   through 308. |
| 9         MR. DONATH: Is that an excerpt, not the |
| 10   whole thing? |
| 11         MS. PARFITT: It is -- it is not. We'll |
| 12   make the book available, but it's just the |
| 13   excerpt. |
| 14         (Exhibit No. 16 was marked for |
| 15         identification.) |
| 16         MS. BRANSCOME: Did someone just join |
| 17   the line? |
| 18         THE REPORTER: They hung up. |
| 19         THE WITNESS: Shall I read a couple of |
| 20   paragraphs from this? |
| 21   BY MS. PARFITT: |
| 22      Q   Well, the question was -- the question |
| 23   was whether or not there was any bases or writings |
| 24   that discussed the methodology that you've |
| 25   employed over the last four decades, and you |

78 (Pages 306 to 309)

Jack Siemiatycki, Ph.D.

## Page 310

1    commented that it was in your book.
2        MS. BRANSCOME: Object --
3    BY MS. PARFITT:
4        Q    So please tell us what's in your book.
5        MS. BRANSCOME: Object to form.
6        THE WITNESS: Well, I -- I won't read
7    the whole book.
8    BY MS. PARFITT:
9        Q    I appreciate that. We all --
10       A    I have a phone book downstairs that I
11   could -- no, I will just read a couple of
12   paragraphs that talk about interpreting and
13   conducting epidemiologic research in general, not
14   specifically related to this particular study --
15   set of studies that I describe in the book.
16           "The main purpose of epidemiology is to
17   find the cause of disease. Despite some
18   controversy concerning the validity of drawing
19   causal inferences in epidemiology. There is a
20   consensus that sanctions and provides guidelines
21   for the practice. The evaluation of causality
22   between a putative risk factor and disease is a
23   complex and subjective process. Equally competent
24   scientists examining the same information can
25   arrive at different conclusions. However, as

## Page 311

1    additional evidence is accumulated, beliefs and
2    consensuses may change. The criteria that are
3    most relevant to the problem of evaluating
4    causality between cancer and an antecedent
5    occupational exposure may be paraphrased as
6    follows:
7            Number 1: "Is sampling variability a
8    plausible explanation for the observed
9    association?"
10           Number 2: "How strong is the
11   association and is there a dose-response
12   relationship?"
13           Number 3: "Is bias or confounding a
14   plausible explanation for the observed
15   association?"
16           Number 4: "Is the association
17   biologically plausible?"
18           Number 5: "Is there relevant supporting
19   evidence from other epidemiologic studies or from
20   non-human test systems, such as animal
21   experimentation or tests of mutagenicity?"
22           I'll stop there. But in answer to your
23   question, this text, published 30 years ago now,
24   encapsulates my approach to how to interpret and
25   use epidemiologic evidence in assessing causality.

## Page 312

1    Is that what you were --
2        Q    That's what I wanted to know.
3        A    -- asking?
4        Q    Thank you. All right.
5            Now, do you recall, Dr. Siemiatycki,
6    that you were asked some questions about the
7    mechanism underlying exposure to talc and genital
8    use of talcum powder products and ovarian cancer?
9    Do you remember Ms. Branscome asked you some
10   questions about that?
11       A    The mechanism of exposure or the
12   mechanism of carcinogenesis?
13       Q    The mechanism of exposure --
14       A    Okay.
15       Q    -- between talcum powder products and
16   ovarian cancer. Do you remember there were a
17   series of questions that were asked about that?
18       MS. BRANSCOME: Object to form.
19       THE WITNESS: I'm -- I'm not --
20   BY MS. PARFITT:
21       Q    Okay. Let me -- okay. Let me -- let me
22   do this. Let me refer you to your report, if you
23   will, and I believe it's been marked as -- I think
24   this is 10 -- as 10.
25           Do you have your report in front of you?

## Page 313

1        A    Yes.
2        Q    Very good. Okay.
3            All right. And specifically I'm
4    referring to page 64 and 65.
5        A    So I'm one or two pages off, so just
6    tell me which section.
7        Q    Okay. I believe it's -- it's under
8    "Biological Plausibility." Do you see that in the
9    lower part? Let's see.
10       A    "Biological Plausibility" -- (reading to
11   himself.) Strength. Okay. I've got it
12   somewhere -- consistency. Here.
13       Q    Okay.
14       A    "Biological Plausibility," yes.
15       Q    Now, I specific -- I believe
16   specifically the question that you were asked is
17   whether or not you will be testifying with regard
18   to the mechanism and the biological mechanism for
19   causing cancer with genital use of talcum powder
20   products. Do you remember that?
21       A    Yes.
22       Q    Okay. Now, in the course of your
23   analysis and in looking at that issue of
24   biological mechanism for causing cancer, what did
25   you consult and review and assess for purposes of

79 (Pages 310 to 313)

Jack Siemiatycki, Ph.D.

Page 314

1  formulating your opinions on that topic?
2        MS. BRANSCOME: Objection.
3        THE WITNESS: I actually started with
4  the IARC 2006 report where there was a high level
5  subgroup of toxicologists and basic scientists who
6  reviewed the evidence. So I read that material.
7        I've read various articles concerning
8  migration of particles, articles about
9  inflammation as a carcinogenic process, oxidative
10 stress as part of the carcinogenic process. And
11 towards the end, started looking at articles about
12 asbestos in talc as filling in some of the
13 information about what the content of talcum
14 powder products were. I at one point was looking
15 at company documents to try to figure out what
16 were the time relationships of using talc versus
17 using substitutes for talc. So all of those kinds
18 of things I was looking for.
19 BY MS. PARFITT:
20    Q  So for purposes of evaluating the
21 evidence and opining on the issue of talcum powder
22 products and ovarian cancer, did you consider the
23 issue of biological plausibility?
24        MS. BRANSCOME: Objection.
25        THE WITNESS: Yes, I considered it.

Page 315

1  BY MS. PARFITT:
2     Q  All right. And what was the basis of
3  your opinion as to whether or not there was
4  biological plausibility between talcum powder
5  product use in the genital area and ovarian
6  cancer?
7        MS. BRANSCOME: Objection. Assumes he
8  formed an opinion.
9        THE WITNESS: Well, my --
10 BY MS. PARFITT:
11    Q  Dr. Siemiatycki, did you formulate an
12 opinion with regard to whether there was
13 biological plausibility between the use of talcum
14 powder products and ovarian cancer?
15    A  Yes, I did.
16    Q  Okay.
17    A  And the first part of the discussion is
18 what one means by "plausibility." And so one
19 issue that I took off the table quite soon is the
20 notion that biological plausibility is synonymous
21 with biological proof. Neither Bradford Hill nor
22 anyone else who has described the use of
23 biological plausibility as a criterion has ever
24 claimed that biological proof of a mechanism is
25 necessary before you can opine about the -- about

Page 316

1  causality.
2        So the bar for establishing plausibility
3  for me is, are there credible scientists who are
4  persuaded or have reasonable confidence that there
5  is a mechanism that can explain the observation.
6  And if so, I would defer to that point of view as
7  being plausible.
8        I would not accept that one or more
9  scientists developing a mechanistic theory are
10 definitely proven, but if there is a credible
11 point of view in the scientific community about
12 the mechanism, I would call that plausible. It
13 doesn't mean it's proven. It's plausible.
14       And to my satisfaction, when I looked at
15 the different reports, including reports of
16 experts in the litigations, I was reasonably
17 assured that there are plausible theories and
18 plausible hypotheses.
19    Q  All right. In your section of your
20 expert report on page 64 through 66, did the
21 factors you identify under the subtitle
22 "Biological Plausibility" provide support for your
23 opinions that indeed there is biological
24 plausibility between the use of genital use of
25 talcum powder products and ovarian cancer?

Page 317

1     A  I think they provide evidence of
2  plausibility for those theories.
3     Q  And did you consider those for purposes
4  of opining that talcum powder products in the
5  genital area, used, can cause ovarian cancer?
6     A  Yes, I considered them.
7     Q  All right. Dr. Siemiatycki, I'm not
8  sure of the -- I don't think we marked it as an
9  exhibit, so let me do that now. I believe we're
10 up to 17.
11       (A discussion was held off the record.)
12       (Exhibit No. 17 was marked for
13       identification.)
14 BY MS. PARFITT:
15    Q  All right. Dr. Siemiatycki, do you
16 recall the discussion you had with Ms. Branscome,
17 again several hours ago, on the issue of
18 confounding and how that can impact study designs?
19    A  Oh, yes.
20    Q  All right. Let me show you a document
21 we have marked as Exhibit No. 17, and it's
22 entitled "Degree of confounding bias related to
23 smoking ethnic group, and socioeconomic status and
24 estimates of the association between occupation
25 and cancer," and I believe that's an article that

80 (Pages 314 to 317)

Jack Siemiatycki, Ph.D.

Page 318

1  you were an author, correct?
2      A   That's correct, yes.
3      Q   All right.  What, if any, support did
4  that particular article that you wrote, I guess
5  back in 1988, provide, if any, for the opinions
6  that you've rendered in this case on the topic of
7  confounding and bias?
8      A   In this study we evaluated 75
9  associations, 25 occupations in relation to lung
10  cancer, to bladder cancer and to stomach cancer,
11  each of them.  And we looked at the association
12  between each occupation and each of the three
13  types of cancer, adjusting for the smoking history
14  of the patients and the subjects.  But another set
15  of analyses not adjusting for their smoking
16  histories, and their socioeconomic status and
17  their ethnic group.  These are factors that are
18  strongly associated with cancer and with different
19  occupations.  We wanted to see how large a
20  confounding bias could be generated by not having
21  proper confounder information.
22          And so I will just read a couple of
23  sentences from the abstract of this article.
24          "Of the 75 associations studied, only
25  one OR was distorted by more than 40 percent.  A

Page 319

1  40 percent distortion would correspond to an odds
2  ratio of 1.4 when comparing unadjusted with
3  adjusted estimates.  Three were distorted by
4  between 30 percent and 40 percent, and four others
5  by between 20 percent and 30 percent."
6          So of these 75 associations, not taking
7  account of very powerful confounders -- smoking is
8  the most powerful confounder we know.  Ethnicity
9  and socioeconomic status are important
10  confounders.  They have strong relative risks with
11  these different cancers.  Not taking them into
12  account could create artifactual odds ratios,
13  maximum of 1.4, even though the original odds
14  ratios of the confounders with these cancers could
15  be as high as 10.
16          So there's a very -- the confounding
17  effect, at most, would be 10 percent or 20
18  percent, but the likelihood that there is some
19  unknown confounder with -- with ovarian cancer
20  that is artifactually creating across the board,
21  across all these studies, an artifactual relative
22  risk of around 1.3 would require some -- that
23  unknown confounder to have an extremely high
24  relative risk, certainly higher than 2, maybe
25  higher than 3 or 4, which is not inconceivable but

Page 320

1  low probability.
2          And this is part of what leads me and
3  what led me in my report to opine that confounding
4  is unlikely to be the explanation for the observed
5  relative risks.
6      Q   Thank you.  All right.
7          THE VIDEOGRAPHER:  Excuse me, Counsel.
8          MS. PARFITT:  Off the record, yes.
9          THE VIDEOGRAPHER:  Off the record?
10          MS. PARFITT:  Yeah, it's a good time,
11  because you're running out of tape.  I could tell.
12          THE VIDEOGRAPHER:  Going off the record
13  at 8:27 p.m.
14          (Recess.)
15          THE VIDEOGRAPHER:  We're going back on
16  the record at 8:31 p.m.
17          MS. PARFITT:  Thank you.
18  BY MS. PARFITT:
19      Q   Dr. Siemiatycki, just one last question.
20          Let me direct your attention to again
21  the documents in your Exhibit No. 4, specifically
22  the "Weight of Evidence:  General Principles and
23  Current Applications at Health Canada," which
24  formed part of the Health Canada recommendation.
25  All right?

Page 321

1      A   I'm not sure if it formed part of the
2  recommendation or if it's a background document.
3      Q   Very good.  I think you're probably
4  right.
5          All right.  And you have -- you have had
6  a chance to review that, correct?
7      A   Yes.
8      Q   All right.  Specifically let me direct
9  your attention to page 7 of that document.  And
10  I'm going to go down to the very last paragraph,
11  and it starts with:  "The majority of risk
12  assessment reports, however, provide a logical
13  narrative description of the relative strengths or
14  weakness of various lines of evidence considered.
15  For most risk assessments, individual lines of
16  evidence are polled and integrated into a final
17  conclusion based on best professional judgment and
18  not mathematical formula."
19          Did I read that correctly?
20      A   Yes, you did.
21      Q   Do you agree with the statement by
22  Health Canada in their "Weight of Evidence:
23  General Principles"?
24      A   Yes, I do.
25          MS. PARFITT:  All right.  I have no

81 (Pages 318 to 321)

Jack Siemiatycki, Ph.D.

---

Page 322

1  further questions.  Thank you.
2      THE WITNESS:  This is also in conformity
3  with all guidelines from agencies and experts who
4  understand science.
5      MS. PARFITT:  Very good.
6      THE WITNESS:  The best data is
7  collected, compiled, and then interpreted by human
8  expert judgment.
9      MS. PARFITT:  Thank you very much,
10  Dr. Siemiatycki.  I believe counsel has some
11  follow-up.
12      MS. BRANSCOME:  I do, but I think I need
13  to take a break to confer amongst ourselves.
14      MS. PARFITT:  Go ahead.
15      THE VIDEOGRAPHER:  We're going off the
16  record at 8:33 p.m.
17      (Recess.)
18      THE VIDEOGRAPHER:  We are going back on
19  the record at 8:46 p.m.
20      REDIRECT EXAMINATION
21  BY MS. BRANSCOME:
22   Q   Good evening, Dr. Siemiatycki.
23      I have some follow-up questions to the
24  questions that were just asked to you by
25  plaintiffs' counsel.

---

Page 323

1      Both myself and counsel for Imerys asked
2  you very specifically if you had contact with
3  any of the authors in connection with the Taher
4  paper or the Health Canada paper.  Do you recall
5  the questions that we asked you?
6   A   I -- I recall that you asked questions
7  about it, yes.
8   Q   Yeah.  Is there a reason why during my
9  questioning and questioning by counsel for Imerys
10  you did not recall having sent an e-mail to
11  Dr. Krewski with respect to the potential
12  publication of the Taher paper?
13   A   I -- I guess I consider -- well, two
14  parts.  I consider a contact sort of a one-way
15  process, and there was no two-way process.  I sent
16  him a message.  He never responded.
17      And number two, it -- it dropped off of
18  my memory screen.  I -- I just forgot about it
19  until she asked.
20   Q   When did you contact Dr. Krewski about
21  the Taher paper?
22   A   In December, when I first learned about
23  it.
24   Q   What specifically did you ask him?
25   A   My recollection, I asked him if -- the

---

Page 324

1  gist of it was whether the paper has been or will
2  be submitted for publication.  I don't recall if
3  there were other important components.  It was a
4  brief message, besides pleasantries of people
5  who've known each other for 30 years.
6      But, you know, I said I -- I've learned
7  about this work that you were involved with.  I
8  can't remember what else I said.
9   Q   In your e-mail communication to
10  Dr. Krewski, did you alert him to the fact that
11  you were serving as a -- an expert on behalf of
12  plaintiffs' counsel in litigation involving talcum
13  powder?
14   A   I don't recall.  Your question used the
15  plural, and in my -- you said "in your
16  communications."  That's what I heard.  No?  Okay.
17   Q   I meant it in the singular.
18   A   You meant it in the singular, so I guess
19  the record will reflect.
20      In my one message to Dr. Krewski -- let
21  me -- if I may.
22   Q   My question again, Dr. Siemiatycki --
23   A   Yeah, please.
24   Q   -- is in your e-mail to Dr. Krewski with
25  respect to the Taher paper, did you notify him in

---

Page 325

1  that e-mail that you were serving as an expert
2  witness retained on behalf of plaintiffs' counsel
3  in litigation involving talcum powder?
4   A   I -- I -- I don't recall if I did or
5  not.  I -- I wouldn't have thought it was a
6  crucial thing to indicate in this first message
7  asking him if his paper was in press or in
8  publication or something like that.
9   Q   Why did you want to know whether it had
10  been submitted for publication?
11   A   I wanted to know what the status of that
12  report was.  I had no -- I didn't follow up my --
13  it wasn't an important issue for me.  I was -- it
14  was kind of an idle gesture of, you know, Hi, I
15  haven't heard from you for a while.  I see that
16  you have this thing.  Are you sending it for
17  publication?  Something like that.
18      And I -- the motivation, was there a
19  specific ulterior motive?  No, there was no --
20  there was nothing I would have done differently.
21  I guess if he had told me, yes, it's about to be
22  submitted, I would have wanted to see the final
23  version, because the version that I saw was
24  obviously an early manuscript.  It was much too
25  long for a -- for a publication submission.  But

---

Jack Siemiatycki, Ph.D.

Page 326

1  it wasn't a big deal for me to -- to have
2  information about that manuscript.
3      Q   Including communications in which you
4  unilaterally reached out to individuals but may
5  not have received a response, have you
6  communicated in any form with any of the
7  participants in the development of the Health
8  Canada Draft Screening Assessment or the Taher
9  paper, other than what we have discussed with
10 respect to Dr. Krewski?
11     A   No.
12     Q   The Health Canada Draft Screening
13 Assessment, you were asked a number of questions
14 about that by counsel for plaintiffs.  Is that a
15 document that you have reviewed closely in forming
16 your opinions in this case?
17     MS. PARFITT:  Objection.  Form.
18     THE WITNESS:  I wouldn't say that I
19 reviewed it closely the way I've reviewed the
20 evidence before submitting my report.  No.
21 BY MS. BRANSCOME:
22     Q   All right.  I want to talk to you about
23 Exhibit 17.  You have that over there.  It's the
24 "Degree of confounding bias related to smoking."
25     A   Oh, yeah.

Page 327

1      Q   All right.  Dr. Siemiatycki, is
2  Exhibit 17 an article that you identified to
3  address the likelihood that a confounding variable
4  could explain the increased risk that you have
5  found in your meta-analysis with respect to the
6  use of talc?
7      A   Yes.
8      Q   Okay.  So I just want to direct you to
9  page 623.  In the right-hand column, do you see a
10 paragraph that begins "One of the criteria"?
11     A   Yes.
12     Q   Does it state:  "One of the criteria
13 used by epidemiologists to distinguish true from
14 false associations is the strength of the
15 association"?  Did I read that correctly?
16     A   Yes, you did.
17     Q   And again, this is an article on which
18 you are the lead author, correct?
19     A   Correct.
20     Q   It continues on:  "That is, among two
21 relative risk assessments which have equal levels
22 of statistical significance but one of which is
23 much greater than 1, while the other is closer
24 to 1, the larger one is considered more likely to
25 reflect a true association than the smaller one."

Page 328

1      Did I read that correctly?
2      MS. PARFITT:  Counsel, just with one
3  correction.  It came out as "estimates."  The
4  article says "estimates," and it came out on the
5  transcript as "assessments."
6      MS. BRANSCOME:  Okay.
7      THE WITNESS:  That -- do you understand
8  what she's indicated?
9  BY MS. BRANSCOME:
10     Q   Yes.  Did I read it correctly?
11     A   You misread one word.
12     Q   Okay.
13     A   But it's not important, but if you want
14 to have it for the record.
15     Q   Well, we can continue on.
16     A   Yes.
17     Q   "This consideration follows from the
18 recognition that some degree of bias is quite
19 likely in any non-experimental study."
20     Did I read that correctly?
21     A   Yes.
22     Q   "Small excess relative risks, even if
23 they are statistically significant, are often
24 interpreted with great caution, if not
25 skepticism."

Page 329

1      Did I read that correctly?
2      A   Yes.
3      Q   "Although there has been no explicit
4  consensus on what level of excess relative risk
5  should be considered too small to be taken
6  seriously, we believe that many epidemiologists
7  use a cut point in the range of 1.2 to 1.5 for
8  this purpose.  Our results indicate that a cut
9  point in this range is reasonable for studies of
10 cancer occupation associations."
11     Did I read that correctly?
12     A   Yes, you did.
13     Q   And the references in those sentences to
14 the words "we" and "our" would include you,
15 Dr. Siemiatycki, correct?
16     A   Correct.
17     Q   And then if we could turn the page to
18 page 624, the paragraph at the top on the
19 left-hand column, I direct your attention to the
20 last complete sentence of that paragraph.
21     "On the other hand, our results also
22 imply that relative risk estimates as low as 1.2
23 for lung cancer associations or 1.1 for bladder or
24 stomach cancer associations run a fair chance of
25 being attributable to confounding bias, even if

83 (Pages 326 to 329)

Jack Siemiatycki, Ph.D.

Page 330

1  they are," quote, "statistically significant."
2       Did I read that correctly?
3    A  Yes, you did.
4    Q  Is that a conclusion that you and your
5  authors reached in the paper that's been
6  identified as Exhibit 17?
7    A  Yes, it was.
8    Q  Your opinion with respect to the
9  existence of biological plausibility of the
10  perineal use of talc and ovarian cancer is limited
11  to the evaluation of whether or not there are
12  credible scientists who are persuaded that there
13  is a mechanism; is that correct?
14       MS. PARFITT:  Objection.  Form.
15       THE WITNESS:  Can you repeat that?  I'm
16  sorry.
17  BY MS. BRANSCOME:
18    Q  Your opinion with respect to the
19  existence of biological plausibility of the
20  perineal use of talc and its potential to cause
21  ovarian cancer is limited to an evaluation of
22  whether or not there are credible scientists who
23  are persuaded that there is a mechanism, correct?
24       MS. PARFITT:  Objection.  Form.
25  Misstates his testimony.

Page 331

1       THE WITNESS:  I would say is based on,
2  rather than is limited to.
3  BY MS. BRANSCOME:
4    Q  Do you have expertise that would allow
5  you to determine what the most likely biological
6  mechanism is, if there is one, for perineal use of
7  talc to cause ovarian cancer?
8    A  No, I wouldn't pretend to -- to have
9  that kind of expertise.
10    Q  Okay.  Is it also true that you are not
11  qualified to opine on the ability or not of talc
12  particles to migrate to the ovaries from the use,
13  the perineal application of talc?
14       MS. PARFITT:  Objection.  Form.
15       THE WITNESS:  Not on the basis of my
16  research, not on the basis of my training, but on
17  the basis of my reading of literature concerning
18  that issue, I have an opinion based on what I've
19  read from experts in the -- that field.
20  BY MS. BRANSCOME:
21    Q  But in forming that opinion, you are
22  relying on --
23    A  Yes.
24    Q  -- the expertise of others, correct?
25    A  Yes.

Page 332

1       MS. PARFITT:  Object to form.
2       THE WITNESS:  Correct.
3  BY MS. BRANSCOME:
4    Q  You indicated in response to questions
5  by plaintiffs' counsel that you were persuaded by
6  the opinions of other experts in the litigation
7  with respect to biological plausibility.  Who are
8  those experts?
9    A  I -- I think I indicated that such
10  experts contributed to the information that I had,
11  not that they were the only ones who persuaded me.
12  So there was literature and there were depositions
13  and reports.
14       So -- I'm trying to remember the names
15  of the various expert reports that I have read and
16  depositions.  I do -- there's the Plunkett, the
17  Saed papers, but I don't know if there was a
18  report by Saed.  There was -- let me look in my
19  list of references.  (Peruses document.)
20       I'm sorry, I'm drawing a blank on the
21  names of the people whose reports and testimonies
22  I've read in the last month or two.
23    Q  When were you provided with copies of
24  these expert reports?
25    A  In the fall.  Some before November 15th

Page 333

1  and some after November 15th.  And -- but also
2  I'm -- I'm reflecting on the various reports and
3  testimonies from the earlier trial, and I read
4  various expert reports from that time.
5    Q  Did you draft the section in your MDL
6  expert report related to biologic plausibility?
7    A  Yes, I did.
8    Q  You personally summarized each of the
9  various studies that you refer to in that section?
10    A  What do you mean by summarized the
11  studies?  I -- I summarized the evidence that's
12  captured there, and I provided references for
13  those statements, yes.
14    Q  You're the original author of the
15  language in that section is my question.
16    A  Yes.  Yes.
17    Q  Can you identify for me which expert
18  reports related to biological plausibility you had
19  reviewed before forming your opinion as
20  represented in the MDL report?
21    A  As I said, it's partly a number of
22  reports that I had seen in the previous trial, and
23  I -- I'm drawing a blank on the names of -- of the
24  people.
25    Q  You understand that there will be

84  (Pages 330 to 333)

Jack Siemiatycki, Ph.D.

Page 334

1  experts retained by defense counsel who will
2  provide reports addressing biological
3  plausibility, correct?
4      A   I assume so, yeah.
5      Q   Okay.  Are you qualified to evaluate
6  between competing expert reports who is correct
7  about the biological mechanism?
8          MS. PARFITT: Objection.  Form.
9  BY MS. BRANSCOME:
10     Q   To the extent one exists.
11         MS. PARFITT: Objection.  Form.
12         THE WITNESS:  No -- no, I wouldn't be.
13  I mean I -- I can read reports from people outside
14  my area and form an opinion about the general
15  coherence and -- and form an initial sense of the
16  credibility of the various reports.  And I'd be
17  happy to review the reports of the experts for the
18  defense on these issues.
19  BY MS. BRANSCOME:
20     Q   But to the extent, for example, that
21  there are credible experts on both sides of the
22  debate, whether or not there has been an
23  established biological mechanism and whether or
24  not there have not been, you are not qualified to
25  evaluate between the two credible experts?

Page 335

1          MS. PARFITT: Objection.  Form.
2          THE WITNESS:  That's correct.  And I've
3  never pretended that -- make -- that it is
4  necessary for me to establish the correct
5  biological mechanism before drawing inferences
6  about causality.
7  BY MS. BRANSCOME:
8      Q   It is your conclusion that more likely
9  than not perineal use of talc can cause ovarian
10  cancer is based on the epidemiological evidence,
11  correct?
12         MS. PARFITT: Objection.  Misstates his
13  evidence and testimony today.
14         THE WITNESS:  In part -- in large part.
15  Yes.
16  BY MS. BRANSCOME:
17     Q   Okay.  Well, my question now is about
18  the, in small part, the evidence in addition to
19  that.  What evidence are you considering that you
20  are qualified to independently evaluate?
21     A   I am qualified to evaluate whether there
22  is a plausible theory about it.  Not to establish
23  whether that theory is correct or not.
24         MS. BRANSCOME: Okay.  All right.  If we
25  could just go off the record very briefly.

Page 336

1          THE VIDEOGRAPHER:  We are going off the
2  record at 9:05 p.m.
3          (Pause in the proceedings.)
4          THE VIDEOGRAPHER:  We're back on the
5  record at 9:06 p.m.
6          MS. BRANSCOME:  At this time I will pass
7  questioning to counsel for Imerys.
8          MS. PARFITT: Thank you.
9              REDIRECT EXAMINATION
10  BY MR. KLATT:
11     Q   Dr. Siemiatycki, a few more questions,
12  sir.
13         I'm going to read a statement and ask if
14  you agree with it.  Okay?
15     A   Yes.
16     Q   "When a pronounced binary association is
17  present, use of the never or no category in
18  assessing trend can induce a trend where none
19  exists."
20     A   Okay.  Can you -- yeah, thank you.
21     Q   And my question is, do you agree or
22  disagree with that statement?
23     A   Yes, I agree it can -- I agree with it.
24  There are some qualifiers that I would add to that
25  sentence, but I agree with it.

Page 337

1      Q   Could you look at your report, please,
2  sir, in the case on page 65, the discussion of
3  biologic plausibility.
4      A   Yes.
5      Q   And actually I think your biologic
6  plausibility discussion actually begins near the
7  bottom of the previous page, 64, and there's a
8  general discussion on the rest of 64 and the first
9  paragraph or two of 65.  Is that correct?
10     A   I -- I believe it's correct.  The
11  version I have in front of me is that version that
12  has a slightly different formatting, so -- but I'm
13  with you.
14     Q   Okay.
15         MS. PARFITT:  And I believe, just for
16  completeness, it starts on 60 --
17         THE WITNESS:  Mine starts on --
18         MS. PARFITT:  His document starts on 65,
19  goes all the way over to 66.  Mike, yours probably
20  starts on the bottom of 64, goes all the way over
21  to the top of 66.
22  BY MR. KLATT:
23     Q   And what I'm focusing on is the
24  paragraph that you wrote that begins with
25  "Insofar" --

85 (Pages 334 to 337)

Jack Siemiatycki, Ph.D.

Page 338

1    A   Yes.
2    Q   -- which is where your specific
3  discussion of biologic plausibility regarding
4  talcum powder products begins.
5    A   Yes.
6    Q   Do you -- do you see that paragraph,
7  sir?
8    A   Yes, I do.
9    Q   And moving down, did you read the
10  articles that you cited here carefully?
11    A   I read them.  I'm not capable of fully
12  understanding articles in areas that are outside
13  my area of -- of expertise.  But to the --
14    Q   Well --
15    MS. PARFITT:  Wait, let him finish.
16    THE WITNESS:  To the extent that I was
17  able to understand them, I read these articles.
18  BY MR. KLATT:
19    Q   I'm focusing on the sentence that you
20  wrote in your report saying:  "First of all, there
21  are two possible routes that talcum powder
22  products can take to reach the ovaries."
23    Do you see where I am?
24    A   Yes, I do.
25    Q   The next sentence says:  "There is

Page 339

1  published evidence that talcum powder products and
2  its constituents and contaminants that are applied
3  to the vaginal area can migrate from there to the
4  fallopian tubes and ovaries," citing Venter 1979,
5  Henderson 1986, Heller 1996, "or to pelvic lymph
6  nodes," citing Cramer 2007.
7    Is that correct?
8    A   Yes, that's correct.
9    Q   Do you recall, Dr. Siemiatycki, that the
10  Venter 1979 article has nothing to do with talc at
11  all?
12    MS. PARFITT:  Objection.  Form.
13    THE WITNESS:  Is that the article about
14  asbestos?
15  BY MR. KLATT:
16    Q   Venter 1979 is the article about albumin
17  microspheres.
18    A   Oh, yeah.  Yes.
19    Q   Do you recall that article?
20    A   I do.  Well, I don't recall it well, but
21  I recall reading it a year or two ago.
22    Q   And in Venter, nothing was applied to
23  the perineal area, correct?  These albumin
24  microspheres were actually injected at the top of
25  the vaginal vault, correct?

Page 340

1    A   I think so.  Is this --
2    Q   And the --
3    A   Is this the South African study?
4    Q   I believe you're right.
5    A   Okay.
6    Q   And the women were not women using
7  perineal talc.  They were women who were being
8  prepared to undergo gynecologic surgery, correct?
9    A   Correct.
10    Q   And after this solution of albumin
11  microspheres was injected at the top of the
12  vaginal vault, the women were tilted in a head
13  down/pelvis up position for two hours beforehand,
14  correct?
15    A   Correct.
16    Q   So --
17    A   Now I'm saying correct, but I don't
18  remember the details that you're quoting.  I
19  remember the article.  I'm -- I -- it doesn't --
20  my recollection doesn't contradict anything you're
21  saying.
22    Q   So Venter doesn't tell us anything at
23  all about dry talc particles applied externally to
24  the genital area being able to migrate up the
25  vagina, across the cervix, up the uterus, up the

Page 341

1  fallopian tubes to the ovaries, correct?
2    MS. PARFITT:  Objection.  Form.
3    THE WITNESS:  I guess I use this as a
4  reference because some other experts used it as a
5  reference for such a statement.  And I read the
6  article, and it sounded plausible.
7  BY MR. KLATT:
8    Q   But you'd agree with me that the Venter
9  1979 article doesn't involve talc particles,
10  doesn't involve external application, and is a
11  very artificial situation compared to the
12  situation of women applying talc to the --
13    MS. PARFITT:  Objection.
14  BY MR. KLATT:
15    Q   -- external genital area?
16    MS. PARFITT:  I'm sorry, Michael.
17  Objection.  Form.
18    THE WITNESS:  I -- I -- I don't disagree
19  with what you said.
20  BY MR. KLATT:
21    Q   And then the other two articles you
22  cite, Henderson 1986 and Heller 1996, say nothing
23  at all about migration of talc particles.  They
24  simply observe talc particles in tissue already
25  without any reference to how they got there,

86 (Pages 338 to 341)

Jack Siemiatycki, Ph.D.

Page 342

1  correct?
2       MS. PARFITT:  Do you need to see the
3  articles?
4       THE WITNESS:  Yes, I think I need to see
5  those articles.
6       MS. PARFITT:  Do we have Henderson or
7  Heller?
8       MR. KLATT:  I'm sorry, I don't have them
9  with me.
10      MS. PARFITT:  Okay.  Let's see.  In your
11  report -- they're in your report.
12  BY MR. KLATT:
13      Q   And you might want to pull Cramer 2007
14  while you're at it, because again my question is
15  the same, it doesn't say anything at all about
16  migration.  It simply identifies particles already
17  in tissue without saying how they got there.
18      MS. PARFITT:  Okay.  Well, let's wait
19  for a question and let's get the articles.  Let's
20  see.  It would be tab -- it's a big binder.
21  BY MR. KLATT:
22      Q   Can I -- can I --
23      THE WITNESS:  I have it in my office.
24  BY MR. KLATT:
25      Q   Can I short-circuit this?

Page 343

1      A   Yes.
2      Q   I think this -- I can short-circuit
3  this.  If you just look at Cramer 2007.  Do you
4  have that handy?
5       MS. PARFITT:  Cramer 2007.  Do you have
6  it?  I don't, Michael.
7       THE WITNESS:  It would be in my office.
8       MR. KLATT:  Could we go off for a second
9  while you are looking?
10      THE VIDEOGRAPHER:  We're going off the
11  record at 9:15 p.m.
12      (Pause in the proceedings.)
13      THE VIDEOGRAPHER:  We are back on the
14  record at 9:17 p.m.
15  BY MR. KLATT:
16      Q   So, Dr. Siemiatycki, at my request,
17  you've pulled the 2007 article, first author
18  Cramer, called "Presence of talc in pelvic lymph
19  nodes of a woman with ovarian cancer and long-term
20  genital exposure to cosmetic talc," correct?
21      A   That's correct.
22      Q   And my question was simply, this -- this
23  article says nothing about talc migrating.  It
24  simply observes that talc was found in a lymph
25  node.  Is that correct?

Page 344

1       MS. PARFITT:  Objection.  Form.
2       Make sure you've read the article.
3       THE WITNESS:  (Peruses document.)  So
4  I -- I've skimmed it quickly.  I haven't read
5  everything, but I don't see that it -- sorry, are
6  we on?
7       MS. PARFITT:  Yes.
8       THE VIDEOGRAPHER:  We're on the record.
9       THE WITNESS:  I don't see that it
10  directly addresses talc moving from the vagina
11  into pelvic lymph nodes, but it certainly concerns
12  the detection of talc in pelvic lymph nodes.
13  BY MR. KLATT:
14      Q   But it says nothing in the article
15  itself about establishing migration, correct?
16      MS. PARFITT:  Objection.  Misstates his
17  testimony.
18  BY MR. KLATT:
19      Q   That you -- that you see.
20      MS. PARFITT:  Objection.  Form,
21  misstates his testimony.
22      THE WITNESS:  I -- I guess, you know --
23  the question I would have is if it gets to the
24  pelvic lymph nodes, it has to migrate there from
25  somewhere.  It's not deposited there deliberately.

Page 345

1  BY MR. KLATT:
2      Q   Well --
3      A   That was my interpretation of -- of
4  this.
5      Q   Well, look at the very first page of
6  this article, Cramer.  You see at the very top
7  under where the authors are listed?
8      A   Yes, I do.
9      Q   It says "Background"?
10     A   Yeah.
11     Q   "Although epidemiologic studies suggest
12  talc use may increase ovarian cancer risk, there
13  is no proof that talc used externally reaches the
14  pelvis."  Correct?
15      MS. PARFITT:  Objection.  Form.
16  BY MR. KLATT:
17     Q   That's what it says.
18     A   That's the background to this study.
19  That's not --
20     Q   And it's 2007, correct?
21     A   Correct.
22     Q   Which is after the Henderson study that
23  you cite.  Correct?
24     A   Correct.
25     Q   And so after -- and what -- so we have

Jack Siemiatycki, Ph.D.

| Page 346 | Page 348 |
|---|---|

**Page 346**

1  Venter that you cited and Henderson, and what
2  else?
3      A   Heller -- Heller?
4      Q   What was the third?  Heller, yes.  Thank
5  you.  1995.  And here is --
6          MS. PARFITT:  No, excuse me.  1996, I
7  believe.
8  BY MR. KLATT:
9      Q   Excuse me, 1996.
10         And here in 2007, we have Dr. Cramer
11  saying that there's no proof that externally
12  applied talc reaches the ovaries, correct?
13         MS. PARFITT:  Objection.  Misstates the
14  science and the article and his testimony.  Form.
15  BY MR. KLATT:
16     Q   I'm just asking what the article -- what
17  Dr. Cramer and Dr. Godleski said in the Background
18  section to this article that you cite in 2007.
19         MS. PARFITT:  Objection.  Form.
20         THE WITNESS:  You want me to comment on
21  whether their background -- the Background section
22  of this abstract contradicts the thesis that there
23  was evidence of migration before 2007?  Is that
24  correct?
25  BY MR. KLATT:

**Page 347**

1      Q   I'm -- my question is, you cited Venter
2  and Henderson and Heller for evidence of
3  migration, correct?
4      A   Right.  Right.
5      Q   And those all predate well before 2007,
6  correct?
7      A   Correct.
8      Q   And here we have Dr. Cramer saying in
9  2007 there is no proof that talc used externally
10  reaches the pelvis, correct?
11         MS. PARFITT:  Objection.  Form,
12  misstates the article.
13  BY MR. KLATT:
14     Q   Is that what he said?
15     A   That's what it says.
16     Q   And you --
17         MS. PARFITT:  Wait.  Wait.  Wait.  Wait,
18  you let him finish.  He said, That's what he said
19  -- finish, please.  Thank you, Michael.
20         THE WITNESS:  The -- the word "proof" in
21  that sentence is a red flag.  I'm not sure what
22  they mean -- they meant by proof.  They might
23  have -- well have said, There is evidence that,
24  but it is not yet conclusive.  That is one
25  interpretation of a sentence like, There is no

**Page 348**

1  proof.  They haven't -- they didn't say there is
2  no evidence.  They said, There is no proof.
3  BY MR. KLATT:
4      Q   Do you understand -- my question,
5  Dr. Siemiatycki, was simply, did Dr. Cramer say
6  there was no proof?  Correct?
7          MS. PARFITT:  Objection.
8          THE WITNESS:  He said there was no
9  proof.
10         MS. PARFITT:  Asked and answered.
11         THE WITNESS:  He didn't say there was no
12  evidence.
13  BY MR. KLATT:
14     Q   Okay.  Can you go back -- let's see,
15  let's go back to your expert report on biologic
16  plausibility.
17         MS. PARFITT:  Right here.
18  BY MR. KLATT:
19     Q   Oh, one other thing.  When you were just
20  scanning Cramer 2007, I saw you were looking on
21  the page where he discussed the Heller paper.  Did
22  you see that?
23         MS. PARFITT:  Just give him a moment to
24  get that again.  I think it was 17.
25         THE WITNESS:  Sorry.  No. 17?

**Page 349**

1          MS. PARFITT:  Yeah.
2          THE WITNESS:  You have very good eyes if
3  you saw me looking at the Heller.  I actually
4  wasn't, but --
5  BY MR. KLATT:
6      Q   I thought you were on that page.
7      A   Well, I was -- I scanned each of the
8  four pages.  There aren't that many pages.  The --
9  I see mention of the Heller article.
10     Q   On page 500?
11     A   Yes, I do see that.
12     Q   Do you see where Dr. Cramer in 2007 is
13  suggesting that the explanation for the Heller
14  study may be contamination that was introduced
15  during the processing of the tissue specimens?
16     A   So I see that he says it might have been
17  introduced during processing, and it's a potential
18  weakness.  He doesn't affirm that it is.  He says
19  it might be.
20     Q   So contamination is another explanation
21  potentially for why you might find talc in ovarian
22  or gynecologic tissues?
23         MS. PARFITT:  Objection.  Form.
24         THE WITNESS:  I -- I guess so.  Not
25  being an expert in pathology and physiology, I --

88 (Pages 346 to 349)

Jack Siemiatycki, Ph.D.

Page 350

1  that seems like a plausible -- seems to me like a
2  plausible alternative explanation.
3  BY MR. KLATT:
4    Q   You go on and comment in the next
5  paragraph of your biologic plausibility on two
6  trace heavy metals, chromium and nickel compounds,
7  correct?
8    A   So where are we -- oh, yeah.  Yes.
9    Q   You're aware that IARC has made
10  determinations regarding chromium and nickel
11  compounds, correct?
12    A   Yes, correct.
13    Q   And neither one of the determinations
14  found they were linked to ovarian cancer at all,
15  correct?
16    A   That's correct.
17    Q   They found they were related to nasal,
18  sinus and lung cancers in people, primarily
19  workers, who had breathed the fumes, correct?
20    A   That's correct.
21    Q   So that's no way analogous to any trace
22  heavy metals in talc, correct?
23    MS. PARFITT:  Objection.  Form.
24    THE WITNESS:  It's -- it's not directly
25  relevant.  It may be indirectly relevant.  The

Page 351

1  evidence that allowed IARC to make determinations
2  about lung cancer risks is evidence from
3  industrial cohorts of males.
4    And so there has never been an
5  evaluation of ovarian cancer risks in relation to
6  exposed women to chromium and nickel.  It's terra
7  incognita basically.
8  BY MR. KLATT:
9    Q   And so following up on that, you're not
10  aware of any evidence at all that women who have
11  used externally applied talcum powder to the
12  genital area have higher blood or tissue levels of
13  chromium or nickel compounds than women who've
14  never ever used talc at all, correct?
15    MS. PARFITT:  Objection.  Form.
16    THE WITNESS:  I've -- I'm not aware of
17  any evidence.
18    MR. KLATT:  I think that's all the
19  questions I have.
20    MS. PARFITT:  I have no further
21  questions.
22    Dr. Siemiatycki, you are done.  We will
23  read and sign.
24    Thank you, Leslie.
25    Thank you all.

Page 352

1    THE VIDEOGRAPHER:  This ends -- this
2  ends the deposition of Jack Siemiatycki.
3    We are going off the record at 9:28 p.m.
4    (Whereupon, the deposition
5    of JACK SIEMIATYCKI, Ph.D. was
6    concluded at 9:28 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 353

1    CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2    The undersigned Certified Shorthand Reporter
3  does hereby certify:
4    That the foregoing proceeding was taken before
5  me at the time and place therein set forth, at
6  which time the witness was duly sworn; That the
7  testimony of the witness and all objections made
8  at the time of the examination were recorded
9  stenographically by me and were thereafter
10  transcribed, said transcript being a true and
11  correct copy of my shorthand notes thereof; That
12  the dismantling of the original transcript will
13  void the reporter's certificate.
14    In witness thereof, I have subscribed my name
15  this date:  February 4, 2019.
16
17    _____
18    LESLIE A. TODD, CSR, RPR
19    Certificate No. 5129
20
21  (The foregoing certification of
22  this transcript does not apply to any
23  reproduction of the same by any means,
24  unless under the direct control and/or
25  supervision of the certifying reporter.)

Jack Siemiatycki, Ph.D.

Page 354

INSTRUCTIONS TO WITNESS

1
2     Please read your deposition over carefully and
3   make any necessary corrections. You should state
4   the reason in the appropriate space on the errata
5   sheet for any corrections that are made.
6     After doing so, please sign the errata sheet
7   and date it.
8     You are signing same subject to the changes
9   you have noted on the errata sheet, which will be
10  attached to your deposition.  It is imperative
11  that you return the original errata sheet to the
12  deposing attorney within thirty (30) days of
13  receipt of the deposition transcript by you. If
14  you fail to do so, the deposition transcript may
15  be deemed to be accurate and may be used in court.

Page 356

ACKNOWLEDGMENT OF DEPONENT

1
2     I,_____, do hereby
3   certify that I have read the foregoing pages, and
4   that the same is a correct transcription of the
5   answers given by me to the questions therein
6   propounded, except for the corrections or changes
7   in form or substance, if any, noted in the
8   attached Errata Sheet.
9
10  _____
11  JACK SIEMIATYCKI, Ph.D.          DATE
12
13
14  Subscribed and sworn to
15  before me this
16  _____day of_____,20____.
17  My commission expires:_____
18  _____
19  Notary Public

Page 355

1       - - - - - -
2       E R R A T A
3       - - - - - -
4   PAGE LINE CHANGE
5   ___ ___ _____
6   REASON: _____
7   ___ ___ _____
8   REASON: _____
9   ___ ___ _____
10  REASON: _____
11  ___ ___ _____
12  REASON: _____
13  ___ ___ _____
14  REASON: _____
15  ___ ___ _____
16  REASON: _____
17  ___ ___ _____
18  REASON: _____
19  ___ ___ _____
20  REASON: _____
21  ___ ___ _____
22  REASON: _____
23  ___ ___ _____
24  REASON: _____
25

90 (Pages 354 to 356)

Jack Siemiatycki, Ph.D.

**A**

**ability**
142:3 180:8 281:8
287:25 331:11
**able**
25:14,23 30:2
31:24 74:22 120:9
122:4 198:3
203:13 220:17
242:7 303:22
338:17 340:24
**absence**
204:8
**absolutely**
39:12 44:24 67:10
80:23 98:22 182:4
205:10 223:25
241:21 253:2
300:12 308:5
**abstract**
175:4 236:13
268:14 294:20
295:7,21 318:23
346:22
**abundance**
45:25 85:19
**academic**
124:4 278:22
**accept**
238:3 259:8 316:8
**accepted**
133:1 148:10 233:6
258:23
**access**
71:21 90:16 99:6
99:11,13 101:17
230:14,17 242:6
**accident**
65:17
**account**
172:17 213:7 319:7
319:12
**accumulated**
192:18 202:19
207:22 311:1
**accumulating**

132:22 282:12
**accurate**
145:8,9 223:7
245:13 354:15
**accurately**
113:12
**achieved**
134:1
**acknowledging**
165:6 239:14
**ACKNOWLED...**
356:1
**acquaintance**
190:12
**acquaintances**
139:14
**across-the-board**
159:16
**Act**
262:22
**action**
213:9 219:5 220:10
221:11,16
**actionable**
181:18
**actions**
219:10
**activity**
50:20 51:16 140:21
159:25 241:11
242:1 249:2
273:24 283:1
284:1 291:5,13
**actual**
145:13 197:1
295:20
**add**
228:6 336:24
**added**
106:19
**addendum**
6:18 17:6,16,23
71:18 82:14 107:4
107:9,17 203:14
**addition**
11:1,24 53:4 67:13

82:3 162:13
191:25 335:18
**additional**
41:11 46:22 143:7
143:23 163:19
311:1
**address**
59:3 68:19 84:13
327:3
**addresses**
344:10
**addressing**
163:20 334:2
**Adele**
190:11
**adenocarcinoma**
204:18
**adequate**
197:19
**adjudicating**
103:17
**adjust**
49:21
**adjusted**
106:25,25 107:2
319:3
**adjusting**
318:13,15
**adjustment**
107:14
**administering**
2:15 181:13
**administrative**
259:11
**adopted**
28:22 186:14 197:6
**advance**
18:19
**advanced**
281:6
**advantages**
23:9 197:13
**advisement**
191:21
**advisory**
230:20

**affect**
158:1,7 169:20
209:24 228:8
**affirm**
349:18
**affirmation**
276:21
**afresh**
286:13
**African**
340:3
**afternoon**
105:6 146:3 209:21
274:15
**agencies**
25:8 26:5,7 43:7,10
84:12,18,24 322:3
**agency**
20:1 43:4,7 85:18
128:21
**agenda**
140:4
**agent**
26:1 35:21 138:15
156:19 158:4
161:9
**agents**
138:8,12
**aggregating**
106:20
**ago**
11:12 19:22 56:19
77:11 81:16 82:10
124:5 125:7,20
126:1 129:16
134:19,21 139:4,9
191:7 257:24
274:21 275:16
306:13 311:23
317:17 339:21
**agree**
29:19 30:8 69:19
117:23 144:6
146:5,13,15 149:1
149:10,14 150:25
157:12 170:10,11

172:20 173:6,19
176:6 183:4
184:25 191:24
192:7 207:20
209:6 237:13
238:15 239:4,20
241:16 247:6
248:25 249:11
264:23,23 269:6
275:23 281:15
302:11 305:19
321:21 336:14,21
336:23,23,25
341:8
**agreed**
136:23 201:12
**agrees**
169:16
**Ah**
86:25 131:3 157:18
**ahead**
15:16 17:15 45:12
75:13 89:12 194:4
214:2,4 222:2
282:5 322:14
**aimed**
284:18
**al**
41:23 102:10
189:19 266:10
**Alastair**
3:16 11:3
**Alberta**
279:11
**albumin**
339:16,23 340:10
**alcohol**
159:24 160:23,24
282:25
**alert**
324:10
**Alexandria**
3:13
**algorithm**
25:24
**allegations**

59:17
allow
116:13,16 117:14
331:4
allowed
351:1
allowing
76:16
allows
25:24
allude
59:7
alluding
156:24 168:2,3
alternative
183:7 186:1 350:2
alternatives
186:18
ambiguity
83:10
ambiguous
226:22
America
274:19
amiss
222:22
amount
99:18 120:23 121:2
121:3,3,4,16
125:10,11 174:7
amounts
77:1 102:16
analogous
133:20 161:15
350:21
analyses
70:11 71:15,17
72:16 76:7,12
79:12,25 80:13,18
81:6 179:6,10
186:19 200:17
201:8,10,13 284:8
284:9 298:2
303:13 318:15
analysis
22:21 23:12 26:14

28:24 29:9 30:2
35:5 66:15 76:1
81:2 107:1 119:3
120:8 125:22
134:23 142:24
189:4 197:12,22
198:2,21 200:16
200:17,18,20,23
201:7,11,12,18
203:12 209:13
227:2,8 228:12
236:22 238:16,24
239:2,12 241:17
244:6,9 266:9
267:11,19 270:4,6
270:15,17 271:25
272:11,16 297:25
307:9 313:23
analyze
125:21 229:24
analyzed
126:8
analyzing
98:9 190:5
Anderson
102:18
and/or
30:24 353:24
Angeles
4:14 136:5
animal
144:17 152:23
153:21 302:2
311:20
animals
144:14
Anita
7:21 124:25 282:9
282:13 287:7
Anne
2:12
annotate
52:3
annotated
44:18
annotation

44:9
annotations
44:5 64:2 66:24
68:4 110:9,14
announce
127:11 128:3
answer
19:4 28:20 29:16
30:13 33:7 34:10
41:14 58:19 68:24
69:10 90:22 91:16
100:9 106:11
107:13 118:14
121:7 125:6
128:13,14 129:9
129:22 133:14
140:13,19 150:10
165:25 167:20
176:24 182:5,15
191:1 211:18
226:23 229:11
237:24 238:1
250:13 311:22
answered
94:22 104:1 129:21
131:25 251:11
276:18 278:3
348:10
answering
18:25 69:17 124:3
156:3 195:23
answers
72:23 77:17 356:5
antecedent
311:4
antenna
73:23 138:6
anticipated
70:13 114:15
anticipating
21:23
antihypertensive
38:12
antiinflammatory
288:4
Anybody

80:24
anyway
28:16 63:14
anyways
87:24
apart
42:6 98:24 124:21
apparent
168:13
appear
128:17 293:24
appearance
159:6
APPEARANCES
4:1 5:1
appeared
128:7 193:24
appears
108:3 109:1 202:9
203:7
APPEL
5:4
appendectomies
65:22
appendices
42:2 230:11,18
231:17,20 235:3
235:10
appendix
200:6,6,7
apples
179:20,22
application
69:13 119:2 121:16
122:19 244:4
246:18 289:2
331:13 341:10
applications
121:4,11 124:14
125:9 268:18
295:10 297:23
320:23
applied
22:8,20 23:12 36:4
121:5 126:25
209:7 339:2,22

340:23 346:12
351:11
applies
66:17 144:11
apply
23:20 39:12 269:7
353:22
applying
39:5 119:16 341:12
appreciate
157:23 234:8 236:4
310:9
approach
21:24 197:11
287:15 311:24
appropriate
268:25 270:22
354:4
appropriateness
244:4
approximately
53:6 55:19 119:9
147:6 203:14
approximation
55:11 118:23
architecture
180:20
area
21:4 39:12 42:6
65:16 73:24 78:11
82:23 83:8 100:2
100:8 104:11
115:12 119:24,25
120:1 143:6,25
197:21 219:21
220:23 291:5,12
301:19 315:5
317:5 334:14
338:13 339:3,23
340:24 341:15
351:12
areas
74:14 75:19 143:8
143:14 164:2
338:12
Argentina

85:24
**argue**
205:24 207:7
228:20
**argued**
227:21
**argument**
168:24 174:11
**arguments**
19:4
**arrangement**
49:17
**arrive**
25:24 185:11
303:25 310:25
**arrived**
40:9 77:17
**arriving**
159:1
**article**
8:8 37:18 44:13
81:25 82:15
123:22 127:7,13
175:23 192:19
193:14 194:23
195:1,9,12 198:18
201:21 220:18,21
222:14 223:7,14
228:5 230:15
254:24 291:19,23
295:16 305:1
317:25 318:4,23
327:2,17 328:4
339:10,13,16,19
340:19 341:6,9
343:17,23 344:2
344:14 345:6
346:14,16,18
347:12 349:9
**articles**
42:24 45:24 81:13
81:19 88:23
238:12 262:21,23
314:7,8,11 338:10
338:12,17 341:21
342:3,5,19

**articulated**
183:20
**artifactual**
319:12,21
**artifactually**
159:6 319:20
**artificial**
341:11
**artificially**
167:13
**asbestos**
95:25 96:3,13,17
96:21 97:4,14,23
98:6 102:1,8,14
102:17 103:2,6,22
314:12 339:14
**ASHCRAFT**
3:11
**aside**
123:21 132:7 135:6
271:10
**asked**
27:21 36:3 45:7
67:14 68:17 69:10
73:4 74:13,17
81:17 90:22 92:9
94:1,21 96:1 98:1
100:11 103:25
124:9 126:17,19
129:20 131:24
160:23,24 161:18
161:19 162:23
163:14 182:5
246:8 251:10
258:7 276:17
278:2 291:18
293:3,5 294:5,19
295:6 306:12,21
312:6,9,17 313:16
322:24 323:1,5,6
323:19,25 326:13
348:10
**asking**
38:1 73:20,21 91:1
91:5,6,7 148:20
173:15 182:17

194:15 231:2
244:20 253:7,8
261:4,9 273:14
293:22 304:12
312:3 325:7
346:16
**asks**
289:6
**aspects**
27:8 36:20 124:15
**assertion**
102:6
**assess**
166:2 313:25
**assessed**
268:18 295:11
**assessing**
67:5 311:25 336:18
**assessment**
207:21 255:2,20,22
256:8,18 257:10
257:15 258:5,9,13
258:16,23 260:19
261:8,22 262:4,6
263:4,18 265:1
292:19 299:18,25
300:1,25 302:16
302:19 303:24
304:1,13,15
305:11 321:12
326:8,13
**assessments**
257:21 321:15
327:21 328:5
**assigning**
27:10 33:21
**assistant**
49:16 71:20 73:20
81:9,10 82:9
286:12
**assistant's**
49:20
**assisting**
125:3
**assoc**
103:5

**associated**
59:4 144:18 176:10
202:7 287:4,16
318:18
**association**
75:18 102:24
126:13 146:21
147:18 148:14
149:6 150:19
153:2 155:8
160:21 171:17
173:22 174:13
177:11 178:5,12
189:8 192:2 202:9
203:6 204:5
205:18,24 218:3
230:6 245:4,9
249:18,21 252:17
253:11,13,25
301:11 305:5,13
305:24 311:9,11
311:15,16 317:24
318:11 327:15,25
336:16
**associations**
8:12 147:3,9 148:6
148:8,11,12 160:9
175:16 177:1,4,14
283:25 318:9,24
319:6 327:14
329:10,23,24
**assume**
237:22 251:1
252:24 254:20
334:4
**assumed**
189:20
**Assumes**
315:7
**assuming**
168:21,23 251:2
254:5
**assumption**
97:19 168:22 227:6
**assumptions**
30:1 299:10

**assure**
79:19
**assured**
316:17
**attached**
6:8,12 7:2,11,14,19
7:20 8:2,7 354:10
356:8
**attempt**
27:9,10 29:6,11
**attempting**
58:19
**attempts**
28:7
**attend**
233:20
**attention**
32:23 294:25
295:19 299:16
300:4 304:23
320:20 321:9
329:19
**attenuate**
169:18
**attenuating**
166:25
**attorney**
354:12
**attorneys**
11:24
**attributable**
329:25
**attribute**
26:22 117:15
**audience**
251:25
**August**
7:5,9 47:10,15,17
47:17,21,22 48:25
49:5 59:22 139:15
**Austin**
5:14
**Australia**
38:13 189:2
**Australians**
250:2,2

Jack Siemiatycki, Ph.D.

**author**
20:19 193:16 232:1
275:12 293:19
318:1 327:18
333:14 343:17
**authored**
20:7 306:18
**authors**
83:1 135:17 192:16
199:14 200:10
201:4 202:23
207:20 209:7
218:12 220:8
221:14,21 222:3
227:12 228:1
231:24 232:23
237:3 239:5,22
240:11,24 243:17
244:22 245:6,25
247:6 248:9,10
249:8,16 250:9,18
251:6 252:5,15
253:9,24 268:3,14
272:25 292:22
294:2 296:12
298:9 302:17
303:1,24 304:12
305:8,19 323:3
330:5 345:7
**author's**
101:9
**automate**
25:24
**automated**
25:18
**available**
21:17 37:23 42:19
60:13 73:19 74:18
75:16 89:2,4
106:12 115:11,15
142:17 143:24
187:2 204:2 237:8
237:15 238:1
240:9,11,23,24
241:2,3,4 301:8
301:22 305:15

306:1 309:12
**Avenue**
3:18 5:13
**average**
38:17
**averaged**
57:9
**avoid**
28:23 29:11 41:17
**aware**
14:4,7,8,9,10 37:6
73:25 75:6 90:5,7
112:23 144:20
159:3 164:24
239:8,22 256:13
258:15,21 264:16
282:9,19 350:9
351:10,16
**awareness**
221:10,15
**a.m**
1:20 9:7 52:19,23
67:24 68:2 140:23

**—— B ——**

**B**
6:7 7:1 8:1 88:22
89:4,8 91:24 93:3
200:6,7,21,21,23
212:9,16,16,18
213:17
**Baby**
59:17
**Bachelor**
279:8
**back**
12:11 32:17 35:15
39:19 52:23 63:21
68:1 69:12 73:4
77:12 78:13 96:16
96:18 105:4 121:1
141:1 145:25
152:25 155:4
165:24 190:18
196:5 199:16,19
201:20 210:8

231:4 242:23
243:1 255:15
257:4 265:17
274:11 275:4
280:20 286:16
290:4,11,11 299:7
318:5 320:15
322:18 336:4
343:13 348:14,15
**background**
148:3 303:6 321:2
345:9,18 346:17
346:21,21
**bad**
27:14 30:24 31:9
**badly**
209:22
**bailiwick**
249:2
**ballpark**
51:4 56:11 174:10
289:1
**banana**
126:21
**bar**
316:2
**Barring**
83:21
**base**
31:14 66:10 144:1
260:21 264:22
**based**
28:24 65:6 66:23
71:17 103:11
113:5 120:7 131:5
153:9 154:5 155:2
162:15 204:2
205:5 220:7
227:23 254:1
301:16,25 303:20
321:17 331:1,18
335:10
**baseline**
269:1,8
**bases**
309:23

**basic**
20:16 67:6 153:22
179:15,16 186:25
314:5
**basically**
38:11,15 73:5 80:6
80:9 81:12 97:6
97:20 101:21
169:16,17 230:12
237:22 351:7
**basin**
64:21,22 66:10
**basis**
29:5 93:4 96:22
127:14 154:19
183:5,6 185:21
202:22 253:23
254:5,6 304:10
315:2 331:15,16
331:17
**basket**
24:8
**batch**
100:17
**Baylen**
3:6
**bear**
74:16
**bearing**
182:4 241:21
**bears**
142:25
**beat**
128:8 193:21
**becoming**
51:18 84:11
**beer**
161:3
**began**
46:13 70:2
**beginning**
12:10 88:9 111:21
145:23 172:2
183:3 219:5
238:15 296:25
303:21

**begins**
52:21 62:2 63:10
64:14 86:8 105:2
206:18 210:6
242:21 296:17
301:1,2 327:10
337:6,24 338:4
**behalf**
3:3 4:10 5:3,10,17
10:2 98:17 141:7
324:11 325:2
**behavior**
178:13
**belief**
103:4,9 184:3
**beliefs**
311:1
**believe**
10:16 17:25,25
30:10 40:7 59:11
69:8 85:21 123:1
176:3 178:25
183:17 185:1
193:20 195:2
196:8 212:19
222:15 234:19
243:1 248:5
253:20 260:2
270:13 275:16
292:25 293:3
294:8,25 295:22
296:3 299:18
302:7 303:21
306:9,21,24
312:23 313:7,15
317:9,25 322:10
329:6 337:10,15
340:4 346:7
**believed**
270:13
**benchmark**
147:9
**benchmarked**
147:17
**bend**
133:22

benefit
31:10
benzene
162:6
Berg
89:20 90:2 91:18
Berge
7:19 42:7 63:11,11
63:17 77:14
111:12,12,22
128:6 192:13
193:16,20 194:3
194:23 195:2,12
195:21 196:9
199:13 200:9
201:3,21 202:5,23
206:7 222:19
224:6,8 235:19
237:19 238:16
239:5,24 247:2,22
247:25 248:4,9,9
251:7 253:10
266:21 267:11,16
267:19
best
25:3 54:3 125:1
128:21 182:5,24
186:12,15,16
321:17 322:6
beyond
121:23
biannual
226:14
bias
8:9 157:8,17,19,20
158:1,6,11,22,25
159:9,15 160:5,7
161:9 166:5,9,10
166:18 169:22
170:6,16,17,20
171:13,22 172:3
174:7 175:14
209:11,11 213:10
217:22,25 218:2,2
218:9 221:22
222:1,4 275:24

278:1 311:13
317:22 318:7,20
326:24 328:18
329:25
biases
165:17,23 169:20
169:23 170:2
172:1
bibliographic
81:12
bibliography
86:19 87:12,22
88:21 89:8 240:18
BIDDLE
4:18
big
42:1 43:1 53:17
58:2 207:16 326:1
342:20
bill
7:4,7 46:14 47:8,12
47:19 48:3 49:8
billable
49:22
billed
47:10,13 49:1,6,20
49:21 51:9 54:6
55:8,13,18,21
billing
51:12
bills
48:20 49:11 50:11
53:1 54:22
binary
162:10 270:25
336:16
binder
6:22,23,25 16:4
42:3,10,20,22,25
43:17,19,23 44:16
44:25 45:13 46:1
46:4 57:25 58:2
108:3 109:17
193:5 195:20
212:3 213:4
234:17,21,23

235:7 243:2 248:1
254:15,17 256:3
294:9 308:1
342:20
binders
14:17 18:16,23,24
19:19 39:21,23
40:2,9,10,12
41:11,17 42:12,23
43:1,16 195:12,19
236:1
biologic
156:24,24 157:3
333:6 337:3,5
338:3 348:15
350:5
biological
75:3,9,18 115:22
116:7 117:19
143:10 152:23
155:9 156:18
165:3,11 205:6
305:6,6 313:8,10
313:14,18,24
314:23 315:4,13
315:20,21,23,24
316:22,23 330:9
330:19 331:5
332:7 333:18
334:2,7,23 335:5
biologically
205:2 311:17
biology
153:22 163:21
164:23
biostatistics
279:18
bit
50:19 88:6 140:21
148:3 171:25
187:14 192:8
195:8 205:19
222:19 290:24
bladder
318:10 329:23
blank

332:20 333:23
block
53:18
blocks
159:1
blood
38:17,17 351:12
Blount
93:15 95:13 102:9
102:11
board
319:20
body
34:17 37:9 101:2
143:9 149:8 154:1
219:7
book
8:4 19:20,21 20:2
20:17,24 21:2,12
21:17 22:6,16
23:13 36:5 37:17
160:14 306:10,13
306:17,22 307:5,6
307:23 308:20
309:4,12 310:1,4
310:7,10,15
books
19:10,12,16 20:22
36:18 40:19
224:22
borderline
186:11
Borenstein
20:20 67:2
bottom
67:1 70:14 101:23
169:12 181:18
186:6 196:20,24
197:14,16 199:1
219:4 224:1,9
228:8 300:20
337:7,20
box
41:2
Bradford
244:6,8 304:13

305:1,9,11 315:21
brain
161:16,17
branch
255:25
branches
74:1
brand
115:3 120:11
brands
117:25
Branscome
4:11 6:3 9:22 10:1
11:8 12:7 15:8
16:7,11,20 17:14
17:20 19:14 20:21
22:12 23:10,19
30:6,25 32:14
34:5 35:13 36:2
39:14 44:2,22,25
45:3,9,12,25 46:8
46:17,24 47:1,23
48:12,16 52:14,24
53:13 54:5,12
55:5 58:8,12
60:14 61:12 62:20
67:20 68:3 70:1
71:3,10 72:6
73:14 75:23 78:18
78:21 81:7 85:5
85:13 86:6 89:16
90:18 91:4 95:4
96:4,12 99:16
101:4 102:19
104:5,14,21 105:5
108:8,10,21,24
109:16,25 110:5
111:18 112:8
116:6,20 117:4,9
118:4 119:10
120:6,17 122:5,17
123:15 125:12
126:3 129:25
130:10 132:6
133:6 134:2 137:6
140:11,17 141:3

145:16 146:2
150:24 151:8
152:4,16 154:11
154:23 155:24
156:2,13 162:8
165:15 167:21
173:5 175:7
176:14,21 177:19
178:14,19,21
185:13 188:24
191:17,22,23
192:10,21,23
193:2,12 194:4,10
194:13,21 199:11
199:22 201:1,25
203:4 204:1
205:11 206:12,17
209:5,25 210:9
211:13,14,17
212:11 213:23
214:9 218:18,24
221:1 222:10
223:11 224:11
225:5,20 227:10
231:15 234:6,9,16
234:19 235:1,4,11
236:2,9 239:16
240:7,19 241:5
242:8,11,14,24
244:21 246:24
247:18 249:6
250:6,16 251:19
252:13 253:5,15
253:22 254:7,13
255:9,17 257:6
258:20 259:2
260:25 261:6
262:3,12 263:15
264:3,18 265:9,11
265:19 267:4,17
270:9 272:2,19
273:12 274:4
275:17 291:15
292:1,10 293:5,14
294:19 300:8,14
300:18 302:5,25

304:2 307:3,12
308:3,13 309:16
310:2,5 312:9,18
314:2,24 315:7
317:16 322:12,21
326:21 328:6,9
330:17 331:3,20
332:3 334:9,19
335:7,16,24 336:6
**break**
41:6 52:16,25
63:22,22 64:6
78:15 87:5 104:15
105:9 106:3 107:8
107:20 135:24
140:10 145:17,19
194:13,14,16
199:23 210:1
242:9 322:13
**breathed**
350:19
**BRENNAN**
4:17 308:23,25
**brief**
324:4
**briefly**
265:12 335:25
**bring**
15:20 16:22 18:1
  18:14 20:23 46:9
  235:9
**broad**
22:22 162:24
**broader**
303:6,8
**broadly**
12:13
**brought**
16:24 17:3,5,5
  18:11,15,15,22
  19:3,5,9 20:23
  22:6,13 24:20
  36:10 37:5 39:19
  39:20 41:13 42:12
  44:6,19 61:18
  72:20 109:14,22

110:13
**building**
132:19 133:10
**builds**
226:2
**bulk**
123:1 180:4
**bunch**
112:14 170:1
**burden**
81:3
**bureau**
256:1
**burner**
84:12
**butchered**
142:3
**button**
256:22
**B-O-R-E-N-S-T-...**
20:20

———————
**C**
———————
**C**
3:1 6:1 9:1
**caffeine**
283:25
**calculate**
106:7 121:14
**calculated**
77:23
**calculates**
234:2 236:11
**calculating**
268:9
**calculation**
77:7,20 107:6,15
  121:21
**California**
4:14 38:13
**call**
86:17 87:12,21
  124:18 146:25
  170:21 186:18
  200:20 223:20
  243:24,25 316:12

called
19:20 20:15,18
  76:2,3 79:24
  86:18 112:12
  175:13 229:20,21
  244:2 298:16
  343:18
**calls**
185:23 188:20
**Campbell**
81:20,22 82:3,10
**Campus**
4:19
**Canada**
1:18 2:6 9:9 38:13
  43:3 50:21 51:17
  52:1 56:20 84:3
  84:10 233:14
  241:12 255:23,24
  255:25 256:18
  257:10,22,24
  258:5,13,16
  264:10 265:1
  275:8,18,25
  291:24 292:4,8,19
  293:8 294:3
  299:16 320:23,24
  321:22 323:4
  326:8,12
**Canadian**
41:23 43:12,14
  230:20 262:21
  263:12
**cancer**
6:21 7:14,17 8:5,13
  12:18 13:11,16
  19:21,23 20:1,25
  21:1,9,12 24:16
  33:13 36:6 38:24
  43:9 56:18 57:19
  58:23 59:3 65:7
  65:11,20 66:12
  69:15 75:4,10
  78:11 84:20 88:11
  89:25 90:23 97:18
  103:16 113:9,15

115:2,24 116:9
117:2 118:7 119:6
119:14 120:1,10
120:19,21,25
121:15 122:9,20
123:18,24 124:1,6
124:8,22 125:24
126:6,14,20 127:8
127:22 128:4
129:1,19 130:2,6
130:15,15 131:8
131:16,22 132:11
132:21 133:21,23
134:7,10,15,23
135:1,6,19 137:1
141:9,18 142:4
143:1 146:8 147:5
147:8,18,22,24
148:7,13 150:6
151:12 152:12
153:11 155:1
157:14 161:2,16
161:18 164:5
165:4 167:12,12
168:4,14,18,24,25
171:4,7,16,18,19
172:9,11,23 173:8
174:14,20 175:16
176:2,8 177:2,3
177:11,12,15
181:20 182:2
189:9,15,17
190:16 192:4
193:18 202:8
204:6,15,16,19,22
204:23,23 205:1,2
205:9,25 213:9
215:14 216:4,9,17
216:25 218:4,16
227:9 230:7,22
232:20,23 233:20
237:10 243:13
247:8 248:11
250:10,20 251:9
252:9 253:12
259:22 261:2

267:9,22 268:7
271:13 272:13
273:3 275:19
276:3,12,15 277:8
277:16 279:25
281:4,5,14 282:9
282:17,24 283:13
283:15,24 284:15
284:17 287:2,5,18
288:6,15,22
296:15 297:9,24
301:12,18 302:10
302:24 305:14,25
306:14 307:11
308:20 309:5
311:4 312:8,16
313:19,24 314:22
315:6,14 316:25
317:5,25 318:10
318:10,10,13,18
319:19 329:10,23
329:24 330:10,21
331:7 335:10
343:19 345:12
350:14 351:2,5
**cancers**
168:11 171:10
203:16 204:11,13
281:2,12 284:16
319:11,14 350:18
**cancer/talc**
81:17
**capable**
103:3,17 263:3
273:20,21,22
338:11
**capricious**
191:2
**capture**
30:21
**captured**
156:22 333:12
**carcino**
142:2
**carcinogen**
145:8

**carcinogenesis**
312:12
**carcinogenic**
122:16 145:14
219:6 314:9,10
**carcinogenicity**
20:4 99:10 142:2
144:12,13 153:13
**carcinogens**
122:13 147:10,11
147:25 148:15
**carcinoma**
204:18
**care**
214:3
**career**
26:4 162:1
**careful**
179:24 254:9
**carefully**
185:18,18 338:10
354:2
**Carolina**
219:22
**CAROLINE**
5:18
**caroline.tinsley...**
5:23
**carried**
27:20 33:15 77:14
79:21 97:12
118:17 132:2
180:3 189:1
196:15 209:2
266:9
**carry**
40:19,25 121:20
142:13 170:7
171:3
**carrying**
270:3
**case**
9:12 10:7,11 12:11
12:15 13:18 16:25
21:19 27:24 38:23
42:21 47:11,14

50:8 53:12,17
58:14,17 59:13,17
59:20 60:1,4 64:5
65:14 66:4,4,5,7
89:20 90:2,21
113:13 124:7
127:16 135:12
143:18 148:5
151:10 154:22
160:9,22 168:7
176:8 181:16
188:21 190:24
194:23 220:12
256:10 261:10
265:3 274:19
318:6 326:16
337:2
**cases**
1:12 56:18,20
59:13,15 64:23
65:8,16,19 66:6,8
66:11 76:20 114:1
159:18 160:20,23
160:25 161:6,18
161:23 166:11,14
166:16,23 168:25
169:5 170:9,24
190:20 197:3
200:24 212:7,9
216:3,15 217:7
274:23
**case-control**
125:3,14 126:10
142:23 146:6,16
159:11,12,18
167:18 168:16
170:7,18 189:1
202:10 205:17,19
283:16 287:3
**case-controlled**
23:7
**case-control/coh...**
206:4
**catch**
140:3
**categories**

76:25 107:1 144:25
158:14 164:8
214:25 215:10
229:19 251:4
**categorization**
299:8
**categorize**
153:3,5
**categorized**
27:23
**category**
17:2 88:24 100:25
145:9 147:13
171:23,24 214:19
214:20 216:25
225:16 227:5
269:1,8 336:17
**causal**
58:22 103:5,5
114:13 115:9
131:7,14,21
132:10 148:11
150:18 153:2
155:8 156:10
157:11 160:21
249:18,21 253:13
253:25 301:22
302:4,8 303:25
305:16 306:2
310:19
**causality**
23:1,2 115:17
117:15 119:4
152:1 304:13
310:21 311:4,25
316:1 335:6
**causation**
21:9,20,21 35:21
130:17 243:19,23
247:13 249:22
271:1
**cause**
69:15 113:8,14
115:2,23 116:8
118:6 120:19,21
121:15 127:8

128:4,25 130:2,8
130:9,11,14,14,15
130:19,20,21
134:6 135:1,6
141:9,17 142:4
151:12 152:11
165:4 182:1 237:9
247:8,17 248:11
249:4,5 250:10,20
251:9,14,21 252:8
310:17 317:5
330:20 331:7
335:9
**caused**
97:15 155:11 161:2
182:23 222:5
**causes**
19:22 119:13
129:18 130:6
174:19 204:22,22
204:23 271:12
288:15,22
**causing**
156:20 313:19,24
**caution**
46:1 85:19 328:24
**cell**
46:11 161:16,17,19
161:20,23 204:18
204:19,19
**Center**
2:5 9:9
**century**
118:10
**CEPA**
264:7,17
**certain**
15:20 72:13 83:4
88:15 98:22 118:8
118:23 119:24,25
137:24 154:19
162:16 174:7
184:5 282:10
**certainly**
22:3 59:5 70:16
73:11 122:22

123:5 129:14
141:11 158:24
160:7 207:2
211:18 261:16
319:24 344:11
**certainty**
103:21 113:7,18
114:6 117:20
131:7
**certificate**
353:1,13,19
**certification**
353:21
**Certified**
353:1,2
**certify**
353:3 356:3
**certifying**
353:25
**cervix**
340:25
**cetera**
35:10 38:20 46:11
64:11 138:15
146:22 159:14
160:2 179:23
196:20,20 226:8,9
**chair**
136:14
**challenged**
21:22 67:15 102:15
**challenges**
21:23
**chance**
105:7 123:12 321:6
329:24
**Chang**
272:7
**change**
70:14 84:9,15
137:18 143:2,5
181:19 191:1
255:23 311:2
355:4
**changed**
13:3 56:13 57:1

71:24 84:6 112:19
137:7 162:24
163:4,15 195:14
195:15 246:19,23
289:3
**changes**
71:4 137:14 187:6
187:9 195:16
354:8 356:6
**chapter**
22:25 23:3,5
307:24 309:7
**chapters**
22:5,18,24
**characterization**
146:6
**characterize**
148:6,21,23 185:7
**characterized**
148:21,23 207:13
**charge**
54:13,17
**check**
41:6 87:5 106:4
107:7
**checkmarks**
112:17
**chemical**
144:8,11,25 152:14
154:14 155:10
**chemicals**
138:2
**cherry**
35:16
**cherry-picking**
29:10 34:12,15
35:19
**choice**
254:10 270:16
**choices**
281:11 284:13
**choose**
65:6,21 146:11
208:10
**chose**
37:2 177:13 197:1

208:10
**chosen**
197:3 208:4
**Chris**
11:3
**Christmas**
257:17
**CHRISTOPHER**
3:4
**chromium**
350:6,10 351:6,13
**CHUM**
2:5 9:9
**CIR**
102:18
**circle**
201:21
**circumstance**
119:20
**circumstances**
130:16
**citation**
238:16
**citations**
102:18
**cite**
135:17 175:17
265:22 267:6
341:22 345:23
346:18
**cited**
261:23 338:10
346:1 347:1
**cities**
118:18
**citing**
339:4,6
**claim**
141:8 216:18
218:15
**claimed**
102:1 315:24
**claims**
98:5
**clamp**
48:8

**clarification**
137:8 157:23
212:12,21
**clarified**
12:23
**clarify**
40:1 121:2
**clarity**
72:21
**class**
179:1,5 213:9
219:5,9 220:10
221:11,16
**classic**
132:21
**classification**
136:24 144:10
149:2,4 150:5,12
151:16,22 152:13
251:3 263:19
267:9
**classified**
144:7 149:6 154:15
168:11
**classify**
151:3 154:20,21
**clean**
108:11,18 110:8
140:15 224:21
**cleaning**
125:20
**clear**
40:8 48:12 50:25
61:13 83:5,24
109:1 111:19
153:4,11 172:6
271:16 275:5
**Climate**
255:23
**clinical**
38:10 180:3,5
**close**
154:17
**closely**
118:24 166:8 240:2
241:8 326:15,19

**closer**
327:23
**coauthored**
232:16
**coauthors**
149:21
**coded**
27:23
**coefficients**
207:14
**coffee**
125:8 135:9 262:10
**cognizance**
261:13
**coherence**
79:21 305:7 334:15
**cohort**
23:7 142:23 159:11
167:18,25 168:8
171:3,3,12,13
205:21 224:13
226:5
**cohorts**
351:3
**coinvestigator**
124:19
**colleague**
124:3
**colleagues**
10:23 135:9
**colleague's**
124:24
**collect**
25:2 171:4 226:11
**collected**
24:3 88:8 126:7
177:5,6 208:18
220:1 229:15,25
322:7
**collecting**
25:10 304:8
**collection**
31:12 36:12,14
125:19 226:11
229:5,9
**colon**

202:16
**Columbia**
2:14
**column**
112:11 219:3 220:1
327:9 329:19
**combination**
197:25 241:24
**combine**
153:21 198:3
271:25
**combined**
225:18 266:11
297:9
**combines**
270:17
**come**
19:11 21:10 28:5
55:22 63:21 65:3
65:15 73:22 74:3
78:13 80:22 89:8
90:19 95:24 96:14
99:9 102:7 128:20
226:10 261:10
**comes**
25:4 90:17 137:23
179:7
**comfort**
261:17
**comfortable**
108:16 114:10
**coming**
65:12 70:8 136:6
201:21 253:6
**comment**
259:14 260:7
346:20 350:4
**commented**
247:13 304:25
305:4 310:1
**comments**
259:8
**commercially**
37:22
**commission**
356:17

**committee**
13:13 28:10 259:9
259:10
**Committee's**
6:13
**common**
126:16,16
**commonly**
22:4
**communicated**
10:20 191:14 233:2
326:6
**communicating**
128:11
**communication**
293:6 294:2 324:9
**communications**
114:3 231:11 275:7
275:11 324:16
326:3
**communities**
118:18 119:21
**community**
37:6 85:2 104:7
131:19 132:4,8
172:21 279:13
316:11
**companies**
92:7 120:4
**company**
92:5,19 96:25
118:24 119:22
120:2 314:15
**comparable**
179:20
**compare**
168:20 177:18
187:14,15 216:7
216:22 223:14
**compared**
99:20 161:7 168:13
177:17 203:19
216:19 217:9
237:18 269:23
270:2 297:10
298:13,25 341:11

**compares**
200:8
**comparing**
159:20 237:20
319:2
**comparison**
38:20 158:13
187:12,17 206:5
217:15 223:16
237:17 238:2
298:5
**comparisons**
208:15
**compatible**
122:23 123:9
217:21,24 243:11
267:20 298:25
**competent**
129:3 310:23
**competing**
334:6
**competition**
138:12
**compile**
203:13
**compiled**
322:7
**compiling**
87:23
**complementary**
269:24
**complete**
17:23 22:16 28:19
110:7 137:15,16
137:19,22 138:21
139:1 141:14
329:20
**completed**
94:8,11 125:18
128:7 256:15
**completely**
77:15 209:17,18
266:23 270:17,20
**completeness**
15:23 337:16
**completing**

96:6,11
**complex**
310:23
**component**
201:15
**components**
26:19 30:23 31:8
32:11 33:17 50:18
197:8 272:8 324:3
**composite**
297:6
**composition**
74:15,25 75:9
92:10,14
**compounds**
350:6,11 351:13
**comprehensive**
76:3 237:7,14,25
**comprised**
34:4
**computation**
270:23
**computer**
71:11,20,23 72:4
79:12 80:14
**computers**
71:24
**conceivable**
103:14
**concentration**
264:9
**concept**
183:25 184:19
252:25
**concepts**
246:12
**concern**
88:11
**concerned**
71:22 197:7 299:5
**concerning**
143:8 219:6 310:18
314:7 331:17
**concerns**
344:11
**conclude**

248:10 249:3,5,12
251:8 264:6 268:4
269:14 273:1,15
305:8,10,21
**concluded**
247:7,16 248:13
273:8 352:6
**concluding**
208:16 253:23
**conclusion**
32:2 35:20 36:1
113:1,5,12 122:25
132:15 151:11
152:10 204:4
228:13 237:1,4
239:21 240:2
247:12 248:8
249:18 250:8
251:18 254:10
262:14 263:23
264:1 267:20
321:17 330:4
335:8
**conclusions**
31:23 126:4 128:19
158:2 195:3 196:9
222:16,18 247:21
262:20 263:4
310:25
**conclusive**
347:24
**concocted**
21:25
**concordant**
263:9
**concurred**
200:18
**conditions**
79:22,23 264:9
**conduct**
67:7 73:15 78:22
134:13 138:21
139:1
**conducted**
37:21 98:9,15
149:15,22 180:5

226:13 260:15
266:14 283:16
292:7,9
**conducting**
21:5 79:10 132:7
141:21 142:1
210:11 310:13
**confer**
191:17 322:13
**conference**
139:15
**conferences**
135:10
**conferring**
61:11
**confidence**
196:18 207:2,3
223:19 236:15,19
236:21 297:12,15
297:16 316:4
**confident**
80:10 104:12
**confirm**
17:21 110:6,11
192:12,17 214:15
245:18 263:1
273:14
**confirmed**
202:17 206:24
**conflict**
260:10 275:20
276:8,24
**conform**
262:24
**conformity**
263:11 322:2
**conforms**
262:23
**confounder**
158:19 178:13
318:21 319:8,19
319:23
**confounders**
288:9 319:7,10,14
**confounding**
8:9 156:8,17,21

157:1,2,2,17
158:11 171:23
172:3,8,15 173:11
173:20 174:1,6,12
174:12 175:14
176:1,5,7 178:6
311:13 317:18,22
318:7,20 319:16
320:3 326:24
327:3 329:25
**confusing**
63:20 248:6
**confusion**
40:13
**conglomeration**
266:13
**Congress**
5:13
**connected**
98:21 176:11
**connection**
47:13 48:22 50:7
51:20 53:8 54:7
54:14,18,25 56:2
56:9,13,25 57:16
57:21 69:10 73:16
80:17 84:2,19
98:17 100:13
123:24 125:14
126:11 127:4
146:7 164:4
240:10 323:3
**conscious**
87:11 167:5
**consciously**
87:21
**consens**
132:19
**consensus**
128:17,24 129:5,17
131:18 132:3,10
132:19 133:5,9
310:20 329:4
**consensuses**
311:2
**conservative**

85:7
**consider**
27:4 35:4,19 74:19
74:24 75:2 90:11
140:6 142:16
151:4 173:21,24
183:8 188:16,19
199:14 201:3,6
204:12 224:13
251:16 272:21
314:22 317:3
323:13,14
**considerable**
26:17
**consideration**
34:19 36:23 328:17
**considerations**
21:7 99:21,23
304:25
**considered**
20:6 25:16 26:16
33:11 68:20 78:7
142:18 147:9
158:14 165:20
169:24 173:24
218:2 239:5,9,10
239:18 256:9
265:24 314:25
317:6 321:14
327:24 329:5
**considering**
26:25 32:2 335:19
**consistency**
67:5 75:21 102:25
299:5 305:5
313:12
**consistent**
146:9,10,14 156:16
222:18 237:4
240:3 265:23
301:10 305:12,22
305:23
**constellation**
130:16,19
**constituent**
137:22

**constituents**
117:17 339:2
**constitute**
264:9,10
**constituted**
286:11
**consult**
99:1 258:7 313:25
**consultant**
276:11 277:1
**consultation**
259:6
**consulting**
278:8
**consumed**
119:24 161:3
**consumer**
115:11,15,15
**consumption**
159:25 160:24
**consumptions**
160:25
**contact**
56:17 275:6,10,18
323:2,14,20
**contacted**
10:13,18 258:11
**contain**
22:19 41:14 48:20
49:13,15 68:14
69:4 110:9,14
**contained**
36:5 40:24 72:25
84:7 149:16 256:3
262:6
**containing**
6:22,23,25 46:2
**contains**
18:20 20:3 22:25
23:3,5 41:22 42:4
42:17 46:4 61:19
233:24 234:19
235:18
**contaminant**
115:24 116:9,10
**contaminants**

103:22 116:25
339:2
**contaminating**
103:7
**contamination**
96:21 97:5,7,20
98:6 103:2 349:14
349:20
**contend**
22:19 164:2
**content**
68:25 258:8 314:13
**contentious**
205:20
**contents**
41:16 101:14
235:13 309:6
**contested**
184:14
**context**
21:25 127:25 135:2
140:1 167:18,20
167:25 168:14,16
172:8 173:25
179:8 269:19
270:1
**contexts**
167:23
**continuation**
296:3
**continue**
297:20 302:22
328:15
**continued**
4:1 5:1 7:1 8:1
275:17
**continues**
202:13 296:6
327:20
**contraceptive**
287:19
**contracted**
292:3
**contradict**
98:4 100:12 232:13
340:20

**contradicts**
98:5 346:22
**Contrast**
163:11
**contribute**
172:22
**contributed**
289:14 332:10
**control**
54:21 65:6 66:1,4,5
66:6,8 74:11
124:8 160:10
177:16,17,18
216:20 217:16
284:17 288:8
353:24
**controlled**
27:25 177:15
**controls**
64:22 65:10,21
66:7,9 76:20
160:20,24 161:7
161:19,24 166:11
166:14,16,23
168:20 170:15,16
170:24 216:8
**controversial**
122:14 148:4
161:22
**controversy**
133:3 310:18
**convenient**
268:1
**conventional**
268:11
**conversation**
139:18 140:2,7,8
141:25
**conversations**
141:24
**convince**
281:21
**convincing**
154:8,9
**cookbook**
25:1

**copies**
46:22 86:15,15
88:4,5,7 175:1
191:4 307:25
308:1,6,14 332:23
**copy**
16:3,8 17:11 18:6
18:12 44:4 46:15
46:18 52:10 61:6
61:15,17 64:1,7
66:25 68:5 89:18
100:22 101:23
108:13,16,18
109:22 110:7,8,12
112:13 174:18,25
225:2,24 234:7
235:2 248:2 255:6
256:17 257:9,15
268:1 285:19,21
294:13 300:11
307:23 308:3
353:11
**copyright**
286:16
**copyrighted**
280:22
**corner**
45:23
**cornstarch**
92:22
**corporation**
54:21,24
**correct**
34:12 39:22 47:12
49:2,3,6,7,9,10
50:12,13 51:14
57:19,20,23,24
58:14 59:10,13,18
59:19,23,24 60:1
60:2,17,22,23
63:6,13 70:11
87:9 103:18
109:17,24 110:2
113:19,20 117:5
119:7 120:12,14
127:25 128:1

136:18,19 137:1,3
137:10,11,12
142:8 144:8,9,14
145:4,14,15
149:18,19,23,24
150:2,3 151:5,7
155:3 162:11,16
163:16,17,22
164:15,16 165:14
165:20,21 167:14
172:14,18,19,23
173:9,23 176:15
179:2 183:6,10,11
184:23,24 185:4
186:5 188:10,13
188:14 191:15
192:14 193:18,19
209:8 210:12,18
211:4,9 212:15
213:11,12,15,16
213:21 214:21,25
215:6,7,10,11,16
215:25 216:1,5,6
216:11,12,20,21
217:3,14,19,20
218:6,19 220:5,6
220:6,11,18,19,23
221:12,13,17
222:5 224:14,15
229:1,2,6,7 232:6
233:25 234:1,3
235:5,6 236:12,16
236:22,23 238:7
238:17,18,19,20
239:2,3 243:23
244:7,19,25 245:4
246:6 247:4,19
249:8 250:21,24
252:18 254:2,4
255:20,24 256:4,5
258:16 265:4
267:12,22,23
268:21 269:10
271:2,19 272:23
272:24 273:4
275:8,9,14,15,21

276:4,16 277:10
278:18 279:3,12
279:19,20,22,23
280:1,2,4,10,18
280:22,23 281:2,8
281:9 283:2,3,19
283:20 284:2,3,20
284:21,23,25
286:9,17,24 287:5
287:10,20 288:9
288:16 292:8,15
293:13 296:18
301:4 304:20,22
304:22 306:19,20
318:1,2 321:6
327:18,19 329:15
329:16 330:13,23
331:24 332:2
334:3,6 335:2,4
335:11,23 337:9
337:10 339:7,8,23
339:25 340:8,9,14
340:15,17 341:1
342:1 343:20,21
343:25 344:15
345:14,20,21,23
345:24 346:12,24
347:3,6,7,10
348:6 350:7,11,12
350:15,16,19,20
350:22 351:14
353:11 356:4
**corrected**
172:1
**correcting**
63:14
**correction**
62:13 110:20
111:16 112:9,11
328:3
**corrections**
18:9 61:20,23
62:23 63:24
110:24 111:25
112:21 354:3,5
356:6

**correctly**
79:17 113:10
116:19 131:10
183:1 202:11,12
202:20,21 237:11
268:20 288:11
301:7,13,23
321:19 327:15
328:1,10,20 329:1
329:11 330:2
**correspond**
62:7 319:1
**correspondence**
191:5
**corresponding**
235:25
**corresponds**
169:14
**corroborate**
270:21
**corroboration**
197:4
**cosmetic**
118:1 343:20
**costly**
196:19
**counsel**
9:15 15:24 16:2
18:19 40:17 46:23
49:20 51:9 55:9
55:13,21 61:11
70:25 74:2,13
89:9,15 90:4 91:2
92:4 94:19 95:16
97:11 98:1,18
100:14 105:15
155:21 177:23
211:10 235:21
274:5 276:3,15
277:16 300:16
320:7 322:10,25
323:1,9 324:12
325:2 326:14
328:2 332:5 334:1
336:7
**count**

67:12 232:10
**counted**
232:13 245:14
**counting**
64:11 67:3 245:15
**countries**
118:19 182:13
**couple**
10:22 18:3,4,22,23
  49:16 50:21 51:2
  63:8 70:9 74:6
  76:14 102:2 175:4
  189:10 195:25
  229:10 274:7
  306:7 309:19
  310:11 318:22
**course**
45:5 79:13 117:10
  134:18 179:7
  192:21 193:10
  234:6 265:13
  302:18 306:24
  307:7 313:22
**court**
1:1 2:13 9:11,16
  109:4,6 186:16
  302:22 354:15
**courtroom**
151:19,21
**courts**
151:24
**covariates**
106:25
**cover**
50:6 252:1 254:19
  258:19 285:7
  303:6,7
**covered**
49:18
**covers**
41:21 47:13 48:3
  48:25 49:4
**Cramer**
136:4 339:6 342:13
  343:3,5,18 345:6
  346:10,17 347:8

348:5,20 349:12
**Cramer's**
272:8
**create**
169:1 174:2 319:12
**created**
133:4 288:25
**creates**
180:24
**creating**
319:20
**credibility**
334:16
**credible**
316:3,10 330:12,22
  334:21,25
**criteria**
153:12 243:19,23
  243:25 244:1,1,2
  244:7,14,23 246:1
  246:4 264:6
  305:23 311:2
  327:10,12
**criterion**
245:3 246:18
  315:23
**critical**
184:5 284:20
**critically**
26:7
**criticism**
29:11 34:12,15
  66:16 199:9
  246:10
**criticisms**
198:21 241:6,9
  246:3,11
**criticize**
245:25 246:16
**criticized**
29:10 246:15
**criticizing**
172:4
**crossed**
136:4
**cross-examination**

227:20 290:18
**crucial**
325:6
**crude**
288:7
**cryptic**
83:2 229:4,9 230:2
**CSR**
353:18
**ctisi@levinlaw.c...**
3:9
**cultures**
250:1
**cumulative**
198:8 202:17
  206:23 297:5
  298:1
**current**
21:13 117:23 248:4
  263:19 283:24
  320:23
**currently**
56:1 92:11 144:7
  173:8 237:7,15
  238:1 281:7 283:2
**curve**
122:1
**cut**
289:1 329:7,8
**cut-and-pasted**
281:24
**CV**
175:20 232:10,17

---

**D**

**D**
9:1 288:3
**da**
206:24,24,24
**Dan**
293:22
**danger**
264:10
**dangerous**
26:1,1
**Daniel**

232:2 292:21 293:1
  293:13
**Daniels**
59:13
**data**
21:7,9 24:4 25:2
  31:13,14 36:12,13
  36:14 39:8 74:18
  82:18 83:2 116:23
  120:15 122:3,22
  123:8 125:19,20
  142:14,15,18
  144:17 162:15,22
  179:15,16,19
  184:12,22 185:3
  186:17 189:21
  201:5 208:18
  215:13 220:1
  222:25 223:4,6,9
  223:13 229:5,9,15
  229:24 230:1
  237:8,15,18
  239:13 250:19
  271:11 272:20
  273:15 283:22
  298:25 301:22
  302:2,2,3,3 304:9
  304:10 305:15
  306:1 322:6
**database**
82:12 142:20 189:9
**dataset**
191:10 198:3
**date**
9:6 54:6 214:19,20
  215:20 353:15
  354:7 356:11
**dated**
7:10 47:9 57:22
  58:5 60:21 61:2
  98:20 255:20
  299:18
**day**
11:22 21:10 25:1,2
  53:22 77:1 83:17
  121:5 212:24

245:8 290:22
  356:16
**days**
11:23 12:12,20
  18:4 51:3 121:5
  126:2 227:19
  231:22 354:12
**DC**
5:7
**de**
114:3
**deadly**
281:5 287:17
**deal**
171:20 197:7 326:1
**dealing**
38:22 39:4 44:16
  159:8
**dealt**
92:19
**debate**
104:7 334:22
**decades**
160:17 306:25,25
  307:8 309:25
**December**
50:20 51:17,24,25
  52:9 59:10 231:18
  241:11 255:20
  299:18 305:20
  323:22
**decide**
90:4 154:4
**decided**
29:11 208:10
**decimal**
223:24 228:9,18,18
**decision**
28:23,25 29:7
  34:10 88:22
  143:18 154:2
  188:23 189:25
  227:21,22 241:25
**decisions**
26:9 38:2 39:1
  138:17 209:12

Jack Siemiatycki, Ph.D.

210:10 222:25
**decline**
207:12,13
**declining**
208:21 209:1
**deemed**
354:15
**DeFelice**
5:25 9:4
**DEFENDANTS**
4:10 5:10
**defense**
214:3 334:1,18
**defer**
58:15 316:6
**deferring**
164:10
**deficient**
197:19
**define**
68:10 158:4
**defines**
68:12
**definite**
155:5
**definitely**
316:10
**definition**
144:10 145:13
**definitions**
20:17
**definitive**
122:25 123:1
154:10,13,18
190:4,16 195:11
**definitiveness**
154:24
**degree**
8:8 103:21 113:7
113:18 114:5
117:20 131:6
162:16 166:15
175:13 197:4
204:17,20 209:9
209:10 317:22
326:24 328:18

**deliberately**
86:17 344:25
**demerits**
228:21
**demonstrate**
269:9 271:1 283:12
**demonstrated**
103:6,10
**demonstrates**
181:21 269:15
**demonstrating**
296:14
**denied**
253:3
**denominator**
129:8
**deny**
198:17
**department**
43:14 65:21,22
124:5 134:9
230:20 257:24
278:23
**depend**
121:7 224:2
**depending**
56:15 186:9
**depends**
26:7 32:5 37:7
153:19 154:17
170:14 178:12
179:14 181:4
223:23 269:22
270:17 271:3
**deponent**
9:14 356:1
**deposing**
354:12
**deposited**
344:25
**deposition**
1:16 2:1 6:9,11,16
7:3 8:3 9:8,25
10:7 12:9,16
13:21 14:14,14,23
14:24 15:11,20,21

16:1,15,23 17:4
18:19 21:18 41:15
44:18,20 45:1,17
46:10,12 50:12,15
50:19 51:14 52:22
59:9,12 61:24
93:7,11,21,23
94:19 95:15
102:11,12 104:24
105:3 145:24
169:9 175:24
210:7 227:19
242:22 246:5
274:22 291:2
352:2,4 354:2,10
354:13,14
**depositions**
45:7 93:8 94:2,16
332:12,16
**derivative**
114:11
**derived**
24:11 115:9 119:15
267:3
**describe**
41:16 47:6 72:8
135:11 172:7
210:20 229:19
230:1 235:12
243:18 250:18
252:8,16 253:11
265:20 287:12
307:6 310:15
**described**
21:3,3,5 23:13
24:18,19 35:16
36:8,21 37:4 46:2
60:3 94:10 130:13
189:4,8 306:23
315:22
**describes**
83:4
**describing**
36:21 136:24 264:1
264:14
**description**

23:11 25:19 37:18
144:24 145:9
198:16 229:14
245:12 251:16
321:13
**deservedly**
226:4
**design**
27:24 38:14 66:8
180:12,20
**designated**
10:10 13:22 14:1,5
**designed**
38:10
**designing**
226:17
**designs**
23:6,8 180:19
317:18
**despite**
83:18 310:17
**detail**
84:4 116:23 201:2
241:15 264:16
**detailed**
163:3 305:22
**details**
246:7 259:1,4
340:18
**detect**
122:15 281:8
**detected**
96:17
**detection**
344:12
**determination**
146:15 151:9
185:21
**determinations**
350:10,13 351:1
**determine**
107:5 116:24
119:16 331:5
**determined**
153:24
**determines**

155:9
**determining**
23:2 121:22,25
184:11,21 185:2
185:15 191:11
**detract**
103:11
**develop**
12:14 75:10 171:11
172:11,23
**developed**
30:10 117:2 119:5
151:17,17
**developing**
37:3 83:18 86:4
173:8 202:8 316:9
**development**
13:8 75:4 122:20
192:3 258:4 267:7
326:7
**developments**
143:13 144:16
164:3,14,18,22
**devote**
241:25
**devoting**
197:19
**diabetes**
226:8
**diagnose**
168:1
**diagnosed**
167:11 168:3
171:11 216:3,4,16
216:17,24,24
281:6 284:19
**diagnosis**
167:17
**diagnostic**
169:22 171:14
**dial**
103:3,12,13
**Dictionary**
20:15
**died**
163:9

Jack Siemiatycki, Ph.D.

**diesel**
99:10
**diet**
159:25 288:3
**differ**
64:22
**difference**
80:7 160:19 171:7
186:19 188:1
190:25 199:4
207:9 217:6,17
248:19
**differences**
69:20,25 80:8
166:10 180:1
181:14 182:12
185:9 186:22
197:14 199:4
222:23
**different**
13:12 18:24 23:5
24:4,14 25:15
26:22 27:8 28:3
31:6,7,8,13,14,15
31:17,18,20,21
32:11,21 33:10,17
33:18 36:24 47:24
65:2,9,13,24 67:6
69:16,18 72:2
76:24,25 77:1
79:21,22,23 82:25
84:17,17 88:20
92:20,22,24 99:18
100:8 103:14
107:22 109:8
114:17 115:13
116:24,25 117:18
117:18 118:16,18
118:18,19,22,22
120:16,16 121:6
126:25 128:11
131:2 137:23
138:6 144:24
150:11 156:7
167:12,17,24
170:4 171:25

177:1,14 179:6,9
179:22,23 180:11
180:12,16,16,19
180:19 181:8,11
181:12,12 182:13
182:13 183:20
185:12 186:4,8,13
186:14 187:8
190:1,2 197:2,3,6
198:10 199:7
208:13 209:2,3
220:4 239:17
246:13 249:25,25
254:19 266:11,12
268:8 270:4
273:24 285:7,8,11
310:25 316:15
318:18 319:11
337:12
**differential**
166:17
**differently**
325:20
**differs**
65:12
**difficult**
82:22 122:14 207:7
263:10
**dig**
8:2:2 135:12 266:4
**digested**
195:16
**digging**
100:15
**digit**
27:11
**digressed**
149:12
**dimension**
27:13 34:3
**dimensions**
27:16 28:4
**dipping**
95:9
**direct**
9:21 22:7 32:22

62:12 208:24
211:23 274:13
295:19 299:15
300:3 304:24
320:20 321:8
327:8 329:19
353:24
**direction**
49:14 103:4,13
106:6 122:24
137:19 166:25
261:15
**directive**
96:19
**directly**
23:13,17 54:19
126:18 344:10
350:24
**director**
139:3,10,13,19
141:4
**directors**
233:21
**disadvantages**
23:9 65:25
**disagree**
192:7 202:22
205:16 206:8
207:16,23 241:16
336:22 341:18
**disagreeing**
253:4
**disc**
52:21 104:23 105:2
145:24 210:6
242:21
**discard**
34:20
**discarded**
73:12
**disciplinary**
303:6
**discipline**
150:14
**disciplines**
150:11

**disclose**
259:24 260:5
276:10,13 278:5
**disclosure**
275:21 276:9
**disclosures**
276:24
**discomfort**
171:21
**disconnected**
174:22
**discount**
221:21
**discovered**
147:12
**discoveries**
283:12
**discredits**
159:17
**discrepancy**
107:22 199:10
**discuss**
83:14 139:23 179:5
201:2 213:1
220:21 221:17
231:8,10
**discussed**
13:21,25 92:20
126:9 135:14
169:19 170:20,23
171:2,14 232:19
232:22 238:7
247:1 263:6
297:17 309:24
326:9 348:21
**discussing**
7:24 157:21 286:8
**discussion**
15:5 22:25 23:7
65:4 66:21 104:20
136:8 156:1
192:24 194:20
202:1,5,24 206:7
206:10,13 218:8
218:11 219:11
221:2,6,9,21

245:2 246:1
256:25 273:8
286:22 295:22
308:12 315:17
317:11,16 337:2,6
337:8 338:3
**discussions**
125:7 218:8 247:14
**disease**
66:11 130:18,20,21
226:8 281:8
283:13 287:17
310:17,22
**diseases**
65:13,14 226:8
306:10
**dismantling**
353:12
**distinction**
87:15 116:13
129:24 276:20
**distinguish**
117:25 327:13
**distorted**
318:25 319:3
**distortion**
171:25 319:1
**distribution**
115:13
**District**
1:1,2 2:14 9:11,12
109:4,4
**diversity**
31:8
**divided**
210:17,19,24 213:5
**division**
256:1
**doctor**
79:8 307:25
**document**
1:11 14:22 15:10
15:14 16:13 33:8
41:3,9 47:3,7 58:4
89:13 105:14
112:15 114:9

Jack Siemiatycki, Ph.D.

117:12 136:1
146:12 169:10
219:16 235:15
249:10 254:16
255:18 256:2,9
262:18 263:11,24
264:16 281:24
296:7 299:17
300:5 317:20
321:2,9 326:15
332:19 337:18
344:3
**documentary**
183:15
**documentation**
294:9
**documents**
15:21 16:24 18:24
19:3 41:14 43:17
43:19 86:11 88:3
88:23 90:6,9
91:25 92:5,6,19
93:3 96:25 100:18
101:17 314:15
320:21
**doing**
28:18 38:9 57:12
70:11 80:5 135:11
188:1,1 214:14
223:16 245:23
354:6
**domain**
38:25 164:25
**domains**
24:11 75:17 163:24
**DONATH**
309:9
**dose**
107:1 243:11 268:5
**dose-response**
121:9,22,24 122:18
122:23 123:7,9
162:19,22 197:18
197:21 198:4,8,11
265:24 266:15,22
266:24 267:8,21

269:9,15 270:14
270:15 272:11,22
273:2,16 296:14
298:11 299:1,6,11
299:12 311:11
**doubt**
102:7 218:10
262:25 303:12
**doubts**
189:24 190:7
**downstairs**
310:10
**downward**
207:21 208:17
**downwards**
207:19
**down/pelvis**
340:13
**Dr**
8:6 9:23 14:16,23
15:9 16:12,19,22
17:21 18:20 20:10
26:10 29:15 30:7
31:2 33:19 39:18
44:3 47:2,25
48:17 53:1 62:5
62:22 79:6 88:2
91:25 95:3 98:8
98:15 100:5,12
101:7,11 102:21
103:20 105:6
109:13 110:6,23
111:19 136:4
140:12 146:3
148:25 175:8
177:20 193:13
196:6 200:2
212:13 214:11
219:24 231:8
232:4,16,20 233:2
234:17 235:2
236:10 242:25
244:13 251:5
253:7 254:9
255:18 257:7
265:20 274:16

275:11 278:17,18
278:21 280:16,24
282:16 284:13
286:1,23 287:8
288:14 290:1,20
290:21 291:3
300:23 301:16
302:15 303:15
307:19 309:5
312:5 315:11
317:7,15 320:19
322:10,22 323:11
323:20 324:10,20
324:22,24 326:10
327:1 329:15
336:11 339:9
343:16 346:10,17
346:17 347:8
348:5,5 349:12
351:22
**draft**
70:5 71:12 72:17
73:7 254:24 255:1
255:19 256:8,17
257:9,15,21 258:4
258:8,12,16,22
260:19 261:8,22
262:4,6 263:4,18
264:25 292:19
299:17,24 300:1
300:25 302:15,18
303:24 304:14
305:20 326:8,12
333:5
**drafted**
58:14 72:8
**drafting**
70:2,15,17
**draw**
120:9 148:17 204:7
228:13 261:17,18
261:20
**drawing**
21:6,8 310:18
332:20 333:23
335:5

**drawn**
158:2 248:21
**drew**
247:21
**DRINKER**
4:18
**drinks**
135:10
**drive**
4:19 18:19 109:15
**driven**
102:25
**drives**
62:18
**dropped**
63:5 190:21 228:15
228:17 323:17
**Drs**
93:22 94:17
**drug**
38:19 181:7
**dry**
340:23
**Duces**
6:12,17
**due**
170:6 174:11 197:9
222:1
**dug**
81:18
**duly**
9:19 353:6
**duration**
197:23 198:5,11
266:25 287:19
297:7
**durations**
77:1

**E**

**E**
3:1,1 6:1,7 7:1 8:1
9:1,1 355:2
**earlier**
11:19 63:8 178:25
180:2 188:16

189:24 190:17,18
193:20 220:16
241:10 278:17
333:3
**earliest**
143:21
**early**
28:22,23 29:7
132:24 133:7
171:20 227:22
281:8 325:24
**ears**
173:1
**easier**
42:25 234:13
**easily**
65:18
**Eastern**
9:12
**easy**
89:3 138:10
**Echeverria**
59:20 60:1 70:8
246:19
**economy**
81:3
**edited**
20:15
**edition**
20:11,13
**educated**
279:3
**effect**
122:2,16 160:20
167:23,24 168:12
168:15,21 169:17
181:7 220:9 221:3
301:22 302:4
305:16 306:2
319:17
**effective**
281:13 282:23
**effects**
219:6 224:2
**effort**
242:1

Jack Siemiatycki, Ph.D.

**eight**
19:19 53:22 186:8
   191:7 219:4
   266:11
**either**
37:4 63:22 70:21
   76:25 134:4
   257:11 271:20
   277:9
**electronic**
86:15 88:5,7
**electronically**
88:18
**element**
229:23
**elementary**
36:20
**eliminate**
97:7
**eliminating**
29:8
**elimination**
291:4
**ELLIS**
4:12 5:19
**else's**
39:17
**embedded**
207:5 211:2,2
**embodied**
198:12
**emergency**
65:20
**emissions**
99:11
**emphasis**
121:21
**employ**
307:8
**employed**
303:25 306:23
   307:7 309:25
**enable**
116:1 117:25
**encapsulates**
311:24

**ended**
140:7,8 227:2
   258:8
**ends**
104:23 352:1,2
**engage**
35:18
**engine**
99:10
**England**
127:11
**engrained**
36:15
**enhance**
72:21
**enhances**
180:7
**enormous**
198:3
**enter**
264:8
**entering**
264:7
**enthusiastic**
221:25
**entire**
93:14 154:1 206:11
   263:24
**entirely**
137:24
**entitled**
8:4,8 230:4 295:22
   303:17 304:14
   309:4 317:22
**Environ**
280:17 286:7
**Environepi**
7:22,23
**environment**
255:23 264:8
**environmental**
160:1 262:21
   288:14 303:4
**Epi**
280:17 286:7
   288:14

**epidemi**
172:17
**epidemiologic**
21:5,6,9 23:6,8
   24:9,10,25 27:6
   93:1 103:1,11
   115:8 116:15
   134:9,14 146:24
   150:16 153:5
   154:20,22 155:2
   156:22 160:4
   225:12 303:10
   310:13 311:19,25
   345:11
**epidemiological**
6:24 44:17 46:3
   75:21 106:4
   115:25 116:12,21
   117:14,24 118:25
   134:18,24 142:20
   151:10 152:7
   153:9 155:7 158:3
   158:7,12 172:18
   173:23 179:1
   204:4 205:5 245:7
   245:13,17 279:14
   302:1 335:10
**epidemiologist**
89:24 95:3 173:21
**epidemiologists**
24:23 66:2 73:24
   281:20 327:13
   329:6
**epidemiology**
20:6,15 21:21 23:1
   30:22 36:16 38:23
   39:4 42:18,23
   44:10 74:8,10
   90:13 95:1 106:1
   152:22,25 153:22
   154:7,12 156:9,15
   157:10,13 163:21
   164:15 167:4
   169:21,25 172:6
   180:10 181:15
   184:8 244:11

   279:17,18 281:1
   310:16,19
**epidi**
245:7
**epidil**
245:7
**EpiTech**
7:4,7
**epithelial**
297:9,23
**equal**
170:23 327:21
**equally**
185:10 310:23
**equals**
268:17 295:9
**equivalent**
53:19 249:21
   277:17,20 302:11
**era**
147:12
**eras**
92:22,24
**errata**
354:4,6,9,11 356:8
**erroneously**
168:11
**error**
166:2,4,7,8,12,15
   166:19 167:3,3,7
   167:16 168:1,12
   169:21,22 170:22
   170:23 197:11
   201:3,6 271:6
**errors**
70:10,22 166:22
   171:14 185:2,8
   223:18,24 224:1,3
   225:21
**especially**
123:2 184:7,7
   204:10 283:11
**ESQUIRE**
3:4,10,16 4:3,11,17
   5:4,11,18
**essentially**

156:8 223:2 277:17
   277:19
**establish**
335:4,22
**established**
117:19 122:21
   173:23 273:2
   282:8 287:17,23
   334:23
**establishing**
316:2 344:15
**estimate**
106:24 125:2
   149:14,17 169:1
   182:24 186:16
   202:13 206:22
   208:11 213:20
   247:11 270:8
**estimated**
160:14 177:13
   199:3
**estimates**
8:11 30:3 76:24
   122:4 160:16
   166:4,21,24 167:1
   169:18 170:25
   175:15 186:8
   192:18 197:15
   202:18 225:17
   267:3 298:18
   317:24 319:3
   328:3,4 329:22
**et**
35:10 38:20 41:23
   46:11 64:11
   102:10 138:15
   146:22 159:14
   160:2 179:23
   189:19 196:19,20
   226:8,9 266:10
**ethnic**
8:10 175:14 182:14
   317:23 318:17
**ethnicity**
177:8 319:8
**European**

43:4
evaluate
27:18 28:4 32:20
32:21 33:23
126:20 138:8
167:6 198:7,19
204:24 266:15
303:8 334:5,25
335:20,21
evaluated
12:19 24:5 27:1
33:9 137:13 138:2
138:13,16 144:18
158:13,17 173:13
192:6 241:8 297:5
318:8
evaluating
21:20,21 25:11
31:13 89:24 90:21
98:25 99:17 146:7
169:24 172:17
184:17 198:3,11
275:24 278:1
283:18 304:9
311:3 314:20
evaluation
20:3 36:13 43:5
99:25 127:15
137:20,22 138:21
139:1 141:14,21
142:13 143:1
150:12,20 151:2
153:7,24 181:17
196:2 197:18
237:7,14,25
260:15 266:21
292:4 299:3
303:10 310:21
330:11,21 351:5
evaluations
26:9 31:16 33:15
137:14 151:25
237:5,6 238:10
258:1
evening
274:15,17 290:20

290:21 322:22
event
87:8
ever-used-it-at-all
77:3
evidence
13:11 24:6,8,11,11
25:5,6,16,20
26:16,22 28:15
29:12 31:8 32:1
32:11 33:11 34:17
43:3,5 67:11
75:16,19,22 78:9
98:4,5 100:11,20
103:1,12 105:20
105:25 113:6
115:8,9,25 116:12
116:15,22 117:14
117:24 118:9
123:2 129:3,4
131:5 132:22,25
133:24 134:16
144:12,13 149:9
150:16,22 151:5
151:10 152:8
153:3,6,10,12,21
153:22 154:1,4,6
154:20,22,25
155:2,7,16 156:15
158:13,14,23,24
160:18 165:6,10
165:11 174:5
183:15 192:18
197:20 202:19
203:11,12,17
204:2,4,9 205:6,7
205:21,22,23
207:22 243:11,18
249:4 261:16
264:14 265:22,23
266:8,9,20 267:5
267:20 270:14,15
270:21 272:22
273:6 281:11
282:12,14,24
288:2 296:13

299:6,11,12 303:9
303:11,13 311:1
311:19,25 314:6
314:21 317:1
320:22 321:14,16
321:22 326:20
333:11 335:10,13
335:18,19 339:1
346:23 347:2,23
348:2,12 351:1,2
351:10,17
evident
298:2
exact
130:23 137:4
138:16 190:19
exactly
15:14 29:25 58:16
59:15 72:4 166:15
198:16 227:4
274:2
examination
6:2 9:21 142:1
274:13 294:23
322:20 336:9
353:8
examine
66:18
examined
9:20 240:1 243:8
examiners
242:12
examining
107:3 177:1 190:23
310:24
example
12:4 26:25 56:14
95:2 101:5 118:1
119:11,17 132:22
134:15 151:1
157:8 158:15
162:1,14 181:19
192:11 223:12
252:15 277:21
334:20
examples

67:17 85:15 144:22
155:19 160:19
excellent
27:14
exception
44:3
exceptional
147:25
excerpt
8:4 309:9,13
excerpts
93:15
excess
119:25 121:12
146:16,19 159:23
176:3 328:22
329:4
excesses
118:25
exchanges
100:16
excited
174:23
exclude
34:11 35:11 209:14
209:15 225:14
269:8 270:22
excluded
29:5 199:5
excludes
252:25 269:1
excluding
28:23 79:24 83:9
228:22
exclusion
228:7
exclusions
227:23
exclusive
251:4
exclusively
57:13
excuse
23:4 111:8 155:21
256:23,23 289:13
320:7 346:6,9

exercise
82:17
exercising
85:18
exhibit
14:15,23 15:6,11
15:19,25 16:5,13
17:17,18,23 43:24
43:25 45:1,18
46:3,5,6,16,20
47:4 48:2,5,18,19
48:24 49:4,24,25
50:5,5 53:3,3,5,5
58:9,10,13,20,25
60:5 61:7,9,14,19
61:25 68:10 69:4
70:3 72:9,25 94:9
108:15,17,18,24
109:14,18,20,25
110:3,7,12,17
111:20 112:4,6,25
149:16,25 163:6
194:5,6,24 213:24
214:4,7,12,15
234:22,25 235:1,8
235:13,25 243:3
256:4 278:12,14
280:12,16,21
285:12,14 286:2
306:9 308:16
309:4,14 317:9,12
317:21 320:21
326:23 327:2
330:6
exhibits
6:9 7:3 8:3 41:18
48:18 49:12 50:4
234:20
exist
116:11 271:18,19
271:20
existed
205:22 271:24,24
existence
217:22 330:9,19
exists

116:1,12,16,22
117:24 118:9
123:8 334:10
336:19
**expect**
80:2 197:14
**expectation**
107:16
**expected**
224:9
**experience**
70:8
**experienced**
159:13 185:11
**experimental**
38:19 144:14,17
**experimentation**
152:23 311:21
**expert**
6:18 7:12,15 10:10
10:14 11:10 13:4
13:25 17:16,24
54:18,25 55:22
57:17 58:4 59:25
60:3,10,13,16,24
60:25 61:1,14
74:19,24 75:2,8
81:13 84:16 91:8
93:4,21 94:13
95:5 98:25 99:2
101:6,6,13 114:1
123:16 141:6
164:9,14,17,21
165:8 233:3
260:21,23 261:11
265:3 276:2,14
277:8,15 316:20
322:8 324:11
325:1 332:15,24
333:4,6,17 334:6
348:15 349:25
**expertise**
74:22 126:24 331:4
331:9,24 338:13
**experts**
13:22 14:1,4 15:16

24:12 74:23 93:24
94:3,7 136:12
316:16 322:3
331:19 332:6,8,10
334:1,17,21,25
341:4
**expires**
356:17
**explain**
176:3,9 177:24
183:12 187:9
199:6 218:3 316:5
327:4
**explained**
66:17 176:4 246:3
246:8
**explanation**
22:19 155:13
190:20 311:8,14
320:4 349:13,20
350:2
**explicit**
26:18 329:3
**explicitly**
29:2 34:8 36:8 37:3
84:13
**expose**
152:24
**exposed**
76:20 92:25 101:2
138:15 160:2
162:6 171:8,9
208:24 227:3,4
269:23 270:2,19
351:6
**exposed/never**
270:18
**exposed/unexpos...**
270:25
**exposition**
72:22
**exposure**
106:21 121:6,10
122:15 131:8,15
132:11 146:8
152:24 158:4

160:3 166:3
168:10 171:5
197:23,24 198:8
213:11 221:15
227:5,7 229:6,18
229:19 230:2
237:9 250:19
267:1 270:4 288:3
288:8 297:6
298:22 301:12
302:9 303:17
305:14,25 311:5
312:7,11,13
343:20
**exposures**
160:1 162:3
**expressed**
83:23 97:22 132:20
241:22
**expressing**
72:19 277:23
**extension**
189:20
**extent**
26:17 121:25
334:10,20 338:16
**external**
341:10,15
**externally**
340:23 345:13
346:11 347:9
351:11
**extra**
16:7 40:20 46:18
285:19,21
**extract**
82:20
**extrapolation**
204:25
**extras**
48:7
**extremely**
122:14 297:25
319:23
**eye**
207:11

**eyes**
143:16 349:2
**e-mail**
100:16 191:4,15
293:13,22 323:10
324:9,24 325:1
**e-mails**
191:19

--- F ---

**F**
5:6
**Fabio**
5:25 9:4
**face**
34:11 308:20
**faces**
289:6
**fact**
17:23 21:24 28:8
32:15 63:13 97:9
103:6,22 111:22
115:21 152:7,12
166:20 167:12
174:9 180:4,18
190:15 198:2
201:7 209:1
214:15 220:20
221:14 222:19
225:15 226:2
235:24 258:15
268:14 269:22
324:10
**factor**
130:4,12,18 156:21
156:22 157:1,17
174:1,6,8,12,12
310:22
**factors**
8:5 19:20 20:24
21:12 24:20 36:6
124:9 125:23
130:20 172:22
173:7,12 174:2
177:9 226:5,7
282:8,11,25

283:24 284:10
287:4,18,23 288:1
288:2 305:10
306:13 308:20
309:4 316:21
318:17
**fail**
354:14
**failed**
102:16 199:14
**failing**
137:19
**fair**
27:2 32:3 35:14
39:5 55:19 60:6
61:20 151:14
152:17,18,18
153:13 165:12
172:7 179:6
185:23 191:9
205:23 207:24
232:11 233:15
239:20 240:20
242:16,16 302:16
329:24
**fairly**
26:18
**fake**
159:22
**fall**
97:25 98:1 147:11
147:12 332:25
**fallopian**
339:4 341:1
**false**
327:14
**familiar**
15:9 64:25 74:21
129:13 192:13
193:13 230:3
243:22,24 244:5
254:16 257:20
258:25 259:3
262:5 264:15
280:17 303:4
**fan**

Jack Siemiatycki, Ph.D.

| | | | |
|---|---|---|---|
| 128:15 | **figure** | 273:18,19,21,24 | 11:18,19 18:24 |
| **far** | 106:8 206:25 207:4 | 273:25 274:1 | 19:5,10 41:11,17 |
| 29:3 71:22 96:18 | 207:19 243:4,5 | 298:8 299:9 302:2 | 56:14,17,19 57:8 |
| 123:5 266:12 | 255:10 314:15 | 305:3 307:9 309:7 | 147:14 194:10 |
| 281:4 | **figures** | **fine** | 238:19 298:17,20 |
| **faster** | 217:2 | 108:20 140:16 | **five-year** |
| 248:2 | **file** | 254:20 255:11 | 138:7,9 |
| **favor** | 71:11 88:18 | **fingers** | **flag** |
| 66:2 | **filed** | 63:4 | 347:21 |
| **favorable** | 109:3 219:5 | **finish** | **flaw** |
| 130:16 | **FileMaker** | 25:2 71:12 140:18 | 67:6 182:23 188:17 |
| **FDA** | 71:19 | 194:17,18 199:23 | **flawed** |
| 43:6 | **files** | 282:3 338:15 | 27:9,11 |
| **February** | 72:4 81:5 | 347:18,19 | **flaws** |
| 353:15 | **filing** | **finished** | 188:20 225:11,12 |
| **feed** | 45:23 | 140:13 248:16,17 | 225:15 226:1 |
| 150:19 153:6 | **fill** | 270:11 | **flip** |
| **feel** | 107:23 | **first** | 286:19 |
| 104:12 114:22 | **filling** | 9:19 10:13 12:24 | **flipping** |
| 150:13 169:7 | 314:12 | 13:12 17:2 20:19 | 63:25 284:12 |
| **feeling** | **final** | 20:22 23:3 40:3 | **Floor** |
| 28:17 100:3 152:19 | 25:20 31:16 90:1 | 44:16 57:17 62:1 | 3:19 |
| 153:1 154:18 | 91:18 153:6,23 | 62:2,25 63:5,12 | **Florham** |
| **feels** | 280:21 321:16 | 86:16 105:13 | 4:20 |
| 289:1 | 325:22 | 111:13,16 113:10 | **Florida** |
| **fees** | **find** | 118:23 157:25 | 3:7 |
| 54:17 55:6,8,12,20 | 37:18 42:24,25 | 195:19 202:20 | **flurry** |
| **fell** | 52:9,10 81:13,25 | 229:13,15 230:19 | 50:19 51:16 241:11 |
| 88:23 155:22 215:9 | 102:16 171:6 | 230:24 231:16 | **FLW** |
| **fellowship** | 182:7 196:21 | 237:11,13 239:22 | 1:6 |
| 279:21 | 198:17 203:11 | 257:14 260:4 | **focus** |
| **feminine** | 209:4,16 225:24 | 262:4 267:24 | 59:2,6 283:25 |
| 288:5 | 226:16,22 242:6 | 280:25 284:17 | **focused** |
| **fetishized** | 244:10 261:19 | 286:21 287:14 | 57:13 171:4 189:12 |
| 184:2 | 296:12 300:19 | 294:14 297:11 | 189:12 197:22 |
| **fibers** | 310:17 349:21 | 300:24 315:17 | 200:9 226:5 |
| 96:3 97:14 102:2,8 | **Findeis** | 323:22 325:6 | 294:25 |
| 103:7 | 3:16 11:4,4,6 | 337:8 338:20 | **focuses** |
| **field** | **finding** | 343:17 345:5 | 281:1 |
| 20:7 125:19 165:11 | 102:8,14 103:11 | **first-year** | **focusing** |
| 331:19 | 123:12 | 36:19 | 20:22 264:4 337:23 |
| **fields** | **findings** | **fit** | 338:19 |
| 75:7 | 21:4 132:18 133:9 | 151:18,22 262:19 | **Focussing** |
| **fifth** | 240:4 248:20,21 | **fits** | 93:20 |
| 20:18 27:14 43:19 | 248:21,22,23,24 | 24:13 | **follow** |
| 298:16 | 248:25 262:20 | **five** | 171:5 200:4 235:14 |

| |
|---|
| 261:19 300:9 |
| 325:12 |
| **followed** |
| 28:2 |
| **following** |
| 29:25 168:8 200:14 |
| 207:1 351:9 |
| **follows** |
| 9:20 311:6 328:17 |
| **follow-up** |
| 171:11 206:3 |
| 226:14,25 227:1 |
| 322:11,23 |
| **fondly** |
| 275:1 |
| **font** |
| 108:4,5 109:8 |
| **force** |
| 72:21 |
| **forcing** |
| 31:10 |
| **foregoing** |
| 353:4,21 356:3 |
| **forever** |
| 22:3 |
| **forget** |
| 75:24 |
| **forgot** |
| 323:18 |
| **form** |
| 12:6 22:9,22 23:15 |
| 29:10,22 32:4 |
| 34:1 35:6,24 |
| 39:10 44:8 53:10 |
| 55:2 60:7 69:23 |
| 71:8,13 73:9 |
| 75:12 80:20 84:21 |
| 85:10,20 90:2,25 |
| 94:22 95:20 99:4 |
| 103:25 104:9 |
| 116:3,14 117:3,6 |
| 118:2 119:8,18 |
| 120:13 121:19 |
| 122:10 123:10 |
| 125:4,15 129:21 |
| 130:7 131:24 |

132:13 133:11
137:2 150:8 151:6
151:15 152:15
154:16 156:11
161:12 165:13
167:12,15 172:24
176:13,16,23
178:9 185:6
188:18 192:5
198:25 200:12
202:25 205:3
207:25 218:17,20
220:24 223:8,22
225:9 239:7 240:5
240:13,25 241:19
246:21 247:9
249:23 250:11
251:10 252:19
253:14,17 254:3
254:11 258:17,24
260:22 261:3,25
263:7,21 264:12
265:5,8 267:16
271:15 272:14
273:5 276:17
277:4,11 278:2
281:16 283:7
284:6,24 288:17
288:23 302:6
304:16 306:4
307:12 310:5
312:18 326:6,17
330:14,24 331:14
332:1 334:8,11,14
334:15 335:1
339:12 341:2,17
344:1,20 345:15
346:14,19 347:11
349:23 350:23
351:15 356:7
**formal**
137:15,16,21 139:6
141:13,21 142:7
151:2 181:17
260:15 268:11
298:22

**formaldehyde**
162:6
**format**
15:15 76:18 135:15
**formation**
240:10
**formatting**
337:12
**formed**
69:5 127:20 128:24
194:25 241:15
256:15 261:9
291:24 315:8
320:24 321:1
**former**
95:2 151:1
**forming**
23:25 24:18 33:11
36:4 50:7,9 90:11
93:4 94:13 120:18
194:22 256:9
261:11 326:15
331:21 333:19
**forms**
121:15
**formula**
114:2 321:18
**formulaic**
277:22
**formulate**
241:9 315:11
**formulated**
292:18
**formulating**
314:1
**forth**
88:22 147:1 182:14
353:5
**forward**
108:11
**found**
32:19 81:18 88:13
91:25 105:16
160:10 176:25
196:22 203:17
223:3,3 239:15,15

242:3,4 257:12
297:23 299:6
327:5 343:24
350:14,17
**four**
11:18,19 40:9,10
40:14 53:15
106:21 126:2
152:21 160:17
248:25 298:14,15
298:15 306:25,25
307:8 309:25
319:4 349:8
**fourth**
20:14 27:14 62:3
63:1 171:1 286:22
297:14 300:24,25
**fraction**
204:10
**fragile**
204:7
**frame**
56:4
**France**
126:19 233:21
**frankly**
90:8
**free**
102:1 169:7
**frequency**
115:13 121:16
162:16 197:24
198:6,12 267:1
297:6
**friends**
135:9
**front**
14:17 33:5 47:3
48:18 50:5 61:8
84:11 91:11
109:17 112:25
192:20 211:11,22
234:5 235:25
255:19 294:8,17
294:18 295:25
312:25 337:11

**frustration**
82:23
**full**
53:19 62:2,25
76:16,17 93:17,17
165:25 196:18
201:21 206:12
219:25 300:24,25
301:1
**fully**
93:14 95:10 177:24
183:13 195:16
196:1 198:13
224:9 241:18
267:2 338:11
**fulsome**
191:11
**fumes**
350:19
**function**
150:14 258:1
**funders**
281:21
**funding**
228:4 233:10,13,16
281:21
**funds**
54:24
**funny**
112:19
**further**
36:21 135:13
157:22 258:21
301:21 305:15
306:1 322:1
351:20
**Furthermore**
80:3
**futile**
242:1

─────────────
**G**
─────────────
**G**
9:1
**gain**
22:7

**Gates**
200:14,18 224:13
224:16 225:2,4,7
225:21,25 227:2
227:12 228:7
**gathering**
134:20
**general**
15:25 16:14 17:2
64:15 65:18 66:2
133:22 154:7
159:16,22 160:6
161:5 190:1
310:13 320:22
321:23 334:14
337:8
**generalized**
161:22
**generalizing**
133:25
**generally**
65:14 85:25 89:2
138:7 162:2
166:24 204:21
276:1
**General's**
133:4,20
**generate**
51:19 60:24 159:6
**generated**
57:17 60:16 61:1
69:11 74:3 99:2
101:6 187:16,20
257:21 318:20
**generic**
58:21 66:21
**genetic**
282:10 287:3
**genital**
59:1 193:17 202:6
204:5 214:24
215:2,4,14,21
216:10 217:7
248:10 268:15
291:5,12 295:3,8
296:15 297:5,10

297:22 298:3
301:19 312:7
313:19 315:5
316:24 317:5
340:24 341:15
343:20 351:12
**genitally**
216:18
**geographic**
65:16 221:12
**GEREL**
3:11
**Gertig**
226:20
**gesture**
325:14
**getting**
39:18 124:11 147:8
173:10
**GI**
65:21
**gist**
137:5 324:1
**give**
14:25 17:13 41:4
55:11 56:3 100:24
101:9 118:23
125:1 131:1 157:4
163:9 165:25
174:4 186:16
261:16 263:13
281:23 285:24
290:4 300:11
348:23
**given**
26:18 38:18 65:8
95:19 134:3 356:5
**gives**
67:17 266:24
**giving**
32:1 148:3 274:22
**glanced**
243:7
**glasses**
46:11
**glitch**

80:11
**go**
17:15 45:12 54:19
54:20 65:8,20,21
67:20,22 75:13
77:12 80:24 83:15
89:12 104:21
107:10 121:1
131:3 148:22
155:4 165:24
170:3 194:4
199:16 214:2,4
222:2 227:16
236:7 242:11
243:3 249:9 255:9
265:11 268:2
274:6 275:4 282:5
282:20 286:21
294:13 298:19
306:11 308:14
321:10 322:14
335:25 343:8
348:14,15 350:4
**Godleski**
346:17
**goes**
36:21 48:11 213:21
216:19 283:10
287:12 301:21
303:22 337:19,20
**going**
52:14,18,23 53:17
60:19 63:24 67:23
68:1,20 72:11
89:6,17 104:16,25
105:4,8 106:4
108:11 109:13
114:15 121:23
124:16 128:16
138:8 140:14,16
140:23 141:1
145:20,25 152:5
157:21 161:2
168:5 169:13
189:6 190:13,14
194:8,9,12 210:3

210:8 211:19,23
219:10 225:3,6
234:23 242:18,23
243:8 255:12
257:1 265:14
274:4,8,11 285:5
290:1 308:4
320:12,15 321:10
322:15,18 336:1
336:13 343:10
352:3
**Golkow**
9:5
**GOLOMB**
4:3,4
**good**
9:3,23,24 18:10
27:13 30:24 34:22
34:23 52:15 67:17
79:19,20 104:14
105:6 145:16
146:3 179:17
181:2 184:15
210:1,2 226:3,4
242:9,10 274:15
274:15,17 290:20
290:21 313:2
320:10 321:3
322:5,22 349:2
**Gordon**
5:12 102:10
**government**
126:19
**governments**
138:3
**gradient**
305:6
**grams**
121:3,16
**grant**
124:14 125:8 289:2
**grants**
124:11
**grapes**
179:21
**gray**

172:5
**great**
52:17 188:8 285:23
328:24
**greater**
114:22 182:8 198:4
214:20 245:11,19
252:7 299:8
327:23
**greatly**
195:14 283:11
**green**
68:6 188:9,12,15
189:2,11,19 190:7
190:8,11 191:5
**Greenland**
20:8
**Green's**
191:10
**ground**
129:5
**group**
7:24 8:10 38:19,20
50:22 65:7 136:14
136:15,21 142:16
142:19,25 143:2,3
143:15,15 144:7
144:11,18 150:21
151:1,3,4,13
152:13,21,21,22
152:23,24,25
153:17,25 154:3,4
154:5,5,8,8,15,18
154:21 155:8
158:15 163:1
168:8,17 170:8
175:14 217:16
225:17,18 265:25
280:8 286:9
288:21 298:16
303:2,3 317:23
318:17
**groups**
138:4 166:18
182:14 213:6
298:17

**growth**
144:1
**Guadeloupe**
126:22
**guess**
11:20 15:15 25:4
51:1 54:10 57:8
59:14 68:17 69:12
72:10 88:25 96:24
97:10 98:20 99:8
147:17 149:5
166:1 168:1
178:10 183:2,9
206:1,25 246:8
257:16,18 259:6
299:3 307:14
318:4 323:13
324:18 325:21
341:3 344:22
349:24
**guesstimate**
55:16
**guidelines**
43:3,4 153:21,23
310:20 322:3
**gut**
100:3
**gynecologic**
281:5 340:8 349:22
**gynecological**
189:14
**G-R-E-E-N-L-A-...**
20:9

---

### H

**H**
6:7 7:1 8:1
**half**
118:10 126:1
256:14
**halfway**
296:11
**hall**
278:23
**hallmark**
133:19

Jack Siemiatycki, Ph.D.

hand
18:5 22:25 52:6
    77:7,20 329:21
handbook
20:14 146:24
handed
280:11
handwriting
18:11
handwritten
7:17 44:5,7 64:2
    110:14
handwrote
73:2
handy
175:23 343:4
happen
155:12 156:14
    170:11 252:4
happened
106:22,23 109:1
    155:18,20
happening
252:6
happens
170:15 209:14
    259:12
happy
183:24 197:5
    222:25 291:8
    334:17
hard
86:14 88:4,7 125:6
    184:8
harder
42:24 169:9
Harvard
279:22
head
299:9 340:12
heading
87:13
health
26:6 43:2,14 50:21
    51:17 52:1 84:2
    84:10,12 85:3,6

85:16,18,23,25
86:3 226:3,12
230:20 233:13
241:12 255:23,25
256:18 257:10,22
257:24 258:5,13
258:16 264:11
265:1 275:8,18,25
279:13 284:14
291:24 292:3,7,19
293:7 294:3
299:16 320:23,24
321:22 323:4
326:7,12
healthy
281:11 284:13
heard
129:10 230:19,19
244:13,17 324:16
325:15
hearing
68:15 69:6 172:25
heart
226:8
heavy
63:4 103:23 350:6
350:22
heightened
221:15
held
2:1 9:8 15:5 20:1
22:4 104:20 143:3
143:20 156:1
192:24 194:20
233:21 256:25
299:7 308:12
317:11
Heller
339:5 341:22 342:7
346:3,3,4 347:2
348:21 349:3,9,13
help
15:2 19:3 41:14
44:23 74:13 81:23
82:6 83:18 95:22
236:1 280:7,9

helped
81:9,13 125:24
helpful
17:3 19:11 212:23
212:25
helpfully
200:8
helping
300:9
Henderson
339:5 341:22 342:6
345:22 346:1
347:2
hesitating
60:8 71:25
heterogeneity
180:14,15,25 181:1
181:2,10,11,16,17
181:21 182:3,6,24
heterogeneous
283:13
heuristic
32:9
Hi
146:4 290:6 325:14
hiding
266:4
high
117:20 119:21
147:7 148:1,16
153:18 155:15
160:10,11 166:19
232:13 287:18
304:8 314:4
319:15,23
higher
129:14 144:4 215:4
259:11 319:24,25
351:12
highfalutin
187:21
highlighted
111:2 166:1
highlighting
44:8
highly

298:1,14
Hill
243:19,22,23,25,25
244:6,7,9,13,23
246:1,4,12,18
305:1,9,11,22
315:21
Hill-like
304:13
hints
121:9
histologic
204:15
histological
202:10 203:7
historic
92:12 102:14,17
historical
132:22
historically
92:11
histories
318:16
history
22:2 92:13 177:7
195:8 318:13
hold
131:12
holding
43:18 129:11
home
169:10
HONIK
4:4
hope
4:13 128:23 259:15
259:15
hopefully
290:24
hopeless
171:9
Hopkins
93:16 95:14 102:5
horizon
143:21
hormonal

125:23 226:7
282:10
hospital
64:22 65:5,8,9 66:3
hospitals
65:12,15,18
hospital-based
64:12,14 65:1,2
66:1,5,22
hotel
136:6
hour
49:9 52:15 54:13
104:17
hours
11:18,19,20 47:13
49:2,6,22,25 51:6
51:7 53:4,5,6,21
53:22,22,23,24
125:2,14 177:21
194:10 293:10
306:12 317:17
340:13
huge
105:20 171:24
human
264:10 301:9 322:7
humans
144:12 237:10
250:21
Huncharek
202:16 235:19
hundred
28:3 170:9
hundreds
33:15,15 40:20,20
40:23 226:9,9
hung
309:18
hygiene
288:5
hypotheses
97:23 128:18
190:23 283:23
316:18
hypothesis

34:19,20 221:22 221:25
**hypothetical**
99:8 117:16 157:5 159:3 160:8 271:17,22
**hypothetically**
115:22 118:15 157:7,13 158:5

**I**

**IARC**
19:25 40:18 105:18 123:22 126:11 128:21,22 131:2 136:15,23 137:7 137:12,14,18 138:21,25 141:5 142:1,7,12,16 144:7,17,25 145:4 146:5,15 149:1 150:7,12,12,20 151:1,16,22,24 152:14,20 153:18 158:15 159:2 163:1,11,16 165:20,25 218:2 237:5 238:6 251:2 260:12 263:19 265:25 267:9 275:18 276:1 299:2,10 314:4 350:9 351:1
**idea**
64:25 148:11 227:3 267:6 269:4
**ideas**
22:2 70:6 128:18
**identical**
38:11 80:4 190:25
**identification**
14:21 15:7 16:6 17:19 44:1 46:7 46:21 48:6 58:11 61:10 110:4 194:7 214:8 266:3

278:15 285:15 309:15 317:13
**identified**
11:25 40:5 43:20 86:11 89:7 158:12 182:23 327:2 330:6
**identifies**
342:16
**identify**
10:25 13:2 17:1 19:15 35:3,9 41:9 62:22 77:22 89:3 91:23 92:17 105:13 106:13 170:8 175:9 181:6 181:10 182:12 183:24 184:9 200:3 265:21 316:21 333:17
**identifying**
74:14 175:22 218:13
**idle**
325:14
**ignore**
182:5,6
**III**
300:5,17,21
**illustrate**
174:16 176:1,18
**illustrates**
174:5,19
**illustration**
134:24
**image**
62:14
**imagine**
45:6 86:2 118:16 191:6 239:11 269:20 281:23
**imagined**
180:14
**Imerys**
5:10 101:7 274:5 274:18 323:1,9

336:7
**impact**
38:16,17 106:14,23 158:18 166:3,5 170:24 173:11 176:1 182:8 218:9 224:1 228:16,21 284:14 317:18
**impacts**
166:21,23,25
**imperative**
354:10
**implementation**
180:21
**implication**
208:24,25
**implicit**
24:22,22,23 36:7 36:15
**implicitly**
29:1
**implies**
114:22
**imply**
249:14 329:22
**implying**
208:20,20
**importance**
26:21 32:11 84:18
**important**
31:2,4,4,24 32:12 33:23,24 123:6 156:18 177:10 196:14 197:7,20 198:1 206:15 260:5 275:24 276:10,13 277:24 288:9 319:9 324:3 325:13 328:13
**improbable**
120:2
**improve**
70:13
**improving**
284:18
**inaccurate**

166:12
**include**
29:12 38:3,4 39:7,9 43:9 50:11 82:18 184:12,12,22 185:3,3,3,4,16,17 186:9,10,17 187:10 188:12 201:11,15 209:14 224:13 225:14 228:25 229:4 252:22 287:18 303:2 329:14
**included**
39:16,17 82:25 106:5 112:12 186:23,24 187:1,6 188:9 189:22 199:5,12,15 200:11 201:14,15 208:3,15 213:18 222:24 240:21 287:22 297:24
**includes**
210:22 211:8 212:6 212:7,9,10 213:14 252:2 271:2 309:6
**including**
53:11 78:7 79:23 88:11 99:24 141:13 142:22 163:20 188:15 225:15 226:6 227:18,18 228:22 229:18 270:5 278:7,8 303:3 316:15 326:3
**inclusion**
228:7
**inclusive**
213:7
**incognita**
351:7
**inconceivable**
319:25
**inconsistency**

155:14
**increase**
103:9,15 146:18 149:2 156:16 176:10 217:2,17 261:17 296:17 297:21 298:11 345:12
**increased**
35:21 120:10 127:22 202:7 297:8 299:5 327:4
**increases**
123:17
**increasing**
103:4 120:24 268:17 295:10 297:22 298:21,21
**increasingly**
102:6
**incumbent**
275:20
**independent**
97:22 107:6,15 223:5 270:20
**independently**
77:15 80:5 106:7 164:9 272:10,15 335:20
**indicate**
107:11 123:6 205:7 219:9 239:21 248:12 293:12 298:20 301:10 325:6 329:8
**indicated**
30:7 32:15 145:6 292:22 299:4 328:8 332:4,9
**indicates**
154:10,13 237:8 250:19 273:16
**indication**
219:12
**indicative**
301:22 302:3

indirectly
350:25
individual
37:10 128:15
    172:10 228:22
    237:6 238:10
    321:15
individuals
10:25 55:7 117:1
    119:5 132:8
    212:15 215:3,5,9
    216:3,14,16,23,25
    217:18,22 326:4
induce
336:18
induced
213:10
industrial
351:3
industry
96:19 97:6 101:25
    126:22
infect
156:9
infects
159:17
infer
251:13
inference
115:17 299:7
inferences
21:6,8 117:21
    180:8 204:8 205:4
    248:20 249:1
    261:17,18,20
    273:10 304:10
    310:19 335:5
inferred
114:2
inflammation
143:12 288:4 314:9
inflated
167:14
inflation
222:5
influence

75:20 143:10,14
    184:10 205:8
    209:11 261:5
influenced
147:4 219:7 266:20
influences
180:23
inform
96:2 141:6
informal
74:1
information
7:21 22:7 23:4,5
    24:4,10,24 25:10
    25:11,17 26:18,19
    27:22 31:14 43:7
    43:15 50:23 51:17
    75:15 76:16,17
    84:7 92:9 93:2
    95:22 96:2 98:2
    99:14 102:21
    103:1 118:21
    126:7,17 134:20
    142:25 143:4
    144:1 162:20
    171:5 177:5,7
    184:17 188:22,25
    189:22,23 226:12
    228:3 229:17
    230:2 231:3,6
    233:11 241:12
    245:24 269:25
    270:6,18,19 271:1
    292:18 305:3
    310:24 314:13
    318:21 326:2
    332:10
informative
91:9 92:1
informed
222:13
inhalation
59:4 123:17
inherent
159:21
initial

70:5 334:15
initially
12:22 152:22
initiate
137:21
initiated
72:13
Initiation
171:15
injected
339:24 340:11
injuries
65:17
input
77:24 80:25 150:11
    151:25
Insofar
337:25
instance
33:23 76:22,23
    77:7 85:16
instances
85:6 86:2
Institute
43:10 233:21
institution
289:6
institutional
289:7
instruction
82:20 96:20
instructions
82:21 90:1,11,20
    91:14,18 354:1
intake
282:25 284:1
integrate
25:4 74:22
integrated
25:20 82:13 196:1
    321:16
integrating
28:6
integrity
197:12
intellectual

22:2
intend
68:15 69:6 84:16
    84:22 259:13,17
    259:23
intended
293:23
intending
139:6
intensive
196:16,17
intention
142:7
interact
275:17
interest
131:20 260:11
    275:21 276:9,24
interested
92:13,24 124:6
    138:14
interesting
140:5 178:2
internal
79:20 92:19,19
    138:5
internally
92:7 259:12
international
13:13 19:25 26:5
internet
256:19 257:12
interpret
273:17,23 311:24
interpretation
67:7 83:16 134:13
    161:20 172:15
    205:10 273:19
    298:12 309:7
    345:3 347:25
interpreted
246:14 274:1 322:7
    328:24
interpreting
183:16 249:1
    273:20,21,25

310:12
interrupt
157:15
interval
236:15,19,21
intervals
190:3 207:2,3
    223:19 297:12,15
    297:16
interview
214:19,20 215:20
interviewed
180:22 200:25
    209:19 211:6,9
    212:8,15 213:15
    213:18,19 215:3,5
    215:15 216:10,15
    216:23 217:1,18
    217:23
interviewing
159:18,19
intimately
264:14
introduced
239:13 349:14,17
Introduction
20:19
invented
209:18
investigated
119:22 161:10
investigator
124:20 209:20
    279:24 283:14
investigators
100:1 237:6 238:11
involve
121:23 156:25
    341:9,10
involved
26:4 53:12 82:14
    138:17 159:11
    161:15,17 189:2
    257:23,25 258:12
    276:11 277:8
    282:19 324:7

Jack Siemiatycki, Ph.D.

**involvement**
12:11 88:10 124:22
127:16 135:12
233:3 258:3 260:5
278:5 282:17
**involves**
25:21 31:6
**involving**
59:17 141:8 218:15
259:24 260:13
276:12 302:23
324:12 325:3
**irrelevant**
245:16
**irrespective**
166:13
**issue**
22:24 31:5 41:24
59:7,25 66:21
74:16 84:11,12
92:7 95:23,24
96:13 104:12
122:14 129:10
131:21 133:23
135:5 136:10
176:2 199:7
247:25 261:5
275:19 298:24
313:23 314:21,23
315:19 317:17
325:13 331:18
**issues**
12:23 95:23 129:13
157:3 189:14
191:2 334:18
**italics**
64:10
**item**
160:4 256:6,7
285:12
**items**
95:15

**J**
**Jack**
1:17 2:1 6:2,11,16

6:19 7:10,12,15
8:6 9:14,18 52:22
104:24 105:3
145:24 210:7
242:22 287:9
288:14 306:18
308:21 309:5
352:2,5 356:11
**January**
1:19 9:6
**jargon**
114:12
**Jersey**
1:2 4:20 9:12 109:5
**JESSICA**
4:17
**jessica.brennan...**
4:22
**jogs**
135:21
**Johnson**
1:5,5 4:10,10 9:10
9:10 10:3,3,7,8
89:20,20 91:20,20
101:7,7,15,15
103:23
**Johnson's**
59:17 103:23
**join**
309:16
**journal**
8:13 127:11 277:21
277:22
**journals**
159:14
**JS**
7:4,7
**judgment**
24:13 25:3,7,12,21
26:8 31:6,9,11
36:13 39:6 82:18
83:6,12 90:1
153:20 184:13,20
185:2,8,9,23
186:1 188:20
227:23 321:17

322:8
**judgments**
30:5 31:7,15,18
39:13 184:13
185:12 186:11
209:7 223:1
227:17
**Julie**
95:14
**July**
7:8 47:14,16,20,21
48:4 49:5 233:22
**jumping**
290:23
**jury**
90:1,11,20 91:14
91:18
**justified**
184:4
**justify**
144:2
**juxtaposed**
24:10
**J.M**
3:16

**K**
**keep**
86:14,15 88:5
108:11 140:14,15
140:16,20 189:6
236:5 266:4
290:24
**kept**
40:25 41:1 71:19
72:5 81:5 92:6
195:11
**key**
142:17
**Kimberly**
4:11 10:1
**kimberly.bransc...**
4:16
**kind**
15:15 20:14,16
57:8 66:21 77:19

83:4 85:22 121:7
121:10 124:9
126:24 128:8
132:17 133:22
135:15 147:16
148:19 152:1
158:20 167:16
187:20 245:15
273:10 281:19,19
325:14 331:9
**kinds**
179:22 180:11
204:22,23 226:7
314:17
**Kingston**
279:15
**KIRKLAND**
4:12
**Klatt**
5:11 6:4 20:10
140:10 252:11
253:21 274:6,14
274:18 276:22
277:6,13 278:6,11
278:16 279:7
280:12,15 281:25
282:4,15 283:9
284:11 285:1,3,21
285:25 286:4,6
288:20 289:10,18
289:21,23 290:4
293:3 300:13
302:6 304:16
306:4 309:1
336:10 337:22
338:18 339:15
341:7,14,20 342:8
342:12,21,24
343:8,15 344:13
344:18 345:1,16
346:8,15,25
347:13 348:3,13
348:18 349:5
350:3 351:8,18
**knew**
73:17 81:25 117:16

222:13
**knocked**
155:25
**know**
18:10 29:2,4 32:12
36:12 38:2 40:13
40:22 46:17 52:8
68:20 77:16 78:3
78:5 83:21,23
85:23 86:5 88:9
91:13,14 92:3,13
93:24 98:3,13
99:6,13 100:1,5
102:23 104:2
107:24 114:8
121:8 124:16
126:1,18,18
127:12 129:6
130:14,17,18
132:1,2,4,20
135:10 136:5,8,11
137:21,24 140:1,3
140:12 142:22
147:13 148:5
151:20 152:20
153:9 155:17
157:20 158:19
159:3 160:1 161:1
162:4 170:13
174:5 177:5
183:24 184:3
187:25,25 188:22
190:11,13 196:2,3
196:3 197:13
204:9 207:12
208:18,19,21
219:19 227:25
228:3,18 229:22
230:12 231:5,23
231:25 232:1
233:5,7,9 237:24
239:10 240:17
242:4,14 245:14
248:1 250:7
251:22 254:25
257:25 259:9,12

260:11 261:20
262:19,22 272:4
274:20 276:1
277:25 281:13,22
282:23 284:15
290:10,17,22
293:1 303:18
312:2 319:8 324:6
325:9,11,14
332:17 344:22
**knowing**
73:23 194:25
**knowledge**
85:4 98:10,12
99:24 117:17
218:14 233:15
240:23
**known**
37:22 67:9,9
147:10,25 148:15
173:8 324:5
**knows**
219:12 231:2
**Koushik**
7:21 124:25 278:18
278:21 280:24
282:16 284:13
286:23 287:7,8
**Koushik's**
280:16
**Krewski**
232:2,4,16,20
233:2 275:11
292:21 293:1,13
293:22 323:11,20
324:10,20,24
326:10
**Kurt**
139:11

_____

**L**

_____

**LA**
53:16
**label**
213:25 214:4
**labeled**

47:19 255:19
**labs**
102:7
**lack**
288:8
**lactation**
287:19
**lag**
85:3 132:17 133:8
**Langseth**
42:8 123:22 126:12
149:18,20 202:16
235:22 299:3
**language**
130:24 219:1
221:14 333:15
**large**
14:16 161:17
172:21 197:14
204:19 224:2
318:19 335:14
**largely**
188:4 298:5
**larger**
108:5 327:24
**largest**
266:13
**Lash**
20:9
**late**
212:24 245:8
**latest**
247:24 266:21
**Laura**
14:11
**law**
262:21,23
**lawsuits**
213:9 218:14 219:5
219:19 220:10
221:11,16 277:17
**lawyers**
10:21 40:9 73:21
88:12 89:5
**lead**
68:25 115:16

127:17 138:11
193:16 280:6
327:18
**leading**
281:6
**leads**
180:13 320:2
**learn**
188:25
**learned**
188:21 230:25
293:21 323:22
324:6
**leave**
206:2,3 225:8
227:12
**leaving**
136:6
**lecture**
134:3
**led**
175:22 230:1 320:3
**left-hand**
206:10 329:19
**legal**
90:15 114:1,3,12
251:25
**legislation**
263:12
**legitimate**
185:9
**lengthy**
196:19
**Lesley**
82:11
**Leslie**
1:25 2:12 9:16
351:24 353:18
**let's**
12:13 17:15,15
45:12 53:22 56:7
65:7 67:18 83:15
105:13 154:9
157:7 160:23
174:11 182:9
194:4,17,17

232:15 242:11
280:24 282:20
285:1 286:15,15
286:20,20,20
308:15 313:9
342:10,18,19,19
348:14,15
**level**
103:9 116:22
122:15 129:14
147:24 153:18
155:15 187:1
261:17 268:12,13
269:17 304:8
314:4 329:4
**levels**
106:21 121:10
270:4 327:21
351:12
**LEVIN**
3:5
**lexicon**
37:8
**Lexington**
3:18
**LHG**
1:6
**LIABILITY**
1:8
**life**
264:10 284:19
**lifestyle**
281:11 282:25
283:23 284:13
291:5
**lifetime**
268:18 295:10
**ligation**
287:20
**light**
109:5 235:24
256:22 283:11
**lights**
257:8
**likelihood**
141:17 319:18

327:3
**limitation**
179:13
**limitations**
178:15,22 179:6,11
**limited**
118:7 144:12 153:4
202:9 203:7
205:19 220:9,22
221:11 233:17
281:7 288:1,7
330:10,21 331:2
**line**
26:3 62:3 63:1,9
70:14 80:1 111:20
148:17 181:18
186:6 196:20,24
197:14,16 199:2
207:19 224:1,9
228:8 303:11
309:17 355:4
**lines**
32:25 139:7 151:4
219:4 321:14,15
**lingering**
190:6,7
**link**
57:18 118:12 126:5
135:18
**linked**
118:24 168:10
350:14
**list**
14:4 86:11 93:4
135:21 138:13
140:6 170:1
287:22 332:19
**listed**
76:4 87:16 88:3
170:19 187:21,22
232:17 287:24
292:24 345:7
**literal**
63:3
**literally**
29:5 160:15

Jack Siemiatycki, Ph.D.

**literature**
12:18,19 13:7
  37:17 38:25 39:21
  65:4 73:15,17
  74:9,10,14 81:23
  85:8 99:18 122:21
  132:9,15 133:10
  162:25 163:19
  164:3,18,23
  172:18 173:25
  196:16 222:22
  241:3 261:24
  262:2 263:5 301:9
  301:17 331:17
  332:12
**litigation**
1:9 9:5 10:8,15
  13:15 22:1 48:22
  53:9 54:8,15,19
  55:1,15,22 56:2
  56:10,13,16,18
  57:1,2,4,5,12,22
  58:6 92:8 98:17
  98:21 99:3,7,12
  99:15 100:13
  123:24 124:23
  127:25 135:2
  141:7 161:11
  196:10 222:12,17
  233:3 259:24
  260:6,13 276:4,12
  276:16 277:9,25
  282:18 302:23
  307:10 324:12
  325:3 332:6
**litigations**
316:16
**litigation-related**
218:1,9
**little**
52:15 112:19
  135:13 140:21
  171:25 222:19
  234:13
**lives**
226:6

**LLP**
3:5,11 4:4,12,18
  5:5,12,19
**local**
219:18,21
**localized**
218:22 219:15
  220:17
**located**
193:14 254:17
**logical**
321:12
**long**
11:17 17:9 29:16
  104:15 108:23
  194:8,9,11 196:19
  279:1 287:19
  290:22 325:25
**longer**
82:9 145:10,11
**Longo**
97:13,24 98:8,15
  100:12 102:10
**Longo's**
100:5 101:7
**longwinded**
182:15
**long-term**
343:19
**look**
14:12 25:5 34:17
  37:16,20 41:20
  51:8 52:9 60:19
  63:18 65:9 77:25
  81:17 83:22 89:10
  89:25 96:10 105:7
  107:19 142:10
  144:5 154:3
  156:18 159:9
  169:7 182:19
  184:17 188:5
  195:19 201:22
  207:3 211:20
  212:1 216:13
  219:10 223:12
  229:11 232:10

243:9,14,15
245:20 247:20,21
247:22 286:10
332:18 337:1
343:3 345:5
**looked**
12:23 72:17 79:18
  79:19 93:10 95:7
  95:8 107:21 161:8
  162:10,19 183:14
  198:15 219:13
  243:5 250:17
  262:16 289:8,15
  316:14 318:11
**looking**
49:24 53:1 58:25
  62:5,10 77:4,21
  78:12 79:20 99:10
  100:16 118:16
  119:4 131:20
  143:15 156:10
  157:11 169:11
  173:22 175:2
  177:11 179:8
  192:9 198:5,6
  200:3,5,7 201:20
  203:9 208:2
  209:13 215:12,24
  225:1 238:14
  256:3 266:2
  267:24 281:20
  285:5 286:13
  305:9 307:13,22
  313:23 314:11,14
  314:18 343:9
  348:20 349:3
**looks**
18:23 62:10 83:14
  83:15 122:1
**loosely**
92:6
**Los**
4:14 136:5
**lost**
37:14 152:3
**lot**

12:21 16:24 38:14
  38:25 73:23
  138:11,12,14
  148:8 150:10
  153:19 160:18
  161:3 162:3
  176:20 177:9
  229:21 281:22
  289:4
**loud**
63:12 169:8,10
  297:3
**Louis**
5:21
**low**
320:1 329:22
**lower**
148:9 149:17
  192:17 199:2
  202:14,18 206:23
  206:24 313:9
**lowering**
167:1
**lumping**
168:24
**lunch**
63:22 78:13,15
  104:18 105:1,9
  107:20
**lunchtime**
63:19 78:1
**lung**
130:14,15 132:21
  133:21 147:4,8,22
  147:24 177:2,3,11
  177:12,15 181:20
  182:1 204:14,15
  204:19,23,23
  281:2 318:9
  329:23 350:18
  351:2
**lymph**
339:5 343:18,24
  344:11,12,24
**Lyon**
20:2 139:15 233:21

**L-A-S-H**
20:9

---

**M**

**M**
5:18
**magical**
184:3
**magnitude**
147:20 159:5
**mailed**
226:14
**main**
42:5 56:17 88:4
  112:12 159:1
  166:1 200:16,17
  200:18 201:7,11
  201:12,12,18
  213:13 228:25
  235:20 256:16
  307:14 310:16
**maintain**
86:10 88:3
**maintained**
82:12 197:11
**major**
227:8
**majority**
129:7 321:11
**making**
25:12 26:8,9 29:25
  52:8 62:23 117:21
  185:21 204:25
  207:17 227:17
  249:1 304:10
**males**
351:3
**managed**
97:6
**Management**
43:13
**MANSUKHANI**
5:12
**Manual**
105:19,24
**manufactured**

101:15 118:8,10
  118:12
**manufacturer**
115:3,18 116:18
**manufacturers**
115:14
**manuscript**
  41:23 51:25 84:3
  125:16,25 193:25
  230:10,18 231:20
  231:24 232:24
  233:5,10,12,17,18
  233:24 234:20
  235:2 239:1
  240:12 241:13,15
  243:1,6,10,18
  244:22 250:18
  268:4 277:22
  325:24 326:2
**manuscripts**
254:8
**margin**
107:11
**margins**
44:15
**mark**
  14:21 15:1,25 16:3
  17:16 18:12 43:23
  45:13 46:1,15
  48:2 58:8 61:6
  108:13 112:18
  178:17 194:4
  213:23 234:15
  278:11 285:1
**marked**
  15:6,10,19 16:5,13
  17:12,18,22 43:25
  45:1 46:6,20 47:4
  48:5,24 49:12
  53:2 58:10,13,20
  58:24 60:5 61:7,9
  61:19,24 68:9
  69:3 70:3 72:9
  94:8 110:3,12
  149:16 194:6,23
  214:7 234:16

235:14 243:2
256:4 278:14
285:3,14 286:2
308:9,15,24
309:14 312:23
317:8,12,21
**market**
  4:5 92:23 118:21
  119:2,7,16,20
  120:5,15
**MARKETING**
1:7
**markets**
  115:16 117:18
  118:22
**marking**
  14:13 41:17 61:13
  108:16 308:19
  309:3
**marks**
  112:14,16,16,19,20
  112:20
**Martinique**
126:22,24
**Master's**
279:13
**match**
88:6
**matched**
223:15
**material**
  12:22 18:16 19:12
  40:8,24,25 88:16
  89:1,2,4 96:5 98:7
  260:20 314:6
**materials**
  13:1 16:22 17:3
  37:4 39:19 40:4
  40:16 42:9 43:21
  44:6 51:21,24
  52:3 80:16 82:7
  84:2 87:19 88:8
  88:12,13 89:3,7
  92:15 94:6
**mathematical**
114:21 321:18

**matter**
  9:10 69:7 109:3
  182:2,6 214:5
**Matthew**
101:11
**maximum**
319:13
**McGill**
279:18
**McTiernan**
  14:11 93:13,22
  94:17 95:8
**MDL**
  1:5 10:8,14,21
  11:10 12:11 13:4
  13:8,23 14:2,6
  16:2 17:24 22:8
  22:21 23:13,21
  24:2,19 25:14
  26:14 36:5 37:20
  40:6 47:11 50:8
  55:14 57:16 60:16
  61:14,23 62:23
  64:7 66:15,25
  68:11,16 70:3
  71:5 84:7 93:5,9
  93:21 94:7,14
  95:6 96:6 110:8
  110:12 127:4
  136:12 150:1
  175:19 186:3
  236:22 240:11
  333:5,20
**mean**
  11:15 12:10,12
  13:9 23:16,17,22
  28:11 29:23,24
  30:4,4,12,19 32:5
  32:6,9,16 34:2
  35:7 37:7 56:4,5
  57:7 64:18,24
  68:17,23 71:16
  77:18 79:20 80:14
  84:23 85:22 86:14
  92:18 96:15 99:6
  101:19,21 109:25

114:6,16 121:2,3
125:7 127:24
128:13,17,21
130:2 131:14,17
133:13,24 134:8
146:20 162:2
166:7 172:3
179:13 188:4
192:2 193:23
196:11 209:10
223:9 226:18
229:8 239:9 244:9
246:11 251:22
263:22 272:16
279:5 316:13
333:10 334:13
347:22
**meaning**
  50:8 114:25 167:17
  216:3,16 269:7
**meaningful**
  102:16 207:8
  266:25
**meaningless**
245:23
**means**
  101:20 137:4
  145:12 229:22
  252:3 281:18
  282:1 315:18
  353:23
**meant**
  32:20,21 33:9
  106:18,19 198:6
  252:17,21 324:17
  324:18 347:22
**measured**
158:20
**measurement**
  166:2,4,7,8,10,12
  167:7 169:21
**measuring**
179:24
**mechanics**
138:16

**mechanism**
  75:9 115:22 116:7
  117:19 143:6
  155:9,10 156:19
  156:25 157:3
  165:3,12 312:7,11
  312:12,13 313:18
  313:18,24 315:24
  316:5,12 330:13
  330:23 331:6
  334:7,23 335:5
**mechanisms**
75:3 152:24
**mechanistic**
  74:16 155:16
  163:22 302:2
  316:9
**media**
230:22
**medical**
129:8
**medication**
  38:12 181:13 288:4
**Medicine**
127:12
**Medicine/Volume**
8:14
**mediocre**
27:13
**medium**
  146:22 147:16
  166:20
**meet**
  9:24 140:3 191:17
**meeting**
  11:17,21 20:1
  137:17 139:16
  143:19 152:20
  233:21
**meetings**
  10:22 11:9,13 12:1
**meets**
264:6
**member**
293:19
**members**

Jack Siemiatycki, Ph.D.

294:3
**memory**
155:19 219:14
323:18
**Mengting**
79:4 81:5 82:1
**mention**
18:3 165:7 187:5
219:2 269:21
284:22 349:9
**mentioned**
19:19 34:9 39:20
70:19 81:8 84:1
105:17 180:2
184:19 305:1
**mentor**
124:10,10
**merely**
276:10,11
**merits**
66:22 228:20
**mesothelioma**
168:4,22
**mesotheliomas**
168:9,19,25
**message**
231:2 323:16 324:4
324:20 325:6
**met**
9:25 11:1 136:16
139:14 274:21
**meta**
42:5 235:19
**metadata**
191:12
**metals**
103:23 350:6,22
**meta-analyses**
6:25 29:1,4 42:5
44:11,12 46:4
76:10,12 77:13,24
79:22 80:6 82:19
83:1 127:2 128:8
142:24 162:21
180:3 181:5,20
183:17 208:4,6,22

209:2,6 235:18,20
239:14 247:2,2,3
247:4,7,11 248:22
248:23,24 251:7
253:9
**meta-analysis**
20:19 36:25 37:3,8
37:8,19,21 38:6,7
38:9,21 39:2,7,11
41:24 42:10,19
67:16 72:12 76:1
76:3,4,19 77:5
78:7,23 79:10,13
79:16 106:5
112:12 127:3
149:15,21 150:2
162:9,17 178:16
178:23 179:11,14
179:16,18,21
180:4,9 181:2,3,5
181:21 183:21,22
183:25 184:4,7,16
184:23 185:17
186:3,4 187:2,3
187:17,18 188:10
188:13 193:18
194:1 195:4
196:25 199:8,13
200:11 202:6,15
202:17 206:18,23
208:5,6,9,23
209:15,17 210:11
210:17 213:13,21
222:24 223:10,21
224:9 225:8
227:13 228:9,25
230:5 233:25
238:22,23 240:15
240:16,22 241:7
275:13 291:23
292:8,15,17
293:20 301:2,3,6
301:8 305:21
327:5
**meta-analyze**
203:14

**meta-estimate**
182:25 247:11
**meta-estimates**
207:4
**meta-relative**
199:2 203:15
209:24
**method**
28:6 36:15 37:2,19
134:24 198:15
**methodological**
21:11 182:22
**methodologies**
36:22 179:2
**methodology**
22:8,19 23:12,18
23:20,23,24 24:17
27:11 29:20 30:9
31:3 36:4,8,11
134:12 185:14
302:17,19 303:23
304:4,8 306:23
307:7 309:24
**methods**
134:10,18 181:13
**metric**
198:1
**metrics**
121:6
**Michael**
5:11 341:16 343:6
347:19
**Michelle**
3:10 16:8 44:22
46:17 300:8
**microphone**
155:22,25
**microspheres**
339:17,24 340:11
**mid**
257:18,18
**middle**
64:9 169:9
**mid-December**
257:18
**mid-November**

53:7
**migrate**
331:12 339:3
340:24 344:24
**migrating**
343:23
**migration**
143:8 314:8 341:23
342:16 344:15
346:23 347:3
**Mike**
274:18 282:6
285:19 289:12,12
289:16,19 337:19
**mind**
30:17 63:18 78:1
78:12 130:5
144:21 169:8
170:3 187:25
195:23 240:3
251:2 273:16
300:8
**mine**
39:16 77:15 100:8
108:12 112:13
174:18 201:14
237:21 254:18
337:17
**minimal**
228:23
**minimize**
221:22
**minimum**
122:15
**minor**
80:8 199:4 223:2
**minority**
129:7
**minus**
53:23
**minute**
41:4 67:19 76:15
275:16
**minutes**
104:17 135:25
229:10 274:7

**misaligned**
110:15
**misconception**
64:10 67:3
**misdiagnoses**
167:8,10
**misdiagnosis**
168:3
**misnomer**
244:18
**misread**
328:11
**missed**
12:24 198:7
**Missouri**
5:21
**misstates**
104:10 125:5
133:12,16 153:14
208:1 241:19
244:15 250:12
265:6 269:13
273:6 330:25
335:12 344:16,21
346:13 347:12
**misunderstanding**
276:7
**miswritten**
63:16
**mix**
88:6 209:23
**mklatt@grsm.com**
5:16
**Mm-hmm**
89:12 281:3 304:6
**models**
153:23
**moderate**
147:1,2 148:18
149:7 229:21
**modest**
146:17,21 149:3
**modifiable**
287:3 288:2 291:6
291:10
**modifications**

70:20,23
**modified**
258:23
**modify**
109:10 287:25
**Mohamed**
230:4
**molecular**
163:21 164:23
**moment**
62:4 79:8 104:8
163:8 271:10
290:2 348:23
**money**
281:23
**monitor**
30:16 32:18 133:18
**monograph**
19:25 136:16
137:10 138:1,25
139:4,10 140:4
141:5 163:11
**monographs**
105:18
**month**
11:11 47:14 48:4
53:18 57:7,7
82:10 256:13,14
332:22
**months**
56:8 95:24 96:14
139:4,9,17 191:7
256:14
**Montreal**
1:18 2:6 9:9 11:15
11:16 279:19
**morbidity**
287:16
**morning**
9:3,23,24 160:15
**mortality**
287:16
**motivated**
185:10 272:17
**motivation**
289:4 325:18

**motive**
325:19
**move**
103:12,13 291:1
**moved**
140:8
**moving**
25:22 103:3 205:12
338:9 344:10
**MParfitt@ashcr...**
3:15
**MSc**
6:19 7:13,16
**multidisciplinary**
150:21 303:2
**multifactorial**
130:17
**multiple**
67:11 151:4 195:18
283:23
**mutagenicity**
311:21
**mutually**
251:4
**M-E-N-G-T-I-N-G**
79:4

--------

**N**
**N**
3:1 6:1,1 9:1
**name**
9:4 10:1 75:25 79:3
82:11 91:8 93:25
101:9 124:24
353:14
**named**
200:22
**names**
289:6 332:14,21
333:23
**napkins**
83:9
**NAPOLI**
3:17
**narrative**
149:8 273:10

321:13
**nasal**
350:17
**national**
26:5 43:9 233:20
**nature**
34:7 179:20 223:23
278:5
**near**
337:6
**nearby**
278:24
**nearly**
53:16 160:17
**necessarily**
31:17 84:25 199:9
261:19
**necessary**
30:23 32:8 81:14
315:25 335:4
354:3
**need**
16:3 31:19 36:17
39:1,12 40:19
83:6 86:8 142:16
150:21 151:4
176:22 194:14
208:17 211:15
227:19 250:22
264:15 281:22
285:22 291:7
296:20 306:8
322:12 342:2,4
**needed**
120:21 121:14
283:11
**needs**
184:20
**negligible**
106:16
**neither**
221:10 315:21
350:13
**networks**
74:11
**never**

33:14 52:7 90:16
126:22,23 127:9
129:6,10 136:3,9
149:6 162:11
170:13 193:24
209:19 225:18
226:25 229:20
244:13 258:14
289:8,14 298:6
323:16 335:3
336:17 351:4,14
**never-used-it**
77:4
**new**
1:2 3:20,20 4:20
9:12 21:25 56:22
70:7,18 73:15,21
73:22 74:17 97:12
108:17 109:4
127:11 143:4,13
143:14,15 165:6
198:14 257:17
285:12
**newer**
191:25
**news**
230:23
**Nice**
9:24
**nickel**
350:6,10 351:6,13
**node**
343:25
**nodes**
339:6 343:19
344:11,12,24
**noise**
140:11
**nondifferential**
170:22
**nonissue**
97:21
**nonmucinous**
297:8,23
**nonparticipation**
170:7

**nonquantitative**
158:17
**nonresponse**
170:6,16
**Nonresponsive**
252:11 253:21
**nonsmokers**
147:8
**nonuse**
297:10
**nonusers**
297:24 298:13,16
**non-experimental**
328:19
**non-human**
311:20
**North**
219:21
**Nos**
46:6
**Notary**
2:13 356:19
**notation**
107:11,16
**notations**
7:18 64:6
**note**
64:16 75:15 78:16
78:20 101:16
107:8 198:9 199:1
199:9 213:2
221:24 225:14
**notebook**
299:19
**noted**
9:15 354:9 356:7
**notes**
44:7,12,14 51:23
353:11
**noteworthy**
209:4
**notice**
2:12 6:10,15 14:14
14:23 15:16,19
16:15
**noticed**

63:25 89:18
144:23
**notify**
260:12 324:25
**notion**
34:18 35:4 84:11
122:23 148:19
259:20 315:20
**notwithstanding**
29:13
**November**
7:6 47:9,10,18
48:11 49:1 50:16
51:3 61:2 62:24
69:21 139:16
332:25 333:1
**number**
9:13 17:13 32:7
33:22 45:15,16
48:10 52:22 63:6
67:4,12 102:7
104:23 105:3
112:5 121:4,4,11
142:21 145:7,24
210:7 215:8,21
216:8 220:2
242:22 268:17
280:13 294:10
297:22 300:4,19
306:9 311:7,10,13
311:16,18 323:17
326:13 333:21
**numbering**
87:6
**numbers**
45:15,20,22 63:2
76:20 77:9 92:17
108:6 109:7
110:15 187:7
217:5 266:18
295:10
**numeral**
300:4,17,21
**Nurses**
226:3,12
**nutritional**

226:6
**N.W**
5:6

**O**

**O**
6:1 9:1
**oath**
2:15
**Object**
54:1 161:12 252:11
253:21 307:12
310:2,5 312:18
332:1
**objecting**
133:15
**Objection**
12:6 22:9,22 23:15
29:22 32:4 34:1
35:6,24 39:10
53:10 55:2 60:7
69:23 71:1,8,13
73:9 75:12 80:20
84:21 85:10,20
90:14,25 94:21
95:20 99:4 103:25
104:9 116:3,14
117:3,6 118:2
119:8,18 120:13
121:19 122:10
123:10 125:4,15
129:20 130:7
131:24 132:13
133:11 137:2
150:8 151:6,15
152:15 153:14
154:16 156:11
165:13 167:15
172:24 176:13,16
176:23 178:9
185:6 188:18
192:5 198:25
200:12 202:25
205:3 207:25
218:17,20 220:24
222:8 223:8,22

225:9 239:7 240:5
240:13,25 241:18
244:15 246:21
247:9 249:23
250:11 251:10
252:19 253:14,17
254:3,11 258:17
258:24 260:22
261:3,25 263:7,21
264:12 265:5
267:13 269:11
271:15 272:14
273:5 276:17
277:4,11 278:2
279:4 281:16
283:7 284:6,24
288:17,23 291:15
292:1,10 293:14
302:5,6,25 304:2
304:16 306:4
307:3 314:2,24
315:7 326:17
330:14,24 331:14
334:8,11 335:1,12
339:12 341:2,13
341:17 344:1,16
344:20 345:15
346:13,19 347:11
348:7 349:23
350:23 351:15
**objections**
6:14 15:25 16:14
353:7
**objective**
34:25
**objectives**
181:6
**obscure**
92:17 162:4
**observable**
121:12
**observation**
209:4 316:5
**observational**
30:22 38:22 39:4
180:10 181:15

184:8
**observations**
298:4
**observe**
159:22 176:4
341:24
**observed**
160:12,13 268:5,16
295:8 297:7 311:8
311:14 320:4
**observes**
343:24
**obtain**
118:19 256:17
257:9
**obtained**
80:4,5 93:3 257:14
**obviously**
325:24
**occasion**
127:9 139:12
**occasionally**
225:19
**occasions**
13:12
**occupation**
8:13,14 175:16
177:3,12 317:24
318:12 329:10
**occupational**
19:22 162:3 174:19
306:10 311:5
**occupations**
177:2,6,13,15
318:9,19
**occur**
83:1
**occurred**
106:14,15 152:19
**occurring**
284:16
**October**
7:11 57:22 58:5
61:1 69:22 127:23
**odds**
76:17,24 77:10,23

106:7,24 160:15
177:13 185:16
214:24 215:2,4
222:5 223:19
225:16 228:10,19
245:10,19 319:1
319:12,13
**offer**
60:11 68:15,24
84:16 263:3
302:22
**offered**
13:4 60:10 97:17
**offering**
60:4 68:20 75:8
101:13 123:16
164:9,13 165:1,2
183:7 265:3
302:21
**offers**
287:15
**offhand**
95:12 100:16
**office**
40:9 73:4 342:23
343:7
**officer**
249:8
**offices**
2:2 278:24
**officiated**
2:14
**offline**
191:18
**oh**
20:12 56:24,24
62:11 63:7 67:3
75:24 86:25 101:1
110:18 111:10,14
112:2 155:23
161:1 175:10
183:3,3 193:6
220:3 232:12
234:6 235:17
241:1 242:16
251:21 266:7

Jack Siemiatycki, Ph.D.

300:10,18 308:7
317:19 326:25
339:18 348:19
350:8
**okay**
18:13 19:17 29:15
32:22 33:4 37:2
39:15,25 41:20
42:14 45:9,21
48:1 49:19 58:18
59:9 60:15 61:17
62:11,17,19 63:6
66:24 68:9 81:22
83:17 84:1 86:16
87:7,11,25 89:10
91:22 92:4 93:20
95:13 98:8,14
99:17,22 100:23
105:11 110:17
112:24 116:7
120:7,18 131:18
132:7 133:17
134:3 136:2 137:7
139:8 145:3 152:5
154:24 155:24
156:14 157:4,7,9
158:6,10 162:18
162:23 164:7
165:16,22 167:22
174:23 176:6
177:22 178:1,15
179:4,8,12 182:9
183:19 184:19
185:25 186:21
187:5 188:3,8
191:22 194:19
196:5 200:1,13
201:20 205:14
209:25 210:16,23
211:25 212:6,20
212:22 213:13
214:5 215:24
217:13,21 218:1
220:13 221:19
223:5 225:24
230:3,9 231:9,12

234:18 235:12
236:6,8 237:13
238:4,25 239:19
241:6 242:8,10
246:25 247:22
248:7,8,14 249:20
250:17 254:14
256:2 264:25
265:10 266:6
267:5,24 268:2,22
269:6 270:10
272:10,20,25
273:13 274:3,25
275:15 278:10
285:17,23 286:15
290:2,3,16,21
293:18 294:5,19
296:22,25 298:7
299:22 300:3,7
306:11,12 308:18
312:14,21,21
313:2,7,11,13,22
315:16 324:16
327:8 328:6,12
331:10 334:5
335:17,24 336:14
336:20 337:14
340:5 342:10,18
348:14
**old**
72:17
**older**
42:7,8
**OLVEY**
4:11
**ones**
34:21 35:11 42:7,8
67:12 92:16 94:24
95:1 123:4 165:19
170:11,12 187:22
197:3 224:5,5,8
237:19 272:6
305:2 332:11
**one-to-one**
152:1
**onset**

281:14 282:23
**Ontario**
279:15
**open**
205:10 242:25
**operation**
82:22
**opine**
127:9 165:9 252:14
315:25 320:3
331:11
**opining**
127:13 314:21
317:4
**opinion**
28:12,24 29:13
32:13 33:12 34:22
36:5 67:15 68:21
83:13 90:11 93:5
100:7,9 101:13
103:20 104:3,6
113:6,13,17 115:1
118:5 120:9,18,20
123:16,19 127:7
127:19,20 128:24
129:12 131:5,12
134:25 150:4
159:2 164:9,14
165:1,2,5 174:1
178:5 200:10
223:21 224:20
225:7 232:19,22
241:16 243:10
253:25 256:16
259:20 260:21,23
261:5,9,11 263:3
263:17 265:8,23
271:11 288:24
291:3 301:15,25
315:3,8,12 330:8
330:18 331:18,21
333:19 334:14
**opinions**
11:10 12:15 13:3,5
13:8,25 23:21,25
24:18 50:7,9 53:8

60:4 68:11,12,13
68:14 69:4 75:6,8
75:20 84:6,16
92:1 94:12,14
97:17,21 102:22
102:24 114:1
128:12,16 141:16
173:17 194:22,25
222:12,13 240:10
241:22 256:10
261:19 265:3
302:21 307:9
314:1 316:23
318:5 326:16
332:6
**opportunity**
128:5 137:18 198:7
259:6 295:13
**opposed**
164:10
**opposite**
221:23
**opposition**
35:11,12
**optimal**
70:12,21
**options**
186:13
**oral**
6:10,15 287:19
293:6
**oranges**
179:21
**order**
28:19 29:19 55:17
147:20 151:2,18
178:6,11 228:15
259:11 292:3
303:25
**ordered**
24:6 292:2
**organization**
26:6 289:11
**organize**
124:7 138:11
**organized**

139:16 274:7
**origin**
266:23
**original**
6:23 42:17 44:17
46:2 70:10 106:11
112:15 126:12
304:9 319:13
333:14 353:12
354:11
**ostensibly**
266:24
**Oules**
59:13 274:22
**outcome**
155:11 156:20
**outcomes**
179:25
**outline**
21:12
**outlining**
199:17
**output**
80:14 81:1 128:9
**outside**
90:15 107:4 135:2
154:2 334:13
338:12
**outstanding**
111:1
**ovarian**
6:20 7:14,17 12:18
13:11,15 24:16
33:13 38:23 56:18
57:19 58:23 65:7
65:10,20 66:11
69:15 75:4,10
78:11 81:17 84:19
88:11 89:25 90:23
97:18 103:16
113:9,15 115:2,23
116:8 117:2 118:6
119:5,14 120:1,10
120:19,21,25
121:15 122:8,20
123:18,23 124:1,6

124:8,22 125:24
126:6,14 127:8,22
128:4 129:1,18
130:2 131:8,16,22
132:11 133:23
134:6,10,23 135:1
135:6,19 137:1
141:9,18 146:8
148:7 150:6
151:12 152:12
153:11 155:1
157:14 164:5
165:4 167:11
168:4,11,14,18,23
168:25 171:16,18
171:19 172:8,11
172:23 173:8
174:13 176:2,8
189:8,14,17
190:16 192:4
193:18 202:8
203:16 204:6,11
204:13 205:1,1,9
205:25 213:9
215:14 216:4,9,17
216:24 218:4,15
227:9 230:7,21
232:20,23 237:10
243:13 247:8
248:11 250:10,20
251:9 252:8
253:12 259:22
261:2 267:9,22
268:7 271:13
272:12 273:3
275:19 276:3,12
277:8 279:25
281:2,4,14 282:9
282:17,24 283:12
283:15,24 284:14
284:16 287:2,4,18
288:6,15,22
296:15 297:9,24
301:12,18 302:10
302:23 305:14,25
307:11 312:8,16

314:22 315:5,14
316:25 317:5
319:19 330:10,21
331:7 335:9
343:19 345:12
349:21 350:14
351:5
**ovaries**
331:12 338:22
339:4 341:1
346:12
**ovary**
122:8 232:20
**overall**
29:13 34:2,7 77:3
77:10 115:16
180:20 182:24
192:17 202:18
234:2 236:11,18
236:20 269:22
270:7,8 298:13
**overlapped**
188:4
**overlapping**
270:6
**overreport**
160:25 161:6,7
**overwhelming**
88:16 125:11
281:10
**oxidative**
143:12 314:9

---

**P**

**p**
3:1,1 9:1 268:17
295:9
**pace**
290:24
**pack**
105:20
**package**
26:23 77:19 79:15
80:24 184:16
271:1
**packages**

79:12
**pad**
169:4
**page**
6:2,9 7:3 8:3 32:25
62:1,5,25 63:8
64:9,10,14 67:1
68:7,7 76:5 86:8
86:20,23 87:1,2,3
87:4,6 89:18
100:21 101:23
107:21 108:1,3,5
108:6,12,12 109:2
109:7 110:14
111:6,8,12,14,16
111:20 112:3,6
113:2 131:3
144:24 145:7
163:5 165:18
169:11,12,13
170:5 182:19,20
200:6 201:22
207:1 213:2
214:12 219:3,24
221:4,7 226:21
229:17 236:25
238:15 243:4,15
248:5,6 250:23
254:2,19 258:19
262:9,13 280:20
280:21,25 284:12
286:16,21,21,22
286:22 295:23
296:11 300:14,18
303:16,21,22
304:24 307:22
313:4 316:20
321:9 327:9
329:17,18 337:2,7
345:5 348:21
349:6,10 355:4
**pages**
7:23 32:25 40:20
40:23,25 41:1
63:8 105:16,21
238:14 280:16

286:8 304:17
309:7 313:5 349:8
349:8 356:3
**pagination**
107:22
**paid**
55:12 134:11,12
276:2,14 277:15
**panel**
123:22 126:11
159:2 165:20
**Paoletti**
102:10
**PAPANTONIO**
3:5
**paper**
46:13 47:24 52:1
88:14,15,19
126:12 149:20
169:4 175:11,13
185:20 187:21,24
189:7,11,18,19,21
189:23 192:14,16
195:20,22 196:2
197:8,9 199:24
201:23 202:5
207:12 208:6,11
209:20 211:21
212:2 219:1
223:20 226:20
229:11 230:4,24
231:14,17 236:20
237:1,3,14 243:14
243:16 246:12
247:23,25 248:4
249:17 266:10,22
267:19,25 268:3
268:15 269:9
271:18,19 292:23
294:12,12,13,20
295:1,7,20,21
296:12 299:4
323:4,4,12,21
324:1,25 325:7
326:9 330:5
348:21

**papers**
135:17 190:14
196:21,22 232:3,8
232:16 239:13
251:8 253:11
266:3 332:17
**paragraph**
62:2 63:1 73:5
113:4 202:4,24
203:2 205:13
206:6,13 219:3,25
219:25 221:20
239:21 264:5,7,17
296:24 297:1
298:9 300:24
305:11 321:10
327:10 329:18,20
337:9,24 338:6
350:5
**paragraphs**
73:2 309:20 310:12
**parallel**
72:10
**parameters**
184:9
**paraphrased**
311:5
**parentheses**
63:2 202:15 268:18
**Parfitt**
3:10 6:5 10:19,23
11:1,6 12:6 14:25
16:9,17 17:8,11
18:18 19:6,8 22:9
22:22 23:15 29:22
32:4 34:1 35:6,24
39:10 44:24 45:2
45:10,14,21 46:19
46:22 47:9,17,21
48:7 53:10 54:1
54:10 55:2 60:7
62:15,18 67:18,22
69:23 71:1,8,13
73:9 75:12 78:20
80:20 84:21 85:10
85:20 89:12 90:14

Jack Siemiatycki, Ph.D.

| | | | | |
|---|---|---|---|---|
| 90:25 94:21 95:20 | 244:15 246:21 | 348:7,10,17,23 | 116:17,18 118:13 | 140:20 257:7 |
| 96:7 99:4 100:24 | 247:9 248:16 | 349:1,23 350:23 | 120:11,11 153:16 | **pay** |
| 102:4 103:25 | 249:23 250:11 | 351:15,20 | 156:9,10 161:24 | 54:23 55:4,6 |
| 104:9,18 107:23 | 251:10 252:19 | **parity** | 172:10 195:14 | **PCPC** |
| 107:25 108:9,15 | 253:14,17 254:3 | 287:18 | 203:18 209:12 | 5:3 |
| 108:20,23,25 | 254:11,23,25 | **Park** | 294:7 302:18 | **PDF** |
| 109:12,19,23 | 255:6,11 257:11 | 4:20 | 310:14 318:4 | 112:18 |
| 110:2 111:4,6,8 | 258:17,24 260:22 | **parse** | **particularities** | **peak** |
| 111:14 112:4 | 261:3,25 263:7,21 | 35:8 115:18 116:1 | 38:24 | 203:18 |
| 116:3,14 117:3,6 | 263:24 264:12 | 116:17 | **particularity** | **pecking** |
| 117:8 118:2 119:8 | 265:5,13 266:6 | **part** | 153:17 | 259:11 |
| 119:18 120:13 | 267:13,15 269:11 | 13:1 18:16 36:14 | **particularly** | **peer** |
| 121:19 122:10 | 269:13 271:15 | 38:5,7 78:23 | 128:15 254:10 | 99:19 127:6 |
| 123:10 125:4,15 | 272:14 273:5 | 83:12 88:21 89:1 | **parties** | **peer-reviewed** |
| 129:20 130:7 | 276:17 277:4,11 | 89:4,8 91:24 93:1 | 138:1,14 | 301:9 |
| 131:24 132:13 | 278:2,13 279:4 | 93:3 99:14 116:5 | **partly** | **pelvic** |
| 133:11,15 137:2 | 281:16 282:2,6 | 117:16 120:3,14 | 37:7 43:11,12 | 339:5 343:18 |
| 140:14,20 145:18 | 283:7 284:6,24 | 128:13,14 130:17 | 73:19 123:3 | 344:11,12,24 |
| 150:8 151:6,15 | 285:2,4,8,11,16 | 130:19 134:17 | 333:21 | **pelvis** |
| 152:15 153:14 | 285:23 286:3,5 | 140:7 149:8 160:6 | **parts** | 345:14 347:10 |
| 154:16 156:11 | 288:17 289:12,16 | 161:10 173:4,13 | 25:22 26:22 201:16 | **pen** |
| 161:12 165:13 | 289:19,24 290:7 | 175:21 177:10 | 323:14 | 52:6 |
| 167:15 172:24 | 290:10,16,19 | 180:18 184:16,16 | **pass** | **pencil** |
| 173:2 174:25 | 291:16 292:5,12 | 198:14,19 222:7,8 | 274:4 336:6 | 163:8 |
| 175:2 176:13,16 | 293:17 300:10,12 | 226:14 256:16 | **passed** | **Penninkilampi** |
| 176:23 178:9 | 300:16,20,22 | 266:20 270:25 | 46:24 | 42:7 74:7 77:14 |
| 185:6 188:18 | 302:13 303:14 | 276:9 281:23 | **paste** | 200:8 222:11,15 |
| 191:20 192:5,19 | 304:5,11,19 306:5 | 291:24 292:18,19 | 289:1 | 223:6,13,20 |
| 192:22,25 193:7 | 307:4,16 308:5,8 | 294:9 313:9 | **pathology** | 224:12,17 227:12 |
| 193:10 194:16,19 | 308:11,13,18 | 314:10 315:17 | 349:25 | 228:1,5 235:19 |
| 198:25 199:18,21 | 309:2,11,21 310:3 | 320:2,24 321:1 | **paths** | 237:20 238:19 |
| 200:12 201:24 | 310:8 312:20 | 335:14,14,18 | 136:4 | 239:5,24 247:3 |
| 202:25 203:21,25 | 314:19 315:1,10 | **participants** | **pathway** | 248:14,23 249:8 |
| 205:3 206:9,14 | 317:14 320:8,10 | 326:7 | 288:3,4 | 249:16 250:9 |
| 207:25 210:2 | 320:17,18 321:25 | **participate** | **patients** | 251:7 253:10 |
| 211:10,16 212:4 | 322:5,9,14 326:17 | 170:10,10,11 | 65:12 66:8 281:5 | **Pennsylvania** |
| 214:2 218:17,20 | 328:2 330:14,24 | **participation** | 318:14 | 4:7 |
| 220:24 222:7 | 331:14 332:1 | 27:19 56:16 123:21 | **pattern** | **Pensacola** |
| 223:8,22 224:21 | 334:8,11 335:1,12 | **particles** | 65:12 79:25 174:2 | 3:7 |
| 224:25 225:9,23 | 336:8 337:15,18 | 143:9 314:8 331:12 | **pause** | **people** |
| 231:1,2,7,10,13 | 338:15 339:12 | 340:23 341:9,23 | 62:4 67:25 140:18 | 26:8 28:13,15 |
| 231:17 234:4,7,10 | 341:2,13,16 342:2 | 341:24 342:16 | 140:22,25 255:14 | 38:18 66:10 73:24 |
| 234:13,21,25 | 342:6,10,18 343:5 | **particular** | 257:3 265:16 | 74:11 81:13 100:1 |
| 235:21,23 236:3,7 | 344:1,7,16,20 | 20:11 24:8 31:25 | 274:10 336:3 | 129:2,12 132:2 |
| 239:7 240:5,13,25 | 345:15 346:6,13 | 33:25 58:14 66:16 | 343:12 | 146:12 147:20 |
| 241:18 242:10,16 | 346:19 347:11,17 | 75:7 115:18 116:9 | **paused** | 148:24 159:18,19 |

Jack Siemiatycki, Ph.D.

159:19,24 160:22
161:6 162:4
166:19 171:8,8
180:21 184:2
185:10 208:5
219:18 243:25
246:14 249:25
250:1 261:18
269:23,24 275:25
276:1,25 277:7
324:4 332:21
333:24 334:13
350:18
**people's**
177:6
**percent**
50:2,2 55:17,17,20
55:25 56:8,11
57:9,10 114:23
119:23,23 120:4
215:16 216:8,19
216:20 217:2,4,9
217:10,11 252:7
318:25 319:1,4,4
319:5,5,17,18
**percentage**
56:12,23 215:13,21
216:15
**percentages**
216:14 217:18
**perception**
133:23
**perennial**
24:15
**perfectly**
80:1 83:5 151:22
**perform**
36:24 37:19 76:7
76:10 81:23
304:13
**performance**
304:14
**performed**
78:23 79:17 80:19
127:3 198:22
302:17,20

**performing**
56:1,9 178:16,22
**peri**
128:25 137:9
**perineal**
59:1 69:14 78:11
83:8 89:25 90:24
113:8,14 115:1
118:5 120:19
122:7,19 126:5,13
127:7,21 128:3,25
129:18 131:8,15
131:22 132:11
134:6,25 135:5,18
136:25 137:9
141:17 144:6,19
146:7 150:5
151:11 152:11
153:10 154:25
158:8 162:25
164:5 165:3 192:3
218:3 230:6 237:8
243:12 250:9,19
251:8 253:12
259:21 267:8,21
268:6 271:12
272:12 273:3
301:11 303:17
305:14,25 330:10
330:20 331:6,13
335:9 339:23
340:7
**perineally**
120:24
**period**
48:25 49:4 118:8
118:13 119:12
120:11 132:17
133:8,8 138:9
207:10 212:8
259:7,14 277:1
**periods**
171:12
**peritoneal**
168:19,21 192:2
**peritoneally**

169:25
**permeates**
167:4
**person**
30:1 150:13
**personal**
45:23 50:1 71:20
**personally**
54:19 55:23 72:24
78:22 83:19
136:11 161:13
227:25 231:23
333:8
**perspective**
159:10
**persuade**
261:14
**persuaded**
316:4 330:12,23
332:5,11
**pertain**
36:22
**pertained**
83:7
**pertains**
118:9 296:13
298:10
**pertinent**
73:18 90:5,6
**peruses**
30:15 32:18 33:8
89:13 117:12
133:18 136:1
169:10 219:15
249:10 262:18
332:19 344:3
**pesticide**
126:21,23
**pharmacology**
279:10
**PhD**
6:19 7:16
**PhDn**
7:13
**phenomenon**
159:9,15,16 160:7

161:6,8,22
**Philadelphia**
4:7
**phone**
46:11 161:17,23
310:10
**phones**
161:16,19,20
**phrase**
60:10 113:21,25
114:7,9 130:1
193:21 244:8,10
249:17
**physical**
159:25 283:1 284:1
**physiological**
205:7
**physiology**
349:25
**Ph.D**
1:17 2:1 6:2 9:14
9:18 79:7 279:17
352:5 356:11
**pick**
222:20
**picked**
18:4 63:24 222:21
**picking**
35:16 65:23 77:9
**picture**
173:14
**piece**
26:16 37:16 46:13
174:4 187:21
245:23 266:9
269:24
**pieces**
25:15 29:12 32:1
33:10 47:24
100:20 142:17
263:5,9,12 265:21
266:8 267:5
**Pier**
93:16 102:5,11
**Pier's**
95:15

**pink**
45:15
**place**
11:13,21 99:18
154:25 210:1
239:12 284:17
353:5
**placed**
47:3
**places**
72:2 120:16
**plaintiffs**
3:3 6:13 13:23 14:2
14:5 15:24 16:1
16:14 40:16 49:20
51:9 55:8,13,21
70:24 74:2 89:8
89:15 90:3 91:2
92:4 94:19 95:16
97:11 98:18
100:14 105:15
136:12 141:7
177:24 276:3,15
277:16 322:25
324:12 325:2
326:14 332:5
**plane**
73:3
**platform**
127:14
**plausibility**
75:18 143:10 305:7
313:8,10,14
314:23 315:4,13
315:18,20,23
316:2,22,24 317:2
330:9,19 332:7
333:6,18 334:3
337:3,6 338:3
348:16 350:5
**plausible**
205:2 311:8,14,17
316:7,12,13,17,18
335:22 341:6
350:1,2
**play**

178:6 288:5

**played**
32:13

**plays**
102:22 148:5

**pleasantries**
324:4

**please**
19:15 41:19 58:3
61:22 64:4,20
105:12 175:8
214:11 282:2
296:24 297:2,20
301:5 307:21
310:4 324:23
337:1 347:19
354:2,6

**plethora**
159:22

**PLLC**
3:17

**plots**
80:22

**plugging**
82:16

**Plunkett**
14:11 93:13,22
94:17 95:3,7
332:16

**plural**
324:15

**plus**
41:24 53:23 241:23

**point**
20:7 30:9 45:17
60:22 66:19 72:13
76:15 86:16 87:6
88:15 96:1 97:3
98:3,7 110:22
114:21 132:5
133:19 142:21
149:14,17 150:1
163:2 183:11
187:23 188:7
195:25 196:13
203:24 207:6,16

207:17 216:18
220:17 223:24
226:17,25 228:10
228:18 245:17
249:14 298:24
314:14 316:6,11
329:7,9

**pointed**
74:5

**points**
143:5 176:17 209:2
237:18

**policies**
25:9 85:3,7 86:4

**policy**
85:16,23

**polled**
321:16

**pooled**
142:24 197:12,22
238:24 239:1

**poor**
281:7

**population**
27:20 66:22 181:8

**populations**
65:24 180:17 181:6
181:12 182:8,10
182:11

**population-based**
64:13,15 66:3,4
283:16

**Porta**
20:16

**portions**
29:18 93:15 105:24
205:15 220:20

**portrait**
35:1

**positing**
272:1

**position**
340:13

**positions**
84:17,25

**positive**

10:17 202:8 203:6
205:18 245:8
301:11 305:13,24

**positively**
284:14

**positives**
119:14

**possibilities**
252:1

**possibility**
117:22 122:6
141:13 154:14
158:25 159:4
160:8 168:6
173:19 213:8
222:4 252:5
271:23

**possible**
24:5 50:24 122:12
126:20 136:24
143:8,11 155:6
156:8,12 165:17
165:22 166:5
168:3 169:20
170:2,17 171:16
218:2 219:6 237:9
250:20,25 251:15
251:17,21 252:1,3
252:8,16,25 253:2
277:20 338:21

**possibly**
96:24,25 183:23
303:3

**postdate**
272:4

**postdoctoral**
279:21

**post-2006**
272:9

**potential**
57:18 75:3 84:19
89:24 126:5
135:18 142:2
146:7 156:17,18
158:11,18 169:23
171:22,24 172:22

173:11 176:1
183:20 220:9
221:3,3 260:10
261:1 272:11
275:24 323:11
330:20 349:17

**potentially**
143:5 158:7 258:12
258:23 267:11,16
349:21

**potted**
145:11

**powder**
1:6 6:20 7:13,16
9:10 57:22 58:6
58:23 59:18 69:14
74:15 78:10 92:10
92:14 95:25 96:3
96:18 97:15 98:9
101:14 102:8,15
102:17 103:2,15
103:23 113:8,14
115:2,4,10,23,25
116:8,10,11,25
118:6,7 119:3,6
119:12,12 120:20
120:23 121:5,14
126:14 127:8,21
131:8,15,22
132:11 134:6
135:1,6 141:8
146:8 170:12
172:13 176:12
202:6 205:8
216:10 217:7
218:15 219:7
237:9 250:20
259:25 260:13
268:16 291:4,12
295:3,8 296:15
297:5,10,22 298:3
301:17,18 302:9
302:23 307:10
312:8,15 313:19
314:14,21 315:4
315:14 316:25

317:4 324:13
325:3 338:4,21
339:1 351:11

**powdering**
83:9 92:21 115:14
171:15,18,21
178:13

**powders**
101:3 102:1

**powerful**
123:4 184:15 319:7
319:8

**practice**
24:25 310:21

**PRACTICES**
1:7

**praise**
241:9

**precaution**
85:9

**precautionary**
86:4

**preceded**
269:21

**precedence**
114:12

**precious**
241:25

**precise**
50:24 53:20 118:20
220:10

**preclude**
250:25 253:19

**preconceived**
34:18 35:4

**predate**
347:5

**predict**
242:3,7

**predominantly**
226:6

**preface**
195:7

**prefer**
88:14,14 156:5
197:11 224:17

244:19
preference
212:1
premise
116:5
premised
97:18
preparation
13:2,7,14,17 38:21
51:1
prepare
11:10 12:8,16 82:6
prepared
57:16 263:3 340:8
preparing
50:12,15,18 302:20
prerogative
153:3
presence
96:2 343:18
present
5:24 11:3 12:1,4
97:14 103:8
116:25 167:5
229:23 237:7
336:17
presented
71:18 134:5,25
186:8
presenting
134:22
presently
56:3
presents
122:8 123:17
press
128:16 256:22
325:7
pressure
38:17,18
presumably
51:12 179:4
presume
51:15 56:4
presumptuous
150:13

pretend
331:8
pretended
335:3
pretty
37:11,12 38:14
74:10 77:8 81:4,4
89:1 171:9 187:23
228:23 242:3
prevent
281:13 282:23
284:16
preventable
291:11,12
prevention
279:25 283:14
284:18 287:1,15
preventive
287:17,23
previous
42:20,20 44:11
53:11 70:16 88:10
118:15 121:1
197:17 202:14
237:4 333:22
337:7
previously
44:4 195:21 256:4
primarily
350:18
primary
70:17 266:8,9
287:14
principal
124:19 279:24
283:14
principle
85:8 152:18 183:12
principles
21:11 320:22
321:23
print
52:11 82:2 132:20
printed
62:6,9 254:19
308:2,10

printouts
43:12
prior
44:18 45:1,7
108:19 109:5
133:16 246:5
priori
25:23
priorities
143:21 144:3,4
privileged
233:11
probability
114:23 252:6 320:1
probable
131:9,16,23 132:12
247:8,13,16
248:11 249:4,5,13
249:13,15,21
250:5,10,25 251:9
251:14 252:2,17
252:22 253:1,3,13
253:20,25 254:6
probably
20:6 44:11 72:14
95:1 129:18,24
130:6,8,9,11
134:19 140:6
143:20 145:14
147:4 177:4
196:14 228:8
259:19 271:12
321:3 337:19
problem
63:21 96:21 97:5
126:20 159:21
170:14 171:2
179:22 203:8
311:3
problems
65:5 127:1 138:6
180:12
procedure
27:4,5 37:9,11
196:17,18 198:10
procedures

37:24
proceeding
353:4
proceedings
255:14 257:3
265:16 274:10
336:3 343:12
process
21:5 23:2 25:18
26:7 29:20 72:8
74:1 99:7 128:20
133:25 137:25
138:18 142:10
143:11 153:18
257:20 258:22
310:23 314:9,10
323:15,15
processes
31:20 153:19
processing
349:15,17
proclaiming
128:19
produce
30:18 34:25 51:19
106:24 150:11
224:10 258:1
produced
57:21 69:21,22
80:17 99:12
108:14 119:23
120:4 128:10
produces
122:16
producing
273:25
product
51:20 90:12 115:25
116:8,10,18
119:12,13,24
120:2 307:10
315:5
production
84:5 132:18 133:8
191:19 273:18
products

1:6,8 9:11 58:23
69:14 74:15 92:11
92:14,21,21,22
95:25 96:3,18
97:15 98:10
101:14 102:9
103:3,15,24 113:8
115:2,11,12,23
116:11 117:1,18
118:1,6,7,10,12
118:21,24 119:4
141:8 176:12
259:25 260:13
291:12 312:8,15
313:20 314:14,22
315:14 316:25
317:4 338:4,22
339:1
professional
7:5,8 24:13 25:7,21
28:12 39:12 46:14
48:3,21 49:11
53:2 55:25 56:8
131:4 278:20
321:17
professionally
136:11
prognosis
281:7 284:18
program
80:23 138:1,8
139:4,10 140:4
141:5 281:1
progresses
31:12
project
124:19
projects
21:4 278:25 283:24
promise
96:19
promising
287:15
prompting
71:6
pronounce

104:12
pronounced
336:16
proof
298:23 315:21,24
345:13 346:11
347:9,20,22 348:1
348:2,6,9
proper
227:11 318:21
properly
173:13 198:7,19
266:14
proportion
132:4
proposal
262:5,7 263:17,22
264:1
proposed
264:5
proposition
150:19
propounded
356:6
prospective
226:4
Protection
262:22
protective
85:17
protocols
180:6
PROVAQ
280:1 283:15
286:23 287:2,13
proven
316:10,13
provide
24:7 74:2,17 76:16
76:17,19 78:9
95:22 98:2 186:13
186:15,18 305:2
307:23 316:22
317:1 318:5
321:12 334:2
provided

16:18 17:7 18:18
24:12 26:13 40:16
46:12 75:15 76:24
82:14 88:12 95:16
96:1 100:14,17
101:5,10,17
105:14 162:20
189:16 197:23
203:10 231:19
332:23 333:12
provides
283:21,22 310:20
provoke
160:5
prudent
204:12
PTI
5:17,18
public
2:13 51:18 84:12
84:18 85:3,6,15
85:18,23,25 86:3
137:25,25 161:10
221:3 230:22
259:5,8,14 260:7
276:1 288:13
356:19
publication
113:22 125:17
127:10,17 128:6,9
138:24 174:17,18
189:3 193:17,25
195:9 203:9 228:1
233:6,8 238:6
261:23 293:23
323:12 324:2
325:8,10,17,25
publications
85:2 97:1,2 133:20
142:22 143:13
164:25 226:10
240:8
publicity
213:8 218:22,23
219:15 220:9,16
220:21 221:4,17

publicly
89:2,4 128:3 241:3
publish
127:18,19 128:18
228:11
published
20:2 28:9 37:18
43:13 50:22 73:18
98:11 99:12 106:8
106:10 127:2,6,23
127:24 133:1
136:15,17 137:10
141:15 160:18
189:18,24 195:10
230:15,16 232:3,8
261:24 272:6,9
311:23 339:1
PubMed
73:20 81:9,14
pull
294:12 342:13
pulled
343:17
punch
80:25 128:9 193:21
purchase
115:12
purchased
119:6
Purdie
189:3,7
purely
252:14
purportedly
262:24
purpose
181:4 245:23
247:10 310:16
329:8
purposes
99:2 162:9 210:16
302:20 313:25
314:20 317:3
Pursuant
2:12
put

15:3 17:13 33:16
41:1 43:8 68:8
80:25 97:13
106:19 108:5
109:2,9 114:24
140:6 184:2 214:4
223:10 267:1
271:25 276:24
285:12 289:7
putative
310:22
putting
108:17 179:20
289:5
P-O-R-T-A
20:16
p-value
270:16,19,23 271:2
297:25
p.m
104:25 105:4
140:24 141:2
145:21 146:1
210:4,8 242:19,23
255:13,16 257:2,5
265:15,18 274:9
274:12 320:13,16
322:16,19 336:2,5
343:11,14 352:3,6

_____

**Q**

qualification
124:2
qualifications
79:9 100:6
qualified
204:24 331:11
334:5,24 335:20
335:21
qualifiers
336:24
qualify
206:1 271:5
qualitative
32:10 182:1
quality

28:25 29:5,13
99:25 100:3,7
184:10 227:24
284:19
quantify
121:24 158:18
quantitative
26:21 30:9 32:7
33:22 114:24
quantity
264:8
quartile
297:11,12,13,14
quartiles
268:19 295:11
297:10,17 298:15
Quebec
279:25 283:15
287:2
Queen's
279:14
question
21:24 22:11 26:11
26:12 28:20 31:1
33:18 35:8 36:3
37:15 56:21 58:19
58:21,21 66:11
68:17,19,23 69:9
69:16,17 72:3,5
72:23 84:14 85:12
87:25 90:22 91:16
96:8 97:14 99:1,8
104:4,7 107:13
108:12 111:11
112:14,16,19
114:16 116:5,19
118:14 121:2
123:5 124:1,3
128:14 129:23
133:18 144:2
149:1,13 150:10
152:6 162:10,24
163:14 164:4
167:20 178:4
181:25 182:1,4,16
183:9 191:1 196:5

196:10 201:21 206:21,21 219:23 226:15,16,23,24 229:12 236:10 247:15 249:25 250:13 251:5 252:24 253:7,8 257:8 271:22 291:7 293:12 309:22,22 311:23 313:16 320:19 324:14,22 333:15 335:17 336:21 342:14,19 343:22 344:23 347:1 348:4

**questioning**
323:9,9 336:7

**questionnaire**
27:22,23 126:8 226:13,15,21

**questionnaires**
160:4 226:18

**questions**
10:2 18:25 19:2 27:21 41:15 67:14 68:24 89:7 108:19 163:4 173:17 177:21 180:22 195:23 206:4 211:18,24 226:17 244:20 275:3 289:19,20 290:23 291:19 294:6 306:7,13 307:1 312:6,10,17 322:1 322:23,24 323:5,6 326:13 332:4 336:11 351:19,21 356:5

**quick**
138:10 139:3 219:17

**quicker**
234:14

**quickly**

18:6 63:15 89:11 131:1 135:20,23 188:5 198:15 201:20 242:3 262:16 344:4

**quite**
65:24 86:12 155:15 210:19 229:4,9 237:24 248:18 256:1 257:13 270:11 274:1 277:20 315:19 328:18

**quote**
64:18 67:2,16 131:9,16 136:24 146:17 148:12 149:2 185:23 249:17 330:1

**quoted**
226:20

**quotes**
276:25

**quote/un**
148:12

**quoting**
340:18

_____

**R**

**R**
3:1 5:11 9:1 355:2 355:2

**random**
170:22

**range**
53:24 146:25 252:1 329:7,9

**ranges**
145:4

**rank**
33:10

**ranking**
33:20 34:6

**rapidly**
132:23

**rappel@seyfarth...**

5:9

**rarely**
181:16

**rate**
27:19 32:16 144:25

**rated**
27:17 33:9

**rating**
131:2 145:3 151:14

**ratio**
76:24 77:10,23 106:7,24 160:16 185:16 215:2,4 228:10,19 245:10 319:2

**ratios**
76:17 177:14 214:24 222:5 223:19 225:16 245:19 319:12,14

**reach**
41:20 120:20 126:4 204:4 240:2 306:8 338:22

**reached**
35:20 129:17 131:18,21 132:3 195:3 196:10 248:9 293:4,19 326:4 330:5

**reaches**
345:13 346:12 347:10

**reaching**
15:2 23:21 32:2

**reaction**
162:5

**read**
30:15 32:17 88:15 96:24 97:7 101:20 102:4 104:3 113:10 117:7 131:10 133:17 137:4 159:13 175:4 183:1,2 202:11,12,20,21

226:18 229:14 230:9,11,12 237:11 238:5 250:3 254:6 262:17 268:20 271:6 288:11 295:14,15 296:20 296:24 297:3,15 298:9 301:13,23 302:15 308:4 309:19 310:6,11 314:6,7 318:22 321:19 327:15 328:1,10,20 329:1 329:11 330:2 331:19 332:15,22 333:3 334:13 336:13 338:9,11 338:17 341:5 344:2,4 351:23 354:2 356:3

**reader**
81:3 107:4

**readers**
31:21 277:25

**reading**
15:13 44:13 52:6 91:18,21 95:10 175:12 185:18,19 239:20 254:2 283:21 301:6 307:20 313:10 331:17 339:21

**ready**
290:8

**real**
74:22 168:13 207:8

**reality**
35:1 99:9

**realized**
70:9

**really**
28:17 30:23 36:17 36:20 45:11 63:3 65:3 73:10 84:9 106:12 128:5

148:14 158:18 167:2 168:9 179:24 180:6 182:2,6 184:9 249:11 257:23 258:1 281:18 289:4

**reanalyses**
72:12

**reanalysis**
271:22

**reason**
59:6 73:12 82:23 87:15 90:20 91:9 127:18 160:3 172:12 192:7 213:5 225:13 241:14 260:17 262:25 303:12 323:8 354:4 355:6 355:8,10,12,14,16 355:18,20,22,24

**reasonable**
103:21 113:7,18 114:5 131:6 208:12 316:4 329:9

**reasonableness**
204:25

**reasonably**
118:20 316:16

**reasons**
30:8 65:11 66:2 143:17 190:21

**reassured**
196:23

**reassures**
222:21

**REATH**
4:18

**rebut**
101:7

**recalculating**
77:10

**recall**
52:8 59:5,7,15

91:17,21 93:19
95:12 101:12,12
157:8,17 158:1,3
158:6,22,25 159:9
159:15 160:5,7
161:9 166:5,9,10
166:13,15,18
169:22 170:19
217:22,25 218:1
218:11 219:7
221:22 222:4
223:16 233:12
274:20,23,24
294:21 299:2
306:15 307:1
312:5 317:16
323:4,6,10 324:2
324:14 325:4
339:9,19,20,21
**receipt**
354:13
**received**
40:10 54:24 97:10
97:11 326:5
**receiving**
83:18
**receptivity**
129:15
**recess**
52:20 105:1 145:22
210:5 242:20
320:14 322:17
**recipe**
25:1
**recognition**
328:18
**recognize**
37:23 47:2 91:12
188:5 222:3
**recognized**
226:4
**recognizing**
133:25
**recollection**
54:3 323:25 340:20
**recommendation**

291:25 320:24
321:2
**recommendations**
259:8
**record**
9:4,16 11:25 15:5
16:18 17:22 19:18
47:6 48:10 52:19
52:23 61:13 67:21
67:22,24 68:2
104:20,22,25
105:4 108:11
109:1 111:15
140:15,23 141:2
145:21,25 156:1
157:21 175:21
192:24 194:20
200:3,4,21 210:4
210:8 226:19
235:13 236:8
242:11,19,23
255:9,13,16
256:24,25 257:2,5
265:12,15,18
274:6,9,12 275:4
307:17 308:12,19
317:11 320:8,9,12
320:16 322:16,19
324:19 328:14
335:25 336:2,5
343:11,14 344:8
352:3
**recorded**
353:8
**recreate**
41:5
**recreational**
284:1
**red**
347:21
**REDIRECT**
322:20 336:9
**redrafting**
72:22
**reduce**
281:11

**reducing**
168:13 287:16
**reduction**
169:1
**REES**
5:12
**reevaluated**
137:13
**reevaluation**
137:15,16
**refer**
13:20 19:12 58:16
69:12 86:9 87:19
92:6 100:20
108:21 111:11
112:4 147:21
157:16,19 165:23
206:9 218:22,25
219:20 224:17
225:22 245:3
262:8 263:13
303:16 304:23
312:22 333:9
**reference**
43:20 86:17 87:18
88:4 89:19 91:24
93:4 105:19,24
111:21 175:18
211:15 213:1
219:8,9,18,20
220:22 225:15
230:23 238:6,9,11
238:14,16,21,25
239:1 250:22
267:15 341:4,5,25
**referenced**
23:14 45:17 50:17
51:16 178:25
185:1 239:10
**references**
18:17,21 39:23
40:4 86:7 87:4,9
87:13,22 88:21
102:3,9 219:1
240:17 329:13
332:19 333:12

**referral**
65:11
**referred**
40:3 87:17 98:15
163:24 244:6
294:20
**referring**
35:15 62:13 63:19
71:14 98:16,19,23
156:25 198:23
219:15 246:15
254:23 262:7
269:20 296:16,23
300:23 304:7
305:17 313:4
**refers**
166:10,12 202:15
206:25 262:19
**refinements**
37:13
**reflect**
49:22 84:25 133:22
324:19 327:25
**reflected**
133:4
**reflecting**
333:2
**reflection**
70:12 180:15,16,18
**reflects**
50:1 132:9,16
200:4 298:5
**regard**
294:6 313:17
315:12
**regarding**
10:21 13:15 43:7
229:5,9 275:8,13
275:19 306:13
338:3 350:10
**region**
69:14 220:10
221:12
**regression**
207:14
**regular**

298:6
**regulations**
146:23
**reimburse**
49:17
**reinforces**
84:10
**rejected**
133:2
**relate**
263:5,8
**related**
8:9 18:21 51:17,25
57:1 58:5 115:24
126:21 157:10
165:11 166:8
167:7 175:14
189:13 226:2
259:22 310:14
317:22 326:24
333:6,18 350:17
**relates**
1:11 263:19 296:14
**relation**
124:8 125:23
189:14 195:24
318:9 351:5
**relationship**
24:15 58:22 78:10
103:5 114:14
115:9 121:10,23
121:24 122:1,19
122:24 123:7,9
131:7,15,21
132:10 136:25
152:2 156:10
157:11 174:8
176:8 243:12
261:1 265:24
267:8,21 268:6
269:10 272:12,23
273:2 278:21
302:9 311:12
**relationships**
314:16
**relative**

23:9 26:20,21
32:10 33:20 76:18
77:23 84:18 106:7
146:24 147:6,13
147:19,24 148:2,9
148:17 149:22
150:1 159:6
166:22,24 167:1
167:14 169:2
170:25 174:10
178:7 181:23,23
182:2,10,11
185:15 191:25
192:1 204:17,21
213:20 225:16
234:3 236:11,18
236:20 245:10
247:12 298:17,18
298:18 319:10,21
319:24 320:5
321:13 327:21
328:22 329:4,22

**relevance**
22:24 89:23

**relevant**
40:24 66:14 90:21
91:13,25 94:25
105:16,23 118:20
164:4 196:21
237:8,15 253:6
311:3,18 350:25
350:25

**reliability**
158:2 223:21

**reliable**
118:20 179:14,17
204:9 260:20

**relied**
90:3 191:9

**relieve**
171:20

**reluctant**
150:9

**rely**
93:2 94:12 158:3
194:3,22 261:12

265:8 267:18

**relying**
221:19 222:11
265:2 272:20
331:22

**remain**
13:5 165:18

**remainder**
291:1

**remained**
190:6

**remains**
182:24 283:2

**remember**
41:3 54:9,11 68:8
90:8,8 100:18,19
141:22 156:3
190:19 207:14
218:7,8 246:7
257:13,14 259:5
269:2,4,18 273:10
274:2 291:19
293:8,9,15 312:9
312:16 313:20
324:8 332:14
340:18,19

**remove**
40:15

**removed**
40:18,21

**render**
100:6,9

**rendered**
318:6

**RENEE**
5:4

**repeat**
22:11 173:3 276:6
330:15

**repeated**
97:8

**replicability**
31:5

**replicable**
30:11,13,14,19
31:3,17

**replicatable**
28:6 80:24

**replicate**
25:14 26:14 80:18
272:16

**replicated**
29:21,24 42:11

**report**
6:18 7:10,12,15,19
7:20 12:20 13:4
13:17 17:5,6,16
17:24 18:5,11,17
18:20,21 21:20
25:14 26:13,18
28:21 39:24 40:5
40:22 42:1 43:20
44:4 50:9 57:15
57:15,17,21 58:5
58:13,20,24 59:3
59:25 60:3,10,11
60:13,16,21,24,25
61:2,6,14,24
62:23 64:1,7
66:15,20,25 67:10
68:5,9,18,21,25
69:3,10,13,17,20
69:21 70:2,4,4,10
70:16,21 71:5,5
71:12 72:9,20
73:16 74:4 76:5,8
76:12 77:22 78:24
80:17,22 82:7
83:19,20 84:5,8
84:10,14,15,23
86:8,21 87:17,20
91:8,23 94:8,11
95:7,9 96:6,11
100:20 101:8
106:8,11 107:4
108:2,7,14,22
109:3,5 110:7,13
110:25 112:7,22
127:23 130:22
131:4 133:4,21
135:18 144:23
145:7 149:16,25

163:3,15 165:16
165:25 166:19
169:6 170:2
175:18 182:18
186:3,5,7 188:16
190:6,8,10 199:16
199:17,18,19,20
200:5,15 213:1,3
229:4,8 230:23
236:16,21 241:22
245:6,19 256:15
261:23 268:22
269:3,19 270:16
293:22 302:21
303:1 305:20
312:22,25 314:4
316:20 320:3
325:12 326:20
332:18 333:6,20
337:1 338:20
342:11,11 348:15

**reported**
1:25 102:7,14
149:18 211:1
215:13,14 216:4,8
216:9,17,24 217:7
223:13 229:3
236:19 245:8
268:8 272:21

**reporter**
2:13 9:16 309:18
353:1,2,25

**reporter's**
353:13

**reporting**
161:23 166:13
170:20,23 213:11
217:17 223:18

**reports**
31:22 40:18 50:21
58:16 92:20 94:2
94:3 95:5,11
97:11,24 98:19
99:2,7,11 101:6
101:10 102:16
185:19 186:20

190:2 223:6 258:2
316:15,15 321:12
332:13,15,21,24
333:2,4,18,22
334:2,6,13,16,17

**represent**
16:17 45:4,8 66:9
109:3 274:18

**representation**
191:10

**representatives**
101:25

**represented**
333:20

**representing**
217:4,6

**represents**
237:14

**reproduced**
80:21

**reproduction**
353:23

**reproductive**
125:23 226:7
282:10 288:1

**reputation**
99:25

**request**
15:24 94:18,23
95:18 108:10
138:20,25 139:6
142:11 191:18
231:16 343:16

**requested**
95:21

**requests**
15:20 56:16 138:3
138:4

**require**
119:5 155:15
319:22

**required**
83:12

**requires**
83:11 184:13 208:2

**requisites**

66:7
**rereview**
13:20
**rereviewed**
12:17 13:6,9
**research**
2:5 7:24 9:9 20:1
21:3,3,6 23:6 24:4
24:9 49:16,19
73:20 74:16 81:9
81:10 82:8 124:7
126:13 127:15
132:18 133:9
159:10,13 160:13
160:17 161:14
174:19 177:25
180:5,6 266:12
273:19 280:25
281:1 283:11
286:9 288:6 292:7
310:13 331:16
**researcher**
289:8
**researchers**
129:9
**resolved**
104:13
**respect**
33:12 35:21 57:18
90:12 94:7 98:9
126:5,10 127:21
137:9 141:16
142:12 150:6
153:10 162:25
164:19,22 165:2
187:10 197:7,9
218:14 233:16
246:17 262:5
263:18 323:11
324:25 326:10
327:5 330:8,18
332:7
**respected**
20:7
**respectfully**
26:10 148:25

177:20
**respective**
215:9
**respond**
166:12
**responded**
323:16
**response**
6:14 218:9 222:1
243:12 268:6
293:11,25 326:5
332:4
**responses**
159:20
**responsibility**
120:3
**responsible**
115:19
**rest**
41:1 272:8 337:8
**restricted**
298:2
**result**
38:16 80:8 82:16
83:7 152:13
167:13 171:15
174:7 181:18
184:4 186:6,10,23
189:16 190:15,16
196:25 200:23
208:11 209:16
221:16 224:1
228:8
**resulted**
149:22
**results**
37:10 38:3 67:4,5
70:14 79:18,25
80:3,4,9,12 82:13
82:25 83:3 128:11
128:12 161:21
174:2 177:17
180:8,23 181:22
181:22 184:5
190:9,24 197:1,16
197:23 208:4,16

209:3 210:18
211:1,2,5,8,21
212:14 217:21
223:10 224:6,10
237:23 240:3
241:21 266:22
296:4,11 329:8,21
**retain**
52:12 105:25 191:4
**retained**
78:4,6 101:6
105:22 276:2,14
277:15 325:2
334:1
**retired**
81:16,22 82:10
**return**
19:18 105:8 354:11
**review**
13:1,3,13 28:15
33:6 51:21 67:7
73:15 74:7 77:12
93:17 96:5 125:24
126:17 163:16
220:7 229:11
230:5 240:9
241:23 259:10
262:17 264:15
273:7,9 301:16
303:20 313:25
321:6 334:17
**reviewed**
12:17 13:10,10
50:22 52:4 72:18
75:14 84:5 93:12
94:6 95:5 99:19
127:7 129:2,4,13
158:24 159:14
195:21 241:15
242:5 253:10
262:15 282:14
314:6 326:15,19
326:19 333:19
**reviewer's**
32:13
**reviewing**

25:13 26:13 51:23
82:15 84:1 91:23
116:23 125:9
248:8 250:7
**reviews**
163:12
**revise**
125:24
**revising**
70:17 125:9
**revision**
51:8
**revisit**
97:16
**rgolomb@golom...**
4:9
**rich**
283:22
**RICHARD**
4:3
**Richardson**
82:11,17
**rid**
96:20
**right**
10:4,6 15:23 16:21
18:2,7 20:22
39:18 57:2 61:5
62:21,25 67:2
78:12 86:23 88:17
93:19 97:3 105:17
106:3 107:19
111:13 130:5
163:9,10,14,18
164:13 188:23
191:3,16 200:5
202:4 205:12
210:19,25 211:12
211:20 214:10,23
216:2,22 224:21
235:23 249:7
250:14 256:6
273:23,23 287:11
289:23 290:1
291:17,18,22
292:6,17,21

293:10 294:1
295:6,13,19,25
296:10 297:20
299:14,15,21
300:1 301:15,21
301:25 303:15,20
306:6,17,21 307:5
309:3 312:4 313:3
315:2 316:19
317:7,15,20 318:3
320:6,25 321:4,5
321:8,25 326:22
327:1 335:24
340:4 347:4,4
348:17
**right-hand**
327:9
**rigueur**
114:3
**risk**
8:5 19:20 20:24
21:12 24:16,20
33:12 35:21 36:6
43:12 59:4 77:24
89:24 90:12,23
103:16 106:8
119:25 120:10,24
122:8 123:18
127:22 130:3,12
143:1 146:16,18
146:19,25 147:7
147:24 149:2,22
150:1 154:10,13
156:16 159:7
166:22,24 167:1
167:14 168:13,14
169:2 170:25
174:8,9,10 178:7
181:23,23 182:3
185:15 191:25
192:1,17 193:17
199:2 202:7,18
203:15,19 204:17
204:21 207:21
209:24 213:20
225:17 230:6

234:3 236:11,18
236:20 245:10,10
247:12 268:17
269:23 281:12
282:7 287:4 288:6
295:9 297:21
298:17,18,18,21
306:13 308:20
309:4 310:22
319:22,24 321:11
321:15 327:4,21
329:4,22 345:12
**risks**
76:18 121:12
126:20 144:18
147:6,13,19 148:2
148:9,17 159:23
160:10,11 176:3
180:16 182:10,12
184:18 189:12
208:25 297:8
299:6 319:10
320:5 328:22
351:2,5
**road**
3:12 29:8 133:22
227:16
**robot**
25:19
**rocket**
79:14
**role**
24:25 98:24 102:21
128:22 143:11
178:7 259:24
260:12 288:6
**roles**
143:11
**Roman**
300:4,4,16,21
**room**
117:20
**Rothman**
20:8
**rough**
33:6

**roughly**
13:19 118:11
136:20 138:18
169:14
**routes**
338:21
**routine**
81:24
**routinely**
65:23
**RPR**
353:18
**rubric**
25:5
**rule**
122:6
**ruled**
123:14
**run**
215:17 329:24
**running**
320:11
**run-up**
39:1
**R-O-T-H-M-A-N**
20:8

**S**

**S**
3:1 6:1,7 7:1 8:1
9:1
**Saed**
332:17,18
**sake**
168:24 174:11
**SALES**
1:7
**Sally**
81:20 82:10
**sample**
266:13 288:7
**samples**
102:15,17
**sampling**
311:7
**Sanchez**

101:11
**sanctions**
310:20
**sanitary**
83:9
**satisfaction**
316:14
**satisfy**
153:12
**save**
73:7,12 80:12 81:3
135:24 224:23
**saw**
97:24 139:15
230:23 325:23
348:20 349:3
**saying**
53:12 67:13 98:3
123:13 163:23
186:6 195:7
221:24 233:13
244:12,18 276:8
282:22 293:15
304:17 338:20
340:17,21 342:17
346:11 347:8
**says**
63:2 69:13 146:24
163:11 206:22
236:13 258:18
264:5 280:24,25
281:10 282:20,24
283:13 284:13
287:1,7,9,13,14
287:21 288:10
328:4 338:25
343:23 344:14
345:9,17 347:15
349:16,18
**scale**
150:7 151:23
154:24 161:10
**scanned**
349:7
**scanning**
219:17 348:20

**scenario**
35:15
**scenarios**
186:9
**Schildkraut**
7:20 123:3 200:21
200:21,23,24
201:4 210:12,17
211:4,7,11 212:7
212:9,14,16,17
213:2,14,17,19,24
214:15 218:12
220:21 266:16
267:11 294:6
**science**
31:10,12 34:22,23
79:14 85:1,1,2,17
186:2 279:10
322:4 346:14
**sciences**
36:16
**scientific**
12:19 13:7 25:17
36:14 37:6,17
39:21 85:4,7 99:1
99:17 103:21
104:7 105:20,25
113:7,18,22 114:6
122:21 128:20
131:6,19 132:8,9
132:14 138:5
153:19,20 162:25
163:19 164:3,18
164:22 172:20
184:20 240:8
245:22 254:8
261:24 262:2
264:14 316:11
**scientist**
31:25 35:2,9,18,20
90:10 91:7,10
116:1
**scientists**
31:6,13,15,18
36:17 128:16
129:3 133:2 134:4

135:4 138:4 303:4
310:24 314:5
316:3,9 330:12,22
**scope**
43:13 68:10,12
303:8
**score**
25:25 27:10 28:3
33:16 67:15
**scored**
28:14
**scores**
27:7
**scoring**
26:24 28:8,9,10
31:11
**screen**
140:21 323:18
**screening**
255:1,19,22 256:8
256:18 257:9,15
257:21 258:5,9,12
260:19 261:8,22
263:4,18 265:1
299:17,24 300:1
300:25 304:15
326:8,12
**scribble**
44:12
**scribbled**
18:5 44:14
**scroll**
135:20
**SCULLY**
5:12
**search**
73:20 196:15
222:22
**searches**
81:10,14,23
**second**
23:3,4 42:10 63:9
113:4 140:23
163:9 170:19
193:5 196:24,25
202:4 206:12

219:3,25 221:6,20
256:24 264:4
266:16 286:21
297:12 300:24
343:8
**secondary**
298:24
**secretary**
286:12
**section**
64:13,17 66:20
86:7,18 87:4,9,14
87:18 88:4,21
91:24 101:2,24
106:1,2 113:1,5
163:10 169:12
198:15 202:1,24
206:7,13 219:11
219:20 221:9
237:1,4 249:3,18
250:8 254:10
262:14 273:8
295:7,21,23 296:4
296:11 300:19
303:21 313:6
316:19 333:5,9,15
346:18,21
**sections**
88:20 221:10
**see**
14:16,20 17:15
41:24 45:2 54:21
69:18 73:11 78:1
86:18,25 89:21,22
94:20,24 107:10
107:21 116:13
130:23 135:21
145:1,2 156:15,19
160:8 161:5
163:12 169:13
174:3,10 175:2
183:4 187:14
188:5 192:9
195:20 198:15
200:14,19 202:1
203:10 212:20

214:13,18,22,23
215:1 217:1,16
219:2,11,18
223:15 228:15
237:1 238:4,12,13
238:22,24 243:17
243:20,21 245:21
247:24 248:7
249:13 258:18
261:18,23 272:17
280:21,24 282:20
286:13,20,20
287:6 295:4,5,12
296:8 306:10
313:8,9 318:19
325:15,22 327:9
338:6,23 342:2,4
342:10,20 344:5,9
344:19 345:6
348:14,22 349:9
349:11,12,16
**seeing**
259:5 263:11
**seek**
212:21
**seen**
15:12,14,17,17
16:12 93:15
113:25 114:1
118:25 139:17
226:21 333:22
**seldom**
229:20
**selected**
28:1,1 80:9 208:8,9
**selecting**
82:18
**selection**
39:6
**selectively**
35:2
**self-evident**
89:1
**semantic**
249:24
**Seminary**

3:12
**sending**
325:16
**sense**
26:14 31:16 60:11
72:5 92:25 148:13
164:11 167:11
252:23 303:5,7,23
334:15
**sensitive**
208:7 209:7
**sensitivity**
79:25 80:13,18
81:2 186:19
200:16 201:8,10
228:12
**sent**
15:16 40:8 47:8
91:3 92:9,16 95:2
98:6 105:21 231:1
231:13 257:11
293:12,21 323:10
323:15
**sentence**
30:15 63:10,16
101:20,22 111:11
111:21 140:1
149:5 183:3
206:22 219:4
222:8 238:5 269:2
281:18,19 295:1,2
296:16 302:12
329:20 336:25
338:19,25 347:21
347:25
**sentences**
104:3 114:16 175:4
205:15,16 262:24
287:14 302:10
318:23 329:13
**separate**
71:16 98:24 210:21
270:21 273:18
**separated**
213:6
**separation**

213:2
**sequence**
72:1
**series**
65:7,19 67:8
312:17
**serious**
65:13,14
**seriously**
329:6
**serous**
202:9 203:7,11,15
203:19,24 204:11
**service**
186:15
**services**
7:5,8 9:6 46:14
47:8 48:3,21
49:12 53:2
**serving**
10:14 141:6 324:11
325:1
**set**
17:9 25:23 37:10
40:3,15 42:9,11
82:11 186:18
211:2 271:10
310:15 318:14
353:5
**sets**
210:18 211:1,1
**setting**
124:11,15 132:7
135:6
**seven**
177:21 219:4
**SEYFARTH**
5:5
**shape**
121:25
**share**
92:23 94:1 119:3,7
119:16,20 120:5
120:15
**shares**
118:21

**SHAW**
5:5
**sheet**
308:20 354:5,6,9
354:11 356:8
**shift**
283:25
**SHKOLNIK**
3:17
**short**
171:11
**shorten**
304:20
**shorthand**
353:1,2,11
**short-circuit**
342:25 343:2
**show**
22:1 160:18 215:17
317:20
**showed**
160:14 203:14
209:3
**showing**
176:25 285:18
286:1
**shown**
103:8,10
**shows**
156:15 211:5
212:14 215:8
298:10
**Shushan**
201:9,9 228:24
**sick**
159:19
**side**
44:13 100:19,19
206:10 277:25
278:7,8
**sides**
334:21
**side-by-side**
187:11,16 208:14
**Siemiatycki**
1:17 2:1 6:2,9,11

6:16,19 7:3,10,12
7:15 8:3,6 9:14,18
9:23 14:16 15:9
16:12,19,22 17:21
20:10 26:10 29:15
30:7 31:2 33:19
39:18 44:3 47:2
47:25 48:17 52:22
53:1 62:5,22 88:2
91:25 102:21
103:20 104:24
105:3,6 109:13
110:6,23 111:19
140:12 145:25
146:3 148:25
175:8 177:20
193:13 196:6
200:2 210:7
212:13 214:11
219:24 231:8
236:10 242:22,25
244:13 251:5
253:7 254:9
255:18 257:7
265:20 274:16
278:17 286:1
287:9 288:14
290:1,20,21 291:3
300:23 301:16
302:15 303:15
306:18 307:19
308:21 309:5
312:5 315:11
317:7,15 320:19
322:10,22 324:22
327:1 329:15
336:11 339:9
343:16 348:5
351:22 352:2,5
356:11
**Siemiatycki's**
14:23 18:20 234:17
235:2
**sign**
351:23 354:6
**signature**

108:1,3,4 109:2
**significance**
60:9 245:9 268:9
268:12 269:17
270:7 298:8,24
327:22
**significant**
67:4,12 178:7
182:22 218:13
225:7,10 266:25
268:5,10,13,16
273:2 295:9
296:17 297:18,21
298:1,4,14 299:13
301:11 305:13,24
328:23 330:1
**significantly**
160:11
**signing**
354:8
**similar**
22:20 62:10 77:17
80:10 165:19
197:2,16 203:15
217:16,17 236:20
297:7
**similarly**
176:11
**simple**
82:21 241:25
**simply**
95:19 119:16 151:9
152:7 173:15
214:14 215:12
225:6 341:24
342:16 343:22,24
348:5
**Singh**
14:11 93:13 94:18
95:8
**Singh's**
93:23
**single**
27:11 38:16 46:13
81:2 82:15 108:9
115:3

**single-digit**
27:7
**singular**
324:17,18
**sinus**
350:18
**sir**
276:5 336:12 337:2
338:7
**sit**
69:1 90:19 91:17
103:19 120:7
153:8 198:20
203:20 220:8
244:12 263:2,16
**situation**
38:8 39:3 76:23
147:5 150:16
155:6 168:7
169:18 181:9
341:11,12
**situations**
158:10 161:15
169:3
**six**
51:3 53:15 139:17
245:8,19
**sixth**
27:15
**size**
266:13
**sizes**
288:7
**skepticism**
328:25
**skill**
99:25
**skilled**
79:11
**skimmed**
344:4
**skip**
287:13
**slightly**
33:18 108:5 110:15
167:24 187:7

195:15 209:3
337:12
**slowly**
290:25
**small**
110:21 195:16
202:7 204:19
213:3 288:7
297:25 305:12,23
328:22 329:5
335:18
**smaller**
42:4 204:10 266:17
327:25
**smokers**
147:7
**smoking**
8:10 130:14 132:21
133:21 147:4,22
147:24 159:24
161:4 175:14
177:7,12,16,16,17
177:18 181:20
182:1,8 204:15,17
204:21,22 283:1
317:23 318:13,15
319:7 326:24
**smoking-lung**
147:17 148:13
**social**
65:16
**socioeconomic**
8:11 175:15 177:8
317:23 318:16
319:9
**software**
37:22 71:19 75:25
76:6,9 79:17
80:15 82:16 199:7
199:8
**sold**
101:15
**solution**
340:10
**Someone's**
63:4

**somewhat**
161:21 202:14
206:23 208:7
**soon**
134:19 315:19
**sorry**
22:10 32:17 37:14
42:16 44:21 47:16
47:24 53:20 56:21
57:15 62:8 63:7
78:4 85:11 100:15
106:10,18 123:25
133:17 149:12
152:3 155:23
156:5 163:8,23
172:25 173:2
174:21 183:4
189:4 195:18
212:16 220:25
224:24 249:9
252:12 262:11
270:11 281:17
290:14 292:11
299:24 330:16
332:20 341:16
342:8 344:5
348:25
**sort**
21:25 22:2 28:19
32:9 38:4,6 40:3
43:15 70:7 73:25
74:5 85:8 108:6
114:3,11 122:15
124:12 127:14
128:17 129:3
132:21 136:6
138:7 151:21
159:16 162:1,23
163:2 166:21
180:15 184:3
223:25 281:24
289:5 304:8
323:14
**sorts**
126:25
**sounded**

341:6
**sounds**
178:2
**source**
70:17 171:12 228:4
233:9,16 283:22
**sources**
137:24 228:4
233:10,16
**South**
3:6 4:13 5:20 340:3
**sovereign**
153:25
**so-called**
246:18
**so-so**
27:14
**space**
354:4
**speak**
139:9 251:23
290:25
**speaking**
13:19 87:18 118:11
138:18 139:13
204:21 251:25
**specialized**
65:15
**specially**
175:22
**specific**
22:5,18 23:20,22
33:22 36:22 44:25
55:4 58:17 59:12
60:1,16 62:13
81:25 92:5 115:3
117:15 157:5
163:2 185:14
204:6 211:21
220:22 221:12
244:3 313:15
325:19 338:2
**specifically**
12:15 14:10 21:16
21:22 39:8 40:5
58:24,25 79:14

83:3 93:20,22
94:18,25 95:18
96:1 98:1 100:13
120:9 137:8 139:8
139:23 142:11,15
161:9 184:21
200:9 202:16
206:25 219:14
228:13 243:3
259:17 262:8
264:4 265:21
276:13 295:20
296:10,21 299:17
300:3 303:16
308:22 309:6
310:14 313:3,16
320:21 321:8
323:2,24
**specificity**
305:5
**specify**
247:15
**specimens**
349:15
**speculate**
91:2
**speculating**
19:2 252:14 254:1
**spend**
51:13 56:1,25
192:8
**spending**
125:20
**spent**
50:12,14 53:6,8,16
56:9,12 125:2,13
126:1
**spilled**
262:10
**spirit**
19:10
**spoke**
41:10 141:4
**spoken**
135:4,8,16 136:3,9
233:1 251:23

**spring**
10:16 144:21
**squamous**
204:18
**St**
5:21
**stable**
227:7
**staff**
138:5 257:12
**stage**
124:21
**stages**
171:20 281:6
**stand**
83:19,24
**standard**
15:15 37:11,12
38:14 131:2
**standardized**
180:6
**start**
14:13 17:2 25:1
57:5 62:21 71:12
101:22,22 105:13
134:17 168:17
171:21 186:25
286:20 296:25
**started**
10:1 72:17,22
92:23 124:4,17
134:20 190:5
201:22 284:8,9
295:2 314:3,11
**starting**
121:8 124:10
125:21 129:5
170:4
**starts**
128:17 206:14
296:6 321:11
337:16,17,18,20
**state**
109:6 113:4,17
130:22 131:4
165:16 237:3

268:15 301:5
327:12 354:3
**stated**
182:20 196:8
212:19
**statement**
52:1 137:12 152:19
183:5 202:23
205:17 248:17
249:12,14 268:24
269:21 271:5
321:21 336:13,22
341:5
**statements**
19:4 21:19 25:9
203:2 333:13
**states**
1:1 9:11 86:1 109:4
202:5 220:4,5
**statistical**
30:3 37:9,24 71:15
71:17 72:12,16
76:1,7,13 77:19
79:11 171:17
198:10,21 205:5
207:6,8 239:12
245:9,16 268:9,12
268:25 269:7,16
269:16 298:23
327:22
**statistically**
67:4 207:8 268:5
273:1 297:17
301:10 305:13,24
328:23 330:1
**statistics**
38:5 106:2 244:11
**status**
8:11 175:15 177:8
227:7 317:23
318:16 319:9
325:11
**stay**
290:1
**Steering**
6:13

**stenographic**
9:16
**stenographically**
353:9
**step**
25:21 38:6
**steps**
29:25 258:21
**stickers**
15:3 285:5
**sticky**
68:6,8
**stock**
281:19
**stomach**
318:10 329:24
**stop**
67:18 189:5 290:13
298:7 311:22
**Straif**
139:11
**straight**
80:22
**straightforward**
77:8
**strand**
86:3
**strands**
270:21
**strategy**
66:1 186:14 197:6
197:15,15
**stratified**
162:15
**Street**
3:6 4:5,13 5:6,20
**strength**
75:20 102:25
146:21 147:3
173:22 207:23
245:3 261:15
305:4 313:11
327:14
**strengths**
165:9 179:5,9
321:13

**stress**
143:12 314:10
**strictly**
38:5 114:21 222:1
238:2
**strikes**
229:13,16
**strong**
146:22,22 147:9,15
147:21,22 148:13
148:14,16,18
149:7 174:7,14
176:22 178:5
204:3 207:18
311:10 319:10
**stronger**
174:14,15 176:9,19
176:20
**strongly**
207:18 318:18
**structure**
226:16
**student**
79:2,7 82:1
**students**
36:19 134:4,8,9,15
134:22 135:7
284:9
**student's**
79:3
**studied**
126:23 162:2
318:24
**studies**
6:22,24 23:7,8 24:4
24:5 27:1,7 28:14
28:22,24 29:3,5,9
30:24 32:16,21
34:11,20 35:3,9
37:10 38:3,4 39:6
39:8 42:18,23
44:10,17 45:5
46:3 64:12,13,15
65:2,6 66:3,4,5,6
66:14,23 67:6,8
67:12 74:3 76:14

77:22 78:6 79:24
79:24 80:7 82:24
93:1 97:12 98:4
102:13 106:5
107:5 118:17
119:1 121:8 125:8
132:23 142:23,23
146:6,17 156:23
158:3,8 159:11,12
159:12,18 160:10
162:20 163:19,22
170:18 171:3,12
171:13 173:23
179:15 180:13
181:12,14 184:5
184:11,21,22
185:2,16 186:9,10
186:17,23,24
187:1,6,10,19
188:6 192:1 197:2
197:22 198:5,5
199:5,12 200:9
202:10 203:9,10
205:18,19,22
208:3,7,15 209:8
209:14,17,23
222:20,24 223:14
224:4,7 225:13
227:17 228:15,21
228:24 237:17,22
238:12 239:6
240:1,16,21 241:2
242:5 245:7,13,21
266:11,14 271:18
271:21,23 272:3,8
273:22 301:9
310:15 311:19
319:21 329:9
333:9,11 345:11
**study**
27:8,12,16,20 28:4
28:25 29:14 33:17
33:22,24,24 34:3
38:12,16 41:23
65:1 66:9 78:5
80:8 98:15 99:19

107:10 118:17
123:2,3,5 124:8
124:11,15 125:3
125:14,18,18
126:4,10 149:18
161:18,21,24
167:18,19,25
168:8,16 170:8
171:4 175:6 180:7
180:11,19,23,24
180:24 184:10,12
184:15 185:18
189:1 190:2,7
195:2 196:9 197:4
198:14 200:22,24
201:17 208:8
209:15,21 210:12
211:6 213:6
214:16 222:16
224:12,13 225:7
225:10,11,22
226:3,5,12 227:9
227:21,24 228:16
228:17,22 237:18
237:23 248:15,20
266:16,17 271:8
272:7 280:1,3
283:15,16,19,21
283:22,23 286:23
287:2,3,13 292:7
292:13,14 294:3,6
298:10 304:14
310:14 317:18
318:8 328:19
340:3 345:18,22
349:14
**studying**
126:25 181:8
263:10
**stuff**
74:13 308:10
**stumbling**
159:1
**subdivided**
152:21
**subgroup**

314:5
**subgroups**
152:22
**subject**
51:7 107:6 354:8
**subjective**
310:23
**subjects**
27:25 105:8 211:5
211:8 213:14,18
213:19 318:14
**submission**
259:23 260:3
277:21 325:25
**submit**
139:6 142:7 193:25
259:13,18,20
260:6
**submitted**
13:18 16:1 110:8
112:15 138:20,25
175:19 233:7
260:14 324:2
325:10,22
**submitting**
326:20
**subscribe**
132:5
**subscribed**
353:14 356:14
**subsequent**
141:14 237:5
238:10
**subsequently**
136:17 147:19,23
231:13
**subset**
211:7
**substance**
356:7
**substantially**
165:19
**substantive**
136:7
**substituted**
213:17

**substitutes**
314:17
**subtitle**
316:21
**subtly**
167:17
**subtopic**
34:7
**subtype**
205:1
**subtypes**
204:6 297:8
**sufficient**
144:1,13 150:17
151:13 152:12
153:4,12 154:22
155:10 199:6
277:1,9 282:13
**sufficiently**
31:20 74:21 179:17
179:19
**suggest**
45:16 220:1 250:4
260:14 298:4
305:23 345:11
**suggested**
139:5
**suggesting**
253:24 349:13
**suggestion**
70:24
**suggestions**
138:2
**suggestive**
249:17,20 250:3
283:1 288:2
**suggests**
202:6 206:19
305:12
**Suite**
3:12 4:6 5:13,20
**summarize**
77:2 104:3 113:13
307:14
**summarized**
27:7 333:8,10,11

**summarizes**
101:21
**summarizing**
37:9
**summary**
243:18
**summer**
10:16 12:11 139:20
139:21 141:5,25
**summer/fall**
13:16
**sun**
288:3
**Sunday**
209:20
**supervision**
353:25
**supplemental**
231:20 235:3,10
**supplied**
61:2
**support**
19:4 34:20 55:7
85:17 151:11
152:10 179:17
183:12 220:18
221:23 243:10
265:22 267:6
272:22 316:22
318:3
**supported**
207:18
**supporting**
259:20 311:18
**supportive**
35:3,10 155:7
267:7
**supports**
115:8 132:15 195:3
196:9,12 222:16
**suppose**
252:24
**supposition**
271:17
**sure**
14:8 15:13 16:16

18:2,7,12 23:16
23:17 30:17 33:8
36:11 40:10 41:8
41:8 44:24 48:7
52:5,10 54:3
56:22 58:16 60:9
62:6 64:21 66:18
68:22 72:15,23
79:13 81:4,4,24
85:11,14 86:5
88:17 90:3 91:16
94:4,23 98:12
101:10 106:11,13
107:12 108:20
109:9,12 116:4
117:11 132:15
141:10 146:11
148:22 155:20
168:2 169:7
178:24 182:16
187:23,24 199:3
203:5 208:19
210:25 211:13,16
212:10,25 215:19
223:17 237:25
239:9 241:3
242:10 246:10
255:11 256:1
259:19 261:14
275:4 276:19
279:5 300:10,12
303:5 304:7
308:16 317:8
321:1 344:2
347:21
**Surgeon**
133:3,20
**surgery**
65:22 340:8
**surprised**
232:12
**surprising**
236:24
**surrounding**
213:8 241:11
**survey**

85:22 129:6 132:2
132:7
**survivors**
284:15
**susceptibility**
172:23
**susceptible**
129:11 173:7
**suspect**
35:23,25
**suspected**
162:2
**suspicious**
209:21
**Swan**
274:22
**swear**
9:17
**Sweden**
85:23
**sweep**
91:15
**swell**
129:5
**switching**
108:17 242:12
**sworn**
9:19 353:6 356:14
**symptoms**
171:20
**synonym**
32:20 130:3
**synonymous**
315:20
**synthesis**
25:17
**synthesize**
24:7,24 25:3 67:11
**synthesized**
25:20
**synthesizing**
25:9 134:20
**system**
26:25 28:10 30:9
30:19 31:11 45:24
82:12 145:3 251:3

**systematic**
29:6 230:5
**systematically**
73:11
**systemic**
159:21
**systems**
28:8 311:20
**S-T-R-A-I-F**
139:11

---
**T**

**T**
6:1,1,7 7:1 8:1 20:8
355:2
**tab**
14:18,22 58:1,4
109:16 110:1,2
192:23,25 193:1,3
193:4,14 195:20
212:2 224:18
234:9 236:2,4
247:23 254:14,17
267:25 342:20
**table**
15:3 17:8 62:3,14
83:4 93:16 95:14
106:20 112:7,7
165:18 189:16
198:12 199:17
200:14 214:11,18
229:16,16,20
244:25 266:23
308:22 309:6
315:19
**tables**
77:10 185:19
223:13 231:21
235:3,10
**Taher**
41:23 42:6 50:22
51:25 84:3 230:4
230:9,14,17,24,24
231:14,17,19,24
232:24 233:5,10
233:17,24 234:2

235:2 236:11,19
237:1,3,13 238:25
239:4,22 240:12
240:24 241:7,12
241:15 243:1,6,9
243:16,18 244:22
245:6,25 247:3
248:24 250:18,18
251:7 252:15
253:10 275:12
291:19,23 292:13
292:17,22 293:19
294:2 299:24
305:22 323:3,12
323:21 324:25
326:8
**take**
11:13,21 12:13
51:23 52:15 65:19
97:9 101:16
105:11 107:9
128:22 132:20
135:25 140:10
145:18 150:14
154:1 169:7
187:13 191:20
193:7,8 194:13
199:23 203:3
209:22,23 210:1
225:14 229:10
242:9 261:13
322:13 338:22
**taken**
40:11 59:9 79:13
93:9 94:17 172:17
201:4 224:7,8,8
258:22 298:3
302:11 329:5
353:4
**takes**
42:2 150:10 171:10
**talc**
10:8,21 12:18
13:11,15 20:3
24:15 33:12 43:9
43:13 53:9 54:7

| | | | | |
|---|---|---|---|---|
| 54:15,19 55:1,15 | 272:12 273:3 | 315:13 316:25 | 68:23 | 157:16 172:5 |
| 55:22 57:4,13,18 | 274:18 275:8,13 | 317:4 324:12 | **technically** | **terminology** |
| 59:1,4 74:25 75:9 | 275:19 276:3 | 325:3 338:4,21 | 87:18 137:11 | 146:20 147:3 148:4 |
| 76:25 83:4,8 | 282:12,17 283:4 | 339:1 351:11 | **Tecum** | 151:20 244:19 |
| 84:19 88:11 89:25 | 283:19 284:4,22 | **talc/ovarian** | 6:12,17 | **terms** |
| 90:24 92:20,21 | 287:22 288:5,15 | 134:14 276:15 | **Telephonically** | 49:25 51:6 53:21 |
| 97:18,23 118:1 | 288:21 301:12,17 | 277:16 | 5:4 | 121:11 147:15 |
| 120:19 122:8,19 | 302:9 303:17 | **talk** | **tell** | 151:19 191:24 |
| 123:17,23,25,25 | 305:15 306:1 | 25:10 36:19 84:3 | 18:6 19:13 45:4,14 | 205:2 247:12 |
| 124:22 126:6,7 | 312:7 314:12,16 | 131:1 163:18 | 88:16 92:16 | 266:18 268:11 |
| 128:4,25 129:18 | 314:17 327:6 | 164:7 221:10 | 100:16 141:15 | **terra** |
| 131:8,15,22 | 330:10,20 331:7 | 310:12 326:22 | 161:2 175:5 | 351:6 |
| 132:11 133:23 | 331:11,13 335:9 | **talked** | 286:10 290:7 | **Terry** |
| 134:11,23 135:19 | 339:10 340:7,23 | 169:21 183:19 | 307:17 310:4 | 63:10,12,13,16 |
| 136:16,25 137:8,9 | 341:9,12,23,24 | 282:16 286:24 | 313:6 320:11 | 111:12,13,21 |
| 137:13,17,22 | 343:18,20,23,24 | **talking** | 340:22 | 123:2,5 142:25 |
| 138:22 139:2 | 344:10,12 345:12 | 36:18 51:2 64:12 | **tells** | 197:8,9,21 198:2 |
| 140:5 141:13,17 | 345:13 346:12 | 74:8 85:24 86:1 | 25:25 | 201:14,15,16 |
| 141:21 142:1,12 | 347:9 349:21 | 115:21 141:12 | **template** | 238:22,23 239:1,6 |
| 144:6,19 146:8 | 350:22 351:14 | 172:2 240:14,15 | 151:18 154:2,3 | 239:24 266:10,17 |
| 148:6 150:6 151:2 | **talcum** | 240:17 287:8 | **temporality** | 267:10,24 268:3 |
| 151:3,11 152:11 | 1:6 6:20 7:13,16 | **tangentially** | 305:6 | 268:15 269:8 |
| 153:10 155:1 | 9:10 57:22 58:6 | 258:4 | **ten** | 270:15 271:7,17 |
| 157:14 158:8 | 58:23 69:14 74:15 | **tape** | 11:20 51:3 56:11 | 271:19,22 272:16 |
| 160:3 162:11,11 | 78:10 92:10,14 | 320:11 | 125:7 129:15 | 272:21 294:12,13 |
| 163:1 164:5 165:4 | 95:25 96:3,18 | **target** | 147:6,6,13,20 | 294:15,16,17,20 |
| 166:3 168:10,14 | 97:15 98:9 101:14 | 181:11 | 148:10 266:11 | 295:1,7 296:12 |
| 168:21 169:25 | 102:1,8,14,17 | **tasks** | 271:21 272:3 | 299:9 |
| 176:2,10 178:12 | 103:2,15,23 113:8 | 55:4,7 | 279:2 | **tertiary** |
| 189:8,12,17 190:9 | 113:14 115:2,4,10 | **teach** | **tenable** | 284:17 |
| 190:16,22 192:3 | 115:23,24 116:8 | 134:9,10,11,12 | 148:14 | **test** |
| 193:17 204:5,5 | 116:10,11,25 | 179:1,4 | **tend** | 268:25 269:7 298:5 |
| 213:9,11 215:15 | 118:6,7 119:3,6 | **teaching** | 44:12 52:11 65:15 | 299:13,13 311:20 |
| 216:18 218:4 | 119:11,12 120:20 | 134:17 | 85:3 123:6 162:3 | **tested** |
| 225:19 226:11 | 120:23 121:14 | **team** | 250:2 | 160:9 |
| 227:8 229:5,18,19 | 126:14 127:8,21 | 12:3 81:13 97:13 | **tendency** | **testified** |
| 230:6,21 232:19 | 134:6 135:1,5 | 189:2 197:10 | 207:11 298:21 | 9:20 42:21 44:5 |
| 232:22 237:9 | 141:8 170:12 | **teams** | **tenuous** | 59:16,22 60:12 |
| 243:12 247:7 | 172:12 176:11 | 266:12 | 117:22 | 241:10 246:19 |
| 248:10 250:10,19 | 205:8 216:10 | **team's** | **ten-hour** | 292:25 |
| 251:8 253:12 | 217:7 218:15 | 45:23 | 11:21 | **testify** |
| 258:13 259:21 | 259:24 260:13 | **tease** | **term** | 69:6 |
| 260:15 261:2 | 291:4,11 301:18 | 30:23 | 92:5 147:2 149:11 | **testifying** |
| 262:6 263:19,20 | 302:23 307:10 | **technical** | 244:23 246:11 | 10:10 164:17,21 |
| 264:6 267:8,10,21 | 312:8,15 313:19 | 157:20 | 252:16 253:16,19 | 313:17 |
| 268:7 271:12 | 314:13,21 315:4 | **technicality** | **terminological** | **testimonies** |

332:21 333:3

**testimony**
104:10 125:5
133:12,16 153:15
208:1 220:16
241:19 244:16
246:5,5 250:12
265:6 269:13
275:6 330:25
335:13 344:17,21
346:14 353:7

**tests**
311:21

**Texas**
5:14

**text**
70:16 71:15,22
87:17 93:17,17
189:15,16 207:12
311:23

**textbook**
20:5 24:19 36:9
67:16 244:11

**textbooks**
19:9 36:9

**texts**
19:8

**thank**
10:5 11:7 20:13
48:9,14 78:14
145:19 157:24
178:3 191:21
192:22 193:9,11
199:25 203:25
210:2,15 212:4,5
225:23 236:3,8
246:25 275:2
285:16,24 289:24
291:17 299:14
300:14 306:6
307:22 309:2
312:4 320:6,17
322:1,9 336:8,20
346:4 347:19
351:24,25

**Thanks**

282:6

**theirs**
77:16 197:10
200:15,20 201:19
237:20,21

**theoretical**
158:20

**theoretically**
158:9

**theories**
316:17 317:2

**theory**
316:9 335:22,23

**thereof**
93:15 353:11,14

**thesis**
114:23 115:8
129:15 346:22

**thick**
42:23 43:16

**thing**
28:21 31:9 38:4
81:18 86:16 97:16
107:7 114:4
124:12 136:7
140:5 151:21
157:16 158:21
166:9,21 179:25
181:3 186:12
191:3 196:24,25
204:12 223:3,25
229:13,15 235:16
235:18 239:15
252:6 307:14
309:10 325:6,16
348:19

**things**
12:24 19:11 28:2
39:13 40:11,12
44:15 45:24 52:11
65:17 70:7,20
72:11,19,20 73:12
74:6 81:14 83:3
83:11,13,23 91:15
96:24 138:10
140:2,8 144:4

147:18 158:16
160:1,22 162:2
166:1 170:4 173:1
183:20 185:8,12
188:20 195:25
241:24 266:5
271:4 273:18
283:18 314:18

**think**
17:6 23:4 26:17
27:6,9 28:13,20
30:20 32:19,20
36:12 37:23 41:25
43:5,18 46:24
50:20,23 53:16,25
62:15 66:16 71:23
71:25 74:5,7 76:2
76:11,21 77:6,13
77:16 84:24 85:1
86:2 89:5,14,14
91:8 94:1,15 95:1
95:8,25 96:10
97:1,25 98:20
101:21 104:19
105:17,18 106:1
106:22 107:23
108:1 109:7,12
112:13 113:23
114:8,12 117:13
118:3,11 122:3,11
122:12 123:3,13
124:17 128:21
129:2,4,13 130:12
132:14 135:14,20
136:1,7,22 137:23
139:20,25 140:5
141:19 142:5,15
142:18 143:17,25
144:21 145:18
150:17,22 154:13
155:18,19 159:4
161:14,25 169:4
169:16 174:6,17
175:20 177:13
183:10,25 186:8
187:4,12,13 189:3

189:7 195:5
197:10,20,24
199:14 200:25
204:3,7,11 206:2
206:16 207:17
209:25 211:19
212:3 217:11
218:21 221:18
224:16 227:16
229:25 230:16,22
231:4,18 234:10
244:10 247:13,24
249:12,15 250:1,4
251:13,24 253:1
254:5,18 256:19
256:20 260:4,8,20
270:13 272:5,8
276:5 281:18
289:13,20 291:9
292:2 299:4 303:2
306:10 308:11
312:23 317:1,8
321:3 322:12
332:9 337:5 340:1
342:4 343:2
348:24 351:18

**thinking**
63:12 75:17 108:18
128:10 142:9
169:8,10 175:25

**third**
20:13 27:13 105:19
111:20 170:21
266:19,19 286:21
297:13 300:24
346:4

**thirty**
354:12

**thought**
18:25 21:10 40:23
42:21 62:13 63:15
67:14 70:12 72:18
90:4,6 94:24
105:22 186:12,15
195:9,10 208:12
231:4 241:20

246:9 290:15
308:5 325:5 349:6

**thousands**
40:22 160:15

**thread**
37:14 152:3

**three**
11:12 18:15 39:20
39:23 40:2,2,12
40:14 42:11
106:21 111:2
126:2 134:21
135:25 247:1,7
251:6 253:9
295:17 318:12
319:3

**threshold**
122:2,7

**thrown**
109:6

**throws**
108:6

**thumb**
18:19 62:18 109:15

**THURSDAY**
1:19

**tick**
112:16,18,18,20

**tied**
120:10

**tilted**
340:12

**time**
9:7 12:24 13:12
15:16 18:2,7
45:18 49:5,8,13
49:18,20,22 50:1
50:11,14,16 51:10
51:13 52:15,17
53:7,18,19 55:25
56:3,8,12,23 57:9
57:10 60:25 71:25
72:15 74:6 83:22
104:14 105:11
106:12 110:25
111:13 112:1,23

118:8,13,20
119:12 120:11
125:13 126:2
127:22 138:11
139:5 141:10
142:10,12 145:16
166:2 187:3,14
192:1,8 198:18
207:22 209:1,3
216:19 218:10
224:23 226:25
241:23,25 242:9
259:7 270:3 274:5
289:17 314:16
320:10 333:4
336:6 353:5,6,8
**timely**
143:18
**times**
118:22 120:16
139:17 147:7
295:17
**TINSLEY**
5:18
**Tisi**
3:4 11:3 48:10,14
104:16 109:21
111:7 178:17
194:8,11,15
234:15,18,23
235:7,16 242:12
254:22,24 255:3,5
262:10 280:14
288:23 290:11,15
300:11 307:25
308:9,17,24
**tissue**
341:24 342:17
349:15 351:12
**tissues**
349:22
**title**
100:25
**titled**
87:9 193:17
**titles**

170:3
**today**
10:2,7 12:9 13:2
16:23 17:4 18:1
18:14 21:14 36:10
37:5 39:20 44:7
44:21 46:10 50:17
51:13 56:4 61:18
69:1,5 90:19
91:17 103:19
110:13 116:1,13
116:16,22 118:9
120:7 123:8
143:19 149:11
153:8 155:1
175:23 194:1
198:20 203:20
204:3 220:8
244:12 263:2,6,16
264:21,22 307:9
335:13
**today's**
9:6 50:12,15
**Todd**
1:25 2:12 9:17
353:18
**told**
11:20 141:10,11
275:16 325:21
**top**
182:20 214:5
329:18 337:21
339:24 340:11
345:6
**topic**
13:14 24:9 33:25
34:18 36:23 73:21
124:6 158:25
225:8 287:1 314:1
318:6
**topics**
7:24 74:18 80:6
126:18 163:20
286:9
**total**
54:11 55:14,18

125:2
**totality**
113:6 131:5 154:5
301:17 302:1
303:8
**toxicologic**
303:12
**toxicologists**
303:3 314:5
**toxicology**
74:15,20 75:8
163:21 164:19
**trace**
350:6,21
**traffic**
65:16
**train**
73:3
**trained**
185:11
**training**
331:16
**transcribed**
353:10
**transcript**
6:8 7:2 8:2 33:3
93:18 95:13,14
328:5 353:10,12
353:22 354:13,14
**transcription**
356:4
**transcripts**
93:8,11,14,21,23
94:2,20
**translation**
112:17
**treat**
210:12
**treated**
65:17
**trend**
191:24 192:17
202:18 206:24
207:15,19,21,24
208:17,21 268:10
268:16,25 269:7

270:6,16 295:9
298:1,3,5,14
336:18,18
**trendline**
207:9
**trends**
122:24 266:24
**trial**
59:16,22 60:12,12
68:15 69:6 88:10
246:4,20 333:3,22
**trials**
38:10 180:3,5
**tricky**
184:13
**tried**
24:7 29:8 50:23
**trivial**
125:10
**true**
114:24 119:19
177:4 180:11
183:18 249:7
327:13,25 331:10
353:10
**truth**
168:18
**try**
29:16 37:16 41:4
127:19 167:6,19
181:10 254:12,12
290:24,25 314:15
**trying**
35:8 41:17 71:25
76:11 102:20
121:24 129:23
140:15,18 155:18
182:7 272:16
281:17,21 291:9
332:14
**tubal**
287:20
**tubes**
339:4 341:1
**TUCKER**
5:19

**turn**
57:25 86:20,23
112:24 113:1
163:5 214:11
236:25 254:14
280:20 286:15
299:9 329:17
**turned**
147:23 257:8
**two**
11:2,23 13:19
14:16 22:24 48:17
49:11 50:4,18
53:1,16 56:20
57:11 59:12 72:10
73:5 76:22 93:18
102:18 105:18
106:21 114:16
125:19 134:19,21
134:21 147:14
160:21 166:18
171:6,10 173:1,1
186:20 187:14
189:24 190:14,24
197:25 210:18,25
213:6,8 217:5
219:5,19 220:20
220:25 221:10,16
224:22 229:18
238:3 241:24
251:3 256:14,15
268:8 272:7
273:17 274:21
302:10 313:5
323:13,17 327:20
332:22 334:25
337:9 338:21
339:21 340:13
341:21 350:5
**two-by-two**
106:20
**two-way**
323:14,15
**type**
26:24 34:6 38:20
51:19 72:24 73:4

117:15 119:11,13
128:9 157:19
167:3 202:10
203:8,11 204:11
205:8 228:11
260:20 261:22
302:19
**typed**
44:8
**types**
19:2 23:8 24:6
54:14 65:2 75:16
92:20 115:10,14
115:16 179:6,10
180:2 203:19,10
204:8,9,15,19
205:1 318:13
**typical**
154:3
**typically**
28:14,16 52:5
76:21 82:1 90:10
91:13 99:1 157:16
158:16
**typo**
63:3 223:25
**typos**
18:4 83:21

---
**U**

**Uh-huh**
279:16
**ulterior**
325:19
**ultimate**
32:2 35:19
**ultimately**
78:8 258:8
**umpteen**
227:21 246:13
**unadjusted**
319:2
**unclear**
283:2
**undergo**
340:8

**underlined**
44:15 52:7
**underlying**
27:1 223:14 271:18
271:21 312:7
**underpin**
292:3
**undersigned**
353:2
**understand**
15:18 26:15 31:22
31:25 46:14 61:17
85:12 95:23 96:7
102:20 115:7
116:4,19 117:11
130:1,4 140:11
143:6 151:24
198:13 205:20
266:23 267:2
276:20 322:4
328:7 333:25
338:17 348:4
**understandable**
31:19,21
**understanding**
10:9 22:13 24:14
32:10 33:5 34:14
34:16 94:16 96:16
96:23 114:11,19
131:19 151:25
155:16 185:20
220:15 239:18
244:3 261:7
291:22 292:20
293:11 338:12
**understood**
172:21
**unexposed**
76:21 225:17 269:1
269:8,24 270:3,5
270:23 271:3
**unfortunately**
289:17
**unilaterally**
326:4
**uninterested**

242:2
**unique**
38:7 39:5
**United**
1:1 9:11 86:1 109:4
220:4
**universal**
86:5
**University**
279:11,14,19
**unknown**
172:9 173:12,20
178:13 319:19,23
**unpack**
29:16
**unusually**
146:9,10,11
**updated**
190:9
**updating**
73:19 74:1
**up-to-date**
84:25 85:1 142:14
189:23
**usable**
28:5 30:11,20
**usage**
76:25
**use**
6:20 7:13,16 23:1
23:24 24:15 25:2
30:14,18 34:19
38:18 58:23 59:1
62:9 72:1 77:4
83:4,8 89:25
90:12,24 113:8,14
113:24 115:1
118:6 120:19
121:11 122:7
126:6,14 127:7,21
128:3,25 129:18
134:6,25 135:5,19
136:25 137:9
141:17 144:6,19
147:15 149:10
150:5 151:11,24

152:11 153:10
155:1 157:14
158:8 161:18,20
161:23 162:25
164:5 165:4
166:20,20 169:25
171:21 172:12
176:10,11 179:15
179:16 185:22
191:11 192:2,3
193:17 202:6
204:6 213:14
214:24 215:2,4,14
215:21 216:10
217:7 218:4
221:15 224:22
225:3 230:6
243:12 244:22
246:17 248:10
249:17 250:2,9
251:8,12 252:24
253:12,16,18
259:21 267:22
268:1,6 271:3,12
272:12 273:3
287:20 288:5,5,15
291:4,11 296:15
297:7 298:1,6,6
301:18 302:23
311:25 312:8
313:19 315:5,13
315:22 316:24,24
327:6 329:7
330:10,20 331:6
331:12 335:9
336:17 341:3
345:12
**useful**
18:25 28:5 30:11
30:20 76:18
181:17 261:20
**users**
119:3,15 268:16
295:3,8 298:2,13
**uses**
145:4

**USNCI**
26:6
**usually**
99:6 181:18
**uterus**
340:25
**utterly**
38:7
**U.S**
279:22

---
**V**

**v**
3:4 89:20 91:20
**vacation**
257:17
**vagina**
340:25 344:10
**vaginal**
339:3,25 340:12
**vague**
69:23 148:19
219:14
**valid**
13:5 27:4,5 28:11
28:17 29:20 30:20
31:5 35:5,22 67:5
**validity**
37:24 213:10
303:12 310:18
**valuable**
184:6,6
**value**
31:7 184:3 227:17
245:10
**values**
298:20
**variability**
82:24 180:13
204:16,20 207:6
311:7
**variable**
56:15 57:6 156:8
156:17 158:11
172:8 173:20
176:7 178:6 229:6

Jack Siemiatycki, Ph.D.

297:6 327:3
**variables**
229:18
**variations**
223:2
**varies**
180:23
**variety**
163:20
**various**
6:22 26:25 79:18
92:7 97:1 101:17
102:13 105:8
115:15 124:9
142:23,24 143:7
165:17,22 169:19
197:8 229:17
235:18 262:20
278:25 304:25
305:9 314:7
321:14 332:15
333:2,4,9 334:16
**vault**
339:25 340:12
**veers**
68:18
**Venter**
339:4,10,16,22
340:22 341:8
346:1 347:1
**verbal**
293:6
**verbatim**
218:7
**verdict**
90:2
**verification**
223:6
**verify**
63:19 79:16
**version**
62:8 76:4 108:13
111:17 112:3,13
145:11,12 190:9
195:10,11,14,24
197:17 266:21

325:23,23 337:11
337:11
**versions**
73:7,12 107:23
**versus**
38:19 64:14 66:22
77:3 314:16
**video**
9:8
**videographer**
5:25 9:3,5 52:18,21
67:23 68:1 104:23
105:2 140:22
141:1 145:20,23
155:21 174:21
210:3,6 242:18,21
255:12,15 257:1,4
265:14,17 274:8
274:11 289:22
290:13 320:7,9,12
320:15 322:15,18
336:1,4 343:10,13
344:8 352:1
**Videotaped**
1:16 6:10,15
**view**
21:14 66:19 114:22
122:18,22 128:3
132:5 134:5
142:21 143:2,3,5
196:13 197:18
198:6 207:6
225:11 226:17
227:11 245:17
250:9 252:4,5
282:13 298:24
316:6,11
**viewed**
93:7
**views**
22:4 244:4 246:17
**Virginia**
3:13
**visceral**
162:5
**vis-à-vis**

143:2
**vitamin**
288:3
**vivo**
302:3
**void**
353:13
**volition**
87:11
**voluminous**
64:5,8 86:12

___

## W

**wait**
222:7 282:2,2
289:12 338:15
342:18 347:17,17
347:17,17
**walk**
61:22 64:4
**walked**
134:15
**want**
14:25 15:1 17:12
21:16 33:6 34:11
41:7 45:3 50:25
64:18 70:7 109:10
110:22 127:12
148:22 161:1
163:2 167:19
176:18 178:17
181:1,9,10 182:9
182:19 189:5
192:8 194:16
195:19 199:18
203:3 211:20
223:17 224:25
234:15 238:2
245:20 270:12,20
273:9,15 275:4
300:13 325:9
326:22 327:8
328:13 342:13
346:20
**wanted**
22:1 39:25 52:12

70:10,19 81:25
87:21 124:7 164:7
187:25 195:24
212:21 213:3
312:2 318:19
325:11,22
**ward**
65:9
**Washington**
5:7
**wasn't**
45:6 51:1 59:5
191:2,2 200:15
258:10 308:9
325:13 326:1
349:4
**way**
24:24 26:21 27:21
27:22,24 28:14,17
34:21 38:11 44:19
45:10 58:18 60:15
62:7 65:5,11 72:7
72:19 73:8 75:19
80:16 81:24 83:24
91:22 92:2 107:3
114:9,10 115:17
118:12 121:13
128:6 130:13
138:12 140:5
156:7 158:17
159:8,17 166:11
172:4 183:16,17
188:1,2 195:6
204:13,14 232:15
247:20 250:4,8
251:1 264:13
265:2 267:18
277:22 296:7
303:22 326:19
337:19,20 350:21
**ways**
24:14 36:24 70:11
79:18 103:15
128:11 196:12
227:22 246:13,13
268:8 281:13

282:23
**weak**
146:21,25 147:16
148:18 149:7
207:15 226:13,16
**weaken**
181:3
**weakness**
179:12 227:8
321:14 349:18
**weaknesses**
72:19 165:9 179:9
179:10,13 183:21
183:22 184:1
**web**
280:16 286:8
**website**
7:22,23 280:17,18
286:7,8,11 288:13
288:14,19 289:7
**websites**
43:8,12
**week**
13:19
**weeks**
11:12 51:2 53:15
53:16
**weigh**
25:6 99:24 209:10
**weighing**
25:11 304:9
**weight**
25:5,15 26:15,20
31:25 32:6,6 43:3
43:4 99:19 197:19
267:2 320:22
321:22
**weighted**
165:10
**welcome**
267:25
**went**
12:20 13:19 29:8
187:19 240:16
257:16
**we'll**

48:12,12 62:21
84:3 105:11
140:14,20 157:12
191:20 199:23
294:13 309:11

**we're**
9:3 51:1 52:23
62:15 67:23 68:1
74:8 99:7 104:24
105:4 109:12
115:21 121:8
131:19 139:14
140:23 141:1
145:25 157:21
210:3,8 223:3
242:18 255:12,15
265:14,17 289:13
289:20 308:16,17
317:9 320:15
322:15 336:4
343:10 344:8

**we've**
52:14 94:8 104:16
108:1 111:2
170:20 171:14
238:7 263:5
276:23,23 277:7
287:8

**whatsoever**
275:7,11

**Whew**
53:15

**whoops**
142:3

**who've**
324:5 351:13

**wide**
161:10,10

**wider**
65:15

**widespread**
218:14,23

**willing**
238:3

**wine**
161:3

**wish**
17:12

**witness**
2:15 9:17 10:14
11:5,7 17:9 18:22
19:7,9 20:12
22:10,23 23:16
29:23 32:5 34:2
35:7,25 39:11
45:19,22 47:19
48:15 52:17 53:11
54:2,11,18 55:3
60:8 62:17,19
69:24 71:2,9,14
73:10 75:14 78:16
80:21 84:22 85:11
85:21 89:13 90:15
91:1 94:23 95:21
96:9 98:25 99:5
101:1 102:5 104:2
104:11 109:10
111:5,10,17 112:6
116:4,15 117:7
118:3 119:9,19
120:14 121:20
122:11 123:11
125:6,16 129:22
130:8 132:1,14
133:13,17 137:3
141:7 150:9 151:7
151:16 153:16
154:17 155:23
156:12 161:13
165:14 167:16
172:25 173:3
174:22 175:1,3
176:17,24 178:10
178:20 185:7
188:19 192:6
193:1,9,11 194:17
199:1,19 200:13
203:1,23 205:4
206:16 208:2
212:5 213:25
218:21 220:25
222:9 223:9,23

224:24 225:1,10
225:24 231:9,12
234:12 235:9,17
235:22 236:6
239:8 240:6,14
241:1,20 244:17
246:22 247:10
248:18 249:24
250:14 251:12
252:20 253:18
254:4,12 255:1,4
255:8 256:21
258:18,25 260:23
261:4 262:1 263:8
263:22,25 264:13
265:7 266:7
267:14 269:12,14
271:16 272:15
273:7 276:19
277:5,12 278:4
279:5 281:17
282:7 283:8 284:7
284:25 285:7,10
288:18,24 289:14
290:6,9 292:2,11
293:15 302:7
303:1 304:3,17
307:13 308:7
309:19 310:6
312:19 314:3,25
315:9 322:2,6
325:2 326:18
328:7 330:15
331:1,15 332:2
334:12 335:2,14
337:17 338:16
339:13 341:3,18
342:4,23 343:7
344:3,9,22 346:20
347:20 348:8,11
348:25 349:2,24
350:24 351:16
353:6,7,14 354:1

**witnesses**
94:13

**woman**

81:11 343:19

**women**
92:25 101:2 115:10
168:8,10,17,20
170:9 171:16,19
208:23,25 209:19
215:13 216:9
225:18,19 226:22
227:3,3 340:6,6,7
340:12 341:12
351:6,10,13

**women's**
226:6 227:6

**wonder**
199:6

**word**
30:12,14,18 87:3
87:12,22 111:22
112:15,18 139:3
146:11,13 147:17
149:5 179:12
187:21 210:19,24
210:25 230:21
239:18 250:3
251:13,17,25
252:25 253:2
254:9 283:4 284:4
291:10 328:11
347:20

**wording**
130:13 137:4
145:10 269:19

**words**
72:24 123:12
185:22 329:14

**work**
10:21 24:23 47:10
47:14 48:21,25
49:13,15 50:6
51:2,20 54:7,14
54:18,25 55:8,21
56:1,9,13,25
57:12 71:11 73:24
88:14 94:12 98:8
98:16 100:2,4,7
100:12 123:23,25

126:11 143:7,23
150:21,25 169:4
283:25 324:7

**worked**
124:14 126:18
193:25 278:18,24

**workers**
350:19

**working**
56:20 124:4 136:14
136:15,21 142:16
142:19 143:2,3,14
143:15,22 144:17
151:1,3 152:20
153:17,25 154:3
155:8 158:15
163:1 223:4
265:25 280:3,5

**workplace**
8:6 19:21 21:1,13
24:21 36:7 159:25
306:14 308:21
309:5

**works**
10:23 49:22

**world**
26:6 85:25

**worry**
16:9

**wouldn't**
78:12 90:16 99:13
103:13 114:24
129:11 197:13
207:16 209:24
242:7 277:1,9,24
325:5 326:18
331:8 334:12

**wrapping**
290:23

**write**
36:17 52:13 125:8
127:12 138:1
146:12 169:5
190:12 254:8

**write-up**
83:10 251:14,15

**writing**
13:17 84:23 206:1
**writings**
309:23
**written**
51:20 52:12 68:7
  83:22 183:15
  233:18 293:7
**wrong**
67:17 184:14 191:2
  209:18 211:4
  245:16
**wrote**
12:19 19:22 36:6
  64:19 67:2 190:11
  190:17 209:20
  231:1,4 246:12
  318:4 337:24
  338:20

**X**

**x**
1:4,13 6:7 7:1 8:1
**Xu**
79:4,6 82:4,5
**X-U**
79:4

**Y**

**yeah**
17:15 20:12,12
  24:1 33:17 41:8
  41:12,19,22 44:24
  52:13 64:3 71:23
  73:13 88:1,1 95:3
  95:10 96:9 108:25
  135:8,22 139:22
  146:20 149:10
  152:9 162:13
  164:1 173:6,18
  183:2 188:9
  192:15,15 196:7
  199:19 203:23
  206:20,20 212:22
  221:5 222:9,9
  224:19 225:25

251:21 254:25
255:8 256:21
259:15 264:2
268:23 286:14,18
291:9 294:18
299:20 308:25
320:10 323:8
324:23 326:25
334:4 336:20
339:18 345:10
349:1 350:8
**year**
56:5 73:23 81:16
  125:20,25 218:13
  286:17 339:21
**years**
19:22 22:4 45:6
  56:6,14,17,19
  57:8,11 77:11
  81:12 88:8 97:4
  124:5 125:7,19
  129:16 132:25
  134:19,21 163:15
  171:6,10 189:10
  189:24 208:22,23
  227:7 246:23
  256:15 257:17,24
  274:21 279:2
  295:18 311:23
  324:5
**Yep**
268:2 301:3
**yesterday**
11:11 63:14
**Yesterday's**
11:18
**York**
3:20,20

**Z**

**zones**
172:5

**$**

**$450**
49:8 54:13

**0**

**0.01**
228:9,18
**0.05**
268:11 269:16
**0.17**
268:17 295:9
**07932**
4:20

**1**

**1**
6:10 7:8 14:15,18
  14:22,23 15:6,11
  15:19 145:4 154:4
  154:8,15,21
  228:18 311:7
  327:23,24
**1st**
49:5
**1.0**
63:3,5 298:17,19
**1.1**
329:23
**1.15**
63:6
**1.18**
297:11 298:19
**1.2**
236:16 329:7,22
**1.22**
297:13,13 298:19
  298:19
**1.25**
63:2
**1.27**
213:22
**1.28**
150:2 213:22 234:3
  236:12
**1.3**
174:10,11,14,15
  176:9,10,19,20
  178:7 298:19
  319:22
**1.35**

149:22
**1.36**
63:6
**1.37**
236:16 297:14
**1.4**
319:2,13
**1.5**
245:10,19 329:7
**1:00**
104:18
**1:46**
105:4
**10**
7:12 45:15 56:6
  57:9,9 61:7,9,14
  61:19,25 68:10
  69:4 70:3 72:9,25
  94:9 97:4 108:18
  108:24 109:18,25
  110:2,7 111:20
  112:25 120:4
  149:16,25 163:6
  181:23 279:2
  312:24,24 319:15
  319:17
**10:55**
52:19
**100**
5:20
**10017**
3:20
**103**
200:6
**107**
108:12
**108**
87:2,4 108:12
**109**
86:8,20
**11**
7:15 108:15,17
  109:14,20,21,25
  110:2,3,12 112:5
  112:6
**11th**

3:19 233:22
**11:15**
52:23
**11:39**
67:24
**11:41**
68:2
**110**
7:18
**12**
7:19 56:7 124:5
  181:24 182:3,12
  194:5,6,24 217:2
  217:4,10 279:2
**12:42**
104:25
**128**
215:21
**13**
7:20 195:20 213:24
  214:6,7,12,15
**13th**
233:22
**134**
89:19
**135**
89:19
**136**
49:1 53:5
**14**
7:21 45:16 217:11
  267:25 278:13,14
  280:14,16 308:25
**1412**
219:3,24 221:4
**1414**
214:12
**1416**
221:7
**1436**
214:4
**15**
6:12 7:23 177:13
  177:14 212:2
  229:17 285:2,14
  286:3,4 303:16,21

Jack Siemiatycki, Ph.D.

304:18
**15th**
59:10 332:25 333:1
**1510**
5:13
**16**
6:17 7:6 8:4 13:14
 87:4,9 210:14
 308:23 309:1,2,2
 309:4,14
**16th**
49:1 59:10
**16-2738**
1:6 9:13
**17**
6:21 8:8 13:14
 96:17 97:17,22
 182:19 298:3
 317:10,12,21
 326:23 327:2
 330:6 348:24,25
**18**
47:9 50:16 192:25
 308:17,17,18
**1835**
4:5
**19**
32:25 33:2
**19103**
4:7
**194**
7:19
**1950s**
132:23,24
**1960s**
132:24
**1964**
132:25
**1965**
246:12
**1970s**
96:19 97:6,20,21
 151:17
**1979**
339:4,10,16 341:9
**1980s**

37:12 102:2
**1982**
226:13 227:1,4
**1986**
339:5 341:22
**1988**
8:15 207:4 318:5
**1990**
227:5
**1990s**
37:12
**1995**
189:3,7,21,23
 346:5
**1996**
228:24 339:5
 341:22 346:6,9
**1997**
188:9,12,15 189:19

———————
**2**
———————
**2**
6:13 7:9 15:25 16:5
 16:13 52:22 55:17
 55:17 58:1,4
 112:7,7 214:11,18
 229:16 244:25
 311:10 319:24
**2A**
144:11 151:3,13
 152:13 154:5,8
**2B**
144:7 154:5 267:10
 299:8
**2nd**
47:15 49:5
**2:41**
140:23
**2:43**
141:2
**2:51**
145:21
**20**
40:25 41:1 56:11
 57:10 97:4 105:16
 136:20 146:12

224:18 232:11
 304:24 319:5,17
 356:16
**200**
53:23,24 54:2
 240:17
**2000**
189:19,20 210:13
 227:5
**20004**
5:7
**2004**
208:9
**2005**
227:5
**2006**
13:12 20:2,4
 123:22 136:16,17
 136:23 137:13,17
 141:15 142:14,17
 142:22 143:3
 144:19 159:2
 163:1 164:25
 165:25 210:12
 218:5 265:25
 272:4,7 299:2
 314:4
**2007**
227:1 339:6 342:13
 343:3,5,17 345:20
 346:10,18,23
 347:5,9 348:20
 349:12
**2008**
123:23 149:18,20
 200:14
**2009**
288:25 289:2
**2010**
20:2 124:17 136:17
 137:10 138:25
 141:15 211:6
 213:15,20 224:13
 224:16 225:2,4,7
 225:22,25 227:12
 228:8 237:5 238:6

288:25 289:2
**2011**
283:17
**2012**
7:19 288:25
**2013**
63:10,16 102:18
 111:21 239:2
 267:25 268:3
 269:9 271:7
 272:21
**2014**
102:10 200:25
 211:9 212:9,10,15
 213:4,10,19
 214:19,21 215:3,6
 215:15,20 216:11
 216:15,23 217:1
 217:19,19,23
 218:13 219:6
**2015**
13:14 211:6 213:15
 213:20
**2016**
7:11 57:23 58:5
 59:3,10 61:1
 69:17,22 70:4,21
 71:5 73:18 74:4
 96:16 97:17,22
 127:23 128:2
 186:4,7 187:3,17
 188:10,22 190:1,9
 190:10 200:1
 201:4 207:5 208:9
 210:17 268:22
 269:3,19 283:17
**2016-A**
211:5
**2016-B**
211:7 212:14,17
**2017**
59:23 98:20 102:10
 102:18 195:10,15
 238:17
**2018**
7:6,9 10:17 13:16

47:9,11,15 49:1,5
 51:25 53:7 60:22
 61:3,6,23 62:24
 63:17 69:11,21
 71:6,12 72:9,14
 73:16 78:24 82:7
 83:19 84:5 98:1
 98:20 102:5,5,11
 102:11,12 107:3
 111:12,23 131:3
 139:21 149:15
 150:1,3 186:14
 187:2,18 188:13
 190:5 191:12
 192:13 194:3
 195:2 196:9
 199:13 200:5,10
 206:7 222:11,16
 223:20 228:1
 230:3,9,14 231:18
 233:10,22,24
 234:2 236:11,19
 237:14 241:7
 243:6 255:20
 267:19 299:18
 305:20,22
**2019**
1:19 9:6 133:7
 280:22 286:16
 353:15
**202**
5:8
**2022**
143:20
**2023**
143:20
**21**
303:22 304:21
**212**
3:21
**213**
4:15
**214**
7:20
**215**
4:8

Jack Siemiatycki, Ph.D.

| | | | | |
|---|---|---|---|---|
| **22311** | **30-odd** | 55:17 145:4,7,9 | **5:07** | 51:7 53:6 337:16 |
| 3:13 | 118:17 | 145:24 206:25 | 210:4 | **60s** |
| **24** | **300** | 207:4 256:4 | **5:36** | 147:5 |
| 144:24 145:7 | 240:17 | 294:10 299:19 | 210:8 | **600** |
| **25** | **308** | 311:16 319:25 | **50** | 4:19 5:20 53:24 |
| 104:17 227:7 | 309:8 | 320:21 353:15 | 114:23 170:10,12 | 54:4 |
| 243:15 318:9 | **309** | **4th** | 252:7 | **61** |
| **253** | 8:7 | 5:20 7:11 57:22 | **50s** | 7:14 |
| 201:22,24 | **31** | 58:5 | 147:5 | **623** |
| **274** | 1:19 236:2,4 | **40** | **500** | 327:9 |
| 6:4 | **31st** | 51:7 53:6,23 | 349:10 | **624** |
| **278** | 9:6 | 246:23 318:25 | **51** | 329:18 |
| 7:22 | **314** | 319:1,4 | 238:15 | **63102** |
| **278-4449** | 5:22 | **400** | **51.5** | 5:21 |
| 4:8 | **316** | 53:23 54:4 | 216:19 217:9 | **64** |
| **285** | 3:6 | **43** | **512** | 313:4 316:20 337:7 |
| 7:24 | **317** | 6:22 | 5:15 | 337:8,20 |
| **29** | 8:15 | **435-7184** | **5129** | **64(c)** |
| 101:23 262:13 | **322** | 3:8 | 353:19 | 264:7,17 |
| **290** | 6:3 | **45** | **53** | **65** |
| 6:5 | **32502** | 63:8 111:4,6,7,8,14 | 170:5 | 313:4 337:2,9,18 |
| **2900** | 3:7 | 111:16,20 | **540-1000** | **650** |
| 4:6 | **33** | **46** | 4:21 | 3:12 |
| **297** | 254:14,17 | 6:24,25 7:6 | **56** | **66** |
| 309:7 | **333** | **47** | 47:13 49:6 53:4 | 316:20 337:19,21 |
| **298** | 4:13 | 62:1,5,25 111:7,9 | **57** | **67** |
| 307:22 | **336** | 111:15 | 169:11 | 68:7 131:3 163:5 |
| | 6:4 | **48** | **571-4965** | 165:18 |
| _____ 3 _____ | **34** | 7:9 64:14 192:23 | 5:22 | **680-8370** |
| **3** | 76:5 216:8 | 193:1,3,4,14 | **58** | 4:15 |
| 6:18 17:17,18,23 | **34.4** | 248:1 | 7:11 | **69** |
| 55:17 76:4 105:3 | 216:20 | **49** | | 113:2 238:12,21 |
| 109:16,23,23 | **36.5** | 64:9 67:1 236:25 | _____ 6 _____ | 239:1 |
| 110:1,2 178:11 | 215:16,21 217:8 | 250:23 | **6** | |
| 198:12 238:12,16 | **360** | **4900** | 6:25 32:25 46:5,6 | _____ 7 _____ |
| 243:4,5 311:13 | 3:18 | 3:12 | 181:23 213:2 | **7** |
| 319:25 | **39** | | 234:21,22,25 | 7:4 46:16,20 47:4 |
| **3:27** | 243:4 | _____ 5 _____ | 235:1,8,13,25 | 48:10,18,24 49:12 |
| 146:1 | **391-0183** | **5** | 243:3 299:20 | 49:24 50:5 53:3,5 |
| **30** | 5:15 | 6:23 46:3,6 120:4 | **6:22** | 298:20 309:7 |
| 8:14 19:22 22:3 | **397-1000** | 178:11 181:23 | 242:19 | 321:9 |
| 53:23 81:11 | 3:21 | 182:3,11 210:7 | **6:40** | **7.2.5** |
| 100:21 245:7 | | 238:12 242:22 | 242:23 | 169:12 |
| 257:24 311:23 | _____ 4 _____ | 311:18 | **6:58** | **7:01** |
| 319:4,5 324:5 | **4** | **5.3.2** | 255:13 | 255:16 |
| 354:12 | 6:22 43:24,25 | 101:2,24 | **60** | **7:03** |

Jack Siemiatycki, Ph.D.

257:2,5
**7:15**
265:15
**7:16**
265:18
**7:31**
274:9
**7:32**
274:12
**70s**
96:18
**703**
3:14
**72**
112:3,6
**74**
213:2
**75**
318:8,24 319:6
**78701**
5:14

**8**

**8**
7:7 33:1 48:2,5,19
  49:4,12,25 50:5
  53:3,5
**8/August**
8:15
**8:27**
320:13
**8:31**
320:16
**8:33**
322:16
**8:46**
322:19
**815**
296:6
**816**
5:13
**817**
295:23 296:11
**828-5371**
5:8
**84**

102:10
**85**
119:23
**850**
3:8

**9**

**9**
6:3 7:5,10 58:9,10
  58:13,20,25 60:5
  62:3,14 163:10
  248:5,6
**9th**
48:25
**9:05**
336:2
**9:06**
336:5
**9:15**
343:11
**9:17**
343:14
**9:28**
352:3,6
**9:49**
1:20 9:7
**90**
119:23
**90071**
4:14
**91**
102:9
**95**
50:2
**96**
55:20 201:9
**973**
4:21
**975**
5:6
**98**
50:2 55:20
**997-1774**
3:14

Exhibit 33

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION**<br><br>*THIS DOCUMENT RELATES TO ALL CASES* | **MDL NO. 16-2738 (FLW) (LHG)** |

**RULE 26 EXPERT REPORT OF**
**SONAL SINGH, MD, MPH**

Date:   November 16, 2018

Sonal Singh, MD, MPH

**TALCUM POWDER PRODUCTS AND RISK OF OVARIAN CANCER**

**EXPERT REPORT**

Prepared by

**Sonal Singh, MD, MPH**

University of Massachusetts School of Medicine

Nov 16, 2018

**Table of Contents**

I.      INTRODUCTION AND SUMMARY. ...............................................................................3

II.     BACKGROUND AND QUALIFICATIONS. .................................................................3

III.    PUBLICATIONS. ............................................................................................................5

IV.     STUDY DESIGN CONSIDERATIONS. .......................................................................7

V.      EPIDEMIOLOGY AND PATHOGENESIS OF OVARIAN CANCER. ....................... 14

VI.     WHAT CONSTITUTES COSMETIC TALCUM POWDER PRODUCTS? .................. 14

VII.    SUMMARY OF OPINIONS. ........................................................................................ 16

VIII.   METHODS FOR THE OVERVIEW OF SYSTEMATIC REVIEW OF OBSERVATIONAL
        STUDIES OF GENITAL TALC USE AND OVARIAN CANCER. ............................... 19

IX.     RESULTS. ...................................................................................................................... 20

X.      BIOLOGICAL MECHANISMS OF TALCUM POWDER INDUCED OVARIAN CANCER. 57

XI.     ASSESSMENT OF CARCINOGENECITY OF TALC BY THE IARC IN 2006. .......................... 60

XII.    COSMETIC EXPERT REVIEW PANEL REPORT. .................................................... 61

XIII.   ASSESSMENT OF CAUSALITY. ............................................................................... 62

XIV.    CONCLUSIONS. .......................................................................................................... 66

References ................................................................................................................................. 67

Table 1. AMSTAR (Assessing the Methodologic Quality of Systematic Reviews) Rating of
        Systematic Reviews and/or Meta-analysis of Genital Talc use and Ovarian Cancer ............... 77

Additional Materials and Data Considered .............................................................................. 79

Other Materials ........................................................................................................................ 87

## I. INTRODUCTION AND SUMMARY.

I have been retained to review scientific evidence and analyze the epidemiological data and, based on these data and other relevant evidence, to provide my professional opinion about whether talcum powder products are causally related to ovarian cancer. I have used a weight of evidence approach in examining the causal relationship between talcum powder products and ovarian cancer. I have relied upon my own systematic review of the literature and the cumulative body of evidence as the basis upon which I provide my opinions. This included gathering all relevant data based on *in vitro*, animal, and human epidemiologic studies on this topic. Although the weight of my opinions is derived from findings published in the peer-reviewed literature, relevant unpublished documents are also noted when applicable. The individual studies were examined for both reliability and validity noting their strengths and limitations. The cumulative body of evidence was then synthesized and examined and weighed using a widely accepted organizing framework- the Bradford Hill approach. (1). Using these materials, my education, and my prior clinical and research experiences, I have employed the methods generally accepted by the scientific community that would be used to develop a peer-reviewed manuscript.

In summary, it is my opinion, to a reasonable degree of scientific and medical certainty, that talcum powder products, specifically here Johnson's Baby Powder and Shower to Shower, can cause ovarian cancer. This finding is based on the totality of the medical and scientific evidence from meta-analysis, and consistent findings of a statistically significantly increased risk in observational studies, evidence of retrograde migration and inhalation of talc, presence of known or suspected carcinogens in Talcum Powder Products, and inflammatory tissue response that initiates multiple pathways and biological mechanisms by which talcum powder products can cause ovarian cancer While these factors carry the most weight in my assessment, available data on the biological gradient of Talc exposure and ovarian cancer (dose response) also support my opinion.

## II. BACKGROUND AND QUALIFICATIONS.

I am an Associate Professor in the Department of Family Medicine and Community Health and the Meyers Primary Care Institute, with a joint appointment in the Department of Quantitative Health Sciences at the University of Massachusetts Medical School, Massachusetts. I received

3

my M.B.B.S. (equivalent to M.D.) in 1998 from Patna Medical College, India. I then completed my internal medicine internship and residency in the Department of Medicine at the Unity Health Center, affiliated with the University of Rochester School of Medicine in 2005. Subsequently, I served on the Faculty as an Instructor of Medicine at Wake Forest University until 2007, and then as an Assistant Professor of Medicine in 2007. I received a joint appointment as an Assistant Professor of Epidemiology at Wake Forest University in 2008. While on the faculty at Wake Forest University, I obtained my master's in public health at Johns Hopkins University in 2008. I was an Assistant Professor in the School of Medicine at Johns Hopkins University as a recipient of the NIH Johns Hopkins Clinical Research Scholars Award in 2009. I held joint appointments in the Department of International Health and Health Policy and Managements and served as the Associate Director at the Center for Drug Safety and Effectiveness at Johns Hopkins University until 2016.

In my current position, I devote most of my professional time to epidemiologic research. I conduct clinical research with a focus on drug safety, evidence synthesis, and shared decision making. The major focus of my research is understanding the adverse effects of pharmacologic therapies. The remainder of my professional effort is dedicated to practicing general medicine and teaching activities. I have taught courses in systematic reviews, clinical epidemiology, pharmacoepidemiology, and the practice of internal medicine to medical students, interns, residents, and public health students at Johns Hopkins University and Wake Forest University. I have taught courses in clinical epidemiology and pharmacoepidemiology to researchers in the Bloomberg School of Public Health at Johns Hopkins University

I have served as an advisor to the World Bank, WHO International Agency for Research on Cancer and various pharmaceutical firms. I was part of World Health Organization International Agency for Research (WHO-IARC) panel which evaluated the carcinogenicity of various drugs and herbal products. (2). I currently serve as a member of the American College of Chest Physicians Guideline Panel. I have also been part of a panel that developed the PRISMA-HARMS (Preferred Item for Reporting Harm in Systematic Reviews and Meta-Analyses) checklist with an aim to improve the reporting of systematic reviews and meta-analysis of adverse effects. (3). My research has been funded by the Food and Drug Administration, the Agency for Health Care Research and Quality, the National Institute of Health and the Patient Centered Outcomes Research Institute. I am a recipient of numerous awards including the prestigious Johns Hopkins Clinical Research Scholars Award from the

4

National Institute of Health and the Tinsley R. Harrison Master Teachers Award at Wake Forest University School of Medicine. My systematic review on varenicline and the risk of cardiovascular events published in the prestigious Canadian Medical Association Journal was awarded the Best Research Paper of the year among hundreds of articles submitted to the Journal. I also serve as a peer reviewer for more than 50 journals and serve on the editorial board of prominent journals such as *BMJ Evidence Based Medicine*. I have reviewed grants for numerous federal and international organizations. I have conducted several epidemiological studies and systematic reviews and meta-analysis featured in prominent medical journals such as the *Journal of the American Medical Association* and the *British Medical Journal*. I have authored or co-authored more than 100 original peer-reviewed scientific articles and my work has been cited more than 13,000 times and my h-index is 48 [h number of papers which has been cited by others at least h times]. My work has been featured in *Science, Journal of the American Medical Association, British Medical Journal, and the Lancet,* as well as media outlets such as the NYTIMES, *Wall Street Journal* and *Washington Post.*

This background provides experise in the use of epidemiological research methods in diverse settings, and in the clinical practice of medicine, both relevant to the present scenario. I have charged a rate of $600.00 per hour in the preparation of this report. Attached as Exhibit A is a copy of my curriculum vitae.

## III.    PUBLICATIONS.

Below is a representative sampling of those articles published in leading medical journals such as *Journal of American Medical Association, Journal of American Medical Association-Internal Medicine,* and *British Medical Journal.* Please refer to my attached curriculum vitae for a complete listing of all publications.

- Singh S, Loke YK, Furberg CD. Long-term risk of cardiovascular events with rosiglitazone- A systematic review and meta-analysis. *Journal of the American Medical Association* 2007; 298: 1189-1195.

- Singh S, Loke YK. Furberg CD. Inhaled anticholinergics and the risk of major adverse cardiovascular events in Patients with Chronic Obstructive Pulmonary Disease: A systematic Review and Meta-analysis. *Journal of the American Medical Association* 2008; 300: 1439-1450. (CME Article in JAMA).

5

- Mills EJ, Wu P, Chong G, Ghement I, Singh S, et al. Efficacy and safety of statin treatment for cardiovascular disease: a network meta-analysis of 170 255 patients from 76 randomized trials. Q J Med 2011; 104: 109-24.

- Singh S, Loke YK, Enright P, Furberg CD. Mortality Associated with Tiotropium Respimat® in Patients with Chronic Obstructive Pulmonary Disease- A Systematic Review and Meta-Analysis of Randomized Controlled Trials. *British Medical Journal* 2011; 342: d3215.

- Singh S, Loke YK, Spangler JG, Furberg CD. Risk of serious adverse cardiovascular events with Varenicline: A Systematic Review and Meta-Analysis of Randomized Controlled Trials. *Canadian Medical Association Journal* 2011; 1831359-66. (with an editorial by JT Hays. Varenicline for smoking cessation. Is it a heart breaker?)- Best Research paper of the year award.

- Singh S, Loke YK. Drug Safety Assessment in Clinical Trials: Methodologic Challenges and Opportunities. Trials 2012, 13: 138.

- Singh S, Chang HY, Richards TM, Weiner JP, Clark JM, Segal JB. Glucagonlike Peptide 1-Based Therapies and Risk of Hospitalization for Acute Pancreatitis in Type 2 Ovarian cancer Mellitus: A Population-Based Matched Case-Control Study. *Journal of the American Medical Association Intern Med*. 2013 25:1-6.

- Grosse Y, Loomis D, Lauby-Secretan B, El Ghissassi F, Bouvard V, Benbrahim-Tallaa L, Guha N, Baan R, Mattock H, Straif K; International Agency for Research on Cancer Monograph Working Group. Collaborators: Stewart BW, Biggar RJ, Lachenmeier DW, Singh S, Tsuda H, Baguley B, Marques MM, Tseng CH, Knight TL, Beland FA, Betz JM, Carcache de Blanco EJ, Cunningham ML, Dunnick JK, Guo L, Jameson CW, Karagas M, Lunn RM, McCormick DL, Witt KL, Zhou S. Carcinogenicity of some drugs and herbal products. *Lancet Oncol*. 2013; 14(9):807-8.

- Zorzela, L., Loke, Y.K., Ioannidis, J.P., Golder, S., Santaguida, P., Altman, D.G., Moher, D., Vohra, S., Boon, H., Clark, J., Derry, S., Gallivan, J., Gardiner, P., Gøtzsche, P., Loder, E., Napoli, M., Pilkington, K., Shekelle, P., Singh S, Witt, C., Lasserson, T., Wu, T., Shamseer, L., Mulrow, C. PRISMA harms checklist: improving harms reporting in systematic reviews. *British Medical Journal* 2016;352: i157.

- Onasanya O, Iyer G, Lucas E, Lin D, Singh S, Alexander GC. Association between exogenous testosterone and cardiovascular events: an overview of systematic reviews. *Lancet Diabetes Endocrinol*. 2016 Nov;4(11):943-956.

- Alexander GC, Iyer G, Lucas E, Lin D, Singh S. Cardiovascular risks of exogenous testosterone among men. *Am J Med*. 2017 Dec;130(12):1449-1457.

6

## IV.    STUDY DESIGN CONSIDERATIONS.

I will examine the strengths and weaknesses of the study designs that are relevant to the present scenario. Each of the study-types discussed below has its advantages and disadvantages. Every study is subject to biases and error; none is appropriate and feasible for every situation. Instead, the evidentiary value of each study must be assessed and weighed on an individual basis, and in the context of the totality of the body of literature or scientific studies.

*IV.I Randomized controlled trials.* In double blind randomized controlled trials (RCTs) both the investigator and the participant are blinded to treatment assignment. All characteristics whether known or unknown, are evenly distributed at random between the intervention and placebo arm. Thus, if there are differences in incidence of outcome, it can be inferred to be a consequence of the exposure itself (i.e. causative).

However, the prospective nature of RCTs also results in several significant drawbacks for effects that are rare and/or slow to develop, like ovarian cancer. In addition to the ethical difficulties of administering a substance that may be harmful, such as talcum powder products, it is difficult prospectively to ensure study-subject compliance over the decade-plus timeframes required to assess ovarian cancer risk, and obviously impractical to have researchers administer a daily perineal talc application to study subjects. Similarly, there is no mechanism by which to randomly assign participants for non-modifiable exposures or the event may be sufficiently rare, such as in the present case of ovarian cancer to be evaluated in a randomized trial. The definitive randomized controlled trial in which patients would be randomized to talcum powder products and/or placebo and measure the outcome of ovarian cancer would be ideal. However, such a randomized trial does not exist, and such a randomized trial would be unethical.[1] Then again, randomized clinical trials are not necessary to establish causal evidence of harm. For instance, there is no randomized trial which supports the causal role of smoking in lung cancer. As a result, to address this question, we must rely on other study designs including observational studies and their meta-analysis to draw inferences on causation. The preponderance of evidence we have on harms of products are derived from such epidemiological studies.

---

[1] Defendants here have admitted this fact. Deposition of Linda Loretz 562:14-563:6 (October 1, 2018) (4); Deposition of Joshua Muscat 408:21-410:20 (September 25, 2018) (5).

*IV.II Systematic reviews and Meta-analysis.* A systematic review and meta-analysis is a study design wherein systematic searches are carried out to identify studies reporting on a question of interest. Systematic reviews provide a high level of evidence when evaluating the effect of interventions. (6).

The meta-analytic point estimate represents the sum of evidence from all the included studies. When individual studies may be underpowered to detect an effect, meta-analysis of cumulative studies may allow one to distinguish whether the entire body of evidence supports the presence or argues against evidence of a causal association. Apart from the P-value as a measure of statistical significance, the confidence intervals are used to assess the statistical variability around the estimate. In a meta-analysis the studies are weighted by the sample size of included studies with larger studies contributing more weight to the final estimate. Studies are examined to determine whether the findings are clinically and statistically homogenous or heterogenous. Clinical heterogeneity includes any differences in populations and interventions. It is also important to evaluate statistical heterogeneity among studies included in the meta-analysis. (7). Although some amount of variation in individual estimates of treatment effect is expected by chance, the excess of variation which cannot be explained by chance alone is referred to as statistical heterogeneity. $I^2$ is used as a measure of *statistical heterogeneity*—a percent of variation due to heterogeneity compared to chance, the higher the value the more the proportion of statistical heterogeneity.

The different approaches to modelling data across studies may yield slightly different results. Fixed effects meta-analysis which assumes that all the studies are measuring the same effect yield tighter confidence intervals, whereas random effects meta-analysis which assume that studies are measuring different effects in the population yield more conservative effects. Random-effects models may be more appropriate when the amount of statistical heterogeneity is high. Some amount of heterogeneity is expected when the database includes observational studies.

However, it must be noted that while meta-analysis can overcome issues of limited statistical power and provide information on consistency or inconsistency of effects, one needs to carefully examine the individual studies for their limitations and susceptibility to bias and confounding.

8

Thus, for example, if a study is too short to detect the effect in question, then even a patient-level pooled analysis of several such studies will very likely fail to detect a true causal relationship, even when one exists. This is an illustration of why it is important to consider study design, bias, and confounding in weighing the results from both individual studies and their meta-analysis. Systematic reviews are also susceptible to various publication and funding biases which need to be considered in interpreting results.

Meta-regression in using summary or group level published data may be susceptible to ecological or group level biases and result in spurious conclusions. (8). As a result, it is not recommended to evaluate the association between treatment effect, such as the difference in the risk of ovarian cancer, and participant characteristics at the study level (e.g., mean age of all participants) using aggregate level data, (9) as these may be susceptible to group level or ecological biases. An individual participant pooled analysis in which investigators have access to the patient-level data, such as that by Terry et al. discussed below, (10) is considered of higher quality than meta-analysis of summary data and provides the ability to reliably assess the effect of other patient and outcome related variables.

**Umbrella reviews and overviews of systematic reviews.** An umbrella review systematically collects and reviews evidence from multiple systematic reviews and meta-analysis and allows integration of evidence from multiple systematic reviews and meta-analysis, (11) to offer a much broader view of the evidence landscape. Individual systematic reviews and/or meta-analysis included in an umbrella review or overview should be critically appraised for quality. The 11-item critical appraisal tool AMSTAR (Assessing the Methodological Quality of Systematic Reviews) is a reliable and valid tool which provides an assessment of the quality of included systematic reviews and meta-analysis in an overview. (12).

**What is the precise causal question or the hypothesis being tested?** One cannot interpret the scientific evidence without being precise about the causal question that is being addressed when evaluating the association between any exposure and an outcome in any epidemiologic study. An exclusively narrowly framed hypothesis (e.g., evaluating only one route of exposure such as using talcum powder on contraceptive diaphragm), (13) while disregarding other important and relevant routes and mechanisms of exposure, is inherently limited by design. Since we may not have a complete picture of the underlying mechanisms or the timings of risk of products at the

9

time of study design, it is even more critical that studies on safety evaluate all potential routes of exposure.

IV.III. *Cohort and Case-Control Studies.* There are several considerations in interpreting data from prospective or retrospective observational studies or case-control studies. However, it is important to consider issues of study design, random error, systematic error, bias, and confounding in the interpretation of data. Random errors are statistical fluctuations in the measured data due to the limitations of the measurement instrument. They may occur in both direction because of the inability to measure exposure and outcomes in precisely the same manner. There is also the possibility of measurement error in the measurement of outcome and exposure in both study designs. If the measurement error is non-differential, such misclassification of exposure or outcomes usually biases findings towards the null. Systematic errors, by contrast, are reproducible inaccuracies that are consistently in the same direction, often due to a problem which persists throughout the entire study and are difficult to correct.

Case-control studies involve subjects diagnosed with the disease at issue, such as ovarian cancer (the "cases"), and a suitable number of subjects without the disease (the "controls"). Exposure is ascertained retrospectively among both cases and controls. The results are then analyzed to see if there is an association between the exposure and the disease. In contrast, prospective cohort studies are study designs in which subjects with and without the exposure of interest are recruited and followed up in time for the development of outcomes. This study design establishes temporality wherein the exposure precedes the outcome. It is important to determine the latency and induction between the exposure and the disease to assess the duration of follow-up. As an example, a 12-month follow-up study to evaluate the association between exposure to smoking and lung cancer would be unlikely to demonstrate an increase in the risk of lung cancer.

There are several strengths to the case-control design including the ability to ascertain long-term exposure-outcome relationships, particularly important to the present scenario because ovarian cancer develops over many years. Once cases and controls have been established, one can evaluate the association between multiple exposures and outcomes. In contrast, prospective cohort studies may be limited by the short-duration of follow-up which may be insufficient to ascertain the effect of exposure on long-term outcomes and bias their findings towards the null. Secondly, for relatively rare diseases, such as ovarian cancer, case-control studies are more

10

efficient. Because we are looking at the incidence of disease between the two arms of a study, a cohort study may have limited statistical power regardless of the actual number of subjects enrolled if the number of cases is small. For example, the Nurses' Health Study recruited almost 80,000 participants for only 307 cases of ovarian cancer. (14).

Both study designs are susceptible to selection bias when the selection of the participants into the study (or their likelihood of being retained in a cohort study) leads to a result that is different from the result had we enrolled the entire target population. In other words, the exposure-outcome relationship in controls or cases may be different from the target population. This can arise due to selection of controls not representative of the target population, non-response that is related to exposure and outcome, or differential loss to follow-up in a cohort study related to exposure and outcome status. Selection bias can bias findings either away from the null or towards the null.

Case-control studies, by their design, are generally not blinded and are also susceptible to bias as a result. They are also susceptible to recall bias, i.e. the concern that subjects with the disease may be more diligent in recollecting past uses. However, the degree of recall bias will depend on the type of exposure with chronic daily long-term exposures, such as talcum powder product use, being less likely to be subject to recall bias than intermittent short-term exposures. In contrast, prospective cohort studies in which subjects are recruited and then followed up for the development of outcomes are less susceptible to recall bias.

In addition, there is the issue of what may be called "behavior change" bias in cohort studies which may also bias their findings towards the null if exposure is only ascertained at baseline and not updated during follow up. This bias towards the null reduces the apparent effect of the exposure on the outcome. For example, if the subjects accurately report their talcum powder product use (or lack there-of) at baseline, but there is no follow-up, then the "ever" users' status will still be correct at the end of the study, because once having used talc, their "ever" status cannot change. This will not be true, however, of the "never" users; if they subsequently use talc, then without follow-up, their status will still be incorrectly recorded as "never." If there is a true causal connection, some ovarian cancers caused in the "never" category will, in fact, belong in the "ever" category, potentially biasing the study towards the null. Cohort studies are also susceptible to attrition bias and efforts should be used to minimize loss to follow-up. The main strengths of cohort studies are that if an effect (after adjusting for other confounding

11

factors) is found despite these biases towards the null, then it is more likely to be a causal relationship; the limitations being that they are less sensitive to determining a causal relationship. Case-control studies are based on past behavior and are not affected by this bias. Cohort studies are also susceptible to several prevalent user biases including potential bias due depletion of susceptibles. (15). A cohort study evaluating the association between talc use and ovarian cancer which limits the analysis to prevalent users (rather than new users), may largely be composed of survivors of the early effect of talc exposure on ovarian cancer, since new users who developed ovarian cancer after talc exposure may be ineligible for inclusion. This will potentially bias the estimates towards the null.

One important distinction to note is between risk factors for the disease and confounders. (16). A risk factor is an exposure which may explain the development or cause of disease in the population. These could be potentially modifiable or non-modifiable risk factors such as genetic risk factors. Confounding represents a special case of bias that results when the relationship between the risk factor -disease relationship is altered. A variable is considered a confounder only when ALL three criteria are present: a) the confounder is associated with the exposure in the population; b) the variable is related to the disease in the population; and c) the variable is not a link in the causal pathway to the disease. Risk factors that do not meet all the above criterion are not considered confounders of the exposure-outcome relationships (and thus may not require adjustment in the analysis).

Observational studies may also be susceptible to unmeasured confounding. Importantly, the potential for confounding does not mean that such a confounding exists. To address bias, confounders of the disease-outcome relationship need to be adjusted for in the analysis of epidemiologic studies. The methods for adjustment for known confounders include regression or propensity score methods. In establishing the effect of any exposure on an outcome it is important to disentangle the direct effect of an exposure of an outcome vs the indirect effect because of some mediators. The strength of association, in and of itself, does not denote whether a risk factor causes the disease. It is reflective of the background rate of the disease in the population and the relative risk of other competing risk factors. When the strength of association is weak, restricting the disease to a low risk population with low background rates of the diseases will magnify the association due to lack of competition among risk factors. (16)

12

One must be careful in interpreting data from subgroup analysis, such as analysis of various dose categories or age or ethnic groups, such as the case here with pre-menopausal women vs post-menopausal women or subgroup of women stratified by age, sex and ethnicity. The results of tests of interaction are important in interpreting data from such studies. If the test of interaction is not significant, this suggests that there is a lack of significant difference between the two groups. However, such subgroup tests can be underpowered because of reduction in sample size. Additionally, while a study may be internally valid it may not be generalizable to participants in the overall population beyond those included in the study. As an example, the cohort study of post-menopausal women reporting a non-significantly increased risk of ovarian cancer with genital talc use may not be generalizable to premenopausal women. (17). Despite the limitations noted above, most of our knowledge of the adverse effects of therapies has been derived from observational studies, since randomized controlled trials are not practical for several agents and rare outcomes.

It is also important to draw attention to the proper interpretation of P-values, confidence intervals and statistical significance. (18). I have followed the general principles laid out by the American Statistical Association on the interpretation of P-values and statistical significance. P-value can only indicate how incompatible data are with a statistical model. P-values do not indicate the probability that the studied hypothesis is true or the probability that data were produced by random chance alone. A P-value does not measure the size of an effect or the importance of a result and undue reliance should not be placed on whether a P-value passes a specific threshold. Full reporting and transparency are needed for interpretation of results. Confidence intervals (CI) measure statistical significance, (19) and indicate the precision and degree of uncertainty associated with a sample statistic. A 95% CI means that if we used the same sampling method to select different samples and computed an interval estimate for each sample, we would expect the true population parameter to fall within the interval estimates 95% of the time. CIs that remain elevated above 1 for relative risks (RRs) or odds ratios (ORs) are considered statistically significant. A narrow CI indicates a relatively higher level of precision. Non-overlapping CIs across two studies suggest a statistically significant difference between the study findings, whereas overlapping CIs may suggest consistent results. Thus, it is not necessary, and it is highly unlikely to have identical point estimates across studies to establish the presence of a consistent exposure-outcome association.

## V.      EPIDEMIOLOGY AND PATHOGENESIS OF OVARIAN CANCER.

Ovarian cancer is the most lethal gynecologic cancer in women. It is the leading cause of cancer death among gynecologic cancer in the US and the fifth most common cause of cancer with more than 14,000 deaths per year. The incidence is 11.4 cases per 100,000 women per year, with a mortality rate of 7.4 deaths per 100,000 women. (20). Approximately 1.3 percent of women will be diagnosed with ovarian cancer at some point during their lifetime. Approximately 22,400 new cases of ovarian cancer would be diagnosed in the US in 2017 with 14,080 deaths. (21).

Most women are diagnosed at an advanced stage of the disease and it is usually asymptomatic but may present as abdominal distention, bloating, and in a minority of cases vaginal bleeding. The prognosis is relatively poor when it presents at the advance stage where therapeutic options including chemotherapy offer little benefit. As discussed in more detail in Section X below, inflammation is known to play an important role in the pathogenesis of ovarian epithelial cancer through a mechanism of cell proliferation, oxidative stress DNA damage and gene mutations.

## VI.      WHAT CONSTITUTES COSMETIC TALCUM POWDER PRODUCTS?

•       While I will examine the evidence of talcum powder products and their causal association with ovarian cancer, ascertaining what constitutes "talcum powder" it is important to emphasize that Talcum powder cosmetic products are not "pure talc." The evidence I reviewed demonstrates talcum powder products contain asbestos, fibrous talc, heavy metals such as cobalt, chromium, nickel, and various fragrance chemicals (22)(23). This report evaluates the risk of ovarian cancer associated with talcum powder products and its constituents. When I refer to talc or talcum powder products in this report, I am referring to commercially available talcum powder products and all constituent elements contained within.

•       Talc is a naturally occurring mineral and its chemical composition is hydrous magnesium silicate with a chemical formula of $Mg_3Si_4O_{10}(OH)_2$. In its natural form, talc may contain asbestos, also a naturally occurring silicate mineral, with a different crystal structure. Both talc and asbestos belong to the family of silicates that may occur in fibrous form, which is known to cause cancer. The structure of talc is characterized by a hexagonal sheet arrangement of silicon oxygen tetrahedral groups in a common plane. This results in a double-sheeted structure where the sheets are held together by weak van der Waals bonds. Talc consists mostly of these plate-

14

like structures ("platy talc") but talc can occur in fibrous form. Talc fibers are like asbestos fibers in size and shape. (22, 24).

• Despite claims that talcum powder products manufactured after the mid-1970s were "asbestos free," published articles, internal company documents, and testing of historical samples I reviewed demonstrate that talcum powder products can contain asbestos and other carcinogenic constituents as discussed below. For example, talc powders from national and international markets were analyzed by Paoletti et al. in a 1983 study to assess fiber content. (25). Samples of talc powders demonstrated fiber contents up to 30% of total particles. About half of the talc powders revealed the presence of asbestos. In some samples, a very high level of asbestos was revealed. (25). Consistently, the 1991 Blount study also found asbestos in cosmetic talcum powder. (26). In a recent deposition, the author of the 1991 study testified she had detected specifically in Johnsons and Johnsons baby powder. (27).

• Although the FDA conducted a survey of talc manufacturers in 2009-2010 and found no asbestos fibers or structures in any of the samples of cosmetic-grade raw material talc or cosmetic products containing talc, (28) the results were limited; only four out of nine talc suppliers submitted samples, and the number of products tested was low. The failure to detect asbestos could either be due to the technique used or the use of a non-representative sample. The FDA itself noted the study could not "prove that most or all talc or talc-containing cosmetic grade products currently marketed in the United States are likely to be free of asbestos contamination." (29).

• I reviewed Longo et al.'s report from August 2017 where he tested 30 bottles of Johnson's Baby Powder. (30). They found 17 samples contained detectable amounts of asbestos. They also found half of the samples contained fibrous talc. I also reviewed two additional reports from Dr. Longo where he found fibrous talc and asbestos in Johnson's Baby Powder. (31, 32). I reviewed the depositions and exhibits of Dr. John Hopkins, corporate representative for Johnson and Johnson, who testified to numerous positive tests for asbestos and fibrous talc. (33).

• In a recent report, Longo et al. (34) estimates that 37 out of 56 random samples ( 66%) of bottles of talcum powder products tested contain asbestos, which indicates that approximately 2 out of 3 bottles of talcum powder containing products are contaminated with asbestos. Talcum powder products are generally used by women habitually for months or years, rather than a

15

single application or a single bottle of use. Each successive use of a bottle of talcum powder product by an individual further accentuates the cumulative probability of their exposure to asbestos, beyond the probability conferred by the use of a single bottle. I reserve the right to supplement my report in order to estimate this probability of exposure to asbestos through habitual use of talcum powder products contaminated with asbestos, once the analysis of additional samples of talc is complete.  Longo et al. also estimates that 41 of 42 random samples of bottles of talcum powder products tested contain fibrous talc. I reserve the right to supplement my report in order to estimate this probability of exposure to fibrous talc through habitual use of talcum powder products contaminated with fibrous talc, once the analysis of additional samples of talc is complete.

• I also reviewed the deposition and exhibits of Julie Pier, corporate representative for Imerys Talc America, Inc., who testified to numerous positive tests for asbestos and heavy metals between 1985 and 2002. (35).

• My review of monographs published by the International Agency for Research on Cancer (IARC) show that asbestos is a well-established carcinogen and unequivocally known to cause several cancers including mesothelioma of the lung, larynx, and ovarian cancer. (36). Overall, the International Agency for Research on Cancer Working Group classified asbestos compounds as "carcinogenic to humans" (Group 1) in 2012. (36, 37). IARC has also concluded that talc including asbestiform fibers grown in an asbestiform habit  - commonly termed "fibrous talc" - is "carcinogenic to humans" (Group 1). (38).

• I also reviewed documents demonstrating talcum powder products may contain heavy metals such as chromium, nickel, and cobalt. (22). Asbestos, chromium, and nickel were all classified as a Group 1 carcinogens by IARC. (36) Cobalt is also present in talcum powder products and classified by IARC as a Group 2B carcinogen.

## VII.   SUMMARY OF OPINIONS.

1. **Statistical Significance**. There is a statistically significant increased risk of ovarian cancer with talcum powder products as demonstrated by most meta-analyses to date. (10, 39-42). Although a flawed analysis conducted limited to the use of talc dusted diaphragms and ovarian cancer conducted on behalf of the manufacturer reported an excess risk which was not

16

statistically significant, (13) it had several data extraction errors and was of lower methodological quality. (43). Several independent meta-analysis by academic researchers, some of which include individual participant data, (10) and the most recent meta-analysis reported a statistically significantly increased risk of ovarian cancer associated with perineal talc use, (42) rendering the previous findings of Huncharek et al obsolete. The studies of the highest rated methodologic quality as shown in **Table 1** which provides a methodologic grading of the quality of the included systematic reviews using the AMSTAR checklist have reported a statistically significantly increased risk of ovarian cancer associated with genital talc use. (10, 41, 42). See Section IX.IV for a summary of findings from epidemiological studies.

2.    **Consistency and Replication**. These findings of a statistically significantly increased risk of ovarian cancer with talc use have been consistently replicated by several independent investigators in different population, and different settings across different data sources using different study designs. These slight differences in magnitude of risk reflect differences in inclusion or exclusion criteria and the accumulation of evidence over time. The meta-analysis of case-control studies has consistently shown a statistically significantly increased risk, whereas the meta-analysis of cohort studies has also shown an excess risk, (42) which failed to reach statistical significance, due to inadequate statistical power and low number of events; but the confidence intervals of results between the two study designs overlap providing evidence of consistency. The number of ovarian cancers in the case-control studies exceeds the number of ovarian cancers in the cohort studies by several fold. (42).

3.    **Strength of Association**. The cumulative strength of association for the increased risk of ovarian cancer associated with talcum powder containing products is significant and ranges from 30 % to 60% %. The strength of association is similar to estimates of other established carcinogens (e.g., 24 % increased risk of lung cancers in non-smokers exposed to environmental tobacco smoke) (44), hormone replacement therapy and breast cancer (RR 1.33, 95% CI: 1.24-1.44) (45), particulate matter and lung cancer (PM2.5: RR 1.09, 95% CI: 1.04, 1.14 and PM10: 1.08, 95% CI: 1.00-1.17). (46). Beyond carcinogens, there are well established examples of causal associations in epidemiology, such as in the case of particulate matter and myocardial infarction, where the statistically significant excess risks are in the order of even less than a percent (carbon monoxide: 1.048, 95% CI: 1.026-1.070; nitrogen dioxide: 1.011, 95% CI, 1.006-1.016; sulfur dioxide: 1.010, 95% CI: 1.003-1.017; PM(10): 1.006, 95% CI: 1.002-1.009; and PM(2.5): 1.025, 95% CI: 1.015-1.036 and ozone: RR 1.003, 95% CI: 0.997-1.010; P = .36). (47).

4.    **Exposure-Response Assessment.** The assessment of exposure–response or biological gradient is hindered by the difficulty in quantifying talcum powder use usually collected by

17

self-reported data (frequency, amount, and duration), timing and patterns of use (e.g., douching), and other individual factors (e.g., co-existence of inflammatory conditions such as endometriosis and or vaginal bleeding) resulting in differences in measurement of exposure across studies. As discussed in the dose-response summary of epidemiological studies below, some studies have measured the frequency of exposure, others the duration of exposure with few studies measuring the combined duration and frequency or intensity of exposure. (48). It is important to interpret the exposure-response data in the context of mechanistic studies which report that talc accelerates the development of ovarian cancer through alteration of the redox state in epithelial ovarian cancer cells, (49) and a monotonic dose-response curve may not accurately reflect this mechanism of development of ovarian cancer mediated via inflammation and alterations in redox states. Some epidemiologists have argued that it is difficult to know how dose-response should be modelled and it is unclear why nature would mandate a monotonic dose-response gradient. (50). Although it is difficult to know how to model the talc-ovarian cancer exposure-response assessment, it is possible that an agent which accelerates the development of cancer could account for threshold effects rather than monotonic dose-response effect. Despite these challenges, I address studies which have shown evidence of dose-response as measured by an increased risk with increased frequency, (48, 51-55) or increased duration, (52, 54, 56) or a combination of frequency and duration of exposure. (52, 57). Some studies have also shown evidence of increased risk with increased number of lifetime applications, (10, 48, 52) which may be a more accurate measure for long term exposure outcome association mediated via inflammation. The most updated meta-analysis reported an increased risk with >3600 lifetime applications compared to <3600 lifetime applications of perineal talc based on data from case-control studies. (42). A limited number of studies have shown no evidence of dose-response either with increased frequency or duration of exposure. (58-60).

5. **Retrograde Migration of Talc and Routes of Talc Exposure.** Talcum powder particles can migrate to the fallopian tubes and ovaries. (61-63). Talc and/or other constituents have been detected within the ovaries of women who report perineal talc use, (64) and found deeply embedded within ovarian tumors. (62, 65). Talc has also been reported in the lymph nodes which could occur through migration absorption or inhalation with transport through the lymphatic system. (66). Although an industry funded study performed by the Cosmetic, Toiletry, and Fragrance Association failed to detect translocation of "measurable quantities of talc" in unrelated monkey models, (67) the timing and techniques of assessment and intraspecies differences could not completely rule out migration of talc particles. Furthermore, supportive evidence for migration comes from the findings of a decreased risk of ovarian cancer with tubal

18

ligation and hysterectomy, (62) evidence of migration of other particles such as starch. (68). The FDA concluded that the "potential for particles to migrate from the perineum vagina to the peritoneal cavity is indisputable." (69). A secondary route of exposure is inhalation. (36, 70).

6.    **Multiple Biological Mechanisms of Talc Induced Ovarian Cancer.** Although not an absolute requirement for demonstrating causality, there is strong evidence that talcum powder products can induce ovarian cancer through established biological mechanisms (Section X). (39, 49, 71, 72). Inflammation plays a leading role in ovarian cancer and talc has pro-inflammatory effects; it also induces alterations in redox potential and pro-oxidant effects. (49) In ovarian cells talc has been shown to increase proliferation, increase neoplastic transformation and increase reactive oxygen species in the ovarian cells. (71). Talc has also been shown to be mutagenic in human ovarian epithelial cells through increased activation of gene activating transcription factors. Finally, the presence of asbestos and other Group 1 carcinogens likely contributes to the carcinogenicity of talcum powder products, and provides biologic plausibility for the consistent and significant increased risk seen in the epidemiologic studies on Talc and Ovarian cancer.

# VIII.   METHODS FOR THE OVERVIEW OF SYSTEMATIC REVIEW OF OBSERVATIONAL STUDIES OF GENITAL TALC USE AND OVARIAN CANCER.

I conducted an overview of systematic reviews and meta-analysis of observational studies of genital talc use and ovarian cancer. I included systematic reviews regardless of the performance of quantitative synthesis as meta-analysis may occasionally not be performed for data from observational studies. To inform the causal question, I also evaluated additional studies which provided evidence on the causal question of whether talcum powder products induce ovarian cancer. I critically appraised the meta-analysis using the 11- item AMSTAR (Assessing the methodologic quality of Systematic Review) checklist for systematic reviews and meta-analysis. (12) The individual epidemiological studies were also evaluated and summarized for their key strengths and limitations.

*VIII.I. Systematic search.* I performed an initial systematic search of Scopus and PubMed with the following search terms on June 12, 2017:

Pubmed:    ("talc"[MeSH Terms] OR "talc"[All Fields]) AND ("ovarian neoplasms"[MeSH Terms] OR ("ovarian"[All Fields] AND "neoplasms"[All

19

Fields]) OR "ovarian neoplasms"[All Fields] OR ("ovarian"[All Fields] AND "cancer"[All Fields]) OR "ovarian cancer"[All Fields])

Scopus:        (TITLE-ABS-KEY (talc) AND TITLE-ABS-KEY (ovarian AND cancer)

*VIII.II Eligibility Criteria.* I included and considered epidemiological studies, including case-control studies, cohort studies and systematic review and meta-analysis which reported on the association between talc and ovarian cancer. I searched the references of included studies and citing articles to find additional original articles. I also included in vitro, animal, and human epidemiologic studies that reported data that either support or refute the role of talc in the development of ovarian cancer. I excluded duplicate articles identified in the two databases, articles with no original data, narrative reviews, commentaries and opinion pieces , and citations not relevant to the present scenario. The title and abstracts of each manuscript were reviewed to identify potential studies for inclusion in this report. I also searched the reference of included studies to find relevant citing articles. New studies were identified after evaluating citing articles. I reviewed the full length of each of these manuscripts and provide a summary of their key findings below.

## IX.    RESULTS.

The results of the initial search yielded 273 citations. I included 9 studies in the section on overview of systematic reviews and meta-analysis. (10, 13, 39-42, 57, 73, 79 ). I also assessed the 29 case-control studies, (48, 51-60, 62, 66, 75-91) and 3 cohort studies (14, 17, 92-93). The list of excluded citations is shown. The difference in the citation count of included and excluded articles largely reflects excluded duplicate articles retrieved from the two databases. I also evaluated several studies (36, 37, 49, 64-68, 72, 94-109) which reported on the biological mechanisms that supported or refuted the causal association between talcum powder products and ovarian cancer.

*IX.I. Overview of Systematic Reviews and Meta-analysis.* Three meta-analysis were not preceded by a systematic search (57, 73, 79). There were 4 systematic reviews and meta-analysis which evaluated the link between perineal talc use and ovarian cancer (39-42) using summary data, while an individual participant data analyses pooled data from case-control studies in the Ovarian Cancer Consortium (10). Another systematic review and meta-analysis analysis conducted on behalf of the manufacturer only evaluated the use of cosmetic talc on

20

contraceptive diaphragms and ovarian cancer (13) and was not directly relevant to the causal question of genital talc use and the development of ovarian cancer, but was critically evaluated for strengths and weaknesses. The results of the methodologic assessment of each of these using the AMSTAR checklist is summarized in the Table 1. Two meta-analysis (13, 40) are of poor methodological quality. Regardless, the findings of older meta-analysis have been superseded given the publication of new meta-analysis. (41, 42).

1.　　In 1992, Harlow et al. combined crude odds ratios from their case-control study, discussed below with 5 pre-existing existing case-control studies (79) to evaluate the association between perineal talc exposure and ovarian cancer. The studies included 1106 cases and 1756 controls, with talc exposure reported among 50.7% of cases and 46.9% of controls. Using crude odds ratios from the individual studies, perineal exposure to talc was associated with a statistically significantly increased risk of ovarian cancer (OR 1.3, 95% CI: 1.1-1.6). Major limitations include the lack of a systematic search methodology.

2.　　A 1995, meta-analysis by Gross and Berg (39) was conducted on behalf of the manufacturer Johnson and Johnson. A search of PubMed issuing the terms "ovarian cancer" and "talc or cosmetic" identified 9 case-control studies and reported a statistically significant increased risk of ovarian cancer in both the crude odds ratio (1.27, 95% CI: 1.09-1.48) and adjusted odds ratio (1.31, 95% CI: 1.08-1.58). They also examined the odds ratio by tumor type and notes that all the analyses produced relative risks greater than 1 with confidence intervals that exceeded 1. Despite the statistically significantly increased risk seen in analyses, the authors concluded that the *"literature does not unequivocally support the hypothesis…. But [does] suggest the possibility of an increased risk of ovarian cancer due to perineal talc use."* The description of study procedures was incomplete, and the search strategy was limited. The study was supported in part by the manufacturer.

3.　　Cramer et al. 1999 combined crude odds ratio data from their case-control study with pre-existing case-control studies in a meta-analysis of 14 total case-control studies, (57) and reported a statistically significant OR of 1.36 (95% CI: 1.24-1.49). The tests for statistical heterogeneity were not significant (p=0.085). Limitations include the lack of a systematic search.

21

4.      Huncharek, for his 2003 publication, conducted a meta-analysis of 16 studies including 11,933 subjects. (40). They searched MEDLARS, Embase and Cancer Lit databases using search term "talc exp ovarian neoplasms." They excluded studies on borderline tumors or those which did not report on types of perineal exposure (dusting vs sanitary napkins). The meta-analysis was conducted using adjusted measures of effect using the inverse variance method. It included 15 population-based and 1 hospital-based study and excluded the 1983 Hartge study. (76). The pooled analyses yielded a significantly increased risk of ovarian cancer (RR 1.33, 95% CI: 1.16-1.45) associated with the perineal use of talc without evidence of statistical heterogeneity. Seven studies reporting on the number of talc applications per month were evaluated where the highest risk category (RR 1.21, 95% CI: 1.00-1.45) and lowest risk category (RR 1.83, 95% CI: 1.55-2.15) reported an increased risk. In sensitivity analyses, hospital-based studies showed no statistically significant excess risk between talc use and ovarian cancer risk, i.e., RRs 1.19 (95% CI: 0.99-1.41) versus population-based studies which showed an increased risk (RR 1.38, 95% CI: 1.25-1.52), despite the proportion of controls using talc being similar across the two designs. The confidence intervals were overlapping suggesting that the findings were consistent. Recent updated meta-analysis discussed below report similar estimates from hospital and population based studies. (42). The RRs were relatively stable even after exclusion of the single cohort study or limiting the analysis to studies that controlled for body weight and BMI. The authors stated that the association between talc use and ovarian cancer could also be attributed to exposure misclassification among prevalent cases or side effects of treatment such as radiotherapy and chemotherapy which may predispose to talc use ("reverse causality"). Study limitations include the inability to conduct meaningful dose-response analysis because only nine of the 16 studies provided data on dose-response, with substantial differences in dose stratification levels among these studies.

5.      Langseth reported on a meta-analysis of 20 case-control studies and one cohort study in 2008. The various case-control studies provided a significant excess risk (10 studies) and non-significant excess risk in 10 studies. (73). The prospective cohort study reported no association between cosmetic talc use and all types of ovarian cancer combined but showed evidence of an increase in serous tumors. The hospital-based case-control studies reported a pooled OR of 1.12 (95% CI: 0.92-1.36) and population-based case-controls studies reported a pooled OR of 1.40 (95% CI: 1.29-1.52). The combined OR from all case-control studies using the fixed effects model was 1.35 (95% CI: 1.26-1.46).

22

6.      Terry et al conducted an individual participant pooled analysis of eight case-control studies was conducted by the investigators for the Ovarian Cancer Consortium. (10). Genital powder use was defined as any powder use (talc, cornstarch, deodorizing) applied directly or indirectly (with sanitary pads, tampons or underwear) to genital, perineal or rectal area. Criteria for exposure varied from ever use to one year or longer. Women who reported both genital and non-genital powder use were considered genital users. Cumulative exposure was calculated by multiplying months of use by frequency of use. Never users and women who reported non-genital powder use were considered as the reference group. Analyses were adjusted for potential confounders such as age, duration of contraceptive use, parity, tubal ligation history, BMI and race/ethnicity. Family history of breast and ovarian cancer was not included in the final model. Genital powder use was reported in 25% of controls and 31% of cases. The rates of genital powder use varied widely between studies ranging from 15-45% in the control group. Ever regular uses of genital powder reported a statistically significantly increased risk of ovarian cancer (OR 1.24, 95% CI: 1.15–1.33) compared to non-users. There was no evidence of heterogeneity in the studies regardless of the reference group ($P_{heterogeneity}$=0.61). Results were similar when the reference group included those with genital powder use and never users. Risk was elevated for various histologic subtypes of ovarian cancer including invasive serous (OR 1.20, 95% CI: 1.09–1.32), endometrioid (OR 1.22, 95% CI: 1.04–1.43), and clear cell (OR 1.24, 95% CI: 1.01–1.52) tumors, and for borderline serous tumors (OR 1.46, 95% CI: 1.24–1.72). There was an increased risk of all nonmucinous subtypes of epithelial ovarian cancer combined across quartiles of genital powder use compared with nonuse: ($OR_{Q1}$ 1.18, 95% CI: 1.02–1.36; $OR_{Q2}$ 1.22, 95% CI: 1.06–1.41; $OR_{Q3}$ 1.22, 95% CI: 1.06–1.40; $OR_{Q4}$ 1.37, 95% CI: 1.19–1.58). Although a significant increase in risk with an increasing number of genital powder applications was found for nonmucinous epithelial ovarian cancer when nonusers were included in the analysis ($P_{trend}$ < 0.0001), no significant trend was seen when analyses were restricted to ever users (P=0.17). After excluding those with tubal ligation or hysterectomy, the results were similar. Restricting analysis to applications before tubal ligation made no substantive difference. There was an evidence of interaction by BMI, with the risk being higher for women with BMI < 30 $kg/m^2$ (OR 1.28, 95% CI: 1.17-1.39) than women with BMI ≥ 30 $kg/m^2$ (OR 1.14, 95% CI: 0.98-1.32; $P_{interaction}$=0.01). There was no evidence of interaction by tubal ligation, parity, endometriosis or post-menopausal status. The association was similar for women who used powder during varying time periods (1952-1961; 1962-1972; and after 1972). The strengths of this meta-analysis include the use of individual participant data, which allowed them to conduct dose-response analysis and analysis by histologic subtype. The lack of statistically significant evidence on non-

mucinous cancer could be attributed to the low number of users, or talc may not be relevant to these tumor types which have different biological mechanisms. The limitations include the definition of exposure as genital powder user varied from ever user, ever regular user to powder use for at least 6 months or at least 1 year in the studies.

7.      Berge et al. 2018, a meta-analysis of 27 studies (41) (24 case-control studies and 3 cohort studies) was conducted according to the Preferred Item for Reporting of Systematic Reviews and Meta-Analysis Guidelines. (110). The authors searched multiple databases including Pubmed, Embase and Scopus. They examined the citations independently and in duplicate. They rated the studies using the New Castle Ottawa scale for study quality. They conducted meta-regression for duration (RR for every 10-year increase in duration) and frequency of genital talc use (RR for one time/week increase in frequency) for studies reporting at least three categories of duration or frequency after excluding the non-exposed category. Dose-response analysis was conducted using two methods. Study specific slopes were estimated from the natural logarithm of the risk estimates within each study; in a second step the slopes were pooled using a random-effects model. The study specific estimates were pooled in a single meta-analysis in the second method. Six of the case-control studies were hospital-based and the remainder were population-based. Most of the studies were conducted in North America and Europe. They reported a statistically significant increase in risk of developing ovarian cancer with talc use (adjusted RR 1.22, 95% CI: 1.13-1.30). A statistically significant risk was seen in the case-control studies (RR 1.26, 95% CI: 1.17-1.35), whereas the excess risk in the cohort studies did not reach statistical significance (RR 1.02, 95% CI: 0.85-1.20; $P_{heterogeneity} = 0.007$). There was no difference between results for borderline (RR 1.27, 95% CI: 1.09–1.44) and invasive ovarian cancer (RR 1.20; 95% CI: 1.08–1.31).  There was a trend in RR with duration and frequency of genital talc use and suggestion of dose-response. There was a statistically significant risk for only serous carcinoma (RR 1.24, 95% CI: 1.15–1.34) and no other histologic subtypes ($P_{heterogeneity}$ between histologic types was 0.04). Use of talcum powder in the "early" period showed increased risk of ovarian cancer (RR 1.18, 95% CI: 0.99–1.37). The use in the "late" period was higher (RR 1.31, 95% CI: 1.03–1.61; P-value for test for heterogeneity between the groups of studies was 0.37), arguing against the hypothesis that a higher risk would be seen only among those with earlier exposure during time-periods in which talcum powder was reported to contain asbestos. The cut-off points varied between studies was variable between 1970 and 1980. Use of sanitary napkins or diaphragms was not associated with an increased risk of ovarian cancer (RR 1.00: 95% CI: 0.84–1.16, and RR 0.75, 95% CI: 0.63–0.88, respectively).

Stratified analysis based on the adjustment for confounders (use of oral contraceptives and hormone replacement therapy, socioeconomic status/ education, BMI) found no evidence of heterogeneity. Meta-regression using the two different approaches yielded similar results. Based on the two-step approach, a 10-year increase in genital talc use was associated with a RR of 0.97 (95% CI: 0.82–1.12; nine studies reporting on duration), whereas the RR for an increase of one application per week was 1.03 (95% CI: 0.82–1.25; five studies reporting on frequency). There was no evidence of publication bias on visual inspection of funnel plot and the Egger test (P=0.7), with the cumulative meta-analysis reporting stabilization RR of in the range of 1.20–1.25. Stratified analyses conducted did not suggest the possibility of residual confounding (i.e, higher adjusted estimates than unadjusted estimates).

There are some limitations to the analysis. While the role of selection and recall bias is a possibility, given higher estimates reported from recent studies, such biases should account for increase in recall for all histologic cancer subtypes and not just serous ovarian cancer. Importantly, the dose-response analyses analyzed duration and frequency separately and not the intensity of exposure (duration combined with frequency) or cumulative exposure to talc and the exclusion of the reference category from the dose-response curve diminished the power of the dose response analysis to detect any threshold effects.

8.      Penninkilampi, et al. 2018 (42), the most recent and comprehensive meta-analysis which focused on studies with greater than 50 cases of ovarian cancer also reported on data from 26 case-control studies (13,421 cases and 19,314 controls) and 3 cohort studies (890 cases). The study was also conducted according to the PRISMA protocol and included a search of multiple databases (MEDLINE, PubMed, EMBASE, Cochrane Central Register of Controlled Trials) and LILACS. They also evaluated the quality of studies using the Newcastle Ottawa Scale. They also evaluated long term talc use in which OR were extracted for group with the longest duration of exposure compared to controls, if there was a minimum of 10 years of talc exposure. Lifetime applications within each study were divided into < 3600 lifetime applications (equivalent to less than 10 years) and >3600 applications or more than 10 years of exposure. The number of lifetime applications is a better marker of intensity of exposure compared to duration or frequency of exposure alone. They assessed publication bias using the failsafe method where the failsafe number is the number of studies missed to nullify the findings of meta-analysis.

25

This was a well-conducted analysis and some strengths and limitations are notable. They found all studies to be of reasonable quality and did not exclude studies based on study quality. None of the analyses in this review had statistically significant heterogeneity except for non-perineal application arguing for the consistency of estimates. Any perineal talc use was associated with an increased risk of ovarian cancer (OR 1.31, 95 % CI: 1.24-1.39). Greater than 3600 lifetime applications were more associated with ovarian cancer than lifetime applications of less than 3600, although risks were significantly elevated in both groups. While the case-control studies reported a statistically significantly increased risk of ovarian cancer (OR 1.35, 95% CI: 1.27-1.43), the cohort studies reported an increased risk which was not statistically significant (OR 1.06, 95 % CI: 0.90-1.25).

9.      **Meta-analysis on Talc-Dusted Diaphragms and Ovarian Cancer.** Another meta-analysis of 9 case-control studies by Huncharek et al. (13) reported on exposure to talc dusted diaphragms and ovarian cancer. On one hand, the authors dismissed the "talc hypothesis" for potential carcinogenicity, but then argued that talc dusted diaphragms was a more "intuitive model" for testing whether talc exposure increased the risk of ovarian cancer without any biological evidence (or references) to support this intuition. They searched MEDLARS, Cancer Lit and Current Contents. They included 9 studies and the pooled analyses yielded an excess risk of ovarian cancer which was not statistically significant (RR 1.03, 95% CI: 0.80-1.33). Exclusion of the study in which exposure to dusted diaphragms was assumed rather than measured further elevated the OR, which was not statistically significant (OR 1.12, 95% CI: 0.84–1.48) similar to a non-significant elevation in OR after the exclusion of the studies not published as full research articles.

This meta-analysis was flawed for several reasons. The most important limitation was its exclusive focus on talc powder dusted diaphragms as the route of exposure which could not inherently address the causal question of whether genital talcum powder dusting is associated with increased risk of ovarian cancer. As a result of this narrow hypothesis, they excluded several available studies that reported a statistically significant excess risk of ovarian cancer with perineal talc use. Several methodological flaws include the exclusion of the lowest category of exposure for some studies, (51) data extractions errors for others (56), and inclusion of ineligible studies that did not disaggregate data between talc and cornstarch users. (77) The study was by Johnson & Johnson and Luzenac America and was of poorer methodological quality than those conducted by their academic counterparts (43). As a result of these serious methodological

26

flaws, <u>and the publication of several newer, higher quality meta-analysis with updated data,</u> (10, 41, 42) the <u>findings of this study have been superseded.</u>

It is important to note here that while the AMSTAR checklist evaluates the methodologic quality of systematic reviews, several studies shown below were published prior to the publication of the AMSTAR checklist.

### IX.II. Case-Control Summaries.

1.      More than three decades ago Cramer et al. (75) evaluated 215 white women diagnosed with epithelial ovarian cancer identified through 12 hospitals in the greater Boston area. They were randomly matched by age, race and residence to 215 population-based controls. Surgical specimens were reviewed to confirm and classify tumors by histologic type. Talc exposure was determined through in person interviews. Multivariable logistic regression was used to estimate the Relative Risk. Ninety-two (42.8%) cases regularly used talc either as a dusting powder on the perineum or on sanitary napkins compared with 61 (28.4%) controls.

Adjusted for parity and menopausal status, this difference yielded a RR of 1.92 (95% CI: 1.27-2.89) for ovarian cancer associated with talc exposure. Women who had regularly engaged in both practices had an adjusted RR of 3.28 (95 % CI: 1.68-6.42; P < 0.001) compared to women with neither exposure. After adjusting for religion, marital status, educational levels, ponderal index, age at menarche, parity, oral contraceptive or menopausal hormone use and smoking the RR was attenuated but remained statistically significant (RR 1.61, 95% CI: 1.04-2.49). The limitations of the study include the potential for selection bias in controls because of high rates of non-participation, although RR remained statistically significantly elevated even though the analysis was restricted to 121 cases matched with controls without a referral. Since approximately 50% of ovarian cancer cases in the Boston area was sampled, any potential for pervasive selection bias of cases was minimal. Other potential limitations include the adjustment for only a limited set of confounders such as parity and menopausal status.

2.      Hartge et al. 1983 (76) conducted a hospital-based case-control study of women with pathologically confirmed primary epithelial ovarian cancers matched to equal number of women for conditions other than gynecologic, psychiatric, or malignant diseases or pregnancy in the same hospitals in Washington, DC. Controls were frequency matched for age, race and hospital. Exposure to talc was ascertained through questions about reproductive and sexual history, medical history, drug use, and other exposures. The questions for talc use were added after the study began yielding 135 cases and 171 controls.

27

Among the women users of talc in sanitary napkins, underwear, or the genital area there was an excess risk of ovarian cancer (unadjusted RR 2.5, 95 % CI: 0.7-10.0) which was not statistically significant due to small sample size (n= 7 cases and 3 controls). The limitations to the study include the limited number of cases and controls reporting genital use of talc (n=10) and publication as a letter to the editor which may or may not undergo peer review depending on editorial practices at the journal. They did not report adjusted results of ovarian cancer after perineal exposure to talc. Another limitation is the potential for recall bias; however, this was likely minimal given similar reporting of douching practices in cases and controls.

3.      In 1988, Whittemore et al. (58) evaluated 188 pre-menopausal and postmenopausal women between the ages of 18 and 74 with primary epithelial ovarian cancer in Santa Clara County hospitals or at the University of California, San Francisco Medical Center. The diagnoses were subsequently histologically verified. One group of controls was selected from the hospital (n=280); and a second group was selected from the population using random digit dialing (n=259). Exposure to talcum powder products was determined through a structured in-person interview at home where subjects were asked about whether they had used talcum powder products on the perineum, sanitary pads and/or diaphragms. Data was recorded by type (perineum, sanitary pads, diaphragm or some combination thereof), and duration of use.

Population cases were more likely to be younger and more likely to be premenopausal than cases and hospital-based controls. Approximately 52% of cases reported talc use compared to 46% controls (RR 1.40, p=0.6). After adjusting for parity and oral contraceptive use, perineal use of talc was associated with an excess risk of ovarian cancer that was not statistically significant (RR 1.45, 95% CI: 0.812.60). Women who used talc an average of 1-20 times per month reported an excess risk in comparison to those who used it less frequently which was not statistically significant (RR 1.27, p=0.29). The risk among users of more than 20 times per month was 1.45 times greater than non-users, but the findings were not statistically significant (p=0.09). The overall increased risk in overall applications per month was 1.30 (p=0.19). Although the data showed a *trend* of increasing risk with increasing frequency of perineal exposure, the trends were not statistically significant and there was no trend with increasing duration of exposure. The risk of ovarian cancer with talc use between one and nine years was 1.6 times the risk of those with a shorter duration (95% CI: 1.00-2.57; p=0.05), and the risk among those with more than 10 years of exposure was 1.11 higher than that of non-users (95% CI: 0.74-1.65; p=0.61).

28

The limitations of the study are the inability to interview cases and the choice of two controls. Some amount of non-differential misclassification of exposure may bias findings towards null. The dose-response analysis was limited by the inability to determine the combined effect of frequency and duration of exposure. The study reported a statistically increased risk of ovarian cancer with coffee consumption and a non-significant reduction in risk with smoking. Subsequent meta-analysis (111) or Mendelian randomization (112) studies have confirmed that there is no association between coffee consumption and ovarian cancer, whereas smoking has a heterogenous relationship to ovarian cancer which varies by histologic subtypes. (112) The reports of such additional spurious associations suggest an element of measurement error in their database.

4.      Harlow et al. 1989 (77) conducted a population-based case-control study which included 116 females 20-79 years old h *serous and mucinous borderline ovarian tumors* identified using International Classification of Disease (ICD)-9 codes from the cancer registries of three western urban counties in Washington State. An independent pathology review confirmed diagnosis for 73% of tumors with 94% agreement, so the additional 33 cases were included. A sample of 158 controls of white women was identified through random digit dialing. Women with bilateral oophorectomy were excluded from the analysis. Any exposure to talc including any perineal exposure to powder, method of use, type of powder use (cornstarch, baby powder, talc, deodorizing powder), and combinations of method and type was ascertained through in-person interviews.

The study reported no statistically significant increased risk of ovarian cancer with perineal use of dusting powders (RR 1.1, 95% CI: 0.7-2.1). When looking at unspecified talc adjusted for the same factors, the RR was 1.0 (95% CI: 0.4-2.4). However, women who reported any use of talc containing powder on sanitary napkins showed an excess risk which was not statistically significant due to limited statistical power (RR 2.2, 95% CI: 0.8-19.8). However, among the sample of women who used deodorizing powders alone or in combination with talc, the risk of ovarian cancer was RR 2.8 (95% CI: 1.1-11.7) attributed to the potential exposure to asbestos. The limitations to the study include the potential for selection bias since 30% of cases and controls did not participate, although their characteristics were like the included participants which may have limited any impact. It is also possible that these findings are limited to borderline rather than malignant ovarian cancers.

5.      In 1989, Booth et al. (51) conducted a population-based case-control study of 280 cases of ovarian cancer in women under 65 years of age from 13 hospitals in London and two in

Oxford. 451 controls were selected from other hospitals as enough age-matched controls were unavailable. The study included both pre- and post-menopausal women. Ovarian cancer was determined through hospital diagnoses with pathological specimens being histologically classified. Serous tumors were most prevalent, though mucinous, endometroid and clear cell carcinoma was included. Information regarding talc exposure was obtained through a questionnaire and frequency of talc use was reported as never, rarely, monthly, weekly, or daily talc use.

After adjusting for age and social class (based on occupation of the husband for married women, and their own occupation for women who were not married) talc users reporting use more than once a week had a higher risk compared to never users. (RR 2.0, 95 % CI: 1.3-3.4). Those who reported daily use also had a non-significantly higher risk (RR 1.3, 95% CI: 0.8-1.9). There was some amount of missing data (8% of cases and 4% of controls), and no consistent trend of increasing risk with increasing frequency of use. However, data was not available on the duration of talc exposure to conduct meaningful dose-response analysis.

6.      In 1992, Harlow et al. (79) included 235 cases of white women between the ages of 18 and 76 who had been diagnosed with ovarian cancer at one of 10 hospitals in the Boston metropolitan area. Controls were randomly selected from the town books; annual publication lists and address lists within 2 years of the age of case as potential controls. Cancer was confirmed through an independent pathology review. Talc exposure was determined through in-person interviews. Talc exposure from infancy with diapering, or use on other parts of the body, was not included. Talc use in other parts of body was considered unexposed. Talc use was reported as any genital application, type of application (sanitary napkin/underwear, via partner or application to diaphragm, via dusting to perineum), number of applications per month, years of use, age at first use, years since last use, whether use was before or after 1960, brand of application, estimated total lifetime applications, estimated applications excluding use after hysterectomy or tubal ligation, and estimated applications excluding use after hysterectomy or tubal ligation and use during nonovulatory months. The Chi square test for change in linear trend based on change in deviance in models.

Most participants reported use of baby powder. Perineal talc use was associated with an increased risk for ovarian cancer (OR 1.5, 95% CI: 1.0-2.1) when adjusted for parity, education, marital status, religion, use of sanitary napkins, douching, age, and weight. Perineal use of talc via dusting powder to perineum was associated with a significantly increased risk of ovarian cancer OR 1.7 (95% CI: 1.1-2.7), whereas use by sanitary napkins, underwear, use via

30

diaphragms was not associated with a significantly increased risk. Adjusted risk was highest for endometrioid tumors (OR 2.8, 95% CI: 1.2-6.4) and borderline tumors. A greater proportion of women with endometroid tumors reported more than 10,000 lifetime applications of talc during ovulatory cycles while having an intact genital tract compared to other histologic types (34 % vs 16%, respectively). The risk of cancer increased significantly with increased frequency of applications per month using a linear test trend as a continuous variable. The risk was highest among the women who applied talc once daily relative to non-users. Women who applied talc for more than 10 years were at 60% greater risk for ovarian cancer relative to non-users. An 80% excess risk was associated with an estimated exposure of more than 10,000 applications. The association between talc and ovarian cancer was greater than in talc products before 1960. Restricting the analysis to exposure during ovulatory months, women with intact genital tract and more than 10,000 applications during ovulatory cycles had a threefold increase in risk of ovarian cancer. Limitations included the high rates of non-response (n=31% cases and 19% of controls) and failure to adjust for family history of ovarian cancer and oral contraceptive use.

7.      Chen et al. 1992 (78) evaluated 112 cases of ovarian cancer in Beijing China. The diagnosis was confirmed by laparotomy and pathological examination. Serous cancer accounted for 51% of cases, mucinous for 19%, and miscellaneous epithelial for 30% of cases. Two controls were matched for each case using random selection from the same street, office, or township. A comprehensive questionnaire was administered through face-to-face interviews and collected information about menstrual, obstetric, marital, medical, familial, and dietary histories with reference to events 3 years or more prior to diagnosis. A total of 224 controls were selected. Talc exposure was measured through a yes or no metric, for exposure occurring 3 or years prior to date of diagnosis or equivalent date in controls. Logistic regression was conducted to estimate relative risk.

The mean age of participants was 48.5 and 49 years among cases and controls respectively. After adjusting for education and parity, there was an excess risk of ovarian cancer associated with a history of long-term (>3 months) application of dusting powder to the lower abdomen and perineum (RR 3.9, 95% CI: 0.9-10.6) which was not statistically significant due to limited statistical power (n=7 cases and 5 controls reporting powder use). The limitations of the study include the small sample size, loss to follow up and death, the inability to fully ascertain all cases of ovarian cancer and the exclusion of controls with other health problems. Although the applicability of these findings from a Chinese population to a US population is limited, the

31

findings of an increased risk in different parts of the world provide evidence in support of an increased risk of ovarian cancer with dusting powder use.

8.      In 1992 Rosenblatt et al. (80) conducted a hospital-based case-control study of the association between genital and respiratory talc exposure and the development of epithelial ovarian cancer at the Johns Hopkins Hospital. Among 140 diagnosed cases of epithelial ovarian cancer, approximately 108 were successfully interviewed. Seventy-seven pathologically-confirmed incident cases diagnosed within 6 months of admission were matched to age-race matched controls (n=46). Exposure was ascertained using a structured questionnaire administered at home and in the hospital. Conditional logistic regression was used to obtain strength of the association.

Although genital powder use was not associated with an increased risk of ovarian cancer, statistically significant increased risk was observed for exposure to talc on sanitary napkins (OR 4.79, 95% CI: 1.29-17.79) after adjusting for confounders such as obesity, socioeconomic status, religion, reproductive status and oral contraceptive use, with a smaller risk after genital bath exposure (RR 1.7, 95% CI: 0.7-3.9). An excess risk of borderline significance was seen for exposure of ≥ 37.4 years (RR 2.4, 95% CI: 1.0-5.8). The limitations include the small sample size, lack of data on frequency of talc use, and the limited generalizability of the findings from one hospital. The control group also reported a very high rate of talc use (90%) which may have limited the ability to detect any differences.

9.      In 1993, Tzonou et al. (81) reported on a hospital-based study of 189 women under 75 years of age with histopathologically confirmed ovarian cancer in Athens, Greece compared with 200 hospital visitor controls in two hospitals. Control patients were those hospitalized in the same ward as cancer cases. Talc exposure was determined by asking participants to report talc use (over an extended period before the onset of illness for cases and for a comparable period among controls) among other characteristics, through interviews in the hospital. Talc use was reported as a yes/no metric. Estimates were adjusted for age, years of schooling, weight before onset of the disease, age at menarche, menopausal status and age at menopause, parity and age at first birth, tobacco smoking, coffee drinking, consumption of alcoholic beverages, hair dyeing and mutual (analgesics-tranquilizers/hypnotics) tranquilizers.

An exceedingly small number of cases (n=6) and controls (n=7) reported perineal use of a talc. There was no statistically significant increased risk of ovarian cancer associated with perineal application of talc (RR 1.05; 95% CI: 0.28 to 3.98). The limitations of the study include the low

32

proportion of talc exposure, which was ascertained in only approximately 3% of cases and controls.

10.    In 1995, Purdie et al. (82) evaluated 824 histologically confirmed cases of epithelial ovarian cancer and 860 controls from gynecological oncology treatment centers in the three most populous Australian states. Controls were selected from electoral rolls in Australia where electoral participation is mandatory using a random procedure to match the age distribution of cases. Talc exposure was determined through face-to-face interviews conducted by trained interviewers using a standard questionnaire.

After adjusting for parity, there was a statistically significant increase risk of ovarian cancer reported with talc use on the abdomen or perineum (OR 1.27, 95% CI: 1.04-1.54). The limitations include high non-response rates in controls which may differ from the source population, but the age distribution of controls was like non-responders suggesting minimal response bias by age. There is also the possibility of bias in the selection of cases. They only adjusted for a limited set of confounders. Some misclassification of outcome is also possible given borderline and malignant cases were lumped together, although no differences were found when results were analyzed separately. Recall and interviewer bias was minimized by trained interviewers who administered standardized questionnaires.

11.    In 1996 Shushan et al. (83) reported on findings from a study of two hundred living cases aged 36-64 years with history confirmed diagnosis of primary invasive or borderline invasive ovarian cancer in the Israel Cancer registry. There were 408 women from the same area selected by random digit dialing. Both were interviewed using standardized questionnaires.

A larger proportion of cases than controls reported using moderate to a large amount of talc (10.5% vs 5.6%; P=0.04) compared to never users or seldom users, a difference which was statistically significant. Limitations include high refusal rate for cases (30%), the low rates of talc exposure among controls and limited adjustment for confounders. (14)

12.    In 1997, Cook et al. (84) reported on 329 white women between the ages of 20-79 diagnosed with epithelial and borderline ovarian cancer identified through the Cancer Surveillance System of Western Washington. Women were randomly selected as controls using random digit dialing from a larger pool of women for cancer studies. Genital powder exposure was collected through structured in person interviews and reported as any lifetime powder application, method of use (perineal dusting only, diaphragm only, sanitary napkin only, or genital deodorant spray only). Additional exposure information included cumulative

33

lifetime days of use for dusting and similar metrics for other methods of use. Genital powder use was also separated into use of talcum powder, baby powder, cornstarch, deodorizing powder, bath/body powder, or unspecified powder. Analysis was presented by age because adjustment for other confounders such as income, marital status, body mass index, oral contraceptive or parity did not change results.

Genital powder exposure was more common among cases (50.8%) than controls (39.3%). After adjusting for age, any use of genital powder was associated with a statistically significant increased of ovarian cancer (RR 1.5, 95% CI: 1.1-2.0) compared to non-use, although there was no clear pattern of increasing risk after increasing duration of use. After adjusting for age, exclusive use of perineal dusting was also associated with a statistically significant increased risk of ovarian cancer (RR 1.8, 95% CI: 1.2-2.9), whereas the risks for use via other routes of exposure (e.g. diaphragms, powder) were not significant. There was a statistically significant increased risk of serous tumors associated with any genital powder application (RR 1.7, 95% CI: 1.1-2.5), but not for the smaller number of mucinous or endometroid tumors. Limitations include low participation rates (64.3% for cases, 68% for controls), the potential for recall bias, and confounding by family history of ovarian cancer in a study where more than 50% of controls were less than 45 years of age.

13.     In 1997, Chang et al. (56) conducted a population-based case study of cases of borderline and invasive histologically confirmed ovarian cancer among participants aged 35 to 79 years from Canada. Talc exposure was determined through a questionnaire conducted during an in-home in person interview to detail medical and reproductive histories. Powder use was reported as talc, cornstarch, or a mixture. Information was provided for type of exposure, number of uses per month, years of use, years of use pre- and post-1970, and well as years of use before and after a tubal ligation or hysterectomy. They adjusted for age, years of oral contraceptive use, number of full-term pregnancies, duration of breastfeeding per pregnancy, tubal ligation, hysterectomy, and having a mother or sister with breast or ovarian cancer.

Talc exposure was reported in 44% of cases and 35.6% of controls. After adjusting for confounders there was a statistically significantly increased risk of ovarian cancer associated any talc exposure via sanitary napkins, direct application to the perineum or both (OR 1.42, 95% CI: 1.08-1.86). The dose-response analysis showed a borderline-significant association was detected between duration of after-bath talc exposure and risk (OR 1.09, 95% CI: 0.98-1.21, per 10 years of exposure), without any significant association between frequency of exposure and

34

risk. Although risk was elevated for both invasive and borderline carcinomas, it was statistically significant only for invasive carcinoma. The limitations of the study include the potential for recall bias and the high rates of non-response (28.7% for cases and 35.5% for controls)

14.     Green et al. 1997 (62) conducted a population based case-control study of 824 women aged 18-79 with histologically confirmed ovarian cancer compared to 824 controls. The methods and limitations were similar to the study by Purdie et al. (82). The prevalence of talc use was approximately 40% in the control use. Perineal talc was significantly associated with ovarian cancer (RR 1.3, 95% CI: 1.1-1.6), without any effect of longer duration of talc use. Compared to women who had neither used talc nor had sterilization, the risk was highest among talc users without surgery like the findings by Whittemore et al. (58). There is the potential for recall bias, and the quantity of talc use was unknown.

15.     In 1998, Godard et al. (85) examined 170 French-Canadian women with a histologic diagnosis of ovarian cancer from 2 large Montreal teaching hospitals. Cancer diagnoses were histologically confirmed, and pathology reports were reviewed for tumor classification. 170 population-based controls were identified using modified random digit dialing to match the age distribution of cases. Talc exposure was obtained through a 57-item questionnaire. 70% of interviews were conducted in person in clinics and 30% were conducted via phone. Talc use was reported through an ever/never metric for perineal use.

Only 10.6% of cases and 4.7% of controls reported talc use. As a result, perineal talc use was associated with an increased risk for ovarian cancer which was not statistically significant (RR 2.49, 95% CI: 0.94-6.58; P = .066) because of limited statistical power. Similar patterns of excess risk which did not reach statistical significance were seen in both the comparisons for sporadic and familial cases and controls. The limitations of the study include a modest non-response rates among cases (13%) and controls (10.7%).

16.     In 1999, Cramer et al. (57) evaluated 563 ovarian cases identified through tumor boards and statewide cancer registries in Massachusetts or New Hampshire in a population-based control study. Pathology reports were reviewed, and slides were sought in any case where there was a discrepancy between histologic description and final diagnosis. Controls were selected from the population using random digit dialing with a response rate of 72% among eligible controls. Talc exposure was obtained through questionnaires in which potential controls and cases were blinded. Specific hypothesis regarding talc use were not discussed. Exposure was assessed prior to 1 year before date of diagnosis or date of interview for

35

controls. Talc use in the genital or rectal area, on sanitary napkins and on underwear was considered as exposure whereas non-use and non-genital use was considered as unexposed. Exposure from condoms and diaphragms was not assessed.

Genital talc exposure was reported in 27% of cases and 18.2% of controls and the average duration of talc use exceeded more than 20 years in cases and controls. There was a statistically significantly increased relative risk of ovarian cancer with genital talc exposure 1.60 (95% CI: 1.18-2.15) after adjusting for age, study center, tubal ligation, BMI, parity, or primary relative with breast or ovarian cancer. The highest risk was seen among women whose age at first use was between 20 and 25 (RR 1.87, 95% CI: 1.03-3.39) those who have used talc for less than 20 years (RR 1.86, 95% CI: 1.16-3.00), those whose total applications is less than 3000 (1.84, 95% CI: 1.12-3.03), women who used talc when nulliparous (RR 2.80, 95% CI: 0.64-12.20), and those with serous invasive tumors (RR 1.70, 95% CI: 1.22-2.39). Only one case and 3 controls reported primarily using cornstarch, these numbers are likely accurate for talc use, despite the potential for including other kinds of powders. There was little evidence of effect by confounders such as age, oral contraceptive use and parity. Linear trends were significant in models that included women who were not exposed without any clear trend in duration or intensity of exposure in models that excluded women who were not exposed. Analysis of dose-response censured after closure of female tract or non-ovulatory cycles, and models showed a trend this was statistically significant only after inclusion of non-genitally exposed categories ($P_{trend}$=0.022).

Potential limitations include the potential for recall bias, although this is likely to be minimal and more likely to occur for short term exposures rather than long term exposures. The evidence for substantial degree of recall bias is refuted by the findings that there is no evidence of higher proportion of perineal talc exposure reported among cases in more recent compared to older studies to suggest stimulated reporting, no evidence of significant excess of non-genital talc exposure among cases, and the excess is limited to invasive serous carcinoma,(84) rather than all types of ovarian cancer or endometrial carcinoma.

17.    In 1999, Wong et al. (86) reported-on a hospital-based study of 499 patients with epithelial ovarian cancer and 775 age-matched controls with non-gynecologic cancer diagnoses. Cancer diagnoses were confirmed in the cancer registry. Exposure was ascertained through self-administered questionnaire in which approximately 15% of participants did not respond to questions about talc use or its frequency.

36

Talc use was reported by 47.8% of cases and 44.9% of controls. Genital talc use was reported by 34% of cases and 32.2% of cases. The mean duration of talc use was 22 years in controls and 21 years in the study population. After adjusting for age at diagnosis, parity, oral contraceptive use, smoking history, family history of epithelial ovarian cancer, age at menarche, menopausal status, income, education, geographic location, history of tubal ligation, and previous hysterectomy there was no statistically significant increased risk of ovarian cancer among ever users of talc (OR 0.92, 95% CI: 0.24-3.62). There was no significant association between duration of use and development of ovarian cancer even after prolonged exposure of more than 20 years. However, when evaluating genital talc use via histologic subtypes of cancer, all ORs were above 1 (except for undifferentiated carcinoma) but were not statistically significant. Similarly, those who had no history of genital tract interruption the ORs were elevated but not statistically significant. However, the study was limited by the non-response rate and the choice of a controls with malignancies. (113). Additionally, data on exposure were reported on a self-administered questionnaire rather than administered by interviewers. The results could not rule out the effect of talc exposure via condom use and data was not available on the frequency of talc use.

18.     Ness et al. (87) conducted a population-based control study. Cases (20-69) years of age with recent diagnosis of ovarian cancer ( n=) were compared with community-based controls 65 years or younger through random digit dialing. Controls were age-matched as well as matched by last 3 digits of the phone number. Approximately 72% of controls were selected. As a part of detailed interviews with calendars women were asked about their reproductive history including talc use. The question was, "As an adult and prior to [reference date] did you ever use talc, baby or deodorizing powder, at least once per month for 6 or more months on your: 1) feet, arms, or breasts, but not the genital or rectal areas? 2) genital or rectal area? 3) on your sanitary napkins? 4) on your underwear? 5) on your diaphragm or cervical cap?" They were then asked whether they had a male sexual partner(s) for more than a year who regularly used such products on his genital area or underwear. The duration of use of talc for each of these modes of use was also queried. The estimates were analyzed using conditional logistic regression after adjusting for age and gravidity (each as continuous variables), race (white/black/other), history of ovarian cancer in any first degree relative (yes/no), oral contraceptive use (yes/no), tubal ligation (yes/no), hysterectomy (yes/no), and breast-feeding (yes/no).

Talc use was reported in 53.2 % of controls. Compared to never talc use, talc use on all parts of the body (OR 1.4, 95% CI 1.1-1.6), genital/rectal ( OR 1.5, 95% CI 1.1-2.0) on sanitary napkins

37

OR 1.6, 95% CI 0 1.1- 2.3) and underwear OR 1.7, 95% CI. 1.2-2.4) was associated with a statistically significantly increased risk of ovarian cancer after adjusting for confounders. However, talc use on diaphragms ( OR 0.6, 95% CI 0.3-1.2) or by male partner ( OR 1.0, 95% CI 0.7 to 1.4) was associated with an increased risk which was not statistically significant. Although duration of talc use did not show a pattern of increased risk with increased risk with duration of exposure, the OR for each categories ( > 1 year, 1-4 years, 5- 9 years and > 10 years) were elevated and were statistically significant for 1-4 years. Tubal ligation and hysterectomy decreased ovarian cancer risk. Limitations to the study include the low response rates among cases and controls due to exclusion of prevalent ovarian cancer. Recall bias while always a concern was less likely to be a concern given that risk factors overall did not increase risk but were limited to those linked to inflammation.

19.    In 2004, Mills et al. (59) conducted a population-based case-control study of 256 women with histologically confirmed <u>incident</u> epithelial ovarian cancer from 22 counties in Central California. They also selected 1122 controls who were residents of that area who had one intact ovary and no history of ovarian cancer. Talc exposure was determined through phone interviews conducted by trained interviewers. Talcum powder use in the genial area was reported as an ever/never metric, as well as by frequency, duration, and cumulative use. The final parsimonious model adjusted for age, race, duration of oral contraceptive use and breast feeding.

The rates of talc use in controls was 37.1 % and higher among white non-Hispanics. Controls were more likely to have been outside the US. Most of talc exposed cases and controls were non-white. There was a statistically significant risk of ovarian cancer associated with genital talcum powder use (OR 1.37, 95% CI: 1.02-1.85) after adjusting or age, race, duration of oral contraceptive use, and breast feeding. Although increasing frequency of use showed a 74% increased risk among women who used talcum powder more than 4-7 times per week ($P_{trend}$= 0.015), this risk was not monotonic because risk the decreased between second (rarely to several times per month) and third categories (1 to 3 times per week). Duration of use also showed increasing risk and peaking between 4-12 years of use and declining thereafter ($P_{trend}$ =0.045). Cumulative exposure increased in the second and third quartiles of exposure but declined among the highest quartile of users ($P_{trend}$=0.051). The risk was highest among those who had stopped using talcum powder in the last 1-2 years compared to those in the more distant past. The risks were primarily elevated for serous and mucinous tumors. Risk was higher among those reporting use after 1975 which may be related to the recency of use, and those after age 20. Limitations of the study include a low response fraction which was only

38

40% for eligible cases and 57% for eligible cases, and high rates of non-participation- 34.2% among cases and 29.3% among controls. The dose-response analysis did not exclude exposure during non-ovulatory periods or after gynecologic surgery which may have diluted the relative risk estimates. However, strengths include the ability to rule out prevalent cases by examining incident cases alone.

20.      In 2004, Langseth et al. (88) conducted a case-control study of pulp and paper workers from different mills in Norway. Only one of these mills reported use of fibrous talc. They included 46 cases and reviewed histological records for each case. Most of the cases were invasive tumors. Four controls free of ovarian cancer and having intact ovaries were matched by birth year +/- 2 years and were drawn by incidence density sampling. A total 179 controls were available for analysis. Talc exposure was determined through personal interviews which took place in mill offices, at home, at a medical institution, or by phone. Talc exposure was reported environmentally and as use by personal hygiene (diapers, sanitary napkins, non-genital area or husbands use in genital area)

Talc exposure was reported among 50% of cases and 48% of controls. After adjusting for number of children, breastfeeding, age at birth of first and last child, age at menarche, age at menopause, smoking, and family history the use of talc use by personal hygiene was associated with an excess risk of ovarian cancer OR 1.15 (95% CI: 0.41-3.21), which was not statistically significant. The study has significant limitations. The sample size of the study was low with limited statistical power to detect a two-fold increased risk with a probability of only 53 % and response rate for interviews were low -76.1% for cases and 65.7% for controls. The inclusions of non-genital or husband's use in genital area among the exposed category diluted the estimates of relative risk for ovarian cancer associated with talc exposure. More information on cases was collected from relatives than controls because 71.5 of cases were deceased compared to only 28.6% of controls. The rates of missing data on talc use was high, because it was obtained from proxy respondents introducing an element of uncertainty in the estimates for relative risk of ovarian cancer associated with talc use.

21.      In 2008, Merritt et al. (89) reported on a population-based study of 1,576 women with epithelial ovarian cancer as part of the Australian Ovarian Cancer Study. Pathology reports and diagnostic slides were reviewed for a sample of 87 women with 97% agreement with original abstracted data. Cases were confirmed by histopathology. 1509 controls were selected from the electoral rolls and were matched by age and residence. Talc exposure was identified through a comprehensive health and lifestyle questionnaire. Talc use was reported as

39

ever/never for perineal use (powder or talc in the genital area or on underwear or on sanitary napkins), years of use prior to surgery, use post-surgery, and use stratified by age at diagnosis. All analyses were conducted for talc use while the reproductive tract was patent and exposure occurring 12 months prior to the diagnosis of cases and similar period in controls was excluded.

The rate of talc use was 43% among controls and 46% among cases. When adjusted for age, education, parity, and oral contraceptive use of talc in the perineal region among women with patent tubes there was a statistically increased risk of ovarian cancer (OR 1.17, 95% CI: 1.01-1.36) with the highest risk reported for serous tumors (OR 1.21, 95% CI: 1.03-1.44). The tests for trends for duration of use were of borderline statistical significance for all cancers and serous subgroup ($P_{trend}$ =0.02 for both). No significant associations between number of years used pre- or post-surgery and significantly elevated risks for overall cancer and serous ovarian cancer were seen in women both above 70 years of age, and below 50 years of age suggesting that timing of talc exposure (before or after 1976) did not affect results. There was no association between PID and the risk of ovarian cancer or the protective effect of NSAIDs. Limitations include low response rates and the lack of data on the frequency of exposure.

22.   In 2008 Gates et al. (55) conducted a nested case-control study as part of the New England Case-Control study and the Nurses' Health Study (NHS). Further cohort analysis from the NHS are presented in the section on cohort studies below. **Section IX.III.I** Ovarian cancer diagnoses were confirmed by the researchers. They included 1385 cases and 1802 controls. 76.7 % of cases were incident with respect to the timing of DNA collection in the NHS. Exposure was accessed through a questionnaire that asked questions related to use of talcum powder. The NECC questionnaires included questions about regular use of talcum, baby or deodorizing powder as an adult. Specific questions asked about type of use (as a dusting powder to the genital area, sanitary napkins, underwear, or non-genital areas), frequency of use, age at first use, number of years used, and brand of powder used. The 1982 NHS questionnaire requested information on whether the participant had ever commonly applied talcum, baby, or deodorizing powder to the perineal area (no, <once/week, 1-6 times/week, or daily) or to sanitary napkins (yes/no). The study defined regular genital talc use as application of powder to the genital/perineal region at least once per week. We also created a categorical variable for frequency of talc use, using the categories from the NHS questionnaire.

Most of the participants were white. Regular genital talc was reported among 56 cases and 44 controls, and daily genital talc use reported among 35 cases and 25 controls, respectively. There was a statistically significant increased risk of total epithelial ovarian cancer (RR 1.36, 95% CI: 1.14-1.63; P<0.001) and of serous invasive subtype (RR 1.60, 95% CI: 1.26-2.02) associated with regular use of talc when adjusted for age, study center, duration of oral contraceptive use, parity, tubal ligation, BMI, and duration of hormone use. The New England Case-control study had a higher RR associated with genital talc use than the Nurses' Health which had a smaller sample size. There was a statistically significant trend between increasing frequency of talc use and risk of both total and serous invasive ovarian cancer in the pooled analyses (P *trend* < 0.001 for both total and serous invasive ovarian cancer). The association between talc and ovarian cancer was stronger among women with the glutathione S-transferase M1 (GSTM1) null genotype (P interaction = 0.03), particularly in combination with the GSTM1 present genotype alone (P interaction = 0.03) in two independent study populations. The strengths of the study include robust findings from two independent study populations. Although talc exposure was only measured in the 1982 NHS questionnaire when participants were between 36 to 61 years of age, the number of users who began talc use after this is likely small as shown by the fact that more than 95% of controls with regular talc in the NECC reported talc use before age 35. The consistent findings from the prospective NHS study and the NECC may have minimized any potential biases due to the case-control design. Since talc exposure was defined as at least once per week, such habitual exposure is less susceptible to recall bias than sporadic exposure.

23.     In 2009, Wu et al. (48) conducted a population-based study of 609 cases of women and 688 controls between the ages of 18 and 74 residing in Los Angeles with histologically confirmed incident invasive or borderline ovarian cancers. Cases were identified through the Surveillance, Epidemiology and End Results (SEER) Program. Cases were matched to neighborhood controls on age and race/ethnicity. Controls were women with one intact ovary with no history of cancer except non-melanomatous skin cancer matched on age and race/ethnicity. Talc exposure was determined through a detailed interview by the same person which included a comprehensive questionnaire that used a reference date of 2 years before the date of diagnosis (or date of interview for controls). Talc use was reported as a yes or no metric (including yes or no for perineal area use), frequency and duration, total times of use, and total times of use before and after 1975. Few users of talc (24) had tubal ligation or hysterectomy prior to talc use and were considered as non-users.

The cases were primarily white woman but also included 41 African American women, 136 Hispanic women, and 51 Asian women. After adjusting for race, age, education, tubal ligation, family history, menopausal status, use of oral contraceptives, and parity perineal use of talc was associated with a statistically significantly increased risk of ovarian cancer (RR 1.53, 95% CI: 1.13-2.09). Elevated risks were also noted among those who used it on sanitary napkins, underwear and on diaphragms but not significant due to limited statistical power. There was a clear trend of increasing risk with increasing frequency of use among users who had used it for more than 20 years. The risk of ovarian cancer increased significantly with increasing frequency and duration of talc use; compared to never users, risk was highest among long duration (20 years), frequent (at least daily) talc users (RR 2.08, 95% CI: 1.34-3.23). The risk increased significantly with lifetime total times of talc use, but the association was limited to those who started talc use before 1975 ($P_{trend}$ <0.001). The association between talc use and ovarian cancer was strongest for serous ovarian cancer. Risk of ovarian cancer increased with the diagnosis of endometriosis. Limitations include the rates of non-response among cases and controls, and classification of talc use among a small number of users with prior hysterectomy as being non-exposed. However, the effect of this misclassification is likely to be minimal.

24.     In 2009, Moorman et al. (90) reported on a study involving 1,114 cases with histopathologically confirmed tumors as part of the North Carolina Ovarian Cancer Study. newly diagnosed cases were identified through the North Carolina Central Cancer Registry. All cases were confirmed by histopathologic review. Controls were frequency matched to cases and recruited from the same geographic region using random digit dialing. The controls could not have had a bilateral oophorectomy. Talc exposure was reported through in-person interviews conducted by nurses with life calendar and pictures of contraceptives, menopausal hormones, and other medications were used to help aid recall. Talc use was reported as a yes/no metric.

The analysis focused on invasive ovarian cancer which comprised of 78% of cancers for African-Americans and 79% for whites. Among controls, talc use was reported by 23.9% among whites and 31.2% of African-Americans. After adjusting for age there was an excess risk reported for both whites (OR 1.04, 95% CI: 0.82-1.33) and African Americans (RR 1.19, 95 % CI: 0.68-2.09) which were not statistically significant. Limitations include the high rates of non-response (33.5% among cases, 39.1% among controls), with higher non-response rates among African-Americans. There was a large proportion of missing data on talc use for cases and controls; 23.6% and 38.5% among whites, respectively, and 25.2% and 29.1% among African Americans, respectively, resulting in misclassification of exposure. The authors did not

42

clarify the route of talc exposure and may have classified non-genital talc exposure to the talc exposed group which may have diluted the RR. Additionally, the study did not adjust for confounders to address the timing, frequency and duration of talc exposure, or whether talc exposure occurred before or after tubal ligation or hysterectomy.

25.     In 2011, Rosenblatt et al. (60) reported on a study of women between the ages of 35 and 74 from 13 counties in Washington state. Cases of borderline or invasive epithelial ovarian cancer were identified through the Cancer Surveillance System. Controls were selected from the population using digit dialing. Talc exposure was determined through in person interviews which included a reference period of unstated length before diagnosis or interview. For powder use on sanitary napkins and deodorant spray, the total number of months of use was recorded. For powder use on perineum after bathing, only intervals of at least one year when powder was usually used was recorded. Talc use was reported as genital powder exposure by type of use, duration of use, lifetime applications, age at first use, age at last use, calendar year of first use, time since first use, and time since last use.

Perineal use of powder after bathing was reported in 12% of controls. Reporting of cornstarch was uncommon in the study. After adjusting for age, calendar year of diagnosis, county of residence, number of full term live births, and duration of hormonal contraception the perineal use of powder after bathing was associated with an increased ovarian cancer risk (OR 1.27, 95% CI: 0.97-1.66) which was not statistically significant, but a statistically significant increased risk was seen among women with borderline tumors (OR 1.55, 95% CI: 1.02-2.37), similar to that reported by Harlow et al. (79) There were no differences in risk among various types of powder use, as the risk among those who reported use of talcum powder was RR 1.38 (95% CI: 0.77-2.47). There was no difference in exposure outcome relationship between talc use before and after 1980. There was no pattern of risk associated with perineal dusting powder and the increasing extant of use as defined by years in which it was used or number of lifetime applications. The participation rate of cases and controls was modest at 76.8% and 69%. Some misclassification of exposure is possible as participants may be unable to provide accurate information on whether the specific powder contained talc. However, the presence of talc, rather than a specific dose, is the primary determinant of exposure in which case genital powder use is a reasonable proxy for talc exposure.

26.     Kurta et al. 2012 (91) reported on a case-control study from the Hormones and Ovarian Cancer Project using 902 ovarian cancer cases and 1802 controls. Participants were diagnosed with histologically confirmed ovarian, fallopian tube or peritoneal cancers. They were at least

43

9 years old and within 9 months of diagnosis. Controls were frequency matched by age and area code to cases at 2:1 ratio. Trained interviewers collected data via questionnaires. Perineal talc use was defined as ever using dusting powder or deodorizing spray on the genital or rectal areas, on sanitary napkins or underwear or on diaphragms or cervical caps.

Perineal talc use was reported among 20.9% of controls and 27.6% of cases. After adjusting for age, race, education perineal talc was associated with a statistically significantly increased risk of ovarian cancer OR 1.40 (95% CI: 1.16-1.69). Limitations include the population which was women seeking treatment for infertility which may limit generalizability.

27.     In 2015, Wu et al. (53) evaluated 1,701 newly diagnosed histologically confirmed cases of invasive epithelial ovarian cancer cases of ovarian cancer among participants aged 18 and 74 in Los Angeles county identified through the USC Cancer Surveillance Program. Cases were primarily white but 308 Hispanic Women and 128 African American women were also included. Controls were selected from residents of LA county and were matched to cases on race/ethnicity and year of birth. Talc exposure was ascertained through in person interviews conducted using standardized questionnaires with a reference date of 12 months prior to diagnosis (or date of interview for controls). Genital talc was reported as no use or less than one year of use, yes use, and use per 5 years of talc.

Among controls the prevalence of talc use ≥ 1 year was 30.4% in non-Hispanic whites, 28.9% in Hispanics and 44.1%. After adjusting for several confounders including race, age group, menopausal status, age at menarche, hormone therapy use, BMI, income, education, life births, tubal ligation, oral contraception, endometriosis, and first-degree family history of ovarian cancer there was a statistically significant increased risk of ovarian cancer associated with genital talc use across all races (OR 1.46, 95% CI: 1.27-1.69), non-Hispanic whites (OR 1.41, 95% CI: 1.21-1.67), and Hispanics (OR 1.77, 95% CI: 1.20-2.62) compared to non-use or less than 1 year of use. The risk was elevated but not statistically significant among African-Americans (OR 1.56, 95% CI: 0.80-3.04) because of low statistical power for the subgroup. Every 5-year use of talc was associated with a statistically significant risk of cancer among the overall population (OR 1.14, 95% CI: 1.09-1.20) and non-Hispanic whites and Hispanics, whereas the excess risk among African-Americans was not statistically significant. The non-response rate for cases (36.8%) and controls was modest. There was no evidence of systematic bias in the ascertainment of exposure as prevalence of various conditions such as endometriosis was consistent with other prior studies.

28.     Schildkraut et al. 2016 (52) evaluated African women aged 20-79 years of as part of the African-American Cancer Epidemiology Study. They selected 584 cases of newly diagnosed epithelial ovarian cancer and matched 745 controls to cases on age and region of residence using random digit dialing. Talc exposure was determined through a telephonic interview which included information on baby powder use. Participants were considered regular users if they reported use at least more than 1 time per month for 6 months. Regular users were asked about genital or nongenital use, frequency, duration, and lifetime applications (number of applications per month by number of months used). Since there was a small number of users who reported only genital powder use, they were grouped with genital and non-genital users to "any" genital use. Exposure was examined by frequency of use (less than 30 times per month, daily), duration of use (<20 years, ≥20 years) and lifetime number of applications (<3600, ≥3600). They also assessed for reporting biases and the effect of stimulant reporting because of the filing of class action lawsuits.

The median duration of body powder use in both cases and controls was 20 years and body powder use were reported among 52.9% of controls. After adjusting for age at diagnosis/interview, study site, education, tubal ligation, parity, BMI, duration of oral contraceptive use, first degree family history of breast or ovarian cancer, and interview year there was a statistically significant increased risk of ovarian cancer with any genital powder use (OR 1.44, 95% CI: 1.11 to 1.86). There was a stronger association for ≥20 years of any genital powder exposure compared with <20 years of exposure and the test for trend was significant ($P_{trend}$ =0.002). Similarly, the ORs for association between daily any genital powder users and EOC were larger in magnitude than never users, and the test for trend was significant ($P_{trend}$ <0.01) There was also evidence of dose-response for any genital powder for the cumulative number of life-time applications with a higher risk among those with lifetime applications ≥3600; the test for trend was significant ($P_{trend}$ <0.01). A stronger association was reported among post-menopausal women who used HRT compared to non-users. There was also an increase associated with non-genital powder exposure (OR 1.31, 95% CI: 0.95-1.79) which was not statistically significant. There was no evidence of statistically significant increased risk with "only" non-genital users and serous ovarian cancer but was statistically significant increased for non-serous ovarian cancer.

Limitations include the assessment of data by self-report. The underreporting of powder use in the abdomen which may reach the genital area may have resulted in a spuriously increased risk among "only" non-genital users or such an effect may be specific to African-American users. Although there was some evidence that there was more reporting of genital powder use

45

after class action lawsuits in 2014, recall bias alone is insufficient to explain these findings because there was a statistically significantly increased risk both before and after 2014.

29.     In 2016, Cramer et al. (54) included 2,041 ovarian cancer cases from Eastern Massachusetts and New Hampshire as part of the Nurses' Health Study and the Ovarian Cancer Association Consortium. Pathology reports were reviewed to confirm diagnosis. The population was primarily white with less than 30 participants who were African Americans, Hispanics, Asians, or other race/ethnicities. Controls were identified through random digit dialing, driver license and town-resident lists and were frequency matched to cases by age and residence. Talc exposure was determined through in person interviews with a reference point 1 year prior to diagnosis or date of interview (for controls). Subjects were asked whether they regularly or monthly applied powder to the genital or rectal area, or on sanitary napkins, tampons or on other non-genital areas. Talc exposure was reported as personal use, potential exposure with no personal use (diaphragm, condoms, partner use), any genital powder use, type of genital powder use (cornstarch, baby powder, other), age of first use, time since exposure ended, frequency of use, years used, months per year of use, and total applications. Lifetime application was assessed by multiplying frequency of application per month with months of exposure. This was divided by 360 to yield talc years which were partitioned into separate quartiles for dose-response analysis. The study adjusted for a variety of confounders, with adjustments for age, study center, study phase, race, BMI, height, weight, parity, breastfeeding, oral contraceptive use, IUD use, ovulatory cycles, endometriosis or painful periods, Jewish ethnicity, family history, personal history of breast cancer, menopausal status, current smoking, ever smoked, asthma, alcohol consumption, and acetaminophen, aspirin or ibuprofen use.

Any genital powder use was reported in 26% of controls. The women who exclusively used cornstarch were considered unexposed. Most talc users began talc exposure around the age of 20. Overall, genital powder use was associated with a statistically significant increased risk of ovarian cancer (OR 1.33, 95% CI: 1.16-1.52) adjusted for age, study center and phase. BMI, smoking and alcohol use did not alter the association by more than 10% suggesting a lack of confounding. Most women reported using Johnson's Baby Powder and Shower to Shower with a trend for increasing risk by talc years. The trend for frequency of use was significant, but the trend for duration of use was flat. The talc ovarian cancer association was largely confined to premenopausal women and post-menopausal women with hormonal therapy. Sensitivity analysis indicated that the risk of misclassification of exposure in controls would have to very high (18%) to nullify the increased risk shown in the study. No data is available

46

on the extent of misclassification of talc exposure. Although some amount of misclassification is possible in retrospective studies, such a large amount is unlikely as shown by estimates from other analogous exposure-outcome association such as alcohol and breast cancer in the Nurses' Health Study. (114).

*IX.III Cohort Studies.* I will discuss the cohort studies below. However, it is important to emphasize that none of the cohort studies discussed below were designed to evaluate the association between talc use and ovarian cancer at the time of cohort assembly. In other words, evaluating the association between talc use and ovarian cancer was not the a-priori primary objective of the study but evaluated as a subsequent hypothesis, with its inherent limitations. For example, the NHS cohort was assembled in 1976 but data on talc use was not collected until 1982. (14). In contrast the primary objective of most case-control studies noted above was to evaluate the risk of ovarian cancer associated with talc use.

*IX.III.I.* In 2000, Gertig et al. (14) reported on an analysis from the U.S. Nurses' Health Study. 121,700 registered nurses were enrolled in the study; 78,630 were included in the cohort study; and 307 cases of ovarian cancer in 11 states. Notably, the Nurses' Health Study was a broad-based study of women's health. Ovarian cancer information was obtained through a questionnaire mailed to married female nurses 30-55 years which were updated every 2 years. Talc exposure was obtained from a survey question which asked "Have you ever commonly used talcum, baby powder, or deodorizing powder a) to apply to perineal (private) area? No, daily, one to six times per week, or less than once per week or b) to apply on sanitary napkins? No, Yes." Frequency was thus both reported as an "ever, never" metric as well as applications per week but duration of use was not recorded. Information gathered by a questionnaire requesting information on perineal talc use was ascertained only in 1982, and never updated during follow-up. Medical records were obtained for women reporting diagnoses of ovarian cancer or those participants who died (mortality follow up was 98% complete). Histologic subtypes of ovarian cancer were determined from pathology reports and classified as serous (cystadenocarcinoma and papillary adenocarcinoma), mucinous (mucinous papillary adenocarcinoma and adenocarcinoma), endometrioid (clear cell and mixed epithelial), and borderline. Cases of epithelial ovarian cancer (ICD 183.0) confirmed by medical record review or death certificate between 1982-1996 were included in the analyses. Participants who did not respond to the 1982 question on talc use were excluded, as were participants with cancer other than non-melanomatous skin cancer, bilateral oophorectomy, ovarian removal and those with radiation therapy. They included 307 cases of ovarian cancer among 984,212 person-years of follow up (0.03% PYs or 31.2/100,000 PYs). Information on covariates was obtained from the

47

biennial questionnaire and included oral contraceptive use, tubal ligation, parity, family history (not asked until 1992), smoking and BMI. Age adjusted incidence rates were calculated after adjusting for covariates above, as well as age at menarche, duration of breast feeding, age at menopause. 40.4% (n=31789) reported ever talc use of which 14.5% were ever daily talc users. Women who were talc users and did not have a tubal ligation had no increased risk of epithelial ovarian cancer with talc use- no evidence of interaction. There was an increased risk for histologic subtypes of ovarian cancer with talc use which was not statistically significant (RR 1.09, 95 % CI: 0.86-1.37) after adjusting for age, duration of oral contraceptive use, body mass index, tubal libation history, smoking status, and postmenopausal hormone use. While daily talc use on perineum (RR 1.12, 95% CI: 0.82-1.55) or use less than once/week (RR 1.14, 95% CI: 0.81-1.59) was associated with an excess risk which was not statistically significant, the point estimates for talc use on perineum 1-6 times/week (RR 0.99, 95% CI: 0.67-1.46) and on sanitary napkins (yes/no) (RR 0.89, 95% CI: 0.61-1.28) were lower than 1, and these confidence intervals may not rule out an increased risk. Importantly, there was a statistically significant increased risk for ever talc use for serous invasive cancers (RR 1.40; 95% CI: 1.02–1.91). For women who reported ever daily use, the RR for serous invasive cancer was 1.49 (95% CI: 0.98-2.26). The RRs for ever-users of less than 1 time/week and of 1-6 times/week were 1.29 (95% CI: 0.81-2.04) and 1.49 (95% CI: 0.77-2.11), respectively ($P_{trend}$=0.05). Women above age 45 in 1982 who reported ever talc use had a higher risk of serous invasive cancer (RR 1.51, 95% CI: 1.07-2.15).

The strengths of the study include the prospective design which reduces the risk of recall bias. The relatively short follow up period may have been unable to determine ovarian cancer. The NHS cohort was not primarily designed to evaluate the association between talc and ovarian cancer. Further, as discussed above, determining "never" use based only on a one-time question near the start of the study (14 years prior to terminating the study in 1996) introduces unidirectional "behavioral change" bias, likely misclassifying some "ever" users who used talc during the study as "never" users; and biased the findings towards the null. The exclusion of prevalent cases of ovarian cancer allows one to determine the influence of exposure on incident ovarian cancer, it also introduces an element of selection bias. Of the initial cohort of 121,700 volunteers, only 78,630 women were enrolled. It is not known whether any (or how many) of the 43,000 excluded women had ovarian cancer, nor whether any (or how many) of any such ovarian cancer volunteers excluded were talc users. They could not determine the intensity of exposure as they had no information on duration of talc exposure, or number of life-time applications or the age at which talc was initiated. The study was not a "new user design" and

48

used prevalent rather than incident users, and is susceptible to "prevalent user biases." (15) Prevalent users are "survivors" of the early period of talc use, which can introduce substantial bias if risk varies with time. This may bias findings towards the null due to the "depletion of susceptibles." They had no data on the intensity of exposure because there was no data on the duration of talc use, or number of life-time applications. The analysis on tubal litigation could not determine whether talc use was initiated after tubal ligation. Any such misclassification of exposure is also likely to be non-differential and bias towards the null.

As a continuation of the Nurses' Health Study, in 2010, Gates et al. reported on 924 cases of the ovarian cancer as part of Nurses' Health Study with ovarian cancer confirmed by a gynecologic pathologist review of medical records. (92). They evaluated the findings between risk factors for ovarian cancer and histologic subtypes of ovarian cancer and information on talc exposure was collected through biennial questionnaires. Talc use was reported as either greater than or less than once a week. After adjusting for body mass index activity, past smoking, current smoking, family history of breast or ovarian cancer, age, parity, parous status, breastfeeding, oral contraceptive use, tubal ligation, hysterectomy, age at natural menopause, and estrogen use they reported a non-significantly increased risk of all epithelial ovarian cancer (RR 1.06, 95% CI: 0.89 to 1.28) with genital talc use > once/week compared to < once a week. Although the estimates for the RR were higher for mucinous subtype (RR 1.50, 95% CI 0.84-2.66), there was no evidence of interaction across the subtypes ($P_{heterogeneity}$ =0.55) in this analysis. The strengths and weaknesses of this study are largely like the Gertig analysis of the NHS cohort above, with the additional limitations in the low number of cases (only 29 cases of epithelial ovarian cancer among genital talc users in 108, 870 women).

*IX.III.II.* In Houghton et al. (17) reported on finding from the Women's Health Initiative Observational Study (50-79 years at enrollment and post-menopausal). Among the 93,676 volunteers, only 61,576 participants were in the study cohort, and 429 adjudicated incident ovarian cancer (0.7%). Participants completed annual mailed questionnaires. Participants with bilateral oophorectomy, unknown number of ovaries, history of cancer (except non-melanomatous skin cancers were excluded). Perineal powder exposure (rather than specifically talc use) was obtained via self-report at baseline, and not updated during follow-up. Participants were asked whether powder had been used on genital areas, diaphragm or sanitary napkin or pad. If the participant answered affirmatively, there were further questions regarding duration of use where participants indicate use for less than 1 year, 1-4 years, 5-9 years, 10-19 years, or 20

49

or more years, but frequency of use was not recorded. The area of use was assessed dichotomously, and duration of use was categorized as never, 9 years or less and 10 years or more for analysis. Analysis was conducted for ever perineal powder use (ever use for any of the three categories) and duration for any powder use (maximum duration of any single area of application). Cancer cases were self-reported and confirmed through medical records including pathology reports. Data on covariates for age, race, education, alcohol, metabolic equivalents, smoking, recreational physical activity, oral contraceptive use duration, hormone replacement therapy, family history, age at last birth, BMI, self-reported family history of ovarian cancer were evaluated. They also evaluated reproductive factors such as age at menarche, age at menopause, age at first birth, age at last birth, parity, breastfeeding duration, history of tubal ligation, hysterectomy, irregular cycles, endometriosis. The covariates were obtained at baseline and not updated. The proportional hazards analysis was conducted to examine the risk of ovarian cancer and proportional hazards was tested using Schoenfied residuals. Participants with other cancers were still considered at risk for ovarian cancer. Covariates were selected for the multivariate analyses, if they had P-values of less than 0.1 during the backward regression until they had a parsimonious model. Additional variables from the literature were also included although they were not statistically significant. They analyzed ever perineal use, perineal use by application area, duration of use and combinations. Test for linear trend was evaluated across duration categories by modeling categories as continuous variables.

The average age of participants was 63.3 years at baseline with 12.4 years of mean follow-up. Most participants were white and were obese. Approximately 52.6% of the population reported ever use of perineal powder. Ever users were more likely to be heavier, used oral contraceptives and/or diaphragms. Perineal use of powder was associated with a 12% excess risk which was not statistically significant ($HR_{adj}$,1.12, 95% CI: 0.92- 1.36) whereas point estimates for use on sanitary napkins and diaphragms were lower than 1 but could not rule out an excess risk. Duration of perineal, sanitary napkin or diaphragms were not associated with ovarian cancer. Strengths include the prospective design which reduces the risk of recall bias. Limitations includes the lack of information on whether the perineal powder use constituted talc use, and the inability to measure the frequency of exposure. It is possible that the analysis by duration included infrequent long duration users with short term frequent users which may result in bias towards null. Since exposure was not updated during follow-up, some never users who became ever users were misclassified as never users resulting in a bias towards the null. The exclusion of prevalent cases of ovarian cancer introduced an element of selection bias. Of the initial cohort

50

of 93,676 volunteers, only 61,576 women were enrolled; 10,622 volunteers who had already developed cancer at baseline were excluded. It is not known whether any (or how many) of these excluded women had ovarian cancer, nor whether any (or how many) were talc users. The inclusion of "prevalent users" rather than "incident users," leads to depletion of susceptibles and may bias findings towards the null. Data on covariates was not available after baseline resulting in the potential inclusion of participants (e.g., oophorectomy) not at risk of ovarian cancer and resulting bias towards the null. The generalizability of the study findings to younger pre-menopausal women is also unknown as the study findings are limited to older post-menopausal women (average age =63.3 years).

*IX.III.III.* In 2016 Gonzales et al. (93) examined the relationship between douching, talc use, and ovarian cancer among 50,884 women aged 35-74 years of age (84 % white and 64% post-menopausal) who had never had breast cancer but had a full or half-sister who with breast cancer. They excluded participants with bilateral oophorectomy and ovarian cancer. Among 41,654 participants 154 incident ovarian cancers (n=135 ovarian cancers) were reported (0.3%). Participants completed a telephone interview which included questions about reproductive history (oophorectomies), health and lifestyle and use of personal care products before enrollment, including the use of douching and use of genital talc applied as a powder or spray applied to underwear, sanitary napkin, diaphragm, cervical cap, or vaginal area. The frequency of use was categorized as no use, less than once a month, 1-3 times per month, 1-5 times per week, > 5 times per week, but duration of use was not recorded. As with the WHI and Nurses' study exposure was only measured at baseline and not updated during follow-up. Updated information on oophorectomy was collected during follow-up and information on cancer cases was collected via annual health update. Data on 37.6% of ovarian cancer cases was available only by self-report and the remainder confirmed by medical record review or death certificate. Cancer cases included tumors of the ovary, fallopian tubes, peritoneum, or of uncertain origin. Those who were BRCA1 or BRCA 1 positive test or those who had a sister with a positive test but had no report of negative test were considered BRCA positive. Cox proportional hazards analysis was conducted until diagnosis of ovarian cancer, oophorectomy, censoring or death. Generalized estimation equations was used to account for familial clustering at baseline. The proportional hazards assumption was evaluated by the goodness of fit test. A joint analysis of talc and douching use was also conducted. The included covariates were patency (yes or no for tubal ligation or hysterectomy), menopausal status, duration of OC use (none, < 2 2 to <10, 10 or more years), parity (yes/no) race and BMI.

<u>The median duration of follow up was only 6.6 years</u>. The average age was mean 57.8 years for cases. These cases were more likely to have a family history of ovarian cancer and carry a BRCA1 or BRCA2 mutation. More non-cases than cases used oral contraceptives. Talc use was only reported by 12% of cases and 14% of non-cases. Talc users were more likely to have BMI >30 kg/m$^2$. Talc use in the last 12 months after adjusting for race, BMI, parity, duration of oral contraceptive use, baseline menopausal status, and patency, was not associated with a statistically significant increased risk of ovarian cancer (HR 0.73, 95% CI: 0.44-1.20], but could not rule out an excess risk. There was no change in estimates when adjusted for douching. Douching at baseline, more common among talc users, was associated with increased risk of ovarian cancer (HR: 1.8 95% CI: 1.2-2.8).

There were significant limitations to the study. The authors acknowledge that an important limitation of their study was that they collected douching and talc information for the year before the study and did not account for the latency. As with the other two cohort studies, the Sister Study was limited by the issue of selection bias through the exclusion of women who had already developed ovarian cancer (and who could also have been lifetime talc users). Secondly, the Sister Study was vulnerable to behavioral change bias. The bias towards the null of this inaccurate assessment of "ever" user status prospectively, at the start of the study, was compounded by the fact that it was also vulnerable to retrospective inaccuracy, because it was based only on the 12 months preceding baseline. Thus, a participant who had last used talc 13 months before baseline would be categorized as a never-user, as would a participant who started using talc after baseline. Thirdly, the Sister Study's median follow-up of only 6.6 years is likely insufficient to detect any risk of ovarian cancer which likely takes more than 6.6 years to develop. The study also suffered from the limitations of prevalent user biases. Additionally, exposure was measured as ever/never use in 12 months prior rather than total applications resulting in non-differential misclassification towards the null. Data was only available by self-report on the diagnosis of ovarian cancer for many cases (37.6%) resulting in misclassification of outcome, which was likely non-differential and may bias findings towards the null. The study reported the lowest rate of talc use among the cohort studies (13.8%), further compounding the limited statistical power due to a short duration of follow-up. The generalizability of these findings is also limited as they included women without breast cancer who all had a family history of breast cancer and may be at a higher risk (60%). The missing data were not missing at random and unclear whether analyses were adjusted for missing data. The authors concluded that the study

52

could not exclude a increased risk despite these findings. The study findings are limited to the predominant cohort of white post-menopausal women who constituted the majority of participants.

## IX. IV. Summary of Findings from Epidemiological Studies.

1. The cumulative evidence from these studies demonstrates a statistically significant increased risk of ovarian cancer associated with perineal talc powder use which has been independently replicated by several investigators in different populations, different settings, across different sources using different study designs and time periods. Slight differences in magnitude of risk among these studies may reflect differences in inclusion or exclusion criteria and the accumulation of evidence over time and some variation due to chance. The updated meta-analyses in 2018, which have included all the studies, reported a statistically significant increased risk of perineal talc use and ovarian cancer, (41, 42), with little evidence of statistical heterogeneity or publication bias. The case-control studies provided 13,421 cases compared to 890 cases in the cohort studies. (42). Most case-control studies demonstrate an increased risk of ovarian cancer associated with talc use with an OR between 1.3 and 1.6, even after adjusting for various risk factors.

2. Meta-analysis which evaluate the association between perineal talc use and ovarian cancer have consistently shown an increased risk of ovarian cancer, (39, 41, 42, 73, 79), including pooled analysis using individual participant data. (10). My conclusions about the causal increase in the risk of ovarian cancer associated with talc exposure are heavily weighted by recent cumulative meta-analysis published in 2018, (41, 42). These meta-analyses provide the most comprehensive evidence base given the size of the study database and their methodologic superiority as assessed by the AMSTAR rating above. (Table 1). Also, importantly, there is no meta-analysis which has reported a statistically significant decreased risk of ovarian cancer with talc.

3. The only case-control study in which point estimates are below one was limited by the poor choice of controls and very high non-response rates. Despite these limitations it could not rule out a 21% increased risk of ovarian cancer associated with talc use which is not inconsistent with other studies. (86). Although the exposure rate to talc in the case-control studies has been variable in the control group from 5%-45%, this reflects the varying practices in the use of talc rather than the lack of an increased risk of ovarian cancer with talc use.

4. Although all studies are at potential risk of outcome misclassification, most of the studies used histologically verification for the diagnosis of ovarian cancer. Any such potential

misclassification of outcomes is likely to be non-differential and would have biased the findings towards the null.

5.      There is no reason to believe, from the studies, that ovarian cancer would result in talc use, so the temporality of the association is established.

6.      Case-control studies are susceptible to recall bias particularly when data on exposure are self-reported. However, several studies have included these questions on talc exposure as a part of larger questionnaires on other risk factors minimizing the possibility of recall bias. Recall bias is less likely to occur for chronic daily exposures such as talc as compared to intermittent short exposures. Further, recall bias is equally likely to affect other histologic types of ovarian (and endometrial) cancer but here the increased risk was limited to only epithelial ovarian cancer in most studies. Finally, the findings that only perineal talc use was associated with ovarian cancer but not with non-genital talc use argues against recall bias alone as a potential explanation of these findings.

7.      Confounding is one potential explanation for these findings. However, several case-control studies adjusted for major confounders including the more recent case-control studies. (54). Although residual confounding is always possible in an observational study, studies that have reported adjusted and non-adjusted findings have reported similar results minimizing the impact of residual confounding. (41). Although there are some risk factors for ovarian cancer (e.g., genetic risk factors, family history, obesity and reproductive history), for any of them to be confounding to an extent that could account for the positive relations that have been reported, they would have to be strongly correlated with talc use. Family history, ethnicity, obesity and some reproductive risk factors are positively associated with the risk of ovarian cancer, but the magnitude of these associations does not appear high enough to introduce enough confounding, even jointly, to explain completely the positive association. To invalidate the statistically significant findings of an increased risk of ovarian cancer from the studies, one would have to postulate a degree of selection, recall bias and confounding pervasive across different time periods, different populations which is highly implausible.

8.      Case-control studies are also at risk of selection bias which may introduce bias in both directions. As opposed to hospital-based controls, which may be less susceptible to selection bias, the population-based case-control studies have consistently showed a higher estimate of increased risk of ovarian cancer associated with talc use.

9.      Reverse causality, where the diagnosis of ovarian cancer results in perineal use of talc, may be one possible explanation of the nonsignificantly increased risk in the group exposed to perineal talc. However, this is also likely minimal in the case of ovarian cancer in which most

54

cases present at advanced stages with abdominal bloating, and vaginal symptoms only occur in a small minority of cases.

10.     One of the cohort studies reported an increased risk with perineal talc exposure and serous invasive cancer (14). The pooled results from all three cohort studies, reported an excess risk of ovarian cancer, (42) which failed to reach statistical significance because of several limitations. The duration of follow up was limited resulting in low number of events and inadequate statistical powder. The only cohort study which reported an inverse association between perineal talc use and ovarian cancer included several other cancers beyond the ovary (such as peritoneum, endometrial) (93), which may have diluted an increased risk. It had a very short duration of median follow up of approximately 6.6 years which is insufficient to ascertain the development of ovarian cancer. Since talc induced carcinogenesis occurs via a foreign body mechanism, the latency period required to demonstrate such an effect is long. Despite these limitations, the upper bounds of the confidence intervals exceeded one and could not rule out an increased risk of ovarian cancer with perineal talc use. The cohort studies were at risk of significant other biases. Exposure was measured at baseline and not updated during follow-up (14, 17), which may have misclassified those participants at baseline who were never users but used talc during the study as never users resulting in a bias towards the null. The exclusion of prevalent cases of ovarian cancer (some of whom may have been exposed to talc) may also bias their findings. (14, 17) The cohort studies were also susceptible to "depletion of susceptibles" biasing their findings towards the null. None of the cohort studies were primarily designed to study the association between genital talc use and ovarian cancer as their primary objective. Despite these limitations, the meta-analysis of cohort studies demonstrated a statistically significant increased risk of serous invasive ovarian cancer.

11.     Ascertaining *dose response* relationship with talc and ovarian cancer is difficult because of the challenges in quantifying talcum powder use usually collected by self-reported data (frequency, amount and duration), timing and patterns of use (e.g. douching), and other individual factors (e.g. co-existence of inflammatory conditions such as endometriosis and or vaginal bleeding) resulting in differences in measurement of exposure across studies. The dose response depends on both the amount of talc exposure, the frequency of talc uses and the duration. It is difficult to quantify the amount of powder actually used and degree of perineal dusting that might constitute an ''application of talc.' Another factor that may affect the dose-response relationship is whether use occurred at a time when the female tract was open, the age of initiation of talc use since the talc/ovarian cancer association is modified by closure of the female tract as a result of tubal ligation or hysterectomy (79). The presence of other risk factors

55

such as post-menopausal status, cancers other than invasive serous ovarian cancer may make it difficult to ascertain a dose-response relationship among older post-menopausal. The lack of statistical trend (58, 60) in some earlier studies may reflect some of these challenges as well the lack of a monotonic dose response effect. The exposure-response data need to be interpreted in the context of mechanistic studies which report that talc accelerates the development of ovarian cancer in susceptible individuals through accelerating the redox state in epithelial ovarian cancer cells. (49). Thus, an assessment of the gradient through a monotonic dose-response curve may not provide a complete picture of the biological gradient. It unclear why nature would mandate an increasing mono-tonic dose-response mechanism for causation, and some have argued that among Bradford-Hill viewpoints it is difficult to know how dose-response should be modelled. (50). Cumulative lifetime exposure may be a more appropriate measurement of exposure given the inflammatory mechanisms by which talc induces the development of ovarian cancer. It is important to recall that if the carcinogenicity of talc induced ovarian cancer most likely resembles that of asbestos induced mesothelioma (with which it shares histologic similarities), asbestos induced mesothelioma does not have a dose-response relationship. In the case of asbestos induced mesothelioma, latency may be more important whereas in the case of talc induced ovarian cancer induced by inflammation latency may be of lesser importance.

12.     Despite these challenges, several studies have shown evidence of dose-response as measured by an increased risk with increased frequency (51-55) or increased duration, (52, 54)or combination of frequency and duration of exposure. (48, 54). Some studies show a exposure-response trend, (54) and the most updated meta-analysis show evidence of duration dose and responsiveness. (42). In the individual participant data meta-analysis a significant increase in risk with an increasing number of genital powder applications was found for nonmucinous epithelial ovarian cancer when nonusers were included in the analysis, but no significant trend was seen when analyses were restricted to ever users. (10) Importantly, the most recent meta-analysis reported an evidence of dose-response with risk being higher among those with >3600 applications of talc compared to participants with <3600 applications. (42) Both of these categories of exposure were associated with an increased risk of ovarian cancer. None of the cohort studies were able to conduct meaningful dose-response analysis because they did not collect data either on duration, (14, 93) or frequency of exposure. (17).

# X.     BIOLOGICAL MECHANISMS OF TALCUM POWDER INDUCED OVARIAN CANCER.

Although not an absolute requirement for determination of causation there are multiple well-established biological and molecular mechanisms by which talcum powder products induce ovarian cancer. The key routes of exposure and biological mechanisms are noted below.

*X.I. Retrograde Migration of Talc Particles.* Genital talc can migrate up to the fallopian tubes and ovaries and talc particles have been detected within the ovaries of women who report perineal talc use. Heller et al. detected talc in the ovaries of 24 women undergoing incidental oophorectomy demonstrating that it can reach the upper genital tract (64) although the fact that talc particle counts were unrelated to reported levels of perineal talc exposure reflects the challenges in measuring exposure to talc. Talc has been found deeply embedded within ovarian tumors,  (65) and subsequent studies have confirmed that these are not due to contamination. (94). Talc has also been demonstrated in pelvic lymph nodes of women with perineal talc exposure.(66). Supportive evidence of migration comes from studies showing retrograde migration of additional particles such as starch after gynecological examination, (68) findings of a decreased risk of ovarian cancer with tubal ligation and hysterectomy in case-control studies, (87) and meta-analysis, (115) which may minimize exposure to inflammatory particles. Although an industry funded study performed by the Cosmetic, Toiletry, and Fragrance Association failed to detect translocation of "measurable quantities of talc' in monkey models, (67) the timing and techniques of assessment and intraspecies differences could not rule out migration of talc particles. The FDA response to Citizen's Petition 2014 concluded the *"potential for particles to migrate from the perineum vagina to the peritoneal cavity is indisputable'*. Johnson & Johnson and IMERYS documents also acknowledge migration. In one document it was stated, "A review of the literature suggests that it is biologically plausible for talc particles to migrate from the vagina to the peritoneal cavity and ovaries following perineal application." (63, 116).

*X.II. Inhalation of Perineal Talcum Powder.* Inhalation of talcum powder is another potential route of exposure that is biologically plausible and can cause inhaled fibrous talc (and asbestos) fibers to reach the ovary and thus increase the risk of ovarian cancer in women using these products. Approximately 50 percent of talc particles in commercially available talcum powder are less than 10 microns in size, (117) which have the potential for inhalation and reach the alveolar regions of the respiratory tract. (118) Asbestos fibers can pass from the alveoli to the

57

lung interstitium, from which they can travel via the lymphatic system to the bloodstream and other organs including ovaries. (119, 120) Inhaled fibrous talc shares extensive physical and chemical similarities with asbestos, and inhaled fibrous talc generated from perineal application may also reach the ovaries by inhalation. This mechanism was confirmed in a September 2017 study, "Below the Waist Application of Johnson & Johnson Baby Powder," Longo, et al. showed that normal application of Johnson's Baby Powder can produce airborne asbestos and talc fibers which could be inhaled. (70).

**_X.III. Talcum Powder Induced Inflammation and Alteration of Redox Potential_**. Inflammation has long been understood to be an important mechanism underlying the development of ovarian cancer. (61). Inflammation may underlie ovulatory events because an inflammatory reaction is induced during the process of ovulation. Risk factors for ovarian cancer include endometriosis (i.e., ectopic implantation of uterine lining tissue) and pelvic inflammatory diseases (PID). (121). PID was associated with an increased risk of borderline ovarian tumors, particularly among women who had had multiple episodes of pelvic inflammatory disease in a meta-analysis. (122). Consistent with the inflammatory mechanism for ovarian cancer, a prospective nested case-control study from the Prostate, Lung, Colorectal and Ovarian Cancer has also shown that global markers of inflammation such as C-reactive protein, Interleukin L-$1\alpha$, Interleukin-8 and Tumor Necrosis Factor-$\alpha$ are associated with a significantly increased in the risk of ovarian cancer. (123). Supportive evidence for the role of inflammation also comes from a meta-analysis showing a decreased risk of ovarian cancer with tubal ligation and hysterectomy. (115). Studies have demonstrated increased risk of ovarian cancer with talcum powder use, and increased risk of ovarian cancer with endometriosis. (87). This risk is 3-fold higher among women exposed to talc who have endometriosis. (48).

Oxidative stress in the form of reactive oxygen species (ROS) and reactive nitrogen species (RNS) plays a role in the pathogenesis, neo-angiogenesis (formation of new vessels) and the dissemination of both early and late stage epithelial ovarian cancer. (124, 125). Epithelial ovarian cancer cells manifest a persistent pro-oxidant state characterized by upregulation of certain key oxidant and downregulation of key antioxidant enzymes, (125) and the presence of oxidative stress triggers cancer cells to favor anaerobic metabolism. Oxidative stress induces phenotypic modification of tumor cells by altering cross-talk between tumor cells and surrounding stroma. Talc can alter this redox state and cause a marked increase in mRNA levels of the prooxidant enzymes, iNOS (nitrous oxide) and MPO (myeloperoxidase) in talc treated ovarian cancer cells as compared to control as early as 24 hours in all doses, (49) as well as a marked decrease in the

58

mRNA levels of the antioxidant enzymes catalase CAT, glutathione peroxidase (GPX), and superoxide dismutase (SOD3) providing a mechanism by which talcum powder products can induce the development of ovarian cancer.

Cancer antigen [CA-125] a tumor marker secreted by the epithelial cell for monitoring recurrence after treatment of ovarian cancer, was elevated when both normal ovarian cell lines [1.7 +/- 0.5-fold] and ovarian cancer cell lines [1.4±0.5 and 4.4±0.5-fold increase in OV90 and TOV-21G EOC cell lines] were exposed to talc, providing another molecular mechanism by which talc can increase the risk of ovarian cancer. (106).

Talc has been shown to increase proliferation, induce neoplastic transformation and increase ROS generation time-dependently in the normal human epithelial and granulosa ovarian cells and dose-dependently in the polymorphonuclear neutrophils. (71). In studies of human mesothelial cells, both nonfibrous talc and asbestos have shown evidence of genotoxicity. (109) Some have suggested that perineal talc use may also increase risk of ovarian cancer by the induction of anti-MUC1(monoclonal antibodies) possibly via heat-shock protein, (72) although the data are not definitive. (101).

### X.IV. Carcinogenicity in Animal Studies

*X.IV. Carcinogenicity in Animal Studies*. Among animal studies a study among rats demonstrated the development of papillary changes after intrabursal injection of talc. Such papillary changes may be precursors of serous papilloma precursors of epithelial cancers. (107). Another 2-year inhalation study with cosmetic grade talc in rats and mice showed evidence of carcinogenic activity in male (an increased incidence of pheochromocytomas of the adrenal gland) and female (increased incidences of alveolar/bronchiolar adenomas) rats and carcinomas of the lung and pheochromocytomas of the adrenal gland. (108). There was no evidence of carcinogenicity in mice. However, limitations of this study include the lack of a suitable control (e.g. titanium dioxide), alternative explanations of these findings via particle overload, (127) and the fact that ovulatory patterns in rats are not fully applicable to humans.

### X.V. Presence of Asbestos and other carcinogens in Talcum powder products.

*X.V. Presence of Asbestos and other carcinogens in Talcum powder products.* In assessing the biological plausibility of talcum powder products as a cause of ovarian cancer, it is important to consider the constituents of talcum powder products including whether it contains known or suspected carcinogens. The presence of asbestos in talcum powder products can and does provide a plausible biological explanation of the development of ovarian cancer. (36, 37).

Occupational exposure to asbestos is a well-established causal agent for the development of pleural and peritoneal mesothelioma, larynx and ovarian cancer. (36, 127). Talc and asbestos also share chemical similarities. The carcinogenicity of asbestos relies on shape of particles with long thin fibers-such as those occurring in crocidolite asbestos being particularly carcinogenic. Although talc consists primarily of platy talc, it may also contain fibrous talc or other asbestiform minerals. Epithelial ovarian cancer, one most closely associated with talc, histologically most closely resembles mesothelioma providing further evidence of biological mechanisms. As Huncharek notes in their meta-analysis of ovarian cancer associated with talc dusted diaphragm meta-analysis on page 427 "*If one is exposed to a mixture of talc and asbestos, it is reasonable to expect a carcinogen effect as it contains a known carcinogen.*" (13). In addition talcum products contain fibrous talc, heavy metals and fragrance ingredients which are known or suspected carcinogens. (26, 33, 35, 36). Like the presence of Asbestos Fibers, the presence of these known or suspected carcinogens provide a plausible biologic explanation for the increased risk seen in the epidemiologic studies.

## XI.    ASSESSMENT OF CARCINOGENECITY OF TALC BY THE IARC IN 2006.

The International Agency for Research on Cancer (IARC) expert panel evaluates the carcinogenicity of various products using the following criterion after review of animal studies, experimental studies and epidemiological data. (128). The data is examined to determine whether there is *sufficient evidence, limited evidence, inadequate evidence, or evidence suggesting lack of carcinogenicity* for both cancer in humans and animals, respectively. The mechanistic and other relevant data are examined to *identify established and likely mechanisms and determines whether each mechanism could operate in humans.* The agents are then classified into several groups. Group 1 are agents *carcinogenic* to humans (e.g., asbestos,) (37), Group 2A are agents *probably* carcinogenic to humans, Group 2B *possibly* carcinogenic to humans, Group 3 agents which are *unclassifiable* and Group 4 agents which are *probably not carcinogenic* to humans.

In 2006 IARC concluded that perineal use of talc not containing asbestos or asbestiform fibers was possibly carcinogenic to humans (129) based on *limited evidence in humans for the carcinogenicity of perineal use of talc based body powder and the limited evidence in experimental animals for the carcinogenicity of talc* (93) (Group 2B-b). (38). Although a positive association has been observed between exposure to the agent and cancer for which causal interpretation is considered by the Working Group to be credible, but chance, bias, or confounding could not be ruled out

60

with reasonable confidence. For purposes of their evaluation, IARC considered 19 case-control studies and 1 cohort study. (14). The Working Group concluded that 8 of the more informative case-control studies (as well as most of the less informative ones) showed a consistent excess risk in the order of 30-60%. The cohort studies neither supported or refuted the evidence from case-control studies.

The IARC assessment was carried under the assumption that talcum powder products did not contain asbestos based on the published findings at the time- an assumption that is not supported by current data. In such a case, talcum powder products would be unequivocally classified as a Group 1 carcinogen like asbestos. Importantly, even absent a finding of asbestos in talcum powder products, the consistent cumulative evidence of peritoneal use of talcum powder products demonstrates an increased risk of ovarian cancer. Several *new systematic reviews based on recently published studies have further added to the accumulating evidence on an increased risk of ovarian cancer with talc use.* (10, 41, 42). *There is now further evidence of exposure response* relationships, with measured by an increased risk with increased duration (52, 54) or combination of frequency and duration (48) and the most updated meta-analysis show evidence of duration dose and responsiveness. (42). Finally, in addition to the epidemiologic evidence there is evidence from toxicology , molecular biology and other mechanistic data which supports my opinions .

## XII.   COSMETIC EXPERT REVIEW PANEL REPORT.

For the sake of completeness I also reviewed a report on the safety of cosmetic talc by an industry sponsored panel. (130). The panel was primarily composed of dermatologists, with limited expertise in epidemiology and carcinogenicity.  The review was carried out under the flawed assumption that cosmetic-grade talc must contain no detectable fibrous, asbestos minerals and thus limited its assessment to animal and clinical  studies on talc that did not contain asbestos, and erroneously concluded that there was no evidence of talc migration.  As a result of these serious methodologic shortcomings and funding biases it arrived at its erroneous conclusions that talc was safe for use in cosmetics. (130) As discussed above, the findings of this panel have been superseded by findings from several new epidemiological studies, mechanistic studies and systematic reviews which have further added to the accumulating evidence on an increased risk of ovarian cancer with talcum powder product use.

61

# XIII.   ASSESSMENT OF CAUSALITY.

While talc is clearly associated with development of ovarian cancer, we must assess whether the observed association leads to an inference about causation. In 1965, in the President's Address to the newly-established Section of Occupational Medicine of the Royal Society of Medicine, Sir Austin Bradford Hill, Professor Emeritus of Medical Statistics at the University of London, attempted to encapsulate the aspects of a causal relationship, as it was understood at the time. (1). As he described them, they were: 1. strength of association, 2. consistency, 3. specificity, 4. temporality, 5. biological gradient, 6. plausibility, 7. coherence, 8. experiment, and 9. analogy. As Professor Hill explained, no aspect alone is either necessary or sufficient: "What I do not believe . . . is that we can usefully lay down some hard-and-fast rules of evidence that *must* be obeyed before we accept cause and effect. None of my nine viewpoints can bring indisputable evidence . . . and none can be required as the *sine qua non*." Further, according to Professor Bradford Hill, these are not the only aspects of causation, but they are informative. It must also always be remembered, as highlighted in a recent statement by the American Statistical Association, that a lack of statistical significance does not imply lack of clinical significance (18) – a point also highlighted by Bradford Hill, who noted that while statistical tests can remind us of the role of chance, *"No formal tests of significance can answer those questions."*

With respect to the analysis at issue, that is, the association between talcum powder products and ovarian cancer—the results are not only statistically significant, but, as described above, have been replicated by several independent authors in multiple studies across a range of study designs. The cumulative body of evidence was appraised using the Bradford Hill viewpoints. In this regard, and as described in this report, I put significant weight on the Strength, Consistency, Temporality, Biologic Plausibility, and coherence factors and, to a lesser extent, Gradient (Dose-Response) and Analogy data to support my opinion that Talcum Powder Products can cause ovarian cancer. For the reasons stated below, I do not weigh heavily the Experiment and Specificity data in light of the totality of the evidence supporting a causal inference. My assessment is described below.

**1. Strength of Association.** This aspect of a causal relationship refers to the degree or magnitude of effect to which the exposure is associated with the outcome. (1). According to Bradford Hill , the more likely the exposure is associated with the outcomes, the more likely is it to be causal. As summarized in the meta-analysis in section above, I conclude that the association of talc with

ovarian cancer shows an approximate 30-60% relative increase in the risk of ovarian cancer, after adjustment for multiple confounders of the talc and ovarian cancer relationship. (10, 42). The strength of the association, replicated in multiple studies, provides evidence in support of a causal association. There are several noteworthy examples of well-established causal relationships (e.g. second hand smoking and lung cancer), (131) where the strength of the association is in the order of 20-40%. Such causal associations can have significant effects on the population if a large segment of the population is exposed, as in the case of air pollutants and myocardial infarction, which are significantly associated with an increase in MI risk with small relative risk (carbon monoxide: 1.048; 95% CI, 1.026-1.070; nitrogen dioxide: 1.011; 95% CI, 1.006-1.016; sulfur dioxide: 1.010; 95% CI, 1.003-1.017; $PM_{10}$: 1.006; 95% CI, 1.002-1.009; and $PM_{2.5}$: 1.025; 95% CI, 1.015-1.036) but a large population burden because of the large percentage of the population that is exposed. (47). Similarly, 75-100 mg of daily Aspirin has been shown to reduce the risk of cardiovascular events among those weighing 50-69 kg by 25 % [HR 0.75, 95% CI, 0.65-0.5] (132) in an individual participant data meta-analysis of randomized controlled trials. An increment of one serving a day of fruit and vegetables reduced all-cause mortality by 5% (HR 0.95 95% CI: 0.92 - 0.98) in a meta-analysis of cohort studies. (133). As discussed below, I place significant weight on the fact that studies demonstrate a strong association between talcum powder use and ovarian cancer and show consistency of the data.

**2. Consistency.** This viewpoint assesses whether the finding is repeated in different settings, place and time. (1). As shown in detail above, the direction and strength of association of talc and ovarian cancer is generally consistent across studies, including observational studies of various designs and their meta-analysis, and observational studies. These studies have been conducted in different clinical settings across the world, with different duration of follow up and the cumulative evidence has consistently shown a significantly increased risk of ovarian cancer with the use of talcum powder products. As expected, there are slight differences in the point estimates which reflect differences in study population with nearly all point estimates showing a direction of increased risk of ovarian cancer. The confidence intervals, however, across study designs overlap, indicating consistent results. I place significant weight on the fact that the consistency and strength of the association found in multiple independent studies demonstrates that the association is causative.

**3. Specificity.** This viewpoint considers whether the outcome of the disease appears to be specific to the exposure, (1) although since the original publication of the Bradford Hill we know

in most cases, absolute specificity for an exposure outcome association is not generally possible for many diseases, particularly cancer, and not required to provide proof of causation. Even the well-established, causal relationship between cigarette smoking and lung cancer or heart disease is not characterized by specificity. Genetic factors may also play a role in the occurrence of ovarian cancer. As discussed above, the occurrence of ovarian cancer is consistently higher among talcum powder users compared to non-users, even after adjusting for several confounders. I placed less weight on absolute specificity of the association between talcum powder exposure and ovarian cancer given the multi-causal nature of the outcome, particularly in light of the strength and consistency of association factors.

**4. Temporality.** The temporality viewpoint assesses whether the exposure always predates the development of disease. (1). In each of the epidemiologic studies noted above, talc exposure occurred before the diagnosis of ovarian cancer. Although some have argued that some of the symptoms of ovarian cancer (vaginal bleeding, irritation) may lead to talcum powder use, since most ovarian cancers present with abdominal bloating and advanced stages of the disease it is difficulty to attribute how development of ovarian cancer would lead to talc use (e.g., reverse causality). I placed significant weight that the exposure to talc preceded the development of ovarian cancer in the studies above.

**5. Biological Gradient.** This viewpoint assesses whether there is a biological gradient or dose-response effect, (1) recognizing that presence of dose-response is not an absolute requirement for causation. In order to determine dose-response, it is necessary first to determine dose. While the presence of a dose-response relationship supports a causal link, the absence of such a relationship does not preclude a causal association. The causal relationship between asbestos and mesothelioma, which most closely resembles the current scenario is not dose-dependent. Assessing dose-response is challenging in the context of perineal talc use for several reasons: first, unlike, say, birth-control pills, the amount of talc powder product use is not fixed, nor is the number of uses per time (day, week, or month). At a minimum, to assess total dose, it is necessary to acquire information about both duration and frequency. Ascertaining a dose-response relationship with talc and ovarian cancer is particularly challenging given that the risk of ovarian cancer may vary with age, premenopausal and post-menopausal status and the presence of other risk factors. The dose-response depends on both the amount of talc exposure, the frequency of talc uses and the duration. The presence of other risk factors such as post-menopausal status, cancers other than invasive serous ovarian cancer and the "depletion of

64

susceptibles" over time may make it difficult to ascertain a dose-response relationship. Several studies show evidence of dose-response as measured by an increased risk with increased frequency, (48, 51-55) or increased duration, (52, 54, 56) or a combination of frequency and duration of exposure. (52, 54). Some studies have also shown evidence of increased risk with increased number of lifetime applications, (10, 48, 52) which may be a more accurate measure for long term exposure outcome association mediated via inflammation. The most updated meta-analysis show evidence of duration dose and responsiveness, (42) with risk being higher among those with >3600 applications of talc compared to participants with < 3600 applications, although with overlapping confidence intervals. (42). Based on the above limitations with study design to ascertain dose effect, specificity of dosing of talc and the possibility of threshold effect, I find biological gradient less compelling, but still compelling of my causation analysis than the other Bradford Hill overviews as referenced above.

**6. Plausibility.** Although this is not a requirement for causation, an association that is biologically plausible is more likely to be causal. (1). While this viewpoint only requires biological mechanism to be *plausible*, which is necessarily limited to the state of biological knowledge at the time of assessment, evidence from the literature described in detail in the section in biological mechanisms shows multiple routes of exposure, multiple pathways and multiple mechanism by which talc can cause ovarian cancer. **Section X** demonstrates how talcum powder products can migrate to the ovaries, induce inflammation, alter redox potential resulting in a pro-oxidant state, (49) and act as a mutagen. (109). As a results of the significant body of evidence that has accumulated on biological mechanisms, I place significant weight on the fact biological plausibility provides evidence in support of the causal role of talc in the development of ovarian cancer and there is a highly biological plausible mechanism here for carcinogenicity which supports my opinion.

**7. Coherence.** This viewpoint assesses whether the cause-and-effect interpretation of data conflicts with the generally known facts of the natural history and biology of the disease. (1). The evidence on the risk of ovarian cancer with talcum powder exposure is consistent with the nature of the disease. Multiple studies suggest that talcum powder products have biological effects which plausibly explain the occurrence of ovarian cancer. Given the biological mechanisms related to inflammation described above, this mechanism and causal association itself fit easily within the current framework of scientific knowledge about the development of

65

ovarian cancer mediated by inflammation. I placed a significant weight on the coherence of findings in support of the causal role of talc in the development of ovarian cancer.

**8. Experiment.** Occasionally, in making a causation assessment, it is possible to appeal to experimental, or semi-experimental, evidence. The definitive experimental evidence would be a placebo controlled randomized trial among patients who are assigned to use talc and others who do not use talc in which the outcome of incident ovarian cancer would be actively ascertained. However, such evidence does not exist and would not be ethical nor feasible with a rare outcome such as ovarian cancer with an incidence of 11.4/100, 000 person-years noted above. While there is no randomized controlled trial here, that is common when dealing with a suspected cancer risk. For instance, there is no randomized controlled trial which supports the causal role of smoking in lung cancer. Such a trial to provide absolute proof of harm, which ignores the body of evidence that has accumulated and places patients at risk for developing ovarian cancer raises significant ethical concerns when data from robust observational studies and their meta-analysis have consistently shown an increased risk of ovarian cancer. In the absence of experimental evidence, this overview is weighted as less important than the other more important viewpoints noted above.

**9. Analogy.** Asbestos has been shown to cause ovarian cancer which offers an appropriate analogy, (40) but this viewpoint was considered less significant than other viewpoints noted above.

## XIV.   CONCLUSIONS.

Based on my background, training and education as a physician and epidemiologist, review and analysis of the totality of the evidence, using the weight of evidence analysis, including considering and weighting the Hill viewpoints, as described in this report, it is my opinion stated to a reasonable degree of scientific and medical certainty that peritoneal use of talcum powder products can cause ovarian cancer.

Signed this 16th day of November 2018

Sonal Singh, MD, MPH

# References

1.      Hill AB. The Environment and Disease: Association or Causation? Proceedings of the Royal Society of Medicine. 1965;58(5):295-300.

2.      Grosse Y, Loomis D, Lauby-Secretan B, El Ghissassi F, Bouvard V, Benbrahim-Tallaa L, et al. Carcinogenicity of some drugs and herbal products. Lancet Oncol. 2013;14(9):807-8.

3.      Zorzela L, Loke YK, Ioannidis JP, Golder S, Santaguida P, Altman DG, et al. PRISMA harms checklist: improving harms reporting in systematic reviews. Bmj. 2016;352:i157.

4.      Deposition of Linda Loretz 562:14-563:6 (October 1, 2018).

5.      Deposition of Joshua Muscat 408:21-410:20 (September 25, 2018).

6.      Oxford Centre for Evidence-based Medicine – Levels of Evidence (March 2009) [Web]. Oxford, UK: Nuffield Department of Primary Health Care; 2009 [cited 2018 Nov 15]. Available from: http://www.cebm.net/oxford-centre-evidence-based-medicine-levels-evidence-march-2009/.

7.      Higgins JPT, Thompson SG, Deeks JJ, Altman DG. Measuring inconsistency in meta-analyses. BMJ. 2003;327(7414):557-60.

8.      Berlin JA, Santanna J, Schmid CH, Szczech LA, Feldman HI. Individual patient- versus group-level data meta-regressions for the investigation of treatment effect modifiers: ecological bias rears its ugly head. Statistics in medicine. 2002;21(3):371-87.

9.      da Costa BR, Jüni P. Systematic reviews and meta-analyses of randomized trials: principles and pitfalls. European Heart Journal. 2014;35(47):3336-45.

10.     Terry KL, Karageorgi S, Shvetsov YB, Merritt MA, Lurie G, Thompson PJ, et al. Genital powder use and risk of ovarian cancer: A pooled analysis of 8,525 cases and 9,859 controls. Cancer Prev Res. 2013;6(8):811-21.

11.     Ioannidis JPA. Integration of evidence from multiple meta-analyses: a primer on umbrella reviews, treatment networks and multiple treatments meta-analyses. CMAJ : Canadian Medical Association journal = journal de l'Association medicale canadienne. 2009;181(8):488-93.

12.     Shea BJ, Hamel C, Wells GA, Bouter LM, Kristjansson E, Grimshaw J, et al. AMSTAR is a reliable and valid measurement tool to assess the methodological quality of systematic reviews. Journal of clinical epidemiology. 2009;62(10):1013-20.

13.     Huncharek M, Muscat J, Onitilo A, Kupelnick B. Use of cosmetic talc on contraceptive diaphragms and risk of ovarian cancer: A meta-analysis of nine observational studies. EurJ Cancer Prev. 2007;16(5):422-9.

14.     Gertig DM, Hunter DJ, Cramer DW, Colditz GA, Speizer FE, Willett WC, et al. Prospective study of talc use and ovarian cancer. J Natl Cancer Inst. 2000;92(3):249-52.

15.     Ray WA. Evaluating Medication Effects Outside of Clinical Trials: New-User Designs. AM J EPIDEMIOL. 2003;158(9):915-20.

16.     Hannan MT. Is it a risk factor or confounder? A discussion of selected analytic methods using education as an example. Arthritis & Rheumatism. 1996;9(5):413-8.

17.     Houghton SC, Reeves KW, Hankinson SE, Crawford L, Lane D, Wactawski-Wende J, et al. Perineal powder use and risk of ovarian cancer. J Natl Cancer Inst. 2014;106(9).

18.     Wasserstein RL, Lazar NA. The ASA's Statement on p-Values: Context, Process, and Purpose. The American Statistician. 2016;70(2):129-33.

19.     Gardner MJ, Altman DG. Confidence intervals rather than P values: estimation rather than hypothesis testing. British Medical Journal (Clinical research ed). 1986;292(6522):746-50.

20.     CDC. United States Cancer Statistics: 1999-2014 Incidence and Mortality Web-based Report2017 March 4 2018 [cited 2018 March 24]. Available from: www.cdc.gov/uscs.

21.     Siegel RL, Miller KD, Jemal A. Cancer statistics, 2017. CA: A Cancer Journal for Clinicians. 2017;67(1):7-30.

22.     Rohl AN, Langer AM, Selikoff IJ, Tordini A, Klimentidis R, Bowes DR, et al. Consumer talcums and powders: mineral and chemical characterization. Journal of toxicology and environmental health. 1976;2(2):255-84.

23.     Crowley, M. Report of Michael M. Crowley, PhD. Regarding the Fragrance Chemical Constituents in Johnson & Johnson Talcum Powder Products (November 12, 2018).

24.     Rohl AN. Asbestos in talc. Environmental health perspectives. 1974;9:129-32.

25.     Paoletti L, Caiazza S, Donelli G, Pocchiari F. Evaluation by electron microscopy techniques of asbestos contamination in industrial, cosmetic, and pharmaceutical talcs. Regulatory toxicology and pharmacology : RTP. 1984;4(3):222-35.

26.     Blount AM. Amphibole content of cosmetic and pharmaceutical talcs. Environmental health perspectives. 1991;94:225-30.

27.     Deposition of Alice M. Blount, 105:21-106:6 (April 13, 2018).

28.     Food and Drug Administration; 2018 [updated March 12 2018; cited 2018 November 15]. Available from: https://www.fda.gov/Cosmetics/ProductsIngredients/Ingredients/ucm293184.htm.

29.     JNJ000637879-JNJ000637881.

30.     Longo, et. al. Analysis of Johnson & Johnson Baby Powder & Valiant Shower to Shower Talc Products for Amphibole (Tremolite) Asbestos (August 2, 2017).

31.     Longo, et al. MAS Project # 14-1683 Johnson's Baby Powder Sample Set (April 28, 2017).

32.     Longo, et al. TEM Analysis of Historical 1978 Johnson's Baby Powder Sample for Asbestos (February 16, 2018).

33.     Deposition of John Hopkins, Exhibit 28 (November 5, 2018).

34.     Longo, et al.  In re: Talcum Power Prod. Liab. Litig., MDL No. 2738 (Nov. 14, 2018).

35.     Deposition of Julie Pier, Exhibit 47 (September 13, 2018).

36.     International Agency for Research in Cancer Monographs on the Evaluation of Carcinogenic Risks to Humans: Volume 100C Arsenic, Metals, Fibers and Dusts (2012)

37.     Straif K, Benbrahim-Tallaa L, Baan R, Grosse Y, Secretan B, El Ghissassi F, et al. A review of human carcinogens. Part C: metals, arsenic, dusts, and fibres. The Lancet Oncology. 2009;10(5):453-4.

38.     World Health Organization. International Agency for Research on Cancer. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Carbon Black, Titanium Dioxide, and Talc Lyon 2010

39.     Gross AJ, Berg PH. A meta-analytical approach examining the potential relationship between talc exposure and ovarian cancer. J EXPOS ANAL ENVIRON EPIDEMIOL. 1995;5(2):181-95.

40.     Huncharek M, Geschwind JF, Kupelnick B. Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: A meta-analysis of 11, 933 subjects from sixteen observational studies. Anticancer Res. 2003;23(2 C):1955-60.

41.     Berge W, Mundt K, Luu H, Boffetta P. Genital use of talc and risk of ovarian cancer: a meta-analysis. EurJ Cancer Prev. 2018; 27(3): 248-257.

42.     Penninkilampi R, Eslick GD. Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis. Epidemiology. 2018;29(1):41-9.

43.     Lane PW, Higgins JP, Anagnostelis B, Anzures-Cabrera J, Baker NF, Cappelleri JC, et al. Methodological quality of meta-analyses: matched-pairs comparison over time and between industry-sponsored and academic-sponsored reports. Research synthesis methods. 2013;4(4):342-50.

44.     Hackshaw AK, Law MR, Wald NJ. The accumulated evidence on lung cancer and environmental tobacco smoke. Bmj. 1997;315(7114):980-8.

45.     Kim S, Ko Y, Lee HJ, Lim JE. Menopausal hormone therapy and the risk of breast cancer by histological type and race: a meta-analysis of randomized controlled trials and cohort studies. Breast cancer research and treatment. 2018;170(3):667-75.

46.     Hamra GB, Guha N, Cohen A, Laden F, Raaschou-Nielsen O, Samet JM, et al. Outdoor particulate matter exposure and lung cancer: a systematic review and meta-analysis. Environmental health perspectives. 2014;122(9):906-11.

47.     Mustafic H, Jabre P, Caussin C, Murad MH, Escolano S, Tafflet M, et al. Main air pollutants and myocardial infarction: a systematic review and meta-analysis. JAMA. 2012;307(7):713-21.

48.     Wu AH, Pearce CL, Tseng CC, Templeman C, Pike MC. Markers of inflammation and risk of ovarian cancer in Los Angeles county. INT J CANCER. 2009;124(6):1409-15.

49.     Fletcher NM, Memaj I, Saed GM. Talcum Powder Enhances Oxidative Stress in Ovarian Cancer Cells, Reproductive Sciences. 2018;25(1_suppl):1A-54A.

50.     Ioannidis JP. Exposure-wide epidemiology: revisiting Bradford Hill. Statistics in medicine. 2016;35(11):1749-62.

51.     Booth M, Beral V, Smith P. Risk factors for ovarian cancer: a case-control study. British journal of cancer. 1989;60(4):592-8.

52.     Schildkraut JM, Abbott SE, Alberg AJ, Bandera EV, Barnholtz-Sloan JS, Bondy ML, et al. Association between Body Powder Use and Ovarian Cancer: the African American Cancer Epidemiology Study (AACES). Cancer Epidemiology Biomarkers & Prevention. 2016.

69

53.     Wu AH, Pearce CL, Tseng CC, Pike MC. African Americans and hispanics remain at lower risk of ovarian cancer than non-hispanic whites after considering nongenetic risk factors and oophorectomy rates. Cancer Epidemiol Biomarkers Prev. 2015;24(7):1094-100.

54.     Cramer DW, Vitonis AF, Terry KL, Welch WR, Titus LJ. The association between talc use and ovarian cancer a retrospective case-control study in two us states. Epidemiology. 2016;27(3):334-46.

55.     Gates MA, Tworoger SS, Terry KL, Titus-Ernstoff L, Rosner B, De Vivo I, et al. Talc use, variants of the GSTM1, GSTT1, and NAT2 genes, and risk of epithelial ovarian cancer. Cancer Epidemiol Biomarkers Prev. 2008;17(9):2436-44.

56.     Chang S, Risch HA. Perineal talc exposure and risk of ovarian carcinoma. CANCER. 1997;79(12):2396-401.

57.     Cramer DW, Liberman RF, Titus-Ernstoff L, Welch WR, Greenberg ER, Baron JA, et al. Genital talc exposure and risk of ovarian cancer. INT J CANCER. 1999;81(3):351-6.

58.     Whittemore AS, Wu ML, Paffenbarger RS, Sarles DL, Kampert JB, Grosser S, et al. Personal and environmental characteristics related to epithelial ovarian cancer: II. Exposures to talcum powder, tobacco, alcohol, and coffee. AM J EPIDEMIOL. 1988;128(6):1228-40.

59.     Mills PK, Riordan DG, Cress RD, Young HA. Perineal talc exposure and epithelial ovarian cancer risk in the central valley of California. INT J CANCER. 2004;112(3):458-64.

60.     Rosenblatt KA, Weiss NS, Cushing-Haugen KL, Wicklund KG, Rossing MA. Genital powder exposure and the risk of epithelial ovarian cancer. Cancer Causes Control. 2011;22(5):737-42.

61.     Ness RB, Cottreau C. Possible role of ovarian epithelial inflammation in ovarian cancer. J Natl Cancer Inst. 1999;91(17):1459-67.

62.     Green A, Purdie D, Bain C, Siskind V, Russell P, Quinn M, et al. Tubal sterilisation, hysterectomy and decreased risk of ovarian cancer. Survey of Women's Health Study Group. Int J Cancer. 1997;71(6):948-51.

63.     JNJ000460665-JNJ000460673.

64.     Heller DS, Westhoff C, Gordon RE, Katz N. The relationship between perineal cosmetic talc usage and ovarian talc particle burden. AM J OBSTET GYNECOL. 1996;174(5):1507-10.

65.     Henderson WJ, Joslin CA, Turnbull AC, Griffiths K. Talc and carcinoma of the ovary and cervix. The Journal of obstetrics and gynaecology of the British Commonwealth. 1971;78(3):266-72.

66.     Cramer DW, Welch WR, Berkowitz RS, Godleski JJ. Presence of talc in pelvic lymph nodes of a woman with ovarian cancer and long-term genital exposure to cosmetic talc. Obstet Gynecol. 2007;110(2 II):498-501.

67.     Wehner AP, Weller RE, Lepel EA. On talc translocation from the vagina to the oviducts and beyond. Food and chemical toxicology : an international journal published for the British Industrial Biological Research Association. 1986;24(4):329-38.

68.     Sjosten AC, Ellis H, Edelstam GA. Retrograde migration of glove powder in the human female genital tract. Human reproduction (Oxford, England). 2004;19(4):991-5.

69.     FDA response to Citizen's Petition (2014), JNJ000489048- JNJ000489054.

70

70.     Longo, et al. Below the Waist Application of Johnson & Johnson Baby Powder (September 2017).

71.     Buz'Zard AR, Lau BHS. Pycnogenol® reduces talc-induced neoplastic transformation in human ovarian cell cultures. Phytother Res. 2007;21(6):579-86.

72.     Cramer DW, Titus-Ernstoff L, McKolanis JR, Welch WR, Vitonis AF, Berkowitz RS, et al. Conditions associated with antibodies against the tumor-associated antigen MUC1 and their relationship to risk for ovarian cancer. Cancer Epidemiol Biomarkers Prev. 2005;14(5):1125-31.

73.     Langseth H, Hankinson SE, Siemiatycki J, Weiderpasse E. Perineal use of talc and risk of ovarian cancer. J Epidemiol Community Health. 2008;62(4):358-60.

74.     Muscat JE, Huncharek MS. Perineal Talc Use and Ovarian Cancer: A Critical Review. European journal of cancer prevention : the official journal of the European Cancer Prevention Organisation (ECP). 2008;17(2):139-46.

75.     Cramer DW, Welch WR, Scully RE, Wojciechowski CA. Ovarian cancer and talc. A case-control study. CANCER. 1982;50(2):372-6.

76.     Hartge P, Hoover R, Lesher LP, McGowan L. Talc and Ovarian Cancer. JAMA. 1983;250(14):1844.

77.     Harlow BL, Weiss NS. A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc. Am J Epidemiol. 1989;130(2):390-4.

78.     Chen Y, Wu PC, Lang JH, Ge WJ, Hartge P, Brinton LA. Risk factors for epithelial ovarian cancer in Beijing, China. Int J Epidemiol. 1992;21(1):23-9.

79.     Harlow BL, Cramer DW, Bell DA, Welch WR. Perineal exposure to talc and ovarian cancer risk. Obstet Gynecol. 1992;80(1):19-26.

80.     Rosenblatt KA, Szklo M, Rosenshein NB. Mineral fiber exposure and the development of ovarian cancer. Gynecol Oncol. 1992;45(1):20-5.

81.     Tzonou A, Polychronopoulou A, Hsieh CC, Trichopoulos D, Rebelakos A, Karakatsani A. Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer. INT J CANCER. 1993;55(3):408-10.

82.     Purdie D, Green A, Bain C, Siskind V, Ward B, Hacker N, et al. Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study. Survey of Women's Health Study Group. Int J Cancer. 1995;62(6):678-84.

83.     Shushan A, Paltiel O, Iscovich J, Elchalal U, Peretz T, Schenker JG. Human menopausal gonadotropin and the risk of epithelial ovarian cancer *. FERTIL STERIL. 1996;65(1):13-8.

84.     Cook LS, Kamb ML, Weiss NS. Perineal powder exposure and the risk of ovarian cancer. AM J EPIDEMIOL. 1997;145(5):459-65.

85.     Godard B, Foulkes WD, Provencher D, Brunet J-S, Tonin PN, Mes-Masson A-M, et al. Risk factors for familial and sporadic ovarian cancer among French Canadians: A case-control study. AM J OBSTET GYNECOL. 1998;179(2):403-10.

86.     Wong C, Hempling RE, Piver MS, Natarajan N, Mettlin CJ. Perineal talc exposure and subsequent epithelial ovarian cancer: A case- control study. Obstet Gynecol. 1999;93(3):372-6.

87.     Ness RB, Grisso JA, Cottreau C, Klapper J, Vergona R, Wheeler JE, et al. Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. Epidemiology. 2000;11(2):111-7.

88.     Langseth H, Kjaerheim K. Ovarian cancer and occupational exposure among pulp and paper employees in Norway. Scandinavian journal of work, environment & health. 2004;30(5):356-61.

89.     Merritt MA, Green AC, Nagle CM, Webb PM, Bowtell D, Chenevix-Trench G, et al. Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer. INT J CANCER. 2008;122(1):170-6.

90.     Moorman PG, Palmieri RT, Akushevich L, Berchuck A, Schildkraut JM. Ovarian Cancer Risk Factors in African-American and White Women. AM J EPIDEMIOL. 2009;170(5):598-606.

91.     Kurta ML, Moysich KB, Weissfeld JL, Youk AO, Bunker CH, Edwards RP, et al. Use of fertility drugs and risk of ovarian cancer: Results from a U.S.-based case-control study. Cancer Epidemiol Biomarkers Prev. 2012;21(8):1282-92.

92.     Gates MA, Rosner BA, Hecht JL, Tworoger SS. Risk factors for epithelial ovarian cancer by histologic subtype. Am J Epidemiol. 2010;171(1):45-53.

93.     Gonzalez NL, O'Brien KM, D'Aloisio AA, Sandler DP, Weinberg CR. Douching, talc use, and risk of ovarian cancer. Epidemiology. 2016;27(6):797-802.

94.     Henderson WJ, Hamilton TC, Griffiths K. Talc in normal and malignant ovarian tissue. Lancet. 1979;1(8114):499.

95.     Wehner AP, Hall AS, Weller RE, Lepel EA, Schirmer RE. Do particles translocate from the vagina to the oviducts and beyond? Food and chemical toxicology : an international journal published for the British Industrial Biological Research Association. 1985;23(3):367-72.

96.     Hartge P, Stewart P. Occupation and ovarian cancer: A case-control study in the Washington, DC, metropolitan area, 1978–1981. J Occup Med. 1994;36(8):924-7.

97.     Boorman GA, Seely JC. The lack of an ovarian effect of lifetime talc exposure in F344/N rats and B6C3F1 mice. REGUL TOXICOL PHARMACOL. 1995;21(2):242-3.

98.     Cramer DW, Xu H. Epidemiologic evidence for uterine growth factors in the pathogenesis of ovarian cancer. Ann Epidemiol. 1995;5(4):310-4.

99.     Heller DS, Gordon RE, Westhoff C, Gerber S. Asbestos exposure and ovarian fiber burden. AM J IND MED. 1996;29(5):435-9.

100.    Rosenblatt KA, Mathews WA, Daling JR, Voigt LF, Malone K. Characteristics of women who use perineal powders. Obstet Gynecol. 1998;92(5):753-6.

101.    Muscat J, Huncharek M, Cramer DW.Talc and anti-MUC1 antibodies.Cancer Epidemiol Biomarkers Prev. 2005 Nov;14(11 Pt 1):2679; author reply.

102.    Keskın N, Teksen YA, Ongun EG, Özay Y, Saygılı H. Does long-term talc exposure have a carcinogenic effect on the female genital system of rats? An experimental pilot study. Arch Gynecol Obstet. 2009;280(6):925-31.

103.    Karageorgi S, Gates MA, Hankinson SE, De Vivo I. Perineal use of talcum powder and endometrial cancer risk. Cancer Epidemiol Biomarkers Prev. 2010;19(5):1269-75.

104.    Gordon RE, Fitzgerald S, Millette J. Asbestos in commercial cosmetic talcum powder as a cause of mesothelioma in women. International journal of occupational and environmental health. 2014;20(4):318-32.

105.    Pierce JS, Riordan AS, Miller EW, Gaffney SH, Hollins DM. Evaluation of the presence of asbestos in cosmetic talc products. Inhalation toxicology. 2017;29(10):443-56.

106.    Nicole M Fletcher, Ira Memaj, Ghassan M Saed.  Talcum Powder Enhances Cancer Antigen 125 levels in Ovarian Cancer Cells, Society for Reproductive Investigation 65th Annual Scientific Meeting, LB-044. 2018.

107.    Hamilton TC, Fox H, Buckley CH, Henderson WJ, Griffiths K. Effects of talc on the rat ovary. British journal of experimental pathology. 1984;65(1):101-6.

108.    NTP Toxicology and Carcinogenesis Studies of Talc (CAS No. 14807-96-6)(Non-Asbestiform) in F344/N Rats and B6C3F1 Mice (Inhalation Studies). National Toxicology Program technical report series. 1993;421:1-287.

109.    Shukla A, MacPherson MB, Hillegass J, Ramos-Nino ME, Alexeeva V, Vacek PM, et al. Alterations in gene expression in human mesothelial cells correlate with mineral pathogenicity. American journal of respiratory cell and molecular biology. 2009;41(1):114-23.

110.    Liberati A, Altman DG, Tetzlaff J, Mulrow C, Gøtzsche PC, Ioannidis JPA, et al. The PRISMA Statement for Reporting Systematic Reviews and Meta-Analyses of Studies That Evaluate Health Care Interventions: Explanation and Elaboration. PLOS Medicine. 2009;6(7):e1000100.

111.    Berretta M, Micek A, Lafranconi A, Rossetti S, Di Francia R, De Paoli P, et al. Coffee consumption is not associated with ovarian cancer risk: a dose-response meta-analysis of prospective cohort studies. Oncotarget. 2018;9(29):20807-15.

112.    Ong JS, Hwang LD, Cuellar-Partida G, Martin NG, Chenevix-Trench G, Quinn MCJ, et al. Assessment of moderate coffee consumption and risk of epithelial ovarian cancer: a Mendelian randomization study. Int J Epidemiol. 2018;47(2):450-9.

113.    Cramer DW, Piver MS. Perineal talc exposure and subsequent epithelial ovarian cancer: A case-control study [4] (multiple letters). Obstet Gynecol. 1999;94(1):160-1.

114.    Giovannucci E, Stampfer MJ, Colditz GA, Manson JE, Rosner BA, Longnecker MP, et al. Recall and selection bias in reporting past alcohol consumption among breast cancer cases. Cancer Causes & Control. 1993;4(5):441-8.

115.    Rice MS, Murphy MA, Tworoger SS. Tubal ligation, hysterectomy and ovarian cancer: A meta-analysis. Journal of ovarian research. 2012;5(1):13-.

116.    IMERYS137677.

117.    Zazenski R, Ashton WH, Briggs D, Chudkowski M, Kelse JW, MacEachern L, et al. Talc: occurrence, characterization, and consumer applications. Regulatory toxicology and pharmacology : RTP. 1995;21(2):218-29.

73

118.    Klaassen CD, Watkins JB. Casarett & Doull's Essentials of Toxicology, Third Edition. Leikauf G.D., editor. New York: McGraw-Hill Education; 2015.

119.    Suzuki Y, Kohyama N. Translocation of inhaled asbestos fibers from the lung to other tissues. Am J Ind Med. 1991;19(6):701-4.

120.    Bunderson-Schelvan M, Pfau JC, Crouch R, Holian A. Nonpulmonary outcomes of asbestos exposure. Journal of toxicology and environmental health Part B, Critical reviews. 2011;14(1-4):122-52.

121.    Kelly MG, Pejovic T, Nezhat FR. What is the relationship between endometriosis and epithelial ovarian cancer? CME J Gynecol Oncol. 2003;8(1):41-7.

122.    Rasmussen CB, Kjaer SK, Albieri V, Bandera EV, Doherty JA, Hogdall E, et al. Pelvic Inflammatory Disease and the Risk of Ovarian Cancer and Borderline Ovarian Tumors: A Pooled Analysis of 13 Case-Control Studies. Am J Epidemiol. 2017;185(1):8-20.

123.    Trabert B, Pinto L, Hartge P, Kemp T, Black A, Sherman ME, et al. Pre-diagnostic serum levels of inflammation markers and risk of ovarian cancer in the Prostate, Lung, Colorectal and Ovarian Cancer (PLCO) Screening Trial. Gynecol Oncol. 2014;135(2):297-304.

124.    Ghassan M Saed,.Robert T Moriss and Nicole Fletecher. New Insights into the Pathogenesis of Ovarian Cancer: Oxidative Stress. 2018 October 24 2018.  Available from https://www.intechopen.com/books/ovarian-cancer-from-pathogenesis-to-treatment

125.    Saed GM, Diamond MP, Fletcher NM. Updates of the role of oxidative stress in the pathogenesis of ovarian cancer. Gynecol Oncol. 2017;145(3):595-602.

126.    Oberdorster G. The NTP Talc Inhalation Study: A Critical Appraisal Focused on Lung Particle Overload. REGUL TOXICOL PHARMACOL. 1995;21(2):233-41.

127.    Camargo MC, Stayner LT, Straif K, Reina M, Al-Alem U, Demers PA, et al. Occupational exposure to asbestos and ovarian cancer: a meta-analysis. Environmental health perspectives. 2011;119(9):1211-7.

128.    WHO IARC. Preamble. [Web]. Lyon, France: IARC; 2006 [updated September 4 2015; cited 2018 Nov 10]. Available from: https://monographs.iarc.fr/preamble-to-the-iarc-monographs-amended-january-2006/.

129.    Baan R, Straif K, Grosse Y, Secretan B, El Ghissassi F, Cogliano V. Carcinogenicity of carbon black, titanium dioxide, and talc. The Lancet Oncology.7(4):295-6.

130.    Fiume M, Ivan B, Wilma FB, Donald VB, Ronald AH, Curtis DK, et al. Safety Assessment of Talc as Used in Cosmetics. International Journal of Toxicology. 2015;34(1_suppl):66S-129S

131.    Reports of the Surgeon General. The Health Consequences of Involuntary Exposure to Tobacco Smoke: A Report of the Surgeon General. Atlanta (GA): Centers for Disease Control and Prevention (US); 2006.

132.    Rothwell PM, Cook NR, Gaziano JM, Price JF, Belch JFF, Roncaglioni MC, et al. Effects of aspirin on risks of vascular events and cancer according to bodyweight and dose: analysis of individual patient data from randomised trials. Lancet. 2018;392(10145):387-99.

133.    Wang X, Ouyang Y, Liu J, Zhu M, Zhao G, Bao W, et al. Fruit and vegetable consumption and mortality from all causes, cardiovascular disease, and cancer: systematic review and dose-response meta-analysis of prospective cohort studies. BMJ : British Medical Journal. 2014;349.

**Table 1. AMSTAR (Assessing the Methodologic Quality of Systematic Reviews) Rating of Systematic Reviews and/or Meta-analysis of Genital Talc use and Ovarian Cancer**

| Criterion | Harlow et al 1992[1] | Gross and Berg et al 1995[2] | Cramer et al 1999[3] | Huncharek et al 2003[4] | Langseth et al 2007[5] | Terry et al 2013 #[6] | Berge et al 2018[7] | Penninkilampi and Eslick 2018.[8] | Huncharek et al 2007 9* |
|---|---|---|---|---|---|---|---|---|---|
| *A priori design* | UA | Y | N | UA | UA | Y | Y | Y | UA |
| *Duplicate study selection & extraction* | N | N | N | Y | N | NA | Y | Y | Y |
| *Comprehensive search* | N | N | N | UA | N | NA | Y | Y | N |
| *Status of publication used as criterion* | UA | N | UA | Y | UA | NA | Y | N | Y |
| *List of included & excluded studies* | N | N | N | N | N | Y | Y | Y | N |
| *Characteristics of studies provided* | N | Y | N | N | N | Y | Y | Y | Y |
| *Scientific quality of studies addressed* | N | UA | N | N | Y | Y | Y | Y | N |
| *Scientific quality of studies used in formulating conclusions* | N | Y | UA | N | Y | Y | Y | Y | N |
| *Methods of combining studies appropriate* | N | Y | Y | Y | Y | Y | Y | Y | N |
| *Likelihood of publication bias addressed* | N | N | N | N | N | NA | Y | Y | N |
| *Conflict of interest included* | Y | Y | Y | UA@ | Y | Y | Y | Y | UA@ |

*Meta-analysis by Huncharek et al in 2007 et al evaluated only talc on contraceptive diaphragms

\# Terry et al 2013 conducted an individual participant data pooled analysis so several items for systematic review NA

@ Incomplete financial disclosures of role of sponsor in meta-analysis

Y= Yes N= No; NA= Not applicable; UA : Unable to answer

77

1. Harlow BL, Cramer DW, Bell DA, et al. Perineal exposure to talc and ovarian cancer risk. *Obstet Gynecol* 1992;80(1):19-26.

2. Gross AJ, Berg PH. A meta-analytical approach examining the potential relationship between talc exposure and ovarian cancer. *J EXPOS ANAL ENVIRON EPIDEMIOL* 1995;5(2):181-95.

3. Cramer DW, Liberman RF, Titus-Ernstoff L, et al. Genital talc exposure and risk of ovarian cancer. *INT J CANCER* 1999;81(3):351-56.

4. Huncharek M, Geschwind JF, Kupelnick B. Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: A meta-analysis of 11, 933 subjects from sixteen observational studies. *Anticancer Res* 2003;23(2 C):1955-60.

5. Langseth H, Hankinson SE, Siemiatycki J, et al. Perineal use of talc and risk of ovarian cancer. *J Epidemiol Community Health* 2008;62(4):358-60. doi: 10.1136/jech.2006.047894

6. Terry KL, Karageorgi S, Shvetsov YB, et al. Genital powder use and risk of ovarian cancer: A pooled analysis of 8,525 cases and 9,859 controls. *Cancer Prev Res* 2013;6(8):811-21. doi: 10.1158/1940-6207.CAPR-13-0037

7. Berge W, Mundt K, Luu H, Boffetta P. Genital use of talc and risk of ovarian cancer: a meta-analysis. EurJ Cancer Prev. 2018; 27(3): 248-257

8. Penninkilampi R, Eslick GD. Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis. *Epidemiology* 2018;29(1):41-49. doi: 10.1097/ede.0000000000000745 [published Online First: 2017/09/02]

9. Huncharek M, Muscat J, Onitilo A, et al. Use of cosmetic talc on contraceptive diaphragms and risk of ovarian cancer: A meta-analysis of nine observational studies. *EurJ Cancer Prev* 2007;16(5):422-29. doi: 10.1097/01.cej.0000236257.03394.4a

## Additional Materials and Data Considered

1.      Adler RH, Rappole BW. Recurrent malignant pleural effusions and talc powder aerosol treatment. Surgery. 1967;62(6):1000-6.

2.      Adler RH, Sayek I. Treatment of malignant pleural effusion: a method using tube thoracostomy and talc. The Annals of thoracic surgery. 1976;22(1):8-15.

3.      Ainsworth S. Not safe for babies' bottom? The practising midwife. 2009;12(4):42.

4.      Baker TR, Piver MS. Etiology, biology, and epidemiology of ovarian cancer. Semin Surg Oncol. 1994;10(4):242-8.

5.      Balkwill, Mantovani. Inflammation and Cancer: Back to Vircvchow? Lancet. 2011; 357(9255):539-45.

6.      Barbetakis N, Asteriou C, Papadopoulou F, Samanidis G, Paliouras D, Kleontas A, et al. Early and late morbidity and mortality and life expectancy following thoracoscopic talc insufflation for control of malignant pleural effusions: A review of 400 cases. J Cardiothoracic Surg. 2010;5(1).

7.      Begg, March. Cause and Association: missing the forest for the trees. American Journal of Public Health (AJPH). 2018; Vol. 108, No. 5.

8.      Bernal LS, Ramos CLM. Risk factors for ovary carcinoma. REV INST NAC CANCEROL. 1996;42(4):213-20.

9.      Berge, Wera, Kenneth Mundt, Hung Luu, and Paolo Boffetta. 2017. "Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis." *European Journal of Cancer Prevention*, January, 1. https://doi.org/10.1097/CEJ.0000000000000340.

10.     Bielsa S, Hernández P, Rodriguez-Panadero F, Taberner T, Salud A, Porcel JM. Tumor type influences the effectiveness of pleurodesis in malignant effusions. Lung. 2011;189(2):151-5.

11.     Boente MP, Godwin AK, Hogan WM. Screening, imaging, and early diagnosis of ovarian cancer. CLIN OBSTET GYNECOL. 1994;37(2):377-91.

12.     Bondoc AYP, Bach PB, Sklarin NT, Vander Els NJ. Arterial Desaturation Syndrome Following Pleurodesis with Talc Slurry: Incidence, Clinical Features, and Outcome. Cancer Invest. 2003;21(6):848-54.

13.     Bronner GM, Baas P, Beijnen JH. Pleurodesis in malignant pleural effusions. NED TIJDSCHR GENEESKD. 1997;141(38):1810-4.

14.     Bulbulyan MA, Ilychova SA, Zahm SH, Astashevsky SV, Zaridze DG. Cancer mortality among women in the Russian printing industry. AM J IND MED. 1999;36(1):166-71.

15.     Carr CJ. Talc: Consumer uses and health perspectives. Proceedings of a Workshop. Bethesda, Maryland, January 31-February 1, 1994 . Regulatory Toxicology and Pharmacology: RTP. 1995; 21(2):211-60.

16.     Chang, Tu, Chen, Yang. Occupational exposure to talc increases the risk of lung cancer: a meta-analysis of occupational cohort studies. Canadian Respiratory Journal. 2017; 2017:1270608.

17.     Chi DS, Abu-Rustum NR, Sonoda Y, Chen SWW, Flores RM, Downey R, et al. The benefit of video-assisted thoracoscopic surgery before planned abdominal exploration in

patients with suspected advanced ovarian cancer and moderate to large pleural effusions. Gynecol Oncol. 2004;94(2):307-11.

18.     Cook LS. No significant association was found between perinea! talcum powder use and epithelial ovarian cancer. Evid-based Obstet Gynecol. 2000;2(2):53-4.

19.     Coussens, L.M. and and Z Werb. Inflammation and cancer. Nature. 2002; 420(6917):860-867.

20.     Cralley L, M Key, D Groth, W Lainhart, R Ligo. Fibrous and mineral content of cosmetic talcum products. American Industrial Hygiene Association Journal. 1968; 29(4):350-354.

21.     Cramer DW, Finn OJ. Epidemiologic perspective on immune-surveillance in cancer. Curr Opin Immunol. 2011;23(2):265-71.

22.     Cramer DW. The Epidemiology of Endometrial and Ovarian Cancer. Hematol Oncol Clin North Am. 2012;26(1):1-12.

23.     Critchley LA, Au HK, Yim AP. Reexpansion pulmonary edema occurring after thoracoscopic drainage of a pleural effusion. Journal of clinical anesthesia. 1996;8(7):591-4.

24.     Crusz, Balkwill . Inflammation and cancer: advances and new agents. Nature reviews. Clinical Oncology. 2015; 12(10):584-96.

25.     Curie P, Sussmann M, Treisser A, Renaud R. Epidemiologic factors in ovarian carcinoma. REV FR GYNECOL OBSTET. 1985;80(6):379-82.

26.     Current Intelligence Bulletin 62(Rev/4/2011) – Asbestos fibers and other elongate mineral particles: state of the science and roadmap for research. National Institute for Occupational Safety and Health (NIOSH) DHSS. (NIOSH) publication No. 2011-159.

27.     Dalley VM. The role of radiotherapy and chemotherapy in the treatment of cancer of the ovary. Int J Radiat Oncol Biol Phys. 1982;8(2):251-5.

28.     Daly M, Obrams GI. Epidemiology and risk assessment for ovarian cancer. Semin Oncol. 1998;25(3):255-64.

29.     Dement, Schuler, Zumwalde. "fiber exposure during use of baby powders". National Institute for Occupational Safety and Health, IWS. 1972; 36-6:1-13.

30.     Dial J, Marzusch K. Ovarian surface epithelium and human ovarian cancer. Gynecol Obstet Invest. 1993;35(3):129-35.

31.     Dietl J, Buchholz F, Stoll P. The ovarian surface epithelium and its histogenetic relation to ovarian carcinoma. GEBURTSHILFE FRAUENHEILKD. 1986;46(9):561-6.

32.     Eberl, George, May Jr., Henderson. Comparative evaluation of the effects of talcum and new absorbable substitute of surgical gloves. The American Journal of Surgery. 1948; Vol. 75, Issue 3, Pgs. 493-497.

33.     Egli G, M. Newton. The transport of carbon particles in the human female reproductive tract, Fertility and Sterility 1961;12(April):151-55.

34.     Elmasry K, Gayther SA. Ovarian cancer aetiology: Facts and fiction. J Fam Plann Reprod Health Care. 2006;32(2):82-6.

35.    Eltabbakh GH, Piver MS, Natarajan N, Mettlin CJ. Epidemiologic differences between women with extraovarian primary peritoneal carcinoma and women with epithelial ovarian cancer. Obstet Gynecol. 1998;91(2):254-9.

36.    Erickson KV, Yost M, Bynoe R, Almond C, Nottingham J. Primary treatment of malignant pleural effusions: video-assisted thoracoscopic surgery poudrage versus tube thoracostomy. The American surgeon. 2002;68(11):955-9; discussion 9-60.

37.    Fedak, Kristen M., Autumn Bernal, Zachary A. Capshaw, and Sherilyn Gross. 2015. "Applying the Bradford Hill Criteria in the 21st Century: How Data Integration Has Changed Causal Inference in Molecular Epidemiology." *Emerging Themes in Epidemiology* 12 (14). https://doi.org/10.1186/s12982-015-0037-4.

38.    Federal Judicial Center and National Research Council of the National Academies (2011). Reference Manual on Scientific Evidence, Third Edition. Washington, D.C., The National Academies Press.

39.    Fernandes, Cobucci, Jatoba, Fernandes, deAzevedo, De Arujo.The role of the mediatiors of inflammation in cancer development. Pathology Oncology Research: POR. 2015; 21(3):527-34.

40.    Fletcher N, J Belotte, M Saed, Memaj, M Diamond, R Morris, G Saed . Talcum Specific point mutations in key redox enzymes are associated with chemoresistance in epithelial ovarian cancer. Fee Radical Bilogy and Medicine. 2016; 102:122-132.

41.    Filosso PL, Sandri A, Felletti G, Ruffini E, Lausi PO, Oliaro A. Preliminary results of a new small-bore percutaneous pleural catheter used for treatment of malignant pleural effusions in ECOG PS 3-4 patients. Eur J Surg Oncol. 2011;37(12):1093-8.

42.    Folkins A, E Jarboe, J Hecht, M Muto and C Crum (2018). "Chapter 24 – Assessing pelvic epithelial cancer risk and intercepting early malignancy." In Diagnostic Gynecologic and Obstetric Pathology (Third Edition), 844-64. Philadelphia: Content Repository Only! https://doi.org/10.1016/B978-0-323-44732-4.00024-8.

43.    Galea, Rogers. Moving beyond the cause constraint: a public health of consequence. The American Journal of Public Health. Vol. 108, No.5. 2018; Editorial 602-603.

44.    Glyone S. Two cases of squamous carcinoma of the lung occurring in asbestosis. Tubercle. 1935; (17)1:5-10.

45.    Gori GB. Session II: Introduction-ovarian exposure concerns. REGUL TOXICOL PHARMACOL. 1995;21(2):252-3.

46.    Goff BA, Mueller PR, Muntz HG, Rice LW. Small chest-tube drainage followed by bleomycin sclerosis for malignant pleural effusions. Obstet Gynecol. 1993;81(6):993-6.

47.    Graham, Jenkins. Value of modified starch as substitute for talc. Lancet. 1952; 1(6708):590-1.

48.    Griffiths K, Chandler JA, Henderson WJ, Joslin CAF. Ovarian cancer: some new analytical approaches. Postgrad Med J. 1973;49(568):69-72.

49.    Grivennikov, Greten, Karin M. Immunity, inflammation and cancer. Cell. 2010; 140(6):883-99.

50.    Gross JL, Disanzio TG, Younes RN, Haddad FJ, Da Silva RA, Avertano ABM. Do concomitant ascites influence the effectiveness of palliative surgical management of pleural effusion in patients with malignancies? World J Surg. 2009;33(2):266-71.

51.    Harper A, G Saed. Talc induces a pro-oxidant state in normal and ovarian cancer cells through gene point mutations in key redox enzymes - Abstract, Society of Gynecologic Oncology, 2018, *in press*.

52.    Hartge PA. A Review of Perineal Talc Exposure and Risk of Ovarian Cancer. REGUL TOXICOL PHARMACOL. 1995;21(2):254-60.

53.    Harter P, Du Bois A. Does tubal sterilization protect against ovarian cancer? Gynakol Prax. 2003;27(3):455-8.

54.    Herbst AL. The epidemiology of ovarian carcinoma and the current status of tumor markers to detect disease. AM J OBSTET GYNECOL. 1994;170(4):1099-107.

55.    Hernan. The C-word: scientific euphemisms do not improve causal inference from observational data. The American Journal of Public Health (AJPH). 2018; Vol. 108. No. 5:616-619.

56.    Horiuchi A, Konishi I. Prevention of ovarian cancer development. Nippon Rinsho. 2004;62 Suppl 10:597-600.

57.    Horn D, Dequanter D, Lothaire P. Palliative treatment of malignant pleural effusions. Acta Chir Belg. 2010;110(1):32-4.

58.    Huncharek M, Muscat J. Perineal talc use and ovarian cancer risk: A case study of scientific standards in environmental epidemiology. EurJ Cancer Prev. 2011;20(6):501-7.

59.    IARC (International Agency for Research on Cancer) (1987) Talc. IARC monographs on evaluation of carcinogenic risk of chemicals to humans, Vol. 42, IARC, Lyon, France, 185-224.

60.    IARC (International Agency for Research on Cancer) (2010) Carbon black, titanium dioxide, and talc, Vol. 93, IARC, Lyon, France.

61.    IARC (International Agency for Research on Cancer) (2012) Talc. Arsenic, Metals Fibres, and Dusts: A review of human carcinogens, Vol. 100C, IARC, Lyon, France.

62.    Institute of Medicine; National Academies of Sciences, Engineering, and Medicine (2016). *Ovarian Cancers: Evolving Paradigms in Research and Care*

63.    Hunn J, Rodriguez GC. Ovarian cancer: Etiology, risk factors, and epidemiology. CLIN OBSTET GYNECOL. 2012;55(1):3-23.

64.    Jordan SJ, Purdie DM, Whiteman DC, Webb PM. Risk factors for epithelial ovarian cancer. Cancer Forum. 2003;27(3):148-51.

65.    Kasper CS, Chandler PJ, Jr. Possible morbidity in women from talc on condoms. JAMA. 1995;273(11):846-7.

66.    Kennedy L, Rusch VW, Strange C, Ginsberg RJ, Sahn SA. Pleurodesis using talc slurry. CHEST. 1994;106(2):342-6.

67.    Kiraly O, Gong G, Olipitz W, Muthupalani S, Engelward BP. Inflammation-induced cell proliferation potentiates DNA damage-induced mutations in vivo. PLoS genectics. 2015; 11(2): e1004901.

68.     Kolschmann S, Ballin A, Gillissen A. Clinical efficacy and safety of thoracoscopic talc pleurodesis in malignant pleural effusions. CHEST. 2005;128(3):1431-5.

69.     Kupryjańczyk J. Adenomatoid tumour of the ovary and uterus in the same patient. Zentralbl Allg Pathol. 1989;135(5):437-44.

70.     Ladjimi S, M'Raihi L, Djemel A, Mathlouthi A, Ben Ayed F, Zegaya M. [Results of talc administration using thoracoscopy in neoplastic pleurisies. Apropos of 218 cases]. Revue des maladies respiratoires. 1989;6(2):147-50.

71.     Langseth H, Andersen A. Cancer incidence among women in the Norwegian pulp and paper industry. AM J IND MED. 1999;36(1):108-13.

72.     Lauchlan SC. The secondary mullerian system revisited. International journal of gynecological pathology : official journal of the International Society of Gynecological Pathologists. 1994;13(1):73-9.

73.     La Vecchia C. Epidemiology of ovarian cancer: A summary review. EurJ Cancer Prev. 2001;10(2):125-9.

74.     Levin. "Baby powder battles: Johnson & Johnson internal documents reveal asbestos worries". https//www.fairwarning.org/2018/01/talc-documents-reveal/.

75.     Lockey. Nonasbestos fibrous minerals. Clinics in chest medicine. 1981; 2(2):203-18.

76.     Lombardi G, Nicoletto MO, Gusella M, Fiduccia P, Dalla Palma M, Zuin A, et al. Intrapleural paclitaxel for malignant pleural effusion from ovarian and breast cancer: A phase II study with pharmacokinetic analysis. Cancer Chemother Pharmacol. 2012;69(3):781-7.

77.     Longo D, Young R. COSMETIC TALC AND OVARIAN CANCER. Lancet. 1979;314(8150):1011-2.

78.     Lowe KA, Shah C, Wallace E, Anderson G, Paley P, McIntosh M, et al. Effects of personal characteristics on serum CA125, mesothelin, and HE4 levels in healthy postmenopausal women at high-risk for ovarian cancer. Cancer Epidemiol Biomarkers Prev. 2008;17(9):2480-7.

79.     Lundin, Dossus, Clendenen, Krogh, Grankvist, Wulff, Sieri, Arlsan, Lenner, Berrino, Hallmans, Zeleniuch-Jacquotte, Toniolo, Lukanova. C-reactive protein and ovarian cancer: a prospective study nested in three cohorts (Sweden, USA, Italy). Caner Causes & Control: CCC. 2009; Vol. 20, Issue 7, PP 1151-1159.

80.     Lumachi F, Mazza F, Ermani M, Chiara GB, Basso SMM. Talc pleurodesis as surgical palliation of patients with malignant pleural effusion. Analysis of factors affecting survival. Anticancer Res. 2012;32(11):5071-4.

81.     Mad'Ar R, Straka S, Baška T. Is ovarian cancer associated with talcum powder? Hygiena. 2002;47(4):239-42.

82.     Mager HJ, Maesen B, Verzijlbergen F, Schramel F. Distribution of talc suspension during treatment of malignant pleural effusion with talc pleurodesis. Lung cancer (Amsterdam, Netherlands). 2002;36(1):77-81.

83.     Malden LT, Tattersall MH. Malignant effusions. QJM. 1986;58(3-4):221-39.

84.     Mallen, Townsend, Tworoger. Risk factors for ovarian carcinoma. Hematology/Oncology Clinics of North America. 2018; 32(6):891-902.

85.     Markman M, Muggia FM. Intracavitary chemotherapy. Crit Rev Oncol Hematol. 1985;3(3):205-33.

86.     Mayer D, C Kasper, P Chandler (1995). To the Editor: Talc and Condoms and reply, JAMA 274(16):1269.

87.     McLemore MR, Miaskowski C, Aouizerat BE, Chen LM, Dodd MJ. Epidemiological and genetic factors associated with ovarian cancer. Cancer Nurs. 2009;32(4):281-8.

88.     Medford ARL, Maskell NA. A national survey of oncologist and chest physicians' attitudes towards empirical anti-oestrogen therapy, early pleurodesis and preference of sclerosing agents in malignant breast and ovarian pleural disease [1]. Palliative Med. 2005;19(5):430-1.

89.     Meisler JG. Toward optimal health: The experts discuss ovarian cancer. J Women's Health Gender Med. 2000;9(7):705-10.

90.     Møller P, P Danielsen, K Jantzen, M Roursgaard & S Loft. Oxidatively damaged DNA in animals exposed to particles, Critical Reviews in Toxicology, 2013;43:2, 96-118

91.     Møller P, N Jacobsen, J Folkmann, P Danielsen, L Mikkelsen, J Hemmingsen, L Vesterdal, L Forchhammer, H Wallin & S Loft. Role of oxidative damage in toxicity of particulates, Free Radical Research, 2010;44:1, 1-46.

92.     Musani AI. Treatment options for malignant pleural effusion. Curr Opin Pulm Med. 2009;15(4):380-7.

93.     Muscat JE, Barish M. Epidemiology of talc exposure and ovarian cancer: A critical assessment.  Comments Toxicol. 1998;6(5):327-35.

94.     Muscat JE, Wynder EL. Re: "Perineal powder exposure and the risk of ovarian cancer". AM J EPIDEMIOL. 1997;146(9):786.

95.     Moon M, J Park, B Choi, S Park, D Kim, Y Chung, N Hisanaga, I Yu. Risk assessment of baby powder exposure through inhalation. Official Journal of Korean Society of Toxicology. 27(3):137-147.

96.     Narod SA. Talc and ovarian cancer. Gynecol Oncol. 2016.

97.     Natow AJ. Talc: need we beware? Cutis. 1986;37(5):328-9.

98.     Neill AS, Nagle CM, Spurdle AB, Webb PM. Use of talcum powder and endometrial cancer risk. Cancer Causes Control. 2012;23(3):513-9.

99.     Newhouse ML. Cosmetic talc and ovarian cancer. Lancet. 1979;2(8141):528.

100.    Ness RB. Ovarian cancer, inflammation and endometriosis. CME J Gynecol Oncol. 2003;8(1):33-40.

101.    Ness, R. Does talc exposure cause ovarian cancer?:IGCS-0015 Ovarian Cancer. International Journal of Gynecological Cancer: Official Journal of the International Gynecological Cancer Society, 2015;25 Suppl. 1:51

102.    Özyurtkan MO, Balci AE, Çakmak M. Predictors of mortality within three months in the patients with malignant pleural effusion. Eur J Intern Med. 2010;21(1):30-4.

103.     Okada. Beyond foreign-body induced carcinogesis: impact of reactive oxygen species derived from inflammatory cells in tumorigenic conversion and tumor progression. Internal Journal of Cancer. 2007; 121(11):2364-72.

104.     Park, Schidlkraut, Alberg, Bandera, Barnholtz-Sloan, Bondy, Crankshaw, Funkhouser, Moorman, Peters, Terry, Wang, Ruterbusch, Schwartz, Cote. Benign gynecology conditions are associated with ovarian cancer risk in African-American women: a case control study. Cancer Causes Control. 2018; Vol. 29, Issue 11, PP 1081-1091.

105.     Pauler DK, Menon U, McIntosh M, Symecko HL, Skates SJ, Jacobs IJ. Factors influencing serum ca125ii levels in healthy postmenopausal women. Cancer Epidemiol Biomarkers Prev. 2001;10(5):489-93.

106.     Pelfrene A, Shubik P. Is talc a carcinogen? A review of present data. NOUV PRESSE MED. 1975;4(11):801-3.

107.     Porzio G, Marchetti P, Paris I, Narducci F, Ricevuto E, Ficorella C. Hypersensitivity reaction to carboplatin: Successful resolution by replacement with cisplatin. Eur J Gynaecol Oncol. 2002;23(4):335-6.

108.     Radic, Vucak, Milosevic, Marusic, Vukicevic, Marusic. Immunosuppression induced by talc granulomatosis in the rat.  Clinical and Experimental Immunology. 1988; 73(2):316-21.

109.     Reid BM, Permuth JB, Sellers TA. Epidemiology of ovarian cancer: a review. Cancer Biol Med. 2017;14(1):9-32.

110.     Reid, De Klerk, Musk. Does exposure to asbestos cause ovarian cancer? A systematic literature review and meta-analysis. Cancer Epidemiology, Biomarkers & Prevention: a Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology. 2011; 20(7):1287-98.

111.     Rothman, K., Greenland, S., & Lash, TL. (2008). Modern Epidemiology, 3rd Edition. Philadelphia, PA: Lippincott Williams & Wilkins.

112.     Reuter, Gupta, Chaturvedi, Aggarwal. Oxidative stress, inflammation, and cancer: how are they linked?.  Free Radical Biology & Medicine. 2010; 49(11):1603-16.

113.     Roe FJ. Controversy: cosmetic talc and ovarian cancer. Lancet. 1979;2(8145):744.

114.     Ross. Geology, asbestos and health. Environmental Health Perspectives. 1974; 9:123-124.

115.     Sagae S, Mori M, Moore MA. Risk factors for ovarian cancers: Do subtypes require separate treatment in epidemiological studies? Asian Pac J Cancer Preven. 2012;3(1):5-16.

116.     Saka H, Shimokata K. State of the art: treatment of malignant pleural and pericardial effusions. Gan To Kagaku Ryoho. 1997;24 Suppl 3:418-25.

117.     Salehi F, Dunfield L, Phillips KP, Krewski D, Vanderhyden BC. Risk factors for ovarian cancer: An overview with emphasis on hormonal factors. J Toxicol Environ Health Part B Crit Rev. 2008;11(3-4):301-21.Salvador S, Scott S, Francis JA, Agrawal A, Giede C. No. 344-Opportunistic Salpingectomy and Other Methods of Risk Reduction for Ovarian/Fallopian Tube/Peritoneal Cancer in the General Population. J Obstet Gynaecol Can. 2017;39(6):480-93.

118.    Salvador S, Scott S, Francis JA, Agrawal A, Giede C. No 344-Salpingectomie opportuniste et autres méthodes pour réduire le risque de cancer de l'ovaire, de la trompe de Fallope et du péritoine dans la population générale. J Obstet Gynaecol Can. 2017;39(6):494-508.

119.    Sanchez-Armengol A, Rodriguez-Panadero F. Survival and talc pleurodesis in metastatic pleural carcinoma, revisited: Report of 125 cases. CHEST. 1993;104(5):1482-5.

120.    Shan, Lui. Inflammation: a hidden path to breaking the spell of ovarian cancer. Cell Cycle (Georgetorn, Tex). 2009; 8(19):31707-11.

121.    Shedbalkar AR, Head JM, Head LR, Murphy DJ, Mason JH. Evaluation of talc pleural symphysis in management of malignant pleural effusion. J Thorac Cardiovasc Surg. 1971;61(3):492-7.

122.    Shen N, Weiderpass E, Antilla A, Goldberg MS, Vasama-Neuvonen KM, Boffetta P, et al. Epidemiology of occupational and environmental risk factors related to ovarian cancer. Scandinavian journal of work, environment & health. 1998;24(3):175-82.

123.    Shlebak AA, Clark PI, Green JA. Hypersensitivity and cross-reactivity to cisplatin and analogues. Cancer Chemother Pharmacol. 1995;35(4):349-51. Silva EG. The Origin of Epithelial Neoplasms of the Ovary: An Alternative View. Adv Anat Pathol. 2016;23(1):50-7.

124.    Shoham Z. Epidemiology, etiology, and fertility drugs in ovarian epithelial carcinoma: Where are we today? FERTIL STERIL. 1994;62(3):433-48.

125.    Sioris T, Sihvo E, Salo J, Räsänen J, Knuuttila A. Long-term indwelling pleural catheter (PleurX) for malignant pleural effusion unsuitable for talc pleurodesis. Eur J Surg Oncol. 2009;35(5):546-51.

126.    Sueblinvong T, Carney ME. Ovarian cancer: risks. Hawaii Med J. 2009;68(2):40-6.

127.    Sueblinvong T, Carney ME. Current understanding of risk factors for ovarian cancer. Curr Treat Options Oncol. 2009;10(1-2):67-81.

128.    Tamaya T. Epidemiology of ovarian cancer. Nippon Rinsho. 2004;62 Suppl 10:435-40.

129.    Tortolero-Luna G, Mitchell MF. The epidemiology of ovarian cancer. Journal of cellular biochemistry Supplement. 1995;23:200-7.

130.    Tortolero-Luna G, Mitchell MF, Rhodes-Morris HE. Epidemiology and screening of ovarian cancer. OBSTET GYNECOL CLIN NORTH AM. 1994;21(1):1-23.

131.    Trabert B, R Ness, W Lo-Ciganic, M Murph, E Goode, E Poole, L Brinton, et al (2014). Aspirin, Nonaspirin Nonsteroidal Anti-inflammatory drug, and acetaminophen use and risk of invasive epithelial ovarian cancer: a pooled analysis in the Ovarian Cancer Association Consortium, Journal of the National Cancer Institute 106(2):djt431.

132.    Urban N, Hawley S, Janes H, Karlan BY, Berg CD, Drescher CW, et al. Identifying post-menopausal women at elevated risk for epithelial ovarian cancer. Gynecol Oncol. 2015;139(2):253-60.

133.    U.S. Department of Health & Human Service – Public Health Service, Agency for Toxic Substances and Disease Registry – "Toxicological profile for asbestos". https://www.atsdr.cdc.gov/toxprofiles/tp61.pdf.

134.    Van Gosen B, H Lowers, S Sutley, and C. Gent. Using the geologic setting of talc deposits as an indicator of amphibole asbestos content. Environmental Geology. 45 (7):920-939.

135.    Venter PF. Ovarian epithelial cancer and chemical carcinogenesis. Gynecol Oncol. 1981;12(3):281-5.

136.    Verma A, Taha A, Venkateswaran S, Tee A. Effectiveness of medical thoracoscopy and thoracoscopic talc poudrage in patients with exudative pleural effusion. Singapore Med J. 2015;56(5):268-73.

137.    Virta. The phrase relationship of talc and amphiboles in a fibrous talc sample. Vol. 8923 of the U.S. Dept. of the Interior, Bureau of Mines – Science.

138.    Vitonis AF, Titus-Ernstoff L, Cramer DW. Assessing ovarian cancer risk when considering elective oophorectomy at the time of hysterectomy. Obstet Gynecol. 2011;117(5):1042-50.

139.    Webb P, Gertig D, Hunter D. Ovarian Cancer.  Textbook of Cancer Epidemiology: Oxford University Press; 2009.

140.    Webb PM. Environmental (nongenetic) factors in gynecological cancers: Update and future perspectives. Future Oncol. 2015;11(2):295-307.

141.    Whitworth JM, Schneider KE, Fauci JM, Bryant AS, Cerfolio RJ, Straughn JM. Outcomes of patients with gynecologic malignancies undergoing video-assisted thoracoscopic surgery (VATS) and pleurodesis for malignant pleural effusion. Gynecol Oncol. 2012;125(3):646-8.

142.    Wehner AP. Biological effects of cosmetic talc. Food Chem Toxicol. 1994;32(12):1173-84.

143.    Wehner AP. Is cosmetic talc 'safe'? Comments Toxicol. 1998;6(5):337-66.

144.    Wehner AP. Cosmetic talc should not be listed as a carcinogen: Comments on NTP's deliberations to list talc as a carcinogen. REGUL TOXICOL PHARMACOL. 2002;36(1):40-50.

145.    Wentzensen N, Wacholder S. Talc use and ovarian cancer: Epidemiology between a rock and a hard place. J Natl Cancer Inst. 2014;106(9).

146.    Werner. Presence of asbestos in talc samples. Atemschutzinformation. 1982; 21:5-7.

147.    Whysner J, Mohan M. Perineal application of talc and cornstarch powders: Evaluation of ovarian cancer risk. AM J OBSTET GYNECOL. 2000;182(3):720-4.

148.    Wu, Song, Wei Zhu, Patricia Thompson, and Yusuf A. Hannun. 2018. "Evaluating Intrinsic and Non-Intrinsic Cancer Risk Factors." *Nature Communications* 9 (1): 3490. https://doi.org/10.1038/s41467-018-05467-z.

## Other Materials

1.    WCD000254-WCD000255
2.    IMERYS210136-IMERYS210137
3.    IMERYS241994-IMERYS242004
4.    IMERYS242050
5.    IMERYS322241-IMERYS322242

6.      IMERYS422289- IMERYS422290

7.      JNJ000087166-JNJ000087230

8.      JNJ000251888-JNJ000251890

9.      JNJ000261010-JNJ000261027

10.     JNJ000460665-JNJ000460673

11.     JNJ000526231-JNJ000526676

12.     JNJAZ55_000000577-JNJAZ55_000000596

13.     JNJAZ55_000003357

14.     JNJAZ55_000012423-JNJAZ55_000012430

15.     JNJI4T5_000004099-JNJI4T5_000004100

16.     JNJI4T5_000006431-JNJI4T5_000006432

17.     JNJMX68_000004996-JNJMX68_000005044

18.     JNJNL61_000001534-JNJNL61_000001535

19.     JNJNL61_000014431-JNJNL61_000014437

20.     JNJNL61_000020359

21.     JNJNL61_000052427

22.     JNJNL61_000061857

23.     JNJNL61_000063473

24.     John Hopkins, Trial Testimony, *Berg v. Johnson & Johnson* 2013

25.     Deposition Transcript & Exhibits – John Hopkins, Aug. 16 & 17, 2018, Oct. 26, 2018, Nov. 5, 2018

26.     Deposition Transcript & Exhibits – Joshua Muscat, Sept. 25, 2018

27.     Deposition Transcript & Exhibits – Julie Pier, Sept. 12 & 13, 2018

28.     Deposition Transcripts - Linda Loretz, Oct. 2, 2018

29.     Deposition Exhibits for Linda Loretz - Exh. 106, 107, 108, Oct. 2, 2018

30.     Deposition Transcript of Alice Blount, Apr. 13, 2018

31.     Educational report of Thomas Dydek

32.     Expert report of Jack Siemiatycki.

33.     Expert report of Laura Plunket (Oules).

34.     Fair warning TalcDoc 15.

35.     Fair warning TalcDoc 5- Exhibit 113 (JNJNL91_000022019).

36.     Letter from Cancer Prevention Coalition to FDA re: Citizen's Petition seeking carcinogenic labeling on all cosmetic talc products, Nov. 17, 1994.

37.     Letter from Cancer Prevention Coalition to FDA re: Citizen's Petition seeking a cancer warning on cosmetic talc products, May 13, 2008.

38.     Letter from Personal Care Products Council to FDA re: Comments on Citizen's Petition to the Commissioner of the Food and Drug Administration Seeking a Cancer Warning on Talc Products, July 21, 2009.

39.     Transcripts of CIR meeting (Unpublished)

88

40.      Rothman, Pastides, Samet. Interpretation of epidemiologic studies of talc and ovarian cancer. 2000.

41.      Zuckerman D, D Shapiro. Talcum Powder and Ovarian Cancer, National Center for Health Research, May 7, 2018 http://www.center4research.org/talcum-powder-ovarian-cancer/

**EXHIBIT A**

**Sonal Singh, MD MPH**
55 Lake Ave North
Worcester, MA 01655-0002 USA
Tel: 774 442 6611.
Sonal.Singh@umassmemorial.org

## Education

| | |
|---|---|
| MPH, Bloomberg School of Public Health, Johns Hopkins University Baltimore, MD | 6/2005 to 5/2008 |
| Internal Medicine Residency, Unity Health System, affiliate University of Rochester Sch of Medicine and Dentistry, Rochester, NY | 7/2002 to 6/2005 |
| MD, Patna Medical College, Patna, India | 12/91 to 05/1999 |

## Academic Appointments

| | |
|---|---|
| Associate Professor, Department of Family Medicine & Comm Health Department of Medicine, University of Massachusetts Medical School | 10/2016 to date |
| Assistant Professor, Dept of Medicine, Johns Hopkins Univ SOM | 7/2009 to 9/2016 |
| Assistant Professor, Center for Public Health and Human Rights Bloomberg School of Public Health, JHU (joint) | 7/2009 to 9/2016 |
| Assistant Professor, Department of Medicine, Wake Forest University | 7/2007 to 6/2009 |
| Instructor, Department of Medicine, Wake Forest University | 7/2005 to 06/2007 |

## Employment History

| | |
|---|---|
| Associate Professor, Department of Fam Medicine & Comm Hlth Meyers Primary Care Institute & Department of Medicine (Joint) University of Massachusetts Medical School Role: Clinician- Investigator | 10/2016-present |
| Associate Professor, Department of Quantitative Health Sciences University of Massachusetts Medical School Role: Clinician- Investigator | 10/2018-present |
| Assistant Professor, Dept of Medicine, Johns Hopkins University. Role: Clinician- Investigator | 7/2009 to 9/2016 |
| Assistant Professor, Department of Medicine, Wake Forest University Role: Clinician- Educator | 7/2007 to 6/2009 |
| Instructor, Department of Medicine, Wake Forest University | 7/2005 to 6/2007 |

1

Sonal Singh M.D., M.P.H

Role: Clinician- Educator

Residency (Medicine) Unity Healthy System, affiliate of the University of Rochester, Rochester, NY                                                                              7/2002 to 6/2005

Role: PGY 1, PGYII and PGY III Internal Medicine Resident

Research Associate, Clinical Pharmacology, Ohio State University          3/2001 to 6/2002
Role: Research assistant in clinical trials

Voluntary Research Associate, Clinical Pharmacology, Ohio State University     8/2000 to 2/2001
Role: Research assistant in clinical trials

USMLE STEP 1, II, III and Clinical Skills Exam Preparation                2/2000 to 7/2000
Role; Medical student

Resident, Medicine, Patna Medical College, Patna, Bihar, India             2/1998 to 1/2000
Role: Junior Resident in Medicine

Compulsory rotatory internship, Patna Medical College, Patna, India         12/97 to 12/98
Role: Fulfilling requirements for completion of medical degree in India

**Certification and Licensure**
Diplomate, American Board of Internal Medicine                           8/2005-12/25

Massachusetts Board of Physicians                                        8/2016-8/2019

Physicians and Surgeons of Maryland (Inactive)                          2009-2017

North Carolina Medical Board (Inactive)                                 2005 to 2009

**Professional Memberships and Activities**
Massachusetts Medical Society                                          2017-current

American College of Physicians                                         2003-2019

International Society of Pharmacoepidemiology                           2011-current

Society of General Internal Medicine                                   2003 to 2016

International Society of Pharmacoeconomic Outcomes Research             2016 to 2017

Academy Health                                                         2013

Global Health Council                                                 2006 to 2010

2

Sonal Singh M.D., M.P.H

**Honors and Awards**

| | |
|---|---|
| Finalist W. Leigh Thompson Excellence in Research: Faculty Award, JHU | 2016 |
| Visiting Professor, Department of Medicine, Univ of Alabama | 2013 |
| 3rd Best Abstract (trainee) 29th ICPE Montreal, Canada | 2013 |
| Bruce Squires Award for the Best Research Paper, CMAJ | 2011 |
| Scholars Abstract Award, Society for Clinical and Translational Sciences. | 2010 |
| Society of General Internal Medicine Clinical Investigator Award (Mid-Atlantic) | 2010 |
| Elected, Delta Omega Honorary Public Health Society, Johns Hopkins University | 2008 |
| Master Teacher Award, WFUSOM | 2008 |
| Tinsley R Harrison Faculty Outpatient Teaching Award, WFUSOM | 2007 |
| Tinsley R Harrison Faculty Outpatient Teaching Award, WFUSOM | 2006 |
| Senior–Resident Scholarship award, Unity Health System, NY | 2005 |
| ACP Health and Public Policy Scholarship, NY | 2005 |

**Committee Assignments and Administrative Services**

| | |
|---|---|
| American College of Physicians, Massachusetts Chapter, Health Policy Committee | 2018 |
| Chairs Advisory Council, Department of Fam Medicine & Comm Hlth | 10/2016-present |
| American College of Chest Physicians, Cough Guideline Expert Panel | 2017- present |
| Associate faculty, Welch Ctr for Prevention, Epi & Clin Research, JHU | 2015 to 2016 |
| Associate-Director, Center for Drug Safety and Effectiveness, JHU | 2013 to 2016 |
| Affiliate faculty, Center for Hlth Services and Outcomes Research, Johns Hopkins Bloomberg School of Public Health | 2012 to 2016 |
| World Health Organization, International Agency of Research on Cancer (IARC) Monograph- 108 Working group, Lyon, France. | 2013 |

3

Sonal Singh M.D., M.P.H

Preferred Items for Reporting of Systematic Reviews and Meta-analysis of harms Working Group
Alberta Canada.                                                                                    2012

Member, Health & Human Rights Working Group, JHU Center for Aids Research  2012

Core faculty, Center for Public Health and Human Rights, Johns Hopkins Bloomberg School of
Public Health                                                                    2009 to 2016

Core faculty, Evidence-Based Practice Center, JHU                                2009 to 2016

Medical Director, Outpatient Clinic, WFUSOM                                       7/2005-6/2009


**Teaching Activities**
<u>Classroom</u>
Comparative effectiveness research (2 cr), Johns Hopkins Medicine                 2015 to 2016
Role: Developed course in CER for MD and MD/PhD trainees in the CTSA

Health and Human Rights, Johns Hopkins Bloomberg School of Public Health         2011 to 2015
Role: Annual lecture in the course for MPH students

Health Economic, Johns Hopkins Bloomberg School of Public Health                 2013
Role: Annual lecture in the course for master's students

Pharmacoepidemiology, Johns Hopkins Bloomberg School of Public Health            2011-2015
Role: Annual lecture in the course for Masters and Doctoral students

Evidence-based Medicine, Johns Hopkins University School of Medicine              2012
Role: Course facilitator

Intro to Clinical Investigation, Johns Hopkins University School of Medicine      2012
Role: Annual lecture in the course

Clinical Epidemiology, Johns Hopkins Bloomberg School of Public Health,           2010-2014
Role: Annual lecture in the course

Patient Physician and Society, Johns Hopkins University School of Medicine        2009
Role: Course facilitator


<u>Clinical Teaching</u>
Outpatient medicine                                                              2016-2018

4

Sonal Singh M.D., M.P.H

Role: Precepting residents and medical students in clinic at University of Massachusetts Medical School

Evidence Based Medicine                                                         2012-2014
Role: Developed a novel course to teach Evidence based Medicine to Osler medical residents at Johns Hopkins University School of Medicine

Outpatient medicine                                                             2005 to 2009
Role: Precepting residents in clinic at Wake Forest University

Inpatient Medicine                                                              2005 to 2009
Role: Precepting internal medicine residents at Wake Forest University

Sonal Singh M.D., M.P.H

| Trainee /Junior Faculty Name | Mentoring Role | Title of Research Project/Paper | Current Position and Institution | Training Period |
|---|---|---|---|---|
| **Univ of Massachusetts** | | | | |
| Mayuko Itofukunaga, MD | Faculty mentor | Systematic review of decision aids for lung cancer screening | Assistant Professor-Pulmonary Medicine and Critical Care | 2017-18 |
| Nathaniel, Erskine MD, PhD (student) | Scholarly activity | SR of herpes zoster and cardiovascular disease | MD/PhD Student Umass Med School | 2017 |
| Richeek Pradhan MS | Scholarly activity | Comparison of data on Adverse events | Phd Student McGill University | 2017-18 |
| **Johns Hopkins Univ** | | | | |
| Omar Mansour | Scholarly activity | SGLT2inhibitors and cardiovascular outcomes | Masters student | 2018 |
| Geetha Iyer, MD | Faculty mentor | Multiple Pharmacoepidemiologic studies | Doctoral student, HSPH | 2015-16 |
| Sathiya Priya Marimathu | Faculty mentor | Generic drugs and patient oriented outcomes | MHS Student, JHMI | 2015-16 |
| Yohalakshmi Chelladurai, MD, MPH | RA Scholarly activity | Review of varenicline | Resident physician, Mercer, Atlanta | 2013 |
| Hsien-Yen Chang PhD | Faculty mentor | Pharmacoepidemiologic studies | Assistant Scientist at JHU | 2011-15 |
| Hasan Shihab, MD, MPH | RA Scholarly activity | Review of GLP-based therapies | Resident, Franklin Square, Baltimore | 2013-14 |
| Joshua Sclar, MD, MPH | Scholarly activity | Systematic review of attacks on health workers | General Preventive Medicine Resident | 2013 |
| Crystal Ng, MPH | Scholarly activity | Human Rights measures | MPH Student, JHSPH | 2013 |
| Ekta Agarwal, MPH | Capstone | Safety of novel anticoagulants | MPH student JHSPH | 2013 |
| Meijia Zhou, MHS | Scholarly activity | Adherence to novel anticoagulants | Doctoral student, Univ of Pennsylvania | 2013 |
| Kaitlin Hayman, MD | Capstone | SR of the impact of disasters On CVD outcomes | MPH student, JHSPH | 2013 |
| Wenze Tang, MPH | Scholarly activity | SCCS analysis of GIB bleeding with dabigatran | Doctoral student, HSPH | 2013 |

6

Sonal Singh M.D., M.P.H

| Omar Mansour | Scholarly activity | SGLT2inhibitors and cardiovascular outcomes | Masters student JHSPH | 2018 |
| Shabana Walia MD | Scholarly activity | SR of CVD among refugees and displaced | ER physician, UT Houston | 2016-2018 |
| **Wake Forest Univ** | | | | |
| Aman Amin, MD | Resident | Inhaled corticosteroids and pneumonia | Practicing internist, NC | 2007-09 |
| Apurva Trivedi, MD | Scholarly activity | SSRIs and bleeding | Gastroenterologist | 2007-09 |
| **Other institutions** | | | | |
| Tonya Breaux-Shropshire PhD, MPH | Scholarly activity | Systematic review | Post-doctoral trainee, UAB | 2015 |
| Abhay Kumar, MD | Resident Scholarly activity | Wernicke encephalopathy after gastric bypass: systematic review | Assistant Professor St Louis University | 2007 |

**Current Grants and Contracts**
**Grants**
(Ming Tai-Seale)                                        2/2016-12/2021
PCORI
Improving Patient-Centered Communication in Primary Care: A Cluster Randomized Controlled Trial of the Comparative Effectiveness of Three Interventions
The aim is to compare three interventions to improve patient communication in primary care
Role: co-investigator

(PI Jerry Gurwitz)                                       08/2018- 09/2019
NIH/NIA-1 R56 AG061813-01
Project Title: Controlling and Stopping Cascades leading to Adverse Drug Effects Study in Alzheimer's Disease (CASCADES-AD)
Role : co-investigator
The aim is to develop interventions to prevent prescribing cascades among those with Alzheimer's related Dementia (ADRD)

**Past Grants**
Death Data Exploration                                   08/01/17- 03/02/18
FDA Foundational Elements 3 HHSF223200910006I
Task Order Number: HHSF22301012T
Efforts to Develop the Sentinel Initiative HHSF223200910006I.
Role (Project Lead)

Effect of Therapeutic Class on Generic Drug Substitutions.          2014-2016
U01FD005267-01 (PI, Jodi Segal)

7

Sonal Singh M.D., M.P.H

FDA                                                                                      349,480
Role: Co-Investigator                                                      0.6 CM


Comparative effectiveness Research & The Cochrane Eyes and Vision Group          2013-2016
U01 EY020522 (PI, Kay Dickersin)
NIH/NEI                                                                               825,397
Role: Co-Investigator                                                      2.4 CM


Systematic review of gabapentin for neuropathic pain using multiple data sources    2015-2016
(PI, Caleb Alexander)
FDA Center of Excellence in Regulatory Science
Role: Co-Investigator          (20% effort)


Integrating multiple data sources for meta-analysis to improve patient-centered outcomes
research                                                                              2014-2016
(PI- Dickersin)
PCORI (ME-1303-5785)                                                         $698,174
Role: Advisor (2% effort)


Development of a scale for human rights violations.                            2013-2014
(PI, Chaisson & Beyrer)
NIH Johns Hopkins Center for AIDS Research                          $ 18,873
Role:  Pilot Awardee


Comparative effectiveness review of therapeutic options for obesity in the Medicare population.
Johns Hopkins Evidence Based Practice Center.                          2013-2014
PI (Eric Bass)
AHRQ                                                                                  $125,000
Role:   Project Principal Investigator (20% effort)


Center for Excellence in Comparative Effectiveness Education                   2012-2013
PHRMA Foundation (PI Jodi Segal)                          Total Direct Cost: $250,000
Role: Co-investigator (5% effort)


A multi criteria decision analysis to assist with regulatory decisions around benefit and risk
Partnership in Applied Comparative Effectiveness Science:               2010 to 2013
PI (PI, Jodi Segal).
FDA                                                                                  $3,509,657
Role: Project Principal Investigator (25% effort)


Combination therapy vs. intensification of statin mono-therapy: An update.          2012-
2013
PI (E. Bass- P.I of EPC.)
AHRQ
Role: Advisor (5% effort)
8

Sonal Singh M.D., M.P.H

Troponin cardiac marker during renal impairment.    2012-2013
(E. Bass- P.I of EPC.)
Agency for Health Care Quality and Research
Role: Advisor (5% effort)

To develop an instrument for attacks on health workers.    2012-2013
PI (Len Rubenstein)
US Institute of Peace
Role: Co-investigator (10% effort)

To develop an instrument for attacks on health workers.    2012-2013
PI (Len Rubenstein)
McArthur Foundation    $434,782
Role: Co-investigator (15% effort)

To conduct a benefit and harm assessment of *roflumilast* in COPD.    2012-2013
Johns Hopkins ICTR
Role: Co-investigator (5% effort)

To develop a China-JHU consultation for civil society public health professionals.    2012
Open Society Foundation    $49,534
Role: PI (20% effort). Proposal for a public health training program.

PACER.    2012
PI (Rothman)
Google-Flu
Role: Coinvestigator (5%) Systematic reviewer and meta-analysis expert.

Methods for Balancing Benefits and Harms in Systematic Reviews
Johns Hopkins Evidence Based Practice Center. (PI, Bass)    2011-2012
AHRQ    $188,871
Role: Project Task Leader and co-Investigator (10% effort)

Comparative effectiveness review of Meditation Programs for Stress and Wellbeing
Johns Hopkins Evidence Based Practice Center. (PI, Bass)    2011-2012
AHRQ    $375,666
Role: Project Task Leader and co-Investigator (15% effort)

Comparative effectiveness review of prevention of VTE in special populations
Johns Hopkins Evidence Based Practice Center. (PI, Bass)    2011-2012
AHRQ    $375,666
Role:   Project Principal Investigator (20% effort)

9

Sonal Singh M.D., M.P.H

To prevent and respond to gender-based violence (GBV) in refugee and conflict-affected populations.                                                          2010-2011
(PI, Vu & Rubenstein)                                                                    $293,946
Role: Co-investigator (10% effort)


Comparative effectiveness review of oral hypoglycemic medications
Johns Hopkins Evidence Based Practice Center. (PI, Bass)                 2009-2010
AHRQ                                                                                              $125,000
Role:   Co- Investigator (0% effort)


Johns Hopkins Clinical Research Junior Faculty Award.                      2009-2012
NIH-KL2
ICTR
Role: Recipient (75% salary support)


Measuring exposure to human rights violations among men who have sex with men.
(PI, Mullany).                                                                                  2009-2010
Center for Global Health Johns Hopkins                                             $50,000
Role: Co-investigator (0% effort).


Research ethics for conducting research in vulnerable populations and unstable settings.
(PI, Mills)                                                                                         2007-2009
CIHR                                                                                              $99, 887
Role: Co-investigator (10% effort).


**Patents** None.

**<u>Editorial work</u>**
*Editor-in-chief and founder*
BMC Conflict and Health                                                                 2007-12


*Editorial Board Membership*
Evidence Based Medicine (BMJ Group of Journals)                           2017-current
Drug Safety                                                                                    2008-16
American College of Physicians-PIER


*Grant review*                                                                               2012-current
Medical research foundation of New Zealand
Johns Hopkins Center for Public Health and Human Rights
Junior Faculty Research Grants
Medical Research Council of South Africa
Catalina Health Technology Assessment, Spain
Diabetes, UK
Johns Hopkins Medicine Research Council Synergy Awards
Johns Hopkins Institute for Clinical and Translational Research

10

Sonal Singh M.D., M.P.H

*Peer Review*

| | |
|---|---|
| 1. | Acta Diabetologica |
| 2. | American Heart Journal |
| 3. | American Journal of Addictions |
| 4. | American Journal of Cardiovascular Drugs |
| 5. | American Journal of Managed Care |
| 6. | American Journal of Psychiatry |
| 7. | Annals of Internal Medicine |
| 8. | Annals of Medicine |
| 9. | Australian Medical Journal |
| 10. | BMJ |
| 11. | BMC Clinical Pharmacology |
| 12. | British Journal of Clinical Pharmacology |
| 13. | Bulletin of the World Health Organization |
| 14. | Chest |
| 15. | Circulation |
| 16. | Canadian Medical Association Journal |
| 17. | Clinical Pharmacology and Therapeutics |
| 18. | Clinical Trials |
| 19. | Cardiovascular Drugs & Therapy |
| 20. | Cochrane Collaboration |
| 21. | Disasters |
| 22. | Diabetolgia |
| 23. | Drug and Alcohol Dependence |
| 24. | Diabetes Obesity and Metabolism |
| 25. | Drug Safety |
| 26. | Epidemiology |
| 27. | European Journal of Neurology |
| 28. | European Journal of Pharmacology |
| 29. | European Respiratory Journal |
| 30. | Expert Opinion in Drug Safety |
| 31. | Global Public Health |
| 32. | Health Policy |
| 33. | International Journal of Epi |
| 34. | International Journal of Obesity |

Sonal Singh M.D., M.P.H

| |
|---|
| 35. *Journal of the American College of Cardiology* |
| 36. *Journal of the American Medical Association (5 in last 12 mo)* |
| 37. *Journal of the American Medical Association-Internal Medicine* |
| 38. *Journal of Cardiac Failure* |
| 39. *Journal of Medical Case Reports* |
| 40. *Journal of the Pancreas* |
| 41. *Journal of General Internal Medicine* |
| 42. *Medscape General Medicine* |
| 43. *Medical Journal of Australia* |
| 44. *Nephrology Dialysis Transplantation* |
| 45. *North Carolina Medical Journal* |
| 46. *Nutrition, Metabolism & Cardiovascular Diseases* |
| 47. *Pediatric Infectious Disease Journal* |
| 48. *Pharmacoepidemiology & Drug Safety-Best Reviewer Award 2013* |
| 49. *Public Library of Science Medicine* |
| 50. *Primary Care Respiratory Journal* |
| 51. *Pediatrics* |
| 52. *Research Synthesis Methods* |
| 53. *Respiratory Medicine* |
| 54. *Respirology* |
| 55. *Southern Medical Journal* |
| 56. *The Lancet* |
| 57. *Thorax* |
| 58. *Tropical Medicine & International Health* |

**Abstracts and Presentations**

**Oral Presentations**

*National/International*

1. GLP-1-based therapies and risk of pancreatitis: A matched case-control study. 29th International Society of Pharmacoepidemiology, Annual Meeting, Montreal Convention Center, August 26. Montreal, Quebec, Canada.2013

2. GLP-1 based therapies and risk of pancreatitis. 36th SGIM Annual Meeting, Denver, Colorado Posters. 2013

3. Risk of fractures with inhaled corticosteroids in COPD: Systematic review and meta-analysis of randomized controlled trials and observational studies, Society of General Internal Medicine, Minneapolis, Minnesota. 2011

12

Sonal Singh M.D., M.P.H

4. Odds of fractures with inhaled corticosteroids in COPD: Systematic review and meta-analysis of clinical trials and observational studies, 27th International Society of Pharmacy-Epidemiology, Annual Meeting, Hyatt Regency August 24th.  Chicago, Illinois. 2011

*Local/Regional*
Not applicable

**Posters**
*National/International Meetings*

1. Diagnostic algorithms for cardiovascular death in administrative claims databases. A systematic review 2018. International Society of Pharmacoepidemiology, Prague, August 24, 2018.

2. Risk of gastrointestinal bleeding among dabigatran users-a self-controlled case series analysis. Health Care Systems Research Network, San Deigo, March 22, 2017.

3. GLP-1 based therapies and risk of pancreatitis. Pancreatitis, Diabetes, and Pancreatic Cancer Workshop. NIH, Bethesda, Maryland. 2013

4. Thiazolidinediones and risk of bladder cancer: A systematic review and meta-analysis. 36th SGIM Annual Meeting, Denver, Colorado.2013

5. Who is the patient's doctor? Primary care responsibility and co-management relationships among generalist and non-generalist physicians in the National Ambulatory Care Survey, 2002 SGIM 29th Annual Meeting, Los Angeles, California.2006

6. The educational value of case reports from the SGIM national meeting in the internal medicine clerkship. SGIM 29th Annual Meeting, Los Angeles, California.2006

7. Using IPod technology to create a self-guided clinic tour for resident orientation SGIM 29th Annual Meeting, Los Angeles, California.2006

8. Narcotic management in chronic non-malignant pain. A survey of resident's knowledge and attitudes. SGIM 29th Annual Meeting, Los Angeles, California.2006

9. Formulary conversion programs pose a significant risk to patients, SGIM 27th Annual Meeting, Chicago, Illinois.2004

*Local regional meetings*
Inhaled corticosteroids and the risk of fractures in COPD: A systematic review and meta-analysis. DOM Annual retreat, Johns Hopkins University 2011

**Invited presentations**
*National/International*

1. Oral direct acting antivirals and the incidence or recurrence of hepatocellular carcinoma. NIH Collaboratory Grand Rounds [ Web] March 2, 2018

2. Resurgence of hepatocellular carcinoma in the era of oral direct acting antivirals. Cause or Consequence? Fundamentals of Biomedicine Seminar Series. Texas Tech University Health Sciences Center. El Paso, Texas Dec 13, 2017

Sonal Singh M.D., M.P.H

3. Aligning evidence with preferences: Methodological Challenges and Opportunities. - Department of Medicine. Dartmouth-Hitchcock Medical Center, Dartmouth, New Hampshire, June 15, 2016

- Dartmouth-Hitchcock Medical Center, Dartmouth, New Hampshire, June 15, 2016
- Department of Health Services and Research, Michael De-Bakey VA and Baylor University, Houston, Texas, May 16, 2016.
- Meyers Primary Care Institute and Department of Family and Community Medicine, University of Massachusetts, Massachusetts, March 31 and June 9 2016.
- VA Center for Chronic Disease and Outcomes Research, Minnesota VA, March 2016.
- Department of Medicine. University of Central Florida, Orlando, Florida, November 2015.
- Center for Health Policy and Research Grand Rounds. UC Davis, Sacramento California, Oct 9 2015;
- Center for Evidence and Outcomes, Agency for Health Care Research and Quality. Gaithersville Maryland, August 31, 2015.

4. Risks of Spiriva Respimat outweigh its benefit: A Debate. Inhalation Asia, University of Hong Kong, Department of Pharmacology and Pharmacy, Hong Kong. 2013

5. GLP-1-based therapies and risk of pancreatitis. Center for Clinical Epidemiology and Biostatistics Seminar Series, Philadelphia, Pennsylvania. 2013

6. Visiting Professor. Department of Medicine. University of Alabama. 2013

7. Value based health care: Can shared decision making methods get us there? Center for Value and Effectiveness, Medicine Institute, Cleveland Clinic, Noon Conference.2013

8. Role of Multi-criteria decision analysis in regulatory policy

- Stanford Prevention Research Center, Stanford University, Palo Alto, Stanford, California. 2013
- South Carolina College of Pharmacy, Columbia, South Carolina.2013
- Department of Medicine. UC Davis, Sacramento, California.2013
- Department of Clinical Sciences, UT Southwestern, Dallas, Texas.2013
- Department of Medicine, Geisenger Medical Center, Danville, Pennsylvania. 2013

9. Weighing benefits and risks: Role of shared decision making in type 2 diabetes. CTSA Grand Rounds, Mayo Clinic, Rochester, Minnesota. 2013

10. Are long-acting muscarinic agents safe for patients with COPD: A Debate. Airway Vista, Asan Medical Center, Seoul, Korea

11. Academia and industry collaboration for cardiovascular risk mitigation. CBI and Applied Clinical Trials. 6th Annual Summit, Closing Address. Ritz Carlton, Arlington, Virginia.2012

12. Varenicline: Where are we today? Tobacco Disease Research Program, UCSF. San Francisco California. Varenicline debate.2012

13. The Maoist Insurgency in Nepal: Health Systems Challenges and Opportunities Conference on Health in Fragile States: Challenges for the Next Decade. United States Institute of Peace. Washington DC.2011

14

Sonal Singh M.D., M.P.H

14. Standards of Care and the Role of Community Advocacy in Clinical Trials. Clinical Research in Developing Countries, IIIrd Annual Marcus Evans Conference, Washington, DC.2008

15. Nepal-A Case study. Integrating public health methods into Conflict Analysis. Norman Patterson School of International Affairs, Carleton University, Ottawa, Canada.2007

*Local/Regional*

1. Oral direct acting antivirals and the incidence or recurrence of hepatocellular carcinoma. Research Seminar Series, Department of Family Medicine and Community Health. University of Massachusetts Medical School. June 15.2018

2. Safety of novel anticoagulants vs warfarin- a case study using complementary study designs. Quantitative Health Sciences, University of Massachusetts Medical School, February 28, 2017

3. GLP-1-based therapies and risk of pancreatic adverse events.  University of Maryland, Division of Endocrinology, Metabolism and Nutrition, Grand Rounds, Baltimore, Maryland. 2013

4. Thiazolidinediones and Patient-Oriented Outcomes in Type 2 Diabetes, GIM Grand Rounds. Johns Hopkins University School of Medicine. 2012

5. Patient-Centered Benefit and Risk Assessment. Center for Health Services and Outcomes Research. Johns Hopkins University 2012

6. Varenicline and cardiovascular and neuropsychiatric adverse events: Do benefits outweigh risks? Welch Center Grand Rounds. Johns Hopkins University. 2011

7. The new wave, HIV, Human Rights and Men who have Sex with Men in Nepal. Johns Hopkins Bloomberg School of Public Health, 2011.

8. Network Meta-analysis and Serious Adverse Events. Network Meta-Analysis Methods Workshop. Johns Hopkins Bloomberg School of Public Health. 2010

9. Thiazolidinediones and Cardiovascular Outcomes in Type 2 Diabetes. Internal Medicine Grand Rounds. Wake Forest University School of Medicine, 2008

10. How Safe Are Our Drugs and How Do We Know? North Carolina ACP, Durham.2008

11. Clinico Pathologic Conference. Internal Medicine Grand Rounds. Wake Forest University School of Medicine, 2007

12. Globalization and Health Equity: An emerging Challenge for Academic Medicine. Internal Medicine Grand Rounds. Wake Forest University School of Medicine, 2007

13. Thiazolidinediones and Cardiovascular Disease: The Seduction of Common Sense. Epidemiology Seminar Series, Public Health Sciences. Wake Forest University 2007

*Workshops and Precourses*

1. ISPOR National Meeting, Next Generation Comparative Effectiveness Research- Are we getting organized to facilitate research for the individual patient? Washington, DC May 24, 2016 (workshop)

2. SGIM national meeting, developing high-quality search strategies for systematic reviews. 2010

3. SGIM national meeting, Systematic Review. 2009

**Peer reviewed original research publications (reverse chronological order)**

*Trainees \**

1. **Singh S**, Fouyazi H, Anzuoni K, Goldman L, Min JY, Griffin M, Grijalva CG, Morrow JA, Whitmore C, Leonard CE, Selvan M, Nair V, Zhou Y, Toh S, Petrone A, Williams J, Fazio-

Sonal Singh M.D., M.P.H

Eynullayeva E, Swain R, Cole DT, Andrade S. Diagnostic algorithms for cardiovascular death in administrative claims databases. A systematic review. Drug Safety 2018 ( accepted)

2. **Singh S,** Zeiman S, Alan Go, Fortmann S, Wenger N, Fleg JL, Radziszewska B, Stone NJ, Zoungas S, Gurwitz J. Statins for Primary Prevention in Older Adults – Moving toward Evidence-Based Decision-Making. *J Am Geriatr Soc. 2018 Oct 2. doi: 10.1111/jgs.15449. [Epub ahead of print]*

3. Tisminetzky M, Nguyen HL, Gurwitz J, McManus D, Gore J, **Singh S**, Yarzebski J, Goldberg RJ. Magnitude and impact of multiple chronic conditions with advancing age in older adults hospitalized with acute myocardial infarction. *International Journal of Cardiology. Published* Online: August 22, 2018. https://doi.org/10.1016/j.ijcard.2018.08.062.

4. Chang HY, **Singh S**, Mansour O, Baksh S, Alexander GC. Association Between Sodium-Glucose Cotransporter-2 (SLGT-2) Inhibitors and Lower Extremity Amputation: A Retrospective Cohort Study. JAMA Internal Medicine 2018. 10.1001/jamainternmed.2018.3034 http://dx.doi.org/10.1001/jamainternmed.2018.3034. August 13, 2018

5. Birring SS, Kavanagh JE, Irwin RS, Keogh K, Lim KG, Ryu JH; **CHEST Expert Cough Panel**. Treatment of Interstitial Lung Disease Associated Cough: CHEST Guideline and Expert Panel Report. Chest. 2018 Jul 20. pii: S0012-3692(18)31075-4. doi: 10.1016/j.chest.2018.06.038. [Epub ahead of print]

6. **Singh S**, Nautiyal A, Loke YK. Oral Direct-acting antivirals and the incidence or recurrence of hepatocellular carcinoma: a systematic review and meta-analysis. Frontline Gastroenterology Published Online First: 30 July 2018. doi: 10.1136/flgastro-2018-101017

7. Chang AB, Oppenheimer JJ, Rubin BK, Weinberger M, Irwin RS; **CHEST Expert Cough Panel**. Chronic Cough Related to Acute Viral Bronchiolitis in Children. Chest. 2018 Apr 26. pii: S0012-3692(18)30632-9. doi: 10.1016/j.chest.2018.04.019. [Epub ahead of print]

8. Haar RJ, Risko CB, **Singh S,** Rayes D, Albaik A, Alnajar M, et al. (2018) Determining the scope of attacks on health in four governorates of Syria in 2016: Results of a field surveillance program. PLoS Med 15(4): e1002559. https://doi. org/10.1371/journal.pmed.1002559

9. Pradhan R, * **Singh S.** Comparison of data on Serious Adverse Events and Mortality in ClinicalTrials.gov corresponding journal articles and medical reviews: A cross-sectional analysis. Drug Safety 2018 Apr 11. doi: 10.1007/s40264-018-0666-y. [Epub ahead of print]

10. Wu CH, Tu ST, Chang YF, Chan DC, Chien JT, Lin CH, **Singh S**, Dasari M, Chen JF, Tsai KS. Fracture liaison services improve outcomes of patients with osteoporosis-related fractures: A systematic literature review and meta-analysis. Bone. 2018 2018 Jun; 111:92-100. doi: 10.1016/j.bone.2018.03.018. Epub 2018 Mar 16

11. Field SK, Escalante P, Fisher DA, Ireland B, Irwin RS; **CHEST Expert Cough Panel**. Cough Due to TB and Other Chronic Infections: CHEST Guideline and Expert Panel Report. Chest. 2018 Feb;153(2):467-497. doi: 10.1016/j.chest.2017.11.018. Epub 2017 Nov 28.

12. Erskine NA, *Tran H, Levin LL, Ulbricht CM, Fingeroth JD, Kiefe CI, Goldberg RJ, **Singh S.** A systematic review and meta-analysis on herpes zoster and the risk of cardiac and cerebrovascular events. PLoS One 2017 Jul 27;12(7): e0181565

13. **Singh S**. Nautiyal A. Aortic dissection and aortic aneurysms associated with fluoroquinolones: a systematic review and meta-analysis of observational studies. American Journal of Medicine 2017;130(12):1449-1457

Sonal Singh M.D., M.P.H

14. Marimuthu S, Iyer G, * Segal JB, **Singh S**.  Patient-relevant outcomes associated with generic tamsulosin, levothyroxine, and amphetamine in the FAERS: A pilot study. J Comp Eff Res. 2017;6(5):437-447.

15. Iyer G, *Marimuthu S, *Segal JB, **Singh S**. An algorithm to identify generic drugs in the FDA Adverse Event Reporting System. Drug Safety 2017 2;40(9):799-808.

16. Tang W, *Chang HY, *Zhou M, * **Singh S**. Risk of gastrointestinal bleeding among dabigatran users-a self-controlled case series analysis. *Sci Rep* 2017 Jan 20; 7:40120. doi: 10.1038/srep40120.

17. Onasanya O, Iyer G, * Lucas E, Lin D, **Singh S**, Alexander GC. Association between exogenous testosterone and cardiovascular events: an overview of systematic reviews. *Lancet Diabetes Endocrinol*. 2016 ;4(11):943-956

18. **Singh S**, Wright EE, Kwan AY, Thompson JC, Syed IA, Korol EE, Waser NA, Yu MB, Juneja R. Glucagon-like peptide-1 receptor agonists compared with basal insulins for the treatment of type 2 diabetes mellitus: a systematic review and meta-analysis. *Diabetes Obes Metab*. 2017;19(2):228-238

19. Alexander GC, Iyer G, Lucas E, Lin D, **Singh S**. Cardiovascular risks of exogenous testosterone among men. *Am J Med*. 2017 ;130(3):293-305

20. Houston KT, Shrestha A, Kafle HM, **Singh S**, Mullany L, Thapa L, Surkan PJ 1. Social isolation and health in widowhood: A qualitative study of Nepali widows' experiences. *Health Care Women Int*. 2016 ;37(12):1277-1288

21. Zorzela, L., Loke, Y.K., Ioannidis, J.P., Golder, S., Santaguida, P., Altman, D.G., Moher, D., Vohra, S., Boon, H., Clark, J., Derry, S., Gallivan, J., Gardiner, P., Gøtzsche, P., Loder, E., Napoli, M., Pilkington, K., Shekelle, P., **Singh S**, Witt, C., Lasserson, T., Wu, T., Shamseer, L., Mulrow, C. PRISMA harms checklist: improving harms reporting in systematic reviews. *BMJ* 2016;352: i157.

22. Fain KM, Yu T, Li T, Boyd CM, **Singh S**, Puhan MA, Evidence Selection for a Prescription Drug's Benefit-Harm Assessment: Challenges and Recommendations, *JCE* 2016 Jun;74:151-7

23. Vu A, Wirtz A, Pham K, **Singh S**, Rubenstein L, Glass N, Perrin N. Psychometric properties and reliability of the Assessment Screen to Identify Survivors Toolkit for Gender Based Violence (ASIST-GBV): results from humanitarian settings in Ethiopia and Colombia. *Confl Health*. 2016 Feb 9; 10:1.

24. Wirtz, AL, Glass N, Pham K, Perrin N, Rubenstein LS, **Singh S**, Vu A. Comprehensive development and testing of the ASIST-GBV, a screening tool for responding to gender-based violence among women in humanitarian settings. *Conflict and Health* 201610:7 DOI: 10.1186/s13031-016-0071-z

25. Hayman KG, *Sharma D, Wardlow RD II, **Singh S**. Burden of cardiovascular morbidity and mortality following humanitarian emergencies: a systematic literature review. *Prehosp Disaster Med*. 2015;30(1):1-9.

26. Chang HY, *Zhou M, * Tang W, * Alexander GC, **Singh S**.  Risk of gastrointestinal bleeding associated with oral anticoagulants: population based retrospective cohort study. *BMJ*. 2015;350:h1585 (editorial by Mary S Vaughn).

17

Sonal Singh M.D., M.P.H

27. Abraham NS, **Singh S**, Alexander GC, Heien H, Haas LR, Crown W, Shah ND. Comparative risk of gastrointestinal bleeding with dabigatran, rivaroxaban, and warfarin: population-based cohort study. *BMJ*. 2015;350:h1857.

28. Chang HY, Hsieh CF, **Singh S**, Tang W, Chiang YT, Huang WF. Anti-diabetic therapies and the risk of acute pancreatitis: a nationwide retrospective cohort study from Taiwan. *Pharmacoepidemiol Drug Saf*. 2015 Jun;24(6):567-75

29. Maruthur NM, Joy SM, Dolan JG, Shihab HM, **Singh S**. Use of the Analytic Hierarchy Process for medication decision-making in type 2 diabetes. *PloS One*. 2015 ;10(5): e0126625.

30. Breaux-Shropshire TL, * Judd E, Vucovich L, Shropshire TS, **Singh S**. Does home blood pressure monitoring improve patient outcomes? A systematic review comparing home and ambulatory blood pressure monitoring on blood pressure control and patient outcomes. *Integrated Blood Pressure Control* 2015 3; 8:43-9.

31. Zhou M, *Chang HY, Segal JB, Alexander GC, **Singh S**. Adherence to a novel oral anticoagulant among patients with atrial fibrillation. *J Manag Care Spec Pharm*. 2015; 21(11):1054-62.

32. Puhan MA, Yu T, Stegeman I, Varadhan R, **Singh S**, Boyd CM. Benefit-Harm Analysis and Charts for Individualized and Preference-Sensitive Prevention - The example of low dose aspirin for primary prevention of cardiovascular disease and cancer.  *BMC Med*. 2015; 13:250.

33. Mayo-Wilson E, Hutfless S, Li T, Gresham G, Fusco N, Ehmsen J, Heyward J, Vedula S, Lock D, Haythornthwaite J, Payne JL, Cowley T, Tolbert E, Rosman L, Twose C, Stuart EA, Hong H, Doshi P, Suarez-Cuervo C, **Singh S**, Dickersin K.Integrating multiple data sources (MUDS) for meta-analysis to improve patient-centered outcomes research: a protocol for a systematic review. *Syst Rev* 2015; 4(1).

34. Morton MJ, DeAugustinis ML, Velasquez CA, **Singh S**, Kelen GD. Developments in Surge Research Priorities: A Systematic Review of the Literature Following the Academic Emergency Medicine Consensus Conference, 2007-2015. *Acad Emerg Med*. 2015 ;22(11):1235-52.

35. *Shihab HM, Akande T, Armstrong K, **Singh S**, Loke YK. Risk of pancreatic adverse events associated with the use of glucagon-like peptide-1 receptor agonist and dipeptidyl peptidase-4 inhibitor drugs: A systematic review and meta-analysis of randomized trials. *World J Meta-Anal* 2015; 3(6): 254-283

36. Haut ER, Garcia LJ, Shihab HM, Brotman DJ, Stevens KA, Sharma R, Chelladurai Y, Akande TO, Shermock KM, Kebede S, Segal JB, **Singh S**. The Effectiveness of Prophylactic Inferior Vena Cava Filters in Trauma Patients: A Systematic Review and Meta-analysis. *JAMA Surg* 2014; 149(2):194-202

37. **Singh S**, Ambrosio M, Semini I, Tawil O, Saleem M, Imran M, Beyrer C. Revitalizing the HIV response in Pakistan: a systematic review and policy implications. *Int J Drug Policy* 2014;25(1):26-33.

38. Turner LW, Nartey D, Stafford RS, **Singh S**, Alexander GC. Ambulatory Treatment of Type 2 Diabetes Mellitus in the United States, 1997-2012.  *Diabetes Care*. 2014;37(4):985-92

39. Yu T, Fain K, Boyd C, Varadhan R, Weiss CO, Li T, **Singh S**, Puhan MA. Benefits and harms of roflumilast in moderate to severe COPD. *Thorax* 2014; 69:616-22

18

Sonal Singh M.D., M.P.H

40. Turner RM, Kwok CS, Chen-Turner C, Maduakor CA, **Singh S**, Loke YK. Thiazolidinediones and associated risk of Bladder Cancer: a Systematic Review and Meta-analysis. *Br J Clin Pharmacol.* 2014 78(2):258-7

41. Goyal M, **Singh S,** Sibinga E, Gould NF, Rowland-Seymour A, Sharma R, Berger Z, Sleicher D, Maron D, Shihab HM, Ranasinghe PD, Linn S, Bass EB, Haythornthwaite JA. Meditation Programs for Psychological Stress and Well-being: A Systematic Review and Meta-analysis. *JAMA Intern Med*. 2014 174(3):357-68 (editorial by Gorroll. Moving towards Evidence Based Complementary Care)

42. Vu A, Adam A, Wirtz A, Pham K, Rubenstein L, Glass N, Beyrer C, **Singh S**. The Prevalence of Sexual Violence among Female Refugees in Complex Humanitarian Emergencies: a Systematic Review and Meta-analysis. *PLOS Currents Disasters.* 2014 Mar 18. Edition 1.

43. Wirtz AL, Pham K, Glass N, Loochkartt S, Kidane T, Cuspoca D, Rubenstein LS, **Singh S**, Vu A. Gender-based violence in conflict and displacement: qualitative findings from displaced women in Colombia. *Confl Health.* 2014; 8:10.

44. *Haar RJ, Footer KH, **Singh S**, Sherman SG, Branchini C, Sclar J, Clouse E, Rubenstein LS. Measurement of attacks and interferences with health care in conflict: validation of an incident-reporting tool for attacks on and interferences with health care in eastern Burma. *Conflict and Health*. 2014, 8:23.

45. Cavallazzi R, El-Kersh K, Abu-Atherah E, **Singh S**, Loke YK, Wiemken T, Ramirez J. Midregional proadrenomedullin for prognosis in community-acquired pneumonia: A systematic review. *Respir Med.* 2014 ;108(11):1569-1580.

46. Dorsey ER, Brocht AFD, Nichols PE, Darwin KC, Anderson KE, Beck CA, **Singh S**, Biglan KM, Shoulson I. Depressed mood and suicidality in individuals exposed to tetrabenazine in a large Huntington disease observational study. *Journal of Huntington's Disease* 2013; 2(4): 509-515.

47. Ter Riet G, Chesley P, Gross AG, Siebeling L, Muggensturm P, Heller N, Umbehr M, Vollenweider D, Yu T, Akl EA, Brewster L, Dekkers OM, Mühlhauser I, Richter B, **Singh S**, Goodman S, Puhan MA. All That Glitters Isn't Gold: A Survey on Acknowledgment of Limitations in Biomedical Studies. *PLoS One* 2013 ;8(11): e73623.

48. Wirtz AL, Glass N, Pham K, Rubenstein LS, **Singh S**, Vu A. Development of a screening tool to identify female survivors of gender-based violence in humanitarian settings: qualitative evidence from research among refugees in Ethiopia. *Conflict and Health* 2013, 7:13.

49. Loke YK, Ho R, Smith M, Wong O, Sandhu M, Sage W, **Singh S**. Systematic review evaluating cardiovascular events of the 5-alpha reductase inhibitor - Dutasteride. *J Clin Pharm Ther* 2013 38(5):405-15

50. Grosse Y, Loomis D, Lauby-Secretan B, El Ghissassi F, Bouvard V, Benbrahim-Tallaa L, Guha N, Baan R, Mattock H, Straif K; International Agency for Research on Cancer Monograph Working Group. Collaborators: Stewart BW, Biggar RJ, Lachenmeier DW, **Singh S**, Tsuda H, Baguley B, Marques MM, Tseng CH, Knight TL, Beland FA, Betz JM, Carcache de Blanco EJ, Cunningham ML, Dunnick JK, Guo L, Jameson CW, Karagas M, Lunn RM, McCormick DL, Witt KL, Zhou S. Carcinogenicity of some drugs and herbal products. *Lancet Oncol*. 2013; 14(9):807-8.

Sonal Singh M.D., M.P.H

51. Maruthur NM, **Joy S**, Dolan J, Segal JB, Shihab HM, Singh S. Systematic assessment of benefits and risks: study protocol for a multicriteria decision analysis using the Analytic Hierarchy Process for comparative effectiveness research. *F1000 Research*. 2013 Jul 24; 2:160

52. Loke YK, **Singh S**. Risk of acute urinary retention associated with inhaled anticholinergics in patients with chronic obstructive lung disease: systematic review. *Therapeutic Advances in Drug Safety* 2013, 4: 19-26.

53. **Singh S**, Chang HY, Richards TM, Weiner JP, Clark JM, Segal JB. Glucagonlike Peptide 1-Based Therapies and Risk of Hospitalization for Acute Pancreatitis in Type 2 Diabetes Mellitus: A Population-Based Matched Case-Control Study. *JAMA Intern Med* 2013   28; 173:1843-4. (editorial by Peter Butler in JAMA Internal Medicine and Edwin Gale in the BMJ)

54. **Singh S**, Chang HY, Richards TM, Weiner JP, Clark JM, Segal JB. Thiazolidinedione use and risk of hospitalization for pneumonia in Type 2 Diabetes Mellitus: A Population-Based Matched Case-Control Study. *F1000Research* 2013 2:145.

55. Brotman DJ, Shihab HM, Prakasa KR, Kebede S, Haut ER, Sharma R, Shermock K, Chelladurai C, **Singh S**, Segal JB. Pharmacological and Mechanical Strategies for Preventing Venous Thromboembolism after Bariatric Surgery: A Systematic Review and Meta-analysis. *JAMA Surg* 2013 148(7):675-86.

56. Kebede S, Prakasa KR, Shermock K, Shihab HM, Brotman DJ, Sharma R, Chelladurai Y, Haut ER, **Singh S**, Segal JB. A systematic review of venous thromboembolism in patients with renal insufficiency, obesity, or on antiplatelet agents. *J Hosp Med* 2013 ;8(7):394-401.

57. *Chelladurai Y, Stevens KA, Haut ER, Brotman DJ, Sharma S, Shermock KM, Kebede S**, Singh S**, Segal JB. Venous thromboembolism in patients with traumatic brain injury: a systematic review. *F1000Research* 2013. May 29; 2:132.

58. **Singh S**, Loke YK, Enright P, Furberg CD. The pro-arrhythmic and pro-ischaemic effects of inhaled anticholinergics. *Thorax* 2013 68: 114-116.

59. Denizard-Thompson NR, **Singh S**, Stevens SR, Miller DP, Wofford JL. IPod™ technology for teaching patients about anticoagulation: a pilot study of mobile computer-assisted patient education. *Prim Health Care Res Dev* 2012 13: 42-7.

60. Treadwell JR, **Singh S**, Talati R, McPheeters ML, Reston JT. A Framework for "Best Evidence" Approaches in Systematic Reviews. *J Clin Epidemiol* 2012; 65: 1159-62.

61. Moore T, Glenmullen J, Maltsberger JT, Furberg CD, **Singh S**. Suicidal Behavior and Depression in Smoking Cessation Treatments. *PLOS One* 2011; 6: e27016.

62. Kwok CS, Yeong JK, Turner RM, Cavallazzi R, **Singh S**, Loke YK. Statins and associated risk of pneumonia: a systematic review and meta-analysis of observational studies. *Eur J Clin Pharmacol* 2012; 68(5): 747-55.

63. Moore T, **Singh S**, Furberg CD. The FDA and New Safety Warnings. *Archives of Internal Medicine* 2012 172:78-80.

64. Kwok CS, Arthur AK, Anibueze CI, **Singh S**, Cavallazzi R, Loke YK. Risk of Clostridium difficile Infection with Acid Suppressing Drugs and Antibiotics: Meta-Analysis. *Am J Gastroenterol* 2012; 107:1011-9 (with an editorial by Leontadis, Miller and Howden. How much do PPIs contribute to C difficile infection)

Sonal Singh M.D., M.P.H

65. **Singh S,** Pant SB, Dhakal S, Pokhrel S, Mullany LC. Human Rights Violations among Sexual and Gender Minorities in Kathmandu, Nepal: A qualitative investigation. *BMC International Health and Human Rights* 2012, 12:7

66. **Singh S**, Chang SM, Matchar DB, Bass EB. Chapter 7. Grading a body of evidence on diagnostic tests. *J Gen Intern Med.* 2012; 27: S47-55.

67. Treadwell JR, Uhl S, Tipton K, Shamliyan T, Vishwanathan M, Berkman ND, Sun X, Coleman CI, Elshaug AG, **Singh S,** Wang SY, Ramakrishnan R. Assessing equivalence and noninferiority. *J Clin Epidemiol* 2012; 65: 1144-9.

68. **Singh S**, Loke YK. Drug Safety Assessment in Clinical Trials: Methodologic Challenges and Opportunities. *Trials* 2012, 13: 138.

69. Puhan M, **Singh S**, Varadhan R, Weiss C, Boyd CM. Methods for Benefit and Harm Assessment in Systematic Reviews. *BMC Medical Research and Methodology* 2012, 12: 173.

70. Mills EJ, Wu P, Chong G, Ghement I, **Singh S**, et al. Efficacy and safety of statin treatment for cardiovascular disease: a network meta-analysis of 170,255 patients from 76 randomized trials. *Q J Med* 2011; 104: 109-24.

71. **Singh S**, Loke YK, Furberg CD. Long-term use of thiazolidinediones and the associated risk of pneumonia or lower respiratory tract infection: Systematic review and meta-analysis. *Thorax* 2011; 66: 383-388.

72. Bennett WL, Maruthur NM, **Singh S**, et al. Comparative effectiveness and safety of medications for Type 2 Diabetes: An update including new drugs and two drug combinations. *Annals of Internal Medicine* 2011; 154: 602-13. Copublished with linked AHRQ report:

73. Loke YK, Kwok CS, **Singh S**. Comparative Cardiovascular Effects of Thiazolidinediones: A systematic review and meta-analysis of observational studies. *BMJ* 2011; 342: d1309.

74. Loke YK, Cavallazi R, **Singh S**. Risk of fractures with inhaled corticosteroids in COPD: systematic review and meta-analysis of randomized controlled trials and observational studies. *Thorax* 2011; 66: 699-708.

75. Miller DP Jr, Spangler JG, Case LD, Goff DC Jr, **Singh S**, Pignone M. Effectiveness of a Web-Based Colorectal Cancer Screening Patient Decision Aid:  A Randomized Controlled Trial in a Mixed Literacy Population. *Am J Prev Med* 2011; 40: 608-15.

76. Li T, Puhan MA, Vedula SS, **Singh S**, et al. Network meta-analysis-highly attractive but more methodological research is needed. *BMC Medicine* 2011; 9: 79.

77. **Singh S**, Loke YK, Enright P, Furberg CD. Mortality Associated with Tiotropium Respimat® in Patients with Chronic Obstructive Pulmonary Disease- A Systematic Review and Meta-Analysis of Randomized Controlled Trials. *BMJ* 2011; 342: d3215. (with an editorial by Chris Cates Safety of Tiotropium)

78. **Singh S**, Loke YK, Spangler JG, Furberg CD. Risk of serious adverse cardiovascular events with Varenicline: A Systematic Review and Meta-Analysis of Randomized Controlled Trials. *CMAJ* 2011; 1831359-66. (with an editorial by JT Hays. Varenicline for smoking cessation. Is it a heartbreaker?)

Sonal Singh M.D., M.P.H

79. Loke YK, Kwok CS, **Singh S**. Risk of myocardial infarction and cardiovascular death associated with inhaled corticosteroids in COPD: a systematic review and meta-analysis. *Eur Respir J* 2010; 35: 1003-1021.

80. Navaneethan S, **Singh S**, Appasamy S, et al. Sodium bicarbonate therapy for prevention of contrast-induced nephropathy- A systematic review and meta-analysis. *AJKD* 2009; 53: 617-627.

81. Loke YK, **Singh S**, Furberg CD. Long-term use of thiazolidinediones and fractures in type 2 diabetes: Systematic Review. *CMAJ* 2009; 180: 32-39. (with an editorial by Lipscombe. Thiazolidinediones: Do harms outweigh benefits?)

82. **Singh S**, Amin A, * Loke YK. Long-term use of inhaled corticosteroids and risk of pneumonia in COPD: A meta-analysis. *Archives of Internal Medicine* 2009; 169: 219-229.

83. Attanayake V, Mckay R, Joffres M, **Singh S**, Burkle Jr F, Mills E. Prevalence of mental disorders among children exposed to war: a systematic review of 7920 children. *Medicine Conflict and Survival* 2009; 25: 4-19.

84. Loke YK, Jeevanantham V*, **Singh S**. Bisphosphonates and atrial fibrillation: systematic review and meta-analysis. *Drug Safety* 2009; 32: 219-228.

85. Boyd M, Watkins F, **Singh S**, Haponik E, Chatterjee A, Conforti J, Chin Jr R. Prevalence of flexible bronchoscopic removal of foreign bodies in the advanced elderly. *Age and Ageing* 2009; 38: 396-400.

86. Loke YK, Trivedi A, **Singh S**. Meta-analysis: Gastrointestinal bleeding due to interaction between Selective Serotonin Reuptake Inhibitors and Non-Steroidal Anti-inflammatory drug. *Alimentary Pharmacol Ther* 2008; 27: 31-40.

87. Mills E, **Singh S**, Roach B, Chong S. Prevalence of mental disorders and torture among Bhutanese refugees in Nepal: A systematic review and its policy implications. *Medicine, Conflict and Survival* 2008; 24: 5-16.

88. Chaukiyal P, Nautiyal A, Radhakrishnan S, **Singh S**, Navaneethan S. Thromboprophylaxis in cancer patients with central venous catheters: A systematic review and meta-analysis. *Thromb Haemost* 2008; 99: 38-43.

89. Wofford JL, Wells M, **Singh S**. Best Strategies for Patient Education Regarding Anticoagulation with Warfarin: A systematic review. *BMC Health Services Research* 2008; 8: 40.

90. Navaneethan SD, Adoulat S, **Singh S**. A systematic review of patient and health system characteristics associated with late referral in chronic kidney disease. *BMC Nephrology* 2008;9: 3.

91. **Singh S**, Loke YK. Furberg CD. Inhaled anticholinergics and the risk of major adverse cardiovascular events in patients with chronic obstructive pulmonary disease: A systematic review and meta-analysis. *JAMA* 2008; 300: 1439-1450. (CME Article in JAMA)

92. Mills EJ, Checchi F, Orbinski JJ, Schull MJ, Burkle Jr FM, Beyrer C, Cooper C, Hardy C, **Singh S**, et al. Users' guides to the medical literature: how to use an article about mortality in a humanitarian emergency. *Confl Health* 2008; 30: 9.

93. **Singh S**, Kumar A. Wernicke encephalopathy after bariatric surgery: A systematic review. *Neurology* 2007; 68: 807-11.

Sonal Singh M.D., M.P.H

94. **Singh S**, Sharma SP, Mills E, Poudel KC, Jimba M. Conflict Induced Internal Displacement in Nepal. *Medicine Conflict and Survival* 2007; 23: 103-110.

95. **Singh S**, Loke YK, Furberg CD. Thiazolidinediones and heart failure: A Teleo-Analysis. *Diabetes Care* 2007; 30: 2148-2153.

96. Beyrer C, Villar JC, Suwanvanichkij V, **Singh S**, Baral SD, Mills EJ. Neglected Diseases, Civil Conflicts and the Right to Health. *Lancet* 2007; 370: 619-627.

97. **Singh S**, Loke YK, Furberg CD. Long-term risk of cardiovascular events with rosiglitazone: A systematic review and meta-analysis. *JAMA* 2007; 298: 1189-1195. (with an editorial by DH Solomon and Winkelmeyer. Cardiovascular risk and the Thiazolidinediones déjà vu all over again?)

98. Mills EJ, **Singh S**. Health, Human Rights and the conduct of research within oppressed populations. *Global Health*. 2007; 3: 10.

99. Mills E Cooper C, Wu P, Rachlis B, **Singh S**, Guyatt GH. Randomized trials stopped early for harm in HIV/AIDS: A systematic survey. *HIV Clinical trials*; 2006; 7: 24-33.

100. Mills E, **Singh S**, Wilson K et al. The Challenges of involving traditional healers in HIV/AIDS care. *Int J STD & AIDS* 2006; 17: 360-363.

101. **Singh S**, Bøhler E, Dahal K, Mills E. The state of child health and human rights in Nepal. *PLoS Med* 2006 3; 7: e203

102. Mills EJ, **Singh S**, Zwi A, Nelson B, Nachega JB. The impact of conflict on HIV/AIDS in Africa. *Int J STD AIDS* 2006; 17: 713-717.

103. Mills E, Nixon S, **Singh S**, Dolma S, Nayyar A, Kapoor S. Enrolling women into HIV vaccine trials: An ethical imperative but a logistical challenge. *PLoS Med* 2006: 3: e94.

104. Dolma S, **Singh S**, Lohfeld L, Orbinski J, Mills E. Dangerous Journey: Documenting the Experience of Tibetan Refugees. *AJPH* 2006; 96: 2061-2064.

105. Wofford JL, **Singh S**. Exploring the Educational Value of Clinical Vignettes from the SGIM National Meeting in the Internal Medicine Clerkship: A Pilot Study. *JGIM* 2006; 21: 1195-1197.

106. Navaneethan SD, **Singh S**. A systematic review of barriers in access to renal transplantation among African Americans in the United States. *Clin Transplant* 2006; 20: 769-775.

107. Mills E, Nachega JB, Buchan I, Attaran A, Orbinski J, **Singh S** et al. Adherence to Antiretroviral therapy in Africa versus North America: A comparative meta-analysis. *JAMA* 2006; 296: 679-690.

108. Mills E, Nachega JB, Bangsberg D, **Singh S**, Rachlis B, Wu P, et al. Adherence to antiretroviral therapy: a systematic review and meta-analysis examining developed and developing nation patient-reported barriers and facilitators. *PLoS Med* 2006; 3: e438.

109. **Singh S**, Loke YK. Statins and pancreatitis: A systematic review of observational studies and spontaneous case reports. *Drug Saf* 2006; 29: 1123-32.

110. **Singh S**, Mills E, Dahal K. Nepal's war on Human Rights: A summit higher than Everest. *Int J Equity Health*. 2005; 4: 9.

111. **Singh S**, Mills E. Honeyman SW, Suvedi BK, Pant NP. HIV in Nepal: Is the conflict fueling the epidemic? *PLoS Med*. 2005; 2: e 216.

112.   Mills EJ, Rachlis B, Wu P, Wong E, Heise L Wilson K, **Singh S**. Media reporting of Tenofovir trials in Cambodia and Cameroon. *BMC International Health and Human Rights* 2005; 5: 6.

113.   Mills E, **Singh S**, Holtz T, Santa-Barbara J, Chase R, and Orbinski J. Prevalence of serious mental disorders among Tibetan refugees: A systematic review. *BMC International Health and Human Rights* 2005; 5: 7.

114.   **Singh S**, Dolan JG, Centor RM. Optimal clinical management of Sore throat: A multi-criteria decision analysis. *BMC Medical Decision-Making* 2005:6; 14.


*Accepted*
None

*Books and monographs*

1.   **Singh S**, Fouyazi H, Anzuoni K, Goldman L, Min JY, Griffin M, Grijalva CG, Morrow JA, Whitmore C, Leonard CE, Selvan M, Nair V, Zhou Y, Toh S, Petrone A, Williams J, Fazio-Eynullayeva E, Swain R, Cole DT, Andrade S. Diagnostic algorithms for cardiovascular death in administrative claims databases. A systematic review 2018. Sentinel Report. Prepared for the Food and Drug Administration.

2.   Some drugs and herbal products / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans (2013: Lyon, France) (IARC monographs on the evaluation of carcinogenic risks to humans; volume 108). Published by the International Agency for Research on Cancer, 150 cours Albert Thomas, 69372 Lyon Cedex 08, France ©International Agency for Research on Cancer, 2015 On-line publication, 15 September 2015.

3.   Maruthur NM, Joy S, Dolan J, Segal JB, Shihab HM, **Singh S**. Systematic assessment of benefits and risks: A multicriteria decision analysis using the Analytic Hierarchy Process for comparative effectiveness research. FDA report 2013

4.   Beyrer C, **Singh S**, Ambrosio M, Semini I. Revitalizing the HIV response in Pakistan: a systematic review and policy recommendations. World Bank, 2012.

5.   Beyrer C, **Singh S**, Sudarshi D. Neglected tropical diseases, conflict and the right to health: A2, pgs 132- 155 in The Causes and Impacts of Neglected Tropical and Zoonotic Diseases: Opportunities for Integrated Intervention Strategies: Workshop Summary. Editors Eileen R. Choffnes and David A. Relman, Rapporteurs; Forum on Microbial Threats; Institute of Medicine ISBN 978-0-309.

6.   Goyal M, **Singh S**, Sibinga EMS, Gould NF, Rowland-Seymour A, Sharma R, Berger Z, Sleicher D, Maron DD, Shihab HM, Ranasinghe PD, Linn S, Bass EB, Haythornthwaite JA. Meditation Programs for Psychological Stress and Well-being: Comparative Effectiveness Review No. 124 (Prepared by The Johns Hopkins University Evidence-based Practice Center, under Contract No. 290-2007-100061-1.) AHRQ Publication No. 13 (14)-EHC116-EF. Rockville, MD: Agency for Healthcare Research and Quality. January 2014

7.   **Singh S**, Haut ER, Brotman DJ, Sharma R, Chelladurai Y, Shermock KM, Kebede S, Stevens KA, Prakasa KR, Shihab HM, Akande TO, Zeidan AM, Garcia LJ, Segal JB. Comparative Effectiveness of Pharmacologic and Mechanical Prophylaxis of Venous Thromboembolism Among Special Populations. Comparative Effectiveness Review No. 116. (Prepared by The

24

Sonal Singh M.D., M.P.H

Johns Hopkins University Evidence-based Practice Center, under Contract No. HHSA 290 2007 10061 I). AHRQ Publication No. 13-EHC082-1 Rockville, MD: Agency for Healthcare Research and Quality. May 2013

8. Puhan MA, **Singh S**, Weiss CO, Varadhan R, Sharma R, Boyd CM. Evaluation of the Benefit and Harm of Aspirin for Primary Prevention of Cardiovascular Events: A Comparison of Quantitative Approaches. Methods Research Report. (Prepared by the Johns Hopkins University Evidence-based Practice Center under Contract No. 290-2007-10061-I). AHRQ Publication No. 12(14)-EHC149-EF. Rockville, MD: Agency for Healthcare Research and Quality; November 2013.

9. Boyd CM, **Singh S**, Varadhan R, Weiss CO, Sharma R, Bass EB, Puhan MA. Methods for Benefit and Harm Assessment in Systematic Reviews. Methods Research Report. (Prepared by the Johns Hopkins University Evidence-based Practice Center under Contract No. 290-2007-10061-I). AHRQ Publication No. 12(13)-EHC150-EF. Rockville, MD: Agency for Healthcare Research and Quality; November 2012.

10. Treadwell JR, **Singh S**, Talati R, McPheeters ML, Reston JT. A Framework for "Best Evidence" Approaches in Systematic Reviews [Internet]. Rockville (MD): Agency for Healthcare Research and Quality (US); 2011 Jun. Report No: 11-EHC046-EF. AHRQ Methods for Effective Health Care.

11. Treadwell J, Uhl S, Tipton K, **Singh S**, Santaguida L, Sun X, Berkman N, Viswanathan M, Coleman C, Shamliyan T, Wang S, Ramakrishnan R, Elshaug A. Assessing Equivalence and Noninferiority. Methods Research Report. (Prepared by the EPC Workgroup under Contract No. 290-2007-10063.) AHRQ Publication No. 12-EHC045-EF. Rockville, MD: Agency for Healthcare Research and Quality, June 2012.

12. **Singh S**, Chang SM, Matchar DB, Bass EB. Grading a body of evidence on medical tests. AHRQ Publication No 12-EHC079-EF. Chapter 7 of the Methods Guide for Medical Test Reviews. 2012 (AHRQ Publication No 12-EHC017). Rockville, MD: Agency for Health Care Research and Quality; June 2012.

13. Bennett WL, Wilson LM, Bolen S, Maruthur N, **Singh S**, et al. Oral Diabetes Medications for Adults with Type 2 Diabetes. An Update. Comparative Effectiveness Review No. 27. (Prepared by Johns Hopkins Evidence-Based Practice Center under Contract No. 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.) AHRQ Publication No. 11-EHC038. Rockville, MD: Agency for Healthcare Research and Quality, March 2011.

14. Khagendra Dahal* and **Sonal Singh**. "Primary Prevention-Acting on Human Rights in Nepal" in Peace Through Health; How health professionals can work for a less violent world" by Neil Arya & Joanna Santa Barbara. 187-188. @ 2008 Kumarian Press.

*Editorials and other scholarly material in peer reviewed journals*

1. **Singh S**. Nautiyal A. Fluoroquinolones increase the risk of aortic aneurysms and aortic dissection? *JACC* 2018: 72 (12): 1379-81

2. **Singh S.** The safety of generic prescription drugs in the United States. *Drug Safety* 2018; 45 (4):325-328.

3. **Singh S**. Valproate use during pregnancy was linked to autism spectrum disorder and childhood autism in offspring.  *ACP Journal Club* 2013; 159: JC13-4.

Sonal Singh M.D., M.P.H

4. **Singh S**. Segal JB. Thiazolidinediones and macular edema: Comment on Thiazolidinediones and macular edema in type 2 diabetes. *Archives of Internal Medicine*. 2012. 172: 1011-3.

5. **Singh S**. Furberg CD. Inhaled anticholinergics for chronic obstructive pulmonary disease: comment on "inhaled anticholinergic drug therapy and the risk of acute urinary retention in chronic obstructive pulmonary disease." *Archives of Internal Medicine* 2011; 171: 920-2.

6. **Singh S**. Daily use of Aspirin reduces long-term risk of death due to some cancers. *ACP Journal Club* 2011; 154: JC3-2.

7. **Singh S**, Furberg CD. Review: Calcium supplements increase risk of myocardial infarction. *Evid Based Med* 2010; 15: 181.

8. **Singh S**, Furberg CD.  Thiazolidinediones and Cardiovascular Outcomes in Type 2 Diabetes. *Heart* 2009; 95: 1-3.

9. **Singh S**. Clinical Research in Emerging Countries. Third Annual Marcus Evans Conference *IDrugs* 2008; 11: 724-727.

10. **Singh S**, Trivedi A. Spontaneous reports as evidence of Adverse Drug Reactions. *South Med J*. 2008; 101: 16.

11. **Singh S**, Orbinski J, Mills EJ. Conflict and Health: A paradigm shift in global health and human rights. *Conflict and Health* 2007, 1: 1.

12. **Singh S**. Nautiyal A. Secondary hypertension due to drugs and toxins: A challenge for research on harm. *South Med J*. 2007; 100: 665-666.

13. **Singh S**. Hydralazine-induced lupus. *South Med J* 2006; 99: 6-7.

14. **Singh S**. Amiodarone-induced alveolar hemorrhage *South Med J* 2006; 99: 329-30.

15. **Singh S** Angiotensin-converting enzyme inhibitor-induced acute pancreatitis: in search of the evidence. *South Med J* 2006; 99: 1327-1328.

16. **Singh S**. Wooltorton E. Increased mortality among elderly patients with dementia using atypical antipsychotics. *CMAJ* 2005 173; 3: 252.

17. **Singh S**. The Stone Circle. *CMAJ* 2005; 172: 522.

18. **Singh S**. Tears from the Land of Snow: Health and Human Rights in Tibet. *Lancet* 2004; 364: 1009.


**Publication of Educational Materials**
*Peer-reviewed educational publications*

1. **Singh S**. Type 2 diabetes pharmacoepidemiology update 2014: safety versus efficacy. *Curr Diab Rep*. 2014; 14(12):563.

2. Chelladurai Y*, **Singh S**. Varenicline and cardiovascular events: a perspective review. *Therapeutic Advances in Drug Safety* 2014; 1-6: doi 10.1177/2042098614530421.

3. Beasley R, **Singh S**, Loke YK, Enright P, Furberg CD. Call for worldwide withdrawal of tiotropium Respimat mist inhaler. *BMJ* 2012; 345: e7390.

4. Loke YK, **Singh S**. Risks associated with tiotropium in chronic obstructive pulmonary disease: overview of the evidence to date. *Therapeutic Advances in Drug Safety* 2012; 3: 123–31

Sonal Singh M.D., M.P.H

5. Cavalazzi R, **Singh S**. Inhaled corticosteroids in Chronic Obstructive Pulmonary Disease: How serious is the risk of pneumonia and should it impact use of ICS in COPD. *Current Infectious Disease Reports*. 2011; 13: 296-301.

6. Lexchin J, Arya N, **Singh S**. Gardasil – The New HPV Vaccine: The Right Product, the Right Time? A Commentary. *Healthcare Policy* 2010; 5: 26-36.

7. Cavalazzi R, **Singh S**. Inhaled corticosteroids in Chronic Obstructive Pulmonary Disease: How serious is the risk of pneumonia and should it impact use of ICS in COPD. *Current Infectious Disease Reports*. 2011; 13: 296-301.

8. **Singh S**, Loke YK. A critical analysis of the benefits and drawbacks of inhaled corticosteroids in chronic obstructive pulmonary disease. *International Journal of COPD* 2010; 5: 189-195.

9. **Singh S**, Loke YK. Risk of pneumonia associated with long-term use of inhaled corticosteroids in COPD: A critical review and update. *Current Opinion in Pulmonary Medicine* 2010; 16: 118-122

10. Mills EJ, Ford N, **Singh S**, Eyawo O. Providing Antiretroviral Care in Conflict Settings. *Current HIV/AIDS Report* 2009; 6: 201-9.

11. **Singh S**, Loke YK. Thiazolidinediones and cardiovascular disease- Balancing Benefit and Harm. *Geriatrics and Aging* 2008; 11: 29-35.

12. Orbinski J, Beyrer C, **Singh S**. Violations of human Rights: health practitioners as witnesses. *The Lancet* 2007; 370: 698-704.

13. **Singh S**, Morrell P.  What caused Buddha's death? *Ars Medica* 2006; 79-84.

14. Mills EJ, Robinson J, Attaran A, Clarke M, **Singh S**, Upshur RE, Hermann KJ Jr, Yusuf S. Sharing evidence on humanitarian relief. *BMJ* 2005; 331: 1485-6.

15. Mills E, **Singh S**, Warren M, Orbinski J, Upshur RE. Designing research in vulnerable populations: lessons from HIV prevention trials that stopped early. *BMJ* 2005; 331: 1403-1406.

16. **Singh S**. Empathy: Lost or found in medical education? The Learning Curve *MedGenMed* 2005; 7: 3

17. **Singh S**. Impact of long-term political conflict on population health in Nepal. *CMAJ* 2004; 171: 1499-1501.

*Peer reviewed Case Reports*

1. *Chaukiyal P, **Singh S**, Woodlock T, Dolan JG, Bruner K. Intravascular large B cell lymphoma with multisystem involvement. *Leuk Lymphoma* 2006; 47: 1688-90.

2. Navaneethan SD, Kannan VS, Osowo A, Shrivastava R, **Singh S**. Concomitant intracranial aneurysm and carotid artery stenosis: A therapeutic dilemma. *South Med J*. 2006, 99: 757-8.

3. **Singh S**, Rajpal C, Nannapaneni S, Venkatesh S. Iopamidol myelography-induced seizures. *MedGenMed* 2005: 7: 11.

4. Nautiyal A, **Singh S**, Parmeswaran G, DiSalle M. Hepatic dysfunction in a patient with Plamodium vivax infection. *Med Gen Med* 2005: 7: 1.

5. Navaneethan SD, **Singh S**, Choudhry W. Nodular glomerulosclerosis in non-diabetic patients: Case report and literature review. *J Nephrol* 2005: 18: 613-615.

6. Nautiyal A, **Singh S**, DiSalle M, O'Sullivan J. Painful Horner syndrome as a silent harbinger of carotid dissection. *PloS Med* 2005; 80: 136-137.

27

Sonal Singh M.D., M.P.H

7. **Singh S**, Nautiyal A, Dolan JG. Recurrent acute pancreatitis possibly induced by atorvastatin and rosuvastatin. Is statin-induced pancreatitis a class effect? *JOP* 2004; 5: 502-504.

8. **Singh S**, Srivastava R, Das V. Formulary Conversion Programs: The need for patient-specific risk assessment. *MedGenMed* 2004; 6: 28.

*Correspondence*

1. **Singh S**, Suchard MA. Pioglitazone Use and Risk of Bladder Cancer. *JAMA*. 2015 Dec 15; 314(23):2567-8.

2. **Singh S**, Loke YK, Furberg CD. Outpatient management of severe COPD. *NEJM* 2010; 363: 493.

3. **Singh S**, Loke YK. Inhaled corticosteroids: a controversial add-on treatment in COPD. *ERJ* 2010; 36:1-1.

4. **Singh S**, Loke YK, Furberg CD. Tiotropium in Chronic Obstructive Pulmonary Disease *NEJM* 2009; 360: 185-187.

5. Loke Y, **Singh S**. Inhaled Corticosteroids in Patients with Chronic Obstructive Pulmonary Disease. *JAMA* 2009; 301: 1432.

6. Toney JH, Fasick JI, **Singh S**, Beyrer C, Sullivan DJ Jr. Purposeful learning with drug repurposing. *Science* 2009; 325: 1339-40.

7. Serra A, Sechi G, **Singh S,** Kumar A. Wernicke encephalopathy after obesity surgery: a systematic review. *Neurology* 2007; 69: 615.

8. **Singh S**, Arya N, Mills E, Holtz T, Westberg G. Free medical students and doctors detained in Nepal. *Lancet* 2006; 367: 1730.

9. **Singh S**. Where next for China? Rising inequalities in health and wealth are greatest challenge. *BMJ* 2006; 333: 499.

10. Mills E, **Singh S**, Orbinski J, Burrows D. The HIV/AIDS epidemic in Cambodia, The *Lancet Infectious Diseases* 2005; 5: 596-597.

11. **Singh S**. Nautiyal A. Neurological complications of bariatric surgery. *Mayo Clinic Proceedings.* 2005; 80:134-137.

12. **Singh S**. Nepal's war and conflict-sensitive development. *PLOS Med*. 2005:2(1): e19.

13. **Singh S**, Dolan JG. Diagnosis and treatment of Group A pharyngitis strep. *Am Fam Physician*. 2005:71:1064.

14. **Singh S**. Drug-induced pancreatitis might be a class effect of statin drugs. *JOP* 2005; 6: 380.

15. **Singh S**.  Special issue on South Asia: focus will be on Asia. *BMJ* 2004; 328: 288.

16. **Singh S**. Letter from the Himalayas. *CMAJ* 2004; 171:309-10.

17. **Singh S**. Post-traumatic stress in former Ugandan child soldiers. *Lancet* 2004; 63: 1648.

18. **Singh S**. Post-Immigrant Refugee Medicine: Children's needs should not be seen in isolation. *BMJ* 2004; 329: 742.

19. **Singh S**. Social and economic justice: the road to health. *CMAJ* 2004; 171: 1021.

***Development of major curricular offerings.***

Sonal Singh M.D., M.P.H

2 credit Course for MD and MPH in comparative effectiveness research for the Johns Hopkins ICTR                                                                                                    2015-2016

Sonal Singh M.D., M.P.H

Sonal Singh MD, MPH received his MD from Patna Medical College India (1999). He completed internal medicine residency training at Unity Health System, affiliate of Strong Memorial Hospital Rochester, NY. (American Board of Internal Medicine 2005) He obtained an MPH from Johns Hopkins Bloomberg School of Public Health (2008) and completed subsequent research training at the Johns Hopkins Hospital (2012) as a Junior Faculty Research Scholar supported by the National Institute of Health.  He was the Associate Director for the Center for Drug Safety and core faculty Evidence Based Practice Center and the Center for Public Health and Human Rights at Johns Hopkins University. He has taught and held faculty appointments at Wake Forest University School of Medicine and Johns Hopkins University. He has received numerous awards including the Senior Scholarship Award from the Unity Health System (2005), Tinsley R Harrison Teaching Award for Education at Wake Forest University in 2007,  Master Teacher Award at Wake Forest University (2008), Mid-Atlantic Society of General Internal Medicine Clinician Investigator of the Year Award ( 2010), the Bruce P Squires Award for the best research paper of the year from the Canadian Medical Association Journal (2011) and the third best student abstract award from the International Society of Pharmacoepidemiology (2013).  He conducts clinical research with a focus on evidence synthesis, drug safety and shared decision making. Dr Singh has conducted research in several countries and has published more than 150 academic manuscripts to advance research and clinical care. His research efforts have been supported by the NIH, FDA, Agency for Health Care Research and Quality and the Patient Centered Outcome Institute and various private foundations. His research has been published in *Science, NEJM, Journal of the American Medical Association, Annals of Internal Medicine, Lancet and the British Medical Journal*, and featured in various outlets including Nature Medicine, NYTIMES, CNN, Washington Post and the Wall Street Journal. He currently serves on the editorial board of the *Evidence Based Medicine Journal* published by the BMJ, as a panel member of the American College of Chest Physician guideline writing group, and  American College of Physicians Health Policy committee (Massachusetts chapter) He has served as a consultant to the World Bank, World Health Organization International Agency for Research Cancer, the Agency for Health Care Research and Quality, pharmaceutical sponsors and research firms and several non-governmental organizations. He is a practicing general internist with a passion for managing patients with complex medical conditions.

**EXHIBIT B**

**Trial Testimony**

I have not provided trial testimony.

**Expert deposition (last 5 years)**

1. US District Court of South Carolina, Charleston; *In Re Lipitor (Atorvastatin Calcium) marketing, sales practices and products liability litigation*, MDL No. 2:14-mn-02502-rmg, April 28, 2015; supplementary deposition, in 2016.

2. US States District Court, Eastern District Court of California; *Kristi Lauris Individually and as Successor in Interest to the Estate of Dainis Lauris; vs Defendants Novartis AG*, Case No. 1:16 cv 00393 –LJO-SAB. Case 2:17-cv-14302-RLR Document 49 Entered on FLSD Docket, 2017.

3. Circuit Court of Camden County, Missouri; *Grace Arlene Rahmoeller v. Walmart Stores, Inc. and Nicholas B. Collins*, Case No.: 15CM-CC00238, April 16, 2018.

4. US District Court, Southern District of Florida, *Dennis McWilliams and Lori McWilliams v. Novartis AG and Novartis Pharmaceuticals Corp.*, Case No. 17-14302, May 2, 2018.

5. *Mary Brufett and Jefferey Brufett, vs Iskra Pusic, MD, Keith E. Stocker Goldstein and Washington University*, Cause No 1622-CC01117 (Division 8), May 10, 2018.

6. US District Court Northern District of California, San Francisco Division; *In Re: Viagra (Sildenafil Citrate) and Cialis (Tadalafil) Products Liability Litigation*, Civil Case  No.:  3:16-md-02691-RS, MDL No. 2691, August 9, 2018.

Exhibit 34

Sonal Singh, M.D., M.P.H.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

-------------------------------------x

IN RE:  JOHNSON & JOHNSON TALCUM

POWDER PRODUCTS MARKETING, SALES

PRACTICES, AND PRODUCTS              MDL NO:

LIABILITY LITIGATION                 16-2738 (FLW)(LHG)

-------------------------------------x

THIS DOCUMENT RELATES TO

ALL CASES

-------------------------------------x

VIDEOTAPED DEPOSITION UNDER ORAL EXAMINATION OF

SONAL SINGH, M.D., M.P.H.

January 16, 2019, 9:07 a.m.

-  -  -

REPORTED BY: JANET M. SAMBATARO, RMR, CRR, CLR

-  -  -

GOLKOW LITIGATION SERVICES

877.370.3377 ph | 917.591.5672 fax

deps@golkow.com

Sonal Singh, M.D., M.P.H.

---

Page 2

1
2
3
4
5
6          Deposition of SONAL SINGH, M.D., M.P.H.,
7    held at the Beechwood Hotel, 363 Plantation Street,
8    Worcester, Massachusetts, pursuant to Agreement
9    before Janet Sambataro, a Registered Merit Reporter,
10   Certified Realtime Reporter, Certified LiveNote
11   Reporter, and a Notary Public within and for the
12   Commonwealth of Massachusetts, on January 16, 2019,
13   commencing at 9:07 a.m.
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1    APPEARANCES:  (Continued)
2
3    TUCKER ELLIS
4    BY:  MICHAEL C. ZELLERS, ESQ.
5    515 South Flower Street
6    Los Angeles, California 90071
7    (213) 430-3400
8    michael.zellers@tuckerellis.com
9    Representing the Defendant, Johnson & Johnson,
10   Johnson & Johnson Consumer Companies, Inc.
11
12
13
14   DRINKER BIDDLE AND REATH, LLP
15   BY:  KATHERINE MCBETH, ESQ.
16   One Logan Square, Suite 2000
17   Philadelphia, Pennsylvania 19103-6996
18   (215) 988-2700
19   katherine.mcbeth@dbr.com
20   Representing the Defendant, Johnson & Johnson,
21   Johnson & Johnson Consumer Companies, Inc.
22
23
24   - Continued -
25

---

Page 3

1    APPEARANCES:
2
3    ASHCRAFT & GEREL, LLP
4    BY:  MICHELLE A. PARFITT, ESQ.
5    4900 Seminary Road
6    Alexandria, Virginia 22311
7    (703) 931-5500
8    mparfitt@ashcraftlaw.com
9    Representing the Plaintiffs
10
11   LEVIN PAPANTONIO
12   BY:  CHRISTOPHER V. TISI, ESQ.
13   316 South Baylen Street
14   Pensacola, Florida 32502
15   (850) 435-7000
16   ctisi@levinlaw.com
17   Representing the Plaintiffs
18
19   RESTAINO LAW LLC
20   BY:  JOHN RESTAINO, ESQ.
21   130 Forest Street
22   Denver, Colorado 80220
23   (303) 839-8000
24   JRestaino@RestainoLLC.com
25   Representing the Plaintiffs

---

Page 5

1    APPEARANCES:  (Continued)
2    GORDON & REES
3    BY:  MICHAEL R. KLATT, ESQUIRE
4    816 Congress Avenue, Suite 1510
5    Austin, Texas 78701
6    (512) 391-0197
7    Representing the Defendants,
8    Imerys Talc America, Inc.
9
10   COUGHLIN DUFFY LLP
11   BY:  MARYAM M. MESEHA, ESQ.
12   350 Mount Kemble Avenue
13   Morristown, New Jersey 07962
14   (973) 267-0058
15   mmeseha@coughlinduffy.com
16   Representing Imerys Talc America, Inc.
17
18   TUCKER ELLIS
19   BY:  JAMES W. MIZGALA, ESQ.
20   233 South Wacker Drive
21   Chicago, Illinois 60606
22   (312) 624-6300
23   james.mizgala@tuckerellis.com
24   Representing PTI
25

2 (Pages 2 to 5)

Sonal Singh, M.D., M.P.H.

Page 6

1   APPEARANCES: (Continued)
2
3   SEYFARTH SHAW LLP
4   BY: THOMAS T. LOCKE, ESQ.
5   975 F Street, N.W.
6   Washington, D.C. 20004
7   (202) 463-2400
8   Representing PCPC
9
10  ALSO PRESENT:
11  Jody Urbati, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1          I N D E X
2   WITNESS        DIRECT   CROSS   REDIRECT
3   SONAL SINGH, M.D., M.P.H.
4   By Mr. Zellers       11
5   By Mr. Klatt              301
6   By Mr. Locke                     337
7          E X H I B I T S
8   Number   Description            Page
9   Exhibit 1  Notice of Oral and
10      Videotaped Deposition of
11      Sonal Singh and Duces Tecum      13
12  Exhibit 2  Rule 26 Expert Report of
13      Sonal Singh, MD, MPH         14
14  Exhibit 3  Sonal Singh, MD, MPH, FACP,
15      curriculum vitae          16
16  Exhibit 4  List of references      17
17  Exhibit 5  Additional Materials and
18      Data Considered          17
19  Exhibit 6  Updated Materials List     18
20  Exhibit 7  List of Trial Testimony    18
21  Exhibit 8  List of Expert Deposition   19
22  Exhibit 9  Table 1 AMSTAR          20
23  Exhibit 10 Rule 26 Expert Report of
24      Sonal Singh, MD, MPH, with
25      attachments             21

Page 8

1          E X H I B I T S
2   Number       Description       Page
3   Exhibit 11 Letter dated June 1, 2015      21
4   Exhibit 12 Email string with top e-mail
5       dated December 27, 2018      23
6   Exhibit 13 Invoices from Dr. Singh      25
7   Exhibit 14 Plaintiffs' Steering Committee's
8       Response and Objections to the
9       Notice of Oral and Videotaped
10      Deposition of Sonal Singh and
11      Duces Tecum          28
12  Exhibit 15 Article entitled "Ovarian,
13      Fallopian Tube, and Primary
14      Peritoneal Cancer Prevention
15      (PDQ) - Health Professional
16      Version              89
17  Exhibit 16 Document entitled "Health Canada
18      Decision-Making Framework for
19      Identifying, Assessing, and
20      Managing Health Risks -
21      August 1, 2000"        101
22  Exhibit 17 Document entitled "Systematic
23      Review and Meta-Analysis of the
24      Association between Perineal Use
25

Page 9

1          E X H I B I T S
2   Number       Description       Page
3   Exhibit 17 (Continued)
4       of Talc and Risk of Ovarian
5       Cancer"          109
6   Exhibit 18 Printout entitled "Ovarian
7       Cancer:  Risk Factors"      120
8   Exhibit 19 Letter dated April 1, 2014   129
9   Exhibit 20 IARC Classifications      133
10  Exhibit 21 Article entitled "Perineal use of
11      talc and risk of ovarian cancer"  143
12  Exhibit 22 Article entitled "Genital use of
13      talc and risk of ovarian cancer:
14      a meta-analysis"        157
15  Exhibit 23 Article entitled "Perineal Talc
16      Use and Ovarian Cancer, A Systematic
17      Review and Meta-Analysis"     172
18  Exhibit 24 Article entitled "The Association
19      Between Talc Use and Ovarian Cancer,
20      A Retrospective Case-Control Study
21      in Two US States"        179
22  Exhibit 25 Article entitled "Tubal Ligation
23      Induces Quiescence in the Epithelia
24      of the Fallopian Tube Fimbria"   206
25      - Continued -

3  (Pages 6 to 9)

Sonal Singh, M.D., M.P.H.

Page 10

1                E X H I B I T S
2    Number        Description         Page
3    Exhibit 26 Article entitled "New Insights
4           into the Pathogenesis of Ovarian
5           Cancer: Oxidative Stress"        228
6    Exhibit 27 Federal Register, Vol. 81,
7           No. 243                    233
8    Exhibit 28 Document entitled "Interpretation
9           of Epidemiologic Studies on Talc
10          and Ovarian Cancer"         244
11   Exhibit 29 Article entitled "Association
12          between Body Powder Use and Ovarian
13          Cancer: The African American
14          Cancer Epidemiology Study (AACES)   261
15   Exhibit 30 Article entitled "Does Exposure to
16          Asbestos Cause Ovarian Cancer?
17          A Systematic Literature Review and
18          Meta-analysis"              289
19   Exhibit 31 Article entitled "Occupational
20          Exposure to Asbestos and Ovarian
21          Cancer: A Meta-analysis"     293
22   Exhibit 32 Chart                316
23
24
25

Page 11

1           P R O C E E D I N G S
2           THE VIDEOGRAPHER:  We are now on the
3    record.  My name is Jody Urbati.  I am a
4    videographer for Golkow Litigation Services.
5    Today's date is January 16, 2019, and the time is
6    9:07 a.m.
7           This video deposition is being held in
8    Worcester, Massachusetts, in the matter of Talcum
9    Powder Litigation, MDL No. 2738, for the United
10   States District Court, District of New Jersey.
11          The deponent today is Sonal Singh,
12   M.D., M.P.H.
13          Counsel will be noted on the
14   stenographic record.
15          The court reporter is Janet Sambataro
16   and will now swear in the witness.
17          SONAL SINGH, M.D., M.P.H.,
18   having been duly sworn, after presenting
19   identification in the form of a driver's license,
20   deposes and says as follows:
21          DIRECT EXAMINATION
22   BY MR. ZELLERS:
23     Q.   State your name, please.
24     A.   Sonal Singh.
25     Q.   Dr. Singh, we are here to take your

Page 12

1    deposition as an expert for the plaintiffs in the
2    Talc MDL; is that correct?
3      A.   Yes.
4      Q.   You are familiar with depositions?
5      A.   Yes.
6      Q.   You've given a number of depositions in
7    your career?
8      A.   I don't know about a number.  Yes, I
9    have.
10     Q.   Can you estimate for us the number of
11   depositions that you've given?
12     A.   I think I've provided that list in the
13   last five years.
14     Q.   I understand.  My question is a little
15   different.
16          How many have you given in your career?
17     A.   I can't tell you in my career.  Maybe
18   ten.  Approximately.
19     Q.   Have you ever testified at trial?
20     A.   No.
21     Q.   You understand today that I'm going to
22   ask you a number of questions and other counsel
23   may as well; correct?
24     A.   Yes.
25     Q.   Please don't answer any question that

Page 13

1    you don't understand.
2           Can you do that?
3      A.   Yes.
4      Q.   If you don't understand a question, let
5    me know, and I'll repeat the question or rephrase
6    it, so that we can make it clear to you.
7           Can you do that?
8      A.   Yes.
9      Q.   If you answer a question that I ask,
10   then I'm going to assume that you understood it.
11   Is that fair?
12     A.   Yes.
13     Q.   You are here today pursuant to a Notice
14   of Deposition, which we have marked as Exhibit 1.
15          (Notice of Oral and Videotaped
16          Deposition of Sonal Singh and Duces Tecum
17          marked Exhibit 1.)
18   BY MR. ZELLERS:
19     Q.   Is that correct?
20     A.   Yes.
21          MR. ZELLERS:  Katherine, when I mark an
22   exhibit, I'm going to need to hand them to you.
23          MS. MCBETH:  Sure.
24          MR. ZELLERS:  Thank you.
25

Sonal Singh, M.D., M.P.H.

Page 14

1   BY MR. ZELLERS:
2       Q.   Did you have an opportunity to review
3   Deposition Exhibit 1 before today's deposition?
4       A.   Yes.
5       Q.   Have you brought with you or provided
6   to counsel for production all materials in your
7   possession that are responsive to the Notice of
8   Deposition?
9       A.   I have.
10          MR. ZELLERS:  I will mark, as
11  Deposition Exhibit 2, your report in this matter
12  dated November 16 of 2018.
13          (Rule 26 Expert Report of Sonal
14  Singh, MD, MPH marked Exhibit 2.)
15  BY MR. ZELLERS:
16      Q.   Is that correct?
17      A.   It is.  It doesn't have the references.
18      Q.   Deposition Exhibit 2 is just a copy of
19  your report itself.  It ends at Page 66.
20          Attached to your report were some additional
21  materials; is that right?
22      A.   Yeah.  Yeah.  I just want to make sure
23  because when I refer to the report, I understand
24  it to include references and tables and so on.
25      Q.   Your report includes everything that

Page 15

1   was produced by plaintiffs' counsel as part of
2   that report; is that right?
3           And, Dr. Singh, I'm going to mark separately
4   a number of the attachments --
5       A.   Okay.
6       Q.   -- to your report.  Right now, I'm just
7   trying to identify, is the body of your report --
8       A.   Yeah.
9       Q.   -- what we have identified and marked
10  as Exhibit 2?
11          MS. PARFITT:  And if I may,
12  Mr. Zellers, object.  The body of the report,
13  Dr. Singh may include as the body of the report
14  plus all of its attachments.
15          So just so the record is clear, but I
16  understand how you'd like to conduct it, and
17  that's fine.
18          MR. ZELLERS:  Understood.
19  BY MR. ZELLERS:
20      Q.   Your counsel today has provided us with
21  two bankers boxes of your report, plus all of the
22  references from the report.  Is that correct?
23      A.   Yes.
24      Q.   You also have brought that along with
25  you; is that right?

Page 16

1       A.   Yes.
2       Q.   If at any time today you need to look
3   at any of those documents, they're available, and
4   you're free to do that.  Understood?
5       A.   It is understood.
6       Q.   You had attached or provided with your
7   report a curriculum vitae, which I understand has
8   been updated; is that right?
9       A.   Yes.
10          MR. ZELLERS:  We will mark your updated
11  CV or curriculum vitae as Deposition Exhibit 3.
12          (Sonal Singh, MD, MPH, FACP,
13  curriculum vitae marked Exhibit 3.)
14          MR. ZELLERS:  Folks, I believe that
15  Ms. Parfitt has distributed to you, before the
16  deposition, Exhibit 3.
17  BY MR. ZELLERS:
18      Q.   Can you tell us, just briefly, in what
19  respect has Exhibit 3 been updated from the CV
20  that was produced with your report in this
21  matter?
22      A.   A few publications, and then I was
23  elected to the fellowship of the American College
24  of Physicians on January 1st.  So I'm an FACP,
25  and, yes, just a couple of publications,

Page 17

1   presentations.
2       Q.   Is the curriculum vitae that we have
3   marked as Deposition Exhibit 3 complete and up to
4   date?
5       A.   Yes.  Up to January 3rd.  Yes.
6       Q.   Of 2019?
7       A.   2019.  Yeah.
8       Q.   Are there any further additions or
9   corrections that need to be made to that CV?
10      A.   No.
11          MR. ZELLERS:  Deposition Exhibit 4 is
12  the list of references from your report.  And
13  that goes from Page 67 to Page 75.
14      Q.   Is that correct?
15      A.   Yes.
16          (List of references marked
17  Exhibit 4.)
18          MR. ZELLERS:  Deposition Exhibit 5 is
19  also from your report, and it's a listing of
20  additional materials and data considered.
21          (Additional Materials and Data
22  Considered marked Exhibit 5.)
23  BY MR. ZELLERS:
24      Q.   Is that right?
25      A.   Yes.

5 (Pages 14 to 17)

Sonal Singh, M.D., M.P.H.

Page 18

1      MR. ZELLERS:  Deposition Exhibit 6 is
2  an updated list of materials that defendants were
3  provided on January 13th of 2019.
4      (Updated Materials List marked
5      Exhibit 6.)
6  BY MR. ZELLERS:
7  Q.  Is that correct?
8  A.  Yes.
9      MR. ZELLERS:  Folks, I need one more of
10  those back.  Can I get one more?  Thank you.
11      Deposition Exhibit 7 is a listing of
12  the trial testimony and expert deposition
13  testimony that you have provided in the last five
14  years.
15      (List of Trial Testimony marked
16      Exhibit 7.)
17  BY MR. ZELLERS:
18  Q.  Is that right?
19  A.  Yes.  Actually, I have provided them an
20  update, as well, of that.  So I don't know if
21  that was with you, but --
22  Q.  You have brought with you today an
23  updated list of expert deposition testimony for
24  the last five years?
25  A.  Yes.  No. 7 is the update.

Page 19

1      MR. ZELLERS:  We will mark the updated
2  trial testimony list as Deposition Exhibit 8.
3      (List of Expert Deposition
4      marked Exhibit 8.)
5      MR. ZELLERS:  And I understand that's
6  out of order, but I premarked one other exhibit.
7  BY MR. ZELLERS:
8  Q.  What is the difference between
9  Deposition Exhibit 8, your updated list of
10  deposition testimony, and Exhibit 6, which is the
11  list of testimony you provided with your report
12  in November?
13  A.  Yes.  So there's an updated deposition
14  in a medical-legal case regarding standard of
15  care.
16  Q.  You've added that --
17  A.  Yes.
18  Q.  -- to --
19  A.  No. 7.
20  Q.  -- what we have marked as Deposition
21  Exhibit 8?
22  A.  Yes, it is.
23  Q.  In addition to the materials that we
24  have marked already, which were provided, other
25  than the updated CV and the updated expert

Page 20

1  testimony list, several additional documents that
2  counsel for plaintiffs has indicated are
3  responsive to the deposition notice.
4      Let me mark these.  I have not had a chance
5  to look at them yet substantively.
6      THE WITNESS:  Sure.
7      MR. ZELLERS:  But I will and may, at a
8  later time today, have some questions for you.
9      THE WITNESS:  Actually, I will say
10  there's a substantive document that's not here.
11  That's the table of rating that I created for the
12  report, and that should be part of the report.
13      MR. ZELLERS:  Let me see if I can find
14  that.
15  BY MR. ZELLERS:
16  Q.  It would be helpful to have that marked
17  as well; is that right?
18  A.  Yes.
19      MR. ZELLERS:  I will mark, as
20  Deposition Exhibit 9, the Amstar rating of
21  reviews, Pages 77 and 78 from your full report.
22      (Table 1 AMSTAR marked
23      Exhibit 9.)
24  BY MR. ZELLERS:
25  Q.  Is that right?

Page 21

1  A.  Thank you.
2      MR. TISI:  That was No. 9?
3      MR. ZELLERS:  No. 9.
4      Let's go off the stenographic record.
5  You can keep the video going.
6      (Discussion off the stenographic record.)
7      MR. ZELLERS:  Let's go back on the
8  stenographic record here.
9      Doctor, counsel for plaintiffs have
10  requested, and I am agreeable to marking a
11  complete copy of your report, including all of
12  the reference list and other materials that we've
13  marked individually, so the complete copy of your
14  report with all attachments, we will mark as
15  Deposition Exhibit 10.
16      (Rule 26 Expert Report of Sonal
17      Singh, MD, MPH, with attachments marked
18      Exhibit 10.)
19  BY MR. ZELLERS:
20  Q.  Have we, though, marked individually
21  your complete record -- strike that.
22      Have we marked individually your complete
23  report prior to marking Exhibit 10?
24  A.  Yes.
25      (Letter dated June 1, 2015

6  (Pages 18 to 21)

Sonal Singh, M.D., M.P.H.

Page 22

1    marked Exhibit 11.)
2  BY MR. ZELLERS:
3    Q.  The documents that were produced by
4  counsel this morning, Deposition Exhibit 11, is a
5  June 1st, 2015 letter with Janssen
6  Pharmaceuticals at the top to you from a
7  Dr. Zanca.  Is that right?
8    A.  Yes.
9    Q.  Is this inviting you to a program?
10   A.  Yes.  Consultation for a panel on
11  products discussion manufactured by Johnson and
12  Janssen Pharmaceuticals.
13   Q.  You're producing this in response to
14  the request asking for all communications between
15  yourself and any Johnson & Johnson company; is
16  that right?
17   A.  That's what I understood it to be,
18  but -- yeah.
19   Q.  You've gone and you've made a search,
20  and in the search for additional records
21  responsive to the Notice of Deposition, which we
22  marked as Exhibit 1, you have brought these
23  additional documents that we're marking here; is
24  that correct?
25   A.  Well, I wouldn't say I made a search.

Page 23

1  I sort of read it, you know, decided, okay, what
2  other additional things that are requested and,
3  you know, recalled that I had had this
4  interaction with Johnson & Johnson employees.
5    Q.  Are you comfortable that you have
6  brought with you today all of the documents that
7  are responsive to the Notice of Deposition?
8    A.  Yes.
9       (Email string with top e-mail
10      dated December 27, 2018 marked Exhibit 12.)
11      MR. ZELLERS:  All right.
12  BY MR. ZELLERS:
13   Q.  Deposition Exhibit 12 is an e-mail
14  string.  The very last e-mail is from you to --
15  well, it's to Michelle Parfitt.  I'm assuming
16  that you were forwarding to Ms. Parfitt just the
17  e-mail below, which is from you to Mr. Restaino
18  and then, apparently, the substantive e-mail is
19  at the bottom of the first page of Exhibit 12.
20      And this is a communication e-mail from you
21  to Lee-May Chen and others; is that right?
22   A.  Yes.
23   Q.  The subject is "Up-to-date references."
24  And the section on epidemiology and risk factors
25  of ovarian cancer; is that right?

Page 24

1    A.  Yes.
2      MS. PARFITT:  And for the record,
3  Mr. Zellers, and we can go ahead and redact the
4  copy later, but just so the record is clear, that
5  communication at the top to me from Dr. Singh was
6  simply, we asked him, do you have any
7  communications, and then he sent it to me.
8      MR. TISI:  We'll redact the part with
9  your agreement.
10     MR. ZELLERS:  Yes.  We can do that at a
11  break --
12     MS. PARFITT:  At a break.
13     MR. ZELLERS:  -- or, you know, at the
14  conclusion --
15     MS. PARFITT:  I appreciate that.  Thank
16  you.
17     MR. ZELLERS:  -- of the deposition.
18  BY MR. ZELLERS:
19   Q.  Do you -- strike that.
20      The date of your e-mail at the bottom of
21  Page 1 is December 13th of 2018; is that right?
22   A.  Yes.
23   Q.  You had been retained as an expert?
24   A.  Yes.
25   Q.  And had submitted, in fact, your expert

Page 25

1  report that we have marked previously; is that
2  right?
3    A.  Yes.
4    Q.  In this communication, Exhibit 12, do
5  you at all identify yourself as a paid, retained
6  expert for the plaintiffs in the talc litigation?
7    A.  No.  This was just a communication
8  about references, and I did not.
9      MR. ZELLERS:  Dr. Singh, the next set
10  of documents that you have brought with you and
11  that we will mark collectively as Exhibit 13 are
12  your invoices.
13      (Invoices from Dr. Singh marked
14      Exhibit 13.)
15  BY MR. ZELLERS:
16   Q.  The first invoice is dated July 14 of
17  2010.  There's a total of five invoices.
18      The last invoice is from July 11, 2018, to
19  November 19, 2018.  Is that right?
20   A.  It should be 2017, not 2010.  I'm
21  sorry.  You mentioned 2010.
22   Q.  And the date is 2017?
23   A.  Yeah.  I wanted to correct that.
24   Q.  No.  Thank you for correcting that.
25      I also have not had a chance to review,

7 (Pages 22 to 25)

Sonal Singh, M.D., M.P.H.

Page 26

1  substantively, the invoices.
2      A.  Sure.
3      Q.  And I don't think we have a complete
4  copy.  I'm going to ask you some questions in a
5  bit.
6      A.  We do have a complete copy.  I mean, in
7  terms of --
8      Q.  No.  I understand that Exhibit 13 is a
9  complete copy of your invoices.
10     A.  Yeah.
11     Q.  That you now have the copy in front of
12  you.  I don't have the copy in front of me.  Keep
13  it.  I'll have some questions for you a bit
14  later.
15     Have we now marked all documents that are
16  responsive to the Notice of Deposition which you
17  have produced here today?  And let me withdraw
18  that.
19     Have we now marked all of the documents that
20  you have produced in response to the Notice of
21  Deposition?
22     A.  Yeah.  And I think that, you know,
23  there were some updated materials that I reviewed
24  that are part of this list.
25     Q.  All right.  And we need to be more

Page 27

1  specific --
2      A.  Sure.
3      Q.  -- as you understand from doing this
4  before.
5      You are referring to the list of updated
6  materials that was produced about a week ago?
7      A.  Yeah.
8      Q.  And that is Deposition Exhibit -- well,
9  strike that.
10     Just for the record, it was produced on
11  January 13th of 2019.  The updated materials that
12  you have reviewed are listed on Deposition
13  Exhibit 6; is that right?
14     A.  I have not reviewed these materials.  I
15  was provided these materials.  I have reviewed
16  portions of these.  I have not had a chance to
17  review all of these materials.
18     Q.  Anything else that you have responsive
19  to the deposition notice that we have not marked?
20     A.  Give me a second.  Let me read.
21         MS. PARFITT:  If we can go off the
22  stenographic record for one moment while he's
23  doing it.
24         MR. ZELLERS:  Sure.
25     (Discussion off the stenographic record.)

Page 28

1      (Plaintiffs' Steering
2  Committee's Response and Objections to the
3  Notice of Oral and Videotaped Deposition of
4  Sonal Singh and Duces Tecum marked Exhibit
5  14.)
6          MR. ZELLERS:  Back on the stenographic
7  record.
8          Dr. Singh, at the request of
9  plaintiffs' counsel, we will mark and
10  incorporate, as an Exhibit 14, the objections
11  that plaintiffs have filed to the deposition
12  notice.
13         MS. PARFITT:  Thank you.
14  BY MR. ZELLERS:
15     Q.  Have we identified and marked all of
16  the documents that you have produced pursuant to
17  the Notice of Deposition?
18     A.  We have.
19     Q.  To your knowledge, there are no
20  additional documents that you have in your
21  possession to produce; is that right?
22     A.  I don't have any additional documents.
23     Q.  The report that we have marked as
24  Deposition Exhibit 10, does that contain all of
25  the opinions that you intend to offer at trial?

Page 29

1      A.  Actually, it's Deposition Exhibit 2.
2      Q.  I understand.
3      A.  Sorry.  I'm a little confused here.
4      Q.  That's fine.  We don't want you to be
5  confused.  And I asked you in the beginning to
6  tell me if you were getting confused.
7      We have marked Deposition Exhibit 10, which
8  contains all of the attachments --
9      A.  Okay.
10     Q.  -- that we have separately marked; is
11  that right?
12     A.  Yeah.  Yeah.
13     Q.  All right.  The substance of your
14  report in terms of your written opinions, we have
15  marked separately as Exhibit 2; correct?
16     A.  Yes.
17     Q.  Does that report, Exhibit 2, and also
18  marked as Exhibit 10, contain all of the opinions
19  that you intend to offer at any trial or hearing
20  in this matter?
21     A.  Well, I mean, it's hard to say it
22  contains all the opinions because there have been
23  some updates since then and, you know, science
24  evolves.
25     Q.  Go ahead.  Finish your answer.

8 (Pages 26 to 29)

Sonal Singh, M.D., M.P.H.

Page 30

1    A.   Science evolves, and, you know, we
2  update our opinions.  So it's not like you offer
3  an updated opinion one day and that stays that
4  way.
5    Q.   Dr. Singh, this is our opportunity to
6  ask you questions about the opinions that you
7  have formed in this matter.
8    As of today, does your report, which we've
9  marked as Exhibit 2 and also --
10    MS. PARFITT:  10.
11    Q.   -- Exhibit 10, does that include all
12  of the opinions that you intend to testify to at
13  any trial or hearing of this matter?
14    A.   Yes.  In terms of the causation
15  opinions, it does.  But in terms of what
16  additional evidence has been reviewed or what
17  additional evidence has come up that, you know,
18  supports or refutes that, that might have
19  changed.
20    Q.   Dr. Singh, do you have any new or
21  additional opinions today that you intend to
22  offer at any trial or hearing of this matter
23  beyond the opinions that are included in your
24  report which we've marked as Exhibit 2 and
25  Exhibit 10?

Page 31

1    A.   I'm sorry.  I'm just not -- it's not
2  like I don't want to answer.  I'm trying to
3  understand.  When you say "additional opinions,"
4  does it just mean like a causal opinion or does
5  it mean --
6    Q.   Dr. Singh, you have done this before;
7  right?
8    A.   Yeah.  I'm trying to understand and I'm
9  trying to be responsive.
10    Q.   This is the defense opportunity to ask
11  you what opinions you intend to offer at any
12  hearing or trial of this matter.
13    As of today, do you have any additional
14  opinions beyond the opinions that are set forth
15  in your report which you intend to offer at any
16  trial or hearing of this matter?
17    A.   I don't -- yeah -- I mean, it's, you
18  know, the opinions that I've offered are included
19  in the report.
20    Q.   Does your report identify -- and by
21  "report," we can refer to the report that we've
22  marked as Exhibit 10.
23    A.   Mm-hmm.
24    Q.   Does that report identify everything
25  that you are relying on in forming the opinions

Page 32

1  that you intend to provide at any hearing or
2  trial in this matter?
3    A.   No.  I'm relying on additional evidence
4  since then that has become available on this.
5    Q.   Let's -- I will ask you a new question.
6    Are all of the materials that you are
7  relying on in forming the opinions that you
8  expect to testify to at any hearing or trial,
9  identified either in your report, which we have
10  marked as Exhibit 10, or the updated list of
11  materials, which we have marked as Exhibit 6?
12    A.   Yes.
13    MS. PARFITT:  And 5.
14    THE WITNESS:  Okay.  That's the part of
15  the whole report.
16    MR. ZELLERS:  Yes.
17  BY MR. ZELLERS:
18    Q.   Exhibit 5 had previously been produced
19  as part of your report; is that right?
20    A.   Yes.
21    Q.   Is your report accurate?
22    A.   Yes.
23    Q.   Is your report complete?
24    A.   Yes, it is.  It has some typos, but...
25    Q.   As we go along, if there's a typo --

Page 33

1  strike that.
2    Are there any typos that are substantive
3  typos?
4    A.   No.  But sometimes it's we and they.  I
5  can point that out at some point in time.
6    Q.   Are there any documents that were in
7  your possession that you produced to counsel
8  responsive to the deposition notice that have not
9  been produced here?
10    A.   No.  Not that I can think of.
11    Q.   When were you first contacted by anyone
12  regarding the talc ovarian cancer litigation?
13    A.   So this was in 2017 by Attorney John
14  Restaino and Attorney Parfitt.  I don't know the
15  exact day, but it has to be the, you know, spring
16  or summer of 2017.  Spring or summer.
17    Q.   Your invoice, your first invoice is
18  dated July of 2017; is that right?
19    A.   Yeah.  But, you know, it just covers a
20  period of background.  It's not that they
21  contacted me and may have contacted me prior to
22  that.
23    Q.   Sometime in the first part of 2017, you
24  were contacted by Mr. Restaino and by
25  Ms. Parfitt; is that right?

9  (Pages 30 to 33)

Sonal Singh, M.D., M.P.H.

**Page 34**

1    A.  Yes.
2    Q.  Anyone else?
3    A.  No.
4    Q.  What attorneys have you met with or
5  communicated with in the talc ovarian cancer
6  litigation other than Ms. Parfitt and
7  Mr. Restaino?
8    A.  So Attorney Chris Tisi, and then I have
9  communicated on the phone with Attorney Gates.
10  Is that -- no.  Margaret?
11    Q.  Margaret Thompson?
12    A.  Thompson.  Yeah.
13    Q.  Do you know Margaret Thompson?
14    A.  I mean, I know her as an attorney.  I
15  just spoke to her on the phone for 30 minutes.
16    Q.  Have you ever met in person with
17  Ms. Thompson?
18    A.  No.
19    Q.  Have you ever had any communications or
20  interactions with Ms. Thompson other than the
21  30-minute-or-so phone call?
22    A.  No.
23    Q.  When was that conversation with
24  Ms. Thompson?
25    A.  I don't know.  A couple of days ago.

**Page 35**

1  Yeah.
2    Q.  It was in preparation for the
3  deposition; is that right?
4    A.  Yes.
5    Q.  How much time did you spend with the
6  lawyers for plaintiffs preparing for this
7  deposition?
8    A.  With the lawyers, I've spent -- yeah,
9  I'd have to go back, maybe five or six hours.
10  But, again, I can't be very precise.
11    Q.  Any other attorneys that you've
12  communicated with that you understand to
13  represent the plaintiffs other than the attorneys
14  that you have identified?
15    A.  No.  Not that I can recall.
16    Q.  Do you understand that you are -- or
17  strike that -- have been retained as an expert by
18  plaintiffs in the MDL talc ovarian cancer
19  litigation?
20    A.  Right now, I do.  Yes.
21    Q.  Is there any other ovarian cancer
22  litigation matter that you have been retained in?
23    A.  No.
24    Q.  When you were retained back in early
25  2017 by Mr. Restaino and Ms. Parfitt, what were

**Page 36**

1  you asked to do?
2    A.  So to clarify, I don't know I was
3  retained at that time.
4    I was asked to consult on and provide, you
5  know, a review and look at -- look at the
6  literature on this topic.  So I'm not sure --
7  depending on semantics, you can define it as
8  being retained or, you know -- I don't think we
9  had an "agreement," but I was asked to provide a
10  consultation on that matter.  And these invoices
11  include that consult.
12    Q.  In the first part of 2017, what were
13  you asked by counsel for plaintiffs in the talc
14  litigation, ovarian cancer talc litigation, to
15  do?
16    MS. PARFITT:  Objection.  Limit your
17  response to communications with regard to simply
18  the requests, not the conversations.
19    A.  Yeah.  So I was asked to review, you
20  know, the literature on talcum powder products
21  and ovarian cancer.
22    Q.  Had you ever done that before?
23    MS. PARFITT:  Objection.  Form.
24    A.  I mean, when I say "review," yes, I had
25  read about talcum powder products and ovarian

**Page 37**

1  cancer.
2    Q.  You were asked to make a systematic
3  review of the literature relating to talcum
4  powder products and ovarian cancer; is that
5  right?
6    A.  Not necessarily a systematic review,
7  but they asked me to, you know, review the
8  literature, and I had been reading it from
9  other -- from my own reading in different
10  journals, and they asked me to, you know, review
11  and, you know, provide my own opinion on that
12  matter.
13    Q.  At some point, you were retained,
14  agreed --
15    A.  Yes.
16    Q.  -- to work with the attorneys for
17  plaintiffs; is that right?
18    A.  Yes.
19    MS. PARFITT:  Objection.  Form.
20    Q.  Were you ever given any new or
21  additional assignment in the MDL talc ovarian
22  cancer litigation other than to do a literature
23  review?
24    MS. PARFITT:  Objection.  Form.
25    A.  Well, I mean, I guess I was, you know,

10 (Pages 34 to 37)

Sonal Singh, M.D., M.P.H.

Page 38

1  asking the causal question that is the use of
2  talcum powder products a cause of ovarian cancer.
3      Q.  You looked at the literature --
4      A.  Mm-hmm.
5      Q.  -- to try to determine if you could
6  answer that question; is that right?
7      A.  Yeah.  So we looked at -- I looked at
8  the literature and, you know, obviously, looked
9  at other documents and performed a methodology,
10  and we can discuss that in detail later.
11      But the primary question of interest is --
12  was, is the use of perineal use of talcum powder
13  products associated with and causally related to
14  the development of ovarian cancer.
15      Q.  That has been the request from
16  plaintiffs' counsel to you in terms of providing
17  expert opinions in this matter; is that right?
18      A.  Yes.
19      Q.  When were you first asked to prepare a
20  report setting forth your opinions?
21      A.  Again, I can't recall the specific
22  timelines.  I'm sorry.  It's been a while.
23      Q.  Were you asked by plaintiffs to assume
24  any facts?
25      A.  No.  I mean, at that time, you know,

Page 39

1  and even prior to that, I was reading the
2  literature.  I was, you know, agnostic to it.
3      And, yeah, I didn't -- in fact, I didn't
4  form an opinion on this topic until -- until the
5  very end of, you know, 2018.
6      Q.  When you say you were "agnostic" --
7      A.  Mm-hmm.
8      Q.  -- to this issue, whether or not
9  talcum powder products are associated with
10  ovarian cancer, do you mean that you had not
11  formally come up with or developed any opinions
12  prior to becoming involved as an expert for
13  plaintiffs?
14      MS. PARFITT:  Objection.  Form.
15      A.  Yeah.  So my -- what I mean is I had
16  not systematically reviewed the literature to
17  form an opinion whether talcum powder products
18  is, so I had not done the processes required to,
19  you know, develop an opinion.
20      Q.  All right.  You have now done that and
21  you're here to talk about it; is that right?
22      A.  Yes.
23      Q.  Plaintiffs' counsel have paid you for
24  your time to review documents, the literature,
25  prepare a report, and render your opinions; is

Page 40

1  that right?
2      A.  Yes.
3      Q.  How much are you charging per hour for
4  your time in this case?
5      A.  $600 an hour.
6      Q.  You have invoices in front of you.
7      What is the total value of the time that
8  you've spent on the talc ovarian cancer
9  litigation, whether that's been billed or not
10  billed, paid or not paid?
11      A.  I can't calculate the time.  I can
12  calculate --
13      Q.  Can you estimate it for us?
14      A.  I don't want to give a number that's
15  inaccurate; right?  I mean, these are accurate
16  numbers.  But I will just have to sum it up --
17      Q.  Let's try to do this as quickly as we
18  can.
19      A.  Yeah.
20      Q.  The five invoices that you've marked
21  or -- strike that -- that we have marked as
22  Deposition Exhibit 13 --
23      A.  Mm-hmm.
24      Q.  -- does that capture all of your time
25  on the ovarian cancer talc litigation through

Page 41

1  November of last year?
2      A.  Yes.
3      Q.  Is there any additional time that you
4  have spent on the talcum powder litigation up
5  through November of last year that's not
6  reflected in the invoices we've marked as
7  Exhibit 13?
8      A.  No.
9      Q.  All right.  First invoice, what is the
10  total?
11      A.  9,300.
12      Q.  The second invoice, total?
13      A.  Twenty, one, zero, zero.
14      Q.  21,000?
15      A.  20,100.
16      Q.  Next invoice, total?
17      A.  5,100.
18      Q.  Next invoice, total?
19      A.  19,200.
20      Q.  Last invoice, total?
21      A.  40,800.
22      Q.  Since November of 2018, can you
23  estimate for us the number of hours that you have
24  spent on this matter?
25      A.  So, I mean, apart from three to five

11 (Pages 38 to 41)

Sonal Singh, M.D., M.P.H.

| Page 42 | Page 44 |
|---|---|
| 1  hours that I spent with the lawyers, I don't | 1  A.  Okay. |
| 2  know.  Maybe I've spent 10, 15 hours on my own. | 2  Q.  What percentage of income is from |
| 3  Maybe more.  I just don't have that exact number. | 3  consulting on litigation matters?  Give us an |
| 4  I'll have to look. | 4  estimate. |
| 5  Q.  At some point, you will submit an | 5  A.  Okay.  Yeah.  Maybe 30 percent.  I'm |
| 6  invoice -- | 6  doing my best to give you -- |
| 7  A.  Yes. | 7  Q.  Is that your -- you're here to be |
| 8  Q.  -- for your time; is that right? | 8  truthful; correct? |
| 9  A.  After today.  Yeah. | 9  A.  Yeah. |
| 10  Q.  Have you been disclosed as an expert in | 10  Q.  Is 30 percent of your income from |
| 11  any other talcum powder proceeding aside from | 11  consulting on litigation matters, is that your |
| 12  this case? | 12  best estimate as you sit here today? |
| 13  A.  No. | 13  MS. PARFITT:  Objection.  Some clarity |
| 14  Q.  What percent of your professional time | 14  as to over what period of time? |
| 15  do you currently spend performing work as a | 15  A.  Yeah.  Over five years, I mean, that's |
| 16  consultant? | 16  my best estimate. |
| 17  A.  Yeah.  It could be -- you know, varies. | 17  Q.  Is it a little bit more now? |
| 18  It could be 20 to 30 percent of my time. | 18  MS. PARFITT:  Objection. |
| 19  Sometimes 20 percent. | 19  A.  Well, over the last year, yes, but over |
| 20  Q.  Has that 20 to 30 percent of your | 20  five. |
| 21  professional time spent working as a consultant, | 21  Q.  Over the last year, what are you |
| 22  has that been consistent for the past five, ten | 22  working on?  You're working on the talc |
| 23  years? | 23  litigation; is that right? |
| 24  A.  Yeah.  So, actually, it's been less in | 24  MS. PARFITT:  Objection.  Form. |
| 25  the past, sometimes a little more, but, you know, | 25  Q.  Doctor, did you hear my question? |

| Page 43 | Page 45 |
|---|---|
| 1  overall, I would average out, you know, sort of | 1  A.  Yeah.  Yeah. |
| 2  as I was preparing over the last five years, it | 2  Q.  What other litigations are you serving |
| 3  would probably be 15 to 20 percent, but, you | 3  as an expert for? |
| 4  know -- | 4  A.  Viagra. |
| 5  Q.  Currently, though, best estimate is 20 | 5  Q.  You're an expert for plaintiffs in |
| 6  to 30 percent; is that right? | 6  Viagra; is that right? |
| 7  A.  Over the last six months.  Yes. | 7  A.  Yes. |
| 8  Q.  What percent of your income is from | 8  Q.  What other litigations are you serving |
| 9  consulting on litigation matters? | 9  as an expert for plaintiffs in? |
| 10  A.  Again, I can't give you my gross | 10  A.  None other than that, that I know of. |
| 11  income.  I mean, I -- | 11  Q.  Are you still working as an expert for |
| 12  Q.  I don't want your gross income.  I'm | 12  plaintiffs in the Lipitor litigation? |
| 13  asking just for -- I just want to know a | 13  A.  That ended several years ago, as far as |
| 14  percentage of your income that comes from | 14  I recall. |
| 15  consulting in litigation cases. | 15  Q.  You list two Tasigna cases against |
| 16  A.  Well, again, you know, consulting is | 16  Novartis. |
| 17  not just litigation for me.  As I said, I've | 17  Are you still working on those cases? |
| 18  consulted, you know, including for J&J, Eli | 18  A.  That ended in, I think, in -- yeah, in |
| 19  Lilly, others, that's, you know, on my CV. | 19  ended. |
| 20  Overall, and other, you know, insurers.  So it's | 20  Q.  You list on your expert testimony, |
| 21  not just -- first of all, it's not litigation | 21  2018; is that right? |
| 22  consulting that I do. | 22  A.  Yes.  I mean, but I listed everything |
| 23  Q.  Dr. Singh -- | 23  that was -- I have done in the five years.  It |
| 24  A.  Yes. | 24  doesn't mean that those are ongoing. |
| 25  Q.  -- listen to my question, if you can. | 25  Q.  You are no longer serving as an expert, |

12 (Pages 42 to 45)

Sonal Singh, M.D., M.P.H.

**Page 46**

1  to your knowledge, in the Tasigna cases; is that
2  right?
3      A.  Yes.
4      Q.  How about the Rahmoeller versus Walmart
5  litigation, is that still ongoing?
6      A.  That stopped but, you know, it's been
7  a year since I've heard anything, so I don't
8  know.
9      Q.  You also provided testimony in a matter
10 of Brufett versus Washington University.
11     Is that still ongoing?
12     A.  That has ended.
13     Q.  Is it fair to say that all of the cases
14 in which you have been retained in the past --
15     A.  Sure.
16     Q.  -- as an expert for plaintiffs
17 involving a pharmaceutical company defendant have
18 involved prescription medications?
19     A.  Yeah.  Prescription medications, issues
20 of systems.  I mean, that's my area of research.
21     Q.  How much of your work is for plaintiffs
22 versus defense as a litigation consultant?
23     MS. PARFITT:  Objection.  Form.
24     A.  Yeah.  I mean, over the last ten years,
25 I've provided opinions to both sides, but I have

**Page 47**

1  not been, you know -- when you say how much of
2  your work, is it time spent or --
3      Q.  In terms of time spent, most of your
4  work is for plaintiffs; is that right?
5      A.  I would say, yeah, 70 percent.  Yeah.
6      Q.  And it can be more than 70 percent; is
7  that right?
8      MS. PARFITT:  Objection to form.
9  Objection to form.
10     A.  Well, it depends, again, for frame of
11 time and, you know, if you say yes, in the last
12 year, yes.  More than --
13     Q.  Last year, it's been more than
14 70 percent --
15     A.  Sure.
16     Q.  -- for plaintiffs; is that right?
17     A.  Yes.
18     Q.  Have you ever been retained in a case
19 involving asbestos?
20     A.  No.
21     Q.  Have you ever been involved in a
22 case -- strike that.
23     Have you ever been retained in a case
24 involving personal injuries?
25     MS. PARFITT:  Objection.  Form.

**Page 48**

1      A.  I don't understand.  Like, what is a
2  personal injury?  Is it like somebody -- MVA kind
3  of case or --
4      Q.  Well, you've been involved in Lipitor.
5  You have been involved in a number of other
6  litigations.  Let me withdraw that question.  Let
7  me make it a little more precise.
8      Have you ever been retained in a case
9  involving cosmetic products?
10     A.  No.
11     Q.  In the preparation of your report, did
12 you review the other expert reports provided by
13 plaintiffs in this MDL litigation?
14     A.  I mean, other than those cited, I have
15 not had a chance to review them.
16     Q.  The updated materials list that you
17 have produced here today, which we've marked as
18 Exhibit 6, it contains a number of expert reports
19 from plaintiff experts in the MDL talcum powder
20 ovarian cancer litigation; is that right?
21     A.  Yes.
22     Q.  What is Exhibit 6?  It says "Updated
23 materials."
24     Does that mean updated materials that you
25 have reviewed and considered?

**Page 49**

1      A.  They were provided to me at some point
2  in time between November 15th, and I haven't
3  even -- I have actually not reviewed any of the
4  expert reports other than those that have been
5  cited in my report.
6      Q.  This list of updated materials is
7  something that was provided to you by plaintiffs'
8  counsel; is that right?
9      A.  Yes.
10     Q.  Have you reviewed any of the materials
11 that are on the updated materials list, which we
12 have marked as Exhibit 6?
13     A.  Yeah.  I had a chance to review some of
14 them.
15     Q.  Which materials that are identified on
16 Exhibit 6, updated materials, have you actually
17 looked at, reviewed, and considered?
18     A.  Yeah.  So, I mean, I was already aware
19 of the Health Canada assessment and, you know, so
20 that's -- I've reviewed.
21     I have reviewed, obviously, the Up to Date,
22 that childs sent.
23     I have reviewed the state of the science.  I
24 have reviewed --
25     Q.  What do you mean "state of science"?

13 (Pages 46 to 49)

Sonal Singh, M.D., M.P.H.

Page 50

1  Where is that listed?
2      A.  No. 2.  No. 2.
3      Q.  All right.  You've reviewed Chen Up to
4  Date.  You have reviewed the second reference,
5  Committee on the State of Science.
6      A.  Yeah.
7      Q.  Have you reviewed the Evolving
8  Paradigms and Research and Care?
9      A.  Yes.
10     Q.  The Draft Screening Assessment, Talc
11  Health Canada?
12     A.  Yes.
13     Q.  The EFSA Science Committee?
14     A.  Yes.
15     Q.  The EPA documents that are listed?
16     A.  No.
17     Q.  The FDA Ingredients Talc?
18     A.  No.
19     Q.  The Fadak Burnola citation?
20     A.  Yes.
21     Q.  The Federal Register, Volume 81?
22     A.  Yes.
23     Q.  Have you reviewed the Kemp hearing
24  opinion and order?
25     A.  I don't think so.

Page 51

1      Q.  The Keys Model Information Bias?
2      A.  Yes.
3      Q.  Kunz?
4      A.  Yes.
5      Q.  Official Journal of the European Union?
6      A.  No.
7      Q.  Qiao, Q-I-A-O?
8      A.  No.
9      Q.  Risk Management Scope, Talc Health
10  Canada?
11     A.  No.
12     Q.  You have not reviewed any of the
13  plaintiff expert reports submitted in this
14  matter.  Is that your testimony?
15     A.  Yeah.  They were provided to me and,
16  you know, I formed my opinion independent of
17  them.
18     Q.  Have you reviewed any of the reports
19  prepared and submitted by plaintiffs that are
20  identified in your updated materials?
21     A.  No.  Except if any of them were cited,
22  that's the one that I reviewed it in.
23     Q.  Yup.  Did you review Talc Canada Plain
24  Language Summary?
25     A.  Yes.

Page 52

1      Q.  Did you review Talc Information Sheet,
2  Health Canada?
3      A.  Yes.
4      Q.  Talc Potential Risk of Lung Effects?
5      A.  Yes.
6      Q.  Task Force on Science Risk Assessment?
7      A.  Yes.
8      Q.  The Weed Reference?
9      A.  Yes.
10     Q.  And the Zervomanolakis citation?
11     A.  Yes.
12     Q.  Have we covered all of the materials
13  that you've reviewed on the updated materials
14  list?  Is that right?
15     A.  Yes.
16     Q.  Have you communicated or had any
17  discussions with any of the other plaintiffs'
18  experts in the talc ovarian cancer litigation?
19     A.  No.
20     Q.  Have you reviewed any deposition or
21  trial transcripts from prior talcum powder cases?
22     A.  Not prior cases, but I reviewed the
23  deposition of Dr. Plunkett.
24     Q.  Plunkett?
25     A.  Plunkett.

Page 53

1      Q.  Have you reviewed any other depositions
2  of experts that have been taken in the MDL
3  ovarian cancer talcum powder litigation?
4      A.  No.
5      Q.  Did you conduct any independent
6  investigation to reach your opinions?
7      A.  I mean, I -- my opinion is independent
8  of these.
9      Q.  As I understand it, what you did is you
10  were asked by plaintiffs to review and consider
11  and form an opinion regarding the causal
12  question.  Is that right?
13     A.  Yes.
14     Q.  To do that, you went and you reviewed a
15  number of different literature sources; is that
16  right?
17         MS. PARFITT:  Objection.  Misstates his
18  opinion.  He indicated he had reviewed some prior
19  to that.
20         MR. ZELLERS:  Ms. Parfitt, just object,
21  form.  And let's not have speaking objections.
22         MS. PARFITT:  And you won't find that I
23  will.  I want to make sure we have an accurate
24  record.
25         I can wait until the very end and do a

14 (Pages 50 to 53)

Sonal Singh, M.D., M.P.H.

| | |
|---|---|
| **Page 54** | **Page 56** |

**Page 54**

1 recross, but I'm trying to clean it up.
2 BY MR. ZELLERS:
3     Q.  Doctor, go ahead.
4     A.  I didn't get the question.  Can you
5 repeat?
6     Q.  Sure.  The question is:  You were asked
7 to form an opinion by plaintiffs.  You went out
8 and you reviewed the literature.
9     You considered the literature and you
10 formulated an opinion; is that right?
11     A.  Yes.
12         MS. PARFITT:  Objection.
13     A.  And it was an independent opinion.
14     Q.  An independent opinion based upon your
15 review of the literature; is that right?
16     A.  Yeah.  Based upon my review of the
17 literature and the documents and, you know,
18 whatever was available to me.
19     Q.  And those -- all of those materials
20 that you reviewed, considered and relied upon
21 have been included in the exhibits that we've
22 marked in this deposition; is that right?
23     A.  That is correct.
24     Q.  Was there anything that you asked
25 plaintiffs' counsel for to prepare your report

**Page 56**

1 not necessarily the ones who may have helped me
2 in printing articles.
3     Q.  My question is:  Who helped prepare
4 your report other than yourself?
5         MS. PARFITT:  Objection.  Objection. I
6 believe you've asked that.  He's answered it.
7     A.  Okay.  Let me answer.
8     Q.  Sure.  Go ahead, Doctor.  Please
9 answer.
10     A.  I prepared my report.
11     Q.  I understand you prepared your report.
12     My question is:  Did anyone assist you in
13 preparing your report?
14         MS. PARFITT:  Objection.
15     A.  No.
16     Q.  You were provided some materials by
17 plaintiffs' counsel; is that right?
18     A.  Yes.
19     Q.  You reviewed some of those materials,
20 but not all of those materials; is that right?
21     A.  Yes.
22     Q.  In terms of the references, Exhibit 4.
23 And that is identified as Pages 67 through 75 in
24 your full report that we marked as Exhibit 10.
25     But looking at your references, Exhibit 4,

| | |
|---|---|
| **Page 55** | **Page 57** |

**Page 55**

1 that you were not provided with?
2     A.  No.
3     Q.  Did anyone assist you in the
4 preparation of your report?
5     A.  Well, I may have asked them to print,
6 like, these things and, you know, I may have
7 asked my -- I had means to print some articles
8 when I was preparing that.
9     Q.  Do you have a staff?
10     A.  Yes.
11     Q.  All right.  Who is your staff?
12     A.  I have several staff.  I have, you
13 know, three offices.
14     Q.  So you have three offices?
15     A.  Yes.
16     Q.  In those three offices, do you have
17 folks who help you?
18     A.  Yeah.
19         MS. PARFITT:  Objection to form.
20     Q.  Do you have folks who do research?
21         MS. PARFITT:  Objection.  Form.
22     A.  So, I mean -- so I have a dual
23 appointment in my research, and so I have
24 clinical staff and my research staff.  I have
25 people who work with me on projects.  They are

**Page 57**

1 some of these references were provided by counsel
2 for plaintiffs to you; is that right?
3         MS. PARFITT:  Objection.
4     A.  Yes.
5     Q.  Some, you went out and found on your
6 own; is that right?
7     A.  Well, it's not that way.  It's the
8 majority of the references, I would say
9 95 percent of, are my own work, and, you know, I
10 had questions about the product and the
11 mechanism, what additional documents were
12 available.
13     And that's a process.  And documents were
14 provided, and they need to be cited and are
15 cited.
16     Q.  Are you able to tell us, of the
17 references that you cite, Deposition Exhibit 4,
18 which ones came from plaintiffs' counsel and
19 which ones you came up with on your own?
20         MS. PARFITT:  Objection.  Form.
21     A.  Sure.
22     Q.  You could do that if we went through
23 one by one?
24     A.  Yeah.
25     Q.  Let me ask you the same question with

15 (Pages 54 to 57)

Sonal Singh, M.D., M.P.H.

Page 58

1  respect to the additional materials and data
2  considered, Exhibit 5.
3      Do you see that?
4      A.  Yes.
5      Q.  What's the difference between
6  Exhibit 4, references, and Exhibit 5, additional
7  materials and data considered?
8      A.  So as I went about and did my, you
9  know, systematic review and, you know, umbrella
10  review, I gathered all the materials and, you
11  know, I included studies and data that provided
12  original data on the causal question that we
13  discussed.
14      Q.  Doctor, my question was simply, what's
15  the difference between references and additional
16  materials and data considered?
17      A.  So the additional materials are those
18  that were, I would say, you know, reviewed, were
19  still reviewed in forming the opinion, but they
20  are not -- they don't -- they don't form the
21  basis of my opinion.
22      Q.  The materials that you relied on in
23  forming your opinion are what you've set forth as
24  your references, Exhibit 4; is that right?
25      MS. PARFITT:  Objection.

Page 59

1      A.  Yeah.  I mean, and then things that,
2  you know -- obviously, for the report, it is the
3  references.  Yeah.
4      I did rely on these to review them and, you
5  know --
6      Q.  Did you -- strike that.
7      MS. PARFITT:  For the record, that was
8  Exhibit 5.
9      MR. ZELLERS:  Well, no -- well, the
10  references is Exhibit 4.  The additional
11  materials and data considered is Exhibit 5.
12      MS. PARFITT:  Correct.
13  BY MR. ZELLERS:
14      Q.  So looking at Exhibit 5, additional
15  materials and data considered, were some of these
16  materials provided to you by counsel for
17  plaintiffs?
18      A.  Yeah.  They may have been.  These are
19  data considered.  So I'm not as familiar with
20  these as --
21      Q.  Have you -- are you finished?
22      A.  Yeah.  I'm not -- I mean, I reviewed
23  them.  I, you know --
24      Q.  Is it your testimony that you have
25  reviewed and considered each and every one of the

Page 60

1  additional materials and data considered, items
2  that are listed in Exhibit 5?
3      A.  By reviewed and considered, I mean,
4  have I read every word of it?  No.  I reviewed
5  and considered.
6      Q.  Who prepared the additional materials
7  and data considered list?
8      MS. PARFITT:  Objection.
9      A.  I prepared the list, but I asked them
10  also to help me with what materials they had
11  sent.
12      Q.  The lawyers for plaintiffs; is that
13  right?
14      A.  Yes.
15      Q.  So in your documents, you do have a
16  listing of the materials that were provided to
17  you by plaintiffs' counsel for consideration; is
18  that right?
19      MR. LOCKE:  Objection.  Misstates the
20  testimony.
21      A.  I'm sorry.  Can you repeat?
22      Q.  Sure.  The question is:  You do have,
23  because you requested it, a listing of the
24  documents and materials that were provided to you
25  by plaintiffs' counsel for you to consider;

Page 61

1  correct?
2      MS. PARFITT:  Objection.  Misstates his
3  testimony.
4      He didn't say he got a list.
5      MR. ZELLERS:  Okay.  Ms. Parfitt,
6  please, form, foundation.  You know, he can
7  testify, and whatever he's testified to, it's
8  part of the record.
9      MS. PARFITT:  Sure.  And, Mr. Zellers,
10  I am not trying to interrupt your deposition,
11  trust me on that, but I do want some clarity to
12  the record.
13      MR. ZELLERS:  Great.  That's what we're
14  doing right here.
15      MS. PARFITT:  Well --
16      MR. ZELLERS:  We've now asked the
17  question two or three times.
18  BY MR. ZELLERS:
19      Q.  Do you have the question?
20      MS. PARFITT:  It's a little different.
21  But go ahead.
22      A.  So I had asked for additional materials
23  in understanding the causal question between
24  talcum powder products and ovarian cancer.
25      Q.  What additional materials did you

16  (Pages 58 to 61)

Sonal Singh, M.D., M.P.H.

Page 62

1  request?
2      A.  I requested additional materials
3  regarding what are the constituents of talcum
4  powder products.  I -- you know, additional
5  materials regarding testing of talcum powder
6  products -- I -- you know, anything to, you know,
7  enhance my understanding whether there's evidence
8  to support or refute what we are seeing in the
9  epidemiologic studies about an increased risk of
10  ovarian cancer with talcum powder products.
11      Q.  When you requested these materials,
12  testing materials, ingredient materials and any
13  other materials, did you want to see all of the
14  materials that were available so that you could
15  form your opinion?
16      MS. PARFITT:  Objection.  Form.
17      A.  All is -- you know, there's only so
18  many hours.  I mean, you know, I think I wanted
19  to see as much as, you know, was relevant to
20  forming an opinion.
21      Q.  Well, you asked for records of testing
22  and you were provided with records, and we'll
23  take a look at it --
24      A.  Sure.
25      Q.  -- that purport to show that there is

Page 63

1  asbestos or asbestos has been found in talcum
2  powder; correct?
3      A.  I mean, that's not the only -- that's
4  not only --
5      Q.  Understood.
6      MS. PARFITT:  Excuse me.  Let him
7  finish his answer, if you will, please.  I'm not
8  sure he was done.  Appreciate that.
9      Q.  Are you done?
10      A.  No.  I'm not.  I want to finish my
11  answer.
12      Q.  Okay.
13      A.  So I requested documents because I
14  wanted to understand what constitutes talcum
15  powder products, and whether it is asbestos or
16  whether it is other heavy metals, that's sort of
17  a separate answer, and we can discuss that, and
18  I'm sure we will.
19      But I wanted to understand the constitution
20  of the product and, you know, whether there were
21  additional studies on, you know, whether it was
22  mechanisms that -- so because -- so that's what
23  the request was for.
24      And the documents were provided.  And my
25  review, looking at the complexity and volume of

Page 64

1  material, I can tell you, there's not enough time
2  to review all of it.  I mean, if somebody has,
3  that's great.  I can't.
4      Q.  Are you done?
5      A.  Yes.
6      Q.  Did you, when you made that request,
7  intend for plaintiffs to provide you with all of
8  the information that was available related to
9  testing or related to ingredients or whatever
10  other issues you requested documents on?
11      MS. PARFITT:  Objection.  Form.
12      A.  Yes.
13      Q.  All right.  In your report, you cite --
14  and this is in references -- to the depositions
15  of witnesses in the talcum powder litigation.
16  For example, and let's take a look at Exhibit 4,
17  your references, Cite No. 4 is to the deposition
18  of Linda Loretz.
19      Did you review this?
20      A.  Yes, I did.
21      Q.  And who is she?
22      A.  I don't recall offhand, who she is.
23      Q.  Is that information that was provided
24  to you by plaintiffs' counsel?
25      A.  Yes.

Page 65

1      Q.  Who is Joshua Muscat, reference list,
2  Cite No. 5?
3      A.  I think he did one of the
4  meta-analyses.  He's an author of one of the
5  meta-analyses as well.
6      Q.  Who is Alice Blount, Cite 27?
7      A.  Yeah.  They did a study on talc and
8  also I was deposed on that.
9      Q.  Did you request that deposition or was
10  that provided to you?
11      MS. PARFITT:  Objection.
12      A.  I requested information on -- as I
13  said, my request wasn't for deposition -- you
14  know, all documents that helped me answer the
15  causal question.
16      Q.  Whether they support plaintiffs'
17  position or refute plaintiffs' position; is that
18  right?
19      A.  To answer the causal question.  That's
20  what --
21      Q.  You wanted, though, all relevant
22  documents, whether they supported plaintiffs'
23  position or whether they refuted plaintiffs'
24  position; correct?
25      A.  To answer the causal questions.  I

17 (Pages 62 to 65)

Sonal Singh, M.D., M.P.H.

Page 66

1  don't --
2      Q.  Can you not answer that question?
3          MS. PARFITT:  Objection.  I believe --
4      A.  I'm answering your question.
5          MS. PARFITT:  -- he did.
6      Q.  My question is:  When you requested
7  documents from plaintiffs' counsel on various
8  topics, did you expect to receive whatever
9  documents may support plaintiffs' position and
10  whatever documents may refute plaintiffs'
11  position?
12      A.  Yes.
13      Q.  All right.  Who is John Hopkins,
14  reference item -- strike that -- reference list,
15  Cite 33?
16      A.  I think it's -- yeah.  It's a
17  deposition on behalf of J&J, I think.
18      Q.  Do you know who Mr. Hopkins is?
19      A.  No, I don't.
20      Q.  Do you know what role he had with
21  talcum powder?
22          MS. PARFITT:  Objection.  Form.
23      A.  I mean, he was deposed in this
24  litigation and he provided testimony.
25      Q.  The question is:  Do you know what role

Page 67

1  Mr. Hopkins played in and with talcum powder?
2      A.  He was providing testimony on behalf of
3  the company.  Is that --
4      Q.  Other than that, do you know anything
5  about what he did on behalf of the company?
6      A.  No.
7      Q.  Do you know what his positions were?
8      A.  I don't recall.
9      Q.  Do you know what his duties and
10  responsibilities were?
11      A.  I don't review that as a part of my
12  deposition, is to review positions and do
13  responsibilities.
14      Q.  And who is Julie Pier, Item 35?
15      A.  She was testifying on behalf of Imerys,
16  I think.
17      Q.  Do you know her position?
18      A.  I don't review -- you know, she was
19  testifying for the company, as that's as far as I
20  know.  Again, I don't know what role she was
21  playing and what she does.
22      Q.  Did you read, for each of these
23  depositions that you reference and cite to, did
24  you read just that section or did you read the
25  entire transcript?

Page 68

1      A.  So we can -- we can go back to the
2  sections where I cite these and then we can
3  discuss.  Is that okay?
4      Q.  No.  Well, and if you need to -- if you
5  can't answer a question, tell me you can't answer
6  a question.
7          My question is:  For these five or six folks
8  who you have quoted a snippet from their
9  deposition, did you review their entire
10  transcript or did you just review an excerpt?
11          MS. PARFITT:  Objection to the form.
12      A.  So the answer will be, we have to go
13  one by one.
14      Q.  All right.  For Mr. Hopkins, did you
15  review his entire deposition?
16      A.  No.
17      Q.  For Ms. Pier, did you review her entire
18  deposition?
19      A.  No.
20      Q.  For Ms. Blount, did you review her
21  entire deposition?
22      A.  I recall, yes.
23      Q.  Yes, you did?
24      A.  Yes.
25      Q.  For Ms. Loretz, did you review her

Page 69

1  entire deposition?
2      A.  Yes.
3      Q.  Did -- strike that.
4          For Mr. Muscat, did you review his entire
5  deposition?
6      A.  Yes, I did.
7      Q.  Did you review all of the exhibits to
8  those depositions?
9      A.  Again, those are pages and pages of
10  documents.  I don't know that -- if I reviewed
11  every single page of it.
12      Q.  Is it your practice, outside of
13  litigation, to rely on excerpts of deposition
14  testimony?
15      A.  Well, I mean, when you say "excerpts of
16  depositions," when I reviewed evidence, when I
17  try to gather evidence, as I said, you know, I
18  was trying to answer the causal question; I try
19  to gather all relevant evidence to the relevant
20  causal question at hand.
21          And sometimes these are unpublished
22  documents, and sometimes these are regulatory
23  documents and sometimes, as is in this case, they
24  are depositions.  And this approach is quite
25  consistent with other -- other approaches, such

18 (Pages 66 to 69)

Sonal Singh, M.D., M.P.H.

Page 70

1    as those conducted by, you know, Health Canada.
2        I mean, they clearly state that, you know,
3    you gather all relevant available evidence.
4        Q.   That was your goal; is that right?
5        A.   Yes.
6        Q.   Did Health Canada review deposition
7    testimony of company witnesses, to your
8    knowledge?
9        A.   Well, they were not available to them.
10       Q.   When you practice, outside of being a
11   litigation consultant, do you rely on excerpts of
12   deposition testimony?
13       A.   Well, again, you know, outside of this,
14   when I do papers -- I mean, I do include
15   unpublished or whatever you can collect,
16   whether -- whether it's excerpts of -- I mean, I
17   haven't -- if I look at my past papers, I can't
18   say that I've used excerpts of deposition
19   transcripts.
20       Q.   Did -- strike that.
21       You also cite company documents in your list
22   of references; is that right?
23       A.   Which one is that?
24       Q.   Exhibit 4.
25       A.   Which company?

Page 71

1        Q.   Well, for example, Item 116 refers to
2    an Imerys document, item 63 refers to a document
3    or set of documents produced by the
4    Johnson & Johnson defendants; correct?
5        A.   What was the second one?  I'm sorry.
6    You said 116 and then?
7        Q.   Yes.  Sixty --
8        MS. PARFITT:  63.
9        Q.   63.
10       A.   I'll have to go back and see what do
11   they cite about, to refresh my memory.
12       Q.   As you sit here, you don't remember
13   what those documents are, do you?
14       A.   Yeah.  Yeah.  I'd have to go back.
15       Q.   Is that correct?
16       A.   Yeah.  I mean, I have to go back to my
17   report and see them.
18       Q.   My question is:  Did plaintiffs'
19   counsel provide you with a large set of J&J
20   and Imerys company documents and you went through
21   and whittled them down, or did they provide you
22   with select documents?
23       MS. PARFITT:  Objection.  Form.
24       A.   Well, I mean, I feel it's a large set.
25   As you can see, I've reviewed, you know, as much

Page 72

1    as humanly possible.
2        Q.   My question is a little more specific.
3    I'm talking now just about any documents produced
4    by Johnson & Johnson defendants or any documents
5    produced by Imerys defendants.
6        You do cite to several of those in your
7    reference list; correct?
8        A.   Yes.
9        Q.   You were provided those documents by
10   counsel for plaintiffs; correct?
11       A.   Yes.
12       Q.   Were you provided a large set of
13   materials, company documents from the J&J
14   defendants and from the Imerys defendants, or
15   were you provided with select documents?
16       MS. PARFITT:  Objection.  Form.
17       A.   I mean, these are company documents.  I
18   mean, what is the difference between the two?
19   Like explain to me by example.
20       Q.   Were you provided a box of J&J
21   documents or documents produced by J&J for your
22   review by plaintiffs' counsel?
23       MS. PARFITT:  Objection.  Form.
24       A.   I don't know.  I mean, they provided
25   documents.  I see them as documents.  I don't see

Page 73

1    a difference between.  You can -- you know, you
2    can make that connection.
3        Q.   Let me do it this way.
4        A.   Sure.
5        Q.   Are the documents that you reviewed
6    relating to those produced by J&J or produced by
7    Imerys, do you list those in your references,
8    Exhibit 4, and your additional materials and data
9    considered, Exhibit 5?
10       A.   They are listed.  Yes.
11       Q.   All right.  When you are doing your day
12   job, outside of your litigation consulting work,
13   do you rely on internal company documents?
14       MS. PARFITT:  Objection.  Form.
15       A.   I mean, I have relied on company
16   documents.  When you say "internal company
17   documents," that's, you know -- yeah.  I have
18   relied on company documents.  We have relied on
19   company trial registries for publications.  We
20   have relied on -- whether you're talking about
21   company communication, that's different.
22       But in terms of if we have data available
23   from the company, there's no reason not to rely
24   on that.
25       Q.   I'm talking about company

19 (Pages 70 to 73)

Sonal Singh, M.D., M.P.H.

Page 74

1    communications, the types of documents that you
2    cite from or produced by J&J and by Imerys in
3    your reference list.
4        Those are not the types of materials that
5    you typically would rely on if you were doing a
6    study for publication; correct?
7        MS. PARFITT: Objection. Form.
8        A.  And, like I just said that, you
9    know, I gathered all the relevant evidence, as
10   would -- you know, as a methodology that's
11   acceptable and considered.
12       But, you know, in my previous reviews, I've
13   not had access to -- access to those documents.
14   And that's the only -- that's the only place
15   where you can get access to these documents.
16       Q.  The answer to my question is no, you
17   know, when you publish articles, you do not rely
18   on internal company documents or communications
19   as you are in this litigation matter; correct?
20       MS. PARFITT: Objection. Form.
21       A.  The reason is because there's a
22   confidentiality order.  And so you can't say you
23   can't publish articles when you can't access
24   them.  I mean, there's a chicken and egg, here,
25   right?

Page 75

1        Q.  Understood.
2        The answer, though, to my question is yes;
3    correct?
4        MS. PARFITT: Objection. Form.
5        A.  The reason is because these
6    documents --
7        Q.  Doctor, you need to answer the
8    question.
9        MS. PARFITT: Wait, Mr. Zellers.
10   Excuse me.  Let the witness answer the question.
11       MR. ZELLERS: I'm asking him to answer
12   the question and then I'll be happy to move on.
13       MS. PARFITT: No.  You're telling him,
14   say yes.  He's trying to answer your question.
15       Ask him again.  He'll answer the
16   question.  He's done it twice.
17       Q.  Do you need me to repeat the question?
18       A.  Yes, please.
19       MR. ZELLERS: Could you read the
20   question?
21       I'll ask it again.
22       Q.  Dr. Singh, when you publish articles,
23   you do not rely on internal company documents;
24   correct?
25       MS. PARFITT: Objection. Misstates his

Page 76

1    testimony.
2        A.  I've already stated that when I publish
3    articles, the approach is to gather all relevant,
4    available evidence.
5        And I have, in fact -- you can go back at my
6    articles -- and included data from company
7    documents in various systematic reviews and
8    meta-analyses.  So this idea that I've not
9    relied on company documents is -- you know, is
10   not.
11       The question is about deposition transcripts
12   and communiques.  Those are generally not
13   available in the published domain, and even for
14   this particular instance, you know, for there's a
15   confidentiality order.  I'm just trying to
16   explain what happens.
17       Q.  So that our record is clear, when you
18   talk about internal communiques, we're talking
19   about internal communications, in this case,
20   materials that you have been provided by
21   plaintiffs that have been produced by J&J and by
22   Imerys.
23       Those are not the types of documents that
24   you typically have available and rely upon in
25   your published work; correct?

Page 77

1        MS. PARFITT: Objection. Misstates his
2    testimony.
3        Q.  Is that correct, Doctor?
4        MS. PARFITT: Objection. Misstates his
5    testimony.
6        A.  These are just not available to form an
7    opinion in the published domain.
8        Q.  You have an additional --
9        THE WITNESS: Can I take a break?
10       MR. ZELLERS: Sure.  Of course.  At any
11   time.
12       THE WITNESS: Sorry about that.
13       MR. ZELLERS: No.  That's fine.
14       THE VIDEOGRAPHER: Off the record.
15   10:22 a.m.
16       (A recess was taken.)
17       THE VIDEOGRAPHER: Here begins media
18   No. 2 in today's deposition of Sonal Singh, M.D.,
19   M.P.H.  Back on the record, 10:35 a.m.
20   BY MR. ZELLERS:
21       Q.  Dr. Singh, are you ready to continue?
22       A.  Yes, I am.
23       Q.  When we broke, we were looking at the
24   additional materials and data considered list,
25   which we have marked as Deposition Exhibit 5.

20 (Pages 74 to 77)

Sonal Singh, M.D., M.P.H.

Page 78

1    Do you have that?
2    A.  Yes.
3    Q.  There are some documents on this list
4  that have a preface of Imerys.  And if you look
5  on Page 87, you list those documents out.  And
6  then turning to Page 88, there's a series of
7  documents that begin with J&J.
8    Do you see those?
9    A.  Yes.
10    Q.  Did you rely on those documents in
11  informing your opinions?
12    A.  No.  I mean, I reviewed -- I don't know
13  if I reviewed them in full.  I just -- you know,
14  they were provided to me.
15    Q.  That is, the set of documents that were
16  provided to you by counsel for plaintiffs; is
17  that right?
18    A.  Yes.
19    Q.  Are you able, as we sit here, to tell
20  me what those documents are?
21    A.  Yeah.  I mean, for example, some of
22  them is, you know, duplicative of expert reports
23  that are listed here.  I don't know by number and
24  number, J&J, what that means.
25    Q.  I'm referring to, for this series of

Page 79

1  questions, just to the other materials that you
2  have listed, the ones that begin with Imerys.  So
3  starting at Item 2 on Page 87.  And then also
4  including the documents that begin J&J that go
5  through Item 23 on Page 88.
6    Are you able to identify and tell us what
7  those documents are?
8    A.  I mean, I was provided them.  I don't
9  know what specifically they are, you know.
10    Q.  Do you know how they were compiled?
11    A.  No.  I'm not aware of the process.
12    Q.  Do you know what percentage of internal
13  documents, internal to Johnson & Johnson
14  companies and to Imerys, have been produced in
15  the case that appear on your reliance list?
16    A.  I'm not aware of that proportion.
17    Q.  Did you request any additional J&J or
18  Imerys documents other than the ones that were
19  provided to you by plaintiffs' counsel?
20    A.  So, it's hard to say request
21  additional.  I requested question -- materials to
22  answer my question.  How would I know what
23  additional -- you know, I requested materials.
24    Q.  The way it worked is you asked
25  plaintiffs for materials that would be helpful to

Page 80

1  answer the causal question in this case; is that
2  right?
3    A.  Yes.
4    MS. PARFITT:  Objection.
5    Q.  You did not have access to internal
6  documents of J&J companies or of Imerys; is that
7  right?
8    A.  Yes.
9    Q.  You asked for those documents, the ones
10  that would be relevant to you in forming an
11  answer to the question you were asked of
12  plaintiffs' counsel; correct?
13    A.  Yeah.  Relevant to consider or support
14  or refute.  Yeah.
15    Q.  The documents that were provided to you
16  are the documents that appear with a J&J
17  preface -- preface and an Imerys preface in the
18  reference list, Exhibit 4, and in the additional
19  materials and data considered list, Exhibit 5;
20  correct?
21    A.  Yes.
22    Q.  Once you got those documents and you
23  looked at those documents -- and you're not sure
24  you looked at all of them; is that right?
25    A.  Yes.  I did not.  I mean --

Page 81

1    Q.  All right.
2    A.  -- because it is not possible to look
3  at all of them.
4    Q.  Did you make any follow-up request for
5  additional company documents, either documents
6  produced by J&J or documents produced by Imerys,
7  of plaintiffs' counsel?
8    A.  I was inundated with these, and I don't
9  think it was practical of me to request for
10  additional documents.
11    Q.  In terms of internal company documents
12  and communications produced either by
13  Johnson & Johnson and by Imerys, the only
14  documents you reviewed are the ones that were
15  hand selected by lawyers for plaintiffs; is that
16  right?
17    MS. PARFITT:  Objection.  Form.
18    A.  The documents that I reviewed are
19  listed, you know, in 4 and 5.
20    Q.  My question --
21    A.  I don't know what -- so you're asking
22  me to infer what they hand selected; right?  I
23  mean, whether they provided all, whether they
24  provided hand selected, that's not my -- I don't
25  know that.  You know that.  But I don't.

21 (Pages 78 to 81)

Sonal Singh, M.D., M.P.H.

Page 82

1      So how can I answer that they were hand
2  selected?
3      Q.   The company documents that you
4  reviewed, internal company documents, they came
5  from plaintiffs; is that correct?
6      A.   Yes.
7      Q.   The updated materials list, we marked
8  that as Exhibit 6.
9      Those are materials that were provided to
10  you by plaintiffs' counsel; is that right?
11      A.   No.   I submitted -- I mean, I had
12  access to several of these documents, you know,
13  after the submission of my report, and I reviewed
14  them and I actually sent them some of them.
15  So...
16      Q.   What documents on this list did you
17  provide to plaintiffs and what documents on this
18  list -- we're looking at Exhibit 6 -- did they
19  provide to you?
20      A.   Like I had the Fadak article.   I had
21  the Health Canada Assessment.   They provided the
22  submitted reports.   I had the Weed article.   They
23  provided the Zervo -- I don't know how to
24  pronounce that name.   Yeah.
25      So, yeah, I had access to some of these, and

Page 83

1  I provided the up-to-date article, and the
2  remainder, they provided.
3          MR. KLATT:   May I interject?   I didn't
4  understand the very first article you said.   It
5  sounded like dark.
6          THE WITNESS:   Fadak.
7          MS. PARFITT:   F-A-D-A-K.
8          THE WITNESS:   Fadak, that's a paper --
9          MR. KLATT:   Okay.   I see.   Thank you.
10          THE WITNESS:   That's a 2015 paper.
11          MR. KLATT:   I saw it.   Thank you.
12  BY MR. ZELLERS:
13      Q.   When did you review the materials that
14  are listed on the updated materials list,
15  Exhibit 6?
16      A.   So, again, maybe we circle back earlier
17  when I said I did not review all of them, like I
18  did not review the expert reports.   Yeah.
19      Q.   Of the materials that you did review,
20  on the updated materials list, when did you
21  review those?
22      A.   Sometime between December and January.
23      Q.   It was after you had prepared your
24  written report and produced it; is that right?
25      A.   Yes.

Page 84

1      Q.   It's fair to say you did not rely on
2  the updated materials list in forming your
3  opinions and preparing your report in this case;
4  correct?
5      A.   Yeah.   I did not rely on this, on these
6  materials in preparing the report, but several of
7  these materials are, you know, are helpful in
8  explaining my opinions on this, which were, you
9  know, provided in the report.
10      Q.   Have you published anywhere your theory
11  that baby powder causes ovarian cancer?
12      A.   I don't consider it my theory.   I mean,
13  several other people have studied this.   I don't
14  know how many studies.   There have been more than
15  30 studies.
16      So I don't consider it my theory.   But, no,
17  I have not published a study on it.
18      Q.   Do you plan to publish on this?
19      A.   Yes, I do.
20      Q.   Are those plans underway?
21      A.   Well, I mean, a lot of it will, again,
22  depend on, you know, the questions you asked
23  about how much of this material will become
24  eventually -- you know, I have signed a
25  confidentiality order.   So, you know, how much is

Page 85

1  allowed to be published.
2      And so, you know, a lot of it will depend
3  on, I guess, the permission of the judge, who
4  allows -- who oversees these kind of -- I would
5  like to, eventually.
6      Q.   Have you previously published on any
7  topic relating to talc and ovarian cancer?
8      A.   No.
9      Q.   Have you conducted any test or
10  experiments to confirm your theory that talc
11  migrates to the ovaries and causes cancer via
12  inflammation?
13      A.   So, again, that is not a theory that I
14  have propounded, that talc migrates through the
15  ovary, that talc migrates up to cause ovarian
16  cancer, that I have evaluated the epidemiologic
17  studies, which show a causal link between talc
18  and ovarian cancer, and several other
19  investigators, some of them which I cite, have
20  provided evidence that -- of talc-induced, you
21  know, migration.
22      So it's not my theory, as you say.
23          MR. ZELLERS:   Move to strike as
24  nonresponsive.   Try to listen.
25      Q.   My question is, I think, a simple

22 (Pages 82 to 85)

Sonal Singh, M.D., M.P.H.

Page 86

1  question.
2     Have you, Dr. Singh, conducted any test or
3  experiments to confirm your statement in your
4  report that talc migrates to the ovaries and
5  causes cancer via inflammation?
6     A.  No.  I have not done any experiments.
7     Q.  Can you identify for me a single
8  article that identifies inflammation anywhere in
9  a woman's reproductive tract resulting from
10  external genital talc application?
11     MS. PARFITT:  Objection.  Form.
12     A.  Can you repeat the question?
13     Q.  Sure.  Can you identify for me a single
14  article that identifies inflammation anywhere in
15  a woman's reproductive tract resulting from
16  external genital talc application?
17     A.  I mean, again, this is, you know, when
18  I reviewed -- so this relates to the biological
19  question about talc.  And when I reviewed the
20  biological evidence, I was on migration and
21  inflammation, I was looking for evidence, support
22  or refute that.
23     And there's studies that show that talc
24  migrates through HS, you know, whatever,
25  hysterosalpingography, and induces inflammation.

Page 87

1  I mean, the definitive study is not there.
2     And, again, I did not do these studies.  So
3  I can only rely on people who have done such
4  studies.
5     Q.  Can you cite a single study, animal or
6  human, that traces externally applied talc up
7  through the reproductive tract to the ovaries?
8     MS. PARFITT:  Objection.  Form.
9     A.  Again, but I do not believe that's
10  necessary to, you know, provide my causal opinion
11  in support of a causal hypothesis.
12     MR. KLATT:  Objection.  Nonresponsive.
13     Q.  Is the answer to my question, no?
14     MS. PARFITT:  Objection.  Form.
15     A.  No, with context.
16     Q.  Health Canada Risk Assessment, that was
17  not something that you included in your
18  references or materials considered as part of
19  your report; is that right?
20     A.  Yes.  It was not available at that
21  time.
22     Q.  All right.  It is listed, the Health
23  Canada Risk Assessment is listed in your updated
24  materials list that we got over the weekend;
25  correct?

Page 88

1     A.  Yeah.  It was available to everyone in
2  December.
3     Q.  Have you looked into what other public
4  health authorities have to say about talc and
5  ovarian cancer?
6     A.  Yes.
7     Q.  Would it be important for you to know
8  that CDC does not list talc as a risk factor for
9  ovarian cancer?
10     MS. PARFITT:  Objection.  Form.
11     A.  I mean, it would be important to know,
12  you know, various agencies, you know, CDC,
13  whatever.  I mean, you would like to know of
14  many, many agencies.
15     But, again, you'd have to -- you'd have to
16  see the quality of their judgment.  I mean, what
17  is their rationale?  What are the studies they
18  reviewed?  What is the data available?
19     Just like as you said, what is the data
20  available to me to make that judgment, what is
21  data available to them?  Just because they are
22  the CDC doesn't mean that, you know -- yes, I
23  would like to know their opinion, but then what
24  is the underlying basis of their opinion?
25     Q.  You're familiar with the CDC; correct?

Page 89

1     A.  I'm very familiar with the CDC.
2     Q.  It is an unbiased governmental entity;
3  correct?
4     A.  Well, it would depend on the opinion.
5     I mean, you know, we cannot say an entity is
6  unbiased.  It would depend what is the particular
7  opinion -- you know, if the CDC provides
8  vaccination.  We have to look at the particular
9  context.
10     Q.  Are you aware that the CDC does not
11  list talc as a risk factor for ovarian cancer?
12     A.  Yes.
13     MS. PARFITT:  Objection.
14     Q.  Are you aware that the Mayo Clinic does
15  not list talc as a risk factor for ovarian
16  cancer?
17     A.  I'm not aware of Mayo Clinic.
18     Q.  You are aware of NIH; correct?
19     A.  Yes.  I'm funded by the NIH.
20     Q.  Do you know that NIH does not list talc
21  as a risk factor for ovarian cancer?
22     A.  Yes.  And I have been aware of, you
23  know, changes in the past to their -- to their
24  statements.
25     (Article entitled "Ovarian,

23  (Pages 86 to 89)

Sonal Singh, M.D., M.P.H.

Page 90

1    Fallopian Tube, and Primary Peritoneal
2    Cancer Prevention (PDQ) - Health
3    Professional Version marked Exhibit 15.)
4         MR. ZELLERS:  Take a look at Deposition
5    Exhibit 15.
6         MS. PARFITT:  Thank you.
7    BY MR. ZELLERS:
8    Q.   Deposition Exhibit 15 is a publication
9    from the National Cancer Institute; is that
10   right?
11   A.   It is.
12   Q.   National Cancer Institute is a leading
13   health authority; is that right?
14   A.   Yes.
15   Q.   It's a leading cancer research
16   institution in the world?
17        MS. PARFITT:  Objection.  Form.
18   A.   Yes.
19   Q.   Have you ever received a grant from the
20   National Cancer Institute?
21   A.   I've applied.  I have not received any.
22   I am applying again.
23   Q.   They fund more cancer research than any
24   organization in the world; correct?
25        MS. PARFITT:  Objection.

Page 91

1    A.   I don't know that particular number,
2    but -- I just don't know that answer.
3    Q.   Are you aware that the National Cancer
4    Institute reviews the peer-reviewed literature as
5    it relates to risk factors for ovarian cancer?
6         MS. PARFITT:  Objection.  Form.
7    A.   Yes.  And I don't know how updated they
8    are.  Based on the document you've provided me,
9    they have four citations for perineal talc and
10   ovarian cancer.
11   So, again, I'm not questioning the NCI's
12   motivation, but I am -- I am raising, what is the
13   quality of their judgment.
14   Q.   Did you consider the CDC's
15   determination that talc is not a risk factor for
16   ovarian cancer in formulating your opinions?
17   A.   Yes.
18   Q.   Did you consider NIH's determination
19   that talc is not a risk factor for ovarian cancer
20   in formulating your opinions?
21   A.   Yes.  Because they did not have
22   sufficient information, based on what they
23   provided in their PDQs.
24   Q.   Did you consider National Cancer
25   Institute's opinion or conclusion that talc is

Page 92

1    not a risk factor for ovarian cancer?
2         MS. PARFITT:  Objection.
3    A.   So the National Cancer Institute hasn't
4    opined on that talc is not a causal -- you know,
5    is causally linked to ovarian cancer.  It has
6    provided a listing of documents.  It has not gone
7    through any systematic process, that I'm aware
8    of, of looking at the epidemiologic data
9    systematically.
10   It has not provided any evidence of
11   inflammation or lack thereof or migration or lack
12   thereof or to even, you know, arrive at this
13   causal hypothesis.
14   Q.   Because it's important to look at both
15   sides of an issue; correct?
16   A.   Yes.  I did look -- so I'm saying that
17   I did look at this and my opinion --
18   Q.   Did you --
19        MS. PARFITT:  Please let him finish.
20   Q.   Are you finished?
21   A.   I'm saying I did look at this, and I'm
22   aware of this document.
23   Q.   Did you cite to the CDC in your report
24   or references?
25   A.   I don't -- I wasn't aware of the CDC.

Page 93

1    Q.   Did you cite to the NIH in your report
2    or your references?
3    A.   I should have.  And if it isn't, it is
4    remiss.
5    Q.   Did you cite to the National Cancer
6    Institute in your report or references?
7    A.   I have to look at it.
8    Q.   The National Cancer Institute, in fact,
9    has done an analysis, a very detailed analysis
10   which we have marked as Exhibit 15 to this
11   deposition; correct?
12        MS. PARFITT:  Objection to form.
13   A.   I don't think it's a detailed analysis
14   of perineal talc and ovarian cancer.
15   There is how many lines?  We can look at it
16   and read it together.  It's, you know -- it's 15
17   lines.  And they have references 41 to 45, which
18   is five references.
19   So I don't know it is a detailed analysis.
20   Q.   National Cancer Institute, one of the
21   things that it does is to review peer-reviewed
22   literature as it relates to risk factors for
23   ovarian cancer.  Is that right?
24        MS. PARFITT:  Objection.  Form.
25   A.   It does do that.

24  (Pages 90 to 93)

Sonal Singh, M.D., M.P.H.

Page 94

1    Q.  All right.  This document, this
2  document that we're looking at from the National
3  Cancer Institute, Exhibit 15, was updated in
4  January of 2019; is that right?
5    A.  Yeah.  But it doesn't mean the review
6  was updated, because it has no recent citations
7  of studies that have been conducted.
8    Q.  We --
9    A.  We should look at the citation.  Let's
10  look at it, because we are discussing this
11  document, so we should look at it in detail.
12    Q.  Doctor, turn to Page 6.
13    A.  No.  Let me finish.  I'm not finished
14  with this document.
15    MS. PARFITT:  Go ahead.  Let him
16  finish.
17    Q.  Doctor, you have to answer my
18  questions.
19    A.  But I haven't answered it.
20    Q.  My question is look at Page 6.  Can you
21  do that?
22    A.  Okay.
23    Q.  All right.  Page 6 is a section on
24  perineal talc exposure; is that right?
25    A.  Yes.

Page 95

1    Q.  This is part of the National Cancer
2  Institute's publication on ovarian, fallopian
3  tube and primary peritoneal cancer prevention; is
4  that right?
5    A.  Yes.
6    Q.  On Page 6, the first sentence under
7  perineal talc exposure states, "The weight of
8  evidence does not support an association between
9  perineal talc exposure and an increased risk of
10  ovarian cancer."
11    Is that right?
12    A.  Based on what?  Based on these 41 to 45
13  citations?  Which are an incomplete listing of
14  studies and an incomplete review of the evidence.
15    So I'm just stating that, yes, what is the
16  underlying basis?
17    Q.  Doctor --
18    MS. PARFITT:  Wait.  Let him finish.
19  He's in the middle of a sentence.
20    A.  What is the underlying basis of this
21  opinion?
22    Q.  Dr. Singh, my question is:  Did I read
23  the conclusion of the National Cancer Institute
24  correctly?
25    MS. PARFITT:  Objection.

Page 96

1    A.  I don't know if it's the conclusion,
2  but, yes, you read that part of the statement
3  correctly.
4    Q.  Why would you rely on Health Canada,
5  but not these other public health organizations?
6    MS. PARFITT:  Objection.  Misstates his
7  testimony.
8    A.  In fact, I did rely on the Health
9  Canada when my report was conducted.  So you
10  see -- I relied on the quality of the review and
11  the breadth of my review, which had hundreds of
12  studies, the breadth of review of biological
13  plausibility, the breadth of review of, you know,
14  animal studies, applying the Bradford Hill
15  framework, and then forming an opinion.
16    Q.  How -- are you done?
17    A.  No.  I'm not done.
18    And the Health Canada Assessment came after
19  that.  And it so happened their methodology --
20  methodology -- methodology and opinions are
21  consistent with mine.
22    So it's not that I'm relying on that.  I'm
23  just saying that they are consistent and they
24  came to the same conclusions.
25    Q.  What materials and analysis was done by

Page 97

1  the CDC in determining that talc is not a risk
2  factor for ovarian cancer?
3    MS. PARFITT:  Objection.  Form.
4    A.  I don't have that.
5    Q.  What materials were reviewed and relied
6  upon by NIH in determining that talc is not a
7  risk factor for ovarian cancer?
8    A.  References 41 to 45.
9    Q.  How do you know that that's all that
10  the NIH and National Cancer Institute reviewed?
11    A.  Because that's what they cite.
12    Q.  Have you been privy to the complete
13  review and analysis of the National Cancer
14  Institute?
15    A.  But you just stated that this was the
16  complete review and analysis of the National
17  Cancer Institute?
18    Q.  I'm asking you:  Do you know what
19  specific studies and materials were reviewed and
20  what analysis was done by NIH and by the National
21  Cancer Institute?
22    A.  Yeah.  These are the studies that were
23  reviewed.
24    Q.  You are assuming that this is the
25  entire analysis and review that was done by the

25  (Pages 94 to 97)

Sonal Singh, M.D., M.P.H.

Page 98

1    National Cancer Institute; is that right?
2         MS. PARFITT: Objection. Form.
3         A.   I'm not assuming anything. I'm
4    assuming that, just as the conclusions that you
5    are assuming are definitive, I'm also, you know,
6    stating that these are the studies that they
7    relied on to form those conclusions.
8         So we can't pick and choose, assess
9    statement of the excerpt that you -- supports
10   your opinion, but then not look at the underlying
11   evidence base that supports that opinion.
12        Q.   But we should consider all of that
13   information; correct?
14        A.   Yeah. And the studies underlying.
15        Q.   And you did not consider the CDC's
16   opinion in your report, did you?
17        A.   I mean, CDC -- so let's just step back
18   a little.
19        When I say CDC opinion, I mean, I'm looking
20   at original studies. I'm looking at data in
21   forming my opinion. I did look at what IARC
22   considered and other agencies considered.
23        My opinion is based on my review and the
24   methodology and I was, you know, obviously,
25   taking into account what agencies say, but

Page 99

1    agencies' opinion is not necessarily the
2    underlying basis of my causal opinion.
3         Q.   Whether it's CDC, NIH, NCI or Health
4    Canada; correct?
5         A.   Yeah. I mean, they're informing. I
6    want to look at their thinking and what is the
7    quality of their judgment on this.
8         Q.   You understand Health Canada has simply
9    produced a draft assessment; is that right?
10        MS. PARFITT: Objection. Form.
11        A.   Yes.
12        Q.   We are at the beginning of the public
13   comment period; is that right?
14        A.   I don't know the timeline of that.
15        Q.   Are you aware that Health Canada can
16   take up to two years to take any action or no
17   action at all?
18        A.   Well, I mean, I was not asked a causal
19   question on what to do about this. I was just
20   asked a question on causality. And I'm not sort
21   of -- I'm not privy to their process.
22        Q.   How did you come to learn of the Health
23   Canada Risk Assessment?
24        A.   News, news documents.
25        Q.   Were you involved in the risk

Page 100

1    assessment prior to its publication?
2         A.   No.
3         Q.   Have you submitted any comments to
4    Health Canada?
5         A.   No.
6         Q.   Do you intend to submit any comments to
7    Health Canada?
8         A.   I don't know. I mean, it will depend
9    on the timeline and I don't know what their
10   timeline is and what my -- you know, I
11   haven't -- I haven't thought about it.
12        Q.   Outside of your litigation consulting,
13   do you generally rely on draft assessments by
14   regulatory agencies?
15        MS. PARFITT: Objection. Form.
16        A.   Yes. I mean, you know, we look at
17   draft assessments on regulatory. There's no
18   reason not to.
19        Q.   Have you ever cited a draft assessment
20   by a regulatory agency in any study that you've
21   published?
22        A.   Oh, I've published 200 papers, and I
23   can't recall, you know, which one, but I know
24   that I have looked at draft assessments by the
25   FDA.

Page 101

1         Q.   Have you cited any?
2         A.   I can't recall and tell you that. It's
3    just something I can't recall.
4         Q.   Are you familiar with the precautionary
5    principle?
6         A.   Yes.
7         Q.   What is the precautionary principle?
8         A.   It is to, you know, apply, as my
9    understanding, is to warn when there is, you
10   know, evidence of a hazard.
11        Q.   That's your understanding of the
12   precautionary principle?
13        A.   Yeah.
14        Q.   Do you understand that, as defined by
15   Health Canada, a precautionary principle means
16   taking a precautionary approach to
17   decision-making that emphasizes the need to take
18   timely preventative action even in the absence of
19   a full scientific demonstration of cause and
20   effect?
21        A.   If you're stating -- well, let's get
22   the document out before we --
23        Q.   Sure. Take a look at deposition
24   Exhibit 16.
25             (Document entitled "Health

26 (Pages 98 to 101)

Sonal Singh, M.D., M.P.H.

Page 102

1    Canada Decision-Making Framework for
2    Identifying, Assessing, and Managing Health
3    Risks - August 1, 2000" marked Exhibit 16.)
4        A.  Okay.  Can you point out which page?
5        Q.  Sure.  Take a look at Pages 8 and 9.
6    So we identify it for the record, Exhibit 16 is
7    the Health Canada Decision-Making Framework for
8    Identifying, Assessing and Managing Health Risk;
9    is that right?
10       A.  Yes.
11       Q.  If you go to Page 8 and 9, Section 1.3
12   are the underlying principles for Health Canada;
13   is that right?
14           MS. PARFITT:  Objection.
15           MR. TISI:  You're looking at the wrong
16   document.  You're not looking at the draft
17   assessment.  You're looking at the --
18           MR. ZELLERS:  Counsel, I am --
19           MR. TISI:  But you identified something
20   as something different than what it is.
21           MR. ZELLERS:  I identified the document
22   as Health Canada Decision-Making Framework for
23   Identifying, Assessing and Managing Health Risk.
24   I'm reading the title of the document.
25           MR. TISI:  Okay.  I have it wrong.  Go

Page 103

1    ahead.
2            MR. ZELLERS:  That's okay.
3        A.  Wherever we are.
4        Q.  No problem, Doctor.
5            MS. PARFITT:  We'll orient ourselves.
6        Q.  Are we oriented?
7        A.  Yeah.  I know the document.  But the
8    page number.
9        Q.  Look at Pages 8 and 9.
10       A.  Okay.
11       Q.  1.3 are the underlying principles for
12   Health Canada decision-making.
13       Do you see that?
14       A.  Yes.
15       Q.  They list out a number of underlying
16   principles on Pages 8 and 9.
17       One of those is to use a precautionary
18   approach; is that right?
19       A.  Yes.
20       Q.  If you then turn to Page 11, at the
21   bottom, they define use of a precautionary
22   approach; is that right?
23       A.  Yes.
24       Q.  Health Canada states in this document,
25   which we've marked as Exhibit 16, "Use a

Page 104

1    precautionary approach.  A key feature of
2    managing health risk is that decisions are often
3    made in the presence of considerable scientific
4    uncertainty.  A precautionary approach to
5    decision-making emphasizes the need to take
6    timely and appropriately preventative action,
7    even in the absence of a full scientific
8    demonstration of cause and effect."
9        Did I read that correctly?
10       A.  Okay.
11       Q.  Do you agree that the recommendation by
12   Health Canada does not require a finding of
13   causation like is required in a court; correct?
14           MS. PARFITT:  Objection.  Form.
15       A.  But I mean, that's what they conclude,
16   that there is a cause.  We can look at the Health
17   Canada document.
18       Q.  Is a guiding principle of the Health
19   Canada Decision-Making and Assessment to use a
20   precautionary approach?
21           MS. PARFITT:  Objection.  Form.
22       A.  Well, no.  I mean, precautionary --
23   they are just defining a precautionary approach.
24   But when they assess talc for its whatever, you
25   know, the talcum powder products, their

Page 105

1    particular assessment clearly states it's causal.
2    And we should open that document.  We should not
3    talk about it in hypotheticals.
4        Q.  On what basis are you relying to state
5    that Health Canada did not use a precautionary
6    approach in assessing talcum powder?
7            MS. PARFITT:  Objection.  Form.
8        A.  No.  No.  No.  Let me answer that
9    question.
10       You were asking about decision-making.
11   Decision-making would be removal of talc, removal
12   of that.
13       But there's two parts to that question about
14   cause and effect.  So let's bring the document
15   out and say where they state there is a causal
16   relationship.
17       Why aren't you bringing that document out?
18   I mean, you can't talk about documents without
19   documents.
20       Q.  Dr. Singh --
21       A.  Yeah.
22       Q.  -- do you have any basis to state
23   that, in evaluating talcum powder, Health Canada
24   did not follow its underlying principle of using
25   a precautionary approach?

27 (Pages 102 to 105)

Sonal Singh, M.D., M.P.H.

Page 106

1      MS. PARFITT: Objection. Form.
2  Misstates the evidence.
3      A.  Yeah.  But that does not preclude at
4  arriving at a causal opinion.  Just because you
5  have a precautionary approach, you can still
6  arrive at causal opinion, which they did.
7      So this is -- this principle is not
8  inconsistent with their report on a causal
9  opinion.
10     Q.  The standard under a precautionary
11 approach is that decisions can be made even in
12 the absence of a full scientific demonstration of
13 cause and effect; correct?
14     MS. PARFITT: Objection. Form.
15     A.  That is a threshold, but that does not
16 preclude the determination of cause and effect,
17 which has been done already.
18     Q.  Are you familiar with the Taher 2018
19 publication?
20     A.  Taher.  I don't know which one.
21     Q.  T-A-H-E-R.
22     A.  Yes.
23     Q.  Are you familiar with that publication?
24     A.  Yeah.  It was cited in the Health
25 Canada document.

Page 107

1      Q.  Have you reviewed and analyzed that
2  publication?
3      A.  I mean, I reviewed it.  I don't know if
4  I analyzed it.
5      What do you mean by "analyzed"?
6      Q.  You have not included it on your
7  references or additional materials considered or
8  updated materials; is that right?
9      MS. PARFITT: Objection.
10     A.  It was part of the Health Canada.  It
11 should have been part, because it was part, in my
12 mind, part of the Health Canada Assessment.
13     Q.  Can you show me where --
14     A.  Well, I haven't.
15     Q.  -- the Taher publication is listed in
16 your updated materials which we marked as
17 Exhibit 6?
18     MS. PARFITT: For the record, we
19 created this list, Mr. Zellers, and part of the
20 Canadian, just for form, and you can inquire.
21     MR. ZELLERS:  That's okay.
22     MS. PARFITT: But since we did create
23 Exhibit No. 6, additional materials, we had
24 included, I will tell you, we had given him
25 Taher.  He may have found it himself.

Page 108

1      A.  No.
2      Q.  Hold on.  Stop.  Stop.
3      A.  Sure.
4      Q.  Just so we're clear, the updated
5  materials list is a list that was created by
6  plaintiffs' counsel; correct?
7      MS. PARFITT:  It was based upon
8  materials that we had either sent or we had sent
9  that he also had; correct.
10     MR. ZELLERS:  This Exhibit 6 is a list
11 of materials that were provided by plaintiffs'
12 counsel to Dr. Singh, understanding that
13 Dr. Singh has testified that he independently had
14 access to some of the materials.
15     MS. PARFITT:  Correct.  Including
16 Taher.
17     THE WITNESS:  Yeah.  And some of them,
18 I added, such as some of the published articles
19 and Health Canada.
20 BY MR. ZELLERS:
21     Q.  You have read the Taher 2018
22 manuscript; is that right?
23     A.  I mean, I read the -- yeah, I mean,
24 primarily, I read their assessment in Health
25 Canada.

Page 109

1      MR. ZELLERS:  Deposition Exhibit --
2  well, strike that.
3      Q.  What you told me, when I asked you
4  about CDC and NIH and NCI, is you got to look at
5  the underlying documents, the underlying studies;
6  is that right?
7      A.  Yes.
8      Q.  One of the underlying documents and
9  studies on which Health Canada reviewed was the
10 Taher article; is that right?
11     A.  Yes.
12     (Document entitled "Systematic
13 Review and Meta-Analysis of the Association
14 between Perineal Use of Talc and Risk of
15 Ovarian Cancer" marked Exhibit 17.)
16 BY MR. ZELLERS:
17     Q.  The Taher article is what we have
18 marked as deposition Exhibit 17; is that right?
19     MS. PARFITT:  Thank you.
20     MR. TISI:  Is it Thayer or Taher?
21     A.  It is Taher, T-A-H-E-R.
22     Q.  Did you have access to the Taher 2018
23 article before it was published?
24     A.  Yes.
25     Q.  How did you have access to the Taher

28 (Pages 106 to 109)

Sonal Singh, M.D., M.P.H.

Page 110

1 2018 article?
2    A.  Yeah.  I requested access from the
3 attorneys, if they had it.  They provided it.
4    Q.  So plaintiffs' attorneys provided you
5 with access to the article we've marked as
6 Exhibit 17 prior to its publication; is that
7 right?
8    A.  Yeah.
9        MS. PARFITT:  Objection.
10    A.  I don't know if it has been published
11 yet.
12    Q.  Did you have access to the appendices
13 or supplemental tables referenced in the Taher
14 publication?
15    A.  Yes, I did.
16    Q.  In your epidemiologic -- strike that.
17    Is the Taher publication, which we've marked
18 as Exhibit 17, is that peer-reviewed?
19    A.  It's peer-reviewed, and I assume that
20 it's going to be published.  And it was reviewed
21 by Health Canada.  So I mean, it is
22 peer-reviewed, is my understanding.
23    It is -- I don't know the exact status of
24 that manuscript.
25    Q.  What organization has peer-reviewed the

Page 111

1 Taher publication, Exhibit 17?
2    A.  So I don't -- yeah, again, I take it --
3 I don't know the status of that manuscript, where
4 it is.
5    Q.  You do not know, one way or the other,
6 as to whether the Taher publication, Exhibit 17,
7 has been peer-reviewed; is that right?
8    A.  Yeah.  Whether it's been accepted or
9 submitted or -- I don't know.
10    Q.  Are you finished?
11    A.  I don't know the status.  I'm trying to
12 say that.
13    Q.  In your epidemiological work, outside
14 of litigation, do you rely on articles that have
15 not been peer-reviewed?
16    A.  Yes.  Several times, we rely on
17 articles.  Several times, we actually request
18 articles if it's key to something that we are
19 working on and we know that a particular
20 investigator is active in that area and he may
21 have.
22    So, yes, we actually -- sometimes we request
23 that.  And the majority of the times people don't
24 provide their work until it's published.  But
25 sometimes we get it.  Yeah.

Page 112

1    Q.  Why did you rely on this article,
2 Taher, Exhibit 17?
3        MS. PARFITT:  Objection to form.
4    A.  I mean, when you say I relied on, I
5 mean, I reviewed the, again, Health Canada
6 Assessment.  So none of this is in isolation.
7    I mean, this is just a part of, you know,
8 the body of evidence.  You know, my testimony
9 relies on -- and my report relies on the evidence
10 cited there.
11    This is, you know, another meta-analysis
12 that, you know, I reviewed the evidence in
13 slightly different ways and came to the same
14 conclusions and, you know, also did a causal
15 analysis.  So it's sort of, you know, you have to
16 review what evidence comes out.
17    If another meta-analysis comes out tomorrow,
18 then I would review it.
19    Q.  Do you know the source of funding for
20 this publication?
21    A.  I don't know.  I mean, Health Canada or
22 something else, I don't know that.  I can't
23 answer that question.
24    Q.  You're assuming that Health Canada is
25 the source of funding for this publication?

Page 113

1    A.  I don't know.  I shouldn't answer that.
2    Q.  Do you know the credentials of the
3 authors of the Taher 2018 publication,
4 Exhibit 17?
5    A.  I have no idea.
6    Q.  Do you personally know any of the
7 authors that are listed?
8    A.  No.
9    Q.  Do you know whether or not any of the
10 authors of the Taher publication, as listed out
11 on the first page of Exhibit 17, have conflicts
12 of interest?
13        MS. PARFITT:  Objection.
14    A.  Not that -- I didn't -- again, I read
15 the article.  I don't know what their, you know,
16 declarations are.  Yeah.
17    And it does say it was conducted under
18 contract to Health Canada.  So it seems like the
19 funding source is Health Canada.  And let's look
20 at their source of funding.
21    Q.  Doctor, we'll never finish if you want
22 to just go through and look at things.
23    My specific question is whether or not you
24 know whether or not any of the authors have
25 conflicts of interest?

29 (Pages 110 to 113)

Sonal Singh, M.D., M.P.H.

Page 114

1    MS. PARFITT:  Objection.
2    A.  That's a very vague and broad question.
3  I mean, conflicts of interest as it relates to
4  what?
5    Q.  Do you know?
6    MS. PARFITT:  Objection.  Form.
7    A.  As it relates to what?
8    Q.  You told me you don't know any of the
9  authors; right?
10    A.  Yeah.
11    Q.  I've now asked you if you know if any
12  of the authors had conflicts of interest.
13    A.  And I'm saying that I'm reading the
14  article and I'm reading their declaration, and
15  that's the only way to find out that they have
16  conflicts of interest, right.
17    Q.  I should be more precise.
18    A.  Yeah.
19    Q.  Of your own personal knowledge, do you
20  know whether or not any of the authors have
21  conflicts of interest?
22    A.  That's a separate --
23    MS. PARFITT:  Objection.
24    A.  So what I'm trying to say is, you know,
25  when you ask about conflicts of interest, if you

Page 115

1  want to ask about my article, you'd have to go
2  and read the article and see that, what is stated
3  there.
4    So that's what I'm trying to answer when you
5  ask.  I'm trying to be honest and truthful about
6  my answers.
7    MR. KLATT:  Objection; nonresponsive.
8    MR. ZELLERS:  Move to strike as
9  nonresponsive.
10    THE WITNESS:  I didn't understand the
11  question.
12    MR. LOCKE:  We all have questions to
13  ask this witness.  We're not going to make the
14  seven hours with these answers that do not answer
15  the questions.
16    THE WITNESS:  Maybe I'm not
17  understanding the question.  I'm sorry.  It's not
18  that I'm trying to --
19    Q.  Dr. Singh, the authors of the Taher
20  paper concluded that the evidence suggests that
21  asbestos contamination does not explain the
22  positive association between perineal use of talc
23  powder and ovarian cancer; is that right?
24    A.  Where do you --
25    Q.  Take a look at Page 41, the last

Page 116

1  sentence.  And I'll read it.  Have you found
2  Page 41 of Exhibit 17?
3    A.  41?
4    Q.  Yes.  Page 41.  Do you have that?
5    A.  Yeah.  Yeah.
6    Q.  The very last --
7    A.  Yeah.  I'm looking at it.
8    Q.  Tell me if I read this correctly.  "The
9  similarity of findings between studies published
10  prior to and after this point suggest asbestos
11  contamination does not explain the positive
12  association between perineal use of talc powder
13  and risk of ovarian cancer."
14    Did I read that correctly?
15    A.  Yes.
16    Q.  Do you disagree with the authors on
17  that point?
18    A.  Let me just read it.
19    Well, I mean, to the extent that they are
20  aware that asbestos does not contaminate -- talc
21  is not contaminated with asbestos, I do agree.
22  But, again, I have, you know, obviously more
23  information on that.
24    Q.  On Page 25 of Exhibit 17, the Taher
25  2018 article, is a table entitled "Summary of

Page 117

1  Evidence for Each of the Hill Criteria of
2  Causation as Applied to Perineal Application of
3  Talc and Ovarian Cancer."
4    Is that right?
5    A.  Yes.
6    Q.  One of the Hill criteria is
7  consistency; is that right?
8    MS. PARFITT:  Objection.  Form.
9    A.  Yes.
10    Q.  Looking at authors' statement on
11  consistency, it states, "15 out of the 30 studies
12  reported positive and significant associations."
13    Is that right?
14    A.  Yes.
15    Q.  15 out of 30, that's 50 percent; is
16  that right?
17    MS. PARFITT:  Objection.  Form.
18    A.  Yeah.  But I have -- I disagree with
19  their interpretation of consistency as being, you
20  know, statistically significant.  I mean, you
21  know, my assessment is, you know, estimates
22  towards greater than one.
23    MR. ZELLERS:  Move to strike as
24  nonresponsive.
25    Q.  My question was:  15 out of 30 is

30 (Pages 114 to 117)

Sonal Singh, M.D., M.P.H.

| Page 118 |
|---|

1  50 percent?
2       A.   Yes.
3             MS. PARFITT:  Objection.  Let me
4  object, please.
5       Q.   That's no better than a coin toss;
6  correct?
7             MS. PARFITT:  Object to the form.
8       A.   It is 50 percent.
9       Q.   Would you say that 15 out of 30 means
10  there are consistent results across studies?
11      A.   Well, I mean, again, my definition of
12  inconsistency, as noted in my report, is
13  different from theirs.
14      Q.   These are just the case control
15  studies; is that right?
16      A.   When you say -- they just say 30
17  studies.  Yeah.
18      Q.   These are case-control studies; is that
19  right?
20            MS. PARFITT:  Objection.  Form.
21      A.   Well, they're both, right?  Case
22  control and core.
23      Q.   The authors in Taher also recognize
24  that there's no consistent dose-response across
25  studies; is that right?

| Page 119 |
|---|

1             MS. PARFITT:  Objection.  Form.
2       A.   Well, let me look at the dose-response
3  section.
4       Q.   Page 21.  And I'm looking at the very
5  last sentence above Section 3.3.2.
6       A.   Tell me, which page number?
7       Q.   Sure.  Page 21.
8       A.   We do have to slow down so that I can
9  move between pages, if you don't mind.
10      Yes.
11      Q.   This is in the section "Evidence from
12  Human Studies"; correct?
13      A.   Okay.
14      Q.   Is that a yes?
15      A.   Yes.
16      Q.   The statement by the authors, "When
17  conducted, findings from trend analyses were not
18  consistent."
19      Is that right?
20      A.   The last line?
21      Q.   Yes.
22      A.   Yes.  But the criteria for
23  dose-response is just exposure-response
24  gradients.  I mean, it doesn't, you know, say
25  as -- even in -- I state in my report, there's no

| Page 120 |
|---|

1  consistent evidence.  There are studies that
2  provide dose-response and other studies that
3  don't.
4       Q.   You currently work for the University
5  of Massachusetts; is that right?
6       A.   Yes.
7       Q.   You work for both the medical school
8  and the medical center; is that right?
9       A.   Yes.
10      Q.   Are you aware that the University of
11  Massachusetts does not claim that talcum powder
12  causes ovarian cancer?
13            MS. PARFITT:  Objection.  Form.
14      A.   I don't know what -- they're listed on
15  their website.  I'm not sure they provide any
16  information sheet that I am aware of.
17            (Printout entitled "Ovarian
18  Cancer:  Risk Factors" marked Exhibit 18.)
19  BY MR. ZELLERS:
20      Q.   Take a look, if you will, at Deposition
21  Exhibit 18.
22            MR. TISI:  What is 16?
23            MR. ZELLERS:  Exhibit 16 was the Health
24  Canada Decision-Making Framework.  It's right
25  here.

| Page 121 |
|---|

1             MR. TISI:  Oh.  I have that, Counsel.
2  Thank you.
3  BY MR. ZELLERS:
4       Q.   Have you had an opportunity, Dr. Singh,
5  to review Deposition Exhibit 18?
6       A.   Yes.
7       Q.   This is a website from the University
8  of Massachusetts Memorial Healthcare; is that
9  right?
10      A.   Yes.
11      Q.   Are you familiar with the website?
12      A.   I mean, overall website, but not this
13  particular document.
14      Q.   On the second page of Exhibit 18,
15  there's a statement by your employer, the
16  University of Massachusetts, on use of talcum
17  powder.
18      Do you see that?
19      A.   Yes.
20      Q.   The statement is, "It's not clear if
21  using talcum powder on the genital area raises
22  the risk for ovarian cancer.  Talk with your
23  healthcare provider if you decide you want to use
24  talcum powder."
25      Did I read that correctly?

31 (Pages 118 to 121)

Sonal Singh, M.D., M.P.H.

Page 122

1    A.  Yes, you did.
2    Q.  Why doesn't your institution list talc
3  exposure as a risk factor for ovarian cancer?
4        MS. PARFITT:  Objection.  Misstates the
5  evidence.
6    A.  So, yeah, I mean, first of all, this
7  is -- I've seen this the first time here, but as
8  you can see, again, this is -- we have to go to
9  Page 3 of 4 and it's medical reviewers and they
10 are, you know, basing their opinion on whatever.
11 This was done in 2013.
12      So it depends on the -- it's not that, you
13 know, my medical, you know, employer is listing
14 it.  Obviously, it's listed there.
15      And but it's based on the quality of the
16 evidence.  This was reviewed on 2016, and it was
17 reviewed by, as you see, the credentials of --
18 did they review the -- did they review the
19 biological evidence?  Did they have any
20 additional information?
21      So I don't disagree with their opinion, I'm
22 just saying.
23    Q.  Dr. Singh, do you recommend to your own
24 patients that they avoid talcum powder use?
25    A.  Now, I do.

Page 123

1    Q.  When did you begin doing that?
2    A.  Last year.
3    Q.  Do you ask them if they use talcum
4  powder as part of a routine screening?
5    A.  In people that -- sorry.
6      In patients that I talk about ovarian
7  cancer.
8    Q.  Is that something that you began doing
9  over the past year?
10   A.  I would say sometime last year.
11   Q.  What about patients with a long history
12 of use?  Do you consider them at elevated risk of
13 developing cancer?
14      MS. PARFITT:  Objection.  Form.
15   A.  So I haven't thought about it that way.
16 I mean, you know, when that discussion about
17 ovarian cancer comes up, we talk about risk
18 factors and, you know, I recommended that.
19   Q.  Have you ever recommended prophylactic
20 surgery to remove the fallopian tubes and ovaries
21 that you think -- patients that you think may
22 have had long-term exposure to talc?
23      MS. PARFITT:  Objection.  Form.
24   A.  No.
25   Q.  Causation.  On Page 66 of your report,

Page 124

1  take a look at Exhibit 2 or Exhibit 10, whichever
2  is easier for you.
3    A.  Page 66?
4    Q.  Yes.  Your conclusion.
5    A.  Yes.
6    Q.  You state that peritoneal use of talcum
7  powder products can cause ovarian cancer;
8  correct?
9    A.  Yes.
10   Q.  Is it your opinion that it does cause
11 ovarian cancer or just that it can?
12      MS. PARFITT:  Objection to form.
13   A.  I don't know the semantics of what
14 would be -- if -- semantics of can and does.  I
15 mean, you can explain to me.  Maybe my English is
16 not as good as yours.
17   Q.  What type of exposure causes ovarian
18 cancer?
19   A.  Perineal application.  So I mean, are
20 you asking specific to talc?
21   Q.  Yes.  With respect to talc exposure,
22 what type of talc exposure causes ovarian cancer?
23      MS. PARFITT:  Objection.  Form.
24   A.  You know, perineal application of talc
25 can, you know, use of talc.

Page 125

1    Q.  What types of -- strike that.
2      What types of talcum powder cause ovarian
3  cancer?
4        MS. PARFITT:  Objection.  Form.
5    A.  So, again, I -- I -- my causal question
6  was the use of talcum powder products and ovarian
7  cancer.  I did not disaggregate between X and Y
8  and Z in terms of, you know, this type of talcum
9  powder product.
10   Q.  What type of ovarian cancer does talc
11 powder cause?
12      MS. PARFITT:  Objection.  Form.
13   A.  Talcum powder products are, you know,
14 causally linked to the development of ovarian
15 cancer, but the link is strongest for serous
16 epithelial ovarian cancer.
17   Q.  Any other types of ovarian cancer that
18 you believe talcum powder causes?
19      MS. PARFITT:  Objection.  Form.
20   A.  You know, other studies have provided,
21 you know, causal links to borderline, you know,
22 other tumors.  But, you know, it's mainly the
23 epithelial ovarian cancer.
24   Q.  What dose of talcum powder is required
25 to cause ovarian cancer?

32 (Pages 122 to 125)

Sonal Singh, M.D., M.P.H.

Page 126

1       MS. PARFITT: Objection. Form.
2       A.  I examined, you know, the causal link
3   between talcum powder products and ovarian cancer
4   as the data was available in the available
5   studies.  You know, I could not -- there was
6   no -- I mean, there was data on
7   dose-responsiveness, and we can discuss that.
8       But, you know, I don't know if it's a single
9   application or it's 20 years.  I mean, it is
10  regular use and that would cause it.
11      Q.  It's correct that you have not
12  evaluated specifically what dose of talcum powder
13  is required to cause ovarian cancer; correct?
14      MS. PARFITT: Object to form.
15      A.  Yeah.  I mean, I don't know a specific
16  dose that would cause ovarian cancer.
17      Q.  What was your methodology for
18  concluding that talc causes ovarian cancer or, I
19  guess to be more precision, serous ovarian
20  cancer?
21      A.  Yeah.  I mean, mainly --
22      MS. PARFITT: Objection.
23      A.  Epithelial ovarian cancer.
24      Q.  What was your methodology?
25      A.  So, yeah, I did, you know -- so prior

Page 127

1   to that, I was aware of systematic reviews and
2   other reviews in this area.
3       So I, as a broad -- you know, we should look
4   at the methods section of this report.
5       Do you want to look at the methods?
6       Q.  Well, if you have to.  I mean, my
7   question was just simply:  What was your
8   methodology for concluding that talc causes
9   epithelial ovarian cancer?
10      MS. PARFITT: Dr. Singh, anytime you
11  need to consult your report.
12      A.  Yeah.  I mean, the methodology was, you
13  know, gathering lines of evidence.  You know,
14  assessing for relevance, reliability and, you
15  know, again, assembling other lines of evidence
16  for animal, human studies, the constituents of
17  talc.  And then assessing them within an analytic
18  framework, the Bradford Hill, and then, you know,
19  providing a weight-of-evidence opinion based on
20  my professional judgment.
21      Q.  In other cases in which you've been
22  retained as an expert, you've conducted a
23  meta-analysis of the available data to reach a
24  conclusion about the relative risk; correct?
25      A.  I have.

Page 128

1       Q.  You did not conduct a meta-analysis
2   here; is that right?
3       A.  Yes.  And I -- partly pragmatic
4   reasons.  Partly, there were so many other
5   meta-analyses that I, you know -- although I
6   would have done things a little bit differently,
7   and I just didn't feel the need for one more
8   meta-analysis that would be informative.
9       Q.  What was your methodology for focusing
10  on certain studies or excluding other studies?
11      A.  So I'm not aware that I excluded
12  certain studies, because I, as I compare, I have
13  included all the epidemiologic studies that are
14  here.  There's always a possibility that once,
15  you know, when you do a review, that you may
16  have.
17      But, you know, I included all the relevant
18  case-control studies and the cohort studies and
19  the systematic review and meta-analysis that I
20  identified.
21      And, yeah, I mean, I may have weighed
22  studies differently based on their quality,
23  validity and reliability.
24      Q.  That's how you tried to make a
25  distinction?

Page 129

1       A.  Yeah.
2       Q.  Do you believe the standard for proving
3   causation in the scientific literature is the
4   same as the one that applies in litigation?
5       MS. PARFITT: Objection. Form.
6       A.  Yeah.  I mean, the standard for
7   causation, you know, is -- at least I was
8   applying the same standard.
9       Q.  Are you familiar with the FDA analysis
10  of the Bradford Hill factors and that they have
11  concluded that causation is not established with
12  respect to talc and ovarian cancer?
13      MS. PARFITT: Objection. Misstates the
14  evidence.
15      A.  I am aware of a FDA letter.  I'm not
16  sure that there's a Bradford Hill analysis.  And
17  if you can share that with me, that would be --
18      Q.  Please review Deposition Exhibit 19.
19      (Letter dated April 1, 2014
20  marked Exhibit 19.)
21      MS. PARFITT:  Thank you.
22  BY MR. ZELLERS:
23      Q.  Deposition Exhibit 19 is a letter from
24  the FDA to Sam Epstein, dated April 1st of 2014;
25  is that right?

33 (Pages 126 to 129)

Sonal Singh, M.D., M.P.H.

Page 130

1    A.  Yes.
2    Q.  And when I say "dated," there's a stamp
3  at the top that says April 1, 2014; correct?
4    A.  Yes.
5    Q.  Have you reviewed this FDA analysis
6  before today?
7    A.  Yes.  I have reviewed the letter.
8  Yeah.
9    Q.  On Page 4 of the FDA document, at the
10  bottom, do you see that?
11    A.  I do.
12    Q.  The FDA noted that selection bias
13  and/or uncontrolled confounding result in
14  spurious positive associations between talc use
15  and ovarian cancer; is that right?
16      MS. PARFITT:  Objection.  Form.
17    A.  Yes.  That's what they conclude.
18    Q.  The FDA notes a lack of consistency in
19  the study results; is that right?
20      MS. PARFITT:  Objection.
21    A.  Yes.  And this was conducted in, I
22  don't know, 2014, 2013.
23    Q.  The FDA specifically states, "Results
24  of case-control studies do not demonstrate a
25  consistent positive association across studies";

Page 131

1  is that right?
2    A.  Yes.  That's what they state.
3    Q.  The FDA also states that,
4  "Dose-response evidence is lacking"; is that
5  right?
6      MS. PARFITT:  Objection.
7    A.  Where is that?  I'm sorry.
8    Q.  Look at Paragraph 3 at the bottom of
9  Page 4.
10    A.  Yes.
11    Q.  The FDA further concludes that, "A
12  cogent biological mechanism by which talc might
13  lead to ovarian cancer is lacking"; is that
14  right?
15      MS. PARFITT:  Objection to form.
16    A.  Yeah.  But it also concludes, in the
17  same letter, that there is, you know, the
18  potential for talc to migrate.  So, I mean, I'm
19  just trying to be -- that's what I reviewed.
20    Yes, it does say that there's no biological
21  mechanism.
22    Q.  You reviewed -- or strike that.
23    In addition to the FDA looking at and
24  applying the Bradford Hill criteria, IARC does
25  that as well; is that right?

Page 132

1      MS. PARFITT:  Objection.  Form.
2    A.  So just to clarify, where do they say
3  they apply the Bradford Hill in this document?
4    Q.  You're familiar with the Bradford Hill
5  criteria; is that right?
6    A.  Yes.  I use it, but in this FDA
7  document, where does it state they apply the --
8    Q.  It is one of the criteria for
9  consistency across studies.  Is that a Bradford
10  Hill criteria?
11    A.  But exactly they don't go through all
12  of them.  So I don't know if they did a Bradford
13  Hill.  So how can I just assume that?  They don't
14  talk about, you know, specificity.  They don't
15  talk about strength of association.  So I can't
16  assume that they're applying Bradford Hill.
17    Q.  IARC did address the Bradford Hill
18  considerations; is that right?
19    A.  Yes.  In the year 2005.  That was
20  around 15 years ago.
21    Q.  IARC rejected classification of talc as
22  carcinogenic and, instead, assigned it to the
23  classification of possibly carcinogenic to
24  humans; is that right?
25      MS. PARFITT:  Objection.  Misstates the

Page 133

1  evidence.
2    A.  So, again, you know, just clarifying
3  that this was done in 2005, with evidence that
4  has accumulated since then.  And I wouldn't
5  classify it -- I have served on IARC panels, and
6  I'm very familiar with their process.  They don't
7  reject anything.  They classify drugs in the
8  particular categories that they're supposed to
9  be.
10    So it was actually classified as possibly
11  carcinogenic.
12    Q.  Take a look at Exhibit 20.
13      (IARC Classifications marked
14    Exhibit 20.)
15  BY MR. ZELLERS:
16    Q.  Deposition Exhibit 20 are the IARC
17  classifications; is that right?
18    I'm sorry.  Did you answer the question?
19    A.  Yes.  Sorry.
20    Q.  That's okay.
21    A.  Yes.
22    Q.  All right.  It lists out, starting with
23  Group 1, carcinogenic to humans, down to Group 4;
24  is that right?
25    A.  Yes.

34  (Pages 130 to 133)

Sonal Singh, M.D., M.P.H.

Page 134

1    Q.  There are 120 agents that have been
2  determined by IARC, the International Agency for
3  Research on Cancer, as Group 1 agents,
4  carcinogenic to humans; is that right?
5    A.  Yeah.  That includes asbestos, many
6  others.
7    Q.  That is the only category in which IARC
8  finds sufficient evidence in humans; correct?
9    A.  No.  To clarify, they have -- it may be
10  in my report, that they have a particular way of
11  defining that category.  And it may not be just
12  sufficient evidence in humans.  They may be
13  something else.  If I can look back at my report.
14    Q.  Well, if it's in your report, it's in
15  your report.  And we can all read that.
16    My question to you is:  Group 1 is a
17  category where IARC has determined that there is
18  sufficient evidence in humans to classify an
19  agent as carcinogenic; is that right?
20    MS. PARFITT:  Objection.  Misstates
21  Dr. Singh's testimony.
22    A.  I mean, do I get time to --
23    Q.  Doctor, I only have seven hours here.
24  So go to Exhibit 20.  I'll make this quick.
25    Do you see Exhibit 20 in front of you?

Page 135

1    A.  Yeah.
2    Q.  This is the IARC classifications; is
3  that right?
4    A.  Okay.  Mm-hmm.
5    Q.  Group 1 states, "Carcinogenic to
6  humans."
7    A.  Yes.
8    Q.  Do you see that?
9    A.  Yeah.
10    Q.  All right.  Group 2A, there are 82
11  agents that are probably carcinogenic to humans;
12  is that right?
13    A.  Yes.
14    Q.  IARC is certainly capable of reaching a
15  decision that something is a known or probable
16  carcinogen; is that right?
17    MS. PARFITT:  Objection.
18    A.  Yes.  I mean, 15 years ago, yes, based
19  on the evidence.
20    Q.  It has placed at least 200 agents in
21  Group 1 or Group 2A; is that right?
22    A.  Yes.
23    Q.  There's only one agent in Group 4,
24  probably not carcinogenic to humans; is that
25  right?

Page 136

1    A.  Yes.
2    Q.  So out of the 1,000 agents that IARC
3  has reviewed, it has placed only one agent in
4  Group 4, probably not carcinogenic; is that
5  right?
6    A.  Yeah.  But 499 are not classifiable as
7  it relates to, so.
8    Q.  IARC doesn't even have a Group 5, not
9  carcinogenic, does it?
10    A.  Well, I mean, all the -- once it's
11  probably not carcinogenic, it's not carcinogenic.
12    Q.  The best that IARC can state is that an
13  agent is probably not carcinogenic to humans,
14  which is Group 4; is that right?
15    A.  Yes.
16    MS. PARFITT:  Objection.
17    Q.  All right.  As with -- strike that.
18    With genital talc, the IARC group 2B
19  designation is based on limited evidence in
20  humans; is that right?
21    MS. PARFITT:  Objection.
22    A.  Yes.  There was some biological
23  consideration.  There were some biological
24  mechanisms, but, again, in 2005, and as I state
25  in my report, which I have, and there have been

Page 137

1  multiple studies since then.  And that, you know,
2  that they should be revisited.
3    Q.  That means IARC cannot rule out chance,
4  bias or confounding with reasonable confidence;
5  correct?
6    A.  Based on the data they had at that
7  time.
8    Q.  What else is in 2B, possibly -- strike
9  that.
10    What else is in class 2B, possibly
11  carcinogenic?  Are you familiar with Ginkgo
12  biloba?
13    MS. PARFITT:  Objection to form.
14    A.  I know the name.
15    Q.  Are you aware that that's classified as
16  a 2B agent by IARC?
17    A.  I don't know.  I mean, you know, they
18  also classify as it relates to exposure.  So I
19  haven't reviewed Ginkgo biloba to be able to
20  answer the question.
21    Q.  Pickled vegetables, 2B; is that right?
22    A.  How do I know?  Show me.
23    Q.  Occupational --
24    A.  That's what you're saying.
25    Q.  -- carpentry and joinery, 2B?  Are you

35 (Pages 134 to 137)

Sonal Singh, M.D., M.P.H.

Page 138

1  aware of that?
2      A.  Again, this is 2015.  And, you know,
3  yes.  I don't know I'm aware of that.  I mean,
4  you can't put words in my mouth that pickle --
5  how do I know that?
6      Q.  There's no chance of my putting words
7  in your mouth.  IARC can change its
8  classification for a substance; is that right?
9      A.  It does.  I mean, from what I
10  understand.
11      Q.  It has not changed its Group 2B
12  classification since it determined that talc was
13  a 2B agent; is that right?
14      MS. PARFITT:  Objection.  Form.
15      A.  It has not carried out an assessment
16  since 2005, that I'm aware of.
17      Q.  Has IARC changed its group 2B
18  classification?
19      A.  No --
20      MS. PARFITT:  Objection.
21      A.  -- and as far as I'm aware, no
22  assessment has been carried out.
23      Q.  Bradford Hill, strength of association
24  is one of the criteria; is that right?
25      A.  I don't consider them criteria.

Page 139

1  There's overviews.  I think -- I'm just picking
2  the terms.  I mean, they're overviews of Bradford
3  Hill.  Doesn't list them as criteria, because
4  criteria implies a list of things that you can
5  pick and choose from.
6      Q.  You would call them what?
7      A.  Overviews.  Actually, that's what he
8  calls them.
9      Q.  Overviews.  Strength of association is
10  a Bradford Hill overview; is that right?
11      A.  Yes.
12      Q.  Epidemiologists consider a 1.3 odds
13  ratio in case-control studies to be a weak or
14  modest association; is that right?
15      MS. PARFITT:  Objection.  Misstates the
16  evidence.
17      A.  No.  I mean, again, strength of
18  association based on -- depends on the study
19  question at hand, the study design, and, you
20  know, the quality of the underlying data.  So
21  strength of association, in and of itself, does
22  not provide any -- any -- any sort of -- any
23  answer to the causal question.  Again, I'll go
24  back to my report, because I have to go back to
25  my report.

Page 140

1      Q.  Doctor, I'm asking you questions.
2      My question is:  Epidemiologists consider a
3  1.3 odds ratio in case-control studies to be a
4  weak or modest association; correct?
5      MS. PARFITT:  Objection.  Misstates the
6  evidence and the science.
7      A.  Not the epidemiologists that I
8  contacted.  You know, we look at various, you
9  know -- as I state in my report, you know, you
10  can have modest associations and you can have a
11  relative risk of one that are lower, and if you
12  go to a low-prevalence population, and then
13  remove competing risk factors, those can be
14  attenuated.
15      So the epidemiologists that I interact with,
16  and we don't look at this as weak or modest or
17  high.  We just look at it in the whole causal
18  framework.
19      Q.  Can you point to any peer-reviewed
20  literature on talc and ovarian cancer that states
21  that 1.3 odds ratio is a strong association?
22      A.  Again, that's not -- I'm not looking at
23  talc at 1.3 is a strong association.  I'm stating
24  that, yeah, I can't point to the talc literature
25  that states that.

Page 141

1      Q.  IARC does not refer to this as a strong
2  association; correct?
3      MS. PARFITT:  Objection.  Form.
4      A.  I don't know what -- the particular
5  objective or qualifier they use.  I mean --
6      Q.  FDA doesn't refer to this as a strong
7  association, do they?
8      MS. PARFITT:  Objection to form.
9      A.  Again, you have to sort of just show me
10  where they are, and I'll agree with it.
11      Q.  Have you seen any statement from IARC
12  that there is a strong association between
13  genital talc use and ovarian cancer?
14      A.  I don't recall that particular phrase.
15      Q.  All right.  The National Cancer
16  Institute doesn't refer to this as a strong
17  association; correct?
18      MS. PARFITT:  Objection to form.
19      A.  I don't recall that particular
20  objective.
21      Q.  Do your opinions on strength of
22  association apply equally to all forms of ovarian
23  cancer?
24      MS. PARFITT:  Objection.  Form.
25      A.  Again, I'm -- you know, my opinions are

36 (Pages 138 to 141)

Sonal Singh, M.D., M.P.H.

Page 142

1  not -- again, we can parse this out.  I mean, I
2  was just looking at the causal question.  Is talc
3  causally related to the development of ovarian
4  cancer?
5      And, you know, most of the evidence that I
6  examined were -- was provided in terms of serous
7  epithelial cancer, and --
8      Q.  I thought you told me that your
9  methodology was to look at the Bradford Hill
10  overview factors; is that right?
11     A.  Yeah.
12     Q.  All right.  And one of those factors is
13  strength of association; is that right?
14     A.  Yes.
15     Q.  And that's a factor that you looked at;
16  correct?
17     A.  Yes.
18     Q.  Do your opinions on strength of
19  association apply equally to all forms of ovarian
20  cancer?
21         MS. PARFITT:  Objection.  Form.
22     A.  Well, I did not disaggregate my, you
23  know, opinion by histologic subtype.
24     Q.  You cite to the Langseth paper; is that
25  right?

Page 143

1      A.  I do.
2      Q.  You state that the authors in Langseth
3  2008 found an odds ratio ranging between 1.12 to
4  1.4, depending upon the type of study design.  Is
5  that right?  This is on Page 22 of your report.
6      A.  Okay.
7      Q.  Langseth, in fact, rejects causation
8  and says more study is needed; correct?
9          MS. PARFITT:  Objection.  Form.
10     A.  I don't know why you have stated they
11  reject causation.  Show me that statement in that
12  article.
13     Q.  Take a look, if you will, at Deposition
14  Exhibit 21.
15         (Article entitled "Perineal use
16     of talc and risk of ovarian cancer" marked
17     Exhibit 21.)
18         MS. PARFITT:  Thank you.
19         MR. ZELLERS:  Mm-hmm.
20  BY MR. ZELLERS:
21     Q.  Deposition Exhibit 21 is the Langseth
22  2008 meta-analysis that you cite in your report;
23  is that right?
24     A.  Yeah.  It's one of the meta-analyses.
25     Q.  Turn to Page 359 of Exhibit 21.  Tell

Page 144

1  me when you have that.
2      A.  Yeah.
3      Q.  "Proposal to research community."  Do
4  you see that?
5      A.  Yes.
6      Q.  Tell me if I read this statement by the
7  authors correctly.
8      "The current body of experimental and
9  epidemiological evidence is insufficient to
10  establish a causal association between perineal
11  use of talc and ovarian cancer risk.
12  Experimental research is needed to better
13  characterize deposition, retention, and clearance
14  of talc to evaluate the ovarian carcinogenicity
15  of talc."
16     Did I read that correctly?
17     A.  Yes.
18     Q.  You're drawing conclusions from this
19  study that are broader than the study authors'
20  own conclusions; is that right?
21         MS. PARFITT:  Objection.
22     A.  I didn't draw.  So you were asking me
23  that whether I drew a single conclusion from the
24  Langseth.  I mean, there are -- I think I cite
25  all the meta-analyses first, and then -- so I'm

Page 145

1  not just drawing inferences from there.
2      And the authors, as far as I am aware, A,
3  there have been several other studies published
4  since then.  This is 2007.  So we have 12 years
5  and several publications.  And, B, the authors
6  themselves have provided opinions that they are
7  causally related.  Dr. Siemiatycki, as far as I'm
8  aware.
9      Q.  Did you cite this paper in your report?
10     A.  Yes.
11     Q.  The authors in this paper state that
12  the current body of experimental and
13  epidemiological evidence is insufficient to
14  establish a causal association between perineal
15  use of talc and ovarian cancer risk; is that
16  right?
17         MS. PARFITT:  Objection.  Misstates the
18  evidence in this case.  The science and
19  testimony.
20     A.  It says the current body of evidence.
21  This is current as of two thousand and whenever.
22     Q.  This is the paper.  2008, Exhibit 21,
23  that you relied on --
24     A.  Yeah.
25     Q.  -- and cite in your report; correct?

37 (Pages 142 to 145)

Sonal Singh, M.D., M.P.H.

Page 146

1      A.  This is not the only --
2          MS. PARFITT:  Objection.  Form.
3      A.  -- paper.  I cited on 2017, 2018.
4      Q.  Go to the acknowledgments section.
5      Do you see the acknowledgments off to the
6  left?
7      A.  Yes.
8      Q.  The authors are IARC members; is that
9  right?
10     A.  Yes.
11     Q.  The authors of this paper, Langseth?
12     A.  Yes.
13     Q.  Another overview factor of Bradford
14  Hill is consistency; is that right?
15     A.  Yes.
16     Q.  The literature does not show a
17  consistent association between talc use and
18  ovarian cancer; right?
19         MS. PARFITT:  Objection to form.
20     A.  I disagree.
21     Q.  The cohort studies do not show an
22  association between talc use and ovarian cancer;
23  correct?
24         MS. PARFITT:  Objection to form.
25     A.  I disagree.  The cohort studies show

Page 147

1  significant -- you know, increased risk, which is
2  in the same direction as the case-control
3  studies, which, as several of the authors, such
4  as Penninkilampi and others and me, interpret as
5  evidence of consistency.
6      Q.  The cohort studies are what?
7      A.  I'm sorry?
8      Q.  List out the cohort studies for us.
9      A.  Penninkilampi is a meta-analysis.  They
10  are an interpretation of the cohort studies.
11     Q.  You told me before that to do a proper
12  analysis, you have to go and look at the
13  individual studies; is that right?
14     A.  I do.  I did.
15     Q.  And you went and you reviewed the
16  cohort studies; is that right?
17     A.  Yes.
18     Q.  And it's your testimony that those
19  cohort studies do show an association between
20  talc use and ovarian cancer.  Is that your
21  testimony?
22     A.  So I reviewed the cohort studies in
23  line with 30 case-control studies in line with
24  70, you know -- sorry -- seven other
25  meta-analyses and, you know, synthesizing the

Page 148

1  overall evidence, my testimony is that the cohort
2  study estimates are in line with the case-control
3  evidence and provide evidence of consistency.
4      Q.  The cohort studies themselves, looking
5  just at those studies, and I'm going to ask you
6  about the others --
7      A.  Sure, sure.
8      Q.  -- do not show a consistent
9  association between talc use and ovarian cancer;
10  correct?
11         MS. PARFITT:  Objection.  Misstates the
12  testimony.
13     A.  So that's not the way I look at
14  evidence.  I look at everything.  That's what you
15  want to look at.  You can look at it.
16     I just look at evidence, you know, whatever
17  is out there.  So I didn't look at cohort studies
18  in and of themselves.
19     And that's why we do systematic reviews.
20  That's why we do meta-analyses, because you want
21  to look at everything at the same time.
22     Q.  You did not look at the cohort studies
23  individually; correct?
24     A.  I did.  And they're in my report.
25     Q.  If you looked at the cohort studies

Page 149

1  individually, they do not show a consistent
2  association between talc use and ovarian cancer;
3  correct?
4          MS. PARFITT:  Objection.  Misstates the
5  evidence.
6      A.  So how can you look at individually and
7  answer questions about consistency?  To answer
8  questions about consistency, you have to look
9  across studies.  And when you look across
10  studies, you have to bring all studies.
11     And that's when you can opine on
12  consistency.
13     Q.  Doctor, my question relates just to the
14  cohort studies.
15     A.  I understand.
16     Q.  The cohort studies do not demonstrate
17  an association between talc use and ovarian
18  cancer; correct?
19         MS. PARFITT:  Objection.  Misstates the
20  evidence.
21     Q.  Just the cohort studies.
22         MS. PARFITT:  Objection.  Misstates the
23  evidence.
24     A.  First of all, you know, they do
25  increase -- an increase of serous epithelial

38 (Pages 146 to 149)

Sonal Singh, M.D., M.P.H.

Page 150

1  ovarian cancer in one of them, and cumulative
2  evidence from cohort studies shows an excess risk
3  of ovarian cancer which is not statistically
4  significant.
5      Q.  Hospital-based, case-control studies
6  collectively do not show an association between
7  talc use and ovarian cancer; correct?
8          MS. PARFITT: Objection. Misstates the
9  evidence.
10     A.  That is incorrect, because
11 hospital-based, case-control studies also show an
12 association between talc use and ovarian cancer
13 which is not, you know -- and I would have to
14 look again.  Please bring out the studies,
15 because I want to look at some of the studies
16 before I, you know, provide specific -- you're
17 asking very specific questions about
18 hospital-based studies, so I have to look at the
19 studies.
20     Q.  If you can't answer a question, tell me
21 you can't answer it.  But my question is,
22 hospital-based, case-control studies collectively
23 do not show an association between talc use and
24 ovarian cancer; correct?
25         MS. PARFITT: Objection. Misstates the

Page 151

1  evidence.
2      A.  No.  I disagree.  And, again, I'd have
3  to -- can we pull the Penninkilampi paper?
4      Q.  Doctor, I'm going to ask you about that
5  paper.
6      A.  No.  But then how can I answer
7  questions?
8      Q.  I need you to answer my questions.
9      If you can't answer a question, then tell me
10 you can't answer the question.
11     A.  I'm willing to answer the question.
12 Just bring me the evidence so that I can look at
13 it.
14     I'm sorry.  I'm trying my best.
15     Q.  In your report, you state that
16 hospital-based, case-control studies may be less
17 susceptible to selection bias than
18 population-based, case-control studies; correct?
19     A.  Where do I state that?
20     Q.  Look at your report on Page 54,
21 Paragraph 8.
22     A.  Actually, I state entirely the
23 opposite.  I state that the population-based
24 studies may have --
25     Q.  So --

Page 152

1          MS. PARFITT: Wait.  Are you in the
2  middle?
3      A.  Yeah.  That's incorrect.  It should be
4  the population-based case studies.  That's my --
5  you know, that's a misstatement on my part.
6      Q.  So you need to amend your report?
7      A.  Yeah.  Yeah.
8      Q.  So if we go to Page 54 --
9      A.  Yeah.
10     Q.  -- Paragraph 8, you state that it's an
11 error when you state, "As opposed to
12 hospital-based controls, which may be less
13 susceptible to selection bias, the
14 population-based, case-control studies have
15 consistently showed a higher estimate of
16 increased risk of ovarian cancer associated with
17 talc use."
18     A.  Yeah.  And I was applying the less
19 susceptible to the population-based statement.
20     Q.  How do you need to correct this
21 statement?
22     A.  I don't know how, you know.  Yeah, it
23 would be as opposed to hospital-based controls,
24 population-based, case-control studies may be
25 less susceptible to selection bias.

Page 153

1      Q.  You believe that population-based
2  studies may be susceptible to less selection
3  bias?
4      A.  May be less susceptible.
5      Q.  Take a look at Exhibit 21.  That's the
6  article we looked at a few minutes ago.
7      Do you see that?
8      A.  That's the Langseth?
9      Q.  Yes.  The Langseth article.
10     Do you see that?
11     A.  Yes.
12     Q.  Take a look under the hospital-based
13 studies.
14     Do you see that on Page 359?
15     A.  Yes.
16     Q.  You are the one who cites this paper
17 and relies on it; is that right?
18     A.  Yes.
19     Q.  If we look at pooled odds ratio for
20 hospital-based studies --
21     A.  Mm-hmm.
22     Q.  -- the odds ratio is 1.2 and the
23 confidence interval is a .92 to 1.36; is that
24 right?
25     A.  Yes.

39 (Pages 150 to 153)

Sonal Singh, M.D., M.P.H.

Page 154

1    Q.  That means that it may or may not be --
2  show an association between talc use and ovarian
3  cancer.  The pooled result; is that right?
4       MS. PARFITT:  Objection to form.
5    Q.  Given that confidence interval.
6       MS. PARFITT:  Objection to form.
7    A.  Yeah.  Again, this is -- you know, at
8  that time.  I don't know what studies have been
9  added.  We can look in the new paper, which I'm
10 not sure why it's not been brought up.
11      But, yes, it does show an excess risk, not
12 statistically significant, consistent with the
13 population studies.
14   Q.  All right.  Hospital-based control
15 studies, you're more likely to be comparing
16 hospitalized patients to hospitalized patients;
17 is that right?
18   A.  Yes.  That's why they're hospital
19 based.
20   Q.  Population-based studies, you're more
21 likely to be comparing ill people to healthy
22 people; is that right?
23   A.  Yeah.  Your source of control.  I
24 mean -- well, it depends.  How do you know if
25 it's ill people?  If you are sourcing from the

Page 155

1  population in both, it's a population-based
2  study.
3    Q.  Population-based, case-control studies,
4  the ones that you look at only show a weak
5  association between talc use and ovarian cancer;
6  is that right?
7       MS. PARFITT:  Objection.  Misstates the
8  evidence.
9    A.  I think we went about that weak.  I
10 don't believe that they are weak.  We went
11 through that.
12   Q.  That's your --
13   A.  Yeah.  My opinion is that they're not
14 weak evidence.
15   Q.  Isn't the absence of an association in
16 the cohort studies especially significant in that
17 the study design reduces the likelihood of recall
18 bias?
19      MS. PARFITT:  Objection to form.
20   A.  Yes.  I mean, it is important to look
21 at recall bias in the cohort studies.  But the
22 study design introduces several elements of other
23 bias for an outcome such as ovarian cancer.
24      You know, I'm answering your question,
25 because you asked about bias.  It introduces

Page 156

1  behavioral change bias, which attenuates towards
2  the null.  It induces an element of
3  misclassification of exposure, which goes towards
4  null.  It limits the duration of assessment,
5  which, you know, limits assessment.  So it
6  doesn't have power to suggest.
7       So, yes, recall bias is a feature that is
8  better assessed in the cohort studies, but recall
9  bias, for exposures that are daily use, such as
10 talc, are less likely, you know, to be in play.
11 Recall bias -- let me finish my explanation.
12      Recall bias would less likely be in play
13 because we don't see evidence with nonperineal
14 talc exposure.  Recall bias are less likely to be
15 in play because we only see it with epithelial
16 ovarian cancer.
17      So, yes, cohort studies less, but there are
18 other biases.
19   Q.  Couldn't recall bias explain the
20 difference between cohort studies and
21 retrospective case-control studies?
22      MS. PARFITT:  Objection.  Form.
23   A.  I don't think so.  There's multiple
24 other biases and multiple other strengths and
25 limitations that would have to be considered.

Page 157

1    Q.  You cite to Berge, a 2017 paper, in
2  your report; is that right?  Is that correct?
3    A.  Yes.
4       MR. ZELLERS:  Take a look at
5  Exhibit 22.
6       (Article entitled "Genital use
7    of talc and risk of ovarian cancer:  A
8    meta-analysis" marked Exhibit 22.)
9       MR. ZELLERS:  Ms. Court Reporter, where
10 do you want me to put it, maybe here, on top?
11      COURT REPORTER:  Sure.
12      MR. TISI:  Thank you.
13 BY MR. ZELLERS:
14   Q.  Deposition Exhibit 22 is a paper that
15 you cite by Berge, is the first named author,
16 2017.  It's a recent meta-analysis; is that
17 right?
18   A.  Yes.
19   Q.  Go to Page 6 of the Berge paper,
20 Exhibit 22.
21      The authors conclude that, "Information bias
22 from retrospective self-report of talc use is a
23 possible explanation for the association detected
24 in case-control studies."  Is that right?
25   A.  Yes.

40 (Pages 154 to 157)

Sonal Singh, M.D., M.P.H.

Page 158

1    Q.  What was your methodology for
2  discounting the effect of recall bias in the
3  population-based, case-control studies?
4    A.  I mean, it's not like there's a -- once
5  recall is operational, there are no methods that
6  you can and do discount.  But just the quality
7  and, you know, the quantity of evidence over
8  studies and the fact that even the cohort
9  studies, despite these limitations, show an
10  increased risk suggests that recall bias, while
11  it is potential, cannot explain -- be the only
12  explanation for a causal link between talc and
13  ovarian cancer.  You cannot adjust for recall
14  bias after the completion of the study.
15    Q.  What is the rate of error in that
16  methodology?
17    A.  I think that none of them have
18  calculated it.  And Dr. Cramer has done in his
19  last study.  And it appears that you'd have to
20  need a significant degree of recall bias.  And I
21  am going to reference my report.
22    Q.  Okay.  Didn't the cohort studies
23  involve a much greater --
24    A.  I'm not done.
25      MS. PARFITT:  Excuse me.

Page 159

1    A.  I'm done.
2      MS. PARFITT:  One moment.  He wanted to
3  reference something in his report.
4    A.  Yeah.  The risk of exposure would have
5  to be very high to nullify the increased risk.
6    Q.  Didn't the cohort studies involve a
7  much greater number of women than the
8  case-control studies?
9      MS. PARFITT:  Objection.  Misstates the
10  evidence.
11    A.  Yeah.  But their combined number of
12  ovarian cancer cases was 890.  So power is only
13  -- depends on the number of cases.
14    Q.  What was your methodology for weighing
15  the power of the cohort studies versus the
16  case-control studies?
17    A.  I mean, retrospective calculations of
18  power are, you know, not really recommended once
19  you already have the results.  I mean, we already
20  see that the overall cumulative evidence
21  from many meta-analyses suggests an increased --
22  you know, provides an increased risk.
23      And we know that there's thousands of cases
24  in the case control.  There's, you know, I don't
25  know how many cases in the cohort, so we know

Page 160

1  that the case-control stories are more powered.
2    Q.  Do you agree that some case-control
3  studies have shown statistically significant
4  findings and others have not?
5    A.  Yes.
6    Q.  What is your methodology for weighing
7  the lack of consistency in statistical
8  significance across studies?
9      MS. PARFITT:  Objection.  Form.
10    A.  I can answer that.  Yeah.
11      So the methodology for correcting the lack
12  of significance, that's why you do a
13  meta-analysis.  That's an inverse variance
14  weighted meta-analysis.  You -- so all of these
15  studies have accounted for the fact that their
16  confidence intervals are crossing 1.  And that's
17  how they have accounted for lack of a statistical
18  significance.
19      So you can see that all of these estimates
20  are weighted by sample size.  So --
21    Q.  Do you agree that if a study does not
22  show a statistically significant association, it
23  could mean that no risk exists?  Correct?
24      MS. PARFITT:  Objection.  Form.
25    A.  In the context of that study.  But,

Page 161

1  again, I am looking at the cumulative evidence.
2    Q.  It could mean -- strike that.
3      It could just be occurring by chance; is
4  that right?
5      MS. PARFITT:  Objection.  Form.
6    A.  I'm looking at the whole body of
7  evidence.
8      In the context of a single study, yes.
9    Q.  If a study is underpowered it could be
10  because the difference in risk is too small to
11  detect such as a risk ratio smaller than 1.15;
12  isn't that right?
13    A.  Yes.  It's possible.
14    Q.  All right.  You have a criticism in
15  your report of the Nurses' Health Study; is that
16  right?
17      MS. PARFITT:  Objection to form.
18    A.  I don't have -- again, I don't have
19  criticisms.  I have pointed out the strengths and
20  limitations.
21    Q.  Well, let's look at some of those.
22      On Pages 40 and 41 of your report, you
23  discuss the Gates 2008 study; is that right?
24    A.  40.  Yes.
25    Q.  The Gates 2008 study showed a

41 (Pages 158 to 161)

Sonal Singh, M.D., M.P.H.

Page 162

1  statistically significant increased risk of total
2  epithelial ovarian cancer; is that right?
3      A.  Let me just look at it.  There's so
4  many of these.  Yes.
5      Q.  The Gates 2008 study used data
6  collected in the Nurses' Health Study; is that
7  right?
8      A.  Yes.  There was another part to it as
9  well.
10     Q.  In the Nurses' Health Study, the
11 participants were asked about their talc exposure
12 in one questionnaire in 1982; is that right?
13     A.  Yes.
14     Q.  When they were asked about their talc
15 use, the participants were between 36 and 61
16 years of age; is that right?
17     A.  Yes.
18     Q.  As you state in your report, you agree
19 that, although talc exposure -- I'm looking
20 at Page 41 --
21     A.  Yes.
22     Q.  The first paragraph.  You agree that,
23 "Although talc exposure was only measured in the
24 1982 Nurses' Health Study questionnaire, when
25 participants were between 36 to 61 years of age,

Page 163

1  the number of users who began talc use after this
2  is likely small, as shown by the fact that more
3  than 95 percent of controls with regular talc in
4  the NECC reported talc use before age 35."
5      A.  Yes.
6      Q.  Is that correct?
7      A.  Yes.
8      Q.  Later in your report, on Pages 47 and
9  48, you discuss the Gertig 2000 study; is that
10 right?
11     A.  Yes.
12     Q.  That study also uses the data from the
13 Nurses' Health Study; correct?
14     A.  Yes.  It's all part of the same cohort.
15     Q.  That study, Gertig 2000, did not find a
16 statistically significant relationship between
17 daily talc use and all types of ovarian cancer;
18 is that right?
19     A.  Yeah.  Again, I mean, they are
20 different -- they're the same cohort with
21 different follow-up time, different design.  But
22 it did not.  And it found an increased risk for
23 serous ovarian cancer.
24     Q.  Gertig 2000, that study also relied on
25 the national -- strike that -- the Nurses' Health

Page 164

1  Study questionnaire; correct?
2      A.  Yes.
3      Q.  And you cite that on Page 48 of your
4  report, second paragraph; is that right?
5      A.  Yes.
6      Q.  You state, "Further, as discussed
7  above, determining never use, based only on a
8  one-time question, near the start of the study,
9  14 years prior to terminating the study in 1996,
10 introduces undirectional behavioral change bias,
11 likely misclassifying some ever users who used
12 talc during the study as never users and biased
13 the findings toward the null."
14     Is that what you state in your report?
15     A.  Let me just read it.  Yes.
16     Q.  So when you discuss the Gertig 2000
17 study, you say that, because the participants in
18 the Nurses' Health Study were only about or only
19 asked about talc use once, near the beginning of
20 the study, women who started using talc after
21 they completed that questionnaire could have been
22 misclassified as never users; is that right?
23     A.  Yeah.
24     Q.  But when you talk about the study that
25 you believe supports your opinion --

Page 165

1      A.  Yeah.
2      Q.  -- Gates 2008, you recognize that the
3  vast majority of women who use talc initiate use
4  before age 36; is that right?
5      A.  Yeah.  But it does not -- both points
6  are valid.  I mean, I'm just stating the
7  limitations of the Gates study and the Gates
8  analysis.  So.
9      I don't see an incongruity that you're
10 trying to point out.  I'm just saying the
11 proportion of women who were never users, the
12 number of users who began is likely small.  But
13 it still does not eliminate the possibility of
14 unidirectional behavioral change bias.
15     Q.  When you're looking at a cohort study,
16 Gertig 2000 that does not support your opinion,
17 you're talking about limitations; correct?
18     MS. PARFITT:  Objection.  Misstates his
19 testimony.
20     A.  I'm not talking about a study that does
21 not support mine.  I'm looking at the strengths
22 and limitations of a study.
23     Q.  You state two different things,
24 depending upon whether you're talking about Gates
25 2008 or Gertig 2000; correct?

42 (Pages 162 to 165)

Sonal Singh, M.D., M.P.H.

Page 166

1        MS. PARFITT:  Objection.  Misstates his
2   testimony.
3        A.  I am not.
4        First of all, they are two different
5   analyses of a cohort.  So they're not two
6   different things about.
7        And I'm pointing out, you know, the reasons
8   that that -- so I'm, you know, pointing out in
9   Gates that, yes, talc exposure is a single-time
10  exposure.  And it is -- you know, introduces an
11  element of bias.
12       But I'm also pointing out in Gates why that
13  bias is likely to be, you know, small coming from
14  the other consortium.
15       Q.  But you don't say that when you discuss
16  Gertig 2000, do you?
17       A.  Yeah.  Because it wasn't done in
18  conjunction with the NECC consortium.
19       Q.  All right.  Look at Page 49 of your
20  report.  You discuss the Houghton 2014 study; is
21  that right?
22       A.  Yes.
23       Q.  All right.  Houghton did not find a
24  statistically significant increase in the risk of
25  ovarian cancer with perineal talc use; is that

Page 167

1   right?
2        A.  Yes.
3        Q.  Houghton did not find a statistically
4   significant increase in the risk of ovarian
5   cancer with use of talcum powder on sanitary
6   napkins or diaphragms; is that right?
7        A.  Yeah.  They found an increased risk
8   which was not statistically significant.
9        Q.  And Houghton 2014 did not find a
10  statistically significant increase in risk of
11  ovarian cancer with increasing durations of use
12  or when stratified by age or tubal ligation
13  status; correct?
14       MS. PARFITT:  Objection.  Form.
15       A.  I don't know that specific.  I mean,
16  you'd have to show me.  Again, I don't remember
17  these studies offhand.
18       Q.  Like the Nurses' Health Study, the
19  Houghton 2014 authors ask participants about
20  their talcum powder use at the participants'
21  entry into the study; is that right?
22       A.  Yes.  And they don't update during a
23  follow-up, introducing, you know, bias.
24       Q.  On Page 50 of your report, second
25  paragraph, you note that the average age of the

Page 168

1   participants in the Houghton 2014 study was 63.3
2   years at baseline, with 12.4 years of follow-up
3   on average; is that right?
4        A.  Yes.
5        Q.  And then you say that, because
6   participants were not asked again about talcum
7   powder use during follow-up, people who initiated
8   talc use after the study began were being
9   misclassified as never users.  Is that right?
10       A.  Yes.
11       Q.  So, again, when the study supports your
12  opinion, you recognize that the vast majority of
13  perineal talc users begin that use well before
14  age 63.
15       MS. PARFITT:  Objection.  Misstates
16  testimony.
17       A.  I don't recognize that.  How do I
18  recognize that?  I'm just citing that, in Gates,
19  they provided that opinion.  Yeah.
20       In the Gates study, they quoted data from
21  the NECC, that that's one study that provides.  I
22  don't know what's happening in the -- in this
23  Houghton study, that vast majority.  That's
24  something that you are providing.  And you
25  provide data that the vast majority of users

Page 169

1   began --
2        Q.  It's something you cited in your
3   report; correct?
4        A.  Yeah.  But it doesn't mean that that
5   applies to, you know, this Houghton study as
6   well.
7        Q.  And that's my point.  You take a piece
8   of information in terms of when women begin their
9   talc use.  You apply it differently in your
10  analysis of studies that favor plaintiffs'
11  position than studies that do not favor
12  plaintiffs' position?
13       A.  I'm sorry.  I have to object.
14       MS. PARFITT:  Objection.
15       A.  I have to object.  This is a
16  mischaracterization of my testimony.  I mean, I
17  have to object to this.  Because -- no, I have
18  to.
19       MS. PARFITT:  Let him finish.  Let
20  him --
21       A.  Because you are mischaracterizing my
22  testimony.
23       Yes, I point out the limitations in one
24  section that, you know, a majority of women.  And
25  I also point out the unidirectional change bias,

43 (Pages 166 to 169)

Sonal Singh, M.D., M.P.H.

Page 170

1  and both are entirely congruent with each other.
2  But yes --
3      Q.  Tell --
4      A.  Yes.
5      Q.  Are you finished?
6      A.  Yes.
7      Q.  All right.  On what are you relying to
8  opine that enough women begin talcum powder use
9  in their 50s and 60s such that the results of
10  Houghton or Gates 2000 are biased toward the
11  null?
12      A.  Well, I mean, we know -- exactly.  I
13  mean, we don't know that.  I mean, we can't --
14  even a small amount, and that's important to
15  know, that even a small amount of users was
16  class- -- because we didn't ask those questions.
17  So even a small amount of users who had moved to
18  the other category would have nullified -- you
19  know, would have biased it towards the null.
20      Q.  Based on all your review, the data that
21  you came across and that you cite in your report,
22  are that the vast majority of women begin talc
23  use in their 20s or earlier; correct?
24      A.  No.  I cite that in the NECC.  That's
25  the data I came across.  And that's why it is

Page 171

1  cited.  So to mischaracterize it as not being
2  cited is incorrect.
3      Q.  What is the latency period for ovarian
4  cancer?
5      A.  I don't know a specific number.  It's,
6  you know, several years.
7      Q.  Several years.
8      That's your testimony based upon all of the
9  data and material you've reviewed?
10      A.  Yes.  I mean --
11      MS. PARFITT:  Objection.
12      Q.  You've -- you've been referring to
13  Penninkilampi; is that right?
14      A.  I don't know the name.  Yes.
15      Q.  But let me give it to you and we can
16  both see if we can pronounce it together.
17      MS. PARFITT:  Before we start, it's
18  about 12:20.  We do have lunch coming.  May I
19  just take two minutes to see if it's here?
20      MR. ZELLERS:  Sure.  Or you can let me
21  ask a couple of questions about this study and we
22  can take a break, but whatever your preference
23  is.
24      MS. PARFITT:  What's your preference?
25      THE WITNESS:  Let's do it.

Page 172

1      MR. ZELLERS:  So I'll ask just a few
2  questions about this study --
3      MS. PARFITT:  And if it's not here --
4      MR. ZELLERS:  -- then we'll take a
5  break, because we've been going for a while.
6          (Article entitled "Perineal Talc
7      Use and Ovarian Cancer, A Systematic Review
8      and Meta-Analysis" marked Exhibit 23.)
9  BY MR. ZELLERS:
10      Q.  Doctor --
11      A.  I think we need a break in five
12  minutes.  I need a break.  I don't know about
13  you.
14      Q.  We don't want to wear you out.
15      A.  It's only half.  Not even half the way.
16      Q.  I'm handing you Exhibit 23.  This is
17  the Penninkilampi meta-analysis that you have
18  referred to in your report and also in your
19  testimony; is that right?
20      A.  Yes.
21      Q.  You rely on this meta-analysis,
22  Deposition Exhibit 23, in forming your opinions;
23  is that right?
24      A.  As one of the studies.  Yes.
25      Q.  It's a 2018 meta-analysis; is that

Page 173

1  right?
2      A.  Yes.
3      Q.  Are you aware that this meta-analysis
4  by Penninkilampi does not include the Gates 2010
5  update of the Nurses' Health Study?
6      A.  When you say the Gates 2002 -- the
7  study that we --
8      Q.  What we looked at before was Gates
9  2008.  And we also looked at Gertig 2000 --
10      A.  All these different studies.
11      Q.  That's all right.
12      You're aware that there are several
13  different cohort studies relating to the Nurses'
14  Health Study; is that right?
15      A.  Yes.
16      Q.  What we talked about earlier was the
17  Gertig 2000 study.
18      A.  Okay.
19      Q.  Correct?
20      A.  Yes.  And before that, we talked
21  about --
22      Q.  The Gates 2008.
23      A.  Okay.
24      Q.  Are you aware that Gates, in 2010,
25  updated the Nurses' Health Study, which we have

44  (Pages 170 to 173)

Sonal Singh, M.D., M.P.H.

Page 174

1    referred to as Gertig 2000?
2       A.   Yeah.  I have.  It's cited in my report
3    as well, 92.
4       Q.   Are you aware that Penninkilampi does
5    not include the Gates 2010 update of the Nurses'
6    Health Study?
7          MS. PARFITT:  Refer to your --
8       A.   Can I take a look?
9          MS. PARFITT:  Of course, you can.
10      Q.   Sure.
11      A.   Yeah.  It cites Gertig.
12      Q.   But it does not cite Gates 2010; is
13   that right?
14      A.   I don't see it.
15      Q.   Do you weigh this study, the
16   meta-analysis by Penninkilampi, less because it
17   does not include the Gates 2010 study?
18      A.   I mean, all of these meta-analyses,
19   most of them have found, you know, similar odds
20   ratio.  You know, some of them have made
21   different decisions.
22         They have made -- for example, they made
23   decisions about more than 50 cases.  Other -- if
24   you look at the Taher meta-analysis, they
25   decided, based on -- that a New Castle Tawas

Page 175

1    Skill Rating will include studies.
2          So you have to review that.  Just because
3    they excluded Gates 2010, I wouldn't weigh it
4    differently.  That's my answer.
5       Q.   Gates 2010 tends to negate an
6    association between perineal talc use and ovarian
7    cancer; correct?
8          MS. PARFITT:  Objection.  Misstates the
9    evidence.
10      A.   So negates the evidence?  I mean, in
11   fact, if you look at influence analyses conducted
12   by Taher, it sort of doesn't matter which study
13   you take out and which study you take in.  All of
14   the estimates are statistically significant.
15      Q.   If you're going to do a reliable
16   meta-analysis, you should include the pertinent
17   studies; correct?
18         MS. PARFITT:  Objection.  Misstates his
19   testimony.
20      A.   Just give me a second.
21         Yeah.  I mean, you have to include the
22   permanent study -- but as we know, as we know,
23   people have made different decisions, like Taher
24   made separate decisions, Berge has made
25   separate -- the previous analysis made.

Page 176

1          So I think it's quite reliable and, you
2    know, they were justified.  They said we're going
3    to look at case control with more than 50 cases.
4    So I don't consider it unreliable for that
5    reason.
6          MR. ZELLERS:  Let's take a break.
7          THE VIDEOGRAPHER:  Here ends Media
8    No. 2.  Off the record, 12:24 p.m.
9          (Lunch recess was taken.)
10         THE VIDEOGRAPHER:  Here begins media
11   No. 3 in today's deposition of Sonal Singh, MD,
12   M.P.H.  Back on the record, 1:02 p.m.
13   BY MR. ZELLERS:
14      Q.   Dr. Singh, another Bradford Hill
15   overview factor that you considered is
16   dose-response; is that right?
17      A.   Yes.
18      Q.   Which studies show a dose-response?
19      A.   Let me just refer to my report.
20         So in -- you know, in assessing
21   dose-response, it's very challenging with an
22   exposure such as perineal talc, particularly
23   because, you know, you need to know the amount,
24   you need to know the duration, you need to know
25   the intensity of exposure.  So there are

Page 177

1    challenges.
2          The second is the challenge of modeling
3    dose-response.  When we say dose-response -- or
4    exposure outcome, is it linear monotonic
5    relationships?
6          And, you know, several studies, some measure
7    duration, some measure intensity, some measure
8    duration and frequency.  So as I cite in my
9    dose-response section, which I'm trying to
10   find -- I'm sorry -- yeah, Page 56 of my report.
11      Q.   Which studies show a dose-response?
12      A.   I mean, this is, you know,
13   references -- with increased frequency, 51 to 55.
14   Duration, 52 to 54.  Frequency and duration,
15   58 -- 48 to 54.
16      Q.   Doctor, which studies did you review
17   that show a dose-response?
18      A.   These are the studies that I cited.
19      Q.   What page are you looking at?
20      A.   Page 56.
21      Q.   Are there studies that do not show a
22   dose-response?
23      A.   Yes.
24      Q.   Do you cite those studies that do not
25   show a dose-response in your report?

45 (Pages 174 to 177)

Sonal Singh, M.D., M.P.H.

Page 178

1  A. Yes, I do.
2  Q. On what page?
3  A. Just give me a second. I know I have
4  cited them, and I'm just trying to find where.
5  Yeah. None of the cohort studies were able
6  to conduct meaningful dose-response because they
7  did not collect durational.
8  Q. Are those the only studies, the cohort
9  studies that did not find a meaningful
10  dose-response?
11  A. No. There were several --
12  MS. PARFITT: Objection to form.
13  A. There were other case-control studies.
14  No. If you take out 41, 55 -- I mean, these
15  references cite above -- that are, you know,
16  included in the sections, and I talk about their
17  dose-response in the respective section.
18  Q. What is your justification for
19  disregarding the studies that did not show a
20  dose-response?
21  MS. PARFITT: Objection. Form.
22  A. So I did not disregard these studies.
23  They are included in the report. So, obviously,
24  the cohort studies already are, and we can go
25  through the case-control studies, which did not

Page 179

1  show dose-response and are included.
2  Q. One of the studies you reviewed and
3  considered and relied upon was the Cramer 2016
4  study; is that right?
5  A. Yeah.
6  (Article entitled "The
7  Association Between Talc Use and Ovarian
8  Cancer, A Retrospective Case-Control Study
9  in Two US States" marked Exhibit 24.)
10  BY MR. ZELLERS:
11  Q. Exhibit 24 is the Cramer 2016 study;
12  correct?
13  A. Yes.
14  Q. This is a retrospective case-control
15  study published in 2016; is that right?
16  A. Yes.
17  Q. You claim in your report that this
18  study shows a trend for increasing risk by talc
19  years on Page 46, the last paragraph; is that
20  right?
21  A. Yes.
22  Q. Let's take a look at whatever the study
23  shows. Turn to Page 337 of Exhibit 24, the
24  Cramer 2016 study.
25  A. 337? Yes.

Page 180

1  Q. On 337, there's a table that shows the
2  risk of ovarian cancer for women who used talc
3  daily for one year, one to five years, five to 20
4  years, and more than 20 years. Is that right?
5  A. Yes.
6  Q. There was only statistical significance
7  for the time periods of one to five years of use
8  and more than 20 years of use; correct?
9  A. Yes.
10  Q. If there is a dose-response, shouldn't
11  there continue to be statistical significance
12  with increased exposure?
13  MS. PARFITT: Objection. Form.
14  A. Yeah. So that is -- I'm just
15  concluding what they concluded. The trend for
16  frequency of use was significant, but the trend
17  for use -- years use was flat. And if you look
18  at Page 337, the last line of that paragraph,
19  "Even with this imprecision, the trend remained,
20  although the increase was less monotonic."
21  Q. When we look at the data, there is only
22  a dose-response -- strike that.
23  The data only shows statistical significance
24  for one to five years of use. It does not show
25  statistical significance for one year or five to

Page 181

1  20 years; correct?
2  MS. PARFITT: Objection. Misstates the
3  evidence.
4  A. Yeah. So let's go to --
5  Q. Is that correct?
6  MS. PARFITT: Objection.
7  A. Yes. But let's go to the section of my
8  testimony in which -- report which discusses how
9  dose-response analysis should be interpreted,
10  because they lose statistical power. So subgroup
11  tests lose statistical significance, and I'll
12  point out --
13  Q. You --
14  MS. PARFITT: Excuse me. I think he's
15  still --
16  A. Yeah. I'm trying to explain something.
17  Yeah. We are talking on the subject of
18  dose-response. And one must be careful in
19  interpreting data from the subgroup analysis such
20  as analysis of dose categories or, you know, as
21  subgroups. The results are important. If the
22  test is not significant, there's lack of
23  significant difference. However, such subgroup
24  tests can be underpowered because of reduction in
25  sample size.

46 (Pages 178 to 181)

Sonal Singh, M.D., M.P.H.

Page 182

1    Q.  Doctor, if there is a dose-response in
2  a study such as the Cramer 2016 paper, looking at
3  the data, shouldn't there continue to be
4  statistical significance with increased exposure?
5        MS. PARFITT:  Objection.
6      A.  No, no, you don't -- it doesn't have to
7  be statistical significance with, you know,
8  increased exposure.  I mean, you look at the test
9  score interaction.
10     So I don't think that, with each category of
11  exposure, you're already -- you have a power for
12  a study.  Now with each, you're decreasing the
13  number of users, so you're not going to get
14  statistical significance.
15     Q.  Then why do you get statistical
16  significance at greater than 20 years of daily
17  use?
18     A.  Yeah.  Because there's differential,
19  you know -- at that point, you know, there's
20  more -- there's, you know, more case subjects
21  have ovarian cancer.
22     Q.  Why do you not have statistical
23  significance at five to 20 years?
24     A.  Because it's underpowered at that time.
25     Q.  Why do you not have statistical

Page 183

1  significance at one year?
2      A.  It's underpowered.
3      Q.  But it is appropriately powered at one
4  to five years?
5      A.  Yes.  Based on the number of cases.
6      Q.  Isn't this an instance where you're
7  cherry-picking the data that is favorable to
8  plaintiffs' position and ignoring all of the data
9  which would tend to refute plaintiffs' position?
10        MS. PARFITT:  Objection.  Form.
11     A.  I don't know what the plaintiffs'
12  position -- but what I'm trying to say is this
13  is -- my interpretation of dose-response is based
14  on, you know, not based on statistical
15  significance.  So that's all.
16     Q.  Which studies show a dose-response for
17  asbestos exposure and ovarian cancer?
18     A.  I have not evaluated the causal link
19  between asbestos and ovarian cancer.  Other
20  agencies have, and they have opined that it
21  causes ovarian cancer.  But I have not.
22     Q.  Do you have any idea how much talcum
23  powder reaches a woman's ovaries each time she
24  uses it?
25     A.  I have not conducted that -- conducted

Page 184

1  that testing to determine how much talcum powder
2  reaches a woman's ovary after each application.
3      Q.  Do you have any idea how much asbestos
4  reaches a woman's ovaries each time she uses
5  talc, assuming that talc powder is contaminated
6  with asbestos?
7        MS. PARFITT:  Objection.  Form.
8      A.  I have not conducted that assessment.
9      Q.  How much heavy metal exposure reaches a
10  woman's ovaries, assuming that there are heavy
11  metals in talcum powder?
12        MS. PARFITT:  Objection.  Form.
13     A.  I have not conducted that assessment.
14     Q.  Do you know that heavy metals,
15  chromium, cobalt and nickel, are in vitamins?
16     A.  Yeah.  They are in, you know -- they
17  are ubiquitous in various other areas as well.
18     Q.  They're in food; right?
19     A.  I don't know which one is in which.
20  Yeah.  I can't be specific.
21     Q.  In drinking water?
22     A.  I don't know.  I don't want to say yes
23  to whichever.
24     Q.  It's in bottled water?
25     A.  I don't know that.

Page 185

1      Q.  Are heavy metals, chromium, cobalt and
2  nickel, considered essential nutrients in the
3  body?
4        MS. PARFITT:  Objection.
5      A.  Yeah.  I mean, that's, you know,
6  it's -- pertaining to this case, the question is
7  not that, whether they are in drinking water.
8      I asked myself this question, causal
9  question, what constitutes talcum powder
10  products.  And to that effect, if there are
11  substances such as, you know, chromium, cobalt,
12  and other heavy metals that have been, you know,
13  classified as Grade I or Grade II carcinogens
14  that provide further evidence of a causal link,
15  whether they are present in air, ambient air,
16  that's not the assessment I've done, and I'm not
17  making a causal claim that chromium, per se, is
18  causing that ovarian cancer in that causal
19  framework.
20     Q.  You have no evidence whatsoever that
21  the blood or tissue levels of any trace heavy
22  metals are higher in genital talc users compared
23  to nonusers; correct?
24        MS. PARFITT:  Objection.  Form.
25     A.  Blood or genital talc.  I'm sorry.  Can

47 (Pages 182 to 185)

Sonal Singh, M.D., M.P.H.

Page 186

1  you repeat?
2      Q.  Sure.  I'll ask it again.
3      You have no evidence that the blood or
4  tissue levels of any trace heavy metals are
5  higher in genital talc users compared to
6  nonusers; correct?
7          MS. PARFITT:  Objection.  Form.
8      A.  Yeah.  But I do know that there is
9  perineal talc application, and at least from the
10 documents I have reviewed, that, you know,
11 asbestos is present in talc, at least from the
12 documents I've reviewed, from the studies that
13 I've reviewed, and from a -- as you say, the
14 excerpts of the deposition.
15     And, you know, whether these are in blood
16 levels or, as you said, in the uterine tissue,
17 no, I don't know that.
18     Q.  Another Bradford Hill overview factor
19 is biological plausibility; right?
20     A.  Well, it's actually plausibility.
21     Q.  Plausibility means that a biological
22 mechanism exists; correct?
23     A.  Well, that's what we mean.  But if you
24 actually go back and read Bradford Hill, he was
25 talking even about social factors.  Yes, but, you

Page 187

1  know, we've gone forward and interpreted that as
2  biologic plausibility.
3      Q.  The biological mechanisms of cancer are
4  not your area of expertise; is that right?
5          MS. PARFITT:  Objection.
6      A.  Yes.  But, again, the question for me
7  was not, you know, to elucidate every precise
8  step either in the occurrence of ovarian cancer
9  or the talc installation into the development.
10     The precise question was, you know, the
11 epidemiology shows these findings.  Whatever is
12 the data in biology, does it support or does it
13 refute, you know, these findings in epidemiology?
14     Q.  On that topic, biologic plausibility,
15 you defer to other experts; is that right?
16         MS. PARFITT:  Objection.
17     A.  Yeah.  I would defer to other people
18 for more details on, you know, precise mechanisms
19 of ovarian cancer.
20     But I do have -- and I'm an epidemiologist.
21 I mean, I can't -- so that's why I just can't
22 look at whether it's Cramer or Penninkilampi or
23 Berge in isolation.  We have to look at the whole
24 evidence, including epidemiology, including --
25 but, yes, I can -- I have that experience to

Page 188

1  infer from whatever the biological evidence that
2  I've reviewed, that there's, you know, evidence
3  that supports biologic probability.  There are
4  some studies that, you know, don't support that
5  claim.
6      Q.  My question simply was if you defer to
7  other experts on the topic of biologic
8  plausibility.
9          MS. PARFITT:  Objection.
10     Q.  You do; correct?
11         MS. PARFITT:  Objection.  That's not
12 his testimony.
13     A.  I won't just defer to them.  I'm just
14 providing my own opinion.  Yeah.  I mean, they
15 can provide -- you know, it depends.  If it's a
16 plaintiff expert, a defense expert.  I mean, how
17 do I know?  I can't defer to somebody without
18 reading their opinion; right?
19     Q.  Is all ovarian cancer caused by the
20 same mechanism?
21     A.  No.  And neither is any kind of cancer.
22     Q.  Different subtypes of cancer have
23 different biological mechanisms; correct?
24     A.  Yes.  But we are dealing with biologic
25 plausibility.

Page 189

1      Again, I don't need to know the precise
2  biological mechanisms to arrive at a causal
3  opinion.
4      Q.  If talc is associated with all subtypes
5  of epithelial ovarian cancer, or with different
6  subtypes in different studies, doesn't that
7  suggest that the association is by chance?
8          MS. PARFITT:  Objection.  Misstates the
9  evidence.
10     A.  I mean, again, I don't know enough
11 details about the biologic plausibility of each
12 ovarian cancer subtype to say that, you know,
13 talc would be, by chance, alone.  I'd defer to,
14 you know, people who evaluate these.
15     Q.  There is no one biological mechanism
16 that could tie all of these subtypes together, is
17 there?
18     A.  I will defer to people with more
19 experience.  I don't know that.  What I know is
20 biological plausibility mechanisms that inform
21 the hypothesis that I was looking at.
22     Q.  How does talc reach the ovaries?
23     A.  Well, you know, talc migrates from, you
24 know -- my understanding and opinion is that, you
25 know, perineal application of talc, you know,

48 (Pages 186 to 189)

Sonal Singh, M.D., M.P.H.

Page 190

1  migrates upwards and upwards through the, you
2  know, vaginal canal and migrates to.
3     Q.  Is that an area of your expertise?
4     A.  Again, no.  But I have reviewed the
5  studies, several studies that -- some studies
6  that I cite, several studies that were added.
7  And it's quite well accepted, at least in the
8  gynecological community, that there's, you know,
9  particulate matter can migrate upwards.
10    Q.  What studies support the theory that
11 talcum powder applied externally migrates from
12 the perineal region to the ovaries?
13    A.  Again, I reviewed various studies on
14 migration.
15    Q.  Can you name them for me?
16    A.  I'm going to look at it.
17    Yeah.  So I cite several studies in this
18 section on migration.  And, again, this in the
19 context of biologic plausibility.  Is it
20 plausible that particulate matter, such as talc,
21 can migrate?  And, again --
22    Q.  What page are you looking at?
23    A.  Sorry.  57.
24    Q.  What studies are you relying on?
25    A.  Yeah.  So I'm relying on the studies

Page 191

1  described by, you know, Heller, 64.
2     Q.  Any others?
3     A.  65.
4     Q.  What is 65?
5     A.  I'll have to go take a look.
6     It's Henderson, I think, but I don't want
7  to -- these are big documents.  Yeah, it is
8  Henderson.
9     And then 66 is presence of talc in lymph
10 nodes and then --
11    Q.  Who is the author?
12    A.  Cramer.
13    And then supportive evidence of migration of
14 other, you know, particulate matter comes from,
15 you know, 68, 87 and --
16    Q.  68 is what?
17    A.  68 is Justin.
18    Q.  Eighty -- is it -- 87 is what?
19    A.  Ness.
20    Q.  Is who?
21    A.  Ness.  Ness 2000.
22    Q.  Cramer is a litigation consultant and
23 expert for plaintiffs in the talc litigation; is
24 that right?
25    MS. PARFITT:  Objection.

Page 192

1     A.  Yeah.  I know that.
2     Q.  Ness is an expert for plaintiffs in the
3  talc litigation; is that right?
4     MS. PARFITT:  Objection.
5     A.  I'm not aware of that.
6     Q.  So Justin, that dealt with glove
7  powder; is that right?
8     A.  Which one was that, 68?
9     Q.  68.
10    A.  Yes.
11    Q.  Isn't it true that that study did not
12 involve perineal use, but an exam with force to
13 the cervix?
14    A.  Yeah.  You know, and I'm relying on it,
15 again, for biologic plausibility.  It does not
16 involve talc.  So, you know, it's glove powder
17 in --
18    Q.  Isn't it true that they found some
19 particles in women who were examined with
20 powder-free gloves?
21    A.  Yes.
22    Q.  Heller, didn't Heller find talc in
23 tissues in all 24 patients, including the 12 who
24 did not use perineal talc?
25    A.  Yes.

Page 193

1     Q.  What is the evidence in the ovarian
2  tissues that have been studied of granulomatous
3  reaction which is what you would see if there was
4  a huge amount of talc?
5     A.  Well, I mean, I'm not opining that
6  there is a huge amount of talc, but others have
7  found talc in the ovaries.  I am just -- my
8  opinion is that it is biologically plausible.  I
9  mean, you know, the FDA has stated that it is
10 biologically plausible for particles, retrograde
11 particles to migrate.
12    And so I'm opining on that.  I'm not saying
13 that talc is in the ovaries and it's inducing
14 this granulomatous reaction.  I mean, these
15 people have found that it can occur.
16    And this is sufficient evidence for my
17 opinion to support on biologic plausibility.
18    Other studies, which I cite in my report,
19 which, you know, for example, monkey models,
20 couldn't, you know detect -- didn't detect
21 translocation.  So there are studies that don't.
22    Q.  Can you cite any article that shows
23 granulomas, fibrosis, or adhesions anywhere up
24 the reproductive tract of a woman as a result of
25 her external genital talc application?

49 (Pages 190 to 193)

Sonal Singh, M.D., M.P.H.

Page 194

1    MS. PARFITT:  Objection.  Form.
2    A.  I did not review those studies, if
3  there are.
4    Q.  In your report, you say that, "The
5  migration theory is supported by findings of a
6  deceased risk" -- strike that.
7    In your report, you say that, "The migration
8  theory is supported by findings of a decreased
9  risk of ovarian cancer with tubal ligation and
10  hysterectomy."  Pages 18 and 19.
11    Is that right?
12    A.  Yes.
13    Q.  Don't the studies pertaining to tubal
14  ligation show mixed results?
15    A.  No.
16    MS. PARFITT:  Objection.
17    A.  As far as --
18    MS. PARFITT:  Sorry.
19    A.  I mean, as far as I'm aware, you know,
20  tubal ligation and hysterectomy are protective
21  risk factors for ovarian cancer.
22    Q.  That's your opinion based upon your
23  review and analysis of the literature; is that
24  right?
25    A.  Yeah.

Page 195

1    Q.  Take a look at the Cramer article that
2  we referred to before, Exhibit 24.  This is
3  Cramer 2016.
4    Do you have that in front of you?
5    A.  Oh, my copy?
6    Q.  Yes.  You have a copy.
7    A.  Yes.  Which page?
8    Q.  Take a look -- well, Cramer found a
9  significantly greater association between talcum
10  powder use and ovarian cancer for women who had a
11  tubal ligation or hysterectomy.  Isn't that true?
12    A.  Where is that?
13    Q.  Look at the bottom of Page 337 of
14  Exhibit 24 to the top of page -- look at 337.
15    A.  And which table?
16    Q.  I'm sorry.  Look at the bottom of
17  Page 337, that carries over to the top of Page
18  339.  This is Cramer describing his results; is
19  that right?
20    A.  Yes.
21    Q.  Tell me if I'm reading this correctly,
22  and I'm starting at the bottom of Page 337.
23    "By test for interaction, Column 3, the
24  association was significantly greater for women
25  who were African American, had no personal

Page 196

1  history of breast cancer, had a tubal ligation or
2  hysterectomy, were pre-menopausal or were
3  post-menopausal and used HT."
4    Is that correct?
5    A.  Yeah.
6    Q.  So, in fact, Cramer did find a
7  significantly greater association between talcum
8  powder use and ovarian cancer for women who had a
9  tubal ligation; is that right?
10    A.  Yeah.  But my -- my point, in Page 57,
11  is that, you know, first of all, that's more than
12  just one Cramer.  There are several studies that
13  -- in inferring biologic plausibility, tubal
14  ligation and hysterectomy are protective of
15  ovarian cancer.  It is not that talc in this had
16  a higher risk among those.
17    I mean, those, again, those are not two
18  incongruent arguments.  I mean, Cramer is making
19  a separate argument that, in his study, he found
20  a higher risk among those who had tubal ligation
21  or hysterectomy.
22    Q.  If you're correct in the opinion that
23  you set forth in your report, you would have
24  expected the Cramer study to show a decreased
25  risk of ovarian cancer for women who had tubal

Page 197

1  ligation or hysterectomy; correct?
2    MS. PARFITT:  Objection.  Form.
3  Misstates his testimony.
4    A.  Yeah.  I mean, I don't -- I mean,
5  that's probably, in that study.  Yeah.
6    Q.  How do you account for the fact that
7  Cramer and the authors of this 2016 paper found a
8  significantly greater association among women who
9  had a tubal ligation or hysterectomy?
10    A.  I have no -- you know, you can find
11  different studies have different findings, but,
12  overall, we know that tubal ligation and
13  hysterectomy are protective.
14    Q.  The Gertig 2000 Nurses' Health Study,
15  that's also a study that you have reviewed; is
16  that right?
17    A.  Yes.
18    Q.  That study did not show a reduction of
19  ovarian cancer in talc users who have had a tubal
20  ligation; correct?
21    A.  Which page is that?
22    Q.  I'm just asking, based upon your review
23  of that study.
24    A.  I can't answer.  You know, there are so
25  many different -- can I ask for the Taher

50 (Pages 194 to 197)

Sonal Singh, M.D., M.P.H.

Page 198

1    appendix, because that actually breaks it down by
2    tubal ligation and hysterectomy.
3        You're asking very specific questions. I
4    need to have specific materials.
5        MR. TISI: I have them.
6        Q.  What are you asking for?
7        A.  You asked a question about tubal
8    ligation.
9        Q.  I understand. What are you asking
10   counsel for plaintiffs to get you?
11       A.  The Taher appendix.
12       Q.  You want to go back and look at the
13   Taher --
14       A.  Appendix. Because they did stratify
15   the analysis by hysterectomy and tubal ligation.
16       Q.  That's the 2018, unpublished paper; is
17   that right?
18       A.  Yes.
19       Q.  All right. Did the Houghton -- as
20   they're looking for this --
21       A.  Yeah. Sure.
22       Q.  Did the Houghton two thousand -- strike
23   that.
24       The Houghton 2014 study also did not show a
25   reduction of ovarian cancer in talc users who

Page 199

1    have had tubal ligation; correct?
2        A.  Again, you know, I don't want to agree
3    or disagree with you without just looking at it.
4    I don't think I comment on it.
5        Q.  Would you agree or can you agree that
6    both Gertig 2000 and Houghton 2014 were large
7    prospective cohort studies; right?
8        A.  Yeah. But we've already discussed
9    their limitation in terms of they were not
10   designed to study the talc ovarian cancer. They
11   had prevalent user biases. You know, they lost a
12   lot of users and cases of ovarian cancer. You
13   know, they had misclassification.
14       And, yes, they were large studies, but had
15   small number of ovarian cancer cases.
16       MR. KLATT: Objection. Nonresponsive.
17       MR. ZELLERS: Join.
18       Q.  You read the Ter Riet 2013
19   meta-analysis; is that right?
20       A.  Yes.
21       Q.  You rely on that; correct?
22       A.  Yes.
23       MS. PARFITT: Objection.
24       Q.  The Ter Riet 2013 meta-analysis also
25   did not show a reduction of ovarian cancer in

Page 200

1    talc users who had a tubal ligation; correct?
2        A.  I mean, I think I need to look at the
3    data. I think -- I don't have it. We are trying
4    to get it, so we'll have to wait.
5        I mean, you're asking me questions. I mean,
6    you have to show me documents. I mean --
7        Q.  Well, you made a statement in your
8    report --
9        A.  How can I make a statement in the
10   report around Taher, because it wasn't even
11   available at that time?
12       Q.  What I'm trying to do is ask you --
13       A.  Sure.
14       Q.  -- about the statement in your report,
15   where you say that, "Migration theory is
16   supported by findings of a decreased risk of
17   ovarian cancer with tubal ligation and
18   hysterectomy."
19       A.  And I'm just stating that I just need
20   to look at a figure in the Taher appendix and
21   then I'll be able to answer that. That's all.
22       Q.  Well, we saw that Cramer doesn't show
23   that; right?
24       A.  Yes.
25       Q.  You're not aware that Gertig 2000 or

Page 201

1    Houghton 2014 shows that. Are you?
2        MS. PARFITT: Objection. Misstates his
3    testimony.
4        A.  You have not shown me that. You have
5    not shown me documents to say one way or the
6    other.
7        Q.  When you did your analysis, didn't you
8    look at the studies to try to see if they
9    supported or refuted the points you were making?
10       A.  I -- you know, I did not look at every
11   subanalysis by, you know -- by whether it's, you
12   know, pre-menopausal, post-menopausal.
13       Q.  You cite Cramer 2016 as supportive of
14   your position and opinions.
15       A.  Sure.
16       Q.  Is that right?
17       A.  Well, again --
18       MS. PARFITT: Objection. Mis --
19       A.  I don't.
20       MS. PARFITT: Let me get my objection
21   in.
22       THE WITNESS: Sorry. Go ahead.
23       MS. PARFITT: No. My objection is in,
24   I think.
25       Q.  But then you ignore those portions or

51 (Pages 198 to 201)

Sonal Singh, M.D., M.P.H.

Page 202

1  parts of Cramer 2016, Gertig 2000, Houghton 2014,
2  Ter Riet 2013, Rosenblatt 2011, Wong 1999, Cook
3  1997, Harlow 1992, that don't support your
4  position.
5      MS. PARFITT:  Counsel completely
6  misstates his opinion.  The question misstates --
7      A.  I don't even know what was the
8  question, and I can't answer that because I don't
9  know what the question was.
10     Q.  The question is:  When you opined in
11 your report that the migration theory is
12 supported by findings of a decreased risk of
13 ovarian cancer with tubal ligation and
14 hysterectomy, did you pick out just a couple of
15 cases to look at and cite or did you try to see
16 if there was consistency to that finding across
17 all of the studies?
18     A.  Yeah.  So when I cite that, and you can
19 see the citation, I am trying to make an
20 inference about separate from talc use, and
21 ovarian cancer, you know, is hysterectomy and
22 tubal ligation protective of that.
23     So that's the inference.  It's not that each
24 of these studies, I'm trying to ignore, you know,
25 the studies that you mentioned.  I'm just trying

Page 203

1  to say, as you're looking at mechanisms, what
2  would happen with tubal -- I'm trying to do the
3  best to explain, tubal ligation and ovarian
4  cancer.
5      If, in the individual studies, yes, as in
6  Cramer, and if we see that in the other studies,
7  then, you know, they provide a different opinion.
8  But I'm trying to make an opinion, based on the
9  general knowledge of tubal ligation and
10 hysterectomy being, you know, protective.
11     Q.  Do you agree with me, to have a
12 scientifically valid opinion --
13     A.  Sure.
14     Q.  -- you need to look at all of or at
15 least the important studies; correct?
16     A.  Yeah.  I did look at these studies.
17     Q.  And, in fact, a number of the studies
18 that you cite in your report --
19     A.  Sure.
20     Q.  -- don't support your position;
21 correct?
22     MS. PARFITT:  Objection.  Form.
23     Support his position on tubal ligation?
24     Q.  Well, right now, we're talking about
25 migration, that the migration theory is supported

Page 204

1  by findings of a decreased risk of ovarian cancer
2  with tubal ligation and hysterectomy.
3      A.  Yeah.  But it doesn't talk about, you
4  know -- so if you look at the reference, in
5  case-control studies and meta-analysis, let's
6  look at the references.  You know, so, yes,
7  there's one.  And if -- let's look at --
8      Q.  Okay.  Can you cite one reference?
9      A.  Yeah.  Let's look at that.
10     Q.  All right.
11     A.  Then let's look at 115.  So when I cite
12 115, that's not even about talc.  That's about
13 tubal ligation and hysterectomy, in general, is
14 it -- you know, so taking talc out of the
15 equation, I'm trying to opine or understand
16 whether tubal ligation and hysterectomy are
17 protective factors, and then I can infer on talc,
18 yes, should only Ness have been cited?  Yes,
19 there are other studies otherwise.
20     Q.  And there are other studies, many
21 studies --
22     A.  Yes.
23     Q.  -- that do not support your position;
24 is that right?
25     MS. PARFITT:  Objection.  Form.  His

Page 205

1  position on tubal ligation?
2      MR. ZELLERS:  Yes.
3      MS. PARFITT:  Thank you.
4      A.  Yeah.  So it's -- it's -- I think
5  there's -- I mean, whether Ness and others should
6  have been cited there, that's a valid point.  But
7  when I make a point about tubal ligation and
8  hysterectomy, it's a general point on the, you
9  know, migration hypothesis.
10 BY MR. ZELLERS:
11     Q.  You should at least cite to or make
12 some reference --
13     A.  Yeah.
14     Q.  -- right, to the studies that do not
15 support that position?
16     A.  Yeah.  And I think that I have made it
17 in the individual sections, and I can try to look
18 for it, but it will take us time there.
19     Q.  Isn't there evidence that if tubal
20 ligation has a protective effect, the protective
21 effect in ovarian cancer stems from the fact that
22 the ligation procedure itself changes the
23 fallopian tube cells?
24     A.  I am not an expert --
25     MS. PARFITT:  Objection.

52 (Pages 202 to 205)

Sonal Singh, M.D., M.P.H.

Page 206

1    A.  -- in, you know, this area to provide,
2  you know, why it would do that.
3    Q.  Did you review or are you familiar with
4  Tiourin, T-I-O-U-R-I-N, a 2015 study?
5    A.  Did I cite that?  I don't remember.
6    Q.  Are you -- is that study familiar to
7  you?
8    A.  I just can't remember the names.  There
9  are so many studies.  If you show it to me, I
10  can --
11    Q.  I'll show it to you.  You can tell me
12  if it's familiar to you.  And if it's not, I'll
13  move on.
14       (Article entitled "Tubal
15       Ligation Induces Quiescence in the
16       Epithelia of the Fallopian Tube Fimbria"
17       marked Exhibit 25.)
18      MR. ZELLERS:  25 is the --
19    A.  No, it's not.  I don't know about.
20  BY MR. ZELLERS:
21    Q.  For the record, 25 is a 2015 study by
22  Tiourin, T-I-O-U-R-I-N.
23    That's not a study that you reviewed or
24  considered; is that right?
25    A.  You know, I have to go through all the

Page 207

1  references, but I can't recall straight off
2  whether it does.
3    Q.  If talcum powder migrates from the
4  perineal region to the ovaries, shouldn't
5  exposure to talc be far greater in concentration
6  in the rectal, vulvar, vaginal, cervical and
7  uterine tissues?
8      MS. PARFITT:  Objection to form.
9    Q.  Because those are closer to the area of
10  initial exposure?
11      MS. PARFITT:  Same objection.
12    A.  Yes.  So, again, my -- I did not
13  examine, you know, which areas of -- now, as an
14  epidemiologist, I examine general exposures to,
15  you know, products and their associations.
16  Whether, you know, we want to know, yes, route of
17  exposure, whether it's perineal application.
18    But, you know, the evidence that I examined
19  was, you know, I did not distinguish within
20  whether it was perineal or vaginal, vulvar.  That
21  would have been different.
22    Q.  Let's go step by step.
23    You do agree that if talcum powder migrates
24  from the perineal region to the ovaries, the
25  exposure to talc would be far greater in

Page 208

1  concentration in the rectal, vulvar, vaginal,
2  cervical, and uterine tissues which are closer to
3  the area of the initial exposure; correct?
4      MS. PARFITT:  Objection.  Misstates his
5  testimony.
6    A.  I just don't have an opinion in terms
7  of where it will be high or low.  Because that's
8  not my area of expertise.
9    Q.  Talc particles should be causing
10  inflammation in all those organs and areas;
11  correct?
12      MS. PARFITT:  Objection.
13    A.  Again, that's -- that's, you know, I'm
14  opining on biological plausible mechanisms of
15  talc-induced ovarian cancer.  I didn't look at,
16  you know, whether it's vaginitis or vulvar or
17  whether it's, you know, rectal inflammation.  And
18  that's not my area of expertise again.
19    Q.  In fact, there are no studies that show
20  inflammation as a result of genital talc use in
21  any of those areas; correct?
22      MS. PARFITT:  Objection.  Misstates the
23  evidence.
24    A.  Again, I have not -- you know, my
25  testimony and report on talcum powder products

Page 209

1  and inflammation is looking at, are there
2  biological plausible mechanisms.
3    And, again, if there's no studies that
4  provide that talc, in and of itself, causes
5  inflammation, then there are no studies.  But,
6  you know, but there's still biologic
7  plausibility.
8      MR. KLATT:  Objection.  Unresponsive.
9    Q.  Are there any studies that you are
10  aware that show a link between external genital
11  talc use and rectal, vulvar, vaginal, cervical,
12  or uterine cancer?
13      MS. PARFITT:  Asked and answered.
14  Objection.
15    A.  I'm not aware of those.  I have not
16  reviewed those studies.
17    Q.  As part of your report, you discuss a
18  study published by Huncharik and others in 2007;
19  is that right?
20    A.  Yes.  Let's bring it out, I mean, if
21  you want to talk about that.
22    Q.  I believe it's on Page 26 of your
23  report.
24    A.  Sure.
25    Q.  Huncharik 2007 is a meta-analysis of

53 (Pages 206 to 209)

Sonal Singh, M.D., M.P.H.

Page 210

1   studies on the relationship between ovarian
2   cancer and using diaphragms that are dusted with
3   talcum powder; is that right?
4       A.  Yes.
5       Q.  A diaphragm is inserted directly onto a
6   woman's cervix; is that right?
7       A.  Yes.
8       Q.  On Page 26 of your report, you say
9   that, "This meta-analysis is flawed because it
10  only focuses on powder-dusted diaphragms";
11  correct?
12      A.  Well, no.  That's not the only flaw.  I
13  mean, there are several other flaws, including
14  exclusion of loss category, data extraction
15  analysis, which is, you know, really inclusion of
16  inability studies that did not disaggregate.
17      I mean, the question is if you're asking
18  about perineal exposure, yes, perineal --
19  diaphragms is one route of exposure.  But that's
20  not the only route of exposure that you should be
21  concerned about.
22      Q.  Do you state in your report, "The most
23  important limitation with the Huncharik 2007
24  meta-analysis was its exclusive focus on talc
25  powder-dusted diaphragms as the route of

Page 211

1   exposure, which could not inherently address the
2   causal question of whether genital talcum powder
3   dusting is associated with increased risk of
4   ovarian cancer"?
5       Is that what you said?
6       MS. PARFITT:  Counsel, do you have a
7   copy of the -- otherwise, may I show him the
8   Huncharik study so he's got it in front of him?
9       MR. ZELLERS:  I'm just asking general
10  questions right now.  That was just a question,
11  does he say that in his report.  If he needs to
12  review the study, then he can look at the study.
13      MS. PARFITT:  I would appreciate that.
14      MR. ZELLERS:  Sure.
15      MS. PARFITT:  I just didn't want to
16  pass something to him without your permission.
17      A.  Yeah.  I do state that.
18      Q.  You say that, "Studies on the use of
19  talcum powder-dusted diaphragms cannot address
20  the question of whether perineal use is
21  associated with an increased risk of ovarian
22  cancer"; correct?
23      A.  Where is that?
24      Q.  It's what we just read.
25      A.  No.  It doesn't mean that.  It just

Page 212

1   means that you cannot exclusively focus on one
2   route of exposure.  So it does not mean that it
3   cannot in and of itself.  You have to look at
4   perineal-dusted diaphragm.  You have to look at,
5   other, you know, perineal applications.
6       Q.  So putting aside inhalation for the
7   moment, your opinion is that talcum powder
8   travels from the perineal region to the ovaries
9   through the woman's reproductive tract; is that
10  right?
11      A.  I mean, I don't even know through the
12  ovaries.  I know it migrates upwards.  That's,
13  you know, my opinion.
14      Q.  So talcum powder must travel past the
15  labia, through the vagina, through the cervix,
16  and then to the uterus; is that right?
17      A.  Yes.  It migrates upwards through the
18  vagina, you know, the tract.
19      Q.  And then the powder travels through the
20  uterus and into the fallopian tubes to reach the
21  ovaries; is that right?
22      A.  Well, I mean, I'm not -- again, I don't
23  intend to elucidate, you know, the precise link
24  that a study has shown that talcum powder -- I
25  think we answered this earlier, I answered this

Page 213

1   earlier -- that I am not aware of one study that
2   shows that.  But, you know, several shows that
3   talc ends up in the ovaries.
4       Q.  Well, given how talc, talcum powder
5   must travel to reach the ovaries, how can you
6   exclude data about the relationship between
7   ovarian cancer and talcum powder that is applied
8   directly to the cervix?
9       MS. PARFITT:  Objection.  Misstates his
10  testimony.
11      A.  Nobody is excluding data.  So this is
12  not exclusion of this data.
13      But I am saying that this particular
14  question of talc-dusted diaphragms, A, is an
15  exclusive focus on one route of exposure, so it
16  does not answer the causal question about
17  perineal exposure.
18      And, two, it is not excluded.  It's included
19  and discussed and several flaws are noted,
20  including, you know, data extraction errors for
21  the most part, inclusion of studies.
22      And so -- and as you can see in my
23  methodological rating of meta-analyses, it is
24  weighted differently than others.  So it is not
25  excluded.

54 (Pages 210 to 213)

Sonal Singh, M.D., M.P.H.

Page 214

1    Q.  But you state, as the most important
2  limitation of the Huncharik 2007 study, is the
3  exclusive focus on talc powder-dusted diaphragms.
4    A.  Yeah.
5    Q.  And those diaphragms are applied
6  directly to the cervix; is that right?
7    A.  Yeah.  Because -- because of its
8  exclusive focus.  If the study had, you know,
9  other routes of exposure, yeah.
10    What I'm trying to say is its exclusive
11  focus on one route of exposure cannot -- if
12  you're just asking the question about dust,
13  dusted diaphragm, then don't make inferences
14  about perineal routes of exposure.  You have to
15  look at broader exposures.
16    Q.  On what studies are you relying to say
17  that talcum powder affects the body differently
18  when it is applied to the perineal region and
19  travels to the cervix compared to when it is
20  applied directly to the cervix?
21    A.  I have not made a distinction between
22  those studies.
23    Q.  And, in fact, when applied to the
24  perineal region, the talcum powder would also be
25  in close contact with a woman's urethra; is that

Page 215

1  right?
2    MS. PARFITT:  Objection.  Form.
3    A.  Yeah.  I mean, anatomically.
4    Q.  Substances are capable of traveling up
5  the urethra; correct?
6    A.  I mean, yes.  Just as we agree that,
7  you know, talc can migrate upwards, substances
8  can migrate through the urethra.  If you agree
9  talc can migrate upwards, then, you know,
10  substances can migrate through the urethra.
11    Q.  Women get urinary tract infections when
12  bacteria travels up the urethra; correct?
13    A.  Yeah.
14    Q.  But studies do not show an increase in
15  bladder cancer with talcum powder use, do they?
16    MS. PARFITT:  Objection to form.
17    A.  I did not ask the causal question about
18  that.  And, you know, I have not evaluated.
19  Maybe there are studies that show decreased risk
20  for all that I know.  I just can't answer that
21  question.
22    Q.  And studies do not show an increase in
23  rectal cancer with talcum powder use; is that
24  right?
25    A.  I don't answer the questions that I

Page 216

1  don't know anything about.  I don't -- you know,
2  I haven't reviewed it to answer that question.
3    Q.  Do you have an opinion on whether
4  inhaled talc can migrate to the ovaries?
5    A.  Yeah.  I mean, I think the primary
6  route of exposure is, you know, reproductive, but
7  there are some potential, I would say, you know,
8  potential plausible mechanisms that, you know,
9  when perineal application is applied, it can get
10  inhaled through the lungs and potentially reach
11  the ovaries.  But I think that that mechanism is
12  probably not as plausible as the reproductive
13  mechanism.
14    Q.  Well, in fact, studies of talcum powder
15  use failed to show a statistically significant
16  association between nongenital use of talcum
17  powder and ovarian cancer; correct?
18    MS. PARFITT:  Objection.  Form.
19    A.  Yeah.  And I've cited those studies.
20    Q.  If inhaled talc could migrate to the
21  ovaries, wouldn't you expect to see increased
22  ovarian cancer risk with nongenital use of talcum
23  powder?
24    MS. PARFITT:  Objection.
25    A.  Well, I mean, it also depends on, you

Page 217

1  know, the quantity of inhalation, the degree of
2  talc that's -- and I don't know enough about that
3  to say that, yes, there's a sufficient quantity,
4  you know, migration to cause that.  I don't know
5  which studies have evaluated sort of inhaled talc
6  and ovarian cancer.
7    Q.  Well, let's look back at Cramer 2016,
8  Page -- or Exhibit 24.  Do you have that in front
9  of you?
10    A.  Yeah.
11    Q.  In that study, Cramer found no apparent
12  risk associated with nongenital talc use; isn't
13  that correct?
14    A.  Yeah.  And I think I cite that in my
15  report, too.
16    Q.  You don't disagree that Cramer, in his
17  study, 2016, did find no apparent risk associated
18  with nongenital talc use; correct?
19    A.  Yeah.
20    Q.  The same result was found in the pooled
21  analysis that was done by OCAC, Ovarian Cancer
22  Association Consortium; is that right?
23    MS. PARFITT:  Objection.  Which study
24  are you referring to?  What year?  There have
25  been many studies by OCAC.

55 (Pages 214 to 217)

Sonal Singh, M.D., M.P.H.

Page 218

1        MR. ZELLERS: I'm referring to Page 341
2   of the Cramer article. Page -- strike that.
3        The second and third paragraphs.
4   BY MR. ZELLERS:
5        Q.   Tell me when you have that, Doctor.
6        A.   341.  Discussion?
7        Q.   Yes.  So in the second and third
8   paragraph, I'm reading the second sentence.
9   "Talc use regularly" -- strike that.
10       "Talc used regularly in the genital area was
11   associated with a 33 percent increase in ovarian
12   cancer risk overall while no apparent risk was
13   associated with talc used only in nongenital
14   areas."
15       A.   Yeah.  And I agree with their opinion.
16       Q.   All right.  Do you also agree with the
17   next sentence?  "Our results are consistent with
18   the recent pooled analysis from the OCAC which
19   reported that use of powder on genitals is
20   associated with a 24 percent increased risk and
21   no effect of nongenital use of talc."
22       A.   Yeah.
23       Q.   Have you ever performed any study
24   yourself pertaining to whether inhaled talc can
25   migrate to the ovaries?

Page 219

1        A.   No.  And I would have a different job.
2   That's not my area of expertise.
3        Q.   And you can't, as we sit here, cite me
4   to such a study; correct?
5        A.   Well, I don't know if it's -- I'll go
6   back to my report and just cite that -- that
7   Dr. Luongo, you know, has done analyses which say
8   that inhaled talc can migrate.
9        Q.   You're not expressing that opinion here
10   today; correct?
11       A.   No.  I'm not.  I'm not vouching for his
12   testimony.
13       Q.   Assuming baby powder can reach the
14   ovaries, what is the method by which baby powder
15   causes ovarian cancer?
16       A.   So, yeah.  I mean, we talked about, you
17   know, potential biological mechanisms of
18   inflammation.
19       And, again, I don't -- in my inference on
20   biologic plausibility, I don't intend to offer
21   the opinion that, A, I know the precise
22   biological mechanisms which cause biological --
23   ovarian cancer or the precise steps by which talc
24   causes it.
25       But, you know, there are several, you know,

Page 220

1   mechanisms that have been shown in terms of
2   increase in, you know, inflammatory enzymes, and
3   increase in alterations of redox potential that
4   are some of the potential plausible biological
5   mechanisms.  Again, other people who are
6   biological experts will opine on them and detract
7   from the strengths and weaknesses.
8        Q.   You have not done an expert review of
9   inflammation evidence yourself; correct?
10       A.   When you say -- I mean, expert review
11   of inflammation.
12       MS. PARFITT:  Object.
13       Q.   You're deferring to other experts on
14   the topic and subject of inflammation; is that
15   right?
16       MS. PARFITT:  Objection.
17       A.   Yeah.  I mean, other experts, I mean, I
18   can look at the evidence and see, A, one, that
19   inflammation plays a role in cancer.  Two,
20   inflammation plays a role in ovarian cancer.
21       At least my opinion is that, you know, talc
22   can, you know, induce inflammation; others will
23   provide more detailed opinion.
24       Q.   In terms of the mechanism by which
25   ovarian cancer may or may not be related to

Page 221

1   inflammation, you are deferring to other experts;
2   correct?
3        MS. PARFITT:  Objection.  Misstates his
4   testimony.  He just told you --
5        MR. ZELLERS:  I'm asking him the
6   question.  Okay?
7        MS. PARFITT:  Counsel, he did answer
8   it.  And you just asked the question again and
9   you misstated what he said.
10       MR. ZELLERS:  Ms. Parfitt, please.  I
11   thought we had a discussion.
12       MS. PARFITT:  We did.
13       MR. ZELLERS:  We ought not to have
14   speaking objections.
15       MS. PARFITT:  We don't.  But I'll tell
16   you the discussion we did have.  You can't
17   misstate --
18       MR. ZELLERS:  I'm allowed to ask the
19   witness what his opinions are and are not.
20       MS. PARFITT:  Absolutely.  But not to
21   misstate them.  That's all.  Let's ask it again.
22       THE WITNESS:  I'm sorry.  I forgot.
23       MR. ZELLERS:  It was a question.
24       THE WITNESS:  What was the question?
25       MR. ZELLERS:  Can you read the

56  (Pages 218 to 221)

Sonal Singh, M.D., M.P.H.

Page 222

1  question?
2       MS. PARFITT:  Listen carefully to the
3  question.
4       MR. ZELLERS:  Okay.  Again,
5  Ms. Parfitt, let the witness handle himself.
6  He's an experienced, capable person.
7       MS. PARFITT:  Yes.  I would certainly
8  both agree with that.  He's quite good.
9       (The question was read by the
10      reporter, as requested.)
11      MS. PARFITT:  Objection.  Misstates his
12  testimony.
13      A.  No.  To the extent that my causal
14  question needs -- you know, evaluated the
15  evidence on the link between, you know,
16  inflammation, ovarian cancer and talc and
17  inflammation, I can opine that, you know, this
18  link supports my causal opinion.  Whereas, to the
19  precise details of such a link, I would obviously
20  defer to other experts.
21  BY MR. ZELLERS:
22      Q.  Not all inflammatory conditions lead to
23  cancer; correct?
24      A.  Yes.  And there are pro-oxidant
25  conditions and there are antioxidants.  And I

Page 223

1  examined the evidence which relates to if there
2  were -- you know, if talcum powder products, for
3  example, had antioxidants or, in the Saed study,
4  they increased the level of antioxidant enzymes,
5  then that would be evidence against the link
6  between redox potential and talc and ovarian
7  cancer.  So there are various pieces of the
8  evidence.
9       Q.  All of us experience inflammatory
10  reactions of one sort or another, including
11  chronic conditions, and they do not all lead to
12  cancer; correct?
13      MS. PARFITT:  Objection.  Form.
14      A.  Yeah.  But it's the balance of -- you
15  know, that is altered between pro-inflammatory
16  and anti-inflammatory conditions and the
17  pro-oxidant state and the antioxidant state in my
18  understanding that, you know, is a plausible
19  mechanism for talc in ovarian cancer.  Again,
20  based on my understanding.  Others will provide
21  details.
22      Q.  Rheumatoid arthritis is an inflammatory
23  condition; right?
24      A.  Heart disease is -- everything is
25  inflammation.

Page 224

1       Q.  Rheumatoid arthritis doesn't increase
2  the risk of ovarian cancer, does it?
3       A.  I don't know that question.  I have not
4  evaluated it.
5       Q.  Psoriasis does not increase the risk of
6  ovarian cancer, does it?
7       A.  For all, it could.  We don't know that.
8  We can spend time reviewing that.  We can't
9  answer questions.
10      Q.  We're here to talk about the science;
11  correct?
12      A.  Yeah.  So the science, you have to
13  look -- I haven't looked at psoriasis and cancer.
14  I haven't looked at, for example, rheumatoid
15  arthritis increases cardiovascular disease,
16  because I've looked at it.  I can't answer
17  questions that I haven't looked at.
18      Q.  Have you done an expert review of the
19  role of inflammation in causing ovarian cancer?
20  Have you personally done that review?
21      A.  No.  I have just looked at, you know,
22  what is the role of inflammation in ovarian
23  cancer, and are there plausible biological
24  mechanisms that either support or refute whether
25  talc can induce inflammation.

Page 225

1       Q.  How does an acute inflammatory response
2  lead to cancer?
3       A.  Yeah.  I mean, and I'm not making a
4  case for an acute inflammatory.  I'm not sure.
5  Did I state that?  You know, this is a chronic
6  inflammatory process.
7       Q.  What evidence is there that externally
8  applied talcum powder causes chronic
9  inflammation?
10      A.  Yeah.  I mean, you know -- can you give
11  me a second?
12      Q.  Sure.
13      A.  Yeah.  I'm not aware of a study that
14  talc specifically itself causes chronic
15  inflammation.
16      Q.  There are no reports in the literature
17  of externally applied talc leading to
18  inflammation, granulomas, fibrosis or adhesions
19  anywhere along a woman's reproductive tract;
20  correct?
21      MS. PARFITT:  Objection.
22      A.  There are other studies that,
23  you know, not externally applied.
24      Q.  If up to 50 percent of U.S. women have
25  used genital talc, shouldn't this be a common

57 (Pages 222 to 225)

Sonal Singh, M.D., M.P.H.

Page 226

1  finding?
2       MS. PARFITT: Objection. Form.
3       A.  So I'll step back and share with you
4  what epidemiology.
5       Yeah.  I mean, ovarian cancer, the incidence
6  of ovarian cancer is, what, 11 by 100,000.  It's
7  a very rare cancer.  Even if 50 percent use it,
8  you know, it increases, you know, it affects it.
9       So we are not -- nobody is saying that,
10 yeah, every woman who gets talc will get it.  So
11 just because there's an increased risk with talc,
12 how much of the U.S. population should get
13 ovarian cancer is a different question.  That's
14 not what I estimated.
15      That's -- you're asking a question about
16 attributable risk and population attributable
17 risk.  Some have attributed it to 10 percent,
18 40 percent.  I haven't done that estimation.
19      MR. KLATT:  Move to strike.
20 Nonresponsive.
21      MR. ZELLERS:  Join.
22      Q.  Granulomas, fibrosis or adhesions don't
23 cause ovarian cancer; correct?
24      MS. PARFITT:  Objection.
25      A.  I'm not aware of precise biological

Page 227

1  mechanisms of, you know, ovarian cancer.
2       Q.  Isn't the theory of inflammation as a
3  cause of ovarian cancer an unproven hypothesis?
4       MS. PARFITT:  Objection.
5       A.  Well, it's a plausible hypothesis that,
6  you know -- and it's well accepted that, you
7  know, one of the mechanisms is inflammation.
8       Q.  It's still unproven; correct?
9       MS. PARFITT:  Objection. Misstates
10 testimony.
11      A.  Well, I'm not -- my standard wasn't
12 looking at absolute certainty that, A, talc
13 induces inflammation, and inflammation causes
14 ovarian cancer.  I'm looking for evidence for or
15 against whether inflammation, you know, induces
16 or reduces ovarian cancer.
17      Q.  What studies or evidence do you cite in
18 your report against the proposition or theory
19 that inflammation is a cause of ovarian cancer?
20      A.  Yeah.  I think -- I'm sorry.  The
21 question was what studies --
22      Q.  You told me it was important to cite
23 both the studies that support your position and
24 also the studies that refute your position; is
25 that right?

Page 228

1       A.  Yeah.  And I think it's the studies on
2  NSAIDs.  I don't remember the precise -- I don't
3  know if -- yeah.  It's Ness or --
4       Q.  I will and do intend to ask you a few
5  questions about NSAIDs and about some of those
6  studies.
7       A.  I think that's where --
8       Q.  Well, let me talk about or ask you a
9  question about a study that you do cite in
10 support of your inflammation opinion.  You rely
11 on -- is it Saed 2018 article?
12      A.  Yes.
13      MR. ZELLERS:  I'll hand you the Saed
14 2018 paper.
15      (Article entitled "New Insights
16 into the Pathogenesis of Ovarian Cancer:
17 Oxidative Stress" marked Exhibit 26.)
18      MS. PARFITT:  Thank you.
19      MR. ZELLERS:  We'll mark that as
20 Deposition Exhibit 26.
21 BY MR. ZELLERS:
22      Q.  This is a study that you cite in
23 support of your position; is that right?
24      A.  I don't know if I cite it as a support
25 of my position.  I cite it as an article that

Page 229

1  shares insight into the parthenogenesis of
2  ovarian cancer.  I mean, you know, he's the
3  expert and he'll form his opinion.
4       So it's a study cited in my report.  In
5  fact, I won't even be able to discuss the details
6  of that study with you.
7       Q.  You're not comfortable discussing the
8  details?
9       A.  Yeah.  I mean --
10      MS. PARFITT:  Objection.
11      A.  -- you can ask a question and I'll try
12 to answer to the best of my ability.  And if I
13 won't, I'll be able --
14      Q.  The point is, this is really an area
15 for other experts; agreed?
16      A.  Yes.  This is an area for other
17 expertise.
18      Q.  Saed, that paper just looked at
19 immortalized cell lines; is that right?
20      MS. PARFITT:  Objection.  Form.
21      A.  Yes.
22      Q.  The authors do not identify what either
23 the positive or the negative controls were; is
24 that right?
25      MS. PARFITT:  Objection.

58 (Pages 226 to 229)

Sonal Singh, M.D., M.P.H.

Page 230

1    A.  So is this the study or is this just
2  their review article?
3    Q.  This is the paper that you cite to in
4  your report.
5    A.  Can you point out in my report which
6  reference number is that?  I know I've cited
7  them, but I'm just trying to orient myself.
8    Q.  Are you familiar with this paper?  Have
9  you looked at it before?
10    A.  Yes.  I have looked at this paper, but
11  they also have other abstracts and other papers.
12  I think that's what I was relying on.
13    Yeah.  So I'm relying on this and 125, Saed.
14    Q.  The authors in this paper that you
15  support -- strike that -- that you cite and are
16  relying on do not identify what either the
17  positive or the negative controls were; correct?
18    MS. PARFITT: Objection.  Misstates the
19  evidence.
20    A.  Let me just look at 125, and then I'll
21  answer the question.
22    No.  That's not 125.
23    Q.  I'll move on and ask another question.
24    A.  Sorry about that.
25    Q.  That's all right.

Page 231

1    Saed references unpublished data; correct?
2    MS. PARFITT: Objection.
3    A.  Yeah.  And I've just been informed by
4  counsel that it has been accepted for
5  publication, but the data that I -- that I
6  referenced were, you know, at the time, available
7  as abstracts.
8    Q.  Saed referenced -- references
9  unpublished data that you rely on in coming up
10  with at least some of the opinions in your
11  report; is that right?
12    A.  Yeah.  I mean, it's one of the, you
13  know, number of studies that I reviewed.  It's
14  not the only study on, you know, on biological
15  mechanisms.
16    Q.  Why doesn't inflammation generally, for
17  example, in pelvic inflammatory disease, cause
18  ovarian cancer?
19    A.  Again, that's not -- you know, that is
20  not -- I'm not going to be opining on the precise
21  mechanisms of ovarian cancer in my testimony or
22  my report.  That's not my area of expertise.
23    Q.  Why don't NSAIDs and aspirin use, which
24  supposedly reduce inflammation, consistently
25  reduce the incidence of ovarian cancer in chronic

Page 232

1  users?
2    A.  Yeah.  So I don't know if that's
3  consistently.  But as I mentioned earlier, and I
4  may have cited it in this study, that when I
5  talked about Ness, and I'm trying to find it,
6  but, yes, there is, you know, NSAIDs have not
7  been -- they don't consistently reduce the risk
8  of ovarian cancer, but in some studies, they have
9  shown to reduce the risk of ovarian cancer.
10    Q.  If, in fact, inflammation was a
11  causative factor in ovarian cancer, and if NSAIDs
12  and aspirin use reduce inflammation, wouldn't you
13  expect some consistency in the studies that would
14  show NSAIDs and aspirin use reduced the incidence
15  of ovarian cancer?
16    A.  So, first of all, you're asking a broad
17  question.  Inflammation.  What do you mean by
18  that?
19    And I don't know -- yeah.  Exactly.  So I
20  don't know the precise biological mechanisms of
21  ovarian cancer.  And just because the ovarian
22  cancer-mediated inflammation is different from,
23  you know, anti-inflammatory, so both may be
24  entirely consistent, I'm not saying they are, but
25  both mechanisms, you could have NSAID-induced

Page 233

1  reduce inflammation and NSAID-induced increase
2  inflammation.  That's just not what -- that area
3  where other people will provide, you know, more
4  testimony.
5    Q.  If inflammation is the issue, why would
6  cornstarch be a superior alternative to talc?
7    MS. PARFITT: Objection.  Form.
8    Q.  And to give you context, the FDA banned
9  the use of cornstarch on surgical gloves because
10  of the risk of inflammation, granulomas,
11  fibrosis, adhesions and irritation; is that
12  right?
13    A.  I'm not aware of all the particular,
14  you know, regulatory actions on cornstarch.
15    Q.  Take a look at the FDA 21 C.F.R. parts
16  878, 880, and 895.
17    MR. ZELLERS: We'll mark that as
18  Deposition Exhibit 27.
19    (Federal Register, Vol. 81, No.
20    243 marked Exhibit 27.)
21  BY MR. ZELLERS:
22    Q.  If you look at the second page, first
23  paragraph, last sentence, so I'm under executive
24  summary.  The last sentence in the last full
25  paragraph.

59 (Pages 230 to 233)

Sonal Singh, M.D., M.P.H.

Page 234

1    "However, the use of powder on medical
2    gloves presents numerous risks to patients and
3    healthcare workers, including inflammation,
4    granulomas, and respiratory allergic reactions."
5        Did I read that right?
6        A.  Yeah.
7        MS. PARFITT:  Do you know where it is?
8    Mm-hmm.
9        A.  Okay.
10       Q.   Why, then, given that, would cornstarch
11   be considered a superior alternative to talc?
12       MS. PARFITT:  Objection.  Form.
13       A.  Am I -- did I state in my -- I mean,
14   you know, I'm not evaluating the causal role of
15   cornstarch and, you know, its role in ovarian
16   cancer.  I'm not even aware of the existence of
17   this document and what it pertains to.
18       I don't see any reference to cornstarch
19   here.  I don't evaluate how they regulate various
20   products, whether it's food or cornstarch.
21       Q.   Are you familiar with the term
22   "confounding"?
23       A.  Yes.
24       Q.   That's where the presence of another
25   association confuses the relationship between the

Page 235

1    exposure and disease being studied; correct?
2        A.  I don't -- I don't think that's the
3    definition of confounding.
4        Q.   What is wrong with that definition?
5        A.  Confusion is not an epidemiologic term.
6    There's no such thing as confusion in
7    epidemiology.  You have bias.  You have
8    misclassification.  You have measurement error.
9        Confounding is a case where you have a
10   variable that's related to the outcome and
11   that's, you know, maybe associated with the
12   exposure and is not on the causal pathway between
13   exposure and outcome.
14       And, you know, it creates an artifactual
15   relationship between exposure and outcome.
16       Q.   Confounding and confusion are similar
17   terms; correct?
18       A.  No.  They're not.  Confounding is a
19   scientific term.  Confusion is layman from that.
20   I don't think it has -- at least in my term, I
21   don't --
22       Q.   So you disagree that confounding
23   relates to the presence of another association
24   which potentially confuses the relationship
25   between the exposure and disease being studied;

Page 236

1    is that right?
2        A.  I don't disagree -- what I am trying to
3    define precisely confounding is that, you know,
4    it creates a different relationship, had the
5    confounder not been present, and I'm just trying
6    to say how it does that.
7        It's associated with the outcome.  It's
8    associated with the exposure and not, you know,
9    and not on the --
10       Q.   Let's use an example, so we're sure
11   we're talking about the same thing.
12       If you are studying the association between
13   coffee and pancreatic cancer, you need to be
14   mindful of whether cigarette smoking is more
15   common in coffee drinkers than in the rest of the
16   population; correct?
17       A.  Yes.
18       Q.   Cigarette smoking could be a confounder
19   in that situation; is that true?
20       A.  Well, so there are several parts to
21   that.  Just because it's more common in coffee
22   drinkers does not make it a confounder.  To make
23   a confounder, you have to have three specific.
24   What you're talking is, yeah, it's associated
25   with coffee.  But is it associated with

Page 237

1    pancreatic cancer?  Is it on the causal pathway?
2        So a confounder is a very precise
3    epidemiologic term.  It's not just everything we
4    pull off the air and say because it's associated
5    with the coffee, it becomes a confounder.
6        Q.   Listen to my question.
7        A.  Sure.
8        Q.   Cigarette smoking could be a confounder
9    in my hypothetical; right?
10       A.  If it was associated with pancreatic
11   cancer and not present in the causal pathway and,
12   obviously, associated with coffee.
13       Q.   Because if more coffee drinkers are
14   smokers than non-coffee drinkers --
15       A.  It could be the other way around.
16       Q.   Exactly.  An association between coffee
17   drinking and pancreatic cancer might be due to
18   smoking and not the coffee drinking; correct?
19       A.  Yes.
20       Q.   Confounding can distort results in
21   epidemiological studies; is that right?
22       A.  Yes.  And you have to adjust for
23   confounding.
24       Q.   Residual confounding is possible in
25   every occupational study; is that right?

60 (Pages 234 to 237)

Sonal Singh, M.D., M.P.H.

Page 238

1        MS. PARFITT:  Objection.
2        A.  Sorry.  Can you repeat the question?
3        MS. PARFITT:  Here it is.
4        Q.  Sure.  Residual confounding is possible
5    in every observational study; correct?
6        A.  Observational.  Yeah.
7        It is possible; right?  Is that what you
8    said?
9        Q.  Yes.
10        A.  Yeah.  Residual confounding is possible
11    because you can't measure, you know, every
12    variable that you can think of.
13        Q.   And unmeasured confounders may be
14    present in every observational study; correct?
15        A.  Yeah.  There's always the potential for
16    unmeasured confounding.  It doesn't mean that it
17    exists.
18        Q.   It's impossible to say that all known
19    and unknown confounding factors have been
20    controlled for in any given study; correct?
21        A.  You don't -- you know, what you don't
22    know, you can't control for.
23        Q.  In this case, new factors possibly
24    involved in ovarian cancer are just being
25    published in the literature; is that right?

Page 239

1        MS. PARFITT:  Objection.  Vague.
2        A.  Yeah.  I don't -- I don't know what
3    you're like -- just give me an example so I
4    can --
5        Q.  Okay.  History of chlamydia infection
6    and history of weight gain during adolescence are
7    two recent examples that are being published in
8    the literature as factors possibly involved with
9    ovarian cancer; correct?
10        MS. PARFITT:  Objection.  Form.
11        A.  I haven't seen them.  But I mean,
12    weight gain has been adjusted for in several of
13    the analyses.  So I don't know about that.  Yeah.
14        Q.  Well, let's assume --
15        A.  We're talking about chlamydia.
16        Q.  Let's assume that that's correct.
17        Those factors, history of chlamydia
18    infection and history of weight gain during
19    adolescence, those factors were not controlled
20    for in any of the published talc-ovarian cancer
21    studies, were they?
22        MS. PARFITT:  Objection.  Form.
23        A.  Yeah.  So if they're not known, first
24    of all, you have to evaluate and, you know, is
25    that a true -- true association?

Page 240

1        But most importantly, just because, A, first
2    of all, are they associated with the outcome?
3    Then you have to ask, are they causally
4    associated, and they would have to be associated
5    with the exposure talc to be considered a
6    confounder, just because they're a risk factor.
7    Every risk factor need not be controlled in a
8    study.  You have to be associated with the
9    exposure to, you know, consider the confounder.
10        That is the precise definition of
11    confounding, is you have to be associated with
12    the exposure.  You have to be associated with the
13    outcome.  And you can't be on the path.
14        So just because chlamydia -- let me finish.
15    Chlamydia, A, has a risk factor of ovarian
16    cancer.  If I design a study tomorrow for X and
17    ovarian cancer, you know, I'm not going to
18    consider it a confounder for my analysis.
19        Q.   Confounders can distort the results in
20    epidemiological studies; correct?
21        MS. PARFITT:  Objection.  Form.
22        A.  Yeah.  We've discussed that, I think.
23        THE WITNESS:  We'll take a break.  If
24    you want to finish this confounding thing.
25        MR. ZELLERS:  No.  We can take a break

Page 241

1    now.
2        MS. PARFITT:  Good.  Thank you.
3        THE VIDEOGRAPHER:  This ends Media 3.
4    Off the record, 2:17 p.m.
5        (A recess was taken.)
6        THE VIDEOGRAPHER:  Here begins Media
7    No. 4 in today's deposition of Sonal Singh, MD,
8    M.P.H.  Back on the record, 2:29 p.m.
9    BY MR. ZELLERS:
10        Q.  Dr. Singh, in your report, at Page 54,
11    Paragraph 7, you address the subject of
12    confounding in studies of talcum powder use and
13    ovarian cancer; is that right?
14        A.  Yes.
15        Q.  On Page 54 of your report, you state,
16    "Although there are some risk factors for ovarian
17    cancer," and then it continues, "for any of them
18    to be confounding to an extent that could account
19    for the positive relations that have been
20    reported, they would have to be strongly
21    correlated with talc use.  Family history,
22    ethnicity, obesity and some reproductive risk
23    factors are positively associated with the risk
24    of ovarian cancer, but the magnitude of these
25    associations does not appear high enough to

61 (Pages 238 to 241)

Sonal Singh, M.D., M.P.H.

Page 242

1  introduce enough confounding either jointly to
2  explain completely the positive associations."
3      And it should be the positive association.
4      A.  Yes.
5      Q.  Is that the statement that you make?
6      A.  Yes.
7      Q.  There's no citation for that statement;
8  is that right?
9      A.  Yes.  But partly because I couldn't
10  find evidence -- and, you know, about the risk of
11  talcum powder use and these risk factors.  And so
12  that -- so the issue that I -- prior to the
13  statement, states that -- these other risk
14  factors, which we know are risk factors for
15  ovarian cancer.
16      Q.  Is this your statement that you made
17  here?
18      A.  Yeah.  Let me just explain what I did
19  here.
20      Q.  That was a simple question.
21      A.  Yeah.  It is my statement.
22      Q.  Have I read your statement?
23      A.  Yes.  But it is about the fact that we
24  don't have, you know, family history, ethnicity,
25  obesity and reproductive factors associated, but

Page 243

1  these associations, as it relates to talc use, we
2  don't have data on how these -- to be considered
3  a confounder, they have to be associated with
4  talc use.  We don't have data on that.
5      Q.  My question just is:  Did you write
6  that?
7      A.  I did.  Yeah.
8      Q.  All right.  Now, do you know who Ken
9  Rothman is?
10      A.  Yeah.  He has written a textbook on
11  epidemiology.
12      Q.  He is a well-respected epidemiologist;
13  is that right?
14      A.  Yeah.  He's well respected.
15      Q.  He has written a textbook on
16  epidemiology that's widely recognized as one of
17  the best; is that right?
18          MS. PARFITT:  Objection.
19      A.  It is nice.  I mean, I have a copy of
20  it.
21      Q.  I've looked at your report and your
22  reliance list.  In terms of your reliance list,
23  you do not cite to a paper by Ken Rothman and
24  others published in 2000 entitled "Interpretation
25  of Epidemiologic Studies in Talc and Ovarian

Page 244

1  Cancer"; is that right?
2      A.  If I haven't, then I haven't.  Yeah.
3      Q.  You did put it on your additional
4  materials and data considered.
5      Do you see that?
6      A.  Yes.
7      Q.  It's on the last page.
8          MR. ZELLERS:  I'm going to mark that
9  paper as Exhibit 28.
10          (Document entitled
11  "Interpretation of Epidemiologic Studies on
12  Talc and Ovarian Cancer" marked
13  Exhibit 28.)
14          MS. PARFITT:  Thank you.
15          MR. ZELLERS:  You're welcome.
16  BY MR. ZELLERS:
17      Q.  Do you see Exhibit 28 in front of you?
18      A.  Yes.
19      Q.  Exhibit 28 is an article prepared by
20  Kenneth Rothman entitled "Interpretation of
21  Epidemiologic Studies of Talc and Ovarian
22  Cancer."
23      Is that right?
24      A.  Yes.
25      Q.  Take a look at Page 5 of that paper,

Page 245

1  the second paragraph.
2      Do you see where --
3      A.  Confounding, you're talking about?
4      Q.  Yes.  Where Rothman discusses
5  confounding?
6      A.  Yeah.
7      Q.  Other than the list of four risk
8  factors in parentheses, you just copied the
9  language from Dr. Rothman's article and pasted it
10  into Page 54 of your report; correct?
11          MS. PARFITT:  Objection.
12      A.  No.
13      Q.  All right.  Do you have your report in
14  front of you, Page 54?
15      A.  And you say that I don't cite this
16  article or --
17      Q.  If you don't cite that article, you
18  have just testified under oath that these are
19  your words in your report.
20      So take a look at Page 54 of your report.
21  Take a look at Page 5 of the Rothman paper.
22      A.  Yeah.  I mean, you know, I may have --
23  I think I'm talking of different risk factors.
24      Q.  Doctor --
25          MS. PARFITT:  Let him finish, please.

62 (Pages 242 to 245)

Sonal Singh, M.D., M.P.H.

Page 246

1      MR. ZELLERS: Okay.
2      A. I may have failed to cite that article.
3  You know, it's okay. I mean, it's not okay, but
4  I'm just saying I may have failed to cite that
5  article.
6      Q. Do you agree that the entire first part
7  of Rothman on confounding that you have cited
8  word for word in your report, and you can start
9  with "although there have been some strong risk
10 factors for ovarian cancer, for any of them to be
11 confounding."
12     A. Yeah.
13     Q. If you read the rest, all the way
14 through the next couple of sentences, down to
15 "positive association," it's --
16     A. Yeah.
17     Q. -- word for word; right?
18     A. Yeah. I wouldn't say I copy and
19 pasted. I would say that I have not referenced
20 it.
21     Q. You copied and pasted it.
22     A. No. I did not. I read it, and I wrote
23 it. And I did not reference it.
24     Q. You didn't write it. It's exactly word
25 for word from the Rothman paper --

Page 247

1      A. No. It isn't.
2      Q. -- with the exception of you added, in
3  parentheses --
4      A. Yeah.
5      Q. -- "genetic risk factors, family
6  history, obesity and reproductive history"; is
7  that right?
8      A. Yeah. And I didn't cite it, but -- so
9  you look at a study and a paper, and, you know, I
10 wrote it. And I was remiss in not citing it. I
11 didn't copy and paste it.
12     Q. Well, you copied it word for word;
13 correct?
14     A. I did not.
15     MS. PARFITT: Objection. Misstates his
16 testimony.
17     A. I'm saying what I did. But I did not
18 cite it.
19     Q. The fact are the facts.
20     A. Well, the facts are that the content is
21 different and I did not cite it.
22     Q. What content is different other than
23 you adding in --
24     A. The risk factors.
25     Q. -- parens, "Example, genetic risk

Page 248

1  factors, family history, obesity and reproductive
2  history," what else is different? Show me one
3  word that is different --
4      A. Yeah.
5      Q. -- between what you've written here and
6  what is written by Rothman in his paper.
7      A. Yeah. It isn't, and I should have
8  cited it.
9      Q. All right. The paper by Rothman and
10 others -- well, strike that.
11     A. And where was this published, just -- I
12 mean, it doesn't have a citation in it.
13     Q. If you're going to copy it word for
14 word --
15     A. I did not.
16     MS. PARFITT: Excuse me. Object to the
17 question. Don't be argumentive, Counsel. He
18 said he didn't cut and paste it. He said he
19 failed to cite it. That's his testimony.
20     A. You can, you know, go forward and say
21 that.
22     Q. The question is: You don't know -- let
23 me withdraw that. You're looking at something.
24     A. Yeah. Go ahead and ask the question.
25     Q. You thought that this was a reliable

Page 249

1  source; correct?
2      A. Yes. And I did not cite it.
3      Q. The Rothman paper, Exhibit 28?
4      A. Yes.
5      Q. All right. Now --
6      A. Well, it's a source. I mean, it's in
7  with other source that I rely on.
8      Q. At least in these couple of
9  sentences --
10     A. In the paragraph.
11     Q. -- you agree; correct?
12     A. Yeah.
13     MS. PARFITT: Agree what? Agree what?
14     Q. Agree that the -- the two sentences
15 from Rothman are the same two sentences as in his
16 report and does he agree with those two
17 sentences?
18     A. Well, obviously, the risk factors are
19 different, because I know more about the risk
20 factors since 2000. And -- but the point that
21 I'm trying to make, and as you can see the
22 language is the same, and it should have been
23 cited.
24     Q. You told us throughout this deposition
25 that it's important for you to be -- as an

63 (Pages 246 to 249)

Sonal Singh, M.D., M.P.H.

Page 250

1  expert, to be fair and to cite information,
2  positions on -- that both support and refute your
3  position and plaintiffs' position; correct?
4      A.  Well, it's not about their position,
5  support or refute the causal hypothesis.
6      And I'm agreeing that I was remiss in not
7  citing this.
8      Q.  You also did not cite the next sentence
9  of Rothman --
10     A.  Yes.
11     Q.  -- which states, "Of course, it remains
12 possible that yet unidentified risk factors for
13 ovarian cancer could be important confounders,
14 and several such factors in the aggregate could
15 give risk to an overall association as weak as
16 the one between talc and ovarian cancer."
17     You did not cite that; correct?
18     A.  Yeah.  And -- but that is already
19 expressed.  The same factor is also expressed in
20 the first sentence.  Confounding is one potential
21 explanation for -- so, you know, again, if I had
22 placed that sentence, you would say that, well,
23 you're taking three lines, four.
24     So I cite that confounding is one potential
25 explanation.

Page 251

1      Q.  You don't disagree with that statement.
2      A.  Yeah.  Yeah.  Because that's one, you
3  know, it's stated that, you know, one potential
4  explanation.
5      Q.  All right.  Look at, if you will, on
6  Page 1 of the Rothman paper, the middle
7  paragraph.  Rothman states, "Most of the
8  published studies are interview-based,
9  case-control studies subject to recall bias which
10 can readily give rise to associations of this
11 magnitude."
12     Did I read that correctly?
13     A.  Yes.
14     Q.  Go to Page 4, third paragraph of the
15 Rothman paper, Exhibit 28.  I'm looking at the
16 section under "recall bias," and the third
17 sentence, "Recall bias can easily introduce
18 enough bias to produce the modestly sized overall
19 effect, relative risk equals 1.3, that emerges
20 from these studies."
21     MS. PARFITT:  The only correction --
22     Q.  Is that what Rothman wrote?
23     MS. PARFITT:  I'm sorry.  It does say
24 "can readily."
25     MR. ZELLERS:  I'm sorry.

Page 252

1      MS. PARFITT:  No worries.  No worries.
2      A.  Which line are you in there?
3      Q.  Sure.  Look at "recall bias."  Does the
4  third sentence state, "Recall bias can readily
5  introduce enough bias to produce the modestly
6  sized overall effect, relative risk equal 1.3,
7  that emerges from these studies"?
8      A.  That's -- yeah, that's his
9  interpretation.
10     Q.  You don't disagree with that, do you?
11     A.  Well, I do disagree in the sense that,
12 you know, he's making inference on the magnitude.
13 I'm not disagreeing that there's a potential for
14 recall bias.  But, you know, as I've discussed in
15 my report and -- and, again, if you say that,
16 then I should be writing the Rothman paper
17 instead of my report.  Right?  You would want Ken
18 Rothman to testify.
19     You have to, you know, take -- you know, I
20 understand what he's trying to say.  He's saying
21 that recall bias can introduce an element that
22 would produce 1.3.
23     Q.  In fact, Rothman and the other authors
24 of this paper conclude that the modest positive
25 association --

Page 253

1      A.  Yeah.
2      Q.  -- seen in epidemiological studies
3  could be explained by recall bias or an
4  unidentified confounding bias; correct?
5      A.  Yes.
6      Q.  You did not note in your report
7  Rothman's conclusion -- and if you turn to
8  Page 8, his conclusion -- "More important, there
9  is also positive evidence against a causal
10 association.  The inverse dose-response trend for
11 both duration of use and frequency of use, a
12 pattern that could not be explained by a causal
13 relation.  Based on these considerations, we
14 suggest that the evidence to date does not
15 indicate that talc can be 'reasonably anticipated
16 to be a human carcinogen.'"
17     A.  Yes.  And this report was prepared on
18 November 8, 2000.  That's 20 years ago.  And we
19 have many other studies subsequent to that
20 talking about dose-response, several other
21 understandings about biological mechanisms.
22     So if I wanted -- if you want me to just
23 cite to the Rothman paper or -- there are 115,
24 you know, papers.  I mean, there are other --
25 others will have opined that talc doesn't cause

64 (Pages 250 to 253)

Sonal Singh, M.D., M.P.H.

Page 254

1  ovarian cancer.
2      Q.  What methodology did you use to rule
3  out the effect of an unidentified confounding
4  bias or multiple unidentified confounding biases?
5      A.  Yeah.  So I mean, as the meta-analyses
6  have shown, there are no differences between --
7  most of the studies show no differences between
8  adjusted and unadjusted estimates, suggesting
9  that the potential for confounding is minimal.
10     There is no way to rule out unmeasured
11 confounding.  And that's always a possibility.
12 It doesn't mean that it exists.
13     Q.  As we discussed earlier, you did review
14 the Gertig 2000 paper and cite it in your report;
15 is that right?
16     A.  Yes.
17     Q.  On Page 48 of your report, you note
18 that Gertig 2000 found a statistically
19 significant increased risk for ever talc use for
20 serous invasive cancers; correct?
21     A.  Let me just come to that section.
22 Yes.
23     Q.  Gertig did not control for BMI or for
24 cigarette smoking, did it?
25     A.  And I'm writing age, duration of

Page 255

1  contraceptive use, BMI, smoking status.
2  Can I look at the study?  Sorry.
3      Q.  You're not wasting my time, are you?
4      A.  No.  No.  Because my writeup says that.
5  I may be incorrect.  And I just want to make sure
6  that my writeup is -- you know, if we need to
7  correct it, I need to correct it.  I'm sorry.
8      MR. TISI:  Did you mark it?
9      MR. ZELLERS:  No.
10     THE WITNESS:  I'm not wasting it, I'm
11 saying that because writeup -- I say that it
12 does.
13     MS. PARFITT:  Just so you know, mine is
14 a marked-up copy of it.
15     MR. ZELLERS:  I'm not going to mark it.
16 I'm not going to look at it.  I just want the
17 doctor to answer the question.
18     MS. PARFITT:  Sure.  Here's a copy of
19 Gertig.
20 BY MR. ZELLERS:
21     Q.  And my question is very simply --
22     A.  Age and smoking.
23     Q.  -- Gertig -- yes -- did not -- well,
24 BMI --
25     A.  Yeah.  It says it conducted for

Page 256

1  cigarette smoking and BMI.
2      Q.  That it did control for that?
3      A.  Yeah.
4      Q.  All right.  Show me where, in Gertig
5  2000, that they state that they did control for
6  BMI and for cigarette smoking.
7      A.  "For age-adjusted analysis, we
8  categorized values as oral contraceptive use,
9  tubal ligation, post-menopausal, cigarette
10 smoking and BMI."
11     Q.  What page?
12     A.  That's two -- whatever that page is,
13 250.  Yeah.  That's my understanding.
14     If you look at Table 1, they do have, you
15 know, cigarette smoking and whatnot.  That's my
16 understanding.
17     Q.  Ter Riet 2013, you cite that in your
18 report; is that right?
19     A.  It is.
20     Q.  Terry 2013 did not adjust for a hormone
21 replacement therapy usage; correct?
22     MS. PARFITT:  Here is Ter Riet.
23     A.  Just let me go back to my report.  This
24 is the Ter Riet meta-analysis?
25     Q.  Yes.  Ter Riet 2013, meta-analysis.

Page 257

1      A.  Okay.
2      Q.  The question is:  Did Ter Riet 2013
3  adjust for hormone replacement therapy usage?
4      A.  Ter Riet.
5      MS. PARFITT:  Here is a copy.
6      A.  Mine doesn't say that.  Usually,
7  Table 1 should answer that question.
8  HRT, right?  I don't have that data, and I
9  haven't included it in my report.
10     Q.  If hormone replacement therapy is a
11 risk factor for ovarian cancer, and assuming that
12 Ter Riet did not account for that, that is a
13 potential confounding factor; correct?
14     A.  Again, I have a slight difference in
15 your and my definition of confounding, that you
16 would have to obviously know if there is an
17 association with talc exposure for it to be
18 considered a confounder in that specific study.
19     Q.  All right.  You cannot say whether the
20 odds ratio of Ter Riet 2013 in that study would
21 have been lower if the authors had adjusted for
22 hormone replacement therapy usage; correct?
23     MS. PARFITT:  Objection.
24     A.  Or higher.  I mean, we cannot say one
25 way or the other.

65 (Pages 254 to 257)

Sonal Singh, M.D., M.P.H.

Page 258

1    Q.  Recall bias, it's a concern in every
2  retrospective study; is that right?
3    A.  Yeah, it is a potential concern in
4  design of studies where, you know, you're asking
5  about past exposure.
6    Q.  Recall bias can distort a scientific
7  evaluation of whether an exposure is actually
8  related to a disease; correct?
9    A.  Yes.
10    Q.  For example, recall bias could distort
11  results if women with ovarian cancer were more
12  likely to remember their exposure to talc than
13  women without ovarian cancer; correct?
14    A.  Yes.  I mean, but the extent here is
15  quite minimal, because we don't see it with a --
16  you know, for daily use, you know, the likely
17  magnitude is small.  We've talked about that.
18    You know, if recall bias was operational, we
19  would see it with nongenital talc use.  They
20  would be reporting that.  And we would be seeing
21  it with other types of, you know, cancer beyond,
22  you know, ovarian.
23    So, yes, recall bias is a potential, but the
24  likely magnitude is small.
25    Q.  On Page 54, Paragraph 6 of your

Page 259

1  report -- do you have Page 54, Paragraph 6?
2    A.  Yeah.  Just to clarify on the question,
3  I disagree with Rothman.  So just because it's in
4  Rothman's study, doesn't mean that it's, you know
5  --
6    Q.  I have a new question.  Are you ready?
7    A.  No.  I mean, I have to finish my last
8  question.
9    Q.  I didn't ask you a question.
10    A.  Okay.  Because we are still on the
11  topic of recall bias.
12    Q.  I asked the question.
13    A.  Okay.
14    Q.  Recall bias could distort results of
15  women with ovarian cancer were more likely to
16  remember their exposure to talc than women
17  without ovarian cancer; correct?
18    A.  Yes.
19    Q.  The next question is:  Can you turn to
20  Page 54, Paragraph 6 of your report?
21    A.  Okay.
22    Q.  You state, "case-control studies are
23  susceptible to recall bias, particularly when
24  data on exposure are self-reported.  However,
25  several studies have included these questions on

Page 260

1  talc exposure as part of larger questionnaires on
2  other risk factors, minimizing the possibility of
3  recall bias."
4    Did you write that?
5    A.  Yes.
6    Q.  How does asking about other risk
7  factors minimize recall bias as to a particular
8  risk factor?
9    A.  Yeah.  Because, you know, you're not
10  stimulating them to answer -- you know, if you're
11  asking them ten questions about, say -- so it's
12  like, well, were you -- you know, were you
13  active, were you using oral contraceptives, were
14  you -- so if you are -- let me finish.  Let me
15  finish my explanation.
16    You're introducing the question of talc use
17  within ten different questionnaires, then you
18  minimize the possibility of recall bias for that
19  particular product versus you're asking talc
20  alone.
21    Q.  On what literature are you relying to
22  say that asking about other risk factors
23  minimizes recall bias as to another risk factor?
24    A.  I mean, that's just my general
25  understanding of epidemiology.  And maybe, you

Page 261

1  know -- yeah, it's not -- I don't know if it's
2  specific to talc usage.  Just a general
3  understanding of epidemiology, about, you know --
4  yeah, recall bias.
5    Q.  Are you done?
6    A.  Yeah.
7    Q.  All right.  Let's look at the effects
8  of recall bias in a study on talcum powder use in
9  ovarian cancer.
10    Are you familiar with the Schildkraut 2016
11  study?
12    A.  Yes.
13    Q.  That was one of the studies that you
14  relied on in forming your opinions; is that
15  right?
16    A.  Yes.
17    MR. ZELLERS:  Let's mark that study as
18  Deposition Exhibit 29.
19    (Article entitled "Association
20    between Body Powder Use and Ovarian Cancer:
21    The African American Cancer Epidemiology
22    Study (AACES) marked Exhibit 29.)
23    MS. PARFITT:  Got it.  Thanks.
24  BY MR. ZELLERS:
25    Q.  This is a study titled "Association

66 (Pages 258 to 261)

Sonal Singh, M.D., M.P.H.

Page 262

1   Between Body Powder Use and Ovarian Cancer; The
2   African American Cancer Epidemiology Study";
3   correct?
4       A.   Yes.
5       Q.   The study looked at, among other
6   things, what impact, if any, lawsuit filings in
7   2014 had on whether women recalled using talc in
8   the past; correct?
9       A.   Yeah.  It examined the issue of
10  stimulated reporting.  And I note it in my
11  report.  I don't -- I don't discount that in my
12  discussion of the Schildkraut study.
13      Q.   We'll call it Schildkraut.  Can we do
14  that?
15      A.   Whatever.  I don't know.
16      Q.   The authors in that study, Exhibit 29,
17  thought that the publicity from lawsuits might
18  influence the participants' recall of prior body
19  powder use; is that right?
20      MS. PARFITT:  Objection.
21      A.   Yes.  And I noted on Page 45 of my
22  report that although there was some evidence that
23  there was more reporting after class action
24  lawsuits in 2014, recall bias alone is
25  insufficient because there is a statistically

Page 263

1   significant risk both before and after 2014.  But
2   the authors did, you know, think it was an
3   important thing to look at.
4       Q.   The authors looked at this and tried to
5   study this; is that right?
6       A.   Yes.
7       Q.   All right.  Go to Page 4, Table 2 of
8   the Schildkraut paper.  Tell me when you have it.
9       A.   I do.
10      Q.   This is a table, Adjusted Odds Ratios
11  for the Associations Between Mode, Frequency and
12  Duration of Body Powder Use and Ovarian Cancer;
13  is that right?
14      A.   Yes.
15      Q.   The second column shows the number of
16  cases.  That's women with ovarian cancer;
17  correct?
18      A.   Yes.
19      Q.   The third column shows the controls.
20  That's the women who do not have ovarian cancer;
21  correct?
22      A.   Yes.
23      Q.   Looking at the data, before 2014,
24  before the lawsuits, the percentage of controls,
25  meaning women without ovarian cancer, who said

Page 264

1   that they used talc on their genitals was
2   34 percent; is that right?
3       A.   Where is that?  Yeah.
4       Q.   The percentage of cases, meaning women
5   with ovarian cancer, that said that they used
6   talc on their genitals was 36.5 percent; is that
7   right?
8       A.   I'm just looking at this.  Give me a
9   second.
10      36 -- interview data after 2004?
11      Q.   No.  My question here is:  For women
12  who were interviewed before 2014 --
13      A.   Mm-hmm.
14      Q.   -- the control, so women without
15  ovarian cancer, they stated they used talc on
16  their genitals, 34 percent; is that right?
17      A.   Yes.
18      Q.   For that same time period, women
19  interviewed before 2014 --
20      A.   Mm-hmm.
21      Q.   -- with ovarian cancer that said that
22  they used talc on their genitals was
23  36.5 percent.
24      A.   Yes.
25      Q.   Is that right?

Page 265

1       So roughly the same reporting of genital
2   talc use between women with and without ovarian
3   cancer occurred before the lawsuits were filed in
4   2014.
5       MS. PARFITT:  Objection.
6       Q.   Correct?
7       A.   I don't know the timing of lawsuits,
8   but yes, 2014.
9       Q.   So then let's look at what happened
10  after the lawsuits were filed.
11      After 2014, what percentage of women without
12  ovarian cancer said that they used talc on their
13  genitals?
14      A.   The case -- are you talking about cases
15  or controls?
16      Q.   Yeah.  I'm talking about controls.
17      A.   34.4, 34.4.
18      Q.   So based on this data, the lawsuits had
19  essentially no effect on how many of the women
20  without ovarian cancer, the controls, remembered
21  or recalled using baby powder; correct?
22      A.   Yes.
23      Q.   It was 34 percent before 2014 and
24  34.4 percent after; is that right?
25      A.   Yes.

67 (Pages 262 to 265)

Sonal Singh, M.D., M.P.H.

Page 266

1    Q.  For women with ovarian cancer, before
2  the lawsuits were filed, 36.5 percent of them
3  said they recalled using baby powder; correct?
4    A.  Yes.
5    Q.  But after the lawsuits were filed, the
6  percent of women with ovarian cancer who said
7  they used baby powder went up to 51.5 percent; is
8  that right?
9    A.  Yes.
10   Q.  So after the lawsuits were filed, the
11  percent of women with ovarian cancer who said
12  they used baby powder jumped by over 40 percent;
13  is that right?
14       MS. PARFITT:  Objection.  Form.
15   A.  By 40 percent?  Where is 40?
16   Q.  A difference between the 36. --
17   A.  10 percent.  It's 51 and 34.  Right?
18   Q.  It jumped -- I don't have a calculator.
19   A.  You're subtracting 51 to 36 or 51 to
20  34?
21   Q.  Well, there was --
22   A.  Sorry.
23   Q.  That's okay.  It's late.
24  There was a significant increase --
25   A.  There was an increase.

Page 267

1    Q.  -- from 36.5 percent before the
2  lawsuits were filed to 51.5 percent after; is
3  that right?
4    A.  Yes.
5    Q.  So, suddenly, women who had ovarian
6  cancer started reporting a higher incidence of
7  talc use than women had reported before 2014; is
8  that right?
9        MS. PARFITT:  Objection.  Form.
10   A.  Yes.  There was -- there was
11  incidence -- you know, evidence of stimulated
12  reporting.  But that is just one element of
13  recall bias.  That's not completely what is being
14  addressed in my statement on recall bias.  This
15  is evidence about stimulated reporting, which is
16  one -- one spectrum of recall bias.
17   Q.  It's at least an example of the
18  potential effect of recall bias; correct?
19   A.  Yes.
20   Q.  All right.  Go to Page 45 of your
21  report, the last sentence.
22   A.  Yes.
23   Q.  "Although" -- and I'm quoting you.
24  "Although there was some evidence that there was
25  more reporting of genital powder use after class

Page 268

1  action lawsuits in 2014, recall bias alone is
2  insufficient to explain these findings, because
3  there was a statistically significant increased
4  risk both before and after 2014."
5    Is that what you state?
6    A.  Yeah.
7    Q.  Let's look at what the study actually
8  shows.  So go to --
9    A.  Yeah.  I correct it.  Should be there
10  was an excess risk, because there was no
11  statistically significant.
12   Q.  Your report is in error; is that right?
13       MS. PARFITT:  Objection.
14   A.  Well, it should be corrected to an
15  excess risk.
16   Q.  It is not, and there is not a
17  statistically significant risk; is that right?
18       MS. PARFITT:  Objection.  Form.
19   A.  Yeah.  The test for effect modification
20  by year of interview was technique, but the
21  particular estimate for above -- for, you know,
22  for before 2014 was not significant.
23   Q.  Exactly.  So pre-2014, there was an
24  odds ratio of 1.19 with a confidence interval
25  ranging from .87 to 1.63; is that right?

Page 269

1    A.  Yeah.  Yeah.
2    Q.  That is not statistically significant;
3  is that right?
4    A.  Yes.
5    Q.  In the absence of statistical
6  significance, that can be indicative of no risk
7  existing; correct?
8        MS. PARFITT:  Objection.  Form.
9    A.  Yeah.  But, you know, I'm opining on
10  the study as a whole.  That's just one element of
11  stimulated reporting in that study, you know.
12  Yeah.  So there's an excess risk, which is in the
13  same direction, but not statistically
14  significant.
15   Q.  If the study had ended before 2014, it
16  would have found no statistically significant
17  relationship between talcum powder and ovarian
18  cancer; is that right?
19   A.  I'm not seeing the study.  I have to
20  interpret the whole study; right?
21   Q.  Well, based upon this data that we just
22  looked at --
23   A.  Yeah.
24   Q.  -- had the study ended before 2014,
25  there was not a statistically significant

68  (Pages 266 to 269)

Sonal Singh, M.D., M.P.H.

Page 270

1  relationship between talcum powder use and
2  ovarian cancer; correct?
3      MS. PARFITT:  Objection.  Misstates the
4  data.
5      A.  Yeah.  There was an excess risk which
6  was not statistically significant.  But, you
7  know, we are picking and choosing analysis by
8  2004.  Again, we talked about are we choosing by
9  duration.  You can pick any one of these analyses
10  to cite it.  You have to look at the cumulative
11  evidence and the cumulative evidence from
12  meta-analyses.
13      Q.  How did you account for this recall
14  bias in weighing the Schildkraut study?
15      MS. PARFITT:  Object to the form.
16      A.  So, again, I did not weigh one
17  individual study.  My weight of evidence is based
18  on the meta-analysis and the cumulative evidence
19  from meta-analysis, the biological studies,
20  animal studies, human studies.
21      So, you know, I point out the limitations of
22  the individual studies, as do the authors of the
23  meta-analyses.
24      Q.  Are your opinions in this matter
25  dependent on talcum powder containing asbestos?

Page 271

1      A.  No.  I arrived at my causal opinion
2  independent of, you know, presence of asbestos
3  or, you know, or my understanding of the
4  constituents.  But I asked to better understand
5  what are the constituents of, you know, talcum
6  powder products.
7      And I was, you know, some of the documents
8  and some of the literature even suggests and
9  shows that, and some of the testing and some of
10  the deposition testimony that I have been privy
11  to, suggests the presence of asbestos in talcum
12  powder product.
13      Q.  Do you believe that talcum powder that
14  does not contain asbestos causes ovarian cancer?
15      A.  Yes.
16      Q.  Is it fair to say that you have not
17  made any independent determination as to whether
18  or not the talcum powder products manufactured by
19  J&J Consumer Products are contaminated with
20  asbestos?
21      A.  Yes.  I have not made a determination.
22  I've looked at the literature.  I have looked at
23  the testimony of the experts that was provided,
24  and I've looked at testimony -- sorry -- the
25  report of Dr. Luongo and I have relied on their

Page 272

1  reports for that.
2      Q.  You have no personal expertise with
3  that; correct?
4      A.  No.
5      Q.  Did you consider any testing that found
6  no asbestos?
7      A.  Yeah.  I did.  I think I'm citing the
8  FDA report in my assessment that there are
9  studies that suggest the -- I don't know if it's
10  an FDA report.  It's an FDA study that talks
11  about it.
12      Q.  If your assumption about contamination
13  of talcum powder products with asbestos were not
14  true, would your opinion in this case change?
15      MS. PARFITT:  Objection.  Form.
16      A.  Well, again, you know, this is a weight
17  of evidence that, does it, you know, contain
18  talcum powder -- I mean -- does talcum powder
19  product contain asbestos?  Or, you know, these
20  other metals we've talked about.
21      But my opinion was, in fact, arrived at
22  before even I was aware of both of the deposition
23  testimony, as well as the results of testing by
24  Dr. Luongo that my causal opinion was that they
25  caused, you know, ovarian cancer.

Page 273

1      MR. ZELLERS:  Move to strike as
2  nonresponsive.  I'm going to ask the question
3  again.
4      THE WITNESS:  Sure.
5  BY MR. ZELLERS:
6      Q.  If your assumption about contamination
7  of talcum powder products with asbestos were not
8  true, would your opinions in this case change?
9      A.  No.
10      Q.  In support of your opinion that talcum
11  powder products contain asbestos, you cite to
12  exhibits from the depositions of John Hopkins and
13  Julie Pier; is that right?
14      A.  Yes.
15      Q.  Are you aware that those exhibits were
16  created by plaintiff attorneys?
17      MS. PARFITT:  Objection.  Misstates the
18  evidence.
19      A.  Yeah.  I mean, I asked them whatever
20  that -- you know, these are -- as I understand
21  them, they are, you know -- they are created as a
22  part of the testimony of these deponents on
23  behalf of, you know, the defendants.  That's my
24  understanding.
25      Q.  Were you told that the exhibits

69  (Pages 270 to 273)

Sonal Singh, M.D., M.P.H.

Page 274

1  Exhibit 28 to the deposition of John Hopkins and
2  Exhibit 47 to the deposition of Julie Pier were
3  exhibits that were created by plaintiffs'
4  attorneys?
5          MS. PARFITT: Objection. Completely
6  misstates the evidence in this case.
7      A.  You know. I asked for constituents. I
8  don't know what -- who created what. So I mean,
9  I'm not going to be able to answer that type of
10 question, who created this.
11     I was asked for, you know, what are the
12 constituents, that can I learn more about this?
13     Q.  Outside of your work in litigation, do
14 you normally rely on documents created by
15 advocates in order to evaluate epidemiological
16 data?
17         MS. PARFITT: Objection. Again,
18 misstates the evidence as to origin of the
19 Hopkins and Pier Exhibits 28 and 40.
20         You may answer.
21     A.  Yeah. I mean, I do. As I said
22 earlier, I rely on our published data. And as
23 the Health Canada approach states, that we rely
24 on whatever evidence becomes available, and, A,
25 is relevant to the particular testimony.

Page 275

1      And, importantly, just as my causal opinion
2  was arrived at independent of the constitution of
3  asbestos in talc, Health Canada also is unaware
4  of the presence of -- or at least, you know, they
5  haven't assessed the presence of asbestos in
6  talc, and they are, you know, both congruent.
7      Q.  Your testimony is that outside of your
8  work in litigation, that you normally do rely on
9  data and documents created by plaintiffs'
10 counsel?
11         MS. PARFITT: Objection. Form. Asked
12 and answered. And misstates the evidence.
13     A.  So I, you know, rely on evidence that's
14 available in terms of epidemiologic evidence.
15 And my testimony on asbestos was based on testing
16 and based on -- testing by -- based on some of,
17 you know, there are studies which suggest the
18 presence of asbestos.
19     Q.  Do you know where the data in
20 Exhibit 28 to Hopkins and Exhibit 47 to Pier came
21 from?
22     A.  You know, I was seeing these were in
23 various mines conducted. That's my
24 understanding.
25     Q.  Do you have an understanding, other

Page 276

1  than from communicating with plaintiffs' counsel?
2      A.  I'm not sure what -- so --
3          MS. PARFITT: I'm going to object to
4  the form.
5      Q.  Sure. The source of data?
6      A.  Like source of --
7      Q.  I'm asking you if you know where the
8  data in those exhibits came from.
9      A.  So I'll try to answer to the best of my
10 ability.
11     My understanding is that the data on J&J and
12 Imerys were from mines tested over the years,
13 ranging, you know, from several decades. And
14 that contained or -- you know, were contaminated
15 with asbestos, various fibers that were created.
16     And the second was the Luongo report was
17 products that were purchased and that were tested
18 in the laboratory. So that's where the source.
19 I mean, I assume these other two sources.
20     Q.  Have you made any effort to investigate
21 the alternative explanations for the data in
22 those charts, Exhibit 28 and Exhibit 47?
23     A.  I mean --
24         MS. PARFITT: Objection.
25     A.  So, for example, I think that those

Page 277

1  data are, as I said earlier, my causal opinion
2  is -- is, you know, this is only a -- my causal
3  opinion is only -- you know, this is only a small
4  link in my causal opinion between talc and
5  ovarian cancer, and it's not predicated on the
6  presence of asbestos.
7      I don't have the expertise to determine
8  whether asbestos is present.
9      Q.  I'm trying to make it a simple
10 question. I'm just trying to find out what you
11 did and what you did not do.
12     Did you make any effort to investigate the
13 alternative explanations for the data in the
14 charts which are marked as Exhibit 28 and
15 Exhibit 47?
16     A.  So --
17         MS. PARFITT: Objection.
18     A.  What is 28, 47?
19         MS. PARFITT: Yeah. Let's get them.
20 Do you have a copy of them here to show --
21         MR. ZELLERS: No.
22         MS. PARFITT: You aren't going to show
23 it to him?
24         MR. ZELLERS: He cites to these in his
25 report.

Sonal Singh, M.D., M.P.H.

Page 278

1    MS. PARFITT:  Then let's get them.
2  We'll get them.  Give him a moment.
3    MR. ZELLERS:  We don't need to get them
4  to answer this question.
5    MS. PARFITT:  Do you need them,
6  Dr. Singh?
7    THE WITNESS:  Yes.
8    MS. PARFITT:  Do you want to take a
9  quick break?
10    MR. ZELLERS:  And I object.  And this
11  should not be time that gets charged me.
12  BY MR. ZELLERS:
13    Q.  My question simply is:  Did he attempt
14  to investigate any alternative causes.  He can
15  either say yes, he can say no, or he can say I
16  don't recall.
17    A.  Yes.
18    Q.  All right.  What did you do to
19  investigate alternative explanations?
20    A.  I mean, you know, I was looking at
21  the -- I was already looking at the published
22  literature, but beyond that, I was looking at
23  what are the alternate -- again, as I said, you
24  know, my expertise in determining -- I'm not a
25  mineralist that I can, you know, that I can

Page 279

1  determine that.  And, again, I'm not opining that
2  Dr. Luongo's report -- I mean, he will have to
3  vouch for his report.
4    Q.  Let me ask it a different way.
5    A.  Yeah.
6    Q.  If scientists from the J&J companies
7  and Imerys scientists say that those tests don't
8  actually show asbestos, it was just tremolite
9  reported, for example, you have no expertise to
10  dispute that; correct?
11    MS. PARFITT:  Objection.  Misstates the
12  evidence in this case, entirely.
13    Do you want to ask him a hypothetical?
14    Q.  It's a hypothetical question.
15    MS. PARFITT:  It's a hypothetical.
16    A.  Again, with my limited expertise and my
17  understanding of whatever I was provided and
18  cited there, my understanding was that there was
19  asbestos present in there and, you know, other
20  people can have different opinions and I think
21  mineralogists, geologists will --
22    Q.  Those are the --
23    A.  Yeah.
24    Q.  -- expertise or the -- those are the
25  types of experts that would have substantive

Page 280

1  knowledge on these issues; correct?
2    A.  Yeah.  I mean, for my purpose, you
3  know, it was more an understanding of the
4  constituents, whether that would provide, you
5  know, proof against biologic plausibility, proof
6  for biologic plausibility.
7    So, for example, you say, did I undertake
8  attempts to understand the constituents?  Yes.  I
9  mean, I was looking for, well, are there some
10  antioxidants that, if you had some antioxidants
11  in that product, and I'm not aware of, or anti,
12  you know, carcinogens and maybe these scientists
13  will be able to provide that.
14    Q.  Did you ask counsel for plaintiffs for
15  any information or testimony from either J&J
16  company folks or Imerys scientists as to what the
17  tests actually showed with respect to asbestos?
18    MS. PARFITT:  Other than Exhibits 28
19  and 47?
20    A.  I assume those testifying were J&J
21  scientists and Imerys, and they were speaking
22  about those tests.
23    Q.  My question is:  Did you ask for any
24  additional information?
25    A.  No.  I mean, I asked -- as I said, I

Page 281

1  asked about the causal question and I got what I
2  got.  We can go about it in various ways.
3    Like did I ask again?  No, I didn't.  And I
4  don't want any more documents.
5    Q.  We'll try to shortcut this.
6    Do you believe Luongo?  You reviewed his
7  testimony; right?
8    MS. PARFITT:  Objection.  Form.
9    Go ahead.
10    A.  Yeah.  It's like how do you believe,
11  you know -- again, it's an area of expertise.  He
12  tests, you know, these products, you know, this
13  is not my area of experience.  At least based on
14  his testing, there is presence of asbestos in
15  my -- and provides additional support.
16    Q.  Did you look at any of the experts for
17  the defendants who have opined to the opposite
18  statement or the opposite?
19    MS. PARFITT:  I think -- objection.
20    A.  I was told that the expert defendants
21  hadn't even been -- you know, haven't submitted
22  reports or haven't been, you know, opined on.
23  That's sort of my understanding.
24    Q.  You believed and accepted the Luongo
25  testing for purposes of this case; is that right?

71 (Pages 278 to 281)

Sonal Singh, M.D., M.P.H.

Page 282

1    MS. PARFITT: Objection. Misstates the
2  heart of his testimony.
3    A.  So, first of all, this report is 70
4  whatever pages. Luongo is maybe a paragraph or
5  two. So, yes, I believe that was one study.
6    For the purposes of, you know, identifying,
7  you know, I identified his. I identified what
8  was shown and what was in those notes. And I
9  identified some epidemiologic -- I mean, some
10  findings in the published literature.
11    I mean, that's as much as I could know about
12  it. I mean, you had Routers' study, you know,
13  talking about it in the media. So there's lots
14  of different things.
15    I didn't go and, you know, go looking into
16  the Routers report. Maybe that's what I should
17  be looking at.
18    Q.  You did not confirm that any of the
19  talc samples mentioned in those charts were
20  actually from talc that was used in baby powder;
21  correct?
22    MS. PARFITT: Objection. Misstates the
23  evidence that was available to him. If you want
24  to show him the charts, you can do it.
25    Q.  Can you answer that question?

Page 283

1    MS. PARFITT: Objection.
2    A.  I did not confirm it myself.
3    Q.  You realize that the vast majority of
4  talc isn't even used for body powder; correct?
5    MS. PARFITT: Objection. Misstates the
6  evidence.
7    A.  I realize that -- yeah, I don't know
8  what -- you know, there are various other uses of
9  talc.
10    Q.  Do you also rely on -- well, strike
11  that.
12    How many Luongo reports have you reviewed?
13    A.  I just have to take a look. I know
14  that I reviewed one. And I'm not trying to slow
15  you down. I'm just trying to be accurate.
16    Q.  I think you are, but --
17    MS. PARFITT: Objection to the
18  characterization, Counsel.
19    A.  I'm trying to find this.
20    MS. PARFITT: He's acted in a
21  professional way throughout all this, so it's
22  good.
23    MR. TISI: You asked him questions
24  looking at his report.
25    MR. ZELLERS: The witness said to me,

Page 284

1  I'm not trying to slow you down.
2    MR. TISI: And you said you think he
3  was.
4    MR. ZELLERS: Yes. And it was in jest,
5  Counsel. We all chuckled and we all laughed.
6    MR. TISI: As long as it was in jest,
7  that's fine.
8    THE WITNESS: I took it to be in jest.
9    I know I reviewed one, but I'm just
10  trying to see if I reviewed another one. There
11  was -- yeah.
12    So I said, No. 30 and then 31, 32, two
13  additional reports. Sorry.
14    Q.  Have you ever met Luongo?
15    A.  I don't know him.
16    Q.  Do you know his qualifications?
17    A.  No.
18    Q.  Had you ever heard of him before you
19  got involved in this MDL talc ovarian cancer
20  litigation?
21    A.  No.
22    Q.  Have you reviewed any Luongo testing
23  where he did not find asbestos?
24    A.  These were the three reports I
25  reviewed. So I don't know if he has conducted

Page 285

1  additional testing.
2    Q.  Let me ask again. Have you reviewed
3  any Luongo testing where he did not find
4  asbestos?
5    A.  I did not review any additional beyond
6  what is cited here.
7    Q.  Have you reviewed the FDA's testing of
8  talcum powder products?
9    A.  I have cited it. I mean, I have not
10  reviewed the specific test, but I have, you know,
11  cited what -- what they -- what they found.
12    Q.  Have you made any effort to quantify
13  the amount of any alleged contaminant in the
14  Johnson & Johnson Consumer Products talcum powder
15  products?
16    A.  That's way beyond my expertise.
17    Q.  Is any amount safe?
18    MS. PARFITT: Objection.
19    A.  Well, as of my understanding that
20  asbestos, you know, any amount of asbestos is not
21  safe, that's my understanding. And, obviously,
22  others can --
23    Q.  Do you defer to other experts on that
24  issue?
25    A.  Yeah. But, you know, my understanding

72 (Pages 282 to 285)

Sonal Singh, M.D., M.P.H.

Page 286

1  is that any amount -- and I think there's some
2  testimony from others to that effect as well.
3  But I'll defer to others.
4      Q.  Do you have an opinion on what type of
5  asbestos is in the baby powder products?
6      A.  Again, you know, this whole -- you
7  know, this sort of questions around constituents
8  of the product, for me, it was more trying to
9  understand whether it's asbestos or any other
10 constituents in the product, provide evidence in
11 support or against.
12     I can't tell you what amount would cause or,
13 you know, not cause baby -- in baby powder will
14 cause ovarian cancer.
15     Q.  What types of asbestos are associated
16 with ovarian cancer?
17     A.  I haven't done a causal analysis of
18 asbestos and ovarian cancer.  I know that the
19 IARC has classified asbestos as a carcinogen,
20 Grade 1, and that also stated that it caused
21 ovarian cancer, but -- about asbestos and fibrous
22 talc, but obviously others will provide more --
23 more specifics.
24     Q.  Do you have any -- strike that.
25     Do you have knowledge as to the different

Page 287

1  types of asbestos?
2      A.  No.
3      Q.  What dose of asbestos is associated
4  with ovarian cancer?
5      A.  I have not evaluated the dose of
6  asbestos with ovarian cancer.
7      Q.  What type of ovarian cancer is asbestos
8  associated with?
9      A.  I have not -- as I said earlier, I have
10 not evaluated the specific causal link between
11 asbestos and ovarian cancer.  My causal question
12 was, does talcum powder products cause ovarian
13 cancer.  And whatever the constituents are, you
14 know, whether they provide evidence in support or
15 against.  And, as you said, there may be
16 additional testing.
17     Q.  Does the type of ovarian cancer vary
18 based upon the type of asbestos?
19     A.  Again, I didn't evaluate that -- that
20 body of evidence.
21     Q.  Did you evaluate studies that have
22 explored the potential link between asbestos and
23 ovarian cancer?
24     A.  Yeah.  I mean, I didn't, again,
25 evaluate the causal link between that.  I looked

Page 288

1  at meta-analysis that, you know, cause, as well
2  as the IARC report that, you know, talks about
3  asbestos and fibrous talc as a carcinogen and
4  also cites studies that show that asbestos causes
5  ovarian cancer.  But, again, I wasn't doing a
6  formal causal analysis.
7      Q.  Do you agree that research on the
8  potential relationship between asbestos and
9  ovarian cancer has only considered a small number
10 of cases?
11         MS. PARFITT: Objection.  Form.
12     A.  I mean, ovarian cancer is a rare, rare
13 disease.  And, you know, it's going to be a small
14 number of cases, regardless of etiology, what
15 they are trying to study.
16     Q.  How many of the studies involve
17 occupational exposure?
18     A.  I think the predominant --
19         MS. PARFITT: Objection.
20     A.  -- studies have involved occupational
21 exposure.
22     Q.  How many were nonoccupational, if any?
23     A.  I don't recall the numbers.
24     Q.  Did any of the nonoccupational asbestos
25 studies reach statistical significance?

Page 289

1          MS. PARFITT: Objection.  Form.
2      A.  Again, I would have to look at the
3  study that you're talking about.  And I just -- I
4  can't recall it off the top of my head.
5      Q.  Can you tell how many women were
6  studied?
7      A.  No, I can't.  I mean, you can't ask
8  questions about these things, and tell me how
9  many women.  No.  You have to show me the study
10 if you want to go down that line of questioning.
11     Q.  I'll show you a study.
12     A.  Sure.
13     Q.  Are you familiar with the Reid study
14 published May 24th of 2011?
15     A.  Yes.
16     Q.  It's one of the studies you looked at;
17 is that right?
18     A.  Yes.
19         MR. ZELLERS: We'll mark that as
20 Exhibit 30.
21         (Article entitled "Does Exposure
22 to Asbestos Cause Ovarian Cancer?  A
23 Systematic Literature Review and
24 Meta-analysis" marked Exhibit 30.)
25         MS. PARFITT: Thank you.

73 (Pages 286 to 289)

Sonal Singh, M.D., M.P.H.

Page 290

1     THE WITNESS:  Can you repeat the
2  question for me?
3     MR. ZELLERS:  Sure.
4     THE WITNESS:  I'm sorry.
5  BY MR. ZELLERS:
6     Q.  Go to the first page, the right column.
7     A.  Mm-hmm.
8     Q.  Reid.  And this article is entitled
9  "Does Exposure to Asbestos Cause Ovarian Cancer?"
10 Is that right?
11    A.  Yes.
12    Q.  The authors state, on the first page,
13 on the right-hand side, right above the No. 1 and
14 No. 2, "Studies that have examined this issue
15 have been limited for two major reasons.  No. 1,
16 small number of cases"; is that right?
17    A.  Yes.
18    Q.  The authors state, "Much fewer women
19 than men have been exposed to asbestos,
20 particularly in more heavily exposed occupational
21 settings where relative risks are higher."
22    You agree with that; correct?
23    A.  Yes.
24    Q.  Then the second major limitation deals
25 with difficulties of diagnosis; is that right?

Page 291

1     A.  Yes.
2     Q.  Are you aware of the difficulties that
3  have existed over time in distinguishing between
4  peritoneal mesothelioma and ovarian cancer?
5     A.  Yes.  As a general idea of -- you know,
6  because they share histologic similarities.
7     Q.  Did those difficulties affect the
8  reliability of the studies?
9     A.  Yes, but if you look at Table 2 of that
10 report, you see that, despite if you look at
11 studies that review the ovarian pathology, you
12 still see a statistically significant increased
13 risk of incidence of mortality from ovarian
14 cancer.  So, yes, overall studies, it's a higher
15 estimate, but even if you take into account
16 mesothelioma diagnoses and misclassification, you
17 still cannot, you know, account that -- we still
18 are left with that asbestos causes, you know,
19 ovarian cancer.
20    Q.  The authors of the Reid paper that you
21 reviewed and relied on, Exhibit 30, stated, "It
22 has been particularly difficult to distinguish
23 between peritoneal mesothelioma and ovarian
24 serous carcinoma"; is that right?
25    MS. PARFITT:  Counsel, I'm sorry.

Page 292

1  Where are you pointing to?
2     MR. ZELLERS:  Sure.  I'm looking at
3  the --
4     MS. PARFITT:  Thank you.
5     MR. ZELLERS:  -- No. 2.
6     MS. PARFITT:  Uh-huh.
7     MR. ZELLERS:  The last full sentence.
8     MS. PARFITT:  Thank you.  I appreciate
9  it.
10    MR. ZELLERS:  On Page -- first page of
11 the article.
12    MS. PARFITT:  Thank you.  I appreciate
13 that.
14    MR. ZELLERS:  Sure.
15    A.  Yes.
16    Q.  Have the studies addressed confounding
17 and independent risk factors?
18    A.  Well, again, you know, my examination
19 of asbestos -- I mean, I was not trying to
20 establish a causal link between asbestos and
21 ovarian cancer, you know, when in trying to look
22 at talcum powder products and ovarian cancer, you
23 know, one of the questions was constituents.
24    And, you know, the IARC agrees that, or at
25 least opines that it is, causally, is a

Page 293

1  carcinogen and lists that and lists the Kamargo
2  study as, you know, that asbestos causes ovarian
3  cancer.
4     Q.  Well, the Camargo 2011 study
5  acknowledges an inability to account for
6  nonoccupational risk factors for ovarian cancer
7  other than age; correct?
8     A.  Again, if I can --
9     Q.  Take a look.  Sure.
10    A.  These statements -- it's getting to the
11 end of the day, so...
12    MR. ZELLERS:  Deposition Exhibit 31.
13    (Article entitled "Occupational
14 Exposure to Asbestos and Ovarian Cancer:  A
15 Meta-analysis" marked Exhibit 31.)
16 BY MR. ZELLERS:
17    Q.  Deposition Exhibit 31 is the Kamargo
18 paper; is that right?
19    A.  Yes.
20    Q.  This is another paper that you have
21 reviewed?
22    A.  Yes.
23    Q.  On the first page, the overview --
24    A.  Yes.
25    Q.  -- it states, "Objective:  A recent

74 (Pages 290 to 293)

Sonal Singh, M.D., M.P.H.

Page 294

1  monograph working group of IARC conducted" -- or
2  strike that -- "concluded that there is
3  sufficient evidence for a causal association
4  between exposure to asbestos and ovarian cancer.
5  We performed a meta-analysis to quantitatively
6  evaluate this association."
7      Is that right?
8      A.  Yes.
9      Q.  If you look at Page 1216, middle
10  column -- are you there?
11      So I'm looking at the second full paragraph
12  above "conclusion."
13      "A further limitation of our analysis was
14  its inability to account for nonoccupational risk
15  factors for ovarian cancer other than age."
16      Do you see that?
17      A.  And what do you mean by that?  I mean,
18  I didn't -- again, you know, I --
19      Q.  Let me just ask.  Is that a
20  limitation --
21      A.  Yeah.
22      Q.  -- on the analysis?
23      A.  It is a limitation.
24      Q.  Hasn't failure to account for
25  misclassification and known risk factors been

Page 295

1  cited as a reason why causality cannot be
2  established?
3          MS. PARFITT:  Objection.
4      A.  We can't rely on IARC.  As you said,
5  one said that it is possibly associated and here,
6  when they haven't arrived at a -- I mean,
7  causality is just not about association in one.
8  I mean, they have to look at other biological
9  mechanisms of asbestos and ovarian cancer, you
10  know, what happens in the lab, what happens -- I
11  haven't done that evaluation.
12      So, yes, this is a limitation.  But this
13  needs to be taken into account with, you know,
14  the entire body of evidence on asbestos and
15  ovarian cancer.
16      Q.  You're looking at and relying on
17  papers, including Reid, Exhibit 30?
18      A.  The IARC monographs.
19      Q.  And Kamargo, Exhibit 31; is that right?
20      A.  Yes.  And, again, I'm clarifying that
21  I'm not making a causal determination on IARC,
22  you know.  I'm just relying on that, you know,
23  that I'm not -- first of all, I didn't set out to
24  make a causal determination on asbestos and
25  ovarian cancer.

Page 296

1      Q.  And you're not making a causal
2  assessment or determination --
3      A.  No.
4      Q.  -- on asbestos; is that right?
5      A.  Yes.
6      Q.  Okay.  Under "discussion," Page 1215 --
7      A.  And I'm going to take a break after
8  that whenever you're done.  I'm sorry.  I need to
9  use the restroom.
10      Q.  That's okay.  That's fine.  That's
11  fine.
12      Do you see under "discussion," this is on
13  the left-hand column, second full paragraph,
14  where they're talking about Edelman?
15      A.  Yes.
16      Q.  And the authors state, "They concluded,
17  however, that despite the positive and
18  significant association, there was insufficient
19  information to infer that ovarian cancers were
20  caused by occupational exposure to asbestos
21  because of concerns about tumor
22  misclassification, inappropriate comparison
23  populations and the failure to take into account
24  for known risk factors."
25      Is that --

Page 297

1      A.  Again --
2      Q.  You don't disagree with that, do you?
3      A.  Yeah.  I mean, I don't -- but I don't
4  disagree -- I mean, I'm relying on the IARC
5  assessment and others that, you know, there's a
6  causal association between exposure.  Again, I
7  did not review.  I would have gotten and reviewed
8  evidence, Edelman and White and others, if I had
9  to do it over again.
10          MR. ZELLERS:  Let's take a break.
11  We'll come back and I'll finish up.  Thank you.
12          THE VIDEOGRAPHER:  Off the record,
13  3:32 p.m.
14          (A recess was taken.)
15          THE VIDEOGRAPHER:  Here begins Media
16  No. 5 in today's deposition of Sonal Singh, MD,
17  M.P.H.  Back on the record, 3:43 p.m.
18  BY MR. ZELLERS:
19      Q.  Dr. Singh, do you agree that exposure
20  to asbestos through perineal cosmetic talc use,
21  assuming the talc contains asbestos fibers, is
22  different than the heavy occupational exposure
23  that's primarily been researched?
24          MS. PARFITT:  Objection to form.
25      A.  Again, you know, I've not professed to

75 (Pages 294 to 297)

Sonal Singh, M.D., M.P.H.

Page 298

1  be an expert in different kinds and routes of
2  asbestos exposure.  My -- my sort of -- at least
3  my understanding of my causal question was
4  exposure to talcum powder products and ovarian
5  cancer and whether the constituents can provide
6  evidence in support or refute that association.
7      So, you know, whether asbestos exposure,
8  what different kinds, others will opine on that.
9      Q.  Do you know what a cleavage fragment
10 is?
11     A.  No.  And we can go on this kind of
12 stuff, and I'll say no.
13     Q.  Do you know how it differs from an
14 asbestos fiber?
15     A.  No.  And I'm not a mineralogist.
16     Q.  If I ask you a whole line of questions
17 about different types of asbestos, you're going
18 to defer to other folks?
19     A.  Yes.
20     Q.  Is there any epidemiology
21 substantiating the theory that fragrance
22 ingredients can cause ovarian cancer?
23     A.  I'm not aware of such studies.
24     Q.  Is there any epidemiology
25 substantiating the theory that exposure to trace

Page 299

1  amounts of the heavy metals at issue can cause
2  ovarian cancer?
3      A.  I'm not aware of -- you know, again, I
4  didn't do the evaluation, trace the specific
5  constituents of ovarian cancer.  I just was
6  trying to understand the constituents, what are
7  they.  I just, you know, whether trace -- trace
8  elements cause inflammation and -- you know, but
9  I am not aware of studies that link them directly
10 to ovarian cancer.
11     Q.  You're not opining in this case that
12 the fragrance chemicals and heavy metals that may
13 be present in baby powder are causally associated
14 with ovarian cancer.
15     MS. PARFITT:  Objection.
16     Q.  Correct?
17     MS. PARFITT:  Form.
18     A.  Yes.  I'm not -- again, I'm not opining
19 on the individual constituents of talcum powder
20 products.  My opinion is, you know, I look at the
21 exposure and the exposure is talcum powder
22 products, and the presence of constituents, some
23 of which are identified as, you know, Grade 1
24 carcinogens, others as Grade 2, provide evidence
25 in support, and others may -- you know, others

Page 300

1  may do testing and provide antioxidants and
2  substances which reduce the risk.  So that will
3  have to be weighed.
4      But I am not providing that causal link
5  between the individual constituent and ovarian
6  cancer.
7      Q.  And that would be true for any of the
8  individual fragrance chemicals and heavy metals
9  that may be present in the baby powder; correct?
10     MS. PARFITT:  Objection.
11     A.  I don't have that area of expertise on
12 individual constituents in products.
13     MR. ZELLERS:  I have no further
14 questions.  Thank you.
15     THE WITNESS:  Thank you for your time.
16     (Discussion off the record.)
17     THE WITNESS:  Thank you.
18     MR. ZELLERS:  Thank you, Doctor.
19     MR. KLATT:  Give me a minute to get
20 organized here, Doctor.
21     THE WITNESS:  Sure.
22     MR. KLATT:  Are we off the record?
23     THE VIDEOGRAPHER:  No.
24     MR. LOCKE:  Let's go off the record,
25 then.

Page 301

1      THE VIDEOGRAPHER:  Off the record,
2  3:47 p.m.
3          (A recess was taken.)
4      THE VIDEOGRAPHER:  Back on the record,
5  3:51 p.m.
6          CROSS-EXAMINATION
7  BY MR. KLATT:
8      Q.  Good afternoon, Dr. Singh.  My name is
9  Mike Klatt, and I represent Imerys Talc America
10 in this case.
11     Have you ever heard of Imerys Talc America
12 before you got involved in this case?
13     A.  I have, but, you know, I don't know in
14 what context and what, you know.
15     Q.  Do you know what Imerys Talc America
16 does?
17     A.  I don't know all the details of the
18 activities or, you know, Imerys.
19     Q.  As you know, Mr. Zellers has covered a
20 fair amount of ground already.  And so I'm going
21 to skip around just to ask you some follow-up
22 questions.
23     You said earlier today, when you were
24 talking to Mr. Zellers, that you potentially
25 intended to write up something about talc and

76 (Pages 298 to 301)

Sonal Singh, M.D., M.P.H.

Page 302

1  ovarian cancer?
2      A.  Sure.
3      Q.  And I just wanted to get a better
4  understanding of what you were referring to.
5      A.  Yeah.  So after, sort of -- and I'm not
6  going to do it until this is all over, because I
7  feel that there, you know, I have access to
8  documents that are -- that are sort of protected
9  by court order.
10     But partly what I'm thinking of is -- like
11 there have been so many systematic reviews and
12 meta-analyses that I was thinking more on the
13 kind of like an umbrella review of all these
14 reviews that I cite in my report and with, you
15 know, some of the rating of reviews.
16     And then -- and that's sort of my thinking,
17 was that what I would do is synthesize the
18 evidence, that -- what I do best is synthesize
19 the evidence from other studies in trying to --
20 you know, so it would be separate from, like,
21 because he asked the question, would you do a
22 systematic review?  You know, meta-analysis.  No.
23 Because there have been so many already.
24     Q.  Have you undertaken that project yet or
25 is this just something you're thinking of?

Page 303

1      A.  Yeah.  I'm thinking about --
2      Q.  I'm sorry.  Let me finish.
3      This is something you're just thinking about
4  doing in the future?
5      A.  In the future.  But I have
6  conceptualized, if I were to do that, that's what
7  I would do.
8      Q.  And if you do do that, you would be
9  obliged, would you not, to disclose to whatever
10 entity, body, journal, that you submitted this
11 work to, that you had been a retained, paid
12 expert by plaintiffs in the talc ovarian cancer
13 litigation; correct?
14     A.  Yeah.  And that's been my standard
15 practice.  If you go back and look at my papers,
16 you know, my papers on SGLT2 inhibitors, I've
17 disclosed that I was funded by, you know,
18 Janssen.  You know, a paper on statins that I
19 wrote last year, I was a paid expert.
20     So it's just standard practice for us to do
21 that.
22     Q.  And now that you bring that up, there's
23 absolutely nothing wrong with a company like
24 Janssen or any other company hiring an outside
25 expert to advise them and to publish on a certain

Page 304

1  subject; correct?
2      MS. PARFITT:  Objection.  Form.
3      A.  I mean, depending -- I don't know the
4  specifics on arrangement, but the question is,
5  you know, as long as the disclosure is
6  transparent, and as long as, you know, the
7  funding mechanisms, what was the reasons, yeah.
8  So it's not like they have commissioned this
9  review.
10     I mean, first of all, I have just thought
11 about it.  I haven't even done it.  I'm not sure
12 I'll do it with my time.  But you would have to
13 disclose that, yeah.
14     Q.  But my question, and, again, I think
15 we'll go quicker if we just focus on the question
16 asked and the answer to that question.
17     But my question is:  It's entirely
18 appropriate for companies to contact and retain
19 outside experts to advise them and then to
20 publish articles in the literature.
21     You've done it yourself; correct?
22     MS. PARFITT:  Objection.  Form.
23     You may answer.
24     A.  Yeah.  I have actually been, you know,
25 I have worked with Eli Lilly on systematic

Page 305

1  reviews of diabetes medications.
2      And -- to a point of clarification, I was
3  not paid by them, but I was an expert on that,
4  which is sort of a strange arrangement; right?
5  You don't get paid, but you're still working for.
6  But, you know, that's my area of expertise.  So,
7  yeah, companies hire and that's how science
8  works.
9      Q.  And, for example, if you contacted your
10 institution, the University of Massachusetts
11 Medical Center, about this ovarian cancer risk
12 factors web pages that they have, and you had any
13 input on that, you would disclose that you're a
14 paid plaintiffs' expert in talc ovarian cancer
15 litigation; correct?
16     A.  Well, so to do that, I don't know where
17 that web page came from.  I didn't contact them.
18 Yes, but, you know, I'm not trying.  So I don't
19 know if you're thinking about like the up-to-date
20 example.  I didn't want to change.  I was just
21 providing them references.
22     But, yes, if I was trying to make changes to
23 a document that's on, you know, I'm trying
24 to write something up, then if you look at my
25 letter, it's just a contact point.  If I'm trying

77 (Pages 302 to 305)

Sonal Singh, M.D., M.P.H.

Page 306

1  to write something up and say, you know what, it
2  increases the risk of cancer, decreases, then,
3  yes, I'd disclose that.
4       Q.  And just to go over that point --
5       A.  Yeah.
6       Q.   -- when you wrote the editor about Up
7  To Date, suggesting that they update their
8  website regarding talc and ovarian cancer, you
9  did not disclose that, at that time, you were a
10 paid retained plaintiffs' expert; is that
11 correct?
12      A.  Yes.  But I asked them to clarify that
13 this was just to update the references, if you
14 look at that.
15      Q.  Now, going back to what this
16 conceptualizing you're having of potentially one
17 day publishing something about talc and ovarian
18 cancer, okay, that's what I'm asking about.
19      Are we on the same page?
20      A.  Yeah.
21      Q.  Wait.  I just want you to know what I'm
22 asking about.  Okay?
23      A.  Okay.
24      Q.  Now, you would agree with me, you
25 mentioned this morning there were confidentiality

Page 307

1  orders in place.  But you'd admit that all of the
2  case-control epidemiology and all the cohort
3  epidemiology and all the meta-analysis that
4  you've reviewed are all out there in the
5  published literature; correct?
6       A.  The majority of them, studies are,
7  yeah.  I mean, Taher is not out in the
8  literature.  It's still in somewhere.
9       Q.  There's no -- there's no meta-analysis
10 cohort study or case-control study you're aware
11 of that is controlled or -- by some sort of
12 protective order that would limit you citing it
13 in some sort of review; correct?
14      MS. PARFITT:  Objection.  Form.
15      A.  So, first of all, yeah.  As you know,
16 Taher is sort of not published.  So I don't know
17 how much of the data you can use.
18      But in terms of protective, I don't know all
19 the rules about what you can use and not use.
20 So, I mean, it's just more my unfamiliarity with
21 the process, but nothing -- if you're asking the
22 question, is something preventing me from doing
23 that?  No.
24      Q.  Okay.
25      A.  Can I go ahead and do it?  It depends

Page 308

1  on time and other considerations.
2       Q.  And, again, focusing my question very
3  specifically, the case-control studies on talc
4  and ovarian cancer, the cohort studies on talc
5  and ovarian cancer, the meta-analysis on talc and
6  ovarian cancer that you've reviewed in this case
7  and that you've cited in your expert report in
8  this case, none of those are bound by a
9  protective order that would prevent you from
10 reading them, analyzing or publishing on them;
11 correct?
12      A.  None of them are restrictive.
13 Everybody has access.  I had, too.
14      Q.  Okay.  You talked briefly about the
15 Centers for Disease Control this morning.
16      A.  Yes.
17      Q.  Have you ever worked with them?
18      A.  No.  I've applied for grants with them,
19 and I wasn't funded, but I'm aware of them.
20 Yeah.
21      Q.  Have you ever conducted a
22 population-based, case-control study yourself?
23      A.  Yes.
24      Q.  As principal investigator?
25      A.  Yes.

Page 309

1       Q.  Have you done so for cohort studies?
2       A.  No.  Not a cohort study.
3       Q.  Could we go to Langseth, whatever
4  exhibit number that is?
5       MR. TISI:  I've got it.  It's
6  Exhibit 21.  I've got a copy of it here.
7       MS. PARFITT:  Yeah.  I know.
8       MR. TISI:  Do you mind me giving our
9  copy?
10      MR. KLATT:  No.  Not at all.
11 BY MR. KLATT:
12      Q.  I just have a few more questions.  You
13 were already asked about Langseth, but I just
14 have a few more questions for you.
15      At the time the Langseth study was
16 published, you would agree with me, Doctor --
17      MS. PARFITT:  I'm sorry, Mike.  I
18 didn't hear your question.  I'm sorry.
19      Q.  Yeah.  Let me start over.
20      MS. PARFITT:  I appreciate that.
21      Q.  I'm talking about the Langseth paper
22 that we've marked as Exhibit 21; is that correct?
23 It was published in 2008 by the IARC working
24 group members; correct?
25      A.  Yes.  Some of the members.  I suspect

78 (Pages 306 to 309)

Sonal Singh, M.D., M.P.H.

| Page 310 |
|---|

1  the group is much larger than these folks.
2     Q.  Well, these happened to be
3  epidemiologists on the IARC working group;
4  correct?
5     A.  I don't know all their qualifications.
6     Q.  Do you know any of those people
7  personally who are listed as authors on
8  Exhibit 21?
9     A.  No.
10     Q.  I'll represent to you that they're
11  epidemiologists.  You would agree with me, that
12  if you turn over to Page 2, they listed 14
13  population-based, case-control studies up at the
14  top, and then they had six more hospital-based,
15  case-control studies; correct?
16     A.  Yes.
17     Q.  At this time, there was one cohort
18  study all on the subject of talc and ovarian
19  cancer at the time; correct?
20     A.  Yes.
21     Q.  You would admit that the
22  population-based, case-control studies did not,
23  consistently across the board, show a
24  statistically significant increased risk
25  according to the table in Exhibit 21, the

| Page 311 |
|---|

1  Langseth paper.  Some were statistically
2  significant, and others were not; correct?
3     A.  Yeah.  But I mean, I don't view
4  statistical significance as --
5     Q.  Doctor --
6     A.  -- areas of consistency.
7     Q.  Doctor, I just asked whether they were
8  statistically significant.
9     A.  No.  All of them were not statistically
10  significant.
11     Q.  And we're talking about the 14
12  population-based, case-control studies in the
13  Langseth paper as of 2008; correct?
14     A.  Yes.  But I view them as consistent.
15     Q.  And the hospital-based, case-control
16  studies that are on Page 2 of the Langseth paper,
17  the six -- the hospital-based, case-control
18  studies, none of them were statistically
19  significant; correct?
20     A.  Yes.  But I still view them as
21  consistent with the overall findings.
22     Q.  And, in fact, when they did a
23  meta-analysis of the hospital-based, case-control
24  studies, that meta-analysis that added all
25  hospital-based, case-control studies together,

| Page 312 |
|---|

1  it, in and of itself, was not statistically
2  significant; correct?
3        MS. PARFITT:  Object to the form.
4     A.  Yes.  But it was consistent with the
5  overall estimates.
6     Q.  And the cohort study didn't show an
7  increased risk.  And the two cohort studies since
8  Langseth have not shown an increased risk of
9  ovarian cancer in talc users; correct?
10        MS. PARFITT:  Objection.  Misstates the
11  evidence.
12     A.  I see that, A, two of the cohort
13  studies have showed an excess risk, which is not
14  statistically significant.  One study has showed
15  statistically significant increased risk, and the
16  third studies have showed, you know, risk
17  estimates lower than one, but their upper bounds
18  are entirely consistent with what we see here and
19  subsequent to this.
20     Q.  So the population-based, case-control
21  studies collectively show an increased risk.  But
22  they're inconsistent; correct?
23     A.  No.
24        MS. PARFITT:  Objection.
25     A.  I mean, let's go to Penninkilampi.  I

| Page 313 |
|---|

1  mean, they clearly opine that --
2     Q.  I'm asking you about Langseth.
3     A.  Why are we looking at 2008 when we are
4  in 2019?
5     Q.  Because I'm asking the questions.
6     A.  Okay.
7     Q.  You would agree with me that, of the
8  three study designs, cohort studies,
9  hospital-based, case-control studies and
10  population-based, case-control studies, only one
11  of those three study designs shows an overall
12  increased risk of ovarian cancer in talc users;
13  correct?
14        MS. PARFITT:  Objection.  Misstates the
15  evidence.
16     A.  No.  I mean, at least at that time, you
17  had one, you know, cohort study.  I believe that
18  all of them show an excess risk, which is
19  consistent.  Two of those study designs that
20  you're talking about, the hospital based and the
21  cohort, did not show a statistically significant,
22  which I still believe a significant excess that's
23  consistent.
24     Q.  And you said earlier that you consider
25  and use the Bradford Hill considerations;

79 (Pages 310 to 313)

Sonal Singh, M.D., M.P.H.

Page 314

1  correct?
2      A.   Sorry.  Just give me a second.
3          Yeah.  The Bradford Hill overviews as one.
4      Q.   And you know, Sir Bradford Hill himself
5  said that, in evaluating consistency, you have to
6  look at consistency across different study
7  designs; correct?
8      A.   Yeah.  And times and places and other
9  things.
10     Q.   But I'm correct that Dr. Bradford or
11 Sir Bradford Hill said that you have to look at
12 consistency across different study designs;
13 correct?
14     A.   That's what I state in my testimony, as
15 well in my report cites that specific phrase,
16 consistency across study designs, times and
17 places.  So I am not -- you know, I am, in fact,
18 quoting him when I cite that.
19     Q.   You said, on Page 15 of your report,
20 that, "Talc-based body powders are used
21 habitually for months or years rather than just a
22 single application"; correct?
23     A.   Where is that?
24         MS. PARFITT:  Page 15.
25     Q.   Page 15.

Page 315

1      A.   Where is that?  I'm sorry.  Which part
2  of it?  15.  I know I have 15.  Is it the last
3  paragraph or --
4          MS. PARFITT:  Yeah.
5      A.   I don't see -- okay.  Yeah.
6      Q.   And what did counsel just point out to
7  you?
8      A.   Yeah.  I saw that.  That's correct.
9      Q.   And can you read what you said there?
10     A.   "Talcum powder products are used
11 habitually for months or years rather than a
12 single application or single body."
13     Q.   Would you flip over to Page 54 of your
14 report, please.  In Paragraph 6 there, you say,
15 in the third sentence that, "Recall bias is less
16 likely to occur for chronic daily exposures such
17 as talc"; correct?
18     A.   That's, you know, that's my
19 understanding.
20     Q.   Talc, in your estimation, is a chronic
21 daily exposure; correct?
22     A.   That's how -- that's my understanding
23 that, you know, women are using it.
24     Q.   You, in response to Mr. Zellers'
25 questions earlier today, said that one of the

Page 316

1  things you had reviewed was an Exhibit 47 to
2  Imerys employee Julie Pier's deposition.
3          Do you recall that?
4      A.   Yes.  If you can show me that.
5          MR. KLATT:  Sure.
6          THE WITNESS:  Thank you.
7          MR. KLATT:  I'm sorry.  I'm sorry.
8          THE WITNESS:  Exhibit --
9          MR. KLATT:  Yeah.  Let's mark it as the
10 next exhibit.  And that would be 33; is that
11 correct?
12         MS. PARFITT:  32.
13         COURT REPORTER:  Here is 32 that you
14 haven't used.
15         MR. KLATT:  Let me do this.  Yes.  That
16 will be 32.
17             (Chart marked Exhibit 32.)
18         MR. TISI:  The chart?
19         MR. KLATT:  Yes.
20 BY MR. KLATT:
21     Q.   I'm going to show you what's been
22 marked as Exhibit 32 to this deposition.  But for
23 future record references, it also has, in the
24 upper right-hand corner, a photocopy, Exhibit
25 No. 47; correct?

Page 317

1      A.   Yeah.
2      Q.   Exhibit 47 was the exhibit number at
3  Ms. Pier's deposition, and Exhibit 32 is the
4  exhibit number we're marking this today; correct?
5      A.   Okay.
6      Q.   Would you agree with me that you don't
7  have the expertise or knowledge to tell me that
8  any of the samples on Exhibit 32 to today's
9  deposition show asbestos in Imerys talc that
10 ended up in Johnson & Johnson's baby powder, do
11 you?
12         MS. PARFITT:  Objection.
13     A.   I mean, it says, you know,
14 anthophyllite -- yeah.  I mean, I don't have
15 asbestos expertise here.
16     Q.   Let's -- you understand that most of
17 these samples, the source of these samples isn't
18 even identified?
19         MS. PARFITT:  Objection.  Form.
20     A.   Yeah.  But -- but, actually, can I
21 answer that?
22         So, for example, separate from the source, I
23 mean, I understand that it says chrysotile
24 asbestos for the first one.  It says serpentine.
25 It says chrysotile.

Sonal Singh, M.D., M.P.H.

Page 318

1    Q.   And where on that first one, and we're
2  looking at the very first line across the top of
3  Exhibit 32 --
4    A.   Sure.
5    Q.   -- where in the world does it say that
6  that was a sample of talc that ended up in
7  Johnson & Johnson's talc-based body powder
8  products?
9    A.   Well, my understanding, and I can share
10  that, that this was -- this was that -- that
11  testimony was given that this was a testing of
12  mines that was being mined by Imerys or -- I
13  mean, that contained asbestos.
14    Whether it ended up in baby powder was not
15  the question.  The question was:  Does talc
16  contain asbestos?
17    Q.   Did plaintiffs' counsel ask you to make
18  that assumption?
19    A.   No.  No.
20    Q.   Okay.  Well, then, I'm confused,
21  because Imerys and its predecessors have tested
22  literally thousands of samples of talc from
23  competitors, from their own mines, from mines
24  that are never used for cosmetic purposes or baby
25  powder, so how can you tell me that the first

Page 319

1  sample on Exhibit 32 has anything to do with baby
2  powder?
3    A.   Well, I'm not telling you anything to
4  do with baby powder.  My question is that, you
5  know -- that what constitutes talcum powder
6  products.  And based on this and, you know, talc
7  is mined together with all these other particles,
8  I wanted to know, what are the results.
9    And at least based on my understanding of
10  these results, again, I'm not a mineralogist,
11  they can argue whether the amount of asbestos is
12  significant or, you know, these fibers, chromium,
13  cobalt, nickel are significant.  My understanding
14  is that these particles are present.
15    Q.   Can you tell me, based on your own
16  knowledge or expertise, that any sample listed on
17  Exhibit 32 was from talc that ended up in
18  Johnson & Johnson's baby powder or Shower to
19  Shower talcum powder products?
20    A.   No.  I cannot.
21    Q.   Okay.  You referred in your report to
22  the Shukla paper; correct?
23    Do you recall that?
24    A.   Show it to me.  It's been a while.
25    Q.   Sure.  I'm going to give you the page

Page 320

1  on your report where I think you refer to it.
2    A.   I know it's in the biologic
3  plausibility section somewhere.
4    Q.   Look on page -- I believe it's Page 61
5  of your report.
6    A.   Yes.
7    Q.   No.  I'm sorry.  It's Page 59 of your
8  report.  And it's the third paragraph down.
9    A.   Mm-hmm.
10    Q.   And you say, in the middle of the third
11  paragraph, "In studies of human mesothelial
12  cells, both nonfibrous talc and asbestos have
13  shown evidence of genotoxicity," and the
14  reference is 109, and my understanding is
15  reference 109 is the Shukla paper published in
16  2009; correct?
17    A.   Where are you referring?  I'm sorry.
18  In Page 59?
19    Q.   Page 59 of your report, third
20  paragraph.
21    A.   Yeah.
22    Q.   Second sentence.
23    A.   Yeah.  It says here, should be Shukla.
24  Yeah.
25    Q.   Did you read the Shukla paper?

Page 321

1    A.   I read -- you know, I didn't read it
2  line by line.  But, yes, I read it.
3    Q.   You know the Shukla paper has nothing
4  to do with genotoxicity; correct?
5    A.   I mean, we can look at it.
6    Q.   Sure.  It's about gene expression;
7  correct?
8    MS. PARFITT:  Let's take a moment,
9  Mr. Klatt, see if he can look at the study here.
10    Q.   Do you have it handy, Doctor?
11    A.   No.  I don't.
12    MS. PARFITT:  What is he referencing,
13  109?
14    A.   Shukla.  I mean, it might be in my
15  files.
16    Q.   Well, I apologize.  I thought I brought
17  an extra copy, but I don't think I have one with
18  me.
19    (Discussion off the record.)
20    Q.   Well, just look at the title.  The
21  title is "Alterations in Gene Expression in Human
22  Mesothelial Cells Correlates with Neural
23  Pathogenicity."  Correct?
24    A.   Yes.  I remember that title and
25  abstract.  Yes.

81 (Pages 318 to 321)

Sonal Singh, M.D., M.P.H.

Page 322

1    Q.  Gene expression is something that
2  occurs in our bodies every day; correct?
3  Trillions of times every day; correct?
4    A.  Yeah.  Yeah.
5    Q.  And changes in gene expression, in and
6  of themselves, don't establish genotoxicity;
7  correct?
8    A.  Yeah.  And I'm not -- again, this, you
9  know, in the section on biologic plausibility,
10  I'm not making this argument that talc is an
11  established mutagen and, you know, whether it's a
12  genotoxic or nongenotoxic carcinogen.  I'm just
13  citing the studies.
14    So, I mean, again, I don't have that
15  expertise, and, you know, does it provide
16  evidence for or against biological plausibility
17  mechanisms.
18    Q.  Okay.  But you don't have the expertise
19  to judge that; correct?
20    MS. PARFITT:  Objection.
21    A.  No.  I have expertise to judge whether
22  these studies suggest evidence of, you know,
23  changes and we should probably just look at it --
24  give me a second.
25    Q.  Sure.

Page 323

1    MS. PARFITT:  Give me a second.
2    Q.  My specific question is you cited
3  Shukla for evidence of genotoxicity, but it says
4  nothing whatsoever about genotoxicity, does it?
5    A.  We have to look at the paper before we
6  say that.
7    It's 109.  Yeah.  Let me look in my binder.
8  I think I have all the studies.
9    Q.  Doctor, I'll represent to you, in the
10  interest of time, I've searched the Shukla paper,
11  and the word "genotoxicity" or "mutagenicity" is
12  never mentioned in the paper.
13    A.  I -- I don't want to deny that.  It may
14  be.  I just feel that I wouldn't have used that
15  term had I not seen it there.
16    Q.  In the interest of time, rather than
17  wasting time, let's move on.
18    You'd agree with me that pelvic inflammatory
19  disease is chronic inflammation of the ovaries,
20  fallopian tubes and peritoneum; correct?
21    A.  Yes.
22    Q.  And, yet, you cited the Rasmussin
23  paper, and the Rasmussin paper says that
24  high-grade serous ovarian cancer, which is the
25  most common form of ovarian cancer and the most

Page 324

1  common in these lawsuits, wasn't associated with
2  pelvic inflammatory disease; correct?
3    A.  Again, I don't remember the papers.
4  Sorry.
5    Q.  All right.  Well, it's on Page 58 of
6  your report and it's reference 122.
7    A.  Which page of my report?
8    Q.  Page 58 of your report that cites
9  reference 122.
10    MS. PARFITT:  Here's the article.
11    Q.  Do you see the reference?
12    A.  Yeah.  Yeah.
13    Q.  Do you see the reference in your
14  report?
15    A.  Sure.
16    Q.  And reference 122 is to the Rasmussin
17  paper from 2017 on pelvic inflammatory disease
18  and ovarian cancer; correct?
19    A.  Yeah.  And my citation is correct.  I
20  mean, about borderline ovarian.  I don't misquote
21  the study.
22    Q.  I didn't say you misquoted it, but the
23  study does stand for the proposition that the
24  most common form of ovarian cancer, both in the
25  U.S. and in these lawsuits, high-grade serous

Page 325

1  ovarian cancer is not associated with pelvic
2  inflammatory disease; correct?
3    A.  Where does it show that?  I didn't --
4    Q.  Can you go to the "Discussion" section.
5    A.  Again, you know, my view of
6  inflammation was, you know, I was looking for
7  evidence for or against.  And, you know, I wasn't
8  disaggregating by ovarian cancer subtype, but I'm
9  happy to look at it.
10    MS. PARFITT:  Mark, do you have a page
11  in the article?
12    MR. KLATT:  I don't know if we have the
13  same pagination, but my page is --
14    MS. PARFITT:  Here.  I got it.  It's 29
15  of 33.
16    MR. KLATT:  I believe that's right.
17    MS. PARFITT:  Okay.
18    MR. KLATT:  It's the "Discussion"
19  section.
20    MS. PARFITT:  Yes.
21  BY MR. KLATT:
22    Q.  And if you look at the "Discussion"
23  section, Doctor --
24    A.  Yes.
25    Q.  -- it starts -- the very first

82 (Pages 322 to 325)

Sonal Singh, M.D., M.P.H.

Page 326

1    paragraph starts with "to our knowledge";
2    correct?
3        A.   Yeah.
4        Q.   Okay.  Go down one, two, three, to the
5    fourth paragraph starting with "in the present
6    study"?
7        A.   Sure.
8        Q.   And in that paragraph, tell me if I
9    correctly quote this sentence.
10       "Conversely, no convincing associations
11   between PID," which is pelvic inflammatory
12   disease, "and the risk of high-grade serous,
13   mucinous, clear cell or endometrioid ovarian
14   cancer were noted in the main analysis."
15       Did I read that correctly?
16       A.   Yes.
17       Q.   And then if you go down to the very
18   next paragraph that begins with "nevertheless."
19       A.   Yeah.  I see that, but I --
20       Q.   Wait.  Wait.
21       A.   No.  No.  I need to answer your
22   question.
23       Q.   I'm just asking you, first of all, if
24   I'm reading this correctly.
25       A.   Sure.

Page 327

1        Q.   In the next paragraph that begins with
2    "nevertheless," do you see what I'm talking
3    about?
4        A.   Yeah.
5        Q.   There's a sentence that says,
6    midparagraph, "In contrast, no associations
7    between pelvic inflammatory disease and
8    high-grade serous ovarian cancer were observed";
9    correct?
10       Did I read that correctly?
11       A.   Our results suggest -- I'm sorry.
12   Where --
13       Q.   In contrast.  Do you see the sentence
14   that says "in contrast"?
15       A.   Where was it?  Is it in the same
16   paragraph?
17       Q.   It's the paragraph starting with
18   "nevertheless, our results."
19       A.   Yeah.  But it says differentially.
20   Where does it say in contrast?  In contrast.
21   Yeah.
22       Q.   Okay.  Can you read that sentence?
23       A.   "In contrast, no associations between
24   PID and high-grade serous ovarian cancers were
25   observed."

Page 328

1        Q.   So the paper you cited, the 2017
2    Rasmussin paper on pelvic inflammatory disease
3    and ovarian cancer is inconsistent with the
4    theory that chronic inflammation causes
5    high-grade serous ovarian cancer; correct?
6        A.   Let's go to Paragraph 3.
7        Q.   Could you just answer my question?
8        A.   Yeah.  I'm trying to.
9            MS. PARFITT:  Objection.
10       A.   No.  It isn't inconsistent.
11       Because if you look at Paragraph 3, they
12   state, "Furthermore, we observed similarly
13   increased risks of serous and mucinous borderline
14   tumors associated with PID status.  Furthermore,"
15   and they also state, "Sensitivity analysis
16   revealed statistically significant increased risk
17   of low-grade serous and endometrial when using
18   data from the North American..."
19       So I don't think your -- and concerning the
20   histologic subtypes, indications of risk of
21   low-grade serous cancers were noted in the main
22   analysis.  I wasn't disaggregating.  But this
23   entirely consistent with what I quote here, that
24   you increase serous type and you increase
25   low-grade type and you increase histologic.

Page 329

1        You are trying to disaggregate this into a
2    high-grade serous.  I don't know what's in the
3    lawsuit.  I'm really not opining on --
4        Q.   I'm not trying to disaggregate
5    anything, Doctor.  I'm saying Rasmussin, the
6    study that you --
7        A.   Yeah.
8        Q.   The study that you chose to cite --
9        A.   Sure.
10       Q.   -- in your article indicates there's no
11   association between pelvic inflammatory disease
12   that is a chronic disease of the female
13   reproductive tract and high-grade serous ovarian
14   cancer; correct?
15       A.   And the same --
16           MS. PARFITT:  Objection is.
17       A.   -- study showed an increase risk of --
18       Q.   Is that correct?
19           MS. PARFITT:  Let him finish, please.
20       A.   -- between PID and serous ovarian
21   cancer.  So it sort of is -- is consistent with
22   my hypothesis of inflammation and ovarian cancer.
23       I was not disaggregating histologic
24   subtypes.
25       Q.   My question is not about low-grade

83 (Pages 326 to 329)

Sonal Singh, M.D., M.P.H.

Page 330

1  serous that doesn't occur very often. My
2  question is about high-grade serous ovarian
3  cancer in the evidence from the Rasmussin paper,
4  and they say clearly twice, that pelvic
5  inflammatory disease is not associated with
6  high-grade serous ovarian cancer; is that
7  correct?
8       A.  That's what they state in the study.
9  But they also state clearly that serous ovarian
10 cancer is associated with PID status.  So that's
11 also clearly stated.
12      Q.  And if, indeed, as they state, there is
13 no association between high-grade serous ovarian
14 cancer and pelvic inflammatory disease, that's
15 inconsistent with the theory that inflammation
16 causes high-grade serous ovarian cancer; correct?
17      MS. PARFITT:  Objection.  Form.
18      A.  So, again, you know, first of all, you
19 know, I -- other people will opine to the
20 biologic sort of arguments about inflammation and
21 ovarian cancer.  And I did not disaggregate
22 specific, and I don't think this study is
23 inconsistent with what I state here.  And I note
24 that borderline ovarian cancer.
25      So this is entirely consistent with the

Page 331

1  inflammation hypothesis.  And I just, you know --
2       Q.  In your report, you cited what you
3  thought was consistent with the inflammation
4  theory, but you didn't cite the evidence from
5  Rasmussin that was inconsistent with the
6  inflammation theory; correct?
7       MS. PARFITT:  Objection.
8       A.  No.  I was not disaggregating to the
9  level of each histologic subtype.
10      Q.  Well, didn't -- in your report, on
11 Page 58 --
12      A.  Yeah.
13      Q.  -- didn't you make the specific point
14 that Rasmussin said inflammation was associated
15 with low-grade cancer?
16      A.  No.  It just said increased risk of
17 borderline ovarian cancer.
18      Q.  Okay.  Borderline.  That's a specific
19 type of ovarian cancer.
20      A.  Sure.
21      Q.  So you did disaggregate in your report,
22 didn't you?
23      A.  Sure.  Yeah, but I mean, if you look at
24 the study, and we want to disaggregate it, the
25 study still shows a risk of serous ovarian

Page 332

1  cancer.  So if we disaggregate it, then we have
2  to disaggregate the way they have defined it.
3       Q.  And when we disaggregate, you come to
4  the conclusion that inflammation is associated
5  with borderline ovarian cancer.  But, in
6  fairness, you have to come to the conclusion that
7  inflammation is not associated with high-grade
8  serous ovarian cancer?
9       MS. PARFITT:  Objection.
10      Q.  If you're being objective; correct?
11      MS. PARFITT:  Objection.  Misstates
12 testimony.
13      A.  I am being objective.  I am providing
14 that they conclude, not I conclude, that, you
15 know, inflammation is PID, you know, it's just
16 one aspect of inflammation.  PID is associated
17 with serous ovarian cancer.  And, yes, it is not
18 associated with high-grade epithelial ovarian
19 cancer.
20      Q.  You talked with Mr. Zellers earlier
21 today about recall bias, correct, and how it can
22 operate in case-control studies?
23      A.  I don't recall the details.
24      Q.  But you recall the subject was
25 discussed --

Page 333

1       A.  Yes.
2       Q.  -- correct?
3       A.  Yes.  And I'm going to take a break in
4  a minute.
5       Q.  Sure.  Do you know if, in any of these
6  case-control studies -- well, let me back up.
7       A case-control study takes a group of cases
8  which are women with -- who already have ovarian
9  cancer, and interviews them; correct?
10      A.  Yes.
11      Q.  And then it takes a group of controls
12 and, in the context of a population-based
13 case-control study, those controls are healthy
14 women out in the community; correct?
15      A.  Yeah.  In the context of -- yes.
16      Q.  Do you know if any of these
17 case-control studies, when they were interviewing
18 the case women who had ovarian cancer, asked them
19 when they entered the study, "Do you have any
20 preconceived notions about what might have caused
21 your ovarian cancer?"
22      A.  I didn't review that specific question.
23      Q.  Wouldn't that be an important question
24 to ask?  Because if a woman already has a
25 preconceived notion from research or word of

84 (Pages 330 to 333)

Sonal Singh, M.D., M.P.H.

Page 334

1  mouth what might cause her ovarian cancer, that
2  may bias the results; correct?
3      MS. PARFITT:  Objection.
4      A.  There's lots of different questions you
5  could ask them.  You know, I would have, if I had
6  designed a study, I would have asked many other
7  questions.
8      Q.  And would you have asked that one, "Do
9  you have preconceived notions as to what might
10  have caused your ovarian cancer," before you
11  entered the study?
12      A.  I don't -- you know, I don't -- I
13  haven't thought about that conceptual or new
14  study.  I'm not sure that is that important
15  question to ask.
16      Q.  It wouldn't be an important question to
17  ask women entering a study, a case-control
18  study --
19      A.  Sure.
20      Q.  -- women who have ovarian cancer, "Do
21  you have a preconceived notion about what caused
22  your ovarian cancer?"
23      A.  You know, I've done -- designed
24  case-control studies of etiology cases and
25  outcomes.  I've never asked the participants

Page 335

1  about what is your preconceived notions about
2  certain outcomes.
3      I mean, I'm just trying to understand, why
4  would you ask that, because --
5      Q.  Because you're trying to eliminate bias
6  from the study; correct?
7      A.  Yeah.
8      Q.  And if you enter the study with a
9  preconceived notion what caused your ovarian
10  cancer, you already have a bias; correct?
11      MS. PARFITT:  Objection.
12      A.  But I mean, aren't you introducing bias
13  by asking these questions?  "Okay, what is your
14  preconceived notion?"  I'm trying to understand
15  this question.  I just don't think that --
16      Q.  So it's your testimony that, typically,
17  in these case-control studies, the women who have
18  the disease of interest, in this case, ovarian
19  cancer, are not asked, when they enter the study,
20  if they already have preconceived notions about
21  what caused their ovarian cancer?
22      A.  Yeah.  In my opinion, if I were to
23  design a next case and control study, I'm not
24  sure that would be a question.  I would have to
25  think about why I would ask that question to

Page 336

1  eliminate for the possibility of recall bias.
2  Others may design it differently.
3      THE WITNESS:  I'm going to take a
4  break.
5      MR. KLATT:  Sure.
6      THE VIDEOGRAPHER:  Off the record,
7  4:30 p.m.
8      (A recess was taken.)
9      THE VIDEOGRAPHER:  Back on the record.
10  4:36 p.m.
11  BY MR. KLATT:
12      Q.  Doctor, are you board certified in
13  epidemiology?
14      A.  No.
15      Q.  Are you a member of the American
16  College of Epidemiology?
17      A.  No.
18      Q.  Are you a member of the Society for
19  Epidemiologic Research?
20      A.  No.
21      MR. KLATT:  All right.  I'm going to
22  turn it over to Mr. Locke.  Thank you for your
23  time.
24      THE WITNESS:  Thank you.
25      THE VIDEOGRAPHER:  Off the record,

Page 337

1  4:36 p.m.
2      (A recess was taken.)
3      THE VIDEOGRAPHER:  Back on the record,
4  4:38 p.m.
5      CROSS-EXAMINATION
6  BY MR. LOCKE:
7      Q.  Doctor, my name is Tom Locke.  I
8  represent the Personal Care Products Council.
9      Prior to this litigation, had you ever heard
10  of the Personal Care Products Council?
11      A.  No.
12      Q.  Sometimes it goes by the name of PCPC.
13  Have you ever heard of that?
14      A.  No.
15      Q.  Previously, the Personal Care Products
16  Council was known as the Cosmetics, Toiletries
17  and Fragrances Association.
18      Prior to this litigation, had you heard of
19  that entity?
20      A.  No.
21      Q.  And sometimes that's abbreviated, CTFA.
22  Had you heard of that entity?
23      A.  No.
24      Q.  Have you, prior to this talc
25  multi-district litigation that we're here on

85 (Pages 334 to 337)

Sonal Singh, M.D., M.P.H.

Page 338

1  today, have you worked with any of the
2  plaintiffs' lawyers with whom you've had dealings
3  in talc?
4      A.  Yeah.  I mentioned that I worked with
5  Attorney Restaino in the atorvastatin that is
6  listed on my testimony.
7      Q.  Anyone else?
8      A.  No.
9      Q.  Have you worked with the Beasley Allen
10  firm?
11     A.  They're not -- I don't know if they're
12  part of this talc.  The name sounds familiar.  I
13  just don't know the name of the lawyers.
14     Q.  Right.  They're part of the lead
15  plaintiffs' counsel in this multi-district
16  litigation.
17     A.  But I just have had correspondence with
18  these lawyers.  So, you know, I may have had --
19  received, I don't know, documents or -- I don't
20  know if invoices or something that may have.  But
21  I don't -- I haven't, like, corresponded with the
22  lawyers of Beasley Allen.
23     Q.  What I'm asking about is whether you
24  had worked with the Beasley Allen firm prior to
25  this talc litigation.

Page 339

1      A.  I have listed the -- you know,
2  listed the cases I worked for.  I don't remember
3  the name of the counsels and, you know, who were
4  on the firms.  So if it ended up that they were
5  involved in Viagra or something else, that's just
6  a recollection issue.
7      Q.  Okay.  Mr. Klatt asked you about
8  materials authored by defense experts.  Let me
9  elaborate on that a little bit.
10     Are you aware that various defense experts
11  authored reports in connection with prior talc
12  litigation?
13     A.  No.  I'm not aware.
14     Q.  Are you aware that there were prior
15  talc trials?
16     A.  I mean, I have seen it in the news
17  that -- I don't know if they're in state court,
18  federal court, you know.  I see it in the news.
19     Q.  Did you --
20     A.  California or something.  Yeah.  I'm
21  not aware.
22     Q.  Did you ask for the testimony of any
23  defense experts who may have testified regarding
24  epidemiology in connection with that other talc
25  litigation trials?

Page 340

1      A.  I remember asking about this specific
2  trial.  I have not asked for other trial
3  testimony, I don't think.
4      Q.  When you say "this specific trial,"
5  what do you mean?
6      A.  When I said -- you know, I said, in
7  this litigation, have epidemiology testimony been
8  submitted.  And I have asked for it.  Yeah.
9      Q.  Would it be relevant to you that other
10  scientists have analyzed the very same issues
11  that are encompassed in your report and testified
12  on behalf of defendants in other talc litigation?
13     A.  Yeah.  And as you see that, I have not
14  even had a chance to review the expert report
15  of -- on behalf of the plaintiffs that were
16  submitted in the list.
17     So, yes, it will be nice to do that.  A, how
18  much time; and, B, you know, I think it would
19  probably be more prudent to wait for the
20  epidemiologists on this particular case.
21     But, you know, as you said, I haven't even
22  had the chance to review the plaintiffs' experts.
23  And, you know, I asked for defendants' expert,
24  you know, report.
25     Q.  You asked for defendants' expert

Page 341

1  reports in this litigation.
2      A.  Sure.
3      Q.  But you didn't ask for defendants'
4  expert reports, deposition transcripts or trial
5  testimony in the prior talc litigation?
6      A.  How do I know?  I mean, I'm not very
7  familiar with how these, you know, different
8  trials are occurring, what you can share, which
9  attorneys are involved in which trials.
10     I'm sorry.  I didn't ask for it.  I know
11  that, but I'm just not familiar with that
12  process, what they can share.
13     Q.  Okay.  Can you go to Page 10 of your
14  report.  And I guess there are two exhibits to
15  it, or it's referred to in two exhibits.
16     Are you looking at Exhibit 10 there?
17     A.  Exhibit 10.
18     Q.  On the front page.
19         MS. PARFITT:  It's your report.  Yes.
20     A.  Exhibit 10.  Yes.
21     Q.  So if you could go to Page 10, I'd
22  appreciate that.  And on Page 10, you're
23  discussing, among other things, the advantages
24  and disadvantages of cohort and case-control
25  studies; is that correct?

86 (Pages 338 to 341)

Sonal Singh, M.D., M.P.H.

Page 342

1    A.  Yes.
2    Q.  Okay.  If you would look at the
3  paragraph that begins with the phrase
4  "case-control studies."
5    Do you see that there?
6    A.  Yeah.
7    Q.  Okay.  You're explaining your opinion
8  why case-control studies have some advantages
9  over cohort studies in that paragraph; is that
10  correct?
11    A.  No.  Not necessarily.  I mean, that
12  just talks about the strength and weaknesses of
13  various studies designs.  I mean, in fact, you
14  know, it talks about whether, you know, that, in
15  fact, it says exposure is ascertained
16  retrospectively.
17    So I'm just talking about the strength and
18  limitations of various designs.
19    Q.  Okay.  I was using advantages and
20  disadvantages.
21    Is there a significant difference between
22  those two?
23    A.  That's just the term we use.  Yeah.
24    Q.  Okay.  Now, one of the strengths, in
25  your opinion, of a case-control study, is that it

Page 343

1  captures the entire time period when an ovarian
2  cancer illness could occur; is that correct?
3    A.  That's not necessarily like an entire
4  time.  First of all, we don't know the precise
5  number of years.
6    But, yes, we know that it is a long-term
7  exposure.  So case-control studies allow us to
8  ascertain long-term exposure.  So that's a much
9  more accurate reflection.
10    Q.  And you were saying one of the
11  weaknesses of a cohort study is that it might not
12  capture all of the ovarian cancer cases because
13  ovarian cancer can develop over a long period of
14  time; is that correct?
15    A.  Yes.  After a particular agent, if it's
16  related, you know.
17    Q.  Okay.  And you mentioned, in fact,
18  there's a sentence here, "It is important to
19  determine the latency and induction between the
20  exposure and the disease to assess the duration
21  of follow-up"; is that correct?
22    A.  It is.
23    Q.  Okay.  And then you give the example of
24  smoking.  And you talked about, if you looked at
25  it for a 12-month follow-up study, that would not

Page 344

1  be useful, because you couldn't find all of the
2  lung cancer cases.
3    A.  Yes.  And that sort of applies to
4  Gonzalez.  And it was a six-month study, and some
5  of the other cohort studies that were of limited
6  duration.
7    So, yes, I mean, I don't know about the time
8  course exactly of lung cancer risk, but can apply
9  to various outcomes.
10    Q.  Okay.  So what is the latency period
11  for perineal talc exposure and ovarian cancer?
12    A.  I do not have -- I don't know, because,
13  you know, I don't -- again, I don't elucidate the
14  mechanism of ovarian cancer and the precise link.
15  So I cannot tell you that X number of days after
16  perineal talc or months after.  I know that it is
17  long-term.  It could be months to years.  And
18  that's as much as I can say.
19    Q.  So your example, when you were talking
20  about 12 months, actually, that really wouldn't
21  be a problem or we don't know whether that's a
22  problem or not because it could be months?
23    A.  No.
24    MS. PARFITT:  Objection.
25    THE WITNESS:  Sorry.

Page 345

1    A.  So, yeah, months would be a problem.
2  It's mostly -- I mean, yes, we have some bounds,
3  but most of the studies we see, it is likely to
4  have been, you know, several years after
5  exposure.
6    Q.  And how do you know that?  Which
7  studies have you reviewed or analyzed that say
8  that it's several years after exposure?
9    A.  Well, all of -- you know, the
10  case-control studies that have provided data on
11  duration of exposure and show evidence of
12  duration responsiveness suggest that -- so, for
13  example, Penninkilampi and others suggest that
14  this is -- you know, while there are increased
15  risks before both more than 20 years or more than
16  3,600 applications as well as those are less, the
17  risk is higher among those with higher duration.
18    But, again, I cannot partition this at 20 or
19  15.
20    Q.  Okay.  You have a phrase in here that
21  says "because ovarian cancer develops over many
22  years."
23    Is that an accurate assessment of your
24  views?
25    A.  Where is that?

87 (Pages 342 to 345)

Sonal Singh, M.D., M.P.H.

Page 346

1    Q.  If you look at the next paragraph,
2  first sentence, last clause.
3    A.  Yeah.
4    Q.  Other plaintiffs' experts have stated
5  in their reports that the latency period could be
6  decades.
7    Would you disagree with that?
8    A.  Yeah.  I mean, when I say many years,
9  it could be -- yeah, I just --
10    Q.  You don't know?
11    A.  I don't know the precise.  I don't want
12  to quantify the number of years.
13    Q.  Okay.  I want to shift topics a little
14  bit here.  You reference Linda Loretz's
15  deposition transcript in -- I think once in your
16  report.
17    If you would go to Page 7, I believe it is.
18  It's in a footnote.  Footnote 1.
19    A.  Mm-hmm.
20    Q.  Now, did you read the entirety of
21  Dr. Loretz's deposition transcript?
22    A.  Again, these are so many documents.  I
23  mean, I reviewed, you know, not -- but I don't
24  know if I read the whole transcript.  Yeah.
25    Q.  Do you know how many days she was

Page 347

1  deposed?
2    A.  I don't recall.
3    Q.  More than one day?
4    A.  I don't know that.  I'm sorry.
5    Q.  So her deposition transcript, I'll
6  represent to you, is 1,133 pages in length.
7    Did you read all that?
8    A.  No.  I didn't agree that I read all of
9  them either.  Yeah.
10    Q.  Okay.  I was a little confused because
11  I thought you had said, for hers, that you had
12  read the whole thing.
13    A.  No.  I didn't say I had read -- you
14  know, I have read the transcript, but it doesn't
15  mean that I read every, you know, precise word
16  and precise --
17    Q.  Do you know what her background is?
18    A.  No, I don't.
19    Q.  Do you know if she's a scientist?
20    A.  I don't remember, you know, the
21  specifics of the transcript.
22    Q.  How is it that you picked out this
23  quote then on -- that's Footnote 1 or this
24  citation, Footnote 1, Page 7?
25    A.  Yeah.  I mean, it's not even -- that's

Page 348

1  not even a citation.  I mean, it's -- I feel
2  that, and we were discussing that, you know,
3  could a randomized trial be here conducted.  And
4  to my mind, it would be unethical.  So...
5    Q.  Well, yeah.  But then you say,
6  "Defendants here have admitted this fact."
7    And so I'm just wondering what brought you
8  to that particular part midway in her deposition,
9  the second day of her deposition of a three-day
10  deposition.
11    A.  Some of this has, you know -- it just
12  doesn't -- I don't know why I would, you know,
13  put it -- but it's sort of -- it's even
14  irrelevant if you take her out of it.  Because,
15  you know, it's like, are we really going to do a
16  randomized trial?
17    Q.  I agree with you.  It's irrelevant.
18    A.  Yeah.
19    Q.  If you could go to Page 62 of your
20  report.  You've got a caption there "Cosmetic
21  Expert Review Panel Report."
22    Do you see that?
23    A.  Yes.
24    Q.  Roman numeral XII?
25    A.  Yes.

Page 349

1    Q.  Do you know what the name of the
2  organization is that you're referring to in that
3  paragraph?
4    A.  I don't know the name.
5    Q.  Do you know if Dr. Loretz testified
6  regarding that review?
7    A.  If I have cited her, then I have.
8    Q.  Well, you didn't cite her on this
9  portion.  That's why I'm asking about it.
10    A.  I don't know.  I mean, you're asking
11  all these different names.  They're all -- if I
12  haven't cited her, then I haven't reviewed it.
13    Q.  Okay.  Have you heard of the Cosmetic
14  Ingredient Review?
15    A.  Yes.
16    Q.  Sometimes referred to as CIR?
17    A.  Yes.
18    Q.  Dr. Loretz, in her deposition,
19  references the CIR dozens of times, doesn't she?
20    A.  Again, as I said, I didn't review the
21  entirety of the thousand pages.
22    Q.  Okay.  I'm just trying to understand
23  what you did review and you didn't.  You wrote a
24  paragraph about the CIR.  And I'm trying to
25  understand why you didn't reference Dr. Loretz

88 (Pages 346 to 349)

Sonal Singh, M.D., M.P.H.

---

**Page 350**

1  when she testified about that.
2      A.  So, as you can see, it's reference to
3  the published report, and, you know, I
4  reviewed -- again, even that was lengthy
5  document, and, you know, I wanted to review that
6  for completeness and understand that.
7      Q.  Did you read the entirety of that
8  report?
9      A.  As much as I can.  Not every word in
10  every sentence.
11      Q.  Okay.  Do you know if the FDA plays a
12  role in the CIR's review that you're referring to
13  on Page 62 of your report?
14      A.  I'm not aware of the specific
15  composition, but I know that FDA is -- attends or
16  is a member or has some sort of role there.
17      Q.  Do you know who the Consumer Federation
18  of America is?
19      A.  No.
20      Q.  Do you know if they play any role in
21  the CIR report?
22      A.  I don't know.  And maybe it's in the
23  study and I can't tell you offhand who is in this
24  panel.
25      Q.  It's also in Dr. Loretz's deposition.

---

**Page 351**

1  That's the reason I'm exploring it.
2      Do you know that one of the missions of the
3  Consumer Federation of America is to represent
4  consumers in connection with Cosmetic Ingredient
5  Reviews?
6      A.  I'm not aware of that.
7      Q.  Okay.  Do you know who was on the panel
8  of the CIR review?
9      A.  No.
10      Q.  Do you know whether there were
11  toxicologists who were part of the panel?
12      A.  I don't know that.
13      Q.  You criticize the panel makeup because
14  it was "primarily composed of dermatologists."
15      A.  Sure.
16      Q.  Do you see that?
17      A.  Yes.
18      Q.  Do you know why dermatologists would be
19  relevant to a review of cosmetics?
20      A.  Yes.  I mean, yeah.  But, of course,
21  the majority of cosmetics are on -- you know,
22  applied on the skin.  Yeah.  It would be
23  relevant.
24      Q.  So they would be relevant to a CIR
25  review?

---

**Page 352**

1      A.  Yes.
2      MS. PARFITT:  Objection.
3      A.  But specific to talc, you would want
4  more diverse representation with gynecologists,
5  oncologists, epidemiologists.
6      So it's not that it was a criticism of the
7  CIR review panel or whoever was on that as a
8  dermatologist, but specific to it, did they have
9  the expertise to -- and maybe they did, but I'm
10  just pointing that out.
11      Q.  So you don't know, one way or another,
12  whether they had the expertise?
13      A.  Yeah.  I mean, from my understanding,
14  they didn't have expertise in carcinogenicity and
15  epidemiology.
16      Q.  What do you base that on?
17      A.  Yeah.  I mean, you know, some of the
18  names that are here, they were dermatologists.
19  That's sort of my understanding.
20      Q.  Did you look them up and investigate
21  what they do or what they have done in their
22  careers?
23      A.  No.  I have not.
24      Q.  Okay.  So you're criticizing them as
25  not having the capability of doing the review,

---

**Page 353**

1  but you don't really know their expertise?
2      MS. PARFITT:  Objection.  Misstates his
3  testimony.
4      A.  Yeah.  It doesn't say -- first of all,
5  it's not a criticism.  It just says, what is the
6  composition of the panel.  It says it was
7  composed of, you know, expertise in epidemiology
8  and carcinogen -- so it's just sometimes
9  panels -- and it may have been very appropriate
10  for the 100 and whatever products that were
11  evaluated by that panel.
12      Q.  Okay.  One of the things that you
13  say --
14      A.  Sure.
15      Q.  -- is that there was a -- the review
16  was limited or limited its assessment to animal
17  and clinical studies on talc that did not contain
18  asbestos.
19      Do you see that?
20      A.  Yeah.
21      Q.  You would agree that the CIR reviewed
22  all of the epidemiological studies that were
23  available at that time; correct?
24      MS. PARFITT:  Objection.  Misstates
25  testimony.

---

89 (Pages 350 to 353)

Sonal Singh, M.D., M.P.H.

Page 354

1    A.  I don't know -- you know, I know that
2  they reviewed the process and they looked at
3  studies, and I don't know if it was all
4  epidemiologic studies, but I think and I
5  understand that presumption was that talc does
6  not contain asbestos.  I mean, that's what -- the
7  premise they started out with.
8    Q.  Well, did the epidemiologic studies
9  make a distinction between talc and its
10  constituents or alleged constituents?
11    A.  Yeah.  I mean, there are -- as I cite
12  in my report, there are -- they don't make
13  distinctions, but they -- some of the studies --
14  you know, some of the testimony we've discussed,
15  some of the, you know, testing we've discussed,
16  and some, you know, small publications suggest
17  that talc may contain asbestos.  So you have
18  these evidence.
19    But the CIR review was already carried out
20  with the presumption that talc did not contain
21  asbestos.
22    Q.  But they reviewed all of those studies
23  that you referenced, or do you not know what they
24  reviewed?
25    MS. PARFITT:  Objection.

Page 355

1    A.  I mean, I do not know every study they
2  reviewed.  I'm just providing -- I don't know
3  every study that IARC reviewed.
4    Q.  Well, you could find that out by
5  looking at the studies; right?
6    A.  There's not enough time.  There's so
7  many studies in this and so many reports, so many
8  assessments that --
9    Q.  But you're criticizing the CIR.
10    A.  Yeah.
11    Q.  And saying it limited its assessment.
12    A.  Sure.
13    Q.  And I just want to understand the basis
14  for that statement, and what you're saying,
15  testifying here today is you don't know what the
16  CIR reviewed.
17    MS. PARFITT:  Objection.  Misstates
18  testimony.
19    A.  No.  That, and we can look at it.
20  Let's look at the, you know, the --
21    Q.  But you made the statement.
22    A.  Sure.
23    Q.  And I'm asking you, sitting here today,
24  can you say what they reviewed?
25    A.  Yes.  I know they reviewed -- because

Page 356

1  they asked -- this statement is about the
2  question they asked.  They asked the question,
3  that talc fiber not containing asbestos, does it
4  cause.
5    So if they ask the question already, we know
6  that, they presume there was no presence of.  So
7  it's about the question that I'm stating it.
8    Q.  But the epidemiologic studies, when
9  they're analyzing talc use among women, they're
10  not making a distinction between talc that
11  contains or doesn't contain constituents.
12  They're talking about women who use products;
13  correct?
14    A.  That is correct.
15    Q.  So if your theory is correct and talc
16  contains harmful substances in addition to talc,
17  then the epidemiologic studies would have
18  reviewed women's exposure to those constituents;
19  correct?
20    A.  Yeah.  So, I mean -- so if you look at
21  what I've written, the review was carried out
22  under the flawed assumption that cosmetic grade,
23  you know, talc was -- did not contain that.  And
24  also limited to talc that did not contain.  And
25  also concluded that there was no evidence of talc

Page 357

1  migration.
2    I do not say that, you know, there was no --
3  they did not review the -- the epidemiologic
4  studies of talcum powder products.  That's not --
5  you know, they reviewed it.  But I'm just
6  pointing out the limitations of that.
7    Q.  Didn't CIR cite the very same studies
8  that were available as of 2013 that you cite in
9  your report?
10    A.  Yes.
11    MS. PARFITT:  Objection.  Form.
12    A.  Again, you know, I don't know if they
13  cite evidence of biologic plausibility.  I don't
14  know if they cite evidence of talc migration.  I
15  don't know how they interpreted the evidence
16  of -- just because they cited a study does not
17  mean that they interpreted the data in the same
18  way that I did.
19    So I don't know what studies specifically in
20  each section they cited.
21    Q.  Okay.  One of the things that you say,
22  "as a result of these serious methodological
23  shortcomings and funding biases."  Let me ask you
24  about that.
25    A.  Sure.

90  (Pages 354 to 357)

Sonal Singh, M.D., M.P.H.

Page 358

1    Q.  Is a review that's funded by an entity
2  with an interest in the outcome of that review
3  inherently flawed?
4    A.  No.  It isn't.  And this is just, you
5  know, one of -- and, you know, it's a potential.
6  It should be potential for funding biases.  It
7  doesn't mean that just because it was funded by
8  PCPC or CIR, it is, you know, biased.
9    But yes, I mean, so, for example, my report
10 and testimony, because it's funded by, you know,
11 should be examined for potential biases.  Just
12 like, you know, CIR's report should be.
13   Q.  I want to ask you about the timing of
14 things, because sometimes you have referred to
15 reports that were done a while ago.  And in this
16 case, you do that with CIR.  You say, "The
17 findings of this panel have been superseded by
18 several new epidemiologic studies," and so forth.
19 The line goes on.
20   Is it your opinion that -- well, let me ask
21 this way:  At what point in time can we say that
22 the epidemiologic studies have sort of been
23 completed so you could rely on that information?
24   MS. PARFITT:  Objection.  Form.
25   A.  Yeah.  I mean, so you rely on

Page 359

1  information from, what, 1982, Cramer one.  But I
2  guess the question is -- I don't know, I'm not
3  trying to put questions in your mouth.  But I
4  don't -- I can't -- because I evaluated the
5  causal question as of 2017 and didn't arrive at
6  an opinion until late 2018.
7    I did not go year by year and, say, okay, in
8  2005, when IARC looked at this, could we have
9  concluded, possible, a problem?  In 2010, when
10 Langseth looked, or 2015.
11   So I did not segmentate it by time.  And
12 you're just asking, even by epidemiologic study.
13 It doesn't work.  You have to look at the whole
14 body of evidence and come to a conclusion.
15   Q.  Isn't it true that, prior to the talc
16 litigation, no scientist had published an article
17 stating that talc causes ovarian cancer?
18   MS. PARFITT:  Objection to form.
19   A.  Yeah.  I mean, you know, I think a lot
20 of these articles have talked about -- and
21 scientists don't necessarily publish statements
22 about causation, you know.
23   You have seen that Health Canada has clearly
24 stated that talc causes ovarian cancer.  Yes, so,
25 in fact, not even scientists, but now we have

Page 360

1  regulatory agency in late 2018.  So things take
2  time.  And, you know, people, scientists take
3  time to come to conclusions.
4    Q.  Okay.  Let's go to Exhibit 22.
5    A.  Which is?
6    Q.  That's the Berge -- I believe that's
7  how it's pronounced -- report?
8    MS. PARFITT:  The Berge study?
9    MR. LOCKE:  Yes, yes.  I'm sorry.
10 BY MR. LOCKE:
11   Q.  So if you could turn to Page 9, can you
12 read the last sentence right before
13 acknowledgments, beginning with the word
14 "several."  If you could read it out loud,
15 please.
16   A.  "Several aspects of our own results,
17 including the heterogeneity between case-control
18 studies and the lack of dose-response with
19 duration of and frequency of use, however, do not
20 support a causal interpretation of the
21 association."
22   Q.  And they're referring to the
23 association between talc and ovarian cancer?
24   A.  Yes.  But other scientists, you know,
25 such as Penninkilampi, have concluded otherwise,

Page 361

1  that there is, you know, suggestive of a causal
2  association.  Health Canada has concluded
3  otherwise, that there's evidence of causal
4  association.
5    Q.  But here we are in 2018, there's a
6  study that's published saying, "Does not support
7  a causal interpretation of the association
8  between talc and ovarian cancer"; correct?
9    A.  Yes.  I mean, you know --
10   Q.  Let me just ask you:  So scientists
11 disagree about this issue?
12   A.  That's why we are here.  If we all
13 agreed, we wouldn't be here.
14   Q.  Okay.  Let me move to a different
15 topic.
16   MR. TISI:  How much time do we have?
17 How much time do we have?  That's okay.  Just
18 write it on a paper.
19   MR. LOCKE:  We're getting close.
20   Q.  Okay.  Can we go to Page 62 of your
21 report.
22   Now, did we already do that?  Maybe we
23 already did that.  Sorry.  I don't want to have
24 to do things again.
25   A.  Please don't.

91 (Pages 358 to 361)

Sonal Singh, M.D., M.P.H.

Page 362

1    THE VIDEOGRAPHER: 6:36.
2    THE WITNESS: So we have 6 minutes, 36
3 seconds?
4    Q. You have 24 minutes.
5    A. Oh, sorry.
6    Q. Sorry. We already did that one. So
7 good there.
8    Let's go to Page 15 of your report. We were
9 talking just a moment ago about regulatory
10 entities and what they found.
11    In the middle of that paragraph or middle of
12 that page, there's a part that says, "Although
13 the FDA conducted a survey."
14    Do you see that?
15    A. Yes.
16    Q. And they found no asbestos fibers or
17 structures.
18    But then you, whatever you want to call it,
19 you can call it criticism or deficiencies or
20 disadvantages, you state, "The results were
21 limited, only four out of nine talc suppliers
22 submitted samples, and the number of products
23 tested was low." Is that correct?
24    A. Well, that is a correct restatement of
25 the facts. So it is not something that I made

Page 363

1 up. I mean, it is true that four out of nine
2 suppliers --
3    Q. J&J was one of the entities that
4 supplied talc to the FDA; correct?
5    A. I didn't -- you know -- I didn't --
6 that FDA document, you know, I'm not aware of who
7 supplied.
8    Q. You didn't look at it. You criticized,
9 but you didn't look at the fact that J&J
10 submitted talc samples and product to the FDA?
11    MS. PARFITT: Objection. Misstates his
12 testimony.
13    A. I reviewed the reference and I reviewed
14 the -- you know, so I'm not testifying I reviewed
15 talcum powder products and ovarian cancer. You
16 know, and I was looking at the evidence. But I
17 didn't look at whether J&J submitted samples or
18 Imerys submitted samples, no.
19    Q. And you don't know whether, then, the
20 FDA, in fact, tested the two J&J products at
21 issue in this litigation and found no asbestos
22 fibers or structures in the samples?
23    MS. PARFITT: Objection. Misstates the
24 survey.
25    A. I don't know -- I don't -- you know, I

Page 364

1 don't know about the specifics, who are
2 manufacturers and -- yeah. But I know the
3 limitations of the survey.
4    And even they acknowledge that the study
5 could not prove that most or all talc-containing
6 cosmetic products currently marketed are likely
7 to be free. So even despite these -- whoever
8 supplied them and whoever, you know, tested them.
9    MR. LOCKE: We're almost there. Then
10 I'll turn it back over.
11 BY MR. LOCKE:
12    Q. Just one second. If you could go to
13 Page 59, please. Okay.
14    On Page 59, you've got a Roman numeral X
15 followed by a Roman Numeral III. Do you see
16 that? Talcum powder-induced inflammation. Am I
17 at the right place?
18    MS. PARFITT: I'm sorry, Tom.
19    MR. TISI: 59 of the report?
20    MR. LOCKE: Yeah.
21    A. It's probably 58.
22    Q. 58 of the report. Sorry.
23    MS. PARFITT: No worries.
24    Q. Okay. So you see that, Roman numeral
25 X, Roman Numeral III?

Page 365

1    A. Have we gone through this? I'll be
2 happy to go through it again.
3    Q. I want to ask you about something.
4    A. Sure.
5    Q. You have a statement, the first
6 sentence says, "Inflammation has long been
7 understood to be an important mechanism
8 underlying the development of ovarian cancer."
9    Do you see that?
10    A. Yes.
11    Q. And then you referenced 61. And if you
12 go to Exhibit 4, that is your list of references;
13 correct?
14    Well, for me, I was looking at it, because
15 it was broken out separately. But you could see
16 it at the back of Exhibit 10 as well.
17    A. Yeah.
18    Q. Do you see that, 61?
19    A. Yeah.
20    Q. And if you -- can you read the title of
21 the reference that you're citing to there?
22    A. The Ness study, is that?
23    Q. Right. The Ness study.
24    A. Possible Risk of Ovarian in -- Cancer.
25    Q. It's "Possible Role of Ovarian

Sonal Singh, M.D., M.P.H.

Page 366

1  Epithelial Inflammation in Ovarian Cancer."
2      Now, you're citing that for "long been
3  understood to be an important mechanism," but, in
4  fact, the first word in the title is "possible."
5      A.  Yeah.  And you can clarify that.  I
6  mean, this is about plausible mechanisms.
7      Q.  But it certainly doesn't say it's long
8  been understood to be an important mechanism.
9      A.  Well, I disagree.  I mean, you know,
10  maybe that -- you can't cite all the articles for
11  each statement you make.  I wish I did.
12      But inflammation, as I understand it, is an
13  important mechanism.  And at least has been known
14  for a long time about ovarian cancer.  And others
15  can opine in more detail.  Is that citation the
16  most?  Yeah, that particular citation has a
17  possible, you know, clarifier on that.
18      MR. LOCKE:  Okay.  Let me just see if
19  I've got anything else here.  That's all I have.
20      THE WITNESS:  Thank you.
21      MR. LOCKE:  Thank you.  Anyone else?
22      MS. PARFITT:  Let's take a quick break
23  and see if we have any follow-up.
24      THE VIDEOGRAPHER:  Off the record,
25  5:13 p.m.

Page 367

1      (A recess was taken.)
2      THE VIDEOGRAPHER:  Back on the record,
3  5:26 p.m.
4      MS. PARFITT:  Thank you.  Dr. Singh,
5  the plaintiffs have no questions.  I want to
6  thank you for your time today.
7      We would ask that Dr. Singh read and
8  sign.
9      MR. ZELLERS:  Thank you, Doctor.
10      THE WITNESS:  Thank you.
11      MR. KLATT:  Wait.  I've got 30 seconds.
12      THE WITNESS:  I want to thank everybody
13  for a very professional, you know -- I've done
14  this a couple of times.  And if I have raised my
15  voice, it hasn't been anything personal.  It's
16  just been trying to explain something.
17      MR. ZELLERS:  Thank you, Doctor.
18      THE VIDEOGRAPHER:  And we're off the
19  record at 5:27 p.m.
20      (Deposition concluded at 5:27 p.m.)
21
22
23
24
25

Page 368

1      - - - - - -
       E R R A T A
2      - - - - - -
3  PAGE  LINE  CHANGE
4  ____  ____  _____
5      REASON:  _____
6  ____  ____  _____
7      REASON:  _____
8  ____  ____  _____
9      REASON:  _____
10  ____  ____  _____
11      REASON:  _____
12  ____  ____  _____
13      REASON:  _____
14  ____  ____  _____
15      REASON:  _____
16  ____  ____  _____
17      REASON:  _____
18  ____  ____  _____
19      REASON:  _____
20  ____  ____  _____
21      REASON:  _____
22  ____  ____  _____
23      REASON:  _____
24  ____  ____  _____
25      REASON:  _____

1      ACKNOWLEDGMENT OF DEPONENT
2
       I,_____, do
3  hereby certify that I have read the
   foregoing pages, and that the same
4  is a correct transcription of the answers
   given by me to the questions therein
5  propounded, except for the corrections or
   changes in form or substance, if any,
6  noted in the attached Errata Sheet.
7
   _____
8  SONAL SINGH, M.D., M.P.H.      DATE
9
10
11
12
13
14
   Subscribed and sworn
15  to before me this
   _____ day of _____, 20_____.
16
   My commission expires:_____
17
   _____
18  Notary Public
19
20
21
22
23
24
25

93 (Pages 366 to 369)

Sonal Singh, M.D., M.P.H.

```
 1          C E R T I F I C A T E
 2     COMMONWEALTH OF MASSACHUSETTS
 3     SUFFOLK, SS.
 4          I, Janet M. Sambataro, a Registered Merit
 5     Reporter and a Notary Public within and for the
 6     Commonwealth of Massachusetts do hereby certify:
 7          THAT SONAL SINGH, M.D., M.P.H., the witness
 8     whose testimony is hereinbefore set forth, was duly
 9     sworn by me and that such testimony is a true and
10     accurate record of my stenotype notes taken in the
11     foregoing matter, to the best of my knowledge, skill
12     and ability; that before completion of the deposition
13     review of the transcript was requested.
14          I further certify that I am not related to any
15     parties to this action by blood or marriage; and that
16     I am in no way interested in the outcome of this
17     matter.
18          IN WITNESS WHEREOF, I have hereunto set my hand
19     this 17th day of January, 2019.
20
21          _____
            JANET M. SAMBATARO
22          Notary Public
       My Commission Expires:
23     July 16, 2021
24
25
```

**A**

**AACES**
10:14 261:22
**abbreviated**
337:21
**ability**
229:12 276:10
    370:12
**able**
57:16 78:19 79:6
    137:19 178:5
    200:21 229:5,13
    274:9 280:13
**absence**
101:18 104:7
    106:12 155:15
    269:5
**absolute**
227:12
**absolutely**
221:20 303:23
**abstract**
321:25
**abstracts**
230:11 231:7
**acceptable**
74:11
**accepted**
111:8 190:7 227:6
    231:4 281:24
**access**
74:13,13,15,23
    80:5 82:12,25
    108:14 109:22,25
    110:2,5,12 302:7
    308:13
**account**
98:25 197:6 241:18
    257:12 270:13
    291:15,17 293:5
    294:14,24 295:13
    296:23
**accounted**
160:15,17
**accumulated**
133:4

**accurate**
32:21 40:15 53:23
    283:15 343:9
    345:23 370:10
**acknowledge**
364:4
**acknowledges**
293:5
**ACKNOWLED...**
369:1
**acknowledgments**
146:4,5 360:13
**acted**
283:20
**action**
99:16,17 101:18
    104:6 262:23
    268:1 370:15
**actions**
233:14
**active**
111:20 260:13
**activities**
301:18
**acute**
225:1,4
**added**
19:16 108:18 154:9
    190:6 247:2
    311:24
**adding**
247:23
**addition**
19:23 131:23
    356:16
**additional**
7:17 14:20 17:20
    17:21 20:1 22:20
    22:23 23:2 28:20
    28:22 30:16,17,21
    31:3,13 32:3
    37:21 41:3 57:11
    58:1,6,15,17
    59:10,14 60:1,6
    61:22,25 62:2,4
    63:21 73:8 77:8

77:24 79:17,21,23
    80:18 81:5,10
    107:7,23 122:20
    244:3 280:24
    281:15 284:13
    285:1,5 287:16
**additions**
17:8
**address**
132:17 211:1,19
    241:11
**addressed**
267:14 292:16
**adhesions**
193:23 225:18
    226:22 233:11
**adjust**
158:13 237:22
    256:20 257:3
**adjusted**
239:12 254:8
    257:21 263:10
**admit**
307:1 310:21
**admitted**
348:6
**adolescence**
239:6,19
**advantages**
341:23 342:8,19
**advise**
303:25 304:19
**advocates**
274:15
**affect**
291:7
**African**
10:13 195:25
    261:21 262:2
**afternoon**
301:8
**age**
162:16,25 163:4
    165:4 167:12,25
    168:14 254:25
    255:22 293:7

294:15
**agencies**
88:12,14 98:22,25
    99:1 100:14
    183:20
**agency**
100:20 134:2 360:1
**agent**
134:19 135:23
    136:3,13 137:16
    138:13 343:15
**agents**
134:1,3 135:11,20
    136:2
**age-adjusted**
256:7
**aggregate**
250:14
**agnostic**
39:2,6
**ago**
27:6 34:25 45:13
    132:20 135:18
    153:6 253:18
    358:15 362:9
**agree**
104:11 116:21
    141:10 160:2,21
    162:18,22 199:2,5
    199:5 203:11
    207:23 215:6,8
    218:15,16 222:8
    246:6 249:11,13
    249:13,14,16
    288:7 290:22
    297:19 306:24
    309:16 310:11
    313:7 317:6
    323:18 347:8
    348:17 353:21
**agreeable**
21:10
**agreed**
37:14 229:15
    361:13
**agreeing**

250:6
**agreement**
2:8 24:9 36:9
**agrees**
292:24
**ahead**
24:3 29:25 54:3
    56:8 61:21 94:15
    103:1 201:22
    248:24 281:9
    307:25
**air**
185:15,15 237:4
**Alexandria**
3:6
**Alice**
65:6
**alleged**
285:13 354:10
**Allen**
338:9,22,24
**allergic**
234:4
**allow**
343:7
**allowed**
85:1 221:18
**allows**
85:4
**alterations**
220:3 321:21
**altered**
223:15
**alternate**
278:23
**alternative**
233:6 234:11
    276:21 277:13
    278:14,19
**ambient**
185:15
**amend**
152:6
**America**
5:8,16 301:9,11,15
    350:18 351:3

Sonal Singh, M.D., M.P.H.

**American**
10:13 16:23 195:25
261:21 262:2
328:18 336:15
**amount**
170:14,15,17
176:23 193:4,6
285:13,17,20
286:1,12 301:20
319:11
**amounts**
299:1
**Amstar**
7:22 20:20,22
**analyses**
119:17 166:5
175:11 219:7
239:13 270:9
**analysis**
93:9,9,13,19 96:25
97:13,16,20,25
112:15 129:9,16
130:5 147:12
165:8 169:10
175:25 181:9,19
181:20 194:23
198:15 201:7
210:15 217:21
218:18 240:18
256:7 270:7
286:17 288:6
294:13,22 326:14
328:15,22
**analytic**
127:17
**analyzed**
107:1,4,5 340:10
345:7
**analyzing**
308:10 356:9
**anatomically**
215:3
**and/or**
130:13
**Angeles**
4:6

**animal**
87:5 96:14 127:16
136:22 270:20
353:16
**answer**
12:25 13:9 29:25
31:2 38:6 56:7,9
63:7,11,17 65:14
65:19,25 66:2
68:5,5,12 69:18
74:16 75:2,7,10
75:11,14,15 79:22
80:1,11 82:1
87:13 91:2 94:17
105:8 112:23
113:1 115:4,14
133:18 137:20
139:23 149:7,7
150:20,21 151:6,8
151:9,10,11
160:10 175:4
197:24 200:21
202:8 213:16
215:20,25 216:2
221:7 224:9,16
229:12 230:21
255:17 257:7
260:10 274:9,20
276:9 278:4
282:25 304:16,23
317:21 326:21
328:7
**answered**
56:6 94:19 209:13
212:25,25 275:12
**answering**
66:4 155:24
**answers**
115:6,14 369:4
**anthophyllite**
317:14
**anti**
280:11
**anticipated**
253:15
**antioxidant**

223:4,17
**antioxidants**
222:25 223:3
280:10,10 300:1
**anti-inflammatory**
223:16 232:23
**anytime**
127:10
**apart**
41:25
**apologize**
321:16
**apparent**
217:11,17 218:12
**apparently**
23:18
**appear**
79:15 80:16 241:25
**APPEARANCES**
3:1 4:1 5:1 6:1
**appears**
158:19
**appendices**
110:12
**appendix**
198:1,11,14 200:20
**application**
86:10,16 117:2
124:19,24 126:9
184:2 186:9
189:25 193:25
207:17 216:9
314:22 315:12
**applications**
212:5 345:16
**applied**
87:6 90:21 117:2
190:11 213:7
214:5,18,20,23
216:9 225:8,17,23
308:18 351:22
**applies**
129:4 169:5 344:3
**apply**
101:8 132:3,7
141:22 142:19

169:9 344:8
**applying**
90:22 96:14 129:8
131:24 132:16
152:18
**appointment**
55:23
**appreciate**
24:15 63:8 211:13
292:8,12 309:20
341:22
**approach**
69:24 76:3 101:16
103:18,22 104:1,4
104:20,23 105:6
105:25 106:5,11
274:23
**approaches**
69:25
**appropriate**
304:18 353:9
**appropriately**
104:6 183:3
**Approximately**
12:18
**April**
9:8 129:19,24
130:3
**area**
46:20 111:20
121:21 127:2
187:4 190:3 206:1
207:9 208:3,8,18
218:10 219:2
229:14,16 231:22
233:2 281:11,13
300:11 305:6
**areas**
184:17 207:13
208:10,21 218:14
311:6
**argue**
319:11
**argument**
196:19 322:10
**argumentive**

248:17
**arguments**
196:18 330:20
**arrangement**
304:4 305:4
**arrive**
92:12 106:6 189:2
359:5
**arrived**
271:1 272:21 275:2
295:6
**arriving**
106:4
**arthritis**
223:22 224:1,15
**article**
8:12 9:10,12,15,18
9:22 10:3,11,15
10:19 82:20,22
83:1,4 86:8,14
89:25 109:10,17
109:23 110:1,5
112:1 113:15
114:14 115:1,2
116:25 143:12,15
153:6,9 157:6
172:6 179:6
193:22 195:1
206:14 218:2
228:11,15,25
230:2 244:19
245:9,16,17 246:2
246:5 261:19
289:21 290:8
292:11 293:13
324:10 325:11
329:10 359:16
**articles**
55:7 56:2 74:17,23
75:22 76:3,6
108:18 111:14,17
111:18 304:20
359:20 366:10
**artifactual**
235:14
**asbestos**

Sonal Singh, M.D., M.P.H.

Page 373

10:16,20 47:19
63:1,1,15 115:21
116:10,20,21
134:5 183:17,19
184:3,6 186:11
270:25 271:2,11
271:14,20 272:6
272:13,19 273:7
273:11 275:3,5,15
275:18 276:15
277:6,8 279:8,19
280:17 281:14
284:23 285:4,20
285:20 286:5,9,15
286:18,19,21
287:1,3,6,7,11,18
287:22 288:3,4,8
288:24 289:22
290:9,19 291:18
292:19,20 293:2
293:14 294:4
295:9,14,24 296:4
296:20 297:20,21
298:2,7,14,17
317:9,15,24
318:13,16 319:11
320:12 353:18
354:6,17,21 356:3
362:16 363:21
**ascertain**
343:8
**ascertained**
342:15
**ASHCRAFT**
3:3
**aside**
42:11 212:6
**asked**
24:6 29:5 36:1,4,9
36:13,19 37:2,7
37:10 38:19,23
53:10 54:6,24
55:5,7 56:6 60:9
61:16,22 62:21
79:24 80:9,11
84:22 99:18,20

109:3 114:11
155:25 162:11,14
164:19 168:6
185:8 198:7
209:13 221:8
259:12 271:4
273:19 274:7,11
275:11 280:25
281:1 283:23
302:21 304:16
306:12 309:13
311:7 333:18
334:6,8,25 335:19
339:7 340:2,8,23
340:25 356:1,2,2
**asking**
22:14 38:1 43:13
75:11 81:21 97:18
105:10 124:20
140:1 144:22
150:17 197:22
198:3,6,9 200:5
210:17 211:9
214:12 221:5
226:15 232:16
258:4 260:6,11,19
260:22 276:7
306:18,22 307:21
313:2,5 326:23
335:13 338:23
340:1 349:9,10
355:23 359:12
**aspect**
332:16
**aspects**
360:16
**aspirin**
231:23 232:12,14
**assembling**
127:15
**assess**
98:8 104:24 343:20
**assessed**
156:8 275:5
**assessing**
8:19 102:2,8,23

105:6 127:14,17
176:20
**assessment**
49:19 50:10 52:6
82:21 87:16,23
96:18 99:9,23
100:1,19 102:17
104:19 105:1
107:12 108:24
112:6 117:21
138:15,22 156:4,5
184:8,13 185:16
272:8 296:2 297:5
345:23 353:16
355:11
**assessments**
100:13,17,24 355:8
**assigned**
132:22
**assignment**
37:21
**assist**
55:3 56:12
**associated**
38:13 39:9 152:16
189:4 211:3,21
217:12,17 218:11
218:13,20 235:11
236:7,8,24,25
237:4,10,12 240:2
240:4,4,8,11,12
241:23 242:25
243:3 286:15
287:3,8 295:5
299:13 324:1
325:1 328:14
330:5,10 331:14
332:4,7,16,18
**association**
8:24 9:18 10:11
95:8 109:13
115:22 116:12
130:25 132:15
138:23 139:9,14
139:18,21 140:4
140:21,23 141:2,7

141:12,17,22
142:13,19 144:10
145:14 146:17,22
147:19 148:9
149:2,17 150:6,12
150:23 154:2
155:5,15 157:23
160:22 175:6
179:7 189:7 195:9
195:24 196:7
197:8 216:16
217:22 234:25
235:23 236:12
237:16 239:25
242:3 246:15
250:15 252:25
253:10 257:17
261:19,25 294:3,6
295:7 296:18
297:6 298:6
329:11 330:13
337:17 360:21,23
361:2,4,7
**associations**
117:12 130:14
140:10 207:15
241:25 242:2
243:1 251:10
263:11 326:10
327:6,23
**assume**
13:10 38:23 110:19
132:13,16 239:14
239:16 276:19
280:20
**assuming**
23:15 97:24 98:3,4
98:5 112:24 184:5
184:10 219:13
257:11 297:21
**assumption**
272:12 273:6
318:18 356:22
**atorvastatin**
338:5
**attached**

14:20 16:6 369:6
**attachments**
7:25 15:4,14 21:14
21:17 29:8
**attempt**
278:13
**attempts**
280:8
**attends**
350:15
**attenuated**
140:14
**attenuates**
156:1
**attorney**
33:13,14 34:8,9,14
338:5
**attorneys**
34:4 35:11,13
37:16 110:3,4
273:16 274:4
341:9
**attributable**
226:16,16
**attributed**
226:17
**August**
8:21 102:3
**Austin**
5:5
**author**
65:4 157:15 191:11
**authored**
339:8,11
**authorities**
88:4
**authority**
90:13
**authors**
113:3,7,10,24
114:9,12,20
115:19 116:16
117:10 118:23
119:16 143:2
144:7,19 145:2,5
145:11 146:8,11

147:3 157:21
167:19 197:7
229:22 230:14
252:23 257:21
262:16 263:2,4
270:22 290:12,18
291:20 296:16
310:7
**available**
16:3 32:4 54:18
57:12 62:14 64:8
70:3,9 73:22 76:4
76:13,24 77:6
87:20 88:1,18,20
88:21 126:4,4
127:23 200:11
231:6 274:24
275:14 282:23
353:23 357:8
**Avenue**
5:4,12
**average**
43:1 167:25 168:3
**avoid**
122:24
**aware**
49:18 79:11,16
89:10,14,17,18,22
91:3 92:7,22,25
99:15 116:20
120:10,16 127:1
128:11 129:15
137:15 138:1,3,16
138:21 145:2,8
173:3,12,24 174:4
192:5 194:19
200:25 209:10,15
213:1 225:13
226:25 233:13
234:16 272:22
273:15 280:11
291:2 298:23
299:3,9 307:10
308:19 339:10,13
339:14,21 350:14
351:6 363:6

**a.m**
1:16 2:13 11:6
77:15,19

_____

**B**

**B**
7:7 8:1 9:1 10:1
145:5 340:18
**baby**
84:11 219:13,14
265:21 266:3,7,12
282:20 286:5,13
286:13 299:13
300:9 317:10
318:14,24 319:1,4
319:18
**back**
18:10 21:7 28:6
35:9,24 68:1
71:10,14,16 76:5
77:19 83:16 98:17
134:13 139:24,24
176:12 186:24
198:12 217:7
219:6 226:3 241:8
256:23 297:11,17
301:4 303:15
306:15 333:6
336:9 337:3
364:10 365:16
367:2
**background**
33:20 347:17
**bacteria**
215:12
**balance**
223:14
**bankers**
15:21
**banned**
233:8
**base**
98:11 352:16
**based**
54:14,16 91:8,22
95:12,12 98:23

108:7 122:15
127:19 128:22
135:18 136:19
137:6 139:18
154:19 164:7
170:20 171:8
174:25 183:5,13
183:14 194:22
197:22 203:8
223:20 253:13
265:18 269:21
270:17 275:15,16
275:16 281:13
287:18 313:20
319:6,9,15
**baseline**
168:2
**basing**
122:10
**basis**
58:21 88:24 95:16
95:20 99:2 105:4
105:22 355:13
**Baylen**
3:13
**Beasley**
338:9,22,24
**becoming**
39:12
**Beechwood**
2:7
**began**
123:8 163:1 165:12
168:8 169:1
**beginning**
29:5 99:12 164:19
360:13
**begins**
77:17 176:10 241:6
297:15 326:18
327:1 342:3
**behalf**
66:17 67:2,5,15
273:23 340:12,15
**behavioral**
156:1 164:10

165:14
**believe**
16:14 56:6 66:3
87:9 125:18 129:2
153:1 155:10
164:25 209:22
271:13 281:6,10
282:5 313:17,22
320:4 325:16
346:17 360:6
**believed**
281:24
**Berge**
157:1,15,19 175:24
187:23 360:6,8
**best**
43:5 44:6,12,16
136:12 151:14
203:3 229:12
243:17 276:9
302:18 370:11
**better**
118:5 144:12 156:8
271:4 302:3
**beyond**
30:23 31:14 258:21
278:22 285:5,16
**bias**
51:1 130:12 137:4
151:17 152:13,25
153:3 155:18,21
155:23,25 156:1,7
156:9,11,12,14,19
157:21 158:2,10
158:14,20 164:10
165:14 166:11,13
167:23 169:25
235:7 251:9,16,17
251:18 252:3,4,5
252:14,21 253:3,4
254:4 258:1,6,10
258:18,23 259:11
259:14,23 260:3,7
260:18,23 261:4,8
262:24 267:13,14
267:16,18 268:1

270:14 315:15
332:21 334:2
335:5,10,12 336:1
**biased**
164:12 170:10,19
358:8
**biases**
156:18,24 199:11
254:4 357:23
358:6,11
**BIDDLE**
4:14
**big**
191:7
**billed**
40:9,10
**biloba**
137:12,19
**binder**
323:7
**biologic**
187:2,14 188:3,7
188:24 189:11
190:19 192:15
193:17 196:13
209:6 219:20
280:5,6 320:2
322:9 330:20
357:13
**biological**
86:18,20 96:12
122:19 131:12,20
136:23 186:19,21
187:3 188:1,23
189:2,15,20
208:14 209:2
219:17,22,22
220:4,6 224:23
226:25 231:14
232:20 253:21
270:19 295:8
322:16
**biologically**
193:8,10
**biology**
187:12

Case 3:16-md-02738-MAS-RLS Document 9886-12 Filed 05/29/19 Page 893 of 1525 PageID: 63039
Sonal Singh, M.D., M.P.H.

Page 375

**bit**
26:5,13 44:17
128:6 339:9
346:14
**bladder**
215:15
**blood**
185:21,25 186:3,15
370:15
**Blount**
65:6 68:20
**BMI**
254:23 255:1,24
256:1,6,10
**board**
310:23 336:12
**bodies**
322:2
**body**
10:12 15:7,12,13
112:8 144:8
145:12,20 161:6
185:3 214:17
261:20 262:1,18
263:12 283:4
287:20 295:14
303:10 314:20
315:12 318:7
359:14
**borderline**
125:21 324:20
328:13 330:24
331:17,18 332:5
**bottled**
184:24
**bottom**
23:19 24:20 103:21
130:10 131:8
195:13,16,22
**bound**
308:8
**bounds**
312:17 345:2
**box**
72:20
**boxes**

15:21
**Bradford**
96:14 127:18
129:10,16 131:24
132:3,4,9,12,16
132:17 138:23
139:2,10 142:9
146:13 176:14
186:18,24 313:25
314:3,4,10,11
**breadth**
96:11,12,13
**break**
24:11,12 77:9
171:22 172:5,11
172:12 176:6
240:23,25 278:9
296:7 297:10
333:3 336:4
366:22
**breaks**
198:1
**breast**
196:1
**briefly**
16:18 308:14
**bring**
105:14 149:10
150:14 151:12
209:20 303:22
**bringing**
105:17
**broad**
114:2 127:3 232:16
**broader**
144:19 214:15
**broke**
77:23
**broken**
365:15
**brought**
14:5 15:24 18:22
22:22 23:6 25:10
154:10 321:16
348:7
**Brufett**

46:10
**Burnola**
50:19

---
**C**

**C**
4:4 11:1 370:1,1
**calculate**
40:11,12
**calculated**
158:18
**calculations**
159:17
**calculator**
266:18
**California**
4:6 339:20
**call**
34:21 139:6 262:13
362:18,19
**calls**
139:8
**Camargo**
293:4
**Canada**
8:17 49:19 50:11
51:10,23 52:2
70:1,6 82:21
87:16,23 96:4,9
96:18 99:4,8,15
99:23 100:4,7
101:15 102:1,7,12
102:22 103:12,24
104:12,17,19
105:5,23 106:25
107:10,12 108:19
108:25 109:9
110:21 112:5,21
112:24 113:18,19
120:24 274:23
275:3 359:23
361:2
**Canadian**
107:20
**canal**
190:2

**cancer**
8:14 9:5,7,11,13,16
9:19 10:5,10,13
10:14,16,21 23:25
33:12 34:5 35:18
35:21 36:14,21
37:1,4,22 38:2,14
39:10 40:8,25
48:20 52:18 53:3
61:24 62:10 84:11
85:7,11,16,18
86:5 88:5,9 89:11
89:16,21 90:2,9
90:12,15,20,23
91:3,5,10,16,19
91:24 92:1,3,5
93:5,8,14,20,23
94:3 95:1,3,10,23
97:2,7,10,13,17
97:21 98:1 109:15
115:23 116:13
117:3 120:12,18
121:22 122:3
123:7,13,17 124:7
124:11,18,22
125:3,7,10,15,16
125:17,23,25
126:3,13,16,18,20
126:23 127:9
129:12 130:15
131:13 134:3
140:20 141:13,15
141:23 142:4,7,20
143:16 144:11
145:15 146:18,22
147:20 148:9
149:2,18 150:1,3
150:7,12,24
152:16 154:3
155:5,23 156:16
157:7 158:13
159:12 162:2
163:17,23 166:25
167:5,11 171:4
172:7 175:7 179:8
180:2 182:21

183:17,19,21
185:18 187:3,8,19
188:19,21,22
189:5,12 194:9,21
195:10 196:1,8,15
196:25 197:19
198:25 199:10,12
199:15,25 200:17
202:13,21 203:4
204:1 205:21
208:15 209:12
210:2 211:4,22
213:7 215:15,23
216:17,22 217:6
219:15,23 220:19
220:20,25 222:16
222:23 223:7,12
223:19 224:2,6,13
224:19,23 225:2
226:5,6,7,13,23
227:1,3,14,16,19
228:16 229:2
231:18,21,25
232:8,9,11,15,21
234:16 236:13
237:1,11,17
238:24 239:9,20
240:16,17 241:13
241:17,24 242:15
244:1,12,22
246:10 250:13,16
254:1 257:11
258:11,13,21
259:15,17 261:9
261:20,21 262:1,2
263:12,16,20,25
264:5,15,21 265:3
265:12,20 266:1,6
266:11 267:6
269:18 270:2
271:14 272:25
277:5 284:19
286:14,16,18,21
287:4,6,7,11,13
287:17,23 288:5,9

Sonal Singh, M.D., M.P.H.

288:12 289:22 290:9 291:4,14,19 292:21,22 293:3,6 293:14 294:4,15 295:9,15,25 298:5 298:22 299:2,5,10 299:14 300:6 302:1 303:12 305:11,14 306:2,8 306:18 308:4,5,6 310:19 312:9 313:12 323:24,25 324:18,24 325:1,8 326:14 327:8 328:3,5 329:14,21 329:22 330:3,6,10 330:14,16,21,24 331:15,17,19 332:1,5,8,17,19 333:9,18,21 334:1 334:10,20,22 335:10,19,21 343:2,12,13 344:2 344:8,11,14 345:21 359:17,24 360:23 361:8 363:15 365:8,24 366:1,14

**cancers**
254:20 296:19 327:24 328:21

**cancer-mediated**
232:22

**capability**
352:25

**capable**
135:14 215:4 222:6

**caption**
348:20

**capture**
40:24 343:12

**captures**
343:1

**carcinogen**
135:16 253:16 286:19 288:3

293:1 322:12 353:8

**carcinogenic**
132:22,23 133:11 133:23 134:4,19 135:5,11,24 136:4 136:9,11,11,13 137:11

**carcinogenicity**
144:14 352:14

**carcinogens**
185:13 280:12 299:24

**carcinoma**
291:24

**cardiovascular**
224:15

**care**
19:15 50:8 337:8 337:10,15

**career**
12:7,16,17

**careers**
352:22

**careful**
181:18

**carefully**
222:2

**carpentry**
137:25

**carried**
138:15,22 354:19 356:21

**carries**
195:17

**case**
19:14 40:4 42:12 47:18,22,23 48:3 48:8 69:23 76:19 79:15 80:1 84:3 118:14,21 145:18 152:4 159:24 176:3 182:20 185:6 225:4 235:9 238:23 265:14 272:14 273:8

274:6 279:12 281:25 299:11 301:10,12 308:6,8 333:18 335:18,23 340:20 358:16

**cases**
1:10 43:15 45:15 45:17 46:1,13 52:21,22 127:21 159:12,13,23,25 174:23 176:3 183:5 199:12,15 202:15 263:16 264:4 265:14 288:10,14 290:16 333:7 334:24 339:2 343:12 344:2

**case-control**
9:20 118:18 128:18 130:24 139:13 140:3 147:2,23 148:2 150:5,11,22 151:16,18 152:14 152:24 155:3 156:21 157:24 158:3 159:8,16 160:1,2 178:13,25 179:8,14 204:5 251:9 259:22 307:2,10 308:3,22 310:13,15,22 311:12,15,17,23 311:25 312:20 313:9,10 332:22 333:6,7,13,17 334:17,24 335:17 341:24 342:4,8,25 343:7 345:10 360:17

**Castle**
174:25

**categories**
133:8 181:20

**categorized**
256:8

**category**
134:7,11,17 170:18 182:10 210:14

**causal**
31:4 38:1 53:11 58:12 61:23 65:15 65:19,25 69:18,20 80:1 85:17 87:10 87:11 92:4,13 99:2,18 105:1,15 106:4,6,8 112:14 125:5,21 126:2 139:23 140:17 142:2 144:10 145:14 158:12 183:18 185:8,14 185:17,18 189:2 211:2 213:16 215:17 222:13,18 234:14 235:12 237:1,11 250:5 253:9,12 271:1 272:24 275:1 277:1,2,4 281:1 286:17 287:10,11 287:25 288:6 292:20 294:3 295:21,24 296:1 297:6 298:3 300:4 359:5 360:20 361:1,3,7

**causality**
99:20 295:1,7

**causally**
38:13 92:5 125:14 142:3 145:7 240:3 292:25 299:13

**causation**
30:14 104:13 117:2 123:25 129:3,7,11 143:7,11 359:22

**causative**
232:11

**cause**
10:16 38:2 85:15 101:19 104:8,16

105:14 106:13,16 124:7,10 125:2,11 125:25 126:10,13 126:16 217:4 219:22 226:23 227:3,19 231:17 253:25 286:12,13 286:14 287:12 288:1 289:22 290:9 298:22 299:1,8 334:1 356:4

**caused**
188:19 272:25 286:20 296:20 333:20 334:10,21 335:9,21

**causes**
84:11 85:11 86:5 120:12 124:17,22 125:18 126:18 127:8 183:21 209:4 219:15,24 225:8,14 227:13 271:14 278:14 288:4 291:18 293:2 328:4 330:16 359:17,24

**causing**
185:18 208:9 224:19

**CDC**
88:8,12,22,25 89:1 89:7,10 92:23,25 97:1 98:17,19 99:3 109:4

**CDC's**
91:14 98:15

**cell**
229:19 326:13

**cells**
205:23 320:12 321:22

**center**
120:8 305:11

**Centers**

Sonal Singh, M.D., M.P.H.

308:15
**certain**
128:10,12 303:25
335:2
**certainly**
135:14 222:7 366:7
**certainty**
227:12
**certified**
2:10,10 336:12
**certify**
369:3 370:6,14
**cervical**
207:6 208:2 209:11
**cervix**
192:13 210:6
212:15 213:8
214:6,19,20
**challenge**
177:2
**challenges**
177:1
**challenging**
176:21
**chance**
20:4 25:25 27:16
48:15 49:13 137:3
138:6 161:3 189:7
189:13 340:14,22
**change**
138:7 156:1 164:10
165:14 169:25
272:14 273:8
305:20 368:3
**changed**
30:19 138:11,17
**changes**
89:23 205:22
305:22 322:5,23
369:5
**characterization**
283:18
**characterize**
144:13
**charged**
278:11

**charging**
40:3
**chart**
10:22 316:17,18
**charts**
276:22 277:14
282:19,24
**chemicals**
299:12 300:8
**Chen**
23:21 50:3
**cherry-picking**
183:7
**Chicago**
5:21
**chicken**
74:24
**childs**
49:22
**chlamydia**
239:5,15,17 240:14
240:15
**choose**
98:8 139:5
**choosing**
270:7,8
**chose**
329:8
**Chris**
34:8
**CHRISTOPHER**
3:12
**chromium**
184:15 185:1,11,17
319:12
**chronic**
223:11 225:5,8,14
231:25 315:16,20
323:19 328:4
329:12
**chrysotile**
317:23,25
**chuckled**
284:5
**cigarette**
236:14,18 237:8

254:24 256:1,6,9
256:15
**CIR**
349:16,19,24
350:21 351:8,24
352:7 353:21
354:19 355:9,16
357:7 358:8,16
**circle**
83:16
**CIR's**
350:12 358:12
**citation**
50:19 52:10 94:9
202:19 242:7
248:12 324:19
347:24 348:1
366:15,16
**citations**
91:9 94:6 95:13
**cite**
57:17 64:13,17
65:2,6 66:15
67:23 68:2 70:21
71:11 72:6 74:2
85:19 87:5 92:23
93:1,5 97:11
142:24 143:22
144:24 145:9,25
157:1,15 164:3
170:21,24 174:12
177:8,24 178:15
190:6,17 193:18
193:22 201:13
202:15,18 203:18
204:8,11 205:11
206:5 217:14
219:3,6 227:17,22
228:9,22,24,25
230:3,15 243:23
245:15,17 246:2,4
247:8,18,21
248:19 249:2
250:1,8,17,24
253:23 254:14
256:17 270:10

273:11 302:14
314:18 329:8
331:4 349:8
354:11 357:7,8,13
357:14 366:10
**cited**
48:14 49:5 51:21
57:14,15 100:19
101:1 106:24
112:10 146:3
169:2 171:1,2
174:2 177:18
178:4 204:18
205:6 216:19
229:4 230:6 232:4
246:7 248:8
249:23 279:18
285:6,9,11 295:1
308:7 323:2,22
328:1 331:2 349:7
349:12 357:16,20
**cites**
153:16 174:11
277:24 288:4
314:15 324:8
**citing**
168:18 247:10
250:7 272:7
307:12 322:13
365:21 366:2
**claim**
120:11 179:17
185:17 188:5
**clarification**
305:2
**clarifier**
366:17
**clarify**
36:2 132:2 134:9
259:2 306:12
366:5
**clarifying**
133:2 295:20
**clarity**
44:13 61:11
**class**

137:10 170:16
262:23 267:25
**classifiable**
136:6
**classification**
132:21,23 138:8,12
138:18
**classifications**
9:9 133:13,17
135:2
**classified**
133:10 137:15
185:13 286:19
**classify**
133:5,7 134:18
137:18
**clause**
346:2
**clean**
54:1
**clear**
13:6 15:15 24:4
76:17 108:4
121:20 326:13
**clearance**
144:13
**clearly**
70:2 105:1 313:1
330:4,9,11 359:23
**cleavage**
298:9
**Clinic**
89:14,17
**clinical**
55:24 353:17
**close**
214:25 361:19
**closer**
207:9 208:2
**CLR**
1:19
**cobalt**
184:15 185:1,11
319:13
**coffee**
236:13,15,21,25

Sonal Singh, M.D., M.P.H.

237:5,12,13,16,18
**cogent**
131:12
**cohort**
128:18 146:21,25
147:6,8,10,16,19
147:22 148:1,4,17
148:22,25 149:14
149:16,21 150:2
155:16,21 156:8
156:17,20 158:8
158:22 159:6,15
159:25 163:14,20
165:15 166:5
173:13 178:5,8,24
199:7 307:2,10
308:4 309:1,2
310:17 312:6,7,12
313:8,17,21
341:24 342:9
343:11 344:5
**coin**
118:5
**collect**
70:15 178:7
**collected**
162:6
**collectively**
25:11 150:6,22
312:21
**College**
16:23 336:16
**Colorado**
3:22
**column**
195:23 263:15,19
290:6 294:10
296:13
**combined**
159:11
**come**
30:17 39:11 99:22
254:21 297:11
332:3,6 359:14
360:3
**comes**

43:14 112:16,17
123:17 191:14
**comfortable**
23:5 229:7
**coming**
166:13 171:18
231:9
**commencing**
2:13
**comment**
99:13 199:4
**comments**
100:3,6
**commission**
369:16 370:22
**commissioned**
304:8
**Committee**
50:5,13
**Committee's**
8:7 28:2
**common**
225:25 236:15,21
323:25 324:1,24
**Commonwealth**
2:12 370:2,6
**communicated**
34:5,9 35:12 52:16
**communicating**
276:1
**communication**
23:20 24:5 25:4,7
73:21
**communications**
22:14 24:7 34:19
36:17 74:1,18
76:19 81:12
**communiques**
76:12,18
**community**
144:3 190:8 333:14
**companies**
4:10,21 79:14 80:6
279:6 304:18
305:7
**company**

22:15 46:17 67:3,5
67:19 70:7,21,25
71:20 72:13,17
73:13,15,16,18,19
73:21,23,25 74:18
75:23 76:6,9 81:5
81:11 82:3,4
280:16 303:23,24
**compare**
128:12
**compared**
185:22 186:5
214:19
**comparing**
154:15,21
**comparison**
296:22
**competing**
140:13
**competitors**
318:23
**compiled**
79:10
**complete**
17:3 21:11,13,21
21:22 26:3,6,9
32:23 97:12,16
**completed**
164:21 358:23
**completely**
202:5 242:2 267:13
274:5
**completeness**
350:6
**completion**
158:14 370:12
**complexity**
63:25
**composed**
351:14 353:7
**composition**
350:15 353:6
**concentration**
207:5 208:1
**conceptual**
334:13

**conceptualized**
303:6
**conceptualizing**
306:16
**concern**
258:1,3
**concerned**
210:21
**concerning**
328:19
**concerns**
296:21
**conclude**
104:15 130:17
157:21 252:24
332:14,14
**concluded**
115:20 129:11
180:15 294:2
296:16 356:25
359:9 360:25
361:2 367:20
**concludes**
131:11,16
**concluding**
126:18 127:8
180:15
**conclusion**
24:14 91:25 95:23
96:1 124:4 127:24
144:23 253:7,8
294:12 332:4,6
359:14
**conclusions**
96:24 98:4,7
112:14 144:18,20
360:3
**condition**
223:23
**conditions**
222:22,25 223:11
223:16
**conduct**
15:16 53:5 128:1
178:6
**conducted**

70:1 85:9 86:2 94:7
96:9 113:17
119:17 127:22
130:21 175:11
183:25,25 184:8
184:13 255:25
275:23 284:25
294:1 308:21
348:3 362:13
**confidence**
137:4 153:23 154:5
160:16 268:24
**confidentiality**
74:22 76:15 84:25
306:25
**confirm**
85:10 86:3 282:18
283:2
**conflicts**
113:11,25 114:3,12
114:16,21,25
**confounder**
236:5,18,22,23
237:2,5,8 240:6,9
240:18 243:3
257:18
**confounders**
238:13 240:19
250:13
**confounding**
130:13 137:4
234:22 235:3,9,16
235:18,22 236:3
237:20,23,24
238:4,10,16,19
240:11,24 241:12
241:18 242:1
245:3,5 246:7,11
250:20,24 253:4
254:3,4,9,11
257:13,15 292:16
**confused**
29:3,5,6 318:20
347:10
**confuses**
234:25 235:24

Sonal Singh, M.D., M.P.H.

confusion
235:5,6,16,19
Congress
5:4
congruent
170:1 275:6
conjunction
166:18
connection
73:2 339:11,24
351:4
consider
53:10 60:25 80:13
84:12,16 91:14,18
91:24 98:12,15
123:12 138:25
139:12 140:2
176:4 240:9,18
272:5 313:24
considerable
104:3
consideration
60:17 136:23
considerations
132:18 253:13
308:1 313:25
considered
7:18 17:20,22
48:25 49:17 54:9
54:20 58:2,7,16
59:11,15,19,25
60:1,3,5,7 73:9
74:11 77:24 80:19
87:18 98:22,22
107:7 156:25
176:15 179:3
185:2 206:24
234:11 240:5
243:2 244:4
257:18 288:9
consistency
117:7,11,19 130:18
132:9 146:14
147:5 148:3 149:7
149:8,12 160:7
202:16 232:13

311:6 314:5,6,12
314:16
consistent
42:22 69:25 96:21
96:23 118:10,24
119:18 120:1
130:25 146:17
148:8 149:1
154:12 218:17
232:24 311:14,21
312:4,18 313:19
313:23 328:23
329:21 330:25
331:3
consistently
152:15 231:24
232:3,7 310:23
consortium
166:14,18 217:22
constituent
300:5
constituents
62:3 127:16 271:4
271:5 274:7,12
280:4,8 286:7,10
287:13 292:23
298:5 299:5,6,19
299:22 300:12
354:10,10 356:11
356:18
constitutes
63:14 185:9 319:5
constitution
63:19 275:2
consult
36:4,11 127:11
consultant
42:16,21 46:22
70:11 191:22
consultation
22:10 36:10
consulted
43:18
consulting
43:9,15,16,22 44:3
44:11 73:12

100:12
Consumer
4:10,21 271:19
285:14 350:17
351:3
consumers
351:4
contact
214:25 304:18
305:17,25
contacted
33:11,21,21,24
140:8 305:9
contain
28:24 29:18 271:14
272:17,19 273:11
318:16 353:17
354:6,17,20
356:11,23,24
contained
276:14 318:13
containing
270:25 356:3
contains
29:8,22 48:18
297:21 356:11,16
contaminant
285:13
contaminate
116:20
contaminated
116:21 184:5
271:19 276:14
contamination
115:21 116:11
272:12 273:6
content
247:20,22
context
87:15 89:9 160:25
161:8 190:19
233:8 301:14
333:12,15
continue
77:21 180:11 182:3
Continued

4:1,24 5:1 6:1 9:3
9:25
continues
241:17
contraceptive
255:1 256:8
contraceptives
260:13
contract
113:18
contrast
327:6,13,14,20,20
327:23
control
118:14,22 154:14
154:23 159:24
176:3 238:22
254:23 256:2,5
264:14 308:15
335:23
controlled
238:20 239:19
240:7 307:11
controls
152:12,23 163:3
229:23 230:17
263:19,24 265:15
265:16,20 333:11
333:13
conversation
34:23
conversations
36:18
Conversely
326:10
convincing
326:10
Cook
202:2
copied
245:8 246:21
247:12
copy
14:18 21:11,13
24:4 26:4,6,9,11
26:12 195:5,6

211:7 243:19
246:18 247:11
248:13 255:14,18
257:5 277:20
309:6,9 321:17
core
118:22
corner
316:24
cornstarch
233:6,9,14 234:10
234:15,18,20
correct
12:2,23 13:19
14:16 15:22 17:14
18:7 22:24 25:23
29:15 44:8 54:23
59:12 61:1 63:2
65:24 71:4,15
72:7,10 74:6,19
75:3,24 76:25
77:3 80:12,20
82:5 84:4 87:25
88:25 89:3,18
90:24 92:15 93:11
98:13 99:4 104:13
106:13 108:6,9,15
118:6 119:12
124:8 126:11,13
127:24 130:3
134:8 137:5 140:4
141:2,17 142:16
143:8 145:25
146:23 148:10,23
149:3,18 150:7,24
151:18 152:20
157:2 160:23
163:6,13 164:1
165:17,25 167:13
169:3 170:23
173:19 175:7,17
179:12 180:8
181:1,5 185:23
186:6,22 188:10
188:23 196:4,22
197:1,20 199:1,21

Sonal Singh, M.D., M.P.H.

| | | | | |
|---|---|---|---|---|
| 200:1 203:15,21 | 333:14 334:2 | 49:8 54:25 56:17 | 20:11 107:19 108:5 | **cut** |
| 208:3,11,21 | 335:6,10 341:25 | 57:1,18 59:16 | 273:16,21 274:3,8 | 248:18 |
| 210:11 211:22 | 342:10 343:2,14 | 60:17,25 64:24 | 274:10,14 275:9 | **CV** |
| 215:5,12 216:17 | 343:21 353:23 | 66:7 71:19 72:10 | 276:15 | 16:11,19 17:9 |
| 217:13,18 219:4 | 356:13,14,15,19 | 72:22 78:16 79:19 | **creates** | 19:25 43:19 |
| 219:10 220:9 | 361:8 362:23,24 | 80:12 81:7 82:10 | 235:14 236:4 | **C.F.R** |
| 221:2 222:23 | 363:4 365:13 | 102:18 108:6,12 | **credentials** | 233:15 |
| 223:12 224:11 | 369:4 | 121:1 198:10 | 113:2 122:17 | |
| 225:20 226:23 | **corrected** | 202:5 211:6 221:7 | **criteria** | **D** |
| 227:8 230:17 | 268:14 | 231:4 248:17 | 117:1,6 119:22 | **D** |
| 231:1 235:1,17 | **correcting** | 275:10 276:1 | 131:24 132:5,8,10 | 7:1 11:1 |
| 236:16 237:18 | 25:24 160:11 | 280:14 283:18 | 138:24,25 139:3,4 | **daily** |
| 238:5,14,20 239:9 | **correction** | 284:5 291:25 | **criticism** | 156:9 163:17 180:3 |
| 239:16 240:20 | 251:21 | 315:6 318:17 | 161:14 352:6 353:5 | 182:16 258:16 |
| 245:10 247:13 | **corrections** | 338:15 | 362:19 | 315:16,21 |
| 249:1,11 250:3,17 | 17:9 369:5 | **counsels** | **criticisms** | **dark** |
| 253:4 254:20 | **correctly** | 339:3 | 161:19 | 83:5 |
| 255:7,7 256:21 | 95:24 96:3 104:9 | **couple** | **criticize** | **data** |
| 257:13,22 258:8 | 116:8,14 121:25 | 16:25 34:25 171:21 | 351:13 | 7:18 17:20,21 58:1 |
| 258:13 259:17 | 144:7,16 195:21 | 202:14 246:14 | **criticized** | 58:7,11,12,16 |
| 262:3,8 263:17,21 | 251:12 326:9,15 | 249:8 367:14 | 363:8 | 59:11,15,19 60:1 |
| 265:6,21 266:3 | 326:24 327:10 | **course** | **criticizing** | 60:7 73:8,22 76:6 |
| 267:18 268:9 | **correlated** | 77:10 174:9 250:11 | 352:24 355:9 | 77:24 80:19 88:18 |
| 269:7 270:2 272:3 | 241:21 | 344:8 351:20 | **CROSS** | 88:19,21 92:8 |
| 279:10 280:1 | **Correlates** | **court** | 7:2 | 98:20 126:4,6 |
| 282:21 283:4 | 321:22 | 1:1 11:10,15 | **crossing** | 127:23 137:6 |
| 290:22 293:7 | **corresponded** | 104:13 157:9,11 | 160:16 | 139:20 162:5 |
| 299:16 300:9 | 338:21 | 302:9 316:13 | **CROSS-EXAMI...** | 163:12 168:20,25 |
| 303:13 304:1,21 | **correspondence** | 339:17,18 | 301:6 337:5 | 170:20,25 171:9 |
| 305:15 306:11 | 338:17 | **covered** | **CRR** | 180:21,23 181:19 |
| 307:5,13 308:11 | **cosmetic** | 52:12 301:19 | 1:19 | 182:3 183:7,8 |
| 309:22,24 310:4 | 48:9 297:20 318:24 | **covers** | **CTFA** | 187:12 200:3 |
| 310:15,19 311:2 | 348:20 349:13 | 33:19 | 337:21 | 210:14 213:6,11 |
| 311:13,19 312:2,9 | 351:4 356:22 | **Cramer** | ctisi@levinlaw.c... | 213:12,20 231:1,5 |
| 312:22 313:13 | 364:6 | 158:18 179:3,11,24 | 3:16 | 231:9 243:2,4 |
| 314:1,7,10,13,22 | **cosmetics** | 182:2 187:22 | **cumulative** | 244:4 257:8 |
| 315:8,17,21 | 337:16 351:19,21 | 191:12,22 195:1,3 | 150:1 159:20 161:1 | 259:24 263:23 |
| 316:11,25 317:4 | **COUGHLIN** | 195:8,18 196:6,12 | 270:10,11,18 | 264:10 265:18 |
| 319:22 320:16 | 5:10 | 196:18,24 197:7 | **current** | 269:21 270:4 |
| 321:4,7,23 322:2 | **Council** | 200:22 201:13 | 144:8 145:12,20,21 | 274:16,22 275:9 |
| 322:3,7,19 323:20 | 337:8,10,16 | 202:1 203:6 217:7 | **currently** | 275:19 276:5,8,11 |
| 324:2,18,19 325:2 | **counsel** | 217:11,16 218:2 | 42:15 43:5 120:4 | 276:21 277:1,13 |
| 326:2 327:9 328:5 | 11:13 12:22 14:6 | 359:1 | 364:6 | 307:17 328:18 |
| 329:14,18 330:7 | 15:1,20 20:2 21:9 | **create** | **curriculum** | 345:10 357:17 |
| 330:16 331:6 | 22:4 28:9 33:7 | 107:22 | 7:15 16:7,11,13 | **date** |
| 332:10,21 333:2,9 | 36:13 38:16 39:23 | **created** | 17:2 | 11:5 17:4 24:20 |

Sonal Singh, M.D., M.P.H.

25:22 49:21 50:4
253:14 306:7
369:8
**dated**
8:3,5 9:8 14:12
21:25 23:10 25:16
33:18 129:19,24
130:2
**day**
30:3 33:15 73:11
293:11 306:17
322:2,3 347:3
348:9 369:15
370:19
**days**
34:25 344:15
346:25
**dealing**
188:24
**dealings**
338:2
**deals**
290:24
**dealt**
192:6
**decades**
276:13 346:6
**deceased**
194:6
**December**
8:5 23:10 24:21
83:22 88:2
**decide**
121:23
**decided**
23:1 174:25
**decision**
135:15
**decisions**
104:2 106:11
174:21,23 175:23
175:24
**decision-making**
8:18 101:17 102:1
102:7,22 103:12
104:5,19 105:10

105:11 120:24
**declaration**
114:14
**declarations**
113:16
**decreased**
194:8 196:24
200:16 202:12
204:1 215:19
**decreases**
306:2
**decreasing**
182:12
**defendant**
4:9,20 46:17
**defendants**
5:7 18:2 71:4 72:4
72:5,14,14 273:23
281:17,20 340:12
340:23,25 341:3
348:6
**defense**
31:10 46:22 188:16
339:8,10,23
**defer**
187:15,17 188:6,13
188:17 189:13,18
222:20 285:23
286:3 298:18
**deferring**
220:13 221:1
**deficiencies**
362:19
**define**
36:7 103:21 236:3
**defined**
101:14 332:2
**defining**
104:23 134:11
**definition**
118:11 235:3,4
240:10 257:15
**definitive**
87:1 98:5
**degree**
158:20 217:1

**demonstrate**
130:24 149:16
**demonstration**
101:19 104:8
106:12
**Denver**
3:22
**deny**
323:13
**depend**
84:22 85:2 89:4,6
100:8
**dependent**
270:25
**depending**
36:7 143:4 165:24
304:3
**depends**
47:10 122:12
139:18 154:24
159:13 188:15
216:25 307:25
**deponent**
11:11 369:1
**deponents**
273:22
**deposed**
65:8 66:23 347:1
**deps@golkow.com**
1:23
**deposes**
11:20
**deposition**
1:14 2:6 7:10,21
8:10 11:7 12:1
13:14,16 14:3,3,8
14:11,18 16:11,16
17:3,11,18 18:1
18:11,12,23 19:2
19:3,9,10,13,20
20:3,20 21:15
22:4,21 23:7,13
24:17 26:16,21
27:8,12,19 28:3
28:11,17,24 29:1
29:7 33:8 35:3,7
40:22 52:20,23
54:22 57:17 61:10

64:17 65:9,13
66:17 67:12 68:9
68:15,18,21 69:1
69:5,13 70:6,12
70:18 76:11 77:18
77:25 90:4,8
93:11 101:23
109:1,18 120:20
121:5 129:18,23
133:16 143:13,21
144:13 157:14
172:22 176:11
186:14 228:20
233:18 241:7
249:24 261:18
271:10 272:22
274:1,2 293:12,17
297:16 316:2,22
317:3,9 341:4
346:15,21 347:5
348:8,9,10 349:18
350:25 367:20
370:12
**depositions**
12:4,6,11 53:1
64:14 67:23 69:8
69:16,24 273:12
**dermatologist**
352:8
**dermatologists**
351:14,18 352:18
**described**
191:1
**describing**
195:18
**Description**
7:8 8:2 9:2 10:2
**design**
139:19 143:4
155:17,22 163:21
240:16 258:4
335:23 336:2
**designation**
136:19

**designed**
199:10 334:6,23
**designs**
313:8,11,19 314:7
314:12,16 342:13
342:18
**despite**
158:9 291:10
296:17 364:7
**detail**
38:10 94:11 366:15
**detailed**
93:9,13,19 220:23
**details**
187:18 189:11
222:19 223:21
229:5,8 301:17
332:23
**detect**
161:11 193:20,20
**detected**
157:23
**determination**
91:15,18 106:16
271:17,21 295:21
295:24 296:2
**determine**
38:5 184:1 277:7
279:1 343:19
**determined**
134:2,17 138:12
**determining**
97:1,6 164:7
278:24
**detract**
220:6
**develop**
39:19 343:13
**developed**
39:11
**developing**
123:13
**development**
38:14 125:14 142:3
187:9 365:8
**develops**

Sonal Singh, M.D., M.P.H.

345:21
**diabetes**
305:1
**diagnoses**
291:16
**diagnosis**
290:25
**diaphragm**
210:5 212:4 214:13
**diaphragms**
167:6 210:2,10,19
210:25 211:19
213:14 214:3,5
**difference**
19:8 58:5,15 72:18
73:1 156:20
161:10 181:23
257:14 266:16
342:21
**differences**
254:6,7
**different**
12:15 37:9 53:15
61:20 73:21
102:20 112:13
118:13 163:20,21
163:21 165:23
166:4,6 173:10,13
174:21 175:23
188:22,23 189:5,6
197:11,11,25
203:7 207:21
219:1 226:13
232:22 236:4
245:23 247:21,22
248:2,3 249:19
260:17 279:4,20
282:14 286:25
297:22 298:1,8,17
314:6,12 334:4
341:7 349:11
361:14
**differential**
182:18
**differentially**
327:19

**differently**
128:6,22 169:9
175:4 213:24
214:17 336:2
**differs**
298:13
**difficult**
291:22
**difficulties**
290:25 291:2,7
**DIRECT**
7:2 11:21
**direction**
147:2 269:13
**directly**
210:5 213:8 214:6
214:20 299:9
**disadvantages**
341:24 342:20
362:20
**disaggregate**
125:7 142:22
210:16 329:1,4
330:21 331:21,24
332:1,2,3
**disaggregating**
325:8 328:22
329:23 331:8
**disagree**
116:16 117:18
122:21 146:20,25
151:2 199:3
217:16 235:22
236:2 251:1
252:10,11 259:3
297:2,4 346:7
361:11 366:9
**disagreeing**
252:13
**disclose**
303:9 304:13
305:13 306:3,9
**disclosed**
42:10 303:17
**disclosure**
304:5

**discount**
158:6 262:11
**discounting**
158:2
**discuss**
38:10 63:17 68:3
126:7 161:23
163:9 164:16
166:15,20 209:17
229:5
**discussed**
58:13 164:6 199:8
213:19 240:22
252:14 254:13
332:25 354:14,15
**discusses**
181:8 245:4
**discussing**
94:10 229:7 341:23
348:2
**discussion**
21:6 22:11 27:25
123:16 218:6
221:11,16 262:12
296:6,12 300:16
321:19 325:4,18
325:22
**discussions**
52:17
**disease**
223:24 224:15
231:17 235:1,25
258:8 288:13
308:15 323:19
324:2,17 325:2
326:12 327:7
328:2 329:11,12
330:5,14 335:18
343:20
**dispute**
279:10
**disregard**
178:22
**disregarding**
178:19
**distinction**

128:25 214:21
354:9 356:10
**distinctions**
354:13
**distinguish**
207:19 291:22
**distinguishing**
291:3
**distort**
237:20 240:19
258:6,10 259:14
**distributed**
16:15
**District**
1:1,2 11:10,10
**diverse**
352:4
**doctor**
21:9 44:25 54:3
56:8 58:14 75:7
77:3 94:12,17
95:17 103:4
113:21 134:23
140:1 149:13
151:4 172:10
177:16 182:1
218:5 245:24
255:17 300:18,20
309:16 311:5,7
321:10 323:9
325:23 329:5
336:12 337:7
367:9,17
**document**
1:9 8:17,22 10:8
20:10 71:2,2 91:8
92:22 94:1,2,11
94:14 101:22,25
102:16,21,24
103:7,24 104:17
105:2,14,17
106:25 109:12
121:13 130:9
132:3,7 234:17
244:10 305:23
350:5 363:6

**documents**
16:3 20:1 22:3,23
23:6 25:10 26:15
26:19 28:16,20,22
33:6 38:9 39:24
50:15 54:17 57:11
57:13 60:15,24
63:13,24 64:10
65:14,22 66:7,9
66:10 69:10,22,23
70:21 71:3,13,20
71:22 72:3,4,9,13
72:15,17,21,21,25
72:25 73:5,13,16
73:17,18 74:1,13
74:15,18 75:6,23
76:7,9,23 78:3,5,7
78:10,15,20 79:4
79:7,13,18 80:6,9
80:15,16,22,23
81:5,5,6,10,11,14
81:18 82:3,4,12
82:16,17 92:6
99:24 105:18,19
109:5,8 186:10,12
191:7 200:6 201:5
271:7 274:14
275:9 281:4 302:8
338:19 346:22
**doing**
27:3,23 44:6 61:14
73:11 74:5 123:1
123:8 288:5 303:4
307:22 352:25
**domain**
76:13 77:7
**dose**
125:24 126:12,16
181:20 287:3,5
**dose-response**
118:24 119:2,23
120:2 131:4
176:16,18,21
177:3,3,9,11,17
177:22,25 178:6
178:10,17,20

Sonal Singh, M.D., M.P.H.

179:1 180:10,22
181:9,18 182:1
183:13,16 253:10
253:20 360:18
**dose-responsiven...**
126:7
**dozens**
349:19
**Dr**
8:6 11:25 15:3,13
22:7 24:5 25:9,13
28:8 30:5,20 31:6
43:23 52:23 75:22
77:21 86:2 95:22
105:20 108:12,13
115:19 121:4
122:23 127:10
134:21 145:7
158:18 176:14
219:7 241:10
245:9 271:25
272:24 278:6
279:2 297:19
301:8 314:10
346:21 349:5,18
349:25 350:25
367:4,7
**draft**
50:10 99:9 100:13
100:17,19,24
102:16
**draw**
144:22
**drawing**
144:18 145:1
**drew**
144:23
**DRINKER**
4:14
**drinkers**
236:15,22 237:13
237:14
**drinking**
184:21 185:7
237:17,18
**Drive**

5:20
**driver's**
11:19
**drugs**
133:7
**dual**
55:22
**Duces**
7:11 8:11 13:16
28:4
**due**
237:17
**DUFFY**
5:10
**duly**
11:18 370:8
**duplicative**
78:22
**duration**
156:4 176:24 177:7
177:8,14,14
253:11 254:25
263:12 270:9
343:20 344:6
345:11,12,17
360:19
**durational**
178:7
**durations**
167:11
**dust**
214:12
**dusted**
210:2 214:13
**dusting**
211:3
**duties**
67:9
**D.C**
6:6

_____
**E**
_____
**E**
7:1,7 8:1 9:1 10:1
11:1,1 368:1
370:1,1

**earlier**
83:16 170:23
173:16 212:25
213:1 232:3
254:13 274:22
277:1 287:9
301:23 313:24
315:25 332:20
**early**
35:24
**easier**
124:2
**easily**
251:17
**Edelman**
296:14 297:8
**editor**
306:6
**effect**
101:20 104:8
105:14 106:13,16
158:2 185:10
205:20,21 218:21
251:19 252:6
254:3 265:19
267:18 268:19
286:2
**effects**
52:4 261:7
**effort**
276:20 277:12
285:12
**EFSA**
50:13
**egg**
74:24
**Eighty**
191:18
**either**
32:9 81:5,12 108:8
187:8 224:24
229:22 230:16
242:1 278:15
280:15 347:9
**elaborate**
339:9

**elected**
16:23
**element**
156:2 166:11
252:21 267:12
269:10
**elements**
155:22 299:8
**elevated**
123:12
**Eli**
43:18 304:25
**eliminate**
165:13 335:5 336:1
**ELLIS**
4:3 5:18
**elucidate**
187:7 212:23
344:13
**Email**
8:4 23:9
**emerges**
251:19 252:7
**emphasizes**
101:17 104:5
**employee**
316:2
**employees**
23:4
**employer**
121:15 122:13
**encompassed**
340:11
**ended**
45:13,18,19 46:12
269:15,24 317:10
318:6,14 319:17
339:4
**endometrial**
328:17
**endometrioid**
326:13
**ends**
14:19 176:7 213:3
241:3
**English**

124:15
**enhance**
62:7
**enter**
335:8,19
**entered**
333:19 334:11
**entering**
334:17
**entire**
67:25 68:9,15,17
68:21 69:1,4
97:25 246:6
295:14 343:1,3
**entirely**
151:22 170:1
232:24 279:12
304:17 312:18
328:23 330:25
**entirety**
346:20 349:21
350:7
**entities**
362:10 363:3
**entitled**
8:12,17,22 9:6,10
9:12,15,18,22
10:3,8,11,15,19
89:25 101:25
109:12 116:25
120:17 143:15
157:6 172:6 179:6
206:14 228:15
243:24 244:10,20
261:19 289:21
290:8 293:13
**entity**
89:2,5 303:10
337:19,22 358:1
**entry**
167:21
**enzymes**
220:2 223:4
**EPA**
50:15
**epidemiologic**

Sonal Singh, M.D., M.P.H.

10:9 62:9 85:16
92:8 110:16
128:13 235:5
237:3 243:25
244:11,21 275:14
282:9 336:19
354:4,8 356:8,17
357:3 358:18,22
359:12
epidemiological
111:13 144:9
145:13 237:21
240:20 253:2
274:15 353:22
epidemiologist
187:20 207:14
243:12
epidemiologists
139:12 140:2,7,15
310:3,11 340:20
352:5
epidemiology
10:14 23:24 187:11
187:13,24 226:4
235:7 243:11,16
260:25 261:3,21
262:2 298:20,24
307:2,3 336:13,16
339:24 340:7
352:15 353:7
Epithelia
9:23 206:16
epithelial
125:16,23 126:23
127:9 142:7
149:25 156:15
162:2 189:5
332:18 366:1
Epstein
129:24
equal
252:6
equally
141:22 142:19
equals
251:19

equation
204:15
Errata
369:6
error
152:11 158:15
235:8 268:12
errors
213:20
especially
155:16
ESQ
3:4,12,20 4:4,15
5:11,19 6:4
ESQUIRE
5:3
essential
185:2
essentially
265:19
establish
144:10 145:14
292:20 322:6
established
129:11 295:2
322:11
estimate
12:10 40:13 41:23
43:5 44:4,12,16
152:15 268:21
291:15
estimated
226:14
estimates
117:21 148:2
160:19 175:14
254:8 312:5,17
estimation
226:18 315:20
ethnicity
241:22 242:24
etiology
288:14 334:24
European
51:5
evaluate

144:14 189:14
234:19 239:24
274:15 287:19,21
287:25 294:6
evaluated
85:16 126:12
183:18 215:18
217:5 222:14
224:4 287:5,10
353:11 359:4
evaluating
105:23 234:14
314:5
evaluation
258:7 295:11 299:4
eventually
84:24 85:5
everybody
308:13 367:12
evidence
30:16,17 32:3 62:7
69:16,17,19 70:3
74:9 76:4 85:20
86:20,21 92:10
95:8,14 98:11
101:10 106:2
112:8,9,12,16
115:20 117:1
119:11 120:1
122:5,16,19
127:13,15 129:14
131:4 133:1,3
134:8,12,18
135:19 136:19
139:16 140:6
142:5 144:9
145:13,18,20
147:5 148:1,3,3
148:14,16 149:5
149:20,23 150:2,9
151:1,12 155:8,14
156:13 158:7
159:10,20 161:1,7
175:9,10 181:3
185:14,20 186:3
187:24 188:1,2

189:9 191:13
193:1,16 205:19
207:18 208:23
220:9,18 222:15
223:1,5,8 225:7
227:14,17 230:19
242:10 253:9,14
262:22 267:11,15
267:24 270:11,11
270:17,18 272:17
273:18 274:6,18
274:24 275:12,13
275:14 279:12
282:23 283:6
286:10 287:14,20
294:3 295:14
297:8 298:6
299:24 302:18,19
312:11 313:15
320:13 322:16,22
323:3 325:7 330:3
331:4 345:11
354:18 356:25
357:13,14,15
359:14 361:3
363:16
evolves
29:24 30:1
Evolving
50:7
exact
33:15 42:3 110:23
exactly
132:11 170:12
232:19 237:16
246:24 268:23
344:8
exam
192:12
examination
1:14 11:21 292:18
examine
207:13,14
examined
126:2 142:6 192:19
207:18 223:1

262:9 290:14
358:11
example
64:16 71:1 72:19
78:21 174:22
193:19 223:3
224:14 231:17
236:10 239:3
247:25 258:10
267:17 276:25
279:9 280:7 305:9
305:20 317:22
343:23 344:19
345:13 358:9
examples
239:7
exception
247:2
excerpt
68:10 98:9
excerpts
69:13,15 70:11,16
70:18 186:14
excess
150:2 154:11
268:10,15 269:12
270:5 312:13
313:18,22
exclude
213:6
excluded
128:11 175:3
213:18,25
excluding
128:10 213:11
exclusion
210:14 213:12
exclusive
210:24 213:15
214:3,8,10
exclusively
212:1
Excuse
63:6 75:10 158:25
181:14 248:16
executive

Sonal Singh, M.D., M.P.H.

233:23
**exhibit**
7:9,12,14,16,17,19
  7:20,21,22,23 8:3
  8:4,6,7,12,17,22
  9:3,6,8,9,10,12,15
  9:18,22 10:3,6,8
  10:11,15,19,22
  13:14,17,22 14:3
  14:11,14,18 15:10
  16:11,13,16,19
  17:3,11,17,18,22
  18:1,5,11,16 19:2
  19:4,6,9,10,21
  20:20,23 21:15,18
  21:23 22:1,4,22
  23:10,13,19 25:4
  25:11,14 26:8
  27:8,13 28:4,10
  28:24 29:1,7,15
  29:17,18 30:9,11
  30:24,25 31:22
  32:10,11,18 40:22
  41:7 48:18,22
  49:12,16 56:22,24
  56:25 57:17 58:2
  58:6,6,24 59:8,10
  59:11,14 60:2
  64:16 70:24 73:8
  73:9 77:25 80:18
  80:19 82:8,18
  83:15 90:3,5,8
  93:10 94:3 101:24
  102:3,6 103:25
  107:17,23 108:10
  109:1,15,18 110:6
  110:18 111:1,6
  112:2 113:4,11
  116:2,24 120:18
  120:21,23 121:5
  121:14 124:1,1
  129:18,20,23
  133:12,14,16
  134:24,25 143:14
  143:17,21,25
  145:22 153:5

157:5,8,14,20
172:8,16,22 179:9
179:11,23 195:2
195:14 206:17
217:8 228:17,20
233:18,20 244:9
244:13,17,19
249:3 251:15
261:18,22 262:16
274:1,2 275:20,20
276:22,22 277:14
277:15 289:20,24
291:21 293:12,15
293:17 295:17,19
309:4,6,22 310:8
310:25 316:1,8,10
316:17,22,24
317:2,2,3,4,8
318:3 319:1,17
341:16,17,20
360:4 365:12,16
**exhibits**
54:21 69:7 273:12
  273:15,25 274:3
  274:19 276:8
  280:18 341:14,15
**existed**
291:3
**existence**
234:16
**existing**
269:7
**exists**
160:23 186:22
238:17 254:12
**expect**
32:8 66:8 216:21
  232:13
**expected**
196:24
**experience**
187:25 189:19
  223:9 281:13
**experienced**
222:6
**experimental**

144:8,12 145:12
**experiments**
85:10 86:3,6
**expert**
7:12,21,23 12:1
  14:13 18:12,23
  19:3,25 21:16
  24:23,25 25:6
  35:17 38:17 39:12
  42:10 45:3,5,9,11
  45:20,25 46:16
  48:12,18 49:4
  51:13 78:22 83:18
  127:22 188:16,16
  191:23 192:2
  205:24 220:8,10
  224:18 229:3
  250:1 281:20
  298:1 303:12,19
  303:25 305:3,14
  306:10 308:7
  340:14,23,25
  341:4 348:21
**expertise**
187:4 190:3 208:8
  208:18 219:2
  229:17 231:22
  272:2 277:7
  278:24 279:9,16
  279:24 281:11
  285:16 300:11
  305:6 317:7,15
  319:16 322:15,18
  322:21 352:9,12
  352:14 353:1,7
**experts**
48:19 52:18 53:2
  187:15 188:7
  220:6,13,17 221:1
  222:20 229:15
  271:23 279:25
  281:16 285:23
  304:19 339:8,10
  339:23 340:22
  346:4
**expires**

369:16 370:22
**explain**
72:19 76:16 115:21
  116:11 124:15
  156:19 158:11
  181:16 203:3
  242:2,18 268:2
  367:16
**explained**
253:3,12
**explaining**
84:8 342:7
**explanation**
156:11 157:23
  158:12 250:21,25
  251:4 260:15
**explanations**
276:21 277:13
  278:19
**explored**
287:22
**exploring**
351:1
**exposed**
290:19,20
**exposure**
10:15,20 94:24
  95:7,9 122:3
  123:22 124:17,21
  124:22 137:18
  156:3,14 159:4
  162:11,19,23
  166:9,10 176:22
  176:25 177:4
  180:12 182:4,8,11
  183:17 184:9
  207:5,10,17,25
  208:3 210:18,19
  210:20 211:1
  212:2 213:15,17
  214:9,11,14 216:6
  235:1,12,13,15,25
  236:8 240:5,9,12
  257:17 258:5,7,12
  259:16,24 260:1
  288:17,21 289:21

290:9 293:14
  294:4 296:20
  297:6,19,22 298:2
  298:4,7,25 299:21
  299:21 315:21
  342:15 343:7,8,20
  344:11 345:5,8,11
  356:18
**exposures**
156:9 207:14
  214:15 315:16
**exposure-response**
119:23
**expressed**
250:19,19
**expressing**
219:9
**expression**
321:6,21 322:1,5
**extent**
116:19 222:13
  241:18 258:14
**external**
86:10,16 193:25
  209:10
**externally**
87:6 190:11 225:7
  225:17,23
**extra**
321:17
**extraction**
210:14 213:20
**e-mail**
8:4 23:9,13,14,17
  23:18,20 24:20

---

**F**

**F**
6:5 370:1
**FACP**
7:14 16:12,24
**fact**
24:25 39:3 76:5
  93:8 96:8 143:7
  158:8 160:15
  163:2 175:11

196:6 197:6
203:17 205:21
208:19 214:23
216:14 229:5
232:10 242:23
247:19 252:23
272:21 311:22
314:17 342:13,15
343:17 348:6
359:25 363:9,20
366:4
**factor**
88:8 89:11,15,21
91:15,19 92:1
97:2,7 122:3
142:15 146:13
176:15 186:18
232:11 240:6,7,15
250:19 257:11,13
260:8,23
**factors**
9:7 23:24 91:5
93:22 120:18
123:18 129:10
140:13 142:10,12
186:25 194:21
204:17 238:19,23
239:8,17,19
241:16,23 242:11
242:14,14,25
245:8,23 246:10
247:5,24 248:1
249:18,20 250:12
250:14 260:2,7,22
292:17 293:6
294:15,25 296:24
305:12
**facts**
38:24 247:19,20
362:25
**Fadak**
50:19 82:20 83:6,8
**failed**
216:15 246:2,4
248:19
**failure**

**feature**
104:1 156:7
**federal**
10:6 50:21 233:19
339:18
**Federation**
350:17 351:3
**feel**
71:24 128:7 302:7
323:14 348:1
**fellowship**
16:23
**female**
329:12
**fewer**
290:18
**fiber**
298:14 356:3
**fibers**
276:15 297:21
319:12 362:16
363:22
**fibrosis**
193:23 225:18
226:22 233:11
**fibrous**
286:21 288:3
**figure**
200:20
**filed**
28:11 265:3,10
266:2,5,10 267:2
**files**
321:15
**filings**
262:6
**Fimbria**
9:24 206:16
**find**
20:13 53:22 114:15
163:15 166:23
167:3,9 177:10
178:4,9 192:22
196:6 197:10
217:17 232:5
242:10 277:10

283:19 284:23
285:3 344:1 355:4
**finding**
104:12 202:16
226:1
**findings**
116:9 119:17 160:4
164:13 187:11,13
194:5,8 197:11
200:16 202:12
204:1 268:2
282:10 311:21
358:17
**finds**
134:8
**fine**
15:17 29:4 77:13
284:7 296:10,11
**finish**
29:25 63:7,10
92:19 94:13,16
95:18 113:21
156:11 169:19
240:14,24 245:25
259:7 260:14,15
297:11 303:2
329:19
**finished**
59:21 92:20 94:13
111:10 170:5
**firm**
338:10,24
**firms**
339:4
**first**
23:19 25:16 33:11
33:17,23 36:12
38:19 41:9 43:21
83:4 95:6 113:11
122:6,7 144:25
149:24 157:15
162:22 166:4
196:11 232:16
233:22 239:23
240:1 246:6
250:20 282:3

290:6,12 292:10
293:23 295:23
304:10 307:15
317:24 318:1,2,25
325:25 326:23
330:18 343:4
346:2 353:4 365:5
366:4
**five**
12:13 18:13,24
25:17 35:9 40:20
41:25 42:22 43:2
44:15,20 45:23
68:7 93:18 172:11
180:3,3,7,24,25
182:23 183:4
**flat**
180:17
**flaw**
210:12
**flawed**
210:9 356:22 358:3
**flaws**
210:13 213:19
**flip**
315:13
**Florida**
3:14
**Flower**
4:5
**FLW**
1:7
**focus**
210:24 212:1
213:15 214:3,8,11
304:15
**focuses**
210:10
**focusing**
128:9 308:2
**folks**
16:14 18:9 55:17
55:20 68:7 280:16
298:18 310:1
**follow**
105:24

**fair**
13:11 46:13 84:1
250:1 271:16
301:20
**fairness**
332:6
**fallopian**
8:13 9:24 90:1 95:2
123:20 205:23
206:16 212:20
323:20
**familiar**
12:4 59:19 88:25
89:1 101:4 106:18
106:23 121:11
129:9 132:4 133:6
137:11 206:3,6,12
230:8 234:21
261:10 289:13
338:12 341:7,11
**family**
241:21 242:24
247:5 248:1
**far**
45:13 67:19 138:21
145:2,7 194:17,19
207:5,25
**favor**
169:10,11
**favorable**
183:7
**fax**
1:22
**FDA**
50:17 100:25 129:9
129:15,24 130:5,9
130:12,18,23
131:3,11,23 132:6
141:6 193:9 233:8
233:15 272:8,10
272:10 350:11,15
362:13 363:4,6,10
363:20
**FDA's**
285:7

Sonal Singh, M.D., M.P.H.

**followed**
364:15
**follows**
11:20
**follow-up**
81:4 163:21 167:23
168:2,7 301:21
343:21,25 366:23
**food**
184:18 234:20
**footnote**
346:18,18 347:23
347:24
**force**
52:6 192:12
**foregoing**
369:3 370:11
**Forest**
3:21
**forgot**
221:22
**form**
11:19 36:23 37:19
37:24 39:4,14,17
44:24 46:23 47:8
47:9,25 53:11,21
54:7 55:19,21
57:20 58:20 61:6
62:15,16 64:11
66:22 68:11 71:23
72:16,23 73:14
74:7,20 75:4 77:6
81:17 86:11 87:8
87:14 88:10 90:17
91:6 93:12,24
97:3 98:2,7 99:10
100:15 104:14,21
105:7 106:1,14
107:20 112:3
114:6 117:8,17
118:7,20 119:1
120:13 123:14,23
124:12,23 125:4
125:12,19 126:1
126:14 129:5
130:16 131:15

132:1 137:13
138:14 141:3,8,18
141:24 142:21
143:9 146:2,19,24
154:4,6 155:19
156:22 160:9,24
161:5,17 167:14
178:12,21 180:13
183:10 184:7,12
185:24 186:7
194:1 197:2
203:22 204:25
207:8 215:2,16
216:18 223:13
226:2 229:3,20
233:7 234:12
239:10,22 240:21
266:14 267:9
268:18 269:8
270:15 272:15
275:11 276:4
281:8 288:11
289:1 297:24
299:17 304:2,22
307:14 312:3
317:19 323:25
324:24 330:17
357:11 358:24
359:18 369:5
**formal**
288:6
**formally**
39:11
**formed**
30:7 51:16
**forming**
31:25 32:7 58:19
58:23 62:20 80:10
84:2 96:15 98:21
172:22 261:14
**forms**
141:22 142:19
**formulated**
54:10
**formulating**
91:16,20

**forth**
31:14 38:20 58:23
196:23 358:18
370:8
**forward**
187:1 248:20
**forwarding**
23:16
**found**
57:5 63:1 107:25
116:1 143:3
163:22 167:7
174:19 192:18
193:7,15 195:8
196:19 197:7
217:11,20 254:18
269:16 272:5
285:11 362:10,16
363:21
**foundation**
61:6
**four**
91:9 245:7 250:23
362:21 363:1
**fourth**
326:5
**fragment**
298:9
**fragrance**
298:21 299:12
300:8
**Fragrances**
337:17
**frame**
47:10
**framework**
8:18 96:15 102:1,7
102:22 120:24
127:18 140:18
185:19
**free**
16:4 364:7
**frequency**
177:8,13,14 180:16
253:11 263:11
360:19

**front**
26:11,12 40:6
134:25 195:4
211:8 217:8
244:17 245:14
341:18
**full**
20:21 56:24 78:13
101:19 104:7
106:12 233:24
292:7 294:11
296:13
**fund**
90:23
**funded**
89:19 303:17
308:19 358:1,7,10
**funding**
112:19,25 113:19
113:20 304:7
357:23 358:6
**further**
17:8 131:11 164:6
185:14 294:13
300:13 370:14
**Furthermore**
328:12,14
**future**
303:4,5 316:23
**F-A-D-A-K**
83:7

_____
**G**
_____
**G**
11:1
**gain**
239:6,12,18
**Gates**
34:9 161:23,25
162:5 165:2,7,7
165:24 166:9,12
168:18,20 170:10
173:4,6,8,22,24
174:5,12,17 175:3
175:5
**gather**

**front**
69:17,19 70:3 76:3
**gathered**
58:10 74:9
**gathering**
127:13
**gene**
321:6,21 322:1,5
**general**
203:9 204:13 205:8
207:14 211:9
260:24 261:2
291:5
**generally**
76:12 100:13
231:16
**genetic**
247:5,25
**genital**
9:12 86:10,16
121:21 136:18
141:13 157:6
185:22,25 186:5
193:25 208:20
209:10 211:2
218:10 225:25
265:1 267:25
**genitals**
218:19 264:1,6,16
264:22 265:13
**genotoxic**
322:12
**genotoxicity**
320:13 321:4 322:6
323:3,4,11
**geologists**
279:21
**GEREL**
3:3
**Gertig**
163:9,15,24 164:16
165:16,25 166:16
173:9,17 174:1,11
197:14 199:6
200:25 202:1
254:14,18,23
255:19,23 256:4

Sonal Singh, M.D., M.P.H.

Page 388

**getting**
29:6 293:10 361:19
**Ginkgo**
137:11,19
**give**
27:20 40:14 43:10
44:3,6 171:15
175:20 178:3
225:10 233:8
239:3 250:15
251:10 264:8
278:2 300:19
314:2 319:25
322:24 323:1
343:23
**given**
12:6,11,16 37:20
107:24 154:5
213:4 234:10
238:20 318:11
369:4
**giving**
309:8
**glove**
192:6,16
**gloves**
192:20 233:9 234:2
**go**
21:4,7 24:3 27:21
29:25 32:25 35:9
54:3 56:8 61:21
68:1,12 71:10,14
71:16 76:5 79:4
94:15 102:11,25
113:22 115:1
122:8 132:11
134:24 139:23,24
140:12 146:4
147:12 152:8
157:19 178:24
181:4,7 186:24
191:5 198:12
201:22 206:25
207:22 219:5
248:20,24 251:14
256:23 263:7

267:20 268:8
281:2,9 282:15,15
289:10 290:6
298:11 300:24
303:15 304:15
306:4 307:25
309:3 312:25
325:4 326:4,17
328:6 341:13,21
346:17 348:19
359:7 360:4
361:20 362:8
364:12 365:2,12
**goal**
70:4
**goes**
17:13 156:3 337:12
358:19
**going**
12:21 13:10,22
15:3 21:5 26:4
110:20 115:13
148:5 151:4
158:21 172:5
175:15 176:2
182:13 190:16
231:20 240:17
244:8 248:13
255:15,16 273:2
274:9 276:3
277:22 288:13
296:7 298:17
301:20 302:6
306:15 316:21
319:25 333:3
336:3,21 348:15
**Golkow**
1:21 11:4
**Gonzalez**
344:4
**good**
124:16 222:8 241:2
283:22 301:8
362:7
**GORDON**
5:2

**gotten**
297:7
**governmental**
89:2
**grade**
185:13,13 286:20
299:23,24 356:22
**gradients**
119:24
**grant**
90:19
**grants**
308:18
**granulomas**
193:23 225:18
226:22 233:10
234:4
**granulomatous**
193:2,14
**great**
61:13 64:3
**greater**
117:22 158:23
159:7 182:16
195:9,24 196:7
197:8 207:5,25
**gross**
43:10,12
**ground**
301:20
**group**
133:23,23 134:3,16
135:5,10,21,21,23
136:4,8,14,18
138:11,17 294:1
309:24 310:1,3
333:7,11
**guess**
37:25 85:3 126:19
341:14 359:2
**guiding**
104:18
**gynecological**
190:8
**gynecologists**
352:4

---
**H**
---
**H**
7:7 8:1 9:1 10:1
**habitually**
314:21 315:11
**half**
172:15,15
**hand**
13:22 69:20 81:15
81:22,24 82:1
139:19 228:13
370:18
**handing**
172:16
**handle**
222:5
**handy**
321:10
**happen**
203:2
**happened**
96:19 265:9 310:2
**happening**
168:22
**happens**
76:16 295:10,10
**happy**
75:12 325:9 365:2
**hard**
29:21 79:20
**Harlow**
202:3
**harmful**
356:16
**hazard**
101:10
**head**
289:4
**health**
8:15,17,20 49:19
50:11 51:9 52:2
70:1,6 82:21
87:16,22 88:4
90:2,13 96:4,5,8
96:18 99:3,8,15
99:22 100:4,7

101:15,25 102:2,7
102:8,12,22,23
103:12,24 104:2
104:12,16,18
105:5,23 106:24
107:10,12 108:19
108:24 109:9
110:21 112:5,21
112:24 113:18,19
120:23 161:15
162:6,10,24
163:13,25 164:18
167:18 173:5,14
173:25 174:6
197:14 274:23
275:3 359:23
361:2
**healthcare**
121:8,23 234:3
**healthy**
154:21 333:13
**hear**
44:25 309:18
**heard**
46:7 284:18 301:11
337:9,13,18,22
349:13
**hearing**
29:19 30:13,22
31:12,16 32:1,8
50:23
**heart**
223:24 282:2
**heavily**
290:20
**heavy**
63:16 184:9,10,14
185:1,12,21 186:4
297:22 299:1,12
300:8
**held**
2:7 11:7
**Heller**
191:1 192:22,22
**help**
55:17 60:10

Sonal Singh, M.D., M.P.H.

Page 389

**helped**
56:1,3 65:14
**helpful**
20:16 79:25 84:7
**Henderson**
191:6,8
**hereinbefore**
370:8
**hereunto**
370:18
**heterogeneity**
360:17
**he'll**
75:15 229:3
**high**
140:17 159:5 208:7
241:25
**higher**
152:15 185:22
186:5 196:16,20
257:24 267:6
290:21 291:14
345:17,17
**high-grade**
323:24 324:25
326:12 327:8,24
328:5 329:2,13
330:2,6,13,16
332:7,18
**Hill**
96:14 117:1,6
127:18 129:10,16
131:24 132:3,4,10
132:13,16,17
138:23 139:3,10
142:9 146:14
176:14 186:18,24
313:25 314:3,4,11
**hire**
305:7
**hiring**
303:24
**histologic**
142:23 291:6
328:20,25 329:23
331:9

**history**
123:11 196:1 239:5
239:6,17,18
241:21 242:24
247:6,6 248:1,2
**Hold**
108:2
**honest**
115:5
**Hopkins**
66:13,18 67:1
68:14 273:12
274:1,19 275:20
**hormone**
256:20 257:3,10,22
**hospital**
154:18 313:20
**hospitalized**
154:16,16
**hospital-based**
150:5,11,18,22
151:16 152:12,23
153:12,20 154:14
310:14 311:15,17
311:23,25 313:9
**Hotel**
2:7
**Houghton**
166:20,23 167:3,9
167:19 168:1,23
169:5 170:10
198:19,22,24
199:6 201:1 202:1
**hour**
40:3,5
**hours**
35:9 41:23 42:1,2
62:18 115:14
134:23
**HRT**
257:8
**HS**
86:24
**HT**
196:3
**huge**

193:4,6
**human**
87:6 119:12 127:16
253:16 270:20
320:11 321:21
**humanly**
72:1
**humans**
132:24 133:23
134:4,8,12,18
135:6,11,24
136:13,20
**Huncharik**
209:18,25 210:23
211:8 214:2
**hundreds**
96:11
**hypothesis**
87:11 92:13 189:21
205:9 227:3,5
250:5 329:22
331:1
**hypothetical**
237:9 279:13,14,15
**hypotheticals**
105:3
**hysterectomy**
194:10,20 195:11
196:2,14,21 197:1
197:9,13 198:2,15
200:18 202:14,21
203:10 204:2,13
204:16 205:8
**hysterosalpingog...**
86:25

――――――――――――
**I**
**IARC**
9:9 98:21 131:24
132:17,21 133:5
133:13,16 134:2,7
134:17 135:2,14
136:2,8,12,18
137:3,16 138:7,17
141:1,11 146:8
286:19 288:2

292:24 294:1
295:4,18,21 297:4
309:23 310:3
355:3 359:8
**idea**
76:8 113:5 183:22
184:3 291:5
**identification**
11:19
**identified**
15:9 28:15 32:9
35:14 49:15 51:20
56:23 102:19,21
128:20 282:7,7,9
299:23 317:18
**identifies**
86:8,14
**identify**
15:7 25:5 31:20,24
79:6 86:7,13
102:6 229:22
230:16
**identifying**
8:19 102:2,8,23
282:6
**ignore**
201:25 202:24
**ignoring**
183:8
**II**
185:13
**III**
364:15,25
**ill**
154:21,25
**Illinois**
5:21
**illness**
343:2
**Imerys**
5:8,16 67:15 71:2
71:20 72:5,14
73:7 74:2 76:22
78:4 79:2,14,18
80:6,17 81:6,13
276:12 279:7

280:16,21 301:9
301:11,15,18
316:2 317:9
318:12,21 363:18
**immortalized**
229:19
**impact**
262:6
**implies**
139:4
**important**
88:7,11 92:14
155:20 170:14
181:21 203:15
210:23 214:1
227:22 249:25
250:13 253:8
263:3 333:23
334:14,16 343:18
365:7 366:3,8,13
**importantly**
240:1 275:1
**impossible**
238:18
**imprecision**
180:19
**inability**
210:16 293:5
294:14
**inaccurate**
40:15
**inappropriate**
296:22
**incidence**
226:5 231:25
232:14 267:6,11
291:13
**include**
14:24 15:13 30:11
36:11 70:14 173:4
174:5,17 175:1,16
175:21
**included**
30:23 31:18 54:21
58:11 76:6 87:17
107:6,24 128:13

Sonal Singh, M.D., M.P.H.

128:17 178:16,23
179:1 213:18
257:9 259:25
**includes**
14:25 134:5
**including**
21:11 43:18 79:4
108:15 187:24,24
192:23 210:13
213:20 223:10
234:3 295:17
360:17
**inclusion**
210:15 213:21
**income**
43:8,11,12,14 44:2
44:10
**incomplete**
95:13,14
**incongruent**
196:18
**incongruity**
165:9
**inconsistency**
118:12
**inconsistent**
106:8 312:22 328:3
328:10 330:15,23
331:5
**incorporate**
28:10
**incorrect**
150:10 152:3 171:2
255:5
**increase**
149:25,25 166:24
167:4,10 180:20
215:14,22 218:11
220:2,3 224:1,5
233:1 266:24,25
328:24,24,25
329:17
**increased**
62:9 95:9 147:1
152:16 158:10
159:5,21,22 162:1

163:22 167:7
177:13 180:12
182:4,8 211:3,21
216:21 218:20
223:4 226:11
254:19 268:3
291:12 310:24
312:7,8,15,21
313:12 328:13,16
331:16 345:14
**increases**
224:15 226:8 306:2
**increasing**
167:11 179:18
**independent**
51:16 53:5,7 54:13
54:14 271:2,17
275:2 292:17
**independently**
108:13
**indicate**
253:15
**indicated**
20:2 53:18
**indicates**
329:10
**indications**
328:20
**indicative**
269:6
**individual**
147:13 203:5
205:17 270:17,22
299:19 300:5,8,12
**individually**
21:13,20,22 148:23
149:1,6
**induce**
220:22 224:25
**induces**
9:23 86:25 156:2
206:15 227:13,15
**inducing**
193:13
**induction**
343:19

**infection**
239:5,18
**infections**
215:11
**infer**
81:22 188:1 204:17
296:19
**inference**
202:20,23 219:19
252:12
**inferences**
145:1 214:13
**inferring**
196:13
**inflammation**
85:12 86:5,8,14,21
86:25 92:11
208:10,17,20
209:1,5 219:18
220:9,11,14,19,20
220:22 221:1
222:16,17 223:25
224:19,22,25
225:9,15,18 227:2
227:7,13,13,15,19
228:10 231:16,24
232:10,12,17,22
233:1,2,5,10
234:3 299:8
323:19 325:6
328:4 329:22
330:15,20 331:1,3
331:6,14 332:4,7
332:15,16 364:16
365:6 366:1,12
**inflammatory**
220:2 222:22 223:9
223:22 225:1,4,6
231:17 323:18
324:2,17 325:2
326:11 327:7
328:2 329:11
330:5,14
**influence**
175:11 262:18
**inform**

189:20
**information**
51:1 52:1 64:8,23
65:12 91:22 98:13
116:23 120:16
122:20 157:21
169:2 250:1
280:15,24 296:19
358:23 359:1
**informative**
128:8
**informed**
231:3
**informing**
78:11 99:5
**ingredient**
62:12 349:14 351:4
**ingredients**
50:17 64:9 298:22
**inhalation**
212:6 217:1
**inhaled**
216:4,10,20 217:5
218:24 219:8
**inherently**
211:1 358:3
**inhibitors**
303:16
**initial**
207:10 208:3
**initiate**
165:3
**initiated**
168:7
**injuries**
47:24
**injury**
48:2
**input**
305:13
**inquire**
107:20
**inserted**
210:5
**insight**
229:1

**Insights**
10:3 228:15
**installation**
187:9
**instance**
76:14 183:6
**Institute**
90:9,12,20 91:4
92:3 93:6,8,20
94:3 95:23 97:10
97:14,17,21 98:1
141:16
**Institute's**
91:25 95:2
**institution**
90:16 122:2 305:10
**insufficient**
144:9 145:13
262:25 268:2
296:18
**insurers**
43:20
**intend**
28:25 29:19 30:12
30:21 31:11,15
32:1 64:7 100:6
212:23 219:20
228:4
**intended**
301:25
**intensity**
176:25 177:7
**interact**
140:15
**interaction**
23:4 182:9 195:23
**interactions**
34:20
**interest**
38:11 113:12,25
114:3,12,16,21,25
323:10,16 335:18
358:2
**interested**
370:16
**interject**

Sonal Singh, M.D., M.P.H.

83:3
**internal**
73:13,16 74:18
75:23 76:18,19
79:12,13 80:5
81:11 82:4
**International**
134:2
**interpret**
147:4 269:20
**interpretation**
10:8 117:19 147:10
183:13 243:24
244:11,20 252:9
360:20 361:7
**interpreted**
181:9 187:1 357:15
357:17
**interpreting**
181:19
**interrupt**
61:10
**interval**
153:23 154:5
268:24
**intervals**
160:16
**interview**
264:10 268:20
**interviewed**
264:12,19
**interviewing**
333:17
**interviews**
333:9
**interview-based**
251:8
**introduce**
242:1 251:17 252:5
252:21
**introduces**
155:22,25 164:10
166:10
**introducing**
167:23 260:16
335:12

**inundated**
81:8
**invasive**
254:20
**inverse**
160:13 253:10
**investigate**
276:20 277:12
278:14,19 352:20
**investigation**
53:6
**investigator**
111:20 308:24
**investigators**
85:19
**inviting**
22:9
**invoice**
25:16,18 33:17,17
41:9,12,16,18,20
42:6
**invoices**
8:6 25:12,13,17
26:1,9 36:10 40:6
40:20 41:6 338:20
**involve**
158:23 159:6
192:12,16 288:16
**involved**
39:12 46:18 47:21
48:4,5 99:25
238:24 239:8
284:19 288:20
301:12 339:5
341:9
**involving**
46:17 47:19,24
48:9
**irrelevant**
348:14,17
**irritation**
233:11
**isolation**
112:6 187:23
**issue**
39:8 92:15 233:5

242:12 262:9
285:24 290:14
299:1 339:6
361:11 363:21
**issues**
46:19 64:10 280:1
340:10
**item**
66:14 67:14 71:1,2
79:3,5
**items**
60:1

**J**

**JAMES**
5:19
**james.mizgala@t...**
5:23
**Janet**
1:19 2:9 11:15
370:4,21
**Janssen**
22:5,12 303:18,24
**January**
1:16 2:12 11:5
16:24 17:5 18:3
27:11 83:22 94:4
370:19
**Jersey**
1:2 5:13 11:10
**jest**
284:4,6,8
**job**
73:12 219:1
**Jody**
6:11 11:3
**John**
3:20 33:13 66:13
273:12 274:1
**Johnson**
1:4,4 4:9,9,10,10
4:20,20,21,21
22:11,15,15 23:4
23:4 71:4,4 72:4,4
79:13,13 81:13,13
285:14,14 317:10

318:7 319:18
**Johnson's**
317:10 318:7
319:18
**Join**
199:17 226:21
**joinery**
137:25
**jointly**
242:1
**Joshua**
65:1
**journal**
51:5 303:10
**journals**
37:10
**JRestaino@Rest...**
3:24
**judge**
85:3 322:19,21
**judgment**
88:16,20 91:13
99:7 127:20
**Julie**
67:14 273:13 274:2
316:2
**July**
25:16,18 33:18
370:23
**jumped**
266:12,18
**June**
8:3 21:25 22:5
**justification**
178:18
**justified**
176:2
**Justin**
191:17 192:6
**J&J**
43:18 66:17 71:19
72:13,20,21 73:6
74:2 76:21 78:7
78:24 79:4,17
80:6,16 81:6
271:19 276:11

279:6 280:15,20
363:3,9,17,20

**K**

**Kamargo**
293:1,17 295:19
**Katherine**
4:15 13:21
**katherine.mcbet...**
4:19
**keep**
21:5 26:12
**Kemble**
5:12
**Kemp**
50:23
**Ken**
243:8,23 252:17
**Kenneth**
244:20
**key**
104:1 111:18
**Keys**
51:1
**kind**
48:2 85:4 188:21
298:11 302:13
**kinds**
298:1,8
**Klatt**
5:3 7:5 83:3,9,11
87:12 115:7
199:16 209:8
226:19 300:19,22
301:7,9 309:10,11
316:5,7,9,15,19
316:20 321:9
325:12,16,18,21
336:5,11,21 339:7
367:11
**know**
12:8 13:5 18:20
23:1,3 24:13
26:22 29:23 30:1
30:17 31:18 33:14
33:15,19 34:13,14

34:25 36:2,5,8,20
37:7,10,11,25
38:8,25 39:2,5,19
42:2,17,25 43:1,4
43:13,16,18,19,20
45:10 46:6,8 47:1
47:11 49:19 51:16
54:17 55:6,13
57:9 58:9,9,11,18
59:2,5,23 61:6
62:4,6,6,17,18,19
63:20,21 65:14
66:18,20,25 67:4
67:7,9,17,18,20
67:20 69:10,17
70:1,2,13 71:25
72:24 73:1,17
74:9,10,12,17
76:9,14 78:12,13
78:22,23 79:9,9
79:10,12,22,23
81:19,21,25,25
82:12,23 84:7,9
84:14,22,24,25
85:2,21 86:17,24
87:10 88:7,11,12
88:12,13,22,23
89:5,7,20,23 91:1
91:2,7 92:4,12
93:16,19 96:1,13
97:9,18 98:5,24
99:14 100:8,9,10
100:16,23,23
101:8,10 103:7
104:25 106:20
107:3 110:10,23
111:3,5,9,11,19
112:7,8,11,12,14
112:15,19,21,22
113:1,2,6,9,15,15
113:24 114:5,8,11
114:20,24 116:22
117:20,21,21
119:24 120:14
122:10,13,13
123:16,18 124:13

124:24,25 125:8
125:13,20,21,21
125:22 126:2,5,8
126:8,15,25 127:3
127:13,13,15,18
128:5,15,17 129:7
130:22 131:17
132:12,14 133:2
137:1,14,17,17,22
138:2,3,5 139:20
140:8,9,9 141:4
141:25 142:5,23
143:10 147:1,24
147:25 148:16
149:24 150:13,16
152:5,22,22 154:7
154:8,24 155:24
156:5,10 158:7
159:18,22,23,24
159:25,25 166:7,8
166:10,13 167:15
167:23 168:22
169:5,24 170:12
170:13,15,19
171:5,6,14 172:12
174:19,20 175:22
175:22 176:2,20
176:23,23,24,24
177:6,12 178:3,15
181:20 182:7,19
182:19,20 183:11
183:14 184:14,16
184:19,22,25
185:5,11,12 186:8
186:10,15,17
187:1,7,10,13,18
188:2,4,15,17
189:1,10,12,14,19
189:19,23,24,25
189:25 190:2,8
191:1,14,15 192:1
192:14,16 193:9
193:19,20 194:19
196:11 197:10,12
197:24 199:2,11
199:13 201:10,11

201:12 202:7,9,21
202:24 203:7,10
204:4,6,14 205:9
206:1,2,19,25
207:13,15,16,16
207:18,19 208:13
208:16,17,24
209:6 210:15
212:5,11,12,13,18
212:23 213:2,20
214:8 215:7,9,18
215:20 216:1,1,6
216:7,8 217:1,2,4
217:4 219:5,7,17
219:21,25,25
220:2,21,22
222:14,15,17
223:2,15,18 224:3
224:7,21 225:5,10
225:23 226:8,8
227:1,6,7,15
228:3,24 229:2
230:6 231:6,13,14
231:19 232:2,6,19
232:20,23 233:3
233:14 234:7,14
234:15 235:11,14
236:3,8 238:11,21
238:22 239:2,13
239:24 240:9,17
242:10,14,24
243:8 245:22
246:3 247:9
248:20,22 249:19
250:21 251:3,3
252:12,14,19,19
253:24 255:6,13
256:15 257:16
258:4,16,16,18,21
258:22 259:4
260:9,10,12 261:1
261:1,3 262:15
263:2 265:7
267:11 268:21
269:9,11 270:7,21
271:2,3,5,7 272:9

272:16,17,19,25
273:20,21,23
274:7,8,11 275:4
275:6,13,17,19,22
276:7,13,14 277:2
277:3 278:20,24
278:25 279:19
280:3,5,12 281:11
281:12,12,21,22
282:6,7,11,12,15
283:7,8,13 284:9
284:15,16,25
285:10,20,25
286:6,7,13,18
287:14 288:1,2,13
291:5,17,18
292:18,21,23,24
293:2 294:18
295:10,13,22,22
297:5,25 298:7,9
298:13 299:3,7,8
299:20,23,25
301:13,13,14,15
301:17,18,19
302:7,15,20,22
303:16,17,18
304:3,5,6,24
305:6,16,18,19,23
306:1,21 307:15
307:16,18 309:7
310:5,6 312:16
313:17 314:4,17
315:2,18,23
317:13 319:5,6,8
319:12 320:2
321:1,3 322:9,11
322:15,22 325:5,6
325:7,12 329:2
330:18,19 331:1
332:15,15 333:5
333:16 334:5,12
334:23 338:11,13
338:18,19,20
339:1,3,17,18
340:6,18,21,23,24
341:6,7,10 342:14

342:14 343:4,6,16
344:7,12,13,16,21
345:4,6,9,14
346:10,11,23,24
346:25 347:4,14
347:15,17,19,20
348:2,11,12,12,15
349:1,4,5,10
350:3,5,11,15,17
350:20,22 351:2,7
351:10,12,18,21
352:11,17 353:1,7
354:1,1,1,3,14,15
354:16,23 355:1,2
355:15,20,25
356:5,23 357:2,5
357:12,12,14,15
357:19 358:5,5,8
358:10,12 359:2
359:19,22 360:2
360:24 361:1,9
363:5,6,14,16,19
363:25,25 364:1,2
364:8 366:9,17
367:13

**knowledge**
28:19 46:1 70:8
114:19 203:9
280:1 286:25
317:7 319:16
326:1 370:11
**known**
135:15 238:18
239:23 294:25
296:24 337:16
366:13
**Kunz**
51:3

___

**L**

**lab**
295:10
**labia**
212:15
**laboratory**
276:18

Sonal Singh, M.D., M.P.H.

lack
92:11,11 130:18
160:7,11,17
181:22 360:18
lacking
131:4,13
Langseth
142:24 143:2,7,21
144:24 146:11
153:8,9 309:3,13
309:15,21 311:1
311:13,16 312:8
313:2 359:10
language
51:24 245:9 249:22
large
71:19,24 72:12
199:6,14
larger
260:1 310:1
late
266:23 359:6 360:1
latency
171:3 343:19
344:10 346:5
laughed
284:5
LAW
3:19
lawsuit
262:6 329:3
lawsuits
262:17,24 263:24
265:3,7,10,18
266:2,5,10 267:2
268:1 324:1,25
lawyers
35:6,8 42:1 60:12
81:15 338:2,13,18
338:22
layman
235:19
lead
131:13 222:22
223:11 225:2
338:14

leading
90:12,15 225:17
learn
99:22 274:12
Lee-May
23:21
left
146:6 291:18
left-hand
296:13
length
347:6
lengthy
350:4
letter
8:3 9:8 21:25 22:5
129:15,19,23
130:7 131:17
305:25
let's
21:4,7 32:5 40:17
53:21 64:16 94:9
98:17 101:21
105:14 113:19
161:21 171:25
176:6 179:22
181:4,7 204:5,7,9
204:11 207:22
209:20 217:7
221:21 236:10
239:14,16 261:7
261:17 265:9
268:7 277:19
278:1 297:10
300:24 312:25
316:9 317:16
321:8 323:17
328:6 355:20
360:4 362:8
366:22
level
223:4 331:9
levels
185:21 186:4,16
LEVIN
3:11

LHG
1:7
LIABILITY
1:7
license
11:19
ligation
9:22 167:12 194:9
194:14,20 195:11
196:1,9,14,20
197:1,9,12,20
198:2,8,15 199:1
200:1,17 202:13
202:22 203:3,9,23
204:2,13,16 205:1
205:7,20,22
206:15 256:9
likelihood
155:17
Lilly
43:19 304:25
limit
36:16 307:12
limitation
199:9 210:23 214:2
290:24 294:13,20
294:23 295:12
limitations
156:25 158:9
161:20 165:7,17
165:22 169:23
270:21 342:18
357:6 364:3
limited
136:19 279:16
290:15 344:5
353:16,16 355:11
356:24 362:21
limits
156:4,5
Linda
64:18 346:14
line
119:20 147:23,23
148:2 180:18
252:2 289:10

298:16 318:2
321:2,2 358:19
368:3
linear
177:4
lines
93:15,17 127:13,15
229:19 250:23
link
85:17 125:15 126:2
158:12 183:18
185:14 209:10
212:23 222:15,18
222:19 223:5
277:4 287:10,22
287:25 292:20
299:9 300:4
344:14
linked
92:5 125:14
links
125:21
Lipitor
45:12 48:4
list
7:16,19,20,21
12:12 17:12,16
18:2,4,15,23 19:2
19:3,9,11 20:1
21:12 26:24 27:5
32:10 45:15,20
48:16 49:6,11
52:14 60:7,9 61:4
65:1 66:14 70:21
72:7 73:7 74:3
77:24 78:3,5
79:15 80:18,19
82:7,16,18 83:14
83:20 84:2 87:24
88:8 89:11,15,20
103:15 107:19
108:5,5,10 122:2
139:3,4 147:8
243:22,22 245:7
340:16 365:12
listed

27:12 45:22 50:1
50:15 60:2 73:10
78:23 79:2 81:19
83:14 87:22,23
107:15 113:7,10
120:14 122:14
310:7,12 319:16
338:6 339:1,2
listen
43:25 85:24 222:2
237:6
listing
17:19 18:11 60:16
60:23 92:6 95:13
122:13
lists
133:22 293:1,1
literally
318:22
literature
10:17 36:6,20 37:3
37:8,22 38:3,8
39:2,16,24 53:15
54:8,9,15,17 91:4
93:22 129:3
140:20,24 146:16
194:23 225:16
238:25 239:8
260:21 271:8,22
278:22 282:10
289:23 304:20
307:5,8
litigation
1:7,21 11:4,9 25:6
33:12 34:6 35:19
35:22 36:14,14
37:22 40:9,25
41:4 43:9,15,17
43:21 44:3,11,23
45:12 46:5,22
48:13,20 52:18
53:3 64:15 66:24
69:13 70:11 73:12
74:19 100:12
111:14 129:4
191:22,23 192:3

Sonal Singh, M.D., M.P.H.

274:13 275:8
284:20 303:13
305:15 337:9,18
337:25 338:16,25
339:12,25 340:7
340:12 341:1,5
359:16 363:21
**litigations**
45:2,8 48:6
**little**
12:14 29:3 42:25
44:17 48:7 61:20
72:2 98:18 128:6
339:9 346:13
347:10
**LiveNote**
2:10
**LLC**
3:19
**LLP**
3:3 4:14 5:10 6:3
**Locke**
6:4 7:6 60:19
115:12 300:24
336:22 337:6,7
360:9,10 361:19
364:9,11,20
366:18,21
**Logan**
4:16
**long**
123:11 284:6 304:5
304:6 343:13
365:6 366:2,7,14
**longer**
45:25
**long-term**
123:22 343:6,8
344:17
**look**
16:2 20:5 36:5,5
42:4 62:23 64:16
70:17 78:4 81:2
89:8 90:4 92:14
92:16,17,21 93:7
93:15 94:9,10,11

94:20 98:10,21
99:6 100:16
101:23 102:5
103:9 104:16
109:4 113:19,22
115:25 119:2
120:20 124:1
127:3,5 131:8
133:12 134:13
140:8,16,17 142:9
143:13 147:12
148:13,14,15,15
148:16,17,21,22
149:6,8,9 150:14
150:15,18 151:12
151:20 153:5,12
153:19 154:9
155:4,20 157:4
161:21 162:3
166:19 174:8,24
175:11 176:3
179:22 180:17,21
182:8 187:22,23
190:16 191:5
195:1,8,13,14,16
198:12 200:2,20
201:8,10 202:15
203:14,16 204:4,6
204:7,9,11 205:17
208:15 211:12
212:3,4 214:15
217:7 220:18
224:13 230:20
233:15,22 244:25
245:20,21 247:9
251:5 252:3 255:2
255:16 256:14
261:7 263:3 265:9
268:7 270:10
281:16 283:13
289:2 291:9,10
292:21 293:9
294:9 295:8
299:20 303:15
305:24 306:14
314:6,11 320:4

321:5,9,20 322:23
323:5,7 325:9,22
328:11 331:23
342:2 346:1
352:20 355:19,20
356:20 359:13
363:8,9,17
**looked**
38:3,7,7,8 49:17
80:23,24 88:3
100:24 142:15
148:25 153:6
173:8,9 224:13,14
224:16,17,21
229:18 230:9,10
243:21 262:5
263:4 269:22
271:22,22,24
287:25 289:16
343:24 354:2
359:8,10
**looking**
56:25 59:14 63:25
77:23 82:18 86:21
92:8 94:2 98:19
98:20 102:15,16
102:17 116:7
117:10 119:4
131:23 140:22
142:2 148:4 161:1
161:6 162:19
165:15,21 177:19
182:2 189:21
190:22 198:20
199:3 203:1 209:1
227:12,14 248:23
251:15 263:23
264:8 278:20,21
278:22 280:9
282:15,17 283:24
292:2 294:11
295:16 313:3
318:2 325:6
341:16 355:5
363:16 365:14
**Loretz**

64:18 68:25 349:5
349:18,25
**Loretz's**
346:14,21 350:25
**Los**
4:6
**lose**
181:10,11
**loss**
210:14
**lost**
199:11
**lot**
84:21 85:2 199:12
359:19
**lots**
282:13 334:4
**loud**
360:14
**low**
208:7 362:23
**lower**
140:11 257:21
312:17
**low-grade**
328:17,21,25
329:25 331:15
**low-prevalence**
140:12
**lunch**
171:18 176:9
**lung**
52:4 344:2,8
**lungs**
216:10
**Luongo**
219:7 271:25
272:24 276:16
281:6,24 282:4
283:12 284:14,22
285:3
**Luongo's**
279:2
**lymph**
191:9

---

**M**

**M**
1:19 5:11 370:4,21
**magnitude**
241:24 251:11
252:12 258:17,24
**main**
326:14 328:21
**major**
290:15,24
**majority**
57:8 111:23 165:3
168:12,23,25
169:24 170:22
283:3 307:6
351:21
**makeup**
351:13
**making**
185:17 196:18
201:9 225:3
252:12 295:21
296:1 322:10
356:10
**Management**
51:9
**managing**
8:20 102:2,8,23
104:2
**manufactured**
22:11 271:18
**manufacturers**
364:2
**manuscript**
108:22 110:24
111:3
**Margaret**
34:10,11,13
**mark**
13:21 14:10 15:3
16:10 19:1 20:4
20:19 21:14 25:11
28:9 228:19
233:17 244:8
255:8,15 261:17
289:19 316:9

| | | | | |
|---|---|---|---|---|
| 325:10 | 64:1 84:23 171:9 | 297:16 | 169:4,16 170:12 | 356:20 357:17 |
| **marked** | **materials** | **MDL** | 170:13,13 171:10 | 358:7,9,25 359:19 |
| 13:14,17 14:14 | 7:17,19 14:6,21 | 1:6 11:9 12:2 35:18 | 174:18 175:10,21 | 361:9 363:1 366:6 |
| 15:9 16:13 17:3 | 17:20,21 18:2,4 | 37:21 48:13,19 | 177:12 178:14 | 366:9 |
| 17:16,22 18:4,15 | 19:23 21:12 26:23 | 53:2 284:19 | 182:8 185:5 | **meaning** |
| 19:4,20,24 20:16 | 27:6,11,14,15,17 | **mean** | 186:23 187:21 | 263:25 264:4 |
| 20:22 21:13,17,20 | 32:6,11 48:16,23 | 26:6 29:21 31:4,5 | 188:14,16 189:10 | **meaningful** |
| 21:22 22:1,22 | 48:24 49:6,10,11 | 31:17 34:14 36:24 | 193:5,9,14 194:19 | 178:6,9 |
| 23:10 25:1,13 | 49:15,16 51:20 | 37:25 38:25 39:10 | 196:17,18 197:4,4 | **means** |
| 26:15,19 27:19 | 52:12,13 54:19 | 39:15 40:15 41:25 | 200:2,5,5,6 205:5 | 55:7 78:24 101:15 |
| 28:4,15,23 29:7 | 56:16,19,20 58:1 | 43:11 44:15 45:22 | 209:20 210:13,17 | 118:9 137:3 154:1 |
| 29:10,15,18 30:9 | 58:7,10,16,17,22 | 45:24 46:20,24 | 211:25 212:2,11 | 186:21 212:1 |
| 30:24 31:22 32:10 | 59:11,15,16 60:1 | 48:14,24 49:18,25 | 212:22 215:3,6 | **measure** |
| 32:11 40:20,21 | 60:6,10,16,24 | 53:7 55:22 59:1 | 216:5,25 219:16 | 177:6,7,7 238:11 |
| 41:6 48:17 49:12 | 61:22,25 62:2,5 | 59:22 60:3 62:18 | 220:10,17,17 | **measured** |
| 54:22 56:24 77:25 | 62:11,12,12,13,14 | 63:3 64:2 66:23 | 225:3,10 226:5 | 162:23 |
| 82:7 90:3 93:10 | 72:13 73:8 74:4 | 69:15 70:2,14,16 | 229:2,9 231:12 | **measurement** |
| 102:3 103:25 | 76:20 77:24 79:1 | 71:16,24 72:17,18 | 232:17 234:13 | 235:8 |
| 107:16 109:15,18 | 79:21,23,25 80:19 | 72:24 73:15 74:24 | 238:16 239:11 | **mechanism** |
| 110:5,17 120:18 | 82:7,9 83:13,14 | 78:12,21 79:8 | 243:19 245:22 | 57:11 131:12,21 |
| 129:20 133:13 | 83:19,20 84:2,6,7 | 80:25 81:23 82:11 | 246:3 248:12 | 186:22 188:20 |
| 143:16 157:8 | 87:18,24 96:25 | 84:12,21 86:17 | 249:6 253:24 | 189:15 216:11,13 |
| 172:8 179:9 | 97:5,19 107:7,8 | 87:1 88:11,13,16 | 254:5,12 257:24 | 220:24 223:19 |
| 206:17 228:17 | 107:16,23 108:5,8 | 88:22 89:5 94:5 | 258:14 259:4,7 | 344:14 365:7 |
| 233:20 244:12 | 108:11,14 198:4 | 98:17,19 99:5,18 | 260:24 272:18 | 366:3,8,13 |
| 261:22 277:14 | 244:4 339:8 | 100:8,16 104:15 | 273:19 274:8,21 | **mechanisms** |
| 289:24 293:15 | **matter** | 104:22 105:18 | 276:19,23 278:20 | 63:22 136:24 187:3 |
| 309:22 316:17,22 | 11:8 14:11 16:21 | 107:3,5 108:23,23 | 279:2 280:2,9,25 | 187:18 188:23 |
| **marked-up** | 29:20 30:7,13,22 | 110:21 112:4,5,7 | 282:9,11,12 285:9 | 189:2,20 203:1 |
| 255:14 | 31:12,16 32:2 | 112:21 114:3 | 287:24 288:12 | 208:14 209:2 |
| **marketed** | 35:22 36:10 37:12 | 116:19 117:20 | 289:7 292:19 | 216:8 219:17,22 |
| 364:6 | 38:17 41:24 46:9 | 118:11 119:24 | 294:17,17 295:6,8 | 220:1,5 224:24 |
| **MARKETING** | 51:14 74:19 | 121:12 122:6 | 297:3,4 304:3,10 | 227:1,7 231:15,21 |
| 1:5 | 175:12 190:9,20 | 123:16 124:15,19 | 307:7,20 311:3 | 232:20,25 253:21 |
| **marking** | 191:14 270:24 | 126:6,9,15,21 | 312:25 313:1,16 | 295:9 304:7 |
| 21:10,23 22:23 | 370:11,17 | 127:6,12 128:21 | 317:13,14,23 | 322:17 366:6 |
| 317:4 | **matters** | 129:6 131:18 | 318:13 321:5,14 | **media** |
| **marriage** | 43:9 44:3,11 | 134:22 135:18 | 322:14 324:20 | 77:17 176:7,10 |
| 370:15 | **Mayo** | 136:10 137:17 | 331:23 335:3,12 | 241:3,6 282:13 |
| **MARYAM** | 89:14,17 | 138:3,9 139:2,17 | 339:16 340:5 | 297:15 |
| 5:11 | **MCBETH** | 141:5 142:1 | 341:6 342:11,13 | **medical** |
| **Massachusetts** | 4:15 13:23 | 144:24 154:24 | 344:7 345:2 346:8 | 120:7,8 122:9,13 |
| 2:8,12 11:8 120:5 | **MD** | 155:20 158:4 | 346:23 347:15,25 | 234:1 305:11 |
| 120:11 121:8,16 | 7:13,14,24 14:14 | 159:17,19 160:23 | 348:1 349:10 | **medical-legal** |
| 305:10 370:2,6 | 16:12 21:17 | 161:2 163:19 | 351:20 352:13,17 | 19:14 |
| **material** | 176:11 241:7 | 165:6 167:15 | 354:6,11 355:1 | **medications** |

Sonal Singh, M.D., M.P.H.

46:18,19 305:1
**member**
336:15,18 350:16
**members**
146:8 309:24,25
**Memorial**
121:8
**memory**
71:11
**men**
290:19
**mentioned**
25:21 202:25 232:3
   282:19 306:25
   323:12 338:4
   343:17
**Merit**
2:9 370:4
**MESEHA**
5:11
**mesothelial**
320:11 321:22
**mesothelioma**
291:4,16,23
**met**
34:4,16 284:14
**metal**
184:9
**metals**
63:16 184:11,14
   185:1,12,22 186:4
   272:20 299:1,12
   300:8
**meta-analyses**
65:4,5 76:8 128:5
   143:24 144:25
   147:25 148:20
   159:21 174:18
   213:23 254:5
   270:12,23 302:12
**meta-analysis**
8:23 9:14,17 10:18
   10:21 109:13
   112:11,17 127:23
   128:1,8,19 143:22
   147:9 157:8,16

160:13,14 172:8
172:17,21,25
173:3 174:16,24
175:16 199:19,24
204:5 209:25
210:9,24 256:24
256:25 270:18,19
288:1 289:24
293:15 294:5
302:22 307:3,9
308:5 311:23,24
**method**
219:14
**methodological**
213:23 357:22
**methodology**
38:9 74:10 96:19
   96:20,20 98:24
   126:17,24 127:8
   127:12 128:9
   142:9 158:1,16
   159:14 160:6,11
   254:2
**methods**
127:4,5 158:5
**MICHAEL**
4:4 5:3
**michael.zellers@...**
4:8
**Michelle**
3:4 23:15
**middle**
95:19 152:2 251:6
   294:9 320:10
   362:11,11
**midparagraph**
327:6
**midway**
348:8
**migrate**
131:18 190:9,21
   193:11 215:7,8,9
   215:10 216:4,20
   218:25 219:8
**migrates**
85:11,14,15 86:4

86:24 189:23
190:1,2,11 207:3
207:23 212:12,17
**migration**
85:21 86:20 92:11
   190:14,18 191:13
   194:5,7 200:15
   202:11 203:25,25
   205:9 217:4 357:1
   357:14
**Mike**
301:9 309:17
**mind**
107:12 119:9 309:8
   348:4
**mindful**
236:14
**mine**
96:21 165:21
   255:13 257:6
**mined**
318:12 319:7
**mineralist**
278:25
**mineralogist**
298:15 319:10
**mineralogists**
279:21
**mines**
275:23 276:12
   318:12,23,23
**minimal**
254:9 258:15
**minimize**
260:7,18
**minimizes**
260:23
**minimizing**
260:2
**minute**
300:19 333:4
**minutes**
34:15 153:6 171:19
   172:12 362:2,4
**Mis**
201:18

**mischaracterizat...**
169:16
**mischaracterize**
171:1
**mischaracterizing**
169:21
**misclassification**
156:3 199:13 235:8
   291:16 294:25
   296:22
**misclassified**
164:22 168:9
**misclassifying**
164:11
**misquote**
324:20
**misquoted**
324:22
**missions**
351:2
**misstate**
221:17,21
**misstated**
221:9
**misstatement**
152:5
**misstates**
53:17 60:19 61:2
   75:25 77:1,4 96:6
   106:2 122:4
   129:13 132:25
   134:20 139:15
   140:5 145:17
   148:11 149:4,19
   149:22 150:8,25
   155:7 159:9
   165:18 166:1
   168:15 175:8,18
   181:2 189:8 197:3
   201:2 202:6,6
   208:4,22 213:9
   221:3 222:11
   227:9 230:18
   247:15 270:3
   273:17 274:6,18
   275:12 279:11

282:1,22 283:5
312:10 313:14
332:11 353:2,24
355:17 363:11,23
**mixed**
194:14
**MIZGALA**
5:19
**mmeseha@coug...**
5:15
**Mm-hmm**
31:23 38:4 39:7
   40:23 135:4
   143:19 153:21
   234:8 264:13,20
   290:7 320:9
   346:19
**Mode**
263:11
**Model**
51:1
**modeling**
177:2
**models**
193:19
**modest**
139:14 140:4,10,16
   252:24
**modestly**
251:18 252:5
**modification**
268:19
**moment**
27:22 159:2 212:7
   278:2 321:8 362:9
**monkey**
193:19
**monograph**
294:1
**monographs**
295:18
**monotonic**
177:4 180:20
**months**
43:7 314:21 315:11
   344:16,17,20,22

Sonal Singh, M.D., M.P.H.

Page 397

345:1
**morning**
22:4 306:25 308:15
**Morristown**
5:13
**mortality**
291:13
**motivation**
91:12
**Mount**
5:12
**mouth**
138:4,7 334:1
359:3
**move**
75:12 85:23 115:8
117:23 119:9
206:13 226:19
230:23 273:1
323:17 361:14
**moved**
170:17
**mparfitt@ashcra...**
3:8
**MPH**
7:13,14,24 14:14
16:12 21:17
**mucinous**
326:13 328:13
**multiple**
137:1 156:23,24
254:4
**multi-district**
337:25 338:15
**Muscat**
65:1 69:4
**mutagen**
322:11
**mutagenicity**
323:11
**MVA**
48:2
**M.D**
1:15 2:6 7:3 11:12
11:17 77:18 369:8
370:7

**M.P.H**
1:15 2:6 7:3 11:12
11:17 77:19
176:12 241:8
297:17 369:8
370:7

**N**

**N**
7:1 11:1
**name**
11:3,23 82:24
137:14 171:14
190:15 301:8
337:7,12 338:12
338:13 339:3
349:1,4
**named**
157:15
**names**
206:8 349:11
352:18
**napkins**
167:6
**national**
90:9,12,20 91:3,24
92:3 93:5,8,20
94:2 95:1,23
97:10,13,16,20
98:1 141:15
163:25
**NCI**
99:3 109:4
**NCI's**
91:11
**near**
164:8,19
**NECC**
163:4 166:18
168:21 170:24
**necessarily**
37:6 56:1 99:1
342:11 343:3
359:21
**necessary**
87:10

**need**
13:22 16:2 17:9
18:9 26:25 57:14
68:4 75:7,17
101:17 104:5
127:11 128:7
151:8 152:6,20
158:20 172:11,12
176:23,24,24
189:1 198:4 200:2
200:19 203:14
236:13 240:7
255:6,7 278:3,5
296:8 326:21
**needed**
143:8 144:12
**needs**
211:11 222:14
295:13
**negate**
175:5
**negates**
175:10
**negative**
229:23 230:17
**neither**
188:21
**Ness**
191:19,21,21 192:2
204:18 205:5
228:3 232:5
365:22,23
**Neural**
321:22
**never**
113:21 164:7,12,22
165:11 168:9
318:24 323:12
334:25
**nevertheless**
326:18 327:2,18
**new**
1:2 5:13 10:3 11:10
30:20 32:5 37:20
154:9 174:25
228:15 238:23

259:6 334:13
358:18
**news**
99:24,24 339:16,18
**nice**
243:19 340:17
**nickel**
184:15 185:2
319:13
**NIH**
89:18,19,20 93:1
97:6,10,20 99:3
109:4
**NIH's**
91:18
**nine**
362:21 363:1
**nodes**
191:10
**nonfibrous**
320:12
**nongenital**
216:16,22 217:12
217:18 218:13,21
258:19
**nongenotoxic**
322:12
**nonoccupational**
288:22,24 293:6
294:14
**nonperineal**
156:13
**nonresponsive**
85:24 87:12 115:7
115:9 117:24
199:16 226:20
273:2
**nonusers**
185:23 186:6
**non-coffee**
237:14
**normally**
274:14 275:8
**North**
328:18
**Notary**

2:11 369:18 370:5
370:22
**note**
167:25 253:6
254:17 262:10
330:23
**noted**
11:13 118:12
130:12 213:19
262:21 326:14
328:21 369:6
**notes**
130:18 282:8
370:10
**notice**
7:9 8:9 13:13,15
14:7 20:3 22:21
23:7 26:16,20
27:19 28:3,12,17
33:8
**notion**
333:25 334:21
335:9,14
**notions**
333:20 334:9 335:1
335:20
**Novartis**
45:16
**November**
14:12 19:12 25:19
41:1,5,22 49:2
253:18
**NSAIDs**
228:2,5 231:23
232:6,11,14
**NSAID-induced**
232:25 233:1
**null**
156:2,4 164:13
170:11,19
**nullified**
170:18
**nullify**
159:5
**number**
7:8 8:2 9:2 10:2

Sonal Singh, M.D., M.P.H.

12:6,8,10,22 15:4
40:14 41:23 42:3
48:5,18 53:15
78:23,24 91:1
103:8,15 119:6
159:7,11,13 163:1
165:12 171:5
182:13 183:5
199:15 203:17
230:6 231:13
263:15 288:9,14
290:16 309:4
317:2,4 343:5
344:15 346:12
362:22

**numbers**
40:16 288:23

**numeral**
348:24 364:14,15
364:24,25

**numerous**
234:2

**Nurses**
161:15 162:6,10,24
163:13,25 164:18
167:18 173:5,13
173:25 174:5
197:14

**nutrients**
185:2

**N.W**
6:5

**O**

**O**
11:1

**oath**
245:18

**obesity**
241:22 242:25
247:6 248:1

**object**
15:12 53:20 118:4
118:7 126:14
169:13,15,17
220:12 248:16

270:15 276:3
278:10 312:3

**objection**
36:16,23 37:19,24
39:14 44:13,18,24
46:23 47:8,9,25
53:17 54:12 55:19
55:21 56:5,5,14
57:3,20 58:25
60:8,19 61:2
62:16 64:11 65:11
66:3,22 68:11
71:23 72:16,23
73:14 74:7,20
75:4,25 77:1,4
80:4 81:17 86:11
87:8,12,14 88:10
89:13 90:17,25
91:6 92:2 93:12
93:24 95:25 96:6
97:3 98:2 99:10
100:15 102:14
104:14,21 105:7
106:1,14 107:9
110:9 112:3
113:13 114:1,6,23
115:7 117:8,17
118:3,20 119:1
120:13 122:4
123:14,23 124:12
124:23 125:4,12
125:19 126:1,22
129:5,13 130:16
130:20 131:6,15
132:1,25 134:20
135:17 136:16,21
137:13 138:14,20
139:15 140:5
141:3,8,18,24
142:21 143:9
144:21 145:17
146:2,19,24
148:11 149:4,19
149:22 150:8,25
154:4,6 155:7,19
156:22 159:9

160:9,24 161:5,17
165:18 166:1
167:14 168:15
169:14 171:11
175:8,18 178:12
178:21 180:13
181:2,6 182:5
183:10 184:7,12
185:4,24 186:7
187:5,16 188:9,11
189:8 191:25
192:4 194:1,16
197:2 199:16,23
201:2,18,20,23
203:22 204:25
205:25 207:8,11
208:4,12,22 209:8
209:14 213:9
215:2,16 216:18
216:24 217:23
220:16 221:3
222:11 223:13
225:21 226:2,24
227:4,9 229:10,20
229:25 230:18
231:2 233:7
234:12 238:1
239:1,10,22
240:21 243:18
245:11 247:15
257:23 262:20
265:5 266:14
267:9 268:13,18
269:8 270:3
272:15 273:17
274:5,17 275:11
276:24 277:17
279:11 281:8,19
282:1,22 283:1,5
283:17 285:18
288:11,19 289:1
295:3 297:24
299:15 300:10
304:2,22 307:14
312:10,24 313:14
317:12,19 322:20

328:9 329:16
330:17 331:7
332:9,11 334:3
335:11 344:24
352:2 353:2,24
354:25 355:17
357:11 358:24
359:18 363:11,23

**objections**
8:8 28:2,10 53:21
221:14

**objective**
141:5,20 293:25
332:10,13

**obliged**
303:9

**observational**
238:5,6,14

**observed**
327:8,25 328:12

**obviously**
38:8 49:21 59:2
98:24 116:22
122:14 178:23
222:19 237:12
249:18 257:16
285:21 286:22

**OCAC**
217:21,25 218:18

**occupational**
10:19 137:23
237:25 288:17,20
290:20 293:13
296:20 297:22

**occur**
193:15 315:16
330:1 343:2

**occurred**
265:3

**occurrence**
187:8

**occurring**
161:3 341:8

**occurs**
322:2

**odds**

139:12 140:3,21
143:3 153:19,22
174:19 257:20
263:10 268:24

**offer**
28:25 29:19 30:2
30:22 31:11,15
219:20

**offered**
31:18

**offhand**
64:22 167:17
350:23

**offices**
55:13,14,16

**Official**
51:5

**Oh**
100:22 121:1 195:5
362:5

**okay**
15:5 23:1 29:9
32:14 44:1,5 56:7
61:5 63:12 68:3
83:9 94:22 102:4
102:25 103:2,10
104:10 107:21
119:13 133:20
135:4 143:6
158:22 173:18,23
204:8 221:6 222:4
234:9 239:5 246:1
246:3,3 257:1
259:10,13,21
266:23 296:6,10
306:18,22,23
307:24 308:14
313:6 315:5 317:5
318:20 319:21
322:18 325:17
326:4 327:22
331:18 335:13
339:7 341:13
342:2,7,19,24
343:17,23 344:10
345:20 346:13

Sonal Singh, M.D., M.P.H.

347:10 349:13,22
350:11 351:7
352:24 353:12
357:21 359:7
360:4 361:14,17
361:20 364:13,24
366:18
**once**
80:22 128:14
136:10 158:4
159:18 164:19
346:15
**oncologists**
352:5
**ones**
56:1 57:18,19 79:2
79:18 80:9 81:14
155:4
**one-time**
164:8
**ongoing**
45:24 46:5,11
**open**
105:2
**operate**
332:22
**operational**
158:5 258:18
**opine**
149:11 170:8
204:15 220:6
222:17 298:8
313:1 330:19
366:15
**opined**
92:4 183:20 202:10
253:25 281:17,22
**opines**
292:25
**opining**
193:5,12 208:14
231:20 269:9
279:1 299:11,18
329:3
**opinion**
30:3 31:4 37:11

39:4,17,19 50:24
51:16 53:7,11,18
54:7,10,13,14
58:19,21,23 62:15
62:20 77:7 87:10
88:23,24 89:4,7
91:25 92:17 95:21
96:15 98:10,11,16
98:19,21,23 99:1
99:2 106:4,6,9
122:10,21 124:10
127:19 142:23
155:13 164:25
165:16 168:12,19
188:14,18 189:3
189:24 193:8,17
194:22 196:22
202:6 203:7,8,12
208:6 212:7,13
216:3 218:15
219:9,21 220:21
220:23 222:18
228:10 229:3
271:1 272:21,24
273:10 275:1
277:1,3,4 286:4
299:20 335:22
342:7,25 358:20
359:6
**opinions**
28:25 29:14,18,22
30:2,6,12,15,21
30:23 31:3,11,14
31:14,18,25 32:7
38:17,20 39:11,25
46:25 53:6 78:11
84:3,8 91:16,20
96:20 141:21,25
142:18 145:6
172:22 201:14
221:19 231:10
261:14 270:24
272:14 273:8
279:20
**opportunity**
14:2 30:5 31:10

121:4
**opposed**
152:11,23
**opposite**
151:23 281:17,18
**oral**
1:14 7:9 8:9 13:15
28:3 256:8 260:13
**order**
19:6 50:24 74:22
76:15 84:25
274:15 302:9
307:12 308:9
**orders**
307:1
**organization**
90:24 110:25 349:2
**organizations**
96:5
**organized**
300:20
**organs**
208:10
**orient**
103:5 230:7
**oriented**
103:6
**origin**
274:18
**original**
58:12 98:20
**ought**
221:13
**outcome**
155:23 177:4
235:10,13,15
236:7 240:2,13
358:2 370:16
**outcomes**
334:25 335:2 344:9
**outside**
69:12 70:10,13
73:12 100:12
111:13 274:13
275:7 303:24
304:19

**ovarian**
8:12 9:4,6,11,13,16
9:19 10:4,10,12
10:16,20 23:25
33:12 34:5 35:18
35:21 36:14,21,25
37:4,21 38:2,14
39:10 40:8,25
48:20 52:18 53:3
61:24 62:10 84:11
85:7,15,18 88:5,9
89:11,15,21,25
91:5,10,16,19
92:1,5 93:14,23
95:2,10 97:2,7
109:15 115:23
116:13 117:3
120:12,17 121:22
122:3 123:6,17
124:7,11,17,22
125:2,6,10,14,16
125:17,23,25
126:3,13,16,18,19
126:23 127:9
129:12 130:15
131:13 140:20
141:13,22 142:3
142:19 143:16
144:11,14 145:15
146:18,22 147:20
148:9 149:2,17
150:1,3,7,12,24
152:16 154:2
155:5,23 156:16
157:7 158:13
159:12 162:2
163:17,23 166:25
167:4,11 171:3
172:7 175:6 179:7
180:2 182:21
183:17,19,21
185:18 187:8,19
188:19 189:5,12
193:1 194:9,21
195:10 196:8,15
196:25 197:19

198:25 199:10,12
199:15,25 200:17
202:13,21 203:3
204:1 205:21
208:15 210:1
211:4,21 213:7
216:17,22 217:6
217:21 218:11
219:15,23 220:20
220:25 222:16
223:6,19 224:2,6
224:19,22 226:5,6
226:13,23 227:1,3
227:14,16,19
228:16 229:2
231:18,21,25
232:8,9,11,15,21
232:21 234:15
238:24 239:9
240:15,17 241:13
241:16,24 242:15
243:25 244:12,21
246:10 250:13,16
254:1 257:11
258:11,13,22
259:15,17 261:9
261:20 262:1
263:12,16,20,25
264:5,15,21 265:2
265:12,20 266:1,6
266:11 267:5
269:17 270:2
271:14 272:25
277:5 284:19
286:14,16,18,21
287:4,6,7,11,12
287:17,23 288:5,9
288:12 289:22
290:9 291:4,11,13
291:19,23 292:21
292:22 293:2,6,14
294:4,15 295:9,15
295:25 296:19
298:4,22 299:2,5
299:10,14 300:5
302:1 303:12

305:11,14 306:8
306:17 308:4,5,6
310:18 312:9
313:12 323:24,25
324:18,20,24
325:1,8 326:13
327:8,24 328:3,5
329:13,20,22
330:2,6,9,13,16
330:21,24 331:17
331:19,25 332:5,8
332:17,18 333:8
333:18,21 334:1
334:10,20,22
335:9,18,21 343:1
343:12,13 344:11
344:14 345:21
359:17,24 360:23
361:8 363:15
365:8,24,25 366:1
366:14

**ovaries**
85:11 86:4 87:7
123:20 183:23
184:4,10 189:22
190:12 193:7,13
207:4,24 212:8,12
212:21 213:3,5
216:4,11,21
218:25 219:14
323:19

**ovary**
85:15 184:2

**overall**
43:1,20 121:12
148:1 159:20
197:12 218:12
250:15 251:18
252:6 291:14
311:21 312:5
313:11

**oversees**
85:4

**overview**
139:10 142:10
146:13 176:15

186:18 293:23
**overviews**
139:1,2,7,9 314:3
**Oxidative**
10:5 228:17

**P**

**P**
11:1
**page**
7:8 8:2 9:2 10:2
14:19 17:13,13
23:19 24:21 69:11
78:5,6 79:3,5
94:12,20,23 95:6
102:4,11 103:8,20
113:11 115:25
116:2,4,24 119:4
119:6,7 121:14
122:9 123:25
124:3 130:9 131:9
143:5,25 151:20
152:8 153:14
157:19 162:20
164:3 166:19
167:24 177:10,19
177:20 178:2
179:19,23 180:18
190:22 195:7,13
195:14,17,17,22
196:10 197:21
209:22 210:8
217:8 218:1,2
233:22 241:10,15
244:7,25 245:10
245:14,20,21
251:6,14 253:8
254:17 256:11,12
258:25 259:1,20
262:21 263:7
267:20 290:6,12
292:10,10 293:23
294:9 296:6
305:17 306:19
310:12 311:16
314:19,24,25

315:13 319:25
320:4,4,7,18,19
324:5,7,8 325:10
325:13 331:11
341:13,18,21,22
346:17 347:24
348:19 350:13
360:11 361:20
362:8,12 364:13
364:14 368:3
**pages**
20:21 56:23 69:9,9
102:5 103:9,16
119:9 161:22
163:8 194:10
282:4 305:12
347:6 349:21
369:3
**pagination**
325:13
**paid**
25:5 39:23 40:10
40:10 303:11,19
305:3,5,14 306:10
**pancreatic**
236:13 237:1,10,17
**panel**
22:10 348:21
350:24 351:7,11
351:13 352:7
353:6,11 358:17
**panels**
133:5 353:9
**PAPANTONIO**
3:11
**paper**
83:8,10 115:20
142:24 145:9,11
145:22 146:3,11
151:3,5 153:16
154:9 157:1,14,19
182:2 197:7
198:16 228:14
229:18 230:3,8,10
230:14 243:23
244:9,25 245:21

246:25 247:9
248:6,9 249:3
251:6,15 252:16
252:24 253:23
254:14 263:8
291:20 293:18,20
303:18 309:21
311:1,13,16
319:22 320:15,25
321:3 323:5,10,12
323:23,23 324:17
328:1,2 330:3
361:18
**papers**
70:14,17 100:22
230:11 253:24
295:17 303:15,16
324:3
**Paradigms**
50:8
**paragraph**
131:8 151:21
152:10 162:22
164:4 167:25
179:19 180:18
218:8 233:23,25
241:11 245:1
249:10 251:7,14
258:25 259:1,20
282:4 294:11
296:13 315:3,14
320:8,11,20 326:1
326:5,8,18 327:1
327:16,17 328:6
328:11 342:3,9
346:1 349:3,24
362:11
**paragraphs**
218:3
**parens**
247:25
**parentheses**
245:8 247:3
**Parfitt**
3:4 15:11 16:15
23:15,16 24:2,12

24:15 27:21 28:13
30:10 32:13 33:14
33:25 34:6 35:25
36:16,23 37:19,24
39:14 44:13,18,24
46:23 47:8,25
53:17,20,22 54:12
55:19,21 56:5,14
57:3,20 58:25
59:7,12 60:8 61:2
61:5,9,15,20
62:16 63:6 64:11
65:11 66:3,5,22
68:11 71:8,23
72:16,23 73:14
74:7,20 75:4,9,13
75:25 77:1,4 80:4
81:17 83:7 86:11
87:8,14 88:10
89:13 90:6,17,25
91:6 92:2,19
93:12,24 94:15
95:18,25 96:6
97:3 98:2 99:10
100:15 102:14
103:5 104:14,21
105:7 106:1,14
107:9,18,22 108:7
108:15 109:19
110:9 112:3
113:13 114:1,6,23
117:8,17 118:3,7
118:20 119:1
120:13 122:4
123:14,23 124:12
124:23 125:4,12
125:19 126:1,14
126:22 127:10
129:5,13,21
130:16,20 131:6
131:15 132:1,25
134:20 135:17
136:16,21 137:13
138:14,20 139:15
140:5 141:3,8,18
141:24 142:21

143:9,18 144:21
145:17 146:2,19
146:24 148:11
149:4,19,22 150:8
150:25 152:1
154:4,6 155:7,19
156:22 158:25
159:2,9 160:9,24
161:5,17 165:18
166:1 167:14
168:15 169:14,19
171:11,17,24
172:3 174:7,9
175:8,18 178:12
178:21 180:13
181:2,6,14 182:5
183:10 184:7,12
185:4,24 186:7
187:5,16 188:9,11
189:8 191:25
192:4 194:1,16,18
197:2 199:23
201:2,18,20,23
202:5 203:22
204:25 205:3,25
207:8,11 208:4,12
208:22 209:13
211:6,13,15 213:9
215:2,16 216:18
216:24 217:23
220:12,16 221:3,7
221:10,12,15,20
222:2,5,7,11
223:13 225:21
226:2,24 227:4,9
228:18 229:10,20
229:25 230:18
231:2 233:7 234:7
234:12 238:1,3
239:1,10,22
240:21 241:2
243:18 244:14
245:11,25 247:15
248:16 249:13
251:21,23 252:1
255:13,18 256:22

257:5,23 261:23
262:20 265:5
266:14 267:9
268:13,18 269:8
270:3,15 272:15
273:17 274:5,17
275:11 276:3,24
277:17,19,22
278:1,5,8 279:11
279:15 280:18
281:8,19 282:1,22
283:1,5,17,20
285:18 288:11,19
289:1,25 291:25
292:4,6,8,12
295:3 297:24
299:15,17 300:10
304:2,22 307:14
309:7,17,20 312:3
312:10,24 313:14
314:24 315:4
316:12 317:12,19
321:8,12 322:20
323:1 324:10
325:10,14,17,20
328:9 329:16,19
330:17 331:7
332:9,11 334:3
335:11 341:19
344:24 352:2
353:2,24 354:25
355:17 357:11
358:24 359:18
360:8 363:11,23
364:18,23 366:22
367:4
**parse**
142:1
**part**
15:1 20:12 24:8
26:24 32:14,19
33:23 36:12 61:8
67:11 87:18 95:1
96:2 107:10,11,11
107:12,19 112:7
123:4 152:5 162:8

163:14 209:17
213:21 246:6
260:1 273:22
315:1 338:12,14
348:8 351:11
362:12
**parthenogenesis**
229:1
**participants**
162:11,15,25
164:17 167:19,20
168:1,6 262:18
334:25
**particles**
192:19 193:10,11
208:9 319:7,14
**particular**
76:14 89:6,8 91:1
105:1 111:19
121:13 133:8
134:10 141:4,14
141:19 213:13
233:13 260:7,19
268:21 274:25
340:20 343:15
348:8 366:16
**particularly**
176:22 259:23
290:20 291:22
**particulate**
190:9,20 191:14
**parties**
370:15
**partition**
345:18
**partly**
128:3,4 242:9
302:10
**parts**
105:13 202:1
233:15 236:20
**pass**
211:16
**paste**
247:11 248:18
**pasted**

245:9 246:19,21
**path**
240:13
**Pathogenesis**
10:4 228:16
**Pathogenicity**
321:23
**pathology**
291:11
**pathway**
235:12 237:1,11
**patients**
122:24 123:6,11,21
154:16,16 192:23
234:2
**pattern**
253:12
**PCPC**
6:8 337:12 358:8
**PDQ**
8:15 90:2
**PDQs**
91:23
**peer-reviewed**
91:4 93:21 110:18
110:19,22,25
111:7,15 140:19
**pelvic**
231:17 323:18
324:2,17 325:1
326:11 327:7
328:2 329:11
330:4,14
**Penninkilampi**
147:4,9 151:3
171:13 172:17
173:4 174:4,16
187:22 312:25
345:13 360:25
**Pennsylvania**
4:17
**Pensacola**
3:14
**people**
55:25 84:13 87:3
111:23 123:5

154:21,22,25
168:7 175:23
187:17 189:14,18
193:15 220:5
233:3 279:20
310:6 330:19
360:2
**percent**
42:14,18,19,20
43:3,6,8 44:5,10
47:5,6,14 57:9
117:15 118:1,8
163:3 218:11,20
225:24 226:7,17
226:18 264:2,6,16
264:23 265:23,24
266:2,6,7,11,12
266:15,17 267:1,2
**percentage**
43:14 44:2 79:12
263:24 264:4
265:11
**performed**
38:9 218:23 294:5
**performing**
42:15
**perineal**
8:24 9:10,15 38:12
91:9 93:14 94:24
95:7,9 109:14
115:22 116:12
117:2 124:19,24
143:15 144:10
145:14 166:25
168:13 172:6
175:6 176:22
186:9 189:25
190:12 192:12,24
207:4,17,20,24
210:18,18 211:20
212:5,8 213:17
214:14,18,24
216:9 297:20
344:11,16
**perineal-dusted**
212:4

Sonal Singh, M.D., M.P.H.

**period**
33:20 44:14 99:13
171:3 264:18
343:1,13 344:10
346:5
**periods**
180:7
**peritoneal**
8:14 90:1 95:3
124:6 291:4,23
**peritoneum**
323:20
**permanent**
175:22
**permission**
85:3 211:16
**person**
34:16 222:6
**personal**
47:24 48:2 114:19
195:25 272:2
337:8,10,15
367:15
**personally**
113:6 224:20 310:7
**pertaining**
185:6 194:13
218:24
**pertains**
234:17
**pertinent**
175:16
**ph**
1:22
**pharmaceutical**
46:17
**Pharmaceuticals**
22:6,12
**Philadelphia**
4:17
**phone**
34:9,15,21
**photocopy**
316:24
**phrase**
141:14 314:15

342:3 345:20
**Physicians**
16:24
**pick**
98:8 139:5 202:14
270:9
**picked**
347:22
**picking**
139:1 270:7
**pickle**
138:4
**Pickled**
137:21
**PID**
326:11 327:24
328:14 329:20
330:10 332:15,16
**piece**
169:7
**pieces**
223:7
**Pier**
67:14 68:17 273:13
274:2,19 275:20
**Pier's**
316:2 317:3
**place**
74:14 307:1 364:17
**placed**
135:20 136:3
250:22
**places**
314:8,17
**Plain**
51:23
**plaintiff**
48:19 51:13 188:16
273:16
**plaintiffs**
3:9,17,25 8:7 12:1
15:1 20:2 21:9
25:6 28:1,9,11
35:6,13,18 36:13
37:17 38:16,23
39:13,23 45:5,9

45:12 46:16,21
47:4,16 48:13
49:7 51:19 52:17
53:10 54:7,25
56:17 57:2,18
59:17 60:12,17,25
64:7,24 65:16,17
65:22,23 66:7,9
66:10 71:18 72:10
72:22 76:21 78:16
79:19,25 80:12
81:7,15 82:5,10
82:17 108:6,11
110:4 169:10,12
183:8,9,11 191:23
192:2 198:10
250:3 274:3 275:9
276:1 280:14
303:12 305:14
306:10 318:17
338:2,15 340:15
340:22 346:4
367:5
**plan**
84:18
**plans**
84:20
**Plantation**
2:7
**plausibility**
96:13 186:19,20,21
187:2,14 188:8,25
189:11,20 190:19
192:15 193:17
196:13 209:7
219:20 280:5,6
320:3 322:9,16
357:13
**plausible**
190:20 193:8,10
208:14 209:2
216:8,12 220:4
223:18 224:23
227:5 366:6
**play**
156:10,12,15

350:20
**played**
67:1
**playing**
67:21
**plays**
220:19,20 350:11
**please**
11:23 12:25 56:8
61:6 63:7 75:18
92:19 118:4
129:18 150:14
221:10 245:25
315:14 329:19
360:15 361:25
364:13
**Plunkett**
52:23,24,25
**plus**
15:14,21
**point**
33:5,5 37:13 42:5
49:1 102:4 116:10
116:17 140:19,24
165:10 169:7,23
169:25 181:12
182:19 196:10
205:6,7,8 229:14
230:5 249:20
270:21 305:2,25
306:4 315:6
331:13 358:21
**pointed**
161:19
**pointing**
166:7,8,12 292:1
352:10 357:6
**points**
165:5 201:9
**pooled**
153:19 154:3
217:20 218:18
**population**
140:12 154:13
155:1 226:12,16
236:16

**populations**
296:23
**population-based**
151:18,23 152:4,14
152:19,24 153:1
154:20 155:1,3
158:3 308:22
310:13,22 311:12
312:20 313:10
333:12
**portion**
349:9
**portions**
27:16 201:25
**position**
65:17,17,23,24
66:9,11 67:17
169:11,12 183:8,9
183:12 201:14
202:4 203:20,23
204:23 205:1,15
227:23,24 228:23
228:25 250:3,3,4
**positions**
67:7,12 250:2
**positive**
115:22 116:11
117:12 130:14,25
229:23 230:17
241:19 242:2,3
246:15 252:24
253:9 296:17
**positively**
241:23
**possession**
14:7 28:21 33:7
**possibility**
128:14 165:13
254:11 260:2,18
336:1
**possible**
72:1 81:2 157:23
161:13 237:24
238:4,7,10 250:12
359:9 365:24,25
366:4,17

possibly
132:23 133:10
137:8,10 238:23
239:8 295:5
post-menopausal
196:3 201:12 256:9
potential
52:4 131:18 158:11
216:7,8 219:17
220:3,4 223:6
238:15 250:20,24
251:3 252:13
254:9 257:13
258:3,23 267:18
287:22 288:8
358:5,6,11
potentially
216:10 235:24
301:24 306:16
powder
1:5 10:12 11:9
36:20,25 37:4
38:2,12 39:9,17
41:4 42:11 48:19
52:21 53:3 61:24
62:4,5,10 63:2,15
64:15 66:21 67:1
84:11 104:25
105:6,23 115:23
116:12 120:11
121:17,21,24
122:24 123:4
124:7 125:2,6,9
125:11,13,18,24
126:3,12 167:5,20
168:7 170:8
183:23 184:1,5,11
185:9 190:11
192:7,16 195:10
196:8 207:3,23
208:25 210:3
211:2 212:7,14,19
212:24 213:4,7
214:17,24 215:15
215:23 216:14,17
216:23 218:19

219:13,14 223:2
225:8 234:1
241:12 242:11
261:8,20 262:1,19
263:12 265:21
266:3,7,12 267:25
269:17 270:1,25
271:6,12,13,18
272:13,18,18
273:7,11 282:20
283:4 285:8,14
286:5,13 287:12
292:22 298:4
299:13,19,21
300:9 315:10
317:10 318:7,14
318:25 319:2,4,5
319:18,19 357:4
363:15
powders
314:20
powder-dusted
210:10,25 211:19
214:3
powder-free
192:20
powder-induced
364:16
power
156:6 159:12,15,18
181:10 182:11
powered
160:1 183:3
practical
81:9
practice
69:12 70:10 303:15
303:20
PRACTICES
1:6
pragmatic
128:3
precautionary
101:4,7,12,15,16
103:17,21 104:1,4
104:20,22,23

105:5,25 106:5,10
precise
35:10 48:7 114:17
187:7,10,18 189:1
212:23 219:21,23
222:19 226:25
228:2 231:20
232:20 237:2
240:10 343:4
344:14 346:11
347:15,16
precisely
236:3
precision
126:19
preclude
106:3,16
preconceived
333:20,25 334:9,21
335:1,9,14,20
predecessors
318:21
predicated
277:5
predominant
288:18
preface
78:4 80:17,17,17
preference
171:22,24
premarked
19:6
premise
354:7
preparation
35:2 48:11 55:4
prepare
38:19 39:25 54:25
56:3
prepared
51:19 56:10,11
60:6,9 83:23
244:19 253:17
preparing
35:6 43:2 55:8
56:13 84:3,6

prescription
46:18,19
presence
104:3 191:9 234:24
235:23 271:2,11
275:4,5,18 277:6
281:14 299:22
356:6
present
6:10 185:15 186:11
236:5 237:11
238:14 277:8
279:19 299:13
300:9 319:14
326:5
presentations
17:1
presenting
11:18
presents
234:2
presume
356:6
presumption
354:5,20
prevalent
199:11
prevent
308:9
preventative
101:18 104:6
preventing
307:22
prevention
8:14 90:2 95:3
previous
74:12 175:25
previously
25:1 32:18 85:6
337:15
pre-menopausal
196:2 201:12
pre-2014
268:23
primarily
108:24 297:23

351:14
primary
8:13 38:11 90:1
95:3 216:5
principal
308:24
principle
101:5,7,12,15
104:18 105:24
106:7
principles
102:12 103:11,16
print
55:5,7
printing
56:2
Printout
9:6 120:17
prior
21:23 33:21 39:1
39:12 52:21,22
53:18 100:1 110:6
116:10 126:25
164:9 242:12
262:18 337:9,18
337:24 338:24
339:11,14 341:5
359:15
privy
97:12 99:21 271:10
probability
188:3
probable
135:15
probably
43:3 135:11,24
136:4,11,13 197:5
216:12 322:23
340:19 364:21
problem
103:4 344:21,22
345:1 359:9
procedure
205:22
proceeding
42:11

Sonal Singh, M.D., M.P.H.

**process**
57:13 79:11 92:7
99:21 133:6 225:6
307:21 341:12
354:2
**processes**
39:18
**produce**
28:21 251:18 252:5
252:22
**produced**
15:1 16:20 22:3
26:17,20 27:6,10
28:16 32:18 33:7
33:9 48:17 71:3
72:3,5,21 73:6,6
74:2 76:21 79:14
81:6,6,12 83:24
99:9
**producing**
22:13
**product**
57:10 63:20 125:9
260:19 271:12
272:19 280:11
286:8,10 363:10
**production**
14:6
**products**
1:5,6 22:11 36:20
36:25 37:4 38:2
38:13 39:9,17
48:9 61:24 62:4,6
62:10 63:15
104:25 124:7
125:6,13 126:3
185:10 207:15
208:25 223:2
234:20 271:6,18
271:19 272:13
273:7,11 276:17
281:12 285:8,14
285:15 286:5
287:12 292:22
298:4 299:20,22
300:12 315:10

318:8 319:6,19
337:8,10,15
353:10 356:12
357:4 362:22
363:15,20 364:6
**professed**
297:25
**professional**
8:15 42:14,21 90:3
127:20 283:21
367:13
**program**
22:9
**project**
302:24
**projects**
55:25
**pronounce**
82:24 171:16
**pronounced**
360:7
**proof**
280:5,5
**proper**
147:11
**prophylactic**
123:19
**proportion**
79:16 165:11
**Proposal**
144:3
**proposition**
227:18 324:23
**propounded**
85:14 369:5
**prospective**
199:7
**protected**
302:8
**protective**
194:20 196:14
197:13 202:22
203:10 204:17
205:20,20 307:12
307:18 308:9
**prove**

364:5
**provide**
32:1 36:4,9 37:11
64:7 71:19,21
82:17,19 87:10
111:24 120:2,15
139:22 148:3
150:16 168:25
185:14 188:15
203:7 206:1 209:4
220:23 223:20
233:3 280:4,13
286:10,22 287:14
298:5 299:24
300:1 322:15
**provided**
12:12 14:5 15:20
16:6 18:3,13,19
19:11,24 27:15
46:9,25 48:12
49:1,7 51:15 55:1
56:16 57:1,14
58:11 59:16 60:16
60:24 62:22 63:24
64:23 65:10 66:24
72:9,12,15,20,24
76:20 78:14,16
79:8,19 80:15
81:23,24 82:9,21
82:23 83:1,2 84:9
85:20 91:8,23
92:6,10 108:11
110:3,4 125:20
142:6 145:6
168:19 271:23
279:17 345:10
**provider**
121:23
**provides**
89:7 159:22 168:21
281:15
**providing**
38:16 67:2 127:19
168:24 188:14
300:4 305:21
332:13 355:2

**proving**
129:2
**pro-inflammatory**
223:15
**pro-oxidant**
222:24 223:17
**prudent**
340:19
**psoriasis**
224:5,13
**PTI**
5:24
**public**
2:11 88:3 96:5
99:12 369:18
370:5,22
**publication**
74:6 90:8 95:2
100:1 106:19,23
107:2,15 110:6,14
110:17 111:1,6
112:20,25 113:3
113:10 231:5
**publications**
16:22,25 73:19
145:5 354:16
**publicity**
262:17
**publish**
74:17,23 75:22
76:2 84:18 303:25
304:20 359:21
**published**
76:13,25 77:7
84:10,17 85:1,6
100:21,22 108:18
109:23 110:10,20
111:24 116:9
145:3 179:15
209:18 238:25
239:7,20 243:24
248:11 251:8
274:22 278:21
282:10 289:14
307:5,16 309:16
309:23 320:15

350:3 359:16
361:6
**publishing**
306:17 308:10
**pull**
151:3 237:4
**purchased**
276:17
**purport**
62:25
**purpose**
280:2
**purposes**
281:25 282:6
318:24
**pursuant**
2:8 13:13 28:16
**put**
138:4 157:10 244:3
348:13 359:3
**putting**
138:6 212:6
**p.m**
176:8,12 241:4,8
297:13,17 301:2,5
336:7,10 337:1,4
366:25 367:3,19
367:20

_____

**Q**

**Qiao**
51:7
**qualifications**
284:16 310:5
**qualifier**
141:5
**quality**
88:16 91:13 96:10
99:7 122:15
128:22 139:20
158:6
**quantify**
285:12 346:12
**quantitatively**
294:5
**quantity**

Sonal Singh, M.D., M.P.H.

158:7 217:1,3
**question**
12:14,25 13:4,5,9
32:5 38:1,6,11
43:25 44:25 48:6
53:12 54:4,6 56:3
56:12 57:25 58:12
58:14 60:22 61:17
61:19,23 65:15,19
66:2,4,6,25 68:5,6
68:7 69:18,20
71:18 72:2 74:16
75:2,8,10,12,14
75:16,17,20 76:11
79:21,22 80:1,11
81:20 85:25 86:1
86:12,19 87:13
94:20 95:22 99:19
99:20 105:9,13
112:23 113:23
114:2 115:11,17
117:25 125:5
127:7 133:18
134:16 137:20
139:19,23 140:2
142:2 149:13
150:20,21 151:9
151:10,11 155:24
164:8 185:6,8,9
187:6,10 188:6
198:7 202:6,8,9
202:10 210:17
211:2,10,20
213:14,16 214:12
215:17,21 216:2
221:6,8,23,24
222:1,3,9,14
224:3 226:13,15
227:21 228:9
229:11 230:21,23
232:17 237:6
238:2 242:20
243:5 248:17,22
248:24 255:17,21
257:2,7 259:2,6,8
259:9,12,19

260:16 264:11
273:2 274:10
277:10 278:4,13
279:14 280:23
281:1 282:25
287:11 290:2
298:3 302:21
304:4,14,15,16,17
307:22 308:2
309:18 318:15,15
319:4 323:2
326:22 328:7
329:25 330:2
333:22,23 334:15
334:16 335:15,24
335:25 356:2,2,5
356:7 359:2,5
**questioning**
91:11 289:10
**questionnaire**
162:12,24 164:1,21
**questionnaires**
260:1,17
**questions**
12:22 20:8 26:4,13
30:6 57:10 65:25
79:1 84:22 94:18
115:12,15 140:1
149:7,8 150:17
151:7,8 170:16
171:21 172:2
198:3 200:5
211:10 215:25
224:9,17 228:5
259:25 260:11
283:23 286:7
289:8 292:23
298:16 300:14
301:22 309:12,14
313:5 315:25
334:4,7 335:13
359:3 367:5 369:4
**quick**
134:24 278:9
366:22
**quicker**

304:15
**quickly**
40:17
**Quiescence**
9:23 206:15
**quite**
69:24 176:1 190:7
222:8 258:15
**quote**
326:9 328:23
347:23
**quoted**
68:8 168:20
**quoting**
267:23 314:18
**Q-I-A-O**
51:7

### R

**R**
5:3 11:1 368:1,1
370:1
**Rahmoeller**
46:4
**raised**
367:14
**raises**
121:21
**raising**
91:12
**randomized**
348:3,16
**ranging**
143:3 268:25
276:13
**rare**
226:7 288:12,12
**Rasmussin**
323:22,23 324:16
328:2 329:5 330:3
331:5,14
**rate**
158:15
**rating**
20:11,20 175:1
213:23 302:15

**ratio**
139:13 140:3,21
143:3 153:19,22
161:11 174:20
257:20 268:24
**rationale**
88:17
**Ratios**
263:10
**reach**
53:6 127:23 189:22
212:20 213:5
216:10 219:13
288:25
**reaches**
183:23 184:2,4,9
**reaching**
135:14
**reaction**
193:3,14
**reactions**
223:10 234:4
**read**
23:1 27:20 36:25
60:4 67:22,24,24
75:19 93:16 95:22
96:2 104:9 108:21
108:23,24 113:14
115:2 116:1,8,14
116:18 121:25
134:15 144:6,16
164:15 186:24
199:18 211:24
221:25 222:9
234:5 242:22
246:13,22 251:12
315:9 320:25
321:1,1,2 326:15
327:10,22 346:20
346:24 347:7,8,12
347:13,14,15
350:7 360:12,14
365:20 367:7
369:3
**readily**
251:10,24 252:4

**reading**
37:8,9 39:1 102:24
114:13,14 188:18
195:21 218:8
308:10 326:24
**ready**
77:21 259:6
**realize**
283:3,7
**really**
159:18 210:15
229:14 329:3
344:20 348:15
353:1
**Realtime**
2:10
**reason**
73:23 74:21 75:5
100:18 176:5
295:1 351:1 368:5
368:7,9,11,13,15
368:17,19,21,23
368:25
**reasonable**
137:4
**reasonably**
253:15
**reasons**
128:4 166:7 290:15
304:7
**REATH**
4:14
**recall**
35:15 38:21 45:14
64:22 67:8 68:22
100:23 101:2,3
141:14,19 155:17
155:21 156:7,8,11
156:12,14,19
158:2,5,10,13,20
207:1 251:9,16,17
252:3,4,14,21
253:3 258:1,6,10
258:18,23 259:11
259:14,23 260:3,7
260:18,23 261:4,8

Sonal Singh, M.D., M.P.H.

262:18,24 267:13
267:14,16,18
268:1 270:13
278:16 288:23
289:4 315:15
316:3 319:23
332:21,23,24
336:1 347:2
**recalled**
23:3 262:7 265:21
266:3
**receive**
66:8
**received**
90:19,21 338:19
**recess**
77:16 176:9 241:5
297:14 301:3
336:8 337:2 367:1
**recognize**
118:23 165:2
168:12,17,18
**recognized**
243:16
**recollection**
339:6
**recommend**
122:23
**recommendation**
104:11
**recommended**
123:18,19 159:18
**record**
11:3,14 15:15 21:4
21:6,8,21 24:2,4
27:10,22,25 28:7
53:24 59:7 61:8
61:12 76:17 77:14
77:19 102:6
107:18 176:8,12
206:21 241:4,8
297:12,17 300:16
300:22,24 301:1,4
316:23 321:19
336:6,9,25 337:3
366:24 367:2,19

370:10
**records**
22:20 62:21,22
**recross**
54:1
**rectal**
207:6 208:1,17
209:11 215:23
**redact**
24:3,8
**REDIRECT**
7:2
**redox**
220:3 223:6
**reduce**
231:24,25 232:7,9
232:12 233:1
300:2
**reduced**
232:14
**reduces**
155:17 227:16
**reduction**
181:24 197:18
198:25 199:25
**REES**
5:2
**refer**
14:23 31:21 141:1
141:6,16 174:7
176:19 320:1
**reference**
21:12 50:4 52:8
65:1 66:14,14
67:23 72:7 74:3
80:18 158:21
159:3 204:4,8
205:12 230:6
234:18 246:23
320:14,15 324:6,9
324:11,13,16
346:14 349:25
350:2 363:13
365:21
**referenced**
110:13 231:6,8

246:19 354:23
365:11
**references**
7:16 14:17,24
15:22 17:12,16
23:23 25:8 56:22
56:25 57:1,8,17
58:6,15,24 59:3
59:10 64:14,17
70:22 73:7 87:18
92:24 93:2,6,17
93:18 97:8 107:7
177:13 178:15
204:6 207:1 231:1
231:8 305:21
306:13 316:23
349:19 365:12
**referencing**
321:12
**referred**
172:18 174:1 195:2
319:21 341:15
349:16 358:14
**referring**
27:5 78:25 171:12
217:24 218:1
302:4 320:17
349:2 350:12
360:22
**refers**
71:1,2
**reflected**
41:6
**reflection**
343:9
**refresh**
71:11
**refute**
62:8 65:17 66:10
80:14 86:22 183:9
187:13 224:24
227:24 250:2,5
298:6
**refuted**
65:23 201:9
**refutes**

30:18
**regard**
36:17
**regarding**
19:14 33:12 53:11
62:3,5 306:8
339:23 349:6
**regardless**
288:14
**region**
190:12 207:4,24
212:8 214:18,24
**Register**
10:6 50:21 233:19
**Registered**
2:9 370:4
**registries**
73:19
**regular**
126:10 163:3
**regularly**
218:9,10
**regulate**
234:19
**regulatory**
69:22 100:14,17,20
233:14 360:1
362:9
**Reid**
289:13 290:8
291:20 295:17
**reject**
133:7 143:11
**rejected**
132:21
**rejects**
143:7
**related**
38:13 64:8,9 142:3
145:7 220:25
235:10 258:8
343:16 370:14
**relates**
1:9 86:18 91:5
93:22 114:3,7
136:7 137:18

149:13 223:1
235:23 243:1
**relating**
37:3 73:6 85:7
173:13
**relation**
253:13
**relations**
241:19
**relationship**
105:16 163:16
210:1 213:6
234:25 235:15,24
236:4 269:17
270:1 288:8
**relationships**
177:5
**relative**
127:24 140:11
251:19 252:6
290:21
**relevance**
127:14
**relevant**
62:19 65:21 69:19
69:19 70:3 74:9
76:3 80:10,13
128:17 274:25
340:9 351:19,23
351:24
**reliability**
127:14 128:23
291:8
**reliable**
175:15 176:1
248:25
**reliance**
79:15 243:22,22
**relied**
54:20 58:22 73:15
73:18,18,20 76:9
96:10 97:5 98:7
112:4 145:23
163:24 179:3
261:14 271:25
291:21

Sonal Singh, M.D., M.P.H.

relies
112:9,9 153:17
rely
59:4 69:13 70:11
    73:13,23 74:5,17
    75:23 76:24 78:10
    84:1,5 87:3 96:4,8
    100:13 111:14,16
    112:1 172:21
    199:21 228:10
    231:9 249:7
    274:14,22,23
    275:8,13 283:10
    295:4 358:23,25
relying
31:25 32:3,7 96:22
    105:4 170:7
    190:24,25 192:14
    214:16 230:12,13
    230:16 260:21
    295:16,22 297:4
remainder
83:2
remained
180:19
remains
250:11
remember
71:12 167:16 206:5
    206:8 228:2
    258:12 259:16
    321:24 324:3
    339:2 340:1
    347:20
remembered
265:20
remiss
93:4 247:10 250:6
removal
105:11,11
remove
123:20 140:13
render
39:25
repeat
13:5 54:5 60:21

75:17 86:12 186:1
238:2 290:1
rephrase
13:5
replacement
256:21 257:3,10,22
report
7:12,23 14:11,13
    14:19,20,23,25
    15:2,6,7,12,13,21
    15:22 16:7,20
    17:12,19 19:11
    20:12,12,21 21:11
    21:14,16,23 25:1
    28:23 29:14,17
    30:8,24 31:15,19
    31:20,21,21,24
    32:9,15,19,21,23
    38:20 39:25 48:11
    49:5 54:25 55:4
    56:4,10,11,13,24
    59:2 64:13 71:17
    82:13 83:24 84:3
    84:6,9 86:4 87:19
    92:23 93:1,6 96:9
    98:16 106:8 112:9
    118:12 119:25
    123:25 127:4,11
    134:10,13,14,15
    136:25 139:24,25
    140:9 143:5,22
    145:9,25 148:24
    151:15,20 152:6
    157:2 158:21
    159:3 161:15,22
    162:18 163:8
    164:4,14 166:20
    167:24 169:3
    170:21 172:18
    174:2 176:19
    177:10,25 178:23
    179:17 181:8
    193:18 194:4,7
    196:23 200:8,10
    200:14 202:11
    203:18 208:25

209:17,23 210:8
210:22 211:11
217:15 219:6
227:18 229:4
230:4,5 231:11,22
241:10,15 243:21
245:10,13,19,20
246:8 249:16
252:15,17 253:6
253:17 254:14,17
256:18,23 257:9
259:1,20 262:11
262:22 267:21
268:12 271:25
272:8,10 276:16
277:25 279:2,3
282:3,16 283:24
288:2 291:10
302:14 308:7
314:15,19 315:14
319:21 320:1,5,8
320:19 324:6,7,8
324:14 331:2,10
331:21 340:11,14
340:24 341:14,19
346:16 348:20,21
350:3,8,13,21
354:12 357:9
358:9,12 360:7
361:21 362:8
364:19,22
reported
1:19 117:12 163:4
    218:19 241:20
    267:7 279:9
reporter
2:9,10,11 11:15
    157:9,11 222:10
    316:13 370:5
reporting
258:20 262:10,23
    265:1 267:6,12,15
    267:25 269:11
reports
48:12,18 49:4
    51:13,18 78:22

82:22 83:18
225:16 272:1
281:22 283:12
284:13,24 339:11
341:1,4 346:5
355:7 358:15
represent
35:13 301:9 310:10
    323:9 337:8 347:6
    351:3
representation
352:4
Representing
3:9,17,25 4:9,20
    5:7,16,24 6:8
reproductive
86:9,15 87:7
    193:24 212:9
    216:6,12 225:19
    241:22 242:25
    247:6 248:1
    329:13
request
22:14 28:8 38:15
    62:1 63:23 64:6
    65:9,13 79:17,20
    81:4,9 111:17,22
requested
21:10 23:2 60:23
    62:2,11 63:13
    64:10 65:12 66:6
    79:21,23 110:2
    222:10 370:13
requests
36:18
require
104:12
required
39:18 104:13
    125:24 126:13
research
46:20 50:8 55:20
    55:23,24 90:15,23
    134:3 144:3,12
    288:7 333:25
    336:19

researched
297:23
Residual
237:24 238:4,10
respect
16:19 58:1 124:21
    129:12 280:17
respected
243:14
respective
178:17
respiratory
234:4
response
8:8 22:13 26:20
    28:2 36:17 225:1
    315:24
responsibilities
67:10,13
responsive
14:7 20:3 22:21
    23:7 26:16 27:18
    31:9 33:8
responsiveness
345:12
rest
236:15 246:13
Restaino
3:19,20 23:17
    33:14,24 34:7
    35:25 338:5
restatement
362:24
restrictive
308:12
restroom
296:9
result
130:13 154:3
    193:24 208:20
    217:20 357:22
resulting
86:9,15
results
118:10 130:19,23
    159:19 170:9

181:21 194:14
195:18 218:17
237:20 240:19
258:11 259:14
272:23 319:8,10
327:11,18 334:2
360:16 362:20
**retain**
304:18
**retained**
24:23 25:5 35:17
    35:22,24 36:3,8
    37:13 46:14 47:18
    47:23 48:8 127:22
    303:11 306:10
**retention**
144:13
**retrograde**
193:10
**retrospective**
9:20 156:21 157:22
    159:17 179:8,14
    258:2
**retrospectively**
342:16
**revealed**
328:16
**review**
8:23 9:17 10:17
    14:2 25:25 27:17
    36:5,19,24 37:3,6
    37:7,10,23 39:24
    48:12,15 49:13
    51:23 52:1 53:10
    54:15,16 58:9,10
    59:4 63:25 64:2
    64:19 67:11,12,18
    68:9,10,15,17,20
    68:25 69:4,7 70:6
    72:22 83:13,17,18
    83:19,21 93:21
    94:5 95:14 96:10
    96:11,12,13 97:13
    97:16,25 98:23
    109:13 112:16,18
    121:5 122:18,18

128:15,19 129:18
170:20 172:7
175:2 177:16
194:2,23 197:22
206:3 211:12
220:8,10 224:18
224:20 230:2
254:13 285:5
289:23 291:11
297:7 302:13,22
304:9 307:13
333:22 340:14,22
348:21 349:6,14
349:20,23 350:5
350:12 351:8,19
351:25 352:7,25
353:15 354:19
356:21 357:3
358:1,2 370:13
**reviewed**
26:23 27:12,14,15
    30:16 39:16 48:25
    49:3,10,17,20,21
    49:23,24 50:3,4,7
    50:23 51:12,18,22
    52:13,20,22 53:1
    53:14,18 54:8,20
    56:19 58:18,19
    59:22,25 60:3,4
    69:10,16 71:25
    73:5 78:12,13
    81:14,18 82:4,13
    86:18,19 88:18
    97:5,10,19,23
    107:1,3 109:9
    110:20 112:5,12
    122:16,17 130:5,7
    131:19,22 136:3
    137:19 147:15,22
    171:9 179:2
    186:10,12,13
    188:2 190:4,13
    197:15 206:23
    209:16 216:2
    231:13 281:6
    283:12,14 284:9

284:10,22,25
285:2,7,10 291:21
293:21 297:7
307:4 308:6 316:1
345:7 346:23
349:12 350:4
353:21 354:2,22
354:24 355:2,3,16
355:24,25 356:18
357:5 363:13,13
363:14
**reviewers**
122:9
**reviewing**
224:8
**reviews**
20:21 74:12 76:7
    91:4 127:1,2
    148:19 302:11,14
    302:15 305:1
    351:5
**revisited**
137:2
**rheumatoid**
223:22 224:1,14
**Riet**
199:18,24 202:2
    256:17,22,24,25
    257:2,4,12,20
**right**
14:21 15:2,6,25
    16:8 17:24 18:18
    20:17,25 22:7,16
    23:11,21,25 24:21
    25:2,19 26:25
    27:13 28:21 29:11
    29:13 31:7 32:19
    33:18,25 35:3,20
    37:5,17 38:6,17
    39:20,21 40:1,15
    41:9 42:8 43:6
    44:23 45:6,21
    46:2 47:4,7,16
    48:20 49:8 50:3
    52:14 53:12,16
    54:10,15,22 55:11

56:17,20 57:2,6
58:24 60:13,18
61:14 64:13 65:18
66:13 68:14 70:4
70:22 73:11 74:25
78:17 80:2,7,24
81:1,16,22 82:10
83:24 87:19,22
90:10,13 93:23
94:1,4,23,24 95:4
95:11 98:1 99:9
99:13 102:9,13
103:18,22 107:8
108:22 109:6,10
109:18 110:7
111:7 114:9,16
115:23 117:4,7,13
117:16 118:15,19
118:21,25 119:19
120:5,8,24 121:9
128:2 129:25
130:15,19 131:1,5
131:14,25 132:5
132:18,24 133:17
133:22,24 134:4
134:19 135:3,10
135:12,16,21,25
136:5,14,17,20
137:21 138:8,13
138:24 139:10,14
141:15 142:10,12
142:13,25 143:5
143:23 144:20
145:16 146:9,14
146:18 147:13,16
153:17,24 154:3
154:14,17,22
155:6 157:2,17,24
161:4,12,14,16,23
162:2,7,12,16
163:10,18 164:4
164:22 165:4
166:19,21,23
167:1,6,21 168:3
168:9 170:7
171:13 172:19,23

173:1,11,14
174:13 176:16
179:4,15,20 180:4
184:18 186:19
187:4,15 188:18
191:24 192:3,7
194:11,24 195:19
196:9 197:16
198:17,19 199:7
199:19 200:23
201:16 203:24
204:10,24 205:14
206:24 209:19
210:3,6 211:10
212:10,16,21
214:6 215:1,24
217:22 218:16
220:15 223:23
227:25 228:23
229:19,24 230:25
231:11 233:12
234:5 236:1 237:9
237:21,25 238:7
238:25 241:13
242:8 243:8,13,17
244:1,23 245:13
246:17 247:7
248:9 249:5 251:5
252:17 254:15
256:4,18 257:8,19
258:2 261:7,15
262:19 263:5,7,13
264:2,7,16,25
265:24 266:8,13
266:17 267:3,8,20
268:12,17,25
269:3,18,20
273:13 278:18
281:7,25 289:17
290:6,10,13,16,25
291:24 293:18
294:7 295:19
296:4 305:4 324:5
325:16 336:21
338:14 355:5
360:12 364:17

Sonal Singh, M.D., M.P.H.

365:23
**right-hand**
290:13 316:24
**rise**
251:10
**risk**
9:4,7,11,13 23:24
51:9 52:4,6 62:9
87:16,23 88:8
89:11,15,21 91:5
91:15,19 92:1
93:22 95:9 97:1,7
99:23,25 102:8,23
104:2 109:14
116:13 120:18
121:22 122:3
123:12,17 127:24
140:11,13 143:16
144:11 145:15
147:1 150:2
152:16 154:11
157:7 158:10
159:4,5,22 160:23
161:10,11 162:1
163:22 166:24
167:4,7,10 179:18
180:2 194:6,9,21
196:16,20,25
200:16 202:12
204:1 211:3,21
215:19 216:22
217:12,17 218:12
218:12,20 224:2,5
226:11,16,17
232:7,9 233:10
240:6,7,15 241:16
241:22,23 242:10
242:11,13,14
245:7,23 246:9
247:5,24,25
249:18,19 250:12
250:15 251:19
252:6 254:19
257:11 260:2,6,8
260:22,23 263:1
268:4,10,15,17

269:6,12 270:5
291:13 292:17
293:6 294:14,25
296:24 300:2
305:11 306:2
310:24 312:7,8,13
312:15,16,21
313:12,18 326:12
328:16,20 329:17
331:16,25 344:8
345:17 365:24
**risks**
8:20 102:3 234:2
290:21 328:13
345:15
**RMR**
1:19
**Road**
3:5
**role**
66:20,25 67:20
220:19,20 224:19
224:22 234:14,15
350:12,16,20
365:25
**Roman**
348:24 364:14,15
364:24,25
**Rosenblatt**
202:2
**Rothman**
243:9,23 244:20
245:4,21 246:7,25
248:6,9 249:3,15
250:9 251:6,7,15
251:22 252:16,18
252:23 253:23
259:3
**Rothman's**
245:9 253:7 259:4
**roughly**
265:1
**route**
207:16 210:19,20
210:25 212:2
213:15 214:11

216:6
**Routers**
282:12,16
**routes**
214:9,14 298:1
**routine**
123:4
**rule**
7:12,23 14:13
21:16 137:3 254:2
254:10
**rules**
307:19

--- S ---

**S**
7:7 8:1 9:1 10:1
11:1
**Saed**
223:3 228:11,13
229:18 230:13
231:1,8
**safe**
285:17,21
**SALES**
1:5
**Sam**
129:24
**Sambataro**
1:19 2:9 11:15
370:4,21
**sample**
160:20 181:25
318:6 319:1,16
**samples**
282:19 317:8,17,17
318:22 362:22
363:10,17,18,22
**sanitary**
167:5
**saw**
83:11 200:22 315:8
**saying**
92:16,21 96:23
114:13 122:22
137:24 165:10

193:12 213:13
226:9 232:24
246:4 247:17
252:20 255:11
329:5 343:10
355:11,14 361:6
**says**
11:20 48:22 130:3
143:8 145:20
255:4,25 317:13
317:23,24,25
320:23 323:3,23
327:5,14,19
342:15 345:21
353:5,6 362:12
365:6
**Schildkraut**
261:10 262:12,13
263:8 270:14
**school**
120:7
**science**
29:23 30:1 49:23
49:25 50:5,13
52:6 140:6 145:18
224:10,12 305:7
**scientific**
101:19 104:3,7
106:12 129:3
235:19 258:6
**scientifically**
203:12
**scientist**
347:19 359:16
**scientists**
279:6,7 280:12,16
280:21 340:10
359:21,25 360:2
360:24 361:10
**Scope**
51:9
**score**
182:9
**screening**
50:10 123:4
**se**

185:17
**search**
22:19,20,25
**searched**
323:10
**second**
27:20 41:12 50:4
71:5 121:14 164:4
167:24 175:20
177:2 178:3 218:3
218:7,8 225:11
233:22 245:1
263:15 264:9
276:16 290:24
294:11 296:13
314:2 320:22
322:24 323:1
348:9 364:12
**seconds**
362:3 367:11
**section**
23:24 67:24 94:23
102:11 119:3,5,11
127:4 146:4
169:24 177:9
178:17 181:7
190:18 251:16
254:21 320:3
322:9 325:4,19,23
357:20
**sections**
68:2 178:16 205:17
**see**
20:13 58:3 62:13
62:19 71:10,17,25
72:25,25 78:8
83:9 88:16 96:10
103:13 115:2
121:18 122:8,17
130:10 134:25
135:8 144:4 146:5
153:7,10,14
156:13,15 159:20
160:19 165:9
171:16,19 174:14
193:3 201:8

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 928 of 1525 PageID: 63074
Sonal Singh, M.D., M.P.H.

Page 410

202:15,19 203:6
213:22 216:21
220:18 234:18
244:5,17 245:2
249:21 258:15,19
284:10 291:10,12
294:16 296:12
312:12,18 315:5
321:9 324:11,13
326:19 327:2,13
339:18 340:13
342:5 345:3
348:22 350:2
351:16 353:19
362:14 364:15,24
365:9,15,18
366:18,23
**seeing**
62:8 258:20 269:19
275:22
**seen**
122:7 141:11
239:11 253:2
323:15 339:16
359:23
**segmentate**
359:11
**select**
71:22 72:15
**selected**
81:15,22,24 82:2
**selection**
130:12 151:17
152:13,25 153:2
**self-report**
157:22
**self-reported**
259:24
**semantics**
36:7 124:13,14
**Seminary**
3:5
**sense**
252:11
**Sensitivity**
328:15

**sent**
24:7 49:22 60:11
82:14 108:8,8
**sentence**
95:6,19 116:1
119:5 218:8,17
233:23,24 250:8
250:20,22 251:17
252:4 267:21
292:7 315:15
320:22 326:9
327:5,13,22
343:18 346:2
350:10 360:12
365:6
**sentences**
246:14 249:9,14,15
249:17
**separate**
63:17 114:22
175:24,25 196:19
202:20 302:20
317:22
**separately**
15:3 29:10,15
365:15
**series**
78:6,25
**serious**
357:22
**serous**
125:15 126:19
142:6 149:25
163:23 254:20
291:24 323:24
324:25 326:12
327:8,24 328:5,13
328:17,21,24
329:2,13,20 330:1
330:2,6,9,13,16
331:25 332:8,17
**serpentine**
317:24
**served**
133:5
**Services**

1:21 11:4
**serving**
45:2,8,25
**set**
25:9 31:14 58:23
71:3,19,24 72:12
78:15 196:23
295:23 370:8,18
**setting**
38:20
**settings**
290:21
**seven**
115:14 134:23
147:24
**SEYFARTH**
6:3
**SGLT2**
303:16
**share**
129:17 226:3 291:6
318:9 341:8,12
**shares**
229:1
**SHAW**
6:3
**sheet**
52:1 120:16 369:6
**shift**
346:13
**shortcomings**
357:23
**shortcut**
281:5
**show**
62:25 85:17 86:23
107:13 137:22
141:9 143:11
146:16,21,25
147:19 148:8
149:1 150:6,11,23
154:2,11 155:4
158:9 160:22
167:16 176:18
177:11,17,21,25
178:19 179:1

180:24 183:16
194:14 196:24
197:18 198:24
199:25 200:6,22
206:9,11 208:19
209:10 211:7
215:14,19,22
216:15 232:14
248:2 254:7 256:4
277:20,22 279:8
282:24 288:4
289:9,11 310:23
312:6,21 313:18
313:21 316:4,21
317:9 319:24
325:3 345:11
**showed**
152:15 161:25
280:17 312:13,14
312:16 329:17
**Shower**
319:18,19
**shown**
160:3 163:2 201:4
201:5 212:24
220:1 232:9 254:6
282:8 312:8
320:13
**shows**
150:2 179:18,23
180:1,23 187:11
193:22 201:1
213:2,2 263:15,19
268:8 271:9
313:11 331:25
**Shukla**
319:22 320:15,23
320:25 321:3,14
323:3,10
**side**
290:13
**sides**
46:25 92:15
**Siemiatycki**
145:7
**sign**

367:8
**signed**
84:24
**significance**
160:8,12,18 180:6
180:11,23,25
181:11 182:4,7,14
182:16,23 183:1
183:15 269:6
288:25 311:4
**significant**
117:12,20 147:1
150:4 154:12
155:16 158:20
160:3,22 162:1
163:16 166:24
167:4,8,10 175:14
180:16 181:22,23
216:15 254:19
263:1 266:24
268:3,11,17,22
269:2,14,16,25
270:6 291:12
296:18 310:24
311:2,8,10,19
312:2,14,15
313:21,22 319:12
319:13 328:16
342:21
**significantly**
195:9,24 196:7
197:8
**similar**
174:19 235:16
**similarities**
291:6
**similarity**
116:9
**similarly**
328:12
**simple**
85:25 242:20 277:9
**simply**
24:6 36:17 58:14
99:8 127:7 188:6
255:21 278:13

Sonal Singh, M.D., M.P.H.

**Singh**
1:15 2:6 7:3,11,13
  7:14,24 8:6,10
  11:11,17,24,25
  13:16 14:14 15:3
  15:13 16:12 21:17
  24:5 25:9,13 28:4
  28:8 30:5,20 31:6
  43:23 75:22 77:18
  77:21 86:2 95:22
  105:20 108:12,13
  115:19 121:4
  122:23 127:10
  176:11,14 241:7
  241:10 278:6
  297:16,19 301:8
  367:4,7 369:8
  370:7
**Singh's**
134:21
**single**
69:11 86:7,13 87:5
  126:8 144:23
  161:8 314:22
  315:12,12
**single-time**
166:9
**Sir**
314:4,11
**sit**
44:12 71:12 78:19
  219:3
**sitting**
355:23
**situation**
236:19
**six**
35:9 43:7 68:7
  310:14 311:17
**Sixty**
71:7
**six-month**
344:4
**size**
160:20 181:25
**sized**

**251:18 252:6**
**skill**
175:1 370:11
**skin**
351:22
**skip**
301:21
**slight**
257:14
**slightly**
112:13
**slow**
119:8 283:14 284:1
**small**
161:10 163:2
  165:12 166:13
  170:14,15,17
  199:15 258:17,24
  277:3 288:9,13
  290:16 354:16
**smaller**
161:11
**smokers**
237:14
**smoking**
236:14,18 237:8,18
  254:24 255:1,22
  256:1,6,10,15
  343:24
**snippet**
68:8
**social**
186:25
**Society**
336:18
**somebody**
48:2 64:2 188:17
**Sonal**
1:15 2:6 7:3,11,13
  7:14,24 8:10
  11:11,17,24 13:16
  14:13 16:12 21:16
  28:4 77:18 176:11
  241:7 297:16
  369:8 370:7
**sorry**

25:21 29:3 31:1
  38:22 60:21 71:5
  77:12 115:17
  123:5 131:7
  133:18,19 147:7
  147:24 151:14
  169:13 177:10
  185:25 190:23
  194:18 195:16
  201:22 221:22
  227:20 230:24
  238:2 251:23,25
  255:2,7 266:22
  271:24 284:13
  290:4 291:25
  296:8 303:2
  309:17,18 314:2
  315:1 316:7,7
  320:7,17 324:4
  327:11 341:10
  344:25 347:4
  360:9 361:23
  362:5,6 364:18,22
**sort**
23:1 43:1 63:16
  99:20 112:15
  139:22 141:9
  175:12 217:5
  223:10 281:23
  286:7 298:2 302:5
  302:8,16 305:4
  307:11,13,16
  329:21 330:20
  344:3 348:13
  350:16 352:19
  358:22
**sounded**
83:5
**sounds**
338:12
**source**
112:19,25 113:19
  113:20 154:23
  249:1,6,7 276:5,6
  276:18 317:17,22
**sources**

53:15 276:19
**sourcing**
154:25
**South**
3:13 4:5 5:20
**speaking**
53:21 221:14
  280:21
**specific**
27:1 38:21 72:2
  97:19 113:23
  124:20 126:15
  150:16,17 167:15
  171:5 184:20
  198:3,4 236:23
  257:18 261:2
  285:10 287:10
  299:4 314:15
  323:2 330:22
  331:13,18 333:22
  340:1,4 350:14
  352:3,8
**specifically**
79:9 126:12 130:23
  225:14 308:3
  357:19
**specificity**
132:14
**specifics**
286:23 304:4
  347:21 364:1
**spectrum**
267:16
**spend**
35:5 42:15 224:8
**spent**
35:8 40:8 41:4,24
  42:1,2,21 47:2,3
**spoke**
34:15
**spring**
33:15,16
**spurious**
130:14
**Square**
4:16

**SS**
370:3
**staff**
55:9,11,12,24,24
**stamp**
130:2
**stand**
324:23
**standard**
19:14 106:10 129:2
  129:6,8 227:11
  303:14,20
**start**
164:8 171:17 246:8
  309:19
**started**
164:20 267:6 354:7
**starting**
79:3 133:22 195:22
  326:5 327:17
**starts**
325:25 326:1
**state**
11:23 49:23,25
  50:5 70:2 105:4
  105:15,22 119:25
  124:6 131:2 132:7
  136:12,24 140:9
  143:2 145:11
  151:15,19,22,23
  152:10,11 162:18
  164:6,14 165:23
  210:22 211:17
  214:1 223:17,17
  225:5 234:13
  241:15 252:4
  256:5 259:22
  268:5 290:12,18
  296:16 314:14
  328:12,15 330:8,9
  330:12,23 339:17
  362:20
**stated**
76:2 97:15 115:2
  143:10 193:9
  251:3 264:15

Sonal Singh, M.D., M.P.H.

286:20 291:21
330:11 346:4
359:24
**statement**
86:3 96:2 98:9
117:10 119:16
121:15,20 141:11
143:11 144:6
152:19,21 200:7,9
200:14 242:5,7,13
242:16,21,22
251:1 267:14
281:18 355:14,21
356:1 365:5
366:11
**statements**
89:24 293:10
359:21
**states**
1:1 9:21 11:10 95:7
103:24 105:1
117:11 130:23
131:3 135:5
140:20,25 179:9
242:13 250:11
251:7 274:23
293:25
**stating**
95:15 98:6 101:21
140:23 165:6
200:19 356:7
359:17
**statins**
303:18
**statistical**
160:7,17 180:6,11
180:23,25 181:10
181:11 182:4,7,14
182:15,22,25
183:14 269:5
288:25 311:4
**statistically**
117:20 150:3
154:12 160:3,22
162:1 163:16
166:24 167:3,8,10

175:14 216:15
254:18 262:25
268:3,11,17 269:2
269:13,16,25
270:6 291:12
310:24 311:1,8,9
311:18 312:1,14
312:15 313:21
328:16
**status**
110:23 111:3,11
167:13 255:1
328:14 330:10
**stays**
30:3
**Steering**
8:7 28:1
**stems**
205:21
**stenographic**
11:14 21:4,6,8
27:22,25 28:6
**stenotype**
370:10
**step**
98:17 187:8 207:22
207:22 226:3
**steps**
219:23
**stimulated**
262:10 267:11,15
269:11
**stimulating**
260:10
**Stop**
108:2,2
**stopped**
46:6
**stories**
160:1
**straight**
207:1
**strange**
305:4
**stratified**
167:12

**stratify**
198:14
**Street**
2:7 3:13,21 4:5 6:5
**strength**
132:15 138:23
139:9,17,21
141:21 142:13,18
342:12,17
**strengths**
156:24 161:19
165:21 220:7
342:24
**Stress**
10:5 228:17
**strike**
21:21 24:19 27:9
33:1 35:17 40:21
47:22 59:6 66:14
69:3 70:20 85:23
109:2 110:16
115:8 117:23
125:1 131:22
136:17 137:8
161:2 163:25
180:22 194:6
198:22 218:2,9
226:19 230:15
248:10 273:1
283:10 286:24
294:2
**string**
8:4 23:9,14
**strong**
140:21,23 141:1,6
141:12,16 246:9
**strongest**
125:15
**strongly**
241:20
**structures**
362:17 363:22
**studied**
84:13 193:2 235:1
235:25 289:6
**studies**

10:9 58:11 62:9
63:21 84:14,15
85:17 86:23 87:2
87:4 88:17 94:7
95:14 96:12,14
97:19,22 98:6,14
98:20 109:5,9
116:9 117:11
118:10,15,17,18
118:25 119:12
120:1,2 125:20
126:5 127:16
128:10,10,12,13
128:18,18,22
130:24,25 132:9
137:1 139:13
140:3 145:3
146:21,25 147:3,6
147:8,10,13,16,19
147:22,23 148:4,5
148:17,22,25
149:9,10,10,14,16
149:21 150:2,5,11
150:14,15,18,19
150:22 151:16,18
151:24 152:4,14
152:24 153:2,13
153:20 154:8,13
154:15,20 155:3
155:16,21 156:8
156:17,20,21
157:24 158:3,8,9
158:22 159:6,8,15
159:16 160:3,8,15
167:17 169:10,11
172:24 173:10,13
175:1,17 176:18
177:6,11,16,18,21
177:24 178:5,8,9
178:13,19,22,24
178:25 179:2
183:16 186:12
188:4 189:6 190:5
190:5,5,6,10,13
190:17,24,25
193:18,21 194:2

194:13 196:12
197:11 199:7,14
201:8 202:17,24
202:25 203:5,6,15
203:16,17 204:5
204:19,20,21
205:14 206:9
208:19 209:3,5,9
209:16 210:1,16
211:18 213:21
214:16,22 215:14
215:19,22 216:14
216:19 217:5,25
225:22 227:17,21
227:23,24 228:1,6
231:13 232:8,13
237:21 239:21
240:20 241:12
243:25 244:11,21
251:8,9,20 252:7
253:2,19 254:7
258:4 259:22,25
261:13 270:19,20
270:20,22 272:9
275:17 287:21
288:4,16,20,25
289:16 290:14
291:8,11,14
292:16 298:23
299:9 302:19
307:6 308:3,4
309:1 310:13,15
310:22 311:12,16
311:18,24,25
312:7,13,16,21
313:8,9,10 320:11
322:13,22 323:8
332:22 333:6,17
334:24 335:17
341:25 342:4,8,9
342:13 343:7
344:5 345:3,7,10
353:17,22 354:3,4
354:8,13,22 355:5
355:7 356:8,17
357:4,7,19 358:18

Sonal Singh, M.D., M.P.H.

358:22 360:18
**study**
9:20 10:14 65:7
74:6 84:17 87:1,5
100:20 130:19
139:18,19 143:4,8
144:19,19 148:2
155:2,17,22
158:14,19 160:21
160:25 161:8,9,15
161:23,25 162:5,6
162:10,24 163:9
163:12,13,15,24
164:1,8,9,12,17
164:18,20,24
165:7,15,20,22
166:20 167:18,21
168:1,8,11,20,21
168:23 169:5
171:21 172:2
173:5,7,14,17,25
174:6,15,17
175:12,13,22
179:4,8,11,15,18
179:22,24 182:2
182:12 192:11
196:19,24 197:5
197:14,15,18,23
198:24 199:10
206:4,6,21,23
209:18 211:8,12
211:12 212:24
213:1 214:2,8
217:11,17,23
218:23 219:4
223:3 225:13
228:9,22 229:4,6
230:1 231:14
232:4 237:25
238:5,14,20 240:8
240:16 247:9
255:2 257:18,20
258:2 259:4 261:8
261:11,17,22,25
262:2,5,12,16
263:5 268:7

269:10,11,15,19
269:20,24 270:14
270:17 272:10
282:5,12 288:15
289:3,9,11,13
293:2,4 307:10,10
308:22 309:2,15
310:18 312:6,14
313:8,11,17,19
314:6,12,16 321:9
324:21,23 326:6
329:6,8,17 330:8
330:22 331:24,25
333:7,13,19 334:6
334:11,14,17,18
335:6,8,19,23
342:25 343:11,25
344:4 350:23
355:1,3 357:16
359:12 360:8
361:6 364:4
365:22,23
**studying**
236:12
**stuff**
298:12
**subanalysis**
201:11
**subgroup**
181:10,19,23
**subgroups**
181:21
**subject**
23:23 181:17
220:14 241:11
251:9 304:1
310:18 332:24
**subjects**
182:20
**submission**
82:13
**submit**
42:5 100:6
**submitted**
24:25 51:13,19
82:11,22 100:3

111:9 281:21
303:10 340:8,16
362:22 363:10,17
363:18
**Subscribed**
369:14
**subsequent**
253:19 312:19
**substance**
29:13 138:8 369:5
**substances**
185:11 215:4,7,10
300:2 356:16
**substantiating**
298:21,25
**substantive**
20:10 23:18 33:2
279:25
**substantively**
20:5 26:1
**subtracting**
266:19
**subtype**
142:23 189:12
325:8 331:9
**subtypes**
188:22 189:4,6,16
328:20 329:24
**suddenly**
267:5
**sufficient**
91:22 134:8,12,18
193:16 217:3
294:3
**SUFFOLK**
370:3
**suggest**
116:10 156:6 189:7
253:14 272:9
275:17 322:22
327:11 345:12,13
354:16
**suggesting**
254:8 306:7
**suggestive**
361:1

**suggests**
115:20 158:10
159:21 271:8,11
**Suite**
4:16 5:4
**sum**
40:16
**summary**
51:24 116:25
233:24
**summer**
33:16,16
**superior**
233:6 234:11
**superseded**
358:17
**supplemental**
110:13
**supplied**
363:4,7 364:8
**suppliers**
362:21 363:2
**support**
62:8 65:16 66:9
80:13 86:21 87:11
95:8 165:16,21
187:12 188:4
190:10 193:17
202:3 203:20,23
204:23 205:15
224:24 227:23
228:10,23,24
230:15 250:2,5
273:10 281:15
286:11 287:14
298:6 299:25
360:20 361:6
**supported**
65:22 194:5,8
200:16 201:9
202:12 203:25
**supportive**
191:13 201:13
**supports**
30:18 98:9,11
164:25 168:11

188:3 222:18
**supposed**
133:8
**supposedly**
231:24
**sure**
13:23 14:22 20:6
26:2 27:2,24 36:6
46:15 47:15 53:23
54:6 56:8 57:21
60:22 61:9 62:24
63:8,18 73:4
77:10 80:23 86:13
101:23 102:5
108:3 119:7
120:15 129:16
148:7,7 154:10
157:11 171:20
174:10 186:2
198:21 200:13
201:15 203:13,19
209:24 211:14
225:4,12 236:10
237:7 238:4 252:3
255:5,18 273:4
276:2,5 289:12
290:3 292:2,14
293:9 300:21
302:2 304:11
316:5 318:4
319:25 321:6
322:25 324:15
326:7,25 329:9
331:20,23 333:5
334:14,19 335:24
336:5 341:2
351:15 353:14
355:12,22 357:25
365:4
**surgery**
123:20
**surgical**
233:9
**survey**
362:13 363:24
364:3

| | | | | |
|---|---|---|---|---|
| susceptible | 118:23 174:24 | 88:4,8 89:11,15 | 217:2,5,12,18 | 61:24 62:3,5,10 |
| 151:17 152:13,19 | 175:12,23 197:25 | 89:20 91:9,15,19 | 218:9,10,13,21,24 | 63:1,14 64:15 |
| 152:25 153:2,4 | 198:11,13 200:10 | 91:25 92:4 93:14 | 219:8,23 220:21 | 66:21 67:1 104:25 |
| 259:23 | 200:20 307:7,16 | 94:24 95:7,9 97:1 | 222:16 223:6,19 | 105:6,23 120:11 |
| suspect | take | 97:6 104:24 | 224:25 225:14,17 | 121:16,21,24 |
| 309:25 | 11:25 62:23 64:16 | 105:11 109:14 | 225:25 226:10,11 | 122:24 123:3 |
| swear | 77:9 90:4 99:16 | 115:22 116:12,20 | 227:12 233:6 | 124:6 125:2,6,8 |
| 11:16 | 99:16 101:17,23 | 117:3 122:2 | 234:11 240:5 | 125:10,13,18,24 |
| sworn | 102:5 104:5 111:2 | 123:22 124:20,21 | 241:21 243:1,4,25 | 126:3,12 167:5,20 |
| 11:18 369:14 370:9 | 115:25 120:20 | 124:22,24,25 | 244:12,21 250:16 | 168:6 170:8 |
| synthesize | 124:1 133:12 | 126:18 127:8,17 | 253:15,25 254:19 | 183:22 184:1,11 |
| 302:17,18 | 143:13 153:5,12 | 129:12 130:14 | 257:17 258:12,19 | 185:9 190:11 |
| synthesizing | 157:4 169:7 | 131:12,18 132:21 | 259:16 260:1,16 | 195:9 196:7 207:3 |
| 147:25 | 171:19,22 172:4 | 136:18 138:12 | 260:19 261:2 | 207:23 208:25 |
| systematic | 174:8 175:13,13 | 140:20,23,24 | 262:7 264:1,6,15 | 210:3 211:2,19 |
| 8:22 9:16 10:17 | 176:6 178:14 | 141:13 142:2 | 264:22 265:2,12 | 212:7,14,24 213:4 |
| 37:2,6 58:9 76:7 | 179:22 191:5 | 143:16 144:11,14 | 267:7 275:3,6 | 213:7 214:17,24 |
| 92:7 109:12 127:1 | 195:1,8 205:18 | 144:15 145:15 | 277:4 282:19,20 | 215:15,23 216:14 |
| 128:19 148:19 | 233:15 240:23,25 | 146:17,22 147:20 | 283:4,9 284:19 | 216:16,22 223:2 |
| 172:7 289:23 | 244:25 245:20,21 | 148:9 149:2,17 | 286:22 288:3 | 225:8 241:12 |
| 302:11,22 304:25 | 252:19 278:8 | 150:7,12,23 | 297:20,21 301:9 | 242:11 261:8 |
| systematically | 283:13 291:15 | 152:17 154:2 | 301:11,15,25 | 269:17 270:1,25 |
| 39:16 92:9 | 293:9 296:7,23 | 155:5 156:10,14 | 303:12 305:14 | 271:5,11,13,18 |
| systems | 297:10 321:8 | 157:7,22 158:12 | 306:8,17 308:3,4 | 272:13,18,18 |
| 46:20 | 333:3 336:3 | 162:11,14,19,23 | 308:5 310:18 | 273:7,10 285:8,14 |
| | 348:14 360:1,2 | 163:1,3,4,17 | 312:9 313:12 | 287:12 292:22 |
| **T** | 366:22 | 164:12,19,20 | 315:17,20 317:9 | 298:4 299:19,21 |
| T | taken | 165:3 166:9,25 | 318:6,15,22 319:6 | 315:10 319:5,19 |
| 6:4 7:7 8:1 9:1 10:1 | 53:2 77:16 176:9 | 168:8,13 169:9 | 319:17 320:12 | 357:4 363:15 |
| 368:1 370:1,1 | 241:5 295:13 | 170:22 172:6 | 322:10 337:24 | 364:16 |
| table | 297:14 301:3 | 175:6 176:22 | 338:3,12,25 | talc-based |
| 7:22 20:11,22 | 336:8 337:2 367:1 | 179:7,18 180:2 | 339:11,15,24 | 314:20 318:7 |
| 116:25 180:1 | 370:10 | 184:5,5 185:22,25 | 340:12 341:5 | talc-containing |
| 195:15 256:14 | takes | 186:5,9,11 187:9 | 344:11,16 352:3 | 364:5 |
| 257:7 263:7,10 | 333:7,11 | 189:4,13,22,23,25 | 353:17 354:5,9,17 | talc-dusted |
| 291:9 310:25 | talc | 190:20 191:9,23 | 354:20 356:3,9,10 | 213:14 |
| tables | 5:8,16 9:4,11,13,15 | 192:3,16,22,24 | 356:15,16,23,24 | talc-induced |
| 14:24 110:13 | 9:19 10:9 12:2 | 193:4,6,7,13,25 | 356:25 357:14 | 85:20 208:15 |
| Taher | 25:6 33:12 34:5 | 196:15 197:19 | 359:15,17,24 | talc-ovarian |
| 106:18,20 107:15 | 35:18 36:13,14 | 198:25 199:10 | 360:23 361:8 | 239:20 |
| 107:25 108:16,21 | 37:21 40:8,25 | 200:1 202:20 | 362:21 363:4,10 | talk |
| 109:10,17,20,21 | 44:22 50:10,17 | 204:12,14,17 | talcum | 39:21 76:18 105:3 |
| 109:22,25 110:13 | 51:9,23 52:1,4,18 | 207:5,25 208:9,20 | 1:4 11:8 36:20,25 | 105:18 121:22 |
| 110:17 111:1,6 | 65:7 85:7,10,14 | 209:4,11 210:24 | 37:3 38:2,12 39:9 | 123:6,17 132:14 |
| 112:2 113:3,10 | 85:15,17 86:4,10 | 213:3,4 214:3 | 39:17 41:4 42:11 | 132:15 164:24 |
| 115:19 116:24 | 86:16,19,23 87:6 | 215:7,9 216:4,20 | 48:19 52:21 53:3 | 178:16 204:3 |

209:21 224:10
228:8
**talked**
173:16,20 219:16
232:5 258:17
270:8 272:20
308:14 332:20
343:24 359:20
**talking**
72:3 73:20,25
76:18 165:17,20
165:24 181:17
186:25 203:24
236:11,24 239:15
245:3,23 253:20
265:14,16 282:13
289:3 296:14
301:24 309:21
311:11 313:20
327:2 342:17
344:19 356:12
362:9
**talks**
272:10 288:2
342:12,14
**Tasigna**
45:15 46:1
**Task**
52:6
**Tawas**
174:25
**technique**
268:20
**Tecum**
7:11 8:11 13:16
28:4
**tell**
12:17 16:18 29:6
57:16 64:1 68:5
78:19 79:6 101:2
107:24 116:8
119:6 143:25
144:6 150:20
151:9 170:3
195:21 206:11
218:5 221:15

263:8 286:12
289:5,8 317:7
318:25 319:15
326:8 344:15
350:23
**telling**
75:13 319:3
**ten**
12:18 42:22 46:24
260:11,17
**tend**
183:9
**tends**
175:5
**Ter**
199:18,24 202:2
256:17,22,24,25
257:2,4,12,20
**term**
234:21 235:5,19,20
237:3 323:15
342:23
**terminating**
164:9
**terms**
26:7 29:14 30:14
30:15 38:16 47:3
56:22 73:22 81:11
125:8 139:2 142:6
169:8 199:9 208:6
220:1,24 235:17
243:22 275:14
307:18
**Terry**
256:20
**test**
85:9 86:2 181:22
182:8 195:23
268:19 285:10
**tested**
276:12,17 318:21
362:23 363:20
364:8
**testified**
12:19 61:7 108:13
245:18 339:23

340:11 349:5
350:1
**testify**
30:12 32:8 61:7
252:18
**testifying**
67:15,19 280:20
355:15 363:14
**testimony**
7:20 18:12,13,15
18:23 19:2,10,11
20:1 45:20 46:9
51:14 59:24 60:20
61:3 66:24 67:2
69:14 70:7,12
76:1 77:2,5 96:7
112:8 134:21
145:19 147:18,21
148:1,12 165:19
166:2 168:16
169:16,22 171:8
172:19 175:19
181:8 188:12
197:3 201:3 208:5
208:25 213:10
219:12 221:4
222:12 227:10
231:21 233:4
247:16 248:19
271:10,23,24
272:23 273:22
274:25 275:7,15
280:15 281:7
282:2 286:2
314:14 318:11
332:12 335:16
338:6 339:22
340:3,7 341:5
353:3,25 354:14
355:18 358:10
363:12 370:8,9
**testing**
62:5,12,21 64:9
184:1 271:9 272:5
272:23 275:15,16
281:14,25 284:22

285:1,3,7 287:16
300:1 318:11
354:15
**tests**
181:11,24 279:7
280:17,22 281:12
**Texas**
5:5
**textbook**
243:10,15
**thank**
13:24 18:10 21:1
24:15 25:24 28:13
83:9,11 90:6
109:19 121:2
129:21 143:18
157:12 205:3
228:18 241:2
244:14 289:25
292:4,8,12 297:11
300:14,15,17,18
316:6 336:22,24
366:20,21 367:4,6
367:9,10,12,17
**Thanks**
261:23
**Thayer**
109:20
**theirs**
118:13
**theory**
84:10,12,16 85:10
85:13,22 190:10
194:5,8 200:15
202:11 203:25
227:2,18 298:21
298:25 328:4
330:15 331:4,6
356:15
**therapy**
256:21 257:3,10,22
**thereof**
92:11,12
**thing**
235:6 236:11
240:24 263:3

347:12
**things**
23:2 55:6 59:1
93:21 113:22
128:6 139:4
165:23 166:6
262:6 282:14
289:8 314:9 316:1
341:23 353:12
357:21 358:14
360:1 361:24
**think**
12:12 26:3,22
33:10 36:8 45:18
50:25 62:18 65:3
66:16,17 67:16
81:9 85:25 93:13
123:21,21 139:1
144:24 155:9
156:23 158:17
172:11 176:1
181:14 182:10
191:6 199:4 200:2
200:3 201:24
205:4,16 212:25
216:5,11 217:14
227:20 228:1,7
230:12 235:2,20
238:12 240:22
245:23 263:2
272:7 276:25
279:20 281:19
283:16 284:2
286:1 288:18
304:14 320:1
321:17 323:8
328:19 330:22
335:15,25 340:3
340:18 346:15
354:4 359:19
**thinking**
99:6 302:10,12,16
302:25 303:1,3
305:19
**third**
218:3,7 251:14,16

Sonal Singh, M.D., M.P.H.

252:4 263:19
312:16 315:15
320:8,10,19
**THOMAS**
6:4
**Thompson**
34:11,12,13,17,20
34:24
**thought**
100:11 123:15
142:8 221:11
248:25 262:17
304:10 321:16
331:3 334:13
347:11
**thousand**
145:21 198:22
349:21
**thousands**
159:23 318:22
**three**
41:25 55:13,14,16
61:17 236:23
250:23 284:24
313:8,11 326:4
**three-day**
348:9
**threshold**
106:15
**tie**
189:16
**time**
11:5 16:2 20:8 33:5
35:5 36:3 38:25
39:24 40:4,7,11
40:24 41:3 42:8
42:14,18,21 44:14
47:2,3,11 49:2
64:1 77:11 87:21
122:7 134:22
137:7 148:21
154:8 163:21
180:7 182:24
183:23 184:4
200:11 205:18
224:8 231:6 255:3

264:18 278:11
291:3 300:15
304:12 306:9
308:1 309:15
310:17,19 313:16
323:10,16,17
336:23 340:18
343:1,4,14 344:7
353:23 355:6
358:21 359:11
360:2,3 361:16,17
366:14 367:6
**timeline**
99:14 100:9,10
**timelines**
38:22
**timely**
101:18 104:6
**times**
61:17 111:16,17,23
314:8,16 322:3
349:19 367:14
**timing**
265:7 358:13
**Tiourin**
206:4,22
**Tisi**
3:12 21:2 24:8 34:8
102:15,19,25
109:20 120:22
121:1 157:12
198:5 255:8
283:23 284:2,6
309:5,8 316:18
361:16 364:19
**tissue**
185:21 186:4,16
**tissues**
192:23 193:2 207:7
208:2
**title**
102:24 321:20,21
321:24 365:20
366:4
**titled**
261:25

**today**
11:11 12:21 13:13
15:20 16:2 18:22
20:8 23:6 26:17
30:8,21 31:13
42:9 44:12 48:17
130:6 219:10
301:23 315:25
317:4 332:21
338:1 355:15,23
367:6
**today's**
11:5 14:3 77:18
176:11 241:7
297:16 317:8
**Toiletries**
337:16
**told**
109:3 114:8 142:8
147:11 221:4
227:22 249:24
273:25 281:20
**Tom**
337:7 364:18
**tomorrow**
112:17 240:16
**top**
8:4 22:6 23:9 24:5
130:3 157:10
195:14,17 289:4
310:14 318:2
**topic**
36:6 39:4 85:7
187:14 188:7
220:14 259:11
361:15
**topics**
66:8 346:13
**toss**
118:5
**total**
25:17 40:7 41:10
41:12,16,18,20
162:1
**toxicologists**
351:11

**trace**
185:21 186:4
298:25 299:4,7,7
**traces**
87:6
**tract**
86:9,15 87:7
193:24 212:9,18
215:11 225:19
329:13
**transcript**
67:25 68:10 346:15
346:21,24 347:5
347:14,21 370:13
**transcription**
369:4
**transcripts**
52:21 70:19 76:11
341:4
**translocation**
193:21
**transparent**
304:6
**travel**
212:14 213:5
**traveling**
215:4
**travels**
212:8,19 214:19
215:12
**tremolite**
279:8
**trend**
119:17 179:18
180:15,16,19
253:10
**trial**
7:20 12:19 18:12
18:15 19:2 28:25
29:19 30:13,22
31:12,16 32:2,8
52:21 73:19 340:2
340:2,4 341:4
348:3,16
**trials**
339:15,25 341:8,9

**tried**
128:24 263:4
**Trillions**
322:3
**true**
192:11,18 195:11
236:19 239:25,25
272:14 273:8
300:7 359:15
363:1 370:9
**trust**
61:11
**truthful**
44:8 115:5
**try**
38:5 40:17 69:17
69:18 85:24 201:8
202:15 205:17
229:11 276:9
281:5
**trying**
15:7 31:2,8,9 54:1
61:10 69:18 75:14
76:15 111:11
114:24 115:4,5,18
131:19 151:14
165:10 177:9
178:4 181:16
183:12 200:3,12
202:19,24,25
203:2,8 204:15
214:10 230:7
232:5 236:2,5
249:21 252:20
277:9,10 283:14
283:15,19 284:1
284:10 286:8
288:15 292:19,21
299:6 302:19
305:18,22,23,25
328:8 329:1,4
335:3,5,14 349:22
349:24 359:3
367:16
**tubal**
9:22 167:12 194:9

194:13,20 195:11
196:1,9,13,20,25
197:9,12,19 198:2
198:7,15 199:1
200:1,17 202:13
202:22 203:2,3,9
203:23 204:2,13
204:16 205:1,7,19
206:14 256:9
**tube**
8:13 9:24 90:1 95:3
205:23 206:16
**tubes**
123:20 212:20
323:20
**TUCKER**
4:3 5:18
**tumor**
296:21
**tumors**
125:22 328:14
**turn**
94:12 103:20
143:25 179:23
253:7 259:19
310:12 336:22
360:11 364:10
**turning**
78:6
**Twenty**
41:13
**twice**
75:16 330:4
**two**
9:21 15:21 45:15
61:17 72:18 99:16
105:13 145:21
165:23 166:4,5
171:19 179:9
196:17 198:22
213:18 220:19
239:7 249:14,15
249:16 256:12
276:19 282:5
284:12 290:15
312:7,12 313:19

326:4 341:14,15
342:22 363:20
**type**
124:17,22 125:8,10
143:4 274:9 286:4
287:7,17,18
328:24,25 331:19
**types**
74:1,4 76:23 125:1
125:2,17 163:17
258:21 279:25
286:15 287:1
298:17
**typically**
74:5 76:24 335:16
**typo**
32:25
**typos**
32:24 33:2,3
**T-A-H-E-R**
106:21 109:21
**T-I-O-U-R-I-N**
206:4,22

_____

**U**

**ubiquitous**
184:17
**Uh-huh**
292:6
**umbrella**
58:9 302:13
**unadjusted**
254:8
**unaware**
275:3
**unbiased**
89:2,6
**uncertainty**
104:4
**uncontrolled**
130:13
**underlying**
88:24 95:16,20
98:10,14 99:2
102:12 103:11,15
105:24 109:5,5,8

139:20 365:8
**underpowered**
161:9 181:24
182:24 183:2
**understand**
12:14,21 13:1,4
14:23 15:16 16:7
19:5 26:8 27:3
29:2 31:3,8 35:12
35:16 48:1 53:9
56:11 63:14,19
83:4 99:8 101:14
115:10 138:10
149:15 198:9
204:15 252:20
271:4 273:20
280:8 286:9 299:6
317:16,23 335:3
335:14 349:22,25
350:6 354:5
355:13 366:12
**understanding**
61:23 62:7 101:9
101:11 108:12
110:22 115:17
189:24 223:18,20
256:13,16 260:25
261:3 271:3
273:24 275:24,25
276:11 279:17,18
280:3 281:23
285:19,21,25
298:3 302:4
315:19,22 318:9
319:9,13 320:14
352:13,19
**understandings**
253:21
**understood**
13:10 15:18 16:4,5
22:17 63:5 75:1
365:7 366:3,8
**undertake**
280:7
**undertaken**
302:24

**underway**
84:20
**undirectional**
164:10
**unethical**
348:4
**unfamiliarity**
307:20
**unidentified**
250:12 253:4 254:3
254:4
**unidirectional**
165:14 169:25
**Union**
51:5
**United**
1:1 11:9
**University**
46:10 120:4,10
121:7,16 305:10
**unknown**
238:19
**unmeasured**
238:13,16 254:10
**unproven**
227:3,8
**unpublished**
69:21 70:15 198:16
231:1,9
**unreliable**
176:4
**Unresponsive**
209:8
**update**
18:20,25 30:2
167:22 173:5
174:5 306:7,13
**updated**
7:19 16:8,10,19
18:2,4,23 19:1,9
19:13,25,25 26:23
27:5,11 30:3
32:10 48:16,22,24
49:6,11,16 51:20
52:13 82:7 83:14
83:20 84:2 87:23

91:7 94:3,6 107:8
107:16 108:4
173:25
**updates**
29:23
**upper**
312:17 316:24
**upwards**
190:1,1,9 212:12
212:17 215:7,9
**up-to-date**
23:23 83:1 305:19
**Urbati**
6:11 11:3
**urethra**
214:25 215:5,8,10
215:12
**urinary**
215:11
**usage**
256:21 257:3,22
261:2
**use**
8:24 9:10,12,16,19
10:12 38:1,12,12
103:17,21,25
104:19 105:5
109:14 115:22
116:12 121:16,23
122:24 123:3,12
124:6,25 125:6
126:10 130:14
132:6 141:5,13
143:15 144:11
145:15 146:17,22
147:20 148:9
149:2,17 150:7,12
150:23 152:17
154:2 155:5 156:9
157:6,22 162:15
163:1,4,17 164:7
164:19 165:3,3
166:25 167:5,11
167:20 168:7,8,13
169:9 170:8,23
172:7 175:6 179:7

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 936 of 1525 PageID: 63082
Sonal Singh, M.D., M.P.H.

Page 418

180:7,8,16,17,17
180:24 182:17
192:12,24 195:10
196:8 202:20
208:20 209:11
211:18,20 215:15
215:23 216:15,16
216:22 217:12,18
218:9,19,21 226:7
231:23 232:12,14
233:9 234:1
236:10 241:12,21
242:11 243:1,4
253:11,11 254:2
254:19 255:1
256:8 258:16,19
260:16 261:8,20
262:1,19 263:12
265:2 267:7,25
270:1 296:9
297:20 307:17,19
307:19 313:25
342:23 356:9,12
360:19
**useful**
344:1
**user**
199:11
**users**
163:1 164:11,12,22
165:11,12 168:9
168:13,25 170:15
170:17 182:13
185:22 186:5
197:19 198:25
199:12 200:1
232:1 312:9
313:12
**uses**
163:12 183:24
184:4 283:8
**Usually**
257:6
**uterine**
186:16 207:7 208:2
209:12

**uterus**
212:16,20
**U.S**
225:24 226:12
324:25

**V**

**V**
3:12
**vaccination**
89:8
**vagina**
212:15,18
**vaginal**
190:2 207:6,20
208:1 209:11
**vaginitis**
208:16
**vague**
114:2 239:1
**valid**
165:6 203:12 205:6
**validity**
128:23
**value**
40:7
**values**
256:8
**variable**
235:10 238:12
**variance**
160:13
**varies**
42:17
**various**
66:7 76:7 88:12
140:8 184:17
190:13 223:7
234:19 275:23
276:15 281:2
283:8 339:10
342:13,18 344:9
**vary**
287:17
**vast**
165:3 168:12,23,25

170:22 283:3
**vegetables**
137:21
**Version**
8:16 90:3
**versus**
46:4,10,22 159:15
260:19
**Viagra**
45:4,6 339:5
**video**
11:7 21:5
**videographer**
6:11 11:2,4 77:14
77:17 176:7,10
241:3,6 297:12,15
300:23 301:1,4
336:6,9,25 337:3
362:1 366:24
367:2,18
**Videotaped**
1:14 7:10 8:9 13:15
28:3
**view**
311:3,14,20 325:5
**views**
345:24
**Virginia**
3:6
**vitae**
7:15 16:7,11,13
17:2
**vitamins**
184:15
**voice**
367:15
**Vol**
10:6 233:19
**volume**
50:21 63:25
**vouch**
279:3
**vouching**
219:11
**vulvar**
207:6,20 208:1,16

209:11

**W**

**W**
5:19
**Wacker**
5:20
**wait**
53:25 75:9 95:18
152:1 200:4
306:21 326:20,20
340:19 367:11
**Walmart**
46:4
**want**
14:22 29:4 31:2
40:14 43:12,13
53:23 61:11 62:13
63:10 99:6 113:21
115:1 121:23
127:5 148:15,20
150:15 157:10
172:14 184:22
191:6 198:12
199:2 207:16
209:21 211:15
240:24 252:17
253:22 255:5,16
278:8 279:13
281:4 282:23
289:10 305:20
306:21 323:13
331:24 346:11,13
352:3 355:13
358:13 361:23
362:18 365:3
367:5,12
**wanted**
25:23 62:18 63:14
63:19 65:21 159:2
253:22 302:3
319:8 350:5
**warn**
101:9
**Washington**
6:6 46:10

**wasn't**
65:13 92:25 166:17
200:10 227:11
288:5 308:19
324:1 325:7
328:22
**wasting**
255:3,10 323:17
**water**
184:21,24 185:7
**way**
30:4 57:7 73:3
79:24 111:15
114:15 123:15
134:10 148:13
172:15 201:5
237:15 246:13
254:10 257:25
279:4 283:21
285:16 332:2
352:11 357:18
358:21 370:16
**ways**
112:13 281:2
**weak**
139:13 140:4,16
155:4,9,10,14
250:15
**weaknesses**
220:7 342:12
343:11
**wear**
172:14
**web**
305:12,17
**website**
120:15 121:7,11,12
306:8
**Weed**
52:8 82:22
**week**
27:6
**weekend**
87:24
**weigh**
174:15 175:3

Sonal Singh, M.D., M.P.H.

270:16
**weighed**
128:21 300:3
**weighing**
159:14 160:6
270:14
**weight**
95:7 239:6,12,18
270:17 272:16
**weighted**
160:14,20 213:24
**weight-of-evidence**
127:19
**welcome**
244:15
**well-respected**
243:12
**went**
53:14 54:7 57:5,22
58:8 71:20 147:15
155:9,10 266:7
**we'll**
24:8 62:22 103:5
113:21 172:4
200:4 228:19
233:17 240:23
262:13 278:2
281:5 289:19
297:11 304:15
**we're**
22:23 61:13 76:18
82:18 94:2 108:4
115:13 176:2
203:24 224:10
236:10,11 239:15
311:11 317:4
318:1 337:25
361:19 364:9
367:18
**we've**
21:12 30:8,24
31:21 41:6 48:17
54:21 61:16
103:25 110:5,17
172:5 187:1 199:8
240:22 258:17

272:20 309:22
354:14,15
**whatnot**
256:15
**whatsoever**
185:20 323:4
**WHEREOF**
370:18
**whichever**
124:1 184:23
**White**
297:8
**whittled**
71:21
**widely**
243:16
**willing**
151:11
**wish**
366:11
**withdraw**
26:17 48:6 248:23
**witness**
7:2 11:16 20:6,9
32:14 75:10 77:9
77:12 83:6,8,10
108:17 115:10,13
115:16 171:25
201:22 221:19,22
221:24 222:5
240:23 255:10
273:4 278:7
283:25 284:8
290:1,4 300:15,17
300:21 316:6,8
336:3,24 344:25
362:2 366:20
367:10,12 370:7
370:18
**witnesses**
64:15 70:7
**woman**
193:24 226:10
333:24
**woman's**
86:9,15 183:23

184:2,4,10 210:6
212:9 214:25
225:19
**women**
159:7 164:20 165:3
165:11 169:8,24
170:8,22 180:2
192:19 195:10,24
196:8,25 197:8
215:11 225:24
258:11,13 259:15
259:16 262:7
263:16,20,25
264:4,11,14,18
265:2,11,19 266:1
266:6,11 267:5,7
289:5,9 290:18
315:23 333:8,14
333:18 334:17,20
335:17 356:9,12
**women's**
356:18
**wondering**
348:7
**Wong**
202:2
**Worcester**
2:8 11:8
**word**
60:4 246:8,8,17,17
246:24,25 247:12
247:12 248:3,13
248:14 323:11
333:25 347:15
350:9 360:13
366:4
**words**
138:4,6 245:19
**work**
37:16 42:15 46:21
47:2,4 55:25 57:9
73:12 76:25
111:13,24 120:4,7
274:13 275:8
303:11 359:13
**worked**

79:24 304:25
308:17 338:1,4,9
338:24 339:2
**workers**
234:3
**working**
42:21 44:22,22
45:11,17 111:19
294:1 305:5
309:23 310:3
**works**
305:8
**world**
90:16,24 318:5
**worries**
252:1,1 364:23
**wouldn't**
22:25 133:4 175:3
216:21 232:12
246:18 323:14
333:23 334:16
344:20 361:13
**write**
243:5 246:24 260:4
301:25 305:24
306:1 361:18
**writeup**
255:4,6,11
**writing**
252:16 254:25
**written**
29:14 83:24 243:10
243:15 248:5,6
356:21
**wrong**
102:15,25 235:4
303:23
**wrote**
246:22 247:10
251:22 303:19
306:6 349:23

**X**

**x**
1:3,8,11 7:1,7 8:1
9:1 10:1 125:7

240:16 344:15
364:14,25
**XII**
348:24

**Y**

**Y**
125:7
**yeah**
14:22,22 15:8 17:7
22:18 25:23 26:10
26:22 27:7 29:12
29:12 31:8,17
33:19 34:12 35:1
35:8 36:19 38:7
39:3,15 40:19
42:9,17,24 44:5,9
44:15 45:1,1,18
46:19,24 47:5,5
49:13,18 50:6
51:15 54:16 55:18
57:24 59:1,3,18
59:22 65:7 66:16
71:14,14,16 73:17
78:21 80:13,14
82:24,25 83:18
84:5 88:1 94:5
97:22 98:14 99:5
101:13 103:7
105:21 106:3,24
108:17,23 110:2,8
111:2,8,25 113:16
114:10,18 116:5,5
116:7 117:18
118:17 122:6
126:15,21,23,25
127:12 128:21
129:1,6 130:8
131:16 134:5
135:1,9 136:6
140:24 142:11
143:24 144:2
145:24 152:3,7,7
152:9,18,22 154:7
154:23 155:13
159:4,11 160:10

163:19 164:23
165:1,5 166:17
167:7 168:19
169:4 174:2,11
175:21 177:10
178:5 179:5
180:14 181:4,16
181:17 182:18
184:16,20 185:5
186:8 187:17
188:14 190:17,25
191:7 192:1,14
194:25 196:5,10
197:4,5 198:21
199:8 202:18
203:16 204:3,9
205:4,13,16
211:17 214:4,7,9
215:3,13 216:5,19
217:10,14,19
218:15,22 219:16
220:17 223:14
224:12 225:3,10
225:13,22 226:5
226:10 227:20
228:1,3 229:9
230:13 231:3,12
232:2,19 234:6
236:24 238:6,10
238:15 239:2,13
239:23 240:22
242:18,21 243:7
243:10,14 244:2
245:6,22 246:12
246:16,18 247:4,8
248:4,7,24 249:12
250:18 251:2,2
252:8 253:1 254:5
255:25 256:3,13
258:3 259:2 260:9
261:1,4,6 262:9
264:3 265:16
268:6,9,19 269:1
269:1,9,12,23
270:5 272:7
273:19 274:21

277:19 279:5,23
280:2 281:10
283:7 284:11
285:25 287:24
294:21 297:3
302:5 303:1,14
304:7,13,24 305:7
306:5,20 307:7,15
308:20 309:7,19
311:3 314:3,8
315:4,5,8 316:9
317:1,14,20
320:21,23,24
322:4,4,8 323:7
324:12,12,19
326:3,19 327:4,19
327:21 328:8
329:7 331:12,23
333:15 335:7,22
338:4 339:20
340:8,13 342:6,23
345:1 346:3,8,9
346:24 347:9,25
348:5,18 351:20
351:22 352:13,17
353:4,20 354:11
355:10 356:20
358:25 359:19
364:2,20 365:17
365:19 366:5,16
**year**
41:1,5 44:19,21
46:7 47:12,13
123:2,9,10 132:19
180:3,25 183:1
217:24 268:20
303:19 359:7,7
**years**
12:13 18:14,24
42:23 43:2 44:15
45:13,23 46:24
99:16 126:9
132:20 135:18
145:4 162:16,25
164:9 168:2,2
171:6,7 179:19

180:3,4,4,7,8,17
180:24 181:1
182:16,23 183:4
253:18 276:12
314:21 315:11
343:5 344:17
345:4,8,15,22
346:8,12
**Yup**
51:23

**Z**

**Z**
125:8
**Zanca**
22:7
**Zellers**
4:4 7:4 11:22 13:18
13:21,24 14:1,10
14:15 15:12,18,19
16:10,14,17 17:11
17:18,23 18:1,6,9
18:17 19:1,5,7
20:7,13,15,19,24
21:3,7,19 22:2
23:11,12 24:3,10
24:13,17,18 25:9
25:15 27:24 28:6
28:14 32:16,17
53:20 54:2 59:9
59:13 61:5,9,13
61:16,18 75:9,11
75:19 77:10,13,20
83:12 85:23 90:4
90:7 102:18,21
103:2 107:19,21
108:10,20 109:1
109:16 115:8
117:23 120:19,23
121:3 129:22
133:15 143:19,20
157:4,9,13 171:20
172:1,4,9 176:6
176:13 179:10
199:17 205:2,10
206:18,20 211:9

211:14 218:1,4
221:5,10,13,18,23
221:25 222:4,21
226:21 228:13,19
228:21 233:17,21
240:25 241:9
244:8,15,16 246:1
251:25 255:9,15
255:20 261:17,24
273:1,5 277:21,24
278:3,10,12
283:25 284:4
289:19 290:3,5
292:2,5,7,10,14
293:12,16 297:10
297:18 300:13,18
301:19,24 315:24
332:20 367:9,17
**zero**
41:13,13
**Zervo**
82:23
**Zervomanolakis**
52:10

**$**

**$600**
40:5

**0**

**07962**
5:13

**1**

**1**
7:9,22 8:3,21 9:8
13:14,17 14:3
20:22 21:25 22:22
24:21 102:3
129:19 130:3
133:23 134:3,16
135:5,21 160:16
251:6 256:14
257:7 286:20
290:13,15 299:23
346:18 347:23,24
**1st**

16:24 22:5 129:24
**1,000**
136:2
**1,133**
347:6
**1.12**
143:3
**1.15**
161:11
**1.19**
268:24
**1.2**
153:22
**1.3**
102:11 103:11
139:12 140:3,21
140:23 251:19
252:6,22
**1.36**
153:23
**1.4**
143:4
**1.63**
268:25
**1:02**
176:12
**10**
7:23 21:15,18,23
28:24 29:7,18
30:10,11,25 31:22
32:10 42:2 56:24
124:1 226:17
266:17 341:13,16
341:17,20,21,22
365:16
**10:22**
77:15
**10:35**
77:19
**100**
353:10
**100,000**
226:6
**101**
8:21
**109**

Sonal Singh, M.D., M.P.H.

Page 421

9:5 320:14,15
321:13 323:7
**11**
7:4 8:3 22:1,4
25:18 103:20
226:6
**115**
204:11,12 253:23
**116**
71:1,6
**12**
8:4 23:10,13,19
25:4 145:4 192:23
344:20
**12-month**
343:25
**12.4**
168:2
**12:20**
171:18
**12:24**
176:8
**120**
9:7 134:1
**1215**
296:6
**1216**
294:9
**122**
324:6,9,16
**125**
230:13,20,22
**129**
9:8
**13**
7:11 8:6 25:11,14
26:8 40:22 41:7
**13th**
18:3 24:21 27:11
**130**
3:21
**133**
9:9
**14**
7:13 8:7 25:16 28:5
28:10 164:9

310:12 311:11
**143**
9:11
**15**
8:12 42:2 43:3 90:3
90:5,8 93:10,16
94:3 117:11,15,25
118:9 132:20
135:18 314:19,24
314:25 315:2,2
345:19 362:8
**15th**
49:2
**1510**
5:4
**157**
9:14
**16**
1:16 2:12 7:15 8:17
11:5 14:12 101:24
102:3,6 103:25
120:22,23 370:23
**16-2738**
1:7
**17**
7:16,18 8:22 9:3
109:15,18 110:6
110:18 111:1,6
112:2 113:4,11
116:2,24
**17th**
370:19
**172**
9:17
**179**
9:21
**18**
7:19,20 9:6 120:18
120:21 121:5,14
194:10
**19**
7:21 9:8 25:19
129:18,20,23
194:10
**19,200**
41:19

**19103-6996**
4:17
**1982**
162:12,24 359:1
**1992**
202:3
**1996**
164:9
**1997**
202:3
**1999**
202:2

---

**2**

**2**
7:12 14:11,14,18
15:10 29:1,15,17
30:9,24 50:2,2
77:18 79:3 124:1
176:8 263:7
290:14 291:9
292:5 299:24
310:12 311:16
**2A**
135:10,21
**2B**
136:18 137:8,10,16
137:21,25 138:11
138:13,17
**2:17**
241:4
**2:29**
241:8
**20**
7:22 9:9 42:18,19
42:20 43:3,5
126:9 133:12,14
133:16 134:24,25
180:3,4,8 181:1
182:16,23 253:18
345:15,18 369:15
**20s**
170:23
**20,100**
41:15
**200**

100:22 135:20
**2000**
4:16 8:21 102:3
163:9,15,24
164:16 165:16,25
166:16 170:10
173:9,17 174:1
191:21 197:14
199:6 200:25
202:1 243:24
249:20 253:18
254:14,18 256:5
**20004**
6:6
**2002**
173:6
**2004**
264:10 270:8
**2005**
132:19 133:3
136:24 138:16
359:8
**2007**
145:4 209:18,25
210:23 214:2
**2008**
143:3,22 145:22
161:23,25 162:5
165:2,25 173:9,22
309:23 311:13
313:3
**2009**
320:16
**2010**
25:17,20,21 173:4
173:24 174:5,12
174:17 175:3,5
359:9
**2011**
202:2 289:14 293:4
**2013**
122:11 130:22
199:18,24 202:2
256:17,20,25
257:2,20 357:8
**2014**

9:8 129:19,24
130:3,22 166:20
167:9,19 168:1
198:24 199:6
201:1 202:1 262:7
262:24 263:1,23
264:12,19 265:4,8
265:11,23 267:7
268:1,4,22 269:15
269:24
**2015**
8:3 21:25 22:5
83:10 138:2 206:4
206:21 359:10
**2016**
122:16 179:3,11,15
179:24 182:2
195:3 197:7
201:13 202:1
217:7,17 261:10
**2017**
25:20,22 33:13,16
33:18,23 35:25
36:12 146:3 157:1
157:16 324:17
328:1 359:5
**2018**
8:5 14:12 23:10
24:21 25:18,19
39:5 41:22 45:21
106:18 108:21
109:22 110:1
113:3 116:25
146:3 172:25
198:16 228:11,14
359:6 360:1 361:5
**2019**
1:16 2:12 11:5 17:6
17:7 18:3 27:11
94:4 313:4 370:19
**202**
6:7
**2021**
370:23
**206**
9:24

Golkow Litigation Services - 1.877.370.DEPS

Sonal Singh, M.D., M.P.H.

**21**
7:25 8:3 9:10 119:4
  119:7 143:14,17
  143:21,25 145:22
  153:5 233:15
  309:6,22 310:8,25
**21,000**
41:14
**213**
4:7
**215**
4:18
**22**
9:12 143:5 157:5,8
  157:14,20 360:4
**22311**
3:6
**228**
10:5
**23**
8:5 9:15 79:5 172:8
  172:16,22
**233**
5:20 10:7
**24**
9:18 179:9,11,23
  192:23 195:2,14
  217:8 218:20
  362:4
**24th**
289:14
**243**
10:7 233:20
**244**
10:10
**25**
8:6 9:22 116:24
  206:17,18,21
**250**
256:13
**26**
7:12,23 10:3 14:13
  21:16 209:22
  210:8 228:17,20
**261**
10:14

**267-0058**
5:14
**27**
8:5 10:6 23:10 65:6
  233:18,20
**2738**
11:9
**28**
8:11 10:8 244:9,13
  244:17,19 249:3
  251:15 274:1,19
  275:20 276:22
  277:14,18 280:18
**289**
10:18
**29**
10:11 261:18,22
  262:16 325:14
**293**
10:21

---

**3**

**3**
7:14 16:11,13,16
  16:19 17:3 122:9
  131:8 176:11
  195:23 241:3
  328:6,11
**3rd**
17:5
**3,600**
345:16
**3.3.2**
119:5
**3:32**
297:13
**3:43**
297:17
**3:47**
301:2
**3:51**
301:5
**30**
10:15 34:15 42:18
  42:20 43:6 44:5
  44:10 84:15

**117:11,15,25**
118:9,16 147:23
284:12 289:20,24
291:21 295:17
367:11
**30-minute-or-so**
34:21
**301**
7:5
**303**
3:23
**31**
10:19 284:12
  293:12,15,17
  295:19
**312**
5:22
**316**
3:13 10:22
**32**
10:22 284:12
  316:12,13,16,17
  316:22 317:3,8
  318:3 319:1,17
**32502**
3:14
**33**
66:15 218:11
  316:10 325:15
**337**
7:6 179:23,25
  180:1,18 195:13
  195:14,17,22
**339**
195:18
**34**
264:2,16 265:23
  266:17,20
**34.4**
265:17,17,24
**341**
218:1,6
**35**
67:14 163:4
**350**
5:12

**359**
143:25 153:14
**36**
162:15,25 165:4
  264:10 266:16,19
  362:2
**36.5**
264:6,23 266:2
  267:1
**363**
2:7
**391-0197**
5:6

---

**4**

**4**
7:16 17:11,17
  56:22,25 57:17
  58:6,24 59:10
  64:16,17 70:24
  73:8 80:18 81:19
  122:9 130:9 131:9
  133:23 135:23
  136:4,14 241:7
  251:14 263:7
  365:12
**4:30**
336:7
**4:36**
336:10 337:1
**4:38**
337:4
**40**
161:22,24 226:18
  266:12,15,15
  274:19
**40,800**
41:21
**41**
93:17 95:12 97:8
  115:25 116:2,3,4
  161:22 162:20
  178:14
**430-3400**
4:7
**435-7000**

**3:15**
**45**
93:17 95:12 97:8
  262:21 267:20
**46**
179:19
**463-2400**
6:7
**47**
163:8 274:2 275:20
  276:22 277:15,18
  280:19 316:1,25
  317:2
**48**
163:9 164:3 177:15
  254:17
**49**
166:19
**4900**
3:5
**499**
136:6

---

**5**

**5**
7:17 17:18,22
  32:13,18 58:2,6
  59:8,11,14 60:2
  65:2 73:9 77:25
  80:19 81:19 136:8
  244:25 245:21
  297:16
**5,100**
41:17
**5:13**
366:25
**5:26**
367:3
**5:27**
367:19,20
**50**
117:15 118:1,8
  167:24 174:23
  176:3 225:24
  226:7
**50s**

Sonal Singh, M.D., M.P.H.

170:9
**51**
177:13 266:17,19
266:19
**51.5**
266:7 267:2
**512**
5:6
**515**
4:5
**52**
177:14
**54**
151:20 152:8
177:14,15 241:10
241:15 245:10,14
245:20 258:25
259:1,20 315:13
**55**
177:13 178:14
**56**
177:10,20
**57**
190:23 196:10
**58**
177:15 324:5,8
331:11 364:21,22
**59**
320:7,18,19 364:13
364:14,19

**6**

**6**
7:19 18:1,5 19:10
27:13 32:11 48:18
48:22 49:12,16
82:8,18 83:15
94:12,20,23 95:6
107:17,23 108:10
157:19 258:25
259:1,20 315:14
362:2
**6:36**
362:1
**60s**
170:9

**60606**
5:21
**61**
162:15,25 320:4
365:11,18
**62**
348:19 350:13
361:20
**624-6300**
5:22
**63**
71:2,8,9 168:14
**63.3**
168:1
**64**
191:1
**65**
191:3,4
**66**
14:19 123:25 124:3
191:9
**67**
17:13 56:23
**68**
191:15,16,17 192:8
192:9

**7**

**7**
7:20 18:11,16,25
19:19 241:11
346:17 347:24
**70**
47:5,6,14 147:24
282:3
**703**
3:7
**75**
17:13 56:23
**77**
20:21
**78**
20:21
**78701**
5:5

**8**

**8**
7:21 19:2,4,9,21
102:5,11 103:9,16
151:21 152:10
253:8,18
**80220**
3:22
**81**
10:6 50:21 233:19
**816**
5:4
**82**
135:10
**839-8000**
3:23
**850**
3:15
**87**
78:5 79:3 191:15
191:18 268:25
**877.370.3377**
1:22
**878**
233:16
**88**
78:6 79:5
**880**
233:16
**89**
8:16
**890**
159:12
**895**
233:16

**9**

**9**
7:22 20:20,23 21:2
21:3 102:5,11
103:9,16 360:11
**9,300**
41:11
**9:07**
1:16 2:13 11:6
**90071**

4:6
**917.591.5672**
1:22
**92**
153:23 174:3
**931-5500**
3:7
**95**
57:9 163:3
**973**
5:14
**975**
6:5
**988-2700**
4:18

Exhibit 35

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>*THIS DOCUMENT RELATES TO ALL CASES* | MDL NO. 16-2738 (FLW) (LHG) |

**RULE 26 EXPERT REPORT OF**
**REBECCA SMITH-BINDMAN, MD**

Date:   November 15, 2018

Rebecca Smith-Bindman, MD

**The Relationship Between Exposure to Perineal Talc Powder Products and Ovarian Cancer**

**Expert Report**

Rebecca Smith-Bindman, MD

Professor, Radiology and Biomedical Imaging, Epidemiology and Biostatistics, Obstetrics, Gynecology and Reproductive Science and Director, Radiology Outcomes Research Lab

University of California San Francisco

**Table of Contents**

*I. Executive Summary* ................................................................................................................. 4

*II. Expertise of Dr. Smith-Bindman* ........................................................................................... 6

   Education and Employment ...................................................................................................... 6

   Research Expertise .................................................................................................................... 6

   Knowledge of Relevant Study Designs ..................................................................................... 6

   Experience as a Medical Expert ............................................................................................... 8

*III. Background: Ovarian cancer and Talc as a Modifiable Risk Factor* ..................................... 8

   Ovarian Cancer ......................................................................................................................... 8

   Histologic types ........................................................................................................................ 9

   Risk Factors ............................................................................................................................. 11

   Etiology: Origins, Causes, Development and Inflammation .................................................... 12

   Association of Ovarian Cancer with Talc Powder Products .................................................... 13

   Why Talc Powder Products were Initially Suspected as Causing Ovarian Cancer ................... 13

   Asbestos .................................................................................................................................. 14

   Talc .......................................................................................................................................... 15

   Heavy Metals ........................................................................................................................... 16

*IV. Overview of Publications on Genital use of Talc powder products and Ovarian Cancer* ...... 16

   Explanation of study designs and article types ....................................................................... 16

   Table of Reviewed Publications .............................................................................................. 18

   Quantifying Exposures ............................................................................................................ 19

   Summary of Data ..................................................................................................................... 19

   Cohort Studies ......................................................................................................................... 19

   Systematic Reviews ................................................................................................................. 22

   Pooled Data ............................................................................................................................. 27

   Case-Control Trials ................................................................................................................. 29

*V. Rationale for and Explanation of the New Systematic Review* ............................................ 30

*VI. New Systematic Review of Literature Quantifying Association Between Regular Frequent Genital (Perineal) Talc powder products Application and Ovarian Epithelial Cancer Risk with A Focus On Invasive Serous Cancer.* ................................................................................................ 31

   Literature Search ..................................................................................................................... 31

   Article Selection ...................................................................................................................... 31

   Exclusion ................................................................................................................................. 32

   Defining Talc powder products Use ........................................................................................ 32

Stratification of Analyses: Focus on a Single Histologic Type Where Possible .............................. 32

Type of Exposures ......................................................................................................................... 32

Statistical Analysis ........................................................................................................................ 33

Results .......................................................................................................................................... 33

New Systematic Meta analytic review: Summary ......................................................................... 34

Overall Summary of the Epidemiology Data Describing the Association Between Talc Powder Products and Ovarian cancer ...................................................................................................... 34

*VII. Other Relevant Factors* .............................................................................................................. *35*

Research Supporting Talc Association with Ovarian Cancer: Transit to ovary and Risk Reduction on Interruption ............................................................................................................................... 35

Interactions ................................................................................................................................... 32

Risks Over Time ............................................................................................................................ 32

Variation in Risk when Talc Use is Discontinued ........................................................................... 35

*VIII. Consideration of Causality of Talc powder products and Ovarian Cancer : Bradford Hill Factors* *35*

A) Strength of Association ............................................................................................................. 36

B) Consistency of Associations in Different Populations and Studies ........................................... 38

C) Specificity Between Cause and Outcome .................................................................................. 39

D) Temporality ............................................................................................................................... 39

E) Dose Response .......................................................................................................................... 39

F) Biologic Plausibility: Factors Linking Talc and Ovarian Cancer ................................................. 40

G) Coherence and Consistency with Understood Biology .............................................................. 41

H) Experimental Evidence ............................................................................................................. 41

I) Analogy ...................................................................................................................................... 41

*References* ...................................................................................................................................... *42*

**I. Executive Summary**

Substantial evidence supports a strong positive association between ovarian cancer and genital exposure to talcum powder products and that regular exposure to talcum powder products causes ovarian cancer in some women. Talc is a naturally occurring mineral used in cosmetic products because of its desirable chemical properties such as being soft and absorbent. Women who have had regular exposure of the genitals (specifically the perineal region from the pubic area to the anal area) to talcum powder products are at increased risk of developing invasive ovarian cancer, in particular serous cancer, the most common and most lethal form. In the United States, a substantial portion of women report having ever used talc powder products at some point in their life. The most commonly reported frequency of talcum powder product use is daily. Women who use talcum powder products daily increase their risk of developing ovarian cancer significantly. Regular exposure causes ovarian cancer in some women.

I was asked to review the medical and scientific literature regarding the relationship between genital talcum powder product use and ovarian cancer and determine whether the relationship is causal. For this extensive analysis and report, I applied the same methodology with the same scientific rigor that I use in my research and clinical practice. I reviewed 43 relevant publications presenting scientific data on the association between ovarian cancer and exposure to talc powder products: 4 cohort studies, 8 systematic reviews, 2 studies that pooled data from multiple individual studies, and 30 case-control studies. I also read numerous review articles, and systematic reviews on related topics such as those completed by the International Agency on Research on Cancer (IARC). I also completed my own, new systematic review on of the studies that I reviewed as part of this report. This report contains my overview of these publications plus a detailed new systematic review of the studies that I conducted. After reading, evaluating, and summarizing these publications, in my expert opinion, I do not have any uncertainty that regular exposure to talc powder products increases a woman's chance of developing epithelial ovarian cancer. In my expert opinion, regular exposure to talcum powder products causes ovarian cancer

Quantifying the precise magnitude of the association is more difficult than establishing the association. The association will certainly vary by demographic and reproductive factors and whether women have other underlying ovarian cancer risk factors and exposures. With that caveat, **it is my opinion that women exposed to perineal talc powder products on a regular basis have about a 50% increase in their subsequent risk of developing invasive serous ovarian cancer**, compared to women who do not regularly use talc and even after accounting for other ovarian cancer risk factors. This estimate is supported by existing publications and my quantitative review of the scientific literature that focused on summarizing studies that addressed regular exposure to talc powder products as a risk factor for epithelial ovarian cancer, and in particular serous cancer. Talcum powder exposure is associated with other epithelial cancer subtypes (in particular, clear cell and endometrioid carcinoma), but because these cancers are less common, and because fewer studies have evaluated these cancers in sufficient numbers, quantifying the associations is more difficult. While some publications estimated talc powder products have a slightly greater risk of these cancer subtypes, others

4

estimated a slightly lower risk of these cancer subtypes. In my opinion, this risk is likely overall in about the same range as for serous cancer, but I would estimate slightly less at 40% increased risk.

The epidemiological evidence documents a strong, positive association between exposure to talcum powder products and ovarian cancer and that regular exposure causes ovarian cancer. The epidemiological evidence alone does not confirm the mechanism by which talc powder product increases ovarian cancer risk, nor does it confirm the specific component in talcum powder products that makes it carcinogenic. Nonetheless, the literature provides compelling evidence that exposure to talcum powder products leads to chronic inflammation and that the inflammation induces a strong biological response that results in the induction, promotion, and growth of cancer. Further, there is evidence that several highly carcinogenic agents are components of the talcum powder products. These include, most importantly, asbestos, a Group 1 carcinogen that the International Agency for Research on Cancer (IARC) has determined causes ovarian cancer. I have seen evidence that talcum powder products contain asbestos. Second, talcum powder products contain asbestiform talc particles which have a similarity in structure to asbestos fibers (and which IARC concludes are carcinogenic). Lastly, talcum powder products contain numerous heavy metals such as, nickel, chromium, (Group 1 carcinogens) and cobalt (Group 2 carcinogen ) according to IARC. These components are carcinogenic (cause cancer) and can contribute to the carcinogenicity of talcum powder products.  Observational and experimental data confirm that talcum powder product particles applied to the perineum can reach the fallopian tubes and ovaries through the vagina, supporting that talc particles applied to the perineum can deposit on the ovaries. Surgery that impedes the movement of particles from the perineum to the ovaries such as hysterectomy (uterine removal) or tubal ligation (tying or blocking the fallopian tubes to the ovaries), reduces the elevated risk of ovarian cancer from exposure to talcum powder products. This finding supports that local tissue response and inflammation in the fallopian tubes and/or ovaries from talcum powder products (with components) causes the elevated ovarian cancer risk.

In summary, **from my review of the scientific literature and my own analysis, it is my opinion that genital exposure to talcum powder products is an actionable and causative risk factor for ovarian cancer.** As a physician involved in women's health issues, I view talcum powder usage as a modifiable "lifestyle" risk factor that should be avoided because of the substantial risk to health and lack of therapeutic benefit.  An elevated risk of 50% is significant and results in a large number of unnecessary ovarian cancers given the large number of women exposed. Depending on estimates of how many women regularly use talcum powder products, between 7% and 20% of all ovarian cancers and 14% - 39% of invasive serous cancers (the most aggressive and feared cancer type) are caused by the use of talcum powder products. These cancers can be prevented if women do not use talcum powder products.

## II. Qualifications

<u>Education and Employment</u>
I am a professor of Radiology and Biomedical Imaging, Epidemiology and Biostatistics, Obstetrics, Gynecology and Reproductive Medicine, and Health Policy at the University of California San Francisco (UCSF) School of Medicine. I graduated from Princeton University with a degree in structural engineering (with combined majors in engineering and architecture) and attended UCSF medical school. My training after medical school included an internship, radiology residency, and clinical fellowship in women's health and a research fellowship in epidemiology and biostatistics in the UCSF Departments of Medicine and Epidemiology and Biostatistics.

I am a clinician-scientist. My clinical work includes one day a week in the Department of Radiology and Biomedical Imaging, with a focus on women's health imaging. I work in the ultrasound section, where a large proportion of the work is focused on the diagnosis of ovarian abnormalities (cancer and other functional issues). I run the UCSF Radiology Outcomes Research Lab, spending most of my time on clinical research and leading large epidemiological studies. I teach in the UCSF School of Medicine and Department of Epidemiology and Biostatistics.

<u>Research Expertise</u>
My research expertise is in epidemiology, outcomes research, comparative effectiveness, health services research, and dissemination and implementation sciences. My epidemiological studies have evaluated the quality, use, accuracy, predictive value, and impact of diagnostic testing on patient health. I have measured the risks and benefits of medical imaging in different contexts and different populations. Much of the research is in women's health, including diagnoses of cancers such as ovarian, endometrial, thyroid and breast. I have led many large, multi-institutional research projects. These projects are typically collaborative, involving researchers and clinicians with diverse expertise including radiology, obstetrics and gynecology, medicine, biostatistics, epidemiology, economics, demography, social sciences, medical informatics, radiation science, and dissemination and implementation science.

I have been a prolific researcher. I have led projects funded by more than 50 million dollars in research grants—entirely focused on cancer diagnosis and prediction. The research has been published in the most prestigious medical journals including the *New England Journal of Medicine*, *Annals of Internal Medicine*, *Journal of the American Medical Association*, *Journal of the American Medical Association Internal Medicine*, *Journal of the National Cancer Institute*, *Obstetrics and Gynecology*, and leading radiology specialty journals such as *Radiology* and *Journal of the American College of Radiology*.

<u>Knowledge of Relevant Study Designs</u>
Several of my published studies have been systematic, meta-analytic, quantitative reviews of the published literature. Meta-analyses review existing evidence on a topic and summarize

and re-analyze data from earlier studies. My systematic reviews focused on the diagnoses of endometrial cancer, breast cancer, and a range of birth defects including trisomy 21 (Down syndrome) and trisomy 18 (Edwards Syndrome). Many of my reviews were published in prestigious medical journals, reflecting their scientific rigor based on an in-depth understanding of how to combine and review results from different studies in a scientifically valid and reproducible way.

Several of my recent research projects quantified the variation in radiation dose associated with medical imaging and the expected impact of this variation on cancer outcomes. This work has brought attention to the need for better standards in medical imaging. I am currently leading two large, multi-institutional epidemiological projects on medical radiation funded by the National Institutes of Health. One project is collecting radiation dose measures associated with computed tomography (CT) imaging from more than 150 hospitals in the United States, Europe, and Asia and testing the impact of providing feedback and education to radiologists on average and high doses. The second project is a multinational epidemiological study on childhood cancer. This project is assessing the risk of cancer associated with medical imaging among 1 million children and 1 million pregnant patients after accounting for a range of other cancer risk factors. The study will be the first to quantify the risk of medical imaging including CT among a large group of patients and uses novel methods to accurately estimate radiation dose from imaging.

I have expertise in a range of research study designs. The projects I currently lead (each funded by the National Institutes of Health or the Patient-Centered Outcomes Research Institute for between 9 - 15 million dollars each) have designs selected to be appropriate for the research question. For example, the study assessing the risk of cancer from medical imaging uses a *case-control study design, in which data are collected on a group of patients and those with a condition (cases), are matched to similar patients without the condition (controls)*. Matching people with a disease to people of similar age, gender, and other factors who do not have the disease allows researchers to determine if circumstances such as exposure to a potential toxin influence disease development.

My project on medical imaging uses a *cohort design, comparing groups of people (cohorts) in a population, some exposed to a potential disease agent and some not exposed*, to see if the agent influences disease. My study on radiation doses from CT uses a *randomized controlled design, in which individual patients are randomly assigned to different treatments* so their effectiveness can be compared. I am studying lung nodules using a *cluster-randomized controlled trial design that randomly assigns groups of people in similar circumstances (for example because they all see the same doctor) to different treatments* so the effects of the treatments can be compared.

I have a deep understanding of how epidemiological studies are conducted. I understand what study designs are suitable to particular datasets, populations, and research questions and the advantages and disadvantages of each design. This is relevant as no single study

design is "best;" there are strengths and weaknesses of each. The most appropriate and valid study design varies based on the research question being asked.

Experience as a Medical Expert

For the National Academy of Medicine, I have contributed to several reports, including Saving Women's Lives (2004), Improving Mammographic Quality Standards (2005), and Breast and the Environment: A Life Course Approach (2012), for which I wrote a review on the association between radiation exposure and breast cancer (Appendix). In addition to this research, I am actively involved in raising awareness of the need for better standards and greater safety around medical imaging, in particular related to radiation exposure. I have spoken at the US Food and Drug Administration, testified before the US Congress on several occasions, and worked with leading professional societies to focus attention on improving medical imaging safety.  I have written several quality measures on radiation dose adopted by the National Quality Forum and developed educational tools to help physicians and patients understand the importance of minimizing radiation exposure from imaging.

Prior to providing my opinions on the association between talcum powder products and ovarian cancer, I had not reviewed the relevant literature and had not published in this area. As a result, I brought an unbiased perspective to my review. This report reflects my review of medical and scientific publications in this area (overviews and scientific studies), my own analysis, and review of documents shared with me by the lawyers who engaged me for this task.  My curriculum vitae is attached as Exhibit A, the materials I considered are attached as Exhibit B, and my fees and prior testimony are attached as Exhibit C.

**III. Background: Ovarian cancer and Talc as a Modifiable Risk Factor**

Ovarian Cancer

Ovarian cancer is the seventh most common cancer in women and the fifth leading cause of cancer deaths in the United States. [1] In  2018, 22,240 women are expected to receive a new diagnosis of ovarian cancer and 14,070 women will die from it. Overall, about 1 in 78 women (1.3%) will be diagnosed with ovarian cancer in their lifetime and around 1 in 108 will die of it. About 224,940 women are currently living with ovarian cancer. [2] Most cases occur among older women; the median age at diagnosis is 62, although this varies by ovarian cancer type. [2]Ovarian cancer is frequently diagnosed at a late stage, when a cure is unlikely. Because so many ovarian cancers are diagnosed at a late stage, the overall mortality rate is high, and the overall 5-year survival is poor. With the poor prognosis and absence of a reliable screening test to find ovarian cancer early, it is a highly feared cancer for women and their physicians alike.

Histologic types

Cancers are classified by histologic type, meaning the type of cells that are involved. Understanding ovarian cancer histologic types is important because the risk factors, etiology and genetics of ovarian cancer can vary by histological type. Therefore, the importance of talcum powder products as a risk factor or cause can also vary by type.

Ovarian cancers (epithelial and non-epithelial) are a heterogeneous group of malignancies that vary in their pathological appearance, molecular biology, risk factors, etiology and prognosis. [1] Epithelial ovarian cancers have several histologic types; most fall into a small group of more common types including serous, endometrioid, clear cell and mucinous. About 90% of ovarian cancers are epithelial (meaning they arise from cells on the surface of the ovary or fallopian tube) and the most common type of epithelial cancer is serous carcinoma. Serous is not only the most common type of ovarian cancer, it is also the most lethal type of ovarian cancer. Further, it is the type of cancer that pathologists can most consistently, reliably, and reproducibly diagnose. Thus, epidemiological studies will have the greatest ability to document a clear association between serous ovarian cancer types and talcum powder products, if a connection exists. It is also the subtype that has been studied most from a molecular and pathologic research standpoint.

| Table 1. Histologic Types of Ovarian Cancers Diagnosed Over 15 Years at the KP Washington (in press, JAMA Internal Medicine) | | |
|---|---|---|
| Histologic Type | Number | Percent of Total Cancers |
| Papillary serous cystadenocarcinoma | 52 | 36.6 |
| Endometrioid carcinoma | 17 | 12.0 |
| Serous cystadenocarcinoma | 15 | 10.6 |
| Clear cell adenocarcinoma | 12 | 8.5 |
| Adenocarcinoma, NOS | 11 | 7.7 |
| Mucinous adenocarcinoma | 7 | 4.9 |
| Mixed cell adenocarcinoma | 3 | 2.1 |
| Serous surface papillary carcinoma | 3 | 2.1 |
| Granulosa cell tumor | 3 | 2.1 |
| Carcinoma, not otherwise specific | 2 | 1.4 |
| Mucinous cystadenocarcinoma | 2 | 1.4 |
| Mucinous cystic tumor of borderline | 2 | 1.4 |
| Carcinoma in situ | 1 | 0.7 |
| Squamous cell carcinoma | 1 | 0.7 |
| Papillary adenocarcinoma | 1 | 0.7 |
| Papillary serous cystadenoma, borderline | 1 | 0.7 |
| Adenocarcinoma with squamous meta | 1 | 0.7 |
| Granulosa cell tumor, malignant | 1 | 0.7 |
| Endometrial stroma sarcoma | 1 | 0.7 |
| Mullerian mixed tumor | 1 | 0.7 |
| Carcinosarcoma | 1 | 0.7 |
| Carcinosarcoma, embryonal | 1 | 0.7 |
| Teratoma, malignant | 1 | 0.7 |
| Astrocytoma | 1 | 0.7 |
| Marginal zone B-cell lymphoma | 1 | 0.7 |
| **Total** | **142** | **100** |
| **Summary** | | |
| Serous carcinoma | 70 | 49.3 |
| Endometroid carcinoma | 17 | 12.0 |
| Clear cell carcinoma | 12 | 8.5 |
| Mucinous carcinoma | 9 | 6.3 |

My research group recently reported on the ultrasound appearance of ovarian cancers among a large cohort of women. The purpose of this cohort study was to quantify the risk of malignant ovarian cancer based on ultrasound findings. We described 142 new ovarian cancer cases in a population of 500,000 women enrolled in Kaiser Permanente Washington, an integrated health plan, between 1997 and 2008, including 72,093 women who underwent pelvic ultrasound. The distribution of cancer histological types is in Table 1. Serous carcinoma was the most common cancer type: In our cohort, it was 50% of the ovarian cancers. Serous carcinoma has the worst prognosis of the ovarian cancer types. Its high frequency and poor

prognosis contribute to the high mortality rate for ovarian cancer overall. The other common histological types of ovarian cancer were endometrioid (12% in our data), clear cell (8.5% in our data), and mucinous (6.3% in our data).

Ovarian cancer types have large differences in stage of diagnosis (a strong predictor of survival) and prognosis independent of stage. The 5-year survival by histological type is in Table 2. Serous cancer is the most frequent and most aggressive, with an overall 5-year survival of 43% as compared with 82% for endometrioid. The survival is strongly influenced by stage at diagnosis, with higher stage numbers indicating more advanced stage. [1] Most serous carcinomas are diagnosed at stage III (51%) or IV (29%) (Figure 1), [2] for which 5-year survivals from the most recent data were 42% and 26%, respectively. These data reflect the aggressive nature of serous cancer. [1] In contrast, the majority (58% to 64%) of endometrioid, mucinous, and clear cell carcinomas are diagnosed at stage I, similar to nonepithelial tumors (Figure 1) . Consequently, the 5-year survivals are 82%, 71%, and 66%, respectively, for endometrioid, mucinous, and clear cell carcinoma. Thus, these cancers behave very differently, even though all are ovarian epithelial cancers.

**Table 2. Percent of Women Surviving 5 Years After Diagnosis by Epithelial Ovarian Cancer Type. Data From 2008–2013.**

|  | All epithelial types | Serous | Endometrioid | Mucinous | Clear cell | Sex cord-stromal | Germ cell |
|---|---|---|---|---|---|---|---|
| **Stage** |  |  |  |  |  |  |  |
| **All** | 47 | 43 | 82 | 71 | 66 | 88 | 94 |
| **Stage I** | 89 | 86 | 95 | 92 | 85 | 98 | 99 |
| **Stage II** | 71 | 71 | 84 | 69 | 71 | 84 | 93 |
| **Stage III** | 41 | 42 | 59 | 30 | 35 | 61 | 90 |
| **Stage IV** | 20 | 26 | 29 | 13 | 16 | 41 | 69 |

**Figure 1. American Joint Committee on Cancer Sixth Edition Stage Distribution (%) for Ovarian Cancer by Histology, US, 2007-2013, SEER 18 Registries, NCI, 2017. This shows that serious cancers are more likely to be diagnosed at state III, IV (green and teal), compared with other tumor types.**



This summary reflects our current knowledge about ovarian cancer histologic types and their associated prognoses. As research results are reported, our knowledge will evolve. For example, recent studies suggest we need to improve our ability to distinguish between high-grade serous and endometrioid carcinomas. Other results suggest that many ovarian mucinous carcinomas are actually gastrointestinal tumors that metastasized to the ovaries and this realization is affecting the reported rates of ovarian mucinous carcinomas (which are declining). [1,3,4] The categorization of noninvasive tumors classified as borderline is also under investigation and a topic of discussion in the field. These noninvasive tumors have historically been considered in the spectrum of ovarian cancer that have less aggressive behavior. However, many previously described borderline cancers are now generally considered non-malignant.

In summary, when assessing the carcinogenicity of talcum power products, this should focus on invasive serous carcinoma as the most important cancer (based on prognosis) and the most reliable cancer to identify (based on histology and understanding of cancer behavior).

Additionally, over the last decade, there has been research suggesting that many ovarian cancers originate from cells in the distal portion of the fallopian tube. Because the pathogenesis, treatment, and prognosis of serous cancers of the fallopian tube, ovary, and peritoneum are similar, these are now typically considered as a single entity. [4] This consideration applies to the association with talcum powder product usage discussed in this report.

Risk Factors

Understanding ovarian cancer risk factors is important because analyzing the impact of talcum powder products exposure must consider *covariates, or other characteristics* that a woman might have that might also influence her ovarian cancer risk such as age, inherited genetic mutations, reproductive factors, or family history of cancer. Every risk factor does not have be considered to come to a valid conclusion; indeed, this is not realistic within the limitations of medical research, and the bias introduced by the exclusion or some risk factors will be small. However, crude analyses that look at the risk of ovarian cancer from talcum powder products without adjusting for any other risk factors must be considered cautiously. For that reason, statistical analyses of research results often adjust for *confounding factors or variables that are covariates that hinder accurate calculation of an association,* for example between talcum powder products and ovarian cancer.

Numerous risk factors are identified for ovarian cancer. [5] Unfortunately, few can be modified by therapies or lifestyle changes. Risk factors vary by histologic type [5] but those that increase risk of ovarian cancer include personal or family history of ovarian or breast cancer, inherited mutations including BRCA1 and BRCA2 [6-10] advanced age, white race, increased education, and endometriosis. Other factors that may increase ovarian cancer risk due to estrogen exposure include having no pregnancies or advanced age at first birth, obesity, and postmenopausal hormone therapy. [11-13] Several factors are associated with reduced risk for ovarian cancer  including breast feeding, multiple pregnancies, use of oral contraception,

tubal ligation, and removal of uterus, fallopian tubes, or both. [14-18] Smoking is a possible risk factor for ovarian cancer, primarily mucinous subtype, although study results have not been consistent. [5,19]

Risk factors vary by cancer type. For example, serous cancer is more strongly associated with reproductive risk factors than mucinous tumors [20-22] and different histologic types have different molecular and genetic profiles. [23-25] Serous tumors are more likely to have a cancer-promoting mutation in the p53 gene, whereas similar KRAS mutations are more common in mucinous tumors. Over time, the occurrence of ovarian cancer has changed, in part due to changes in risk factors. For example, small declines in the rates of endometrioid and serous cancer are attributed to declining use of hormone replacement among postmenopausal women.

<u>Etiology: Origins, Causes, Development and Inflammation</u>
Our understanding of the etiology and course of ovarian cancer continues to evolve. Hereditary genetic predisposition increases risk, but overall, accounts for only a small proportion of cancers. And even in women with hereditary genetic mutations, not all will develop ovarian cancer. The majority of ovarian cancers are now believed to arise in the distal portion of the fallopian tube. By convention, fallopian tube, ovary and peritoneal cancers are considered as a single entity. The most widely accepted mechanism for initiation, promotion and progression of ovarian cancer is tissue inflammation leading to a series of responses that result in cancer.

There is  very clear and extensive scientific literature describing the relationship  between inflammation and cancer across many anatomic areas. Chronic inflammation, and even subtle, subclinical inflammation, is associated with an increased risk of cancer. [26-28] Many inflammatory conditions predispose to cancer development. Diverse factors that lead to inflammation - infection,  chemical  exposures, physical  agents,  autoimmune  factors, and even inflammatory  reactions  of  uncertain  etiology - can lead to an increase in cancer incidence. For example, there are well described and accepted causal pathways linking inflammation in the etiology of bladder cancer (schistosomiasis, toxic chemicals), cervical cancer (papillomavirus), gastric cancer (H Pylori), colon cancer (inflammatory bowel disease), liver cancer (hepatitis), mesothelioma (asbestos) and ovarian cancer (pelvic inflammatory disease and endometriosis). The biological pathways associated with inflammation include stimulation/interference with a range of biological responses that are involved in initiation of cancer, promotion of cancer, and progression of cancer. Oxidative stress resulting from inflammation can impact all stages of cancer development including cancer initiation (DNA is damaged by introducing gene mutations and structural alterations of DNA leading to inhibition of DNA repair and malignant transformation); promotion (which may be manifest as abnormal gene expression resulting in cell proliferation and decrease apoptosis) and progression (further DNA damage and enhancement of cell growth. [29] Local inflammatory response can lead to signaling molecules such as cytokines, chemokines, prostaglandins, growth transcription factors, microRNAs having higher expression that can promote cancer

development and can create a favorable microenvironment for the development and progression of cancer. [30] Inflammation impacts every step of tumorigenesis, from initiation through tumor promotion, and extending to metastatic progression. Similarly, the most compelling mechanism for the etiology of ovarian cancer is that of chronic inflammation and scarring in the ovary that leads to malignant transformation and cancer progression. This mechanism involves cell proliferation, oxidative stress, DNA damage and gene mutations. [31-33] [31,34-37] The microenvironment of ovarian cancer contains a broad spectrum of pro-inflammatory cytokines and chemokines contributing to the mechanism. [38]

There are many processes that can lead to inflammation and tumorigenesis and the exposure to talcum powder products is one such exposure that can strongly enhance the tumor promotion or progression as seen in in vitro and animal studies.   For example, normal repeated ovulation leads to injury of ovarian epithelial cells and transformation to malignant cancer cells that can be enhanced by various factors such as talc or asbestos particles. Exposure to talcum powder products can induce the production of pro-oxidant enzymes and reduced production of antioxidant enzymes leads to malignant transformation. In support of inflammation from talcum powder products causing cancer, hysterectomy or bilateral tubal ligation, which would significantly limit ovarian exposure to inflammatory mediators, and toxins, is associated with reduced ovarian cancer risk.

<u>Relationship Between Ovarian Cancer and  Talcum Powder Products</u>
The epidemiological evidence described in detail below demonstrates a strong and positive association between exposure to talcum powder products and ovarian cancer and that talcum powder products cause ovarian cancer. Although epidemiologic evidence alone does not provide a definitive mechanism or pathophysiological process that accounts for the increased risk, the evidence for inflammation as described above is very strong. Similarly, epidemiological evidence alone does not confirm the specific component or ingredient in talcum powder products that is responsible for its carcinogenesis. Nonetheless, several constituents within talc powder products are worth highlighting as they may be acting individually or together to create the carcinogenicity of talc powder products inasmuch as they are individually highly carcinogenic

<u>Why Talcum Powder Products were Initially Suspected as Causing Ovarian Cancer</u>
In 1978 samples of commercial body powders were shown to contain asbestos silica minerals. Asbestos was a known carcinogen and about half of the powder samples contained respirable quartz, a lung carcinogen. Concerns were primarily raised that inhaled powder could cause lung scarring, lung cancer, or mesothelioma. In 1971, Henderson observed talc particles deeply embedded in ovarian cancer tissue. The authors noted the close association of talc to the asbestos group of minerals. [39]Further concern was raised , in 1982 whena case-control study of ovarian cancer that collected information on talcum powder use reported an increased risk with perineal dusting. [40] These findings were reported in widely circulated newspapers such as The Globe, raising concern that the powders were carcinogenic because

13

of the contamination with asbestos, using the relationship between asbestos and lung cancer and mesothelioma as the basis for the concern.

<u>Carcinomic of Constituents of Talc Powder Products</u>
There are hundreds of different constituents and ingredients within talcum powder products in addition to platy talc. Many of these are Group 1 carcinogens (such as asbestos, talc containing asbestiform fibers, heavy metals, and some fragrance chemicals) that likely contribute to the carcinogenicity of the products.

<u>Asbestos</u>
Asbestos is the generic commercial designation for a group of naturally occurring mineral silicate fibers; serpentine mineral fibers are called chrysotile, and amphibole minerals include actinolite, amosite, anthophyllite, crocidolite and tremolites. Talc is formed by complex geological processes acting on pre-existing rock formations with diverse chemical composition. Small amounts of chrysotile (asbestos) may occur in these talc deposits [41,42] When talc is mined it may contain asbestos fibers [42,43] A study of 21 consumer talcum powders obtained from retail stores in 1971–1975 reported that 10 contained concentrations of asbestos fibers ranging from 0.2 to 14%. [41,44] Because of concern that asbestos was present in talcum powder products and the known carcinogenicity of asbestos, it has been reported that voluntary guidelines were established by the cosmetic industry in 1976 to limit the content of asbestos fibers in commercial talc preparations. While currently talcum powder products are believed to free from asbestos, the data on its continued presences are strong. I have seen evidence of continued presence since 1976. [45-48] For example, Longo tested approximately 50 samples that were taken between the years 1960 through 2000 and the majority of sample are positive for asbestos. [47]

Asbestos is a known and potent human carcinogen. Asbestos is highly carcinogenic to the lungs, lining of the lungs, and larynx. [49] Asbestos is also highly carcinogenic to the ovaries. [49-58] Women working in asbestos-manufacturing industries have an increased risk of ovarian cancer. IARC reviewed the association between asbestos exposure and ovarian cancer in 2012. To assess the relationship, IARC reviewed data primarily from large epidemiological cohort studies of women who had occupational exposure to asbestos as well case-control studies on non-occupational exposure. The context and lengths of exposures varied, along with the type of asbestos fibers to which the women were exposed and the study designs and assessments. Nonetheless, the results were consistent. Most, but not all, were statistically significant and documented a strong and compelling causal association between exposure to asbestos and ovarian cancer, largely the result of the association from cohort studies of women with substantial occupational exposures. [50-54] **IARC concluded that there is sufficient evidence that asbestos is carcinogenic in humans and that asbestos causes cancer of the ovary.**This is the highest risk category. [49] IARC also concluded that this categorization applied to all forms of asbestos and to talc containing asbestiform fibers (talc in a fibrous habit or fibrous talc)). IARC also concluded that asbestos is carcinogenic based on animal studies. Camargo completed a systematic review of the relationship between women occupationally exposed to asbestos and ovarian cancer. [59] The authors found that of the 18 cohort studies

the pooled standard mortality estimate for ovarian cancer was 1.77 (95% confidence interval, 1.37-2.28). The range in reported SMR values was 1.1– 5.4 across the included cohort studies and the most common values were 2–3. This study supports  IARC's conclusion that exposure to asbestos causes ovarian cancer.

**IARC explicitly stated that the findings in this Monograph applied to all forms of asbestos, as well as asbestiform talc (fibrous talc).**

I reviewed many publications and primary research studies, including experimental and basic science models showing molecular and genetic cancer-promoting changes to cells that occur from exposure to asbestos fibers. I also strongly conclude that asbestos causes ovarian cancer.

Talc
Talc is the primary component of talcum powder products. The chemical structures of talc and asbestos can be similar. While talc particles are usually plate-like, talc can also grow as a fiber which is similar to the group of minerals called asbestos. Both are magnesium silicate and when talc has the fibrous form it is called asbestiform because of its similarity to asbestos. The form of the talc fibers is long and thin, with parallel bundles that are easy to separate from each other, and closely resembles the physical appearance of asbestos minerals. The histologic appearances of mesothelioma and ovarian cancer are similar. The known carcinogenicity of asbestos for lung, pleural, peritoneal and ovarian cancer has led to the theory that the similarity in the fibers and the resulting cancers suggests that talc works mechanistically within the ovary to induce cancer in a way that is similar to how asbestos in the chest induces mesothelioma.

Early observations demonstrated talc particles in both malignant and normal ovaries establishing a route from the perineum to the ovary and shows that many women are exposed to talc. [39,60] In 2006, the International Agency for Research on Cancer (IARC) reviewed the data on cosmetic (perineal) talc ("non-asbestiform") application and concluded that it is possibly carcinogenic to humans. [61] This is not as strong a recommendation as they made for asbestos and ovarian cancer, but nonetheless is a strong recommendation. IARC classified genital-perineal use of talc-based powder as possibly carcinogenic. Exposure to talc particles can induce an inflammatory response, either directly at the ovary and ovary-fallopian tube juncture, causing local irritation from talc particulates or through more generalized peritoneal inflammation. The mechanism that can lead to cancer is local irritation by talc fibers that disrupts the epithelial surface, increasing rates of cell division and DNA repair that can lead to mutations. Also increased are oxidative stress and cytokine production, indicating inflammation. Fibers that are incorporated into the epithelial cells enter ovarian tissue. This inflammation initiates a series of responses, supported by research, that promote cancer. The reduction in the elevated risk of ovarian cancer from talcum powder exposure after hysterectomy or tubal ligation supports the mechanism by which local irritation and inflammation to the ovary from talc or asbestos causes an elevated cancer risk.

Heavy Metals

**Talc powder products can contain Group 1 metals that are considered by IARC as carcinogenic to humans.** [44,49] This includes nickel compounds which IARC documents cause lung and nasal cavity and paranasal sinus cancer. (IARC100c-10, 2012). Nickel compounds "cause DNA damage, chromosomal aberrations, delayed mutagenicity and chromosomal instability ... and nickel compounds act as co-mutagens." Talcum powder products also contain Chromium (VI) (IARC100c-9, 2012) another Group 1 carcinogen, where there is sufficient evidence in humans for carcinogenicity (to the nose and nasal sinus). The mechanism includes "DNA damage, generation of oxidative stress and aneuploidy. Talc powder products can also contain Group 2A metals that are considered probably carcinogenic to humans, such as Cobalt which can be found in talc powder products. [62] IARC considers Cobalt metal with tungsten carbide as probably carcinogenic to humans (Group 2A), but worth noting that a number of the IARC working group members supported an evaluation in Group 1 because they judged the epidemiological evidence to be sufficient, leading to an overall evaluation in Group 1; or they judged the mechanistic evidence to be strong enough to justify upgrading the default evaluation from 2A to 1. The majority of working group members, who supported the group 2A evaluation, cited the need for either sufficient evidence in humans or strong mechanistic evidence in exposed humans. Cobalt metal without tungsten carbide is also considered possibly carcinogenic to humans (Group 2B). Cobalt sulfate and other soluble cobalt(II) salts are possibly carcinogenic to humans (Group 2B).

Any and all of these heavy metals can cause ovarian cancer through an inflammatory mechanism

Fragrances
There are more than 150 different chemicals added to Johnson's Baby Powder and Shower to Shower products. I reviewed the expert report from Dr. Crowley that concludes that some of these chemicals may contribute to the inflammatory response, toxicity, and potential carcinogenicity of Johnson & Johnson's talcum powder products. I concur with his opinion. [63]

**IV. Overview of Publications on Genital Use of Talc Powder Products and Ovarian Cancer**

To understand the relationship between exposure to talcum powder products and ovarian cancer, I searched for and reviewed scientific papers on this topic. I used several searchable publication databases (Scopus, Embase, Pubmed) and manually searched the reference lists of all articles I found, including a large number of reviews. The results of my review follow the explanation of the main types of studies and articles.

Explanation of study designs and article types
Nearly all published studies that I reviewed used one of two designs: case-control and cohort. Each design has strengths and biases. The commonly held view is that cohort studies are better than case-control studies. This is a misconception thus it is worth explaining their differences. Many articles I reviewed were systematic reviews, which are also explained.

*Case-control studies compare people with a condition (cases) by matching them to people with similar characteristics who do not have the condition (controls)* to determine the effect of a potential disease-causing factor. They often analyze existing data *retrospectively, after people have been diagnosed,* and involve tens or hundreds of patients. *Cohort studies compare cohorts, or groups of people, who were exposed or not exposed to a potential disease agent.* They often collect data on people *prospectively, before they develop a disease* and track their health over time. Both case-control and cohort studies, if well done, can provide accurate and meaningful information about statistical associations. In general, however, the risk of bias is greater for case-control studies. (An example is *recall bias*, in which women are more likely to remember and report exposure to talc powder products after they have been diagnosed with cancer compared to women without a diagnosis, perhaps because diagnosed women heard that talc powder products is harmful and are more likely to remember talc use). Nonetheless, when studying a rare disease, the case-control design is frequently highly efficient and desirable as it allows you to assemble a much larger number of cases and can delve in great depth for particular exposures. You can identify all patients who have the outcome of interest, and then query them (and some control group) about any antecedent exposure. The identification of the control group is very important. My large, National Institutes of Health-funded study of cancer risk factors in children is employing a case-control design. This design permits us to ask very detailed questions of a small number of individuals about their various exposures.

Cohort studies potentially avoid some biases of case-control studies since exposures are prospectively assessed and quantified, that is, before disease outcomes. This design also has limitations, though. An extremely important limitation is that because cohort studies are expensive and time-consuming, they rarely focus on a single, narrowly defined question such as the association between regular use of talcum powder products and cancer. Usually, researchers investigate a broad range of questions in cohort studies, so asking patients in-depth questions about any given topic is difficult, especially since tens of thousands of patients may be surveyed on many topics. Further, in cohort studies, having comprehensive assessment of outcomes on all individuals in the cohort is extremely important. Losing patients to follow up (meaning researchers cannot contact or find records on a participant) leads to study bias. The other disadvantage of cohort studies is that a very large number of patients must be assessed over a long period of time to see who will develop a rare outcome (like ovarian cancer). Because of this, typically there will be far fewer patients with disease in a cohort study as compared with case control study (like in this case).

The small number of cohort studies I found on the relationship between talcum powder products exposure and ovarian cancer did not focus on the details of this topic. While they may have included questions about talcum powder exposure, they were not sufficiently nuanced  to provide meaningful information. Thus, in most of the cohort studies I found, measurements of exposure were poor, not specific, or inaccurate. Further, several had very short follow-up periods with data or information about the time before the cancer occurred. This negates an advantage of cohort studies, which is being able to learn about exposures before the cancer, eliminating recall bias.

*Systematic reviews quantitatively summarize results across multiple studies.* One of the rationales of this study design is that individual studies may not have enough participants to yield meaningful results because they are too small or insufficiently powered. Combining small studies can provide more stable and reliable summary estimates of the effects of disease agents and risk factors. Further, a systematic review may be better than a single study, as it provides broader evidence of the results and includes patients from diverse settings. However, in order to statistically combine and summarize the data from different research studies into a single systematic meta-analytic review, the combined studies must ask the same research question and follow sufficiently similar and rigorous scientific methods. A meta-analysis does not compensate for gaps or flaws in an original study: Combining three poorly performed studies does not yield reliable summary estimates even though there may be three times the number of patients. Similarly, combining studies that ask different research questions (for example, assessing women of different ages for a disease in which age is an important risk factor) does not provide reliable summaries. Results from different studies often vary when the studies ask different research questions, have different criteria for including participants, or use different methods. I raise these issues to point out that systematic reviews must be read extremely carefully to ensure that their conclusions are valid.

<u>Table of Reviewed Publications</u>

I identified and reviewed 43 English-language publications that provided quantitative data based on epidemiological studies about the relationship between genital talcum powder exposure and ovarian cancer (Table 3). This list includes 4 cohort studies, 8 systematic meta-analytic reviews, 2 studies that pooled individual patient-level data from several research studies, and 30 case-control studies. One study contributed both the systematic review and a case control study. I also read multiple review articles that are not included in the table. The epidemiological studies were published between 1982 and 2018. I have described the results organized by study design below.

Most studies used a case-control study design with a small number using a cohort study design. Although some studies assessed powder use to any part of the body or assessed the use of talcum powder on diaphragms, condoms or sanitary napkins, the primary research question that I focused on in my review and that was assessed in all included individual research studies, was whether genital area exposure to talcum powder  increases risk of epithelial ovarian cancer. Occasionally, study authors assessed combination exposures (i.e., to genitals and other body parts). These studies were included as long as genital powder use was assessed. Nearly all studies adjusted for known ovarian cancer risk factors, but those factors varied. The vast majority of studies found a positive association between any exposure to talcum powder products and cancer. However, the sample size of some studies was small and resulted in high statistical uncertainty. Because of these and other limitations, quantifying a precise association between exposure and cancer was difficult from my review of the literature. The data for some studies may have shown that effects of talcum powder exposure (measured as odds ratios, ORs) was meaningful for cancer development, but with statistical

18

uncertainty; whereas other studies showed the reverse results, with ORs not showing a positive association, but statistical parameters suggesting that a meaningful association was nonetheless possible because of wide confidence intervals. Therefore, I thought a more precise and careful review was called for. The number of individual women included in each study and the reported or estimated effect size for "any exposure to talc" (adjusted for other risk factors such as age) are in Table 4.

A subset of the studies quantified the *intensity (frequency)* of each woman's exposure to talc to assess the importance of use patterns (e.g., if a single lifetime use or weekly, monthly, or daily use increased ovarian cancer risk) or *dose dependency (links between the number of exposures and cancer risk, e.g., if doubling exposure doubles risk)*. Further, a subset of studies stratified by cancer type (invasive vs. low malignant potential/borderline) and whether the risks varied by histological types including the four dominant types of serous, mucinous, clear cell, and endometrioid cancer.

Studies that provided data on the frequency of talc use and association by histologic type were included in a separate systematic meta-analytic review that I conducted as part of my review of the literature to include in this report. The reason I completed my own statistical review is further explained below.

Quantifying Exposures

A large proportion of women will have used talcum powder products, highlighting the importance of this issue. However, publications that focus on women reporting "any" genital exposure to talc (i.e., talc at any point in life and for any duration) may be too broad to provide meaningful information. For example, "any use" will include women who applied talc powder products three times over five decades and women who used talc powder products daily, whose might have had 20,000 applications and exposures in comparison to three. Defining a variable as any use is the equivalent of creating a variable of any smoking use, that combines data on individuals who tried one cigarette in their life with individuals with 50 pack years of tobacco use. Combining data on women with infrequent or sporadic exposures with data from women with frequent, sustained use leads to imprecise results, masking any causal associations. Therefore, I selected the studies for my own review that quantified the frequency of talc powder products use as having the most informative data and included them in a separate systematic review.

Summary of Data

I grouped the research studies by their study design. What follows is my review of the cohort studies, systematic review studies, pooled data studies, followed by my own review.

Cohort Studies

Four cohorts (Gertig, Gates, Houghton, Gonzalez) have been published on talcum powder products and ovarian cancer.

**Cohort 1: Gertig (2000)** [64]

This first cohort study assessed the relationship between perineal talc and ovarian cancer within the context of the US Nurses' Health Study, a prospective study of 121,700 female registered nurses in the United States who were aged 30–55 years at enrollment in 1976. These are mostly premenopausal women. While talc exposure was not an initial part of the study, questions about talc, including measuring frequency of exposure, were added in 1982; a large subset of the cohort (78,630 women) completed these questions and were included in analyses. Among these women who were followed for 14 years, 307 were diagnosed with epithelial ovarian cancer. After adjusting for confounding variables, the *relative risk (RR)* of developing ovarian cancer (*the likelihood of ovarian cancer in talc users compared to nonusers, with higher RR meaning increased risk stronger association*) among daily users of talc was RR 1.12 (95% *confidence interval [CI]* 0.82, 1.55, *a measure of statistical uncertainty, with wider ranges indicating greater uncertainty*), which was not statistically significant. However, when results were classified by histologic subtype, the RR of invasive serous cancers was significantly elevated among any users of talc (RR 1.40, 95% CI 1.02, 1.9) and the RR of invasive serous cancer among daily users of talc was higher at RR 1.49 (95% CI 0.98, 2.3).

In this cohort study, the researchers assessed talc exposure before cancer diagnosis, avoiding the possibility of the recall bias of case-control studies. This was a strong strength of this study. A potential weakness was that frequency (i.e. daily) but not duration (number of years) of talc use was measured, so a clear lifetime exposure measure was missing. The researchers nonetheless quantified exposure at the time the talc questions were asked, which was probably strongly associated with prior use (i.e. an approximation on ongoing use). **This study provides strong evidence that perineal exposure to talc increases the risk of invasive serous ovarian cancer, particularly among daily users of talc, with about a 50% increased risk**, which is substantial and meaningful.

**Cohort 2: Gates (2010)** [24]

This study assessed the association between ovarian cancer risk factors and incidence of ovarian tumors by histological type using data from the US Nurses' Health Study combined with data from the Nurses' Health Study II, which included a second period of enrolling participants. Unfortunately, talc use was assessed only on the first survey and not assessed among patients enrolled in the Nurses' Health Study II. Thus, this extends the period of follow up from the initial NHS but does not include greater information about risk factors. Results were presented for any talc powder products use and not for frequency of use. **Thus, this report does not add to a meaningful assessment of the relationship between talc use and ovarian cancer because it used exactly the same patient group as Gertig (2000) but provided less information to quantify the frequency of talc use.**

**Cohort 3: Houghton (2013)** [65]

This study assessed perineal talc powder products use and risk of ovarian cancer in the Women's Health Initiative Observational study, in which postmenopausal women aged 50–79 were enrolled in a prospective cohort of women from 40 clinical centers across the United

States in 1993–1998. Overall, 61,576 women were included in analyses, including 429 diagnosed with ovarian cancer. Perineal powder use was assessed at the start of the study. Participants were asked if they **ever used talc powder products** on their private parts (genital areas). Those who responded yes were asked about duration (years) of use. Women were followed for a mean of 12 years and the median age of participants was 63. **Talc powder products use was associated with a 12% increase in risk of ovarian cancer after accounting for covariates** (RR 1.12, 95% CI 0.92, 1.36). When limited to women who used perineal powder for 20 years or more, the RR was 1.10 (95% CI 0.82, 1.48). When limited to serous ovarian cancer, the RR was 1.13 (95% CI 0.84, 1.51.) **The primary limitation of the study was that frequency of talc powder products use was not assessed—and thus the authors could focus only on any talcum powder use.** The imprecision in estimation of talcum powder exposure makes the results not terribly meaningful. The second limitation was the relatively short follow-up of 12 years to identify ovarian cancer diagnoses.

**Cohort 4: Gonzalez (2016) [66]**

The Sister Study (2003–2009) followed 50,884 women ages 35 to 75 years in the US and Puerto Rico who had a sister diagnosed with breast cancer. After excluding participants who had bilateral oophorectomies, ovarian cancer, or were lost to follow-up, 41,654 participants were included. At baseline participants were asked about douching and talc use during the previous 12 months, and during follow-up (median of 6.6 years) 154 participants reported a diagnosis of ovarian cancer. The authors computed adjusted hazard ratios (HR) and 95% confidence intervals (CI) for ovarian cancer risk using the Cox proportional hazards model. The authors found no significant association between baseline perineal talc use and subsequent ovarian cancer (HR: 0.73 CI: 0.44, 1.2). **The primary limitations of this study are that the authors combined a large number of potential talc exposures into a single category, including genital talc use in the form of powder or spray applied to a sanitary napkin, underwear, diaphragm, cervical cap, or vaginal area. Further, the authors categorized the exposure based on the 12 months prior to enrollment as a dichotomous ever/never.** Thus not only was it an ever versus never category, the ever category was extremely broad, making the lack of association less meaningful. Further, there are several other factors that make the results questionable, including lower than expected proportion of women who report any exposure to talc powder products, and the lack of a validated approach to ascertainment of ovarian cancer.

**Cohort Studies: Summary**

Analyses of data from the US Nurses' Health study and the Women's Health Initiative estimated that women who report any exposure talc powder products will have a 12% increase in ovarian cancer compared to women who never report talc powder products use, although this estimate was not statistically significant. The primary limitation of this estimate is that it is based on *any talc powder products* use, which is a weak, crude predictor. Similarly, while the results from the Sisters study did not identify a significant association between talc powder products use and ovarian cancer, they too used a measure of ever use, and included a large number of different types of exposures that would not be expected to measure a single exposure. The most important and meaningful conclusion that I draw from the cohort studies

is from the Gertig 2000 study using data from the US Nurses' Health study: That women who are **daily users of talc have an approximately 50% increase (OR 1.49) in their risk of invasive serous** cancer, the most lethal and frequent type of ovarian cancer.

Systematic Reviews

I found nine systematic reviews that summarized the relationship between talc and ovarian cancer, summarized below. These reviews were completed using various subsets of the full list of publications. The systematic reviewers are presented with the most recent first, because the more recent studies tended to be more complete, comprehensive and the most methodologically rigorous.

**Systematic Review 1: Penninkilampi (2018)** [67]

This comprehensive systematic review of the association between any genital use of talcum powder products and ovarian cancer conducted a stratified analyses showing the association by frequency of talc use and histologic cancer subtype. The methods of the study are well described. The researchers identified studies using six electronic databases and reviewed publications with 50 or more cases of ovarian cancer. They identified 24 case-control studies describing 13,421 cases and the three cohort studies (890 cases, 181,860 person-years) described above. Any reported use of perineal talc powder products was associated with increased risk of ovarian cancer compared to no use (OR = 1.31; 95% CI 1.24, 1.39). Women with more than 3600 lifetime applications had slightly higher risks (OR = 1.42; 95% CI 1.25, 1.61). Women who reported long-term (>10 years) talc use also had an increased risk (OR 1.25; 95% CI = 1.10, 1.43). The association between any talcum powder product exposure and ovarian cancer was limited to studies that used a case-control design. The cohort studies showed an increased risk of serous invasive cancer subtypes for perineal talc use compared to no use (OR = 1.25; 95% CI = 1.01, 1.55). While serous and endometrioid cancer were associated with talcum powder products use, no association was seen with mucinous or clear cell cancers. The review authors concluded, from the data, that perineal talcum powder use and ovarian cancer were consistently associated, with a slightly higher risk in women who report greater usage. Some variation in the magnitude of the effect of talcum powder products was found when considering the study designs and ovarian cancer subtypes. Several small methodological issues are that Penniniklampi may have included some groups of patients more than once in analyses and did not include updated data or previously unpublished data available from a research consortium on ovarian cancer. However, these concerns are unlikely to have had a significant impact on their estimates.

## Table 3. List of Included Studies, sorted by study design

| | Study Type | Year | Author | Journal | Title |
|---|---|---|---|---|---|
| 1 | Cohort Study | 2000 | Gerting | J Natl Cancer Inst | Prospective study of talc use and ovarian cancer (in the Nurses' Health Study) |
| 2 | Cohort Study | 2010 | Gates | Am J Epidemiol | Risk factors for epithelial ovarian cancer by histologic type; US Nurses Health Study |
| 3 | Cohort Study | 2014 | Houghton | J Natl Cancer Inst | Perineal powder use and risk of ovarian cancer: Results from the Women's Health Initiati |
| 4 | Cohort Study | 2016 | Gonzalez | Epidemiology | Douching, talc use and risk of ovarian cancer: Results from the Sister Study |
| 5 | Systematic Rev. | 1992 | Harlow | Obst Gyn | Perineal exposure to talc and ovarian cancer risk |
| 6 | Systematic Rev. | 1995 | Gross | J Expo Anal Env Epid | A meta-analytical approach examining the potential relationship between talc exposure and ovarian cancer |
| 7 | Systematic Rev. | 2003 | Huncharek | Anticancer Res | Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies |
| 8 | Systematic Rev. | 2007 | Huncharek | Eur J Cancer Prev | Use of cosmetic talc on contraceptive diaphragms and risk of ovarian cancer: a meta-analysis of nine observational studies. |
| 9 | Systematic Rev. | 2008 | Langseth | J Epid Community Health | Perineal use of talc and risk of ovarian cancer. |
| 10 | Systematic Rev. | 2010 | IARC | IARC Monographs | IARC monographs on the evalatuion of carcinogentic risks to humans: Carbon black, titanium dioxide, and talc |
| 11 | Systematic Rev. | 2017 | Berg | European J of Can Prev | Genital use of talc and risk of ovarian cancer: A meta-analysis |
| 12 | Systematic Rev. | 2018 | Penninkilampi | Epidemiology | Perineal talc use and ovarian cancer: A systematic review and meta-analysis. |
| 13 | Pooled Data | 2013 | Terry | Cancer Prev Res | Genital powder use and risk of ovarian cancer: a pooled analysis of 8525 cases and 9859 controls |
| 14 | Pooled Data | 2016 | Cramer | Epidemiology | The association between talc use and ovarian cancer- A retrospective case- control study two US states |
| 15 | Case-Control | 1982 | Cramer | Cancer | Ovarian cancer and talc: A case control study |
| 16 | Case-Control | 1983 | Hartge | JAMA | Talc and ovarian cancer |
| 17 | Case-Control | 1988 | Whittemoore | Am J Epidemiol | Personal and environmental characteristics related to epithelial ovarian cancer. Exposure to talcum powder, tobacco, alcohol, and coffee |
| 5 | Case-Control | 1989 | Harlow | Am J Epidemiol | A case-control study of borderline ovarian tumors: The influence of perineal exposure to talc |
| 18 | Case-Control | 1989 | Booth | BR Cancer | Risk factors for ovarian cancer: a case-control study |
| 19 | Case-Control | 1992 | Harlow | Obstet Gynecol | Perineal exposure to talc and ovarian cancer risk |
| 20 | Case-Control | 1992 | Rosenblatt | Gynecol Oncol | Mineral fiber exposure and the development of ovarian cancer |
| 21 | Case-Control | 1992 | Chen | Int J Epidemiol | Risk factors of epithelial ovarian cancer in Beijing, China |
| 22 | Case-Control | 1993 | Tzonous | Int J Cancer | Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer |
| 23 | Case-Control | 1995 | Purdie | Int J Cancer | Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study |
| 24 | Case-Control | 1996 | Shushan | Fertil Steril | Human menopausal gonadotropin and the risk of epithelial ovarian cancer |
| 25 | Case-Control | 1997 | Chang | Cancer | Perineal talc exposure and risk of ovarian carcinoma |
| 26 | Case-Control | 1997 | Cook | Am J Epidemiol | Perineal powder exposure and the risk of ovarian cancer |
| 27 | Case-Control | 1998 | Green | In J Cancer | Tubal sterilization, hysterectomy and decreased risk of ovarian cancer. |
| 28 | Case-Control | 1998 | Godard | Am J Obstet Gynecol | Risk factors for familial and spordic ovarian cancer among French Canadians: A case-contr study |
| 29 | Case-Control | 1999 | Cramer | International J of Cancer | Genital talc exposure and risk of ovarian cancer |
| 30 | Case-Control | 1999 | Wong | Obstet Gynecol | Perineal talc exposure and subsequent epithelial ovarian cancer: A case-control study |
| 31 | Case-Control | 2000 | Ness | Epidemiol | Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer |
| 32 | Case-Control | 2004 | Pike | Fertil  Steril | Hormonal factors and the risk of invasive ovarian cancer: A population based case control study |
| 33 | Case-Control | 2004 | Mills | Am J Epidemiol | Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California |
| 34 | Case-Control | 2008 | Goodman | Endcor Relat Cancer | Association of two common single-nucleotide polymorphisms in the CYP19A1 locus and ovarian cancer risk |
| 35 | Case-Control | 2008 | Gates | Cancer Epid Bio Prev | Talc use, variants of the GSTM1, GSTT1, and NAT2 genes, and risk of epithelial ovarian cancer |
| 36 | Case-Control | 2008 | Merritt | Int J Cancer | Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer |
| 37 | Case-Control | 2009 | Moorman | Am J Epidemiol | Ovarian cancer risk factors in African-American and white women |
| 38 | Case-Control | 2009 | Wu | Int J Cancer | Markers of inflammation and risk of ovarian cancer in Los Angeles County |
| 39 | Case-Control | 2011 | Rosenblatt | Gynecol Oncol | Mineral fiber exposure and the development of ovarian cancer |
| 40 | Case-Control | 2012 | Lo-Cignaic | Epidemiol | Aspirin, non-aspirin non-steroidal anti-inflammatory drugs, or acetaminophen and risk of ovarian cancer |
| 41 | Case-Control | 2012 | Kurta | Cancer Epid Bio Prev | Use of fertility drugs and risk of ovarian cancer: results from a U.S.-based case-control stu |
| 42 | Case-Control | 2015 | Wu | Cancer Epid Bio Prev | African Americans and Hispanics remain at lower risk of ovarian cancer than non-Hispanic whites after considering nongenetic risk factors and oophorectomy rates |
| 43 | Case-Control | 2016 | Schildkraut | Cancer Epid Bio Prev | Association between body powder use and ovarian cancer: the African American Cancer epidemiology Study |

**Table 4. List of Included Studies with Number of Cancers, Controls, and Reported Odds Ratios**

| | Study Type | Year | Author | Cancers | Controls or Cohort Size | Odds Ratio | 95% CI |
|---|---|---|---|---|---|---|---|
| 1 | Cohort Study | 2000 | Gerting | 307 | 78,630 | 1.12 | (0.82,1.55) |
| 2 | Cohort Study | 2010 | Gates | 797 | 108,073 | 1.06 | (0.89, 1.28) |
| 3 | Cohort Study | 2014 | Houghton | 427 | 61,576 | 1.12 | (0.92,1.36) |
| 4 | Cohort Study | 2016 | Gonzalez | 154 | 41,654 | 0.73 | (0.44,1.2) |
| 5 | Systematic Review | 1992 | Harlow * | 1,106 | 1,756 | 1.30 | (1.1, 1.6) |
| 6 | Systematic Review | 1995 | Gross | 1,333 | 2,362 | 1.29 | (1.02, 1.63) |
| 7 | Systematic Review | 2007 | Huncharek | 1,858 | 2,830 | NA | NA |
| 8 | Systematic Review | 2003 | Huncharek | 5,260 | 6,673 | 1.33 | (1.16, 1.45) |
| 9 | Systematic Review | 2008 | Langseth | | | 1.35 | NA |
| 10 | Systematic Review | 2010 | IARC | | | 1.30 | |
| 11 | Systematic Review | 2017 | Berg | 15,230 | NR | 1.22 | (1.13, 1.30) |
| 12 | Systematic Review | 2018 | Penninkilampi | 14,311 | NR | 1.31 | 1.24, 1.39 |
| 13 | Pooled Data | 2013 | Terry | 4,472 | 6,175 | 1.37 | (1.19-1.58) |
| 14 | Pooled Data | 2016 | Cramer | 2,041 | 2,100 | 1.38 | (1.01,1.99) |
| 15 | Case-Control Study | 1982 | Cramer | 215 | 215 | 1.58 | (0.98, 2.47) |
| 16 | Case-Control Study | 1983 | Hartge | 135 | 171 | 2.50 | (0.70, 10.0) |
| 17 | Case-Control Study | 1988 | Whittemoore | 188 | 539 | 1.45 | (0.94, 2.22) |
| 5 | Case-Control Study | 1989 | Harlow | 116 | 158 | 1.10 | (0.70,2.1) |
| 18 | Case-Control Study | 1989 | Booth | 235 | 451 | 1.30 | (0.80,1.9) |
| 19 | Case-Control Study | 1992 | Harlow | 235 | 239 | 1.80 | (1.1, 3.0) |
| 20 | Case-Control Study | 1992 | Rosenblatt | 77 | 46 | 1.70 | (.70, 3.9) |
| 21 | Case-Control Study | 1992 | Chen | 112 | 224 | 3.90 | (0.9,10.6) |
| 22 | Case-Control Study | 1993 | Tzonous | 189 | 200 | 1.05 | (.28, 3.98) |
| 23 | Case-Control Study | 1995 | Purdie | 824 | 860 | 1.27 | (1.04, 1.54) |
| 24 | Case-Control Study | 1996 | Shushan ** | 200 | 408 | 2.00 | NA |
| 25 | Case-Control Study | 1997 | Chang | 367 | 564 | 1.51 | (1.13,2.02) |
| 26 | Case-Control Study | 1997 | Cook | 313 | 422 | 1.60 | (0.9, 2.9) |
| 27 | Case-Control Study | 1998 | Green | 824 | 855 | 1.30 | (1.1, 1.6) |
| 28 | Case-Control Study | 1998 | Godard | 170 | 170 | 2.49 | (0.94,6.56) |
| 29 | Case-Control Study | 1999 | Cramer | 563 | 523 | 1.60 | (1.18, 2.15) |
| 30 | Case-Control Study | 1999 | Wong*** | 499 | 755 | 1.13 | (0.89, 1.43) |
| 31 | Case-Control Study | 2000 | Ness | 767 | 1,367 | 1.50 | (1.1, 2.0) |
| 32 | Case-Control Study | 2004 | Pike | | | | |
| 33 | Case-Control Study | 2004 | Mills | 256 | 1,122 | 1.74 | (1.14, 2.64) |
| 34 | Case-Control Study | 2008 | Goodman | 367 | 602 | 0.99 | (.70, 1.41) |
| 35 | Case-Control Study | 2008 | Gates | | | 1.41 | (1.14, 1.76) |
| 36 | Case-Control Study | 2008 | Merritt | 1,576 | 1,509 | 1.34 | (1.06, 1.68) |
| 37 | Case-Control Study | 2009 | Moorman | 1,086 | 1,057 | 1.37 | (1.05, 1.80) |
| 38 | Case-Control Study | 2009 | Wu | 609 | 688 | 2.08 | ((1.34 3.23) |
| 39 | Case-Control Study | 2011 | Rosenblatt | 812 | 1,313 | 1.13 | (0.93,1.36) |
| 40 | Case-Control Study | 2012 | Lo-Cignaic | 902 | 1,802 | 1.34 | (1.07,1.66) |
| 41 | Case-Control Study | 2012 | Kurta | 902 | 1,802 | 1.41 | (1.16, 1.69) |
| 42 | Case-Control Study | 2015 | Wu | 1,701 | 2,391 | 1.46 | (1.27,1.69) |
| 43 | Case-Control Study | 2016 | Schildkraut | 584 | 745 | 1.71 | (1.26, 2.33) |

Odds ratio, likelihood (odds) that an outcome will occur because of a particular exposure compared to the likelihood it will occur without the exposure. 95% CI, 95% confidence interval, a measure of statistical uncertainty that says with about 95% of the time that the true value is within the range of numbers. The wider the range, the higher the uncertainty. NR, not reported.

* crude unadjusted estimate

** approximate, unadjusted estimate

*** assessed perineal or thigh use, and controls all have cancer

24

**Berge (2018)** [68]

This large, comprehensive systematic review of the association between genital use of talc powder products and ovarian cancer also had well-described methods. Berge reviewed and abstracted data for 27 publications and reported an overall summary estimate of the association between talc exposure and ovarian cancer. For six of the reviewed studies, Berge included data published in a pooled data analysis, from Terry [69] described below) that had not been previously included in the original publications. Overall, data on 15,230 women with ovarian cancer were analyzed (a number that is incorrectly reported in the paper). This is slightly higher than the number included in Penninkilampi because of the additional patients from the Terry publication. The summary estimate for risk of ovarian cancer for women who ever used genital talc was RR 1.22 (95% CI 1.13, 1.30). When stratified by histologic type, serous carcinoma was the only type with a significant association to talc use (RR 1.24, 95% CI 1.15, 1.34). There was no difference in risk when tumors were categorized as invasive versus borderline.

To assess relationships among ovarian cancer and intensity and duration of use, these measures were analyzed separately rather than as a combined measure that would give an estimate of the total number of exposures; the analyses did not demonstrate a significant dose response. Importantly, these measures were assessed only in five studies with the results on frequency of use presented as increased risk per additional day per week of talc use, which assumes a very linear association. I was not able to identify the original studies used in the review that reported the results with this level of granularity. Because of the small number of studies, the results (3% increase in risk per additional day of talc used, with high statistical uncertainty) were not surprising.

The authors also stratified the results by the study design (as did Penninkilampi) and found that the association between talc exposure and ovarian cancer was significant only for the case-control studies, although, as above, the cohort studies had the weakest definition of exposure. The primary limitation of the review is defining exposure as ever having used talc. As described above, this is a broad, vague definition that probably dilutes any estimated association, as it includes both women with trivial use and with regular use. A second limitation is that the included studies adjusted for a variety of covariates although this is unavoidable in this type of summary. The large difference in general between adjusted and crude results emphasizes the importance of adjustments when estimating particular risk.

**Langseth (2008)** [70]

This systematic review of the association between genital use of talc powder products and ovarian cancer included 21 publications. The overall pooled odds of cancer were OR 1.35 across all studies.  Several authors of this systematic review were involved in an IARC report on talc exposure. They analyzed a subset of eight studies used in the IARC report that were considered to be the most informative for estimating ovarian cancer risk. Analysis of these more relevant, higher quality studies, produced an increased ovarian cancer risk of 30 to 60% (presumably OR 1.3–1.6) associated  with talcum powder use. This subset analysis did not document a dose response or assess associations by cancer types.

### Huncharek (2007) [71]

Huncharek summarized the results of nine studies that reported on the association between talc used on contraceptive diaphragms and ovarian cancer. No data on perineal talc exposure were analyzed and the data are not included herein. Of note, the reported methodological details suggest a very poorly designed and conducted study. Some of the included papers do not even mention talcum powder products used with diaphragms. This systematic review is poor quality.

### IARC (2006) [62]

Beginning in 1969 the International Agency for Research on Cancer (IARC) began a program to critically review the data on the carcinogenic risk of chemicals to humans. They subsequently expanded their reviews to included evaluation of carcinogenic risks associated with a range of exposures (including risks associated with biological and physical agents, lifestyle factors, complex mixtures of exposures, occupations, etc.) The purpose of the IARC program is to elaborate and publish detailed monographs including critical review of data, to evaluate human risks, and to indicate where uncertainty exists and where additional data are needed. They also give an overall assessment of the strength of the associations. It is worth noting that the individuals who contribute to IARC reports (the Working Group) include extremely knowledgeable and unbiased scientists who have specific content expertise and who have no apparent conflicts of interest. Invited specialists and representatives from international health agencies are brought in to supplement the scientific experts. In their evaluation, they heavily weight whether data support a conclusion of causality. They score evidenced into four categories, ranging from a) evidenced suggesting lack of carcinogenicity; b) inadequate evidence of carcinogenicity c) limited evidence of carcinogenicity and d) sufficient evidence of carcinogenicity. Category c is used when there is possibly carcinogenicity, and this category is not used lightly. An exposure meets category c if there is a positive association between observed exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance of bias or confounding could not be ruled out. They further categorize agents into 3 groups: Group 1, corresponding to d above (sufficient evidence), the agent is carcinogenic to humans; Group 2, which includes 2A (the agent is probably carcinogenic) and 2B: the agent is possibly carcinogenic to humans. A review focused on the risks associated with carbon black, titanium oxide and talc was published in 2006. The review included a detailed review of the individual studies examining perineal talc use as a risk factor for cancer. IARC concluded that perineal use of talc-based body powder is possibly carcinogenic to humans (Group 2B)

### Huncharek (2003) [72]

This review of 16 studies assessed the relationship between genital exposure to talc and ovarian cancer using data for 5260 women with cancer and 6673 controls. The pooled OR for ever being exposed to perineal talc powder products was 1.33 (95% CI 1.16, 1.45). Small differences were observed in the estimated ORs by whether controls in the case-control studies were from hospital populations (OR 1.19, 95% CI 0.99, 1.4), or the general population (OR 1.38, 95% CI 1.25, 1.52). I believe these differences are small. In general, in case-control

studies, population controls are likely more relevant and valid. However, as with several of the other reviews, talcum powder exposure was assessed as any exposure rather than quantifying by intensity. No stratification by tumor subtype or invasiveness was performed.

**Gross (1995)** [73]
Gross reviewed 10 studies on the association between talc exposure and ovarian cancer using data on 1333 women with cancer and 2362 without cancer. To summarize the RR of malignant epithelial cancer types due to any exposure to talc, adjusting for ovarian cancer risk factors, the authors combined results from five studies for OR 1.29 (95% CI 1.02, 1.63). For an analysis of all cancers (borderline and invasive), they included data from seven studies for a similar OR of 1.31 (95% CI 1.08, 1.58). Notably, the authors did not provide any methodological details of how they identified, assessed, and combined studies, making the results difficult to fully interpret. As with several of the other reviews, they assessed any exposure to talc.

**Harlow (1992)** [74]
Harlow reviewed five previously published studies and summarized an OR, not adjusted for confounding factors, and added his own data for a crude estimated OR of 1.3 (95% CI 1.1, 1.6). Unfortunately, no methodological details were provided on how studies were identified, assessed, and combined or how exposure was defined, making the results difficult to fully interpret. Further, only the combined, estimated, non-adjusted crude OR was reported. Of note, the results of the five published studies used in the review (in contrast to the summary) are well described and of good methodological quality.

**Systematic Reviews: Summary**
**The systematic reviews provide a remarkably consistent estimate of an approximately 30% increase in the risk of ovarian cancer associated with any talc powder products use.** The studies summarized in the systematic reviews reported consistent results with little variability and closely overlapping estimates for ovarian cancer risk due to talc use. Further, the reviews suggest that the risks are greater for invasive serous cancer. I believe Penninkilampi provides a comprehensive and high quality review and his estimate is that women who regularly use talc powder products, defined as >3600 lifetime applications, have a 40% increased risk of ovarian cancer compared to women with no regular talc power product use. The association was significant for serous cancers.

While the methodological approaches of these systematic reviews were generally valid, I believe they all shared the weakness of focusing on any talcum powder use rather than daily talcum powder use, and this motivated my own review (below).

<u>Pooled Data</u>
Two large studies pooled data from several studies. They are worth describing because of their larger sample size and strong methodology in comparison to the individual case-control studies.

**Pooled Data 1: Terry (2013)[69]**

This report pooled data on ovarian cancer patients from a national research consortium and assessed the relationship between talc powder products exposure and ovarian cancer by histologic subtype and invasiveness. Data were from eight case-controlled studies and importantly included previously unpublished data. The authors tried to unify definitions across the studies, but the definitions nonetheless varied widely. The prevalence of genital powder use in the controls varied widely across participating study sites, ranging from 15%–45%, suggesting either large variations in the underlying populations or, probably more likely, variation in the definition of powder use that led to these differences.

The data were for a total of 8525 cases and 9859 controls in the primary analysis. The authors found that **genital talcum powder  use was associated with an approximately 24% increased risk of epithelial ovarian cancer (OR 1.24, 95% CI 1.15, 1.33).** When stratified by cancer type, the risk was increased for all cancers except mucinous cancer. Risks were approximately equally elevated for invasive and borderline tumors. They used a subset of patient data to determine RR of ovarian cancer for the highest talcum powder users, measured as cumulative lifetime perineal applications (defined as applications per month and months of the year). They also considered age (inclusion in the highest user group required more use at age 70 than age 40) and assessed risk of cancer among the highest users. **The odds of cancer in the highest talc exposure category was higher than for women who ever used talc (OR 1.37, 95% CI 1.19, 1.58).** A significant dose response was seen when data on all patients were analyzed, with greater exposure leading to greater risk.

**Pooled Data 2: Cramer (2016) [75]**

Cramer conducted several case-control studies on the relationship between genital talc powder use and ovarian cancer. He pooled data from a large number of these studies, described as reflecting study enrollment in 1992–1997, 1998–2002, and 2003–2008. This publication reports the analysis of pooled data from these separate enrollment phases and a more detailed characterization of those data. Cases were women who resided in Eastern Massachusetts and New Hampshire diagnosed with epithelial ovarian cancer between the ages of 18 and 80. Controls were women identified through random-digit dialing, driver's license lists and town resident lists. Women were interviewed in person, and details of talc use were elicited including the number of applications per month (allowing assessment of frequency of use), timing of use, and lifetime exposures. These descriptions gave far greater detail than most other reports and are thus an important contribution to the field. Further, more demographic and clinical history were obtained and described in these enrollments than for other reviewed studies. This report gave associations from pooled data for 2041 cases and 2100 controls. The larger size of the population, unified variables, and greater detail about cases and controls allowed a larger number of stratifications than other studies.

Overall, genital talc use was associated with an OR of 1.33 (95% CI 1.1.6, 1.52). An important observation was that risk decreased with time since last use. Thus, how often women regularly used talcum powder (daily, or weekly or monthly) was meaningful for predicting ovarian cancer risk, but not if the women had not used talcum powder for 5 or more years.

**Women who reported using talcum powder daily (>30 applications per month) had an OR of 1.46 (95% CI 1.2, 1.78)**. Of note, among women in the ovarian cancer case group who used talcum powder, daily was the most commonly reported frequency of use**. When analysis used data on women who reported their total number of talcum powder applications, those in the highest group category (>7200 lifetime applications, the equivalent of 20 years of daily application) had an OR for ovarian cancer of 1.49 (95% CI 1.06, 2.1).**

Cramer conducted detailed analysis of factors that could influence/interact with the association between talcum powder and ovarian cancer. Some of the results are quite striking. First, a very strong interaction with race was noted. **African-American women seem to be at a particularly elevated risk of ovarian cancer following talcum powder exposure (OR 5.08, 95% CI 1.32, 19.6) compared with white women (OR 1.35, 95% CI 1.17, 1.55).** This finding calls for greater research given the higher incidence, and poorer outcomes among African American women. Asian women seem to be at reduced risk (OR 0.04, 95% CI 0.01, 0.34). **Analysis showed a strong relationship with menopausal status and use of hormone replacement therapy.** ORs were significantly increased in premenopausal women (OR 1.41, 95% CI 1.13, 1.75) and **postmenopausal women who used hormone treatment (OR 2.21, 95% CI 1.63, 3.0).** Postmenopausal women who did not use hormone therapy were not at increased risk of ovarian cancer (OR 1.0, 0.68, 1.49). **Interestingly, the risk of ovarian cancer among postmenopausal hormone-treatment users was elevated only if they used hormones before hysterectomy and tubal ligation but risk was substantial (OR 3.49, 95% CI 1.39, 8.75) if talcum powder was used before these surgeries (OR 5.85, 95% CI 2.89, 11.9) compared to talcum powder use both before and after surgery.**

These findings merit further assessment in other populations but raise the possibility that estrogen is important in ovarian carcinogenesis. The authors also stratified analyses by histologic type and found that the relationship between ovarian cancer and frequency of talcum powder use was significantly elevated for invasive and borderline serous cancer and invasive endometrioid cancer, but not for mucinous, clear cell or mucinous borderline cancer. **Among the most frequent users of talc the adjusted OR for invasive serous cancer is 1.54 (95% CI 1.15, 2.07).** This relationship was even stronger among premenopausal women (OR 1.85, 95% CI 1.21, 2.8) compared to postmenopausal women (OR 1.33, 95% CI 0.96, 1.85).

**Pooled Data of Case-Control Studies: Summary**
**The increased risk of ovarian cancer associated with talc use was estimated at around 40% across these studies. The increased risk for serous cancer was even higher at 50%.**

<u>Case-Control Trials</u>
A large number of case-control studies are published—too many to dedicate a paragraph to summarizing the methods of each.
[21,24,36,40,74,76-99]

 I carefully read and abstracted data from each study. Without assessing the quality of the case-control studies, I included them in a table and sorted them by size of the reported effect

of talc on ovarian cancer risk. It's a way to get an overview of what they report – and Viewing them in this way is easy to see the general direction of the effect. All but two demonstrate a positive association (OR > 1) between any talc powder products use and ovarian cancer, with ORs ranging from 0.73–3.9 across studies, Table 5 .

**Table 5: List of Case-Control Studies Sorted by Estimated Effect Size (Odds Ratio)**

| Year | First author | | | Odds ratio | Confidence interval |
|------|-------------|-----|------|-----------|--------------------|
| | Goodman | 367 | | 602 | 0.99    (.70, 1.41) |
| 1993 | Tzonous | 189 | 200 | 1.05 | (.28, 3.98) |
| 1989 | Harlow | 116 | 158 | 1.10 | (0.70,2.1) |
| 1999 | Wong* | 499 | 755 | 1.13 | (0.89, 1.43) |
| 2011 | Rosenblatt | 812 | 1313 | 1.13 | (0.93,1.36) |
| 1995 | Purdie | 824 | 860 | 1.27 | (1.04, 1.54) |
| 1989 | Booth | 235 | 451 | 1.30 | (0.80,1.9) |
| 1998 | Green | 824 | 855 | 1.30 | (1.1, 1.6) |
| 2008 | Merritt | 1576 | 1509 | 1.34 | (1.06, 1.68) |
| 2012 | Lo-Cignaic | 902 | 1802 | 1.34 | (1.07,1.66) |
| 2009 | Moorman | 1086 | 1057 | 1.37 | (1.05, 1.80) |
| 2008 | Gates | | | 1.41 | (1.14, 1.76) |
| 2012 | Kurta | 902 | 1802 | 1.41 | (1.16, 1.69) |
| 1988 | Whittemoore | 188 | 539 | 1.45 | (0.94, 2.22) |
| 2015 | Wu | 1701 | 2391 | 1.46 | (1.27,1.69) |
| 2000 | Ness | 767 | 1367 | 1.50 | (1.1, 2.0) |
| 1997 | Chang | 367 | 564 | 1.51 | (1.13,2.02) |
| 1982 | Cramer | 215 | 215 | 1.58 | (0.98, 2.47) |
| 1997 | Cook | 313 | 422 | 1.60 | (0.9, 2.9) |
| 1999 | Cramer | 563 | 523 | 1.60 | (1.18, 2.15) |
| 1992 | Rosenblatt | 77 | 46 | 1.70 | (.70, 3.9) |
| 2016 | Schildkraut | 584 | 745 | 1.71 | (1.26, 2.33) |
| 2004 | Mills | 256 | 1122 | 1.74 | (1.14, 2.64) |
| 1992 | Harlow | 235 | 239 | 1.80 | (1.1, 3.0) |
| 1996 | Shushan ** | 200 | 408 | 2.00 | NA |
| 2009 | Wu | 609 | 688 | 2.08 | ((1.34 3.23) |
| 1998 | Godard | 170 | 170 | 2.49 | (0.94,6.56) |
| 1983 | Hartge | 135 | 171 | 2.50 | (0.70, 10.0) |
| 1992 | Chen | 112 | 224 | 3.90 | (0.9,10.6) |
| 2004 | Pike | | | NA | |

**V. Rationale for and Explanation of the New Systematic Review**

In previous systematic reviews that I have conducted, I have obtained the most meaningful and consistent results by narrowly defining the research topic of the review, including only studies that provide data on this narrow topic in a well-defined population and stratifying my analysis of the studies' results by relevant factors such as age or race/ethnicity. The benefit of this approach is more accurate, precise, and meaningful results, while the potential tradeoff is a reduction in general applicability of the results, because many studies may be excluded for inadequate data. I believe greater accuracy is more important because I want to be certain about the data I am describing. For example, when I conducted a systematic review on the use of transvaginal ultrasound as a diagnostic test for endometrial cancer, I initially stratified

the results by patient use of hormone therapy. The reviewed studies had consistent results, but only if profoundly different diagnostic criteria were applied for women who did and did not use hormone therapy. For this reason, I completed one review on hormone users and another on non-users. In this case, I had sufficient data to assess both groups.

In this review on talcum powder use, I had sufficient data to summarize results for regular users of talcum powder (as close to daily but reflecting use of talc powder products several times per week) and risks of serous cancer; I did not have sufficient data to summarize results for occasional users or risk of other cancer types.  I believe the most important research question to answer in this review is whether regular exposure to talcum powder is associated with ovarian cancer.  I want to point out that this does not mean that other uses (i.e. less than approximate daily use) does not cause ovarian cancer, nor that talc powder products does not cause other types types of ovarian cancer (e.g. endometrioid cancer). Thus, for the systematic review below of case-control studies on the relationship between perineal exposure to talcum powder products and ovarian cancer, I focused on whether regular use of perineal (genital) talc increases the risk of the ovarian cancer. When possible, I focused on the most common and serious type, invasive serous ovarian cancer.

**VI. New Systematic Review of Literature Quantifying Association Between Regular Frequent Genital (Perineal) Talcum Powder Products Application and Ovarian Epithelial Cancer Risk with A Focus on Invasive Serous Cancer.**

Literature Search
I performed a literature search to identify primary research studies (not reviews) that included patient-level data on the association between talc and ovarian cancer. The literature search was performed in the Medline, Embase, and Scopus databases using keywords "ovarian cancer," "talc," "perineal powder" and "genital powder." Abstracts of resulting publications were reviewed to identify if they addressed the topic and included data. Only English-language articles were reviewed. The references of identified articles and reviews were scanned to identify additional publications. Review articles, editorials, letters to the editor were excluded.

Article Selection
Articles were included based on relevance to the question: **Does the regular (as close to approximately daily)** use of genital (perineal) talcum powder increase invasive epithelial ovarian cancer? Because daily use was the most dominant use category, when studies stratified their results into quartiles of use, or lifetime applications, I included the highest use category that had a reasonable number of data points to reflect daily use. Wherever possible, data on invasive serous cancer were abstracted separately. When I found duplicate reports on the same patient group, the largest and most detailed publication was included. This usually meant the most recent publication, but not always. An important caveat is that I could not always identify duplicative results. I included data from the Terry 2013 pooled data study because it included new data from previous studies. I also included data from the Cramer

2016 pooled analysis and earlier publications with duplicative patients were not included.  But I calculated the results both including and excluding these studies.

<u>Exclusion</u>
Studies were not included if they reported only crude ORs unadjusted for confounding factors, A few studies were excluded because, the research methods were poorly defined, even though they reported on women who frequently used talcum powder. Studies that asked participants a single question about ever use of talcum powder, without further quantification of exposure, were not included in the summary.

<u>Defining Talcum Powder Products Use</u>
Regular use was defined ideally as daily or at least more than 3 uses per week. I also accepted studies that defined use as "regular" where the description made it clear that this was regular use. Studies that reported "regular use" but defined it as use of less than this frequency, were not included. Regular use was selected to differentiate occasional use (which may include one-time or infrequent use or use during only a particular time of a woman's menstrual cycle) from sustained regular use. Studies that asked participants a single question about ever use of talc, without further quantification of exposure, were not included in the summary. For example, Purdie reported that 52–57% of women reported ever using talc without further quantification and was not included. Several studies asked about *regular use* defined as at least once a month. These studies were not included unless they further characterized women into different categories of use; if so, I included data for women in the highest use category as long as this was group was large enough to be meaningful. When studies asked about ever use but defined use and stratified results by use, I included any data that may have reflected daily use. This measure of regular use is imprecise but is more accurate and meaningful than evaluating talcum powder exposure as any use.

<u>Stratification of Analyses: Focus on a Single Histologic Type Where Possible</u>
My review focused on invasive serous cancer where possible, but also included all invasive cancer. The decision to focus on a single histologic cancer type was in part because ovarian cancers include a broad range of types and association of talc and ovarian cancer might differ by type. I chose serous cancers because they are most common invasive ovarian cancer type. Importantly, serous ovarian cancer is the only histologic type for which most individual research studies accumulated sufficient cases for valid statistical analysis. This cancer type also has the least uncertainty in pathological diagnosis (see Section III, Histologic Types). Further and most importantly, serous ovarian cancer is the most aggressive histologic type, so identifying causal factors is important. Finally, I focused on invasive cancer (as opposed to borderline cancer) because the risk of death from invasive serous tumors is far higher than for noninvasive types, with growing consensus that borderline tumors may not be malignant.

<u>Type of Exposures</u>
Studies were included if they reported on perineal exposure (rather than exposure through sanitary napkins, diaphragms, or condoms) as this is the most common exposure type and is

likely to reflect the most consistent exposure. I did not exclude studies if they reported combined use, as long as the exposure included perineal use.

<u>Statistical Analysis</u>

Two individuals (Smith-Bindman and a consultant biostatistician) reviewed an abstracted data from each publication. Differences were resolved by consensus. The focus of the review was on quantifying the association between regular talcum powder products use and ovarian cancer, with a sub analysis on serous cancer and invasive cancer. Meta-analysis was performed using the metafor package in R (Version 3.5.1). The rma function was used to apply linear mixed effects models to study results and calculate summary statistics on effect size. Due to varying amounts and types of available data from each included publication, adjusted odds ratios (OR) and standard errors were used as the model inputs. Standard error (SE) was estimated using the relationship: 95% confidence interval = Effect size +/- 1.96*SE, assuming a roughly normal distribution of data and roughly symmetrical upper and lower confidence interval bounds. Incorporating adjusted ORs and SE into models in this way provides the added benefit of allowing model use of covariate-adjusted data (versus crude OR data). Weighting was done based on estimates of inverse variance. Study result heterogeneity was estimated based on maximum likelihood methods and was summarized via an I2 statistic and associated p-value. The decision to include results from the cohort study by Gertig and colleagues (2000), which reported relative risk (RR), was based on the estimation that the RR value was only nominally different from the OR, a safe assumption in a study sample where less than 0.4% of the cohort developed the condition-of-interest.

<u>Results</u>

Overall 10 studies reported on daily talc powder products use and the risk of ovarian cancer. These studies were homogenous, and the odds of ovarian cancer associated with regular use was 1.43 (95% CI 1.15 1.71). The included studies with associated point estimates are shown in a Forrest Plot in Figure 2

Figure 2. Forrest plot showing odds of ovarian cancer associated with regular use of talcum powder products.



33

The primary analysis of this excluded Terry, but the results were nearly identical if Terry was included

There were studies reported on regular talcum powder use and invasive serous cancer (or all invasive cancer if serous not reported) These studies were homogenous. The odds of invasive serous cancer associated with regular use was 1.52 (95% CI 1.15, 1.88).  The results were similar when assessing the odds of all serous cancer.

Figure 3 Forrest plot showing odds of ovarian cancer assocated with regular use of talcum powder products and invasive serous cancer.



New Systematic Meta-Analytic Review: Summary

The results of my systematic review of case-control studies on talcum powder use and ovarian cancer risk were consistent and indicate a **50% increase in risk of serous invasive cancer related to routine talcum powder exposure compared to no exposure**. This review had limitations including that study results were self-reported. I tried to be consistent in defining exposure, but this factor was subjectively determined by the individual studies. I tried to eliminate overlap of participant populations used in the included studies, but some patients may have contributed data to more than one study.

Overall Summary of the Epidemiology Data Describing the Association Between Talcum Powder Products and Serous Ovarian Cancer

I conclude, based on the review of the available primary studies, systematic reviews and my own quantitative review, that regular exposure to talcum powder products increases ovarian cancer risk by around 50%. The existing systematic reviews (in particular Penninkilampi and Berge) also concluded a significant increase in ovarian cancer risk following talcum powder exposure.

## VII. Other Relevant Factors

Research Supporting Talcum Association with Ovarian Cancer: Transit to Ovary and Risk
Reduction on Interruption

Evidence from relevant studies is clear that talcum powder particles applied to the genital
region will ascend through the vagina and fallopian tubes and enter the pelvic cavity, reaching
fallopian tubes and ovaries. In humans, this route has been established experimentally by
labelling inert particles, applying them to the perineum just prior to planned hysterectomy,
and then recovering them from the fallopian tubes following surgery. [Egli Fertil Stwril 1961]

Further, talc particles have been found in normal and malignant ovarian tissue. Henderson
found that in 10 of 13 tested epithelial ovarian cancer tumors, 75% had talc embedded in the
tissue. This result confirms that talc reached to the areas with cancerous tissue, but not that it
caused the cancer. Histological evaluation of ovaries removed because of ovarian cancer or
benign conditions have identified both talc particles and asbestos fibers in the ovarian tissue,
further supporting that particles applied to the perineum reach the ovaries. [60,100] Heller found
that in all women in a study who were having ovaries removed for benign ovarian growth had
talc in their ovaries. These results confirm that talcum powder applied to the perineum may
be absorbed into the vagina and migrate or be transported to the tubes and ovaries. [101-104] In
1967, Graham and Graham demonstrated that intraperitoneal application of asbestos in
guinea pigs and rats results in overgrowth of ovarian epithelial cells comparable to the
histologic changes in epithelial ovarian tumors in women. The greater frequency at which talc
particles are discovered in ovarian cancerous tissue than in normal ovarian tissue further
supports that these particles may be causing cancer.

Several epidemiological studies evaluated the risk of ovarian cancer associated with talcum
powder products before and after women had tubal ligation or hysterectomy, which
surgically removes the route by which talc reaches the ovaries. The studies strongly suggest
that the increased risk of ovarian cancer associated with talcum powder products use is
reduced or eliminated after tubal ligation or hysterectomy. The results support that the risk
from talcum powder products is elevated when women have an open pathway from the
perineum to the ovary that enables powder components to reach the ovaries via
unobstructed fallopian tubes., The collective results demonstrate that talcum powder
products are carcinogenic through direct transport/migration to the fallopian tubes and
ovaries.

Variation in Risk when Talc Use is Discontinued

Several studies showed that the risk of ovarian cancer associated with talc powder products
decreases as the time from discontinuation of powder use increases. For example, Cramer
found an elevated risk of ovarian cancer with talc powder products use and the risk decreased
as time since last use increased. [75]

## VIII. Consideration of Causality of Talc Powder Products and Ovarian Cancer : Bradford Hill Analysis

Causality is easiest to determine in studies such as randomized controlled trial, in which participants are randomized to receive or not receive a treatment, then their health is followed to see their response. However, people cannot ethically be randomized to be exposed to a potentially cancer-causing agent. Therefore, when assessing risk factors for cancer, the Bradford Hill Factors are often used. They provide a framework for assessing the weight of evidence to help decide if causality is likely, given a particular association, such as between talcum powder and ovarian cancer. The guidelines are imperfect and provide a framework as compared with an absolute set of criteria.

I address each of the Bradford Hill factors below, with my understanding of how the evidence of talcum powder products exposure supports or refutes causality. While the Bradford Hill Factors include  nine aspects of association, they should not be used as a checklist for causation. Instead, they can help interpret associations and aid in inferring causality.  For each factor, I have highlighted why I believe this factor is more or less important.

A) Strength of Association
It is frequently argued that the larger an apparent association, the more likely the association is to be real (causal) and important for epidemiological assessment. This would suggest that an OR of 2.0 is more likely to indicate causality and importance than an OR of 1.5. While this is often argued, I do not believe this is necessarily the case. If a risk factor increases the risk of disease by 50%, and the exposure is common, it will have a far greater impact on a number of people, in comparison to a rare exposure that has a higher associated OR. And if the association is truly one that increases risk by 50%, then this is the magnitude of the association that will be detected. It is not intuitive that if an exposure increases a risk by 50%, this difference is not discoverable compared with an exposure that increases risk by 100%. A larger association between exposure and disease may be easier to identify, but I do not believe it is more likely to indicate causality or importance.

As an example, Table 6 shows an overview of the relationship between bladder cancer and two of its known risk factors; occupational industrial chemicals and smoking. Several industrial chemicals such as 2-naphthylamine are strongly associated with bladder cancer risk. In 1954, Case et al. reported a 200-fold increased bladder cancer risk for workers exposed to 2-naphthylamine. In cohort studies of rubber industry workers, elevated standardized mortality ratios (SMRs) as high as 253 (95% CI 93, 551) were reported. Use of some of these chemicals are now prohibited in Europe and their use is regulated in the United States because they cause cancer.(OSHA, 2011).

Cigarette smoking is also a known bladder cancer risk factor. However, the RR for smoking and bladder cancer is around 3, and therefore about 100 times lower than the RR for exposure to industrial chemicals. Yet bladder cancer is the second most common cancer attributed to smoking in the United States. It impacts a very large number of individuals. Of the 70,000 cases of bladder cancer diagnosed each year, as many as 60% are estimated as attributable to smoking.

36

Using the RR magnitude to quantify the "importance" of these two risk factors, industrial chemicals and smoking, would be misleading. Smoking will result in far more cancers than industrial chemicals, even though the RR is much lower. In the crude data in Table 6, of the approximately 70,000 bladder cancers diagnosed annually in the United States, 50,000 are thought to result from cigarettes while fewer than 1000 result from occupational exposures. A 50% reduction in smoking exposure will save 25,000 men from getting bladder cancer. Reducing industrial chemical exposures will saving around 500 men from getting bladder cancer. Thus, any impact on reducing known exposures for bladder cancer has the potential to be around 50 times more impactful if directed at smoking.

**Table 6. An example showing the number of individuals who might be impacted through exposure to an occupational chemical that leads to bladder cancer as opposed to smoking.**

|  | Occupational Exposure 2-naphthylamine | Smoking |
|---|---|---|
| Estimated odds ratio associated with exposure | 200 | 3 |
| Number of individuals exposed annually | 10,000 | 50,000,000 |
| **Bladder cancers due to exposure annually** | **1000** | **50,000** |
| **Impact on number of cancers diagnosed annual if exposure reduced by 50%** | **500** | **25,000** |

The bladder cancer example highlights that a factor that increases risk by 50% will have an enormous impact on population mortality if the exposure is common or if the cancer is particularly lethal. This is certainly the case for talcum powder products, which are used by as many as half of all women in the U.S. Women's use of talcum powder products is so widespread that even a relatively modest increase in risk would pose a sizeable health risk to the population. Further, a 50% risk increase is particularly important for ovarian cancer, which has a high mortality rate, with rare early detection.

Defining a "strong" association is critical for assessing potentially causal relationships. A current concept in epidemiology is that considerations about whether a factor causes a disease should weigh statistical validity and significance and the multiple factors that influence the disease. Thus, assessing *strength of association* when inferring causality requires examining underlying research and analytic methods, comparing the weight of evidence in the literature, and considering other contextual factors. The data supporting the causality of  talcum powder products exposure for ovarian cancer is extremely strong.

Using the existing evidence, I reviewed and assembled for this report, I estimated how many ovarian cancers that occur each year in the United States are likely to be caused by exposure to talcum powder products in comparison to other risk factors for ovarian cancer, Table 7. This is a relatively simple analysis, but nonetheless is informative. The total number of ovarian cancers that are estimated to occur in the US annually is 22,240, and these will occur among

the 50.8 percent of the U.S. population of 311 million who are women. Of these ovarian cancer cases, approximately half (11,120) will reflect invasive serous carcinoma. For the purpose of this simple analysis, I have assumed that the elevation in ovarian cancer risk associated with talcum powder product exposures occurs only with invasive serous carcinoma. This is not true, but the data are the most certain for these cancer and this is a conservative assumption (meaning the true number of cancer and proportion of cancers caused by talcum powder product users will be even higher than my calculation).  A proportion of ovarian cancers will occur among women who regularly use talcum powder products, and the remainder will occur in women who do not regularly use talcum powder products. If we estimate that women who use talcum powder products regularly have a 50% elevated risk of invasive serious cancer and we estimate the number of women who are exposed to daily talcum powder products is between 10% and 30% (this proportion is fewer than ever users of talcum powder products), then between 1,589 and 4,351 women will be diagnosed each year with invasive serous cancer caused by the exposures, reflecting between 14% and 39% of all invasive serous cancers and reflecting between 7% - 20% of all ovarian cancer diagnosed each year. <u>This is a tremendous risk. This is a very large number of cancers to be caused by a product that provides no medical benefit. This Bradford Hill Factor of the Strength of the association is important and is met.</u>

**Table 7 An estimate of the number of ovarian cancers and invasive serous cancers caused by regular use of perineal talc powder products.**

| Proportion of women who regularly use Talcum powder products | Annual Invasive Serous Cancer in Women Exposed to Talcum Powder Products | Annual Invasive Serous Cancer in Women Not Exposed to Talcum Powder Products | % Invasive Serous Cancer in Women Exposed to Talcum Powder Products | % of all ovarian Cancer in Women Exposed to Talcum Powder Products |
|---|---|---|---|---|
| **10%** | 1,589 | 9,531 | 0.14 | 0.07 |
| **20%** | 3,033 | 8,087 | 0.27 | 0.14 |
| **30%** | 4,351 | 6,769 | 0.39 | 0.20 |

<u>B) Consistency of Associations in Different Populations and Studies</u>
Another consideration for association and causality is consistency of the data. The data on the association between genital talc and ovarian cancer are highly consistent. The relative stability in the estimated increase in the risk of ovarian cancer associated with talc powder products use (50% increase for regular users of talcum powder and serous cancers; around 40% increase for all epithelial ovarian cancer and regular users of talcum powder products), as assessed across time and in diverse populations with diverse study designs, <u>strongly argues that the causal association is real and satisfies the Bradford Hill guideline  for consistency of associations across populations and studies.</u>

C) Specificity Between Cause and Effect

The Bradford Hill factors suggest that associations are more likely to be causal when an exposure causes only one disease. While some examples of highly specific exposures and outcomes exist, many exposures and health concerns involve complex chemical mixtures and low-dose environmental and occupational exposures complicated by a variety of personal risk factors. A recent review stated, "The original criterion of *specificity* is widely considered weak or irrelevant from an epidemiologic standpoint." [105]  Asbestos, for example, is associated with a range of cancers and various exposures. Regardless of doubts about the meaningfulness of this factor, talcum powder products are primarily associated with ovarian cancer and thus fulfills the specificity consideration, although this consideration is not one of the most important considerations for causality in my expert opinion.

D) Temporality

An exposure must come before an outcome for the exposure to be causal. Bradford Hill explained that for an exposure-disease relationship to be causal, exposure must precede the onset of disease. While this is self-evident, in epidemiological studies, reverse causality, in which behavior related to a health issue is influenced by knowledge or events about the issue, is always a concern. For example, women who undergo ovarian cancer treatment may begin using talcum powder products during their pre- and post-operative period because of symptoms or side effects perceived to be alleviated by talcum powder products use. Assessing talcum powder use without specifying the time of use might lead to women with ovarian cancer being more likely to report talcum powder products use. In this example, talcum powder may not have caused the cancer; rather, use of talcum powder products was caused by the cancer (and treatments). The importance of this issue led to Bradford Hill's consideration of temporality when assessing causality.

In essentially all of the case-control studies that assessed use of talcum powder products, women were specifically asked to report talc powder products only during past, not current periods; thus, the studies explicitly assessed exposure to talcum before cancer. Typically, questions were phrased "Did you ever use talc, but not in the last year before cancer diagnosis?" to exclude the year prior to diagnosis. This issue is not relevant for the included cohort studies, as women were surveyed about their exposures prior to cancer ascertainment. Thus, the  temporality consideration is important for my consideration and  is satisfied.

E) Dose Response

In general, when risks are proportional to exposure (e.g., doubling exposure doubles risk) this dose-response evidence is considered to support causality. Many of the reviewed studies did not collect sufficient data to carefully quantify the dose response, and many limited their comparisons to an ever/never comparison. This is in part what motivated me to complete my separate quantitative review to at least be able to dis-entangle ever into regular versus not regular use.  The reviewed studies that did provide data that could be used to assess the

39

potential for dose response had mixed results in quantifying dose response. While most studies showed evidence of a dose response, others did not. For example, Schildkraut showed that >20 years of any genital powder use (OR 1.51, 95% CI 1.11, 2.06) showed a stronger association with ovarian cancer than <20 years of use (OR 1.33, 95% CI 0.95, 1.86). [99] Terry and Harlow showed significant dose responses, where ORs increased as exposures increased. [69,74] The adjusted ORs increased from 1.3, to 1.5 to 1.8 with <1000, 1000–10,000, and >10,000 lifetime applications. Overall, any exposure to talcum powder resulted in an OR of 1.5; direct perineal application had an OR of 1.7 (95% CI 1.1, 2.7), daily exposure had an OR of 1.8 (95% CI 1.1, 3.0) and women with an intact genital tract who were estimated to have had more than 10,000 applications during ovulating years had the highest risk (OR 2.8 95% CI 1.4, 5.4). This exposure was found in 14% of women with ovarian cancer. Penninkilampi [67],the most comprehensive of the systematic reviews, also showed a dose response where women with more than 3600 lifetime applications had slightly higher risks as did women who reported long-term (>10 years) talc use. In contrast, Whittemore [77] showed no dose response, and Booth [78] demonstrated the reverse—the higher the dose, the lower the risks. The data from reviewed studies were too diverse to summarize a dose-response relationship. The measures of exposure frequency and duration varied, and the studies used different thresholds for quantifying exposures. Further, the measures to quantify dose tended to be crude, making the response even more difficult to establish.

In summary, most but not all studies of talcum powder products and ovarian cancer show a dose response, but the results are inconsistent, and more importantly, are not considered or assessed in most of the published studies. A dose-response relationship is not required for causality and in large part because data were not consistently available, this factor does not weight heavily in my consideration. Further, this factor did not weight heavily in my considerations in that not all exposures will have a dose response, and some will indeed have a threshold effect. This is important here because asbestos is believed to exhibit a threshold, rather than a linear, dose-response.

F) Biologic Plausibility: Factors Linking Talc and Ovarian Cancer
The epidemiological evidence suggests a strong and positive association between exposure to talcum powder products and invasive ovarian cancer. However, epidemiological evidence alone does not provide a mechanism or pathophysiological process that accounts for the increased risk. Nor does the epidemiological evidence confirm the specific component or ingredient in talc powder products that is responsible for carcinogenesis. Nonetheless, the data are persuasive that particles contained in talcum powder reach the tubes and ovaries, inflammation initiate a  causal pathway, and that several components of talc powder products including asbestos, asbestiform fibers in talc, and heavy metals can contribute to the carcinogenicity of the products. This was a strong factor in my consideration of the evidence because there is extremely strong evidence that the components of talc powder products are known to be highly carcinogenic in other settings.

G)  Coherence and Consistency with Understood Biology

The guideline  of coherence is considered similar to biological plausibility. For both, the cause-and-effect explanation should be consistent with all knowledge available. For talcum powder and ovarian cancer, this consideration is easily satisfied.

H)  Experimental Evidence

The evidence in humans of the impact of talcum powder products exposure and ovarian cancer development is based on a large number of observational studies. Direct experimental evidence in the form of randomized controlled trials in humans is simply not possible to generate, for ethical reasons. The experimental evidence in humans that talc particles can migrate to the ovary and be incorporated into ovarian tissue is relevant to developing a causal model but does not directly prove that that exposure causes cancer. There is also human data relating to the inflammatory nature of ovarian cancer. There is compelling in vitro research delineating the inflammatory mechanism by which talcum powder causes cancer.  Animal studies showing inflammatory tissue effects and tumor formation with talcum powder exposure are also supportive.

I) Analogy

Bradford Hill implied that when evidence is strong of a causal relationship between a risk factor and disease, researchers should be more accepting of weaker evidence that a similar risk factor may cause a similar disease. Thus, analogy has been interpreted to mean that when one causal agent is known, the standards of evidence are lowered for a second causal agent that is similar. The strong evidence for the association between asbestos and lung cancer, and the chemical similarity between these minerals, as well as their fibrous nature, supports the analogy consideration and causal inference.

**Summary:  Consideration of Causality of Talc Powder Products and Ovarian Cancer using Bradford Hill**

In consideration of Bradford Hill, the clear strength of the association (A), remarkable consistency in the published literature across a large number of populations and research studies (B), temporality (D) considered in all of the published studies, and perhaps most importantly, biological plausibility (F) were the criteria that I considered of paramount importance when assessing the causality of exposures of talc powder products and epithelial ovarian cancer

**IX. Conclusion**

In conclusion, substantial evidence supports a strong, positive and causal association between ovarian cancer and genital exposure to talcum powder products. Regular exposure to talcum powder products causes ovarian cancer in some women. This opinion is based on my extensive review of the medical and scientific literature, my own independent meta-analysis of the data, and my experience and expertise in the areas of epidemiology and women's health, including ovarian cancer.

All opinions are made to a reasonable degree of medical and scientific certainty. I reserve the right to amend or supplement this report as new information becomes available.

### References

1.  Torre LA, Trabert B, DeSantis CE, et al. Ovarian cancer statistics, 2018. *CA Cancer J Clin.* 2018;68(4):284-296.
2.  SEER Cancer Statistics Review, 1975-2015, National Cancer Institute, Bethesda, MD, Https://Seer.cancer.gov/csr/1975_2015/, based on November 2017 SEER data submission, posted to the SEER web site, April 2018. 2018.
3.  Yang M, Li X, Chun-Hong P, Lin-Ping H. Pure mucinous breast carcinoma: a favorable subtype. *Breast Care (Basel).* 2013;8(1):56-59.
4.  Lee KR, Nucci MR. Ovarian mucinous and mixed epithelial carcinomas of mullerian (endocervical-like) type: a clinicopathologic analysis of four cases of an uncommon variant associated with endometriosis. *Int J Gynecol Pathol.* 2003;22(1):42-51.
5.  Wentzensen N, Poole EM, Trabert B, et al. Ovarian Cancer Risk Factors by Histologic Subtype: An Analysis From the Ovarian Cancer Cohort Consortium. *Journal of clinical oncology : official journal of the American Society of Clinical Oncology.* 2016;34(24):2888-2898.
6.  Bolton KL, Ganda C, Berchuck A, Pharoah PD, Gayther SA. Role of common genetic variants in ovarian cancer susceptibility and outcome: progress to date from the Ovarian Cancer Association Consortium (OCAC). *Journal of internal medicine.* 2012;271(4):366-378.
7.  Weissman SM, Weiss SM, Newlin AC. Genetic testing by cancer site: ovary. *Cancer journal (Sudbury, Mass).* 2012;18(4):320-327.
8.  Hunn J, Rodriguez GC. Ovarian cancer: etiology, risk factors, and epidemiology. *Clinical obstetrics and gynecology.* 2012;55(1):3-23.
9.  Pal T, Akbari MR, Sun P, et al. Frequency of mutations in mismatch repair genes in a population-based study of women with ovarian cancer. *British journal of cancer.* 2012;107(10):1783-1790.
10. Gayther SA, Pharoah PD. The inherited genetics of ovarian and endometrial cancer. *Current opinion in genetics & development.* 2010;20(3):231-238.
11. Lacey JV, Jr., Brinton LA, Leitzmann MF, et al. Menopausal hormone therapy and ovarian cancer risk in the National Institutes of Health-AARP Diet and Health Study Cohort. *Journal of the National Cancer Institute.* 2006;98(19):1397-1405.
12. Trabert B, Wentzensen N, Yang HP, et al. Ovarian cancer and menopausal hormone therapy in the NIH-AARP diet and health study. *British journal of cancer.* 2012;107(7):1181-1187.
13. Lahmann PH, Cust AE, Friedenreich CM, et al. Anthropometric measures and epithelial ovarian cancer risk in the European Prospective Investigation into Cancer and Nutrition. *International journal of cancer.* 2010;126(10):2404-2415.
14. Jordan SJ, Siskind V, A CG, Whiteman DC, Webb PM. Breastfeeding and risk of epithelial ovarian cancer. *Cancer causes & control : CCC.* 2010;21(1):109-116.
15. Garg PP, Kerlikowske K, Subak L, Grady D. Hormone replacement therapy and the risk of epithelial ovarian carcinoma: a meta-analysis. *Obstetrics and gynecology.* 1998;92(3):472-479.
16. Lacey JV, Jr., Mink PJ, Lubin JH, et al. Menopausal hormone replacement therapy and risk of ovarian cancer. *Jama.* 2002;288(3):334-341.

17.  Seidman JD RP, Kurman RJ. . Surface epithelial tumors of the ovary. In: Kurman RJ, ed. Blaustein's Pathology of the Female Genital Tract. 5th ed. New York: Springer-Verlag; 2002:791–904.

18.  Faber MT, Jensen A, Frederiksen K, et al. Oral contraceptive use and impact of cumulative intake of estrogen and progestin on risk of ovarian cancer. *Cancer causes & control : CCC.* 2013;24(12):2197-2206.

19.  Faber MT, Kjaer SK, Dehlendorff C, et al. Cigarette smoking and risk of ovarian cancer: a pooled analysis of 21 case-control studies. *Cancer causes & control : CCC.* 2013;24(5):989-1004.

20.  Risch HA, Marrett LD, Jain M, Howe GR. Differences in risk factors for epithelial ovarian cancer by histologic type. Results of a case-control study. *American journal of epidemiology.* 1996;144(4):363-372.

21.  Purdie D, Green A, Bain C, et al. Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study. Survey of Women's Health Study Group. *International journal of cancer.* 1995;62(6):678-684.

22.  Purdie DM, Bain CJ, Siskind V, Webb PM, Green AC. Ovulation and risk of epithelial ovarian cancer. *International journal of cancer.* 2003;104(2):228-232.

23.  Kurian AW, Balise RR, McGuire V, Whittemore AS. Histologic types of epithelial ovarian cancer: have they different risk factors? *Gynecologic oncology.* 2005;96(2):520-530.

24.  Gates MA, Rosner BA, Hecht JL, Tworoger SS. Risk factors for epithelial ovarian cancer by histologic subtype. *American journal of epidemiology.* 2010;171(1):45-53.

25.  Gilks CB. Molecular abnormalities in ovarian cancer subtypes other than high-grade serous carcinoma. *Journal of oncology.* 2010;2010:740968.

26.  Balkwill F, Mantovani A. Inflammation and cancer: back to Virchow? *Lancet (London, England).* 2001;357(9255):539-545.

27.  Coussens LM, Werb Z. Inflammation and cancer. *Nature.* 2002;420(6917):860-867.

28.  Crusz SM, Balkwill FR. Inflammation and cancer: advances and new agents. *Nature reviews Clinical oncology.* 2015;12(10):584-596.

29.  Reuter S, Gupta SC, Chaturvedi MM, Aggarwal BB. Oxidative stress, inflammation, and cancer: how are they linked? *Free radical biology & medicine.* 2010;49(11):1603-1616.

30.  Fernandes JV, Cobucci RN, Jatoba CA, Fernandes TA, de Azevedo JW, de Araujo JM. The role of the mediators of inflammation in cancer development. *Pathology oncology research : POR.* 2015;21(3):527-534.

31.  Saed GM, Diamond MP, Fletcher NM. Updates of the role of oxidative stress in the pathogenesis of ovarian cancer. *Gynecologic oncology.* 2017;145(3):595-602.

32.  Saed GM MR, Fletcher NM. New Insights into the Pathogenesis of Ovarian Cancer: Oxidative Stress. *In press*

33.  Saed GM, Ali-Fehmi R, Jiang ZL, et al. Myeloperoxidase serves as a redox switch that regulates apoptosis in epithelial ovarian cancer. *Gynecologic oncology.* 2010;116(2):276-281.

34.  Saed GM, Fletcher NM, Diamond MP, Morris RT, Gomez-Lopez N, Memaj I. Novel expression of CD11b in epithelial ovarian cancer: Potential therapeutic target. *Gynecologic oncology.* 2018;148(3):567-575.

35.  Shan W, Liu J. Inflammation: a hidden path to breaking the spell of ovarian cancer. *Cell cycle (Georgetown, Tex).* 2009;8(19):3107-3111.

36.  Ness RB, Grisso JA, Cottreau C, et al. Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. *Epidemiology (Cambridge, Mass).* 2000;11(2):111-117.

37.  Ness RB, Cottreau C. Possible role of ovarian epithelial inflammation in ovarian cancer. *Journal of the National Cancer Institute.* 1999;91(17):1459-1467.

38. Freedman RS, Deavers M, Liu J, Wang E. Peritoneal inflammation - A microenvironment for Epithelial Ovarian Cancer (EOC). *Journal of translational medicine.* 2004;2(1):23.

39. Henderson WJ, Joslin CA, Turnbull AC, Griffiths K. Talc and carcinoma of the ovary and cervix. *J Obstet Gynaecol Br Commonw.* 1971;78(3):266-272.

40. Cramer DW, Welch WR, Scully RE, Wojciechowski CA. Ovarian cancer and talc: a case-control study. *Cancer.* 1982;50(2):372-376.

41. Rohl AN, Langer AM, Selikoff IJ, et al. Consumer talcums and powders: mineral and chemical characterization. *Journal of toxicology and environmental health.* 1976;2(2):255-284.

42. Zazenski R, Ashton WH, Briggs D, et al. Talc: occurrence, characterization, and consumer applications. *Regulatory toxicology and pharmacology : RTP.* 1995;21(2):218-229.

43. Blount AM. Amphibole content of cosmetic and pharmaceutical talcs. *Environmental health perspectives.* 1991;94:225-230.

44. Carbon black, titanium dioxide, and talc. *IARC monographs on the evaluation of carcinogenic risks to humans.* 2010;93:1-413.

45. Longo. Analysis of Johnson & Johnson Baby Powder & Valiant Shower to Shower Products for Amphibole (Tremolite) Asbestos, Expert Report of William E. Longo, PhD and Mark W. Rigler, PhD (August 2, 2017). 2017.

46. Longo. Below the Waist Application of Johnson & Johnson Baby Powder. Longo, William E., Mark W. Rigler, and William B. Egeland. Materials Analytical Service, LLC, September 2017. 2017.

47. Longo. Expert Report of William E. Longo, PhD and Mark W. Rigler, PhD, In re: Talcum Power Prod. Liab. Litig., MDL No. 2738 (Nov. 12, 2018). 2018.

48. Longo R. TEM Analysis of Historical 1978 Johnson's Baby Powder Sample for Amphibole Asbestos, Expert Report of William E. Longo, PhD and Mark W. Rigler, PhD (Feb. 16, 2018).

49. Arsenic, metals, fibres, and dusts. *IARC monographs on the evaluation of carcinogenic risks to humans.* 2012;100(Pt C):11-465.

50. Acheson ED, Gardner MJ, Pippard EC, Grime LP. Mortality of two groups of women who manufactured gas masks from chrysotile and crocidolite asbestos: a 40-year follow-up. *British journal of industrial medicine.* 1982;39(4):344-348.

51. Wignall BK, Fox AJ. Mortality of female gas mask assemblers. *British journal of industrial medicine.* 1982;39(1):34-38.

52. Germani D, Belli S, Bruno C, et al. Cohort mortality study of women compensated for asbestosis in Italy. *American journal of industrial medicine.* 1999;36(1):129-134.

53. Berry G, Newhouse ML, Wagner JC. Mortality from all cancers of asbestos factory workers in east London 1933-80. *Occupational and environmental medicine.* 2000;57(11):782-785.

54. Magnani C, Ferrante D, Barone-Adesi F, et al. Cancer risk after cessation of asbestos exposure: a cohort study of Italian asbestos cement workers. *Occupational and environmental medicine.* 2008;65(3):164-170.

55. Reid A, Heyworth J, de Klerk N, Musk AW. The mortality of women exposed environmentally and domestically to blue asbestos at Wittenoom, Western Australia. *Occupational and environmental medicine.* 2008;65(11):743-749.

56. Vasama-Neuvonen K, Pukkala E, Paakkulainen H, et al. Ovarian cancer and occupational exposures in Finland. *American journal of industrial medicine.* 1999;36(1):83-89.

57. Langseth H, Kjaerheim K. Ovarian cancer and occupational exposure among pulp and paper employees in Norway. *Scandinavian journal of work, environment & health.* 2004;30(5):356-361.

58. Pira E, Pelucchi C, Buffoni L, et al. Cancer mortality in a cohort of asbestos textile workers. *British journal of cancer.* 2005;92(3):580-586.

59.   Camargo MC, Stayner LT, Straif K, et al. Occupational exposure to asbestos and ovarian cancer: a meta-analysis. *Environmental health perspectives.* 2011;119(9):1211-1217.

60.   Heller DS, Westhoff C, Gordon RE, Katz N. The relationship between perineal cosmetic talc usage and ovarian talc particle burden. *American journal of obstetrics and gynecology.* 1996;174(5):1507-1510.

61.   Baan R, Straif K, Grosse Y, et al. Carcinogenicity of carbon black, titanium dioxide, and talc. *Lancet Oncol.* 2006;7(4):295-296.

62.   *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 86, Cobalt in Hard Metals and Cobalt Sulfate, Gallium Arsenide, Indium Phosphide and Vanadium Pentoxide* 2006.

63.   Crowley. Expert Report of Michael Crowley, PhD, In re: Talcum Power Prod. Liab. Litig., MDL No. 2738 (Nov. 12, 2018). 2018.

64.   Gertig DM, Hunter DJ, Cramer DW, et al. Prospective study of talc use and ovarian cancer. *Journal of the National Cancer Institute.* 2000;92(3):249-252.

65.   Houghton SC, Reeves KW, Hankinson SE, et al. Perineal powder use and risk of ovarian cancer. *Journal of the National Cancer Institute.* 2014;106(9).

66.   Gonzalez NL, O'Brien KM, D'Aloisio AA, Sandler DP, Weinberg CR. Douching, Talc Use, and Risk of Ovarian Cancer. *Epidemiology (Cambridge, Mass).* 2016;27(6):797-802.

67.   Penninkilampi R, Eslick GD. Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis. *Epidemiology (Cambridge, Mass).* 2018;29(1):41-49.

68.   Berge W, Mundt K, Luu H, Boffetta P. Genital use of talc and risk of ovarian cancer: a meta-analysis. *European journal of cancer prevention : the official journal of the European Cancer Prevention Organisation (ECP).* 2018;27(3):248-257.

69.   Terry KL, Karageorgi S, Shvetsov YB, et al. Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. *Cancer prevention research (Philadelphia, Pa).* 2013;6(8):811-821.

70.   Langseth H, Hankinson SE, Siemiatycki J, Weiderpass E. Perineal use of talc and risk of ovarian cancer. *Journal of epidemiology and community health.* 2008;62(4):358-360.

71.   Huncharek M, Muscat J, Onitilo A, Kupelnick B. Use of cosmetic talc on contraceptive diaphragms and risk of ovarian cancer: a meta-analysis of nine observational studies. *European journal of cancer prevention : the official journal of the European Cancer Prevention Organisation (ECP).* 2007;16(5):422-429.

72.   Huncharek M, Geschwind JF, Kupelnick B. Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies. *Anticancer research.* 2003;23(2c):1955-1960.

73.   Gross AJ, Berg PH. A meta-analytical approach examining the potential relationship between talc exposure and ovarian cancer. *Journal of exposure analysis and environmental epidemiology.* 1995;5(2):181-195.

74.   Harlow BL, Cramer DW, Bell DA, Welch WR. Perineal exposure to talc and ovarian cancer risk. *Obstetrics and gynecology.* 1992;80(1):19-26.

75.   Cramer DW, Vitonis AF, Terry KL, Welch WR, Titus LJ. The Association Between Talc Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US States. *Epidemiology (Cambridge, Mass).* 2016;27(3):334-346.

76.   Hartge P, Hoover R, Lesher LP, McGowan L. Talc and ovarian cancer. *Jama.* 1983;250(14):1844.

77.   Whittemore AS, Wu ML, Paffenbarger RS, Jr., et al. Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. *American journal of epidemiology.* 1988;128(6):1228-1240.

78.     Booth M, Beral V, Smith P. Risk factors for ovarian cancer: a case-control study. *British journal of cancer.* 1989;60(4):592-598.

79.     Harlow BL, Weiss NS. A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc. *American journal of epidemiology.* 1989;130(2):390-394.

80.     Chen Y, Wu PC, Lang JH, Ge WJ, Hartge P, Brinton LA. Risk factors for epithelial ovarian cancer in Beijing, China. *International journal of epidemiology.* 1992;21(1):23-29.

81.     Rosenblatt KA, Szklo M, Rosenshein NB. Mineral fiber exposure and the development of ovarian cancer. *Gynecologic oncology.* 1992;45(1):20-25.

82.     Tzonou A, Polychronopoulou A, Hsieh CC, Rebelakos A, Karakatsani A, Trichopoulos D. Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer. *International journal of cancer.* 1993;55(3):408-410.

83.     Shushan A, Paltiel O, Iscovich J, Elchalal U, Peretz T, Schenker JG. Human menopausal gonadotropin and the risk of epithelial ovarian cancer. *Fertility and sterility.* 1996;65(1):13-18.

84.     Chang S, Risch HA. Perineal talc exposure and risk of ovarian carcinoma. *Cancer.* 1997;79(12):2396-2401.

85.     Cook LS, Kamb ML, Weiss NS. Perineal powder exposure and the risk of ovarian cancer. *American journal of epidemiology.* 1997;145(5):459-465.

86.     Green A, Purdie D, Bain C, et al. Tubal sterilisation, hysterectomy and decreased risk of ovarian cancer. Survey of Women's Health Study Group. *International journal of cancer.* 1997;71(6):948-951.

87.     Godard B, Foulkes WD, Provencher D, et al. Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study. *American journal of obstetrics and gynecology.* 1998;179(2):403-410.

88.     Cramer DW, Liberman RF, Titus-Ernstoff L, et al. Genital talc exposure and risk of ovarian cancer. *International journal of cancer.* 1999;81(3):351-356.

89.     Wong C, Hempling RE, Piver MS, Natarajan N, Mettlin CJ. Perineal talc exposure and subsequent epithelial ovarian cancer: a case-control study. *Obstetrics and gynecology.* 1999;93(3):372-376.

90.     Mills PK, Riordan DG, Cress RD, Young HA. Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. *International journal of cancer.* 2004;112(3):458-464.

91.     Goodman MT, Lurie G, Thompson PJ, McDuffie KE, Carney ME. Association of two common single-nucleotide polymorphisms in the CYP19A1 locus and ovarian cancer risk. *Endocr Relat Cancer.* 2008;15(4):1055-1060.

92.     Merritt MA, Green AC, Nagle CM, Webb PM. Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer. *International journal of cancer.* 2008;122(1):170-176.

93.     Moorman PG, Palmieri RT, Akushevich L, Berchuck A, Schildkraut JM. Ovarian cancer risk factors in African-American and white women. *American journal of epidemiology.* 2009;170(5):598-606.

94.     Wu AH, Pearce CL, Tseng CC, Templeman C, Pike MC. Markers of inflammation and risk of ovarian cancer in Los Angeles County. *International journal of cancer.* 2009;124(6):1409-1415.

95.     Rosenblatt KA, Weiss NS, Cushing-Haugen KL, Wicklund KG, Rossing MA. Genital powder exposure and the risk of epithelial ovarian cancer. *Cancer causes & control : CCC.* 2011;22(5):737-742.

96.     Lo-Ciganic W-H, Zgibor JC, Bunker CH, Moysich KB, Edwards RP, Ness RB. Aspirin, Non-Aspirin Nonsteroidal Anti-inflammatory Drugs, or Acetaminophen and risk of ovarian cancer. *Epidemiology (Cambridge, Mass).* 2012;23(2):311-319.

97.     Kurta ML, Moysich KB, Weissfeld JL, et al. Use of fertility drugs and risk of ovarian cancer: results from a U.S.-based case-control study. *Cancer epidemiology, biomarkers & prevention : a publication of the American Association for Cancer Research, cosponsored by the American Society of Preventive Oncology.* 2012;21(8):1282-1292.

98.     Wu AH, Pearce CL, Tseng CC, Pike MC. African Americans and Hispanics Remain at Lower Risk of Ovarian Cancer Than Non-Hispanic Whites after Considering Nongenetic Risk Factors and Oophorectomy Rates. *Cancer epidemiology, biomarkers & prevention : a publication of the American Association for Cancer Research, cosponsored by the American Society of Preventive Oncology.* 2015;24(7):1094-1100.

99.     Schildkraut JM, Abbott SE, Alberg AJ, et al. Association between Body Powder Use and Ovarian Cancer: The African American Cancer Epidemiology Study (AACES). *Cancer epidemiology, biomarkers & prevention : a publication of the American Association for Cancer Research, cosponsored by the American Society of Preventive Oncology.* 2016;25(10):1411-1417.

100.    Heller DS, Gordon RE, Westhoff C, Gerber S. Asbestos exposure and ovarian fiber burden. *American journal of industrial medicine.* 1996;29(5):435-439.

101.    Egli GE, Newton M. The Transport of Carbon Particles in the Human Female Reproductive Tract. *Fertility and sterility.* 1961;12(2):151-155.

102.    Sjosten AC, Ellis H, Edelstam GA. Retrograde migration of glove powder in the human female genital tract. *Human reproduction (Oxford, England).* 2004;19(4):991-995.

103.    Venter PF, Iturralde M. Migration of a particulate radioactive tracer from the vagina to the peritoneal cavity and ovaries. *South African medical journal = Suid-Afrikaanse tydskrif vir geneeskunde.* 1979;55(23):917-919.

104.    RE J. Jones, Richard E., and Kristin H. Lopez. "Human Reproductive Biology - 4th Edition Chapter 9 - Gamete Transport and Fertilization." In Human Reproductive Biology, Third., 159–73. San Diego: Academic Press, 2006. https://doi.org/10.1016/B978-0-12-382184-3.00009-X. MAS Project #14-1683, Analysis of William E. Longo, PhD and Mark W. Rigler, PhD (April 28, 2017).

105.    Fedak KM, Bernal A, Capshaw ZA, Gross S. Applying the Bradford Hill criteria in the 21st century: how data integration has changed causal inference in molecular epidemiology. *Emerging themes in epidemiology.* 2015;12:14.

# Exhibit A

# CURRICULUM VITAE
# REBECCA SMITH-BINDMAN, MD

**Title**      Professor, Radiology and Biomedical Imaging, Epidemiology and Biostatistics, Obstetrics, Gynecology and Reproductive Sciences, Phillip R. Lee Institute for Health Policy
Director, Radiology Outcomes Research Lab, University of California San Francisco

**Address:**   Department of Radiology and Biomedical Imaging
350 Parnassus Ave, Suite 307
San Francisco, CA 94117
Voice: 415 353-4946**;** Fax: 415 353-2790
Email: Rebecca.Smith-Bindman@ucsf.edu

## EDUCATION

| | | | |
|---|---|---|---|
| 1980 - 1985 | Princeton University | BSE | Engineering / Architecture |
| 1985 - 1986 | Columbia University | | Post Bacc Pre-Med |
| 1987 - 1991 | University of California, San Francisco | MD | Medicine |
| 1991 - 1992 | University of California, San Francisco | Intern | Pathology |
| 1992 - 1996 | University of California, San Francisco | Resident | Radiology |
| 1996 - 1997 | University of California, San Francisco | Clinical Instructor | Radiology, Ultrasound |
| 1996 - 1998 | University of California, San Francisco | Fellow | Epidemiology & Biostatistics |

## LICENSES, CERTIFICATION

| | |
|---|---|
| 1992 | California Medical License # G76462 |
| 1993 | California X-ray Supervisor and Operator License RHL 143658 |
| 1996 | Board Certification, American Board of Radiology |

## PRINCIPAL POSITIONS HELD

| | | |
|---|---|---|
| 1998 - 2003 | UCSF, Radiology and Biomedical Imaging, Epidemiology and Biostatistics, Obstetrics, Gynecology and Reproductive Sciences | Assistant Professor |
| 2003 - 2009 | UCSF, Radiology and Biomedical Imaging, Epidemiology and Biostatistics, Obstetrics, Gynecology and Reproductive Sciences | Associate Professor |
| 2009 - current | UCSF, Radiology and Biomedical Imaging, Epidemiology and Biostatistics, Obstetrics, Gynecology and Reproductive Sciences | Professor |
| 2014 - current | UCSF, Phillip R. Lee Institute for Health Policy Studies | Member |
| 2000 - current | UCSF, Radiology Outcomes Research Lab | Director |

## OTHER POSITIONS HELD CONCURRENTLY

| | | |
|---|---|---|
| 1999 - 2000 | St Bartholomew's and The Royal London School of Medicine | Research Fellow |
| 2009 - 2010 | NIH, National Cancer Institute, Radiation Epidemiology Branch | Research Scientist |

## HONORS AND AWARDS

| | |
|---|---|
| 1985 | Cum laude, Princeton University |
| 1985 | Senior Thesis Prize, Princeton University |
| 1991 | Student Summer Research Fellowship, Institute for Health Policy Studies, UCSF |
| 1999, 2000 | Nycomed Amersham Fellow, Radiologic Society of North America |
| 2007 | Nomination, Clinical Research Mentor of the Year, Bay Area Symposium on Clinical Research |
| 2010 | Nomination, CTSI Consultant of the Year, Impact Award |
| 2010 | Scientific Paper of the Year, Minnies, Auntminnie.com |
| 2010 | Finalist, Most Influential Radiology Researcher, Minnies, Auntminnie.com |
| 2011 | Leader in Imaging, Auntminnie.com |
| 2012 | Finalist, Scientific Paper of the Year, Auntminnie.com, Minnies |
| 2012 | Semifinalist, Scientific Paper of the Year, Auntminnie.com, Minnies |
| 2012 | Winner, UCSF Center for Health Care Value, Medical Center Initiative, Innovation Award |
| 2013 | Finalist, Scientific Paper of the Year, Auntminnie.com, Minnies |
| 2013 | Runner-up, Scientific Paper of the Year, Auntminnie.com, Minnies |
| 2013 | Paper honored as 1 of the top 10 publications Funded by NCI's Epidemiology and Genomics Research Program |
| 2014 | Invited Editor, J of the American College of Radiology, March 2014, Radiation Dose Optimization |
| 2014 | Among Philip R. Lee Institute for Health Policy Studies faculty videos on UCTV, "Is Medical Imaging Harmful to Health: Opportunities to Influence Health Policy", most popular, N = 409,937 |
| 2015 | Academy of Radiology Research, Distinguished Investigator Award |
| 2015 | Election to Fellowship, Society of Radiologists in Ultrasound |

## KEYWORDS AND AREAS OF INTEREST

Health Services Research, Outcomes Research, Disparities Research, Women's Imaging, Comparative Effectiveness Research, Quality Improvement, Dissemination and Implementation Sciences, Evidenced Based Radiology, Assessment of Population Impact of Screening Tests, Radiation Associated with Medical Imaging, Radiation as an Environmental Cause of Cancer, Management of Incidental Findings on Diagnostic Testing

2

## OVERVIEW

## Narrative

Dr. Smith-Bindman is a clinical researcher with expertise in health services research, epidemiology, outcomes research, comparative effectiveness research, and dissemination and implementation sciences focused on diagnostic imaging. Her research has focused on evaluating the quality, utilization, accuracy, predictive values and impact of diagnostic testing on patient health, and has quantified both the risks and benefits of medical imaging when used in different contexts and by different populations. One area of focus has been on evaluating racial and ethnic differences in access and utilization of screening mammography and how that contributes to higher breast cancer mortality among African American women, and on factors that influence the quality and access to screening among vulnerable populations (see references 33, 34, 37, 43, 46, 48, 61, 67 at the end of CV). A separate area of focus has been on quantified the variation in radiation dose associated with medical imaging across patients and institutions, and quantified the impact of radiation, particularly from computed tomography, as an environmental carcinogen. (see references 53, 58, 60, 62, 65, 68, 69, 72, 76, 78, 79., 81, 87, 89, 91, 97, 102, 107.) Separate from her research activities, she has been actively involved in translating evidence into changes in practice and policy. She has *informed policy leaders, practitioners and the public about* the safety concerns surrounding the use of radiation in imaging by describing the issue in main stream media, testifying before the US Congress, and by advising the FDA, The Joint Commission, the International Atomic Energy Agency, the International Council on Radiation Protection and leading professional societies. She has also written quality measures focused on radiation safety, and her work has resulted in organizations which monitor health care quality to adopt measures of diagnostic imaging safety.

## Significant Publications

1. **Smith-Bindman** et al. Ultrasound vs Computed Tomography for Suspected Nephrolithiasis NEJM. 2014; 371:1100-10

2. Miglioretti DL, Johnson E, William SA, Grenlee RT, Weinmann S, Solberg LI, Feigelson HS, Roblin D, Flynn MJ, Vanneman N, **Smith-Bindman R**. The use of computed tomography in pediatrics and the associated radiation exposure and estimated cancer risk. JAMA Pediatr. 2013 167 (88): 700-7

3. **Smith-Bindman R**, et al. Risk of Thyroid Cancer based on Thyroid Ultrasound Imaging Characteristic: Result of A Population Based-Study. JAMA Internal Medicine. 2013 173(19):1788-96

4. **Smith-Bindman R.** Appendix F. Ionizing Radiation Exposure to the US Population, with a Focus on Radiation from Medical Imaging, included in Breast and the Environment: A Life Course Approach. The Institute of Medicine. March 20 2012

5. **Smith-Bindman R et al.** Radiation dose associated with common computed tomography examinations and the associated lifetime attributable risk of cancer. JAMA Internal Medicine 2009;169(22):2078-86

6. Curtis E, Quale C, Haggstrom D, **Smith-Bindman R**. Racial and Ethnic Differences in Breast Cancer Survival: How Much Is Explained By Screening, Tumor Severity, Biology, Treatment, and Co-morbidities. Cancer 2008 112(1):171

7. Goldman L, Haneuse S, Miglioretti D, Kerlikoswke K, Buist D, Yankaskas B, **Smith-Bindman R**, An assessment of the quality of mammography care at facilities treating medically vulnerable populations Medical Care 2008 46(7):701-8.

8. **Smith-Bindman et al.** Does Utilization of Screening Mammography Explain Racial and Ethnic Differences in Breast Cancer? Ann Intern Med, 2006; 144(8):541-53

9. Haggstrom DA, Quale C, **Smith-Bindman R**. Differences in the Quality of Breast Cancer Care Among Vulnerable Populations. Cancer. 2005 Dec 1;104(11):2347-58.

10. **Smith-Bindman, R,** et al Endovaginal ultrasound to evaluate endometrial abnormalities. JAMA 1999;281:1693-4

**PROFESSIONAL ACTIVITIES**

**CLINICAL**

Attending physician, Ultrasound Section, Department of Radiology and Biomedical Imaging, UCSF, 25%. Includes supervised instruction of residents and fellows. My teaching focuses on how to use evidence to help inform interpretation of clinical examinations.

**PROFESSIONAL ORGANIZATIONS**

Memberships

| | |
|---|---|
| 1997 - 2018 | Society of Radiologists in Ultrasound (SRU) |
| 1997 - 2018 | Radiology Alliance for Health Services Research in Radiology (RAHSR) |
| 2013 - 2018 | American College of Radiology (ACR) |
| 2014 - 2018 | American Roentgen Ray Society (ARRS) |
| 2014 - 2018 | Association of University Radiologists (AUR) |

Service to Professional Organizations (selected)

| | |
|---|---|
| 2010 - 2011 | American Board of Medical Specialties, American Board of Radiology, American College of Radiology, and Physician Consortium for Performance Improvements. Patient Radiation Dose Work Group |
| 2011 - 2012 | Institute of Medicine Committee on Breast Cancer and the Environment, commissioned report "Temporal Changes in Ionizing Radiation and Estimate of Contributions to Breast Cancer," contributing author |
| 2012 | Centers for Disease Control and Prevention, Cancer Prevention Work Group |
| 2012 - 2014 | The Joint Commission, Diagnostic Ionizing Radiation and Magnetic Resonance work group focused on issues of safety and guideline development |
| 2012 - Present | International Council on Radiation Protection (ICRP) Task Group #79 on Defining Effective Dose Use in Medicine |
| 2014 | International Atomic Energy Agency (IAEA) United Nations General Assembly and Security Council. Special Committee Considering Population Impact of Low Dose Radiation |
| 2015 | Council of Distinguished Investigators of the Academy of Radiology Research |

Service to Professional Publications (selected)

| | |
|---|---|
| 2000 - 2018 | Journal of the American Medical Association (JAMA) |
| 2000 - 2018 | JAMA Internal Medicine |
| 2000 - 2018 | New England Journal of Medicine (NEJM) |
| 2000 - 2018 | Radiology |
| 2000 - 2018 | American Journal of Radiology |
| 2000 - 2011 | Journal of the National Cancer Institute |
| 2000 - 2011 | Health Affairs |

4

| 2000 - 2015 | Health Services Research |
| 2000 - 2010 | American Journal of Obstetrics & Gynecology |
| 2000 - 2010 | American Journal of Public Health |
| 2000 - 2010 | Annals of Internal Medicine |
| 2000 - 2010 | Journal of Medical Screening |
| 2000 - 2010 | Journal of Women's Health |
| 2000 - 2010 | Medical Care |
| 2000 - 2010 | Medical Decision Making |
| 2000 - 2010 | Obstetrics and Gynecology |
| 2000 - 2010 | Ultrasound in Obstetrics & Gynecology |

## INVITED PRESENTATIONS

<u>International</u>

| 2001 | US - UK Cancer Learning Network, Deprivation and Cancer, *London, United Kingdom* |
| 2001 | British Society of Human Genetics, Prenatal Screening for Down syndrome in England and Wales and Birth Outcomes, *London, United Kingdom* |
| 2002 | Global Summit on Mammographic Screening, Europe Institute of Oncology, U.S.-U.K. Comparison of Screening Mammography, *Milan, Italy* |
| 2005 | University of Copenhagen, Does Practice Make Perfect; Association Between Volume and Accuracy of Mammography, *Copenhagen, Denmark* |
| 2006 | International Society for Prenatal Diagnosis, Prenatal Screening for Down syndrome in The Second Trimester of Pregnancy, *Kyoto, Japan* |
| 2009 | Canadian Breast Cancer Foundation, Forum on the Earlier Detection and Diagnosis of Breast Cancer, *Toronto, Canada* |
| 2010 | Nation Cancer Research Institute (NCRI), Risk of Cancer from Computed Tomography Examinations, *Liverpool, United Kingdom* |
| 2013 | Bach Mai University Hospital, Radiation for Medical Imaging: A Hidden Epidemic, *Hanoi, Vietnam* |
| 2014 | International Atomic Energy Agency (IAEA), Health Effects of Exposure to Low Dose Ionizing Radiation Associated with Medical Imaging, *Vienna, Austria* |
| 2014 | Korea College of Radiology, Tracking and Monitoring Radiation Dose and Its Impact Across the University of California Medical Centers and CT Radiation Doses Are Not What You Think: Why It's Important to Monitor and Track Dose Seoul, Republic of Korea |
| 2016 | International Atomic Energy Agency (IAEA), Exposure to low dose ionizing radiation from medical imaging and the health effects from these exposures. International Atomic Energy Agency. Technical Meeting on Science, Technology and Society Perspectives on Nuclear Science, Radiation and Human Health: The View from Asia, Singapore University |
| 2016 | University of North Carolina School of Medicine, Chapill Hill, NC, Radiology Department Grand Rounds , Diagnostic Imaging: Increasing Effectiveness and Safety Radiation From Medical Imaging, |

5

| | |
|---|---|
| 2016 | Singapore General Hospital, Singapore. Radiology Grand Rounds. Visualizing Patients and Their Dose to Improve Health Care Quality, |
| 2016 | St Luke's International Hospital, Tokyo, Japan. Hospital-wide grand rounds, Radiation from Medical imaging: A Hidden Epidemic. |
| 2017 | Childhood Leukemia International Consortium, Annual Meeting, Minneapolis, Minnesota, Estimating Radiation Exposure from Imaging Procedures |
| 2017 | Charity Hospital, Berlin, Germany. Radiology Grand Rounds, Radiation from Medical Imaging: A Hidden Epidemic |
| 2017 | Charity Hospital, Berlin, Germany, Imaging for Suspected Nephrolithiasis: Results from the Randomized Controlled Trial |
| 2017 | University Hospital, Basel, Switzerland, Radiology Grand Rounds. A Dose of Reality: The Need for Active CT Dose Management |
| 2017 | Center for Diagnostic Imaging Quality Institute Council of Medical Directors, Scottsdale, AZ Keynote: Radiation from Medical Imaging |
| 2017 | The Leap Frog Group Pediatric Computed Tomography Radiation Dose |
| 2017 | PCORI Advisory Panel on Communication and Dissemination Research Presentation UCSF CT Radiation Dose Registry to Ensure a Patient-Centered Approach for Imaging |
| 2017 | American Urological Association (AUA) Quality Improvement Summit, Baltimore Maryland Keynote Address. Imaging Wisely: Improving the Value of Medical Imaging |
| 2018 | Jakarta Radiology Society, Jakarta Indonesia. Dose Optimization Implementation to achieve better radiology service in HospitalKeynote Addresses: Radiation from Medical Imaging: A Hidden Epidemic and Optimizing Radiation Doses for CT |
| 2018 | Westmead Hospital Sydney Australia. Radiology Grand Rounds. Radiation from Medical Imaging: A Hidden Epidemic |
| 2018 | Westmead Childrends Hospital, Sydney Australia. Optiizing Radiation Doses For Pediatric CT |

<u>National</u>

| | |
|---|---|
| 2000 | American College of Medical Genetics |
| 2000 | Society of Radiologists in Ultrasound |
| 2000 | Society for Health Services Research in Radiology |
| 2001 | Society of Radiologists in Ultrasound Annual Meeting |

6

| | |
|---|---|
| 2001 | Society for Health Services Research in Radiology |
| 2002 | Society of Radiologists in Ultrasound |
| 2003 | Breast Cancer Surveillance Consortium |
| 2003 | Society of Radiologists in Ultrasound |
| 2003 | Centers for Disease Control and Prevention |
| 2003 | RSNA 88th Scientific Assembly and Annual Meeting |
| 2004 | Institute of Medicine (IOM): Saving Women's Lives |
| 2004 | Breast Cancer Surveillance Consortium |
| 2005 | Improving Mammographic Quality Standards Institute of Medicine (IOM) |
| 2006 | Beth Israel Deaconess Medical Center, Grand Rounds |
| 2006 | National Institute Child Health and Human Development |
| 2007 | National Cancer Institute, National Institute of Health  (x2) |
| 2008 | Mount Sinai Urban Health Institute; Metro Chicago Breast Cancer Taskforce, Partnerships in Translation: Advancing Research and Clinical Care |
| 2008 | University of Washington, Seattle, Washington, Grand Rounds, and Visiting Professor, |
| 2008 | HMO Research Network Conference (4th annual), Danville, Pennsylvania |
| 2009 | Society of Radiologists in Ultrasound, National Conference on Management of Ovarian Cysts |
| 2009 | Canadian Forum for the Earlier Detection and Diagnosis of Breast Cancer |
| 2010 | Center for Disease Control & Prevention, Annual Cancer Registry Meeting, Atlanta, Georgia |
| 2010 | HMO Research Network conference, Emerging Frontier in Healthcare, Research Delivery, Austin, Texas |
| 2010 | National Council on Radiation Protection (NCRP), Communication of Radiation Benefits and Risks in Decision Making |
| 2010 | National Cancer Institute, Board of Scientific Advisors, Bethesda, Maryland |
| 2010 | American Statistical Association Conference on Radiation Health, Annapolis, Maryland |
| 2010 | Breast Cancer Surveillance Consortium Annual Meeting, Washington, D.C. |
| 2010 | Kaiser Permanente: National Radiology Leadership Group, held at the RSNA, Chicago, IL |
| 2011 | Cleveland Clinic, Health Care Quality Innovation, Cleveland, Ohio |
| 2011 | Auntminnie.com, Live WebEx Conference RADEXPO 2011 |
| 2011 | University of New Mexico, Visiting Professor, External Reviewer, Resident Research Day |
| 2011 | Oregon Health Sciences University, Department of Emergency Medicine, Grand Rounds |
| 2012 | Society for Imaging Informatics for Medicine (SIIM), San Francisco, CA |
| 2012 | Brown University, Grand Rounds, Emergency Medicine, RI Hospital, Providence, RI |
| 2012 | Society for Imaging Informatics in Medicine (SIIM), Los Angeles, CA |

| 2012 | PharmMed OUT, Georgetown University, Washington, DC |
| 2012 | Agency for Healthcare Research and Quality, Rockville, MD |
| 2012 | Radiology Society of North America, expert witness in full day mock trial focused on radiation safety and whether radiologists need to communicate risks to patients, Chicago, IL |
| 2012 | University of Pennsylvania, Grand Rounds, Emergency Medicine, Philadelphia, PA |
| 2013 | Radiology Society of North America (RSNA), Controversies Session, CT Radiation and Risk: How Certain Are We of the Uncertainty? Chicago, IL |
| 2013 | American Cancer Society, Doc Talk Lecture Series |
| 2013 | Association of University Radiologists (AUR), Comparative Effectiveness and Patient-centered Outcomes Research, Los Angeles, CA |
| 2014 | Cancer.net Podcast, "CT Scans and Cancer Risk", Available Online at http://www.cancer.net/blog/2014-10/ct-scans-and-cancer-risk |
| 2014 | Oregon Chapter, American College of Emergency Physicians, Portland, Oregon |
| 2015 | Women in Government Foundation (non-profit, non-partisan organization of all U.S. female state legislators) Diagnostic Imaging. Increasing Its Effectiveness and Safety, at 16th Annual Southern & Eastern Regional Conference, Charleston S Carolina |
| 2016 | Lindeberger Cancer Center, University of North Carolina, Chappil Hill NC, Radiation From Medical Imaging: A Hidden Epidemic |
| 2017 | American Urological Association (AUA) Quality Improvement Summit, Baltimore Maryland Keynote Address.  Imaging Wisely: Improving the Value of Medical Imaging |

Regional Presentations (selected)

| 2000 | Kaiser Permanente Department of Genetics, Oakland CA |
| 2001 | San Francisco State University, SF CA |
| 2001 | UCSF, San Francisco General Hospital, Department of Medicine, Grand Rounds |
| 2001 | American College of Obstetrics and Gynecology |
| 2002 | UCSF Breast Oncology Program Comprehensive Cancer Center Grand Rounds |
| 2003 | UCSF Obstetrics and Gynecology Grand Rounds, SF CA |
| 2004 | UCSF Multi-Department Symposium. Racial Disparity and Breast Cancer, SF CA |
| 2004 | UCSF Quality of Breast Cancer Care Symposium, SF CA |
| 2005 | Sisters Network, San Francisco (African American Advocacy Organization) |
| 2005 | Stanford University, Department of Health Research and Policy, Grand Rounds, Palo Alto CA |
| 2006 | UCSF, Lunch and Learn: San Francisco Community Outreach, SF CA |
| 2006 | Bay Area Health Care and Quality Outcomes, San Francisco, CA |
| 2007 | California Breast Cancer Research Symposium, Los Angeles, CA |
| 2010 | Bay Area Clinical Research Symposium, Plenary Speaker, San Francisco CA |

| 2011 | UCSF Department of Medicine Grand Rounds, San Francisco, CA |
| 2011 | San Francisco General Hospital Department of Medicine, Grand Rounds, San Francisco, CA |
| 2011 | UCSF, Department of Urology Grand Rounds, San Francisco, CA |
| 2011 | UCSF Department of Radiology Grand Rounds, San Francisco, CA |
| 2011 | Eden Hospital, Department of Medicine Grand Rounds, Alameda, CA |
| 2011 | Stanford Hospital, Department of Medicine, Grand Rounds, Palo Alto, CA |
| 2011 | Kaiser Permanente Medical Center, Multi-departmental Grand Rounds, San Francisco, CA |
| 2011 | UCSF Institute for Health Policy Studies, San Francisco, CA. |
| 2012 | Kaiser Permanente Medical Center, Grand Rounds, San Francisco, CA |
| 2012 | Kaiser Permanente Medical Center, Grand Rounds, Oakland, CA |
| 2012 | Massachusetts General Hospital, Department of Emergency Medicine, Grand Rounds Boston, |
| 2012 | Beth Israel Hospital, Department of Emergency Medicine Grand Rounds, Boston, MA |
| 2012 | Univ. of California Office of the President, Quality Improvement and Technology, Oakland, CA |
| 2012 | UCSF, Department of Radiation Oncology, Grand Rounds, |
| 2012 | Southern California Kaiser Radiology Chiefs Grand Rounds, |
| 2014 | UCSF, Endocrine Grand Rounds, San Francisco, CA |
| 2015 | California Society of Radiology Technologists, Annual Meeting, San Francisco, CA Keynote Address. Radiation from CT: A Hidden Epidemic. Strategies to minimize doses: What technologists can do? |
| 2016 | Society of Radiology in Ultrasound, Annual Meeting, Baltimore Maryland.  Risk of Thyroid Cancer Based on Thyroid Ultrasound Imaging Characteristics |
| 2016 | UCSF, Breast Oncology Program, Radiation from Medical Imaging: A Hidden Epidemic and Approaches for Improving. |
| 2016 | UCSF Mini-Medical School Radiation Safety and Medical Imaging |
| 2017 | University of California Davis, Radiology Grand Rounds, Radiation from Medical Imaging; A Hidden Epidemic |
| 2017 | UCSF: Stand Up for Science: Panel Discussant |

## GOVERNMENT AND OTHER PROFESSIONAL SERVICE (selected)

| 2002 - 2003 | CDC, National Breast and Cervical Cancer Early Detection Program, Planning Committee |
| 2002 - 2005 | Cochrane Collaboration Screening and Diagnostic Tests, Methods Working Group |
| 2003 - 2003 | Radiology National Boards, Examination Question Writer |
| 2003 - 2010 | National Cancer Institute, Physician Data Query (PDQ) |

9

| 2004 - 2005 | CDC, National Breast and Cervical Cancer Early Detection Program, Panelist, Committee on Assessment of Covered Benefits, Expert |
| 2007 - 2010 | California Health Benefits Review Program (CHBRP) |
| 2008 - 2011 | Center for Scientific Review, NIH, Health Services Organization and Delivery Study Section |
| 2010 - 2011 | American Board of Medical Specialties, American Board of Radiology, American College of Radiology, and Physician Consortium for Performance Improvements. Patient Radiation Dose Work Group |
| 2010 | Congressional Hearing, US House of Representatives, Energy and Commerce, Subcommittee on Health. Medical Radiation: An Overview of the Issues. Expert Witness |
| 2010 | Food and Drug Administration, Center for Devices & Radiological Health, National Meeting Focus on Radiation Safety, Presenter |
| 2010 - 2011 | National Quality Forum, Imaging Efficiently Steering Committee |
| 2011 - 2012 | Institute of Medicine Committee on Breast Cancer and the Environment, commissioned report "Temporal Changes in Ionizing Radiation and Estimate of Contributions to Breast Cancer," contributing author |
| 2010 - 2011 | Lung Cancer Screening with CT Evidence Review Committee. Multidisciplinary collaboration, including American Cancer Society, American College of Chest Physicians; American Society of Clinical Oncology & The National Comprehensive Cancer Network |
| 2011 - 2016 | International Council on Radiation Protection (ICRP), Task Group 79 on Defining Effective Dose Use in Medicine |
| 2012 | Congressional Hearing, US House of Representatives, Energy and Commerce, Subcommittee on Health, hearing on the Consistency, Accuracy, Responsibility, and Excellence in Medical Imaging and Radiation Therapy (The CARE Bill), Expert Witness |
| 2012 | Centers for Disease Control and Prevention, Cancer Prevention Work Group |
| 2012 - 2014 | The Joint Commission, Diagnostic Ionizing Radiation and Magnetic Resonance work group focused on issues of safety and guideline development |
| 2013 | Government Accountability Office: Medicare Imaging Accreditation Establishing Minimum National Standards and an Oversight Framework to Ensure Quality and Safety of Advanced Diagnostic Imaging Services, May 2013, Contributor |
| 2014 | International Atomic Energy Agency (IAEA) United Nations General Assembly and Security Council. Special Committee Considering Impact of Low Dose Radiation |
| 2015 | Council of Distinguished Investigators of the Academy of Radiology Research |

# UNIVERSITY AND PUBLIC SERVICE

## Service Narrative

There are several activities to which Dr. Smith-Bindman has contributed. For seven years she participated in the NCI sponsored Physicians Data Query (PDQ), an NCI committee charged with presenting evidenced based, on-line, widely accessible and widely disseminated guidelines relating to cancer screening and diagnosis. She

participated in several activities related to breast cancer screening including acting as a reviewer for the CDC on assessing the guidelines for the National Breast and Cervical Cancer Detection Program, participating in coverage decisions, acting as reviewer and content expert for the CA Health Benefits Review Program analyzing several bills before the state legislature that would expand breast cancer screening to include MRI, and participating in the creation of several IOM Reports. She has participated in several community projects, such as acting on the board of an African American breast cancer advocacy group, and as a consultant to the Metropolitan Breast Cancer Task Force, charged with improving breast cancer mortality rates and racial disparities. During the last five years She has been very active in local, statewide and national efforts around improving radiation safety, including invited presentations to the FDA, testifying before the US Congress on two occasions, working with innumerable societies and government organizations on guidelines and submitting two endorsed quality measures on radiation safety to the National Quality Forum. Her involvement in service activities within the University have focused on increasing the quality and quantity of translational research through participation in several University-wide task forces. Dr. Smith-Bindman serves on several Medical Center Committees, focusing on improved oversight and stewardship around radiation, and projects to improve the efficiency and effectiveness with CT.

## UNIVERSITY SERVICE (selected)

| | |
|---|---|
| 2001 - 2015 | UCSF School of Medicine, Faculty Recruitment Committees, Radiology, Rad Onc, Medicine |
| 2002 | UCSF School of Medicine Dean's Leadership Retreat, Santa Cruz |
| 2003 | University of California, Blueprint for Regional Excellence in Breast Cancer Care |
| 2003 | UCSF School of Medicine Task Force, Future of UCSF and Mission Bay |
| 2003 | UCSF Medical Center, Hospital Exceptional Physician Award, Committee Co-Chair |
| 2003 - 2004 | UCSF School of Medicine Task Force, Physician Scientist Program Clinic-Based |
| 2003 - 2005 | UCSF School of Medicine Faculty Council |
| 2005 | UCSF School of Medicine, Dean's Leadership Retreat, Santa Cruz, CA |
| 2005 - 2006 | UCSF Department of Radiology Seminars and Presentation Committee |
| 2005 - 2008 | UCSF Department of Radiology Annual Research Symposium Abstract Review Committee |
| 2005 - 2009 | UCSF Department of Radiology, SEED Grant Review Committee |
| 2006 - 2007 | UCSF Pathways for Clinical and Translational Research |
| 2008 - 2010 | UCSF Pathways to Discovery, Clinical and Translational Research, Advisory Council |
| 2007 - 2010 | University of California, Office of the President, CA Health Benefits Review Program |
| 2009 - 2017 | UCSF, Radiation Safety Committee |
| 2012 - 2014 | UCSF Department of Radiology, Maintenance of Certification Committee |
| 2012 - 2015 | UCSF Medical Center, Center for Health Care Value |
| 2013 - 2017 | UCSF School of Medicine, Conflict of Interest Advisory Committee |
| 2014 - 2016 | UCSF Clinical Enterprise, Strategic Plan, Committee for Continuous Process Improvement |
| 2015 - 2017 | UCSF Clinical Enterprise, Utilization Management Committee |

## PUBLIC SERVICE

| | |
|---|---|
| 2003 – 2007 | SF Sisters, an African American breast cancer advocacy group, board member |
| 2008 - 2008 | Metropolitan Chicago Breast Cancer Task Force, Chicago IL, unpaid consultant |
| 2011 - 2014 | National Quality Form, National Consensus Standard for Patient Safety. Measure Developer "UCSF CT Radiation Dose Patient Safety Measure" Measure endorsed |
| 2015 | National Quality Forum, Pediatric Measures. Measure Developer, "Pediatric Computed Tomography Radiation Dose" Measure endorsed |

## TEACHING AND MENTORING

### Teaching Narrative

Dr. Smith-Bindman spends substantial time mentoring trainees in clinical research. The trainees have ranged in experience from high school students through mid-career UCSF faculty. The individuals have come from a broad range of departments at UCSF including Radiology, Internal Medicine, Hospital Medicine, Emergency Medicine, Obstetrics and Gynecology, and Urology, and have also come from the UCSF Medical School, The University of California Berkeley, and local SF high schools. On average, she meets with each trainee 1-2 hours per week while collaborating. An NIH Mid-Career Investigator Award (K24) supported her time mentoring these individuals.

She teaches in several formal classes in the department of Epidemiology and Biostatistics primarily targeted to post graduate students who are completing a master's degree in clinical research. She is actively engaged in teaching the Radiology residents and fellows while attending on the clinical service and provides frequent lectures to the Radiology residents focused at research methods; frequently teaches in courses organized by the UCSF Office of Continuing Medical Education for both radiology courses and courses within other medical specialties. The radiology courses focus on using evidence to interpret our studies (usually focused on ultrasound topics), the lectures for other medical specialties focused on how to use imaging more appropriately. As listed above, she also frequently gives grand rounds within UCSF, and nationally on using imaging more appropriately. Lastly, she organized and ran a large, ongoing, virtual symposium on Radiation Safety described below. Both the content and format of this meeting were novel.

## TEACHING

### Formal scheduled classes for UCSF students.

The first class listed is a course for UCSF Medical Students. The remaining are part of the coursework offered within the UCSF Masters in Clinical Research Program, Department of Epidemiology and Biostatistics

| Year | Title | Role | Class Size |
|---|---|---|---|
| 2002 - 2005 | Epidemiology and Biostatistics, UCSF School of Med | Section Leader | 20 |
| 2005 | Introduction to Diagnostic Testing | Lecturer | 18 |
| 2007 - 2008 | Clinical Performance and Health Outcome Measurement | Lecturer | 20 |
| 2011 - 2014 | Translating Evidence into Policy: Theory and Design | Lecturer | 30 |
| 2010 - 2015 | Framing Research to Influence Policy | Lecturer | 25 |

12

Post Graduate CME courses (1-5 lectures/meeting)

| 2001 | UCSF Obstetrics and Gynecology Update, San Francisco, CA |
| 2001 | UCSF Primary Care Medicine, Aspen, CO |
| 2001 | Primary Care Medicine, Maui, HI |
| 2001 | Management of the Hospitalized Patient, San Francisco, CA |
| 2001 | Controversies in Women's Health, San Francisco, CA |
| 2001 | Diagnostic Imaging in Women's Health, San Francisco, CA |
| 2001 | MRI & Ultrasound Imaging, Lake Tahoe, CA |
| 2002 | Obstetrics and Gynecology Update, San Francisco, CA. |
| 2002 | 17th Annual Primary Care Medicine: Concepts and Controversies, Aspen, CO |
| 2002 | 10th Annual Controversies in Women's Health, San Francisco, CA |
| 2002 | Diagnostic Imaging in Women's Health, San Francisco, CA |
| 2002 | Diagnostic Imaging, Maui, HI |
| 2002 | Obstetical, Gynocological and Abdominal Ultrasound, San Francisco, CA |
| 2003 | Primary Care Medicine, Diagnostic Imaging in Women's Health, Maui, HI |
| 2003 | 11th Annual Controversies in Women's Health, San Francisco, CA |
| 2003 | Diagnostic Imaging for Disease Prevention, San Francisco, CA |
| 2003 | 46th Annual Diagnostic Radiology Postgraduate Course, San Francisco, CA |
| 2003 | OB/GYN and Abdominal Ultrasound, San Francisco, CA |
| 2003 | MRI and Ultrasound by the Lake, Lake Tahoe, CA |
| 2004 | Women's Imaging, Sonoma, CA |
| 2004 | Primary Care Medicine, Maui, HI |
| 2004 | Diagnostic Imaging in Clinical Practice, San Francisco, CA |
| 2005 | Obstetrical and Gynecologic Sonography, San Francisco, CA |
| 2005 | Radiology Spring Training, Scottsdale, Arizona |
| 2005 | Abdominal Imaging, Montreal and Quebec, Canada |
| 2006 | Controversies in Women's Health, San Francisco, CA |
| 2006 | Controversies in Breast Cancer Screening and Diagnosis, San Francisco, CA |
| 2006 | Cutting Edge Radiology, Diagnosis and Intervention, Vancouver, Canada |
| 2008 | Primary Care Medicine: Update 2008, San Francisco, CA |
| 2008 | Diagnostic Imaging in Women's Health, San Francisco, CA |
| 2008 | Obstetrical/Gynecological and Abdominal Sonography, San Francisco, CA |
| 2009 | Primary Care Medicine: Update 2008, San Francisco, CA |

| 2009 | Obstetrical/Gynecological and Abdominal Sonography Update, San Francisco, CA |
| 2011 | Imaging of Kidney Stones, San Francisco, CA, Director |
| 2011 | Primary Care Medicine, Principles & Practice, San Francisco, CA, Keynote |
| 2011 | 39th Annual Advances in Internal Department of Medicine, San Francisco, CA, Keynote |
| 2011 | Controversies in Women's Health, Department of Medicine, San Francisco, CA, Keynote |
| 2012 | Updates on Imaging, Maui, Hawaii |
| 2013 | UCSF Otolaryngology Annual Conference, San Francisco, CA |
| 2017 | UCSF Practical Body Imaging, Kona, Hawaii |

## Other Teaching

Radiation Safety and CT: Virtual Symposium. Innovative on-line Interactive CME course targeted to physicians (radiologists and those who order imaging), technologists, medical physicists, and trainees.  This was created as an on-line, free, virtual meeting focuses on radiation safety. The initial creation of this virtual meeting began in 2013. Creating the meeting involved creating a multidisciplinary, on line, virtual meeting with over 100 lectures (see list of lectures, now offered freely on line - http://rorl.ucsf.edu/speakers ), 10 live interactive sessions/chat rooms and over 500 registrants enrolled in the meeting during the "live days", and ongoing attendees attend each month. The speakers at the meeting included numerous department chairs, the director of the Agency for Health Care Policy at the time, a US Congressman, leaders from numerous societies, The Joint Commission, The American Board of Internal Medicine Foundation, and innumerable scientific experts on diverse patient safety issues, and the meeting was an integration of diverse viewpoints and perspectives. Dr. Smith-Bindman directed this meeting and personally wrote and delivered 7 lectures for the meeting. The meeting was novel in format and content.

## MENTORING

Pre-doctoral students directly supervised

| Dates | Name | Program or School | Current Position |
|---|---|---|---|
| 2004 - 2005 | C. Kagay | UCSF Medical School | Radiologist, Private Practice |
| 2005 - 2006 | A. Ding | UCB/ UCSF MD/MPH | MGH |
| 2005 - 2008 | A. Venkatesan | UCSF Medical School | Resident, Stanford |
| 2006 - 2007 | E. Dinkelspiel | Urban High School | Student, Univ. of Chicago |
| 2011 - 2015 | J. Keegan | Lick Wilmerding High | San Luis Obispo College |
| 2010 - 2015 | P. Mehta | UC Berkeley/UCLA Med School | UCLA Medical School |
| 2012 - 2013 | J. Zhang | UC Berkeley | Senior |
| 2014  summer | A. Fraser | University High | Georgetown College |

Postdoctoral fellows and residents directly supervised

| Dates | Name | Position | Current Position |
|---|---|---|---|
| 1998 - 2000 | M. Copanigro, MD | Radiology Resident / Fellow | Private Practice |

14

| | | | |
|---|---|---|---|
| 1998 - 2000 | N. Vincoff, MD | Radiology Resident / Fellow | Private Practice |
| 2003 - 2004 | E. Weiss, MD | OB GYN Resident | Private Practice |
| 2003 - 2005 | K. Schueler, MD | RORL Research Fellow | Private Practice |
| 2003 - 2005 | D. Haggstrom, MD | Internal Medicine Fellow | Indiana University, Faculty |
| 2005 - 2006 | K. Reid, MD | Internal Medicine Fellow | Emory Faculty |
| 2005 | A. Jensen | PhD student, Copenhagen | Faculty |
| 2005 - 2006 | B. Ching, MD | Radiology Fellow | Private Practice, |
| 2005 - 2006 | A. Cole, MD | Radiology Fellow | Private Practice |
| 2005 - 2007 | L. Goldman, MD | Internal Medicine Fellow | UCSF Faculty |
| 2006 - 2010 | J. Lipson, MD | Radiology T32 Scholar | Stanford Faculty |
| 2007 - 2008 | J Stengel, MD | Radiology Fellow | Private Practice |
| 2007 - 2008 | A. Heath, MD | RORL Research Fellow | Private Practice |
| 2007 - 2009 | R. Cho, MD | Radiology Fellow | Private Practice |
| 2007 - 2009 | D. Sellami, MD | Radiology Resident / Fellow | Private Practice |
| 2008 - 2009 | A.  Kamath, MD | Radiology T32 Scholar | NYU Faculty |
| 2009 - 2010 | J Ching, MD | OB GYN Resident | Faculty |
| 2009 - 2011 | N, Brasic, MD | Radiology Fellow | UCSF Faculty |
| 2010 - 2011 | D. Sridhar, MD | Radiology Resident | Private Practice |
| 2010 - 2012 | P. Lebda, MD | Radiology Fellow | Cleveland Clinic Faculty |
| 2010 - 2013 | I. Burger, MD | Radiology Resident | Private Practice |
| 2010 - 2013 | G. Merry, MD | Radiology Resident | Private Practice |
| 2011 - 2014 | J. Mongan, MD PhD | Rad Resident / Fellow | UCSF, Faculty |
| 2013 - 2014 | S. Hou, MD | Radiology Resident | NYU Faculty |
| 2013 - 2014 | C. Lee, MD | Radiology Resident | UCSF Faculty |
| 2013 - 2014 | T. Morgan, MD | Radiology Resident | UCSF Faculty |
| 2013 - 2015 | LA Hampton, MD | Urology Resident / Fellow | Fellow, Wash U |
| 2013 - 2015 | V. Arasu, MD | Radiology Resident | Resident |
| 2013 - 2015 | N. Benedetti, MD | Radiology Resident | University of Wash Faculty |
| 2014 - 2015 | B Carpenter, MD | Radiology Fellow | UCSF Faculty |
| 2014 - 2015 | J. Hsu, MD | Radiology Fellow | Private Practice |
| 2014 - 2018 | J. Demb | Epidemiology | UCSF |

Faculty Mentoring

| Dates | Name | Department / Section | Current Position |
|-------|------|----------------------|------------------|
| 2002 - 2005 | John Shepherd, MD | Radiology / Musculoskeletal | UCSF, Faculty, Radiology |
| 2004 - 2005 | Elaina Curtis, MD | UCSF Visiting Fellow | Univer. of Auckland Faculty |
| 2005 - 2006 | John Stein, MD | Emergency Medicine | UCSF Faculty, Emerg Med |
| 2005 - 2006 | Max Wintermark, MD | Radiology / Neuro | UVA, Faculty, Radiology |
| 2007 - 2013 | Lauren Goldman, MD | Internal Medicine | UCSF, Faculty, Medicine |
| 2008 - 2011 | Larry Rand, MD | OBGYN / Maternal Medicine | UCSF, Faculty, OBGYN |
| 2008 - 2014 | Antonio Westphalen, MD | Radiology / Abdominal Imaging | UCSF, Faculty, Radiology |
| 2009 - 2017 | Liina Poder, MD | Radiology / Abdominal Imaging | UCSF, Faculty, Radiology |
| 2010 - 2018 | Ralph Wang, MD | Emergency Medicine | UCSF Faculty, Emerg Med |
| 2014 - 2018 | John Mongan, MD, PhD | Radiology / Abdominal Imaging | UCSF, Faculty, Radiology |
| 2014 - 2017 | Cindy Lee, MD | Radiology / Abdominal Imaging | UCSF, Faculty, Radiology |
| 2014 - 2017 | Tara Morgan, MD | Radiology / Abdominal Imaging | UCSF, Faculty, Radiology |
| 2014 - 2018 | Maureen Kohi, MD | Radiology / Interventional | UCSF, Faculty, Radiology |
| 2015 - 2018 | Ben Franc, MD PhD | Radiology / Nuclear Medicine | UCSF, Faculty, Radiology |
| 2017 - 2018 | Brian Haas MD | Radiology | UCSF, Faculty, Radiology |

## RESEARCH AND CREATIVE ACTIVITIES

### Research Narrative

Dr. Smith-Bindman's research focuses on understanding the impact of diagnostic testing on patient outcomes. She is the director of the UCSF Radiology Outcomes Research Laboratory, and her team includes several programmers, biostatisticians, a developer, and a handful of epidemiologists who serve as project managers for the funded grants below. Her research expertise is in areas of epidemiology, technology assessment, outcomes research, comparative effectiveness research, health services research, and dissemination and implementation sciences focused on imaging. The research has focused on evaluating the quality, utilization, accuracy, predictive values and impact of diagnostic testing on patient health, and has quantified both the risks and benefits of medical imaging when used in different contexts and by different populations. I am leading several studies that assess and standardize the radiation dose used for CT scanning, in order to minimize doses, without loss of diagnostic accuracy. Additional current research is focused on putting systems-based solutions in place to standardize the use of imaging. For example, ongoing projects focus on improving decision support provided to physicians to help improve the use of testing, using evidence to drive and guide the change in practice, and determining the optimal surveillance strategy for the follow up of incidental findings seen on CT imaging. The research projects she leads, listed below, are typically collaborative, involving researchers from diverse clinical areas and who offer diverse methodological expertise.

## RESEARCH AWARDS

<u>Current</u>

**PI**                                                                07/02/2014 - 06/30/2019
NIH                                                                   $1,140,000 direct/yr1
**CT DOSE Collaboration: Partnership for Dose**      **$7,900,000 total**

*Collaboration across the US and Europe to standardize and optimize the doses used for CT. The study uses a novel randomized controlled trial design to compare simple feedback to a multicomponent intervention as strategies to optimize doses. There are approximately 125 hospitals participating in the trial.*

**PI**                                                                09/02/2013 - 08/31/2016
PCORI (Patient Centered Outcomes Research Institute)                  $492,163 direct/yr1
**CT Radiation Dose Registry to Ensure a Patient Centered**     **$2,069,365 total**
**Approach for Imaging**

*Collaboration across the US and Europe to create benchmarks and standards for CT by pooling data from a large number of hospitals and outpatient facilities*

**PI**                                                                3/01/2015- 02/28/2020
NIH                                                                   $1,834,410 direct/yr1
**Risk of Cancer in Childhood Associated with Medical Imaging**     **$10,600,000 total**

*Retrospective cohort across large integrated health care systems to assess imaging in pregnant women and children and to quantify the risk of childhood and adolescent cancer associated with these exposures.*

**PI**  (co-PI with Gould, Kaiser Foundation Research)                4/01/2015- 03/30/2020
PCORI
**Pragmatic Trial of More versus Less Intensive Strategies for**     **$14,458,936 total**
**Surveillance of Patients with Small Pulmonary Nodules**

*Prospective comparative effectiveness study across 15 health care systems to compare different strategies for the surveillance of lung nodules. The study is novel in that patients will be recruited with routine clinical care at imaging and the creation of systematic quality improvement strategies to ensure no loss to follow up.*

<u>Past</u>
**PI**                                                                10/01/2010 - 09/30/2013
AHRQ                                                                  $4,830,368 direct/yr1
**RCT of US versus CT for Patients with Suspected Renal Colic**     **$9,210,000 total**

*15 Center randomized pragmatic comparative effectiveness trial comparing different strategies for imaging patients with suspected kidney stones. The study exceeded enrollment and follow up targets, and the primary results were published in the NEJM in 2014. Many additional analyses are ongoing using these data.*

**PI**                                                                09/01/2008 - 07/31/2015
NIH K24                                                               $172,000 direct/yr1
**Mid-Career Development Award: Risk of Cancer Associated with**     **$868,632 total**
**Incidental Findings**

**PI**                                                                07/01/2011 - 07/01/2014
University of California Office of the President, CHQI                $250,000 direct/yr1
**Standardization and Optimization of CT Radiation Dose**     **$750,000 total**

17

**Across the University of California Medical Centers.**
*Five-center observational study to collect radiation data across the five University of California campuses using automated techniques, analyze the sources of variation in dose, and conduct quality improvement initiatives to standardize practice*

**PI**                                                        09/30/2012 - 09/29/2014
CDC (Centers for Disease Control and Prevention)             $250,000 direct/yr1
**PEDS CT-DOSE: Pediatric CT Dose Optimization and**         **$500,000 total**
**Standardization Endeavor**
*Ten center observational study to collect radiation data and create benchmarks in children*

**Co-Investigator** (PI Solberg, Health Partners)            07/01/2012 - 06/30/2014
PCORI (Patient Centered Outcomes Research Institute)         $250,000 direct/yr1
**Measuring Patient Outcome from High Tech Imaging Studies**  **$500,000 total**

*Mixed methods study to understand imaging use, positive rates of imaging and patient perspectives on imaging, with respect to identifying patient centered outcomes important to patients.*

**PI**                                                        04/01/2009 - 03/31/2011
NIH / R21                                                    **$317,000 total**
**Risk of Cancer with Incidental Findings Identified on US Imaging**

*Retrospective cohort to understand cancer risks of incidental findings*

**PI**
NIH / R21                                                    09/01/2008 - 08/31/2010
**Radiation Exposure from Imaging: are Doses in a Carcinogenic**  **$317,000 total**
**Range**

*Retrospective cohort to understand use of medical imaging within integrated health care systems*

**PI**                                                        10/01/1999 - 07/01/2005
DOD                                                          **$725,515 total**
**Outcomes of Screening Mammography in Elderly Women**

*Medicare Data were analyzed to determine utilization of mammography and factors influencing survival*

**PI**
NIH K07                                                      09/01/1999 - 06/01/2005
**Outcomes of Screening Mammography in Elderly Women**        **$635,687 total**

*NIH Career development award to study breast cancer screening among elderly women.*

**PI**
California Breast Cancer Research Program                    07/01/2003 - 02/01/2007
**Racial Disparity in Breast Cancer Mortality**              **$583,287 total**

*Retrospective cohort to understand the causes for racial disparity in breast cancer outcomes*

**Co-Investigator** (PI Kerlikowske UCSF)                04/01/2000 - 03/31/2005
NIH, U01                                                 **$3,100,000 total**
**San Francisco Mammography Registry: A Research Resource**

*Dr. Smith-Bindman project lead on 1) Physician Predictors of Mammography Accuracy and 2) Validation of the Medicare Screening Algorithm*

**Co-Investigator**  (PI – McCune, UCSF)
NIH                                                      09/30/2006 - 06/30/2011
**Clinical and Translational Science Institute (CTSI)**

*The grant is to enhance training and infrastructure across UCSF. I participate in the Biomedical Informatics Program to educate trainees about imaging, epidemiology and study design*

**Co-Investigator** (PI- Lu, UCSF)
**NIH**                                                  **04/01/2006 - 03/01/2009**
**Statistical Methods for Evaluation and Validation of Tests**

**Co-Investigator** (PI Tlsty, UCSF))
NIH                                                      10/01/2005 - 09/30/2010
**Biological Basis of Breast Density and Breast Cancer Risk**

**Co-Investigator** (PI Esserman, UCSF)                  05/01/2003 - 04/30/2007
Department of Defense/USAMRC                             **$6,900,000 total**
**Blueprint for Regional Excellence in Breast Cancer Care**

**PI**                                                   01/01/2002 - 12/01/2006
Women's Health Research Center, UCSF                     **$70,000 total**
**Down Syndrome Screening in the US**

**PI**                                                   04/01/2001 - 04/01/2003
Society of Radiologists in Ultrasound                    $**40,000 total**
**Prenatal Ultrasound for Detection of Birth Defects and Chromosome Abnormalities**

**PI**
Society of Radiologists in Ultrasound                    04/01/2001 - 04/01/2004
**Physician Variation in Ultrasound Accuracy**           **$30,000 total**

**PI**                                                   07/01/2000 - 06/01/2001Radiologic
Society of North America                                 **$40,000 direct/yr1**
**U.S. U.K Comparison of The Accuracy of Screening Mammography**

**P
I**
Radiologic Society of North America                      07/07/1999 - 06/01/2000
**Prenatal diagnostic ultrasound for the detection of chromosomal**   **$35,000 direct**
**Abnormalities**

19

**MOST SIGNIFICANT RESEARCH PUBLICATIONS**

**1)      Smith-Bindman et al.  Endovaginal ultrasound to evaluate endometrial abnormalities <u>JAMA</u> 1999**
*Vaginal bleeding affects 7% of post-menopausal women, and historically women have undergone an invasive endometrial biopsy to exclude a diagnosis of cancer.  This meta-analytic review found that endovaginal ultrasound is an easily tolerated non-invasive test that is accurate for the diagnosis of cancer, so that most women can avoid the need for an endometrial biopsy if they have a normal ultrasound test result.  These results have been integrated into clinical practice guidelines in the US, Scotland, England, Germany, and Hong Kong. The publication has been cited 427 times based on SCOPUS accessed in 2015.*

**2)      Smith-Bindman et al. Second-trimester ultrasound to detect fetuses with Down syndrome: a meta-analysis. <u>JAMA.</u> 2001.** *Prenatal ultrasound is widely used to screen for Down syndrome, but the impact on patients has not been well studied.  This meta-analytic review suggests that the use of ultrasound for the detection of fetuses affected by Down syndrome may be associated with more harm than benefit, as it can lead to large numbers of unnecessary amniocenteses and subsequent fetal losses with little evidence of benefits. This article was accompanied by extensive media coverage (AP, Reuters, NY Times), and controversy, and prompted discussion regarding the role of ultrasound in prenatal diagnoses.  The manuscript has been cited 217 times based on SCOPUS accessed in 2015.*

**3)      Smith-Bindman R et al. US-UK Comparison of Screening Mammography. <u>JAMA</u> 2003.** *Screening mammography is an imprecise test, and there are considerable differences between physicians and programs in the accuracy of screening. This international comparison of screening mammography described 5.5 million mammograms obtained between 1996 to 1999 within three large-scale mammography registries or screening programs. Recall rates and open surgical biopsy rates were twice as high in the U.S. as in the U.K., although cancer rates were nearly identical. There was extensive media coverage (AP, Reuters, NY Times, Wall Street Journal, National Public Radio). These results have been widely cited, and were included in the IOM Report, "Saving Women's Lives." The publication was cited 223 times based on SCOPUS accessed in 2015.*

**4)      Smith-Bindman et al.  Physician Predictors of Mammographic Accuracy. <u>J Natl Cancer Inst</u> 2005.**
*Beyond the issues raised about the collective quality of mammographic screening in the United States, even more pronounced concern is the glaring variation among U.S. physicians in the ability to accurately interpretation their patients' mammograms. Dr. Smith-Bindman studied the accuracy of mammographic screening among 208 U.S. physicians, who collectively interpreted 1.2 million mammograms, and she found extraordinary variation in the interpretive abilities of radiologists; the sensitivity spanned 29% to 97%, while the false positive rate (the percentage of women who did not have cancer, but who underwent additional diagnostic testing or biopsy at their physician's recommendation) ranged from 1 to 29%. The difference in accuracy was principally due to differences in their training, experience and dedication to screening mammography; in short, the more experienced mammographers - and those who read more than the minimum number of mammograms required by MQSA guidelines - did substantially better.  These findings have already been integrated into the Institute of Medicine's report on Mammography Quality Standards, regarding Enhancement of Interpretative Performance. The manuscript was cited 82 times based on SCOPUS accessed in 2015.*

**5)      Smith-Bindman et al.  Does Utilization of Screening Mammography Explain Racial and Ethnic Differences in Breast Cancer? <u>Ann Intern Med,</u> 2006** *Racial and ethnic minorities tend to have larger, more advanced stage breast cancers at diagnosis than white women, and African American women have significantly higher breast cancer mortality. It has not been clear, however, if this is due to inherent differences in biology or the utilization of screening mammography. This paper sought to disentangle whether biology or the use of screening was largely responsible for the known racial and ethnic differences in breast cancer. This study was*

*unique in that detailed cancer information was available from tumor registries that were linked with detailed information regarding mammography utilization. The results were striking. Most of the racial and ethnic differences in breast cancer features were reduced or eliminated after accounting for the frequency of mammography screening. The manuscript was cited 175 times on SCOPUS.*

6)      **Smith-Bindman et al. Second trimester prenatal ultrasound for the detection of pregnancies at increased risk of Down syndrome. <u>Prenat Diagn</u> 2007** *Prenatal ultrasound is widely used to screen for Down syndrome, but the impact on patients has not been well studied.  Our meta-analytic review found that ultrasound was not useful and this prompted our large prospective study which evaluated ultrasound in a larger cohort, including nearly 20,000 women, in whom nearly 500 had fetuses affected by Down syndrome. This large study confirmed these preliminary results. The manuscript was cited 51 times on SCOPUS.*

7)      **Smith-Bindman et al. Radiation dose associated with common computed tomography examinations and the associated lifetime attributable risk of cancer. <u>JAMA Internal Medicine</u> 2009** *This paper documented the variation in doses associated with routine CT. The widespread media attention that this paper received contributed to active policy discussion in this area. I was invited to present and discuss the results at the FDA, at a Congressional Hearing sponsored by the Health Subcommittee of the Committee on Energy and Commerce, and innumerable professional society meetings, and submitted (and had endorsed) a measure of quality around CT imaging by the National Quality Forum. The manuscript was cited 857 times based on SCOPUS accessed in 2015.*

8)      **Smith-Bindman R, Appendix F. Ionizing Radiation Exposure to the US Population, with a Focus on Radiation from Medical Imaging, in Breast and the Environment: A Life Course Approach. <u>The Institute of Medicine</u>. 2012** The IOM was commissioned to write a report on environmental causes of breast cancer. The Komen Foundation commissioned the report. I was asked to summarize what is known about the harmful effects of ionizing radiation on breast cancer risks. The IOM concluded that ionizing radiation is one of the largest, and the most preventable causes of breast cancer.

9)      **Miglioretti DL et al. Smith-Bindman senior author. The use of computed tomography in pediatrics and the associated radiation exposure and estimated cancer risk. <u>JAMA Pediatr.</u> 2013** Using a retrospective cohort design, this paper quantified the use of imaging among children within one of 7 large integrated health care systems, quantified the radiation exposure associated with these examinations, and estimated the likely impact of improved standardization of the conduct of CT on the risks of cancer. The manuscript concluded that if the top outlying radiation exposures could be reduced to the average (a modest goal) that 40% of expected cancer could be eliminated. *The manuscript was cited 150 times based on SCOPUS accessed in 2015*

10)     **Smith-Bindman R**, **et al.  Risk of Thyroid Cancer based on Thyroid Ultrasound Imaging Characteristic: Result of A Population Based-Study. <u>JAMA Internal Medicine</u>. 2013**. This retrospective observational study documented the risk of cancer associated with specific thyroid imaging findings.  This is the first study that links a large cohort of patients with detailed imaging findings, with a comprehensive tumor registry to permit the quantification of the risk of cancer associated with specific findings. The results suggest that the number of biopsies can be reduced by up to 90%, with a relatively small impact on cancer detected.  The results are being rapidly embraced by endocrinologists, surgeons and radiologists.

11)     **Smith-Bindman et al Ultrasound versus Computed Tomography for Suspected Nephrolithiasis <u>NEJM.</u>  2014.** *This 15-center randomized comparative effectiveness study assessed whether ultrasound or CT should be the first imaging test in patients with suspected kidney stones. The study is unique in using a rigorous randomized trial design to assess a diagnostic imaging test, and in assessing a broad range of outcomes other than diagnostic accuracy. Emergency department patients with abdominal pain and suspected nephrolithiasis*

*were randomly assigned to one of three arms for imaging: ultrasound performed by an emergency medicine physician, ultrasound provided by a radiologist, or computerized tomography (CT). No significant differences were observed over the next 6 months in rates of severe serious adverse events (SAEs), related SAEs, or total SAEs, or ED or hospital admission rates at 7 or 30 days; however, initial imaging with ultrasound was associated with lower 1 day and 6-month cumulative radiation exposures than initial imaging with CT. The manuscript was cited 45 times based on SCOPUS accessed in 2015*

## PUBLICATIONS

### Peer Reviewed

1.  Block JE, **Smith R**, Black D, Tenant HK. Does Exercise Prevent Osteoporosis? JAMA 1987 257:3115-3117.

2.  Genant HK, Block JE, Steiger P, Glueer CC, **Smith R.** Quantitative Computed Tomography in Assessment of Osteoporosis. <u>Sem in Nuclear Med</u> 4 1987:316-333.

3.  Genant HK, Steiger P, Block JE, **Smith R**, Black D, Ettinger B, Harris ST. Rate of change in bone mineral content as measured by QCT, DPA and SPA in postmenopausal women. <u>J Bone Miner Res</u> 1987 25; 212.

4.  Ettinger B, Block JE, **Smith R,** Cummings SR, Harris ST, Genent HK. An examination of the association between vertebral deformities, physical disabilities and psychosocial problems. <u>Maturitas</u> 1988 10:283-96.

5.   Block JE, **Smith R**, Glueer CC, Steiger P, Ettinger B, Genant HK. Models of Spinal Trabecular Bone Loss as Determined by Quantitative Computed Tomography. <u>J Bone Miner Res</u> 1989 4:249-57.

6.  **Smith-Bindman R**, Cummings SR, Steiger P, Genant HK. A comparison of morphometric definitions of vertebral fractures. <u>J Bone Miner Res</u> 1991 6:25-34.

7.  **Smith-Bindman R**, Steiger P, Cummings SR, Genant HK. The Index of Radiographic Area (IRA): a new approach for estimating the severity of vertebral deformity. <u>Bone and Mineral</u> 1991 15:137-50

8.  **Smith-Bindman R**, Kerlikowske K, Feldstein V, Subak L, Scheidler J, Segal M, Brand R,Grady D. Endovaginal ultrasound to exclude endometrial cancer and other endometrial abnormalities: a meta- analytic review. <u>JAMA</u> 1998 280:1510-1517

9.  **Smith-Bindman, R**, Kerlikowske K, Feldstein V. Endovaginal ultrasound to evaluate endometrial abnormalities. <u>JAMA</u> 1999 281:1693-4.

10.  Vincoff N, Callen P, **Smith-Bindman R**, Goldstein R. Effect of transducer frequency on the appearance of the fetal bowel. <u>J Ultrasound Med</u> 1999 18:799-803

11.  **Smith-Bindman R**, Gebretsadik T, Kerlikowske K, Newman J. Is screening mammography effective in elderly women? <u>Am J Med</u> 2000 108:112-118, 2000

12. **Smith-Bindman R**, Hosmer W, Feldstein VA, Deeks JJ, Goldberg JD. Second-trimester ultrasound to detect fetuses with Down syndrome: a meta-analysis. JAMA 2001 285 (8):1044-55.

13. **Smith-Bindman R**, Hosmer W, Coppanigro M, Cunningham G. The variability in the interpretation of prenatal diagnostic ultrasound. Ultrasound Obstet Gynecol 2001 17:(4):326-332.

14. Goldstein RB, Bree RL, Benson CB, Benacerraf BR, Bloss JD, Carlos R, Fleischer AC,Goldstein SR, Hunt RB, Kurman RJ, Kurtz AB, Laing FC, Parsons AK, **Smith-Bindman R**, Walker J.Evaluation of woman with postmenopausal bleeding: Society of Radiologists in Ultrasound Consensus Conference Statement. J Ultrasound Med 2001 20 10;1025-1036.

15. **Smith-Bindman R**, Feldstein V, Goldberg JD. The Genetic Sonogram in Screening for Down Syndrome, J Ultrasound Med 2001 (20);1153-5.

16. **Smith-Bindman R**, Chu P, Ecker J, Feldstein V, Filly R, Bacchetti P. US evaluation of fetal growth: prediction of neonatal outcomes. Radiology 2002 223(1):153-161.

17. Shepherd JA, Kerlikowske K, **Smith-Bindman R**, Genant H, Cummings SR. Measurement of breast density with dual X-ray absorptiometry: feasibility. Radiology 2002 223(5): 554-557.

18. Prevrhal S, Shepherd JA, **Smith-Bindman R**, Kerlikowske K, Cummings SR. Accuracy of Mammographic Breast Density analysis: Results of Formal Operator Training. J Cancer, Epi. Bio. & Prev 2002 11(11); 1389-93.

19. **Smith-Bindman R**, Chu PW, Miglioretti DL, Sickles EA, Blanks R, Ballard-Barbash R, Bobo JK, Lee NC, Wallis MG, Patnick J, Kerlikowske K. Comparison of Screening Mammography in the US and the UK. JAMA 2003 290(16):2129-37.

20. **Smith-Bindman R**, Chu P, Bacchetti P, Waters JJ, Mutton D, Alberman E. Prenatal screening for Down syndrome in England and Wales and population-based birth outcomes. Am J Obstet Gynecol 2003 189(4):980-5.

21. **Smith-Bindman R**, Chu P, Ecker J, Feldstein V, Bacchetti P, Filly R. Adverse birth outcomes in relation to prenatal sonographic measurements of fetal size. J Ultrasound Med 2003 Apr 22:347-356.

22. Kerlikowske K, **Smith-Bindman R**, Barclay J, Ling BM, Grady D. Evaluation of Abnormal Mammography Results and Palpable Breast Abnormalities. Ann Intern Med 2003 139(4):274-84.

23. Ziv E, Shepherd J, **Smith-Bindman R** Kerlikowske K. Mammographic Breast Density and Family History of Breast Cancer. J Natl Cancer Inst 2003 95(7) 556-558.

24. **Smith-Bindman R**, Weiss E, Feldstein V. How thick is too thick? What endometrial thickness should prompt biopsy in an asymptomatic postmenopausal woman? Ultrasound Obstet Gynecol, 2004 June; 24:558-565

25.   **Smith-Bindman R**. Diagnostic Imaging in the Differential Diagnosis of Vaginal Bleeding and Breast Mass. Adv Stud Med 2004 (9):476-482.

26.   Ziv E, Tice J, **Smith-Bindman R**, Shepherd J, Cummings S, Kerlikowske K. Mammographic density and estrogen receptor status of breast cancer. Cancer Epidemiol Biomarkers Prev 2004 13 (12):2090-5

27.   Benn PA, Egan JF, Fang M, **Smith-Bindman R**. Changes in the utilization of prenatal diagnosis. Obstet Gynecol 2004 103(6):1255-60.

28.   **Smith-Bindman R**, Chu P, Miglioretti D, Quale C, Rosenberg R, Cutter G, Geller B, Bacchetti P, Sickles E, Kerlikowske K. Physician Predictors of Mammographic Accuracy. J Natl Cancer Inst 2005 97:358-67

29.   Kerlikowske K, **Smith-Bindman R**, Abraham LA, Lehman CD, Yankaskas BC, Ballard Barbash R, Barlow WE, Voeks JH, Geller BM, Carney PA, Sickles EA. Breast Cancer Yield for Screening Mammographic Examinations with Recommendation for Short-Interval Follow-up. Radiology 2005 234(3):684-692.

30.   **Smith-Bindman R**, Ballard-Barbash R, Miglioretti D, Patnick J, Kerlikowske K. Comparing the Performance of Mammography Screening in the United States and the United Kingdom. J Med Screen 2005 12(1): 50-54.

31.   Sickles EA, Miglioretti D, Ballard-Barbash R, Geller B, Leung J, Rosenberg R, **Smith-Bindman R**, Yankaskas B. Performance Benchmarks for Diagnostic Mammography. Radiology 2005 235(3):775-90

32.   Kerlikowske K, Creasman J, Leung JW, **Smith-Bindman R**, Ernster VL. Differences in screening outcomes among White, Chinese, and Filipino women. Arch Intern Med. 2005 165(16):1862-8

33.   Haggstrom DA, Quale C, **Smith-Bindman R**. Differences in the Quality of Breast Cancer Care Among Vulnerable Populations. Cancer. 2005 Dec 1;104(11):2347-58.

34.   **Smith-Bindman R**, Miglioretti D, Lurie N, Abraham L, Ballard Barbash R, Strzelczyk J, Dignan M, Barlow W, Beasley C, Kerlikowske K. Does Utilization of Screening Mammography Explain Racial and Ethnic Differences in Breast Cancer? Ann Intern Med, 2006 144(8):541-53.

35.   **Smith-Bindman R**, Quale C, Chu PW, Rosenberg R, Kerlikowske K. Can Medicare Billing Claims Data Be Used to Assess Mammography Utilization Among Women Age 65 and Older. Medical Care 2006 44(5):463-70

36.   Kado DM, Christianson L, Palermo L **Smith-Bindman R**, Cummings SR, Greendale GA. Comparing a supine radiologic versus standing clinical measurement of kyphosis in older women: The Fracture Intervention Trial Spine 2006 31:4;4463-467.

37.   Kagay C, Quale C, **Smith-Bindman.** Mammography Use Among the American Elderly," Am J Prev Med 2006 Aug;31(2):142-9

38.    Schell MJ, Yankaskas BC, Ballard-Barbash R, Qaqish BF, Barlow WE, Rosenberg RD, **Smith-Bindman R**. Evidence-based target recall rates for screening mammography. <u>Radiology</u> 2007;243(3):681-9

39.    **Smith-Bindman R**, Chu P, Goldberg JD. Second trimester prenatal ultrasound for the detection of pregnancies at increased risk of Down Syndrome. <u>Prenat Diagn</u> 2007;27(6):535-44.

40.    Kerlikowske K, Ichikawa L, Miglioretti DL, Buist DS, Vacek PM, **Smith-Bindman R**, Yankaskas B, Carney PA, Ballard-Barbash R; National Institutes of Health Breast Cancer Surveillance Consortium. Longitudinal measurement of clinical mammographic breast density to improve estimation of breast cancer risk. <u>J Natl Cancer Inst</u> 2007;99(5):386-95

41.    Carrell D, Miglioretti D, **Smith-Bindman R**., Coding free text radiology reports using the Cancer Text Information Extaction System (caTIES).  AMIA Annu Symp Proc. 2007 11:889.

42.    Miglioretti DL, **Smith-Bindman R**, Abraham L, Brenner RJ, Carney PA, Bowles EJ, Buist DS, Elmore JG Radiologist Predictors of the Interpretive Performance of Diagnostic Mammography. <u>J Natl Cancer Inst</u> 2007 10;99(24)1854-63

43.    Curtis E, Quale C, Haggstrom D, **Smith-Bindman R**. Racial and Ethnic Differences in Breast Cancer Survival: How Much Is Explained by Screening, Tumor Severity, Biology, Treatment, and Co-morbidities. <u>Cancer</u> 2008 112(1):171

44.    **Smith-Bindman R**, Miglioretti DL, Rosenberg R, Reid RJ, Taplin SH, Geller BM, Kerlikowske K; N ational Institutes of Health Breast Cancer Surveillance Consortium. Physician workload in mammography. <u>Am J Roentgenol</u>. 2008 Feb;190(2):526-32.

45.    Dinkelspiel E, Chu P, **Smith-Bindman R**, Access to Diagnostic Mammography in the San Francisco Bay Area. <u>Journal of Women's Health</u> 2008 17(5):893-9

46.    Goldman L, Haneuse S, Miglioretti D, Kerlikoswke K, Buist D, Yankaskas B, **Smith-Bindman R**, An assessment of the quality of mammography care at facilities treating medically vulnerable populations <u>Medical Care</u> 2008 46(7):701-8.

47.    Tice JA, Cummings SR, **Smith-Bindman R**, Ichikawa L, Barlow WE, Kerlikowshe K. Using clinical factors and mammograhic breast density to estimate breast cancer risk: development and validation of a new predictive model. <u>Ann Intern Med</u> 2008 Mar 4;148(5):337-47.

48.    Scheuler K, Chu B, **Smith-Bindman R**. Factors Associated with Mammography Utilization: A Quantitative Meta-Analytic Review. <u>Journal of Women's Health</u> 2008 November 17 (9); 1477-98.

49.    **Smith-Bindman R**, Miglioretti D, Larson E. Utilization of diagnostic medical imaging in a large integrated healthcare system: modality and organ system trends. <u>Health Aff (Millwood)</u>. 2008 27(6):1491-502.

50.    Venkatesan A, Chu P, Kerlikowske K, **Smith-Bindman R** The positive predictive value of specific mammographic findings according to reader and patient variables. <u>Radiology</u> 2009 50(3):648-57.

51.     Cho R, Chu B, **Smith-Bindman R**. Second Trimester prenatal ultrasound for the detection of pregnancies at increased risk for Trisomy 18. <u>Prenatal Diagnosis</u> 2009 29(2):129-39

52.     Cummings SR, Browner WB, Tice JA, Bauer S, Cuzick J, ivE, Vogel V, Shepherd J, Vachon C, **Smith-Bindman R**, Kerlkowske K. Prevention of Breast Cancer in Postmenopausal Women: Approaches to Estimating and Reducing Risk. <u>J Natl Cancer Inst</u>. 2009 101(6):384-98

53.     **Smith-Bindman** R, Lipson J, Marcus R, Kim KP, Mahesh M, Gould R, Berrington de González A, Miglioretti DL. Radiation dose associated with common computed tomography examinations and the associated lifetime attributable risk of cancer. <u>Archives of Internal Medicine</u> 2009;169(22):2078-86.

54.     **Smith-Bindman R**, McCulloch CE, Ding A, Quale C, Chu PW. Diagnostic imaging rates for head injury in the ED and states' medical malpractice tort reforms. <u>Am J Emerg Med.</u> 2011 Jul;29(6):656-64

55.     Taplin S, Abraham LA, Geller B, Barlow WE, Buist DSM, **Smith-Bindman R**, Lehman C, Harvey S, Weaver D, Yankaskas BC. The effect of previous benign breast biopsy on the interpretive performance of subsequent screening mammography. <u>Journal of the National Cancer Institute</u>. 2010 102(14):1040-51.

56.     Levine D, Brown DL, Andreotti RF, Benacerraf B, Benson CB, Brewster WR, Coleman B, Depriest P, Doubilet PM, Goldstein SR, Hamper UM, Hecht JL, Horrow M, Hur HC, Marnach M, Patel MD, Platt LD, Puscheck E, **Smith-Bindman R**. Management of asymptomatic ovarian and other adnexal cysts imaged at US: Society of Radiologists in Ultrasound Consensus Conference Statement. <u>Radiology</u>. 256(3):943-54.

57.     Stengel JW, Webb EM, Poder L, Yeh BM, **Smith-Bindman R**, Coakley FV. Acute appendicitis: clinical outcome in patients with an initial false-position CT diagnosis. <u>Radiology</u>. 2010 256(1):119-26.

58.     **Smith-Bindman R**. Is computed tomography safe? <u>N Engl J Med.</u> 2010 Jul 1;363(1):1-4.

59.     Levine D, Brown DL, Andreotti RF, Benacerraf B, Benson CB, Brewster WR, Coleman B, DePriest P, Doubilet PM, Goldstein SR, Hamper UM, Hecht JL, Horrow M, Hur HC, Marnach M, Patel MD, Platt LD, Puscheck E, **Smith-Bindman R**; Management of asymptomatic ovarian and other adnexal cysts imaged at US Society of Radiologists in Ultrasound consensus conference statement.  Society of Radiologists in Ultrasound.  <u>Ultrasound Q.</u> 2010 26(3):121-31.

60.     Berrington de Gonzalez A, Kim KP, **Smith-Bindman R**, McAreavey D. Myocardial perfusion scans: projected population cancer risks from current levels of use in the United States. Circulation. 2010 122(23):2403-10.

61.     Goldman LE, Walker R, Miglioretti DL, **Smith-Bindman R**, Kerlikowske K; Accuracy of diagnostic mammography at facilities serving vulnerable women.  National Cancer Institute Breast Cancer Surveillance Consortium. <u>Med Care.</u> 2011 49(1):67-75

62.     Berrington de Gonzalez AB, Kim KP, Knudsen AB, Lansdorp-Vogelaar I, Rutter CM, **Smith-Bindman R**, Yee J, Kuntz KM, van Ballegooijen M, Zauber AG, Berg CD. Radiation-related

cancer risks from CT colonography screening: a risk-benefit analysis. Am J Roentgenol. 2011 196(4):816-23.

63.     Mehta P, **Smith-Bindman R** Airport Full-Body Screening: What is the Risk? Arch Intern Med. 2011 171(12):1112-5

64.     Rosenberg RD, Haneuse SJ, Geller BM, Buist DS, Miglioretti DL, Brenner RJ, **Smith-Bindman R**, Taplin SH; Breast Cancer Surveillance Consortium. Timeliness of follow-up after abnormal screening mammogram: variability of facilities. Radiology. 2011 261(2):404-13.

65.     Miglioretti DL, **Smith-Bindman R** Overuse of computed tomography and associated risks. Am Fam Physician. 2011 83(11):1252-4.

66      Westphalen AC, Koff WJ, Coakley FV, Muglia VF, Neuhaus JM, Marcus RT, Kurhanewicz J, **Smith-Bindman R**. Prostate cancer: prediction of biochemical failure after external-beam radiation therapy--Kattan nomogram and endorectal MR imaging estimation of tumor volume. Radiology. 2011 261(2):477-86.

67.     Goldman LE, Walker R, Miglioretti DL, **Smith-Bindman R**, Kerlikowske AK; Breast Cancer Surveillance Consortium. Facility characteristics do not explain higher false-positive rates in diagnostic mammography at facilities serving vulnerable women. Med Care. 2012 50(3):210-6.

68.     **Smith-Bindman** R, Miglioretti DL, Johnson E, Lee C, Feigelson HS, Flynn M, Greenlee RT, Kruger RL, Hornbrook MC, Roblin D, Solberg LI, Vanneman N, Weinmann S, Williams AE. Use of diagnostic imaging studies and associated radiation exposure for patients enrolled in large integrated health care systems, 1996-2010. JAMA. 2012 Jun 13;307(22):2400-9.

69.     **Smith-Bindman R**. Environmental causes of breast cancer and radiation from medical imaging: findings from the Institute of Medicine report. Arch Intern Med. 2012 172(13):1023-7.

70.     Bach PB, Mirkin JN, Oliver TK, Azzoli CG, Berry DA, Brawley OW, Byers T, Colditz GA, Gould MK, Jett JR, Sabichi AL, **Smith-Bindman R**, Wood DE, Qaseem A, Detterbeck FC. Benefits and harms of CT screening for lung cancer: a systematic review. JAMA 307(22):2418-29.

71.     Fenton JJ, Zhu W, Balch S, **Smith-Bindman R**, Lindfors KK, Hubbard RA.  External validation of Medicare claims codes for digital mammography and computer-aided detection. Cancer Epidemiol Biomarkers Prev. 2012 Aug 23(8):1344-7.

72.     Fazel R, Curtis J, Wang Y, Einstein AJ, **Smith-Bindman R**, Tsai TT, Chen J, Shah ND, Krumholz HM, Nallamothu BK. Determinants of fluoroscopy time for invasive coronary angiography and percutaneous coronary intervention: Insights from the NCDR. Catheter Cardiovasc Interv. 2013 82(7):1091-105

74.     Miglioretti DL, Johnson E, William SA, Grenlee RT, Weinmann S, Solberg LI, Feigelson HS, Roblin D, Flynn MJ, Vanneman N, **Smith-Bindman R**. The use of computed tomography in pediatrics and the associated radiation exposure and estimated cancer risk. JAMA Pediatr. 2013 167 (88): 700-7

75. **Smith-Bindman R**, Lebda P, Feldtein VA, Sellami D, Goldstein RB, Brasic N, Jin C, Kornak J. Risk of Thyroid Cancer based on Thyroid Ultrasound Imaging Characteristic: Result of A Population Based-Study. <u>JAMA Internal Medicine</u>. 2013 173(19):1788-96

76. Keegan J, Miglioretti DL, Gould R, Donnely LF, **Smith-Bindman R**, Wilson ND. Radiation Dose Metrics in Computed Tomography: Assessing Dose Using the National Quality Forum CT Patient Safety Measure. <u>J Am Coll Radiol</u>. 2014 11(3):309-15.

77. Fenton JJ, Zhu W, Balch S, **Smith-Bindman R**, Fishman P, Hubbard RA. Med Care. Distinguished Screening from Diagnostic Mammograms Using Medicare Claims Data. <u>Med Care</u>. 2014 52(7):e44-51

78. Miglioretti DL, Zhang Y, Johnson E, Lee C, Morin RL, Vanneman N, **Smith-Bindman R**. Personalized Technologist Dose Audit Feedback for Reducing Patient Radiation Exposure from CT. <u>J Am Coll Radiol</u>. 2014 11(3):300-8.

79. Lee CS, Reinhardt EB, **Smith-Bindman R**. CTSim: An Interactive Computer Simulation to Learn the Fundamentals of CT Dose Optimization. <u>J Am Coll Radiol</u>. 2014 11(3):255-6.

80. Wilson N, Valencia V, **Smith-Bindman R**. Virtual Meetings: Improving Impact and Accessibility of CME. <u>J Am Coll Radiol</u>. 2014 11(3):231-2.

81. **Smith-Bindman R**, Boone JM. Radiation Dose Optimization-Improving the Safety of CT.  <u>J Am Coll Radiol</u>. 2014 11(3):229-30.

82. Valencia V, Moghadassi M, Kriesel DR, Cummings S, **Smith-Bindman R**. Study of Tomography Of Nephrolithiasis Evaluation (STONE): Methodology, approach and rationale. <u>Contemp Clin Trials</u>. 2014 38(1):92-101

83. **Smith-Bindman** R, Aubin C, Bailitz J, Bengiamin RN, Camargo CA Jr, Corbo J, Dean AJ, Goldstein RB, Griffey RT, Jay GD, Kang TL, Kriesel DR, Ma OJ, Mallin M, Manson W, Melnikow J, Miglioretti DL, Miller SK, Mills LD, Miner JR, Moghadassi M, Noble VE, Press GM, Stoller ML, Valencia VE, Wang J, Wang RC, Cummings SR. Ultrasound versus Computed Tomography for Suspected Nephrolithiasis.<u> N Engl J Med</u>. 2014 371(12):1100-10.

84. Hubbard RA, Benjamin-Johnson R, Onega T, **Smith-Bindman R**, Zhu W, Fenton JJ. Classification accuracy of claims-based methods for identifying providers failing to meet performance targets. <u>Stat Med</u>. 2015 15;34(1):93-105

85. **Smith-Bindman R,** Appendix F. Ionizing Radiation Exposure to the US Population, with a Focus on Radiation from Medical Imaging, in Breast and the Environment: A Life Course Approach. <u>The Institute of Medicine</u>. 2012

86. **Smith-Bindman R**, Moghadassi M, Griffey RT, Camargo CA Jr, Bailitz J, Beland M, Miglioretti DL. Computed Tomography Radiation Dose in Patients with Suspected Urolithiasis. <u>JAMA Intern Med</u>. 2015 Aug;175(8):1413-6

87. **Smith-Bindman R**, Moghadassi M, Wilson N, Nelson TR, Boone JM, Cagnon CH, Gould R, Hall DJ, Krishnam M, Lamba R, McNitt-Gray M, Seibert A, Miglioretti DL. Radiation Doses in

Consecutive CT Examinations from Five University of California Medical Centers. Radiology. 2015 277(1):134-41.

88. Hubbard RA, Benjamin-Johnson R, Onega T, **Smith-Bindman R**, Zhu W, Fenton JJ. Classification accuracy of claims-based methods for identifying providers failing to meet performance targets. Stat Med. 2015 15;34(1):93-105.

89. **Smith-Bindman R**. CT Radiation and the Risk of Cancer. Current Radiology Reports. 2015 3:3

90. Mongan J, Kline J, **Smith-Bindman R**. Age and sex-dependent trends in pulmonary embolism testing and derivation of a clinical decision rule for young patients. Emerg Med J. 2015 32(11):840-5

91. Bahadori A, Miglioretti D, Kruger R, Flynn M, Weinmann S, **Smith-Bindman R**, Lee C. Calculation of Organ Doses for a Large Number of Patients Undergoing CT Examinations. Am J Roentgenol. 2015 205(4):827-33.

92. Solberg LI, Asche SE, Butler J, Carrell D, Norton CK, Jarvik JG, **Smith-Bindman R**, Tillema JO, Whitebird RR, Ziegenfuss JY. The Effect of Achieving Patient-Reported Outcome Measures on Satisfaction. J Am Board Fam Med. 2015 Nov-Dec;28(6):785-92.

93. Burke LMB, Semelka RC, **Smith-Bindman R**. Trends of CT Utilization in North America over the last decade. Current Radiology Reports, January 2015 3:78

94. Melnikow J, Xing G, Cox G, Leigh P, Mills L, Miglioretti DL, Moghadassi M, **Smith-Bindman R**. Cost Analysis of the STONE Randomized Trial: Can Health Care Costs be Reduced One Test at a Time? Med Care. 2016 54(4):337-42.

95. Morgan TA, **Smith-Bindman R**, Harbell J, Kornak J, Stock PG, Feldstein VA. US Findings in Patients at Risk for Pancreas Transplant Failure. Radiology. 2016 280(1):281-9.

96. Wang RC, Bent S, Weber E, Neilson J, **Smith-Bindman R**, Fahimi J. The Impact of Clinical Decision Rules on Computed Tomography Use and Yield for Pulmonary Embolism: A Systematic Review and Meta-analysis. Ann Emerg Med. 2016 67(6):693-701.

97. Harrison JD, Balonov M, Martin CJ, Ortiz Lopez P, Menzel HG, Simmonds JR, **Smith-Bindman R**, Wakeford R. Use of effective dose. Ann ICRP. 2016 45(1 Suppl):215-24.

98. **Smith-Bindman R**, Bindman AB. Imaging More Wisely. JAMA Intern Med. 2016 176(2):168-70.

99. Wang RC, Rodriguez RM, Moghadassi M, Noble V, Bailitz J, Mallin M, Corbo J, Kang TL, Chu P, Shiboski S, **Smith-Bindman R**. External Validation of the STONE Score, a Clinical Prediction Rule for Ureteral Stone: An Observational Multi-Institutional Study. Ann Emerg Med. 2016 67(4):423-432.e2.

100 Onega T, Goldman LE, Walker RL, Miglioretti DL, Buist DS, Taplin S, Geller BM, Hill DA, **Smith-Bindman R**. Facility Mammography Volume in Relation to Breast Cancer Screening Outcomes. J Med Screen. 2016 23(1):31-7.

101   Fenton JJ, Onega T, Zhu W, Balch S, **Smith-Bindman R**, Henderson L, Sprague BL, Kerlikowske K, Hubbard RA. Validation of a Medicare Claims-based Algorithm for Identifying Breast Cancers Detected at Screening Mammography. Med Care. 2016;54(3).

102.  Demb J, Chu P, Nelson T, Hall D, Seibert A, Lamba R, Boone J, Krishnam M, Cagnon C, Bostani M, Gould R, Miglioretti D, **Smith-Bindman R.** Optimizing Radiation Doses for Computed Tomography Across Institutions: Dose Auditing and Best Practices. JAMA Intern Med. 2017 177(6):810-817.

103.  Wang RC, Addo N, Chi T, Moore C, Mallin M, Shiboski S, Stoller M, **Smith-Bindman R.** Medical expulsive therapy use in emergency department patients diagnosed with ureteral stones. Am J Emerg Med. 2017 35(8):1069-1074.

104.  Wang RC, Rodriguez RM, Fahimi J, Hall MK, Shiboski S, Chi T, **Smith-Bindman R.** Derivation of decision rules to predict clinically important outcomes in acute flank pain patients. Am J Emerg Med. 2017 35(4):554-563.

105.  Metzler IS, **Smith-Bindman R,** Moghadassi M, Wang RC, Stoller ML, Chi T. Emergency Department Imaging Modality Effect on Surgical Management of Nephrolithiasis: A Multicenter, Randomized Clinical Trial. J Urol. 2017 197(3 Pt 1):710-714.

106.  Wang RC, **Smith-Bindman R**, Whitaker E, Neilson J, Allen IE, Stoller ML, Fahimi J. Effect of Tamsulosin on Stone Passage for Ureteral Stones: A Systematic Review and Meta-analysis. Ann Emerg Med. 2017 Mar;69(3):353-361

107.  **Smith-Bindman R**, Wang Y, Yellen-Nelson TR, Moghadassi M, Wilson N, Gould R, Seibert A, Boone JM, Krishnam M, Lamba R, Hall DJ, Miglioretti DL. Predictors of CT Radiation Dose and Their Effect on Patient Care: A Comprehensive Analysis Using Automated Data. Radiology. 2017 Jan;282(1):182-193.

108.  **Smith-Bindman R**. Use of Advanced Imaging Tests and the Not-So-Incidental Harms of Incidental Findings. JAMA Intern Med. 2017 Dec 26.

109.  **Smith-Bindman R**, Poder L, Johnson E, Miglioretti D. Risk of Malignant Ovarian Cancer Based on Ultrasound Findings in a Large Unselected Population JAMA Intern Med Published online November 12, 2018. doi:10.1001/jamainternmed.2018.5113

110.  **Smith-Bindman R**, Yifei Wang Y, Chu P, Chung R, et al, International Variation in Radiation Dose For Computed Tomography. BMJ In press

**Publications, Other (selected)**

1.    **Smith-Bindman R.** Positron emission tomography to evaluate lung lesions. JAMA. 2001 285(21):2711-2

2.    **Smith-Bindman R**, Feldstein VA, Goldberg JD. The genetic sonogram in screening for Down syndrome. J Ultrasound Med. 2001 20(11):1153-8

3       **Smith-Bindman R**, Miglioretti DL. CTDIvol, DLP, and effective dose are excellent measures
        for use in CT quality improvement. Radiology. 2011 261(3):999

4.      **Smith-Bindman R**. Ultrasonography vs. CT for suspected nephrolithiasis. N Engl J Med. 2014
        Dec 25;371(26):2531

5.      **Smith-Bindman R**, Miglioretti D. Cell-free DNA Analysis for Noninvasive Examination of
        Trisomy. N Engl J Med. 2015 Dec 24;373(26)**:2581.**

**6.**     Rita F. Redberg and Rebecca Smith-Bindman "We Are Giving Ourselves Cancer." Editorial. The
        New York Times 31 Jan. 2014, The New York ed.: A27. 30 Jan. 2014.

7.      **Smith-Bindman R**, Bindman AB. Imaging More Wisely-Already At Work. JAMA Intern Med.
        2016 176(6):870-1.

**8.**     **Smith-Bindman R,** Kwan ML, Miglioretti DL. Who Gets to Decide? Radiology. 2016
        278(2):635-6

## Conference Abstracts

1.      Smith-Bindman R, Kerlikowske K. Is there a downside to elderly women undergoing screening
        mammography? J Natl Cancer Inst 1999:18;1322-3.

2.      Smith-Bindman, R, Kerlikowske, K, Feldstein, V. Endovaginal ultrasound to evaluate
        endometrial abnormalities JAMA 1999;281:1693-4.

3.      Smith-Bindman R. Positron emission tomography to evaluate lung lesions JAMA
        2001;285:2711-2.

4.      Smith-Bindman, R, Goldberg, JD. Ultrasound markers of fetal Down syndrome. JAMA
        2001;285:2858.

5.      Smith-Bindman R, Feldstein V, Goldberg JD. The Genetic Sonogram in Screening For Down
        Syndrome, J Ultrasound Med 2001 Nov; 20(11):1153-8.

6.      Kerlikowske K, Smith-Bindman R, Sickles EA. Short-interval follow-up mammography: are we
        doing the right thing? J Natl Cancer Inst 2003 Aug 6;95(15):1175-6.

7.      Smith-Bindman R, Miglioretti D, Kerlikowske K. Comparison of screening mammography in
        the United States and the United Kingdom. JAMA. 2004 Feb 18;291(7):824.

8.      Sellami D, Goldstein R, Feldstein V, Smith-Bindman R. Ultrasound Can Help Low-Risk Patients
        Avoid Invasive Thyroid Biopsy. American Roentgen Ray Society, 2009

9.      Kamath A, Smith-Bindman R. CT radiation dose shows wide variance in Emergency
        Department, RSNA 2009

10.  Chang JH, Rand L, Smith-Bindman. Second trimester prenatal ultrasound for the detection of fetal structural anomalies and their associated risk for chromosomal abnormalities. American Journal of Obstetics and Gynecology Volume 201, Issue 6, Supplement (December 2009) and poster presentation. Society for Maternal-Fetal Medicine: 2010 30th Annual Meeting: The Pregnancy Meeting Chicago, IL; February 4, 2010

11.  Rand L, Smith-Bindman R, Saadai P, Machin GA, Farmer DL, Feldstein VA. Monochorionic twin pregnancy outcomes: Impact of cord insertion sites. (IFMSS 2009, Brazil)

12.  Rand L, Smith-Bindman R, Saadai P, Machin GA, Lee H, Farmer DL, Feldstein VA. Monochorionic twin pregnancy outcomes: Impact of arterio-arterial and veno-venous anastomoses. (IFMSS 2009, Brazil)

13.  Rand L, Smith-Bindman R, Payam Saadai, Geoffrey Machin, Vickie Feldstein. Placental Predictors of Adverse Outcomes in Monochorionic twins. (SMFM 2010, Chicago)

14.  Rand L, Smith-Bindman R, Saadai P, Machin GA, Feldstein VA. Natural History and Outcomes of Monochorionic Twin Pregnancies in a Large Population-Based Study. (SMFM 2010, Chicago)

15.  Lebada P, Feldstein V, Goldstein R, Sellami D, Smith-Bindman R. Risk of Thyroid Cancer Assocaited with Ultrasound Findings. Results from a population based study. Association of University Radiologists, 2011, Boston MA

16.  Burger I, Miglioretti D, Johnson E, et al. Rise in Radiation Exposure from Diagnostic Imaging in Patients Across Several Different HMO Populations. Paper presented at: RSNA, December 2 20102010; Chicago, IL

17.  Burger I, Miglioretti D, Johnson E, Vanneman N, Smith-Bindman R. Radiation Exposure Increased Dramatically in a Large Health Plan, Particularly Among Cancer Patients. Paper presented at: RSNA, December 1 20102010; Chicago, IL

18.  Merry, MD et al. Breast Cancer Risk from Medical Imaging Including Computed Tomography (CT) and Nuclear Medicine among Females Enrolled in a Large Integrated health Care System – manuscript in preparation. Presented at the Radiological Society of North America Annual Meeting, Chicago, IL, 2012

19.  Mongan, et al. Improving Efficiency of Pulmonary Embolism Testing in Young Female patients manuscript in preparation. Presented at the Radiological Society of North America Annual Meeting, Chicago, IL, 2012

**Abstract Presentations at Scientific Meetings**

Current CT doses from a Computed Tomography Dose Registry, presented at the *Conference on Radiation in Health, Radiation Research Society*, Kona, HI, 10/15-17, 2016

Current Exposure to Computed Tomography Imaging in US Integrated Health
Care Systems, presented at the Conference on Radiation in Health by the Radiation Research
Society, Kona, HI, 10/15-17, 2016

Current CT doses from a Computed Tomography Dose Registry in Pediatric Patients, Presented at
the American Academy of Pediatrics Annual Meeting, San Francisco, CA, 10/22-25/2017

European Congress of Radiology, European Society of Radiology, 2017
*Practical Strategies for Optimizing Dose, A Dose of Reality*

European Congress of Radiology, European Society of Radiology, 2018
*An International Randomized Controlled Trial of Two Interventions for Reducing Doses for
Computed Tomography (CT) Through Audit Feedback and Sharing Best Practices*

European Congress of Radiology, European Society of Radiology, 2018
*International Variation in Radiation Dose for Computed Tomography (CT)*

# Exhibit B

"A Survey of the Long-Term Effects of Talc and Kaolin Pleurodesis." *British Journal of Diseases of the Chest* 73 (1979): 285–88. https://doi.org/10.1016/0007-0971(79)90054-8.

Acencio, Milena M. P., Evaldo Marchi, Lisete R. Teixeira, Bruna Rocha Silva, Juliana Sanchez Silva, Carlos Sergio Rocha Silva, Vanessa Adelia Alvarenga, Leila Antonangelo, Francisco Suso Vargas, and Vera Luiza Capelozzi. "Talc Particles and Pleural Mesothelium Interface Modulate Apoptosis and Inflammation." *Pathology* 46, no. S2 (2014): S76.

Acheson, E D, M J Gardner, E C Pippard, and L P Grime. "Mortality of Two Groups of Women Who Manufactured Gas Masks from Chrysotile and Crocidolite Asbestos: A 40-Year Follow-Up." *British Journal of Industrial Medicine* 39, no. 4 (November 1982): 344–48.

Akhtar, Mohd Javed, Maqusood Ahamed, M.A. Majeed Khan, Salman A. Alrokayan, Iqbal Ahmad, and Sudhir Kumar. "Cytotoxicity and Apoptosis Induction by Nanoscale Talc Particles from Two Different Geographical Regions in Human Lung Epithelial Cells." *Environmental Toxicology* 29 (2014): 394–406. https://doi.org/10.1002/tox.21766.

Akhtar, Mohd Javed, Sudhir Kumar, Ramesh Chandra Murthy, Mohd Ashquin, Mohd Imran Khan, Govil Patil, and Iqbal Ahmad. "The Primary Role of Iron-Mediated Lipid Peroxidation in the Differential Cytotoxicity Caused by Two Varieties of Talc Nanoparticles on A549 Cells and Lipid Peroxidation Inhibitory Effect Exerted by Ascorbic Acid." *Toxicology in Vitro: An International Journal Published in Association with BIBRA* 24, no. 4 (June 2010): 1139–47. https://doi.org/10.1016/j.tiv.2010.03.002.

American Cancer Society. "Key Statistics for Ovarian Cancer," n.d. https://www.cancer.org/cancer/ovarian-cancer/about/key-statistics.html.

———. "What Is Ovarian Cancer?," n.d. https://www.cancer.org/cancer/ovarian-cancer/about/what-is-ovarian-cancer.html.

Anderson, Garnet L., Howard L. Judd, Andrew M. Kaunitz, David H. Barad, Shirley A. A. Beresford, Mary Pettinger, James Liu, S. Gene McNeeley, Ana Maria Lopez, and Women's Health Initiative Investigators. "Effects of Estrogen plus Progestin on Gynecologic Cancers and Associated Diagnostic Procedures: The Women's Health Initiative Randomized Trial." *JAMA* 290, no. 13 (October 1, 2003): 1739–48. https://doi.org/10.1001/jama.290.13.1739.

Antoniou, A., P. D. P. Pharoah, S. Narod, H. A. Risch, J. E. Eyfjord, J. L. Hopper, N. Loman, et al. "Average Risks of Breast and Ovarian Cancer Associated with BRCA1 or BRCA2 Mutations Detected in Case Series Unselected for Family History: A Combined Analysis of 22 Studies." *American Journal of Human Genetics* 72, no. 5 (May 2003): 1117–30.

Arellano-Orden, Elena, Auxiliadora Romero-Falcon, Jose Martin Juan, Manuel Ocana Jurado, Francisco Rodriguez-Panadero, and Ana Montes-Worboys. "Small Particle-Size Talc Is Associated with Poor Outcome and Increased Inflammation in Thoracoscopic Pleurodesis." *Respiration* 86 (2013): 201–9. https://doi.org/10.1159/000342042.

Armstrong, Deborah K., Brian Bundy, Lari Wenzel, Helen Q. Huang, Rebecca Baergen, Shashikant Lele, Larry J. Copeland, Joan L. Walker, Robert A. Burger, and Gynecologic Oncology Group. "Intraperitoneal Cisplatin and Paclitaxel in Ovarian Cancer." *The New England Journal of Medicine* 354, no. 1 (January 5, 2006): 34–43. https://doi.org/10.1056/NEJMoa052985.

"ATSDR - Toxicological Profile: Asbestos." Accessed August 16, 2018. https://www.atsdr.cdc.gov/toxprofiles/tp.asp?id=30&tid=4.

Baldwin, Lauren A., Bin Huang, Rachel W. Miller, Thomas Tucker, Scott T. Goodrich, Iwona Podzielinski, Christopher P. DeSimone, Fred R. Ueland, John R. van Nagell, and Leigh G. Seamon. "Ten-Year Relative Survival for Epithelial Ovarian Cancer:" *Obstetrics & Gynecology* 120, no. 3 (September 2012): 612–18. https://doi.org/10.1097/AOG.0b013e318264f794.

Balkwill, Fran, and Alberto Mantovani. "Inflammation and Cancer: Back to Virchow?" *The Lancet* 357, no. 9255 (February 2001): 539–45. https://doi.org/10.1016/S0140-6736(00)04046-0.

Beck, B. D., H. A. Feldman, J. D. Brain, T. J. Smith, M. Hallock, and B. Gerson. "The Pulmonary Toxicity of Talc and Granite Dust as Estimated from an in Vivo Hamster Bioassay." *Toxicology and Applied Pharmacology* 87, no. 2 (February 1987): 222–34.

Begg, Melissa D., and Dana March. "Cause and Association: Missing the Forest for the Trees." *American Journal of Public Health* 108, no. 5 (May 2018): 620. https://doi.org/10.2105/AJPH.2018.304366.

Belotte, Jimmy, Nicole M. Fletcher, Awoniyi O. Awonuga, Mitchell Alexis, Husam M. Abu-Soud, Ghassan M. Saed, Michael P. Diamond, and Mohammed G. Saed. "The Role of Oxidative Stress in the Development of Cisplatin Resistance in Epithelial Ovarian Cancer." *Reproductive Sciences* 21, no. 4 (2014): 503–8. https://doi.org/10.1177/1933719113503403.

Belotte, Jimmy, Nicole M. Fletcher, Mohammed G. Saed, Mohammed S. Abusamaan, Gregory Dyson, Michael P. Diamond, and Ghassan M. Saed. "A Single Nucleotide Polymorphism in Catalase Is Strongly Associated with Ovarian Cancer Survival." *PloS One* 10, no. 8 (2015). https://doi.org/e0135739. doi:10.1371/journal. pone.0135739.

Berge, Wera, Kenneth Mundt, Hung Luu, and Paolo Boffetta. "Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis." *European Journal of Cancer Prevention*, January 2017, 1. https://doi.org/10.1097/CEJ.0000000000000340.

———. "Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis." *European Journal of Cancer Prevention: The Official Journal of the European Cancer Prevention Organisation (ECP)* 27, no. 3 (2018): 248–57. https://doi.org/10.1097/CEJ.0000000000000340.

Berry, G., M. L. Newhouse, and J. C. Wagner. "Mortality from All Cancers of Asbestos Factory Workers in East London 1933-80." *Occupational and Environmental Medicine* 57, no. 11 (November 2000): 782–85.

Bertolotti, Marinella, Daniela Ferrante, Dario Mirabelli, Mario Botta, Marinella Nonnato, Annalisa Todesco, Benedetto Terracini, and Corrado Magnani. "[Mortality in the cohort of the asbestos cement workers in the Eternit plant in Casale Monferrato (Italy)]." *Epidemiologia E Prevenzione* 32, no. 4–5 (October 2008): 218–28.

Blank, M M, N Wentzensen, M A Murphy, A Hollenbeck, and Y Park. "Dietary Fat Intake and Risk of Ovarian Cancer in the NIH-AARP Diet and Health Study." *British Journal of Cancer* 106, no. 3 (January 31, 2012): 596–602. https://doi.org/10.1038/bjc.2011.572.

Blount, A M. "Amphibole Content of Cosmetic and Pharmaceutical Talcs." *Environmental Health Perspectives* 94 (August 1991): 225–30.

Bluemel, Piza, and Zischka-Konorsa, W. "Animal experimental investigations of tissue reactions to starch and talcum powder after intraperitoneal application." *Wiener klinische Wochenschrift* 74, no. 1 (January 1962).

Blumenkrantz, M. J., N. Gallagher, R. A. Bashore, and H. Tenckhoff. "Retrograde Menstruation in Women Undergoing Chronic Peritoneal Dialysis." *Obstetrics and Gynecology* 57, no. 5 (May 1981): 667–70.

Boorman, G. A., and J. C. Seely. "The Lack of an Ovarian Effect of Lifetime Talc Exposure in F344/N Rats and B6C3F1 Mice." *Regulatory Toxicology and Pharmacology: RTP* 21, no. 2 (April 1995): 242–43. https://doi.org/10.1006/rtph.1995.1035.

Booth, M., V. Beral, and P. Smith. "Risk Factors for Ovarian Cancer: A Case-Control Study." *British Journal of Cancer* 60, no. 4 (October 1989): 592–98.

Bottazzi, Barbara, Elio Riboli, and Alberto Mantovani. "Aging, Inflammation and Cancer." *Seminars in Immunology*, November 5, 2018. https://doi.org/10.1016/j.smim.2018.10.011.

Bunderson-Schelvan, Melisa, Jean C. Pfau, Robert Crouch, and Andrij Holian. "Nonpulmonary Outcomes of Asbestos Exposure." *Journal of Toxicology and Environmental Health. Part B, Critical Reviews* 14, no. 1–4 (2011): 122–52. https://doi.org/10.1080/10937404.2011.556048.

Burn, John, Anne-Marie Gerdes, Finlay Macrae, Jukka-Pekka Mecklin, Gabriela Moeslein, Sylviane Olschwang, Diane Eccles, et al. "Long-Term Effect of Aspirin on Cancer Risk in Carriers of Hereditary Colorectal Cancer: An Analysis from the CAPP2 Randomised Controlled Trial." *Lancet (London, England)* 378, no. 9809 (December 17, 2011): 2081–87. https://doi.org/10.1016/S0140-6736(11)61049-0.

Buz'Zard, Amber R., and Benjamin H. S. Lau. "Pycnogenol® Reduces Talc-Induced Neoplastic Transformation in Human Ovarian Cell Cultures." *Phytotherapy Research* 21, no. 6 (June 2007): 579–86. https://doi.org/10.1002/ptr.2117.

Caldwell, Carlyle G., White Thomas Aubrey, William L. George, and James J. Eberl. Medical dusting powder. United States US2626257A, filed May 21, 1952, and issued January 20, 1953. https://patents.google.com/patent/US2626257A/en?q=medical&q=dusting+powder&oq=medical+dusting+powder.

Camargo, M. Constanza, Leslie T. Stayner, Kurt Straif, Margarita Reina, Umaima Al-Alem, Paul A. Demers, and Philip J. Landrigan. "Occupational Exposure to Asbestos and Ovarian Cancer: A Meta-Analysis." *Environmental Health Perspectives* 119, no. 9 (September 2011): 1211–17. https://doi.org/10.1289/ehp.1003283.

Carr, C.J. "Talc: Consumer Uses and Health Perspectives" 21 (1995): 211–15.

Chan, Andrew T., Edward L. Giovannucci, Jeffrey A. Meyerhardt, Eva S. Schernhammer, Gary C. Curhan, and Charles S. Fuchs. "Long-Term Use of Aspirin and Nonsteroidal Anti-Inflammatory Drugs and Risk of Colorectal Cancer." *JAMA* 294, no. 8 (August 24, 2005): 914–23. https://doi.org/10.1001/jama.294.8.914.

Chang, Che-Jui, Yu-Kang Tu, Pau-Chung Chen, and Hsiao-Yu Yang. "Occupational Exposure to Talc Increases the Risk of Lung Cancer: A Meta-Analysis of Occupational Cohort Studies." *Canadian Respiratory Journal*, 2017. https://doi.org/10.1155/2017/1270608.

Chang, Stella, and Harvey A. Risch. "Perineal Talc Exposure and Risk of Ovarian Carcinoma." *Cancer* 79, no. 12 (June 15, 1997): 2396–2401. https://doi.org/10.1002/(SICI)1097-0142(19970615)79:12<2396::AID-CNCR15>3.0.CO;2-M.

Chen, F., K. Gaitskell, M. J. Garcia, A. Albukhari, J. Tsaltas, and A. A. Ahmed. "Serous Tubal Intraepithelial Carcinomas Associated with High-Grade Serous Ovarian Carcinomas: A Systematic Review." *BJOG: An International Journal of Obstetrics and Gynaecology* 124, no. 6 (May 2017): 872–78. https://doi.org/10.1111/1471-0528.14543.

Chen, Lee-May, and Jonathan S Berek. "Overview of Epithelial Carcinoma of the Ovary, Fallopian Tube, and Peritoneum." *UpToDate*, 2018.

Chen, L-M, et al. "Epithelial Carcinoma of the Ovary, Fallopian Tube, and Peritoneum: Epidemiology and Risk Factors - UpToDate," 2018. https://www.uptodate.com/contents/epithelial-carcinoma-of-the-ovary-fallopian-tube-and-peritoneum-epidemiology-and-risk-factors?search=Epithelial%20carcinoma%20of%20the%20ovary,%20fallopian%20tube,%20and%20peritoneum:%20Epidemiology%20and%20risk%20factors&source=search_result&selectedTitle=1~150&usage_type=default&display_rank=1.

Chen, Xi, Gerd A. Müller, Marianne Quaas, Martin Fischer, Namshik Han, Benjamin Stutchbury, Andrew D. Sharrocks, and Kurt Engeland. "The Forkhead Transcription Factor FOXM1

Controls Cell Cycle-Dependent Gene Expression through an Atypical Chromatin Binding Mechanism." *Molecular and Cellular Biology* 33, no. 2 (January 2013): 227–36. https://doi.org/10.1128/MCB.00881-12.

Chen, Y., P. C. Wu, J. H. Lang, W. J. Ge, P. Hartge, and L. A. Brinton. "Risk Factors for Epithelial Ovarian Cancer in Beijing, China." *International Journal of Epidemiology* 21, no. 1 (February 1992): 23–29.

Chien, Jeremy, Hugues Sicotte, Jian-Bing Fan, Sean Humphray, Julie M. Cunningham, Kimberly R. Kalli, Ann L. Oberg, et al. "TP53 Mutations, Tetraploidy and Homologous Recombination Repair Defects in Early Stage High-Grade Serous Ovarian Cancer." *Nucleic Acids Research* 43, no. 14 (August 18, 2015): 6945–58. https://doi.org/10.1093/nar/gkv111.

Chittenden, B. G., G. Fullerton, A. Maheshwari, and S. Bhattacharya. "Polycystic Ovary Syndrome and the Risk of Gynaecological Cancer: A Systematic Review." *Reproductive Biomedicine Online* 19, no. 3 (September 2009): 398–405.

Cibula, D., M. Widschwendter, O. Májek, and L. Dusek. "Tubal Ligation and the Risk of Ovarian Cancer: Review and Meta-Analysis." *Human Reproduction Update* 17, no. 1 (January 1, 2011): 55–67. https://doi.org/10.1093/humupd/dmq030.

Cibula, David, Martin Widschwendter, Michael Zikan, and Ladislav Dusek. "Underlying Mechanisms of Ovarian Cancer Risk Reduction after Tubal Ligation." *Acta Obstetricia Et Gynecologica Scandinavica* 90, no. 6 (June 2011): 559–63. https://doi.org/10.1111/j.1600-0412.2011.01114.x.

CIMBA, Georgia Chenevix-Trench, Roger L Milne, Antonis C Antoniou, Fergus J Couch, Douglas F Easton, and David E Goldgar. "An International Initiative to Identify Genetic Modifiers of Cancer Risk in BRCA1 and BRCA2 Mutation Carriers: The Consortium of Investigators of Modifiers of BRCA1 and BRCA2 (CIMBA)." *Breast Cancer Research* 9, no. 2 (December 2007). https://doi.org/10.1186/bcr1670.

Cohen, Samuel M., and Lora L. Arnold. "Chemical Carcinogenesis." *Toxicological Sciences* 120, no. suppl_1 (March 1, 2011): S76–92. https://doi.org/10.1093/toxsci/kfq365.

Colditz, Graham A. "Cancer Prevention." *UpToDate*, 2018.

Collaborative Group on Epidemiological Studies of Ovarian Cancer, V. Beral, R. Doll, C. Hermon, R. Peto, and G. Reeves. "Ovarian Cancer and Oral Contraceptives: Collaborative Reanalysis of Data from 45 Epidemiological Studies Including 23,257 Women with Ovarian Cancer and 87,303 Controls." *Lancet* 371, no. 9609 (January 26, 2008): 303–14. https://doi.org/10.1016/S0140-6736(08)60167-1.

Collaborative Group On Epidemiological Studies Of Ovarian Cancer, V. Beral, K. Gaitskell, C. Hermon, K. Moser, G. Reeves, and R. Peto. "Menopausal Hormone Use and Ovarian Cancer Risk: Individual Participant Meta-Analysis of 52 Epidemiological Studies." *Lancet (London, England)* 385, no. 9980 (May 9, 2015): 1835–42. https://doi.org/10.1016/S0140-6736(14)61687-1.

Committee on Practice Bulletins–Gynecology, Committee on Genetics, Society of Gynecologic Oncology. "Practice Bulletin No 182: Hereditary Breast and Ovarian Cancer Syndrome." *Obstetrics and Gynecology* 130, no. 3 (2017): e110–26. https://doi.org/10.1097/AOG.0000000000002296.

Compton, Sarah A., Sezgin Ozgür, and Jack D. Griffith. "Ring-Shaped Rad51 Paralog Protein Complexes Bind Holliday Junctions and Replication Forks as Visualized by Electron Microscopy." *The Journal of Biological Chemistry* 285, no. 18 (April 30, 2010): 13349–56. https://doi.org/10.1074/jbc.M109.074286.

Cook, Linda S., Mary L. Kamb, and Noel S. Weiss. "Perineal Powder Exposure and the Risk of Ovarian Cancer." *American Journal of Epidemiology* 145, no. 5 (March 1, 1997): 459–65.

Cook, LS. "Erratum in 'Perineal Powder Exposure and the Risk of Ovarian Cancer'." *American Journal of Epidemiology* 148, no. 410 (1997).

Coussens, Lisa M., and Zena Werb. "Inflammation and Cancer." *Nature* 420, no. 6917 (December 19, 2002): 860–67. https://doi.org/10.1038/nature01322.

Cralley, L. J., M. M. Key, D. H. Groth, W. S. Lainhart, and R. M. Ligo. "Fibrous and Mineral Content of Cosmetic Talcum Products." *American Industrial Hygiene Association Journal* 29, no. 4 (August 1968): 350–54. https://doi.org/10.1080/00028896809343015.

Cramer, D. W. "Perineal Talc Exposure and Subsequent Epithelial Ovarian Cancer: A Case-Control Study." *Obstetrics and Gynecology* 94, no. 1 (July 1999): 160–61.

Cramer, D. W., R. F. Liberman, L. Titus-Ernstoff, W. R. Welch, E. R. Greenberg, J. A. Baron, and B. L. Harlow. "Genital Talc Exposure and Risk of Ovarian Cancer." *International Journal of Cancer. Journal International Du Cancer* 81, no. 3 (May 5, 1999): 351–56.

Cramer, D. W., W. R. Welch, R. E. Scully, and C. A. Wojciechowski. "Ovarian Cancer and Talc: A Case-Control Study." *Cancer* 50, no. 2 (July 15, 1982): 372–76.

Cramer, Daniel W., Linda Titus-Ernstoff, John R. McKolanis, William R. Welch, Allison F. Vitonis, Ross S. Berkowitz, and Olivera J. Finn. "Conditions Associated with Antibodies Against the Tumor-Associated Antigen MUC1 and Their Relationship to Risk for Ovarian Cancer." *Cancer Epidemiology Biomarkers & Prevention* 14, no. 5 (May 1, 2005): 1125–31. https://doi.org/10.1158/1055-9965.EPI-05-0035.

Cramer, Daniel W., Allison F. Vitonis, Kathryn L. Terry, William R. Welch, and Linda J. Titus. "The Association between Talc Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US States." *Epidemiology (Cambridge, Mass.)*, December 17, 2015. https://doi.org/10.1097/EDE.0000000000000434.

———. "The Association Between Talc Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US States." *Epidemiology (Cambridge, Mass.)* 27, no. 3 (May 2016): 334–46. https://doi.org/10.1097/EDE.0000000000000434.

Cramer, Daniel W., William R. Welch, Ross S. Berkowitz, and John J. Godleski. "Presence of Talc in Pelvic Lymph Nodes of a Woman with Ovarian Cancer and Long-Term Genital Exposure to Cosmetic Talc." *Obstetrics and Gynecology* 110, no. 2 Pt 2 (August 2007): 498–501. https://doi.org/10.1097/01.AOG.0000262902.80861.a0.

Cramer, Daniel W., William R. Welch, Robert E. Scully, and Carol A. Wojciechowski. "Ovarian Cancer and Talc. A Case-Control Study." *Cancer* 50, no. 2 (July 15, 1982): 372–76. https://doi.org/10.1002/1097-0142(19820715)50:2<372::AID-CNCR2820500235>3.0.CO;2-S.

Crum, Christopher P, Jonathan Bijron, and Brooke E. Howitt. "Pathogenesis of Ovarian, Fallopian Tubal, and Peritoneal Serous Carcinomas." *UpToDate*, 2018.

Crusz, Shanthini M., and Frances R Balkwill. "Inflammation and Cancer: Advances and New Agents." *Nature Reviews Clinical Oncology* 12 (October 2015): 584–96. https://doi.org/10.1038/nrclinonc.2015.105.

Curtis D. Klaassen, and John Doull. *Casarett and Doull's Toxicology : The Basic Science of Poisons*. 8th Edition. McGraw-Hill Education, 2013. https://www.ncbi.nlm.nih.gov/nlmcatalog/101586259.

Danforth, Kim N., Shelley S Tworoger, Jonathan L. Hecht, Bernard A. Rosner, Graham A. Colditz, and Susan E. Hankinson. "Breastfeeding and Risk of Ovarian Cancer in Two Prospective

Cohorts." *Cancer Causes & Control: CCC* 18, no. 5 (June 2007): 517–23.
https://doi.org/10.1007/s10552-007-0130-2.

"Deposition & Exhibits of John Hopkins, PhD, MDL No. 2738." In re: Talcum Power Prod. Liab. Litig., August 16, 2018.

"Deposition & Exhibits of Julie Pier, MDL No. 2738." In re: Talcum Power Prod. Liab. Litig., September 12, 2018.

"Deposition of Alice M. Blount, Ph.D., Circuit Court of the City of St. Louis State of Missouri, Case No.: 1522-CC10417-01," April 13, 2018.

Devaja, Omer. *Ovarian Cancer  From Pathogenesis to Treatment*. IntechOpen, 2018.

Ding, Yuan C., Lesley McGuffog, Sue Healey, Eitan Friedman, Yael Laitman, Shani- Paluch-Shimon, Bella Kaufman, et al. "A Nonsynonymous Polymorphism in IRS1 Modifies Risk of Developing Breast and Ovarian Cancers in BRCA1 and Ovarian Cancer in BRCA2 Mutation Carriers." *Cancer Epidemiology, Biomarkers & Prevention: A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 21, no. 8 (August 2012): 1362–70. https://doi.org/10.1158/1055-9965.EPI-12-0229.

Dixon, Suzanne C., Christina M. Nagle, Nicolas Wentzensen, Britton Trabert, Alicia Beeghly-Fadiel, Joellen M. Schildkraut, Kirsten B. Moysich, et al. "Use of Common Analgesic Medications and Ovarian Cancer Survival: Results from a Pooled Analysis in the Ovarian Cancer Association Consortium." *British Journal of Cancer* 116, no. 9 (April 25, 2017): 1223–28. https://doi.org/10.1038/bjc.2017.68.

Dodson, R. F., M. O'Sullivan, C. J. Corn, and S. P. Hammar. "Quantitative Comparison of Asbestos and Talc Bodies in an Individual with Mixed Exposure." *American Journal of Industrial Medicine* 27, no. 2 (February 1995): 207–15.

D.R. Petterson. "JNJ 000251888," April 26, 1973.

Dubeau, L., and R. Drapkin. "Coming into Focus: The Nonovarian Origins of Ovarian Cancer." *Annals of Oncology: Official Journal of the European Society for Medical Oncology* 24 Suppl 8 (November 2013): viii28–35. https://doi.org/10.1093/annonc/mdt308.

Eberl, J. J., and W. L. George. "Comparative Evaluation of the Effects of Talcum and a New Absorbable Substitute on Surgical Gloves." *American Journal of Surgery* 75, no. 3 (March 1948): 493–97.

Egli, G. E., and M. Newton. "The Transport of Carbon Particles in the Human Female Reproductive Tract." *Fertility and Sterility* 12 (April 1961): 151–55.

Eng, Kevin H., J. Brian Szender, John Lewis Etter, Jasmine Kaur, Samantha Poblete, Ruea-Yea Huang, Qianqian Zhu, et al. "Paternal Lineage Early Onset Hereditary Ovarian Cancers: A Familial Ovarian Cancer Registry Study." *PLoS Genetics* 14, no. 2 (February 2018): e1007194. https://doi.org/10.1371/journal.pgen.1007194.

"Expert Report of Michael Crowley, Ph.D., In Re: Talcum Powder Prod. Liab. Litig., MDL No. 2738," November 12, 2018.

Fasching, Peter A., Simon Gayther, Leigh Pearce, Joellen M. Schildkraut, Ellen Goode, Falk Thiel, Georgia Chenevix-Trench, et al. "Role of Genetic Polymorphisms and Ovarian Cancer Susceptibility." *Molecular Oncology* 3, no. 2 (April 2009): 171–81. https://doi.org/10.1016/j.molonc.2009.01.008.

Fathalla, M. F. "Incessant Ovulation and Ovarian Cancer - a Hypothesis Re-Visited." *Facts, Views & Vision in ObGyn* 5, no. 4 (2013): 292–97.

———. "Incessant Ovulation--a Factor in Ovarian Neoplasia?" *Lancet* 2, no. 7716 (July 17, 1971): 163.

FDA. "Ltr to Samuel S. Epstein, M.D., RE: Docket Numbers 94P-0420 and FDA-2008-P-0309-0001
/CP," April 1, 2017.

Fedak, Kristen M., Autumn Bernal, Zachary A. Capshaw, and Sherilyn Gross. "Applying the
Bradford Hill Criteria in the 21st Century: How Data Integration Has Changed Causal Inference
in Molecular Epidemiology." *Emerging Themes in Epidemiology* 12, no. 14 (2015).
https://doi.org/10.1186/s12982-015-0037-4.

"Federal Register Vol. 81, No.243, December 19, 2016 FDA Ban on Surgical Gloves." Accessed
August 16, 2018.
https://www.gpo.gov/fdsys/search/pagedetails.action?collectionCode=FR&browsePath=2016%2
F12%2F12-
19%5C%2F%2FConsumer+Product+Safety+Commission&isCollapsed=true&leafLevelBrowse
=true&packageId=FR-2016-12-
19&isDocumentResults=true&ycord=173&isDocumentResults=true&ycord=173.

Ferguson, Lynnette R. "Chronic Inflammation and Mutagenesis." *Mutation Research* 690, no. 1–2
(August 7, 2010): 3–11. https://doi.org/10.1016/j.mrfmmm.2010.03.007.

Fernandes, José Veríssimo, Ricardo Ney Oliveira Cobucci, Carlos André Nunes Jatobá, Thales
Allyrio Araújo de Medeiros Fernandes, Judson Welber Veríssimo de Azevedo, and Josélio Maria
Galvão de Araújo. "The Role of the Mediators of Inflammation in Cancer Development."
*Pathology & Oncology Research* 21, no. 3 (July 2015): 527–34. https://doi.org/10.1007/s12253-
015-9913-z.

Ferrante, Daniela, Marinella Bertolotti, Annalisa Todesco, Dario Mirabelli, Benedetto Terracini, and
Corrado Magnani. "Cancer Mortality and Incidence of Mesothelioma in a Cohort of Wives of
Asbestos Workers in Casale Monferrato, Italy." *Environmental Health Perspectives* 115, no. 10
(October 2007): 1401–5. https://doi.org/10.1289/ehp.10195.

Ferrer, Jaume, Juan F. Montes, Maria A. Villarino, Richard W. Light, and José García-Valero.
"Influence of Particle Size on Extrapleural Talc Dissemination after Talc Slurry Pleurodesis."
*Chest* 122, no. 3 (September 2002): 1018–27.

Fiume, Monice M., Ivan Boyer, Wilma F. Bergfeld, Donald V. Belsito, Ronald A. Hill, Curtis D.
Klaassen, Daniel C. Liebler, et al. "Safety Assessment of Talc as Used in Cosmetics."
*International Journal of Toxicology* 34, no. 1 suppl (July 1, 2015): 66S-129S.
https://doi.org/10.1177/1091581815586797.

Fletcher, Nicole M., Jimmy Belotte, Mohammed G. Saed, Ira Memaj, Michael P. Diamond, Robert T.
Morris, and Ghassan M. Saed. "Specific Point Mutations in Key Redox Enzymes Are Associated
with Chemoresistance in Epithelial Ovarian Cancer." *Free Radical Biology and Medicine* 102
(2017): 122–32. https://doi.org/10.1016/j.freeradbiomed.2016.11.028.

Fletcher, Nicole M., Zhongliang Jiang, Rouba Ali-Fehmi, Nancy K. Levin, Jimmy Belotte, Michael
A. Tainsky, Michael P. Diamond, Husam M. Abu-Soud, and Ghassan M. Saed.
"Myeloperoxidase and Free Iron Levels: Potential Biomarkers for Early Detection and Prognosis
of Ovarian Cancer." *Cancer Biomarkers* 10 (2012 2011): 267–75. https://doi.org/10.3233/CBM-
2012-0255.

Fletcher, Nicole, Memaj, Ira, and Saed, Ghassan. "Talcum Powder Enhances Oxidative Stress in
Ovarian Cancer Cells." *Reproductive Sciences*, February 28, 2018.
https://doi.org/10.1177/1933719118759999.

Fletcher, NM, and GM Saed. "Talcum Powder Enhances Cancer Antigen 125 Levels in Ovarian
Cancer Cells." *Presented at the 65th Meeting of the Society for Reproductive Investigation, San
Diego, California*, 2018.

Folkins, Ann K., Elke A. Jarboe, Jonathan L. Hecht, Michael G. Muto, and Christopher P. Crum. "Chapter 24 - Assessing Pelvic Epithelial Cancer Risk and Intercepting Early Malignancy." In *Diagnostic Gynecologic and Obstetric Pathology (Third Edition)*, 844–64. Philadelphia: Content Repository Only!, 2018. https://doi.org/10.1016/B978-0-323-44732-4.00024-8.

Ford, D., D.F. Easton, M. Stratton, S. Narod, D. Goldgar, P. Devilee, D.T. Bishop, et al. "Genetic Heterogeneity and Penetrance Analysis of the BRCA1 and BRCA2 Genes in Breast Cancer Families." *The American Journal of Human Genetics* 62, no. 3 (March 1998): 676–89. https://doi.org/10.1086/301749.

Freedman, Ralph S, Michael Deavers, Jinsong Liu, and Ena Wang. "Peritoneal Inflammation – A Microenvironment for Epithelial Ovarian Cancer (EOC)." *Journal of Translational Medicine* 2, no. 23 (2004). https://doi.org/10.1186/1479-5876-2-23.

Friebel, Tara M., Susan M. Domchek, and Timothy R. Rebbeck. "Modifiers of Cancer Risk in BRCA1 and BRCA2 Mutation Carriers: Systematic Review and Meta-Analysis." *Journal of the National Cancer Institute* 106, no. 6 (June 2014): dju091. https://doi.org/10.1093/jnci/dju091.

Frost, G. "The Latency Period of Mesothelioma among a Cohort of British Asbestos Workers (1978-2005)." *British Journal of Cancer* 109, no. 7 (October 1, 2013): 1965–73. https://doi.org/10.1038/bjc.2013.514.

Galea, Sandro, and Roger D. Vaughan. "Moving Beyond the Cause Constraint: A Public Health of Consequence, May 2018." *American Journal of Public Health* 108, no. 5 (May 2018): 602–3. https://doi.org/10.2105/AJPH.2018.304390.

Gates, Margaret A., Bernard A. Rosner, Jonathan L. Hecht, and Shelley S. Tworoger. "Risk Factors for Epithelial Ovarian Cancer by Histologic Subtype." *American Journal of Epidemiology* 171, no. 1 (January 1, 2010): 45–53. https://doi.org/10.1093/aje/kwp314.

Gates, Margaret A., Shelley S. Tworoger, Kathryn L. Terry, Linda Titus-Ernstoff, Bernard Rosner, Immaculata De Vivo, Daniel W. Cramer, and Susan E. Hankinson. "Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer." *Cancer Epidemiology, Biomarkers & Prevention : A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 17, no. 9 (September 2008): 2436–44. https://doi.org/10.1158/1055-9965.EPI-08-0399.

Genofre, Eduardo H., Francisco S. Vargas, Milena M. P. Acencio, Leila Antonangelo, Lisete R. Teixeira, and Evaldo Marchi. "Talc Pleurodesis: Evidence of Systemic Inflammatory Response to Small Size Talc Particles." *Respiratory Medicine* 103, no. 1 (January 2009): 91–97. https://doi.org/10.1016/j.rmed.2008.07.021.

Germani, D., S. Belli, C. Bruno, M. Grignoli, M. Nesti, R. Pirastu, and P. Comba. "Cohort Mortality Study of Women Compensated for Asbestosis in Italy." *American Journal of Industrial Medicine* 36, no. 1 (July 1999): 129–34.

Gertig, D. M., D. J. Hunter, D. W. Cramer, G. A. Colditz, F. E. Speizer, W. C. Willett, and S. E. Hankinson. "Prospective Study of Talc Use and Ovarian Cancer." *Journal of the National Cancer Institute* 92, no. 3 (February 2, 2000): 249–52.

Ghio, Andrew J., Joleen M. Soukup, Lisa A. Dailey, Judy H. Richards, Jennifer L. Turi, Elizabeth N. Pavlisko, and Victor L. Roggli. "Disruption of Iron Homeostasis in Mesothelial Cells after Talc Pleurodesis." *American Journal of Respiratory Cell and Molecular Biology* 46, no. 1 (January 1, 2012): 80–86. https://doi.org/10.1165/rcmb.2011-0168OC.

Gloyne, S. R. "Two Cases of Squamous Carcinoma of the Lung Occurring in Asbestosis." *Tubercle* 17 (1935): 5–10.

Godard, B., W. D. Foulkes, D. Provencher, J. S. Brunet, P. N. Tonin, A. M. Mes-Masson, S. A. Narod, and P. Ghadirian. "Risk Factors for Familial and Sporadic Ovarian Cancer among French Canadians: A Case-Control Study." *American Journal of Obstetrics and Gynecology* 179, no. 2 (August 1998): 403–10.

Gonzalez, Kelly D., Katie A. Noltner, Carolyn H. Buzin, Dongqing Gu, Cindy Y. Wen-Fong, Vu Q. Nguyen, Jennifer H. Han, et al. "Beyond Li Fraumeni Syndrome: Clinical Characteristics of Families with P53 Germline Mutations." *Journal of Clinical Oncology: Official Journal of the American Society of Clinical Oncology* 27, no. 8 (March 10, 2009): 1250–56. https://doi.org/10.1200/JCO.2008.16.6959.

Gonzalez, Nicole L., Katie M. O'Brien, Aimee A. D'Aloisio, Dale P. Sandler, and Clarice R. Weinberg. "Douching, Talc Use, and Risk of Ovarian Cancer." *Epidemiology (Cambridge, Mass.)* 27, no. 6 (2016): 797–802. https://doi.org/10.1097/EDE.0000000000000528.

Goodman, Marc T, Galina Lurie, Pamela J Thompson, Katharine E McDuffie, and Michael E Carney. "Association of Two Common Single-Nucleotide Polymorphisms in the CYP19A1 Locus and Ovarian Cancer Risk." *Endocrine-Related Cancer* 15, no. 4 (December 2008): 1055–60. https://doi.org/10.1677/ERC-08-0104.

Gordon, Ronald E., Sean Fitzgerald, and James Millette. "Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women." *International Journal of Occupational and Environmental Health* 20, no. 4 (October 2014): 318–32. https://doi.org/10.1179/2049396714Y.0000000081.

Graham, J., and R. Graham. "Ovarian Cancer and Asbestos." *Environmental Research* 1, no. 2 (October 1967): 115–28.

Graham, and Jenkins. "Value of Modified Starch as a Substitute for Talc." *Lancet (London, England)* 1, no. 6708 (March 22, 1952): 590–91.

Green, A., D. Purdie, C. Bain, V. Siskind, P. Russell, M. Quinn, and B. Ward. "Tubal Sterilisation, Hysterectomy and Decreased Risk of Ovarian Cancer. Survey of Women's Health Study Group." *International Journal of Cancer. Journal International Du Cancer* 71, no. 6 (June 11, 1997): 948–51.

Grivennikov, Sergei I., Florian R. Greten, and Michael Karin. "Immunity, Inflammation, and Cancer." *Cell* 140, no. 6 (March 19, 2010): 883–99. https://doi.org/10.1016/j.cell.2010.01.025.

Gross, A. J., and P. H. Berg. "A Meta-Analytical Approach Examining the Potential Relationship between Talc Exposure and Ovarian Cancer." *Journal of Exposure Analysis and Environmental Epidemiology* 5, no. 2 (June 1995): 181–95.

Hall, J. M., M. K. Lee, B. Newman, J. E. Morrow, L. A. Anderson, B. Huey, and M. C. King. "Linkage of Early-Onset Familial Breast Cancer to Chromosome 17q21." *Science (New York, N.Y.)* 250, no. 4988 (December 21, 1990): 1684–89.

Halme, J., M. G. Hammond, J. F. Hulka, S. G. Raj, and L. M. Talbert. "Retrograde Menstruation in Healthy Women and in Patients with Endometriosis." *Obstetrics and Gynecology* 64, no. 2 (August 1984): 151–54.

Hamilton, T. C., H. Fox, C. H. Buckley, W. J. Henderson, and K. Griffiths. "Effects of Talc on the Rat Ovary." *British Journal of Experimental Pathology* 65, no. 1 (February 1984): 101–6.

Hankinson, S. E., D. J. Hunter, G. A. Colditz, W. C. Willett, M. J. Stampfer, B. Rosner, C. H. Hennekens, and F. E. Speizer. "Tubal Ligation, Hysterectomy, and Risk of Ovarian Cancer. A Prospective Study." *JAMA* 270, no. 23 (December 15, 1993): 2813–18.

Hannenhalli, Sridhar, and Klaus H. Kaestner. "The Evolution of Fox Genes and Their Role in Development and Disease." *Nature Reviews. Genetics* 10, no. 4 (April 2009): 233–40. https://doi.org/10.1038/nrg2523.

Harlow, B. L., D. W. Cramer, D. A. Bell, and W. R. Welch. "Perineal Exposure to Talc and Ovarian Cancer Risk." *Obstetrics and Gynecology* 80, no. 1 (July 1992): 19–26.

Harlow, B. L., and P. A. Hartge. "A Review of Perineal Talc Exposure and Risk of Ovarian Cancer." *Regulatory Toxicology and Pharmacology: RTP* 21, no. 2 (April 1995): 254–60. https://doi.org/10.1006/rtph.1995.1039.

Harlow, B. L., and N. S. Weiss. "A Case-Control Study of Borderline Ovarian Tumors: The Influence of Perineal Exposure to Talc." *American Journal of Epidemiology* 130, no. 2 (August 1989): 390–94.

Harper, Amy K, and Ghassan Saed. ""Talc Induces a pro-Oxidant State in Normal and Ovarian Cancer Cells through Genetic Point Mutations in Key Redox Enzymes," Accepted for Presentation at SGO Meeting," In Press 2019.

Hartge, P., R. Hoover, L. P. Lesher, and L. McGowan. "Talc and Ovarian Cancer." *JAMA: The Journal of the American Medical Association* 250, no. 14 (October 14, 1983): 1844.

Hasselbalch, Hans Carl. "Chronic Inflammation as a Promotor of Mutagenesis in Essential Thrombocythemia, Polycythemia Vera and Myelofibrosis. A Human Inflammation Model for Cancer Development?" *Leukemia Research* 37, no. 2 (February 2013): 214–20. https://doi.org/10.1016/j.leukres.2012.10.020.

Havrilesky, Laura J., Patricia G. Moorman, William J. Lowery, Jennifer M. Gierisch, Remy R. Coeytaux, Rachel Peragallo Urrutia, Michaela Dinan, et al. "Oral Contraceptive Pills as Primary Prevention for Ovarian Cancer: A Systematic Review and Meta-Analysis." *Obstetrics and Gynecology* 122, no. 1 (July 2013): 139–47. https://doi.org/10.1097/AOG.0b013e318291c235.

Heller, D. S., R. E. Gordon, and N. Katz. "Correlation of Asbestos Fiber Burdens in Fallopian Tubes and Ovarian Tissue." *American Journal of Obstetrics and Gynecology* 181, no. 2 (August 1999): 346–47.

Heller, D. S., R. E. Gordon, C. Westhoff, and S. Gerber. "Asbestos Exposure and Ovarian Fiber Burden." *American Journal of Industrial Medicine* 29, no. 5 (May 1996): 435–39. https://doi.org/10.1002/(SICI)1097-0274(199605)29:5<435::AID-AJIM1>3.0.CO;2-L.

Heller, D. S., C. Westhoff, R. E. Gordon, and N. Katz. "The Relationship between Perineal Cosmetic Talc Usage and Ovarian Talc Particle Burden." *American Journal of Obstetrics and Gynecology* 174, no. 5 (May 1996): 1507–10.

Henderson, W. J., T. C. Hamilton, M. S. Baylis, C. G. Pierrepoint, and K. Griffiths. "The Demonstration of the Migration of Talc from the Vagina and Posterior Uterus to the Ovary in the Rat." *Environmental Research* 40, no. 2 (August 1986): 247–50.

Henderson, W. J., C. A. Joslin, A. C. Turnbull, and K. Griffiths. "Talc and Carcinoma of the Ovary and Cervix." *The Journal of Obstetrics and Gynaecology of the British Commonwealth* 78, no. 3 (March 1971): 266–72.

Hernán, Miguel A. "The C-Word: Scientific Euphemisms Do Not Improve Causal Inference From Observational Data." *American Journal of Public Health* 108, no. 5 (May 2018): 616–19. https://doi.org/10.2105/AJPH.2018.304337.

Hill, Austin Bradford. "The Environment and Disease: Association or Causation?" *Proceedings of the Royal Society of Medicine* 58, no. 5 (May 1965): 295–300.

Hillegass, Jedd M., Arti Shukla, Maximilian B. MacPherson, Jeffrey P. Bond, Chad Steele, and Brooke T. Mossman. "Utilization of Gene Profiling and Proteomics to Determine Mineral

Pathogenicity in a Human Mesothelial Cell Line (LP9/TERT-1)." *Journal of Toxicology and Environmental Health. Part A* 73, no. 5 (January 2010): 423–36. https://doi.org/10.1080/15287390903486568.

Horowitz, Neil S., Austin Miller, Bunja Rungruang, Scott D. Richard, Noah Rodriguez, Michael A. Bookman, Chad A. Hamilton, Thomas C. Krivak, and G. Larry Maxwell. "Does Aggressive Surgery Improve Outcomes? Interaction between Preoperative Disease Burden and Complex Surgery in Patients with Advanced-Stage Ovarian Cancer: An Analysis of GOG 182." *Journal of Clinical Oncology: Official Journal of the American Society of Clinical Oncology* 33, no. 8 (March 10, 2015): 937–43. https://doi.org/10.1200/JCO.2014.56.3106.

Houghton, Serena C., Katherine W. Reeves, Susan E. Hankinson, Lori Crawford, Dorothy Lane, Jean Wactawski-Wende, Cynthia A. Thomson, Judith K. Ockene, and Susan R. Sturgeon. "Perineal Powder Use and Risk of Ovarian Cancer." *Journal of the National Cancer Institute* 106, no. 9 (September 2014). https://doi.org/10.1093/jnci/dju208.

Huncharek, Michael, J. F. Geschwind, and Bruce Kupelnick. "Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies." *Anticancer Research* 23, no. 2C (April 2003): 1955–60.

Huncharek, Michael, Joshua Muscat, Adedayo Onitilo, and Bruce Kupelnick. "Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies." *European Journal of Cancer Prevention: The Official Journal of the European Cancer Prevention Organisation (ECP)* 16, no. 5 (October 2007): 422–29. https://doi.org/10.1097/01.cej.0000236257.03394.4a.

Hunn, Jessica, and Gustavo C. Rodriguez. "Ovarian Cancer: Etiology, Risk Factors, and Epidemiology." *Clinical Obstetrics and Gynecology* 55, no. 1 (March 2012): 3–23. https://doi.org/10.1097/GRF.0b013e31824b4611.

IARC. "IARC Monographs on the Evaluation of Carcinogenic Risks to Humans – IARC : Asbestos," 1977. https://monographs.iarc.fr/iarc-monographs-on-the-evaluation-of-carcinogenic-risks-to-humans-79/.

———. "IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 58.  Beryllium, Cadmium, Mercury, and Exposures in the Glass Manufacturing Industry," 1993.

———. "IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Volume 93 Carbon Black, Titanium Dioxide, and Talc." *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans / World Health Organization, International Agency for Research on Cancer* 93 (2010): 1–413.

———. "IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Volume 100C," 2012.

———. "IARC Monographs on the Evaluation of the Carcinogenic Risk of Chemicals to Humans: Silica and Some Silicates." IARC, 1987.

———. "IARC Monographs on the Evaluation of the Carcinogenic Risks to Humans.  Overall Evaluations of Carcinogenicity: An Updating of IARC Monographs Volumes 1-42.  Supplement 7," 1987. https://monographs.iarc.fr/wp-content/uploads/2018/06/Suppl7.pdf.

IARC, International Agency for Research on Cancer, and World Health Organization, eds. *Carbon Black, Titanium Dioxide, and Talc*. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, v. 93. Lyon, France : Geneva: International Agency for Research on Cancer ; Distributed by WHO Press, 2010.

"IMERYS 013188," n.d.

"IMERYS 088907 Rio Tinto Minerals HSE&EA Science Advisory Meeting." September 17, 2007.

"IMERYS 284935," n.d.

"IMERYS137677-IMERYS137690," 2004.

"IMERYS209971," 1972.

"IMERYS210136," n.d.

"IMERYS241866," n.d.

"IMERYS248877," n.d.

"IMERYS255101," n.d.

"IMERYS255224," n.d.

"IMERYS255384," n.d.

"IMERYS255394," n.d.

"IMERYS255395," n.d.

"IMERYS279884," n.d.

"IMERYS279968," n.d.

"IMERYS281335," n.d.

"IMERYS281776," n.d.

"IMERYS324700," n.d.

"IMERYS-A_0011817," n.d.

"Inflammation: A Hidden Path to Breaking the Spell of Ovarian Cancer." *Cell Cycle* 8, no. 19 (2009): 3107–11.

Institute of Medicine (US) Committee on Asbestos: Selected Health Effects. *Asbestos: Selected Cancers*. The National Academies Collection: Reports Funded by National Institutes of Health. Washington (DC): National Academies Press (US), 2006. http://www.ncbi.nlm.nih.gov/books/NBK20332/.

Isaacs, Claudine, and Beth N Peshkin. "Management of Patients at High Risk for Breast and Ovarian Cancer." *UpToDate*, 2018.

Iturralde, M., and P. F. Venter. "Hysterosalpingo-Radionuclide Scintigraphy (HERS)." *Seminars in Nuclear Medicine* 11, no. 4 (October 1981): 301–14.

J. Lightfoot, G.A. Kingston, and F.D. Pooley. "An Examination of Italian Mine Samples and Relevant Powders," 1972.

Jaiswal, M., N. F. LaRusso, L. J. Burgart, and G. J. Gores. "Inflammatory Cytokines Induce DNA Damage and Inhibit DNA Repair in Cholangiocarcinoma Cells by a Nitric Oxide-Dependent Mechanism." *Cancer Research* 60, no. 1 (January 1, 2000): 184–90.

"JANSSEN-000056 P-23 (Pltf_MISC_00000321) Ortho Diaphragm Information," n.d.

Jaurand, M. C. "Mechanisms of Fiber-Induced Genotoxicity." *Environmental Health Perspectives* 105 Suppl 5 (September 1997): 1073–84. https://doi.org/10.1289/ehp.97105s51073.

———. "Particulate-State Carcinogenesis: A Survey of Recent Studies on the Mechanisms of Action of Fibres." *IARC Scientific Publications*, no. 90 (1989): 54–73.

Jaurand, MC. "Mechanisms of Fibre Genotoxicity." In *Mechanisms in Fibre Carcinogenesis*. New York: Plenum Press, 1991.

Jervis, Sarah, Honglin Song, Andrew Lee, Ed Dicks, Jonathan Tyrer, Patricia Harrington, Douglas F. Easton, Ian J. Jacobs, Paul P. D. Pharoah, and Antonis C. Antoniou. "Ovarian Cancer Familial Relative Risks by Tumour Subtypes and by Known Ovarian Cancer Genetic Susceptibility Variants." *Journal of Medical Genetics* 51, no. 2 (February 2014): 108–13. https://doi.org/10.1136/jmedgenet-2013-102015.

Jia, D, Y Nagaoka, S Orsulic, and M Katsumata. "Inflammation Is a Key Contributor to Ovarian Cancer Cell Seeding." *Scientific Reports* 8, no. 12394 (August 17, 2018). https://doi.org/10.1038/s41598-018-30261-8.

Jiang, Zhongliang, Nicole M. Fletcher, Rouba Ali-Fehmi, Michael P. Diamond, Husam M. Abu-Soud, Adnan R. Munkarah, and Ghassan M. Saed. "Modulation of Redox Signaling Promotes Apoptosis in Epithelial Ovarian Cancer Cells." *Gynecologic Oncology* 122, no. 2 (August 2011): 418–23. https://doi.org/10.1016/j.ygyno.2011.04.051.

"JNJ000000704 P-396," n.d.

"JNJ000011150," n.d.

"JNJ000016645," n.d.

"JNJ000019415," n.d.

"JNJ000025132," 1976.

"JNJ000025132," n.d.

"JNJ000026987," n.d.

"JNJ000046293," n.d.

"JNJ000245678," n.d.

"JNJ000245762," n.d.

"JNJ000251888," n.d.

"JNJ000260700," n.d.

"JNJ000261010," n.d.

"JNJ000265536," n.d.

"JNJ000279507," n.d.

"JNJ000348778," n.d.

"JNJ000404860," n.d.

"JNJ000460665," n.d.

"JNJ000526750," n.d.

John M. DeSesso. "Exponent Talc Defense Presentation Toxic Talc?" January 18, 2018.

Jones, Richard E., and Kristin H. Lopez. "Human Reproductive Biology - 4th Edition Chapter 9 - Gamete Transport and Fertilization." In *Human Reproductive Biology*, Third., 159–73. San Diego: Academic Press, 2006. https://doi.org/10.1016/B978-0-12-382184-3.00009-X.

Jordan, SJ, KL Cushing-Haugen, KG Wicklund, JA Doherty, and MA Rossing. "Breast Feeding and Risk of Epithelial Ovarian Cancer." *Cancer Causes & Control : CCC* 23, no. 6 (June 2012): 919–27. https://doi.org/10.1007/s10552-012-9963-4.

Jordan, Susan J., Victor Siskind, Adèle C Green, David C. Whiteman, and Penelope M. Webb. "Breastfeeding and Risk of Epithelial Ovarian Cancer." *Cancer Causes & Control: CCC* 21, no. 1 (January 2010): 109–16. https://doi.org/10.1007/s10552-009-9440-x.

Jordan, Susan J., David C. Whiteman, David M. Purdie, Adèle C. Green, and Penelope M. Webb. "Does Smoking Increase Risk of Ovarian Cancer? A Systematic Review." *Gynecologic Oncology* 103, no. 3 (December 2006): 1122–29. https://doi.org/10.1016/j.ygyno.2006.08.012.

Jurinski, Joseph B., and J. Donald Rimstidt. "Biodurability of Talc." *American Mineralogist* 86, no. 4 (April 2001): 392–99. https://doi.org/10.2138/am-2001-0402.

Kane, AB, P Boffetta, R Saracci, and JD Wilbourn. "Mechanisms of Fibre Carcinogenesis." IARC, 1996.

Kang, N., D. Griffin, and H. Ellis. "The Pathological Effects of Glove and Condom Dusting Powders." *Journal of Applied Toxicology* 12, no. 6 (December 1992): 443–49. https://doi.org/10.1002/jat.2550120614.

13

Karageorgi, Stalo, Margaret A. Gates, Susan E. Hankinson, and Immaculata De Vivo. "Perineal Use of Talcum Powder and Endometrial Cancer Risk." *Cancer Epidemiology, Biomarkers & Prevention : A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 19, no. 5 (May 2010): 1269–75. https://doi.org/10.1158/1055-9965.EPI-09-1221.

Kasper, C. S., and P. J. Chandler. "Possible Morbidity in Women from Talc on Condoms." *JAMA: The Journal of the American Medical Association* 273, no. 11 (March 15, 1995): 846–47.

Kauff, Noah D., Nandita Mitra, Mark E. Robson, Karen E. Hurley, Shaokun Chuai, Deborah Goldfrank, Eve Wadsworth, et al. "Risk of Ovarian Cancer in BRCA1 and BRCA2 Mutation-Negative Hereditary Breast Cancer Families." *Journal of the National Cancer Institute* 97, no. 18 (September 21, 2005): 1382–84. https://doi.org/10.1093/jnci/dji281.

Keskin, Nadi, Yasemin Aktan Teksen, Esra Gürlek Ongun, Yusuf Ozay, and Halil Saygili. "Does Long-Term Talc Exposure Have a Carcinogenic Effect on the Female Genital System of Rats? An Experimental Pilot Study." *Archives of Gynecology and Obstetrics* 280, no. 6 (December 2009): 925–31. https://doi.org/10.1007/s00404-009-1030-3.

Khan, Mohd Imran, AmoghA. Sahasrabuddhe, Govil Patil, Mohd Javed Akhtar, Mohd Ashquin, and Iqbal Ahmad. "Nano-Talc Stabilizes TNF- $\alpha$ m-RNA in Human Macrophages." *Journal of Biomedical Nanotechnology* 7, no. 1 (January 1, 2011): 112–13. https://doi.org/10.1166/jbn.2011.1227.

King, HM. "Talc: The Softest Mineral.," n.d. https://geology.com/minerals/talc.shtml.

King, Talmadge. "Asbestos-Related Pleuropulmonary Disease." Edited by Kevin Flaherty. *UpToDate*, 2018.

Kiraly, Orsolya, Guanyu Gong, Werner Olipitz, Sureshkumar Muthupalani, and Bevin P. Engelward. "Inflammation-Induced Cell Proliferation Potentiates DNA Damage-Induced Mutations In Vivo." *PLoS Genetics*, February 3, 2015. https://doi.org/10.1371/journal.pgen.1004901.

Kissler, Stefan, Ernst Siebzehnruebl, Joachim Kohl, Anja Mueller, Nadja Hamscho, Regine Gaetje, Andre Ahr, Achim Rody, and Manfred Kaufmann. "Uterine Contractility and Directed Sperm Transport Assessed by Hysterosalpingoscintigraphy (HSSG) and Intrauterine Pressure (IUP) Measurement." *Acta Obstetricia Et Gynecologica Scandinavica* 83, no. 4 (April 2004): 369–74.

Klampfer, Lidija. "Cytokines, Inflammation and Colon Cancer." *Current Cancer Drug Targets* 11, no. 4 (May 2011): 451–64.

Knudson, A. G. "Mutation and Cancer: Statistical Study of Retinoblastoma." *Proceedings of the National Academy of Sciences of the United States of America* 68, no. 4 (April 1971): 820–23.

Kunz, G., D. Beil, H. Deininger, A. Einspanier, G. Mall, and G. Leyendecker. "The Uterine Peristaltic Pump. Normal and Impeded Sperm Transport within the Female Genital Tract." *Advances in Experimental Medicine and Biology* 424 (1997): 267–77.

Kurman, Robert J., and Ie-Ming Shih. "Molecular Pathogenesis and Extraovarian Origin of Epithelial Ovarian Cancer. Shifting the Paradigm." *Human Pathology* 42, no. 7 (July 2011): 918–31. https://doi.org/10.1016/j.humpath.2011.03.003.

———. "The Dualistic Model of Ovarian Carcinogenesis." *The American Journal of Pathology* 186, no. 4 (April 1, 2016): 733–47. https://doi.org/10.1016/j.ajpath.2015.11.011.

———. "The Origin and Pathogenesis of Epithelial Ovarian Cancer: A Proposed Unifying Theory." *The American Journal of Surgical Pathology* 34, no. 3 (March 2010): 433–43. https://doi.org/10.1097/PAS.0b013e3181cf3d79.

Kurta, Michelle L., Kirsten B. Moysich, Joel L. Weissfeld, Ada O. Youk, Clareann H. Bunker, Robert P. Edwards, Francesmary Modugno, Roberta B. Ness, and Brenda Diergaarde. "Use of Fertility

14

Drugs and Risk of Ovarian Cancer: Results from a US-Based Case-Control Study." *Cancer Epidemiology, Biomarkers & Prevention : A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 21, no. 8 (August 2012): 1282–92. https://doi.org/10.1158/1055-9965.EPI-12-0426.

La Vecchia. "Ovarian Cancer: Epidemiology and Risk Factors." *European Journal of Cancer Prevention* 26 (2017): 55–62.

Lancaster, Johnathan M., C. Bethan Powell, Lee-may Chen, and Debra L. Richardson. "Society of Gynecologic Oncology Statement on Risk Assessment for Inherited Gynecologic Cancer Predispositions." *Gynecologic Oncology* 136, no. 1 (January 2015): 3–7. https://doi.org/10.1016/j.ygyno.2014.09.009.

Landen, Charles N., Michael J. Birrer, and Anil K. Sood. "Early Events in the Pathogenesis of Epithelial Ovarian Cancer." *Journal of Clinical Oncology: Official Journal of the American Society of Clinical Oncology* 26, no. 6 (February 20, 2008): 995–1005. https://doi.org/10.1200/JCO.2006.07.9970.

Langseth, H., S. E. Hankinson, J. Siemiatycki, and E. Weiderpass. "Perineal Use of Talc and Risk of Ovarian Cancer." *Journal of Epidemiology and Community Health* 62, no. 4 (April 2008): 358–60. https://doi.org/10.1136/jech.2006.047894.

Langseth, H., B.V. Johansen, J.M. Nesland, and K. Kjaerheim. "Asbestos Fibers in Ovarian Tissue from Norwegian Pulp and Paper Workers." *International Journal of Gynecological Cancer* 17, no. 1 (January 2007): 44–49. https://doi.org/10.1111/j.1525-1438.2006.00768.x.

Langseth, Hilde, and Kristina Kjaerheim. "Ovarian Cancer and Occupational Exposure among Pulp and Paper Employees in Norway." *Scandinavian Journal of Work, Environment & Health* 30, no. 5 (October 2004): 356–61.

Lanphear, B. P., and C. R. Buncher. "Latent Period for Malignant Mesothelioma of Occupational Origin." *Journal of Occupational Medicine.: Official Publication of the Industrial Medical Association* 34, no. 7 (July 1992): 718–21.

Lee, Jennifer S., Esther M. John, Valerie McGuire, Anna Felberg, Kimberly L. Ostrow, Richard A. DiCioccio, Frederick P. Li, Alexander Miron, Dee W. West, and Alice S. Whittemore. "Breast and Ovarian Cancer in Relatives of Cancer Patients, with and without BRCA Mutations." *Cancer Epidemiology, Biomarkers & Prevention: A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 15, no. 2 (February 2006): 359–63. https://doi.org/10.1158/1055-9965.EPI-05-0687.

Levanon, Keren, Christopher Crum, and Ronny Drapkin. "New Insights Into the Pathogenesis of Serous Ovarian Cancer and Its Clinical Impact." *Journal of Clinical Oncology* 26, no. 32 (November 10, 2008): 5284–93. https://doi.org/10.1200/JCO.2008.18.1107.

Levy-Lahad, E., and E. Friedman. "Cancer Risks among BRCA1 and BRCA2 Mutation Carriers." *British Journal of Cancer* 96, no. 1 (January 15, 2007): 11–15. https://doi.org/10.1038/sj.bjc.6603535.

Lin, Hui-Wen, Ying-Yueh Tu, Shiyng Yu Lin, Wei-Ju Su, Wei Li Lin, Wei Zer Lin, Shen-Chi Wu, and Yuen-Liang Lai. "Risk of Ovarian Cancer in Women with Pelvic Inflammatory Disease: A Population-Based Study." *The Lancet. Oncology* 12, no. 9 (September 2011): 900–904. https://doi.org/10.1016/S1470-2045(11)70165-6.

Liou, Geou-Yarh, and Peter Storz. "Reactive Oxygen Species in Cancer." *Free Radical Research* 44, no. 5 (May 2010): 476–96. https://doi.org/10.3109/10715761003667554.

Liu, D. T., and A. Hitchcock. "Endometriosis: Its Association with Retrograde Menstruation, Dysmenorrhoea and Tubal Pathology." *British Journal of Obstetrics and Gynaecology* 93, no. 8 (August 1986): 859–62.

Lo-Ciganic, Wei-Hsuan, Janice C. Zgibor, Clareann H. Bunker, Kirsten B. Moysich, Robert P. Edwards, and Roberta B. Ness. "Aspirin, Nonaspirin Nonsteroidal Anti-Inflammatory Drugs, or Acetaminophen and Risk of Ovarian Cancer." *Epidemiology (Cambridge, Mass.)* 23, no. 2 (March 2012): 311–19. https://doi.org/10.1097/EDE.0b013e3182456ad3.

Lockey, J. E. "Nonasbestos Fibrous Minerals." *Clinics in Chest Medicine* 2, no. 2 (May 1981): 203–18.

"Longo - Feb 2018 MAS Report," 2018.

Longo, D. L., and R. C. Young. "Cosmetic Talc and Ovarian Cancer." *Lancet* 2, no. 8138 (August 18, 1979): 349–51.

Longo, William E., and Mark W. Rigler. "Analysis of Johnson & Johnson Baby Powder & Valiant Shower to Shower Products for Amphibole (Tremolite) Asbestos," August 2, 2017.

Longo, William E., and Rigler, Mark W. "MAS Project #14-1683, Analysis of William E. Longo, PhD and Mark W. Rigler, PhD," April 28, 2017.

———. "TEM Analysis of Historical 1978 Johnson's Baby Powder Sample for Amphibole Asbestos," February 16, 2018.

Longo, William E., and Mark W. Rigler. "The Analysis of Johnson & Johnson's Historical Baby Powder & Shower to Shower Products from the 1960's to the Early 1990's for Amphibole Asbestos," November 14, 2018.

Longo, William E., Mark W. Rigler, and William B. Egeland. "Below the Waist Application of Johnson & Johnson Baby Powder." Materials Analytical Service, LLC, September 2017.

Luan, Nan-Nan, Qi-Jun Wu, Ting-Ting Gong, Emily Vogtmann, Yong-Lai Wang, and Bei Lin. "Breastfeeding and Ovarian Cancer Risk: A Meta-Analysis of Epidemiologic Studies1234." *The American Journal of Clinical Nutrition* 98, no. 4 (October 2013): 1020–31. https://doi.org/10.3945/ajcn.113.062794.

Lundin, Eva, Laure Dossus, Tess Clendenen, Vittorio Krogh, Kjell Grankvist, Marianne Wulff, Sabina Sieri, et al. "C-Reactive Protein and Ovarian Cancer: A Prospective Study Nested in Three Cohorts (Sweden, USA, Italy)." *Cancer Causes & Control: CCC* 20, no. 7 (September 2009): 1151–59. https://doi.org/10.1007/s10552-009-9330-2.

Madsen, Cecilie, Louise Baandrup, Christian Dehlendorff, and Susanne K. Kjaer. "Tubal Ligation and Salpingectomy and the Risk of Epithelial Ovarian Cancer and Borderline Ovarian Tumors: A Nationwide Case-Control Study." *Acta Obstetricia Et Gynecologica Scandinavica* 94, no. 1 (January 2015): 86–94. https://doi.org/10.1111/aogs.12516.

Magnani, C., D. Ferrante, F. Barone-Adesi, M. Bertolotti, A. Todesco, D. Mirabelli, and B. Terracini. "Cancer Risk after Cessation of Asbestos Exposure: A Cohort Study of Italian Asbestos Cement Workers." *Occupational and Environmental Medicine* 65, no. 3 (March 2008): 164–70. https://doi.org/10.1136/oem.2007.032847.

Mäki-Nevala, Satu, Virinder Kaur Sarhadi, Aija Knuuttila, Ilari Scheinin, Pekka Ellonen, Sonja Lagström, Mikko Rönty, et al. "Driver Gene and Novel Mutations in Asbestos-Exposed Lung Adenocarcinoma and Malignant Mesothelioma Detected by Exome Sequencing." *Lung* 194, no. 1 (February 2016): 125–35. https://doi.org/10.1007/s00408-015-9814-7.

Mallen, Adrianne R., Mary K. Townsend, and Shelley S. Tworoger. "Risk Factors for Ovarian Carcinoma." *Hematology/Oncology Clinics of North America*, September 2018. https://doi.org/10.1016/j.hoc.2018.07.002.

Mannino, David M. "Cigarette Smoking and Other Possible Risk Factors for Lung Cancer." *UpToDate*, 2018.

McCullough, Marie. "Condom Makers Stop Using Talc." *Asbury Park Press*. January 16, 1996.

———. "Women's Health Concerns Prompt Condom Makers to Stop Using Talc." *Jersey Journal*. April 17, 1996, City Edition edition.

McLaughlin-Drubin, Margaret E., and Karl Munger. "Viruses Associated with Human Cancer." *Biochimica et Biophysica Acta* 1782, no. 3 (March 2008): 127–50. https://doi.org/10.1016/j.bbadis.2007.12.005.

McLemore, Miaskowski, Chen Aouizerat, and Dodd. "Epidemiological and Genetic Factors Associated With Ovarian Cancer." *Cancer Nursing* 32, no. 4 (2009): 281–88.

Melaiu, Ombretta, Federica Gemignani, and Stefano Landi. "The Genetic Susceptibility in the Development of Malignant Pleural Mesothelioma." *Journal of Thoracic Disease* 10, no. Suppl 2 (January 2018): S246–52. https://doi.org/10.21037/jtd.2017.10.41.

Meng, Qingsong, Weixue Sun, John Jiang, Nicole M. Fletcher, Michael P. Diamond, and Ghassan M. Saed. "Identification of Common Mechanisms between Endometriosis and Ovarian Cancer." *Journal of Assisted Reproduction and Genetics* 28 (2011): 917–23.

Merritt, Melissa A., Adèle C. Green, Christina M. Nagle, Penelope M. Webb, Australian Cancer Study (Ovarian Cancer), and Australian Ovarian Cancer Study Group. "Talcum Powder, Chronic Pelvic Inflammation and NSAIDs in Relation to Risk of Epithelial Ovarian Cancer." *International Journal of Cancer. Journal International Du Cancer* 122, no. 1 (January 1, 2008): 170–76. https://doi.org/10.1002/ijc.23017.

Miller, Diane M, and Jessica N. McAlpine. "Opportunistic Salpingectomy for Ovarian, Fallopian Tubal, and Peritoneal Carcinoma Risk Reduction." *UpToDate*, 2018.

Mills, Paul K., Deborah G. Riordan, Rosemary C. Cress, and Heather A. Young. "Perineal Talc Exposure and Epithelial Ovarian Cancer Risk in the Central Valley of California." *International Journal of Cancer. Journal International Du Cancer* 112, no. 3 (November 10, 2004): 458–64. https://doi.org/10.1002/ijc.20434.

Milne, R. L., and A. C. Antoniou. "Genetic Modifiers of Cancer Risk for BRCA1 and BRCA2 Mutation Carriers." *Annals of Oncology: Official Journal of the European Society for Medical Oncology* 22 Suppl 1 (January 2011): i11-17. https://doi.org/10.1093/annonc/mdq660.

Milne, Roger L., and Antonis C. Antoniou. "Modifiers of Breast and Ovarian Cancer Risks for BRCA1 and BRCA2 Mutation Carriers." *Endocrine-Related Cancer* 23, no. 10 (2016): T69-84. https://doi.org/10.1530/ERC-16-0277.

Moller, Danielsen, and Roursgaard Jantzen. "Oxidatively Damaged DNA in Animals Exposed to Particles." *Critical Reviews in Toxicology* 43, no. 2 (2013): 96–118.

Moon, Min Chaul, Jung Duck Park, Byung Soon Choi, So Young Park, Dong Won Kim, Yong Hyun Chung, Naomi Hisanaga, and Il Je Yu. "Risk Assessment of Baby Powder Exposure through Inhalation." *Toxicological Research* 27, no. 3 (September 2011): 137–41. https://doi.org/10.5487/TR.2011.27.3.137.

Moorman, Patricia G. "Scientific Review of the Epidemiologic Evidence on Talc Use and Ovarian Cancer," February 2018.

Moorman, Patricia G., Rachel T. Palmieri, Lucy Akushevich, Andrew Berchuck, and Joellen M. Schildkraut. "Ovarian Cancer Risk Factors in African-American and White Women." *American Journal of Epidemiology* 170, no. 5 (September 1, 2009): 598–606. https://doi.org/10.1093/aje/kwp176.

Mostafa, S. A., C. B. Bargeron, R. W. Flower, N. B. Rosenshein, T. H. Parmley, and J. D. Woodruff. "Foreign Body Granulomas in Normal Ovaries." *Obstetrics and Gynecology* 66, no. 5 (November 1985): 701–2.

Murphy, Megan A., Britton Trabert, Hannah P. Yang, Yikyung Park, Louise A. Brinton, Patricia Hartge, Mark E. Sherman, Albert Hollenbeck, and Nicolas Wentzensen. "Non-Steroidal Anti-Inflammatory Drug Use and Ovarian Cancer Risk: Findings from the NIH-AARP Diet and Health Study and Systematic Review." *Cancer Causes & Control : CCC* 23, no. 11 (November 2012): 1839–52. https://doi.org/10.1007/s10552-012-0063-2.

Muscat, J. E., and M. S. Huncharek. "Causation and Disease: Biomedical Science in Toxic Tort Litigation." *Journal of Occupational Medicine.: Official Publication of the Industrial Medical Association* 31, no. 12 (December 1989): 997–1002.

Nadler, Diana L., and Igor G. Zurbenko. "Estimating Cancer Latency Times Using a Weibull Model," 2014, 8.

Narod, Steven A. "Talc and Ovarian Cancer." *Gynecologic Oncology* 141, no. 3 (2016): 410–12. https://doi.org/10.1016/j.ygyno.2016.04.011.

National Cancer Institute, Surveillance, Epidemiology, and End Results Program. "Cancer Stat Facts: Ovarian Cancer," 2018. https://seer.cancer.gov/statfacts/html/ovary.html.

"National Toxicology Program (NTP) Technical Report (NTP TR 421) on the Toxicology and Carcinogenesis Studies of Talc in F344/N Rats and B6C3F1 Mice." National Institutes of Health, 1993.

Nelson, Heather H., and Karl T. Kelsey. "The Molecular Epidemiology of Asbestos and Tobacco in Lung Cancer." *Oncogene* 21, no. 48 (October 21, 2002): 7284–88. https://doi.org/10.1038/sj.onc.1205804.

Ness, R. B., and C. Cottreau. "Possible Role of Ovarian Epithelial Inflammation in Ovarian Cancer." *JNCI Journal of the National Cancer Institute* 91, no. 17 (September 1, 1999): 1459–67. https://doi.org/10.1093/jnci/91.17.1459.

Ness, R. B., J. A. Grisso, C. Cottreau, J. Klapper, R. Vergona, J. E. Wheeler, M. Morgan, and J. J. Schlesselman. "Factors Related to Inflammation of the Ovarian Epithelium and Risk of Ovarian Cancer." *Epidemiology (Cambridge, Mass.)* 11, no. 2 (March 2000): 111–17.

Ness, Roberta B., Daniel W. Cramer, Marc T. Goodman, Susanne Krüger Kjaer, Kathy Mallin, Berit Jul Mosgaard, David M. Purdie, Harvey A. Risch, Ronald Vergona, and Anna H. Wu. "Infertility, Fertility Drugs, and Ovarian Cancer: A Pooled Analysis of Case-Control Studies." *American Journal of Epidemiology* 155, no. 3 (February 1, 2002): 217–24.

Neutra, Raymond Richard, Carl F. Cranor, and David Gee. "The Use and Misuse of Bradford Hill in U.S. Tort Law." *Jurimetrics J.*, 2018, 127–62.

Newhouse, M. L., G. Berry, J. C. Wagner, and M. E. Turok. "A Study of the Mortality of Female Asbestos Workers." *British Journal of Industrial Medicine* 29, no. 2 (April 1972): 134–41.

Nick, Alpa M., Robert L. Coleman, Pedro T. Ramirez, and Anil K. Sood. "A Framework for a Personalized Surgical Approach to Ovarian Cancer." *Nature Reviews. Clinical Oncology* 12, no. 4 (April 2015): 239–45. https://doi.org/10.1038/nrclinonc.2015.26.

NIOSH. "Asbestos Fibers and Other Elongated Mineral Particles: State of the Science and Roadmap for Research (Revised Draft)," January 2009.

———. "Fiber Exposure during Use of Baby Powders, Report No. IWS-36-6.," July 1972. https://www.cdc.gov/niosh/nioshtic-2/00106056.html.

"NIOSH 2011 Current Intelligence Bulletin No. 62," 2011.

"NIOSHTIC-2 Publications Search - 00106056 - Fiber Exposure during Use of Baby Powders, Report No. IWS-36-6." Accessed August 16, 2018. https://www.cdc.gov/niosh/nioshtic-2/00106056.html.

"NIOSHTIC-2 Publications Search - 00106056 - Fiber .Pdf," n.d.

Norquist, Barbara M., Maria I. Harrell, Mark F. Brady, Tom Walsh, Ming K. Lee, Suleyman Gulsuner, Sarah S. Bernards, et al. "Inherited Mutations in Women With Ovarian Carcinoma." *JAMA Oncology* 2, no. 4 (April 2016): 482–90. https://doi.org/10.1001/jamaoncol.2015.5495.

NTP. "NTP Technical Report on the Toxicology and Carcinogenesis Studies of Benzophenone (CAS No. 119-61-9) In F344/N Rats and B6C3F1 Mice," February 2006.

"NTP Toxicology and Carcinogenesis Studies of Talc (CAS No. 14807-96-6)(NonAsbestiform) in F344/N.Rats and B6C3Fl Mice (Inhalation Studies)," 1993.

Oberdörster, Günter, Eva Oberdörster, and Jan Oberdörster. "Nanotoxicology: An Emerging Discipline Evolving from Studies of Ultrafine Particles." *Environmental Health Perspectives* 113, no. 7 (July 2005): 823–39. https://doi.org/10.1289/ehp.7339.

Okada, Futoshi. "Beyond Foreign-Body-Induced Carcinogenesis: Impact of Reactive Oxygen Species Derived from Inflammatory Cells in Tumorigenic Conversion and Tumor Progression." *International Journal of Cancer* 121, no. 11 (December 1, 2007): 2364–72. https://doi.org/10.1002/ijc.23125.

Paoletti, L., S. Caiazza, G. Donelli, and F. Pocchiari. "Evaluation by Electron Microscopy Techniques of Asbestos Contamination in Industrial, Cosmetic, and Pharmaceutical Talcs." *Regulatory Toxicology and Pharmacology: RTP* 4, no. 3 (September 1984): 222–35.

Park, Hyo K., Joellen M. Schildkraut, Anthony J. Alberg, Elisa V. Bandera, Jill S. Barnholtz-Sloan, Melissa Bondy, Sydnee Crankshaw, et al. "Benign Gynecologic Conditions Are Associated with Ovarian Cancer Risk in African-American Women: A Case–Control Study." *Cancer Causes & Control*, September 29, 2018. https://doi.org/10.1007/s10552-018-1082-4.

Parmar, M. K. B., J. A. Ledermann, N. Colombo, A. du Bois, J.-F. Delaloye, G. B. Kristensen, S. Wheeler, et al. "Paclitaxel plus Platinum-Based Chemotherapy versus Conventional Platinum-Based Chemotherapy in Women with Relapsed Ovarian Cancer: The ICON4/AGO-OVAR-2.2 Trial." *Lancet (London, England)* 361, no. 9375 (June 21, 2003): 2099–2106.

Parmley, T. H., and J. D. Woodruff. "The Ovarian Mesothelioma." *American Journal of Obstetrics and Gynecology* 120, no. 2 (September 15, 1974): 234–41.

*Pathology of Asbestos-Associated Diseases*, 2011. http://www.springer.com/medicine/pathology/book/978-1-4419-1894-9.

"PCPC_MDL00062175," May 25, 1999.

Pearce, Celeste Leigh, Claire Templeman, Mary Anne Rossing, Alice Lee, Aimee M Near, Penelope M Webb, Christina M Nagle, et al. "Association between Endometriosis and Risk of Histological Subtypes of Ovarian Cancer: A Pooled Analysis of Case–Control Studies." *The Lancet Oncology* 13, no. 4 (April 2012): 385–94. https://doi.org/10.1016/S1470-2045(11)70404-1.

Pejovic, Tanja, and Farr Nezhat. "Missing Link: Inflammation and Ovarian Cancer." *The Lancet. Oncology* 12, no. 9 (September 2011): 833–34. https://doi.org/10.1016/S1470-2045(11)70203-0.

Pelling, D., and J. G. Evans. "Long-Term Peritoneal Tissue Response in Rats to Mould-Release Agents and Lubricant Powder Used on Surgeons' Gloves." *Food and Chemical Toxicology: An International Journal Published for the British Industrial Biological Research Association* 24, no. 5 (May 1986): 425–30.

Penninkilampi, Ross, and Guy D. Eslick. "Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis." *Epidemiology (Cambridge, Mass.)* 29, no. 1 (January 2018): 41–49. https://doi.org/10.1097/EDE.0000000000000745.

Peshkin, B., and et al. "Genetic Counseling and Testing for Hereditary Breast and Ovarian Cancer - UpToDate," 2018. https://www.uptodate.com/contents/genetic-counseling-and-testing-for-hereditary-breast-and-ovarian-cancer?search=Genetic%20counseling%20and%20testing%20for%20hereditary%20breast%20and%20ovarian%20cancer&source=search_result&selectedTitle=1~150&usage_type=default&display_rank=1.

———. "Overview of Hereditary Breast and Ovarian Cancer Syndromes - UpToDate," 2018. https://www.uptodate.com/contents/overview-of-hereditary-breast-and-ovarian-cancer-syndromes?search=Overview%20of%20hereditary%20breast%20and%20ovarian%20cancer%20syndromes&source=search_result&selectedTitle=1~150&usage_type=default&display_rank=1.

———. "Prevalence of BRCA1 and BRCA2 Mutations and Associated Cancer Risks - UpToDate," 2018. https://www.uptodate.com/contents/prevalence-of-brca1-and-brca2-mutations-and-associated-cancer-risks?search=prevalence-of-brca1-and-brca2-mu%E2%80%A6search_result%26selectedTitle%3D1~73%26usage_type%3Ddefault%26display_rank%3D1&source=search_result&selectedTitle=2~150&usage_type=default&display_rank=2.

Phillips, J. C., P. J. Young, K. Hardy, and S. D. Gangolli. "Studies on the Absorption and Disposition of 3H-Labelled Talc in the Rat, Mouse, Guinea-Pig and Rabbit." *Food and Cosmetics Toxicology* 16, no. 2 (April 1978): 161–63.

Pira, E, C Pelucchi, L Buffoni, A Palmas, M Turbiglio, E Negri, P G Piolatto, and C La Vecchia. "Cancer Mortality in a Cohort of Asbestos Textile Workers." *British Journal of Cancer* 92, no. 3 (February 2005): 580–86. https://doi.org/10.1038/sj.bjc.6602240.

Pira, Enrico, Canzio Romano, Francesco S. Violante, Andrea Farioli, Giovanna Spatari, Carlo La Vecchia, and Paolo Boffetta. "Updated Mortality Study of a Cohort of Asbestos Textile Workers." *Cancer Medicine* 5, no. 9 (2016): 2623–28. https://doi.org/10.1002/cam4.824.

"Pltf_MISC_00000272 (JANSSEN-000001-19)," 1962.

Porro, F. W., and N. M. Levine. "Pathology of Talc Pneumoconiosis with Report of an Autopsy." *Northern New York Medical Journal* 3 (April 1946): 23–25.

Pott, R., and K. H. Friedrichs. "Tumors in Rats Following i.p. Injection of Fiberform Dusts." *Naturwissenschaften* 59 (n.d.): 318–24.

Prat, Jaime, and FIGO Committee on Gynecologic Oncology. "Abridged Republication of FIGO's Staging Classification for Cancer of the Ovary, Fallopian Tube, and Peritoneum." *Cancer* 121, no. 19 (October 1, 2015): 3452–54. https://doi.org/10.1002/cncr.29524.

Pukkala, Eero, Jan Ivar Martinsen, Elsebeth Lynge, Holmfridur Kolbrun Gunnarsdottir, Pär Sparén, Laufey Tryggvadottir, Elisabete Weiderpass, and Kristina Kjaerheim. "Occupation and Cancer - Follow-up of 15 Million People in Five Nordic Countries." *Acta Oncologica (Stockholm, Sweden)* 48, no. 5 (2009): 646–790. https://doi.org/10.1080/02841860902913546.

Purdie, D., A. Green, C. Bain, V. Siskind, B. Ward, N. Hacker, M. Quinn, G. Wright, P. Russell, and B. Susil. "Reproductive and Other Factors and Risk of Epithelial Ovarian Cancer: An Australian Case-Control Study. Survey of Women's Health Study Group." *International Journal of Cancer. Journal International Du Cancer* 62, no. 6 (September 15, 1995): 678–84.

Purdie, David M., Christopher J. Bain, Victor Siskind, Penelope M. Webb, and Adèle C. Green. "Ovulation and Risk of Epithelial Ovarian Cancer." *International Journal of Cancer. Journal International Du Cancer* 104, no. 2 (March 20, 2003): 228–32. https://doi.org/10.1002/ijc.10927.

Radic, I, I Vucak, J Milosevic, A Marusic, S Vukicevic, and M Marusic. "Immunosuppression Induced by Talc Granulomatosis in the Rat." *Clinical and Experimental Immunology* 73, no. 2 (August 1988): 316–21.

Ramus, Susan J., Antonis C. Antoniou, Karoline B. Kuchenbaecker, Penny Soucy, Jonathan Beesley, Xiaoqing Chen, Lesley McGuffog, et al. "Ovarian Cancer Susceptibility Alleles and Risk of Ovarian Cancer in BRCA1 and BRCA2 Mutation Carriers." *Human Mutation* 33, no. 4 (April 2012): 690–702. https://doi.org/10.1002/humu.22025.

Rasool, Nabila, Amanda Nickles Fader, Leigh Seamon, Nikki L. Neubauer, Fadi Abu Shahin, Heather A. Alexander, Kathleen Moore, et al. "Stage I, Grade 3 Endometrioid Adenocarcinoma of the Endometrium: An Analysis of Clinical Outcomes and Patterns of Recurrence." *Gynecologic Oncology* 116, no. 1 (January 2010): 10–14. https://doi.org/10.1016/j.ygyno.2009.10.043.

Rayburn, Elizabeth R., Scharri J. Ezell, and Ruiwen Zhang. "Anti-Inflammatory Agents for Cancer Therapy." *Molecular and Cellular Pharmacology* 1, no. 1 (2009): 29–43. https://doi.org/10.4255/mcpharmacol.09.05.

Rebbeck, Timothy R., Nandita Mitra, Fei Wan, Olga M. Sinilnikova, Sue Healey, Lesley McGuffog, Sylvie Mazoyer, et al. "Association of Type and Location of BRCA1 and BRCA2 Mutations with Risk of Breast and Ovarian Cancer." *JAMA* 313, no. 13 (April 7, 2015): 1347–61. https://doi.org/10.1001/jama.2014.5985.

"Reference Manual on Scientific Evidence" Third Edition (2011).

Reid, A., J. Heyworth, N. de Klerk, and A. W. Musk. "The Mortality of Women Exposed Environmentally and Domestically to Blue Asbestos at Wittenoom, Western Australia." *Occupational and Environmental Medicine* 65, no. 11 (November 2008): 743–49. https://doi.org/10.1136/oem.2007.035782.

Reid, A., N. de Klerk, and A. W. Musk. "Does Exposure to Asbestos Cause Ovarian Cancer? A Systematic Literature Review and Meta-Analysis." *Cancer Epidemiology Biomarkers & Prevention* 20, no. 7 (July 1, 2011): 1287–95. https://doi.org/10.1158/1055-9965.EPI-10-1302.

Reid, A., N. H. de Klerk, C. Magnani, D. Ferrante, G. Berry, A. W. Musk, and E. Merler. "Mesothelioma Risk after 40 Years since First Exposure to Asbestos: A Pooled Analysis." *Thorax* 69, no. 9 (September 2014): 843–50. https://doi.org/10.1136/thoraxjnl-2013-204161.

Reid, Alison, Amanda Segal, Jane S. Heyworth, Nicholas H. de Klerk, and Arthur W. Musk. "Gynecologic and Breast Cancers in Women after Exposure to Blue Asbestos at Wittenoom." *Cancer Epidemiology, Biomarkers & Prevention: A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 18, no. 1 (January 2009): 140–47. https://doi.org/10.1158/1055-9965.EPI-08-0746.

Reid, Brett M., Jennifer B. Permuth, and Thomas A. Sellers. "Epidemiology of Ovarian Cancer: A Review." *Cancer Biology & Medicine* 14, no. 1 (February 2017): 9–32. https://doi.org/10.20892/j.issn.2095-3941.2016.0084.

Reuter, Simone, Subash C. Gupta, Madan M. Chaturvedi, and Bharat B. Aggarwal. "Oxidative Stress, Inflammation, and Cancer: How Are They Linked?" *Free Radical Biology and Medicine* 49, no. 11 (December 1, 2010): 1603–16.

Rice, Megan S., Susan E. Hankinson, and Shelley S. Tworoger. "Tubal Ligation, Hysterectomy, Unilateral Oophorectomy, and Risk of Ovarian Cancer in the Nurses' Health Studies." *Fertility and Sterility* 102, no. 1 (July 2014): 192-198.e3. https://doi.org/10.1016/j.fertnstert.2014.03.041.

Ring, Kari L., Christine Garcia, Martha H. Thomas, and Susan C. Modesitt. "Current and Future Role of Genetic Screening in Gynecologic Malignancies." *American Journal of Obstetrics and Gynecology* 217, no. 5 (2017): 512–21. https://doi.org/10.1016/j.ajog.2017.04.011.

Riska, A., J. I. Martinsen, K. Kjaerheim, E. Lynge, P. Sparen, L. Tryggvadottir, E. Weiderpass, and E. Pukkala. "Occupation and Risk of Primary Fallopian Tube Carcinoma in Nordic Countries." *International Journal of Cancer* 131, no. 1 (July 1, 2012): 186–92. https://doi.org/10.1002/ijc.26337.

Roggli, Victor L., Robin T. Vollmer, Kelly J. Butnor, and Thomas A. Sporn. "Tremolite and Mesothelioma." *Annals of Occupational Hygiene* 46, no. 5 (July 1, 2002): 447–53. https://doi.org/10.1093/annhyg/mef056.

Rohl, A. N. "Asbestos in Talc." *Environmental Health Perspectives* 9 (December 1974): 129–32.

Rohl, A. N., A. M. Langer, I. J. Selikoff, A. Tordini, R. Klimentidis, D. R. Bowes, and D. L. Skinner. "Consumer Talcums and Powders: Mineral and Chemical Characterization." *Journal of Toxicology and Environmental Health* 2, no. 2 (November 1976): 255–84. https://doi.org/10.1080/15287397609529432.

Roodhouse Gloyne, S. "Two Cases of Squamous Carcinoma of the Lung Occurring in Asbestosis." *Tubercle* 17, no. 1 (October 1935): 5-IN2. https://doi.org/10.1016/S0041-3879(35)80795-2.

Rosalind A. Eeles, Christine D. Berg, and Jeffery S. Tobias. *Cancer Prevention and Screening: Concepts, Principles and Controversies*. 1st ed. Accessed August 21, 2018. https://www.wiley.com/en-us/Cancer+Prevention+and+Screening%3A+Concepts%2C+Principles+and+Controversies-p-9781118990872.

Rosenblatt, K. A., M. Szklo, and N. B. Rosenshein. "Mineral Fiber Exposure and the Development of Ovarian Cancer." *Gynecologic Oncology* 45, no. 1 (April 1992): 20–25.

Rosenblatt, Karin A., Noel S. Weiss, Kara L. Cushing-Haugen, Kristine G. Wicklund, and Mary Anne Rossing. "Genital Powder Exposure and the Risk of Epithelial Ovarian Cancer." *Cancer Causes & Control: CCC* 22, no. 5 (May 2011): 737–42. https://doi.org/10.1007/s10552-011-9746-3.

Rösler, J. A., H. J. Woitowitz, H. J. Lange, R. H. Woitowitz, K. Ulm, and K. Rödelsperger. "Mortality Rates in a Female Cohort Following Asbestos Exposure in Germany." *Journal of Occupational Medicine.: Official Publication of the Industrial Medical Association* 36, no. 8 (August 1994): 889–93.

Ross, M. "Geology, Asbestos, and Health." *Environmental Health Perspectives* 9 (December 1974): 123–24.

Rothman, Kenneth J., Sander Greenland, and Timothy L. Lash. *Modern Epidemiology*. Lippincott Williams & Wilkins, 2008.

Saed, Ghassan M., Rouba Ali-Fehmi, Zhong L. Jiang, Nicole M. Fletcher, Michael P. Diamond, Husam M. Abu-Soud, and Adnan R. Munkarah. "Myeloperoxidase Serves as a Redox Switch That Regulates Apoptosis in Epithelial Ovarian Cancer." *Gynecologic Oncology* 116, no. 2 (February 2010): 276–81. https://doi.org/10.1016/j.ygyno.2009.11.004.

Saed, Ghassan M., Michael P. Diamond, and Nicole M. Fletcher. "Updates of the Role of Oxidative Stress in the Pathogenesis of Ovarian Cancer." *Gynecologic Oncology* 145, no. 3 (June 2017): 595–602. https://doi.org/10.1016/j.ygyno.2017.02.033.

Saed, Ghassan M., Nicole M. Fletcher, Michael P. Diamond, Robert T. Morris, Nardhy Gomez-Lopez, and Ira Memaj. "Novel Expression of CD11b in Epithelial Ovarian Cancer: Potential Therapeutic Target." *Gynecologic Oncology* 148, no. 3 (2018): 567–75. https://doi.org/10.1016/j.ygyno.2017.12.018.

Saed, Ghassan M., Robert T. Morris, and Nicole M. Fletcher. *New Insights into the Pathogenesis of Ovarian Cancer: Oxidative Stress*, 2018.

Schenken, Robert S. "Endometriosis: Pathogenesis, Clinical Features, and Diagnosis." *UpToDate*, 2018.

Schildkraut, Joellen M., Sarah E. Abbott, Anthony J. Alberg, Elisa V. Bandera, Jill S. Barnholtz-Sloan, Melissa L. Bondy, Michele L. Cote, et al. "Association between Body Powder Use and Ovarian Cancer: The African American Cancer Epidemiology Study (AACES)." *Cancer Epidemiology, Biomarkers & Prevention: A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 25, no. 10 (2016): 1411–17. https://doi.org/10.1158/1055-9965.EPI-15-1281.

"SEER Cancer Statistics Review, 1975-2015, National Cancer Institute, Bethesda, MD, Based on November 2017 SEER Data Submission, Posted to the SEER Web Site," April 2018. https://Seer.cancer.gov/csr/1975_2015/.

Shan, Weiwei, and Jinsong Liu. "Inflammation: A Hidden Path to Breaking the Spell of Ovarian Cancer." *Cell Cycle* 8, no. 19 (2009): 3107–11. https://doi.org/10.4161/cc.8.19.9590.

Shukla, Arti, Maximilian B. MacPherson, Jedd Hillegass, Maria E. Ramos-Nino, Vlada Alexeeva, Pamela M. Vacek, Jeffrey P. Bond, Harvey I. Pass, Chad Steele, and Brooke T. Mossman. "Alterations in Gene Expression in Human Mesothelial Cells Correlate with Mineral Pathogenicity." *American Journal of Respiratory Cell and Molecular Biology* 41, no. 1 (July 2009): 114–23. https://doi.org/10.1165/rcmb.2008-0146OC.

Shushan, A., O. Paltiel, J. Iscovich, U. Elchalal, T. Peretz, and J. G. Schenker. "Human Menopausal Gonadotropin and the Risk of Epithelial Ovarian Cancer." *Fertility and Sterility* 65, no. 1 (January 1996): 13–18.

Singh, Naveena, C. Blake Gilks, Lynn Hirschowitz, Sean Kehoe, Iain A. McNeish, Dianne Miller, Raj Naik, Nafisa Wilkinson, and W. Glenn McCluggage. "Primary Site Assignment in Tubo-Ovarian High-Grade Serous Carcinoma: Consensus Statement on Unifying Practice Worldwide." *Gynecologic Oncology* 141, no. 2 (2016): 195–98. https://doi.org/10.1016/j.ygyno.2015.10.022.

Sjösten, A. C. E., H. Ellis, and G. a. B. Edelstam. "Retrograde Migration of Glove Powder in the Human Female Genital Tract." *Human Reproduction* 19, no. 4 (April 1, 2004): 991–95. https://doi.org/10.1093/humrep/deh156.

Soini, Tuuli, Ritva Hurskainen, Seija Grénman, Johanna Mäenpää, Jorma Paavonen, and Eero Pukkala. "Cancer Risk in Women Using the Levonorgestrel-Releasing Intrauterine System in Finland." *Obstetrics and Gynecology* 124, no. 2 Pt 1 (August 2014): 292–99. https://doi.org/10.1097/AOG.0000000000000356.

Soong, Thing Rinda, Brooke E. Howitt, Alexander Miron, Neil S. Horowitz, Frank Campbell, Colleen M. Feltmate, Michael G. Muto, et al. "Evidence for Lineage Continuity between Early Serous Proliferations (ESPs) in the Fallopian Tube and Disseminated High-Grade Serous Carcinomas." *The Journal of Pathology*, July 25, 2018. https://doi.org/10.1002/path.5145.

Stanton, M. F., M. Layard, A. Tegeris, E. Miller, M. May, E. Morgan, and A. Smith. "Relation of Particle Dimension to Carcinogenicity in Amphibole Asbestoses and Other Fibrous Minerals." *Journal of the National Cancer Institute* 67, no. 5 (November 1981): 965–75.

Starman, Daniel H., Leslie A. Litzky, and Larry R. Kaiser. "Epidemiology of Malignant Pleural Mesothelioma." *UpToDate*, 2018.

Steiling, W., J. F. Almeida, H. Assaf Vandecasteele, S. Gilpin, T. Kawamoto, L. O'Keeffe, G. Pappa, K. Rettinger, H. Rothe, and A. M. Bowden. "Principles for the Safety Evaluation of Cosmetic Powders." *Toxicology Letters*, August 17, 2018. https://doi.org/10.1016/j.toxlet.2018.08.011.

Steiling, W., M. Bascompta, P. Carthew, G. Catalano, N. Corea, A. D'Haese, P. Jackson, et al. "Principle Considerations for the Risk Assessment of Sprayed Consumer Products." *Toxicology Letters* 227, no. 1 (May 16, 2014): 41–49. https://doi.org/10.1016/j.toxlet.2014.03.005.

Stewart, Louise M., C. D'Arcy J. Holman, Patrick Aboagye-Sarfo, Judith C. Finn, David B. Preen, and Roger Hart. "In Vitro Fertilization, Endometriosis, Nulliparity and Ovarian Cancer Risk." *Gynecologic Oncology* 128, no. 2 (February 2013): 260–64. https://doi.org/10.1016/j.ygyno.2012.10.023.

Stewart, Louise M., Katrina Spilsbury, Susan Jordan, Colin Stewart, C. D'Arcy J. Holman, Aime Powell, Joanne Reekie, and Paul Cohen. "Risk of High-Grade Serous Ovarian Cancer Associated with Pelvic Inflammatory Disease, Parity and Breast Cancer." *Cancer Epidemiology* 55 (August 2018): 110–16. https://doi.org/10.1016/j.canep.2018.05.011.

Straif, Kurt. "Update of the Scientific Evidence on Asbestos and Cancer." presented at the International Conference on Environmental and Occupational Determinants of Cancer: Interventions for Primary Prevention, Asturias (Avilés, Gijón), Spain, March 17, 2011.

"Talc." *IARC Monographs on the Evaluation of the Carcinogenic Risk of Chemicals to Humans* 42 (1987): 185–224.

Tarchi, M., D. Orsi, P. Comba, M. De Santis, R. Pirastu, G. Battista, and M. Valiani. "Cohort Mortality Study of Rock Salt Workers in Italy." *American Journal of Industrial Medicine* 25, no. 2 (February 1994): 251–56.

Terry, Kathryn L., Stalo Karageorgi, Yurii B. Shvetsov, Melissa A. Merritt, Galina Lurie, Pamela J. Thompson, Michael E. Carney, et al. "Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls." *Cancer Prevention Research (Philadelphia, Pa.)* 6, no. 8 (August 2013): 811–21. https://doi.org/10.1158/1940-6207.CAPR-13-0037.

Tewari, Devansu, James J. Java, Ritu Salani, Deborah K. Armstrong, Maurie Markman, Thomas Herzog, Bradley J. Monk, and John K. Chan. "Long-Term Survival Advantage and Prognostic Factors Associated with Intraperitoneal Chemotherapy Treatment in Advanced Ovarian Cancer: A Gynecologic Oncology Group Study." *Journal of Clinical Oncology: Official Journal of the American Society of Clinical Oncology* 33, no. 13 (May 1, 2015): 1460–66. https://doi.org/10.1200/JCO.2014.55.9898.

Thai, T. H., F. Du, J. T. Tsan, Y. Jin, A. Phung, M. A. Spillman, H. F. Massa, et al. "Mutations in the BRCA1-Associated RING Domain (BARD1) Gene in Primary Breast, Ovarian and Uterine Cancers." *Human Molecular Genetics* 7, no. 2 (February 1998): 195–202.

Thomas, Charles A., and Major G. Seelig. Powder lubricated surgeon's rubber glove. United States US2621333A, filed June 27, 1947, and issued December 16, 1952. https://patents.google.com/patent/US2621333/en.

Torre, Lindsey A., Britton Trabert, Carol E. DeSantis, Kimberly D. Miller, Goli Samimi, Carolyn D. Runowicz, Mia M. Gaudet, Ahmedin Jemal, and Rebecca L. Siegel. "Ovarian Cancer Statistics, 2018." *CA: A Cancer Journal for Clinicians* 68, no. 4 (July 2018): 284–96. https://doi.org/10.3322/caac.21456.

Trabert, Britton. "Body Powder and Ovarian Cancer Risk – What Is the Role of Recall Bias?" *Cancer Epidemiology, Biomarkers & Prevention : A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 25, no. 10 (October 2016): 1369–70. https://doi.org/10.1158/1055-9965.EPI-16-0476.

Trabert, Britton, Ligia Pinto, Patricia Hartge, Troy Kemp, Amanda Black, Mark E. Sherman, Louise A. Brinton, et al. "Pre-Diagnostic Serum Levels of Inflammation Markers and Risk of Ovarian

Cancer in the Prostate, Lung, Colorectal and Ovarian Cancer (PLCO) Screening Trial." *Gynecologic Oncology* 135, no. 2 (November 2014): 297–304. https://doi.org/10.1016/j.ygyno.2014.08.025.

Trabert, Britton, Elizabeth M Poole, Emily White, Kala Visvanathan, Hans-Olov Adami, Garnet L Anderson, Theodore M Brasky, et al. "Analgesic Use and Ovarian Cancer Risk: An Analysis in the Ovarian Cancer Cohort Consortium." *JNCI: Journal of the National Cancer Institute*, May 31, 2018. https://doi.org/10.1093/jnci/djy100.

Trabert, Britton, Elizabeth M. Poole, Emily White, Kala Visvanathan, Hans-Olov Adami, Garnet L. Anderson, Theodore M. Brasky, et al. "Analgesic Use and Ovarian Cancer Risk: An Analysis in the Ovarian Cancer Cohort Consortium." *Journal of the National Cancer Institute* 111, no. 2 (2019). https://doi.org/10.1093/jnci/djy100.

Tsilidis, K K, N E Allen, T J Key, L Dossus, A Lukanova, K Bakken, E Lund, et al. "Oral Contraceptive Use and Reproductive Factors and Risk of Ovarian Cancer in the European Prospective Investigation into Cancer and Nutrition." *British Journal of Cancer* 105, no. 9 (October 25, 2011): 1436–42. https://doi.org/10.1038/bjc.2011.371.

Tsilidis, Konstantinos K., Naomi E. Allen, Timothy J. Key, Laure Dossus, Rudolf Kaaks, Kjersti Bakken, Eiliv Lund, et al. "Menopausal Hormone Therapy and Risk of Ovarian Cancer in the European Prospective Investigation into Cancer and Nutrition." *Cancer Causes & Control: CCC* 22, no. 8 (August 2011): 1075–84. https://doi.org/10.1007/s10552-011-9782-z.

Tworoger, Shelley S., Kathleen M. Fairfield, Graham A. Colditz, Bernard A. Rosner, and Susan E. Hankinson. "Association of Oral Contraceptive Use, Other Contraceptive Methods, and Infertility with Ovarian Cancer Risk." *American Journal of Epidemiology* 166, no. 8 (October 15, 2007): 894–901. https://doi.org/10.1093/aje/kwm157.

Tzonou, A., A. Polychronopoulou, C. C. Hsieh, A. Rebelakos, A. Karakatsani, and D. Trichopoulos. "Hair Dyes, Analgesics, Tranquilizers and Perineal Talc Application as Risk Factors for Ovarian Cancer." *International Journal of Cancer. Journal International Du Cancer* 55, no. 3 (September 30, 1993): 408–10.

US EPA. "Health Assessment Document for Talc. | National Technical Reports Library - NTIS." - 600/8-91/217, 1992. https://ntrl.ntis.gov/NTRL/dashboard/searchResults/titleDetail/PB92239524.xhtml.

Van Gosen, B. S., H.A. Lowers, S.J. Sutley, and C.A. Gent. "Using the Geologic Setting of Talc Deposits as an Indicator of Amphibole Asbestos Content." *Environmental Geology* 45, no. 7 (2004): 20. https://doi.org/10.1007/s00254-003-0955-2.

Vanderhyden, Barbara C, Tanya J Shaw, and Jean-François Ethier. "Animal Models of Ovarian Cancer." *Reproductive Biology and Endocrinology : RB&E* 1 (October 7, 2003): 67. https://doi.org/10.1186/1477-7827-1-67.

VanOrden, D. "Weight Percent Compositional Analysis of Seven RTV Talc Samples. Analytical Report to R. T. Vanderbilt Company, Inc. Submitted to Public Comments Record – C. W. Jameson, National Toxicology Program, 10th ROC Nominations 'Talc (Containing Asbestiform Fibers)'. 4 December 2000., National Toxicology Program.," November 22, 2000.

Vasama-Neuvonen, K., E. Pukkala, H. Paakkulainen, P. Mutanen, E. Weiderpass, P. Boffetta, N. Shen, T. Kauppinen, H. Vainio, and T. Partanen. "Ovarian Cancer and Occupational Exposures in Finland." *American Journal of Industrial Medicine* 36, no. 1 (July 1999): 83–89.

Vasey, Paul A., Gordon C. Jayson, Alan Gordon, Hani Gabra, Rob Coleman, Ronnie Atkinson, David Parkin, et al. "Phase III Randomized Trial of Docetaxel-Carboplatin versus Paclitaxel-

Carboplatin as First-Line Chemotherapy for Ovarian Carcinoma." *Journal of the National Cancer Institute* 96, no. 22 (November 17, 2004): 1682–91. https://doi.org/10.1093/jnci/djh323.

Venkatesan, Priya. "Possible X Chromosome-Linked Transmission of Ovarian Cancer." *The Lancet. Oncology* 19, no. 4 (April 2018): e185. https://doi.org/10.1016/S1470-2045(18)30183-9.

Venter, P. F., and M. Iturralde. "Migration of a Particulate Radioactive Tracer from the Vagina to the Peritoneal Cavity and Ovaries." *South African Medical Journal = Suid-Afrikaanse Tydskrif Vir Geneeskunde* 55, no. 23 (June 2, 1979): 917–19.

Verdoodt, Freija, Christian Dehlendorff, Søren Friis, and Susanne K. Kjaer. "Non-Aspirin NSAID Use and Ovarian Cancer Mortality." *Gynecologic Oncology* 150, no. 2 (2018): 331–37. https://doi.org/10.1016/j.ygyno.2018.06.018.

Vicus, Danielle, Amy Finch, Barry Rosen, Isabel Fan, Linda Bradley, Ilana Cass, Ping Sun, et al. "Risk Factors for Carcinoma of the Fallopian Tube in Women with and without a Germline BRCA Mutation." *Gynecologic Oncology* 118, no. 2 (August 1, 2010): 155–59. https://doi.org/10.1016/j.ygyno.2010.03.009.

Vineis, Paolo, Phyllis Illari, and Federica Russo. "Causality in Cancer Research: A Journey through Models in Molecular Epidemiology and Their Philosophical Interpretation." *Emerging Themes in Epidemiology* 14, no. 7 (2017). https://doi.org/DOI 10.1186/s12982-017-0061-7.

Virta, RL. "The Phase Relationship of Talc and Amphiboles in a Fibrous Talc Sample." IH; Report of Investigations, 1985. https://www.cdc.gov/niosh/nioshtic-2/10004328.html.

Vitonis, Allison F., Linda Titus-Ernstoff, and Daniel W. Cramer. "Assessing Ovarian Cancer Risk When Considering Elective Oophorectomy at the Time of Hysterectomy." *Obstetrics and Gynecology* 117, no. 5 (May 2011): 1042–50. https://doi.org/10.1097/AOG.0b013e318212fcb7.

Wang, Chunpeng, Zhenzhen Liang, Xin Liu, Qian Zhang, and Shuang Li. "The Association between Endometriosis, Tubal Ligation, Hysterectomy and Epithelial Ovarian Cancer: Meta-Analyses." *International Journal of Environmental Research and Public Health* 13, no. 11 (November 14, 2016): 1138. https://doi.org/10.3390/ijerph13111138.

Wang, Xiaorong, Sihao Lin, Ignatius Yu, Hong Qiu, Yajia Lan, and Eiji Yano. "Cause-Specific Mortality in a Chinese Chrysotile Textile Worker Cohort." *Cancer Science* 104, no. 2 (February 2013): 245–49. https://doi.org/10.1111/cas.12060.

Watson, Ian R., Koichi Takahashi, P. Andrew Futreal, and Lynda Chin. "Emerging Patterns of Somatic Mutations in Cancer." *Nature Reviews. Genetics* 14, no. 10 (October 2013): 703–18. https://doi.org/10.1038/nrg3539.

Wehner, A. P., A. S. Hall, R. E. Weller, E. A. Lepel, and R. E. Schirmer. "Do Particles Translocate from the Vagina to the Oviducts and Beyond?" *Food and Chemical Toxicology: An International Journal Published for the British Industrial Biological Research Association* 23, no. 3 (March 1985): 367–72.

Wehner, A. P., R. E. Weller, and E. A. Lepel. "On Talc Translocation from the Vagina to the Oviducts and Beyond." *Food and Chemical Toxicology: An International Journal Published for the British Industrial Biological Research Association* 24, no. 4 (April 1986): 329–38.

Weiss, W. "Cigarette Smoking and Lung Cancer Trends. A Light at the End of the Tunnel?" *Chest* 111, no. 5 (May 1997): 1414–16.

Wentzensen, Nicolas, Elizabeth M. Poole, Britton Trabert, Emily White, Alan A. Arslan, Alpa V. Patel, V. Wendy Setiawan, et al. "Ovarian Cancer Risk Factors by Histologic Subtype: An Analysis From the Ovarian Cancer Cohort Consortium." *Journal of Clinical Oncology: Official Journal of the American Society of Clinical Oncology* 34, no. 24 (20 2016): 2888–98. https://doi.org/10.1200/JCO.2016.66.8178.

Werner, I. "Presence of Asbestos in Talc Samples." *Atemschutzinform* 21, no. 5 (1982).

Whiteman, David C., Michael F. G. Murphy, Linda S. Cook, Daniel W. Cramer, Patricia Hartge, Polly A. Marchbanks, Philip C. Nasca, Roberta B. Ness, David M. Purdie, and Harvey A. Risch. "Multiple Births and Risk of Epithelial Ovarian Cancer." *Journal of the National Cancer Institute* 92, no. 14 (July 19, 2000): 1172–77. https://doi.org/10.1093/jnci/92.14.1172.

Whittemore, A. S., R. Harris, and J. Itnyre. "Characteristics Relating to Ovarian Cancer Risk: Collaborative Analysis of 12 US Case-Control Studies. IV. The Pathogenesis of Epithelial Ovarian Cancer. Collaborative Ovarian Cancer Group." *American Journal of Epidemiology* 136, no. 10 (November 15, 1992): 1212–20.

Whittemore, A. S., M. L. Wu, R. S. Paffenbarger, D. L. Sarles, J. B. Kampert, S. Grosser, D. L. Jung, S. Ballon, and M. Hendrickson. "Personal and Environmental Characteristics Related to Epithelial Ovarian Cancer. II. Exposures to Talcum Powder, Tobacco, Alcohol, and Coffee." *American Journal of Epidemiology* 128, no. 6 (December 1988): 1228–40.

Whysner, J., and M. Mohan. "Perineal Application of Talc and Cornstarch Powders: Evaluation of Ovarian Cancer Risk." *American Journal of Obstetrics and Gynecology* 182, no. 3 (March 2000): 720–24.

Wignall, B.K., and A.J. Fox. "Mortality of Female Gas Mask Assemblers." *British Journal of Industrial Medicine* 39, no. 1 (1982): 34–38.

Wild, P. "Lung Cancer Risk and Talc Not Containing Asbestiform Fibres: A Review of the Epidemiological Evidence." *Occupational and Environmental Medicine* 63, no. 1 (January 2006): 4–9. https://doi.org/10.1136/oem.2005.020750.

Wolff, Henrik, Tapio Vehmas, Panu Oksa, Jorma Rantanen, and Harri Vainio. "Asbestos, Asbestosis, and Cancer, the Helsinki Criteria for Diagnosis and Attribution 2014: Recommendations." *Scandinavian Journal of Work, Environment & Health* 41, no. 1 (January 2015): 5–15. https://doi.org/10.5271/sjweh.3462.

Wong, C., R. E. Hempling, M. S. Piver, N. Natarajan, and C. J. Mettlin. "Perineal Talc Exposure and Subsequent Epithelial Ovarian Cancer: A Case-Control Study." *Obstetrics and Gynecology* 93, no. 3 (March 1999): 372–76.

Woodruff, J. D. "The Pathogenesis of Ovarian Neoplasia." *The Johns Hopkins Medical Journal* 144, no. 4 (April 1979): 117–20.

Wright, H. R., J. C. Wheeler, J. A. Woods, J. Hesford, P. Taylor, and R. F. Edlich. "Potential Toxicity of Retrograde Uterine Passage of Particulate Matter." *Journal of Long-Term Effects of Medical Implants* 6, no. 3–4 (1996): 199–206.

Wu, A. H., C. L. Pearce, C.-C. Tseng, and M. C. Pike. "African Americans and Hispanics Remain at Lower Risk of Ovarian Cancer Than Non-Hispanic Whites after Considering Nongenetic Risk Factors and Oophorectomy Rates." *Cancer Epidemiology Biomarkers & Prevention* 24, no. 7 (July 1, 2015): 1094–1100. https://doi.org/10.1158/1055-9965.EPI-15-0023.

Wu, Anna H., Celeste L. Pearce, Chiu-Chen Tseng, and Malcolm C. Pike. "African Americans and Hispanics Remain at Lower Risk of Ovarian Cancer Than Non-Hispanic Whites after Considering Nongenetic Risk Factors and Oophorectomy Rates." *Cancer Epidemiology, Biomarkers & Prevention: A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 24, no. 7 (July 2015): 1094–1100. https://doi.org/10.1158/1055-9965.EPI-15-0023.

Wu, Anna H., Celeste L. Pearce, Chiu-Chen Tseng, Claire Templeman, and Malcolm C. Pike. "Markers of Inflammation and Risk of Ovarian Cancer in Los Angeles County." *International*

*Journal of Cancer. Journal International Du Cancer* 124, no. 6 (March 15, 2009): 1409–15. https://doi.org/10.1002/ijc.24091.

Wu, Song, Wei Zhu, Patricia Thompson, and Yusuf A. Hannun. "Evaluating Intrinsic and Non-Intrinsic Cancer Risk Factors." *Nature Communications* 9, no. 1 (August 28, 2018): 3490. https://doi.org/10.1038/s41467-018-05467-z.

Yan, Bin, Yuanlin Peng, and Chuan-Yuan Li. "Molecular Analysis of Genetic Instability Caused by Chronic Inflammation." *Methods in Molecular Biology (Clifton, N.J.)* 512 (2009): 15–28. https://doi.org/10.1007/978-1-60327-530-9_2.

Yan, Bin, Huili Wang, Zahid Rabbani, Yulin Zhao, Wenrong Li, Yuqing Yuan, Fang Li, Mark W. Dewhirst, and Chuan-Yuan Li. "Tumor Necrosis Factor-a Is a Potent Endogenous Mutagen That Promotes Cellular Transformation." *Cancer Research* 66 (December 15, 2006): 11565.

"You Can Steer Clients to Condoms Free from Potentially Harmful Talc: Condom Companies Agree to Produce without the Dry Lubricant." *Contraceptive Technology Update* 16, no. 11 (November 1995): 133–44.

Zazenski, R., W. H. Ashton, D. Briggs, M. Chudkowski, J. W. Kelse, L. MacEachern, E. F. McCarthy, M. A. Nordhauser, M. T. Roddy, and N. M. Teetsel. "Talc: Occurrence, Characterization, and Consumer Applications." *Regulatory Toxicology and Pharmacology: RTP* 21, no. 2 (April 1995): 218–29.

Zervomanoklakis, I, H.W. Ott, D Hadziomerovic, V. Mattle, B.E. Seeber, I. Virgolini, D. Heute, S. Kissler, G. Leyendecker, and L. Wildt. "Physiology of Upward Transport in the Human Female Genital Tract." *Annals of New York Acadamy of Sciences* 1101, no. 1 (2007): 1–20. https://doi.org/10.1196/annals.1389.032.

Zhao, Weixing, Justin B. Steinfeld, Fengshan Liang, Xiaoyong Chen, David G. Maranon, Chu Jian Ma, Youngho Kwon, et al. "BRCA1-BARD1 Promotes RAD51-Mediated Homologous DNA Pairing." *Nature* 550, no. 7676 (19 2017): 360–65. https://doi.org/10.1038/nature24060.

# Exhibit C

**Rebecca Smith-Bindman Compensation and Prior Testimony**

Dr. Smith-Bindman's fees are $1,000/hr.  She has not testified in other cases during the previous four years.

Exhibit 36

Rebecca Smith-Bindman, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

_____

                                        )
IN RE:  JOHNSON & JOHNSON TALCUM    )
POWDER PRODUCTS MARKETING, SALES    )
PRACTICES, AND PRODUCTS LIABILITY   )
LITIGATION                          )
                                        )  MDL No.
                                        )  2738 (FLW)(LHG)
                                        )
_____)


VIDEOTAPED DEPOSITION OF

REBECCA SMITH-BINDMAN, M.D.

San Francisco, California

Thursday, February 7, 2019

Volume I


Reported by:
MARY J. GOFF
CSR No. 13427

Rebecca Smith-Bindman, M.D.

| Page 2 | | Page 4 |
|---|---|---|
| 1 | 1 | APPEARANCES (continued): |
| 2 | 2 | For Plaintiffs |
| 3 | 3 | Restaino Law LLC |
| 4 | 4 | BY: JOHN M. RESTAINO JUNIOR |
| 5 Videotaped Deposition of REBECCA | 5 | Attorney at Law |
| 6 SMITH-BINDMAN, M.D., Volume I, taken on behalf of | 6 | 130 Forest Lane |
| 7 Johnson & Johnson, at Levin Simes Abrams LLP, | 7 | Denver, Colorado 80220 |
| 8 1700 Montgomery Street, Suite 250, San Francisco, | 8 | jrestaino@restainollc.com |
| 9 California 94111, beginning at 9:20 a.m. and ending | 9 | 720-891-7921 |
| 10 at 4:01 p.m., on February 7, 2019, before MARY J. | 10 | |
| 11 GOFF, California Certified Shorthand Reporter No. | 11 | |
| 12 13427. | 12 | For Defendant Johnson & Johnson |
| 13 | 13 | Tucker Ellis LLP |
| 14 | 14 | BY: MICHAEL C. ZELLERS |
| 15 | 15 | Attorney at Law |
| 16 | 16 | 515 South Flower Street |
| 17 | 17 | 42nd Floor |
| 18 | 18 | Los Angeles, California 90071 |
| 19 | 19 | michael.zellers@tuckerellis.com |
| 20 | 20 | 213-430-3301 |
| 21 | 21 | |
| 22 | 22 | |
| 23 | 23 | |
| 24 | 24 | |
| 25 | 25 | |

| Page 3 | | Page 5 |
|---|---|---|
| 1 APPEARANCES: | 1 | APPEARANCES (continued): |
| 2 | 2 | For Defendant Johnson & Johnson |
| 3 For Plaintiffs | 3 | Skadden, Arps, Slate, Meagher & Flom, LLP. |
| 4 Beasley Allen Law Firm | 4 | BY: BENJAMIN HALPERIN |
| 5 BY: P. LEIGH O'DELL | 5 | Attorney at Law |
| 6 MARGARET M. THOMPSON, MD, JD, MPAff | 6 | 4 Times Square |
| 7 Attorney at Law | 7 | New York, New York 10036 |
| 8 218 Commerce Street | 8 | benjamin.halperin@skadden.com |
| 9 Montgomery, Alabama 36103 | 9 | 212-735-2453 |
| 10 leigh.odell@beasleyallen.com | 10 | |
| 11 334-269-2343 | 11 | |
| 12 For Plaintiffs | 12 | For Defendant Imerys |
| 13 Robinson Calcagnie, Inc. | 13 | Dykema |
| 14 BY: CYNTHIA L. GARBER | 14 | BY: JANE BOCKUS |
| 15 Attorney at Law | 15 | Attorney at Law |
| 16 19 Corporate Plaza Drive | 16 | 112 E. Pecan Street |
| 17 Newport Beach, California 92660 | 17 | Suite 1800 |
| 18 cgarber@robinsonfirm.com | 18 | San Antonio, Texas 78205 |
| 19 For Plaintiffs | 19 | jbockus@dykema.com |
| 20 Wilentz, Goldman & Spitzer P.A. | 20 | 210-554-5549 |
| 21 Daniel R. Lapinski | 21 | |
| 22 Attorney at Law | 22 | |
| 23 90 Woodbridge Center Drive, | 23 | |
| 24 Suite 900 Box 10 | 24 | |
| 25 Woodbridge, New Jersey 07095-0958 | 25 | |

2 (Pages 2 to 5)

Rebecca Smith-Bindman, M.D.

Page 6

1  APPEARANCES (continued):
2  For Defendant Imerys
3     Gordon & Rees LLP
4     BY: JENNIFER A. FOSTER
5     Attorney at Law
6     816 Congress Avenue
7     Suite 1510
8     Austin, Texas 78701
9     jfoster@gordonrees.com
10    512-391-0197
11
12
13 For Defendant PCPC, Personal Care Products Council
14    Seyfarth Shaw, LLP
15    BY: JAMES R. BILLINGS-KANG
16    Attorney at Law
17    975 F Street, NW
18    Washington, D.C. 20004
19    jbillingskang@seyfarth.com
20    202-828-5356
21
22
23
24
25

Page 7

1  APPEARANCES (continued):
2
3  For Defendants PTI Union, LLC and PTI Royston, LLC
4     Tucker Ellis LLP
5     BY: CAROLINE M. TINSLEY
6     Attorney at Law
7     100 South 4th Street`
8     Suite 600
9     St. Louis, Missouri, 63102
10    caroline.tinsley@tuckerellis.com
11
12 Videographer:
13    Joseph Morgas
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1                INDEX
2  WITNESS              EXAMINATION
3  REBECCA SMITH-BINDMAN, M.D.
4  Volume I
5
6       BY MR. ZELLERS       12
7
8  NUMBER      DESCRIPTION       PAGE
9  Exhibit 1  Notice of Oral and Videotaped   24
          Deposition
10
11 Exhibit 2  Rule 26 Expert Report of    25
          Rebecca Smith-Bindman, MD
12
13 Exhibit 3  IMERYS list, Amended Expert Report   30
14
15 (Exhibit 4-11, premarked Hopkins Exhibit 28
16 (Spreadsheet) premarked Pier 47 (Exhibit Number
17 list) and unmarked article "Pycnogenol Reduces
18 Talc-induced Neoplastic Transformation in Human
19 Ovarian Cell Cultures" (Pltf_MISC_00000046) are
20 contained in the blue folder)
21
22 Exhibit 4  Reproductive Sciences      34
23
   Exhibit 5  Safety Assessment article     35
24
25

Page 9

1  EXHIBITS CONTINUED:        PAGE
2  Exhibit 6  IARC Monographs, Volume 93   35
3
4  Exhibit 7  J&J article by Owen Dyer, BMJ   36
5
6  Exhibit 8  IARC Volumes 1-123      36
7
8  Exhibit 9  "On Talc Translocation from the   36
          Vagina" article
9
10 Exhibit 10  Alterations in Gene Expression   37
          article
11
12 Exhibit 11  Draft Screening Assessment, 12/18   38
13
14 Exhibit 12  (Binder) Talc Articles I     39
15
16 Exhibit 13  (Binder) Talc Articles II    39
          (Exhibit 21 is inside Exhibit 13)
17
18 Exhibit 14  CV of Smith-Bindman, MD    53
19 Exhibit 15  List of articles       54
20 Exhibit 16  9/24/18 e-mail string     76
          forest plots
21
22 Exhibit 17  Rule 26 Expert Report of    90
          Smith-Bindman, MD
23
24 Exhibit 18  The Association Between Talc Use  95
          and Ovarian Cancer article
25

3 (Pages 6 to 9)

Rebecca Smith-Bindman, M.D.

## Page 10

EXHIBITS CONTINUED:                      PAGE

Exhibit 19  NCI, SEER Training Modules       130
            Risk Factors

Exhibit 20  NCI article, Ovarian, Fallopian  132
            Tube and Primary Peritoneal
            Cancer Prevention PDQ-Health
            Professional Version

Exhibit 21  Handwritten notes               156
            (Inside Binder Exhibit 13)

Exhibit 22  Genital Talc Exposure and Risk  179
            of Ovarian Cancer article

Exhibit 23  Genital Powder Exposure article  179

Exhibit 24  9/29/18 e-mail string            184

Exhibit 25  Perineal Talc Exposure article   189

Exhibit 26  Letter to Samuel Epstein, MD     203

Exhibit 27  IARC Agents Classified by IARC   206
            Monographs, Volumes 1-123

## Page 11

San Francisco, California
February 7, 2019
9:20 a.m.

REBECCA SMITH-BINDMAN, M.D.,
being first duly sworn or affirmed to testify to the
truth, the whole truth, and nothing but the truth,
was examined and testified as follows:

THE VIDEOGRAPHER:  We are now on the
record.  My name is Joseph morgue.  I'm a
videographer for Golkow Litigation Services.

Today's date is February 7, 2019.  The
time on the video monitor is 9:20 a.m.

This video deposition is being held at
1700 Montgomery Street, Suite 250, San Francisco,
California, in the matter In Re: Johnson & Johnson
Talcum Powder Products Marketing, Sales Practices,
and Products Liability Litigation, for the United
States District Court, for the District of
New Jersey.

The deponent is Dr. Rebecca Smith-Bindman.
Counsel will be noted on the stenographic record.
The court reporter is Mary Goff.  She will now
administer the oath.

## Page 12

REBECCA SMITH-BINDMAN, M.D., VOLUME I,
being first duly sworn or affirmed to testify to the
truth, the whole truth, and nothing but the truth,
was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANTS

BY MR. ZELLERS:

Q   State your name.
A   Rebecca Smith-Bindman.
Q   Dr. Bindman, we are here today to take
your deposition in the talcum powder MDL litigation.
Are you aware of that?
A   I am.
Q   Have you been deposed before?
A   I have.
Q   On how many occasions?
A   Three to four times.
Q   Have you ever testified at trial?
A   I have.
Q   On how many occasions?
A   One.
Q   You are generally familiar with the rules
we're going to follow here today?
A   I am.
Q   If at any time I ask you a question or any
counsel asks you a question that you don't

## Page 13

understand, please don't answer it.  Tell us you
don't understand, and we'll rephrase the question or
repeat it so it's clear to you.

Can you do that?
A   I can.
Q   If you answer a question, is it fair for
us to assume that you understood it?
A   It is.
Q   Please don't guess or speculate as to any
answers.  If you don't know the answer to a question
or it would call you to guess or speculate, tell us.

Can you do that?
A   I can.
Q   If at any time you need to take a break as
we proceed through the day, please tell us.  And
once we finish whatever line of questioning we're
involved with, then we will take a break.
A   Okay.
Q   Tell us the times that you have been
deposed.  When is the last time you were deposed?
A   I think approximately six years ago.
Q   What was the litigation or the matter?
A   I have been deposed a few times.  I'm not
sure which happened when --
Q   That's fine.

Rebecca Smith-Bindman, M.D.

Page 14

1    A  -- but I can tell you in general what they
2  were about.
3    Q  Tell us -- the three to four times that
4  you have been deposed, will you tell us what each of
5  those matters was?
6    A  Yes.  I am in addition to being an
7  epidemiologist, I'm a clinical radiologist.  And
8  each of those cases had to do with diagnosis and
9  communication within medical malpractice cases.
10    One case had to do with a delayed
11  diagnosis of breast cancer and not communicating
12  results.
13    One case had to do with a misdiagnosis of
14  a first trimester pregnancy loss.
15    One case had to do with misdiagnosis of a
16  complication of a twin/twin pregnancy.  I think
17  those are the cases I was deposed in.
18    Q  All of the cases in which you have been
19  deposed previously have been medical malpractice
20  cases?
21    A  Yes.
22    Q  Were those cases in which you had provided
23  treatment to a patient or were they cases in which
24  you were an expert witness independent of that
25  particular plaintiff?

Page 15

1    A  For each of those cases, I was an expert
2  witness.  I had never personally been involved in a
3  medical malpractice cases.
4    Q  Were each of those cases in the
5  San Francisco area or where were they located?
6    A  None of those cases were in the
7  San Francisco area.  One of them was in Huntsville
8  Alabama, one was in Northern California, and one was
9  in Southern California.
10    Q  Do you remember the names of any of those
11  cases?
12    A  I do not.
13    Q  Do you remember the name of the lawyer or
14  lawyers that you worked with in those cases?
15    A  I do not.
16    Q  Did you testify in those cases on behalf
17  of the plaintiff or on behalf of a defendant?
18    A  They were split.  So I have been involved
19  in cases on both slides.
20    Q  Well, my understanding is you have been
21  involved in three prior litigations; is that right
22  --
23    MS. O'DELL:  Object to the form.
24    Q  (BY MR. ZELLERS) -- in which you served as
25  an expert witness and were deposed?

Page 16

1    A  And -- and I was deposed.
2    MS. O'DELL:  Excuse me.
3    Q  (BY MR. ZELLERS) Yes.  So three prior
4  litigations in which you served as an expert and you
5  were deposed; is that right?
6    A  I --
7    MS. O'DELL:  Object to the form.  I think
8  she said four, but --
9    MR. ZELLERS:  Well, she said three to
10  four.  But then when she was telling us about those
11  cases --
12    A  -- so I remember what was fourth case was.
13    Q  (BY MR. ZELLERS) All right.  What was the
14  fourth case?
15    A  There was a case of delay in the diagnosis
16  of an ovarian cancer.
17    Q  Where was that case?
18    A  Somewhere in the middle of the country.
19    Q  When did you testify in that case?
20    A  I -- I only testified in a single case.
21  So it -- do you mean deposed?
22    Q  Yes.  When were you deposed in that case?
23    A  I -- sometime between -- all of the cases
24  were sometime between six and 12 years ago.  I'm
25  not --

Page 17

1    Q  All right.  Did --
2    A  -- sure I remember the years.
3    Q  The case in which you testified as an
4  expert witness in the delay of diagnosis of ovarian
5  cancer, were you testifying for the defense or for
6  the plaintiff?
7    A  I believe that case was for the defense.
8    Q  Do you remember the name of the plaintiff?
9    A  I do not.
10    Q  Do you remember the name of the defendant?
11    A  I do not.
12    Q  Do you remember the name of the attorney
13  who retained you?
14    A  I do not.
15    Q  Do you remember where in the middle of the
16  country that case was pending?
17    A  I do not.
18    Q  You stated that you have testified one
19  time at trial; is that right?
20    A  Yes.
21    Q  Where did you testify at trial?
22    A  That was Huntsville -- the Fayetteville,
23  Alabama case.
24    Q  In that case, did you testify for the
25  plaintiff or the defense?

5 (Pages 14 to 17)

Rebecca Smith-Bindman, M.D.

Page 18

1      A   For the plaintiff.
2      Q   Do you remember how long ago it was?
3      A   In the ballpark of seven or eight years
4   ago.
5      Q   The Northern California case that you gave
6   deposition testimony in that -- in, was that for the
7   plaintiff or the defense?
8      A   I don't remember.
9      Q   Southern California, that medical
10   malpractice case, did you testify for the plaintiff
11   or the defense?
12      A   Can I go back?  I -- I do remember.
13         So the Northern California case was the
14   plaintiff.  The Southern California case was the
15   defense.
16      Q   Do you remember the attorneys that you
17   worked with in the Northern California case?
18      A   I do not.
19      Q   The Southern California case?
20      A   I do not.
21      Q   Do you remember the name of any of the
22   parties in any of the cases in which you have either
23   given deposition testimony in or trial testimony in?
24      A   I do not.
25      Q   Today I'm going to ask you questions about

Page 19

1   talcum powder or baby powder.  Can we agree that
2   when I refer during the deposition to products, to
3   talc products, talcum powder products, baby powder,
4   or Shower to Shower at issue in this MDL, that I am
5   referring to the baby powder product manufactured by
6   Johnson & Johnson Consumer Products, Inc., and the
7   Shower to Shower product that was formerly
8   manufactured by Johnson & Johnson Consumer Products,
9   Inc.?
10      A   Yes.
11      Q   How would you define the area of expertise
12   in which you were offering opinions in this case,
13   "this case" being the talc MDL?
14      A   I was asked to provide an expert review in
15   the area of epidemiology, ovarian cancer and its
16   causes, the health effects of talc powder products.
17   I think those are the main areas.
18      Q   Are -- are you testifying today as an
19   epidemiologist?
20      A   Yes.
21      MS. O'DELL:  Object to --
22      A   Am --
23      MS. O'DELL:  -- the form.
24      A   -- I bringing expertise to that?
25      Q   (BY MR. ZELLERS) Yes.

Page 20

1      A   Yes.
2      Q   You are not testifying here today as a
3   radiologist; is that right?
4      MS. O'DELL:  Object to the form.
5      A   I think some of my experiences as a
6   radiologist are highly relevant to my expertise, and
7   so there are some questions that I think that that
8   is very relevant.
9      Q   (BY MR. ZELLERS) Are there any areas in
10   which you anticipate providing expert testimony in
11   this litigation, other than in the areas of
12   epidemiology and radiology?
13      MS. O'DELL:  Object to the form.
14      A   I mentioned ovarian cancer.  So risk
15   factors for ovarian cancer falls into epidemiology.
16         The mechanism of ovarian cancer, the
17   pathophysiology, the biological processes are not
18   technically epidemiology.  They're related, and so
19   some of my opinions, I think, would fall into that
20   category.
21      Q   (BY MR. ZELLERS) How would you define that
22   area of expertise for which you are providing expert
23   opinions?
24      MS. O'DELL:  Object to the form.
25      Q   (BY MR. ZELLERS) We have got that you are

Page 21

1   going to provide expert opinions relating to
2   epidemiology.  You're going to provide expert
3   opinions relating to radiology.
4         Are there any other areas that you intend
5   to provide expert opinions in?
6      MS. O'DELL:  Other than what she has just
7   described?
8      Q   (BY MR. ZELLERS) Well, other than
9   epidemiology and radiology.
10      MS. O'DELL:  Object to the form.  She gave
11   another -- a host -- a suite of things she expected
12   to testify on, but --
13      MR. ZELLERS:  And so --
14      MS. O'DELL:  -- I'll object to the form.
15      MR. ZELLERS:  -- yeah, thank you.
16      A   Could you repeat back to me what I have
17   already said?
18      Q   (BY MR. ZELLERS) No.  I'm asking you what
19   you are going to provide expert testimony in, what
20   you consider yourself to be an expert in.
21         I understand epidemiology, and I
22   understand the epidemiology opinions you are going
23   to give, relate to whether or not talcum powder is
24   associated with ovarian cancer, whether or not
25   talcum powder causes ovarian cancer, so I believe

6 (Pages 18 to 21)

Rebecca Smith-Bindman, M.D.

Page 22

1  those are epidemiology-based opinions.
2       I also understand that you have a -- your
3  training and your background is in radiology and
4  that you will provide, to the extent relevant,
5  radiology opinions.
6       But you're not testifying here today as a
7  gynecologic oncologist, are you?
8    A   I am not.
9    Q   You are not testifying here today as an
10 expert in asbestos; is that fair?
11      MS. O'DELL:  Object to the form.
12   A   I am going to provide opinions, if asked,
13 about the health effects of asbestos.
14   Q   (BY MR. ZELLERS) Are you an expert or do
15 you consider yourself to be an expert in asbestos?
16      MS. O'DELL:  Object to the form.
17   A   The question is about asbestos, in
18 general, and I consider myself an expert on the
19 health effects of asbestos.
20   Q   (BY MR. ZELLERS) Does that mean that you
21 are an expert in asbestos or simply looking at
22 studies that have evaluated the epidemiology of
23 asbestos and asbestos exposure to certain
24 conditions?
25      MS. O'DELL:  Object to the form.

Page 23

1    A   I think there are a lot of acts -- aspects
2  of asbestos, so I would absolutely not consider
3  myself an expert on the geology of asbestos or in
4  the mechanism of mining asbestos.
5       But I would consider myself an expert on
6  the changes to the body that can be the result of
7  exposure to asbestos in the context of epidemiology
8  studies, but also in the context of molecular
9  changes, cellular changes like that.
10      And -- and those technically are probably
11 not in the category of epidemiology, but would
12 overlap other areas of my training and experience,
13 such as pathology and...
14   Q   You are not an expert in the testing of
15 asbestos; is that fair?
16   A   I -- I would, yes, agree.
17   Q   You are not an expert in the different
18 forms and types of asbestos --
19   A   I --
20   Q   -- correct?
21   A   -- I -- correct.
22   Q   Okay.
23   A   I'm not an expert in those types of --
24   Q   You are --
25   A   -- asbestos.

Page 24

1    Q   -- not an expert -- well -- and let me
2  withdraw that.
3       You have produced an expert report in this
4  case; is that right?
5    A   I have.
6    Q   Let's mark a couple of things at the
7  outset.
8       Deposition Exhibit 1 is copy of the Notice
9  of Deposition.
10      (Exhibit 1 was marked for identification
11 and is attached to the transcript.)
12      MS. O'DELL:  Thank you.
13   Q   (BY MR. ZELLERS) Have you seen the Notice
14 of Deposition prior to today?
15   A   Yes, I have.
16   Q   Have you either brought with you or
17 through counsel have they brought all of the
18 materials that you believe are responsive to the
19 Deposition Notice?
20      MR. ZELLERS:  And, Ms. O'Dell, I recognize
21 that you have objected to the Deposition Notice and
22 the record will reflect that.
23      MS. O'DELL:  And just so I have a chance
24 to say something, we'll just reassert those
25 objections now.

Page 25

1       Dr. Smith-Bindman has brought with her
2  documents subject to our objections.
3       MR. ZELLERS:  And I would really like
4  Dr. Smith-Bindman to answer the question.
5       MS. O'DELL:  I'm sure she's ready to do
6  that.
7    A   To the best of my knowledge, I have
8  responded or brought or provided all of --
9    Q   (BY MR. ZELLERS) You --
10   A   -- those items.
11   Q   -- you are not aware of items that are
12 called for in the Deposition Notice, what we have
13 marked as Exhibit 1 that have not been produced or
14 not available here today; is that right?
15   A   That's correct.
16   Q   Ms. O'Dell and I spoke earlier about your
17 invoices, and apparently you do have some invoices
18 relating to your work in this matter.  At some point
19 today we'll collect those and we will mark those.
20      (Exhibit 2 was marked for identification
21 and is attached to the transcript.)
22   Q   (BY MR. ZELLERS) Deposition Exhibit 2 is
23 your report in this matter; is that right?
24      MS. O'DELL:  Thank you.
25   A   Okay.  Yes.

7 (Pages 22 to 25)

Rebecca Smith-Bindman, M.D.

1    Q   (BY MR. ZELLERS) Does your report in this
2  matter, Deposition Exhibit 2, contain all of the
3  opinions that you intend to offer at trial or at any
4  hearing in this matter?
5    A   The report summarizes my opinions.  I have
6  written in the report.  As new information comes
7  available, I may take that into account as well.
8        So when we began, counsel mentioned a few
9  additional papers that I had seen since the time my
10 report was written.  And so those are -- are --
11 won't -- have not changed my views, but those are
12 not necessarily referenced in this report.
13   Q   In terms of your opinions and the opinions
14 that you expect to render in this matter, either at
15 trial or any hearing, those opinions are contained
16 in your report which we marked as Exhibit 2,
17 correct?
18       MS. O'DELL:  Object to the form.
19   A   I have not, since writing my report, seen
20 any documents that have changed my views.
21       But as I continue to keep up with the
22 published literature, my opinions may reflect
23 changing documents that I have seen since the time
24 my report was generated.
25

1    Q   (BY MR. ZELLERS) All I can do is ask you
2  questions today.  As of today, does your report
3  contain the opinions that you expect to provide at
4  any trial or hearing in this matter?
5    A   Yes, they do.
6    Q   My understanding from one of your prior
7  answers is that you have reviewed some additional
8  materials since you prepared and since your report
9  on or about November 15 of 2018; is that right?
10   A   That is correct.
11   Q   Those materials, you believe, support the
12 opinions that you have put in your report, but have
13 not changed your opinions; is --
14   A   It --
15   Q   -- that right?
16   A   -- that's correct.
17   Q   What new or additional materials have you
18 reviewed and considered since preparing your report
19 on November 15, 2018?
20   A   So I have seen a draft of a publication --
21 submitted for publication by Dr. Saed about the
22 cellular and molecular changes to cell lines of
23 being exposed to various talcum powder products,
24 which I think is an important paper that has
25 influenced my views.

1    Q   Okay.  Right now all I want to do is get a
2  list of what you have looked at and considered since
3  you prepared your report.
4    A   I have seen an updated testing report by
5  Mr. Longo.
6        I have seen a report and deposition by
7  Mr. Cooke.  I -- I think those are the...
8    Q   You -- counsel for Plaintiffs, Ms. O'Dell,
9  told me before the deposition that you also have
10 looked at a health assessment from Health Canada or
11 a risk assessment; is -- is that correct?
12   A   Yes, that's correct.
13   Q   All right.  Did you also look at a
14 meta-analysis that was performed or at least the
15 draft of a meta-analysis by the first name, author,
16 Thayer (phonetic)?
17   A   I -- I saw that report briefly.
18   Q   Anything else that you have reviewed
19 and/or considered that is not included in the
20 materials that you reference either in your list of
21 references or in your Materials Considered List?
22   A   There was also a series of reports in --
23 in The New York Times and Reuters and a summary of
24 that in the BMJ, which I have seen since I have
25 issued my report.

1    Q   Are you basing any of your opinions on the
2  Reuters or New York Times articles?
3    A   Those reports support my opinions, but no,
4  I'm not basing my report on -- on those.
5    Q   Ms. O'Dell also provided me with a list
6  materials that she has represented that you have
7  reviewed since you prepared your report.
8        It's a series of Imerys documents.  It's
9  one J&J produced document.  And then the last item
10 listed is an Amended Expert Report of Robert Cooke.
11       Have you reviewed those materials since
12 preparing your report?
13   A   So yes, the -- the Mr. Cooke report, which
14 is one I mentioned.  Yes, I have seen the Imerys
15 report.  And I can't remember what you said, the
16 Johnson & Johnson?
17   Q   Are those additional documents or
18 materials that you have reviewed since preparing
19 your report?
20   A   I'm sorry.  I understand the question.  I
21 don't remember what the Johnson & Johnson material
22 was.
23   Q   I --
24   A   You listed it.  I just don't --
25   Q   -- well, I didn't --

Rebecca Smith-Bindman, M.D.

Page 30

1      A  -- remember that.
2      Q  -- list it.  This was a list that was
3  prepared and provided to me by counsel for
4  Plaintiffs so --
5          MS. O'DELL:  But I don't think he
6  characterized the documented in any way other than
7  the Bates number, so -- so it's a J&J document --
8      A  What is that item?
9          MS. O'DELL:  -- that's just the Bates
10  number for that particular document.  And it's
11  the -- the test results that you reviewed yesterday.
12      A  Yes.
13          (Exhibit 3 was marked for identification
14  and is attached to the transcript.)
15      Q  (BY MR. ZELLERS) Are all of the documents
16  contained on Exhibit 3, the -- a listing that was
17  put together by counsel for the Plaintiffs,
18  documents that you reviewed yesterday in preparation
19  for your deposition today?
20      A  Yes.
21      Q  Are those documents that were selected by
22  plaintiffs' counsel to show you to help prepare you
23  for the deposition?
24          MS. O'DELL:  Object to the form.
25      A  The document are ones that I asked for to

Page 31

1  see testing results, both positive and negative,
2  from Johnson & Johnson.  So I requested documents
3  that would show that, and I believe that's what each
4  of these were provided for.
5      Q  When did you make that request to
6  plaintiffs' counsel?
7          MS. O'DELL:  And Mr. Zellers is -- he can
8  ask you when you made the request.  In terms of the
9  specifics of the request or conversations with
10  counsel, those would be protected, and I would
11  instruct you not to -- to disclose those.
12      A  To not say when I read the request?
13          MS. O'DELL:  You can say when you gave the
14  request.  But the substance of the request or the
15  substance of the discussions, I would have ask you
16  not to --
17      A  Okay.
18          MS. O'DELL:  -- testify to those.
19      Q  (BY MR. ZELLERS) My question again is:
20  When did you make the request for the documents that
21  are identified on Exhibit 3?
22      A  I believe it was a few weeks ago.
23      Q  You made a request for testing documents
24  of talcum powder used in Johnson & Johnson Consumer,
25  Inc., baby powder or former Shower to Shower powder;

Page 32

1  is that right?
2      A  Yes, I did.
3          MS. O'DELL:  Object to the form.
4      Q  (BY MR. ZELLERS) You asked for documents
5  that were both positive and negative relating that
6  testing; is that right?
7      A  Yes.
8      Q  Do you believe that you have now seen, as
9  part of your review, all documents relating to the
10  testing of Johnson's baby powder and/or Shower to
11  Shower powder?
12      A  I --
13          MS. O'DELL:  Object to the form.
14      A  -- I do not believe I have seen the
15  entirety of the testing results.
16      Q  (BY MR. ZELLERS) Was it your request that
17  you see whatever pertinent documents that were
18  relating to the testing of the baby powder?
19      A  It was not my request.  I wanted to
20  understand, in general, what kind of testing had
21  been done.  I -- I was not planning to delve into
22  the entirety of testing.
23      Q  Any other materials that you have reviewed
24  prior -- strike that -- subsequent to preparing your
25  report, which we marked as Exhibit 2?

Page 33

1      A  None that come to mind.
2      Q  You have brought with you here today
3  several notebooks and it looks like a blue folder;
4  is that right?
5      A  Yes.
6      Q  What is contained in the blue folder that
7  you brought here today?
8      A  Primarily in the blue folder are either
9  additional documents that I have reviewed since I
10  wrote my report, but also a few documents that -- in
11  preparation for the deposition, I went through my
12  report and pulled some articles to look at in
13  greater depth, and so I brought those with --
14      Q  So --
15      A  -- me.
16      Q  -- in the blue folder are materials that
17  you pulled out to have available for the deposition
18  today for your use as needed in responding to
19  questions that were asked?
20      A  Yes, that's correct.
21      Q  Can I see you blue folder, please?  And,
22  Dr. Smith-Bindman, have you taken any medications
23  that impair your ability to answer questions today?
24      A  I have not.
25      Q  All right.  The first document in your

9 (Pages 30 to 33)

Rebecca Smith-Bindman, M.D.

Page 34

1  blue folder is a document, "Reproductive Sciences"
2  at the top, "Molecular basis Supporting the
3  Association of Talcum Powder Use with Increased Risk
4  of Ovarian Cancer."
5      The first named author is Nicole Fletcher.
6      And is this the article by Dr. Saed that
7  you sold me about?
8      A  Yes, it is.
9      Q  There are a number of notes and
10 highlighting that are contained in the document.
11 Are all of those your notes and highlighting?
12     A  They are.
13     Q  We'll mark your copy of Dr. Saed's paper
14 as Exhibit 4.
15     (Exhibit 4 was marked for identification
16 and is attached to the transcript.)
17     Q  (BY MR. ZELLERS) The next paper in your
18 blue folder that you brought here today is a
19 document with the first named author, Fiume,
20 F I U M E.  The title is "Safety Assessment of Talc
21 as Used in Cosmetics."
22     It appeared in the International Journal
23 of Toxicology.  Again, there's highlighting in the
24 document and underlying lining.
25     Did you do the highlighting and did you do

Page 35

1  the underlining in this document?
2      A  Yes, I did.
3      Q  We'll mark that document, your copy, as
4  Exhibit 5.
5      (Exhibit 5 was marked for identification
6  and is attached to the transcript.)
7      Q  (BY MR. ZELLERS) I see here that there is
8  the IARC monograph dated 2010 on the evaluation of
9  carcinogenic risk to humans.
10     The bottom part of page 1 is torn off.  Do
11 you know why that is?
12     A  I do not.
13     Q  All right.  So the first page gives a date
14 reference of 2010.  The second page gives -- well,
15 it also lists a 2006 date and a 2010 date.  There is
16 highlighting throughout.
17     Whose highlighting is contained in the
18 document that we'll mark as Exhibit 6?
19     A  That would be mine.
20     (Exhibit 6 was marked for identification
21 and is attached to the transcript.)
22     Q  (BY MR. ZELLERS) We then have a news
23 article from the British Medical Journal that was
24 published December 28 of 2008.  It's just a one-page
25 document with underlining and writing on it.

Page 36

1      Are those your notations?
2      A  Yes, they are.
3      Q  All right.  We'll mark that as Exhibit 7.
4      (Exhibit 7 was marked for identification
5  and is attached to the transcript.)
6      (Exhibit 8 was marked for identification
7  and is attached to the transcript.)
8      Q  (BY MR. ZELLERS) Exhibit 8 are the
9  classifications of the International Agency for
10 Research on Cancer or IARC.
11     Are you generally familiar with the IARC
12 classifications relating to the carcino --
13 carcinogenicity of different agents?
14     A  I am.
15     Q  The next document in your folder that also
16 has some underlining and highlighting is on "Talc
17 Translocation from the Vagina to the Oviducts and
18 Beyond."
19     (Exhibit 9 was marked for identification
20 and is attached to the transcript.)
21     Q  (BY MR. ZELLERS) This is an article that
22 was published in 1985.  The first named author is
23 A.P. Wehner.
24     Is this also a document that you brought
25 here today?

Page 37

1      A  It is.
2      Q  The highlighting in the document, is that
3  your document -- strike that.
4      Is that your highlighting?
5      A  It -- it is.
6      Q  Are all of these documents either on your
7  reference list or on your Materials Considered List,
8  other than what you told us about at the start of
9  the deposition?
10     A  Yes.
11     Q  We have Deposition Exhibit 47 from the
12 Pier deposition.  I will not mark that.
13     We have an article here by Shukla,
14 S H U K L A, "Alterations in Gene Expression in
15 Human Mesothelial Cells Correlate with Mineral
16 Pathogenicity."
17     (Exhibit 10 was marked for identification
18 and is attached to the transcript.)
19     Q  (BY MR. ZELLERS) Is that a document that
20 you brought here today?
21     A  Yes, it is.
22     Q  Are the highlights and writing on that
23 document yours?
24     A  Yes, they are.
25     Q  You have an article by Biz'Zard that was

10 (Pages 34 to 37)

Rebecca Smith-Bindman, M.D.

Page 38

1  published in -- is that -- Phytotherapy Research,
2  2007; is that right?
3      A   Yes.
4      Q   There do not appear to be any handwriting
5  on that document, so I won't mark it.
6          We have got the Hopkins Deposition
7  Exhibit 28.  There's no highlighting on that
8  document.
9          And then we have the "Draft Screening
10 Assessment" from Health Canada dated December 2018.
11 Is the highlighting in that document
12 yours?
13     A   Yes, it is.
14     Q   All right.  We'll mark that as
15 Deposition Exhibit 11.
16         (Exhibit 11 was marked for identification
17 and is attached to the transcript.)
18     Q   (BY MR. ZELLERS) Have we covered all of
19 the documents that you have brought with you today
20 in your blue folder?
21     A   Yes.
22     Q   All right.  Let me see your two notebooks
23 that you also have brought with you today.  One
24 notebook is "Talc Articles I."  The second notebook
25 is "Talc Articles II."

Page 39

1          Are all of the articles that are contained
2  in these two notebooks, articles that are contained
3  either on your reference list or on your reliance
4  materials list?
5      A   Yes, they are.
6      Q   As I go through this quickly, it appears
7  that there is underlining and highlighting of the
8  articles that you have brought here today; is that
9  right?
10     A   Yes, it is.
11     Q   Is all of the highlighting and underlining
12 and marking, are those your highlights and marking?
13     A   Yes, they are.
14     Q   Who prepared the notebooks?  And let's
15 mark Talc Articles I, the entire notebook as
16 Exhibit 12.
17         (Exhibit 12 was marked for identification
18 and is attached to the transcript.)
19     Q   (BY MR. ZELLERS) Talc Articles II, the
20 entire notebook, as Exhibit 13.
21         (Exhibit 13 was marked for identification
22 and is attached to the transcript.)
23     Q   (BY MR. ZELLERS) Who prepared Exhibits 12
24 and 13 for you?
25     A   I did.

Page 40

1      Q   Did you have any staff that helped you in
2  terms of your review of materials and preparation of
3  your report other -- other than Dr. Hall?
4      A   I had a copy editor -- once I had a draft
5  of my report -- review it.
6      Q   Who is your copy editor?
7      A   Her name is Chris Tachibana.
8      Q   And where is she employed?
9      A   She is a freelance medical copy editor.
10     Q   What role did she play in your review and
11 analysis of materials and your -- the preparation of
12 your report?
13     A   So she played no role in the review -- or
14 the drafting of the report, but she reviewed a draft
15 near the end for grammatical issues to remove
16 redundancy.
17         She's someone I work with a great deal for
18 my medical publications, and so --
19     Q   You have worked with her in the past -- I
20 --
21     A   That's right --
22     Q   -- is that right?
23     A   -- yes.
24     Q   Is she here in the San Francisco area?
25     A   She is not.

Page 41

1      Q   Where is she located?
2      A   She splits her time between Seattle,
3  Washington, and Germany.
4      Q   She charges for her services; is that
5  right?
6      A   She does.
7      Q   Are those charges that you paid or that
8  were paid by plaintiffs' counsel?
9      A   They have not yet been paid, but the plan
10 is for her to submit those invoices.  And it will
11 come out of my fees, but will be paid by the
12 counsel.
13     Q   All right.  When you submit invoices,
14 will -- the charges for the copy editor, will those
15 be included in your invoice to plaintiffs' counsel?
16     A   My plan is for it to come out of my fee.
17 So I am paying for it, but it should be literally
18 paid by counsel, since I'm not able to pay and
19 deduct taxes or pay taxes or -- or so -- or...
20     Q   All right.  You will pay it out of your
21 pocket and will not include it on your statement to
22 plaintiffs' counsel; is that right?
23     A   That's correct.
24     Q   Approximately how much have you paid or
25 will you pay to your copy editor?

11 (Pages 38 to 41)

Rebecca Smith-Bindman, M.D.

Page 42

1    A   I believe the total is in the ballpark of
2  about 1,500 or $1,700.
3    Q   How about Dr. hall?  Are her fees being
4  paid by you or are they being paid by plaintiffs'
5  counsel?
6    A   Her fees are being paid by counsel.
7    Q   Dr. Hall either has or will submit her own
8  separate invoice relating to her work on this
9  matter?
10   A   Yes.
11   Q   Has she already done that?
12   A   I believe she has submitted it.  I -- I'm
13  not 100 percent sure.
14   Q   Do you know what Dr. Hall's fees are at
15  least through the present time relating to her work
16  on this matter?
17   A   I believe the amount is in the ballpark of
18  the same 1,500 to $2,000.
19   Q   You believe, though, that Dr. Hall either
20  has or will be submitting invoice -- an invoice
21  separately for her work to plaintiffs' counsel; is
22  that right?
23   A   Yes.
24   Q   You have submitted invoices; is that
25  right?

Page 43

1    A   I have.
2    Q   When were you first retained in this
3  matter -- well, strike that.
4        When were you first contacted with
5  respect to this litigation, the talcum powder MDL?
6    A   My recollection is mid-2017.
7    Q   Who contacted you in mid-2017?
8    A   I was initially contacted by a law firm
9  that i believe was helping the law firms find expert
10  witnesses and asked if I would be willing to speak
11  with them to see if this could be something that I
12  would be interested in doing.
13   Q   What law firm or lawyer contacted you
14  initially in mid-2017?
15   A   I -- I don't remember that initial
16  contact.
17   Q   You don't remember the name of the lawyer
18  or the law firm that initially contacted you in this
19  matter?
20   A   The initial law firm basically asked me if
21  I would be willing to speak to these lawyers, and I
22  do not know the name of that lawyer who originally
23  contacted me.
24   Q   Did you ever speak to that lawyer again?
25   A   No.

Page 44

1    Q   What did that lawyer tell you or ask you
2  about this engagement?
3    A   They told me that there was a -- a case
4  that they would like some epidemiology research on
5  and that they thought I would be a very good fit and
6  would I be willing to speak with them.
7        I don't believe they even told me what the
8  content of -- of the case was about, but rather,
9  that it was a case.  And the role that they were
10  seeking was as an epidemiologist, not as a
11  radiologist or on the medical care.
12   Q   Was this a phone call or an e-mail or how
13  did they contact you?
14   A   I believe it was a short e-mail followed
15  by a short phone call.
16   Q   I mean, do you keep those e-mails?  And if
17  at some point we ask for them to be produced, is
18  that something you could do?
19   A   For the particular e-mail that you are
20  asking about, I cannot find it.  So I don't have
21  that.  I looked.
22   Q   You were contacted by a lawyer or law
23  firm, asked if you would be willing.
24        You said you would be willing without even
25  knowing what the matter related to?

Page 45

1    A   I didn't say I would be willing to be an
2  expert.  I said I would be willing to have a
3  conversation with the lawyers to learn about the
4  case.
5    Q   Were you told at that time that the case
6  related to talcum powder?
7    A   I was not.
8    Q   Were you told at that time that the
9  medical issue in the case related to ovarian cancer?
10   A   I do not believe I was.
11   Q   What is the next contact then that you had
12  with any lawyer relating to this matter?
13   A   So then a phone call was set up between
14  myself and, I believe it was, three lawyers involved
15  in this litigation and told about the -- what the --
16  what the case was about and told what they were
17  looking for to see if I would be interested in
18  speaking with them.
19        And that lead to an in-person meeting
20  where we then discussed what the case was about.
21   Q   When was the phone call with the three
22  attorneys?
23   A   All of this was in mid-2017, June-July
24  time frame.
25   Q   The same question.  When was the in-person

12 (Pages 42 to 45)

Rebecca Smith-Bindman, M.D.

Page 46

1  meeting?
2      A   Within that same -- maybe a month later,
3  but same time frame.
4      Q   Was the in-person -- strike that.
5          Where was the in-person meeting?
6      A   It was in my office in San Francisco.
7      Q   Who were the three attorneys that you
8  spoke with initially over the phone and then met
9  with in person?
10     A   So Dr. Thompson was one; John Restaino was
11 one; and a third lawyer whose name is alluding me.
12     Q   Was it a man or a woman?
13     A   A woman.
14     Q   Is it a lawyer that you have had any
15 further contact with or communications with?
16     A   Yes.
17     Q   But you can't remember her name?
18     A   I can't.  But if we give it a minute, I
19 think I will be able to.
20     Q   Well, if you do remember it at some point
21 today, let us know.
22         When you had the phone call with
23 Ms. Thompson and with Mr. Restaino and this third
24 lawyer in the in-person meeting, what did they ask
25 you to do?

Page 47

1      A   They asked me if I would be willing to do
2  a comprehensive and unbiased review of the
3  literature around talcum powder products and ovarian
4  cancer.
5      Q   Did they ask you to do anything else?
6      A   Well, they asked if I would be willing to
7  be an expert witness in this case.
8      Q   Anything else?
9      A   Nothing else that I can recall.
10     Q   You said you would do a review of the
11 literature, correct?
12     A   I -- yes --
13     Q   You --
14     A   -- I did.
15     Q   -- you said that you would be willing to
16 serve as an expert for Plaintiffs, correct?
17         MS. O'DELL:  Object to the form.
18     A   I -- I hesitated on the last question
19 because I was very upfront and clear that I was
20 willing to do a review, but that I did not know this
21 field in any great depth and that I would only be
22 interested in doing that if I was permitted to do
23 the review the same as I do in my other scientific
24 work and that I didn't know if my conclusion would
25 support my becoming an expert on their behalf.

Page 48

1      Q   (BY MR. ZELLERS) You understood they
2  represented the Plaintiffs in this litigation --
3      A   Yes.
4      Q   -- is that right?
5      A   Yes.
6      Q   You told them that you would be willing to
7  do the review.  You did not at that point agree to
8  serve as an expert witness for the Plaintiffs; is
9  that fair?
10     A   That's fair.
11     Q   Did you then go and do your review,
12 literature review?
13     A   Yes, I did.
14     Q   You, at least at that point in time, had
15 never previously done any research or review
16 relating to talcum powder or relating to any
17 potential association between talcum powder,
18 perineal talcum powder use, and ovarian concern; is
19 that right?
20     A   That's correct.
21         MS. O'DELL:  Object to the form.
22     Q   (BY MR. ZELLERS) You went out and reviewed
23 the literature; is that right?
24     A   Yes.
25     Q   Did plaintiff's counsel, the two lawyers

Page 49

1  that you met -- well, strike that.
2          The three lawyers you met with, did they
3  provide you with some articles to get started with?
4      A   They provided access to a database, a
5  Dropbox, where they had a large number of articles
6  that they made available to me.
7      Q   You reviewed those articles.  Did you then
8  have another meeting or communication with the
9  plaintiffs' lawyers?
10         MS. O'DELL:  Object to the form.
11     A   I had several meetings with the lawyers
12 over the subsequent year.
13     Q   (BY MR. ZELLERS) Eventually were you
14 asked, you know, to render an opinion on a topic or
15 topics?
16         MS. O'DELL:  Object to the form.
17     A   I -- I was asked to draft a report of my
18 review of the -- the literature and the data that
19 were available.
20     Q   (BY MR. ZELLERS) At this time were there
21 any new lawyers that you were meeting with on the
22 plaintiffs' side or was it still the three original
23 lawyers?
24     A   They were -- I -- I believe those would
25 be -- I think there was one additional lawyer

13 (Pages 46 to 49)

Rebecca Smith-Bindman, M.D.

Page 50

1  that --
2      Q   Do you remember his or her name?
3      A   Her name.  Breanne was her first name.
4      Q   Do you know Breanne's last name?
5      A   Maybe Cope or something that's similar to
6  Cope.
7      Q   You reviewed the articles.  You were asked
8  then by Plaintiffs to write up something relating to
9  the articles; is that right?
10     A   Yes.
11         MS. O'DELL:  Object to the form.
12     Q   (BY MR. ZELLERS) At some point did either
13  you suggest or the plaintiff lawyers ask you to form
14  certain opinions relating to this matter?
15         MS. O'DELL:  Object to the form.
16     A   I'm not -- I'm not sure what you mean,
17  "form opinions."
18     Q   (BY MR. ZELLERS) You met with the lawyers;
19  is that right, after you had done your literature
20  review?
21     A   Yes.
22     Q   You had not yet agreed to be an expert
23  witness for the Plaintiffs; is that right?
24     A   Yes.
25     Q   After you had done your literature review,

Page 51

1  did the plaintiffs' lawyer say:  Well,
2  Dr. Smith-Bindman, do you have an opinion as to
3  whether or not there's an association between
4  perineal talcum powder use and ovarian cancer?
5      A   I don't remember any such conversation.
6  I -- I think from the very beginning the lawyers
7  were guessing that I was going to feel strongly that
8  there's a strong association.  So I don't remember
9  being retained as an expert after my report came
10  out.
11         At -- at some point I think it became
12  clear to them when I explained my views that they
13  would like to have me be an expert.
14         But I don't remember a particular
15  conversation where they asked me to -- where they
16  linked my being an expert to the finished product of
17  the report.  By the time I drafted the report, they
18  knew that they had wanted me to be an expert in this
19  case.
20     Q   All right.  At -- at some point after you
21  had reviewed the literature and you sat and you
22  talked with plaintiffs' counsel, you became an
23  expert witness for the Plaintiffs; is that right?
24     A   Yes.
25     Q   Are you able to time that for us any

Page 52

1  better than what you have already done?
2      A   No.
3      Q   As part of serving as an expert for
4  Plaintiffs, you did an -- either A -- do you call it
5  a systematic review or a meta-analysis?  What do you
6  call that?
7      A   I call it a systematic review.
8      Q   What's the difference between a systematic
9  review and a meta-analysis?
10     A   I -- I don't think there's any difference.
11  They're -- they're both trying to describe an
12  unbiased, quantitative review of the medical
13  literature.
14     Q   Did -- your systematic review that you
15  did, you did that after you had done this review of
16  the literature, fair?
17         MS. O'DELL:  Object to the form.
18     A   My systematic review grew out of my
19  reading the literature and realizing that there was
20  a real gap, which I thought needed to be filled.
21  And I chose to do that.
22     Q   (BY MR. ZELLERS) I will today, you know,
23  ask you some more detailed questions about that.
24  Let me make sure I have covered by basics here.
25         Your report includes as attachments, a

Page 53

1  list of references; is that right?
2      A   Yes, it does.
3      Q   What is meant to be included in the
4  references that appear and are attached to your
5  report, pages 42 through 47?
6      A   Those are references that I have cited
7  specifically in my report.
8      Q   In addition along with your report, you
9  provided a curriculum vitae; is that right?
10     A   Yes.
11     Q   We'll mark that as Exhibit 14.
12         (Exhibit 14 was marked for identification
13  and is attached to the transcript.)
14         MS. O'DELL:  Thank you.
15     Q   (BY MR. ZELLERS) The curriculum vitae that
16  is attached as -- strike that -- that you provided
17  with your report and that we have marked as
18  Exhibit 14, is that complete and up to date?
19     A   Yes, it is.
20     Q   Any additions or corrections that need to
21  be made to that?
22     A   There are some details of recent
23  publications that are not provided in this, but
24  those are relatively minor changes.
25     Q   Are any of -- the details to publications

14 (Pages 50 to 53)

Rebecca Smith-Bindman, M.D.

Page 54

1  that you would update your curriculum vitae to, do
2  any of those relate to this matter or to the
3  opinions you're giving here today?
4      A   They do not.
5      Q   Deposition Exhibit 15 is also a document
6  that was provided along with your report.  It
7  appears to be a reliance list; is that right?
8      MS. O'DELL:  Object to the form.  Thank
9  you.
10     (Exhibit 15 was marked for identification
11 and is attached to the transcript.)
12     A   Yes, it is.
13     Q   (BY MR. ZELLERS) What is included on the
14 reliance list which we have marked as a Exhibit 14?
15     A   This is a broad list of --
16     THE COURT REPORTER:  15.
17     Q   (BY MR. ZELLERS) Oh, I'm sorry.  Yes let
18 me ask that question again.
19     What documents are listed and included on
20 the reliance list which we have marked as
21 Exhibit 15?
22     A   That is a broader list of documents.  It
23 includes documents that I may have read, but I
24 didn't believe needed to be cited.
25     It also includes documents that counsel

Page 55

1  provided to me that -- that may or may not have been
2  closely read.
3      So it includes both articles I know very
4  many, as well as additional documents I may not have
5  as deep of a knowledge of.
6      Q   Was -- Deposition Exhibit 15, was that
7  prepared by you or was that prepared by counsel?
8      A   That was prepared by counsel.
9      Q   Have you reviewed all of the references
10 and materials that are listed out on Deposition
11 Exhibit 15?
12     A   I -- I do not know.  I would have to go
13 through them one at a time to know if I had reviewed
14 all of them.
15     Q   Can you easily tell us which of the
16 materials listed on Exhibit 15, your reliance list,
17 were provided by you and which were provided by
18 counsel?
19     MS. O'DELL:  Objection.  Objection to
20 form.  I think the documents and materials
21 considered -- materials and data considered list.
22     MR. ZELLERS:  Well, there's no caption at
23 the top.  I have tried to be as descriptive as I can
24 with the witness on it.
25     MS. O'DELL:  I think it's referred to in

Page 56

1  the report in that manner, but just to clarify.
2      A   No, I could not easily go through and pick
3  out which ones were ones that I provided to them or
4  which ones they provided to me.
5      Q   (BY MR. ZELLERS) All right.  Are you aware
6  -- do you know who Dr. Judith Wolf is?
7      A   No, I do not.  I know the name, but not
8  the person.
9      Q   Are you aware that your reliance list or
10 additional Materials Considered List, what we have
11 marked as Exhibit 15, is identical to the Materials
12 Considered List that was attached to Dr. Wolf's
13 report?
14     A   I -- I don't know who Dr. Wolf is, nor do
15 I know her reliance list.
16     Q   All right.  Exhibit 15 is a reliance list
17 or Materials Considered List that was prepared by
18 counsel for Plaintiffs; is that right?
19     A   It was the list provided to me.
20     Q   You may have reviewed some of these
21 documents -- or you have reviewed some of these
22 documents, but potentially not all of these
23 documents --
24     MS. O'DELL:  Object to the form.
25     Q   (BY MR. ZELLERS) -- fair?

Page 57

1      A   Yes.
2      Q   Looking at your report, Deposition
3  Exhibit 2 -- and let me withdraw that.
4      Have we covered now all of the documents
5  that you have either reviewed and relied upon in
6  preparing your opinions in this matter and your
7  report, which we marked as Exhibit 2, or that were
8  made available to you and you may or may not have
9  looked at them?
10     MS. O'DELL:  Object to the form.
11     A   Yes.
12     Q   (BY MR. ZELLERS) Is your report,
13 Exhibit 2, accurate?
14     A   Yes, it is.
15     Q   Is your report, Exhibit 2, complete, other
16 than perhaps citing to some of the documents that
17 you reviewed after preparing your report that we
18 identified earlier today?
19     A   Yes, it is.
20     Q   There were -- withdraw that.
21     You have a fee schedule.  You're charging
22 a thousand dollars an hour to review materials and
23 talk with the lawyers in this matter and provide
24 opinions; is that right?
25     A   Yes.

15 (Pages 54 to 57)

Rebecca Smith-Bindman, M.D.

Page 58

1      Q   I kind of got sidetracked in terms of
2  asking you about the Plaintiff lawyers that you met
3  with.
4         We had gotten up to your meeting with
5  Ms. Thompson, with Mr. Restaino, with a lawyer
6  perhaps with the first name of Breanne; is that
7  correct?
8      A   Yep.
9      Q   Have you remembered the fourth lawyer yet?
10     A   I -- I have not.  Can -- can I call a
11  friend?
12     Q   No.  No, need to call a friend.
13        What other Plaintiff lawyers have you met
14  with relating to your work as a plaintiff expert for
15  the MDL litigation?
16     A   There are no others that I recall.
17     Q   We have other lawyers here today.  You met
18  them --
19     A   I apologize.
20     Q   -- at least in the last day or two?
21     A   Yes.
22     Q   Well, don't apologize to me.  You probably
23  hurt their feelings.
24        Did you meet all of the lawyers who are
25  here today at some point?

Page 59

1      A   Yes, I did.
2      Q   Some of them you have met just in the last
3  couple of days as you prepared for the deposition;
4  is that right?
5      A   That's correct.
6      Q   Other than the lawyers who are present in
7  the room today for Plaintiffs, have you met with any
8  other lawyers or communicated with any other lawyers
9  that you believe represent the Plaintiffs in this
10  litigation?
11     A   I have not.
12     Q   What did you do to prepare for your
13  deposition here today?
14     A   My primary preparation was to review my
15  report and to reaccess references that I included in
16  my report to make sure that I was aware of the
17  details or -- or relevant...
18     Q   What else did you do to prepare for your
19  deposition here today?
20     A   I also met with the lawyers yesterday to
21  review the process of the deposition and so forth.
22     Q   How long did you meet with the lawyers
23  yesterday?
24     A   We met most of the day yesterday.
25     Q   Other than meeting with the lawyers for

Page 60

1  most of the day yesterday, did you have any other
2  meetings or conversations with the lawyers for the
3  Plaintiffs to prepare for your deposition?
4      A   Yes, I did.  So today is Thursday.
5  Wednesday, we met for most of the day.  And I met
6  with Dr. Thompson for an hour or so on Wednesday as
7  well.
8      Q   All right.  Any other --
9         MS. O'DELL:  I think the days may be mixed
10  up.  You said "Wednesday" twice.
11     A   I apologize.  So Tuesday, we met at the
12  end of the day for an hour and then most of the day
13  yesterday, Wednesday, and then today.  Thank you.
14     Q   (BY MR. ZELLERS) Any other meetings or
15  communications with counsel for Plaintiffs to
16  prepare for the deposition here today?
17     A   Any other in-person meetings or --
18     Q   Or phone calls in which there was, you
19  know, discussion about preparing for the deposition.
20     A   I believe over -- well, I had asked to
21  reschedule this deposition.  So there were a couple
22  of e-mails related to that.
23        I also had asked for a couple of
24  additional documents to help ensure that I was
25  seeing all materials that I felt were relevant to

Page 61

1  the case.
2      Q   Are those the materials that were on
3  Exhibit 3 that we talked about at the very
4  beginning?
5      A   Yes, they are.
6      Q   Anything else that you did with the
7  lawyers in terms of preparing for your deposition
8  here today?
9      A   No.
10        MS. O'DELL:  Dr. Smith-Bindman, feel free
11  to testify regarding meetings, when they happened,
12  phone calls, et cetera, but not the substance of
13  those discussions.
14     A   Okay.
15        MS. O'DELL:  Thank you.
16     Q   (BY MR. ZELLERS) Any others?
17     A   None that I can remember.
18     Q   Ms. Thompson -- did you know Ms. Thompson
19  before she initially called you and then came and
20  sat down to meet with you?
21     A   Initially, you --
22     Q   Yes.
23     A   -- mean?  No, I did not.
24     Q   Had you ever worked with Ms. Thompson on
25  any other litigation?

16 (Pages 58 to 61)

Rebecca Smith-Bindman, M.D.

Page 62

1    A   No.
2    Q   Other than the talcum powder litigation
3  that we're here deposing you in, have you worked on
4  other litigations for either defendants or
5  plaintiffs?
6        MS. O'DELL:  Other than the ones she has
7  testified to?
8    Q   (BY MR. ZELLERS) Well, other than, yes,
9  the cases.
10   A   No, I have not.
11   Q   You have served as an expert witness in
12  other matters in which you did not provide
13  deposition testimony; is that right?
14       MS. O'DELL:  Object to the form.
15   A   There are a small number of additional
16  medical malpractice cases that I was also involved
17  with which would have settled before I was asked to
18  take a deposition.
19   Q   (BY MR. ZELLERS) My question is:  Have you
20  ever testified or consulted with either plaintiffs
21  or defense in -- in a product liability litigation
22  like this?
23   A   I have not.
24   Q   Have you ever provided testimony in a
25  matter relating to a consumer product?

Page 63

1    A   I have not.
2    Q   Have you ever been retained as an expert
3  or provided testimony in a matter relating to
4  asbestos?
5    A   I have not.
6    Q   Mr. Restaino -- had you ever met
7  Mr. Restaino before that initial phone call and
8  meeting back in mid-2017?
9    A   I had not.
10   Q   When I look at your invoices, will they
11  generally outline the times that you had meetings
12  and communications with Plaintiff lawyers?
13   A   Yes, they will.
14   Q   Will they also outline whatever work
15  that -- and I don't mean work, but at least dates as
16  to when you began your systematic review or
17  meta-analysis?
18   A   The work that I did will be itemized.  I'm
19  not sure if I break down writing the report versus
20  doing the systematic review into separate buckets,
21  but it might.
22   Q   The invoices will start with sometime in
23  mid-2017, when you started meeting with the lawyers;
24  is that right?
25   A   Yes.

Page 64

1    Q   Do the invoices go through the time that
2  you prepared your opinions and report as of
3  November 15 of 2018?
4    A   Yes, they will.
5    Q   All right.  Is that where they end?
6    A   They would also include some hours that I
7  have worked reviewing the material since that time.
8  Although, I don't believe I have submitted those
9  reports -- those invoices, but I certainly can.
10   Q   So my question is:  How much time have you
11  spent on this matter since your last invoice?  Can
12  you estimate that for us?
13   A   I would guess in the ballpark of 10 hours,
14  not including the time I met with the lawyers
15  yesterday -- not this week.  Excluding the time this
16  week.
17   Q   How much time did you spend this week in
18  addition to that 10 hours with the lawyers in
19  preparing yourself to provide deposition testimony?
20   A   In the ballpark of another 10 hours.
21   Q   Have you been served or been asked to
22  serve as an expert witness or consultant in any
23  other talcum powder litigation or matters?
24   A   I have not.
25   Q   What percent of your professional time do

Page 65

1  you spend working as a consultant?
2    A   A small amount.  Probably less than
3  5 percent.
4    Q   What percent of your income is from
5  consulting on litigation matters?
6        MS. O'DELL:  For a particular year or time
7  period or average, just --
8    Q   (BY MR. ZELLERS) Well, the last couple of
9  years.
10   A   In the last couple of years, a -- a small
11  amount.  Probably 5 or 10 percent.
12   Q   What is the largest percent of your income
13  that has related to consulting on litigation
14  matters?
15       And what I'm asking you to do is to look
16  back.  And what was the high point in terms of
17  income that you received from consulting on
18  medical/legal matters?
19   A   Probably the 10 percent I cited.
20   Q   Have you ever attended a convention or a
21  meeting with plaintiff lawyers and other plaintiff
22  experts?
23   A   I have not.
24   Q   Never?
25   A   A meeting of lawyers?

17 (Pages 62 to 65)

Rebecca Smith-Bindman, M.D.

Page 66

1     Q   Yes, a meeting of lawyers --
2     A   Never.
3     Q   -- and plaintiff experts.
4     A   Never.
5     Q   All right.  Have you --
6     A   I didn't know there was such a thing.
7     Q   Do you know any of the experts that have
8  also been retained by the Plaintiffs in this
9  litigation?
10    A   I don't know them personally, but I -- I
11 have seen their names.  And their names are the
12 same -- some of the names are names that are
13 familiar to me.
14    Q   Have you communicated with any of the
15 other experts for Plaintiffs?
16    A   I have not.
17    Q   Have you reviewed reports from any of the
18 experts for Plaintiffs?
19    A   I have reviewed a handful of them --
20    Q   What --
21    A   -- yes.
22    Q   -- reports of other plaintiff experts have
23 you reviewed?
24    A   I reviewed Dr. Cooke's report.  I reviewed
25 Mr. Longo's report.  I reviewed an ob --

Page 67

1  obstetrician gynecologist report.
2     Q   Do you remember who?
3     A   Clarke perhaps or something like Clarke.
4        MS. O'DELL:  If you need to refer to your
5  report or your materials, feel free to do that.
6     A   Okay.  I think Mr. Cralley's (phonetic)
7  report.
8     Q   (BY MR. ZELLERS) Do you know any of those
9  experts personally?
10    A   I do not.
11    Q   All right.  You have never communicated
12 with any of those experts; is that right?
13    A   I have not.
14    Q   You have just reviewed their reports; is
15 that right?
16    A   That's correct.
17    Q   Have you reviewed any deposition testimony
18 or portions of depositions of plaintiff experts in
19 this matter?
20    A   I have reviewed small pieces of several of
21 them.
22    Q   Okay.  What experts have you reviewed a --
23 small pieces of their deposition?
24    A   Dr. Moorman's testimony or deposition, I
25 saw some of.

Page 68

1     Q   What others?
2     A   Mr. Cooke's deposition, I believe.
3     Q   What others?  Did you put in your report,
4  the names of other experts that you reviewed their
5  deposition testimony of?
6     A   I -- I -- I'm checking if -- if I have.
7  I...
8     Q   Well, you have a recollection of reviewing
9  --
10    A   -- I -- I don't have a recollection of any
11 others that I have looked at.
12    Q   Do you know who David Kessler is?
13    A   I do.
14    Q   How do you know Dr. Kessler?
15    A   I --
16       MS. O'DELL:  Object to the form.
17    A   -- Dr. Kessler is a faculty member at
18 UCSF.
19    Q   (BY MR. ZELLERS) Do you know him
20 personally?
21    A   Not well, but enough to say hello.
22    Q   Been at meetings with him?
23    A   I have.
24    Q   You understand that he's an expert for the
25 Plaintiffs?

Page 69

1     A   I -- I have been told that.
2     Q   Have you had any discussions with
3  Dr. Kessler at all relating to this matter, the
4  talcum powder matter?
5     A   I have not.
6     Q   Have you participated in any projects --
7  medical/legal projects with Dr. Kessler --
8     A   I --
9     Q   -- in the past?
10    A   -- I have not.
11    Q   Have you heard of a documentary called
12 "The Bleeding Edge"?
13    A   I have.
14    Q   Did you participate in the documentary
15 called "The Bleeding Edge"?
16    A   I did.
17    Q   You understand that Dr. Kessler also
18 participated in that; is that right?
19    A   I -- yes.
20    Q   That is a documentary related to what?
21    A   A medical devices, primarily.
22    Q   Have you served as a consultant or expert
23 in medical device matters?
24    A   I have not.
25    Q   Pharmaceutical matters?

18 (Pages 66 to 69)

Rebecca Smith-Bindman, M.D.

Page 70

1    A  I have not.
2    Q  How was it then that you were retained or
3  ended up participating in "The Bleeding Edge"
4  documentary?
5    MS. O'DELL:  Object to the form.
6    A  I -- I'm not sure if you have had a chance
7  to see the documentary or not, but my role in it
8  is -- is pretty off topic.
9    And so at an initial incarnation of that
10  documentary, they had thought about focusing on an
11  issue where I do do research, radiation for medical
12  imaging.
13    It no longer fits into their new topic,
14  but somehow they kept a quote of me in that film.
15    Q  Did -- Dr. Kessler, was he the one
16  responsible for putting that documentary together?
17    A  I -- no, I don't -- I don't believe he
18  was.
19    Q  Were you paid for your work in
20  participating in that documentary?
21    A  No I was not.
22    Q  All right.  Jane Hall, she assisted you
23  with your systematic review.  Is -- is that the
24  right way you would characterize it, a systematic
25  review?

Page 71

1    A  Yes, the systematic review -- you asked
2  the difference between a meta-analysis.  It sort of
3  implies a certain scientific review -- rigor when
4  you call it a systematic review, so that's how I
5  like to think about it.
6    Q  You think systematic review implies more
7  scientific rigor than meta-analysis?
8    A  I think it's a subtle distinction, but
9  yes, I do.
10    Q  Well, you communicated and hired Jane hall
11  to assist you; is that right?
12    A  Yes, I did.
13    Q  Have you produced all of your
14  communications and materials with Jane Hall?
15    A  I have.
16    Q  How did you come in contact with Dr. Hall?
17    A  I work closely with an emergency medicine
18  researcher, and I have assisted him in several
19  systematic reviews.
20    And I knew he had a biostatistician who
21  generated the kind of graphics and analysis that I
22  wanted.  And so I reached out to him, and he
23  introduced me to Dr. Hall.
24    Q  You had never worked with Dr. Hall prior
25  to performing your systematic review --

Page 72

1    A  I had --
2    Q  -- in this case --
3    A  -- not.
4    Q  -- is that right?
5    A  That's correct.
6    Q  Have you worked with other
7  biostatisticians in the past?
8    A  I have.
9    Q  Why did you decide you needed to work with
10  a new biostatistician for this litigation?
11    A  The primary work that I needed was to do a
12  few graphs and figures, and so I wanted someone who
13  was both an expert in that and who I thought could
14  respond relatively quickly.
15    I have on my team, several
16  biostatisticians who are part of my research group,
17  but they don't have particularly relevant expertise
18  in generating these graphs.
19    And it would have required them to acquire
20  some skills, and so I wanted someone who focuses
21  specifically on this who could do that.
22    Q  Did you review any work from Dr. Hall
23  before you hired her?
24    A  I have been involved in systematic reviews
25  that she contributed to that I was very impressed

Page 73

1  with.  And so --
2    Q  So what other --
3    A  -- I reached out.
4    Q  -- sorry.  I didn't mean to interrupt you.
5    What other systematic reviews have you
6  been involved with Dr. Hall?
7    A  Actually, two of them.  One of them is on
8  a treatment for kidney stones.  Ralph Wang is the
9  senior author.
10    And the second was a systematic review
11  around the diagnosis of and treatment for pulmonary
12  embolism that also Dr. Wang was the leader on.
13    Q  Did you ever meet with Dr. Hall with
14  respect to this work in person?
15    A  I never met with her related to anything.
16  It was all by electronic communication.
17    Q  Did you ever talk with her over the phone?
18    A  Yes.  We spoke a few times.
19    Q  Did you take notes of your conversations
20  with Dr. Hall?
21    A  Not that I recall.
22    Q  You did have e-mails with Dr. Hall --
23    A  Yes.
24    Q  -- is that right?
25    A  Yes.

19 (Pages 70 to 73)

Rebecca Smith-Bindman, M.D.

Page 74

1    Q   Do you have receipts for the work that
2  Dr. Hall performed for you?
3        MS. O'DELL:  Object to the form.
4    A   Like an invoice receipt?
5    Q   (BY MR. ZELLERS) Yes, an invoice receipt.
6    A   No, I do not.
7    Q   You ended up paying her rush fees so that
8  she would do the work and the analysis more quickly;
9  is that right?
10       MS. O'DELL:  Object to the form.
11   A   I -- I remember telling her I didn't mind
12 her rush fee.  But -- but all of the invoicing was
13 done directly with counsel.
14   Q   (BY MR. ZELLERS) Well, Dr. Hall came to
15 you and said:  You know, it's going to take X amount
16 of time to do a thorough analysis?
17   A   Yes.
18   Q   She did offer to rush the analysis --
19   A   Yes.
20   Q   -- when you told her you needed it?
21   A   Yes.
22   Q   And your recollection is she, you know,
23 did rush the analysis and -- and got it done within
24 a couple of days?
25       MS. O'DELL:  Object to the form.

Page 75

1    A   I believe the analysis actually took a
2  couple of weeks.
3        But I was very open to paying her rush
4  fee.  I thought her fee was extraordinarily
5  reasonable, and so it just made it easier for me to
6  get it done quickly rather than to delay.
7    Q   (BY MR. ZELLERS) You defer to the e-mails
8  and the documents as to the timing of when you
9  requested that she rush the analysis and when she
10 provided it to you; is that right?
11       MS. O'DELL:  Object to the form.
12   A   I believe my documents would be correct
13 about when I asked for stuff and when it was done,
14 yes.
15       MS. O'DELL:  Excuse me, Mike.  We have
16 been going about an hour and 20 minutes.  Is this a
17 good time to take a quick break?
18       MR. ZELLERS:  Absolutely.
19       THE VIDEOGRAPHER:  We are off the record.
20 The time is 10:40 a.m.  This is the end of Disc 1.
21       (A break was taken from 10:40 a.m. to
22 11:10 a.m.)
23       THE VIDEOGRAPHER:  We are back on the
24 record.  This marks the beginning of Disc No. 2 in
25 the deposition of Dr. Rebecca Smith-Bindman.  The

Page 76

1  time is 11:10 a.m.
2    Q   (BY MR. ZELLERS) Dr. Smith-Bindman, I'm
3  handing you Deposition Exhibit 16, which is an
4  e-mail chain.  The very first e-mail, meaning the
5  last e-mail at the top of page 1, is Jane Hall --
6  from Jane Hall, September 24, 2018, at 8:04 a.m. to
7  you.
8        (Exhibit 16 was marked for identification
9  and is attached to the transcript.)
10   Q   (BY MR. ZELLERS) Will you take a look at
11 that and tell us if that is a printout of some of
12 your e-mail exchanges with Dr. Hall?
13   A   Yes.
14   Q   If we go to the very first e-mail in the
15 chain, it appears that you contacted Dr. Hall on
16 Wednesday, September 19, 2018, in the afternoon,
17 3:21 p.m., and told her that you were interested
18 primarily in generating a forest plot with a summary
19 estimate and test for heterogeneity; is that right?
20   A   Yes.
21   Q   That was your initial contact with
22 Dr. Hall; is that right?
23   A   Yes.
24   Q   You contacted your referring person,
25 Ralph, on the e-mail; is that right?

Page 77

1    A   Yes.
2    Q   All right.  You told -- the next day you
3  had some exchanges of e-mails with Dr. Hall.  You
4  told Dr. Hall that because you were doing a review
5  for a legal case, you did not need the detail that
6  you would need for a paper; is that right?
7        MS. O'DELL:  Object to the form.
8    A   Can you tell me where you're reading?
9    Q   (BY MR. ZELLERS) Sure.  I'm reading on
10 page 2 of Exhibit 16, the very last e-mail.  This is
11 from you September 20 of 2018.
12       You thanked Dr. Hall for her willingness
13 to help.
14       "As Ralph mentioned, I am doing a review
15 for a legal case and don't need quite the detail I
16 would usually need for a paper."
17       Is that what you told Dr. Hall?
18   A   Yes, it is.
19   Q   As of -- well, you communicated with
20 Dr. Hall on Friday, September 21st, in the
21 morning.  This is the very last e-mail on page 1 of
22 Exhibit 16.
23       You asked her to send you whatever she was
24 doing sooner rather than later because you needed to
25 get your report finished ASAP; is that right?

20  (Pages 74 to 77)

Rebecca Smith-Bindman, M.D.

Page 78

1    MS. O'DELL: Object to the form. I think
2  you misstated date on the e-mail but --
3    Q  (BY MR. ZELLERS) Well, I'm sorry. Let me
4  ask that question again. On Friday morning,
5  September 21, 2018, you told Dr. Hall that you
6  needed her information as soon as possible because
7  you had to finish your report ASAP; is that right?
8    A  Yes.
9    Q  Dr. Hall got back to you that day and
10 said, you know, I'll do my best. But if you want, I
11 can rush the work, if you're willing to pay time and
12 a half.
13    You then got back to her on Monday
14 morning, September 24, and said: Yes, I'll pay the
15 rush fee, and I would like your work as soon as
16 possible.
17    Is that right?
18    MS. O'DELL: Object to the form. Object
19 to the form.
20    A  I -- I think you're paraphrasing what it
21 says. The -- the idea was she said that if I paid
22 the rush, she could have some money to defray
23 childcare cost during --
24    Q  (BY MR. ZELLERS) Right. And --
25    A  -- that time, and I agreed to do that.

Page 79

1    Q  Exactly. And she said back to you: Okay.
2  By the end of -- so this is on a Monday. She said
3  you'll have the work product from her Wednesday at
4  the earliest, probably Thursday.
5    "I should have at least two sets of plots
6  today, and I'll send them to you as they are
7  output."
8    Is that right?
9    A  Yes.
10    Q  You have produced all of your e-mails and
11 communications with Dr. Hall in this matter; is that
12 right?
13    A  I have. You're not showing me all of
14 those communications; is that right?
15    Q  I haven't yet.
16    A  Okay.
17    Q  I'm going to show you some more.
18    A  Yes.
19    Q  But my question to you is: Included in
20 the production, at least you have included all of
21 your communications --
22    A  Yes.
23    Q  -- with Dr. Hall --
24    A  Yes.
25    Q  -- is that right?

Page 80

1    A  Yes.
2    Q  Have you communicated about this
3  litigation with anyone other than the plaintiffs'
4  counsel that you have told us about with Dr. Hall?
5  Anyone else?
6    MS. O'DELL: Object to the form.
7    A  I -- you asked me if I have mentioned this
8  litigation to anyone else?
9    Q  (BY MR. ZELLERS) Well, let's start there.
10 Have you mentioned this litigation to anyone else?
11    A  I have.
12    Q  Who have you mentioned this litigation to?
13    A  I have certainly mentioned it to my
14 husband.
15    Q  Other than your husband?
16    A  And then I have mentioned it to several
17 close friends.
18    Q  Your husband is a physician; is that
19 right?
20    A  He is.
21    Q  Did he provide any professional input to
22 you related to your review of this matter?
23    A  No, he did not.
24    Q  The close friends that you mentioned this
25 to, did they provide any input or assistance or

Page 81

1  direction to you relating to this matter?
2    A  No.
3    Q  I asked you before if you read any of the
4  depositions of the plaintiff experts. Have you
5  discussed generally with plaintiffs' counsel, the
6  deposition testimony that's been given by other
7  plaintiff experts in this litigation?
8    MS. O'DELL: I would instruct you not to
9  answer that question.
10    MR. ZELLERS: I disagree, but we'll
11 reserve that issue.
12    Q  (BY MR. ZELLERS) Was there anything that
13 you asked plaintiffs' counsel to provide to you in
14 connection with your review or for preparation of
15 your report that you were not provided with?
16    A  So most of the documents that I included
17 in my report, I found by doing an independent search
18 online.
19    There were several items that I didn't
20 find that I wanted to review as well. And so some
21 of the items that I asked counsel for were items
22 that I couldn't find through scientific research
23 that I asked them to provide.
24    Q  And you have told us about those
25 documents, and those are listed out on Exhibit 3; is

21 (Pages 78 to 81)

Rebecca Smith-Bindman, M.D.

Page 82

1    that right?
2        A   That's correct.
3        Q   My question was a little bit different.
4            Is there anything that you asked for from
5    plaintiffs' counsel that they were not able to or did
6    not provide to you?
7            MS. O'DELL:  Object to the form.
8        A   I -- I can't think of anything that fits
9    into that question.
10       Q   (BY MR. ZELLERS) Take a look at your
11   reliance list, which we have marked as Deposition
12   Exhibit 15.
13           Do you have that in front of you?
14       A   I have my copy of the reliance list.  I
15   don't have your Exhibit 15 in front of me.
16       Q   If you have your copy -- does it start
17   with page 1?
18       A   Yes, it does.
19       Q   At the very top --
20       A   Yes.
21       Q   -- the first item is "A Survey of The
22   Long-Term Effects"?
23       A   Yes.
24       Q   If you turn to pages 11 and 12, there's a
25   series of documents that begin with "IMERYS"

Page 83

1    followed by numbers.
2            Do you see that?
3        A   I do.
4        Q   Do you know whether or not you reviewed
5    some or all of those Imerys-produced documents as
6    part of your review in this matter?
7        A   If those reflect Imerys testing documents
8    then yes, I did review at least some of them.  I
9    can't be sure all of them.
10       Q   Do you know whether or not these documents
11   relate to Imerys testing?
12       A   I have reviewed at least a half dozen
13   Imerys testing documents.
14       Q   In --
15       A   I believe that's what these are, but I --
16   I'm not sure.
17       Q   There are a number of Imerys documents
18   that are listed on Exhibit 3, which you identified
19   as testing documents; is that right?
20       A   Yes.
21       Q   Do you know if you reviewed any Imerys
22   documents other than the documents that are listed
23   out on Exhibit 3?
24           MS. O'DELL:  Can you just make a --
25   Exhibit 3, would you remind --

Page 84

1            MR. ZELLERS:  Sure.  Exhibit 3 is the list
2    you gave me today of -- of the documents that
3    Dr. Smith-Bindman reviewed in addition to whatever
4    else is marked.
5            MS. O'DELL:  -- I see.  I see.
6            MR. ZELLERS:  So there's a -- it's a list
7    of Bates-stamped documents.
8            MS. O'DELL:  Yes.
9            MR. ZELLERS:  There's 10 or 12 Imerys
10   documents.  There's one J&J Bates-stamped document
11   --
12           MS. O'DELL:  Right.
13           MR. ZELLERS:  -- and then there's the, I
14   think, expert report or --
15           MS. O'DELL:  Right.
16           MR. ZELLERS:  -- deposition of Dr. Cooke
17   listed?
18           MS. O'DELL:  Right.  Okay.  I just object
19   to the form of the question.  And -- and --
20       A   Could I --
21           MS. O'DELL:  -- then --
22       A   -- see Exhibit 3?
23           MS. O'DELL:  -- yes.  And then I would --
24   Counsel, permit me -- there was a question related
25   to Exhibit 3.  I thought you were referring to the

Page 85

1    materials list, and so I'm going to assert my
2    objection a little bit late.
3            MR. ZELLERS:  Okay.  I just want to move
4    forward.
5            MS. O'DELL:  I know that you do.
6            MR. ZELLERS:  Yes.
7            MS. O'DELL:  I just want to be clear.
8    Because Exhibit 3 that we provided were additional
9    materials that Dr. Smith-Bindman asked for and
10   reviewed in addition to the Materials Considered.  I
11   don't want the record to be unclear.  So --
12           MR. ZELLERS:  Well --
13           MS. O'DELL:  -- I have noted my objection.
14           MR. ZELLERS:  -- and the record is clear
15   that Dr. Smith-Bindman did not review all of the
16   materials listed in the Materials Considered List,
17   Exhibit 15.  But that testimony will stand as it is.
18           My question just is:  In addition to the
19   documents that I was told about this morning that
20   you believe are testing documents, do you know
21   whether you reviewed any other Imerys-produced
22   documents, and specifically the ones that are
23   itemized on pages 11 and 12 of your Materials
24   Considered List?
25       A   I would need to see those documents to

22 (Pages 82 to 85)

Rebecca Smith-Bindman, M.D.

Page 86

1  know if I reviewed them.  The names are awfully
2  nonspecific.
3      Q    With respect to the Imerys documents -- or
4  Imerys-produced documents that are identified in
5  Exhibit 15, which is your Materials Considered List,
6  do you know how those were compiled?
7          MS. O'DELL:  Object to the form.
8      A    You're asking me where this list came
9  from?
10     Q    (BY MR. ZELLERS) I think you have told us
11 the list came from plaintiffs' counsel; is that
12 right?
13     A    Yes.
14     Q    My question then, I guess, is more
15 precise.  Do you know how plaintiffs' counsel
16 compiled this list of Imerys-produced documents or
17 how they selected those documents?
18     A    I know I had a lot of back and forth in
19 generating this list with actually Breanne at the
20 time.  I sent her a lot of documents that I had
21 looked at that I hadn't cited that she added to the
22 list.
23         These were ones that she added to the
24 list, and I don't remember what they were.
25     Q    I'm going to ask my question again.  Do

Page 87

1  you know how -- these documents, the documents that
2  are on pages 11 and 12 of your Materials Considered
3  List that begin with the "Imerys" name, do you know
4  how they were compiled?
5      A    No.
6      Q    All right.  The same question.  If you
7  look on page 13 of your Materials Considered List,
8  there's a series of documents that have J&J and then
9  a number; is that right?
10     A    Yes.
11     Q    You, as we sit here, do not know what
12 those documents relate to; is that right?
13     A    That's correct.
14         MS. O'DELL:  Object to the form.
15     Q    (BY MR. ZELLERS) You do not know how this
16 listing of J&J documents was compiled; is that
17 right?
18     A    That's correct.
19     Q    These are documents produced by Imerys and
20 by Johnson & Johnson companies as part of this
21 overall list of materials that were available, you
22 know, for you to review; is that right?
23         MS. O'DELL:  Object to the form.
24     A    Yes.
25     Q    (BY MR. ZELLERS) Outside of your work in

Page 88

1  litigation -- so when you do your research work or
2  when you do your publishing work -- do you rely on
3  documents that are picked by someone else that may
4  not represent the full body of evidence?
5          MS. O'DELL:  Object to the form.
6      A    In my work, I review whatever data are
7  available.  And sometimes those data are identified
8  by me and sometimes they have been given to me by
9  other sources to review.
10     Q    (BY MR. ZELLERS) Is that a -- yes or a
11 no?  And let me withdraw that.
12         The documents that we have looked at in
13 your reliance list Materials Considered List that
14 begin with Imerys and begin with J&J, your
15 understanding, those are documents that have been
16 produced by the Defendants in this litigation; is
17 that right?
18     A    Yes.
19     Q    Do you know what percentage of the overall
20 documents that have been produced by Johnson &
21 Johnson companies and by Imerys, these documents
22 that are listed in Exhibit 15, represent?
23         MS. O'DELL:  Object to the form.
24     A    Are you asking me if the handful of
25 documents from Johnson & Johnson that are in this

Page 89

1  list reflect all of the documents ever created at
2  Johnson & Johnson or all relevant documents or --
3      Q    (BY MR. ZELLERS) Do you have any idea?
4      A    No, no idea.
5      Q    This is a handful of documents that have
6  been listed out by plaintiffs' counsel for you; is
7  that right?
8      A    Yes.
9          MS. O'DELL:  Object to the form.
10     A    Yes.
11     Q    (BY MR. ZELLERS) All right.  In your
12 report you cite two exhibits from the depositions of
13 several witnesses.  There's an exhibit from a
14 deposition of John Hopkins.
15         Do you know who John Hopkins is?
16     A    I know what the document is, but I -- I
17 don't know what -- who John Hopkins is.
18     Q    Do you know what company he works for?
19     A    I do not.
20     Q    Do you know what his position or title is?
21         MS. O'DELL:  Object to the form.
22     Q    (BY MR. ZELLERS) You're looking in your
23 materials at the exhibit that you were provided from
24 his deposition; is that right?
25     A    Yes.  I -- I -- I do not --

23 (Pages 86 to 89)

Rebecca Smith-Bindman, M.D.

Page 90

1    Q   Have --
2    A   -- see.
3    Q   -- you read any portion of the deposition
4  of John Hopkins?
5    A   I have not.
6    Q   Have you reviewed any other exhibits from
7  the deposition of John Hopkins?
8    A   I have not.
9    Q   Do you know who Julie Pier is?
10   A   I believe I do.
11   Q   Who is Julie Pier?
12   A   I -- I'm just checking.  I -- I -- I got a
13 few names wrong earlier, so I want to just check
14 if --
15   Q   Well, you're going back now and you are
16 looking at your report?
17   A   Yes.
18   Q   And you have annotated your report, I
19 guess, that you are using here today; is that right?
20   A   Yes.
21   Q   Why don't we -- just so we have a complete
22 record, we'll mark your annotated report as
23 Exhibit 17.
24   A   Yes.
25       (Exhibit 17 was marked for identification

Page 91

1  and is attached to the transcript.)
2    A   And -- and I would like to clarify based
3  on some of my notes.  But -- so I think Dr. Hopkins
4  oversaw testing for -- for talc products at J&J.
5    Q   (BY MR. ZELLERS) Is that a note that you
6  have on your report?
7    A   It is.
8    Q   All right.  That's a note that you put on
9  your report in preparation for your deposition
10 today?
11       MS. O'DELL:  Object to the form.
12   A   It's a note I put on my report when I was
13 reviewing my report and the documents I'm citing and
14 so forth.
15   Q   (BY MR. ZELLERS) Who is Julie Pier?  Do
16 you know who she is?
17   A   I'm -- what I believe -- although, I don't
18 see that I made a note of it -- is that she was
19 someone who did testing from one of the New York
20 hospitals of -- of the talc powder products.
21   Q   Do you know anything more than that about
22 Julie Pier or who she worked for or what her role
23 with respect to talcum powder was?
24   A   Now that I am remembering where I -- I --
25 no, I don't really know those things.

Page 92

1    Q   All right.  You were provided -- just as
2  you were for the exhibit from the deposition of John
3  Hopkins, you were provided with the exhibit that you
4  are reviewing from Julie Pier's deposition; is that
5  right?
6        MS. O'DELL:  Object to the form.
7    A   No, I don't -- well, I -- I don't believe
8  that's why I know who she is.
9        I -- I believe The New York Times story
10 and the Reuters story discussed her deposition.  So
11 I don't remember reading her deposition.  But I --
12 if I'm not confusing her with someone else, I think
13 that's where I learned about her testing.
14   Q   (BY MR. ZELLERS) Okay.  You're a couple of
15 questions ahead of me here.  No. 1, the exhibit
16 that's in your blue folder from the deposition of
17 Julie Pier, that was provided to you for review by
18 counsel for Plaintiffs; is that right?
19   A   Thank you for that reminder.  That's the
20 Imerys document.  Yes.  Yes.
21   Q   I'm going to go back to my question.
22   A   Yes.
23   Q   The exhibit from Julie Pier's deposition,
24 that was provided to you for review by plaintiffs'
25 counsel; is that right?

Page 93

1    A   Yes.
2        MS. O'DELL:  Object to the form.
3    Q   (BY MR. ZELLERS) You have not reviewed the
4  deposition transcript of Ms. Pier; is that right?
5    A   Not that I recall.
6    Q   You have not reviewed any exhibit -- other
7  exhibits to her deposition; is that right?
8    A   That is correct.
9    Q   Are you aware that the two exhibits that
10 you were provided by counsel for Plaintiffs -- one
11 from the deposition of John Hopkins and one from the
12 deposition of Julie Pier -- that those exhibits were
13 prepared by plaintiffs' experts for this litigation?
14       MS. O'DELL:  Object to the form.  I think
15 you referred to plaintiffs' experts.  I think you
16 misspoke.  You said they were prepared by
17 plaintiffs' experts.
18       MR. ZELLERS:  Well -- and I will ask it
19 again then.
20   Q   (BY MR. ZELLERS) Are you aware that the
21 exhibits that were provided to you -- one from
22 Ms. Pier's deposition and one from the Hopkins
23 deposition -- are exhibits that were prepared by
24 Plaintiffs in this litigation?
25       MS. O'DELL:  Object to the form.

24  (Pages 90 to 93)

Rebecca Smith-Bindman, M.D.

Page 94

1    A   I was provided these documents from a
2  prior case. I don't know who prepared them or where
3  they came from. I -- they were provided to me by
4  counsel.
5    Q   (BY MR. ZELLERS) Let me ask you just a
6  couple of background questions from your review of
7  the literature in this case. You have reviewed a
8  lot of literature relating to talcum powder and
9  talcum powder use by women in the perineal region;
10  is that right?
11    A   Yes, I have.
12    Q   I think you say in your report that you
13  reviewed upwards of 40 studies in papers relating to
14  that. Does that sound about right?
15    MS. O'DELL: Object to the form.
16    A   Upward of 40 studies that provided primary
17  new data. There were probably hundreds of papers I
18  reviewed on the topic.
19    Q   (BY MR. ZELLERS) From that review, do you
20  agree that most women who use talcum powder in their
21  perineal region begin that use before age 30?
22    A   I don't know the -- when -- I -- I think a
23  lot of women start use when they're young. I would
24  have to check my report if I have cites as to when
25  they began using talcum powder products.

Page 95

1    Q   (BY MR. ZELLERS) Well, take a look, if you
2  will, at Deposition Exhibit 18, which is a report by
3  Cramer.
4    (Exhibit 18 was marked for identification
5  and is attached to the transcript.)
6    Q   (BY MR. ZELLERS) He's the first named
7  author. This is the 2016 study --
8    MS. O'DELL: Thank you.
9    Q   (BY MR. ZELLERS) -- report. Are you --
10    MS. O'DELL: Are we at 18?
11    MR. ZELLERS: 18.
12    Q   (BY MR. ZELLERS) You're familiar with the
13  paper we have marked as Deposition Exhibit 18; is
14  that right?
15    A   Yes, I am.
16    Q   I do want to ask you questions later
17  about that. But for purposes of this question when
18  do most women who use talcum power -- powder in
19  their perineal region begin, go to page 336 of
20  Exhibit 18 and specifically Table 1.
21    A   Yes.
22    Q   One of the categories that is reported
23  here in Table 1 is "Age First Used Genital Powder";
24  is that right?
25    A   Yes.

Page 96

1    Q   And if we looked at the data for when and
2  the age that women were when they first used genital
3  powder, at least from this study by Dr. Cramer, it
4  appears that the vast majority of women began using
5  talcum powder in their genital area before age 30;
6  is that right?
7    A   In this publication.
8    Q   Do you recall any other publications
9  that -- that you reviewed that provided contrary
10  information?
11    A   The question you're asking me is not one
12  that I spent a lot of time thinking about and so
13  can't recall -- sort of across the hundreds of
14  papers I read and 50 that talked about the
15  association -- what time the age of first use was.
16    I -- I see Dr. Cramer's experience is that
17  women do report beginning use earlier, but I --
18  there's no way for me to know if that's a reflection
19  of his sampling, the place he studied the women, and
20  so forth.
21    Q   At least on that point, you would refer to
22  Dr. Cramer, fair?
23    MS. O'DELL: Object to the form.
24    A   I -- I would defer to a comprehensive
25  review of the literature to come up with that view.

Page 97

1    My -- my guess would be that Dr. Cramer
2  believes his numbers in his population, but I -- but
3  I don't know that that's the truth in other
4  populations.
5    Q   (BY MR. ZELLERS) Well, let me ask you
6  another question. On average from the studies that
7  you reviewed, do women who use talcum powder in
8  their perineal region continue that use for over
9  20 years?
10    MS. O'DELL: Object to the form.
11    A   My recollection of the literature is that
12  most publications could not assess or did not ask in
13  detailed enough form of how long women used it.
14    I -- I -- again, it's possibly a question
15  that could be answered from the literature, but I
16  don't recall knowing that answer from my review of
17  the literature.
18    Q   (BY MR. ZELLERS) Did you review the Wu
19  2015 paper?
20    A   I did.
21    Q   Do you have that in one of your notebooks?
22    A   I will have it in here.
23    Q   That makes it easy.
24    A   2009 or --
25    Q   '15. No. The 2015 Wu paper.

25 (Pages 94 to 97)

Rebecca Smith-Bindman, M.D.

Page 98

1      A   Yes, I do.
2      Q   Turn to page 1097, Table 2.
3      A   Could you -- unfortunately, the page --
4   the version I have is a free download, and it
5   doesn't have the same page --
6      Q   How --
7      A   -- numbers.
8      Q   -- about -- can you find Table 2?  It's
9   the table that's captioned "Prevalence of Risk
10  Factors in Non-Hispanic white, Hispanic, and
11  African-American Control."
12     A   Yes, I have that paper.
13     Q   All right.  So if you look at the
14  controls, at the very bottom of that section, it
15  gives a mean number of years of talc use among
16  users; is that right?
17     A   Yes.
18     Q   And whether we're looking at non-Hispanic
19  whites, Hispanics, or African-Americans, at least
20  the number of years of talc use that's reported is
21  greater than 20 years for each of those groups; is
22  that right?
23     A   In --
24         MS. O'DELL:  Object to the form.
25     A   -- in Dr. Wu's paper, there is reported

Page 99

1   that the mean number of years is greater than 20.
2      Q   (BY MR. ZELLERS) If we look down at the
3   group below, the number of cases, the mean number of
4   years of talc use among users is greater than
5   20 years, also for each of those groups; is that
6   right?
7          MS. O'DELL:  Object to the form.
8      A   Dr. Wu found that the average number of
9   years was greater than 20, yes.
10     Q   (BY MR. ZELLERS) All right.  You have
11  never published on a, you know, any topic relating to
12  talcum powder or any association between talcum
13  powder and ovarian cancer; is that right?
14     A   I have not.
15     Q   Your opinion is that women exposed to
16  perineal talcum powder products on a regular basis
17  have about a 50 percent increase in their subsequent
18  risk of developing serous invasive cancer; is that
19  correct?
20     A   Yes, that is my opinion.
21     Q   You also opine in your report that there
22  is a causal association between genital talcum
23  powder use and ovarian cancer generally; is that
24  right?
25         MS. O'DELL:  Object to the form.

Page 100

1      A   Yes.
2      Q   (BY MR. ZELLERS) Are you able to tell us
3   how far before you prepared your report, November 15
4   of 2018, that you formed those conclusions?
5          MS. O'DELL:  Object to the form.
6      A   I spent considerable hours during 2018
7   reviewing the literature.  And over the course of
8   that year, my opinions started to solidify when I
9   saw the evidence that strongly supported that
10  ovarian cancer is caused by talcum powder products.
11  I --
12     Q   (BY MR. ZELLERS) And --
13     A   -- I -- I believe that my final systematic
14  review was for me important to -- to confirm that
15  association.  And that wasn't done -- that wasn't
16  completed until my report was basically -- close to
17  when my report had to be drafted.
18     Q   The systematic review that you did was in
19  and around September and October of 2018; is that
20  right?
21     A   I believe the final statistical analysis
22  was then, but my -- my systematic review went on for
23  many months.
24     Q   Well, your systematic review, at least
25  insofar as Dr. Hall assisted you, was in September

Page 101

1   of 2018; is that right?
2          MS. O'DELL:  Object to the form.
3      A   The systematic review that I described in
4   my report has a lot of components.  So one component
5   is to do a complete comprehensive review of -- of
6   what's been published.
7          And that involved doing the search,
8   according -- obtaining all the papers, and then
9   reviewing the bibliography of all of those papers.
10         Then reviewing all those papers critically
11  and then abstracting data for those papers.  Kind of
12  towards the tail end of that review is to
13  statistically combine the studies.
14         Dr. Hall was involved both in abstracting
15  the data as a second set of eyes and in doing the
16  statistical summary.  But I reached out to her after
17  all of those initial points were completed.  So that
18  went on for many months.
19     Q   (BY MR. ZELLERS) Is it the objective of a
20  systematic review to bring clarity to a research
21  question by combining like-with-like data?
22         MS. O'DELL:  Object to the form.
23     A   The purpose of the systematic review is to
24  take individual papers that may not have enough
25  statistical power to provide by themselves,

26 (Pages 98 to 101)

Rebecca Smith-Bindman, M.D.

Page 102

1  individual results that are meaningful.  And if the
2  methodology is combinable, to pool the sample size
3  to get greater statistical power to come up with a
4  conclusion.
5        But your question about combining like
6  with like is -- is -- is very important.
7    Q   (BY MR. ZELLERS) In order for research to
8  be useful, it must be valid, correct?
9    A   Yes.
10    Q   Inaccurate and incomplete reporting of
11  methods can make research unreasonable and unusable;
12  is that right?
13        MS. O'DELL:  Object to the form.
14    A   I -- I -- I think there are separate
15  phases of research that need happen.  I think the
16  reporting of methodology is so that other people can
17  duplicate your results, understand your results.
18        But in and of themselves, the reporting
19  does not influence the reliability of the -- of the
20  research.
21    Q   (BY MR. ZELLERS) Is reporting of
22  methodology important?
23    A   I -- I think reporting of methodology so
24  that other people can duplicate the results is
25  important.

Page 103

1        So if -- if I move ahead as I'm planning
2  to publish my systematic review, then I would
3  include greater details about the methodology so
4  that other investigators could duplicate my work,
5  should -- should they so choose.
6    Q   At least as of now, other scientists or
7  epidemiologists would not be able to reproduce what
8  you have done based upon your report --
9        MS. O'DELL:  Object --
10    Q   (BY MR. ZELLERS) -- correct?
11        MS. O'DELL:  -- object to the form.
12    A   I am -- I am not sure that's the
13  case.
14    Q   (BY MR. ZELLERS) Do you think that all of
15  the steps that you followed in terms of preparing
16  your systematic review are set forth in your report?
17        MS. O'DELL:  Object to the form.
18    A   I think the path that I followed in this
19  review and the method that I used is a method that I
20  have used in a number of other published systematic
21  reviews.
22        And so to the degree that people could
23  sort of say:  Well, this is what Dr. Smith-Bindman
24  does in a review -- she focuses on stratified
25  results -- these are the methods that have done --

Page 104

1  been done, I tried, in writing my report, to
2  highlight the details of what would be needed to
3  understand my result.
4        But I have not, for example, included
5  certain details that you would typically put in a
6  journal article.
7        So in a journal article, you would always
8  publish the version of SAS or R that was used for
9  the report.  I -- I would not have included that.
10        And -- and I believe some of the documents
11  I shared with you that Dr. Hall provided to me on
12  the methodology were included in the e-mail to me.
13        And I may not have included it in the
14  report, thinking that the reader would not -- you,
15  for example, would be interested in some of those
16  biostatistical nuances.
17        But when I publish it, I would put those
18  in because the readership might care about them.
19    Q   You talked, I believe, a minute ago about
20  abstracting data; is that right?
21    A   Yes.
22    Q   Is data abstraction one of the most
23  important steps in conducting a meta-analysis or a
24  systematic review?
25        Would you agree with that?

Page 105

1    A   I would agree with that.
2    Q   Would you agree that the accuracy of the
3  data abstraction is very important to the validity
4  of the analysis?
5    A   I think one of the hallmarks of doing a
6  systematic review is, in fact, to have several
7  people abstract the data points so that you can be
8  assured that there are -- that they're done as
9  accurately as possible, with the understanding of a
10  single data abstraction by a single person can never
11  be perfect.
12        And so the more people that abstract and
13  review, the greater the accuracy of the data.
14    Q   Your data abstraction was not perfect,
15  correct?
16    A   It was not.
17        MS. O'DELL:  Object to the form.
18    Q   (BY MR. ZELLERS) The data abstraction that
19  was done by Dr. Hall was not perfect; is that right?
20        MS. O'DELL:  Object to the form.
21    A   That is correct.
22    Q   (BY MR. ZELLERS) If data is misrepresented
23  -- well, strike that.
24        Are you familiar with the
25  term "misrepresentation"?

27 (Pages 102 to 105)

Rebecca Smith-Bindman, M.D.

Page 106

1      MS. O'DELL:  Object to the form.
2      A   I -- I will admit I'm not sure what the
3  context is you're asking --
4      Q   (BY MR. ZELLERS) Well --
5      A   -- about.
6      Q   -- let me try to put it in another context
7  or at least ask a question that may get to what I am
8  trying to get to.
9          If data is misrepresented from the
10 original study, the analysis -- the systematic
11 review or the meta-analysis can be comprised,
12 correct?
13     A   Yes, I agree.
14     Q   Inaccuracy and misrepresentation of data
15 are considered violations of generally accepted
16 standards of research; is that right?
17     MS. O'DELL:  Object to the form.
18     A   Misrepresentation of data suggests to me
19 that there's some malicious or devious attempt where
20 occasionally there are sometimes simple errors in
21 abstraction when you write down the No. 5 and, in
22 fact, the number really is .5.
23         And often when abstracting data, it's not
24 so much an error of writing down 5 or .5, but it's
25 choosing which number in that manuscript reflects

Page 107

1  what you are really trying to capture and get at.
2          So typically there are more than one way
3  to abstract data.  It's why it's not -- it -- it's
4  why it's not simply having multiple people so they
5  don't make typos or small extraction mistakes, but
6  rather, that they're making similar choices.
7          And so misrepresentation, the way you have
8  asked it, makes it sound like there's some malicious
9  attempt to get it wrong or to -- to manipulate it
10 rather than the wrong number was chosen for either a
11 simple error or because there was a choice and the
12 choice was not made in a way that two people would
13 agree.  And so...
14     Q   (BY MR. ZELLERS) There can be differences
15 in the way different folks go about doing a research
16 project or a meta-analysis or a systematic review;
17 is that right?
18     A   Yes.
19     Q   In order for someone to reproduce or
20 replicate what another epidemiologist or scientist
21 has done, they need to see the steps that the
22 scientist or epidemiologist followed; is that right?
23     A   That is --
24     MS. O'DELL:  Object to the --
25     A   -- correct.

Page 108

1      MS. O'DELL:  -- form.
2      Q   (BY MR. ZELLERS) Go back to my question.
3  And -- and with the background that you have given
4  and with your qualification, do you agree that
5  inaccuracy and misrepresentation are considered
6  violations of generally accepted standards of
7  research?
8      MS. O'DELL:  Object to the form.  If you
9  don't understand the question, you may ask him to
10 rephrase it.  If --
11     A   I --
12     MS. O'DELL:  -- you understand --
13     A   -- I --
14     MS. O'DELL:  -- the question, feel free to
15 answer it.
16     A   -- I felt like I had answered the question
17 that I understood, so it -- perhaps I'm not
18 understanding your question.
19     Q   (BY MR. ZELLERS) Are you able to answer
20 that question?
21     A   Yes.  I think that misrepresentation of
22 data is not how I would describe an error in
23 abstraction of data or in a difference of opinion
24 about what value reflects the data point you were
25 looking for.  I wouldn't consider that a

Page 109

1  misrepresentation of data.
2      Q   Understood.  Let me ask my question once
3  more.
4      A   Okay.
5      Q   Misrepresentation of data would be a
6  violation of generally accepted standards of
7  research, correct?
8      A   I agree that misrepresentation of data
9  would be a violation of research.
10     Q   A causal analysis cannot be determined
11 based on a single piece of evidence, but requires
12 consideration of the totality of relevant evidence.
13         Do you agree with that?
14     A   I would say in the field of epidemiology,
15 it's unusual to have a single piece of evidence.
16 But I think in some circumstances a single piece of
17 evidence can establish causality.  Not typically in
18 epidemiology work.
19     Q   What do you mean in your report by "causal
20 association"?
21     A   So in my report, I did research as -- sort
22 of as I outlined in my Table of Contents of, you
23 know, number of different areas.
24     Q   Okay.  And I'm going to ask you about
25 those.  Right now my question just --

28 (Pages 106 to 109)

Rebecca Smith-Bindman, M.D.

Page 110

1      A   No.
2      Q   -- is --
3      A   I understand.  I --
4      Q   What --
5      A   -- understand.
6      Q   -- do you mean when you say "causal
7   association"?
8      A   No.  I -- I understand.  I -- I apologize.
9   I was not getting there quite quickly enough.
10     Q   That's all right.
11     A   So I did research on several topics that I
12   thought were highly relevant to coming up with a
13   causal determination, and I put those different
14   pieces of research and expertise together in terms
15   of the causality by specifically looking at the
16   Bradford Hill criteria.
17     Q   I -- and I'm going to get to eventually, I
18   hope, why you came up with whatever opinion you came
19   up with.
20         Right now I'm just trying to understand
21   what you mean when you use the words "causal
22   association."
23         MS. O'DELL:  Object to the form.  Is there
24   a specific case in her report that --
25     Q   (BY MR. ZELLERS) Sure.  "Conclusion."

Page 111

1   Page 41 of the report, In conclusion, substantial
2   evidence supports a strong, positive, and causal
3   association between ovarian cancer and genital
4   exposure to talcum powder products.
5         I just want to know what you mean when you
6   say "causal association."
7         MS. O'DELL:  I think she answered your
8   question.
9         But you may answer him, if you understand
10   it.
11     A   I -- I think that the -- the four
12   sentences just above that says that, Summary
13   consideration of causality of talc powder products
14   and ovarian cancer using the Bradford Hill.
15         So I -- I -- I believe, using this
16   framework, the Bradford Hill, the components of the
17   Bradford Hill demonstrate that ovarian cancer is
18   caused by regular talcum powder exposure based on
19   the strength of the association, based on the
20   consistency, the temporality of -- of the components
21   of my analysis.
22     Q   (BY MR. ZELLERS) Do you believe that
23   perineal use of talcum powder by women on a regular
24   basis causes ovarian cancer?
25     A   Yes, I do.

Page 112

1      Q   Is that what you mean by "causal
2   association"?
3      A   Yes, it is.
4      Q   What are the other causes of ovarian
5   cancer?
6      A   So there's a whole long list of risk
7   factors for ovarian cancer.
8      Q   What is the difference between a risk
9   factor and a cause?
10     A   A risk factor is something that puts you
11   at increased risk, increases the probability that
12   you will get ovarian cancer.  And there are
13   innumerable mechanisms and ways that that can go
14   about.
15         But often -- not entirely, but often, you
16   don't think of risk factors as being things that you
17   can alter.  That's not entirely true.
18         There are some risk factors.  For example,
19   the use of -- well, the -- the most commonly cited
20   risk factor for cancer in general is smoking, and
21   that's clearly something that can be started or
22   ended, that can be changed.
23         But often you think of risk factors as
24   things that can't be changed.  So elevation in age,
25   inherited genetics.

Page 113

1         So those things lead to ovarian cancer,
2   the risk factors that I describe in my report.  But
3   most of them are not things that you can influence.
4   Some of them are, but most of them are not.
5         Where talcum powder products -- the use of
6   perineal talcum powder products -- products is
7   something that can be changed.  That -- that is a
8   behavior, and so I think that's the distinction that
9   I would make.
10     Q   A risk factor is something that increases
11   the potential risk of a disease, but cannot be
12   changed, correct?
13         MS. O'DELL:  Object to the form.
14     A   I -- I said that it's often something that
15   can't be changed.  But -- but again, there are risk
16   factors that, by convention, we consider risk
17   factors, but that are modifiable.
18     Q   (BY MR. ZELLERS) All right.
19     A   And I gave smoking as an example.
20     Q   A cause of a disease is something that can
21   be modified; is -- is that correct?
22     A   It --
23         MS. O'DELL:  Object to the form.
24     A   -- again, it is often used that way.
25     Q   (BY MR. ZELLERS) What makes a factor cross

29  (Pages 110 to 113)

Rebecca Smith-Bindman, M.D.

Page 114

1    the line from being a risk factor to being a cause?
2       A   I -- I think what I was suggesting is it's
3    a blurry distinction. I think it's by convention
4    things that cannot be modified are typically thought
5    as risk factors. Things that can be modified are
6    generally thought about as being in the causal
7    family -- pathway.
8          But there's no distinction that you can
9    separate something that increases your risk of
10   something versus something that causes it. The --
11   the causal pathways could be the exact same causal
12   pathways in both situations.
13      Q   What other causes are there of ovarian
14   cancer?
15      A   So I'm guessing from what I have just said
16   that you are asking about causes and risk factors or
17   would you like them to be --
18      Q   Well, do you use "risk factor" and "cause"
19   interchangeably or are they different?
20         MS. O'DELL: Object to the form; asked and
21   answered.
22      A   I -- I believe that by convention we
23   typically describe risk factors that are things that
24   cannot be altered.
25         But technically there is no difference

Page 115

1    between factors, covariants that influence your
2    cancer risk that you can change or not. So I can
3    tell you the list of things that fall into those two
4    categories.
5       Q   (BY MR. ZELLERS) All right. What I want
6    to know is: Based upon your review and your
7    research over the past year or so, other than
8    perineal use of talcum powder on a regular basis,
9    what other causes of ovarian cancer are there?
10      A   So in my report on page 11, I write that,
11   Numerous risk factors are identified for ovarian
12   cancer. Unfortunately, few can be modified by
13   therapies or lifestyle changes. Risk factors
14   include personal or family history of -- of cancer,
15   inherited mutations, BRC1 and BRC2, advanced age,
16   white, race, education, endometriosis.
17         Other factors that may increase --
18   increase ovarian cancer due to estrogen exposure
19   include having no pregnancies or advanced age at
20   first birth, obesity, post menopausal hormone
21   therapy.
22         Several factors I list are associated with
23   a decreased risk of ovarian cancer such as breast
24   feeding or multiple pregnancies, oral
25   contraceptions, tubal ligation, or hysterectomy.

Page 116

1    Smoking is a possible risk factor.
2          So all of those are in the category of
3    risk factors for ovarian cancer.
4       Q   My question goes to cause. Based upon
5    your review of the literature over the past year,
6    what other causes of ovarian cancer have you
7    identified, if any?
8          MS. O'DELL: Objection to form; asked and
9    answered.
10      A   There are other contributors to ovarian
11   cancer like pelvic inflammatory disease, which I
12   think was on the list of what I just noted.
13         There are no other modifiable factors that
14   I would put on the list of things that cause ovarian
15   cancer other than exposure to talc powder products.
16      Q   (BY MR. ZELLERS) Based upon your review of
17   the literature in terms of a cause for ovarian
18   cancer, the only cause that you have identified is
19   the regular perineal use of talcum powder by women,
20   correct?
21         MS. O'DELL: Object to the form.
22   Misstates her testimony.
23      A   I believe I just said that pelvic
24   inflammatory disease increases the risk of ovarian
25   cancer.

Page 117

1       Q   (BY MR. ZELLERS) Is pelvic in --
2          MS. O'DELL: Excuse me. I'm sorry. Were
3    you finished, Dr. Smith-Bindman? I mean, if you're
4    not, you -- you may continue. If so, I apologize --
5       A   I --
6          MS. O'DELL: -- for interrupting you both.
7       A   -- I was going to add that endometriosis
8    has been noted also as a contributor to --
9       Q   (BY MR. ZELLERS) Is -- are you finished?
10      A   -- I am.
11      Q   Okay. Is pelvic inflammatory disease a
12   cause of ovarian cancer?
13      A   I -- I -- you -- you keep asking me the
14   same question, and I don't understand the
15   distinction that you are asking me to make between
16   something that causes cancer and something that's a
17   risk factor.
18         In both situation -- situations there is a
19   probability of getting a disease versus not getting
20   a disease. There's no 100 percent association, and
21   so most people, as an analogy who smoke cigarettes,
22   do not get lung cancer. It's fewer than 15 percent.
23         Does smoking cause lung cancer? Yes. Is
24   it a risk factor for lung cancer? Yes. Is it a
25   single pathway that everyone who smokes, gets lung

30 (Pages 114 to 117)

Rebecca Smith-Bindman, M.D.

Page 118

1  cancer?  No.
2        So I -- you're asking me to make a
3  distinction that I don't make in my head, so I'm --
4  I'm not sure -- all of the things I suggested as
5  risk factors in some women will cause them to have
6  cancer.
7        Q   You are opining in this case that the
8  regular perineal use of talcum powder causes ovarian
9  cancer, correct?
10       A   Yes, I am.
11       Q   My question is:  Does pelvic inflammatory
12  disease cause ovarian cancer?
13       A   In some women, pelvic inflammatory disease
14  will cause cancer.
15       Q   You -- you would list a pelvic
16  inflammatory disease as a cause of ovarian cancer;
17  is that your testimony?
18       MS. O'DELL:  Objection, asked and
19  answered.
20       A   I would include pelvic inflammatory
21  disease with all the other ovarian cancer risk
22  factors like BRCA1 and 2 as being one of a large
23  number of contributors and risk factors for ovarian
24  cancer.
25       There -- there is not -- no other

Page 119

1  exposure -- a modifiable exposure that I can think
2  of that leads to getting ovarian cancer or causing
3  ovarian cancer.
4        Q   (BY MR. ZELLERS) In -- in your practice as
5  a radiologist, you do not evaluate what caused an
6  individual patient's ovarian cancer; is that right?
7        MS. O'DELL:  Object to the form.
8        A   As a -- a radiologist, I do not.
9        Q   (BY MR. ZELLERS) You don't diagnose what
10  caused any individual patient's ovarian cancer; is
11  that right, in your practice -- your medical
12  practice.
13       MS. O'DELL:  Objection, asked and
14  answered.
15       A   I -- I -- I do not.  I diagnose ovarian
16  cancer.  I diagnosis pelvic inflammatory disease.
17  But in an individual patient, I wouldn't tell a
18  patient why they got ovarian cancer.
19       Q   (BY MR. ZELLERS) You -- you have not, at
20  least as of this time, published on your theory that
21  there is a causal association between genital talcum
22  powder exposure and ovarian cancer; is that right?
23       MS. O'DELL:  Object to the form.
24       A   I have not published on my conclusion that
25  talcum powder products causes ovarian cancer.

Page 120

1        Q   (BY MR. ZELLERS) Have you done anything to
2  advise the health community about your belief that
3  there is a causal association between talcum powder
4  use and ovarian cancer?
5        A   I have mentioned to you that I have spoken
6  about my review to several individuals, several
7  close mentors of mine in leadership roles within the
8  healthcare community.  So I --
9        Q   Who?
10       A   -- not -- not individuals I am willing to
11  name.
12       Q   You won't tell me who you have talked to
13  about your belief or your theory that there's a
14  causal association between genital talcum powder use
15  and ovarian cancer?
16       A   I would prefer not to share that
17  information.
18       Q   Have you contacted any public health
19  authorities such as the FDA or the National Cancer
20  Institute?
21       A   I have not.
22       Q   Have you written any type of an op-ed or
23  other news article on this topic?
24       A   Not yet.  I have not.
25       Q   You have done that in the past; is that

Page 121

1  right?
2        A   Had -- you're asking if I have written
3  op-eds on areas I have done research?
4        Q   Yes.
5        A   Yes, I have.
6        Q   Back in 2014, you did an op-ed in The New
7  York Times relating to CT scans; is that right?
8        A   Yes, I did.
9        Q   All right.  You concluded or at least put
10  in the op-ed, In 2007, CT scans will cause 29,000
11  excess cancer cases and 14,500 excess deaths; is
12  that right?
13       A   I don't have it in front of me.  But it
14  looks like you do, and so I'm going to guess that
15  that's correct.
16       Q   Well, does that sound right to you?
17       A   It does sound right.
18       Q   You put in that editorial or op-ed that in
19  your opinion, 3 percent to 5 percent of all future
20  cancers may result from exposure to medical imaging
21  such as CT scans; is that right?
22       MS. O'DELL:  And if you have a
23  recollection and -- and you -- and your memory
24  confirms those -- those facts, please feel free to
25  testify to it.  If you need to see the op-ed, then

31 (Pages 118 to 121)

Rebecca Smith-Bindman, M.D.

Page 122

1  I'm sure counsel would be willing to put it in front
2  of you.
3      A   That particular statistic, I don't have to
4  see. I know that static --
5      Q   (BY MR. ZELLERS) All right.
6      A   -- so yes.
7      Q   You are familiar with the Center for
8  Disease Control, correct?
9      A   Yes, I am.
10     Q   The CDC or Center for Disease Control is a
11 reputable organization; is that right?
12         MS. O'DELL:  Object to the form.
13     A   I think they're a very reputable
14 organization.
15     Q   (BY MR. ZELLERS) You have served on
16 several committees for the CDC in the past; is that
17 right?
18     A   I currently work on several committees
19 with them.
20     Q   Do the doctors and scientists in the CDC
21 work hard to protect women's health, based on your
22 experience?
23     A   Yes, they do.
24     Q   In forming your opinions in this case, did
25 you consider the risk factors that the CDC

Page 123

1  recognizes for ovarian cancer?
2      A   From my report, I read an enormous number
3  of articles, and I spent considerably time
4  considering those articles from a data point of
5  view.
6          And I did not, for the most part, weigh
7  other organization's summaries if they were not
8  quantitative and very explicit in what reviews they
9  did, what literature they included.
10         And sometimes they -- organizations did do
11 that, but did not do nearly as -- a comprehensive
12 job. So I -- I would not have relied on any
13 professional organization's reviews unless they were
14 quantitative the way -- the way my own were?
15         MR. ZELLERS:  Move to strike as
16 nonresponsive.
17     Q   (BY MR. ZELLERS) Let me ask the question
18 again. In forming your opinions in this case, did
19 you consider the risk factors that the CDC
20 recognizing for ovarian cancer?
21         MS. O'DELL:  Object to the form.
22     A   I saw documents on their websites that
23 list risk factors, and no individual organization's
24 summaries, either for patients or for clinicians,
25 formed a very large piece of my opinion. It was one

Page 124

1  of many pieces of information I used.
2      Q   (BY MR. ZELLERS) Are you aware that in
3  their patient-facing websites, as well as their
4  publicly available information about ovarian cancer,
5  the CDC does not identify perineal use of talcum
6  powder as a risk factor for ovarian cancer?
7      A   Yes, I do remember seeing that.
8      Q   You don't have any reason to believe that
9  the folks at the CDC have not kept up to date with
10 talc and ovarian cancer epidemiology, do you?
11         MS. O'DELL:  Object to the form.
12     A   I believe that the comprehensiveness of
13 the review that I did and the amount of time that I
14 put into this review, as I have in -- in many other
15 reviews, requires a very deep dive into the
16 literature.
17         And I do not believe that the CDC has
18 funding or resources to do that kind of deep dive.
19 And so typically what they do is sort of review some
20 things that have been published. Most things, they
21 don't end up reviewing.
22         And so I have no reason to believe anyone
23 at the CDC deliberately didn't do a comprehensive
24 review of the literature, but -- nor do I have any
25 evidence that they did a comprehensive review of the

Page 125

1  literature.
2      Q   (BY MR. ZELLERS) Do you have any personal
3  knowledge one way or the other as to the extent of
4  the review of the science and literature that the
5  CDC did in compiling its list of risk factors for
6  ovarian cancer?
7      A   I --
8          MS. O'DELL:  Object to the form.
9      A   -- I would have to refresh my memory by
10 looking at their -- their website and documents. If
11 you provided those, I could.
12     Q   (BY MR. ZELLERS) My question is:  Do you
13 have any personal knowledge one way or the other as
14 to what the CDC has done with respect to a review of
15 the scientific literature in compiling its list of
16 risk factors for ovarian cancer?
17     A   I don't know offhand what they did. And I
18 don't recall when looking at their website, what
19 references they listed.
20         I think if their reference list included a
21 very short -- small number of references, I would
22 have concluded that they had not done a very
23 comprehensive review.
24     Q   (BY MR. ZELLERS) My question is:  Do you
25 have any personal knowledge as to what the CDC did

32 (Pages 122 to 125)

Rebecca Smith-Bindman, M.D.

| Page 126 | Page 128 |
|---|---|

**Page 126**

1  or did not do with respect to its review of the
2  literature?
3      A   Again, I don't know off the top of my
4  head. But I know I went to their website, and I
5  don't --
6      Q   Other than looking at their website, do
7  you have any personal knowledge?
8      A   No, I do not.
9      Q   All right. Have you communicated to
10  anyone at the CDC that you disagree with their
11  position?
12      A   I -- I'm laughing at the nature of the
13  question. There wouldn't be anyone at the CDC to
14  disagree with.
15      Q   There -- there's no one at the CDC that
16  you, as a concerned radiologist, could go to and
17  say: Hey, I think that you should list perineal
18  talc use as a risk factor for ovarian cancer?
19          MS. O'DELL: Object to the form.
20      Q   (BY MR. ZELLERS) There's no one you could
21  talk to at the CDC about that?
22      A   I -- I would -- I would have to confirm
23  that that -- I have been -- I -- I study
24  environmental carcinogens.
25          And you pointed out my New York Times

**Page 127**

1  op-ed that put a message out there that said: I
2  think this is an environmental carcinogen.
3          And I have spoken about that topic in many
4  forms. I have testified before Congress several
5  times. I testified to the FDA. I have spoken to
6  CMS.
7          All of that took years to get people to
8  hear those messages. It was not that: Oh, I see
9  there's a problem here. Let me just tell the top
10  person to do that.
11          And -- and so I'm -- you're suggesting
12  there's someone at the CDC that I could call and
13  say: Oh, by the way, I think that's an important
14  topic. I appreciate your giving me that idea. I
15  will move forward once I publish a paper on this
16  topic.
17          But -- but that's not nearly as -- as
18  simple as you're suggesting in your question.
19  There's a naiveness there that there's someone at
20  the CDC who would -- who takes responsibility for
21  what they do and -- on all of their websites and you
22  can sort of give them feedback on that.
23      Q   You believe I'm being naive to think that
24  there's a person responsible at the CDC for
25  compiling a list of risk factors for ovarian cancer?

**Page 128**

1          MS. O'DELL: Object to the form.
2      A   Naive to suggest that a single person
3  could just call them and say: I have looked at this
4  topic, and you should change what you are doing.
5      Q   (BY MR. ZELLERS) Are you familiar with the
6  National Institute of Health?
7      A   I am.
8      Q   You have received funding from the
9  National Institute of Health; is that right?
10      A   I have.
11      Q   Do you know that the National Institute of
12  Health does not list talc use as a risk factor for
13  ovarian cancer?
14          MS. O'DELL: Object to form.
15      A   Again, I -- yeah, I know that the NCI, PDQ
16  that writes reports for patients and clinicians
17  about risk factors for cancer has a report on risk
18  factors for ovarian cancer and that they conclude
19  that there's inadequate evidence for talc.
20      Q   (BY MR. ZELLERS) Inadequate evidence,
21  correct?
22      A   I -- I -- I wasn't finished.
23      Q   Please finish.
24      A   So they don't stand -- just to clarify,
25  for the National Institute of Health. It's a very

**Page 129**

1  prestige body. It's an organization within a small
2  part of the NCI.
3          I know it well, because I served on that
4  committee for many years. I know the process
5  whereby they review the literature and created a
6  whole a bunch of standards within what they do
7  around that.
8          And I looked and saw that they updated
9  their summary of talc in 2018. And -- and yet,
10  within that summary, they do list the references
11  that they cite, and they omit a large number of
12  references that are recent.
13          So I do know their conclusion. I do not
14  agree with their conclusion. And there were large
15  gaps in their literature. And that update was very
16  recent.
17      I -- I told you I don't know the
18  leadership at the CDC, and they don't have a
19  process. But I do know the leadership on this
20  committee -- and will point out their omissions
21  to this committee.
22      Q   Well, I haven't gotten to the National
23  Cancer Institute yet.
24          My question was: Do you know that NIH,
25  the National Institute of Health, does not list use

33 (Pages 126 to 129)

Rebecca Smith-Bindman, M.D.

Page 130

1  of talcum powder as a risk factor for ovarian
2  cancer?
3      A   So I -- I -- I don't know what -- I'm
4  sorry.  I don't know what you're talking about,
5  the --
6      Q   All right.
7      A   -- NIH.
8      Q   Take a look, if you will, at Deposition
9  Exhibit 19, which is captioned NIH steer -- or
10 "SEER, S E E R, Training Modules" and has got "Risk
11 Factors" at the top.
12         (Exhibit 19 was marked for identification
13 and is attached to the transcript.)
14         MS. O'DELL:  Thank you.
15      A   So SEER is also a part of National Cancer
16 Institute.  It's the surveillance epidemiology --
17         MR. LAPINSKI:  Have her wait for a
18 question.
19         MS. O'DELL:  Sorry.  Just wait for his
20 question.  Yeah, thanks, Dan.
21      Q   (BY MR. ZELLERS) You recognize Exhibit 19
22 as a training module from NIH and specifically from
23 the National Cancer Institute; is that right?
24      A   So this says at the top "SEER Training
25 Modules."

Page 131

1          I don't know what this is.  I know SEER
2  quite well.  It's the National Cancer Registries.
3  But I -- I don't -- don't know what this training
4  module is.  But I do see that you are showing me
5  some risk factors.
6      Q   Talc is not listed as a risk factor for
7  ovarian cancer in this document, Exhibit 19, that
8  was updated in June of 2018 from NIH and the
9  National Cancer Institute; is that right?
10      A   I -- I want to sort of explain my
11 confusion.  The SEER, Surveillance, Epidemiology,
12 and End Result, program does not train or educate
13 individuals typically using documents like this.
14         Often this is for cancer abstractors to
15 know what information they're asking their
16 abstractors to collect.
17         I -- I don't know what this is, but it
18 doesn't look to me like something that's identifying
19 risk factors as much as asking medical chart
20 abstractors to write down information that they're
21 collecting as part of their data.
22      Q   My question is very simple.  This is a
23 list that at the top says "Risk Factors."
24         The introductory statement says, The main
25 risk and protective factors for ovarian cancers

Page 132

1  include modifiable and nonmodifiable parameters.
2          Is that right?  And then it lists out
3  nonmodifiable parameters and modifiable parameters;
4  is that right?
5      A   Yes, that's what this --
6      Q   Talcum --
7      A   -- says.
8      Q   -- powder use is not listed, correct?
9      A   Correct.
10      Q   All right.  Take a look, if you will --
11 and this is the document that you were talking about
12 a moment ago -- at Deposition Exhibit 20.
13         (Exhibit 20 was marked for identification
14 and is attached to the transcript.)
15      Q   (BY MR. ZELLERS) This is the "National
16 Cancer Institute Review of Ovarian, Fallopian Tube,
17 and Primary Peritoneal Cancer Prevention PDQ"; is
18 that right?
19      A   Yes, it is.
20      Q   This is the document that you told us a
21 few minutes ago that you disagree with the
22 conclusion; is that right?
23         And specifically if you go to page 5 of 9
24 under "Perineal Talc Exposure," the statement from
25 the National Cancer Institute in this document is

Page 133

1  that the weight of evidence does not support an
2  association between perineal talc exposure and an
3  increased risk of ovarian cancer.  Results from
4  case-control and cohort studies are inconsistent.
5          Is that right?
6      A   That is what they conclude.
7      Q   This was updated, if you looked at the
8  last page, page 9 of 9, on January 4 of 2019; is
9  that right?
10         MS. O'DELL:  Object to the form.
11      A   Can you show me where it's been updated?
12      Q   (BY MR. ZELLERS) Sure.  Look at the very
13 last page.  In bold, "Updated January 4, 2019"; is
14 that right?
15      A   It does say that --
16      Q   All right.
17      A   -- yes.
18      Q   Are there limitations on epidemiological
19 data?
20      A   Yes, there are.
21      Q   Do you agree that epi -- epidemiologic
22 data alone cannot permit a determination regarding
23 causation?
24      A   I'm sorry.  Can you just --
25      Q   Do you need me to say it again or can you

34 (Pages 130 to 133)

Rebecca Smith-Bindman, M.D.

Page 134

1  read it off the screen?
2      A   I can read it off the screen.  I think
3  epidemiologic data can provide an enormous amount of
4  information about causation.  But there are other
5  considerations that would have to be also taken into
6  account to also support that.
7      Q   Can epidemiologic data alone permit a
8  determination regarding causation?
9          MS. O'DELL:  Object to the form.
10     A   I think epidemiologic data can be used in
11 combination with other data to determine causality,
12 but by itself cannot be used alone to determine
13 causality.
14     Q   (BY MR. ZELLERS) The current epidemiologic
15 data, as it exists, does not enable someone to
16 distinguish between brands of cosmetic talc
17 products; is that right?
18         MS. O'DELL:  Object to the form.
19     A   I would agree.
20     Q   (BY MR. ZELLERS) You can't tell in any of
21 the 40 plus studies that you reviewed, that the
22 women who were involved in those studies used talc
23 products manufactured by Johnson & Johnson
24 Consumer, Inc., or by another company; is that
25 right?

Page 135

1          MS. O'DELL:  Object to the form.
2      A   I -- I would agree that most of the papers
3  that I read did not specify what the source of the
4  baby powder was.
5      Q   (BY MR. ZELLERS) Based on the analysis
6  that you have done, you're not able to draw an
7  opinion specifically about an increased risk of
8  ovarian cancer that is tied to a particular brand of
9  talcum powder, correct?
10         MS. O'DELL:  Object to the form.
11     A   My impression is that a large proportion
12 of the talcum powder products that are available
13 happen to be made by Johnson & Johnson, but I do not
14 know for any given study -- for most of the studies,
15 at least, what kind of talcum powder it was.
16     Q   (BY MR. ZELLERS) Okay.  Is your impression
17 that you just shared with us, you know, based on
18 information that you have received from plaintiffs'
19 counsel?
20         MS. O'DELL:  Object to the form.  Don't --
21 don't discuss what's been provided by -- let me say
22 that again.
23         Don't -- don't discuss conversations with
24 plaintiffs' counsel.  Thank you.
25     A   I -- my impression is based on seeing an

Page 136

1  awful lot of Johnson & Johnson baby powder over the
2  last 50 plus years.  And -- and I am --
3      Q   (BY MR. ZELLERS) And --
4      A   -- not sure whether there's lots of other
5  dominant players in the space.  I -- I don't know
6  that.
7          My impression is that Johnson -- baby
8  powder baby is a Johnson & Johnson a product very,
9  very often.
10     Q   But you have not done any type of survey
11 --
12     A   I have --
13     Q   -- or analysis?
14     A   -- I have not.
15     Q   If the biological mechanism by which a
16 talcum powder product can increase the risk of
17 ovarian cancer is because of a particular
18 contaminant or collection of contaminants, but that
19 contaminant or collection of contaminants does not
20 exist in all talcum powder products, will the
21 epidemiologic evidence that exists today allow you
22 to see that distinction?
23         MS. O'DELL:  Object to the form.
24     A   You're asking about contaminants of talcum
25 powder products.  My understanding from what I have

Page 137

1  reviewed is that the components of talcum powder
2  products include asbestos, include fibrous talc,
3  include heavy metals, include fragrances.
4          Let's get rid of the header -- the --
5  the fragrances.  Just the heavy metals, the
6  asbestos, and the fibrous talc.  My understanding is
7  that those are in the same mines as the platy talc,
8  which is the desired type of talc.
9          To the degree that those are all part and
10 parcel of the same product, they're not -- I
11 wouldn't think of them as contaminants.  I would
12 think of them as just part of the product.
13         And so to the degree that that product
14 cannot be separated, I would be concerned that any
15 talcum powder products have all of the above.
16         I separated fragrance, because that's
17 something that's added.  That's not mined directly.
18 But the other items, my understanding is that's part
19 of the talc.
20     Q   You don't know one way or the other
21 whether talcum powder products contain asbestos, do
22 you?
23         MS. O'DELL:  Object to the form.
24     A   You're asking me to opine whether talcum
25 powder products contain asbestos?

35 (Pages 134 to 137)

Rebecca Smith-Bindman, M.D.

| Page 138 |
|---|
| 1    Q   (BY MR. ZELLERS) Yes. |
| 2    A   Yes, I -- I feel very certain that talcum |
| 3    powder products, at least over many years, contained |
| 4    asbestos. |
| 5    Q   Is that part of your opinion in this case? |
| 6    A   Yes, it is. |
| 7    Q   Is it your opinion in this case that |
| 8    talcum powder products contain trace amounts of |
| 9    heavy metals? |
| 10   A   Yes, it is. |
| 11   Q   Is it also part of your opinion in this |
| 12   case that talcum powder products contain different |
| 13   fragrance chemicals? |
| 14   A   Yes, it is. |
| 15   Q   Do you have any opinion as to how many |
| 16   fragrance chemicals are contained in talcum powder |
| 17   manufactured by a Johnson & Johnson company at any |
| 18   time? |
| 19       MS. O'DELL:  Object to the form.  With |
| 20   regard to "opinion." |
| 21   A   I have seen long lists of chemicals and |
| 22   fragrances that are contained. |
| 23       I'm not familiar enough with -- with the |
| 24   testing that was done to understand how that's |
| 25   changed over time in a Johnson & Johnson product |

| Page 139 |
|---|
| 1    versus other talcum powder products. |
| 2    Q   (BY MR. ZELLERS) Do you have any opinion |
| 3    or knowledge as to the amount or concentration of |
| 4    particular fragrance chemicals that are contained in |
| 5    talcum powder manufactured by Johnson & Johnson? |
| 6    A   I -- I do not. |
| 7    Q   Do you have any opinion or knowledge as to |
| 8    the amount or concentration of trace chemicals |
| 9    -- strike that -- trace heavy metals that may be |
| 10   contained in talcum powder manufactured by Johnson & |
| 11   Johnson? |
| 12   A   I have seen reports of the amounts that -- |
| 13   you know, sort of in the ballpark of hundreds to |
| 14   thousands of parts per million. |
| 15       But I'm not an expert in understanding |
| 16   those numbers in comparison to the concentrations in |
| 17   other things that we're exposed to.  They're much |
| 18   higher.  They're orders of magnitudes higher, but |
| 19   I'm not an expert to understand how those different |
| 20   concentrations might be expected to have an |
| 21   influence on talc. |
| 22   Q   The same question with respect to |
| 23   asbestos.  Do you have any opinion or knowledge as |
| 24   to the amount or concentration of asbestos that you |
| 25   believe is contained in any talcum powder |

| Page 140 |
|---|
| 1    manufactured by Johnson & Johnson? |
| 2        MS. O'DELL:  Object to the form. to the |
| 3    form. |
| 4    A   So unlike the question about heavy metals |
| 5    where it sort -- there are traces of heavy metals in |
| 6    other things to which we're exposed regularly, like |
| 7    water.  We don't expect any concentrations of |
| 8    asbestos in products that we're exposed to. |
| 9        And so put in that context, while I'm not |
| 10   an expert in the mineralogy, the numbers that I have |
| 11   seen are tens of thousands to millions of fibers |
| 12   that might be in grams of product seem like an awful |
| 13   lot of units or dose of -- of asbestos or fibrous |
| 14   talc. |
| 15       MR. ZELLERS:  Move to strike as |
| 16   nonresponsive. |
| 17   Q   (BY MR. ZELLERS) You do not have personal |
| 18   knowledge as to any amounts or concentrations of |
| 19   asbestos in talcum powder manufactured by Johnson & |
| 20   Johnson -- |
| 21       MS. O'DELL:  Objection. |
| 22   Q   (BY MR. ZELLERS) -- correct? |
| 23       MS. O'DELL:  Objection, asked and |
| 24   answered. |
| 25   A   I have seen several reports of Johnson & |

| Page 141 |
|---|
| 1    Johnson products that have been tested for |
| 2    concentrations of asbestos or asbestiform talc that |
| 3    have concentrations shown kind of in ranges of a |
| 4    tenth of a percent or, as I mentioned, tens of |
| 5    thousands or mid -- millions of fibers. |
| 6        And those have been tested by -- by |
| 7    several different people, but coming up with units |
| 8    of dose within Johnson & Johnson talcum powder |
| 9    products. |
| 10   Q   (BY MR. ZELLERS) You're not a geologist, |
| 11   correct? |
| 12   A   I am not a geo -- |
| 13   Q   You're -- |
| 14   A   -- logist. |
| 15   Q   -- not a mineralogist, correct? |
| 16   A   I am not. |
| 17   Q   You have reviewed some expert reports from |
| 18   Dr. Longo; is that right? |
| 19   A   Among others, yes. |
| 20   Q   You have reviewed some testing reports. |
| 21   Some purportedly show that there is asbestos present |
| 22   in talcum powder and some that show that there's not |
| 23   asbestos in talcum powder; is that right? |
| 24       MS. O'DELL:  Object to the form. |
| 25   A   I have seen a lot of reports that have |

36 (Pages 138 to 141)

Rebecca Smith-Bindman, M.D.

Page 142

1  shown the presence of talcum powder containing
2  asbestos and fibrous talc.
3       You listed some of those, the Longo
4  reports, a bunch of publications in the literature
5  such as Blount's.
6       I have seen some testing from Dr. Hopkins,
7  from Imerys, from Cooke. I have also seen some
8  negative reports.
9    Q   (BY MR. ZELLERS) The answer to my question
10  is: Yes, you have seen testing that purportedly
11  shows there to be some asbestos in the J&J
12  manufactured talcum powder and you have seen reports
13  that, you know, indicate there's not asbestos in the
14  talcum powder; is that fair?
15   A   The way that you have described it makes
16  it seem like I have seen comprehensive reports that
17  have shown in totality there is asbestos and reports
18  that have shown there's not. I haven't seen that.
19   Q   All right.
20   A   I have seen reports that have shown in
21  totality there are. I have seen individual samples
22  that have shown there's not asbestos in those
23  individual samples.
24       But I haven't seen a systematic report
25  that have shown in, for example, a large number of

Page 143

1  specimens, none had asbestos. I haven't seen that.
2    Q   You have seen, at least in large part, the
3  information that's been provided to you by
4  plaintiffs' attorneys; is that right?
5       MS. O'DELL: Object to the form. to the
6  form.
7    A   I think some of the public -- published
8  literature was not provided by plaintiff attorneys
9  and some has been, such as the Longo reports.
10       MR. ZELLERS: All right.
11       MS. O'DELL: Mike, we have been going
12  about an hour and 30 minutes. And our lunch is
13  here, so is this a good time.
14       MR. ZELLERS: Sure --
15       MS. O'DELL: -- for a break?
16       MR. ZELLERS: -- of course.
17       THE VIDEOGRAPHER: This marks the end of
18  Disc 2. We are off the record at 12:37 p.m.
19       (A break was taken from 12:37 p.m. to
20  1:36 p.m.)
21       THE VIDEOGRAPHER: We are back on the
22  record. This marks the beginning of Disc No. 3 in
23  the deposition of Dr. Rebecca Smith-Bindman. The
24  time is 1:36 p.m.
25       MR. ZELLERS: Dr. Smith-Bindman, let's go

Page 144

1  off the record for a moment.
2       THE VIDEOGRAPHER: We're off the record at
3  1:36 p.m.
4       (A break was taken from 1:36 p.m. to
5  1:37 p.m.)
6       THE VIDEOGRAPHER: We are back on the
7  record. The time is 1:37 p.m.
8    Q   (BY MR. ZELLERS) Dr. Smith-Bindman, you
9  had recalled, I believe, the name of the fourth
10  plaintiff lawyer that you met with?
11   A   Carmen Scott.
12   Q   I want to ask you some questions about the
13  systematic review that you did. You have not
14  published it, correct?
15   A   I have not.
16   Q   If at any point you do publish your
17  systematic review, would you disclose that you are a
18  paid expert for the Plaintiffs in the talcum powder
19  litigation?
20   A   Yes, I would.
21   Q   You would expect any expert who is paid to
22  perform a review or who has a study funded by
23  Plaintiffs to make that disclosure, correct?
24       MS. O'DELL: Object to the form.
25   A   My understanding from my experience is

Page 145

1  that different journals require different
2  disclosures. So if you're paid by someone, you
3  typically would have to disclose, but the detail
4  would -- would vary by journal.
5    Q   (BY MR. ZELLERS) What methodology or
6  methodologies did you use to arrive at your opinion
7  that regular use of talcum powder increases a
8  woman's risk of developing invasive serous cancer by
9  about 50 percent?
10   A   So I would say there were two parts. The
11  first part is my systematic review of the published
12  literature. I think I mentioned earlier that I have
13  published several systematic reviews.
14       And the mechanism of perform -- performing
15  those systematic reviews are both ones that I have
16  personally used and ones that I was involved in
17  developing the methodology as part of my work on the
18  Cochrane collaboration.
19       So it involves doing a very standardized
20  search, creating an approach for abstracting data,
21  abstracting the data. An approach that I used for
22  summarizing the data, which usually is looking at
23  stratified results, results in sort of specific
24  categories as opposed to broad categories.
25  Statistically summarizing the results and showing

Rebecca Smith-Bindman, M.D.

Page 146

1  them.
2      So part of my conclusion was based on my
3  own systematic review. And then part of my
4  conclusion was based on my review of the published
5  literature on the actual epidemiology data, as well
6  as other considerations that went into consideration
7  of the Bradford Hill criteria such as mechanistic
8  data and any other requirements of Bradford Hill.
9      Q   Tell us step by step how you performed
10  your systematic review or analysis. And now I'm
11  referring to the meta-analysis or meta-analysis-like
12  review that you did.
13      A   Okay. So I would just like to do a slight
14  preamble to that, which is that the direction that
15  my review took was partly informed by having read
16  through a number of articles on the topic. So
17  determining sort of where there was a gap, what was
18  the most important area to focus on. So that sort
19  of was the background.
20      And then for the review, the literature
21  search is the first step. So you want to broadly
22  identify all relevant literature, published and
23  unpublished, to include.
24      And that includes searching on several
25  databases -- PubMed was -- Medline were -- Embase,

Page 147

1  Scopus were -- were databases that I started my
2  search.
3      I included in the report some of the
4  keywords I used, keywords including "ovarian cancer,
5  talc, perineal powder, genital powder."
6      So I generated a long list of articles
7  that I retrieved and then reviewed the references
8  for each of those articles, which usually doesn't
9  identify a lot more articles, but usually identifies
10  a few that I may have missed in my search, but that
11  other people have found in their reviews or
12  systematic reviews. So the first step was to
13  identify the literature.
14      Q   What was the next step? And again, I'm
15  focused on your methodology for the systematic
16  review or analysis that you did, as reflected in
17  your report?
18      A   So the second step is: Identified a large
19  number of publications, but some of them may not
20  have been particularly relevant.
21      For example, they may have sounded in the
22  title like they were primary data, but they may have
23  actually only been review data.
24      So Step 2 is to review the abstracts for
25  all of those identified articles and then to go

Page 148

1  through those and to review to make sure that they
2  had primary data.
3      So I was only interested in studies that
4  had primary data, which meant that review articles
5  or editorials or letters to the editors or opinion
6  pieces were dropped from that list.
7      So then I had data that were -- I had
8  studies that had primary data, so that became my
9  list of articles.
10      And -- and then I created a data
11  abstraction form for what variables I wanted to
12  include. So some variables are the number of cases;
13  the number of controls; the kind of study design
14  whether it was a case-control study or another
15  design.
16      It included -- included the groups that I
17  cared most about. So you mentioned serous cancer,
18  so I included what kind of histologies they looked
19  at.
20      I included in my initial data form,
21  variables that I ended up not using in my review
22  because I didn't have enough data.
23      So in my initial draft of variables that I
24  might like to abstract was the relationship in pre
25  versus postmenopausal women.

Page 149

1      But when I ended up reviewing articles,
2  there just was not -- not enough data there to make
3  sense of, so I created a data abstraction form.
4      I then went one by one through the
5  articles which I organized and abstracted the data
6  that I had set out to do.
7      And in the course of doing that, I would
8  ensure that the participants that were described in
9  those reports were, in fact, unique subjects.
10      So within this field, just like many
11  fields, people sometimes publish an individual
12  patient in more than one study. And -- and you
13  don't want to include that, if you can.
14      So as part of my review was to determine
15  how independent the patients were and to make a note
16  if there was overlap.
17      I also didn't mention some of the features
18  that I abstracted. But it wasn't just the primary
19  result, which was what was the adjusted odds ratio
20  or risk ratio associated with exposure to talcum
21  powder products, but it was also -- what I was most
22  interested in is quantifying that exposure to a
23  degree that had not been present in all the
24  individual reviews that I had previously said. So I
25  was interested primarily in abstracting data on

38 (Pages 146 to 149)

Rebecca Smith-Bindman, M.D.

Page 150

1  regular exposure to talcum powder.
2      So when I went through the articles, I
3  noted whether -- what the point estimates were, but
4  also whether they had information on all of the
5  things that were in my database.
6      I went through and abstracted data several
7  times.
8      Q   Okay.  Well, that's --
9      A   Oh.
10     MS. O'DELL:  She may not be done but --
11     Q   (BY MR. ZELLERS) Well, I understand.  So
12 I'm just trying to go through your methodology here.
13     So after you abstracted the data and
14 included it or put it on your data abstraction form
15 for each study, what was the next step in your
16 systematic review?
17     MS. O'DELL:  So just continue on, Doctor,
18 what your process was.
19     A   Okay.  Well -- so the next step was to
20 decide which -- which of those papers might have
21 been missing data.
22     So once I abstracted the data, there were
23 gaps almost certainly in the data.  And so I -- I
24 just wanted to emphasize -- I was starting to say
25 this earlier -- that I -- I went back to the papers

Page 151

1  and tried to sort of ensure that I was consistently
2  pulling the data in my database requirement for
3  every study.
4      After I did that, the next step would be
5  to combine the data statistically.  And that would
6  be to pro -- perform steps to figure out how the
7  data can be -- could be combined.
8      And that required looking at issues of
9  consistency across the studies or heterogeneity and
10 then to make sure that the sub analysis that I
11 wanted to do -- the stratified analysis that I
12 wanted to do could be done based on whether I had
13 data for each of those studies in the stratified
14 category.
15     So as an example, I wanted to make sure
16 that I -- I had whatever information was in the
17 paper that could then go to the next step of
18 analysis.
19     And so that's when, actually, I reached
20 out to a biostatistician with -- expert in the
21 biostatistical aspect to do two things:  To both
22 double-check my numbers and ensure that the numbers
23 that -- had been abstracted correctly and then to do
24 the biostatistical analysis and generate the
25 graphical representation of the data.

Page 152

1      Q   That's what Dr. Hall did; is that right?
2      A   That is what Dr. Hall did.  I should have
3  a caveat there.  We -- she absolutely lead that part
4  of the analysis, but I reviewed every step of that
5  very carefully.
6      And there were several places that I --
7  I -- I saw errors in some of the calculations that
8  we went back and forth on to correct those
9  calculation errors.
10     Q   Have you completed your methodology or the
11 different steps in your methodology?
12     MS. O'DELL:  In terms of the
13 meta-analysis?
14     Q   (BY MR. ZELLERS) Yes.  In terms of the
15 systematic review or meta-analysis that you did.
16     A   I believe I have highlighted all the
17 steps.
18     Q   You tried or did correct any errors in
19 calculations or numbers by Dr. Hall; is that right?
20     MS. O'DELL:  Object to the form.
21     A   Yes, I did.
22     Q   (BY MR. ZELLERS) Did anyone else review
23 your calculations and Dr. Hall's calculations?
24     A   No.  Just the two of us.
25     You said something, that I corrected some

Page 153

1  of her numbers.  I -- she also corrected some of my
2  numbers.
3      It was a bi-directional two set of eyes on
4  all of the analysis --
5      Q   I --
6      A   -- and abstractions.
7      Q   -- essentially what you did is you
8  analyzed the studies.  You abstracted data on each
9  of the studies on your Data Abstraction Form,
10 correct?
11     A   Yes.
12     Q   Have you produced your Data Abstraction
13 Forms to us for review?
14     A   I -- I believe I have.
15     Q   All right.  You have them available; is
16 that right?
17     A   Yes.
18     Q   And this would be a form for each of the
19 studies in which you went through and you abstracted
20 data; is that right?
21     A   It's --
22     MS. O'DELL:  Object to the form.  Sorry.
23 Go ahead.
24     A   -- yeah, it's -- it's an electronic
25 database.  It's an Excel file.

39 (Pages 150 to 153)

Rebecca Smith-Bindman, M.D.

|  | Page 154 |
|---|---|

1    Q   (BY MR. ZELLERS) But there would be a form
2    or an Excel sheet for each of the studies where you
3    abstracted the data; is that right?
4         MS. O'DELL:  Object to the form.
5    A   There's an Excel sheet with each study
6    listed as a separate line of data and many, many
7    rows -- columns for each -- it's not a physical
8    piece of paper and...
9    Q   (BY MR. ZELLERS) But it's something that
10   could be printed out; is that right?
11   A   Yes.
12   Q   All right.  Did you develop any type of
13   protocol setting forth the different steps that you
14   followed to do your systematic analysis that you
15   have told us about?
16   A   The protocol that I followed for these
17   steps is a very well-established, well-published --
18   including by myself from any prior reviews --
19   protocols.
20   Q   My question is:  Did you write down
21   anywhere, the protocol that you followed for doing
22   this particular systematic review?
23        MS. O'DELL:  Object to the form.
24   A   I did not specifically write down for this
25   review that I would do a literature search or

|  | Page 155 |
|---|---|

1    abstract data and record points and then do the
2    analysis.
3    Q   (BY MR. ZELLERS) What you have done in
4    your systematic review is a subgroup analysis of
5    those studies that you thought should be included;
6    is that fair?
7    A   I call it a stratified analysis rather
8    than a subgroup analysis.  Usually a subgroup
9    analysis is usually used to describe only limiting
10   to certain groups of patients as opposed to some
11   questions.  So I -- I'm not sure that there's a
12   distinction but...
13   Q   Well, you -- whether we call it a subgroup
14   or whether we call it a stratified analysis, you
15   went through the studies to try to find the studies
16   that would give you information on women who were
17   regular users, as you defined "regular users," and
18   who developed invasive serous ovarian cancer,
19   correct?
20        MS. O'DELL:  Object to the form.
21   A   Yes, that's what I did.
22        When you asked about whether I have a
23   protocol written down, I have written that I was
24   going to abstract information about regular use of
25   talc powder products defined as closely as three

|  | Page 156 |
|---|---|

1    times week or more as possible and that I would
2    focus on invasive serous cancer wherever possible.
3         And so if that -- if that's what you mean
4    by my "protocol," then yes, that was written down
5    ahead of time.
6    Q   (BY MR. ZELLERS) I'm confused.  Do you
7    define -- well -- and No. 1, did you produce that
8    protocol?
9    A   So I have -- I have my notes and -- which
10   was part of the documents that you saw earlier
11   today.
12   Q   The notes, you would describe as your
13   protocol or an outline of your methodology?
14   A   Yes.
15   Q   All right.  We'll mark your notes, which
16   are your protocol, as Exhibit 21.
17        (Exhibit 21 was marked for identification
18   and is attached to the transcript.)
19   Q   (BY MR. ZELLERS) And it's just the one
20   side sheet; is that right?
21   A   I believe I provided other documents in
22   the datasheet that also has the notes of what group
23   I was focusing on in e-mails that I have sent you.
24   Q   That would be other materials that you
25   have produced; is --

|  | Page 157 |
|---|---|

1    A   That's --
2    Q   -- the right?
3    A   -- correct.
4    Q   To your knowledge, there's nothing that
5    you have not produced --
6    A   No.
7    Q   -- relating -- hold --
8    A   Okay.
9    Q   -- on.  Let me finish.
10        There's nothing, to your knowledge, that
11   you have not produced relating to your analysis; is
12   that right?
13   A   That's correct.
14   Q   I was confused.  I thought you stated a
15   moment ago that you defined "regular use" as the use
16   of talcum powder three times a week or more.
17        Is that your definition of "regular use"?
18   A   I--
19        MS. O'DELL:  Object to the form.
20   A   -- I describe the definition in my report
21   on page 32.  And --
22   Q   (BY MR. ZELLERS) My question just is:  Is
23   that the correct definition or did you use a
24   different definition of "regular use"?
25        MS. O'DELL:  Object to the form.  You may

40 (Pages 154 to 157)

Rebecca Smith-Bindman, M.D.

Page 158

1  describe your --
2      A   So I -- I --
3      MS. O'DELL:  -- definition.
4      A   -- have listed how I have defined it.  And
5  it's a little bit more -- more nuanced than what you
6  have just asked me to confirm.
7      Q   (BY MR. ZELLERS) What is your definition
8  of "regular use" with respect to the systematic
9  review and analysis that you did?
10     A   So I have written, Regular use was defined
11 ideally as daily or at least more than three uses
12 per week.
13     Q   More than three uses a week; is that
14 right?
15     A   I -- I wasn't finished.  May I finish?
16     Q   Sure.
17     A   "I also accepted studies that defined
18 "use" as regular where the description made it clear
19 that this was regular use.
20         A study that reported regular use, but
21 defined it as less -- as used less frequency --
22 at -- use of less than as -- frequency were not
23 included.
24         Regular use was selected to differentiate
25 occasional use, which may include one-time

Page 159

1  infrequent use or used along a particular time of a
2  woman's menstrual cycle from sustained use.
3         Studies that ask participants a single
4  question about every use of talc without further
5  quantification of exposure were not included for the
6  summary.
7         For example, Perdue reported that 52 to
8  57 percent of women ever using talc without further
9  quantification was not included."
10         THE COURT REPORTER:  Please slow down.
11     Q   (BY MR. ZELLERS) Okay.
12     A   Yes.
13     Q   Doctor, I just wanted to know your
14 definition of "regular use."
15     A   I -- I -- I have spent considerable time
16 both writing my definition and applying it to --
17     Q   What --
18     A   -- the papers.
19     Q   -- what page --
20     MS. O'DELL:  Excuse me, sir.  If you were
21 asking for the page, she can direct you to the page
22 --
23     Q   (BY MR. ZELLERS) What page --
24     A   So --
25     MS. O'DELL:  Doctor --

Page 160

1      A   -- page --
2      MS. O'DELL:  -- go ahead.
3      A   -- 32.
4      Q   (BY MR. ZELLERS) You have defined "regular
5  use" in your report on page 32; is that right?
6      A   Yes.
7      Q   What is Dr. Hall's field of expertise?
8      A   She is a biostatistician who is -- does a
9  lot of summaries of systematic review.
10     Q   You are not a biostatistician; is that
11 right?
12     A   I did a two-year post-graduate fellowship
13 in the Department of Epidemiology and Biostatistics,
14 have taken many courses in biostatistician --
15 biostatistics, and have thought classes in biostatus
16 --
17     Q   Do you con --
18     A   -- statistics.
19     Q   -- do you consider yourself to be an
20 expert biostatistician?
21     A   I consider myself an expert in
22 biostatistics.
23     Q   And Dr. Hall is also an expert in
24 biostatistics; is that right?
25     A   Yes.

Page 161

1      Q   Do you know -- well, did you conduct your
2  systematic review and analysis using the PRISMA
3  standards?
4      A   Yes.
5      Q   And those are the preferred reporting
6  items for systematic reviews and meta-analyses; is
7  that right?
8      A   Yes.
9      Q   What materials did you provide to Dr. Hall
10 to assist you with your review?
11     A   I provided her with the data abstraction
12 table that had information about each of the
13 included studies.
14     Q   The data abstraction table that you
15 prepared; is that right?
16     A   Yes.
17     Q   What specifically did Dr. Hall do to
18 assist you?
19     A   She did two things.  She personally
20 reabstracted data from all of the publications.
21 Most of those publications she found on her own.
22 But for a couple, she was not able to find them, and
23 I provided electronic versions of them.
24         And then she statistically combined and
25 compared the study to assess for heterogeneity to

41 (Pages 158 to 161)

Rebecca Smith-Bindman, M.D.

Page 162

1   calculate forest plots and summary-weighted
2   estimates.
3        Q   What could Dr. Hall do with respect to
4   your analysis that you could not?
5        A   I did not know how to use the software to
6   generate the graphs.  And I thought that by the time
7   I learned how to use that software, it would be a
8   lot more efficient for her to generate them.
9        Q   What did you do to check Dr. Hall's work
10  to make sure it was accurate?
11       A   Dr. Hall sent me back my data abstraction
12  database where she had double-checked all of my
13  numbers and sent -- I think there were several data
14  points where she had questions about either whether
15  I abstracted the right number or put it in the right
16  category.
17       And of all of the items that she had
18  suggestions -- I think it was a small number -- I
19  went back to the original article to -- to confirm
20  or refute whether I agreed with her changes or not.
21  Sort of a way to -- by consensus to decide what the
22  right answer was.  That was part of what I did.  I
23  --
24       Q   How -- did you finish?
25       A   -- no.

Page 163

1        Q   All right.  Well, finish.
2        A   She also generated -- she -- we went back
3   and forth.  She had a bunch of questions.
4        But she also generated summary estimates.
5   And there were a bunch of categories that I asked
6   her to do.  Some of those summary estimates, to me,
7   seemed like they didn't totally make essence.
8        So one analysis used seven studies and one
9   used nine, but it had the same final odds ratio out
10  to three digits.  And it should have been the same
11  result perhaps, but not out to three digits.
12       So I went through those and sort of said:
13  Look, can you redouble-check this to make sure that
14  the weighting was correct?
15       And in one or two cases she came back and
16  said:  No, the weighting was not correct.
17       So I rechecked every graph and every
18  number that she generated.
19       Q   Ultimately, you identified -- let me
20  withdraw that.
21       You reviewed the studies; you did your
22  data abstraction; and you formulated your research
23  question or questions for the systematic review,
24  correct?
25       MS. O'DELL:  Object to the form.

Page 164

1        A   I would not do it in that order.  I -- I
2   generated the research questions first.
3        Q   (BY MR. ZELLERS)  You generated the
4   research questions after doing the initial
5   literature review you told us about this morning,
6   correct?
7        A   I --
8        MS. O'DELL:  Object to the form.
9        A   -- yes.
10       Q   (BY MR. ZELLERS)  All right.  You
11  identified ten studies that discuss what you define
12  as "regular talc powder product use and risk of
13  ovarian cancer," and those are what you list on a
14  page 33 of your report; is that right?
15       A   That's close to correct.  I would include
16  in that another study, the Terry study, which is a
17  large study that pulls data from a bunch of other
18  component studies -- you can see on the top of
19  page 34 -- whether or not Terry was included or
20  excluded.  The results were basically identical.
21       Q   I'm just looking at your report.  Your
22  report, on page 33, in Figure 2, you identify ten
23  studies that discuss what you define as "regular
24  talc powder product use and risk of ovarian cancer,"
25  correct?

Page 165

1        MS. O'DELL:  Object to the form.
2        A   So that -- that paragraph is continued on
3   page 34, the next page at the top which says, The
4   primary analysis of this excluded Terry, but the
5   results were nearly identical if Terry was included.
6        Q   (BY MR. ZELLERS)  You could have included
7   Terry as part of Figure 2, and that would have been
8   an 11th study; is that right?
9        A   Yes, that's correct.
10       Q   Why did you not include Terry in your
11  analysis and -- in Figure 2?
12       A   Terry included, within its -- within her
13  assembled papers, other patients that are already
14  included in Figure 2.
15       And including Terry would have listed --
16  would have weighted some patients more than once.
17       Q   Is there, to your knowledge, any
18  duplication or overlap in the patients for the ten
19  studies that you list in Figure 2 on page 33 of your
20  report?
21       A   To the degree that I could eliminate
22  overlap, I did.
23       Q   Is there overlap in some of the patients
24  and some of the studies?
25       A   I would have to look at it again to remind

42 (Pages 162 to 165)

Rebecca Smith-Bindman, M.D.

Page 166

1  myself if there is any overlap.  I -- I don't
2  believe there is.
3          And any overlap, I made every effort to
4  get rid of.  I would have to look at those papers a
5  little bit more closely to remember if there was any
6  overlap.
7          I -- I know there was a lot of overlap if
8  I included Terry, which is why that was an important
9  exclusion.
10   Q   How did you identify these ten studies
11  that you list in Figure 2?
12   A   So I -- I did not identify those studies.
13  That was what -- Dr. Hall used the data that I
14  provided -- to identify which studies had the -- the
15  appropriate data to look at -- look at this.
16   Q   How did Dr. Hall identify these ten
17  studies as being the ones to include in Figure 2?
18   A   These were the studies that had data on
19  daily talc powder -- powder products.
20   Q   You only used subsets of data from these
21  ten studies -- those ten studies listed in
22  Figure 2 -- to reach your conclusions, correct?
23      MS. O'DELL:  Object to the form.
24   A   I don't remember offhand if I used all of
25  the data from these studies or subsets of data from

Page 167

1  these studies to reach my conclusion.
2          There were only data from these ten
3  studies included in this figure, but I'm not sure if
4  I used all of the data from those studies or
5  subsets, as you asked.
6   Q   (BY MR. ZELLERS) Would you agree that only
7  two of the ten studies in Figure 2 demonstrates
8  statistical significance?
9   A   I would agree that taken altogether, these
10  studies show statistical significance.  But I think
11  you're asking if they weren't taken together, if the
12  original studies were used, would those individual
13  studies show statistical significance?  Is that what
14  you are asking?
15   Q   No.  You have listed out ten studies in
16  Figure 2; is that correct?
17   A   Yes.
18   Q   You are not aware whether you used all of
19  data from those studies for your systematic review
20  and analysis or subsets of the data, correct?
21      MS. O'DELL:  Object to the form.
22   A   Yes, that is correct.
23   Q   (BY MR. ZELLERS) Would you agree that only
24  two of the ten studies in Figure 2 demonstrate
25  statistical significance?

Page 168

1   A   I -- I would not -- the individual studies
2  are shown with the confidence interval around those
3  point estimates.
4          One way to establish statistical
5  significance is -- is that statistically different
6  within an individual study than one.
7          But I don't believe that only two of these
8  show statistical significance as a group of studies.
9  So if you're asking if two don't overlap one, then I
10  would agree with you.  If you're asking if these
11  together show statistical --
12   Q   (BY MR. ZELLERS) I'm going to ask you --
13      MS. O'DELL:  Excuse me.  Sorry.  Let her
14  finish.  Sorry.
15   Q   (BY MR. ZELLERS) Did you finish?
16   A   I -- I'm trying to understand if you're
17  asking me if the original studies here show -- or
18  if -- just each line by itself.
19   Q   If we go line by line for these ten
20  studies, only two of these ten studies demonstrate
21  statistical significance; is that right?
22   A   Yes.
23   Q   Yet you conclude by looking at all ten of
24  the studies that there is statistical significance;
25  is that right?

Page 169

1   A   So the way you're asking the question
2  suggests that when you're combining studies in a
3  systematic review, you care about the initial sample
4  size of the question.
5          And so I conclude taken as a group of
6  studies, the individual sample size or power of the
7  individual associations is not sufficient to come up
8  with a narrow confidence interval.
9          And the width of the confidence interval
10  suggests that while the point estimate is greater
11  than one, the confidence interval overlaps one,
12  meaning you can't be sure if it's significantly
13  significant.
14          But the purpose of the systematic review
15  is to combine those studies together.  So combining
16  them together gives a very powerful, positive
17  estimate that's very different than one.
18   Q   Okay.
19      MR. ZELLERS:  Move to strike as
20  nonresponsive.
21   Q   (BY MR. ZELLERS) My question is:  When you
22  looked at the ten studies together, you determined
23  that there was statistical significance; is that
24  right?
25   A   Yes.

43 (Pages 166 to 169)

Rebecca Smith-Bindman, M.D.

---

Page 170

1      Q   How did you make that calculation? How
2   did you calculate statistical significance from
3   those ten studies?
4          MS. O'DELL: Object to the form. I
5   believe she has already answered that, but you may
6   describe that again, Doctor.
7      A   So the software that was used, is that
8   what you are asking?
9      Q   (BY MR. ZELLERS) I want to know how it is
10  that you calculated that these ten studies -- eight
11  of which did not demonstrate statistical
12  significance when they were looked at together --
13  were statistically significant?
14     A   So I need to provide you with just a
15  little background on the field of systematic reviews
16  to answer that question.
17     Q   All right. Well, try to be as direct as
18  you can, because I have only got a certain amount of
19  time.
20         Are you able to answer the question?
21     A   Absolutely.
22     Q   Then please tell us how you calculated
23  statistical significance for the RE model.
24     A   So we looked at adjusted odds ratios of
25  each of the studies. We weighted them based on the

---

Page 171

1   standard errors for each of them and calculated sort
2   of an overlying association when basically the size
3   of each study, the point estimate of each study were
4   taken into consideration.
5          So taking them altogether, it allows the
6   summary estimate, if you look, to have a much
7   narrower confidence interval than the individual
8   study.
9          So you use the weight of all the studies
10  to combine the -- to give you a summary estimate.
11     Q   Where can I see the weighting and the
12  calculation that you did to come up with the
13  statistically significant number?
14     A   So the -- the name of the software we used
15  was in Metafor package in R. "R" is a program.
16         The data set that I provided to you of the
17  extracted database, if you put those numbers -- if
18  anyone puts those numbers in the Metafor package in
19  R and instructs the software that you want to apply
20  a -- linear mixed models to study that data set, you
21  will get the exact same estimate that I got.
22     Q   And I will be able to see that from the
23  documents that you have produced; is that right?
24     A   Absolutely.
25     Q   How did you calculate the confidence

---

Page 172

1   interval around the odds ratio for each of these ten
2   studies?
3          MS. O'DELL: Object to the form.
4      A   So most of the studies, if not all of
5   those, would have had published adjusted odds ratios
6   in the original calculations.
7          I believe one of the studies, the Gertig,
8   was an adjusted risk ratio, not an odds ratio, which
9   had a bit of back-and-forth discussion with the
10  biostatistician.
11         And we decided they were essentially
12  equivalent. But the other ones would have been
13  extracted from the initial studies.
14     Q   The confidence intervals for the ten
15  studies on -- in Figure 2, page 33 of your report
16  came from the studies themselves?
17     A   Yes.
18     Q   Were there any other selection criteria
19  that you used to identify these ten studies, other
20  than what you have testified to?
21     A   No.
22     Q   Of the 43 or so studies that had primary
23  data, are these the only studies, other than Terry,
24  that discuss regular use of talc?
25     A   So I am just looking for where my fullest

---

Page 173

1   of studies is in the report. I think it's pages 23
2   and 24.
3          The fullest of studies that I looked at
4   included -- I think there were seven systematic
5   reviews. So the systematic reviews did not
6   contribute to the -- they were not eligible for --
7   for -- for my own review because they didn't have
8   primary data, and they would overlap.
9          And the same thing with -- well, the
10  Terry, we know about. So it was only the other
11  studies that were eligible.
12     Q   These ten studies that you list in
13  Figure 2 are the only studies that you reviewed that
14  discuss regular use of talc, and that's why you
15  included them here; is that right?
16         MS. O'DELL: Object to the form.
17     A   No, that's -- that's not what I said.
18         The systematic reviews I read and had
19  data, many of them, on regular use of talc.
20         But those were not included in my
21  systematic review because that would have had
22  overlap of -- of -- of patients. So they were not
23  included because it overlapped patients.
24     Q   (BY MR. ZELLERS) Which studies were those
25  seven?

44 (Pages 170 to 173)

Rebecca Smith-Bindman, M.D.

Page 174

1    A   So they're listed on page 23 as systematic
2  reviews.  So Penninkilampi and Berge and the IARC
3  and Langseth and Huncharek and Gross and Harlow.
4        The reason Terry was pulled out from that
5  to possibly include was because Terry provided new
6  data points that weren't included in the component
7  studies, and so I wanted to make sure not to miss
8  those patients.
9        But these other systematic reviews were
10 all covered in the other primary studies that I
11 included.
12   Q   Why did you not include the Cramer study,
13 1999?
14   A   Cramer was one of the authors that had a
15 lot of patients that kept appearing in subsequent
16 publications.  So he published the same patients
17 more than once, so --
18   Q   What analysis did you do to determine that
19 there was overlap between any of the patients
20 reported on by Cramer in 1999 and any of the ten
21 studies that you did choose to include?
22   A   I went through -- I think there's a
23 separate page in my data fields that's just
24 attributed to the Cramer studies -- and wrote down
25 what years of enrollment the patients were.

Page 175

1        And to the best I could, I identified the
2  cohorts and then pulled them out to only identify
3  all patients once, which -- which is the reason I
4  hesitated to say there was no overlap.
5        But I did my best to only include every
6  patient once.  And --
7    Q   Okay.
8    A   -- Cramer got his own worksheet because it
9  was trickier to figure out.
10   Q   Cramer 1999 you did not include in your
11 systematic review because you analyzed that paper
12 and the other studies and determined that there was
13 overlap; is that right?
14   A   I didn't quite say that.  I'm saying that
15 I was very careful not to include overlap patients.
16 I don't know why Cramer 1999 didn't make it into the
17 review.
18   Q   I--
19   A   I don't know if he didn't have regular use
20 of talc or -- I -- I -- you know, I would have to --
21 to figure out why it wasn't included.
22   Q   Well, take a look at the Cramer 1999
23 paper, which we'll mark as Exhibit 22.
24        (Exhibit 22 was marked for identification
25 and is attached to the transcript.)

Page 176

1    Q   (BY MR. ZELLERS) If you turn to --
2        MS. O'DELL:  I'll take that.
3    Q   (BY MR. ZELLERS) -- turn to Table 2 on
4  page 353, the bottom table -- at the bottom of the
5  table.
6    A   Yes.
7    Q   Do you see data with respect to "frequency
8  of use per month"?
9    A   Yes.
10   Q   That's the type of study and the type of
11 information that you did include in your systematic
12 review; is that right?
13   A   Yes.
14   Q   Is it fair to say that as you sit here
15 today, you just don't remember why you did not
16 include Cramer 1999?
17        MS. O'DELL:  Object to the form.
18   A   In looking at this, you have convinced me
19 it's not because he doesn't have frequency of use,
20 because there is frequency of use in here.  I do not
21 know why it didn't make it into the final database.
22        But I'm looking at my paper from Cramer
23 from 2016, "The Association Between Talc Use and
24 Ovarian Cancer, a Retrospective Case-control Study."
25        He describes -- this is on page 334 of

Page 177

1  that other article -- that data came from three
2  enrollment phases.
3        And my notes on the side say "minus Cramer
4  '99," suggesting -- I don't mind showing you my
5  notes -- showing that there's overlap with Cramer
6  '99 --
7    Q   Okay.
8    A   -- so.
9    Q   You -- do you believe that the reason you
10 did not include Cramer 1999 is because there was
11 overlap with the patients included in Cramer 2016 or
12 you're not sure?
13   A   Yes.
14        MS. O'DELL:  Object to the form.
15   Q   (BY MR. ZELLERS) Which one is it?
16        MS. O'DELL:  Object to the form.
17   A   I -- I do not know why it wasn't included,
18 but I believe there was overlap with 2016, is why it
19 was not included.
20   Q   (BY MR. ZELLERS) You also did not include
21 Rosenblatt 2011 in your systematic review; is that
22 right?
23   A   Rosenblatt was included in the review.
24 But on much -- it looks like it didn't make it into
25 the final graph or the final group of ten.

Rebecca Smith-Bindman, M.D.

Page 178

1    Q   Why did it not make it into the final
2  graph or group of ten?
3    A   So I don't -- let me just say I don't
4  remember why Rosenblatt was not included.
5      I specifically asked the biostatistician
6  to do the analysis with and without Rosenblatt, and
7  I believe the reason was -- I believe is that -- the
8  quality of Rosenblatt seems very poor, and I can't
9  remember why.
10     But I asked her to do the analysis with
11  and without Rosenblatt. I asked her to do, I think,
12  four different analyses with and without Terry, with
13  and without Rosenblatt.
14     My recollection is it had no impact. But
15  I do not remember why I asked her with the quality
16  issue -- I would have to go back to my database to
17  remember why I asked her to do it both ways.
18    Q   Rosenblatt contained information over --
19  or strike that -- including a lifetime number of
20  applications and included information on more than
21  10,000 lifetime applications, correct?
22    A   Yes.
23    Q   All right.
24    A   Well, I -- I'm -- I'm looking for it.
25  Yeah, I'm guessing that --

Page 179

1    Q   Here is a --
2      MS. O'DELL: Don't -- don't. Excuse me --
3  yeah, don't guess. Just if you know.
4    A   -- I --
5    Q   (BY MR. ZELLERS) Exhibit 23 is Rosenblatt.
6    A   I have got the paper.
7      MS. O'DELL: Yeah. Feel free to take a
8  moment. And if you need your original spreadsheets
9  to answer any of these detailed questions, then we
10  can pull those out for you --
11    A   Okay.
12     MS. O'DELL: -- if counsel does not have a
13  copy for you.
14    Q   (BY MR. ZELLERS) Just for the record,
15  Exhibit 23 is Rosenblatt.
16     (Exhibit 23 was marked for identification
17  and is attached to the transcript.)
18    Q   (BY MR. ZELLERS) As you sit here, do you
19  know what the difference in results were if
20  Rosenblatt was included in your systematic review or
21  not?
22    A   I -- I do.
23     MS. O'DELL: Object to the form.
24    Q   (BY MR. ZELLERS) Okay. What is --
25    A   I do.

Page 180

1    Q   -- the difference in result?
2    A   It -- it had no impact on the overall --
3    Q   Was --
4    A   -- results.
5    Q   -- it exactly the same?
6    A   It was within a decimal fraction of a
7  percent the same.
8    Q   Can you tell us what the result was with
9  Rosenblatt included?
10    A   It was the same with and without
11  Rosenblatt included --
12    Q   Is --
13    A   -- within a hundredth of a percent.
14    Q   Did you produce that calculation for us?
15    A   Within the files that I shared, it is
16  included in the forest plot tables that Dr. Hall
17  generated.
18    Q   Go to Figure 2, if you will, in your
19  report, page 33. Do you have that?
20     MS. O'DELL: If you need to see the -- the
21  data that you produced, Doctor, the Excel
22  spreadsheets --
23    A   Oh, that would be great.
24     MS. O'DELL: -- okay. And I -- I'm going
25  to hand you my computer. But it's --

Page 181

1    A   Can I --
2      MS. O'DELL: -- it's the data --
3    A   -- this is what I shared with you.
4      MS. O'DELL: -- and that's what she is
5  discussing.
6    Q   (BY MR. ZELLERS) Yeah. I have a question
7  pending. If you can answer my -- if you need to
8  look at your counsel's computer to answer my
9  question, you can.
10     But my question is: Will you look at
11  Figure 2 on page 33 of your report.
12     MS. O'DELL: Just hang on. Just -- what
13  I'm showing the doctor is data that -- the tables
14  that she has been discussing, but you have not
15  provided to her, which would be the fair way to
16  examine here on them.
17     But this is the -- the information that
18  was produced to Defendants for purposes of
19  Dr. Smith-Bindman's, you know, deposition. So if
20  you need that, just -- you may refer to it.
21    Q   (BY MR. ZELLERS) Are you ready,
22  Dr. Smith-Bindman?
23    A   I'm close to ready, but not quite.
24    Q   I -- I'm not sure what you are doing.
25     MS. O'DELL: Well, she is looking at the

46 (Pages 178 to 181)

Rebecca Smith-Bindman, M.D.

Page 182

1  calculation that you were just asking her about.
2      Q   (BY MR. ZELLERS) I have finished those
3  questions.  She has answered those questions.  I'm
4  asking a new question.  Or I would like to.
5      A   Okay.  Thank you.
6          MS. O'DELL:  You're welcome.  If you need
7  to see any of the tables --
8      A   Okay.
9          MS. O'DELL:  -- Doctor, I have all that
10  has been produced right here.
11      A   Fantastic.
12      Q   (BY MR. ZELLERS) Okay.
13  Dr. Smith-Bindman -- Bindman, looking at Figure 2,
14  looking at the confidence intervals that you have
15  listed for each of those ten studies, are you aware
16  that not one of those confidence intervals for any
17  of the ten studies are actually listed in or come
18  from the study publications?
19          MS. O'DELL:  Object to the form.
20      A   I am not aware of that.
21      Q   (BY MR. ZELLERS) In fact, did you
22  recalculate the confidence interval for each of
23  these studies?
24      A   The confidence intervals and the point
25  estimate are adjusted confidence intervals and odds

Page 183

1  ratios, so you -- you can't recalculate them from
2  the data in the paper.
3      Q   My -- my question is:  Who calculated
4  these confidence intervals that appear in Figure 2?
5  Did you calculate those confidence intervals?
6      A   To the best of my knowledge, these
7  confidence intervals came from the primary
8  publications.
9      Q   And -- and I will represent to you that I
10  have looked at all of the primary publications and
11  the confidence intervals that you have listed in
12  Figure 2.  None of those confidence intervals come
13  from the publication.
14          So do you have any idea as to how these
15  confidence intervals were calculated?
16          MS. O'DELL:  If there's --
17      A   You would have to show me --
18          MS. O'DELL:  Yes.
19      A   -- those -- those disagreements for me to
20  --
21      Q   (BY MR. ZELLERS) Well, let's --
22      A   -- to know what we're looking at.
23      Q   -- let's -- I'll get to that in just a
24  second.  Let me show you a couple of documents.
25  Deposition Exhibit 24.

Page 184

1          (Exhibit 24 was marked for identification
2  and is attached to the transcript.)
3      Q   (BY MR. ZELLERS) Is this another e-mail
4  exchange between you and Dr. Hall?  Is that yes?
5      A   I'm so sorry.  I didn't hear your
6  question.
7      Q   Sure.  My question is:  Is this an e-mail
8  exchange between you and Dr. Hall?
9      A   Yes.
10      Q   If you look at the e-mail at the bottom of
11  the second-to-last page, Dr. Hall writes you on
12  Monday, September 24, 2018, at 11:42, and tells you
13  that she is encountering obstacles; is that right?
14          And I'm sorry.  It's the third-to-last
15  page is where that e-mail starts.
16      A   I see what you are saying.  She has a note
17  at the bottom of the page.
18      Q   She tells you she's encountering
19  obstacles?
20      A   Yes.
21      Q   She asks you a number of questions?
22      A   Yes.
23      Q   No. 1 is that there's missing proportion
24  information and the data is missing.
25          If you go down to 1B, she says, Where the

Page 185

1  raw numbers are not available, I would do my best to
2  estimate unless you have access to them and can send
3  them to me.
4          How did you respond to that question?
5      A   Can't we see what my answers were?
6      Q   Sure.  Where are you answers?  If you, in
7  any of the documents that have been produced, can
8  show us how you answered these questions, that would
9  be helpful.
10          MS. O'DELL:  Object to the form.
11      A   I would like to just clarify something in
12  her request, which is she is not asking me in this
13  case for an estimate of the odds ratios or the
14  confidence intervals, even although though it seems
15  like she is.
16          What she is asking for is an estimate of
17  the sample size in terms of the N of cases and N of
18  controls that can be used for weighting those
19  studies in generating the summary estimate.
20          So that's where she's trying to fill in
21  the blanks, not for the odds ratios or confidence
22  intervals, but to calculate -- calculate --
23  calculate how -- how much weight it should be in the
24  summary statistic.
25      Q   (BY MR. ZELLERS) How did you respond to

47 (Pages 182 to 185)

Rebecca Smith-Bindman, M.D.

Page 186

1    her first question where she advised you that there
2    was missing proportion information and her proposal
3    that "where the raw numbers are not available, I'll
4    do my best to estimate, unless you have access to
5    them and can send them to me"?
6         MS. O'DELL:  Object to the form; asked and
7    answered.
8    A    I did not have, other than going to the
9    papers, any additional information to supplement.
10        Q    (BY MR. ZELLERS) Okay.  No. 2 --
11        MS. O'DELL:  Are you finished, Doctor?
12   A    Say it again.
13        MS. O'DELL:  Are you finished?
14   A    No.
15        MS. O'DELL:  Okay.
16   A    And so, again, she's not asking me about
17   the abstraction.  She's asking me if a study
18   reported, for example, that there were a hundred
19   patients with serous carcinoma or if there were
20   150 patients altogether, it reported the odds ratios
21   for serous carcinoma, but may not have specified in
22   the table how many cases of serous carcinoma there
23   were, could she estimate that proportion when we had
24   the point estimate we needed.
25        We had the odds ratio we needed, but she

Page 187

1    needed to know how many serous cancers there were to
2    weight it.
3         And I would have told her, when the raw
4    numbers for those missing proportions were not
5    available, to do her best to estimate those.
6         Q    (BY MR. ZELLERS) Did you respond to this
7    e-mail?
8    A    I sent you all of the documents that I had
9    for our correspondence.
10        Q    Okay.
11   A    I certainly could look again to see if I
12   have an answer to this.  Or it could be that we
13   discussed the answers on the telephone.
14        Q    No. 2 --
15   A    Let me just see if we have -- if it says.
16   I think we spoke on the telephone.
17        Q    Do you have any notes of that telephone
18   conversation?
19   A    No, I don't.
20        Q    All right.  No. 2, when she told you that
21   she was unable to calculate the associated
22   95 percent confidence intervals without the
23   variants, which is not reported and she gave you
24   three options, which option did you tell her to
25   follow, if any?

Page 188

1         MS. O'DELL:  Object to the form.
2    A    We discussed this at length, and she ended
3    up going with Option 3, using relative risk as an
4    underestimation of the odds ratios, but
5    approximately equal because of the rareness of the
6    disease.
7         Q    (BY MR. ZELLERS) So she adopted, at your
8    suggestion, the option that she states,
9    understanding that relative risk may considerably
10   underestimate odds ratios; is that right?
11   A    Yes, it is.
12        Q    And you advised her -- for No. 3, how did
13   you advise her when she told you that she was unable
14   to calculate the true -- or truly estimate for any
15   talc use and suggested that you consider pooling the
16   results from rarely, monthly, weekly, and daily?
17        MS. O'DELL:  Object to the form.  Are you
18   talking about No. 3?  It's not clear.
19   A    So the option that we did for that choice
20   is actually neither Option 1 or Option 2.
21        The focus of the review that she completed
22   was, in fact, on daily talc use.  It's not different
23   than she suggested.
24        But she used the numbers that were
25   incorrectly categorized as any talc use instead to

Page 189

1    represent daily talc use, so that -- that data point
2    was moved for the daily talc use category.
3         Q    Let me show you the Chang paper.  This is
4    one of the papers that you cite both in Figure 2 and
5    again on Figure 3; is that right?
6    A    Yes.
7         Q    All right.  Here's the Chang paper which
8    we have marked as Exhibit 25.
9    A    Oh.
10        (Exhibit 25 was marked for identification
11   and is attached to the transcript.)
12        Q    (BY MR. ZELLERS) Do you have that in front
13   of you?
14   A    I do.
15        Q    Okay.  Show us -- you see in Figure 2,
16   that Chang is listed twice, and it has a confidence
17   interval of .51 to 1.39.
18        Do you see that?
19   A    You said it's listed twice?
20        Q    I'm sorry.  It was -- it's listed in
21   Figure 2 and then you list it again in Figure 3; is
22   that right?
23   A    Yes.
24        Q    All right.  The first question is:  Where
25   in the Chang publication do you get a confidence

48 (Pages 186 to 189)

Rebecca Smith-Bindman, M.D.

Page 190

1  interval of .51 to 1.39?
2      A   Hum?  So the point estimate that I
3  think -- I need to look at the paper a little more
4  closely.
5          So the number I see in this paper is
6  instead of being .51 to 1.39 is .61 to 1.49 is about
7  ten points higher.
8      Q   All right.  You don't know where, for
9  Figure 2, the confidence interval of .51 to 1.39
10  came from, correct?
11      A   I -- I do not.  It's so close to the
12  publication -- the publication that I'm not sure if
13  it reflects a data abstraction error or if it was --
14  I think that's probably what it -- what it does, but
15  I'm not sure.
16      Q   The Chang paper involved 450 patients with
17  borderline and invasive ovarian carcinoma; is that
18  right?
19      A   Say it one more time for me.
20      Q   Sure.  The Chang paper --
21      A   Yeah.
22      Q   -- Exhibit 25, involved a total of
23  450 patients with borderline and invasive ovarian
24  carcinoma; is that right?
25      A   Yes.

Page 191

1      Q   You used or Dr. Hall used, in your
2  analysis, only 41 of those 450 patients because
3  those are the only ones that had greater than
4  25 times of use per month, correct?
5      A   So I would need to look at my datasheet to
6  know how many made it into the analysis, but I
7  believe you're correct, that there were
8  approximately 10 percent that were frequent users.
9      Q   How did you determine, just looking at the
10  Chang paper, how many of those 41 had invasive
11  serous ovarian cancer?
12          MS. O'DELL:  If you need to look at your
13  datasheets --
14      A   Please.
15          MS. O'DELL:  Which --
16      A   That would be great.
17          MS. O'DELL:  -- which data -- tell -- data
18  summary, is that what --
19      A   Yeah --
20          MS. O'DELL:  -- you are --
21      A   -- that should be it.
22          MS. O'DELL:  Okay.  This is both --
23  both -- both of the spreadsheets are there, so just
24  --
25      A   Okay.  So I don't have all of my detailed

Page 192

1  notes here, but I believe what I did for Chang is
2  that Chang's numbers are included in the Terry
3  report where she used the data that were published,
4  as well as the supplemental data that were provided
5  by Chang.
6          And within the supplemental data, Terry
7  did a stratified analysis that provided additional
8  information on serous cancer that was not actually
9  in the original Chang report.
10          And those are the data that made it into
11  what is under Chang in this systematic review.
12      Q   (BY MR. ZELLERS) Okay.
13      A   So they're data from Chang's work and
14  following Chang's methods.  They happen not to be
15  published in Chang's original report, but rather
16  included in the Terry report from -- from 2013.
17          And Terry -- the paper that I am talking
18  about for Terry is genital powder use and risk of
19  ovarian cancer, a pooled analysis of 8,500 cases and
20  ninety-eight hundred fifty-nine controls.
21          And then within that describes within the
22  methods, getting extra data for studies describing
23  the regular use and then breaking down the results
24  into whether or not it was invasive borderline,
25  invasive serous, and so forth --

Page 193

1      Q   So --
2      A   -- so that's where those numbers came
3  from.
4      Q   You believe that if I looked at the Terry
5  paper, I would be able to tell of these 41 cases
6  that have greater than 25 uses per month, which of
7  those cases involved invasive serous ovarian cancer,
8  correct?
9          MS. O'DELL:  Object to the form.
10      A   I believe the -- I believe the number of
11  cases is specified in the Terry paper that I would
12  have to look at to find that -- that number.
13      Q   (BY MR. ZELLERS) All right.  Let me ask
14  you a few questions.
15      A   Yes.
16      Q   In the Chang paper --
17      A   Yes.
18      Q   -- the authors do not define "regular use"
19  as daily, do they?
20      A   What Chang says in the original
21  publication is questions about regular talc use and
22  type of talc use, as well as duration and frequency
23  could be derived or included; dusting or powdering
24  behavior considered improved regular application of
25  talc to the perineum after showering or bathing and

49 (Pages 190 to 193)

Rebecca Smith-Bindman, M.D.

Page 194

1  dusting.
2      And then that was categorized, I believe
3  by Terry, as regular use when she got supplemental
4  data.
5      Q   Okay.  In the Chang paper, the authors do
6  not define "regular use" as daily use, correct?
7      MS. O'DELL:  Object to the form; asked and
8  answered.
9      A   The Chang paper explicitly says "regular
10  use."  In the original publication, they don't
11  define it.
12      Q   (BY MR. ZELLERS) They do not include
13  information in the Chang paper about how many times
14  per week women used talcum powder, correct?
15      MS. O'DELL:  Object to the form.
16      A   In -- in Table 2 of Chang, they define it
17  as less than ten, ten to 25, or greater than 25
18  times per week.
19      Q   (BY MR. ZELLERS) Where do you see that?
20      A   In Chang?
21      Q   Yes.  I'm looking at the same table, and I
22  think it's per month.
23      A   Per month.
24      Q   Okay.  And that's the only data that's
25  provided with respect to use is the number of

Page 195

1  monthly applications, correct?
2      A   Yes.
3      Q   The authors of Chang did not arrive at a
4  specific odds ratio for serous invasive cancer based
5  on frequency of use, correct?
6      A   The Chang data was used by Terry to
7  calculate frequency of use for serous and invasive
8  by supplementing the original data that they had
9  from additional data from Chang as a participant in
10  the OCAC consortium.
11      So additional data from that study was
12  shared with Terry, which is what we used in our
13  analysis.
14      Q   If we look at Chang in Table 3, they
15  describe a histologic type of invasive; is that
16  right, in Table 3, page 2399?
17      A   Yes.
18      Q   They also describe serous; is that right?
19      A   Yes.
20      Q   In the Chang data, what's the difference
21  between invasive and serous?
22      A   I'm -- I'm sorry.  In lot -- in Table 3
23  you're asking what those different entries mean?
24      Q   Yes.
25      A   "Invasive" presumably includes other types

Page 196

1  of invasive besides just serous.
2      Q   Do you know that?
3      A   I -- I don't think they specify what's
4  included in that.  I have to add up the total to see
5  if they are overlapping or not overlapping.
6      Could you add -- could you add that for
7  me?  Actually, the total should be -- they're
8  overlapping.  360, 460.  Yeah, they're overlapping.
9  Yeah.
10      Q   What do you mean, "they're overlapping"?
11      A   Invasive and borderline should add up to
12  the total.
13      And then serous mucin -- mucinous and
14  endometrioid should add up to the total, except to
15  the degree that they are missing information.
16      Q   Looking at the questions that Dr. Hall
17  asked you --
18      A   Yes.
19      Q   -- in Exhibit 24, you would agree that
20  there were number of assumptions that you and she
21  made in order to complete your systematic review; is
22  that right?
23      A   Absolutely.
24      Q   Is there anywhere that you have written
25  down, you know, what the assumptions were that you

Page 197

1  and Dr. Hall arrived at, at least in part in
2  response to her questions?
3      A   So for some of the issues, it took me
4  quite a bit of remembering to remember that we used
5  some of the extracted data from more than one
6  source.
7      We have notes in our data form of what the
8  source of the data was, so it would say in some of
9  the data I said -- under Chang, it would say "in a
10  column from Terry."
11      Q   My question --
12      A   So that -- that -- so to answer the
13  assumption of where the data came from, it's in my
14  data spreadsheet.  I just -- I just didn't remember
15  that we pulled data.
16      Q   My -- my question is a little different I
17  --
18      A   Okay.
19      Q   -- think.  In terms of all of the
20  questions that Dr. Hall asked you and all of the
21  assumptions that would need to be made so that
22  estimates could be arrived at, do you have either
23  your protocol or a listing of the assumptions that
24  were made by you and by Dr. Hall in -- at least in
25  part in response to the question she raised?

Rebecca Smith-Bindman, M.D.

Page 198

1    MS. O'DELL: Objection, asked and
2  answered. Respond.
3    A  I am under the impression that they're
4  documented within our e-mail exchanges, but I do not
5  have a protocol with each of these decisions that
6  are laid out.
7    Q  (BY MR. ZELLERS) I -- my best source would
8  be the e-mail exchanges that you had with Dr. Hall,
9  correct?
10    MS. O'DELL: Object to the form.
11    Q  (BY MR. ZELLERS) Is that right?
12    A  Yes.
13    Q  Okay. Once you did your ten studies that
14  are in Figure 2 -- and those were just the --
15  the studies that you chose to include, as you have
16  told us, showing odds of ovarian cancer associated
17  with regular use of talcum powder -- you further
18  refined the studies or narrowed down the studies to
19  four which you state plot or who the odds of ovarian
20  cancer associated with regular use of talcum powder
21  and invasive serous cancer; is that right?
22    MS. O'DELL: Object to the form.
23    A  With the caveat that when -- when I laid
24  out our stratified analysis on page 32, it says, My
25  review focused on invasive serous cancer where

Page 199

1  possible, but also included all invasive cancer.
2    Q  (BY MR. ZELLERS) What did you do to get
3  from the ten studies that you list in Figure 2 to
4  the four studies that you list in Figure 3?
5    A  Figure 2 is ovarian cancer with regular
6  use, and Figure 3 is invasive serous cancer.
7    If there was not invasive serous but there
8  was just invasive, they also might be in this. I
9  would have to review these four studies to know if
10  it was invasive or invasive serous.
11    Q  Do you know, as you sit here, what you did
12  to go from the ten studies in Figure 2 to the four
13  studies in Figure 3?
14    MS. O'DELL: Object to the form.
15    A  In the data set that I sent to you and
16  sent to Dr. Hall, they would -- there were different
17  sets of complete data. And the Figure 3 had data
18  for invasive or invasive serous cancer; whereas,
19  Figure 2 had -- included invasive and noninvasive.
20    So it would just be where there were data
21  available in the data worksheet. I -- I was not
22  involved in making the selection to go from one to
23  the other. It was just where there were data that
24  were abstracted from the papers.
25    Q  (BY MR. ZELLERS) Where did you get the

Page 200

1  confidence interval for the -- let's say the Chang
2  data that you list in Figure 3?
3    A  I'm going to have to look into the exact
4  calculation of the confidence interval.
5    The question that you asked me about Chang
6  for the first table is very close to the one that's
7  published -- so close -- that I'm not sure how it
8  would be different.
9    I don't -- I thought these were abstracted
10  from the paper. And I would have to go back and
11  talk to Dr. Hall about how they were calculated.
12    I thought they were calculated, but I -- I
13  may be -- I may be wrong. They may have been in
14  some way reestimated.
15    So again, similar with this, these numbers
16  are close to the ones that are in this paper, but
17  are slightly off, and I'm not sure why.
18    So I would have to go back to the data
19  that I abstracted and then the data that she sent me
20  back for the final tables to see why they were
21  different.
22    Q  Okay.
23    A  But they're -- they're different to a --
24  such a slight degree that -- and I'm not really sure
25  where that difference came from.

Page 201

1    Q  Were there any other analyses that you or
2  Dr. Hall con -- conducted that are not included in
3  your report?
4    A  I had asked Dr. Hall, I believe, to look
5  at -- at several analyses that are all in the data
6  that I shared with you.
7    The sensitivity analysis for Terry and the
8  sensitivity analysis for the Rosen [sic] study are
9  in the data I sent you, but are not summarized in
10  the report.
11    MS. O'DELL: And by "the data," you're
12  talking about the spreadsheets --
13    A  Yes.
14    MS. O'DELL: -- that you provided?
15    A  Yes. There -- there are more analyses
16  that were done that you haven't seen. But they --
17  they were analysis for four analyses.
18    I just see two here. So I -- there were
19  two others. I think it was including Terry and
20  including Rosenblatt, I think, are the other two.
21    But you have all of the -- there were no
22  other analyses except those four that she completed.
23    MS. O'DELL: Excuse me, Mike. I'm sorry.
24  We're right at 3:00 p.m. When you get to a stopping
25  point, can we take a break?

51 (Pages 198 to 201)

Rebecca Smith-Bindman, M.D.

Page 202

1    MR. ZELLERS:  All right.  Let's stop.
2  We're stopping for the day; is that right?
3    MS. O'DELL:  Let's -- let me speak with
4  Dr. Smith-Bindman on the break and then I'll let you
5  know.
6    MR. ZELLERS:  All right.
7    THE VIDEOGRAPHER:  We're off the record at
8  2:59 p.m.
9    (A break was taken from 2:59 p.m. to
10  3:11 p.m.)
11    THE VIDEOGRAPHER:  We are back on the
12  record.  This marks the beginning of Disc No. 4 in
13  the deposition of Dr. Rebecca Smith-Bindman.  The
14  time is 3:11 p.m.
15    Q   (BY MR. ZELLERS) Dr. Smith-Bindman, what
16  methodology, if anything different, did you use to
17  arrive at your opinion that there was a causal
18  association between genital talcum powder use and
19  ovarian cancer?
20    A   I used the Bradford Hill criteria.
21    Q   Are you familiar with the Bradford Hill
22  criteria?
23    A   I am.  Yes, I am.
24    Q   You're familiar that over time the FDA has
25  gone through and done various analyses with respect

Page 203

1  to perineal talcum powder use and any association
2  with ovarian cancer; is that right?
3    MS. O'DELL:  Object to the form.
4    A   I -- I have seen some documents by the
5  FDA.
6    Q   (BY MR. ZELLERS) And the FDA, back in
7  2014, did a review and analysis of the epidemiology
8  at that time; is that right?
9    MS. O'DELL:  Object to the form.
10    A   Could you show me that document?
11    Q   (BY MR. ZELLERS) Sure.  This is a document
12  that we'll mark as Exhibit 26.
13    (Exhibit 26 was marked for identification
14  and is attached to the transcript.)
15    Q   (BY MR. ZELLERS) It's a document from the
16  FDA.  It's got a date stamp at the top --
17    MS. O'DELL:  Thank you.
18    Q   (BY MR. ZELLERS) -- April 1 of 2014.
19    Is this one of the documents that you have
20  reviewed in connection with your expert work in this
21  matter?
22    A   Yes, it is.
23    Q   Turn, if you will, to page 4 of that
24  document.  Do you see that?
25    A   Yes.

Page 204

1    Q   The FDA, in 2014, reviewed the
2  epidemiology and etiology findings relating to
3  ovarian cancer and the genital application of talc;
4  is that right?
5    MS. O'DELL:  Object to the form.
6    A   Yes.
7    Q   (BY MR. ZELLERS) The FDA noted that
8  selection bias and/or uncontrolled confounding
9  result in spurious positive associations between
10  talc use and ovarian cancer; is that right?
11    MS. O'DELL:  Object to the form.
12    A   The FDA concluded that some of the studies
13  had biases.  Yes, they did.
14    Q   (BY MR. ZELLERS) And if we look at No. 2,
15  the FDA states, No single study has considered all
16  the factors that potentially contribute to ovarian
17  cancer, including selection biased and/or
18  uncontrolled confounding that result in spurious
19  positive associations between talc use and ovarian
20  cancer risk.
21    Is that right?
22    A   That is what the FDA concluded.
23    Q   The FDA also noted that there was a lack
24  of consistency in the study results; is that right?
25    A   That is what the FDA concluded.

Page 205

1    Q   And specifically the FDA concludes,
2  Results of case-control studies do not demonstrate a
3  consistent, positive association across studies; is
4  that right?
5    MS. O'DELL:  I think it says something
6  further than that.
7    A   Can I just add something?  This -- the FDA
8  did some review that I don't know the details of.
9  And this is their summary of that review, which I
10  don't know the details of, yes.
11    Q   (BY MR. ZELLERS) The FDA, at least in this
12  review, stated that dose response evidence is
13  lacking; is that right?
14    And I am looking at the end of Point No. 3
15  on page 4.
16    A   That is what the FDA concluded.
17    Q   And looking at Point No. 4, the FDA found
18  that a cogent biological mechanism was lacking; is
19  that right?
20    A   That is what the FDA concluded.
21    Q   You have reviewed IARC; is that right?
22  And I think in your blue folder here you have
23  included some IARC documents?
24    A   I have included IARC work reflecting
25  analysis through 2006 and then more recently

52 (Pages 202 to 205)

Rebecca Smith-Bindman, M.D.

Page 206

```
 1   through -- through 2010, each published a few years
 2   after that.
 3       Q   IARC has gone through and addressed the
 4   Bradford Hill considerations with respect to the
 5   classification of genital talc; is that right?
 6       MS. O'DELL:  Object to the form.
 7       A   Can you remind me which analysis you're
 8   referring to?
 9       Q   (BY MR. ZELLERS) Well, let's start with
10   the classifications.  Take a look at Exhibit 27, if
11   you will.
12       (Exhibit 27 was marked for identification
13   and is attached to the transcript.)
14       Q   (BY MR. ZELLERS) Are these the IARC
15   classifications for its determination --
16       MS. O'DELL:  Thank you.
17       Q   (BY MR. ZELLERS) -- as to the
18   carcinogenicity -- carcinogenicity of different
19   agents?
20       A   Yes.
21       Q   And you're generally familiar with these
22   classifications; is that right?
23       A   I am.
24       Q   Group 1, these are the agents that IARC
25   has determined are carcinogenic to humans, correct?
```

Page 207

```
 1       A   Yes.
 2       Q   And that's the only category in which IARC
 3   finds sufficient evidence in humans; is that right?
 4       MS. O'DELL:  Object to the form.
 5       A   That's how they define that category.
 6       Q   (BY MR. ZELLERS) IARC puts 82 agents in
 7   Group 2A probably carcinogenic to humans; is that
 8   right?
 9       A   That is correct.
10       Q   So IARC has gone through and has evaluated
11   many, many, many agents and has determined that
12   there are over 200 agents in both the Group 1
13   category and also the Group 2A category, correct?
14       A   Yes.
15       Q   There's only one agent in Group 4,
16   probably not carcinogenic to humans; is that right?
17       MS. O'DELL:  Object to the form.
18       A   Yes, that's correct.
19       Q   (BY MR. ZELLERS) So out of the over a
20   thousand agents that IARC has reviewed, it's only
21   placed one agent in Group 4 probably not
22   carcinogenic; is that right?
23       MS. O'DELL:  Object to the form.
24       A   To be considered by IARC, there has to be
25   data to suggest there's some potential harm.  And to
```

Page 208

```
 1   prove that something is safe is -- is next to
 2   impossible --
 3       Q   (BY MR. ZELLERS) Right.
 4       A   -- and so that's why that category is
 5   not -- is used.  Category 3 and four can, for the
 6   sake of discussion, be considered the same.
 7       Q   And that's why there's no Group 5, not
 8   carcinogenic; is that right?
 9       A   Yes.
10       Q   Correct?  Now, with genital talc, IARC has
11   determined that it is appropriately placed in the
12   "to be" category; is that right?
13       MS. O'DELL:  Object to the form.
14       A   I -- I would take a slight pause to that
15   consideration.  I think that in the first review
16   when they have looked at platy talc, they consider
17   it a "to be" possibly carcinogenic to humans.
18       Whereas, in the report looking at asbestos
19   and fibrous talc, which also counts in the same
20   category as asbestos, the -- that is in the category
21   that's a Group 1 carcinogenic to humans.
22       Q   (BY MR. ZELLERS) IARC has determined that
23   genital talc is a group to be possibly carcinogenic
24   to humans; is that right?
25       MS. O'DELL:  Object to the form.
```

Page 209

```
 1   Misstates her testimony.
 2       A   So in their initial review -- in their
 3   earlier review, they concluded that genital talc is
 4   possibly carcinogenic to humans.
 5       In the more recent 2012, they discuss that
 6   cosmetics are the primary sources of exposure to
 7   talc in the general population; that perineal
 8   application is the primary route and that fibrous
 9   talc, which is part of talc, is actually Group 1
10   carcinogenic.
11       Q   (BY MR. ZELLERS) All right.  Show me the
12   IARC designation of genital talc as a Group 1
13   carcinogenic.
14       MS. O'DELL:  Object to the form.
15       A   Genital talc contains platy talc, as well
16   as fibrous talc, as well as asbestiform contaminated
17   talc, and they consider any fibrous talc to be a
18   Group 1 carcinogen.
19       Q   (BY MR. ZELLERS) Show me where the
20   perineal application of genital talc has been
21   determined by IARC to be a Group 1 carcinogen.
22       MS. O'DELL:  Object to the form.  Would
23   you like to see the IARC?
24       A   Can you show me the IARC report?
25       Q   (BY MR. ZELLERS) No.  I would like you --
```

53 (Pages 206 to 209)

Rebecca Smith-Bindman, M.D.

Page 210

1  you're the one who is testifying.
2      A  I just don't have the document in front of
3  me. How would you like me to show it to you?
4      Q  I -- I would like you to show me where
5  genital talc has been found by IARC to be a Group 1
6  carcinogen.
7          MS. O'DELL:  Object to the form. So was
8  that not -- excuse me, Doctor. Is that not
9  something you're going to put in front of her?
10     Q  (BY MR. ZELLERS) I -- I have my
11 information. And my IARC review says that they have
12 classified genital talc as a group to be possibly
13 carcinogenic to humans.
14     A  Do you have the 2012 --
15         MS. O'DELL:  Yes. Let me just get it for
16 you, Doctor. Give me a moment to see what number it
17 is in your references.
18     Q  (BY MR. ZELLERS) As your counsel is
19 looking for that document, can we agree that the "to
20 be" designation with IARC is based on limited
21 evidence in humans, which means IARC cannot rule out
22 chance, bias, or confounding with reasonable
23 confidence?
24     A  In their original assessment of talc in
25 2010 where they classified it as to be, the "to be"

Page 211

1  designation means that it's possibly carcinogenic,
2  which is a very high bar for them to put them in
3  that category, but could also be due to chance.
4      Q  Okay. Also, in class "to be" as possibly
5  carcinogenic is ginkgo biloba; is that right?
6      A  I -- I have no idea.
7      Q  Occupational carpentry and joinery; is
8  that right?
9      A  I -- I -- I have no idea.
10     Q  Pickled --
11     A  I --
12     Q  -- vegetables?
13     A  -- I think pickled vegetables are pretty
14 carcinogenic, but I -- I don't know what IARC thinks
15 of them.
16     Q  Do you believe that the standard for
17 prove -- proving causation in the scientific
18 literature is the same as the one that applies in
19 litigation?
20     A  Yes, I do.
21     Q  Do you want to show me what your counsel
22 has provided you?
23     A  Yes.
24     Q  And I am looking for the finding that IARC
25 that genital talc use is a Group 1 carcinogen.

Page 212

1      A  So this is the monograph -- the
2  monograph -- the IARC monograph on the evaluation of
3  carcinogenic risks -- arsenic metals, fibrous and
4  dust, volume 100C. So --
5      Q  I'm looking for perineal talc.
6      A  No. No. I know. I understand.
7      Q  Okay.
8      A  I'm just telling you where I'm -- I'm
9  going to be pulling this from. And I'm looking at
10 the section under "Asbestos." And under the Pier --
11 the -- the section under "Asbestos, it talks, under
12 1.C --
13     Q  What page?
14     A  -- 230. And I will read several sections
15 of it. This section says, Talc particles are
16 normally plate-like. These particles are viewed on
17 edge under the microscope.
18         THE COURT REPORTER:  I have to have you
19 slow down when you read.
20     A  I'm so sorry. May appear to be fibers.
21 Talc may also form true mineral fibers that are
22 asbestiform in habit.
23         In some talc deposits, tremolite,
24 anthophyllite, and actinolite may occur. Talc
25 containing asbestiform fibers is a term that has

Page 213

1  been used inconsistently.
2          I'm -- I'm just seeing where the --
3      Q  (BY MR. ZELLERS) That's okay. And I am
4  looking for the statement or the finding that
5  genital talc -- cosmetic genital talc has been
6  determined by IARC to be a Group 1 carcinogen.
7      A  So I'm in the section --
8          MS. O'DELL:  Object to the form.
9      A  -- on the talc and asbestiform talc. And
10 under 1.65, "Human Exposure," under "A," it says,
11 Exposure of the general population:  Consumer
12 products, cosmetics, pharmaceuticals are the primary
13 source of exposure to talc for the general
14 population. Inhalation and dermal contact through
15 perineal application are the primary routes of
16 exposure.
17     Q  (BY MR. ZELLERS) Where does IARC conclude
18 that perineal talc use, cosmetic talc, is a Group 1
19 carcinogen?
20         MS. O'DELL:  Object to the form.
21     A  As late as 1973, talc products contained
22 detectable levels of chrysotile asbestos, tremolite,
23 or anthophyllite role. And it's possible they
24 remained on the market in some places for some time
25 after that. And these are asbestiform in habit.

54 (Pages 210 to 213)

Rebecca Smith-Bindman, M.D.

Page 214

1    It goes on to cite a whole lot of other
2  places, Blount and so forth.
3    And then in this same document they
4  categorize the asbestos and asbestiform fibers as
5  being a Group 1 carcinogen.
6    Q   (BY MR. ZELLERS) I'm going to ask you
7  about asbestos and I'm going to ask you about
8  asbestiform fibers.
9    What I want to know is:  Where does IARC,
10  in the publication you're looking at, categorize
11  cosmetic talc applied perineal -- to the perineal
12  region as a Group 1 carcinogen?
13    MS. O'DELL:  Object to the form.
14    A   They're telling us in this document that
15  asbestos and asbestiform talc are Group 1
16  carcinogens.
17    They're telling us at the cite -- the --
18  the most common exposure is consumer products.  And
19  inhalation and dermal contact with perineal
20  application of talc powders are the primary routes
21  of exposure.
22    Q   (BY MR. ZELLERS) Where does IARC state
23  that perineal use of cosmetic talc is a Group 1
24  carcinogen?
25    MS. O'DELL:  Object to the form.

Page 215

1    A   So IARC is telling us which compounds are
2  Group 1 carcinogens.
3    Q   (BY MR. ZELLERS) Where does it state that
4  the perineal use of cosmetic talc is a Group 1
5  carcinogen?
6    MS. O'DELL:  Object to the form.  She has
7  already stated that three times.
8    MR. ZELLERS:  Well, I haven't heard it
9  yet --
10    MS. O'DELL:  Yes.
11    MR. ZELLERS:  -- Counsel.
12    MS. O'DELL:  Yes, you -- she has described
13  it to you three times or four times maybe.  And so
14  she has --
15    MR. ZELLERS:  Counsel --
16    MS. O'DELL:  -- answered your question.
17    MR. ZELLERS:  -- please don't coach the
18  witness.  Just --
19    MS. O'DELL:  -- I'm not -- I'm not --
20    MR. ZELLERS:  -- object to form, if you
21  want to object to form.
22    MS. O'DELL:  -- well, don't harass the
23  witness, which -- that's what I am --
24    MR. ZELLERS:  I'm not harassing the
25  witness.

Page 216

1    MS. O'DELL:  As I'm not coaching the
2  witness.  So you can ask the questions, but you
3  can't raise your voice and -- and continue --
4    MR. ZELLERS:  We have a video record.
5    MS. O'DELL:  -- yes, we do.
6    MR. ZELLERS:  No one here would say that
7  I'm raising my voice to the witness or behaving in
8  any way other than professionally.
9    A   I'm looking for the executive summary.
10  It's just taking a while in this very large document
11  to -- I see the problem.
12    The copy of this document, I'm missing my
13  first few pages.
14    Q   (BY MR. ZELLERS) Okay.
15    A   It starts at 30 -- 31.
16    THE COURT REPORTER:  Did you say "few" or
17  "first three"?
18    A   I think I'm missing the first 30 pages.
19    Q   (BY MR. ZELLERS) All right.  Let --
20    A   So --
21    Q   -- me move on then.
22    A   -- okay.
23    Q   Strength of association is a Bradford Hill
24  criteria -- is that -- criterion; is that right?
25    A   Yes, it is.

Page 217

1    Q   You -- one of the studies you reviewed was
2  Langseth; is that right?
3    A   Yes, it is.
4    Q   Langseth reviewed the overall pooled odds
5  of cancer and found that there was an odds ratio of
6  1.35 across the studies; is that right?
7    A   I'm going to look for it, but --
8    Q   Okay.  I --
9    A   -- it sounds about right.
10    Q   -- I will hand you Langseth.
11    A   I have it.
12    Q   If you take a look at page 359,
13  Figure 1 -- do you see that -- do you know Langseth?
14    A   I do.
15    Q   Langseth looks at the case-control
16  studies, both the population-based and the
17  hospital-based; is that right?
18    A   He looked at the studies that had a -- he
19  had available when this was established a decade
20  ago, yes.
21    Q   And -- and he lists out 20 case-control
22  studies, correct?
23    A   14?
24    Q   I'm looking at the chart above Figure 1.
25  And you think there's only 14 studies there?

55 (Pages 214 to 217)

Rebecca Smith-Bindman, M.D.

Page 218

1    A   Oh, I apologize.  I thought you were
2  talking about the population-based studies.
3        No.  You're absolutely right.  20 studies.
4    Q   And of those 20 studies, only ten have
5  statistical significance; is that right?
6    A   The original studies with the sample size
7  they had, ten seemed to have difference than one.
8    Q   Of the 20 studies -- the 20 case-control
9  studies that were available and were studied by
10 Langseth, only ten had statistically significant
11 results; is that right?
12       MS. O'DELL:  Object to the form.
13   A   Again, he is combining them together.  But
14 in the original form when they were not combined,
15 there are ten in their original form that had
16 statistical differences than one.  They could
17 exclude one.
18   Q   (BY MR. ZELLERS) Half of the studies did
19 not have statistically significant results; is that
20 right?
21   A   The original studies had wide confidence
22 intervals.  And the original studies, before they
23 were combined, many of them overlapped one.
24   Q   Is the answer yes to my question?
25       MS. O'DELL:  She has answered your

Page 219

1  question.
2        MR. ZELLERS:  Well, I -- I don't know.  I
3  haven't heard an answer.
4        MS. O'DELL:  You have heard a complete
5  answer.
6    A   You're asking me to look at the results in
7  Figure 1 --
8    Q   (BY MR. ZELLERS) Yes.
9    A   -- which are meant to combine results.
10 But they also had the individual original study
11 sample size and show that about half of them overlap
12 one.
13   Q   Half is no better than a coin toss,
14 correct?
15       MS. O'DELL:  Object to the form.
16   A   It's an interesting question.  But if
17 you're looking for something, is there an
18 association with an exposure with cancer, a random
19 selection of that, you would expect to find very few
20 positive associations.
21       To find half is an enormous association to
22 find from random studies if there was no
23 association.
24   Q   (BY MR. ZELLERS) Do you believe that based
25 upon the Langseth paper and analysis, that there is

Page 220

1  a causal association between perineal use of talc
2  and ovarian cancer?
3        MS. O'DELL:  Objection to form.
4    A   The Langseth study is one review.  And as
5  I describe in my report, it seems like a well-done
6  review, although it does not provide the kind of
7  details that I would hope it would provide given
8  sort of the stature of some of the people who were
9  involved in writing the report.
10       That being said, this systematic review
11 suggests that there's an association between
12 perineal talc exposure and ovarian cancer.
13   Q   You --
14   A   By itself, I don't think it provides
15 enough data to have causality, but it provides good
16 evidence that there's an association.
17   Q   You understand that your interpretation of
18 this study is different and broader than the
19 authors' interpretation of the data, correct?
20       MS. O'DELL:  Object to the form.
21   A   One of the author's conclusion that I
22 found quite compelling was in -- on page 358 in the
23 second paragraph -- in the second column --
24   Q   (BY MR. ZELLERS) Can you answer my
25 question?

Page 221

1        MS. O'DELL:  She has answered your
2  question.  Don't --
3        MR. ZELLERS:  Well, I don't think she is
4  answering my question.
5    A   I think you are asking me about what the
6  authors conclude.
7    Q   (BY MR. ZELLERS) I asked if your
8  conclusion was broader than the authors' --
9        MS. O'DELL:  And she is telling you what
10 the authors' conclusions are.  You may finish,
11 Doctor.
12   A   What -- what Langseth says is that, Eight
13 of the population-based case-control studies were
14 identified by the Arforthinger (phonetic) as being
15 the most informative in terms of the size of the
16 studies, whether the studies were population-based
17 participation rates and adjustment for confounding
18 variables.  These selected studies -- among these
19 eight studies, the prevalence of use of talc was 16
20 to --
21       THE COURT REPORTER:  I can't hear.
22   A   -- sorry.  The selected studies included
23 at least 188 cases and had participation rates
24 ranging up to 75 percent.  Among these eight
25 studies, the prevalence of peritoneal use of

56 (Pages 218 to 221)

Rebecca Smith-Bindman, M.D.

Page 222

1  talc-based body powder among controls ranged from 16
2  to 52 percent.
3       The relative risk of ovarian cancer among
4  body powder users were homogeneous across the set of
5  eight studies, each of which indicated a 30 to
6  60 percent increase in risk.
7       Among the other 12 case-control studies,
8  most also reported relative risk of this magnitude
9  or higher.
10      So I think the authors of this concluded
11  that the better studies showed a very strong
12  association.  And -- and I -- I'm not sure what
13  conclusion of the authors you're asking me to
14  disagree with.
15      Q   (BY MR. ZELLERS)  Okay.  Doctor, take a
16  look at "Proposal to Research Community" on the
17  right-hand side of page 359.
18      Do you see that?
19      A   I do.
20      Q   I'm going to read this, and you tell me if
21  I read it correctly.
22      "The current body of experimental and
23  epidemiological evidence is insufficient to
24  establish a causal association between perineal use
25  of talc and ovarian cancer risk.

Page 223

1       Experimental research is needed to better
2  characterize deposition, retention, and clearance of
3  talc to evaluate the ovarian carcinogenicity of
4  talc."
5       Did I read that correctly?
6      A   Not only did you read that correctly, I
7  would agree with that based on data available in
8  2008.
9       So you asked me if I thought this study by
10  itself evaluated causality.
11      And this study did not discuss the
12  deposition, the retention, or clearance.  And I
13  think those factors are crucial to understanding the
14  causality.
15      Q   Okay.
16      A   And that's new since --
17      MR. ZELLERS:  Move --
18      A   -- 2008.
19      MR. ZELLERS:  -- to strike as not --
20      MS. O'DELL:  She is --
21      MR. ZELLERS:  -- she finished.
22      MS. O'DELL:  -- she did not finish.
23      MR. ZELLERS:  Did you finish?
24      A   I was close enough.
25      MR. ZELLERS:  All right.  Move to strike

Page 224

1  as nonresponsive.
2       My question was:  Did I read that
3  correctly?
4      A   You read that text correctly.
5      Q   All right.  You conclude in your report
6  with respect to strength of association that because
7  a very large number of ovarian cancers are caused by
8  talcum powder and talcum powder provides no
9  better -- no medical benefit, the Hill criterion of
10  strength of association is important and met.
11      Is that right?
12      A   I don't think that's exactly right.  I --
13  I think all of the things I believe are in there
14  somewhere, but that's not quite what I would be --
15      Q   I --
16      A   -- report.
17      Q   -- I'm just reading from page 38 of your
18  report.  Do you believe that because a very large
19  number of ovarian cancers are caused by talcum
20  powder and talcum powder provides no medical
21  benefit, the Hill criterion of strength of
22  association is important and is met?
23      MS. O'DELL:  Object to the form.  I don't
24  think you read that --
25      A   I --

Page 225

1       MS. O'DELL:  -- the report correctly.  But
2  if you were intending to read from her report
3  verbatim, I don't believe that was correct.
4       MR. ZELLERS:  Counsel, please, just object
5  to form, if you do have an objection.
6       MS. O'DELL:  I have an objection.
7      A   Could you -- again, you -- the -- what I
8  believe has been -- within your statement, but
9  that's not the reason I believe that the Bradford
10  Hill criteria are met.
11      Q   (BY MR. ZELLERS)  Well, let me ask you a
12  question.
13      A   Yes.
14      Q   In your discussion of the Bradford Hill
15  criterion of strength of association, you include
16  Table 7, which is entitled "An Estimate of the
17  Number of Ovarian Cancers and Invasive Serous
18  Cancers Caused by Regular Use of Perineal Talc
19  Powder Products"; is that right?
20      A   Yes.
21      Q   Is that a calculation that you did to try
22  to determine whether or not there is strength of
23  association?
24      A   No, but that's not why I included that.
25      Q   Well, is it included in your "Strength of

57 (Pages 222 to 225)

Rebecca Smith-Bindman, M.D.

Page 226

1  Association" section?
2      A   It is included in the strength of
3  association to demonstrate how -- an odds ratio of
4  1.5, how many patients could be impacted on that.
5      So one of the questions is:  Is there a
6  strong association?  And the second, which is really
7  quite a different question, is:  What's the
8  magnitude of that association?
9          And sometimes the magnitude of the
10 association is mistakenly used as an approximation
11 of the strength of the association.
12         And I was trying to disentangle the
13 strength of the association.  How truly do we know
14 they're associated with -- if it is associated, how
15 big of an impact would it have?
16         And so the purpose of Table 7 is not in
17 any way to demonstrate the strengths of the
18 association, which is a requirement to assess for
19 Bradford Hill --
20     Q   Would your --
21         MR. LAPINSKI:  She's not finished --
22     A   -- but how many --
23         MR. LAPINSKI:  -- Counsel.
24     A   -- but --
25         MR. ZELLERS:  Okay.  Counsel, one lawyer

Page 227

1  can object.  Okay.  I don't want all of you
2  objecting.
3          MR. LAPINSKI:  Don't -- don't raise your
4  voice to me.
5          MR. ZELLERS:  No.  I don't want all of you
6  objecting.
7          MR. LAPINSKI:  Counsel, if you want to
8  make a statement.
9          MR. ZELLERS:  Yeah --
10         MR. LAPINSKI:  -- make a statement.
11         MR. ZELLERS:  -- I'm making a statement
12 that I do not want --
13         MR. LAPINSKI:  That's --
14         MR. ZELLERS:  -- the whole group of
15 lawyers --
16         MR. LAPINSKI:  -- and you --
17         MR. ZELLERS:  -- on the Plaintiffs' side
18 objecting.
19         MR. LAPINSKI:  -- I'm sitting directly
20 across the table from you.  And I can hear you, and
21 I have heard you all day.
22         MR. ZELLERS:  All right.
23         MR. LAPINSKI:  I have heard you carry on
24 the way you have carried on all day.  There's no
25 reason to raise your voice to me.  I can hear you

Page 228

1  fine.
2          MR. ZELLERS:  Please don't interrupt
3  the --
4          MS. O'DELL:  That's --
5          MR. ZELLERS:  -- deposition.
6          MR. LAPINSKI:  -- better.  Thank you.
7          MR. ZELLERS:  Ms. O'Dell is doing a
8  fabulous job of making objections --
9          MR. LAPINSKI:  Yes, she is.
10         MR. ZELLERS:  -- for all of you.
11     Q   (BY MR. ZELLERS) Okay.  Doctor.  You were
12 trying --
13         MS. O'DELL:  Excuse me.  I don't -- still
14 don't think she was finished.
15         MR. ZELLERS:  Okay.
16         MS. O'DELL:  So you may continue, Doctor.
17 If you were finished, great.  If you weren't, you
18 may finish your answer.
19     A   I -- I'm going to have to say I -- I -- so
20 the -- the -- Table 7 is an illustration of the
21 number of women who would be impacted.
22         And the point was to explain that the
23 strength of the association is separate from the
24 number of women impacted.  But indeed, it
25 illustrates how important the number of women

Page 229

1  impacted is.
2      Q   Let's go through your math.
3      A   Yes.
4      Q   So the table, Table 7, includes several
5  assumptions; is that right?
6      A   A great number of assumptions.
7      Q   You ran the data, assuming that 10 percent
8  of the female population in the United States used
9  talcum powder products regularly, as you define
10 "regularly"; is that right?
11     A   Just to clarify, I -- I demonstrated what
12 the impact would be if we estimated the number of
13 women at 10 percent.
14     Q   You did the same calculation for
15 20 percent and 30 percent; is that right?
16     A   Yes, I did.
17     Q   You don't actually know what percentage of
18 women use talcum powder products regularly --
19     A   I --
20     Q   -- correct?
21     A   -- I do not.
22     Q   All right.  The calculation -- or your
23 conclusion is that .14 percent of women exposed to
24 talcum powder products have invasive serous cancer.
25 And I am looking at your 10 percent assumption that

58 (Pages 226 to 229)

Rebecca Smith-Bindman, M.D.

Page 230

1  you make.
2      Did you mean .14 or did you mean for that
3  to be 14 percent?
4      A  So I -- I take your correction as a -- as
5  correct.
6      Q  Okay.
7      A  I do mean 14 percent, but -- but it's not
8  the way you have interpreted it.
9      The -- the -- the calculation -- the
10  columns are the percent of invasive cancer that is
11  attributable to talcum powder, not the proportion of
12  cancer -- the proportion of women exposed who will
13  develop cancer.  Those are very different.
14      Q  I'm not sure I understand.  Your column
15  here says, The percent of invasive serous cancer in
16  women exposed to talcum powder products; is that
17  right?
18      A  That is correct.
19      Q  Okay.  The universe of talcum powder
20  products, which you're estimating here -- and I
21  understand it's an estimation -- is 10 percent of
22  the population; is that right?
23      MS. O'DELL:  Object to the form.
24      A  I -- I -- I -- I'm estimating in this
25  table that 10 percent of women use talcum powder --

Page 231

1      Q  (BY MR. ZELLERS) Right.
2      A  -- products in the U.S.
3      Q  There are approximately -- what do you say
4  -- 30 --
5      A  311 million.
6      Q  -- all right.  So 311 million.  And you
7  are estimating for purposes of this exercise that
8  31,100,000 are regular users; is that right?
9      A  Yes.
10      Q  And what you are trying to determine is of
11  those 31,100,000, what percent of regular talc users
12  will have invasive serous cancer, correct?
13      A  Yes.
14      Q  And you have calculated 14 percent; is
15  that right?
16      A  No.
17      Q  It's wrong, right?
18      A  The way you are describing it is wrong.
19  But I can give you an example to help you understand
20  that table.
21      Q  Well --
22      A  The number of cancers, we're talking about
23  31 million women or women who were exposed to
24  cancers.
25      I'm not saying 13 -- 14 percent of those

Page 232

1  women get ovarian cancer.  That would be five
2  million women.
3      I'm saying if we look at the world of
4  invasive serous cancers in the United States, there
5  will be in the ballpark of 11,000 serous cancers
6  every year in the United States.
7      Of those, 14 percent of those will occur
8  in regular users of talc powders.  86 percent will
9  occur in nonregular talc users.
10      So you're interpreting what is listed as a
11  column percent.  It says, Percent of invasive serous
12  cancer in women exposed to talc products.
13      You're interpreting that as if I'm saying
14  that the women exposed, that 15 percent of them will
15  get ovarian cancer.
16      Q  And in fact, if -- if your caption is
17  right, if we really are looking at the percent of
18  invasive serous cancer in women exposed to talcum
19  powder products, it would be less than .01 percent,
20  right?
21      A  Um --
22      MS. O'DELL:  Object to the form.
23      A  -- you -- you're asking me how many women
24  with exposure will end up getting?
25      Q  (BY MR. ZELLERS) Yes.

Page 233

1      A  So that's a -- a good number.  It's not
2  one I presented, but certainly one I can estimate,
3  which is -- if we're talking about 31 million women
4  who have regular exposure and of those who will
5  get -- I'm scribbling on my exhibit.  I hope that's
6  okay.  Is that okay?  One, two, three -- one, two,
7  three.  One -- one out of -- one out of 3,000 women
8  will get --
9      Q  So --
10      A  -- ovarian cancer.
11      Q  -- approximately .01 percent, correct?
12      A  That sounds pretty good, actually.
13      Q  All right.  Dose response.  A significant
14  number of the talcum powder studies that you looked
15  at do not show a dose response or fail to account
16  for dose response altogether; is that right?
17      A  In my summary of dose response on page 39,
18  I note that Penninkilampi, one of the large
19  meta-analyses, which I think is the most
20  comprehensive review, talks about dose response.
21      I didn't cite here -- and it was an
22  oversight -- Berge, another large comprehensive
23  meta-analysis, also shows dose response.
24      So the two systematic reviews showed dose
25  response.  I also list Terry as showing dose

59 (Pages 230 to 233)

Rebecca Smith-Bindman, M.D.

Page 234

1    response.  That's the pool data of a large number of
2    studies.  Those are, you know, both quite -- I -- I
3    have covered most of the publications, so those show
4    dose response.
5        There are a few others that I show.  There
6    are definitely a bunch that do not address the issue
7    of dose response, but -- but I wouldn't characterize
8    it as most do not.
9        Q    Well, you state on page 40 of your report
10   with respect to dose response, The results are
11   inconsistent and more importantly are not considered
12   or assessed in most of the published studies.
13       That was your conclusion with respect to
14   dose response; is that right?
15       A    You are going to have to tell me where
16   you're reading.  What I'm reading says, In summary,
17   most, but not all, studies of talcum powder products
18   in ovarian cancer show a dose response.
19       THE COURT REPORTER:  Slow down when you
20   read, please.
21       A    I'm so sorry.
22       In summary, most, but not all, studies of
23   talcum powder products in ovarian cancer show a dose
24   response.  Most do.
25       But the results are inconsistent and more

Page 235

1    importantly are not considered assessed in most --
2    that -- that should not say "most."  It should say
3    "in many of the published studies."
4        Q    (BY MR. ZELLERS) All right.  So you would
5    amend your report from "most" to "many; is that
6    right?
7        A    I -- I used "most" twice in the same
8    sentence as meaning different things.  So yes, I --
9        Q    Go --
10       A    -- it was an error.
11       Q    -- Gertig 2000 study found that there was
12   no increase in risk of ovarian cancer with
13   increasing frequency of use; is that right?
14       A    I would have to check that, but I'm happy
15   to do so.  I believe that's correct.
16       Q    Hunchcharek 2003 found that the data
17   showed a lack of clear dose response relationship,
18   making the relative risk of questionable validity;
19   is that right?
20       A    Which -- which one?
21       Q    Sure.  Huncharek 2003, page 19 of 55.
22       A    Wait.  This one is 2011.  I don't -- I
23   don't think I have that one.
24       Q    All right.  Consistency.  Consistency is
25   another factor that you looked at; is that right?

Page 236

1        A    Yes.
2        Q    Would you agree that generally when you
3    looked at the published studies, that they showed an
4    association of around 1.3 between perineal talc use
5    and ovarian cancer?
6        A    I think many of the studies showed an
7    association of about 1.3 of any talc use.  Not
8    quantifying the amount of exposure.
9        Q    But would you agree that an -- that
10   epidemiologists generally consider a 1.3 odds ratio
11   in a case-control study to be a weak or modest
12   association?
13       MS. O'DELL:  Object to the form.
14       A    I am -- I am unaware what -- of what most
15   epidemiologists think.
16       Q    (BY MR. ZELLERS) Have you seen any peer
17   reviewed literature on talc and ovarian cancer that
18   states that 1.3 is a strong association?
19       A    I mean, Penninkilampi concludes there's a
20   consistent association between perineal talc -- talc
21   use and ovarian cancer.
22       And I'm just looking for how he quantifies
23   that.  He concludes the results indicate that
24   perineal talc use is associated with a 24 to
25   39 percent increased risk of ovarian cancer.

Page 237

1        He doesn't quantify it as weak or strong,
2    but there's a suggestion that a 39 percent increase
3    is important.  But he -- he doesn't quantify it.  So
4    I would have to look through the authors'
5    conclusions.
6        Q    Do you know who Penninkilampi is?
7        A    I do not.
8        Q    Do you know that he is a medical student?
9        A    I'm very impressed.  He did a beautiful
10   review.
11       Q    Do you know who Guy Eslick is, the other
12   author on that paper?
13       A    I do not.
14       Q    Do you know if he's an expert for the
15   Plaintiffs in the talc litigation?
16       A    I -- I do not.
17       MS. O'DELL:  Object to the form.
18       Q    (BY MR. ZELLERS) Does Mr. Eslick disclose
19   or identify that he is working for or has worked for
20   Plaintiffs in the talc litigation?
21       A    I might -- I don't know the answer to
22   that.
23       Q    You would expect that if that was true,
24   that there would be a disclosure of that; is that
25   right?

Rebecca Smith-Bindman, M.D.

Page 238

1      A   I--
2          MS. O'DELL:  Object to the form.
3      A   -- it's published in a very high-impact,
4  high-quality medical journal, and I would suspect
5  that that would be required of that journal.
6          But -- but I -- I -- I -- I don't -- I --
7  I don't know that journal's requirements, but I
8  would suspect that they would require reporting
9  funding.
10     Q   You --
11     A   It says -- I'm sorry.  It says, The
12  authors report no conflicts of interest and have not
13  reported funding.
14         And typically when you have to reporting
15  conflicts of interest in the same area, you also
16  report funding, and I don't see any of that.
17     Q   The cohort studies.  There are four cohort
18  studies; is that right?
19     A   Yes.
20     Q   All right.  You rely only on the Gertig
21  study, the 2000 study; is that right --
22         MS. O'DELL:  Object to the form.
23     Q   (BY MR. ZELLERS) -- of those four?
24         MS. O'DELL:  Excuse me.  Object to the
25  form.

Page 239

1      A   My report summarizes all four of them, and
2  that all went into the weight of my report.
3          In terms of being included in any
4  systematic review, only one of them was included in
5  the systematic review.
6      Q   (BY MR. ZELLERS) If you looked just at the
7  cohort studies --
8      A   Yes.
9      Q   -- you would not find a statistically
10  significant association between perineal talc use
11  and ovarian cancer, correct?
12         MS. O'DELL:  Object to the form.
13     A   I--
14         MS. O'DELL:  Excuse me.  When -- when you
15  get to a good stopping point, it would be good to
16  take a break --
17         MR. ZELLERS:  Okay.
18         MS. O'DELL:  -- but whenever you're -- if
19  you have a few more minutes, that's fine, but
20  whenever you get to a good point.
21     A   -- so I summarize my view of the cohort
22  studies, which are not exactly what you -- what you
23  just summarized -- the way you just summarized them
24  on page 21.
25         So I think that often the cohort studies

Page 240

1  are summarized the way you summarized them.  And I
2  think if you look at them a little more closely, I
3  would not make that conclusion.  So --
4      Q   For the reasons set forth in your report?
5      A   It's in my report.
6          MR. ZELLERS:  All right.  Let's take a
7  break.
8          THE VIDEOGRAPHER:  We're off the record.
9  The time is 3:58 p.m.
10         (A break was taken from 3:58 p.m. to
11  3:58 p.m.)
12         (Next portion not on video record.)
13         MR. ZELLERS:  So we are back on the
14  written record, but not the video record.  My
15  understanding is that, you know, we are taking a
16  break as an accommodation to the witness, and that
17  that's fine, but that, you know, we are not going
18  to use this time to further meet and prepare the
19  witness based upon the questions I asked today.
20         MS. O'DELL:  Correct.  There's --
21  there's -- Dr. Smith-Bindman is taking this break
22  because she is still recovering from her concussion.
23         There will be no meeting with
24  Dr. Smith-Bindman.  I do want to point out counsel
25  for J&J seems to have dictated this requirement in

Page 241

1  order to accommodate the witness's situation.
2          But I would just note the deposition
3  protocol has no such restriction, and -- and so
4  that -- to that degree, I would say we have no
5  intent to prepare the witness any further.
6          But we're not restricted from talking to
7  the witness, and I don't want the record to suggest
8  otherwise.
9          MR. ZELLERS:  We will see you tomorrow.
10         MS. O'DELL:  Thank you.
11         THE VIDEOGRAPHER:  We are back on the
12  record at 4:01 p.m, and this is the end of Disc
13  No. 4 in today's testimony of Dr. Rebecca
14  Smith-Bindman.  The time is 4:01 p.m.
15
16         (TIME NOTED: 4:01 p.m.)
17
18
19
20
21
22
23
24
25

61 (Pages 238 to 241)

Rebecca Smith-Bindman, M.D.

Page 242

1
2
3
4        I, REBECCA SMITH-BINDMAN, M.D., VOLUME I, do
5   hereby declare under penalty of perjury that I have
6   read the foregoing transcript; that I have made any
7   corrections as appear noted, in ink, initialed by
8   me, or attached hereto; that my testimony as
9   contained herein, as corrected, is true and correct.
10       EXECUTED this_____ day of_____,
11   20_____, at_____, _____.
              (City)          (State)
12
13
14       _____
         REBECCA SMITH-BINDMAN, M.D.
15            VOLUME I
16
17
18
19
20
21
22
23
24
25

Page 244

1            ERRATA SHEET
2          Golkow Litigation Services
3     1650 Market Street, One Liberty Plaza, 51st Floor
4         Philadelphia, Pennsylvania 19103
5               877-370-3377
6      CASE:  Talcum Powder Litigation
7   PAGE  LINE  FROM              TO
8    __|___|_____|_____|
9    __|___|_____|_____|
10   __|___|_____|_____|
11   __|___|_____|_____|
12   __|___|_____|_____|
13   __|___|_____|_____|
14   __|___|_____|_____|
15   __|___|_____|_____|
16   __|___|_____|_____|
17   __|___|_____|_____|
18   __|___|_____|_____|
19   __|___|_____|_____|
20       _____
21      REBECCA SMITH-BINDMAN, M.D., VOLUME I
22   Subscribed and sworn to before me
23   this _____ day of _____, 2019.
24   _____
25       Notary Public

Page 243

1        I, MARY J. GOFF, CSR No. 13427, Certified
2   Shorthand Reporter of the State of California,
3   certify;
4        That the foregoing proceedings were taken
5   before me at the time and place herein set forth, at
6   which time the witness declared under penalty of
7   perjury; that the testimony of the witness and all
8   objections made at the time of the examination were
9   recorded stenographically by me and were thereafter
10  transcribed under my direction and supervision; that
11  the foregoing is a full, true, and correct
12  transcript of my shorthand notes so taken and of the
13  testimony so given;
14       That before completion of the deposition,
15  review of the transcript ( ) was (XX) was not
16  requested:  ( ) that the witness has failed or
17  refused to approve the transcript.
18       I further certify that I am not financially
19  interested in the action, and I am not a relative or
20  employee of any attorney of the parties, nor of any
21  of the parties.
22       I declare under penalty of perjury under the
23  laws of California that the foregoing is true and
24  correct, dated this   day of     , 2019.
25            MARY J. GOFF

62  (Pages 242 to 244)

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1119 of 1525
PageID: 63265
Rebecca Smith-Bindman, M.D.

Page 245

**A**

**ability**
33:23
**able**
41:18 46:19 51:25
82:5 100:2 103:7
108:19 135:6
161:22 170:20
171:22 193:5
**Abrams**
2:7
**absolutely**
23:2 75:18 152:3
170:21 171:24
196:23 218:3
**abstract**
105:7,12 107:3
148:24 155:1,24
**abstracted**
149:5,18 150:6,13
150:22 151:23
153:8,19 154:3
162:15 199:24
200:9,19
**abstracting**
101:11,14 104:20
106:23 145:20,21
149:25
**abstraction**
104:22 105:3,10,14
105:18 106:21
108:23 148:11
149:3 150:14
153:9,12 161:11
161:14 162:11
163:22 186:17
190:13
**abstractions**
153:6
**abstractors**
131:14,16,20
**abstracts**
147:24
**accepted**
106:15 108:6 109:6
158:17

**access**
49:4 185:2 186:4
**accommodate**
241:1
**accommodation**
240:16
**account**
26:7 134:6 233:15
**accuracy**
105:2,13
**accurate**
57:13 162:10
**accurately**
105:9
**acquire**
72:19
**actinolite**
212:24
**action**
243:19
**acts**
23:1
**actual**
146:5
**add**
117:7 196:4,6,6,11
196:14 205:7
**added**
86:21,23 137:17
**addition**
14:6 53:8 64:18
84:3 85:10,18
**additional**
26:9 27:7,17 29:17
33:9 49:25 55:4
56:10 60:24 62:15
85:8 186:9 192:7
195:9,11
**additions**
53:20
**address**
234:6
**addressed**
206:3
**adjusted**
149:19 170:24

172:5,8 182:25
**adjustment**
221:17
**administer**
11:24
**admit**
106:2
**adopted**
188:7
**advanced**
115:15,19
**advise**
120:2 188:13
**advised**
186:1 188:12
**affirmed**
11:6 12:2
**African-American**
98:11
**African-America...**
98:19
**afternoon**
76:16
**age**
94:21 95:23 96:2,5
96:15 112:24
115:15,19
**Agency**
36:9
**agent**
207:15,21
**agents**
10:19 36:13 206:19
206:24 207:6,11
207:12,20
**ago**
13:21 16:24 18:2,4
31:22 104:19
132:12,21 157:15
217:20
**agree**
19:1 23:16 48:7
94:20 104:25
105:1,2 106:13
107:13 108:4
109:8,13 129:14

133:21 134:19
135:2 167:6,9,23
168:10 196:19
210:19 223:7
236:2,9
**agreed**
50:22 78:25 162:20
**ahead**
92:15 103:1 153:23
156:5 160:2
**Alabama**
3:9 15:8 17:23
**Allen**
3:4
**allow**
136:21
**allows**
171:5
**alluding**
46:11
**alter**
112:17
**Alterations**
9:10 37:14
**altered**
114:24
**altogether**
167:9 171:5 186:20
233:16
**amend**
235:5
**Amended**
8:13 29:10
**amount**
42:17 65:2,11
74:15 124:13
134:3 139:3,8,24
170:18 236:8
**amounts**
138:8 139:12
140:18
**analogy**
117:21
**analyses**
178:12 201:1,5,15
201:17,22 202:25

**analysis**
40:11 71:21 74:8
74:16,18,23 75:1
75:9 100:21 105:4
106:10 109:10
111:21 135:5
136:13 146:10
147:16 151:10,11
151:18,24 152:4
153:4 154:14
155:2,4,7,8,9,14
157:11 158:9
161:2 162:4 163:8
165:4,11 167:20
174:18 178:6,10
191:2,6 192:7,19
195:13 198:24
201:7,8,17 203:7
205:25 206:7
219:25
**analyzed**
153:8 175:11
**and/or**
28:19 32:10 204:8
204:17
**Angeles**
4:18
**annotated**
90:18,22
**answer**
13:1,6,10 25:4
33:23 81:9 97:16
108:15,19 111:9
142:9 162:22
170:16,20 179:9
181:7,8 187:12
197:12 218:24
219:3,5 220:24
228:18 237:21
**answered**
97:15 108:16 111:7
114:21 116:9
118:19 119:14
140:24 170:5
182:3 185:8 186:7
194:8 198:2

Rebecca Smith-Bindman, M.D.

Page 246

215:16 218:25
221:1
**answering**
221:4
**answers**
13:10 27:7 185:5,6
187:13
**anthophyllite**
212:24 213:23
**anticipate**
20:10
**Antonio**
5:18
**apologize**
58:19,22 60:11
110:8 117:4 218:1
**apparently**
25:17
**appear**
38:4 53:4 183:4
212:20 242:7
**APPEARANCES**
3:1 4:1 5:1 6:1 7:1
**appeared**
34:22
**appearing**
174:15
**appears**
39:6 54:7 76:15
96:4
**application**
193:24 204:3 209:8
209:20 213:15
214:20
**applications**
178:20,21 195:1
**applied**
214:11
**applies**
211:18
**apply**
171:19
**applying**
159:16
**appreciate**
127:14

**approach**
145:20,21
**appropriate**
166:15
**appropriately**
208:11
**approve**
243:17
**approximately**
13:21 41:24 188:5
191:8 231:3
233:11
**approximation**
226:10
**April**
203:18
**area**
15:5,7 19:11,15
20:22 40:24 96:5
146:18 238:15
**areas**
19:17 20:9,11 21:4
23:12 109:23
121:3
**Arforthinger**
221:14
**Arps**
5:3
**arrive**
145:6 195:3 202:17
**arrived**
197:1,22
**arsenic**
212:3
**article**
8:17,23 9:4,8,10,24
10:4,9,11,15 34:6
35:23 36:21 37:13
37:25 104:6,7
120:23 162:19
177:1
**articles**
9:14,16,19 29:2
33:12 38:24,25
39:1,2,8,15,19
49:3,5,7 50:7,9

55:3 123:3,4
146:16 147:6,8,9
147:25 148:4,9
149:1,5 150:2
**ASAP**
77:25 78:7
**asbestiform**
141:2 209:16
212:22,25 213:9
213:25 214:4,8,15
**asbestos**
22:10,13,15,17,19
22:21,23,23 23:2
23:3,4,7,15,18,25
63:4 137:2,6,21
137:25 138:4
139:23,24 140:8
140:13,19 141:2
141:21,23 142:2
142:11,13,17,22
143:1 208:18,20
212:10,11 213:22
214:4,7,15
**asked**
19:14 22:12 30:25
32:4 33:19 43:10
43:20 44:23 47:1
47:6 49:14,17
50:7 51:15 60:20
60:23 62:17 64:21
71:1 75:13 77:23
80:7 81:3,13,21
81:23 82:4 85:9
107:8 114:20
116:8 118:18
119:13 140:23
155:22 158:6
163:5 167:5 178:5
178:10,11,15,17
186:6 194:7
196:17 197:20
198:1 200:5 201:4
221:7 223:9
240:19
**asking**
21:18 44:20 58:2

65:15 86:8 88:24
96:11 106:3
114:16 117:13,15
118:2 121:2
131:15,19 136:24
137:24 159:21
167:11,14 168:9
168:10,17 169:1
170:8 182:1,4
185:12,16 186:16
186:17 195:23
219:6 221:5
222:13 232:23
**asks**
12:25 184:21
**aspect**
151:21
**aspects**
23:1
**assembled**
165:13
**assert**
85:1
**assess**
97:12 161:25
226:18
**assessed**
234:12 235:1
**assessment**
8:23 9:12 28:10,11
34:20 38:10
210:24
**assist**
71:11 161:10,18
**assistance**
80:25
**assisted**
70:22 71:18 100:25
**associated**
21:24 115:22
149:20 187:21
198:16,20 226:14
226:14 236:24
**association**
9:24 34:3 48:17
51:3,8 96:15

99:12,22 100:15
109:20 110:7,22
111:3,6,19 112:2
117:20 119:21
120:3,14 133:2
171:2 176:23
202:18 203:1
205:3 216:23
219:18,21,23
220:1,11,16
222:12,24 224:6
224:10,22 225:15
225:23 226:1,3,6
226:8,10,11,13,18
228:23 236:4,7,12
236:18,20 239:10
**associations**
169:7 204:9,19
219:20
**assume**
13:7
**assuming**
229:7
**assumption**
197:13 229:25
**assumptions**
196:20,25 197:21
197:23 229:5,6
**assured**
105:8
**attached**
24:11 25:21 30:14
34:16 35:6,21
36:5,7,20 37:18
38:17 39:18,22
53:4,13,16 54:11
56:12 76:9 91:1
95:5 130:13
132:14 156:18
175:25 179:17
184:2 189:11
203:14 206:13
242:8
**attachments**
52:25
**attempt**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1121 of 1525
PageID: 63267
Rebecca Smith-Bindman, M.D.

Page 247

106:19 107:9
**attended**
65:20
**attorney**
3:7,15,22 4:5,15
5:5,15 6:5,16 7:6
17:12 243:20
**attorneys**
18:16 45:22 46:7
143:4,8
**attributable**
230:11
**attributed**
174:24
**Austin**
6:8
**author**
28:15 34:5,19
36:22 73:9 95:7
237:12
**authorities**
120:19
**authors**
174:14 193:18
194:5 195:3
220:19 221:6,8,10
222:10,13 237:4
238:12
**author's**
220:21
**available**
25:14 26:7 33:17
49:6,19 57:8
87:21 88:7 124:4
135:12 153:15
185:1 186:3 187:5
199:21 217:19
218:9 223:7
**Avenue**
6:6
**average**
65:7 97:6 99:8
**aware**
12:11 25:11 56:5,9
59:16 93:9,20
124:2 167:18

182:15,20
**awful**
136:1 140:12
**awfully**
86:1
**a.m**
2:9 11:3,13 75:20
75:21,22 76:1,6
**A.P**
36:23

—————————————
**B**
—————————————
**baby**
19:1,3,5 31:25
32:10,18 135:4
136:1,7,8
**back**
18:12 21:16 63:8
65:16 75:23 78:9
78:13 79:1 86:18
90:15 92:21 108:2
121:6 143:21
144:6 150:25
152:8 162:11,19
163:2,15 178:16
200:10,18,20
202:11 203:6
240:13 241:11
**background**
22:3 94:6 108:3
146:19 170:15
**back-and-forth**
172:9
**ballpark**
18:3 42:1,17 64:13
64:20 139:13
232:5
**bar**
211:2
**based**
91:2 103:8 109:11
111:18,19 115:6
116:4,16 122:21
135:5,17,25 146:2
146:4 151:12
170:25 195:4

210:20 219:24
223:7 240:19
**basically**
43:20 100:16
164:20 171:2
**basics**
52:24
**basing**
29:1,4
**basis**
34:2 99:16 111:24
115:8
**Bates**
30:7,9
**Bates-stamped**
84:7,10
**bathing**
193:25
**Beach**
3:17
**Beasley**
3:4
**beautiful**
237:9
**becoming**
47:25
**began**
26:8 63:16 94:25
96:4
**beginning**
2:9 51:6 61:4 75:24
96:17 143:22
202:12
**behalf**
2:6 15:16,17 47:25
**behaving**
216:7
**behavior**
113:8 193:24
**belief**
120:2,13
**believe**
17:7 21:25 24:18
27:11 31:3,22
32:8,14 42:1,12
42:17,19 43:9

44:7,14 45:10,14
49:24 54:24 59:9
60:20 64:8 68:2
70:17 75:1,12
83:15 85:20 90:10
91:17 92:7,9
100:13,21 104:10
104:19 111:15,22
114:22 116:23
124:8,12,17,22
127:23 139:25
144:9 152:16
153:14 156:21
166:2 168:7 170:5
172:7 177:9,18
178:7,7 191:7
192:1 193:4,10,10
194:2 201:4
211:16 219:24
224:13,18 225:3,8
225:9 235:15
**believes**
97:2
**benefit**
224:9,21
**BENJAMIN**
5:4
**benjamin.halperi...**
5:8
**Berge**
174:2 233:22
**best**
25:7 78:10 175:1,5
183:6 185:1 186:4
187:5 198:7
**better**
52:1 219:13 222:11
223:1 224:9 228:6
**Beyond**
36:18
**bias**
204:8 210:22
**biased**
204:17
**biases**
204:13

**bibliography**
101:9
**big**
226:15
**BILLINGS-KA...**
6:15
**biloba**
211:5
**Binder**
9:14,16 10:7
**Bindman**
12:9 182:13
**biological**
20:17 136:15
205:18
**biostatistical**
104:16 151:21,24
**biostatistician**
71:20 72:10 151:20
160:8,10,14,20
172:10 178:5
**biostatisticians**
72:7,16
**biostatistics**
160:13,15,22,24
**biostatus**
160:15
**birth**
115:20
**bit**
82:3 85:2 158:5
166:5 172:9 197:4
**Biz'Zard**
37:25
**bi-directional**
153:3
**blanks**
185:21
**Bleeding**
69:12,15 70:3
**Blount**
214:2
**Blount's**
142:5
**blue**
8:20 33:3,6,8,16,21

Rebecca Smith-Bindman, M.D.

34:1,18 38:20
92:16 205:22
**blurry**
114:3
**BMJ**
9:4 28:24
**BOCKUS**
5:14
**body**
23:6 88:4 129:1
222:1,4,22
**bold**
133:13
**borderline**
190:17,23 192:24
196:11
**bottom**
35:10 98:14 176:4
176:4 184:10,17
**Box**
3:24
**Bradford**
110:16 111:14,16
111:17 146:7,8
202:20,21 206:4
216:23 225:9,14
226:19
**brand**
135:8
**brands**
134:16
**BRCA1**
118:22
**BRC1**
115:15
**BRC2**
115:15
**break**
13:14,17 63:19
75:17,21 143:15
143:19 144:4
201:25 202:4,9
239:16 240:7,10
240:16,21
**breaking**
192:23

**Breanne**
50:3 58:6 86:19
**Breanne's**
50:4
**breast**
14:11 115:23
**briefly**
28:17
**bring**
101:20
**bringing**
19:24
**British**
35:23
**broad**
54:15 145:24
**broader**
54:22 220:18 221:8
**broadly**
146:21
**brought**
24:16,17 25:1,8
33:2,7,13 34:18
36:24 37:20 38:19
38:23 39:8
**buckets**
63:20
**bunch**
129:6 142:4 163:3
163:5 164:17
234:6

————————
**C**
————————
**C**
4:14
**Calcagnie**
3:13
**calculate**
162:1 170:2 171:25
183:5 185:22,22
185:23 187:21
188:14 195:7
**calculated**
170:10,22 171:1
183:3,15 200:11
200:12 231:14

**calculation**
152:9 170:1 171:12
180:14 182:1
200:4 225:21
229:14,22 230:9
**calculations**
152:7,19,23,23
172:6
**California**
1:14 2:9,11 3:17
4:18 11:1,16 15:8
15:9 18:5,9,13,14
18:17,19 243:2,23
**call**
13:11 44:12,15
45:13,21 46:22
52:4,6,7 58:10,12
63:7 71:4 127:12
128:3 155:7,13,14
**called**
25:12 61:19 69:11
69:15
**calls**
60:18 61:12
**Canada**
28:10 38:10
**cancer**
9:24 10:5,9 14:11
16:16 17:5 19:15
20:14,15,16 21:24
21:25 34:4 36:10
45:9 47:4 51:4
99:13,18,23
100:10 111:3,14
111:17,24 112:5,7
112:12,20 113:1
114:14 115:2,9,12
115:14,18,23
116:3,6,11,15,18
116:25 117:12,16
117:22,23,24
118:1,6,9,12,14
118:16,21,24
119:2,3,6,10,16
119:18,22,25
120:4,15,19

121:11 123:1,20
124:4,6,10 125:6
125:16 126:18
127:25 128:13,17
128:18 129:23
130:2,15,23 131:2
131:7,9,14 132:16
132:17,25 133:3
135:8 136:17
145:8 147:4
148:17 155:18
156:2 164:13,24
176:24 191:11
192:8,19 193:7
195:4 198:16,20
198:21,25 199:1,5
199:6,18 202:19
203:2 204:3,10,17
204:20 217:5
219:18 220:2,12
222:3,25 229:24
230:10,12,13,15
231:12 232:1,12
232:15,18 233:10
234:18,23 235:12
236:5,17,21,25
239:11
**cancers**
121:20 131:25
187:1 224:7,19
225:17,18 231:22
231:24 232:4,5
**caption**
55:22 232:16
**captioned**
98:9 130:9
**capture**
107:1
**carcino**
36:12
**carcinogen**
127:2 209:18,21
210:6 211:25
213:6,19 214:5,12
214:24 215:5
**carcinogenic**

35:9 206:25 207:7
207:16,22 208:8
208:17,21,23
209:4,10,13
210:13 211:1,5,14
212:3
**carcinogenicity**
36:13 206:18,18
223:3
**carcinogens**
126:24 214:16
215:2
**carcinoma**
186:19,21,22
190:17,24
**care**
6:13 44:11 104:18
169:3
**cared**
148:17
**careful**
175:15
**carefully**
152:5
**Carmen**
144:11
**CAROLINE**
7:5
**caroline.tinsley...**
7:10
**carpentry**
211:7
**carried**
227:24
**carry**
227:23
**case**
14:10,13,15 16:12
16:14,15,17,19,20
16:22 17:3,7,16
17:23,24 18:5,10
18:13,14,17,19
19:12,13 24:4
44:3,8,9 45:4,5,9
45:16,20 47:7
51:19 61:1 72:2

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1123 of 1525
PageID: 63269
Rebecca Smith-Bindman, M.D.

Page 249

77:5,15 94:2,7
103:13 110:24
118:7 122:24
123:18 138:5,7,12
185:13 244:6
**cases**
14:8,9,17,18,20,22
14:23 15:1,3,4,6
15:11,14,16,19
16:11,23 18:22
62:9,16 99:3
121:11 148:12
163:15 185:17
186:22 192:19
193:5,7,11 221:23
**case-control**
133:4 148:14
176:24 205:2
217:15,21 218:8
221:13 222:7
236:11
**categories**
95:22 115:4 145:24
145:24 163:5
**categorize**
214:4,10
**categorized**
188:25 194:2
**category**
20:20 23:11 116:2
151:14 162:16
189:2 207:2,5,13
207:13 208:4,5,12
208:20,20 211:3
**causal**
99:22 109:10,19
110:6,13,21 111:2
111:6 112:1 114:6
114:11,11 119:21
120:3,14 202:17
220:1 222:24
**causality**
109:17 110:15
111:13 134:11,13
220:15 223:10,14
**causation**

133:23 134:4,8
211:17
**cause**
112:9 113:20 114:1
114:18 116:4,14
116:17,18 117:12
117:23 118:5,12
118:14,16 121:10
**caused**
100:10 111:18
119:5,10 224:7,19
225:18
**causes**
19:16 21:25 111:24
112:4 114:10,13
114:16 115:9
116:6 117:16
118:8 119:25
**causing**
119:2
**caveat**
152:3 198:23
**CDC**
122:10,16,20,25
123:19 124:5,9,17
124:23 125:5,14
125:25 126:10,13
126:15,21 127:12
127:20,24 129:18
**cell**
8:19 27:22
**Cells**
37:15
**cellular**
23:9 27:22
**Center**
3:23 122:7,10
**certain**
22:23 50:14 71:3
104:5 138:2
155:10 170:18
**certainly**
64:9 80:13 150:23
187:11 233:2
**Certified**
2:11 243:1

**certify**
243:3,18
**cetera**
61:12
**cgarber@robins...**
3:18
**chain**
76:4,15
**chance**
24:23 70:6 210:22
211:3
**Chang**
189:3,7,16,25
190:16,20 191:10
192:1,5,9,11
193:16,20 194:5,9
194:13,16,20
195:3,6,9,14,20
197:9 200:1,5
**change**
115:2 128:4
**changed**
26:11,20 27:13
112:22,24 113:7
113:12,15 138:25
**changes**
23:6,9,9 27:22
53:24 115:13
162:20
**changing**
26:23
**Chang's**
192:2,13,14,15
**characterize**
70:24 223:2 234:7
**characterized**
30:6
**charges**
41:4,7,14
**charging**
57:21
**chart**
131:19 217:24
**check**
90:13 94:24 162:9
235:14

**checking**
68:6 90:12
**chemicals**
138:13,16,21 139:4
139:8
**childcare**
78:23
**choice**
107:11,12 188:19
**choices**
107:6
**choose**
103:5 174:21
**choosing**
106:25
**chose**
52:21 198:15
**chosen**
107:10
**Chris**
40:7
**chrysotile**
213:22
**cigarettes**
117:21
**circumstances**
109:16
**cite**
89:12 129:11 189:4
214:1,17 233:21
**cited**
53:6 54:24 65:19
86:21 112:19
**cites**
94:24
**citing**
57:16 91:13
**City**
242:11
**clarify**
56:1 91:2 128:24
185:11 229:11
**clarity**
101:20
**Clarke**
67:3,3

**class**
211:4
**classes**
160:15
**classification**
206:5
**classifications**
36:9,12 206:10,15
206:22
**classified**
10:19 210:12,25
**clear**
13:3 47:19 51:12
85:7,14 158:18
188:18 235:17
**clearance**
223:2,12
**clearly**
112:21
**clinical**
14:7
**clinicians**
123:24 128:16
**close**
80:17,24 100:16
120:7 164:15
181:23 190:11
200:6,7,16 223:24
**closely**
55:2 71:17 155:25
166:5 190:4 240:2
**CMS**
127:6
**coach**
215:17
**coaching**
216:1
**Cochrane**
145:18
**cogent**
205:18
**cohort**
133:4 238:17,17
239:7,21,25
**cohorts**
175:2

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1124 of 1525 PageID: 63270
Rebecca Smith-Bindman, M.D.

Page 250

coin
219:13
collaboration
145:18
collect
25:19 131:16
collecting
131:21
collection
136:18,19
Colorado
4:7
column
197:10 220:23
230:14 232:11
columns
154:7 230:10
combinable
102:2
combination
134:11
combine
101:13 151:5
169:15 171:10
219:9
combined
151:7 161:24
218:14,23
combining
101:21 102:5 169:2
169:15 218:13
come
33:1 41:11,16
71:16 96:25 102:3
169:7 171:12
182:17 183:12
comes
26:6
coming
110:12 141:7
Commerce
3:8
committee
129:4,20,21
committees
122:16,18

common
214:18
commonly
112:19
communicated
59:8 66:14 67:11
71:10 77:19 80:2
126:9
communicating
14:11
communication
14:9 49:8 73:16
communications
46:15 60:15 63:12
71:14 79:11,14,21
community
120:2,8 222:16
companies
87:20 88:21
company
89:18 134:24
138:17
compared
161:25
comparison
139:16
compelling
220:22
compiled
86:6,16 87:4,16
compiling
125:5,15 127:25
complete
53:18 57:15 90:21
101:5 196:21
199:17 219:4
completed
100:16 101:17
152:10 188:21
201:22
completion
243:14
complication
14:16
component
101:4 164:18 174:6

components
101:4 111:16,20
137:1
compounds
215:1
comprehensive
47:2 96:24 101:5
123:11 124:23,25
125:23 142:16
233:20,22
comprehensiven...
124:12
comprised
106:11
computer
180:25 181:8
con
160:17 201:2
concentration
139:3,8,24
concentrations
139:16,20 140:7,18
141:2,3
concern
48:18
concerned
126:16 137:14
conclude
128:18 133:6
168:23 169:5
213:17 221:6
224:5
concluded
121:9 125:22
204:12,22,25
205:16,20 209:3
222:10
concludes
205:1 236:19,23
conclusion
47:24 102:4 110:25
111:1 119:24
129:13,14 132:22
146:2,4 167:1
220:21 221:8
222:13 229:23

234:13 240:3
conclusions
100:4 166:22
221:10 237:5
concussion
240:22
conditions
22:24
conduct
161:1
conducted
201:2
conducting
104:23
confidence
168:2 169:8,9,11
171:7,25 172:14
182:14,16,22,24
182:25 183:4,5,7
183:11,12,15
185:14,21 187:22
189:16,25 190:9
200:1,4 210:23
218:21
confirm
100:14 126:22
158:6 162:19
confirms
121:24
conflicts
238:12,15
confounding
204:8,18 210:22
221:17
confused
156:6 157:14
confusing
92:12
confusion
131:11
Congress
6:6 127:4
connection
81:14 203:20
consensus
162:21

consider
21:20 22:15,18
23:2,5 108:25
113:16 122:25
123:19 160:19,21
188:15 208:16
209:17 236:10
considerable
100:6 159:15
considerably
123:3 188:9
consideration
109:12 111:13
146:6 171:4
208:15
considerations
134:5 146:6 206:4
considered
27:18 28:2,19,21
37:7 55:21,21
56:10,12,17 85:10
85:16,24 86:5
87:2,7 88:13
106:15 108:5
193:24 204:15
207:24 208:6
234:11 235:1
considering
123:4
consistency
111:20 151:9
204:24 235:24,24
consistent
205:3 236:20
consistently
151:1
consortium
195:10
consultant
64:22 65:1 69:22
consulted
62:20
consulting
65:5,13,17
consumer
19:6,8 31:24 62:25

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1125 of 1525
PageID: 63271
Rebecca Smith-Bindman, M.D.

Page 251

134:24 213:11
214:18
**contact**
43:16 44:13 45:11
46:15 71:16 76:21
213:14 214:19
**contacted**
43:4,7,8,13,18,23
44:22 76:15,24
120:18
**contain**
26:2 27:3 137:21
137:25 138:8,12
**contained**
8:20 26:15 30:16
33:6 34:10 35:17
39:1,2 138:3,16
138:22 139:4,10
139:25 178:18
213:21 242:9
**containing**
142:1 212:25
**contains**
209:15
**contaminant**
136:18,19
**contaminants**
136:18,19,24
137:11
**contaminated**
209:16
**content**
44:8
**Contents**
109:22
**context**
23:7,8 106:3,6
140:9
**continue**
26:21 97:8 117:4
150:17 216:3
228:16
**continued**
4:1 5:1 6:1 7:1 9:1
10:1 165:2
**contraceptions**

115:25
**contrary**
96:9
**contribute**
173:6 204:16
**contributed**
72:25
**contributor**
117:8
**contributors**
116:10 118:23
**Control**
98:11 122:8,10
**controls**
98:14 148:13
185:18 192:20
222:1
**convention**
65:20 113:16 114:3
114:22
**conversation**
45:3 51:5,15
187:18
**conversations**
31:9 60:2 73:19
135:23
**convinced**
176:18
**Cooke**
28:7 29:10,13
84:16 142:7
**Cooke's**
66:24 68:2
**Cope**
50:5,6
**copy**
24:8 34:13 35:3
40:4,6,9 41:14,25
82:14,16 179:13
216:12
**Corporate**
3:16
**correct**
23:20,21 25:15
26:17 27:10,16
28:11,12 33:20

41:23 47:11,16
48:20 58:7 59:5
67:16 72:5 75:12
82:2 87:13,18
93:8 99:19 102:8
103:10 105:15,21
106:12 107:25
109:7 113:12,21
116:20 118:9
121:15 122:8
128:21 132:8,9
135:9 140:22
141:11,15 144:14
144:23 152:8,18
153:10 155:19
157:3,13,23
163:14,16,24
164:6,15,25 165:9
166:22 167:16,20
167:22 178:21
190:10 191:4,7
193:8 194:6,14
195:1,5 198:9
206:25 207:9,13
207:18 208:10
217:22 219:14
220:19 225:3
229:20 230:5,18
231:12 233:11
235:15 239:11
240:20 242:9
243:11,24
**corrected**
152:25 153:1 242:9
**correction**
230:4
**corrections**
53:20 242:7
**correctly**
151:23 222:21
223:5,6 224:3,4
225:1
**Correlate**
37:15
**correspondence**
187:9

**cosmetic**
134:16 213:5,18
214:11,23 215:4
**cosmetics**
34:21 209:6 213:12
**cost**
78:23
**Council**
6:13
**counsel**
11:22 12:5,25
24:17 26:8 28:8
30:3,17,22 31:6
31:10 41:8,12,15
41:18,22 42:5,6
42:21 48:25 51:22
54:25 55:7,8,18
56:18 60:15 74:13
80:4 81:5,13,21
82:5 84:24 86:11
86:15 89:6 92:18
92:25 93:10 94:4
122:1 135:19,24
179:12 210:18
211:21 215:11,15
225:4 226:23,25
227:7 240:24
**counsel's**
181:8
**country**
16:18 17:16
**counts**
208:19
**couple**
24:6 59:3 60:21,23
65:8,10 74:24
75:2 92:14 94:6
161:22 183:24
**course**
100:7 143:16 149:7
**courses**
160:14
**court**
1:1 11:19,23 54:16
159:10 212:18
216:16 221:21

234:19
**covariants**
115:1
**covered**
38:18 52:24 57:4
174:10 234:3
**Cralley's**
67:6
**Cramer**
95:3 96:3,22 97:1
174:12,14,20,24
175:8,10,16,22
176:16,22 177:3,5
177:10,11
**Cramer's**
96:16
**created**
89:1 129:5 148:10
149:3
**creating**
145:20
**criteria**
110:16 146:7
172:18 202:20,22
216:24 225:10
**criterion**
216:24 224:9,21
225:15
**critically**
101:10
**cross**
113:25
**crucial**
223:13
**CSR**
1:24 243:1
**CT**
121:7,10,21
**Cultures**
8:19
**current**
134:14 222:22
**currently**
122:18
**curriculum**
53:9,15 54:1

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1126 of 1525
PageID: 63272
Rebecca Smith-Bindman, M.D.

Page 252

**CV**
9:18
**cycle**
159:2
**CYNTHIA**
3:14

**D**

**daily**
158:11 166:19
  188:16,22 189:1,2
  193:19 194:6
**Dan**
130:20
**Daniel**
3:21
**data**
49:18 55:21 88:6,7
  94:17 96:1 101:11
  101:15,21 104:20
  104:22 105:3,7,10
  105:13,14,18,22
  106:9,14,18,23
  107:3 108:22,23
  108:24 109:1,5,8
  123:4 131:21
  133:19,22 134:3,7
  134:10,11,15
  145:20,21,22
  146:5,8 147:22,23
  148:2,4,7,8,10,20
  148:22 149:2,3,5
  149:25 150:6,13
  150:14,21,22,23
  151:2,5,7,13,25
  153:8,9,12,20
  154:3,6 155:1
  161:11,14,20
  162:11,13 163:22
  164:17 166:13,15
  166:18,20,25,25
  167:2,4,19,20
  171:16,20 172:23
  173:8,19 174:6,23
  176:7 177:1
  180:21 181:2,13

183:2 184:24
189:1 190:13
191:17,17 192:3,4
192:6,10,13,22
194:4,24 195:6,8
195:9,11,20 197:5
197:7,8,9,13,14
197:15 199:15,17
199:17,20,21,23
200:2,18,19 201:5
201:9,11 207:25
220:15,19 223:7
229:7 234:1
235:16
**database**
49:4 150:5 151:2
  153:25 162:12
  171:17 176:21
  178:16
**databases**
146:25 147:1
**datasheet**
156:22 191:5
**datasheets**
191:13
**date**
11:12 35:13,15,15
  53:18 78:2 124:9
  203:16
**dated**
35:8 38:10 243:24
**dates**
63:15
**David**
68:12
**day**
13:15 58:20 59:24
  60:1,5,12,12 77:2
  78:9 202:2 227:21
  227:24 242:10
  243:24 244:23
**days**
59:3 60:9 74:24
**deal**
40:17
**deaths**

121:11
**decade**
217:19
**December**
35:24 38:10
**decide**
72:9 150:20 162:21
**decided**
172:11
**decimal**
180:6
**decisions**
198:5
**declare**
242:5 243:22
**declared**
243:6
**decreased**
115:23
**deduct**
41:19
**deep**
55:5 124:15,18
**defendant**
4:12 5:2,12 6:2,13
  15:17 17:10
**defendants**
7:3 12:5 62:4 88:16
  181:18
**defense**
17:5,7,25 18:7,11
  18:15 62:21
**defer**
75:7 96:24
**define**
19:11 20:21 156:7
  164:11,23 193:18
  194:6,11,16 207:5
  229:9
**defined**
155:17,25 157:15
  158:4,10,17,21
  160:4
**definitely**
234:6
**definition**

157:17,20,23,24
  158:3,7 159:14,16
**defray**
78:22
**degree**
103:22 137:9,13
  149:23 165:21
  196:15 200:24
  241:4
**delay**
16:15 17:4 75:6
**delayed**
14:10
**deliberately**
124:23
**delve**
32:21
**demonstrate**
111:17 167:24
  168:20 170:11
  205:2 226:3,17
**demonstrated**
229:11
**demonstrates**
167:7
**Denver**
4:7
**Department**
160:13
**deponent**
11:21
**deposed**
12:13 13:20,20,23
  14:4,17,19 15:25
  16:1,5,21,22
**deposing**
62:3
**deposition**
1:12 2:5 8:9 11:14
  12:10 18:6,23
  19:2 24:8,9,14,19
  24:21 25:12,22
  26:2 28:6,9 30:19
  30:23 33:11,17
  37:9,11,12 38:6
  38:15 54:5 55:6

55:10 57:2 59:3
59:13,19,21 60:3
60:16,19,21 61:7
62:13,18 64:19
67:17,23,24 68:2
68:5 75:25 76:3
81:6 82:11 84:16
89:14,24 90:3,7
91:9 92:2,4,10,11
92:16,23 93:4,7
93:11,12,22,23
95:2,13 130:8
132:12 143:23
181:19 183:25
202:13 223:2,12
228:5 241:2
243:14
**depositions**
67:18 81:4 89:12
**deposits**
212:23
**depth**
33:13 47:21
**derived**
193:23
**dermal**
213:14 214:19
**describe**
52:11 108:22 113:2
  114:23 155:9
  156:12 157:20
  158:1 170:6
  195:15,18 220:5
**described**
21:7 101:3 142:15
  149:8 215:12
**describes**
176:25 192:21
**describing**
192:22 231:18
**description**
8:8 158:18
**descriptive**
55:23
**design**
148:13,15

Rebecca Smith-Bindman, M.D.

**designation**
209:12 210:20
  211:1
**desired**
137:8
**detail**
77:5,15 145:3
**detailed**
52:23 97:13 179:9
  191:25
**details**
53:22,25 59:17
  103:3 104:2,5
  205:8,10 220:7
**detectable**
213:22
**determination**
110:13 133:22
  134:8 206:15
**determine**
134:11,12 149:14
  174:18 191:9
  225:22 231:10
**determined**
109:10 169:22
  175:12 206:25
  207:11 208:11,22
  209:21 213:6
**determining**
146:17
**develop**
154:12 230:13
**developed**
155:18
**developing**
99:18 145:8,17
**device**
69:23
**devices**
69:21
**devious**
106:19
**diagnose**
119:9,15
**diagnosis**
14:8,11 16:15 17:4

**73:11 119:16**
**dictated**
240:25
**difference**
52:8,10 71:2
  108:23 112:8
  114:25 179:19
  180:1 195:20
  200:25 218:7
**differences**
107:14 218:16
**different**
23:17 36:13 82:3
  107:15 109:23
  110:13 114:19
  138:12 139:19
  141:7 145:1,1
  152:11 154:13
  157:24 168:5
  169:17 178:12
  188:22 195:23
  197:16 199:16
  200:8,21,23
  202:16 206:18
  220:18 226:7
  230:13 235:8
**differentiate**
158:24
**digits**
163:10,11
**direct**
159:21 170:17
**direction**
81:1 146:14 243:10
**directly**
74:13 137:17
  227:19
**disagree**
81:10 126:10,14
  132:21 222:14
**disagreements**
183:19
**Disc**
75:20,24 143:18,22
  202:12 241:12
**disclose**

31:11 144:17 145:3
  237:18
**disclosure**
144:23 237:24
**disclosures**
145:2
**discuss**
135:21,23 164:11
  164:23 172:24
  173:14 209:5
  223:11
**discussed**
45:20 81:5 92:10
  187:13 188:2
**discussing**
181:5,14
**discussion**
60:19 172:9 208:6
  225:14
**discussions**
31:15 61:13 69:2
**disease**
113:11,20 116:11
  116:24 117:11,19
  117:20 118:12,13
  118:16,21 119:16
  122:8,10 188:6
**disentangle**
226:12
**distinction**
71:8 113:8 114:3,8
  117:15 118:3
  136:22 155:12
**distinguish**
134:16
**District**
1:1,2 11:19,19
**dive**
124:15,18
**doctor**
150:17 159:13,25
  170:6 180:21
  181:13 182:9
  186:11 210:8,16
  221:11 222:15
  228:11,16

**doctors**
122:20
**document**
29:9 30:7,10,25
  33:25 34:1,10,19
  34:24 35:1,3,18
  35:25 36:15,24
  37:2,3,19,23 38:5
  38:8,11 54:5
  84:10 89:16 92:20
  131:7 132:11,20
  132:25 203:10,11
  203:15,24 210:2
  210:19 214:3,14
  216:10,12
**documentary**
69:11,14,20 70:4,7
  70:10,16,20
**documented**
30:6 198:4
**documents**
25:2 26:20,23 29:8
  29:17 30:15,18,21
  31:2,20,23 32:4,9
  32:17 33:9,10
  37:6 38:19 54:19
  54:22,23,25 55:4
  55:20 56:21,22,23
  57:4,16 60:24
  75:8,12 81:16,25
  82:25 83:5,7,10
  83:13,17,19,22,22
  84:2,7,10 85:19
  85:20,22,25 86:3
  86:4,16,17,20
  87:1,1,8,12,16,19
  88:3,12,15,20,21
  88:25 89:1,2,5
  91:13 94:1 104:10
  123:22 125:10
  131:13 156:10,21
  171:23 183:24
  185:7 187:8 203:4
  203:19 205:23
**doing**
43:12 47:22 63:20

77:4,14,24 81:17
  101:7,15 105:5
  107:15 128:4
  145:19 149:7
  154:21 164:4
  181:24 228:7
**dollars**
57:22
**dominant**
136:5
**dose**
140:13 141:8
  205:12 233:13,15
  233:16,17,20,23
  233:24,25 234:4,7
  234:10,14,18,23
  235:17
**double-check**
151:22
**double-checked**
162:12
**download**
98:4
**dozen**
83:12
**Dr**
11:21 12:9 25:1,4
  27:21 33:22 34:6
  34:13 40:3 42:3,7
  42:14,19 46:10
  51:2 56:6,12,14
  60:6 61:10 66:24
  67:24 68:14,17
  69:3,7,17 70:15
  71:16,23,24 72:22
  73:6,12,13,20,22
  74:2,14 75:25
  76:2,12,15,22
  77:3,4,12,17,20
  78:5,9 79:11,23
  80:4 84:3,16 85:9
  85:15 91:3 96:3
  96:16,22 97:1
  98:25 99:8 100:25
  101:14 103:23
  104:11 105:19

Rebecca Smith-Bindman, M.D.

117:3 141:18
142:6 143:23,25
144:8 152:1,2,19
152:23 160:7,23
161:9,17 162:3,9
162:11 166:13,16
180:16 181:19,22
182:13 184:4,8,11
191:1 196:16
197:1,20,24 198:8
199:16 200:11
201:2,4 202:4,13
202:15 240:21,24
241:13

**draft**
9:12 27:20 28:15
38:9 40:4,14
49:17 148:23

**drafted**
51:17 100:17

**drafting**
40:14

**draw**
135:6

**Drive**
3:16,23

**Dropbox**
49:5

**dropped**
148:6

**due**
115:18 211:3

**duly**
11:6 12:2

**duplicate**
102:17,24 103:4

**duplication**
165:18

**duration**
193:22

**dust**
212:4

**dusting**
193:23 194:1

**Dyer**
9:4

**Dykema**
5:13

**D.C**
6:18

**— E —**

**E**
5:16 34:20 130:10
130:10

**earlier**
25:16 57:18 90:13
96:17 145:12
150:25 156:10
209:3

**earliest**
79:4

**easier**
75:5

**easily**
55:15 56:2

**easy**
97:23

**edge**
69:12,15 70:3
212:17

**editor**
40:4,6,9 41:14,25

**editorial**
121:18

**editorials**
148:5

**editors**
148:5

**educate**
131:12

**education**
115:16

**effects**
19:16 22:13,19
82:22

**efficient**
162:8

**effort**
166:3

**eight**
18:3 170:10 221:12

221:19,24 222:5

**either**
18:22 24:16 26:14
28:20 33:8 37:6
39:3 42:7,19
50:12 52:4 57:5
62:4,20 107:10
123:24 162:14
197:22

**electronic**
73:16 153:24
161:23

**elevation**
112:24

**eligible**
173:6,11

**eliminate**
165:21

**Ellis**
4:13 7:4

**Embase**
146:25

**embolism**
73:12

**emergency**
71:17

**emphasize**
150:24

**employed**
40:8

**employee**
243:20

**enable**
134:15

**encountering**
184:13,18

**ended**
70:3 74:7 112:22
148:21 149:1
188:2

**endometrioid**
196:14

**endometriosis**
115:16 117:7

**engagement**
44:2

**enormous**
123:2 134:3 219:21

**enrollment**
174:25 177:2

**ensure**
60:24 149:8 151:1
151:22

**entire**
39:15,20

**entirely**
112:15,17

**entirety**
32:15,22

**entitled**
225:16

**entries**
195:23

**environmental**
126:24 127:2

**epi**
133:21

**epidemiologic**
133:21 134:3,7,10
134:14 136:21

**epidemiological**
133:18 222:23

**epidemiologist**
14:7 19:19 44:10
107:20,22

**epidemiologists**
103:7 236:10,15

**epidemiology**
19:15 20:12,15,18
21:2,9,21,22
22:22 23:7,11
44:4 109:14,18
124:10 130:16
131:11 146:5
160:13 203:7
204:2

**epidemiology-ba...**
22:1

**Epstein**
10:17

**equal**
188:5

**equivalent**
172:12

**ERRATA**
244:1

**error**
106:24 107:11
108:22 190:13
235:10

**errors**
106:20 152:7,9,18
171:1

**Eslick**
237:11,18

**essence**
163:7

**essentially**
153:7 172:11

**establish**
109:17 168:4
222:24

**established**
217:19

**estimate**
64:12 76:19 169:10
169:17 171:3,6,10
171:21 182:25
185:2,13,16,19
186:4,23,24 187:5
188:14 190:2
225:16 233:2

**estimated**
229:12

**estimates**
150:3 162:2 163:4
163:6 168:3
197:22

**estimating**
230:20,24 231:7

**estimation**
230:21

**estrogen**
115:18

**et**
61:12

**etiology**
204:2

Rebecca Smith-Bindman, M.D.

| | | | | |
|---|---|---|---|---|
| **evaluate** | **excluded** | 132:12,13 156:16 | 237:14 | **extraordinarily** |
| 119:5 223:3 | 164:20 165:4 | 156:17 175:23,24 | **expertise** | 75:4 |
| **evaluated** | **Excluding** | 179:5,15,16 | 19:11,24 20:6,22 | **eyes** |
| 22:22 207:10 | 64:15 | 183:25 184:1 | 72:17 110:14 | 101:15 153:3 |
| 223:10 | **exclusion** | 189:8,10 190:22 | 160:7 | **e-mail** |
| **evaluation** | 166:9 | 196:19 203:12,13 | **experts** | 9:20 10:13 44:12 |
| 35:8 212:2 | **excuse** | 206:10,12 233:5 | 65:22 66:3,7,15,18 | 44:14,19 76:4,4,5 |
| **eventually** | 16:2 75:15 117:2 | **exhibits** | 66:22 67:9,12,18 | 76:12,14,25 77:10 |
| 49:13 110:17 | 159:20 168:13 | 9:1 10:1 39:23 | 67:22 68:4 81:4,7 | 77:21 78:2 104:12 |
| **evidence** | 179:2 201:23 | 89:12 90:6 93:7,9 | 93:13,15,17 | 184:3,7,10,15 |
| 88:4 100:9 109:11 | 210:8 228:13 | 93:12,21,23 | **explain** | 187:7 198:4,8 |
| 109:12,15,17 | 238:24 239:14 | **exist** | 131:10 228:22 | **e-mails** |
| 111:2 124:25 | **EXECUTED** | 136:20 | **explained** | 44:16 60:22 73:22 |
| 128:19,20 133:1 | 242:10 | **exists** | 51:12 | 75:7 77:3 79:10 |
| 136:21 205:12 | **executive** | 134:15 136:21 | **explicit** | 156:23 |
| 207:3 210:21 | 216:9 | **expect** | 123:8 | |
| 220:16 222:23 | **exercise** | 26:14 27:3 140:7 | **explicitly** | **F** |
| **exact** | 231:7 | 144:21 219:19 | 194:9 | **F** |
| 114:11 171:21 | **exhibit** | 237:23 | **exposed** | 6:17 34:20 |
| 200:3 | 8:9,11,13,15,15,16 | **expected** | 27:23 99:15 139:17 | **fabulous** |
| **exactly** | 8:22,23 9:2,4,6,8 | 21:11 139:20 | 140:6,8 229:23 | 228:8 |
| 79:1 180:5 224:12 | 9:10,12,14,16,16 | **experience** | 230:12,16 231:23 | **fact** |
| 239:22 | 9:16,18,19,20,22 | 23:12 96:16 122:22 | 232:12,14,18 | 105:6 106:22 149:9 |
| **examination** | 9:24 10:2,4,7,7,9 | 144:25 | **exposure** | 182:21 188:22 |
| 8:2 12:5 243:8 | 10:11,13,15,17,19 | **experiences** | 10:9,11,15 22:23 | 232:16 |
| **examine** | 24:8,10 25:13,20 | 20:5 | 23:7 111:4,18 | **factor** |
| 181:16 | 25:22 26:2,16 | **experimental** | 115:18 116:15 | 112:9,10,20 113:10 |
| **examined** | 30:13,16 31:21 | 222:22 223:1 | 119:1,1,22 121:20 | 113:25 114:1,18 |
| 11:8 12:4 | 32:25 34:14,15 | **expert** | 132:24 133:2 | 116:1 117:17,24 |
| **example** | 35:4,5,18,20 36:3 | 8:11,13 9:22 14:24 | 149:20,22 150:1 | 124:6 126:18 |
| 104:4,15 112:18 | 36:4,6,8,19 37:11 | 15:1,25 16:4 17:4 | 159:5 209:6 | 128:12 130:1 |
| 113:19 142:25 | 37:17 38:7,15,16 | 19:14 20:10,22 | 213:10,11,13,16 | 131:6 235:25 |
| 147:21 151:15 | 39:16,17,20,21 | 21:1,2,5,19,20 | 214:18,21 219:18 | **factors** |
| 159:7 186:18 | 53:11,12,18 54:5 | 22:10,14,15,18,21 | 220:12 232:24 | 10:2 20:15 98:10 |
| 231:19 | 54:10,14,21 55:6 | 23:3,5,14,17,23 | 233:4 236:8 | 112:7,16,18,23 |
| **Excel** | 55:11,16 56:11,16 | 24:1,3 29:10 43:9 | **Expression** | 113:2,16,17 114:5 |
| 153:25 154:2,5 | 57:3,7,13,15 61:3 | 45:2 47:7,16,25 | 9:10 37:14 | 114:16,23 115:1 |
| 180:21 | 76:3,8 77:10,22 | 48:8 50:22 51:9 | **extent** | 115:11,13,17,22 |
| **excess** | 81:25 82:12,15 | 51:13,16,18,23 | 22:4 125:3 | 116:3,13 118:5,22 |
| 121:11,11 | 83:18,23,25 84:1 | 52:3 58:14 62:11 | **extra** | 118:23 122:25 |
| **exchange** | 84:22,25 85:8,17 | 63:2 64:22 68:24 | 192:22 | 123:19,23 125:5 |
| 184:4,8 | 86:5 88:22 89:13 | 69:22 72:13 84:14 | **extracted** | 125:16 127:25 |
| **exchanges** | 89:23 90:23,25 | 139:15,19 140:10 | 171:17 172:13 | 128:17,18 130:11 |
| 76:12 77:3 198:4,8 | 92:2,3,15,23 93:6 | 141:17 144:18,21 | 197:5 | 131:5,19,23,25 |
| **exclude** | 95:2,4,13,20 | 151:20 160:20,21 | **extraction** | 204:16 223:13 |
| 218:17 | 130:9,12,21 131:7 | 160:23 203:20 | 107:5 | **facts** |

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1130 of 1525
PageID: 63276
Rebecca Smith-Bindman, M.D.

Page 256

121:24
**faculty**
68:17
**fail**
233:15
**failed**
243:16
**fair**
13:6 22:10 23:15
48:9,10 52:16
56:25 96:22
142:14 155:6
176:14 181:15
**fall**
20:19 115:3
**Fallopian**
10:4 132:16
**falls**
20:15
**familiar**
12:21 36:11 66:13
95:12 105:24
122:7 128:5
138:23 202:21,24
206:21
**family**
114:7 115:14
**Fantastic**
182:11
**far**
100:3
**Fayetteville**
17:22
**FDA**
120:19 127:5
202:24 203:5,6,16
204:1,7,12,15,22
204:23,25 205:1,7
205:11,16,17,20
**features**
149:17
**February**
1:15 2:10 11:2,12
**fee**
41:16 57:21 74:12
75:4,4 78:15

**feedback**
127:22
**feeding**
115:24
**feel**
51:7 61:10 67:5
108:14 121:24
138:2 179:7
**feelings**
58:23
**fees**
41:11 42:3,6,14
74:7
**fellowship**
160:12
**felt**
60:25 108:16
**female**
229:8
**fewer**
117:22
**fibers**
140:11 141:5
212:20,21,25
214:4,8
**fibrous**
137:2,6 140:13
142:2 208:19
209:8,16,17 212:3
**field**
47:21 109:14
149:10 160:7
170:15
**fields**
149:11 174:23
**fifty-nine**
192:20
**figure**
151:6 164:22 165:7
165:11,14,19
166:11,17,22
167:3,7,16,24
172:15 173:13
175:9,21 180:18
181:11 182:13
183:4,12 189:4,5

189:15,21,21
190:9 198:14
199:3,4,5,6,12,13
199:17,19 200:2
217:13,24 219:7
**figures**
72:12
**file**
153:25
**files**
180:15
**fill**
185:20
**filled**
52:20
**film**
70:14
**final**
100:13,21 163:9
176:21 177:25,25
178:1 200:20
**financially**
243:18
**find**
43:9 44:20 81:20
81:22 98:8 155:15
161:22 193:12
219:19,21,22
239:9
**finding**
211:24 213:4
**findings**
204:2
**finds**
207:3
**fine**
13:25 228:1 239:19
240:17
**finish**
13:16 78:7 128:23
157:9 158:15
162:24 163:1
168:14,15 221:10
223:22,23 228:18
**finished**
51:16 77:25 117:3

117:9 128:22
158:15 182:2
186:11,13 223:21
226:21 228:14,17
**firm**
3:4 43:8,13,18,20
44:23
**firms**
43:9
**first**
11:6 12:2 14:14
28:15 33:25 34:5
34:19 35:13 36:22
43:2,4 50:3 58:6
76:4,14 82:21
95:6,23 96:2,15
115:20 145:11
146:21 147:12
164:2 186:1
189:24 200:6
208:15 216:13,17
216:18
**fit**
44:5
**fits**
70:13 82:8
**Fiume**
34:19
**five**
232:1
**Fletcher**
34:5
**Flom**
5:3
**Floor**
4:17 244:3
**Flower**
4:16
**FLW**
1:8
**focus**
146:18 156:2
188:21
**focused**
147:15 198:25
**focuses**

72:20 103:24
**focusing**
70:10 156:23
**folder**
8:20 33:3,6,8,16,21
34:1,18 36:15
38:20 92:16
205:22
**folks**
107:15 124:9
**follow**
12:22 187:25
**followed**
44:14 83:1 103:15
103:18 107:22
154:14,16,21
**following**
192:14
**follows**
11:8 12:4
**foregoing**
242:6 243:4,11,23
**forest**
4:6 9:20 76:18
162:1 180:16
**form**
15:23 16:7 19:23
20:4,13,24 21:10
21:14 22:11,16,25
26:18 30:24 32:3
32:13 47:17 48:21
49:10,16 50:11,13
50:15,17 52:17
54:8 55:20 56:24
57:10 62:14 68:16
70:5 74:3,10,25
75:11 77:7 78:1
78:18,19 80:6
82:7 84:19 86:7
87:14,23 88:5,23
89:9,21 91:11
92:6 93:2,14,25
94:15 96:23 97:10
97:13 98:24 99:7
99:25 100:5 101:2
101:22 102:13

103:11,17 105:17
105:20 106:1,17
108:1,8 110:23
113:13,23 114:20
116:8,21 119:7,23
122:12 123:21
124:11 125:8
126:19 128:1,14
133:10 134:9,18
135:1,10,20
136:23 137:23
138:19 140:2,3
141:24 143:5,6
144:24 148:11,20
149:3 150:14
152:20 153:9,18
153:22 154:1,4,23
155:20 157:19,25
163:25 164:8
165:1 166:23
167:21 170:4
172:3 173:16
176:17 177:14,16
179:23 182:19
185:10 186:6
188:1,17 193:9
194:7,15 197:7
198:10,22 199:14
203:3,9 204:5,11
206:6 207:4,17,23
208:13,25 209:14
209:22 210:7
212:21 213:8,20
214:13,25 215:6
215:20,21 218:12
218:14,15 219:15
220:3,20 224:23
225:5 230:23
232:22 236:13
237:17 238:2,22
238:25 239:12
**formed**
100:4 123:25
**former**
31:25
**formerly**

19:7
**forming**
122:24 123:18
**forms**
23:18 127:4 153:13
**formulated**
163:22
**forth**
59:21 86:18 91:14
96:20 103:16
152:8 154:13
163:3 192:25
214:2 240:4 243:5
**forward**
85:4 127:15
**FOSTER**
6:4
**found**
81:17 99:8 147:11
161:21 205:17
210:5 217:5
220:22 235:11,16
**four**
12:16 14:3 16:8,10
111:11 178:12
198:19 199:4,9,12
201:17,22 208:5
215:13 238:17,23
239:1
**fourth**
16:12,14 58:9
144:9
**fraction**
180:6
**fragrance**
137:16 138:13,16
139:4
**fragrances**
137:3,5 138:22
**frame**
45:24 46:3
**framework**
111:16
**Francisco**
1:14 2:8 11:1,15
15:5,7 40:24 46:6

**free**
61:10 67:5 98:4
108:14 121:24
179:7
**freelance**
40:9
**frequency**
158:21,22 176:7,19
176:20 193:22
195:5,7 235:13
**frequent**
191:8
**Friday**
77:20 78:4
**friend**
58:11,12
**friends**
80:17,24
**front**
82:13,15 121:13
122:1 189:12
210:2,9
**full**
88:4 243:11
**fullest**
172:25 173:3
**funded**
144:22
**funding**
124:18 128:8 238:9
238:13,16
**further**
46:15 159:4,8
198:17 205:6
240:18 241:5
243:18
**future**
121:19

_____
**G**
**gap**
52:20 146:17
**gaps**
129:15 150:23
**GARBER**
3:14

**Gene**
9:10 37:14
**general**
14:1 22:18 32:20
112:20 209:7
213:11,13
**generally**
12:21 36:11 63:11
81:5 99:23 106:15
108:6 109:6 114:6
206:21 236:2,10
**generate**
151:24 162:6,8
**generated**
26:24 71:21 147:6
163:2,4,18 164:2
164:3 180:17
**generating**
72:18 76:18 86:19
185:19
**genetics**
112:25
**genital**
10:9,11 95:23 96:2
96:5 99:22 111:3
119:21 120:14
147:5 192:18
202:18 204:3
206:5 208:10,23
209:3,12,15,20
210:5,12 211:25
213:5,5
**geo**
141:12
**geologist**
141:10
**geology**
23:3
**Germany**
41:3
**Gertig**
172:7 235:11
238:20
**getting**
110:9 117:19,19
119:2 192:22

232:24
**ginkgo**
211:5
**give**
21:23 46:18 127:22
155:16 171:10
210:16 231:19
**given**
18:23 81:6 88:8
108:3 135:14
220:7 243:13
**gives**
35:3,14 98:15
169:16
**giving**
54:3 127:14
**go**
18:12 39:6 48:11
55:12 56:2 64:1
76:14 92:21 95:19
107:15 108:2
112:13 126:16
132:23 143:25
147:25 150:12
151:17 153:23
160:2 168:19
178:16 180:18
184:25 199:12,22
200:10,18 229:2
235:9
**goes**
116:4 214:1
**Goff**
1:23 2:11 11:23
243:1,25
**going**
12:22 18:25 21:1,2
21:19,22 22:12
51:7 74:15 75:16
79:17 85:1 86:25
90:15 92:21
109:24 110:17
117:7 121:14
143:11 155:24
168:12 180:24
186:8 188:3 200:3

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1132 of 1525
PageID: 63278
Rebecca Smith-Bindman, M.D.

Page 258

210:9 212:9 214:6
214:7 217:7
222:20 228:19
234:15 240:17
**Goldman**
3:20
**Golkow**
11:11 244:2
**good**
44:5 75:17 143:13
220:15 233:1,12
239:15,15,20
**Gordon**
6:3
**gotten**
58:4 129:22
**grammatical**
40:15
**grams**
140:12
**graph**
163:17 177:25
178:2
**graphical**
151:25
**graphics**
71:21
**graphs**
72:12,18 162:6
**great**
40:17 47:21 180:23
191:16 228:17
229:6
**greater**
33:13 98:21 99:1,4
99:9 102:3 103:3
105:13 169:10
191:3 193:6
194:17
**grew**
52:18
**Gross**
174:3
**group**
72:16 99:3 156:22
168:8 169:5

177:25 178:2
206:24 207:7,12
207:13,15,21
208:7,21,23 209:9
209:12,18,21
210:5,12 211:25
213:6,18 214:5,12
214:15,23 215:2,4
227:14
**groups**
98:21 99:5 148:16
155:10
**guess**
13:9,11 64:13
86:14 90:19 97:1
121:14 179:3
**guessing**
51:7 114:15 178:25
**Guy**
237:11
**gynecologic**
22:7
**gynecologist**
67:1

----

**H**

**H**
37:14
**habit**
212:22 213:25
**half**
78:12 83:12 218:18
219:11,13,21
**hall**
40:3 42:3,7,19
70:22 71:10,14,16
71:23,24 72:22
73:6,13,20,22
74:2,14 76:5,6,12
76:15,22 77:3,4
77:12,17,20 78:5
78:9 79:11,23
80:4 100:25
101:14 104:11
105:19 152:1,2,19
160:23 161:9,17

162:3,11 166:13
166:16 180:16
184:4,8,11 191:1
196:16 197:1,20
197:24 198:8
199:16 200:11
201:2,4
**hallmarks**
105:5
**Hall's**
42:14 152:23 160:7
162:9
**HALPERIN**
5:4
**hand**
180:25 217:10
**handful**
66:19 88:24 89:5
**handing**
76:3
**handwriting**
38:4
**Handwritten**
10:7
**hang**
181:12
**happen**
102:15 135:13
192:14
**happened**
13:24 61:11
**happy**
235:14
**harass**
215:22
**harassing**
215:24
**hard**
122:21
**Harlow**
174:3
**harm**
207:25
**head**
118:3 126:4
**header**

137:4
**health**
19:16 22:13,19
28:10,10 38:10
120:2,18 122:21
128:6,9,12,25
129:25
**healthcare**
120:8
**hear**
127:8 184:5 221:21
227:20,25
**heard**
69:11 215:8 219:3
219:4 227:21,23
**hearing**
26:4,15 27:4
**heavy**
137:3,5 138:9
139:9 140:4,5
**held**
11:14
**hello**
68:21
**help**
30:22 60:24 77:13
231:19
**helped**
40:1
**helpful**
185:9
**helping**
43:9
**hereto**
242:8
**hesitated**
47:18 175:4
**heterogeneity**
76:19 151:9 161:25
**Hey**
126:17
**high**
65:16 211:2
**higher**
139:18,18 190:7
222:9

**highlight**
104:2
**highlighted**
152:16
**highlighting**
34:10,11,23,25
35:16,17 36:16
37:2,4 38:7,11
39:7,11
**highlights**
37:22 39:12
**highly**
20:6 110:12
**high-impact**
238:3
**high-quality**
238:4
**Hill**
110:16 111:14,16
111:17 146:7,8
202:20,21 206:4
216:23 224:9,21
225:10,14 226:19
**hired**
71:10 72:23
**Hispanic**
98:10
**Hispanics**
98:19
**histologic**
195:15
**histologies**
148:18
**history**
115:14
**hold**
157:7
**homogeneous**
222:4
**hope**
110:18 220:7 233:5
**Hopkins**
8:15 38:6 89:14,15
89:17 90:4,7 91:3
92:3 93:11,22
142:6

Case 3:16-md-02738-MAS-RLS  Document 9886-12  Filed 05/29/19  Page 1133 of 1525
PageID: 63279
Rebecca Smith-Bindman, M.D.

Page 259

hormone
115:20
hospitals
91:20
hospital-based
217:17
host
21:11
hour
57:22 60:6,12
  75:16 143:12
hours
64:6,13,18,20
  100:6
Hum
190:2
Human
8:18 37:15 213:10
humans
35:9 206:25 207:3
  207:7,16 208:17
  208:21,24 209:4
  210:13,21
Huncharek
174:3 235:21
Hunchcharek
235:16
hundred
186:18 192:20
hundreds
94:17 96:13 139:13
hundredth
180:13
Huntsville
15:7 17:22
hurt
58:23
husband
80:14,15,18
hysterectomy
115:25

I

IARC
9:2,6 10:19,19 35:8
  36:10,11 174:2

205:21,23,24
206:3,14,24 207:2
207:6,10,20,24
208:10,22 209:12
209:21,23,24
210:5,11,20,21
211:14,24 212:2
213:6,17 214:9,22
215:1
idea
78:21 89:3,4
  127:14 183:14
  211:6,9
ideally
158:11
identical
56:11 164:20 165:5
identification
24:10 25:20 30:13
  34:15 35:5,20
  36:4,6,19 37:17
  38:16 39:17,21
  53:12 54:10 76:8
  90:25 95:4 130:12
  132:13 156:17
  175:24 179:16
  184:1 189:10
  203:13 206:12
identified
31:21 57:18 83:18
  86:4 88:7 115:11
  116:7,18 147:18
  147:25 163:19
  164:11 175:1
  221:14
identifies
147:9
identify
124:5 146:22 147:9
  147:13 164:22
  166:10,12,14,16
  172:19 175:2
  237:19
identifying
131:18

II

9:16 38:25 39:19
illustrates
228:25
illustration
228:20
imaging
70:12 121:20
Imerys
5:12 6:2 8:13 29:8
  29:14 82:25 83:7
  83:11,13,17,21
  84:9 86:3 87:3,19
  88:14,21 92:20
  142:7
Imerys-produced
83:5 85:21 86:4,16
impact
178:14 180:2
  226:15 229:12
impacted
226:4 228:21,24
  229:1
impair
33:23
implies
71:3,6
important
27:24 100:14 102:6
  102:22,25 104:23
  105:3 127:13
  146:18 166:8
  224:10,22 228:25
  237:3
importantly
234:11 235:1
impossible
208:2
impressed
72:25 237:9
impression
135:11,16,25 136:7
  198:3
improved
193:24
inaccuracy
106:14 108:5

Inaccurate
102:10
inadequate
128:19,20
incarnation
70:9
include
41:21 64:6 103:3
  115:14,19 118:20
  132:1 137:2,2,3,3
  146:23 148:12
  149:13 158:25
  164:15 165:10
  166:17 174:5,12
  174:21 175:5,10
  175:15 176:11,16
  177:10,20 194:12
  198:15 225:15
included
28:19 41:15 53:3
  54:13,19 59:15
  79:19,20 81:16
  104:4,9,12,13
  123:9 125:20
  147:3 148:16,16
  148:18,20 150:14
  155:5 158:23
  159:5,9 161:13
  164:19 165:5,6,12
  165:14 166:8
  167:3 173:4,15,20
  173:23 174:6,11
  175:21 177:11,17
  177:19,23 178:4
  178:20 179:20
  180:9,11,16 192:2
  192:16 193:23
  196:4 199:1,19
  201:2 205:23,24
  221:22 225:24,25
  226:2 239:3,4
includes
52:25 54:23,25
  55:3 146:24
  195:25 229:4
including

64:14 147:4 154:18
  165:15 178:19
  201:19,20 204:17
income
65:4,12,17
incomplete
102:10
inconsistent
133:4 234:11,25
inconsistently
213:1
incorrectly
188:25
increase
99:17 115:17,18
  136:16 222:6
  235:12 237:2
increased
34:3 112:11 133:3
  135:7 236:25
increases
112:11 113:10
  114:9 116:24
  145:7
increasing
235:13
independent
14:24 81:17 149:15
INDEX
8:1
indicate
142:13 236:23
indicated
222:5
individual
101:24 102:1 119:6
  119:10,17 123:23
  142:21,23 149:11
  149:24 167:12
  168:1,6 169:6,7
  171:7 219:10
individuals
120:6,10 131:13
inflammatory
116:11,24 117:11
  118:11,13,16,20

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1134 of 1525
PageID: 63280
Rebecca Smith-Bindman, M.D.

Page 260

119:16
**influence**
102:19 113:3 115:1
139:21
**influenced**
27:25
**information**
26:6 78:6 96:10
120:17 124:1,4
131:15,20 134:4
135:18 143:3
150:4 151:16
155:16,24 161:12
176:11 178:18,20
181:17 184:24
186:2,9 192:8
194:13 196:15
210:11
**informative**
221:15
**informed**
146:15
**infrequent**
159:1
**inhalation**
213:14 214:19
**inherited**
112:25 115:15
**initial**
43:15,20 63:7 70:9
76:21 101:17
148:20,23 164:4
169:3 172:13
209:2
**initialed**
242:7
**initially**
43:8,14,18 46:8
61:19,21
**ink**
242:7
**innumerable**
112:13
**input**
80:21,25
**inside**

9:16 10:7
**insofar**
100:25
**Institute**
120:20 128:6,9,11
128:25 129:23,25
130:16,23 131:9
132:16,25
**instruct**
31:11 81:8
**instructs**
171:19
**insufficient**
222:23
**intend**
21:4 26:3
**intending**
225:2
**intent**
241:5
**interchangeably**
114:19
**interest**
238:12,15
**interested**
43:12 45:17 47:22
76:17 104:15
148:3 149:22,25
243:19
**interesting**
219:16
**International**
34:22 36:9
**interpretation**
220:17,19
**interpreted**
230:8
**interpreting**
232:10,13
**interrupt**
73:4 228:2
**interrupting**
117:6
**interval**
168:2 169:8,9,11
171:7 172:1

182:22 189:17
190:1,9 200:1,4
**intervals**
172:14 182:14,16
182:24,25 183:4,5
183:7,11,12,15
185:14,22 187:22
218:22
**introduced**
71:23
**introductory**
131:24
**invasive**
99:18 145:8 155:18
156:2 190:17,23
191:10 192:24,25
193:7 195:4,7,15
195:21,25 196:1
196:11 198:21,25
199:1,6,7,8,10,10
199:18,18,19
225:17 229:24
230:10,15 231:12
232:4,11,18
**investigators**
103:4
**invoice**
41:15 42:8,20,20
64:11 74:4,5
**invoices**
25:17,17 41:10,13
42:24 63:10,22
64:1,9
**invoicing**
74:12
**involved**
13:17 15:2,18,21
45:14 62:16 72:24
73:6 101:7,14
134:22 145:16
190:16,22 193:7
199:22 220:9
**involves**
145:19
**in-person**
45:19,25 46:4,5,24

60:17
**issue**
19:4 45:9 70:11
81:11 178:16
234:6
**issued**
28:25
**issues**
40:15 151:8 197:3
**item**
29:9 30:8 82:21
**itemized**
63:18 85:23
**items**
25:10,11 81:19,21
81:21 137:18
161:6 162:17

_____

**J**

**J**
1:23 2:10 243:1,25
**JAMES**
6:15
**Jane**
5:14 70:22 71:10
71:14 76:5,6
**January**
133:8,13
**jbillingskang@se...**
6:19
**jbockus@dykem...**
5:19
**JD**
3:6
**JENNIFER**
6:4
**Jersey**
1:2 3:25 11:20
**jfoster@gordonr...**
6:9
**job**
123:12 228:8
**John**
4:4 46:10 89:14,15
89:17 90:4,7 92:2
93:11

**Johnson**
1:5,5 2:7,7 4:12,12
5:2,2 11:16,16
19:6,6,8,8 29:16
29:16,21,21 31:2
31:2,24,24 87:20
87:20 88:20,21,25
88:25 89:2,2
134:23,23 135:13
135:13 136:1,1,7
136:8,8 138:17,17
138:25,25 139:5,5
139:10,11 140:1,1
140:19,20,25
141:1,8,8
**Johnson's**
32:10
**joinery**
211:7
**Joseph**
7:13 11:10
**journal**
34:22 35:23 104:6
104:7 145:4 238:4
238:5
**journals**
145:1
**journal's**
238:7
**jrestaino@restai...**
4:8
**Judith**
56:6
**Julie**
90:9,11 91:15,22
92:4,17,23 93:12
**June**
131:8
**June-July**
45:23
**JUNIOR**
4:4
**J&J**
9:4 29:9 30:7 84:10
87:8,16 88:14
91:4 142:11

Rebecca Smith-Bindman, M.D.

240:25

## K

**K**
37:14
**keep**
26:21 44:16 117:13
**kept**
70:14 124:9 174:15
**Kessler**
68:12,14,17 69:3,7
69:17 70:15
**keywords**
147:4,4
**kidney**
73:8
**kind**
32:20 58:1 71:21
101:11 124:18
135:15 141:3
148:13,18 220:6
**knew**
51:18 71:20
**know**
13:10 35:11 42:14
43:22 46:21 47:20
47:24 49:14 50:4
52:22 55:3,12,13
56:6,7,14,15
60:19 61:18 66:6
66:7,10 67:8
68:12,14,19 74:15
74:22 78:10 83:4
83:10,21 85:5,20
86:1,6,15,18 87:1
87:3,11,15,22
88:19 89:15,16,17
89:18,20 90:9
91:16,21,25 92:8
94:2,22 96:18
97:3 99:11 109:23
111:5 115:6 122:4
125:17 126:3,4
128:11,15 129:3,4
129:13,17,19,24
130:3,4 131:1,1,3

131:15,17 135:14
135:17 136:5
137:20 139:13
142:13 159:13
161:1 162:5 166:7
170:9 173:10
175:16,19,20
176:21 177:17
179:3,19 181:19
183:22 187:1
190:8 191:6 196:2
196:25 199:9,11
202:5 205:8,10
211:14 212:6
214:9 217:13
219:2 226:13
229:17 234:2
237:6,8,11,14,21
238:7 240:15,17
**knowing**
44:25 97:16
**knowledge**
25:7 55:5 125:3,13
125:25 126:7
139:3,7,23 140:18
157:4,10 165:17
183:6

## L

**L**
3:14 37:14
**lack**
204:23 235:17
**lacking**
205:13,18
**laid**
198:6,23
**Langseth**
174:3 217:2,4,10
217:13,15 218:10
219:25 220:4
221:12
**Lapinski**
3:21 130:17 226:21
226:23 227:3,7,10
227:13,16,19,23

228:6,9
**large**
49:5 118:22 123:25
129:11,14 135:11
142:25 143:2
147:18 164:17
216:10 224:7,18
233:18,22 234:1
**largest**
65:12
**late**
85:2 213:21
**laughing**
126:12
**law**
3:4,7,15,22 4:3,5
4:15 5:5,15 6:5,16
7:6 43:8,9,13,18
43:20 44:22
**laws**
243:23
**lawyer**
15:13 43:13,17,22
43:24 44:1,22
45:12 46:11,14,24
49:25 51:1 58:5,9
144:10 226:25
**lawyers**
15:14 43:21 45:3
45:14 48:25 49:2
49:9,11,21,23
50:13,18 51:6
57:23 58:2,13,17
58:24 59:6,8,8,20
59:22,25 60:2
61:7 63:12,23
64:14,18 65:21,25
66:1 227:15
**lead**
45:19 113:1 152:3
**leader**
73:12
**leadership**
120:7 129:18,19
**leads**
119:2

**learn**
45:3
**learned**
92:13 162:7
**legal**
77:5,15
**LEIGH**
3:5
**leigh.odell@beas...**
3:10
**length**
188:2
**Letter**
10:17
**letters**
148:5
**let's**
24:6 39:14 80:9
137:4 143:25
183:21,23 200:1
202:1,3 206:9
229:2 240:6
**levels**
213:22
**Levin**
2:7
**LHG**
1:8
**liability**
1:6 11:18 62:21
**Liberty**
244:3
**lifestyle**
115:13
**lifetime**
178:19,21
**ligation**
115:25
**like-with-like**
101:21
**limitations**
133:18
**limited**
210:20
**limiting**
155:9

**line**
13:16 114:1 154:6
168:18,19,19
244:7
**linear**
171:20
**lines**
27:22
**lining**
34:24
**linked**
51:16
**list**
8:13,17 9:19 28:2
28:20,21 29:5
30:2,2 37:7,7 39:3
39:4 53:1 54:7,14
54:15,20,22 55:16
55:21 56:9,10,12
56:15,16,17,19
82:11,14 84:1,6
85:1,16,24 86:5,8
86:11,16,19,22,24
87:3,7,21 88:13
88:13 89:1 112:6
115:3,22 116:12
116:14 118:15
123:23 125:5,15
125:20 126:17
127:25 128:12
129:10,25 131:23
147:6 148:6,9
164:13 165:19
166:11 173:12
189:21 199:3,4
200:2 233:25
**listed**
29:10,24 54:19
55:10,16 81:25
83:18,22 84:17
85:16 88:22 89:6
125:19 131:6
132:8 142:3 154:6
158:4 165:15
166:21 167:15
174:1 182:15,17

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1136 of 1525
PageID: 63282
Rebecca Smith-Bindman, M.D.

Page 262

183:11 189:16,19
189:20 232:10
**listing**
30:16 87:16 197:23
**lists**
35:15 132:2 138:21
217:21
**literally**
41:17
**literature**
26:22 47:3,11
48:12,23 49:18
50:19,25 51:21
52:13,16,19 94:7
94:8 96:25 97:11
97:15,17 100:7
116:5,17 123:9
124:16,24 125:1,4
125:15 126:2
129:5,15 142:4
143:8 145:12
146:5,20,22
147:13 154:25
164:5 211:18
236:17
**litigation**
1:7 11:11,18 12:10
13:22 20:11 43:5
45:15 48:2 58:15
59:10 61:25 62:2
62:21 64:23 65:5
65:13 66:9 72:10
80:3,8,10,12 81:7
88:1,16 93:13,24
144:19 211:19
237:15,20 244:2,6
**litigations**
15:21 16:4 62:4
**little**
82:3 85:2 158:5
166:5 170:15
190:3 197:16
240:2
**LLC**
4:3 7:3,3
**LLP**

2:7 4:13 5:3 6:3,14
7:4
**located**
15:5 41:1
**logist**
141:14
**long**
18:2 59:22 97:13
112:6 138:21
147:6
**longer**
70:13
**Longo**
28:5 141:18 142:3
143:9
**Longo's**
66:25
**Long-Term**
82:22
**look**
28:13 33:12 63:10
65:15 76:10 82:10
87:7 95:1 98:13
99:2 130:8 131:18
132:10 133:12
163:13 165:25
166:4,15,15 171:6
175:22 181:8,10
184:10 187:11
190:3 191:5,12
193:12 195:14
200:3 201:4
204:14 206:10
217:7,12 219:6
222:16 232:3
237:4 240:2
**looked**
28:2,10 44:21 57:9
68:11 86:21 88:12
96:1 128:3 129:8
133:7 148:18
169:22 170:12,24
173:3 183:10
193:4 208:16
217:18 233:14
235:25 236:3

239:6
**looking**
22:21 45:17 57:2
89:22 90:16 98:18
108:25 110:15
125:10,18 126:6
145:22 151:8
164:21 168:23
172:25 176:18,22
178:24 181:25
182:13,14 183:22
191:9 194:21
196:16 205:14,17
208:18 210:19
211:24 212:5,9
213:4 214:10
216:9 217:24
219:17 229:25
232:17 236:22
**looks**
33:3 121:14 177:24
217:15
**Los**
4:18
**loss**
14:14
**lot**
23:1 86:18,20 94:8
94:23 96:12 101:4
136:1 140:13
141:25 147:9
160:9 162:8 166:7
174:15 195:22
214:1
**lots**
136:4
**Louis**
7:9
**lunch**
143:12
**lung**
117:22,23,24,25

**M**

**M**
3:6 4:4 7:5 34:20

**magnitude**
222:8 226:8,9
**magnitudes**
139:18
**main**
19:17 131:24
**majority**
96:4
**making**
107:6 199:22
227:11 228:8
235:18
**malicious**
106:19 107:8
**malpractice**
14:9,19 15:3 18:10
62:16
**man**
46:12
**manipulate**
107:9
**manner**
56:1
**manufactured**
19:5,8 134:23
138:17 139:5,10
140:1,19 142:12
**manuscript**
106:25
**MARGARET**
3:6
**mark**
24:6 25:19 34:13
35:3,18 36:3
37:12 38:5,14
39:15 53:11 90:22
156:15 175:23
203:12
**marked**
24:10 25:13,20
26:16 30:13 32:25
34:15 35:5,20
36:4,6,19 37:17
38:16 39:17,21
53:12,17 54:10,14
54:20 56:11 57:7

76:8 82:11 84:4
90:25 95:4,13
130:12 132:13
156:17 175:24
179:16 184:1
189:8,10 203:13
206:12
**market**
213:24 244:3
**Marketing**
1:6 11:17
**marking**
39:12,12
**marks**
75:24 143:17,22
202:12
**Mary**
1:23 2:10 11:23
243:1,25
**material**
29:21 64:7
**materials**
24:18 27:8,11,17
28:20,21 29:6,11
29:18 32:23 33:16
37:7 39:4 40:2,11
55:10,16,20,21
56:10,11,17 57:22
60:25 61:2 67:5
71:14 85:1,9,10
85:16,16,23 86:5
87:2,7,21 88:13
89:23 156:24
161:9
**math**
229:2
**matter**
11:16 13:22 25:18
25:23 26:2,4,14
27:4 42:9,16 43:3
43:19 44:25 45:12
50:14 54:2 57:6
57:23 62:25 63:3
64:11 67:19 69:3
69:4 79:11 80:22
81:1 83:6 203:21

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1137 of 1525
PageID: 63283
Rebecca Smith-Bindman, M.D.

Page 263

matters
14:5 62:12 64:23
  65:5,14,18 69:23
  69:25
MD
3:6 8:11 9:18,22
  10:17
MDL
1:7 12:10 19:4,13
  43:5 58:15
Meagher
5:3
mean
16:21 22:20 44:16
  50:16 61:23 63:15
  73:4 98:15 99:1,3
  109:19 110:6,21
  111:5 112:1 117:3
  156:3 195:23
  196:10 230:2,2,7
  236:19
meaning
76:4 169:12 235:8
meaningful
102:1
means
210:21 211:1
meant
53:3 148:4 219:9
mechanism
20:16 23:4 136:15
  145:14 205:18
mechanisms
112:13
mechanistic
146:7
medical
14:9,19 15:3 18:9
  35:23 40:9,18
  44:11 45:9 52:12
  62:16 69:21,23
  70:11 119:11
  121:20 131:19
  224:9,20 237:8
  238:4
medical/legal

65:18 69:7
medications
33:22
medicine
71:17
Medline
146:25
meet
58:24 59:22 61:20
  73:13 240:18
meeting
45:19 46:1,5,24
  49:8,21 58:4
  59:25 63:8,23
  65:21,25 66:1
  240:23
meetings
49:11 60:2,14,17
  61:11 63:11 68:22
member
68:17
memory
121:23 125:9
menopausal
115:20
menstrual
159:2
mention
149:17
mentioned
20:14 26:8 29:14
  77:14 80:7,10,12
  80:13,16,24 120:5
  141:4 145:12
  148:17
mentors
120:7
Mesothelial
37:15
message
127:1
messages
127:8
met
46:8 49:1,2 50:18
  58:2,13,17 59:2,7

59:20,24 60:5,5
  60:11 63:6 64:14
  73:15 144:10
  224:10,22 225:10
Metafor
171:15,18
metals
137:3,5 138:9
  139:9 140:4,5
  212:3
meta-analyses
161:6 233:19
meta-analysis
28:14,15 52:5,9
  63:17 71:2,7
  104:23 106:11
  107:16 146:11
  152:13,15 233:23
meta-analysis-like
146:11
method
103:19,19
methodologies
145:6
methodology
102:2,16,22,23
  103:3 104:12
  145:5,17 147:15
  150:12 152:10,11
  156:13 202:16
methods
102:11 103:25
  192:14,22
MICHAEL
4:14
michael.zellers@...
4:19
microscope
212:17
mid
141:5
middle
16:18 17:15
mid-2017
43:6,7,14 45:23
  63:8,23

Mike
75:15 143:11
  201:23
million
139:14 231:5,6,23
  232:2 233:3
millions
140:11 141:5
mind
33:1 74:11 177:4
mine
35:19 120:7
mined
137:17
mineral
37:15 212:21
mineralogist
141:15
mineralogy
140:10
mines
137:7
mining
23:4
minor
53:24
minus
177:3
minute
46:18 104:19
minutes
75:16 132:21
  143:12 239:19
misdiagnosis
14:13,15
misrepresentation
105:25 106:14,18
  107:7 108:5,21
  109:1,5,8
misrepresented
105:22 106:9
missed
147:10
missing
150:21 184:23,24
  186:2 187:4

196:15 216:12,18
Missouri
7:9
misspoke
93:16
misstated
78:2
Misstates
116:22 209:1
mistakenly
226:10
mistakes
107:5
mixed
60:9 171:20
model
170:23
models
171:20
modest
236:11
modifiable
113:17 116:13
  119:1 132:1,3
modified
113:21 114:4,5
  115:12
module
130:22 131:4
Modules
10:2 130:10,25
molecular
23:8 27:22 34:2
moment
132:12 144:1
  157:15 179:8
  210:16
Monday
78:13 79:2 184:12
money
78:22
monitor
11:13
monograph
35:8 212:1,2,2
Monographs

9:2 10:19
**Montgomery**
2:8 3:9 11:15
**month**
46:2 176:8 191:4
193:6 194:22,23
**monthly**
188:16 195:1
**months**
100:23 101:18
**Moorman's**
67:24
**Morgas**
7:13
**morgue**
11:10
**morning**
77:21 78:4,14
85:19 164:5
**move**
85:3 103:1 123:15
127:15 140:15
169:19 216:21
223:17,25
**moved**
189:2
**MPAff**
3:6
**mucin**
196:13
**mucinous**
196:13
**multiple**
107:4 115:24
**mutations**
115:15
**M.D**
1:13 2:6 8:3 11:5
12:1 242:4,14
244:21

**N**

**N**
185:17,17
**naive**
127:23 128:2

**naiveness**
127:19
**name**
11:10 12:7 15:13
17:8,10,12 18:21
28:15 40:7 43:17
43:22 46:11,17
50:2,3,3,4 56:7
58:6 87:3 120:11
144:9 171:14
**named**
34:5,19 36:22 95:6
**names**
15:10 66:11,11,12
66:12 68:4 86:1
90:13
**narrow**
169:8
**narrowed**
198:18
**narrower**
171:7
**National**
120:19 128:6,9,11
128:25 129:22,25
130:15,23 131:2,9
132:15,25
**nature**
126:12
**NCI**
10:2,4 128:15
129:2
**near**
40:15
**nearly**
123:11 127:17
165:5
**necessarily**
26:12
**need**
13:14 53:20 58:12
67:4 77:5,6,15,16
85:25 102:15
107:21 121:25
133:25 170:14
179:8 180:20

181:7,20 182:6
190:3 191:5,12
197:21
**needed**
33:18 52:20 54:24
72:9,11 74:20
77:24 78:6 104:2
186:24,25 187:1
223:1
**negative**
31:1 32:5 142:8
**neither**
188:20
**Neoplastic**
8:18
**never**
15:2 48:15 65:24
66:2,4 67:11
71:24 73:15 99:11
105:10
**new**
1:2 3:25 5:7,7
11:20 26:6 27:17
28:23 29:2 49:21
70:13 72:10 91:19
92:9 94:17 121:6
126:25 174:5
182:4 223:16
**Newport**
3:17
**news**
35:22 120:23
**Nicole**
34:5
**NIH**
129:24 130:7,9,22
131:8
**nine**
163:9
**ninety-eight**
192:20
**noninvasive**
199:19
**nonmodifiable**
132:1,3
**nonregular**

232:9
**nonresponsive**
123:16 140:16
169:20 224:1
**nonspecific**
86:2
**Non-Hispanic**
98:10,18
**normally**
212:16
**Northern**
15:8 18:5,13,17
**Notary**
244:25
**notations**
36:1
**note**
91:5,8,12,18
149:15 184:16
233:18 241:2
**notebook**
38:24,24 39:15,20
**notebooks**
33:3 38:22 39:2,14
97:21
**noted**
11:22 85:13 116:12
117:8 150:3 204:7
204:23 241:16
242:7
**notes**
10:7 34:9,11 73:19
91:3 156:9,12,15
156:22 177:3,5
187:17 192:1
197:7 243:12
**Notice**
8:9 24:8,13,19,21
25:12
**November**
27:9,19 64:3 100:3
**nuanced**
158:5
**nuances**
104:16
**number**

8:8,16 30:7,10 34:9
49:5 62:15 83:17
87:9 98:15,20
99:1,3,3,8 103:20
106:22,25 107:10
109:23 118:23
123:2 125:21
129:11 142:25
146:16 147:19
148:12,13 162:15
162:18 163:18
171:13 178:19
184:21 190:5
193:10,12 194:25
196:20 210:16
224:7,19 225:17
228:21,24,25
229:6,12 231:22
233:1,14 234:1
**numbers**
83:1 97:2 98:7
139:16 140:10
151:22,22 152:19
153:1,2 162:13
171:17,18 185:1
186:3 187:4
188:24 192:2
193:2 200:15
**Numerous**
115:11
**NW**
6:17

**O**

**oath**
11:24
**ob**
66:25
**obesity**
115:20
**object**
15:23 16:7 19:21
20:4,13,24 21:10
21:14 22:11,16,25
26:18 30:24 32:3
32:13 47:17 48:21

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1139 of 1525
PageID: 63285
Rebecca Smith-Bindman, M.D.

Page 265

49:10,16 50:11,15
52:17 54:8 56:24
57:10 62:14 68:16
70:5 74:3,10,25
75:11 77:7 78:1
78:18,18 80:6
82:7 84:18 86:7
87:14,23 88:5,23
89:9,21 91:11
92:6 93:2,14,25
94:15 96:23 97:10
98:24 99:7,25
100:5 101:2,22
102:13 103:9,11
103:17 105:17,20
106:1,17 107:24
108:8 110:23
113:13,23 114:20
116:21 119:7,23
122:12 123:21
124:11 125:8
126:19 128:1,14
133:10 134:9,18
135:1,10,20
136:23 137:23
138:19 140:2
141:24 143:5
144:24 152:20
153:22 154:4,23
155:20 157:19,25
163:25 164:8
165:1 166:23
167:21 170:4
172:3 173:16
176:17 177:14,16
179:23 182:19
185:10 186:6
188:1,17 193:9
194:7,15 198:10
198:22 199:14
203:3,9 204:5,11
206:6 207:4,17,23
208:13,25 209:14
209:22 210:7
213:8,20 214:13
214:25 215:6,20

215:21 218:12
219:15 220:20
224:23 225:4
227:1 230:23
232:22 236:13
237:17 238:2,22
238:24 239:12
**objected**
24:21
**objecting**
227:2,6,18
**objection**
55:19,19 85:2,13
116:8 118:18
119:13 140:21,23
198:1 220:3 225:5
225:6
**objections**
24:25 25:2 228:8
243:8
**objective**
101:19
**obstacles**
184:13,19
**obstetrician**
67:1
**obtaining**
101:8
**OCAC**
195:10
**occasional**
158:25
**occasionally**
106:20
**occasions**
12:15,19
**Occupational**
211:7
**occur**
212:24 232:7,9
**October**
100:19
**odds**
149:19 163:9
170:24 172:1,5,8
182:25 185:13,21

186:20,25 188:4
188:10 195:4
198:16,19 217:4,5
226:3 236:10
**offer**
26:3 74:18
**offering**
19:12
**offhand**
125:17 166:24
**office**
46:6
**Oh**
54:17 127:8,13
150:9 180:23
189:9 218:1
**okay**
13:18 23:22 25:25
28:1 31:17 61:14
67:6,22 79:1,16
84:18 85:3 92:14
109:4,24 117:11
135:16 146:13
150:8,19 157:8
159:11 169:18
175:7 177:7
179:11,24 180:24
182:5,8,12 186:10
186:15 187:10
189:15 191:22,25
192:12 194:5,24
197:18 198:13
200:22 211:4
212:7 213:3
216:14,22 217:8
222:15 223:15
226:25 227:1,22
228:11,15 230:6
230:19 233:6,6
239:17
**omissions**
129:20
**omit**
129:11
**once**
13:16 40:4 109:2

127:15 150:22
165:16 174:17
175:3,6 198:13
**oncologist**
22:7
**ones**
30:25 56:3,3,4 62:6
85:22 86:23
145:15,16 166:17
172:12 191:3
200:16
**one-page**
35:24
**one-time**
158:25
**online**
81:18
**open**
75:3
**opine**
99:21 137:24
**opining**
118:7
**opinion**
49:14 51:2 99:15
99:20 108:23
110:18 121:19
123:25 135:7
138:5,7,11,15,20
139:2,7,23 145:6
148:5 202:17
**opinions**
19:12 20:19,23
21:1,3,5,22 22:1,5
22:12 26:3,5,13
26:13,15,20,22
27:3,12,13 29:1,3
50:14,17 54:3
57:6,24 64:2
100:8 122:24
123:18
**opposed**
145:24 155:10
**option**
187:24 188:3,8,19
188:20,20

**options**
187:24
**op-ed**
120:22 121:6,10,18
121:25 127:1
**op-eds**
121:3
**oral**
8:9 115:24
**order**
102:7 107:19 164:1
196:21 241:1
**orders**
139:18
**organization**
122:11,14 129:1
**organizations**
123:10
**organization's**
123:7,13,23
**organized**
149:5
**original**
49:22 106:10
162:19 167:12
168:17 172:6
179:8 192:9,15
193:20 194:10
195:8 210:24
218:6,14,15,21,22
219:10
**originally**
43:22
**outline**
63:11,14 156:13
**outlined**
109:22
**output**
79:7
**outset**
24:7
**Outside**
87:25
**ovarian**
8:19 9:24 10:4,9
16:16 17:4 19:15

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1140 of 1525
PageID: 63286
Rebecca Smith-Bindman, M.D.

Page 266

20:14,15,16 21:24
21:25 34:4 45:9
47:3 48:18 51:4
99:13,23 100:10
111:3,14,17,24
112:4,7,12 113:1
114:13 115:9,11
115:18,23 116:3,6
116:10,14,17,24
117:12 118:8,12
118:16,21,23
119:2,3,6,10,15
119:18,22,25
120:4,15 123:1,20
124:4,6,10 125:6
125:16 126:18
127:25 128:13,18
130:1 131:7,25
132:16 133:3
135:8 136:17
147:4 155:18
164:13,24 176:24
190:17,23 191:11
192:19 193:7
198:16,19 199:5
202:19 203:2
204:3,10,16,19
220:2,12 222:3,25
223:3 224:7,19
225:17 232:1,15
233:10 234:18,23
235:12 236:5,17
236:21,25 239:11
**overall**
87:21 88:19 180:2
217:4
**overlap**
23:12 149:16
165:18,22,23
166:1,3,6,7 168:9
173:8,22 174:19
175:4,13,15 177:5
177:11,18 219:11
**overlapped**
173:23 218:23
**overlapping**

196:5,5,8,8,10
**overlaps**
169:11
**overlying**
171:2
**oversaw**
91:4
**oversight**
233:22
**Oviducts**
36:17
**Owen**
9:4
**O'Dell**
3:5 15:23 16:2,7
19:21,23 20:4,13
20:24 21:6,10,14
22:11,16,25 24:12
24:20,23 25:5,16
25:24 26:18 28:8
29:5 30:5,9,24
31:7,13,18 32:3
32:13 47:17 48:21
49:10,16 50:11,15
52:17 53:14 54:8
55:19,25 56:24
57:10 60:9 61:10
61:15 62:6,14
65:6 67:4 68:16
70:5 74:3,10,25
75:11,15 77:7
78:1,18 80:6 81:8
82:7 83:24 84:5,8
84:12,15,18,21,23
85:5,7,13 86:7
87:14,23 88:5,23
89:9,21 91:11
92:6 93:2,14,25
94:15 95:8,10
96:23 97:10 98:24
99:7,25 100:5
101:2,22 102:13
103:9,11,17
105:17,20 106:1
106:17 107:24
108:1,8,12,14

110:23 111:7
113:13,23 114:20
116:8,21 117:2,6
118:18 119:7,13
119:23 121:22
122:12 123:21
124:11 125:8
126:19 128:1,14
130:14,19 133:10
134:9,18 135:1,10
135:20 136:23
137:23 138:19
140:2,21,23
141:24 143:5,11
143:15 144:24
150:10,17 152:12
152:20 153:22
154:4,23 155:20
157:19,25 158:3
159:20,25 160:2
163:25 164:8
165:1 166:23
167:21 168:13
170:4 172:3
173:16 176:2,17
177:14,16 179:2,7
179:12,23 180:20
180:24 181:2,4,12
181:25 182:6,9,19
183:16,18 185:10
186:6,11,13,15
188:1,17 191:12
191:15,17,20,22
193:9 194:7,15
198:1,10,22
199:14 201:11,14
201:23 202:3
203:3,9,17 204:5
204:11 205:5
206:6,16 207:4,17
207:23 208:13,25
209:14,22 210:7
210:15 213:8,20
214:13,25 215:6
215:10,12,16,19
215:22 216:1,5

218:12,25 219:4
219:15 220:3,20
221:1,9 223:20,22
224:23 225:1,6
228:4,7,13,16
230:23 232:22
236:13 237:17
238:2,22,24
239:12,14,18
240:20 241:10

─────────────
**P**
**P**
3:5
**package**
171:15,18
**page**
8:8 9:1 10:1 35:10
35:13,14 76:5
77:10,21 82:17
87:7 95:19 98:2,3
98:5 111:1 115:10
132:23 133:8,8,13
157:21 159:19,21
159:21,23 160:1,5
164:14,19,22
165:3,3,19 172:15
174:1,23 176:4,25
180:19 181:11
184:11,15,17
195:16 198:24
203:23 205:15
212:13 217:12
220:22 222:17
224:17 233:17
234:9 235:21
239:24 244:7
**pages**
53:5 82:24 85:23
87:2 173:1 216:13
216:18
**paid**
41:7,8,9,11,18,24
42:4,4,6 70:19
78:21 144:18,21
145:2

**paper**
27:24 34:13,17
77:6,16 95:13
97:19,25 98:12,25
127:15 151:17
154:8 175:11,23
176:22 179:6
183:2 189:3,7
190:3,5,16,20
191:10 192:17
193:5,11,16 194:5
194:9,13 200:10
200:16 219:25
237:12
**papers**
26:9 94:13,17
96:14 101:8,9,10
101:11,24 135:2
150:20,25 159:18
165:13 166:4
186:9 189:4
199:24
**paragraph**
165:2 220:23
**parameters**
132:1,3,3
**paraphrasing**
78:20
**parcel**
137:10
**part**
32:9 35:10 52:3
72:16 83:6 87:20
123:6 129:2
130:15 131:21
137:8,9,12,18
138:5,11 143:2
145:11,17 146:2,3
149:14 152:3
156:10 162:22
165:7 197:1,25
209:9
**participant**
195:9
**participants**
149:8 159:3

Rebecca Smith-Bindman, M.D.

participate
69:14
participated
69:6,18
participating
70:3,20
participation
221:17,23
particles
212:15,16
particular
14:25 30:10 44:19
51:14 65:6 122:3
135:8 136:17
139:4 154:22
159:1
particularly
72:17 147:20
parties
18:22 243:20,21
partly
146:15
parts
139:14 145:10
path
103:18
Pathogenicity
37:16
pathology
23:13
pathophysiology
20:17
pathway
114:7 117:25
pathways
114:11,12
patient
14:23 119:17,18
149:12 175:6
patients
123:24 128:16
149:15 155:10
165:13,16,18,23
173:22,23 174:8
174:15,16,19,25
175:3,15 177:11

186:19,20 190:16
190:23 191:2
226:4
patient's
119:6,10
patient-facing
124:3
pause
208:14
pay
41:18,19,20,25
78:11,14
paying
41:17 74:7 75:3
PCPC
6:13
PDQ
128:15 132:17
PDQ-Health
10:5
Pecan
5:16
peer
236:16
pelvic
116:11,23 117:1,11
118:11,13,15,20
119:16
penalty
242:5 243:6,22
pending
17:16 181:7
Penninkilampi
174:2 233:18
236:19 237:6
Pennsylvania
244:4
people
102:16,24 103:22
105:7,12 107:4,12
117:21 127:7
141:7 147:11
149:11 220:8
percent
42:13 64:25 65:3,4
65:11,12,19 99:17

117:20,22 121:19
121:19 141:4
145:9 159:8 180:7
180:13 187:22
191:8 221:24
222:2,6 229:7,13
229:15,15,23,25
230:3,7,10,15,21
230:25 231:11,14
231:25 232:7,8,11
232:11,14,17,19
233:11 236:25
237:2
percentage
88:19 229:17
Perdue
159:7
perfect
105:11,14,19
perform
144:22 145:14
151:6
performed
28:14 74:2 146:9
performing
71:25 145:14
perineal
10:15 48:18 51:4
94:9,21 95:19
97:8 99:16 111:23
113:6 115:8
116:19 118:8
124:5 126:17
132:24 133:2
147:5 203:1 209:7
209:20 212:5
213:15,18 214:11
214:11,19,23
215:4 220:1,12
222:24 225:18
236:4,20,24
239:10
perineum
193:25
period
65:7

peritoneal
10:4 132:17 221:25
perjury
242:5 243:7,22
permit
84:24 133:22 134:7
permitted
47:22
person
46:9 56:8 73:14
76:24 105:10
127:10,24 128:2
personal
6:13 115:14 125:2
125:13,25 126:7
140:17
personally
15:2 66:10 67:9
68:20 145:16
161:19
pertinent
32:17
Pharmaceutical
69:25
pharmaceuticals
213:12
phases
102:15 177:2
Philadelphia
244:4
phone
44:12,15 45:13,21
46:8,22 60:18
61:12 63:7 73:17
phonetic
28:16 67:6 221:14
physical
154:7
physician
80:18
Phytotherapy
38:1
pick
56:2
picked
88:3

pickled
211:10,13
piece
109:11,15,16
123:25 154:8
pieces
67:20,23 110:14
124:1 148:6
Pier
8:16 37:12 90:9,11
91:15,22 92:17
93:4,12 212:10
Pier's
92:4,23 93:22
place
96:19 243:5
placed
207:21 208:11
places
152:6 213:24 214:2
plaintiff
14:25 15:17 17:6,8
17:25 18:1,7,10
18:14 50:13 58:2
58:13,14 63:12
65:21,21 66:3,22
67:18 81:4,7
143:8 144:10
plaintiffs
3:3,12,19 4:2 28:8
30:4,17,22 31:6
41:8,15,22 42:4
42:21 47:16 48:2
48:8 49:9,22 50:8
50:23 51:1,22,23
52:4 56:18 59:7,9
60:3,15 62:5,20
66:8,15,18 68:25
80:3 81:5,13 82:5
86:11,15 89:6
92:18,24 93:10,13
93:15,17,24
135:18,24 143:4
144:18,23 227:17
237:15,20
plaintiff's

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1142 of 1525
PageID: 63288
Rebecca Smith-Bindman, M.D.

Page 268

48:25
**plan**
41:9,16
**planning**
32:21 103:1
**plate-like**
212:16
**platy**
137:7 208:16
209:15
**play**
40:10
**played**
40:13
**players**
136:5
**Plaza**
3:16 244:3
**please**
13:1,9,15 33:21
121:24 128:23
159:10 170:22
191:14 215:17
225:4 228:2
234:20
**plot**
76:18 180:16
198:19
**plots**
9:20 79:5 162:1
**Pltf_MISC_0000...**
8:19
**plus**
134:21 136:2
**pocket**
41:21
**point**
25:18 44:17 46:20
48:7,14 50:12
51:11,20 58:25
65:16 96:21
108:24 123:4
129:20 144:16
150:3 168:3
169:10 171:3
182:24 186:24

189:1 190:2
201:25 205:14,17
228:22 239:15,20
240:24
**pointed**
126:25
**points**
101:17 105:7 155:1
162:14 174:6
190:7
**pool**
102:2 234:1
**pooled**
192:19 217:4
**pooling**
188:15
**poor**
178:8
**population**
97:2 209:7 213:11
213:14 229:8
230:22
**populations**
97:4
**population-based**
217:16 218:2
221:13,16
**portion**
90:3 240:12
**portions**
67:18
**position**
89:20 126:11
**positive**
31:1 32:5 111:2
169:16 204:9,19
205:3 219:20
**possible**
78:6,16 105:9
116:1 156:1,2
199:1 213:23
**possibly**
97:14 174:5 208:17
208:23 209:4
210:12 211:1,4
**post**

115:20
**postmenopausal**
148:25
**post-graduate**
160:12
**potential**
48:17 113:11
207:25
**potentially**
56:22 204:16
**powder**
1:6 10:11 11:17
12:10 19:1,1,3,3,5
19:16 21:23,25
27:23 31:24,25,25
32:10,11,18 34:3
43:5 45:6 47:3
48:16,17,18 51:4
62:2 64:23 69:4
91:20,23 94:8,9
94:20,25 95:18,23
96:3,5 97:7 99:12
99:13,16,23
100:10 111:4,13
111:18,23 113:5,6
115:8 116:15,19
118:8 119:22,25
120:3,14 124:6
130:1 132:8 135:4
135:9,12,15 136:1
136:8,16,20,25
137:1,15,21,25
138:3,8,12,16
139:1,5,10,25
140:19 141:8,22
141:23 142:1,12
142:14 144:18
145:7 147:5,5
149:21 150:1
155:25 157:16
164:12,24 166:19
166:19 192:18
194:14 198:17,20
202:18 203:1
222:1,4 224:8,8
224:20,20 225:19

229:9,18,24
230:11,16,19,25
232:19 233:14
234:17,23 244:6
**powdering**
193:23
**powders**
214:20 232:8
**power**
95:18 101:25 102:3
169:6
**powerful**
169:16
**practice**
119:4,11,12
**Practices**
1:6 11:17
**pre**
148:24
**preamble**
146:14
**precise**
86:15
**prefer**
120:16
**preferred**
161:5
**pregnancies**
115:19,24
**pregnancy**
14:14,16
**premarked**
8:15,16
**preparation**
30:18 33:11 40:2
40:11 59:14 81:14
91:9
**prepare**
30:22 59:12,18
60:3,16 240:18
241:5
**prepared**
27:8 28:3 29:7 30:3
39:14,23 55:7,7,8
56:17 59:3 64:2
93:13,16,23 94:2

100:3 161:15
**preparing**
27:18 29:12,18
32:24 57:6,17
60:19 61:7 64:19
103:15
**presence**
142:1
**present**
42:15 59:6 141:21
149:23
**presented**
233:2
**prestige**
129:1
**presumably**
195:25
**pretty**
70:8 211:13 233:12
**prevalence**
98:9 221:19,25
**Prevention**
10:5 132:17
**previously**
14:19 48:15 149:24
**primarily**
33:8 69:21 76:18
149:25
**primary**
10:4 59:14 72:11
94:16 132:17
147:22 148:2,4,8
149:18 165:4
172:22 173:8
174:10 183:7,10
209:6,8 213:12,15
214:20
**printed**
154:10
**printout**
76:11
**prior**
15:21 16:3 24:14
27:6 32:24 71:24
94:2 154:18
**PRISMA**

Case 3:16-md-02738-MAS-RLS    Document 9886-12    Filed 05/29/19    Page 1143 of 1525
PageID: 63289
Rebecca Smith-Bindman, M.D.

Page 269

161:2
**pro**
151:6
**probability**
112:11 117:19
**probably**
23:10 58:22 65:2
65:11,19 79:4
94:17 190:14
207:7,16,21
**problem**
127:9 216:11
**proceed**
13:15
**proceedings**
243:4
**process**
59:21 129:4,19
150:18
**processes**
20:17
**produce**
156:7 180:14
**produced**
24:3 25:13 29:9
44:17 71:13 79:10
87:19 88:16,20
153:12 156:25
157:5,11 171:23
180:21 181:18
182:10 185:7
**product**
19:5,7 51:16 62:21
62:25 79:3 136:8
136:16 137:10,12
137:13 138:25
140:12 164:12,24
**production**
79:20
**products**
1:6,6 6:13 11:17,18
19:2,3,3,6,8,16
27:23 47:3 91:4
91:20 94:25 99:16
100:10 111:4,13
113:5,6,6 116:15

119:25 134:17,23
135:12 136:20,25
137:2,15,21,25
138:3,8,12 139:1
140:8 141:1,9
149:21 155:25
166:19 213:12,21
214:18 225:19
229:9,18,24
230:16,20 231:2
232:12,19 234:17
234:23
**professional**
10:5 64:25 80:21
123:13
**professionally**
216:8
**program**
131:12 171:15
**project**
107:16
**projects**
69:6,7
**proportion**
135:11 184:23
186:2,23 230:11
230:12
**proportions**
187:4
**proposal**
186:2 222:16
**protect**
122:21
**protected**
31:10
**protective**
131:25
**protocol**
154:13,16,21
155:23 156:4,8,13
156:16 197:23
198:5 241:3
**protocols**
154:19
**prove**
208:1 211:17

**provide**
19:14 21:1,2,5,19
22:4,12 27:3 49:3
57:23 62:12 64:19
80:21,25 81:13,23
82:6 101:25 134:3
161:9 170:14
220:6,7
**provided**
14:22 25:8 29:5
30:3 31:4 49:4
53:9,16,23 54:6
55:1,17,17 56:3,4
56:19 62:24 63:3
75:10 81:15 85:8
89:23 92:1,3,17
92:24 93:10,21
94:1,3,16 96:9
104:11 125:11
135:21 143:3,8
156:21 161:11,23
166:14 171:16
174:5 181:15
192:4,7 194:25
201:14 211:22
**provides**
220:14,15 224:8,20
**providing**
20:10,22
**proving**
211:17
**PTI**
7:3,3
**public**
120:18 143:7
244:25
**publication**
27:20,21 96:7
183:13 189:25
190:12,12 193:21
194:10 214:10
**publications**
40:18 53:23,25
96:8 97:12 142:4
147:19 161:20,21
174:16 182:18

183:8,10 234:3
**publicly**
124:4
**publish**
103:2 104:8,17
127:15 144:16
149:11
**published**
26:22 35:24 36:22
38:1 99:11 101:6
103:20 119:20,24
124:20 143:7
144:14 145:11,13
146:4,22 172:5
174:16 192:3,15
200:7 206:1
234:12 235:3
236:3 238:3
**publishing**
88:2
**PubMed**
146:25
**pull**
179:10
**pulled**
33:12,17 174:4
175:2 197:15
**pulling**
151:2 212:9
**pulls**
164:17
**pulmonary**
73:11
**purportedly**
141:21 142:10
**purpose**
101:23 169:14
226:16
**purposes**
95:17 181:18 231:7
**put**
27:12 30:17 68:3
91:8,12 104:5,17
106:6 110:13
116:14 121:9,18
122:1 124:14

127:1 140:9
150:14 162:15
171:17 210:9
211:2
**puts**
112:10 171:18
207:6
**putting**
70:16
**Pycnogenol**
8:17
**P.A**
3:20
**p.m**
2:10 76:17 143:18
143:19,20,24
144:3,4,5,7
201:24 202:8,9,10
202:14 240:9,10
240:11 241:12,14
241:16

---

**Q**

**qualification**
108:4
**quality**
178:8,15
**quantification**
159:5,9
**quantifies**
236:22
**quantify**
237:1,3
**quantifying**
149:22 236:8
**quantitative**
52:12 123:8,14
**question**
12:24,25 13:2,6,10
22:17 25:4 29:20
31:19 45:25 47:18
54:18 62:19 64:10
78:4 79:19 81:9
82:3,9 84:19,24
85:18 86:14,25
87:6 92:21 95:17

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1144 of 1525
PageID: 63290
Rebecca Smith-Bindman, M.D.

Page 270

96:11 97:6,14
101:21 102:5
106:7 108:2,9,14
108:16,18,20
109:2,25 111:8
116:4 117:14
118:11 123:17
125:12,24 126:13
127:18 129:24
130:18,20 131:22
139:22 140:4
142:9 154:20
157:22 159:4
163:23 169:1,4,21
170:16,20 181:6,9
181:10 182:4
183:3 184:6,7
185:4 186:1
189:24 197:11,16
197:25 200:5
215:16 218:24
219:1,16 220:25
221:2,4 224:2
225:12 226:7
**questionable**
235:18
**questioning**
13:16
**questions**
18:25 20:7 27:2
33:19,23 52:23
92:15 94:6 95:16
144:12 155:11
162:14 163:3,23
164:2,4 179:9
182:3,3 184:21
185:8 193:14,21
196:16 197:2,20
216:2 226:5
240:19
**quick**
75:17
**quickly**
39:6 72:14 74:8
75:6 110:9
**quite**

77:15 110:9 131:2
175:14 181:23
197:4 220:22
224:14 226:7
234:2
**quote**
70:14

---

**R**

**R**
3:21 6:15 104:8
130:10 171:15,15
171:19
**race**
115:16
**radiation**
70:11
**radiologist**
14:7 20:3,6 44:11
119:5,8 126:16
**radiology**
20:12 21:3,9 22:3,5
**raise**
216:3 227:3,25
**raised**
197:25
**raising**
216:7
**Ralph**
73:8 76:25 77:14
**ran**
229:7
**random**
219:18,22
**ranged**
222:1
**ranges**
141:3
**ranging**
221:24
**rarely**
188:16
**rareness**
188:5
**rates**
221:17,23

**ratio**
149:19,20 163:9
172:1,8,8 186:25
195:4 217:5 226:3
236:10
**ratios**
170:24 172:5 183:1
185:13,21 186:20
188:4,10
**raw**
185:1 186:3 187:3
**reabstracted**
161:20
**reaccess**
59:15
**reach**
166:22 167:1
**reached**
71:22 73:3 101:16
151:19
**read**
31:12 54:23 55:2
81:3 90:3 96:14
123:2 134:1,2
135:3 146:15
173:18 212:14,19
222:20,21 223:5,6
224:2,4,24 225:2
234:20 242:6
**reader**
104:14
**readership**
104:18
**reading**
52:19 77:8,9 92:11
224:17 234:16,16
**ready**
25:5 181:21,23
**real**
52:20
**realizing**
52:19
**really**
25:3 91:25 106:22
107:1 200:24
226:6 232:17

**reason**
124:8,22 174:4
175:3 177:9 178:7
225:9 227:25
**reasonable**
75:5 210:22
**reasons**
240:4
**reassert**
24:24
**Rebecca**
1:13 2:5 8:3,11
11:5,21 12:1,8
75:25 143:23
202:13 241:13
242:4,14 244:21
**recalculate**
182:22 183:1
**recall**
47:9 58:16 73:21
93:5 96:8,13
97:16 125:18
**recalled**
144:9
**receipt**
74:4,5
**receipts**
74:1
**received**
65:17 128:8 135:18
**rechecked**
163:17
**recognize**
24:20 130:21
**recognizes**
123:1
**recognizing**
123:20
**recollection**
43:6 68:8,10 74:22
97:11 121:23
178:14
**record**
11:10,22 24:22
75:19,24 85:11,14
90:22 143:18,22

144:1,2,7 155:1
179:14 202:7,12
216:4 240:8,12,14
240:14 241:7,12
**recorded**
243:9
**recovering**
240:22
**redouble-check**
163:13
**Reduces**
8:17
**redundancy**
40:16
**Rees**
6:3
**reestimated**
200:14
**refer**
19:2 67:4 96:21
181:20
**reference**
28:20 35:14 37:7
39:3 125:20
**referenced**
26:12
**references**
28:21 53:1,4,6 55:9
59:15 125:19,21
129:10,12 147:7
210:17
**referred**
55:25 93:15
**referring**
19:5 76:24 84:25
146:11 206:8
**refined**
198:18
**reflect**
24:22 26:22 83:7
89:1
**reflected**
147:16
**reflecting**
205:24
**reflection**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1145 of 1525
PageID: 63291
Rebecca Smith-Bindman, M.D.

Page 271

96:18
**reflects**
106:25 108:24
190:13
**refresh**
125:9
**refused**
243:17
**refute**
162:20
**regard**
138:20
**regarding**
61:11 133:22 134:8
**region**
94:9,21 95:19 97:8
214:12
**Registries**
131:2
**regular**
99:16 111:18,23
115:8 116:19
118:8 145:7 150:1
155:17,17,24
157:15,17,24
158:8,10,18,19,20
158:24 159:14
160:4 164:12,23
172:24 173:14,19
175:19 192:23
193:18,21,24
194:3,6,9 198:17
198:20 199:5
225:18 231:8,11
232:8 233:4
**regularly**
140:6 229:9,10,18
**relate**
21:23 54:2 83:11
87:12
**related**
20:18 44:25 45:6,9
60:22 65:13 69:20
73:15 80:22 84:24
**relating**
21:1,3 25:18 32:5,9

32:18 36:12 42:8
42:15 45:12 48:16
48:16 50:8,14
58:14 62:25 63:3
69:3 81:1 94:8,13
99:11 121:7 157:7
157:11 204:2
**relationship**
148:24 235:17
**relative**
188:3,9 222:3,8
235:18 243:19
**relatively**
53:24 72:14
**relevant**
20:6,8 22:4 59:17
60:25 72:17 89:2
109:12 110:12
146:22 147:20
**reliability**
102:19
**reliance**
39:3 54:7,14,20
55:16 56:9,15,16
82:11,14 88:13
**relied**
57:5 123:12
**rely**
88:2 238:20
**remained**
213:24
**remember**
15:10,13 16:12
17:2,8,10,12,15
18:2,8,12,16,21
29:15,21 30:1
43:15,17 46:17,20
50:2 51:5,8,14
61:17 67:2 74:11
86:24 92:11 124:7
166:5,24 176:15
178:4,9,15,17
197:4,14
**remembered**
58:9
**remembering**

91:24 197:4
**remind**
83:25 165:25 206:7
**reminder**
92:19
**remove**
40:15
**render**
26:14 49:14
**repeat**
13:3 21:16
**rephrase**
13:2 108:10
**replicate**
107:20
**report**
8:11,13 9:22 24:3
25:23 26:1,5,6,10
26:12,16,19,24
27:2,8,12,18 28:3
28:4,6,17,25 29:4
29:7,10,12,13,15
29:19 32:25 33:10
33:12 40:3,5,12
40:14 49:17 51:9
51:17,17 52:25
53:5,7,8,17 54:6
56:1,13 57:2,7,12
57:15,17 59:15,16
63:19 64:2 66:24
66:25 67:1,5,7
68:3 77:25 78:7
81:15,17 84:14
89:12 90:16,18,22
91:6,9,12,13
94:12,24 95:2,9
96:17 99:21 100:3
100:16,17 101:4
103:8,16 104:1,9
104:14 109:19,21
110:24 111:1
113:2 115:10
123:2 128:17
142:24 147:3,17
157:20 160:5
164:14,21,22

165:20 172:15
173:1 180:19
181:11 192:3,9,15
192:16 201:3,10
208:18 209:24
220:5,9 224:5,16
224:18 225:1,2
234:9 235:5
238:12,16 239:1,2
240:4,5
**reported**
1:23 95:22 98:20
98:25 158:20
159:7 174:20
186:18,20 187:23
222:8 238:13
**reporter**
2:11 11:23 54:16
159:10 212:18
216:16 221:21
234:19 243:2
**reporting**
102:10,16,18,21,23
161:5 238:8,14
**reports**
28:22 29:3 64:9
66:17,22 67:14
128:16 139:12
140:25 141:17,20
141:25 142:4,8,12
142:16,17,20
143:9 149:9
**represent**
59:9 88:4,22 183:9
189:1
**representation**
151:25
**represented**
29:6 48:2
**reproduce**
103:7 107:19
**Reproductive**
8:22 34:1
**reputable**
122:11,13
**request**

31:5,8,9,12,14,14
31:20,23 32:16,19
185:12
**requested**
31:2 75:9 243:16
**require**
145:1 238:8
**required**
72:19 151:8 238:5
**requirement**
151:2 226:18
240:25
**requirements**
146:8 238:7
**requires**
109:11 124:15
**reschedule**
60:21
**research**
36:10 38:1 44:4
48:15 70:11 72:16
81:22 88:1 101:20
102:7,11,15,20
106:16 107:15
108:7 109:7,9,21
110:11,14 115:7
121:3 163:22
164:2,4 222:16
223:1
**researcher**
71:18
**reserve**
81:11
**resources**
124:18
**respect**
43:5 73:14 86:3
91:23 125:14
126:1 139:22
158:8 162:3 176:7
194:25 202:25
206:4 224:6
234:10,13
**respond**
72:14 185:4,25
187:6 198:2

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1146 of 1525
PageID: 63292
Rebecca Smith-Bindman, M.D.

Page 272

responded
25:8
responding
33:18
response
197:2,25 205:12
   233:13,15,16,17
   233:20,23,25
   234:1,4,7,10,14
   234:18,24 235:17
responsibility
127:20
responsible
70:16 127:24
responsive
24:18
Restaino
4:3,4 46:10,23 58:5
   63:6,7
restricted
241:6
restriction
241:3
result
23:6 104:3 121:20
   131:12 149:19
   163:11 180:1,8
   204:9,18
results
14:12 30:11 31:1
   32:15 102:1,17,17
   102:24 103:25
   133:3 145:23,23
   145:25 164:20
   165:5 179:19
   180:4 188:16
   192:23 204:24
   205:2 218:11,19
   219:6,9 234:10,25
   236:23
retained
17:13 43:2 51:9
   63:2 66:8 70:2
retention
223:2,12
retrieved

147:7
Retrospective
176:24
Reuters
28:23 29:2 92:10
review
19:14 32:9 40:2,5
   40:10,13 47:2,10
   47:20,23 48:7,11
   48:12,15 49:18
   50:20,25 52:5,7,9
   52:12,14,15,18
   57:22 59:14,21
   63:16,20 70:23,25
   71:1,3,4,6,25
   72:22 73:10 77:4
   77:14 80:22 81:14
   81:20 83:6,8
   85:15 87:22 88:6
   88:9 92:17,24
   94:6,19 96:25
   97:16,18 100:14
   100:18,22,24
   101:3,5,12,20,23
   103:2,16,19,24
   104:24 105:6,13
   106:11 107:16
   115:6 116:5,16
   120:6 124:13,14
   124:19,24,25
   125:4,14,23 126:1
   129:5 132:16
   144:13,17,22
   145:11 146:3,4,10
   146:12,15,20
   147:16,23,24
   148:1,4,21 149:14
   150:16 152:15,22
   153:13 154:22,25
   154:4 158:9 160:9
   161:2,10 163:23
   164:5 167:19
   169:3,14 173:7,21
   175:11,17 176:12
   177:21,23 179:20
   188:21 192:11

196:21 198:25
199:9 203:7 205:8
205:9,12 208:15
209:2,3 210:11
220:4,6,10 233:20
237:10 239:4,5
243:15
reviewed
27:7,18 28:18 29:7
   29:11,18 30:11,18
   32:23 33:9 40:14
   48:22 49:7 50:7
   51:21 55:9,13
   56:20,21 57:5,17
   66:17,19,23,24,24
   66:25 67:14,17,20
   67:22 68:4 83:4
   83:12,21 84:3
   85:10,21 86:1
   90:6 93:3,6 94:7
   94:13,18 96:9
   97:7 134:21 137:1
   141:17,20 147:7
   152:4 163:21
   173:13 203:20
   204:1 205:21
   207:20 217:1,4
   236:17
reviewing
64:7 68:8 91:13
   92:4 100:7 101:9
   101:10 124:21
   149:1
reviews
71:19 72:24 73:5
   103:21 123:8,13
   124:15 145:13,15
   147:11,12 149:24
   154:18 161:6
   170:15 173:5,5,18
   174:2,9 233:24
rid
137:4 166:4
right
15:21 16:5,13 17:1
   17:19 20:3 24:4

25:14,23 27:9,15
28:1,13 32:1,6
33:4,25 35:13
36:3 38:2,14,22
39:9 40:21,22
41:5,13,20,22
42:22,25 48:4,19
48:23 50:9,19,23
51:20,23 53:1,9
54:7 56:5,16,18
57:24 59:4 60:8
62:13 63:24 64:5
66:5 67:11,12,15
69:18 70:22,24
71:11 72:4 73:24
74:9 75:10 76:19
76:22,25 77:2,6
77:25 78:7,17,24
79:8,12,14,25
80:19 82:1 83:19
84:12,15,18 86:12
87:6,9,12,17,22
88:17 89:7,11,24
90:19 91:8 92:1,5
92:18,25 93:4,7
94:10,14 95:14,24
96:6 98:13,16,22
99:6,10,13,24
100:20 101:1
102:12 104:20
105:19 106:16
107:17,22 109:25
110:10,20 113:18
115:5 119:6,11,22
121:1,7,9,12,16
121:17,21 122:5
122:11,17 126:9
128:9 130:6,23
131:9 132:2,4,10
132:18,22 133:5,9
133:14,16 134:17
134:25 141:18,23
142:19 143:4,10
152:1,19 153:15
153:16,20 154:3
154:10,12 156:15

156:20 157:2,12
158:14 160:5,11
160:24 161:7,15
162:15,15,22
163:1 164:10,14
165:8 168:21,25
169:24 170:17
171:23 173:15
175:13 176:12
177:22 178:23
182:10 184:13
187:20 188:10
189:5,7,22,24
190:8,18,24
193:13 195:16,18
196:22 198:11,21
201:24 202:1,2,6
203:2,8 204:4,10
204:21,24 205:4
205:13,19,21
206:5,22 207:3,8
207:16,22 208:3,8
208:12,24 209:11
211:5,8 216:19,24
217:2,6,9,17
218:3,5,11,20
223:25 224:5,11
224:12 225:19
229:5,10,15,22
230:17,22 231:1,6
231:8,15,17
232:17,20 233:13
233:16 234:14
235:4,6,13,19,24
235:25 237:25
238:18,20,21
240:6
right-hand
222:17
rigor
71:3,7
risk
10:2,9 20:14 28:11
   34:3 35:9 98:9
   99:18 112:6,8,10
   112:11,16,18,20

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1147 of 1525
PageID: 63293
Rebecca Smith-Bindman, M.D.

Page 273

112:23 113:2,10
113:11,15,16
114:1,5,9,16,18
114:23 115:2,11
115:13,23 116:1,3
116:24 117:17,24
118:5,21,23
122:25 123:19,23
124:6 125:5,16
126:18 127:25
128:12,17,17
130:1,10 131:5,6
131:19,23,25
133:3 135:7
136:16 145:8
149:20 164:12,24
172:8 188:3,9
192:18 204:20
222:3,6,8,25
235:12,18 236:25

**risks**
212:3

**Robert**
29:10

**Robinson**
3:13

**role**
40:10,13 44:9 70:7
91:22 213:23

**roles**
120:7

**room**
59:7

**Rosen**
201:8

**Rosenblatt**
177:21,23 178:4,6
178:8,11,13,18
179:5,15,20 180:9
180:11 201:20

**route**
209:8

**routes**
213:15 214:20

**rows**
154:7

**Royston**
7:3

**rule**
8:11 9:22 210:21

**rules**
12:21

**rush**
74:7,12,18,23 75:3
75:9 78:11,15,22

————————
**S**

**S**
37:14 130:10

**Saed**
27:21 34:6

**Saed's**
34:13

**safe**
208:1

**Safety**
8:23 34:20

**sake**
208:6

**Sales**
1:6 11:17

**sample**
102:2 169:3,6
185:17 218:6
219:11

**samples**
142:21,23

**sampling**
96:19

**Samuel**
10:17

**San**
1:14 2:8 5:18 11:1
11:15 15:5,7
40:24 46:6

**SAS**
104:8

**sat**
51:21 61:20

**saw**
28:17 67:25 100:9
123:22 129:8

152:7 156:10

**saying**
175:14 184:16
231:25 232:3,13

**says**
78:21 111:12
130:24 131:23,24
132:7 165:3
184:25 187:15
193:20 194:9
198:24 205:5
210:11 212:15
213:10 221:12
230:15 232:11
234:16 238:11,11

**scans**
121:7,10,21

**schedule**
57:21

**science**
125:4

**Sciences**
8:22 34:1

**scientific**
47:23 71:3,7 81:22
125:15 211:17

**scientist**
107:20,22

**scientists**
103:6 122:20

**Scopus**
147:1

**Scott**
144:11

**screen**
134:1,2

**Screening**
9:12 38:9

**scribbling**
233:5

**search**
81:17 101:7 145:20
146:21 147:2,10
154:25

**searching**
146:24

**Seattle**
41:2

**second**
35:14 38:24 73:10
101:15 147:18
183:24 220:23,23
226:6

**second-to-last**
184:11

**section**
98:14 212:10,11,15
213:7 226:1

**sections**
212:14

**see**
31:1 32:17 33:21
35:7 38:22 43:11
45:17 70:7 83:2
84:5,5,22 85:25
90:2 91:18 96:16
107:21 121:25
122:4 127:8 131:4
136:22 164:18
171:11,22 176:7
180:20 182:7
184:16 185:5
187:11,15 189:15
189:18 190:5
194:19 196:4
200:20 201:18
203:24 209:23
210:16 216:11
217:13 222:18
238:16 241:9

**seeing**
60:25 124:7 135:25
213:2

**seeking**
44:10

**seen**
24:13 26:9,19,23
27:20 28:4,6,24
29:14 32:8,14
66:11 138:21
139:12 140:11,25
141:25 142:6,7,10

142:12,16,18,20
142:21,24 143:1,2
201:16 203:4
236:16

**SEER**
10:2 130:10,15,24
131:1,11

**selected**
30:21 86:17 158:24
221:18,22

**selection**
172:18 199:22
204:8,17 219:19

**send**
77:23 79:6 185:2
186:5

**senior**
73:9

**sense**
149:3

**sensitivity**
201:7,8

**sent**
86:20 156:23
162:11,13 187:8
199:15,16 200:19
201:9

**sentence**
235:8

**sentences**
111:12

**separate**
42:8 63:20 102:14
114:9 154:6
174:23 228:23

**separated**
137:14,16

**separately**
42:21

**September**
76:6,16 77:11,20
78:5,14 100:19,25
184:12

**series**
28:22 29:8 82:25
87:8

Case 3:16-md-02738-MAS-RLS    Document 9886-12    Filed 05/29/19    Page 1148 of 1525
PageID: 63294
Rebecca Smith-Bindman, M.D.

Page 274

**serous**
99:18 145:8 148:17
155:18 156:2
186:19,21,22
187:1 191:11
192:8,25 193:7
195:4,7,18,21
196:1,13 198:21
198:25 199:6,7,10
199:18 225:17
229:24 230:15
231:12 232:4,5,11
232:18
**serve**
47:16 48:8 64:22
**served**
15:24 16:4 62:11
64:21 69:22
122:15 129:3
**services**
11:11 41:4 244:2
**serving**
52:3
**set**
45:13 101:15
103:16 149:6
153:3 171:16,20
199:15 222:4
240:4 243:5
**sets**
79:5 199:17
**setting**
154:13
**settled**
62:17
**seven**
18:3 163:8 173:4
173:25
**Seyfarth**
6:14
**share**
120:16
**shared**
104:11 135:17
180:15 181:3
195:12 201:6

**Shaw**
6:14
**sheet**
154:2,5 156:20
244:1
**short**
44:14,15 125:21
**shorthand**
2:11 243:2,12
**show**
30:22 31:3 79:17
133:11 141:21,22
167:10,13 168:8
168:11,17 183:17
183:24 185:8
189:3,15 203:10
209:11,19,24
210:3,4 211:21
219:11 233:15
234:3,5,18,23
**showed**
222:11 233:24
235:17 236:3,6
**Shower**
19:4,4,7,7 31:25,25
32:10,11
**showering**
193:25
**showing**
79:13 131:4 145:25
177:4,5 181:13
198:16 233:25
**shown**
141:3 142:1,17,18
142:20,22,25
168:2
**shows**
142:11 233:23
**Shukla**
37:13
**sic**
201:8
**side**
49:22 156:20 177:3
222:17 227:17
**sidetracked**

**58:1**
**signed**
27:8
**significance**
167:8,10,13,25
168:5,8,21,24
169:23 170:2,12
170:23 218:5
**significant**
169:13 170:13
171:13 218:10,19
233:13 239:10
**significantly**
169:12
**Simes**
2:7
**similar**
50:5 107:6 200:15
**simple**
106:20 107:11
127:18 131:22
**simply**
22:21 107:4
**single**
16:20 105:10,10
109:11,15,16
117:25 128:2
159:3 204:15
**sir**
159:20
**sit**
87:11 176:14
179:18 199:11
**sitting**
227:19
**situation**
117:18 241:1
**situations**
114:12 117:18
**six**
13:21 16:24
**size**
102:2 169:4,6
171:2 185:17
218:6 219:11
221:15

**Skadden**
5:3
**skills**
72:20
**Slate**
5:3
**slides**
15:19
**slight**
146:13 200:24
208:14
**slightly**
200:17
**slow**
159:10 212:19
234:19
**small**
62:15 65:2,10
67:20,23 107:5
125:21 129:1
162:18
**Smith-Bindman**
1:13 2:6 8:3,11
9:18,22 11:5,21
12:1,8 25:1,4
33:22 51:2 61:10
75:25 76:2 84:3
85:9,15 103:23
117:3 143:23,25
144:8 181:22
182:13 202:4,13
202:15 240:21,24
241:14 242:4,14
244:21
**Smith-Bindman's**
181:19
**smoke**
117:21
**smokes**
117:25
**smoking**
112:20 113:19
116:1 117:23
**software**
162:5,7 170:7
171:14,19

**sold**
34:7
**solidify**
100:8
**soon**
78:6,15
**sooner**
77:24
**sorry**
29:20 54:17 73:4
78:3 117:2 130:4
130:19 133:24
153:22 168:13,14
184:5,14 189:20
195:22 201:23
212:20 221:22
234:21 238:11
**sort**
71:2 96:13 103:23
109:21 124:19
127:22 131:10
139:13 140:5
145:23 146:17,18
151:1 162:21
163:12 171:1
220:8
**sound**
94:14 107:8 121:16
121:17
**sounded**
147:21
**sounds**
217:9 233:12
**source**
135:3 197:6,8
198:7 213:13
**sources**
88:9 209:6
**South**
4:16 7:7
**Southern**
15:9 18:9,14,19
**space**
136:5
**speak**
43:10,21,24 44:6

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1149 of 1525
PageID: 63295
Rebecca Smith-Bindman, M.D.

Page 275

202:3
**speaking**
45:18
**specific**
110:24 145:23
195:4
**specifically**
53:7 72:21 85:22
95:20 110:15
130:22 132:23
135:7 154:24
161:17 178:5
205:1
**specifics**
31:9
**specified**
186:21 193:11
**specify**
135:3 196:3
**specimens**
143:1
**speculate**
13:9,11
**spend**
64:17 65:1
**spent**
64:11 96:12 100:6
123:3 159:15
**Spitzer**
3:20
**split**
15:18
**splits**
41:2
**spoke**
25:16 46:8 73:18
187:16
**spoken**
120:5 127:3,5
**spreadsheet**
8:16 197:14
**spreadsheets**
179:8 180:22
191:23 201:12
**spurious**
204:9,18

**Square**
5:6
**St**
7:9
**staff**
40:1
**stamp**
203:16
**stand**
85:17 128:24
**standard**
171:1 211:16
**standardized**
145:19
**standards**
106:16 108:6 109:6
129:6 161:3
**start**
37:8 63:22 80:9
82:16 94:23 206:9
**started**
49:3 63:23 100:8
112:21 147:1
**starting**
150:24
**starts**
184:15 216:15
**state**
12:7 198:19 214:22
215:3 234:9
242:11 243:2
**stated**
17:18 157:14
205:12 215:7
**statement**
41:21 131:24
132:24 213:4
225:8 227:8,10,11
**states**
1:1 11:19 188:8
204:15 229:8
232:4,6 236:18
**static**
122:4
**statistic**
122:3 185:24

**statistical**
100:21 101:16,25
102:3 167:8,10,13
167:25 168:4,8,11
168:21,24 169:23
170:2,11,23 218:5
218:16
**statistically**
101:13 145:25
151:5 161:24
168:5 170:13
171:13 218:10,19
239:9
**statistics**
160:18
**stature**
220:8
**steer**
130:9
**stenographic**
11:22
**stenographically**
243:9
**step**
146:9,9,21 147:12
147:14,18,24
150:15,19 151:4
151:17 152:4
**steps**
103:15 104:23
107:21 151:6
152:11,17 154:13
154:17
**stones**
73:8
**stop**
202:1
**stopping**
201:24 202:2
239:15
**story**
92:9,10
**stratified**
103:24 145:23
151:11,13 155:7
155:14 192:7

198:24
**Street**
2:8 3:8 4:6,16 5:16
6:17 7:7 11:15
244:3
**strength**
111:19 216:23
224:6,10,21
225:15,22,25
226:2,11,13
228:23
**strengths**
226:17
**strike**
32:24 37:3 43:3
46:4 49:1 53:16
105:23 123:15
139:9 140:15
169:19 178:19
223:19,25
**string**
9:20 10:13
**strong**
51:8 111:2 222:11
226:6 236:18
237:1
**strongly**
51:7 100:9
**student**
237:8
**studied**
96:19 218:9
**studies**
22:22 23:8 94:13
94:16 97:6 101:13
133:4 134:21,22
135:14 148:3,8
151:9,13 163:8,9
153:19 154:2
155:5,15,15
158:17 159:3
161:13 163:8,21
164:11,18,23
165:19,24 166:10
166:12,14,17,18
166:21,21,25

167:1,3,4,7,10,12
167:13,15,19,24
168:1,8,17,20,20
168:24 169:2,6,15
169:22 170:3,10
170:25 171:9
172:2,4,7,13,15
172:16,19,22,23
173:1,3,11,12,13
173:24 174:7,10
174:21,24 175:12
182:15,17,23
185:19 192:22
198:13,15,18,18
199:3,4,9,12,13
204:12 205:2,3
217:1,6,16,18,22
217:25 218:2,3,4
218:6,8,9,18,21
218:22 219:22
221:13,16,16,18
221:19,22,25
222:5,7,11 233:14
234:2,12,17,22
235:3 236:3,6
238:17,18 239:7
239:22,25
**study**
95:7 96:3 106:10
126:23 135:14
144:22 148:13,14
149:12 150:15
151:3 154:5
158:20 161:25
164:16,16,17
165:8 168:6 171:3
171:3,8,20 174:12
176:10,24 182:18
186:17 195:11
201:8 204:15,24
219:10 220:4,18
223:9,11 235:11
236:11 238:21,21
**stuff**
75:13
**sub**

Rebecca Smith-Bindman, M.D.

151:10
**subgroup**
155:4,8,8,13
**subject**
25:2
**subjects**
149:9
**submit**
41:10,13 42:7
**submitted**
27:21 42:12,24
64:8
**submitting**
42:20
**Subscribed**
244:22
**subsequent**
32:24 49:12 99:17
174:15
**subsets**
166:20,25 167:5,20
**substance**
31:14,15 61:12
**substantial**
111:1
**subtle**
71:8
**sufficient**
169:7 207:3
**suggest**
50:13 128:2 207:25
241:7
**suggested**
118:4 188:15,23
**suggesting**
114:2 127:11,18
177:4
**suggestion**
188:8 237:2
**suggestions**
162:18
**suggests**
106:18 169:2,10
220:11
**suite**
2:8 3:24 5:17 6:7

7:8 11:15 21:11
**summaries**
123:7,24 160:9
**summarize**
239:21
**summarized**
201:9 239:23,23
240:1,1
**summarizes**
26:5 239:1
**summarizing**
145:22,25
**summary**
28:23 76:18 101:16
111:12 129:9,10
159:6 163:4,6
171:6,10 185:19
185:24 191:18
205:9 216:9
233:17 234:16,22
**summary-weight...**
162:1
**supervision**
243:10
**supplement**
186:9
**supplemental**
192:4,6 194:3
**supplementing**
195:8
**support**
27:11 29:3 47:25
133:1 134:6
**supported**
100:9
**Supporting**
34:2
**supports**
111:2
**sure**
13:24 17:2 25:5
42:13 50:16 52:24
59:16 63:19 70:6
77:9 83:9,16 84:1
103:12 106:2
110:25 118:4

122:1 133:12
136:4 143:14
148:1 151:10,15
155:11 158:16
162:10 163:13
167:3 169:12
174:7 177:12
181:24 184:7
185:6 190:12,15
190:20 200:7,17
200:24 203:11
222:12 230:14
235:21
**surveillance**
130:16 131:11
**survey**
82:21 136:10
**suspect**
238:4,8
**sustained**
159:2
**sworn**
11:6 12:2 244:22
**systematic**
52:5,7,8,14,18
63:16,20 70:23,24
71:1,4,6,19,25
72:24 73:5,10
100:13,18,22,24
101:3,20,23 103:2
103:16,20 104:24
105:6 106:10
107:16 142:24
144:13,17 145:11
145:13,15 146:3
146:10 147:12,15
150:16 152:15
154:14,22 155:4
158:8 160:9 161:2
161:6 163:23
167:19 169:3,14
170:15 173:4,5,18
173:21 174:1,9
175:11 176:11
177:21 179:20
192:11 196:21

220:10 233:24
239:4,5

_____

**T**

_____

**table**
95:20,23 98:2,8,9
109:22 161:12,14
176:3,4,5 186:22
194:16,21 195:14
195:16,22 200:6
225:16 226:16
227:20 228:20
229:4,4 230:25
231:20
**tables**
180:11 181:13
182:7 200:20
**Tachibana**
40:7
**tail**
101:12
**take**
12:9 13:14,17 26:7
62:18 73:19 74:15
75:17 76:10 82:10
95:1 101:24 130:8
132:10 175:22
176:2 179:7
201:25 206:10
208:14 217:12
222:15 230:4
239:16 240:6
**taken**
2:6 33:22 75:21
134:5 143:19
144:4 160:14
167:9,11 169:5
171:4 202:9
240:10 243:4,12
**takes**
127:20
**talc**
9:8,14,16,24 10:9
10:15 19:3,13,16
34:20 36:16 38:24
38:25 39:15,19

91:4,20 98:15,20
99:4 111:13
116:15 124:10
126:18 128:12,19
129:9 131:6
132:24 133:2
134:16,22 137:2,6
137:7,8,19 139:21
140:14 141:2
142:2 147:5
155:25 159:4,8
164:12,24 166:19
172:24 173:14,19
175:20 176:23
188:15,22,25
189:1,2 193:21,22
193:25 204:3,10
204:19 206:5
208:10,16,19,23
209:3,7,9,9,12,15
209:15,16,17,17
209:20 210:5,12
210:24 211:25
212:5,15,21,23,24
213:5,5,9,9,13,18
213:18,21 214:11
214:15,20,23
215:4 220:1,12
221:19 222:25
223:3,4 225:18
231:11 232:8,9,12
236:4,7,17,20,20
236:24 237:15,20
239:10
**talcum**
1:5 11:17 12:10
19:1,3 21:23,25
27:23 31:24 34:3
43:5 45:6 47:3
48:16,17,18 51:4
62:2 64:23 69:4
91:23 94:8,9,20
94:25 95:18 96:5
97:7 99:12,12,16
99:22 100:10
111:4,18,23 113:5

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1151 of 1525
PageID: 63297
Rebecca Smith-Bindman, M.D.

Page 277

113:6 115:8
116:19 118:8
119:21,25 120:3
120:14 124:5
130:1 132:6 135:9
135:12,15 136:16
136:20,24 137:1
137:15,21,24
138:2,8,12,16
139:1,5,10,25
140:19 141:8,22
141:23 142:1,12
142:14 144:18
145:7 149:20
150:1 157:16
194:14 198:17,20
202:18 203:1
224:8,8,19,20
229:9,18,24
230:11,16,19,25
232:18 233:14
234:17,23 244:6
**talc-based**
222:1
**Talc-induced**
8:18
**talk**
57:23 73:17 126:21
200:11
**talked**
51:22 61:3 96:14
104:19 120:12
**talking**
130:4 132:11
188:18 192:17
201:12 218:2
231:22 233:3
241:6
**talks**
212:11 233:20
**taxes**
41:19,19
**team**
72:15
**technically**
20:18 23:10 114:25

**telephone**
187:13,16,17
**tell**
13:1,11,15,19 14:1
14:3,4 44:1 55:15
76:11 77:8 100:2
115:3 119:17
120:12 127:9
134:20 146:9
170:22 180:8
187:24 191:17
193:5 222:20
234:15
**telling**
16:10 74:11 212:8
214:14,17 215:1
221:9
**tells**
184:12,18
**temporality**
111:20
**ten**
164:11,22 165:18
166:10,16,21,21
167:2,7,15,24
168:19,20,23
169:22 170:3,10
172:1,14,19
173:12 174:20
177:25 178:2
182:15,17 190:7
194:17,17 198:13
199:3,12 218:4,7
218:10,15
**tens**
140:11 141:4
**tenth**
141:4
**term**
105:25 212:25
**terms**
26:13 31:8 40:2
58:1 61:7 65:16
103:15 110:14
116:17 152:12,14
185:17 197:19

221:15 239:3
**Terry**
164:16,19 165:4,5
165:7,10,12,15
166:8 172:23
173:10 174:4,5
178:12 192:2,6,16
192:17,18 193:4
193:11 194:3
195:6,12 197:10
201:7,19 233:25
**test**
30:11 76:19
**tested**
141:1,6
**testified**
11:8 12:4,17 16:20
17:3,18 62:7,20
127:4,5 172:20
**testify**
11:6 12:2 15:16
16:19 17:21,24
18:10 21:12 31:18
61:11 121:25
**testifying**
17:5 19:18 20:2
22:6,9 210:1
**testimony**
18:6,23,23 20:10
21:19 62:13,24
63:3 64:19 67:17
67:24 68:5 81:6
85:17 116:22
118:17 209:1
241:13 242:8
243:7,13
**testing**
23:14 28:4 31:1,23
32:6,10,15,18,20
32:22 83:7,11,13
83:19 85:20 91:4
91:19 92:13
138:24 141:20
142:6,10
**Texas**
5:18 6:8

**text**
224:4
**thank**
21:15 24:12 25:24
53:14 54:8 60:13
61:15 92:19 95:8
130:14 135:24
182:5 203:17
206:16 228:6
241:10
**thanked**
77:12
**thanks**
130:20
**Thayer**
28:16
**theory**
119:20 120:13
**therapies**
115:13
**therapy**
115:21
**thing**
66:6 173:9
**things**
21:11 24:6 91:25
112:16,24 113:1,3
114:4,5,23 115:3
116:14 118:4
124:20,20 139:17
140:6 150:5
151:21 161:19
224:13 235:8
**think**
13:21 14:16 16:7
19:17 20:5,7,19
23:1 27:24 28:7
30:5 46:19 49:25
51:6,11 52:10
55:20,25 60:9
67:6 71:5,6,8 78:1
78:20 82:8 84:14
86:10 91:3 92:12
93:14,15 94:12,22
102:14,15,23
103:14,18 105:5

108:21 109:16
111:7,11 112:16
112:23 113:8
114:2,3 116:12
119:1 122:13
125:20 126:17
127:2,13,23 134:2
134:10 137:11,12
143:7 145:12
162:13,18 167:10
173:1,4 174:22
178:11 187:16
190:3,14 194:22
196:3 197:19
201:19,20 205:5
205:22 208:15
211:13 216:18
217:25 220:14
221:3,5 222:10
223:13 224:12,13
224:24 228:14
233:19 235:23
236:6,15 239:25
240:2
**thinking**
96:12 104:14
**thinks**
211:14
**third**
46:11,23
**third-to-last**
184:14
**Thompson**
3:6 46:10,23 58:5
60:6 61:18,18,24
**thorough**
74:16
**thought**
44:5 52:20 70:10
72:13 75:4 84:25
110:12 114:4,6
155:5 157:14
160:15 162:6
200:9,12 218:1
223:9
**thousand**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1152 of 1525
PageID: 63298
Rebecca Smith-Bindman, M.D.

Page 278

57:22 207:20
**thousands**
139:14 140:11
141:5
**three**
12:16 14:3 15:21
16:3,9 45:14,21
46:7 49:2,22
155:25 157:16
158:11,13 163:10
163:11 177:1
187:24 215:7,13
216:17 233:6,7
**Thursday**
1:15 60:4 79:4
**tied**
135:8
**time**
11:13 12:24 13:14
13:20 17:19 26:9
26:23 41:2 42:15
45:5,8,24 46:3
48:14 49:20 51:17
51:25 55:13 64:1
64:7,10,14,15,17
64:25 65:6 74:16
75:17,20 76:1
78:11,25 86:20
96:12,15 119:20
123:3 124:13
138:18,25 143:13
143:24 144:7
156:5 159:1,15
162:6 170:19
190:19 202:14,24
203:8 213:24
240:9,18 241:14
241:16 243:5,6,8
**times**
5:6 12:16 13:19,23
14:3 28:23 29:2
63:11 73:18 92:9
121:7 126:25
127:5 150:7 156:1
157:16 191:4
194:13,18 215:7

215:13,13
**timing**
75:8
**TINSLEY**
7:5
**title**
34:20 89:20 147:22
**today**
12:9,22 18:25
19:18 20:2 22:6,9
24:14 25:14,19
27:2,2 30:19 33:2
33:7,18,23 34:18
36:25 37:20 38:19
38:23 39:8 46:21
52:22 54:3 57:18
58:17,25 59:7,13
59:19 60:4,13,16
61:8 79:6 84:2
90:19 91:10
136:21 156:11
176:15 240:19
**today's**
11:12 241:13
**told**
28:9 37:8 44:3,7
45:5,8,15,16 48:6
69:1 74:20 76:17
77:2,4,17 78:5
80:4 81:24 85:19
86:10 129:17
132:20 154:15
164:5 187:3,20
188:13 198:16
**tomorrow**
241:9
**top**
34:2 55:23 76:5
82:19 126:3 127:9
130:11,24 131:23
164:18 165:3
203:16
**topic**
49:14 70:8,13
94:18 99:11
120:23 127:3,14

127:16 128:4
146:16
**topics**
49:15 110:11
**torn**
35:10
**toss**
219:13
**total**
42:1 190:22 196:4
196:7,12,14
**totality**
109:12 142:17,21
**totally**
163:7
**Toxicology**
34:23
**trace**
138:8 139:8,9
**traces**
140:5
**train**
131:12
**training**
10:2 22:3 23:12
130:10,22,24
131:3
**transcribed**
243:10
**transcript**
24:11 25:21 30:14
34:16 35:6,21
36:5,7,20 37:18
38:17 39:18,22
53:13 54:11 76:9
91:1 93:4 95:5
130:13 132:14
156:18 175:25
179:17 184:2
189:11 203:14
206:13 242:6
243:12,15,17
**Transformation**
8:18
**Translocation**
9:8 36:17

treatment
14:23 73:8,11
**tremolite**
212:23 213:22
**trial**
12:17 17:19,21
18:23 26:3,15
27:4
**trickier**
175:9
**tried**
55:23 104:1 151:1
152:18
**trimester**
14:14
**true**
112:17 188:14
212:21 237:23
242:9 243:11,23
**truly**
188:14 226:13
**truth**
11:7,7,7 12:3,3,3
97:3
**try**
106:6 155:15
170:17 225:21
**trying**
52:11 106:8 107:1
110:20 150:12
168:16 185:20
226:12 228:12
231:10
**tubal**
115:25
**Tube**
10:4 132:16
**Tucker**
4:13 7:4
**Tuesday**
60:11
**turn**
82:24 98:2 176:1,3
203:23
**twice**
60:10 189:16,19

235:7
**twin/twin**
14:16
**two**
38:22 39:2 48:25
58:20 73:7 79:5
89:12 93:9 107:12
115:3 145:10
151:21 152:24
153:3 161:19
163:15 167:7,24
168:7,9,20 201:18
201:19,20 233:6,6
233:24
**two-year**
160:12
**type**
120:22 136:10
154:12 176:10,10
193:22 195:15
**types**
23:18,23 195:25
**typically**
104:5 107:2 109:17
114:4,23 124:19
131:13 145:3
238:14
**typos**
107:5

——————
**U**
——————
**U**
34:20 37:14
**UCSF**
68:18
**Ultimately**
163:19
**Um**
232:21
**unable**
187:21 188:13
**unaware**
236:14
**unbiased**
47:2 52:12
**unclear**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1153 of 1525
PageID: 63299
Rebecca Smith-Bindman, M.D.

Page 279

85:11
**uncontrolled**
204:8,18
**underestimate**
188:10
**underestimation**
188:4
**underlining**
35:1,25 36:16 39:7
39:11
**underlying**
34:24
**understand**
13:1,2 21:21,22
22:2 29:20 32:20
68:24 69:17
102:17 104:3
108:9,12 110:3,5
110:8,20 111:9
117:14 138:24
139:19 150:11
168:16 212:6
220:17 230:14,21
231:19
**understanding**
15:20 27:6 88:15
105:9 108:18
136:25 137:6,18
139:15 144:25
188:9 223:13
240:15
**understood**
13:7 48:1 108:17
109:2
**unfortunately**
98:3 115:12
**Union**
7:3
**unique**
149:9
**United**
1:1 11:18 229:8
232:4,6
**units**
140:13 141:7
**universe**

230:19
**unmarked**
8:17
**unpublished**
146:23
**unreasonable**
102:11
**unusable**
102:11
**unusual**
109:15
**update**
54:1 129:15
**updated**
28:4 129:8 131:8
133:7,11,13
**upfront**
47:19
**Upward**
94:16
**upwards**
94:13
**use**
9:24 33:18 34:3
48:18 51:4 94:9
94:20,21,23 95:18
96:15,17 97:7,8
98:15,20 99:4,23
110:21 111:23
112:19 113:5
114:18 115:8
116:19 118:8
120:4,14 124:5
126:18 128:12
129:25 132:8
145:6,7 155:24
157:15,15,17,23
157:24 158:8,10
158:18,19,20,22
158:24,25 159:1,2
159:4,14 160:5
162:5,7 164:12,24
171:9 172:24
173:14,19 175:19
176:8,19,20,23
188:15,22,25

189:1,2 191:4
192:18,23 193:18
193:21,22 194:3,6
194:6,10,25 195:5
195:7 198:17,20
199:6 202:16,18
203:1 204:10,19
211:25 213:18
214:23 215:4
220:1 221:19,25
222:24 225:18
229:18 230:25
235:13 236:4,7,21
236:24 239:10
240:18
**useful**
102:8
**users**
98:16 99:4 155:17
155:17 191:8
222:4 231:8,11
232:8,9
**uses**
158:11,13 193:6
**usually**
77:16 145:22 147:8
147:9 155:8,9
**U.S**
231:2

**V**
**Vagina**
9:8 36:17
**valid**
102:8
**validity**
105:3 235:18
**value**
108:24
**variables**
148:11,12,21,23
221:18
**variants**
187:23
**various**
27:23 202:25

**vary**
145:4
**vast**
96:4
**vegetables**
211:12,13
**verbatim**
225:3
**version**
10:5 98:4 104:8
**versions**
161:23
**versus**
63:19 114:10
117:19 139:1
148:25
**video**
11:13,14 216:4
240:12,14
**videographer**
7:12 11:9,11 75:19
75:23 143:17,21
144:2,6 202:7,11
240:8 241:11
**Videotaped**
1:12 2:5 8:9
**view**
96:25 123:5 239:21
**viewed**
212:16
**views**
26:11 27:25 51:12
**violation**
109:6,9
**violations**
106:15 108:6
**vitae**
53:9,15 54:1
**voice**
216:3,7 227:4,25
**volume**
1:16 2:6 8:4 9:2
12:1 212:4 242:4
242:15 244:21
**Volumes**
9:6 10:19

**W**
**wait**
130:17,19 235:22
**Wang**
73:8,12
**want**
28:1 78:10 85:3,7
85:11 90:13 95:16
111:5 115:5
131:10 144:12
146:21 149:13
170:9 171:19
211:21 214:9
215:21 227:1,5,7
227:12 240:24
241:7
**wanted**
32:19 51:18 71:22
72:12,20 81:20
148:11 150:24
151:11,12,15
159:13 174:7
**Washington**
6:18 41:3
**wasn't**
100:15,15 128:22
149:18 158:15
175:21 177:17
**water**
140:7
**way**
30:6 70:24 96:18
107:2,7,12,15
113:24 123:14,14
125:3,13 127:13
137:20 142:15
162:21 168:4
169:1 181:15
200:14 216:8
226:17 227:24
230:8 231:18
239:23 240:1
**ways**
112:13 178:17
**weak**
236:11 237:1

Case 3:16-md-02738-MAS-RLS    Document 9886-12    Filed 05/29/19    Page 1154 of 1525
PageID: 63300
Rebecca Smith-Bindman, M.D.

Page 280

**website**
125:10,18 126:4,6
**websites**
123:22 124:3
127:21
**Wednesday**
60:5,6,10,13 76:16
79:3
**week**
64:15,16,17 156:1
157:16 158:12,13
194:14,18
**weekly**
188:16
**weeks**
31:22 75:2
**Wehner**
36:23
**weigh**
123:6
**weight**
133:1 171:9 185:23
187:2 239:2
**weighted**
165:16 170:25
**weighting**
163:14,16 171:11
185:18
**welcome**
182:6
**well-done**
220:5
**well-established**
154:17
**well-published**
154:17
**went**
33:11 48:22 100:22
101:18 126:4
146:6 149:4 150:2
150:6,25 152:8
153:19 155:15
162:19 163:2,12
174:22 239:2
**weren't**
167:11 174:6

**228:17**
**we'll**
13:2 24:24 25:19
34:13 35:3,18
36:3 38:14 53:11
81:10 90:22
156:15 175:23
203:12
**we're**
12:22 13:16 62:3
98:18 139:17
140:6,8 144:2
183:22 201:24
202:2,7 231:22
233:3 240:8 241:6
**white**
98:10 115:16
**whites**
98:19
**wide**
218:21
**width**
169:9
**Wilentz**
3:20
**willing**
43:10,21 44:6,23
44:24 45:1,2 47:1
47:6,15,20 48:6
78:11 120:10
122:1
**willingness**
77:12
**withdraw**
24:2 57:3,20 88:11
163:20
**witness**
8:2 14:24 15:2,25
17:4 47:7 48:8
50:23 51:23 55:24
62:11 64:22
215:18,23,25
216:2,7 240:16,19
241:5,7 243:6,7
243:16
**witnesses**

**43:10 89:13**
**witness's**
241:1
**Wolf**
56:6,14
**Wolf's**
56:12
**woman**
46:12,13
**woman's**
145:8 159:2
**women**
94:9,20,23 95:18
96:2,4,17,19 97:7
97:13 99:15
111:23 116:19
118:5,13 134:22
148:25 155:16
159:8 194:14
228:21,24,25
229:13,18,23
230:12,16,25
231:23,23 232:1,2
232:12,14,18,23
233:3,7
**women's**
122:21
**Woodbridge**
3:23,25
**words**
110:21
**work**
25:18 40:17 42:8
42:15,21 47:24
58:14 63:14,15,18
70:19 71:17 72:9
72:11,22 73:14
74:1,8 78:11,15
79:3 87:25 88:1,2
88:6 103:4 109:18
122:18,21 145:17
162:9 192:13
203:20 205:24
**worked**
15:14 18:17 40:19
61:24 62:3 64:7

**71:24 72:6 91:22**
237:19
**working**
65:1 237:19
**works**
89:18
**worksheet**
175:8 199:21
**world**
232:3
**wouldn't**
108:25 119:17
126:13 137:11
234:7
**write**
50:8 106:21 115:10
131:20 154:20,24
**writes**
128:16 184:11
**writing**
26:19 35:25 37:22
63:19 104:1
106:24 159:16
220:9
**written**
26:6,10 120:22
121:2 155:23,23
156:4 158:10
196:24 240:14
**wrong**
90:13 107:9,10
200:13 231:17,18
**wrote**
33:10 174:24
**Wu**
97:18,25 99:8
**Wu's**
98:25

**X**

**X**
74:15
**XX**
243:15

**Y**

**71:24 72:6 91:22**
**yeah**
21:15 128:15
130:20 153:24
178:25 179:3,7
181:6 190:21
191:19 196:8,9
227:9
**year**
49:12 65:6 100:8
115:7 116:5 232:6
**years**
13:21 16:24 17:2
18:3 65:9,10 97:9
98:15,20,21 99:1
99:4,5,9 127:7
129:4 136:2 138:3
174:25 206:1
**Yep**
58:8
**yesterday**
30:11,18 59:20,23
59:24 60:1,13
64:15
**York**
5:7,7 28:23 29:2
91:19 92:9 121:7
126:25
**young**
94:23

**Z**

**Zellers**
4:14 8:6 12:6 15:24
16:3,9,13 19:25
20:9,21,25 21:8
21:13,15,18 22:14
22:20 24:13,20
25:3,9,22 26:1
27:1 30:15 31:7
31:19 32:4,16
34:17 35:7,22
36:8,21 37:19
38:18 39:19,23
48:1,22 49:13,20
50:12,18 52:22
53:15 54:13,17

Rebecca Smith-Bindman, M.D.

55:22 56:5,25
57:12 60:14 61:16
62:8,19 65:8 67:8
68:19 74:5,14
75:7,18 76:2,10
77:9 78:3,24 80:9
81:10,12 82:10
84:1,6,9,13,16
85:3,6,12,14
86:10 87:15,25
88:10 89:3,11,22
91:5,15 92:14
93:3,18,20 94:5
94:19 95:1,6,9,11
95:12 97:5,18
99:2,10 100:2,12
101:19 102:7,21
103:10,14 105:18
105:22 106:4
107:14 108:2,19
110:25 111:22
113:18,25 115:5
116:16 117:1,9
119:4,9,19 120:1
122:5,15 123:15
123:17 124:2
125:2,12,24
126:20 128:5,20
130:21 132:15
133:12 134:14,20
135:5,16 136:3
138:1 139:2
140:15,17,22
141:10 142:9
143:10,14,16,25
144:8 145:5
150:11 152:14,22
154:1,9 155:3
156:6,19 157:22
158:7 159:11,23
160:4 164:3,10
165:6 167:6,23
168:12,15 169:19
169:21 170:9
173:24 176:1,3
177:15,20 179:5

179:14,18,24
181:6,21 182:2,12
182:21 183:21
184:3 185:25
186:10 187:6
188:7 189:12
192:12 193:13
194:12,19 198:7
198:11 199:2,25
202:1,6,15 203:6
203:11,15,18
204:7,14 205:11
206:9,14,17 207:6
207:19 208:3,22
209:11,19,25
210:10,18 213:3
213:17 214:6,22
215:3,8,11,15,17
215:20,24 216:4,6
216:14,19 218:18
219:2,8,24 220:24
221:3,7 222:15
223:17,19,21,23
223:25 225:4,11
226:25 227:5,9,11
227:14,17,22
228:2,5,7,10,11
228:15 231:1
232:25 235:4
236:16 237:18
238:23 239:6,17
240:6,13 241:9

_____
**$**
_____
**$1,700**
42:2
**$2,000**
42:18

_____
**0**
_____
**01**
232:19 233:11
**07095-0958**
3:25

_____
**1**
_____
**1**

8:9 24:8,10 25:13
35:10 75:20 76:5
77:21 82:17 92:15
95:20,23 156:7
184:23 188:20
203:18 206:24
207:12 208:21
209:9,12,18,21
210:5 211:25
213:6,18 214:5,12
214:15,23 215:2,4
217:13,24 219:7
**1B**
184:25
**1,500**
42:2,18
**1-123**
9:6 10:19
**1.C**
212:12
**1.3**
236:4,7,10,18
**1.35**
217:6
**1.39**
189:17 190:1,6,9
**1.49**
190:6
**1.5**
226:4
**1.65**
213:10
**1:36**
143:20,24 144:3,4
**1:37**
144:5,7
**10**
3:24 9:10 37:17
64:13,18,20 65:11
65:19 84:9 191:8
229:7,13,25
230:21,25
**10,000**
178:21
**10:40**
75:20,21

**100**
7:7 42:13 117:20
**100C**
212:4
**10036**
5:7
**1097**
98:2
**11**
9:12 38:15,16
82:24 85:23 87:2
115:10
**11th**
165:8
**11,000**
232:5
**11:10**
75:22 76:1
**11:42**
184:12
**112**
5:16
**12**
8:6 9:14 16:24
39:16,17,23 82:24
84:9 85:23 87:2
222:7
**12/18**
9:12
**12:37**
143:18,19
**13**
9:16,16 10:7 39:20
39:21,24 87:7
231:25
**130**
4:6 10:2
**132**
10:4
**13427**
1:24 2:12 243:1
**14**
9:18 53:11,12,18
54:14 217:23,25
229:23 230:2,3,7
231:14,25 232:7

**14,500**
121:11
**15**
9:19 27:9,19 54:5
54:10,16,21 55:6
55:11,16 56:11,16
64:3 82:12,15
85:17 86:5 88:22
97:25 100:3
117:22 232:14
**150**
186:20
**1510**
6:7
**156**
10:7
**16**
9:20 76:3,8 77:10
77:22 221:19
222:1
**1650**
244:3
**17**
9:22 90:23,25
**1700**
2:8 11:15
**179**
10:9,11
**18**
9:24 95:2,4,10,11
95:13,20
**1800**
5:17
**184**
10:13
**188**
221:23
**189**
10:15
**19**
3:16 10:2 76:16
130:9,12,21 131:7
235:21
**19103**
244:4
**1973**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1156 of 1525
PageID: 63302
Rebecca Smith-Bindman, M.D.

Page 282

213:21
**1985**
36:22
**1999**
174:13,20 175:10
175:16,22 176:16
177:10

**2**

**2**
8:11 25:20,22 26:2
26:16 32:25 57:3
57:7,13,15 75:24
77:10 98:2,8
118:22 143:18
147:24 164:22
165:7,11,14,19
166:11,17,22
167:7,16,24
172:15 173:13
176:3 180:18
181:11 182:13
183:4,12 186:10
187:14,20 188:20
189:4,15,21 190:9
194:16 198:14
199:3,5,12,19
204:14
**2A**
207:7,13
**2:59**
202:8,9
**20**
10:4 75:16 77:11
97:9 98:21 99:1,5
99:9 132:12,13
217:21 218:3,4,8
218:8 229:15
242:11
**200**
207:12
**2000**
235:11 238:21
**20004**
6:18
**2003**

**2006**
35:15 205:25
**2007**
38:2 121:10
**2008**
35:24 223:8,18
**2009**
97:24
**2010**
35:8,14,15 206:1
210:25
**2011**
177:21 235:22
**2012**
209:5 210:14
**2013**
192:16
**2014**
121:6 203:7,18
204:1
**2015**
97:19,25
**2016**
95:7 176:23 177:11
177:18
**2018**
27:9,19 38:10 64:3
76:6,16 77:11
78:5 100:4,6,19
101:1 129:9 131:8
184:12
**2019**
1:15 2:10 11:2,12
133:8,13 243:24
244:23
**202-828-5356**
6:20
**203**
10:17
**206**
10:19
**21**
9:16 10:7 78:5
156:16,17 239:24
**21st**

77:20
**210-554-5549**
5:20
**212-735-2453**
5:9
**213-430-3301**
4:20
**218**
3:8
**22**
10:9 175:23,24
**23**
10:11 173:1 174:1
179:5,15,16
**230**
212:14
**2399**
195:16
**24**
8:9 10:13 76:6
78:14 173:2
183:25 184:1,12
196:19 236:24
**25**
8:11 10:15 189:8
189:10 190:22
191:4 193:6
194:17,17
**250**
2:8 11:15
**26**
8:11 9:22 10:17
203:12,13
**27**
10:19 206:10,12
**2738**
1:8
**28**
8:15 35:24 38:7
**29,000**
121:10

**3**

**3**
8:13 30:13,16
31:21 61:3 81:25

83:18,23,25 84:1
84:22,25 85:8
121:19 143:22
188:3,12,18 189:5
189:21 195:14,16
195:22 199:4,6,13
199:17 200:2
205:14 208:5
**3,000**
233:7
**3:00**
201:24
**3:11**
202:10,14
**3:21**
76:17
**3:58**
240:9,10,11
**30**
8:13 94:21 96:5
143:12 216:15,18
222:5 229:15
231:4
**31**
216:15 231:23
233:3
**31,100,000**
231:8,11
**311**
231:5,6
**32**
157:21 160:3,5
198:24
**33**
164:14,22 165:19
172:15 180:19
181:11
**334**
176:25
**334-269-2343**
3:11
**336**
95:19
**34**
8:22 164:19 165:3
**35**

8:23 9:2
**353**
176:4
**358**
220:22
**359**
217:12 222:17
**36**
9:4,6,8
**360**
196:8
**36103**
3:9
**37**
9:10
**38**
9:12 224:17
**39**
9:14,16 233:17
236:25 237:2

**4**

**4**
5:6 8:22 34:14,15
133:8,13 202:12
203:23 205:15,17
207:15,21 241:13
**4th**
7:7
**4-11**
8:15
**4:01**
2:10 241:12,14,16
**40**
94:13,16 134:21
234:9
**41**
111:1 191:2,10
193:5
**42**
53:5
**42nd**
4:17
**43**
172:22
**450**

Rebecca  Smith-Bindman, M.D.

Page  283

| | | | | |
|---|---|---|---|---|
| 190:16,23 191:2 | **7** | **900** | | |
| **460** | 1:15 2:10 9:4 11:2 | 3:24 | | |
| 196:8 | 11:12 36:3,4 | **90071** | | |
| **47** | 225:16 226:16 | 4:18 | | |
| 8:16 37:11 53:5 | 228:20 229:4 | **92660** | | |
| **5** | **720-891-7921** | 3:17 | | |
| **5** | 4:9 | **93** | | |
| 8:23 35:4,5 65:3,11 | **75** | 9:2 | | |
| 106:21,22,24,24 | 221:24 | **94111** | | |
| 121:19 132:23 | **76** | 2:9 | | |
| 208:7 | 9:20 | **95** | | |
| **50** | **78205** | 9:24 187:22 | | |
| 96:14 99:17 136:2 | 5:18 | **975** | | |
| 145:9 | **78701** | 6:17 | | |
| **51** | 6:8 | **99** | | |
| 189:17 190:1,6,9 | **8** | 177:4,6 | | |
| **51st** | **8** | | | |
| 244:3 | 9:6 36:6,8 | | | |
| **512-391-0197** | **8,500** | | | |
| 6:10 | 192:19 | | | |
| **515** | **8:04** | | | |
| 4:16 | 76:6 | | | |
| **52** | **80220** | | | |
| 159:7 222:2 | 4:7 | | | |
| **53** | **816** | | | |
| 9:18 | 6:6 | | | |
| **54** | **82** | | | |
| 9:19 | 207:6 | | | |
| **55** | **86** | | | |
| 235:21 | 232:8 | | | |
| **57** | **877-370-3377** | | | |
| 159:8 | 244:5 | | | |
| **6** | **9** | | | |
| **6** | **9** | | | |
| 9:2 35:18,20 | 9:8 36:19 132:23 | | | |
| **60** | 133:8,8 | | | |
| 222:6 | **9/24/18** | | | |
| **600** | 9:20 | | | |
| 7:8 | **9/29/18** | | | |
| **61** | 10:13 | | | |
| 190:6 | **9:20** | | | |
| **63102** | 2:9 11:3,13 | | | |
| 7:9 | **90** | | | |
| **7** | 3:23 9:22 | | | |

Rebecca Smith-Bindman, M.D.

Page 245

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

_____

                                    )
IN RE:  JOHNSON & JOHNSON TALCUM     )
POWDER PRODUCTS MARKETING, SALES     )
PRACTICES, AND PRODUCTS LIABILITY    )
LITIGATION                           )
                                     )   MDL No.
                                     )   2738 (FLW)(LHG)
                                     )
_____)


VIDEOTAPED DEPOSITION OF

REBECCA SMITH-BINDMAN, M.D.

San Francisco, California

Friday, February 8, 2019

Volume II


Reported by:
MARY J. GOFF
CSR No. 13427

Rebecca Smith-Bindman, M.D.

| Page 246 |
|---|

1
2
3
4
5        Videotaped Deposition of REBECCA
6  SMITH-BINDMAN, M.D., Volume II, taken on behalf of
7  Johnson & Johnson, at Levin Simes Abrams LLP,
8  1700 Montgomery Street, Suite 250, San Francisco,
9  California 94111, beginning at 9:26 a.m. and ending
10 at 12:48 p.m., on February 8, 2019, before MARY J.
11 GOFF, California Certified Shorthand Reporter No.
12 13427.
13
14
15
16
17
18
19
20
21
22
23
24
25

| Page 248 |
|---|

1  APPEARANCES (continued):
2
3  For Defendant Johnson & Johnson
4      Tucker Ellis LLP
5      BY:  MICHAEL C. ZELLERS
6      Attorney at Law
7      515 South Flower Street
8      42nd Floor
9      Los Angeles, California 90071
10     michael.zellers@tuckerellis.com
11     213-430-3301
12
13
14 For Defendant Johnson & Johnson
15     Skadden, Arps, Slate, Meagher & Flom, LLP.
16     BY:  BENJAMIN HALPERIN
17     Attorney at Law
18     4 Times Square
19     New York, New York 10036
20     benjamin.halperin@skadden.com
21     212-735-2453
22
23
24
25

| Page 247 |
|---|

1  APPEARANCES:
2
3  For Plaintiffs
4      Beasley Allen Law Firm
5      BY:  P. LEIGH O'DELL
6         MARGARET M. THOMPSON, MD, JD, MPAff
7      Attorney at Law
8      218 Commerce Street
9      Montgomery, Alabama 36103
10     leigh.odell@beasleyallen.com
11     334-269-2343
12 For Plaintiffs
13     Robinson Calcagnie, Inc.
14     BY:  CYNTHIA L. GARBER
15     Attorney at Law
16     19 Corporate Plaza Drive
17     Newport Beach, California 92660
18     cgarber@robinsonfirm.com
19 For Plaintiffs
20     Wilentz, Goldman & Spitzer P.A.
21     Daniel R. Lapinski
22     Attorney at Law
23     90 Woodbridge Center Drive,
24     Suite 900 Box 10
25     Woodbridge, New Jersey 07095-0958

| Page 249 |
|---|

1  APPEARANCE (continued):
2  For Defendant Imerys
3      Dykema
4      BY:  JANE BOCKUS
5      Attorney at Law
6      112 E. Pecan Street
7      Suite 1800
8      San Antonio, Texas 78205
9      jbockus@dykema.com
10     210-554-5549
11
12 For Defendant Imerys
13     Gordon & Rees LLP
14     BY:  JENNIFER A. FOSTER
15     Attorney at Law
16     816 Congress Avenue
17     Suite 1510
18     Austin, Texas 78701
19     jfoster@gordonrees.com
20     512-391-0197
21
22
23
24
25

2 (Pages 246 to 249)

Rebecca Smith-Bindman, M.D.

---

Page 250

```
 1  APPEARANCES (continued):
 2  For Defendant PCPC, Personal Care Products Council
 3      Seyfarth Shaw, LLP
 4      BY: JAMES R. BILLINGS-KANG
 5      Attorney at Law
 6      975 F Street, NW
 7      Washington, D.C. 20004
 8      jbillingskang@seyfarth.com
 9      202-828-5356
10
11
12
13
14  For Defendants PTI Union, LLC and PTI Royston, LLC
15      Tucker Ellis LLP
16      BY: CAROLINE M. TINSLEY
17      Attorney at Law
18      100 South 4th Street`
19      Suite 600
20      St. Louis, Missouri, 63102
21      caroline.tinsley@tuckerellis.com
22
23  Videographer:
24      Andrew Graves
25
```

---

Page 252

```
 1  EXHIBITS CONTINUED:                         PAGE
 2  Exhibit 34  Does Exposure to Asbestos Cause   324
                    Ovarian Cancer article
 3
 4  Exhibit 35  Occupational Exposure to Asbestos  327
                    article
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 251

```
 1              INDEX
 2  WITNESS              EXAMINATION
 3  REBECCA SMITH-BINDMAN, M.D.
 4  Volume II
 5
 6          BY MR. ZELLERS        254, 372
 7          BY MS. O'DELL          354
 8          BY MR. BILLINGS-KANG   347
 9          BY MS. BOCKUS         331, 369
10
```

```
11  NUMBER         DESCRIPTION          PAGE
12  Exhibit 28  6/1/17 Letter, Invoice      259
13
14  Exhibit 29  Bill, Invoice 147           261
15
16
17  Exhibit 30  Perineal Use of Talc and Risk   276
                    of Ovarian Cancer article
18
19
20  Exhibit 31  Influence of Aspirin and nonaspirin  297
                    NSAID Use article
21
22  Exhibit 32  Article, Talc              317
23
24  Exhibit 33  Invoice, Tachibana, UCSF, 10/18   319
25
```

---

Page 253

```
 1          San Francisco, California
 2             February 8, 2019
 3                9:26 a.m.
 4
 5      THE VIDEOGRAPHER:  We are now on the
 6  record.  My name is Andrew Graves.  I'm a
 7  videographer for Golkow Litigation Services.
 8  Today's date is February 8, 2019.  The time is
 9  9:26 a.m.
10      This video deposition is being held at
11  1700 Montgomery Street, Suite 250, San Francisco,
12  California, In the Matter of In Re: Johnson &
13  Johnson Talcum Powder Products Marketing, Sales
14  Practices, and Products Liability Litigation, for
15  the United States District Court, District of
16  New Jersey.
17      The deponent is Rebecca Smith-Bindman,
18  Ph.D., Volume II.
19      Would counsel please identify yourselves.
20      MR. ZELLERS:  Can we waive that since we
21  were all here yesterday?
22      THE VIDEOGRAPHER:  Okay.  The court
23  reporter is Mary Goff, and she will now swear in the
24  witness.
25
```

---

3 (Pages 250 to 253)

Rebecca Smith-Bindman, M.D.

Page 254

1     REBECCA SMITH-BINDMAN, M.D., VOLUME II,
2   being first duly sworn or affirmed to testify to the
3   truth, the whole truth, and nothing but the truth,
4   was examined and testified as follows:
5       EXAMINATION BY COUNSEL FOR THE DEFENDANTS
6   BY MR. ZELLERS:
7     Q   Good morning.
8     A   Good morning.
9     Q   Dr. Smith-Bindman, did you do anything to
10  prepare -- or further prepare for your deposition
11  since the time we concluded yesterday and this
12  morning?
13    A   I did two things. I reviewed my report
14  again, and I called the biostatistician who worked
15  on my meta-analysis to review a few of the details.
16    Q   You called Dr. Hall?
17    A   I did.
18    Q   When was the last time that you had talked
19  with Dr. Hall before yesterday?
20    A   Speaking to her at the time of -- that she
21  did the analysis. And I -- I think there was an
22  e-mail or two over the last several weeks asking for
23  her CV or something like that, but not any
24  meaningful conversation.
25    Q   Have you produced the e-mails -- the

Page 255

1   recent e-mails with Dr. Hall?
2     A   I -- I'm not sure if I produced the one
3   asking for her CV, but the -- and actually, I don't
4   remember when I asked her for that. I might have
5   presented --
6       MS. O'DELL: I think that's part of the
7   production --
8     Q   (BY MR. ZELLERS) How --
9       MS. O'DELL: -- but -- excuse me.
10    Q   (BY MR. ZELLERS) How long did you speak
11  with Dr. Hall yesterday?
12    A   About 15 -- 10-15 minutes.
13    Q   Did you make any written notes?
14    A   I -- I think I scribbled in my usual
15  scribble place.
16    Q   What notes did you make from your
17  conversation with Dr. Hall yesterday after the first
18  session of your deposition?
19    A   So -- so I did -- I did -- I did jot some
20  notes on my meta-analysis. But mostly I asked her
21  to clarify how she did the calculations of the
22  numbers that are shown in the figures.
23      I was struggling to understand why the
24  numbers and the figures were not exactly the same as
25  the ones that you showed me in the published

Page 256

1   manuscript.
2       I was quite surprised that they weren't
3   exactly the same. They were not meaningfully
4   different, but there was a very slight shift in
5   the ones that are in my report.
6       I mean, I asked Dr. Jane why that was the
7   case. And in fact, the numbers are calculated using
8   the standard errors in the confidence intervals and
9   the sample size which very slightly shifts it from
10  the reported numbers.
11      So you were correct when you said the
12  numbers are not exactly the same, and she explained
13  that that's why that's the case.
14    Q   Are the numbers that were contained in
15  Figure -- Figures 2 and 3 in your report, estimates?
16      MS. O'DELL: Object to the form.
17    A   The numbers are calculated. So I -- I
18  think by that, you mean estimates.
19    Q   (BY MR. ZELLERS) Did you do the
20  calculations?
21    A   No. She -- she did them.
22    Q   Do we --
23      THE COURT REPORTER: Can you raise your
24  voice for me, please?
25    A   Yes, I can. I apologize.

Page 257

1     Q   (BY MR. ZELLERS) Do we have her work
2   product as to the calculations that were made?
3     A   In the documents that I shared, she
4   specified the -- the software that she used, the
5   program that she used.
6       In fact, the way of estimating it, it's
7   actually in my report as well. And so yes, it's
8   explained there, and it's in all of the documents
9   that I shared with you.
10    Q   Her calculations are contained in the
11  documents that are shared; is that right?
12    A   Yes.
13    Q   The numbers that you got from the Terry
14  study, those came from the Terry publication; is
15  that right?
16    A   Yes.
17    Q   Any additional notes you made from your
18  discussion with Dr. Hall, other than what you have
19  generally told us about?
20    A   No. Just that.
21    Q   The notes that you added to your annotated
22  report from your discussion with Dr. Hall, which we
23  marked as Exhibit 17, those notes are on which page
24  or pages?
25    A   Page 33 and 34.

4 (Pages 254 to 257)

Rebecca Smith-Bindman, M.D.

Page 258

1    Q   It looks like you made those notes in an
2   aqua pen is -- is that right, or --
3    A   Yes.
4    Q   -- I --
5    A   Yes.
6    Q   Okay.
7    A   Yes, absolutely.
8    Q   Any --
9    A   I would say teal, but...
10    Q   Well, I think you're probably more correct
11   than I am.
12    Any other notes that you had from your
13   discussion with Dr. Hall?
14    A   No.
15    Q   Any other communications that you had with
16   Dr. Hall, other than your 10- or 15-minute phone
17   conversation yesterday afternoon or evening?
18    A   No.
19    Q   Did you communicate with Dr. Hall via
20   e-mail or any way other than just the phone call?
21    A   No.
22    Q   Did you communicate with anyone else
23   between the time we finished yesterday and this
24   morning about the subject matter that we're here to
25   talk about?

Page 259

1    A   No.
2    Q   At the start of the session today, counsel
3   for Plaintiffs, Ms. O'Dell, provided me with copies
4   of your invoices.
5    I'm going to hand you what we have marked
6   as Exhibit 28. It is a five-page exhibit.
7    The first page is a cover letter. It
8   looks like an engagement or general engagement
9   letter from you to -- you say Mr. Carmen Scott.
10    Is it a Ms. Carmen Scott?
11    (Exhibit 28 was marked for identification
12   and is attached to the transcript.)
13    A   It is.
14    Q   All right. That was on June 1 of 2017.
15   The last invoice is November 13 of 2018; is that
16   right?
17    A   I'm sorry. What was the question? Is
18   this --
19    Q   The question is: Are those all of our
20   invoices that you have generated thus far in the
21   talcum powder MDL litigation?
22    A   I -- I think I mentioned that there are --
23   I haven't submitted anything beyond this, but that
24   there are additional hours that I recorded after
25   this.

Page 260

1    Q   What do you -- well, I will take that as a
2   yes, that at least through November 13, 2018, that
3   Deposition Exhibit 28 are all of your invoices --
4    A   Yeah.
5    Q   -- is that right?
6    A   Yes.
7    Q   Those invoices total approximately
8   160 hours. Does that sound right?
9    A   160?
10    Q   160.
11    A   I'm -- I'm going to believe you.
12    Q   Well, and anyone can go and check my math.
13    How many hours do you estimate that you
14   have spent up until today on this matter both doing
15   additional work, reviewing those additional studies
16   and materials we talked about yesterday, preparing
17   for the deposition, meeting with counsel for
18   Plaintiffs?
19    MS. O'DELL: Since the last invoice?
20    MR. ZELLERS: Since the last invoice is
21   what I had intended to ask.
22    MS. O'DELL: Yeah. Thank you.
23    A   I -- I think approximately 25 hours.
24    Q   (BY MR. ZELLERS) In addition, we were
25   provided with a two-page exhibit which are two

Page 261

1   invoices from Jane Hall, which total around $3,000.
2    (Exhibit 29 was marked for identification
3   and is attached to the transcript.)
4    Q   (BY MR. ZELLERS) Can you look at
5   Exhibit 29 and verify for us that those are the
6   e-mails -- strike that -- that those are the
7   invoices for the work that was done by Dr. Hall?
8    A   I -- I -- I believe so.
9    Q   Are you aware of any additional invoices
10   beyond that?
11    A   I'm not.
12    Q   Do you have any invoices from your copy
13   editor, Ms. Tachibana?
14    A   She sent me an invoice, which I forwarded
15   to counsel.
16    Q   All right. How much was that invoice for?
17    A   I think it was about $1,500.
18    Q   How much an hour does Ms. Tachibana
19   charge?
20    A   I think it's about a hundred dollars an
21   hour.
22    Q   Was that for all of the work that she did
23   with respect to your report?
24    A   Yes. There was no other work other than
25   that 15 -- it might have been $1,700.

5 (Pages 258 to 261)

Rebecca Smith-Bindman, M.D.

Page 262

1      MS. O'DELL:  Excuse me.  I'm sorry, Mike.
2  I apologize for not copying that.  We're going to
3  make a copy, and I will provide it to your
4  momentarily at --
5      MR. ZELLERS:  Very good.  We'll mark it
6  before the conclusion of the deposition.  Thank you.
7      Q   (BY MR. ZELLERS) Do you have your report
8  in front of you?  You can use your annotated
9  version, No. -- Exhibit 17.  We also marked your
10  report as Exhibit 2.
11     A   Yes.
12     Q   Do you have that in front of you?
13     A   I do.
14     Q   Go to page 17, if you will, please.
15         MR. LAPINSKI:  Counsel, you said page 17?
16         MR. ZELLERS:  Yes, page 17.
17     A   Yes.
18     Q   (BY MR. ZELLERS) On page 17, you make a
19  number of general statements about the advantages
20  and disadvantages of case control and cohort
21  studies; is that right?
22     A   Yes.
23     Q   There are no citations there.  Is this
24  based and those statements based on your general
25  knowledge?

Page 263

1      A   Yes.  This is based on Epi 101, sort of...
2      Q   You make a statement in the middle
3  paragraph on page 17 where you talk about "cohort
4  studies."
5          And you state that they rarely focus on a
6  single narrowly defined question and that that's an
7  important limitation of cohort studies.
8          Do you see that?
9      A   I do.
10     Q   Can you cite to any other epidemiologists
11  who agree with you on that point?
12     A   So it's very well known the cost of doing
13  a cohort study is often very large, and so the topic
14  that's often the central focus of the cohort study
15  is very, very well done.
16         It's the ancillary topics that often get
17  short shrift.  And so that -- I -- I could probably
18  find this explained in any basic textbook.
19         And -- and I -- I apologize for not citing
20  it.  This is sort of just very well-known general
21  concepts of study design.
22     Q   Can you cite to any published literature
23  that states that cohort studies are unlikely to
24  detect real associations for this reason?
25         MS. O'DELL:  Are you reading a particular

Page 264

1  paragraph, Mike?  I have lost track.
2      MR. ZELLERS:  I was asking about the
3  specific statement in the middle paragraph of
4  page 17 relating to cohort studies and the
5  limitation that they rarely focus on a single
6  narrowly defined question.
7      MS. O'DELL:  Yes.  Thank you.
8      Q   (BY MR. ZELLERS) But my question now is --
9      A   Yes.
10     Q   -- whether or not Dr. Smith-Bindman, as
11  you sit here, can cite any published literature that
12  states the cohort studies are unlikely to detect a
13  real association -- or unlikely to detect real
14  associations for this reason.
15     A   I --
16         MS. O'DELL:  Excuse me.  Are you
17  quoting -- when you say "unlikely to detect real
18  associations for this reason," is that reading --
19  are you reading from her report or is that just --
20         MR. ZELLERS:  No.  That's my question.
21         MS. O'DELL:  -- okay.  Sorry.
22         MR. ZELLERS:  And if it's not very
23  articulate --
24     A   I -- I think cohort -- cohort studies are
25  able to detect real associations, if they ask about

Page 265

1  those associations.
2          If they don't ask about it, then it
3  can't -- then -- then it doesn't have an ability to
4  measure it.
5          So what I am saying here is that cohort
6  studies don't have the capacity to go in depth and
7  ask.
8          I think all of the cohort studies that I
9  reviewed for -- for this review discuss the lack of
10  detail in the cohort question, meaning that it's not
11  that the study design was the problem.  It was that
12  they just didn't have the right predicter
13  information being assessed.
14     Q   Despite this limitation -- or in your
15  view, limitation of cohort studies, you did include
16  the Gertig 2000 cohort study in your systematic
17  review; is that right?
18     A   I did.  I just want to clarify the answer.
19  Cohort studies are a very strong study design that I
20  like very much and that I have used currently
21  I'm -- I'm using in study designs.
22          It's rather if the study design uses a
23  cohort, which is a good design, doesn't have enough
24  detail, because that's not the focus, that
25  doesn't -- it can't be used to answer other

6 (Pages 262 to 265)

Rebecca Smith-Bindman, M.D.

Page 266

1  questions easily.
2      So I think in general I like cohort
3  designs very much, and I think it's a very powerful
4  study design.  But if you haven't asked the right
5  questions, it's hard to the expand it.
6      So I did -- I read all of the cohorts on
7  this topic.
8      Q   And you concluded that the Gertig cohort
9  study, you know, asked the right information or had
10 sufficient information for you to include it both in
11 your general systematic review and in your more
12 focused systematic review which you set forth as
13 Figures 2 and 3 in your report, correct?
14     A   That's correct.  That -- those -- those
15 were looking at regular use, and I thought the
16 Gertig was the cohort that allowed me to understand
17 regular use of perineal talc.
18     Q   Gertig was based on the Nurses' Health
19 Study; is that right?
20     A   Yes.
21     Q   Gertig and the authors do recognize that
22 the biologic evidence for the association of talc
23 and ovarian cancer is incomplete, correct?
24     MS. O'DELL:  Object to the form.
25     A   I -- I don't have it in front of me, but

Page 267

1  it may be that they reported as of 2000, they didn't
2  have evidence of the biologic mechanism.  I --
3      Q   And I will ask you about biologic
4  mechanism before we conclude here today.
5      You did not, though -- well, let me
6  withdraw that.
7      There was a follow-up cohort study to
8  Gertig 2000, and that was the Gates 2010 cohort
9  study; is that right?
10     A   Yes.
11     Q   That had a longer follow-up than Gertig;
12 is that right?
13     A   Yes.
14     Q   It was an analysis of the data collected
15 in the Nurses' Health Study; is that right?
16     MS. O'DELL:  Object to the form.
17     A   It was analysis of some of the data
18 collected in the -- in the Nurses' Health Study, but
19 they did not report the variable in such a way that
20 would allow you to understand or to quantify the
21 exposure as opposed to the first cohort study which
22 did.
23     So the latter study, they -- they had the
24 data, which is why I'm answering it this way.  They
25 clearly had it, because the data hadn't change, and

Page 268

1  yet they didn't report it that way.
2      They only reported on any exposure to talc
3  powder products.  And that is a very vague
4  definition as opposed to the frequency of use.
5      And for that reason, I couldn't tell in --
6  in nearly the same detail as I could for the earlier
7  study, the -- the exposure.  They just chose not to
8  present it that way.
9      Q   The Gates 2010 cohort study did include
10 over a hundred thousand women; is that right?
11     A   The Gates?
12     Q   Yes.
13     A   It was large, but I need to check the
14 actual numbers.
15     Q   Here.  Let me hand it to --
16     A   I have it.  I have it.
17     Q   Do you have it?
18     A   Yeah.
19     Q   Okay.  And I am looking at page 47.  And
20 it's quoting the Nurses' Health Study as involving
21 close to 109,000 --
22     A   I'm not sure.
23     Q   -- women?
24     A   I'm not sure.  I'm looking at the -- the
25 Gates -- are you asking about Gates or Gertig?

Page 269

1      Q   I'm asking about Gates 2010.
2      A   In mine it says $221,000 woman with 924
3  epithelial ovarian cancer.
4      Am I looking in the wrong place?
5      Q   No.  I -- and then if you look further, it
6  talks about -- at least in the Nurses' Health Study,
7  there being 108,870 women; is that right?
8      A   Yes.
9      Q   The women in the national health study,
10 which was the basis for both the Gertig 2000 cohort
11 study and Gates 2010 cohort study, those women were
12 followed from 1976 to 2006, so for 30 years --
13     A   Yes.
14     Q   -- is that right?
15     A   Yes.
16     Q   And -- and after following these hundred
17 thousand women -- or over hundred thousand women for
18 three decades, the authors in Gates 2010 concluded
19 that the data did not show a statistically
20 significant relationship between talcum powder use
21 and any type of epithelial ovarian cancer; is -- is
22 that right?
23     A   The Gates authors concluded that there was
24 no association between any talcum powder product
25 use, and it was not significant in ovarian cancer,

7 (Pages 266 to 269)

Rebecca Smith-Bindman, M.D.

Page 270

1    yes.
2        Q   Another short study that you did not
3    include in your systematic review was the Houghton
4    study; is that right?
5        MS. O'DELL:  Object to form.
6        A   Yes, that is true.
7        Q   (BY MR. ZELLERS) The Houghton study was
8    based on -- or is also called the Women's Health
9    Initiative Study; is that right?
10       A   Yes, it is.
11       Q   That involved 61,000 women; is that right?
12       A   That is correct.
13       Q   Houghton 2014 did not find a statistically
14   significant relationship between perineal talc use
15   and ovarian cancer among women who had ever used
16   talc; is that right?
17       A   That is what they concluded.
18       Q   Or among women who had fewer than nine
19   years of perineal talc use, correct?
20       A   Correct.
21       Q   Or among women who had more than 10 years
22   of perineal talc use, correct?
23       A   Can you say that last part?
24       Q   Sure.
25       A   Sorry.

Page 271

1        Q   Houghton 2014, that cohort study --
2        A   Okay.  No.  I -- yes, that is correct.
3        Q   And also, they did not find a
4    statistically significant relationship between
5    perineal talc use -- strike that.
6            They also did not find a statistically
7    significant relationship between the use of talcum
8    powder on sanitary napkins or diaphragms on -- and
9    ovarian cancer; is that right?
10       A   That's correct.
11       Q   Houghton does report on duration of use at
12   least more than 10 years of use; is that right?
13       A   Yes.
14       Q   But would you consider women who use
15   talcum powder for more than 10 years to be frequent
16   talc users?
17       MS. O'DELL:  Object to the form.
18       A   So you're asking if duration of use can be
19   equated with frequency of use, and -- and I would
20   very strongly disagree that those are equivalent.
21           And that is the primary reason that I
22   discount the results of the Gonzalez and Houghton
23   and Gates studies.
24           Because frequency of use, meaning to use
25   it once a month or once a year, is not the same as

Page 272

1    using it on a -- on a frequent basis, so I think the
2    duration is very different measure.
3        Q   We talked yesterday about your definition
4    of "regular use," and you pointed me to your report
5    where you give an extensive discussion of that.
6            Do you remember?
7        A   I do.
8        Q   Did -- your definition of "regular use,"
9    was that every psychometrically tested to
10   demonstrate any validity or reliability?
11       MS. O'DELL:  Object to the form.
12       A   Of -- are you asking about the reliability
13   of the way we defined it --
14       Q   (BY MR. ZELLERS) Yes.
15       A   -- or about the concept?
16       Q   No.  About the way you defined it.
17       A   I believe we explained in the report that
18   we tried to approximate regular use, frequency use
19   by being at least three times a week and as close to
20   daily as possible.
21           But in terms of -- if that is -- I -- I'm
22   not -- we have not validated that in different
23   studies or --
24       Q   That's something that you came up with; is
25   that right?

Page 273

1        A   Yeah.
2        MS. O'DELL:  Object to the form.
3        A   Yes, it is.
4        Q   (BY MR. ZELLERS) Gonzalez.  You criticize
5    Gonzalez in your report for combining various types
6    of use.  Do you recall that generally?  So that's
7    page 21 where --
8        A   No.  I'm -- I'm on my report.  My -- my
9    hesitation is it's not so much that I'm criticizing
10   the study.  It's rather it doesn't contribute to
11   answering the question that I was asking, which was:
12   Does regular perineal talc exposure increase the
13   risk?
14           It doesn't mean that the questions they
15   have asked are not interesting questions.  They were
16   just not the ones I was focusing on.
17       Q   Why would combining various types of use,
18   bias the results in favor of not detecting an
19   association?
20           I guess from your statement it -- it may
21   well not bias the results; is that right?  It just
22   was just a different question --
23       A   It's just a different question.
24       Q   -- than what --
25       A   I --

8 (Pages 270 to 273)

Rebecca Smith-Bindman, M.D.

Page 274

1    Q   -- you were looking at?
2    A   -- I believe that you want to have as
3  narrow a definition, in my belief, of meta-analysis
4  as possible to understand when you're pooling
5  results, make sure -- something you said -- you're
6  combining apples to apples.
7        And I think one would expect that any
8  potential -- potential exposure to talcum powder
9  would matter what skin or surface or cell line or
10  tissue you're putting against, and you wouldn't
11  necessarily expect the same result in a cervical
12  exposure or a diaphragm exposure or a vaginal
13  exposure.
14        You -- you might have an association of
15  those places.  You might not.  I just think it's a
16  different question.
17    Q   All of the cohort studies were prospective
18  as opposed to retrospective; is that right?
19    A   Yes.
20    Q   Prospective studies are not subject to
21  recall bias like retrospective studies, correct?
22    A   Yes, that's true.
23    Q   They're also not subject to the same
24  selection bias as retrospective studies, correct?
25        MS. O'DELL:  Object to the form.

Page 275

1    A   In general, case-control studies are often
2  plagued with selection bias, but they don't have to
3  be.
4    Q   (BY MR. ZELLERS)  Well, recall bias can
5  distort a scientific evaluation of whether an
6  exposure is actually related to a disease, correct?
7    A   Yes.
8    Q   So for example, recall bias could distort
9  results if women with ovarian cancer were more
10  likely to remember their exposure to talc than women
11  without ovarian cancer; is that right?
12    A   That is a theoretical risk.
13    Q   In fact, in your report on page 17, you
14  acknowledge that the risk of bias is greater for
15  case-control studies as opposed to cohort studies;
16  is that right?
17    A   Yes.
18    Q   Recall bias could explain the fact that
19  some retrospective case-control studies have found a
20  statistically significant relationship between
21  talcum powder and ovarian cancer, but the cohort
22  studies have not, correct?
23    A   That is a theoretical risk.  To do that
24  you would need to have some knowledge in the
25  population that influenced that recall bias, but

Page 276

1  absolutely that's a possibility.
2    Q   You also looked at both the hospital-based
3  and the population-based case-control studies; is
4  that right?
5    A   I did.
6    Q   None of the hospital-based case-control
7  studies show a statistically significant association
8  between talc use and ovarian cancer, correct?
9    A   I -- I'm not sure --
10    Q   Take a look at --
11    A   -- where you're getting that from.
12    Q   I will show you the Langseth paper from
13  2008, which you cite and we talked about yesterday.
14  Let's mark this as Exhibit 30.
15        (Exhibit 30 was marked for identification
16  and is attached to the transcript.)
17    A   I have it.  I have it.
18    Q   (BY MR. ZELLERS)  All right.  Now -- and
19  let me just -- I'll put it in the record there.
20        MS. O'DELL:  Thank you.
21    Q   (BY MR. ZELLERS)  If you look at the
22  Langseth paper, on the second page, Figure 1, they
23  list out all of the population -- or at least a
24  great number of the population-based and
25  case-control studies and the hospital-based

Page 277

1  case-control studies; is that right?
2    A   Yes, they do.
3    Q   (BY MR. ZELLERS)  At least among the
4  hospital-based case-control studies that are
5  identified by Langseth in Figure 1, it appears that
6  there's six hospital-based case-control studies.
7        None of those hospital-based case-control
8  studies show a statistically significant
9  association, correct?
10        MS. O'DELL:  Object to the form.
11    A   We discussed this yesterday.  But if
12  you're asking if the individual hospital-based
13  studies overlap one, then they overlap one.
14    Q   (BY MR. ZELLERS)  They do not overlap one?
15    A   The -- the hospital-based studies do
16  overlap one.
17    Q   Okay.  The population-based case-control
18  studies, which are up above in our
19  Langseth Figure 1, some of those -- if we look at
20  the individual studies -- show statistical
21  significance, and some of those do not; is that
22  right?
23    A   I'm -- I'm hesitant to be as definitive
24  about using the confidence interval that are
25  presented here as being a reflection of statistical

9 (Pages 274 to 277)

Rebecca Smith-Bindman, M.D.

Page 278

1  significance.
2       All of them are shifted to the right. All
3  of them have a positive association. And the
4  confidence interval for some of them overlap one.
5       But taken as a group, there's statistical
6  significance for the entirety of the population --
7  of the population of studies that he looked at.
8       Q   As we did discuss yesterday, if you look
9  at the population-based studies individually, at
10 least based upon what's reported by Langseth in his
11 Figure 1, some demonstrate statistical significance
12 and some do not; is that right?
13      A   I -- again, it's -- they're slightly --
14 it's -- it's not the only -- the confidence interval
15 overlapping one is sort of what I consider a
16 quick-and-dirty way to answer statistical
17 significance.
18      It's not exactly that way. But some of
19 them clearly suggest statistical significance. I
20 think ten of them. And four of them suggest not
21 statistical significance. So the individual
22 studies. But it's a little more complicated than
23 that.
24      Q   Would you agree that if a study does not
25 show statistical significance, that it could mean

Page 279

1  that no risk exists?
2       A   If --
3       MS. O'DELL:  Object to the form.
4       A   -- an individual study shows no
5  statistical significance, it means -- with all
6  research -- that the most likely truth is the point
7  estimate, which is whatever that point estimate is,
8  but that you could not exclude chance as one of the
9  possible causes for the results.
10      Q   (BY MR. ZELLERS) If we looked just at the
11 population-based case-control studies and the
12 hospital-based case-control studies that are shown
13 by Langseth in Figure 1, there is an inconsistency
14 between the two in that each of the individual
15 hospital-based case-control studies have confidence
16 intervals which overlap one, and many of the
17 population-based or at least some of the
18 population-based studies do not, correct?
19      A   I -- I do not believe there is
20 inconsistency between the pooled odds ratio for
21 population-based studies, which has a confidence
22 interval that overlaps the confidence intervals for
23 the pooled odd ratio for the hospital-based studies.
24      So using the approach that you are
25 suggesting of using confidence intervals, the way to

Page 280

1  tell if things are different or the -- or
2  indistinguishable, the confidence interval for the
3  pooled odds ratio for the population-based studies
4  goes from 1.29 to 1.52, so the truth is likely in
5  that range, where the truth for the hospital-based
6  studies is 0.92 to 1.63. They overlap.
7       And so I would interpret that using this
8  sort of quick approach is that there's not a
9  statistical difference between the summary of the
10 pooled odd ratio based on the type of populations
11 that were recruited.
12      Again, the point estimates are a little
13 bit different for sure, 1.4 versus 1.12. But the
14 confidence intervals overlap, suggesting that
15 they're not -- they're not different.
16      Q   You are familiar with selection bias; is
17 that right?
18      A   I am.
19      Q   Would you agree that the hospital-based
20 case-control studies may be less susceptible to
21 selection bias than population-based case-control
22 studies?
23      MS. O'DELL:  Object to the form.
24      A   I -- I would not agree with that. In
25 general, you think about hospital-based studies as

Page 281

1  being potentially a great deal more bias.
2       Now, that -- with that caveat, it depends
3  on how you found your cases and your controls.
4       But in general, you want to find
5  population-based cases and controls, I believe,
6  rather than hospital-based. But it matters how they
7  are recruited.
8       Q   Hospital-based control studies are
9  comparing hospitalized patients to hospitalized
10 patients; is that right?
11      A   I -- I -- in this case, yes, I think
12 that's --
13      Q   And --
14      A   -- how they define it.
15      Q   -- in population based studies, you're
16 more likely to be comparing ill people to healthy
17 people; is that right?
18      A   Again, it -- it depends on how you're
19 selecting. If you're selecting patients who are
20 sick in the hospital and comparing that to healthy
21 patients who are outpatient population based, that
22 would be the kind of bias that you are describing.
23 That would be the worst.
24      But if you're, in fact, comparing
25 relatively comparable population-based cases and

10 (Pages 278 to 281)

Rebecca Smith-Bindman, M.D.

Page 282

1    controls, then I don't agree that hospital-based
2    controls are -- are better.
3        Q   Penninkilampi.  One of the studies that
4    you talked to us about yesterday was Penninkilampi
5    2018; is that right?
6        A   Yes.
7        Q   Penninkilampi 2018 did not include the
8    Gates 2010 cohort study; is that right?
9        A   That's correct.
10       Q   Did you verify that the data that
11   Penninkilampi reports is accurate?
12       A   I did not.  Did I go back and validate
13   their individual abstracted data?
14       Q   Yeah.
15       A   I did not.
16       Q   In determining that a study is of high
17   quality, would it be important to you that the
18   authors are accurately reporting the odds ratios and
19   confidence intervals?
20       A   Data accuracy is important to me.  And --
21   and I would look towards the journal peer review
22   process to have done that, yes.
23       Q   If -- if there were errors in reporting of
24   the odds ratios or the confidence intervals, that
25   could call into question the reliability of the

Page 283

1    study; is that right?
2        MS. O'DELL:  Object to the form.
3        A   Yes, that's definitely possible.
4        Q   (BY MR. ZELLERS) Penninkilampi 2018, that
5    study specifically states that a certain causal link
6    between talc use and ovarian cancer has not been
7    established, correct?
8        MS. O'DELL:  Object to the form.
9        A   I don't remember them concluding that.
10   But if you tell me where --
11       Q   (BY MR. ZELLERS) Sure.
12       A   -- it is --
13       Q   Look at page 42, at the end of first
14   paragraph.
15       A   Well, perineal talc use has not been shown
16   to be safe.  In a similar regard, a certain causal
17   link between the use and ovarian cancer has not been
18   established --
19       Q   And you --
20       A   -- is what --
21       Q   -- okay.
22       A   -- Penninkilampi says.
23       Q   And I think you omitted the word "talc."
24   But their specific statement is, A certain causal
25   link between talc use and ovarian cancer has not yet

Page 284

1    been established; is that right?
2        A   That is what they say.
3        Q   Meta-analyses or systematic analyses, that
4    can combine the work of other published studies into
5    one study; is that right?
6        A   Yes.
7        Q   If there are biases and confounding in the
8    underlying studies, the meta-analysis or the
9    systematic review or analysis will reflect the
10   biases and confounding; is that right?
11       MS. O'DELL:  Object to the form.
12       A   Any biases in the papers will not go away
13   by combining them.  I'm not sure what you mean by
14   "the confounding."  If -- if a paper has an
15   accounting for confounding --
16       Q   (BY MR. ZELLERS) Let me ask you another
17   question.  A proper meta-analysis or systematic
18   review must analyze the sources of heterogeneity
19   across the studies; is that right?
20       A   Yes.
21       Q   And a proper meta-analysis or systematic
22   review must examine the methodology of each of the
23   underlying studies, correct?
24       A   Yes.
25       Q   You have given some opinions -- or at

Page 285

1    least you state some opinions relating to the
2    biological mechanisms of cancer; is that right?
3        A   Yes.
4        Q   The biological mechanisms of cancer are
5    not your area of expertise; is that correct?
6        MS. O'DELL:  Object to the form.
7        A   I'm knowledgeable about the biological
8    mechanism of cancer as a scientist, as a physician,
9    as a cancer epidemiologist.
10       Q   (BY MR. ZELLERS) Would you agree that
11   there are others who are more closely involved in
12   the area of biologic plausibility as it relates to
13   the perineal use of talcum powder and ovarian
14   cancer?
15       MS. O'DELL:  Object to the form.
16       A   I believe there are others who have more
17   expertise directly in that area than I do.
18       Q   (BY MR. ZELLERS) Your opinion is that
19   talcum powder travels from the perineal region to
20   the ovaries through the women's reproductive tract;
21   is that right?
22       A   Yes.
23       Q   If talcum powder can make this migration,
24   can other substances make the same migration?
25       A   Yes.

11 (Pages 282 to 285)

Rebecca Smith-Bindman, M.D.

Page 286

1    Q    Sand from the beach?
2    A    I don't know if there's evidence of sand
3  from the beach.
4    Q    Toilet paper particles?
5    A    I -- I -- I do not know if there's
6  evidence of that.
7    Q    There are no human studies that
8  demonstrate the migration of any particulate matter
9  from outside the peri -- peritoneum to the ovaries,
10  correct?
11    MS. O'DELL:  Object to the form.
12    A    When you say "demonstrate," do you mean
13  active demonstration or a suggestion that it has
14  gone that route?
15    Q    (BY MR. ZELLERS) Active -- active
16  demonstration.
17    A    So there are no studies that I know of
18  that have taken talcum powder and then documented
19  its movement through -- to the ovaries.
20    Q    Or any particulate from outside the
21  perineum to the ovaries, correct?
22    MS. O'DELL:  Object to the form.
23    A    I -- I don't know of any sort of active
24  studies that have watched it moved.  It's rather the
25  studies have found the particulate matter at its

Page 287

1  destination and then have supposed it had to travel
2  there in some way.
3    Q    (BY MR. ZELLERS) None of the studies that
4  you cite in your report actually looked at whether
5  talcum powder can migrate from perineal application
6  through the fallopian tubes to the ovaries, correct?
7    A    Correct.
8    MS. O'DELL:  Object to the form.
9    Q    (BY MR. ZELLERS) You also cannot cite any
10  article that shows granulomas, fibrosis, or
11  adhesions anywhere up the reproductive tract of a
12  women as result of her external genital talc
13  application; is -- is that right?
14    A    Yes.
15    Q    If talcum powder migrates from the
16  perineal region to the ovaries, shouldn't exposure
17  to talc be far greater in concentration in the
18  rectal, vulvar, vaginal, cervical, and uterine
19  tissues which are closer to the area of initial
20  exposure?
21    MS. O'DELL:  Object to the form.
22    A    I think that assumes that proximity and
23  concentration, which you would expect which would
24  fall off with more distance, is the only factor that
25  would determine concentrations when, in fact, there

Page 288

1  are a lot of other factors such as sphincters or the
2  type of mucosa that it is or mucous barriers that
3  might have a very strong relationship to the
4  concentration of talc.
5    So the rectum and the bladder have
6  sphincters, and the mucosa and the vagina and the
7  bladder and rectum are very different than the
8  mucosa of the ovary.  The endometrium has different
9  tissue.
10    So I agree with you that you would expert
11  proximity would be one factor that might affect
12  concentration.  But the characteristics of the
13  tissue, the barriers, the physical or mucosal could
14  be expected to have a much bigger impact.
15    Q    No studies that you're aware of show
16  inflammation as a result of genital talc use in the
17  rectal, vulvar, vaginal, cervical, and uterine
18  tissues; is that right?
19    A    I do not know of those studies.
20    Q    And no studies show a link between
21  external genital talc use and rectal, vulvar,
22  vaginal, cervical, or uterine cancer; is that right?
23    MS. O'DELL:  Object to the form.
24    A    That is correct.
25    Q    (BY MR. ZELLERS) You have not done an

Page 289

1  expert review of the inflammation evidence yourself;
2  is that fair?
3    MS. O'DELL:  Object to the form.
4    A    I -- I have done a lot of reading of the
5  inflammation literature.  I'm not sure how I would
6  define it as an expert or not an expert -- expert
7  review.
8    Q    (BY MR. ZELLERS) You do know that not all
9  inflammatory conditions lead to cancer, correct?
10    A    There's a lot of literature about certain
11  inflammation that causes chronic -- in particular a
12  lot of different kind of cancers, more publications
13  about acute inflammation that does not lead to
14  cancer.
15    But yes, there are both cancers that are
16  very susceptible to inflammation or caused by it and
17  some that are not.
18    Q    Chronic inflammation.  There are many
19  chronic inflammatory conditions that do not lead to
20  cancer; is that right?
21    A    Yes.
22    Q    Do you agree that an agent can be a
23  carcinogenic for one type of cancer, but not for
24  others?
25    A    Yes.

12 (Pages 286 to 289)

Rebecca Smith-Bindman, M.D.

Page 290

1    Q   Rheumatoid arthritis, that is a chronic
2  inflammation condition, but it does not increase the
3  risk of my ovarian cancer, correct?
4    A   Correct.
5    Q   The same with psoriasis; is that right?
6    A   Not that I know of.
7    Q   Page 41 of your report, you conclude that,
8  Regular exposure to talcum powder products causes
9  ovarian cancer in some women.
10       Do you see that?
11   A   I do.
12   Q   Is there a certain amount of talcum powder
13 that a product must contain to cause inflammation?
14       MS. O'DELL:  Object to the form.
15   A   I -- I -- I do not know of evidence that
16 quantifies the amount of exposure that's necessary
17 that a published literature supports the amount
18 women use is an amount that leads to cancer, but
19 I -- I don't know if there's a minimum threshold
20 or...
21   Q   (BY MR. ZELLERS) Do you consider
22 cornstarch to be a talcum powder product that causes
23 inflammation?
24       MS. O'DELL:  Object to the form.
25   A   Talcum powder -- cornstarch -- talcum

Page 291

1  powder causes inflammation.  Cornstarch can also
2  cause inflammation.
3        I believe cornstarch tends to be an acute
4  inflammatory process rather than a chronic
5  inflammation process.  But --
6    Q   (BY MR. ZELLERS) You --
7    A   -- I -- I wouldn't consider cornstarch to
8  be a talcum powder --
9    Q   Is --
10   A   -- product.
11   Q   -- is there a study that you can point me
12 to that states that any inflammation from cornstarch
13 is acute and not chronic?
14       MS. O'DELL:  Object to the form.
15   A   There's a literature about cornstarch
16 leading to acute inflammation, for example, in the
17 surgical literature when it was on surgical gloves
18 or on physical exams which has led to its being
19 removed so -- so as to reproduce acute inflammatory
20 processes.
21   Q   (BY MR. ZELLERS) My question to you is:
22 Are you aware of any literature that states that
23 cornstarch is not associated with a chronic
24 inflammatory condition?
25       MS. O'DELL:  Object to the form.

Page 292

1    A   In a few of the papers I reviewed -- not
2  very many of them, but a few of them had a small
3  proportion of women who were exposed to cornstarch
4  rather than talc powder products.
5        I -- I think it -- they had negative
6  results, but they were small -- a small number of
7  women, so I wouldn't use that to prove that it's
8  safe.
9        But I don't know of any literature that
10 suggests cornstarch is carcinogenic.
11   Q   Your opinion that talcum powder products
12 cause inflammation is not based on the determination
13 that there is a threshold amount of talcum powder
14 that will be required to be in the product before
15 you can conclude that the product will cause chronic
16 inflammation; is -- is that right?
17       MS. O'DELL:  Object to the form.
18   A   I -- I -- I think I would like to agree.
19 I'm just not sure exactly of -- what I am agreeing
20 to.  So I -- I don't know any level --
21       MS. O'DELL:  That's always --
22   A   -- of --
23       MS. O'DELL:  -- a good sign you should --
24   A   -- I -- I can't --
25       MS. O'DELL:  -- be --

Page 293

1    A   -- I can't tell exactly the -- what
2  the question is.
3        I -- there -- I don't know -- I don't know
4  an amount of talcum powder that would make a product
5  safe.
6    Q   (BY MR. ZELLERS) Do you believe that
7  cornstarch is a superior alternative to talc?
8    A   I believe that talcum powder products will
9  increase women's risk of cancer, and I would avoid
10 using it as a woman or as a doctor counseling my
11 patients.
12   Q   Well --
13   A   I don't have views that cornstarch is a
14 carcinogenic product.  So in terms of any potential
15 risk-benefit relationship of cornstarch has the same
16 value in terms of absorbency and much fewer risk of
17 harm, then if that's the question, then I think
18 cornstarch is preferable.
19   Q   There are no reports in the literature of
20 externally applied talc leading to inflammation,
21 granulomas, fibrosis, or adhesions anywhere along a
22 women's reproductive tract, correct?
23       MS. O'DELL:  Objection, asked and
24 answered.
25   A   Not that I know of.

13 (Pages 290 to 293)

Rebecca Smith-Bindman, M.D.

Page 294

1    Q   (BY MR. ZELLERS) On page 12 of your report
2  you state, The most widely accepted mechanism for
3  initiation, promotion, and progression of ovarian
4  cancer is tissue inflammation, leading to a series
5  of responses that result in cancer.
6         Do you see that statement?
7    A   I do.
8    Q   You do not cite any support in your report
9  for that proposition, correct?
10        MS. O'DELL:  Object to the form.
11   A   I -- I think my -- that first paragraph
12  was sort of an introduction to that section.  So
13  then I go on to cite, I -- I think, the supporting
14  evidence within the next few paragraphs.
15   Q   (BY MR. ZELLERS) You would agree that
16  research regarding whether chronic inflammation can
17  cause ovarian cancer is ongoing, correct?
18   A   It's an active area of research.
19   Q   Are you familiar with a paper published by
20  Melissa Merritt in 2008, entitled "Talcum Powder
21  Chronic Pelvic Inflammation and NSAIDS in Relation
22  to Risk of Epithelial Ovarian Cancer"?
23   A   I am.
24   Q   It's included in your reliance materials
25  on page 17; is that right?

Page 295

1    A   Can you tell me the title again?  Yeah.
2  Okay.
3    Q   Sure.  Do you have that or I can --
4    A   No.
5    Q   -- mark it?
6    A   No, I have it.
7    Q   If you go to page 174 of the Merritt
8  paper -- and tell me when you're --
9    A   I'm there.
10   Q   -- there -- at the bottom of the first
11  paragraph of the discussion, the authors conclude,
12  These results, in combination with previous studies,
13  suggest that chronic inflammation is unlikely to
14  play a major role in the development of ovarian
15  cancer.
16        Is that right?  Did I read that correctly?
17   A   Using the results that they had available
18  on the data in 2007, that is what Dr. Merritt
19  concluded.
20   Q   You also discuss in your report -- well,
21  let me withdraw that.
22        You're familiar with NSAIDS, nonsteroidal
23  antiinflammatory agents; is that right --
24   A   Yes, I am.
25   Q   -- and aspirin?  Those medicines reduce

Page 296

1  inflammation; is that right?
2    A   Yes, they do.
3    Q   If inflammation is a mechanism for ovarian
4  cancer, you would expect women who use NSAIDS or
5  aspirin to have a lower risk of ovarian cancer,
6  correct?
7         MS. O'DELL:  Object to the form.
8    A   Other things being equal, you might expect
9  that if you could measure inflammation or influence
10  it by using NSAIDS, that that might be associated.
11  That is true.
12   Q   (BY MR. ZELLERS) The literature, though,
13  is mixed in terms of whether or not the use of
14  NSAIDS or aspirin actually reduce the risk of
15  ovarian cancer; is that right, or the incidence of
16  --
17   A   So --
18   Q   -- ovarian cancer?
19   A   -- I have reviewed those papers and would
20  agree with that some seem to suggest one
21  direction, some others.  I haven't quantified them
22  together or tried to summarize them.
23        But I would agree.  There doesn't seem to
24  be a consistent message in that literature.
25   Q   One of those papers is -- that's included

Page 297

1  in your reliance list is the Verdoodt 2017 paper; is
2  that right?  That's V E R D O O D T.
3    A   I am going to have to defer to seeing
4  that.
5    Q   Okay.  Let me --
6    A   I believe --
7    Q   -- show you --
8    A   -- it's on my list.
9    Q   -- I will mark that paper as Exhibit 31.
10        (Exhibit 31 was marked for identification
11  and is attached to the transcript.)
12   A   Thank you.
13   Q   (BY MR. ZELLERS) And turn, if you will, to
14  page 5 under "Discussion" on the first paragraph.
15   A   And just to confirm, this is -- I -- I
16  have read this.  This is a review article, right?
17   A   Yes.
18   A   Okay.
19   Q   So on page 5 under "Discussion," the first
20  sentence, the authors state, The sparse and
21  equivocal results for the association between NSAID
22  use and mortality among ovarian and endometrial
23  cancer patients preclude any firm conclusions at
24  this point.
25        Is that right?

14 (Pages 294 to 297)

Rebecca Smith-Bindman, M.D.

Page 298

1    A   That is what this author concludes. I'm
2  trying to see what references he used for that, but
3  that is what he concludes.
4    Q   Okay. And this is an article that was
5  published in 2017, correct?
6    A   Yes.
7    Q   Yesterday counsel for plaintiffs indicated
8  that you have -- in addition to the materials in
9  your report -- reviewed a 2018 chapter by Saed and
10 the Harper and Saed 2019 abstract; is that right?
11   A   I -- I reviewed several of his abstracts
12 and -- and a recent paper, yes.
13   Q   Do you know that Dr. Saed is a paid expert
14 for the Plaintiffs in this litigation?
15   A   I know he's a very well-respected
16 scientist that they have supported in his research.
17   Q   Is that a yes?
18       MS. BOCKUS:  I object. Nonresponsive.
19       MS. O'DELL:  Mike, excuse me.
20       MR. ZELLERS:  Sure.
21       MS. O'DELL:  You said the 2019 abstract.
22 Did you mean the abstract or the manuscript, just to
23 make sure I'm following the conversation?
24       MR. ZELLERS:  I -- I believe I mean the
25 abstract. But we mean whatever the doctor has in

Page 299

1  her file that we marked yesterday.
2        THE COURT REPORTER:  Who objected down
3  there?
4        MS. BOCKUS:  Jane Bockus.
5        MS. O'DELL:  I think what she had in her
6  file was the manuscript. So I think that's what you
7  marked as an exhibit, but I don't want there to be
8  confusion.
9    Q   (BY MR. ZELLERS) You have reviewed several
10 publications within the last year or two from
11 Dr. Saed --
12   A   Yes.
13   Q   -- is that right?
14   A   Yes, I have.
15       THE COURT REPORTER:  Wait.
16       MR. ZELLERS:  All right. Are you okay,
17 Ms. Court Reporter?
18       THE COURT REPORTER:  Yes. I just have to
19 have you wait until the end of the question, please.
20   Q   (BY MR. ZELLERS) Let me re-ask my --
21   A   Please.
22   Q   -- question. Did you know that Dr. Saed
23 is a paid expert for the Plaintiffs in this
24 litigation?
25   A   Yes, I do.

Page 300

1    Q   Have you spoken with Dr. Saed?
2    A   I have not.
3    Q   Have you requested any information from
4  Dr. Saed?
5    A   I have not.
6    Q   The Saed study just looked at immortalized
7  cell lines; is that right?
8    A   Yes, I believe that's how the cell lines
9  were --
10   Q   Are --
11   A   -- defined.
12   Q   -- are you -- are you aware that Dr. Saed
13 testified that the cells were modified with a virus
14 to make them keep undergoing division in vitro?
15   A   I -- I'm aware that that's what happens to
16 cell lines. I -- I don't believe I saw his
17 deposition to say that.
18   Q   Are you aware that Dr. Saed testified that
19 the P53 gene was turned off in those cells?
20   A   No, I'm not aware.
21   Q   Are you aware based upon your reading that
22 the loss of the P53 protein contributes to
23 unrestrained cellular proliferation?
24       MS. O'DELL:  Object to the form.
25   A   I -- I believe that the reason you have

Page 301

1  controls in experiment is to account for the
2  underlying expression in turnover cells so you can
3  compare something you do to the cell versus the
4  baseline in order to account for the baseline,
5  whatever it is, proliferation of the cell or
6  apoptosis levels or expression of oxidants or
7  antioxidants.
8        So I -- I -- the way you're asking the
9  question is -- is: Are you comparing this cell line
10 to living cells in context?
11       And I would agree with you that this cell
12 line is different than living cells in context.
13       But if you're asking if it's a valid
14 comparison to do the experiment in this cell line,
15 it is because you are doing an intervention to those
16 cells that has a control group.
17       And so this cell line has a different
18 behavior than a -- a living cell does, but provides
19 a comparison group.
20   Q   (BY MR. ZELLERS) What methodology did you
21 use to apply Dr. Saed's results to normal cells in
22 actual organs?
23   A   So --
24       MS. O'DELL:  Object to the form.
25   A   -- in some of the work that I do around a

15 (Pages 298 to 301)

Rebecca Smith-Bindman, M.D.

Page 302

1  different environmental carcinogen -- radiation, for
2  example -- we look at changes of expression, certain
3  enzymes in cells to radiation to understand what
4  that damage does in terms of expression of relevant
5  genes, cell proliferation, and things like that.
6      So I take his research to mean that I can
7  understand the changes to pro oxidants to
8  antioxidants to apoptosis to gene expression in the
9  cell. Not that I can come up with the exact
10 quantification in a patient that would correspond to
11 it, but rather, what mechanisms will be stimulated
12 by the talc.
13     So to answer your question, I -- it tells
14 me what parts of the cell are sensitive to it, but
15 not the quantity that might lead to that
16 sensitivity.
17     Q   (BY MR. ZELLERS) Can you cite any data
18 showing that the concentrations of exposure used in
19 the Saed study are the same as would be encountered
20 with the use of cosmetic talc in the perineal
21 region?
22     A   I cannot. That's what I was trying to
23 express.
24     Q   Can you cite any data showing that the
25 level of concentration of exposure used in the Saed

Page 303

1  study has ever occurred in women with perineal talc
2  use?
3      MS. O'DELL:  Object to the form.
4      A   I want to clarify my answer. I don't know
5  those data.
6      Q   (BY MR. ZELLERS) Would you agree that
7  reactive oxygen species are a normal part of cell
8  physiology?
9      A   Yes.
10     Q   Do all substances that cause oxidative
11 stress also cause cancer?
12     A   I think you care about the balance of
13 oxidative, pro oxidative, antioxidative levels.
14     That being said, I do not know that every
15 instance where you have more pro oxidative leads to
16 cancer. I know of some where it does. I don't know
17 if it always does.
18     Q   Does the presence of oxidative stress in a
19 tissue indicate that cancer will develop in that
20 tissue?
21     A   I think I mentioned this yesterday, that
22 there's a sense of a probability. So the
23 probability will likely increase.
24     But most cells, thankfully, will repair
25 and -- that damage, and so most cells will not

Page 304

1  develop enough mutations to develop into cancer.
2      But the greater the oxidative stress for
3  cancer like ovarian cancer, the greater the chance
4  of inducing cancer.
5      Q   Can you cite me to any study that says
6  that?
7      MS. O'DELL:  Object to the form.
8      A   Any study that says that there's a dose
9  response related to the amount of stress and the
10 member -- numbers of cancers?
11     Q   (BY MR. ZELLERS) That supports, yes, your
12 statement and your position.
13     A   I -- the data that I am thinking of -- and
14 I'm not sure if it's quite the same as the question
15 that you're asking -- is the number of gene
16 mutations is higher in cancer cells than it is in
17 noncancer cells. So --
18     THE COURT REPORTER:  In noncancer?
19     A   In non -- cancer cells have many more
20 genetic mutations than noncancer cells.
21     Both have generic mutations. And the
22 environment of having more oxidative stress is
23 associated with getting more mutations --
24     Q   (BY MR. ZELLERS) If -- if it's --
25     A   -- but --

Page 305

1      Q   -- are you finished?
2      A   -- I -- I am.
3      Q   Okay. If -- if exposure to a substance
4  causes oxidative stress in certain tissue, does that
5  mean that the substance will cause oxidative stress
6  in all types of tissues?
7      A   No.
8      Q   Does the body have a protective mechanism
9  that can limit tissue damage from oxidative stress?
10     A   Yes.
11     Q   Are there any publications that you are
12 aware of that indicate that oxidative stress is
13 involved in the development of ovarian cancer?
14     A   We discussed earlier that inflammation
15 increases oxidative stress such as pelvic
16 inflammatory disease leads to oxidative stress.
17     And pelvic inflammatory disease is
18 associated and leads to ovarian cancer. But I'm not
19 sure if that's answers the question that you are...
20     Q   Well, if I had more time, we would discuss
21 that at greater length. You're familiar with the
22 term "confounding" is that right?
23     A   I -- I -- Yes, I'm --
24     Q   All right.
25     A   -- familiar with that term.

16 (Pages 302 to 305)

Rebecca Smith-Bindman, M.D.

Page 306

1    Q   Confounding is where the presence of
2  another association confuses the relationship
3  between the exposure and the disease being studied;
4  is -- is that right?
5    A   Yes.
6    Q   Confounding can distort results in
7  epidemiological studies; is that right?
8    A   Yes.
9    Q   Would you agree that residual confounding
10  is possible in every observational study?
11    A   Yes.
12    Q   It's also -- strike that.
13      It's possible that unmeasured confounders
14  may be present in every observational study,
15  correct?
16    A   Yes.
17    Q   It's impossible to say that all known and
18  unknown confounding factors have been controlled for
19  in any given study; is that right?
20    A   Yes.
21    Q   Would you agree that there are new factors
22  that are being discussed that are possibly involved
23  with ovarian cancer that are just being published in
24  the literature such as a history of chlamydia
25  infection and a history of weight gain during

Page 307

1  adolescence?
2      MS. O'DELL:  Object to the form.
3    A   Chlamydia infection would be the most
4  common infection of PID, and so that's something
5  that I just mentioned.  I'm not sure that that's
6  such a new one.
7      And weight gain during adolescence is
8  something that's of interest across a range of
9  cancers, like breast cancer.  I don't know it
10  personally around ovarian cancer, but...
11    Q   (BY MR. ZELLERS) Those factors that we
12  just talked about generally have not been controlled
13  for in any of the published talcum powder ovarian
14  cancer studies; is that right?
15    A   I -- the PID, I -- I think, has it in a
16  paper or two.  And -- and the weight gain, I -- I
17  don't -- I have never seen that one.
18    Q   We talked yesterday about the Berge study.
19  Do you remember that?
20    A   I do.
21    Q   And you talk about Berge on page 25 of
22  your report.
23      What do you mean when you say, A second
24  limitation of Berge is that the included studies
25  adjusted for a variety of covariates, although this

Page 308

1  is unavoidable in this type of summary.  The large
2  difference in general between adjusted and crude
3  results emphasizes the importance of adjustments
4  when estimating particular risk?
5      THE COURT REPORTER:  When estimating?
6      MR. ZELLERS:  Particular risk.
7    A   Are you asking what I meant by that?
8    Q   (BY MR. ZELLERS) Yes.  What did you mean
9  by that?
10    A   Okay.  I -- I would say my sentence is not
11  as clear as it should have been.  What I mean -- and
12  I'm not really sure why I pointed this out just for
13  Berge -- it's really a general -- is that the
14  studies they included, adjusted for different
15  covariants.
16      They didn't all adjust for the same
17  covariates.  So a variety of covariates, meaning
18  they didn't all adjust for the exact same
19  covariates.
20      But this is unavoidable in this type of
21  study.  So I was just saying that some of the
22  included studies adjusted for A, B and C; and others
23  were adjusted for B, C, and D; and others D, E, and
24  F.
25    Q   Huncharek, page 26.  Do you see that

Page 309

1  reference where you talk about that study?
2    A   Yes.
3    Q   You say that the difference between a
4  relative risk of 1.19 and 1.38 is small; is that
5  right?
6      MS. O'DELL:  You're talking about 2007 or
7  2003?
8    Q   (BY MR. ZELLERS) Whichever --
9    A   Which page?
10    Q   -- so page 26 --
11      MS. O'DELL:  They're both on the same
12  page.
13    Q   (BY MR. ZELLERS) I think I'm looking at
14  the one at the bottom.
15      MS. O'DELL:  Okay.  All right.  2003?
16      MR. ZELLERS:  Yes.
17    Q   (BY MR. ZELLERS) So are you with me?  Are
18  you looking at your last couple of lines there on
19  page 26?
20    A   Yes.
21    Q   And you do say that the difference between
22  a relative risk of 1.19 and 1.38 is small; is that
23  right?
24    A   It -- odds ratios --
25    Q   Yeah.

17 (Pages 306 to 309)

Rebecca Smith-Bindman, M.D.

Page 310

1    A  -- but yes.
2    Q  All right.  And -- and so a difference in
3  odds ratios of .19, you would consider that to be a
4  small difference?
5        MS. O'DELL:  Object to the form.
6    A  You're asking why I said those differences
7  are small?
8    Q  (BY MR. ZELLERS) No.  Well, what I guess
9  what I want to know is:  Would you agree that the
10  difference between an odds ratio of 1.0 and 1.2 is
11  small?
12        MS. O'DELL:  Object to the form.
13    A  I think the question of whether or not you
14  have a difference of absolute odds of .2 along
15  different values means the same thing.  And I would
16  say it doesn't mean the same thing.
17        So if you have an odds ratio as an example
18  of 4.7 versus 4.9, they're kind of the same number.
19  If you have a number that's 1.0 versus 1.2, those
20  are not the same number.
21        So I don't think you would want to assume
22  the shift in the absolute magnitude of the
23  difference in odds.  I often published difference in
24  odds ratios of .2 is stable.
25        But I think is -- your point is well taken

Page 311

1  that that's not a trivial difference.  I was just
2  saying in the context of a systematic review, those
3  are both very strong, positive associations, and
4  that's a relatively minor difference.
5    Q  (BY MR. ZELLERS) An odds ratio range of
6  1.19 to 1.38 is much closer to an odds ratio of 1.0
7  to 1.2 than it is to an odds ratio of 4.5 to 4.7,
8  correct?
9    A  I -- I think that's a valid -- a valid
10  comparison.
11    Q  On page 26, 27, there's a carryover there,
12  but you state that the population controls are more
13  likely relevant and valid than hospital controls.
14        What's your support for that?
15    A  It's what we discussed earlier.  I -- I
16  think population-based controls are -- are better
17  than hospital-based controls.
18    Q  With respect to your systematic review,
19  did you attempt to identify gaps or flaws in the
20  underlying studies?
21    A  I reviewed the individual studies and set
22  forth criteria that I thought were required for
23  inclusion.
24    Q  What were those criteria?  Are those
25  contained in your forms that we talked about --

Page 312

1    A  Yeah.
2    Q  -- yesterday?
3    A  So the most important -- as it points out
4  here in -- in Huncharek, the next sentence of where
5  we are, is that this review looked at any exposure
6  rather than quantifying.
7        And I think the primary concern that I had
8  was that any exposure is a very vague definition.
9  And I thought it was much more important to have a
10  meaningful measure of exposure.
11        So the studies that I primarily included
12  were ones that had quantification of the exposure,
13  but also had some other requirements.
14        I -- I -- I want to say that my systematic
15  review was one piece of the information that I
16  considered, but my summary estimate in the
17  systematic review that I completed had the same
18  conclusion as all these other systematic reviews.
19        In the ballpark, it just gave me greater
20  confidence that we were truly looking at regular
21  exposure rather than any exposure.
22        Now, we know that the most common exposure
23  is regular exposure.  That's the -- the more
24  important -- most common.
25    Q  Take a look at page 39 in your report

Page 313

1  where you discuss temporality; is that right?
2    A  Yes.
3    Q  You say that women may use talc when
4  undergoing ovarian cancer treatment.
5        Do you see that?
6    A  Yes.
7    Q  What is your support for that or what is
8  that statement based on?
9    A  I -- I think it's based on my clinical
10  experience that postop patients often will use
11  talcum powder products for systematic relief of
12  symptoms that could be related to the surgical
13  procedure itself.
14    Q  All right.  Asbestos.  Are your opinions
15  in this case dependent on talcum powder containing
16  asbestos?
17    A  No, they're not.
18    Q  Are your opinions in this case dependent
19  on talcum powder containing trace amounts of metals?
20        MS. O'DELL:  Object to the form.
21    A  No, they're not.
22    Q  (BY MR. ZELLERS) Are your opinions in this
23  case dependent upon talcum powder containing any
24  particular fragrance chemical?
25    A  No, they're not.

18 (Pages 310 to 313)

Rebecca Smith-Bindman, M.D.

Page 314

1    Q   Do you believe that talcum powder, which
2   does not contain asbestos, causes ovarian cancer?
3    A   I don't have any data on which to conclude
4   based on epidemiologic evidence that there is such a
5   product, so I don't know that there is any product
6   that has been studied that doesn't contain asbestos
7   and fibrous talc.
8        I think in a laboratory setting, people
9   have studied products that they describe as being
10  asbestos free, and those products do cause cellular
11  damage.
12       But from an epidemiologic perspective,
13  which is primarily the data I looked at, all of the
14  products that have been studied, I believe contain
15  asbestos and fibrous talc.
16   Q   You have made an assumption or it is your
17  belief that all talcum powder products contain
18  asbestos; is that right?
19       MS. O'DELL:  Object to the form.
20   A   My belief is that many talcum powder
21  products contain asbestos or --
22   Q   (BY MR. ZELLERS) If --
23   A   -- fibrous.
24   Q   -- if your assumption about contamination
25  of talcum powder products with asbestos were not

Page 315

1   true, would that change your opinions in this case?
2        MS. O'DELL:  Object to the form.
3    A   In -- in this case, it would not.  I --
4   I -- the epidemiologic evidence is very strong that
5   exposure to talcum powder products, whatever it
6   contains, is carcinogenic.
7    Q   (BY MR. ZELLERS) You have looked at
8   several reports from Dr. Longo; is that right?
9    A   I have.
10   Q   You're aware he is a paid litigation
11  expert; is that right?
12   A   Yes, I am.
13   Q   You're aware he wrote his reports for the
14  purpose of this litigation and that those reports
15  have not been published; is that right?
16   A   I -- I know that he has generated a report
17  for this, yes.
18   Q   Do you know if any defense ex -- strike
19  that.
20       Do you know if any defense experts have
21  addressed or responded to Dr. Longo's litigation
22  reports?
23       MS. O'DELL:  I would object to the form.
24  There's been no defense reports in this case, as you
25  know.

Page 316

1    A   I -- I haven't seen any.
2    Q   (BY MR. ZELLERS) Have you requested any?
3        MS. O'DELL:  Object to the form.  There
4   have been no defense expert reports in this case.
5        MR. ZELLERS:  Counsel, please object to
6   form.  There have been many defense expert reports
7   in the talcum powder litigation generally.
8        But my question was whether or not she has
9   seen anything, so she can -- I think she has already
10  answered.
11   Q   (BY MR. ZELLERS) Is that right?  Have you
12  answered the question?
13       MS. O'DELL:  Object to the form.
14   A   I have asked to seen reports.  No.  I have
15  asked to seen testing results.  I have not asked to
16  seen reports.
17   Q   (BY MR. ZELLERS) Have you seen testing
18  results from the FDA and its testing of talcum
19  powder?
20   A   I have.
21   Q   The FDA did some testing in 2010.  Did you
22  see those results?
23   A   I did.
24       MS. O'DELL:  Do you need a break or are
25  you good or --

Page 317

1    A   I actually would love a -- a break.  I
2   don't mind going a few more minutes, if that would
3   be good or -- but otherwise, I would love a break.
4        MS. O'DELL:  Whenever is a good time.
5        MR. ZELLERS:  Sure.  I'll just finish
6   this.
7    Q   (BY MR. ZELLERS) I'll hand you the
8   exhibit, Exhibit 32.
9        (Exhibit 32 was marked for identification
10  and is attached to the transcript.)
11   Q   (BY MR. ZELLERS) Is that --
12   A   Thank you.
13   Q   -- the -- at least some of the testing by
14  the FDA that you have seen?
15   A   Yes, it is.
16   Q   That testing was done by an independent
17  laboratory; is that right?
18   A   I -- I -- I don't know that, but I believe
19  you.
20   Q   Take --
21       MS. O'DELL:  Do you have a copy for me?
22       MR. ZELLERS:  Oh, I'm so sorry.  I have
23  that, yes.  Sorry.
24       MS. O'DELL:  Thanks.
25   Q   (BY MR. ZELLERS) If you go to the second

19 (Pages 314 to 317)

Rebecca Smith-Bindman, M.D.

Page 318

1  page, the second paragraph, We contracted with AMA
2  Analytical Services of Lanham, Maryland, to conduct
3  this laboratory service -- or strike that -- survey.
4       Do you see that?
5  A   I don't.  I'm on the right page.
6  Q   On the second page.
7  A   The second page.
8  Q   The second paragraph, the second --
9  A   Yes.
10 Q   -- sentence --
11 A   -- yes.  Yes.  Thank you.
12 Q   All right.
13 A   Yes.
14 Q   And at least based upon this report, no
15 asbestos was detected in the talcum powder that was
16 tested; is that right?
17 A   In the reports that they show, which
18 might -- my understanding is that they had two
19 samples of baby powder, talcum powder in this.  And
20 that in those two specimens using the testing method
21 they used, they didn't find evidence of asbestos.
22      MR. ZELLERS:  All right.  Let's take a
23 break.
24      THE VIDEOGRAPHER:  The time is 10:47 a.m.
25 We are now off the record.

Page 319

1       (A break was taken from 10:47 a.m. to 1
2  11:00.)
3       THE VIDEOGRAPHER:  It's 11:00 a.m.  We are
4  now back on the record.  Here begins Media No. 2 of
5  the deposition of Dr. Rebecca Smith-Bindman, Ph.D.,
6  Volume II.
7  Q   (BY MR. ZELLERS) Dr. Smith-Bindman, I was
8  handed the invoice for Chris Tachibana, which we
9  have marked as Exhibit 33.
10      (Exhibit 33 was marked for identification
11 and is attached to the transcript.)
12 Q   (BY MR. ZELLERS) Is that the invoice that
13 your copy editor provided to you?
14 A   Yes.
15 Q   Are there any other invoices that you have
16 received from her?
17 A   No.
18 Q   Do you expect there to be any other work
19 that Ms. Tachibana does with respect to your report?
20 A   Not with respect to my report.
21      If I move ahead to publish these results,
22 then I would likely reach out to her to help -- as
23 well.
24      THE COURT REPORTER:  To help?
25 A   If we choose to publish the results, I

Page 320

1  would like -- she edits all of my publications
2  before I submit them.
3  Q   (BY MR. ZELLERS) When we left the last
4  session, I asked you about asbestos and whether or
5  not asbestos is contained in talcum powder.
6       Is there any amount of asbestos that would
7  be safe in talcum powder products?
8  A   And the simple answer would be no, I don't
9  think there's any amount that would be safe in
10 talcum powder products.
11 Q   All right.  Is there any amount of trace
12 metals that would be safe in talcum powder products?
13      MS. O'DELL:  Object to the form.
14 A   I believe there would be amounts of trace
15 metals that would be acceptable.
16 Q   (BY MR. ZELLERS) Are there any amounts of
17 fragrance chemicals that would be safe in talcum
18 powder products?
19 A   I believe there would be in certain
20 categories.  And in others, there would not.
21 Q   There have been no fragrance chemicals, to
22 your knowledge, that have been found in a study to
23 be associated with ovarian cancer, correct?
24      MS. O'DELL:  Object to the form.
25 A   I -- I know of no -- no such exploration.

Page 321

1  Q   (BY MR. ZELLERS) Do you have an opinion on
2  what type of asbestos is in talcum powder products?
3  A   I believe asbestos is sort of a family of
4  chemicals.  I think there are six that kind of get
5  grouped together.  I think all of them have been
6  identified in talcum powder products, but I don't
7  know the distribution of the different kinds.
8  Q   What type of asbestos is associated with
9  ovarian cancer?  And by that question, you believe
10 that there's six subtypes of asbestos --
11      MS. O'DELL:  Object to the form.
12 Q   (BY MR. ZELLERS) -- is that generally your
13 understanding?
14 A   It's generally my understanding.
15 Q   Are -- are you able to give us any
16 opinions with respect to what type or types of
17 asbestos is associated with ovarian cancer?
18 A   The -- the strongest summary of the
19 relationship that I know about is in the IARC 2012
20 reports.
21      And those are from a number of different
22 studies, including some cohort studies and case
23 control studies.
24      To my knowledge, I don't know that they
25 have divided them by the type of mineral silicate

Rebecca Smith-Bindman, M.D.

Page 322

1  fibers that were in those studies.
2      Q   What amount of asbestos exposure is
3  associated with ovarian cancer?
4          MS. O'DELL:  Object to the form.
5      A   To the best of my knowledge, the amount
6  that's contained within talc powder products is
7  probably associated with -- the amount that's in
8  it is probably the -- cancer.
9      Q   (BY MR. ZELLERS) Can you be any more
10 definitive?
11     A   The talcum powder products that women have
12 used is associated with ovarian cancer.  And I
13 believe that to know how much asbestos it takes to
14 cause cancer, the easiest way to answer that is to
15 quantify how much asbestos is within the --
16 the powder products.
17         So I'm not in any way an expert on this.
18 But in the Longo report, it talked about an average
19 of 50,000 particles of asbestos being in each
20 gram of -- on average in each gram of baby powder
21 products.
22         And he estimates that in a container, that
23 would be millions of particles, which seems like a
24 large number to me, but -- so I don't know the
25 amount that would be required to be carcinogenic,

Page 323

1  but that's the amount that they were exposed to that
2  was carcinogenic.
3      Q   What type of ovarian cancer is asbestos
4  associated with?
5          MS. O'DELL:  Object to the form.
6      A   I think the most stable estimate of the
7  association of talcum powder products with ovarian
8  cancer is for all ovarian cancer and the
9  meta-analysis that others did.  And my summary
10 estimate was for all ovarian cancer -- epithelial
11 ovarian cancer, I should say.
12         In my more limited review, I focused on
13 serous cancer, because I think as the most common
14 cancer -- the most common invasive cancer, it's the
15 one where there's enough statistical power to
16 quantify the association, so I think the data are
17 the most compelling for serous ovarian cancer.
18         But the overall meta-analysis looks at any
19 cancer, and that's what we did as well.
20     Q   You -- you looked at talcum powder,
21 correct?
22     A   Talcum powder products, yes.
23     Q   You did not undertake a Bradford Hill
24 analysis of the literature on asbestos and ovarian
25 cancer, correct?

Page 324

1      A   I did not.
2      Q   Would you agree that research on the
3  potential relationship between asbestos and ovarian
4  cancer has only considered a small number of cases?
5          MS. O'DELL:  Object to the form.
6      A   I think the IARC review on the
7  occupational exposures to asbestos had quite a
8  number of cancers, but I would have to go back to
9  those studies to remember the number.
10     Q   (BY MR. ZELLERS) Did you review the Reid
11 2011 study?
12     A   I believe that's one that I -- I reviewed.
13     Q   Do you need me to hand that to you if --
14     A   Yes --
15     Q   -- ask you a couple of questions about it?
16     A   -- please.
17     Q   Now, in the Reid 2011 paper, which we will
18 mark as Exhibit 34 --
19     A   And is that one of the studies that
20 Camargo included in -- I think it is -- in his
21 systematic review?  Yeah.  So this is a different
22 systematic review.
23         (Exhibit 34 was marked for identification
24 and is attached to the transcript.)
25     Q   (BY MR. ZELLERS) Do you recognize

Page 325

1  Exhibit 34?
2      A   No.
3      Q   Okay.  Well, Exhibit 34 is a study and --
4  and a review by the first named author, Allison
5  Reid.
6          "Does Exposure to Asbestos Cause Ovarian
7  Cancer?"
8      A   I -- I have seen this paper.
9      Q   All right.
10     A   I'm sorry.  I didn't remember.  So sorry.
11     Q   If you look at her conclusions -- or the
12 author's conclusions on the right-hand side of the
13 first page -- so I'm --
14     A   Yes.
15     Q   -- looking right here --
16     A   Yes.
17     Q   -- the relationship between asbestos
18 exposure and ovarian cancer is not well
19 understood -- is not as well understood as -- as
20 that of asbestos-related diseases.  Studies that
21 have examined this issue have been limited for two
22 major reasons.
23         No. 1, there's a small number of cases.
24 And No. 2, there's difficulties with diagnosis and
25 specifically distinguishing between peritoneal

21 (Pages 322 to 325)

Rebecca Smith-Bindman, M.D.

Page 326

1  mesothelioma and ovarian cancer; is -- is that
2  right?
3            MS. O'DELL:  Object to the form.
4      A  So this -- those are the conclusions that
5  she makes.  But I -- I want just to explain what she
6  means by "small number of cases."
7            She's comparing it to the number of men
8  exposed to asbestos.  Just there -- there are many
9  more men exposed to asbestos than -- than women
10 exposed to asbestos.
11           So I think -- I mean, I -- I think it's a
12 challenge, but I -- wouldn't say that there are a
13 small number of cases.
14           MR. ZELLERS:  Move to strike as
15 nonresponsive.
16     Q  (BY MR. ZELLERS) Would you agree that most
17 of the studies that have been done and the data that
18 exists relates to occupational exposure of asbestos
19 and ovarian cancer?
20     A  Yes.  I --
21     Q  All right.
22     A  -- yes.
23     Q  You looked at the Camargo paper 2011; is
24 that right?
25     A  Yes.

Page 327

1      Q  That study points out that there's an
2  inability to account for nonoccupational risk
3  factors for ovarian cancer in these studies other
4  than age; is that right?
5            MS. O'DELL:  If -- if you remember.  If
6  you need to see --
7      A  I -- I don't remember.
8      Q  (BY MR. ZELLERS) All right.  Do you have
9  the Camargo paper in front --
10     A  I --
11     Q  -- of you or would you like me to give it
12 to you?
13     A  -- please.
14     Q  Camargo 2011, we will mark as deposition
15 Exhibit 35.
16           (Exhibit 35 was marked for identification
17 and is attached to the transcript.)
18     A  Thank you.
19     Q  (BY MR. ZELLERS) Do you have that in front
20 of you now?
21           MS. O'DELL:  Thank you.
22     A  Yes, I do.
23     Q  (BY MR. ZELLERS) Camargo.  Take a look, if
24 you will, you know, on page 1216.  The second
25 paragraph above "Conclusion," does Camargo and the

Page 328

1  author state, Further limitation of our analysis was
2  its inability to account for nonoccupational risk
3  factors for ovarian cancer other than age?
4      A  Yes, I do see that.
5      Q  On page 25 -- I'm sorry -- 1215.  So the
6  page before the second paragraph under "Discussion,"
7  they talk about Edelman 1992; is that right?
8      A  Yes.
9      Q  And the authors state, They concluded,
10 however, that despite the positive and significant
11 association, there was insufficient information to
12 infer that ovarian cancers were caused by
13 occupational exposure to asbestos --
14     A  I -- I'm sorry.  I --
15     Q  Sure.
16     A  -- I -- I'm lost.  Where are we?
17     Q  Okay.  So do you see under "Discussion" --
18     A  Yes.
19     Q  -- the second paragraph --
20     A  Yes.
21     Q  -- I believe the second sentence?  It
22 says, They concluded.
23           Are you with me?
24     A  Yes.  They are describing another
25 meta-analysis --

Page 329

1      Q  Yes.
2      A  -- they concluded, yes.
3      Q  This -- this is a review of different meta
4  --
5      A  Yeah.
6      Q  -- analyses; is that right?
7      A  Yes.
8      Q  And they're describing Edelman 1992.  And
9  they state, They concluded, however, that despite
10 the positive and significant association, there was
11 insufficient information to infer that ovarian
12 cancers were caused by occupational exposure to
13 asbestos because of concerns about tumor
14 misclassification, inappropriate comparison
15 populations, and the failure to take into account
16 for known risk factors.
17           Is that right?
18     A  You're reading from Camargo, who is
19 quoting from a discussion by Edelman, so that --
20 that's what it says.  I -- I don't -- I don't know
21 that that's what Edelman says, but -- but yes,
22 that's the...
23     Q  Wouldn't you expect to find higher rates
24 of other cancers in women using talc, like
25 mesothelioma, if they are being exposed to

22 (Pages 326 to 329)

Rebecca Smith-Bindman, M.D.

Page 330

1  substantial amounts of asbestos?
2      MS. O'DELL:  Object to the form.
3      A  I -- I'm confused.  I'm confused.  Are you
4  saying women exposed to asbestos are not getting
5  mesothelioma?
6      Q   (BY MR. ZELLERS) Well, let me ask it this
7  way:  Are -- are women who use talc in the perineal
8  region at greater risk of mesothelioma?
9      A  I do not know studies that have said that.
10      Q   Are women who use talc in the perineal
11  region at greater risk of asbestosis?
12      A  In the lungs?
13      Q  Yes.
14      A  I -- I do not know those studies.
15      Q   With respect to fragrance chemicals, you
16  have no evidence that the blood or tissue levels of
17  any trace metals are higher in genital talc users
18  compared to nonusers, correct?
19      A  I -- I don't know that literature at all.
20      Q   And you have no knowledge as to either the
21  amount or concentration of different fragrance
22  chemicals in the baby powder, correct?
23      A  I -- I do not.
24      MR. ZELLERS:  Okay.  I have no further
25  questions.  My colleagues may have some questions.

Page 331

1      MS. BOCKUS:  Could we go off the record
2  for just a minute to move the microphone down?
3      THE VIDEOGRAPHER:  The time is 11:16 a.m.
4  We are off the record.
5      (A break was taken from 1:16 a.m. to 11:17
6  a.m.)
7      THE VIDEOGRAPHER:  The time is 11:17 a.m
8  we are now back on the record.
9      EXAMINATION BY COUNSEL FOR THE DEFENDANTS
10  BY MS. BOCKUS:
11      Q   Good morning, Doctor.  I introduced myself
12  yesterday, I hope.  I'm not sure I did.  I'm Jane
13  Bockus.  I represent Imerys in this matter.
14      How are you feeling today?
15      A  I'm good.  Thank you.
16      Q   Have you gone back to work full time since
17  your skiing accident?
18      A  I am primarily a researcher, so I get to
19  choose my own hours.  So I have gone back to work
20  full time, but I often leave work a little earlier
21  and take a rest.
22      Q   Has your injury from your skiing accident
23  affected your ability to answer all the questions
24  you have been asked in the last day and a half?
25      A  It has not.

Page 332

1      Q   Okay.  So when -- if you answered a
2  question, is it because you believe you understood
3  it and that you felt able to answer it?
4      A  Yes.
5      MS. O'DELL:  Object to the form.
6      Q   (BY MS. BOCKUS) Okay.  So before being
7  hired in this case, you had not really looked at the
8  association between talc and ovarian cancer; is that
9  fair?
10      A  That's correct.
11      Q   The person who wrote to you first, do you
12  remember if it was a male or a female, the attorney?
13      A  I think it was a women.
14      Q   Okay.  And have you -- tell me what search
15  you have done to locate that person's name.
16      A  I could probably search some more.  I --
17  I -- my correspondence with these lawyers that I
18  have a document of on my computer is from July.
19      But Mike reminded me that I must have met
20  with them in June.  So I could go through -- there
21  are ways I can access older e-mails to look if
22  that's important to you.  I'm happy to try and find
23  that person.
24      Q   I just was curious.  There -- because you
25  have nothing in the published literature about the

Page 333

1  etiology of ovarian cancer, correct?
2      A  I do not.  And I will tell you I asked the
3  person who contacted me what the case was about, was
4  it an area of my expertise.
5      And the person who contacted me, I think,
6  was someone who knew of me from another case.  And
7  it was my researching abilities, not my content
8  expertise, that led her to reach out to me.
9      Q   Okay.  So it was with the understanding
10  that you would start a whole new area of research in
11  order to answer the question; is that correct?
12      MS. O'DELL:  Object to the form.
13      A  Yes.
14      Q   (BY MS. BOCKUS) Okay.  In fact, when you
15  appeared before congress, you stated that you're a
16  clinical radiologist and you conduct research
17  focusing on -- or focused on assessing the risk and
18  benefits of medical imaging, correct?
19      A  If -- if you have my testimony there, I'm
20  going to believe you.
21      Q   And when you have given interviews or have
22  written opinion pieces, you identify yourself as
23  primarily a radiologist who focuses on evaluating
24  the risks and benefits of medical imaging, correct?
25      MS. O'DELL:  Object to the form.

23 (Pages 330 to 333)

Rebecca Smith-Bindman, M.D.

Page 334

1      A   So I have given a lot of interviews, and I
2   often identify as a professor of epidemiology and
3   biostatistics.  I'm not sure what interview that you
4   are looking at.
5          I often -- often introduce myself as a
6   professor of obstetrics, gynecology, and
7   reproductive sciences.
8          And my guess is that whomever is
9   publishing the interview will choose to present me
10  in a way that they think highlights my skill.
11         But -- but my -- I'm a professor in
12  radiology and epidemiology and biostatistics,
13  obstetrics, gynecology, and a member of the Philip
14  R. Lee Institute for Health Policies Studies.
15         So I -- I get presented with whichever of
16  those first the presenter thinks might highlight my
17  expertise.
18     Q   Are you board-certified in obstetrics and
19  gynecology?
20     A   I'm not.
21     Q   The Bradford Hill criteria, the first
22  consideration is the "strength of the association";
23  is that correct?
24     A   First criteria?  Yes.
25     Q   What do you consider to be a strong

Page 335

1   association?
2      A   So it overlaps a little bit with the
3   second concept of Bradford Hill in the consistency
4   of -- of the data.
5          But where the association is meaningfully
6   and legitimately documented across study designs and
7   patient populations such that the association is
8   believable and meaningful, not necessarily
9   associated with a particular point estimate of
10  association, if that's the question.
11         I don't have any particular number.  It's
12  rather the entirety of the relationship, that it's a
13  meaningful quantifiable association.
14     Q   Do you teach epidemiology?
15     A   I do.
16     Q   Can you identify textbooks that you find
17  reliable on the subject of epidemiology?
18     A   The textbook that I often use to teach
19  epidemiology is a book -- I -- I'm not sure if the
20  authorship has changed over the years, but by holly
21  Cummings that talks about principles of
22  epidemiology.  It's sort of the clearest version
23  that I know.
24         And -- and they -- and I haven't looked
25  this particular question up, but they wouldn't talk

Page 336

1   about a quantitative association, but rather, the
2   biases and legitimacy of the association.
3      Q   Are you familiar with the text "Analysis
4   of Case-Control Studies" by Breslow and Day?
5      A   I -- I -- yes.
6      Q   Do you find that to be a reliable text on
7   the subject of the analysis of case-control studies?
8          MS. O'DELL:  Object to the form.
9      A   I -- I don't know that chapter or section
10  enough to answer that question without looking at
11  it.
12     Q   (BY MS. BOCKUS) But you're familiar with
13  their work?
14     A   Yes.
15     Q   And they're well-respected
16  epidemiologists?
17     A   Yes.
18         MS. O'DELL:  Object to the form.
19     Q   (BY MS. BOCKUS) You make a statement in
20  your report on page 12 that the most widely accepted
21  mechanism for initiation, promotion, and progression
22  of ovarian cancer is tissue inflammation leading to
23  a series of responses that result in cancer.
24         And you have talked about that sentence a
25  bit with Mr. Zellers already.

Page 337

1          Did you do a survey of the literature to
2   determine what was the most widely accepted
3   mechanism for initiation of ovarian cancer?
4      A   I did.
5      Q   And did you do a survey of the cancer
6   biology literature?
7          MS. O'DELL:  Object to the form.
8      A   What was the first literature you asked me
9   about?
10     Q   (BY MS. BOCKUS) The literature that
11  supported your statement that the most widely
12  accepted mechanism was inflammation.
13         And you said you did a survey on the
14  inflammation literature -- or I mean on the
15  etiology -- let me start all over again.
16         Have you done a survey on articles that
17  discuss the likely mechanism for the etiology of
18  ovarian cancer?
19     A   Yes, I have .
20     Q   Have you -- have you -- did your survey
21  include the literature on the cancer biology --
22     A   Yes.
23     Q   -- of --
24     A   Yes, it did.
25     Q   -- of ovarian cancer?

24 (Pages 334 to 337)

Rebecca Smith-Bindman, M.D.

Page 338

1      A   Yes, it did.
2      Q   And did you find that as the issue of
3  inflammation as an initiator of ovarian cancer is
4  not a settled question?
5          MS. O'DELL:  Object to the form.
6      A   I -- I would acknowledge that -- that none
7  of it is settled.  It's just the most widely
8  accepted, most widely supported, most wide -- widely
9  enhanced view supported by the data, but I don't
10  think the issue is settled.
11      Q   (BY MS. BOCKUS) In fact, there's still
12  considerable research going on on the subject --
13      A   Yes --
14      Q   -- correct?
15      A   -- I think there is.
16      Q   In the next paragraph you talk about, for
17  example, this is the middle -- there are
18  well-described and accepted causal pathways
19  linking in -- linking inflammation to bladder
20  cancer, gastric cancer, colon cancer, et cetera.
21          You would agree and you identify the
22  inflammatory sometimes virus or whatever that's --
23  that's well described and accepted for all of the
24  different cancers that you list there, correct?
25          For example, you identify toxic chemicals

Page 339

1  for the etiology of bladder cancer, correct?
2          MS. O'DELL:  Object to the form.
3      Q   (BY MS. BOCKUS) Do you see where I'm
4  reading?
5      A   I -- I don't see where you're reading
6  exactly, but -- but I agree with you that I have
7  given examples where we know the cause of the
8  inflammation for many of those cancers.
9      Q   (BY MS. BOCKUS) You would agree that there
10  is no equivalent literature linking ovarian cancer
11  to talcum powder use, correct?
12          MS. O'DELL:  Object to the form.
13      A   I think there's a strong literature on
14  components of the analysis.  But I think for several
15  of the examples I have given, the data are a little
16  bit clearer and further along.
17          So path -- HPV and cervical cancer has a
18  longer historical data collection period when we
19  have them --
20      Q   (BY MS. BOCKUS) And --
21      A   -- identified.  So I think that's your
22  question.
23      Q   -- so the strength of the association
24  between HPV virus and cervical cancer is much, much
25  stronger than any association that's been reported

Page 340

1  with body powder use and ovarian cancer, correct?
2          MS. O'DELL:  Object to the form.
3      A   I -- I'm going to go back to say that I --
4  I don't know what the strength of the association is
5  with -- with these individual cancers.
6          I -- I don't know if it's a 20 percent
7  increase or a 500 percent increase, except for the
8  one that I gave the example of of bladder cancer.
9          So for bladder cancer, I gave two examples
10  that cause inflammation of the bladder.  One being
11  toxic chemicals and the second being cigarette
12  smoking.
13          The toxic chemicals have a very strong
14  relative risk of 200 or 300, where I think smoking
15  has a relative risk of more like 1.3.
16          And so I -- I -- I don't know it for these
17  other cancers.  But at least for bladder cancer,
18  which I think is -- I think the second most common
19  cancer and cigarette smoke is -- I think the
20  association in the ballpark of 1.3.
21          I think I have it in here.  But -- so for
22  most of these, I don't know what that number is.
23          MS. BOCKUS:  I'm going to object as
24  nonresponsive.
25      Q   (BY MS. BOCKUS) Because the question I

Page 341

1  asked was about the HPV virus and cervical cancer --
2      A   I don't --
3      Q   -- correct?
4      A   -- know the -- the relative --
5      Q   All right.
6      A   -- risk for that.  But I -- I thought I
7  said the only one I do know is the bladder cancer
8  numbers.
9      Q   Has your methodology in determining what
10  studies to include and what studies to exclude been
11  peer reviewed in any way, shape, or form?
12      A   It has not.
13      Q   Has your math --
14      A   Oh, I'm sorry.  Has my methodology been
15  peer reviewed?
16      Q   In -- in this particular case, the method
17  --
18      A   Okay.  The method has been peer reviewed.
19  But in this particular case, it has not.
20      Q   So no one has looked over your report and
21  determined whether your decision -- and as I
22  understand it, it was your decision alone, correct,
23  as to whether to include data from a particular
24  study or not --
25      A   Again --

25 (Pages 338 to 341)

Rebecca Smith-Bindman, M.D.

Page 342

1    Q   -- and --
2    A   -- it was a decision between myself and
3  the -- and -- and -- and Dr. Hall --
4    Q   So --
5    A   -- just the two of us.
6    Q   -- okay.  So did Dr. Hall participate in
7  the decision-making process as to which of the
8  case-control studies and the cohort studies to
9  include and which to exclude?
10   A   It -- so it's -- it's a -- the answer is
11 partly and partly not.
12      So in terms of whether the studies were
13 included in the final analysis, Dr. Hall was
14 involved in that decision.
15      But in terms of setting up the question to
16 begin with, she was not involved in that.  I -- I
17 set that up.
18   Q   So other than you and Dr. Hall, has anyone
19 been involved in the process of determining which
20 studies were going to be involved -- in -- were
21 going to be included in your systematic review and
22 which were not?
23   A   Nobody else.
24   Q   Okay.  And has anyone other than you and
25 Dr. Hall even checked your work for transcription

Page 343

1  errors?
2       MS. O'DELL:  Object to the form.
3    A   No.
4    Q   (BY MS. BOCKUS) And has anyone other than
5  you and Dr. Hall checked your work for mathematical
6  errors?
7    A   No.
8    Q   You excluded all of the data from the
9  cohort studies with the exception of the earliest
10 reported data from the Nurses' Health Study; is that
11 correct?
12   A   Yes.
13      MS. O'DELL:  Object to the form.
14   Q   (BY MS. BOCKUS) Did you run the -- the --
15 the numbers to determine if there would be a
16 difference if you included the data from all the
17 cohort studies and if you excluded them?
18   A   So the requirement to be in our review was
19 to have a measure of regular use of talcum powder
20 products, and those other studies didn't have
21 something to plug into that equation.
22      So -- so I didn't have a number from those
23 studies to include in a sensitivity analysis.  They
24 -- they didn't report regular use, so I -- I
25 couldn't do what you are asking me to have done.

Page 344

1    Q   Would you agree that you're -- at this
2  point in time your report is not yet ready to be
3  submitted for peer review?
4       MS. O'DELL:  Object to the form.
5    A   I would agree that the description in this
6  report needs more detail, more -- to submit it to
7  peer review.  Not necessarily different work, but
8  definitely different detail and description.
9    Q   (BY MS. BOCKUS) Have you satisfied
10 yourself that the studies that you did include do
11 not overlap with regard to patients; that you
12 haven't counted the same patients multiple times?
13   A   I -- I am comfortable that I did my best
14 to do that.  But I know there were some cases where
15 I felt like I wasn't 100 percent sure.
16   Q   And you would agree that by -- including
17 the same cases and controls multiple times could
18 skew the -- the data?
19      MS. O'DELL:  Object to the form.
20   A   I think that that theoretically is a
21 concern of mine, which is why I try to you exclude
22 them if there was overlap.
23      On a practical level, the benefit of
24 pooling data from multiple sources is that the final
25 summary is less sensitive to any individual result,

Page 345

1  let alone some patients that might overlap.
2       But I agree with you that you want to
3  avoid that because of that concern.
4    Q   (BY MS. BOCKUS) All right.  Would you turn
5  to page 35 of your study.  And I am looking at
6  the -- right in the middle of the page, the
7  paragraph that starts with the word, Further talc
8  particles.
9       But I'm going to the last sentence in the
10 paragraph.
11      "The greater frequency at which talc
12 particles are discovered in ovarian cancerous tissue
13 than in normal ovarian tissue further supports that
14 these target -- particles may be causing cancer."
15      You don't have a source for that.  You
16 don't cite to any study.  And I would like to know
17 where you got that information.
18      MS. O'DELL:  Objection to form.
19   A   I would have to review Heller and
20 Henderson.  No.  Henderson is just cancer.
21      So I would have to review -- review
22 Heller, but that -- I -- I -- I don't remember what
23 the -- cite of it.  I would have to look at the
24 articles that I cite in that paragraph and see if I
25 could remember.

26  (Pages 342 to 345)

Rebecca Smith-Bindman, M.D.

| Page 346 |
|---|

1    Q   (BY MS. BOCKUS) The next statement has to
2   do with the reduction in incidence of ovarian cancer
3   after tubal ligation or hysterectomy?
4    A   Yes.
5    Q   Is it not correct that that statement is
6   true for both women who have used talcum powder
7   product and who -- let me ask a better question.
8       Here you're talking about that the
9   elevated -- that studies that look at the risk of
10   ovarian cancer associated with powder products
11   report a reduction in risk after hysterectomy or
12   tubal ligation, correct?
13    A   Yes.
14    Q   Isn't that also true in the general
15   population for all women, that there -- whether they
16   have used talcum powder products or not, that their
17   risk of ovarian cancer is reduced by hysterectomy or
18   oophorectomy --
19    A   Yes.
20    Q   -- or tubal ligation?  I'm sorry.
21    A   Yes.  It's even more reduced by
22   oophorectomy.
23    Q   Well, sure.  I misspoke.
24       MS. BOCKUS:  I believe that's all the
25   questions I have.  Thank you.

| Page 347 |
|---|

1       MS. O'DELL:  Why don't we go off the
2   record.  I'm sorry.  Do you --
3       MR. ZELLERS:  No.
4       MR. BILLINGS-KANG:  I may have two or
5   three questions.
6       MS. O'DELL:  Oh, sorry, James.  Yeah,
7   please.
8       THE VIDEOGRAPHER:  We are still on?
9       MS. O'DELL:  Yes.
10       THE VIDEOGRAPHER:  Do we want to go off?
11       MR. BILLINGS-KANG:  Yeah.
12       MS. BOCKUS:  We need to go off to move the
13   mic.
14       THE VIDEOGRAPHER:  The time is 11:37 a.m.
15   We are going off the record.
16       (A break was taken from 11:37 a.m. to
17   11:40 a.m.)
18       THE VIDEOGRAPHER:  The time is 11:40 a.m.
19   We are now back on the record.
20       EXAMINATION BY COUNSEL FOR THE DEFENDANTS
21   BY MR. BILLINGS-KANG:
22    Q   Good morning, Dr. Smith-Bindman.  How are
23   you?
24    A   Good.
25    Q   My name is James Billings-Kang.  I'm an

| Page 348 |
|---|

1   attorney who represents Defendant Personal Care
2   Products Council.
3       So for purposes of this deposition when I
4   reference "Personal Care Products Council," I mean
5   PCPC or CPFA or any of its predecessors.  Is that
6   okay?
7    A   Yes.
8    Q   So I want to turn to Exhibit 15, which is
9   your reference list.  And that reference list is
10   Exhibit B of your expert report; is that correct?
11    A   Yes.
12    Q   And if you can turn to page 19 of that
13   reference list.  And just let me know when you're
14   there.
15    A   I am there.
16    Q   And if you go about 75 percent of the way
17   down, there's a reference to a PCPC document.
18       Do you see that?
19    A   Yes.
20    Q   Do you happen to know what that document
21   is?
22    A   I do not.
23    Q   Did you rely on this document --
24    A   You would have to --
25       MS. O'DELL:  Object to the form.  Excuse

| Page 349 |
|---|

1   me.  Object to the form.  If -- if --
2    A   -- you would have to tell me what it is to
3   know if --
4       MS. O'DELL:  -- or show it to her if
5   you --
6       MR. BILLINGS-KANG:  Sure.
7       MS. O'DELL:  -- have a question about it.
8    Q   (BY MR. BILLINGS-KANG) But for purposes of
9   formulating your opinion in the expert report, did
10   you rely on any PCPC-produced documents?
11       MS. O'DELL:  Object to the form.
12    A   You would have to show --
13       MS. O'DELL:  Put --
14    A   -- it to me.
15       MS. O'DELL:  -- just put it in front of
16   her if you're going to ask her a question about it
17   so she can --
18    Q   (BY MR. BILLINGS-KANG) I'm just asking:
19   Based on your memory, do you recall using any
20   PCPC-produced document to formulate your opinion.
21       MS. O'DELL:  I would -- I would just
22   object to the form.
23    Q   (BY MR. BILLINGS-KANG) That's --
24       MS. O'DELL:  None of --
25    Q   (BY MR. BILLINGS-KANG) -- that's fine.

27 (Pages 346 to 349)

Rebecca Smith-Bindman, M.D.

Page 350

1  You can answer --
2      MS. O'DELL:  None of that --
3      Q   (BY MR. BILLINGS-KANG) -- yes or no, if
4  you remember.
5      MS. O'DELL:  -- none of us would be
6  expected to remember a document based on a Bates
7  number.
8      Q   (BY MR. BILLINGS-KANG) Well, I'm asking
9  her just generally PCPC-produced documents, if she
10  relied on any of those --
11      MS. O'DELL:  Objection.
12      Q   (BY MR. BILLINGS-KANG) -- to formulate her
13  opinion?
14      MS. O'DELL:  Object to the form.  I'm
15  putting that --
16      MR. BILLINGS-KANG:  Sure.
17      MS. O'DELL:  -- that Bates number in front
18  of her.  And if you --
19      MR. BILLINGS-KANG:  Sure.
20      MS. O'DELL:  -- remember, you remember.
21      A   This is a document that lists different
22  research studies that have been done over time.  Is
23  that the document that we're --
24      Q   (BY MR. BILLINGS-KANG) Well, I -- I'm not
25  too sure.  This is a document you listed in the

Page 351

1  reference list.
2      A   I -- I'm just trying to make sure that I'm
3  looking at the document that you are --
4      Q   According to your counsel, this is what's
5  been identified on page 19 of the reference list.
6      A   I -- I do not remember this document.
7  This --
8      Q   Okay.
9      A   -- document is just a list of studies.
10      Q   So you do not recall whether you relied on
11  this document in formulating your opinion?
12      A   My --
13      MS. O'DELL:  Object to the form.
14      A   -- opinion is not based on a -- on a --
15  a list of studies.
16      Q   (BY MR. BILLINGS-KANG) Okay.  So that's --
17  that's a -- that's a yes, you do not -- you did not
18  rely on this document in formulating your opinion?
19      A   I -- I don't remember seeing this
20  document.  As I'm going through this document, there
21  are a lot of studies that I reviewed that I did rely
22  on.
23      So I don't know if you're asking me if I
24  relied specifically on some of the items in here
25  that I have relied on or the -- this document

Page 352

1  itself.
2      Q   Just --
3      A   I don't remember --
4      Q   -- the document --
5      A   -- seeing --
6      Q   -- itself.
7      A   -- this -- I don't remember seeing this
8  document.
9      Q   Okay.  You can -- you can put that away.
10  And I will go to your expert report that's
11  Exhibit 2, page 14.  Just let me know when --
12      A   I'm there.
13      Q   -- you're there.  And this -- the first
14  paragraph under "Asbestos," it's about halfway in
15  that first paragraph beginning with, Because of
16  concern that asbestos was present in talcum powder
17  products in the known carcinogenicity of asbestos,
18  it has been reported that voluntarily guidelines
19  were established by the cosmetic industry in 1976 to
20  limit the content of asbestos fibers in commercial
21  talc preparations.
22      Did I read that correctly?
23      A   You did.
24      Q   And these are your words, correct?
25      A   Yes, they are.

Page 353

1      Q   And what did you mean by "voluntarily
2  guidelines"?
3      A   I -- I have read a lot about the
4  guidelines.  And it -- the idea was that the
5  industry decided to self-regulate and to do what
6  they could to remove the asbestos, is my
7  understanding of what that was as opposed to being
8  required to submit testing to document that they had
9  done so.
10      Q   And -- and what did you rely upon for this
11  particular sentence?
12      A   This particular sentence is repeated in --
13  in at least half of the papers that I have read that
14  are epidemiology papers.
15      It's repeated in all of the news studies.
16  It's repeated in reports by consumer organizations,
17  by the FDA, by the recent Canadian report, which I
18  didn't have in hand.
19      But it's something that I -- I have read a
20  lot -- a great deal, that there were voluntarily
21  standards that were established by the industry.
22      Q   And so did you read any publication or
23  whatever reliance materials that you had that
24  described these guidelines as anything else other
25  than voluntarily guidelines?

28 (Pages 350 to 353)

Rebecca Smith-Bindman, M.D.

## Page 354

1    A   I -- I -- I did not. I looked for
2 documents like that. I was not able to find them.
3 Required -- requirements, I was not able to find.
4      MR. BILLINGS-KANG: Okay. That's all I
5 have.
6      MS. O'DELL: Why don't we take a short
7 break.
8      THE VIDEOGRAPHER: The time is 11:45 a.m.
9 We are now off the record.
10      (A break was taken from 11:45 a.m. to
11 12:15 p.m.)
12      THE VIDEOGRAPHER: The time is 12:15 p.m.
13 We are now back on the record.
14      EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
15 BY MS. O'DELL:
16    Q   Dr. Smith-Bindman, I have just a few
17 questions for you. First, during all of your work
18 in this case, was it your understanding that you
19 were serving as an expert consultant?
20    A   Yes.
21    Q   And you know, throughout the early
22 meetings in June, I believe, of 2017, where you met
23 with Plaintiffs' counsel, did Plaintiffs' counsel
24 provide information regarding their theories of the
25 talcum powder litigation?

## Page 355

1    A   Yes.
2    Q   And have you been paid by Plaintiffs'
3 counsel for all the work that you have billed in
4 this case?
5    A   Yes, I have.
6    Q   Okay. You have been asked a number of
7 questions about the meta-analysis, the systematic
8 review that you performed on the regular use of --
9 of talcum powder.
10      Would you have reached your opinions in
11 this case without having performed that analysis?
12    A   My systematic review ended up with the
13 same estimates as essentially all of the other
14 well-done systematic reviews.
15      And it was very helpful for me to confirm
16 the results. But yes, it's the same as the other
17 studies, and so my -- my conclusion about the
18 causality of talcum powder products and ovarian
19 cancer would be exactly the same, even without mine.
20      It just made me a little more comfortable
21 that I was certain about the -- the results
22 presented by other people.
23    Q   And in a sense, the analysis that you did
24 replicated the work that had been published in the
25 -- in the literature?

## Page 356

1      MR. ZELLERS: Objection, form.
2    Q   (BY MS. O'DELL) Let me strike that and
3 start again. Did your meta-analysis replicate what
4 had been published in the literature?
5    A   The --
6      MR. ZELLERS: Form.
7    A   -- the results of my meta-analysis and the
8 previous ones are nearly identical. So yes, it was
9 a very close replication.
10    Q   (BY MS. O'DELL) And you have mentioned
11 your intent to publish your -- your meta-analysis,
12 your systematic review. And I believe you testified
13 that in the published version, you would add
14 additional detail.
15      What did you mean by that?
16    A   So the analysis that I have done is
17 complete. But the presentation of the results in a
18 paper would require more beautiful graphics, would
19 require explaining our inclusion and exclusion
20 criteria more fully than I did in this published
21 report. Things like that.
22      And that actually is a substantial part of
23 the writing of a scientific paper, sort of
24 explaining every step of what you did, and so I
25 would have to do more of that to publish this study.

## Page 357

1    Q   Is there sufficient detail in the -- in
2 your report regarding your methodology, as well as
3 in the documentation provided in the spreadsheets
4 to -- for someone to replicate the work that you
5 have done?
6      MR. ZELLERS: Objection, form.
7    A   I believe that if someone used the
8 software that we said and had the inclusion criteria
9 that we led out -- set out, that they would get the
10 -- the same results as we got.
11      And I think the fact that our review
12 provides the same results as other systematic
13 reviews sort of, you know, also supports that. But
14 yes, I think someone could easily replicate our --
15 our analysis.
16    Q   (BY MS. O'DELL) Okay. You were asked a
17 number of -- before I do that, let me ask you: Can
18 there be multiple causes of ovarian cancer?
19    A   Absolutely. I -- I describe in the
20 report, a whole number of different risk factors for
21 ovarian cancer.
22    Q   And in a -- in a patient -- hypothetically
23 in a patient who has a BRCA1 mutation, possibly has
24 other risk factors for ovarian cancer, and also uses
25 talcum powder products, under those circumstances,

29 (Pages 354 to 357)

Rebecca Smith-Bindman, M.D.

Page 358

1  would talcum powder products be a contributing cause
2  of her cancer?
3         MR. ZELLERS:  Objection, form.
4     A   I think patients can have multiple risk
5  factors and causes of -- of cancer.  Some causes,
6  you would imagine, would be quite synergistic.
7         So having both together would be worse
8  than twice having either of those alone.  So it
9  would be worse than having -- it -- it would be more
10 than double the initial, because they would be
11 basically enhancing.
12        So if -- if some risk factors caused lots
13 of oxidative stress and another enhanced that
14 oxidative stress and prevented repair or cell
15 apoptosis, you would get even more impact.
16        So yes, I would say multiple risk factors
17 for most diseases occur concurrently, and sometimes
18 they enhance or are synergistic.
19    Q   (BY MS. O'DELL) Can asbestos be inhaled
20 and cause ovarian cancer?
21        MR. ZELLERS:  Objection, form; foundation.
22    A   Absolutely.  The -- the IARC 2012 report
23 was primarily on the basis of inhalation of
24 asbestos.
25    Q   (BY MS. O'DELL) Can fibrous talc be

Page 359

1  inhaled and cause ovarian cancer?
2     A   I --
3         MR. ZELLERS:  Objection, form; foundation.
4     A   -- yes.
5     Q   (BY MS. O'DELL) And what's your basis for
6  that statement?
7         MR. ZELLERS:  Same objections.  None of
8  this was in her report.  None of this has been in
9  her opinions.
10        These are all new opinions.  So inhalation
11 has not been any part of her testimony or her
12 opinion.
13        MS. O'DELL:  Inhalation is mentioned in
14 her report.
15    A   I -- I -- you know, the -- the chapter on
16 asbestos and occupational exposure and IARC report
17 is -- is about inhalation.
18        I'm not sure if I -- I was explicit about
19 the route, but that is where the data come from for
20 asbestos, as well as fibrous talc.
21        And those articles talk about the fact
22 that there might be other exposures in addition, but
23 they're primarily inhalation studies.
24        MR. ZELLERS:  Again, object to what the
25 defense views as a completely new opinion that was

Page 360

1  not disclosed in Dr. Smith-Bindman's expert report.
2     A   Can I read?  Just on page 14, The results
3  were consistent, significant, and documented a
4  strong and compelling causal association between
5  exposure to asbestos and ovarian cancer largely
6  result in the association from cohort studies of
7  women with substantial occupational exposures.
8         That -- that was the --
9     Q   (BY MS. O'DELL) Okay.  Let me -- let me
10 ask you to -- to turn, Dr. Smith-Bindman, to the
11 Langseth paper that was marked as Exhibit 30 by
12 counsel for J&J.
13        And specifically to turn to page 2 of the
14 paper to Figure 1.
15    A   Yes.
16    Q   You were asked a number of questions about
17 whether the studies that had confidence intervals
18 that cross one were essentially by chance.  In other
19 words, they -- they did not speak to a potential
20 increased risk in ovarian cancer as a result of
21 talcum powder use.
22        Are the -- what's your analysis of those
23 studies and whether, as counsel put it, it was
24 equivalent to a coin toss?
25    A   So if there was no relationship between

Page 361

1  ovarian cancer and exposure to talcum powder
2  products, you would expect the forest plot in
3  Figure 1 to have half of the point estimates be
4  above one, saying there's a risk; and half of the
5  point estimates being below one, saying there isn't
6  a risk.
7         In fact, every one of the studies on this
8  table is at or above one.  It's to the right.  So to
9  get that by chance is highly, highly, highly
10 unlikely.
11        The best estimate is -- the point estimate
12 in all of those are very different than one.
13        And so to call that by chance doesn't make
14 sense.  The fact that for an individual study, the
15 confidence interval overlap one doesn't mean it's by
16 chance.
17        So again, by chance would mean half the
18 studies have a positive association, half have a
19 protective.
20        And in fact, every one of the studies has
21 a value that's either substantially greater than one
22 or just a little greater than one.
23    Q   Okay.  You were asked questions about
24 starting -- in reference to the Langseth paper you
25 were asked questions about the -- the pooled odds

30 (Pages 358 to 361)

Rebecca Smith-Bindman, M.D.

|  | Page 362 |
|---|---|

1  ratio for hospital-based studies and the focus on
2  that finding being that it was not a statistically
3  significant increased risk.
4      Did the Berge paper also look at a pooled
5  analysis of the hospital-based studies?
6      A   She did.  If you look at Table 2, Table 2
7  shows the results of the case-control studies that
8  were hospital based versus community based.
9      And those individual group of
10  hospital-based studies are statistically
11  significant.
12      But I would point out that in this case
13  the -- they report the relative risk of a hospital
14  based versus community based.  They're relatively
15  similar.  They're both significant, and they're
16  relatively similar, which is what I concluded from
17  Langseth.  They're very similar.
18      Q   Okay.  You were asked about studies
19  relating to migration.  And the specific -- the
20  specific question, as I wrote it down was:  Is there
21  a study that demonstrates talc on the -- applied to
22  the perineum, traveling to the -- or migrating to
23  the ovary, and you said, No.
24      What evidence are you relying on to
25  support your opinion that talcum powder can migrate

|  | Page 363 |
|---|---|

1  when applied -- applied to the genital area to the
2  ovary?
3      A   So I was asked a very narrow question, is
4  there a study that talks about transport from the
5  perineum.
6      But in fact, there is extensive evidence
7  that particles from the perineum could get to the
8  ovary and do get to the ovary.
9      And part of that is the perineum is
10  basically equivalent to the vagina.  It is one open
11  system to the ovary.
12      And so my evidence for that is
13  several-fold.  First, I'm a clinical radiologist,
14  and I do a lot of procedures in women where I am
15  putting catheters in the vagina and injecting fluid
16  that goes to the uterus, to the tubes.  I watch the
17  fluid spill.  It's a wide-open system.
18      Occasionally patients have complications
19  that don't let me do that, and I might inject fluid
20  literally on the perineum to get a backlash to the
21  ovaries.  And it's a wide-open connected system.
22      All of our textbooks talk about it being a
23  bi-directional system.  You know, infection goes
24  both directions.  Retrograde menstruation and
25  menstruation go both directions.

|  | Page 364 |
|---|---|

1      There have been studies of sperm, both
2  living and dead, going in both directions.  So it's
3  not just the mobile sperm, but the dead sperm.
4      Carbon particles -- you know, a tiny
5  study -- but have been shown to move -- radioactive
6  material has been seen to move.  Material on gloves
7  has been seen.
8      So it's a wide-open system.  The idea that
9  we think of that as being a barrier system is just
10  false.
11      Now, I don't know of an individual study
12  that has put talc on the perineum.  I think that's,
13  unfortunately, not an ethical study to do.  And I
14  don't know of such a study or why you would do such
15  a study.
16      But to think that there's any barrier
17  between the perineum and the vagina makes no sense
18  whatsoever.
19      Q   Let me transition to talk about
20  inflammation for a moment, and specifically
21  inflammation as a cause of ovarian cancer first.
22      What evidence are you relying on to
23  support your opinion that inflammation -- chronic
24  inflammation causes ovarian cancer?
25      A   Okay.  So there's an enormous amount of

|  | Page 365 |
|---|---|

1  literature that understands what we see when there's
2  inflammation, what kind of changes you see on a
3  cellular level.
4      So you see increase in pro oxidation, a
5  reduction in antioxidation.  You see increase in
6  cell turnover, reduction in cell death, expression
7  of inflammatory agents, cellular changes at the DNA
8  level that leads to greater expression.
9      We -- we understand those pathways.  And
10  those pathways occur both with talc exposure and in
11  the setting of things that cause ovarian cancer.
12      So I -- in my reference list, I reference
13  a whole bunch of references -- Saed references,
14  Shawn (phonetic) references, Ness references.
15  There's really enormous numbers of references.
16      I -- in my documents I have Shukla
17  references, BuzZard references, Hamilton references
18  that talk away sort of these inflammatory pathways
19  and biologic mechanisms that lead to changes that go
20  along with inflammation.
21      Q   I know you have reviewed Dr. Saed's
22  research in regard to whether talcum powder causes
23  inflammation in vitro.
24      First, let me ask you this:  Does
25  Dr. Saed's work support the conclusion that

31 (Pages 362 to 365)

Rebecca Smith-Bindman, M.D.

Page 366

1    Johnson's baby powder causes inflammation?
2         MR. ZELLERS:  Objection, form.
3         A   So Saed specifically looked at Johnson
4    baby powder, so his results specifically pertained
5    to Johnson baby powder.
6         He looked at several different measures
7    that -- I have just mentioned inflammation.  So he
8    looked specifically at oxidative stress, the up
9    regulation or down regulation of --
10        THE COURT REPORTER:  The?
11        A   -- up regulation or pro oxidants, down
12   regulation of antioxidants.  He looked at cell
13   proliferation.  He looked at SNPS point mutations
14   that are associated with this.
15        THE COURT REPORTER:  Snips?
16        A   S N P S, SNPS.
17        THE COURT REPORTER:  Because you're facing
18   that way, and the mic is here.  Thanks.
19        A   And showed substantial changes to talcum
20   powder to all of these.  I -- I was really quite
21   impressed with the consistency in these markers of
22   inflammation.
23        Some of them overlap clinical markers we
24   use.  Like CA125 went up very strongly just like it
25   goes up for ovarian cancer.

Page 367

1         So he very clearly showed this.  And the
2    results he showed were not different than those that
3    Shukla showed, that Buz'Zard showed, that -- the
4    expression in genes.
5         He -- he just had it in a very compelling
6    experiment where he showed dose response, where he
7    showed the control didn't have the changes, but that
8    the talc powder products did have the changes.
9         And so he identified, in this cellular
10   cell line model, all of the changes that you would
11   expect from inflammation.  So I think the results
12   were very compelling.
13        I -- I was asked if kind of that
14   experiment has any relevance in humans.  And I would
15   say it would be nice to do that experiment in
16   humans.
17        But you can't do that experiment in
18   humans.  And that's what --
19        THE COURT REPORTER:  Wait.
20        A   -- you can't do such an experiment in
21   humans.  So -- so that is what sort of cellular
22   studies are -- are meant to approximate.
23        There's no direct translation, so how much
24   you put in the cell versus how much you put in the
25   patient, I -- you know, I don't know how you would

Page 368

1    do that.  That's beyond me.  But that's what this
2    whole model is, to try to help you understand what
3    the effect mechanistically is from these changes.
4         Q   (BY MS. O'DELL) And is the use of that
5    model in scientific research generally accepted?
6         A   Highly.
7         MR. ZELLERS:  Objection, form.
8         A   My understanding is that is the basis for
9    much of the research that comes -- that happens at
10   my research institution.
11        Q   (BY MS. O'DELL) Just to make sure that the
12   record is clear, Dr. Smith-Bindman, in -- I asked
13   the question:  Is the use of that model in
14   scientific research generally accepted?  I'm not
15   sure your answer came through.  What's your answer?
16        MR. ZELLERS:  For your -- just objection,
17   form.  Go ahead.
18        A   Yes.  I -- I said that that's a very
19   common model at UCSF.
20        Q   Okay.
21        MS. O'DELL:  I have nothing further.
22   Thank you.
23        MR. ZELLERS:  Let's take a break for a
24   couple of minutes.
25        THE VIDEOGRAPHER:  The time is 12:34 p.m.

Page 369

1    We are now off the record.
2         (A break was taken from 12:34 p.m. to
3    12:41 p.m.)
4         THE VIDEOGRAPHER:  The time is 12:41 p.m.
5    We are now back on the record.
6         EXAMINATION BY COUNSEL FOR THE DEFENDANTS
7    BY MS. BOCKUS:
8         Q   Doctor, you made a comment about the fact
9    that there can be a synergistic effect between
10   different risk factors; is that correct?
11        A   Yes.
12        Q   That is something that can be studied,
13   correct?
14        A   Yes.
15        Q   There are studies that can be designed to
16   determine whether there's a synergistic effect
17   between, say, BRCA mutation carriers and women who
18   have regularly used talcum powder --
19        A   Yes.
20        Q   -- correct?
21        That study has not been done, correct?
22        A   Not that I know of.
23        Q   In fact, are you familiar or aware of any
24   studies that have looked for a synergistic effect
25   between regular talc use and any other risk factors

32 (Pages 366 to 369)

Rebecca Smith-Bindman, M.D.

Page 370

1   for ovarian cancer?
2        MS. O'DELL:  Object to the form.
3        A   I would have to look through my papers
4   with that question in mind.  I know some of the
5   papers have looked at BRCA, but I can't remember if
6   they sort of stratified the results by -- with or
7   without BRCA, so I -- I'm not sure of the answer to
8   that.
9        I was more speaking about, from work that
10  I do, the idea of synergy between risk factors.  And
11  one of those is BRCA and radiation exposure.  So
12  I -- I -- I meant generally it can be the case.  I
13  didn't mean to suggest we know what it is for this.
14       Q   (BY MS. BOCKUS) Okay.  Then you spoke
15  about the female reproductive system being a
16  wide-open system.
17       What procedure are you doing when you are
18  putting fluid on a women's perineum to see if it
19  goes to the ovaries?
20       A   I apologize.  So the primary procedures
21  would be a hysterosonogram, which we're putting
22  water into the uterus and the tubes mostly to look
23  for patency.
24       But it turns out we end up needing to do
25  procedures in postop patients, not infrequently,

Page 371

1   where we might be looking for connections between
2   different structures, preop or postop.
3        In the ballpark of 10 percent of women to
4   20 percent have cervical stenosis, and you can't
5   catheterize.
6        Or there might be some reason we don't
7   want to catheterize or put the tubes in the vagina.
8   We might put the tube directly on the perineum and
9   see if we can create kind of a -- a way to keep,
10  let's say, a balloon in place and then inject in a
11  retrograde fashion.
12       So it feels like it comes out probably
13  every couple of months.  But we're actually pretty
14  far from the cervix.  And we're injecting usually
15  water or sometimes contrast and then looking mostly
16  with ultrasound, but sometimes with fluoroscopy.
17       Q   And when you say "inject," that means with
18  some degree of pressure, you're putting the water or
19  other fluid into the vagina?
20       A   There is some degree of pressure, yes.
21       Q   And when you do that, is the patient's
22  head lower than her hips?
23       A   Not -- not usually, no.
24       Q   Is she on her back?
25       A   Yes.

Page 372

1        Q   Do you know if anything about what you
2   just described has any correlation to the way in
3   which women use talcum powder in their perineal
4   region?
5        MS. O'DELL:  Object to the form.
6        A   I -- I don't know what -- how women use
7   talcum powder on their perineum.
8        Q   (BY MS. BOCKUS) Do you know what
9   percentage of sperm that are placed in a women's
10  vagina make it to the ovaries?
11       A   Only from child cartoons that make it seem
12  like it's a competitive race.  But percentagewise, I
13  don't know.
14       Q   Do you have any reason to believe that
15  talc makes it from the vagina to the ovaries in
16  greater percentage than sperm?
17       A   I -- I -- I would guess that that's not
18  the case.
19       MS. BOCKUS:  That's all I have.
20       MR. ZELLERS:  I have just a couple.
21       EXAMINATION BY COUNSEL FOR THE DEFENDANTS
22  BY MR. ZELLERS:
23       Q   Dr. Smith-Bindman, did you discuss with
24  Plaintiffs' counsel, calling Dr. Hall on our break
25  between yesterday's first session and today's

Page 373

1   session?
2        MS. O'DELL:  I'm going to ask -- ask
3   you -- instruct you not to answer questions
4   regarding discussions with counsel.
5        MR. ZELLERS:  The defense agreed to split
6   this deposition of Dr. Smith-Bindman over two days
7   on the expressed condition that the extended break
8   not be used for preparation.
9        The witness and Plaintiffs' counsel
10  violated that understanding.  Further, it's entirely
11  inappropriate for an expert witness to consult with
12  a consulting expert during a break.
13       We move to strike all of
14  Dr. Smith-Bindman's testimony and will take the
15  issue to court.
16       MS. O'DELL:  The record is clear that
17  counsel did not speak with Dr. Smith-Bindman last
18  night.  There was no preparation done between the
19  conclusion of the deposition yesterday and the
20  beginning of the deposition this morning.  I think
21  the record has been clear on that.
22       That was -- we agreed to do that.  We had
23  not -- we were not compelled to do that.  Because as
24  counsel is aware, the deposition protocol allows
25  both parties, when they're putting up their

33 (Pages 370 to 373)

Rebecca Smith-Bindman, M.D.

| | |
|---|---|
| **Page 374** | **Page 376** |

**Page 374**

1　respective witnesses, to confer with the witness.
2　　　　And we did confer with Dr. Smith-Bindman
3　prior to the deposition this morning for about
4　10 minutes, and that's perfectly within our rights,
5　and so we would oppose any such motion.
6　　　　MR. ZELLERS:  Done?  We are concluded.
7　　　　THE VIDEOGRAPHER:  The time is 12:48 p.m.
8　We are now off the record.
9　　　　(TIME NOTED:  12:48 p.m..)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 376**

1　　　I, MARY J. GOFF, CSR No. 13427, Certified
2　Shorthand Reporter of the State of California,
3　certify;
4　　　That the foregoing proceedings were taken
5　before me at the time and place herein set forth, at
6　which time the witness declared under penalty of
7　perjury; that the testimony of the witness and all
8　objections made at the time of the examination were
9　recorded stenographically by me and were thereafter
10　transcribed under my direction and supervision; that
11　the foregoing is a full, true, and correct
12　transcript of my shorthand notes so taken and of the
13　testimony so given;
14　　　That before completion of the deposition,
15　review of the transcript ( ) was (XX) was not
16　requested:   (  ) that the witness has failed or
17　refused to approve the transcript.
18　　　I further certify that I am not financially
19　interested in the action, and I am not a relative or
20　employee of any attorney of the parties, nor of any
21　of the parties.
22　　　I declare under penalty of perjury under the
23　laws of California that the foregoing is true and
24　correct, dated this   day of      , 2019.
25　　　　　　　　————————————————

**Page 375**

1
2
3
4　　　　I, REBECCA SMITH-BINDMAN, M.D., do hereby
5　declare under penalty of perjury that I have read
6　the foregoing transcript; that I have made any
7　corrections as appear noted, in ink, initialed by
8　me, or attached hereto; that my testimony as
9　contained herein, as corrected, is true and correct.
10　　　　EXECUTED this_____ day of_____,
11　20_____, at_____, _____.
　　　　　　　(City)　　　　　(State)
12
13
14　　　　　　————————————————————
　　　　　REBECCA SMITH-BINDMAN, M.D.
15　　　　　VOLUME II
16
17
18
19
20
21
22
23
24
25

**Page 377**

1　　　　　　　　ERRATA SHEET
2　　　　　　　Golkow Litigation Services
3　　　　1650 Market Street, One Liberty Plaza, 51st Floor
4　　　　　Philadelphia, Pennsylvania 19103
5　　　　　　　　877-370-3377
6　　　　　CASE:  Talcum Powder Litigation
7　PAGE LINE FROM　　　　　　TO
8　___|____|_____|_____
9　___|____|_____|_____
10　___|____|_____|_____
11　___|____|_____|_____
12　___|____|_____|_____
13　___|____|_____|_____
14　___|____|_____|_____
15　___|____|_____|_____
16　___|____|_____|_____
17　___|____|_____|_____
18　___|____|_____|_____
19　___|____|_____|_____
20　　　————————————————————
21　　　REBECCA SMITH-BINDMAN, M.D., VOLUME II
22　Subscribed and sworn to before me
23　this _____ day of _____, 2019.
24　　————————————————————————
25　　　　Notary Public

34  (Pages 374 to 377)

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1192 of 1525
PageID: 63338
Rebecca Smith-Bindman, M.D.

Page 378

## A

**abilities**
333:7
**ability**
265:3 331:23
**able**
264:25 321:15
332:3 354:2,3
**Abrams**
246:7
**absolute**
310:14,22
**absolutely**
258:7 276:1 357:19
358:22
**absorbency**
293:16
**abstract**
298:10,21,22,25
**abstracted**
282:13
**abstracts**
298:11
**acceptable**
320:15
**accepted**
294:2 336:20 337:2
337:12 338:8,18
338:23 368:5,14
**access**
332:21
**accident**
331:17,22
**account**
301:1,4 327:2
328:2 329:15
**accounting**
284:15
**accuracy**
282:20
**accurate**
282:11
**accurately**
282:18
**acknowledge**
275:14 338:6

**action**
376:19
**active**
286:13,15,15,23
294:18
**actual**
268:14 301:22
**acute**
289:13 291:3,13,16
291:19
**add**
356:13
**added**
257:21
**addition**
260:24 298:8
359:22
**additional**
257:17 259:24
260:15,15 261:9
356:14
**addressed**
315:21
**adhesions**
287:11 293:21
**adjust**
308:16,18
**adjusted**
307:25 308:2,14,22
308:23
**adjustments**
308:3
**adolescence**
307:1,7
**advantages**
262:19
**affect**
288:11
**affirmed**
254:2
**afternoon**
258:17
**age**
327:4 328:3
**agent**
289:22

**agents**
295:23 365:7
**agree**
263:11 278:24
280:19,24 282:1
285:10 288:10
289:22 292:18
294:15 296:20,23
301:11 303:6
306:9,21 310:9
324:2 326:16
338:21 339:6,9
344:1,5,16 345:2
**agreed**
373:5,22
**agreeing**
292:19
**ahead**
319:21 368:17
**Alabama**
247:9
**Allen**
247:4
**Allison**
325:4
**allow**
267:20
**allowed**
266:16
**allows**
373:24
**alternative**
293:7
**AMA**
318:1
**amount**
290:12,16,17,18
292:13 293:4
304:9 320:6,9,11
322:2,5,7,25
323:1 330:21
364:25
**amounts**
313:19 320:14,16
330:1
**analyses**

**284:3 329:6**
**analysis**
254:21 267:14,17
284:9 323:24
328:1 336:3,7
339:14 342:13
343:23 355:11,23
356:16 357:15
360:22 362:5
**Analytical**
318:2
**analyze**
284:18
**ancillary**
263:16
**Andrew**
250:24 253:6
**Angeles**
248:9
**annotated**
257:21 262:8
**answer**
265:18,25 278:16
302:13 303:4
320:8 322:14
331:23 332:3
333:11 336:10
342:10 350:1
368:15,15 370:7
373:3
**answered**
293:24 316:10,12
332:1
**answering**
267:24 273:11
**answers**
305:19
**antiinflammatory**
295:23
**antioxidants**
301:7 302:8 366:12
**antioxidation**
365:5
**antioxidative**
303:13
**Antonio**

249:8
**apologize**
256:25 262:2
263:19 370:20
**apoptosis**
301:6 302:8 358:15
**appear**
375:7
**APPEARANCE**
249:1
**APPEARANCES**
247:1 248:1 250:1
**appeared**
333:15
**appears**
277:5
**apples**
274:6,6
**application**
287:5,13
**applied**
293:20 362:21
363:1,1
**apply**
301:21
**approach**
279:24 280:8
**approve**
376:17
**approximate**
272:18 367:22
**approximately**
260:7,23
**aqua**
258:2
**area**
285:5,12,17 287:19
294:18 333:4,10
363:1
**Arps**
248:15
**arthritis**
290:1
**article**
251:17,20,22 252:2
252:4 287:10

Rebecca Smith-Bindman, M.D.

297:16 298:4

**articles**
337:16 345:24
359:21

**articulate**
264:23

**asbestos**
252:2,4 313:14,16
314:2,6,10,15,18
314:21,25 318:15
318:21 320:4,5,6
321:2,3,8,10,17
322:2,13,15,19
323:3,24 324:3,7
325:6,17 326:8,9
326:10,18 328:13
329:13 330:1,4
352:14,16,17,20
353:6 358:19,24
359:16,20 360:5

**asbestosis**
330:11

**asbestos-related**
325:20

**asked**
255:4,20 256:6
266:4,9 273:15
293:23 316:14,15
316:15 320:4
331:24 333:2
337:8 341:1 355:6
357:16 360:16
361:23,25 362:18
363:3 367:13
368:12

**asking**
254:22 255:3 264:2
268:25 269:1
271:18 272:12
273:11 277:12
301:8,13 304:15
308:7 310:6
343:25 349:18
350:8 351:23

**aspirin**
251:20 295:25

296:5,14

**assessed**
265:13

**assessing**
333:17

**associated**
291:23 296:10
304:23 305:18
320:23 321:8,17
322:3,7,12 323:4
335:9 346:10
366:14

**association**
264:13 266:22
269:24 273:19
274:14 276:7
277:9 278:3
297:21 306:2
323:7,16 328:11
329:10 332:8
334:22 335:1,5,7
335:10,13 336:1,2
339:23,25 340:4
340:20 360:4,6
361:18

**associations**
263:24 264:14,18
264:25 265:1
311:3

**assume**
310:21

**assumes**
287:22

**assumption**
314:16,24

**attached**
259:12 261:3
276:16 297:11
317:10 319:11
324:24 327:17
375:8

**attempt**
311:19

**attorney**
247:7,15,22 248:6
248:17 249:5,15

250:5,17 332:12
348:1 376:20

**Austin**
249:18

**author**
298:1 325:4 328:1

**authors**
266:21 269:18,23
282:18 295:11
297:20 328:9

**authorship**
335:20

**author's**
325:12

**available**
295:17

**Avenue**
249:16

**average**
322:18,20

**avoid**
293:9 345:3

**aware**
261:9 288:15
291:22 300:12,15
300:18,20,21
305:12 315:10,13
369:23 373:24

**a.m**
246:9 253:3,9
318:24 319:1,3
331:3,5,6,7
347:14,16,17,18
354:8,10

---

**B**

**B**
308:22,23 348:10

**baby**
318:19 322:20
330:22 366:1,4,5

**back**
282:12 319:4 324:8
331:8,16,19 340:3
347:19 354:13
369:5 371:24

**backlash**
363:20

**balance**
303:12

**balloon**
371:10

**ballpark**
312:19 340:20
371:3

**barrier**
364:9,16

**barriers**
288:2,13

**based**
262:24,24 263:1
266:18 270:8
278:10 280:6
281:15,21 292:12
300:21 313:8,9
314:4 318:14
349:19 350:6
351:14 362:8,8,14
362:14

**baseline**
301:4,4

**basic**
263:18

**basically**
358:11 363:10

**basis**
269:10 272:1
358:23 359:5
368:8

**Bates**
350:6,17

**beach**
247:17 286:1,3

**Beasley**
247:4

**beautiful**
356:18

**beginning**
246:9 352:15
373:20

**begins**
319:4

**behalf**
246:6

**behavior**
301:18

**belief**
274:3 314:17,20

**believable**
335:8

**believe**
260:11 261:8
272:17 274:2
279:19 281:5
285:16 291:3
293:6,8 297:6
298:24 300:8,16
300:25 314:1,14
317:18 320:14,19
321:3,9 322:13
324:12 328:21
332:2 333:20
346:24 354:22
356:12 357:7
372:14

**benefit**
344:23

**benefits**
333:18,24

**BENJAMIN**
248:16

**benjamin.halperi...**
248:20

**Berge**
307:18,21,24
308:13 362:4

**best**
322:5 344:13
361:11

**better**
282:2 311:16 346:7

**beyond**
259:23 261:10
368:1

**bias**
273:18,21 274:21
274:24 275:2,4,8
275:14,18,25

Rebecca Smith-Bindman, M.D.

280:16,21 281:1
281:22
**biases**
284:7,10,12 336:2
**bigger**
288:14
**Bill**
251:14
**billed**
355:3
**Billings-Kang**
250:4 251:8 347:4
347:11,21,25
349:6,8,18,23,25
350:3,8,12,16,19
350:24 351:16
354:4
**biologic**
266:22 267:2,3
285:12 365:19
**biological**
285:2,4,7
**biology**
337:6,21
**biostatistician**
254:14
**biostatistics**
334:3,12
**bit**
280:13 335:2
336:25 339:16
**bi-directional**
363:23
**bladder**
288:5,7 338:19
339:1 340:8,9,10
340:17 341:7
**blood**
330:16
**board-certified**
334:18
**Bockus**
249:4 251:9 298:18
299:4,4 331:1,10
331:13 332:6
333:14 336:12,19

337:10 338:11
339:3,9,20 340:23
340:25 343:4,14
344:9 345:4 346:1
346:24 347:12
369:7 370:14
372:8,19
**body**
305:8 340:1
**book**
335:19
**bottom**
295:10 309:14
**Box**
247:24
**Bradford**
323:23 334:21
335:3
**BRCA**
369:17 370:5,7,11
**BRCA1**
357:23
**break**
316:24 317:1,3
318:23 319:1
331:5 347:16
354:7,10 368:23
369:2 372:24
373:7,12
**breast**
307:9
**Breslow**
336:4
**bunch**
365:13
**Buz'Zard**
365:17 367:3

——————
**C**
——————
**C**
248:5 308:22,23
**Calcagnie**
247:13
**calculated**
256:7,17
**calculations**

255:21 256:20
257:2,10
**California**
245:15 246:9,11
247:17 248:9
253:1,12 376:2,23
**call**
258:20 282:25
361:13
**called**
254:14,16 270:8
**calling**
372:24
**Camargo**
324:20 326:23
327:9,14,23,25
329:18
**Canadian**
353:17
**cancer**
251:17 252:2
266:23 269:3,21
269:25 270:15
271:9 275:9,11,21
276:8 283:6,17,25
285:2,4,8,9,14
288:22 289:9,14
289:20,23 290:3,9
290:18 293:9
294:4,5,17,22
295:15 296:4,5,15
296:18 297:23
303:11,16,19
304:1,3,3,4,16,19
305:13,18 306:23
307:9,10,14 313:4
314:2 320:23
321:9,17 322:3,8
322:12,14 323:3,8
323:8,10,11,13,14
323:14,17,19,25
324:4 325:7,18
326:1,19 327:3
328:3 332:8 333:1
336:22,23 337:3,5
337:18,21,25

338:3,20,20,20
339:1,10,17,24
340:1,8,9,17,19
341:1,7 345:14,20
346:2,10,17
355:19 357:18,21
357:24 358:2,5,20
359:1 360:5,20
361:1 364:21,24
365:11 366:25
370:1
**cancerous**
345:12
**cancers**
289:12,15 304:10
307:9 324:8
328:12 329:12,24
338:24 339:8
340:5,17
**capacity**
265:6
**Carbon**
364:4
**carcinogen**
302:1
**carcinogenic**
289:23 292:10
293:14 315:6
322:25 323:2
**carcinogenicity**
352:17
**care**
250:2 303:12 348:1
348:4
**Carmen**
259:9,10
**CAROLINE**
250:16
**caroline.tinsley...**
250:21
**carriers**
369:17
**carryover**
311:11
**cartoons**
372:11

**case**
256:7,13 262:20
281:11 313:15,18
313:23 315:1,3,24
316:4 321:22
332:7 333:3,6
341:16,19 354:18
355:4,11 362:12
370:12 372:18
377:6
**cases**
281:3,5,25 324:4
325:23 326:6,13
344:14,17
**case-control**
275:1,15,19 276:3
276:6,25 277:1,4
277:6,7,17 279:11
279:12,15 280:20
280:21 336:4,7
342:8 362:7
**categories**
320:20
**catheterize**
371:5,7
**catheters**
363:15
**causal**
283:5,16,24 338:18
360:4
**causality**
355:18
**cause**
252:2 290:13 291:2
292:12,15 294:17
303:10,11 305:5
314:10 322:14
325:6 339:7
340:10 358:1,20
359:1 364:21
365:11
**caused**
289:16 328:12
329:12 358:12
**causes**
279:9 289:11 290:8

Rebecca Smith-Bindman, M.D.

290:22 291:1
305:4 314:2
357:18 358:5,5
364:24 365:22
366:1
**causing**
345:14
**caveat**
281:2
**CA125**
366:24
**cell**
274:9 300:7,8,16
301:3,5,9,11,14
301:17,18 302:5,9
302:14 303:7
358:14 365:6,6
366:12 367:10,24
**cells**
300:13,19 301:2,10
301:12,16,21
302:3 303:24,25
304:16,17,19,20
**cellular**
300:23 314:10
365:3,7 367:9,21
**Center**
247:23
**central**
263:14
**certain**
283:5,16,24 289:10
290:12 302:2
305:4 320:19
355:21
**Certified**
246:11 376:1
**certify**
376:3,18
**cervical**
274:11 287:18
288:17,22 339:17
339:24 341:1
371:4
**cervix**
371:14

**cetera**
338:20
**cgarber@robins...**
247:18
**challenge**
326:12
**chance**
279:8 304:3 360:18
361:9,13,16,17
**change**
267:25 315:1
**changed**
335:20
**changes**
302:2,7 365:2,7,19
366:19 367:7,8,10
**chapter**
298:9 336:9 359:15
**characteristics**
288:12
**charge**
261:19
**check**
260:12 268:13
**checked**
342:25 343:5
**chemical**
313:24
**chemicals**
320:17,21 321:4
330:15,22 338:25
340:11,13
**child**
372:11
**chlamydia**
306:24 307:3
**choose**
319:25 331:19
334:9
**chose**
268:7
**Chris**
319:8
**chronic**
289:11,18,19 290:1

**cetera** 291:4,13,23
292:15 294:16,21
295:13 364:23
**cigarette**
340:11,19
**circumstances**
357:25
**citations**
262:23
**cite**
263:10,22 264:11
276:13 287:4,9
294:8,13 302:17
302:24 304:5
345:16,23,24
**citing**
263:19
**City**
375:11
**clarify**
255:21 265:18
303:4
**clear**
308:11 368:12
373:16,21
**clearer**
339:16
**clearest**
335:22
**clearly**
267:25 278:19
367:1
**clinical**
313:9 333:16
363:13 366:23
**close**
268:21 272:19
356:9
**closely**
285:11
**closer**
287:19 311:6
**cohort**
262:20 263:3,7,13
263:14,23 264:4
264:12,24,24

265:5,8,10,15,16
265:19,23 266:2,8
266:16 267:7,8,21
268:9 269:10,11
271:1 274:17
275:15,21 282:8
321:22 342:8
343:9,17 360:6
**cohorts**
266:6
**coin**
360:24
**colleagues**
330:25
**collected**
267:14,18
**collection**
339:18
**colon**
338:20
**combination**
295:12
**combine**
284:4
**combining**
273:5,17 274:6
284:13
**come**
302:9 359:19
**comes**
368:9 371:12
**comfortable**
344:13 355:20
**comment**
369:8
**Commerce**
247:8
**commercial**
352:20
**common**
307:4 312:22,24
323:13,14 340:18
368:19
**communicate**
258:19,22
**communications**

258:15
**community**
362:8,14
**comparable**
281:25
**compare**
301:3
**compared**
330:18
**comparing**
281:9,16,20,24
301:9 326:7
**comparison**
301:14,19 311:10
329:14
**compelled**
373:23
**compelling**
323:17 360:4 367:5
367:12
**competitive**
372:12
**complete**
356:17
**completed**
312:17
**completely**
359:25
**completion**
376:14
**complicated**
278:22
**complications**
363:18
**components**
339:14
**computer**
332:18
**concentration**
287:17,23 288:4,12
302:25 330:21
**concentrations**
287:25 302:18
**concept**
272:15 335:3
**concepts**

263:21
**concern**
312:7 344:21 345:3
    352:16
**concerns**
329:13
**conclude**
267:4 290:7 292:15
    295:11 314:3
**concluded**
254:11 266:8
    269:18,23 270:17
    295:19 328:9,22
    329:2,9 362:16
    374:6
**concludes**
298:1,3
**concluding**
283:9
**conclusion**
262:6 312:18
    327:25 355:17
    365:25 373:19
**conclusions**
297:23 325:11,12
    326:4
**concurrently**
358:17
**condition**
290:2 291:24 373:7
**conditions**
289:9,19
**conduct**
318:2 333:16
**confer**
374:1,2
**confidence**
256:8 277:24 278:4
    278:14 279:15,21
    279:22,25 280:2
    280:14 282:19,24
    312:20 360:17
    361:15
**confirm**
297:15 355:15
**confounders**

306:13
**confounding**
284:7,10,14,15
    305:22 306:1,6,9
    306:18
**confused**
330:3,3
**confuses**
306:2
**confusion**
299:8
**congress**
249:16 333:15
**connected**
363:21
**connections**
371:1
**consider**
271:14 278:15
    290:21 291:7
    310:3 334:25
**considerable**
338:12
**consideration**
334:22
**considered**
312:16 324:4
**consistency**
335:3 366:21
**consistent**
296:24 360:3
**consult**
373:11
**consultant**
354:19
**consulting**
373:12
**consumer**
353:16
**contacted**
333:3,5
**contain**
290:13 314:2,6,14
    314:17,21
**contained**
256:14 257:10

311:25 320:5
    322:6 375:9
**container**
322:22
**containing**
313:15,19,23
**contains**
315:6
**contamination**
314:24
**content**
333:7 352:20
**context**
301:10,12 311:2
**continued**
248:1 249:1 250:1
    252:1
**contracted**
318:1
**contrast**
371:15
**contribute**
273:10
**contributes**
300:22
**contributing**
358:1
**control**
262:20 281:8
    301:16 321:23
    367:7
**controlled**
306:18 307:12
**controls**
281:3,5 282:1,2
    301:1 311:12,13
    311:16,17 344:17
**conversation**
254:24 255:17
    258:17 298:23
**copies**
259:3
**copy**
261:12 262:3
    317:21 319:13
**copying**

262:2
**cornstarch**
290:22,25 291:1,3
    291:7,12,15,23
    292:3,10 293:7,13
    293:15,18
**Corporate**
247:16
**correct**
256:11 258:10
    266:13,14,23
    270:12,19,20,22
    271:2,10 274:21
    274:24 275:6,22
    276:8 277:9
    279:18 282:9
    283:7 284:23
    285:5 286:10,21
    287:6,7 288:24
    289:9 290:3,4
    293:22 294:9,17
    296:6 298:5
    306:15 311:8
    320:23 323:21,25
    330:18,22 332:10
    333:1,11,18,24
    334:23 338:14,24
    339:1,11 340:1
    341:3,22 343:11
    346:5,12 348:10
    352:24 369:10,13
    369:20,21 375:9
    376:11,24
**corrected**
375:9
**corrections**
375:7
**correctly**
295:16 352:22
**correlation**
372:2
**correspond**
302:10
**correspondence**
332:17
**cosmetic**

302:20 352:19
**cost**
263:12
**Council**
250:2 348:2,4
**counsel**
253:19 254:5 259:2
    260:17 261:15
    262:15 298:7
    316:5 331:9
    347:20 351:4
    354:14,23,23
    355:3 360:12,23
    369:6 372:21,24
    373:4,9,17,24
**counseling**
293:10
**counted**
344:12
**couple**
309:18 324:15
    368:24 371:13
    372:20
**court**
245:2 253:15,22
    256:23 299:2,15
    299:17,18 304:18
    308:5 319:24
    366:10,15,17
    367:19 373:15
**covariants**
308:15
**covariates**
307:25 308:17,17
    308:19
**cover**
259:7
**CPFA**
348:5
**create**
371:9
**criteria**
311:22,24 334:21
    334:24 356:20
    357:8
**criticize**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1197 of 1525
PageID: 63343
Rebecca Smith-Bindman, M.D.

Page 383

273:4
**criticizing**
273:9
**cross**
360:18
**crude**
308:2
**CSR**
245:24 376:1
**Cummings**
335:21
**curious**
332:24
**currently**
265:20
**CV**
254:23 255:3
**CYNTHIA**
247:14

**D**

**D**
297:2,2 308:23,23
**daily**
272:20
**damage**
302:4 303:25 305:9
  314:11
**Daniel**
247:21
**data**
267:14,17,24,25
  269:19 282:10,13
  282:20 295:18
  302:17,24 303:5
  304:13 314:3,13
  323:16 326:17
  335:4 338:9
  339:15,18 341:23
  343:8,10,16
  344:18,24 359:19
**date**
253:8
**dated**
376:24
**day**

331:24 336:4
  375:10 376:24
  377:23
**days**
373:6
**dead**
364:2,3
**deal**
281:1 353:20
**death**
365:6
**decades**
269:18
**decided**
353:5
**decision**
341:21,22 342:2,14
**decision-making**
342:7
**declare**
375:5 376:22
**declared**
376:6
**Defendant**
248:3,14 249:2,12
  250:2 348:1
**Defendants**
250:14 254:5 331:9
  347:20 369:6
  372:21
**defense**
315:18,20,24 316:4
  316:6 359:25
  373:5
**defer**
297:3
**define**
281:14 289:6
**defined**
263:6 264:6 272:13
  272:16 300:11
**definitely**
283:3 344:8
**definition**
268:4 272:3,8
  274:3 312:8

**definitive**
277:23 322:10
**degree**
371:18,20
**demonstrate**
272:10 278:11
  286:8,12
**demonstrates**
362:21
**demonstration**
286:13,16
**dependent**
313:15,18,23
**depends**
281:2,18
**deponent**
253:17
**deposition**
245:13 246:5
  253:10 254:10
  255:18 260:3,17
  262:6 300:17
  319:5 327:14
  348:3 373:6,19,20
  373:24 374:3
  376:14
**depth**
265:6
**describe**
314:9 357:19
**described**
338:23 353:24
  372:2
**describing**
281:22 328:24
  329:8
**description**
251:11 344:5,8
**design**
263:21 265:11,19
  265:22,23 266:4
**designed**
369:15
**designs**
265:21 266:3 335:6
**despite**

265:14 328:10
  329:9
**destination**
287:1
**detail**
265:10,24 268:6
  344:6,8 356:14
  357:1
**details**
254:15
**detect**
263:24 264:12,13
  264:17,25
**detected**
318:15
**detecting**
273:18
**determination**
292:12
**determine**
287:25 337:2
  343:15 369:16
**determined**
341:21
**determining**
282:16 341:9
  342:19
**develop**
303:19 304:1,1
**development**
295:14 305:13
**diagnosis**
325:24
**diaphragm**
274:12
**diaphragms**
271:8
**difference**
280:9 308:2 309:3
  309:21 310:2,4,10
  310:14,23,23
  311:1,4 343:16
**differences**
310:6
**different**
256:4 272:2,22

273:22,23 274:16
  280:1,13,15 288:7
  288:8 289:12
  301:12,17 302:1
  308:14 310:15
  321:7,21 324:21
  329:3 330:21
  338:24 344:7,8
  350:21 357:20
  361:12 366:6
  367:2 369:10
  371:2
**difficulties**
325:24
**direct**
367:23
**direction**
296:21 376:10
**directions**
363:24,25 364:2
**directly**
285:17 371:8
**disadvantages**
262:20
**disagree**
271:20
**disclosed**
360:1
**discount**
271:22
**discovered**
345:12
**discuss**
265:9 278:8 295:20
  305:20 313:1
  337:17 372:23
**discussed**
277:11 305:14
  306:22 311:15
**discussion**
257:18,22 258:13
  272:5 295:11
  297:14,19 328:6
  328:17 329:19
**discussions**
373:4

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1198 of 1525
PageID: 63344
Rebecca Smith-Bindman, M.D.

Page 384

disease
275:6 305:16,17
   306:3
diseases
325:20 358:17
distance
287:24
distinguishing
325:25
distort
275:5,8 306:6
distribution
321:7
District
245:2,3 253:15,15
divided
321:25
division
300:14
DNA
365:7
doctor
293:10 298:25
   331:11 369:8
document
332:18 348:17,20
   348:23 349:20
   350:6,21,23,25
   351:3,6,9,11,18
   351:20,20,25
   352:4,8 353:8
documentation
357:3
documented
286:18 335:6 360:3
documents
257:3,8,11 349:10
   350:9 354:2
   365:16
doing
260:14 263:12
   301:15 370:17
dollars
261:20
dose
304:8 367:6

double
358:10
Dr
254:9,16,19 255:1
   255:11,17 256:6
   257:18,22 258:13
   258:16,19 261:7
   264:10 295:18
   298:13 299:11,22
   300:1,4,12,18
   301:21 315:8,21
   319:5,7 342:3,6
   342:13,18,25
   343:5 347:22
   354:16 360:1,10
   365:21,25 368:12
   372:23,24 373:6
   373:14,17 374:2
Drive
247:16,23
duly
254:2
duration
271:11,18 272:2
Dykema
249:3
D.C
250:7

—————— E ——————
E
249:6 297:2 308:23
earlier
268:6 305:14
   311:15 331:20
earliest
343:9
early
354:21
easiest
322:14
easily
266:1 357:14
Edelman
328:7 329:8,19,21
editor

261:13 319:13
edits
320:1
effect
368:3 369:9,16,24
either
330:20 358:8
   361:21
elevated
346:9
Ellis
248:4 250:15
emphasizes
308:3
employee
376:20
encountered
302:19
ended
355:12
endometrial
297:22
endometrium
288:8
engagement
259:8,8
enhance
358:18
enhanced
338:9 358:13
enhancing
358:11
enormous
364:25 365:15
entirely
373:10
entirety
278:6 335:12
entitled
294:20
environment
304:22
environmental
302:1
enzymes
302:3

Epi
263:1
epidemiologic
314:4,12 315:4
epidemiological
306:7
epidemiologist
285:9
epidemiologists
263:10 336:16
epidemiology
334:2,12 335:14,17
   335:19,22 353:14
epithelial
269:3,21 294:22
   323:10
equal
296:8
equated
271:19
equation
343:21
equivalent
271:20 339:10
   360:24 363:10
equivocal
297:21
ERRATA
377:1
errors
256:8 282:23 343:1
   343:6
essentially
355:13 360:18
established
283:7,18 284:1
   352:19 353:21
estimate
260:13 279:7,7
   312:16 323:6,10
   335:9 361:11,11
estimates
256:15,18 280:12
   322:22 355:13
   361:3,5
estimating

257:6 308:4,5
et
338:20
ethical
364:13
etiology
333:1 337:15,17
   339:1
evaluating
333:23
evaluation
275:5
evening
258:17
evidence
266:22 267:2 286:2
   286:6 289:1
   290:15 294:14
   314:4 315:4
   318:21 330:16
   362:24 363:6,12
   364:22
ex
315:18
exact
302:9 308:18
exactly
255:24 256:3,12
   278:18 292:19
   293:1 339:6
   355:19
examination
251:2 254:5 331:9
   347:20 354:14
   369:6 372:21
   376:8
examine
284:22
examined
254:4 325:21
example
275:8 291:16 302:2
   310:17 338:17,25
   340:8
examples
339:7,15 340:9

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1199 of 1525
PageID: 63345
Rebecca Smith-Bindman, M.D.

Page 385

exams
291:18
exception
343:9
exclude
279:8 341:10 342:9
  344:21
excluded
343:8,17
exclusion
356:19
excuse
255:9 262:1 264:16
  298:19 348:25
EXECUTED
375:10
exhibit
251:12,14,17,20,22
  251:24 252:2,4
  257:23 259:6,6,11
  260:3,25 261:2,5
  262:9,10 276:14
  276:15 297:9,10
  299:7 317:8,8,9
  319:9,10 324:18
  324:23 325:1,3
  327:15,16 348:8
  348:10 352:11
  360:11
EXHIBITS
252:1
exists
279:1 326:18
expand
266:5
expect
274:7,11 287:23
  296:4,8 319:18
  329:23 361:2
  367:11
expected
288:14 350:6
experience
313:10
experiment
301:1,14 367:6,14

367:15,17,20
expert
288:10 289:1,6,6,6
  298:13 299:23
  315:11 316:4,6
  322:17 348:10
  349:9 352:10
  354:19 360:1
  373:11,12
expertise
285:5,17 333:4,8
  334:17
experts
315:20
explain
275:18 326:5
explained
256:12 257:8
  263:18 272:17
explaining
356:19,24
explicit
359:18
exploration
320:25
exposed
292:3 323:1 326:8
  326:9,10 329:25
  330:4
exposure
252:2,4 267:21
  268:2,7 273:12
  274:8,12,12,13
  275:6,10 287:16
  287:20 290:8,16
  302:18,25 305:3
  306:3 312:5,8,10
  312:12,21,21,22
  312:23 315:5
  322:2 325:6,18
  326:18 328:13
  329:12 359:16
  360:5 361:1
  365:10 370:11
exposures
324:7 359:22 360:7

express
302:23
expressed
373:7
expression
301:2,6 302:2,4,8
  365:6,8 367:4
extended
373:7
extensive
272:5 363:6
external
287:12 288:21
externally
293:20
e-mail
254:22 258:20
e-mails
254:25 255:1 261:6
  332:21

F

F
250:6 308:24
facing
366:17
fact
256:7 257:6 275:13
  275:18 281:24
  287:25 333:14
  338:11 357:11
  359:21 361:7,14
  361:20 363:6
  369:8,23
factor
287:24 288:11
factors
288:1 306:18,21
  307:11 327:3
  328:3 329:16
  357:20,24 358:5
  358:12,16 369:10
  369:25 370:10
failed
376:16
failure

329:15
fair
289:2 332:9
fall
287:24
fallopian
287:6
false
364:10
familiar
280:16 294:19
  295:22 305:21,25
  336:3,12 369:23
family
321:3
far
259:20 287:17
  371:14
fashion
371:11
favor
273:18
FDA
316:18,21 317:14
  353:17
February
245:16 246:10
  253:2,8
feeling
331:14
feels
371:12
felt
332:3 344:15
female
332:12 370:15
fewer
270:18 293:16
fibers
322:1 352:20
fibrosis
287:10 293:21
fibrous
314:7,15,23 358:25
  359:20
Figure

256:15 276:22
  277:5,19 278:11
  279:13 360:14
  361:3
figures
255:22,24 256:15
  266:13
file
299:1,6
final
342:13 344:24
financially
376:18
find
263:18 270:13
  271:3,6 281:4
  318:21 329:23
  332:22 335:16
  336:6 338:2 354:2
  354:3
finding
362:2
fine
349:25
finish
317:5
finished
258:23 305:1
firm
247:4 297:23
first
254:2 255:17 259:7
  267:21 283:13
  294:11 295:10
  297:14,19 325:4
  325:13 332:11
  334:16,21,24
  337:8 352:13,15
  354:17 363:13
  364:21 365:24
  372:25
five-page
259:6
flaws
311:19
Flom

248:15
**Floor**
248:8 377:3
**Flower**
248:7
**fluid**
363:15,17,19
370:18 371:19
**fluoroscopy**
371:16
**FLW**
245:9
**focus**
263:5,14 264:5
265:24 362:1
**focused**
266:12 323:12
333:17
**focuses**
333:23
**focusing**
273:16 333:17
**followed**
269:12
**following**
269:16 298:23
**follows**
254:4
**follow-up**
267:7,11
**foregoing**
375:6 376:4,11,23
**forest**
361:2
**form**
256:16 266:24
267:16 270:5
271:17 272:11
273:2 274:25
277:10 279:3
280:23 283:2,8
284:11 285:6,15
286:11,22 287:8
287:21 288:23
289:3 290:14,24
291:14,25 292:17

294:10 296:7
300:24 301:24
303:3 304:7 307:2
310:5,12 313:20
314:19 315:2,23
316:3,6,13 320:13
320:24 321:11
322:4 323:5 324:5
326:3 330:2 332:5
333:12,25 336:8
336:18 337:7
338:5 339:2,12
340:2 341:11
343:2,13 344:4,19
345:18 348:25
349:1,11,22
350:14 351:13
356:1,6 357:6
358:3,21 359:3
366:2 368:7,17
370:2 372:5
**forms**
311:25
**formulate**
349:20 350:12
**formulating**
349:9 351:11,18
**forth**
266:12 311:22
376:5
**forwarded**
261:14
**FOSTER**
249:14
**found**
275:19 281:3
286:25 320:22
**foundation**
358:21 359:3
**four**
278:20
**fragrance**
313:24 320:17,21
330:15,21
**Francisco**
245:15 246:8 253:1

253:11
**free**
314:10
**frequency**
268:4 271:19,24
272:18 345:11
**frequent**
271:15 272:1
**Friday**
245:16
**front**
262:8,12 266:25
327:9,19 349:15
350:17
**full**
331:16,20 376:11
**fully**
356:20
**further**
254:10 269:5 328:1
330:24 339:16
345:7,13 368:21
373:10 376:18

---

**G**

**gain**
306:25 307:7,16
**gaps**
311:19
**GARBER**
247:14
**gastric**
338:20
**Gates**
267:8 268:9,11,25
268:25 269:1,11
269:18,23 271:23
282:8
**gene**
300:19 302:8
304:15
**general**
259:8 262:19,24
263:20 266:2,11
275:1 280:25
281:4 308:2,13

346:14
**generally**
257:19 273:6
307:12 316:7
321:12,14 350:9
368:5,14 370:12
**generated**
259:20 315:16
**generic**
304:21
**genes**
302:5 367:4
**genetic**
304:20
**genital**
287:12 288:16,21
330:17 363:1
**Gertig**
265:16 266:8,16,18
266:21 267:8,11
268:25 269:10
**getting**
276:11 304:23
330:4
**give**
272:5 321:15
327:11
**given**
284:25 306:19
333:21 334:1
339:7,15 376:13
**gloves**
291:17 364:6
**go**
260:12 262:14
265:6 282:12
284:12 294:13
295:7 317:25
324:8 331:1
332:20 340:3
347:1,10,12
348:16 352:10
363:25 365:19
368:17
**goes**
280:4 363:16,23

366:25 370:19
**Goff**
245:23 246:11
253:23 376:1
**going**
259:5 260:11 262:2
297:3 317:2
333:20 338:12
340:3,23 342:20
342:21 345:9
347:15 349:16
351:20 364:2
373:2
**Goldman**
247:20
**Golkow**
253:7 377:2
**Gonzalez**
271:22 273:4,5
**good**
254:7,8 262:5
265:23 292:23
316:25 317:3,4
331:11,15 347:22
347:24
**Gordon**
249:13
**gram**
322:20,20
**granulomas**
287:10 293:21
**graphics**
356:18
**Graves**
250:24 253:6
**great**
276:24 281:1
353:20
**greater**
275:14 287:17
304:2,3 305:21
312:19 330:8,11
345:11 361:21,22
365:8 372:16
**group**
278:5 301:16,19

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1201 of 1525
PageID: 63347
Rebecca Smith-Bindman, M.D.

Page 387

362:9
**grouped**
321:5
**guess**
273:20 310:8 334:8
372:17
**guidelines**
352:18 353:2,4,24
353:25
**gynecology**
334:6,13,19

**H**
**half**
331:24 353:13
361:3,4,17,18
**halfway**
352:14
**Hall**
254:16,19 255:1,11
255:17 257:18,22
258:13,16,19
261:1,7 342:3,6
342:13,18,25
343:5 372:24
**HALPERIN**
248:16
**Hamilton**
365:17
**hand**
259:5 268:15 317:7
324:13 353:18
**handed**
319:8
**happen**
348:20
**happens**
300:15 368:9
**happy**
332:22
**hard**
266:5
**harm**
293:17
**Harper**
298:10

**head**
371:22
**health**
266:18 267:15,18
268:20 269:6,9
270:8 334:14
343:10
**healthy**
281:16,20
**held**
253:10
**Heller**
345:19,22
**help**
319:22,24 368:2
**helpful**
355:15
**Henderson**
345:20,20
**hereto**
375:8
**hesitant**
277:23
**hesitation**
273:9
**heterogeneity**
284:18
**high**
282:16
**higher**
304:16 329:23
330:17
**highlight**
334:16
**highlights**
334:10
**highly**
361:9,9,9 368:6
**Hill**
323:23 334:21
335:3
**hips**
371:22
**hired**
332:7
**historical**

339:18
**history**
306:24,25
**holly**
335:20
**hope**
331:12
**hospital**
281:20 311:13
362:8,13
**hospitalized**
281:9,9
**hospital-based**
276:2,6,25 277:4,6
277:7,12,15
279:12,15,23
280:5,19,25 281:6
281:8 282:1
311:17 362:1,5,10
**Houghton**
270:3,7,13 271:1
271:11,22
**hour**
261:18,21
**hours**
259:24 260:8,13,23
331:19
**HPV**
339:17,24 341:1
**human**
286:7
**humans**
367:14,16,18,21
**Huncharek**
308:25 312:4
**hundred**
261:20 268:10
269:16,17
**hypothetically**
357:22
**hysterectomy**
346:3,11,17
**hysterosonogram**
370:21

**I**

**IARC**
321:19 324:6
358:22 359:16
**idea**
353:4 364:8 370:10
**identical**
356:8
**identification**
259:11 261:2
276:15 297:10
317:9 319:10
324:23 327:16
**identified**
277:5 321:6 339:21
351:5 367:9
**identify**
253:19 311:19
333:22 334:2
335:16 338:21,25
**II**
245:17 246:6 251:4
253:18 254:1
319:6 375:15
377:21
**ill**
281:16
**imagine**
358:6
**imaging**
333:18,24
**Imerys**
249:2,12 331:13
**immortalized**
300:6
**impact**
288:14 358:15
**importance**
308:3
**important**
263:7 282:17,20
312:3,9,24 332:22
**impossible**
306:17
**impressed**
366:21
**inability**

327:2 328:2
**inappropriate**
329:14 373:11
**incidence**
296:15 346:2
**include**
265:15 266:10
268:9 270:3 282:7
337:21 341:10,23
342:9 343:23
344:10
**included**
294:24 296:25
307:24 308:14,22
312:11 324:20
342:13,21 343:16
**including**
321:22 344:16
**inclusion**
311:23 356:19
357:8
**incomplete**
266:23
**inconsistency**
279:13,20
**increase**
273:12 290:2 293:9
303:23 340:7,7
365:4,5
**increased**
360:20 362:3
**increases**
305:15
**independent**
317:16
**INDEX**
251:1
**indicate**
303:19 305:12
**indicated**
298:7
**indistinguishable**
280:2
**individual**
277:12,20 278:21
279:4,14 282:13

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1202 of 1525
PageID: 63348
Rebecca Smith-Bindman, M.D.

Page 388

311:21 340:5
344:25 361:14
362:9 364:11
**individually**
278:9
**inducing**
304:4
**industry**
352:19 353:5,21
**infection**
306:25 307:3,4
363:23
**infer**
328:12 329:11
**inflammation**
288:16 289:1,5,11
289:13,16,18
290:2,13,23 291:1
291:2,5,12,16
292:12,16 293:20
294:4,16,21
295:13 296:1,3,9
305:14 336:22
337:12,14 338:3
338:19 339:8
340:10 364:20,21
364:23,24 365:2
365:20,23 366:1,7
366:22 367:11
**inflammatory**
289:9,19 291:4,19
291:24 305:16,17
338:22 365:7,18
**influence**
251:20 296:9
**influenced**
275:25
**information**
265:13 266:9,10
300:3 312:15
328:11 329:11
345:17 354:24
**infrequently**
370:25
**inhalation**
358:23 359:10,13

359:17,23
**inhaled**
358:19 359:1
**initial**
287:19 358:10
**initialed**
375:7
**initiation**
294:3 336:21 337:3
**Initiative**
270:9
**initiator**
338:3
**inject**
363:19 371:10,17
**injecting**
363:15 371:14
**injury**
331:22
**ink**
375:7
**instance**
303:15
**Institute**
334:14
**institution**
368:10
**instruct**
373:3
**insufficient**
328:11 329:11
**intended**
260:21
**intent**
356:11
**interest**
307:8
**interested**
376:19
**interesting**
273:15
**interpret**
280:7
**interval**
277:24 278:4,14
279:22 280:2

361:15
**intervals**
256:8 279:16,22,25
280:14 282:19,24
360:17
**intervention**
301:15
**interview**
334:3,9
**interviews**
333:21 334:1
**introduce**
334:5
**introduced**
331:11
**introduction**
294:12
**invasive**
323:14
**invoice**
251:12,14,24
259:15 260:19,20
261:14,16 319:8
319:12
**invoices**
259:4,20 260:3,7
261:1,7,9,12
319:15
**involved**
270:11 285:11
305:13 306:22
342:14,16,19,20
**involving**
268:20
**issue**
325:21 338:2,10
373:15
**items**
351:24

_____
**J**
_____
**J**
245:23 246:10
376:1
**James**
250:4 347:6,25

**Jane**
249:4 256:6 261:1
299:4 331:12
**jbillingskang@se...**
250:8
**jbockus@dykem...**
249:9
**JD**
247:6
**JENNIFER**
249:14
**Jersey**
245:3 247:25
253:16
**jfoster@gordonr...**
249:19
**Johnson**
245:6,6 246:7,7
248:3,3,14,14
253:12,13 366:3,5
**Johnson's**
366:1
**jot**
255:19
**journal**
282:21
**July**
332:18
**June**
259:14 332:20
354:22
**J&J**
360:12

_____
**K**
_____
**keep**
300:14 371:9
**kind**
281:22 289:12
310:18 321:4
365:2 367:13
371:9
**kinds**
321:7
**knew**
333:6

**know**
266:9 286:2,5,17
286:23 288:19
289:8 290:6,15,19
292:9,20 293:3,3
293:25 298:13,15
299:22 303:4,14
303:16,16 307:9
310:9 312:22
314:5 315:16,18
315:20,25 317:18
320:25 321:7,19
321:24 322:13,24
327:24 329:20
330:9,14,19
335:23 336:9
339:7 340:4,6,16
340:22 341:4,7
344:14 345:16
348:13,20 349:3
351:23 352:11
354:21 357:13
359:15 363:23
364:4,11,14
365:21 367:25,25
369:22 370:4,13
372:1,6,8,13
**knowledge**
262:25 275:24
320:22 321:24
322:5 330:20
**knowledgeable**
285:7
**known**
263:12 306:17
329:16 352:17

_____
**L**
_____
**L**
247:14
**laboratory**
314:8 317:17 318:3
**lack**
265:9
**Langseth**
276:12,22 277:5,19

278:10 279:13
360:11 361:24
362:17
**Lanham**
318:2
**Lapinski**
247:21 262:15
**large**
263:13 268:13
308:1 322:24
**largely**
360:5
**Law**
247:4,7,15,22
248:6,17 249:5,15
250:5,17
**laws**
376:23
**lawyers**
332:17
**lead**
289:9,13,19 302:15
365:19
**leading**
291:16 293:20
294:4 336:22
**leads**
290:18 303:15
305:16,18 365:8
**leave**
331:20
**led**
291:18 333:8 357:9
**Lee**
334:14
**left**
320:3
**legitimacy**
336:2
**legitimately**
335:6
**LEIGH**
247:5
**leigh.odell@beas...**
247:10
**length**

305:21
**letter**
251:12 259:7,9
**let's**
276:14 318:22
368:23 371:10
**level**
292:20 302:25
344:23 365:3,8
**levels**
301:6 303:13
330:16
**Levin**
246:7
**LHG**
245:9
**Liability**
245:7 253:14
**Liberty**
377:3
**ligation**
346:3,12,20
**limit**
305:9 352:20
**limitation**
263:7 264:5 265:14
265:15 307:24
328:1
**limited**
323:12 325:21
**line**
274:9 301:9,12,14
301:17 367:10
377:7
**lines**
300:7,8,16 309:18
**link**
283:5,17,25 288:20
**linking**
338:19,19 339:10
**list**
276:23 297:1,8
338:24 348:9,9,13
351:1,5,9,15
365:12
**listed**

350:25
**lists**
350:21
**literally**
363:20
**literature**
263:22 264:11
289:5,10 290:17
291:15,17,22
292:9 293:19
296:12,24 306:24
323:24 330:19
332:25 337:1,6,8
337:10,14,21
339:10,13 355:25
356:4 365:1
**litigation**
245:8 253:7,14
259:21 298:14
299:24 315:10,14
315:21 316:7
354:25 377:2,6
**little**
278:22 280:12
331:20 335:2
339:15 355:20
361:22
**living**
301:10,12,18 364:2
**LLC**
250:14,14
**LLP**
246:7 248:4,15
249:13 250:3,15
**locate**
332:15
**long**
255:10
**longer**
267:11 339:18
**Longo**
315:8 322:18
**Longo's**
315:21
**look**
261:4 269:5 276:10

276:21 277:19
278:8 282:21
283:13 302:2
312:25 325:11
327:23 332:21
345:23 346:9
362:4,6 370:3,22
**looked**
276:2 278:7 279:10
287:4 300:6 312:5
314:13 315:7
323:20 326:23
332:7 335:24
341:20 354:1
366:3,6,8,12,13
369:24 370:5
**looking**
266:15 268:19,24
269:4 274:1
309:13,18 312:20
325:15 334:4
336:10 345:5
351:3 371:1,15
**looks**
258:1 259:8 323:18
**Los**
248:9
**loss**
300:22
**lost**
264:1 328:16
**lot**
288:1 289:4,10,12
334:1 351:21
353:3,20 363:14
**lots**
358:12
**Louis**
250:20
**love**
317:1,3
**lower**
296:5 371:22
**lungs**
330:12

| **M** |
| --- |

**M**
247:6 250:16
**magnitude**
310:22
**major**
295:14 325:22
**male**
332:12
**manuscript**
256:1 298:22 299:6
**MARGARET**
247:6
**mark**
262:5 276:14 295:5
297:9 324:18
327:14
**marked**
257:23 259:5,11
261:2 262:9
276:15 297:10
299:1,7 317:9
319:9,10 324:23
327:16 360:11
**markers**
366:21,23
**Market**
377:3
**Marketing**
245:7 253:13
**Mary**
245:23 246:10
253:23 376:1
**Maryland**
318:2
**material**
364:6,6
**materials**
260:16 294:24
298:8 353:23
**math**
260:12 341:13
**mathematical**
343:5
**matter**
253:12 258:24

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1204 of 1525
PageID: 63350
Rebecca Smith-Bindman, M.D.

Page 390

260:14 274:9
286:8,25 331:13
**matters**
281:6
**MD**
247:6
**MDL**
245:8 259:21
**Meagher**
248:15
**mean**
256:6,18 273:14
278:25 284:13
286:12 298:22,24
298:25 302:6
305:5 307:23
308:8,11 310:16
326:11 337:14
348:4 353:1
356:15 361:15,17
370:13
**meaning**
265:10 271:24
308:17
**meaningful**
254:24 312:10
335:8,13
**meaningfully**
256:3 335:5
**means**
279:5 310:15 326:6
371:17
**meant**
308:7 367:22
370:12
**measure**
265:4 272:2 296:9
312:10 343:19
**measures**
366:6
**mechanism**
267:2,4 285:8
294:2 296:3 305:8
336:21 337:3,12
337:17
**mechanisms**

**mechanistically**
368:3
**Media**
319:4
**medical**
333:18,24
**medicines**
295:25
**meeting**
260:17
**meetings**
354:22
**Melissa**
294:20
**member**
304:10 334:13
**memory**
349:19
**men**
326:7,9
**menstruation**
363:24,25
**mentioned**
259:22 303:21
307:5 356:10
359:13 366:7
**Merritt**
294:20 295:7,18
**mesothelioma**
326:1 329:25 330:5
330:8
**message**
296:24
**met**
332:19 354:22
**meta**
329:3
**metals**
313:19 320:12,15
**Meta-analyses**
284:3
**meta-analysis**
254:15 255:20

**mechanistically**
285:2,4 302:11
365:19
**method**
318:20 341:16,18
**methodology**
284:22 301:20
341:9,14 357:2
**mic**
347:13 366:18
**MICHAEL**
248:5
**michael.zellers@...**
248:10
**microphone**
331:2
**middle**
263:2 264:3 338:17
345:6
**migrate**
287:5 362:25
**migrates**
287:15
**migrating**
362:22
**migration**
285:23,24 286:8
362:19
**Mike**
262:1 264:1 298:19
332:19
**millions**
322:23
**mind**
317:2 370:4
**mine**
269:2 344:21
355:19
**mineral**
321:25
**minimum**
290:19
**minor**
311:4
**minute**
331:2

274:3 284:8,17,21
323:9,18 328:25
355:7 356:3,7,11
**minutes**
255:12 317:2
368:24 374:4
**misclassification**
329:14
**Missouri**
250:20
**misspoke**
346:23
**mixed**
296:13
**mobile**
364:3
**model**
367:10 368:2,5,13
368:19
**modified**
300:13
**moment**
364:20
**momentarily**
262:4
**Montgomery**
246:8 247:9 253:11
**month**
271:25
**months**
371:13
**morning**
254:7,8,12 258:24
331:11 347:22
373:20 374:3
**mortality**
297:22
**motion**
374:5
**move**
319:21 326:14
331:2 347:12
364:5,6 373:13
**moved**
286:24
**movement**
286:19
**MPAff**
247:6

**mucosa**
288:2,6,8
**mucosal**
288:13
**mucous**
288:2
**multiple**
344:12,17,24
357:18 358:4,16
**mutation**
357:23 369:17
**mutations**
304:1,16,20,21,23
366:13
**M.D**
245:14 246:6 251:3
254:1 375:4,14
377:21

---

**N**

**N**
366:16
**name**
253:6 332:15
347:25
**named**
325:4
**napkins**
271:8
**narrow**
274:3 363:3
**narrowly**
263:6 264:6
**national**
269:9
**nearly**
268:6 356:8
**necessarily**
274:11 335:8 344:7
**necessary**
290:16
**need**
268:13 275:24
316:24 324:13
327:6 347:12
**needing**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1205 of 1525
PageID: 63351
Rebecca Smith-Bindman, M.D.

Page 391

370:24
**needs**
344:6
**negative**
292:5
**Ness**
365:14
**never**
307:17
**new**
245:3 247:25
248:19,19 253:16
306:21 307:6
333:10 359:10,25
**Newport**
247:17
**news**
353:15
**nice**
367:15
**night**
373:18
**nine**
270:18
**non**
304:19
**nonaspirin**
251:20
**noncancer**
304:17,18,20
**nonoccupational**
327:2 328:2
**nonresponsive**
298:18 326:15
340:24
**nonsteroidal**
295:22
**nonusers**
330:18
**normal**
301:21 303:7
345:13
**Notary**
377:25
**noted**
374:9 375:7

**notes**
255:13,16,20
257:17,21,23
258:1,12 376:12
**November**
259:15 260:2
**NSAID**
251:20 297:21
**NSAIDS**
294:21 295:22
296:4,10,14
**number**
251:11 262:19
276:24 292:6
304:15 310:18,19
310:20 321:21
322:24 324:4,8,9
325:23 326:6,7,13
335:11 340:22
343:22 350:7,17
355:6 357:17,20
360:16
**numbers**
255:22,24 256:7,10
256:12,14,17
257:13 268:14
304:10 341:8
343:15 365:15
**Nurses**
266:18 267:15,18
268:20 269:6
343:10
**NW**
250:6

_____
**O**
_____
**O**
297:2,2
**object**
256:16 266:24
267:16 270:5
271:17 272:11
273:2 274:25
277:10 279:3
280:23 283:2,8
284:11 285:6,15

286:11,22 287:8
287:21 288:23
289:3 290:14,24
291:14,25 292:17
294:10 296:7
298:18 300:24
301:24 303:3
304:7 307:2 310:5
310:12 313:20
314:19 315:2,23
316:3,5,13 320:13
320:24 321:11
322:4 323:5 324:5
326:3 330:2 332:5
333:12,25 336:8
336:18 337:7
338:5 339:2,12
340:2,23 343:2,13
344:4,19 348:25
349:1,11,22
350:14 351:13
359:24 370:2
372:5
**objected**
299:2
**objection**
293:23 345:18
350:11 356:1
357:6 358:3,21
359:3 366:2 368:7
368:16
**objections**
359:7 376:8
**observational**
306:10,14
**obstetrics**
334:6,13,18
**Occasionally**
363:18
**occupational**
252:4 324:7 326:18
328:13 329:12
359:16 360:7
**occur**
358:17 365:10
**occurred**

303:1
**odd**
279:23 280:10
**odds**
279:20 280:3
282:18,24 309:24
310:3,10,14,17,23
310:24 311:5,6,7
361:25
**Oh**
317:22 341:14
347:6
**okay**
253:22 258:6
264:21 268:19
271:2 277:17
283:21 295:2
297:5,18 298:4
299:16 305:3
308:10 309:15
325:3 328:17
330:24 332:1,6,14
333:9,14 341:18
342:6,24 348:6
351:8,16 352:9
354:4 355:6
357:16 360:9
361:23 362:18
364:25 368:20
370:14
**older**
332:21
**omitted**
283:23
**once**
271:25,25
**ones**
255:25 256:5
273:16 312:12
356:8
**ongoing**
294:17
**oophorectomy**
346:18,22
**open**
363:10

**opinion**
285:18 292:11
321:1 333:22
349:9,20 350:13
351:11,14,18
359:12,25 362:25
364:23
**opinions**
284:25 285:1
313:14,18,22
315:1 321:16
355:10 359:9,10
**oppose**
374:5
**opposed**
267:21 268:4
274:18 275:15
353:7
**order**
301:4 333:11
**organizations**
353:16
**organs**
301:22
**outpatient**
281:21
**outside**
286:9,20
**ovarian**
251:17 252:2
266:23 269:3,21
269:25 270:15
271:9 275:9,11,21
276:8 283:6,17,25
285:13 290:3,9
294:3,17,22
295:14 296:3,5,15
296:18 297:22
304:3 305:13,18
306:23 307:10,13
313:4 314:2
320:23 321:9,17
322:3,12 323:3,7
323:8,10,11,17,24
324:3 325:6,18
326:1,19 327:3

Rebecca Smith-Bindman, M.D.

328:3,12 329:11
332:8 333:1
336:22 337:3,18
337:25 338:3
339:10 340:1
345:12,13 346:2
346:10,17 355:18
357:18,21,24
358:20 359:1
360:5,20 361:1
364:21,24 365:11
366:25 370:1

**ovaries**
285:20 286:9,19,21
287:6,16 363:21
370:19 372:10,15

**ovary**
288:8 362:23 363:2
363:8,8,11

**overall**
323:18

**overlap**
277:13,13,14,16
278:4 279:16
280:6,14 344:11
344:22 345:1
361:15 366:23

**overlapping**
278:15

**overlaps**
279:22 335:2

**oxidants**
301:6 302:7 366:11

**oxidation**
365:4

**oxidative**
303:10,13,13,15,18
304:2,22 305:4,5
305:9,12,15,16
358:13,14 366:8

**oxygen**
303:7

**O'Dell**
247:5 251:7 255:6
255:9 256:16
259:3 260:19,22

262:1 263:25
264:7,16,21
266:24 267:16
270:5 271:17
272:11 273:2
274:25 276:20
277:10 279:3
280:23 283:2,8
284:11 285:6,15
286:11,22 287:8
287:21 288:23
289:3 290:14,24
291:14,25 292:17
292:21,23,25
293:23 294:10
296:7 298:19,21
299:5 300:24
301:24 303:3
304:7 307:2 309:6
309:11,15 310:5
310:12 313:20
314:19 315:2,23
316:3,13,24 317:4
317:21,24 320:13
320:24 321:11
322:4 323:5 324:5
326:3 327:5,21
330:2 332:5
333:12,25 336:8
336:18 337:7
338:5 339:2,12
340:2 343:2,13
344:4,19 345:18
347:1,6,9 348:25
349:4,7,11,13,15
349:21,24 350:2,5
350:11,14,17,20
351:13 354:6,15
356:2,10 357:16
358:19,25 359:5
359:13 360:9
368:4,11,21 370:2
372:5 373:2,16

_____

**P**
P

247:5 366:16

**page**
251:11 252:1
257:23,25 259:7
262:14,15,16,18
263:3 264:4
268:19 273:7
275:13 276:22
283:13 290:7
294:1,25 295:7
297:14,19 307:21
308:25 309:9,10
309:12,19 311:11
312:25 318:1,5,6
318:7 325:13
327:24 328:5,6
336:20 345:5,6
348:12 351:5
352:11 360:2,13
377:7

**pages**
257:24

**paid**
298:13 299:23
315:10 355:2

**paper**
276:12,22 284:14
286:4 294:19
295:8 297:1,9
298:12 307:16
324:17 325:8
326:23 327:9
356:18,23 360:11
360:14 361:24
362:4

**papers**
284:12 292:1
296:19,25 353:13
353:14 370:3,5

**paragraph**
263:3 264:1,3
283:14 294:11
295:11 297:14
318:1,8 327:25
328:6,19 338:16
345:7,10,24

352:14,15

**paragraphs**
294:14

**part**
255:6 270:23 303:7
356:22 359:11
363:9

**participate**
342:6

**particles**
286:4 322:19,23
345:8,12,14 363:7
364:4

**particular**
263:25 289:11
308:4,6 313:24
335:9,11,25
341:16,19,23
353:11,12

**particulate**
286:8,20,25

**parties**
373:25 376:20,21

**partly**
342:11,11

**parts**
302:14

**patency**
370:23

**path**
339:17

**pathways**
338:18 365:9,10,18

**patient**
302:10 335:7
357:22,23 367:25

**patients**
281:9,10,19,21
293:11 297:23
313:10 344:11,12
345:1 358:4
363:18 370:25

**patient's**
371:21

**PCPC**
250:2 348:5,17

**PCPC-produced**
349:10,20 350:9

**Pecan**
249:6

**peer**
282:21 341:11,15
341:18 344:3,7

**pelvic**
294:21 305:15,17

**pen**
258:2

**penalty**
375:5 376:6,22

**Penninkilampi**
282:3,4,7,11 283:4
283:22

**Pennsylvania**
377:4

**people**
281:16,17 314:8
355:22

**percent**
340:6,7 344:15
348:16 371:3,4

**percentage**
372:9,16

**percentagewise**
372:12

**perfectly**
374:4

**performed**
355:8,11

**peri**
286:9

**perineal**
251:17 266:17
270:14,19,22
271:5 273:12
283:15 285:13,19
287:5,16 302:20
303:1 330:7,10
372:3

**perineum**
286:21 362:22
363:5,7,9,20
364:12,17 370:18

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1207 of 1525
PageID: 63353
Rebecca Smith-Bindman, M.D.

Page 393

371:8 372:7
**period**
339:18
**peritoneal**
325:25
**peritoneum**
286:9
**perjury**
375:5 376:7,22
**person**
332:11,23 333:3,5
**Personal**
250:2 348:1,4
**personally**
307:10
**person's**
332:15
**perspective**
314:12
**pertained**
366:4
**Philadelphia**
377:4
**Philip**
334:13
**phone**
258:16,20
**phonetic**
365:14
**physical**
288:13 291:18
**physician**
285:8
**physiology**
303:8
**Ph.D**
253:18 319:5
**PID**
307:4,15
**piece**
312:15
**pieces**
333:22
**place**
255:15 269:4
371:10 376:5

**placed**
372:9
**places**
274:15
**plagued**
275:2
**plaintiffs**
247:3,12,19 259:3
260:18 298:7,14
299:23 354:14,23
354:23 355:2
372:24 373:9
**plausibility**
285:12
**play**
295:14
**Plaza**
247:16 377:3
**please**
253:19 256:24
262:14 299:19,21
316:5 324:16
327:13 347:7
**plot**
361:2
**plug**
343:21
**point**
263:11 279:6,7
280:12 291:11
297:24 310:25
335:9 344:2 361:3
361:5,11 362:12
366:13
**pointed**
272:4 308:12
**points**
312:3 327:1
**Policies**
334:14
**pooled**
279:20,23 280:3,10
361:25 362:4
**pooling**
274:4 344:24
**population**

275:25 276:23
278:6,7 281:15,21
311:12 346:15
**populations**
280:10 329:15
335:7
**population-based**
276:3,24 277:17
278:9 279:11,17
279:18,21 280:3
280:21 281:5,25
311:16
**position**
304:12
**positive**
278:3 311:3 328:10
329:10 361:18
**possibility**
276:1
**possible**
272:20 274:4 279:9
283:3 306:10,13
**possibly**
306:22 357:23
**postop**
313:10 370:25
371:2
**potential**
274:8,8 293:14
324:3 360:19
**potentially**
281:1
**powder**
245:7 253:13
259:21 268:3
269:20,24 271:8
271:15 274:8
275:21 285:13,19
285:23 286:18
287:5,15 290:8,12
290:22,25 291:1,8
292:4,11,13 293:4
293:8 294:20
307:13 313:11,15
313:19,23 314:1
314:17,20,25

315:5 316:7,19
318:15,19,19
320:5,7,10,12,18
321:2,6 322:6,11
322:16,20 323:7
323:20,22 330:22
339:11 340:1
343:19 346:6,10
346:16 352:16
354:25 355:9,18
357:25 358:1
360:21 361:1
362:25 365:22
366:1,4,5,20
367:8 369:18
372:3,7 377:6
**power**
323:15
**powerful**
266:3
**practical**
344:23
**Practices**
245:7 253:14
**preclude**
297:23
**predecessors**
348:5
**predicter**
265:12
**preferable**
293:18
**preop**
371:2
**preparation**
373:8,18
**preparations**
352:21
**prepare**
254:10,10
**preparing**
260:16
**presence**
303:18 306:1
**present**
268:8 306:14 334:9

352:16
**presentation**
356:17
**presented**
255:5 277:25
334:15 355:22
**presenter**
334:16
**pressure**
371:18,20
**pretty**
371:13
**prevented**
358:14
**previous**
295:12 356:8
**primarily**
312:11 314:13
331:18 333:23
358:23 359:23
**primary**
271:21 312:7
370:20
**principles**
335:21
**prior**
374:3
**pro**
302:7 303:13,15
365:4 366:11
**probability**
303:22,23
**probably**
258:10 263:17
322:7,8 332:16
371:12
**problem**
265:11
**procedure**
313:13 370:17
**procedures**
363:14 370:20,25
**proceedings**
376:4
**process**
282:22 291:4,5

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1208 of 1525
PageID: 63354
Rebecca Smith-Bindman, M.D.

Page 394

342:7,19
processes
291:20
produced
254:25 255:2
product
257:2 269:24
290:13,22 291:10
292:14,15 293:4
293:14 314:5,5
346:7
production
255:7
products
245:7,7 250:2
253:13,14 268:3
290:8 292:4,11
293:8 313:11
314:9,10,14,17,21
314:25 315:5
320:7,10,12,18
321:2,6 322:6,11
322:16,21 323:7
323:22 343:20
346:10,16 348:2,4
352:17 355:18
357:25 358:1
361:2 367:8
professor
334:2,6,11
program
257:5
progression
294:3 336:21
proliferation
300:23 301:5 302:5
366:13
promotion
294:3 336:21
proper
284:17,21
proportion
292:3
proposition
294:9
prospective

274:17,20
protective
305:8 361:19
protein
300:22
protocol
373:24
prove
292:7
provide
262:3 354:24
provided
259:3 260:25
319:13 357:3
provides
301:18 357:12
proximity
287:22 288:11
psoriasis
290:5
psychometrically
272:9
PTI
250:14,14
Public
377:25
publication
257:14 353:22
publications
289:12 299:10
305:11 320:1
publish
319:21,25 356:11
356:25
published
255:25 263:22
264:11 284:4
290:17 294:19
298:5 306:23
307:13 310:23
315:15 332:25
355:24 356:4,13
356:20
publishing
334:9
purpose

315:14
purposes
348:3 349:8
put
276:19 349:13,15
352:9 360:23
364:12 367:24,24
371:7,8
putting
274:10 350:15
363:15 370:18,21
371:18 373:25
P.A
247:20
p.m
246:10 354:11,12
368:25 369:2,3,4
374:7,9
P53
300:19,22
_____
Q
_____
quality
282:17
quantifiable
335:13
quantification
302:10 312:12
quantified
296:21
quantifies
290:16
quantify
267:20 322:15
323:16
quantifying
312:6
quantitative
336:1
quantity
302:15
question
259:17,19 263:6
264:6,8,20 265:10
273:11,22,23
274:16 282:25

284:17 291:21
293:2,17 299:19
299:22 301:9
302:13 304:14
305:19 310:13
316:8,12 321:9
332:2 333:11
335:10,25 336:10
338:4 339:22
340:25 342:15
346:7 349:7,16
362:20 363:3
368:13 370:4
questions
266:1,5 273:14,15
324:15 330:25,25
331:23 346:25
347:5 354:17
355:7 360:16
361:23,25 373:3
quick
280:8
quick-and-dirty
278:16
quite
256:2 304:14 324:7
358:6 366:20
quoting
264:17 268:20
329:19
_____
R
_____
R
247:21 250:4 297:2
334:14
race
372:12
radiation
302:1,3 370:11
radioactive
364:5
radiologist
333:16,23 363:13
radiology
334:12
raise

256:23
range
280:5 307:8 311:5
rarely
263:5 264:5
rates
329:23
ratio
279:20,23 280:3,10
310:10,17 311:5,6
311:7 362:1
ratios
282:18,24 309:24
310:3,24
reach
319:22 333:8
reached
355:10
reactive
303:7
read
266:6 295:16
297:16 352:22
353:3,13,19,22
360:2 375:5
reading
263:25 264:18,19
289:4 300:21
329:18 339:4,5
ready
344:2
real
263:24 264:13,13
264:17,25
really
308:12,13 332:7
365:15 366:20
reason
263:24 264:14,18
268:5 271:21
300:25 371:6
372:14
reasons
325:22
Rebecca
245:14 246:5 251:3

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1209 of 1525
PageID: 63355
Rebecca Smith-Bindman, M.D.

Page 395

253:17 254:1
319:5 375:4,14
377:21
**recall**
273:6 274:21 275:4
275:8,18,25
349:19 351:10
**received**
319:16
**recognize**
266:21 324:25
**record**
253:6 276:19
318:25 319:4
331:1,4,8 347:2
347:15,19 354:9
354:13 368:12
369:1,5 373:16,21
374:8
**recorded**
259:24 376:9
**recruited**
280:11 281:7
**rectal**
287:18 288:17,21
**rectum**
288:5,7
**reduce**
295:25 296:14
**reduced**
346:17,21
**reduction**
346:2,11 365:5,6
**Rees**
249:13
**reference**
309:1 348:4,9,9,13
348:17 351:1,5
361:24 365:12,12
**references**
298:2 365:13,13,14
365:14,15,17,17
365:17
**reflect**
284:9
**reflection**

277:25
**refused**
376:17
**regard**
283:16 344:11
365:22
**regarding**
294:16 354:24
357:2 373:4
**region**
285:19 287:16
302:21 330:8,11
372:4
**regular**
266:15,17 272:4,8
272:18 273:12
290:8 312:20,23
343:19,24 355:8
369:25
**regularly**
369:18
**regulation**
366:9,9,11,12
**Reid**
324:10,17 325:5
**related**
275:6 304:9 313:12
**relates**
285:12 326:18
**relating**
264:4 285:1 362:19
**Relation**
294:21
**relationship**
269:20 270:14
271:4,7 275:20
288:3 293:15
306:2 321:19
324:3 325:17
335:12 360:25
**relative**
309:4,22 340:14,15
341:4 362:13
376:19
**relatively**
281:25 311:4

362:14,16
**relevance**
367:14
**relevant**
302:4 311:13
**reliability**
272:10,12 282:25
**reliable**
335:17 336:6
**reliance**
294:24 297:1
353:23
**relied**
350:10 351:10,24
351:25
**relief**
313:11
**rely**
348:23 349:10
351:18,21 353:10
**relying**
362:24 364:22
**remember**
255:4 272:6 275:10
283:9 307:19
324:9 325:10
327:5,7 332:12
345:22,25 350:4,6
350:20,20 351:6
351:19 352:3,7
370:5
**reminded**
332:19
**remove**
353:6
**removed**
291:19
**repair**
303:24 358:14
**repeated**
353:12,15,16
**replicate**
356:3 357:4,14
**replicated**
355:24
**replication**

356:9
**report**
254:13 256:5,15
257:7,22 261:23
262:7,10 264:19
266:13 267:19
268:1 271:11
272:4,17 273:5,8
275:13 287:4
290:7 294:1,8
295:20 298:9
307:22 312:25
315:16 318:14
319:19,20 322:18
336:20 341:20
343:24 344:2,6
346:11 348:10
349:9 352:10
353:17 356:21
357:2,20 358:22
359:8,14,16 360:1
362:13
**reported**
245:23 256:10
267:1 268:2
278:10 339:25
343:10 352:18
**reporter**
246:11 253:23
256:23 299:2,15
299:17,18 304:18
308:5 319:24
366:10,15,17
367:19 376:2
**reporting**
282:18,23
**reports**
282:11 293:19
315:8,13,14,22,24
316:4,6,14,16
318:17 321:20
353:16
**represent**
331:13
**represents**
348:1

**reproduce**
291:19
**reproductive**
285:20 287:11
293:22 334:7
370:15
**requested**
300:3 316:2 376:16
**require**
356:18,19
**required**
292:14 311:22
322:25 353:8
354:3
**requirement**
343:18
**requirements**
312:13 354:3
**research**
279:6 294:16,18
298:16 302:6
324:2 333:10,16
338:12 350:22
365:22 368:5,9,10
368:14
**researcher**
331:18
**researching**
333:7
**residual**
306:9
**respect**
261:23 311:18
319:19,20 321:16
330:15
**respective**
374:1
**responded**
315:21
**response**
304:9 367:6
**responses**
294:5 336:23
**rest**
331:21
**result**

Case 3:16-md-02738-MAS-RLS    Document 9886-12    Filed 05/29/19    Page 1210 of 1525
PageID: 63356
Rebecca Smith-Bindman, M.D.

Page 396

274:11 287:12
288:16 294:5
336:23 344:25
360:6,20
**results**
271:22 273:18,21
274:5 275:9 279:9
292:6 295:12,17
297:21 301:21
306:6 308:3
316:15,18,22
319:21,25 355:16
355:21 356:7,17
357:10,12 360:2
362:7 366:4 367:2
367:11 370:6
**retrograde**
363:24 371:11
**retrospective**
274:18,21,24
275:19
**review**
254:15 265:9,17
266:11,12 270:3
282:21 284:9,18
284:22 289:1,7
297:16 311:2,18
312:5,15,17
323:12 324:6,10
324:21,22 325:4
329:3 342:21
343:18 344:3,7
345:19,21,21
355:8,12 356:12
357:11 376:15
**reviewed**
254:13 265:9 292:1
296:19 298:9,11
299:9 311:21
324:12 341:11,15
341:18 351:21
365:21
**reviewing**
260:15
**reviews**
312:18 355:14

357:13
**re-ask**
299:20
**Rheumatoid**
290:1
**right**
257:11,15 258:2
259:14,16 260:5,8
261:16 262:21
265:12,17 266:4,9
266:19 267:9,12
267:15 268:10
269:7,14,22 270:4
270:9,11,16 271:9
271:12 272:25
273:21 274:18
275:11,16 276:4
276:18 277:1,22
278:2,12 280:17
281:10,17 282:5,8
283:1 284:1,5,10
284:19 285:2,21
287:13 288:18,22
289:20 290:5
292:16 294:25
295:16,23 296:1
296:15 297:2,16
297:25 298:10
299:13,16 300:7
305:22,24 306:4,7
306:19 307:14
309:5,15,23 310:2
313:1,14 314:18
315:8,11,15
316:11 317:17
318:5,12,16,22
320:11 325:9,15
326:2,21,24 327:4
327:8 328:7 329:6
329:17 341:5
345:4,6 361:8
**rights**
374:4
**right-hand**
325:12
**risk**

251:17 273:13
275:12,14,23
279:1 290:3 293:9
293:16 294:22
296:5,14 308:4,6
309:4,22 327:2
328:2 329:16
330:8,11 333:17
340:14,15 341:6
346:9,11,17
357:20,24 358:4
358:12,16 360:20
361:4,6 362:3,13
369:10,25 370:10
**risks**
333:24
**risk-benefit**
293:15
**Robinson**
247:13
**role**
295:14
**route**
286:14 359:19
**Royston**
250:14
**run**
343:14

————————————

**S**

S
366:16,16
**Saed**
298:9,10,13 299:11
299:22 300:1,4,6
300:12,18 302:19
302:25 365:13
366:3
**Saed's**
301:21 365:21,25
**safe**
283:16 292:8 293:5
320:7,9,12,17
**Sales**
245:7 253:13
**sample**

256:9
**samples**
318:19
**San**
245:15 246:8 249:8
253:1,11
**sand**
286:1,2
**sanitary**
271:8
**satisfied**
344:9
**saw**
300:16
**saying**
265:5 308:21 311:2
330:4 361:4,5
**says**
269:2 283:22 304:5
304:8 328:22
329:20,21
**sciences**
334:7
**scientific**
275:5 356:23 368:5
368:14
**scientist**
285:8 298:16
**Scott**
259:9,10
**scribble**
255:15
**scribbled**
255:14
**search**
332:14,16
**second**
276:22 307:23
317:25 318:1,6,7
318:8,8 327:24
328:6,19,21 335:3
340:11,18
**section**
294:12 336:9
**see**
263:8 290:10 294:6

298:2 308:25
313:5 316:22
318:4 327:6 328:4
328:17 339:3,5
345:24 348:18
365:1,2,4,5
370:18 371:9
**seeing**
297:3 351:19 352:5
352:7
**seen**
307:17 316:1,9,14
316:15,16,17
317:14 325:8
364:6,7
**selecting**
281:19,19
**selection**
274:24 275:2
280:16,21
**self-regulate**
353:5
**sense**
303:22 355:23
361:14 364:17
**sensitive**
302:14 344:25
**sensitivity**
302:16 343:23
**sent**
261:14
**sentence**
297:20 308:10
312:4 318:10
328:21 336:24
345:9 353:11,12
**series**
294:4 336:23
**serous**
323:13,17
**service**
318:3
**Services**
253:7 318:2 377:2
**serving**
354:19

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1211 of 1525
PageID: 63357
Rebecca Smith-Bindman, M.D.

Page 397

**session**
255:18 259:2 320:4
    372:25 373:1
**set**
266:12 311:21
    342:17 357:9
    376:5
**setting**
314:8 342:15
    365:11
**settled**
338:4,7,10
**several-fold**
363:13
**Seyfarth**
250:3
**shape**
341:11
**shared**
257:3,9,11
**Shaw**
250:3
**Shawn**
365:14
**SHEET**
377:1
**shift**
256:4 310:22
**shifted**
278:2
**shifts**
256:9
**short**
263:17 270:2 354:6
**shorthand**
246:11 376:2,12
**show**
269:19 276:7,12
    277:8,20 278:25
    288:15,20 297:7
    318:17 349:4,12
**showed**
255:25 366:19
    367:1,2,3,3,6,7
**showing**
302:18,24

**shown**
255:22 279:12
    283:15 364:5
**shows**
279:4 287:10 362:7
**shrift**
263:17
**Shukla**
365:16 367:3
**sick**
281:20
**side**
325:12
**sign**
292:23
**significance**
277:21 278:1,6,11
    278:17,19,21,25
    279:5
**significant**
269:20,25 270:14
    271:4,7 275:20
    276:7 277:8
    328:10 329:10
    360:3 362:3,11,15
**silicate**
321:25
**Simes**
246:7
**similar**
283:16 362:15,16
    362:17
**simple**
320:8
**single**
263:6 264:5
**sit**
264:11
**six**
277:6 321:4,10
**size**
256:9
**Skadden**
248:15
**skew**
344:18

**skiing**
331:17,22
**skill**
334:10
**skin**
274:9
**Slate**
248:15
**slight**
256:4
**slightly**
256:9 278:13
**small**
292:2,6,6 309:4,22
    310:4,7,11 324:4
    325:23 326:6,13
**Smith-Bindman**
245:14 246:6 251:3
    253:17 254:1,9
    264:10 319:5,7
    347:22 354:16
    360:10 368:12
    372:23 373:6,17
    374:2 375:4,14
    377:21
**Smith-Bindman's**
360:1 373:14
**smoke**
340:19
**smoking**
340:12,14
**Snips**
366:15
**SNPS**
366:13,16
**software**
257:4 357:8
**sorry**
259:17 262:1
    264:21 270:25
    317:22,23 325:10
    325:10 328:5,14
    341:14 346:20
    347:2,6
**sort**
263:1,20 278:15

**280**:8 286:23
    294:12 321:3
    335:22 356:23
    357:13 365:18
    367:21 370:6
**sound**
260:8
**source**
345:15
**sources**
284:18 344:24
**South**
248:7 250:18
**sparse**
297:20
**speak**
255:10 360:19
    373:17
**speaking**
254:20 370:9
**species**
303:7
**specific**
264:3 283:24
    362:19,20
**specifically**
283:5 325:25
    351:24 360:13
    364:20 366:3,4,8
**specified**
257:4
**specimens**
318:20
**spent**
260:14
**sperm**
364:1,3,3 372:9,16
**sphincters**
288:1,6
**spill**
363:17
**Spitzer**
247:20
**split**
373:5
**spoke**

**370**:14
**spoken**
300:1
**spreadsheets**
357:3
**Square**
248:18
**St**
250:20
**stable**
310:24 323:6
**standard**
256:8
**standards**
353:21
**start**
259:2 333:10
    337:15 356:3
**starting**
361:24
**starts**
345:7
**state**
263:5 285:1 294:2
    297:20 311:12
    328:1,9 329:9
    375:11 376:2
**stated**
333:15
**statement**
263:2 264:3 273:20
    283:24 294:6
    304:12 313:8
    336:19 337:11
    346:1,5 359:6
**statements**
262:19,24
**states**
245:2 253:15
    263:23 264:12
    283:5 291:12,22
**statistical**
277:20,25 278:5,11
    278:16,19,21,25
    279:5 280:9
    323:15

Rebecca Smith-Bindman, M.D.

**statistically**
269:19 270:13
  271:4,6 275:20
  276:7 277:8 362:2
362:10
**stenographically**
376:9
**stenosis**
371:4
**step**
356:24
**stimulated**
302:11
**stratified**
370:6
**Street**
246:8 247:8 248:7
  249:6 250:6,18
  253:11 377:3
**strength**
334:22 339:23
  340:4
**stress**
303:11,18 304:2,9
  304:22 305:4,5,9
  305:12,15,16
  358:13,14 366:8
**strike**
261:6 271:5 306:12
  315:18 318:3
  326:14 356:2
  373:13
**strong**
265:19 288:3 311:3
  315:4 334:25
  339:13 340:13
  360:4
**stronger**
339:25
**strongest**
321:18
**strongly**
271:20 366:24
**structures**
371:2
**struggling**

**255:23**
**studied**
306:3 314:6,9,14
  369:12
**studies**
260:15 262:21
  263:4,7,23 264:4
  264:12,24 265:6,8
  265:15,19 271:23
  272:23 274:17,20
  274:21,24 275:1
  275:15,15,19,22
  276:3,7,25 277:1
  277:4,6,8,13,15
  277:18,20 278:7,9
  278:22 279:11,12
  279:15,18,21,23
  280:3,6,20,22,25
  281:8,15 282:3
  284:4,8,19,23
  286:7,17,24,25
  287:3 288:15,19
  288:20 295:12
  306:7 307:14,24
  308:14,22 311:20
  311:21 312:11
  321:22,22,23
  322:1 324:9,19
  325:20 326:17
  327:3 330:9,14
  334:14 336:4,7
  341:10,10 342:8,8
  342:12,20 343:9
  343:17,20,23
  344:10 346:9
  350:22 351:9,15
  351:21 353:15
  355:17 359:23
  360:6,17,23 361:7
  361:18,20 362:1,5
  362:7,10,18 364:1
  367:22 369:15,24
**study**
257:14 263:13,14
  263:21 265:11,16
  265:19,21,22

266:4,9,19 267:7
267:9,15,18,21,23
268:7,9,20 269:6
269:9,11,11 270:2
270:4,7,9 271:1
273:10 278:24
279:4 282:8,16
283:1,5 284:5
291:11 300:6
302:19 303:1
304:5,8 306:10,14
306:19 307:18
308:21 309:1
320:22 324:11
325:3 327:1 335:6
341:24 343:10
345:5,16 356:25
361:14 362:21
363:4 364:5,11,13
364:14,15 369:21
**subject**
258:24 274:20,23
  335:17 336:7
  338:12
**submit**
320:2 344:6 353:8
**submitted**
259:23 344:3
**Subscribed**
377:22
**substance**
305:3,5
**substances**
285:24 303:10
**substantial**
330:1 356:22 360:7
  366:19
**substantially**
361:21
**subtypes**
321:10
**sufficient**
266:10 357:1
**suggest**
278:19,20 295:13
  296:20 370:13

**suggesting**
279:25 280:14
**suggestion**
286:13
**suggests**
292:10
**Suite**
246:8 247:24 249:7
  249:17 250:19
  253:11
**summarize**
296:22
**summary**
280:9 308:1 312:16
  321:18 323:9
  344:25
**superior**
293:7
**supervision**
376:10
**support**
294:8 311:14 313:7
  362:25 364:23
  365:25
**supported**
298:16 337:11
  338:8,9
**supporting**
294:13
**supports**
290:17 304:11
  345:13 357:13
**supposed**
287:1
**sure**
255:2 268:22,24
  270:24 274:5
  276:9 280:13
  283:11 284:13
  289:5 292:19
  295:3 298:20,23
  304:14 305:19
  307:5 308:12
  317:5 328:15
  331:12 334:3
  335:19 344:15

346:23 349:6
  350:16,19,25
  351:2 359:18
  368:11,15 370:7
**surface**
274:9
**surgical**
291:17,17 313:12
**surprised**
256:2
**survey**
318:3 337:1,5,13
  337:16,20
**susceptible**
280:20 289:16
**swear**
253:23
**sworn**
254:2 377:22
**symptoms**
313:12
**synergistic**
358:6,18 369:9,16
  369:24
**synergy**
370:10
**system**
363:11,17,21,23
  364:8,9 370:15,16
**systematic**
265:16 266:11,12
  270:3 284:3,9,17
  284:21 311:2,18
  312:14,17,18
  313:11 324:21,22
  342:21 355:7,12
  355:14 356:12
  357:12

---

**T**

**T**
297:2
**table**
361:8 362:6,6
**Tachibana**
251:24 261:13,18

Rebecca Smith-Bindman, M.D.

319:8,19
**take**
260:1 276:10 302:6
312:25 317:20
318:22 327:23
329:15 331:21
354:6 368:23
373:14
**taken**
246:6 278:5 286:18
310:25 319:1
331:5 347:16
354:10 369:2
376:4,12
**takes**
322:13
**talc**
251:17,22 266:17
266:22 268:2
270:14,16,19,22
271:5,16 273:12
275:10 276:8
283:6,15,23,25
287:12,17 288:4
288:16,21 292:4
293:7,20 302:12
302:20 303:1
313:3 314:7,15
322:6 329:24
330:7,10,17 332:8
345:7,11 352:21
358:25 359:20
362:21 364:12
365:10 367:8
369:25 372:15
**talcum**
245:6 253:13
259:21 269:20,24
271:7,15 274:8
275:21 285:13,19
285:23 286:18
287:5,15 290:8,12
290:22,25,25
291:8 292:11,13
293:4,8 294:20
307:13 313:11,15

313:19,23 314:1
314:17,20,25
315:5 316:7,18
318:15,19 320:5,7
320:10,12,17
321:2,6 322:11
323:7,20,22
339:11 343:19
346:6,16 352:16
354:25 355:9,18
357:25 358:1
360:21 361:1
362:25 365:22
366:19 369:18
372:3,7 377:6
**talk**
258:25 263:3
307:21 309:1
328:7 335:25
338:16 359:21
363:22 364:19
365:18
**talked**
254:18 260:16
272:3 276:13
282:4 307:12,18
311:25 322:18
336:24
**talking**
309:6 346:8
**talks**
269:6 335:21 363:4
**target**
345:14
**teach**
335:14,18
**teal**
258:9
**tell**
268:5 280:1 283:10
293:1 295:1,8
332:14 333:2
349:2
**tells**
302:13
**temporality**

313:1
**ten**
278:20
**tends**
291:3
**term**
305:22,25
**terms**
272:21 293:14,16
296:13 302:4
342:12,15
**Terry**
257:13,14
**tested**
272:9 318:16
**testified**
254:4 300:13,18
356:12
**testify**
254:2
**testimony**
333:19 359:11
373:14 375:8
376:7,13
**testing**
316:15,17,18,21
317:13,16 318:20
353:8
**Texas**
249:8,18
**text**
336:3,6
**textbook**
263:18 335:18
**textbooks**
335:16 363:22
**Thank**
260:22 262:6 264:7
276:20 297:12
317:12 318:11
327:18,21 331:15
346:25 368:22
**thankfully**
303:24
**Thanks**
317:24 366:18

**theoretical**
275:12,23
**theoretically**
344:20
**theories**
354:24
**thing**
310:15,16
**things**
254:13 280:1 296:8
302:5 356:21
365:11
**think**
254:21 255:6,14
256:18 258:10
259:22 260:23
261:17,20 264:24
265:8 266:2,3
272:1 274:7,15
278:20 280:25
281:11 283:23
287:22 292:5,18
293:17 294:11,13
299:5,6 303:12,21
307:15 309:13
310:13,21,25
311:9,16 312:7
313:9 314:8 316:9
320:9 321:4,5
323:6,13,16 324:6
324:20 326:11,11
332:13 333:5
334:10 338:10,15
339:13,14,21
340:14,18,18,19
340:21 344:20
357:11,14 358:4
364:9,12,16
367:11 373:20
**thinking**
304:13
**thinks**
334:16
**THOMPSON**
247:6
**thought**

266:15 311:22
312:9 341:6
**thousand**
268:10 269:17,17
**three**
269:18 272:19
347:5
**threshold**
290:19 292:13
**time**
253:8 254:11,18,20
258:23 305:20
317:4 318:24
331:3,7,16,20
344:2 347:14,18
350:22 354:8,12
368:25 369:4
374:7,9 376:5,6,8
**times**
248:18 272:19
344:12,17
**TINSLEY**
250:16
**tiny**
364:4
**tissue**
274:10 288:9,13
294:4 303:19,20
305:4,9 330:16
336:22 345:12,13
**tissues**
287:19 288:18
305:6
**title**
295:1
**today**
259:2 260:14 267:4
331:14
**today's**
253:8 372:25
**Toilet**
286:4
**told**
257:19
**topic**
263:13 266:7

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1214 of 1525
PageID: 63360
Rebecca Smith-Bindman, M.D.

Page 400

**topics**
263:16
**toss**
360:24
**total**
260:7 261:1
**toxic**
338:25 340:11,13
**trace**
313:19 320:11,14
330:17
**track**
264:1
**tract**
285:20 287:11
293:22
**transcribed**
376:10
**transcript**
259:12 261:3
276:16 297:11
317:10 319:11
324:24 327:17
375:6 376:12,15
376:17
**transcription**
342:25
**transition**
364:19
**translation**
367:23
**transport**
363:4
**travel**
287:1
**traveling**
362:22
**travels**
285:19
**treatment**
313:4
**tried**
272:18 296:22
**trivial**
311:1
**true**

270:6 274:22
296:11 315:1
346:6,14 375:9
376:11,23
**truly**
312:20
**truth**
254:3,3,3 279:6
280:4,5
**try**
332:22 344:21
368:2
**trying**
298:2 302:22 351:2
**tubal**
346:3,12,20
**tube**
371:8
**tubes**
287:6 363:16
370:22 371:7
**Tucker**
248:4 250:15
**tumor**
329:13
**turn**
297:13 345:4 348:8
348:12 360:10,13
**turned**
300:19
**turnover**
301:2 365:6
**turns**
370:24
**twice**
358:8
**two**
254:13,22 260:25
279:14 299:10
307:16 318:18,20
325:21 340:9
342:5 347:4 373:6
**two-page**
260:25
**type**
269:21 280:10

288:2 289:23
308:1,20 321:2,8
321:16,25 323:3
**types**
273:5,17 305:6
321:16

_____
U
_____
**UCSF**
251:24 368:19
**ultrasound**
371:16
**unavoidable**
308:1,20
**undergoing**
300:14 313:4
**underlying**
284:8,23 301:2
311:20
**understand**
255:23 266:16
267:20 274:4
302:3,7 341:22
365:9 368:2
**understanding**
318:18 321:13,14
333:9 353:7
354:18 368:8
373:10
**understands**
365:1
**understood**
325:19,19 332:2
**undertake**
323:23
**unfortunately**
364:13
**Union**
250:14
**United**
245:2 253:15
**unknown**
306:18
**unmeasured**
306:13
**unrestrained**

300:23
**use**
251:17,20 262:8
266:15,17 268:4
269:20,25 270:14
270:19,22 271:5,7
271:11,12,14,18
271:19,24,24
272:4,8,18,18
273:6,17 276:8
283:6,15,17,25
285:13 288:16,21
290:18 292:7
296:4,13 297:22
301:21 302:20
303:2 313:3,10
330:7,10 335:18
339:11 340:1
343:19,24 355:8
360:21 366:24
368:4,13 369:25
372:3,6
**users**
271:16 330:17
**uses**
265:22 357:24
**usual**
255:14
**usually**
371:14,23
**uterine**
287:18 288:17,22
**uterus**
363:16 370:22

_____
V
_____
**V**
297:2
**vagina**
288:6 363:10,15
364:17 371:7,19
372:10,15
**vaginal**
274:12 287:18
288:17,22
**vague**

268:3 312:8
**valid**
301:13 311:9,9,13
**validate**
282:12
**validated**
272:22
**validity**
272:10
**value**
293:16 361:21
**values**
310:15
**variable**
267:19
**variety**
307:25 308:17
**various**
273:5,17
**Verdoodt**
297:1
**verify**
261:5 282:10
**version**
262:9 335:22
356:13
**versus**
280:13 301:3
310:18,19 362:8
362:14 367:24
**video**
253:10
**videographer**
250:23 253:5,7,22
318:24 319:3
331:3,7 347:8,10
347:14,18 354:8
354:12 368:25
369:4 374:7
**Videotaped**
245:13 246:5
**view**
265:15 338:9
**views**
293:13 359:25
**violated**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1215 of 1525
PageID: 63361
Rebecca Smith-Bindman, M.D.

Page 401

373:10
**virus**
300:13 338:22
339:24 341:1
**vitro**
300:14 365:23
**voice**
256:24
**Volume**
245:17 246:6 251:4
253:18 254:1
319:6 375:15
377:21
**voluntarily**
352:18 353:1,20,25
**vulvar**
287:18 288:17,21

**W**
**wait**
299:15,19 367:19
**waive**
253:20
**want**
265:18 274:2 281:4
299:7 303:4 310:9
310:21 312:14
326:5 345:2
347:10 348:8
371:7
**Washington**
250:7
**wasn't**
344:15
**watch**
363:16
**watched**
286:24
**water**
370:22 371:15,18
**way**
257:6 258:20
267:19,24 268:1,8
272:13,16 278:16
278:18 279:25
287:2 301:8

322:14,17 330:7
334:10 341:11
348:16 366:18
371:9 372:2
**ways**
332:21
**week**
272:19
**weeks**
254:22
**weight**
306:25 307:7,16
**well-described**
338:18
**well-done**
355:14
**well-known**
263:20
**well-respected**
298:15 336:15
**went**
366:24
**weren't**
256:2
**We'll**
262:5
**we're**
258:24 262:2
350:23 370:21
371:13,14
**whatsoever**
364:18
**whichever**
309:8 334:15
**wide**
338:8
**widely**
294:2 336:20 337:2
337:11 338:7,8,8
**wide-open**
363:17,21 364:8
370:16
**Wilentz**
247:20
**withdraw**
267:6 295:21

**witness**
251:2 253:24 373:9
373:11 374:1
376:6,7,16
**witnesses**
374:1
**woman**
269:2 293:10
**women**
268:10,23 269:7,9
269:11,17,17
270:11,15,18,21
271:14 275:9,10
287:12 290:9,18
292:3,7 296:4
303:1 313:3
322:11 326:9
329:24 330:4,7,10
332:13 346:6,15
360:7 363:14
369:17 371:3
372:3,6
**women's**
270:8 285:20 293:9
293:22 370:18
372:9
**Woodbridge**
247:23,25
**word**
283:23 345:7
**words**
352:24 360:19
**work**
257:1 260:15 261:7
261:22,24 284:4
301:25 319:18
331:16,19,20
336:13 342:25
343:5 344:7
354:17 355:3,24
357:4 365:25
370:9
**worked**
254:14
**worse**
358:7,9

**worst**
281:23
**wouldn't**
274:10 291:7 292:7
326:12 329:23
335:25
**writing**
356:23
**written**
255:13 333:22
**wrong**
269:4
**wrote**
315:13 332:11
362:20

**X**
**XX**
376:15

**Y**
**Yeah**
260:4,22 268:18
273:1 282:14
295:1 309:25
312:1 324:21
329:5 347:6,11
**year**
271:25 299:10
**years**
269:12 270:19,21
271:12,15 335:20
**yesterday**
253:21 254:11,19
255:11,17 258:17
258:23 260:16
272:3 276:13
277:11 278:8
282:4 298:7 299:1
303:21 307:18
312:2 331:12
373:19
**yesterday's**
372:25
**York**
248:19,19

**Z**
**Zellers**
248:5 251:6 253:20
254:6 255:8,10
256:19 257:1
260:20,24 261:4
262:5,7,16,18
264:2,8,20,22
270:7 272:14
273:4 275:4
276:18,21 277:3
277:14 279:10
283:4,11 284:16
285:10,18 286:15
287:3,9 288:25
289:8 290:21
291:6,21 293:6
294:1,15 296:12
297:13 298:20,24
299:9,16,20
301:20 302:17
303:6 304:11,24
307:11 308:6,8
309:8,13,16,17
310:8 311:5
313:22 314:22
315:7 316:2,5,11
316:17 317:5,7,11
317:22,25 318:22
319:7,12 320:3,16
321:1,12 322:9
324:10,25 326:14
326:16 327:8,19
327:23 330:6,24
336:25 347:3
356:1,6 357:6
358:3,21 359:3,7
359:24 366:2
368:7,16,23
372:20,22 373:5
374:6

**$**
**$1,500**
261:17
**$1,700**

Rebecca Smith-Bindman, M.D.

261:25
**$221,000**
269:2
**$3,000**
261:1

**0**

**0.92**
280:6
**07095-0958**
247:25

**1**

**1**
259:14 276:22
277:5,19 278:11
279:13 319:1
325:23 360:14
361:3
**1.0**
310:10,19 311:6
**1.12**
280:13
**1.19**
309:4,22 311:6
**1.2**
310:10,19 311:7
**1.29**
280:4
**1.3**
340:15,20
**1.38**
309:4,22 311:6
**1.4**
280:13
**1.52**
280:4
**1.63**
280:6
**1:16**
331:5
**10**
247:24 258:16
270:21 271:12,15
371:3 374:4
**10-15**

255:12
**10/18**
251:24
**10:47**
318:24 319:1
**100**
250:18 344:15
**10036**
248:19
**101**
263:1
**108,870**
269:7
**109,000**
268:21
**11:00**
319:2,3
**11:16**
331:3
**11:17**
331:5,7
**11:37**
347:14,16
**11:40**
347:17,18
**11:45**
354:8,10
**112**
249:6
**12**
294:1 336:20
**12:15**
354:11,12
**12:34**
368:25 369:2
**12:41**
369:3,4
**12:48**
246:10 374:7,9
**1215**
328:5
**1216**
327:24
**13**
259:15 260:2
**13427**

245:24 246:12
376:1
**14**
352:11 360:2
**147**
251:14
**15**
255:12 261:25
348:8
**15-minute**
258:16
**1510**
249:17
**160**
260:8,9,10
**1650**
377:3
**17**
257:23 262:9,14,15
262:16,18 263:3
264:4 275:13
294:25
**1700**
246:8 253:11
**174**
295:7
**1800**
249:7
**19**
247:16 310:3
348:12 351:5
**19103**
377:4
**1976**
269:12 352:19
**1992**
328:7 329:8

**2**

**2**
256:15 262:10
266:13 310:14,24
319:4 325:24
352:11 360:13
362:6,6
**20**

340:6 371:4 375:11
**200**
340:14
**2000**
265:16 267:1,8
269:10
**20004**
250:7
**2003**
309:7,15
**2006**
269:12
**2007**
295:18 309:6
**2008**
276:13 294:20
**2010**
267:8 268:9 269:1
269:11,18 282:8
316:21
**2011**
324:11,17 326:23
327:14
**2012**
321:19 358:22
**2014**
270:13 271:1
**2017**
259:14 297:1 298:5
354:22
**2018**
259:15 260:2 282:5
282:7 283:4 298:9
**2019**
245:16 246:10
253:2,8 298:10,21
376:24 377:23
**202-828-5356**
250:9
**21**
273:7
**210-554-5549**
249:10
**212-735-2453**
248:21
**213-430-3301**

248:11
**218**
247:8
**25**
260:23 307:21
328:5
**250**
246:8 253:11
**254**
251:6
**259**
251:12
**26**
308:25 309:10,19
311:11
**261**
251:14
**27**
311:11
**2738**
245:9
**276**
251:17
**28**
251:12 259:6,11
260:3
**29**
251:14 261:2,5
**297**
251:20

**3**

**3**
256:15 266:13
**30**
251:17 269:12
276:14,15 360:11
**300**
340:14
**31**
251:20 297:9,10
**317**
251:22
**319**
251:24
**32**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1217 of 1525
PageID: 63363
Rebecca Smith-Bindman, M.D.

Page 403

251:22 317:8,9
**324**
252:2
**327**
252:4
**33**
251:24 257:25
319:9,10
**331**
251:9
**334-269-2343**
247:11
**34**
252:2 257:25
324:18,23 325:1,3
**347**
251:8
**35**
252:4 327:15,16
345:5
**354**
251:7
**36103**
247:9
**369**
251:9
**372**
251:6
**39**
312:25

**4**

**4**
248:18
**4th**
250:18
**4.5**
311:7
**4.7**
310:18 311:7
**4.9**
310:18
**41**
290:7
**42**
283:13

**42nd**
248:8
**47**
268:19

**5**

**5**
297:14,19
**50,000**
322:19
**500**
340:7
**51st**
377:3
**512-391-0197**
249:20
**515**
248:7

**6**

**6/1/17**
251:12
**600**
250:19
**61,000**
270:11
**63102**
250:20

**7**

**75**
348:16
**78205**
249:8
**78701**
249:18

**8**

**8**
245:16 246:10
253:2,8
**816**
249:16
**877-370-3377**
377:5

**9**

**9:26**
246:9 253:3,9
**90**
247:23
**900**
247:24
**90071**
248:9
**924**
269:2
**92660**
247:17
**94111**
246:9
**975**
250:6

Exhibit 37

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IN RE JOHNSON & JOHNSON
TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY
LITIGATION

*THIS DOCUMENT RELATES TO ALL CASES*

MDL NO. 16-2738 (FLW) (LHG)

# RULE 26 EXPERT REPORT OF
## JUDITH ZELIKOFF, PHD

Date:   November 16, 2018

_____

Judith Zelikoff, PhD

## I.      BACKGROUND AND QUALIFICATIONS

I received my Ph.D in Experimental Pathology and Immunology at Rutgers: NJ Medical School (formerly known as University of Medicine and Dentistry of NJ) in 1982, after receiving a Master's degree from Fairleigh Dickinson University in Microbiology. My post-doctoral training was in toxicology at the NYU School of Medicine, Department of Environmental Medicine as a National Heart Lung Blood Institute (NHLBI) fellow.

I am currently a tenured-professor in Toxicology at NYU. As part of the NYU NIEHS (National Institute of Environmental Health Science) Center of Excellence, I serve as Director of the  Community Engagement Core. In this capacity, I engage with environmentally-impacted underserved communities throughout New Jersey and New York to better engage the community to achieve long-term and sustainable outcomes, processes, relationships, discourse, decision-making, and implementation regarding environmental health. These goals are carried out through town hall meetings, focus groups, listening sessions, forums on relevant environmental concerns, surveys, as well as outdoor and indoor measurements of toxic metals such as lead, cadmium, mercury, and arsenic in water, air, and soil. I also provide service to the NYU School of Medicine as a member of the Grievance Committee, Institutional Animal and Use Committee (IACUC) and as an NYU Senator representing the School of Medcine.

I have served in numerous leadership positions in the field of toxicology, including NIH Study Sections, United Nations Environmental Programme, NASA boards, and National Academy of Science Panels (i.e., Institute of Medicine, National Research Council and Engineering, and Medicine's Board on Earth Sciences and Resources), as well as Environmental Protection Agency study sections and advisory boards concerning the toxic effects of air pollution, metals, and alternative tobacco products. Furthermore, I served for two years (2010-2012) as a member of the National Toxicology Program (NTP) Board of Scientific Advisors. In this capacity, I reviewed documents and provided input and guidance on the toxicity of various chemicals that were nominated for review and sent to the NTP for study and/or discussion. In some cases, we also decided on the carcinogenicity of specific compounds.  I was not part of the NTP 10 ROC or 12 ROC, both of which deferred the decision on talc.

In addition, I presented about 150 international/national papers in the areas of toxicology and environmental and public health.  I have organized several international toxicology meetings, served as editor for several toxicology/environmental public health books and authored numerous book chapters in the same areas. I have over 125 publications and book chapters in the area of immunotoxicology (for which I received a Lifetime Achievement Award from the Society of Toxicology), air pollution toxicology, metal toxicology, immunotoxicology, and developmental and reproductive toxicology associated with inhaled metals, mixtures, nanomaterials, dusts (i.e., World Trade Center Dust), and tobacco/nicotine toxicology.

I have held numerous executive positions in the Society of Toxicology (SOT) which includes three years as Secretary on the SOT Executive Council and one year as Chair of the Education Committee and Committee for Diversity Initiatives Committees. I have also provided leadership for four individual SOT Specialty Sections (SS). I have served as President of the Immunotoxicology, Metals and Ethical, Legal, Forensic and Societal Issues Specialty Section and currently serve as Senior Councilor of the Inhalation and Respiratory Specialty Section. I have received three major SOT awards including the Mentorship Award from "Women in Toxicology", Global Host award and in 2018, Education award for meritorious teaching skills in toxicology. As a teaching scholar, I have taught and continue to teach toxicology on a global level in such countries as Thailand, Nigeria, South Africa, Tasmania and New Zealand.

My education, training and publications are further set out in my Curriculum Vitae, which is attached to this report as an **Exhibit A**.

## II.   MANDATE AND METHODOLOGY

Mandate:  I was asked to review the scientific literature and assess whether there is a biologically plausible explanation for the increased risk of ovarian cancer with the perineal use of talcum powder products.

The notion of biological plausibility is multi-factoral. As a part of my analysis, while considering the totality of the evidence, I evaluated the genital use of talcum powder products, the routes of exposure by which talcum powder could reach the ovaries, the composition of the talcum powder products, the biological and toxicological effects of talcum powder, and the potential mechanisms of carciogenisis. Biological plausibility does not mean proof of mechanism, but rather whether what is known about the products is consistent with a cause and effect relationship.

I performed an independent, comprehensive literature review using research databases and search enginges including PubMed, ToxLit and  Google to identify relevant literature. The keywords/phrases used initially for searching, included: talc, talcum powder, talc  and cancer, talc and toxicity, talc and toxicology, ovarian cancer, oxidative stress, talc and ovarian cancer, animal models and talc, talc powder and the immune response and talc chemical structure. Keywords and phrases expanded upon those terms in later searches.

More than 300 publications (research papers, reviews, abstracts, reports, documents) and book chapters from the 1960s to the present were identified as having some relevancy for the talc-ovarian cancer topic. Following closer scrutiny of these publications, between 200-250 research papers, scholarly reviews, abstracts, documents, reports were found critical for informing my opinion. Toxicological studies, including *in vivo, in vitro* and *ex vivo* investigations, were the topics most appropriate for my area of expertise.  In addition, I have reviewed depositions and numerous documents, internal memorandum

2

and published and unpublished studies and testing results that I have found in my own searches, documents provided by attorneys, and documents that I requested.  A list of materials and data considered for this report are attached as **Exhitit B**.

My opinions below are based upon my experience as a toxicologist and research scientist and have been reached through employing the same scientific methodology and rigor that I employ in my academic research and professional duties.  To my knowledge, I considered and evaluated the majority of all available relevant studies in the process of evaluating the literature, including those that reported an elevated risk of ovarian cancer with exposure to talc and those where other chemicals were reported within talc-based body powders, including those that did not find an increased risk. The same approach was used in evaluating the animal data and the mechanistic data.

## III.    TALC

Primary talc deposits are found on almost every continent around the world[1].  Talc is commonly formed by the hydrothermal alteration of magnesium- and iron-rich rocks (ultramafic rocks) and by low-grade thermal metamorphism of siliceous dolomites. Talc is the softest mineral on earth, mined around the world for use in a wide variety of products personal, cosmetic or industrial in nature. The word "talc" can refer to two things. The first is a mineral and the second is a commercially available product that can be used both industrially and in pharmaceuticals and cosmetics. For this report, when talking about the former, I use the term "mineral talc," and when talking about the latter, I use the term "talcum powder products."  Johnson & Johnson talcum powder products are classified as cosmetic talc.  Dermal contact (including perineal application of talcum powder products) is a primary route of human exposure, while inhalation also represents a route of  exposure for talc/talcum powder products.

As a mineral, talc corresponds to the chemical structure of hydrous magnesium silicate with a formula of $Mg_3Si_4O_{10}(OH)_2$ and a theoretical chemical composition, expressed as oxides, of 31.7% by weight magnesium oxide (MgO), 63.5% silicon dioxide ($SiO_2$) and 4.8% water ($H_2O$). Talc belongs to the silicate subclass phyllosilicates and is known as a sheet silicate. It is the softest mineral on Mohs' hardness scale, and it's structure and chemical bond arrangement is such that it is easily broken into thin sheets.  The structure consists of three sheets that are octahedrally coordinated magnesium hydroxide groups (brucite layer) layered between 2 layers of tetrahedrally linked silica layers. The apical oxygen atom positions of the tetrahedral layers are shared with one of the oxygen atom positions of the octahedral layer. The composite sheets repeat every 9.4 angstroms and the triple-sheet crystalline units are held together by van der Waals forces. Talc particles are normally plate-like in shape, but may form mineral fibers, as discussed below.

---

[1] https://minerals.usgs.gov/minerals/pubs/commodity/talc/mcs-2017-talc.pdf

3

Small amounts of aluminum and ferric (III) iron can substitute for silicon in talc tetrahedral sites. Trace amounts of nickel and small to moderate amounts of ferrous (II) and ferric (III) iron, aluminum and/or manganese can substitute for magnesium in talc octahedral sites. Additionally, talc deposits may contain varying amounts of quartz, nickel, chromium and cobalt, as well as asbestos or asbestos-forming minerals including amphibole (tremolite, actinolite, antigorite and anthophyllite) and serpentine (chrysotile) (Cralley, 1968; Lockey, 1981; McCarthy 2006; Rohl, 1976). The pH of cosmetic talcs are usually alkaline (8.0-9.5) and are insoluble in water, cold acids or in alkalis.

Talc powder particle size depends on the process used to make the powder. Johnson and Johnson's analysis of particle size in talcum powder shows particles range on average from 0.8 µm to over 50 µm, with a median particle size of 11.39 µm, where approximately 43.9% of particles are less than 10 µm (JNJTALC00878141).

## A.    Fibrous Talc

As a mineral, talc is most commonly found in plate-like form, but may also form as true mineral fibers that are asbestiform (IARC 2010, IARC 2012). Asbestiform talc (also known as fibrous talc) is different from talc containing asbestos. Fibrous talc fibers are very long and thin and occur in parallel bundles that are easily separated from each other by hand pressure (IARC Monographs, 2010). The 2010 IARC clearly states that the term 'asbestiform fiber' means any mineral, including talc, when it grows into an asbestiform habit. In its fibrous form, talc has been classified as a Group I, known carcinogen (IARC 1987 Supp 7; IARC 2010; IARC 2012). OSHA considered fibrous talc exposure limits to be equivalent to those of asbestos (OSHA, 1972). In 2010, IARC expanded the Group 1 designation ("known carcinogen") from "talc containing asbestiform fibers" to "talc containing asbestos or other asbestiform fibres." (IARC, 2010). Additionally, the American Conference of Governmental Industrial Hygienists (ACGIH) clarifies that "talc may also take the form of long thin fibers (fibrous talc) and can occur in bundles that are easily separated (asbestiform talc). Asbestiform talc should not be confused with talc containing asbestos…" (ACGIH, 2010).

Asbestiform talc fibers have been reported by Johnson & Johnson and Imerys to be found in: mines from which ore for Johnson & Johnson talcum powder products were sourced; in talcum powder used in Johnson & Johnson talcum powder products; and in the Johnson & Johnson talcum powder final product.[2]

Recent TEM testing on historic samples of Johnson's Baby Powder from 1978 showed the presence of fibrous talc in the product (Longo & Rigler, Feb 2018 MAS Report). Additional TEM testing of 30 samples of J & J baby powder and Shower to Shower dating from a span of many years resulted in a finding of fibrous talc in 15 samples (Longo & Rigler, Aug 2017 Expert Report).

---

[2] See also:  IMERYS477879 (fibrous talc in Grade 66 Q1 composite); JNJ 000269848 (talc needles found in medicated powder 1971, see with TEM results in JNJ 000281921); JNJ 000245002 (Fibrous talc in Hammondsville mine 1970)) .

4

## IV.    ASBESTOS

Asbestos, like talc, is a naturally occurring silicate mineral, but with a different crystal structure (Mossman & Churg, 1998).  Asbestos is a generic name referring to a group of naturally occurring mineral silicate fibers. It is recognized as a known human carcinogen by the U.S. Occupational Safety and Health Administration (OSHA), the U.S. Environmental Protection Agency (USEPA) and the National Toxicology Program (NTP)(OSHA, 2014; USEPA, 1995; NTP, 2016).  The National Institute for Occupational Health (NIOSH) has stated there is no safe level of asbestos and the American Conference of Governmental Industrial Hygienists (ACGIH) characterizes it as a "confirmed human carcinogen" (NIOSH, 1980; ACGIH, 2017).  All forms of asbestos are Group 1 carcinogens (carcinogenic to humans)(IARC, 2012).

The U.S. EPA defines asbestos by limiting the term to 6 specific fibrous minerals from two distinct groups: chrysotile (from the Serpentine group); and amosite, crocidolite, tremolite, actinolite and anthophyllite (from the Amphibole group). "Asbestiform" describes the pattern of growth of a mineral that is referred to as a "habit" (IARC, 2010).  Minerals with a "non-asbestiform" habit have crystals that grow in two or three dimensions, and "cleave into fragments, rather than breaking into fibrils" (*Id.*). Chrysotile occurs in the asbestiform habit, whereas, of the amphiboles, amosite and crocidolite occur only in the asbestiform habit, and tremolite, anthophyllite and actinolyte can occur in asbestiform or non-asbestiform habits.  OSHA defines an asbestos fiber as having a length > 5mm and a length:width aspect ratio of 3:1, whereas the USEPA definitition incorporates the aspect ratio of > 5:1 (OSHA, 1992; USEPA, 1987).

While amphibole and serpentine asbestos may have fibrous habits, they have very different forms. The amphiboles are double-chain silicates also called inosilicates. The basic structural unit is $(Si_4O_{11})^{-6}$ with side groups that are responsible for the overall amphibole structure. Amphiboles are distinguished from one another by the amount and positioning of metal atoms including: sodium, calcium, manganese, magnesium, iron(II), iron(III) and aluminum.  Traces of these types of asbestos are extracted when other minerals are being mined and, due to inefficient or non-existant separation techniques, are ultimately incorporated into the final product. Even incidental contamination by amphibole forms of asbestos is hazardous enough to cause asbestos-related illnesses (Rohl & Langer, 1976).

The serpentine group of minerals has the formula $Mg_3Si_2O_5(OH)_4$ and the structure resembles a bending sheet.  Chrysotile is the only one in which the sheets are bent to form continuous tubes, which gives the mineral the fibrous habit related to asbestos. Chrysotile is very flexible and less likely to be "friable" than the amphiboles. Friability of asbestos is generally defined as the ability to easily be turned into a dust with finger pressure. It is this friability that can release asbestos fibers and potentially result in health problems.

### A.    Asbestos in Talc

Associated minerals found in commercial talc products vary from deposit to deposit depending on the formation conditions. The most common minerals associated with talc include chlorite, magnetite, dolomite, calcite, mica, quartz and fluoapatite (Fiume et al., 2015). In its natural form, some talc also contains asbestos, classified as a Group I, "known carcinogen" by IARC (IARC Monographs, 1973, 1977, 1987, 2012). Amphiboles and serpentine fibers have been associated with many talc deposits (Van Gosen, 2004; Marconi and Verdel, 1990; Lockey, 1981; Rohl and Langer, 1974; Gamble et al., 1979; Kleinfeld et al., 1973, 1974; Pooley, 1972 (JNJ000319762); Chidester, 1968).  The close proximity of asbestos and talc in mineral deposits makes extraction of either material alone difficult, if not impossible.  (Rohl and Langer, 1974; IARC, 2010; Dion et al. 2010 [3]).

Cralley (1968) analyzed twenty-two commercially available cosmetic talcum products (manufacturers not reported).  Authors reported the fiber content ranged from 8% - 30% (by count) with an average of 19% and that the fibrous material was predominantly fibrous talc.  Pooley and Rowlands (1975) analyzed twenty-seven talc powders (cosmetic and industrial) and detected tremolite fibers in three samples.

Because asbestos is a known carcinogen, its presence in cosmetic talc is unacceptable (FDA, 2012; FDA 2015).  The former Director of National Institute for Occupational Safety and Health (NIOSH) and former President of Industrial Minerals Association – North America (IMA-NA) stated in a recent deposition that if there were a fiber of asbestos in talcum-based products it would "certainly" provide a biologically plausible mechanism for increased lung disease, and that he suspected it would also have a "similar mechanism of disease in other tissues and organs" (Deposition of Robert Glenn, October 18, 2018, 341:15-342:3).

In 1976, specifications were developed for cosmetic talc requiring that no detectable fibrous, asbestos mineral be present (CTFA, 1990;  Fiume, 2015).  The talc industry, and specifically Defendants, developed a "zero tolerance" standard for asbestos in talc (IMERYS 170006; JNJ 000383662; JNJ 000001918). Despite this standard, the presence of asbestos in cosmetic talc has been reported in the literature, and Johnsom and Johnson indicated in a letter in 1973 that "asbestos-form particles cannot be removed from talc" and that the "Johnson & Johnson process for beneficiating Vermont talc…will not guarantee a zero tolerance for elongated particles" (JNJ 000233691).  In 1976, Rohl et al. tested 20 different talcs and powders including 20 body powders, baby powders, facial talcums, and also one pharmaceutical talc to determine their mineralogical and chemical composition. Where known, all were formulated prior to 1973. Of the 20 products, 9 contained detectable amounts of tremolite and anthophyllite, principally asbestiform, while some also contained fragmented forms of these minerals. The amounts ranged from tenths of a percent to over 14% by weight; two contained detectable amounts of chrysotile asbestos fiber. Eight samples contained quartz, seven ranging from 2 to 5%, with one as high as 35%. Analyses showed that the consumer products examined were rarely the pure mineral talc, but rather were mixtures of various minerals.

---

[3] Available online at:  http://www.irsst.qc.ca/media/documents/PubIRSST/R-755.pdf

In 1984, Paoletti et al. performed studies by electron microscopy to assess asbestos contamination in industrial and cosmetic talcs from the Italian market and the European Pharmacopoeia (Paoletti, 1984). Nine of the 25 pharmaceutical and cosmetic grade talcs contained tremolite fibers, with total percent asbestos concentrations ranging from 0.4% - 22%. About half of the talc powders revealed the presence of asbestos: in five samples chrysotile (a serpentine asbestos) was present, the others contained tremolite and anthophyllite (an amphibole asbestos).

Cosmetic and pharmaceutical talc products from deposits in Vermont, Montana, North Carolina and Alabama were examined and tested positive for asbestos (Blount, 1991). The investigator of that study recently affirmed the samples included Johnson & Johnson baby powder, purchased off the shelf (Deposition of Alice Blount, PhD, April 13, 2018). The early analytical methods used to measure asbestos fibers before 1990 were not very sensitive and thus it appears that extrapolation of the levels of asbestos from counts measured before this date could have been conservative (Blount, 1991).

In a study that examined the amphibole asbestos content of commercial talc deposits in the USA, Van Gosen et al. (2004) found that the talc-forming environment directly influenced the amphibole and amphibole-asbestos content of the talc deposit. Specifically, the study found that contact metamorphic talcs showed a strong tendency to contain amphiboles, and regional metamorphic talc bodies consistently contained amphiboles, which display a variety of compositions and habits (including asbestiform). In a German study (Mattenklott, 2007), the author examined the presence of asbestos in talc powder and found that in one-quarter of the 57 talc powder samples tested, asbestos could be detected. Two samples contained quantities exceeding 0.1 weight percent which could reach a value of 10,000 fibers/m$^3$. This weight percent is, in some cases, half that reported by Johnson & Johnson in their internal documents, as seen in the corporate depositions reported below.

Defendants have claimed that asbestos has been "eliminated" from cosmetic talc products.[4] However, there is substantial evidence that talcum powder products still contain asbestos, recognized as a Group 1 carcinogen. During the recent deposition of John Hopkins (Johnson and Johnson corporate representative), Mr. Hopkins affirmed testing results showing the presence of asbestos in mines from which talc ore was taken for use in Johnson & Johnson baby powder products, processed talc used in Johnson & Johnson baby powder products, and in complete Johnson & Johnson baby powder products. Those results may be found at Exhibit 28[5] of Dr. Hopkins' deposition. Additional examples of testing performed by and commissioned by Johnson and Johnson and Imerys may be found at Exhibit 47 to the deposition of Julie Pier, corporate representative of Imerys.[6]

In 1975, McCrone Associates also confirmed the presence of amphibole particles, alone and in bundles as seen in Defendants' internal documents (JNJMX68_000012745). In 2004, a television station reported that Johnson's Baby Powder had been analyzed and found anthophyllite asbestos at 0.2% (JNJ 000089413). A 1972 Johnson & Johnson document demonstrates the presence of up to 5% chrysotile in

---

[4] PCPC Submission to FDA, July 2009 – "Since the early 1970's, the relevant industries voluntarily eliminated asbestos contamination from talc products."
[5] Ex. 28, John Hopkins Dep. (Aug. 16 & 17, 2018; Oct. 17, 2018; and Nov. 5, 2018).
[6] Ex. 47, Julie Pier Dep. (Sept. 12 & 13, 2018).

Johnson's Baby Powder and Shower to Shower samples (JNJ 000232996).    These data clearly demonstrate the possibility for women who used talcum powder during these dates to have had exposure to this ovarian carcinogen.

Recent TEM testing on historic samples of Johnson & Johnson baby powder from 1978 showed the presence of fibrous anthophyllite in the product.  (Longo and Rigler, 2018; Ex. 47, Pier Dep.). Additional TEM testing of 30 samples of Johnson & Johnson baby powder and Shower to Shower ranging in production date over a span of many years resulted in a finding of amphibole asbestos (tremolite, anthophyllite, richterite and actinolite) in 17 samples.  (Longo and Rigler, 2017).   Additionally, I have reviewed a recent report prepared by Dr. William Longo and Dr. Mark Rigler that reports that talcum powder products manufactured by Johnson & Johnson's Baby Powder and Shower to Shower have contained and continue to contain asbestos and talc containing asbestiform fibers (e.g. talc occurring in a fibrous habit).[7]  These results were obtained from testing talcum powder product samples manufactured during the period of the 1960s through the 1990s.  Results showed 37 of 56 samples tested contained tremolite and/or anthophyllite asbestos, and 41 of 42 samples tested contained fibrous talc.

*The substantial evidence of the presence of asbestos and fibrous talc in talcum powder products provides a biologically plausible explanation for the increased risk of ovarian cancer associated with the perineal use of talcum powder products.*

## V.    HEAVY METALS

### A.    Properties of Heavy Metals

*__Nickel__* is classified by IARC as a human carcinogen (Group 1) (IARC, 1973, 1976, 1979, 1982, 1987, 1990).  The exact mechanisms of nickel-induced carcinogenesis are not known, but likely involve genetic and epigenetic routes. Nickel (II)-induced genotoxicity may be aggravated through the generation of DNA-damaging reactive oxygen species (ROS) and the inhibition of DNA repair by this metal. Nickel exposure also causes a broad spectrum of epigenetic effects.  Contact with nickel compounds can cause a variety of adverse effects on human health (Zambelli and Ciurli, 2013).

Nickel ions have been shown to cause single-strand DNA breaks and DNA-protein crosslinks (Patierno, 1985).  In a study by Patierno (1985), Chinese hamster ovary cells were exposed to $NiCl_2$, and nickel-induced DA-protein crosslinking appeared in late S phase of the cell cycle (*Id.*).  Authors associate these alterations as an early event in the process of nickel transformation (*Id.*).

Contact with nickel compounds can cause a variety of adverse effects on human health, such as nickel allergy in the form of contact dermatitis, lung fibrosis, cardiovascular and kidney diseases and

---

[7] Expert Report of William E. Longo, PhD and Mark W. Rigler, PhD (Nov. 14, 2018).

cancer of the respiratory tract. Chronic non-cancer health effects may result from long-term exposure to relatively low concentrations of pollutants (Duda-Chodak and Blaszcyk, 2008).    Although the accumulation of nickel in the body through chronic exposure can lead to a number of diseases, the most serious concerns relate to nickel's carcinogenic activity. Increased risks of malignant tumors, such as nasal and sinusoidal cancers, and cancers of the lung and larynx have been noted (IARC, 1987). The marked differences in the carcinogenic activities of various nickel compounds most likely reflect the differences in their uptake, transport, distribution and retention, and ultimately—the capacity to deliver nickel (II) ions to specific cells and target molecules.

In experimental animals, nickel compounds induce tumors at virtually all sites of application (Denkhaus, 2002; IARC, 1987; Zabmelli, 2013).  The routes of administration that were shown to produce tumors include inhalation, intramuscular, intrarenal, intraperitoneal, intraocular, subcutaneous and the intra-articular space (*Id.*).

**_Chromium_**  is a naturally occurring element found in rocks, animals, plants, soil, and volcanic dust and gases. It comes in several different forms, including trivalent chromium (chromium (III)) and hexavalent chromium (chromium (VI)).  In contrast, chromium (VI) compounds cause cancer in humans and in experimental animals and exert genetic toxicity in bacteria and in mammalian cells  *in vitro* (Fang, 2014; IARC, 2009).  Adverse health effects, other than cancer, associated with chromium (VI) exposure include occupational asthma, eye irritation and damage, perforated eardrums, respiratory irritation, kidney damage, liver damage, pulmonary congestion and edema, upper abdominal pain, nose irritation and damage, respiratory cancer, skin irritation, and erosion and discoloration of the teeth. Some people with extensive dermal exposure can also develop an allergic skin reaction, called allergic contact dermatitis (Bruynzeel et al., 1988).  Primary irritant dermatitis is related to the direct cytotoxic properties of chromium, while allergic contact dermatitis is an inflammatory response mediated by the immune system. During reduction to the trivalent form, chromium may interact with cellular macromolecules, including DNA (Wiegand et al., 1985), or may be slowly released from the cell. Complexes of chromium (III) that are bound to lower molecular weight ligands are most likely to be able to traverse cell membranes.

Chromium  (III) has weak cell membrane permeability, allowing it to cross the cell membrane, where it can bind to DNA and cause lesions, resulting in genetic damage such as strand breaks and DNA-protein crosslinks (Nickens, 2010).  This damage leads to genomic instability.  Another study has shown that chromium (III) causes DNA damage in cells by interfering with base pair stacking in the cell's replication cycle, and chromium (VI) intercalates DNA – both directly cause genotoxicity in vivo (Fang, 2014).

Hexavalent chromium compounds are classified by IARC as carcinogenic to humans (Group 1)(IARC, 2009). Mechanistically, they have been shown to cause direct DNA damage after intracellular reduction to Cr(III), mutation, genomic inistability, aneuploidy, and cell transformation (*Id.*).  Chromium (VI) can cause damage leading to dysfunctional DNA replication, aberrant cell cycle, DNA strand breaks, dysfunctional DNA repair and DNA-protein crosslinks and directly causing genotoxicity (Nickens, 2010).

Besides direct genotoxic effects of chromium (VI), chromium compounds such as chromate can activate transcription factors involved in inflammation and tumor growth (IARC, 1990). Major factors

governing the toxicity of chromium compounds are oxidation state and solubility. These compounds, which are powerful oxidizing agents and thus tend to be irritating and corrosive, appear to be much more toxic systemically than chromium (III) compounds, given similar amounts and solubilities. Chromium (VI) enters many types of cells and, under physiological conditions, can be reduced by hydrogen peroxide ($H_2O_2$), glutathione (GSH) reductase and ascorbic acid to produce reactive intermediates, including chromium (V), chromium (IV), thiyl radicals, hydroxyl radicals, and ultimately, chromium (III). Any of these species could attack DNA, proteins and membrane lipids, thereby disrupting cellular integrity and functions (De Mattia, Bravi *et al.* 2004). Besides cancer, chromium is one of the most common skin sensitizers. It also causes toxicity of the kidney, liver, gastrointestinal tract, and cardiovascular, hematological and  reproductive systems along with causing developmental effects.[8] High doses of chromium (VI) compounds have been reported to cause developmental toxicity in mice and shown to potentiate the effects of other toxicants, including the nephrotoxins, mercuric chloride, citrinin, hexachlorobutadiene, and maleic acid.

*Cobalt*   IARC declared that cobalt metal with tungsten carbide is *probably carcinogenic to humans (Group 2A)*, while cobalt metal without tungsten carbide is *possibly carcinogenic to humans (Group 2B)*. Two different mechanisms of genotoxicity, (1) DNA breakage induced by cobalt metal and especially hard metal particles, and (2) inhibition of DNA repair by cobalt (II) ions contribute to the carcinogenic potential of cobalt compounds (Lison et al., 2001; IARC, 2006). Cobalt can also contribute to allergic reactions. In humans, gastrointestinal absorption of cobalt has been reported to vary between 5 and 45% and it has been suggested that absorption is higher in women than in men. Cobalt can be absorbed through intact human skin (IARC, 2006). Soluble cobalt salts interfere adversely with cell division, bind irreversibly to nucleic acids in the cell nucleus, induce chromosome aberrations in plants, and are weakly mutagenic in some *in vitro* tests. Injections or implantation of cobalt metal, alloys and compounds induced local and sometimes metastasizing sarcomas in rats, rabbits, and mice (*Id.*).  Data indicating possible carcinogenic effects of cobalt alloys or compounds in human populations has arisen from medical use, use in hard-metal industries, and from cobalt production sites.

### B.      Metals in Talcum Powder Products

In an early paper by Cralley et al., (1968), 22 cosmetic talcum products purchased off the shelf were analyzed for fibrous content, selected metals and quartz. In these studies, 19 samples contained cobalt under 25 parts per million (ppm) by weight, chromium under 22 ppm, nickel below 29 ppm and manganese under 78 ppm. Certain samples had a nickel content of 1270 ppm, chromium 340 ppm and 1210 ppm nickel; qualitative tests demonstrated that some of the chromium was hexavalent (carcinogenic form). All of these talcs had a considerable fiber content (suggesting the presence of asbestos) (*Id.*). Studies here suggest that women who used talcum powder in the 1960s could have been exposed to considerable amounts of toxic heavy metals depending on the type of talc used and frequency of use (*Id.*).

---

[8] Accessible online at:  https://www.atsdr.cdc.gov/csem/csem.asp?csem=10&po=10

In a 2013 study by Rehman, toxic and carcinogenic heavy metals were found to be present in small amounts in all 30 brands of cosmetic talcum powder tested; the concentrations of heavy metals differed dramatically depending upon the brand of talcum powder (Rehman, 2013).  Heavy metals measured (and found in samples) included cadmium, chromium, copper, cobalt and lead.  Authors found all levels to be within safe limits.  However, authors caution that excess use of talcum powder affects the health of the consumer (*Id.*).

In a paper by Gondal et al. (2012), published in Applied Optics, lead and chromium were measured in talcum powder using laser-breakdown spectroscopy.  Using this system, the authors were able to detect 15-20 parts per million (ppm) of lead and 20-30 ppm of total chromium in the talcum powder sample. This study, like that by Rehman, demonstrates the presence of toxic heavy metals associated with talcum powder.  However, the levels of heavy metals in this study were significantly higher. The method used for measuring metals in this study was far more precise than that used by Rehman et al. (2013). This study supports the presence of toxic and potentially carcinogenic metals in some talcum powders.

According to Johnson & Johnson's corporate representative, the maximum amount of allowable nickel in the company's talcum powder products was 5 ppm (Deposition of John Hopkins, August 16, 2018, Ex. 3). Written specifications state that the maximum allowable nickel content is 10 ppm (JNJ 000629320; JNJ000488188;  JNJMX68_000022920). Despite these limits, nickel in concentrations exceeding 2000 ppm were reported in Vermont talc used in talcum powder products for decades, greatly in excess of the product specification limit of 10 ppm (JNJ 000629320; JNJ 000488188; JNJMX68_000022920).  Examples of testing results for heavy metals in Defendants' talcum powder products can be found in **Exhibit C**, attached to this report.

Over the years from 1972 to 2004, talc mined in Vermont had consistent, excessive levels of nickel, routinely exceeding 94 to 250 times the upper limit provided in J&J's specifications (Exhibit C). This is troubling considering nickel is a known carcinogen (IARC 2012).

Cobalt was found in Vermont talc ores in amounts ranging from 8 – 89 ppm from 1972 through 2004.  Like nickel it, too, appears to occur routinely in talc products in amounts exceeding the 10  ppm upper limit for heavy metals in the talc product specifications (Exhibit C).

Internal documents outline Johnson & Johnson's concern regarding the potential carcinogenic nature of chromium (VI), a Group I carcinogen (JNJ 000131758;  JNJ 000131754; JNJ 000378044; JNJ 000378046).  A 2010 J&J memo written discusses raising the upper limit acceptable for total Cr to 7 ppm (JNJ 000131758).  An accompanying memo also discusses the relationship between chromium (III) and chromium (VI) (JNJ 000131754), and a discussion of the inhalation of hexavalent chromium is contained in this document. Regardless of valence, Grade 66 analyses consistently show total chromium contents far in excess of 5-, 7-, or 10 ppm. During the period from 1972 thru 2004, the chromium content varied from 25 ppm to 569 ppm (Ex. 47, Pier Dep.), with typical levels around 200 ppm.

Interestingly, there is a significant difference between the reported chromium content of Grade 66 talc when the sample has been prepared by Johnson & Johnson (internal) method BPT 148 versus the

11

United States Pharmacopeia (USP) method which uses a total digestion technique (IMERYS-A_0015621). The levels reported using the USP method were much higher than the Johnson & Johnson method (*Id.*).

### C.      Fragrances

There are more than 150 different chemicals added to Johnson's Baby Powder and Shower to Shower products. I reviewed the expert report from Dr. Michael Crowley that concludes that some of these chemicals may contribute to the inflammatory response, toxicity, and potential carcinogenicity of Johnson & Johnson's talcum powder products.[9] I concur with his opinion.

*There is substantial evidence that talcum powder products contain excess levels of nickel, chromium, and cobalt, all known carcinogens and/or inflammatory agents. Moreover, a significant number of the fragrance chemicals added to talc elicit an inflammatory response. Each of these elements individually and together can contribute to an inflammatory response caused by the product. As will be explained in more detail below, inflammation is a known mediator of ovarian cancer. The presence of these inflammatory agents provides additional biologic evidence explaining the causal relationship between genital use of talc and ovarian cancer.*

## VI.      EXPOSURE – TALC PARTICLE ACCESS TO THE BODY

### A.      Exposure Routes

Based on the tenets of toxicology, there are four basic routes of human exposure including: inhalation, ingestion, dermal and injection.

A common exposure route for cosmetic talc is via the dermal route, including vaginally after perineal application. Talc body powders are often applied to the perineum for hygienic purposes. It has been shown that glove powder and other materials can migrate upwards through the female reproductive tract (Venter & Iturralde, 1979; Iturre and Venter, 1981; Sjosten et al., 2004; Heller et al., 1995) and the data are supported by animal investigations (Wright et al., 1996; Edelstam et al., 1997; De Boer, 1972; Henderson et al., 1986), also reflective of a dermal exposure route.

Inhalation is the route of exposure that has been most commonly studied to assess talc toxicity. In one inhalation study, after talc exposure of hamsters, there was a consistent elevation in cytotoxic enzyme levels, and macrophage phagocytosis was persistently depressed (Beck et al., 1987). These results also indicated that, when a similar mass of talc and granite dust (12% quartz) was deposited in the lungs,

---

[9] Expert Report of Michael Crowley, PhD (Nov. 12, 2018).

talc caused more lung injury than did granite (*Id.*).  Based on its physical properties talc, in a powder form, can be inhaled while being applied (EPA, 1992; IARC, 2010).  Additional evidence that application of talc body powder products results in inhalation exposure of talcum powder is provided in a 2017 study by Longo, et. al., and other studies (Longo, September 2017, "*Below the Waist Application of Johnson & Johnson Baby Powder*"; Wells, 1979; van Huisstede, 2010; Frank and Jorge, 2011; Jasuja, 2017).

### 1.      Dermal - Migration Through the Upper Genital Tract

*Animal models*:      Though animal studies have limitations due to the differences in anatomy, they provide evidence that talc can migrate through the reproductive system.  Rats were exposed vaginally or via the perineum to either talc or no treatment for 3-mo on a daily basis (Keskin et al., 2009). In this study, there was evidence of foreign body reaction and genital infection, along with an increase in inflammatory cells in all the genital tissues. While no neoplastic changes were observed, the number of ovarian follicles in the talc groups were increased. No peritoneal changes were observed. The investigators concluded that talc by perineum exposure has adverse effects on the genital system in the form of foreign body reactions and infection (*Id.*).

In a series of two experiments, Henderson et al. (1986) demonstrated the presence of talc in the ovaries of two groups of animals following vaginal and intrauterine talc applications, whereas none was present in the ovaries of control animals. Particles were also seen in animals that had received intravaginal talc that were sacrificed after 4 days.  (*Id.*)

Studies by Wright et al. (1995) also demonstrated the potential toxicity of retrograde uterine passage of particulate matter. Despite the aforementioned studies which demonstrate the plausibility of talc translocation, a study by Wehner et al. (1996) failed to demonstrate the same outcomes in a small sample of monkeys, which may have been due to the small sample size.

*Human studies*:      A number of human studies over many years have observed migration of particles following vaginal administration: these studies began as early as 1961 when Egli and Newton studied the translocation of carbon particles following vagina application. In 1972, De Boer deposited colloidal carbon black (CB) suspension in the uterus, cervical canal or vagina in over 100 patients prior to surgery (De Boer, 1972). Subsequent observation revealed rapid translocation of CB to the oviducts and beyond. Some CB deposited in the cervical canal also translocated to the uterine passage, albeit in a lower percentage of patients (*Id.*).  An early study by the National Institute of Occupational Safety and Health (NIOSH) in 1972 showed commercially available talc body powder samples contained fibers, and that exposure to fibers occurred during diapering (JNJ 000231304).

A study by Venter and Itteralde (1979) administered radiolabeled human albumin microspheres (no size provided) in the vagina of patients, followed by surgical removal of uterus, oviducts and ovaries. Results demonstrated that 9 out of 14 patients had radioactivity in their oviducts and ovaries. Recent studies have demonstrated the presence of talc particles in ovarian tumors (to be discussed in a later section). Another clinical study examined a total of 24 women undergoing oopherectormy (Heller et al.,

1995). In this case, women were questioned as to their use of perineal talc applications. Ovarian tissue was removed from each group and analyzed and quantitated for talc by polarized light and electron microscopy. These data support the ability of talc to migrate from the perineal region upward and reach the upper genital tract (*Id.*).

Further evidence for migration of particles to the upper genital areas comes from a document from the FDA to Dr. Epstein (Cancer Prevention Coalition, University of Illinois, Chicago) concerning Citizen Petitions dated 1994 and 2008 and requesting a cancer warning on cosmetic talc products. In this document, the FDA stated that "the potential for particulates to migrate from the perineum and vagina to the peritoneal cavity is indisputable" (JNJ 000488318).

In addition, a 2004 document from Luzenac America to Dr. Al Wehner (IMERYS 137677) recalls a 2004 published paper by Sjosten et al. (2004). Luzenac states that the paper "offers some compelling evidence **in support** of the 'migration' hypothesis." The paper concluded that starch particles migrate from the vagina through the Fallopian tubes up to four days after examination with powdered gloves (*Id.*). The author of the Luzenac document goes on to state that combining this evidence with the theory that talc inititates epithelial inflammation and you have a "potential formula" for the NTP classification of talc as a carcinogen.

The most recent systematic review of the association between genital use of talcum powder products and ovarian cancer (Penninkilampi, 2018) reported an increased risk of ovarian cancer with increased perineal talcum powder use, with a slightly higher risk in women who report greater usage. Data was collected as "lifetime" usage – frequency of use over time. Any use was associated with increased risk of ovarian cancer as compared to no use, and women with long-term (> 10 years) talcum powder use had an increased risk. The authors concluded perineal talcum powder use and ovarian cancer were consistently associated, with a slightly higher risk in women who report greater usage.

Pathways that allow for the migration of particles to the lymph nodes are also available for that complex portion of the lymphatic system surrounding the ovaries. Importantly, studies by Chan et al. (2007) have demonstrated a positive association between lymphadenectomy and survival in stage 1 ovarian cancer patients. In support of this finding, Cramer et al. (2007) described the presence of talc particles in pelvic lymph nodes of a woman with ovarian cancer and long-term genital exposure to cosmetic talc.

*Animal and human studies demonstrate that talcum powder products can migrate from the perineal region to the ovaries.*

## 2.    Inhalation

Effects of size on particle translocation and toxicity have been studied most extensively with inhaled particulate air pollutants and nanomaterials. These studies will be discussed to provide a scientific

14

premise for movement of particles of a certain size throughout the body. Small-sized particles can enter the bloodstream – translocation of particles and often toxicity are related to their size; perhaps because of the larger mass concentration of smaller vs. larger particles (Driscoll et al., 1997).

J&J's analysis of particle size in talcum powder products shows particles range on average from 0.8 µm to over 50 µm, with a median particle size of 11.39 µm, where approximately 43.9% of particles are less than 10 µm (JNJTALC00878141).

Ultrafine particles (UFPs; < 0.1 µm) can directly affect the cardiovascular system by migration from the respiratory system to the systemic circulation (Nakane, 2012; Elder et al., 2006; Kreyling et al., 2006). Inhaled UFPs deposited in the lung can pass through the epithelial barrier because of their very small size; some particles may move into lung capillaries and then into the systemic circulation. Numerous studies and reviews have been written concerning the migration of these particles. In a systematic literature review (Nakane, 2012), particle size was shown to be a strong factor for migration. Particles that were translocated to various sites were observed to have the following sizes: ≤0.05 µm for remote organs, ≤1 µm for blood, and ≤10 µm for lung tissues. In order to be detected in the blood, particles that have passed through the epithelial barrier of the lungs must migrate into the capillaries. The largest chance for migration to the brain was observed at a 0.05-µm cutoff size. However, $MnO_2$ particles as large as 1.3 µm have also been detected in the cerebral cortex (Nakane, 2012). A categorical regression analysis based on currently available inhalation data showed that all of the effects of particle size, particle material, animal species, and exposure route were statistically significant (*Id.*). The effects were large for particle size and particle material, and small for exposure route and animal species.  These results suggest that, in an experiment to evaluate the migration of solid particles, the characteristics of the particles (i.e., size and material) should be considered carefully.

Evidence from an internal document (1971) demonstrates  rolled talc fibers between 0.1 - 3µm in a Johnson and Johnson's commercial product (JNJAZ55_000005957). Other documents from Defendants have demonstrated that while median particle size is ~10.5 µm, sizes can  be as small as 0.3 µm (IMERYS030347; IMERYS031791). V66 non-shear talc was approved for use in JNJ Shower to Showder products and the size of some of the particles had a diameter as small as 0.1 µm (JNJTALC000878141). While the median particle size was ~12 µm, the standard deviation was very high (~9µm) demonstrating a large range of particle sizes. Fine-size particles such as those found in talc, can also translocate readily throughout the body (Peters et al., 2006), providing a strong basis for the ability of fine-size talc particles (<2.5 µm to migrate throughout the body).

Ultrafine and fine particles can penetrate through the different tissue compartments of the lungs and eventually reach the capillaries and circulating cells. These particles are then translocated by the circulation to other organs including the liver, the spleen, the kidneys, the heart and the brain, and the ovaries where they may be deposited. It remains to be shown by which mechanism(s) ultrafine particles penetrate through tissue and enter capillaries. Lymph capillaries remove the large protein molecules and other particulate matter from the tissue spaces of the lung. Thus, cellular debris and foreign particles inhaled into the lungs can be conveyed to the regional lymph nodes.

Talc particle size analyses for many inhalation studies demonstrated that most talc particles were between 1 and 8 µm; 1 µm is considered ultrafine in size and thus particles could easily migrate from the lungs and throughout the body. Genofre et al., (2009) examined the effect of talc particle size on induced pleurodesis following intrapleural injection of rabbits with two different sizes of talc. One group contained mixed sizes of talc (mean size = 25.4 µm) and the other group small size talc only (mean size = 4.2 µm with 50% <6.4 µm) (*Id.*). Particles of both sizes migrated to the spleen, liver and kidney; more small talc particles (compared to mixed talc) was seen in the liver and kidneys. Both size particles produced an acute systemic inflammatory response, with small particle talc producing a more pronounced pleural and systemic response and resulting in greater particle deposition in the organs than the mixed talc (*Id.*). In addition, serum levels of the pro-inflammatory cytokine, IL-8 and VEGF were more markedly increased in the small talc group (*Id.*). Particles found in all systemic organs were <5µm. A number of other studies have shown migration of talc particles from the pleural cavity to the systemic circulation (Ferrer, 2002; Rossi, 2010). It appears that small particles may be more easily taken up by the lymphatics than larger particles. The inflammatory effects observed showed a strong correlation with the small particle group. This study shows that size of talc particles matter and the smaller the size the greater the ability to translocate and increase the extent of the inflammatory response. As Defendants' internal documents demonstrate their talc particle size to cover a wide size range (100 µm to ~0.3 µm) [10], there is extensive evidence that particles can be inhaled and transported through the blood and lymph to the ovaries.

In 1993, the National Toxicology Program (NTP) issued a report from a study concluding that there was "some evidence of carcinogenic activity" in male rats, "clear evidence of carcinogenic activity" in female rats, and no evidence of carcinogenic activity in male or female mice exposed to aersols of talc reported as nonasbestiform cosmetic-grade (National Toxicology Program, 1993). Authors of that study speculated these effects could be due to cytokines released from macrophages or a nonspecific effect of the stress of inflammation (*Id.*).

In another study, rabbits were injected with normal size talc (Dmax = 8.36 µm) or larger particles talc (Dmax = 12 µm) (Ferrer et al., 2002). Pleural inflammation was greater with normal talc than large talc, and animals receiving normal talc had talc particles in the liver, supporting the premise that talc particles instilled into the pleural cavity can escape and migrate to extrapleural organs. Talc dissemination can be significant, and granulomas have been seen to develop in the interstitium after particles migrate from the lungs, with resultant pulmonary interstitial fibrosis (Hollinger, 1990). In another study illustrating talc dissemination (Werebe, 1999), talc was administered into the pleural space of rats. At both 24- and 48-hours, talc crystals were found in every organ of all animals, with the amount of talc being statistically different between the organs. Authors concluded there was a rapid absorption of talc through the pleural surface and a progressive systemic distribution of particles (*Id.*).

In addition to migration of ultrafine particles through tissue and movement to the lymhph nodes, fine and coarse particles may be phagocytized by macrophages and dendritic cells which may carry the particles to lymph nodes in the lung or to those closely associated with the lungs (IARC, 2010). The uptake of fine particles (0.1–2.5 µm in diameter) by macrophages is a specific ligand-receptor mediated

---

[10] IMERYS346016; IMERYS030347; IMERYS031791; JNJAZ55_000005957.

actin-based process (phagocytosis), whereas the uptake of ultrafine particles (<0.1 μm in diameter) apparently occurs by other, non-specific mechanisms (Peters, 2006). These mechanisms are termed "adhesive interactions," and include electrostatic, van der Waals and steric inter-actions (*Id.*). Particles with a diameter of 0.2 μm and smaller appear to enter cells passively, that is by a mechanism which is different from phagocytosis. Larger particles are much more avidly taken up by macrophages, but by the specific receptor mediated, actin-dependent mechanism. Below the particle size of 0.2 μm, particles increasingly enter the macrophages by the non-specific "adhesive interaction" mechanisms mentioned above (*Id.*).

*There is substantial evidence in the scientific and medical literature that support a conclusion that talc powder particles can reach the ovaries through inhalation.*

## VII.   MECHANISM OF CANCER

### A.   Cancer - General

Tumorigenesis, the formation and growth of tumors, is a complex and multifactorial progressive process of transformation of normal cells into malignant ones (Pogribny and Rusyn, 2014). It is characterized by the accumulation of multiple cancer-specific heritable phenotypes, including persistent proliferative signaling, resistance to cell death, evasion of growth suppression, replicative immortality, inflammatory response, deregulation of energy metabolism, genomic instability, induction of angiogenesis, and activation of invasion ultimately resulting in metastases. It encompasses genetic, behavioral, and environmental factors that can all contribute to its development.

Mutations can occur as a result of the processes inside the cell, or alternatively, can be caused by external factors, such as chemicals. In addition, some people can inherit faults in particular genes that make them more likely to develop cancer. While normal cells obey signals indicating they have reached their growth limit, in cancer cells, the normal signaling system is disrupted. Mutations in particular genes may result in over- or under- production of proteins, or the production of abnormally formed proteins, all of which can lead to a lack of cellular regulation.

In general, cancer is an uncontrolled growth of abnormal cells in the body, which occurs when the body's normal control mechanisms are disrupted. Excessive cellular division leads to a growth called a tumor. Mutations can happen by chance when a cell is dividing. Some mutations act by inhibiting normal controls over cell growth, leading to uncontrolled cell division. DNA may be damaged during routine cellular processes, and cells have mechanisms to repair that damage. However, over time, the damage may accumulate. Once cells exhibit increased cell growth, they are more likely to pick up additional mutations and are less likely to be able to repair the damaged genes.

17

If the DNA damage cannot be repaired, the cell can self-destruct, a process called apoptosis. In cancer cells, molecules in the repair pathway are faulty. For example, a protein called p53 normally determines whether genes can be repaired or if the cell should undergo apoptosis.  Many cancers have a defective version of p53, and don't repair themselves properly. Thus, cancer cells can override self-destruct signals and don't undergo apoptosis when they should.

## B.    Genetic Mutations

*Inherited mutations* are passed down from parent to child and are present throughout a person's life in virtually every cell in the body. These mutations are also called germline mutations because they are present in the parent's egg or sperm (germ) cells.  When an egg and a sperm cell unite, the resulting fertilized egg cell receives DNA from both parents. If this DNA has a mutation, the child that grows from the fertilized egg will have the mutation in each of his or her cells.

A genetic predisposition (sometimes also called genetic susceptibility) is an increased likelihood of developing a particular disease based on a person's genetic makeup. A genetic predisposition results from specific genetic variations that are often inherited from a parent. These genetic changes contribute to the development of a disease, but do not directly cause it. For example, mutations in the *BRCA* gene result in an increased risk for ovarian cancer.  Some people with a predisposing genetic variation will never get the disease while others will, even within the same family. Genetic variations can have large or small effects on the likelihood of developing a particular disease. Although each of these variations only slightly increases a person's risk, having changes in several different genes may combine to increase disease risk significantly. Changes in many genes, each with a small effect, may underlie susceptibility to many common diseases, including cancer.

In people with a genetic predisposition, the risk of disease can depend on multiple factors in addition to an identified genetic change. These include other genetic factors (sometimes called modifiers) as well as lifestyle and environmental factors. Diseases that are caused by a combination of factors are described as multifactorial.   Most disease-causing gene mutations are uncommon in the general population. However, other genetic changes occur more frequently. Genetic alterations that occur in more than 1 percent of the population are called polymorphisms.

*Acquired (or somatic) mutations* occur at some time during a person's life and are present only in certain cells, not in every cell in the body. These changes can be caused by environmental factors such as ultraviolet radiation from the sun, chemical exposure, or can occur if an error is made as DNA copies itself during cell division. Acquired mutations in somatic cells (other than sperm and egg cells) cannot be passed to the next generation.

Environmental and occupational exposures to natural substances, as well as man-made chemical and physical agents, play a causative role in human cancer. Acquisition of cancer-specific alterations may be triggered by the mutational and/or non-mutational (i.e., epigenetic) events in the genome which, in turn, affect gene expression and downstream phenotypes including persistent proliferative signaling, resistance to cell death, evasion of growth suppression, replicative immortality, inflammatory response,

18

deregulation of energy metabolism, genomic instability, induction of angiogenesis, and activation of invasion ultimately resulting in metastases.

Genotoxic carcinogens are agents that interact directly or after metabolic activation with DNA, causing mutations and leading to tumor formation. Non-genotoxic carcinogens are a diverse group of chemical compounds that are known to cause tumors by mechanisms other than direct damage to DNA. In a broad sense, carcinogenesis may be induced through either genotoxic or non-genotoxic mechanisms. However, both genotoxic and non-genotoxic carcinogens also cause prominent epigenetic changes (Pogribny and Rusyn, 2013). Disruption of epigenetic processes can lead to altered gene function and malignant cell transformation. Global changes in the epigenetic landscape are a hallmark of cancer.

The presence of talc particles in the ovaries (deep in the tumor) of some ovarian cancer patients and presence of talc in pelvic lymph nodes provides indirect evidence for talc carcinogenicity (Heller et al., 1996). Changes in signal transduction pathways that lead to increased and chronic inflammation are also associated with cancer, as are changes in cancer stem cells which have the ability to generate tumors through the processes of self-renewal and differentiation into multiple cell types. Cancer stem cells are thought to play a major role in tumor escape, chemoresistance/recurrence of ovarian cancer. Users of talcum powder have lower plasma levels of anti-MUC1 antibodies than non-users (Karageorgi et al., 2010). MUC1 is a protein highly expressed by ovarian, breast, and endometrial tumors, and low levels of anti-MUC1 antibodies are associated with poorer prognosis. Reducing immunity to MUC-1 could be one mechanism by which talc increases endometrial and/or ovarian cancer risk (Karageorgi et al. 2010).

## C.    Ovarian Cancer

There are two major categories of ovarian carcinogenesis based on the idea that tumors are heterogeneous: high-grade malignancies that tend to be fast growing and chemo-sensitive, and low-grade neoplasms which typically grow slowly, but are less sensitive to chemotherapy. The low-grade pathway is associated with a stepwise mutation process, whereas the high-grade develops through genetic instability (Lengyel, 2010). Ovarian cancer comprises at least five distinct histological subtypes, the most common and well-studied being high-grade serous ovarian cancer. The majority of these tumors arise from the distal end of the fallopian tube and evolve from premalignant lesions called tubal intraepithelial carcinoma (Saad, 2010). Several risk factors have been associated with increased risk of ovarian cancer and include: low parity, infertility, early age of menarche and late age of menopause.

Multiple mechanisms can explain the progression of ovarian cancer  (Fleming et al., 2006; Fathalla, 2013; Saad, 2010; Smith and Xu, 2008). These mechanisms include: incessant ovulation- whereby repeated damage and trauma to the ovarian epithelium during ovulation increases the risk for genetic mutation and ovarian neoplasm during epithelium repair; pituitary gonadotropin changes- high levels of gonadotropins increase estrogen stimulation which can cause ovarian epithelial cells to become entrapped in inclusion cysts that undergo malignant changes; androgen/progesterone alterations-androgens stimulate ovarian cancer formation and progestins are protective; inflammation- factors that predispose to inflammation, such as endometriosis, PID, perineal talc use and hyperthyroidism could stimulate ovarian cancer. The molecular pathway in the inflammatory process involves intracellular

effectors implicated in malignant transformation such as VEGF, NF-κB, nitric oxide synthase, and cyclooxygenase (Williams et al., 1999).

Genetic mutations also play a role in the development of ovarian cancer. For example, certain mutations in the *BRCA1* or *BRCA2* genes increase a person's risk of developing ovarian cancer. Both inherited and acquired gene mutations work together to cause cancer. Even if one has inherited a genetic mutation that predisposes one to cancer, that doesn't mean he or she is certain to get cancer. Rather, one or more additional gene mutations may be needed to cause cancer. The inherited gene mutation could instead make one more likely to develop cancer when exposed to certain cancer-causing substances.

### D.    Roles of the Immune System

It is well established that inflammation has paradoxical roles during tumor development (Coussens and Werb, 2002). While acute inflammation can be protective against tumors, chronic inflammation provides an environment for the tumor to thrive. The net outcome of tumor-associated inflammation depends on the dominance of either tumor-promoting or tumor-suppressive actions. Inflammation normally functions to maintain tissue homeostasis in response to tissue stressors such as infection or tissue damage. However, studies also suggest a close association between inflammation and tumorigenesis (Rakoff-Nahoum, 2006).

Two stages of inflammation exist, acute and chronic inflammation (Ingersoll, 2011). Acute inflammation is an initial stage of inflammation (innate immunity), which is mediated through the activation of the immune system. This type of inflammation persists only for a short time and is usually beneficial for the host. Acute inflammation (e.g., involving innate immunity, macrophages, natural killer cells, neutrophils) frequently precedes the development of protective adaptive immune responses to pathogens and cancer.

Chronic inflammation, by contrast, has been shown to contribute to tumorigenesis at all stages (Crusz and Balkwill, 2015). It contributes to cancer promotion by inducing cellular proliferation; and to cancer progression by enhancing angiogenesis and tissue invasion. Over time, chronic inflammation can cause DNA damage and lead to cancer. Inflammation initiated by genital application of talc is likely to be sustained, since studies indicate that women start using talcum powder at an early age and continue using it for decades.

### E.    Ovarian Cancer and Inflammation

Inflammation plays an important role in the progression of ovarian cancer, and it is a biologically plausible mechanism that mediates ovarian cancer. Recent clinical and prospective data suggest that C-reactive protein (CRP), a marker of global inflammation, is associated with increased ovarian cancer risk (Li, 2017; Poole, 2013; Jing, 2017). Other inflammatory markers may be important in ovarian carcinogenesis. In premenopausal women, ovarian epithelial cells secrete cytokines as part of ovarian function and some of these cytokines are also produced by ovarian cancer cells (Jammal, 2016). Epithelial

20

cells in proximity to ovulating follicles are likely exposed to these inflammatory mediators that may signal oxidative stress, and enhance the risk of mutagenesis. Importantly, cytokines involved in ovarian function, follicle rupture, and repair (physiologic processes before menopause) are suggested to remain activated in postmenopausal women and may play an etiologic role in ovarian carcinogenesis; these cytokines include: interleukin (IL)-1α, IL-1β, IL-2, IL-6, IL-8, IL-10, tumor necrosis factor alpha (TNF-α), interferon gamma (IFN-γ), granulocyte colony- stimulating factor (G-CSF), and granulocyte macrophage colony-stimulating factor (GMCSF). Many inflammatory mediators, including prostaglandins, leukotrienes, and cytokines, are locally elevated during ovulation. Epithelial cells in proximity to ovulating follicles are likely exposed to these inflammatory mediators that may signal oxidative stress, and enhance the risk of mutagenesis. Moreover, IL-8, an important angiogenesis factor, is elevated in ovarian cancer patients and is believed to be a key factor for cancer growth and new vessel formation (Lane, 2011). Additionally, Saed et al. (2017) has reported that oxidative stress can play an important role in the pathogeneis, neoangiogenesis and dissemination of local or distant ovarian cancer.

Endometriosis is a pelvic disorder associated with inflammation and scarring. Studies also link endometriosis with the increased risk of epithelial ovarian carcinoma through pathways related to oxidative stress and inflammation (Melin, 2006; Worley, 2013). Studies indicate that women with endometriosis differ in the expression of inflammatory mediators, and changes in the cytokine network indicating immune dysregulation, which could contribut to the development of endometriosis (Pizzo, 2002). Wu et al. (2009) performed a study to determine the role of talc in the development of ovarian cancer, considering the history of endometriosis. Results demonstrated an increased risk of ovarian cancer with increasing frequency and duration of talc use; compared to never users, risk was highest among long duration, frequent talc users. A history of physician-diagnosed endometriosis was significantly associated with ovarian cancer in risks, and women who were talc users and had a history of endometriosis showed a 3-fold increased risk, and authors concluded risk of ovarian cancer is significantly associated with talc use and a history of endometriosis.

## VIII.   MECHANISM OF INFLAMMATION

Inflammation has long been associated with the development of cancer (reviewed by Heidland, 2006; Balkwill, Mantovani, 2001; Rakoff-Nahoum, 2006; Todoric, 2016). An inflammatory process begins when chemical mediators are released by the damaged tissue. The inflammatory response orchestrates host defenses and mediates tissue repair and regeneration in response to damage from chemical toxicants, foreign organisms or carcinogens. Epidemiological evidence points to a connection between inflammation and a predisposition for the development of cancer, i.e., long-term inflammation leads to the development of dysplasia (abnormal cell growth preceding cancer).

Inflammation is a well-established risk factor for all stages of carcinogenesis and tumor progression (Chow, 2012), including ovarian cancer (Maccio and Madeddu, 2012). Inflammation is a factor in a number of mechanisms regarding the etiology of epithelial ovarian cancer and a contributor to

ovarian tumor development and tumor progression (reviewed in Ness, 1999). Inhibition of inflammatory cytokines in the tumor milieu acts on inflammatory-induced angiogenesis and apoptosis and improves prognosis.    In a review paper by Ness and Cottreau (1999), talc and asbestos are discussed as risk factors for ovarian cancer, along with endometriosis and pelvic inflammatory disease which are all associated with induction of local cancer.

### A.    Cytokine Networks

The cytokine networks are very active in producing pro-inflammatory cytokines, growth factors, and chemokines, all of which are molecules active in immune system signalling. There is evidence that inflammatory cytokines and chemokines, which are produced by tumor cells and/or tumor-associated leukocytes, may contribute directly to malignancy. Tumor necrosis factor (TNF)-alpha, a major mediator of inflammation, has actions directed towards both tissue destruction and recovery. TNF can be detected in malignant and/or stromal cells in human ovarian, breast, prostrate, bladder and colorectal cancer, lymphomas and leukemias and often is associated with IL- 1 and -6 and macrophage colony stimulating factor. TNF-α is also implicated in the induction of a chemokine called MCP-1 which can regulate the macrophage and lymphocyte infiltrate and of MMP-9 in the ovarian tumor microenvironment. There is also evidence for pro-cancer actions of TNF-α in animal models. The molecular basis is thought to involve induction of ROS in the form of NO synthase. NO can directly oxidize DNA, resulting in mutagenic changes, and may damage some DNA repair proteins. Inducible NO synthase has been detected in gynegological cancers, including ovarian cancer.

### B.    Macrophages

The neoplastic process which consists of proliferation, survival and migration is linked with the tumor microenvironment and synchronized with the influx of inflammatory cells, including neutrophils and macrophages which are a main source of exogenous reactive oxygen species (ROS) (Forman and Torres, 2002). Macrophages and the innate immune system can be responsible for tissue injury, when in excess or continuous.

This can also indicate macrophage activation leading to excess production of other macrophage-generated mediators, including cytokines. Macrophages can engulf talc particles and play a critical role in disease. Moreover, macrophages are the major constituents in granulomas.  Talc can promote murine macrophage survival and DNA synthesis *in vitro* (Hamilton, 2001). Such enhancement of macrophage survival by talc, if it occurred *in vivo,* could lengthen the cells' tenure in a lesion with the result that more cells would be present to produce inflammatory mediators, such as cytokines, proteinases, and eicosanoids, perhaps potentiated by additional stimuli. This could be another mechanism as to how macrophage cell numbers increase in talc-induced granulomas and inflammatory reactions.

In a 2005 *in vitro* study (Bogatu and Contag, 2005), talc (as a fibrogenic dust) was shown to adsorb high density lipoprotein (HDL). The authors concluded that the adsorption of HDL could have a "causal relationship" with triggering of a fibrotic reaction. The adsorption on the surface of fibrogenic dust particles, including talc provides an opportunity for the intake of HDL by macrophages which then

22

release an increased amount of fibrogenic mediators. Coating of talc by HDL allows for more rapid uptake by the macrophage as it can use multiple receptors as points of entry into the cell. In general, surfaces of all fibrogenic particles, such as talc, have a specific property which is lacking in non-fibogenic (inert) particles or is at least significantly less effective. However, even upon overloading, non-fibrogenic dusts cannot produce fibrosis.

In another study (Ghio et al., 2012), both mesothelial and airway epithelial cells exposed to talc significantly increased iron importation and concentration of the iron storage protein, ferritin. The production of pro-inflammatory cytokines was also induced by *in vitro* talc exposure relative to control lung tissue, and a time-dependent and concentration-dependent release of oxidents was observed in both cell types. Talc toxicity was also observed in an *in vitro* study comparing effects of micro-scale talc particles with those of smaller nanotalc particles on lung cells (Akhtar, 2010). Cell viability was decreased for all talc exposures, and decreased as a function of talc concentration, origin and particle size. Nanotalc particles differentially induced lipid peroxidation, reactive oxygen species and depletion of the anti-oxidant, glutathione.  Further, data suggests that talc toxicity was mediated through oxidative stress.

A study by Khan et al. (2011) demonstrated that nanoscale talc, as opposed to larger talc particles enhanced its cytotoxicity. In this study, macrophages exposed to nanotalc increased the manufacture (transcription) of three macrophage-released pro-inflammatory cytokines and the phosphorylation of two signal transduction pathways.  The authors indicated that the inflammatory potential of nano talc particles might be (at least partially) a potential mechanism in talc-mediated pathogenicity.

An early study (Davies et al., 1983) in which the cytotoxicity of seven talcs was evaluated using rat peritoneal macrophage demonstrated modest, but consistent macrophage cytotoxicity visualzed by an increase in macrophage production of two enzymatic cell injury markers including lactate dehydrogenase (LDH) and B-glucuronidase (compared to *in vitro* treatment with a non-fibrogenic dust. This study points to the potential of talc to "activate" macrophage leading to increased production of macrophage-released mediators including pro-inflammatory cytokines. Some investigators have suggested such *in vitro* macrophage changes could predict fibrogenicity *in vivo*. Based on talc chemical analyses, the authors concluded that effects on macrophages were not due to contaminating minerals.

In a molecular cell study by Shukla et al. (2009), non-fibrous-containing talc at low concentrations caused increased expression of the gene Activating Transcription Factor (ATF genes modulates production of pro-inflammatory cytokines and growth factors in human lung cells) in cultured mesothelial cells at 8 hr and no changes at 24 hr, whereas expression levels of 30 genes were elevated at 8 hr at high talc concentrations.

Tumor necrosis factor (TNF)-α is a cell signaling protein produced by macrophages, primarily involved in the regulation of immune cells.  Pre-diagnostic serum levels of 46-inflammation –related biomarkers were measured in 149 incident ovarian cancer cases and matched controls. As his been discussed in several aforementioned sections of this Report, C-reactive protein (CRP), IL-1-α and TNF-α proved to all be significantly elevated and associated with increased cancer risk. In analyses restricted to serous ovarian cancer (n=83), the associations with CRP and IL-8 remained or strengthened. Thus, IL-8

23

can also be considered an inflammatory biomarker of ovarian cancer (Trabert et al., 2014), again demonstrating talc's action as an inflammatory agent.  Iron and its homeostasis are intimately tied to the inflammatory response (Wessling-Resnik, 2010).  Talc has been shown to modulate TNF- α and IL-6 production by its binding to iron (Ghio, 2011). TNF-α, like CRP, is a marker of various inflammation processes. TNF-α has been shown to play a role in later steps of carcinogenesis. For example, NF-κB activation by TNF- α is involved in neoplastic transformation, proliferation, and tumor survival. In addition, in ovarian cancer cells, TNF-α enhances cell migration and metastasis through the action of NF-κB. TNF-α was positively associated with ovarian cancer in case-control studies using serum samples collected at diagnosis.

### C.    Role of Oxidants in Ovarian Cancer

The chronic inflammatory states associated with infection and irritation may lead to environments that foster genomic lesions and tumor initiation. One effector mechanism by which the host system responds to insult is production of free radicals such as reactive oxygen species (ROS), hydroxyl radical (OH•) and superoxide (O$_2$-•) and reactive nitrogen species (RNS), nitric oxide (NO•) and peroxynitrite (ONOO). Primarily thought to be anti-microbial, these molecules form due to the activities of host enzymes such as myeloperoxidase, NADPH oxidase, and nitric oxide, which are regulated by inflammatory signaling pathways. Importantly, ROS and RNS lead to oxidative damage and nitration of DNA bases which increase the risk of DNA mutations.

During inflammation, macrophages, mast cells and neutrophils are recruited to the site of damage, which leads to a 'respiratory burst' due to an increased uptake of oxygen, and thus, an increased release and accumulation of ROS at the site of damage. A sustained inflammatory/oxidative environment leads to a vicious circle, which can damage healthy neighboring epithelial and stromal cells and over a long period of time may lead to carcinogenesis. Oxidative stress can also activate a variety of transcription factors. Activation of these transcription factors can lead to the expression of over 500 different genes, including those for growth factors, inflammatory cytokines, chemokines, cell cycle regulatory molecules, and anti-inflammatory molecules that can also be linked to cancer. Under a sustained environmental stress, ROS are produced over a long time, and thus significant damage may occur to cell structure and functions that could induce neoplastic transformation. In general, the longer the inflammation persists, the higher the risk of cancer.

Following an inflammatory stimulus, initiation of carcinogenesis mediated by ROS may be direct (oxidation, nitration, halogenation of nuclear DNA, RNA, and lipids), or mediated by the signaling pathways activated by ROS (Reuter, 2010; Saed, 2011; Saed, 2017). Hydrogen peroxide plays an important role in carcinogenesis because it is capable of diffusing through cell membranes and producing many types of cell injury. NO is another free radical implicated in carcinogenesis (Saed, 2017). iNOS, calcium-independent isoform, produces large amounts of NO and is only expressed during inflammation. ROS can specifically activate certain signaling pathways and thus contribute to tumor development through the regulation of cellular proliferation, angiogenesis, and metastasis.

24

## 1.      Talc-Induced Inflammation and Oxidative Stress

Even a single dose of a carcinogen can produce effects that are adverse to cells and tissue at the site of exposure.  *In vitro* studies provide a safe and effective vehicle by which to measure those effects in a controlled environment.

Carcinogenic potential of any compound can be determined by performing a well-established methodology called a neoplastic cell transformation assay. In a 2007 study by Buz'Zard, two human ovarian cell culture lines were treated in vitro with talc from 24 to 120 hr (Buz'Zard, 2007). Another group of talc-treated cells were also treated with a specific anti-inflammatory inhibitor to determine whether talc produced transformation through the production of inflammation.  Following talc treatment of both ovarian cell types, the cells' ability to grow in suspension, a key characteristic of neoplastically transformed cells, was measured - non-neoplastically-transformed normal cells cannot grow in suspension.  Results showed that treatment with talc can transform ovarian cells which further demonstrates the carcinogenic potential of talc. As anti-inflammatory treatment reduced formation of ROS and number of transformed colonies, a relationship between cell transformation and inflammation was demonstrated.  Interestingly, exposure of ovarian cells to talc also increased ROS generation in this study in a time and dose-dependent manner. These effects could be linked with neoplastic changes as chronic inflammation is associated with cancer induction and ROS are often seen as a component of the tumor microenvironment. Human neutrophils exposed to talc in this study also increased ROS generation significantly compared to control phagocytes.

In a study carried out by Keskin in 2009, rats exposed to talc produced an increase in ovarian follicles which could be related to the " ovulation theory" associated with ovarian cancer, thus demonstrating a plausible mechanism for talcum powder-induced ovarian cancer.

Recent data demonstrates the importance of oxidative stress in ovarian cancer.  The effects of talcum powder exposure on oxidative stress levels in normal ovarian epithelial cells, ovarian epithelial cells and cancerous ovarian epithelial cells were measured (Saed, 2017; Fletcher, 2018 (abstract)).  Studies indicate that epithelial ovarian cancer manifests a persistent pro-oxidant state through alteration of the redox balance by the up-regulation of several oxidant enzymes in epithelial ovarian caner tissues (Saed, 2018).  Advancing similar work, i n a recently accepted abstract, Harper and Saed report a mechanism by which talc enhances the pro-oxidant state in normal (ovarian and tubal) and ovarian cancer cells, through induction of gene point mutations (corresponding to known  specific single nucleotide polymorphisms - SNPs)  in key oxidant enzymes, altering their activities (Harper and Saed, 2018).

Emerging science by Fletcher (2018) demonstrated that talc-treated ovarian cancer cell lines and normal ovarian epithelial cells showed a marked increase in mRNA levels of pro-oxidant enzymes, including iNOS and MPO. This shift to a pro-oxidant environment indicates oxidative stress as early as 24 hours after exposure.  These recent facts provide strong support for the ability of talc to produce an oxidant state that leads to inflammation and in turn epithelial ovarian cancer.  This latter study shows that talcum powder enhances the redox state as part of the inflammatory cascade in both normal ovarian

epithelial cells and in ovarian cancer cells, revealing a plausible mechanistic underpinning for talc-induced ovarian cancer.

Another study by the same authors showed that talcum powder exposure increased levels of the cancer antigen, CA-125, in both normal ovarian cells and ovarian cancer cells.  (Fletcher and Saed, 2018). CA-125 is an antigen that is elevated in some patients with specific types of cancers, and is used as a biomarker for ovarian cancer detection, providing further information about talcum powder's carcinogenic properties.

In a study by Shim et al. (2015), inhalation of talc revealed infiltration of macrophages and the increased expression of the antioxidant, superoxide dismutase indicating oxidative stress in rats. Moreover, in the same study inhalation of talc demonstrated macrophage aggregations and oxidative damage in the lungs. Intrapleural injection of talc particles produced an acute serum inflammatory response, more pronounced with smaller particles (Genofre et al., 2009). In addition, talc exposure induced vasoconstriction in the brain via the action of superoxide anions (Mori et al., 1995). Non-fibrous talc at low *in vitro* exposure concentrations caused increased expression of transcription factors associated with the inflammatory process in a time and dose-dependent manner (Shukla et al., 2009). Nano-talc exposure enhanced the production of pro-inflammatory cytokines by macrophages *in vitro* (Khan et al., 2011). Also, pre-treatment of macrophage (prior to talc exposure) with inflammatory signal transduction inhibitors reduced TNF mRNA stability demonstrating their role in TNF mRNA stabilization and expression (Khan et al., 2011).

In an epidemiological study, talc exposure was significantly associated with ovarian cancer in women who lacked a specific anti-oxidant genotype (glutathione-S transferase M1/T1) (Gates et al., 2008). Finally, talc exposure increases COX2, an enzyme that plays a critical role in inflammation (Pace et al., 2006).

At high concentrations or chronic exposure, ROS can damage cellular macromolecules and contribute to neoplastic transformation and/or tumor growth.  Other likely manifestations of talc-induced inflammation include reduced fibrinolysis, activation of neutrophils and macrophages and increased production of cytokines and growth factors, and these have been suggested to occur in the peritoneum in response to contamination by surgical glove powder (Merritt et al., 2008).

*In sum, inflammation is a primary mediator of ovarian cancer.  As the scientific studies outlined above demonstrate, talcum powder products cause inflammation that can result in an elevation of biomarkers; changes in cell signaling; activation of chemokines and cytokines; changes in the oxidative environment; gene alterations and/or mutations; inhibition of apoptosis and induces neoplastic transformation and prolifearation (i.e., cancer). This talcum powder-induced inflammatory cascade provides significant biologic and toxicologic support for a conclusion that talcum powder products can cause ovarian cancer.*

### D.    Iron-Facilitated Inflammation

Talc particles can bind iron and iron facilitates inflammation and ROS production; surfaces of silicates including talc has a net negative charge on the surface which generates a capacity for the adsorption and exchange of cations like iron which has a high affinity for oxygen-donor ligands. According to J&J documents from Luzenac America Technical Center, heavy metal analyses on Grade 66 Non-Shear Disk Test Run samples demonstrated very high levels of iron (15,200 – 21,500 mg/kg) that could cause oxidative stress and an inflammatory response. Multiple studies have demonstrated that exposure to talc disrupts iron homeostasis, oxidative stress, and causes a fibro-inflammatory response (Akhtar et al., 2010; Ghio et al., 1992; Ghio et al., 2012). Talc exposure significantly increases iron importation and concentrations of ferritin (iron storage protein). The accumulation of iron, the accompanying oxidative stress, and inflammatory events after exposure to talc are comparable to those with other forms of particulate matter. The capacity of talc particles to support the *in vitro* generation of oxidants in an acellular environment was significantly affected by the concentration of associated iron, with talc-Fe producing a significantly greater signal for lipid peroxidation relative to talc alone (Akhtar, 2010). This relationship is supported by inhibition of the effect by addition of a metal chelator and a hydroxyl radical scavenger. The disruption of cell iron homeostasis is frequently associated with oxidative stress and inflammation.

## IX.    SUMMARY OF OPINIONS

I hold the following opinions to a reasonable degree of scientific certainty:

1.  Based on the scientific literature and the testing results that I have seen by Defendants and Drs. Longo and Rigler, it is my opinion that talcum powder products, including Johnson's Baby Powder and Shower to Shower, may contain known carcinogens, including asbestos, fibrous talc, and heavy metals. In addition, these products contain fragrance chemicals, many of which are inflammatory agents, toxicants, or potential carcinogens.

2.  Talcum powder can reach the ovaries through two routes with anticipated use: 1) perineal application (dermal) with migration/transport through the genital tract via the vagina, uterous, and fallopian tubes; and, 2) inhalation of talcum powder particles. Through either route, talcum powder and its constituents could reach the lymphatic system and bloodstream.

3.  Exposure to talcum powder products causes an inflammatory tissue reaction which may result in the following:
    a.  Elevation of increased inflammatory markers;
    b.  Changes in cell signaling;
    c.  Activation and/or release of chemokines and cytokines;
    d.  Changes in the oxidative environment;
    e.  Gene alterations and/or mutations;
    f.  Inhibition of apoptosis; and

     g.  Neoplastic transformation and proliferation

4.  Based on knowledge of the carcinogenic components of talcum powder products, the potential of the powder, with its components, to reach the ovaries and the resultant inflammatory tissue response, it is biologically plausible for talcum powder products to cause ovarian cancer.

     I reserve the right to amend or modify this report as new information becomes available.  I have not testified in litigation over the previous 4 years.  I am charging $ 350 per hour for my work on this matter.

# Exhibit A

**JUDITH TERRY ZELIKOFF, Ph.D.**
**Tenured Professor**

229 Mulberry Road
Ramsey, NJ 07446
H: (201)-934-6777
W: (845)-731-3528
Email: Judith.zelikoff@nyumc.org

## EDUCATION

**1973:**     Bachelor of Science (**Biology**)
Upsala College
East Orange, NJ

**1976:**     Master of Science **(Microbiology)**
Farleigh Dickinson University
Department of Biology
Teaneck, NJ,
in conjunction with,
UMDNJ-New Jersey Medical School
Department of Neuroscience
Newark, NJ
**Thesis Dissertation:**  Herpes Simplex Virus-IgM Specific Antibodies in
Guillian-Barre Syndrome

**1982:**     Doctor of Philosophy (**Experimental Pathology**)
UMDNJ-New Jersey Medical School
Department of Pathology
Newark, NJ
**Thesis Dissertation**:  Cytoskeletal Modifications of Human Fibroblasts
that Occur During a Complement-Dependent Cytotoxic Antibody
Response

## PROFESSIONAL EXPERIENCE

**1982-Present:**     *NEW YORK UNIVERSITY SCHOOL OF MEDICINE*
Institute of Environmental Medicine
Tuxedo, NY

**2005- Present: <u>Tenured Professor</u>**
*Laboratory of Pulmonary & Systemic Toxicology*

<u>Developmental Immunotoxicology</u>: Effects of fetal insults on later life
immune-related diseases in the offspring.

<u>Pulmonary Immunotoxicology:</u> Characterization of inhaled metal, gaseous,
and airborne pollutant mixtures including woodsmoke and tobacco smoke,
on pulmonary immune defense mechanisms and host resistance against
infectious disease and asthma.

Environmental Toxicology/Ecoimmunotoxicology: Effects of aquatic pollutants on the immune responses of fish; development of immune biomarkers. Alternate animal models for immunotoxicological studies.

**1995-2005: <u>Associate Professor</u> (Tenured in 1997)**
*Laboratory of Systemic Toxicology*

**1989-1995: <u>Assistant Professor</u>**
**1986-1989: <u>Research Assistant Professor</u>**
*Laboratory of Pulmonary Biology*
*Laboratory of Environmental Toxicology*

Environmental Toxicology: Characterization of aquatic pollutants and immune defense mechanisms of fish. Studies concerning drug bioaccumulation and metabolism in different fish species.

Inhalation/Pulmonary Toxicology: Effects of ambient pollutants on macrophage metabolism and immune function.

**1984-1986: <u>Associate Research Scientist</u>**
*Laboratory of Environmental Toxicology*

Genetic Toxicology: Clastogenic/mutagenic effects of complex environmental mixtures.

Cell Biology: Establishment of primary cultures for assessing the toxicity of environmental contaminants *in vitro.*

**1982-1984: <u>NIH (NHLBI) Post-Doctoral Fellow</u>**
*Laboratory of Environmental Toxicology*

Genetic Toxicology: Development of short-term *in vitro* bioassays to detect carcinogens, promoters and co-carcinogens in complex environmental mixtures.

**1977-1978: *PFIZER PHARMACEUTICAL***
*Laboratory of Chemical Carcinogenesis*
Maywood, NJ

**<u>Assistant Research Scientist</u>**
Laboratory studies using animal models and *in vitro* mammalian cell systems to investigate chemical- and viral-induced carcinogenesis.

**1974-1975: *VA HOSPITAL /UMDNJ-NEW JERSEY MEDICAL SCHOOL***
Department of Neuroimmunology
East Orange, NJ

**<u>Associate Research Scientist</u>**
Laboratory studies investigating the etiology of viral-induced neuropathologies

## TEACHING EXPERIENCE - NATIONAL

**1990-Present:**   *NEW YORK UNIVERSITY SCHOOL OF MEDICINE*
Department of Environmental Medicine
Tuxedo, NY
**Graduate Courses**
o   Global toxicology & community health (NYU Global College of Public Health: Organizer/Director, Fall, 2018; offered every year)
o   Environmental Immunotoxicology (Organizer/Director, 1993-present)
o   Organ System Toxicology (Director, 2001-present)
o   Toxicology (Biology-cross linked: Director, 2010 – present)
o   Communication Skills (Lecturer; 2010-present)
o   Principles of Toxicology (Lecturer; 1992-present)
o   Environmental Physiology of the Respiratory Tract (Lecturer; 1992– 1994)

**1979-1994:**   *WILLIAM PATERSON COLLEGE*
Department of Biology
Wayne, NJ

Adjunct Professor
**Undergraduate Courses**
o   Microbiology lecture and laboratory (1979 - 1984)
o   Human biology lecture and laboratory (1979 - 1994)

**1991-1994:**   *ROCKLAND COMMUNITY COLLEGE*
Department of Biology
Suffern, NY

Adjunct Professor
**Undergraduate Courses**
o   Microbiology lecture and laboratory

**1979-1982:**   *SETON HALL UNIVERSITY*
Department of Biology
South Orange, NJ

Research Scientist/Graduate Assistant
-Laboratory studies in immunopathology, virology, viral immunology, and microbiology

-**Undergraduate and Graduate Courses**
o   Bacteriology lecture and laboratory
o   Advanced Microbiology
o   Cell biology/Virology techniques

**1976-1979:**   *FAIRLEIGH DICKINSON UNIVERSITY*
Department of Biology
Teaneck, NJ

Adjunct Professor
**Undergraduate and Graduate Courses**
o   General biology lecture and laboratory

- o Human genetics
- o Immunology

## TEACHING EXPERIENCE - INTERNATIONAL

**2013-present** *UNIVERSITY OF PORT HARCOURT (Port Harcourt, Nigeria)*
Dept. of Toxicology
Lecturer in graduate toxicology course

**2002-present:** *CHULABHORN RESEARCH & GRADUATE INSTITUTE (Professor, Course Director)*
Department of Toxicology
Bangkok, Thailand
**Graduate Course (3 weeks- given every even year)**
- o Environmental Immunotoxicology and Reprotoxicology

**1999**         **1999-2000:**   *UNIVERSITY OF TASMANIA (Adjunct Professor)*
Department of Environmental Toxicology
Tasmania, Australia
**Graduate Course (2 weeks)**
- o Fish Immunology & Immunotoxicology (Organizer/Director; Lecture and Lab)

**1999-2000**:   *LINCOLN UNIVERSITY*
Department of Environmental Health Sciences
Christ Church, New Zealand
**Graduate Course (2 weeks)**
- o Fish Immunology & Immunotoxicology (Organizer/Director; Lecture and Lab)

## HONORS AND AWARDS
- 2018 – Society of Toxicology (SOT), Education Award
- 2015 – SOT, Women in Toxicology Mentorship Award
- 2013 – West African SOT (WASOT), Distinguished Recognition
- 2012 - 2014, SOT, Distinguished Service as SOT Secretary
- 2012 - SOT, Global Senior Scholar Host Award
- 2012 – SOT, Career Achievement Award in Immunotoxicology
- 2008 – Mid-Atlantic Chapter Society of Toxicology, President

## PUBLICATIONS
*Peer-reviewed Journals (In ascending order)*

1. Ende, N., E.V. Orsi, F. Buechel, N.Z. Baturay and **J.T. Zelikoff.** Antibodies to synovial derived cells in patients undergoing artificial prosthesis transplants. *J. Orthopedic Res.* 3: 78-83 (1985).

2. **Zelikoff, J.T**., J.M. Daisey, K. Traul and T.J. Kneip. Balb/c 3T3 cell transformation response to organic extracts of airborne particulate matter as seen by their survival in aggregate form. *Mutat. Res.* 144: 107-116 (1985).

3. **Zelikoff, J.T**., N. Atkins, T.G. Rossman and J.M. Daisey. Cytotoxicity of fine particles with and without absorbed polycyclic aromatic hydrocarbons using Chinese hamster lung cells (V79). *Environ. Internat.* 11: 331-339 (1985).

4.   **Zelikoff, J.T**., N. Atkins and S. Belman. Stimulation of cell growth and proliferation in NIH-3T3 cells using onion and garlic oil. *Cell Biol. Toxicol.* 2: 369-378 (1986).

5.   Ende, J., J. Grizzanti, E.V. Orsi, P.P. Lubanski, R.C. Amarusso, L.B. Reichman and **J.T. Zelikoff.** Sarcoid and cytotoxic lung antibodies. *Life Sciences* 39: 2435-2440 (1986).

6.   Rossman, T.G., **J.T. Zelikoff,** S. Agarwal and T.J. Kneip. Genetic toxicology of metal compounds: An examination of appropriate cellular models. *Toxicol. Environ. Chem.* 14: 251-262 (1987).

7.   Squibb, K.S., C.M.F. Michel, **J.T. Zelikoff** and J.M. O'Connor. Kinetics and metabolism in the channel catfish *Ictalurus punctatus. Veterinary Human Toxicol.* 34: 620 (1988).

8.   **Zelikoff, J.T**., J.H. Li, A. Hartwig and T.G. Rossman. Genetic toxicology of lead compounds. *Carcinogenesis* 9: 1727-1732 (1988).

9.   Schlesinger, R.B., A.F. Gunnison and **J.T. Zelikoff.** Modulation of pulmonary eicosanoid biosynthesis following exposure to sulfuric acid. *Fundam. Appl. Toxicol.* 15: 151-162 (1990).

10.  Schlesinger, R.B., K.E. Driscoll, A.F. Gunnison and **J.T. Zelikoff.** Pulmonary arachadonic acid metabolism following acute exposures to ozone and nitrogen dioxide. *J. Toxicol. Environ. Health* 31: 275-290 (1990).

11.  Schlesinger, R.B., L.C. Chen and **J.T. Zelikoff.** Comparative potency of inhaled acidic sulfate aerosols: The influence of specific components and the role of H$^+$ ions. *Environ. Res.* 52: 210-224 (1990).

12.  Schlesinger, R.B., P.A. Weideman and **J.T. Zelikoff.** Effects of repeated exposure to ozone on respiratory tract prostanoids. *Inhal. Toxicol.* 3: 27-36 (1991).

13.  **Zelikoff, J.T.**, N.A. Enane, D. Bowser, K.S. Squibb and K. Frenkel. Development of fish peritoneal macrophages as a model for higher vertebrates in immunotoxicological studies.  I. Characterization of trout macrophage morphological, functional and biochemical properties. *Fundam. Appl. Toxicol.* 16: 576-589 (1991).

14.  **Zelikoff, J.T**., G.L. Kreamer, M.C. Vogel and R.B. Schlesinger. Immunomodulating effects of ozone on macrophage functions important for tumor surveillance and host defense of the lung. *J. Toxicol. Environ. Health* 34: 449-467 (1991).

15.  Costa, M., N.T. Christie, O. Cantoni, **J.T. Zelikoff**, X.W. Wang and T.G. Rossman. DNA damage by mercury compounds:  An overview. Proc. of Advances for Mercury Toxicology. In *Advances in Mercury Toxicology* (T. Suzuki, Ed.), Plenum Press, NY.  pp. 255-273 (1991).

16.   Schlesinger, R.B., **J.T. Zelikoff,** L.C. Chen and P.L. Kinney. Assessment of toxicologic interactions resulting from acute inhalation exposure to sulfuric acid and ozone mixtures. *Toxicol. Appl. Pharmacol.* 115(2): 183-190 (1992).

17.   **Zelikoff, J.T**. and R.B. Schlesinger. Immunomodulation by sulfuric acid aerosol: Effects on pulmonary macrophage-derived tumor necrosis factor and superoxide production. *Toxicology* 76: 271-281 (1992).

18.   Cohen, M.D., E. Parsons, R.B. Schlesinger and **J.T. Zelikoff.** Immunotoxicity of *in vitro* vanadium exposure:  Effects on interleukin-1, tumor necrosis factor, and prostaglandin E2 production by macrophages. *Int. J. Immunopharmacol. Immunotoxicol.*  15: 437-446 (1993).

19.   **Zelikoff, J.T**. Metal pollution-induced immunomodulation in fish. *Ann. Rev. Fish Dis.* 2: 305-325 (1993).

20.   **Zelikoff, J.T.**, E. Parsons and R.B. Schlesinger. Immunomodulating activity of inhaled particulate lead oxide disrupts pulmonary macrophage-mediated functions important for host defense and tumor surveillance in the lung. *Environ. Res.*  62: 207-222 (1993).

21.   Enane, N.A., K. Frenkel, J.M. O'Connor, K.S. Squibb and **J.T. Zelikoff.** Fish macrophages as an alternative model for mammalian phagocytes. *Immunol.*, 80: 68-72 (1993).

22.   **Zelikoff,** J.T., R. Smialowicz, P.E. Bigazzi, R.A. Goyer, D.A. Lawrence, H.I. Maibach and D. Gardner.  Immunomodulation by metals. *Fund. Appl. Toxicol.* 22: 1-8 (1994).

23.   Bowser, D., K. Frenkel and **J.T. Zelikoff**. Effects of *in vitro* nickel exposure on macrophage-mediated immunity in rainbow trout. *Bull Environ. Cont. Toxicol.* 52: 367-373 (1994).

24.   Schlesinger, R.B., H. El-Fawal, **J.T. Zelikoff,** J.E. Gorczynski, T. McGovern, C.E. Nadziejko, and L.C. Chen. Pulmonary effects of repeated episodic exposures to nitric acid vapor alone and in combination with ozone. *Inhal. Toxicol.*  6: 21-41 (1994).

25.   Cohen, M.D., Z. Yang and **J.T. Zelikoff**. Immunotoxicity of particulate lead: *In vitro* exposure alters pulmonary macrophage tumor necrosis factor production and activity. *J. Toxicol. Environ. Health*  42: 377-392 (1994).

26.   **Zelikoff, J.T**., M. Sisco, Z. Yang, M.D. Cohen and R.B. Schlesinger. Immunotoxicity of sulfuric acid aerosol: Effects on pulmonary macrophage effector and functional activities critical for maintaining host resistance against infectious diseases. *Toxicology*  92: 269-286 (1994).

27.   **Zelikoff, J.T.**, J.E. Bertin, R.K. Miller, S. Tabacova, E.S. Hunter, E.K. Silbergeld, T.M. Burbacher, and J. Rogers. Health risks associated with prenatal metal exposure. *Fund. Appl. Toxicol.*  25: 161-170 (1995).

28.   **Zelikoff, J.T.**, K. Squibb, D. Bowser and K. Frenkel. Immunotoxicity of low level cadmium exposure in fish: Alternative animal models for immunotoxicological studies. *J. Toxicol. Environ Health*  45:235-248 (1995).

29.    Cohen, M.D., T.P. McManus, Z. Yang, Q. Qu, R.B. Schlesinger, and **J.T. Zelikoff**. Vanadium alters macrophage interferon-gamma interactions and interferon-inducible responses. *Toxicol. Appl. Pharmacol.* 138: 110-120 (1996).

30.    Cohen, M.D., **J.T. Zelikoff,** T.P. McManus, Q. Qu, and R.B. Schlesinger. Effects of ozone upon macrophage-interferon-gamma interactions. *Toxicology* , 114: 243-252 (1996).

31.    Cohen, M.D., Z. Yang, **J.T. Zelikoff**, and R.B. Schlesinger. Pulmonary immunotoxicity of inhaled ammonium metavanadate in Fisher-344 rats. *Fund. Appl Toxicol.* 33: 254-263 (1996).

32.    Cohen, M.D., S. Becker, R. Devlin, R.B. Schlesinger, and **J.T. Zelikoff.** Effects of vanadium upon polyI:C-induced responses in rat lung and alveolar macrophage. *J. Toxicol. Environ. Health* 51: 591-608 (1997).

33.    **Zelikoff, J.T**., M. Sisco, M.D. Cohen, Y. Tsai, P.E. Morrow, M.W. Frampton, M.J. Utell, and R.B. Schlesinger. Effects of inhaled sulfuric acid aerosols on pulmonary immunocompetence: A comparative study in humans and animals. *Inhal. Toxicol.* 9: 731-752 (1997).

34.    Rodgers, K., P. Klykken, J. Jacobs, C. Frondoza, V. Tomazic, and **J.T. Zelikoff.** Immunotoxicity of medical devices. *Fund. Appl. Toxicol.* 36:1-14 (1997).

35.    Luebke, R.W., P.V. Hodson, M. Faisal, P.S. Ross, K.A. Grasman, and **J.T. Zelikoff.** Aquatic pollution-induced immunotoxicity in wildlife species. *Fund. Appl. Toxicol.* 37:1-15 (1997).

36.    Anderson, M.J., M.G. Barron, S.A. Diamond, J. Lipton, and **J.T. Zelikoff**. Biomarker selection for restoration monitoring of fishery resources. ASTM STP 1317 (F. J. Dwyer, T.R. Doane, M.L. Hinman, Eds.), American Society for Testing and Materials. pp. 333 - 359 (1997).

37.    Cohen, M.D., J.T. **Zelikoff,** L.C. Chen, and R.B. Schlesinger. Pulmonary retention and distribution of inhaled chromium: Effects of particle solubility and co-exposure to ozone. *Inhal. Toxicol.* 9:843-865 (1997).

38.    **Zelikoff, J.T**. Biomarkers of immunotoxicity in fish and other non-mammalian sentinel species: Predictive value for mammals. *Toxicology* 129:63-71 (1998).

39.    Cohen, M.D., **J.T. Zelikoff,** L.C. Chen, and R.B. Schlesinger. Immunological effects of inhaled chromium alone and in combination with ozone. *Toxicol. Appl. Pharmacol.* 152:30-40 (1998).

40.    Beaman, J.R., R. Finch, H. Gardner, F. Hoffman, A. Rosencrance, and **J.T. Zelikoff.** Mammalian immunoassays for predicting the toxicity of malathion in a laboratory fish model. *J. Toxicol. Environ. Health* 56:523-542 (1999).

41.    **Zelikoff, J.T**., A. Raymond, E. Carlson, Y. Li, J.R. Beaman, and M. Anderson. Biomarkers of immunotoxicity in fish: From the lab to the ocean. *Toxicol. Lett.* 112-113:325-331 (2000).

42.     Barron, M.G., M. Anderson, D. Beltman, T. Podrabsky, W. Walsh, D. Cacela, J. Lipton, S.T. Teh, D. Hinton, **J.T. Zelikoff,** A.L. Dikkeboom, B.A. Lasee, S.K. Woolley, D.E. Tillitt, M. Holey, P. Bouchard, and N. Denslow. Association between PCBs, liver lesions, and biomarker responses in adult walleye (*Stizostedium vitreum vitreum*) collected from Green Bay, Wisconsin. *J. Great Lakes Res.* 3:156-170 (2000).

43.     Cohen, M.D., M. Sisco, Y. Li, and **J.T. Zelikoff,** and R.B. Schlesinger. Immunomodulatory effects of ozone upon *in situ* cell-mediated responses in the lungs. *Toxicol. Appl. Pharmacol.* 171:71-84 (2001).

44.     Sweet, L.I., and **J.T. Zelikoff.** The toxicology and immunotoxicology of mercury: A comparative review in fish and humans. *J. Toxicol. Environ. Health*-B 4:161-205 (2001).

45.     Palchaudhuri, S., A. Raymond, E. Carlson, Y. Li, and **J.T. Zelikoff.** Cytotoxic and cytoprotective effects of selenium on bluegill sunfish (*Lepomis macrochirus*) phagocytic cells *in vitro. Bull. Environ. Contam. Toxicol.* 67:672-679 (2001).

46.     **Zelikoff, J.T.**, E. Carlson, Y. Li, A. Raymond, and J. Duffy. Immunotoxicity biomarkers in fish: Development, validation, and application for field studies and risk assessment. *Human and Ecotoxicol. Risk Assess.* 8:253:263 (2002).

47.     Carlson, E., Y. Li, and **J.T. Zelikoff.** Exposure of Japanese medaka (*Oryziaslatipes*) to benzo(a)pyrene suppresses immune function and host resistance against bacterial challenge. *Aquat. Toxicol.* 56:289-301 (2002).

48.     Schlesinger, R.B., M.D. Cohen, T. Gordon, C. Nadziejko, J.T. Z**elikoff,** M. Sisco, J.F. Regal, and M. Ménache. Ozone differentially modulates airway responsiveness in atopic vs nonatopic guinea pigs. *Inhal. Toxicol.* 14:431-457 (2002).

49.     **Zelikoff, J.T.,** M.D. Cohen, L.C. Chen, and R.B. Schlesinger. Toxicology of Woodsmoke. *J. Toxicol. Environ. Health - Part B.* 5 (3):269-282 (2002).

50.     Cohen, M.D., M. Sisco, K. Baker,Y. Li, D. Lawrence, H. van Loveren, **J.T. Zelikoff,** and R.B. Schlesinger. Effect of inhaled ozone on pulmonary immune cells critical to antibacterial responses *in situ. Inhal. Toxicol.* 14:599-619 (2002).

51      Carlson, E., Y. Li, and **J.T. Zelikoff.** The Japanese medaka (*Oryziaslatipes*) model: Applicability for investigating the immunosuppressive effects of the aquatic pollutant benzo(a)pyrene. *Mar. Environ. Res.*   54:5 - 9 (2002).

52.     Duffy, J.E., E. Carlson, Y. Li, C. Prophete, and **J.T. Zelikoff.** Impact of polychlorinated biphenyls (PCBs) on the immune function of fish: Age as a variable in determining adverse outcome. *Mar. Environ. Res.* 54:1-5 (2002).

53.     **Zelikoff, J.T.**, K.R. Schermerhorn, K. Fang, M.D. Cohen, and Schlesinger, R.B. A role for associated transition metals in the immunotoxicity of inhaled ambient particulate matter (PM). *Environ. Health Perspect.* 110:871-875 (2002).

54.     **Zelikoff, J.T.**, L.C. Chen, M.D. Cohen, K. Fang, T. Gordon, Y. Li, C. Nadziejko, and R.B. Schlesinger. Effects of inhaled ambient particulate matter (PM) on pulmonary anti-microbial immune defense. *Inhal. Toxicol.* 15:101-120 (2003).

55.   Duffy, J., E. Carlson, Y. Li, C. Prophete, and **J.T. Zelikoff.** Exposure to a coplanar PCB congener differentially alters the immune responsiveness of juvenile and aged fish. *Ecotoxicol.* 12:251-259 (2003).

56.   Lippmann, M., Frampton, M., Schwartz, J., Dockery, D., Schlesinger, R., Koutrakis, P., Froines, J., Nel, A., Finkelstein, J., Godleski, J., Kaufman, J., Koenig, J., Larson, T., Luchtel, D., Liu L.J., Oberdorster, G., Peters, A., Sarnat, J., Sioutas C., Suh, H., Sullivan, J., Utell, M., Wichmann, E., and **Zelikoff, J.T**. The U.S. Environmental Protection Agency particulate matter health effects Research Centers Program: A midcourse report of status, progress, and plans. *Environ. Health Perspect.* 111:1073-1092 (2003).

57.   Adams, S.M., M.S. Greeley, D.G. Fitzgerald, J.M. Law, E.J. Noga, and **J.T. Zelikoff.** Effects of flooding from three sequential hurricanes on the health and condition of fish in Pamlico Sound, NC. *Estuaries* 112:221-230 (2003).

58.   Anderson, J.S., D. Cacela, D. Beltman, S.J. Teh, M.S. Okihiro, D.E. Hinton, N. Denslow, and **J.T. Zelikoff.** Biochemical indicators and toxicopathologic lesions assessed in smallmouth bass recovered from a polychlorinated biphenyl (PCB) contaminated river. *Biomarkers* 8:371-393 (2003).

59.   Carlson, E., Y. Li, and **J.T. Zelikoff.** Suppressive effects of benzo[a]pyrene upon fish immune function: Evolutionarily conserved cellular mechanisms of immunotoxicity. *Mar. Environ. Res.* 151:131-138 (2004).

60.   Carlson, E.A., Y. Li, **J.T. Zelikoff.** Benzo(a)pyrene-induced immunotoxicity in Japanese medaka (*Oryzias latipes*): Relationship between lymphoid CYP1A activity and humoral immune suppression. *Toxicol. Appl. Pharmacol.* 201:40-52 (2004).

61.   Duffy, J.E., Y. Li, and **J.T. Zelikoff.** CYP1A induction in PCB 126-induced immunotoxicity in a feral fish model. *Bull. Environ Contam Toxicol.* 74:107-113 (2005).

62.   Ng, S.P., A.E., Silverstone, Z-W. Lai, and **J.T. Zelikoff**. Effects of prenatal exposure to cigarette smoke on offspring tumor susceptibility and associated immune mechanisms. *Toxicol. Sci.* 89(1):135-144 (2006).

63.   Duffy, J.E., and **J.T. Zelikoff**. Use of a fish model to examine the relationship between PCB-induced immunotoxicity and hepatic CYP1A induction. *J. Immunotoxicol* 3:39-47 (2006*).

64.   Prophete, C., E.A. Carlson, Y. Li, J. Duffy, B. Steinetz, S. Lasano, and **J.T. Zelikoff**. Effects of elevated temperature and nickel pollution on the immune status of Japanese medaka. *Fish & Shellfish Immunol.* 21:325-334 (2006).

65.   Steinetz, B.G., T. Gordon, S. Lasano, T. L. Horton, S.P., Ng, **J.T. Zelikoff**, A. Nadas, and M.C Bosland. The parity-related protection against breast cancer is compromised by cigarette smoke during rat pregnancy: Observations on tumorigenesis and immunological defenses of the neonate. *Carcinogenesis* 27:1146-1152 (2006).

66.    Cohen, M.D., C. Prophete, M. Sisco, L.C. Chen, **J.T. Zelikoff**, J. Smee, M. Holder, G. Crans. Pulmonary immunotoxic potential of metals are governed by select physiochemical properties: Chromium agents. J. Immunotoxicol. 3:69-81 (2006).

67.    Ng, S.P., B.G. Steinetz, S.G., Lasano and **J.T. Zelikoff**. Hormonal changes accompanying cigarette smoke- induced pre-term births in a mouse model. *Exp. Biol. & Med.* 231:1403-1409. (2006).

68.    Iba, M.M., J. Fung, Chung, L., J Zhao, B. Winnik, B. Buckley, L.C. Chen, **J.T. Zelikoff,** Y. Kou. Differential inducibility of rat pulmonary CYP1A1 by cigarette smoke and wood smoke. *Mutat. Res.* 606:1-11 (2006).

69.    Ng, S.P. and **J.T. Zelikoff**. Smoking during pregnancy: Subsequent effects on offspring immune competence and disease vulnerability in later life. *Repro. Toxicol.* 23(3): 428-437 (2007).

70.    Naher, L.P., K.R. Smith, M. Brauer, C. Simpson, J,Q, Koenig, M. Lipsett, **J.T. Zelikoff**. Woodsmoke Health Effects: A Review. *Inhal. Toxicol.* 19:67-106 (2007).

71.    Cohen, M.D., C. Prophete, M. Sisco, L.C. Chen, **J.T. Zelikoff**, J. Smee, M. Holder, G. Crans, A. J. Ghio, J.D. Stonehuerner. Pulmonary immunotoxic potential of metals are governed by select physiochemical properties: Vanadium agents. *J. Immunotoxicol.* 4:49-60 (2007).

72.    Doherty, S.P., C. Prophete, P. Maciejczyk, K. Salnikow, T. Gould, T. Larson, J. Koenig, P. Jaques, C. Sioutas,  **J.T. Zelikoff**, M. Lippmann and M.D. Cohen. Use of iron response protein binding activity analysis to detect changes in iron homeostasis inducible by PM2.5 components. *Inhal. Toxicol.* 19:553-562 (2007).

73.    Duffy-Whritenour, J.E., and **J.T. Zelikoff.** Relationship between the immune and serotonergic systems in a teleost model. *Brain, Behavior and Immunity.* 22:257-264 (2008).

74.    Ng, S, and **J.T. Zelikoff**. Effects of prenatal cigarette smoke exposure on offspring immune parameters later in life. *J. Toxicol. Environ. Health 71:445-453* (2008).

75.    Dietert, R.R. and J.T. Zelikoff. Early-life environment, developmental Immunotoxicology, and the risk of pediatric allergic disease including asthma. *Birth Defects Research Part B – Developmental and Reproductive Toxicology* 44:231-240 (2008).

76.    Dietert, R.R. and **J.T. Zelikoff**. Pediatric immune dysfunction and health risks following early-life immune insult. . *Curr. Pediatr. Rev.* 5:36-51. (2009).

77.    Vancza, E., S,P, Ng, and **J.T. Zelikoff**. The role of parity status in cigarette smoke-induced modulation of immune tumor surveillance mechanisms: A mouse model. *J. Immunotoxicol.* 6(2):94-104. (2009).

78.   Ng, S.P., D. Conklin, A. Bhatnagar, Bolanowski, D.D., Lyon, J., and **J.T. Zelikoff**. Prenatal exposure to cigarette smoke induces diet- and sex-dependent dyslipidemia and weight gain in adult murine offspring. *Environ. Health Perspect*. 117(7):1042-1049. (2009).

79.   Doherty-Lyons, S.P., J. Grabowski, C. Hoffman, and **J.T. Zelikoff**. Early life insult from cigarette smoke may be predictive of chronic diseases later in life. *Biomarkers* 114:102-106 (2009).

80.   Tangjarukij, C., P. Navasumrit,  D. Settachan, **J.T. Zelikoff,** M. Ruchirawat. The effects of pyridoxine  deficiency and supplementation on hematological profiles, lymphocyte function, and hepatic cytochrome P450 in B6C3F1 mice. *J. of Immunotoxicol.* 6(3):147-160 (2009).

81.   Cohen, M.D., Sisco, M., Prophete, C., Yoshida, K., Chen, L-C., **Zelikoff, J.T.**, Smee, J., Holder, A.A., Stonehuerner, J., Crans, D.C. and A.J. Ghio. Effects of metal compounds with distinct physicochemical properties on iron homeostasis and anti-bacterial activity in the lungs: Cr and V. *Inhal. Toxicol.* 22:169-178 (2010).

82.   Dietert, R.R., and **J.T. Zelikoff.** Identifying patterns of immune-related disease: Use in disease prevention and management. *World Journal of Pediatric*s (Open Journal), 2010.

83.   Dietert, R.R., DeWitt, J., Germolec, D.R., and **J.T. Zelikoff**. Breaking patterns of environmentally-influenced disease for health risk reduction: Immune perspectives. *Environ. Health Perspect*. Doi: 10.1289/ehp.1001971 ( http://dx.doi.org/) .

84.   Duffy-Whritenour, J.E., R.Z. Kurtzman, S. Kennedy, and **J.T. Zelikoff.** Non-coplanar polychlorinated biphenyl (PCB)-induced immunotoxicity is coincident with alterations in the serotonergic system. *J. Immunotoxicol.* 120:45-51 (2011).

85.   Allina, J., Grabowski, J., Doherty-Lyons, S., Fiel, M.I., Jackson, C.E., *Zelikoff, J.T., and ˙Joseph A.   Odin (co-corresponding Authors). Maternal exposure to environmental stressors during pregnancy increased hepatic fibrosis and immune modulation in adult male offspring in a mouse model. *J. Immunotoxicol.* 8:258 (2011).

86.   Blum, J., Hoffman, C., and **J.T. Zelikoff**. Inhaled cadmium oxide nanoparticles alters reproductive outcomes and fetal growth. Toxicol. Sci. 126 (2): 478-486 (2012).

87.   Willis, D., Popovich, M.A., Gany, F., and **J.T. Zelikoff**. Toxicology of smokeless tobacco: implications for immune, reproductive, and cardiovascular systems. *J. Toxicol. Environ. Health* B. Critical Reviews. 15(5):317-331 (2012).

88.   Rajamani, K., Doherty-Lyons, D., Bolden, C., Willis, D., Hoffman, C., **Zelikoff, J.T.,** Chen, L.C., and Gu, H., Prenatal and Early-Life Exposure to High-Level Diesel Exhaust Particles Leads to Increased Locomotor Activity and Repetitive

Behaviors in Mice. *Autism Res.* 6(4): 248-257 (2013).

89.   Ng, S.P., Silverstone, A.E., Lai, Z.W., Harkema, J.R., and **J.T. Zelikoff**. Prenatal exposure to cigarette smoke suppresses anti-tumor cytotoxic T-lymphocyte (CTL) activity via changes in T-regulatory cells. *J. Toxicol. Environ. Health.* 76(19):1096-1100 (2013).

90.   Amrock, S.M., Gordon, T., Zelikoff, J.T., and Weitzman, M. Hookah use among adolescents in the United States: Results of a national survey. *Nicotine Tobacco Res.* 16(2):231-237 (2014).

91.   Vaughan J., Garrett B., Prophete C., Horton L., Sisco M., Soukup J.M., Zelikoff J. Ghio A., Peltier R., Chen L.C., and Cohen M.D. A Novel System to Generate WTC Dust Particles for Inhalation Exposures. *J. of Exp. Sci. and Environ. Epidemiol. 24(1):105-112 (2014).*

92.   Blum J.L., Rosenblum L.K., Grunig G., Beasley M.B., Xiong J.Q., and **J.T. Zelikoff**. Short-term inhalation of cadmium oxide nanoparticles alters pulmonary dynamics associated with lung injury, inflammation, and repair in a mouse model *Inhal. Toxicol. 26(1):48-58 (2014).*

93.    Willis D.N., Popovech M.A., Gany F., Hoffman C., Blum J.L. and **J.T. Zelikoff**. Toxicity of gutkha, a smokeless tobacco product, gone global: Is there more to the toxicity than nicotine? *Int. J. Environ. Res. Public Health.* 11(1):919-933. (2014).

94.   Yochum C., Doherty-Lyon S., Hoffman C., Hossain, M.M., **Zelikoff J.T.** and J.R. Richardson. Prenatal cigarette smoke exposure causes hyperactivity and hyper-aggressive behaviors: relevance to maternal smoking and ADHD. (Zelikoff and Richardson are co-senior authors). *Exper. Neurol.* 254:145-152 (2014).

95.    Orisakwe O.E., Blum J.L., Sujak S., and **Zelikoff, J.T**.Metal Pollution in Nigeria: A biomonitoring update. *J. Health & Pollution.* 4:40-52 (2014).

96.   Zhou S, Rosenthal DG, Sherman S, **Zelikoff J.T.,** Gordon T, Weitzman M. Physical, behavioral, and cognitive effects of prenatal tobacco and postnatal secondhand smoke exposure. *Curr Probl Pediatr Adolesc Health Care.* 2014; 44(8):219-241.

97.   Amrock SM, Gordon T, **Zelikoff JT**, Weitzman M. Hookah use among adolescents in the United States: results of a national survey. *Nicotine Tob Res.* 2014. 16(2):231-237.

98.   Lauterstein D., Hoshino R, Watkins BX, Weitzman M, Zelikoff J.T. The changing face of tobacco use among US youth. Curr Drug Abuse Rev. 7(1):29-43 (2014) PMID 25323124.

99.   Cohen, MD, Vaughan, JM; Garrett, B, Prophete, C, Horton, L, Sisco M, Kodavanti UP, Ward, WO, Peltier RE; **Zelikoff, JT**, Chen LC. Acute high-level exposure to WTC particles alters expression of genes associated with oxidative stress and immune function in the lung. *J Immunotoxicol.* 12(2):140-153 (2015).

100.    Blum JL, Edwards JR, Prozialeck WC, Xiong JQ, **Zelikoff JT.** Inhalation of
        cadmium oxide nanoparticles during pregnancy produces nephrotoxicity in both
        mother and offspring. *J. Toxicol. Env. Health.* Pt. A. 2015:78(12):711-724.DOI:
        10.1080/15287394.2015.1026622 (2015).

101.    O'Neill BO, Dauterstein[a], D, Patel JC **Zelikoff JT\***, Rice ME. Striatal dopamine
        release regulation by the cholinergic properties of the smokeless tobacco,
        gutkha. *ACS chemical neuroscience.* 2015:6(6):832-837.DOI:
        10.1021/cn500283b \*Co-corresponding author. (2015).

102.    Cohen, Mitchell D; Vaughan, Joshua M; Garrett, Brittany; Prophete, Colette;
        Horton, L.; Sisco, Maureen; Ghio, Andrew; **Zelikoff, Judith;** Lung-Chi, Chen.
        Impact of acute exposure to WTC dust on ciliated and goblet cells in lungs of
        rats. *Inhal. Toxicol.* 27(7):354-361.DOI: 10.3109/08958378.2015.1054531
        (2015).

103.    Yao Y., Chen T., Shen SS., Niu Y., DesMarais TL., Saunders E., Fan Z., Lioy P.,
        KluzT., Chen LC., Wu Z., Costa M., **Zelikoff J.** Malignant human cell
        transformation of Marcellus Shale gas drilling for flow back water. *Toxicol. Appl.
        Pharmacol.* 1;296:85. (2015)

104.    Lauterstein, De., Tijerina PB., Corbett K., Oksuz A., Shen SS., Gordon T., Klein
        C., **Zelikoff JT.** Frontal cortex transcriptome analysis of mice exposed to
        electronic cigarettes during early life stages. *Int. J. Envron. Res. Public Health.*
        (2016) pii: E417. doi: 10.3390/ijerph13040417.
        PMID: 27077873.

105.    Gany F., Bari S., Prasad L., Leng J., Lee T., Thurston G.D., Gordon T., Acharya
        S., Rexford B., **J.T. Zelikoff**.   Perception and reality of particulate matter (PM)
        exposure on New York City taxi drivers. J. Expos. Sci. Environ. Epidemiol. (In
        press, 2016, *Epub ahead of print; doi: 10.1038/jes.2016.23.).*

106.    Kumar S., Smith-Norowitz TA., Kohlhoff S., Apfalter P., Roblin P., Kutlin A.,
        Harkema J., Ng SP., Doherty-Lyons S., **Zelikoff JT (co-corresponding author),**
        Hammerschlag MR\*. Exposure to cigarette smoke and *Chlamydia penumoniae*
        infection in mide: Effect on infectious burden, systemic dissemination and
        cytokine responses: A pilot study. *J. Immunotoxicol.* 13(1):77-83 (2016).

107.    Iain P., Sexton K., Prytherch Z., Blum J., **Zelikoff J.T\*.** (co-corresponding
        author), BeruBe K.A\*., An *in vitro* versus in vivo toxicogenomics investigation of
        pre-natal exposures to tobacco smoke. Appl. *In Vitro Toxicol.* (In press, 2017).

108.    Blum J.L., Chen L-C., **Zelikoff J.T\*** (corresponding author). Exposure to ambient
        particulate matter during specific gestational periods produces adverse obstetric
        consequences in mice. Environ. Health Perspect. *Environ Health Perspect*;
        DOI:10.1289/EHP1029.

109.    Gany F., Mukherjea A., Surani Z., Modayll M., Aghi M., Ulpe R., **Zelikoff J.,** Leng
        J., Parascandola M., Gupta P., South Asian alternative tobacco products:
        culture, epidemiology and policy. *J. Immigrant Minority Health.* (Jan. 2017).

110.    Klocke C., Allen JL., Sobolewski M., Mayer-Proschel M., Blum JL., Lauterstein
        D., Zelikoff JT., Cory-Slechta. Neuropathological consequences of gestational
        exposure to concentrated ambient fine and ultrafine particles in the mouse.
        *Toxicol. Sci. Apr 1:556(2):492-508.(2017)*

111.    Zelikoff, Judith T., Parmalee N., Corbett K., Gordon T., Klein C B., Aschner m.
        Microglia Activation and Gene Expression Alteration of Neurotrophins in the
        Hippocampus Following Early Life Exposure to E-cigarette Aerosols in a Murine
        Model. Toxicol Sci. 2017 Nov 17. doi: 10.1093/toxsci/kfx257. [Epub ahead of
        print]

112.    Church JS, Tijerina PB, Emerson FJ, Coburn MA, Blum,
        JL, Zelikoff JT, Schwartzer JJ. *Perinatal exposure to concentrated ambient
        particulates results in autism-like behavioral deficits in adult mice.
        Neurotoxicology.* Nov 13. pii: S0161-813X(17)30211-5. doi:
        10.1016/j.neuro.2017.10.007. [Epub ahead of print].

113.    Duffy-Whritenour, J.E., S. Kennedy, and **J.T. Zelikoff**. Involvement of the
        neuroimmune axis in noncoplanar polychlorinated biphenyl-induced
        immunotoxicity. (In preparation). (*J. Immunotoxicol*).

114.    Blum, J.L., Doherty-Lyon, D., Hoffman, C., Conklin, D., Young, D. and **J.T.
        Zelikoff**. High fat diet exacerbates the dyslipidemic effects of prenatal exposure
        to cadmium nanoparticles in the adult offspring. In preparation. (*Toxicol. Sci.).*

***Commentaries/Letters to the Editor/Profiles:***
1.      **Zelikoff, J.T.**, S. Garte and S. Belman. Response to publication "Differential
phosphorylation events associated with phorbol ester effects on acceleration versus
inhibition of cell growth." *Cancer Res.* 47: 389-390 (1987).
2.      **Zelikoff, J.T**. Commentary on "Ecotoxicity Testing."  *Toxicology and
Ecotoxicology News* 1: 123-124 (1995).
3.      Penn, A. and **J.T. Zelikoff.**  "Profile of the Department of Environmental
Medicine, New York University Medical Center."  *Toxicology and Ecotoxicology News* 3:
114:116 (1996).
4.      Bayne, C. and **J.T. Zelikoff,.** Meeting review on "Modulators of Immune
Responses-A PhylogeneticeApproach." *Immunology Today* 20: 12-18 (1996).
5.      **Zelikoff, J.T**.  "Fish immunotoxicology: A new scientific discipline". *Toxicology
and Ecotoxicology News.*  5: 130-132 (1996).

***Book Chapters & Reports (1988 – Present, in ascending order):***
**1.**      Rossman, T.G., **J.T. Zelikoff**, S. Agarwal and T.J. Kneip. 1988. Genetic
toxicology of metal compounds: An examination of appropriate cellular models. In:
*Carcinogenic and Mutagenic Metal Compounds* 2. (E. Merian, et al., Eds), Gordon and
Breach Science Publishers, NY. pp. 195-206.
**2.**      **Zelikoff, J.T.** and Enane, N. 1991. Assays used to assess the activation state of
rainbow trout peritoneal macrophages. In: *Techniques in Fish Immunology-2* (J.S.
Stolen, et al., Eds.), SOS Publications, NJ. pp. 107-124.
**3.**      **Zelikoff, J.T**. 1993. Immunological alterations as indicators of environmental
metal exposure. In: *Modulators of Fish Immune Response: Models for Environmental
Toxicology/Biomarkers, Immunostimulators-Vol.* 1 (J.S. Stolen, T. Fletcher, **J.T.
Zelikoff**, S.L. Kaattari,  D.P. Anderson, and L.E. Twerdok, Eds.), SOS Publications, NJ.
pp. 101-110.

4.      **Zelikoff, J.T**. and D. Bowser. 1994. Care and short-term laboratory maintenance of rainbow trout in laboratories with limited aquatic facilities. In: *Techniques in Fish Immunology*-3 (J.S. Stolen, et al. Eds.), SOS Publications, NJ. pp. 13-14.

5.      **Zelikoff, J.T**. 1994. Fish immunotoxicology. In: *Immunotoxicology and Immunopharmacology* (J. Dean, M. Luster, A. Munson, I. Kimber Eds), Raven Press, NY. pp. 386-403.

6.      **Zelikoff, J. T**. and M. D. Cohen 1995. Immunotoxicity of inorganic metal compounds. In: *Immunotoxicology*. (R. Smialowicz, and M. Holsapple, Eds.), CRC Press, Boca Raton, FL. pp. 125-146.

7.      **Zelikoff, J.T**., W. Wang, N. Islam, L.E., Twerdok, M. Curry, J. Beaman, and E. Flescher. 1996. Assays of reactive oxygen intermediates and antioxidant enzymes in medaka *(Oryzias latipes)*: Potential biomarkers for predicting the effects of environmental pollution.  In: *Techniques in Aquatic Toxicology*.  (G. Ostrander Ed.), CRC Press, FL.  pp. 178-206.

8.      **Zelikoff, J.T**. W. Wang, N. Islam, E. Flescher, and L.E. Twerdok. 1996. Heavy metal-induced changes in antioxidant enzymes and oxyradical production by fish phagocytes: Application as biomarkers for predicting the immunotoxic effects of metal-polluted aquatic environments. In: *Modulators of Immune Responses-A Phylogenetic Approach* - Vol. 2 (J. Stolen, **J.T. Zelikoff**, L.E. Twerdok, D. Anderson, C. Bayne, C. Secombes, T. Fletcher, Eds.), SOS Publications, NJ.  pp. 135-148.

9.      Twerdok, L.E., J.R. Beaman, M.W. Curry, and **J.T. Zelikoff**.  1996. Health status determination and monitoring in an aquatic model *(Oryzias latipes)* used in immunotoxicological testing. In: *Modulators of Immune Responses -  A Phylogenetic Approach*-Vol. 2  (J. Stolen, **J.T. Zelikoff**, L.E. Twerdok, D. Anderson, C. Bayne, C. Secombes, T. Fletcher, Eds.), SOS Publications, NJ. pp. 210-215.

10.     Benson, J. and **J.T. Zelikoff**. 1996. Respiratory toxicology of metals. In: *Toxicology of Metals*. (L.W. Chang, Ed.), CRC Press, FL. pp. 929-938.

11.     **Zelikoff, J.T**. and R. 1996. Smialowicz. Metal-induced alterations in innate immunity. In: *Toxicology of Metals*.  (L.W. Chang, Ed.), CRC Press, FL. pp. 811-826.

12.     **Zelikoff, J.T**., W. Wang, N. Islam and L.E. Twerdok. 1997. Immune responses of fish as biomarkers to predict the health effects of aquatic pollution: Application of laboratory assays for field studies. In: *Ecotoxicology: Responses, Biomarkers and Risk Assessment* (J.T. Zelikoff, J. Schepers, J. Lynch, Eds.), SOS Publications, Fair Haven, NJ. pp. 218-235.

13.     **Zelikoff, J.T**.  and M.D. Cohen.  1997. Metal Immunotoxicology. In: *Handbook of Human Toxicology*, (E.J. Massaro, Ed.), CRC Press, Boca Raton, FL. pp. 811-852.

14.     Thomas, P.T. and **J.T. Zelikoff.** 1999. Air pollutants: Modulators of pulmonary host resistance against infection. In: *Air Pollutants and Effects on Health*. (S.L. Hogate, H.S. Koren, J.M. Samet, R.L. Maynard, Eds.), Academic Press, London. pp. 420-450.

15.     **Zelikoff, J.T**., C. Nadziejko, K. Fang, T. Gordon, C. Premdass, and M.D. Cohen. 1999. Short-term, low-dose inhalation of ambient particulate matter exacerbates ongoing pneumococcal infections in *Streptococcus pneumoniae*-infected rats. *Proceedings of Third Colloquium on Particulate Air Pollution and Human Health*. 8-94-8-104.

16.     **Zelikoff, J.T**. Woodsmoke, kerosene emissions, and diesel exhaust emissions. In: *Pulmonary Immunotoxicology* (M.D. Cohen, **J.T. Zelikoff**, R.B. Schlesinger, Eds.), Klewar Publ., MA. pp. 369-387 (2000).

17.     Schlesinger, R.B., LC. Chen, and **J.T. Zelikoff.** 2000. Sulfur and nitrogen oxides. In: *Pulmonary Immunotoxicology* (M.D. Cohen, **J.T. Zelikoff**, R.B. Schlesinger, Eds.), Klewar Publ., MA. pp. 337-353.

18.     **Zelikoff, J.T**., E. Carlson, E., Y. Li, A. Raymond, and J.R. Beaman. 2002. Immune system biomarkers in fish for predicting the effects of environmental pollution. In: *Proceedings of the Fourth Princess Chulabhorn International Science Congress*.

*Chemicals in the 21st Century/Chemicals for Sustainable Development.* (Chulabhorn Research Institute, Ed.), Trinity Publishing Co., Ltd., Bangkok, THAILAND, pp. 34-56.

**19.**     Duffy, J., and J.T. **Zelikoff.** 2005. Approaches and models for the assessment of chemical-induced immunotoxicity in fish. In: *Investigative Immunotoxicology.* (H. Tryphonas, M. Fournier, B.R. Blakley, J.E. Smits, P. Brousseau, Eds.),Taylor and Francis, NY. pp. 49-63.

**20.  Zelikoff, J.T.** 2005. Trace metals and the immune system. In: *Encyclopedic Reference of Immunotoxicology.* (H.W. Vorh). Springer-Verlag, Germany  pp. 340-345.

**21.**     Carlson, E. and **J.T. Zelikoff.** 2008. Fish immunology.  In: *Toxicology of Fishes* (D. Hinton and R. Di Giulio, Eds.), CRC Press. pp. 340-352.

**22.**     Ramanathan VM., Agrawal M., Akimoto H., Aufhammer S., (and 34 others), Zelikoff JT. UNEP: Atmospheric Brown Cloud: A Regional Assessment Report with Focus on Asia. Published in Bangkok by United Nations Environmental Program (2008).

**23**.     Ng, SP., K. Yoshido, and **J.T. Zelikoff**. *2010.* Host resistance tumor challenge assays. In: *Techniques in Immunotoxicology (R. Dietert, Ed.) Informa Press.*

**24**.     **Zelikoff, J.T**. 2010. Other environmental health issues: Inhaled woodsmoke. In: *Encyclopedia of Environmental Health.* J. Nriagu (Ed.). Elsevier, UK. Pages 310-330.

**25.**     Mudipalli, A. and **Zelikoff, J.T.** (Eds). Essential and non-essential metals: carcinogenesis, prevention and therapeutics. Springer, UK. 2018.

**26.**     Ng, S.P**., Zelikoff J.T.** Tumor challenges in immunotoxicity testing. Vol. 599. Humana Press, Springer Science.  Immunotoxicity Testing: Methods and Protocols, Methods in Molecular Biology. (2018)

**27.**     **Zelikoff, J.T.**, and M.D. Cohen. Pulmonary Immunology. In: *Comprehensive Toxicology.* (C. McQueen, Ed.). Elsevier, UK. 2018.

## INVITED NATIONAL AND INTERNATIONAL LECTURES/PRESENTATIONS **(Present – 2000,** *in descending order***):**

**August 2018: International Society of Exposure Science (ISES); International Society for Environmental Exposure (ISEE).** *Contamination of the Ramapough Nation: A toxic legacy.* **Environmental contamination and Indigenous populations symposia.** Ontario, Canada.

**February 2018: Louisiana State University.** Electronic cigarettes and pregnancy: Lessons learned from mice. Baton Rouge, LA

**January 2018: Mt. Holyoke College.** What's safer for the unborn child: electronic cigarettes or air pollution? MA.

**December 2017: Texas A & M.** Prenatal exposure to ambient particulate matter impacts
        cardiovascular development. TX.

**December 2017: International Conference on Environmental Impacts.** Air pollution and pregnancy. Deradun, India

**November 2017: International Conference on "Impact of Environment on Women's Health**: **Amity University Uttar Pradesh**. Maternal exposure to particulate air pollution during pregnancy and Impacts on fetal health: What are we learning from animal studies? Lucknow, India.

**November 2017**: **American Public Health Assoc. (APHA) Annual Meeting**. Identifying Environmental concerns, environmental exposures and health concerns in the Ramapough Lenape Tribe. Atlanta, GA.

**October 2017: International Society of Exposure Science.** A community in toxic crisis: Ramapough Native Americans. Durham, NC.

**April 2017: Queensborough College.** Neurocognitive effects of E-cigarettes. Queens, NY.

**July 2016: NIOSH seminar.** Reproductive implications of Nanomaterials. WV

**July 2016: EPA seminar.** Ambient particulate matter and cardiotoxicity. Chapel Hill, NC.

**June 2016: Workshop on Nanomaterials and the fetal-placental unit.** Prenatal Nephrotoxicity and Maternal Nanomaterial Inhalation. Boston, MA.

**May 2016:  NIH Tobacco Research.** Toxicological assessment of smokeless tobacco products: A systematic ranking system. Bethesda, MD

**April 2016: AHA, ATrac Meeting.** Toxicity ranking of alternative tobacco products. Louisville, KY.

**March 2016: Society of Toxicology: Course in Medical Education.** Effects of fracking on reproductive and developmental health. New Orleans, LA

**March 2016: Society of Toxicology: Symposia on Fracking and Health.** Effects of fracking on reproductive and developmental health. New Orleans, LA

**February 2016: American Association for Advancement of Science: Symposia on Alternative Tobacco Products and Health.** Early life exposure to alternative tobacco products as a major risk factor of later life chronic disease. Washington, DC

**October 2015: 7th International Symposia on Nanotechnology and Occupational and Environmental Health.** Reproductive and developmental toxicity of gold nanoparticles in a mouse model of pulmonary exposure. Limpopo Province, South Africa.

**May 2015: Amer. Assoc. Immunol.** Maternal inhalation of ambient particulate matter causes alterations in immune profiles and anti-tumor mechanisms in juvenile murine offspring. New Orleans, LA.

**April 2015: Wayne State University,** *CURES Seminar Series at Wayne State University's Institute of Environmental Health Sciences*. Maternal exposure to particulate air pollution during pregnancy impacts fetal development and neonatal growth in a mouse model.

**March 2015**: **Society of Toxicology**. Symposia on: New and Emerging Tobacco Products—Biomarkers of Exposure and Injury (Chair). Reproductive/Developmental effects of exposure to new and emerging tobacco products and to nicotine delivery devices in a mouse model. San Diego, CA.

**Dec. 2014: University of Illinois –** Maternal exposure to ambient particulate matter during particular gestational windows produce developmental and reproductive consequences in a mouse model. Urbane, IL.

**July 2014: Oregon State University –** Early life nanoparticle exposure brings early and later life health consequences.  Corvallis, OR.

**March 2014: Society of Toxicology –** Tobacco products and prenatal exposures. Phoenix, Arizona.

**February 2014:** *West African Society of Toxicology* – Air pollution in developing nations. Lagos, Nigeria.

**January 2014:** *Ernst Strungmann (ES) Forum, (Rapporteur)- Heavy metals and infectious disease.* Frankfurt Germany.

**November 2013: American Chemical Council.** Risk Assessment and Communication, Working Group. Washington, DC.

**October 2013**: *First International Conference on Waterpipe Tobacco Research*. Working Discussion Group Leader: Abu Dhabi.

**October 2013:** *NIH-sponsored Workshop in South Asian Diversity Populations and Health Effects.* Sloan Kettering Cancer Center. Working Group member on smokeless tobacco. NY, NY.

**June 2013**: *FDA, Center for Tobacco Control*. Public health impacts of fetal exposures to tobacco & environmental toxicants: From early life to adult disease and policy needs. MD

**March 2013**: *Society of Toxicology, Committee on Diversity Initiatives* – Exposure to smoked and smokeless tobacco *in utero*: Fetal injury and life long consequences. San Antonio, TX

**February 2013**: *Nigeria University* – Smokeless tobacco: A global look at the problem, Port Harcourt, NIGERIA

**February 2013**: *FDA: Center for Medical Devices* – Fetal basis of adult disease: early life exposure to environmental and occupational toxicants. Silver Spring, MD.

<u>**October 2012**</u>: *Memorial Sloan Kettering* – Arsenic contamination in Bangledesh. New York, NY

<u>**May 2012**</u>: *Memorial Sloan Kettering* – Toxicology of Smokeless tobacco. NY, NY.

**April 2012**: *University of Connecticut* – Tobacco products *in utero* are associated with later life disease outcomes. Storrs, CT.

**March 2012**: *Biomass Symposium* – Toxicological implications for domestic burning. Feb. 2012: **NYU Medical Center, Dept. of Psychiatry** - Chemical stressors *in utero* and later life disease outcomes. New York, NY.

**Jan 2012:** *British American Tobacco* **–** *In vitro* translational studies and the toxicology of smoking. Southampton, UK.

**Dec. 2011**: FDA – *The reproductive effects of cadmium nanoparticles*. Reston, VA.

**Dec. 2011**: **NYU Dept. of Bioethics** – Cigarette smoking & smokeless tobacco: Is there really a good choice? New York

**Oct. 2011**: NorCal SOT **– Fetal basis of adult disease – the role of maternal smoking**. Menlo Park, CA.

**Sept. 2011**: *European Aerosol Conference – Plenary Lecture*: The toxicology of biomass combustion emissions. Satellite Workshop on Biomass Combustion, Manchester, England.

**March 2011**: *NYU Ethics Forum* - Exposure to Cigarette Smoke *in Utero*: Fetal injury and Life Long Consequences**.** New York

**March 2011:** *NYU Medical Center, Dept. of Obstetrics and Gynecology Grand Rounds* – Early life insult by tobacco smoke and later life disease susceptibilities. March 15, 2011

**March 2011:** *Society of Toxicology, Committee for Diversity Interests* – Cigarette exposure *in utero*: You are what you breathe. Washington, DC. March, 2011.

**Nov. 2010:** *Texas A & M University –* Early life exposure to cigarette smoke suppresses anti-tumor immune defenses of the prenatally exposed offspring in a mouse model" College Station, TX.

**May 2010**: *Workshop on Emissions and Health Impacts of Biomass Fuels* – Health effects of woodsmoke: A toxicological model for mechanisms and policy needs. Penn State, State College, PA.

**March 2010**: *Environmental and Occupational Health Sciences Institute, Rutgers University* - Fetal exposure to cigarette smoke mediates anti-tumor immune mechanisms in adult murine offspring. New Brunswick, NJ. March, 2010.

**March 2010**: *Society of Toxicology, Committee for Diversity Interests –* Exposure to cigarette smoke in utero: Fetal injury and life-long consequences. Salt Lake City, UT.

**Nov. 2009:** *United Nations Environmental Programme –* Toxicological assessment of the atmospheric brown cloud. Incheon, Korea.

**Sept. 2009:** *7th Congress of Toxicology in Developing Countries* – Fetal insult and later onset diseases. Sun City, South Africa.

**August 2009**:*Japanese Society of Immunotoxicology* – Prenatal exposure to cigarette smoke increases tumor susceptibility of juvenile mice via changes in anti-tumor immune mechanisms. Asahikawa, Japan.

**May 2009:** *Asia-Pacific Forum on Andrology*, Hormonal changes accompanying cigarette smoke induced preterm births in a mouse model. Nanjing China.

**Dec. 2008**: *St. Johns University* – Mechanistic insights into offspring cancer risk associated with maternal smoking. Queens, NY.

**August 2008**: *U.S. EPA, National Center for Environmental Assessment* - Gender-related effects on offspring tumor risk and response to prenatal cigarette smoke exposure may be related to testosterone: a toxicological model. Washington, DC.

**June 2008**: *Institute for Science and Health (IFSH)* **–** Early exposure to cigarette smoke may serve as an indicator of chronic diseases in the offspring later in life. Cardiff, Wales.

**March 2008:** *Society of Toxicology* –Prenatal exposure to tobacco smoke induces asthma-related responses  in non-sensitized female offspring later in life. Seattle, Washington.

**March 2008:** *Society of Toxicology* – Prenatal exposure to cigarette smoke: Are our children paying the price? Seattle, Washington. March 2008.

**August 2007:** *United Nations Environmental Program (UNEP)* – Toxicology of the Atmospheric Brown Cloud (ABC). Seoul, Korea.

**March 2007:** *University of Louisville (KY)* – Increased cancer risk: A possible birth defect associated with maternal smoking. Louisville, KY.

**March 2007:** *Institute for Science and Health (IFSH)* – Prenatal cigarette smoke exposure and offspring asthma. Louisville, KY.

**Feb. 2007**: *International Conference on Environment: Survival and Sustainability* **-** Sustaining a healthy fetal environment: A little told threat of increased cancer and asthma risk for the juvenile offspring exposed prenatally to cigarette Smoke. Near East University, Nicosia-Northern Cyprus.

**Feb. 2007**: *International Conference on Environment: Survival and Sustainability* - Contamination of aquatic environments with polychlorinated biphenyls (PCBs) or benzo(a)pyrene (B[a]P) can adversely impact the immune health and sustainability of inhabiting Fish.  Near East University, Nicosia-Northern Cyprus.

**Dec. 2006**: *Philip Morris External Review Symposia* **–** Effects of prenatal exposure to cigarette smoke on tumor development and immune surveillance mechanisms in the developing offspring: A toxicological model. Landsdowne, VA. Dec. 2006.

**May 2006**: *MidAtlantic Chapter of Society of Toxicology (MASOT)* – Increased cancer risk in the offspring: A birth defect associated with maternal smoking. Scotch Plains, NJ.

**April 2006**: *University of Guelph* – Maternal smoking and cancer: Are the unborn children paying the price? Kempville, Ontario Canada.

**March 2006**: *Institute for Science and Health* **–** Prenatal exposure to mainstream cigarette smoke alters susceptibility of the offspring to asthma. Vienna, Austria.

**March 2006:** *Society of Toxicology* **–** Maternal smoking and cancer: Are the unborn children paying the price? San Diego, CA.

**October 2005:** *Chulabhorn Research Institute* – *Immunotoxicology: A new focus for Thai science.* Scientific Research Institute of Thailand. Bangkok, Thailand.

**May 2005**: *American Thorasic Society* **-** Immunotoxicological mechanisms of prenatally-exposed respiratory contaminants. Symposia on "Impact of prenatal and early infancy environmental exposures on neonatal and infant health". San Diego, CA..

**May 2005:** *California Society of Environmental Toxicology and Chemistry –* Mechanisms of Fish Immunotoxicity. Berkley, CA.

**April 2005:** *Life Science Research Organization (LSRO) –* Prenatal exposure to cigarette smoke increases tumor susceptibility in the offspring: A toxicological model. St. Louis, MO.

**March 2005 -** *Society of Toxicology –* Immunotoxicity of prenatal mainstream cigarette smoke exposure. Symposia on "Mechanisms Linking the Lung and Immune System". New Orleans, LA.

**Feb. 2005:** *Institute for Science and Health (IFSH) –* Effects of in utero cigarette smoke exposure on asthma development in the offspring. Washington, DC.

**Feb. 2005:** *Canadian Lung Association –* Health Effects of Woodburning. New Brunswick, Canada.

**Nov. 2004:** *Environmental Mercury Research Forum.* Metal toxicity in aquatic organisms. Energy & Environmental Research Center (U. of North Dakota). Grand Forks, ND.

**Oct. 2004:** *VIIth Annual Conference of Soil, Sediments and Water.* Immunological Alterations as Bioindicators of Environmental Health. Amherst, MA.

**Sept. 2004:** *Slovenian Society of Toxicology –* Immunological biomarkers. Lublijana, Slovenia.

**March 2004:** *Society of Toxicology –* Inhalation of concentrated ambient particulate matter and associated metals increases host susceptibility to pulmonary pneumonia. Baltimore, MD.

**Jan. 2004:** *University of Arizona –* Toxicological impact of inhaled wood smoke on pulmonary antimicrobial defense. Tucson, AZ.

**Jan. 2004:** *College of Staten Island –* Toxic insult and human health effects: Lessons learned from an aquatic species. Staten Island, NY.

**Dec. 2003: Sixth National Environmental Public Health Conference (Center for Disease Control)** Woodsmoke: A closer look at public health concerns and mechanisms of toxicity. Atlanta, GA.

**Nov. 2003:** *Society of Environmental Toxicology and Chemistry -* Immunotoxicology and Risk Assessment. Austin, TX.

**Oct. 2003:** *Chulabhorn Research Institute –* Immunotoxicology Course Series (10d). Bangkok, Thailand.

**June 2003:** *International Symposium on Pharmaceutical Sciences -* Health Effects of Inhaled Particulates. University of Pharmaceutical Sciences. Ankara, Turkey.

**June 2003: United States Army Center for Environmental Health Research -** Immune Assays for Hazard Assessment and Species Extrapolation. Fort Detrick, MD.

**May 2003 -** *Pollutant Responses of Marine Organisms (PRIMO) -* Immunotoxicology in Fish. Tampa, FL.

**March 2003:** *Society of Toxicology -* Woodsmoke: Cozy Atmosphere or Public Menace? Salt Lake City, UT.

**Nov. 2002:** *Society of Toxicology and Chemistry -* Immune Biomarkers for Use in Ecological Risk Assessment. Salt Lake City, UT.

**Oct. 2002:** *Padova University -* Lessons Learned About Human Health From Aquatic Species. Padova, Italy.

**Oct. 2002 -** *Slovenia Society of Toxicology -* Biomarkers for Ecotoxicology. Ljubljana, Slovinia.

**Sept. 2002:** *University of Florida -* Effects and Mechanisms of Benzo(a)pyrene-induced Immunosuppression in Fish. Gainsville, FL.

**June 2002**: *Yale University, Dept. of Occupational and Environmental Medicine* - Lessons on Human Health and Toxic Impact Learned from our Aquatic Counterparts.

**Sept. 2001**: *Third International Meeting on Molecular Mechanisms of Metal Toxicity and Carcinogenicity* - Immunodysfunction: An underlying Mechanism of Metal Toxicity in Aquatic Organisms. Sardinia, Italy.

**July 2001**: *Pollutant Responses in Marine Organisms* - Immunotoxicology in fish - Applications and Mechanisms of Response. Plymouth, England.

**Oct. 2000**: *Conference on Women in Science* - Aging: Good or Bad News for the Immune Response. Rutgers University. New Brunswick, NJ.

**Oct. 2000**: *International Conference on Environmental and Occupational Lung Disease* - Woodsmoke Impairs Host Resistance Against Pulmonary Infections in an Animal Model. Lucknow, India.

**May 2000**: *EPA-Duluth* - Fish Immune Status: A Sensitive System for Assessing Toxicological Impact of Aquatic Environments. Duluth, MN.

**May 2000**: *University of Minnesota-Duluth* - Processes and Mechanisms of Woodsmoke-induced Immunosuppression. Duluth, MN.

**March 2000**: *International Symposia on Medaka* - Japanese Medaka: A Sensitive Teleost Model for Assessing the Immunotoxic Effects of Potential Endocrine-Disrupting Chemicals. Osako, Japan.

**Nov. 2000**: *The Fourth Princess Chulabhorn Science Congress*- Immune System Biomarkers for Predicting the Effects of Environmental Pollution. Bangkok, Thailand.

## EDITOR/EDITORIAL BOARD APPOINTMENTS
### Editor and Co-Editor:

Metal Toxicology, Co-Editor  (Springer Publ.) – (2016)
Pulmonary Immunotoxicology (Klewar Publ.) - (2000)
Immunotoxicology of Occupational and Environmental Metals. (Taylor and Francis) - (1998)
Ecotoxicology: Responses, Biomarkers and Risk Assessment. (SOS Publications) - (1997)
Modulators of Immune Responses: A Phylogenetic Approach  - Vol. 2 (SOS Publications)-(1996)
Modulators of Immune Responses  - Vol. 1 (SOS Publications) - (1994)
Toxicology and Ecotoxicology News (Taylor & Francis) - (1995-1998)
Book series on: Ecotoxicology (John Wiley & Sons) - (1995-1997)

### Associate Editor-

*Open Journal of Immunology (2015-2018)*
*Journal of Developmental Origins of Health & Disease (2012-2013; Themed Editor)*
*Journal of Toxicology and Applied Pharmacology* – (2005-2014)
*Journal of Toxicology and Environmental Health* - Part A - (2001 - Present)
*Biomarkers: Exposure, Effects and Susceptibility* - (1995 – 2007)

### Editorial Advisory Board-
*Envronmental Health Perspectives (2017-2020)*
*Open Journal of Toxicology (2015-present)*
*Inhalation Toxicology (2015-present)*
*Open Journal on Immunology* (2009-present)
*Journal of Immunotoxicology*  (2004 - 2016)

*Toxicol. Sci.* (2007-2016)
*Toxicology* (1997- 2016)
Environmental Health Perspectives (2009 – 2013; named a top reviewer for 2011)
*Environmental Bioindicators (2005- 2011)*
*Inhalation Toxicology* (2004 – 2008; 2013-2016)
*Fish and Shellfish Immunology* (1997 - 2008)
     *Toxicology Applied Pharmacology* (1996 - 2005)
     *Diseases of Aquatic Organisms* (1995 - 2006)
     *Aquatic Toxicology* (1998 - 2006)
     *Journal of Toxicology and Environmental Health* (1996 - 2001)
     *Fish Immunology Technical Communications- Vols. 2-5* (1994 - 1997)


**CHAIRED SESSIONS/MEETING ORGANIZER (1997 – present, descending order)**
<u>Outside University</u>
o    Organizer/Instructor of International Student & Faculty Workshop on "Fish Immunology" (Tasmania, Australia; February 1997)
o    Organizer/Instructor of Student & Faculty Mini-workshop on "Fish Immunology" (Christ Church, New Zealand; February 1997)
o    Chairperson at International Meeting on "Developmental and Comparative Immunology" (Williamsburg VA; July 1997)
o    Organizer of Student & Faculty International Workshop on "Fish Immunotoxicology Techniques" (American College, Madurai India; February 1999).
o    Organizer of Continuing Education Course on "Exposure Assessment: Methods and Applications" at Aquatic Toxicity Workshop Meeting (Edmonton, Canada; October 1999).
o    Chairperson of Symposium on "Profiling Immunotoxicology" at Aquatic Toxicity Workshop Meeting (Edmonton, Canada; October 1999).
o    International Conference on Environmental and Occupational Lung Disease (Lucknow, India; October, 2000)
o    Symposium Coordinator/Chairperson at Society of Toxicology (1993, 1994, 1996-1999; 2005-2009)
o    Continuing Education Coordinator/Chairperson at Society of Toxicology (1994, 1995, 2000, 2001)
o    Slovenian Society of Toxicology (Nova Gorica, Slovenia; September 2004, 2005)
o    Aerosol Dynamics and Health: Strategies to Reduce Exposure & Harm. (Chairperson, Public Health Issues Involving Environmental & Tobacco Aerosols; Cardiff, Wales 2008)
o    SOT - Co-Chair, Symposia and Continuing Education Course, 2009, 2010, 2011, 2015, 2016, 2018, 2019
o    ISEE/ISES – co-Chair, Symposia on Environmental Contamination and Indigenous populations. (Ontario, Canada, 2018)


<u>**FEDERAL & STATE ADVISORY BOARDS/PANELS/REGULATORY AGENCIES (Contributions to Regulatory Guidelines)**</u>

**2018-2019: New York City Housing Authority, Advisory Board member for "Healthy Homes".**

**2017-2018: National Academy of Science, Engineering, Medicine –**
    **-Board on Earth Sciences & Resources; Board on Environmental Studies & Toxicology; Board on Health Sciences Policy:** Potential Human Health Effects of Surface Coal Mining Operations in Central Appalachia. 2017-2019.

**2015: European Respiratory Society and Environment and Health Committee for American Thoracic Society**. Position paper participant on "What constitutes an adverse health of air pollution?" Brussels, BE, March 2015.

**2013: American Chemistry Council's Center for Advancing Risk Assessment Science and Policy (ARASP) Workshop** - Informing Risk Assessment: Understanding and Communicating Uncertainty in Hazard Assessment. (2013)

**2011: Department of Defense**
- Gulf War Illness Peer Review Panel (2011)

**2013: FDA, Tobacco Control Division, Advisory Consultant (**2013)

**2013-2006: NASA**
- Lunar Dust Exposure Standard Review Panel (2013)
-Lunar Science Institute, Moon Science Grant Review Panel (2008)
- Lunar Dust Non-Advocate Review Panel (Chair, 2006-2008)

**2002-2012: National Academy of Science**
- National Research Council (NRC): Committee on Low Level Lead in Ammunition (2011 – 2012)
- National Research Council (NRC): Peer Review of NRC Report on Acute Exposure Guideline
Levels (2010)
- Institute of Medicine (IOM): Peer Review of IOM Report on Depleted Uranium final document
(2008)
- National Research Council (NRC) - Committee on Toxicology/Subcommittee on Spacecraft Water
Exposure Guidelines (2001 - 2008)
- Institute of Medicine (IOM): Committee on Gulf War and Health - Part 3 (2002 – 2004)
- Institute of Medicine (IOM):  Reviewer for Agent Orange final document (2003)

**2012-2010: National Toxicology Program, Science Advisory Board (2010-2012)**

**1996-2017: National Institute of Health (NIH) & National Institute of Environmental Health Science (NIEHS)**

*NIEHS, Member reviewer for Core Centers (2018)*

*-NIEHS, Study Section member (2015-2017)*

-NIEHS KO1, K99, R23 reviewer (2014, 2015)
-NIEHS K01, K99 Awards member (2013)
**-**NIEHS Immunotoxicology Center Program (2012, 2013)
-NIEHS Oceans Centers (2012)
**-**     NIEHS Just-in-time Grants (**Chair,** 2012)
**-**     NIH College of Scientific Reviewers  (2010 – 2013)
**-**     NIH Integrative  & Comparative Endocrinology (2011)

- NIEHS Time Sensitive Grant (**Chair;** 2010)
-NIEHS P30 (NIEHS Centers of Excellence), (2008, 2009)
- NIEHS Challenge Grants, (2009)
- NIEHS K01 grant applications, (2008)
- NIH Innate Immunity and Inflammation (III) Study Section Full Member, (2005 – 2007)
- NIEHS Program Project grants, *(2006)*
- NIEHS ALTX – 4 (Alcohol and Toxicology) Study Section Full Member, (1996 – 2000)

**2005: National Institute of Environmental Health Sciences (NIEHS) & U.S.EPA & NASA**
- Expert Panel on "Global Earth Observations: Application to Air Quality and Human Health" (2005)

**2005: National Institute of Allergy & Infectious Disease (NIAID) & Department of Defense (DOD)**
- Expert Panel Workshop on Pulmonary Threat Agents (2005)

**2013-210: New Jersey Department of Environmental Protection**
- Human health Committee (2010 – 2013)
- Soil Standards Sub-committee (2010 – 2011)
- Aerosol Sub-committee (2011 – 2012)

**2011-2011: United Nations Environmental Program (UNEP) Steering Committee** (2006 – 2011)
- Atmospheric Brown Cloud Human Health Panel

**2004-2005: U.S. EPA Science Advisory Board & Review Panel**
- Metals Risk Assessment Framework Review Panel, (**Co-Chair** of Human Health Breakout Group, 2004 – 2005)
- Nanoparticle Review Panel (2005)

**APPOINTMENTS/ELECTED OFFICES**
**Society of Toxicology (SOT)**

*Nominating Committee (2018-2020)*
*Committee for Diversity Initiatives* (2014-2015, member; 2015-2016, Co-chair; 2015-2016; Chair, 2016--2017)
*Board of Councilors* (2011 – 2014**; Secretary-elect**, 2011-2012; **Secretary**, 2012-2014)
Nominating Committee (2007 - 2009)
Congressional Representative (2004 – 2005)
Education Committee (2002 – 2005; **Chair**, 2004 – 2005)
Education Sub-Committee for Minority Initiatives (2001 - 2004; **Chair**, 2003-2004)
Continuing Education Committee (1998 - 2001; **Chair,** 1999 - 2000)
Program Committee (1995-1998)

**Inhalation & Respiratory Specialty Section**
Councilor (2017-2019)

**Ethical and Legal Specialty Section**

President (2017-2018)
VP-elect (2016)

**Immunotoxicology Specialty Section**
President (1999-2000)
Vice-President (1998-1999)
Secretary/Treasurer (1995-1997)
Program Committee (1993-1999)
Awards Committee (1993, 1998, 2000)
Education Committee (Chair, 1992-1996; 2004-2009)
Nominating Committee (1998 - 2001, Chair, 1999-2000)
Councilor (2000-2001)

**Metals Specialty Section**
President (2003-2004)
Vice President (2002-2003)
Awards Committee (**Chair,** 2001 - 2004)
Program Committee (**Chair**, 2001 - 2004)
Nominating Committee (2001 – 2004, **Chair**, 2001-2003)

**MidAtlantic (Chapter) Society of Toxicology (MASOT)**
Nominating Committee (2009 [**Chair]**, 2010, 2011)
Past president, Councilor (2009-2010)
President (2008-2009)
Vice President (2007-2008)
Vice President-elect (2006-2007)
Councilor (2001 - 2004)
Program Committee (2000 – Present; Chair 2006-2007)

**NYU Langone School of Medicine**
**Faculty Council Representative** (2010-2019; Vice President 2011-2012, 2014-2015);
Benefits and Tenure Sub-committee (2015-2016)
Academic Affairs Sub-committee (Chair, 2012-Present)
Basic Science Sub-committee (co-Chair, 2017-2019)
**IACUC Review Board (2009-2011; 2017-2019)**
**Grievance Committee (2017-2020)**
**NYU Senate (alternate; 2018-2021)**

**Department of Environmental Medicine**
Promotion & Tenure Committee (2008-2014; **Chair**, 2010-2012)
Search Committee (2010-2013)
Biological Safety Committee- (**Chair**, 1990-1999)
Graduate Steering Committee (1999- 2014; Interim **Co-chair** 2001-2002)
Toxicology Masters' Program (Director, 2002 – 2008; **Co-director**, 2008-2011)

**GRANT REVIEWER *Ad hoc* (Federal [Non-NIH]/State/Private):**
*Federal*
Scandanavian Research Program (2013, 2016)
NASA, Moon dust program (2008)
Canadian Centers for Research (2000 – 2004)
DOD  (*Ad hoc,* 1999 - present)

EPA (*Ad hoc,* 2002 - present)
Natural Sciences and Engineering Research Council of Canada (*Ad hoc,* 2002 – present)

*State/Private*
Center for Indoor Air Research
Environmental and Occupational Science Health Inst. (Rutgers U.)
IFS Research Grants for Developing Nations
Johns Hopkins Pilot Projects
Michigan Sea Grant
New Jersey Sea Grant
New York Sea Grant
Philip Morris Foundation

## ADJUNCT APPOINTMENTS, CONSULTING, ADVISORY BOARDS
o        **Weill Cornell Medical School** (NY, NY) – External Advisory Board for NIH Diversity Grant (2013-2015)
o        **Chulabhorn Research Institute & University** (Bangkok, Thailand) **-** Adjunct Professor (2003-present)
o        **Cornell University, Inst. for Comparative and Environmental Toxicology** (Ithaca, NY) - Adjunct Professor (1996-2005)
o        **American Lung Association** - Criteria Document on Woodsmoke (2001)
o        **Fish and Wildlife Services** - Status of the Hudson River (2000)
o        **International Life Sciences Institute** - Research strategy on age-related differences in susceptibility (1998)
o        **Stratus Consulting Inc. -** Assessment of PCB-contaminated sites (1997 - 2000)
**U.S. EPA** - Criteria document on the immunotoxicity of endocrine disruptors (1997)

## MENTORING ON A GLOBAL LEVEL (6)
•        Juliet Igbo (Doctoral student co-mentor – U. of Lagos, Nigeria – 2015-2019)
•        Anishka Lewis (Masters student- Jamaica – 2014)
•        LeighAnn Koekemoer (Masters student – South Africa-2014)
•        Dr. Orish Orisakwe – University of Port Harcourt, Nigeria – 2013-present)
•        Dr. Hari Jott Dosih (Nepal Health Research Council – Kathmandu, Nepal- 2014-present)
•        Dr. Chanthana Tangjarukij (Chulabhorn Research Institute – Bangkok, Thailand-2012-present)

## STUDENT & JUNIOR FACULTY MENTORING
### Research Advisor:
*College and High School* (15)
•        Aaron Asiedu-Wiafe (2017-2018; Monroe-Woodbury High School, Monroe, NY)
•        Aastha Parikh (2016-2017; Monroe-Woodbury High School, Monroe, NY)
•        Daniel Smith (2013-2014; Fairlawn High School, Fairlawn, NJ)
•        Alejandro Jorge (2012; Ramapo College, NJ)
•        Eric Bloom (2011-2012; Highland Mills High School [Highland Mills, NY])
•        Sujay Avencar (2009-2011; Suffern High School [Suffern, NY])
•        Sam Openheim (2009-2011; Suffern High School [Suffern, NY])
•        Monica Feldman (2007-2009; Spring Valley High School [Spring Valley, NY])

- George Markt (2005-2009; Ramapo High School [Ramapo, NY])
- Payal Roy (2006 – 2007; New York University [NY, NY])
- Rebecca Kurtzman (2005 – 2007; Spring Valley High School [Spring Valley, NY])
- Erica Stone (2006, Ramapo College [Mahwah, NJ])
- Elizabeth Nadziejko (2000; Washingtonville High School [Washingtonville, NY[)
- Kevin Hazard (1999 – 2000; Spring Valley High School [Spring Valley, NY])
- Songeeta Pachachuria (1997-2000; Spring Valley High School, [Spring Valley, NY])
-

**Post-Baccalaureate (2)**
- *Parnavi Desai* (2015-present; NYU, Biology)
- *Tomas Dunne* (2014-2015; Penn State)

***Masters* (30)**
- Arianna Schwartzer (2017-2019; NYU Environ. Health Sci)
- Kathryn Fetce (2016-2018; NYU Environmental Health Sciences)
- Nicholas Lawrence (2016-2018; NYU Environmental Health Sciences)
- Alexander Lucca (2017-2018; NYU Biology)
- Annie J.Thaikkatil (2016-2017; NYU Biology)
- Leena Babiker (2017-2018; NYU Biology)
- Patricia Costa (2014-2016; NYU Environ. Health Sci
- Maria Putilina (2013-2014-NYU, Biology)
- Kirtan Kaur (2013-2015)
- Sarah Attreed (2013-2015)
- Sabina Sutjec (2013-2014-NYU, Biology)
- Kaitlyn Koenig (2012-2014)
- Heather Larkin (2012-2013-NYU, Biology))
- Dana Lauterstein (2011-2013) – 2 SOT student awards (2013)
- Yi-Chuh Chen (2010-2011 Incomplete-NYU Biology)
- Ya-Chien Yu (2010-2011-IncompleteNYU Biology)
- Yuan-Chun Hsiao (2010-2011-Incomplete NYU Biology)
- Lauren Rosenblum (2009-2011-NYU Biology)
- Sandra Perella (2008-2010)
- Kotaro Hoshido (2007-2009-NYU Biology)
- Jacqueline Grabowski (2006-2008)
- Elizabeth Vanza (2004 – 2006) – *SOT student award (2006)*
- Elizabeth Berg (2003 - 2005)
- Shannon Doherty (2002 - 2005)
- Colette Prophete (1998 - 2001)
- Jessica Duffy (1999 - 2001)
- Migali Jorge (1998 - 2000)
- Cheryl Premdass (1998 - 2000)
- Andrea Raymond (1997 - 2000) – *1 SOT award*
- Thomas McManus (1994 – 1996, Co-advisor)

***Doctorate* (9)**
- Pamela Tijerna (2013-present) – *SOT CDI award (2014); SOT (1st place Hispanic Organization of Toxicology, 2015); SOT(Mary Amdur Inhalation Fellowship, 2015)*
- Dana Lauterstein (2013-present)- SOT (Safety Assessment Specialty Section, 2015)
- Juliett Igbo (2015-2016), Co-Advisor (U. of Lagos, Nigeria)
- Sheung Pui Ng (2004 - 2010) – *9 SOT student awards including Novartis Achievement Award (2008-2010)*
- Jessica Duffy (2001 – 2007) – *2 SOT awards (2004); 3 SETAC awards (2004, 2005, 2006)*
- Chanthana Settachan (Co-Advisor; 2003 – 2009; Chulabhorn Research Institute, Bangkok Thailand)
- Erik Carlson (1999- 2003) – *1 SOT award (2000)*
- Ninah Enane (Co-Advisor, 1995 - 1999)
- Peter Atkins (Co-Advisor, 1992 - 1996)

***Post-doctoral Trainees* (2) & Mentoring Committees**
- Jason Blum (2009 – 2012) – *1 SOT post-doc award*
- Daniel Willis (2011 – 2013)- NSF/FDA post-doctoral fellowship (Zelikoff, PI)-2013

***Junior Faculty Mentoring Committee* (2)**
- Jason Blum (2012 – Present)
- Kevin Cromar (2012-Present)

**Doctoral Thesis Committee** (12):
- Kirtan Kaur (2016-2018, Chair)
- Carolyn Klocke (2015-2017) – University of Rochester (External Examiner)
- Mary Francis (2015-2016) - Rutgers University (External Examiner)
- Eric Saunders (2012-2015)
- Joshua Vaughn (2012 – 2015)
- AJ Cuevas (2007 – 2012)
- Jessica Lyon (2007 - 2012)
- Judy Blatt Nichols (Chair, 2007 – 2011)
- Patricia Gillespie (2006 - 2010)
- Elizabeth Vanza (Chair, 2004 – 2009)
- Ann Zulkosky (2005 – 2007; SUNY Stony Brook)
- Samantha DeLeon (Chair, 1999 – 2003)

**COMMUNITY OUTREACH, EDUCATION & ENGAGEMENT INITIATIVES:**
- ***Director****, Community Outreach & Education Program, NYU, Dept. of Environ. Med.* (2005- present)
- ***Director****, NIEHS Center of Excellence, Community Outreach & Engagement Program, NYU, Dept. of Env. Med. (2005 – present)*
- ***Director,*** *NIEHS Superfund Community Outreach and Education Core, NYU, Dept. of Environ. Med.* (2005- 2010)

- **Co-director**, NIEHS Superfund Translation Core, *NYU, Dept. of Environ. Med.* (2005- 2011)
  - **Community Partners:**
    - *Ironbound Community Corporation (ICC): Newark, NJ (2015-present)*
    - *Ramapough Lenape Tribal Nation: Ringwood, NJ/Mahwah, NJ/Hillburn, NY (2013-present)*
    - *City of Garfield, NJ (2012-present)*
    - *Susquehanna, PA: Fracking communities (2015-2016)*
    - Flint, Michigan via Water Defense

**Translation/Communication of toxicology to non-toxicologists & underserved minorities**

- Community groups in PA and NY: Environmental and Health Implications of Hydraulic Fracturing (2013-2014).
- Ramapo Indians: Living on a Superfund Site (2014-present)
- NY Presbyterian Lang Program for Underserved Youth (2010 - Present)
- *Harlem Children Society Mentoring Program - Bronx, NY* (2010-Present)
- Y-2 Kids (NY State 4th – 12th grade, Career day representative, 2008 - Present)
- *Center for Talented Youth, New York University Department of Environmental Medicine & Johns Hopkins Center for Talented Youth (2005 – Present)*
- *Environmental Commission of Ramsey (2001 – 2007; Vice-Chair; 2004-2006)* - Ramsey, New Jersey. Woodburning: A Cozy Atmosphere or a Public Menace? (2003)
- *Senior Citizen Advisory Board of Ramsey* (2003 - 2005)
- *Ramsey High School (Presenter on toxicology and the environment 2005-2006)*
- *Youth Guidance Commission of Ramsey* (1999 - 2001)
- *Rotary Club*, Goshen, New York. Woodburning: A Cozy Atmosphere or a Public Menace? (2003)
- *Upper Saddle River Community Center*, Upper Saddle River, New Jersey. The Hazards of Woodburning (1997)

**Non-Academic Related Outreach Committees:**

- 2011- 2014 – *Board of Ethics*, Community Hospice of Bergen County (NJ)
- 2009- 2014 – *Fundraising Committee*, Community Hospice of Bergen County (NJ)
- 2006-2013 – President, Condominium Association
- 2013-2016 – Vice-President, Condominium Association
- 2018 – South Bronx Asthma Coalition

# Exhibit B

## MATERIALS AND DATA CONSIDERED

### Literature

Abraham, J.L., and D.D. McEuen. "Inorganic Particulates Associated with Pulmonary Alveolar Proteinosis:  SEM and X-Ray Microanalysis Results." *Appl. Pathol.* 4 (1986): 138-146.

Abubaker, Kalid, Rodney B. Luwor, et al. "Inhibition of the JAK2/STAT3 pathway in ovariancancer results in the loss of cancer stem cell-like characteristics and a reduced tumor burden." *BMC Cancer* No. 14 (2014): 317.

Abubaker, Kalid, Rodney B. Luwor, et al. "Targeted disruption of the JAK2/STAT3 pathwayin combination with systemic administration of paclitaxel inhibits the priming of ovarian cancer stem cells leading to a reduced tumor burden." *Frontiers in Oncology* No. 4(75) (2014).

Acheson, E D, M J Gardner, E C Pippard, and L P Grime. "Mortality of Two Groups of Women Who Manufactured Gas Masks from Chrysotile and Crocidolite Asbestos: A 40-Year Follow-Up." *British Journal of Industrial Medicine*, No. 39 (1982): 344–48.

Acencio, Milena M. P., Evaldo Marchi, Lisete R. Teixeira, Bruna Rocha Silva, Juliana Sanchez Silva, Carlos Sergio Rocha Silva, Vanessa Adelia Alvarenga, Leila Antonangelo, Francisco Suso Vargas, and Vera Luiza Capelozzi. "Talc Particles and Pleural Mesothelium Interface Modulate Apoptosis and Inflammation." *Pathology* 46, no. S2 (2014): S76.

Akhtar, Mohd Javed, Maqusood Ahamed, M.A. Majeed Khan, Salman A. Alrokayan, Iqbal Ahmad, and Sudhir Kumar. "Cytotoxicity and Apoptosis Induction by Nanoscale Talc Particles from Two Different Geographical Regions in Human Lung Epithelial Cells." *Environmental Toxicology* 29 (2014): 394–406. https://doi.org/10.1002/tox.21766.

Akhtar, Mohd Javed, Sudhir Kumar, et al. "The primary role of iron-mediated lipid peroxidation in the differential cytotoxicity caused by two varieties of talc nanoparticles on A549 cells and lipid peroxidation inhibitory effect exerted by ascorbic acid." *Toxicology in Vitro* No. 24 (2010): 1139–1147

Allaire, Guy S., Zachary D. Goodman, Kamal G. Ishak and Lionel Rabin. "Talc in Liver Tissue of Intravenous Drug Abusers with Chronic Hepatitis." *Am J Clin Pathol* 92 (1989): 583-588.

American Thoracic Society. "Health Effects of Tremolite." *Medical Section of the American Lung Association* (1991).

Arellano-Orden, Elena, Auxiliadora Romero-Falcon, Jose Martin Juan, Manuel Ocana Jurado, Francisco Rodriguez-Panadero, and Ana Montes-Worboys. "Small Particle-Size Talc Is Associated with Poor Outcome and Increased Inflammation in Thoracoscopic Pleurodesis." *Respiration* 86 (2013): 201–9. https://doi.org/10.1159/000342042.

 "ATSDR - Toxicological Profile: Asbestos." Accessed August 16, 2018. https://www.atsdr.cdc.gov/toxprofiles/tp.asp?id=30&tid=4.

Aust, Ann, James C. Ball, Autumn A. Hu, JoAnn S. Lighty, Kevin R. Smith, et al. "Particle Characteristics Responsible for Effects on Human Lung Epithelial Cells." *HEI* 110 (December 2002).

Aust, Ann E., Philip M. Cook, and Ronald F. Dodson. "Morphological and Chemical Mechanisms of Elongated Mineral Particle Toxicities." *Journal of Toxicology and Environmental Health, Part B* 14, (2011): 40-75.

Baan, Robert, Kurt Straif, Yann Grosse, Béatrice Secretan, Fatiha El Ghissassi, and Vincent Cogliano. "Carcinogenicity of Carbon Black, Titanium Dioxide, and Talc." *The Lancet Oncology* 7, No. 4 (April 2006): 295–96.

Baandrup, Louise, Mette T. Faber, Jane Christensen, Allan Jensen, Klaus K. Andersen, Søren Friis, and Susanne K. Kjaer. "Nonsteroidal Anti-Inflammatory Drugs and Risk of Ovarian Cancer: Systematic Review and Meta-Analysis of Observational Studies." *Acta Obstet Gynecol Scand* 92, No. 3 (March 2013): 245–55.

Balkwill, Fran, and Alberto Mantovani. "Inflammation and Cancer: Back to Virchow?" *The Lancet* 357, No. 9255 (February 2001): 539–45.

Basuli, D., L. Tesfay, Z. Deng, B. Paul, Y. Yamamoto, G. Ning, W. Xian, F. McKeon, M. Lynch, C.P. Crum, et al. "Iron Addiction: A Novel Therapeutic Target in Ovarian Cancer." *Oncogene* 36, (2017): 4089-99.

Beck, Barbara D., Henry A. Feldman, Joseph D. Brain et al. "The Pulmonary Toxicity of Talc and Granite Dust as Estimated from an in Vivo Hamster Bioassay." *Toxicology and Applied Pharmacology*, 87 (1987): 222-234.

Begg, Melissa D., and Dana March. "Cause and Association: Missing the Forest for the Trees." *American Journal of Public Health* 108, No. 5 (May 2018): 620.

Belotte, Jimmy, Nicole M. Fletcher, Awoniyi O. Awonuga, Mitchell Alexis, Husam M. Abu-Soud, Ghassan M. Saed, Michael P. Diamond, and Mohammed G. Saed. "The Role of Oxidative Stress in the Development of Cisplatin Resistance in Epithelial Ovarian Cancer." *Reproductive Sciences* 21, no. 4 (2014): 503–8. https://doi.org/10.1177/1933719113503403.

Berge, Wera, Kenneth Mundt, Hung Luu, and Paolo Boffetta. "Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis." *European Journal of Cancer Prevention*, 2017, 1.

Berry, G., M.L. Newhouse and J.C. Wagner. "Mortality from All Cancers of Asbestos Factory Workers in East London 1933-80." *Occup Environ Med* 57, No. 11 (November 1, 2000): 782–85.

Bertolotti, Marinella, Daniela Ferrante, Dario Mirabelli, Mario Botta, Marinella Nonnato, Annalisa Todesco, Benedetto Terracini, and Corrado Magnani. "[Mortality in the cohort of the asbestos cement workers in the Eternit plant in Casale Monferrato (Italy)]." *Epidemiologia E Prevenzione* 32, no. 4–5 (October 2008): 218–28.

Blejer, Hector P., and Robert Arlon. Talc: A Possible Occupational and Environmental Carcinogen." *Journal of Occupational Medicine* 15, No. 2 (February 1973): 92-97.

Blount, A M. "Amphibole Content of Cosmetic and Pharmaceutical Talcs." *Environmental Health Perspectives* 94 (August 1991): 225–30.

Bluemel, Piza, and Zischka-Konorsa, W. "Animal experimental investigations of tissue reactions to starch and talcum powder after intraperitoneal application." *Wiener klinische Wochenschrift* 74, no. 1 (January 1962).

Blumenkrantz, M. J., N. Gallagher, R. A. Bashore, and H. Tenckhoff. "Retrograde Menstruation in Women Undergoing Chronic Peritoneal Dialysis." *Obstetrics and Gynecology* 57, no. 5 (May 1981): 667–70.

Bogatu, Bettina, Bodo Contag, et al. "Adsorption of Lipoproteins onto Mineral Dust Surfaces: A Possible Factor in the Pathogenesis of Particle-induced Pulmonary Fibrosis?" *Z. Naturforsch* 60c, (2005): 792-798.

Boorman, G. A., and J. C. Seely. "The Lack of an Ovarian Effect of Lifetime Talc Exposure in F344/N Rats and B6C3F1 Mice." *Regulatory Toxicology and Pharmacology: RTP* 21,

no. 2 (April 1995): 242–43. https://doi.org/10.1006/rtph.1995.1035.

Booth, M, V Beral, and P Smith. "Risk Factors for Ovarian Cancer: A Case-Control Study." *British Journal of Cancer* 60, No. 4 (October 1989): 592–98. https://doi.org/10.1038/bjc.1989.320.

British Thoratic Association "A Survey of the Long-Term Effects of Talc and Kaolin Pleurodesis." *British Journal of Diseases of the Chest* 73 (1979): 285–88. https://doi.org/10.1016/0007-0971(79)90054-8.

Bunderson-Schelvan, Melisa, Jean C. Pfau, Robert Crouch, and Andrij Holian. "Nonpulmonary Outcomes of Asbestos Exposure." *Journal of Toxicology and Environmental Health, Part B* 14, No. 1–4 (May 2, 2011): 122–52.

Buz'Zard, Amber R., and Benjamin H. S. Lau. "Pycnogenol® Reduces Talc-Induced Neoplastic Transformation in Human Ovarian Cell Cultures." *Phytother. Res.* 21, No. 6 (June 2007): 579–86.

Camargo, M. Constanza, Leslie T. Stayner, Kurt Straif, Margarita Reina, Umaima Al-Alem, Paul A. Demers, and Philip J. Landrigan. "Occupational Exposure to Asbestos and Ovarian Cancer: A Meta-Analysis." *Environ Health Perspect* 119, No. 9 (September 2011): 1211–17.

Carr, C.J. "Talc: Consumer Uses and Health Perspectives" 21 (1995): 211–15.

Chan, J.K., Munro, E.G., Cheung, M.K., Husain, A., Teng, N.N., Berek, J.S., Osann, K. Association of lymphadenectomy and survival in stage I ovarian cancer patients. Obstet Gynecol.  2007.  Jan; 109(1):12-9.

Chan, J.K., Munro, E.G., Cheung, M.K., Husain, A., Teng, N.N., Berek, J.S., Osann, K. Association of lymphadenectomy and survival in stage I ovarian cancer patients.  Obstet Gynecol.  2007.  Jan; 109(1):12-9.

Chang, Che-Jui, Yu-Kang Tu, Pau-Chung Chen, and Hsiao-Yu Yang. "Occupational Exposure to Talc Increases the Risk of Lung Cancer: A Meta-Analysis of Occupational Cohort Studies." *Canadian Respiratory Journal* 2017 (2017): 1–12.

Chang, Stella, and Harvey A. Risch. "Perineal Talc Exposure and Risk of Ovarian Carcinoma." *Cancer* 79, No. 12 (June 15, 1997): 2396–2401.

Chen, L-M, et al. "Epithelial Carcinoma of the Ovary, Fallopian Tube, and Peritoneum: Epidemiology and Risk Factors - UpToDate," 2018. https://www.uptodate.com/contents/epithelial-carcinoma-of-the-ovary-fallopian-tube-and -peritoneum-epidemiology-and-risk-factors?search=Epithelial%20carcinoma%20of%20t he%20ovary,%20fallopian%20tube,%20and%20peritoneum:%20Epidemiology%20and %20risk%20factors&source=search_result&selectedTitle=1~150&usage_type=default&d isplay_rank=1.

Chen, Yong, Pao-Chen Wu, Jing-He Lang, Wen-Jun Ge, Patricia Hartge and Louise A. Brinton. "Risk Factors for Epithelial Ovarian Cancer in Beijing, China." *International Journal of Epidemiology* 21, No. 1 (1992): 23-29.

Chow, M.T., Moller, A., Smyth, M.J.  Inflammation and immune surveillance in cancer. Seminars in Cancer Biology.  2012.  22:23-32.

Churg, Andrew and Martha L. Warnock. "Analysis of the Cores of Ferruginous (Asbestos) Bodies from the General Population." *Laboratory Investigation* 40, No. 5 (1979): 622-26.

Clin, B., F. Morlais, B. Dubois, A.-V. Guizard, N. Desoubeaux, M.-F. Marquign, C. Raffaellis, C. Paris, F. Galateau-Salle, G. Launoy and M. Letourneux. "Occupational Asbestos Exposure and Digestive Cancers – A Cohort Study." *Alimentary Pharmacology &*

*Therapeutics* 30, (2009): 364-74.

Coggiola, Maurizio, Davide Bosio, Enrico Pira, Pier Giorgio Piolatto, Carlo La Vecchia, Eva Negri, Marco Michelazzi, and Alessandro Bacaloni. "An Update of a Mortality Study of Talc Miners and Millers in Italy." *American Journal of Industrial Medicine* 44, No. 1 (July 2003): 63–69.

Committee on Practice Bulletins–Gynecology, Committee on Genetics, Society of Gynecologic Oncology. "Practice Bulletin No 182: Hereditary Breast and Ovarian Cancer Syndrome." *Obstetrics and Gynecology* 130, no. 3 (2017): e110–26. https://doi.org/10.1097/AOG.0000000000002296.

Cook, Linda S., Mary L. Kamb, and Noel S. Weiss. "Perineal Powder Exposure and the Risk of Ovarian Cancer." *Am J Epidemiol* 145, No. 5 (March 1, 1997): 459–65.

Coussens, L.M., and Werb, Z. (2002). Inflammation and cancer. *Nature* 420, 860-867.

Cox, Mary Jude, Julia A. Woods, Steven Newman, Richard F. Edlich. "Toxic Effects of Surgical Glove Powders on the Eye." *Journal of Long-Term Effects of Medical Implants* 6, Nos. 3 and 4 (1996): 219-226.

Cralley, L.J., M.M. Key, D.H. Groth, W.S. Lainhart and R.M. Ligo. "Fibrous and Mineral Content of Cosmetic Talcum Products." *American Industrial Hygiene Association Journal* (July-August 1968): 350-354.

Cramer, D. W. "Perineal Talc Exposure and Subsequent Epithelial Ovarian Cancer: A Case-Control Study." *Obstetrics and Gynecology* 94, no. 1 (July 1999): 160–61.

Cramer, Daniel W., William R. Welch, Ross S. Berkowitz, John J. Godleski. "Presence of Talc in Pelvic Lymph Nodes of a Woman With Ovarian Cancer and Long-Term Genital Exposure to Cosmetic Talc." *Obstetrics & Gynecology* 110, (2007): 498-501.

Cramer, Daniel W, and Olivera J Finn. "Epidemiologic Perspective on Immune-Surveillance in Cancer." *Curr Opin Immunol* 23, No. 2 (April 2011): 265–71.

Cramer, Daniel W., Rebecca F. Liberman, Linda Titus-Ernstoff, William R. Welch, E. Robert Greenberg, John A. Baron, and Bernard L. Harlow. "Genital Talc Exposure and Risk of Ovarian Cancer." *Int. J. Cancer* 81, No. 3 (May 5, 1999): 351–56.

Cramer, Daniel W., Linda Titus-Ernstoff, John R. McKolanis, William R. Welch, Allison F. Vitonis, Ross S. Berkowitz, and Olivera J. Finn. "Conditions Associated with Antibodies Against the Tumor-Associated Antigen MUC1 and Their Relationship to Risk for Ovarian Cancer." *Cancer Epidemiology Biomarkers & Prevention* 14, no. 5 (May 1, 2005): 1125–31. https://doi.org/10.1158/1055-9965.EPI-05-0035.

Cramer, Daniel W., Allison F. Vitonis, Kathryn L. Terry, William R. Welch, and Linda J. Titus. "The Association Between Talc Use and Ovarian Cancer: A Retrospective Case–Control Study in Two US States." *Epidemiology* 27, No. 3 (May 2016): 334–46.

Cramer, Daniel W., William R. Welch, Robert E. Scully, and Carol A. Wojciechowski. "Ovarian Cancer and Talc. A Case-Control Study." *Cancer* 50, No. 2 (July 15, 1982): 372–76.

Crusz, Shanthini M., Frances R. Balkwill. "Inflammation and cancer: advances and new agents." *Nat. Rev. Clin. Oncol.* 12 (2015):584-596.

Cubillos-Ruiz, Juan R., Pedra C. Silberman, et al. "ER Stress Sensor XBP1 Controls Anti-tumor Immunity by Disrupting Dendritic Cell Homeostasis." *Cell* 161, (June 2015): 1527–1538.

Davies, R., J.W. Skidmore, D.M. Griffiths and C.B. Moncrieff. "Cytotoxicity of Talc for Macrophages in Vitro." *Fd. Chem. Tox.* 21, No. 2 (1983): 201-207.

De Boer, C. H. "Transport Of Particulate Matter Through The Human Female Genital Tract." *J. Reprod. Fert.* 28, (1972): 295-297.

De Mattia G, Bravi MC, Laurenti O, De Luca O, Palmeri A, Sabatucci A, Mendico G, Ghiselli A. Impairment of cell and plasma redox state in subjects professionally exposed to chromium. Am J Ind Med. 2004; 46(2):120–125.

Denkhaus, E., K. Salnikow "Nickel essentiality, toxicity, and carcinogenicity." *Oncology/Hematology* No. 42 (2002): 35–56.

DeSesso, John M. "Exponent Talc Defense Presentation Toxic Talc?" January 18, 2018.

Di Cristo, Luisana, Dania Movia, Massimiliano G. Bianchi, Manfredi Allegri, Bashir M. Mohamed, Alan P. Bell, Caroline Moore, et al. "Proinflammatory Effects of Pyrogenic and Precipitated Amorphous Silica Nanoparticles in Innate Immunity Cells." *Toxicological Sciences* 150, No. 1 (March 2016): 40–53.

Dion, Chantal, Guy Perrault, Mounia Rhazi. Institut de recherche Robert-Sauve en sante et en securite du travail (IRSST). "Synthesis of Knowledge on Tremolite in Talc." *Chemical Substances and Biological Agents: Studies and Research Projects* Report R-755, (2012): 1-98.

Dixon, Suzanne C., Christina M. Nagle, Nicolas Wentzensen, Britton Trabert, Alicia Beeghly-Fadiel, Joellen M. Schildkraut, Kirsten B. Moysich, et al. "Use of Common Analgesic Medications and Ovarian Cancer Survival: Results from a Pooled Analysis in the Ovarian Cancer Association Consortium." *British Journal of Cancer* 116, no. 9 (April 25, 2017): 1223–28. https://doi.org/10.1038/bjc.2017.68.

Dodson, Ronald F., Michael O'Sullivan, Carolyn J. Corn, and Samuel P. Hammar. "Quantitative Comparison of Asbestos and Talc Bodies in an Individual with Mixed Exposure." *American Journal of Industrial Medicine* 27, No. 2 (February 1995): 207–15.

Dreher, R., H.U. Keller, M.W. Hess, B. Roos and H. Cottier. "Early Appearance and Mitotic Activity of Multinucleated Giant Cells in Mice after Combined Injection of Talc and Prednisolone Acetate." *International Academy of Pathology* 38, No. 2 (1978): 149-156.

Driscoll, K. "Effects of Particle Exposure and Particle-Elicited Inflammatory Cells on Mutation in Rat Alveolar Epithelial Cells." *Carcinogenesis* 18, No. 2 (February 1, 1997): 423–30.

Duda-Chodak, Aleksandra, Urszula Blaszczyk. "The Impact of Nickel on Human Health." *J. Elementol.* No. 13(4) (2008): 685-696.

Edelstam, G. A. B., A. C. E. Sjosten, H. Ellis. "Retrograde Migration of Starch in the Genital Tract of Rabbits." *Inflammation* Vol. 21, No. 5 (1997): 489-499.

Egilman, David "The Production of Corporate Research to Manufacture Doubt About the Health

Egli, G. E., and M. Newton. "The Transport of Carbon Particles in the Human Female Reproductive Tract." *Fertility and Sterility* 12 (April 1961): 151–55.

Elder, A., Gelein, R., Silva, V., Feikert, T., Opanashuk, L., Carter, J., Potter, R., Maynard, A., Ito, Y., Finkelstein, J., Oberdorster, G.   Translocation of inhaled ultrafine manganese oxide particles to the central nervous system. Environ Health Perspect. 2006. 114:1172-1178.

Hazards of Products: An Overview of the Exponent BakeliteVR Simulation Study." *NEW SOLUTIONS: A Journal of Environmental and Occupational Health Policy* Vol. 28(2) (2018): 179–201.

Endo-Capron, S., A. Renier, X. Janson, L. Kheuang, and M.C. Jaurand. "In Vitro Response of Rat Pleural Mesothelial Cells to Talc Samples in Genotoxicity Assays (Sister Chromatid Exchanges and DNA Repair)." *Toxicology in Vitro* 7, No. 1 (January 1993): 7–14.

Eng, Kevin H., J. Brian Szender, John Lewis Etter, Jasmine Kaur, Samantha Poblete, Ruea-Yea Huang, Qianqian Zhu, et al. "Paternal Lineage Early Onset Hereditary Ovarian Cancers:

A Familial Ovarian Cancer Registry Study." *PLoS Genetics* 14, no. 2 (February 2018): e1007194. https://doi.org/10.1371/journal.pgen.1007194.

Enticknap, J.B. and W.J. Smither. "Peritoneal Tumours in Asbestosis." *British Journal of Industrial Medicine* 21 (1964): 20-31.

EPA. "Drinking Water Standard for Arsenic." (January 2001).

EPA. "Health Assessment Document for Talc." (March 1992).

European Center for Ecotoxicology and Toxicology of Chemicals. "Evaluation of Systemic Health Effects Following Dermal Exposure to Chemicals." Technical Report No. 119 ISSN-0773-8072-119 (March 2013).

Fang, Zhijia, Min Zhao, et al. "Genotoxicity of Tri- and Hexavalent Chromium Compounds In Vivo and Their Modes of Action on DNA Damage In Vitro." *PLOS One.* Vol. 9 Issue 8. *(*August 2014).

Fasching, Peter A., Simon Gayther, Leigh Pearce, Joellen M. Schildkraut, Ellen Goode, Falk Thiel, Georgia Chenevix-Trench, et al. "Role of Genetic Polymorphisms and Ovarian Cancer Susceptibility." *Molecular Oncology* 3, no. 2 (April 2009): 171–81. https://doi.org/10.1016/j.molonc.2009.01.008.

Fathalla, M. F. "Incessant Ovulation – A Factor in Ovarian Neoplasia." *The Lancet* (July 1971): 163.

FDA. "Ltr to Samuel S. Epstein, M.D., RE: Docket Numbers 94P-0420 and FDA-2008-P-0309-0001 /CP," April 1, 2017.

FDA. "Talc." https://www.fda.gov/Cosmetics/ProductsIngredients/Ingredients/ucm293184.htm

Federal Register 37, "Subpart G-Occupational Health and Environmental Control." No. 202 (October 18, 1972): 22139-144.

Federal Register 40 CFR Part 763, "Part III – Environmental Protection Agency: Asbestos-Containing Materials in Schools; Final Rule and Notice." Vol. 52, No. 210 (October 30, 1987): 41826-41906.

Fernandes, José Veríssimo, Ricardo Ney Oliveira Cobucci, Carlos André Nunes Jatobá, Thales Allyrio Araújo de Medeiros Fernandes, Judson Welber Veríssimo de Azevedo, and Josélio Maria Galvão de Araújo. "The Role of the Mediators of Inflammation in Cancer Development." *Pathology & Oncology Research* 21, no. 3 (July 2015): 527–34. https://doi.org/10.1007/s12253-015-9913-z.

Ferrante, Daniela, Marinella Bertolotti, Annalisa Todesco, Dario Mirabelli, Benedetto Terracini, and Corrado Magnani. "Cancer Mortality and Incidence of Mesothelioma in a Cohort of Wives of Asbestos Workers in Casale Monferrato, Italy." *Environmental Health Perspectives* 115, No. 10 (October 2007).

Ferrer, Jaume, Juan F. Montes, Maria A. Villarino, Richard W. Light, and José Garcìa-Valero. "Influence of Particle Size on Extrapleural Talc Dissemination After Talc Slurry Pleurodesis." *Chest* 122, No. 3 (September 2002): 1018–27.

Finley, Brent L., Jennifer S. Pierce. "Evaluation of tremolite asbestos exposures associated with the use of commercial products." *Critical Reviews in Toxicology.* No. 42(2) (2012): 119–146

Finnish Institute of Occupational Health. *Asbestos, Asbestosis, and Cancer, Helsinki Criteria for Diagnosis and Attribution 2014.* (June 2014).

Fiume, Monice M., Ivan Boyer, Wilma F. Bergfeld et al. "Safety Assessment of Talc as Used in Cosmetics." *International Journal of Toxicology* Vol. 34, No. 1 (2015): 66-129.

Fletcher, Nicole, Jimmy Belotte, et al. "Specific point mutations in key redox enzymes are associated with chemoresistance in epithelial ovarian cancer." *Free Radical Biology and*

*Medicine*. 102 (2017) 122–132.

Fletcher, Nicole M., Zhongliang Jiang, Rouba Ali-Fehmi, Nancy K. Levin, Jimmy Belotte, Michael A. Tainsky, Michael P. Diamond, Husam M. Abu-Soud, and Ghassan M. Saed. "Myeloperoxidase and Free Iron Levels: Potential Biomarkers for Early Detection and Prognosis of Ovarian Cancer." *Cancer Biomarkers* 10 (2012 2011): 267–75. https://doi.org/10.3233/CBM-2012-0255.

Fleming, Jean S., Clare R. Beaugié, Izhak Haviv, Georgia Chenevix-Trench, and Olivia L. Tan. "Incessant Ovulation, Inflammation and Epithelial Ovarian Carcinogenesis: Revisiting Old Hypotheses." *Molecular and Cellular Endocrinology* 247, No. 1–2 (March 2006): 4–21.

Fletcher, Nicole, Ira Memaj, and Ghassan M Saed. "Talcum Powder Enhances Oxidative Stress in Ovarian Cancer Cells." *Reproductive Sciences* 25, Supplement 1 (March 2018): 214A-215A.

Forman, Henry Jay and Martine Torres. "Reactive Oxygen Species and Cell Signaling Respiratory Burst in Macrophage Signaling." *Am J Respir Crit Care Med.* Vol 166. (2002) pp S4–S8.

Frank, Czul, Lascano Jorge. "An uncommon hazard: Pulmonary talcosis as a result of recurrent aspiration of baby powder." *Respiratory Medicine CME* 4, (2011): 109-111.

Freedman, Ralph S, Michael Deavers, Jinsong Liu, and Ena Wang. "Peritoneal Inflammation – A Microenvironment for Epithelial Ovarian Cancer (EOC)." *Journal of Translational Medicine* 2, no. 23 (2004). https://doi.org/10.1186/1479-5876-2-23.

Friebel, Tara M., Susan M. Domchek, and Timothy R. Rebbeck. "Modifiers of Cancer Risk in BRCA1 and BRCA2 Mutation Carriers: Systematic Review and Meta-Analysis." *Journal of the National Cancer Institute* 106, no. 6 (June 2014): dju091. https://doi.org/10.1093/jnci/dju091.

Friedrichs, Karl Heinz. "Electron Microscopic Analyses of Dust From the Lungs and the Lymph Nodes of Talc-Mine Employees." *American Industrial Hygiene Association Journal* 48, No. 7 (July 1987): 626–33.

Galea, Sandro and Roger Vaughan. "Moving Beyond the Cause of Constraint: A Public Health of Consequence." *American Journal of Public Health* 108, No. 5 (May 2018): 602-03.

Gamble, John F., William Fllner and Michal J. Dimeo. "An Epidemiologic Sutdy of a Group of Talc Workers." *American Review of Respiratory Diesease.* Vol. 119 (1979): 741-753.

Gardner, M.J., P.D. Winter, B. Pannett, and C.A. Powell. "Follow Up Study of Workers Manufacturing Chrysotile Asbestos Cement Products." *British Journal of Industrial Medicine* 43, (1986): 726-32.

Gates, M. A., B. A. Rosner, J. L. Hecht, and S. S. Tworoger. "Risk Factors for Epithelial Ovarian Cancer by Histologic Subtype." *Am J Epidemiol* 171, No. 1 (2010): 45–53.

Gates, M. A., S. S. Tworoger, K. L. Terry, L. Titus-Ernstoff, B. Rosner, I. De Vivo, D. W. Cramer, and S. E. Hankinson. "Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer." *Cancer Epidemiol Biomarkers Prev.* 17, No. 9 (September 2008): 2436–44.

Gavalas, Nikos G, Alexandra Karadimou, et al. "Immune Response in Ovarian Cancer: How Is the Immune System Involved in Prognosis and Therapy: Potential for Treatment Utilization. *Clinical and Developmental Immunology.* Vol. 2010. Article ID 791603.

Genofre, Eduardo H., Francisco S. Vargas, Milena M.P. Acencio, Leila Antonangelo, Lisete R. Teixeira, and Evaldo Marchi. "Talc Pleurodesis: Evidence of Systemic Inflammatory

Response to Small Size Talc Particles." *Respiratory Medicine* 103, No. 1 (2009): 91–97.

Germani, D., S. Belli, C. Bruno, M. Grignoli, M. Nesti, R. Pirastu, and P. Comba. "Cohort Mortality Study of Women Compensated for Asbestosis in Italy." *Am. J. InD. Med.* 36, No. 1 (1999): 129–34.

Gertig, Dorota M., David J. Hunter, Daniel W. Cramer, Graham A. Colditz, Frank E. Speizer, Walter C. Willett, and Susan E. Hankinson. "Prospective Study of Talc Use and Ovarian Cancer." *J Natl Cancer Inst* 92, No. 3 (2000): 249–52.

Getze, George. "Asbestos Blamed for Increase in Ovary Cancer." *The Philadelphia Inquirer* (March 28, 1968).

Ghio, Andrew J. and Victor Roggli. "Letter to the Editor: Talc Should Not Be Used for Pleurodesis in Patients with Nonmalignant Pleural Effusions." *American Journal of Respiratory Critical Care Medicine* (2001): 1741.

Ghio, Andrew J., Joleen M. Soukup, Lisa A. Dailey, Judy H. Richards, Jennifer L. Turi, Elizabeth N. Pavlisko, and Victor L. Roggli. "Disruption of Iron Homeostasis in Mesothelial Cells after Talc Pleurodesis." *Am J Respir Cell Mol Biol* 46, No. 1 (January 2012): 80–86.

Ghio, Andrew J., Joleen M. Soukup, Lisa A. Dailey, Judy Richards, Zhongping Deng, Jerrold L. Abraham." Gadolinium exposure disrupts iron homeostasis in cultured cells." *J Biol Inorg Chem.* No. 16 (2011): 567–575.

Gilbert, Christopher, Benjamin R. Furman, et al. "Description of Particle Size, Distribution, and Behavior of Talc Preparations Commercially Available Within the United States." *J Bronchol Intervent Pulmonol.* Vol. 25, No. 1. (January 2018).

"Global Ban on the Mining and Use of Asbestos." *World Federation of Public Associations*. (2005).

Godard, Beatrice, William D. Foulkes, Diane Provencher, Jean-Sebastien Brunet, Patricia N. Tonin, Anne-Marie Mes-Masson, Steven A. Narod, and Parviz Ghadirian. "Risk Factors for Familial and Sporadic Ovarian Cancer among French Canadians: A Case-Control Study." *Am J Obstet Gynecol* 179, No. 2 (August 1998): 403–10.

Gondal, Mohammed A., Mohamed A. Dastageer, Akhtar A. Naqvi, Anvar A. Isab, Yasin W. Maganda. "Detection of toxic metals (lead and chromium) in talcum powder using laser induced breakdown spectroscopy." *Applied Optics* Vol. 51, No. 30 (October 2012): 7395-7401.

Gonzalez, N.L., K.M. O'Brien, A.A. D'Aloisio, D.P. Sandler, and C.R. Weinberg. "Douching, Talc Use, and Risk of Ovarian Cancer:" *Epidemiology* 27, No. 6 (November 2016): 797–802.

Gordon, Ronald E., Sean Fitzgerald, and James Millette. "Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women." *International Journal of Occupational and Environmental Health* 20, No. 4 (October 2014): 318–32.

Graham, and Jenkins. "Value of Modified Starch as a Substitute for Talc." *Lancet (London, England)* 1, no. 6708 (March 22, 1952): 590–91.

Graham, John, and Ruth Graham. "Ovarian Cancer and Asbestos." *Environmental Research* 1, No. 2 (October 1967): 115–28.

Green, Adèle, David Purdie, Christopher Bain, Victor Siskind, Peter Russell, Michael Quinn, and Bruce Ward. "Tubal Sterilisation, Hysterectomy and Decreased Risk of Ovarian Cancer." *Int. J. Cancer* 71, No. 6 (June 11, 1997): 948–51.

Grivennikov, Sergei I., Florian R. Greten, and Michael Karin. "Immunity, Inflammation, and

Cancer." *Cell* 140, no. 6 (March 19, 2010): 883–99. https://doi.org/10.1016/j.cell.2010.01.025.

Gross, Alan J., and Paul H. Berg. "A Meta-Analytical Approach Examining the Potential Relationship Between Talc Exposure and Ovarian Cancer." *Journal of Exposure Analysis and Environmental Epidemiology* 5, No. 2 (1995): 181-195.

Halme, J., M. G. Hammond, J. F. Hulka, S. G. Raj, and L. M. Talbert. "Retrograde Menstruation in Healthy Women and in Patients with Endometriosis." *Obstetrics and Gynecology* 64, no. 2 (August 1984): 151–54.

Hammar, S.P., R.F. Dodson. "Asbestos: Risk Assessment, Epidemiology, and Health Effects, Second Edition." 2nd Edition, Ch. 28 (2017): 927-930; 976.

Hamilton, John A., Geraldine McCarthy and Genevieve Whitty. "Primary research Inflammatory microcrystals induce murine macrophage survival and DNA synthesis." *Arthritis Res No. 3* (2001): 242–246.

Hamilton, T.C., H. Fox, C.H. Buckley, W.J. Henderson', W J, and K Griffiths. "Effects of Talc on the Rat Ovary." *Br. J. Exp. Path.* 65, (1984): 101-106.

Hammar, S.P. and R.F. Dodson. *Asbestos: Risk Assessment, Epidemiology, and Health Effects.*

Harding, A.H., A. Darnton, J. Wegerdt, and D. McElvenny. "Mortality Among British Asbestos Workers Undergoing Regular Medical Examinations." *Occupational and Environmental Medicine* 66, (2009): 487-95.

Harlow, Bernard L., and Noel S. Weiss. "A Case-Control Study of Borderline Ovarian Tumors: The Influence of Perineal Exposure to Talc." *American Journal of Epidemiology* 130, No. 2 (August 1989): 390–94.

Harlow, Bernard L., Daniel W. Cramer, Debra A. Bell and William R. Welch. "Perineal Exposure to Talc and Ovarian Cancer Risk." *Obstet Gynecol* 80, No. 1 (July 1992): 19-26.

Hartge, Patricia, Robert Hoover, Linda P. Lesher, and Larry McGowan. "Talc and Ovarian Cancer." *JAMA* 250, No. 14 (October 14, 1983): 1844.

Heidland, A., Klassen A., Rutkowski, P., Bahner, U.   The contribution of Rudolf Virchow to the concept of inflammation: what is still of importance? Journal of nephrology. 2006; 29(Suppl 10): S102-109.

Hein, Misty J., Leslie T. Stayner, Everett Lehman, John M. Dement. "Follow-Up Study of Chrysotile Textile Workers: Cohort Mortality and Exposure-Response." *Occupational and Environmental Medicine* 64, (2007): 616-25.

Henderson, W.J., C.A.F. Joslin, A.C. Turnbull. "Talc and Carcinoma of the Ovary and Cervix." *The Journal of Obstetrics and Gynaecology of the British Commonwealth* Vol. 78 (March 1971): 266-272.

Henderson, W.J., A.V. Maskell, K Griffiths. "Contamination of Surgical Gloves." *British Medical Journal*, (February 1978): 363.

Henderson, W.J., T.C. Hamilton, M.S. Baylis, C.G. Pierrepoint, K. Griffiths. "The Demonstration of the Migration of Talc from the Vagina and Posterior Uterus to the Ovary in the Rat." *Environmental Research* 40 (1986): 247-250.

Heller, Debra S., Ronald E. Gordon, and Norman Katz. "Correlation of Asbestos Fiber Burdens in Fallopian Tubes and Ovarian Tissue." *Am J Obstet Gynecol* 181, No. 2 (August 1999): 346–47.

Heller, Debra S., Ronald E. Gordon, Carolyn Westhoff, and Susan Gerber. "Asbestos Exposure and Ovarian Fiber Burden." *American Journal of Industrial Medicine* 29, No. 5 (May

1996): 435–39.

Heller, D. S., C. Westhoff, R. E. Gordon, and N. Katz. "The Relationship between Perineal Cosmetic Talc Usage and Ovarian Talc Particle Burden." *American Journal of Obstetrics and Gynecology* 174, no. 5 (May 1996): 1507–10.

Hernán, Miguel A. "The C-Word: Scientific Euphemisms Do Not Improve Causal Inference From Observational Data." *Am J Public Health* 108, No. 5 (May 2018): 616–19.

Hildick-Smith, Gavin Y. "The Biology of Talc." *British Journal of Industrial Medicine* 33, (1976): 217-229.

Hill, Austin Bradford. "The Environment and Disease: Association or Causation?" *Proceedings of the Royal Society of Medicine* 58, no. 5 (May 1965): 295–300.

Hillegass, Jedd M., Arti Shukla, Maximilian B. MacPherson, Jeffrey P. Bond, Chad Steele, and Brooke T. Mossman. "Utilization of Gene Profiling and Proteomics to Determine Mineral Pathogenicity in a Human Mesothelial Cell Line (LP9/TERT-1)." *Journal of Toxicology and Environmental Health. Part A* 73, no. 5 (January 2010): 423–36. Hoffeld, J. Terrell. "Inhibition of Lymphocyte Proliferation and Antibody Production in Vitro by Silica, Talc, Bentonite Or Corynebacterium Parvum: Involvement of Peroxidative Processes." *Eur. J. Immunol* 13, No. 5 (1983): 364–69.

Hollinger, Mannfred A. "Pulmonary toxicity of inhaled and intravenous talc." *Elsevier: Toxicology Letters* 52 (1990): 121-127.

Holschneider, Christine H., and Jonathan S. Berek. "Ovarian Cancer: Epidemiology, Biology, and Prognostic Factors." *Semin. Surg. Oncol.* 19, No. 1 (July 2000): 3–10.

Honda, Yasushi, Colleen Beall, Elizabeth Delzell, Kent Oestenstad, Ilene Brill and Robert Matthews. "Mortality among Workers at a Talc Mining and Milling Facility." *The Annals of Occupational Hygiene* 46, No. 7 (October 2002): 575-85.

Houghton, S. C., K. W. Reeves, S. E. Hankinson, L. Crawford, D. Lane, J. Wactawski-Wende, C. A. Thomson, J. K. Ockene, and S. R. Sturgeon. "Perineal Powder Use and Risk of Ovarian Cancer." *JNCI J Natl Cancer Inst* 106, No. 9 (September 10, 2014).

Huncharek, Michael, J.F. Geschwind and Bruce Kupelnick. "Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies." *Anticancer Research* 25, (2003): 1955-1960.

Huncharek, Michael, and Joshua Muscat. "Perineal Talc Use and Ovarian Cancer Risk: A Case Study of Scientific Standards in Environmental Epidemiology." *European Journal of Cancer Prevention* 20, No. 6 (November 2011): 501–7.

Huncharek, Michael, Joshua Muscat, Adedayo Onitilo, and Bruce Kupelnick. "Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies." *European Journal of Cancer Prevention* 16, No. 5 (October 2007): 422–29.

Hunn, Jessica, Gustavo C. Rodriguez. "Ovarian Cancer: Etiology, Risk Factors, and Epidemiology" *Clinical Obstetrics and Gynecology* Vol. 55, No. 1: 3-23.

"Inflammation: A Hidden Path to Breaking the Spell of Ovarian Cancer." *Cell Cycle* 8, no. 19 (2009): 3107–11.

Institute of Medicine (US) Committee on Asbestos: Selected Health Effects. *Asbestos: Selected Cancers*. The National Academies Collection: Reports Funded by National Institutes of Health. Washington (DC): National Academies Press (US), 2006. http://www.ncbi.nlm.nih.gov/books/NBK20332/.

International Agency for Research on Cancer (IARC), "Some Inorganic and Organometallic Compounds", IARC Monograph No. 2 (1973).

International Agency for Research on Cancer (IARC), "IARC Monographs On The Evaluation Of Carcinogenic Risk Of Chemicals To Man: Cadmium, Nickel, Some Epoxides, Miscellaneous Industrial Chemicals and General Considerations on Volatile Anaesthetics." IARC Monograph Vol. 11 (1976): 1-282.

International Agency for Research on Cancer (IARC), "Asbestos", IARC Monograph No. 14 (1977).

International Agency for Research on Cancer (IARC), "IARC Monographs On The Evaluation Of The Carcinogenic Risks To Humans: Chemicals and Industrial Processes Associated with Cancer in Humans." IARC Monographs, Volumes 1 to 20 Supplement 1 (1979).

International Agency for Research on Cancer (IARC), "IARC Monographs On The Evaluation Of The Carcinogenic Risks To Humans: Chemicals, Industrial Processes and Industries Associated With Cancer in Humans." IARC Monographs, Volumes 1 to 29 Supplement 4 (1982).

International Agency for Research on Cancer (IARC), "Carbon Black, Titanium Dioxide, and Talc." IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, v. 93. Lyon, France : Geneva: International Agency for Research on Cancer ; Distributed by WHO Press, 2010.

International Agency for Research on Cancer (IARC), "Overall Evaluation of Carcinogenicity: An Updating of IARC Monographs Volumes 1 to 42 Supplement 7 (1987).

International Agency for Research on Cancer (IARC), "Silica and Some Silicates", IARC Monograph No. 42 (1987).

International Agency for Research on Cancer (IARC), "Mechanisms of Fibre Carcinogenesis", IARC Scientific Publications No. 140 (1996).

International Agency for Research on Cancer (IARC), "Silica, Some Silicates, Coal Dust and Para-Aramid Fibrils", IARC Monograph No. 68 (1997).

International Agency for Research on Cancer (IARC), "A review of human carcinogens-Part C: metals, arsenic, dusts and fibres." *The Lancet* 10 (2009): 453-454.

International Agency for Research on Cancer (IARC), "Carbon Black, Titanium Dioxide, and Talc", IARC Monographs No. 93., (2010).

International Agency for Research on Cancer (IARC), "Arsenic, Metals, Fibres, and Dusts," IARC Monograph No. 100C (2012).

International Agency for Research on Cancer (IARC), "Table 2.8. Epidemiologic studies of asbestos exposure and ovarian cancer." 1-3.

International Labour Organization (ILO), "Resolution concerning asbestos, 2006." *ILO Resolution* (June 2006): 1-2.

Ingersoll, Molly A., Andrew M. Platt, Stephane Potteaux, Gwendalyn J. Randolph. "Monocyte trafficking in acute and chronic inflammation." *Trends Immunol.* 32, No. 10 (October 2011): 470-477.

Iturralde, Mario, Pieter Ferdinand Venter. "Hysterosalpingo-Radionuclide Scintigraphy (HERS)." *Seminars in Nuclear Medicine* Vol. XI, No. 4 (October 1981): 301-314.

Jammal, Millena Prata, Agrimaldo Martins-Filho, et al., "Cytokines and Prognostic Factors in Epithelial Ovarian Cancer." *Clinical Medicine Insights: Oncology* 10 (2016): 71-76.

Jampol, Lee M., Tomoichi Setogawa, Krishna Rao V. Rednam, Mark O.M Tso. "Talc Retinopathy in Primates." *Archives of Opthalmology* 99, (July 1981): 1273-80.

Jarad, N Al, M Macey, S Uthayakumar, A C Newland, and R M Rudd. "Lymphocyte Subsets in Subjects Exposed to Asbestos: Changes in Circulating Natural Killer Cells." *British Journal of Industrial Medicine* 49, (1992): 811-814.

Jasuja, Sonia, Brooks T. Kuhn, Michael Schivo, Jason Y. Adams. "Cosmetic Talc-Related Pulmonary Granulomatosis." *Journal of Investigative Medicine High Impact Case Reports* Vol. 1, No. 4 (2017): 1-4.

Jervis, Sarah, Honglin Song, Andrew Lee, Ed Dicks, Jonathan Tyrer, Patricia Harrington, Douglas F. Easton, Ian J. Jacobs, Paul P. D. Pharoah, and Antonis C. Antoniou. "Ovarian Cancer Familial Relative Risks by Tumour Subtypes and by Known Ovarian Cancer Genetic Susceptibility Variants." *Journal of Medical Genetics* 51, no. 2 (February 2014): 108–13. https://doi.org/10.1136/jmedgenet-2013-102015.

Jia, D, Y Nagaoka, S Orsulic, and M Katsumata. "Inflammation Is a Key Contributor to Ovarian Cancer Cell Seeding." *Scientific Reports* 8, no. 12394 (August 17, 2018). https://doi.org/10.1038/s41598-018-30261-8.

Jiang, Zhongliang, Nicole M. Fletcher, Rouba Ali-Fehmi, Michael P. Diamond, Husam M. Abu-Soud, Adnan R. Munkarah, and Ghassan M. Saed. "Modulation of Redox Signaling Promotes Apoptosis in Epithelial Ovarian Cancer Cells." *Gynecologic Oncology* 122, no. 2 (August 2011): 418–23. https://doi.org/10.1016/j.ygyno.2011.04.051.

Jing, Jiongjie, Xiaolong Jiang, Jianwei Chen, Xiaolei Yao et al. "Notch signaling pathway promotes the development of ovine ovarian follicular granulosa cells." *Animal Reproduction Science* 181 (2017): 69-78.

Jing, Xuquan, Feng Li, Xue Meng, Zhitong Liu, Jinming Yu, Bo Liu. "Ovarian metastasis from lung adenocarcinoma with ALK-positive rearrangement detected by next generation sequencing: A case report and literatures review." *Cancer Biology & Therapy* Vol. 18, No. 5 (2017): 279-284.

Jo, Hwanju, Young Nam Jang and Jung Hyun Jo. "A Low Temperature Detoxification Method for Treatment of Chrysotile-Containing Waste Roofing Slate." *Minerals* 7, No. 144 (2017).

Jones, Richard E., and Kristin H. Lopez. "Human Reproductive Biology - 4th Edition Chapter 9 - Gamete Transport and Fertilization." In *Human Reproductive Biology*, Third., 159–73. San Diego: Academic Press, 2006. https://doi.org/10.1016/B978-0-12-382184-3.00009-X.

Jordan, Susan J., Adèle C. Green, David C. Whiteman, and Penelope M. Webb. "Risk Factors for Benign Serous and Mucinous Epithelial Ovarian Tumors:" *Obstetrics & Gynecology* 109, No. 3 (March 2007): 647–54.

Jurinski, Joseph B., and J. Donald Rimstidt. "Biodurability of Talc." *American Mineralogist* 86, No. 4 (April 2001): 392–99.

Kane, AB, P Boffetta, R Saracci, and JD Wilbourn. "Mechanisms of Fibre Carcinogenesis." IARC, 1996.

Kang, N., D. Griffin, and H. Ellis. "The Pathological Effects of Glove and Condom Dusting Powders." *Journal of Applied Toxicology* 12, No. 6 (December 1992): 443–49.

Karageorgi, S., M. A. Gates, S. E. Hankinson, and I. De Vivo. "Perineal Use of Talcum Powder and Endometrial Cancer Risk." *Cancer Epidemiology Biomarkers & Prevention* 19, No. 5 (May 2010): 1269–75.

Kauff, Noah D., Nandita Mitra, Mark E. Robson, Karen E. Hurley, Shaokun Chuai, Deborah Goldfrank, Eve Wadsworth, et al. "Risk of Ovarian Cancer in BRCA1 and BRCA2

Mutation-Negative Hereditary Breast Cancer Families." *Journal of the National Cancer Institute* 97, no. 18 (September 21, 2005): 1382–84. https://doi.org/10.1093/jnci/dji281.

Keal, E E. "Asbestosis and Abdominal Neoplasms." *The Lancet* (December 3, 1960): 1211-16.

Kerger, Brent D., Robert C. James and David A. Galbraith. "Tumors that Mimic Asbestos-Related Mesothelioma: Time to Consider a Genetics-Based Tumor Registry." *Frontiers in Genetics* 5, No. 151 (May 30, 2014): 1-14.

Keskın, Nadi, Yasemin Aktan Teksen, Esra Gürlek Ongun, Yusuf Özay, and Halil Saygılı. "Does Long-Term Talc Exposure Have a Carcinogenic Effect on the Female Genital System of Rats? An Experimental Pilot Study." *Archives of Gynecology and Obstetrics* 280, No. 6 (December 2009): 925–31.

Khan, Mohd Imran, Amogh A. Sahasrabuddhe, Govil Patil, Mohd Javed Akhtar, Mohd Ashquin, and Iqbal Ahmad. "Nano-Talc Stabilizes TNF- $\alpha$ m-RNA in Human Macrophages." *Journal of Biomedical Nanotechnology* 7, No. 1 (January 2011): 112–13.

Kim, Brian, Francis M. Giardiello. "Chemoprevention in familial adenomatous polyposis." *Best Pract Res Clin Gastroenterol* Vol. 25, No. 0 (August 2011): 607-622.

Kiraly, Orsolya, Guanyu Gong, Werner Olipitz, Sureshkumar Muthupalani, and Bevin P. Engelward. "Inflammation-Induced Cell Proliferation Potentiates DNA Damage-Induced Mutations In Vivo." *PLoS Genetics*, February 3, 2015. https://doi.org/10.1371/journal.pgen.1004901.

Kissler, Stefan, Ernst Siebzehnruebl, Joachim Kohl, Anja Mueller, Nadja Hamscho, Regine Gaetje, Andre Ahr, Achim Rody, and Manfred Kaufmann. "Uterine Contractility and Directed Sperm Transport Assessed by Hysterosalpingoscintigraphy (HSSG) and Intrauterine Pressure (IUP) Measurement." *Acta Obstetricia Et Gynecologica Scandinavica* 83, no. 4 (April 2004): 369–74.

Kleinfeld, M., J. Messite, Olive Kooyman, Mahfouz H. Zaki. "Mortality Among Talc Miners and Millers in New York State." *Archives of Environmental Health: An International Journal* Vol. 14, No. 5 (1967): 663-667.

Kleinfeld, M., J. Messite, M. H. Zaki. "Mortality Experiences Among Talc Workers: A Follow-up Study." *Journal of Occupational Medicine* Vol. 16, No. 5 (May 1974): 345-349.

Kreyling, W.G., Semmler-Behnke, M.S., Moller, W.   Ultrafine particle-lung interaction: Does size matter? Journal of Aerosol Medicine. 2006. 19(1).

Kunz, G., D. Beil, H. Deiniger, A. Einspanier, G. Mall, and G. Leyendecker. "The Uterine Peristaltic Pump. Normal and Impeded Sperm Transport within the Female Genital Tract." *Advances in Experimental Medicine and Biology* 424 (1997): 267–77.

Kurta, M. L., K. B. Moysich, J. L. Weissfeld, A. O. Youk, C. H. Bunker, R. P. Edwards, F. Modugno, R. B. Ness, and B. Diergaarde. "Use of Fertility Drugs and Risk of Ovarian Cancer: Results from a US-Based Case-Control Study." *Cancer Epidemiology Biomarkers & Prevention* 21, No. 8 (August 2012): 1282–92.

La Vecchia, Carlo. "Ovarian Cancer: Epidemiology and Risk Factors." *European Journal of Cancer Prevention* 26, No. 1 (January 2017): 55–62.

Landen, Charles N., Michael J. Birrer, and Anil K. Sood. "Early Events in the Pathogenesis of Epithelial Ovarian Cancer." *Journal of Clinical Oncology: Official Journal of the American Society of Clinical Oncology* 26, no. 6 (February 20, 2008): 995–1005.

Lane, D., Matte, I., Rancourt, C., Piche, A.   Prognostic significance of IL-6 and IL-8 ascites levels in ovarian cancer patients.   BMC Cancer.   2011. 11:210.

Lane, Denis, Veronique Robert et al. "Malignant ascites protect against TRAIL-induced apoptosis by activating the PI3K/Akt pathway in human ovarian carcinoma cells." *Int. J. Cancer 121* (2007): 1227-1237.

Langseth, H, S E Hankinson, J Siemiatycki, and E Weiderpass. "Perineal Use of Talc and Risk of Ovarian Cancer." *Journal of Epidemiology & Community Health* 62, No. 4 (April 2008): 358–60.

Langseth, H., B.V. Johansen, J.M. Nesland, and K. Kjaerheim. "Asbestos Fibers in Ovarian Tissue from Norwegian Pulp and Paper Workers." *International Journal of Gynecological Cancer* 17, No. 1 (January 2007): 44–49.

Langseth, Hilde, and Kristina Kjærheim. "Ovarian Cancer and Occupational Exposure Among Pulp and Paper Employees in Norway." *Scandinavian Journal of Work, Environment & Health* 30, No. 5 (October 2004): 356–61.

Lee, Jennifer S., Esther M. John, Valerie McGuire, Anna Felberg, Kimberly L. Ostrow, Richard A. DiCioccio, Frederick P. Li, Alexander Miron, Dee W. West, and Alice S. Whittemore. "Breast and Ovarian Cancer in Relatives of Cancer Patients, with and without BRCA Mutations." *Cancer Epidemiology, Biomarkers & Prevention: A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 15, no. 2 (February 2006): 359–63. https://doi.org/10.1158/1055-9965.EPI-05-0687.

Lee, Richard, and Drew Van Orden. "Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women." *International Journal of Occupational and Environmental Health* 21, No. 4 (October 2, 2015): 337–41.

Lee, Sang Hee, and Roy J. Richards. "Montserrat Volcanic Ash Induces Lymph Node Granuloma and Delayed Lung Inflammation." *Toxicology* 195, No. 2–3 (February 2004): 155–65.

Li, Jing, Xuedan Jiao, Zhongfu Yuan, Haifeng Qiu, Ruixia Guo. "C-reactive protein and risk of ovarian cancer A systematic review and meta-analysis." *Medicine* Vol. 96, No. 34 (2017): 1-7.

Li, Yong-Jian, Kai Yao, Min-Xun Lu, Wen-Biao Zhang, Cong Xiao, Chong-Qi Tu. "Prognostic value of the C-reactive protein to albumin ratio: a novel inflammation-based prognostic indication in osteosarcoma." *OncoTargets and Therapy* 10 (2017): 5255-5261.

Liou, Geou-Yarh, and Peter Storz. "Reactive Oxygen Species in Cancer." *Free Radical Research* 44, no. 5 (May 2010): 476–96.

Lison, D., Boeck, M.D., Kirsch-Volders, M.   Update on the genotoxicity and carcinogenicity of cobalt compounds.   Occup Environ Med 2001.   Oct; 58(10):619-25.

Liu, D. T., and A. Hitchcock. "Endometriosis: Its Association with Retrograde Menstruation, Dysmenorrhoea and Tubal Pathology." *British Journal of Obstetrics and Gynaecology* 93, no. 8 (August 1986): 859–62.

Lengyel, Ernst. "Ovarian Cancer Development and Metastasis." *The American Journal of Pathology* Vol. 177, No. 3 (September 2010): 1053-1064.

Lockey, James E. "Nonasbestos Fibrous Minerals." *Clinics in Chest Medicine* Vol. 2, No. 2 (May 1981): 203-218.

Longo, D.L. and R.C. Young. Aug 1979 – "Cosmetic Talc and Ovarian Cancer." *The Lancet* (August 18, 1979): 349-351.

Longo, D.L. and R.C. Young. Nov 1979 – "Cosmetic Talc and Ovarian Cancer." *The Lancet* (November 10, 1979): 1011-1012.

Longo, William E., Mark W. Rigler, and William B. Egeland. "Below the Waist Application of Johnson & Johnson Baby Powder." Materials Analytical Service, LLC, September 2017.

Longo, William E., and Mark W. Rigler. "The Analysis of Johnson & Johnson's Historical Baby Powder & Shower to Shower Products from the 1960's to the Early 1990's for Amphibole Asbestos," November 14, 2018.

Loomis, D., J.M. Dement, S.H. Wolf, and D.B. Richardson. "Lung Cancer Mortality and Fibre Exposures Among North Carolina Asbestos Textile Workers." *Occupational and Environmental Medicine* 66, (2009): 535-542.

Lopez-Galindo, A, C. Viseras, and P. Cerezo. "Compositional, Technical and Safety Specifications of Clays to Be Used as Pharmaceutical and Cosmetic Products." *Applied Clay Science* 36, No. 1–3 (April 2007): 51–63.

Lord, G.H. "The Biological Effects of Talc in the Experimental Animal: A Literature Review." *Food and Cosmetics Toxicology* 16, No. 1 (February 1978): 51–57.

Low, L.C.K., J. Lang, and W.D. Alexander. "Excretion of Carbimazole and Propylthiouracil in Breast Milk." *The Lancet* 314, No. 8150 (November 10, 1979): 1011.

Lu, Hsiao-Mei, Shuwei Li, Mary H. Black et al. "Association of Breast and Ovarian Cancers With Predisposition Genes Identified by Large-Scale Sequencing." *JAMA Oncology* (August 16, 2018): E1-E8.

Maccio, A., and Madeddu, C. (2012). Inflammation and ovarian cancer. *Cytokine 58*, 133-147.

Magnani, C, D Ferrante, F Barone-Adesi, M Bertolotti, A Todesco, D Mirabelli, and B Terracini. "Cancer Risk after Cessation of Asbestos Exposure: A Cohort Study of Italian Asbestos Cement Workers." *Occupational and Environmental Medicine* 65, No. 3 (2007): 164–70.

Mahmood, Samiya. "A Comparative Situation Analysis on Pre-Cancerous Lesions among Slum and Brothel Dwelling Women and Average Housewives Who Fall within the Reproductive Age Group and Living in Bangladesh." *Gynecology & Obstetrics* 07, No. 09 (2017).

Mäki-Nevala, Satu, Virinder Kaur Sarhadi, Aija Knuuttila, Ilari Scheinin, Pekka Ellonen, Sonja Lagström, Mikko Rönty, et al. "Driver Gene and Novel Mutations in Asbestos-Exposed Lung    Adenocarcinoma and Malignant Mesothelioma Detected    by Exome Sequencing." *Lung* 194, no. 1 (February 2016): 125–35. https://doi.org/10.1007/s00408-015-9814-7.

Mamo, Carlo and Giuseppe Costa. "Mortality Experience in an Historical Cohort of Chrysotile Asbestos Textile Workers." (2004).

Marconi, A., U. Verdel. "Asbestos content of talcs from Italian mines and fibre concentration in various commercial talcum powders used in Italy." *Health Related Effects of Phyllosilicates* Vol. G 21 (1990): 107-115.

Mariani-Costantini, Renato, Frank S. Jannotta, and Frank B. Johnson. "Systemic Visceral Talc Granulomatosis Associated with Miliary Tuberculosis in a Drug Addict." *American Journal of Clinical Pathology* 78, No. 5 (November 1982): 785–89.

Mariani, F., Sena, P., Roncucci, L.  Inflammatory pathways in the early steps of colorectal cancer development.  World J Gastroenterol.  2014.  August 7; 20(29):9716-9731.

Mattenklott, M. "Asbest in Talkumpudern und Speckstein – heutige Situation." *Gefahrstoffe – Reinhaltung der Luft* Vol. 67, No. 7/8 (2007): 287-292.

McCarthy, Edward F., Noel A. Genco, Ernest H. Reade Jr. "Talc." 7th Edition (2006): 1-16.

McCluggage, W. G., D.C. Allen. "Ovarian granulomas: a report of 32 cases." *J Clin Pathol* 50, (1997): 324-327.

McDonald, J.C., J.M. Harris, and G. Berry. "Sixty Years on: the Price of Assembling Military Gas Masks in 1940." *Occupational and Environmental Medicine* 63, (2006): 852-55.

McLemore, Monica R., Christine Miaskowski, Bradley E. Aouizerat, Lee-may Chen, and Marylin J. Dodd. "Epidemiological and Genetic Factors Associated with Ovarian Cancer." *Cancer* Nursing 32, No. 4 (2009): 281-88.

Medford, A. R. L., M. N. Sheppard et al., "An unusual cause of difficult asthma: talc granulomatous disease." *Grand Rounds* Vol. 5 (2005): 1-5.

Medford, A. R. L. "Consider Talc Too in Poorly Controlled Asthma and Unexplained Bronchiolitis." *Chest* Vol. 143, No. 1 (January 2013): 278-279.

Melaiu, Ombretta, Federica Gemignani, and Stefano Landi. "The Genetic Susceptibility in the Development of Malignant Pleural Mesothelioma." *Journal of Thoracic Disease* 10, no. Suppl 2 (January 2018): S246–52. https://doi.org/10.21037/jtd.2017.10.41.

Melin, A., P. Sparen, I. Persson, A. Bergqvist. "Endometriosis and the risk of cancer with special emphasis on ovarian cancer." *Human Reproduction* Vol. 21, No. 5 (2006): 1237-1242.

Meng, Qingsong, Weixue Sun, John Jiang, Nicole M. Fletcher, Michael P. Diamond, and Ghassan M. Saed. "Identification of Common Mechanisms between Endometriosis and Ovarian Cancer." *Journal of Assisted Reproduction and Genetics* 28 (2011): 917–23.

Merritt, Melissa A., Adèle C. Green, Christina M. Nagle, Penelope M. Webb, and Australian Cancer Study (Ovarian Cancer) and Australian Ovarian Cancer Study Group. "Talcum Powder, Chronic Pelvic Inflammation and NSAIDs in Relation to Risk of Epithelial Ovarian Cancer." *International Journal of Cancer* 122, No. 1 (January 2008): 170–76.

Michalowski, R. "Silica Granuloma at the Site of Circumcision for Phimosis: A Case Report." *Dermatologica* 166, (1983): 261-63.

Mills, Paul K., Deborah G. Riordan, Rosemary D. Cress, and Heather A. Young. "Perineal Talc Exposure and Epithelial Ovarian Cancer Risk in the Central Valley of California." *International Journal of Cancer* 112, No. 3 (November 10, 2004): 458–64. (Bates No. JNJ000018682)

Milne, R. L., and A. C. Antoniou. "Genetic Modifiers of Cancer Risk for BRCA1 and BRCA2 Mutation Carriers." *Annals of Oncology: Official Journal of the European Society for Medical Oncology* 22 Suppl 1 (January 2011): i11-17. https://doi.org/10.1093/annonc/mdq660.

Milne, Roger L., and Antonis C. Antoniou. "Modifiers of Breast and Ovarian Cancer Risks for BRCA1 and BRCA2 Mutation Carriers." *Endocrine-Related Cancer* 23, no. 10 (2016): T69-84. https://doi.org/10.1530/ERC-16-0277.

Møller, Peter, Pernille Høgh Danielsen, Kim Jantzen, Martin Roursgaard, and Steffen Loft. "Oxidatively Damaged DNA in Animals Exposed to Particles." *Critical Reviews in Toxicology* 43, No. 2 (February 2013): 96–118.

Moon, Min-Chaul, Jung Duck Park, Byung Soon Choi, So Young Park, Dong Won Kim, Yong Hyun Chung, Naomi Hisanaga, and Il Je Yu. "Risk Assessment of Baby Powder Exposure through Inhalation." *Toxicological Research* 27, No. 3 (September 2011): 137–41.

Moorman, P. G., R. T. Palmieri, L. Akushevich, A. Berchuck, and J. M. Schildkraut. "Ovarian Cancer Risk Factors in African-American and White Women." *American Journal of Epidemiology* 170, No. 5 (September 2009): 598–606.

Mori, T., K. Nagata, T. Matsuit, T. Ishida, H. Ohami, T. Asanot. "Superoxide anions in the

pathogenesis of talc-induced cerebral vasocontraction." *Neuropathology and Applied Neurobiology* 21, (1995): 278-385.

Mossman, Brooke T., Andrew Churg. "Mechanisms in the Pathogenesis of Asbestosis and Silicosis." *Am J Respir Crit Care Med* Vol. 157, (1998): 1666-1680.

Mostafa, S. A., C. B. Bargeron, R. W. Flower, N. B. Rosenshein, T. H. Parmley, and J. D. Woodruff. "Foreign Body Granulomas in Normal Ovaries." *Obstetrics and Gynecology* 66, no. 5 (November 1985): 701–2.

Murray, Peter J., Thomas A. Wynn. "Protective and pathogenic functions of macrophage subsets." *Nat Rev Immunol* Vol. 11, No. 11 (2011): 723-727.

Muscat, J. E., and M. S. Huncharek. "Causation and Disease: Biomedical Science in Toxic Tort Litigation." *Journal of Occupational Medicine.: Official Publication of the Industrial Medical Association* 31, no. 12 (December 1989): 997–1002.

Muscat, Joshua E., and Michael S. Huncharek. "Perineal Talc Use and Ovarian Cancer: A Critical Review:" *European Journal of Cancer Prevention* 17, No. 2 (April 2008): 139–46.

Nadler, Diana L., and Igor G. Zurbenko. "Estimating Cancer Latency Times Using a Weibull Model," 2014, 8.

Nakane, Hideo. "Translocation of particles deposited in the respiratory system: a systematic review and statistical analysis." *Environ Health Prev Med*, 17 (2012): 263-274.

Narod, Steven A. "Talc and Ovarian Cancer." *Gynecologic Oncology* 141, no. 3 (2016): 410–12. https://doi.org/10.1016/j.ygyno.2016.04.011.

Nelson, Heather H., and Karl T. Kelsey. "The Molecular Epidemiology of Asbestos and Tobacco in Lung Cancer." *Oncogene* 21, no. 48 (October 21, 2002): 7284–88. https://doi.org/10.1038/sj.onc.1205804.

Ness, R. "Does Talc Exposure Cause Ovarian Cancer?" *International Journal of Gynecological Cancer* 25, Supplement 1 (May 2015): 51.

Ness, R. B., and C. Cottreau. "Possible Role of Ovarian Epithelial Inflammation in Ovarian Cancer." *Journal of the National Cancer Institute* 91, No. 17 (September 1, 1999): 1459–67.

Ness, Roberta B., Jeane Ann Grisso, Carrie Cottreau, Jennifer Klapper, Ron Vergona, James E. Wheeler, Mark Morgan, and James J. Schlesselman. "Factors Related to Inflammation of the Ovarian Epithelium and Risk of Ovarian Cancer." *Epidemiology* 11, No. 2 (March 2000): 111–17.

Newhouse, M.L. and K.R. Sullivan. "A Mortality Study of Workers Manufacturing Friction Materials: 1941-86." *British Journal of Industrial Medicine* 46, (1989): 176-79.

Newhouse, Muriel L., G. Berry, J.C. Wagner and Mary E. Turok. "A Study of the Mortality of Female Asbestos Workers." *Brit. J. Industr. Med.* 29, (1972): 134-41.

Nickens, Kristen P., Steven R. Patierno, Susan Ceryak. "Chromium genotoxicity: a double-edged sword." *Chem Biol Interact* Vol. 188, No. 5 (November 2010): 276-288.

Nicolini, Andrea, Paola Ferrari, Giuseppe Rossi, Angelo Carpi. "Tumour growth and immune evasion as targets for a new strategy in advanced cancer." *Endocrine-Related Cancer* Vol. 25, No. 11 (2018): 577-604.

NIOSH "Workplace Exposure to Asbestos: Review and Recommendations." DHHS Publication No. 81-103 (April 1980): 1-47.

NIOSH Pocket Guide to Chemical Hazards. (September 2007). Appendix C.

NIOSH – CDC – Current Intelligence Bulletin 62 Revised Edition "Asbestos Fibers and Other

Elongate Mineral Particles: State of the Science and Roadmap for Research." April 2011.

NIOSH. "CDC – Occupational Cancer – Carcinogen List – NIOSH Safety and Health Topic." (2012)

NIOSH "Fiber Exposure during Use of Baby Powders, Report No. IWS-36-6.," July 1972. (JNJ000231304)

NIOSH CURRENT INTELLIGENCE BULLETIN Revised Edition "Asbestos Fibers and Other Elongated Mineral Particles: State of the Science and Roadmap for Research," January 2009.

Nolan, Robert P. and Arthur M. Langer. *Chapter 9: Limitations of the Stanton Hypothesis*. (1993).

Norman, R. J., M. Brannstrom. "Cytokines in the Ovary: Pathophysiology and Potential for Pharmacological Intervention." *Pharmacol Ther.* Vol. 69, No. 3 (1996): 219-236.

NTP "Asbestos." (CAS No. 1332-21-4)." *Report on Carcinogens, Thirteenth Edition.* (2014).

NTP "Toxicology and Carcinogenesis Studies of Talc." (CAS No. 14807-96-6) In F344/N Rats and B6C3F Mice (Inhalation Studies)."

Oberdörster, Günter, Eva Oberdörster, and Jan Oberdörster. "Nanotoxicology: An Emerging Discipline Evolving from Studies of Ultrafine Particles." *Environmental Health Perspectives* 113, no. 7 (July 2005): 823–39. https://doi.org/10.1289/ehp.7339.

Occupational Safety and Health Administration (OSHA) – Department of Labor "Occupational Exposure to Asbestos, Tremolite, Anthophyllite and Actinolite." *Federal Register – Rules and Regulations* Vol. 57, No. 110 (June 8, 1992): 24310-24331.

Occupational Safety and Health Administration (OSHA) – Department of Labor "OSHA Fact Sheet Asbestos" (2014): 1-2.

Okada, Futoshi. "Beyond Foreign-Body-Induced Carcinogenesis: Impact of Reactive Oxygen Species Derived from Inflammatory Cells in Tumorigenic Conversion and Tumor Progression." *International Journal of Cancer* 121, No. 11 (December 2007): 2364–72.

Omenka, Sunday Samuel, Adebola Abosede Adeyi. "Heavy metal content of selected personal care products (PCPs) available in Ibadan, Nigeria and their toxic effects." *Toxicology Reports 3* (2016): 628-635.

Oury, Tim D., Thomas A. Sporn, and Victor L. Roggli. (2014) *Pathology of Asbestos-Associated Diseases*. New York: Springer.

Øvrevik, J., Marit Lag, Per Schwarze, and Magne Refsnes. "p38 and Src-ERK1/2 Pathways Regulate Crystalline Silica-Induced Chemokine Release in Pulmonary Epithelial Cells." *Toxicological Sciences* 81, No. 2 (July 14, 2004): 480–90.

Øvrevik, Johan, Magne Refsnes, Marit Låg, Jørn A. Holme, and Per E. Schwarze. "Activation of Proinflammatory Responses in Cells of the Airway Mucosa by Particulate Matter: Oxidant- and Non-Oxidant-Mediated Triggering Mechanisms." *Biomolecules* 5, No. 3 (July 2, 2015): 1399–1440.

Pace, E., Siena, L., Ferraro, M., Profita, M., Mondello, P., Chiappara, G., Montalbano, A.M., Giarratano, A., Bonsignore, G., Gjomarkaj, M.  Role of prostaglandin E2 in the invasiveness, growth and protection of cancer cells in malignant pleuritis.  European Journal of Cancer. 2006.  42(14):2382-2389.

Paoletti, L., Caiazza, S., Donelli, G., Pocchiari. "Evaluation by Electron Microscopy Techniques of Asbestos Contamination in Industrial, Cosmetic, and Pharmaceutical Talcs." *Regulatory Toxicology and Pharmacology* 4. (December 9, 1983): 222-235.

Parmley, Tim H., and J. Donald Woodruff. "The Ovarian Mesothelioma." *American Journal of*

*Obstetrics and Gynecology* 120, No. 2 (September 15, 1974): 234–41.

Patierno, Steven R., Sugiyama, Masayasu, Basilion, James P., Costa, Max. "Preferential DNA-Protein Cross-Linking by NiCI2 in Magnesium-insoluble Regions of Fractionated Chinese Hamster Ovary Cell Chromatin." Cancer Research 45 (November 1985): 5787-5794.

Pelling, D., and J.G. Evans. "Long-Term Peritoneal Tissue Response in Rats to Mould-Release Agents and Lubricant Powder Used on Surgeons' Gloves." *Food and Chemical Toxicology* 24, No. 5 (May 1986): 425–30.

Penninkilampi, Ross, Guy D. Eslick. "Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis." *Epidemiology* Vol. 29, No. 1 (January 2018): 41-49.

Peshkin, B., and et al. "Genetic Counseling and Testing for Hereditary Breast and Ovarian Cancer - UpToDate," 2018. https://www.uptodate.com/contents/genetic-counseling-and-testing-for-hereditary-breast-and-ovarian-cancer?search=Genetic%20counseling%20and%20testing%20for%20hereditary%20breast%20and%20ovarian%20cancer&source=search_result&selectedTitle=1~150&usage_type=default&display_rank=1.

Peshkin, B., and et al. "Overview of Hereditary Breast and Ovarian Cancer Syndromes - UpToDate," 2018. https://www.uptodate.com/contents/overview-of-hereditary-breast-and-ovarian-cancer-syndromes?search=Overview%20of%20hereditary%20breast%20and%20ovarian%20cancer%20syndromes&source=search_result&selectedTitle=1~150&usage_type=default&display_rank=1.

Peshkin, B., and et al. "Prevalence of BRCA1 and BRCA2 Mutations and Associated Cancer Risks - UpToDate," 2018. https://www.uptodate.com/contents/prevalence-of-brca1-and-brca2-mutations-and-associated-cancer-risks?search=prevalence-of-brca1-and-brca2-mu%E2%80%A6search_result%26selectedTitle%3D1~73%26usage_type%3Ddefault%26display_rank%3D1&source=search_result&selectedTitle=2~150&usage_type=default&display_rank=2.

Peters, Annette, Veronesi, Bellina, Calderón-Garcidueñas, Lilian, Gehr, Peter, Chi Chen, Lung, Geiser, Marianne, Reed, William, Rothen-Rutishauser, Barbara, Schürch, Samuel, Schulz, Holger. "Translocation and Potential Neurological Effects of Fine and Ultrafine Particles a Critical Update." *Particle and Fibre Toxicology* (September 8, 2006).

Pierce, Jennifer S., Riordan, Alexander S., Miller, Eric W., Gaffney, Shannon H., Hollins, Dana M. "Evaluation of the Presence of Asbestos in Cosmetic talcum Products, Inhalation Toxicology." 29:10, (2017) 443-456.

Phillips, J C, and P J Young. "Studies on the Absorption and Disposition of H-Labelled Talc in the Rat, Mouse, Guinea-Pig and Rabbit." *Food and Chemical Toxicology* 16, (1978): 161–63.

Pickrell, John A., Morris B. Snipes, Janet M. Benson, Ray L. Hanson, Robert K. Jones, Robert L. Carpenter, James J. Thompson, Charles H. Hobbs, and Sandra C. Brown. "Talc Deposition and Effects after 20 Days of Repeated Inhalation Exposure of Rats and Mice to Talc." *Environmental Research* 49, No. 2 (August 1989): 233–45.

Pinto, Mauricio P., Carlos Balmaceda, Maria L. Bravo, Sumie Kato, Alejandra Villarroel, Gareth I. Owen, Juan Carlos Roa, et al. "Patient Inflammatory Status and CD4+/CD8+ Intraepithelial Tumor Lymphocyte Infiltration are Predictors of Outcomes in High-Grade Serous Ovarian Cancer." *Gynecologic Oncology* (2018).

Pira, E, C Pelucchi, L Buffoni, A Palmas, M Turbiglio, E Negri, P G Piolatto, and C La Vecchia. "Cancer Mortality in a Cohort of Asbestos Textile Workers." *British Journal of Cancer* 92, No. 3 (February 2005): 580–86.

Pira, E, C Pelucchi, P G Piolatto, E Negri, G Discalzi and C La Vecchia. "First and Subsequent Asbestos Exposures in Relation to Mesothelioma and Lung Cancer Mortality." *British Journal of Cancer* 97, No. 9 (2007): 1300-1304.

Pira, Enrico, Canzio Romano, Francesco S. Violante, Andrea Farioli, Giovanna Spatari, Carlo La Vecchia, and Paolo Boffetta. "Updated Mortality Study of a Cohort of Asbestos Textile Workers." *Cancer Medicine* 5, No. 9 (September 2016): 2623–28.

Pizzo, Alfonsa, Salmeri, Francesca M., Ardita, Francesca V., Sofo, Vincenza, Tripepi, Maria, Marsico, Silvano. "Behaviour of Cytokine Levels in Serum and Peritoneal Fluid of Women with Endometriosis." *Gynecol Obstet Invest.* (2002) 54:82–87.

Pogribny, Igor P., Rusyn, Ivan. "Environmental Toxicants, Epigenetics, and Cancer." *Adv Exp Med Biol.* (2013) 754: 215–232.

Pogribny, Igor P., Rusyn, Ivan. "Role of Epigenetic Aberrations in the Development and Progression of Human Hepatocellular Carcinoma." *Cancer Lett.* (January 28, 2014) 342(2): 223–230.

Poole, Elizabeth M., Lee, I-Min, Ridker, Paul M., Buring, Julie E., Hankinson, Susan E., Tworoger, Shelley S. "A Prospective Study of Circulating C-Reactive Protein, Interleukin-6, and Tumor Necrosis Factor α Receptor 2 Levels and Risk of Ovarian Cancer." American Journal of Epidemiology. Vol. 178, No. 8. (May 2, 2013).

Pooley, F.D., Rowlands, N. "Chemical and Physical Properties of British Talc Powders." *Department of Mineral Exploitation.* (1975)

Pott, F., and K.H. Friedrichs. "Tumors in Rats After the Intraperitoneal Administration of Fibrous Dusts (Translation)." *Naturwissenchaften* 59, No. 7 (1972).

*Product: *2017 TLVs and BEIs: ACGIH*. Accessed August 16, 2018.

Pukkala, Eero, Jan Ivar Martinsen, Elsebeth Lynge, Holmfridur Kolbrun Gunnarsdottir, Pär Sparén, Laufey Tryggvadottir, Elisabete Weiderpass, and Kristina Kjaerheim. "Occupation and Cancer – Follow-up of 15 Million People in Five Nordic Countries." *Acta Oncologica* 48, No. 5 (2009): 646–790.

Purdie, David, Adèle Green, Christopher Bain, Victor Siskind, Bruce Ward, Neville Hacker, Michael Quinn, Gordon Wright, Peter Russell, and Beatrice Susil. "Reproductive and Other Factors and Risk of Epithelial Ovarian Cancer: An Australian Case-Control Study." *International Journal of Cancer* 62, No. 6 (September 15, 1995): 678–84.

Radic, I., I. Vucak, Jasminka Milosevic, Ana Marusic, S. Vukicevic and M. Marusic. "Immunosuppression Induced by Talc Granulomatosis in the Rat." *Clinical & Experimental Immunology* 73, (1988): 316-321.

Rai, Alex J. and Raja M. Flores. "Association of Malignant Mesothelioma and Asbestos Related Conditions with Ovarian Cancer: Shared Biomarkers and a Possible Etiological Link?" *Clinical Chemistry and Laboratory Medicine* 49, No. 1 (2011): 5-7.

Rakoff-Nahoum, Seth. "Why Cancer and Inflammation?" *Yale Journal of Biology and Medicine.* 79 (2006): 123-130.

Ramanakumar, Agnihotram V., Marie-Élise Parent, Benoit Latreille, and Jack Siemiatycki. "Risk of Lung Cancer Following Exposure to Carbon Black, Titanium Dioxide and Talc: Results from Two Case–Control Studies in Montreal." *International Journal of Cancer* 122, No. 1 (2008): 183–89.

Rauh-Hain, J. Alejandro, Growdon, Whitfield B., Rodriquez, Noah, Goodman, A.K., Boruta, David M., II., Schorge, John O., Horowitz, Carmen, Marcela G. del. "Carcinosarcoma of the Ovary: A Case-Control Study." *Gynecologic Oncology.* (2011): 447-481.

Rauh-Hain, Jose A., MD, Krivak, Thomas, C., MD, Carmen, Marcela G. del, MD, MPH, Olawaiye, Alexander B., MD. "Ovarian Cancer Screening and Early Detection in the General Population." Reviews in Obstetrics & Gynecology. Vol. 4, No. 1 (2011) 15-21.

"Reference Manual on Scientific Evidence" Third Edition (2011).

Reid, A., N. de Klerk, and A. W. Musk. "Does Exposure to Asbestos Cause Ovarian Cancer? A Systematic Literature Review and Meta-Analysis." *Cancer Epidemiology Biomarkers & Prevention* 20, No. 7 (July 2011): 1287–95.

Reid, A., A. Segal, J. S. Heyworth, N. H. de Klerk, and A. W. Musk. "Gynecologic and Breast Cancers in Women After Exposure to Blue Asbestos at Wittenoom." *Cancer Epidemiology Biomarkers & Prevention* 18, No. 1 (January 2009): 140–47.

Reid, A., J. Heyworth, N. de Klerk, and A. W. Musk. "The Mortality of Women Exposed Environmentally and Domestically to Blue Asbestos at Wittenoom, Western Australia." *Occupational and Environmental Medicine* 65, no. 11 (November 2008): 743–49. https://doi.org/10.1136/oem.2007.035782.

Reid, Alison, Peter Franklin, Nola Olsen, Jan Sleith, Latha Samuel, Patrick Aboagye-Sarfo, Nicholas de Klerk, and A.W. (Bill) Musk. "All-Cause Mortality and Cancer Incidence Among Adults Exposed to Blue Asbestos During Childhood." *American Journal of Industrial Medicine* 56, (2013): 133-45.

Reid, Alison, Jane Heyworth, Nicholas H. de Klerk, and Bill Musk. "Cancer Incidence Among Women and Girls Environmentally and Occupationally Exposed to Blue Asbestos at Wittenoom, Western Australia." *International Journal of Cancer* 122, (2008): 2337-44.

Reid, Brett M., Jennifer B. Permuth, and Thomas A. Sellers. "Epidemiology of Ovarian Cancer: A Review." *Cancer Biology & Medicine* 14, no. 1 (February 2017): 9–32. https://doi.org/10.20892/j.issn.2095-3941.2016.0084.

Report on Carcinogens (ROC), Fourteenth Edition. "Asbestos." National Toxicology Program, *Department of Health and Human Services* (2016): 1-3.

Reuter, Simone, et al. "Oxidative Stress, Inflammation, and Cancer: How Are They Linked?" *Free Radic Biol Med*. (2010 December 1); 49(11): 1603–1616.

Ring, Kari L., Christine Garcia, Martha H. Thomas, and Susan C. Modesitt. "Current and Future Role of Genetic Screening in Gynecologic Malignancies." *American Journal of Obstetrics and Gynecology* 217, no. 5 (2017): 512–21. https://doi.org/10.1016/j.ajog.2017.04.011.

Risch, Harvey A. "Hormonal Etiology of Epithelial Ovarian Cancer, With a Hypothesis Concerning the Role of Androgens and Progesterone." *Journal of the National Cancer Institute*, Vol. 90, No. 23. (December 2, 1998).

Roberts, G. B. S. "Granuloma of the Fallopian Tube Due to Surgical Glove Talc Silicious Granuloma." *British Journal of Surgery* 34, No. 136 (April 1947): 417–23.

Roberts, William Clifford. "Pulmonary Talc Granulomas, Pulmonary Fibrosis, and Pulmonary Hypertension Resulting from Intravenous Injection of Talc-Containing Drugs Intended for Oral Use." *Baylor University Medical Center Proceedings* 15, No. 3 (July 2002): 260–61.

Robinson, B. W. S. "Asbestos and Cancer: Human Natural Killer Cell Activity is Suppressed by Asbestos Fibers but Can Be Restored by Recombinant Lnterleukin-2." *American Review*

*of Respiratory Disease* 139, No. 4 (April 1989): 897–901.

Roggli, V L, P C Pratt, and A R Brody. "Asbestos Content of Lung Tissue in Asbestos Associated Diseases: A Study of 110 Cases." *British Journal of Industrial Medicine* 43, No. 1 (January 1986): 18–28.

Roggli, Victor L., and Philip C. Pratt. "Numbers of Asbestos Bodies on Iron-Stained Tissue Sections in Relation to Asbestos Body Counts in Lung Tissue Digests." *Human Pathology* 14, No. 4 (April 1983): 355–61.

Rohl, Arthur N. "Asbestos in Talc." *Environmental Health Perspectives* 9, (December 1974): 129-132.

Rohl, A.N., A.M. Langer, J. Selikoff, A. Tordini, R. Klimentidis, D.R. Bowes, and D.L. Skinner. "Consumer Talcums and Powders: Mineral and Chemical Characerization." *Journal of Toxicology and Environmental Health* 2, (1976): 255-284.

Rosenblatt, Karin A., Wayne A. Mathews, Janet R. Daling, Lynda F. Voigt, and Kathleen Malone. "Characteristics of Women Who Use Perineal Powders." *Obstetrics & Gynecology* 92, No. 5 (November 1998): 753-6.

Rosenblatt, Karin A., Moyses Szklo, and Neil B. Rosenshein. "Mineral Fiber Exposure and the Development of Ovarian Cancer." *Gynecologic Oncology* 45, No. 1 (April 1992): 20–25.

Rosenblatt, Karin A., Noel S. Weiss, Kara L. Cushing-Haugen, Kristine G. Wicklund, and Mary Anne Rossing. "Genital Powder Exposure and the Risk of Epithelial Ovarian Cancer." *Cancer Causes & Control* 22, No. 5 (May 2011): 737–42.

Rösler, Joachim A., Hans-Joachim Woitowitz, Heinz-Joachim Lange, Rotraud H. Woitowitz, Kurt Ulm, Klaus Rödelsperger. "Mortality Rates in a Female Cohort Following Asbestos Exposure in Germany." *JOM* 36, No. 8 (August 1994): 889-93.

Ross, M. "Geology, Asbestos, and Health." *Environmental Health Perspectives* 9 (December 1974): 123–24.

Rossi, V.F., et al. "Acute Inflammatory Response Secondary to Intrapleural Administration of Two Types of Talc." European Respiratory Journal, Volume 35, Number 2; (2010) 369-401.

Rubino G.F., G. Scansetti, G. Piolatto, and G. Gay. "Mortality and Morbidity Among Talc Miners and Millers in Italy" (1979). 357-63.

Rubino G.F., Giovanni Scansetti, Giorgio Piolatto, and Canzio A. Romano. "Mortality Study of Talc Miners and Millers." *J Occup Med* 18, No. 3 (March 1976): 186-93.

Saad, Antonio F., et al. "Microenvironment and Pathogenesis of Epithelial Ovarian Cancer." Horm Cancer. (2010 December); 1(6): 277–290.

Saed, Ghassan M., Ph.D. "LB-044 - Talcum Powder Enhances Cancer Antigen 125 Levels in Ovarian Cancer Cells and in Normal Ovarian Epithelial Cells." (March 10, 2018).

Saed, Ghassan M., et al. "Novel Expression of CD11b in Epithelial Ovarian Cancer: Potential Therapeutic Target." Gynecologic Oncology, 148 (2018): 567-575.

Saed, Ghassan M., Michael P. Diamond, and Nicole M. Fletcher. "Updates of the Role of Oxidative Stress in the Pathogenesis of Ovarian Cancer." *Gynecologic Oncology* 145, No. 3 (June 2017): 595–602.

Saed, Ghassan M., Robert T. Morris, and Nicole M. Fletcher. *Chapter 4: New Insights of into the Pathogenesis of Ovarian Cancer: Oxidative Stress.* (October 24, 2018).

Saed, Ghassan M., Rouba Ali-Fehmi, Zhong L. Jiang, Nicole M. Fletcher, Michael P. Diamond, Husam M. Abu-Soud, and Adnan R. Munkarah. "Myeloperoxidase Serves as a Redox Switch That Regulates Apoptosis in Epithelial Ovarian Cancer." *Gynecologic Oncology*

116, no. 2 (February 2010): 276–81. https://doi.org/10.1016/j.ygyno.2009.11.004.

Saed, Ghassan M., Robert T. Morris, and Nicole M. Fletcher. *New Insights into the Pathogenesis of Ovarian Cancer: Oxidative Stress*, 2018.

 "Safety Assessment of Talc as Used in Cosmetics." Cosmetic Ingredient Review (December 18, 2012).

Savant, Sudha S., Shruthi Sriramkumar and Heather M. O'Hagan. "The Role of Inflammation and Inflammatory Mediators in the Development, Progression, Metastasis and Chemoresistance of Epithelial Ovarian Cancer." *Cancers* 10, No. 251 (2018).

Schildkraut, J. M., S. E. Abbott, A. J. Alberg, E. V. Bandera, J. S. Barnholtz-Sloan, M. L. Bondy, M. L. Cote, et al. "Association Between Body Powder Use and Ovarian Cancer: The African American Cancer Epidemiology Study (AACES)." *Cancer Epidemiology Biomarkers & Prevention* 25, No. 10 (October 2016): 1411–17.

Seelig, M.G., M.D., et al. "The Talcum Powder Problem in Surgery and its Solution." (1943) 950-954.

Selevan, Sherry G. John M. Dement, Joseph K. Wagoner, and John R. Froines. "Mortality Patterns among Miners and Millers of Non-Asbestiform Talc: Preliminary Report." *Journal of Environmental Pathology and Toxicology* 2, (1979): 273-84.

Selikoff, Irving J., Jacob Churg, and E. Cuyler Hammond. "Asbestos Exposure and Neoplasia." *JAMA* 188, No. 1 (April 6, 1964): 22-26.

Sharma, Anjali, Satnam Singh, Sanjeev Kumar. "Ovarian Cancer Detection: Cause, Symptoms and Techniques" *International Journal of Core Engineering & Management* 2, No. 4 (July 2015): 34-42.

Shim, Ilseob, Hyun-mi Kim, Sangyoung Yang, Min Choi, Gyun-baek Seo, Byung-Woo Lee, Byung-Il Yoon, Pilje Kim, and Kyunghee Choi. "Inhalation of Talc Induces Infiltration of Macrophages and Upregulation of Manganese Superoxide Dismutase in Rats." *International Journal of Toxicology* 34, No. 6 (November 2015): 491–99.

Shinto, Hiroyuki, Tomonori Fukasawa, Kosuke Yoshisue, Mikihito Tezuka, and Mayumi Orita. "Cell Membrane Disruption Induced by Amorphous Silica Nanoparticles in Erythrocytes, Lymphocytes, Malignant Melanocytes, and Macrophages." *Advanced Powder Technology* 25, No. 6 (November 2014): 1872–81.

Shukla, A., MacPherson, M.B., Hillegass, J., Ramos-Nino, M.E., Alexeeva, V., Vacek, P.M., Bond, J.P., Pass, H.I., Steele, C., Mossman, B.T. Alterations in gene expression in human mesothelial cells correlate with mineral pathogenicity. *Am J Respir Cell Mol Biol.* (2009). 41:114-123.

Shushan, Asher, Ora Paltiel, Jose Iscovich, Uri Elchalal, Tamar Peretz and Joseph G. Schenker. "Human Menopausal Gonadotropin and the Risk of Epithelial Ovarian Cancer." *Fertility and Sterility* 65, No. 1 (January 1996): 13-18.

Sigel, Astrid, Sigel, Helmut, Sigel, Roland K.O. "Interrelations Between Essential Metal Ions and Human Diseases" *Metal Ions in Life Sciences* 13. Vol. 13 (2013).

Sjosten, A. C. E., H. Ellis, G. A. B. Edelstam. "Retrograde migration of glove powder in the human female genital tract." *Human Reproduction* Vol. 19, No. 4 (February 2004): 991-995.

Song, Zhiwang, et al. "Expression of IL-1α and IL-6 is Associated with Progression and Prognosis of Human Cervical Cancer." Med Sci Monit, (2016) 22: 4475-4481.

Soong, Thing Rinda, Brooke E. Howitt, Alexander Miron, Neil S. Horowitz, Frank Campbell, Colleen M. Feltmate, Michael G. Muto, et al. "Evidence for Lineage Continuity between

Early Serous Proliferations (ESPs) in the Fallopian Tube and Disseminated High-Grade Serous Carcinomas." *The Journal of Pathology*, July 25, 2018. https://doi.org/10.1002/path.5145.

Sparrow, S.A., and L.A. Hallam. "Talc Granulomas." *British Medical Journal* 303, (July 6, 1991): 58.

Stanton, Mearl F., Maxwell Layard, Andrew Tegeris, Eliza Miller, Margaret May, Elizabeth Morgan and Alroy Smith. "Relation of Particle Dimension to Carcinogenicity in Amphibole Asbestoses and Other Fibrous Minerals." *Journal of the National Cancer Institute* 67, No. 5 (November 1981): 965-75.

Stanton, Mearl F. Maxwell Layard, Andrew Tegeris, Eliza Miller, Margaret May, and Elizabeth Kent. "Carcinogenicity of Fibrous Glass: Pleural Response in the Rat in Relation to Fiber Dimension." *Journal of the National Cancer Institute* 58, No. 3 (March 1977): 587-603.

Steffen, Joan, Triet Tran, Ella Fassler, and David S. Egilman. "Presence of Asbestos in Consumer Talc Products: Evaluating a 'Zero Tolerance' Policy" Powerpoint Presentation.

Steiling, W., J. F. Almeida, H. Assaf Vandecasteele, S. Gilpin, T. Kawamoto, L. O'Keeffe, G. Pappa, K. Rettinger, H. Rothe, and A. M. Bowden. "Principles for the Safety Evaluation of Cosmetic Powders." *Toxicology Letters*, August 17, 2018. https://doi.org/10.1016/j.toxlet.2018.08.011.

Steiling, W., M. Bascompta, P. Carthew, G. Catalano, N. Corea, A. D'Haese, P. Jackson, et al. "Principle Considerations for the Risk Assessment of Sprayed Consumer Products." *Toxicology Letters* 227, no. 1 (May 16, 2014): 41–49. https://doi.org/10.1016/j.toxlet.2014.03.005.

Stenback F., V.-M. Wasenius, and J. Rowland. "Alveolar and Interstitial Changes in Silicate-Associated Lung Tumors in Syrian Hamsters." *Cancer Research Monographs* 2 Chapter 21. (1986) 199-213.

Stewart, Louise M., Katrina Spilsbury, Susan Jordan, Colin Stewart, C. D'Arcy J. Holman, Aime Powell, Joanne Reekie, and Paul Cohen. "Risk of High-Grade Serous Ovarian Cancer Associated with Pelvic Inflammatory Disease, Parity and Breast Cancer." *Cancer Epidemiology* 55 (August 2018): 110–16. https://doi.org/10.1016/j.canep.2018.05.011.

Straif, Kurt, Lamia Benbrahim-Tallaa, Robert Baan, Yann Grosse, Béatrice Secretan, Fatiha El Ghissassi, Véronique Bouvard, et al. "A Review of Human Carcinogens—Part C: Metals, Arsenic, Dusts, and Fibres." *The Lancet Oncology* 10, No. 5 (May 2009): 453–54.

Straif, Kurt. "Update of the Scientific Evidence on Asbestos and Cancer." presented at the International Conference on Environmental and Occupational Determinants of Cancer: Interventions for Primary Prevention, Asturias (Avilés, Gijón), Spain, March 17, 2011.

Sueblinvong, Thanasak and Michael E. Carney. "Ovarian Cancer: Risks" *Hawai'I Medical Journal* 68, (March 2009): 40-46.

Szeszenia-Debrowska, Neonila, Urszula Wilczynska, Wieslaw Szymczak and Alicja Strzelecka. "Mortality Study of Workers Compensated for Asbestosis in Poland, 1970-1997." *International Journal of Occupational Medicine and Environmental Health* 15, No. 3 (2002): 267-78.

Tarchi, Marzia, Daniela Orsi, Pietro Comba, Marco de Santis, Roberta Pirastu, Giuseppe Battista, and Mauro Valiani. "Cohort Mortality Study of Rock Salt Workers in Italy." *American Journal of Industrial Medicine* 25, No. 2 (February 1994): 251–56.

Tee, Nicolin, Yingdong Zhu, Gysell M. Mortimer, Darren J. Martin and Rodney F. Minchin.

"Fluoromica Nanoparticle Cytotoxicity in Macrophages Decreases with Size and Extent Of Uptake." *International Journal of Nanomedicine* 10, (March 26, 2015), 2363-75.

Terry, K. L., S. Karageorgi, Y. B. Shvetsov, M. A. Merritt, G. Lurie, P. J. Thompson, M. E. Carney, et al. "Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls." *Cancer Prevention Research* 6, No. 8 (August 2013): 811–21.

Thomas, Terry L., and Patricia A. Stewart. "Mortality from Lung Cancer and Respiratory Disease Among Pottery Workers Exposed to Silica and Talc." *American Journal of Epidemiology* 125, No. 1 (January 1987): 35–43.

Todoric, Jelena, et al. "Targeting Inflammation in Cancer Prevention and Therapy." Cancer Prev Res (Phila) (12): (2016 December): 9895–905.

Tossavainen, A., A. Karjalainen, and P.J. Karhunen. "Retention of Asbestos Fibers in the Human Body." *Environmental Health Perspectives* 102, Supplement 5 (October 1994): 253-55.

Trabert, Britton, et al. "Aspirin, Nonaspirin Nonsteroidal Anti-inflammatory Drug, and Acetaminophen Use and Risk of Invasive Epithelial Ovarian Cancer: A Pooled Analysis in the Ovarian Cancer Association Consortium." *JNCI, Oxford University Press* (2014).

Trabert, Britton, Ligia Pinto, Patricia Hartge, Troy Kemp, Amanda Black, Mark E. Sherman, Louise A. Brinton, et al. "Pre-Diagnostic Serum Levels of Inflammation Markers and Risk of Ovarian Cancer in the Prostate, Lung, Colorectal and Ovarian Cancer (PLCO) Screening Trial." *Gynecologic Oncology* 135, No. 2 (November 2014): 297–304.

Trabert, Britton, Elizabeth M Poole, Emily White, Kala Visvanathan, Hans-Olov Adami, Garnet L Anderson, Theodore M Brasky, et al. "Analgesic Use and Ovarian Cancer Risk: An Analysis in the Ovarian Cancer Cohort Consortium." *JNCI: Journal of the National Cancer Institute*, May 31, 2018. https://doi.org/10.1093/jnci/djy100.

Tzonou, Anastasia, Argy Polychronopoulou, Chung-cheng Hsieh, Apostolos Rebelakos, Anna Karakatsani, and Dimitrios Trichopolous. "Hair Dyes, Analgesics, Tranquilizers and Perineal Talc Application as Risk Factors for Ovarian Cancer." *International Journal of Cancer* 55, (1993): 408-410.

US EPA. "Health Assessment Document for Talc. | National Technical Reports Library - NTIS." -600/8-91/217, 1992. https://ntrl.ntis.gov/NTRL/dashboard/searchResults/titleDetail/PB92239524.xhtml.

US EPA National Center for Environmental Assessment. "Arsenic, inorganic; CASRN 7440-38-2." (1995).

Vanderhyden, Barbara C, Tanya J Shaw, and Jean-François Ethier. "Animal Models of Ovarian Cancer." *Reproductive Biology and Endocrinology : RB&E* 1 (October 7, 2003): 67. https://doi.org/10.1186/1477-7827-1-67.

Van Dyke, Knox, Shaily Patel, and Val Vallyathan. "Lucigenin Chemiluminescence Assay as an Adjunctive Tool for Assessment of Various Stages of Inflammation: A Study of Quiescent Inflammatory Cells." *Journal of Biosciences* 28, No. 1 (February 2003): 115–19.

Van Gosen, Bradley S. "Using the Geologic Setting of Talc Deposits as an Indicator of Amphibole Asbestos Conent." *Environmental Geology.* (2004): 45:920-939.

Van Huisstede, A. et al. "Talcosis due to abundant use of cosmetic talcum powder." *European Respiratory Review* Vol. 19, No. 116 (2010): 165-168.

Vasama-Neuvonen, Eero Pukkala, Harri Paakkulainen, Perttie Mutanen, Elisabeth Weiderpass, Paolo Boffetta, et al. "Ovarian Cancer and Occupational Exposures in Finland."

*American Journal of Industrial Medicine* 36, (1999): 83-89.

Venkatesan, Priya. "Possible X Chromosome-Linked Transmission of Ovarian Cancer." *The Lancet. Oncology* 19, no. 4 (April 2018): e185. https://doi.org/10.1016/S1470-2045(18)30183-9.

Venter, P. F., M. Iturralde. "Migration of a Particulate Radioactive Tracer from the Vagina to the Peritoneal Cavity and Ovaries." *SA Medical Journal* (1979): 917-919.

Verdoodt, Freija, Christian Dehlendorff, Søren Friis, and Susanne K. Kjaer. "Non-Aspirin NSAID Use and Ovarian Cancer Mortality." *Gynecologic Oncology* 150, no. 2 (2018): 331–37. https://doi.org/10.1016/j.ygyno.2018.06.018.

Virta, RL. "The Phase Relationship of Talc and Amphiboles in a Fibrous Talc Sample." IH; Report of Investigations, 1985. https://www.cdc.gov/niosh/nioshtic-2/10004328.html.

Virta, Robert L. "Talc and Pyrophyllite." *U.S. Geological Survey Minerals Yearbook* (1999).

Wagner, J.C., G. Berry, T.J. Cooke, R.J. Hill, F.D. Pooley, and J.W. Skidmore. "Animal Experiments with Talc." (1977). (JNJ 000020991-98).

Wang, Xiaorong, Sihao Lin, Ignatius Yu, Hong Qiu, Yajia Lan, and Eiji Yano. "Cause-Specific Mortality in a Chinese Chrysotile Textile Worker Cohort." *Cancer Science* 104, No. 2 (February 2013): 245–49.

Wehner, A.P. "Biological Effects of Cosmetic Talc." *Food and Chemical Toxicology* 32, No. 12 (1994): 1173-84.

Wehner, A.P., G.M. Zwicker, W.C. Cannon, C.R. Watson, and W.W. Carlton. "Inhalation of Talc Baby Powder by Hamsters." *Food and Cosmetics Toxicology* 15, No. 2 (January 1977): 121–29.

Wehner, A.P., A.S. Hall, R.E. Weller, E.A. Lespel, and R.E. Schirmer. "Do Particles Translocate from the Vagina to the Oviducts and Beyond?" *Food and Chemical Toxicology* 23, No. 3 (1985): 367-72.

Wehner, A.P., R.E. Weller, and E.A. Lepel. "On Talc Translocation from the Vagina to the Oviducts and Beyond." *Food and Chemical Toxicology* 24, No. 4 (1986): 329-38.

Wells, I. P., P. A. Dubbins, W. F. Whimster. "Pulmonary disease caused by the inhalation of cosmetic talcum powder." *British Journal of Radiology* 52 (1979): 586-588

Wendel, Jillian R. Hufgard, Xiyin Wang, and Shannon M. Hawkins. "The Endometriotic Tumor Microenvironment in Ovarian Cancer." *Cancers* 10, No. 261 (2018).

Werebe, Eduardo Campos, et al. "Systemic Distribution of Talc After Intrapleural Administration in Rats" Laboratory and Animal Investigations, CHEST 115 (January 1999): 190-193.

Werner, I. "Presence of Asbestos in Talc Samples." *Atemschutzinform* 21, no. 5 (1982).

Wessling-Resnick, Marianne. "Iron Homeostasis and the Inflammatory Response." Annu Rev Nutr. (2010 August 21): 30: 105–122.

Whittemore, Alice S, Marion L. Wu, Ralph S. Paffenbarger, Jr., Dorien L Sarles, James B Kampert, and Stella Grosser, et al. "Personal and Environmental Characteristics Related to Epithelial Ovarian Cancer." *American Journal of Epidemiology* 128, No. 6 (1988): 1228-40.

Whysner, John, and Melissa Mohan. "Perineal Application of Talc and Cornstarch Powders: Evaluation of Ovarian Cancer Risk." *American Journal of Obstetrics and Gynecology* 182, No. 3 (March 2000): 720–24.

Wiegand, HJ; Ottenwalder, H; Bolt, HM. (1985) Fast uptake kinetics in vitro of 51Cr(VI) by red blood cells of man and rat. Arch Toxicol 57:31-34.

Wignall, B.K., and A.J. Fox. "Mortality of Female Gas Mask Assemblers." *British Journal of Industrial Medicine* 39, No. 1 (February 1, 1982): 34–38.

Wilczynksa, Urszula, Wieslaw Szymczak, and Neonila Szeszenia. "Mortality from Malignant Neoplasms Among Workers of an Asbestos Processing Plant in Poland: Results of Prolonged Observation." *International Journal of Occupational Medicine and Environmental Health* 18, No. 4 (2005): 313-26.

Wild, P., K. Leodolter, M. Refregier, H. Schmidt, T. Zidek, G. Haidinger. "A Cohort Mortality and Nested Case-Control Study of French and Austrian Talc Workers." *Occupational and Environmental Medicine* 59, No. 2 (February 2002): 98–105.

Wild, P. "Lung Cancer Risk and Talc Not Containing Asbestiform Fibres: A Review of the Epidemiological Evidence." *Occupational and Environmental Medicine* 63, No. 1 (January 2006): 4–9.

Wong, C., Ronald E. Hempling, M. Steven Piver, Nachimuthu Natarajan, and Curtis J. Mettlin. "Perineal Talc Exposure and Subsequent Epithelial Ovarian Cancer: A Case-Control Study." *Obstetrics & Gynecology* 93, No. 3 (March 1999): 372–76.

Woodruff, J. D. "The Pathogenesis of Ovarian Neoplasia." *The Johns Hopkins Medical Journal* 144, no. 4 (April 1979): 117–20.

World Bank, Operations Policy and Country Services, May 2009: https://siteresources.worldbank.org/EXTPOPS/Resources/AsbestosGuidanceNoteFinal.pdf

Worley, Michael J., Jr., et al. "Endometriosis-Associated Ovarian Cancer: A Review of Pathogenis." *Int. J. Mol. Sci.* 14, (2013): 5367-5379.

Wright, H.R., J.C. Wheeler et al. "Potential toxicity of retrograde uterine passage of particulate matter." *Journal of Long-Term Effects of Medical Implants* Vol. 6, Nos. 3-4 (1996): 199-206.

Wu, A.H., C.L. Pearce, C.-C. Tseng, and M.C. Pike. "African Americans and Hispanics Remain at Lower Risk of Ovarian Cancer Than Non-Hispanic Whites after Considering Nongenetic Risk Factors and Oophorectomy Rates." *Cancer Epidemiology Biomarkers & Prevention* 24, No. 7 (July 2015): 1094–1100.

Wu, Anna H., Celeste L. Pearce, Chiu-Chen Tseng, Claire Templeman, and Malcolm C. Pike. "Markers of Inflammation and Risk of Ovarian Cancer in Los Angeles County." *International Journal of Cancer* 124, No. 6 (March 15, 2009): 1409–15.

Wu, Ruijin, et al. "Macrophage Contributions to Ovarian Function." *Human Reproduction Update*, Vol.10, No.2 (2004): pp. 119-133.

Yafei, Zhu, et al. "Correlation Between Macrophage Infiltration and Prognosis of Ovarian Cancer-A Preliminary Study." *Biomedical Research*, 27 (2): (2016) 305-312.

Yilmaz, Ercan, et al. "Immunhistochemical Analysis of Nuclear Factor Kappa Beta Expression in Etiopathogenesis of Ovarian Tumors." *Acta Cir Bras*; 33(7) (2018) 641-650.

Zazenski, R., W. H. Ashton, D. Briggs, M. Chudkowski, J. W. Kelse, L. MacEachern, E. F. McCarthy, M. A. Nordhauser, M. T. Roddy, and N. M. Teetsel. "Talc: Occurrence, Characterization, and Consumer Applications." *Regulatory Toxicology and Pharmacology: RTP* 21, no. 2 (April 1995): 218–29.

Zervomanoklakis, I, H.W. Ott, D Hadziomerovic, V. Mattle, B.E. Seeber, I. Virgolini, D. Heute, S. Kissler, G. Leyendecker, and L. Wildt. "Physiology of Upward Transport in the Human Female Genital Tract." *Annals of New York Acadamy of Sciences* 1101, no. 1 (2007): 1–20. https://doi.org/10.1196/annals.1389.032.

**Produced Documents**

000526 _ 17 (MA90013-0005)
IMERSY 210810
IMERSY 238270
IMERSY 238457
IMERSY 499486
IMERYS 030347
IMERYS 031791
IMERYS 051370
IMERYS 051436
IMERYS 051442
IMERYS 060644
IMERYS 088907
IMERYS 120564
IMERYS 130504
IMERYS 137677
IMERYS 170006
IMERYS 210707
IMERYS 210758
IMERYS 211157
IMERYS 238132
IMERYS 238468
IMERYS 238478
IMERYS 342524
IMERYS 442232-33
IMERYS 477879
IMERYS 500801
IMERYS045182
IMERYS045184
IMERYS051370
IMERYS053387
IMERYS053387
IMERYS189001
IMERYS189001
IMERYS210136
IMERYS210700
IMERYS210701
IMERYS210724
IMERYS210788-210799

IMERYS210794
IMERYS210801-210803
IMERYS210810-210812
IMERYS210824
IMERYS211157
IMERYS214720
IMERYS219720
IMERYS219720
IMERYS241866
IMERYS248877
IMERYS255101
IMERYS255224
IMERYS255384
IMERYS255394
IMERYS255395
IMERYS279884
IMERYS279968
IMERYS281335
IMERYS281776
IMERYS286445
IMERYS304036
IMERYS304036
IMERYS324700
IMERYS340454
IMERYS340798
IMERYS342524
IMERYS346016
IMERYS469478
IMERYS477879
IMERYS501956
IMERYS-A_0015621
IMERYS-A_0015663
IMERYS-MDL-AB_0005560
J&J-0007797 (JNJMX68_000012854)
J&J-0007801 (JNJMX68_000012858)
JNJ 000000704
JNJ 000001918
JNJ 000037468
JNJ 000046293
JNJ 000062176
JNJ 000063608

JNJ 000063951
JNJ 000087928
JNJ 000088570
JNJ 000089413
JNJ 000131754
JNJ 000223449
JNJ 000229914
JNJ 000231304
JNJ 000233691
JNJ 000234805
JNJ 000237076
JNJ 000237379
JNJ 000238011
JNJ 000239723
JNJ 000239730
JNJ 000246437
JNJ 000252742
JNJ 000269848
JNJ 000281921
JNJ 000286900
JNJ 000319762
JNJ 000347962
JNJ 000375383
JNJ 000383662
JNJ 000383914
JNJ 000390346
JNJ 000460665
JNJ 000488188
JNJ 000488318
JNJ000063608
JNJ000065666
JNJ000085374
JNJ000086280
JNJ000131758
JNJ000222851
JNJ000232897
JNJ000232996
JNJ000237076
JNJ000238826,
JNJ000239723
JNJ000239730

JNJ000245002
JNJ000246437
JNJ000246844
JNJ000248023
JNJ000251888
JNJ000260807
JNJ000261010
JNJ000269904
JNJ000281919
JNJ000281921
JNJ000285351
JNJ000291914
JNJ000291916
JNJ000314406
JNJ000314680
JNJ000346572
JNJ000346747
JNJ000347962
JNJ000347962
JNJ000347962
JNJ000378044
JNJ000521616
JNJ000629320
JNJ000886067
JNJAZ55_000005957
JNJAZ55_000008177
JNJAZ55_00004644
JNJI4T5_000004521
JNJNL61_00000266
JNJMX68_000003729 (Exhibit J&J-185)
JNJMX68_000004296
JNJMX68_000012745
JNJMX68_000013019
JNJMX68_000022920
JNJNL61_000001341
JNJNL61_000005343
JNJNL61_000006591
JNJNL61_000006591
JNJNL61_000006591
JNJNL61_000006792

JNJNL61_000023234

JNJNL61_000024449
JNJNL61_000024650
JNJNL61_000024657
JNJNL61_000025152
JNJNL61_000027053
JNJNL61_000032036
JNJNL61_000033574
JNJNL61_000043243
JNJNL61_000043244
JNJNL61_000043245
JNJNL61_000043246
JNJNL61_000043271
JNJNL61_000043272
JNJNL61_000064161
JNJNL61_000064162
JNJNL61_000079334
JNJNL61_000090039

JNJS71R_000000139

JNJS71R_000001978
JNJS71R_000002199
JNJS71R_000007083
JNJS71R_000009825
JNJS71R_000011316
JNJTALC000384809
JNJTALC000864509
JNJTALC000878141
JOJO-MA2330

**Depositions**

Deposition of Alice M. Blount Dated 4.13.2018
Deposition and Exhibits of Laura M. Plunkett Dated 1.11.2017-1.13.2017
Deposition of Dr. Thomas Dydek Dated 8.21.18
Deposition and Exhibits of John Hopkins Dated 8.16.18-8.17.18
Deposition and Exhibits of Julie Pier Dated 9.12.18-9.13-18
Deposition and Exhibits of Pat Downey Dated 8.7.18-8.8.18
Deposition of Robert Glenn Dated 10.18.18

Deposition and Exhibits of Donald Hicks Dated 6.28.18-6.29.8

**<u>Reports</u>**

Expert Report of Michael M. Crowley, PhD

Expert Report of William E. Long, PhD and Mark W. Rigler PhD.   Analysis of J&J Baby Powder & Valiant Shower to Shower Talc Products for Amphibole (Tremolite) Asbestos Expert Report.   August 2, 2017.

Expert Report of William E. Long, PhD, Mark W. Rigler, PhD and William B. Egeland, M.S., P.G.   Below the Waist Application of J&J Baby Powder Expert Report.   September, 2017.

Expert Report of William E. Longo, PhD and Mark W. Rigler PhD.   TEM Analysis of Historical 1978 Johnson's Baby Powder Sample for Amphibole Asbestos .   February 16, 2018.

Expert Report of William E. Longo, PhD and Mark W. Rigler, PhD. November. 14, 2018.

Expert Report (Brower v. J&J) of Dr. Thomas Dydek

Expert Report (Brower v. J&J) of Dr. Laura Plunkett

Supplmental Expert Report (Brower v. J&J) of Dr. Laura Plunkett

Exhibit 38

Judith Zelikoff, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW JERSEY

- - -

IN RE:  JOHNSON &            :
JOHNSON TALCUM POWDER        :
PRODUCTS MARKETING,          :
SALES PRACTICES, AND         :   NO. 16-2738
PRODUCTS LIABILITY           :   (FLW)(LHG)
LITIGATION                   :
                             :
THIS DOCUMENT RELATES        :
TO ALL CASES                 :

- - -

January 21, 2019

- - -

Videotaped deposition of
JUDITH ZELIKOFF Ph.D., taken pursuant to
notice, was held at the Sheraton Mahwah
Hotel, 1 International Boulevard, Mahwah,
New Jersey, beginning at 9:11 a.m., on
the above date, before Michelle L. Gray,
a Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph| 917.591.5672
deps@golkow.com

Judith Zelikoff, Ph.D.

|  | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 |  |
|  | BEASLEY ALLEN, P.C. |
| 3 | BY:  P. LEIGH O'DELL, ESQ. |
|  | BY:  JENNIFER K. EMMEL, ESQ. |
| 4 | 234 Commerce Street |
|  | Montgomery, Alabama 36103 |
| 5 | (334) 269-2343 |
|  | leigh.odell@beasleyallen.com |
| 6 | Jennifer.emmel@beasleyallen.com |
| 7 |    - and - |
| 8 | LEVIN PAPANTONIO THOMAS |
|  | MITCHELL RAFFERTY & PROCTOR, PA |
| 9 | BY:  CHRISTOPHER V. TISI, ESQ. |
|  | 316 South Baylen Street, |
| 10 | Suite 600 |
|  | Pensacola, Florida 32502 |
| 11 | (888) 435-7001 |
|  | Ctisi@levinlaw.com |
| 12 |  |
|  |    - and - |
| 13 |  |
|  | GOLOMB & HONIK P.C. |
| 14 | BY:  RICHARD M. GOLOMB, ESQ. |
|  | 1835 Market Street, Suite 2900 |
| 15 | Philadelphia, PA 19103 |
|  | (215) 985.9177 |
| 16 | Rgolomb@golombhonik.com |
| 17 |    - and - |
| 18 | NAPOLI SHKOLNIK, PLLC |
|  | BY:  ALASTAIR J.M. FINDEIS, ESQ. |
| 19 | 400 Broadhollow Road, Suite 305 |
|  | Melville, New York 11747 |
| 20 | (631) 224-1133 |
|  | afindeis@napolilaw.com |
| 21 | Representing the Plaintiffs' |
|  | Steering Committee |
| 22 |  |
| 23 |  |
| 24 |  |

|  | Page 4 |
|---|---|
| 1 | APPEARANCES:  (Cont'd.) |
| 2 |  |
| 3 | SEYFARTH SHAW, LLP |
|  | BY:  THOMAS T. LOCKE, ESQ. |
| 4 | 975 F Street, NW |
|  | Washington, D.C. 20004 |
| 5 | (202) 463-2400 |
|  | tlocke@seyfarth.com |
| 6 | Representing the Defendant, PCPC |
| 7 |  |
|  | TUCKER ELLIS, LLP |
| 8 | BY:  JAMES W. MIZGALA, ESQ. |
|  | 233 South Wacker Drive, Suite 6950 |
| 9 | Chicago, Illinois 60606 |
|  | (312) 624-6307 |
| 10 | james.mizgala@tuckerellis.com |
|  | Representing the Defendant, PTI |
| 11 | Royston LLC and PTI Union LLC |
| 12 |  |
| 13 |  |
| 14 | ALSO PRESENT: |
| 15 |  |
|  | VIDEOTAPE TECHNICIAN: |
| 16 |   Henry Marte |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

|  | Page 3 |
|---|---|
| 1 | APPEARANCES:  (Cont'd.) |
| 2 |  |
|  | SHOOK, HARDY & BACON, LLP |
| 3 | BY:  MARK C. HEGARTY, ESQ. |
|  | 2555 Grand Boulevard |
| 4 | Kansas City, MO 64108 |
|  | (816) 474-6550 |
| 5 | Mhegarty@shb.com |
| 6 |    - and - |
| 7 | SKADDEN ARPS, LLP |
|  | BY:  BENJAMIN S. HALPERIN, ESQ. |
| 8 | 4 Times Square |
|  | New York, New York 10036 |
| 9 | (212) 735-2453 |
|  | Benjamin.halperin@skadden.com |
| 10 | Representing the Defendant, Johnson |
|  | & Johnson entities |
| 11 |  |
| 12 | GORDON & REES, LLP |
|  | BY:  KENNETH J. FERGUSON, ESQ. |
| 13 | 816 Congress Avenue, Suite 1510 |
|  | Austin, Texas 78701 |
| 14 | (512) 391.0183 |
|  | kferguson@gordonrees.com |
| 15 |  |
|  |    - and - |
| 16 |  |
|  | COUGHLIN DUFFY, LLP |
| 17 | BY:  MARK K. SILVER, ESQ. |
|  | 350 Mount Kemble Avenue |
| 18 | Morristown, New Jersey 07962 |
|  | (973) 267-0058 |
| 19 | msilver@coughlinduffy.com |
|  | Representing the Defendant, Imerys |
| 20 | Talc America, Inc. |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |

|  | Page 5 |
|---|---|
| 1 |          - - - |
| 2 |     I N D E X |
| 3 |          - - - |
| 4 |  |
|  | Testimony of:   JUDITH ZELIKOFF, Ph.D. |
| 5 |  |
|  | By Mr. Hegarty  14, 464, 523, 576 |
| 6 |  |
|  | By Mr. Ferguson        442 |
| 7 |  |
|  | By Ms. O'Dell        486, 571 |
| 8 |  |
| 9 |  |
| 10 |  |
|  |          - - - |
| 11 |  |
|  |     E X H I B I T S |
| 12 |  |
|  |          - - - |
| 13 |  |
| 14 | NO.     DESCRIPTION       PAGE |
| 15 | Zelikoff-1  Compilation of     16 |
|  |     Invoices of |
| 16 |     Dr. Zelikoff |
| 17 | Zelikoff-2  Rule 26 Expert     35 |
|  |     Report of Judith |
| 18 |     Zelikoff, Ph.D. |
|  |     11/16/18 |
| 19 |  |
|  | Zelikoff-3  Longo & Rigler     36 |
| 20 |     Report |
|  |     1/15/19 |
| 21 |  |
|  | Zelikoff-4  Rule 26 Report     40 |
| 22 |     Of Michael Crowley |
| 23 | Zelikoff-5  Listing of Chemicals 43 |
| 24 |  |

Judith Zelikoff, Ph.D.

Page 6

E X H I B I T S (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Zelikoff-6 | Notice of Deposition Of Dr. Zelikoff | 50 |
| Zelikoff-7 | Thumb Drive | 53 |
| Zelikoff-8 | Molecular Basis Supporting the Association of Talcum Powder Use with Increased Risk of Ovarian Cancer (Saed) | 55 |
| Zelikoff-9 | Data Screening Assessment 12/2018 | 57 |
| Zelikoff-10 | Systematic Review and Meta-Analysis Of the Association Between Perineal Use of Talc And Risk of Ovarian Caner (Taher) | 60 |
| Zelikoff-11 | Exhibit C Listing of Bates Numbered Documents | 62 |
| Zelikoff-12 | Academic Integrity For Students at NYU | 78 |
| Zelikoff-13 | Comparison of Quotes with Shawn Levy | 83 |

Page 7

E X H I B I T S (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Zelikoff-14 | Comparison of Quotes with Smith-Bindman | 88 |
| Zelikoff-15 | Comparison of Quotes with Genetics Home Reference | 92 |
| Zelikoff-16 | Comparison of Quotes with Simone Reuter | 102 |
| Zelikoff-17 | Comparison of Quotes with Environmental Chemistry.com | 106 |
| Zelikoff-18 | Comparison of Quotes with Rakoff-Nahoum | 115 |
| Zelikoff-19 | Comparison of Quotes with Health Effects | 119 |
| Zelikoff-20 | Why Cancer Inflammation? (Rakoff-Nahoum) | 118 |
| Zelikoff-21 | Comparison of Quotes with Kasprzak | 121 |
| Zelikoff-22 | Curriculum Vitae Of Dr. Zelikoff | 175 |

Page 8

E X H I B I T S (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Zelikoff-23 | Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention NCI | 393 |
| Zelikoff-24 | (Skipped) | |
| Zelikoff-25 | Comparison of Quotes with Cancer Research How Cancer Starts | 125 |
| Zelikoff-26 | Comparison of Quotes with Safety Assessment of Talc as Used in Cosmetics | 125 |
| Zelikoff-27 | Comparison of Quotes with CSEM | 125 |
| Zelikoff-28 | Comparison of Quotes with NIH Public Access Chromium Toxicity | 125 |
| Zelikoff-29 | Comparison of Quotes with IARC Monograph | 125 |

Page 9

E X H I B I T S (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Zelikoff-30 | Comparison of Quotes with NIH Public Access Environmental Toxicants | 125 |
| Zelikoff-31 | Comparison of Quotes with Peters | 125 |
| Zelikoff-32 | Comparison of Quotes with Trabert | 125 |
| Zelikoff-33 | Response Letter To Citizen's Petition 4/1/14 | 430 |
| Zelikoff-34 | Perineal Talc Use And Ovarian Cancer (Penninkilampi) | 398 |
| Zelikoff-35 | Consumer Talcums And Powders (Rohl) | 405 |
| Zelikoff-36 | Arsenic, Metals Fibres Excerpt (IARC Monograph) | 457 |
| Zelikoff-37 | Ingredients Talc | 454 |

3 (Pages 6 to 9)

Judith Zelikoff, Ph.D.

Page 10

1                - - -
2        E X H I B I T S  (Cont'd.)
3                - - -
4    NO.        DESCRIPTION        PAGE
5    Zelikoff-38  Talcum Powder      469
6        Chronic Pelvic
         Inflammation
7        (Merritt)
8
         Zelikoff-39  Markers of       471
9        Inflammation
         And Risk
10       (Wu)
11   Zelikoff-40  Binder Labeled      480
         Saad 2010 -
12       Zambelli 2013
13   Zelikoff-41  Binder Labeled      480
         Production Documents
14
     Zelikoff-42  Binder Labeled      480
15       Depositions
         ACGIH 2010 -
16       Frank & Jorge 2011
17   Zelikoff-43  Binder Labeled      480
         IARC 1977 -
18       IARC 2006
19   Zelikoff-44  Binder Labeled      480
         Gamble 1979 -
20       IARC 1976
21   Zelikoff-45  Binder Labeled      480
         Ingersoll 2011 -
22       Marconi 1990
23
24

Page 12

1                - - -
2        DEPOSITION SUPPORT INDEX
3                - - -
4
5    Direction to Witness Not to Answer
6    PAGE   LINE
     None.
7
8    Request for Production of Documents
9    PAGE   LINE
     None.
10
11   Stipulations
12   PAGE   LINE
     None.
13
     Questions Marked
14
     PAGE   LINE
15   None.
16
17
18
19
20
21
22
23
24

Page 11

1                - - -
2        E X H I B I T S  (Cont'd.)
3                - - -
4
5    NO.        DESCRIPTION        PAGE
6    Zelikoff-46  Binder Labeled      480
         Mattenklott 2007 -
7        Rossi 2009
8    Zelikoff-47  Binder Labeled      480
         IARC 2009 -
9        IARC, 2012
10   Zelikoff-48  Alterations in      481
         Gene Expression
11       In Human Mesothelial
         Cells
12       (Shukla)
13   Zelikoff-49  Experts of Transcript 549
         Of Robert Glenn
14       10/18/18
15   Zelikoff-50  Presence of        562
         Talc in Pelvic
16       Lymph Nodes of a Woman
         (Cramer)
17
     Zelikoff-51  Does Long-Term      567
18       Talc Exposure
         Have a Carcinogenic
19       Effect
         (Keskin)
20
21
22
23
24

Page 13

1            THE VIDEOGRAPHER:  We are on
2    the record.  My name is Henry
3    Marte.  I am a videographer with
4    Golkow Litigation Services.
5            Today is January 21st, 2019,
6    and the time is 9:11 a.m.
7            This video deposition is
8    being held in Mahwah, New Jersey,
9    in the matter of Talcum Powder
10   Litigation.
11           The deponent today is Dr.
12   Judith Zelikoff.
13           All appearances will be
14   noted on the stenographic record.
15   Will the court reporter please
16   administer the oath to the
17   witness.
18               - - -
19           ... JUDITH ZELIKOFF, Ph.D.,
20   having been first duly sworn, was
21   examined and testified as follows:
22               - - -
23           EXAMINATION
24               - - -

4 (Pages 10 to 13)

Judith Zelikoff, Ph.D.

Page 14

1    BY MR. HEGARTY:
2        Q.   Good morning, Dr. Zelikoff.
3        A.   Good morning.
4        Q.   My name is Mark Hegarty.  I
5    represent the J&J defendants in this
6    action.  Can you please state your full
7    name for the record, please?
8        A.   Judith Terri Zelikoff.
9        Q.   Dr. Zelikoff, who is your
10   current employer?
11       A.   New York University School
12   of Medicine, also known as NYU Langone
13   Health.
14       Q.   What is your title at New
15   York University School of Medicine?
16       A.   Professor with tenure.
17       Q.   How long have you held that
18   position?
19       A.   Since 1982.
20       Q.   Do you have any separate
21   personal consulting business for
22   litigation purposes?
23       A.   I do not.
24       Q.   Where do the fees go that

Page 15

1    you earn as an expert witness in this
2    case?
3        A.   They go to household
4    expenses as well as charity.
5        Q.   But they go to you, correct?
6        A.   They go to me.
7        Q.   Other than your work at New
8    York University and the fees that you're
9    earning as part of this litigation, do
10   you have any other sources of income?
11       A.   Just income that I have from
12   advisory boards or -- when you -- when
13   you sit on panels, they also pay you.
14   But other than that, no.
15       Q.   Tell me an example of an
16   advisory board for which you receive
17   income.
18       A.   It's on a very sporadic
19   basis.  And it depends on what it is.
20   But the NIEHS, National Institute of
21   Environmental Health Sciences.  And it's
22   an NIH institute.  And I serve as a -- I
23   review grants for them.
24       Q.   What are you charging

Page 16

1    plaintiffs' counsel for your services in
2    this litigation?
3        A.   $350 per hour.
4        Q.   Is there any difference in
5    your rate depending on whether it's
6    literature review, sitting for a
7    deposition, trial testimony?
8        A.   Sitting for a deposition or
9    trial testimony is $450.
10       Q.   Did anyone outside of
11   plaintiffs' attorneys assist you in any
12   way with your expert report in this case?
13       A.   No one with my expert
14   report.
15       Q.   We were provided today a
16   copy of several invoices that you have
17   prepared for your work in this case.  I'm
18   going to mark as Exhibit Number 1 a copy
19   of those invoices.
20           (Document marked for
21           identification as Exhibit
22           Zelikoff-1.)
23   BY MR. HEGARTY:
24       Q.   Dr. Zelikoff, would you look

Page 17

1    at Exhibit Number 1 and tell me whether
2    those are all the invoices that you have
3    generated and provided to plaintiffs'
4    counsel in this case.
5        A.   It appears to be.
6        Q.   Thank you.  The last work
7    noted is December 24, 2018.
8            Have you spent any
9    additional time on this case for which
10   you intend to bill plaintiffs' counsel --
11       A.   Yes, I have.
12       Q.   -- that's not reflected in
13   the invoices?
14       A.   Yes, I have.
15       Q.   How much additional time?
16       A.   Approximately 25 to 30 hours
17   by the end of this deposition.  Not
18   including the deposition.
19       Q.   With regard to these
20   invoices, have they all been paid?
21       A.   Yes, they have.
22       Q.   Were you paid a retainer for
23   your work on this case?
24       A.   I don't recall.

5 (Pages 14 to 17)

Judith Zelikoff, Ph.D.

Page 18

1      Q.   Dr. Zelikoff, as you know
2  we're here to take your deposition in the
3  case of In Re Johnson & Johnson Talc
4  Litigation, which is an MDL setting.  Are
5  you aware you've been designated as an
6  expert in that case?
7      A.   I am aware.
8      Q.   When were you first
9  contacted about serving as an expert in
10  this case?
11      A.   Early 2017.  I was
12  requested -- I was requested if I had
13  interest in it.
14      Q.   The first invoice that you
15  provided has a date of April 5, 2017.
16  When in relation to the first invoice
17  entry was that initial contact?
18      A.   To the best of my knowledge,
19  it was January or February.
20      Q.   Of 2017?
21      A.   Of 2017, right.
22      Q.   Who contacted you?
23      A.   Jennifer Emmel.
24      Q.   Did you know her before she

Page 19

1  contacted you?
2      A.   Not at all.
3      Q.   How was the contact made, by
4  telephone?
5      A.   By telephone.
6      Q.   Apart from anything that
7  attorneys for plaintiffs may have told
8  you, do you know how she came to contact
9  you?
10      A.   I'm not aware as to how she
11  came to contact me.
12      Q.   Did you have any prior
13  litigation work with her?
14      A.   Not with Ms. Emmel, no.
15      Q.   How do you spell her name?
16      A.   How do I --
17      Q.   Yes.
18      A.   -- spell her name?
19      Q.   Yes.
20      A.   To the best of my knowledge,
21  it's E-M-M-E-L.
22      Q.   Have you had any prior
23  litigation work with any of the lawyers
24  with whom you have met that are

Page 20

1  representing plaintiffs?
2      A.   No, sir.
3      Q.   Did you agree to serve as an
4  expert witness at the time of Ms. Emmel's
5  first contact with you?
6      A.   No, sir.  I told her that I
7  would have to do some literature
8  searching myself and come up with a
9  conclusion as to whether or not I felt
10  comfortable based on the science in
11  serving in that capacity.
12      Q.   At one point -- at what
13  point between -- at what point did you
14  come to or did -- strike that.
15          At what point did you agree
16  to serve as an expert witness in this
17  litigation in relation to that first
18  call?
19      A.   Probably about a month
20  later.
21      Q.   What did Ms. Emmel tell you
22  at that first call about the litigation?
23          MS. O'DELL:  We just
24  instruct -- I mean conversations,

Page 21

1  in terms of -- let me just strike
2  that and say don't discuss
3  anything that you communicated to
4  us or we communicated to you after
5  you decided to become an expert in
6  the case.
7  BY MR. HEGARTY:
8      Q.   Correct.  I'm talking about,
9  right now I'm talking about that initial
10  phone call where you said you had not --
11  where you did not agree at that point in
12  time to serve as an expert witness.
13  That's the only call I'm talking about.
14          What did Ms. Emmel tell you
15  about the litigation or about what they
16  wanted you to do at that first call?
17      A.   Well, I don't remember the
18  details as it was about over a year ago.
19  But to the best of my knowledge and my
20  recollection, it was just that they
21  represented the plaintiffs in a case of
22  ovarian cancer and its relationship to
23  talcum powder products, and was I
24  familiar with it, did I know anything

6 (Pages 18 to 21)

Judith Zelikoff, Ph.D.

Page 22

1  about it, and did I have -- did I have
2  interest in being associated with, and I
3  responded to her that I follow the
4  science, that's all I do is I follow the
5  science.
6        And if the science leads me
7  in a direction that I would have interest
8  or that I felt comfortable in doing this,
9  then I would let her know.
10       Q.   What was your response when
11  she asked you if you were familiar with
12  the science of talc and ovarian cancer?
13       A.   I was familiar with it at
14  that time in a superficial manner.  I
15  work in a very high-powered department of
16  environmental medicine.  And we discuss
17  current events over lunch.
18       Q.   When you say in a
19  superficial manner, what do you mean?
20       A.   Certainly not to the depth
21  that I'm aware of the issue currently.
22       Q.   Is it correct that you had
23  not formed any opinions as to any link
24  between talc and ovarian cancer as of the

Page 23

1  time of that first call with Ms. Emmel?
2        A.   I had -- I had no opinion at
3  that time.
4        Q.   Did you have any discussions
5  with Ms. Emmel or any other lawyer
6  representing plaintiffs between that
7  initial phone call and when you agreed to
8  serve as an expert witness?
9        A.   To my -- to the best of my
10  knowledge, I had not spoken to
11  Ms. O'Dell.  So to the best of my
12  knowledge it was just Ms. Emmel.
13       Q.   Again, focusing on that
14  first phone call -- well, strike that.
15       Had you had any further
16  discussion with Ms. Emmel between the
17  time of that first call and the time you
18  agreed to serve as an expert witness?
19       A.   I'm sorry, between the time
20  of the first call and the time I agreed,
21  could you repeat the question please?
22       Q.   Sure.  Did you have any
23  additional discussions with Ms. Emmel
24  between the time of the first call and

Page 24

1  the time that you agreed to serve as an
2  expert witness in the case?
3        A.   No, not -- not to my
4  recollection.
5        Q.   Do you recall anything else
6  that you discussed with Ms. Emmel at that
7  first call besides what we talked about
8  already?
9        A.   No, sir.
10       Q.   Did Ms. Emmel at that first
11  call tell you anything about plaintiffs'
12  theory of causation or theory of
13  mechanism of action or biologic
14  plausibility?
15       A.   No, sir, not at all.
16       Q.   Did she send you any
17  documents before you agreed to serve as
18  an expert witness?
19       A.   Not to my knowledge.  I
20  think the -- I'm sure the literature
21  reviews that I did at that time were
22  solely my own.
23       Q.   Had you heard of lawsuits
24  involving talc and ovarian cancer before

Page 25

1  being contacted by Ms. Emmel?
2        A.   I actually had not.
3        Q.   What then were your sources
4  of knowledge about talc and ovarian
5  cancer as of the time of the first call?
6        A.   The media, whatever I might
7  have read in the paper and any
8  discussions that might have been brought
9  up by my colleagues.
10       Q.   Do you recall any colleague
11  who brought the -- anything up about talc
12  and ovarian cancer?
13       A.   I do not recall a specific
14  colleague.  Lunchroom chatter.
15       Q.   Did you form any opinions
16  from the material you did read in the
17  media or from discussion with your
18  colleagues?
19       A.   I had no opinion.
20       Q.   And you were ultimately
21  retained and asked to give expert
22  opinions in this case, correct?
23       A.   I was ultimately retained,
24  yes, correct.

7 (Pages 22 to 25)

Judith Zelikoff, Ph.D.

| Page 26 | Page 28 |
|---|---|

**Page 26**

1  Q.   The lawyers for the
2  plaintiffs in this case have paid you to
3  review materials and offer opinions,
4  correct?
5      MS. O'DELL:  Objection to
6  the form.
7      THE WITNESS:  Do I answer
8  the question?
9  BY MR. HEGARTY:
10     Q.   Yes.
11     MS. O'DELL:  Yes.
12     THE WITNESS:  They have
13  remunerated me for my time and
14  effort in reading hundreds of
15  articles.
16  BY MR. HEGARTY:
17     Q.   The opinions that you've
18  formulated were ultimately set out in
19  your November 16, 2018, MDL report,
20  correct?
21     A.   That's correct.
22     Q.   The hours you spent in
23  preparing that report are reflected in
24  the invoices we marked as Exhibit

**Page 27**

1  Number 1, correct?
2      A.   I don't recall what exhibit
3  number it is, but it is in one of the
4  invoices.
5      Q.   A description that you have
6  in your invoices includes report
7  preparation.  Is that a description which
8  describes your -- the time you spent
9  preparing your report?
10     A.   Yes, it is.
11     Q.   Every entry under report
12  preparation would be the time that you
13  spent preparing your report?
14     A.   Yes, that's true.  That
15  could include reading material, searching
16  for material or writing.
17     Q.   The invoices we marked as an
18  exhibit also reflect the time you spent
19  with lawyers for plaintiffs; is that
20  correct?
21     A.   It does.
22     Q.   With regard to your
23  deposition here today, how much time did
24  you spend preparing to come here and

**Page 28**

1  testify today?
2      A.   It would be in my invoice,
3  but if I had to approximate that without
4  the knowledge of having that in front of
5  me, I would say 30 to 50 hours.
6      Q.   What attorneys did you meet
7  with to prepare for your deposition here
8  today?
9      A.   I met with Ms. O'Dell and
10  Ms. Emmel.
11     Q.   Anyone else?
12     A.   In a face-to-face.
13     Q.   Face-to-face.  There were
14  phone calls as well?
15     A.   There were -- one of -- one
16  of the phone calls, it may have been two.
17  I also -- Chris, and I'm not familiar
18  with your last name, sorry.
19     Chris from the --
20     MS. O'DELL:  Tisi.
21     THE WITNESS:  Tisi?  Chris
22  Tisi and Alistair --
23     MR. FINDEIS:  Findeis.
24     MS. O'DELL:  Findeis.

**Page 29**

1      THE WITNESS:  Findeis -- was
2  on the phone, and there may have
3  been one or two others, but I
4  don't recall.
5  BY MR. HEGARTY:
6      Q.   Have you spoken with any of
7  your colleagues about your work in this
8  litigation?
9      A.   What -- can you explain what
10  you mean by colleagues?
11     Q.   Well, you mentioned
12  colleagues in discussing talc and ovarian
13  cancer.  So those colleagues.
14     A.   If -- do you mean other
15  faculty?
16     Q.   Correct.
17     A.   And the question again,
18  please?
19     Q.   Sure.  Have you spoken with
20  other faculty at New York University
21  regarding your work on this litigation?
22     A.   No, I have not.
23     Q.   Have you told any faculty at
24  New York University of your opinions in

8 (Pages 26 to 29)

Judith Zelikoff, Ph.D.

Page 30

1   this case?
2       A.   I have not.
3       Q.   Have you told anyone at NYU
4   School of Medicine of your opinions?
5       A.   I have not.  I have
6   discussed, not my opinion, but in my
7   class, my toxicology course, to graduate
8   students at NYU.
9            I have, in my course on
10  speaking about reproductive toxicology
11  and developmental toxicology, in
12  discussing risk factors, two graduate
13  students I have discussed -- I've
14  included talc as a potential risk factor.
15      Q.   When did you start including
16  talc as a potential risk factor in that
17  course?
18      A.   Prior -- if you're asking me
19  was it prior to or -- prior to my
20  retainment, it was prior to my
21  retainment.
22      Q.   So prior to your
23  retainment -- let me -- let me word it
24  differently.

Page 31

1            Prior to the call from
2   Ms. Emmel, you had included in your
3   course to -- your toxicology course a
4   discussion about talc and ovarian cancer?
5       A.   Not a discussion, just
6   didactic lecture saying that this is the
7   female reproductive tract.  Ovarian
8   cancer is part of an adverse outcome of
9   disease.  It's very prevalent.  And there
10  are factors including early menarche,
11  late menopause, and there's some issues
12  currently on the table as to whether
13  cosmetic talc also plays a role.
14           No opinion was given to my
15  class.  Just information.
16      Q.   Do you have any materials
17  for your course, whether in PowerPoint
18  form or other form that sets out that
19  discussion you just had?
20      A.   No.
21      Q.   Is that the extent of the
22  discussion that you had with your
23  toxicology students about talc and
24  ovarian cancer?

Page 32

1       A.   Yes.
2       Q.   Does that continue to be the
3   extent of any discussion you had with any
4   students at New York University about
5   talc and ovarian cancer?
6       A.   Well, right now we're on
7   break.  I -- I probably will -- I will
8   continue after the deposition to also
9   talk -- talk with them and list it as
10  a -- as a risk factor for ovarian cancer.
11      Q.   What about -- strike that.
12           Did you have discussions,
13  that same discussion with toxicology
14  students between -- I should say before
15  you were contacted by Ms. Emmel and
16  today, have you had -- continued to have
17  that same discussion with your toxicology
18  students?
19      A.   I've not --
20           MS. O'DELL:  Objection to
21      form.
22           Doctor, give me just a
23      moment after the question if I
24      need to object.  Thank you.

Page 33

1            THE WITNESS:  Shall I
2   continue?
3   BY MR. HEGARTY:
4       Q.   Sure.
5       A.   Could you repeat the
6   question, please?
7       Q.   Sure.  You mentioned that
8   the discussion that we just went over was
9   before your contact by Ms. Emmel,
10  correct?
11      A.   I said that it started.  My
12  lectures started prior to my conversation
13  with Ms. Emmel.
14      Q.   What was -- what was the
15  name of the course that you had that
16  lecture?
17      A.   Organ system toxicology.
18      Q.   Have you taught that course
19  since your call with Ms. Emmel?
20      A.   Actually it's coming up
21  this -- this semester, starting the 30th
22  of January.
23      Q.   So between -- as of the
24  first part of 2017 through today you have

9 (Pages 30 to 33)

Judith Zelikoff, Ph.D.

Page 34

1    not taught that same course?
2        A.   It's taught every other
3    year.
4        Q.   Have you communicated with
5    anyone outside of plaintiffs' counsel in
6    this case about your opinions in your
7    report?
8        A.   Not about my opinions, no.
9        Q.   Have you talked with anyone
10   outside of plaintiffs' counsel in this
11   case about your report?
12       A.   Only to say that I -- to my
13   friends, when I refuse to go anywhere
14   with them, because I have to stay home
15   and work, only to say that I'm working on
16   a report.
17       Q.   Have you discussed the
18   litigation or your report with any other
19   experts retained by the plaintiffs in
20   this case?
21       A.   No, sir, I have not.
22       Q.   Have you reviewed any of the
23   other plaintiffs' experts' MDL reports in
24   this litigation besides those referenced

Page 35

1    in your report?
2        A.   I reviewed Dr. Dydek's.  I
3    reviewed -- did you say the plaintiffs'
4    witnesses?
5        Q.   Yeah, let me -- let me -- in
6    your report -- and I can -- we can get it
7    out here in a moment.  But you list
8    the -- in your list of reports, you list
9    the report of Michael Crowley.
10       A.   I'm sorry, sir.  Can you --
11       Q.   It's in Exhibit B at the end
12   of Exhibit B of your report.  If you need
13   a copy I can give it to you now.
14       A.   Can you give me a copy.
15           (Document marked for
16       identification as Exhibit
17       Zelikoff-2.)
18   BY MR. HEGARTY:
19       Q.   I'm marking Exhibit 2 Dr.
20   Zelikoff's report that was provided to us
21   in this case.
22       A.   Thank you.  And what page
23   are you referring to?
24       Q.   It is the last page of

Page 36

1    Exhibit B.  It should be the very last
2    page of that document.
3        A.   Thank you.
4        Q.   The very last page of
5    Exhibit B of your report, you list a
6    number of expert reports, correct?
7        A.   I do.  Deposition and
8    exhibits.
9        Q.   Have you reviewed any other
10   expert reports -- strike that.
11           Did you review any other
12   expert reports for purposes of your
13   expert report besides those listed here?
14       A.   No, sir.  Unless --
15   Dr. Longo, December 2018 supplement, that
16   was a report, and I did review that.
17       Q.   We were provided today with
18   a copy of a report of Longo and Rigler,
19   January 15, 2019.  And I'm going to mark
20   that as Exhibit 3.
21           (Document marked for
22       identification as Exhibit
23       Zelikoff-3.)
24   BY MR. HEGARTY:

Page 37

1        Q.   Is that the supplemental
2    report that you described for us?
3        A.   It is, sir.  It's an
4    analysis Johnson & Johnson Historical
5    Product Containers and Imerys' Historical
6    Railroad Car Samples, etc..
7        Q.   That report is dated
8    January 15th, 2019, correct?
9        A.   Yes, sir.
10       Q.   When did you receive this
11   report?
12       A.   In January.
13       Q.   When in relation to
14   January 15, 2019?
15       A.   Today is the --
16       Q.   Is the 21st.
17       A.   Today is the 21st.  I would
18   say somewhere between the 15th and the
19   21st.  Actually it was this past Saturday
20   as it was placed in my Dropbox and I
21   could not open my Dropbox.
22       Q.   When did you review Exhibit
23   Number 3?
24       A.   That same report?

10 (Pages 34 to 37)

Judith Zelikoff, Ph.D.

Page 38

1    Q.   Yes.
2    A.   I received it on Saturday.
3  I reviewed it on Sunday.
4    Q.   How much time did you spend
5  reviewing this additional Longo and
6  Rigler report?
7    A.   Sorry.  About three hours.
8    Q.   Did you read every page?
9    A.   I read -- I reviewed each
10  page but I did not scrutinize every page.
11    Q.   Did you read the entirety of
12  the text in this supplemental report?
13    A.   May I see the report,
14  please.
15      MS. O'DELL:  Objection.
16      Asked and answered.  That's the
17      same question.
18      THE WITNESS:  Should I
19      answer?
20      MS. O'DELL:  Yes, you may.
21      THE WITNESS:  I reviewed the
22      text going up to Page 32 with
23      greater rigor than I did the
24      tables.

Page 39

1  BY MR. HEGARTY:
2    Q.   When you say "reviewed,"
3  does that mean that you read every -- all
4  the words on every page up to Page 32?
5    A.   I did.
6    Q.   You included in the list of
7  reports that you reviewed, the report of
8  Michael Crowley, correct?
9    A.   Every one of the reports
10  were not read with the -- read with
11  the -- sorry, I'm caught up in the
12  microphone -- were not read with the same
13  intensity and duration of time put into
14  it.  I reviewed it.  To what extent, I'm
15  not clear at this moment.
16    Q.   The first report that you
17  list in the list of reports in Exhibit B
18  is the expert report of Michael M.
19  Crowley, correct?
20    A.   It's written that way, yes.
21    Q.   Did you prepare this list of
22  reports?
23    A.   I did not.
24    Q.   Who did?

Page 40

1    A.   The attorneys.
2    Q.   I'm going to show you --
3    A.   Plaintiffs' attorneys.
4      (Document marked for
5      identification as Exhibit
6      Zelikoff-4.)
7  BY MR. HEGARTY:
8    Q.   I'm going to show you what I
9  marked as Exhibit Number 4.  This is the
10  MDL report provided to us for Michael
11  Crowley.
12    A.   Mm-hmm.
13    Q.   Did you read the entirety of
14  that report?
15    A.   I cannot say that I read the
16  entirety of this report.  I reviewed the
17  report.
18    Q.   Okay.  Well, your report is
19  dated November 16, 2018.  And that report
20  is dated November 12, 2012, -- 2018.
21  When did you receive the report by
22  Dr. Crowley in relation to the date on
23  the first page, November 12th.
24    A.   I really cannot say with

Page 41

1  certainty.  It seems to me that I
2  received this prior to my report
3  conclusion.
4    Q.   There are 212 pages there.
5  Again, did you read every word of every
6  page?
7    A.   No, sir.  Did I look at
8  every word of every page?  Yes.
9    Q.   No, my question is did you
10  read every word of every page.
11    A.   My answer is --
12      MS. O'DELL:  She answered
13      your question.
14      THE WITNESS:  -- I looked at
15      every page.
16  BY MR. HEGARTY:
17    Q.   Did you read all the
18  references that he has in that report?
19    A.   I looked at the references.
20    Q.   Did you actually pull the
21  references and read the citations that he
22  refers to?
23    A.   No, sir.  I did my own -- my
24  own literature search in terms of

11 (Pages 38 to 41)

Judith Zelikoff, Ph.D.

Page 42

1  fragrance and chemicals within the
2  fragrances.  And I did receive that as an
3  exhibit this morning.
4      Q.   I'm sorry.  What did you
5  say?
6      A.   I said I did my own
7  literature search in terms of fragrances,
8  and I think you received a copy of that
9  this morning.  In that report that I did,
10  that I prepared, I was assessing
11  carcinogenicity of each of the compounds.
12      Q.   Going back to the Crowley
13  report, did you read all the tables in
14  that report?
15      A.   I did not read.  I reviewed.
16      Q.   What is --
17      A.   I looked at them.
18      Q.   Okay.  What is the
19  difference between reading and reviewing
20  to you?
21      A.   In my mind, reading is
22  in-depth assessment, and whereas
23  reviewing is looking over.  Reading is
24  more intense.

Page 43

1      Q.   You pointed to us -- pointed
2  to us -- strike that.
3          You pointed to the document
4  that was provided to us this morning,
5  which you say is -- what I think you said
6  reflects your own literature search with
7  regard to fragrances; is that correct?
8      A.   Mine and a student.
9      Q.   What student?
10      A.   A graduate student in my
11  laboratory.
12          (Document marked for
13          identification as Exhibit
14          Zelikoff-5.)
15  BY MR. HEGARTY:
16      Q.   I've marked as Exhibit
17  Number 5 the document that was produced
18  to us this morning.  Can you tell me what
19  Exhibit Number 5 is.
20      A.   Exhibit Number 5 is -- is a
21  list of the chemicals that -- part of
22  which, if not in its entirety, were taken
23  from the fragrances that were -- and the
24  chemicals that were listed in

Page 44

1  Dr. Crowley's report.  And with that I --
2  I used the case number.  I reviewed each
3  one of the chemicals in terms of their
4  potential carcinogenicity by, number one,
5  putting -- writing down the chemical,
6  looking to see if there were other
7  structures or chemicals -- or chemicals
8  that had similar names.
9          I reviewed through Google,
10  through PubMed and through Tox Lit and
11  IARC reports to see whether or not there
12  was a listing for them in terms of
13  carcinogenicity.  And that is the result.
14  This is the result.
15      Q.   When did you do all of that?
16      A.   I did that post the
17  report --
18      Q.   When -- sorry.
19      A.   -- as part of my preparation
20  for the deposition.
21      Q.   When did you do it post
22  report in relation to today?
23      A.   One to two weeks ago.
24      Q.   Did you review -- strike

Page 45

1  that.
2          Did you read all the MSDSes
3  that you list in Exhibit Number 5?
4      A.   I did not read all of the
5  MSDSes.  But I did look at them.  I
6  reviewed them to make sure they were
7  accurate.
8      Q.   Did you -- did you look at
9  and review every MSDS listed in Exhibit
10  Number 5?
11      A.   No, sir.
12      Q.   I'm sorry?
13      A.   No, sir.
14      Q.   Approximately how many did
15  you look at in review?
16      A.   I would say I looked at
17  perhaps half.  Looked -- looked at, not
18  reviewed.
19      Q.   But with regard to your
20  analysis of the fragrances that are
21  reportedly in Johnson's Baby Powder, you
22  did not do any of your own analysis as of
23  the time of your report, correct?
24      A.   I --

12  (Pages 42 to 45)

Judith Zelikoff, Ph.D.

Page 46

1          MS. O'DELL:  Objection to
2      the form.
3          THE WITNESS:  I did no
4      analysis except to gather the
5      information that is out there by
6      reputable organizations.
7      BY MR. HEGARTY:
8          Q.   Well, did you gather that
9      information before you completed your
10     expert report?
11         A.   I did this after my expert
12     report.
13         Q.    And my question was, before
14     your expert report, did you do any of
15     your own analysis of the fragrances that
16     we -- are listed in Exhibit Number 5?
17         MS. O'DELL:  Objection to
18     form.
19         THE WITNESS:  I'm not sure
20     what you mean by analysis.
21     BY MR. HEGARTY:
22         Q.   Well, did you do any of your
23     own research, review of the literature,
24     anything with regard to fragrances as of

Page 47

1      the time of your signing of your expert
2      report November 16, 2018?
3          A.   I very briefly looked up
4      limonene and eugenol.  And it wasn't in
5      regards to this case.  It was in regards
6      to work that I do with electronic
7      cigarettes.  They are being used as
8      flavorants.
9          Q.   Was that the extent of your
10     review of the fragrances as of the time
11     of your expert report, November 16, 2018?
12         MS. O'DELL:  Object to form.
13         You may answer.
14         THE WITNESS:  Whatever is in
15         the report from Dr. Crowley that
16         listed, I looked at those.
17     BY MR. HEGARTY:
18         Q.   But as you indicated, you
19     did not read all the citations, the
20     literature resources that Dr. Crowley
21     cites in his report and review them
22     yourself?
23         MS. O'DELL:  Object to form.
24         form.

Page 48

1          THE WITNESS:  I --
2      post-report, I did my own search.
3      BY MR. HEGARTY:
4          Q.   But my question was, before
5      your report, with regard to Dr. Crowley's
6      report, did you actually pull the
7      literature references that he cites and
8      read them yourself?
9          A.   No, sir.
10         Q.   You also make reference to
11     reviewing Dr. Longo's report, MDL report,
12     which is dated November 14, 2018.  That's
13     in the last page of Exhibit Number B.  Do
14     you see that?
15         A.   I -- I see that, yes.
16         Q.   Did you read every page of
17     that report?
18         A.   No, sir, I did not.  But I
19     did read every page of the December 2018
20     Longo mass supplement report.
21         Q.   Well, focusing on the
22     November 14, 2018, report, that report is
23     over 2,000 pages.  Are you aware of that?
24         A.   Yes, sir.

Page 49

1          Q.   Did you read all 2,000
2      pages?
3          A.   No, sir.  I did not.
4          Q.   Did you read any of those
5      2,000 pages?
6          A.   I reviewed several of those
7      pages.
8          Q.   Okay.  How about the rest of
9      the reports that are listed there?  Did
10     you read every page of the reports that
11     are listed there?
12         A.   I read every page of the
13     Dr. Thomas Dydek's report.  And I read
14     two-thirds of Dr. Plunkett's.
15         Q.   As to the rest, did you
16     review the remaining reports?
17         MS. O'DELL:  Object to the
18     form.
19     BY MR. HEGARTY:
20         Q.   Or not look at them at all?
21         A.   I glanced over them.
22         Q.   Do you recall if you were
23     ever provided any draft reports from any
24     of the plaintiffs' experts in the MDL,

13 (Pages 46 to 49)

Judith Zelikoff, Ph.D.

Page 50

1  where you understood them to be drafts?
2      A.   I never received anything
3  that I understood to be a draft document.
4          (Document marked for
5      identification as Exhibit
6      Zelikoff-6.)
7  BY MR. HEGARTY:
8      Q.   Dr. Zelikoff, I'm marking
9  Exhibit Number 6 a copy of your
10  deposition notice for purposes of today's
11  deposition.
12     A.   Yes, sir.  I see it.
13     Q.   Did you have a chance to
14  look at that before today?
15     A.   I did not.
16     Q.   What materials did you bring
17  with you to the deposition today?
18         MS. O'DELL:  I would just
19     reassert that the objections that
20     plaintiffs have served regarding
21     certain of the requests and would
22     state that Dr. Zelikoff has
23     brought binders of her cited
24     materials, and then I believe I

Page 51

1      gave you a jump drive of all the
2      reference materials.
3  BY MR. HEGARTY:
4      Q.   Let me go back to my
5  question. Sitting to your right are
6  binders of materials.  Do you know what
7  those binders are, Dr. Zelikoff?
8      A.   I do know what those black
9  binders are to my right.
10     Q.   What are they?
11     A.   They are binders containing
12  materials, papers, literature --
13  literature, in alphabetical order of
14  papers that are relevant to my -- to my
15  testimony, as well as production
16  documents which include letters, reports
17  of internal documents.
18     Q.   Your Exhibit B in your
19  report starts with a page Materials and
20  Data Considered.  Do you see that?
21     A.   Page please?
22     Q.   It's Exhibit B.
23     A.   Materials and data
24  considered, I have it, yes, sir.

Page 52

1      Q.   Is it correct that the
2  binders to your right are copies of
3  everything in -- under the listing --
4  under the heading of Materials and Data
5  Considered?
6          MS. O'DELL:  Object to the
7      form.
8          THE WITNESS:  I cannot say
9      that every single paper in here is
10     in there.  Maybe in something that
11     I have looked up, but I can't say
12     with likely certainty that yes,
13     everything is in there.  Although
14     I cannot tell you that I reviewed
15     every single one and matched it to
16     this page.
17  BY MR. HEGARTY:
18     Q.   Who prepared -- who prepared
19  the document Materials and Data
20  Considered?
21     A.   What do you mean by
22  prepared?
23     Q.   Did you prepare it?
24         MS. O'DELL:  Object to the

Page 53

1      form.
2          THE WITNESS:  I supplied
3      data, references, and in
4      coordination and complementation
5      with the plaintiffs' attorneys,
6      they prepared this.
7          (Document marked for
8      identification as Exhibit
9      Zelikoff-7.)
10  BY MR. HEGARTY:
11     Q.   I'm marking as Exhibit
12  Number 7 a flash drive that we were
13  provided here today.  Do you know what
14  Exhibit Number 7 is?
15     A.   I do not.
16     Q.   Do you know what's contained
17  on the flash drive?
18     A.   I have not seen the data
19  within the flash drive.
20         MS. O'DELL:  I'll just
21     represent that I prepared the
22     flash drive and the flash drive
23     has all the materials on
24     Exhibit B, on behalf of

14 (Pages 50 to 53)

Judith Zelikoff, Ph.D.

Page 54

1    Dr. Zelikoff.
2  BY MR. HEGARTY:
3    Q.   Are the materials you also
4  cited -- I'm sorry.  Are the references
5  you also cited in the body of your report
6  contained in those notebooks to your
7  knowledge?
8    A.   To my knowledge, they are.
9    Q.   Are the materials that --
10 that are in those notebooks materials you
11 reviewed or had access to prior to
12 completion of your expert report?
13   A.   Prior to the completion.
14 However I also prepared my own.  So in
15 going through -- in coming to my
16 conclusion and opinion, I also went
17 through the literature using various
18 websites including, as I said Tox Lit,
19 Google and PubMed.  And I arranged my
20 documents that I thought were relevant
21 after reviewing all of the ones that came
22 up in my literature search, and I
23 reviewed the abstracts and if I found
24 them to be relevant, I placed them in --

Page 55

1  in order and in bins, in silos, in
2  different areas, and I prepared my own.
3    Q.   We were also provided today,
4  this morning, what I've marked as Exhibit
5  Number 8 which is a manuscript from a
6  publication called Reproductive Sciences.
7  The lead author, Ghassam Saed.
8       (Document marked for
9       identification as Exhibit
10      Zelikoff-8.)
11 BY MR. HEGARTY:
12   Q.   Can you tell me when you
13 received that manuscript?
14   A.   I received the manuscript in
15 December.
16   Q.   Approximately when in
17 December?
18   A.   Let me say that it was
19 either December or early January.  I
20 cannot be more exact than that.
21   Q.   Have you read that
22 manuscript?
23   A.   Have I -- yes, I've read
24 this manuscript.

Page 56

1    Q.   You had not read that
2  manuscript though at the time you
3  completed your report, correct?
4    A.   No, I did not, sir.
5    Q.   So that manuscript did not
6  inform the opinions set out in your
7  report, correct?
8       MS. O'DELL:  Objection to
9  form.
10      THE WITNESS:  Do I answer?
11      MS. O'DELL:  Yes, you may
12 answer.
13      THE WITNESS:  Okay.
14      MS. O'DELL:  Yes.
15      THE WITNESS:  I -- I had
16 access to an abstract from the
17 same author with emerging results
18 that was brought forward in larger
19 context and in greater detail in
20 the publication.  So I had -- so
21 the abstract did go into my
22 thinking.
23 BY MR. HEGARTY:
24   Q.   The manuscript though we

Page 57

1  marked as Exhibit 8 did not go into your
2  thinking?
3    A.   The manuscript -- no, sir,
4  it did not.  It did post my report and it
5  added supplementary and compelling
6  evidence for my opinion.
7       (Document marked for
8       identification as Exhibit
9       Zelikoff-9.)
10 BY MR. HEGARTY:
11   Q.   I've also marked as Exhibit
12 Number 9 another document we were
13 provided this morning which is -- which
14 is called Draft Screening Assessment.
15      When did you receive this
16 draft screening assessment?
17   A.   January.
18   Q.   Approximately when in
19 January?
20   A.   About two weeks ago.
21   Q.   Who -- what was your source
22 for getting that document?
23   A.   Ms. Emmel.
24   Q.   Did Ms. Emmel also provide

15 (Pages 54 to 57)

Judith Zelikoff, Ph.D.

|  | Page 58 |
|---|---|
| 1 | the -- the Saed manuscript? |
| 2 | A. Yes, sir, she did. |
| 3 | Q. So neither the Canadian |
| 4 | assessment nor Dr. Saed's manuscript were |
| 5 | materials you found on your own, correct? |
| 6 | A. Correct. |
| 7 | Q. Do you know how Ms. Emmel |
| 8 | came to receive an unpublished |
| 9 | manuscript, apart from any discussions |
| 10 | that you had with plaintiffs' counsel? |
| 11 | A. Actually, which manuscript |
| 12 | are you referring to? |
| 13 | Q. Well, there's only one |
| 14 | manuscript in front of you? |
| 15 | A. Reproductive Science -- |
| 16 | Q. Dr. -- yes. |
| 17 | A. -- Dr. Saed? |
| 18 | To my knowledge, this has -- |
| 19 | and seeing the cover letter that was |
| 20 | associated with this, this is not a |
| 21 | manuscript. This is an in-press |
| 22 | manuscript, and there is a very large |
| 23 | difference. |
| 24 | Q. Okay. Apart from anything |

|  | Page 59 |
|---|---|
| 1 | that counsel for plaintiffs may have told |
| 2 | you, do you know how this manuscript |
| 3 | became available for you to review? |
| 4 | A. I have no knowledge. |
| 5 | Q. With regard to the |
| 6 | Canadian -- sorry, the draft screening |
| 7 | assessment, did you read the entirety of |
| 8 | this assessment? |
| 9 | A. I'm looking for it right |
| 10 | now. |
| 11 | Q. Sorry. |
| 12 | A. Thank you. Except for the |
| 13 | references, I read the entirety of the |
| 14 | text. |
| 15 | Q. Did you pull the references |
| 16 | and review the references themselves? |
| 17 | A. No, sir, I did not. |
| 18 | Q. There are also supplemental |
| 19 | materials associated with this -- or do |
| 20 | you know whether there are supplemental |
| 21 | materials associated with this draft, or |
| 22 | with this draft screening assessment? |
| 23 | A. I was also provided a |
| 24 | document by Dr. Taher. I'm not sure if |

|  | Page 60 |
|---|---|
| 1 | that is a supplement of that or a -- an |
| 2 | adjacent document. |
| 3 | Q. Do you have that document |
| 4 | with you? |
| 5 | A. Perhaps. I do, yes, sir. |
| 6 | Q. May I see it, please. |
| 7 | (Document marked for |
| 8 | identification as Exhibit |
| 9 | Zelikoff-10.) |
| 10 | BY MR. HEGARTY: |
| 11 | Q. I'm going to mark as Exhibit |
| 12 | Number 10 what you just handed to me, |
| 13 | which is titled "Systematic Review and |
| 14 | Meta-Analysis of the Association Between |
| 15 | Perineal Use of Talc and Risk of Ovarian |
| 16 | Cancer," lead author Taher. |
| 17 | When did you receive Exhibit |
| 18 | Number 10? |
| 19 | MS. O'DELL: Did we skip |
| 20 | nine? |
| 21 | MR. HEGARTY: Exhibit 9 is |
| 22 | the draft screening assessment. |
| 23 | MS. O'DELL: Okay. I'm |
| 24 | sorry. I had that as Number 8. |

|  | Page 61 |
|---|---|
| 1 | MR. HEGARTY: Number 8 is |
| 2 | the manuscript by Dr. Saed. |
| 3 | MS. O'DELL: Okay. I'm |
| 4 | sorry. |
| 5 | BY MR. HEGARTY: |
| 6 | Q. Going back to my question, |
| 7 | when did you receive the article by |
| 8 | Taher? |
| 9 | A. At the same time that I |
| 10 | received the health -- the screening |
| 11 | health assessment from Health Canada. |
| 12 | Q. Who provided it to you? |
| 13 | A. Ms. Emmel. |
| 14 | Q. Did you read the entirety of |
| 15 | that document? |
| 16 | A. I read the entirety of this |
| 17 | document minus the references. |
| 18 | Q. Did you pull the literature |
| 19 | cited in the Taher article and review it |
| 20 | yourself? |
| 21 | A. I may have looked at |
| 22 | references that have -- were on the |
| 23 | reference list of the Saed document, but |
| 24 | I did not go through each individual |

16 (Pages 58 to 61)

Judith Zelikoff, Ph.D.

Page 62

1 reference in the document and pull it
2 specifically.
3     Q.    The Taher article -- strike
4 that.
5         You were provided the Taher
6 article after you completed your expert
7 report in this case, correct?
8     A.    That's correct.
9     Q.    So it's correct that it did
10 not inform your opinions in your report,
11 correct?
12     A.    It informed my opinions --
13 let me say that it added to my opinions
14 following the writing of my report.  It
15 supported my position.
16     Q.    Did the assessment conclude
17 that talc use causes ovarian cancer?
18 Strike that.  Let me strike that
19 question.  We'll come back to that.
20         (Document marked for
21         identification as Exhibit
22         Zelikoff-11.)
23 BY MR. HEGARTY:
24     Q.    I'm going to mark next as

Page 63

1 Exhibit Number 11 a copy of the Exhibit C
2 that's referenced in your report.
3         Did you prepare Exhibit
4 Number C?
5     A.    If you mean by preparation,
6 did I write it, did I prepare the
7 summary, no, sir I did not.
8     Q.    Do you know who prepared it?
9     A.    From my reading, it appears
10 as though the attorneys may have prepared
11 it based upon -- to my knowledge, based
12 upon other deponents.
13     Q.    Other than the documents
14 that we have talked about that are laid
15 out before us, did you bring any other
16 documents with you to the deposition?
17     A.    Other than the documents
18 that are to my right in the folders, the
19 health assessment from the -- the
20 screening health assessment from Canada,
21 Dr. Taher's paper, a letter -- this is in
22 the documents to my right, a letter from
23 Luzenac to Dr. Al Wehner, my CV, the
24 expert report, Exhibit B, my CV, no, sir.

Page 64

1     Q.    Have you reviewed any
2 materials since completion of your report
3 for purposes of your work on this case
4 that we have not talked about this
5 morning?
6     A.    I reviewed -- since my
7 report, I reviewed Dr. Pier's deposition.
8 Is that what you mean?
9     Q.    Dr. Julie Pier's deposition?
10     A.    Yes.  Three-quarters of it.
11 It is a very long deposition.
12     Q.    The second-to-last page of
13 Exhibit Number B under depositions makes
14 reference to depositions and exhibits of
15 Julie Pier dated 9/12 to 9/13/2018.
16         Do you see that?
17     A.    Sorry, sir.  Fifth line
18 down, deposition/exhibits of Julie Pier.
19     Q.    Is that the deposition to
20 which you just referred?
21     A.    To the best of my knowledge.
22     Q.    Anything else that you have
23 reviewed for purposes of your work on
24 this case that we have not talked about

Page 65

1 this morning or made reference to?
2     A.    I reviewed Dr. Hopkins'
3 report.
4     Q.    Let me ask it different.
5 Anything that you have reviewed that's
6 either not listed somewhere in your
7 report or we have not marked as an
8 exhibit?
9     A.    To the best of my knowledge,
10 no.
11     Q.    With regard to Exhibit C,
12 did you review all the documents that are
13 referenced in Exhibit Number C?
14     A.    Can I see that, please.
15     Q.    I think you still have a
16 copy in front of you.
17     A.    Okay.
18     Q.    It's Exhibit Number 11,
19 which is marked Exhibit -- which is
20 Exhibit C.  Did you actually pull the
21 documents and confirm the accuracy of the
22 information --
23     A.    No, sir.
24     Q.    -- contained in Exhibit C?

17 (Pages 62 to 65)

Judith Zelikoff, Ph.D.

Page 66

1      A.   There are no -- there are no
2  references in here, as I understand it.
3      Q.   Well, there are Bates
4  numbers --
5      A.   Bates numbers.
6      Q.   -- that are listed at the
7  right, which correspond to documents,
8  correct?
9      A.   Yes, but when I -- when I
10  hear references I think of citations,
11  papers.
12      Q.   Did you actually pull the
13  documents whose Bates numbers are listed
14  and confirm the accuracy of the
15  information contained in Exhibit C?
16      A.   I did not pull them as part
17  of reviewing this exhibit, but I have
18  looked at them, because I have gone
19  through all of the production documents.
20      Q.   With regard to your expert
21  report in this case, is it correct that
22  you prepared that report -- strike that.
23          With regard to your expert
24  report it defines the scope of your

Page 67

1  testimony in this case, correct?
2          MS. O'DELL:  Objection to
3      form.
4          THE WITNESS:  Yes, it does.
5  BY MR. HEGARTY:
6      Q.   And is it correct that the
7  report was prepared with the same
8  methodology and approach as you would
9  have prepared an article for publication
10  in a scientific journal?
11      A.   An article, a grant, a
12  review, an advisory board report, with
13  the same rigor and the same scrutiny,
14  yes.
15      Q.   In other words, is it
16  correct that you prepared this report in
17  the same manner as you had prepared all
18  of your articles for publication?
19          MS. O'DELL:  Asked and
20      answered.
21          THE WITNESS:  I used the
22      same methodology, the same
23      scrutiny and the same rigor to
24      prepare this, yes.

Page 68

1  BY MR. HEGARTY:
2      Q.   You agree that the standard
3  for proving biologic plausibility or any
4  other scientific issue in the medical
5  literature is the same one that applies
6  in litigation, correct?
7          MS. O'DELL:  Object to the
8      form.  If you know.
9          THE WITNESS:  Can you repeat
10      that, please.
11  BY MR. HEGARTY:
12      Q.   Sure.  You agree that the
13  standard for proving biologic
14  plausibility or any other scientific
15  issue in a medical literature or in
16  science should be the same that is
17  applied in litigation?
18          MS. O'DELL:  Object to the
19      form.
20          THE WITNESS:  I will use the
21      same scrutiny and rigor, as I said
22      before.
23  BY MR. HEGARTY:
24      Q.   You would -- you intend to

Page 69

1  apply the same standards to your report
2  and your opinions in this case as you
3  would apply if you were looking at this
4  as simply a professor at New York
5  University?
6      A.   Well, I don't see simply a
7  professor.
8          If I were -- I review
9  papers.  I think I've answered this
10  already.  But I review papers and
11  literature with the same scrutiny as I
12  prepared this report.
13      Q.   Did you apply the same
14  standard for assessing biologic
15  plausibility as you apply in your work at
16  NY University?
17      A.   I do.
18      Q.   Did you sign your report
19  dated November 16, 2018, with the same
20  intent as if signed under penalty of
21  perjury?
22      A.   Could you repeat that
23  please.
24      Q.   Sure.  Did you sign your

18 (Pages 66 to 69)

Judith Zelikoff, Ph.D.

Page 70

1   expert report dated November 16, 2018,
2   with the same intent as if signed under
3   penalty of perjury?
4            MS. O'DELL:  Object to form.
5            THE WITNESS:  I'm not sure I
6        understand what that question
7        means.
8   BY MR. HEGARTY:
9        Q.   Well, did you -- by signing
10  this report, did you confirm to the
11  accuracy of everything contained in the
12  report?
13       A.   To the best of my knowledge,
14  I signed this report knowing that I
15  prepared this report and there is -- with
16  the same intent of accuracy and rigor.
17       Q.   You understand this is
18  supposed to be your testimony as if on a
19  stand before a judge or a jury, correct?
20           MS. O'DELL:  Object to the
21       form.
22           THE WITNESS:  My
23       understanding of the deposition is
24       that it is a legal document and

Page 71

1        testifying my -- my opinion.  And
2        that it has to be honest and
3        truthful and transparent.
4   BY MR. HEGARTY:
5        Q.   Well, this time I'm talking
6   about your report.  Do you understand
7   your report is supposed to be your
8   testimony as if you are before a judge
9   and a jury?
10           MS. O'DELL:  Object to the
11       form.
12           THE WITNESS:  I -- I
13       understand that this has to be
14       honest and truthful, and this will
15       be -- could be, will be, the basis
16       for my testimony in a court trial,
17       if that is what you're asking.
18  BY MR. HEGARTY:
19       Q.   You understand it's supposed
20  to set out your -- the entirety of your
21  opinions in this case?
22           MS. O'DELL:  Object to the
23       form.
24           THE WITNESS:  I understand

Page 72

1        that these are my -- my report
2        reflects my opinion.
3   BY MR. HEGARTY:
4        Q.   Are they -- are there any
5   necessary changes, or revisions to your
6   report?
7        A.   Not to my knowledge.
8        Q.   And all the opinions that
9   you intend to offer in this litigation
10  are set out in your report, as you just
11  said, correct?
12       A.   To come to my decision or my
13  opinion, prior to -- included all the
14  documents that I had in my possession and
15  were -- had access to prior to my report.
16       Q.   My question is a little bit
17  different, Doctor.  My question is, the
18  opinions that you intend to offer as you
19  just indicated, those are set out in your
20  report, correct?
21       A.   The opinions that I intend
22  to offer, yes.
23       Q.   As your report shows, you
24  don't intend to offer the opinion that

Page 73

1   use of Johnson's Baby Powder or Shower to
2   Shower causes ovarian cancer, correct?
3        A.   My mission, the question
4   that I was asked by plaintiff attorney
5   was to confer or to assess biological
6   plausibility in the causation of talc for
7   ovarian cancer.
8        Q.   And as your report shows,
9   you did not do a risk assessment or
10  Bradford Hill analysis of all the
11  literature looking at talc products and
12  ovarian cancer, correct?
13       A.   I think I answered that, but
14  I'm not an epidemiologist, and my -- my
15  question was to look at biological
16  plausibility.
17       Q.   And all the materials that
18  you intend to rely upon for purposes of
19  your opinions, are those set out in your
20  report, those we've talked about here
21  this morning, correct?
22       A.   Yes, including the
23  contributions that were made after my
24  report including Dr. Longo's supplement,

19 (Pages 70 to 73)

Judith Zelikoff, Ph.D.

Page 74

1  including Dr. Saed's paper.  They added
2  to my opinion, supplemented them.  But it
3  is -- but my -- my opinion stays the same
4  as the report.
5      Q.   Okay.
6          MR. HEGARTY:  The next
7  section I have is pretty long.  I
8  don't know if you want to take a
9  quick break now or just keep
10 going.  It's up to you.
11         MS. O'DELL:  We've been
12 going about an hour.  I think
13 that's probably a good idea.
14         MR. HEGARTY:  Because
15 otherwise it's not -- there's not
16 going to be a good break time.  So
17 we should probably do it now.
18         MS. O'DELL:  Well, we can
19 definitely do it now, but we'll --
20 of course we'll break when the
21 witness needs to break.
22         MR. HEGARTY:  Understood.
23 Understood.  But you know what I
24 mean.

Page 75

1          MS. O'DELL:  Yeah.
2          THE VIDEOGRAPHER:  Stand by
3  please.  The time is 10:11 a.m.
4  Off the record.
5          (Short break.)
6          THE VIDEOGRAPHER:  We are
7  back on the record.  The time is
8  10:26 a.m.
9  BY MR. HEGARTY:
10     Q.   Dr. Zelikoff, with regard to
11 your expert report, do you have that in
12 front of you?
13     A.   I do now.  Thank you.
14     Q.   We marked that as exhibit
15 what?
16     A.   Exhibit 2.
17     Q.   With regard to Exhibit
18 Number 2, is it your testimony that all
19 of the sentences in your report are your
20 own words and not copied from others,
21 except where you used quotations?
22     A.   Mm-hmm.  The way I report
23 and write publications is if something
24 is, I feel, common knowledge or provided

Page 76

1  by more than one investigator, and is a
2  compilation of different points, then
3  I -- I will use -- I will not necessarily
4  put quotations around it.  And I will not
5  necessarily reference it, because it's --
6  may have been taken from another document
7  but it's common knowledge.
8      Q.   What about --
9      A.   And it's --
10     Q.   I'm sorry.  I didn't mean to
11 interrupt.
12     A.   I couldn't -- I'm sorry.  I
13 couldn't write it any better than as it
14 was put.
15     Q.   What about if you take
16 materials from a published article for
17 purposes of your report, did you
18 reference those articles?
19     A.   In some cases, not.  Again,
20 it's my opinion that if there is
21 something that is stated by an
22 investigator and it's written extremely
23 well, and it's common knowledge for
24 scientists in that area, as well as

Page 77

1  others, then I will -- I will use it.
2      Q.   That's not how you prepare
3  your report -- that's not how you prepare
4  your articles for journals though,
5  correct?
6      A.   No, that's the same way I
7  prepare them.
8          If they are -- if they are,
9  again, common knowledge, I will not
10 necessarily cite them.
11     Q.   Is it not your approach that
12 authors are to cite material to which
13 they are relying on or referring to in
14 published articles?
15     A.   Again, I think you're asking
16 me the same question.  But again, if
17 something is well known, then I do not
18 necessarily reference it.
19     Q.   What is the definition --
20 what is your definition of well known?
21     A.   For example, if chromium --
22 let's use nickel instead.  If nickel is
23 being spoken about by IARC, by U.S. EPA,
24 by National Toxicology Program, and

20  (Pages 74 to 77)

Judith Zelikoff, Ph.D.

Page 78

1  they're all saying the same thing, I in
2  some cases may take what the IARC has
3  said and put it in my reference.
4      Q.   And it's your testimony that
5  you do that in all -- you've done that in
6  all the articles that you've ever
7  published?
8          MS. O'DELL:  Objection to
9      form.
10         THE WITNESS:  I can't say
11     about all the articles.  I
12     published over 130 --
13         MR. HEGARTY:  Mark --
14         THE WITNESS:  --
15     publications and book chapters.
16         (Document marked for
17     identification as Exhibit
18     Zelikoff-12.)
19  BY MR. HEGARTY:
20     Q.   Let me mark as Exhibit
21  Number 12 the academic integrity for
22  students at NYU policy.  Is this the
23  policy applicable to your university?
24     A.   It appears to be that you've

Page 79

1  taken it off the website in the academic
2  integrity for students at NYU.
3      Q.   If you turn to the second
4  page, there is a definition of
5  plagiarism, that says, "Presenting
6  others' works without adequate
7  acknowledgment of its source as though it
8  were one's own."
9      A.   I'm sorry.
10     Q.   Do you agree with that
11  definition?
12     A.   I'm sorry.  What --
13     Q.   Second page of Exhibit 12.
14     A.   You mean on the back?  Is it
15  under Number 2, Number 1?
16     Q.   Number 1.  The definition of
17  plagiarism by your university for your
18  students is, "Presenting others' work
19  without adequate acknowledgment of its
20  source as though it were one's own."
21         Do you agree with that --
22  that definition?
23     A.   I agree that there's many
24  different ways to interpret that.

Page 80

1      Q.   Is that not -- is that a
2  definition you agree with?
3      A.   I agree that there's ways to
4  interpret that.
5      Q.   Is that -- is that the
6  definition New York University applies to
7  its students?
8      A.   This sentence, "Presenting
9  others' work without adequate
10  acknowledgment of its source as though it
11  were one's own," that is for students.
12  That is not what I'm doing in my opinion.
13         In my opinion, I'm taking
14  common knowledge and presenting it.
15     Q.   Well, they go on to give
16  examples of plagiarism that include, "A
17  sequence of words incorporated without
18  quotation marks."
19         Do you see where I'm
20  reading?
21     A.   I do see it.  "A sequence of
22  words incorporated without quotation
23  marks."
24     Q.   It also says that,

Page 81

1  "Plagiarism is an unacknowledged passage
2  paraphrased from another's work."
3      Q.   Do you see that?
4      A.   Some examples of plagiarism,
5  "Unacknowledged passage rephrased from
6  another's work."
7      Q.   Do you agree those are --
8  the two definitions that I just read from
9  your university's own policy for students
10  are examples of plagiarism?
11     A.   This is the NYU
12  interpretation or what they've put on the
13  website, yes.
14     Q.   Should this be a policy --
15  strike that.
16         Is this a policy that
17  applies to students at NY university?
18     A.   It applies -- it's an
19  academic integrity for students at NYU.
20     Q.   Do you agree that professors
21  at NY university should also conform to
22  this policy?
23     A.   I believe that honesty,
24  transparency is the key factor for all

21 (Pages 78 to 81)

Judith Zelikoff, Ph.D.

Page 82

1    scientists at any level.
2        Q.   You would agree that this
3    should apply to your work as well,
4    correct?
5        A.   I think that this definition
6    is open to interpretation.
7        Q.   Well, do you either agree or
8    disagree that this -- well, strike that.
9        Do you agree that this
10   policy should be applied to your work in
11   this case?
12       A.   I agree that plagiarism is
13   defined as presenting others' work
14   without adequate acknowledgment of its
15   source as though it were one's own.
16   That's the NYU policy for students.
17       Q.   Did you -- you did that in
18   your own report, correct?
19       MS. O'DELL:  Object to form.
20       THE WITNESS:  I did what in
21   my own report?
22   BY MR. HEGARTY:
23       Q.   You plagiarized portions of
24   other people's work without proper

Page 83

1    acknowledgment, correct?
2        MS. O'DELL:  Objection to
3    form.
4        THE WITNESS:  That is
5    totally incorrect.
6        I used sentences from other
7    people's -- other people's papers
8    because they were common knowledge
9    and contributed by multiple
10   authors.  And it was --
11   BY MR. HEGARTY:
12       Q.   I'm going to mark -- sorry.
13       A.   And it was stated in a way
14   that I couldn't have stated better.
15       Q.   I'm going to mark as
16   Exhibit 13 a report -- a portion of your
17   report dated November 16, 2018.  And the
18   back of that is a portion of Rule 26
19   expert report of an expert by the name of
20   Shawn Levy.
21       (Document marked for
22       identification as Exhibit
23       Zelikoff-13.)
24   BY MR. HEGARTY:

Page 84

1        Q.   Do you know who Shawn Levy
2    is?
3        A.   I do not.
4        Q.   Did you review Dr. Levy's
5    report for purposes of your -- preparing
6    your report in this case?
7        A.   I actually looked at it, but
8    did not -- did not read it.
9        Q.   When did you have a chance
10   to look at his expert report?
11       A.   I have looked at it -- I'm
12   trying to gather the knowledge.  I
13   actually do not recall when I looked at
14   it.
15       Q.   If you look at your report
16   on Page 20.  In that exhibit, Doctor.
17       A.   Oh okay.
18       Q.   Your report and the portion
19   of Dr. Levy's report is attached, and if
20   you look at your report Page 20 and his
21   report Page 5 --
22       MS. O'DELL:  I think, Mark,
23   I think there's confusion because
24   there's two documents put together

Page 85

1    in this --
2        MR. HEGARTY:  Right.  One is
3    her report and one is Levy's
4    report.
5        MS. O'DELL:  I just think
6    that that was the confusion.
7        THE WITNESS:  Thank you.
8    BY MR. HEGARTY:
9        Q.   So the -- do you see that
10   sentences marked as 1 and 2 from
11   Dr. Levy's report are identical to
12   sentences marked 1 and 2 in your report?
13       MS. O'DELL:  Object to form.
14       And, Doctor, if you need to
15   take the documents apart and
16   compare them, rather than flipping
17   back and forth, if that would be
18   helpful to you, feel free to do
19   that.
20       THE WITNESS:  Good idea.  I
21   actually don't recall.  Could
22   you -- could you tell me when my
23   report is dated please?
24   BY MR. HEGARTY:

22 (Pages 82 to 85)

Judith Zelikoff, Ph.D.

Page 86

1    Q.   November 16. His report is
2  also dated November 16.
3    A.   I did not actually see this
4  report until after mine.
5         However, let me address your
6  question to the best of my ability.
7         "Things stated as both
8  inherited and acquired gene mutations
9  work together to cause cancer."
10        Everyone from the time of
11 their scientific career back in college
12 knows that.
13        "While genetic testing" --
14 let me make sure I have both -- "both
15 inherited and acquired gene mutations
16 work together to cause cancer."
17        How -- there is no way for
18 me to say that differently. This is a
19 very well statement, very well put
20 statement. I used it without a
21 reference. Even if one --
22    Q.   My question -- I'm sorry. I
23 thought you were finished.
24    A.   "Even if one has inherited a

Page 87

1  genetic mutation that predisposes one's
2  chances, doesn't mean he or she has to
3  get cancer." Again, common knowledge
4  from everyone.
5    Q.   Well, Dr. Zelikoff, my
6  question is different than that.
7         My question is, can you
8  explain to us here today, given that you
9  did not see Dr. Levy's report until after
10 you completed your report, how you have
11 several identical sentences between your
12 report and Dr. Levy's report?
13        MS. O'DELL: Object to the
14    form.
15 BY MR. HEGARTY:
16    Q.   Dr. Levy's report.
17    A.   I cannot -- I -- I don't
18 know. The only -- what I can say is that
19 there was likely a publication. But that
20 is speculation, because I have not looked
21 that over.
22    Q.   But is it your testimony
23 here today that the words in your report
24 were solely your own words and not taken

Page 88

1  from either Dr. Levy's report or from
2  somewhere -- some other source?
3    A.   The thoughts are the same.
4  The words seem to be identical. And
5  again, if you interpret that one way and
6  I interpret it another, I certainly do
7  not interpret it as plagiarism.
8    Q.   Let me show you another
9  example.
10        (Document marked for
11    identification as Exhibit
12    Zelikoff-14.)
13 BY MR. HEGARTY:
14    Q.   I'm going to mark as
15 Exhibit 14, again a portion of your
16 report Page 12 and a portion of a report
17 by Rebecca Smith-Bindman. Do you know
18 who that is?
19    A.   Not at all.
20    Q.   Did you see her report in
21 this case before preparing your report?
22    A.   I never looked at her
23 report.
24    Q.   If you would look at the two

Page 89

1  reports side by side under the
2  definition -- under the heading
3  Fragrances --
4    A.   I'm sorry, I don't have her
5  report.
6    Q.   You have one page of her
7  report in that exhibit. You have the --
8  the front page and the one page of her
9  report, and you have Page 12 of your
10 report, correct?
11    A.   I see. Correct.
12    Q.   Do you see that the section
13 under the heading Fragrances is identical
14 between the two reports?
15    A.   Yes. They are identical
16 wording.
17    Q.   And none of those sentences
18 are common knowledge, correct?
19        MS. O'DELL: Object to the
20    form.
21        THE WITNESS: It's a
22    statement.
23 BY MR. HEGARTY:
24    Q.   But it's not common

23 (Pages 86 to 89)

Judith Zelikoff, Ph.D.

Page 90

1    knowledge, correct, Doctor?
2        A.   But it's a -- it is -- there
3    are more than 150 different chemicals
4    added to Johnson's Baby Powder and Shower
5    to Shower products.  I reviewed the
6    expert report from Dr. Crowley that
7    concludes that some of these chemicals
8    may contribute to the inflammatory
9    response, toxicity, and potential
10   carcinogenicity.  I concur with his
11   opinion.
12       I say the same thing as
13   Dr. Smith-Bindman.
14       Q.   Is it your testimony that
15   you and Dr. Smith-Bindman came to the
16   exact same words just by coincidence?
17           MS. O'DELL:  Object to the
18       form.
19           THE WITNESS:  We came to the
20       same conclusions.
21   BY MR. HEGARTY:
22       Q.   That's not my question.  My
23   question is, is it your testimony here
24   today that you and Dr. Smith-Bindman came

Page 91

1    to the exact -- to say the exact same
2    thing under the section Fragrance simply
3    by coincidence?
4            MS. O'DELL:  Objection to
5        form.
6            THE WITNESS:  I don't do
7        anything usually by coincidence.
8    BY MR. HEGARTY:
9        Q.   Okay.  Is it your testimony
10   that the words that you wrote under the
11   section Fragrances on Page 12 are your
12   words and came from nowhere else?
13       A.   I don't quite understand
14   where they could have come from because I
15   did not review her report.
16       Q.   Is it your testimony that
17   the words in your report under the
18   section Fragrances are your words and
19   your words alone from no other source?
20           MS. O'DELL:  Object to the
21       form.
22           THE WITNESS:  Could you
23       please repeat the question?
24   BY MR. HEGARTY:

Page 92

1        Q.   Sure.  Is it your testimony
2    that the words in your report under
3    section -- under the section Fragrances
4    are your words and your words alone from
5    no other source?
6            MS. O'DELL:  Object to the
7        form.
8            THE WITNESS:  I don't quite
9        understand what you mean by no
10       other source.
11           These are my words.  They
12       confer my opinion.
13   BY MR. HEGARTY:
14       Q.   Well, did you copy those
15   words from some source besides
16   Smith-Bindman's report?
17       A.   I did not copy words.  I --
18   I don't know how this happened.
19       If I was in error, I own
20   that responsibility.
21           (Document marked for
22       identification as Exhibit
23       Zelikoff-15.)
24   BY MR. HEGARTY:

Page 93

1        Q.   I'm going to show you what
2    I'm next marking as Exhibit 15.
3            MS. O'DELL:  Is this one
4        exhibit?
5            MR. HEGARTY:  That's one
6        exhibit.
7    BY MR. HEGARTY:
8        Q.   Doctor, Exhibit Number 15 is
9    again a portion of your report, and also
10   attached to it is a reference from
11   Genetics Home Reference dated June 27,
12   2017.  Do you see both documents?
13       A.   I do see both documents.
14       Q.   We have highlighted and
15   numbered in Exhibit 15 the portions from
16   your report which are taken word for word
17   from Genetics Home Reference without a
18   single reference to that authority
19   anywhere in your report, including in the
20   materials considered or reviewed.
21           MS. O'DELL:  Objection.
22   BY MR. HEGARTY:
23       Q.   Do you see that?
24           MS. O'DELL:  Objection to

24 (Pages 90 to 93)

Judith Zelikoff, Ph.D.

Page 94

1    form.
2        And -- and, Doctor, take a
3    moment to review both, because the
4    way this is put together is a
5    little confusing.
6        THE WITNESS: I see what
7    you're referring to.
8    BY MR. HEGARTY:
9        Q.   And did you copy, for
10   purposes of your report, without citation
11   to this authority, the words that we've
12   identified from this reference to Genetic
13   Home Reference?
14       MS. O'DELL: Objection to
15   the form.
16       THE WITNESS: So when you
17   have things like, "Inherited
18   mutations are passed down from
19   parent to child and are present
20   throughout a person's life in
21   virtually in every cell of the
22   body." Biology 101, basically,
23   where that came from.
24       "These mutations are called

Page 95

1    germ line mutations because
2    they're present in the parents'
3    egg or sperm, a germ cell."
4        Yes, some of these sentences
5    appear to be the same as what is
6    in here.
7        However, again, I stand on
8    the fact that all of these -- all
9    of my statements are common
10   knowledge that have come from
11   numerous references.  Although the
12   words may be the same, the
13   thoughts are -- are said as well
14   as they can be said.
15   BY MR. HEGARTY:
16       Q.   Dr. Zelikoff, have you ever
17   seen this reference to Genetic Home
18   Reference before right now?
19       A.   Not to my knowledge.
20       Q.   So is it your testimony that
21   you did not copy the words from Genetic
22   Home Reference that we have highlighted
23   that correspond by number to the portions
24   in your report for purposes of preparing

Page 96

1    your report in this case?
2        A.   I may have used -- it
3    appears that I have used the same words.
4        And if I did that, which it
5    appears that I have, then I've done it
6    with the intent to get those same points
7    across.
8        Q.   But you do agree that you
9    have included in your report a sequence
10   of words incorporated from another source
11   without quotation marks, correct?
12       MS. O'DELL: Objection to
13   form.
14       THE WITNESS: I don't use --
15   I don't usually use quotation
16   marks.
17   BY MR. HEGARTY:
18       Q.   Well, you have used other
19   people's words without acknowledging
20   where they came from, correct?
21       MS. O'DELL: Object to the
22   form.
23       THE WITNESS: I could have
24   used quotation marks.  And if I

Page 97

1    were to do this over, I would use
2    quotation marks.
3    BY MR. HEGARTY:
4        Q.   You're not telling us,
5    Doctor, that if you prepared an article
6    for publication in a journal, that you
7    would take references from another source
8    like Genetic Home Reference, include them
9    in the article, verbatim, not use
10   quotation marks and not reference that
11   cite.  Is that what you're saying?
12       MS. O'DELL: Objection to
13   form.
14       THE WITNESS: I'm standing
15   on my interpretation, and that is
16   that in a reference that I would
17   prepare in a publication, it would
18   be accepted for peer review if
19   there was something that I felt
20   was common knowledge, that I would
21   not reference it.
22       To your point, if I had to
23   do this over, I would have put
24   quotation marks around this.

25  (Pages 94 to 97)

Judith Zelikoff, Ph.D.

Page 98

```
 1   BY MR. HEGARTY:
 2       Q.   You would have cited to the
 3   authority, as well, from which that --
 4   those passages were lifted, correct?
 5           MS. O'DELL:  Objection to
 6       form.
 7           THE WITNESS:  I certainly
 8       could if that was a concern from
 9       the journal or from the reviewer,
10       then I would definitely put in the
11       reference.
12   BY MR. HEGARTY:
13       Q.   If a student had prepared
14   this, and you became aware that the
15   student had lifted portions from Genetic
16   Home Reference without any citation,
17   without acknowledging where it came from,
18   would that be okay with you?
19           MS. O'DELL:  Objection to
20       form.
21           THE WITNESS:  There are --
22       this is a large document.  And in
23       order for something to be copied
24       or, as you put it, plagiarized,
```

Page 99

```
 1   there has to be a certain amount
 2   or percentage of the document that
 3   has to be the same.
 4       And this document, my
 5   report, is quite large.  So if a
 6   student prepared this, and their
 7   term paper, for example, was 50
 8   pages, I would let them know that
 9   if I prepared the next time they
10   might want to put in a reference.
11       But I would have to look at
12   the entire size of the document
13   and the percentage of it which had
14   similar -- similar statements and
15   sentences.
16   BY MR. HEGARTY:
17       Q.   You do agree that under the
18   policy we marked, we're talking about
19   what you did with regard to this Genetics
20   Home Reference cite, meets the definition
21   of plagiarism?
22           MS. O'DELL:  Objection to
23       form.
24           THE WITNESS:  I certainly
```

Page 100

```
 1       will not -- this is the -- what
 2       you gave me was an interpretation,
 3       was NYU policy, an interpretation
 4       of that, which is not the same as
 5       mine.
 6   BY MR. HEGARTY:
 7       Q.   Well, you do agree, though,
 8   that between the -- your report, the
 9   portions taken from your report and the
10   Genetic Home Reference reference are
11   identical?
12           MS. O'DELL:  Object to the
13       form.
14           THE WITNESS:  I agree that
15       there are sentences that are
16       identical.  Yes.
17   BY MR. HEGARTY:
18       Q.   You did not acknowledge that
19   source anywhere in your report, correct?
20       A.   If you say so.
21       Q.   Do you think that's okay to
22   do that?
23           MS. O'DELL:  Objection to
24       form.
```

Page 101

```
 1           THE WITNESS:  If I had not
 2       thought it was okay, I would not
 3       have done it.
 4   BY MR. HEGARTY:
 5       Q.   Would that -- would that be
 6   acceptable for purposes of publishing
 7   your report?
 8           MS. O'DELL:  Objection to
 9       the form.
10           THE WITNESS:  My opinion
11       stands.  And that is my
12       interpretation of what is okay to
13       do based on common knowledge and
14       multiple sources, stands the same.
15   BY MR. HEGARTY:
16       Q.   If you were to publish your
17   report, as it is, would you go back and
18   use quotation marks and cite the
19   reference that we just looked at --
20       A.   If I had --
21       Q.   -- Exhibit Number 16?
22           MS. O'DELL:  Excuse me,
23       Doctor.  Just let him finish.
24           THE WITNESS:  Of course.
```

26 (Pages 98 to 101)

Judith Zelikoff, Ph.D.

Page 102

1    I'm sorry.
2        MS. O'DELL:  Thank you.  And
3    just give me a moment to object.
4    Thank you.
5    BY MR. HEGARTY:
6        Q.   Did you hear my question?
7        A.   Could you repeat your
8    question, please?
9        Q.   Sure.  If you were to
10   publish a report as it is, would you go
11   back and use quotation marks and cite the
12   reference that we just looked at in
13   Exhibit Number 16?
14       A.   Now that you've pointed out
15   your interpretation of it, I would
16   certainly consider that.
17           (Document marked for
18           identification as Exhibit
19           Zelikoff-16.)
20   BY MR. HEGARTY:
21       Q.   Let me show you what I'm
22   next marking as Exhibit Number 16.
23           MS. O'DELL:  I'll reach
24           over, instead of you throwing it.

Page 103

1    BY MR. HEGARTY:
2        Q.   This is another portion of
3    your report which we've correspondingly
4    referenced to an article by Simone
5    Reuter.  And you can see where we've
6    identified six different times where
7    sentences have been copied verbatim from
8    this article without any quotation or any
9    acknowledgment of its -- of the source.
10           Do you see that?
11           MS. O'DELL:  Object --
12   excuse me.  Object to the form.
13   Feel free to review it, the
14   reference or the exhibit.  There
15   are two things paper clipped
16   together, if you need to look at
17   it in more detail.
18           THE WITNESS:  Again, there
19   are sentences such as, "During
20   inflammation macrophages, mast
21   cells, and neutrophils are
22   recruited at the site of damage,
23   leads to a respiratory burst and
24   increased uptake of oxygen, and an

Page 104

1    increased release of ROS."
2        That is a very common --
3    commonly known point.
4    BY MR. HEGARTY:
5        Q.   How about Point Number 4 in
6    the abstract?
7        A.   As --
8        Q.   That's -- is it your
9    testimony that Point Number 4 in the
10   abstract is what you consider common
11   knowledge?
12       A.   "Activation of the
13   transcription factors can lead to the
14   expression of over 500 genes, including
15   more for growth factors."  And I'm going
16   to read the entire abstract.
17           Actually this is a review
18   paper.  And this is not a unique finding
19   to this particular author.
20           And thus "Activation of
21   transcription factors," again as I read,
22   is an outcome of many, many authors.  And
23   as I said, is a review paper, not a
24   unique investigator-initiated outcome.

Page 105

1        Q.   You keep referring to common
2    knowledge.  Who is -- who has this common
3    knowledge?
4        A.   People who read scientific
5    journals.
6        Q.   So is it your testimony that
7    someone who would read your report would
8    understand that that is not -- those are
9    not your words but taken from
10   somewhere -- somewhere else?
11           MS. O'DELL:  Object to the
12   form.
13           THE WITNESS:  It would
14   depend upon who is reading it.
15   BY MR. HEGARTY:
16       Q.   Can you cite for me any
17   publication that you have ever written
18   where you have cited another authority
19   word for word and did not use quotation
20   marks and did not reference that
21   authority?
22       A.   Not off the top of my head.
23       Q.   But you did do that in your
24   expert report in this case, correct?

27 (Pages 102 to 105)

Judith Zelikoff, Ph.D.

Page 106

1    MS. O'DELL: Object to the
2    form.
3        THE WITNESS: It appears
4    from what you're showing me, that
5    in my interpretation of common
6    knowledge and multiple -- multiple
7    investigators, I have done that,
8    yes.
9        (Document marked for
10    identification as Exhibit
11    Zelikoff-17.)
12    BY MR. HEGARTY:
13       Q.   I'm going to mark next
14    Exhibit Number 17, another portion of
15    your report where you, again, take
16    sentences from a publication called
17    EnvironmentalChemistry.com.
18           You cite them word for word
19    in your report and you make no reference
20    anywhere in your report to this
21    authority.
22       A.   I said --
23       MS. O'DELL: Excuse me.
24    Excuse Me, Doctor.  Excuse me.

Page 107

1        MR. HEGARTY:  I'm not
2    finished with my question.
3        MS. O'DELL:  I thought you
4    were finished with your question.
5        MR. HEGARTY:  Because I just
6    made a statement.
7        MS. O'DELL:  Well, I object
8    to the statement.  You ask your
9    question, and I'll probably object
10    to that.
11           But give me a chance, the
12    two of you, please.
13    BY MR. HEGARTY:
14       Q.   Let me -- Doctor, this --
15    the reference that we have here in the
16    Exhibit Number 17 is to a website called
17    EnvironmentalChemistry.com.  Did you
18    review this website in preparing your
19    report?
20       A.   I don't recall.
21       Q.   Do you see where we make
22    reference to five different places where
23    you copied word for word from
24    EnvironmentalChemistry.com?

Page 108

1        MS. O'DELL: Object to the
2    form.
3        THE WITNESS:  Yes, I see
4    what you're saying.
5    BY MR. HEGARTY:
6       Q.   And nowhere in your report
7    do you give acknowledgment to
8    EnvironmentalChemistry.com as a source of
9    the information that you copied, correct?
10       MS. O'DELL: Object to the
11    form.
12        THE WITNESS:  I do say the
13    U.S. EPA defines asbestos by
14    limiting the term to six specific
15    fibrous minerals from two distinct
16    groups.  And I go on from there.
17    That is a referral to the U.S.
18    EPA.
19    BY MR. HEGARTY:
20       Q.   Doctor, nowhere in your
21    report, in those notebooks or anywhere do
22    you cite to EnvironmentalChemistry.com,
23    do you?
24        MS. O'DELL: Object.  Object

Page 109

1    to the form.
2        THE WITNESS:  Not to my
3    knowledge.
4    EnvironmentalChemistry.com, I
5    don't even recall reviewing it.
6    BY MR. HEGARTY:
7       Q.   But don't you agree that you
8    would have had to review it based on the
9    fact that there are identical sentences
10    taken from -- that are identical
11    sentences, in Environmental Chemistry and
12    in your report?
13        MS. O'DELL:  Object to the
14    form.
15        THE WITNESS:  This -- again,
16    this information is common
17    knowledge.  This is not a creation
18    of EnvironmentalChemistry.com.
19    They are not an individual
20    investigator finding this data.
21    They are reporting this on
22    the internet for people's review.
23    BY MR. HEGARTY:
24       Q.   Is

28 (Pages 106 to 109)

Judith Zelikoff, Ph.D.

Page 110

1  EnvironmentalChemistry.com a reliable
2  authority?
3          MS. O'DELL:  Object to the
4  form.
5          THE WITNESS:  I have no
6  idea -- sorry.
7          MS. O'DELL:  Go ahead.
8          THE WITNESS:  I have no idea
9  of the impact factor or the
10 reliability of this.  However, in
11 talking about this, and saying the
12 things that I -- that you have
13 said I have used identically,
14 which appear to be the case --
15 "while amphibole and serpentine
16 asbestos may have fibrous habits,
17 they have very different forms.
18 Amphibole are double-chain
19 silicates."
20     This is known in the
21 asbestos -- in the asbestos
22 literature.  And the basic
23 structural unit is silicone oxide.
24 This is not Environmental

Page 111

1  Chemistry's individual
2  investigator initiated.
3          I think you may be confusing
4  an individual paper where an
5  investigator sits down in the
6  laboratory and works out or comes
7  up with a fact and that it's his.
8  As opposed to data that's just out
9  there in the internet, out there
10 in the world, out there in book
11 chapters, out there everywhere,
12 that people know.
13      This is not an investigator
14 initiated, whether it's
15 EnvironmentalChemistry.com.
16      So I will -- I will say to
17 you that in many cases, I did use
18 the same sentence.  Certainly
19 EnvironmentalChemistry.com is not
20 an investigator-initiated point of
21 reference.  It's just facts that
22 are supported by other experts.
23 BY MR. HEGARTY:
24      Q.   Can you cite for me any

Page 112

1  published methodology which says that
2  your interpretation of what you are to
3  quote and what you are to cite in an
4  article is an accepted methodology in
5  publishing scientific literature?
6      A.   It's my professional opinion
7  after 30 years of work.
8      Q.   Well, can you cite for me
9  any published authority that says your
10 definition of what you are to cite and
11 what you are to reference is the
12 definition that's applicable to medical
13 literature?
14          MS. O'DELL:  Objection to
15 form.
16          THE WITNESS:  I have never
17 been accused or cited by any
18 publication in any of my 135
19 papers or my over 30 book chapters
20 of having anything that was of a
21 dubious nature, ever.
22 BY MR. HEGARTY:
23      Q.   That's not my question.  My
24 question was can you cite for me any

Page 113

1  written authority that says that in
2  publishing medical literature, if you're
3  citing what you call general knowledge
4  word for word from another source, you
5  don't have to quote it and you do not
6  have to give it any reference.
7      A.   Just my professional opinion
8  of 30 years of work.
9      Q.   Okay.  And in a -- and
10 you've never done that in any medical
11 article you -- any article you have
12 published, correct?
13      A.   I cannot -- I cannot speak
14 to all.
15      Q.   Well, if you were to write a
16 medical article -- a scientific article
17 today, and you were to quote something
18 from -- take something word for word from
19 EnvironmentalChemistry.com, is it your
20 testimony you wouldn't give any reference
21 to it or wouldn't use quotation marks?
22          MS. O'DELL:  Object to the
23 form.
24          THE WITNESS:  I -- I stand

29 (Pages 110 to 113)

Judith Zelikoff, Ph.D.

Page 114

1    on the opinion that I have, that
2    it would be common knowledge.
3    BY MR. HEGARTY:
4        Q.   That's not my question.  My
5    question is if you were to write an
6    article today and you were to cite
7    Environmental.com word for word, is it
8    your testimony you would not quote
9    that -- those words or give any reference
10   or acknowledgment to environmental --
11   to --
12       A.   EnvironmentalChemistry.com.
13       Q.   EnvironmentalChemistry.com?
14           MS. O'DELL:  Object to the
15   form.
16           THE WITNESS:  I would do the
17   same thing I've done for this
18   report.
19   BY MR. HEGARTY:
20       Q.   Okay.  And is that true for
21   every resource that we've looked at so
22   far?  You would -- if you were to write a
23   scientific journal today, you would --
24   and quoted from all those resources, you

Page 115

1    would not use quotation marks and you
2    would not give any acknowledgment in
3    any -- if you were to write a scientific
4    article today?
5           MS. O'DELL:  Object to form.
6    Misstates her testimony.
7           THE WITNESS:  I -- I did say
8    that there are certain cases that
9    if I had to do it over and based
10   upon your rigorous opinion of
11   this, that I would place quotation
12   marks or add a reference, yes.
13           (Document marked for
14   identification as Exhibit
15   Zelikoff-18.)
16   BY MR. HEGARTY:
17       Q.   I'm going to show you what
18   I'm next marking as Exhibit 18.
19           This is another portion of
20   your report.  In addition to that
21   exhibit -- with that exhibit is a
22   reference to a publication by
23   Rakoff-Nahoum, where you again made
24   references to four different sentences

Page 116

1    that you have copied verbatim from that
2    publication without giving any
3    acknowledgment to Dr. Rakoff-Nahoum or
4    use any quotation marks.  Do you see
5    that?
6           MS. O'DELL:  Object to the
7    form.
8           THE WITNESS:  So on Page 124
9    of the review by Seth
10   Rakoff-Nahoum -- Nahoum, if you
11   look on -- under cancer and
12   inflammation, and one of the
13   points that you make here -- and
14   by the way, this is a review
15   paper, again not an independent
16   investigator-initiated data from
17   the laboratory -- "Epidemiological
18   evidence points to a connection
19   between inflammation and" -- "and
20   predisposition for the development
21   of cancer, i.e., long-term
22   inflammation leads to the
23   development of dysplasia," there's
24   no reference there.

Page 117

1           So this author also,
2    Dr. Rakoff-Nahoum -- sorry, I'm
3    murdering his name -- also gives
4    no reference to that.
5           Again, in this case, using
6    my analogy of something that has
7    been gathered by numerous other
8    investigators and is common
9    knowledge to the -- to the
10   scientific population, he did also
11   not use a reference.  And I did
12   not use a reference.
13   BY MR. HEGARTY:
14       Q.   But if -- but if you look at
15   his -- the last reference, Number 4, he
16   does acknowledge a resource for all of
17   those statements, Resource 20 in the
18   publication, correct?
19           MS. O'DELL:  Objection.
20           Could you provide, if you're
21   going to use this exhibit, provide
22   the full manuscript that
23   identifies Resource 20.
24           (Document marked for

30 (Pages 114 to 117)

Judith Zelikoff, Ph.D.

Page 118

1      identification as Exhibit
2      Zelikoff-20.)
3   BY MR. HEGARTY:
4      Q.   I'll mark as 20, the
5   entirety of the Rakoff-Nahoum article,
6   which does include 20, which is a
7   reference to Hussain, "Radical Causes of
8   Cancer."
9      A.   Citation 20 in Exhibit 20 is
10  also a review paper, and none of these
11  references are going back to the
12  independent investigator who actually
13  said this.
14      So these are reviewed in.
15  Again, standing by my opinion that
16  oftentimes in review articles which --
17  in -- in review articles, they often take
18  the liberty, as seen in your first point,
19  that you do not use a reference.
20      Now, I would have to read
21  Reference 20 in order to see whether
22  that, in fact, reviews Points 2, 3 and 4
23  in your "Why Cancer and Inflammation"
24  paper.

Page 119

1      I do not know that
2   Reference 20 actually reviews all of
3   these points and are the reference.
4      Also, many of these
5   points -- and again, another review
6   paper.
7      Many of these points, the
8   chronic inflammatory states associated
9   with infection, irritation, may lead to
10  environments that foster genomic lesions
11  in tumor initiation, no reference there.
12      One effect and mechanism, et
13  cetera, et cetera. Hydroxyl radicals,
14  reactive oxygen species, no reference
15  there. No quotation marks.
16      So I don't know whether he,
17  in fact, uses the same logic that I did.
18      (Document marked for
19      identification as Exhibit
20      Zelikoff-19.)
21  BY MR. HEGARTY:
22      Q.   I'm going to show you
23  Exhibit 19. This is another reference
24  where you copied portions of a

Page 120

1   publication by OSHA for purposes of your
2   report. Do you see that?
3      MS. O'DELL: Objection to
4      form.
5      THE WITNESS: I do see what
6   you're pointing to. I also will
7   tell you that Point 1 that you
8   point out in the OSHA United
9   States Department of Labor, on
10  hexavalent chromium, which is off
11  the internet, adverse health
12  effects associated, yes, I used
13  adverse health -- health effects
14  other than cancer, and then I had
15  these different words.
16      I'm just explaining what I
17  see.
18      With chromium-6, hexavalent
19  chromium exposure include
20  occupational asthma, eye
21  irritation and damage, perforated
22  ear drums, et cetera, et cetera.
23  This can be found in numerous,
24  numerous references. This again

Page 121

1   is common knowledge for anyone
2   doing chromium -- chromium
3   studies.
4      Again, did I use the same
5   words? In many cases, I did here.
6      "Can also develop an
7   allergic skin reaction called
8   allergic contact dermatitis." I'm
9   not quite sure how else you can
10  say that, that phrase.
11      So I still feel confident in
12  what I did was based upon my
13  professional judgment.
14      (Document marked for
15      identification as Exhibit
16      Zelikoff-21.)
17  BY MR. HEGARTY:
18      Q.   Okay. I'll show you what I
19  next marked as Exhibit 21. Exhibit 21 is
20  again a portion of your report where we
21  have identified statements that are taken
22  verbatim without acknowledgment from the
23  publication attached thereto by Kasprzak.
24      A.   Kasprzak. I'm sorry, sir.

31 (Pages 118 to 121)

Judith Zelikoff, Ph.D.

Page 122

1    MS. O'DELL: Did you finish
2 your question?
3 BY MR. HEGARTY:
4    Q.   No.  Do you see where I'm
5 talk -- do you see where I'm referencing?
6    MS. O'DELL:  Object to form.
7    THE WITNESS:  I --
8    MS. O'DELL:  Take a moment
9 if you need to, Doctor.
10    THE WITNESS:  So what I see
11 in the abstract of a paper, a
12 review paper called Nickel
13 Carcinogenesis by Kasprzak and
14 Sunderman and Konstantine
15 Salnikow, you say -- you're
16 pointing to, "The exact mechanisms
17 of nickel-induced carcinogenesis
18 are not known and have been
19 subject of numerous
20 epidemiological and experimental
21 investigations."
22    That is not -- that -- okay.
23 And what's in my paper is, "The
24 exact mechanisms of nickel-induced

Page 123

1 cainogenesis are not known but
2 likely involve genetic and
3 epigenetic routes."
4    That's not the same as this
5 sentence.  It has portions of the
6 same, but not the entire sentence
7 is the same.
8    "Are likely to evolve
9 genetic and epigenetic routes."
10 Not quite sure how else you would
11 say this.
12    And this again is a review
13 paper.  And going through it, here
14 I can cite a sentence.
15 "Occupational exposure to nickel
16 occurs predominately in mining,
17 refining, alloy production,
18 electroplating, and welding."
19 This is in the review by Kasprzak.
20 There's no reference there either.
21    In this sentence, "In 1990
22 the International Committee on
23 Nickel Carcinogenesis in Man
24 suggested that respiratory cancer

Page 124

1 risks are primarily related to
2 exposure to soluble nickel
3 concentrations," et cetera, et
4 cetera.
5    But in many cases throughout
6 this reference, I can also -- it
7 being a review paper, I can also
8 tell you there's epidemiological
9 evidence on possible cancer risk
10 from general environment and
11 dietary nickel exposures not cited
12 as a reference, not quoted.
13 BY MR. HEGARTY:
14    Q.   Are you finished?
15    A.   I am, thank you.
16    THE WITNESS:  Excuse me.
17 May I just point out that it's
18 getting even colder in here and
19 I'm a bit uncomfortable.
20    (Whereupon, a discussion was
21 held off the record.)
22    THE WITNESS:  May I go get
23 my scarf?
24    MR. HEGARTY:  Off the

Page 125

1 record.
2    THE VIDEOGRAPHER:  The time
3 is 11:11 a.m.  Off the record.
4    (Short break.)
5    THE VIDEOGRAPHER:  The time
6 is 11:23 a.m.  Back on record.
7    (Documents marked for
8 identification as Exhibits
9 Zelikoff-25 through 32.)
10    MR. HEGARTY:  We're back on
11 the record.  I'm going to mark --
12 I've marked as Exhibits 25 through
13 32, other examples taken from
14 Dr. Zelikoff's report where --
15 along with the references to which
16 they were taken.  And I'm just
17 going to mark those for purposes
18 of the deposition as those
19 exhibits.
20    MS. O'DELL:  What's the
21 exhibit number?
22    MR. HEGARTY:  Exhibits 25
23 through 32, and I did skip over
24 through 22 through 24, but I'll

32 (Pages 122 to 125)

Judith Zelikoff, Ph.D.

Page 126

1    come back to it.  So we did get
2    kind of out of order in the way I
3    marked those.
4          MS. O'DELL:  So plaintiff
5    objects to the Exhibit 25 through
6    32 being added to the record.
7    There's no testimony from
8    Dr. Zelikoff.  So any assertion
9    that counsel has made that those
10   are relevant, we would object
11   and -- and oppose their being
12   included.
13   BY MR. HEGARTY:
14         Q.   Doctor, if you would look at
15   your report which is Exhibit Number 2.
16         A.   Yes, sir.
17         Q.   On Page 2 of your report,
18   under the section Mandate and
19   Methodology?
20         A.   Yes, sir, I see it.
21         Q.   You say your mandate was to
22   look at the scientific literature and
23   assess whether there is biologic
24   plausibility for talc to cause ovarian

Page 127

1    cancer from perineal use; is that
2    correct?
3          MR. GOLOMB:  I'm sorry.
4    What page are you on?
5          MR. HEGARTY:  Page 2.
6          THE WITNESS:  Are you done?
7    BY MR. HEGARTY:
8          Q.   Yes.
9          A.   My mandate was to review the
10   scientific literature and assess whether
11   there was biological plausible
12   explanation for the increased risk of
13   ovarian cancer with perineal use of
14   talcum powder products, yes, that is
15   correct.
16         Q.   Who gave you that mandate?
17         A.   That was the plaintiff
18   attorney, Ms. Emory [sic] and Ms. O'Dell.
19         Q.   You say --
20         A.   They -- I -- but let me add
21   they -- when you say gave me that
22   mandate, can you explain what you mean by
23   gave me that mandate?
24         Q.   Well, from --

Page 128

1          A.   That was my -- that was --
2    the request was to assess biological
3    plausibility.
4          Q.   You say in that portion that
5    we just reviewed that -- you say for the
6    increased risk of ovarian cancer with
7    talc use.  Did you assume for purposes of
8    your report that there is, in fact, an
9    increased risk of ovarian cancer with
10   talc use?
11         A.   I'm sorry, sir, can you tell
12   me exactly which paragraph?
13         Q.   In the first paragraph under
14   the section Mandate and Methodology, you
15   say "assess whether there is biologic
16   plausibility" -- "biologically plausible
17   explanation for the increased risk of
18   ovarian cancer with the perineal use of
19   talcum powder products."
20             Do you see that?  See where
21   I'm reading?
22         A.   I am sorry, sir, I do not.
23         Q.   First paragraph under
24   page -- on Page 2 under mandate and

Page 129

1    methodology.
2          A.   Is that the notion of
3    biological plausibility paragraph, or are
4    you --
5          Q.   It's the first paragraph
6    under the section Mandate and
7    Methodology.
8          A.   Well, sir, there are two,
9    two paragraphs.  One says mandate.  I was
10   asked to review the scientific
11   literature.  Then there is another
12   paragraph that says the notion of
13   biological plausibility is
14   multifactorial.
15         Q.   Doctor, if you'd listen to
16   my question.  I said the first paragraph
17   under mandate and methodology.  Do you
18   understand that?
19         A.   I do not -- I do not see it
20   and you can --
21         Q.   You don't see the first
22   paragraph that begins mandate?
23         A.   I just read that to you,
24   sir.

33 (Pages 126 to 129)

Judith Zelikoff, Ph.D.

| Page 130 | Page 132 |
|---|---|

**Page 130**

1    Q.   And -- and you understand
2   that's the first paragraph of -- under
3   the section Mandate and Methodology?
4    A.   Under mandate it says, "I
5   was asked to review the scientific
6   literature and assess whether there is
7   biological plausible explanation for the
8   increased risk of ovarian cancer and the
9   perineal use of talcum powder products."
10    Q.   And for purposes of your
11   mandate, did you assume that there was,
12   in fact, an increased risk of ovarian
13   cancer with the perineal use of talcum
14   powder?
15    A.   I made no assumptions.
16    Q.   Did you individually assess
17   whether there is an increased risk of
18   ovarian cancer with the perineal use of
19   talcum powder products?
20    A.   Could you please slow down?
21   You are asking the question very quickly.
22    Q.   Okay.  Did you
23   individually -- did you do an analysis of
24   whether there's an increased risk of

**Page 132**

1    Q.   What graduate students
2   assisted you?
3    A.   Are you asking me for their
4   names?
5    Q.   Yes.
6    A.   Nick Lawrence who was a
7   master student.  And Catherine Fecchi who
8   was my master student.  Both of them have
9   which graduated.
10    Q.   Did you bill plaintiffs'
11   counsel for their time?
12    A.   I paid them out of my
13   pocket.
14    Q.   And how much did you pay
15   them per hour?
16    A.   $25 per hour.
17    Q.   Do you describe -- strike
18   that.
19        Anyone else assist you with
20   your literature search?
21    A.   I'm sorry, anyone else?
22    Q.   Assist you in your
23   independent comprehensive literature
24   review.

**Page 131**

1   ovarian cancer with perineal use of
2   talcum powder products?
3    A.   No.  As you can see by the
4   mandate I was asked to assess the
5   biological plausibility.  I did no
6   analysis of causation.
7    Q.   You did no analysis of
8   whether there is, in fact, an increased
9   risk of ovarian cancer with the perineal
10   use of talcum powder products?
11    A.   I did no analysis of
12   causation.  I'm not an epidemiologist.
13    Q.   You also discuss in the
14   third paragraph, which begins "I
15   performed an independent comprehensive
16   literature review."
17    A.   I see that, yes.  Thank you.
18    Q.   That you did do a literature
19   search, correct?
20    A.   I did do a literature
21   search, correct.
22    Q.   Did you do this yourself?
23    A.   I did do this myself along
24   with several graduate students.

**Page 133**

1    A.   No, sir.
2    Q.   So doing the searches was
3   part of your methodology for preparing
4   your report, correct?
5    A.   Doing the searches were my
6   initial, my initial, yes.
7    Q.   Did you prepare in advance a
8   written protocol on how you were going to
9   do the searches?
10    A.   I followed the same protocol
11   that I used for papers, publications,
12   advisory boards, grant -- grant reviews
13   and grants that I write.
14    Q.   That's not my question.  My
15   question is, did you prepare a written
16   protocol as far as how you were going to
17   do the literature review for purposes of
18   your report?
19    A.   I did not do a written
20   outline as to how to do this.  I've been
21   doing this for over 35 years.
22    Q.   You agree that it was part
23   of your methodology is -- for your
24   literature search, to find and review all

34 (Pages 130 to 133)

Judith Zelikoff, Ph.D.

|  | Page 134 |
|---|---|

1    literature that touch on talc and its
2    biologic effects, correct?
3         MS. O'DELL: Object to the
4    form.
5         THE WITNESS: My purpose was
6    to examine the literature, assess
7    the literature, first identify the
8    literature that I felt was --
9    well, all -- all the literature
10   that I could find or that the
11   students could find, and from me
12   to review them in terms of
13   relevancy and pertinence to the
14   question that I was being asked.
15   BY MR. HEGARTY:
16        Q.   Did you do any testing of
17   your methodology of doing searches to
18   ensure that you had captured all the
19   relevant literature?
20        MS. O'DELL: Object to the
21   form.
22        THE WITNESS: What do you
23   mean by testing?
24   BY MR. HEGARTY:

|  | Page 135 |
|---|---|

1         Q.   Well, I don't know. Did you
2    do any tests, having someone else do
3    searches, repeating the searches, to see
4    if your original searches captured all of
5    the relevant literature?
6         A.   We did several searches
7    doing -- using different words and
8    different aspects, so that we could -- we
9    got numerous duplicates because we came
10   in with different words, and key --
11   keywords and key phrases.
12        Q.   You do agree that it would
13   be necessary for a proper methodology to
14   reach opinions about biologic
15   plausibility, that you have reviewed all
16   the pertinent literature, correct?
17        MS. O'DELL: Object to the
18   form.
19        THE WITNESS: To my
20   knowledge I reviewed the
21   literature that was pertinent to
22   the question that I was being
23   asked.
24        I am not stating that I

|  | Page 136 |
|---|---|

1    reviewed all of the literature out
2    there. I have no way of knowing
3    that I reviewed or have not.
4         I gathered the literature in
5    a systematic fashion and I
6    reviewed that literature.
7    BY MR. HEGARTY:
8         Q.   Did you read every paper
9    that you found from your literature
10   search?
11        A.   Only those that were
12   relevant. I read the abstracts to
13   determine whether it was in fact related
14   to the question that I was being asked.
15        When you do a literature
16   search, you come up with things that are
17   related and some that are not related at
18   all.
19        Q.   Does your report anywhere
20   describe or include a description of how
21   you weighed the various authorities that
22   you reviewed?
23        A.   My report talks about under
24   mandate and methodology how I -- the last

|  | Page 137 |
|---|---|

1    paragraph, and that begins more than 300
2    publications, will -- talks about how
3    I -- how I looked at the publications and
4    how I decided how to cut down or dismiss
5    certain papers based on a closer
6    scrutiny. And I focused specifically for
7    biological plausibility and being a
8    toxicologist on in vitro, in vivo, and ex
9    vivo studies as well as cell studies,
10   animal studies, and tissues.
11        Q.   Did you assign any numerical
12   value to each authority as they relate to
13   the importance to you?
14        A.   I did not assign any
15   numerical value. There was no
16   quantitative measurement done.
17        Q.   Was it also part of your
18   methodology to review all expert reports
19   in the litigation that concerned biologic
20   plausibility?
21        MS. O'DELL: Object to the
22   form.
23        THE WITNESS: Can you ask me
24   that again, please.

35 (Pages 134 to 137)

Judith Zelikoff, Ph.D.

Page 138

```
 1   BY MR. HEGARTY:
 2       Q.   Sure.  Was it part of your
 3   methodology to review all expert reports
 4   in the litigation concerning biologic
 5   plausibility?
 6       A.   I -- I looked at reports
 7   that had relevancy in terms of animal
 8   models, in vitro cultures or ex vivo
 9   studies, yes.  My opinion was formed
10   primarily by the publications and the
11   science that I reviewed.
12       Q.   Was it part of your
13   methodology for purposes of your opinions
14   to review the expert witness reports from
15   the litigation that touch on biologic
16   plausibility?
17           MS. O'DELL:  Object to the
18       form.  Asked and answered.
19           THE WITNESS:  I reviewed the
20       publications and the book chapters
21       and information that I thought
22       would go towards my -- my opinion.
23   BY MR. HEGARTY:
24       Q.   Your expert report, as we
```

Page 139

```
 1   have looked at, includes references to
 2   several other experts' reports, correct?
 3   We looked at that earlier.
 4       A.   If you say so, yes.
 5       Q.   Did you select those expert
 6   reports for purposes of your review?
 7           MS. O'DELL:  Object to the
 8       form.
 9           THE WITNESS:  I formed my
10       opinion with contributions from
11       some of the reports that I had.
12       But it was primarily based upon
13       literature reviews.
14   BY MR. HEGARTY:
15       Q.   The reports that you had
16   were provided to you by plaintiffs'
17   counsel, correct?
18       A.   Reports that I received was
19   supplied to me by plaintiffs' counsel.
20       Q.   They selected the reports
21   that they were going to provide to you,
22   correct?
23           MS. O'DELL:  Object to the
24       form.
```

Page 140

```
 1           THE WITNESS:  To my
 2       knowledge, I have no knowledge as
 3       to how they selected the reports
 4       or which reports they selected to
 5       send.
 6   BY MR. HEGARTY:
 7       Q.   You didn't have -- get a
 8   list of all expert reports and decide
 9   which ones you wanted, correct?
10           MS. O'DELL:  Object to the
11       form.
12           THE WITNESS:  I -- no.  I
13       did not get a list of an entirety.
14   BY MR. HEGARTY:
15       Q.   Do you know plaintiffs'
16   counsel methodology for purposes of
17   selecting the reports to provide to you?
18       A.   I do not know their
19   methodology, but I would guess since
20   papers were supplied to me that had both
21   opinions and conclusions that led to
22   either positive associations or lack of
23   positive or data from scientific in vivo
24   studies, et cetera, that showed effects
```

Page 141

```
 1   and no effects, I would assume that I got
 2   all the literature both -- from both
 3   perceptions.
 4       Q.   Can you identify any medical
 5   literature that you had reviewed prior to
 6   being contacted by Ms. Emmel?
 7       A.   Medical literature on?
 8       Q.   Let me finish my question.
 9       A.   I'm sorry.
10       Q.   Can you identify any
11   scientific or medical literature that you
12   reviewed before being contacted by
13   Ms. Emmel concerning talc and ovarian
14   cancer?
15       A.   There is no literature that
16   I reviewed prior to me being contacted by
17   Ms. Emmel.
18       Q.   Also in Exhibit B --
19       A.   B as in boy?
20       Q.   -- boy -- to your report.
21   There is a listing of produced documents
22   by Bates number.
23       A.   Correct.  I see it,
24   "materials and data considered."
```

36 (Pages 138 to 141)

Judith Zelikoff, Ph.D.

Page 142

1  Q.  Did the plaintiffs' counsel
2  provide you with copies of those
3  documents?
4  A.  I have not gone through
5  every paper in those multiple binders. I
6  would assume that many of them are in
7  there.
8  Q.  That's not my question,
9  Doctor. My question was, were those
10 documents provided to you by counsel for
11 plaintiffs?
12      MS. O'DELL: What documents
13  are you referring to?
14      MR. HEGARTY: The documents
15  that are listed by Bates number in
16  Exhibit B.
17      THE WITNESS: Oh, you're
18  talking about produced documents?
19 BY MR. HEGARTY:
20  Q.  Yes.
21  A.  Repeat your question,
22  please.
23  Q.  Sure. Were the documents
24 listed by Bates number under produced

Page 143

1  documents provided to you by counsel for
2  plaintiffs?
3  A.  Produced documents were
4  supplied to me in the folder that is
5  listed, production documents.
6  Q.  Did you ask for those
7  specific documents?
8  A.  I did not.
9  Q.  Do you know what the
10 methodology was for selecting those
11 specific documents to send to you?
12  A.  I do not.
13      MS. O'DELL: Object to the
14  form.
15      THE WITNESS: Sorry.
16 BY MR. HEGARTY:
17  Q.  Did you ask for any
18 additional documents that would fall
19 under the definition of produced
20 documents besides those plaintiffs'
21 counsel provided to you?
22  A.  Not to my knowledge.
23  Q.  Did you review all the
24 documents that are listed under the

Page 144

1  section "produced documents"?
2  A.  I reviewed all of the
3  documents that are in the binder listed
4  as production documents. I did not check
5  one for another, so I cannot say I did
6  all of these --
7  Q.  Did you receive --
8  A.  -- or they did not.
9  Q.  I'm sorry. Did you receive
10 from counsel from plaintiffs all the
11 documents that have been produced in this
12 litigation that concerned biologic
13 plausibility?
14      MS. O'DELL: Object to the
15  form.
16      THE WITNESS: I have no
17  knowledge of whether I received
18  every single document there is out
19  there.
20 BY MR. HEGARTY:
21  Q.  Did you ask for -- did you
22 ask counsel for plaintiffs to provide you
23 all the documents that have been produced
24 in this case concerning biologic

Page 145

1  plausibility?
2      MS. O'DELL: Object to the
3  form.
4      THE WITNESS: Did not ask it
5  in that manner.
6      I did ask for in vitro
7  studies that they could find, ex
8  vivo studies, and I also did my
9  own literature search. Yes.
10 BY MR. HEGARTY:
11  Q.  Were you -- did you
12 understand that -- or do you understand
13 that you've been provided with all the
14 produced documents that concern biologic
15 plausibility?
16      MS. O'DELL: Object to form.
17      THE WITNESS: I have no
18  knowledge of whether I received
19  all documents.
20 BY MR. HEGARTY:
21  Q.  With regard to the produced
22 documents, did you sign a protective
23 order before reviewing those documents?
24  A.  Regarding these produced

37 (Pages 142 to 145)

Judith Zelikoff, Ph.D.

Page 146

```
 1   documents --
 2       Q.   Yes.
 3       A.   -- did I sign a protective
 4   order?
 5       Q.   Yes.
 6           MS. O'DELL:  Object to the
 7       form.  It's a confidentiality
 8       order in this litigation.  You may
 9       not be aware of it.
10           MR. HEGARTY:  Okay, well,
11       confidentiality order.
12           MS. O'DELL:  Just so it's
13       not unclear to the witness.
14   BY MR. HEGARTY:
15       Q.   Did you sign a
16   confidentiality order before reviewing
17   the Bates-stamped documents?
18       A.   I signed a confidentiality
19   agreement early on.
20       Q.   Do you rely on any tests for
21   purposes of your opinions that are not
22   reported in the medical literature?
23       A.   Again --
24           MS. O'DELL:  Object to the
```

Page 147

```
 1       form.
 2           THE WITNESS:  Please
 3       describe "tests."
 4   BY MR. HEGARTY:
 5       Q.   Well, did you rely on any
 6   testing or tests for purposes of your
 7   opinions that are not contained in the
 8   medical literature --
 9           MS. O'DELL:  Objection to
10       form.
11   BY MR. HEGARTY:
12       Q.   -- that we wouldn't have
13   access to but that you did?
14           MS. O'DELL:  Object to the
15       form.  Besides those produced in
16       the litigation?
17           MR. HEGARTY:  Yeah, that
18       goes without saying.
19           MS. O'DELL:  It doesn't go
20       without saying.  It's an unfair
21       question.
22           THE WITNESS:  So if I
23       understand your question to mean
24       are there any laboratory
```

Page 148

```
 1       experiments that I'm aware of that
 2       were done that I have knowledge
 3       of?  No I have no knowledge of any
 4       laboratory testing or experimental
 5       testing in this field.
 6   BY MR. HEGARTY:
 7       Q.   You did not do any testing
 8   yourself for purposes of developing your
 9   opinions in this case, correct?
10       A.   I did not do any laboratory
11   tests.
12       Q.   All the opinions that are
13   set out in your report about biologic
14   plausibility between talc and ovarian
15   cancer were formed after being contacted
16   by counsel for plaintiffs about
17   testifying as an expert in this case,
18   correct?
19           MS. O'DELL:  Objection to
20       form.
21           THE WITNESS:  After being
22       contacted by the plaintiffs I did
23       a literature search and followed
24       the science.
```

Page 149

```
 1   BY MR. HEGARTY:
 2       Q.   That's not my question,
 3   Doctor.
 4           My question is, all the
 5   opinions set out in your report about
 6   biologic plausibility as they relate to
 7   talc and ovarian cancer were formed after
 8   being contacted by counsel for
 9   plaintiffs, correct?
10       A.   That is correct.
11       Q.   Can you cite for us any
12   occasion where you've done the exact same
13   thing that you have done here to prepare
14   your report; that is, do an analysis of
15   the literature on the biologic
16   plausibility between the exposure to a
17   substance and a disease?
18       A.   Nothing has been done
19   exactly like it's been here, but for
20   advisory boards that I've been on,
21   including the National Toxicology Board,
22   the Institute of Medicine, the Institute
23   of Engineering for the National Academies
24   of Science, we have -- we were requested
```

38 (Pages 146 to 149)

Judith Zelikoff, Ph.D.

Page 150

1  to do literature reviews on the question
2  that's in front of them and come up with
3  an opinion based upon our literature
4  reviews.
5      Q.   Have you ever published an
6  article in the medical literature where
7  you've done the same thing that you've
8  done here, which is to review all the
9  literature on a substance and a disease
10  and offer opinions as to whether there's
11  biologic plausibility between that
12  substance and a disease?
13      A.   I have written reviews that
14  are a culmination of all of the
15  literature that I reviewed on topics.
16  Never one on ovarian cancer and talc.
17      And to my knowledge, I have
18  not offered an opinion, but followed a
19  conclusion from the science.
20      Q.   I think my question is a
21  little bit different.  My question is,
22  have you published any article in the
23  literature where you have done
24  essentially the same thing that you have

Page 151

1  done here, which is review all the
2  literature on an exposure and a disease
3  and offer opinions as to whether there's
4  biologic plausibility between the
5  exposure and the disease?
6      A.   Most of the papers that I
7  publish will offer a potential, whether a
8  speculative potential or one that is
9  defined within other published literature
10  as a potential mechanism of action or as
11  potential plausible outcome.
12      So for any published paper
13  from the research that I've done or that
14  people do, we explain an observation that
15  has been found in our laboratory from
16  testing, as you call it.  And we will
17  explain the observation in terms of
18  biological plausibility, if that's what
19  you're referring to.
20      Q.   Well, have you ever used the
21  phrase "biologic plausibility" in any
22  published article?
23      A.   I cannot cite them for you,
24  but I -- I am confident that I have used

Page 152

1  the words "biological feasibility" or
2  "potential mechanisms" or "plausible" --
3  I may have used the word "plausibility,"
4  but I have used words that are similar to
5  those.
6      Q.   Doctor, when did you first
7  become aware of an alleged link between
8  ovarian cancer and talc use?
9      MS. O'DELL:  Object to the
10  form.
11      THE WITNESS:  When did I
12  first become aware of the alleged
13  link between ovarian cancer and
14  talc use?  From -- from the media.
15  I would say maybe a year prior to
16  being contacted by Ms. Emmel.
17  BY MR. HEGARTY:
18      Q.   Can you cite for me any
19  scientific or medical group, entity or
20  organization who has concluded that
21  genital talc use causes ovarian cancer?
22      A.   I -- really, my opinion is
23  based on biological plausibility.
24      Q.   I understand that.  But my

Page 153

1  question is simply from your knowledge,
2  here today, can you cite for me any
3  scientific or medical group, entity or
4  organization who has concluded that
5  genital talc use causes ovarian cancer?
6      MS. O'DELL:  Object to the
7  form.
8      THE WITNESS:  Well,
9  concluded is -- is a word for
10  discussion.
11      IARC in the 1993 report from
12  inhalation toxicology and
13  inhalation of talc did show that
14  there was tumor induction in
15  female rats in the lungs and that
16  there was adrenal gland tumors
17  that were formed.
18  BY MR. HEGARTY:
19      Q.   Well, IARC has never
20  concluded that the use of talc in the
21  genital area causes ovarian cancer,
22  correct?
23      A.   You asked me whether there
24  was any body of literature or any

39 (Pages 150 to 153)

Judith Zelikoff, Ph.D.

Page 154

1  advisory boards or any institution which
2  has concluded that there is a causal
3  relationship.  And I've cited to you a
4  study --
5      Q.   That's not my question.  My
6  question was can you cite for me any
7  scientific or medical group, entity or
8  organization who has concluded that
9  genital talc use causes ovarian cancer.
10         MS. O'DELL:  Object to the
11     form.
12         THE WITNESS:  I have -- I
13     have given you information on a
14     study done at the national
15     toxicology program.
16  BY MR. HEGARTY:
17     Q.   Is that the extent of your
18  answer?
19     A.   There are -- to my
20  knowledge, that's the best study that I
21  can cite to you.
22     Q.   That's a study, correct?
23     A.   That was a study, and they
24  are also a body that makes conclusions.

Page 155

1      Q.   That study did not involve
2  any commentary on ovarian cancer,
3  correct?
4      A.   The study did not involve
5  commentary on that.
6      Q.   Can you name any regulatory
7  body who has stated that talc use is a
8  cause of ovarian cancer?
9      A.   Not as I sit here right now.
10  But again, making conclusions on
11  causation was not my question, is not
12  my -- is not within my purview.
13         And there are different
14  levels of cancer conclusion.  For
15  instance, IARC has several
16  classifications.  And -- as you know, I,
17  II-A, II-B, et cetera.
18     Q.   And what is IARC's
19  classification of talc use in the genital
20  area?
21         MS. O'DELL:  Object to the
22     form.
23         THE WITNESS:  To my
24     knowledge, I think it's a II-B.

Page 156

1  BY MR. HEGARTY:
2      Q.   II-B is possibly
3  carcinogenic, correct?
4      A.   To humans.
5      Q.   I'm sorry?
6      A.   To humans.  Possibly
7  carcinogenic to humans.  That doesn't
8  exclude the fact that there is animal
9  data supporting that conclusion.  If
10  there were no animal data it -- it would
11  not even be considered a II-B.  So
12  there -- there's evidence that the IARC
13  evaluated and came up with a II-B
14  classification.
15     Q.   Is it your opinion that the
16  biologic plausibility of talc products
17  causing ovarian cancer has been generally
18  accepted in the medical community?
19     A.   I think it depends on the
20  medical community.
21     Q.   Well, aside from any medical
22  community that has accepted that there is
23  biologic plausibility between the use of
24  talc products in -- in ovarian cancer.

Page 157

1  Let me -- let me restate that.
2         Can you cite for me any
3  medical community that has accepted that
4  there is biologic plausibility of talc
5  products causing ovarian cancer?
6      A.   I'm not knowledgeable at --
7  about all the medical communities and
8  what disciplines they are in.
9      Q.   Well, can you cite for me
10  any medical or scientific community that
11  has accepted that there is biologic
12  plausibility of talcum powder products
13  causing ovarian cancer?
14     A.   I have no knowledge of that.
15  That doesn't mean it's not out there.  It
16  means that I have no knowledge of that.
17     Q.   You have no knowledge --
18  you -- so you cannot testify that the
19  medical or scientific communities have
20  accepted that there is biologic
21  plausibility of talcum powder products
22  causing ovarian cancer?
23         MS. O'DELL:  Object to the
24     form.

40  (Pages 154 to 157)

Judith Zelikoff, Ph.D.

| Page 158 |
|---|
| 1       THE WITNESS:  What I'm |
| 2    saying is I have no knowledge of |
| 3    the documents they have put out |
| 4    with a conclusion as a white paper |
| 5    or any other published literature |
| 6    that has made that conclusion. |
| 7  BY MR. HEGARTY: |
| 8       Q.    What does -- sorry. |
| 9       A.    Or has not made that |
| 10  conclusion. |
| 11      Q.    What does general acceptance |
| 12  mean to you? |
| 13      A.    General acceptance -- for |
| 14  example, benzine, it causes leukemia and |
| 15  other blood cancers.  That is a general |
| 16  acceptance by the medical community which |
| 17  we all adhere to, abide by, based upon |
| 18  the excessive amount of literature that |
| 19  is out there showing -- proving and |
| 20  addressing Hill's criteria and coming up |
| 21  with the fact that it is a -- it is a |
| 22  carcinogen for blood cancers. |
| 23      That is general knowledge. |
| 24  General knowledge is something saying |

| Page 159 |
|---|
| 1    that nickel can be a carcinogen, nickel |
| 2    is a carcinogen and is classified by IARC |
| 3    as a I.  In that case, the general |
| 4    population is aware of that. |
| 5       Q.    Before being hired by the |
| 6    plaintiffs' lawyers in this case, you had |
| 7    never written anything about talc, |
| 8    correct? |
| 9       A.    That's correct. |
| 10      Q.    Or commented on talc in any |
| 11  setting, correct? |
| 12      A.    Other than teaching? |
| 13      Q.    Other than the teaching |
| 14  reference you cited earlier? |
| 15      A.    That's correct. |
| 16      Q.    Before being hired by |
| 17  plaintiffs' counsel you had never written |
| 18  anything about any cosmetic, correct? |
| 19      MS. O'DELL:  Object to the |
| 20    form. |
| 21      Could you please -- it's |
| 22    vague in terms of cosmetic.  Do |
| 23    you have a definition in mind? |
| 24      THE WITNESS:  Exactly. |

| Page 160 |
|---|
| 1       Thank you. |
| 2  BY MR. HEGARTY: |
| 3       Q.    You don't -- you don't know |
| 4    what a cosmetic is? |
| 5       A.    I'm asking you what your |
| 6    definition is. |
| 7       Q.    Well, I -- what is your |
| 8    definition? |
| 9       A.    A definition of a cosmetic |
| 10  is -- since I'm not in the cosmetic |
| 11  field -- a cosmetic is something that is |
| 12  used for hygiene or aesthetics and used |
| 13  dermally. |
| 14      Q.    Have you ever written any |
| 15  scientific article about a cosmetic under |
| 16  your definition? |
| 17      A.    Not to my knowledge, but I |
| 18  would have to look at all of my papers |
| 19  again, if you'd like me to do that. |
| 20      Q.    Can you cite for me any |
| 21  publication of yours where you comment on |
| 22  asbestos? |
| 23      A.    I would have to look at my |
| 24  references.  I go back from 1982. |

| Page 161 |
|---|
| 1       Q.    Sitting here today, can you |
| 2    cite for us, without looking at any |
| 3    references, any article you've ever |
| 4    written about asbestos? |
| 5       MS. O'DELL:  Doctor, if you |
| 6    need to look at your CV, you're |
| 7    welcome to do that. |
| 8  BY MR. HEGARTY: |
| 9       Q.    Well, my question didn't ask |
| 10  about the CV.  I said just simply sitting |
| 11  here today, just based on your memory -- |
| 12      A.    Okay. |
| 13      Q.    -- are you able to recall |
| 14  any article you've ever written about |
| 15  asbestos. |
| 16      MS. O'DELL:  If you would |
| 17    like to look at your CV, it's in |
| 18    front of you.  You are welcome |
| 19    to -- to do that. |
| 20      MR. HEGARTY:  I'll withdraw |
| 21    the question. |
| 22  BY MR. HEGARTY: |
| 23      Q.    Doctor, have you ever |
| 24  written any article about a fragrance? |

41 (Pages 158 to 161)

Judith Zelikoff, Ph.D.

Page 162

1        A.   I would also like to look at
2   my CV.
3        Q.   Without looking at your CV,
4   you can't say one way or the other?
5        A.   I can't say conclusively.
6   My CV and my publications go back to
7   1982. It was quite a while ago.
8        Q.   And you can't say
9   conclusively whether you've written an
10  article about asbestos?
11       A.   I would rather look at my --
12  my publications.
13       Q.   Okay. Have you ever
14  written --
15       A.   Would you like me to do
16  that, sir?
17       Q.   No. I'm not asking you to
18  do that right now.
19       A.   Thank you.
20       Q.   Sitting here today without
21  looking at your CV, can you cite for me
22  any article you've ever written about
23  asbestos?
24       MS. O'DELL:  Objection to

Page 163

1   form.
2        THE WITNESS:  To my
3   knowledge at this particular
4   moment, I cannot cite for you an
5   article that I specifically wrote
6   on asbestos.  Whether or not I was
7   a co-author on one, I cannot
8   recall.
9   BY MR. HEGARTY:
10       Q.   Would that be the same
11  answer as to a fragrance?
12       A.   I -- I would really rather
13  look at my CV and my publications and
14  book chapters.
15       Q.   Before being contacted by
16  counsel for plaintiffs in this case, you
17  had never developed or offered any
18  opinions about talc, correct?
19       A.   That is correct.
20       Q.   You've never written
21  anything about ovarian cancer, correct?
22       A.   Again, just to put on the
23  record, I would really like to look at my
24  CV and look at my publications.  We are,

Page 164

1   as scientists, involved as co-authors,
2   oftentimes.  And I do not recall back to
3   1982.
4        Q.   Well, for purposes of your
5   report, you do not cite to any of your
6   own work, correct?
7        A.   That is correct.
8        Q.   You've never written
9   anything about talc and ovarian cancer,
10  correct?
11       A.   I think I asked and answered
12  that. I think I answered that. But I
13  can repeat it.
14       Q.   No, you did not. I did not
15  ask you that question, ma'am.
16       A.   So can --
17       Q.   I asked you had you ever
18  written anything about talc. My question
19  that I just asked you is have you ever
20  written anything about talc and ovarian
21  cancer?
22       A.   To my knowledge, as I sit
23  here now without looking at my
24  publications, no.

Page 165

1        Q.   Prior to being contacted by
2   plaintiff's counsel have you ever
3   reviewed the body of literature on the
4   etiologies or biology related to ovarian
5   cancer?
6        A.   Not prior to being
7   contacted, no.
8        Q.   You've never published any
9   opinions about the causes of ovarian
10  cancer, correct?
11       A.   To my knowledge, sitting
12  here, no.
13       Q.   You never published any
14  opinions about the risk factors for
15  ovarian cancer, correct?
16       A.   I really -- I'm not sure. I
17  know that I have given that information,
18  not an opinion, but have given that
19  information in teaching courses.
20       Q.   Have you ever taught any
21  courses on asbestos?
22       A.   Asbestos has been included.
23  I give lectures in my organ system
24  toxicology course as well as in my

42 (Pages 162 to 165)

Judith Zelikoff, Ph.D.

Page 166

1    toxicology course for biology masters.  I
2    give courses in air pollutants and
3    cancer-causing agents and the toxicology
4    of -- of airborne.
5         Q.   Have you ever taught in your
6    courses any discussion about fragrances
7    and toxicity?
8         A.   It may have come up as a
9    minor point.  We talk about pesticides,
10   we talk about air pollutants.  We talk
11   about metals.  Fragrances, we talked
12   about limonene, eugenol, menthol and
13   other fragrances in that realm in the
14   discussion of electronic cigarettes and
15   the aerosols produced by them.
16        Q.   And you provided to us all
17   the lectures or the content of lectures
18   that you've given where you mentioned
19   talc, correct?
20        A.   I was not asked to --
21        MS. O'DELL:  Object to the
22   form.
23        THE WITNESS:  I was not
24   asked to provide them.  But please

Page 167

1    let me explain my teaching style.
2         My teaching style is such
3    that I use few PowerPoints as
4    queues.  And much of my teaching
5    is done verbally, one-on-one.  And
6    they're not recorded.
7         So there is really not that
8    much -- there is nothing to supply
9    to counsel.
10   BY MR. HEGARTY:
11        Q.   Well, other than the
12   reference that you provided to us earlier
13   about talc and ovarian cancer, you have
14   not otherwise lectured regarding this
15   subject, correct?
16        A.   That is correct.
17        Q.   There are toxicologists who
18   focus on issues dealing with reproductive
19   medicine or reproductive sciences such as
20   ovarian cancer and uterine cancer,
21   correct?
22        A.   There are scientists whose
23   major focus is on talc and ovarian cancer
24   and there are OB/GYNs as well as

Page 168

1    reproductive docs who do focus on this,
2    yes.
3         Q.   And that has not been an
4    area of your focus, correct?
5         A.   Not -- not in past.  Has not
6    been a primary focus.
7         Q.   You have provided for us
8    your CV, correct?
9         A.   That is correct.
10        Q.   That's included as part of
11   Exhibit B to your expert report, correct?
12        MS. O'DELL:  Objection to
13   form.
14        THE WITNESS:  I think it's
15   stated here as Exhibit A.
16   BY MR. HEGARTY:
17        Q.   It's Exhibit A to your
18   expert report.  Is that a current CV of
19   yours?
20        A.   It was updated in
21   August 2018.  So it is not completely
22   updated as of January 2019.
23        Q.   Did you bring an updated CV
24   to your deposition?

Page 169

1         A.   I did not.
2         Q.   As you stated --
3         A.   I'm sorry.  I can provide
4    that.
5         Q.   Does your CV anywhere list
6    any professional experience on ovarian
7    cancer?
8         A.   Excuse me.  Not to my
9    knowledge, in briefly reviewing my CV,
10   and not to my knowledge as I sit here.
11        Q.   Does your CV list any
12   professional experience regarding
13   asbestos?
14        A.   Specifically, asbestos as I
15   review, no.  No, sir.
16        Q.   Does your CV list any
17   professional experience regarding
18   fragrances?
19        A.   Not to my knowledge, no,
20   sir.  But you're asking me only what's in
21   my CV.
22        I have -- I have worked -- I
23   have looked at or heard about from other
24   advisory boards things to do with

43 (Pages 166 to 169)

Judith Zelikoff, Ph.D.

| Page 170 | Page 172 |
|---|---|
| 1 flavorants, as I said with electronic<br>2 cigarettes, hookah and smokeless tobacco.<br>3 So I am familiar with other -- which may<br>4 not be listed here in detail, which is<br>5 not listed here in detail, on flavorants<br>6 and some of those same flavors used in<br>7 electronic cigarettes are also, I found,<br>8 listed here.<br>9     Q.   Has any entity or agency<br>10 consulted you with regard to diseases of<br>11 the female reproductive tract?<br>12         MS. O'DELL:  Object to the<br>13    form.<br>14         THE WITNESS:  Not to my<br>15    knowledge.<br>16 BY MR. HEGARTY:<br>17     Q.   And no one has ever asked<br>18 you to look into any of the issues set<br>19 out in your report besides plaintiffs'<br>20 counsel, correct?<br>21     A.   I'm sorry.  Again?<br>22     Q.   No one has asked you to look<br>23 at the issues set out in your expert<br>24 report in this case other than | 1 or scientist who believes that there is<br>2 biologic plausibility between use of<br>3 talcum powder and ovarian cancer?<br>4         MS. O'DELL:  Object to form.<br>5         THE WITNESS:  I have not<br>6    spoken to any doctors in that<br>7    regard.<br>8 BY MR. HEGARTY:<br>9     Q.   How about any scientists?<br>10     A.   I have not spoke to any<br>11 scientists in that regard.<br>12     Q.   Have you --<br>13     A.   My opinion was specifically<br>14 based upon the scientific literature that<br>15 I had access to.<br>16     Q.   Have you ever had your<br>17 deposition taken before?<br>18     A.   I have.  Yes, sir.<br>19     Q.   How many times?<br>20     A.   One that I can recall.  Two<br>21 that I'm now recalling.  One that was<br>22 in -- for Dow Chemical on breast implants<br>23 and relationship with autoimmune disease<br>24 and one from a personal attorney who |

| Page 171 | Page 173 |
|---|---|
| 1 plaintiffs' counsel, correct?<br>2     A.   This specific ovarian cancer<br>3 and asbestos, that is correct.<br>4     Q.   You have not submitted your<br>5 expert report in this case for peer<br>6 review, correct?<br>7     A.   The only ones who have seen<br>8 my report have been the plaintiff<br>9 attorneys, to my knowledge.<br>10        If that was given out to<br>11 others at that point, I do not -- I do<br>12 not have knowledge of that.<br>13     Q.   You certainly have not<br>14 submitted your report for peer review,<br>15 correct?<br>16     A.   I have not submitted my<br>17 report for peer review.<br>18     Q.   Have you spoken to any<br>19 physicians who treat ovarian cancer<br>20 regarding talc and ovarian cancer?<br>21     A.   I have not.<br>22     Q.   Other than experts<br>23 identified by plaintiffs in this<br>24 litigation, can you identify any doctor | 1 was -- who had a client who was exposed<br>2 to wood burning from a wood stove, an<br>3 outdoor wood stove.<br>4     Q.   As to the latter case, do<br>5 you know where that case was pending or<br>6 was filed?<br>7     A.   I was deposed in New York<br>8 City.<br>9     Q.   Do you know the name of the<br>10 case?<br>11     A.   I'm afraid not, sir.<br>12     Q.   How long ago was it?<br>13     A.   15 years.<br>14     Q.   You were testifying on<br>15 behalf of the plaintiff in that case?<br>16        MS. O'DELL:  Object to form.<br>17        THE WITNESS:  I was not<br>18    testifying.  I was deposed for<br>19    the -- sorry, for the person who<br>20    was making the claim that they had<br>21    increased asthma as a result of<br>22    neighbors use of a wood boiler.<br>23 BY MR. HEGARTY:<br>24     Q.   In the Dow Chemical breast |

44 (Pages 170 to 173)

Judith Zelikoff, Ph.D.

| Page 174 |
|---|

1  implant case, were you testifying as an
2  expert witness?
3      A.  I was.
4      Q.  On behalf of the plaintiffs?
5      A.  If you're talking about on
6  the part of Dow, yes.
7      Q.  Well, on the part of Dow who
8  was the defendant or the plaintiffs?
9      A.  Dow was the defendant.  I'm
10  sorry.
11      Q.  Were you testifying on
12  behalf of Dow?
13      A.  I was.
14      Q.  Any other cases you've been
15  deposed in?
16      A.  Not that I can recall.
17      Q.  Have you been identified in
18  any other cases as an expert witness
19  besides this one to your knowledge?
20      A.  I have done literature
21  reviews for a number of attorneys but
22  have not been deposed.
23      Q.  My question is specific to
24  whether you -- whether you are aware that

| Page 175 |
|---|

1  you've been designated, identified, in
2  the case as a testifying expert besides
3  this case.  Are you aware of any such
4  cases?
5      A.  Not to my knowledge.
6      Q.  I know I referred earlier to
7  your CV.  But I'm marking it as
8  Exhibit 22.  You can look at that one or
9  Exhibit 22.
10          (Document marked for
11          identification as Exhibit
12          Zelikoff-22.)
13  BY MR. HEGARTY:
14      Q.  Are there any publications
15  of yours that relate to any of the issues
16  in this case that are not included in
17  your CV?
18          MS. O'DELL:  Object to form.
19          THE WITNESS:  Let's talk
20      about the issues of the case.  Can
21      you define them a little better?
22  BY MR. HEGARTY:
23      Q.  Yeah, let me ask you a
24  different question.  Are there any

| Page 176 |
|---|

1  cases -- are there any articles on which
2  you rely for purposes of your opinions --
3  strike that.  Let me ask it a different
4  way.
5          How many articles have you
6  published since August of 2018?
7      A.  I'm going to look at the
8  last publication.
9          I have one that was accepted
10  in press on the Garfield community and
11  looking at chromium exposure and doing
12  community engagement for the community
13  and looking at blood level of
14  measurements -- or toenail measurements,
15  excuse me, toenail measurement of
16  chromium, as they're impacting
17  communities environmentally.
18          Also two publications have
19  come out with the lead author, my being a
20  corresponding author with the lead author
21  being from the University of Rochester in
22  the area of inhaled particulate matter
23  and -- during pregnancy and effects on
24  the -- on the offspring and on the fetus.

| Page 177 |
|---|

1      Q.  You are not a medical
2  doctor, correct?
3      A.  I am not a medical doctor,
4  although I did go to medical school for
5  my Ph.D. training.
6      Q.  You can't treat patients,
7  correct?
8      A.  I do not treat patients.
9      Q.  You are not an oncologist,
10  correct?
11      A.  I am not an oncologist.
12      Q.  You have no training in
13  oncology, correct?
14      A.  I have no training in
15  oncology.  I have training in pathology,
16  which is what I got my Ph.D. degree in at
17  a medical school.
18      Q.  You have never diagnosed or
19  treated a disease in a patient, including
20  cancer, correct?
21      A.  That is correct.
22      Q.  You have no expertise in
23  treating patients with ovarian cancer,
24  correct?

45 (Pages 174 to 177)

Judith Zelikoff, Ph.D.

Page 178

1      A.   I have no expertise in that,
2  no.
3      Q.   You have no expertise in
4  diagnosing ovarian cancer, correct?
5      A.   I do not.
6      Q.   You are not an expert on
7  asbestos, correct?
8      A.   I have not been classified
9  as an expert in asbestos, although as I
10  said, I do work in air pollution and if
11  asbestos is in the confines -- taken in
12  the confines of air pollution, I could
13  speak to that.  But I have not been
14  designated as an expert.
15      Q.   What's the difference
16  between amphibole and serpentine forms of
17  asbestos?
18          MS. O'DELL:  Object to form.
19  BY MR. HEGARTY:
20      Q.   You can answer.
21      A.   It depends on whether it's
22  asbestiform or non-asbestiform.
23      Q.   Okay.  Asbestiform.  What's
24  the difference between amphibole and

Page 179

1  serpentine forms?
2      A.   Well it --
3          MS. O'DELL:  Object to the
4      form.
5          THE WITNESS:  Amphibole
6      lists serpentine which is
7      associated with chrysotile.  They
8      all have an aspect ratio of,
9      depending on who you are looking
10      at, whether it's three to one or
11      five to one.  Johnson & Johnson
12      includes it as five to one, which
13      is length-to-width ratio.  They
14      both have the same length-to-width
15      ratio.
16          If they're asbestiform, then
17      they are fibers that are made up
18      of fibrils.  They both have that.
19          And they go in a
20      longitudinal manner and they are
21      in one direction.
22          Amphibole includes within it
23      the crocidolite, and as well as
24      tremolite, amosite, and some of

Page 180

1      those forms can exist both in
2      crystalline form or in a
3      non-asbestiform.
4          So they are both -- both
5      concluded to be asbestos.
6  BY MR. HEGARTY:
7      Q.   Well, are there any
8  differences between --
9      A.   By the EPA.
10      Q.   Are there any differences
11  between amphibole and serpentine forms of
12  asbestos?
13          MS. O'DELL:  Object to form.
14          THE WITNESS:  Well, they are
15      different -- they are different
16      minerals.  But they are both
17      classified as asbestos.
18  BY MR. HEGARTY:
19      Q.   Any other differences?
20      A.   It -- both of which contain
21  carcinogenic -- classified I, as IARC.
22  Both have within them carcinogenic
23  asbestos.  To my knowledge, that is --
24  that is all I --

Page 181

1      Q.   What was the most
2  commercially used asbestos?
3      A.   Well, it -- it depends on
4  the time.  But for commercial use, in
5  paints and housing and insulation, it was
6  either chrysotile was used commercially
7  and crocidolite was also used
8  commercially.
9      Q.   Okay.  How did the supposed
10  toxicities various -- vary across the
11  various forms of asbestos?
12          MS. O'DELL:  Object to the
13      form.
14          THE WITNESS:  When you say
15      toxicity what do you mean?
16  BY MR. HEGARTY:
17      Q.   The -- the toxicities vary
18  across the various forms.
19          MS. O'DELL:  Object to the
20      form.
21          THE WITNESS:  Mm-hmm.  It
22      depends on the chemical
23      composition.  It depends on the
24      surface material.  It depends on

46 (Pages 178 to 181)

Judith Zelikoff, Ph.D.

| Page 182 |
| --- |

1    the amount of iron.  It depends on
2    the size of the fiber or the
3    crystal.
4         And so depending upon those
5    factors you are going to have
6    differences in toxicity.
7    BY MR. HEGARTY:
8         Q.   Well, how does -- does
9    tremolite asbestos compare to chrysotile
10   asbestos in terms of toxicity?
11        A.   I don't really -- I don't
12   think I can answer that in terms of
13   ranking it.  I can tell you that
14   chrysotile is a well-known carcinogen,
15   well-established carcinogen by the
16   agencies.  That tremolite is an amphibole
17   and it can exist in both forms, either
18   asbestiform in the long longitudinal
19   fibriles, or it can exist as a mineral
20   that has dimensions in all different
21   directions.
22        So tremolite -- it's
23   difficult to rank, but chrysotile appears
24   to be -- when you say more toxic, you

| Page 183 |
| --- |

1    have to understand what is the outcome
2    that you're looking at.  They can both
3    cause toxicity.  I don't know what you
4    exactly mean by more toxic.
5         Do you mean at a given
6    dose -- what -- what do you mean by --
7         Q.   I didn't -- I didn't use the
8    word "more toxic."  I just -- I asked you
9    how does tremolite asbestos compare to
10   chrysotile asbestos in terms of toxicity.
11        A.   I think I -- yeah, that's a
12   very difficult question to a
13   toxicologist.  Because when you compare
14   toxicity across -- across lines, you have
15   to somehow rank them based on a
16   particular outcome.
17        So toxicity could be does it
18   produce more lactate dehydrogenase when
19   put in a macrophages culture of -- of
20   pulmonary cells, or does it produce more
21   apoptosis.  You can't just say toxicity
22   in my opinion.  You have to give me an
23   outcome.  Does this produce more toxicity
24   in this area.

| Page 184 |
| --- |

1         Q.   You are not an expert in
2    fragrances, correct?
3              MS. O'DELL:  Object to form.
4              THE WITNESS:  I have -- I
5         have not been listed as an expert
6         in fragrances.
7    BY MR. HEGARTY:
8         Q.   Would you consider yourself
9    an expert in fragrances?
10        A.   I am a toxicologist so I can
11   review chemicals and make a decision or
12   assess their toxicity based on outcomes.
13        Q.   Before being contacted by
14   Ms. Emmel in this case, would you have
15   considered yourself an expert in
16   fragrances?
17              MS. O'DELL:  Objection.
18              THE WITNESS:  Expert in
19        fragrances.  It is not something I
20        studied in my own laboratory.
21              However, a toxicologist
22        should be able to go into the
23        literature and have a greater
24        knowledge than most people in

| Page 185 |
| --- |

1         looking up different chemicals.
2    BY MR. HEGARTY:
3         Q.   You are not an expert on
4    talc, correct?
5              MS. O'DELL:  Object to the
6         form.
7              THE WITNESS:  I have done
8         much work in dust, including the
9         World Trade Center dust.  I've
10        done work on diesel exhaust and
11        other things that are powders.  So
12        particularly talc, I don't think I
13        am classified as a talc expert.
14             But as I said I've done much
15        work in other dusts, other
16        aerosols, vapors, gases,
17        particles, and I am an expert in
18        particles.
19   BY MR. HEGARTY:
20        Q.   You are not a geneticist,
21   correct?
22        A.   I'm -- if a geneticist is
23   someone who has been trained specifically
24   in genetics, I have not been trained in

47 (Pages 182 to 185)

Judith Zelikoff, Ph.D.

Page 186

1  genetics.  I have had courses in
2  molecular toxicology and I do teach some
3  molecular toxicology.
4        Q.   You are not a mineralogist,
5  correct?
6        A.   I am not a mineralogist.
7        Q.   You are not an expert on
8  testing for the presence of asbestos,
9  correct?
10       A.   I am not a chemist.
11       Q.   You are not an expert on
12  testing the air for asbestos, correct?
13       A.   We collect -- I collect
14  particles in the air.  I do air
15  measurements.  That is the basis of my
16  research.
17            When it comes to asbestos,
18  we will send those -- those filters out
19  to be analyzed by an expert laboratory,
20  and then we will help interpret the data.
21       Q.   You are not an industrial
22  hygienist, correct?
23       A.   I work with industrial
24  hygienists, but I do not have a degree in

Page 187

1  it.
2        Q.   You are not an expert on
3  Johnson's Baby Powder, correct?
4            MS. O'DELL:  Objection to
5        form.
6            THE WITNESS:  I am not an
7        expert on -- I -- could you
8        rephrase that?
9  BY MR. HEGARTY:
10       Q.   I don't think I can.
11       A.   I don't know what you mean
12  by expert.  I mean I need to have -- I
13  think I need to have some criteria that
14  would make me an expert.  If you are
15  talking about the number of publications
16  I have or whether I've testified.
17            I -- the word "expert"
18  throws me off a bit.
19       Q.   Well, where is the talc for
20  J&J's Baby Powder been mined over the
21  years?
22       A.   In Vermont, in Italy, and
23  also in Korea.
24       Q.   What are the current

Page 188

1  components by percentage of Johnson's
2  Baby Powder?
3            MS. O'DELL:  Object to the
4        form.  Vague.
5            THE WITNESS:  I cannot --
6        although I have looked at it, I
7        cannot tell you that off the top
8        of my head.  I would have to
9        look -- refresh my memory by
10       looking at an exhibit or a
11       document.
12  BY MR. HEGARTY:
13       Q.   What were the current
14  components of Johnson's Baby Powder by
15  percentage from the 19 -- 1900s through
16  the present?
17       A.   I cannot --
18            MS. O'DELL:  Excuse me.
19       Excuse me.  Object to the form.
20       Vague.
21            THE WITNESS:  I cannot give
22       you percentages off the top of my
23       head.  If you allow me to look at
24       a document I -- I could tell you.

Page 189

1  BY MR. HEGARTY:
2        Q.   Are the opinions in your
3  report specific to particular
4  formulations of talcum powder consumer
5  products?
6            MS. O'DELL:  Object to the
7        form.
8            THE WITNESS:  Are the
9        opinions in your report specific
10       to particular formulations.
11            My opinion is based on
12       biological plausibility based on
13       studies that have used talcum
14       powder or talc or fibrous talc or
15       nonfibrous talc.
16  BY MR. HEGARTY:
17       Q.   Did you analyze specifically
18  the biologic plausibility of the
19  components of Johnson's Baby Powder for
20  purposes of your opinions?
21            MS. O'DELL:  Object to the
22       form.
23            THE WITNESS:  I looked at
24       the individual components that I

48 (Pages 186 to 189)

Judith Zelikoff, Ph.D.

Page 190

1  was aware of.  And looked at their
2  ability to cause inflammation,
3  let's say, or their carcinogenic
4  potential.
5  BY MR. HEGARTY:
6      Q.  But did you look
7  specifically -- did you specifically
8  analyze biologic plausibility specific to
9  J&J's -- strike that.
10        Did you analyze biological
11  plausibility specific to Johnson's Baby
12  Powder in your report?
13      A.  If the literature was there,
14  there was some -- I'm sorry, I can't
15  remember the author now.  But there were
16  authors and investigators that did use
17  Johnson's Baby Powder in their studies,
18  and if they used those studies, and I
19  used that for -- to provide biological
20  plausibility, then yes.
21      Q.  What studies were done
22  specific to Johnson's Baby Powder?
23        MS. O'DELL:  Object to the
24  form.

Page 191

1        THE WITNESS:  Of course all
2      of the product documents.
3        Sorry, I'm having difficulty
4      recalling that -- the particular
5      name.  It's not a memory test.
6      I'm sorry.
7  BY MR. HEGARTY:
8      Q.  With regard to ovarian
9  cancer, what are the subtypes of the
10  disease?
11      A.  Well, as -- as --
12        MS. O'DELL:  Object to the
13      form.
14        THE WITNESS:  -- was pointed
15      out, I'm not an OB/GYN.  I can
16      tell you just from cursory
17      knowledge that there are serous,
18      high grade, low grade serous,
19      endometrioid, mucous cell,
20      epithelioid.
21  BY MR. HEGARTY:
22      Q.  What are the differences in
23  subtypes?
24      A.  Again, this is not in my --

Page 192

1  in the question that I was asked to
2  comment on, but from cursory knowledge
3  there are different cell types.
4      Q.  What's the difference
5  between a low grade and high grade tumor?
6      A.  The induction of
7  invasiveness and proliferation capacity.
8      Q.  What is thought to be the
9  primary origin of high-grade serous
10  ovarian cancer?
11        MS. O'DELL:  Object to the
12      form.
13        THE WITNESS:  Primary
14      origin.  I'm not sure what that
15      means.
16  BY MR. HEGARTY:
17      Q.  Well, what is -- what is
18  typically the primary location or origin
19  of high-grade serous?
20      A.  Do you mean in the ovary?
21      Q.  I don't think I can ask it
22  any different way.
23      A.  Well, I don't quite
24  understand your question.

Page 193

1      Q.  What is the primary origin
2  of clear cell carcinoma?
3        MS. O'DELL:  Object to the
4      form.
5        THE WITNESS:  If you're
6      asking me the types, I don't
7      recall the type of cell for clear
8      cell carcinoma.  Again, I'm not an
9      OB/GYN, and I'm not a histologist.
10  BY MR. HEGARTY:
11      Q.  For purposes of your report,
12  did you analyze biologic plausibility for
13  each subtype of ovarian cancer?
14      A.  No, sir.
15      Q.  Is it your opinion that the
16  etiology of each of the subtypes of
17  ovarian cancer is the same?
18      A.  There are many
19  commonalities.
20        As I said, from my cursory
21  knowledge and my background, early
22  background in 1980, of being a --
23  pathology when this was not even
24  considered or thought about, there is

49 (Pages 190 to 193)

Judith Zelikoff, Ph.D.

Page 194

1   etiologies -- I'm sorry, I had to refresh
2   my memory of your question.
3           There are different
4   etiologies. Many -- and many of the
5   same, and so I think that -- if I may
6   gather my thoughts and refresh your
7   question.
8           So as I said, in terms of my
9   opinion that the etiology in each of the
10  subtypes of ovarian cancer is the same,
11  there are many commonalities in --
12  etiology being the underlying reason.
13  There are many commonalities for the same
14  cancers, including things like cancer
15  stem cells in ovarian cancer, which are
16  now being identified in the literature as
17  a possibility for recurrence of ovarian
18  cancer.
19          So, yes, there are definite
20  commonalities in terms of the induction
21  of ovarian types of cancer.
22      Q.   Well, my question was, is it
23  your opinion that the etiologies of each
24  subtype are the same?

Page 195

1           MS. O'DELL: Objection to
2   form.
3           THE WITNESS: I have --
4           MS. O'DELL: Asked and
5   answered.
6           THE WITNESS: I have no
7   opinion on that.
8   BY MR. HEGARTY:
9       Q.   Is it your opinion --
10          MS. O'DELL: Excuse me.
11          THE WITNESS: Other than
12  what I --
13          MS. O'DELL: Sorry.
14          THE WITNESS: I'm sorry.
15          MS. O'DELL: You may finish.
16  I didn't mean to cut you off.
17          THE WITNESS: Other than
18  what I've just given.
19          MS. O'DELL: So, Mark, we've
20  been going about an hour and ten
21  minutes, I think.
22          MR. HEGARTY: Okay. Take a
23  break.
24          THE VIDEOGRAPHER: Stand by.

Page 196

1           Remove your microphones. The time
2   is 12:22 p.m. Off the record.
3           (Lunch break.)
4           THE VIDEOGRAPHER: We are
5   back on the record. The time is
6   1:17 p.m.
7   BY MR. HEGARTY:
8       Q.   Doctor, we're back on the
9   record. I want to go back to something
10  we talked about at the beginning, that
11  is, the initial call that you had from
12  Ms. Emmel.
13          You mentioned that you
14  reviewed materials between the time of
15  the call and the time that you agreed to
16  serve as an expert witness. Do you
17  recall saying that?
18      A.   I do recall.
19      Q.   What materials did you
20  review?
21      A.   Just random, whatever I got
22  from the -- that came out using keywords
23  of talc, talcum powder, ovarian cancer.
24  Those were my initial keywords.

Page 197

1       Q.   Do you recall, sitting here
2   today, any particular articles, whether
3   by author name or by name of that initial
4   search that you did before agreeing to
5   serve as an expert?
6       A.   I looked at Ghio, G-I --
7   G-H-I-O. Did inhalation of talc and
8   airway cells in in vitro study.
9           I also looked at
10  Dr. De Boers and migration of carbon
11  black material.
12          I also looked at Dr. Venter
13  and Iturralde, who talked about
14  administered radiolabeled microspheres.
15          I read Dr. Weiner's --
16  Weiner's -- Dr. Weiner's publication. I
17  read Dr. Epstein's letter.
18      Q.   Is that something that you
19  found on your own?
20      A.   Excuse me. It wasn't
21  Dr. Epstein's letter. I'm sorry. I
22  stand corrected.
23          I read the National
24  Toxicology Report, the NTP 1993.

50 (Pages 194 to 197)

Judith Zelikoff, Ph.D.

Page 198

1    Q.   Did you do a more expansive
2  literature search and literature review
3  after agreeing to serve as an expert
4  witness?
5    A.   Of course.
6    Q.   Did you form any opinions,
7  though, from that initial search that you
8  performed?
9    A.   My opinion at that time was
10  that there was certainly -- I had a great
11  deal of interest in the topic, that there
12  was certainly enough information and
13  enough evidence to provide -- that was
14  provided by these publications that --
15  certainly that particles of the size of
16  talc can be -- can be translocated,
17  migrated, and that -- at least from the
18  lung, and so that there was biological
19  plausibility for movement within the
20  body.
21      And I found it convincing
22  that I could -- that I could get involved
23  in this case and that I believe that
24  there was, at that point with only

Page 199

1  superficial literature searching, that
2  there was indeed room for an opinion.
3  And that opinion being that there
4  certainly was information provided that
5  could lead me to provide biological
6  plausibility in that regard.  Otherwise,
7  I would not have taken the case.
8      What I would like to say is
9  that I would have done the same thing if
10  you had called me, sir, to answer the
11  question of what my beliefs are and where
12  the science is.
13    Q.   If you look at Page 2 again
14  of your expert report.
15    A.   Yes, sir.
16    Q.   That's Exhibit 2.  Again,
17  under the section mandate --
18    A.   Yes.
19    Q.   -- and methodology.
20    A.   I see it.
21    Q.   You say at the end of the
22  second paragraph that, "Biological
23  plausibility does not mean proof of
24  mechanism, but rather whether what is

Page 200

1  known about the product is consistent
2  with a cause-and-effect relationship."
3      Do you see that where I'm
4  reading?
5    A.   I see where you're reading.
6    Q.   Where does that definition
7  of biological plausibility come from?
8    A.   It is my professional
9  opinion.
10    Q.   Is there still biological
11  plausibility if what is known about a
12  substance and a disease is consistent
13  with no cause-and-effect relationship?
14      MS. O'DELL:  Object to the
15  form.
16      THE WITNESS:  Biological
17  plausibility, to me, as stated
18  here -- and I will state it a
19  different way, is that there is
20  actually literature and
21  information, reliable, sound
22  science that could -- that
23  provides evidence that there is a
24  mechanism or mechanisms as well as

Page 201

1  underlying information that could
2  prove the -- although it's not
3  necessary in Hill's criteria, that
4  could be used to prove a causal
5  relationship.
6      And in this case, that
7  talcum powder, in particular
8  Johnson & Johnson talcum powder,
9  can lead to ovarian cancer.
10  BY MR. HEGARTY:
11    Q.   Well, do you agree that the
12  finding of biologic plausibility by
13  itself does not mean causation?
14    A.   Biological plausibility is
15  used to supplement or to add on.  It is
16  actually one of Hill's criteria.  One
17  that he listed in his 1962 paper that is
18  not absolutely necessary but does provide
19  compelling evidence.  And I do believe
20  that biological plausibility is extremely
21  important, in my personal opinion, in
22  causal relationship.  And Hill agrees to
23  that as well.
24    Q.   You agree, though, that the

51 (Pages 198 to 201)

Judith Zelikoff, Ph.D.

|  | Page 202 |
| --- | --- |

1    other Hill factors should be applied to
2    determine causality, other than -- in
3    addition to biological plausibility?
4         A.    Well, I really can't say.
5    Again, I know -- I know of Hill's work,
6    and I know of his groundbreaking
7    publication.  But again, I'm here to talk
8    about plausibility, not causation.
9         Q.    At the bottom of Page 2 you
10   say as part of your analysis you
11   reviewed, "Depositions and numerous
12   documents, internal memorandum and
13   published and unpublished studies and
14   testing results that I have found in my
15   own searches of documents, documents
16   provided by attorneys, and documents that
17   I requested."  That's carrying over to
18   Page 3.
19         Do you see that?
20         A.    Toxicological studies.  Are
21   we talking about toxicological studies
22   including in vivo and in vitro?
23         Q.    No.  I'm looking at the very
24   last sentence of the paragraph at the

|  | Page 203 |
| --- | --- |

1    bottom of Page 2, carrying over to the
2    top of Page 3.
3         A.    In addition, I've reviewed
4    depositions and numerous documents
5    internal memorandum and published and
6    unpublished studies and testing results
7    that I have found in my own searches.
8         Q.    Correct.  In any scientific
9    analysis that you have done, have you
10   ever included as part of that analysis
11   documents provided by attorneys?
12         A.    In my -- when I publish, I
13   look at all relevant information that I
14   have access to.  It's about the science.
15         Q.    Not my question.  My
16   question is in any prior work that you
17   have done where you have published an
18   article, have you included in the review
19   for purposes of publishing that article,
20   documents provided by lawyers?
21         A.    No, sir, not to my
22   knowledge.
23         Q.    Have you ever included as
24   materials that you have reviewed for any

|  | Page 204 |
| --- | --- |

1    publication of yours, depositions or
2    expert reports in a litigation?
3         A.    No.  However, there are
4    papers and regulatory -- regulatory
5    documents that are not considered
6    published, published.  If you mean
7    peer-reviewed literature, that's one way
8    of publishing.  But another way of
9    publishing is also documents that are in
10   a report.
11         And I have used reports in
12   my own publications, if they -- if they
13   are accessible to me.
14         Q.    Have you ever in a published
15   scientific article of yours cited to an
16   expert report from a doctor in a
17   litigation?
18         A.    I'm sorry.  I have to look
19   down at your question.
20         Not that I recall.  But
21   that's not to say that I would not.
22         If it was appropriate for
23   the paper that I was writing, I would
24   certainly use it.

|  | Page 205 |
| --- | --- |

1         Q.    Can you identify any
2    scientific group -- strike that.
3         Before I ask you about
4    causation, now I want to ask you about
5    biological plausibility.  Can you cite
6    for me any scientific group, body, or
7    even paper that has concluded that there
8    is biological plausibility between
9    perineal talc use and ovarian cancer?
10         A.    Mm-hmm-hmm.  If you look at
11   -- I don't know what exhibit it is.  But
12   it is the Health Canada report.  And --
13   Canadian U.S. EPA.  And if you look at
14   Taher's paper, systemic review and
15   meta-analysis, in both of those -- okay.
16   So the environmental -- Health Canada and
17   Canadian EPA, they put out this -- this
18   document, which is an assessment, a
19   screening assessment document, to look at
20   biological plausibility as well as the
21   other epidemiological literature.
22         And they do speak to the
23   causation and they do speak to biological
24   plausibility of talc and its association

52 (Pages 202 to 205)

Judith Zelikoff, Ph.D.

| Page 206 |
|---|

1  or talc and it's causation for ovarian
2  cancer.  So they do in that document.
3        The systematic review and
4  meta-analysis 2018 of Taher also speaks
5  of it and reviews the 30 -- I think it's
6  30 -- 30 studies, of which there are 26
7  case-controls and -- studies, and I think
8  four cohort studies.  And they do also
9  conclude that, by looking at the
10  meta-analysis, that there are -- that
11  there is causation associated -- that
12  there is causation for talcum powder and
13  ovarian cancer.
14        Q.   Actually, Doctor, both
15  documents to which you reference conclude
16  only that perineal use of talcum powder
17  is a possible cause of ovarian cancer,
18  correct?
19        MS. O'DELL:  Object to the
20        form.
21        THE WITNESS:  They state
22        cause.  And if you give me a
23        moment, I can look for it, within
24        the document.  So I'm looking at

| Page 207 |
|---|

1  the Health Canada document.
2        Meta -- page -- I'm sorry.
3  Roman Numeral III, "Meta-analysis
4  of the available human studies in
5  the peer-reviewed literature
6  indicate a consistent and
7  statistically significant positive
8  association between perineal
9  exposure to talc and ovarian
10  cancer.  Further available data
11  are indicative of causal effect."
12  BY MR. HEGARTY:
13        Q.   Okay.  What is their
14  ultimate conclusion?
15        A.   This is part of their
16  conclusion.
17        Q.   Can I look at that document?
18        A.   Absolutely.
19        MR. TISI:  Is this marked as
20        an exhibit, Mark?
21        MR. HEGARTY:  Yes.
22        MR. FINDEIS:  Sorry, which
23        number is it marked?  So the
24        record is clear.

| Page 208 |
|---|

1        MS. O'DELL:  It's Exhibit 9.
2  BY MR. HEGARTY:
3        Q.   If you would look -- do you
4  have the Taher review?
5        A.   I do.
6        Q.   What's that marked as?
7        A.   That is Exhibit 10.
8        Q.   Exhibit 10?
9        A.   Based on your yellow mark,
10  yes.
11        Q.   If you look at the abstract
12  under the conclusion section, it
13  concludes that perineal use of talcum
14  powder is a possible cause of human
15  ovarian cancer.
16        Do you see that?
17        A.   Excuse me.  I dropped my
18  microphone.
19        Okay.  Please repeat your
20  question.  Your comment.
21        Q.   Second page under the
22  conclusion section.  The conclusion of
23  the Taher article is, "The perineal use
24  of talc powder is a possible cause of

| Page 209 |
|---|

1  human ovarian cancer," correct?
2        MS. O'DELL:  Objection to
3        form.
4        THE WITNESS:  I see that
5        conclusion sentence.
6  BY MR. HEGARTY:
7        Q.   Nowhere in here do they say
8  that talcum powder causes ovarian cancer,
9  correct?
10        MS. O'DELL:  Objection to
11        form.
12        THE WITNESS:  If you're
13        looking for a specific sentence,
14        allow me to review.
15  BY MR. HEGARTY:
16        Q.   Well, are you going to need
17  to review the entirety of the paper?
18        A.   I may.
19        Q.   Okay.  Well, I can't -- we
20  don't have time for you to review the
21  entirety of the paper so I'll withdraw
22  the question.  If you need to review the
23  entirety of the paper.
24        Can you cite here without

53 (Pages 206 to 209)

Judith Zelikoff, Ph.D.

Page 210

1  reviewing it anywhere where they say
2  talcum powder causes ovarian cancer?
3       A.   I cannot --
4            MS. O'DELL:  Excuse me.  And
5       you're referring specifically to
6       Exhibit 10?
7            MR. HEGARTY:  Correct.
8            MS. O'DELL:  The Taher
9       paper?
10            THE WITNESS:  I can't say it
11       without looking at the paper.
12  BY MR. HEGARTY:
13       Q.   Has the Taher paper been
14  peer reviewed?
15       A.   The Taher paper has -- is a
16  document that, yes, has been peer
17  reviewed.  To my knowledge.
18       Q.   Okay.  What publication peer
19  reviewed that document?
20       A.   Excuse me?
21       Q.   Who peer reviewed that
22  document?
23       A.   I have -- I have no
24  knowledge of that.

Page 211

1       Q.   How do you know it's been
2  peer reviewed?
3       A.   The -- the plaintiff lawyers
4  have shown me a document, a cover letter,
5  information, I specifically asked that
6  question of them.
7       Q.   And are you relying on what
8  they provided to you for purposes of
9  saying it's peer reviewed?
10       A.   Please allow me to -- I'm
11  going to take a look into the document
12  again.  There may be evidence that's in
13  the document which says it's peer
14  reviewed.
15       Q.   Doctor, what are you looking
16  at for purposes of peer review?  I asked
17  you --
18       A.   I'm looking to see -- sorry,
19  please finish your question.
20       Q.   I asked you how do you know
21  it's been peer reviewed.
22       A.   And I stated that the
23  plaintiff lawyer -- the plaintiffs'
24  lawyers have shown me a document, a cover

Page 212

1  letter, information.  And I specifically
2  asked that same question.
3       Q.   Now, are you relying on the
4  fact it's been peer reviewed for your
5  opinions in this case?
6       A.   I'm relying on the science.
7       Q.   Well, are you relying on
8  whether -- on what plaintiffs' counsel
9  told you as far as whether it's been peer
10  reviewed?
11            MS. O'DELL:  Object to the
12       form.
13            THE WITNESS:  That is what
14       I'm trying to look, whether there
15       is an acknowledgment and whether
16       there is a statement within it
17       which says it's peer reviewed.
18            It -- it's stated that in
19       order for this -- in order for a
20       document such as this, and again
21       it depends on what you mean by
22       peer review, whether it's a
23       community or whether it's the
24       government.  The government has

Page 213

1       looked at this, and they were
2       submitted by Health Canada, and as
3       of now it's been submitted for
4       peer review, but it was looked at
5       by the Health Canada and by EPA.
6  BY MR. HEGARTY:
7       Q.   What document were you shown
8  that shows it's been peer reviewed?
9       A.   On the first page,
10  Exhibit 10, materials submitted to Health
11  Canada, materials submitted to journal
12  for peer review.
13       Q.   So it's not been peer
14  reviewed?
15       A.   To my knowledge, it has been
16  peer reviewed.  And again I'm relying on
17  plaintiffs' attorney with that
18  information.
19       Q.   Have you ever cited in a
20  scientific article of yours a publication
21  that's not been peer reviewed?
22       A.   All the time.
23       Q.   So that's something that --
24  that you have done as part of your

54 (Pages 210 to 213)

Judith Zelikoff, Ph.D.

|  | Page 214 |
|---|---|

1  methodology?
2      MS. O'DELL: Object to the
3  form.
4      THE WITNESS: It's
5  something -- if there is -- based
6  on my opinion of the study design,
7  the information, the science, if
8  it -- if it needs to be stated, if
9  the science needs to be out there,
10  then I have cited numerous times
11  unpublished information.
12  BY MR. HEGARTY:
13      Q.   Do you understand that for
14  purposes -- that the -- strike that.
15      Do you understand that the
16  Health Canada risk assessment is a --
17  only a draft assessment at this point in
18  time?
19      A.   It is going to be reviewed,
20  yes. I understand that it -- it is a
21  draft assessment. I also understand that
22  it has gone through scrutiny by both
23  Health Canada and Canadian EPA.
24      Q.   Do you understand that

|  | Page 215 |
|---|---|

1  there's a comment period that's going on
2  right now?
3      A.   I understand that, yes.
4      Q.   And that this is not a final
5  statement?
6      A.   Final statement. In any
7  document, any regulatory document that --
8  those that are put out by the National
9  Academy of Science, whatever document
10  you're using, there's always a peer
11  review or comment period.
12      In my opinion, in my
13  professional career, documents do not
14  change that drastically based upon the
15  comments that come in. Based upon
16  National Academy of Science, and the
17  National Toxicology Program. There are
18  usually not -- there are no -- by the
19  time it reaches this point, there are no
20  substantive comments that allow for
21  extensive changes.
22      Q.   Other than the Canadian
23  documents you just cited, can you cite
24  for me any other scientific group, body

|  | Page 216 |
|---|---|

1  or paper that has concluded that there is
2  biologic plausibility between talcum
3  powder use and ovarian cancer?
4      A.   Biological plausibility, in
5  my case, and for my review and for my
6  report, I'm looking at the inflammation
7  as a biological plausibility.
8      There is data going back and
9  scientific reviews and publications going
10  back to the '60s which implicate
11  inflammation as a biological mediator for
12  cancer.
13      Q.   Doctor, listen to my
14  question. My question is very specific
15  to talc and the biologic plausibility
16  between talc and ovarian cancer.
17      Can you cite for me, besides
18  the Canadian documents you cited, any
19  scientific group, body or organization
20  that has concluded that there is biologic
21  plausibility between talcum powder use
22  and ovarian cancer?
23      A.   There is biological
24  plausibility and there is evidence that

|  | Page 217 |
|---|---|

1  in Step 1, that talc causes inflammation.
2  In Step 2, that inflammation is a
3  well-known and well-established factor
4  in -- in cancer.
5      Q.   Doctor, you are not
6  answering my question. Do you want to
7  read my question? My question is very
8  specific.
9      Can you cite for me any
10  scientific body or group or organization,
11  other than what you say the Canadian
12  group or groups did, that has concluded
13  that there is biologic plausibility
14  between talcum powder use and ovarian
15  cancer?
16      MS. O'DELL: Objection.
17      Objection to the question. Asked
18      and answered.
19      THE WITNESS: I stand by my
20      answer. That, again, talc can
21      cause inflammation. It's well
22      known. And inflammation is an
23      underpinning for cancer.
24  BY MR. HEGARTY:

55 (Pages 214 to 217)

Judith Zelikoff, Ph.D.

Page 218

1    Q.   Okay.  Cite for me any
2  scientific group, body or organization
3  who has said that.
4    A.   That is throughout
5  literature.  If you go back to 1960 and
6  talk about the Vertel and the role of
7  inflammation in cancer, and numerous
8  other publications since that, if you
9  look at -- talc is used to induce
10  pleurodesis because of its inflammatory
11  responsiveness.
12    Q.   Doctor, you still are not
13  answering my question.  My question is
14  name a scientific body, organization or
15  group who has concluded, as you have
16  done, or you say you do in your paper,
17  that there is biologic plausibility
18  between talc and ovarian cancer.
19        MS. O'DELL:  Objection to
20    the form.
21        THE WITNESS:  I gave you --
22  BY MR. HEGARTY:
23    Q.   Cite for me the groups.
24        MS. O'DELL:  Excuse me.  Let

Page 219

1    me -- objection to form.  Asked
2    and answered.  The doctor has
3    answered your question.  You may
4    not like the answer, but she's
5    answered it.
6  BY MR. HEGARTY:
7    Q.   Cite for me the groups by
8  name.
9        MS. O'DELL:  Objection to
10    form.
11        THE WITNESS:  Ask the
12    question again?
13  BY MR. HEGARTY:
14    Q.   Cite for me any name of any
15  group that has reached the same opinion
16  as you?
17    A.   Besides the Health Canada?
18    Q.   Correct.
19    A.   There are -- I -- you're
20  asking for something that is not -- I'm
21  answering the question by telling you
22  that you have talc which is an
23  inflamagogue, and you have talc and its
24  relationship with cancer.  And that is a

Page 220

1  biological mechanism that everyone
2  including the National Toxicology, the
3  IARC, the National Academy of Science,
4  EPA, all recognize.
5    Q.   Cite for me any group.
6  Again, you are not answering my question.
7        My answer --
8    A.   Okay.
9    Q.   -- my question is other than
10  the Canadian groups you've cited, cite
11  for me any group by name who has reached
12  the same opinion as you about biologic
13  plausibility.
14        MS. O'DELL:  Objection to
15    form.  Other than those she just
16    listed in her last answer?
17        MR. HEGARTY:  Well, she
18    didn't list any.  I think the
19    record shows that.
20        MS. O'DELL:  Yes, she did.
21        MR. HEGARTY:  Which ones did
22    she list?
23        MS. O'DELL:  NTP.  IARC.
24        MR. HEGARTY:  Okay.  Are you

Page 221

1  going on the record to say NTP has
2  concluded that talcum powder use
3  is a biologic
4  plausibility/plausible cause of
5  ovarian cancer?
6        THE WITNESS:  We're not --
7        MS. O'DELL:  She was talking
8    about inflammation and cancer, as
9    you well know.
10        MR. HEGARTY:  Right, which
11    is why she's not answering my
12    question.
13        MS. O'DELL:  No, no.  Your
14    question was not in relation to
15    specific talc and biologic
16    plausibility.
17        So the doctor has answered
18    your question.
19        MR. HEGARTY:  I think the
20    record will reflect otherwise.
21  BY MR. HEGARTY:
22    Q.   Doctor, listen to my
23  question --
24        MS. O'DELL:  No, it will

56 (Pages 218 to 221)

Judith Zelikoff, Ph.D.

Page 222

1      not.
2    BY MR. HEGARTY:
3        Q.   Listen to my question.
4           Can you cite for me any
5    group besides the Canadian group who has
6    concluded that there is biologic
7    plausibility, who has made a statement
8    that there is biologic plausibility
9    between talcum powder use and ovarian
10   cancer?
11       A.   I'm telling -- as I said
12   before, you're leaving out the word
13   "inflammation."
14       Q.   Doctor, you -- you need to
15   answer the question I ask.
16       A.   I -- I --
17       Q.   Your counsel can come back
18   and ask you that question.  I under -- I
19   want to know the name of any organization
20   by name who has concluded that there is
21   biologic plausibility between perineal
22   use of talc and ovarian cancer.
23       A.   Anyone --
24           MS. O'DELL:  Other than the

Page 223

1       ones she -- she's listed.
2           THE WITNESS:  Anyone that
3       you say -- any -- I'll do it
4       again.  National Toxicology
5       Program.  IARC.  Institute of
6       Medicine.
7           They may not say the
8       sentence you are -- you are
9       implying or you're stating.  But
10      they all show that talc has --
11      produces inflammation.
12          I don't think that the -- I
13      think that's a very common
14      knowledge that talc or talcum
15      powder products does produce
16      inflammation.
17   BY MR. HEGARTY:
18       Q.   Doctor, where have you ever
19   published a methodology for determining
20   whether there is biologic plausibility
21   between an exposure and a disease?
22       A.   Almost every paper that I
23   have in my CV talks about the biological
24   plausibility for the observations that

Page 224

1    I've shown, whether it's in air pollution
2    or whether it's in tobacco products or
3    nicotine products or World Trade Center
4    dust or metal inhalation or nanoparticle
5    inhalation.  They all give biological
6    plausibility statements for the
7    observations that have been found in my
8    laboratory.
9        Q.   Where have you ever
10   published step-by-step methodology for
11   how you go about determining whether
12   there is biological plausibility between
13   a substance and a disease?
14       A.   I use my professional
15   judgment.
16       Q.   Have you ever published that
17   professional judgment?
18          MS. O'DELL:  Objection to
19      form.
20          THE WITNESS:  I don't think
21      that would be publishable
22      material.
23   BY MR. HEGARTY:
24       Q.   In the end, Doctor, your

Page 225

1    report is your subjective take on the
2    studies, correct?
3           MS. O'DELL:  Objection to
4       form.
5    BY MR. HEGARTY:
6        Q.   I mean, you don't speak for
7    any scientific group, do you?
8        A.   I'm an expert toxicologist,
9    recognized clearly by the Society of
10   Toxicology as an expert in my field.
11   And -- I'm sorry.  I --
12       Q.   Well, is your report
13   speaking for the society --
14          MS. O'DELL:  Excuse me.
15   BY MR. HEGARTY:
16       Q.   Is your report speaking for
17   the Society of Toxicology?
18          MS. O'DELL:  She wasn't
19      finished.
20          THE WITNESS:  I wasn't.  I
21      was --
22          MS. O'DELL:  She wasn't
23      finished.  Please let the witness
24      finish.

57 (Pages 222 to 225)

Judith Zelikoff, Ph.D.

Page 226

1         MR. HEGARTY:  I'll withdraw
2     the question.
3   BY MR. HEGARTY:
4       Q.   Doctor, do you speak for the
5   Society of Toxicology for purposes of
6   your opinions in your report?
7       A.   No.
8       Q.   Do you speak for any
9   society, any toxicology society --
10  society for purposes of your opinions?
11      A.   You didn't let me finish my
12  answer.
13          I do not speak for the
14  society of toxicology.  But I am a
15  recognized toxicology expert, recognized
16  by the Society of Toxicology as an
17  expert.  And I have written this report
18  based upon literature, scientific
19  evidence, and my professional judgment.
20      Q.   What society has recognized
21  you as an expert in talc and ovarian
22  cancer?
23      A.   I'm recognized as expert in
24  toxicology.

Page 227

1       Q.   What society has --
2       A.   Society of Toxicology.
3       Q.   Has the Society of
4   Toxicology recognized you as an expert in
5   talc and ovarian cancer?
6          MS. O'DELL:  Objection to
7       form.
8          THE WITNESS:  I was
9       recognized as an expert in tox and
10      ovarian cancer and talc by the
11      very basis that I'm sitting here.
12  BY MR. HEGARTY:
13      Q.   You don't speak for your
14  university, do you?
15      A.   No one -- no one speaks
16  directly for the university.  But what we
17  say, we understand our paychecks come
18  from the university, and we follow within
19  the university and the medical school
20  guidelines.
21      Q.   Are your opinions in this
22  case the opinions of New York University?
23      A.   This is my --
24          MS. O'DELL:  Objection to

Page 228

1       form.
2          You can answer.
3          THE WITNESS:  This is my
4   opinion based upon my systematic
5   review of all the scientific
6   literature.  And they -- by the
7   nature of hiring me, they have
8   approved of my -- my opinions.
9   Maybe not specifically in this
10  case, but they would not have
11  hired me or kept me for 35 years
12  if they did not agree that I was a
13  well-known established
14  toxicologist whose opinions are
15  based in my professional judgment.
16  BY MR. HEGARTY:
17      Q.   Did you tell the university,
18  New York University, of your opinions in
19  this case?
20      A.   I did not.
21      Q.   Have you told them that
22  you're an expert witness for plaintiffs
23  in this litigation?
24      A.   I have, yes.

Page 229

1       Q.   Have you reported, in your
2   financial disclosure, the money that
3   you've made in this litigation?
4       A.   Up until -- we are asked
5   that question -- we have to fill out
6   reports on transparency and conflicts of
7   interest.  And I think the last time I
8   did it was in November of 2018.  And I
9   reported up to that time, yes.  We are
10  required to do that and, yes, I am
11  completely transparent.
12          So any money that I've made
13  since November, or since the filing of
14  the confidentiality agreement has not
15  been reported but will be coming in March
16  or April.
17      Q.   You don't speak for any
18  journal for the purpose of your report,
19  do you?
20      A.   For purposes of this report
21  I do not speak for journals.  But I do
22  speak for journals because I'm an editor,
23  I'm an associate editor and on the
24  editorial boards for numerous

58 (Pages 226 to 229)

Judith Zelikoff, Ph.D.

| Page 230 |
|---|

1    environmental health and toxicology
2    journals.
3        Q.    At the top of Page 3 of your
4    report, you say in the first full
5    paragraph that you considered the studies
6    that did not find an increased risk of
7    ovarian cancer with talc use.
8            Do you see that?
9            MS. O'DELL:  What page are
10   you on?  I'm sorry.
11   BY MR. HEGARTY:
12       Q.    Page 3.
13       A.    I'm sorry.  I know we're on
14   Page 3.
15       Q.    The first full paragraph.
16       A.    My opinions below?
17       Q.    The first full paragraph.
18       A.    My opinions below.  "My
19   opinions below" --
20       Q.    At the very -- at the very
21   end, you say you considered those studies
22   that did not find an increased risk.
23            Do you see that?
24       A.    I'm reading it.

| Page 231 |
|---|

1            Yes, okay.  You were reading
2    in the middle of the sentence.  "To my
3    knowledge, I considered and evaluated the
4    majority of all available relevant
5    studies in the process of evaluating the
6    literature, including those that reported
7    an elevated risk of ovarian cancer with
8    exposure to talc and those where other
9    chemicals were reported within talc-based
10   body powders, including those that did
11   not find an increased risk."  Yes.
12       Q.    You did not cite a single
13   paper in your report that did not find an
14   increased risk of ovarian cancer with
15   talc use, did you?
16            MS. O'DELL:  Objection to
17       form.
18            THE WITNESS:  There were --
19       in reading over the meta-analysis
20       of -- I'm sorry, I'm probably
21       going to get his name wrong --
22       Penninkilampi.
23            In reading over the
24       meta-analysis of several -- from

| Page 232 |
|---|

1            several, there are case-control
2        studies as well as cohort studies
3        which showed negative
4        associations.
5    BY MR. HEGARTY:
6        Q.    You did not cite any of
7    those in your report, though, did you?
8        A.    No.  What I said -- I'm
9    sorry.  Let me try and make it clear.
10           Yes, those meta-analyses
11   were included in the report or -- I need
12   to find the names.  Systematic review
13   that I cited was
14   P-E-N-N-I-N-K-I-L-A-M-P-I 2018.  And that
15   was a meta-analysis which reviewed the
16   epidemiological case-control and cohort
17   studies which showed that there were
18   studies that had negative associations.
19       Q.    Is that the only reference
20   that you included in your report, to
21   studies that did not find an increased
22   risk of ovarian cancer with talc use?
23            MS. O'DELL:  Object to the
24       form.

| Page 233 |
|---|

1            THE WITNESS:  No.  No.
2            MS. O'DELL:  Excuse me.
3        Object to the form.
4            THE WITNESS:  No.  Under the
5        animal models on Page 13, there
6        were -- with rats that were
7        exposed by the peritoneum --
8        perineum, sorry, to either talc or
9        no treatment.  And while they did
10       find inflammatory response --
11       again, going back to my biological
12       plausibility -- they did not find
13       neoplasms.
14   BY MR. HEGARTY:
15       Q.    So that would be an example
16   of a study that did not show an increased
17   risk of ovarian cancer with talc use,
18   correct?
19       A.    That is --
20            MS. O'DELL:  Object to the
21       form.
22            Go ahead.
23   BY MR. HEGARTY:
24       Q.    Is that correct?

59 (Pages 230 to 233)

Judith Zelikoff, Ph.D.

| Page 234 | Page 236 |
|---|---|

Page 234

1    A.   Sorry.  Repeat the question.
2  Repeat the question, please.
3    Q.   Sure.  So that is an example
4  of a study that, in your opinion, does
5  not show an increased risk of ovarian
6  cancer with talc use?
7    MS. O'DELL:  Objection to
8  form.  Go ahead.  Sorry.
9    THE WITNESS:  Sorry.
10    This is a study which shows
11    biological plausibility by showing
12    that there is a foreign body
13    reaction and inflammatory
14    response.  However, it does not
15    show that there was any change in
16    neoplasm -- or any induction of
17    neoplasms or cancer.
18  BY MR. HEGARTY:
19    Q.   Did you read any cell study
20  that showed that talc is not cytotoxic?
21    A.   Can you please explain what
22  you mean by cytotoxic?  I want to answer
23  the question as you understand it.
24    Q.   What is your definition of

Page 236

1  showing that talc was not toxic to cells?
2    A.   I read comparison studies.
3  Let me please find that, the exact names.
4    Q.   Let me withdraw the
5  question.  Doctor, in your opinion is
6  talc mutagenic?
7    A.   How do you define
8  "mutagenic"?
9    Q.   Doctor, what's your --
10  mutagenic is mutation to genes.  Does
11  talc mutate genes?
12    A.   Talc leads to changes in
13  gene expression which can be inferred as
14  a mutation.  However, when you talk about
15  mutation, you have many different
16  mechanisms of mutation.  Mutation can
17  occur as a result of a genotoxic or
18  direct impact on DNA, or it can occur as
19  a result of changes in the epigenome,
20  which leads to changes in expression of
21  the gene.
22    Q.   Does talc directly mutate
23  genes?
24    A.   Talc has been shown to

| Page 235 | Page 237 |
|---|---|

Page 235

1  cytotoxicity?
2    A.   I'd like to answer the
3  question that you're asking me.
4    Q.   I'm asking you your
5  definition.  The way a deposition works
6  is I ask you questions.  You don't ask me
7  questions.
8    MS. O'DELL:  Don't be -- be
9  courteous to the witness, please.
10    MR. HEGARTY:  I am.
11    THE WITNESS:  I appreciate
12    that.  I just want to, as a
13    toxicologist, the word
14    "cytotoxicity" carries many
15    meanings.
16  BY MR. HEGARTY:
17    Q.   What is your definition --
18  basic definition of cytotoxicity?
19    A.   There are many meanings.
20  Cytotoxicity taken literally meaning
21  toxicity to a cell.  Cyto, cell;
22  toxicity, toxic.  However, toxicity can
23  be measured by numerous endpoints.
24    Q.   Did you read any studies

Page 237

1  cause -- to cause changes in particular
2  enzymes in the gene expression.  So a
3  mutation -- yes, it has been -- it has
4  been shown for mutation.  But I just
5  need -- I need the attorneys to
6  understand that there are many ways to
7  mutate a cell, not only can you do it by
8  chemical agent, but you can also -- it
9  occurs with aging.
10    So you do not need -- I'm
11  sorry.  You do not need genotoxicity to
12  produce mutagenesis.
13    Now, if you look at many
14  different assays such as the Ames assay
15  which uses bacteria to assess
16  mutagenicity, you are not going to see
17  that as a possibility for talc because
18  the bacteria cannot engulf the particle
19  and the particle needs to be ingested in
20  order to show mutagenesis.
21    Q.   Doctor, on Page 4 above your
22  section "fibrous talc" --
23    A.   I see it.
24    Q.   -- you refer to particle

60 (Pages 234 to 237)

Judith Zelikoff, Ph.D.

| | |
|---|---|
| Page 238 | Page 240 |

**Page 238**

1  size for talc.
2      A.   That's correct.
3      Q.   Is knowing particle size
4  part of your methodology for your
5  opinions in your report?
6      A.   I'm sorry.  I don't
7  understand what you mean by was it part
8  of my methodology.
9      Q.   Well, what is the threshold
10  size of a talc particle to establish
11  biologic plausibility?
12          MS. O'DELL:  Object to form.
13          THE WITNESS:  I don't think
14      you can answer that question.
15          In -- let me say this.
16          In doing my methodology and
17      accumulating literature, I -- as I
18      said, I binned or siloed
19      individual things.
20          And one of the silos and one
21      of the categories that I -- that I
22      wanted to read was size.  Size
23      makes a very big difference in
24      particles, and for example, if the

**Page 239**

1      particle is greater than
2      10 microns it's going to be what
3      we call inhalable as opposed to
4      respirable.  So where a particle
5      can go in terms of, and now I'm
6      using the lung as an example,
7      where the particle can go will
8      depend upon its size and how long
9      it will remain in a tissue.
10          So in my bins, in my silos
11      were -- certainly size was a
12      parameter.
13  BY MR. HEGARTY:
14      Q.   And what is the threshold
15  size of a talc particle to establish
16  biologic plausibility between talc and
17  ovarian cancer?
18          MS. O'DELL:  Objection to
19      the form.
20  BY MR. HEGARTY:
21      Q.   What size must the particle
22  be?
23          MS. O'DELL:  Objection to
24      form.

**Page 240**

1          THE WITNESS:  Establishing
2      my biological plausibility was --
3      was travel -- is traveling through
4      migration and the ability for a --
5      for the powder to migrate or the
6      constituents to migrate.  And --
7      and also the ability to be
8      inflammatory.
9  BY MR. HEGARTY:
10      Q.   Well, what size -- what size
11  of particle -- what size must the
12  particle be to cause inflammation that
13  leads to ovarian cancer?
14      A.   Particles of any --
15          MS. O'DELL:  Objection to
16      form.  You may go.
17          THE WITNESS:  Particles of
18      any size can cause inflammation.
19  BY MR. HEGARTY:
20      Q.   What about talc particles,
21  what size of talc particle must there be
22  to cause inflammation?
23      A.   Talc particles of any size
24  can cause inflammation.

**Page 241**

1      Q.   And is there --
2      A.   However, there are
3  differences, from reading the literature,
4  that indicates that the smaller the
5  particle the greater the inflammation.
6          And that's universally
7  known.
8      Q.   Was part of your analysis,
9  did you -- did that involve investigating
10  biologic plausibility as it relates to
11  particle size?
12      A.   That was -- that was part of
13  my reading and part of my -- my thought
14  process, my gathering of information,
15  yes.
16      Q.   And is there a certain size
17  of particle necessary to establish
18  biologic plausibility under your opinion?
19          MS. O'DELL:  Objection.
20      Asked and answered.
21          THE WITNESS:  Well, I do
22      think I answered that question.
23      But again there's really --
24      apart -- it is not just particle

61 (Pages 238 to 241)

Judith Zelikoff, Ph.D.

Page 242

1    size which is important in
2    producing an inflammation.  It is
3    many parameters.  And so there was
4    no one size or one cutoff that
5    induces inflammation or does not.
6    It's chemical composition, it's
7    shape of the particle, it's
8    bioavailability of the particle.
9    BY MR. HEGARTY:
10       Q.   Can you cite for me the --
11   the particle size for Johnson's Baby
12   Powder over the last 120 years?
13       MS. O'DELL:  Objection to
14   form.
15       THE WITNESS:  I'm not sure I
16   can cite it over the last
17   120 years.  But I can tell you
18   from the information in the
19   documents that I -- that I
20   reviewed, that particle size goes
21   from above 50 microns,
22   micrometers, microns, down to
23   0.3 micron with an average size of
24   10.5 to 11.5 depending on the

Page 243

1    document that you read.  So an
2    average or median size.
3    BY MR. HEGARTY:
4        Q.   So did you -- did you do
5    analysis for biologic plausibility
6    purposes of every size of talc particle?
7        MS. O'DELL:  Objection.
8    Asked and answered.
9        THE WITNESS:  Did I do
10   analysis -- I -- no, as I said, I
11   gave you the size of the -- of the
12   talcum that was reviewed, that I
13   reviewed within the documents.
14   BY MR. HEGARTY:
15       Q.   You, on -- on page -- strike
16   that.
17       Under the section Fibrous
18   Talc, you say that -- is it your
19   testimony that -- strike that.
20       Is it your opinion that
21   asbestiform talc is also called fibrous
22   talc?
23       A.   Talc and asbestos are -- are
24   different minerals.

Page 244

1        Q.   Well, fibrous talc is only
2    talc that grows in an -- in an
3    asbestiform habit, correct?
4        A.   Fibrous talc refers to the
5    shape and the longitudinal direction of
6    the fibers.  That's what fibrous talc is,
7    and asbestiform refers to the same
8    longitudinal pattern of the particular
9    fibrils and -- to form a bundle or to
10   form a fiber.
11       Q.   So you don't agree that
12   fibrous talc is only talc that grows in
13   an asbestiform habit?
14       MS. O'DELL:  Objection to
15   form.
16       THE WITNESS:  Fibrous talc
17   by its very nature is saying that
18   it grows in an asbestiform-like
19   phenotype or asbestiform-like
20   morphology.  That's the nature of
21   asbestiform.
22       Asbestiform is a form.
23   BY MR. HEGARTY:
24       Q.   You state in the middle

Page 245

1    paragraph, in that section, that talc in
2    its fibrous form has been classified by
3    IARC as Group I, a known carcinogen.
4    That's not correct, is it?
5        MS. O'DELL:  Objection to
6    form.
7        THE WITNESS:  I'm sorry,
8    could you say again?
9    BY MR. HEGARTY:
10       Q.   Well, you agree that only
11   talc containing asbestiform fibers has
12   been classified as Group I by IARC,
13   correct?
14       A.   Are you referring to in 2010
15   IARC expanded or -- I'm sorry, in its
16   fibrous form, talc has been classified as
17   a Group I known carcinogen?
18       Q.   Correct.
19       A.   Asbestiform fibers have been
20   listed by IARC as a carcinogen.
21       Q.   A talc containing
22   asbestiform fibers is the only form of
23   talc that's been designated as a class --
24   as a Category I carcinogen by IARC,

62 (Pages 242 to 245)

Judith Zelikoff, Ph.D.

Page 246

1  correct?
2       A.   It's not the only one that's
3  been associated with it, but for the
4  purpose of my report that I put down,
5  it's the asbestiform that has been
6  classified by the IARC.
7       Q.   Well, it's talc containing
8  asbestiform fibers, correct?
9           MS. O'DELL:  Objection to
10  form.
11          THE WITNESS:  It's -- it's
12  fibrous talc.
13  BY MR. HEGARTY:
14       Q.   Is that -- that's your --
15  your -- it's your opinion that IARC's
16  designation in 2012 is of asbestiform
17  talc?
18       A.   Their designations is
19  form -- is talc fibers, which are
20  asbestiform in nature.
21       Q.   Do you cite to any published
22  data in the medical literature that
23  asbestiform talc has been found in
24  Johnson's Baby Powder?

Page 247

1       A.   I'm sorry.
2           You cite -- do you cite to
3  any published data in the medical
4  literature that asbestiform talc...
5           The documents, the published
6  documents within Johnson & Johnson and
7  the Longo report, Longo's 2017, as well
8  as 2018 supplement from December, shows
9  asbestiform fibers.
10       Q.   My question though is can
11  you cite any data published in the
12  medical literature that has found
13  asbestiform talc in Johnson's Baby
14  Powder?
15       A.   I thought I just did in
16  terms of the Longo report.
17       Q.   Is the Longo report
18  published in the medical literature?
19       A.   It's -- I'm not sure whether
20  it's accessible in the medical -- medical
21  literature at this point.  But I'm sure
22  it could be gathered.
23       Q.   My -- my question is solely
24  as to the published medical literature.

Page 248

1  Can you cite for me any published medical
2  literature finding asbestiform talc in
3  Johnson's Baby Powder?
4       A.   Page 6 of my report speaks
5  of the Crowley report, and that the fiber
6  content ranged from 8 percent to
7  30 percent.  And that Pooley and Rohl
8  analyzed 27 talc powders and detected
9  tremolite fibers in three samples.
10       Q.   Is it your testimony that
11  Crowley -- Crowley's article refers to
12  Johnson's Baby Powder?
13       A.   I would have to see the
14  article.
15       Q.   How about Pooley and Rohl,
16  do they refer to Johnson's Baby Powder?
17       A.   I would have to see the
18  article.
19       Q.   In the end, for purposes of
20  your opinion as to asbestos and talc,
21  you're relying on the report of Longo and
22  Rigler, correct?
23          MS. O'DELL:  Objection to
24  form.

Page 249

1           THE WITNESS:  No, I rely on
2  the scientific literature, not on
3  any one paper.  I used weight of
4  evidence to come to my opinion.
5  BY MR. HEGARTY:
6       Q.   Did you include in your
7  weighing of evidence the expert reports
8  of Longo and Rigler?
9       A.   I read the Longo supplement
10  2018 after I wrote the report.
11       Q.   For purposes -- for purposes
12  of the opinions again in this case, do
13  you rely in any way on the Longo and
14  Rigler reports?
15          MS. O'DELL:  Objection to
16  form.
17          THE WITNESS:  I'm not sure I
18  understand your question.  As I
19  said, I wrote the report on
20  November 16th.  I read the Longo
21  supplement report in -- about two
22  weeks ago.
23  BY MR. HEGARTY:
24       Q.   But you cite in your report

63 (Pages 246 to 249)

Judith Zelikoff, Ph.D.

Page 250

1   the -- the MDL report of Longo and
2   Rigler, correct?
3       A.   What page is that please?
4       Q.   At the end of Exhibit B.
5       A.   I -- okay.
6            Excuse me.  I referred to
7   Longo on page -- there is no page.
8   Sorry.
9            The cosmetic talc in the
10  Lancet and cosmetic talc in -- and
11  ovarian cancer in the Lancet.  Those are
12  very early papers which I -- which I
13  reviewed.  Those papers were considered.
14  The latest papers from Longo were not
15  considered in my report.
16      Q.   Are you talking about the
17  latest --
18      A.   2017, 2018.  They were not
19  read until after the report was
20  finalized.
21      Q.   Do you know Longo and
22  Rigler?
23      A.   Not at all.
24           THE VIDEOGRAPHER:  Doctor,

Page 251

1   can you raise your microphone up?
2            THE WITNESS:  Oh, sure.
3   BY MR. HEGARTY:
4       Q.   Did you do anything to
5   assess their expertise in this area?
6       A.   I -- I --
7            MS. O'DELL:  Are you
8   referring to Dr. Longo and
9   Dr. Rigler?
10           MR. HEGARTY:  Yes.
11           THE WITNESS:  I read the --
12  the bio sketch, a brief, very
13  brief bio sketch of Ray Longo.
14  And I looked up his credentials in
15  terms of how long he's been in
16  the -- this company, how he
17  started this company or at least
18  was president of this company for
19  a short period of time.
20           From what I know of my own
21  work in the laboratory and working
22  with other chemists and technical
23  instrumentation people in the
24  laboratory, I -- the XRD that they

Page 252

1            use, the polarized light
2   microscopy and the TEM all seem to
3   be the way he describes it.  His
4   methodologies were spot on in
5   terms of what other people do.
6   BY MR. HEGARTY:
7       Q.   Are you an expert in XRD?
8       A.   As I stated, I worked with
9   people who used the instrumentation.  An
10  expert, again, I'm not sure what you mean
11  by expert.  Have I done XRD on my own,
12  no.  But in our department we have
13  numerous people who -- who use that
14  instrumentation.
15      Q.   Are you an expert in TEM?
16      A.   I have done TEM for my Ph.D.
17  thesis.
18      Q.   Have you do TEM -- have you
19  ever done TEM to detect asbestos?
20      A.   I have not done TEM to
21  detect asbestos.  But I looked at his
22  methodologies, his study design, and the
23  instruments that he used.  And they are
24  state of the art.

Page 253

1       Q.   Have you ever performed the
2   test that he describes in his articles or
3   reports?
4       A.   I have used polarized light
5   microscopy.
6       Q.   That's not my question.  My
7   question is have you performed the same
8   tests in your lab or in any -- in your
9   experience that he has performed and
10  reported on in his reports?
11      A.   Personally, no.
12      Q.   Starting on Page 5, you talk
13  about asbestos.
14      A.   Page 5 of what?
15      Q.   Of your report.
16      A.   Thank you.
17      Q.   Is it your opinion that any
18  amount of exposure to asbestos, even to a
19  single fiber, can cause disease?
20      A.   From the scientific
21  literature it is -- it appears -- it
22  appears pretty conclusive that there is
23  no threshold for the amount of
24  asbestiform asbestos that is needed to at

64 (Pages 250 to 253)

Judith Zelikoff, Ph.D.

Page 254

1    least start a disease process.
2        Q.    Before being contacted by
3    counsel for plaintiffs in this case, had
4    you read any literature concerning
5    asbestos and ovarian cancer?
6        A.    I have not read literature
7    prior to that on asbestos and ovarian
8    cancer.  However, I am familiar with, as
9    I said, other particles, other dusts,
10   other fibers that I have worked with in
11   the laboratory.
12       Q.    Had you even heard of a link
13   between asbestos and ovarian cancer
14   before being contacted by plaintiffs'
15   counsel?
16       A.    Yes.
17       Q.    Where did you hear that
18   from?
19       A.    Discussed it with my
20   colleagues.  As I said, I've listened to
21   the media on discussing it.  And my
22   colleagues are a very good source,
23   although they do not do this work in
24   their laboratory, we all try to keep up

Page 255

1    with the latest emerging scientific
2    debates.
3        Q.    What is the minimum number
4    of asbestos fibers necessary to cause
5    ovarian cancer?
6        A.    Can -- do you mean -- I said
7    that there is really no threshold.  And
8    it can be one fiber.  It depends on the
9    individual and the susceptibilities and
10   the vulnerabilities of that particular
11   individual.
12       Q.    So it's your opinion that
13   one fiber of asbestos can cause ovarian
14   cancer?
15       A.    Under certain conditions,
16   yes, it is my opinion.
17       Q.    Can you cite for me any
18   authority for that opinion specific to
19   one fiber?
20           MS. O'DELL:  Object to form.
21   BY MR. HEGARTY:
22       Q.    And ovarian cancer.
23           MS. O'DELL:  Object to the
24       form.

Page 256

1            THE WITNESS:  I don't think
2    that's -- I don't think that's --
3    I don't personally think that's
4    the question.
5            The question is, asbestos is
6    well classified, well known as a
7    Class 1 carcinogen by IARC.  And
8    one fiber has the potential to
9    initiate the biological processes
10   or provides biological
11   plausibility that there, in fact,
12   by producing inflammation and
13   producing reactive oxygen
14   intermediates, one fiber can start
15   the process for ovarian cancer.
16           And again, let me just
17   repeat that my mission, my
18   question that was asked, was to
19   provide biological plausibility
20   for talc, not to define causation
21   as an epidemiologist.
22   BY MR. HEGARTY:
23       Q.    So it's your opinion that a
24   single fiber of asbestos in talc can

Page 257

1    establish biological plausibility between
2    talc and ovarian cancer?
3        A.    My --
4            MS. O'DELL:  Object to the
5        form.
6            THE WITNESS:  My opinion is
7        that a single fiber can induce
8        inflammation and reactive oxygen
9        species and can change the cell
10       into a pro-oxidant cell that
11       starts the process for ovarian
12       cancer.
13   BY MR. HEGARTY:
14       Q.    Do you agree that there are
15   background rates of asbestos in certain
16   areas?
17       A.    Do you mean in the air?
18       Q.    In the air?
19       A.    In the air, it depends on
20   that area.  If that's an area where
21   there's mining or there's a house being
22   redone from the 1970s or 19 -- early '80s
23   that might have used asbestos, then there
24   will be asbestos in the air.  But not

65 (Pages 254 to 257)

Judith Zelikoff, Ph.D.

| | Page 258 | | Page 260 |
|---|---|---|---|

**Page 258**

1 sitting in this room, unless there is
2 asbestos in the walls, which I doubt
3 because it was only built about ten years
4 ago.
5     Q.   Do the background rates of
6 asbestos in certain areas cause ovarian
7 cancer?
8     A.   Asbestos has been shown to
9 cause ovarian cancer by inhalation, yes.
10     Q.   Is it your opinion that
11 background rates of asbestos in the air
12 can cause ovarian cancer?
13     MS. O'DELL:  Object to the
14     form.
15     THE WITNESS:  I don't --
16     again, background rates, it has
17     been shown that workers that are
18     in places where asbestos is made
19     have a higher incidence of lung
20     cancer as shown by Dr. Selikoff
21     many, many years ago.
22 BY MR. HEGARTY:
23     Q.   Doctor, you know what a
24 background rate of -- background level of

**Page 259**

1 a particle in air is, right?
2     A.   Yes, sir, I do.
3     Q.   Okay.  And is it your
4 opinion that background levels of
5 asbestos in the air can cause ovarian
6 cancer?
7     MS. O'DELL:  Objection to
8     form.
9     THE WITNESS:  As I said,
10     sitting in this room, there should
11     not be any background level of
12     asbestos.  So if you're talking
13     about background level in a
14     particular institute or industry
15     where they're developing it, those
16     levels are quite high, and yes, I
17     do believe that those levels
18     within a working environment can
19     indeed cause inflammation that can
20     lead to causation.
21 BY MR. HEGARTY:
22     Q.   There are background levels
23 of asbestos in the air in New York City,
24 correct?

**Page 260**

1     A.   It depends.  After the World
2 Trade Center, there was.
3     Q.   Are those background
4 levels -- do those background levels
5 cause ovarian cancer?
6     MS. O'DELL:  Objection to
7     the form.
8     THE WITNESS:  The studies
9     that have been done by my
10     colleagues in the aftermath of the
11     World Trade Center disaster where
12     asbestos was generated have not at
13     this time -- and New York City
14     Public Health has not at this time
15     looked at ovarian cancer.  Ovarian
16     cancer occurs within 10 to 30, up
17     to 40 years later.  So since 9/11
18     was only 2001, there is -- there
19     is not sufficient time to have
20     developed ovarian cancer.
21 BY MR. HEGARTY:
22     Q.   Doctor, before 9/11 there
23 were background levels of asbestos in
24 certain parts of New York City, correct?

**Page 261**

1     A.   When there are houses that
2 were built with it.  There is -- asbestos
3 is not just -- should not be -- unless
4 there's a source, asbestos should not --
5 it would not be coming from jet engines.
6 It would not be coming from other
7 sources.  If it's there, it came from a
8 specific source.  It's like we should not
9 have lead in our body at all.  But we do
10 because the lead came from the air where
11 there was lead in the gasoline.
12     So there shouldn't be
13 background levels of asbestos just
14 hanging around unless there's an adequate
15 source that produced it.
16     Q.   Does EPA allow background
17 levels of asbestos in water?
18     A.   I'm not familiar with that
19 information.  That's in water.  You asked
20 me about air.
21     Q.   I asked you a different
22 question.  I can ask you a different
23 question, Doctor.
24     A.   I understand the question,

66 (Pages 258 to 261)

Judith Zelikoff, Ph.D.

Page 262

1    yes.
2        Q.   Does EPA allow background
3    levels of asbestos in water?
4        A.   I have not reviewed that
5    literature.
6        Q.   As a toxicologist, you agree
7    that dose or level of exposure determines
8    the toxicity of substances, correct?
9        MS. O'DELL:  Object to the
10       form.
11       THE WITNESS:  I believe that
12       dose as well as frequency,
13       duration, time of exposure are
14       all -- as well as dose contribute
15       to the toxicity of an agent.
16   BY MR. HEGARTY:
17       Q.   You agree that a substance
18   can produce a harmful effect only if it
19   reaches a susceptible biological system
20   within the body in high enough
21   concentration, correct?
22       MS. O'DELL:  Objection to
23       form.
24       THE WITNESS:  It depends on

Page 263

1    the -- let me read your question
2    over.  It was a lengthy question.
3    It depends on the -- on the
4    toxicant that you're talking
5    about.  There is dose that you're
6    exposed to, or concentration that
7    you're supposed to, and dose to
8    the target tissue.  And for every
9    different -- every different
10   chemical, there is a different
11   target dose that could start a
12   biological process.
13   BY MR. HEGARTY:
14       Q.   And what is the target dose
15   that is necessary to start the biologic
16   process of talc and ovarian cancer?
17       MS. O'DELL:  Object to the
18       form.
19       THE WITNESS:  Well, if
20   you -- if you look at talc as a
21   whole, to give you a
22   concentration, a threshold
23   concentration, I'm not sure that
24   has been -- I don't -- that has

Page 264

1    not been done.
2        There are -- there is
3    information on no observable
4    adverse effect level that has been
5    established using a dose-response
6    by the NTP, National Toxicology
7    Program.
8        And two milligrams of talc
9    that they used produced minimal --
10   minimal affects in the rats and
11   mice that they tested.  So
12   somewhere below at least, from an
13   inhalation perspective, is --
14   produces no effect.
15       However, they saw effects
16   even at the lowest, two milligrams
17   per.
18   BY MR. HEGARTY:
19       Q.   My question was specific to
20   ovarian cancer.  That study did not --
21   did not identify any ovarian cancers in
22   the mice -- in the mice or rats, correct?
23       A.   That's not what they looked
24   for.

Page 265

1        Q.   My question is specific to
2    ovarian cancer.
3        A.   Let me read your question
4    over again.  Could you repeat your
5    question.  It's already gone past.
6        Q.   What is the target dose that
7    is necessary to start the biologic
8    process of talc and ovarian cancer?
9        A.   Well, as I talked about, one
10   fiber of asbestos could start the
11   biological process.  It is not clear if
12   there is a threshold dose or a
13   concentration, or whether one -- and
14   we're talking about the whole talcum
15   powder product.  We're not talking about
16   any one product.  You're talking about
17   the whole process and how much it will
18   start the biological process.
19       It's unknown, it's not in
20   the literature.  But I will tell you that
21   even small doses that are used of the
22   talcum -- of a talcum product, if you
23   take a woman who takes a handful, if you
24   take a woman that takes a little bit on a

67 (Pages 262 to 265)

Judith Zelikoff, Ph.D.

Page 266

1  powder puff, that amount could even,
2  depending upon the woman, the
3  susceptibility, the vulnerability, can
4  all start the process.
5      We're talking about the
6  process, in my opinion.  What you're
7  talking about and in the opinion that I
8  report here, is that that can start an
9  inflammatory process.
10     Q.    And what is the number of
11  particles of talc necessary to start the
12  biologic process?
13         MS. O'DELL:  Object to form.
14         THE WITNESS:  That is not in
15     the scientific literature.
16  BY MR. HEGARTY:
17     Q.    Over Pages 6 through 8 of
18  your report you discuss asbestos.  Is the
19  presence of asbestos in talc necessary
20  for your biologic plausibility opinions?
21     A.    I looked at the entire
22  product.
23     Q.    Well, do you intend to
24  testify that there is biologic

Page 267

1  plausibility between pure talc, the platy
2  talc, and ovarian cancer?
3         MS. O'DELL:  Object to the
4     form.
5         THE WITNESS:  I don't
6     think -- my opinion is that there
7     may not be anything such as platy
8     talc in a pure form.
9  BY MR. HEGARTY:
10     Q.    Okay.  It's your opinion
11  that pure talc does not exist?
12         MS. O'DELL:  I'm not sure
13     she -- she finished her answer.
14         Had you finished, Doctor,
15     before?
16         THE WITNESS:  I actually
17     need a little water.
18         MS. O'DELL:  Okay.  Sure.
19         Had you finished your answer
20     before the second question was
21     asked?
22         THE WITNESS:  No.
23         MS. O'DELL:  Okay.  You may
24     finish.

Page 268

1         THE WITNESS:  Can -- can you
2     address the question again?
3  BY MR. HEGARTY:
4     Q.   Is it your opinion that pure
5  talc does not exist?
6         When I say pure talc, I mean
7  talc without asbestos, without heavy
8  metals, without fragrance.
9         MS. O'DELL:  Objection to
10     form.
11         THE WITNESS:  The idea of
12     talc is that it has, within its
13     lattice, metals.
14         So platy talc refers to the
15     structure or the morphology of the
16     talc, how it looks, what
17     dimensions it's in.
18         So, do I think there is
19     platy talc?  Of course there is
20     platy talc.
21  BY MR. HEGARTY:
22     Q.   Is there platy talc without
23  asbestos?
24     A.   Well, according to the

Page 269

1  studies out of Mossman's laboratories,
2  they used asbestos, they used talc that
3  contained nonfibrous talc.
4     Q.   Do you have an opinion on
5  whether there is talc without asbestos?
6         MS. O'DELL:  Object to the
7     form.
8         THE WITNESS:  In many of the
9     documents from Johnson & Johnson,
10     they measured fibrous talc as well
11     as other forms, non-asbestiform,
12     and they -- they found that there
13     were samples, individual samples
14     that they reported as
15     nondetectable as having
16     asbestiform talc.
17  BY MR. HEGARTY:
18     Q.   Well, do you have an opinion
19  of whether there is talc without
20  asbestos?
21     A.   It depends where -- where
22  it's mined.  If it's mined in an area
23  where people were extremely cautious,
24  there could be.

68 (Pages 266 to 269)

Judith Zelikoff, Ph.D.

Page 270

1    Q.   Did you do analysis of
2   biologic plausibility for talc without
3   asbestos?
4        MS. O'DELL:  Objection to
5   form.
6        THE WITNESS:  My biological
7   assessment, my -- my biological
8   plausibility was looking at the
9   entire product of talcum powder.
10  BY MR. HEGARTY:
11       Q.   And how do you define the
12  entire product?
13       A.   The entire product is
14  whatever are the ingredients or listed
15  within the documents or the test results
16  from Imerys that -- that indicate what
17  they measured, including the metals, the
18  asbestos, the -- the asbestiform fibers,
19  the fragrances.
20       Q.   So you did your biologic
21  plausibility analysis with -- based on
22  talc that has asbestos, heavy metals and
23  fragrance in it, correct?
24       MS. O'DELL:  Objection to

Page 271

1   form.
2        THE WITNESS:  I did my
3   biological plausibility on talcum
4   powder products.
5        I looked at individual
6   products, individual constituents
7   in adding to my -- to my report,
8   to my document.  But I looked at
9   the entire product.  And it is my
10  opinion that the entire product
11  causes inflammation and that
12  inflammation then goes on as a
13  triggering mechanism to turn on
14  certain genes and to bind iron
15  that can lead to the changes
16  needed for cancer in the ovary.
17  BY MR. HEGARTY:
18       Q.   You did not do a separate
19  analysis of talc without asbestos or
20  without -- and without heavy metals and
21  without fragrance, correct?
22       MS. O'DELL:  Object to the
23  form.
24       THE WITNESS:  I'm not even

Page 272

1   sure how that would be done or I
2   don't think it could be done.
3        What I did was I did it for
4   the entire product.
5   BY MR. HEGARTY:
6        Q.   And what do you -- what do
7   you think -- what is your opinion --
8   strike that.
9        What is in the entire
10  product in your opinion?
11       A.   Based upon the Johnson &
12  Johnson documents.  That's where my --
13  that's where I will tell you what is in
14  there.
15       As -- as far as the product
16  documents, it indicates that there are
17  metals, including -- not -- not totally
18  inclusive of, but to mention a few of the
19  more well-known ones, cobalt, chromium
20  and nickel.
21       There are also, according to
22  the Crowley report, there are also many
23  chemicals that make up a fragrance.  And
24  there -- and in many of the samples

Page 273

1   tested, there was asbestos or asbestiform
2   fibers, some of which were called fibrous
3   talc, others were called asbestiform and
4   others in which they were called asbestos
5   fibers, or amphiboles or anthophyllite.
6        Q.   Did you review all the
7   test --
8        A.   Anthophyllite.
9        Q.   I'm sorry.
10       Did you review all the
11  testing documents produced by Johnson &
12  Johnson and Imerys in this case?
13       A.   I reviewed the documents
14  that are in the production document black
15  binder to my right.
16       Q.   Those were provided to you
17  by plaintiffs' counsel, correct?
18       A.   That is correct.
19       Q.   Did you ask them if they
20  provided to you all testing documents
21  that had been produced in this case with
22  regard -- by Johnson & Johnson and
23  Imerys?
24       A.   I did not ask that question

69 (Pages 270 to 273)

Judith Zelikoff, Ph.D.

Page 274

1  specifically.
2      Q.   Do you know whether there
3  are additional documents of tests --
4  documents describing tests that were done
5  by Johnson & Johnson and/or Imerys with
6  regard to asbestos, heavy metals,
7  fragrances and talc?
8         MS. O'DELL:  Object to form.
9         THE WITNESS:  Plaintiff
10 counsels and myself did talk about
11 that, some of that information,
12 and --
13        MS. O'DELL:  Doctor,
14 don't -- in terms of our
15 conversations --
16        THE WITNESS:  I'm sorry.
17        MS. O'DELL:  -- those
18 conversations are our work
19 product.
20        But to the degree that your
21 answer doesn't depend on our
22 conversations, you may -- you may
23 answer.
24        THE WITNESS:  I -- I made it

Page 275

1     clear that I would like to see
2     documents that could go into my
3     assessment of biological
4     plausibility.
5  BY MR. HEGARTY:
6      Q.   Would you like to see
7  documents showing that there is no
8  asbestos in talcum powder, in particular
9  Johnson's Baby Powder?
10     A.   I will review any documents
11 that are provided to me, if asked to
12 review them.
13     Q.   Did you ask plaintiffs'
14 counsel to provide you documents of
15 testing showing no asbestos in Johnson's
16 Baby Powder?
17     A.   Many of those -- of the
18 documents that are in the product
19 production document show that there are
20 samples that do not contain asbestos, or
21 I will say asbestiform or talc fibers.
22 So there is information in there showing
23 when there is -- it is present and
24 information in there showing when it was

Page 276

1  not present.
2      Q.   You relied on plaintiffs'
3  counsel to select for you the testing
4  documents that you reviewed, correct?
5      A.   I -- I read and reviewed
6  whatever they sent me.
7      Q.   And did you do anything to
8  verify that you had all the documents
9  regarding the testing of Johnson's Baby
10 Powder?
11     A.   I did nothing personally
12 other than ask the -- the attorneys if
13 there was anything else I needed in
14 forming my opinion.  In -- of production
15 documents, if we're just referring to
16 that.
17        I have no access to
18 production documents on my own or through
19 the internet.  And I know none of the
20 other deposees.
21     Q.   Did you do a comparison of
22 biologic plausibility across various
23 brands of talcum powder products?
24     A.   I did not personally do any

Page 277

1  of that.  However many of the documents
2  and many of the studies including the
3  Longo supplement did compare, for
4  example, I think I misspoke when I said
5  one of the places that Johnson & Johnson
6  gets their talc is Korea.  What I meant
7  was China.  I should have said Asia.  So
8  Korea is also a mine that provided, but
9  not to Johnson & Johnson.
10        MS. O'DELL:  Hey, Mark,
11 we've been going about an hour and
12 15 minutes.
13        MR. HEGARTY:  Okay.
14        MS. O'DELL:  Can we take a
15 break?
16        MR. HEGARTY:  Yeah.
17        THE VIDEOGRAPHER:  The time
18 is 2:27 p.m.  Off the record.
19        (Short break.)
20        THE VIDEOGRAPHER:  We are
21 back on the record.  The time is
22 2:45 p.m.
23 BY MR. HEGARTY:
24     Q.   Doctor, if evidence was that

70 (Pages 274 to 277)

Judith Zelikoff, Ph.D.

| Page 278 | Page 280 |
|---|---|

**Page 278**

1  there is no asbestos in Johnson's Baby
2  Powder, would that change your opinions
3  as to biological plausibility?
4      A.   No, sir, it would not.
5      Q.   Same question with regard to
6  heavy metals.  If there were no heavy
7  metals in Johnson's Baby Powder, would
8  that change your opinions on biological
9  plausibility?
10     A.   I looked at the entire
11 product and it would not -- it would not
12 change my opinion, as it exists
13 currently, with biological plausibility
14 that it would cause ovarian cancer
15 through -- through inflammation, is my
16 opinion.
17     Q.   In looking at your heavy
18 metals section, beginning at Page 8 of
19 your report -- are you there?
20     A.   I'm not.  I had to put my
21 glasses on.  Thank you.
22     Q.   There are no studies that
23 have looked at the effects of these
24 metals in powder dusted on the perineum,

**Page 280**

1  ludicrous actually.
2      Q.   None of the studies that you
3  cite in your heavy metals section link
4  the exposures that you discussed to
5  ovarian cancer risk, correct?
6          THE WITNESS:  I'm sorry.
7      This is not coming up.
8          (Whereupon, a discussion was
9      held off the stenographic record.)
10         THE WITNESS:  They -- the
11     studies that I list for the
12     individual metals talk about the
13     potential inflammatory and
14     carcinogenic potential of those
15     particular metals.  And based on
16     the Crowley report, there are, and
17     other production documents from
18     Johnson & Johnson, they list three
19     particular metals that are
20     associated with Johnson & Johnson
21     products, cobalt, nickel and
22     chromium.
23 BY MR. HEGARTY:
24     Q.   That was not my question.

| Page 279 | Page 281 |
|---|---|

**Page 279**

1  correct?
2      A.   Your question is there are
3  no studies looking at these individual
4  metals?
5      Q.   Correct?
6      A.   Perineal studies in the
7  ovarian --
8      Q.   No, my question is, there
9  are no studies that looked at the effects
10 of these metals in powder dusted on the
11 perineum, correct?
12     A.   I'm not sure I understand
13 your question.
14     Q.   You don't cite any studies
15 that have looked at the effect of
16 applying these metals to the perineum,
17 correct?
18     A.   To my knowledge, there are
19 no specific animal studies that show
20 nickel was applied to the perineal.
21     Q.   There are no human studies
22 either, correct?
23     A.   To my knowledge, there are
24 no human studies.  That would be

**Page 281**

1  My question is, none of the studies that
2  you cite --
3      A.   On the --
4      Q.   -- in your section on heavy
5  metals, evaluate ovarian carcinogenicity
6  potentials of these metals, correct?
7          MS. O'DELL:  Object to the
8      form.
9          THE WITNESS:  I do not talk
10     about ovarian cancer in particular
11     relation to these three metals
12     that I cited --
13 BY MR. HEGARTY:
14     Q.   No studies --
15     A.   -- in the report.
16     Q.   -- that you cite refer to
17 risk of ovarian cancer with exposure to
18 these metals, correct?
19     A.   With my charge being
20 biological plausibility, I thought that
21 it was my opinion -- my professional
22 opinion is that it was more important to
23 discuss the potential for inflammatory
24 responsiveness and carcinogenic

71 (Pages 278 to 281)

Judith Zelikoff, Ph.D.

Page 282

1   potential.
2        Q.   Doctor, you don't cite any
3   studies that look at -- look at the
4   ovarian carcinogenicity potential of any
5   of these metals, correct?
6        MS. O'DELL:  Object to form.
7        THE WITNESS:  Not in my
8   report.
9   BY MR. HEGARTY:
10       Q.   What are the exposure levels
11  of these metals necessary to have
12  biologic plausibility of ovarian cancer?
13       A.   As far as biological
14  plausibility of these metals, these
15  metals are -- unless there are particular
16  standards for a particular metal, nothing
17  is really established for what it would
18  take for nickel to cause ovarian cancer.
19       However, the ability of
20  these metals to produce inflammation are
21  very, very low levels.  And if they
22  produce inflammation, then they have the
23  potential to go on to produce cancer.
24  And many of these metals do.

Page 284

1   them.
2        Q.   Did you find any?
3        A.   Again, the purpose of
4   writing this section on heavy metals had
5   to do with bringing out the inflammatory
6   and the biological plausibility that in
7   my mind is linked to talc and ovarian
8   cancer.
9        Q.   Doctor, listen to my
10  question.  Did you find any studies
11  reporting on a risk of ovarian cancer
12  with exposure to any of those metals?
13       MS. O'DELL:  Objection to
14  form.
15       THE WITNESS:  I found in
16  cobalt, but it does not have to do
17  with ovarian cancer, but I did
18  find that the absorption of cobalt
19  is much higher in women than in
20  men.  And that many of these
21  studies show that you have
22  increased proliferation.  And as I
23  said, mine was -- my question that
24  I needed to address was biological

Page 283

1        Q.   Well, none of these studies
2   report a threshold level of exposure to
3   cobalt, chromium, or nickel to increase
4   the risk of ovarian cancer, correct?
5        MS. O'DELL:  Object to the
6   form.
7        THE WITNESS:  That was not
8   the purpose of my writing.
9        My -- my writing was to
10  exemplify the carcinogenic
11  potential and the inflammatory and
12  some of the human health effects
13  that are commonly seen.  Ovarian
14  cancer is not that common.  And so
15  it's not unusual that other --
16  that ovarian cancer was not looked
17  into in some of these studies.
18  BY MR. HEGARTY:
19       Q.   Well, you found no studies
20  looking at exposure to any of those
21  metals and risk of ovarian cancer,
22  correct?
23       A.   It's not that I didn't find
24  any.  I wasn't particularly looking for

Page 285

1   plausibility.
2        So I did find many of these
3   factors, many of these metals, all
4   of these metals have the potential
5   to produce the changes that are in
6   the carcinogenic process.
7   BY MR. HEGARTY:
8        Q.   I'm going to ask the
9   question one more time.  And if we don't
10  get an answer I'm going to call Judge
11  Pisano.
12       Cite for me, which study did
13  you find that linked exposure to these
14  metals to ovarian cancer?
15       MS. O'DELL:  Objection to
16  the form.
17       Dr. Zelikoff has answered
18  your question multiple times.
19       But you may answer it again.
20  BY MR. HEGARTY:
21       Q.   Let me ask it differently.
22  Did you find any studies reporting on a
23  risk of ovarian cancer with exposure to
24  any of these metals, that being cobalt,

72 (Pages 282 to 285)

Judith Zelikoff, Ph.D.

Page 286

1  chromium, or nickel?
2        A.  I was not looking
3  specifically for that.  So, no, I did not
4  find that.
5        Q.   Which of the studies that
6  you report show that the exposure levels
7  evaluated in those studies are in any way
8  related to human exposure levels through
9  Johnson's Baby Powder?
10        MS. O'DELL:  Object to the
11     form.
12        THE WITNESS:  Are you
13     talking about inhalation or
14     perineal application?
15 BY MR. HEGARTY:
16        Q.   Either method of exposure.
17        A.   So many of the inhalation
18  numbers are concentrations, and looking
19  at the Johnson & Johnson documents in
20  terms of what is in the head and in the
21  face area after diapering as well as
22  during powdering, indicates that the
23  concentrations that are possibly inhaled
24  contain particles that can initiate a

Page 287

1  response.
2        Also, from looking at the
3  Johnson & Johnson documents, many of
4  those results indicate -- and I think we
5  have an exhibit here of the table of the
6  concentrations that were found.
7        Well, it's not at my local
8  fingertips here.  But --
9        MS. O'DELL:  Are you looking
10     for Exhibit C, Doctor, I think
11     it's right there with -- on
12     your -- on your paper clip.
13        MR. HEGARTY:  Let me
14     withdraw the question.
15 BY MR. HEGARTY:
16        Q.   Doctor, how much nickel,
17  cobalt and chromium reach the ovary with
18  one application of Johnson's Baby Powder
19  to the perineum?
20        MS. O'DELL:  Object to the
21     form.
22        THE WITNESS:  Since much of
23     the -- since Johnson's Baby Powder
24     has a high concentrations of some

Page 288

1        of these metals in terms of parts
2        per million, whatever talc reached
3        there, there's -- there is a
4        strong potential that that amount
5        of the concentration of the metal
6        would also reach the target organ.
7  BY MR. HEGARTY:
8        Q.   That's not my question,
9  Doctor.
10        How much nickel, cobalt and
11  chromium reached the ovary with a single
12  application of Johnson's Baby Powder to
13  the perineum?
14        A.   I don't have -- that
15  information is not available.
16        They did show in studies, in
17  a few studies, I think it was the
18  Hamilton study that -- or Henderson
19  study -- that there -- talc indeed does
20  reach the ovary from perineal application
21  or from intravaginal application.  And
22  whatever is -- whatever the concentration
23  is that reached the ovary, carried with
24  it these -- one -- one or more or all of

Page 289

1  these three metals.
2        Q.   You agree --
3        A.   So it was a similar
4  concentration.
5        Q.   You agree that all of the
6  metals you talk about are in -- are all
7  around us, they are in food, correct?
8        A.   The metals nickel, chromium,
9  cobalt can be in food, yes.
10        Q.   They are in the air,
11  correct?
12        A.   They are in certain ambient
13  environments.
14        Q.   These are metals that are
15  considered ubiquitous, correct?
16        MS. O'DELL:  Objection to
17     the form.
18        THE WITNESS:  They are --
19     chromium not as much -- I'm sorry,
20     cobalt not as much.  But chromium
21     and nickel, they are in the air,
22     and depending upon the environment
23     that is producing it, if you go to
24     Sundre, Canada, you can have lots

73 (Pages 286 to 289)

Judith Zelikoff, Ph.D.

Page 290

1  of nickel in the air. But if you
2  go to New York City, concentrate
3  as we've measured in my laboratory
4  prior to this deposition, or prior
5  to this case, my involvement in
6  this case, you will see very small
7  concentrations of nickel. There
8  should not be a lot in the air.
9      And we also measured
10 chromium, and it should not be --
11 unless you have a polluted
12 environment there should not be a
13 lot of these metals in the air.
14 BY MR. HEGARTY:
15     Q.   Is the metal are not -- the
16 metals that are in the air, nickel and
17 chromium, sufficient to have biologic
18 plausibility between those metals and
19 ovarian cancer?
20     A.   Those -- those metals, yes,
21 the metals in the air can cause an
22 inflammatory response. The
23 concentrations of the metals in the air
24 can cause an inflammatory response and

Page 291

1  can start processes and change gene
2  expression within cells.
3      Q.   Cite for me any study that
4  shows that inflammatory response has ever
5  occurred in the ovary.
6      MS. O'DELL: Objection to
7  form.
8      THE WITNESS: There are
9  granulomas that have been found in
10 animal studies of -- in the lung.
11 You are talking about in the
12 ovary, I understand that.
13 BY MR. HEGARTY:
14     Q.   I'm talking about the
15 studies that have not looked at talc, but
16 have looked at cobalt, chromium --
17     A.   Okay.
18     Q.   -- nickel and cobalt without
19 regard to talc, cite for me any studies
20 that have shown that those metals have
21 caused inflammation in the ovary?
22     A.   By themselves, there are no
23 studies that demonstrate that, that I'm
24 aware of.

Page 292

1      Q.   Did you do an analysis
2  yourself of Johnson's Baby Powder for the
3  presence of these heavy metals?
4      A.   I did not do any
5  instrumentation studies measuring the
6  amount. I -- I relied on the documents.
7      Q.   But you are capable of doing
8  that analysis, correct?
9      A.   We are capable, in my
10 laboratory, along with colleagues, of
11 measuring by XRF, x-ray fluorescence, and
12 by ICP mass spec, measuring the amounts
13 of metals in tissues, correct.
14     Q.   But you did not do that
15 testing here, correct?
16     A.   My job was to define
17 biological plausibility based upon
18 literature, relevant literature and
19 documents, internal documents.
20     Q.   Nowhere in your report do
21 you identify the exposure levels of any
22 of these metals that are necessary to
23 cause ovarian cancer, correct?
24     MS. O'DELL: Objection to

Page 293

1  form. Asked and answered.
2      THE WITNESS: There is no
3  literature that says you need one
4  particle or ten particles.
5      The inflammatory response
6  that nickel causes is extremely
7  well established, even at very low
8  concentrations. And -- and the
9  same is true for hexavalent
10 chromium and for chromium,
11 trivalent chromium.
12 BY MR. HEGARTY:
13     Q.   Are there any studies that
14 report on exposure of these metals to the
15 ovaries?
16     A.   Are you talking about alone?
17     Q.   Individually or together,
18 but the metals themselves.
19     A.   Just the metals --
20     MS. O'DELL: Object --
21 objection to form.
22     THE WITNESS: These metals
23 by themselves have been tested
24 extensively in cells and in -- in

74 (Pages 290 to 293)

Judith Zelikoff, Ph.D.

Page 294

1    animals to produce inflammation,
2    to change the epigenome of the
3    cells, to change gene expression.
4    And there was no -- there was no
5    reason to believe whether or not
6    there are specific studies
7    associated with the ovary.  There
8    are no reason to believe that it
9    would not do the same effects in
10   cells as well as in the ovary, in
11   the lung, and the kidney and the
12   liver.
13   BY MR. HEGARTY:
14       Q.   Doctor, you are not aware of
15   any studies that have looked at the
16   effects of these metals on human ovarian
17   cells, correct?
18       MS. O'DELL:  Object to the
19   form.
20       THE WITNESS:  Again, I'm not
21   an epidemiologist, so -- and I'm
22   not a clinical toxicologist.  So I
23   will have to stand by the -- the
24   data that I do know in -- in

Page 295

1    extensive -- have extensive
2    knowledge of.  And that's human ex
3    vivo and in vitro studies.  And I
4    am not aware.
5        That is not to say that they
6    are not out there.  And I
7    especially do not know about the
8    humans, because I focus as a
9    toxicologist.  I'm an animal
10   toxicologist.
11   BY MR. HEGARTY:
12       Q.   Did you do any comparison
13   between the doses of -- of the metals
14   reported in the studies that you cited to
15   those in women using talc?
16       A.   I did no calculations on --
17   on my own.
18       Q.   Did you do any calculations
19   that tested these metals in animals to
20   determine what the -- that -- that they
21   relate in any way to the dose that a
22   human would experience through Johnson's
23   Baby Powder use?
24       MS. O'DELL:  Objection to

Page 296

1    form.
2        THE WITNESS:  The exposures
3    are similar, or can be similar.
4        But as I stated before, for
5    these metals as well as for
6    asbestiform fibers, all it takes
7    is a small amount, if not just one
8    fiber, to cause the response and
9    to start the process of
10   inflammation, gene expression,
11   upregulation of genes that are
12   associated with biological
13   mediators, proinflammatory
14   cytokines.
15   BY MR. HEGARTY:
16       Q.   Yet you cite no study that
17   reports that response in human ovarian
18   cells, correct?
19       MS. O'DELL:  Object to the
20   form.
21       THE WITNESS:  I -- if you're
22   still talking about individual
23   metals, no.
24       But if you're talking about

Page 297

1    in vitro studies like those of
2    Saed who looked for oxidative
3    stress and -- and prooxidant
4    changes, and if you are talking
5    about Shukla study who also looked
6    at ovarian cells, human ovarian
7    cells, and looked at changes in
8    gene expression associated with
9    oxidant production and reactive
10   oxygen species production, then
11   yes, in cell culture using human
12   ovarian epithelial cells, because
13   that's what we are talking about
14   here.
15   BY MR. HEGARTY:
16       Q.   None of those studies
17   applied nickel to human ovarian cells,
18   did they?
19       A.   No, they did not.
20       Q.   None of those studies
21   applied cobalt to human ovarian cells,
22   correct?
23       A.   No, they did not.
24       Q.   None of those studies

75 (Pages 294 to 297)

Judith Zelikoff, Ph.D.

Page 298

1 applied chromium to ovarian -- human
2 ovarian cells, correct?
3 A. Correct. But what we're
4 talk -- what I'm talking about and the
5 basis of my opinion is the product in its
6 entirety, not breaking it down to
7 individual constituents.
8 Q. Is it necessary for purposes
9 of your biologic plausibility opinion
10 that talc reach the ovary?
11 A. Not necessarily.
12 Talc does -- talc and any
13 other particle does not have to reach the
14 site of deposition. They can, and -- and
15 do, I believe that they not only migrate
16 to an area and they can get to an area
17 and then cause inflammation which then
18 can be -- the cytokines where there's
19 tumor necrosis factor, interleukin-1, or
20 any of the other proinflammatory
21 cytokines can then get to the air, the
22 site of this -- this target organ.
23 So you do not have to have,
24 in particle toxicology and in talc

Page 299

1 toxicology, you do not have to have the
2 presence. Although, in early studies
3 they have found talc particles not only
4 in the ovary, but also in the lymph
5 node -- in the lymphatics that drain the
6 ovary.
7 Q. Cite for me any study that
8 has reported inflammation in the ovaries
9 from inflammation of -- due to a particle
10 in the lung -- strike that.
11 Is it your contention that
12 inflammation in the lung due to a
13 particle will cause inflammation in the
14 ovaries?
15 MS. O'DELL: Objection to
16 form.
17 THE WITNESS: I'm telling
18 you that --
19 MS. O'DELL: Go ahead.
20 THE WITNESS: -- there's
21 biological plausibility to suggest
22 that.
23 When you have a particle
24 coming in and going to a local

Page 300

1 target site, let's say in the case
2 of inhalation or in the case of
3 direct application to the perineal
4 area, you will have the process of
5 impacting with those cells and
6 generating cell mediated reactions
7 and immunological reactions and
8 inflammatory responses.
9 And those inflammatory
10 responses and those reactive
11 oxygen species, except for
12 hydrogen peroxide which can't
13 travel a far distance, can get
14 into -- can and do get into the
15 blood circulation and then can
16 reach distant organs.
17 BY MR. HEGARTY:
18 Q. Cite for me any published
19 authority that says that inflammation in
20 the lungs will cause inflammation in the
21 ovaries.
22 MS. O'DELL: Object to the
23 form. Misstates her testimony.
24 THE WITNESS: To that

Page 301

1 specific question, no. But I
2 can -- I can cite you many studies
3 that show in terms of other
4 particles for the lungs that has
5 been shown to cause inflammation
6 in other areas.
7 For example, in the case of
8 Ghio and other investigators, you
9 will find inflammation not only in
10 the blood by the measurement of
11 cytokines in the blood, even
12 though the first target organ was
13 the -- was the lungs.
14 Also, if you look at
15 obesity, obesity is a pro-oxidant
16 state, and that can generate --
17 the reason obesity causes other
18 health effects is because it's a
19 big mass of inflammation. And the
20 inflammation in that particular
21 site of all those fatty cells,
22 they can release inflammatory
23 mediators that go all over. And
24 that literature is out there.

76 (Pages 298 to 301)

Judith Zelikoff, Ph.D.

Page 302

1    BY MR. HEGARTY:
2        Q.   So is it your opinion for
3    purposes of your biological
4    plausibility -- strike that.
5            Is it -- is your biological
6    plausibility opinion that talc inhaled
7    and in the lungs causes inflammation in
8    the ovaries that can lead to ovarian
9    cancer?
10       A.   There's plausibility for
11   that, yes.
12       Q.   And can you cite for me any
13   published authority that says that talc
14   inhaled in the lungs will cause
15   inflammation in the ovaries that can lead
16   to ovarian cancer?
17       A.   There's multiple parts of
18   that question.
19       Q.   That's a very specific
20   question to that very specific subject
21   area.  Can you cite to me any published
22   literature that says that?
23           MS. O'DELL:  Would you mind
24       repeating the full question or

Page 303

1        read it.
2            THE WITNESS:  Any published
3        authority that says that -- that
4        says that talc inhaled in the
5        lungs will cause inflammation in
6        the ovaries that can lead to
7        ovarian cancer.
8            For that particular, and
9        that specific of a question, I
10       cannot cite you.
11   BY MR. HEGARTY:
12       Q.   You have published
13   extensively on particulates in the air
14   causing inflammation in the lungs,
15   correct?
16       A.   In the lungs and
17   systemically.
18       Q.   And those particulates
19   include?
20       A.   Air particulates;
21   particulate matter, called PM, ambient
22   PM; diesel exhaust particles.  I'm also
23   going to go to my CV.  Nanoparticles,
24   metal nanoparticles, specifically

Page 304

1    cadmium.
2        Q.   So in other words a lot of
3    particles besides talc, according to you,
4    can cause inflammation of the lungs,
5    correct?
6        A.   Many do.  There are others
7    that do not, like titanium dioxide which
8    were used in many studies as a control.
9        Q.   And those nanoparticles,
10   those air particles --
11       A.   In fact --
12       Q.   -- those diesel particles.
13       A.   I'm sorry.
14       Q.   Okay.  And those
15   nanoparticles, those diesel particles,
16   air particles that can cause inflammation
17   in the lungs, will also cause
18   inflammation in the ovaries, correct?
19           MS. O'DELL:  Objection to
20       form.
21           THE WITNESS:  I said they
22       will cause inflammation
23       systemically.  I did not indicate
24       the ovaries.

Page 305

1    BY MR. HEGARTY:
2        Q.   Well, there's no -- there's
3    nothing unique about talc particles
4    versus the other particles you mentioned,
5    correct?
6            MS. O'DELL:  Object to form.
7            THE WITNESS:  Size, chemical
8        composition, they -- they --
9        particles -- particles are -- they
10       can -- they can be different and
11       they can be the same.  So many
12       studies use model particles to
13       look at a negative effect like in
14       the Shukla study where they used
15       titanium dioxide particles of a
16       similar size in their -- as a
17       control and got no gene expression
18       changes.
19           Particles in the air, if
20       you're looking at -- there are
21       many factors that go into how a
22       particle behaves, including size,
23       including composition, including
24       morphology.

77 (Pages 302 to 305)

Judith Zelikoff, Ph.D.

Page 306

1  BY MR. HEGARTY:
2      Q.   Well, by your methodology,
3  any particle inhaled that causes
4  inflammation in the lungs is biologically
5  plausible, can lead to ovarian cancer,
6  correct?
7           MS. O'DELL:  Object to form.
8           THE WITNESS:  No, it can --
9      sorry.  It can lead to
10     inflammation systemically.
11 BY MR. HEGARTY:
12     Q.   That can lead to ovarian
13 cancer, correct?
14     A.   Inflammation --
15          MS. O'DELL:  Object to the
16     form.
17          Go ahead.
18          THE WITNESS:  Sorry.
19          MS. O'DELL:  Sorry.
20          THE WITNESS:  Inflammation
21     is responsible for -- in my
22     opinion, is the underlying
23     mechanism, a key underlying
24     mechanism for the association for

Page 307

1      ovarian cancer, yes.
2  BY MR. HEGARTY:
3      Q.   And that mechanism can be
4  initiated by any particle inhaled into
5  the lungs, correct?
6      A.   No, it's --
7           MS. O'DELL:  Objection to
8      form.
9           THE WITNESS:  Sorry.
10          Well, as -- again, as I
11     stated, it depends on the -- it
12     depends on the particle.  For
13     example, titanium dioxide will not
14     produce inflammation in the lungs.
15     However, other particles, many
16     other particles, including
17     cadmium, cadmium oxide particles
18     do cause inflammation, as well as
19     asbestos does, as well as talc has
20     been shown to.
21          They can all produce
22     inflammation or oxidative stress.
23 BY MR. HEGARTY:
24     Q.   Cadmium particles induce the

Page 308

1  same inflammation that you believe that
2  talc does, correct?
3      A.   Inflammation is
4  characterized by certain key components.
5  Inflammation -- whether it's an
6  inflammation in the ovary or an
7  inflammation in the lung or inflammation
8  in the kidney, inflammation is an immune
9  response.  And it's going to involve key
10 cells, including the macrophage, the
11 neutrophil, the natural killer cell, all
12 of which can produce reactive oxygen
13 species -- well, primarily the
14 macrophages and neutrophils produce
15 oxygen radicals.
16          However, the natural killer
17 cell, they all produce cytokines, which
18 can produce inflammation.  So
19 inflammation is characterized by the same
20 components.
21     Q.   And you can't cite for me
22 any different components of the
23 inflammation caused by cadmium as you
24 believe the inflammation that is caused

Page 309

1  by talc, correct?
2      A.   When I measured inflammatory
3  responses to the inhalation of cadmium
4  nanoparticles, I looked for the standard
5  inflammatory markers.  So I measured in
6  the lung and in the circulation.  I
7  measured the percentages of neutrophils,
8  which is a key indicator, key criteria
9  for inflammation.  I determined
10 macrophage numbers as well as function in
11 terms of their ability to phagocytose, in
12 their ability to produce reactive oxygen
13 species.  And I looked for lung injury,
14 as measured by lactose, lactate
15 dehydrogenase.
16          So when one looks for
17 inflammation in the body, whether it's an
18 animal or a human, C-reactive protein,
19 you are going to be looking for all the
20 same markers.
21     Q.   You identified, based on
22 your opinion, no difference in the
23 inflammation caused by talc and the
24 inflammation caused by cadmium, correct?

78 (Pages 306 to 309)

Judith Zelikoff, Ph.D.

Page 310

1      A.   I did not do talc inhalation
2   in my laboratory.  The studies
3   indicate -- looked for the same thing.
4   They look for changes in gene expression
5   of activating transcription factors.
6   They did in the Shukla study.
7          They look for the percentage
8   of neutrophils.  They look for macrophage
9   activation.  We all look at the same
10  thing when coming to the conclusion of
11  inflammation.
12     Q.   And according to you, talc
13  and cadmium act similarly with regard to
14  inducing inflammation in the lungs?
15         MS. O'DELL:  Objection to
16  form.
17         THE WITNESS:  Do they act
18  similarly?  Well, I think I
19  answered that question.
20         Inflammation is -- is the --
21  inflammation is modified by the
22  same components, the same soluble
23  factors, the same cell type
24  factors, including macrophages and

Page 311

1   neutrophils, dendritic cells,
2   whatever.  So inflammation,
3   whether it's acute or chronic
4   inflammation used the same
5   parameters.
6          We call inflammation -- we
7   call inflammation when you -- in a
8   tissue or in organs when you see
9   these characteristics.  And we say
10  these are markers indicative.
11  These are pathologies
12  indicative -- these are -- of an
13  inflammatory response.
14  BY MR. HEGARTY:
15     Q.   So according to your
16  opinion, that's biologic plausibility
17  between cadmium exposure and ovarian
18  cancer?
19         MS. O'DELL:  Objection to
20  form.
21         THE WITNESS:  I would have
22  to do more research on that to be
23  able to say that.  I would not say
24  biological plausibility, only

Page 312

1   because I haven't investigated
2   that literature.
3          But inflammation --
4   inflammation doesn't change.  It
5   can get out of the particular
6   local organ.  I don't think that
7   cadmium has been investigated in
8   terms of the ovary.  It's
9   certainly been investigated in
10  terms of the kidney, which is
11  local -- which is systemically a
12  distant organ from the local
13  target, which is the lung.  And it
14  can cause inflammation in the
15  kidney.
16  BY MR. HEGARTY:
17     Q.   You haven't identified any
18  differences between the inflammation
19  caused by other particulates and the
20  inflammation caused by talc, correct?
21         MS. O'DELL:  Objection to
22  form.
23         THE WITNESS:  Inflammation
24  is inflammation.

Page 313

1   BY MR. HEGARTY:
2      Q.   You referred to fragrances.
3      A.   I'm sorry.  Could you give
4   me a page?
5      Q.   Over on Page 12.  You cite
6   to a single study that discusses what
7   exposure levels of these fragrances have
8   been shown to induce a biologically
9   plausible effect in the ovary.
10         MS. O'DELL:  Object to the
11  form.
12         THE WITNESS:  Many of these
13  fragrances, many of these
14  chemicals within a specific
15  fragrance, it can consist of maybe
16  150 or even more chemicals within
17  any one given fragrance.  Many of
18  them have been shown to cause
19  inflammation.
20  BY MR. HEGARTY:
21     Q.   Have any of the chemicals in
22  the fragrances that you looked at been
23  reported in the medical literature to
24  induce inflammation in the ovaries?

79 (Pages 310 to 313)

Judith Zelikoff, Ph.D.

Page 314

1    A.   No one specifically -- to my
2 knowledge, no one specifically looked at
3 inflammation in the ovaries.  But again,
4 if you go back to the idea of
5 inflammation being caused by a particle
6 at a local site and then having the
7 potential -- or having the capacity I
8 should say, to -- to have that
9 inflammation go to a distant -- a more
10 distant site.
11    So the fact that no one has
12 looked at it does not delete the fact
13 that certainly inflammation can get to
14 distant sites, including the ovary.
15    Q.   Well, what is the dose of
16 nickel or -- and cobalt and chromium
17 individually that must -- that the woman
18 must be exposed to in vivo to induce
19 inflammation in the ovaries?
20    MS. O'DELL:  Object to the
21    form.  Asked and answered.
22    THE WITNESS:  There are --
23    as I said, there's really -- one
24    particle, one piece can start the

Page 315

1    process for inflammation.
2 BY MR. HEGARTY:
3    Q.   So it --
4    A.   It could be one.
5    Q.   -- it's your opinion that
6 one particle of nickel will induce
7 inflammation in the ovaries?
8    MS. O'DELL:  Objection.
9 BY MR. HEGARTY:
10    Q.   Is that correct?
11    A.   Will?  I can't -- I haven't
12 gone through the literature, but could,
13 certainly.
14    Q.   And what literature can you
15 cite that would say that one particle of
16 nickel could cause inflammation in the
17 ovary?
18    A.   It's my professional
19 judgment being an expert toxicologist in
20 the area of metals.
21    Q.   Okay.  Same question as to
22 cobalt and chromium.
23    A.   Well, metals can't be lumped
24 together like that.  Metals are indeed

Page 316

1 metals, but there's also -- if you look
2 at nickel and it's a micronutrient, so
3 you can have very, very, very tiny
4 amounts in the body -- very tiny.  And it
5 can be used as a micronutrient.
6    You can have lead, but that
7 should not be in the body at all.  And
8 there is no safe level of lead.  So
9 despite what the regulatory agencies say,
10 there is no safe level which is what
11 their conclusion is moving towards.
12    And -- so a metal is not a
13 metal is not a metal.
14    Now, when you look at these
15 three metals, so for example you have
16 nickel which is classified as a 1A
17 carcinogen, but --
18    Q.   I'll withdraw the question.
19 You're not -- Doctor, you're not
20 answering my question.
21    MS. O'DELL:  She is
22    answering your question.
23    MR. HEGARTY:  No, she is
24    not.

Page 317

1    MS. O'DELL:  Yes, she is.
2 And if you don't -- let her
3 finish.
4    MR. HEGARTY:  Okay.
5 We'll -- we'll call Judge Pisano
6 and he'll see if we're asking the
7 question -- if she's answering the
8 question.
9    MS. O'DELL:  Are you
10 threatening the witness by saying
11 that?
12    MR. HEGARTY:  No, I'm
13 talking to you.  We'll go off the
14 record --
15    MS. O'DELL:  You're
16 threatening the witness and -- no,
17 we're not going off the record.
18    MR. HEGARTY:  Go off the
19 record, let's go off the record.
20    MS. O'DELL:  No, we are not
21 going off the record.
22    MR. HEGARTY:  Yes, let's go
23 off the record.
24    MS. O'DELL:  If she's

80 (Pages 314 to 317)

Judith Zelikoff, Ph.D.

|  | Page 318 |
|---|---|

1    answering your question, she --
2    she gets the right to finish her
3    answer.  You don't cut her off,
4    Mark.
5         MR. HEGARTY:  Let's go off
6    the record.
7         MS. O'DELL:  No, we're not
8    going off the record.  She's
9    finishing her answer.
10        MR. HEGARTY:  Let's go off
11   the record.  I'm not --
12        MS. O'DELL:  And then you
13   can ask her another question.
14        MR. HEGARTY:  Let's go off
15   the record.  It's my deposition.
16        MS. O'DELL:  No.  It's your
17   deposition, but it's not fair to
18   mistreat this witness if she is
19   answering your question.
20        MR. HEGARTY:  I'm not
21   mistreating the witness.
22        MS. O'DELL:  Yes, you are.
23        MR. HEGARTY:  We'll go off
24   the record and call Judge Pisano.

|  | Page 319 |
|---|---|

1         MS. O'DELL:  You are
2    mistreating the witness by not
3    allowing her to finish her --
4         MR. HEGARTY:  I withdrew the
5    question.
6         MS. O'DELL:  Well, okay.
7    The with -- the question was
8    withdrawn.  Ask a question, let
9    her --
10        MR. HEGARTY:  No, we're off
11   the record.  We're going to call
12   Judge Pisano.
13        MS. O'DELL:  Okay.  Great.
14        THE VIDEOGRAPHER:  Off the
15   record.  The time is 3:21 p.m.
16   Off the record.
17        (Whereupon, a discussion was
18   held off the record.)
19        THE VIDEOGRAPHER:  We are
20   back on the record.  The time is
21   3:23 p.m.
22   BY MR. HEGARTY:
23        Q.   Dr. Zelikoff, is it your
24   opinion that one particle of nickel

|  | Page 320 |
|---|---|

1    either inhaled or applied to the perineum
2    will induce inflammation in the ovaries?
3         A.   It's my opinion that it
4    could.
5         Q.   What literature do you have
6    to support that opinion?
7         A.   My professional opinion as a
8    toxicologist in metals with over
9    30 years.
10        Q.   Next question.  Is it your
11   opinion that one particle of cobalt,
12   either inhaled or applied to the
13   perineum, will induce inflammation in the
14   ovaries?
15        A.   Again, it's my opinion that
16   it -- it could.  It has the biological
17   plausibility to, because inflammation,
18   although not as toxic in many ways as
19   it's classified as a 2B -- 2B by IARC
20   is -- has the potential -- does cause
21   inflammation, and that inflammation can
22   leave the site of the target site.
23        Q.   What authority do you have
24   for that opinion?

|  | Page 321 |
|---|---|

1         A.   My professional opinion.
2         Q.   Is it your opinion that one
3    particle of chromium, either inhaled or
4    applied to the perineum, will induce
5    inflammation in the ovaries?
6         MS. O'DELL:  Objection to
7    the form.
8         THE WITNESS:  It depends on
9    the form of the chromium.
10   BY MR. HEGARTY:
11        Q.   What form of chromium does
12   it need to be?
13        A.   A trivalent chromium
14   which -- I'm sorry, hexavalent chromium
15   which will then get into the cell, start
16   the process and -- and convert to
17   chromium-3, 4 and 5.
18        Q.   That's chromium-6, correct?
19        A.   Hexavalent chromium is
20   chromium-6, right.
21        Q.   Is it your opinion that one
22   particle of chromium-6, either inhaled or
23   applied to the perineum, will induce
24   inflammation in the ovaries?

81 (Pages 318 to 321)

Judith Zelikoff, Ph.D.

Page 322

1        MS. O'DELL: Objection to
2    form.
3        THE WITNESS: It could,
4    because inflammation again could
5    leave the target site. And it
6    depends on the form of the metal.
7        So we have soluble metals --
8    I don't want to go on too long.
9    You have soluble metals and
10   insoluble metals. Some of them
11   are more toxic and more -- and
12   potentially more carcinogenic than
13   other forms. There are many salts
14   within those metals that you gave.
15   BY MR. HEGARTY:
16       Q.   And what authority do you
17   have for the statement that one particle
18   of chromium, either inhaled or applied to
19   the perineum, will induce inflammation in
20   the ovaries?
21       A.   My professional judgment.
22       Q.   Will one particle of the
23   fragrance of the chemicals that you list
24   from the fragrances, either inhaled or

Page 323

1    applied to the perineum, cause
2    inflammation to the ovaries?
3        MS. O'DELL: Objection to
4    the form.
5        THE WITNESS: If -- I -- I
6    don't have the knowledge, I don't
7    have the literature knowledge to
8    answer that question.
9    BY MR. HEGARTY:
10       Q.   Will one -- will one
11   particle of -- of cadmium, either inhaled
12   or applied to the perineum, cause
13   inflammation in the ovaries?
14       A.   It can cause --
15       MS. O'DELL: Objection to
16   form. You can answer.
17       THE WITNESS: It can cause
18   inflammation in the area if it's
19   inhaled in the lung and that
20   inflammation can get out
21   systemically.
22       Now it depends, again, on
23   the size of the particle. Metals,
24   as I said before, cannot be

Page 324

1    lumped. And particles oftentimes,
2    if they're different in size, if
3    they're different in chemical
4    structure, if they have iron or
5    don't have iron, you have -- you
6    may have differences.
7    BY MR. HEGARTY:
8        Q.   Will one particle from
9    diesel exhaust, inhaled or applied to the
10   perineum, cause inflammation in the
11   ovary?
12       MS. O'DELL: Object to the
13   form.
14       THE WITNESS: Again, same
15   answer, it could. Depends on the
16   particle size, the particle type,
17   the particle morphology. And it
18   has the potential to induce
19   inflammation as shown in cells.
20   And can produce an oxidant state.
21   BY MR. HEGARTY:
22       Q.   Doesn't inflammation just
23   reflect the body's normal response to the
24   presence of the particles?

Page 325

1        A.   There are two -- there are
2    two forms of -- well, there are multiple
3    forms of inflammation. But the two that
4    are of concern and in -- in response to
5    your question, is that they are acute
6    inflammation and there is chronic
7    inflammation.
8        And with acute inflammation,
9    the first response to a foreign -- a
10   foreign particle or an antigen on a
11   bacterial cell or an infectious agent, is
12   for the body to mount an immune response.
13       How it does that is through
14   the same cell types that I just
15   mentioned. Polymorphonucleocytes, also
16   known as neutrophil. Macrophages, and
17   those are the two key players, but
18   natural killer cells all come into it.
19       That involves the innate
20   immune system. And so the first thing to
21   protect the body, whether it's a viral
22   infection or whether it's a bacterial
23   infection or whether it's a foreign
24   particle, is to mount that kind of immune

82 (Pages 322 to 325)

Judith Zelikoff, Ph.D.

Page 326

1  response to kill or negatively impact
2  that particular particle.
3        That will then -- that's an
4  innate immune response being active.
5  That will then, in some cases, upregulate
6  the T-cell and -- and humoral or -- and
7  cell-mediated immune response.
8        Now, that is, in terms of
9  cancers and in terms of tumors, that is
10 called immunosurveillance and that's the
11 first thing.  And you're absolutely
12 right.  The purpose of the immune system
13 is to protect the body.  That is the
14 function.
15       However, there are three
16 stages or three types of processes for
17 the immune system in carcinogenesis.  The
18 second being immuno equilibrium.  But the
19 part that is the last part is that the
20 tumor can actually quiet or cause
21 immunosenescence of the immune system.
22       So in a chronic
23 inflammation, it does not always act in
24 the best interest of the -- of the host

Page 327

1  but in the best interest of the tumor.
2        So your -- the answer to
3  your question is yes, that's the function
4  of it.  But it can behave, it's a
5  two-prong sword.
6        Q.   You said there are multiple
7  types of inflammation and you listed two
8  types:  Acute and chronic.  Are there any
9  other types besides those two?
10       A.   Well, you have the reactions
11 to those inflammation in terms of having
12 a foreign body reaction.  That is part of
13 an inflammatory response.  So in terms of
14 temporality or timing, inflammation is
15 acute and is chronic.
16       What occurs during that
17 time, such as a foreign body reaction
18 where macrophages all come together and
19 engulf the particle or the fiber and try
20 to keep it within a localized space, that
21 is a process that can occur within
22 inflammation.
23       So my answer to you is that
24 there are two major types of

Page 328

1  inflammation.  Not that they involve
2  different cell types or different
3  mechanisms.  But they are called, in
4  terms of timing or temporality, acute
5  which will kill whatever right away and
6  then chronic which unfortunately keeps
7  playing back on itself and the
8  inflammation will continue.
9        Q.   Granulomas which you just
10 mentioned don't cause cancer, correct?
11       A.   Granulomas do not -- I'm
12 sorry.
13       Q.   Granulomas which you just
14 mentioned don't cause cancer, correct?
15       A.   Granulomas are in response
16 to a foreign body.  In the case of
17 asbestos or in the case of another type
18 of fiber, macrophage will come over and
19 their normal process in what we call
20 innate immunity is to engulf the fiber.
21 And unfortunately, many times the fiber
22 cannot be engulfable or the particle
23 cannot be engulfable.
24       And so many macrophage will

Page 329

1  come over, and they will try to engulf it
2  as a body.  And that is called a
3  granulomatous reaction.
4        And that's what happens
5  during tuberculosis when the organism
6  forms, many macrophages come over to kill
7  the organism, but it can't, and so they
8  form granulomas.
9        Q.   Doctor, listen to my
10 question.  I didn't ask you what a
11 granuloma was.  I asked you, granulomas
12 don't cause cancer, correct?
13       MS. O'DELL:  Object to form.
14       THE WITNESS:  There is no
15       literature to my knowledge that
16       shows a granuloma, meaning immune
17       response, forming macrophages
18       engulfing, can cause cancer.
19 BY MR. HEGARTY:
20       Q.   And a reaction to
21 inflammation can include the development
22 of fibrosis or scar tissue, correct?
23       A.   That is a long-term chronic
24 response associated with chronic

83 (Pages 326 to 329)

Judith Zelikoff, Ph.D.

Page 330

1  inflammation.
2        Q.   And there's no literature
3  linking fibrosis to cancer, correct?
4        MS. O'DELL:  Object to the
5  form.
6        THE WITNESS:  My
7  professional opinion is that there
8  is literature -- let me just read
9  over the question, please.
10       So fibrosis is produced by
11  release of factors from the
12  macrophage.  And it causes
13  scarring within that particular
14  target organ.
15       Now, whether or not that --
16  those -- that scarring can
17  actually make that site more
18  vulnerable to cancer, like in the
19  case of hepatitis, where you get
20  scarring, and you get cancer as a
21  result of that particular
22  fibrosis, but they are two
23  different diseases.
24       But whether the area of

Page 331

1        fibrosis creates a more vulnerable
2  tissue base that can -- that can
3  progress or go to cancer is a
4  question that there is some
5  examples of, but -- in the liver
6  in particular.
7  BY MR. HEGARTY:
8        Q.   Well, there's no literature
9  reporting an increased risk of cancer in
10  any organ because there's fibrosis in
11  that organ, correct?
12       A.   What I'm saying is that in
13  terms of the liver and in terms of
14  fibrosis, let's say from ethanol or
15  acetaminophen ingestion, you get fibrosis
16  which is a whole disease or symptomology
17  by itself, and then you have cancer,
18  which is another disease.  But what I'm
19  saying is that in the area where the
20  injury and the fibrosis occurs, in the
21  liver there is a higher risk of getting
22  cancer.
23       Q.   Fibrosis doesn't morph or
24  turn into cancer?

Page 332

1        A.   Fibrosis does not morph or
2  turn into cancer.  That is correct.
3        Q.   In Section 12 -- I'm sorry.
4  On Page 12, under your section
5  "exposure," talc particle access to the
6  body.
7        Do you see that section?
8        A.   Is this Paragraph 1, 2, or
9  3?
10       Q.   Well, I'm looking just at
11  the Section Number 4 right now.
12       A.   Yes.  Okay.  Section Number
13  6 is on Page 12.
14       Q.   Section 6.  I'm sorry.  I
15  had those transposed.
16       A.   And please repeat your
17  question.
18       Q.   You never -- prior to being
19  contacted by counsel for plaintiffs, you
20  never looked at the studies reporting on
21  whether talc can reach the ovaries via
22  inhalation or perineal application,
23  correct?
24       A.   I did not study the

Page 333

1        literature or review the literature prior
2  to being contacted.  But I studied it and
3  reviewed it extensively after being
4  contacted.
5        Q.   On Page 12 of the last
6  paragraph -- I'm sorry -- second-to-last
7  paragraph, which begins, "A common
8  exposure route."
9        Do you see that paragraph?
10       A.   I do.  Thank you.
11       Q.   You write, "Again, a common
12  exposure route for cosmetic talc is via
13  the dermal route including vaginally
14  after perineal application."
15       A.   Yes.
16       Q.   Is it your testimony that
17  there's biologic plausibility with talc
18  applied to the skin?
19       A.   Applied to the skin, talc
20  does not -- is not absorbed into the skin
21  or through the skin, although there is
22  some question as to whether if there's
23  injury or scratch or openings in the
24  skin, whether the talc can penetrate.

84 (Pages 330 to 333)

Judith Zelikoff, Ph.D.

Page 334

1  But in and of itself talc cannot
2  penetrate through the skin.
3        However, we're not -- when
4  we're talking about perineal or vaginal
5  application, you are not talking about an
6  epidermal subcutaneous keratinized skin.
7        Q.   None of the studies that you
8  cite in this paragraph researched
9  particle transport through the
10 reproductive tract through perineal
11 application, correct?
12       MS. O'DELL:  Object to the
13       form.
14       THE WITNESS:  These -- it is
15       extremely technically difficult,
16       from my knowledge as an animal
17       toxicologist, to do perineal
18       application to a mouse.
19 BY MR. HEGARTY:
20       Q.   I'm going to withdraw the
21 question.  Doctor, you will not respond
22 to my question.  My question is simply,
23 none of the studies that you cite in this
24 paragraph researched particle transport

Page 335

1  through the reproductive tract through
2  perineal application.  That's correct?
3        A.   There is a study, and I'm
4  afraid the name of the author does not
5  come to me.  So allow me to look at my
6  report.
7        Q.   And I'm just talking about
8  the authorities that you cite in the
9  second paragraph beginning, "A common
10 exposure route."
11       MS. O'DELL:  Feel free to
12       look at your report if you need
13       to, Doctor.
14       THE WITNESS:  I understand.
15       On Page 13, animal models --
16 BY MR. HEGARTY:
17       Q.   Doctor, that's not my
18 question.  My question is in the
19 paragraph that I referenced beginning a
20 common exposure route, none of those
21 authorities looked at transport of the
22 particles via application of those
23 particles to the perineum?
24       MS. O'DELL:  Objection to

Page 336

1        the form.
2  BY MR. HEGARTY:
3        Q.   Correct?
4        MS. O'DELL:  Excuse me.  You
5        may answer his question any way
6        you'd want to, Doctor.
7        THE WITNESS:  None of these
8        that I have stated on Page 12
9        refer to perineal exposure in the
10       second paragraph in terms of
11       Venter, Iturralde, Sjosten and
12       Heller.
13       However, on Page -- on Page
14       13, there is a study by Keskin,
15       who used rats and did a vaginal or
16       perineum to talc.
17 BY MR. HEGARTY:
18       Q.   I'm going to move to strike.
19 We're going to go off the record.
20       MR. HEGARTY:  We're going to
21       call Judge Pisano.  There's no
22       reason to add that additional part
23       to the answer to that question.
24       And I'm not -- I'm tired of that

Page 337

1        happening.  So we'll call him
2        unless you're going to talk to the
3        witness.
4        MS. O'DELL:  Is your
5        objection she didn't answer your
6        question?  Because she -- you
7        asked her about the paragraph.
8        She said "no; however" --
9        MR. HEGARTY:  We're off the
10       record.
11       MS. O'DELL:  No, we're not
12       off the record.
13       MR. HEGARTY:  We're off the
14       record.
15       MS. O'DELL:  No, we --
16       MR. HEGARTY:  We're going
17       off the record.
18       MR. LOCKE:  We are off.  Let
19       me throw out something.  We've got
20       seven hours.  I think there's a
21       plan here to stall, and we need to
22       do a better job of keeping things
23       moving, or we are going to have to
24       ask the court for more time.

85 (Pages 334 to 337)

Judith Zelikoff, Ph.D.

| Page 338 | Page 340 |
|---|---|
| 1      MR. HEGARTY:  Let's go off | 1   have looked at transport of dry powder |
| 2   the record. | 2   talc to the perineum showing that the -- |
| 3      MS. O'DELL:  The suggestion | 3   that talc transports to the ovaries, |
| 4   that there's -- let me just -- | 4   correct? |
| 5   before we go off the record, the | 5      MS. O'DELL:  Object to the |
| 6   suggestion that there's somehow a | 6      form. |
| 7   plan to -- is incorrect, and | 7      THE WITNESS:  When we say -- |
| 8   improper.  So if you want to go | 8      when you say talc, you're |
| 9   off the record, I think you've got | 9      referring to talcum powder |
| 10   an answer to your question, which | 10      products? |
| 11   was, "No, not in the paragraph." | 11   BY MR. HEGARTY: |
| 12      However, she has a right to | 12      Q.   Correct, correct. |
| 13   point to evidence in her report. | 13      A.   That's correct to my |
| 14   That's perfectly appropriate. | 14   knowledge. |
| 15      MR. HEGARTY:  We'll let | 15      Q.   And are you aware that talc |
| 16   Judge Pisano decide.  We'll go off | 16   is in toilet paper? |
| 17   the record. | 17      A.   Yes, I just learned that |
| 18      THE VIDEOGRAPHER:  The time | 18   recently. |
| 19   is 3:39 p.m.  Going off the | 19      Q.   Can talc in toilet paper |
| 20   record. | 20   migrate to the ovaries? |
| 21      (Short break.) | 21      MS. O'DELL:  Object to the |
| 22      THE VIDEOGRAPHER:  The time | 22      form. |
| 23   is 4:04 p.m.  Back on the record. | 23      THE WITNESS:  Can -- my |
| 24      MR. HEGARTY:  We're back on | 24      knowledge is that talc in toilet |

| Page 339 | Page 341 |
|---|---|
| 1   the record and we're going to | 1      paper is -- is bound to the |
| 2   continue without calling Judge | 2      other -- the other components |
| 3   Pisano at this time.  But we do | 3      there.  So unless it becomes |
| 4   reserve the right to ask Judge | 4      bioavailable it cannot migrate |
| 5   Pisano for more time based on our | 5      from the toilet paper. |
| 6   belief that Dr. Zelikoff has many | 6   BY MR. HEGARTY: |
| 7   occasions over the course of this | 7      Q.   How about talc -- talc in |
| 8   deposition not been responsive to | 8   soap, is there talc in soaps? |
| 9   the questions asked and as a | 9      A.   To my knowledge there is. |
| 10   result has -- has wasted the | 10      Q.   Can talc in soaps, if |
| 11   defendant's time and to our | 11   applied to the perineum, migrate to the |
| 12   prejudice. | 12   ovaries? |
| 13      So -- but we're going to go | 13      A.   If it becomes -- |
| 14   forward and see if we can finish | 14      MS. O'DELL:  Object to form. |
| 15   this deposition. | 15      THE WITNESS:  If it becomes |
| 16      MS. O'DELL:  Plaintiffs will | 16      bioavailable.  Likely bound up to |
| 17   obviously oppose that -- that | 17      the other components. |
| 18   motion.  Dr. Zelikoff has been | 18   BY MR. HEGARTY: |
| 19   responsive to your questions. | 19      Q.   When you say bioavailable, |
| 20   BY MR. HEGARTY: | 20   what do you mean? |
| 21      Q.   Dr. Zelikoff, we're talking | 21      A.   To me, "bioavailable" means |
| 22   about the section on talc particle's | 22   that the body can see it, and it |
| 23   access to the body.  There have been no | 23   becomes -- it becomes -- it has access to |
| 24   studies in either animals or humans that | 24   biological responsiveness. |

86 (Pages 338 to 341)

Judith Zelikoff, Ph.D.

Page 342

1      Q.   And do you know a
2    Dr. Benjamin Neel at NY University -- New
3    York University?
4      A.   Dr. Neel, isn't he the head
5    of the cancer center?
6      Q.   He is.
7      A.   He is the head of the cancer
8    center.
9      Q.   Do you know him?
10      A.   I do not know him.
11      Q.   Does he know more about
12    cancer biology than you do?
13          MS. O'DELL:  Object to the
14      form.
15          THE WITNESS:  I've not seen
16      his CV.  I would assume as head of
17      the cancer center, that he
18      probably does.  Since that is not
19      my area of study.
20    BY MR. HEGARTY:
21      Q.   Are dose-response
22    relationships important in evaluating
23    potential carcinogenicity of a substance?
24      A.   Dose-response --

Page 343

1    dose-responses are -- contribute to, as I
2    said frequency, duration, exposure route.
3    They all contribute to carcinogenicity.
4      Q.   In other words, in
5    evaluating the carcinogenicity of a
6    substance, it's important to look at dose
7    relationships, correct?
8      A.   Are you speaking about
9    dose-response, or more than one dose?
10      Q.   Let me ask it again.  In
11    evaluating the substance for
12    carcinogenicity purposes, it's important
13    to look at dose-response relationships,
14    correct?
15      A.   It's important to look at
16    dose-response relationships, but it's not
17    the only factor, is what I'm saying.
18      Q.   In your report, you cite a
19    number of reactions to talc that have
20    been reported, pleural inflammation,
21    granulomas, pulmonary
22    interstitial fibrosis --
23      A.   What page are you referring
24    to?

Page 344

1      Q.   You need a specific page?
2    Over on Page 16.  Over the course of this
3    page and carrying over to the next page,
4    you cite a number of studies that refer
5    to talc causing pleural inflammation,
6    correct?
7      A.   Yes.
8      Q.   Talc causing granulomas,
9    correct?
10      A.   Yes.
11      Q.   Talc causing pulmonary
12    interstitial fibrosis, correct?
13      A.   Talcum powder can do those
14    things, yes.
15      Q.   And talc causing
16    carcinogenic activity in the lungs,
17    correct?
18      A.   Are you referring to a
19    specific line?
20      Q.   No, I'm not referring to a
21    specific line.  I'm talking about
22    generally from this part of your report.
23      A.   In general, this is the
24    section on inhalation.  I'm talking

Page 345

1    about -- yes, I'm talking about talcum
2    powder and its ability to bring about
3    changes in the lungs that could lead to
4    carcinogenic -- carcinogenesis.
5      Q.   Of the reactions that we
6    just talked about, have any of those been
7    reported in women using talc on the
8    perineum?
9      A.   There have been no studies
10    to my knowledge showing that application
11    of perineal talc can produce -- produces
12    lesions in the lungs.
13      Q.   And there's been no studies
14    that you are -- of which you are aware
15    that have reported findings of granulomas
16    in women using talc in the perineum,
17    correct?
18      A.   There is evidence of
19    inflammation clearly, but there -- to my
20    knowledge, I have not seen any of the
21    literature which shows a granuloma in the
22    ovary.
23      Q.   What studies have you seen
24    that have reported seeing inflammation in

87 (Pages 342 to 345)

Judith Zelikoff, Ph.D.

Page 346

1  the ovaries of women using talc on the
2  perineum?
3          MS. O'DELL:  Object to the
4      form.
5          THE WITNESS:  I'm just
6      trying to find the section.
7          There were many studies, I
8      can't right now, without finding
9      it in my report, identify any one
10     in particular.
11 BY MR. HEGARTY:
12     Q.   Well, sitting here today,
13 can you cite any study that has reported
14 on finding inflammation of the ovaries
15 following perineal application of talc?
16     A.   As I said, there are many --
17 there are many examples in animal models
18 that was not perineal, that was vaginal,
19 as you stated.
20         There were studies --
21 study -- an early study which identified
22 talcum powder particles in the ovary with
23 inflammatory responsiveness or
24 inflammatory responses.  That was a

Page 347

1  very -- that was a very early study.  I'm
2  not sure if it was Hamilton or Henderson.
3  If I may.
4          I'm sorry it's not coming to
5      mind now.
6      Q.   Okay.  Over on Page 20 you
7  discuss the role of the immune system --
8      A.   Yes, sir.
9      Q.   -- correct?
10     A.   I see that, yes.
11     Q.   You agree that it's not
12 generally accepted by the medical or
13 scientific communities that all cancers
14 are caused by chronic inflammation,
15 correct?
16     A.   There are other mechanisms
17 that are associated with carcinogenesis
18 and the process of carcinogenesis.  If
19 you'd like, I can identify those.
20     Q.   You agree that there are
21 types of chronic inflammation that are
22 not related to cancer.  Rheumatoid
23 arthritis is one, correct?
24     A.   That's an autoimmune

Page 348

1  disease.
2      Q.   Okay.  Rheumatoid arthritis
3  does not increase the risk of cancer,
4  correct?
5      A.   Rheumatoid arthritis, for
6  what's known now, does not increase the
7  risk of cancer.
8      Q.   Psoriasis is another chronic
9  inflammatory process, correct?
10     A.   Another autoimmune disease
11 and another inflammatory process, yes.
12     Q.   Having psoriasis does not
13 increase the risk of any form of cancer,
14 correct?
15     A.   Not that -- not that we know
16 with the current knowledge.
17     Q.   So just having chronic
18 inflammation does not mean cancer will
19 develop, correct?
20         MS. O'DELL:  Object to the
21     form.
22         THE WITNESS:  Just having
23     chronic inflammation does not have
24     to indicate.  It's one -- again,

Page 349

1      it's one mechanism that provides
2      biological plausibility for the
3      cancer induction.
4          If I may give an example.
5  BY MR. HEGARTY:
6      Q.   Well, let me -- that's not
7  what I asked you for.
8      A.   Okay.  I thought I answered
9  your question.
10     Q.   Does having pelvic
11 inflammatory disease cause ovarian
12 cancer?
13     A.   The inflammation has been
14 linked with ovarian cancer, yes.
15     Q.   In your opinion is there a
16 biologically plausible mechanism between
17 PID and ovarian cancer?
18     A.   Well, PID is usually
19 associated with an infection.  And what's
20 related to cancer and why there's higher
21 risk in inflammatory diseases of
22 endometriosis and pelvic inflammatory
23 disease is through a mechanism of
24 inflammation.

88 (Pages 346 to 349)

Judith Zelikoff, Ph.D.

Page 350

```
 1        Q.   Your biologically plausible
 2   mechanism for talc and ovarian cancer is
 3   inflammation, correct?
 4        A.   That's primary, yes.
 5        Q.   You make reference to MUC-1.
 6   That's not your biological plausibility
 7   mechanism, is it?
 8        A.   You mean MUC-1 --
 9        Q.   Yes.
10        A.   -- antibodies?
11        Q.   Correct?
12        A.   MUC-1, if I may explain it,
13   is mucin.  And --
14        Q.   I don't want to interrupt.
15   I'm not after an explanation.  I just
16   wanted to know whether it's part --
17   whether the references you include in
18   your report to MUC-1 are included in your
19   biologically plausible opinion?
20        A.   It is included in my -- in
21   reaching my opinion, yes.
22        Q.   Is that a separate mechanism
23   from inflammation?
24        A.   It is a separate mechanism
```

Page 351

```
 1   from inflammation.  It's seen in ovarian
 2   cancer as a marker.  And when you have --
 3   evidence has shown that if you have
 4   antibodies to MUC-1, and if they're
 5   decreased as is seen in response to talc,
 6   that you will have less of an immune
 7   response and protection.
 8        Q.   Can you cite for me any
 9   study that has correlated MUC-1 levels
10   with ovarian cancer risk?
11             MS. O'DELL:  Object to form.
12             THE WITNESS:  They use it as
13        a marker.  The literature uses
14        MUC-1 as a marker of cancer.  Can
15        I cite you any studies that links
16        it with ovarian cancer?  No, I
17        cannot.
18   BY MR. HEGARTY:
19        Q.   Are there any studies that
20   link the levels of MUC-1 to ovarian
21   cancer risk?
22        A.   Do you mean human studies or
23   animal?
24        Q.   Yes, human studies only.
```

Page 352

```
 1        A.   It's -- the only evidence
 2   out there that addresses this is when
 3   they do correlation studies with the
 4   level of antibodies to MUC-1.  And when
 5   the antibody levels are decreased, then
 6   you have -- they found that you have an
 7   increased risk of ovarian cancer.
 8        Q.   There are no studies
 9   reporting or correlating MUC-1 levels in
10   talcum powder users to ovarian cancer
11   risk, correct?
12             MS. O'DELL:  Object to form.
13             THE WITNESS:  Not to my
14        knowledge.
15             MS. O'DELL:  Sorry.
16   BY MR. HEGARTY:
17        Q.   And measuring MUC-1 is not
18   used to diagnose ovarian cancer, correct?
19        A.   MUC-1 is also known as
20   CA-125, and it is used as a marker.
21        Q.   My question is, is MUC-1
22   used to -- levels -- strike that.
23             Are MUC-1 levels used to
24   diagnose a woman with ovarian cancer?
```

Page 353

```
 1        A.   My response to that is MUC-1
 2   is synonymous with CA-125.  CA-125 is a
 3   shed marker in the blood associated with
 4   ovarian cancer, so yes.
 5        Q.   Okay.  Is it your testimony
 6   that for purposes of -- strike that.
 7             Is it your testimony that
 8   CA-125 levels are used to diagnose
 9   ovarian cancer?
10             MS. O'DELL:  Object to the
11        form.
12             THE WITNESS:  I'm saying
13        that CA-125 is used as a
14        biological marker of progression,
15        extent, and intensity and whether
16        ovarian cancer is present.
17   BY MR. HEGARTY:
18        Q.   My question is, in a woman
19   who comes in complaining of symptoms that
20   might be ovarian cancer, is CA-125 used
21   to diagnose ovarian cancer?
22        A.   I'm sorry, I'm not a
23   physician.  I can't answer that question
24   in terms of what -- what an OB/GYN or an
```

89 (Pages 350 to 353)

Judith Zelikoff, Ph.D.

Page 354

1    oncologist would do.
2        Q.   And measuring CA-125 levels
3    does not give you any evidence of the
4    etiology of the ovarian cancer, correct?
5        A.   Not to the etiology.
6    However, it is an epithelial-associated
7    protein.
8            So if we are talking about
9    epithelial, and we are talking about
10   epithelial ovary carcinoma, it is related
11   to -- to that.
12       Q.   Does all types -- do all
13   types of inflammation irreparably damage
14   tissue?
15       A.   Irreparably.  Do you mean
16   persistently without -- is there
17   recovery?
18       Q.   No, my question is do all
19   types of inflammation, all acute, all
20   chronic inflammation, damage tissue where
21   it's not repaired?
22       A.   Where it's not repaired?
23       Q.   Yes.
24       A.   No, you can have -- with

Page 355

1    acute inflammation, of course you can
2    have repair or -- it's there to protect
3    against the invader.
4        Q.   Does having inflammation in
5    one organ or one tissue in the body
6    always mean that other tissues in the
7    body will be inflamed?
8        A.   It does not always mean
9    that.
10       Q.   The medical community has
11   not generally accepted that chronic
12   inflammation is a cause of ovarian
13   cancer, correct?
14           MS. O'DELL:  Objection to
15   form.
16           THE WITNESS:  Again, I'm not
17   quite sure what you mean by
18   generally accepted.  Everyone
19   has -- every medical community has
20   its own opinion.  I'm sure there
21   are many doctors who do embrace
22   it.  And I'm sure there are many
23   doctors who do not.  I'm not sure
24   whether they've done the extent of

Page 356

1        the systematic review of the
2        literature as I have.  But each
3        doctor, I'm sure, makes their own
4        opinion.
5    BY MR. HEGARTY:
6        Q.   Can you cite any doctor who
7    treats ovarian cancer or researches
8    ovarian cancer who believes that the
9    biological plausible mechanism of ovarian
10   cancer is inflammation?
11       A.   I have not spoken to any
12   doctors in that regard.
13       Q.   What does the inflammation
14   in the ovary look like in your opinion
15   from talc exposure?
16       A.   It looks like any other
17   local target of inflammation, in that
18   there are neutrophils, immune cells that
19   migrate into the area.  There are
20   macrophages that migrate into the area.
21   There can be higher levels of cytokines
22   like interleukin and chemotactic factor,
23   growth factor.
24       Q.   Such inflammation, if it was

Page 357

1    occurring would be visible, correct?
2        A.   Not necessarily.  In a -- in
3    a chronic -- first of all, you can get
4    different time periods.  So
5    inflammation -- if it's chronic
6    inflammation you are talking about one
7    thing.  And then you might see some
8    remnants of the inflammation.
9            But if you look at a period
10   of time, you can miss the inflammatory
11   response.  It can be there, impact the
12   cells and then be gone.
13       Q.   Even with chronic
14   inflammation?
15       A.   With chronic inflammation,
16   if you looked hard enough you would find
17   the remnants of its presence and you will
18   also likely find neutrophilic
19   infiltration.
20       Q.   Has that --
21       A.   That does not last forever.
22       Q.   Has that ever -- that --
23   those findings ever been reported in
24   women using talc in the perineum?

90 (Pages 354 to 357)

Judith Zelikoff, Ph.D.

Page 358

1      A.   The inflammatory response?
2      Q.   Correct.
3      A.   Or the infiltration?  Not
4   that I'm aware of.  Not in my report.
5      Q.   How many applications of
6   talc to the perineum does it take to
7   cause chronic inflammation in the
8   ovaries?
9      A.   That's -- that
10  information -- that is not known how many
11  applications, whether it could be one or
12  it needs to be over a period of three
13  years or a period of ten years.  Some of
14  the meta-analysis evaluations indicated
15  that there were some temporal
16  associations with it, and that it needed
17  to be used longer than ten years, where
18  you saw responsiveness.  And others
19  indicated less than ten years.
20      So it's -- it's difficult to
21  say, and it's also associated with the
22  woman.
23      Q.   Does acute inflammation
24  cause cancer?

Page 359

1      A.   Acute inflammation has not
2   been linked to my knowledge to cancer.
3   As I said, it's used as an immune
4   surveillance and protective mechanism as
5   you pointed out.
6      Q.   Over on Pages 20 and 21 of
7   your report you refer to CRP and other
8   inflammatory markers, cytokines,
9   inflammatory mediators.  Do you see the
10  section I'm referring to?
11      A.   I -- roles of the immune
12  system, and then Section E, ovarian
13  cancer inflammation?
14      Q.   Correct.
15      A.   Which section are you
16  referring to?
17      Q.   Well, the section ovarian
18  cancer inflammation at the bottom of
19  Page 20, carrying over to the top of
20  Page 21.
21      A.   I see that.
22      Q.   And there you talk about a
23  number of inflammatory markers, correct?
24      A.   Correct.

Page 360

1      Q.   None of those inflammatory
2   markers are tested to diagnose or monitor
3   a woman for developing ovarian cancer,
4   correct?
5      A.   To my knowledge, tumor
6   necrosis factors, C-reactive protein,
7   none of the interleukins are monitored.
8      But again, I have to say
9   that I'm not an OB/GYN and so I'm not --
10  I'm not familiar with what their -- what
11  they are using other than what's in the
12  literature.
13      Q.   And no study has clinically
14  correlated those markers with ovarian
15  cancer or ovarian cancer risk, correct?
16      MS. O'DELL:  Objection to
17      form.
18      THE WITNESS:  In looking at
19      biological plausibility, which
20      I'm -- which I'm focused on, the
21      indication of those elevated
22      levels as well as decreased levels
23      of antioxidants are associated
24      with inflammation and are

Page 361

1      associated with ovarian cancer.
2   BY MR. HEGARTY:
3      Q.   Well, can you cite for me
4   any study that has clinically correlated
5   those findings to ovarian cancer risk?
6      MS. O'DELL:  Objection.
7      Asked and answered.
8      THE WITNESS:  First of all,
9      I'm not -- and again, not an
10     OB/GYN.
11     I can tell you that those
12     risk factors, which are
13     inflammatory markers, are used as
14     an indicator of inflammation as a
15     biological plausible mechanism.
16  BY MR. HEGARTY:
17      Q.   Well, do you cite in your
18  paper any studies that have --
19      A.   I'm sorry, do you mean the
20  report?
21      Q.   In your report.  Do you cite
22  in your report any studies that have
23  found that women with these markers have
24  a higher -- higher or an increased risk

91 (Pages 358 to 361)

Judith Zelikoff, Ph.D.

Page 362

1    of ovarian cancer?
2        A.   Well, what I -- no.  But
3    what I have found is that in women who
4    have ovarian cancer, when they measure
5    concurrently or subsequently, that the
6    levels of certain inflammatory markers
7    are elevated.
8        Q.   My question was specific to
9    women prior to being diagnosed with
10   ovarian cancer, has any study shown that
11   women with higher levels of these
12   inflammatory markers have an increased
13   risk of ovarian cancer?
14       MS. O'DELL:  Objection to
15       form.
16       THE WITNESS:  Not in that
17       particular context.  But again I'm
18       not an OB/GYN.
19   BY MR. HEGARTY:
20       Q.   Has any study shown that
21   these inflammatory factors are elevated
22   in women using talc on the perineum?
23       MS. O'DELL:  Objection to
24       the form.

Page 363

1        THE WITNESS:  It's not a
2        common thing to measure
3        inflammatory mediators as a result
4        of the common use of talcum powder
5        products.  So there is no
6        indication of that because there
7        are no studies of that.
8    BY MR. HEGARTY:
9        Q.   If you look over on Page 24
10   of your report under the section Role of
11   Oxidants in Ovarian Cancer.  Do you see
12   that section?
13       A.   Section C on Page 24?
14       Q.   Correct.
15       A.   Yes.
16       Q.   All the processes that you
17   describe in this section occur in
18   everyone everyday, correct?
19       MS. O'DELL:  Object to the
20       form.
21       THE WITNESS:  To a degree,
22       yes.
23   BY MR. HEGARTY:
24       Q.   The reactive oxygen species

Page 364

1    are a normal product of cell activity,
2    correct?
3        A.   That is correct --
4        Q.   For example, for many --
5        A.   -- for many cells.
6        Q.   -- reactive oxygen species
7    increase if we exercise, correct?
8        A.   As well as antioxidants
9    increase, yes.
10       Q.   The same is true for
11   reactive nitrogen species, correct?
12       A.   Yes.
13       Q.   These --
14       A.   It's a matter of degree.
15       Q.   Reactive oxygen species and
16   reactive nitrogen species increase if
17   we're under stress, correct?
18       A.   They have been shown to do
19   that, yes.
20       Q.   And the body has defense
21   mechanisms to handle this increase in
22   reactive oxygen species and reactive
23   nitrogen species, correct?
24       MS. O'DELL:  Objection to

Page 365

1        form.
2        THE WITNESS:  The body has
3        antioxidant mechanisms, including
4        superoxide dismutase, catalase, et
5        cetera, that are -- that elevate
6        in response to reactive oxygen
7        species.  But they can be
8        overwhelmed by the amount of ROS
9        release.
10   BY MR. HEGARTY:
11       Q.   But it would be improper to
12   say that simply by the generation of
13   reactive oxygen species or reactive
14   nitrogen species, DNA mutations and tumor
15   development will occur, correct?
16       MS. O'DELL:  Object to form.
17       THE WITNESS:  One couldn't
18       say that just by the -- as you
19       point out, as the normal -- under
20       normal circumstances, endogenously
21       within the body, and not in
22       response to a particular agent
23       does produce these.  So one cannot
24       say, to answer your question, that

92 (Pages 362 to 365)

Judith Zelikoff, Ph.D.

Page 366

1    it -- just the presence of
2    reactive oxygen species will lead
3    to cancer.
4    BY MR. HEGARTY:
5        Q.   What data shows that the
6    body's response system to reactive oxygen
7    species and reactive nitrogen species is
8    unable to handle those species that might
9    be generated by talc exposure?
10       A.   Numerous cell studies and
11   numerous animal studies.  And you would
12   look at that by the level of antioxidants
13   that are also present.  And if a
14   substance such as talcum powder product
15   reduces antioxidants, then the cell or
16   the tissue is going to be overwhelmed by
17   that product.
18       Q.   Has that process ever been
19   shown in vivo?
20       A.   In a -- I'm not sure if this
21   answers your question.  I'll do my best
22   to answer it.  And your question was has
23   that process, meaning the process of
24   antioxidant change -- is that your

Page 367

1    question?
2        Q.   No.  The process where the
3    cell or the tissue is going to be
4    overwhelmed, has that process ever been
5    shown in vivo in women?
6        A.   In women?
7        Q.   Yes.
8        MS. O'DELL:  Object to the
9    form.  You can answer.
10       THE WITNESS:  Certainly in
11   animals, but not to my knowledge
12   in women.
13       I'm sorry.  I'm still
14   thinking.
15       Whenever the antioxidant
16   levels are decreased, that is an
17   indicator of being overwhelmed by
18   the reactive oxygen species or the
19   oxidation stress.
20   BY MR. HEGARTY:
21       Q.   And what studies have shown
22   the antioxidant levels are decreased in
23   women using talc?
24       A.   In women using talc -- most

Page 368

1    of the literature comes from in vivo
2    animal studies as well as in vitro cell
3    studies.  But my role is to -- is to look
4    at biological plausibility.  And so
5    studies that reveal or indicate that
6    response in an animal model and in cell
7    culture indicates to me that there's no
8    likely reason why it could not happen in
9    women.
10       Q.   Okay.  At the top of Page 25
11   of your report, you say that even a
12   single dose of a carcinogen can produce
13   effects that are adverse to cells and
14   tissue at the site of exposure.
15       Do you see where I'm
16   reading?
17       A.   Yes.
18       Q.   When you say dose, do you
19   mean exposure at a dose or volume of
20   exposure to a substance that studies have
21   proven are adverse to cells and tissues?
22       MS. O'DELL:  Object to the
23   form.
24       THE WITNESS:  That's a

Page 369

1    multiple question.  But when I
2    refer to even a single dose, I
3    mean even a single exposure.
4    BY MR. HEGARTY:
5        Q.   Are you saying there a
6    single molecule of the substance?
7        A.   What I meant in this report
8    is even a single exposure.  The
9    concentration of which could be unknown.
10   A single exposure to a certain
11   concentration, whatever that
12   concentration is, can produce effects.
13   I'm not saying can produce cancer.  What
14   I'm saying is can start the process of
15   either inflammation or oxidative stress.
16       Q.   And to what tissue does that
17   single dose need to reach to have the
18   adverse effects that you describe there?
19       MS. O'DELL:  Object to the
20   form.
21       THE WITNESS:  Whatever that
22   particular -- it depends upon the
23   carcinogen or the inflammagogue
24   that one is looking at in terms of

93 (Pages 366 to 369)

Judith Zelikoff, Ph.D.

| Page 370 | Page 372 |
|---|---|

Page 370

1    a single exposure. And it depends
2    on the susceptibility of the
3    tissue. So to answer your
4    question, doses or concentration
5    to the target tissue is unknown or
6    open.
7    BY MR. HEGARTY:
8        Q.   You're not saying that a
9    single application of talc to the
10   perineum can produce effects that are
11   adverse to cells and tissue in the
12   ovaries, correct?
13          MS. O'DELL: Object to the
14   form.
15          THE WITNESS: I'm not saying
16   that it can't. I think I
17   testified earlier that a single --
18   depending upon what that product
19   is -- in this case we're talking
20   about talcum powder product --
21   that one exposure, one
22   application, one perineal direct
23   exposure could in fact trigger the
24   cells to start a process leaning

Page 372

1        A.   In women?
2        Q.   Yes.
3        A.   I can -- I cannot off the
4    top of my head or looking at my report
5    tell you that. Again, I just want to
6    repeat that my charge was to look at
7    biological plausibility and I -- I see
8    those effects or processes that you're
9    indicating in cells and animal models,
10   but I do not have that information with
11   humans.
12       Q.   Are you aware of any study
13   correlating the exposures used in those
14   cell and animal models to the exposures
15   that women would experience with perineal
16   application of talc?
17          MS. O'DELL: Object to the
18   form.
19          THE WITNESS: Well, in my
20   mind, and in reality, women use
21   different amounts, whether it's
22   different handfuls. So I can't
23   really give you a concentration.
24   But there are studies, the in

Page 371

1        towards inflammation.
2    BY MR. HEGARTY:
3        Q.   And where the talc -- where
4    does the talc need to go in the body to
5    trigger that mechanism?
6        A.   Well, once it gets -- once
7    it's applied to the perineal region, it's
8    my belief that it then migrates up to
9    the -- to the vaginal area. And in the
10   vaginal area, it could also start
11   mechanisms, gene expression changes in
12   the vaginal tissues that could lead to
13   inflammation, or it could get to the
14   point of the cervix or to the fallopian
15   tubes. It causes changes in cells,
16   whether it's gene expression or an
17   inflammation, at any one of those
18   upward -- upward reproductive tract organ
19   systems or tissues. They're all made up
20   of cells that are susceptible to oxidant
21   stress.
22       Q.   Can you cite to us any study
23   that has shown that process in women
24   using talc to the perineum?

Page 373

1    vitro studies, that did use more.
2          However, when you're looking
3    at toxicology and you're looking
4    to define a mechanism or a
5    potential mechanism, if you use
6    even a higher dose, you're
7    still -- you still can elicit the
8    same mechanism.
9          So perineal application --
10   to answer your question, perineal
11   application can put a lot or a
12   little. But it also depends on
13   the frequency and the duration of
14   the use.
15   BY MR. HEGARTY:
16       Q.   Doctor, my question, though,
17   was, has any study correlated the
18   exposures in the animal or cell studies
19   to which you are referring to, to show
20   that those same exposures are occurring
21   in women applying talc to the perineum?
22       A.   No.
23       Q.   For purposes of your
24   opinions on biological plausibility, do

94 (Pages 370 to 373)

Judith Zelikoff, Ph.D.

Page 374

1  you rely on the studies that you cite in
2  your report done by Dr. Saed?
3       A.  I relied on the information
4  from Dr. Saed.  It went into making up my
5  opinion, yes.
6       Q.  If those studies were not
7  available to you, would your opinions
8  still be the same?
9       A.  As I said, one of the -- one
10 of the manuscripts came after my report.
11 And it was -- I looked at an abstract, so
12 I had information.  And other -- others
13 of Dr. Saed's I reviewed.  But I would
14 have come to the same conclusion.  That
15 was just -- that was supplemental and
16 complementary and compelling.
17      Q.  Have you ever cited an
18 abstract in any published article of
19 yours?
20      A.  Yes, I have.
21      Q.  Are you an expert in the
22 kinds of testing that Dr. Saed has
23 reported in the materials you reviewed?
24      A.  Yes, I am.

Page 375

1       Q.  Do you understand that
2  Dr. Saed is an expert for the plaintiffs
3  in this litigation?
4       A.  I do understand that from
5  looking at his publication.
6       Q.  Did you do anything yourself
7  to verify the reliability of the testing
8  that he performed whose results you have
9  read in his publications?
10      A.  I focused my review and
11 reading of the study design, which is --
12 and the experimental approach, which are
13 key factors for evaluating any study.
14 And I agree with the experimental
15 approach and the study design that he
16 used.
17          He used proper controls.  He
18 used a dose-response.  He used the proper
19 techniques in analyzing for cell
20 survivability as well as for oxidative
21 stress and gene expression changes.
22      Q.  Have you ever done studies
23 using epithelial cell lines?
24      MS. O'DELL:  Ovarian or

Page 376

1  just?
2  BY MR. HEGARTY:
3       Q.  Ovarian epithelial -- thank
4  you.
5          Have you ever done studies
6  using any type of ovarian epithelial cell
7  lines?
8       A.  I have not.
9       Q.  Have you ever done any study
10 using ovarian cancer cell lines?
11      A.  I have not.  Not personally.
12      Q.  What data shows that the
13 doses that Dr. Saed used in his studies
14 are comparable to those to which
15 epithelial ovarian cells would be exposed
16 to via perineal application of talc?
17      MS. O'DELL:  Objection to
18 form.
19      THE WITNESS:  There was no
20 comparison in his study directly.
21 But if I may, I just want to say,
22 when you're looking at biological
23 plausibility, which was the
24 question that I was asked,

Page 377

1  oftentimes higher doses in vitro
2  studies are used to provide a
3  mechanism or a plausibility or
4  feasibility that that can -- that
5  that product, in this case, talcum
6  powder product, can induce
7  inflammation, inflammatory
8  responses and changes in
9  antioxidant levels.
10          So it is not uncommon to use
11 higher doses in in vitro studies
12 than what might be seen in a human
13 for biological plausibility
14 studies.
15 BY MR. HEGARTY:
16      Q.  Can you cite any study that
17 has shown the results reported in
18 Dr. Saed's studies in vivo in women using
19 talc?
20      MS. O'DELL:  Objection to
21 form.
22      THE WITNESS:  May I get
23 Dr. Saed's paper?
24 BY MR. HEGARTY:

95 (Pages 374 to 377)

Judith Zelikoff, Ph.D.

Page 378

1      Q.   Well, I'm actually not
2  asking about Dr. Saed's paper.
3      A.   Okay.
4      Q.   But my question is -- you've
5  read Dr. Saed's papers, correct?
6      A.   Yes, I have.
7      Q.   Can you cite for me any
8  study that has shown the results he
9  reports in his studies in women using
10 talc?
11         MS. O'DELL:  Object to form.
12         THE WITNESS:  His studies
13     were in vitro studies.
14 BY MR. HEGARTY:
15     Q.   Are there any such studies
16 looking at the effects in vivo of talc?
17         MS. O'DELL:  Objection.
18         THE WITNESS:  In vivo in
19     humans or in vivo in animals?
20 BY MR. HEGARTY:
21     Q.   In humans.
22         MS. O'DELL:  Object to the
23     form.
24         THE WITNESS:  When you refer

Page 379

1      to such studies, can you tell me
2      which studies -- which types of
3      studies again are you referring
4      to?
5  BY MR. HEGARTY:
6      Q.   The cell studies that you
7  reference by Dr. Saed on Page 25 of your
8  report.
9      A.   And the question is are
10 there any?
11     Q.   Studies in humans showing
12 such effects following application of
13 talc to the perineum.
14         MS. O'DELL:  Objection to
15     form.
16         THE WITNESS:  Not to my
17     knowledge.
18         Excuse me.  You said that
19     was on Page 25 that you were
20     referring to?
21 BY MR. HEGARTY:
22     Q.   Correct.
23         Have you ever published a
24 paper discussing single nucleotide

Page 380

1  polymorphisms?
2      A.   I need to look at my CV
3  again, as being co-investigator.  I've
4  worked with other people.  I have not
5  performed studies looking at single
6  nucleotide polymorphisms.  But I have
7  worked with people who have -- have done
8  them.  And if I look at my curriculum
9  vitae, I can tell you if I've been on any
10 publications.
11     Q.   Okay.  Because of time, just
12 sitting here today, recognizing for the
13 record you haven't looked at your CV, do
14 any such studies come to mind?
15     A.   I don't -- I have not done
16 those studies in my own laboratory.
17 Although I'm -- I'm just saying that I
18 may have been on a publication where
19 colleagues of mine have used that -- that
20 method, those methods.
21     Q.   Do you have an opinion about
22 talc in single nucleotide polymorphisms
23 or SNPs?
24         MS. O'DELL:  Objection.

Page 381

1          THE WITNESS:  I think
2      there -- there is literature
3      showing, including in Dr. Saed's
4      papers, that there are single --
5      and in -- in a paper that looked
6      at women and looked at antioxidant
7      enzymes and they showed there was
8      single nucleotide polymorphism
9      changes in those women.
10         Looking at, I think it was
11     glutathione S-transferase M 1.
12         So what is my -- so if your
13     question is what is my opinion on
14     single nucleotide polymorphisms in
15     ovarian cancer?
16 BY MR. HEGARTY:
17     Q.   Well, let me ask a different
18 question.  Is your biologic mechanism --
19 I'm sorry.  Is your biologic plausibility
20 opinion between talc and ovarian cancer
21 the process or action that Dr. Saed
22 describes in his studies?
23     A.   I believe that it could be
24 adding to the -- the plausibility of the

96 (Pages 378 to 381)

Judith Zelikoff, Ph.D.

Page 382

1  relationship or of the causation between
2  ovarian cancer and talcum powder
3  products.
4      Q.   Well, is it your opinion
5  that the mechanism by which talc can be
6  biologically -- be a biological plausible
7  cause of ovarian cancer, that's cited by
8  Dr. Saed in his cell studies?
9      MS. O'DELL:  Objection to
10  form.
11      THE WITNESS:  I believe
12  that -- in my opinion what I'm
13  stating here in the report, is
14  that inflammation is the
15  primary -- one of the primary
16  biological mechanisms.
17      Whether it appears from the
18  literature that single nucleotide
19  polymorphisms may, in fact, play a
20  role.
21  BY MR. HEGARTY:
22      Q.   Okay.  But is -- is that --
23  is it your opinion that -- not that they
24  play -- just that they play a role, but

Page 383

1  that is the mechanism for biologic
2  plausibility between talc and ovarian
3  cancer?
4      A.   I -- I do not believe it
5  is -- it is not my opinion that -- it is
6  my opinion that single nucleotide
7  polymorphisms, along with inflammation
8  and -- and perhaps other mechanisms may
9  be involved that talc is associated with.
10      I focused my -- my opinion
11  on the assessment of inflammation and its
12  role.
13      MR. HEGARTY:  Off the record
14  for a minute.
15      THE VIDEOGRAPHER:  The time
16  is 4:48 p.m.  We are off the
17  record.
18      (Short break.)
19      THE VIDEOGRAPHER:  We are
20  back on the record.  The time is
21  5:08 p.m.
22  BY MR. HEGARTY:
23      Q.   Dr. Zelikoff, I'm going to
24  jump around a little bit from topic to

Page 384

1  topic.  I'll introduce the topic each
2  time that I ask you a question.
3      Going back to the Canadian
4  health assessment that you provided to us
5  at the beginning of the day.
6      A.   Yes.
7      (Brief interruption.)
8  BY MR. HEGARTY:
9      Q.   Doctor, we talked earlier
10  about Canada's health assessment with
11  regard to talc.  Are you familiar with
12  the process by which the Canadian
13  authorities do that health assessment?
14      A.   I am -- only from what is in
15  the document.
16      Q.   Have you ever been a part of
17  that, of a Canadian health assessment
18  like the one shown with talc?
19      A.   I've worked with Health
20  Canada.
21      Q.   Okay.  Have you ever worked
22  with Health Canada on doing a health
23  assessment like that reflected in the
24  document we looked at earlier today?

Page 385

1      A.   No, I have not.
2      Q.   Do you know what kind of
3  standards that they apply in determining
4  whether to call -- whether to say whether
5  there's a potential for harm with a
6  substance?
7      A.   Just what is in the
8  document.  And then I use my own
9  professional judgment, whether I agree
10  with that or not.
11      Q.   Did plaintiff's counsel
12  provide you with some scientific and
13  medical literature with regard to talc or
14  ovarian cancer?
15      A.   So the question is whether I
16  was provided with some scientific and
17  medical literature with regard -- yes,
18  many of the articles in the binders were
19  provided to me by them.
20      Q.   Are you able to identify
21  which of those articles came from
22  plaintiffs' counsel versus which you
23  found on your own?
24      A.   I may be able to do that

97 (Pages 382 to 385)

Judith Zelikoff, Ph.D.

| | Page 386 |
|---|---|

1  with some, yes. But this is over a
2  period of, as I said, 2017 to now.
3      Q.   With regard to your
4  invoices -- do you have your invoices
5  there?
6      A.   I do not.
7      Q.   They've been marked as an
8  exhibit.
9      A.   Oh.
10     Q.   Can someone help her find
11 those invoices?
12         MS. O'DELL:  Did you take
13     them back?  I don't know that --
14     there was only one copy.
15         MR. HEGARTY:  I don't think
16     I did.  I think it was Exhibit 1.
17         MS. O'DELL:  The reason I
18     say that is I did not see it
19     during the lunch break when I
20     looked at --
21         THE WITNESS:  I do have the
22     invoices in my binder here.
23 BY MR. HEGARTY:
24     Q.   Okay.  If you can turn to

| | Page 387 |
|---|---|

1  your binder, please.
2      A.   If I recall.
3      Q.   If we can find that exhibit,
4  that would be helpful?
5          MS. O'DELL:  I'm not sure
6      there are any invoices in her
7      binder.
8          Is it in the stack that's
9      right there?
10         MR. HEGARTY:  No, I don't
11     think so.
12 BY MR. HEGARTY:
13     Q.   Yeah invoices.  I found it.
14         Your invoices, Doctor,
15 reflect that you prepared a final report
16 delivered on February 4, 2018.
17         Do you see that?
18     A.   I do see that.
19     Q.   That was almost a year ago,
20 correct?
21         MS. O'DELL:  Objection to
22     form.
23         THE WITNESS:  Yes.
24 BY MR. HEGARTY:

| | Page 388 |
|---|---|

1      Q.   What are the differences
2  between your current report dated
3  November 16, 2018, and the final report
4  that you provided as shown here back in
5  February of 2018?
6      A.   It was -- I own that.  It
7  should have said draft report.  And the
8  difference is that that's more literature
9  and more time had gone by for the
10 emergence and review of more literature.
11     Q.   You go from a reference on
12 February 4, 2018, to the next reference
13 on September 20th -- I'm sorry.  Did I
14 say -- let me back up.
15         You go form a reference on
16 February 4, 2018, to the next cite for
17 time on September 20, 2018.  Did you
18 review any additional literature between
19 February 4th and September 20, 2018?
20     A.   Yes, I'm sure I did.  And I
21 also reviewed the production documents
22 within that time.  More of the production
23 documents.
24     Q.   Your report doesn't show any

| | Page 389 |
|---|---|

1  time invoiced between February 4, 2018,
2  and September 20, 2018.  Did you spend
3  time reviewing literature or otherwise
4  working on your report that's not
5  contained in your invoices?
6      A.   It -- I may have.  I did not
7  always invoice for something that I spent
8  maybe an hour on.
9      Q.   Are you able to cite for me
10 the sections in your report that you
11 added or changed between the report that
12 you prepared on February 4, 2018, and the
13 November 16, 2018, report?
14     A.   Not without seeing both
15 reports side by side.
16     Q.   Do you still have a copy of
17 the February 4, 2018, report?
18     A.   Not with me.
19     Q.   Does it exist?
20     A.   It likely does on my
21 computer, yes.
22     Q.   You mentioned that you
23 referred to -- that you reviewed Julie
24 Pier's deposition testimony?

98 (Pages 386 to 389)

Judith Zelikoff, Ph.D.

Page 390

1        A.   I said three-quarters of the
2   deposition, half to three-quarters.
3        Q.   That was provided to you by
4   counsel for plaintiffs, correct?
5        A.   Yes, correct.
6        Q.   Do you know how they went
7   about selecting the deposition
8   transcripts to provide to you for
9   purposes of your review in this case?
10        A.   I do not.
11        Q.   Did you ask for any
12   deposition -- did you ask for the
13   depositions of all experts who have
14   testified in this litigation?
15            MS. O'DELL:  Objection to
16        form.
17            THE WITNESS:  I did not ask
18        for depositions.
19            Let me -- let me retract
20        that, please.  If in reading my
21        literature there was something
22        that I thought might be in a
23        deposition of someone, I asked the
24        plaintiff attorneys if they had

Page 391

1        anything in that regard that would
2        lend to my opinion.
3   BY MR. HEGARTY:
4        Q.   And did you ever ask for any
5   additional depositions beyond those that
6   were provided?
7        A.   No, I did not.
8        Q.   Going back to the Health
9   Canada assessment.  Have you ever cited
10   to a Health Canada assessment in any
11   written publication of yours?
12        A.   Without looking at my
13   publications, I cannot.  But I can tell
14   you that coming to mind just sitting
15   here, as I said, I worked with Health
16   Canada, and I worked with them on my
17   research in fish immunology, and it is
18   possible that I cited Health Canada --
19   Health Canada literature in those
20   publications concerning fish.
21        Q.   Sitting here today, can you
22   recall at any point in time when you --
23   when your opinions were informed by a
24   draft screening assessment by Health

Page 392

1   Canada, like Exhibit Number 9?
2        A.   I'm sorry.
3            MS. O'DELL:  Objection to
4        form.
5            THE WITNESS:  All I can say
6        is that in working with Health
7        Canada on immunology in my early
8        career days, that I may have used
9        an assessment like that.
10   BY MR. HEGARTY:
11        Q.   Can you cite for me, sitting
12   here today, anytime that you -- your
13   opinions were informed by a Health Canada
14   safety assessment or screening
15   assessment?
16            MS. O'DELL:  Object to the
17        form.  Other than what she said?
18            THE WITNESS:  Except for
19        what I said, I cannot recall.
20   BY MR. HEGARTY:
21        Q.   Did you review for purposes
22   of your opinions in this case the current
23   National Cancer Institutes position --
24   healthcare -- healthcare -- health

Page 393

1   professional PDQ, or the NCI PDQ?
2        A.   I have seen that recently.
3        Q.   I'll mark as Exhibit Number
4   23, a copy of the NCI PDQ that mentions
5   talc.
6            (Document marked for
7        identification as Exhibit
8        Zelikoff-23.)
9   BY MR. HEGARTY:
10        Q.   Have you seen what I marked
11   as Exhibit 23 before -- or as of the time
12   that you drafted your report?
13        A.   No, sir.
14        Q.   Plaintiffs' counsel did not
15   provide you a copy of that?
16        A.   Not prior to my report, no.
17        Q.   How did you happen -- who --
18   strike that.
19            Did -- from where did you
20   receive a copy of Exhibit 23 after
21   preparing your report?
22        A.   From the plaintiff attorney.
23        Q.   Did you ask for it?
24        A.   In general, I asked for all

99 (Pages 390 to 393)

Judith Zelikoff, Ph.D.

| Page 394 |
|---|

1    relevant literature and internal
2    information.  But I did not specifically
3    ask for the NCI report.
4         Q.   When you asked for all
5    relevant information, internal
6    information, was that prior to preparing
7    your expert report?
8         A.   That's pretty much on a
9    chronic level, in other words from the
10   time that I was recruited or asked to
11   participate in this, I always asked, "Is
12   there literature?  Is there more
13   literature?  Here is the literature that
14   I have found," which were quite a number.
15   "Is there anything else that you can add
16   to this?"  So I provided literature, and
17   they provided me with literature.
18        Q.   You did not find the NCI's
19   PDQ yourself?
20        A.   I did not find it myself.
21        Q.   Did the NCI PDQ statements
22   on perineal talc exposure inform your
23   opinions in this case?
24        A.   As I said, I only saw it

| Page 395 |
|---|

1    within the last few days.
2         Q.   Understood.  But you also
3    reviewed the Saed manuscript, you
4    reviewed the Canadian health assessment.
5    You said both those documents informed
6    your opinions.
7              So my question is, did the
8    NCI PDQ also inform your opinions.
9              MS. O'DELL:  Object to the
10   form.
11             THE WITNESS:  Well, the --
12   the documents that you previously
13   mentioned do not inform my opinion
14   prior to my report of
15   November 16th.  However, it's
16   information that has added to me
17   to get to this place where I am
18   right now.
19             So my opinion has not
20   changed from my report until
21   sitting here today.
22   BY MR. HEGARTY:
23        Q.   Did the NCI PDQ add to your
24   opinions in this case?

| Page 396 |
|---|

1         A.   I reviewed their opinions.
2    I have many questions about how they
3    reached their opinions and what studies
4    they used.
5              If we can just be on the
6    same page in terms of what their opinion
7    is?
8         Q.   I'm looking at the section
9    under perineal talc exposure.  And my --
10   my question is -- strike that.
11             I'm looking at the section
12   on perineal talc exposure which is about
13   four pages from the end.
14        A.   I see.
15        Q.   And my question is only
16   whether that section informed your
17   opinions in this case.
18             MS. O'DELL:  Object to the
19   form.
20             THE WITNESS:  I reviewed it.
21   It did not change my opinion.
22   Did -- did it inform my opinion?
23   It did not change my opinion.
24   BY MR. HEGARTY:

| Page 397 |
|---|

1         Q.   Do you agree with the NCI
2    PDQ statement on perineal talc exposure?
3         A.   If we are talking about
4    their final conclusion?
5         Q.   I'm talking -- yes.  We can
6    talk about their final conclusion.
7         A.   Okay.  If I'm recalling
8    this, their final conclusion that -- was
9    that there was no causal relationship
10   between talc -- talcum powder exposure
11   and ovarian cancer.  Is that --
12        Q.   Well, the -- the weight of
13   the evidence does not support an
14   association between perineal talc
15   exposure and an increased risk of ovarian
16   cancer.  Do you agree with that
17   statement?
18        A.   I do not agree with that
19   statement.
20             And I find, in reading this
21   document, that I'm not sure how they
22   reached that conclusion.  On several
23   points, if you're interested.
24             One is --

100  (Pages 394 to 397)

Judith Zelikoff, Ph.D.

Page 398

1      Q.   No, I'm just asking you
2   whether you agreed with it.
3      A.   I do not agree with their
4   final conclusion.
5      Q.   Neither FDA nor any
6   scientific regulatory or other group has
7   ever sought out your opinions with regard
8   to the biologic plausibility of talc and
9   ovarian cancer, correct?
10      A.   That is correct.
11      Q.   You made reference earlier
12   to the Penninkilampi article.  Do you
13   recall that?
14      A.   I recall mentioning it, yes.
15      Q.   I'm going to mark as
16   Exhibit 34 a copy of the Penninkilampi
17   article.  That's the article that you
18   were talking about earlier, correct?
19      A.   2018, correct.
20         (Document marked for
21         identification as Exhibit
22         Zelikoff-34.)
23   BY MR. HEGARTY:
24      Q.   If you turn over to page --

Page 399

1   strike that.
2         This is an article that you
3   rely on for purposes of your opinions in
4   this case, correct?
5      A.   This is an article that I
6   reviewed and played into, yes, informed
7   my opinions.
8      Q.   Did you find it to be a
9   reliable source of information?
10         MS. O'DELL:  Object to the
11         form.
12         THE WITNESS:  I found no
13         problems in the study design as I
14         read it.
15         Again, I'm not an
16         epidemiologist.  So getting into
17         the nuances of this.  I'm a
18         toxicologist and I depend on my
19         epidemiology colleagues to fill in
20         the gaps.
21   BY MR. HEGARTY:
22      Q.   Over on Page 45, under the
23   section Discussion.  Do you see that
24   section?

Page 400

1      A.   Yes, I do.
2      Q.   Third line down it says,
3   "The mechanism by which perineal talc use
4   may increase the risk of ovarian cancer
5   is uncertain."
6         Do you agree with that
7   statement?
8         MS. O'DELL:  Objection to
9         form.
10         THE WITNESS:  I think
11         there's no -- in providing
12         biological plausibility,
13         biological plausibility, in and of
14         itself, says that there is a
15         possible mechanism or action that
16         could provide evidence for the
17         causation.
18         So the mechanism by which
19         perineal talc use may increase the
20         risk of ovarian cancer is
21         uncertain.  It does not mean
22         it's -- it means it's uncertain,
23         that there are many viewpoints on
24         it.

Page 401

1   BY MR. HEGARTY:
2      Q.   At the very -- in the very
3   last line of that article -- I'm sorry,
4   the very last line of that paragraph it
5   says, "The potential mechanism by which
6   genital talc is associated with an
7   increased risk of ovarian cancer hence
8   remains unclear."
9         Do you agree with that
10   statement?
11      A.   I think there is -- in -- in
12   regards to your previous questions that
13   asked me if it was -- if there was an
14   agreement among the medical population,
15   and I said that I didn't know that there
16   was agreement or was not agreement.  I
17   thought that there were not agreement.
18   So I agree with the statement that there
19   is still room for further study.
20         Unclear does not mean
21   unknown or that there are not biological
22   plausible mechanisms that could be
23   entertained.
24      Q.   Is inflammation part of a

101 (Pages 398 to 401)

Judith Zelikoff, Ph.D.

| Page 402 | Page 404 |
|---|---|
| 1 normal mechanism of response to the | 1 statement in the third paragraph at the |
| 2 presence of particles in the lungs? | 2 end that says even incidental -- the |
| 3    A.   Depending upon the particle, | 3 third paragraph at the end. |
| 4 inflammation can be a normal part of a | 4    A.   I was looking for a pen. |
| 5 response, yes. | 5 Excuse me. |
| 6    Q.   Can tumors occur in the | 6        Okay.  Go ahead. |
| 7 respiratory system with very high | 7    Q.   Says, "Even incidental |
| 8 exposure to particles that overwhelm the | 8 contamination by amphibole forms of |
| 9 body's clearance mechanisms and lead to | 9 asbestos is hazard enough to cause |
| 10 particle overload of lung macrophages? | 10 asbestos-related illnesses." |
| 11    A.   Are you referring to the NTP | 11        Do you see where I'm |
| 12 study? | 12 reading? |
| 13    Q.   I'm not referring to any | 13    A.   I'm sorry, are you in the |
| 14 study in particular.  That was just a | 14 first paragraph? |
| 15 question in general. | 15    Q.   Third paragraph. |
| 16    A.   Okay.  Can you repeat the | 16    A.   Third paragraph. |
| 17 question? | 17    Q.   At the end. |
| 18    Q.   Yeah.  Can tumors occur in | 18    A.   At the -- traces of these |
| 19 the respiratory system with very high | 19 types of asbestos are -- |
| 20 exposure to particles that overwhelm the | 20    Q.   No, third paragraph. |
| 21 body's clearance mechanisms and lead to | 21 Even -- the last line.  "Even incidental |
| 22 particle overload of lung macrophages? | 22 contamination by amphibole forms of |
| 23        MS. O'DELL:  Object to form. | 23 asbestos is hazard enough to cause |
| 24        THE WITNESS:  That is a -- | 24 cancer-related illnesses." |

| Page 403 | Page 405 |
|---|---|
| 1        that has been seen as a | 1        Do you see where I'm |
| 2        potential -- as a potential to | 2 reading? |
| 3        occur, yes. | 3    A.   Says, "Cause |
| 4 BY MR. HEGARTY: | 4 asbestos-related illnesses." |
| 5    Q.   Are there any publications | 5    Q.   I'm sorry.  "Can cause |
| 6 that indicate such a mechanism of | 6 asbestos-related illnesses."  You cite -- |
| 7 particle overload can occur in the | 7    A.   I see where you are reading. |
| 8 ovaries? | 8    Q.   -- the Rohl and Langer |
| 9        MS. O'DELL:  Objection to | 9 paper? |
| 10        form. | 10    A.   Yes. |
| 11        THE WITNESS:  No studies | 11    Q.   I'll mark as Exhibit 35 the |
| 12        that I'm aware of that -- that | 12 Rohl and Langer paper that you've cited. |
| 13        refer to particle overload in the | 13        (Document marked for |
| 14        ovaries in this regard, in regard | 14        identification as Exhibit |
| 15        to talcum powder.  There's | 15        Zelikoff-35.) |
| 16        evidence, of course, as I said | 16 BY MR. HEGARTY: |
| 17        that there is talcum powder in the | 17    Q.   Doctor, nowhere in that |
| 18        ovary. | 18 paper did the author say that incidental |
| 19 BY MR. HEGARTY: | 19 contamination by amphibole forms of |
| 20    Q.   Over on Page 5 of your | 20 asbestos is hazard enough -- hazardous |
| 21 report, Exhibit 2. | 21 enough to cause asbestos-related |
| 22    A.   Page headed by Section 4, | 22 illnesses, do they? |
| 23 Asbestos? | 23        MS. O'DELL:  Objection to |
| 24    Q.   Correct.  You make a | 24        form. |

Judith Zelikoff, Ph.D.

Page 406

1         THE WITNESS: I'm sorry, I'm
2    not certain that this is the same
3    paper. This is Rohl, et al. The
4    paper that I cited is Rohl and
5    Langer.
6  BY MR. HEGARTY:
7      Q.   It's dated 1976 --
8      A.   1976.
9      Q.   -- correct?
10     A.   That's correct.
11     Q.   If you look in the abstract
12   of that paper --
13     A.   Yes. The paper --
14     Q.   -- the paper that I marked
15   as Exhibit 35.
16     A.   Rohl, et al, yes.
17     Q.   Yes. It says, "It's
18   possible adverse health effects from
19   intermittent use of these products,
20   especially those that contain asbestiform
21   and fragmented anthophyllite, tremolite,
22   chrysotile, quartz, and trace minerals
23   are presently unknown and warrant
24   evaluation."

Page 407

1         Did I read that correctly?
2      A.   I'm sorry, you are in the
3    abstract, but I don't know what line you
4    are on.
5      Q.   The very last line of the
6    abstract.
7      A.   "Possible adverse health
8    effects from intermittent use of these
9    products especially those that contain
10   asbestiform and fragmented anthophyllite,
11   tremolite, chrysotile, quartz, and trace
12   minerals are presently unknown and
13   warrant evaluation."
14        Yes. This is also dated
15   1976.
16     Q.   Which is the date that you
17   cite to the Rohl and Langer paper?
18     A.   Yes, I -- I understand that,
19   sir. However, because this is a Rohl et
20   al., it is certainly possible that I
21   miscited and it was Rohl et al. But my
22   citation in there is Rohl and Langer. So
23   it may have been an error on my part.
24   However, there's pause.

Page 408

1         Many investigators,
2    including myself, have papers that come
3    out the same year but with different
4    authors.
5      Q.   If you -- you turn over to
6    Page 6 of your report.
7      A.   Yes, sir.
8      Q.   At the end of the first
9    paragraph, at the top of the page.
10     A.   Yes.
11     Q.   You say that "the close
12   proximity of asbestos in talc and mineral
13   deposits makes extraction of either
14   material alone difficult, if not
15   impossible."
16        Do you see where I'm
17   reading?
18     A.   Yes, I do.
19     Q.   Is it your testimony that it
20   is impossible to extract talc from
21   mineral deposits without asbestos?
22        MS. O'DELL: Objection to
23   form.
24        THE WITNESS: I'm not a --

Page 409

1         I'm not a geologist. I cannot --
2    I can only rely on the references
3    that are there.
4  BY MR. HEGARTY:
5      Q.   Can you list all the steps
6    used in the processing of pharmaceutical
7    grade talc?
8      A.   I can give you an overview.
9    But again, I'm not a commercial talc
10   production person, nor am I a geologist,
11   nor am I in the industry. So I can only
12   give you a superficial glimpse.
13     Q.   Can you describe the
14   benefication for talc?
15        MS. O'DELL: Objection to
16   form. Asked and answered.
17        THE WITNESS: Not in -- not
18   in detail. I only know in general
19   that there is -- actually, I
20   prefer not to answer that at all
21   because I don't want to be
22   inaccurate. It's not my field.
23  BY MR. HEGARTY:
24     Q.   Can you turn over to Page 7

103 (Pages 406 to 409)

Judith Zelikoff, Ph.D.

| Page 410 | Page 412 |
|---|---|
| 1 of your report. | 1 Q. You read every word of it? |
| 2 In the second paragraph you | 2 A. I reviewed it. And I read |
| 3 refer to the deposition of Alice Blount. | 3 it to the best of my ability. |
| 4 Do you see that? | 4 Q. You make reference there to |
| 5 A. Yes, I do. Second sentence. | 5 Exhibits 47 and 28, 47 from Julie Pier |
| 6 Q. And you contend that the | 6 deposition and 28 from Dr. Hopkins' |
| 7 sample she tested claimed to include | 7 deposition. |
| 8 asbestos, including asbestos in Johnson's | 8 Do you see that? |
| 9 Baby Powder. Do you see where you make | 9 A. Yes, I do. |
| 10 that reference? | 10 Q. Do you know who prepared |
| 11 A. Yes, I'm citing her | 11 those exhibits? |
| 12 deposition. | 12 A. I do not. I would make an |
| 13 Q. Did you read the entirety of | 13 assumption that it was attorneys. |
| 14 her deposition? | 14 Q. Were you aware that they |
| 15 A. No, sir. | 15 were prepared by counsel for plaintiffs? |
| 16 Q. What testing method did she | 16 MS. O'DELL: Objection to |
| 17 use? | 17 form. |
| 18 A. I'd like to see the | 18 THE WITNESS: As the |
| 19 deposition again. | 19 questions were asked by some of |
| 20 Q. Did you see from her | 20 the attorneys for the plaintiff, I |
| 21 deposition where she testified that her | 21 would make that assumption. |
| 22 results published in 1991 came from a | 22 BY MR. HEGARTY: |
| 23 Johnson's Baby Powder bottle purchased in | 23 Q. Did you do anything yourself |
| 24 1996? | 24 to verify the accuracy of the information |

| Page 411 | Page 413 |
|---|---|
| 1 A. You know, I'm waiting for | 1 in any of those exhibits? |
| 2 the -- see the article, please. | 2 A. I'm not sure what you mean |
| 3 Q. Let me withdraw the | 3 did I do anything myself. I read them, |
| 4 question. I don't have time to cover | 4 and I did not do any further literature |
| 5 that. | 5 searching, if that's what you mean. |
| 6 If you turn over to -- if | 6 Q. Did you review the test |
| 7 you look at Page 7, the second-to-last | 7 results themselves that are supposedly |
| 8 paragraph you make reference there to the | 8 reported in those two exhibits? |
| 9 testimony of Dr. Hopkins and the | 9 MS. O'DELL: Objection to |
| 10 testimony of Julie Pier. | 10 form. |
| 11 Do you see that? | 11 THE WITNESS: Did I review |
| 12 A. I see reference to | 12 the testing methodology? I did |
| 13 Dr. Hopkins in the third sentence. And | 13 not review it in the sense that I |
| 14 in the same paragraph, I see on the last | 14 did further literature searching, |
| 15 sentence, deposition of Julie Pier, | 15 but I -- I looked at and reviewed |
| 16 corporate representative of Imerys. | 16 the testing methods that they -- |
| 17 Q. You've already testified | 17 that they said they used. |
| 18 that you have not completed reading the | 18 BY MR. HEGARTY: |
| 19 deposition of Julie Pier, correct? | 19 Q. Did you actually pull the |
| 20 A. I have testified to that, | 20 tests that are referenced in those |
| 21 yes. | 21 exhibits and look at the test results |
| 22 Q. Did you read the entirety of | 22 yourself? |
| 23 the deposition of Dr. Hopkins? | 23 A. I did not. |
| 24 A. I read the entirety, yes. | 24 Q. Are you aware that in 2009 |

104 (Pages 410 to 413)

Judith Zelikoff, Ph.D.

Page 414

1  FDA pulled -- did its own testing with
2  regard to asbestos and talc?
3      A.   I am aware of that.
4      Q.   Did you review the results
5  of those tests?
6      A.   I did review the results.
7  It doesn't come to mind right now.  I'd
8  like to see a copy of it, if I may.
9      Q.   Nowhere in your report do
10  you cite those test results, do you?
11      A.   Not that I can recall.
12          I do cite a paper or a
13  comment by Epstein writing to the FDA in
14  here.  And the FDA's response in terms of
15  migration.
16          But in answer to your
17  question -- can you repeat your question?
18      Q.   Sure.  Did you cite -- you
19  agree that you didn't cite anywhere --
20  strike that.
21          You did not cite anywhere in
22  your report the results of the FDA's
23  testing of talc in 2009, correct?
24      A.   It doesn't appear so, no.

Page 415

1      Q.   Did you have that
2  information before you finalized your
3  report?
4      A.   I'm not certain.  Probably
5  yes.
6      Q.   Did you review all the
7  epidemiologic literature looking at
8  asbestos exposure and ovarian cancer?
9      A.   Well, as I said, I'm not an
10  epidemiologist.  So I looked at several
11  of the meta-analyses, including
12  Dr. Taher.
13      Q.   Did you read all the
14  meta-analyses that had been published
15  with regard to asbestos and ovarian
16  cancer?
17      A.   No, I have not.
18      Q.   The medical literature
19  looking at asbestos exposure and ovarian
20  cancer was based on exposure to -- was
21  based on a heavy industrial exposure,
22  correct?
23          MS. O'DELL:  Objection to
24      form.

Page 416

1          THE WITNESS:  There are many
2      studies that IARC used, not just
3      worker study populations.
4  BY MR. HEGARTY:
5      Q.   But their conclusion with
6  regard to designating talc -- sorry,
7  designating asbestos as Category 1 was
8  based on five cohort studies involving
9  heavy industrial exposure, correct?
10      A.   The preponderance -- or the
11  weight -- the weight of evidence was
12  contributed among all studies, but it's
13  my -- it's my thought that the worker
14  studies were probably weighted as heavy
15  as any others.
16      Q.   You agree -- you agree that
17  nowhere in your report do you analyze
18  what asbestos exposure levels had been
19  shown to induce a biologically plausible
20  effect in tissues, correct?
21          MS. O'DELL:  Object to the
22      form.
23          THE WITNESS:  Again, what do
24      you mean by analyze?

Page 417

1  BY MR. HEGARTY:
2      Q.   Well, nowhere do you cite
3  studies in your report reporting on the
4  effect of asbestos in tissues, correct?
5      A.   I certainly do talk about
6  asbestos.  If you give me a minute to
7  review.
8          I talk about it on Page 7
9  being listed as a Group 1 carcinogen.
10      Q.   My question is nowhere in
11  your report do you analyze the studies
12  that look at the toxicity or discuss the
13  toxicity of asbestos in human tissue,
14  correct?
15          MS. O'DELL:  Object to the
16      form.
17          THE WITNESS:  I -- I did not
18      look at -- I did not analyze in
19      depth, no, the studies that are
20      associated with the IARC report,
21      if that's what you're asking.
22  BY MR. HEGARTY:
23      Q.   What type of chromium --
24  strike that.

105 (Pages 414 to 417)

Judith Zelikoff, Ph.D.

Page 418

1          Is chromium-6 in Johnson's
2   Baby Powder?
3          A.   Chromium is in Johnson's
4   Baby Powder.
5          Q.   I'm sorry?
6          A.   Chromium is present.
7          Q.   Is chromium-6 present in
8   Johnson's Baby Powder?
9          A.   There are indications.  They
10  just discuss total chromium.
11         Q.   Can you testify here today
12  that Johnson's Baby Powder has chromium-6
13  in it?
14         MS. O'DELL:  Object to the
15  form.
16         THE WITNESS:  Again, not
17  being a geologist and only going
18  by the internal documents, and if
19  I may also look at one of the
20  exhibits that has the data for the
21  metals.  I'm sorry.
22         MS. O'DELL:  It's Exhibit C
23  that was marked.
24         THE WITNESS:  I don't want

Page 419

1   to go by my memory alone.  I'd
2   like to see that.
3          Thank you very much.
4          In the document prepared as
5   Exhibit C, chromium has not been
6   speciated and it's listed as total
7   chromium.  I would make the
8   assumption from my professional
9   opinion that in mining, you do get
10  both chromium-6 and chromium-3
11  when you have -- when you're
12  mining talc.  But I'm not a
13  geologist.
14  BY MR. HEGARTY:
15         Q.   Does chromium-6 only come
16  through industrial processing?
17         A.   No.  It can actually be
18  found in the soil as a product of
19  contamination.
20         Q.   If you look over --
21         A.   And it can be re-oxidized.
22  Yes.
23         Q.   If you look over on Page 9?
24         A.   Of?

Page 420

1          Q.   Of your report.  The third
2   paragraph from the bottom where it
3   begins, "Chromium-3."
4          A.   Yes.
5          Q.   You say, "Chromium-3 has
6   weak cell membrane permeability, allowing
7   it to cross the cell membrane in order to
8   bind to DNA and cause lesions."  That's
9   not correct, is it?
10         A.   That is not correct.  That
11  is an error on my part in the report.
12  Chromium-3 has strong membrane
13  permeability.  And when you asked me the
14  question initially whether there was an
15  error in my report, I should have looked
16  at it, and that is an error.  Yes.
17         Q.   In fact chromium-3 does not
18  cross the cell membrane, correct?  It's
19  unable to cross the cell membrane?
20         A.   Chromium-6 crosses the cell
21  membrane and then converts into -- is
22  oxidized to chromium-3.  And chromium-3
23  is the actual component which causes the
24  instability.

Page 421

1          Q.   But chromium-3 is unable to
2   cross the cell membrane, correct?
3          A.   Completely.  To some degree
4   it has -- it can cross to some -- some
5   minimal degree.  But it's hexavalent
6   chromium which can cross -- which has
7   great capacity to cross the cell
8   membrane, yes.
9          May I take a minute, please.
10         Let me -- let me restate
11  based upon the third paragraph that
12  starts, "Chromium-3 has weak cell
13  membrane permeability."
14         It has weak to no cell
15  membrane permeability.
16         It is the active oxidized
17  product of hexavalent chromium or
18  chromium-6, that along with chromium-4
19  and chromium-5 which is responsible for
20  genetic instability and oxidative stress.
21  So it's chromium-3.
22         Q.   If you turn over to Page
23  13 -- I'm sorry, Page 12 of your report.
24  Section entitled C, Fragrances?

106 (Pages 418 to 421)

Judith Zelikoff, Ph.D.

| Page 422 | Page 424 |
|---|---|

Page 422

1    A.   Yes.
2    Q.   As of the time you prepared
3  your report, your entire opinions with
4  regard to fragrances was based on the
5  report by Michael Crowley, correct?
6    A.   That is correct.
7    Q.   You understand --
8    A.   And, and what I know about
9  some of the components from other --
10  other studies.
11    Q.   Have you had any prior work
12  experience with him?
13    A.   Dr. Michael Crowley?
14    Q.   Yes.
15    A.   No.
16    Q.   Do you know anything about
17  his qualifications beyond -- beyond what
18  you read in his report?
19    A.   No.  Just in his report and
20  the information that he gives about
21  himself.  And the questions that were
22  asked to him and the responses.
23    Q.   You say that you concur --
24  "I concur with his opinion."  Does that

Page 424

1  expert witness report in litigation?
2    MS. O'DELL:  Object to the
3  form.
4    THE WITNESS:  I am trying to
5  recall whether or not I have ever
6  had that opportunity.
7  BY MR. HEGARTY:
8    Q.   Sitting here right now, can
9  you recall when you had such an
10  opportunity?
11    A.   In this particular setting
12  of being deposed?
13    Q.   Or in any -- in any setting
14  where you are concurring with the opinion
15  of someone who -- who comments on
16  toxicity in an expert witness report
17  written for litigation?
18    MS. O'DELL:  Objection to
19  form.
20    THE WITNESS:  I would --
21  I -- I would comment on it if I
22  agreed.
23    And in this case, you know,
24  having the knowledge base that I

Page 423

1  mean that you agreed with everything that
2  he says in his report?
3    MS. O'DELL:  Object to the
4  form.
5    THE WITNESS:  I concur with
6  his statement which says that
7  "some of these chemicals in
8  fragrances may contribute to the
9  inflammatory response, toxicity
10  and potential carcinogenicity of
11  Johnson & Johnson talcum powder
12  products."
13    And that's based on the
14  knowledge of some of the chemicals
15  as I said that I've reviewed for
16  other studies and personal
17  studies.  And they are indeed
18  inflammatory and can cause
19  toxicity.
20  BY MR. HEGARTY:
21    Q.   Prior to reading
22  Dr. Crowley's report, had you ever
23  concurred with a finding as to toxicity
24  of a substance based on the reading of an

Page 425

1  have, not on -- certainly not on
2  all 150 different chemicals, which
3  is why I did my own literature
4  search, but on the chemicals that
5  I do know, I did agree with the
6  fact that they -- they do
7  contribute to inflammatory
8  responses, toxicity, some are
9  cytotoxic and produce cell injury
10  and potential carcinogenicity.
11    So as ethyl benzene as one
12  of the ingredients or one of the
13  constituents in fragrances, is
14  listed as a type -- as a Class 2
15  carcinogen.  So I did agree with
16  it.
17    If I had any question, I did
18  my own search.
19  BY MR. HEGARTY:
20    Q.   Over on page -- Pages 12 and
21  13, again you discuss exposure routes of
22  talc either through perineal exposure or
23  through inhalation, correct?  And that
24  carries over to Pages 14 and 15, and 16

107 (Pages 422 to 425)

Judith Zelikoff, Ph.D.

Page 426

1 and 17.
2      A.   Okay.
3      Q.   So in that section, did you
4  in any way analyze whether the particles
5  that -- whether talc can transport in the
6  same way that the particles do in the
7  studies that you cite?
8           MS. O'DELL:  Objection to
9  form.
10 BY MR. HEGARTY:
11     Q.   In other words, did you cite
12 any authority showing that talc particles
13 transport in the same way as the
14 particles you reference in these studies?
15     A.   Not conclusively.  But as I
16 said, if the particles are of similar
17 sizes, which they are in these -- in
18 these animal studies, then I would have
19 no reason to believe that the talc
20 particles did not move in the same
21 manner.
22     Q.   Well, do you agree that it
23 is important when talking about transport
24 of particles, that -- strike that.  Let

Page 427

1  me ask it a different way.
2           You cite to an authority
3  that makes the following statement, I
4  don't want to ask you -- I want to ask
5  you if you agree with it.
6      A.   Okay.
7      Q.   In an experiment to
8  evaluate --
9      A.   I'm sorry.  What page?
10     Q.   It's -- it's not on -- it's
11 not in your report.  It's part of my
12 question.
13     A.   Okay.
14     Q.   Do you agree that in an
15 experiment to evaluate the translocation
16 of solid particles, the characteristics
17 of the particle, i.e., size and material,
18 should be considered carefully?
19     A.   I agree that the size should
20 be considered very carefully.
21     Q.   And did you do any
22 comparison with the size of particles
23 that are referenced in the literature
24 that you cite, to the size of particles

Page 428

1  that are applied to talc via the perineal
2  route?
3      A.   What I did was I looked at
4  the internal documents, found that the --
5  according to the -- the instrumentation
6  and the graphics that they did, as well
7  as Dr. Longo, and looked at the size
8  range of the particles.  As I said, the
9  median and the average is around 10.5 to
10 11.5, but there were particle size range
11 in the talc -- talcum powder products
12 that range all the way from 50 microns or
13 larger all the way down to 0.3 microns or
14 300 nanometers.
15     Q.   Well, did you do any
16 correlation to determine whether the --
17 the size of the particles studied in
18 the -- in the articles you cite in any
19 way correlate or relate to the particle
20 sizes in Johnson's Baby Powder?
21          MS. O'DELL:  Object to the
22 form.
23          THE WITNESS:  The size of
24 particles that were used in many

Page 429

1  of the animal studies certainly
2  fall within the range that I just
3  gave you.
4  BY MR. HEGARTY:
5      Q.   Well, a number of the animal
6  studies used nanoparticles, correct?
7      A.   They used .1 micron, but
8  they also used larger particles.
9      Q.   Is it your testimony that
10 there are nanoparticles of talc in
11 Johnson's Baby Powder?
12     A.   If a particle -- a particle
13 is considered an ultra fine particle if
14 it's .1 micron or less.
15     Q.   But my question is as to
16 nanoparticles.  Are there nanoparticles
17 in Johnson's Baby Powder?
18     A.   Not that your literature
19 showed.  But ultra fines are also -- can
20 be called nanoparticles because they go
21 as low as .1.
22     Q.   If you look over on Page 14
23 of your report, you cite in the second
24 paragraph a letter from FDA to

108 (Pages 426 to 429)

Judith Zelikoff, Ph.D.

Page 430

1   Dr. Epstein, correct?
2       A.   That's correct.
3       Q.   I marked as Exhibit
4   Number 33 a copy of that letter.
5           (Document marked for
6           identification as Exhibit
7           Zelikoff-33.)
8   BY MR. HEGARTY:
9       Q.   Is that a copy of the letter
10  that you are referencing in that
11  paragraph?
12      A.   If you could point me to the
13  paragraph, please.
14      Q.   Well, it's the second --
15  it's the second paragraph at the top of
16  Page 14.
17      A.   Stating "further evidence
18  for migration"?
19      Q.   Correct.
20      A.   Okay.  Yes.  This is the
21  letter that I'm referring to.
22      Q.   In the same paragraph that
23  you reference, where you make -- where
24  you -- in the same paragraph where you

Page 431

1   pull out the statement that you cite
2   here, "FDA states that while there exists
3   no direct proof of talc in ovarian
4   carcinogenesis" --
5       A.   Genesis?
6       Q.   Genesis, carcinogenesis.
7   It's getting late for me too.
8           Did you cite that finding by
9   FDA in this paragraph?
10      A.   No.  What I was trying to
11  cite was referring to migration through
12  the upper genital tract.  So citing the
13  information on carcinogenesis would not
14  have been appropriate in that paragraph.
15      Q.   If you turn over to Page 4
16  of the FDA's letter.  At the very bottom
17  FDA states, "A cogent biological
18  mechanism by which talc might lead to
19  ovarian cancer is lacking."
20          Do you see that?
21      A.   I do see that.
22      Q.   You do not cite that
23  statement anywhere in your report,
24  correct?

Page 432

1       A.   I did not.
2       Q.   Why not?
3       A.   And in terms of my report,
4   and talking about migration, again, the
5   ovarian cancer and cogent biological
6   mechanism was not appropriate for that,
7   where I cited the original statement.
8       Q.   But you cite elsewhere in
9   your report statements and studies you
10  contend support your opinion that there
11  is a biologically plausible mechanism
12  between talc and ovarian cancer, correct?
13      A.   Yes, I do.
14      Q.   This statement by FDA
15  concerns whether there's a biologically
16  plausible mechanism between talc and
17  ovarian cancer, correct?
18      A.   That is -- that is what the
19  FDA says, yes.
20      Q.   Did you cite FDA's statement
21  about -- as to its view of whether a
22  cogent biological mechanism exists
23  anywhere in your report?
24      A.   I did not cite this

Page 433

1   statement.
2       Q.   You cite one statement by
3   FDA that you believe they are correct
4   about?
5       A.   They put a lot of weight
6   into that statement and...
7       Q.   Well, how did you weigh that
8   statement versus the other statement that
9   I read at the bottom of Page 4?
10      A.   Sorry, I'd like to find it.
11          And repeat the question
12  please.
13      Q.   How did you weigh the
14  statements you cite about migration
15  versus the other statement that I read at
16  the bottom of Page 4 about a cogent
17  biologic mechanism?
18      A.   In terms of the migration,
19  this is something that not only has been
20  found by the FDA and -- and is being
21  reiterated as a result of numerous
22  studies, this, Number 4, a cogent
23  biological mechanism by which talc led to
24  ovarian cancer is lacking is the FDA's

109 (Pages 430 to 433)

Judith Zelikoff, Ph.D.

| Page 434 | Page 436 |
|---|---|

**Page 434**

1  opinion in 19 -- in 2014, and I did not
2  know at all how they came to that
3  conclusion.
4        So in terms of migration,
5  that's been ferreted out and it's well
6  known in the literature for migration of
7  particles.  But the -- their opinion, the
8  FDA's opinion on this, I could not
9  substantiate in terms of what they were
10  basing that conclusion on.
11       Q.   What methodology did you use
12  to determine which of the statements by
13  FDA in this letter you believed are
14  correct and which you believed are not
15  correct?
16       MS. O'DELL:  Object to the
17    form.
18       THE WITNESS:  Well, if it
19    was a common finding such as that
20    which particles can migrate which
21    has been shown since late 1990s,
22    versus information that is given
23    in this report and is the basis --
24    and is what the FDA is opining on,

**Page 435**

1    however, I don't know what the --
2    what the literature is that they
3    reached in that conclusion.
4  BY MR. HEGARTY:
5       Q.   IARC includes a citation in
6  its 2010 monograph saying essentially
7  that the evidence of migration to the
8  ovaries is weak.  Do you recall reading
9  that?
10       A.   I do not recall reading
11  that.  I've reviewed the IARC paper, but
12  I -- I do not recall.  And I could look
13  at it and tell you what I thought.
14       Q.   You made reference earlier
15  in the deposition to the 1992 NTP study,
16  correct?
17       A.   Yes.
18       Q.   Do you find that to be a
19  well-done study?
20       A.   For what it was, I do find
21  it to be a well-done study.  It worked
22  with the NTP.  I've served as an advisory
23  board member.  And I think that the work
24  they do are -- is with rigor and

**Page 436**

1  scrutiny.  I think that for what they
2  did, they did a good study.
3       Q.   If you look at Page 3 of the
4  FDA letter.
5       A.   Okay.
6       Q.   At the bottom, do you see
7  they comment on the very NTP study --
8       A.   Yes.
9       Q.   -- that you just mentioned,
10  right?
11       MS. O'DELL:  Which page are
12    you on?
13       MR. HEGARTY:  Page 3.
14       THE WITNESS:  There were a
15    number --
16  BY MR. HEGARTY:
17       Q.   I'm not -- I'm haven't asked
18  a question.
19       A.   Oh, I'm sorry.
20       Q.   My question was simply, do
21  you see where they comment on that NTP
22  study?
23       A.   I see that, yes.
24       Q.   Do you cite anywhere in your

**Page 437**

1  report FDA's commentary on the NTP study?
2       A.   I can find it in my report.
3  I did comment on some of the other that
4  there's been some controversy by
5  Dr. Warheit and Dr. Goodman.  They had
6  some pushback on this.  I think I
7  commented on that, but I'd like to find
8  the page where I said that.
9       Q.   You agree that you didn't
10  cite to FDA's commentary about the NTP
11  study in its February 14, 2014, letter?
12       A.   Not -- not that I recall,
13  no.  But as I said, I did comment on
14  other -- their -- the FDA's comments are
15  very similar to those made by other
16  scientists.
17       Q.   You say the FDA's comments
18  are very similar to those made by other
19  scientists.  You are talking about the
20  comments on Page 3?
21       A.   I am.  And I'm talking about
22  the comments made by Dr. Jay Goodman and
23  Dr. David Warheit that pushed back on the
24  studies by the NTP and the conclusion.

110 (Pages 434 to 437)

Judith Zelikoff, Ph.D.

| Page 438 |
| --- |

1      Q.   For purposes of your
2   analysis in this case, did you review all
3   the studies on talc miners and millers?
4      A.   No, I did not.
5      Q.   For purposes --
6      A.   I am not an epidemiologist.
7      Q.   For purposes of your
8   analysis in this case, did you look at
9   all the studies looking at talc --
10   looking at long-term effects of talc
11   pleurodesis?
12         MS. O'DELL:  Object to the
13      form.
14         THE WITNESS:  It was -- it
15      was not my question to look at --
16      only to bring the pulmonary
17      aspects in in manners that relate
18      to ovarian effects and
19      inflammation and plausibility.
20         So, no, I did not.  I
21      reviewed several studies on
22      pleurodesis, in terms of
23      understanding it, why talcum
24      powder is used, and the effect of

| Page 439 |
| --- |

1      talcum powder on pleurodesis.
2   BY MR. HEGARTY:
3      Q.   What is the volume of talc
4   that gets introduced in vivo with a
5   single application to the perineum?
6         MS. O'DELL:  In pleurodesis?
7         THE WITNESS:  For
8      pleurodesis?
9   BY MR. HEGARTY:
10      Q.   No, just in women in
11   applying -- strike that.
12         MS. O'DELL:  I'm sorry.
13   BY MR. HEGARTY:
14      Q.   What is the volume of talc
15   that gets introduced in vivo with a
16   single application of talc to the
17   perineum?
18         MS. O'DELL:  Objection to
19      form.
20         THE WITNESS:  I do not know
21      the concentration.  It depends on
22      the person and how they're using
23      it.  It also depends on the
24      frequency that they are using it.

| Page 440 |
| --- |

1      So when you're looking at
2      toxicology, it's not just the
3      concentration that you use.  It's
4      also the length and duration and
5      frequency of the use and their
6      cumulative effects.
7   BY MR. HEGARTY:
8      Q.   Is it your opinion that a
9   single particle of talc is sufficient for
10   biologic plausibility?
11         MS. O'DELL:  Objection to
12      form.
13         THE WITNESS:  I'm pretty
14      sure I answered that question
15      before.  But I will -- again,
16      talcum powder is known to produce
17      inflammation, and inflammation is
18      known to be a biological mechanism
19      for cancer.
20   BY MR. HEGARTY:
21      Q.   My question is, is a single
22   particle of talc in vivo sufficient for
23   your biologic plausibility opinion in
24   this case?

| Page 441 |
| --- |

1      A.   If it produces inflammation,
2   it could be used that way.  As a matter
3   of relevancy, I don't think that there's
4   anyone who produces -- who uses a single
5   molecule.  But in answer to your
6   question, if that single talc -- talcum
7   powder product produced inflammation,
8   then yes, it could -- it could be related
9   to biological plausibility.
10      Q.   Can you cite any published
11   authority that supports that opinion?
12      A.   That shows me that one
13   particle could produce inflammation?
14      Q.   That could lead to cancer.
15      A.   That could lead to cancer.
16   I cannot show you.  It's not that I don't
17   know if it's there or not there.  I just,
18   to my knowledge, I am not aware.
19         MR. HEGARTY:  I'm going to
20      let Mr. Ferguson ask you some
21      questions for a little bit.  Then
22      I will come back and finish up.
23         THE WITNESS:  Okay.  Thank
24      you.

111 (Pages 438 to 441)

Judith Zelikoff, Ph.D.

Page 442

1    THE VIDEOGRAPHER:  The time
2  is 6:00 p.m.  Off the record.
3    (Short break.)
4    THE VIDEOGRAPHER:  The time
5  is 6:25 p.m.  Back on the record.
6    - - -
7    EXAMINATION
8    - - -
9  BY MR. FERGUSON:
10   Q.   Hello, Dr. Zelikoff.
11   A.   Hello.
12   Q.   How are you?
13   A.   Good, thank you.
14   Q.   My name is Ken Ferguson, and
15  I represent Imerys, one of the parties to
16  this litigation.  Do you understand that?
17   A.   I understand what you said,
18  yes.
19   Q.   Okay.  And I'm going to have
20  some questions for you, which I'm going
21  to maybe try to go through pretty
22  quickly.  But just stop me if I speed up
23  too much.  I'm told that I talk slowly.
24  So maybe I won't be speeding up too much.

Page 443

1    So first of all, let me just
2  go back briefly to your background and
3  qualifications.
4    A.   Okay.
5    Q.   Just briefly, do you
6  currently have a laboratory?
7    A.   I do have a laboratory.
8    Q.   And how many personnel do
9  you have employed in the laboratory?
10   A.   Today?
11   Q.   Yes, ma'am.
12   A.   Today I have no one
13  employed, but three graduate students.
14   Q.   And where does the funding
15  come from to support that laboratory?
16   A.   It comes from the NIEHS,
17  National Institute of Environmental
18  Health Sciences from a career grant.  And
19  that is the main source at this moment.
20   Q.   Are you the principal
21  investigator of any extramural or
22  intramural funding at the current time?
23   A.   I have -- as of today, I'm
24  not.

Page 444

1    Q.   Have you ever been elected
2  to membership in any of the national
3  academies, for example the National
4  Academy of Science?
5    A.   I've not been elected as a
6  member, but I have served on the advisory
7  body numerous times.
8    Q.   Okay.  But you haven't been
9  elected to membership; is that right?
10   A.   No, that is correct.
11   Q.   Dr. Zelikoff, have you
12  communicated with any regulatory bodies
13  of any country regarding the issue of
14  talc and ovarian cancer that we've been
15  discussing today?
16   A.   I have not.
17   Q.   Have you communicated with
18  any scientific journals or publications
19  regarding talc and ovarian cancer?
20   A.   I have not.
21   Q.   So, can you turn to your
22  report, which is Exhibit Number 2.
23   A.   I have it.
24   Q.   Okay.  Can you look at the

Page 445

1  top of Page 3, please.
2    A.   Yes, sir.
3    Q.   And in the first full
4  paragraph on that page, it says, "My
5  opinions below are based upon my
6  experience as a toxicologist and research
7  scientist and have been reached through
8  employing the same scientific methodology
9  and rigor that I employ in my academic
10  research and professional duties."
11  Correct?
12   A.   Yes, sir, I see that.
13   Q.   And is that true?
14   A.   That is true.
15   Q.   And in your professional
16  duties and academic research, do you
17  customarily rely on peer-reviewed
18  publications in the scientific literature
19  for your research?
20   A.   I do -- peer reviews, I rely
21  on.  Abstracts come into play.
22  Documents.  Whatever is needed, I will
23  use and cite in my publications.
24   Q.   Do you customarily rely on

112 (Pages 442 to 445)

Judith Zelikoff, Ph.D.

| Page 446 | Page 448 |
|---|---|
| 1   non-peer-reviewed research that is paid<br>2   for by a party that has a direct<br>3   financial interest in the outcome of the<br>4   study?<br>5        MS. O'DELL: Object to the<br>6   form.<br>7        THE WITNESS: I go by the<br>8   science. I don't look at the<br>9   funding. Many scientists do. But<br>10   I think if the science is sound, I<br>11   look at the science -- I go by the<br>12   science.<br>13   BY MR. FERGUSON:<br>14        Q.   Look at -- look at Page 8,<br>15   please.<br>16        A.   Yes, sir.<br>17        Q.   There in the first full<br>18   paragraph, you talk about recent TEM<br>19   testing on historic samples.<br>20        Do you see that sentence?<br>21        A.   Recent TEM testing on<br>22   historic samples, yes.<br>23        Q.   And you cite Longo and<br>24   Rigler from 2018, correct? | 1        testing from the company?<br>2   BY MR. FERGUSON:<br>3        Q.   And my question was, can you<br>4   cite any scientific articles that you've<br>5   authored in which you cited an<br>6   unpublished paper authored by an expert<br>7   witness who is being paid in the<br>8   litigation on the very topic that you're<br>9   writing on?<br>10        A.   I have not had that<br>11   opportunity so the answer is no.<br>12        Q.   So, you've never done that<br>13   in your academic writings, correct?<br>14        A.   If you mean that -- by that,<br>15   that I have never cited an unpublished<br>16   paper authored by an expert witness?<br>17        Q.   Yes, ma'am.<br>18        A.   I have not done -- I have<br>19   not had the opportunity to do that. My<br>20   publications are primarily, if not<br>21   solely, based either on reviews or -- or<br>22   results that have emerged from my own<br>23   laboratory or a colleague's laboratory.<br>24        I've not had that |

| Page 447 | Page 449 |
|---|---|
| 1        A.   Mm-hmm-hmm, yes.<br>2        Q.   Okay. And are you aware<br>3   that Longo and Rigler are paid expert<br>4   witnesses who were hired by plaintiffs'<br>5   counsel to testify in talc litigation,<br>6   including this matter you're working on?<br>7        A.   I understand -- I understand<br>8   today that they are plaintiffs'<br>9   witnesses, experts.<br>10        Q.   Can you cite any scientific<br>11   articles that you've authored in the past<br>12   in which you cited an unpublished paper<br>13   that was authored by expert witnesses<br>14   hired by a party in litigation on the<br>15   very topic that you're writing on?<br>16        MS. O'DELL: Objection to<br>17   form.<br>18        THE WITNESS: I relied<br>19   primarily on Longo. But it is, as<br>20   I said, or as I will say, it's a<br>21   Johnson & Johnson product that<br>22   they are testing, so in my<br>23   opinion, who better to know what's<br>24   there than someone who did the | 1   opportunity. So the answer is no.<br>2        Q.   If you look at Page 7.<br>3        A.   Of the report?<br>4        Q.   Of -- of your report. Yes<br>5   please.<br>6        On Page 7 you say, "In 2004,<br>7   a television station reported that<br>8   Johnson's Baby Powder had been analyzed<br>9   and found anthophyllite asbestos at<br>10   0.2 percent," correct?<br>11        A.   I see that. That's in the<br>12   last paragraph. The second sentence: In<br>13   2004, a television station reported<br>14   Johnson's Baby Powder had been analyzed<br>15   and found anthophyllite asbestos at<br>16   0.2 percent, yes.<br>17        Q.   In your previous academic<br>18   research, have you ever cited to stories<br>19   run on local television stations?<br>20        A.   I have.<br>21        Q.   And is that something that<br>22   you think shows scientific rigor?<br>23        MS. O'DELL: Objection to<br>24   form. |

113 (Pages 446 to 449)

Judith Zelikoff, Ph.D.

Page 450

1    THE WITNESS:  It depends on
2  the scientific paper.  And it --
3  it depends on the source of the
4  media.
5  BY MR. FERGUSON:
6    Q.   If we go to Pages 6 --
7    A.   If -- if I may add to that,
8  my recollection is that that television
9  station data was given to Johnson &
10  Johnson and it was not -- I did not cite
11  television station itself, but the -- the
12  document that was turned over to Johnson
13  & Johnson.
14    Q.   If you go to Page 6 of
15  your --
16    A.   Page what, I'm sorry?
17    Q.   6.
18    A.   6?
19    Q.   So on Pages 6 to 8 you cite
20  documents or other sources that you claim
21  show the presence of asbestos in talc
22  powder, correct?  You --
23    A.   Pages 6 to 8?
24    Q.   Yeah.  Why don't you go to

Page 451

1  the top of 7.  Let me go to it
2  specifically.
3    One of the things you cite
4  to is Paoletti in 1984?
5    A.   Yes, sir.
6    Q.   Okay.  And the Paoletti
7  study was completed -- I don't know if I
8  can do my math very well, but is that
9  36 years ago?
10    A.   36, yes.
11    Q.   And you notice they have
12  assessed, according to your own report,
13  contamination in industrial and cosmetic
14  talcs, correct?
15    A.   9 of the 24 pharmaceutical
16  and cosmetic grade talcs contain
17  tremolite fibers.
18    Q.   And they are from the
19  Italian market, correct?
20    A.   From the Italian market.
21    MS. O'DELL:  Objection to
22  form.
23    THE WITNESS:  And the
24  European pharmacopeia.

Page 452

1  BY MR. FERGUSON:
2    Q.   And that's in your report,
3  correct?
4    A.   On Page 7 at the top.
5    Q.   Then you also cited
6  Dr. Blount's paper that you and
7  Mr. Hegarty talked about, correct?
8    A.   I'm sorry, can you give me a
9  location?
10    Q.   Sure.  It's the second
11  paragraph on Page 7.
12    A.   Van Gosen?
13    Q.   No, the second full
14  paragraph, cosmetic and pharmaceutical
15  talc products, et cetera --
16    A.   Yes, deposition of Alice
17  Blount.  Yes.
18    Q.   Correct.
19    A.   Sorry to interrupt.
20    Q.   And Dr. Blount's paper was
21  some 30 or so years ago, correct?
22    A.   1991.
23    Q.   And -- and I won't go
24  through this in detail, but Mr. Hegarty

Page 453

1  discussed with you the fact that U.S.
2  Food and Drug Administration conducted a
3  survey of cosmetic grade raw material
4  talc and some cosmetic products
5  containing talc.  And you were generally
6  aware of that, correct?
7    A.   The FDA report that he -- he
8  pointed me to, yes.
9    Q.   Okay.  You were aware but
10  you didn't cite it, correct?
11    A.   I was aware but I did not
12  cite it.
13    Q.   And that came from 2010 as
14  opposed to 1984 or 1991, correct?
15    MS. O'DELL:  Objection --
16    THE WITNESS:  Yes --
17    MS. O'DELL:  Excuse me.
18  Objection to form.
19    If you're going to ask a
20  specific -- about a specific date,
21  I would ask -- or a specific item
22  of that -- in that document I
23  would just ask that you show the
24  witness.

114 (Pages 450 to 453)

Judith Zelikoff, Ph.D.

Page 454

1  BY MR. FERGUSON:
2      Q.   Do you -- do you recall when
3  that survey was from?
4      A.   The FDA was 2014.  I don't
5  recall a specific.
6      Q.   Well, okay.  Counsel's
7  suggested it.  Why don't we go ahead and
8  mark as Exhibit 37.
9          (Document marked for
10         identification as Exhibit
11         Zelikoff-37.)
12  BY MR. FERGUSON:
13     Q.   And is this a document that
14  you've reviewed before?
15     A.   This is a document that I
16  have reviewed, yes.
17     Q.   Okay.  If you look at Page 2
18  at the top of the page, in the second
19  paragraph there, it says, "The study ran
20  from September 28, 2009, to September 27,
21  2010," correct?
22     A.   So I'm trying to put that
23  sentence into context.  So I need to read
24  the above sentences.

Page 455

1          I assume that the study they
2  are talking about was the contract with
3  the AMA analytical services to conduct
4  the laboratory survey.
5          Is that the study that they
6  are referring to?  It's unclear.
7      Q.   And in your review of this
8  document, did you read that there was no
9  asbestos detected by the survey by the
10  FDA in either the cosmetic grade raw
11  material talc, or the finished product
12  cosmetic products containing talc,
13  correct?
14     A.   I'm trying to find where
15  that was stated.
16     Q.   If you look at Page 3?
17     A.   Yes, sir.
18     Q.   See where it says at the top
19  of the page, "Cosmetic raw material
20  talc"?
21     A.   I see that, yes, sir.
22     Q.   Correct?
23          Then there is a list of
24  suppliers called Rio Tinto Minerals

Page 456

1  Luzenac America, correct?
2      A.   Correct.  On the left side.
3      Q.   On the left side.  And on
4  the right side there are two columns that
5  say percentage asbestos by PLM and
6  percentage asbestos by TEM, correct?
7      A.   I see that.
8      Q.   And each of those says NAD,
9  correct?
10     A.   They say NAD.
11     Q.   And from your review of
12  this, do you know that NAD means no
13  asbestos detected?
14     A.   Yes, I do.  That means that
15  the measurements that they had and the
16  scientific -- and the sensitivities that
17  they were using at the given time, they
18  did not see any, is my interpretation of
19  that.
20     Q.   According to the paper that
21  you said, NAD means no asbestos detected,
22  correct?
23     A.   In this study, yes, correct.
24     Q.   Let's take a look.  You've

Page 457

1  cited to IARC several times during
2  your -- in your report, correct?
3      A.   Yes, I did.
4      Q.   And let's look at the IARC
5  monograph 100 C, which was published in
6  2012 that I've marked as Exhibit 36.
7          (Document marked for
8          identification as Exhibit
9          Zelikoff-36.)
10         THE WITNESS:  Entitled
11     Arsenic Metals, Fibrous and Dusts?
12  BY MR. FERGUSON:
13     Q.   Correct.
14         And if you -- I've provided
15  you a page there, correct?
16     A.   You've provided me with
17  three pages.
18     Q.   Okay.  And was that
19  Page 225?
20     A.   225 starts 1.5 human
21  exposure.
22     Q.   Okay.  If you look at the
23  top of 225.  Do you have that page?
24     A.   Yes, sir.

Judith Zelikoff, Ph.D.

Page 458

1    Q.  In an exposure it says,
2  "Inhalation and ingestion are the primary
3  routes of exposure to asbestos," correct?
4         MS. O'DELL:  Objection to
5  form.
6  BY MR. FERGUSON:
7    Q.  The very first sentence.
8    A.  Mm-hmm-hmm.  I cannot attest
9  to ingestion, but certainly inhalation is
10  a primary.
11   Q.  But you'd agree that -- that
12  this is what IARC said, correct?
13   A.  I agree that this is what's
14  in IARC, yes, 2012.
15   Q.  And then there's another
16  section called exposure of the general
17  population, correct?
18   A.  Yes, sir.
19   Q.  And in the second paragraph
20  under that, do you see that paragraph
21  starts in studies of asbestos
22  concentrations?
23   A.  I do.
24   Q.  Okay.  And -- and let's --

Page 459

1  let's read it and see if it -- you and I
2  agree on what it says.
3         "In studies of asbestos
4  concentrations in outdoor air, chrysotile
5  is the predominant fiber detected.  Low
6  levels of asbestos have been measured in
7  outdoor air in rural locations; typical
8  concentration, 10 fibers per cubic meter.
9  Typical concentrations are about tenfold
10  higher in urban locations and about 1,000
11  times in close proximity to industrial
12  sources of exposure, e.g., asbestos mine
13  or factory demolition site, or improperly
14  protected asbestos-containing waste
15  site," correct?
16   A.  That's what's written here,
17  yes.
18   Q.  Okay.  And if you go down to
19  the first sentence of the next paragraph,
20  it says, "In indoor air, for example in
21  homes, schools and other buildings,
22  measured concentrations of asbestos are
23  in the range of 30 to 6,000 fibers per
24  cubic meter," correct?

Page 460

1    A.  That's what's here, yes.
2    Q.  Okay.  So certainly based on
3  what IARC has said, a person could inhale
4  or ingest one or more asbestos fibers
5  from the air that they breathe, correct?
6         MS. O'DELL:  Objection to
7  form.
8         THE WITNESS:  Based on the
9  measurements, I can't really tell
10  where they took these, where they
11  took the measurements or how they
12  measured them, from this Page 225,
13  but based on what they are saying
14  here, they have measured in
15  outdoor air and rural locations,
16  10 fibers per cubic meter, yes.
17         As I said, if you look down
18  in that paragraph it also
19  indicates that asbestos has been
20  measured in the air in a disaster
21  such as the World Trade Center, in
22  higher concentrations by
23  Dr. Longo.
24  BY MR. FERGUSON:

Page 461

1    Q.  And then if you look at
2  Page 229.  Are you with me?
3    A.  Yes, I am.
4    Q.  Under B, dietary exposure.
5    A.  Yes.
6    Q.  It says in the first
7  sentence under that paragraph heading,
8  "The general population can be exposed to
9  asbestos in drinking water," correct?
10   A.  It can happen under certain
11  conditions, yes.  It says, "The general
12  population can be exposed to asbestos in
13  drinking water."
14   Q.  And then below it says about
15  nine lines down, "In the U.S.A., the
16  concentration of asbestos in most
17  drinking water supplies is less than one
18  fiber per milliliter even in areas with
19  asbestos deposits or with asbestos cement
20  water supply pipes."  Correct?
21   A.  That's what it says here.
22   Q.  And then it says, "However,
23  in some locations the concentration in
24  water may be extremely high containing 10

Judith Zelikoff, Ph.D.

Page 462

1  to 300 million fibers per liter or even
2  higher." Correct?
3      MS. O'DELL: Objection to
4  form.
5      THE WITNESS: That's what it
6  says here.
7  BY MR. FERGUSON:
8      Q.  So --
9      A.  But it's talking about --
10  it's talking about specific locations and
11  it's also saying "can." This is not a
12  normal situation. Normal -- this is a
13  contaminated situation.
14      Q.  But as IARC said, in the
15  first line we talked about, inhalation
16  and ingestion can be routes of exposure
17  to asbestos for the general population,
18  correct?
19      A.  It can be. Can being the
20  keyword.
21      Q.  I've got some more questions
22  that I could ask. But I'm going to pass
23  it back to Mr. Hegarty.
24      THE WITNESS: Hello again.

Page 463

1      MR. HEGARTY: Hello again.
2      MS. O'DELL: So are you
3  finished with your questions?
4      MR. FERGUSON: I have other
5  questions that I could ask. But
6  I'm trying to the limited
7  time that we have.
8      MS. O'DELL: I understand.
9  I'm just trying -- typically we
10  don't go back and forth between
11  the parties. The plaintiffs' side
12  has had time to ask questions. So
13  I guess I'm just trying to figure
14  out what y'all are doing.
15      MR. HEGARTY: Let's go off
16  the record real quick and have a
17  discussion. Because what we
18  planned to do, I took the time
19  that Ken was using to organize my
20  notes and to finish up the
21  remaining time.
22      Go off the record.
23      THE VIDEOGRAPHER: The time
24  is 6:45 p.m. Off the record.

Page 464

1      (Whereupon, a discussion was
2  held off the record.)
3      THE VIDEOGRAPHER: The time
4  is 6:46 p.m. Back on the record.
5         - - -
6      EXAMINATION
7         - - -
8  BY MR. HEGARTY:
9      Q.  Doctor, you have done a
10  number of studies looking at inhalation
11  of particles in animal species primarily,
12  correct?
13      A.  In animal species primarily,
14  but also I have done studies in cell
15  culture, yes.
16      Q.  In any of the studies where
17  you have looked at inhalation of
18  particles in animals, have you reported
19  finding those particles in the ovaries?
20      A.  I did not look in the
21  ovaries.
22      Q.  So have you ever evaluated
23  the ovaries in any study that you have
24  done?

Page 465

1      A.  I have evaluated -- in the
2  cadmium particle studies, we looked for
3  the soluble ions, that's what we
4  measured, using atomic absorption and ICT
5  mass spec. And we did find cadmium --
6  sorry. Sorry. We did find soluble
7  cadmium ions in the -- in the tissue --
8  in the ovaries.
9      Q.  Of what animal?
10      A.  Mice.
11      Q.  So there's nothing unique
12  with regard to talc in your opinion with
13  regard to its ability to transport within
14  the body, correct?
15      MS. O'DELL: Object to the
16  form.
17      THE WITNESS: Talc is a
18  fiber and will transport as a
19  fiber. It's also hydrophilic so
20  it will require some time for the
21  other products within the talc
22  molecule to be released. I am not
23  sure if I answered your question.
24  BY MR. HEGARTY:

117 (Pages 462 to 465)

Judith Zelikoff, Ph.D.

| Page 466 | Page 468 |
|---|---|
| 1    Q.   What about platy talc?  Will | 1    to reach -- it can reach the deep lung, |
| 2  platy talc travel in the body as cadmium | 2  if it's five micrometers or smaller. |
| 3  would travel? | 3  And -- |
| 4    A.   Cadmium is a -- has traveled | 4    Q.   Go ahead. |
| 5  as a soluble ion.  So platy talc -- | 5    A.   And in that case since it's |
| 6  neither platy talc nor asbestos will | 6  not disposed of through the mucociliary |
| 7  travel as a soluble ion.  They are | 7  escalator, then it is in the other parts |
| 8  fibers. | 8  of the lung and it can reach the |
| 9    Q.   Have you done -- | 9  capillaries.  And once it gets into the |
| 10    A.   They are -- I'm sorry, platy | 10  bloodstream, it can be transported. |
| 11  talc is a crystal with different forms. | 11  Certain particles have predilections for |
| 12  But my understanding is that platy talc | 12  where they go. |
| 13  can fracture and also form fragments and | 13    Q.   When you say it can be |
| 14  they could travel, given their size. | 14  transported, does that include to the |
| 15    Q.   Could they travel as cadmium | 15  ovaries? |
| 16  has traveled in your studies, if that | 16    A.   Are you asking specifically |
| 17  happens? | 17  about talc or particles in general? |
| 18    A.   No, in -- in my studies we | 18    Q.   Particles in general that |
| 19  did not measure -- we did not look for | 19  meet the size standards that you just |
| 20  the presence of the particle -- of the | 20  referenced of getting into the deep lung? |
| 21  nanoparticle in the tissues.  We measured | 21    A.   Mm-hmm-hmm.  There's no |
| 22  for the metal in those tissues. | 22  reason not to believe that it couldn't |
| 23        So we are of the opinion | 23  get into the ovaries. |
| 24  that it was the soluble ion that was | 24    Q.   Did you examine, for |

| Page 467 | Page 469 |
|---|---|
| 1  released, and in this case, I know of no | 1  purposes of your biological plausibility |
| 2  studies off the top of my head that | 2  opinion, all the studies looking at |
| 3  measured how much of the other components | 3  NSAIDs and use of aspirin in women with |
| 4  were released. | 4  ovarian cancer? |
| 5    Q.   Can any particle that's | 5    A.   I looked at several studies. |
| 6  inhaled reach the ovary? | 6  I'm sure I -- |
| 7    A.   If it -- if it meets certain | 7      (Document marked for |
| 8  size constituents.  There's no reason why | 8      identification as Exhibit |
| 9  a particle could not reach the ovary or | 9      Zelikoff-38.) |
| 10  the kidney or the liver or -- under | 10  BY MR. HEGARTY: |
| 11  proper circumstances. | 11    Q.   I'm going to show you what I |
| 12    Q.   Is there a certain size | 12  marked as Exhibit 38, which is a study |
| 13  limitation? | 13  that you cited by Wu 2009. |
| 14    A.   Well, something that's | 14    A.   Actually, it's Merritt. |
| 15  inhaled, is that what you're talking | 15    Q.   I'm sorry.  It's Merritt |
| 16  about? | 16  2008, correct? |
| 17    Q.   Yes. | 17    A.   Yes.  And let me find it in |
| 18    A.   Something that's inhaled, if | 18  my report. |
| 19  it's 10 micrometers or greater, it's | 19    Q.   You cite it on Page 26. |
| 20  going to be caught in the upper airways | 20  Above the italicized paragraph -- |
| 21  and probably dismissed through the | 21  italicized paragraph at the bottom. |
| 22  mucociliary escalator.  If it's of a | 22    A.   I see it.  "At high |
| 23  smaller nature, then depending on where | 23  concentrations with chronic exposure, |
| 24  the impaction is for the lung, it's going | 24  reactive oxygen species, known as ROS, |

Judith Zelikoff, Ph.D.

Page 470

1  can damage cellular macromolecules and
2  contribute to neoplastic transformation
3  and/or tumor growth.  Other likely
4  manifestations of talc."  That's the
5  paragraph that you're referring to.
6       Q.   You do agree that a relevant
7  body of literature is whether NSAIDs or
8  aspirin have an effect on ovarian cancer
9  risk, if you're considering inflammation
10  as a biologically plausibility mechanism.
11       A.   NSAIDs being an -- one type
12  of anti-inflammatory, it could reduce
13  oxidative stress, yes, to different
14  degrees.
15       Q.   If you look at the abstract
16  on the first page of the Merritt paper.
17       A.   Yes.
18       Q.   At the very end, they say,
19  "We conclude that on balance chronic
20  inflammation does not play a major role
21  in the development of ovarian cancer."
22            Do you see where I'm
23  reading?
24       A.   I'm seeing the last

Page 471

1  sentence, yes.
2       Q.   Do you agree with that
3  statement in general?
4       A.   I do not agree with that
5  statement.  That's -- my biological
6  plausibility is associated with the
7  oxidative stress and inflammation.  Also
8  this paper was written in 2008.
9       Q.   Did you cite that finding
10  that I just read anywhere in your report?
11       A.   I cite Merritt.
12       Q.   Do you cite for the reader
13  of your report the statement that I just
14  read in the abstract?
15       A.   Not to my recollection.
16            (Document marked for
17       identification as Exhibit
18       Zelikoff-39.)
19  BY MR. HEGARTY:
20       Q.   I'm showing you what I've
21  marked as Exhibit Number 39.  That is the
22  Wu paper.
23       A.   Mm-hmm-hmm.
24       Q.   You cite the Wu paper over

Page 472

1  on Page 21 of your report?
2       A.   Can you direct me to it?
3  Oh, I see it.  Second paragraph.  "Wu, et
4  al, 2009, performed a study to determine
5  the role of talc in the development of
6  ovarian cancer considering the history of
7  endometriosis."
8       Q.   If you look at the abstract
9  of the Wu paper, about two-thirds of the
10  way down, it reads, "Contrary to the
11  hypothesis."
12            Do you see that start of the
13  sentence?
14       A.   I do.
15       Q.   "Contrary to the hypothesis
16  that risk of ovarian cancer may be
17  reduced by use of NSAIDs, risk increased
18  with increasing the frequency in years of
19  NSAID use," citing the relative risk, the
20  confidence intervals.  "This was
21  consistent across types of incident."
22            Do you see where I'm
23  reading?
24       A.   I do see where you're

Page 473

1  reading.
2       Q.   That finding is inconsistent
3  with inflammation as a mechanism by which
4  ovarian cancer can occur, correct?
5            MS. O'DELL:  Object to the
6       form.
7            THE WITNESS:  This -- NSAIDs
8       are known as antioxidants.  And
9       yes, that's true, but there are
10       other antioxidants from other
11       papers that demonstrate that it
12       does indeed reduce inflammation.
13  BY MR. HEGARTY:
14       Q.   Well, did you cite the
15  finding of the Wu paper with regard to
16  its data on NSAID use and the risk of
17  ovarian cancer?
18       A.   I did have a section, to my
19  recollection, on the papers of Wu and
20  Merritt.
21       Q.   Well, in the section that I
22  was referring to, in the middle of the
23  paragraph on Page 21, middle paragraph on
24  Page 21, you don't cite that study's

Judith Zelikoff, Ph.D.

Page 474

1  findings as to NSAIDs and risk of ovarian
2  cancer, correct?
3        A.   I do not cite that
4  particular sentence, no.
5        Q.   Over on Page 23, you refer
6  to the Shukla study?
7        A.   Yes, sir.
8        Q.   That's second to the last
9  paragraph?
10       A.   "In a molecular cell study
11  by Shukla"?
12       Q.   Yes.  The -- strike that.
13            Gene expressions like those
14  measured in the Shukla study occur
15  everyday in everyone, correct?
16            MS. O'DELL:  Objection to
17       form.
18            THE WITNESS:  There are
19       changes in genes per day.  But
20       I'm -- I'm not -- I do not know
21       nor do I have knowledge of whether
22       the gene for ATF3 or ATF1 is
23       changed everyday by no exposure.
24  BY MR. HEGARTY:

Page 475

1        Q.   But the -- the fact of gene
2  expression is not a -- strike that.
3            The fact that gene
4  expression occurs does not mean that
5  cancer will occur, correct?
6        A.   No.  My role is to look for
7  biological plausibility, and when you
8  have a transcription factor which is so
9  well immersed into oxidation and reactive
10  oxygen species and inflammation, and I
11  would say that changes or upregulation of
12  the -- of the ATF gene certainly is
13  linked with inflammation.
14       Q.   Can you cite for me any
15  studies that have used measurements of
16  level -- of the levels of ATF3 to assess
17  ovarian cancer risk?
18       A.   I cannot cite those studies
19  to you, but again, going back to
20  biological plausibility, I can tell you
21  that this gene is extremely important in
22  growth factors and proinflammatory
23  cytokines.  So an upregulation is going
24  to lead to the production of

Page 476

1  proinflammatory cytokines and oxidase,
2  yes.
3        Q.   Is there any study that
4  sites the clinical significance of ATF as
5  it relates to ovarian cancer risk?
6            MS. O'DELL:  Object to the
7       form.
8            THE WITNESS:  No study that
9       I'm currently aware of.  But there
10       are many studies that link ATF
11       upregulation to inflammation and
12       then inflammation to -- in the
13       process of carcinogenesis, both
14       progression and initiation.
15  BY MR. HEGARTY:
16       Q.   If you turn over to the
17  second to the last page of your report,
18  Page 27.
19            In Paragraph 3, you say that
20  exposure to talcs --
21       A.   Excuse me, Number 3?
22       Q.   I called it Paragraph 3.
23  You can call it Number 3.
24       A.   It's listed as Number 3.

Page 477

1        Q.   3.  You state that "exposure
2  to talcum powder products causes an
3  inflammatory tissue reaction which may
4  result in the following," and then you
5  list --
6        A.   Elevation.
7        Q.   -- a number of -- of events
8  that you label as A through F -- I'm
9  sorry, A through G carrying over to the
10  top of the next page.
11       A.   I see that, thank you.
12       Q.   Can you cite for me any
13  studies showing any of that activity in
14  women using talc on the perineum?
15            MS. O'DELL:  Object to the
16       form.
17            THE WITNESS:  If I can
18       recall the Health Canada study, I
19       think they looked at -- they also
20       included inflammatory responses
21       that are seen in some of their
22       meta-analysis.
23  BY MR. HEGARTY:
24       Q.   Well, the Health Canada

120 (Pages 474 to 477)

Judith Zelikoff, Ph.D.

Page 478

1 study, the Taher study, was a
2 meta-analysis, correct?
3     A.   Yes, correct.
4     Q.   Can you cite for me any
5 studies reporting that -- reporting these
6 events occurring in women using talc on
7 the perineum?
8         MS. O'DELL: Object to the
9     form.
10        THE WITNESS: If you're
11    asking me if gene alterations or
12    mutations or the level of
13    apoptosis has been measured in any
14    women exposed, no, I do not recall
15    that.
16 BY MR. HEGARTY:
17    Q.   Have any of the processes --
18    A.   Excuse me. If I may add.
19 But inflammatory markers have been looked
20 at in women with ovarian cancer and they
21 are elevated.
22    Q.   And my question, as you'll
23 recall, is specific to talc users,
24 correct?

Page 479

1         MS. O'DELL: Objection to
2     form.
3         THE WITNESS: Talc -- yes,
4     talc products.
5 BY MR. HEGARTY:
6    Q.   Can you -- can you cite to
7 me any studies showing elevations of any
8 of these processes in women using talc?
9         MS. O'DELL: Object to the
10    form.
11        THE WITNESS: Well,
12    neoplastic transformation and
13    proliferation is clearly seen
14    in -- obviously if there's a
15    variant answer, you've had
16    neoplastic transformation
17    proliferation.
18 BY MR. HEGARTY:
19    Q.   Well, my question is
20 specific to women using talc prediagnosis
21 of ovarian cancer.
22    A.   I see. No, sir.
23        MR. HEGARTY: For purposes
24    of the deposition, we want to mark

Page 480

1         as exhibit -- Exhibits 40 through
2     48 -- I'm sorry, 47 -- the
3     notebooks that had been produced
4     for purposes of the deposition
5     here today.
6         (Documents marked for
7     identification as Exhibits
8     Zelikoff-40 through 47.)
9 BY MR. HEGARTY:
10    Q.   Over on Page 23, you --
11    A.   Of my report?
12    Q.   Of your report, with regard
13 to the Shukla study.
14        I'm sorry, over on Page 26.
15 You cite again the Shukla study. Do you
16 see that where -- do you see where you
17 say "nonfibrous talc at low in vitro
18 exposure concentrations caused increased
19 expression of transcription factors
20 associated with the inflammatory process
21 in a time and dose dependent manner"?
22    A.   I'm sorry, I'm not clear
23 on --
24    Q.   Middle of the second full

Page 481

1 paragraph.
2    A.   Not -- after the Mori
3 citation?
4    Q.   Yes.
5    A.   "Nonfibrous talc at low in
6 vitro exposure concentrations caused
7 increased expression of transcription
8 factors associated with the inflammatory
9 process in a time and dose dependent
10 manner." Yes, I see that.
11    Q.   What did you mean by say --
12 by time and dose manner?
13    A.   May I see the paper?
14        (Document marked for
15    identification as Exhibit
16    Zelikoff-48.)
17 BY MR. HEGARTY:
18    Q.   Marking as Exhibit 49 -- 48
19 that paper.
20    A.   Thank you.
21        MR. TISI: We are at seven
22    hours by the way.
23        MS. O'DELL: We are at seven
24    hours?

121 (Pages 478 to 481)

Judith Zelikoff, Ph.D.

Page 482

1      MR. TISI:  Yes, we are.
2      MS. O'DELL:  We're at seven
3   hours, Mark.
4      MR. HEGARTY:  Okay.  Are you
5   going to instruct her not to
6   answer that question?
7      MS. O'DELL:  Well, the
8   federal rules limit this
9   deposition to seven hours and --
10      MR. HEGARTY:  No, I
11   understand, but I also remember a
12   deposition where I think I let
13   Chris go over about two or
14   three minutes.
15      MR. TISI:  Yeah, but you are
16   using a whole new exhibit.
17      MS. O'DELL:  You just marked
18   it --
19      MR. HEGARTY:  I just want to
20   make sure that was --
21      MR. TISI:  Are you going to
22   suggest --
23      MR. HEGARTY:  No, I just
24   want to know if that -- if you

Page 483

1   want to end the deposition for me
2   right here?
3      MR. TISI:  That was a fact
4   witness, as you know.
5      I leave it to Leigh.  If
6   we're going to -- if we're going
7   to have this rule, we need to kind
8   of be consistent with it.
9      MR. HEGARTY:  No, I'm not
10   looking to apply another rule.
11   Just tell me whether you'll let
12   her answer the question or if the
13   time -- because the time is up,
14   that question will not be
15   answered.
16      MS. O'DELL:  The time -- the
17   time is up.  What is your -- what
18   was your question?
19      MR. HEGARTY:  My question
20   was, "What do you mean where you
21   say time and dose dependent
22   manner."  But I'm not going to
23   insist on any applicable rule.
24   I'll let you decide whether you

Page 484

1   want to let her answer or not.
2   It's simply up to you.  If you say
3   we're done, then I will -- I'm not
4   going to dispute it.
5      MS. O'DELL:  We are -- I
6   will let you answer that question.
7   But after that, we're -- we're
8   done.
9      MR. HEGARTY:  Okay.  Thank
10   you.
11      MS. O'DELL:  Do you recall
12   the question, Dr. Zelikoff?
13      THE WITNESS:  Yes.  The
14   question is -- what -- I'll repeat
15   it from here.
16      What did I mean by a time
17   and dose dependent manner?
18   BY MR. HEGARTY:
19   Q.   Yes.
20   A.   In the Shukla study?
21   Q.   Correct.
22   A.   Well, if we look at Figure 2
23   concerning cell viability in the Shukla
24   paper, Page 117.

Page 485

1      So we can see, I'm trying to
2   find the exact one that I want to refer
3   to.  Figure A, one can see that in terms
4   of the concentration and over time, that
5   the number -- total number of viable
6   cells were altered.  And in Figure 2, 15
7   and 75 -- no, scratch Figure 2, sorry.
8      So on Page 118, in looking
9   at number of genes that were
10   significantly changed, we can see looking
11   at the concentration -- and this is for
12   asbestos -- there was a change in effect
13   in asbestos.  If one looks at -- I think
14   that's it.  That's what I meant.
15      MR. HEGARTY:  Okay.  Thank
16   you.
17      MS. O'DELL:  Off the record.
18      THE VIDEOGRAPHER:  The time
19   is 7:07 p.m.  Off the record.
20      (Short break.)
21      THE VIDEOGRAPHER:  We are
22   back on the record.  The time is
23   7:30 p.m.
24          - - -

122 (Pages 482 to 485)

Judith Zelikoff, Ph.D.

Page 486

1           EXAMINATION
2              - - -
3   BY MS. O'DELL:
4       Q.   Dr. Zelikoff, I have a few
5   follow-up questions for you.
6            Prior to your involvement in
7   litigation, this litigation, did you hold
8   the opinion that inflammation causes
9   cancer?
10           MR. HEGARTY:  Objection to
11       form.
12           THE WITNESS:  Yes.  I held
13       the opinion for a very long time
14       that inflammation causes cancer.
15  BY MS. O'DELL:
16      Q.   And in terms of your
17  knowledge and opinion prior to your
18  involvement in the litigation, did you --
19  did you have an opinion regarding the
20  role of oxidative stress in the
21  development of cancer?
22      A.   Yes, I did.  My opinion was
23  that oxidative stress was closely
24  involved with the causation of cancer.

Page 487

1       Q.   So to the degree that your
2   work in this case addressed new
3   considerations, were those considerations
4   primarily focused on talc and its ability
5   to cause inflammation and oxidative
6   stress?
7            MR. HEGARTY:  Objection to
8       form.
9            THE WITNESS:  That is
10      correct.
11  BY MS. O'DELL:
12      Q.   Can you -- if I could ask
13  you to take your report.  I think it's
14  right to your left.  I'm going to ask
15  you -- if you'll turn to Page 12.  Do you
16  see that?  The subsection involving
17  fragrance, fragrance chemicals?
18      A.   Yeah.  C, fragrances.
19      Q.   And did you rely on
20  Dr. Crowley's report and his review of
21  the relevant literature and other
22  information regarding the chemicals that
23  are included in the fragrance for Baby
24  Powder and Shower to Shower?

Page 488

1       A.   I relied on his report, yes.
2       Q.   And did Dr. Crowley conclude
3   that the chemicals involved in the
4   fragrances for both Johnson & Johnson's
5   Baby Powder and Shower to Shower may
6   contribute to the inflammatory response,
7   toxicity and potential carcinogenicity of
8   Johnson & Johnson's talcum powder
9   products?
10           MR. HEGARTY:  Objection to
11      form.
12           THE WITNESS:  Yes.  I concur
13      with that whole opinion.
14  BY MS. O'DELL:
15      Q.   And in fact, that's the
16  specific opinion he included in his
17  report that you relied on?
18      A.   Yes, that's correct.
19           MR. HEGARTY:  Objection to
20      form.
21  BY MS. O'DELL:
22      Q.   And so if another expert was
23  also relying on Dr. Crowley's analysis,
24  it wouldn't be surprising that the same

Page 489

1   wording was used?
2            MR. HEGARTY:  Objection to
3       form.
4            THE WITNESS:  Absolutely
5       not.
6   BY MS. O'DELL:
7       Q.   Let me ask you other
8   questions about the general principles in
9   your report.  I think you testified, you
10  were asked a number of questions about
11  general principals.  And in your
12  judgment, is it generally accepted to --
13  to use common phrasing for general
14  principles in scientific publications?
15      A.   Yes.
16           MR. HEGARTY:  Objection to
17      form.
18           THE WITNESS:  I answered
19      that question before, and yes.
20      Common, well-publicized,
21      well-established concepts, yes.
22  BY MS. O'DELL:
23      Q.   You were asked during the
24  early part of the day certain questions

123 (Pages 486 to 489)

Judith Zelikoff, Ph.D.

|  | Page 490 |
|---|---|

1  about whether you were an expert in areas
2  such as talc and inflammation?
3       A.   Yes.
4       Q.   And I think if you recall
5  the response you answered you were not
6  classified as an expert.  What did you
7  mean by that?
8            MR. HEGARTY:  Objection to
9  form.
10           THE WITNESS:  What I meant
11  was in terms of legal, whether --
12  one of the questions that arose
13  was, in the past, have I been
14  listed as an expert in other
15  cases.  And so I followed that
16  line of thought and thought that
17  we were still talking about
18  litigation and formal declaration
19  as an expert in that area.
20  BY MS. O'DELL:
21       Q.   Are you an expert in the
22  toxicological effects of minerals on
23  the -- on humans?
24           MR. HEGARTY:  Objection to

|  | Page 491 |
|---|---|

1       form.
2            THE WITNESS:  I'm expert in
3       toxicology of environmental
4       chemicals, including mixtures,
5       including fibers, including
6       particles, including talc.
7  BY MS. O'DELL:
8       Q.   And would that -- would that
9  also include -- when you said fibers,
10  would that also include asbestos and
11  fibrous talc?
12           MR. HEGARTY:  Objection to
13  form.
14           THE WITNESS:  Yes.
15  BY MS. O'DELL:
16       Q.   Are you an expert in the
17  toxicological effects of heavy metals on
18  the humans?
19           MR. HEGARTY:  Objection to
20  form.
21           THE WITNESS:  Yes, I am.
22  BY MS. O'DELL:
23       Q.   And what do you base that
24  statement on?

|  | Page 492 |
|---|---|

1       A.   My numerous publications in
2  that area of metal toxicology that I've
3  been doing for many, many, many years.
4       Q.   And in addition to your
5  training, experience, do you also make
6  those statements based on your review of
7  the available scientific and medical
8  literature?
9       A.   In regards to metals?
10      Q.   In all the environmental
11  exposures we've just discussed?
12      A.   Yes.  I rely on
13  literature --
14      Q.   You were asked questions --
15      A.   -- as well as my own
16  scientific research.
17      Q.   Excuse me.  I didn't mean to
18  cut you off, Doctor.
19           You were asked questions
20  about whether there were any studies or
21  evidence that you relied on involving
22  Johnson's Baby Powder.
23           Do you recall that?
24      A.   I do recall that question,

|  | Page 493 |
|---|---|

1  yes.
2       Q.   And do the -- strike that
3  and start again.
4            Did Dr. Saed in the testing
5  that was done and reported in not only
6  the abstracts but also his manuscript,
7  involve Johnson's Baby Powder?
8            MR. HEGARTY:  Objection to
9  form.
10           THE WITNESS:  Yes.
11  Dr. Saed's did.  Thank you for
12  reminding me.
13  BY MS. O'DELL:
14      Q.   Was Dr. Longo and Rigler's
15  testing of historical samples of talcum
16  powder products produced in this
17  litigation, including Johnson's Baby
18  Powder and Shower to Shower?
19      A.   Dr. Longo stated he did use
20  products over time from Johnson & Johnson
21  talcum powders.
22      Q.   And was the evidence that
23  was presented in Hopkins Exhibit 28, did
24  it involve Johnson's talcum powder

124 (Pages 490 to 493)

Judith Zelikoff, Ph.D.

Page 494

1  products?
2      A.   Yes, it did.
3      Q.   Was evidence that you relied
4  on in the form of Pier Exhibit 47, did
5  those also involve talc that was taken
6  from sources used to supply Johnson's
7  talcum powder products?
8          MR. SILVER:  Objection to
9  form.
10         MR. HEGARTY:  Objection to
11  form.
12         THE WITNESS:  Dr. Pier?
13  BY MS. O'DELL:
14     Q.   Yes.
15     A.   To my recollection, yes.  If
16  you'd like, I can look at the paper and
17  confirm that.
18     Q.   Let me ask you about
19  Dr. Blount.  You were asked previously
20  about her publication in 1991.
21         Did Dr. Blount test
22  Johnson's Baby Powder?
23     A.   Yes.  But again, if I looked
24  at the reference I could give you -- I

Page 495

1  could give you specifics.
2      Q.   Okay.  And do you recall
3  that that -- did -- let me just ask it
4  this way.
5          Did Dr. Blount find that
6  there was asbestos in the Johnson's Baby
7  Powder samples that she tested?
8      A.   Yes.  To my recollection,
9  she did, yes.
10     Q.   You were asked about some
11  testing that had been done by the FDA on
12  certain cosmetic powders.  Do you
13  remember that?  It was Exhibit 37.
14         MS. O'DELL:  And is that in
15  the bottom of that stack, 37?
16         Thanks, Mark.  If you'll
17  hand those to me.  I appreciate
18  it.
19         THE WITNESS:  Sorry.  My
20  microphone.
21         MS. O'DELL:  Oh, did it come
22  off?
23         THE VIDEOGRAPHER:  Raise it
24  up as high as possible.  There you

Page 496

1      go.
2  BY MS. O'DELL:
3      Q.   Did the FDA conclude in
4  Exhibit 37 that -- well, let me just ask
5  the question this way.
6          If you'll turn to Page 2 of
7  Exhibit 37, what was the FDA's conclusion
8  regarding the testing that they had
9  performed on the cosmetic powders?
10         Doctor, I'll direct you to
11  the second-to-the-last paragraph at the
12  bottom of the page, the middle sentence.
13  Do you see that, "Beginning for these
14  reasons"?
15     A.   Yes, I see that.
16     Q.   And what was the FDA's
17  conclusion?
18     A.   "For these reasons, while
19  FDA finds these results informative, they
20  do not prove that most or all talc or
21  talc-containing cosmetic products that
22  are currently or currently marketed in
23  the United States are likely to be free
24  of asbestos contamination."

Page 497

1      Q.   You were also asked a number
2  of questions regarding the FDA response
3  to Dr. Epstein's letter in April of 2014,
4  Exhibit 33.
5          Do you recall those
6  questions?
7      A.   I recall that questions were
8  asked in this regard, yes.
9      Q.   While at this point in the
10  day, I wouldn't expect you to recall the
11  specific question, but you recall those
12  general discussions?
13     A.   Yes, I do.
14     Q.   All right.  Let me ask you,
15  if you wouldn't mind, to turn to Page 3
16  of -- of Exhibit 33.
17         And the second paragraph.
18     A.   Starting, "The survey
19  found"?
20     Q.   Yes.  Yes, ma'am.
21         And as of April 2014, was it
22  the FDA's conclusion that their testing
23  results did not prove that
24  talc-containing cosmetic powders

125 (Pages 494 to 497)

Judith Zelikoff, Ph.D.

| | Page 498 |
|---|---|

1    currently marketed in the U.S. are free
2    of asbestos contamination?
3              MR. HEGARTY:  Objection to
4    form.
5              THE WITNESS:  Yes.  I can
6         read the sentence, "While FDA
7         found this data informative, the
8         results were limited by the fact
9         that only four suppliers submitted
10        samples and the number of products
11        used.  They do not prove that all
12        talc containing cosmetic products
13        currently marketed in the United
14        States are free of asbestos
15        contamination."
16   BY MS. O'DELL:
17        Q.   Okay.  While we are on this
18   Exhibit 33, Doctor, if you'll turn to
19   Page 5 of the exhibit.  About two-thirds
20   of the way down, the paragraph beginning,
21   "While."
22        A.   "While there exists no
23   direct proof"?
24        Q.   Yes.  And would you mind

| | Page 499 |
|---|---|

1    reading, you know, the -- the -- those
2    first two sentences of that paragraph,
3    please?
4         A.   "While there exists no
5    direct proof of talc and ovarian
6    carcinogenesis, the potential for
7    particulates to migrate from the
8    peritoneum" -- "the perineum and vagina
9    to the peritoneal cavity is
10   indisputable."
11        Q.   And then if you'll read the
12   next sentence?
13        A.   "It is, therefore, plausible
14   that perineal talc and other particulate
15   that reaches the endometrial cavity, the
16   fallopian tubes and ovaries and the
17   peritoneum may elicit a foreign body-type
18   reaction and an inflammatory response
19   that in some exposed women may progress
20   to epithelial cancers."
21        Q.   And are those statements
22   written by the FDA consistent with your
23   opinions regarding the biologic
24   plausibility of talcum powder products

| | Page 500 |
|---|---|

1    causing ovarian cancer?
2              MR. HEGARTY:  Objection to
3    form.
4              THE WITNESS:  They are
5         consistent with my opinion, yes.
6    BY MS. O'DELL:
7         Q.   Let me ask you if you would,
8    Doctor, to -- I'll do it for you.
9    Because it was marked here.
10             I'm going to hand to you the
11   Health Canada draft screening assessment
12   that was marked previously as Exhibit 9.
13        A.   I see it.
14        Q.   And let me ask you if you
15   would please, Doctor, first, did you
16   submit your report in this case prior to
17   Health Canada issuing the draft causal
18   assessment?
19        A.   I submitted my -- my final
20   report November 15th or 16th.  I'm not
21   quite clear on the date.  And received
22   this or saw it for the first time in
23   January.  So it did not go into my -- it
24   was not cited in my report and was not

| | Page 501 |
|---|---|

1    reviewed for my report.
2         Q.   And by virtue of the fact
3    that came out after your report, did --
4    did the health -- strike that and start
5    again.
6              Did the Health Canada
7    assessment inform your opinions in this
8    case?
9         A.   It -- it could not have
10   informed my opinion that's written out in
11   the report.  It was compelling evidence
12   that helped support the opinion that I
13   came to.
14        Q.   Did it confirm your
15   opinions?
16             MR. HEGARTY:  Objection to
17   form.
18             THE WITNESS:  Yes.  It
19        confirmed my opinions on many
20        lines, including methodology.
21   BY MS. O'DELL:
22        Q.   If you'll look at Page 18 of
23   the assessment.
24        A.   Yes.  I see it.

126  (Pages 498 to 501)

Judith Zelikoff, Ph.D.

Page 502

1      Q.   And looking at the
2   literature that is cited in this section,
3   did you cite in support of your opinions
4   Keskin 2009?
5      A.   Keskin 2009, yes.
6      Q.   And did you -- of course we
7   talked about it before.  You cited
8   Penninkilampi 2018?
9      A.   Yes, I did.
10     Q.   And did you cite other
11  references included in the mode of action
12  discussion that was undertaken by Health
13  Canada on Pages 18, 19 and, you know, 20
14  of the Health Canada assessment?
15     A.   Yes, I did.  Do you want me
16  to tell you which ones?
17     Q.   Just give us a few.  Just
18  give us a few.
19     A.   Henderson 1971.  These are
20  the ones that come to mind readily.
21  Edelstam 1997.  Egli and Newton 1961.  De
22  Boer in 1972.  Venter and Iturralde,
23  1979.  Heller 1996.  Cramer in 2007.
24        Would you like me to go on?

Page 503

1      Q.   So it's fair to say that
2   many of the references that you read,
3   reviewed, relied on in your report are
4   some of the same studies that Health
5   Canada relied on in their causal
6   assessment?
7        MR. HEGARTY:  Objection to
8        form.
9        THE WITNESS:  Yes.  This was
10       very validating for my -- my
11       report in my opinion.
12  BY MS. O'DELL:
13     Q.   Were you aware of the -- of
14  the assessment prior to it being issued
15  to the public?
16     A.   Not at all.  It was -- it
17  came out in late 2018, in December.
18     Q.   In the assessment that was
19  undertaken by Health Canada, did they
20  assign any numerical weights in the
21  causal assessment to certain studies?
22     A.   No, they do not.
23     Q.   Did they discuss
24  inflammation as a sort of recognized

Page 504

1   mechanism for the cause of cancer?
2        MR. HEGARTY:  Objection to
3        form.
4        THE WITNESS:  Biological
5        plausibility.
6   BY MS. O'DELL:
7      Q.   They -- let me ask a better
8   question.  Did they -- did they discuss
9   chronic inflammation, inflammation as a
10  biologically plausible mechanism for the
11  development of ovarian cancer?
12     A.   Yes, they did.
13     Q.   Did they discuss the role of
14  reactive oxygen species as part of the
15  biologically plausible mechanism of talc
16  in the development of ovarian cancer?
17        MR. HEGARTY:  Objection to
18        form.
19        THE WITNESS:  Oxidative
20        stress, yes.  Yeah.  React -- ROS.
21        Oxidative stress.
22        May I give the statement?
23  BY MS. O'DELL:
24     Q.   Yes.

Page 505

1      A.   With respect to talc,
2   specifically local chronic irritation
3   leading to inflammatory response is one
4   possible mechanism of tumor progression
5   that is frequently hypothesized.
6      Q.   And that's consistent with
7   your -- with your opinion in this case?
8        MR. HEGARTY:  Objection to
9        form.
10       THE WITNESS:  Yes.
11  BY MS. O'DELL:
12     Q.   Is that consistent with your
13  opinion in this case?
14     A.   Yes, it is.
15     Q.   Did they discuss migration
16  as part of the biologically plausible
17  mechanism for the connection between
18  perineal use of talc and development of
19  ovarian cancer?
20     A.   Yes, they did.
21     Q.   Okay.  Did they, on Page 15
22  and 16, did they discuss some of the
23  animal studies that you reference and
24  rely on in reaching your opinions in this

127 (Pages 502 to 505)

Judith Zelikoff, Ph.D.

Page 506

1    case?
2        A.   Yes, they do.
3        MR. HEGARTY:  Objection to
4    form.
5        THE WITNESS:  And --
6    BY MS. O'DELL:
7        Q.   Excuse me.
8        A.   They include Hamilton et
9    al., 1984.  Keskin 2009.  Hamilton 1984
10   again.  Keskin again.
11       Q.   Okay.  And if you'll turn to
12   Page 21.  You'll see at the top of the
13   page, they have a section on biologic
14   plausibility.
15       A.   Yes, they do.
16       Q.   Is -- is their discussion of
17   biological plausibility as outlined on
18   Page 21 consistent with your opinions in
19   this case?
20       MR. HEGARTY:  Objection to
21   form.
22       THE WITNESS:  Definitely
23   consistent.  Particles of talc are
24   hypothesized to migrate into the

Page 508

1        Q.   Counsel directed your
2    attention to the sentence -- counsel for
3    Johnson & Johnson -- direct -- directed
4    your attention to the sentence near the
5    bottom of the left column.
6        A.   An important finding of this
7    study is that talc use?
8        Q.   Yeah, the -- the potential
9    mechanism by which genital talc is
10   associated with an increased risk of
11   ovarian cancer --
12       A.   I'm sorry.  Again,
13   discussion on the left side.
14       Q.   Yes.  At the bottom of the
15   first paragraph, the last sentence.
16       A.   Okay.  I'm sorry.
17   "Potential mechanism by which general
18   talc associated with an increased risk of
19   ovarian cancer hence remains unclear."
20       Q.   And Johnson & Johnson's
21   counsel asked you about that sentence.
22       A.   Yes, they did.
23       Q.   But they didn't ask you
24   about other sentences in this -- this

Page 507

1        pelvis and ovarian tissue causing
2        irritation and inflammation.  And
3        the presence of talc in the
4        ovaries as I discussed previously
5        has been documented by Heller in
6        1996.
7    BY MS. O'DELL:
8        Q.   Great.  Thank you.
9        Doctor, you were also asked
10   some questions about the Penninkilampi
11   paper.
12       Do you recall those?
13       A.   I do recall being asked,
14   yeah, from that.
15       Q.   Potentially the most
16   difficult name to pronounce in the
17   litigation.
18       The Penninkilampi paper
19   was -- was marked as Exhibit 34.  Do you
20   recall that?
21       A.   I see, I see it here.  Yes.
22       Q.   And if I can ask you to turn
23   to Page 45.
24       A.   I see Page 45.

Page 509

1    paper, fair?
2        A.   That's fair.
3        Q.   So if you'll look to the
4    right column on Page 45.  Do you see the
5    sentence beginning "if chronic
6    inflammation"?
7        A.   I do.  "If chronic
8    inflammation due to ascending foreign
9    bodies is indeed the mechanism by which
10   talc use is associated with increased
11   ovarian cancer risks, then the results
12   fit the picture."
13       Q.   Is -- is that statement that
14   the authors of the Penninkilampi study
15   included in their report, excuse me, in
16   their article, is that consistent with
17   your opinions in this case?
18       A.   It is consistent.
19       Q.   And does it confirm the
20   opinions that you reached in this case?
21       A.   It acts to confirm, yes, it
22   does.
23       Q.   Okay.  You were asked
24   about -- a number of questions about

128 (Pages 506 to 509)

Judith Zelikoff, Ph.D.

Page 510

1  asbestos and the specific amount of
2  asbestos that would be introduced with
3  the perineal application of -- of talc.
4      A.  Yes --
5      Q.  And let me ask you --
6      A.  -- I recall.
7      Q.  You recall those questions?
8      A.  Yes, I do.
9      Q.  Is there any safe level of
10 asbestos --
11         MR. HEGARTY:  Objection to
12 form.
13 BY MS. O'DELL:
14     Q.  -- in the perineum?
15     A.  My opinion and conclusion is
16 no.
17     Q.  Is asbestos a known potent
18 carcinogen?
19     A.  It is.  According --
20     Q.  Excuse me.  Please go ahead.
21     A.  According to the regulators
22 and the documents, it is, yes, a known
23 carcinogen, and it's extremely potent.
24 If you look at the effects that it causes

Page 511

1  and at the dose levels that it causes
2  these effects.
3      Q.  And of course IARC has --
4      A.  IARC has classified it as a
5  Class 1A.
6      Q.  And did you review and rely
7  on IARC's conclusion regarding asbestos?
8      A.  I did.
9      Q.  Excuse me.  And its
10 contribution to the -- to the development
11 of ovarian cancer?
12     A.  Yes, I did.
13     Q.  Did you review and rely on
14 IARC's conclusions regarding fibrous talc
15 or talc in an asbestiform habit regarding
16 its ability to cause ovarian cancer?
17         MR. HEGARTY:  Objection to
18 form.
19         THE WITNESS:  I did.
20 BY MS. O'DELL:
21     Q.  If you'll turn to Page 6 in
22 your report.
23     A.  Yes, I see it.
24     Q.  Did you -- did you cite the

Page 512

1  deposition of Robert Glenn in your
2  report?
3      A.  I'm sorry, the deposition of
4  who?
5      Q.  Robert Glenn.  Page 6, about
6  midway down.
7      A.  Yes, I did.  "Because
8  asbestos is a known carcinogen, its
9  presence in cosmetic talc is
10 unacceptable, FDA 2012, FDA 2015."
11     Q.  And do you recall that --
12 was Mr. Glenn a former director of the
13 National Institute for Occupational
14 Safety and Health or NIOSH?
15     A.  Yes.
16     Q.  And what did Mr. Glenn
17 testify to regarding the presence of
18 asbestos in talc-based products?
19     A.  He says, "As stated in a
20 recent deposition, that if there were a
21 fiber of asbestos in talcum-based
22 products, it would certainly 'provide a
23 biologically plausible mechanism for
24 increased lung disease' and that he

Page 513

1  suspected that it would also have a
2  similar mechanism of disease in other
3  tissues and organs."
4      Q.  And you were asked a number
5  of questions about the different
6  constituents of talcum powder products.
7      A.  Yes.
8      Q.  If talcum powder products
9  did not contain asbestos, would that
10 change your opinion about the biological
11 plausible mechanism of -- that explains
12 talc -- talc-based products causing
13 ovarian cancer?
14     A.  No, it would not.
15     Q.  You were asked questions
16 about a Dr. Neel from NYU.
17     A.  The NYU Cancer Center.
18     Q.  And you were asked if you
19 knew Dr. Neel.
20     A.  Yes, I recall the question.
21     Q.  And what's your
22 understanding of Dr. Neel's position?
23     A.  My understanding is that he
24 is the chair -- he may not be called the

129 (Pages 510 to 513)

Judith Zelikoff, Ph.D.

Page 514

1 chair -- but he is the director of the
2 cancer center for NYU Langone Health and
3 NYU Medical School. It morphs into
4 different names.
5     Q.   And in regard to the
6 toxicity of talcum powder products and
7 its effects, toxicological effects,
8 would -- would you be more knowledgeable
9 about those particular effects than a
10 clinician who diagnoses and treats
11 ovarian cancer?
12         MR. HEGARTY: Objection to
13 form.
14 BY MS. O'DELL:
15     Q.   Like Dr. Neel?
16     A.   I'm a toxicologist, and so
17 my main area of focus and understanding
18 and literature has to do with toxicology,
19 toxicological mechanisms, toxicological
20 effects.
21     Q.   So --
22     A.   So my knowledge base in
23 those areas would -- I would suspect very
24 strongly would exceed that of Dr. Neel's,

Page 515

1 who is a clinician.
2     Q.   You were asked some
3 questions about the Shukla paper.
4     A.   Yes.
5     Q.   And -- and the Shukla paper
6 involved the use of talcum powder?
7     A.   Yes.
8     Q.   And if the --
9     A.   Do you recall what exhibit
10 that was?
11     Q.   I think it was the last
12 exhibit.
13     A.   May I have a copy?
14     Q.   48. And did the Shukla
15 study involve the testing of, or the use
16 of talcum powder?
17     A.   Yes. As they call it,
18 non-fibrous talc.
19     Q.   And if the talcum powder
20 used in the Shukla study contained
21 nickel, that would be -- the data that
22 was reported in that study would be
23 relevant for the effects of nickel, fair?
24         MR. HEGARTY: Objection to

Page 516

1 form.
2         THE WITNESS: Could you
3 clarify that question?
4 BY MS. O'DELL:
5     Q.   Yeah. It was a bad
6 question. I'm sorry. I'm getting tired.
7     A.   If you're asking -- would
8 you like to ask -- rephrase it, or should
9 I give you my thought of what you were
10 trying to ask?
11     Q.   Well, why don't you
12 interpret my question, and I'll follow
13 up.
14     A.   If you're asking me if
15 nickel was a component of the non-fibrous
16 talc, then was nickel also in place when
17 it was treated, when the cells were
18 treated?
19     Q.   That's correct.
20     A.   Yes, if nickel was in the
21 non-fibrous talc then, yes, it was also
22 there when the cells were being exposed.
23     Q.   And so -- and that would be
24 true of chromium and cobalt?

Page 517

1     A.   Yes.
2     Q.   And so, the results from the
3 Shukla study would have bearing on the
4 effect of those heavy metals if contained
5 in talcum powder?
6         MR. HEGARTY: Objection to
7 form.
8         THE WITNESS: Yes, if they
9 were -- yes, as constituents, they
10 would -- I would imagine and know
11 that they would play -- they could
12 be playing a role in the
13 toxicity -- the cell toxicity or
14 the gene expression changes that
15 were observed.
16 BY MS. O'DELL:
17     Q.   Thank you. And in regard to
18 your opinions related to cobalt,
19 chromium, and nickel, you were asked a
20 number of questions about whether there
21 were any human studies measuring the
22 effect of -- of nickel at -- in the
23 ovary. Do you recall that?
24     A.   I recall that question --

130 (Pages 514 to 517)

Judith Zelikoff, Ph.D.

Page 518

1    those questions.
2        Q.   Would it be possible to
3    design a study in humans where nickel was
4    deposited at their ovary to see if a
5    female would develop ovarian cancer?
6        A.   I think I answered and said
7    that would be ridiculous in the sense
8    that this would be totally unethical to
9    take a known carcinogen or a classified
10   1A carcinogen and use it for experimental
11   studies in humans by placing it in the
12   perineal -- or anywhere within the body
13   intentionally.
14       Q.   And would that also be true
15   for similar reasons for cobalt and
16   chromium?
17       A.   Yes.
18       Q.   Would the same also be true
19   of designing a study that applied
20   asbestos to a female's ovary for purposes
21   of seeing if she developed cancer?
22       A.   I'm smiling because it holds
23   true for any -- any known or suspected
24   carcinogen cannot be used intentionally

Page 519

1    on a human being for testing.  It's
2    unethical, and would probably in all
3    likelihood not be approved by the
4    institutional review board of academic
5    institutions or any reputable scientists.
6        Q.   Would that be true of
7    fibrous talc?
8            MR. HEGARTY:  Objection to
9        form.
10   BY MS. O'DELL:
11       Q.   You may answer.
12       A.   That would be true of
13   fibrous talc.
14       Q.   Would it be true of platy
15   talc, if there is such a thing as pure
16   platy talc?
17       A.   If there is a -- if there is
18   any suspicion that any product, including
19   platy talc, might be involved in
20   producing inflammation or any other type
21   of adverse health effect, then it would
22   be very unethical to go ahead and
23   intentionally use that in a human study,
24   in my opinion, and in the opinion of most

Page 520

1    IRBs.
2        Q.   Okay.  You looked at, as I
3    understand it, for your purposes of your
4    task in this case, you looked at the
5    issue of biologic plausibility for
6    perineal talc use and ovarian cancer.
7        A.   Yes, I did.
8        Q.   Did you -- did you -- was
9    that inquiry focused on epithelial
10   ovarian cancer in particular?
11       A.   It -- it was -- most, if not
12   all the studies I looked at in animals
13   and -- were associated with epithelial
14   ovarian cancer.
15           Some studies in humans did
16   look -- did break out the differences.
17       Q.   Let me ask you if you
18   wouldn't mind, to turn to Page 8 of your
19   report.  And you'll look at the top of
20   the page.  In the first full paragraph,
21   middle of the -- that paragraph discusses
22   Dr. Longo and Rigler's recent report that
23   reports that talcum powder products
24   manufactured by Johnson's Baby Powder and

Page 521

1    Shower to Shower have contained and
2    continue to contain asbestos.  Do you see
3    that sentence?
4        A.   Yes, I do.
5        Q.   And then it goes on, you go
6    on to report his results from test of
7    samples manufactured from the 1960s and
8    1990s.
9        A.   Through -- through the
10   1990s.
11       Q.   Through the 1990s, that's
12   correct.
13           And you -- you have a
14   footnote here to Footnote 7?
15       A.   Yes.
16       Q.   And Dr. Longo and Rigler's
17   report is noted in the footnote and it's
18   dated November 14, 2018.
19       A.   Yes.
20       Q.   Do you see that?
21       A.   Yes.
22       Q.   And just, did you have in
23   your possession and review Dr. Rigler and
24   Longo's November 14, 2018, report during

131 (Pages 518 to 521)

Judith Zelikoff, Ph.D.

Page 522

1  the completion of your own report?
2       A.   I had it available prior to
3  the submission of my final report, yes.
4       The only thing I did not
5  have was the December 2018 supplement.
6       Q.   His most recent supplement?
7       A.   His most recent supplement,
8  yes.
9       Q.   I think just to be clear,
10  that -- was his most recent supplemental
11  report you're referring to, was that the
12  report dated in January, I think 16th or
13  15th of this month?
14       A.   It was sometime in January.
15       Q.   Okay.
16       A.   Yes.  I could answer that
17  question specifically if I saw the
18  exhibit.
19       Q.   And I've handed you what's
20  been marked I think as Exhibit --
21       A.   3.
22       Q.   3.  And is Exhibit 3 the
23  supplemental report --
24       A.   Yes, it is.

Page 523

1       Q.   -- that you reviewed
2  recently?
3       A.   I'm sorry, yes.
4       Q.   And what's the date on the
5  report?
6       A.   January 15, 2019.
7       MS. O'DELL:  Okay.  I have
8  nothing further, Doctor.  Thank
9  you.
10       MR. HEGARTY:  Take a break.
11  I need to use the restroom.
12       THE VIDEOGRAPHER:  The time
13  is 8:10 p.m.  Going off the
14  record.
15       (Short break.)
16       THE VIDEOGRAPHER:  We are
17  back on the record.  The time is
18  8:16 p.m.
19             - - -
20          EXAMINATION
21             - - -
22  BY MR. HEGARTY:
23       Q.   Dr. Zelikoff, I have some
24  questions in follow-up to the questions

Page 524

1  that Ms. O'Dell asked you.
2       First of all, you were
3  referred to Page 12 of your report
4  under -- under Section C, Fragrances.
5  Would you go to that portion of your
6  report please?
7       A.   I will, thank you.  Yes.
8  I'm here.
9       Q.   You were asked about this
10  part of your report being identical to
11  the same part of Smith-Bindman's report.
12  Do you recall being asked those
13  questions?
14       MS. O'DELL:  Object to the
15  form.
16       THE WITNESS:  Smith --
17  Smith-Bindman report?  I'm sorry,
18  I don't recall -- oh, in the
19  beginning of the deposition?
20  BY MR. HEGARTY:
21       Q.   Yes.
22       A.   Okay.  That was a long time
23  ago.
24       Q.   First of all, are you aware

Page 525

1  that Dr. Crowley has been deposed in this
2  litigation?
3       A.   Yes.
4       Q.   Did you read his deposition?
5       A.   I did.
6       Q.   When did you read his
7  deposition?
8       A.   I'm sorry, I don't recall
9  the exact date.
10       May I see Dr. Crowley's
11  deposition?
12       Q.   Well, I just asked you if
13  you had read it.  That's my only
14  question.
15       Other than Dr. Crowley's
16  deposition, have you read the depositions
17  of any other plaintiffs' experts deposed
18  in the MDL, this litigation?
19       A.   Any of the other plaintiffs'
20  depositions?
21       Q.   Correct.
22       A.   Dr. Dydek.
23       Q.   Anybody else?
24       A.   I'm looking to see the

132 (Pages 522 to 525)

Judith Zelikoff, Ph.D.

Page 526

1    others.
2        Q.   It's at the end of Exhibit
3    B.
4        A.   Okay.  Thank you.  Thank
5    you.
6        Q.   Well, my question -- let me
7    ask a different question.  Let me ask
8    whether you have reviewed the MDL
9    depositions; that is, the depositions
10   that plaintiffs' experts have taken in
11   this litigation over their expert reports
12   besides Dr. Crowley?
13       MS. O'DELL:  Object to form.
14       THE WITNESS:  Dr. Longo.
15   Sorry.
16   BY MR. HEGARTY:
17       Q.   Dr. Longo has not yet been
18   deposed in --
19       A.   I read his report.
20       Q.   -- for his MDL report.
21       No, I'm talking about the
22   deposition --
23       A.   I'm sorry.
24       Q.   -- of an expert who has

Page 527

1    been -- who is being deposed about their
2    report in the MDL.
3        You said Dr. Crowley.  Have
4    you read anyone else's deposition that
5    have discussed their report in the MDL?
6        MS. O'DELL:  I think there
7    may be some confusion between
8    report and deposition.
9        THE WITNESS:  Yes.  There
10   was.
11   BY MR. HEGARTY:
12       Q.   Did you read Dr. Crowley's
13   deposition over his report?
14       A.   I read Dr. Crowley's report.
15   I'm sorry.  I stand corrected.
16       Q.   Dr. Crowley's report does
17   not contain the sentences that you've
18   included under your Section C,
19   fragrances, correct?
20       MS. O'DELL:  Object to the
21   form.
22       THE WITNESS:  What page are
23   we going back to, please?
24   BY MR. HEGARTY:

Page 528

1        Q.   Page 12.
2        A.   "There are more than 150
3    different chemicals"?
4        Q.   Those four sentences, or
5    three -- or strike that.
6        The second sentence in that
7    section is not in Dr. Crowley's report.
8    He did not write, "I reviewed the expert
9    report of Dr. Michael Crowley that
10   concludes that some of these chemicals
11   may contribute to the inflammatory
12   response, toxicity, and potential
13   toxicity of Johnson & Johnson's talcum
14   powder products."
15       MS. O'DELL:  Objection.
16   BY MR. HEGARTY:
17       Q.   That sentence is not in
18   Dr. Crowley's report?
19       MS. O'DELL:  Objection.
20       THE WITNESS:  I'm terribly
21   sorry.  I'm going to silence that
22   or we can and talk over it.
23       MS. O'DELL:  Go ahead and
24   silence it.

Page 529

1        (Brief interruption.)
2        MR. HEGARTY:  Let's go off
3    the record.
4        THE VIDEOGRAPHER:  The time
5    is 8:21 p.m.  Off the record.
6        (Whereupon, a discussion was
7    held off the record.)
8        THE VIDEOGRAPHER:  The time
9    is 8:21 p.m.  Back on the record.
10   BY MR. HEGARTY:
11       Q.   The second sentence under
12   your section fragrances is nowhere in
13   Dr. Crowley's report?
14       A.   That --
15       MS. O'DELL:  Objection to
16   form.
17       THE WITNESS:  That sentence
18   is not there, but I concluded that
19   when he talked about the
20   fragrances, I concluded that -- I
21   inferred from his -- from his
22   report, that these chemicals do
23   contribute to the inflammatory
24   response, toxicity and potential

133 (Pages 526 to 529)

Judith Zelikoff, Ph.D.

| Page 530 |
| --- |

1      carcinogenicity.
2   BY MR. HEGARTY:
3      Q.   The sentence, "I concur with
4   his opinion," is not in Dr. Crowley's
5   report, is it?
6      A.   No.  That was my opinion.
7      Q.   That same opinion, stated
8   exactly the same way, is in the
9   Dr. Smith-Bindman report, correct?
10      A.   Can I see that report?
11      Q.   Do you recall without
12   looking at it, that that same section is
13   in her report?
14      A.   I do not.  I do not recall.
15      Q.   Okay.  Did you -- do you
16   know -- have you ever spoken to
17   Dr. Smith-Bindman?
18      A.   Not at all.
19      Q.   Do you know who she is?
20      A.   I don't.
21      Q.   Do you know her expertise?
22      A.   I do not.
23      Q.   Have you ever heard her name
24   before today?

| Page 531 |
| --- |

1      A.   Not -- not to my knowledge.
2   But I would like to see -- to refresh my
3   memory, if it's available.
4      Q.   You were asked about your
5   expertise as it relates to talc and
6   inflammation.  Before you were contacted
7   by Ms. Emmel, you had no expertise in
8   talc, correct?
9          MS. O'DELL:  Objection to
10      form.
11          THE WITNESS:  I performed no
12      scientific studies in it.
13   BY MR. HEGARTY:
14      Q.   You also reviewed no
15   scientific studies concerning talc,
16   correct?
17          MS. O'DELL:  Objection to
18      form.
19          THE WITNESS:  I have
20      reviewed papers.  I am editor and
21      associate editor on an editorial
22      board so that in my past
23      experience, I likely reviewed
24      papers --

| Page 532 |
| --- |

1   BY MR. HEGARTY:
2      Q.   Doctor, you --
3      A.   -- that included talc.
4      Q.   Doctor, you testified
5   earlier in this deposition that your
6   information as it relates to talc and
7   ovarian cancer came from the media and
8   discussion with colleagues, correct?
9      A.   Prior to being contacted.
10      Q.   Right.  So prior to being
11   contacted for counsel for plaintiffs, you
12   had no expertise in talc and ovarian
13   cancer, correct?
14      A.   As a toxicologist -- I'm
15   sorry.  I'm getting hung up on the word
16   "expert" as you're using it.  As a
17   toxicologist, I am familiar with talc.  I
18   am familiar with much of the toxicity of
19   it.  But the primary -- in discussing
20   talc and its relationship to cancer, it
21   was through colleagues and the media,
22   yes, correct.
23      Q.   You had not studied, prior
24   to being contacted by plaintiffs'

| Page 533 |
| --- |

1   counsel, any issues reported in the
2   medical literature with regard to talc
3   and ovarian cancer, correct?
4      A.   I have not studied in my
5   laboratory, that's correct.
6      Q.   You also did not review any
7   literature discussing talc and ovarian
8   cancer prior to being contacted by
9   counsel for plaintiff?
10      A.   That is correct.
11      Q.   Prior to being contacted by
12   counsel for plaintiffs you had not
13   studied the toxicology -- toxic aspects,
14   if any, of talc, correct?
15          MS. O'DELL:  Object to the
16      form.
17          THE WITNESS:  I have -- as I
18      stated, I have reviewed papers
19      that have looked at it.  And I've
20      reviewed them for acceptance into
21      journals.
22   BY MR. HEGARTY:
23      Q.   Can you cite for us today
24   any such papers?

134 (Pages 530 to 533)

Judith Zelikoff, Ph.D.

Page 534

1      A.   Over my career, I cannot.
2  Sorry.
3      Q.   Can you identify any study
4  you have published that investigated or
5  discussed the toxicity of cobalt?
6      A.   I've written review articles
7  on the toxicology of metals in general
8  and cobalt was in there, and in book
9  chapters.
10      Q.   But it's your testimony that
11  you have written review papers where you
12  discussed the toxicity of cobalt?
13      A.   I did not say review papers.
14  I said book chapters.
15      Q.   So you had written a book
16  chapter to discuss the toxicity of
17  cobalt?
18      MS. O'DELL:  Objection to
19      form.
20      THE WITNESS:  I was an
21      editor of a book, several books --
22      two books actually, which looked
23      at the toxicity of cobalt --
24      looked at the toxicity of metals.

Page 535

1      And cobalt, to my recollection,
2      was in both of those books.
3  BY MR. HEGARTY:
4      Q.   Did you write those
5  chapters?
6      A.   I reviewed those chapters
7  for publication in those books.
8      Q.   My question was did you
9  write those chapters?
10      A.   I'm sorry.  Did I write
11  those chapters on cobalt?  No, I did not.
12      Q.   Have you ever written any
13  published chapter or article discussing
14  the toxicity of cobalt?
15      A.   I have not --
16      MS. O'DELL:  Objection.
17      THE WITNESS:  -- written an
18      article in the area of cobalt, but
19      I am familiar with metals, very
20      much so from the department and
21      the research that I do.
22  BY MR. HEGARTY:
23      Q.   Have you written any
24  published article discussing toxicity of

Page 536

1  nickel?
2      A.   Yes.
3      Q.   What published article have
4  you -- have you written discussing the
5  toxicity of nickel?
6      A.   One that comes to my mind,
7  without looking at my CV, is an early
8  publication associated with the
9  immunology and immunotoxicity of nickel
10  in fish.
11      Q.   What nickel -- was it a
12  nickel compound?
13      A.   It was a nickel chloride, a
14  soluble nickel compound.
15      Q.   Are nickel compounds in
16  Johnson's Baby Powder?
17      A.   Nickel -- according to the
18  J&J documents and other -- other internal
19  documents, yes.
20      Q.   Okay.  What nickel compounds
21  are in Johnson's Baby Powder?
22      A.   The report indicates nickel.
23  It does not break it down to a particular
24  salt or a particular compound of nickel.

Page 537

1      Q.   Have you written any papers
2  looking at the toxicity of chromium-3?
3      A.   I'm going to look in my --
4  in my CV.
5      Q.   Well, without looking at
6  your CV, for purposes of time, can you
7  recall any such article?
8      MS. O'DELL:  If you need to
9      take a moment, Doctor, feel free
10      to.
11      MR. HEGARTY:  We'll go off
12      the record if she needs to take a
13      moment.
14  BY MR. HEGARTY:
15      Q.   Because I qualified my
16  question by asking you, without looking
17  at your CV, are you able to cite an
18  article that you've written?
19      A.   I want to give actual data
20  to you.  In my mind, I recall a paper
21  that I wrote with Dr. Max Costa on
22  chromium.  And -- and possibly with Toby
23  Rossman.  But without looking, I can't be
24  absolutely sure.

135 (Pages 534 to 537)

Judith Zelikoff, Ph.D.

Page 538

```
 1      Q.   You refer over on pages --
 2  or on Page 25 of your report --
 3      A.   Yes.
 4      Q.   -- to --
 5      A.   Talc-induced inflammation.
 6      Q.   Well, let me finish my
 7  question.
 8      A.   Oh, I'm sorry.
 9      Q.   You refer over on Page 25 in
10  the fourth paragraph to an abstract and
11  other material by Dr. Harper and
12  Dr. Saed, correct?
13      A.   Yes.  In the last -- in the
14  last paragraph, in the last sentence.
15      Q.   And none of those
16  publications refer to testing using
17  Johnson's Baby Powder, correct?
18          MS. O'DELL:  Objection to
19      form.
20          THE WITNESS:  To my
21      knowledge, no, but I would have to
22      look at the paper to be absolutely
23      sure.  But they did use talc,
24      yes -- talcum powder.
```

Page 539

```
 1  BY MR. HEGARTY:
 2      Q.   Can you cite for me any
 3  animal or cell studies that you reviewed
 4  for purposes of preparing your report
 5  that tested Johnson's Baby Powder other
 6  than Dr. Saed's recent manuscript?
 7      A.   I know I have, I just can't
 8  recall.
 9          You are talking about
10  publications, correct?
11      Q.   Yes.  That you've cited in
12  your report.
13      A.   I can't find it at the
14  moment, so I would have to say no.
15      Q.   Did you find Exhibit 33, the
16  FDA's response letter to Dr. Epstein?
17      A.   Thank you.
18      Q.   You were referred to Page 3
19  in FDA's statement with regard to its
20  testing of samples of cosmetic grade raw
21  material talc and cosmetic products for
22  asbestos?
23      A.   Yes, I did.
24      Q.   You did not refer to any of
```

Page 540

```
 1  the statements that you were asked about
 2  by plaintiffs' counsel in your expert
 3  report, correct?
 4          MS. O'DELL:  Object to form.
 5          THE WITNESS:  Not without
 6      checking my document, I can't
 7      answer conclusively.
 8  BY MR. HEGARTY:
 9      Q.   You did not rely on this
10  portion of the FDA's letter for purposes
11  of your opinions in this case, correct?
12          MS. O'DELL:  Regarding the
13      asbestos testing?
14  BY MR. HEGARTY:
15      Q.   The portion that I just
16  referred you to, the top two paragraphs
17  at Page 3.
18      A.   They do not prove that all
19  talc-containing cosmetic products
20  currently marketed in the United States
21  are free of asbestos.  Is that --
22      Q.   Yes.
23      A.   Okay.  And the question was?
24      Q.   You did not refer to that
```

Page 541

```
 1  statement in your report, correct?
 2      A.   That is correct, yes.
 3      Q.   Also you did not cite on
 4  Page 5 in your report the statement that
 5  "it is, therefore, plausible that
 6  perineal talc and other particulate that
 7  reaches the endometrial cavity, et
 8  cetera, may elicit foreign body-type
 9  reaction and inflammatory response that
10  in some exposed women may progress to
11  epithelial cancers."
12          You did not cite that
13  sentence in your report either, correct?
14      A.   I did not --
15          MS. O'DELL:  Objection to
16      form.
17          THE WITNESS:  I did not cite
18      that sentence in my report either.
19      However, this document was in
20      my -- in my citations in the
21      overall reliance -- reliance
22      document.
23  BY MR. HEGARTY:
24      Q.   With regard to the draft
```

136 (Pages 538 to 541)

Golkow Litigation Services - 1.877.370.DEPS

Judith Zelikoff, Ph.D.

Page 542

1  screening assessment by Canada, Canada
2  employs a precautionary principle. Are
3  you aware of that?
4      A.  Yes.
5      Q.  Do you know what a
6  precautionary principle is?
7      A.  I do know what a
8  precaution --
9      Q.  What is it?
10     A.  A precautionary principle is
11 one where you -- in my -- in my opinion
12 and what -- to my knowledge, it's a
13 principle in which you use every
14 precaution in terms of assessment, in
15 terms of use in animal models and human
16 models. You follow precaution.
17     Q.  Okay. The draft screenings
18 assessment, Exhibit Number 9, contains
19 the following statement -- and I only --
20 I only have your copy.
21     A.  Oh okay.
22     Q.  I'm going to read it to you
23 and tell me whether you agree with it.
24     A.  Okay.

Page 543

1      Q.  "The etiology of most
2  ovarian tumors in general has not been
3  well established."
4          MS. O'DELL:  What page are
5  you on, please?
6          MR. HEGARTY:  Page 18.
7  BY MR. HEGARTY:
8      Q.  Do you agree with that
9  statement?
10     A.  Please read it again.
11     Q.  "The etiology of most
12 ovarian tumors in general has not been
13 well established."
14     A.  The etiology is -- has not
15 been well established. But it has been
16 studied. But there -- okay. I'm done.
17     Q.  The -- on page -- strike
18 that. On Page 21 --
19     A.  Of my report?
20     Q.  No, of the --
21     A.  Health Canada.
22     Q.  -- health assessment states
23 the following statement and tell me
24 whether you agree with it.

Page 544

1          "The specific mechanisms and
2  cascade of molecular events by which talc
3  might cause ovarian cancer have not been
4  identified."
5          MS. O'DELL:  Wait. Do you
6  mind showing Dr. Zelikoff?
7          MR. HEGARTY:  Well, then I
8  won't have -- I'm just reading
9  this statement.
10         MS. O'DELL:  Well, but if
11 you're reading from the draft
12 assessment --
13         MR. HEGARTY:  You know what,
14 I -- this is the only copy I have.
15 If you want to hand me your copy.
16         MR. TISI:  I have my copy.
17 It has my notes on it. If you...
18         Do you want it?
19         MS. O'DELL:  You're welcome
20 to my copy.
21         MR. HEGARTY:  Thank you.
22 BY MR. HEGARTY:
23     Q.  Page 18, second paragraph.
24 I was on Page 18, Doctor.

Page 545

1      A.  You handed it to me like
2  this, sir.
3      Q.  Right. On page -- I'm
4  sorry, Page 21.
5      A.  This is Page 21.
6      Q.  Sorry. Page 21, second
7  paragraph. The statement at the end
8  reads, "However, the specific mechanisms
9  and cascade of molecular events by which
10 talc might cause ovarian cancer have not
11 been identified."
12         Do you agree with that
13 statement?
14         MS. O'DELL:  Objection to
15 form.
16         THE WITNESS:  That's a
17 statement here.
18 BY MR. HEGARTY:
19     Q.  Do you agree with that
20 statement?
21     A.  Oh, I'm sorry. I'm sorry,
22 I've lost -- Page 21, what --
23     Q.  Page 21, second paragraph --
24     A.  -- what paragraph?

137 (Pages 542 to 545)

Judith Zelikoff, Ph.D.

Page 546

1         Under --
2     Q.   Last two lines.
3     A.   Under --
4     Q.   Under -- in the biologic
5   plausibility section.
6     A.   I see it.  Thank you.
7     Q.   It read -- the statement
8   reads:  The specific mechanisms and
9   cascade of molecular events by which talc
10  might cause ovarian cancer have not been
11  identified.
12         Do you agree with that
13  statement?
14     A.   Yes, they have not been
15  clearly and conclusively identified.
16     Q.   But that's not what that
17  sentence reads.  My question was do you
18  agree with the sentence that I just read
19  to you.
20     A.   It is -- I think it's a
21  sentence taken out of text.
22         Do I agree with the sentence
23  as it is written?  No.  I would have to
24  add the words, "have not been clearly

Page 547

1   identified."
2     Q.   So you don't agree with
3   everything in the --
4     A.   Or established.
5     Q.   So you don't agree with
6   everything in Health Canada's risk
7   assessment, correct?
8         MS. O'DELL:  Objection to
9         form.
10        THE WITNESS:  I -- I do not
11        agree with this sentence, correct.
12  BY MR. HEGARTY:
13    Q.   You do rely on, for purposes
14  of your opinions in this case, the draft
15  screening assessment, correct?
16        MS. O'DELL:  Objection.
17        THE WITNESS:  No.  That came
18        out well after I handed in my
19        final report, so it was not used
20        to inform my opinion.  It was
21        supporting validation for my
22        opinion.
23  BY MR. HEGARTY:
24    Q.   So still -- still through

Page 548

1   today it's not -- you're not using it to
2   inform your opinions, correct?
3     A.   It is -- it is support and
4   validation of my opinions.
5     Q.   You referenced IARC and its
6   designation of asbestos.  What has IARC
7   designated talc for genital uses as?
8         MS. O'DELL:  Objection.
9         THE WITNESS:  I -- in -- in
10        terms of classification, may I
11        look at the document?
12  BY MR. HEGARTY:
13    Q.   Well, they've designated
14  talc used --
15    A.   Fibrous -- fibrous --
16    Q.   -- for perineal use as 2B,
17  correct?
18    A.   2B, yes.  Fibrous talc,
19  correct.
20    Q.   You were asked about the
21  deposition of Robert Glenn, correct?
22    A.   The past manager and
23  director of NIOSH.
24    Q.   Yes.

Page 549

1     A.   Yes.
2     Q.   Did you read the entirety of
3   his deposition?
4     A.   No, I did not.
5     Q.   Did you agree with
6   everything he said in his deposition?
7     A.   I said I did not read the
8   entirety.  I can't answer.
9         (Document marked for
10        identification as Exhibit
11        Zelikoff-49.)
12  BY MR. HEGARTY:
13    Q.   I'm going to mark as
14  Exhibit 49, portions of the deposition of
15  Dr. Robert Glenn.  If you turn to the
16  first page of that exhibit, Page 482.
17    A.   Page 482, yes.
18    Q.   Yes.  Mr. Glenn was asked in
19  the middle of the page, Lines 12 to 14,
20  "Has the data also showed that talcum
21  powder is not cytotoxic, meaning it
22  doesn't damage cells?"
23        Mr. Glenn answer's, "Yes."
24    A.   Yes.

138 (Pages 546 to 549)

Judith Zelikoff, Ph.D.

| Page 550 | Page 552 |
|---|---|
| 1     Q.  Did you cite that portion of | 1  shows that talcum powder is not |
| 2 his testimony in your expert report? | 2 mutagenic? There is. |
| 3     MS. O'DELL: Objection to | 3     Q.  Did you cite that portion of |
| 4 form. | 4 Mr. Glenn's testimony in your report? |
| 5     THE WITNESS: No. | 5     A.  No, I did not. |
| 6 BY MR. HEGARTY: | 6     Q.  If you look at the next page |
| 7     Q.  Did you read it? | 7 at the top. The question, 2 through 7, |
| 8     A.  I said that I did not read | 8 with the answer on 8. |
| 9 this in its -- in its entirety. | 9     A.  Mm-hmm-hmm. |
| 10     Q.  Do you agree with that | 10     Q.  Did you cite that question |
| 11 sentence? | 11 and answer in your report? |
| 12     I'm sorry, do you agree with | 12     MS. O'DELL: Object to the |
| 13 his answer to that question? | 13 form. |
| 14     MS. O'DELL: Objection to | 14     THE WITNESS: I did not cite |
| 15 form. | 15 any of Dr. Glenn's information |
| 16     THE WITNESS: To the | 16 because I -- I did not read it in |
| 17 question, "Has the data also | 17 detail. |
| 18 showed that talcum powder is not | 18 BY MR. HEGARTY: |
| 19 cytotoxic, meaning it doesn't | 19     Q.  You can put that aside. |
| 20 damage cells?" | 20     Is it your testimony that |
| 21     So if the question is do I | 21 you're more knowledgeable regarding talc |
| 22 agree with that sentence -- do I | 22 and ovarian cancer than Dr. Neel? |
| 23 agree with his answer of yes, | 23     A.  No, what my testimony is to |
| 24 there have been data showing, in | 24 is that I have extensive knowledge in |

| Page 551 | Page 553 |
|---|---|
| 1    certain circumstances, in certain | 1 toxicological aspects, the cytotoxicity |
| 2    cell lines, that talcum powder has | 2 of it, and the inflammatory responses |
| 3    not been shown to be cytotoxic at | 3 from an -- from an academic perspective |
| 4    certain concentrations. | 4 and a biological mechanism perspective. |
| 5 BY MR. HEGARTY: | 5     Q.  What is Dr. Neel's knowledge |
| 6     Q.  Looking down at the next | 6 of the toxicological aspects and the |
| 7 question, 18 through 21, he's asked, "And | 7 toxicity of talc? |
| 8 has the data also showed that talcum | 8     A.  I do not know. |
| 9 powder is not mutagenic, meaning it | 9     Q.  What's his -- is he a |
| 10 doesn't mutate genes?" | 10 cancer -- strike that. |
| 11     "Answer: Yes." | 11     He is a cancer biologist, |
| 12     Do you agree with his answer | 12 correct? |
| 13 to that question? | 13     MS. O'DELL: Objection to |
| 14     A.  I do not agree. I think | 14 form. |
| 15 that the -- I do not agree with his | 15     THE WITNESS: The only thing |
| 16 answer. I think that his -- that the | 16 I know about Dr. Neel is that he |
| 17 question has to be -- the question in my | 17 is the director of the Cancer |
| 18 opinion, it was ambiguous. And I'm not | 18 Institute. I am not familiar with |
| 19 sure what he was basing that on in terms | 19 his research. |
| 20 of his response. | 20 BY MR. HEGARTY: |
| 21     If you -- if he was looking | 21     Q.  Have you ever evaluated his |
| 22 at mutagenicity in terms of Ames assays | 22 qualifications? |
| 23 or yes, they have not shown mutagenicity. | 23     A.  No. I was not on the search |
| 24     So is there data that also | 24 committee nor do I have access to his CV. |

139 (Pages 550 to 553)

Judith Zelikoff, Ph.D.

Page 554

1        Q.   You made statements
2    indicating that you believe that you are
3    more knowledgeable than Dr. Neel
4    regarding the toxicities of talc.  Is
5    that true?
6        A.   What I do know is that he is
7    not a toxicologist.
8        Q.   Do you know what his area of
9    expertise is?
10       A.   He's -- OB/GYN and oncology.
11       Q.   Do you know what his level
12   of knowledge is in the area of
13   toxicology?
14       A.   I do not.
15       Q.   Have you ever met him?
16       A.   Yes, I have met him.
17       Q.   Have you ever talked to him
18   about his qualifications in the area of
19   toxicology?
20       A.   No, I have not.  But I know
21   he is not a -- he is not considered a
22   toxicologist by his peers, by colleagues.
23   He is known as a cancer oncologist.  He
24   is not known or recognized as a

Page 555

1    toxicologist.
2        Q.   Who have you ever asked --
3    who have you ever spoken with regarding
4    to Dr. Neel's qualifications as it
5    relates to toxicology?
6        A.   I have not spoken to him
7    about his qualifications.  My answer
8    comes from the fact that I am an active
9    member in the Society of Toxicology, but
10   nationwide and internationally.  And also
11   I'm an active member in the International
12   Union of Toxicology and active member in
13   the other -- other toxicology programs
14   and societies.
15            And I have -- I have not
16   seen Dr. Neel at any of these, nor have I
17   heard of him being spoken at or about in
18   these -- in these meetings.
19       Q.   Do you go to OB/GYN
20   conferences?
21       A.   I do not.
22       Q.   Do you go to oncology
23   conferences?
24       A.   I do not.

Page 556

1        Q.   Are you a board-certified
2    oncologist?
3        A.   I am not, never claimed to
4    be.
5        Q.   Are you a board-certified
6    gynecologic oncologist?
7            MS. O'DELL:  Wait a minute.
8            THE WITNESS:  I am not, nor
9        have I ever claimed to be.
10       Because --
11   BY MR. HEGARTY:
12       Q.   You were asked -- you were
13   asked about whether you could do --
14   whether there could be studies looking at
15   risk of cancer in women exposed to
16   cobalt, chromium, and nickel.  Do you
17   recall those questions?
18       A.   I do.
19       Q.   Studies looking at exposures
20   of metals in humans are done all the
21   time.  They are called retrospective
22   case-control studies, correct?
23       A.   They are not done in a
24   laboratory nor is there insertion of

Page 557

1    those metals into humans.
2        Q.   That's not my question.  You
3    said -- you testified that there is no
4    way that you can do a study looking at
5    the effect of nickel in humans.  That's
6    not true, is it?
7            MS. O'DELL:  Objection to
8        form.  Misstates --
9            THE WITNESS:  I'm sorry.
10           MS. O'DELL:  -- the question
11       and the testimony.
12           Excuse me, Doctor.
13           THE WITNESS:  I was -- I was
14       talking about clinical studies and
15       studies in people.
16   BY MR. HEGARTY:
17       Q.   There are retrospective
18   case-control studies looking at exposure
19   of humans to nickel, correct?
20       A.   That is -- those are
21   epidemiological studies.  My
22   understanding of the question that was
23   asked of me had to do with laboratory
24   studies and intentional exposure.

140  (Pages 554 to 557)

Judith Zelikoff, Ph.D.

Page 558

1      Q.   Well, can you cite for me
2  any epidemiologic studies showing an
3  increased risk of ovarian cancer in women
4  exposed to nickel?
5      A.   Nickel alone, I have not
6  reviewed that.  But I do know the IARC
7  document talks about it as a Class 1
8  carcinogen.
9      Q.   Can you cite for me, any
10 retrospective case-control studies,
11 showing an increased risk of ovarian
12 cancer in women exposed to chromium?
13     A.   Chromium alone?
14     Q.   Yes.
15     A.   No, I cannot.
16     Q.   Same question as to cobalt?
17     A.   No, I cannot.
18     Q.   Can you cite for me any
19 case-control studies looking at whether
20 there's an increased risk of ovarian
21 cancer in women exposed to nickel,
22 chromium, and cobalt in combination?
23     A.   I hope I understand your
24 question right.  But what I am -- what

Page 559

1  I'm saying is yes, there is an increased
2  risk in exposure to talc because talc
3  contains, according to the J&J documents,
4  and according to other studies that just
5  looked at talcum powder products,
6  contains nickel, cobalt, and chromium in
7  elevated levels.
8      Q.   My question is specific to
9  looking only at exposure to cobalt,
10 nickel, and chromium.  Can you cite for
11 me any case-control studies showing an
12 increased risk of ovarian cancer in women
13 exposed to those three metals in
14 combination?
15     A.   No, I can't.
16          MS. O'DELL:  Objection.
17     Asked and answered.
18 BY MR. HEGARTY:
19     Q.   It would not be unethical to
20 do such a case-control study, correct?
21          MS. O'DELL:  Objection.
22          THE WITNESS:  A case-control
23     study or an epidemiological study
24     which uses data from populations

Page 560

1      is not unethical, but to use it in
2      a clinical study would be
3      extremely unethical.
4  BY MR. HEGARTY:
5      Q.   It would also be appropriate
6  to do cell studies looking at nickel,
7  cobalt, and chromium in ovarian cancer
8  cells, correct?
9          MS. O'DELL:  Objection to
10     form.
11          THE WITNESS:  Alone -- I'm
12     sorry.  Alone or in combination?
13 BY MR. HEGARTY:
14     Q.   Or all of the above.
15     A.   Your question was it would
16 be unethical to do cell culture studies?
17     Q.   Would it be unethical in
18 your opinion?
19     A.   Not to do cell culture
20 studies.
21     Q.   Have such studies been done?
22     A.   I'm not sure about the
23 combination.  There have been studies, a
24 number of studies that have been done in

Page 561

1  cell culture.  I can't cite them all,
2  because there are numerous that have
3  looked at nickel or cobalt or chromium in
4  cell culture studies, and many that have
5  been done in my own laboratory.
6      Q.   Can you cite to me any such
7  studies that have done those tests in
8  ovarian cells?
9      A.   I'm sorry.  When you say
10 "any such studies," do you mean cell
11 culture studies?
12     Q.   Yes.
13     A.   Well, the Shukla study, the
14 Saed studies.
15     Q.   So the Shukla and Saed
16 studies applied nickel, chromium and
17 cobalt to the cells?
18     A.   I'm sorry.  I'm sorry.  I
19 thought you said talcum powder.
20     Q.   Doctor, listen to my
21 question.  My question is can, you cite
22 for me any culture studies that have
23 applied nickel, cobalt, or chromium or
24 all three to ovarian cancer cells?

141 (Pages 558 to 561)

Judith Zelikoff, Ph.D.

Page 562

1    A.   I cannot -- I have not seen
2  that literature, no.
3    Q.   Those studies could be done,
4  correct?
5    A.   Those studies could be done.
6    Q.   They could be done in your
7  laboratory, couldn't they?
8    A.   I have the facilities to
9  carry out those studies.
10    Q.   You have not done those
11  studies?
12        MS. O'DELL:  Objection to
13  form.
14        THE WITNESS:  Correct.
15  BY MR. HEGARTY:
16    Q.   You cited to the Cramer 2007
17  study, which I'm marking as Exhibit
18  Number 40.
19        (Whereupon, a discussion was
20  held off the stenographic record.)
21        (Document marked for
22  identification as Exhibit
23  Zelikoff-50.)
24  BY MR. HEGARTY:

Page 563

1    Q.   I'm marking as Exhibit
2  Number 50 the Cramer 2007 study that you
3  referred to in response to counsel's
4  questions.
5    A.   Mm-hmm-hmm.
6        MS. O'DELL:  Objection.
7  That misstates the record.  I
8  never referred to the Cramer
9  study.
10        MR. HEGARTY:  She cited it
11  in response to your questions.
12        MS. O'DELL:  No, she did
13  not.  But you may ask questions
14  about it, but that's not a proper.
15        MR. HEGARTY:  Well, she
16  cited the Cramer 2007 article.
17  BY MR. HEGARTY:
18    Q.   Do you find this article to
19  be a credible source of information for
20  you?
21    A.   It was published in
22  Obstetrics and Gynecology.  That is good
23  journal, reputable journal.
24    Q.   And if you look at the top

Page 564

1  of the first page on the right-hand
2  column.
3    A.   Yes.
4    Q.   The authors state that
5  the -- "First, the association is a
6  relatively weak" -- "a relatively weak
7  one; i.e., summary relative risk of
8  approximately 1.3."
9        Do you agree with that
10  statement?
11        MS. O'DELL:  Objection to
12  form.
13        THE WITNESS:  Number one, I
14  am not an epidemiologist so I'm
15  not testifying to epidemiological
16  odds ratio, whether that is weak
17  or not weak.
18  BY MR. HEGARTY:
19    Q.   The next sentence says,
20  "Second, no clear increase in risk or
21  duration of use has been found in most
22  studies."
23        Do you agree with that
24  sentence?

Page 565

1        MS. O'DELL:  Objection to
2  form.
3        THE WITNESS:  There are many
4  studies that do show that duration
5  plays a role.
6  BY MR. HEGARTY:
7    Q.   That's not my question.  My
8  question is do you agree with that
9  sentence?
10    A.   I see.
11        MS. O'DELL:  Objection to
12  form.  Asked and answered.
13        THE WITNESS:  I do not agree
14  that there is no clear -- there is
15  some evidence that leads to an
16  increase in risk associated with
17  duration of use.
18  BY MR. HEGARTY:
19    Q.   So you don't agree with that
20  sentence?
21    A.   So I do not completely agree
22  with that sentence.
23    Q.   The next sentence reads,
24  "Third, the ability of talc used in the

142 (Pages 562 to 565)

Judith Zelikoff, Ph.D.

Page 566

1   genital area to enter the pelvic cavity
2   has not been conclusively proven."
3        Do you agree with that
4   sentence?
5        A.   None of these are -- none of
6   these sentences are cited or referenced
7   by the way.
8        It has not been conclusively
9   proven.  I agree with the sentence.
10        May I --
11        Q.   You cited as well to the
12   Keskin paper.  You cited that several
13   times, including in response to counsel's
14   questions.
15        A.   Yes, I did.  I recall that.
16        Q.   The Keskin paper was an
17   animal study that did not show tumor
18   formation from application of talc,
19   correct?
20        MS. O'DELL:  Object to the
21   form.
22        THE WITNESS:  If you allow
23   me to specifically look for that,
24   please.

Page 567

1   BY MR. HEGARTY:
2        Q.   I'll mark it as Exhibit 51.
3        (Document marked for
4        identification as Exhibit
5        Zelikoff-51.)
6   BY MR. HEGARTY:
7        Q.   The Keskin paper over in the
8   conclusion section on Page 927 says that
9   with regard to the reported effects of
10   talc, "This effect seems to be in the
11   form of foreign body reaction or
12   infection rather than a neoplastic
13   change."
14        A.   Which is inflammation.
15        Q.   And in this study it showed
16   no neoplastic changes in any of the
17   animal study, correct?
18        MS. O'DELL:  Object to the
19   form.
20        You may answer.
21        THE WITNESS:  It was -- he
22   did not find or they did not find
23   that there was neoplastic changes,
24   but they did find a number of

Page 568

1        findings that led to inflammation
2        including an increased number of
3        follicles, and that goes to
4        biological plausibility.
5   BY MR. HEGARTY:
6        Q.   Did you agree with that
7   finding?
8        A.   That there were increased
9   number of follicles?
10        Q.   Yes.
11        A.   And the histopathology?
12        That there was foreign body
13   reactions and that there were infections,
14   I agree with those studies.
15        Q.   Do you agree with the
16   statement that the author made that this
17   effect seems to be in the form of foreign
18   body reaction or infection rather than a
19   neoplastic change?
20        A.   I'm sorry, could you tell me
21   where that might be?
22        Q.   Again, in the conclusion
23   section that we have just been looking
24   at.

Page 569

1        A.   Mm-hmm-hmm.
2        Well, a foreign body
3   reaction can -- is an immunological
4   response.  Whether it's considered a
5   neoplastic change, likely not.  A foreign
6   body reaction does not necessarily -- is
7   not necessarily known as a neoplastic
8   response, correct.
9        Q.   And you -- you didn't cite
10   that statement from the Keskin paper in
11   your report, did you?
12        A.   Not that I recall.
13        Q.   Do you agree with the --
14        A.   But my -- my role was to
15   define biological plausibility.  So what
16   I did -- what I did put in my report were
17   the things that indicated to me that
18   there was inflammation.
19        Q.   You agree with the
20   conclusions from the Taher paper?
21        MS. O'DELL:  Object to the
22   form.
23        Doctor, it's in this stack.
24        THE WITNESS:  Okay.  Thank

143 (Pages 566 to 569)

Judith Zelikoff, Ph.D.

| Page 570 | Page 572 |
|---|---|
| 1     you. Oh, thank you. | 1   counsel has it. I'll hand it to you. If |
| 2  BY MR. HEGARTY: | 2  you'll -- |
| 3     Q.   Second page, Line 34, on the | 3     A.   Oh. You mean the draft |
| 4  second page. | 4  screening assessment? |
| 5     A.   In the abstract? | 5     Q.   Yes. Sorry, I was going to |
| 6     Q.   Yes. | 6  it by the wrong name. It is Exhibit -- |
| 7     MS. O'DELL: Give me just a | 7     A.   9. |
| 8  moment, I'm sorry. I'll pull out | 8     Q.   Thank you. |
| 9  my copy. | 9     If you'll turn to Page 16. |
| 10     THE WITNESS: I'm sorry, | 10     A.   I see that, Keskin et al., |
| 11  should I wait? | 11  2009, it's the first statement under |
| 12     MR. HEGARTY: I think Leigh | 12  human studies. |
| 13  wants you to wait. | 13     Q.   Yes. Right above that when |
| 14     MS. O'DELL: Okay. Go | 14  it refers to the Keskin and colleagues |
| 15  ahead. I'm sorry. | 15  2009. What was the conclusion that the |
| 16  BY MR. HEGARTY: | 16  sentence beginning "while no cancer"? Do |
| 17     Q.   Do you agree with the | 17  you see that above human studies on |
| 18  statement made in Line 34? | 18  Page 16? |
| 19     A.   Perineal use of talc powder | 19     A.   The conclusion, "while no |
| 20  is a possible cause of human ovarian | 20  cancer"? |
| 21  cancer? | 21     Q.   Yes. |
| 22     Q.   Yes. | 22     A.   "While no cancer/precancer |
| 23     A.   I believe that it's more | 23  effects were observed, Keskin and |
| 24  than a possible cause. I believe that | 24  colleagues noted the study's duration may |

| Page 571 | Page 573 |
|---|---|
| 1  there's biological plausibility which | 1  have been too short to note these types |
| 2  shows that it -- it could be, it is | 2  of effects." |
| 3  linked to human ovarian cancer. | 3     Q.   And in regard to -- and |
| 4     Q.   So you don't -- you disagree | 4  that -- that statement's consistent with |
| 5  with that statement? | 5  the statements that you've included in |
| 6     A.   One could say that, taking | 6  your report, fair? |
| 7  it literally, that it is certainly a | 7     MR. HEGARTY: Objection to |
| 8  possible cause. I just believe that it | 8  form. |
| 9  is greater than a possible cause. | 9     THE WITNESS: Yeah. |
| 10     MR. HEGARTY: Okay. Thank | 10  BY MS. O'DELL: |
| 11  you. I think that's it for my | 11     Q.   And then secondly you were |
| 12  time. | 12  asked a question, several questions about |
| 13     MS. O'DELL: Okay. | 13  the actual Keskin paper itself. And I |
| 14     - - - | 14  think it's still in front of you. Do you |
| 15     EXAMINATION | 15  see that? It's Exhibit 51. Yeah, |
| 16     - - - | 16  Exhibit 51. |
| 17  BY MS. O'DELL: | 17     A.   This is it, thank you. |
| 18     Q.   Doctor, I just have two | 18     Q.   Okay. And I'll turn you to |
| 19  questions for you. | 19  the conclusion please, Dr. Zelikoff. |
| 20     I think you had the causal | 20     A.   That is on Page 930? |
| 21  assessment in front of you. | 21     Q.   It's 927 actually. One of |
| 22     A.   Do you mean the Taher? | 22  the conclusions, at least the ones I -- I |
| 23     Q.   No, ma'am. The actual | 23  was looking at. |
| 24  causal assessment -- actually I think | 24     927. Do you see that? |

144 (Pages 570 to 573)

Judith Zelikoff, Ph.D.

Page 574

1    A.   I see.
2    Q.   And counsel directed your
3  attention to the sentence that said,
4  "However this effect seems to be in the
5  form of foreign body reaction or
6  infection rather than neoplastic change."
7       Do you see that?  Recall
8  those questions --
9    A.   In the conclusion section?
10   Q.   Yes.
11   A.   On Page --
12   Q.   927.
13   A.   "However this effect seems
14 to be in the form of a foreign body
15 reaction or infection rather than a
16 neoplastic change."
17      Yes, I see that.
18   Q.   And if you'll look to the
19 next sentence, what also did the authors
20 conclude?
21   A.   "Results of previous studies
22 are in favor of a neoplastic effect,
23 particularly in the ovaries."
24      And they conclude that more

Page 575

1  experimental and clinical studies are
2  warranted.
3    Q.   All right.  And one other
4  question.  You were asked about the Saed
5  studies regarding talc and cell culture,
6  both ovarian cancer cells and regular
7  cells.
8    A.   Yes.  I recall.
9    Q.   And you were asked earlier
10 about the manuscript that's been marked
11 as --
12   A.   Exhibit 8.
13   Q.   -- Exhibit 8.
14      Is it -- is it -- turn to
15 Page 5 of the manuscript please.
16   A.   I see it.
17   Q.   And looking at the top, did
18 Dr. Saed use Johnson's Baby Powder as a
19 part of the -- his treatment of cells?
20   A.   Yes.  It's Page 5, top,
21 treatment of cells, talcum powder from
22 Fisher -- Fisher Scientific or Baby
23 Powder from Johnson & Johnson, and the
24 numbers of the lots are given were

Page 576

1  dissolved in DMSO.
2    Q.   Is -- is the data included
3  in this manuscript, was that part of
4  the -- the data you relied on in abstract
5  in reaching your opinions in this case?
6    A.   In abstract form, yes.  That
7  was all that was -- that was available
8  since this only came out a few weeks ago.
9       MS. O'DELL:  Okay.  I have
10 nothing further.
11      THE WITNESS:  Accepted for
12 E-press a few weeks ago.
13      MS. O'DELL:  Okay.  I have
14 nothing further.
15      - - -
16      EXAMINATION
17      - - -
18 BY MR. HEGARTY:
19   Q.   Dr. Zelikoff, in looking at
20 the Keskin paper, in -- in particular at
21 the portion of the conclusions section
22 that counsel asked you to read --
23   A.   Yes.
24   Q.   -- the results of previous

Page 577

1  studies, that sentence?
2    A.   Yes, I see it on Page 927.
3    Q.   Can you cite for me any
4  previous studies to Keskin which were in
5  favor of a neoplastic effect?
6    A.   Culture cell studies that
7  have looked at proliferation, increased
8  proliferation which was seen in the Saed
9  studies and in the abstract.
10 Proliferation is one hallmark of the
11 carcinogenic process.
12   Q.   Doctor, listen to my
13 question.  This publication was in 2008.
14   A.   Okay.  I'm sorry.
15      MS. O'DELL:  2009 I believe,
16 but go ahead.
17      THE WITNESS:  2009.
18 BY MR. HEGARTY:
19   Q.   Received December 2009.
20 Published 2009.
21      The sentence reads:  The
22 results of previous studies before 2009
23 are in favor of neoplastic effect.
24      What studies are they

145 (Pages 574 to 577)

Judith Zelikoff, Ph.D.

Page 578

1   referring to?
2        A.   I don't know because it's
3   not referenced.
4            MR. HEGARTY:  I don't have
5   any additional questions.
6            MS. O'DELL:  Nothing
7   further, Doctor.
8            THE VIDEOGRAPHER:  Stand by
9   please.  This marks the end of
10  today's deposition.  The time is
11  9:03 p.m.  Off the record.
12           (Excused.)
13           (Deposition concluded at
14  approximately 9:03 p.m.)
15
16
17
18
19
20
21
22
23
24

Page 579

1
2        CERTIFICATE
3
4
5        I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
6   deposition is a true record of the
    testimony given by the witness.
7
         It was requested before
8   completion of the deposition that the
    witness, JUDITH ZELIKOFF Ph.D., have the
9   opportunity to read and sign the
    deposition transcript.
10
11
12   _____
     MICHELLE L. GRAY,
13   A Registered Professional
     Reporter, Certified Shorthand
14   Reporter, Certified Realtime
     Reporter and Notary Public
15   Dated: January 23, 2019
16
17
18        (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

Page 580

1        INSTRUCTIONS TO WITNESS
2
3        Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8            After doing so, please sign
9   the errata sheet and date it.
10           You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14           It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 581

1        - - - - - -
         E R R A T A
2        - - - - - -
3
4   PAGE LINE CHANGE
5   ____ ____ _____
6        REASON: _____
7   ____ ____ _____
8        REASON: _____
9   ____ ____ _____
10       REASON: _____
11  ____ ____ _____
12       REASON: _____
13  ____ ____ _____
14       REASON: _____
15  ____ ____ _____
16       REASON: _____
17  ____ ____ _____
18       REASON: _____
19  ____ ____ _____
20       REASON: _____
21  ____ ____ _____
22       REASON: _____
23  ____ ____ _____
24       REASON: _____

146 (Pages 578 to 581)

Judith Zelikoff, Ph.D.

Page 582

```
 1
 2        ACKNOWLEDGMENT OF DEPONENT
 3
 4         I,_____, do
 5    hereby certify that I have read the
 6    foregoing pages, 1 - 583, and that the
 7    same is a correct transcription of the
 8    answers given by me to the questions
 9    therein propounded, except for the
10    corrections or changes in form or
11    substance, if any, noted in the attached
12    Errata Sheet.
13
14
15    _____
16    JUDITH ZELIKOFF Ph.D.        DATE
17
18
19    Subscribed and sworn
      to before me this
20    _____ day of _____, 20____.
21    My commission expires:_____
22
      _____
23    Notary Public
24
```

Page 583

```
 1        LAWYER'S NOTES
 2    PAGE  LINE
 3    _____ _____ _____
 4    _____ _____ _____
 5    _____ _____ _____
 6    _____ _____ _____
 7    _____ _____ _____
 8    _____ _____ _____
 9    _____ _____ _____
10    _____ _____ _____
11    _____ _____ _____
12    _____ _____ _____
13    _____ _____ _____
14    _____ _____ _____
15    _____ _____ _____
16    _____ _____ _____
17    _____ _____ _____
18    _____ _____ _____
19    _____ _____ _____
20    _____ _____ _____
21    _____ _____ _____
22    _____ _____ _____
23    _____ _____ _____
24    _____ _____ _____
```

147 (Pages 582 to 583)

Case 3:16-md-02738-MAS-RLS  Document 9886-12  Filed 05/29/19  Page 1460 of 1525
PageID: 63606
Judith Zelikoff, Ph.D.

Page 584

**A**

**abide**
158:17
**ability**
86:6 190:2 240:4,7
282:19 309:11,12
345:2 412:3
465:13 487:4
511:16 565:24
**able**
161:13 184:22
311:23 385:20,24
389:9 537:17
**absolutely**
201:18 207:18
326:11 489:4
537:24 538:22
**absorbed**
333:20
**absorption**
284:18 465:4
**abstract**
56:16,21 104:6,10
104:16 122:11
208:11 374:11,18
406:11 407:3,6
470:15 471:14
472:8 538:10
570:5 576:4,6
577:9
**abstracts**
54:23 136:12
445:21 493:6
**academic**
6:21 78:21 79:1
81:19 445:9,16
448:13 449:17
519:4 553:3
**academies**
149:23 444:3
**Academy**
215:9,16 220:3
444:4
**acceptable**
101:6
**acceptance**

158:11,13,16
533:20
**accepted**
97:18 112:4 156:18
156:22 157:3,11
157:20 176:9
347:12 355:11,18
489:12 576:11
**access**
8:18 9:7 54:11
56:16 72:15
147:13 172:15
203:14 276:17
332:5 339:23
341:23 553:24
**accessible**
204:13 247:20
**accumulating**
238:17
**accuracy**
65:21 66:14 70:11
70:16 412:24
**accurate**
45:7 580:20
**accused**
112:17
**acetaminophen**
331:15
**ACGIH**
10:15
**acknowledge**
100:18 117:16
**acknowledgement**
79:19
**acknowledging**
96:19 98:17
**acknowledgment**
79:7 80:10 82:14
83:1 103:9 108:7
114:10 115:2
116:3 121:22
212:15 582:2
**acquired**
86:8,15
**act**
310:13,17 326:23

**action**
14:6 24:13 151:10
381:21 400:15
502:11
**activating**
310:5
**activation**
104:12,20 310:9
**active**
326:4 421:16 555:8
555:11,12
**activity**
344:16 364:1
477:13
**acts**
509:21
**actual**
420:23 537:19
571:23 573:13
**acute**
311:3 325:5,8
327:8,15 328:4
354:19 355:1
358:23 359:1
**add**
115:12 127:20
201:15 336:22
394:15 395:23
450:7 478:18
546:24
**added**
57:5 62:13 74:1
90:4 126:6 389:11
395:16
**adding**
271:7 381:24
**addition**
115:20 202:3 203:3
492:4
**additional**
17:9,15 23:23 38:5
143:18 274:3
336:22 388:18
391:5 578:5
**address**
86:5 268:2 284:24

**addressed**
487:2
**addresses**
352:2
**addressing**
158:20
**adequate**
79:6,19 80:9 82:14
261:14
**adhere**
158:17
**adjacent**
60:2
**administer**
13:16
**administered**
197:14
**Administration**
453:2
**adrenal**
153:16
**advance**
133:7
**adverse**
31:8 120:11,13
264:4 368:13,21
369:18 370:11
406:18 407:7
519:21
**advisory**
15:12,16 67:12
133:12 149:20
154:1 169:24
435:22 444:6
**aerosols**
166:15 185:16
**aesthetics**
160:12
**afindeis@napolil...**
2:20
**afraid**
173:11 335:4
**aftermath**
260:10
**agencies**
182:16 316:9

**agency**
170:9
**agent**
237:8 262:15
325:11 365:22
**agents**
166:3
**aging**
237:9
**ago**
21:18 44:23 57:20
162:7 173:12
249:22 258:4,21
387:19 451:9
452:21 524:23
576:8,12
**agree**
20:3,15 21:11 68:2
68:12 79:10,21,23
80:2,3 81:7,20
82:2,7,9,12 96:8
99:17 100:7,14
109:7 133:22
135:12 201:11,24
228:12 244:11
245:10 257:14
262:6,17 289:2,5
347:11,20 375:14
385:9 397:1,16,18
398:3 400:6 401:9
401:18 414:19
416:16,16 425:5
425:15 426:22
427:5,14,19 437:9
458:11,13 459:2
470:6 471:2,4
542:23 543:8,24
545:12,19 546:12
546:18,22 547:2,5
547:11 549:5
550:10,12,22,23
551:12,14,15
564:9,23 565:8,13
565:19,21 566:3,9
568:6,14,15
569:13,19 570:17

Judith Zelikoff, Ph.D.

**agreed**
23:7,18,20 24:1,17
    196:15 398:2
    423:1 424:22
**agreeing**
197:4 198:3
**agreement**
146:19 229:14
    401:14,16,16,17
**agrees**
201:22
**ahead**
110:7 233:22 234:8
    299:19 306:17
    404:6 454:7 468:4
    510:20 519:22
    528:23 570:15
    577:16
**air**
166:2,10 178:10,12
    186:12,14,14
    224:1 257:17,18
    257:19,24 258:11
    259:1,5,23 261:10
    261:20 289:10,21
    290:1,8,13,16,21
    290:23 298:21
    303:13,20 304:10
    304:16 305:19
    459:4,7,20 460:5
    460:15,20
**airborne**
166:4
**airway**
197:8
**airways**
467:20
**al**
63:23 406:3,16
    407:20,21 472:4
    506:9 572:10
**Alabama**
2:4
**ALASTAIR**
2:18
**Alice**

410:3 452:16
**Alistair**
28:22
**alleged**
152:7,12
**ALLEN**
2:2
**allergic**
121:7,8
**allow**
188:23 209:14
    211:10 215:20
    261:16 262:2
    335:5 566:22
**allowing**
319:3 420:6
**alloy**
123:17
**alphabetical**
51:13
**alterations**
11:10 478:11
**altered**
485:6
**AMA**
455:3
**ambient**
289:12 303:21
**ambiguous**
551:18
**America**
3:20 456:1
**Ames**
237:14 551:22
**amosite**
179:24
**amount**
99:1 158:18 182:1
    253:18,23 266:1
    288:4 292:6 296:7
    365:8 510:1
**amounts**
292:12 316:4
    372:21
**amphibole**
110:15,18 178:16

178:24 179:5,22
    180:11 182:16
    404:8,22 405:19
**amphiboles**
273:5
**analogy**
117:6
**analysis**
37:4 45:20,22 46:4
    46:15,20 73:10
    130:23 131:6,7,11
    149:14 202:10
    203:9,10 241:8
    243:5,10 270:1,21
    271:19 292:1,8
    438:2,8 488:23
**analytical**
455:3
**analyze**
189:17 190:8,10
    193:12 416:17,24
    417:11,18 426:4
**analyzed**
186:19 248:8 449:8
    449:14
**analyzing**
375:19
**and/or**
274:5 470:3 579:21
**animal**
137:10 138:7 156:8
    156:10 233:5
    279:19 291:10
    295:9 309:18
    334:16 335:15
    346:17 351:23
    366:11 368:2,6
    372:9,14 373:18
    426:18 429:1,5
    464:11,13 465:9
    505:23 539:3
    542:15 566:17
    567:17
**animals**
294:1 295:19
    339:24 367:11

378:19 464:18
    520:12
**another's**
81:2,6
**answer**
12:5 26:7 38:19
    41:11 47:13 56:10
    56:12 154:18
    163:11 178:20
    182:12 199:10
    217:20 219:4
    220:7,16 222:15
    226:12 228:2
    234:22 235:2
    238:14 267:13,19
    274:21,23 285:10
    285:19 318:3,9
    323:8,16 324:15
    327:2,23 336:5,23
    337:5 338:10
    353:23 365:24
    366:22 367:9
    370:3 373:10
    409:20 414:16
    441:5 448:11
    449:1 479:15
    482:6 483:12
    484:1,6 519:11
    522:16 540:7
    549:8 550:13,23
    551:11,12,16
    552:8,11 555:7
    567:20
**answered**
38:16 41:12 67:20
    69:9 73:13 138:18
    164:11,12 195:5
    217:18 219:2,3,5
    221:17 241:20,22
    243:8 285:17
    293:1 310:19
    314:21 349:8
    361:7 409:16
    440:14 465:23
    483:15 489:18
    490:5 518:6

559:17 565:12
**answering**
217:6 218:13
    219:21 220:6
    221:11 316:20,22
    317:7 318:1,19
**answers**
366:21 582:8
**answer's**
549:23
**anthophyllite**
273:5,8 406:21
    407:10 449:9,15
**antibodies**
350:10 351:4 352:4
**antibody**
352:5
**antigen**
325:10
**antioxidant**
365:3 366:24
    367:15,22 377:9
    381:6
**antioxidants**
360:23 364:8
    366:12,15 473:8
    473:10
**anti-inflammatory**
470:12
**Anybody**
525:23
**anytime**
392:12
**apart**
19:6 58:9,24 85:15
    241:24
**apoptosis**
183:21 478:13
**appear**
95:5 110:14 414:24
**appearances**
2:1 3:1 4:1 13:13
**appears**
17:5 63:9 78:24
    96:3,5 106:3
    182:23 253:21,22

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1462 of 1525
PageID: 63608
Judith Zelikoff, Ph.D.

Page 586

382:17
**applicable**
78:23 112:12
483:23
**application**
286:14 287:18
288:12,20,21
300:3 332:22
333:14 334:5,11
334:18 335:2,22
345:10 346:15
370:9,22 372:16
373:9,11 376:16
379:12 439:5,16
510:3 566:18
**applications**
358:5,11
**applied**
68:17 82:10 202:1
279:20 297:17,21
298:1 320:1,12
321:4,23 322:18
323:1,12 324:9
333:18,19 341:11
371:7 428:1
518:19 561:16,23
**applies**
68:5 80:6 81:17,18
**apply**
69:1,3,13,15 82:3
385:3 483:10
579:19
**applying**
279:16 373:21
439:11
**appreciate**
235:11 495:17
**approach**
67:8 77:11 375:12
375:15
**appropriate**
204:22 338:14
431:14 432:6
560:5 580:6
**approved**
228:8 519:3

**approximate**
28:3
**approximately**
17:16 45:14 55:16
57:18 564:8
578:14
**April**
18:15 229:16 497:3
497:21
**area**
76:24 153:21
155:20 168:4
176:22 183:24
251:5 257:20,20
269:22 286:21
298:16,16 300:4
302:21 315:20
323:18 330:24
331:19 342:19
356:19,20 371:9
371:10 490:19
492:2 514:17
535:18 554:8,12
554:18 566:1
**areas**
55:2 257:16 258:6
301:6 461:18
490:1 514:23
**arose**
490:12
**ARPS**
3:7
**arranged**
54:19
**Arsenic**
9:20 457:11
**art**
252:24
**arthritis**
347:23 348:2,5
**article**
61:7,19 62:3,6 67:9
67:11 76:16 97:5
97:9 103:4,8
112:4 113:11,11
113:16,16 114:6

115:4 118:5 150:6
150:22 151:22
160:15 161:3,14
161:24 162:10,22
163:5 203:18,19
204:15 208:23
213:20 248:11,14
248:18 374:18
398:12,17,17
399:2,5 401:3
411:2 509:16
535:13,18,24
536:3 537:7,18
563:16,18
**articles**
26:15 67:18 76:18
77:4,14 78:6,11
118:16,17 176:1,5
197:2 253:2
385:18,21 428:18
447:11 448:4
534:6
**asbestiform**
178:22,23 179:16
182:18 243:21
244:3,7,13,21,22
245:11,19,22
246:5,8,16,20,23
247:4,9,13 248:2
253:24 269:16
270:18 273:1,3
275:21 296:6
406:20 407:10
511:15
**asbestiform-like**
244:18,19
**asbestos**
108:13 110:16,21
110:21 160:22
161:4,15 162:10
162:23 163:6
165:21,22 169:13
169:14 171:3
178:7,9,11,17
180:5,12,17,23
181:2,11 182:9,10

183:9,10 186:8,12
186:17 243:23
248:20 252:19,21
253:13,18,24
254:5,7,13 255:4
255:13 256:5,24
257:15,23,24
258:2,6,8,11,18
259:5,12,23
260:12,23 261:2,4
261:13,17 262:3
265:10 266:18,19
268:7,23 269:2,5
269:20 270:3,18
270:22 271:19
273:1,4 274:6
275:8,15,20 278:1
307:19 328:17
403:23 404:9,19
404:23 405:20
408:12,21 410:8,8
414:2 415:8,15,19
416:7,18 417:4,6
417:13 449:9,15
450:21 455:9
456:5,6,13,21
458:3,21 459:3,6
459:12,22 460:4
460:19 461:9,12
461:16,19,19
462:17 466:6
485:12,13 491:10
495:6 496:24
498:2,14 510:1,2
510:10,17 511:7
512:8,18,21 513:9
518:20 521:2
539:22 540:13,21
548:6
**asbestos-containi...**
459:14
**asbestos-related**
404:10 405:4,6,21
**ascending**
509:8
**Asia**

277:7
**aside**
156:21 552:19
**asked**
22:11 25:21 38:16
67:19 73:4 129:10
130:5 131:4
134:14 135:23
136:14 138:18
153:23 164:11,17
164:19 166:20,24
170:17,22 183:8
192:1 195:4 211:5
211:16,20 212:2
217:17 219:1
229:4 241:20
243:8 256:18
261:19,21 267:21
275:11 293:1
314:21 329:11
337:7 339:9 349:7
361:7 376:24
390:23 393:24
394:4,10,11
401:13 409:16
412:19 420:13
422:22 436:17
489:10,23 492:14
492:19 494:19
495:10 497:1,8
507:9,13 508:21
509:23 513:4,15
513:18 515:2
517:19 524:1,9,12
525:12 531:4
540:1 548:20
549:18 551:7
555:2 556:12,13
557:23 559:17
565:12 573:12
575:4,9 576:22
**asking**
30:18 71:17 77:15
130:21 132:3
160:5 162:17
169:20 193:6

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1463 of 1525
PageID: 63609
Judith Zelikoff, Ph.D.

Page 587

219:20 235:3,4
317:6 378:2 398:1
417:21 468:16
478:11 516:7,14
537:16
**aspect**
179:8
**aspects**
135:8 438:17
533:13 553:1,6
**aspirin**
469:3 470:8
**assay**
237:14
**assays**
237:14 551:22
**assertion**
126:8
**assess**
73:5 126:23 127:10
128:2,15 130:6,16
131:4 134:6
184:12 237:15
251:5 475:16
**assessed**
451:12
**assessing**
42:10 69:14
**assessment**
6:13 8:13 42:22
57:14,16 58:4
59:7,8,22 60:22
61:11 62:16 63:19
63:20 73:9 205:18
205:19 214:16,17
214:21 270:7
275:3 383:11
384:4,10,13,17,23
391:9,10,24 392:9
392:14,15 395:4
500:11,18 501:7
501:23 502:14
503:6,14,18,21
542:1,14,18
543:22 544:12
547:7,15 571:21

**assign**
137:11,14 503:20
**assist**
16:11 132:19,22
**assisted**
132:2
**associate**
229:23 531:21
**associated**
22:2 58:20 59:19
59:21 119:8
120:12 179:7
206:11 246:3
280:20 294:7
296:12 297:8
329:24 347:17
349:19 353:3
358:21 360:23
361:1 383:9 401:6
417:20 471:6
480:20 481:8
508:10,18 509:10
520:13 536:8
565:16
**association**
6:9,15 60:14
205:24 207:8
306:24 397:14
564:5
**associations**
140:22 232:4,18
358:16
**assume**
128:7 130:11 141:1
142:6 342:16
455:1
**assumption**
412:13,21 419:8
**assumptions**
130:15
**asthma**
120:20 173:21
**ATF**
475:12 476:4,10
**ATF1**

571:24 572:4

474:22
**ATF3**
474:22 475:16
**atomic**
465:4
**attached**
84:19 93:10 121:23
580:12 582:11
**attention**
508:2,4 574:3
**attest**
458:8
**attorney**
73:4 127:18 172:24
213:17 393:22
580:16
**attorneys**
16:11 19:7 28:6
40:1,3 53:5 63:10
171:9 174:21
202:16 203:11
237:5 276:12
390:24 412:13,20
**August**
168:21 176:6
**Austin**
3:13
**author**
55:7 56:17 60:16
104:19 117:1
176:19,20,20
190:15 197:3
335:4 405:18
568:16
**authored**
447:11,13 448:5,6
448:16
**authorities**
136:21 335:8,21
384:13
**authority**
93:18 94:11 98:3
105:18,21 106:21
110:2 112:9 113:1
137:12 255:18
300:19 302:13

303:3 320:23
322:16 426:12
427:2 441:11
**authors**
77:12 83:10 104:22
190:16 408:4
509:14 564:4
574:19
**autoimmune**
172:23 347:24
348:10
**available**
59:3 207:4,10
231:4 288:15
374:7 492:7 522:2
531:3 576:7
**Avenue**
3:13,17
**average**
242:23 243:2 428:9
**aware**
18:5,7 19:10 22:21
48:23 98:14 146:9
148:1 152:7,12
159:4 174:24
175:3 190:1
291:24 294:14
295:4 340:15
345:14 358:4
372:12 403:12
412:14 413:24
414:3 441:18
447:2 453:6,9,11
476:9 503:13
524:24 542:3
**a.m**
1:15 13:6 75:3,8
125:3,6

---
**B**
---
**B**
5:11 6:2 7:2 8:2 9:2
10:2 11:2 35:11
35:12 36:1,5
39:17 48:13 51:18
51:22 53:24 63:24

64:13 141:18,19
142:16 168:11
250:4 461:4 526:3
**Baby**
45:21 73:1 90:4
187:3,20 188:2,14
189:19 190:11,17
190:22 242:11
246:24 247:13
248:3,12,16 275:9
275:16 276:9
278:1,7 286:9
287:18,23 288:12
292:2 295:23
410:9,23 418:2,4
418:8,12 428:20
429:11,17 449:8
449:14 487:23
488:5 492:22
493:7,17 494:22
495:6 520:24
536:16,21 538:17
539:5 575:18,22
**back**
42:12 51:4 61:6
62:19 75:7 79:14
83:18 85:17 86:11
101:17 102:11
118:11 125:6,10
126:1 160:24
162:6 164:2 196:5
196:8,9 216:8,10
218:5 222:17
233:11 277:21
314:4 319:20
328:7 338:23,24
383:20 384:3
386:13 388:4,14
391:8 437:23
441:22 442:5
443:2 462:23
463:10 464:4
475:19 485:22
523:17 527:23
529:9
**background**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1464 of 1525
PageID: 63610
Judith Zelikoff, Ph.D.

Page 588

193:21,22 257:15
258:5,11,16,24,24
259:4,11,13,22
260:3,4,23 261:13
261:16 262:2
443:2
**BACON**
3:2
**bacteria**
237:15,18
**bacterial**
325:11,22
**bad**
516:5
**balance**
470:19
**base**
331:2 424:24
491:23 514:22
**based**
20:10 63:11,11
101:13 109:8
115:9 121:12
137:5 139:12
150:3 152:23
158:17 161:11
172:14 183:15
184:12 189:11,12
208:9 214:5
215:14,15 226:18
228:4,15 270:21
272:11 280:15
292:17 309:21
339:5 415:20,21
416:8 421:11
422:4 423:13,24
445:5 448:21
460:2,8,13 492:6
**basic**
110:22 235:18
**basically**
94:22
**basing**
434:10 551:19
**basis**
6:8 15:19 71:15

186:15 227:11
298:5 434:23
**Bates**
6:19 66:3,5,13
141:22 142:15,24
**Bates-stamped**
146:17
**Baylen**
2:9
**bearing**
517:3
**BEASLEY**
2:2
**beginning**
1:15 196:10 278:18
335:9,19 384:5
496:13 498:20
509:5 524:19
572:16
**begins**
129:22 131:14
137:1 333:7 420:3
**behalf**
53:24 173:15 174:4
174:12
**behave**
327:4
**behaves**
305:22
**belief**
339:6 371:8
**beliefs**
199:11
**believe**
50:24 81:23 198:23
201:19 259:17
262:11 294:5,8
298:15 308:1,24
381:23 382:11
383:4 426:19
433:3 468:22
554:2 570:23,24
571:8 577:15
**believed**
434:13,14
**believes**

172:1 356:8
**benefication**
409:14
**Benjamin**
3:7 342:2
**Benjamin.halper...**
3:9
**benzene**
425:11
**benzine**
158:14
**best**
18:18 19:20 21:19
23:9,11 64:21
65:9 70:13 86:6
154:20 326:24
327:1 366:21
412:3
**better**
76:13 83:14 175:21
337:22 447:23
504:7
**beyond**
391:5 422:17,17
**big**
238:23 301:19
**bill**
17:10 132:10
**bind**
271:14 420:8
**binder**
10:11,13,14,17,19
10:21 11:6,8
144:3 273:15
386:22 387:1,7
**binders**
50:23 51:6,7,9,11
52:2 142:5 385:18
**binned**
238:18
**bins**
55:1 239:10
**bio**
251:12,13
**bioavailability**
242:8

**bioavailable**
341:4,16,19,21
**biologic**
24:13 68:3,13
69:14 126:23
128:15 134:2
135:14 137:19
138:4,15 144:12
144:24 145:14
148:13 149:6,15
150:11 151:4,21
156:16,23 157:4
157:11,20 172:2
189:18 190:8
193:12 201:12
216:2,15,20
217:13 218:17
220:12 221:3,15
222:6,8,21 223:20
238:11 239:16
241:10,18 243:5
263:15 265:7
266:12,20,24
270:2,20 276:22
282:12 290:17
298:9 311:16
333:17 381:18,19
383:1 398:8
433:17 440:10,23
499:23 506:13
520:5 546:4
**biological**
73:5,15 127:11
128:2 129:3,13
130:7 131:5 137:7
151:18 152:1,23
189:12 190:10,19
198:18 199:5,22
200:7,10,16
201:14,20 202:3
205:5,8,20,23
216:4,7,11,23
220:1 223:23
224:5,12 233:11
234:11 240:2
256:9,10,19 257:1

262:19 263:12
265:11,18 270:6,7
271:3 275:3 278:3
278:8,13 281:20
282:13 284:6,24
292:17 296:12
299:21 302:3,5
311:24 320:16
341:24 349:2
350:6 353:14
356:9 360:19
361:15 368:4
372:7 373:24
376:22 377:13
382:6,16 400:12
400:13 401:21
431:17 432:5,22
433:23 440:18
441:9 469:1 471:5
475:7,20 504:4
506:17 513:10
553:4 568:4
569:15 571:1
**biologically**
128:16 306:4 313:8
349:16 350:1,19
382:6 416:19
432:11,15 470:10
504:10,15 505:16
512:23
**biologist**
553:11
**biology**
94:22 165:4 166:1
342:12
**bit**
72:16 124:19
150:21 187:18
265:24 383:24
441:21
**black**
51:8 197:11 273:14
**blood**
158:15,22 176:13
300:15 301:10,11
353:3

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1465 of 1525
PageID: 63611
Judith Zelikoff, Ph.D.

Page 589

bloodstream
468:10
Blount
410:3 452:17
494:19,21 495:5
Blount's
452:6,20
board
15:16 67:12 149:21
435:23 519:4
531:22
boards
15:12 133:12
149:20 154:1
169:24 229:24
board-certified
556:1,5
bodies
444:12 509:9
body
54:5 94:22 153:24
154:24 155:7
165:3 198:20
205:6 215:24
216:19 217:10
218:2,14 231:10
234:12 261:9
262:20 309:17
316:4,7 325:12,21
326:13 327:12,17
328:16 329:2
332:6 339:23
341:22 355:5,7
364:20 365:2,21
371:4 444:7
465:14 466:2
470:7 518:12
567:11 568:12,18
569:2,6 574:5,14
body's
324:23 366:6 402:9
402:21
body-type
499:17 541:8
Boer
502:22

Boers
197:10
boiler
173:22
book
78:15 111:10
112:19 138:20
163:14 534:8,14
534:15,21
books
534:21,22 535:2,7
bottle
410:23
bottom
202:9 203:1 359:18
420:2 431:16
433:9,16 436:6
469:21 495:15
496:12 508:5,14
Boulevard
1:14 3:3
bound
341:1,16
boy
141:19,20
Bradford
73:10
brands
276:23
break
32:7 74:9,16,20,21
75:5 125:4 195:23
196:3 277:15,19
338:21 383:18
386:19 442:3
485:20 520:16
523:10,15 536:23
breaking
298:6
breast
172:22 173:24
breathe
460:5
brief
251:12,13 384:7
529:1

briefly
47:3 169:9 443:2,5
bring
50:16 63:15 168:23
345:2 438:16
bringing
284:5
Broadhollow
2:19
brought
25:8,11 50:23
56:18
buildings
459:21
built
258:3 261:2
bundle
244:9
burning
173:2
burst
103:23
business
14:21

_____
                C
C
3:3 6:19 63:1,4
65:11,13,20,24
66:15 287:10
363:13 418:22
419:5 421:24
457:5 487:18
524:4 527:18
cadmium
304:1 307:17,17,24
308:23 309:3,24
310:13 311:17
312:7 323:11
465:2,5,7 466:2,4
466:15
cainogenesis
123:1
calculations
295:16,18
call

20:18,22 21:10,13
21:16 23:1,7,14
23:17,20,24 24:7
24:11 25:5 31:1
33:19 113:3
151:16 196:11,15
239:3 285:10
311:6,7 317:5
318:24 319:11
328:19 336:21
337:1 385:4
476:23 515:17
called
55:6 57:14 94:24
106:16 107:16
121:7 122:12
199:10 243:21
273:2,3,4 303:21
326:10 328:3
329:2 429:20
455:24 458:16
476:22 513:24
556:21
calling
339:2
calls
28:14,16
Canada
61:11 63:20 205:12
205:16 207:1
213:2,5,11 214:16
214:23 219:17
289:24 384:20,22
391:9,10,16,18,19
392:1,7,13 477:18
477:24 500:11,17
501:6 502:13,14
503:5,19 542:1,1
543:21
Canada's
384:10 547:6
Canadian
58:3 59:6 205:13
205:17 214:23
215:22 216:18
217:11 220:10

222:5 384:3,12,17
395:4
cancer
6:11 7:18 8:7,11,11
9:16 21:22 22:12
22:24 24:24 25:5
25:12 29:13 31:4
31:8,24 32:5,10
60:16 62:17 73:2
73:7,12 86:9,16
87:3 116:11,21
118:8,23 120:14
123:24 124:9
127:1,13 128:6,9
128:18 130:8,13
130:18 131:1,9
141:14 148:15
149:7 150:16
152:8,13,21 153:5
153:21 154:9
155:2,8,14 156:17
156:24 157:5,13
157:22 163:21
164:9,21 165:5,10
165:15 167:13,20
167:20,23 169:7
171:2,19,20 172:3
177:20,23 178:4
191:9 192:10
193:13,17 194:10
194:14,15,18,21
196:23 201:9
205:9 206:2,13,17
207:10 208:15
209:1,8 210:2
216:3,12,16,22
217:4,15,23 218:7
218:18 219:24
221:5,8 222:10,22
226:22 227:5,10
230:7 231:7,14
232:22 233:17
234:6,17 239:17
240:13 250:11
254:5,8,13 255:5
255:14,22 256:15

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1466 of 1525
PageID: 63612
Judith Zelikoff, Ph.D.

Page 590

257:2,12 258:7,9
258:12,20 259:6
260:5,15,16,20
263:16 264:20
265:2,8 267:2
271:16 278:14
280:5 281:10,17
282:12,18,23
283:4,14,16,21
284:8,11,17
285:14,23 290:19
292:23 302:9,16
303:7 306:5,13
307:1 311:18
328:10,14 329:12
329:18 330:3,18
330:20 331:3,9,17
331:22,24 332:2
342:5,7,12,17
347:22 348:3,7,13
348:18 349:3,12
349:14,17,20
350:2 351:2,10,14
351:16,21 352:7
352:10,18,24
353:4,9,16,20,21
354:4 355:13
356:7,8,10 358:24
359:2,13,18 360:3
360:15,15 361:1,5
362:1,4,10,13
363:11 366:3
369:13 376:10
381:15,20 382:2,7
383:3 385:14
392:23 397:11,16
398:9 400:4,20
401:7 415:8,16,20
431:19 432:5,12
432:17 433:24
440:19 441:14,15
444:14,19 469:4
470:8,21 472:6,16
473:4,17 474:2
475:5,17 476:5
478:20 479:21

486:9,14,21,24
500:1 504:1,11,16
505:19 508:11,19
509:11 511:11,16
513:13,17 514:2
514:11 518:5,21
520:6,10,14 532:7
532:13,20 533:3,8
544:3 545:10
546:10 552:22
553:10,11,17
554:23 556:15
558:3,12,21
559:12 560:7
561:24 570:21
571:3 572:16,20
575:6
**cancers**
158:15,22 194:14
264:21 326:9
347:13 499:20
541:11
**cancer-causing**
166:3
**cancer-related**
404:24
**cancer/precancer**
572:22
**Caner**
6:17
**capable**
292:7,9
**capacity**
20:11 192:7 314:7
421:7
**capillaries**
468:9
**captured**
134:18 135:4
**Car**
37:6
**carbon**
197:10
**carcinogen**
158:22 159:1,2
182:14,15 245:3

245:17,20,24
256:7 316:17
368:12 369:23
417:9 425:15
510:18,23 512:8
518:9,10,24 558:8
**carcinogenesis**
122:13,17 123:23
326:17 345:4
347:17,18 431:4,6
431:13 476:13
499:6
**carcinogenic**
11:18 156:3,7
180:21,22 190:3
280:14 281:24
283:10 285:6
322:12 344:16
345:4 577:11
**carcinogenicity**
42:11 44:4,13
90:10 281:5 282:4
342:23 343:3,5,12
423:10 425:10
488:7 530:1
**carcinoma**
193:2,8 354:10
**career**
86:11 215:13 392:8
534:1
**carefully**
427:18,20 580:4
**carried**
288:23
**carries**
235:14 425:24
**carry**
562:9
**carrying**
202:17 203:1 344:3
359:19 477:9
**cascade**
544:2 545:9 546:9
**case**
15:2 16:12,17 17:4
17:9,23 18:3,6,10

21:6,21 24:2
25:22 26:2 30:1
34:6,11,20 35:21
44:2 47:5 62:7
64:3,24 66:21
67:1 69:2 71:21
82:11 84:6 88:21
96:1 105:24
110:14 117:5
144:24 148:9,17
159:3,6 163:16
170:24 171:5
173:4,5,10,15
174:1 175:2,3,16
175:20 184:14
198:23 199:7
201:6 212:5 216:5
227:22 228:10,19
249:12 254:3
273:12,21 290:5,6
300:1,2 301:7
328:16,17 330:19
370:19 377:5
390:9 392:22
394:23 395:24
396:17 399:4
424:23 438:2,8
440:24 467:1
468:5 487:2
500:16 501:8
505:7,13 506:1,19
509:17,20 520:4
540:11 547:14
576:5
**cases**
1:8 76:19 78:2
111:17 115:8
121:5 124:5
174:14,18 175:4
176:1 326:5
490:15
**case-control**
232:1,16 556:22
557:18 558:10,19
559:11,20,22
**case-controls**

206:7
**catalase**
365:4
**categories**
238:21
**Category**
245:24 416:7
**Catherine**
132:7
**caught**
39:11 467:20
**causal**
154:2 201:4,22
207:11 397:9
500:17 503:5,21
571:20,24
**causality**
202:2
**causation**
24:12 73:6 131:6
131:12 155:11
201:13 202:8
205:4,23 206:1,11
206:12 256:20
259:20 382:1
400:17 486:24
**cause**
86:9,16 126:24
155:8 183:3 190:2
206:17,22 208:14
208:24 217:21
221:4 237:1,1
240:12,18,22,24
253:19 255:4,13
258:6,9,12 259:5
259:19 260:5
278:14 282:18
290:21,24 292:23
296:8 298:17
299:13 300:20
301:5 302:14
303:5 304:4,16,17
304:22 307:18
312:14 313:18
315:16 320:20
323:1,12,14,17

Judith Zelikoff, Ph.D.

324:10 326:20
328:10,14 329:12
329:18 349:11
355:12 358:7,24
382:7 404:9,23
405:3,5,21 420:8
423:18 487:5
504:1 511:16
544:3 545:10
546:10 570:20,24
571:8,9
**caused**
291:21 308:23,24
309:23,24 312:19
312:20 314:5
347:14 480:18
481:6
**causes**
62:17 73:2 118:7
152:21 153:5,21
154:9 158:14
165:9 209:8 210:2
217:1 271:11
293:6 301:17
302:7 306:3
330:12 371:15
420:23 477:2
486:8,14 510:24
511:1
**cause-and-effect**
200:2,13
**causing**
156:17 157:5,13,22
303:14 344:5,8,11
344:15 500:1
507:1 513:12
**cautious**
269:23
**cavity**
499:9,15 541:7
566:1
**CA-125**
352:20 353:2,2,8
353:13,20 354:2
**cell**
94:21 95:3 137:9

191:19 192:3
193:2,7,8 234:19
235:21,21 237:7
257:9,10 297:11
300:6 308:11,17
310:23 321:15
325:11,14 328:2
364:1 366:10,15
367:3 368:2,6
372:14 373:18
375:19,23 376:6
376:10 379:6
382:8 420:6,7,18
420:19,20 421:2,7
421:12,14 425:9
464:14 474:10
484:23 517:13
539:3 551:2 560:6
560:16,19 561:1,4
561:10 575:5
577:6
**cells**
11:11 103:21
183:20 194:15
197:8 236:1 291:2
293:24 294:3,10
294:17 296:18
297:6,7,12,17,21
298:2 300:5
301:21 308:10
311:1 324:19
325:18 356:18
357:12 364:5
368:13,21 370:11
370:24 371:15,20
372:9 376:15
485:6 516:17,22
549:22 550:20
560:8 561:8,17,24
575:6,7,19,21
**cellular**
470:1
**cell-mediated**
326:7
**cement**
461:19

**center**
185:9 224:3 260:2
260:11 342:5,8,17
443:18 460:21
513:17 514:2
**certain**
50:21 99:1 115:8
137:5 241:16
255:15 257:15
258:6 260:24
271:14 289:12
308:4 362:6
369:10 406:2
415:4 461:10
467:7,12 468:11
489:24 495:12
503:21 551:1,1,4
**certainly**
22:20 88:6 98:7
99:24 102:16
111:18 171:13
198:10,12,15
199:4 204:24
239:11 312:9
314:13 315:13
367:10 407:20
417:5 425:1 429:1
458:9 460:2
475:12 512:22
571:7
**certainty**
41:1 52:12
**CERTIFICATE**
579:2
**certification**
579:18
**Certified**
1:16,16 579:13,14
**certify**
579:5 582:5
**certifying**
579:22
**cervix**
371:14
**cetera**
119:13,13 120:22

120:22 124:3,4
140:24 155:17
365:5 452:15
541:8
**chair**
513:24 514:1
**chance**
50:13 84:9 107:11
**chances**
87:2
**change**
215:14 234:15
257:9 278:2,8,12
291:1 294:2,3
312:4 366:24
396:21,23 485:12
513:10 567:13
568:19 569:5
574:6,16 581:4
**changed**
389:11 395:20
474:23 485:10
**changes**
72:5 215:21 236:12
236:19,20 237:1
271:15 285:5
297:4,7 305:18
310:4 345:3
371:11,15 375:21
377:8 381:9
474:19 475:11
517:14 567:16,23
580:11 582:10
**chapter**
534:16 535:13
**chapters**
78:15 111:11
112:19 138:20
163:14 534:9,14
535:5,6,9,11
**characteristics**
311:9 427:16
**characterized**
308:4,19
**charge**
281:19 372:6

**charging**
15:24
**charity**
15:4
**chatter**
25:14
**check**
144:4
**checking**
540:6
**chemical**
44:5 172:22 173:24
181:22 237:8
242:6 263:10
305:7 324:3
**chemicals**
5:23 42:1 43:21,24
44:3,7,7 90:3,7
184:11 185:1
231:9 272:23
313:14,16,21
322:23 423:7,14
425:2,4 487:17,22
488:3 491:4 528:3
528:10 529:22
**chemist**
186:10
**Chemistry**
109:11
**Chemistry's**
111:1
**Chemistry.com**
7:13
**chemists**
251:22
**chemotactic**
356:22
**Chicago**
4:9
**child**
94:19
**China**
277:7
**chloride**
536:13
**Chris**

28:17,19,21
482:13
**CHRISTOPHER**
2:9
**chromium**
8:19 77:21 120:10
120:19 121:2,2
176:11,16 272:19
280:22 283:3
286:1 287:17
288:11 289:8,19
289:20 290:10,17
291:16 293:10,10
293:11 298:1
314:16 315:22
321:3,9,11,13,14
321:19 322:18
417:23 418:3,6,10
419:5,7 421:6,17
516:24 517:19
518:16 537:22
556:16 558:12,13
558:22 559:6,10
560:7 561:3,16,23
**chromium-3**
321:17 419:10
420:3,5,12,17,22
420:22 421:1,12
421:21 537:2
**chromium-4**
421:18
**chromium-5**
421:19
**chromium-6**
120:18 321:18,20
321:22 418:1,7,12
419:10,15 420:20
421:18
**chronic**
10:6 119:8 311:3
325:6 326:22
327:8,15 328:6
329:23,24 347:14
347:21 348:8,17
348:23 354:20
355:11 357:3,5,13

357:15 358:7
394:9 469:23
470:19 504:9
505:2 509:5,7
**chrysotile**
179:7 181:6 182:9
182:14,23 183:10
406:22 407:11
459:4
**cigarettes**
47:7 166:14 170:2
170:7
**circulation**
300:15 309:6
**circumstances**
365:20 467:11
551:1
**citation**
94:10 98:16 118:9
407:22 435:5
481:3
**citations**
41:21 47:19 66:10
541:20
**cite**
77:10,12 97:11
99:20 101:18
102:11 105:16
106:18 108:22
111:24 112:3,8,10
112:24 114:6
123:14 149:11
151:23 152:18
153:2 154:6,21
157:2,9 160:20
161:2 162:21
163:4 164:5 205:5
209:24 215:23
216:17 217:9
218:1,23 219:7,14
220:5,10 222:4
231:12 232:6
242:10,16 246:21
247:2,2,11 248:1
249:24 255:17
279:14 280:3

281:2,16 282:2
285:12 291:3,19
296:16 299:7
300:18 301:2
302:12,21 303:10
308:21 313:5
315:15 334:8,23
335:8 343:18
344:4 346:13
351:8,15 356:6
361:3,17,21
371:22 374:1
377:16 378:7
388:16 389:9
392:11 405:6
407:17 414:10,12
414:18,19,21
417:2 426:7,11
427:2,24 428:18
429:23 431:1,8,11
431:22 432:8,20
432:24 433:2,14
436:24 437:10
441:10 445:23
446:23 447:10
448:4 450:10,19
451:3 453:10,12
469:19 471:9,11
471:12,24 473:14
473:24 474:3
475:14,18 477:12
478:4 479:6
480:15 502:3,10
511:24 533:23
537:17 539:2
541:3,12,17 550:1
552:3,10,14 558:1
558:9,18 559:10
561:1,6,21 569:9
577:3
**cited**
50:23 54:4,5 61:19
98:2 105:18
112:17 124:11
154:3 159:14
204:15 213:19

214:10 215:23
216:18 220:10
232:13 281:12
295:14 374:17
382:7 391:9,18
405:12 406:4
432:7 447:12
448:5,15 449:18
452:5 457:1
469:13 500:24
502:2,7 539:11
562:16 563:10,16
566:6,11,12
**cites**
47:21 48:7
**citing**
113:3 410:11
431:12 472:19
**Citizen's**
9:14
**City**
3:4 173:8 259:23
260:13,24 290:2
**claim**
173:20 450:20
**claimed**
410:7 556:3,9
**clarify**
516:3
**class**
30:7 31:15 245:23
256:7 425:14
511:5 558:7
**classification**
155:19 156:14
548:10
**classifications**
155:16
**classified**
159:2 178:8 180:17
180:21 185:13
245:2,12,16 246:6
256:6 316:16
320:19 490:6
511:4 518:9
**clear**

39:15 193:2,7
207:24 232:9
265:11 275:1
480:22 500:21
522:9 564:20
565:14
**clearance**
402:9,21
**clearly**
225:9 345:19
479:13 546:15,24
**client**
173:1
**clinical**
294:22 476:4
557:14 560:2
575:1
**clinically**
360:13 361:4
**clinician**
514:10 515:1
**clip**
287:12
**clipped**
103:15
**close**
408:11 459:11
**closely**
486:23
**closer**
137:5
**cobalt**
272:19 280:21
283:3 284:16,18
285:24 287:17
288:10 289:9,20
291:16,18 297:21
314:16 315:22
320:11 516:24
517:18 518:15
534:5,8,12,17,23
535:1,11,14,18
556:16 558:16,22
559:6,9 560:7
561:3,17,23
**cogent**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1469 of 1525
PageID: 63615
Judith Zelikoff, Ph.D.

Page 593

433:16,22
**cohort**
206:8 232:2,16
416:8
**coincidence**
90:16 91:3,7
**colder**
124:18
**colleague**
25:10,14
**colleagues**
25:9,18 29:7,10,12
29:13 254:20,22
260:10 292:10
380:19 399:19
532:8,21 554:22
572:14,24
**colleague's**
448:23
**collect**
186:13,13
**college**
86:11
**column**
508:5 509:4 564:2
**columns**
456:4
**combination**
558:22 559:14
560:12,23
**come**
20:8,14 27:24
62:19 72:12 91:14
95:10 126:1
136:16 150:2
166:8 176:19
200:7 215:15
222:17 227:17
249:4 325:18
327:18 328:18
329:1,6 335:5
374:14 380:14
408:2 414:7
419:15 441:22
443:15 445:21
495:21 502:20

**comes**
111:6 186:17
353:19 368:1
443:16 536:6
555:8
**comfortable**
20:10 22:8
**coming**
33:20 54:15 158:20
229:15 261:5,6
280:7 299:24
310:10 347:4
391:14
**comment**
160:21 192:2
208:20 215:1,11
414:13 424:21
436:7,21 437:3,13
**commentary**
155:2,5 437:1,10
**commented**
159:10 437:7
**comments**
215:15,20 424:15
437:14,17,20,22
**Commerce**
2:4
**commercial**
181:4 409:9
**commercially**
181:2,6,8
**commission**
582:21
**committee**
2:21 123:22 553:24
**common**
75:24 76:7,23 77:9
80:14 83:8 87:3
89:18,24 95:9
97:20 101:13
104:2,10 105:1,2
106:5 109:16
114:2 117:8 121:1
223:13 283:14
333:7,11 335:9,20
363:2,4 434:19

489:13,20
**commonalities**
193:19 194:11,13
194:20
**commonly**
104:3 283:13
**communicated**
21:3,4 34:4 444:12
444:17
**communities**
157:7,19 176:17
347:13
**community**
156:18,20,22 157:3
157:10 158:16
176:10,12,12
212:23 355:10,19
**company**
251:16,17,18 448:1
**comparable**
376:14
**compare**
85:16 182:9 183:9
183:13 277:3
**comparison**
6:22 7:6,7,9,12,14
7:16,20 8:10,12
8:15,17,20 9:6,9
9:11 236:2 276:21
295:12 376:20
427:22
**compelling**
57:5 201:19 374:16
501:11
**compilation**
5:15 76:2
**complaining**
353:19
**complementary**
374:16
**complementation**
53:4
**completed**
46:9 56:3 62:6
87:10 411:18
451:7

**completely**
168:21 229:11
421:3 565:21
**completion**
54:12,13 64:2
522:1 579:8
**component**
420:23 516:15
**components**
188:1,14 189:19,24
308:4,20,22
310:22 341:2,17
422:9 467:3
**composition**
181:23 242:6 305:8
305:23
**compound**
536:12,14,24
**compounds**
42:11 536:15,20
**comprehensive**
131:15 132:23
**computer**
389:21
**concentrate**
290:2
**concentration**
262:21 263:6,22,23
265:13 288:5,22
289:4 369:9,11,12
370:4 372:23
439:21 440:3
459:8 461:16,23
485:4,11
**concentrations**
124:3 286:18,23
287:6,24 290:7,23
293:8 458:22
459:4,9,22 460:22
469:23 480:18
481:6 551:4
**concepts**
489:21
**concern**
98:8 145:14 325:4
**concerned**

137:19 144:12
**concerning**
138:4 141:13
144:24 254:4
391:20 484:23
531:15
**concerns**
432:15
**conclude**
62:16 206:9,15
470:19 488:2
496:3 574:20,24
**concluded**
152:20 153:4,9,20
154:2,8 180:5
205:7 216:1,20
217:12 218:15
221:2 222:6,20
529:18,20 578:13
**concludes**
90:7 208:13 528:10
**conclusion**
20:9 41:3 54:16
150:19 155:14
156:9 158:4,6,10
207:14,16 208:12
208:22,22 209:5
310:10 316:11
374:14 397:4,6,8
397:22 398:4
416:5 434:3,10
435:3 437:24
496:7,17 497:22
510:15 511:7
567:8 568:22
572:15,19 573:19
574:9
**conclusions**
90:20 140:21
154:24 155:10
511:14 569:20
573:22 576:21
**conclusive**
253:22
**conclusively**
162:5,9 426:15

Judith Zelikoff, Ph.D.

540:7 546:15
566:2,8
**concur**
90:10 422:23,24
423:5 488:12
530:3
**concurred**
423:23
**concurrently**
362:5
**concurring**
424:14
**conditions**
255:15 461:11
**conduct**
455:3
**conducted**
453:2
**confer**
73:5 92:12
**conferences**
555:20,23
**confidence**
472:20
**confident**
121:11 151:24
**confidentiality**
146:7,11,16,18
229:14
**confines**
178:11,12
**confirm**
65:21 66:14 70:10
494:17 501:14
509:19,21
**confirmed**
501:19
**conflicts**
229:6
**conform**
81:21
**confusing**
94:5 111:3
**confusion**
84:23 85:6 527:7
**Congress**

3:13
**connection**
116:18 505:17
**consider**
102:16 104:10
184:8
**considerations**
487:3,3
**considered**
51:20,24 52:5,20
93:20 141:24
156:11 184:15
193:24 204:5
230:5,21 231:3
250:13,15 289:15
427:18,20 429:13
554:21 569:4
**considering**
470:9 472:6
**consist**
313:15
**consistent**
200:1,12 207:6
472:21 483:8
499:22 500:5
505:6,12 506:18
506:23 509:16,18
573:4
**constituents**
240:6 271:6 298:7
425:13 467:8
513:6 517:9
**consulted**
170:10
**consulting**
14:21
**consumer**
9:18 189:4
**contact**
18:17 19:3,8,11
20:5 33:9 121:8
**contacted**
18:9,22 19:1 25:1
32:15 141:6,12,16
148:15,22 149:8
152:16 163:15

165:1,7 184:13
254:2,14 332:19
333:2,4 531:6
532:9,11,24 533:8
533:11
**contain**
180:20 275:20
286:24 406:20
407:9 451:16
513:9 521:2
527:17
**contained**
53:16 54:6 65:24
66:15 70:11 147:7
269:3 389:5
515:20 517:4
521:1
**Containers**
37:5
**containing**
51:11 245:11,21
246:7 453:5
455:12 461:24
498:12
**contains**
542:18 559:3,6
**contaminated**
462:13
**contamination**
404:8,22 405:19
419:19 451:13
496:24 498:2,15
**contend**
410:6 432:10
**content**
166:17 248:6
**contention**
299:11
**context**
56:19 362:17
454:23
**continue**
32:2,8 33:2 328:8
339:2 521:2
**continued**
32:16

**contract**
455:2
**Contrary**
472:10,15
**contribute**
90:8 262:14 343:1
343:3 423:8 425:7
470:2 488:6
528:11 529:23
**contributed**
83:9 416:12
**contribution**
511:10
**contributions**
73:23 139:10
**control**
304:8 305:17
579:21
**controls**
375:17
**controversy**
437:4
**Cont'd**
3:1 4:1 6:2 7:2 8:2
9:2 10:2 11:2
**conversation**
33:12
**conversations**
20:24 274:15,18,22
**convert**
321:16
**converts**
420:21
**convincing**
198:21
**coordination**
53:4
**copied**
75:20 98:23 103:7
107:23 108:9
116:1 119:24
**copies**
52:2 142:2
**copy**
16:16,18 35:13,14
36:18 42:8 50:9

63:1 65:16 92:14
92:17 94:9 95:21
386:14 389:16
393:4,15,20
398:16 414:8
430:4,9 515:13
542:20 544:14,15
544:16,20 570:9
**corporate**
411:16
**correct**
15:5 21:8 22:22
25:22,24 26:4,20
26:21 27:1,20
29:16 33:10 36:6
37:8 39:8,19 43:7
45:23 52:1 56:3,7
58:5,6 62:7,8,9,11
66:8,21 67:1,6,16
68:6 70:19 72:11
72:20 73:2,12,21
77:5 82:4,18 83:1
89:10,11,18 90:1
96:11,20 98:4
100:19 105:24
108:9 113:12
117:18 127:2,15
131:19,21 133:4
134:2 135:16
139:2,17,22 140:9
141:23 148:9,18
149:9,10 153:22
154:22 155:3
156:3 159:8,9,11
159:15,18 163:18
163:19,21 164:6,7
164:10 165:10,15
166:19 167:15,16
167:21 168:4,8,9
168:11 170:20
171:1,3,6,15
177:2,7,10,13,20
177:21,24 178:4,7
184:2 185:4,21
186:5,9,12,22
187:3 203:8

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1471 of 1525
PageID: 63617
Judith Zelikoff, Ph.D.

Page 595

206:18 209:1,9
210:7 219:18
225:2 233:18,24
238:2 244:3 245:4
245:13,18 246:1,8
248:22 250:2
259:24 260:24
262:8,21 264:22
270:23 271:21
273:17,18 276:4
279:1,5,11,17,22
280:5 281:6,18
282:5 283:4,22
289:7,11,15 292:8
292:13,15,23
294:17 296:18
297:22 298:2,3
303:15 304:5,18
305:5 306:6,13
307:5 308:2 309:1
309:24 312:20
315:10 321:18
328:10,14 329:12
329:22 330:3
331:11 332:2,23
334:11 335:2
336:3 340:4,12,12
340:13 343:7,14
344:6,9,12,17
345:17 347:9,15
347:23 348:4,9,14
348:19 350:3,11
352:11,18 354:4
355:13 357:1
358:2 359:14,23
359:24 360:4,15
363:14,18 364:2,3
364:7,11,17,23
365:15 370:12
378:5 379:22
387:20 390:4,5
398:9,10,18,19
399:4 403:24
406:9,10 411:19
414:23 415:22
416:9,20 417:4,14

420:9,10,18 421:2
422:5,6 425:23
429:6 430:1,2,19
431:24 432:12,17
433:3 434:14,15
435:16 444:10
445:11 446:24
448:13 449:10
450:22 451:14,19
452:3,7,18,21
453:6,10,14
454:21 455:13,22
456:1,2,6,9,22,23
457:2,13,15 458:3
458:12,17 459:15
459:24 460:5
461:9,20 462:2,18
464:12 465:14
469:16 473:4
474:2,15 475:5
478:2,3,24 484:21
487:10 488:18
516:19 521:12
525:21 527:19
530:9 531:8,16
532:8,13,22 533:3
533:5,10,14
538:12,17 539:10
540:3,11 541:1,2
541:13 547:7,11
547:15 548:2,17
548:19,21 553:12
556:22 557:19
559:20 560:8
562:4,14 566:19
567:17 569:8
582:7
**corrected**
197:22 527:15
**corrections**
580:5,7 582:10
**correctly**
407:1
**correlate**
428:19
**correlated**

351:9 360:14 361:4
373:17
**correlating**
352:9 372:13
**correlation**
352:3 428:16
**correspond**
66:7 95:23
**corresponding**
176:20
**correspondingly**
103:3
**cosmetic**
31:13 159:18,22
160:4,9,10,11,15
250:9,10 333:12
451:13,16 452:14
453:3,4 455:10,12
455:19 495:12
496:9,21 497:24
498:12 512:9
539:20,21 540:19
**Cosmetics**
8:14
**Costa**
537:21
**COUGHLIN**
3:16
**counsel**
16:1 17:4,10 34:5
34:10 58:10 59:1
126:9 132:11
139:17,19 140:16
142:1,10 143:1,21
144:10,22 148:16
149:8 159:17
163:16 165:2
167:9 170:20
171:1 212:8
222:17 254:3,15
273:17 275:14
276:3 332:19
385:11,22 390:4
393:14 412:15
447:5 508:1,2,21
532:11 533:1,9,12

540:2 572:1 574:2
576:22
**counsels**
274:10
**counsel's**
454:6 563:3 566:13
**country**
444:13
**course**
30:7,9,17 31:3,3,17
33:15,18 34:1
74:20 101:24
165:24 166:1
191:1 198:5
268:19 339:7
344:2 355:1
403:16 502:6
511:3
**courses**
165:19,21 166:2,6
186:1
**court**
1:1 13:15 71:16
337:24 580:20
**courteous**
235:9
**cover**
58:19 211:4,24
411:4
**co-author**
163:7
**co-authors**
164:1
**co-investigator**
380:3
**Cramer**
11:16 502:23
562:16 563:2,8,16
**creates**
331:1
**creation**
109:17
**credentials**
251:14
**credible**
563:19

**criteria**
158:20 187:13
201:3,16 309:8
**crocidolite**
179:23 181:7
**cross**
420:7,18,19 421:2
421:4,6,7
**crosses**
420:20
**Crowley**
5:22 35:9 39:8,19
40:11,22 42:12
47:15,20 90:6
248:5,11 272:22
280:16 422:5,13
488:2 525:1
526:12 527:3
528:9
**Crowley's**
44:1 48:5 248:11
423:22 487:20
488:23 525:10,15
527:12,14,16
528:7,18 529:13
530:4
**CRP**
359:7
**crystal**
182:3 466:11
**crystalline**
180:2
**CSEM**
8:16
**Ctisi@levinlaw.c...**
2:11
**cubic**
459:8,24 460:16
**culmination**
150:14
**culture**
183:19 297:11
368:7 464:15
560:16,19 561:1,4
561:11,22 575:5
577:6

Judith Zelikoff, Ph.D.

**cultures**
138:8
**cumulative**
440:6
**current**
14:10 22:17 168:18
    187:24 188:13
    348:16 388:2
    392:22 443:22
**currently**
22:21 31:12 278:13
    443:6 476:9
    496:22,22 498:1
    498:13 540:20
**curriculum**
7:22 380:8
**cursory**
191:16 192:2
    193:20
**customarily**
445:17,24
**cut**
137:4 195:16 318:3
    492:18
**cutoff**
242:4
**CV**
63:23,24 161:6,10
    161:17 162:2,3,6
    162:21 163:13,24
    168:8,18,23 169:5
    169:9,11,16,21
    175:7,17 223:23
    303:23 342:16
    380:2,13 536:7
    537:4,6,17 553:24
**Cyto**
235:21
**cytokines**
296:14 298:18,21
    301:11 308:17
    356:21 359:8
    475:23 476:1
**cytotoxic**
234:20,22 425:9
    549:21 550:19

551:3
**cytotoxicity**
235:1,14,18,20
    553:1
**C-reactive**
309:18 360:6

──────────

**D**

**D**
5:2
**damage**
103:22 120:21
    354:13,20 470:1
    549:22 550:20
**data**
6:12 51:20,23 52:4
    52:19 53:3,18
    109:20,21 111:8
    116:16 140:23
    141:24 156:9,10
    186:20 207:10
    216:8 246:22
    247:3,11 294:24
    366:5 376:12
    418:20 450:9
    473:16 498:7
    515:21 537:19
    549:20 550:17,24
    551:8,24 559:24
    576:2,4
**date**
1:15 18:15 40:22
    407:16 453:20
    500:21 523:4
    525:9 580:9
    582:16
**dated**
37:7 40:19,20
    48:12 64:15 69:19
    70:1 83:17 85:23
    86:2 93:11 388:2
    406:7 407:14
    521:18 522:12
    579:15
**David**
437:23

**day**
384:5 474:19
    489:24 497:10
    582:20
**days**
392:8 395:1 580:16
**De**
197:10 502:21
**deal**
198:11
**dealing**
167:18
**debates**
255:2
**December**
17:7 36:15 48:19
    55:15,17,19 247:8
    503:17 522:5
    577:19
**decide**
140:8 338:16
    483:24
**decided**
21:5 137:4
**decision**
72:12 184:11
**declaration**
490:18
**decreased**
351:5 352:5 360:22
    367:16,22
**deemed**
580:19
**deep**
468:1,20
**defendant**
3:10,19 4:6,10
    174:8,9
**defendants**
14:5
**defendant's**
339:11
**defense**
364:20
**define**
175:21 236:7

256:20 270:11
    292:16 373:4
    569:15
**defined**
82:13 151:9
**defines**
66:24 108:13
**definite**
194:19
**definitely**
74:19 98:10 506:22
**definition**
77:19,20 79:4,11
    79:16,22 80:2,6
    82:5 89:2 99:20
    112:10,12 143:19
    159:23 160:6,8,9
    160:16 200:6
    234:24 235:5,17
    235:18
**definitions**
81:8
**degree**
177:16 186:24
    274:20 363:21
    364:14 421:3,5
    487:1
**degrees**
470:14
**dehydrogenase**
183:18 309:15
**delete**
314:12
**delivered**
387:16
**demolition**
459:13
**demonstrate**
291:23 473:11
**dendritic**
311:1
**department**
22:15 120:9 252:12
    535:20
**depend**
105:14 239:8

274:21 399:18
**dependent**
480:21 481:9
    483:21 484:17
**depending**
16:5 179:9 182:4
    242:24 266:2
    289:22 370:18
    402:3 467:23
**depends**
15:19 156:19
    178:21 181:3,22
    181:23,24 182:1
    212:21 255:8
    257:19 260:1
    262:24 263:3
    269:21 307:11,12
    321:8 322:6
    323:22 324:15
    369:22 370:1
    373:12 439:21,23
    450:1,3
**deponent**
13:11 582:2
**deponents**
63:12
**deposed**
173:7,18 174:15,22
    424:12 525:1,17
    526:18 527:1
**deposees**
276:20
**deposing**
580:16
**deposited**
518:4
**deposition**
1:13 6:6 12:2 13:7
    16:7,8 17:17,18
    18:2 27:23 28:7
    32:8 36:7 44:20
    50:10,11,17 63:16
    64:7,9,11,19
    70:23 125:18
    168:24 172:17
    235:5 290:4

Judith Zelikoff, Ph.D.

| | | | | |
|---|---|---|---|---|
| 298:14 318:15,17 | 274:4 | developed | 120:15 135:7,8,10 | 376:20 |
| 339:8,15 389:24 | **description** | 163:17 260:20 | 150:21 155:13 | **director** |
| 390:2,7,12,23 | 5:14 6:5 7:5 8:5 9:5 | 518:21 | 175:24 176:3 | 512:12 514:1 |
| 410:3,12,14,19,21 | 10:5 11:5 27:5,7 | **developing** | 180:15,15 182:20 | 548:23 553:17 |
| 411:15,19,23 | 136:20 | 148:8 259:15 360:3 | 185:1 192:3,22 | **disagree** |
| 412:6,7 435:15 | **design** | **development** | 194:3 200:19 | 82:8 571:4 |
| 452:16 479:24 | 214:6 252:22 | 116:20,23 329:21 | 236:15 237:14 | **disaster** |
| 480:4 482:9,12 | 375:11,15 399:13 | 365:15 470:21 | 243:24 261:21,22 | 260:11 460:20 |
| 483:1 512:1,3,20 | 518:3 | 472:5 486:21 | 263:9,9,10 305:10 | **disciplines** |
| 524:19 525:4,7,11 | **designated** | 504:11,16 505:18 | 308:22 324:2,3 | 157:8 |
| 525:16 526:22 | 18:5 175:1 178:14 | 511:10 | 328:2,2 330:23 | **disclosure** |
| 527:4,8,13 532:5 | 245:23 548:7,13 | **developmental** | 357:4 372:21,22 | 229:2 |
| 548:21 549:3,6,14 | **designating** | 30:11 | 381:17 408:3 | **discuss** |
| 578:10,13 579:6,8 | 416:6,7 | **diagnose** | 425:2 427:1 | 21:2 22:16 131:13 |
| 579:9 580:3,13,17 | **designation** | 352:18,24 353:8,21 | 466:11 470:13 | 266:18 281:23 |
| 580:19 | 246:16 548:6 | 360:2 | 513:5 514:4 526:7 | 347:7 417:12 |
| **depositions** | **designations** | **diagnosed** | 528:3 | 418:10 425:21 |
| 10:15 64:13,14 | 246:18 | 177:18 362:9 | **differently** | 503:23 504:8,13 |
| 202:11 203:4 | **designing** | **diagnoses** | 30:24 86:18 285:21 | 505:15,22 534:16 |
| 204:1 390:13,18 | 518:19 | 514:10 | **difficult** | **discussed** |
| 391:5 525:16,20 | **despite** | **diagnosing** | 182:23 183:12 | 24:6 30:6,13 34:17 |
| 526:9,9 | 316:9 | 178:4 | 334:15 358:20 | 254:19 280:4 |
| **deposition/exhibits** | **detail** | **diapering** | 408:14 507:16 | 453:1 492:11 |
| 64:18 | 56:19 103:17 170:4 | 286:21 | **difficulty** | 507:4 527:5 534:5 |
| **deposits** | 170:5 409:18 | **didactic** | 191:3 | 534:12 |
| 408:13,21 461:19 | 452:24 552:17 | 31:6 | **dimensions** | **discusses** |
| **deps@golkow.com** | **details** | **diesel** | 182:20 268:17 | 313:6 520:21 |
| 1:21 | 21:18 | 185:10 303:22 | **dioxide** | **discussing** |
| **depth** | **detect** | 304:12,15 324:9 | 304:7 305:15 | 29:12 30:12 254:21 |
| 22:20 417:19 | 252:19,21 | **dietary** | 307:13 | 379:24 444:15 |
| **dermal** | **detected** | 124:11 461:4 | **direct** | 532:19 533:7 |
| 333:13 | 248:8 455:9 456:13 | **difference** | 236:18 300:3 | 535:13,24 536:4 |
| **dermally** | 456:21 459:5 | 16:4 42:19 58:23 | 370:22 431:3 | **discussion** |
| 160:13 | **determine** | 178:15,24 192:4 | 446:2 472:2 | 23:16 25:17 31:4,5 |
| **dermatitis** | 136:13 202:2 | 238:23 309:22 | 496:10 498:23 | 31:19,22 32:3,13 |
| 121:8 | 295:20 428:16 | 388:8 | 499:5 508:3 | 32:17 33:8 124:20 |
| **describe** | 434:12 472:4 | **differences** | 579:21 | 153:10 166:6,14 |
| 132:17 136:20 | **determined** | 180:8,10,19 182:6 | **directed** | 280:8 319:17 |
| 147:3 363:17 | 309:9 | 191:22 241:3 | 508:1,3 574:2 | 399:23 463:17 |
| 369:18 409:13 | **determines** | 312:18 324:6 | **direction** | 464:1 502:12 |
| **described** | 262:7 | 388:1 520:16 | 12:5 22:7 179:21 | 506:16 508:13 |
| 37:2 | **determining** | **different** | 244:5 | 529:6 532:8 |
| **describes** | 223:19 224:11 | 55:2 65:4 72:17 | **directions** | 562:19 |
| 27:8 252:3 253:2 | 385:3 | 76:2 79:24 87:6 | 182:21 | **discussions** |
| 381:22 | **develop** | 90:3 103:6 107:22 | **directly** | 23:4,23 25:8 32:12 |
| **describing** | 121:6 348:19 518:5 | 110:17 115:24 | 227:16 236:22 | 58:9 497:12 |

Judith Zelikoff, Ph.D.

| | | | | |
|---|---|---|---|---|
| **disease** | 108:20 122:9 | 115:13 117:24 | 243:13 247:5,6 | **Dow** |
| 31:9 149:17 150:9 | 126:14 129:15 | 119:18 121:14 | 269:9 270:15 | 172:22 173:24 |
| 150:12 151:2,5 | 142:9 149:3 152:6 | 144:18 175:10 | 272:12,16 273:11 | 174:6,7,9,12 |
| 172:23 177:19 | 161:5,23 171:24 | 188:11,24 205:18 | 273:13,20 274:3,4 | **Dr** |
| 191:10 200:12 | 177:2,3 196:8 | 205:19 206:2,24 | 275:2,7,10,14,18 | 5:16 6:6 7:23 13:11 |
| 223:21 224:13 | 204:16 206:14 | 207:1,17 210:16 | 276:4,8,15,18 | 14:2,9 16:24 18:1 |
| 253:19 254:1 | 211:15 216:13 | 210:19,22 211:4 | 277:1 280:17 | 35:2,19 36:15 |
| 331:16,18 348:1 | 217:5 218:12 | 211:11,13,24 | 286:19 287:3 | 40:22 44:1 47:15 |
| 348:10 349:11,23 | 219:2 221:17,22 | 212:20 213:7 | 292:6,19,19 | 47:20 48:5,11 |
| 512:24 513:2 | 222:14 223:18 | 215:7,7,9 243:1 | 388:21,23 395:5 | 49:13,14 50:8,22 |
| **diseases** | 224:24 226:4 | 271:8 273:14 | 395:12 418:18 | 51:7 54:1 58:4,16 |
| 170:10 330:23 | 236:5,9 237:21 | 275:19 384:15,24 | 428:4 445:22 | 58:17 59:24 61:2 |
| 349:21 | 250:24 258:23 | 385:8 393:6 | 450:20 480:6 | 63:21,23 64:7,9 |
| **dismiss** | 260:22 261:23 | 397:21 398:20 | 510:22 536:18,19 | 65:2 73:24 74:1 |
| 137:4 | 267:14 274:13 | 405:13 419:4 | 559:3 | 75:10 84:4,19 |
| **dismissed** | 277:24 282:2 | 430:5 450:12 | **doing** | 85:11 87:5,9,12 |
| 467:21 | 284:9 287:10,16 | 453:22 454:9,13 | 22:8 80:12 121:2 | 87:16 88:1 90:6 |
| **dismutase** | 288:9 294:14 | 454:15 455:8 | 133:2,5,21 134:17 | 90:13,15,24 95:16 |
| 365:4 | 316:19 329:9 | 457:7 469:7 | 135:7 176:11 | 116:3 117:2 |
| **disposed** | 334:21 335:13,17 | 471:16 481:14 | 238:16 292:7 | 125:14 126:8 |
| 468:6 | 336:6 356:3,6 | 540:6 541:19,22 | 384:22 463:14 | 197:10,12,15,16 |
| **dispute** | 373:16 384:9 | 548:11 549:9 | 492:3 580:8 | 197:17,21 251:8,9 |
| 484:4 | 387:14 405:17 | 558:7 562:21 | **dose** | 258:20 285:17 |
| **dissolved** | 464:9 492:18 | 567:3 | 183:6 262:7,12,14 | 319:23 339:6,18 |
| 576:1 | 496:10 498:18 | **documented** | 263:5,7,11,14 | 339:21 342:2,4 |
| **distance** | 500:8,15 507:9 | 507:5 | 265:6,12 295:21 | 374:2,4,13,22 |
| 300:13 | 523:8 532:2,4 | **documents** | 314:15 343:6,9 | 375:2 376:13 |
| **distant** | 537:9 544:24 | 6:20 10:13 12:8 | 368:12,18,19 | 377:18,23 378:2,5 |
| 300:16 312:12 | 557:12 561:20 | 24:17 51:16,17 | 369:2,17 373:6 | 379:7 381:3,21 |
| 314:9,10,14 | 569:23 571:18 | 54:20 63:13,16,17 | 480:21 481:9,12 | 382:8 383:23 |
| **distinct** | 577:12 578:7 | 63:22 65:12,21 | 483:21 484:17 | 411:9,13,23 412:6 |
| 108:15 | **doctors** | 66:7,13,19 72:14 | 511:1 | 415:12 422:13 |
| **DISTRICT** | 172:6 355:21,23 | 84:24 85:15 93:12 | **doses** | 423:22 428:7 |
| 1:1,2 | 356:12 | 93:13 125:7 | 265:21 295:13 | 430:1 437:5,5,22 |
| **DMSO** | **document** | 141:21 142:3,10 | 370:4 376:13 | 437:23 442:10 |
| 576:1 | 1:8 16:20 35:15 | 142:12,14,18,23 | 377:1,11 | 444:11 452:6,20 |
| **DNA** | 36:2,21 40:4 43:3 | 143:1,3,5,7,11,18 | **dose-response** | 460:23 484:12 |
| 236:18 365:14 | 43:12,17 50:3,4 | 143:20,24 144:1,3 | 264:5 342:21,24 | 486:4 487:20 |
| 420:8 | 52:19 53:7 55:8 | 144:4,11,23 | 343:9,13,16 | 488:2,23 493:4,11 |
| **docs** | 57:7,12,22 59:24 | 145:14,19,22,23 | 375:18 | 493:14,19 494:12 |
| 168:1 | 60:2,3,7 61:15,17 | 146:1,17 158:3 | **dose-responses** | 494:19,21 495:5 |
| **doctor** | 70:24 76:6 78:16 | 191:2 202:12,15 | 343:1 | 497:3 513:16,19 |
| 32:22 72:17 84:16 | 83:21 88:10 92:21 | 202:15,16 203:4 | **double-chain** | 513:22 514:15,24 |
| 85:14 90:1 93:8 | 98:22 99:2,4,12 | 203:11,20 204:5,9 | 110:18 | 520:22 521:16,23 |
| 94:2 97:5 101:23 | 102:17 106:9 | 206:15 215:13,23 | **doubt** | 523:23 525:1,10 |
| 106:24 107:14 | | 216:18 242:19 | 258:2 | 525:15,22 526:12 |

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1475 of 1525
PageID: 63621
Judith Zelikoff, Ph.D.

Page 599

526:14,17 527:3
527:12,14,16
528:7,9,18 529:13
530:4,9,17 537:21
538:11,12 539:6
539:16 544:6
549:15 552:15,22
553:5,16 554:3
555:4,16 573:19
575:18 576:19
**draft**
49:23 50:3 57:14
57:16 59:6,21,22
60:22 214:17,21
388:7 391:24
500:11,17 541:24
542:17 544:11
547:14 572:3
**drafted**
393:12
**drafts**
50:1
**drain**
299:5
**drastically**
215:14
**drinking**
461:9,13,17
**drive**
4:8 6:7 51:1 53:12
53:17,19,22,22
**Dropbox**
37:20,21
**dropped**
208:17
**Drug**
453:2
**drums**
120:22
**dry**
340:1
**dubious**
112:21
**due**
299:9,12 509:8
**DUFFY**

3:16
**duly**
13:20 579:5
**duplicates**
135:9
**duration**
39:13 262:13 343:2
373:13 440:4
564:21 565:4,17
572:24
**dust**
185:8,9 224:4
**dusted**
278:24 279:10
**dusts**
185:15 254:9
457:11
**duties**
445:10,16
**Dydek**
525:22
**Dydek's**
35:2 49:13
**dysplasia**
116:23
**D.C**
4:4

─────── E ───────

**E**
5:2,11 6:2 7:2 8:2
9:2 10:2 11:2
359:12 581:1
**ear**
120:22
**earlier**
139:3 159:14
167:12 175:6
370:17 384:9,24
398:11,18 435:14
532:5 575:9
**early**
18:11 31:10 55:19
146:19 193:21
250:12 257:22
299:2 346:21

347:1 392:7
489:24 536:7
**earn**
15:1
**earning**
15:9
**EASTERN**
1:2
**Edelstam**
502:21
**editor**
229:22,23 531:20
531:21 534:21
**editorial**
229:24 531:21
**effect**
11:19 119:12
207:11 262:18
264:4,14 279:15
305:13 313:9
416:20 417:4
438:24 470:8
485:12 517:4,22
519:21 557:5
567:10 568:17
574:4,13,22 577:5
577:23
**effects**
7:17 120:12,13
134:2 140:24
141:1 176:23
264:15 278:23
279:9 283:12
294:9,16 301:18
368:13 369:12,18
370:10 372:8
378:16 379:12
406:18 407:8
438:10,18 440:6
490:22 491:17
510:24 511:2
514:7,7,9,20
515:23 567:9
572:23 573:2
**effort**
26:14

egg
95:3
**Egli**
502:21
**either**
55:19 65:6 82:7
88:1 123:20
140:22 181:6
182:17 233:8
279:22 286:16
320:1,12 321:3,22
322:18,24 323:11
339:24 369:15
408:13 425:22
448:21 455:10
541:13,18
**elected**
444:1,5,9
**electronic**
47:6 166:14 170:1
170:7
**electroplating**
123:18
**elevate**
365:5
**elevated**
231:7 360:21 362:7
362:21 478:21
559:7
**Elevation**
477:6
**elevations**
479:7
**elicit**
373:7 499:17 541:8
**ELLIS**
4:7
**else's**
527:4
**embrace**
355:21
**emerged**
448:22
**emergence**
388:10
**emerging**

56:17 255:1
**Emmel**
2:3 18:23 19:14
20:21 21:14 23:1
23:5,12,16,23
24:6,10 25:1
28:10 31:2 32:15
33:9,13,19 57:23
57:24 58:7 61:13
141:6,13,17
152:16 184:14
196:12 531:7
**Emmel's**
20:4
**Emory**
127:18
**employ**
445:9
**employed**
443:9,13
**employer**
14:10
**employing**
445:8
**employs**
542:2
**endogenously**
365:20
**endometrial**
499:15 541:7
**endometrioid**
191:19
**endometriosis**
349:22 472:7
**endpoints**
235:23
**engagement**
176:12
**Engineering**
149:23
**engines**
261:5
**engulf**
237:18 327:19
328:20 329:1
**engulfable**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1476 of 1525
PageID: 63622
Judith Zelikoff, Ph.D.

Page 600

328:22,23
engulfing
329:18
ensure
134:18
enter
566:1
entertained
401:23
entire
99:12 104:16 123:6
   266:21 270:9,12
   270:13 271:9,10
   272:4,9 278:10
   422:3
entirety
38:11 40:13,16
   43:22 59:7,13
   61:14,16 71:20
   118:5 140:13
   209:17,21,23
   298:6 410:13
   411:22,24 549:2,8
   550:9
entities
3:10
entitled
421:24 457:10
entity
152:19 153:3 154:7
   170:9
entry
18:17 27:11
environment
124:10 259:18
   289:22 290:12
environmental
7:13 9:7 15:21
   22:16 109:11
   110:24 114:10
   205:16 230:1
   443:17 491:3
   492:10
EnvironmentalC...
106:17 107:17,24
   108:8,22 109:4,18

110:1 111:15,19
   113:19 114:12,13
environmentally
176:17
Environmental.c...
114:7
environments
119:10 289:13
enzymes
237:2 381:7
EPA
77:23 108:13,18
   180:9 205:13,17
   213:5 214:23
   220:4 261:16
   262:2
epidemiologic
415:7 558:2
epidemiological
116:17 122:20
   124:8 205:21
   232:16 557:21
   559:23 564:15
epidemiologist
73:14 131:12
   256:21 294:21
   399:16 415:10
   438:6 564:14
epidemiology
399:19
epidermal
334:6
epigenetic
123:3,9
epigenome
236:19 294:2
epithelial
297:12 354:9,10
   375:23 376:3,6,15
   499:20 520:9,13
   541:11
epithelial-associa...
354:6
epithelioid
191:20
Epstein

414:13 430:1
   539:16
Epstein's
197:17,21 497:3
equilibrium
326:18
errata
580:6,9,12,15
   582:12
error
92:19 407:23
   420:11,15,16
escalator
467:22 468:7
especially
295:7 406:20 407:9
ESQ
2:3,3,9,14,18 3:3,7
   3:12,17 4:3,8
essentially
150:24 435:6
establish
238:10 239:15
   241:17 257:1
established
228:13 264:5
   282:17 293:7
   543:3,13,15 547:4
Establishing
240:1
et
119:12,13 120:22
   120:22 124:3,3
   140:24 155:17
   365:4 406:3,16
   407:19,21 452:15
   472:3 506:8 541:7
   572:10
ethanol
331:14
ethyl
425:11
etiologies
165:4 194:1,4,23
etiology
193:16 194:9,12

354:4,5 543:1,11
   543:14
eugenol
47:4 166:12
European
451:24
evaluate
281:5 427:8,15
evaluated
156:13 231:3 286:7
   464:22 465:1
   553:21
evaluating
231:5 342:22 343:5
   343:11 375:13
evaluation
406:24 407:13
evaluations
358:14
events
22:17 477:7 478:6
   544:2 545:9 546:9
everyday
363:18 474:15,23
evidence
57:6 116:18 124:9
   156:12 198:13
   200:23 201:19
   211:12 216:24
   226:19 249:4,7
   277:24 338:13
   345:18 351:3
   352:1 354:3
   397:13 400:16
   403:16 416:11
   430:17 435:7
   492:21 493:22
   494:3 501:11
   565:15
evolve
123:8
ex
137:8 138:8 145:7
   295:2
exact
55:20 90:16 91:1,1

122:16,24 149:12
   236:3 485:2 525:9
exactly
128:12 149:19
   159:24 183:4
   530:8
EXAMINATION
13:23 442:7 464:6
   486:1 523:20
   571:15 576:16
examine
134:6 468:24
examined
13:21
example
15:15 77:21 88:9
   99:7 158:14
   233:15 234:3
   238:24 239:6
   277:4 301:7
   307:13 316:15
   349:4 364:4 444:3
   459:20
examples
80:16 81:4,10
   125:13 331:5
   346:17
exceed
514:24
Excerpt
9:21
excessive
158:18
exclude
156:8
excuse
101:22 103:12
   106:23,24,24
   124:16 169:8
   176:15 188:18,19
   195:10 197:20
   208:17 210:4,20
   218:24 225:14
   233:2 250:6 336:4
   379:18 404:5
   453:17 476:21

Judith Zelikoff, Ph.D.

478:18 492:17
506:7 509:15
510:20 511:9
557:12
**Excused**
578:12
**exemplify**
283:10
**exercise**
364:7
**exhaust**
185:10 303:22
324:9
**exhibit**
6:19 16:18,21 17:1
26:24 27:2,18
35:11,12,16,19
36:1,5,20,22
37:22 39:17 40:5
40:9 42:3 43:13
43:16,19,20 45:3
45:9 46:16 48:13
50:5,9 51:18,22
53:8,11,14,24
55:4,9 57:1,15,21
60:8,11,17,21
62:21 63:1,1,3,24
64:13 65:8,11,13
65:18,19,20,24
66:15,17 75:14,16
75:17 78:17,20
79:13 83:16,22
84:16 88:11,15
89:7 92:22 93:2,4
93:6,8,15 101:21
102:13,18,22
103:14 106:10,14
107:16 115:14,18
115:21,21 117:21
118:1,9 119:19,23
121:15,19,19
125:21 126:5,15
141:18 142:16
168:11,15,17
175:8,9,11 188:10
199:16 205:11

207:20 208:1,7,8
210:6 213:10
250:4 287:5,10
386:8,16 387:3
392:1 393:3,7,11
393:20 398:16,21
403:21 405:11,14
406:15 418:22
419:5 430:3,6
444:22 454:8,10
457:6,8 469:8,12
471:17,21 480:1
481:15,18 482:16
493:23 494:4
495:13 496:4,7
497:4,16 498:18
498:19 500:12
507:19 515:9,12
522:18,20,22
526:2 539:15
542:18 549:10,14
549:16 562:17,22
563:1 567:2,4
572:6 573:15,16
575:12,13
**exhibits**
36:8 64:14 125:8
125:12,19,22
412:5,11 413:1,8
413:21 418:20
480:1,7
**exist**
180:1 182:17,19
267:11 268:5
389:19
**exists**
278:12 431:2
432:22 498:22
499:4
**expanded**
245:15
**expansive**
198:1
**expect**
497:10
**expenses**

15:4
**experience**
169:6,12,17 253:9
295:22 372:15
422:12 445:6
492:5 531:23
**experiment**
427:7,15
**experimental**
122:20 148:4
375:12,14 518:10
575:1
**experiments**
148:1
**expert**
5:17 15:1 16:12,13
18:6,9 20:4,16
21:5,12 23:8,18
24:2,18 25:21
36:6,10,12,13
39:18 46:10,11,14
47:1,11 54:12
62:6 63:24 66:20
66:23 70:1 75:11
83:19,19 84:10
90:6 105:24
137:18 138:3,14
138:24 139:5
140:8 148:17
168:11,18 170:23
171:5 174:2,18
175:2 178:6,9,14
184:1,5,9,15,18
185:3,13,17 186:7
186:11,19 187:2,7
187:12,14,17
196:16 197:5
198:3 199:14
204:2,16 225:8,10
226:15,17,21,23
227:4,9 228:22
249:7 252:7,10,11
252:15 315:19
374:21 375:2
394:7 424:1,16
447:3,13 448:6,16

488:22 490:1,6,14
490:19,21 491:2
491:16 526:11,24
528:8 532:16
540:2 550:2
**expertise**
177:22 178:1,3
251:5 530:21
531:5,7 532:12
554:9
**experts**
11:13 34:19,23
49:24 111:22
139:2 171:22
390:13 447:9
525:17 526:10
**expires**
582:21
**explain**
29:9 87:8 127:22
151:14,17 167:1
234:21 350:12
**explaining**
120:16
**explains**
513:11
**explanation**
127:12 128:17
130:7 350:15
**exposed**
173:1 233:7 263:6
314:18 376:15
461:8,12 478:14
499:19 516:22
541:10 556:15
558:4,12,21
559:13
**exposure**
11:18 120:19
123:15 124:2
149:16 151:2,5
176:11 207:9
223:21 231:8
253:18 262:7,13
281:17 282:10
283:2,20 284:12

285:13,23 286:6,8
286:16 292:21
293:14 311:17
313:7 332:5 333:8
333:12 335:10,20
336:9 343:2
356:15 366:9
368:14,19,20
369:3,8,10 370:1
370:21,23 394:22
396:9,12 397:2,10
397:15 402:8,20
415:8,19,20,21
416:9,18 425:21
425:22 457:21
458:1,3,16 459:12
461:4 462:16
469:23 474:23
476:20 477:1
480:18 481:6
557:18,24 559:2,9
**exposures**
124:11 280:4 296:2
372:13,14 373:18
373:20 492:11
556:19
**expression**
11:10 104:14
236:13,20 237:2
291:2 294:3
296:10 297:8
305:17 310:4
371:11,16 375:21
475:2,4 480:19
481:7 517:14
**expressions**
474:13
**extensive**
215:21 295:1,1
552:24
**extensively**
293:24 303:13
333:3
**extent**
31:21 32:3 39:14
47:9 154:17

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1478 of 1525
PageID: 63624
Judith Zelikoff, Ph.D.

Page 602

353:15 355:24
**extract**
408:20
**extraction**
408:13
**extramural**
443:21
**extremely**
76:22 201:20
269:23 293:6
334:15 461:24
475:21 510:23
560:3
**eye**
120:20
**E-M-M-E-L**
19:21
**E-press**
576:12
**e.g**
459:12

**F**

**F**
4:4 477:8
**face**
286:21
**face-to-face**
28:12,13
**facilities**
562:8
**fact**
95:8 109:9 111:7
118:22 119:17
128:8 130:12
131:8 136:13
156:8 158:21
212:4 256:11
304:11 314:11,12
370:23 382:19
420:17 425:6
453:1 475:1,3
483:3 488:15
498:8 501:2 555:8
**factor**
30:14,16 32:10

81:24 110:9 217:3
298:19 343:17
356:22,23 475:8
**factors**
30:12 31:10 104:13
104:15,21 165:14
182:5 202:1 285:3
305:21 310:5,23
310:24 330:11
360:6 361:12
362:21 375:13
475:22 480:19
481:8
**factory**
459:13
**facts**
111:21
**faculty**
29:15,20,23
**fail**
580:18
**fair**
318:17 503:1 509:1
509:2 515:23
573:6
**fall**
143:18 429:2
**fallopian**
8:6 371:14 499:16
**familiar**
21:24 22:11,13
28:17 170:3 254:8
261:18 360:10
384:11 532:17,18
535:19 553:18
**far**
114:22 133:16
212:9 272:15
282:13 300:13
**fashion**
136:5
**fatty**
301:21
**favor**
574:22 577:5,23
**FDA**

398:5 414:1,13
429:24 431:2,9,17
432:14,19 433:3
433:20 434:13,24
436:4 453:7 454:4
455:10 495:11
496:3,19 497:2
498:6 499:22
512:10,10
**FDA's**
414:14,22 431:16
432:20 433:24
434:8 437:1,10,14
437:17 496:7,16
497:22 539:16,19
540:10
**feasibility**
152:1 377:4
**February**
18:19 387:16 388:5
388:12,16,19
389:1,12,17
437:11
**Fecchi**
132:7
**federal**
482:8
**feel**
75:24 85:18 103:13
121:11 335:11
537:9
**fees**
14:24 15:8
**felt**
20:9 22:8 97:19
134:8
**female**
31:7 153:15 170:11
518:5
**female's**
518:20
**Ferguson**
3:12 5:6 441:20
442:9,14 446:13
448:2 450:5 452:1
454:1,12 457:12

458:6 460:24
462:7 463:4
**ferreted**
434:5
**fetus**
176:24
**fiber**
182:2 244:10 248:5
253:19 255:8,13
255:19 256:8,14
256:24 257:7
265:10 296:8
327:19 328:18,20
328:21 459:5
461:18 465:18,19
512:21
**fibers**
179:17 244:6
245:11,19,22
246:8,19 247:9
248:9 254:10
255:4 270:18
273:2,5 275:21
296:6 451:17
459:8,23 460:4,16
462:1 466:8 491:5
491:9
**Fibres**
9:20
**fibriles**
182:19
**fibrils**
179:18 244:9
**fibrosis**
329:22 330:3,10,22
331:1,10,14,15,20
331:23 332:1
343:22 344:12
**fibrous**
108:15 110:16
189:14 237:22
243:17,21 244:1,4
244:6,12,16 245:2
245:16 246:12
269:10 273:2
457:11 491:11

511:14 519:7,13
548:15,15,18
**field**
148:5 160:11
225:10 409:22
**Fifth**
64:17
**figure**
463:13 484:22
485:3,6,7
**filed**
173:6
**filing**
229:13
**fill**
229:5 399:19
**filters**
186:18
**final**
215:4,6 387:15
388:3 397:4,6,8
398:4 500:19
522:3 547:19
**finalized**
250:20 415:2
**financial**
229:2 446:3
**find**
133:24 134:10,11
145:7 230:6,22
231:11,13 232:12
232:21 233:10,12
236:3 283:23
284:2,10,18 285:2
285:13,22 286:4
301:9 346:6
357:16,18 386:10
387:3 394:18,20
397:20 399:8
433:10 435:18,20
437:2,7 455:14
465:5,6 469:17
485:2 495:5
539:13,15 563:18
567:22,22,24
**Findeis**

Judith Zelikoff, Ph.D.

| | | | |
|---|---|---|---|
| 2:18 28:23,23,24 | 301:12 325:9,20 | **folders** | 98:6,20 99:23 | 266:13 267:4,8 |
| 29:1 207:22 | 326:11 357:3 | 63:18 | 100:13,24 101:9 | 268:10 269:7 |
| **finding** | 361:8 404:14 | **follicles** | 103:12 105:12 | 270:5 271:1,23 |
| 104:18 109:20 | 408:8 443:1 445:3 | 568:3,9 | 106:2 108:2,11 | 274:8 281:8 282:6 |
| 201:12 248:2 | 446:17 458:7 | **follow** | 109:1,14 110:4 | 283:6 284:14 |
| 346:8,14 423:23 | 459:19 461:6 | 22:3,4 227:18 | 112:15 113:23 | 285:16 286:11 |
| 431:8 434:19 | 462:15 470:16 | 516:12 542:16 | 114:15 115:5 | 287:21 289:17 |
| 464:19 471:9 | 499:2 500:15,22 | **followed** | 116:7 120:4 122:6 | 291:7 293:1,21 |
| 473:2,15 508:6 | 508:15 520:20 | 133:10 148:23 | 134:4,21 135:18 | 294:19 296:1,20 |
| 568:7 | 524:2,24 549:16 | 150:18 490:15 | 137:22 138:18 | 299:16 300:23 |
| **findings** | 564:1,5 572:11 | **following** | 139:8,24 140:11 | 304:20 305:6 |
| 345:15 357:23 | **fish** | 62:14 346:15 | 143:14 144:15 | 306:7,16 307:8 |
| 361:5 474:1 568:1 | 391:17,20 536:10 | 379:12 427:3 | 145:3,16 146:7 | 310:16 311:20 |
| **finds** | **Fisher** | 477:4 542:19 | 147:1,10,15 | 312:22 313:11 |
| 496:19 | 575:22,22 | 543:23 | 148:20 152:10 | 314:21 321:7,9,11 |
| **fine** | **fit** | **follows** | 153:7 154:11 | 322:2,6 323:4,16 |
| 429:13 | 509:12 | 13:21 | 155:22 157:24 | 324:13 329:8,13 |
| **fines** | **five** | **follow-up** | 159:20 163:1 | 330:5 334:13 |
| 429:19 | 107:22 179:11,12 | 486:5 523:24 | 166:22 168:13 | 336:1 340:6,22 |
| **fingertips** | 416:8 468:2 | **food** | 170:13 172:4 | 341:14 342:14 |
| 287:8 | **flash** | 289:7,9 453:2 | 173:16 175:18 | 346:4 348:13,21 |
| **finish** | 53:12,17,19,22,22 | **footnote** | 178:18 179:4 | 351:11 352:12 |
| 101:23 122:1 141:8 | **flavorants** | 521:14,14,17 | 180:2,13 181:13 | 353:11 355:15 |
| 195:15 211:19 | 47:8 170:1,5 | **foregoing** | 181:20 184:3 | 360:17 362:15,24 |
| 225:24 226:11 | **flavors** | 579:18 582:6 | 185:6 187:5 188:4 | 363:20 365:1,16 |
| 267:24 317:3 | 170:6 | **foreign** | 188:19 189:7,22 | 367:9 368:23 |
| 318:2 319:3 | **flipping** | 234:12 325:9,10,23 | 190:24 191:13 | 369:20 370:14 |
| 339:14 441:22 | 85:16 | 327:12,17 328:16 | 192:12 193:4 | 372:18 376:18 |
| 463:20 538:6 | **Florida** | 499:17 509:8 | 195:2 198:6 | 377:21 378:11,23 |
| **finished** | 2:10 | 541:8 567:11 | 200:15 206:20 | 379:15 382:10 |
| 86:23 107:2,4 | **fluorescence** | 568:12,17 569:2,5 | 209:3,11 212:12 | 387:22 388:15 |
| 124:14 225:19,23 | 292:11 | 574:5,14 | 214:3 218:20 | 390:16 392:4,17 |
| 267:13,14,19 | **FLW** | **forever** | 219:1,10 220:15 | 395:10 396:19 |
| 455:11 463:3 | 1:6 | 357:21 | 224:19 225:4 | 399:11 400:9 |
| **finishing** | **focus** | **form** | 227:7 228:1 | 402:23 403:10 |
| 318:9 | 167:18,23 168:1,4 | 25:15 26:6 31:18 | 231:17 232:24 | 405:24 408:23 |
| **first** | 168:6 295:8 | 31:18 32:21 46:2 | 233:3,21 234:8 | 409:16 412:17 |
| 13:20 18:8,14,16 | 514:17 | 46:18 47:12,24 | 238:12 239:19,24 | 413:10 415:24 |
| 20:5,17,22 21:16 | **focused** | 49:18 52:7 53:1 | 240:16 242:14 | 416:22 417:16 |
| 23:1,14,17,20,24 | 137:6 360:20 | 56:9 67:3 68:8,19 | 244:9,10,15,22 | 418:15 423:4 |
| 24:7,10 25:5 | 375:10 383:10 | 70:4,21 71:11,23 | 245:2,6,16,22 | 424:3,19 426:9 |
| 33:24 39:16 40:23 | 487:4 520:9 | 78:9 82:19 83:3 | 246:10,19 248:24 | 428:22 434:17 |
| 118:18 128:13,23 | **focusing** | 85:13 87:14 89:20 | 249:16 255:20,24 | 438:13 439:19 |
| 129:5,16,21 130:2 | 23:13 48:21 | 90:18 91:5,21 | 257:5 258:14 | 440:12 446:6 |
| 134:7 152:6,12 | **folder** | 92:7 94:1,15 | 259:8 260:7 | 447:17 449:24 |
| 213:9 230:4,15,17 | 143:4 | 96:13,22 97:13 | 262:10,23 263:18 | 451:22 453:18 |

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1480 of 1525
PageID: 63626
Judith Zelikoff, Ph.D.

Page 604

458:5 460:7 462:4
465:16 466:13
473:6 474:17
476:7 477:16
478:9 479:2,10
486:11 487:8
488:11,20 489:3
489:17 490:9
491:1,13,20 493:9
494:4,9,11 498:4
500:3 501:17
503:8 504:3,18
505:9 506:4,21
510:12 511:18
514:13 516:1
517:7 519:9
524:15 526:13
527:21 529:16
531:10,18 533:16
534:19 538:19
540:4 541:16
545:15 547:9
550:4,15 552:13
553:14 557:8
560:10 562:13
564:12 565:2,12
566:21 567:11,19
568:17 569:22
573:8 574:5,14
576:6 582:10
**formal**
490:18
**formation**
566:18
**formed**
22:23 138:9 139:9
148:15 149:7
153:17
**former**
512:12
**forming**
276:14 329:17
**forms**
110:17 178:16
179:1 180:1,11
181:11,18 182:17

269:11 322:13
325:2,3 329:6
404:8,22 405:19
466:11
**formulated**
26:18
**formulations**
189:4,10
**forth**
85:17 463:10
**forward**
56:18 339:14
**foster**
119:10
**found**
54:23 58:5 120:23
136:9 151:15
170:7 197:19
198:21 202:14
203:7 224:7
246:23 247:12
269:12 283:19
284:15 287:6
291:9 299:3 352:6
361:23 362:3
385:23 387:13
394:14 399:12
419:18 428:4
433:20 449:9,15
497:19 498:7
564:21
**four**
115:24 206:8
396:13 498:9
528:4
**fourth**
538:10
**fracture**
466:13
**fragmented**
406:21 407:10
**fragments**
466:13
**fragrance**
42:1 91:2 161:24
163:11 268:8

270:23 271:21
272:23 313:15,17
322:23 487:17,17
487:23
**fragrances**
42:2,7 43:7,23
45:20 46:15,24
47:10 89:3,13
91:11,18 92:3
166:6,11,13
169:18 184:2,6,9
184:16,19 270:19
274:7 313:2,7,13
313:22 322:24
421:24 422:4
423:8 425:13
487:18 488:4
524:4 527:19
529:12,20
**Frank**
10:16
**free**
85:18 103:13
335:11 496:23
498:1,14 537:9
540:21
**frequency**
262:12 343:2
373:13 439:24
440:5 472:18
**frequently**
505:5
**friends**
34:13
**front**
28:4 58:14 65:16
75:12 89:8 150:2
161:18 571:21
573:14
**full**
14:6 117:22 230:4
230:15,17 302:24
445:3 446:17
452:13 480:24
520:20
**function**

309:10 326:14
327:3
**funding**
443:14,22 446:9
**further**
23:15 207:10
401:19 413:4,14
430:17 523:8
576:10,14 578:7

## G

**G**
477:9
**Gamble**
10:19
**gaps**
399:20
**Garfield**
176:10
**gases**
185:16
**gasoline**
261:11
**gather**
46:4,8 84:12 194:6
**gathered**
117:7 136:4 247:22
**gathering**
241:14
**gene**
11:10 86:8,15
236:13,21 237:2
291:1 294:3
296:10 297:8
305:17 310:4
371:11,16 375:21
474:13,22 475:1,3
475:12,21 478:11
517:14
**general**
113:3 124:10
158:11,13,15,23
158:24 159:3
344:23 393:24
402:15 409:18
458:16 461:8,11

462:17 468:17,18
471:3 489:8,11,13
497:12 508:17
534:7 543:2,12
**generally**
156:17 344:22
347:12 355:11,18
453:5 489:12
**generate**
301:16
**generated**
17:3 260:12 366:9
**generating**
300:6
**generation**
365:12
**genes**
104:14 236:10,11
236:23 271:14
296:11 474:19
485:9 551:10
**Genesis**
431:5,6
**genetic**
86:13 87:1 94:12
95:17,21 97:8
98:15 100:10
123:2,9 421:20
**geneticist**
185:20,22
**genetics**
7:8 93:11,17 99:19
185:24 186:1
**genital**
152:21 153:5,21
154:9 155:19
401:6 431:12
508:9 548:7 566:1
**genomic**
119:10
**genotoxic**
236:17
**genotoxicity**
237:11
**geologist**
409:1,10 418:17

Judith Zelikoff, Ph.D.

419:13
**germ**
95:1,3
**getting**
57:22 124:18
331:21 399:16
431:7 468:20
516:6 532:15
**Ghassam**
55:7
**Ghio**
197:6 301:8
**give**
25:21 32:22 35:13
35:14 80:15 102:3
107:11 108:7
113:6,20 114:9
115:2 165:23
166:2 183:22
188:21 206:22
224:5 263:21
313:3 349:4 354:3
372:23 409:8,12
417:6 452:8
494:24 495:1
502:17,18 504:22
516:9 537:19
570:7
**given**
31:14 87:8 154:13
165:17,18 166:18
171:10 183:5
195:18 313:17
434:22 450:9
456:17 466:14
575:24 579:6
582:8
**gives**
117:3 422:20
**giving**
116:2
**glanced**
49:21
**gland**
153:16
**glasses**

278:21
**Glenn**
11:13 512:1,5,12
512:16 548:21
549:15,18,23
**Glenn's**
552:4,15
**glimpse**
409:12
**glutathione**
381:11
**go**
14:24 15:3,5,6
34:13 51:4 56:21
57:1 61:24 80:15
101:17 102:10
108:16 110:7
124:22 138:22
147:19 160:24
162:6 177:4
179:19 184:22
196:9 218:5
224:11 233:22
234:8 239:5,7
240:16 275:2
282:23 289:23
290:2 299:19
301:23 303:23
305:21 306:17
314:4,9 317:13,18
317:19,22 318:5
318:10,14,23
322:8 331:3
336:19 338:1,5,8
338:16 339:13
371:4 388:11,15
404:6 419:1
429:20 442:21
443:2 446:7,11
450:6,14,24 451:1
452:23 454:7
459:18 463:10,15
463:22 468:4,12
482:13 496:1
500:23 502:24
510:20 519:22

521:5 524:5
528:23 529:2
537:11 555:19,22
570:14 577:16
**goes**
147:18 242:20
271:12 521:5
568:3
**going**
16:18 36:19 38:22
40:2,8 42:12
54:15 60:11 61:6
62:24 74:10,12,16
83:12,15 88:14
93:1 104:15
106:13 115:17
117:21 118:11
119:22 123:13
125:11,17 133:8
133:16 139:21
176:7 182:5
195:20 209:16
211:11 214:19
215:1 216:8,9
221:1 231:21
233:11 237:16
239:2 277:11
285:8,10 299:24
303:23 308:9
309:19 317:17,21
318:8 319:11
334:20 336:18,19
336:20 337:2,16
337:23 338:19
339:1,13 366:16
367:3 383:23
384:3 391:8
398:15 418:17
441:19 442:19,20
453:19 462:22
467:20,24 469:11
475:19,23 482:5
482:21 483:6,6,22
484:4 487:14
500:10 523:13
527:23 528:21

537:3 542:22
549:13 572:5
**Golkow**
1:20 13:4
**GOLOMB**
2:13,14 127:3
**good**
14:2,3 74:13,16
85:20 254:22
436:2 442:13
563:22
**Goodman**
437:5,22
**Google**
44:9 54:19
**GORDON**
3:12
**Gosen**
452:12
**government**
212:24,24
**grade**
191:18,18 192:5,5
409:7 451:16
453:3 455:10
539:20
**graduate**
30:7,12 43:10
131:24 132:1
443:13
**graduated**
132:9
**Grand**
3:3
**grant**
67:11 133:12,12
443:18
**grants**
15:23 133:13
**granuloma**
329:11,16 345:21
**granulomas**
291:9 328:9,11,13
328:15 329:8,11
343:21 344:8
345:15

**granulomatous**
329:3
**graphics**
428:6
**Gray**
1:15 579:12
**great**
198:10 319:13
421:7 507:8
**greater**
38:23 56:19 184:23
239:1 241:5
467:19 571:9
**groundbreaking**
202:6
**group**
152:19 153:3 154:7
205:2,6 215:24
216:19 217:10,12
218:2,15 219:15
220:5,11 222:5,5
225:7 245:3,12,17
398:6 417:9
**groups**
108:16 217:12
218:23 219:7
220:10
**grows**
244:2,12,18
**growth**
104:15 356:23
470:3 475:22
**guess**
140:19 463:13
**guidelines**
227:20
**gynecologic**
556:6
**Gynecology**
563:22
**G-H-I-O**
197:7
**G-I**
197:6

---

**H**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1482 of 1525
PageID: 63628
Judith Zelikoff, Ph.D.

Page 606

**H**
5:11 6:2 7:2 8:2 9:2
  10:2 11:2
**habit**
244:3,13 511:15
**habits**
110:16
**half**
45:17 390:2
**hallmark**
577:10
**HALPERIN**
3:7
**Hamilton**
288:18 347:2 506:8
  506:9
**hand**
495:17 500:10
  544:15 572:1
**handed**
60:12 522:19 545:1
  547:18
**handful**
265:23
**handfuls**
372:22
**handle**
364:21 366:8
**hanging**
261:14
**happen**
368:8 393:17
  461:10
**happened**
92:18
**happening**
337:1
**happens**
329:4 466:17
**hard**
357:16
**HARDY**
3:2
**harm**
385:5
**harmful**

262:18
**Harper**
538:11
**hazard**
404:9,23 405:20
**hazardous**
405:20
**head**
105:22 188:8,23
  286:20 342:4,7,16
  372:4 467:2
**headed**
403:22
**heading**
52:4 89:2,13 461:7
**health**
7:17 14:13 15:21
  61:10,11,11 63:19
  63:20 120:11,13
  120:13 205:12,16
  207:1 213:2,5,10
  214:16,23 219:17
  230:1 260:14
  283:12 301:18
  384:4,10,13,17,19
  384:22,22 391:8
  391:10,15,18,19
  391:24 392:6,13
  392:24 395:4
  406:18 407:7
  443:18 477:18,24
  500:11,17 501:4,6
  502:12,14 503:4
  503:19 512:14
  514:2 519:21
  543:21,22 547:6
**healthcare**
392:24,24
**hear**
66:10 102:6 254:17
**heard**
24:23 169:23
  254:12 530:23
  555:17
**heavy**
268:7 270:22

271:20 274:6
278:6,6,17 280:3
281:4 284:4 292:3
415:21 416:9,14
491:17 517:4
**Hegarty**
3:3 5:5 14:1,4
  16:23 21:7 26:9
  26:16 29:5 33:3
  35:18 36:24 39:1
  40:7 41:16 43:15
  46:7,21 47:17
  48:3 49:19 50:7
  51:3 52:17 53:10
  54:2 55:11 56:23
  57:10 60:10,21
  61:1,5 62:23 67:5
  68:1,11,23 70:8
  71:4,18 72:3 74:6
  74:14,22 75:9
  78:13,19 82:22
  83:11,24 85:2,8
  85:24 87:15 88:13
  89:23 90:21 91:8
  91:24 92:13,24
  93:5,7,22 94:8
  95:15 96:17 97:3
  98:1,12 99:16
  100:6,17 101:4,15
  102:5,20 103:1
  104:4 105:15
  106:12 107:1,5,13
  108:5,19 109:6,23
  111:23 112:22
  114:3,19 115:16
  117:13 118:3
  119:21 121:17
  122:3 124:13,24
  125:10,22 126:13
  127:5,7 134:15,24
  136:7 138:1,23
  139:14 140:6,14
  142:14,19 143:16
  144:20 145:10,20
  146:10,14 147:4
  147:11,17 148:6

149:1 152:17
153:18 154:16
156:1 158:7 160:2
161:8,20,22 163:9
167:10 168:16
170:16 172:8
173:23 175:13,22
178:19 180:6,18
181:16 182:7
184:7 185:2,19
187:9 188:12
189:1,16 190:5
191:7,21 192:16
193:10 195:8,22
196:7 201:10
207:12,21 208:2
209:6,15 210:7,12
213:6 214:12
217:24 218:22
219:6,13 220:17
220:21,24 221:10
221:19,21 222:2
223:17 224:23
225:5,15 226:1,3
227:12 228:16
230:11 232:5
233:14,23 234:18
235:10,16 239:13
239:20 240:9,19
242:9 243:3,14
244:23 245:9
246:13 249:5,23
251:3,10 252:6
255:21 256:22
257:13 258:22
259:21 260:21
262:16 263:13
264:18 266:16
267:9 268:3,21
269:17 270:10
271:17 272:5
275:5 277:13,16
277:23 280:23
281:13 282:9
283:18 285:7,20
286:15 287:13,15

288:7 290:14
291:13 293:12
294:13 295:11
296:15 297:15
300:17 302:1
303:11 305:1
306:1,11 307:2,23
311:14 312:16
313:1,20 315:2,9
316:23 317:4,12
317:18,22 318:5
318:10,14,20,23
319:4,10,22
321:10 322:15
323:9 324:7,21
329:19 331:7
334:19 335:16
336:2,17,20 337:9
337:13,16 338:1
338:15,24 339:20
340:11 341:6,18
342:20 346:11
349:5 351:18
352:16 353:17
356:5 361:2,16
362:19 363:8,23
365:10 366:4
367:20 369:4
370:7 371:2
373:15 376:2
377:15,24 378:14
378:20 379:5,21
381:16 382:21
383:13,22 384:8
386:15,23 387:10
387:12,24 391:3
392:10,20 393:9
395:22 396:24
398:23 399:21
401:1 403:4,19
405:16 406:6
409:4,23 412:22
413:18 416:4
417:1,22 419:14
423:20 424:7
425:19 426:10

Case 3:16-md-02738-MAS-RLS    Document 9886-12    Filed 05/29/19    Page 1483 of 1525
PageID: 63629
Judith Zelikoff, Ph.D.

Page 607

429:4 430:8 435:4
436:13,16 439:2,9
439:13 440:7,20
441:19 452:7,24
462:23 463:1,15
464:8 465:24
469:10 471:19
473:13 474:24
476:15 477:23
478:16 479:5,18
479:23 480:9
481:17 482:4,10
482:19,23 483:9
483:19 484:9,18
485:15 486:10
487:7 488:10,19
489:2,16 490:8,24
491:12,19 493:8
494:10 498:3
500:2 501:16
503:7 504:2,17
505:8 506:3,20
510:11 511:17
514:12 515:24
517:6 519:8
523:10,22 524:20
526:16 527:11,24
528:16 529:2,10
530:2 531:13
532:1 533:22
535:3,22 537:11
537:14 539:1
540:8,14 541:23
543:6,7 544:7,13
544:21,22 545:18
547:12,23 548:12
549:12 550:6
551:5 552:18
553:20 556:11
557:16 559:18
560:4,13 562:15
562:24 563:10,15
563:17 564:18
565:6,18 567:1,6
568:5 570:2,12,16
571:10 573:7

576:18 577:18
578:4
**held**
1:14 13:8 14:17
124:21 280:9
319:18 464:2
486:12 529:7
562:20
**Heller**
336:12 502:23
507:5
**Hello**
442:10,11 462:24
463:1
**help**
186:20 386:10
**helped**
501:12
**helpful**
85:18 387:4
**Henderson**
288:18 347:2
502:19
**Henry**
4:16 13:2
**hepatitis**
330:19
**hexavalent**
120:10,18 293:9
321:14,19 421:5
421:17
**Hey**
277:10
**he'll**
317:6
**high**
191:18 192:5
259:16 262:20
287:24 402:7,19
461:24 469:22
495:24
**higher**
258:19 284:19
331:21 349:20
356:21 361:24,24
362:11 373:6

377:1,11 459:10
460:22 462:2
**highlighted**
93:14 95:22
**high-grade**
192:9,19
**high-powered**
22:15
**Hill**
73:10 201:22 202:1
**Hill's**
158:20 201:3,16
202:5
**hired**
159:5,16 228:11
447:4,14
**hiring**
228:7
**histologist**
193:9
**histopathology**
568:11
**historic**
446:19,22
**historical**
37:4,5 493:15
**history**
472:6
**hold**
486:7
**holds**
518:22
**home**
7:8 34:14 93:11,17
94:13 95:17,22
97:8 98:16 99:20
100:10
**homes**
459:21
**honest**
71:2,14
**honesty**
81:23
**HONIK**
2:13
**hookah**

170:2
**hope**
558:23
**Hopkins**
65:2 411:9,13,23
412:6 493:23
**host**
326:24
**Hotel**
1:14
**hour**
16:3 74:12 132:15
132:16 195:20
277:11 389:8
**hours**
17:16 26:22 28:5
38:7 337:20
481:22,24 482:3,9
**house**
257:21
**household**
15:3
**houses**
261:1
**housing**
181:5
**human**
11:11 207:4 208:14
209:1 279:21,24
283:12 286:8
294:16 295:2,22
296:17 297:6,11
297:17,21 298:1
309:18 351:22,24
377:12 417:13
457:20 517:21
519:1,23 542:15
570:20 571:3
572:12,17
**humans**
156:4,6,7 295:8
339:24 372:11
378:19,21 379:11
490:23 491:18
518:3,11 520:15
556:20 557:1,5,19

**humoral**
326:6
**hundreds**
26:14
**hung**
532:15
**Hussain**
118:7
**hydrogen**
300:12
**hydrophilic**
465:19
**Hydroxyl**
119:13
**hygiene**
160:12
**hygienist**
186:22
**hygienists**
186:24
**hypothesis**
472:11,15
**hypothesized**
505:5 506:24

**I**

**IARC**
8:21 9:21 10:17,18
10:20 11:8,9
44:11 77:23 78:2
153:11,19 155:15
156:12 159:2
180:21 220:3,23
223:5 245:3,12,15
245:20,24 246:6
256:7 320:19
416:2 417:20
435:5,11 457:1,4
458:12,14 460:3
462:14 511:3,4
548:5,6 558:6
**IARC's**
155:18 246:15
511:7,14
**ICP**
292:12

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1484 of 1525
PageID: 63630
Judith Zelikoff, Ph.D.

Page 608

ICT
465:4
idea
74:13 85:20 110:6
   110:8 268:11
   314:4
identical
85:11 87:11 88:4
   89:13,15 100:11
   100:16 109:9,10
   524:10
identically
110:13
identification
16:21 35:16 36:22
   40:5 43:13 50:5
   53:8 55:9 57:8
   60:8 62:21 78:17
   83:22 88:11 92:22
   102:18 106:10
   115:14 118:1
   119:19 121:15
   125:8 175:11
   393:7 398:21
   405:14 430:6
   454:10 457:8
   469:8 471:17
   480:7 481:15
   549:10 562:22
   567:4
identified
94:12 103:6 121:21
   171:23 174:17
   175:1 194:16
   309:21 312:17
   346:21 544:4
   545:11 546:11,15
   547:1
identifies
117:23
identify
134:7 141:4,10
   171:24 205:1
   264:21 292:21
   346:9 347:19
   385:20 534:3

III
207:3
II-A
155:17
II-B
155:17,24 156:2,11
   156:13
Illinois
4:9
illnesses
404:10,24 405:4,6
   405:22
imagine
517:10
Imerys
3:19 37:5 270:16
   273:12,23 274:5
   411:16 442:15
immersed
475:9
immune
308:8 325:12,20,24
   326:4,7,12,17,21
   329:16 347:7
   351:6 356:18
   359:3,11
immunity
328:20
immuno
326:18
immunological
300:7 569:3
immunology
391:17 392:7 536:9
immunosenescence
326:21
immunosurveilla...
326:10
immunotoxicity
536:9
impact
110:9 236:18 326:1
   357:11
impacting
176:16 300:5
impaction

467:24
imperative
580:14
implant
174:1
implants
172:22
implicate
216:10
implying
223:9
importance
137:13
important
201:21 242:1
   281:22 342:22
   343:6,12,15
   426:23 475:21
   508:6
impossible
408:15,20
improper
338:8 365:11
improperly
459:13
inaccurate
409:22
incidence
258:19
incident
472:21
incidental
404:2,7,21 405:18
include
27:15 51:16 80:16
   97:8 118:6 120:19
   136:20 249:6
   303:19 329:21
   350:17 410:7
   468:14 491:9,10
   506:8
included
30:14 31:2 39:6
   72:13 96:9 126:12
   165:22 168:10
   175:16 203:10,18

203:23 232:11,20
   350:18,20 477:20
   487:23 488:16
   502:11 509:15
   527:18 532:3
   573:5 576:2
includes
27:6 139:1 179:12
   179:22 435:5
including
17:18 30:15 31:10
   54:18 73:22,24
   74:1 93:19 104:14
   149:21 177:19
   185:8 194:14
   202:22 220:2
   231:6,10 270:17
   272:17 277:2
   305:22,23,23
   307:16 308:10
   310:24 314:14
   333:13 365:3
   381:3 408:2 410:8
   415:11 447:6
   491:4,5,6
   493:17 501:20
   519:18 566:13
   568:2
inclusive
272:18
income
15:10,11,17
inconsistent
473:2
incorporated
80:17,22 96:10
incorrect
83:5 338:7
increase
283:3 348:3,6,13
   364:7,9,16,21
   400:4,19 564:20
   565:16
increased
6:10 103:24 104:1
   127:12 128:6,9,17

130:8,12,17,24
   131:8 173:21
   230:6,22 231:11
   231:14 232:21
   233:16 234:5
   284:22 331:9
   352:7 361:24
   362:12 397:15
   401:7 472:17
   480:18 481:7
   508:10,18 509:10
   512:24 558:3,11
   558:20 559:1,12
   568:2,8 577:7
increasing
472:18
independent
116:15 118:12
   131:15 132:23
INDEX
12:2
indicate
207:6 270:16 287:4
   304:23 310:3
   348:24 368:5
   403:6
indicated
47:18 72:19 358:14
   358:19 569:17
indicates
241:4 272:16
   286:22 368:7
   460:19 536:22
indicating
372:9 554:2
indication
360:21 363:6
indications
418:9
indicative
207:11 311:10,12
indicator
309:8 361:14
   367:17
indisputable
499:10

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1485 of 1525
PageID: 63631
Judith Zelikoff, Ph.D.

Page 609

individual
61:24 109:19 111:1
  111:4 189:24
  238:19 255:9,11
  269:13 271:5,6
  279:3 280:12
  296:22 298:7
individually
130:16,23 293:17
  314:17
indoor
459:20
induce
218:9 257:7 307:24
  313:8,24 314:18
  315:6 320:2,13
  321:4,23 322:19
  324:18 377:6
  416:19
induces
242:5
inducing
310:14
induction
153:14 192:6
  194:20 234:16
  349:3
industrial
186:21,23 415:21
  416:9 419:16
  451:13 459:11
industry
259:14 409:11
infection
119:9 325:22,23
  349:19 567:12
  568:18 574:6,15
infections
568:13
infectious
325:11
inferred
236:13 529:21
infiltration
357:19 358:3
inflamagogue

219:23
inflamed
355:7
inflammagogue
369:23
inflammation
7:19 10:7,9 103:20
  116:12,19,22
  118:23 190:2
  216:6,11 217:1,2
  217:21,22 218:7
  221:8 222:13
  223:11,16 240:12
  240:18,22,24
  241:5 242:2,5
  256:12 257:8
  259:19 271:11,12
  278:15 282:20,22
  291:21 294:1
  296:10 298:17
  299:8,9,12,13
  300:19,20 301:5,9
  301:19,20 302:7
  302:15 303:5,14
  304:4,16,18,22
  306:4,10,14,20
  307:14,18,22
  308:1,3,5,6,7,7,8
  308:18,19,23,24
  309:9,17,23,24
  310:11,14,20,21
  311:2,4,6,7 312:3
  312:4,14,18,20,23
  312:24 313:19,24
  314:3,5,9,13,19
  315:1,7,16 320:2
  320:13,17,21,21
  321:5,24 322:4,19
  323:2,13,18,20
  324:10,19,22
  325:3,6,7,8
  326:23 327:7,11
  327:14,22 328:1,8
  329:21 330:1
  343:20 344:5
  345:19,24 346:14

347:14,21 348:18
  348:23 349:13,24
  350:3,23 351:1
  354:13,19,20
  355:1,4,12 356:10
  356:13,17,24
  357:5,6,8,14,15
  358:7,23 359:1,13
  359:18 360:24
  361:14 369:15
  371:1,13,17 377:7
  382:14 383:7,11
  401:24 402:4
  438:19 440:17,17
  441:1,7,13 470:9
  470:20 471:7
  473:3,12 475:10
  475:13 476:11,12
  486:8,14 487:5
  490:2 503:24
  504:9,9 507:2
  509:6,8 519:20
  531:6 538:5
  567:14 568:1
  569:18
inflammatory
90:8 119:8 218:10
  233:10 234:13
  240:8 266:9
  280:13 281:23
  283:11 284:5
  290:22,24 291:4
  293:5 300:8,9
  301:22 309:2,5
  311:13 327:13
  346:23,24 348:9
  348:11 349:11,21
  349:22 357:10
  358:1 359:8,9,23
  360:1 361:13
  362:6,12,21 363:3
  377:7 423:9,18
  425:7 477:3,20
  478:19 480:20
  481:8 488:6
  499:18 505:3

528:11 529:23
  541:9 553:2
inform
56:6 62:10 394:22
  395:8,13 396:22
  501:7 547:20
  548:2
information
31:15 46:5,9 65:22
  66:15 108:9
  109:16 138:21
  154:13 165:17,19
  198:12 199:4
  200:21 201:1
  203:13 211:5
  212:1 213:18
  214:7,11 241:14
  242:18 261:19
  264:3 274:11
  275:22,24 288:15
  358:10 372:10
  374:3,12 394:2,5
  394:6 395:16
  399:9 412:24
  415:2 422:20
  431:13 434:22
  487:22 532:6
  552:15 563:19
informative
496:19 498:7
informed
62:12 391:23
  392:13 395:5
  396:16 399:6
  501:10
Ingersoll
10:21
ingest
460:4
ingested
237:19
ingestion
331:15 458:2,9
  462:16
ingredients
9:22 270:14 425:12

inhalable
239:3
inhalation
153:12,13 197:7
  224:4,5 258:9
  264:13 286:13,17
  300:2 309:3 310:1
  332:22 344:24
  425:23 458:2,9
  462:15 464:10,17
inhale
460:3
inhaled
176:22 286:23
  302:6,14 303:4
  306:3 307:4 320:1
  320:12 321:3,22
  322:18,24 323:11
  323:19 324:9
  467:6,15,18
inherited
86:8,15,24 94:17
initial
18:17 21:9 23:7
  133:6,6 196:11,24
  197:3 198:7
initially
420:14
initiate
256:9 286:24
initiated
111:2,14 307:4
initiation
119:11 476:14
injury
309:13 331:20
  333:23 425:9
innate
325:19 326:4
  328:20
inquiry
520:9
insertion
556:24
insist
483:23

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1486 of 1525
PageID: 63632
Judith Zelikoff, Ph.D.

Page 610

insoluble
322:10
instability
420:24 421:20
instance
155:15
institute
15:20,22 149:22,22
223:5 259:14
443:17 512:13
553:18
Institutes
392:23
institution
154:1
institutional
519:4
institutions
519:5
instruct
20:24 482:5
INSTRUCTIONS
580:1
instrumentation
251:25 252:9,14
292:5 428:5
instruments
252:23
insulation
181:5
integrity
6:21 78:21 79:2
81:19
intend
17:10 68:24 72:9
72:18,21,24 73:18
266:23
intense
42:24
intensity
39:13 353:15
intent
69:20 70:2,16 96:6
intentional
557:24
intentionally

interest
18:13 22:2,7
198:11 229:7
326:24 327:1
446:3
interested
397:23
interleukin
356:22
interleukins
360:7
interleukin-1
298:19
intermediates
256:14
intermittent
406:19 407:8
internal
51:17 202:12 203:5
292:19 394:1,5
418:18 428:4
536:18
International
1:14 123:22 555:11
internationally
555:10
internet
109:22 111:9
120:11 276:19
interpret
79:24 80:4 88:5,6,7
186:20 516:12
interpretation
81:12 82:6 97:15
100:2,3 101:12
102:15 106:5
112:2 456:18
interrupt
76:11 350:14
452:19
interruption
384:7 529:1
interstitial
343:22 344:12
intervals

intramural
443:22
intravaginal
288:21
introduce
384:1
introduced
439:4,15 510:2
invader
355:3
invasiveness
192:7
investigated
312:1,7,9 534:4
investigating
241:9
investigations
122:21
investigator
76:1,22 109:20
111:2,5,13 118:12
443:21
investigators
106:7 117:8 190:16
301:8 408:1
investigator-initi...
104:24 111:20
116:16
invoice
18:14,16 28:2
389:7
invoiced
389:1
invoices
5:15 16:16,19 17:2
17:13,20 26:24
27:4,6,17 386:4,4
386:11,22 387:6
387:13,14 389:5
involve
123:2 155:1,4
241:9 308:9 328:1
493:7,24 494:5
515:15
involved

164:1 198:22 383:9
486:24 488:3
515:6 519:19
involvement
290:5 486:6,18
involves
325:19
involving
24:24 416:8 487:16
492:21
in-depth
42:22
in-press
58:21
ion
466:5,7,24
ions
465:3,7
IRBs
520:1
iron
182:1 271:14 324:4
324:5
irreparably
354:13,15
irritation
119:9 120:21 505:2
507:2
issue
22:21 68:4,15
444:13 520:5
issued
503:14
issues
31:11 167:18
170:18,23 175:15
175:20 533:1
issuing
500:17
Italian
451:19,20
italicized
469:20,21
Italy
187:22
item

453:21
Iturralde
197:13 336:11
502:22
i.e
116:21 427:17
564:7

J

J
3:12
JAMES
4:8
james.mizgala@t...
4:10
January
1:10 13:5 18:19
33:22 36:19 37:8
37:12,14 55:19
57:17,19 168:22
500:23 522:12,14
523:6 579:15
Jay
437:22
Jennifer
2:3 18:23
Jennifer.emmel...
2:6
Jersey
1:2,15 3:18 13:8
jet
261:5
job
292:16 337:22
Johnson
1:4,5 3:10,10 18:3
18:3 37:4,4
179:11,11 201:8,8
247:6,6 269:9,9
272:11,12 273:11
273:12,22,22
274:5,5 277:5,5,9
277:9 280:18,18
280:20,20 286:19
286:19 287:3,3
423:11,11 447:21

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1487 of 1525
PageID: 63633
Judith Zelikoff, Ph.D.

Page 611

447:21 450:9,10
450:12,13 488:4,8
493:20,20 508:3,3
508:20 528:13
575:23,23
**Johnson's**
45:21 73:1 90:4
187:3 188:1,14
189:19 190:11,17
190:22 242:11
246:24 247:13
248:3,12,16 275:9
275:15 276:9
278:1,7 286:9
287:18,23 288:12
292:2 295:22
410:8,23 418:1,3
418:8,12 428:20
429:11,17 449:8
449:14 488:4,8
492:22 493:7,17
493:24 494:6,22
495:6 508:20
520:24 528:13
536:16,21 538:17
539:5 575:18
**Jorge**
10:16
**journal**
67:10 97:6 98:9
114:23 213:11
229:18 563:23,23
**journals**
77:4 105:5 229:21
229:22 230:2
444:18 533:21
**judge**
70:19 71:8 285:10
317:5 318:24
319:12 336:21
338:16 339:2,4
**judgment**
121:13 224:15,17
226:19 228:15
315:19 322:21
385:9 489:12

**Judith**
1:13 5:4,17 13:12
13:19 14:8 579:8
582:16
**Julie**
64:9,15,18 389:23
411:10,15,19
412:5
**jump**
51:1 383:24
**June**
93:11
**jury**
70:19 71:9
**J&J**
14:5 536:18 559:3
**J&J's**
187:20 190:9
**J.M**
2:18

**K**

**K**
2:3 3:17
**Kansas**
3:4
**Kasprzak**
7:21 121:23,24
122:13 123:19
**keep**
74:9 105:1 254:24
327:20
**keeping**
337:22
**keeps**
328:6
**Kemble**
3:17
**Ken**
442:14 463:19
**KENNETH**
3:12
**kept**
228:11
**keratinized**
334:6

**Keskin**
11:19 336:14 502:4
502:5 506:9,10
566:12,16 567:7
569:10 572:10,14
572:23 573:13
576:20 577:4
**key**
81:24 135:10,11
306:23 308:4,9
309:8,8 325:17
375:13
**keyword**
462:20
**keywords**
135:11 196:22,24
447:23 451:7
**kferguson@gord...**
3:14
**kidney**
294:11 308:8
312:10,15 467:10
**kill**
326:1 328:5 329:6
**killer**
308:11,16 325:18
**kind**
126:2 325:24 385:2
483:7
**kinds**
374:22
**knew**
513:19
**know**
18:1,24 19:8 21:24
22:9 51:6,8 53:13
53:16 58:7 59:2
59:20 63:8 68:8
74:8,23 84:1
87:18 88:17 92:18
99:8 111:12 119:1
119:16 135:1
140:15,18 143:9
155:16 160:3
165:17 173:5,9
175:6 183:3
187:11 202:5,5,6

205:11 211:1,20
221:9 222:19
230:13 250:21
251:20 258:23
274:2 276:19
294:24 295:7
342:1,9,10,11
348:15 350:16
385:2 386:13
390:6 401:15
407:3 409:18
411:1 412:10
422:8,16 424:23
425:5 434:2 435:1
439:20 441:17
447:23 451:7
456:12 467:1
474:20 482:24
483:4 499:1
502:13 517:10
530:16,19,21
539:7 542:5,7
544:13 553:8,16
554:6,8,11,20
558:6 578:2
**knowing**
70:14 136:2 238:3
**knowledge**
18:18 19:20 21:19
23:10,12 24:19
25:4 28:4 54:7,8
58:18 59:4 63:11
64:21 65:9 70:13
72:7 75:24 76:7
76:23 77:9 80:14
83:8 84:12 87:3
89:18 90:1 95:10
95:19 97:20
101:13 104:11
105:2,3 106:6
109:3,17 113:3
114:2 117:9 121:1
135:20 140:2,2
143:22 144:17
145:18 148:2,3
150:17 153:1

154:20 155:24
157:14,16,17
158:2,23,24
160:17 163:3
164:22 165:11
169:9,10,19
170:15 171:9,12
174:19 175:5
180:23 184:24
191:17 192:2
193:21 203:22
210:17,24 213:15
223:14 231:3
279:18,23 295:2
314:2 323:6,7
329:15 334:16
340:14,24 341:9
345:10,20 348:16
352:14 359:2
360:5 367:11
379:17 423:14
424:24 441:18
474:21 486:17
514:22 531:1
538:21 542:12
552:24 553:5
554:12
**knowledgeable**
157:6 514:8 552:21
554:3
**known**
14:12 77:17,20
104:3 110:20
122:18 123:1
200:1,11 217:22
241:7 245:3,17
256:6 325:16
348:6 352:19
358:10 434:6
440:16,18 469:24
473:8 510:17,22
512:8 518:9,23
554:23,24 569:7
**knows**
86:12
**Konstantine**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1488 of 1525
PageID: 63634
Judith Zelikoff, Ph.D.

Page 612

122:14
**Korea**
187:23 277:6,8

## L

**L**
1:15 579:12
**lab**
253:8
**label**
477:8
**Labeled**
10:11,13,14,17,19
10:21 11:6,8
**Labor**
120:9
**laboratories**
269:1
**laboratory**
43:11 111:6 116:17
147:24 148:4,10
151:15 184:20
186:19 224:8
251:21,24 254:11
254:24 290:3
292:10 310:2
380:16 443:6,7,9
443:15 448:23,23
455:4 533:5
556:24 557:23
561:5 562:7
**lack**
140:22
**lacking**
431:19 433:24
**lactate**
183:18 309:14
**lactose**
309:14
**laid**
63:14
**Lancet**
250:10,11
**Langer**
405:8,12 406:5
407:17,22

**Langone**
14:12 514:2
**large**
58:22 98:22 99:5
**larger**
56:18 428:13 429:8
**late**
31:11 431:7 434:21
503:17
**latest**
250:14,17 255:1
**lattice**
268:13
**Lawrence**
132:6
**lawsuits**
24:23
**lawyer**
23:5 211:23
**lawyers**
19:23 26:1 27:19
159:6 203:20
211:3,24
**LAWYER'S**
583:1
**lead**
55:7 60:16 104:13
119:9 176:19,20
199:5 201:9
259:20 261:9,10
261:11 271:15
302:8,15 303:6
306:5,9,12 316:6
316:8 345:3 366:2
371:12 402:9,21
431:18 441:14,15
475:24
**leading**
505:3
**leads**
22:6 103:23 116:22
236:12,20 240:13
565:15
**leaning**
370:24
**learned**

340:17
**leave**
320:22 322:5 483:5
**leaving**
222:12
**lecture**
31:6 33:16
**lectured**
167:14
**lectures**
33:12 165:23
166:17,17
**led**
140:21 433:23
568:1
**left**
456:2,3 487:14
508:5,13
**legal**
70:24 490:11
**Leigh**
2:3 483:5 570:12
**leigh.odell@beas...**
2:5
**lend**
391:2
**length**
440:4
**lengthy**
263:2
**length-to-width**
179:13,14
**lesions**
119:10 345:12
420:8
**letter**
9:13 58:19 63:21
63:22 197:17,21
211:4 212:1
429:24 430:4,9,21
431:16 434:13
436:4 437:11
497:3 539:16
540:10
**letters**
51:16

**let's**
77:22 175:19 190:3
300:1 317:19,22
318:5,10,14
331:14 338:1
456:24 457:4
458:24 459:1
463:15 529:2
**leukemia**
158:14
**level**
82:1 176:13 258:24
259:11,13 262:7
264:4 283:2 316:8
316:10 352:4
366:12 394:9
475:16 478:12
510:9 554:11
**levels**
155:14 259:4,16,17
259:22 260:4,4,23
261:13,17 262:3
282:10,21 286:6,8
292:21 313:7
351:9,20 352:5,9
352:22,23 353:8
354:2 356:21
360:22,22 362:6
362:11 367:16,22
377:9 416:18
459:6 475:16
511:1 559:7
**LEVIN**
2:8
**Levy**
6:23 83:20 84:1
**Levy's**
84:4,19 85:3,11
87:9,12,16 88:1
**LHG**
1:6
**LIABILITY**
1:6
**liberty**
118:18
**life**

94:20
**lifted**
98:4,15
**light**
252:1 253:4
**likelihood**
519:3
**limit**
482:8
**limitation**
467:13
**limited**
463:6 498:8
**limiting**
108:14
**limonene**
47:4 166:12
**line**
12:6,9,12,14 64:17
95:1 344:19,21
400:2 401:3,4
404:21 407:3,5
462:15 490:16
570:3,18 581:4
583:2
**lines**
183:14 375:23
376:7,10 461:15
501:20 546:2
549:19 551:2
**link**
22:23 152:7,13
254:12 280:3
351:20 476:10
**linked**
284:7 285:13
349:14 359:2
475:13 571:3
**linking**
330:3
**links**
351:15
**list**
32:9 35:7,8,8 36:5
39:6,17,17,21
43:21 45:3 61:23

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1489 of 1525
PageID: 63635
Judith Zelikoff, Ph.D.

Page 613

140:8,13 169:5,11
169:16 220:18,22
280:11,18 322:23
409:5 455:23
477:5
**listed**
36:13 43:24 45:9
46:16 47:16 49:9
49:11 65:6 66:6
66:13 142:15,24
143:5,24 144:3
170:4,5,8 184:5
201:17 220:16
223:1 245:20
270:14 327:7
417:9 419:6
425:14 476:24
490:14
**listen**
129:15 216:13
221:22 222:3
284:9 329:9
561:20 577:12
**listened**
254:20
**listing**
5:23 6:19 44:12
52:3 141:21
**lists**
179:6
**Lit**
44:10 54:18
**liter**
462:1
**literally**
235:20 571:7
**literature**
16:6 20:7 24:20
41:24 42:7 43:6
46:23 47:20 48:7
51:12,13 54:17,22
61:18 68:5,15
69:11 73:11
110:22 112:5,13
113:2 126:22
127:10 129:11

130:6 131:16,18
131:20 132:20,23
133:17,24 134:1,6
134:7,8,9,19
135:5,16,21 136:1
136:4,6,9,15
139:13 141:2,5,7
141:11,15 145:9
146:22 147:8
148:23 149:15
150:1,3,6,9,15,23
151:2,9 153:24
158:5,18 165:3
172:14 174:20
184:23 190:13
194:16 198:2,2
199:1 200:20
204:7 205:21
207:5 218:5
226:18 228:6
231:6 238:17
241:3 246:22
247:4,12,18,21,24
248:2 249:2
253:21 254:4,6
262:5 265:20
266:15 292:18,18
293:3 301:24
302:22 312:2
313:23 315:12,14
320:5 323:7
329:15 330:2,8
331:8 333:1,1
345:21 351:13
356:2 360:12
368:1 381:2
382:18 385:13,17
388:8,10,18 389:3
390:21 391:19
394:1,12,13,13,16
394:17 413:4,14
415:7,18 425:3
427:23 429:18
434:6 435:2
445:18 470:7
487:21 492:8,13

502:2 514:18
533:2,7 562:2
**litigation**
1:7,20 13:4,10
14:22 15:9 16:2
18:4 19:13,23
20:17,22 21:15
29:8,21 34:18,24
68:6,17 72:9
137:19 138:4,15
144:12 146:8
147:16 171:24
204:2,17 228:23
229:3 375:3
390:14 424:1,17
442:16 447:5,14
448:8 486:7,7,18
490:18 493:17
507:17 525:2,18
526:11
**little**
72:16 94:5 150:21
175:21 265:24
267:17 373:12
383:24 441:21
**liver**
294:12 331:5,13,21
467:10
**LLC**
4:11,11
**LLP**
3:2,7,12,16 4:3,7
**local**
287:7 299:24 312:6
312:11,12 314:6
356:17 449:19
505:2
**localized**
327:20
**location**
192:18 452:9
**locations**
459:7,10 460:15
461:23 462:10
**LOCKE**
4:3 337:18

**logic**
119:17
**long**
14:17 64:11 74:7
173:12 182:18
239:8 251:15
322:8 486:13
524:22
**longer**
358:17
**longitudinal**
179:20 182:18
244:5,8
**Longo**
5:19 36:15,18 38:5
48:20 247:7,16,17
248:21 249:8,9,13
249:20 250:1,7,14
250:21 251:8,13
277:3 428:7
446:23 447:3,19
460:23 493:14,19
520:22 521:16
526:14,17
**Longo's**
48:11 73:24 247:7
521:24
**long-term**
11:17 116:21
329:23 438:10
**look**
16:24 41:7 45:5,8
45:15 49:20 50:14
73:15 84:10,15,20
88:24 99:11
103:16 116:11
117:14 126:14,22
160:18,23 161:6
161:17 162:1,11
163:13,23,24
170:18,22 175:8
176:7 188:9,23
190:6 199:13
203:13 204:18
205:10,13,19
206:23 207:17

208:3,11 211:11
212:14 218:9
237:13 263:20
282:3,3 301:14
305:13 310:4,7,8
310:9 316:1,14
335:5,12 343:6,13
343:15 356:14
357:9 363:9
366:12 368:3
372:6 380:2,8
406:11 411:7
413:21 417:12,18
418:19 419:20,23
429:22 435:12
436:3 438:8,15
444:24 446:8,11
446:14,14 449:2
454:17 455:16
456:24 457:4,22
460:17 461:1
464:20 466:19
470:15 472:8
475:6 484:22
494:16 501:22
509:3 510:24
520:16,19 537:3
538:22 548:11
552:6 563:24
566:23 574:18
**looked**
41:14,19 42:17
45:16,17,17 47:3
47:16 52:11 61:21
66:18 84:7,11,13
87:20 88:22
101:19 102:12
114:21 137:3
138:6 139:1,3
169:23 188:6
189:23 190:1
197:6,9,12 213:1
213:4 251:14
252:21 260:15
264:23 266:21
271:5,8 278:10,23

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1490 of 1525
PageID: 63636
Judith Zelikoff, Ph.D.

Page 614

279:9,15 283:16
291:15,16 294:15
297:2,5,7 309:4
309:13 310:3
313:22 314:2,12
332:20 335:21
340:1 357:16
374:11 380:13
381:5,6 384:24
386:20 413:15
415:10 420:15
428:3,7 464:17
465:2 469:5
477:19 478:19
494:23 520:2,4,12
533:19 534:22,24
559:5 561:3 577:7
**looking**
42:23 44:6 59:9
69:3 73:11 161:2
162:3,21 164:23
176:11,13 179:9
183:2 185:1
188:10 202:23
206:9,24 209:13
210:11 211:15,18
216:6 270:8
278:17 279:3
283:20,24 286:2
286:18 287:2,9
305:20 309:19
332:10 360:18
369:24 372:4
373:2,3 375:5
376:22 378:16
380:5 381:10
391:12 396:8,11
404:4 415:7,19
438:9,10 440:1
464:10 469:2
483:10 485:8,10
502:1 525:24
530:12 536:7
537:2,5,16,23
551:6,21 556:14
556:19 557:4,18

558:19 559:9
560:6 568:23
573:23 575:17
576:19
**looks**
268:16 309:16
356:16 485:13
**lost**
545:22
**lot**
290:8,13 304:2
373:11 433:5
**lots**
289:24 575:24
**low**
191:18 192:5
282:21 293:7
429:21 459:5
480:17 481:5
**lowest**
264:16
**ludicrous**
280:1
**lumped**
315:23 324:1
**lunch**
22:17 196:3 386:19
**Lunchroom**
25:14
**lung**
198:18 239:6
258:19 291:10
294:11 299:10,12
308:7 309:6,13
312:13 323:19
402:10,22 467:24
468:1,8,20 512:24
**lungs**
153:15 300:20
301:4,13 302:7,14
303:5,14,16 304:4
304:17 306:4
307:5,14 310:14
344:16 345:3,12
402:2
**Luzenac**

63:23 456:1
**lymph**
11:16 299:4
**lymphatics**
299:5

### M

**M**
2:14 39:18 381:11
**macromolecules**
470:1
**macrophage**
308:10 309:10
310:8 328:18,24
330:12
**macrophages**
103:20 183:19
308:14 310:24
325:16 327:18
329:6,17 356:20
402:10,22
**Mahwah**
1:14,14 13:8
**main**
443:19 514:17
**major**
167:23 327:24
470:20
**majority**
231:4
**making**
155:10 173:20
374:4
**Man**
123:23
**manager**
548:22
**mandate**
126:18,21 127:9,16
127:22,23 128:14
128:24 129:6,9,17
129:22 130:3,4,11
131:4 136:24
199:17
**manifestations**
470:4

**manner**
22:14,19 67:17
145:5 179:20
426:21 480:21
481:10,12 483:22
484:17
**manners**
438:17
**manufactured**
520:24 521:7
**manuscript**
55:5,13,14,22,24
56:2,5,24 57:3
58:1,4,9,11,14,21
58:22 59:2 61:2
117:22 395:3
493:6 539:6
575:10,15 576:3
**manuscripts**
374:10
**March**
229:15
**Marconi**
10:22
**mark**
3:3,17 14:4 16:18
36:19 60:11 62:24
78:13,20 83:12,15
84:22 88:14
106:13 118:4
125:11,17 195:19
207:20 208:9
277:10 318:4
393:3 398:15
405:11 454:8
479:24 482:3
495:16 549:13
567:2
**marked**
12:13 16:20 26:24
27:17 35:15 36:21
40:4,9 43:12,16
50:4 53:7 55:4,8
57:1,7,11 60:7
62:20 65:7,19
75:14 78:16 83:21

85:10,12 88:10
92:21 99:18
102:17 106:9
115:13 117:24
119:18 121:14,19
125:7,12 126:3
175:10 207:19,23
208:6 386:7 393:6
393:10 398:20
405:13 406:14
418:23 430:3,5
454:9 457:6,7
469:7,12 471:16
471:21 480:6
481:14 482:17
500:9,12 507:19
522:20 549:9
562:21 567:3
575:10
**marker**
351:2,13,14 352:20
353:3,14
**markers**
10:8 309:5,20
311:10 359:8,23
360:2,14 361:13
361:23 362:6,12
478:19
**market**
2:14 451:19,20
**marketed**
496:22 498:1,13
540:20
**MARKETING**
1:5
**marking**
35:19 50:8 53:11
93:2 102:22
115:18 175:7
481:18 562:17
563:1
**marks**
80:18,23 96:11,16
96:24 97:2,10,24
101:18 102:11
105:20 113:21

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1491 of 1525
PageID: 63637
Judith Zelikoff, Ph.D.

Page 615

115:1,12 116:4
119:15 578:9
**Marte**
4:16 13:3
**mass**
48:20 292:12
301:19 465:5
**mast**
103:20
**master**
132:7,8
**masters**
166:1
**matched**
52:15
**material**
25:16 27:15,16
77:12 181:24
197:11 224:22
408:14 427:17
453:3 455:11,19
538:11 539:21
**materials**
26:3 31:16 50:16
50:24 51:2,6,12
51:19,23 52:4,19
53:23 54:3,9,10
58:5 59:19,21
64:2 73:17 76:16
93:20 141:24
196:14,19 203:24
213:10,11 374:23
**math**
451:8
**Mattenklott**
11:6
**matter**
13:9 176:22 303:21
364:14 441:2
447:6
**Max**
537:21
**ma'am**
164:15 443:11
448:17 497:20
571:23

**MDL**
18:4 26:19 34:23
40:10 48:11 49:24
250:1 525:18
526:8,20 527:2,5
**mean**
20:24 22:19 29:10
29:14 39:3 46:20
52:21 63:5 64:8
74:24 76:10 79:14
87:2 92:9 127:22
134:23 147:23
157:15 158:12
181:15 183:4,5,6
187:11,12 192:20
195:16 199:23
201:13 204:6
212:21 225:6
234:22 238:7
252:10 255:6
257:17 268:6
341:20 348:18
350:8 351:22
354:15 355:6,8,17
361:19 368:19
369:3 400:21
401:20 413:2,5
416:24 423:1
448:14 475:4
481:11 483:20
484:16 490:7
492:17 561:10
571:22 572:3
**meaning**
235:20 329:16
366:23 549:21
550:19 551:9
**meanings**
235:15,19
**means**
70:7 157:16 192:15
341:21 400:22
456:12,14,21
579:20
**meant**
277:6 369:7 485:14

490:10
**measure**
362:4 363:2 466:19
**measured**
235:23 269:10
270:17 290:3,9
309:2,5,7,14
459:6,22 460:12
460:14,20 465:4
466:21 467:3
474:14 478:13
**measurement**
137:16 176:15
301:10
**measurements**
176:14,14 186:15
456:15 460:9,11
475:15
**measuring**
292:5,11,12 352:17
354:2 517:21
**mechanism**
24:13 119:12
151:10 199:24
200:24 220:1
271:13 306:23,24
307:3 349:1,16,23
350:2,7,22,24
356:9 359:4
361:15 371:5
373:4,5,8 377:3
381:18 382:5
383:1 400:3,15,18
401:5 402:1 403:6
431:18 432:6,11
432:16,22 433:17
433:23 440:18
470:10 473:3
504:1,10,15 505:4
505:17 508:9,17
509:9 512:23
513:2,11 553:4
**mechanisms**
122:16,24 152:2
200:24 236:16
328:3 347:16

364:21 365:3
371:11 382:16
383:8 401:22
402:9,21 514:19
544:1 545:8 546:8
**media**
25:6,17 152:14
254:21 450:4
532:7,21
**median**
243:2 428:9
**mediated**
300:6
**mediator**
216:11
**mediators**
296:13 301:23
359:9 363:3
**medical**
68:4,15 112:12
113:2,10,16 141:4
141:7,11 146:22
147:8 150:6
152:19 153:3
154:7 156:18,20
156:21 157:3,7,10
157:19 158:16
177:1,3,4,17
227:19 246:22
247:3,12,18,20,20
247:24 248:1
313:23 347:12
355:10,19 385:13
385:17 401:14
415:18 492:7
514:3 533:2
**medicine**
14:12,15 22:16
30:4 149:22
167:19 223:6
**meet**
28:6 468:19
**meetings**
555:18
**meets**
99:20 467:7

**Melville**
2:19
**member**
435:23 444:6 555:9
555:11,12
**membership**
444:2,9
**membrane**
420:6,7,12,18,19
420:21 421:2,8,13
421:15
**memorandum**
202:12 203:5
**memory**
161:11 188:9 191:5
194:2 419:1 531:3
**men**
284:20
**menarche**
31:10
**menopause**
31:11
**menthol**
166:12
**mention**
272:18
**mentioned**
29:11 33:7 166:18
196:13 305:4
325:15 328:10,14
389:22 395:13
436:9
**mentioning**
398:14
**mentions**
393:4
**Merritt**
10:7 469:14,15
470:16 471:11
473:20
**Mesothelial**
11:11
**met**
19:24 28:9 554:15
554:16
**Meta**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1492 of 1525
PageID: 63638
Judith Zelikoff, Ph.D.

Page 616

207:2
**metal**
224:4 282:16 288:5
290:15 303:24
316:12,13,13
322:6 466:22
492:2
**metals**
9:20 166:11 268:8
268:13 270:17,22
271:20 272:17
274:6 278:6,7,18
278:24 279:4,10
279:16 280:3,12
280:15,19 281:5,6
281:11,18 282:5
282:11,14,15,20
282:24 283:21
284:4,12 285:3,4
285:14,24 288:1
289:1,6,8,14
290:13,16,18,20
290:21,23 291:20
292:3,13,22
293:14,18,19,22
294:16 295:13,19
296:5,23 315:20
315:23,24 316:1
316:15 320:8
322:7,9,10,14
323:23 418:21
457:11 491:17
492:9 517:4 534:7
534:24 535:19
556:20 557:1
559:13
**meta-analyses**
232:10 415:11,14
**meta-analysis**
6:15 60:14 205:15
206:4,10 207:3
231:19,24 232:15
358:14 477:22
478:2
**meter**
459:8,24 460:16

**method**
286:16 380:20
410:16
**methodologies**
252:4,22
**methodology**
67:8,22 112:1,4
126:19 128:14
129:1,7,17 130:3
133:3,23 134:17
135:13 136:24
137:18 138:3,13
140:16,19 143:10
199:19 214:1
223:19 224:10
238:4,8,16 306:2
413:12 434:11
445:8 501:20
**methods**
380:20 413:16
**Mhegarty@shb.c...**
3:5
**mice**
264:11,22,22
465:10
**Michael**
5:22 35:9 39:8,18
40:10 422:5,13
528:9
**Michelle**
1:15 579:12
**micrometers**
242:22 467:19
468:2
**micron**
242:23 429:7,14
**microns**
239:2 242:21,22
428:12,13
**micronutrient**
316:2,5
**microphone**
39:12 208:18 251:1
495:20
**microphones**
196:1

**microscopy**
252:2 253:5
**microspheres**
197:14
**middle**
231:2 244:24
473:22,23 480:24
496:12 520:21
549:19
**midway**
512:6
**migrate**
240:5,6 298:15
340:20 341:4,11
356:19,20 434:20
499:7 506:24
**migrated**
198:17
**migrates**
371:8
**migration**
197:10 240:4
414:15 430:18
431:11 432:4
433:14,18 434:4,6
435:7 505:15
**millers**
438:3
**milligrams**
264:8,16
**milliliter**
461:18
**million**
288:2 462:1
**mind**
42:21 159:23 284:7
302:23 347:5
372:20 380:14
391:14 414:7
497:15 498:24
502:20 520:18
536:6 537:20
544:6
**mine**
43:8 86:4 100:5
277:8 284:23

380:19 459:12
**mined**
187:20 269:22,22
**mineral**
182:19 408:12,21
**mineralogist**
186:4,6
**minerals**
108:15 180:16
243:24 406:22
407:12 455:24
490:22
**miners**
438:3
**minimal**
264:9,10 421:5
**minimum**
255:3
**mining**
123:16 257:21
419:9,12
**minor**
166:9
**minus**
61:17
**minute**
383:14 417:6 421:9
556:7
**minutes**
195:21 277:12
482:14
**miscited**
407:21
**mission**
73:3 256:17
**misspoke**
277:4
**misstates**
115:6 300:23 557:8
563:7
**mistreat**
318:18
**mistreating**
318:21 319:2
**MITCHELL**
2:8

**mixtures**
491:4
**MIZGALA**
4:8
**Mm-hmm**
40:12 75:22 181:21
**Mm-hmm-hmm**
205:10 447:1 458:8
468:21 471:23
552:9 563:5 569:1
**MO**
3:4
**mode**
502:11
**model**
305:12 368:6
**models**
138:8 233:5 335:15
346:17 372:9,14
542:15,16
**modified**
310:21
**molecular**
6:8 186:2,3 474:10
544:2 545:9 546:9
**molecule**
369:6 441:5 465:22
**moment**
32:23 35:7 39:15
94:3 102:3 122:8
163:4 206:23
443:19 537:9,13
539:14 570:8
**money**
229:2,12
**monitor**
360:2
**monitored**
360:7
**monograph**
8:21 9:21 435:6
457:5
**Montgomery**
2:4
**month**
20:19 522:13

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1493 of 1525
PageID: 63639
Judith Zelikoff, Ph.D.

Page 617

Mori
481:2
morning
14:2,3 42:3,9 43:4
   43:18 55:4 57:13
   64:5 65:1 73:21
morph
331:23 332:1
morphology
244:20 268:15
   305:24 324:17
morphs
514:3
Morristown
3:18
Mossman's
269:1
motion
339:18
mount
3:17 325:12,24
mouse
334:18
move
336:18 426:20
movement
198:19
moving
316:11 337:23
MSDS
45:9
MSDSes
45:2,5
msilver@coughli...
3:19
mucin
350:13
mucociliary
467:22 468:6
mucous
191:19
MUC-1
350:5,8,12,18
   351:4,9,14,20
   352:4,9,17,19,21
   352:23 353:1

multifactorial
129:14
multiple
83:9 101:14 106:6
   106:6 142:5
   285:18 302:17
   325:2 327:6 369:1
murdering
117:3
mutagenesis
237:12,20
mutagenic
236:6,8,10 551:9
   552:2
mutagenicity
237:16 551:22,23
mutate
236:11,22 237:7
   551:10
mutation
87:1 236:10,14,15
   236:16,16 237:3,4
mutations
86:8,15 94:18,24
   95:1 365:14
   478:12
_____
N
N
5:2
NAD
456:8,10,12,21
Nahoum
116:10
name
13:2 14:4,7 19:15
   19:18 28:18 33:15
   83:19 117:3 155:6
   173:9 191:5 197:3
   197:3 218:14
   219:8,14 220:11
   222:19,20 231:21
   335:4 442:14
   507:16 530:23
   572:6
names

44:8 132:4 232:12
   236:3 514:4
nanometers
428:14
nanoparticle
224:4 466:21
nanoparticles
303:23,24 304:9,15
   309:4 429:6,10,16
   429:16,20
NAPOLI
2:18
national
15:20 77:24 149:21
   149:23 154:14
   197:23 215:8,16
   215:17 220:2,3
   223:4 264:6
   392:23 443:17
   444:2,3 512:13
nationwide
555:10
natural
308:11,16 325:18
nature
112:21 228:7
   244:17,20 246:20
   467:23
NCI
8:8 393:1,4 394:3
   394:21 395:8,23
   397:1
NCI's
394:18
near
508:4
necessarily
76:3,5 77:10,18
   298:11 357:2
   569:6,7
necessary
72:5 135:13 201:3
   201:18 241:17
   255:4 263:15
   265:7 266:11,19
   282:11 292:22

298:8 580:4
necrosis
298:19 360:6
need
32:24 35:12 85:14
   103:16 122:9
   161:6 187:12,13
   209:16,22 222:14
   232:11 237:5,5,10
   237:11 267:17
   293:3 321:12
   335:12 337:21
   344:1 369:17
   371:4 380:2
   454:23 483:7
   523:11 537:8
needed
253:24 271:16
   276:13 284:24
   358:16 445:22
needs
74:21 214:8,9
   237:19 358:12
   537:12
Neel
342:2,4 513:16,19
   514:15 552:22
   553:16 554:3
   555:16
Neel's
513:22 514:24
   553:5 555:4
negative
232:3,18 305:13
negatively
326:1
neighbors
173:22
neither
58:3 398:5 466:6
neoplasm
234:16
neoplasms
233:13 234:17
neoplastic
470:2 479:12,16

567:12,16,23
   568:19 569:5,7
   574:6,16,22 577:5
   577:23
neutrophil
308:11 325:16
neutrophilic
357:18
neutrophils
103:21 308:14
   309:7 310:8 311:1
   356:18
never
50:2 88:22 112:16
   113:10 150:16
   153:19 159:7,17
   163:17,20 164:8
   165:8,13 177:18
   332:18,20 448:12
   448:15 556:3
   563:8
new
1:2,15 2:19 3:8,8
   3:18 13:8 14:11
   14:14 15:7 29:20
   29:24 32:4 69:4
   80:6 173:7 227:22
   228:18 259:23
   260:13,24 290:2
   342:2 482:16
   487:2
Newton
502:21
Nick
132:6
nickel
77:22,22 122:12
   123:15,23 124:2
   124:11 159:1,1
   272:20 279:20
   280:21 282:18
   283:3 286:1
   287:16 288:10
   289:8,21 290:1,7
   290:16 291:18
   293:6 297:17

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1494 of 1525
PageID: 63640
Judith Zelikoff, Ph.D.

Page 618

314:16 315:6,16
316:2,16 319:24
515:21,23 516:15
516:16,20 517:19
517:22 518:3
536:1,5,9,11,12
536:13,14,15,17
536:20,22,24
556:16 557:5,19
558:4,5,21 559:6
559:10 560:6
561:3,16,23
**nickel-induced**
122:17,24
**nicotine**
224:3
**NIEHS**
15:20 443:16
**NIH**
8:18 9:7 15:22
**nine**
60:20 461:15
**NIOSH**
512:14 548:23
**nitrogen**
364:11,16,23
365:14 366:7
**node**
299:5
**Nodes**
11:16
**nondetectable**
269:15
**nonfibrous**
189:15 269:3
480:17 481:5
**non-asbestiform**
178:22 180:3
269:11
**non-fibrous**
515:18 516:15,21
**non-peer-reviewed**
446:1
**normal**
324:23 328:19
364:1 365:19,20

402:1,4 462:12,12
**Notary**
1:17 579:14 582:23
**note**
573:1
**notebooks**
54:6,10 108:21
480:3
**noted**
13:14 17:7 521:17
572:24 580:11
582:11
**notes**
463:20 544:17
583:1
**notice**
1:14 6:6 50:10
451:11
**notion**
129:2,12
**November**
26:19 40:19,20,23
47:2,11 48:12,22
69:19 70:1 83:17
86:1,2 229:8,13
249:20 388:3
389:13 395:15
500:20 521:18,24
**NSAID**
472:19 473:16
**NSAIDs**
469:3 470:7,11
472:17 473:7
474:1
**NTP**
197:24 220:23
221:1 264:6
402:11 435:15,22
436:7,21 437:1,10
437:24
**nuances**
399:17
**nucleotide**
379:24 380:6,22
381:8,14 382:18
383:6

**number**
16:18 17:1 27:1,3
36:6 37:23 40:9
43:17,19,20 44:2
44:4 45:3,10
46:16 48:13 50:9
53:12,14 55:5
57:12 60:12,18,24
61:1 63:1,4 64:13
65:13,18 75:18
78:21 79:15,15,16
93:8 95:23 101:21
102:13,22 104:5,9
106:14 107:16
117:15 125:21
126:15 141:22
142:15,24 174:21
187:15 207:23
255:3 266:10
332:11,12 343:19
344:4 359:23
392:1 393:3
394:14 429:5
430:4 433:22
436:15 444:22
464:10 471:21
476:21,23,24
477:7 485:5,5,9
489:10 497:1
498:10 509:24
513:4 517:20
542:18 560:24
562:18 563:2
564:13 567:24
568:2,9
**numbered**
6:20 93:15
**numbers**
66:4,5,13 286:18
309:10 575:24
**Numeral**
207:3
**numerical**
137:11,15 503:20
**numerous**
95:11 117:7 120:23

120:24 122:19
135:9 202:11
203:4 214:10
218:7 229:24
235:23 252:13
366:10,11 433:21
444:7 492:1 561:2
**NW**
4:4
**NY**
69:16 81:17,21
342:2
**NYU**
6:21 14:12 30:3,8
78:22 79:2 81:11
81:19 82:16 100:3
513:16,17 514:2,3

**O**

**oath**
13:16
**obesity**
301:15,15,17
**object**
32:24 47:12,23
49:17 52:6,24
68:7,18 70:4,20
71:10,22 82:19
85:13 87:13 89:19
90:17 91:20 92:6
96:21 100:12
102:3 103:11,12
105:11 106:1
107:7,9 108:1,10
108:24,24 109:13
110:3 113:22
114:14 115:5
116:6 122:6
126:10 134:3,20
135:17 137:21
138:17 139:7,23
140:10 143:13
144:14 145:2,16
146:6,24 147:14
152:9 153:6
154:10 155:21

157:23 159:19
166:21 170:12
172:4 173:16
175:18 178:18
179:3 180:13
181:12,19 184:3
185:5 188:3,19
189:6,21 190:23
191:12 192:11
193:3 200:14
206:19 212:11
214:2 232:23
233:3,20 238:12
255:20,23 257:4
258:13 262:9
263:17 266:13
267:3 269:6
271:22 274:8
281:7 282:6 283:5
286:10 287:20
293:20 294:18
296:19 300:22
305:6 306:7,15
313:10 314:20
324:12 329:13
330:4 334:12
340:5,21 341:14
342:13 346:3
348:20 351:11
352:12 353:10
363:19 365:16
367:8 368:22
369:19 370:13
372:17 378:11,22
392:16 395:9
396:18 399:10
402:23 416:21
417:15 418:14
423:3 424:2
428:21 434:16
438:12 446:5
465:15 473:5
476:6 477:15
478:8 479:9
524:14 526:13
527:20 533:15

Judith Zelikoff, Ph.D.

540:4 552:12
566:20 567:18
569:21
**objection**
26:5 32:20 38:15
46:1,17 56:8 67:2
78:8 83:2 91:4
93:21,24 94:14
96:12 97:12 98:5
98:19 99:22
100:23 101:8
112:14 117:19
120:3 147:9
148:19 162:24
168:12 184:17
187:4 195:1 209:2
209:10 217:16,17
218:19 219:1,9
220:14 224:18
225:3 227:6,24
231:16 234:7
239:18,23 240:15
241:19 242:13
243:7 244:14
245:5 246:9
248:23 249:15
259:7 260:6
262:22 268:9
270:4,24 284:13
285:15 289:16
291:6 292:24
293:21 295:24
299:15 304:19
307:7 310:15
311:19 312:21
315:8 321:6 322:1
323:3,15 335:24
337:5 355:14
360:16 361:6
362:14,23 364:24
376:17 377:20
378:17 379:14
380:24 382:9
387:21 390:15
392:3 400:8 403:9
405:23 408:22

409:15 412:16
413:9 415:23
424:18 426:8
439:18 440:11
447:16 449:23
451:21 453:15,18
458:4 460:6 462:3
474:16 479:1
486:10 487:7
488:10,19 489:2
489:16 490:8,24
491:12,19 493:8
494:8,10 498:3
500:2 501:16
503:7 504:2,17
505:8 506:3,20
510:11 511:17
514:12 515:24
517:6 519:8
528:15,19 529:15
531:9,17 534:18
535:16 538:18
541:15 545:14
547:8,16 548:8
550:3,14 553:13
557:7 559:16,21
560:9 562:12
563:6 564:11
565:1,11 573:7
**objections**
50:19
**objects**
126:5
**observable**
264:3
**observation**
151:14,17
**observations**
223:24 224:7
**observed**
517:15 572:23
**Obstetrics**
563:22
**obviously**
339:17 479:14
**OB/GYN**

191:15 193:9
353:24 360:9
361:10 362:18
554:10 555:19
**OB/GYNs**
167:24
**occasion**
149:12
**occasions**
339:7
**occupational**
120:20 123:15
512:13
**occur**
236:17,18 327:21
363:17 365:15
402:6,18 403:3,7
473:4 474:14
475:5
**occurred**
291:5
**occurring**
357:1 373:20 478:6
**occurs**
123:16 237:9
260:16 327:16
331:20 475:4
**odds**
564:16
**offer**
26:3 72:9,18,22,24
150:10 151:3,7
**offered**
150:18 163:17
**offspring**
176:24
**oftentimes**
118:16 164:2 324:1
377:1
**oh**
84:17 142:17 251:2
386:9 436:19
472:3 495:21
524:18 538:8
542:21 545:21
570:1 572:3

okay
40:18 42:18 49:8
56:13 58:24 60:23
61:3 65:17 74:5
84:17 91:9 98:18
100:21 101:2,12
113:9 114:20
121:18 122:22
130:22 146:10
161:12 162:13
178:23 181:9
195:22 205:15
207:13 208:19
209:19 210:18
218:1 220:8,24
231:1 250:5 259:3
267:10,18,23
277:13 291:17
304:14 315:21
317:4 319:6,13
332:12 347:6
348:2 349:8 353:5
368:10 378:3
380:11 382:22
384:21 386:24
397:7 402:16
404:6 426:2 427:6
427:13 430:20
436:5 441:23
442:19 443:4
444:8,24 447:2
451:6 453:9 454:6
454:17 457:18,22
458:24 459:18
460:2 482:4 484:9
485:15 495:2
498:17 505:21
506:11 508:16
509:23 520:2
522:15 523:7
524:22 526:4
530:15 536:20
540:23 542:17,21
542:24 543:16
569:24 570:14
571:10,13 573:18

576:9,13 577:14
**once**
371:6,6 468:9
**oncologist**
177:9,11 354:1
554:23 556:2,6
**oncology**
177:13,15 554:10
555:22
**ones**
54:21 140:9 171:7
220:21 223:1
272:19 502:16,20
573:22
**one's**
79:8,20 80:11
82:15 87:1
**one-on-one**
167:5
**open**
37:21 82:6 370:6
**openings**
333:23
**opining**
434:24
**opinion**
23:2 25:19 30:6
31:14 54:16 57:6
71:1 72:2,13,24
74:2,3 76:20
80:12,13 90:11
92:12 101:10
112:6 113:7 114:1
115:10 118:15
138:9,22 139:10
150:3,18 152:22
156:15 165:18
172:13 183:22
189:11 193:15
194:9,23 195:7,9
198:9 199:2,3
200:9 201:21
214:6 215:12
219:15 220:12
228:4 234:4 236:5
241:18 243:20

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1496 of 1525
PageID: 63642
Judith Zelikoff, Ph.D.

Page 620

246:15 248:20
249:4 253:17
255:12,16,18
256:23 257:6
258:10 259:4
266:6,7 267:6,10
268:4 269:4,18
271:10 272:7,10
276:14 278:12,16
281:21,22 298:5,9
302:2,6 306:22
309:22 311:16
315:5 319:24
320:3,6,7,11,15
320:24 321:1,2,21
330:7 349:15
350:19,21 355:20
356:4,14 374:5
380:21 381:13,20
382:4,12,23 383:5
383:6,10 391:2
395:13,19 396:6
396:21,22,23
419:9 422:24
424:14 432:10
434:1,7,8 440:8
440:23 441:11
447:23 465:12
466:23 469:2
486:8,13,17,19,22
488:13,16 500:5
501:10,12 503:11
505:7,13 510:15
513:10 519:24,24
530:4,6,7 542:11
547:20,22 551:18
560:18
**opinions**
22:23 25:15,22
26:3,17 29:24
30:4 34:6,8 56:6
62:10,12,13 69:2
71:21 72:8,18,21
73:19 135:14
138:13 140:21
146:21 147:7

148:9,12 149:5
150:10 151:3
163:18 165:9,14
176:2 189:2,9,20
198:6 212:5 226:6
226:10 227:21,22
228:8,14,18
230:16,18,19
238:5 249:12
266:20 278:2,8
373:24 374:7
391:23 392:13,22
394:23 395:6,8,24
396:1,3,17 398:7
399:3,7 422:3
445:5 499:23
501:7,15,19 502:3
505:24 506:18
509:17,20 517:18
540:11 547:14
548:2,4 576:5
**opportunity**
424:6,10 448:11,19
449:1 579:9
**oppose**
126:11 339:17
**opposed**
111:8 239:3 453:14
**order**
51:13 55:1 98:23
118:21 126:2
145:23 146:4,8,11
146:16 212:19,19
237:20 420:7
**organ**
33:17 165:23 288:6
298:22 301:12
312:6,12 330:14
331:10,11 355:5
371:18
**organism**
329:5,7
**organization**
152:20 153:4 154:8
216:19 217:10
218:2,14 222:19

**organizations**
46:6
**organize**
463:19
**organs**
300:16 311:8 513:3
**origin**
192:9,14,18 193:1
**original**
135:4 432:7 580:15
**OSHA**
120:1,8
**outcome**
31:8 104:22,24
   151:11 183:1,16
   183:23 446:3
**outcomes**
184:12
**outdoor**
173:3 459:4,7
   460:15
**outline**
133:20
**outlined**
506:17
**outside**
16:10 34:5,10
**ovarian**
6:11,16 8:6 9:16
   21:22 22:12,24
   24:24 25:4,12
   29:12 31:4,7,24
   32:5,10 60:15
   62:17 73:2,7,12
   126:24 127:13
   128:6,9,18 130:8
   130:12,18 131:1,9
   141:13 148:14
   149:7 150:16
   152:8,13,21 153:5
   153:21 154:9
   155:2,8 156:17,24
   157:5,13,22
   163:21 164:9,20
   165:4,9,15 167:13
   167:20,23 169:6

171:2,19,20 172:3
177:23 178:4
191:8 192:10
193:13,17 194:10
194:15,17,21
196:23 201:9
205:9 206:1,13,17
207:9 208:15
209:1,8 210:2
216:3,16,22
217:14 218:18
221:5 222:9,22
226:21 227:5,10
230:7 231:7,14
232:22 233:17
234:5 239:17
240:13 250:11
254:5,7,13 255:5
255:13,22 256:15
257:2,11 258:6,9
258:12 259:5
260:5,15,15,20
263:16 264:20,21
265:2,8 267:2
278:14 279:7
280:5 281:5,10,17
282:4,12,18 283:4
283:13,16,21
284:7,11,17
285:14,23 290:19
292:23 294:16
296:17 297:6,6,12
297:17,21 298:1,2
302:8,16 303:7
306:5,12 307:1
311:17 349:11,14
349:17 350:2
351:1,10,16,20
352:7,10,18,24
353:4,9,16,20,21
354:4 355:12
356:7,8,9 359:12
359:17 360:3,14
360:15 361:1,5
362:1,4,10,13
363:11 375:24

376:3,6,10,15
381:15,20 382:2,7
383:2 385:14
397:11,15 398:9
400:4,20 401:7
415:8,15,19 431:3
431:19 432:5,12
432:17 433:24
438:18 444:14,19
469:4 470:8,21
472:6,16 473:4,17
474:1 475:17
476:5 478:20
479:21 499:5
500:1 504:11,16
505:19 507:1
508:11,19 509:11
511:11,16 513:13
514:11 518:5
520:6,10,14 532:7
532:12 533:3,7
543:2,12 544:3
545:10 546:10
552:22 558:3,11
558:20 559:12
560:7 561:8,24
570:20 571:3
575:6
**ovaries**
293:15 299:8,14
   300:21 302:8,15
   303:6 304:18,24
   313:24 314:3,19
   315:7 320:2,14
   321:5,24 322:20
   323:2,13 332:21
   340:3,20 341:12
   346:1,14 358:8
   370:12 403:8,14
   435:8 464:19,21
   464:23 465:8
   468:15,23 499:16
   507:4 574:23
**ovary**
192:20 271:16
   287:17 288:11,20

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1497 of 1525
PageID: 63643
Judith Zelikoff, Ph.D.

Page 621

288:23 291:5,12
291:21 294:7,10
298:10 299:4,6
308:6 312:8 313:9
314:14 315:17
324:11 345:22
346:22 354:10
356:14 403:18
467:6,9 517:23
518:4,20
**overall**
541:21
**overload**
402:10,22 403:7,13
**overview**
409:8
**overwhelm**
402:8,20
**overwhelmed**
365:8 366:16 367:4
367:17
**oxidant**
297:9 324:20
371:20
**Oxidants**
363:11
**oxidase**
476:1
**oxidation**
367:19 475:9
**oxidative**
297:2 307:22
369:15 375:20
421:20 470:13
471:7 486:20,23
487:5 504:19,21
**oxide**
110:23 307:17
**oxidized**
420:22 421:16
**oxygen**
103:24 119:14
256:13 257:8
297:10 300:11
308:12,15 309:12
363:24 364:6,15

364:22 365:6,13
366:2,6 367:18
469:24 475:10
504:14
**O'Dell**
2:3 5:7 20:23 23:11
26:5,11 28:9,20
28:24 32:20 38:15
38:20 41:12 46:1
46:17 47:12,23
49:17 50:18 52:6
52:24 53:20 56:8
56:11,14 60:19,23
61:3 67:2,19 68:7
68:18 70:4,20
71:10,22 74:11,18
75:1 78:8 82:19
83:2 84:22 85:5
85:13 87:13 89:19
90:17 91:4,20
92:6 93:3,21,24
94:14 96:12,21
97:12 98:5,19
99:22 100:12,23
101:8,22 102:2,23
103:11 105:11
106:1,23 107:3,7
108:1,10,24
109:13 110:3,7
112:14 113:22
114:14 115:5
116:6 117:19
120:3 122:1,6,8
125:20 126:4
127:18 134:3,20
135:17 137:21
138:17 139:7,23
140:10 142:12
143:13 144:14
145:2,16 146:6,12
146:24 147:9,14
147:19 148:19
152:9 153:6
154:10 155:21
157:23 159:19
161:5,16 162:24

166:21 168:12
170:12 172:4
173:16 175:18
178:18 179:3
180:13 181:12,19
184:3,17 185:5
187:4 188:3,18
189:6,21 190:23
191:12 192:11
193:3 195:1,4,10
195:13,15,19
200:14 206:19
208:1 209:2,10
210:4,8 212:11
214:2 217:16
218:19,24 219:9
220:14,20,23
221:7,13,24
222:24 224:18
225:3,14,18,22
227:6,24 230:9
231:16 232:23
233:2,20 234:7
235:8 238:12
239:18,23 240:15
241:19 242:13
243:7 244:14
245:5 246:9
248:23 249:15
251:7 255:20,23
257:4 258:13
259:7 260:6 262:9
262:22 263:17
266:13 267:3,12
267:18,23 268:9
269:6 270:4,24
271:22 274:8,13
274:17 277:10,14
281:7 282:6 283:5
284:13 285:15
286:10 287:9,20
289:16 291:6
292:24 293:20
294:18 295:24
296:19 299:15,19
300:22 302:23

304:19 305:6
306:7,15,19 307:7
310:15 311:19
312:21 313:10
314:20 315:8
316:21 317:1,9,15
317:20,24 318:7
318:12,16,22
319:1,6,13 321:6
322:1 323:3,15
324:12 329:13
330:4 334:12
335:11,24 336:4
337:4,11,15 338:3
339:16 340:5,21
341:14 342:13
346:3 348:20
351:11 352:12,15
353:10 355:14
360:16 361:6
362:14,23 363:19
364:24 365:16
367:8 368:22
369:19 370:13
372:17 375:24
376:17 377:20
378:11,17,22
379:14 380:24
382:9 386:12,17
387:5,21 390:15
392:3,16 395:9
396:18 399:10
400:8 402:23
403:9 405:23
408:22 409:15
412:16 413:9
415:23 416:21
417:15 418:14,22
423:3 424:2,18
426:8 428:21
434:16 436:11
438:12 439:6,12
439:18 440:11
446:5 447:16
449:23 451:21
453:15,17 458:4

460:6 462:3 463:2
463:8 465:15
473:5 474:16
476:6 477:15
478:8 479:1,9
481:23 482:2,7,17
483:16 484:5,11
485:17 486:3,15
487:11 488:14,21
489:6,22 490:20
491:7,15,22
493:13 494:13
495:14,21 496:2
498:16 500:6
501:21 503:12
504:6,23 505:11
506:6 507:7
510:13 511:20
514:14 516:4
517:16 519:10
523:7 524:1,14
526:13 527:6,20
528:15,19,23
529:15 531:9,17
533:15 534:18
535:16 537:8
538:18 540:4,12
541:15 543:4
544:5,10,19
545:14 547:8,16
548:8 550:3,14
552:12 553:13
556:7 557:7,10
559:16,21 560:9
562:12 563:6,12
564:11 565:1,11
566:20 567:18
569:21 570:7,14
571:13,17 573:10
576:9,13 577:15
578:6

**P**
**P**
2:3
**PA**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1498 of 1525
PageID: 63644
Judith Zelikoff, Ph.D.

Page 622

2:8,15
page
5:14 6:5 7:5 8:5 9:5
  10:5 11:5 12:6,9
  12:12,14 35:22,24
  36:2,4 38:8,10,10
  38:22 39:4,4
  40:23 41:6,8,10
  41:15 48:13,16,19
  49:10,12 51:19,21
  52:16 64:12 79:4
  79:13 84:16,20,21
  88:16 89:6,8,8,9
  91:11 116:8
  126:17 127:4,5
  128:24,24 199:13
  202:9,18 203:1,2
  207:2 208:21
  213:9 230:3,9,12
  230:14 233:5
  237:21 243:15
  248:4 250:3,7,7
  253:12,14 278:18
  313:4,5 332:4,13
  333:5 335:15
  336:8,13,13
  343:23 344:1,2,3
  344:3 347:6
  359:19,20 363:9
  363:13 368:10
  379:7,19 396:6
  398:24 399:22
  403:20,22 408:6,9
  409:24 411:7
  417:8 419:23
  421:22,23 425:20
  427:9 429:22
  430:16 431:15
  433:9,16 436:3,11
  436:13 437:8,20
  445:1,4 446:14
  449:2,6 450:14,16
  452:4,11 454:17
  454:18 455:16,19
  457:15,19,23
  460:12 461:2

469:19 470:16
472:1 473:23,24
474:5 476:17,18
477:10 480:10,14
484:24 485:8
487:15 496:6,12
497:15 498:19
501:22 505:21
506:12,13,18
507:23,24 509:4
511:21 512:5
520:18,20 524:3
527:22 528:1
538:2,9 539:18
540:17 541:4
543:4,6,17,18
544:23,24 545:3,4
545:5,6,22,23
549:16,16,17,19
552:6 564:1 567:8
570:3,4 572:9,18
573:20 574:11
575:15,20 577:2
581:4 583:2
pages
41:4 48:23 49:2,5,7
  99:8 266:17 359:6
  396:13 425:20,24
  450:6,19,23
  457:17 502:13
  538:1 582:6
paid
17:20,22 26:2
  132:12 446:1
  447:3 448:7
paints
181:5
panels
15:13
Paoletti
451:4,6
PAPANTONIO
2:8
paper
25:7 52:9 63:21
  74:1 99:7 103:15

104:18,23 111:4
116:15 118:10,24
119:6 122:11,12
122:23 123:13
124:7 136:8 142:5
151:12 158:4
201:17 204:23
205:7,14 209:17
209:21,23 210:9
210:11,13,15
216:1 218:16
223:22 231:13
249:3 287:12
340:16,19 341:1,5
361:18 377:23
378:2 379:24
381:5 405:9,12,18
406:3,4,12,13,14
407:17 414:12
435:11 447:12
448:6,16 450:2
452:6,20 456:20
470:16 471:8,22
471:24 472:9
473:15 481:13,19
484:24 494:16
507:11,18 509:1
515:3,5 537:20
538:22 566:12,16
567:7 569:10,20
573:13 576:20
papers
51:12,14 66:11
  69:9,10 83:7
  112:19 133:11
  137:5 140:20
  151:6 160:18
  204:4 250:12,13
  250:14 378:5
  381:4 408:2
  473:11,19 531:20
  531:24 533:18,24
  534:11,13 537:1
paragraph
128:12,13,23 129:3
  129:5,12,16,22

130:2 131:14
137:1 199:22
202:24 230:5,15
230:17 245:1
332:8 333:6,7,9
334:8,24 335:9,19
336:10 337:7
338:11 401:4
404:1,3,14,15,16
404:20 408:9
410:2 411:8,14
420:2 421:11
429:24 430:11,13
430:15,22,24
431:9,14 445:4
446:18 449:12
452:11,14 454:19
458:19,20 459:19
460:18 461:7
469:20,21 470:5
472:3 473:23,23
474:9 476:19,22
481:1 496:11
497:17 498:20
499:2 508:15
520:20,21 538:10
538:14 544:23
545:7,23,24
paragraphs
129:9 540:16
parameter
239:12
parameters
242:3 311:5
paraphrased
81:2
parent
94:19
parents
95:2
part
15:9 31:8 33:24
  43:21 44:19 66:16
  133:3,22 137:17
  138:2,12 168:10
  174:6,7 202:10

203:10 207:15
213:24 238:4,7
241:8,12,13
326:19,19 327:12
336:22 344:22
350:16 384:16
401:24 402:4
407:23 420:11
427:11 489:24
504:14 505:16
524:10,11 575:19
576:3
participate
394:11
particle
237:18,19,24 238:3
238:10 239:1,4,7
239:15,21 240:11
240:12,21 241:5
241:11,17,24
242:7,8,11,20
243:6 259:1 293:4
298:13,24 299:9
299:13,23 305:22
306:3 307:4,12
314:5,24 315:6,15
319:24 320:11
321:3,22 322:17
322:22 323:11,23
324:8,16,16,17
325:10,24 326:2
327:19 328:22
332:5 334:9,24
402:3,10,22 403:7
403:13 427:17
428:10,19 429:12
429:12,13 440:9
440:22 441:13
465:2 466:20
467:5,9
particles
185:17,18 186:14
198:15 238:24
240:14,17,20,23
254:9 266:11
286:24 293:4

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1499 of 1525
PageID: 63645
Judith Zelikoff, Ph.D.

Page 623

286:24 293:4
299:3 301:4
303:22 304:3,10
304:12,15,16
305:3,4,9,9,12,15
305:19 307:15,16
307:17,24 324:1
324:24 335:22,23
346:22 402:2,8,20
426:4,6,12,14,16
426:20,24 427:16
427:22,24 428:8
428:17,24 429:8
434:7,20 464:11
464:18,19 468:11
468:17,18 491:6
506:23
**particle's**
339:22
**particular**
104:19 163:3
183:16 189:3,10
191:4 197:2 201:7
237:1 244:8
255:10 259:14
275:8 280:15,19
281:10 282:15,16
301:20 303:8
312:5 326:2
330:13,21 331:6
346:10 362:17
365:22 369:22
402:14 424:11
474:4 514:9
520:10 536:23,24
576:20
**particularly**
185:12 283:24
574:23
**particulate**
176:22 303:21
499:14 541:6
**particulates**
303:13,18,20
312:19 499:7
**parties**

**parts**
260:24 288:1
302:17 468:7
**party**
446:2 447:14
**pass**
462:22
**passage**
81:1,5
**passages**
98:4
**passed**
94:18
**pathologies**
311:11
**pathology**
177:15 193:23
**patient**
177:19
**patients**
177:6,8,23
**pattern**
244:8
**pause**
407:24
**pay**
15:13 132:14
**paychecks**
227:17
**PCPC**
4:6
**PDQ**
393:1,1,4 394:19
394:21 395:8,23
397:2
**peer**
97:18 171:5,14,17
210:14,16,18,21
211:2,9,13,16,21
212:4,9,17,22
213:4,8,12,13,16
213:21 215:10
445:20
**peers**
554:22

442:15 463:11
**peer-reviewed**
204:7 207:5 445:17
**pelvic**
10:6 11:15 349:10
349:22 566:1
**pelvis**
507:1
**pen**
404:4
**penalty**
69:20 70:3
**pending**
173:5
**penetrate**
333:24 334:2
**Penninkilampi**
9:17 231:22 398:12
398:16 502:8
507:10,18 509:14
**Pensacola**
2:10
**people**
105:4 111:12
151:14 184:24
251:23 252:5,9,13
269:23 380:4,7
557:15
**people's**
82:24 83:7,7 96:19
109:22
**percent**
248:6,7 449:10,16
**percentage**
99:2,13 188:1,15
310:7 456:5,6
**percentages**
188:22 309:7
**perceptions**
141:3
**perfectly**
338:14
**perforated**
120:21
**performed**
131:15 198:8 253:1
253:7,9 375:8

380:5 472:4 496:9
531:11
**perineal**
6:16 9:15 60:15
127:1,13 128:18
130:9,13,18 131:1
131:9 205:9
206:16 207:8
208:13,23 222:21
279:6,20 286:14
288:20 300:3
332:22 333:14
334:4,10,17 335:2
336:9 345:11
346:15,18 370:22
371:7 372:15
373:9,10 376:16
394:22 396:9,12
397:2,14 400:3,19
425:22 428:1
499:14 505:18
510:3 518:12
520:6 541:6
548:16 570:19
**perineum**
233:8 278:24
279:11,16 287:19
288:13 320:1,13
321:4,23 322:19
323:1,12 324:10
335:23 336:16
340:2 341:11
345:8,16 346:2
357:24 358:6
362:22 370:10
371:24 373:21
379:13 439:5,17
477:14 478:7
499:8 510:14
**period**
215:1,11 251:19
357:9 358:12,13
386:2
**periods**
357:4
**peritoneal**

8:7 499:9
**peritoneum**
233:7 499:8,17
**perjury**
69:21 70:3
**permeability**
420:6,13 421:13,15
**peroxide**
300:12
**persistently**
354:16
**person**
173:19 409:10
439:22 460:3
**personal**
14:21 172:24
201:21 423:16
**personally**
253:11 256:3
276:11,24 376:11
**personnel**
443:8
**person's**
94:20
**perspective**
264:13 553:3,4
**pertinence**
134:13
**pertinent**
135:16,21
**pesticides**
166:9
**Peters**
9:10
**Petition**
9:14
**ph**
1:20
**phagocytose**
309:11
**pharmaceutical**
409:6 451:15
452:14
**pharmacopeia**
451:24
**phenotype**

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1500 of 1525
PageID: 63646
Judith Zelikoff, Ph.D.

Page 624

244:19
**Philadelphia**
2:15
**phone**
21:10 23:7,14
  28:14,16 29:2
**phrase**
121:10 151:21
**phrases**
135:11
**phrasing**
489:13
**physician**
353:23
**physicians**
171:19
**Ph.D**
1:13 5:4,18 13:19
  177:5,16 252:16
  579:8 582:16
**picture**
509:12
**PID**
349:17,18
**piece**
314:24
**Pier**
64:15,18 411:10,15
  411:19 412:5
  494:4,12
**Pier's**
64:7,9 389:24
**pipes**
461:20
**Pisano**
285:11 317:5
  318:24 319:12
  336:21 338:16
  339:3,5
**place**
115:11 395:17
  516:16
**placed**
37:20 54:24
**places**
107:22 258:18

277:5
**placing**
518:11
**plagiarism**
79:5,17 80:16 81:1
  81:4,10 82:12
  88:7 99:21
**plagiarized**
82:23 98:24
**plaintiff**
73:4 126:4 127:17
  171:8 173:15
  211:3,23 274:9
  390:24 393:22
  412:20 533:9
**plaintiffs**
2:21 16:1,11 17:3
  17:10 19:7 20:1
  21:21 23:6 24:11
  26:2 27:19 34:5
  34:10,19,23 35:3
  40:3 49:24 50:20
  53:5 58:10 59:1
  132:10 139:16,19
  140:15 142:1,11
  143:2,20 144:10
  144:22 148:16,22
  149:9 159:6,17
  163:16 170:19
  171:1,23 174:4,8
  211:23 212:8
  213:17 228:22
  254:3,14 273:17
  275:13 276:2
  332:19 339:16
  375:2 385:22
  390:4 393:14
  412:15 447:4,8
  463:11 525:17,19
  526:10 532:11,24
  533:12 540:2
**plaintiff's**
165:2 385:11
**plan**
337:21 338:7
**planned**

463:18
**platy**
267:1,7 268:14,19
  268:20,22 466:1,2
  466:5,6,10,12
  519:14,16,19
**plausibility**
24:14 68:3,14
  69:15 73:6,16
  126:24 128:3,16
  129:3,13 131:5
  135:15 137:7,20
  138:5,16 144:13
  145:1,15 148:14
  149:6,16 150:11
  151:4,18,21 152:3
  152:23 156:16,23
  157:4,12,21 172:2
  189:12,18 190:8
  190:11,20 193:12
  198:19 199:6,23
  200:7,11,17
  201:12,14,20
  202:3,8 205:5,8
  205:20,24 216:2,4
  216:7,15,21,24
  217:13 218:17
  220:13 221:16
  222:7,8,21 223:20
  223:24 224:6,12
  233:12 234:11
  238:11 239:16
  240:2 241:10,18
  243:5 256:11,19
  257:1 266:20
  267:1 270:2,8,21
  271:3 275:4
  276:22 278:3,9,13
  281:20 282:12,14
  284:6 285:1
  290:18 292:17
  298:9 299:21
  302:4,6,10 311:16
  311:24 320:17
  333:17 349:2
  350:6 360:19

368:4 372:7
  373:24 376:23
  377:3,13 381:19
  381:24 383:2
  398:8 400:12,13
  438:19 440:10,23
  441:9 469:1
  470:10 471:6
  475:7,20 499:24
  504:5 506:14,17
  520:5 546:5 568:4
  569:15 571:1
**plausibility/plau...**
221:4
**plausible**
127:11 128:16
  130:7 151:11
  152:2 306:5 313:9
  349:16 350:1,19
  356:9 361:15
  382:6 401:22
  416:19 432:11,16
  499:13 504:10,15
  505:16 512:23
  513:11 541:5
**play**
382:19,24,24
  445:21 470:20
  517:11
**played**
399:6
**players**
325:17
**playing**
328:7 517:12
**plays**
31:13 565:5
**please**
13:15 14:6,7 23:21
  29:18 33:6 38:14
  51:21 60:6 65:14
  68:10 69:23 75:3
  85:23 91:23 102:8
  107:12 130:20
  137:24 142:22
  147:2 159:21

166:24 208:19
  211:10,19 225:23
  234:2,21 235:9
  236:3 250:3 330:9
  332:16 387:1
  390:20 411:2
  421:9 430:13
  433:12 445:1
  446:15 449:5
  499:3 500:15
  510:20 524:6
  527:23 543:5,10
  566:24 573:19
  575:15 578:9
  580:3,8
**pleural**
343:20 344:5
**pleurodesis**
218:10 438:11,22
  439:1,6,8
**PLLC**
2:18
**PLM**
456:5
**Plunkett's**
49:14
**PM**
303:21,22
**pocket**
132:13
**point**
20:12,13,13,15
  21:11 97:22 104:3
  104:5,9 111:20
  118:18 120:7,8
  124:17 166:9
  171:11 198:24
  214:17 215:19
  247:21 338:13
  365:19 371:14
  391:22 430:12
  497:9
**pointed**
43:1,1,3 102:14
  191:14 359:5
  453:8

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1501 of 1525
PageID: 63647
Judith Zelikoff, Ph.D.

Page 625

pointing
120:6 122:16
points
76:2 96:6 116:13
  116:18 118:22
  119:3,5,7 397:23
polarized
252:1 253:4
policy
78:22,23 81:9,14
  81:16,22 82:10,16
  99:18 100:3
pollutants
166:2,10
polluted
290:11
pollution
178:10,12 224:1
polymorphism
381:8
polymorphisms
380:1,6,22 381:14
  382:19 383:7
Polymorphonucl...
325:15
Pooley
248:7,15
population
117:10 159:4
  401:14 458:17
  461:8,12 462:17
populations
416:3 559:24
portion
83:16,18 84:18
  88:15,16 93:9
  103:2 106:14
  115:19 121:20
  128:4 524:5
  540:10,15 550:1
  552:3 576:21
portions
82:23 93:15 95:23
  98:15 100:9
  119:24 123:5
  549:14

position
14:18 62:15 392:23
  513:22
positive
140:22,23 207:7
possession
72:14 521:23
possibility
194:17 237:17
possible
124:9 206:17
  208:14,24 391:18
  400:15 406:18
  407:7,20 495:24
  505:4 518:2
  570:20,24 571:8,9
possibly
156:2,6 286:23
  537:22
post
44:16,21 57:4
post-report
48:2
potent
510:17,23
potential
30:14,16 44:4 90:9
  151:7,8,10,11
  152:2 190:4 256:8
  280:13,14 281:23
  282:1,4,23 283:11
  285:4 288:4 314:7
  320:20 324:18
  342:23 373:5
  385:5 401:5 403:2
  403:2 423:10
  425:10 488:7
  499:6 508:8,17
  528:12 529:24
potentially
322:12 507:15
potentials
281:6
powder
1:5 6:10 10:6 13:9
  21:23 45:21 73:1

90:4 127:14
128:19 130:9,14
130:19 131:2,10
157:12,21 172:3
187:3,20 188:2,14
189:4,14,19
190:12,17,22
196:23 201:7,8
206:12,16 208:14
208:24 209:8
210:2 216:3,21
217:14 221:2
222:9 223:15
240:5 242:12
246:24 247:14
248:3,12,16
265:15 266:1
270:9 271:4 275:8
275:9,16 276:10
276:23 278:2,7,24
279:10 286:9
287:18,23 288:12
292:2 295:23
340:1,9 344:13
345:2 346:22
352:10 363:4
366:14 370:20
377:6 382:2
397:10 403:15,17
410:9,23 418:2,4
418:8,12 423:11
428:11,20 429:11
429:17 438:24
439:1 440:16
441:7 449:8,14
450:22 477:2
487:24 488:5,8
492:22 493:7,16
493:18,24 494:7
494:22 495:7
499:24 513:6,8
514:6 515:6,16,19
517:5 520:23,24
528:14 536:16,21
538:17,24 539:5
549:21 550:18

551:2,9 552:1
559:5 561:19
570:19 575:18,21
575:23
powdering
286:22
powders
9:18 185:11 231:10
  248:8 493:21
  495:12 496:9
  497:24
PowerPoint
31:17
PowerPoints
167:3
PRACTICES
1:6
precaution
542:8,14,16
precautionary
542:2,6,10
prediagnosis
479:20
predilections
468:11
predisposes
87:1
predisposition
116:20
predominant
459:5
predominately
123:16
prefer
409:20
pregnancy
176:23
prejudice
339:12
preparation
27:7,12 44:19 63:5
prepare
28:7 39:21 52:23
  63:3,6 67:24 77:2
  77:3,7 97:17
  133:7,15 149:13

prepared
16:17 42:10 52:18
  52:18,22 53:6,21
  54:14 55:2 63:8
  63:10 66:22 67:7
  67:9,16,17 69:12
  70:15 97:5 98:13
  99:6,9 387:15
  389:12 412:10,15
  419:4 422:2
preparing
26:23 27:9,13,24
  84:5 88:21 95:24
  107:18 133:3
  393:21 394:6
  539:4
preponderance
416:10
presence
11:15 186:8 266:19
  292:3 299:2
  324:24 357:17
  366:1 402:2
  450:21 466:20
  507:3 512:9,17
present
4:14 94:19 95:2
  188:16 275:23
  276:1 353:16
  366:13 418:6,7
presented
493:23
presenting
79:5,18 80:8,14
  82:13
presently
406:23 407:12
president
251:18
press
176:10
pretty
74:7 253:22 394:8
  440:13 442:21
prevalent
31:9

Case 3:16-md-02738-MAS-RLS Document 9886-12 Filed 05/29/19 Page 1502 of 1525
PageID: 63648
Judith Zelikoff, Ph.D.

Page 626

**Prevention**
8:7
**previous**
401:12 449:17
574:21 576:24
577:4,22
**previously**
395:12 494:19
500:12 507:4
**primarily**
124:1 138:10
139:12 308:13
447:19 448:20
464:11,13 487:4
**primary**
8:6 168:6 192:9,13
192:18 193:1
350:4 382:15,15
458:2,10 532:19
**principal**
443:20
**principals**
489:11
**principle**
542:2,6,10,13
**principles**
489:8,14
**prior**
19:12,22 30:18,19
30:19,20,22 31:1
33:12 41:2 54:11
54:13 72:13,15
141:5,16 152:15
165:1,6 203:16
254:7 290:4,4
332:18 333:1
362:9 393:16
394:6 395:14
422:11 423:21
486:6,17 500:16
503:14 522:2
532:9,10,23 533:8
533:11
**probably**
20:19 32:7 74:13
74:17 107:9

231:20 342:18
415:4 416:14
467:21 519:2
**problems**
399:13
**process**
231:5 241:14 254:1
256:15 257:11
263:12,16 265:8
265:11,17,18
266:4,6,9,12
285:6 296:9 300:4
315:1 321:16
327:21 328:19
347:18 348:9,11
366:18,23,23
367:2,4 369:14
370:24 371:23
381:21 384:12
476:13 480:20
481:9 577:11
**processes**
256:9 291:1 326:16
363:16 372:8
478:17 479:8
**processing**
409:6 419:16
**PROCTOR**
2:8
**produce**
183:18,20,23
223:15 237:12
262:18 282:20,22
282:23 285:5
294:1 307:14,21
308:12,14,17,18
309:12 324:20
345:11 365:23
368:12 369:12,13
370:10 425:9
440:16 441:13
**produced**
43:17 141:21
142:18,24 143:3
143:19 144:1,11
144:23 145:14,21

145:24 147:15
166:15 261:15
264:9 273:11,21
330:10 441:7
480:3 493:16
**produces**
223:11 264:14
345:11 441:1,4
**producing**
242:2 256:12,13
289:23 519:20
**product**
37:5 191:2 200:1
265:15,16,22
266:22 270:9,12
270:13 271:9,10
272:4,10,15
274:19 275:18
278:11 298:5
364:1 366:14,17
370:18,20 377:5,6
419:18 421:17
441:7 447:21
455:11 519:18
**production**
10:13 12:8 51:15
66:19 123:17
143:5 144:4
273:14 275:19
276:14,18 280:17
297:9,10 388:21
388:22 409:10
475:24
**products**
1:5,6 21:23 73:11
90:5 127:14
128:19 130:9,19
131:2,10 156:16
156:24 157:5,12
157:21 189:5
223:15 224:2,3
271:4,6 276:23
280:21 340:10
363:5 382:3
406:19 407:9
423:12 428:11

452:15 453:4
455:12 465:21
477:2 479:4 488:9
493:16,20 494:1,7
496:21 498:10,12
499:24 512:18,22
513:6,8,12 514:6
520:23 528:14
539:21 540:19
559:5
**professional**
1:16 112:6 113:7
121:13 169:6,12
169:17 200:8
215:13 224:14,17
226:19 228:15
281:21 315:18
320:7 321:1
322:21 330:7
385:9 393:1 419:8
445:10,15 579:13
**professor**
14:16 69:4,7
**professors**
81:20
**program**
77:24 154:15
215:17 223:5
264:7
**programs**
555:13
**progress**
331:3 499:19
541:10
**progression**
353:14 476:14
505:4
**proinflammatory**
296:13 298:20
475:22 476:1
**proliferation**
192:7 284:22
479:13,17 577:7,8
577:10
**pronounce**
507:16

**proof**
199:23 431:3
498:23 499:5
**prooxidant**
297:3
**proper**
82:24 135:13
375:17,18 467:11
563:14
**propounded**
582:9
**protect**
325:21 326:13
355:2
**protected**
459:14
**protection**
351:7
**protective**
145:22 146:3 359:4
**protein**
309:18 354:7 360:6
**protocol**
133:8,10,16
**prove**
201:2,4 496:20
497:23 498:11
540:18
**proven**
368:21 566:2,9
**provide**
57:24 117:20,21
139:21 140:17
142:2 144:22
166:24 169:3
190:19 198:13
199:5 201:18
256:19 275:14
377:2 385:12
390:8 393:15
400:16 512:22
**provided**
16:15 17:3 18:15
35:20 36:17 40:10
43:4 49:23 53:13
55:3 57:13 59:23

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1503 of 1525
PageID: 63649
Judith Zelikoff, Ph.D.

Page 627

61:12 62:5 75:24
139:16 142:10
143:1,21 145:13
166:16 167:12
168:7 198:14
199:4 202:16
203:11,20 211:8
273:16,20 275:11
277:8 384:4
385:16,19 388:4
390:3 391:6
394:16,17 457:14
457:16
**provides**
200:23 256:10
349:1
**providing**
400:11
**proving**
68:3,13 158:19
**proximity**
408:12 459:11
**pro-oxidant**
257:10 301:15
**psoriasis**
348:8,12
**PTI**
4:10,11
**public**
1:17 8:18 9:7
260:14 503:15
579:14 582:23
**publication**
55:6 56:20 67:9,18
87:19 97:6,17
105:17 106:16
112:18 115:22
116:2 117:18
120:1 121:23
160:21 176:8
197:16 202:7
204:1 210:18
213:20 375:5
380:18 391:11
494:20 535:7
536:8 577:13

**publications**
75:23 78:15 133:11
137:2,3 138:10,20
162:6,12 163:13
163:24 164:24
175:14 176:18
187:15 198:14
204:12 216:9
218:8 375:9
380:10 391:13,20
403:5 444:18
445:18,23 448:20
489:14 492:1
538:16 539:10
**publish**
101:16 102:10
151:7 203:12
**publishable**
224:21
**published**
76:16 77:14 78:7
78:12 112:1,9
113:12 150:5,22
151:9,12,22 158:5
165:8,13 176:6
202:13 203:5,17
204:6,6,14 223:19
224:10,16 246:21
247:3,5,11,18,24
248:1 300:18
302:13,21 303:2
303:12 374:18
379:23 410:22
415:14 441:10
457:5 534:4
535:13,24 536:3
563:21 577:20
**publishing**
101:6 112:5 113:2
203:19 204:8,9
**PubMed**
44:10 54:19
**puff**
266:1
**pull**
41:20 48:6 59:15

61:18 62:1 65:20
66:12,16 413:19
431:1 570:8
**pulled**
414:1
**pulmonary**
183:20 343:21
344:11 438:16
**purchased**
410:23
**pure**
267:1,8,11 268:4,6
519:15
**purpose**
134:5 229:18 246:4
283:8 284:3
326:12
**purposes**
14:22 36:12 50:10
64:3,23 73:18
76:17 84:5 94:10
95:24 101:6 120:1
125:17 128:7
130:10 133:17
138:13 139:6
140:16 146:21
147:6 148:8 164:4
176:2 189:20
193:11 203:19
211:8,16 214:14
226:5,10 229:20
243:6 248:19
249:11,11 298:8
302:3 343:12
353:6 373:23
390:9 392:21
399:3 438:1,5,7
469:1 479:23
480:4 518:20
520:3 537:6 539:4
540:10 547:13
**pursuant**
1:13
**purview**
155:12
**pushback**

437:6
**pushed**
437:23
**put**
39:13 76:4,14 78:3
81:12 84:24 86:19
94:4 97:23 98:10
98:24 99:10 158:3
163:22 183:19
205:17 215:8
246:4 278:20
373:11 433:5
454:22 552:19
569:16
**putting**
44:5
**P-E-N-N-I-N-K-I...**
232:14
**P.C**
2:2,13
**p.m**
196:2,6 277:18,22
319:15,21 338:19
338:23 383:16,21
442:2,5 463:24
464:4 485:19,23
523:13,18 529:5,9
578:11,14

---

**Q**
**qualifications**
422:17 443:3
553:22 554:18
555:4,7
**qualified**
537:15
**quantitative**
137:16
**quartz**
406:22 407:11
**question**
23:21 26:8 29:17
32:23 33:6 38:17
41:9,13 46:13
48:4 51:5 61:6
62:19 70:6 72:16

72:17 73:3,15
77:16 86:6,22
87:6,7 90:22,23
91:23 102:6,8
107:2,4,9 112:23
112:24 114:4,5
122:2 129:16
130:21 133:14,15
134:14 135:22
136:14 141:8
142:8,9,21 147:21
147:23 149:2,4
150:1,20,21 153:1
154:5,6 155:11
161:9,21 164:15
164:18 174:23
175:24 183:12
192:1,24 194:2,7
194:22 199:11
203:15,16 204:19
208:20 209:22
211:6,19 212:2
216:14,14 217:6,7
217:7,17 218:13
218:13 219:3,12
219:21 220:6,9
221:12,14,18,23
222:3,15,18 226:2
229:5 234:1,2,23
235:3 236:5
238:14 241:22
247:10,23 249:18
253:6,7 256:4,5
256:18 261:22,23
261:24 263:1,2
264:19 265:1,3,5
267:20 268:2
273:24 278:5
279:2,8,13 280:24
281:1 284:10,23
285:9,18 287:14
288:8 301:1
302:18,20,24
303:9 310:19
315:21 316:18,20
316:22 317:7,8

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1504 of 1525
PageID: 63650
Judith Zelikoff, Ph.D.

Page 628

318:1,13,19 319:5
319:7,8 320:10
323:8 325:5 327:3
329:10 330:9
331:4 332:17
333:22 334:21,22
334:22 335:18,18
336:5,23 337:6
338:10 349:9
352:21 353:18,23
354:18 362:8
365:24 366:21,22
367:1 369:1 370:4
373:10,16 376:24
378:4 379:9
381:13,18 384:2
385:15 395:7
396:10,15 402:15
402:17 411:4
414:17,17 417:10
420:14 425:17
427:12 429:15
433:11 436:18,20
438:15 440:14,21
441:6 448:3
465:23 478:22
479:19 482:6
483:12,14,18,19
484:6,12,14
489:19 492:24
496:5 497:11
504:8 513:20
516:3,6,12 517:24
522:17 525:14
526:6,7 535:8
537:16 538:7
540:23 546:17
550:13,17,21
551:7,13,17,17
552:7,10 557:2,10
557:22 558:16,24
559:8 560:15
561:21,21 565:7,8
573:12 575:4
577:13
**questions**

12:13 235:6,7
339:9,19 396:2
401:12 412:19
422:21 441:21
442:20 462:21
463:3,5,12 486:5
489:8,10,24
490:12 492:14,19
497:2,6,7 507:10
509:24 510:7
513:5,15 515:3
517:20 518:1
523:24,24 524:13
556:17 563:4,11
563:13 566:14
571:19 573:12
574:8 578:5 582:8
**queues**
167:4
**quick**
74:9 463:16
**quickly**
130:21 442:22
**quiet**
326:20
**quite**
91:13 92:8 99:5
121:9 123:10
162:7 192:23
259:16 355:17
394:14 500:21
**quotation**
80:18,22 96:11,15
96:24 97:2,10,24
101:18 102:11
103:8 105:19
113:21 115:1,11
116:4 119:15
**quotations**
75:21 76:4
**quote**
112:3 113:5,17
114:8
**quoted**
114:24 124:12
**Quotes**

6:23 7:6,8,10,12,15
7:17,21 8:10,13
8:16,18,20 9:6,9
9:12

---

## R

**R**
581:1,1
**Radical**
118:7
**radicals**
119:13 308:15
**radiolabeled**
197:14
**RAFFERTY**
2:8
**Railroad**
37:6
**raise**
251:1 495:23
**Rakoff-Nahoum**
7:15,19 115:23
116:3,10 117:2
118:5
**ran**
454:19
**random**
196:21
**range**
428:8,10,12 429:2
459:23
**ranged**
248:6
**rank**
182:23 183:15
**ranking**
182:13
**rate**
16:5 258:24
**rates**
257:15 258:5,11,16
**ratio**
179:8,13,15 564:16
**rats**
153:15 233:6
264:10,22 336:15

raw
453:3 455:10,19
539:20
**Ray**
251:13
**reach**
102:23 135:14
287:17 288:6,20
298:10,13 300:16
332:21 369:17
467:6,9 468:1,1,8
**reached**
219:15 220:11
288:2,11,23 396:3
397:22 435:3
445:7 509:20
**reaches**
215:19 262:19
499:15 541:7
**reaching**
350:21 505:24
576:5
**React**
504:20
**reaction**
121:7 234:13
327:12,17 329:3
329:20 477:3
499:18 541:9
567:11 568:18
569:3,6 574:5,15
**reactions**
300:6,7 327:10
343:19 345:5
568:13
**reactive**
119:14 256:13
257:8 297:9
300:10 308:12
309:12 363:24
364:6,11,15,16,22
364:22 365:6,13
365:13 366:2,6,7
367:18 469:24
475:9 504:14
**read**

25:7,16 38:8,9,11
39:3,10,10,12
40:13,15 41:5,10
41:17,21 42:13,15
45:2,4 47:19 48:8
48:16,19 49:1,4
49:10,12,13 55:21
55:23 56:1 59:7
59:13 61:14,16
81:8 84:8 104:16
104:21 105:4,7
118:20 129:23
136:8,12 197:15
197:17,23 217:7
234:19 235:24
236:2 238:22
243:1 249:9,20
250:19 251:11
254:4,6 263:1
265:3 276:5 303:1
330:8 375:9 378:5
399:14 407:1
410:13 411:22,24
412:1,2 413:3
415:13 422:18
433:9,15 454:23
455:8 459:1
471:10,14 498:6
499:11 503:2
525:4,6,13,16
526:19 527:4,12
527:14 542:22
543:10 546:7,18
549:2,7 550:7,8
552:16 576:22
579:9 580:3 582:5
**reader**
471:12
**readily**
502:20
**reading**
26:14 27:15 42:19
42:21,23 63:9
80:20 105:14
128:21 200:4,5
230:24 231:1,19

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1505 of 1525
PageID: 63651
Judith Zelikoff, Ph.D.

Page 629

| | | | | |
|---|---|---|---|---|
| 231:23 241:3,13 | 25:13 27:2 29:4 | 503:24 554:24 | 472:17 | 413:20 427:23 |
| 368:16 375:11 | 49:22 84:13 85:21 | **recognizing** | **reduces** | 468:20 548:5 |
| 390:20 397:20 | 107:20 109:5 | 380:12 | 366:15 | 566:6 578:3 |
| 404:12 405:2,7 | 161:13 163:8 | **recollection** | **REES** | **references** |
| 408:17 411:18 | 164:2 172:20 | 21:20 24:4 450:8 | 3:12 | 41:18,19,21 48:7 |
| 423:21,24 435:8 | 174:16 193:7 | 471:15 473:19 | **refer** | 53:3 54:4 59:13 |
| 435:10 470:23 | 196:17,18 197:1 | 494:15 495:8 | 237:24 248:16 | 59:15,16 61:17,22 |
| 472:23 473:1 | 204:20 387:2 | 535:1 | 281:16 336:9 | 66:2,10 95:11 |
| 499:1 544:8,11 | 391:22 392:19 | **record** | 344:4 359:7 369:2 | 97:7 115:24 |
| **reads** | 398:13,14 414:11 | 13:2,14 14:7 75:4,7 | 378:24 403:13 | 118:11 120:24 |
| 472:10 545:8 546:8 | 424:5,9 435:8,10 | 124:21 125:1,3,6 | 410:3 474:5 485:2 | 125:15 139:1 |
| 546:17 565:23 | 435:12 437:12 | 125:11 126:6 | 538:1,9,16 539:24 | 160:24 161:3 |
| 577:21 | 454:2,5 477:18 | 163:23 196:2,5,9 | 540:24 | 350:17 409:2 |
| **real** | 478:14,23 484:11 | 207:24 220:19 | **reference** | 502:11 503:2 |
| 463:16 | 490:4 492:23,24 | 221:1,20 277:18 | 7:8 48:10 51:2 | **referencing** |
| **reality** | 495:2 497:5,7,10 | 277:21 280:9 | 61:23 62:1 64:14 | 122:5 430:10 |
| 372:20 | 497:11 507:12,13 | 317:14,17,19,19 | 65:1 76:5,18 | **referral** |
| **really** | 507:20 510:6,7 | 317:21,23 318:6,8 | 77:18 78:3 86:21 | 108:17 |
| 40:24 152:22 | 512:11 513:20 | 318:11,15,24 | 93:10,11,17,18 | **referred** |
| 163:12,23 165:16 | 515:9 517:23,24 | 319:11,15,16,18 | 94:12,13 95:17,18 | 64:20 175:6 250:6 |
| 167:7 182:11 | 524:12,18 525:8 | 319:20 336:19 | 95:22 97:8,10,16 | 313:2 389:23 |
| 202:4 241:23 | 530:11,14 537:7 | 337:10,12,14,17 | 97:21 98:11,16 | 524:3 539:18 |
| 255:7 282:17 | 537:20 539:8 | 338:2,5,9,17,20 | 99:10,20 100:10 | 540:16 563:3,8 |
| 314:23 372:23 | 556:17 566:15 | 338:23 339:1 | 100:10 101:19 | **referring** |
| 460:9 | 569:12 574:7 | 380:13 383:13,17 | 102:12 103:14 | 35:23 58:12 77:13 |
| **realm** | 575:8 | 383:20 442:2,5 | 105:20 106:19 | 94:7 105:1 142:13 |
| 166:13 | **recalling** | 463:16,22,24 | 107:15,22 111:21 | 151:19 210:5 |
| **Realtime** | 172:21 191:4 397:7 | 464:2,4 485:17,19 | 112:11 113:6,20 | 245:14 251:8 |
| 1:17 579:14 | **receipt** | 485:22 523:14,17 | 114:9 115:12,22 | 276:15 340:9 |
| **reason** | 580:17 | 529:3,5,7,9 | 116:24 117:4,11 | 343:23 344:18,20 |
| 194:12 294:5,8 | **receive** | 537:12 562:20 | 117:12,15 118:7 | 359:10,16 373:19 |
| 301:17 336:22 | 15:16 37:10 40:21 | 563:7 578:11 | 118:19,21 119:2,3 | 379:3,20 402:11 |
| 368:8 386:17 | 42:2 57:15 58:8 | 579:6 | 119:11,14,23 | 402:13 430:21 |
| 426:19 467:8 | 60:17 61:7 144:7 | **recorded** | 123:20 124:6,12 | 431:11 455:6 |
| 468:22 580:5 | 144:9 393:20 | 167:6 | 159:14 167:12 | 470:5 473:22 |
| 581:6,8,10,12,14 | **received** | **recovery** | 206:15 232:19 | 522:11 578:1 |
| 581:16,18,20,22 | 38:2 41:2 42:8 50:2 | 354:17 | 350:5 379:7 | **refers** |
| 581:24 | 55:13,14 61:10 | **recruited** | 388:11,12,15 | 41:22 244:4,7 |
| **reasons** | 139:18 144:17 | 103:22 394:10 | 398:11 410:10 | 248:11 268:14 |
| 496:14,18 518:15 | 145:18 500:21 | **recurrence** | 411:8,12 412:4 | 572:14 |
| **reassert** | 577:19 | 194:17 | 426:14 430:23 | **refining** |
| 50:19 | **recognize** | **redone** | 435:14 494:24 | 123:17 |
| **Rebecca** | 220:4 | 257:22 | 505:23 | **reflect** |
| 88:17 | **recognized** | **reduce** | **referenced** | 27:18 221:20 |
| **recall** | 225:9 226:15,15,20 | 470:12 473:12 | 34:24 63:2 65:13 | 324:23 387:15 |
| 17:24 24:5 25:10 | 226:23 227:4,9 | **reduced** | 103:4 335:19 | **reflected** |

Judith Zelikoff, Ph.D.

17:12 26:23
384:23
**reflects**
43:6 72:2
**refresh**
188:9 194:1,6
531:2
**refuse**
34:13
**regard**
17:19 27:22 43:7
45:19 46:24 48:5
59:5 65:11 66:20
66:23 75:10,17
99:19 145:21
170:10 172:7,11
191:8 199:6
273:22 274:6
278:5 291:19
310:13 356:12
384:11 385:13,17
386:3 391:1 398:7
403:14,14 414:2
415:15 416:6
422:4 465:12,13
473:15 480:12
497:8 514:5
517:17 533:2
539:19 541:24
567:9 573:3
**regarding**
29:21 50:20 145:24
167:14 169:12,17
171:20 276:9
444:13,19 486:19
487:22 496:8
497:2 499:23
511:7,14,15
512:17 540:12
552:21 554:4
555:3 575:5
**regards**
47:5,5 401:12
492:9
**region**
371:7

**Registered**
1:16 579:13
**regular**
575:6
**regulators**
510:21
**regulatory**
155:6 204:4,4
215:7 316:9 398:6
444:12
**reiterated**
433:21
**relate**
137:12 149:6
175:15 295:21
428:19 438:17
**related**
124:1 136:13,17,17
165:4 286:8
347:22 349:20
354:10 441:8
517:18
**relates**
1:8 241:10 476:5
531:5 532:6 555:5
**relation**
18:16 20:17 37:13
40:22 44:22
221:14 281:11
**relationship**
21:22 154:3 172:23
200:2,13 201:5,22
219:24 382:1
397:9 532:20
**relationships**
342:22 343:7,13,16
**relative**
472:19 564:7
**relatively**
564:6,6
**release**
104:1 301:22
330:11 365:9
**released**
465:22 467:1,4
**relevancy**

134:13 138:7 441:3
**relevant**
51:14 54:20,24
126:10 134:19
135:5 136:12
203:13 231:4
292:18 394:1,5
470:6 487:21
515:23
**reliability**
110:10 375:7
**reliable**
110:1 200:21 399:9
**reliance**
541:21,21
**relied**
276:2 292:6 374:3
447:18 488:1,17
492:21 494:3
503:3,5 576:4
**rely**
73:18 146:20 147:5
176:2 249:1,13
374:1 399:3 409:2
445:17,20,24
487:19 492:12
505:24 511:6,13
540:9 547:13
**relying**
77:13 211:7 212:3
212:6,7 213:16
248:21 488:23
**remain**
239:9
**remaining**
49:16 463:21
**remains**
401:8 508:19
**remember**
21:17 190:15
482:11 495:13
**reminding**
493:12
**remnants**
357:8,17
**Remove**

196:1
**remunerated**
26:13
**repair**
355:2
**repaired**
354:21,22
**repeat**
23:21 33:5 68:9
69:22 91:23 102:7
142:21 164:13
208:19 234:1,2
256:17 265:4
332:16 372:6
402:16 414:17
433:11 484:14
**repeating**
135:3 302:24
**rephrase**
187:8 516:8
**rephrased**
81:5
**report**
5:17,20,21 16:12
16:14 26:19,23
27:6,9,11,13 34:7
34:11,16,18 35:1
35:6,9,12,20 36:5
36:13,16,18 37:2
37:7,11,24 38:6
38:12,13 39:7,16
39:18 40:10,14,16
40:17,18,19,21
41:2,18 42:9,13
42:14 44:1,17,22
45:23 46:10,12,14
47:2,11,15,21
48:5,6,11,11,17
48:20,22,22 49:13
51:19 54:5,12
56:3,7 57:4 62:7
62:10,14 63:2,24
64:2,7 65:3,7
66:21,22,24 67:7
67:12,16 69:1,12
69:18 70:1,10,12

70:14,15 71:6,7
72:1,6,10,15,20
72:23 73:8,20,24
74:4 75:11,19,22
76:17 77:3 82:18
82:21 83:16,17,19
84:5,6,10,15,18
84:19,20,21 85:3
85:4,11,12,23
86:1,4 87:9,10,12
87:12,16,23 88:1
88:16,16,20,21,23
89:5,7,9,10 90:6
91:15,17 92:2,16
93:9,16,19 94:10
95:24 96:1,9 99:5
100:8,9,19 101:7
101:17 102:10
103:3 105:7,24
106:15,19,20
107:19 108:6,21
109:12 114:18
115:20 120:2
121:20 125:14
126:15,17 128:8
133:4,18 136:19
136:23 138:24
141:20 148:13
149:5,14 153:11
164:5 168:11,18
170:19,24 171:5,8
171:14,17 189:3,9
190:12 193:11
197:24 199:14
204:10,16 205:12
216:6 225:1,12,16
226:6,17 229:18
229:20 230:4
231:13 232:7,11
232:20 238:5
246:4 247:7,16,17
248:4,5,21 249:10
249:19,21,24
250:1,15,19
253:15 266:8,18
271:7 272:22

Judith Zelikoff, Ph.D.

Page 631

281:15 282:8
283:2 286:6
292:20 293:14
335:6,12 338:13
343:18 344:22
346:9 350:18
358:4 359:7
361:20,21,22
363:10 368:11
369:7 372:4 374:2
374:10 379:8
382:13 387:15
388:2,3,7,24
389:4,10,11,13,17
393:12,16,21
394:3,7 395:14,20
403:21 408:6
410:1 414:9,22
415:3 416:17
417:3,11,20 420:1
420:11,15 421:23
422:3,5,18,19
423:2,22 424:1,16
427:11 429:23
431:23 432:3,9,23
434:23 437:1,2
444:22 449:3,4
451:12 452:2
453:7 457:2
469:18 471:10,13
472:1 476:17
480:11,12 487:13
487:20 488:1,17
489:9 500:16,20
500:24 501:1,3,11
503:3,11 509:15
511:22 512:2
520:19,22 521:6
521:17,24 522:1,3
522:11,12,23
523:5 524:3,6,10
524:11,17 526:19
526:20 527:2,5,8
527:13,14,16
528:7,9,18 529:13
529:22 530:5,9,10

530:13 536:22
538:2 539:4,12
540:3 541:1,4,13
541:18 543:19
547:19 550:2
552:4,11 569:11
569:16 573:6
**reported**
146:22 229:1,9,15
231:6,9 253:10
269:14 295:14
299:8 313:23
343:20 345:7,15
345:24 346:13
357:23 374:23
377:17 413:8
449:7,13 464:18
493:5 515:22
533:1 567:9
**reportedly**
45:21
**reporter**
1:16,16,17 13:15
579:13,14,14,22
**reporting**
109:21 284:11
285:22 331:9
332:20 352:9
417:3 478:5,5
**reports**
34:23 35:8 36:6,10
36:12 39:7,9,17
39:22 44:11 49:9
49:10,16,23 51:16
89:1,14 137:18
138:3,6,14 139:2
139:6,11,15,18,20
140:3,4,8,17
204:2,11 229:6
249:7,14 253:3,10
296:17 378:9
389:15 520:23
526:11
**represent**
14:5 53:21 442:15
**representative**

411:16
**represented**
21:21
**representing**
2:21 3:10,19 4:6,10
20:1 23:6
**reproduction**
579:20
**reproductive**
30:10 31:7 55:6
58:15 167:18,19
168:1 170:11
334:10 335:1
371:18
**reputable**
46:6 519:5 563:23
**request**
12:8 128:2
**requested**
18:12,12 149:24
202:17 579:7
**requests**
50:21
**require**
465:20
**required**
229:10
**research**
8:11 46:23 151:13
186:16 311:22
391:17 445:6,10
445:16,19 446:1
449:18 492:16
521:21 553:19
**researched**
334:8,24
**researches**
356:7
**reserve**
339:4
**resource**
114:21 117:16,17
117:23
**resources**
47:20 114:24
**respect**

505:1
**respirable**
239:4
**respiratory**
103:23 123:24
402:7,19
**respond**
334:21
**responded**
22:3
**response**
9:13 22:10 90:9
233:10 234:14
287:1 290:22,24
291:4 293:5 296:8
296:17 308:9
311:13 324:23
325:4,9,12 326:1
326:4,7 327:13
328:15 329:17,24
351:5,7 353:1
357:11 358:1
365:6,22 366:6
368:6 402:1,5
414:14 423:9
488:6 490:5 497:2
499:18 505:3
528:12 529:24
539:16 541:9
551:20 563:3,11
566:13 569:4,8
**responses**
300:8,10 309:3
346:24 377:8
422:22 425:8
477:20 553:2
**responsibility**
92:20
**responsible**
306:21 421:19
**responsive**
339:8,19
**responsiveness**
218:11 281:24
341:24 346:23
358:18

**rest**
49:8,15
**restate**
157:1 421:10
**restroom**
523:11
**result**
44:13,14 173:21
236:17,19 330:21
339:10 363:3
433:21 477:4
**results**
56:17 202:14 203:6
270:15 287:4
375:8 377:17
378:8 410:22
413:7,21 414:4,6
414:10,22 448:22
496:19 497:23
498:8 509:11
517:2 521:6
574:21 576:24
577:22
**retained**
25:21,23 34:19
**retainer**
17:22
**retainment**
30:20,21,23
**retract**
390:19
**retrospective**
556:21 557:17
558:10
**return**
580:15
**Reuter**
7:10 103:5
**reveal**
368:5
**review**
6:15 15:23 16:6
26:3 36:11,16
37:22 44:24 45:9
45:15 46:23 47:10
47:21 49:16 59:3

Judith Zelikoff, Ph.D.

59:16 60:13 61:19
65:12 67:12 69:8
69:10 84:4 91:15
94:3 97:18 103:13
104:17,23 107:18
109:8,22 116:9,14
118:10,16,17
119:5 122:12
123:12,19 124:7
127:9 129:10
130:5 131:16
132:24 133:17,24
134:12 137:18
138:3,14 139:6
143:23 150:8
151:1 169:15
171:6,14,17
184:11 196:20
198:2 203:18
205:14 206:3
208:4 209:14,17
209:20,22 211:16
212:22 213:4,12
215:11 216:5
228:5 232:12
273:6,10 275:10
275:12 333:1
356:1 375:10
388:10,18 390:9
392:21 413:6,11
413:13 414:4,6
415:6 417:7 438:2
455:7 456:11
487:20 492:6
511:6,13 519:4
521:23 533:6
534:6,11,13
**reviewed**
34:22 35:2,3 36:9
38:3,9,21 39:2,7
39:14 40:16 42:15
44:2,9 45:6,18
49:6 52:14 54:11
54:23 64:1,6,7,23
65:2,5 90:5 93:20
118:14 128:5

135:15,20 136:1,3
136:6,22 138:11
138:19 141:5,12
141:16 144:2
150:15 165:3
196:14 202:11
203:3,24 210:14
210:17,19,21
211:2,9,14,21
212:4,10,17 213:8
213:14,16,21
214:19 232:15
242:20 243:12,13
250:13 262:4
273:13 276:4,5
333:3 374:13,23
388:21 389:23
395:3,4 396:1,20
399:6 412:2
413:15 423:15
435:11 438:21
454:14,16 501:1
503:3 523:1 526:8
528:8 531:14,20
531:23 533:18,20
535:6 539:3 558:6
**reviewer**
98:9
**reviewing**
38:5 42:19,23
48:11 54:21 66:17
109:5 145:23
146:16 169:9
210:1 389:3
**reviews**
24:21 118:22 119:2
133:12 139:13
150:1,4,13 174:21
206:5 216:9
445:20 448:21
**revisions**
72:5
**re-oxidized**
419:21
**Rgolomb@golo...**
2:16

**Rheumatoid**
347:22 348:2,5
**RICHARD**
2:14
**ridiculous**
518:7
**right**
18:21 21:9 32:6
51:5,9 52:2 59:9
63:18,22 66:7
85:2 95:18 155:9
162:18 215:2
221:10 259:1
273:15 287:11
318:2 321:20
326:12 328:5
332:11 338:12
339:4 346:8 387:9
395:18 414:7
424:8 436:10
444:9 456:4 483:2
487:14 497:14
509:4 532:10
545:3 558:24
572:13 575:3
**right-hand**
564:1
**Rigler**
5:19 36:18 38:6
248:22 249:8,14
250:2,22 251:9
446:24 447:3
521:23
**Rigler's**
493:14 520:22
521:16
**rigor**
38:23 67:13,23
68:21 70:16
435:24 445:9
449:22
**rigorous**
115:10
**Rio**
455:24
**risk**

6:10,16 10:9 30:12
30:14,16 32:10
60:15 73:9 124:9
127:12 128:6,9,17
130:8,12,17,24
131:9 165:14
214:16 230:6,22
231:7,11,14
232:22 233:17
234:5 280:5
281:17 283:4,21
284:11 285:23
331:9,21 348:3,7
348:13 349:21
351:10,21 352:7
352:11 360:15
361:5,12,24
362:13 397:15
400:4,20 401:7
470:9 472:16,17
472:19 473:16
474:1 475:17
476:5 508:10,18
547:6 556:15
558:3,11,20 559:2
559:12 564:7,20
565:16
**risks**
124:1 509:11
**Road**
2:19
**Robert**
11:13 512:1,5
548:21 549:15
**Rochester**
176:21
**Rohl**
9:19 248:7,15
405:8,12 406:3,4
406:16 407:17,19
407:21,22
**role**
31:13 218:6 347:7
363:10 368:3
382:20,24 383:12
470:20 472:5

475:6 486:20
504:13 517:12
565:5 569:14
**roles**
359:11
**Roman**
207:3
**room**
199:2 258:1 259:10
401:19
**ROS**
104:1 365:8 469:24
504:20
**Rossi**
11:7
**Rossman**
537:23
**route**
333:8,12,13 335:10
335:20 343:2
428:2
**routes**
123:3,9 425:21
458:3 462:16
**Royston**
4:11
**rule**
5:17,21 83:18
483:7,10,23
**rules**
482:8
**run**
449:19
**rural**
459:7 460:15

_____

**S**

**S**
3:7 5:11 6:2 7:2 8:2
9:2 10:2 11:2
**Saad**
10:11
**Saed**
6:11 55:7 58:1,17
61:2,23 297:2
374:2,4,22 375:2

Judith Zelikoff, Ph.D.

376:13 379:7
381:21 382:8
395:3 493:4
538:12 561:14,15
575:4,18 577:8
**Saed's**
58:4 74:1 374:13
377:18,23 378:2,5
381:3 493:11
539:6
**safe**
316:8,10 510:9
**safety**
8:13 392:14 512:14
**SALES**
1:6
**Salnikow**
122:15
**salt**
536:24
**salts**
322:13
**sample**
410:7
**samples**
37:6 248:9 269:13
269:13 272:24
275:20 446:19,22
493:15 495:7
498:10 521:7
539:20
**Saturday**
37:19 38:2
**saw**
264:15 358:18
394:24 500:22
522:17
**saying**
31:6 78:1 97:11
108:4 110:11
147:18,20 158:2
158:24 196:17
211:9 244:17
317:10 331:12,19
343:17 353:12
369:5,13,14 370:8

370:15 380:17
435:6 460:13
462:11 559:1
**says**
79:5 80:24 112:1,9
113:1 129:9,12
130:4 211:13
212:17 293:3
300:19 302:13,22
303:3,4 400:2,14
401:5 404:2,7
405:3 406:17
423:2,6 432:19
445:4 454:19
455:18 456:8
458:1 459:2,20
461:6,11,14,21,22
462:6 512:19
564:19 567:8
**scar**
329:22
**scarf**
124:23
**scarring**
330:13,16,20
**school**
14:11,15 30:4
177:4,17 227:19
514:3
**schools**
459:21
**science**
20:10 22:4,5,6,12
58:15 68:16
138:11 148:24
149:24 150:19
199:12 200:22
203:14 212:6
214:7,9 215:9,16
220:3 444:4 446:8
446:10,11,12
**sciences**
15:21 55:6 167:19
443:18
**scientific**
67:10 68:4,14

86:11 105:4 112:5
113:16 114:23
115:3 117:10
126:22 127:10
129:10 130:5
140:23 141:11
152:19 153:3
154:7 157:10,19
160:15 172:14
203:8 204:15
205:2,6 213:20
215:24 216:9,19
217:10 218:2,14
225:7 226:18
228:5 249:2
253:20 255:1
266:15 347:13
385:12,16 398:6
444:18 445:8,18
447:10 448:4
449:22 450:2
456:16 489:14
492:7,16 531:12
531:15 575:22
**scientist**
172:1 445:7
**scientists**
76:24 82:1 164:1
167:22 172:9,11
437:16,19 446:9
519:5
**scope**
66:24
**scratch**
333:23 485:7
**screening**
6:12 57:14,16 59:6
59:22 60:22 61:10
63:20 205:19
391:24 392:14
500:11 542:1
547:15 572:4
**screenings**
542:17
**scrutinize**
38:10

**scrutiny**
67:13,23 68:21
69:11 137:6
214:22 436:1
**search**
41:24 42:7 43:6
48:2 54:22 131:19
131:21 132:20
133:24 136:10,16
145:9 148:23
197:4 198:2,7
425:4,18 553:23
**searches**
133:2,5,9 134:17
135:3,3,4,6
202:15 203:7
**searching**
20:8 27:15 199:1
413:5,14
**second**
79:3,13 199:22
208:21 267:20
326:18 335:9
336:10 410:2,5
429:23 430:14,15
449:12 452:10,13
454:18 458:19
472:3 474:8
476:17 480:24
497:17 528:6
529:11 544:23
545:6,23 564:20
570:3,4
**secondly**
573:11
**second-to-last**
64:12 333:6 411:7
**second-to-the-last**
496:11
**section**
74:7 89:12 91:2,11
91:18 92:3,3
126:18 128:14
129:6 130:3 144:1
199:17 208:12,22
237:22 243:17

245:1 278:18
280:3 281:4 284:4
332:3,4,7,11,12
332:14 339:22
344:24 346:6
359:10,12,15,17
363:10,12,13,17
396:8,11,16
399:23,24 403:22
421:24 426:3
458:16 473:18,21
502:2 506:13
524:4 527:18
528:7 529:12
530:12 546:5
567:8 568:23
574:9 576:21
**sections**
389:10
**see**
38:13 44:6,11
48:14,15 50:12
51:20 60:6 64:16
65:14 69:6 80:19
80:21 81:3 85:9
86:3 87:9 88:20
89:11,12 93:12,13
93:23 94:6 103:5
103:10 107:21
108:3 116:4
118:21 120:2,5,17
122:4,5,10 126:20
128:20,20 129:19
129:21 131:3,17
135:3 141:23
199:20 200:3,5
202:19 208:16
209:4 211:18
230:8,23 237:16
237:23 248:13,17
275:1,6 290:6
311:8 317:6 332:7
333:9 339:14
341:22 347:10
357:7 359:9,21
363:11 368:15

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1510 of 1525
PageID: 63656
Judith Zelikoff, Ph.D.

Page 634

372:7 386:18
387:17,18 396:14
399:23 404:11
405:1,7 408:16
410:4,9,18,20
411:2,11,12,14
412:8 414:8 419:2
431:20,21 436:6
436:21,23 445:12
446:20 449:11
455:18,21 456:7
456:18 458:20
459:1 469:22
470:22 472:3,12
472:22,24 477:11
479:22 480:16,16
481:10,13 485:1,3
485:10 487:16
496:13,15 500:13
501:24 506:12
507:21,21,24
509:4 511:23
518:4 521:2,20
525:10,24 530:10
531:2 546:6
565:10 572:10,17
573:15,24 574:1,7
574:17 575:16
577:2
**seeing**
58:19 345:24
389:14 470:24
518:21
**seen**
53:18 95:17 118:18
171:7 283:13
342:15 345:20,23
351:1,5 377:12
393:2,10 403:1
477:21 479:13
555:16 562:1
577:8
**select**
139:5 276:3
**selected**
139:20 140:3,4

**selecting**
140:17 143:10
390:7
**Selikoff**
258:20
**semester**
33:21
**send**
24:16 140:5 143:11
186:18
**sense**
413:13 518:7
**sensitivities**
456:16
**sent**
276:6
**sentence**
80:8 111:18 123:5
123:6,14,21
202:24 209:5,13
223:8 231:2 410:5
411:13,15 446:20
449:12 454:23
458:7 459:19
461:7 471:1
472:13 474:4
496:12 498:6
499:12 508:2,4,15
508:21 509:5
521:3 528:6,17
529:11,17 530:3
538:14 541:13,18
546:17,18,21,22
547:11 550:11,22
564:19,24 565:9
565:20,22,23
566:4,9 572:16
574:3,19 577:1,21
**sentences**
75:19 83:6 85:10
85:12 87:11 89:17
95:4 99:15 100:15
103:7,19 106:16
109:9,11 115:24
454:24 499:2
508:24 527:17

528:4 566:6
**separate**
14:20 271:18
350:22,24
**September**
388:13,17,19 389:2
454:20,20
**sequence**
80:17,21 96:9
**serous**
191:17,18 192:9,19
**serpentine**
110:15 178:16
179:1,6 180:11
**serve**
15:22 20:3,16
21:12 23:8,18
24:1,17 196:16
197:5 198:3
**served**
50:20 435:22 444:6
**services**
1:20 13:4 16:1
455:3
**serving**
18:9 20:11
**set**
26:18 56:6 71:20
72:10,19 73:19
148:13 149:5
170:18,23
**Seth**
116:9
**sets**
31:18
**setting**
18:4 159:11 424:11
424:13
**seven**
337:20 481:21,23
482:2,9
**SEYFARTH**
4:3
**shape**
242:7 244:5
**share**

463:6
**SHAW**
4:3
**Shawn**
6:23 83:20 84:1
**shed**
353:3
**sheet**
580:7,9,12,15
582:12
**Sheraton**
1:14
**SHKOLNIK**
2:18
**SHOOK**
3:2
**short**
75:5 125:4 251:19
277:19 338:21
383:18 442:3
485:20 523:15
573:1
**Shorthand**
1:16 579:13
**show**
40:2,8 88:8 93:1
102:21 115:17
119:22 121:18
153:13 223:10
233:16 234:5,15
237:20 275:19
279:19 284:21
286:6 288:16
301:3 373:19
388:24 441:16
450:21 453:23
469:11 565:4
566:17
**showed**
140:24 232:3,17
234:20 381:7
429:19 549:20
550:18 551:8
567:15
**Shower**
73:1,2 90:4,5

487:24,24 488:5,5
493:18,18 521:1,1
**showing**
106:4 158:19
234:11 236:1
275:7,15,22,24
340:2 345:10
379:11 381:3
426:12 471:20
477:13 479:7
544:6 550:24
558:2,11 559:11
**shown**
211:4,24 213:7
224:1 236:24
237:4 258:8,17,20
291:20 301:5
307:20 313:8,18
324:19 351:3
362:10,20 364:18
366:19 367:5,21
371:23 377:17
378:8 384:18
388:4 416:19
434:21 551:3,23
**shows**
72:23 73:8 213:8
220:19 234:10
247:8 291:4
329:16 345:21
366:5 376:12
441:12 449:22
552:1 571:2
**Shukla**
11:12 297:5 305:14
310:6 474:6,11,14
480:13,15 484:20
484:23 515:3,5,14
515:20 517:3
561:13,15
**sic**
127:18
**side**
89:1,1 389:15,15
456:2,3,4 463:11
508:13

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1511 of 1525
PageID: 63657
Judith Zelikoff, Ph.D.

Page 635

sign
  69:18,24 145:22
    146:3,15 579:9
    580:8
signed
  69:20 70:2,14
    146:18
significance
  476:4
significant
  207:7
significantly
  485:10
signing
  47:1 70:9 580:10
silence
  528:21,24
silicates
  110:19
silicone
  110:23
siloed
  238:18
silos
  55:1 238:20 239:10
SILVER
  3:17 494:8
similar
  44:8 99:14,14
    152:4 289:3 296:3
    296:3 305:16
    426:16 437:15,18
    513:2 518:15
similarly
  310:13,18
Simone
  7:10 103:4
simply
  69:4,6 91:2 153:1
    161:10 334:22
    365:12 436:20
    484:2
single
  52:9,15 93:18
    144:18 231:12
    253:19 256:24

257:7 288:11
  313:6 368:12
  369:2,3,6,8,10,17
  370:1,9,17 379:24
  380:5,22 381:4,8
  381:14 382:18
  383:6 439:5,16
  440:9,21 441:4,6
sir
  20:2,6 24:9,15
  34:21 35:10 36:14
  37:3,9 41:7,23
  45:11,13 48:9,18
  48:24 49:3 50:12
  51:24 56:4 57:3
  58:2 59:17 60:5
  63:7,24 64:17
  65:23 121:24
  126:16,20 128:11
  128:22 129:8,24
  133:1 162:16
  169:15,20 172:18
  173:11 193:14
  199:10,15 203:21
  259:2 278:4 347:8
  393:13 407:19
  408:7 410:15
  445:2,12 446:16
  451:5 455:17,21
  457:24 458:18
  474:7 479:22
  545:2
sit
  15:13 155:9 164:22
  169:10
site
  103:22 298:14,22
  300:1 301:21
  314:6,10 320:22
  320:22 322:5
  330:17 368:14
  459:13,15
sites
  314:14 476:4
sits
  111:5

sitting
  16:6,8 51:5 161:1
    161:10 162:20
    165:11 197:1
    227:11 258:1
    259:10 346:12
    380:12 391:14,21
    392:11 395:21
    424:8
situation
  462:12,13
six
  103:6 108:14
size
  99:12 182:2 198:15
    238:1,3,10,22,22
    239:8,11,15,21
    240:10,10,11,18
    240:21,23 241:11
    241:16 242:1,4,11
    242:20,23 243:2,6
    243:11 305:7,16
    305:22 323:23
    324:2,16 427:17
    427:19,22,24
    428:7,10,17,23
    466:14 467:8,12
    468:19
sizes
  426:17 428:20
Sjosten
  336:11
SKADDEN
  3:7
sketch
  251:12,13
skin
  121:7 333:18,19,20
    333:21,24 334:2,6
skip
  60:19 125:23
Skipped
  8:9
slow
  130:20
slowly

442:23
small
  265:21 290:6 296:7
smaller
  241:4 467:23 468:2
smiling
  518:22
Smith
  524:16
Smith-Bindman
  7:6 88:17 90:13,15
    90:24 524:17
    530:9,17
Smith-Bindman's
  92:16 524:11
smokeless
  170:2
SNPs
  380:23
soap
  341:8
soaps
  341:8,10
societies
  555:14
society
  225:9,13,17 226:5
    226:9,9,10,14,16
    226:20 227:1,2,3
    555:9
soil
  419:18
solely
  24:22 87:24 247:23
    448:21
solid
  427:16
soluble
  124:2 310:22 322:7
    322:9 465:3,6
    466:5,7,24 536:14
sorry
  23:19 28:18 35:10
    38:7 39:11 42:4
    44:18 45:12 54:4
    59:6,11 60:24

61:4 64:17 76:10
  76:12 79:9,12
  83:12 86:22 89:4
  102:1 110:6 117:2
  121:24 127:3
  128:11,22 132:21
  141:9 143:15
  144:9 156:5 158:8
  169:3 170:21
  173:19 174:10
  190:14 191:3,6
  194:1 195:13,14
  197:21 204:18
  207:2,22 211:18
  225:11 230:10,13
  231:20 232:9
  233:8 234:1,8,9
  237:11 238:6
  245:7,15 247:1
  250:8 273:9
  274:16 280:6
  289:19 304:13
  306:9,18,19 307:9
  313:3 321:14
  328:12 332:3,14
  333:6 347:4
  352:15 353:22
  361:19 367:13
  381:19 388:13
  392:2 401:3
  404:13 405:5
  406:1 407:2 416:6
  418:5,21 421:23
  427:9 433:10
  436:19 439:12
  450:16 452:8,19
  465:6,6 466:10
  469:15 477:9
  480:2,14,22 485:7
  495:19 508:12,16
  512:3 516:6 523:3
  524:17 525:8
  526:15,23 527:15
  528:21 532:15
  534:2 535:10
  538:8 545:4,6,21

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1512 of 1525
PageID: 63658
Judith Zelikoff, Ph.D.

Page 636

545:21 550:12
557:9 560:12
561:9,18,18
568:20 570:8,10
570:15 572:5
577:14
**sort**
503:24
**sought**
398:7
**sound**
200:21 446:10
**source**
57:21 79:7,20
80:10 82:15 88:2
91:19 92:5,10,15
96:10 97:7 100:19
103:9 108:8 113:4
254:22 261:4,8,15
399:9 443:19
450:3 563:19
**sources**
15:10 25:3 101:14
261:7 450:20
459:12 494:6
**South**
2:9 4:8
**space**
327:20 580:6
**speak**
113:13 178:13
205:22,23 225:6
226:4,8,13 227:13
229:17,21,22
**speaking**
30:10 225:13,16
343:8
**speaks**
206:4 227:15 248:4
**spec**
292:12 465:5
**speciated**
419:6
**species**
119:14 257:9
297:10 300:11

308:13 309:13
363:24 364:6,11
364:15,16,22,23
365:7,13,14 366:2
366:7,7,8 367:18
464:11,13 469:24
475:10 504:14
**specific**
25:13 108:14 143:7
143:11 171:2
174:23 189:3,9
190:8,11,22
209:13 216:14
217:8 221:15
255:18 261:8
264:19 265:1
279:19 294:6
301:1 302:19,20
303:9 313:14
344:1,19,21 362:8
453:20,20,21
454:5 462:10
478:23 479:20
488:16 497:11
510:1 544:1 545:8
546:8 559:8
**specifically**
62:2 137:6 163:5
169:14 172:13
185:23 189:17
190:7,7 210:5
211:5 212:1 228:9
274:1 286:3
303:24 314:1,2
394:2 451:2
468:16 505:2
522:17 566:23
**specifics**
495:1
**speculation**
87:20
**speculative**
151:8
**speed**
442:22
**speeding**

442:24
**spell**
19:15,18
**spend**
27:24 38:4 389:2
**spent**
17:8 26:22 27:8,13
27:18 389:7
**sperm**
95:3
**spoke**
172:10
**spoken**
23:10 29:6,19
77:23 171:18
172:6 356:11
530:16 555:3,6,17
**sporadic**
15:18
**spot**
252:4
**Square**
3:8
**stack**
387:8 495:15
569:23
**stages**
326:16
**stall**
337:21
**stand**
70:19 75:2 95:7
113:24 195:24
197:22 217:19
294:23 527:15
578:8
**standard**
68:2,13 69:14
309:4
**standards**
69:1 282:16 385:3
468:19
**standing**
97:14 118:15
**stands**
101:11,14

**start**
30:15 254:1 256:14
263:11,15 265:7
265:10,18 266:4,8
266:11 291:1
296:9 314:24
321:15 369:14
370:24 371:10
472:12 493:3
501:4
**started**
33:11,12 251:17
**starting**
33:21 253:12
497:18
**starts**
8:11 51:19 257:11
421:12 457:20
458:21
**state**
14:6 50:22 200:18
206:21 244:24
252:24 301:16
324:20 477:1
564:4 580:5
**stated**
76:21 83:13,14
86:7 155:7 168:15
169:2 200:17
211:22 212:18
214:8 252:8 296:4
307:11 336:8
346:19 455:15
493:19 512:19
530:7 533:18
**statement**
86:19,20 89:22
107:6,8 212:16
215:5,6 222:7
322:17 397:2,17
397:19 400:7
401:10,18 404:1
423:6 427:3 431:1
431:23 432:7,14
432:20 433:1,2,6
433:8,8,15 471:3

**start**
471:5,13 491:24
504:22 509:13
539:19 541:1,4
542:19 543:9,23
544:9 545:7,13,17
545:20 546:7,13
564:10 568:16
569:10 570:18
571:5 572:11
**statements**
95:9 99:14 117:17
121:21 224:6
394:21 432:9
433:14 434:12
492:6 499:21
540:1 554:1 573:5
**statement's**
573:4
**states**
1:1 119:8 120:9
431:2,17 496:23
498:14 540:20
543:22
**stating**
135:24 223:9
382:13 430:17
**station**
449:7,13 450:9,11
**stations**
449:19
**statistically**
207:7
**stay**
34:14
**stays**
74:3
**Steering**
2:21
**stem**
194:15
**stenographic**
13:14 280:9 562:20
**Step**
217:1,2
**steps**
409:5

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1513 of 1525
PageID: 63659
Judith Zelikoff, Ph.D.

Page 637

step-by-step
224:10
Stipulations
12:11
stop
442:22
stories
449:18
stove
173:2,3
Street
2:4,9,14 4:4
stress
297:3 307:22
364:17 367:19
369:15 371:21
375:21 421:20
470:13 471:7
486:20,23 487:6
504:20,21
strike
20:14 21:1 23:14
32:11 36:10 43:2
44:24 62:3,18,18
66:22 81:15 82:8
132:17 176:3
190:9 205:2
214:14 243:15,19
272:8 299:10
302:4 336:18
352:22 353:6
393:18 396:10
399:1 414:20
417:24 426:24
439:11 474:12
475:2 493:2 501:4
528:5 543:17
553:10
strong
288:4 420:12
strongly
514:24
structural
110:23
structure
268:15 324:4

structures
44:7
student
43:8,9,10 98:13,15
99:6 132:7,8
students
6:21 30:8,13 31:23
32:4,14,18 78:22
79:2,18 80:7,11
81:9,17,19 82:16
131:24 132:1
134:11 443:13
studied
184:20 333:2
428:17 532:23
533:4,13 543:16
studies
121:3 137:9,9,10
138:9 140:24
145:7,8 189:13
190:17,18,21
202:13,20,21
203:6 206:6,7,8
207:4 225:2 230:5
230:21 231:5
232:2,2,17,18,21
235:24 236:2
260:8 269:1 277:2
278:22 279:3,6,9
279:14,19,21,24
280:2,11 281:1,14
282:3 283:1,17,19
284:10,21 285:22
286:5,7 288:16,17
291:10,15,19,23
292:5 293:13
294:6,15 295:3,14
297:1,16,20,24
299:2 301:2 304:8
305:12 310:2
332:20 334:7,23
339:24 344:4
345:9,13,23 346:7
346:20 351:15,19
351:22,24 352:3,8
361:18,22 363:7

366:10,11 367:21
368:2,3,5,20
372:24 373:1,18
374:1,6 375:22
376:5,13 377:2,11
377:14,18 378:9
378:12,13,15
379:1,2,3,6,11
380:5,14,16
381:22 382:8
396:3 403:11
416:2,8,12,14
417:3,11,19
422:10 423:16,17
426:7,14,18 429:1
429:6 432:9
433:22 437:24
438:3,9,21 458:21
459:3 464:10,14
464:16 465:2
466:16,18 467:2
469:2,5 475:15,18
476:10 477:13
478:5 479:7
492:20 503:4,21
505:23 517:21
518:11 520:12,15
531:12,15 539:3
556:14,19,22
557:14,15,18,21
557:24 558:2,10
558:19 559:4,11
560:6,16,20,21,23
560:24 561:4,7,10
561:11,14,16,22
562:3,5,9,11
564:22 565:4
568:14 572:12,17
574:21 575:1,5
577:1,4,6,9,22,24
study
154:4,14,20,22,23
155:1,4 197:8
214:6 233:16
234:4,10,19
252:22 264:20

285:12 288:18,19
291:3 296:16
297:5 299:7
305:14 310:6
313:6 332:24
335:3 336:14
342:19 346:13,21
346:21 347:1
351:9 360:13
361:4 362:10,20
371:22 372:12
373:17 375:11,13
375:15 376:9,20
377:16 378:8
399:13 401:19
402:12,14 416:3
435:15,19,21
436:2,7,22 437:1
437:11 446:4
451:7 454:19
455:1,5 456:23
464:23 469:12
472:4 474:6,10,14
476:3,8 477:18
478:1,1 480:13,15
484:20 508:7
509:14 515:15,20
515:22 517:3
518:3,19 519:23
534:3 557:4
559:20,23,23
560:2 561:13
562:17 563:2,9
566:17 567:15,17
study's
473:24 572:24
style
167:1,2
subcutaneous
334:6
subject
122:19 167:15
302:20 580:10
subjective
225:1
submission

522:3
submit
500:16
submitted
171:4,14,16 213:2
213:3,10,11 498:9
500:19
Subscribed
582:19
subsection
487:16
subsequently
362:5
substance
149:17 150:9,12
200:12 224:13
262:17 342:23
343:6,11 366:14
368:20 369:6
385:6 423:24
582:11
substances
262:8
substantiate
434:9
substantive
215:20
subtype
193:13 194:24
subtypes
191:9,23 193:16
194:10
sufficient
260:19 290:17
440:9,22
suggest
299:21 482:22
suggested
123:24 454:7
suggestion
338:3,6
Suite
2:10,14,19 3:13 4:8
summary
63:7 564:7
Sunday

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1514 of 1525
PageID: 63660
Judith Zelikoff, Ph.D.

Page 638

38:3
Sunderman
122:14
Sundre
289:24
superficial
22:14,19 199:1
  409:12
superoxide
365:4
supervision
579:22
supplement
36:15 48:20 60:1
  73:24 201:15
  247:8 249:9,21
  277:3 522:5,6,7
supplemental
37:1 38:12 59:18
  59:20 374:15
  522:10,23
supplementary
57:5
supplemented
74:2
supplied
53:2 139:19 140:20
  143:4
suppliers
455:24 498:9
supplies
461:17
supply
167:8 461:20 494:6
support
12:2 320:6 397:13
  432:10 443:15
  501:12 502:3
  548:3
supported
62:15 111:22
supporting
6:9 156:9 547:21
supports
441:11
supposed

70:18 71:7,19
  181:9 263:7
supposedly
413:7
sure
23:22 24:20 29:19
  33:4,7 45:6 46:19
  59:24 68:12 69:24
  70:5 86:14 92:1
  102:9 121:9
  123:10 138:2
  142:23 165:16
  192:14 234:3
  242:15 247:19,21
  249:17 251:2
  252:10 263:23
  267:12,18 272:1
  279:12 347:2
  355:17,20,22,23
  356:3 366:20
  387:5 388:20
  397:21 413:2
  414:18 440:14
  452:10 465:23
  469:6 482:20
  537:24 538:23
  551:19 560:22
surface
181:24
surprising
488:24
surveillance
359:4
survey
453:3 454:3 455:4
  455:9 497:18
survivability
375:20
susceptibilities
255:9
susceptibility
266:3 370:2
susceptible
262:19 371:20
suspect
514:23

suspected
513:1 518:23
suspicion
519:18
sword
327:5
sworn
13:20 579:5 582:19
symptomology
331:16
symptoms
353:19
synonymous
353:2
system
33:17 165:23
  262:19 325:20
  326:12,17,21
  347:7 359:12
  366:6 402:7,19
systematic
6:14 60:13 136:5
  206:3 228:4
  232:12 356:1
systemic
205:14
systemically
303:17 304:23
  306:10 312:11
  323:21
systems
371:19
S-transferase
381:11

        ___ T ___
T
4:3 5:11 6:2 7:2 8:2
  9:2 10:2 11:2
  581:1
table
31:12 287:5
tables
38:24 42:13
Taher
6:17 59:24 60:16

61:8,19 62:3,5
  206:4 208:4,23
  210:8,13,15
  415:12 478:1
  569:20 571:22
Taher's
63:21 205:14
take
18:2 74:8 76:15
  78:2 85:15 94:2
  97:7 106:15
  113:18 118:17
  122:8 195:22
  211:11 225:1
  265:23,24 277:14
  282:18 358:6
  386:12 421:9
  456:24 487:13
  518:9 523:10
  537:9,12
taken
1:13 43:22 76:6
  79:1 87:24 93:16
  100:9 105:9
  109:10 121:21
  125:13,16 172:17
  178:11 199:7
  235:20 494:5
  526:10 546:21
takes
265:23,24 296:6
talc
3:20 6:16 8:14 9:15
  9:23 11:15,18
  18:3 22:12,24
  24:24 25:4,11
  29:12 30:14,16
  31:4,13,23 32:5
  60:15 62:17 73:6
  73:11 126:24
  128:7,10 134:1
  141:13 148:14
  149:7 150:16
  152:8,14,21 153:5
  153:13,20 154:9
  155:7,19 156:16

156:24 157:4
  159:7,10 163:18
  164:9,18,20
  166:19 167:13,23
  171:20 185:4,12
  185:13 187:19
  189:14,14,15
  196:23 197:7
  198:16 205:9,24
  206:1 207:9
  208:24 216:15,16
  217:1,20 218:9,18
  219:22,23 221:15
  222:22 223:10,14
  226:21 227:5,10
  230:7 231:8,15
  232:22 233:8,17
  234:6,20 236:1,6
  236:11,12,22,24
  237:17,22 238:1
  238:10 239:15,16
  240:20,21,23
  243:6,18,21,22,23
  244:1,2,4,6,12,12
  244:16 245:1,11
  245:16,21,23
  246:7,12,17,19,23
  247:4,13 248:2,8
  248:20 250:9,10
  256:20,24 257:2
  263:16,20 264:8
  265:8 266:11,19
  267:1,2,8,11
  268:5,6,7,12,14
  268:16,19,20,22
  269:2,3,5,10,16
  269:19 270:2,22
  271:19 273:3
  274:7 275:21
  277:6 284:7 288:2
  288:19 291:15,19
  295:15 298:10,12
  298:12,24 299:3
  302:6,13 303:4
  304:3 305:3
  307:19 308:2

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1515 of 1525
PageID: 63661
Judith Zelikoff, Ph.D.

Page 639

| | | | | |
|---|---|---|---|---|
| 309:1,23 310:1,12 | 491:6,11 494:5 | 439:1 440:16 | 187:15 202:21 | 375:19 |
| 312:20 332:5,21 | 496:20 498:12 | 441:6 477:2 488:8 | 221:7 250:16 | **telephone** |
| 333:12,17,19,24 | 499:5,14 504:15 | 493:15,21,24 | 259:12 263:4 | 19:4,5 |
| 334:1 336:16 | 505:1,18 506:23 | 494:7 499:24 | 265:14,15,16 | **television** |
| 339:22 340:2,3,8 | 507:3 508:7,9,18 | 513:6,8 514:6 | 266:5,7 286:13 | 449:7,13,19 450:8 |
| 340:15,19,24 | 509:10 510:3 | 515:6,16,19 517:5 | 291:11,14 293:16 | 450:11 |
| 341:7,7,8,10 | 511:14,15 512:9 | 520:23 528:13 | 296:22,24 297:4 | **tell** |
| 343:19 344:5,8,11 | 513:12 515:18 | 538:24 549:20 | 297:13 298:4 | 15:15 17:1 20:21 |
| 344:15 345:7,11 | 516:16,21 519:7 | 550:18 551:2,8 | 317:13 334:4,5 | 21:14 24:11 43:18 |
| 345:16 346:1,15 | 519:13,15,16,19 | 552:1 559:5 | 335:7 339:21 | 52:14 55:12 85:22 |
| 350:2 351:5 | 520:6 531:5,8,15 | 561:19 575:21 | 344:21,24 345:1 | 120:7 124:8 |
| 356:15 357:24 | 532:3,6,12,17,20 | **Talcums** | 354:8,9 357:6 | 128:11 182:13 |
| 358:6 362:22 | 533:2,7,14 538:23 | 9:18 | 370:19 397:3,5 | 188:7,24 191:16 |
| 366:9 367:23,24 | 539:21 541:6 | **talcum-based** | 398:18 426:23 | 228:17 242:17 |
| 370:9 371:3,4,24 | 544:2 545:10 | 512:21 | 432:4 437:19,21 | 265:20 272:13 |
| 372:16 373:21 | 546:9 548:7,14,18 | **talc-based** | 455:2 462:9,10 | 361:11 372:5 |
| 376:16 377:19 | 552:21 553:7 | 231:9 512:18 | 467:15 490:17 | 379:1 380:9 |
| 378:10,16 379:13 | 554:4 559:2,2 | 513:12 | 526:21 539:9 | 391:13 435:13 |
| 380:22 381:20 | 565:24 566:18 | **talc-containing** | 557:14 | 460:9 475:20 |
| 382:5 383:2,9 | 567:10 570:19 | 496:21 497:24 | **talks** | 483:11 502:16 |
| 384:11,18 385:13 | 575:5 | 540:19 | 136:23 137:2 | 542:23 543:23 |
| 393:5 394:22 | **talcs** | **Talc-induced** | 223:23 558:7 | 568:20 |
| 396:9,12 397:2,10 | 451:14,16 476:20 | 538:5 | **target** | **telling** |
| 397:14 398:8 | **talcum** | **talk** | 263:8,11,14 265:6 | 97:4 219:21 222:11 |
| 400:3,19 401:6 | 1:5 6:10 10:6 13:9 | 32:9,9 122:5 166:9 | 288:6 298:22 | 299:17 |
| 408:12,20 409:7,9 | 21:23 127:14 | 166:10,10 175:19 | 300:1 301:12 | **TEM** |
| 409:14 414:2,23 | 128:19 130:9,13 | 202:7 218:6 | 312:13 320:22 | 252:2,15,16,18,19 |
| 416:6 419:12 | 130:19 131:2,10 | 236:14 253:12 | 322:5 330:14 | 252:20 446:18,21 |
| 425:22 426:5,12 | 157:12,21 172:3 | 274:10 280:12 | 356:17 370:5 | 456:6 |
| 426:19 428:1,11 | 189:4,13 196:23 | 281:9 289:6 298:4 | **task** | **temporal** |
| 429:10 431:3,18 | 201:7,8 206:12,16 | 337:2 359:22 | 520:4 | 358:15 |
| 432:12,16 433:23 | 208:13 209:8 | 397:6 417:5,8 | **taught** | **temporality** |
| 438:3,9,10 439:3 | 210:2 216:2,21 | 442:23 446:18 | 33:18 34:1,2 | 327:14 328:4 |
| 439:14,16 440:9 | 217:14 221:2 | 528:22 | 165:20 166:5 | **ten** |
| 440:22 441:6 | 222:9 223:14 | **talked** | **teach** | 195:20 258:3 293:4 |
| 444:14,19 447:5 | 243:12 265:14,22 | 24:7 34:9 63:14 | 186:2 | 358:13,17,19 |
| 450:21 452:15 | 265:22 270:9 | 64:4,24 73:20 | **teaching** | **tenfold** |
| 453:4,5 455:11,12 | 271:3 275:8 | 166:11 196:10 | 159:12,13 165:19 | 459:9 |
| 455:20 465:12,17 | 276:23 340:9 | 197:13 265:9 | 167:1,2,4 | **tenure** |
| 465:21 466:1,2,5 | 344:13 345:1 | 345:6 384:9 452:7 | **technical** | 14:16 |
| 466:6,11,12 | 346:22 352:10 | 462:15 502:7 | 251:22 | **term** |
| 468:17 470:4 | 363:4 366:14 | 529:19 554:17 | **technically** | 99:7 108:14 |
| 472:5 477:14 | 370:20 377:5 | **talking** | 334:15 | **terms** |
| 478:6,23 479:3,4 | 382:2 397:10 | 21:8,9,13 71:5 | **TECHNICIAN** | 21:1 41:24 42:7 |
| 479:8,20 480:17 | 403:15,17 423:11 | 99:18 110:11 | 4:15 | 44:3,12 134:12 |
| 481:5 487:4 490:2 | 428:11 438:23 | 142:18 174:5 | **techniques** | 138:7 151:17 |

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1516 of 1525
PageID: 63662
Judith Zelikoff, Ph.D.

Page 640

159:22 182:10,12
183:10 194:8,20
239:5 247:16
251:15 252:5
274:14 286:20
288:1 301:3
309:11 312:8,10
326:8,9 327:11,13
328:4 331:13,13
336:10 353:24
369:24 396:6
414:14 432:3
433:18 434:4,9
438:22 485:3
486:16 490:11
542:14,15 548:10
551:19,22
**Terri**
14:8
**terribly**
528:20
**test**
191:5 253:2 270:15
273:7 413:6,21
414:10 494:21
521:6
**tested**
264:11 273:1
293:23 295:19
360:2 410:7 495:7
539:5
**testified**
13:21 187:16
370:17 390:14
410:21 411:17,20
489:9 532:4 557:3
**testify**
28:1 157:18 266:24
418:11 447:5
512:17
**testifying**
71:1 148:17 173:14
173:18 174:1,11
175:2 564:15
**testimony**
5:4 16:7,9 51:15

67:1 70:18 71:8
71:16 75:18 78:4
87:22 90:14,23
91:9,16 92:1
95:20 104:9 105:6
113:20 114:8
115:6 126:7
243:19 248:10
300:23 333:16
353:5,7 389:24
408:19 411:9,10
429:9 534:10
550:2 552:4,20,23
557:11 579:6
**testing**
86:13 134:16,23
147:6 148:4,5,7
151:16 186:8,12
202:14 203:6
273:11,20 275:15
276:3,9 292:15
374:22 375:7
410:16 413:12,16
414:1,23 446:19
446:21 447:22
448:1 493:4,15
495:11 496:8
497:22 515:15
519:1 538:16
539:20 540:13
**tests**
135:2 146:20 147:3
147:6 148:11
253:8 274:3,4
413:20 414:5
561:7
**Texas**
3:13
**text**
38:12,22 59:14
546:21
**thank**
17:6 32:24 35:22
36:3 59:12 75:13
85:7 102:2,4
124:15 131:17

160:1 162:19
253:16 278:21
333:10 376:3
419:3 441:23
442:13 477:11
481:20 484:9
485:15 493:11
507:8 517:17
523:8 524:7 526:4
526:4 539:17
544:21 546:6
569:24 570:1
571:10 572:8
573:17
**Thanks**
495:16
**theory**
24:12,12
**thereto**
121:23
**thesis**
252:17
**thing**
78:1 90:12 91:2
114:17 149:13
150:7,24 199:9
310:3,10 325:20
326:11 357:7
363:2 519:15
522:4 553:15
**things**
86:7 94:17 103:15
110:12 136:16
169:24 185:11
194:14 238:19
337:22 344:14
451:3 569:17
**think**
24:20 42:8 43:5
65:15 66:10 69:9
73:13 74:12 77:15
82:5 84:22,23
85:5 100:21 111:3
150:20 155:24
156:19 164:11,12
168:14 182:12

183:11 185:12
187:10,13 192:21
194:5 195:21
206:5,7 220:18
221:19 223:12,13
224:20 229:7
238:13 241:22
256:1,2,3 267:6
268:18 272:2,7
277:4 287:4,10
288:17 310:18
312:6 337:20
338:9 370:16
381:1,10 386:15
386:16 387:11
400:10 401:11
435:23 436:1
437:6 441:3
446:10 449:22
477:19 482:12
485:13 487:13
489:9 490:4
515:11 518:6
522:9,12,20 527:6
546:20 551:14,16
570:12 571:11,20
571:24 573:14
**thinking**
56:22 57:2 367:14
**third**
131:14 400:2 404:1
404:3,15,16,20
411:13 420:1
421:11 565:24
**thirty**
580:16
**Thomas**
2:8 4:3 49:13
**thought**
54:20 86:23 101:2
107:3 138:21
192:8 193:24
241:13 247:15
281:20 349:8
390:22 401:17
416:13 435:13

490:16,16 516:9
561:19
**thoughts**
88:3 95:13 194:6
**threatening**
317:10,16
**three**
38:7 179:10 248:9
280:18 281:11
289:1 316:15
326:15,16 358:12
443:13 457:17
482:14 528:5
559:13 561:24
**three-quarters**
64:10 390:1,2
**threshold**
238:9 239:1
253:23 255:7
263:22 265:12
283:2
**throw**
337:19
**throwing**
102:24
**throws**
187:18
**Thumb**
6:7
**time**
13:6 17:9,15 20:4
21:12 22:14 23:1
23:3,17,17,19,20
23:24 24:1,21
25:5 26:13 27:8
27:12,18,23 38:4
39:13 45:23 47:1
47:10 56:2 61:9
71:5 74:16 75:3,7
86:10 99:9 125:2
125:5 132:11
181:4 196:1,5,14
196:15 198:9
209:20 213:22
214:18 215:19
229:7,9 251:19

Judith Zelikoff, Ph.D.

260:13,14,19
262:13 277:17,21
285:9 319:15,20
327:17 337:24
338:18,22 339:3,5
339:11 357:4,10
380:11 383:15,20
384:2 388:9,17,22
389:1,3 391:22
393:11 394:10
411:4 422:2 442:1
442:4 443:22
456:17 463:7,12
463:18,21,23
464:3 465:20
480:21 481:9,12
483:13,13,16,17
483:21 484:16
485:4,18,22
486:13 493:20
500:22 523:12,17
524:22 529:4,8
537:6 556:21
571:12 578:10
**times**
3:8 103:6 172:19
214:10 285:18
328:21 444:7
457:1 459:11
566:13
**timing**
327:14 328:4
**Tinto**
455:24
**tiny**
316:3,4
**tired**
336:24 516:6
**Tisi**
2:9 28:20,21,22
207:19 481:21
482:1,15,21 483:3
544:16
**tissue**
239:9 263:8 311:8
329:22 331:2

354:14,20 355:5
366:16 367:3
368:14 369:16
370:3,5,11 417:13
465:7 477:3 507:1
**tissues**
137:10 292:13
355:6 368:21
371:12,19 416:20
417:4 466:21,22
513:3
**titanium**
304:7 305:15
307:13
**title**
14:14
**titled**
60:13
**tlocke@seyfarth....**
4:5
**tobacco**
170:2 224:2
**Toby**
537:22
**today**
13:5,11 16:15
27:23 28:1,8
32:16 33:24 36:17
37:15,17 44:22
50:14,17 53:13
55:3 87:8,23
90:24 113:17
114:6,23 115:4
153:2 161:1,11
162:20 197:2
346:12 380:12
384:24 391:21
392:12 395:21
418:11 443:10,12
443:23 444:15
447:8 480:5
530:24 533:23
548:1
**today's**
50:10 578:10
**toenail**

176:14,15
**toilet**
340:16,19,24 341:5
**told**
19:7 20:6 29:23
30:3 59:1 212:9
228:21 442:23
**top**
105:22 188:7,22
203:2 230:3
359:19 368:10
372:4 408:9
430:15 445:1
451:1 452:4
454:18 455:18
457:23 467:2
477:10 506:12
520:19 540:16
552:7 563:24
575:17,20
**topic**
198:11 383:24
384:1,1 447:15
448:8
**topics**
150:15
**total**
418:10 419:6 485:5
**totally**
83:5 272:17 518:8
**touch**
134:1 138:15
**tox**
44:10 54:18 227:9
**toxic**
182:24 183:4,8
235:22 236:1
320:18 322:11
533:13
**toxicant**
263:4
**Toxicants**
9:8
**toxicities**
181:10,17 554:4
**toxicity**

8:19 90:9 166:7
181:15 182:6,10
183:3,10,14,17,21
183:23 184:12
235:21,22,22
262:8,15 417:12
417:13 423:9,19
423:23 424:16
425:8 488:7 514:6
517:13,13 528:12
528:13 529:24
532:18 534:5,12
534:16,23,24
535:14,24 536:5
537:2 553:7
**toxicological**
202:20,21 490:22
491:17 514:7,19
514:19 553:1,6
**toxicologist**
137:8 183:13
184:10,21 225:8
228:14 235:13
262:6 294:22
295:9,10 315:19
320:8 334:17
399:18 445:6
514:16 532:14,17
554:7,22 555:1
**toxicologists**
167:17
**toxicology**
30:7,10,11 31:3,23
32:13,17 33:17
77:24 149:21
153:12 154:15
165:24 166:1,3
186:2,3 197:24
215:17 220:2
223:4 225:10,17
226:5,9,14,15,16
226:24 227:2,4
230:1 264:6
298:24 299:1
373:3 440:2 491:3
492:2 514:18

533:13 534:7
554:13,19 555:5,9
555:12,13
**Trabert**
9:12
**trace**
406:22 407:11
**traces**
404:18
**tract**
31:7 170:11 334:10
335:1 371:18
431:12
**Trade**
185:9 224:3 260:2
260:11 460:21
**trained**
185:23,24
**training**
177:5,12,14,15
492:5
**transcript**
11:13 579:9,19
580:17,19
**transcription**
104:13,21 310:5
475:8 480:19
481:7 582:7
**transcripts**
390:8
**transformation**
470:2 479:12,16
**translocated**
198:16
**translocation**
427:15
**transparency**
81:24 229:6
**transparent**
71:3 229:11
**transport**
334:9,24 335:21
340:1 426:5,13,23
465:13,18
**transported**
468:10,14

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1518 of 1525
PageID: 63664
Judith Zelikoff, Ph.D.

Page 642

transports
340:3
transposed
332:15
travel
240:3 300:13 466:2
  466:3,7,14,15
traveled
466:4,16
traveling
240:3
treat
171:19 177:6,8
treated
177:19 516:17,18
treating
177:23
treatment
233:9 575:19,21
treats
356:7 514:10
tremolite
179:24 182:9,16,22
  183:9 248:9
  406:21 407:11
  451:17
trial
16:7,9 71:16
trigger
370:23 371:5
triggering
271:13
trivalent
293:11 321:13
true
27:14 114:20 293:9
  364:10 445:13,14
  473:9 516:24
  518:14,18,23
  519:6,12,14 554:5
  557:6 579:6
truthful
71:3,14
try
232:9 254:24
  327:19 329:1

442:21
trying
84:12 212:14 346:6
  424:4 431:10
  454:22 455:14
  463:6,9,13 485:1
  516:10
Tube
8:6
tuberculosis
329:5
tubes
371:15 499:16
TUCKER
4:7
tumor
119:11 153:14
  192:5 298:19
  326:20 327:1
  360:5 365:14
  470:3 505:4
  566:17
tumors
153:16 326:9 402:6
  402:18 543:2,12
turn
79:3 271:13 331:24
  332:2 386:24
  398:24 408:5
  409:24 411:6
  421:22 431:15
  444:21 476:16
  487:15 496:6
  497:15 498:18
  506:11 507:22
  511:21 520:18
  549:15 572:9
  573:18 575:14
turned
450:12
two
28:16 29:3 30:12
  44:23 57:20 81:8
  84:24 88:24 89:14
  103:15 107:12
  108:15 129:8,9

172:20 176:18
249:21 264:8,16
325:1,2,3,17
327:7,9,24 330:22
413:8 456:4
482:13 499:2
534:22 540:16
546:2 571:18
two-prong
327:5
two-thirds
49:14 472:9 498:19
type
193:7 310:23
  324:16 328:17
  376:6 417:23
  425:14 470:11
  519:20
types
192:3 193:6 194:21
  325:14 326:16
  327:7,8,9,24
  328:2 347:21
  354:12,13,19
  379:2 404:19
  472:21 573:1
typical
459:7,9
typically
192:18 463:9
T-cell
326:6

_____
        U
_____
ubiquitous
289:15
ultimate
207:14
ultimately
25:20,23 26:18
ultra
429:13,19
unable
366:8 420:19 421:1
unacceptable
512:10

unacknowledged
81:1,5
uncertain
400:5,21,22
unclear
146:13 401:8,20
  455:6 508:19
uncomfortable
124:19
uncommon
377:10
underlying
194:12 201:1
  306:22,23
underpinning
217:23
understand
66:2 70:6,17 71:6
  71:13,19,24 91:13
  92:9 105:8 129:18
  130:1 145:12,12
  147:23 152:24
  183:1 192:24
  214:13,15,20,21
  214:24 215:3
  227:17 234:23
  237:6 238:7
  249:18 261:24
  279:12 291:12
  335:14 375:1,4
  407:18 422:7
  442:16,17 447:7,7
  463:8 482:11
  520:3 558:23
understanding
70:23 438:23
  466:12 513:22,23
  514:17 557:22
understood
50:1,3 74:22,23
  395:2
undertaken
502:12 503:19
unethical
518:8 519:2,22
  559:19 560:1,3,16

560:17
unfair
147:20
unfortunately
328:6,21
Union
4:11 555:12
unique
104:18,24 305:3
  465:11
unit
110:23
United
1:1 120:8 496:23
  498:13 540:20
universally
241:6
university
14:11,15 15:8
  29:20,24 32:4
  69:5,16 78:23
  79:17 80:6 81:17
  81:21 176:21
  227:14,16,18,19
  227:22 228:17,18
  342:2,3
university's
81:9
unknown
265:19 369:9 370:5
  401:21 406:23
  407:12
unpublished
58:8 202:13 203:6
  214:11 447:12
  448:6,15
unusual
283:15
updated
168:20,22,23
upper
431:12 467:20
upregulate
326:5
upregulation
296:11 475:11,23

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1519 of 1525
PageID: 63665
Judith Zelikoff, Ph.D.

Page 643

476:11
**uptake**
103:24
**upward**
371:18,18
**urban**
459:10
**use**
6:10,16 9:15 60:15
62:17 68:20 73:1
76:3 77:1,22
96:14,15 97:1,9
101:18 102:11
105:19 111:17
113:21 115:1
116:4 117:11,12
117:21 118:19
121:4 127:1,13
128:7,10,18 130:9
130:13,18 131:1
131:10 152:8,14
152:21 153:5,20
154:9 155:7,19
156:23 167:3
172:2 173:22
181:4 183:7
190:16 204:24
205:9 206:16
208:13,23 216:3
216:21 217:14
221:2 222:9,22
224:14 230:7
231:15 232:22
233:17 234:6
252:1,13 295:23
305:12 351:12
363:4 372:20
373:1,5,14 377:10
385:8 400:3,19
406:19 407:8
410:17 434:11
440:3,5 445:23
469:3 472:17,19
473:16 489:13
493:19 505:18
508:7 509:10

515:6,15 518:10
519:23 520:6
523:11 538:23
542:13,15 548:16
560:1 564:21
565:17 570:19
575:18
**users**
352:10 478:23
**uses**
119:17 237:15
351:13 441:4
548:7 559:24
**usually**
91:7 96:15 215:18
349:18
**uterine**
167:20
**U.S**
77:23 108:13,17
205:13 453:1
498:1
**U.S.A**
461:15

_____

**V**

**V**
2:9
**vagina**
499:8
**vaginal**
334:4 336:15
346:18 371:9,10
371:12
**vaginally**
333:13
**vague**
159:22 188:4,20
**validating**
503:10
**validation**
547:21 548:4
**value**
137:12,15
**Van**
452:12

**vapors**
185:16
**variant**
479:15
**various**
54:17 136:21
181:10,11,18
276:22
**vary**
181:10,17
**Venter**
197:12 336:11
502:22
**verbally**
167:5
**verbatim**
97:9 103:7 116:1
121:22
**verify**
276:8 375:7 412:24
**Vermont**
187:22
**versus**
305:4 385:22 433:8
433:15 434:22
**Vertel**
218:6
**viability**
484:23
**viable**
485:5
**video**
13:7
**videographer**
13:1,3 75:2,6 125:2
125:5 195:24
196:4 250:24
277:17,20 319:14
319:19 338:18,22
383:15,19 442:1,4
463:23 464:3
485:18,21 495:23
523:12,16 529:4,8
578:8
**VIDEOTAPE**
4:15

**Videotaped**
1:13
**view**
432:21
**viewpoints**
400:23
**viral**
325:21
**virtually**
94:21
**virtue**
501:2
**visible**
357:1
**vitae**
7:22 380:9
**vitro**
137:8 138:8 145:6
197:8 202:22
295:3 297:1 368:2
373:1 377:1,11
378:13 480:17
481:6
**vivo**
137:8,9 138:8
140:23 145:8
202:22 295:3
314:18 366:19
367:5 368:1
377:18 378:16,18
378:19 439:4,15
440:22
**volume**
368:19 439:3,14
**vulnerabilities**
255:10
**vulnerability**
266:3
**vulnerable**
330:18 331:1

_____

**W**

**W**
4:8
**Wacker**
4:8

**wait**
544:5 556:7 570:11
570:13
**waiting**
411:1
**walls**
258:2
**want**
74:8 99:10 196:9
205:4 217:6
222:19 234:22
235:12 322:8
336:6 338:8
350:14 372:5
376:21 409:21
418:24 427:4,4
479:24 482:19,24
483:1 484:1 485:2
502:15 537:19
544:15,18
**wanted**
21:16 140:9 238:22
350:16
**wants**
570:13
**Warheit**
437:5,23
**warrant**
406:23 407:13
**warranted**
575:2
**Washington**
4:4
**wasn't**
47:4 197:20 225:18
225:20,22 283:24
**waste**
459:14
**wasted**
339:10
**water**
261:17,19 262:3
267:17 461:9,13
461:17,20,24
**way**
16:12 39:20 75:22

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1520 of 1525
PageID: 63666
Judith Zelikoff, Ph.D.

Page 644

77:6 83:13 86:17
88:5 94:4 116:14
126:2 136:2 162:4
176:4 192:22
200:19 204:7,8
235:5 249:13
252:3 286:7
295:21 336:5
426:4,6,13 427:1
428:12,13,19
441:2 472:10
481:22 495:4
496:5 498:20
530:8 557:4 566:7
**ways**
79:24 80:3 237:6
320:18
**weak**
420:6 421:12,14
435:8 564:6,6,16
564:17
**website**
79:1 81:13 107:16
107:18
**websites**
54:18
**weeks**
44:23 57:20 249:22
576:8,12
**Wehner**
63:23
**weigh**
433:7,13
**weighed**
136:21
**weighing**
249:7
**weight**
249:3 397:12
416:11,11 433:5
**weighted**
416:14
**weights**
503:20
**Weiner's**
197:15,16,16

**welcome**
161:7,18 544:19
**welding**
123:18
**well-done**
435:19,21
**well-established**
182:15 217:3
489:21
**well-known**
182:14 217:3
228:13 272:19
**well-publicized**
489:20
**went**
33:8 54:16 374:4
390:6
**we'll**
62:19 74:19,20
317:5,5,13 318:23
337:1 338:15,16
537:11
**we're**
18:2 32:6 99:18
125:10 196:8
221:6 230:13
265:14,15 266:5
276:15 298:3
317:6,17 318:7
319:10,11 334:3,4
336:19,20 337:9
337:11,13,16
338:24 339:1,13
339:21 364:17
370:19 482:2
483:6,6 484:3,7,7
**we've**
73:20 74:11 94:11
103:3,5 114:21
195:19 277:11
290:3 337:19
444:14 492:11
**white**
158:4
**withdraw**
161:20 209:21

226:1 236:4
287:14 316:18
334:20 411:3
**withdrawn**
319:8
**withdrew**
319:4
**witness**
12:5 13:17 15:1
20:4,16 21:12
23:8,18 24:2,18
26:7,12 28:21
29:1 33:1 38:18
38:21 41:14 46:3
46:19 47:14 48:1
52:8 53:2 56:10
56:13,15 67:4,21
68:9,20 70:5,22
71:12,24 74:21
78:10,14 82:20
83:4 85:7,20
89:21 90:19 91:6
91:22 92:8 94:6
94:16 96:14,23
97:14 98:7,21
99:24 100:14
101:1,10,24
103:18 105:13
106:3 108:3,12
109:2,15 110:5,8
112:16 113:24
114:16 115:7
116:8 120:5 122:7
122:10 124:16,22
127:6 134:5,22
135:19 137:23
138:14,19 139:9
140:1,12 142:17
143:15 144:16
145:4,17 146:13
147:2,22 148:21
152:11 153:8
154:12 155:23
158:1 159:24
163:2 166:23
168:14 170:14

172:5 173:17
174:2,18 175:19
179:5 180:14
181:14,21 184:4
184:18 185:7
187:6 188:5,21
189:8,23 191:1,14
192:13 193:5
195:3,6,11,14,17
196:16 198:4
200:16 206:21
209:4,12 210:10
212:13 214:4
217:19 218:21
219:11 221:6
223:2 224:20
225:20,23 227:8
228:3,22 231:18
233:1,4 234:9
235:9,11 238:13
240:1,17 241:21
242:15 243:9
244:16 245:7
246:11 249:1,17
251:2,11 256:1
257:6 258:15
259:9 260:8
262:11,24 263:19
266:14 267:5,16
267:22 268:1,11
269:8 270:6 271:2
271:24 274:9,16
274:24 280:6,10
281:9 282:7 283:7
284:15 286:12
287:22 289:18
291:8 293:2,22
294:20 296:2,21
299:17,20 300:24
303:2 304:21
305:7 306:8,18,20
307:9 310:17
311:21 312:23
313:12 314:22
317:10,16 318:18
318:21 319:2

321:8 322:3 323:5
323:17 324:14
329:14 330:6
334:14 335:14
336:7 337:3 340:7
340:23 341:15
342:15 346:5
348:22 351:12
352:13 353:12
355:16 360:18
361:8 362:16
363:1,21 365:2,17
367:10 368:24
369:21 370:15
372:19 376:19
377:22 378:12,18
378:24 379:16
381:1 382:11
386:21 387:23
390:17 392:5,18
395:11 396:20
399:12 400:10
402:24 403:11
406:1 408:24
409:17 412:18
413:11 416:1,23
417:17 418:16,24
423:5 424:1,4,16
424:20 428:23
434:18 436:14
438:14 439:7,20
440:13 441:23
446:7 447:18
448:7,16 450:1
451:23 453:16,24
457:10 460:8
462:5,24 465:17
473:7 474:18
476:8 477:17
478:10 479:3,11
483:4 484:13
486:12 487:9
488:12 489:4,18
490:10 491:2,14
491:21 493:10
494:12 495:19

Judith Zelikoff, Ph.D.

Page 645

| | | | | |
|---|---|---|---|---|
| 498:5 500:4 | 173:2,2,3,22 | **worker** | 231:21 572:6 | 15:8 29:20,24 |
| 501:18 503:9 | **word** | 416:3,13 | **wrote** | 32:4 69:4 80:6 |
| 504:4,19 505:10 | 30:23 41:5,8,10 | **workers** | 91:10 163:5 249:10 | 173:7 227:22 |
| 506:5,22 511:19 | 93:16,16 105:19 | 258:17 | 249:19 537:21 | 228:18 259:23 |
| 516:2 517:8 | 105:19 106:18,18 | **working** | **Wu** | 260:13,24 290:2 |
| 524:16 526:14 | 107:23,23 113:4,4 | 34:15 251:21 | 10:10 469:13 | 342:3 |
| 527:9,22 528:20 | 113:18,18 114:7,7 | 259:18 389:4 | 471:22,24 472:3,9 | **y'all** |
| 529:17 531:11,19 | 152:3 153:9 183:8 | 392:6 447:6 | 473:15,19 | 463:14 |
| 533:17 534:20 | 187:17 222:12 | **works** | | |
| 535:17 538:20 | 235:13 412:1 | 79:6 111:6 235:5 | **X** | **Z** |
| 540:5 541:17 | 532:15 | **world** | **X** | **Zambelli** |
| 545:16 547:10,17 | **wording** | 111:10 185:9 224:3 | 5:2,11 6:2 7:2 8:2 | 10:12 |
| 548:9 550:5,16 | 89:16 489:1 | 260:1,11 460:21 | 9:2 10:2 11:2 | **Zelikoff** |
| 552:14 553:15 | **words** | **wouldn't** | **XRD** | 1:13 5:4,16,18 6:6 |
| 556:8 557:9,13 | 39:4 67:15 75:20 | 113:20,21 147:12 | 251:24 252:7,11 | 7:23 13:12,19 |
| 559:22 560:11 | 80:17,22 87:23,24 | 488:24 497:10,15 | **XRF** | 14:2,8,9 16:24 |
| 562:14 564:13 | 88:4 90:16 91:10 | 520:18 | 292:11 | 18:1 50:8,22 51:7 |
| 565:3,13 566:22 | 91:12,17,18,19 | **write** | **x-ray** | 54:1 75:10 87:5 |
| 567:21 569:24 | 92:2,4,4,11,15,17 | 63:6 75:23 76:13 | 292:11 | 95:16 126:8 |
| 570:10 573:9 | 94:11 95:12,21 | 113:15 114:5,22 | | 285:17 319:23 |
| 576:11 577:17 | 96:3,10,19 105:9 | 115:3 133:13 | **Y** | 339:6,18,21 |
| 579:5,6,8 580:1 | 114:9 120:15 | 333:11 528:8 | **yeah** | 383:23 442:10 |
| **witnesses** | 121:5 135:7,10 | 535:4,9,10 | 35:5 75:1 147:17 | 444:11 484:12 |
| 35:4 447:4,9,13 | 152:1,4 304:2 | **writing** | 175:23 183:11 | 486:4 523:23 |
| **woman** | 343:4 394:9 | 27:16 44:5 62:14 | 277:16 387:13 | 544:6 573:19 |
| 11:16 265:23,24 | 426:11 546:24 | 204:23 283:8,9 | 402:18 450:24 | 576:19 579:8 |
| 266:2 314:17 | **work** | 284:4 414:13 | 482:15 487:18 | 582:16 |
| 352:24 353:18 | 15:7 16:17 17:6,23 | 447:15 448:9 | 504:20 507:14 | **Zelikoff's** |
| 358:22 360:3 | 19:13,23 22:15 | **writings** | 508:8 516:5 573:9 | 35:20 125:14 |
| **women** | 29:7,21 34:15 | 448:13 | 573:15 | **Zelikoff-1** |
| 284:19 295:15 | 47:6 64:3,23 | **written** | **year** | 5:15 16:22 |
| 345:7,16 346:1 | 69:15 79:18 80:9 | 39:20 76:22 105:17 | 21:18 34:3 152:15 | **Zelikoff-10** |
| 357:24 361:23 | 81:2,6 82:3,10,13 | 113:1 133:8,15,19 | 387:19 408:3 | 6:14 60:9 |
| 362:3,9,11,22 | 82:24 86:9,16 | 150:13 159:7,17 | **years** | **Zelikoff-11** |
| 367:5,6,12,23,24 | 112:7 113:8 164:6 | 160:14 161:4,14 | 112:7 113:8 133:21 | 6:19 62:22 |
| 368:9 371:23 | 178:10 185:8,10 | 161:24 162:9,14 | 173:13 187:21 | **Zelikoff-12** |
| 372:1,15,20 | 185:15 186:23 | 162:22 163:20 | 228:11 242:12,17 | 6:21 78:18 |
| 373:21 377:18 | 202:5 203:16 | 164:8,18,20 | 258:3,21 260:17 | **Zelikoff-13** |
| 378:9 381:6,9 | 251:21 254:23 | 226:17 391:11 | 320:9 358:13,13 | 6:22 83:23 |
| 439:10 469:3 | 274:18 422:11 | 424:17 459:16 | 358:17,19 451:9 | **Zelikoff-14** |
| 477:14 478:6,14 | 435:23 487:2 | 471:8 499:22 | 452:21 472:18 | 7:6 88:12 |
| 478:20 479:8,20 | **worked** | 501:10 534:6,11 | 492:3 | **Zelikoff-15** |
| 499:19 541:10 | 169:22 252:8 | 534:15 535:12,17 | **yellow** | 7:7 92:23 |
| 556:15 558:3,12 | 254:10 380:4,7 | 535:23 536:4 | 208:9 | **Zelikoff-16** |
| 558:21 559:12 | 384:19,21 391:15 | 537:1,18 546:23 | **York** | 7:9 102:19 |
| **wood** | 391:16 435:21 | **wrong** | 2:19 3:8,8 14:11,15 | **Zelikoff-17** |

Judith Zelikoff, Ph.D.

7:12 106:11
**Zelikoff-18**
7:14 115:15
**Zelikoff-19**
7:16 119:20
**Zelikoff-2**
5:17 35:17
**Zelikoff-20**
7:18 118:2
**Zelikoff-21**
7:20 121:16
**Zelikoff-22**
7:22 175:12
**Zelikoff-23**
8:6 393:8
**Zelikoff-24**
8:9
**Zelikoff-25**
8:10 125:9
**Zelikoff-26**
8:12
**Zelikoff-27**
8:15
**Zelikoff-28**
8:17
**Zelikoff-29**
8:20
**Zelikoff-3**
5:19 36:23
**Zelikoff-30**
9:6
**Zelikoff-31**
9:9
**Zelikoff-32**
9:11
**Zelikoff-33**
9:13 430:7
**Zelikoff-34**
9:15 398:22
**Zelikoff-35**
9:18 405:15
**Zelikoff-36**
9:20 457:9
**Zelikoff-37**
9:22 454:11
**Zelikoff-38**

10:6 469:9
**Zelikoff-39**
10:8 471:18
**Zelikoff-4**
5:21 40:6
**Zelikoff-40**
10:11 480:8
**Zelikoff-41**
10:13
**Zelikoff-42**
10:14
**Zelikoff-43**
10:17
**Zelikoff-44**
10:19
**Zelikoff-45**
10:21
**Zelikoff-46**
11:6
**Zelikoff-47**
11:8
**Zelikoff-48**
11:10 481:16
**Zelikoff-49**
11:13 549:11
**Zelikoff-5**
5:23 43:14
**Zelikoff-50**
11:15 562:23
**Zelikoff-51**
11:17 567:5
**Zelikoff-6**
6:6 50:6
**Zelikoff-7**
6:7 53:9
**Zelikoff-8**
6:8 55:10
**Zelikoff-9**
6:12 57:9

--- **$** ---

**$25**
132:16
**$350**
16:3
**$450**

16:9

--- **0** ---

**0.2**
449:10,16
**0.3**
242:23 428:13
**07962**
3:18

--- **1** ---

**1**
1:14 16:18 17:1
  27:1 79:15,16
  85:10,12 120:7
  217:1 256:7 332:8
  381:11 386:16
  416:7 417:9 429:7
  429:14,21 558:7
  582:6
**1A**
316:16 511:5
  518:10
**1,000**
459:10
**1.3**
564:8
**1.5**
457:20
**1/15/19**
5:20
**1:17**
196:6
**10**
60:12,18 208:7,8
  210:6 213:10
  239:2 260:16
  459:8 460:16
  461:24 467:19
**10.5**
242:24 428:9
**10/18/18**
11:14
**10:11**
75:3
**10:26**

75:8
**100**
457:5
**10036**
3:8
**101**
94:22
**102**
7:9
**106**
7:12
**11**
63:1 65:18
**11.5**
242:24 428:10
**11/16/18**
5:18
**11:11**
125:3
**11:23**
125:6
**115**
7:14
**117**
484:24
**11747**
2:19
**118**
7:18 485:8
**119**
7:16
**12**
40:20 78:21 79:13
  88:16 89:9 91:11
  313:5 332:3,4,13
  333:5 336:8
  421:23 425:20
  487:15 524:3
  528:1 549:19
**12th**
40:23
**12/2018**
6:13
**12:22**
196:2
**120**

242:12,17
**121**
7:20
**124**
116:8
**125**
8:10,12,15,17,20
  9:6,9,11
**13**
83:16 233:5 335:15
  336:14 421:23
  425:21
**130**
78:12
**135**
112:18
**14**
5:5 48:12,22 88:15
  425:24 429:22
  430:16 437:11
  521:18,24 549:19
**15**
36:19 37:14 93:2,8
  93:15 173:13
  277:12 425:24
  485:6 505:21
  523:6
**15th**
37:8,18 500:20
  522:13
**150**
90:3 313:16 425:2
  528:2
**1510**
3:13
**16**
5:15 26:19 40:19
  47:2,11 69:19
  70:1 83:17 86:1,2
  101:21 102:13,22
  344:2 388:3
  389:13 425:24
  505:22 572:9,18
**16th**
249:20 395:15
  500:20 522:12

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1523 of 1525
PageID: 63669
Judith Zelikoff, Ph.D.

Page 647

**16-2738**
1:6
**17**
106:14 107:16
  426:1
**175**
7:22
**18**
115:18 501:22
  502:13 543:6
  544:23,24 551:7
**1835**
2:14
**19**
119:23 188:15
  257:22 434:1
  502:13
**1900s**
188:15
**19103**
2:15
**1960**
218:5
**1960s**
521:7
**1961**
502:21
**1962**
201:17
**1970s**
257:22
**1971**
502:19
**1972**
502:22
**1976**
10:20 406:7,8
  407:15
**1977**
10:17
**1979**
10:19 502:23
**1980**
193:22
**1982**
14:19 160:24 162:7

164:3
**1984**
451:4 453:14 506:9
  506:9
**1990**
10:22 123:21
**1990s**
434:21 521:8,10,11
**1991**
410:22 452:22
  453:14 494:20
**1992**
435:15
**1993**
153:11 197:24
**1996**
410:24 502:23
  507:6
**1997**
502:21

─────────────
         **2**
─────────────
**2**
35:19 75:16,18
  79:15 85:10,12
  118:22 126:15,17
  127:5 128:24
  199:13,16 202:9
  203:1 217:2 332:8
  403:21 425:14
  444:22 454:17
  484:22 485:6,7
  496:6 552:7
**2B**
320:19,19 548:16
  548:18
**2,000**
48:23 49:1,5
**2:27**
277:18
**2:45**
277:22
**20**
84:16,20 117:17,23
  118:4,6,9,9,21
  119:2 347:6 359:6

359:19 388:17,19
  389:2 502:13
  582:20
**20th**
388:13
**20004**
4:4
**2001**
260:18
**2004**
449:6,13
**2006**
10:18
**2007**
11:6 502:23 562:16
  563:2,16
**2008**
469:16 471:8
  577:13
**2009**
11:7,8 413:24
  414:23 454:20
  469:13 472:4
  502:4,5 506:9
  572:11,15 577:15
  577:17,19,20,22
**2010**
10:11,15 245:14
  435:6 453:13
  454:21
**2011**
10:16,21
**2012**
11:9 40:20 246:16
  457:6 458:14
  512:10
**2013**
10:12
**2014**
434:1 437:11 454:4
  497:3,21
**2015**
512:10
**2017**
18:11,15,20,21
  33:24 93:12 247:7

250:18 386:2
**2018**
17:7 26:19 36:15
  40:19,20 47:2,11
  48:12,19,22 69:19
  70:1 83:17 168:21
  176:6 206:4 229:8
  232:14 247:8
  249:10 250:18
  387:16 388:3,5,12
  388:16,17,19
  389:1,2,12,13,17
  398:19 446:24
  502:8 503:17
  521:18,24 522:5
**2019**
1:10 13:5 36:19
  37:8,14 168:22
  523:6 579:15
**202**
4:5
**21**
1:10 121:19,19
  359:6,20 472:1
  473:23,24 506:12
  506:18 543:18
  545:4,5,6,22,23
  551:7
**21st**
13:5 37:16,17,19
**212**
3:9 41:4
**215**
2:15
**22**
125:24 175:8,9
**224-1133**
2:20
**225**
457:19,20,23
  460:12
**229**
461:2
**23**
393:4,11,20 474:5
  480:10 579:15

**233**
4:8
**234**
2:4
**24**
17:7 125:24 363:9
  363:13 451:15
**25**
17:16 125:12,22
  126:5 368:10
  379:7,19 538:2,9
**2555**
3:3
**26**
5:17,21 83:18
  206:6 469:19
  480:14
**267-0058**
3:18
**269-2343**
2:5
**27**
93:11 248:8 454:20
  476:18
**28**
412:5,6 454:20
  493:23
**2900**
2:14

─────────────
         **3**
─────────────
**3**
36:20 37:23 118:22
  202:18 203:2
  230:3,12,14 332:9
  436:3,13 437:20
  445:1 455:16
  476:19,21,22,23
  476:24 477:1
  497:15 522:21,22
  522:22 539:18
  540:17
**3:21**
319:15
**3:23**
319:21

Case 3:16-md-02738-MAS-RLS   Document 9886-12   Filed 05/29/19   Page 1524 of 1525
PageID: 63670
Judith Zelikoff, Ph.D.

Page 648

**3:39**
338:19
**30**
17:16 28:5 112:7
112:19 113:8
206:5,6,6 248:7
260:16 320:9
452:21 459:23
580:16
**30th**
33:21
**300**
137:1 428:14 462:1
**305**
2:19
**312**
4:9
**316**
2:9
**32**
38:22 39:4 125:9
125:13,23 126:6
**32502**
2:10
**33**
430:4 497:4,16
498:18 539:15
**334**
2:5
**34**
398:16 507:19
570:3,18
**35**
5:17 133:21 228:11
405:11 406:15
**350**
3:17
**36**
5:19 451:9,10
457:6
**36103**
2:4
**37**
454:8 495:13,15
496:4,7
**38**

469:12
**39**
471:21
**391.0183**
3:14
**393**
8:6
**398**
9:15

---
**4**

**4**
3:8 40:9 104:5,9
117:15 118:22
237:21 321:17
332:11 387:16
388:12,16 389:1
389:12,17 403:22
431:15 433:9,16
433:22
**4th**
388:19
**4/1/14**
9:14
**4:04**
338:23
**4:48**
383:16
**40**
5:21 260:17 480:1
562:18
**400**
2:19
**405**
9:18
**43**
5:23
**430**
9:13
**435-7001**
2:11
**442**
5:6
**45**
399:22 507:23,24
509:4

**454**
9:22
**457**
9:20
**463-2400**
4:5
**464**
5:5
**469**
10:6
**47**
412:5,5 480:2,8
494:4
**471**
10:8
**474-6550**
3:4
**48**
480:2 481:18
515:14
**480**
10:11,13,14,17,19
10:21 11:6,8
**481**
11:10
**482**
549:16,17
**486**
5:7
**49**
481:18 549:14

---
**5**

**5**
18:15 43:17,19,20
45:3,10 46:16
84:21 253:12,14
321:17 403:20
498:19 541:4
575:15,20
**5:08**
383:21
**50**
6:6 28:5 99:7
242:21 428:12
563:2

**500**
104:14
**51**
567:2 573:15,16
**512**
3:14
**523**
5:5
**53**
6:7
**549**
11:13
**55**
6:8
**562**
11:15
**567**
11:17
**57**
6:12
**571**
5:7
**576**
5:5
**583**
582:6

---
**6**

**6**
50:9 248:4 266:17
332:13,14 408:6
450:6,14,17,18,19
450:23 511:21
512:5
**6,000**
459:23
**6:00**
442:2
**6:25**
442:5
**6:45**
463:24
**6:46**
464:4
**60**
6:14

**60s**
216:10
**600**
2:10
**60606**
4:9
**62**
6:19
**624-6307**
4:9
**631**
2:20
**64108**
3:4
**6950**
4:8

---
**7**

**7**
53:12,14 409:24
411:7 417:8 449:2
449:6 451:1 452:4
452:11 521:14
552:7
**7:07**
485:19
**7:30**
485:23
**735-2453**
3:9
**75**
485:7
**78**
6:21
**78701**
3:13

---
**8**

**8**
55:5 57:1 60:24
61:1 248:6 266:17
278:18 446:14
450:19,23 520:18
552:8 575:12,13
**8:10**
523:13

Judith Zelikoff, Ph.D.

| | | | | |
|---|---|---|---|---|
| **8:16**<br>523:18<br>**8:21**<br>529:5,9<br>**80s**<br>257:22<br>**816**<br>3:4,13<br>**83**<br>6:22<br>**877.370.3377**<br>1:20<br>**88**<br>7:6<br>**888**<br>2:11<br><br>**9**<br><br>**9**<br>57:12 60:21 208:1<br>392:1 419:23<br>451:15 500:12<br>542:18 572:7<br>**9/11**<br>260:17,22<br>**9/12**<br>64:15<br>**9/13/2018**<br>64:15<br>**9:03**<br>578:11,14<br>**9:11**<br>1:15 13:6<br>**917.591.5672**<br>1:20<br>**92**<br>7:7<br>**927**<br>567:8 573:21,24<br>574:12 577:2<br>**930**<br>573:20<br>**973**<br>3:18<br>**975**<br>4:4 | **985.9177**<br>2:15 | | | |