# Exhibit 17

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING SALES PRACTICES AND PRODUCT LIABILITY LITIGATION ) MDL 16-2738 (FLW)(LHG)

THIS DOCUMENT PERTAINS TO ALL CASES

WEDNESDAY, DECEMBER 19, 2018

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

- - -

Videotaped deposition of Laura Plunkett, Ph.D., DABT, held at the Four Seasons Hotel, 999 North 2nd Street, St. Louis, Missouri, commencing at 9:12 a.m., on the above date, before Carrie A. Campbell, Registered Diplomate Reporter, Certified Realtime Reporter, Illinois, California & Texas Certified Shorthand Reporter, Missouri & Kansas Certified Court Reporter.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

APPEARANCES:

BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.
BY: TED MEADOWS
Ted.Meadows@BeasleyAllen.com
RYAN BEATTIE
Ryan.Beattie@BeasleyAllen.com
218 Commerce Street
Montgomery, Alabama 36104
(334) 269-2343

ASHCRAFT & GEREL, LLP
BY: MICHELLE A. PARFITT
mparfitt@ashcraftlaw.com
4900 Seminary Road, Suite 650
Alexandria, VA 22311
(703) 931-5500

LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY & PROCTOR, P.A.
BY: CHRISTOPHER V. TISI
ctisi@levinlaw.com
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
(850) 435-7000

GOLOMB & HONIK, P.C.
BY: RICHARD GOLOMB
rgolomb@golombhonik.com
1835 Market Street, Suite 2900
Philadelphia, Pennsylvania 19103
(215) 278-4449
Counsel for Plaintiffs

KIRKLAND & ELLIS LLP
BY: KIMBERLY OLVEY BRANSCOME
kimberly.branscome@kirkland.com
WILLIAM SMITH
333 South Hope Street
Los Angeles, California 90071
(213) 680-8370
Counsel for Defendant Johnson & Johnson

DYKEMA
BY: JANE E. BOCKUS
jbockus@dykema.com
RYAN J. SULLIVAN
rsullivan@dykema.com
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
(210) 554-5500
Counsel for the Defendant Imerys Talc America

SEYFARTH SHAW LLP
BY: THOMAS T. LOCKE
tlocke@seyfarth.com
975 F Street, N.W.
Washington, DC 20004
(202) 463-2400
Counsel for Defendant Personal Care Products Council

TUCKER ELLIS LLP
BY: CAROLINE M. TINSLEY
caroline.tinsley@tuckerellis.com
100 South Fourth Street, Suite 600
St. Louis, Missouri 63102
(314) 571-4965
Counsel for PTI Union, LLC and PTI Royston, LLC

ALSO PRESENT:
KATIE TUCKER, Beasley Allen

VIDEOGRAPHER:
JACOB ARNDT,
Golkow Litigation Services

---

INDEX

| | PAGE |
|---|---|
| APPEARANCES | 2 |
| EXAMINATIONS | |
| BY MS. BRANSCOME | 8 |
| BY MS. BOCKUS | 287 |
| BY MR. LOCKE | 319 |

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Notice of Oral and Videotaped Deposition of Plaintiffs' Expert and Duces Tecum | 8 |
| 2 | Expert Report of Laura M. Plunkett, Ph.D., DABT, October 5, 2016 | 13 |
| 3 | Supplemental Expert Report of Laura M. Plunkett, Ph.D., DABT, August 29, 2018 | 13 |
| 4 | Rule 26 Expert Report of Laura M. Plunkett, Ph.D., DABT, November 16, 2018 | 13 |
| 5 | "Systematic Review and Meta-Analysis of the Association between Perineal Use of Talc and Risk of Ovarian Cancer," Taher, et al. | 16 |
| 6 | Printout of Health Canada's risk assessment of talcum powder | 17 |
| 7 | "Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention (PDQ)-Health Professional Version," National Cancer Institute | 111 |

| No. | Description | Page |
|---|---|---|
| 8 | "Weight of Evidence: General Principles and Current Applications at Health Canada" | 211 |

(Exhibits attached to the deposition.)

VIDEOGRAPHER: We are now on the record.

My name is Jacob Arndt. I'm a videographer for Golkow Litigation Services.

Today's date is December 19, 2018, and the time is 9:12 a.m.

This deposition is being held in St. Louis, Missouri, In Re: Johnson & Johnson Products Marketing Sales Practices, for the United States District Court for the District of New Jersey.

The deponent is Dr. Laura Plunkett.

Will counsel please identify themselves?

MR. MEADOWS: Ted Meadows for plaintiffs.

MS. PARFITT: Michelle Parfitt for the plaintiffs.

MR. BEATTIE: Ryan Beattie for plaintiffs.

MR. TISI: Chris Tisi for plaintiffs.

MR. GOLOMB: Richard Golomb for plaintiffs.

MR. LOCKE: Tom Locke for the Personal Care Products Council.

MS. TINSLEY: Caroline Tinsley for PTI Union, LLC, and PTI Royston, LLC.

MR. SULLIVAN: Ryan Sullivan for Imerys.

MS. BOCKUS: Jane Bockus for Imerys.

MR. SMITH: William Smith for Johnson & Johnson.

MS. BRANSCOME: Kimberly Branscome for Johnson & Johnson.

VIDEOGRAPHER: Thank you.

The court reporter is Carrie Campbell and will now swear in the witness.

LAURA PLUNKETT, Ph.D., DABT, of lawful age, having been first duly sworn to tell the truth, the whole truth and nothing but the truth, deposes and says on behalf of the Defendant Johnson & Johnson, as follows:

DIRECT EXAMINATION

QUESTIONS BY MS. BRANSCOME:

Q. All right. Good morning, Dr. Plunkett. I introduced myself right before we started, but my name is Kimberly Branscome, and I am here on behalf of Johnson & Johnson.

Is it your understanding today that you are giving your deposition for the purpose of a Daubert analysis in the MDL related to Johnson's baby powder?

A. That's my understanding, yes.

(Plunkett Exhibit 1 marked for identification.)

QUESTIONS BY MS. BRANSCOME:

Q. I want to start by handing you what I will mark as Plunkett Deposition Exhibit 1.

Do you recognize the document that I just handed you?

A. Yes.

Q. Okay. Have you seen this document before?

A. Yes.

Q. All right. When was this

document provided to you?

A. Either earlier this -- this week or late last week. I don't recall if it was Friday or Monday.

Q. Okay. For the purposes of the record, could you just identify what the document is that I just handed you as Plunkett Deposition Exhibit Number 1?

A. It's a notice of oral and videotaped deposition for myself, dated -- I don't see the date, but probably on the very last -- do you need that or just -- is that enough of an identification?

Q. That's all right.

Now, contained within the deposition notice there is a reference to a request for materials that are identified in more detail in Schedule A.

Do you see that?

A. Yes.

Q. Have you reviewed Schedule A?

A. Yes.

Q. Did you bring any documents with you in response to the request in Schedule A?

Page 10

A. The only thing that I believe that I had to bring that had not already been provided was additional billing since the time of my last deposition.
Q. Okay. And is it my understanding that the documentation related to additional billing that you have done since your prior deposition was produced yesterday at the deposition in the Forrest case?
A. That's correct.
Q. All right. And the information contained in the documents produced at the Forrest deposition yesterday, do those contain an up-to-date record of the billing that you have submitted for your work in connection with the litigation against Johnson & Johnson?
A. Yes, with the understanding that I haven't submitted a bill for December yet.
Q. Okay. How much time have you spent working in connection with your opinions in the case against Johnson & Johnson related to its baby powder in the

Page 11

month of December?
A. So I'm -- on all the cases that I am involved in that are pending, not just this deposition?
Q. I'll ask first all cases and then we'll narrow it to the deposition.
A. So in all --
Q. I mean to the MDL, I'm sorry.
A. Okay. So in all cases this month, probably eight hours so far, maybe ten.
Q. Does that include the time that you've spent attending deposition?
A. No, that's not including yesterday's deposition time. I apologize. I forgot about that.
Q. And how much of the eight to ten hours that you have spent this month working on these cases against Johnson & Johnson, setting aside the time you spent in deposition yesterday, relate to the MDL specifically?
A. So it will probably be billed -- it will be one bill for the preparation time because the prep overlapped,

Page 12

but I'll bill separately for the time I spent yesterday right before the deposition and then at the deposition, so...
Q. What did you do to prepare for your deposition today?
A. I reviewed my reports, the three reports that I filed in the litigation. I had a meeting with attorneys on Monday, and then we had a short meeting yesterday evening because some attorneys arrived that were not here on Monday.
And essentially went through some of the documents that -- went through some of the documents that I had cited in the report in certain paragraphs, just to refresh my memory of what they were. So if you want me to tell you which paragraphs, I can do that.
Q. I will in just a moment. Okay.
A. Want me to repeat that? I'm sorry.
Q. That's all right.
Dr. Plunkett, you referenced the fact that you reviewed specific paragraphs of your expert reports in

Page 13

preparation for today's deposition.
Could you identify those paragraphs for me?
And it's helpful to you, we can go ahead and mark your three expert reports, if you're referring to all three.
A. I'm going to refer just to the MDL report because that's what we're here to talk about. I mean, if you want to talk about what I did to get ready for yesterday separately or --
MR. MEADOWS: Might be helpful to go ahead and mark them.
MS. BRANSCOME: Why don't we go ahead and just mark the three reports, and then we can walk through.
(Plunkett Exhibits 2, 3 and 4 marked for identification.)
QUESTIONS BY MS. BRANSCOME:
Q. So, Dr. Plunkett, do you have a copy of your three reports in front of you?
A. Yes, I do.
Q. Do those contain any markings, highlightings or flags?
A. No, they don't.

Q. Okay. Do you mind if we mark your copies as the official records?
A. No, that's fine.
Q. So we will mark -- well, let's do this in chronological order. So I am marking as Plunkett Deposition Exhibit Number 2 the expert report of Dr. Plunkett dated October 5, 2016.
Could you confirm, Dr. Plunkett, that that's what I marked as Deposition Exhibit Number 2?
A. Yes, it is.
Q. And then we will mark as Deposition Exhibit Number 3 supplemental expert report of Dr. Laura Plunkett dated August 29, 2018.
Dr. Plunkett, could you confirm that I marked that as Exhibit Number 3?
A. Yes, that's correct.
Q. And then Exhibit Number 4, we will mark the expert report dated November 16, 2018, by Dr. Plunkett that was produced in the MDL.
Could you confirm that I marked that as Deposition Exhibit Number 4?

A. Yes, that's correct.
Q. All right. And so now back to the question of you referenced the fact that you looked at specific paragraphs of your expert report in preparation for today's deposition. If you could, using Deposition Exhibit Number 4, identify which paragraphs you looked at specifically in preparation for the deposition.
A. So it wasn't the paragraphs. There were certain documents in paragraphs, so that's what I was referring to, so...
So starting in paragraph 38 where I'm talking about sort of the timeline of information about human health hazards and talc dust. So I just went back and refreshed on a few of the older papers.
I looked again at the patent documents that are cited in the first bullet.
I looked again at a paper by Eberl, 1948, which is in the last bullet. The patent documents are also there as well.
And that -- so that would be all I pulled in that paragraph.
I believe that those documents

are also cited in paragraph 39 as well, some of those same ones that are...
And then in Section 5 of my report where I'm talking about exposure, I looked again at Parmley and Woodruff. I looked again at Vetner and Iturrulde and Egli and Newton last night.
And the only other thing I looked at is not cited in this report because it came out after the report was filed, and that was -- and I did bring a copy of that. That was the risk assessment that was done in Canada. Some people refer to it as -- by the first author's last name, Taher, T-a-h-e-r. And I may be pronouncing that wrong, but...
(Plunkett Exhibit 5 marked for identification.)
QUESTIONS BY MS. BRANSCOME:
Q. All right. And I see that you brought a copy of that document with you. Just for the purposes of the record, let's mark that as Plunkett Deposition Exhibit Number 5.
Are there any markings, highlightings or notations on that document?

A. No, there's not.
And then the other document I looked at that was not cited in the report, there is a printout from the government of Canada website that talks about some statements on talc, and so I printed that out as well. This was published at the same time that the risk assessment was published.
(Plunkett Exhibit 6 marked for identification.)
QUESTIONS BY MS. BRANSCOME:
Q. All right. We'll mark that for purposes of the record as Plunkett Deposition Exhibit Number 6. We might come back to those documents.
So returning briefly to the deposition notice and the requests in Schedule A, the billing information you produced yesterday and then we just discussed additional information with respect to that, are there any other documents that you have in your possession that are responsive to requests identified in Schedule A that have not been produced?
A. I don't believe so, no.

Everything -- I do believe that there were some objections filed to this, so there's some things that I did not provide based on that.

Some of the things I don't have, too. I think you asked for -- maybe you didn't ask for that. Usually people ask for copies of old depositions, and I don't keep those. And maybe you didn't ask for that, but that's usually a request.

Let me see.

Q. Okay. Now, you mentioned that you met with attorneys on Monday. And who was present at that meeting?

A. So on Monday it was Mr. Meadows, sitting here. Ms. Tucker, Mr. Beattie, were at the meeting on Monday.

Q. All right. And how long did that meeting last?

A. Probably six hours, I guess, six hours with them, and then I also did some other work on my own, but...

Q. Okay. And then you mentioned that you had another meeting last night.

Who was present at that

meeting?

A. So that was probably about an hour, and that would have been Mr. Tisi -- or maybe two hours. Mr. Tisi joined us yesterday afternoon. And Mr. Golomb, too, I'm sorry.

Q. All right. Okay. Now, looking at the three reports that you have produced in the litigation involving Johnson's baby powder, I wanted to get an understanding of how those three reports relate to one another.

So you have the first report that you produced that was dated October 5, 2016. I believe that was originally produced in the Uhl case; is that correct?

A. I'm not sure the name of the first case, but it was in the -- some of the St. Louis cases, yes.

Q. All right. And when did you begin work on that report?

A. You'd have to look at my billing record, which I know was an exhibit to yesterday's deposition. I believe they started in 2015.

Q. All right. And then you produced a supplemental report earlier this year, on August 29, 2018, and that's been marked as Deposition Exhibit Number 3, correct?

A. Yes.

Q. When did you begin work on the supplemental report that you produced at the end of August in 2018?

A. I want to say -- let's see. I want to say sometime in the summer. Maybe as early as May, but I believe May -- May, June time frame of 2018.

My billing would reflect that, so, again, we can pull my billing. And I would have called it preparation of the supplemental report in my billing.

Q. Okay. Why did you choose to draft a supplemental expert report?

A. So over the time I had worked on different trials here in St. Louis particularly, additional documents that were not cited in my original report became reliance materials based on their presentation at trial. So there were enough

of those that I thought it was important to add to the original report with additional documents that I had reviewed over time.

Since October of 2016 through, let's say, the summer of 2018, there were a variety of additional documents that I had -- I had seen.

It was also my understanding that during that time period Johnson & Johnson had provided additional documents that weren't provided or available to me in 2016, so additional discovery that was now available to look at. So some of this is a matter of additional evidence that wasn't available when I wrote my initial -- my initial report.

Q. All right. Now when you say the additional documents became reliance materials in trial, what do you mean by that?

A. So additional documents that we refer to in trial that I use to support opinions that weren't necessarily specifically cited within the body of my report or described within the body of my report. They were likely on my larger

reliance list, but they weren't things that were cited.

In other words, if you look at my original report in -- when I say the body, the paragraphs. I always put a reference list and then I'll have Bates numbers. So during trial, things that were from my larger reliance list that weren't specifically discussed in my report became support for different opinions that -- based on questions at trial.

Q. Okay. When you say these were documents that "we" refer to at trial, you're referring to yourself and attorneys representing the plaintiffs?

A. Yes, that's correct.

Q. Okay. And understanding that the purpose of today's deposition is focused specifically on the MDL, then you produced a report specific to the MDL on November 16, 2018, that we've marked as Exhibit 4, correct?

A. Yes.

Q. When did you begin work on the report that you produced specifically in the

MDL?

A. Sometime right after -- I would say early fall of 2018, sometime after this -- the supplemental report was filed. Probably right after that.

Q. Okay. So is it fair to say that you began work on your MDL report after completing the supplemental expert report that has been marked as Exhibit 3?

A. Yes, that's correct.

Q. Okay. Who was involved in the drafting of the report that's been identified as Exhibit 4?

MR. MEADOWS: Objection. Hang on a second.

Are you asking about communications between attorneys and Dr. Plunkett?

QUESTIONS BY MS. BRANSCOME:

Q. Dr. Plunkett, none of the questions I will ask you here today are intended to elicit information that's protected by the attorney-client privilege.

So setting that aside, anything that you understand to be privileged, I can

ask who the -- who was involved in the drafting of the report that was produced in the MDL?

MR. MEADOWS: Hold on just one second.

Ask the question one more time. I want to make sure we're not venturing into attorney work product realm here.

QUESTIONS BY MS. BRANSCOME:

Q. Dr. Plunkett, do you consider the report that you have issued in the MDL which is identified as Exhibit 4 to be attorney work product?

MR. MEADOWS: Objection. Don't answer that. That calls for a legal conclusion, and at this point I'm going to instruct you not to answer questions about how the report came into be.

MS. BRANSCOME: Are you instructing her to refuse to answer any questions that involve the development of her expert report?

MR. MEADOWS: I'm instructing

her not to answer your last question.

QUESTIONS BY MS. BRANSCOME:

Q. Are you following your attorney's instructions, Dr. Plunkett?

A. Yes.

MS. BRANSCOME: At this point I would like to go off the record, please.

VIDEOGRAPHER: Okay. We are going off the record at 9:30 a.m.

(Off the record at 9:30 a.m.)

VIDEOGRAPHER: We are back on the record at 9:32 a.m.

QUESTIONS BY MS. BRANSCOME:

Q. Dr. Plunkett, other than attorneys, if attorneys were involved -- I am not asking questions about that -- were there any individuals who assisted you in preparing the report that has been marked as Exhibit 4?

A. There was no one that actually assisted in writing the report. I do -- when I did my literature searches, I had my husband help me retrieve articles that I identified for retrieval, but certainly there was no -- he doesn't participate in the

actual review of articles or in drafting of the report. That's all my work.

Q. Okay. And when you say that your husband retrieved articles, was this simply -- what information did you provide him in order to enable him to retrieve a particular article?

A. So we use a service in Houston called Loansome Doc, which is affiliated with our local medical library system and also with the National Library of medicine and NIH libraries. So I give him an online search that I put into a clipboard. He takes that, makes the request or retrieves -- some of them will be free, and so he'll actually go to the websites for the -- and then put them into a folder for me.

So he does that physical part of it through the computer, but he doesn't -- he doesn't do the searches or decide which ones to retrieve. I do that.

Q. Okay. Did you have any discussions with your husband about the substantive content of the report that's identified as Exhibit 4?

A. No.

Q. Does he do any evaluation -- for example, if you were to provide him a search and it generates multiple documents by a given author, does he identify additional articles that you might want to consider?

A. Only -- he has done that, but only with the streams of letters to the editor. So I ask him always if I'm pulling an article. Happens a lot at the New England Journal of Medicine or some of the other medical journals where there's pretty active letter to the editor correspondence that happens.

So I always say to him, "If there's any citation to this through the letter to the editor comments, would you please retrieve those," and so he will do that search to look for that.

Q. Okay.

A. And I'm not sure that that happened in any of these articles, but I'm talking my general process that we use.

Q. Okay. In terms of the relationship of the three reports that have

been marked as Exhibits 2, 3 and 4 to each other, what is your -- what is your position with respect to opinions that you have stated or language you have used in Exhibits 2 and 3 that may not appear in Exhibit 4?

A. I don't think I understand what your -- what you mean by my position. Are you asking --

MS. PARFITT: And I'll object to that question.

THE WITNESS: Are you asking me to describe -- I mean, I could describe for you the overlap. I mean, there's not complete overlap. Is that what you're asking me or --

QUESTIONS BY MS. BRANSCOME:

Q. I am. Why don't you take a shot at it and then I may narrow my question, but I'm just trying to understand how the reports relate to one another.

MR. MEADOWS: Objection.

THE WITNESS: So they relate to each other, I would say, based on timing first, because obviously the first report was two years ago, and

then many more documents. So that's how the 1 and 2 relate -- or Exhibit 2 and 3 relate to each other.

In the MDL litigation, I was asked to address very specific topics and things because there's a -- it's a different -- I don't know all of them, but there's a different set of experts that work in different litigations.

So my role in the MDL, I believe, is set out based on this report, whereas in the original reports I may have had -- I did have a broader role in some of those cases.

QUESTIONS BY MS. BRANSCOME:

Q. Okay. Can you describe for me your understanding of your role in the MDL?

A. It's my understanding that I have been asked to provide opinions related to the -- generally the toxicology of talcum powder products, including all the individual constituents that make up that product; to look historically back in time about what was known and when about the toxic effects of talc and different constituents within talc.

Page 30

And that was sort of the -- that's been -- I consider that sort of the meat of what I've been asked to do.

But separate from that, another part important part of my testimony or things I was asked to provide was an overview of the regulatory process for cosmetics and then the information that accumulated scientifically, how that related to what a company is required to do under the regulations in order to provide consumers with appropriate information about the safety of the product. So kind of the regulatory opinions, I guess you want to call it, that area.

I have sections on that, and I think you can see that by the different sections in my report where I set out different general topics.

And then I was also asked to address some of the issues related to how the information on the safety of talc has been disseminated publicly and also based on my review of different internal company documents, both from Johnson & Johnson -- or from Johnson & Johnson, Imerys, as well as

Page 31

the PCPC, which is the Personal Care Products Council, formerly known as the CTFA, to look at those interactions and how those companies set about to influence the process around the safety assessment of talc over the years. So different activities that happened with respect to the ISRTP meetings in the '90s, with respect to the NTP process at different points in time.

The CIR process, I think I cover, and I also talk a little bit about IARC, I believe, as well.

So the interactions of the industry with the science and then how that science ends up getting described within -- either to regulators or to bodies that are reviewing the science related to the products.

Q. You mentioned as one of the categories that you were asked to opine about in the MDL that you were looking to set about the influence that companies may have exerted over the regulatory process or PCPC.

When you began that analysis, did you start with the predicate belief that

Page 32

the companies had, in fact, influenced the regulators or PCPC?

MR. MEADOWS: Objection.

THE WITNESS: Not in my -- not when I first started this process. So that is -- those opinions actually go back into my original report. So that's not something, I don't believe, that was not covered in my original report or even in my supplemental report. I just have different -- some additional documents that I have reviewed.

QUESTIONS BY MS. BRANSCOME:

Q. Okay.

A. And this is something when I first evaluated the case and first started looking at the documents, those are opinions that I had formed based on my review.

Certainly by the time I drafted the MDL report, I think if you listened to my -- read my trial testimony, you understand I had those opinions at the time I started writing this report.

Q. Now, what I'd like to

Page 33

understand next is, are there -- of the topics that you just identified that you understand that you're offering opinions about in the MDL, which, if any, of those topics are in your view new as compared to the opinions that you have offered that are contained in Exhibits 2 and 3?

MS. PARFITT: Objection.

THE WITNESS: So I don't think any of the MDL opinions are new.

QUESTIONS BY MS. BRANSCOME:

Q. Okay.

A. I think that they may have -- they may -- they may cite to additional documents that haven't been cited to in the first two reports, but I believe there's a significant overlap even on the documents that are cited.

Q. And you mentioned that your role in the MDL is more narrow than the role you've served in other cases.

What topics have you opined about in other cases that you are not intending to opine about in the MDL?

A. So I am not doing general

Page 34

causation in the MDL, although I am indeed providing opinions on certain aspects of the cause and effect relationship such as -- you know, I talk about biologic plausibility, underlying knowledge about different toxicities of the compounds over time, but I'm not doing a full causation analysis in my MDL report, and hopefully you see that when you read the report.
Q. So as you sit here today, Dr. Plunkett, you are not intending to offer the opinion in the MDL that Johnson's baby powder causes ovarian cancer; is that correct?
A. Not in those words. I think if you read my report, I talk about the fact that Johnson -- it's my opinion that Johnson's baby powder increases the risk of cancer -- ovarian cancer, which is a different assessment than the way you stated it.
Q. All right. And it is -- as you sit here today, Dr. Plunkett, it is your understanding that you are not being offered to give a, as you termed it, a general

Page 35

causation opinion in the MDL, correct?
A. That's my understanding, yes.
Q. Now, you mentioned that the analysis as to whether a substance increases the risk of a particular outcome is different than a causation analysis.
Can you explain to me what you meant by that?
A. So I discussed this yesterday in my deposition. There's -- there's a process called risk assessment. Sometime -- in the area of consumer products you can also refer to it as safety assessment. And then there's the process of what I call general causation analysis, or full causation analysis.
So even though the types of information that are considered may overlap between those two, the outcome or the statements or the -- the way you go about assessing the information is a bit different.
Q. Explain to me how they're different.
A. So in a risk assessment, the process starts with setting out some basic

Page 36

principles of, first, is there a hazard, is the first step. Is there a hazard that would be relevant to human health.
Then looking at the data and determining whether that -- that body of data allows you to either quantify risk in some way or to qualitatively shows you that there's a change in risk based on exposure to the product.
So your statement may be as simple as there's an increased risk, or you can take data in a risk assessment and do a quantification such as in a -- a cancer risk assessment based on an animal data set. You might actually calculate a cancer potency factor, for example. Those kinds of things. That's another application of risk assessment. Same basic process but focusing just, for example, on one study.
My human health risk assessment or safety assessment, like the causation analysis, does look across all kinds of data, but my goal was not to analyze the data under the Hill considerations, which is what I would typically do, in order to go through

Page 37

the process of making that final opinion that indeed baby powder -- exposure to baby powder through genital application is a cause of ovarian cancer in women. That's -- to me, that's a different way to go about thinking about the question that you have to answer.
And also the -- some of the data that you evaluate is evaluated a bit differently. So, for example, in my increase -- in my issue of increased risk, I use the epidemiology as supporting evidence, but I'm really focused on -- on -- more on the underlying sort of the biologic information that we have that identifies hazard and risk. So looking at the animal data, the exposure potential for the product, and then using that along with what we know with the human experience to characterize risk.
Q. Is there a different level of certainty required to render a causation opinion than to render an opinion that there's an increased risk?
A. I don't know that I'd describe it quite that way but -- because to me it's a

different process. I certainly have to be just as certain about what I say about risk when I do a risk assessment as I do about -- as I do when I'm doing a causation analysis.

I don't -- maybe you mean something else, so maybe you can -- I mean, I -- I certainly use the same basic standards in my mind, how I weigh evidence to do the different processes, but I go about them in a little bit different way when I do a risk assessment versus -- versus a causation analysis.

Q. In your view, does the strength of the evidence have to be greater in order to determine that an agent causes a disease, for example, than it does simply to say that an agent increases the risk of a particular outcome?

MR. MEADOWS: Objection.

THE WITNESS: I don't think I've ever thought about it that way. I would say to you that strength -- the strength of the association is a consideration under Hill that you apply the epidemiology data mainly, so

that is a different consideration under causation than you do -- as you would do it in a risk assessment.

But the strength of the evidence, it's still a judgment based on your experience and training as far as whether or not there is enough information to be able to say that you believe that there is -- enough information to say that the risk is increased based on that exposure and those conditions and whatever the toxicity profile of that compound is.

QUESTIONS BY MS. BRANSCOME:

Q. Okay. We'll get into this more a little bit later, but when you say that a risk is increased, is there a threshold level of increase that you need to see in order to render an opinion in a court of law that an agent increases the risk of a particular outcome?

MR. MEADOWS: Objection.

THE WITNESS: So I need you to define what you mean by threshold. Are you asking me a specific

statistical test you would apply, or what are you asking?

QUESTIONS BY MS. BRANSCOME:

Q. So understanding that for the most part if you're looking at statistical significance, you're looking whether the confidence interval crosses 1.

Are you following?

A. Yes, I know that, yeah.

Q. All right. And so when you're evaluating, though, whether a particular substance, in this case Johnson's baby powder, increases the risk of an outcome, again, in this case ovarian cancer, would it be sufficient for you if that increase was .01 percent, for example?

MR. MEADOWS: Objection.

THE WITNESS: That doesn't make sense to me, an increase of .01 percent, but maybe I can answer it this way for you based on what you've laid out there.

Certainly when I do a risk assessment and I make it -- if I'm going to make the conclusion that I

believe that it's my opinion to a reasonable degree of scientific certainty that exposure to baby powder in women increases the risk of cancer, I'm having to rely on -- I do rely on data that allows me to draw conclusions because either there's a statistical significant finding found or the -- there's a consistency among the pattern of the data that shows there's information that fits together consistently. And maybe -- you want me to explain what I mean by that? No?

Whereas I think what you're asking is when an epidemiologist applies -- looks at a body of -- in a causation analysis looks at a body -- and I do this, too -- looks at a body of epidemiological studies and you weight the studies, obviously you're weighting the studies differently based on whether they have shown statistical significance or not, right?

And it isn't that it's a one to one. If you have one positive and one negative, that isn't how you may decide to finally weight that evidence, but certainly you have to consider whether or not what was seen or reported is showing you something reliable -- or you can make a statement reliably about whether or not that finding was biologically significant. And biologically significant would typically be linked to a finding that has statistical significance in an epi study unless the study was not designed to be able to answer the question properly.

So -- and I've discussed that a little bit yesterday with Mr. Smith on the issue of power to detect. So that's something you do consider in epi.

But, yes, statistical significance certainly goes into your weight of the evidence there.

QUESTIONS BY MS. BRANSCOME:

Q. Okay. You talked about you're intending to offer an opinion with respect to what a company is required to do under the regulations; is that correct?

A. Yes.

Q. Okay. What regulations are you specifically referring to?

A. So cosmetic regulations that exist within -- so it's the entire process as I describe how cosmetic -- what -- are cosmetics subject to regulation by FDA? Yes. What are the types of things that companies have to do before they're marketed, what does the company have to do once the product is on the market, those kinds of things.

Q. Have you ever worked directly for any regulatory agency?

A. No, I have not.

Q. And suffice it to say you have never been in a decision-making position within a regulatory agency, correct?

A. That's correct, I have not.

Q. Have you ever been in a decision-making position with respect to a company evaluating compliance with FDA regulations with respect to cosmetics?

A. Yes.

Q. Okay. What is your experience with respect to that?

A. So that's -- one of the clients that I currently work for where I am asked to provide input on advertising, promotion and labeling of some of the products and then also some of the ingredients that are being promoted for use to -- to produce cosmetic products. So it's the idea of providing that advice over my understanding of the regulations what can be said and can't be said about certain ingredients.

This company is involved in making both ingredients but also some finished products now based on -- it's a large company that owns a lot of little subsidiaries.

Q. My question, though, Dr. Plunkett, was, have you ever been in a decision-making position for a company evaluating compliance with FDA regulations with respect to cosmetics?

MS. PARFITT: Objection. Asked and answered.

THE WITNESS: So that's what I'm saying. They're relying on my input to make a decision on what will go in the materials.

QUESTIONS BY MS. BRANSCOME:

Q. Do you have decision-making authority within that company or, as you described it, are you providing advice and input?

A. I'm providing advice, but the things I'm advising on are the things that happened. So in other words, they don't have anybody in the company that understands the process of what they can say. So I -- I advise them that you need to remove this language or that this is more appropriate language. They make those changes, and then that is what is done.

So I agree, I'm not an employee of that company. I am a consultant working with the company, but it is a little different than some of the work that I do where I -- what I -- the advice that I'm

giving is actually something that I know actually happened. Sometimes you give advice to companies, but it doesn't -- we have no idea whether the company actually follows our advice.

Q. My question is slightly different, Dr. Plunkett.

If you were to give advice to the company that you've referenced as having experience with cosmetic regulation compliance that that company chose not to follow, that company has the ability to ignore your advice, correct?

A. Yes, I would imagine that they could do that.

Q. Okay. Have you ever drafted regulations that relate to cosmetics?

A. Actually drafted a regulation? No, I have not.

Q. All right. You reference in your report language out of 21 CFR 740.1, and specifically -- you reference it in a few places. And I can direct you specifically to paragraph 22 in Exhibit 4.

A. Yes. I'm there.

Q. All right. And do you see here you have replicated language from 21 CFR 740.1 that reads, "The label of a cosmetic product shall bear a warning statement whenever necessary or appropriate to prevent a health hazard that may be associated with the product"?

Do you see that?

A. Yes.

Q. And you added emphasis on particular portions of this sentence, correct?

A. Yes, I did that, exactly.

Q. All right. Now there's a clause in this sentence that states, "Whenever necessary or appropriate."

Do you see that?

A. Yes.

Q. You did not emphasize that language; is that correct?

A. That's correct, I did not.

Q. What is your understanding as -- what you describe as an FDA regulatory specialist of the meaning of "whenever necessary or appropriate" in 21 CFR 740.1?

A. So it's -- first off, you would use the common English language definition. I don't believe that those -- I haven't seen a definition separate within the regulations. Sometimes there will be.

So based on that and my experience and the looking into what others have described about this, this is the idea of considering how the product is used, is one of the -- one of the concerns that you have, and whether or not the -- based on how the product is used and how the product is being sold, that in order to prevent a health hazard, a warning hazard -- a warning statement would be needed.

Q. Can you cite to me any language within the regulation or even supporting documentation, a comment, something of that nature, that would define "whenever necessary or appropriate" with respect to how the product is used?

MS. PARFITT: Objection.

THE WITNESS: I don't think I understand your question.

Are you asking me to cite to a

reference or a part of the regulation where they explain it, or what are you asking me? Guidance document or --

QUESTIONS BY MS. BRANSCOME:

Q. Yes. Can you point me to anything other than your personal view of the interpretation of this language that would tie the requirement "whenever necessary or appropriate" to how a product is used?

MS. PARFITT: Objection. Form.

THE WITNESS: I'll have to go look for you whether there's a guidance that states it that way. This is based on my experience in dealing with the products in the past.

I think that's also consistent with what is described, I would say to you, within -- it's consistent -- what I'm describing to you, it's consistent as well with how the CIR standard for safety assessment is done, looking at the issue of the -- of the -- of the use.

QUESTIONS BY MS. BRANSCOME:

Q. When you say that you're basing

your interpretation of the clause "whenever necessary or appropriate" on your personal experience, can you point me to something specific?

MS. PARFITT: Objection.

THE WITNESS: Are you asking me -- are you asking me if I've ever had a company that I worked for that that particular clause in here was extremely important to how we interpreted it? I don't think I can point you to that. I don't recall ever having to do that specifically.

Or is it something different you're asking me?

QUESTIONS BY MS. BRANSCOME:

Q. Dr. Plunkett, I asked you what your basis was for interpreting the language "whenever necessary or appropriate" means that it's related to how a product is being used, and the answer that you provided was that it was based off of your personal experience.

So I'm asking you, what is that personal experience that gives you the basis

for that specific interpretation?

MR. MEADOWS: Objection.

MS. PARFITT: Objection.

THE WITNESS: So it's in my experience in dealing with companies that make products and what types of warnings are put or not put onto -- or not -- or on labeling. So I don't know how else to answer it other than that.

I can go back and look at the guidance documents to see if that is described in another way, but I don't recall that.

QUESTIONS BY MS. BRANSCOME:

Q. So as you sit here today, you're not able to provide me either with a third-party document or an independent document interpreting "whenever necessary or appropriate" as you've suggested today, nor can you give me specific example from your personal experience; is that correct?

MS. PARFITT: Objection.

THE WITNESS: Well, I certainly -- I'd have to go back and

look at my documents in order -- the first part of your question, I'd have to go back and look. Off the top of my head, I can't tell what I would point you to.

On the second one, I think I was telling you, is I don't -- I've never -- I don't have a client that I've worked for where that part of the language was the only issue that I had to deal with when I'm looking at whether or not the product needs a warning or not.

So typically -- I'm just telling you that when I have looked at labeling for products and looked at the issue of does it need a warning statement, when I'm reading it as "whenever necessary or appropriate," I'm looking at whether or not the ingredient that I'm concerned about within the product, how that is used or what the exposure pattern would be, route of exposure, how those things might relate to how I would assess the

safety issue at hand. And so that's what I'm trying to tell you.

QUESTIONS BY MS. BRANSCOME:

Q. Okay. You also have -- changing topics a little bit, in this -- in your report marked as Exhibit 4, if you could turn to paragraph 10.

On page 7, you state on the first paragraph on page 7, "In other instances I have directed others to perform searches on my behalf," and this is with respect to identifying documents for review in forming your opinions.

What did you mean by that?

A. So in addition to doing my own searches of the database, sometimes I -- I have called the attorney's office and asked them to -- to do a search for certain things that I'm looking for to add to. So in other words, I have a document I've identified. I'm looking for other documents like that in the large millions and millions of documents that are available. And so sometimes I will ask attorneys to do -- to look in the database for other documents like the ones

Page 54

that I've identified.
Q. And without getting into anything that would be -- that would call for information protected by the attorney/client privilege or attorney work product, what percentage of the overall searches for relevant documents from these particular databases that are discussed in paragraph 10 would you say that you have done yourself as opposed to directed others to do?
A. Well, initially when I first started searching, those were my own searches exclusively. I would say that more recently, in the last year, since I haven't added any real new areas but there's new documents that have become available, so anything -- any of the searches probably in the last year that dealt with new discovery that was produced, I would have asked the attorneys to do some of the searching in that for me. Like I'm looking for documents that are similar to this document that I cited in my original report around this same frame that may be discussing this same topic area.
So in the last year I have

Page 55

asked them to do that more than I have done it, but initially it was what I did initially.
Q. Okay. Do you keep any records of the various document searches either that you have performed or you have asked to be performed?
A. No, I don't. My record would be -- the initial -- the record would have been what I listed in my reliance list for you in the initial report, but since then it would just be what is going to be changing within my reliance list, looking at additional documents. That's the only way I could identify for you. That would be my -- my trail to know what was new and what was not.
Q. My question is slightly different. Understanding that you have provided to some extent a record of the documents, my question is: Do you have any type of record for the nature of the searches, what it was that you set out to identify in the database and how did you go about finding those documents?

Page 56

A. So that might cross over into work product because it's not my database, but I don't know how to answer that. I mean, I'm sure -- it's very possible that in the database you can track that, but I -- I don't know.
MR. MEADOWS: Okay.
THE WITNESS: I don't have anything saved on my computer that way, but when you go to the database itself, it's possible you could track that. I just don't have a record on my computer in my office.
QUESTIONS BY MS. BRANSCOME:
Q. When you made the decision at some point in time -- it may have been even prior to you issuing your first report -- that you wanted to look at company documents, did you set out specific categories of documents that you wanted to review?
A. Not so much categories but key words. So -- and areas. I guess areas is what I -- yes, I was focusing, for example, in my initial report on documents that described what was known -- what the company

Page 57

was discussing about cancer, ovarian cancer, cancer generally. So that was a key word used.
And then I also was linking that in different searches with different time periods such as the NTP review process and dates. You can, you know, narrow down by dates or by the CIR process. Those kinds of things.
So I did start with that, trying to understand what -- what is -- what was in the company files or in the files I had access to, the database, that dealt with those kinds of things because those aren't things that I could get to publicly. Obviously in the literature. So I had to -- if I wanted to understand what the company knew, I had to go into their database to find out, you know, what they knew -- what they knew or were discussing over time about the ovarian cancer issue or about asbestos in talc or about CIR process, things like that.
Q. Using the reports that you have produced, Exhibits 2, 3 and 4, really, and the full -- the entirety of the materials

that you have produced in the MDL, is there any way that someone reviewing those documents, and those documents alone, could replicate the searches that you have conducted in the company databases?

MR. MEADOWS: Objection.

THE WITNESS: I don't know. That's a good question. I've never thought about whether you could replicate or not.

I mean, I think I've told you what I did. My strategy was to focus on topic areas. So I think you might -- by topic areas, if you use the same kinds of topics areas as described, I think you would come up with documents that -- what it focused down to.

For example, I also would sometimes, as linking those words, I might put in J&J documents only or Imerys documents only, because the database has a variety -- and the PCPC. There's some different ways by the Bates numbers that you can

segregate documents as well. But I don't know other than that. That's all I can tell you.

QUESTIONS BY MS. BRANSCOME:

Q. You would agree with me that your report does not contain a complete explanation of the process by which you identify company documents to review, correct?

A. I haven't laid out my search structure, that is true.

Q. All right. Now, the articles that you have listed on your reliance list, have you read each and every one of those articles?

A. Unfortunately, yes, over time I have. Some of them I have only read parts of them. For example, if I started reading a document and I felt that it was something I pulled that really wasn't directly on point for an area I'm covering, I may not have read every word, but certainly I have been through each of those, yes.

Q. Are there any articles in your reliance list, that you maintained on your

reliance list, that you read, but then once you started reading decided weren't relevant to the opinions that you were offering?

A. I would have to look to answer that for you. I don't know. If you want me to do that, I'd have to look.

Q. I ask you more as a process matter.

A. Oh.

Q. If you pull an article and you start reading it and you realize that it is not relevant to the opinions that you offered in this case, the example that you just gave, is it something that you would include in your reliance list?

A. Yes, I -- I have given you everything I retrieved. So if I retrieved it, you would have, yes, absolutely.

Q. Okay. So it's fair to say of the articles that are on your reliance list, you could not say as you sit here today that you have read each and every word of each and every one of them, correct?

A. That's correct. And I could probably tell you -- I could give you a

little guidance in that possibly if I went to my list, I could try to pull some out that I recognize, but that's all I would be able to do for you.

Q. Okay. How did you go about identifying what articles you wanted to review in forming your opinions in the MDL?

A. So first off, I went back to what I already had. So my MDL report is a -- is a compilation of a lot of material that's in my first few reports. That was the basis for some of the things that went into it.

So I didn't -- I did do, though, a updating on literature searches for the MDL report, looking for anything new, for example, in the area, especially the area of cancer data or reports of dealing with ovarian cancer either -- or any articles dealing with the link between inflammation and cancer, ovarian cancer, generally. That's one of the areas I updated looking at.

And then I did -- I don't think I did any large, new searches, however, because honestly the areas covered here are a little narrower than what was covered here.

Page 62

I don't believe that there was any from the published -- the publicly available medical literature. There wasn't a need to do a whole new area of search. It was more updating the things that I've done in the past.

So it's a real easy search to update because you can just put in talc and cancer and just look at -- get lots, but you can then just start chronologically and look what was published in the last year, for example.

Q. Okay. Earlier when we were discussing the fact that you in some instances have asked your husband to pull articles, have you maintained any records of the searches that you have done with respect to scientific literature, including the searches that you have asked your husband to do?

A. I have not. It's possible that there are records on billing from the library that tells you how many I ordered at different times, but that is the only records, because we do have to pay the

Page 63

library for the retrieval.

Q. Okay. And if I understood what you said earlier correctly, you indicated that any article you have ever pulled for review, you have listed on your reliance list; is that correct?

A. Yes. And when I -- and let's just make sure we're talking about the same thing.

So, you know, in my reports I typically have articles cited in the report separate from the reliance list. So I'm talking about the reliance list, right? Okay.

So -- because I do -- I do usually -- I don't know whether I did that in this report, but I typically have a list of articles cited at the back called references, that is, things that you're actually seeing in the report body, and then there should be a separate reliance list sent to you as an appendix. I don't know what the appendix was.

Q. Well, so then let's clarify that. So, Dr. Plunkett, when you're

Page 64

referring to the reliance list, are you referring to the list of articles that begins on page 40 of Exhibit 4, or is there a separate document?

A. There's a separate document. So it -- that's -- I usually call reliance list the separate document. I call this references cited. So I apologize for that confusion.

So these, I have read every word. If it's in my reference list, those are not an issue of not having read every word, and these should all be cited somewhere in the report.

Q. Okay. If you could turn to paragraph 21 in your initial report.

A. Yes, I'm there.

Q. Okay. So we're looking at paragraph 21 in Exhibit 2. This is on page 10.

Do you see there is a sentence here that refers to -- it's referring generally to the topic of the ability of talc to migrate from the site of application to the ovaries.

Page 65

Do you see that?

A. Yes.

Q. And then the next sentence states, "This issue was discussed by scientific and regulatory bodies that review the toxicokinetics of talc."

Do you see that?

A. Yes.

Q. And in parentheses it identified EPA 1992, IARC 2010, and CIR 2013.

Do you see that?

A. Yes.

Q. Okay. And then if you could turn to Exhibit 4, which is your MDL report, at paragraph 43. It's on page 28.

Are you with me?

A. Yes, I am.

Q. You see that the exact same sentence appears -- well, not the exact same. It's been slightly modified to combine the first two sentences. But here you cite only to EPA 1992 and IARC 2010.

Why did you remove CIR 2013?

A. Because of my further evaluation since my initial report in 2016 of

Page 66

the process that was involved in the drafting of the CIR and the actual production of the report.

Q. Is it your position that the migration of talc was not evaluated as part of CIR 2013?

A. No. That's not my position, no.

Q. Okay. And so would the sentence that's contained in paragraph 43 in Exhibit 4, which is your MDL report, if you cited to CIR 2013 in the parenthetical there, would that not be an accurate citation?

A. I believe it would not be an accurate citation because I have formed opinions about the reliability of that document at this point in time.

So it has to do with -- I'm citing to authorities here that I believe are reliable as far as the discussion that I see, and it's a different -- I have a different opinion now about the CIR report, which I lay out in pretty detail, I think.

In fact, if you go to my section following this now in -- you'll

Page 67

understand one of the issues I had was the -- the difference in the evidence that was actually available once you dig into it a little further versus what they actually reviewed. That's one of the issues.

Q. And I'll follow up with some more questions about the CIR, but my question here is, the sentence in your report simply states, "The migration of talc internally after perineal application was discussed by scientific and regulatory bodies that review the toxicokinetics of talc."

Would it be inaccurate to say that as part of the CIR 2013 process that body did, in fact, discuss the migration of talc internally after perineal application?

A. It is true that they did discuss it. I just have an issue with the reliability of their findings.

Q. And so you made the decision to just remove it from the citation; is that correct?

A. Yes, at this point -- at this point, at this report, that's exactly right.

Q. All right. And then I had

Page 68

another question. In paragraph 43, you added two studies from your prior -- that were -- that did not appear in your prior report, and it was Gardner 1981 and Edelstam 1997. This related to animal studies showing that in some species talc can migrate from the lower to the upper genital tract?

A. Yes.

Q. Okay. Were those studies that you were aware of before drafting your prior reports?

A. I don't know that they -- I can't answer that without looking at my reliance materials for the original report. I did identify additional articles, and there's also additional articles cited here in earlier paragraph 43 that were not cited in my original report as well. I don't think I had the -- the Kunz article then cited. I'd have to go back and look.

So it's possible that they were in my -- when I say my reliance materials, my original report also had a larger list of literature I didn't cite. So I'd have to look. I can't tell you whether I had them or

Page 69

I did not.

Q. Okay. With respect to Edelstam 1997 study, do you happen to know the title of that article? Even an approximation would work.

A. It'll be -- should be back here. Just a second. If it's not here, that's a mistake.

Oh, here it is. "Retrograde migration of starch in the genital tract of rabbits."

Q. So you are citing that article for the proposition that animal studies have demonstrated that talc can migrate from the lower to upper genital tract?

A. Yes, I'm citing it because it's relevant to the issue of particle migration, which talc is a particle. So, yes, that's correct.

Q. Okay. But that study did not specifically deal with talc migration, correct?

A. No. Well, it -- it's relevant to talc migration, but you're exactly right, they looked at the starch migration, yes. Or

particles that were starch, yes.

Q. We'll cover this in more detail, but is it your opinion that all particles have similar characteristics with respect to their ability to migrate in the genital tract?

A. It's my -- I don't know if I'd state it quite that way. What I would say is that the evidence shows that particles generally have the ability to move up the reproductive tract in women, yes, and that if a particle is one that is similar to talc or some of the other ones where the information has been collected, I would characterize that as being within that, quote/unquote, relevance of particles.

That doesn't mean all particles, but certainly in the ones that I have looked at and the data I've relied upon, there's a variety of different types of particles or substances that have been studied and shown to be able to migrate.

Q. So let's take Edelstam 1997 as an example.

Did you do any analysis that

you can point me to that establishes that starch would have a similar migration pattern as talc?

A. So I would say that the paper itself shows -- talks about the movement of starch, but are you asking something different?

Are you asking me have I done a specific analysis of any differences that may occur between the migration pattern of starch and talc? Is that what you're asking me?

Q. That is what I'm asking you.

A. I certainly didn't do an in-depth analysis of the differences, no, but based upon my review of the literature, I believe that that paper is relevant to the overall question of migration of particulate through the reproductive tract, including particles of talc.

Q. Regardless of whether or not it was an in-depth analysis, can you point me to anything other than just your belief after having read these articles that starch and talc would have similar migratory characteristics in the human or animal

genital tract?

MS. PARFITT: Objection.

THE WITNESS: Again, I haven't done an in-depth analysis. I mean, as a toxicologist, there are differences between starch and talc, absolutely. For example, starch would -- I would expect to be more easily solubilized within fluids, and so that could affect the ability of them to actually not migrate as well as a talc particle, which would be less soluble than the starch would be.

And there's -- I even -- there's a paper I have in here, and I can look for it if you want, that talks about that difference, and it's one of the issues of cornstarch versus talc, on whether or not you would expect to get the long-term chronic responses with the difference between those two substances.

So I do think there's difference, absolutely, as toxicologists generally. And the only

reason I'm citing this paper is because I'm trying to be complete about people that have looked at this issue. And certainly it was a study that looked at this issue and talks about the movement.

But I wouldn't expect starch and the talc to have the same liabilities, and I also wouldn't expect them to move exactly the same speed maybe. That's very true.

QUESTIONS BY MS. BRANSCOME:

Q. So you would agree with me that Edelstam is not a study demonstrating that talc can migrate from the lower to upper genital tract, correct?

MS. PARFITT: Objection. Form.

THE WITNESS: I wouldn't say it that way. What I would say instead is that Edelstam is a study that forms the overall weight of the evidence for the ethics -- for the studies that are available that address the issue of migration, but certainly it is not studying talc. So I don't disagree

with you there.
Unfortunately, the majority of the information that I have relied upon, and others such as the FDA in making their statements about migration, is not all directed studies just to talc. It's looking at the issue of particle movement.
QUESTIONS BY MS. BRANSCOME:
Q. Now, in terms of doing your risk assessment -- well, let me get back. We covered this earlier, and I want to return to it for a moment. Just to confirm: For your work in the MDL, you did not do a Bradford Hill analysis, correct?
A. I did not sit down and do a Bradford Hill analysis when I started writing this report. I have done a Bradford Hill analysis in the past, which is in my original reports, but I certainly did not redo a Bradford Hill when I sat down to draft my MDL report, that is true.
Q. Okay. Let me be more precise.
In the report that you have produced that contains a description of your

opinions in the MDL, you have not set forth a Bradford Hill analysis in that document which is identified as Exhibit 4, correct?
A. That is true, yes.
MS. PARFITT: Objection.
QUESTIONS BY MS. BRANSCOME:
Q. And in fact, the paragraph that you -- or paragraphs that you have in your prior reports that reference a Bradford Hill analysis, those have not -- those have actually not been replicated in any form in Exhibit 4, correct?
A. Yes, because, again, it was not my role to do general cause.
Q. Okay. So then when we look at the methodology that you employed in reaching your opinions that are contained here in Exhibit 4, how would you characterize the methodology?
A. As I have in the report. I talk about it being a risk assessment or a safety assessment, that you could use those terms interchangeably here. And then I've also used a weight of the evidence as a tool to go through the different steps of the risk

assessment.
Q. Okay. What publication would you direct me to that has used the same methodology that you have used to reach your opinions in Exhibit 4?
A. I think I cite you to -- cite you to some of those. You could -- well, the directly relevant one would be looking at the chapter on risk -- toxicology in the reference manual on scientific evidence.
You can also go to the NRC report where they -- it lays out the different steps that you use when you kind of break data apart into exposure versus response information.
And then I cite to -- there are some guidance documents that I cite to, and this is in paragraph 13. And I'd have to pull them out again to tell you which ones relate to different pieces because some of these are -- some of these documents are specific to only, for example, maybe one part of what I did.
But certainly the risk assessment process at IARC is -- they do what

I call a hazard assessment. They identify hazard and they couldn't quantify risk, but the steps they go through are essentially the same types of steps that I went through as far as gathering data on not just response but also the potential for exposure and how that relates to the response.
And then also the data that I've collected on the biologic effects of talc, toxicology of talc, are also discussed within that document as well.
Q. Okay. Focusing specifically on the weight of the evidence tool, as you describe it, is there a particular document or publication that I would go to that could lay out the same process that you used for how you weighted certain pieces of evidence?
A. So the documents that I've cited for you in paragraph 13 talk about what weight of the evidence is generally, but if you read what it is, it's essentially a process that each scientist brings their experience, training and judgment to.
So I try to lay out for you in my discussion of the literature my thought

process as I review each piece of information, and that is what you do as part of weight of the evidence. You gather all of the relevant information that you can find that address the question you're trying to answer, and since I'm looking at both exposure and response, I gather different pools of information.

Q. You would agree that there are ways to do a weight of the evidence assessment of published literature that assign, for example, quantitative values to particular pieces of evidence, correct?

A. Certain individuals have put together, but there's no one general accepted process that everyone uses. So I -- that's the issue. Again, there are certain -- certain cases where I've seen that done, and then there are many -- most cases that it's not what's done.

Q. Okay.

A. Another body, by the way, that I -- it's new. It's not in paragraph 13. I just want to make sure I tell you that so we're clear. If you look at the Canadian

document, they also -- in fact, a lot of what they have, you'll see the same literature described within my assessment as well.

Q. So using the Canadian assessment as an example, for instance, in that assessment there were actually values assigned to particular pieces of literature, correct?

A. Mainly the epidemiological literature, that is true. Again, but I'm not doing causation, so I didn't approach it that way.

But certainly if you look at what I did, it's consistent with that because I talk about the differences between the limitations of a case-control versus a prospective study. I talk about both the positives and the negatives within the database, but I don't lay it out in a table like they do. But it's certainly the same basic process.

I was actually quite surprised at how similar the database of information that they reviewed was to what I honed in on as well.

Q. Okay. As you were forming your opinions, Dr. Plunkett, about whether or not there is a risk associated with the use of Johnson's baby powder with respect to ovarian cancer, how do you keep track of the pieces of scientific evidence that you have reviewed and the respective weight that you give to them?

Presumably you did not read everything in one day, for example?

A. No. That's correct. So I typically will -- I typically will save the papers -- when I read the papers, I will often highlight in yellow information that I think is going to -- will be extremely relevant. I don't put notes on the document. I highlight in yellow on the PDF file to use that to write.

And I also start drafting report very early, which then gets overwritten and actually ends up looking like an outline that eventually becomes the report.

So one of the ways I keep track of things is I may put a paragraph name that

I know I'm going to write, such as exposure migration, and then I -- as I'm reading a paper, I'll type in a paper -- the ones that I believe are important to my overall assessment. So I will do that as I'm -- as I'm going through the evidence.

So that's one of the tools I use, but I don't keep notes. I just kind of use that as a living document that eventually becomes a report.

Q. Do your opinions ever change as you read additional pieces of scientific evidence?

A. Yes, it does. It may change. And it often -- often the changes, though, are not that I believe -- with the exception of epidemiology. In other areas. Epidemiology is a little bit different issue when you're reviewing studies.

But on toxicology I always start with reviews and regulatory authorities, looking at what others have said generally about the toxicology. And so even though I may refine opinions differently or I might change, I certainly wouldn't agree to

work on a project to start with if my initial reviews on hazard, for example, didn't convince me that I believe that there is a hazard. But you refine it from there. That's exactly right.

So there are cases, however, where I'm asked to work on a project where there is no review or regulatory authority or any kind of assessment over a period of years, and in those cases there are times when I start working on a project and I stop and say, "I can't do this." Because that happens, yes.

So opinions do change sometimes based on review of additional information.

Q. Is there any documentation that you've produced either in your report or otherwise in the MDL that would allow someone reviewing the material to understand the order in which you reviewed materials or the specific weight that you assign them?

A. So order of review, no. I don't think you would know that other than -- you will note order of review if you look at the differences in the literature cited in my

original report versus in the MDL.

So in my original reliance list, if there were documents that weren't there and they're now here, obviously that tells you it was a review.

On the issue of a -- of the weight of the evidence process, the only answer I can give you for that is that articles that I believe are -- are reliable, are relevant and are -- those are kind of the -- you look at the reliability of the studies, whether they're peer-reviewed or not or if they have proper controls put into place, things like that, whether or not the -- they're relevant to the question at hand. That you can get from looking at how I discuss them in the document. But certainly there's no, like, summary of that.

But certainly -- I think you understand -- you should understand when you read my report what weight I'm giving based on how I'm describing those -- those materials. I mean, it's --

Q. Well, for example, you do have different studies that you've identified in

your report that have been criticized by others at some point in time, correct?

A. Yes, that's true.

Q. Okay. Now, in some instances you state that you then give little weight to those studies, correct?

A. Yes.

Q. But in other instances you find the criticized study to be helpful and informative, correct?

A. That's true. Because, again, judgment -- as anybody does weight of the evidence, different scientists can have different judgment.

Mainly, I think, when I look at the differences in that -- in that regard, I think you should pay attention to what the person is. So as a toxicologist, I may view a certain type of -- piece of data very differently than an epidemiologist may view it, as far as the reliability or the relevance, because we're coming at it from a different training and experience and judgment -- set of judgment on what is important to a toxicologist when I'm talking

about risk versus how an epidemiologist might talk about risk.

Q. Could two different toxicologists review the same piece of literature and give it very different weight?

A. I don't know about different weight, but they certainly -- I know people come to different conclusions based on their overall assessments. That happens, definitely. I mean, there are always going to be individuals that look at things differently.

I know in this case there are people -- I've seen defense experts that reports in -- not in the MDL but in other cases, where people disagree with some of my opinions, and I disagree with their opinions. That happens.

Q. Okay. And so if I were -- well, let me just ask something. You have not provided any sort of quantitative assessment of the weight that you gave different pieces of evidence that you cite in forming your opinions in the MDL, correct?

MS. PARFITT: Objection.

Page 86

Misstates her testimony.
MR. MEADOWS: Objection.
THE WITNESS: So I don't report for you a table where I quantify that, that is correct, but certainly that is -- because, again, based upon looking at the way that I was trained and the documents that I'm talking -- I'm pointing you to to describe how to do weight of the evidence, it is not -- it is not a numerical exercise, how many here, how many there, this one gets 5 points because of this or 6 points because of this.
It's more an issue, again, of judgment. It's the idea of looking across all of the available information and determining whether or not, based on that, it's your opinion that there -- that, for example, talc -- talc's toxicity profile includes cancer. That's one of the judgments -- weight of the evidence judgments you make, for example.

Page 87

QUESTIONS BY MS. BRANSCOME:
Q. So -- but, Dr. Plunkett, just to be clear, you do not provide a numerical value to the particular pieces of evidence that you have considered as part of your weight of the evidence assessment in the MDL, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: So I do not provide a numerical value as you see it laid out, for example, in the Canadian table, but certainly I do judge articles that I include in my weight of the evidence based on a system that includes different considerations such as -- like I said, peer-reviewed or not, that makes an issue.
Whether or not the study that's being reported is the only one -- the first or is this something that is -- that is describing an assessment that's been done by someone else and so you see a repetition or a consistency among the studies that

Page 88

you're looking at.
The robustness of the data. For example, the NTP GLP quality animal study, very high quality in the weight of the evidence. And I talked to you about that. In fact, it -- even though people criticize that study, that study is very valuable for looking at biologic changes that are consistent with a carcinogenic mechanism being initiated.
So even though you may say that you can't quantify risk from that animal study as far as calculating a cancer potency factor, what you can do is use that study of high quality to make judgments within a weight of the evidence for risk.
QUESTIONS BY MS. BRANSCOME:
Q. Dr. Plunkett, you understand I have seven hours today, and I -- while I'm very interested in the answers that you give, if we could just -- we will get to things like NTP when we get there, if you could just attempt to answer the question that I've

Page 89

asked.
I simply asked the question: Are there numerical values assigned to the particular pieces of evidence that you have considered as part of your weight of the evidence assessment in reaching your opinions in the MDL; yes or no?
A. And I said to you, not in the way that it's done -- I assume you're referring to something like what was done -- what's in the Canadian epidemiology table. I have not done that, no.
Q. Okay.
A. That's exactly right.
Q. Have you provided a qualitative chart, for example, of the evidence that you have considered in forming your opinions in the MDL?
MS. PARFITT: Objection. Form.
THE WITNESS: I don't know what you mean by qualitative chart. I certainly have -- I certainly, I believe, have given you qualitative descriptions of my weight within my discussions of each study, yes, I have

Page 90

done that.
QUESTIONS BY MS. BRANSCOME:
Q. You mention in response to the prior question that you have a system for weighting the pieces of evidence that you have reviewed.
Can you point me to paragraphs in your report marked Exhibit 4 that would outline in detail the system that you used to apply different weight analysis to different pieces of evidence?
MS. PARFITT: Objection. Form.
THE WITNESS: And I think I answered that, that there's no system written down by anyone. But what there is, instead, is if you read these -- if you read these descriptions of use of weight of the evidence that I've cited in paragraph 13 as well as the discussion of methodology in the Canadian document, that is consistent with what I do. It's the idea that you start with a literature search for peer-reviewed, publicly available

Page 91

information. You look at the quality of the studies, the statistically significant findings. Those are all things that are discussed within these documents I'm pointing you to.
QUESTIONS BY MS. BRANSCOME:
Q. Now, you --
A. But it's -- it's -- I don't know of anyone who has written down a specific system that applies in all circumstances, no.
Q. Okay. Have you written down a system that applies specifically in this case?
A. I think I have tried to do that for you when I describe what I did.
Q. Okay. You just referenced the fact that your system can be found in the Canadian document.
You agree that the Canadian analysis was actually published or produced after you had completed your report in the MDL, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: Certainly it was

Page 92

published afterwards, and what I thought I said to you was that if you look at that document -- it's not in paragraph 13, but if you look at that document, it lays out a process. And I wouldn't call it a system. It's a process. It's a process by which you screen information for relevance to the question being asked and how, then, based on that, you look at characteristics of that information such as -- and I tried to give you some of those.
And I've said this before in depositions in these cases. You know, you look at the issue of whether or not the study was peer-reviewed, whether or not there was statistically -- statistical significance or at least statistics applied to the data. What was the quality of the study as far as the size in order to be able to answer the question being asked. Those are the kinds of things that you look at.

Page 93

And then also the question -- when you're looking at a specific question, you may pull in -- like you asked me about the starch particle. You may pull in things that you give less weight because obviously that's not just talc, that's starch, and you have to consider that. So that is part of the process.
QUESTIONS BY MS. BRANSCOME:
Q. Dr. Plunkett, the question I asked you simply was: The paper that you reference that contains some detail about the Canadian analysis, that was published after you completed your report that's marked here as Exhibit 4; is that correct?
MR. MEADOWS: Objection.
THE WITNESS: Yes, and I believe I answered that at the start. I usually try to answer your question, and then I try to explain further some details I think are important context on my answer.
QUESTIONS BY MS. BRANSCOME:
Q. I understand that,

Dr. Plunkett. You have given many depositions. You understand I can ask you for more detail if that would be helpful to me.

If you could, just focus on the question that I asked, and we can explore additional areas if that's something I'm interested in doing.

Okay?

MR. MEADOWS: Objection. She's --

MS. BOCKUS: Break?

MR. MEADOWS: After I finish my objection.

She's going to answer the question as thoroughly as she feels like she needs to answer the question based on the way you ask it.

Want to take a break now?

MS. BRANSCOME: We can go off the record.

VIDEOGRAPHER: We're going off the record at 10:41 a.m.

(Off the record at 10:41 a.m.)

VIDEOGRAPHER: We are back on

the record at 10:56 a.m.

QUESTIONS BY MS. BRANSCOME:

Q. All right. Dr. Plunkett, we started talking a little bit about the CIR analysis that was done in 2013.

Am I correct you no longer consider that reliable? Is that your opinion?

A. Yes.

Q. Okay. And you identify in your report marked as Exhibit 4, I believe it's paragraph 56?

A. Yes, that's correct. And I think I talked about it later on as well, but definitely I do here.

Q. Okay. And in paragraph 56, you state that the CIR panel failed to account for all the studies that informed on the issue of migration of particles such as talc upwards through the reproductive tract.

Is that your opinion?

A. Yes.

Q. Okay. And then you state that because of that you assign, quote, little weight to the conclusions reached by the CIR

panel; is that correct?

A. Yes.

Q. And so is it your view that a study or an analysis that reaches a particular conclusion should be assigned little weight if it fails to consider all relevant scientific evidence to the issue that it's evaluating?

MS. PARFITT: Objection.

THE WITNESS: I think it depends on the situation, but that could be the case, yes. It depends on -- on the -- depends on -- I think it would depend on each case, the question being asked, and what was omitted. But, yes, I think it could.

QUESTIONS BY MS. BRANSCOME:

Q. Okay. And in this situation you identify -- I believe you claimed that eight human studies were not considered by the CIR 2013 panel; is that correct?

A. Let me look at the number, but that sounds about right. Yes.

Q. All right. And returning, actually, to your prior answer, you said that

the failure to consider all relevant scientific evidence on a topic would lead you to assign little weight to a particular conclusion. You said that that could happen.

Under what circumstances would you assign a conclusion little weight for failing to consider what you consider to be all relevant pieces of scientific literature?

A. Well, I think it depends -- well, the reason I specifically addressed that in this case is because that was -- the conclusions about migration is the main reason why the CIR panel then draws additional conclusions later on.

So my issue is, migration was key to what -- the decisions they made about the safety issues of talc. And so in that particular case, this -- this failure to consider all the evidence was extremely important, in my view, and I gave it little weight.

There might be a situation where some -- for example, you may only look at six or eight studies, even though there may be dozens out there. You may have a

reason for why you only looked at six or eight, or it may be -- and as a result you may lay that out and, therefore, you may still give weight to conclusions drawn. Or it may be that the six or eight are -- studies that you discuss are not -- the weight is not affected by what you've omitted.

I believe that the weight is affected by what is omitted when you look at some of the articles being review articles, which give you an understanding of what was generally accepted within the scientific community when you get to reviews, those kinds of things. So it really is a case-by-case basis.

But certainly I do believe that it is possible that in another circumstance where things are omitted you would come to the same conclusion, that you give those conclusions less weight.

Q. Is there a way, if someone were try to replicate the weighting of particular evidence based upon your process, for them to know whether or not the omission of a

citation of certain studies means that a study should be given little weight or whether it wouldn't affect the weighting of that scientific article?

MS. PARFITT: Objection. Form.

THE WITNESS: So I think this is the issue of judgment, training and experiencing that is applied to all such assessments, and this is why different scientists may come to different conclusions. But certainly it is -- it was important to my assessment on this issue because of the prominent role that the CIR report gives to their conclusions here for why they then drew conclusions about safety. And so that link was extremely important.

MS. BRANSCOME: Can we pause for just a moment?

VIDEOGRAPHER: We are going off the record at 11:00 a.m.

(Off the record at 11:00 a.m.)

VIDEOGRAPHER: We are back on the record at 11:01 a.m.

QUESTIONS BY MS. BRANSCOME:

Q. Okay. Of the eight studies that you identify on page 37 of your report that you contend the CIR panel did not account for, do any of those eight studies specifically discuss the migration of talc in human subjects?

A. No, I don't believe they do, but there are a couple of these studies that I found to be extremely important if you want me to explain that to you.

Q. Do you break out in your report in any other paragraphs which of these eight articles you consider to be extremely important?

And if you could just point me to paragraph numbers, that's good enough if you have, in fact, broken them out.

A. I have. I -- this whole section I break -- I talk about each one individually. So I think you can tell by what I read -- what I'm discussing what I thought was important and informative about each of those.

Q. Do you rank the eight studies

in any way by their importance to you?

A. Not with any numerical rank, no, but certainly I think I do that for you when I talk about the studies. I give you an understanding of ones that I think are particularly informative and ones that are not.

So, for example, I weight the human data -- I think I tell you that -- more than the animal data because of the differences between the reproductive tracts of humans versus animals generally, upright versus -- upright and habits and things that humans do that relate to insertions in and out of the reproductive tract, I guess is a nice way to describe it, versus an animal, that those can have, and then also the differences between animals and humans in terms of bursal sac around the ovary, those kinds of things.

So I do -- that -- I guess that ranking I do give you here. I tell you that I think these -- I think that the most relevant are going to be the human studies versus the animal studies.

Page 102

Q. Right.
So my question specifically is, where would you point me to in your report to understand the weight that you gave each of these particular eight studies?
A. At my descriptions of those studies and what I describe. That's all I can tell you.
Q. And I'm just asking, Dr. Plunkett, can you point me in the report to where that discussion takes place?
A. It takes place -- I have a discussion for each study, and I would -- and if you read what I say about each study, I try to go through what the strengths and weaknesses of those studies are.
And so those -- that would be, let's see -- you want me to give you the starting paragraph?
Q. So, for example, Parmley and Woodruff. Can you point me to where in your report you discuss Parmley and Woodruff, such that I can understand the weight that you gave that particular study?
A. So the year of it is...

Page 103

So I think I discuss it in paragraph 44, and so I describe for you what important information is in there, which is the information that I take as forming part of my weight of the evidence.
So one of the most important things is what -- they have a figure they show, and they're showing -- which is one of the unique figures in all of the published literature. But it talks about the differences between the female reproductive tract and the male reproductive tract, and it shows the actual -- it talks about a discussion of movement from substance in the environment through -- into the vagina, into the fallopian tubes. So it's a paper that addresses that very specific issue.
Q. So my question to you, though, is, where do you have a discussion of the weight that you give to these particular articles?
A. So the discussion of the weight has to do with the information described. I don't give them a numerical ranking. I told you that.

Page 104

So what I do is, when I'm discussing about these -- all of these papers here contribute to my weight of the evidence. And if it's a human study, I'm giving those more weight than I'm giving animal studies. And that's described.
And then within papers I'm pulling out information that contributes to what I think is important about what the study says, and that -- and the importance of what is described within the study contributes to my weight.
And I don't know how else to describe it to you. That is the process that scientists go through when they evaluate data.
Q. And so my question to you: Earlier you said of these eight studies, some of them were particularly important to you.
How would I, using only what's written in your report, understand which of those eight studies was of particular importance to you?
A. So it would have to do with what I discuss about the study. So I'm

Page 105

telling you, when I -- if you look through this entire section, this is the Parmley and Woodruff paper. It is important because it addresses the specific issue of movement of environmental substances from the outside to the inside. So I'm giving that importance in my evaluation because of what that author is actually discussing.
I don't know how else to describe that. I apologize. I mean, to me, weight of the evidence is a process that scientists use bringing their training and experience and judgment, and it's not a numerical process across the board, it just is not, based on the way weight of the evidence is used within science.
Q. Now, Dr. Plunkett, though, you would acknowledge that if you wanted to assign numerical values to the studies, that has been something that has been done by other authors and other authors on whom you rely, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: I don't believe that's true. I'll need to look -- I

don't believe that's true with respect to the biological information. I believe it may be true with respect to the epidemiology studies.
You want me to look real quick to confirm that? I can do that really quick, but...
QUESTIONS BY MS. BRANSCOME:
Q. I'm simply saying, could you assign a numerical value if you chose to do so?
MR. MEADOWS: Objection. Objection. Form.
THE WITNESS: And I'm -- what I'm trying to say to you is I think that I -- that there is no one set of rules that you would assign in order to do that for all the types of studies that you weigh.
I would agree that I have seen it routinely done -- well, not routinely, but I've seen it done within the epidemiological community when they go through the epi data. But not -- it's not something that

I've seen done when you talk about weight of the evidence as part of a human health risk assessment. That is not something that scientists typically do as far as giving numerical rankings.
QUESTIONS BY MS. BRANSCOME:
Q. You're familiar with the National Cancer Institute, correct?
A. Yes, I am.
Q. All right. They are considered to be the nation's leader in cancer research, correct?
MS. PARFITT: Objection to form.
THE WITNESS: The National Cancer Institute?
Yes, they are. I don't know if they're "the" leading, but they're one of the leading, that's true.
QUESTIONS BY MS. BRANSCOME:
Q. Okay. And you're familiar with publications that they issue called physician data queries?
A. Yes, I am.

Q. All right. And you are aware that there is, in fact -- called PDQs, correct?
A. That's the abbreviation, yes.
Q. Right. And you're aware that the National Cancer Institute has in fact published a PDQ that addresses a potential connection between talc and ovarian cancer, correct?
A. I'm aware of several that have been done over the years, but, yes, I'm aware of that.
Q. And have you reviewed those?
A. Yes, I have.
Q. Are they listed on your reliance list?
A. No, but they're listed within the materials as discussed within my depositions, and I thought -- and my testimony. I thought that was part of my reliance list. I believe that it -- it was in my reliance list, is encompassing all of the testimony as well as the actual documents. Maybe I'm mistaken, but that was my understanding.

Q. Okay. If they are not on your reliance list, should they be?
A. I believe that they are on my reliance list by it having been pointed to as part of the testimony that I have given and the documents that I have relied upon during testimony.
Q. Okay. And you are aware that they have issued a PDQ that -- on the website as of today, correct?
A. I haven't looked today, so I'm sure -- but I know that -- I don't believe it has been removed, so I believe that there is something there, yes.
Q. All right. And what is your understanding of the position stated in the PDQ with respect to a possible link between talc and ovarian cancer?
A. So I'd have to look at the one today to tell you what it says, but it's evolved over time and it's changed over time, and I have specific opinions that I've expressed at trial about that issue.
Do you want me to go into that details or I mean --

Q. I'm not asking about your opinions about what their position is. I'm simply asking you, Dr. Plunkett, the most recent NCI PDQ that you have reviewed, what is the position that the National Cancer Institute has taken with respect to the relationship between talc and ovarian cancer?

A. So I would want to pull it out to give you the specific statement of their position, but their position has changed such that later in time they've weakened the link -- their statements about the link between ovarian cancer and genital talc use.

So it used to be seen as a cause, and now I believe it's not seen as a cause. I don't know the exact language, though. I'd have to look at it as -- maybe risk factor is the better word to use.

And I need to look at the most recent one. And that would be the best way. Let's just see what it says.

Q. Okay. 'Cause is it your position as you sit here today that the National Cancer Institute has ever issued a statement that talc causes ovarian cancer?

A. I believe it was listed as a risk factor for ovarian cancer in the older PDQs.

(Plunkett Exhibit 7 marked for identification.)

QUESTIONS BY MS. BRANSCOME:

Q. I do have a copy here. Just for the sake of the record, we will mark this as Plunkett Deposition Exhibit Number 7.

Handing a copy to you, Dr. Plunkett, do you recognize the document that I just handed you that's marked as Exhibit 7?

MR. LOCKE: What's the date of that?

MS. BRANSCOME: This was printed on December 14, 2018.

THE WITNESS: It's -- the updated date is June 22, 2018, if that helps.

MR. LOCKE: Yes, thank you.

THE WITNESS: I have seen this one, yes.

QUESTIONS BY MS. BRANSCOME:

Q. All right. And you can review

any -- whatever portion of this is helpful to you.

And then if you could answer my question, Dr. Plunkett, of what is the position as stated in Deposition Exhibit Number 7 of the National Cancer Institute with respect to the relationship between talc and ovarian cancer?

A. So I would be looking at the section on page 12 of 18, and maybe you're looking somewhere else, but that's where they actually talk about perineal talc exposure. And it's under the section where they have now moved into factors with an adequate evidence of an association and they describe it here. So they're calling it an association where the weight of the evidence is not adequate to support that association.

Q. All right. And so the first sentence of the section under perineal talc exposure states, "The weight of the evidence does not support an association between perineal talc exposure and an increased risk of ovarian cancer."

Did I read that correctly?

A. You did read that correctly.

Q. All right. And it indicates that "results from case-control and cohort studies are inconsistent."

Did I read that correctly, Dr. Plunkett?

A. You did.

Q. And the question that I would ask simply is, do you discuss the National Cancer Institute PDQ in the report that you've issued in the MDL, which is identified as Exhibit 4?

A. I don't specifically discuss this document, no, I do not.

Q. Okay. And you understand that the NCI PDQ did a weight of the evidence analysis that followed a formal evidence ranking system, correct?

MS. PARFITT: Objection.

THE WITNESS: So I -- it's not laid out here, but they do have a process they use.

Is that what you're asking me?

QUESTIONS BY MS. BRANSCOME:

Q. Yes.

Page 114

A. Yes. And again, they're ranking the epidemiological data, and so I understand that that is there, yes.
Q. Now, you've said a few times that you could qualitative -- you could give a quantitative weight to an epidemiological study, somehow suggesting that it is different from other types of studies.
What is it about a toxicological study, for example, that would prevent someone from giving a quantitative weight in a weight of the evidence analysis?
A. Because it is just what is typically done and not done. There are certain practices within the community, what is kind of -- I would say that scientists use routinely, or scientists have used. Not all scientists give numerical rankings to epidemiological data either, because even within a Bradford Hill assessment, when you use the considerations, there's no requirement for ranking studies in order to meet the requirements of use of that methodology.
Q. Okay.

Page 115

A. But I have seen it done in the epidemiology community, and that is the most common place I see it. I do not see other toxicologists that are assessing animal studies and in vitro studies doing it that same way.
When you do a human health risk assessment, that isn't routine practice to do numerical rankings on studies.
Q. Okay.
A. At least in my experience and in my training, and I was trained in the use of risk assessment by one of the individuals who actually invented the process.
Q. Okay. Okay. But do you consider the epidemiological evidence as part of your risk assessment in the MDL?
A. I do, because I'm looking at it in the context of what is out there and what's available. I don't always have human data when I do risk assessments, but in this one I do. So I do consider them, yes.
Q. Okay. Did anything prevent you from doing a quantitative assessment of the weight that you were giving different pieces

Page 116

of epidemiological evidence?
A. If by -- you mean prevent, was someone stopping me from doing that, no. But if you ask what would be standard practice based on my experience, I would not be doing that.
Q. Has anyone -- and I'm not referring in this case to any attorneys. But has anyone reviewed your -- the weighting that you gave specific pieces of evidence as essentially a form of a peer review process?
A. If by that you mean have I submitted my opinions for publication, no, I have not done that. Part of -- that's partly driven by my understanding of the evidence that I reviewed, that some of it may not be something that I should be discussing necessarily in a public form outside of the cases I'm working in.
But certainly I have not submitted it for publication, if that's what you mean. No, I have not done that.
Q. Okay. Has the methodology that you have used in the MDL, has that been -- have you submitted any type of analysis using

Page 117

that methodology for publication even outside of particularly looking at Johnson's baby powder, for example?
A. Yes, in -- if you look at my publications that describe risk assessments that I have done. So the one that would come to -- to play that's similar as far as the scope of the weight of the evidence would -- at least with the animal and the in vitro studies, would be the paper that I published on copper, looking at the database of copper and identifying points of departure and target organs and risk -- risk issues based on copper use in humans, trying to set a -- understand what a safe exposure level could be to copper in water. And that was published -- that actually was one of the papers that's published with Dr. Krewski, who is one of the authors of this risk assessment in Canada.
Q. And is it your position that you follow the same methodology in what you've reported in the MDL with respect to Johnson's baby powder that you did in your analysis of copper?

A. Yes, with the process of going through all of the publicly available information, putting it together based on its relevancy and reliability.

We did a process where we grouped it based on animal versus human, just like I've done here. And we call it the bins, but it's the same idea. I have a bin of human idea, I have a bin of animal data and a bin of in vitro data. And so, yes, the process was very, very similar.

Q. Okay. Returning back to some documents that you chose not to cite in your report, you do not discuss the Gonzales 2016 study in your report for the MDL, correct?

MS. PARFITT: Objection. Form.

THE WITNESS: I'll have to look. It is not cited in the reference list to my report, that is true. So that means it would not be mentioned specifically in the body of the report.

QUESTIONS BY MS. BRANSCOME:

Q. You're familiar with the Gonzalez 2016 study, correct?

A. If you want me to talk about it, you'd have to pull it out for me, but I know the name, yes.

Q. Okay. And it was looking at an association between the perineal use of talc and ovarian cancer, correct?

A. That, I'd have to look at it to tell you. I believe it was a human study that would be consistent with that, but I need to pull it out to look at it.

Q. All right. Do you, as you sit here today, do you know why you did not discuss it in your report?

A. I wasn't doing a full causation analysis in this report, so as a result I'm not trying to characterize every piece of human data. But I certainly am looking at the consistency across the studies, and that's what I've done.

And I mention it here. I do think I mention here that there are studies that came to different conclusions than the ones that I'm specifically describing.

Q. Okay. And so why is it that -- why is it acceptable for you to choose not to

include something like the Gonzales 2016 study, but yet you will disagree the 2013 -- the CIR 2013, you will give it little weight for not discussing particular studies?

A. So that's a very different exercise. You want me to explain my thinking on that? I can do that for you, but I believe that's apples and oranges question.

My reasons for giving little weight to the CIR overall assessment versus my weight or the assessment I make of an individual piece of data, that's different. And that's what you're describing for me.

And I believe Gonzales is in my overall reliance list, so I have read Gonzales. It is something that I have considered; it's not something that I've cited in my paragraphs. So it doesn't mean it didn't go into my weight of the evidence, because I do have it and I have reviewed it. I just don't recall the details on it.

Q. Is it your position as you sit here today that you know for sure that the CIR panel did not -- was not aware of or even considered any of the eight studies that you

contend the omission of which makes it of little weight?

MS. PARFITT: Objection. Form.

THE WITNESS: I would say I'm 99.9 percent sure, based on the process that is -- that goes in. And if you want me to explain, I'll tell you why I feel that level of surety.

You know, I can always say that maybe there was someone that came to the panel that did a search on their own, but that is not what's done. The individuals that come to the panel are given a body of information provided to them in written form that they review. So it's not like they -- they have access to anything that isn't cited in the actual report.

QUESTIONS BY MS. BRANSCOME:

Q. Okay. The eight articles that you discuss that are not mentioned in the CIR panel's work, they are publicly available pieces of scientific literature, correct?

A. Yes, which was why it's interesting to me that those were not grabbed

Page 122

and included within -- within the assessment done by the -- by the PCPC's group that handles CIR -- handled the CIR process here.
Q. Okay. We received just before your deposition, a few days in advance, a list of materials that have been added to your reliance list since you produced your report in this case.
Did you provide that list of materials to counsel to -- are you aware of the materials that were identified?
A. Yes, I am. They're ones that I have reviewed since my report and -- yes, which would have been, I believed, important for you to know about, because obviously you wouldn't know if I hadn't provided that to you, and fair game for you to ask me about.
Q. On that list was contained a number of news articles.
A. Uh-huh.
Q. Are news articles pieces of scientific information that you typically consider in performing a risk assessment?
A. No, they're not part of my risk assessment, but they -- but they were

Page 123

relevant to -- they were relevant to my overall assessment of the issue of what the company is doing with regard to public dissemination of information.
So it's not the risk assessment part. It's more on the issue of the -- when I talk about the different influences of the company on public dissemination of information, I went through the different specific issues. So this would be a specific issue related to a news report that someone comes out with, the Reuters report, and then looking at what the company is saying in addition to that.
So it's understanding -- for example, the documents that Reuters discusses, many of those I'm sure I have seen, although I don't have access to -- I wasn't able to go on websites and download everything that they cite. But certainly they looked familiar, some of the ones I did see.
So it's that issue of -- the last part of my report, I think. Want me to tell you the section? It would be in the

Page 124

section on the role of the industry in Section 7.
Q. Okay. So the newspaper articles are not something that you are considering as part of your analysis of whether there is a risk of ovarian cancer from Johnson's baby powder, correct?
A. No, that's a separate issue because it's not -- it's not scientific data, per se.
Q. Okay. All right. Now, if you could turn to paragraph 31 in your report.
Okay. You discuss the biological effects of talc in this paragraph and in others, correct?
A. Yes, I would call this my introductory paragraph to transition into a specific topic, yes.
Q. Okay. And you talk here about the structure and size of talc affecting its properties.
What do you mean by that?
A. So whether it's fibrous enough, platy, fibrous. Whether it is particle sizes of less than 10 microns, less than 5 microns,

Page 125

greater than 75 microns. There's different -- certain pieces of literature deal with different size ranges of talc. The smaller the size range, the more toxic it is, for example, to lung tissue; the more likely it is to be able to move, based upon the size, versus being engulfed by a macrophage if it's a larger particle, things like that.
Q. So focusing specifically on ovarian cancer, what role does size and structure of a talc particle play with respect to a risk of ovarian cancer in your opinion?
A. I don't think I formed a opinion that it has to be a specific size or structure, because the -- my opinions are related to the fact that we have a complex mixture of ingredients within the body powder, and my assessment's been on the overall consumer product, not on any one particular ingredient only within it.
So it's the idea of just understanding that size and structure of these particles are general principles that affect toxicology. So a larger particle or a

fibrous particle may have a different tissue toxicity response than a smaller particle.
So in other words -- I think I discuss this later in a paragraph about pleurodesis, the idea that you can get acute versus chronic inflammation, or respiratory distress or not. So it's just this idea of a general principle that outlines how you would think about particles generally as a toxicologist.
Q. Well, okay. So you said that your assessment is based on the overall consumer product. That would be Johnson's baby powder or SHOWER TO SHOWER®, correct?
A. Yes.
Q. All right.
A. Or Shimmer. I think that's the other name. There's a third product.
Q. Okay. But my question to you is, you actually cite a number of pieces of literature in the section about the alleged toxicity of talc that don't relate to the overall consumer products at issue in this case, correct?
MS. PARFITT: Objection. Form.

THE WITNESS: No, I would disagree with that when you use the word "relate." Relate to me means is it relevant to the assessment, and they are, even if they're not just on the finished product.
But if what you mean is that there are studies that did not test the consumer product but individual ingredients or -- that is true, yes, but all of that is relevant or relates to the overall risk assessment.
QUESTIONS BY MS. BRANSCOME:
Q. Okay. So given your view that information about the individual constituents is relevant to evaluating the overall toxicity of the ultimate consumer products, then my question to you is: How does the structure and size of the component talc particles play a role in toxicity with respect to ovarian cancer?
A. Just generally -- it's not just -- well, with respect to ovarian cancer, we start with irritation, inflammation potential. Size of particles and shape are

known to affect tissue toxicity as far as adverse events like inflammation and/or irritation.
Q. Okay. So that's -- that's what I'm trying to understand in more detail.
What is your opinion with respect to -- let's take size to start with. Is there a particular size talc particle that is more or less likely to cause inflammation, in your opinion?
A. It depends whether you're talking about acute or chronic. I would say for acute inflammation the larger particles, such as some of the particle sizes that are used in the pleurodesis products, are more likely to initiate an acute inflammatory response due to the fact that they're large enough that the body will recognize them with a fairly robust foreign body response.
Q. What is your definition of large?
A. So the literature varies, but certainly particles that are above -- some of the literature talks about particles that are in the range of 25 to 75. Some of them talk

about larger particles even than that.
It has to do with the fact that -- this is complicated by the fact that any consumer product -- or any talc sample will have a range of sizes because they don't select for one size. They select for smaller than. So a 200 mesh, a 400 mesh, that has do with what will filter through.
So pleurodesis, they try to avoid for those products the really small -- large amounts of less than 10 because that leads to respiratory distress, whereas many of the consumer talc products are using much smaller, finer particles to get that feel and performance they want from the consumer body powders.
Q. Have you reviewed -- focusing specific on Johnson & Johnson's products, have you reviewed the documents that relate to the specifications for the Johnson's products with respect to the size of the plate particles?
A. I have seen those, yes. I can't tell you what each of them says without pulling them out, but, yes, that is certainly

Page 130

documents I have seen and relied upon.
Q. Is it consistent with your understanding that it was Johnson & Johnson's intention to select large platy talc particles for its products?
MS. PARFITT: Objection to form.
QUESTIONS BY MS. BRANSCOME:
Q. Have you seen that in the documents?
A. I don't know that it's described quite that way, but they certainly were doing a 200 mesh selection. So -- for their body powders products. So -- and they were trying -- and they did make attempts to look for sources that were more platy talc than other forms, but that doesn't ensure that everything is platy talc.
Q. Are you familiar with the term "fines"?
A. Yes, generally, but I'm not -- but I'm not an expert in the processing of talc as far as how you would go about choosing an ore or a mine. There's others that will be addressing that. That's not my

Page 131

area.
Q. What is your understanding of the term "fines"?
A. My understanding of the term "fines" has to be looking for a sample or a group that has been processed such that it has certain characteristics.
Other than that, I would refer you to the individuals in litigation that are going to be dealing with the processing.
Q. Okay. Have you taken into account in your analysis in any way the beneficiation process that occurs between the time that the talc is mined and it ends up in one of the consumer products that is relevant to your analysis?
MR. MEADOWS: Objection.
THE WITNESS: So what do you mean by taking it into account? Am I aware that they have something that's in place for that? Yes.
But take into account, what do you mean by that?
QUESTIONS BY MS. BRANSCOME:
Q. Are you familiar with the

Page 132

effects that beneficiation can have on the level of the component -- the components in talc and what ultimately ends up in one of Johnson & Johnson's consumer products?
MR. MEADOWS: Objection.
THE WITNESS: So I'm not -- I'm not familiar with all the details, but I am familiar that it is a process they're using to attempt to result in a product that has characteristics that would be desirable for a consumer product.
Again, there is my understanding that others are going to be discussing the geology or the processing, and that is not something I'm looking at.
The literature as it relates to what has been tested in the public literature in particular, and that would be either an ingredient or a -- or a consumer product or a -- they may discuss exposure occupationally to mining or milling, which is -- which is an issue that you can consider when

Page 133

you're reviewing that literature as well.
QUESTIONS BY MS. BRANSCOME:
Q. Okay. And so when you cite -- for example, you have a significant number of -- I'm trying to find the right paragraph.
You have a section in your report where you discuss a number of different articles that relate to talc, and in parentheses you identify that the talc source might be cosmetic, it might be industrial, things of that nature, correct?
A. Yes, I do that on purpose because I wanted -- I did look at the literature to understand what they were -- what they were -- what type of exposure they were describing.
Q. Okay. And so understanding that some of those products are not representative of what ultimately is in Johnson's baby powder, do you have anything in your report that explains how you did or did not give weight to those particular studies?
MS. PARFITT: Objection. Form.

THE WITNESS: Let me look and see what I say.

If the question has to do with numerical rankings, no, I did not do that. But you're asking something else, right, broader than that, correct?

QUESTIONS BY MS. BRANSCOME:

Q. The question that I have is, how did -- is there somewhere in this report that I can understand the weight that you assigned to say a study that related to industrial talc as opposed to information about cosmetic talc, for example?

MR. MEADOWS: Objection.

THE WITNESS: So I -- I'm -- I believe I address that. I don't know it's exactly answering your question, but I lay out for you the characteristics of the literature in paragraph 37, and I point out that the scientific literature varies.

And the fact -- and I point -- and I admit -- I'm not admitting. I'm stating the fact that in some cases

the authors will not describe it specifically as the type of talc, but just talc, whereas -- with no description of purity or state, for example. But in cases where the literature does, I did consider that in my weight of the evidence.

So, for example, when I -- when I lay it out here in these bullets where I'm putting for you tremolite mining industrial grade cosmetic, it certainly is something that I weighed. And obviously as much information as I can get on cosmetic-grade talc is going to be most important in the assessment, but that doesn't mean the other information isn't relevant.

You want me to explain why?

QUESTIONS BY MS. BRANSCOME:

Q. Well, so, for example, you describe the Dreessen article that related to trimellitic talc that's mined out of New York.

You would agree that trimellitic talc from New York is not

something that ever ended up in Johnson's products, correct?

MR. MEADOWS: Objection.

THE WITNESS: I don't think I can answer that yes or no. I haven't done an assessment to see whether it ever ended up in the products. That's a different question.

I certainly am aware of the fact that was not a primary source of their talc, that is true. I do know that.

In other words, I don't have records from -- going back from 1894 on what the source of their talc was. So I can't tell you over time.

What I do know, what's been put into depositions and testimony of company employees more recently, where it's my understanding that the principal sources over the years were either the Vermont mine, the Italian mine or the Chinese mine. And there were different interruptions in time where different mines were used,

depending on sourcing.

QUESTIONS BY MS. BRANSCOME:

Q. So as part of your expert analysis where you are evaluating articles that relate to different types of talc from different sources of talc, have you done an analysis of how those particular types of talc do or do not relate to what is in the consumer product manufactured by Johnson & Johnson?

MS. PARFITT: Objection. Form.

THE WITNESS: The first part of your question, again? I'm sorry.

MS. BRANSCOME: Would you read it back?

THE WITNESS: Could you read it back to me again? I didn't mean to wander, but the first few words I missed.

(Court Reporter read back question.)

THE WITNESS: Okay. So I certainly did, which is why I'm breaking this out here for you this way.

So I am -- I am certainly recognizing, and I analyzed on the paper -- through the papers what type of product, if available, that the data is on.

But if you read my report in the process of risk assessment, all of these categories of papers are relevant to telling you something about what talc can do. And then when you talk about drawing final conclusions, I'm looking for information, if I can, and I have it, that is on point to the product that was sold.

So certainly the studies that give me information on cosmetic-grade talc are extremely important to my assessment, and they're ones that I've discussed or we've even used in trial before when we've talked about putting together a timeline.

That's what this is about, by the way. This discussion here, I'm starting to lay out what information

was available over time, and that's simply what this is. It's a survey of the literature that talks about adverse effects of talc, and if I can, I separate it into different qualities or purities.

QUESTIONS BY MS. BRANSCOME:

Q. Dr. Plunkett, respectfully, I don't believe you answered my question.

Can you point me to anywhere in your expert report that's been produced in this MDL where you do an analysis of how the different talc types and sources that you are citing as support for the toxicity of talc generally relate to the products manufactured by Johnson & Johnson?

MR. MEADOWS: Objection.

THE WITNESS: So I don't know how else to answer that but to tell you I think that's what this whole section is about. I step you through -- I identify different types of evidence. I identify for you what was tested in those different pieces of evidence, and then I step through

that to draw conclusions based upon what was available for me to assess.

QUESTIONS BY MS. BRANSCOME:

Q. Okay.

A. I don't know how else to answer it for you. That's what the section is meant to do, and that's why I broke it out that way. You know, I recognize that there is data on different things.

What's interesting about even the data on different things, there's a common mechanism that is involved with the type of tissue toxicity you get, and that's irritation and inflammation. Regardless of whether it is of a certain grade or not, you get certain types of adverse reactions. May be a more sustained reaction with a industrial grade versus cosmetic grade, but they all have the capability to produce that type of adverse effect.

Q. Dr. Plunkett, where can you point me to in your report that you discuss the weight that you give studies that relate to talc from New York as opposed to studies that relate to cosmetic talc that ultimately

ended up in Johnson's baby powder?

MS. PARFITT: Objection. Form.

THE WITNESS: I've tried to answer that for you. The weight that I'm giving -- the weight that I'm giving is part of my assessment. So, again, I don't give numerical rankings. I've answered that for you. I don't do that.

What I instead do is I'm looking at everything that's relevant, everything that's available. I do categorize it, so I am selecting -- I am identifying or analyzing the information for what it describes. And then if you go further on down, I try to tell you what I think is important about that information.

The overall conclusions I'm drawing in the report, though, when I cite to specific studies in the risk assessment, the majority of those studies I believe that I'm citing for you, outside of notice, have to do with -- that's more of a warnings

issue -- have to do with the issue of cosmetic talc. Because the human studies are describing cosmetic talc. The NTP studies is a pure talc. Many of the in vitro studies and other animal studies are looking at, quote/unquote, a talc that is not an industrial grade or from a mine that would have -- be looked at in that way. So --
QUESTIONS BY MS. BRANSCOME:
Q. You understand that there are different types of cosmetic talc, correct?
A. Yes, I am aware.
Q. And cosmetic talc can be mined from a number of different mines globally, correct?
A. That's correct.
Q. And some of the studies that you cite in your report are testing cosmetic talc from other consumer products, for example, Cashmere Bouquet, correct?
A. Some. The majority of them are not, but I would agree that some do, yes.
Q. Okay. Have you done an

analysis of how the talc that is used in Cashmere Bouquet, for example, relates to the talc that is used in Johnson's baby powder?
Is that an analysis that you have done before relying on that information in your report?
MR. MEADOWS: Objection.
MS. PARFITT: Objection.
THE WITNESS: My analysis -- I did do an analysis to look at what was described, what products are described, but I certainly -- I certainly did not throw out studies that described Cashmere Bouquet because I would -- I still believe as a toxicologist and a risk assessor that those types of products are important to the overall weight of the evidence about the hazard and the risks posed by talc.
You know, I just -- I just -- I guess I disagree with you if you're saying they're irrelevant. I don't believe that they are.

QUESTIONS BY MS. BRANSCOME:
Q. I was simply asking: Did you do an analysis that would allow you to compare the ingredients in another product, like consumer Cashmere Bouquet, before you rendered an opinion with respect to Johnson's baby powder based on tests of Cashmere Bouquet? Did you do that analysis?
MR. MEADOWS: Objection.
THE WITNESS: I do not have access to internal company documents for the manufacturers of Cashmere Bouquet, so I certainly couldn't do the analysis in the same way that I can do it here, where I can identify what Johnson & Johnson and Imerys describe as sources of the talc that was used for the Johnson & Johnson baby powder, without --
QUESTIONS BY MS. BRANSCOME:
Q. So you have no way of knowing one way or the other whether that talc is similar, correct?
MR. MEADOWS: Objection.
MS. PARFITT: Objection.

THE WITNESS: Well, I think I do know it's similar, if you look on the bottle as far as what is described it being, but if you're asking me -- if you're asking did we fingerprint it to only a particular mine, this is the beauty of the data. The data shows that regardless of the type of product you're looking at, there's consistency across the study.
So -- but I did not try to segregate out studies that only dealt with Cashmere Bouquet, no, I did not do that.
QUESTIONS BY MS. BRANSCOME:
Q. Okay. As you sit here today as a toxicologist, is it your position that industrial-grade talc that might contain up to 70 percent tremolite presents the same level of toxic effect as cosmetic talc that may contain no tremolite or tremolite at a very, very low level?
MS. PARFITT: Objection. Form.
THE WITNESS: I haven't formed that opinion, no.

QUESTIONS BY MS. BRANSCOME:
Q. Okay. And so have you formed an opinion that I could find in your report that discusses in any way the relative toxicity of different types of talc?
A. That, you may find. I need to go back and look how I set it out, but I think I -- I talked with you about the difference between fibrous versus platy. I do discuss that.
And I talk about the problems when you have a complex mixture that has added to it things like asbestos and heavy metals, because I talk about the additivity issue that can come to play. So that -- in other words, increased risk when you have a complex mixture with additional components that all share the same toxic properties as far as target organs or types of effects or mechanisms that are triggered in the body. That's what I point you to.
I -- I don't -- that's the only way I can answer that for you, I think, based on what I know I have in here.
Q. Okay. You talk about the term

"asbestiform talc."
You talk about asbestiform talc.
Are you familiar with that?
A. I do mention that in my report, yes.
Where are you?
Q. At paragraph 30. It's on page 19 of your report.
A. Yes, I'm here.
Q. Okay. And the first sentence in paragraph 30 you state, "In the published medical literature, there is often discussion of talc using terms such as fibrous talc, asbestiform talc, non-asbestiform talc or tremolite."
Do you see that?
A. Yes, I do.
Q. Okay. Is it your opinion that tremolite is a form of talc?
A. So tremolite is a -- is a -- is a type of fiber or a -- tremolite is a -- is a substance or a entity that has been identified as a specific morphology, I guess, identified characteristics of a -- it has

identified characteristics.
There's -- within the asbestos -- the asbestos literature there's -- it's one of the forms -- forms of asbestos that's described. For example, in IARC, they describe all of the ones that have carcinogenic properties. It's one of them.
Within the literature within Johnson & Johnson's documents, there's tremolite discussed as -- I assume them referring to asbestos tremolite, asbestos in a tremolite characteristic. I have seen tremolite talc also mentioned in the literature.
If you want a specific discussion of each of those, again, there's -- I understand there's experts that are going to describe the distinguishing characteristics of each of those.
I'm only setting out this is what I have seen, talked about, in the literature.
Q. So you are not an expert on the differences between fibrous talc, asbestiform talc, non-asbestiform talc and tremolite as

it relates to toxicity. Is that your opinion today?
A. No, that's not what I'm saying. I'm saying that if you want me to -- I'm -- if you want me to describe the characteristics and the morphology of each of those individually, that's something a geologist would do.
But certainly as far as the toxicity assessment I did, each of these types of -- each of these words, I guess, or names have been applied in the literature when they talk about toxicity of talc. Some of the literature talks about fibrous talc or just -- other literature just talks about talc. Some of it, for example, the IARC monographs, distinguish between asbestiform talc and non-asbestiform talc in their assessments of the cancer risk.
And then tremolite is discussed as a component of talc. And I have seen papers that talk about tremolite -- nontremolite talc or tremolite-containing talc. That's how you most often see it.
So it's the idea that it is a

constituent of certain mines that -- and that's my understanding of it. But if you want -- and they all -- they all certainly do show that the toxicity can be affected, whether it's a fiber or a platy particle. So tremolite being a fiber would certainly affect my overall assessment of risk. The more tremolite that you would have would make -- would make it more likely to be reactive in terms of a foreign body response, depending on the size.
Q. What's your basis for saying that?
A. That's based on a fibrous form versus a platy particle form. That's the issue of -- I have that paragraph where I talk about what macrophages look for, can engulf or not engulf. So those are all things that are important to a toxicologist to understand exist.
But certainly within my assessment I have to include literature from all of those because of the fact that all of those are relevant to the toxicity profile, since I know that the cosmetic baby powders

and the data I've seen shows detection of something called fibrous talc.
I see detection of tremolite within certain samples of baby powder.
And then I have just the general category of asbestiform versus non-asbestiform when I consider the way, for example, IARC has reviewed the carcinogenicity.
So those are -- those are terms that I'm laying out because I think they are something you need to understand exists in the literature.
Q. Okay. But I'm trying to understand, not helping me understand the literature. I'm trying to understand your opinions with respect to toxicity.
Is it, for example, your opinion that fibrous talc has the same toxic potential -- let's focus specifically with respect to ovarian cancer -- as tremolite?
A. I haven't formed that opinion, but, again, I would -- my opinion has been formed on the fact that we have complex mixture that includes all of these things.

Q. Okay. And so when you're looking at a complex mixture, you would agree as a toxicologist it would be important to understand the constituent elements of that mixture, correct?
A. Yes, it is important to understand that this is -- what is in the mixture, and that's -- that's part of what I try to do.
Q. Okay. And it would be important before drawing conclusions from one study that might have different constituent components, it's important to understand the relative toxicity of individual constituent elements, correct?
A. Depends if you can or not. I mean, there's certain types of studies you can, where in the published literature that's been described. That's why I'm pointing this out. It's the idea that within the literature, when you go through, it's important to understand what you can say about the consistency across the literature where maybe different types of talc are discussed.

And that's what I -- I think I lay out for you. I tell you there's consistency in certain toxic effects that are seen. Regardless of the form that you're looking at, talc has certain properties, and all of these things are -- been shown to be in the complex mixture, so I have -- as a result, all of that literature has relevance to at least the hazard part of my assessment, and certainly have relevance to -- when you want to talk about warning and the final risk assessment, they're definitely relevant, but certainly the -- when I go through this process, I am trying to focus as much as I can on a product that is most similar to the one I'm assessing.
So obviously that's why -- that's one of the reasons I do look at the human data, because the human data is involving a consumer product use, which is what I'm talking about here.
Q. Is it using specifically Johnson's baby powder?
A. Many of them are, yes.
Q. Okay.

Page 154

A. Based on my understanding of what I see discussed within the literature.
Q. Did you identify in your report specifically which report -- which studies have used a consumer product manufactured by Johnson & Johnson?
A. I haven't laid them out individually, no, but I am aware of discussions of this general issue within some of the documents I've seen, and essentially Johnson's body powders products were the overwhelming share of the market.
Q. But you would agree that studies that did not involve the consumer product manufactured by Johnson & Johnson should be given less weight when analyzing whether or not there are risks associated specifically with Johnson & Johnson's products?
MS. PARFITT: Objection. Form.
MR. MEADOWS: Objection.
THE WITNESS: It depends on the question being asked within the assessment, the risk assessment. It really does, I mean, because each of

Page 155

these studies brings a piece of evidence to the risk assessment.
And so the question is -- for each one, you consider it on a case-by-case basis. It is possible, yes, that you would give less weight. It's also possible that you would not, dependent upon what you know about that study and how it relates to other studies that are out there.
QUESTIONS BY MS. BRANSCOME:
Q. So methodologically, how would I understand from your report marked as Exhibit 4 under what circumstances to give a study that relates to, for example, industrial talc less weight than a study that actually used Johnson's baby powder?
MR. MEADOWS: Objection.
THE WITNESS: Well, I've tried to tell you that. That's what I said for you. That's why I am doing it. I certainly am trying to focus in on studies that deal with the consumer product.
But what I find when I look

Page 156

across the studies that are dealing with not the consumer product but other descriptions, there is a consistency in the types of effects you see.
And since I'm not quantifying the risk but identifying it as being increased or not, in other words, is it more likely than not that someone exposed in this way could be at a risk of ovarian cancer, that's what I'm talking about.
So again, it's -- if I was trying to identify differences in cancer potency factors for different types, then, yes, if I had an animal study on each of those, I could compare potency for cancer, but that hasn't been done.
QUESTIONS BY MS. BRANSCOME:
Q. Okay.
A. So instead, what I have to do is rely on what is available to me. And based on my judgment, that's how I review the studies.

Page 157

Q. And so for the opinions that you are offering in the MDL, you agree that you are not quantifying the risk associated with Johnson's baby powder, SHOWER TO SHOWER® or Shimmer with respect to the potential for causing ovarian cancer?
MS. PARFITT: Objection. Form.
THE WITNESS: In terms of a cancer potency factor, that is true, I am not. Instead, what I am doing is I am quantifying whether or not I believe that the risk is increased above a background risk.
That has to do with -- that's where I bring in, in my risk assessment, the human data, because the human data is showing statistically significant increases in risk in populations using the consumer product.
So I have a quantification where I'm using the word "increased," and I believe to a reasonable degree of medical certainty that indeed the risk is increased. So I'm quantifying

in that way, but I'm not giving it a number. I'm not saying that the cancer potency factor is such that you increase the risk from one in a million to 10 in a million to 1 in a thousand. That I have not done because I don't have the data, the studies. The company has not done studies on each of these to allow me to do that.

QUESTIONS BY MS. BRANSCOME:

Q. Okay. The reference that you made to the human data that you believe shows a statistically increased risk in populations using the consumer product, have -- which -- have you identified in your report which of those studies are specifically using a product that was manufactured by Johnson & Johnson?

A. I don't lay that out for my report, I do not, but certainly it is something that for some of the studies I believe you can -- you might be able to get some of that information from. But certainly I have not laid that out individually in my

report, no.

Q. And you would agree that for some of those studies there is no information as to the specific type of consumer talc that the individuals who are being studied used, correct?

MS. PARFITT: Objection. Form.

THE WITNESS: I would agree that in some of those studies they're not saying, but that is why you look at the evidence overall.

And what's important to look at in terms of now -- if you wanted to go to Bradford Hill, that's why you look at things such as consistency. So what do the studies show. We see a certain level of increased risk across studies, regardless of who did the study or what population was being looked at.

So that's the best way I can answer that for you. That is -- that is part of the -- of the assessment that you look at.

QUESTIONS BY MS. BRANSCOME:

Q. In reaching your opinion in the MDL that there is an increased risk above background of ovarian cancer from the use of products manufactured by Johnson & Johnson, have you made an attempt to identify specifically which studies, the human studies on which you rely, test or look at people who have used Johnson & Johnson's products?

MS. PARFITT: Objection. Form.

THE WITNESS: It's my -- my review of the study indicates that I would say for the vast majority of them you cannot do that.

But you can take what is reported and look at things such as market share and those kind of things to get an idea of what you believe the exposure would have been.

But certainly I have not -- I have not tried to apply some kind of a numerical value to how many people in the study may have used Johnson's baby powder or not, no, that has not been done. I don't think anybody -- any of

the bodies that have looked at this have done that.

QUESTIONS BY MS. BRANSCOME:

Q. You have not done a market share analysis, correct?

A. No, I've seen this in documents only. I have not done my own. There are company documents that talk about their market share.

Q. Okay. Have you made an attempt to examine the levels of fibrous talc or asbestiform talc that are in different consumer products, aside from Johnson's baby powder or SHOWER TO SHOWER® or Shimmer?

A. So for that are you referring to things such as -- other types of cosmetics like foundations or lipsticks or --

Q. I'll rephrase.

Have you made any attempt to examine whether other cosmetic talc body powders have a different percentage of fibrous, or what you refer to as asbestiform talc, from the Johnson & Johnson products?

Have you done any analysis to make that comparison one way or the other?

Page 162

MS. PARFITT: Objection. Form.
THE WITNESS: I certainly haven't done -- I certainly didn't do a directed analysis to try to determine that, but there is information, I believe, in -- I think if you look at some of Dr. Longo's work, that may be there.
And I believe in Dr. Blount's published paper there may be a discussion of the type of powder product used, where she was looking for -- at least for asbestiform -- asbestos within the talc. It may be tremolite as well, but -- if you want me to look, I can do that. I just don't recall whether -- I think she did talk about sources of the talc, where it came from, so...
QUESTIONS BY MS. BRANSCOME:
Q. Okay. But as you sit here today, you can't point me to any analysis that you did or an analysis that you relied on that would relate different brands of cosmetic talc body powders with respect to

Page 163

their constituent components?
MS. PARFITT: Objection. Completely misstates her testimony. She mentioned Dr. Blount. She mentioned others.
THE WITNESS: So I think what I started with, I said I haven't done a directed analysis to try to determine specifically how this product versus this product versus this product may have looked over time, because I don't have access to a full data to do that.
But what I do have is data that has -- I do see published data, for example, Blount and maybe some of the other published studies, that looked at this issue, at least of asbestos presence in talc. And I believe Dr. Longo also had things that weren't just Johnson's. I believe he had Cashmere Bouquet, for example, samples in some of the things he looked at.
So I can point you to those things that I have reviewed, but I haven't -- there's nowhere in here

Page 164

that I state for you that it's my opinion that Cashmere Bouquet has this specific pattern of constituents as compared to Johnson & Johnson's. No, I have not done that.
QUESTIONS BY MS. BRANSCOME:
Q. Okay. And that would be true for any other brand of cosmetic talc, body powders, Jean Nate, Lily of the Valley, not just Cashmere Bouquet, correct?
MS. PARFITT: Objection.
THE WITNESS: That is correct, I don't have access to that information.
QUESTIONS BY MS. BRANSCOME:
Q. Have you done any analysis of the constituent components of talc and how they have changed even within Johnson's -- Johnson & Johnson's manufactured products, how the constituents of the consumer products may or may not have changed over time?
A. I've done some of that, yes, and I laid that out, I think, for you, when I talk about the differences in the products that are described within the documents, the

Page 165

company documents, from the '70s versus the '80s versus later on, as far as the changes that were made to specifications of the product, for example. That's something -- and I think I've talked about that a bit at trial as well.
Q. Okay. And is it your view that the risk potential for Johnson & Johnson's manufactured products have changed at all over time with respect to ovarian cancer?
MS. PARFITT: Objection.
THE WITNESS: I have not -- I have not attempted to differentiate a risk potential at only one point in time.
What I have done over points of time is looked at the issue of warnings and what should be warned about.
But my analysis related to the hazard or the risk assessment of the products is considering all of the available information, which would be all of that information over time.

QUESTIONS BY MS. BRANSCOME:
Q. Okay. You talk about, in paragraph 35 primarily -- we'll talk about the fragrance components in more detail, but you talk about the idea of chemicals being a potential irritant.
Are you familiar with that?
A. Yes, that's correct.
Q. Is it your position that any product that contains chemicals that could be an irritant should be labeled with a health warning?
MS. PARFITT: Objection.
MR. MEADOWS: Okay.
THE WITNESS: I don't think that's -- no, I don't think I've formed that specific opinion.
But the opinion that I think I'm expressing here is that when you have a -- the information that I have, which unfortunately the company hasn't given us percentages or actual levels, instead, what I do as a toxicologist, I look at what is there. And when I see over a hundred chemicals there,

that 70 percent of them have been linked as an irritant hazard, there is the issue of toxicological additivity to consider.
So certainly as a risk assessor, when I have that many potential sources of irritation as far as chemicals going into a complex mixture, certainly I think I have formed the opinion that I think that is something that needs to be considered when you're talking about providing information to consumers, yes.
QUESTIONS BY MS. BRANSCOME:
Q. As a toxicologist, would it be important to you to understand the exact percentages of all of the constituent components of, say, Johnson's baby powder, for example?
A. Are you talking about just the fragrance or are you talking about everything that's in it?
Q. Dr. Plunkett, you referenced the fact that the company has not provided

you with specific percentages, and so I'm asking you, is that something that as a toxicologist would be important information to you?
A. Depends. Certainly with the fragrance -- and I'm talking about the conversation about this paragraph is focusing on the fragrance components.
So, yes, I mention that it would be nice to know, it would be good to know, if we could, exactly what was in there, because I could quantify the hazard or quantify the risk, actually. So instead, I have -- I identify it as a hazard, but I can't quantify it without those levels.
But does that change -- make a difference in the overall conclusions I draw? No, it doesn't affect the overall conclusions that I have drawn, but it adds that other piece of the puzzle that deals with the fact that we have a complex mixture that have a combination of ingredients that target irritation.
And irritation and the potential to produce an inflammatory

response, in my -- if you've read my report, you understand that I think that's a key factor in increasing the risk for ovarian cancer.
Q. Understanding the percentages of the constituent components, is that limited only to fragrance, or would it also be important to understand the percentages for the heavy metals that you contend are in Johnson's baby powder?
A. So if I was trying to define the hazard of each component, I would certainly want one to know that. As a result, what I'm doing instead is looking at the complex mixture. In other words, this is a mixture of all these things.
I break out those individual components, or constituents, to tell you about the hazard that is brought to play or the toxicity profiles that exists. And what's important about that in my overall evaluation of the end product, which is what my risk assessment is based on, the end product, shows that I have multiple components with similar types of effects.

Page 170

And as a toxicologist, when you do that, that affects the conclusion that you can draw about a body of literature.

Q. Okay. You do understand that there is testing data available about the percentages of the constituent components with respect to heavy metals, et cetera, that have been in Johnson's baby powder over time, correct?

A. There is some information. Unfortunately, the information is not complete as to every lot or every sample, as far as what I have seen. And also, there's some -- some of the sampling is reported as more of a limit versus an actual quantification. So it depends upon which -- which result, study result or document, you're looking at.

There is some there, yes, and that's one of the reasons why I identified these as part of my risk assessment, because I look for a pattern of these metals that are known to carry a hazard and whether or not these are ones I'm seeing detected time and time again.

Page 171

Q. But you made no attempt to quantify the risk with respect to any of those components or use that data in any way, correct?

MS. PARFITT: Objection. Form.

THE WITNESS: No, I used that -- that data as part of -- my risk assessment as part of my hazard assessment, absolutely. It's part of the hazard assessment.

But as far as quantifying them individually, no. I am quantifying the risk and looking at the risk of the entire product, not of just one individual component of the product.

QUESTIONS BY MS. BRANSCOME:

Q. Well, we already discussed you're not quantifying the risk with respect to the entire product, correct?

A. Well, I'm quantifying it in terms of an increase above background, which I'm not giving you a -- I told you I wasn't giving you a cancer potency factor. That is true. That I am not doing.

But I am quantifying it by

Page 172

using a word such as an increase -- an increased risk.

Is that a specific number? Am I telling you that it's increased by two times or four times or six times? No. The data available did not allow us to do that, with the exception of the epidemiological data. And the epidemiological data can show you that in that piece of evidence there appears to be a 30 percent increased risk above background.

Q. Did you make an attempt to quantify the risk with the data that you had available to you with respect to the final consumer product?

A. I could not, based on the data I had, because I didn't have a well-controlled animal study to be able to pull that out that way.

Instead, what I -- in this type of weight of the evidence, you look at what you might be able to quantify based on the human data. And certainly the human data showing the statistically significant consistent findings across studies for that

Page 173

30 percent increased risk, that is part of my overall weight of the evidence for me making the statement the risk is increased.

But you'll notice I don't say increased risk of 30 percent, because I don't believe that I can state that with certainty in the way I do a risk assessment. But certainly as any one individual -- any one individual piece of evidence or any one body, like the epi data, others have made -- other bodies who have looked at the -- talked about the consistency of the increased risk signal in the epi studies as being in the range of 30 percent.

Q. Okay. But you would agree that based on the methodology that you applied in this case, you could not say to a reasonable degree of scientific certainty that there is an increased risk of, for example, 30 percent with respect to use of Johnson's baby powder and ovarian cancer, correct?

MR. MEADOWS: Objection.

THE WITNESS: I have not done that. And I'm not saying that somebody else couldn't do that. I

Page 174

have not -- I have not chosen to do that based on my evaluation of the data.
QUESTIONS BY MS. BRANSCOME:
Q. And the same would be true if I asked that question and substituted any particular number, a 10 percent increased risk, a 20 percent increased risk, correct?
MR. MEADOWS: Objection.
THE WITNESS: I haven't given a specific number in my final opinions, that is true.
QUESTIONS BY MS. BRANSCOME:
Q. Okay.
A. I've tried to explain to you what evidence I do think is there, however.
Q. Now, we've talked about different types of talc that might have different constituent components, but you also look at exposure to talc in an occupational setting.
Do you recall that?
A. Some of the studies that I've relied upon, yes, some of them were occupational.

Page 175

Q. Okay. And you understand that in an occupational setting, you would agree that the exposure, particularly via inhalation, would be much higher than it would be through the use of a consumer product, correct?
A. It depends on the occupation, but, yes. For example, I would agree a miner would be expected to have that, but there are certain, quote/unquote, occupational studies where the exposure levels that -- for example, there are -- I believe there's at least one study that looked at application of talc powders in -- maybe in a material, coating materials in a factory. Those kinds of studies would be different than a mining study.
But, certainly, yes, I understand that occupational studies, the inhalation exposure is the pathway that would be predominant versus in the consumer body powder use, I'm talking about the predominant exposure pathway in my opinion is going to be through perineal use, even though inhalation exposure can occur.

Page 176

Q. Is it your opinion as you sit here today that someone could develop ovarian cancer through -- exclusively through the inhalation of Johnson's baby powder?
MS. PARFITT: Objection.
THE WITNESS: I haven't formed that opinion at this point in time.
QUESTIONS BY MS. BRANSCOME:
Q. Have you done any analysis or can you point me to any analysis in your report that makes a comparison of the exposure levels that might be seen in an occupational setting to what would be seen by a consumer?
A. Are you asking me for a piece of evidence that does that comparison, or is there evidence that allows you to do that comparison?
Q. Have you cited or discussed any of the evidence or done an analysis in any way that would compare exposure levels in an occupational setting to what you would anticipate a consumer using Johnson's baby powder might be exposed to?
A. I don't think I did it as a

Page 177

separate analysis, but as part of my analysis I considered evidence that showed -- provided me with such data. So, for example, if you want, I can point you to a -- I have an inhalation paragraph, I think.
Let me look for it real quick. See if I can find it quickly for you. I don't want to waste your time.
Q. Sure.
A. So there's -- I don't see it cited here, but there's at least one document I reviewed where the company themselves made a comparison, and I have seen that, of inhalation exposure to talc suspended in air with diapering. Dr. Longo has done a measurement of exposure in air with perineal application of talc. So I'm aware of those studies.
And then I certainly am aware of the fact that those numbers are different, or smaller, than many of the numbers I see reported in some of the occupational studies. But I can't say that's true for all.
I would certainly, though, say that if you're just talking inhalation, I

certainly would expect a miner or a miller to have a greater potential for inhalation exposure than routine use of the consumer product, with the exception of the studies -- the reports of large amounts of exposure in children where the inhalation -- where they were inhaling large amounts of powder.

And so that's a different story. That's sort of an acute overdose exposure, I guess, versus the typical daily exposure through occupational or consumer use.

Q. And that raises an interesting question. You discuss health hazards associated with talc being known, and in some cases deaths had been reported.

You're aware that those relate to asphyxiation deaths, correct?

A. Or long-term injury to lungs. Maybe not an immediate asphyxiation, but lung damage produced by large amounts -- some of the children would go to the hospital and be sick for a while and then die. So they didn't asphyxiate immediately, right? But some of them did. You're exactly right.

Both of those things occur, and I address that also in my warning section about the fact that that warning didn't -- was not put on the product for a long period of time even though those types of reports were coming in early.

Q. You would agree that that is a completely different biologic mechanism than what you are proposing the biological mechanism is for ovarian cancer to develop with respect to talc use, correct?

MR. MEADOWS: Objection.

THE WITNESS: I would agree that it's an acute response versus chronic, yes, that I agree with.

It's not entirely different in some cases because some of the tissue reactions you saw were indicative of irritation when some of the lung samples were looked at. But certainly, yes, that's acute exposure versus chronic exposure, and I'm focusing on ovarian cancer on chronic exposure scenarios.

QUESTIONS BY MS. BRANSCOME:

Q. Okay. Now, you would agree that -- so let's set aside inhalation.

You agree that for talc -- for Johnson's baby powder or another one of Johnson & Johnson's consumer talc products to reach an individual's ovaries, it must pass from the perineum, through the vagina and the cervical canal, move across the uterus -- and again, it's the ciliary motion of the fallopian tubes -- cross the peritoneal space between the fimbriae and ovaries, escape phagocytosis in the peritoneal space, and then attach to the surface of the ovaries, correct?

MS. PARFITT: Objection. Form.

MR. MEADOWS: Okay.

THE WITNESS: If the issue is attaching to the surface, yes.

There's also some information indicates the site of attack may be actually at the fallopian tube exit to the peritoneum. But, yes, that's correct, there's been some discussion in the literature on ovarian cancer

about whether the tumors are arising in the tubes versus the ovaries.

But I would agree, I think both -- I think both of those things -- those things -- there is a passage that has to happen, regardless of whether the end point is at the fallopian tube or at the ovary.

QUESTIONS BY MS. BRANSCOME:

Q. Okay. Is it your view that the consensus has been reached that ovarian cancer can be caused by talc landing in the fallopian tubes?

A. I haven't formed that opinion, though I do believe this will be discussed by some of the other experts.

Q. Okay. Have you personally conducted any tests or experiments to confirm the theory that talc migrates from application at the perineum to the ovaries?

A. If by that you mean something where I performed a laboratory test myself, no, I have not done that.

Q. As a toxicologist, are you capable of doing that?

A. Yes, I believe if asked I could -- I could attempt to design something to look at that issue.
Q. Okay.
A. But I would argue that I think it doesn't make a lot of sense to revisit based upon what we already know from the scientific literature and the review papers from the gynecological community. I believe it's -- it's understood that it can migrate.
Q. In your opinion, has an animal model been successfully developed that would allow the testing of talc migration in humans from the perineum to the ovaries?
A. I think I tell that you in my report. I believe that the human data is the relevant data to look at this issue.
So it would be very difficult to design a study to do this based on the typical laboratory species that are used in toxicology testing. Even -- even the monkeys have issues, and the biggest issues with monkeys is the ethicality of using a monkey to settle -- to address a question that I believe is settled within the gynecological

and scientific community.
Q. Now, you state in your report that talc that's applied through perineal use -- I believe the term you use -- routinely migrates to the ovaries.
Is that your opinion?
A. Are you reading from my report?
MR. MEADOWS: To the extent that question is still lingering, I object to it.
QUESTIONS BY MS. BRANSCOME:
Q. On paragraph 43 on page 29.
A. So I think as I've stated it, the studies that I have reviewed demonstrate that inert particles routinely move from the lower female reproductive tract up into fallopian tubes and towards the ovaries.
Q. What do you mean by routinely?
A. It's the percentages of movement that are reported in the patients. In other words, if you look at some of the individual studies -- if you want we can pull them out, but, you know, eight of ten patients, nine of ten patients, all the patients showed movement of the particles.

And then on top of that, you have the review articles that talk about migration of particles in the female reproductive tract and are describing it as an event that is known to occur. So it's those things weighed together.
But certainly routine could be supported by the observations where the majority of the patients in the studies were showing movement of inert particles.
Q. Is it your opinion that every perineal application of cosmetic talc powder results in talc being deposited on the ovaries?
A. I have not formed that opinion, no.
Q. Have you formed an opinion as to with what frequency -- so let's say someone uses a cosmetic talc on a perineal application ten times. Out of those ten times, have you formed an opinion as to how many of those instances would talc deposit on the ovaries?
MS. PARFITT: Objection.
THE WITNESS: I haven't formed

an opinion in that particular way, no. I think what I've -- I've tried to describe to you in my report is that I believe it is known that inert particles have the ability to migrate. And based on that, I form the opinion that it's my opinion to a reasonable degree of scientific certainty, which would be a more likely than not standard, that particles of talc would be migrating when women are using them perineally. But I haven't told you that it has to be a specific number, no.
QUESTIONS BY MS. BRANSCOME:
Q. Have you done any analysis to establish over a lifetime use of cosmetic talc where the app -- the perineal application, with what frequency during a lifetime the talc may have been deposited on that individual's ovaries?
A. So I certainly looked for information to allow me to assess that, but unfortunately those kinds of studies would be unethical to do. Because that would be a

matter of sampling women during -- using them and then taking biopsies, and that's something that would be difficult to do. I would say impossible to get approval to do under human testing guidelines.

Q. Okay. So it's your opinion that it is possible for talc that is applied through a perineal application to reach the ovaries, but you cannot say with what frequency that occurs?

MS. PARFITT: Objection. Form. Misstates her testimony.

THE WITNESS: That's not -- what I'm telling you is, I think it -- that to a reasonable degree of scientific certainty that it migrates, and that would be the standard of more likely than not. I think it's more likely than not that the talc is reaching the ovaries when people are using it perineally.

I did form the opinion -- and I've talked about this at trial and yesterday. I have formed the opinion that this is a issue of chronic or --

or use of the products. In other words, people aren't just using it once, but people are using it -- you can use the word "routinely," as a habit, in their daily life perineally. And that would be consistent with the studies that have been done that have looked at the issue of dose response.

And I discuss that in my report, too.

QUESTIONS BY MS. BRANSCOME:

Q. Okay. But you have not made an attempt to quantify, nor have you seen it in the literature, the overall dose of talc that someone might be exposed to in terms of contact with the ovaries throughout their lifetime, chronic use of cosmetic talc?

MS. PARFITT: Objection. Form.

THE WITNESS: Those -- that's the kinds of studies that have not been done and I believe could not be done based upon ethics of human testing. But certainly I -- that -- that data is not available that I'm aware of.

MS. BRANSCOME: Okay. Can we just go off the record for a second?

VIDEOGRAPHER: We are going off the record at 12:23 p.m.

(Off the record at 12:23 p.m.)

VIDEOGRAPHER: We are back on the record at 12:24 p.m.

QUESTIONS BY MS. BRANSCOME:

Q. As you sit here today, how would you characterize the biological mechanism by which you claim Johnson's baby powder, their other cosmetic talc products, present a risk of ovarian cancer?

A. So I outline this for you in the MDL report. I think I have a section on -- let's see if I can -- you want me to tell you where or...

So paragraph 65, I think I set out part of this argument or part of this. And then also in paragraph -- I believe in 67.

Q. All right. Well, let me take a step back.

Is it your opinion that the biological mechanism by which talc, cosmetic

talc, can in your view cause ovarian cancer, is that something that has been definitively established?

A. What do you mean by definitively? I mean, I think -- I believe more likely than not that -- so I believe I have reached a conclusion that I think what the most likely biologically plausible mechanism, but maybe you're ask -- meaning something else.

Q. Okay. Well, let's start with specifically you discuss a number of different potential mechanisms in your report. So if you believe you have reached an opinion more likely than not about the specific biological mechanism by which cosmetic talc and specifically Johnson & Johnson's products can cause ovarian cancer, can you describe that for me?

A. So it's a chronic inflammatory process, and so -- but like all compounds, constituents, even drugs that we look at, we don't know each individual step within the molecular mechanism.

Instead, what we know is that

Page 190

there are certain components to the process of cancer that are consistent with the effects produced by talc, and we know that talc can produce a chronic inflammatory process.

And so that's why I was pointing you to the paragraph 65 and I think 67.

Q. Is it your opinion that consensus has been reached in the scientific community that cosmetic talc can cause ovarian cancer through a chronic inflammatory response?

MS. PARFITT: Objection.

THE WITNESS: I don't know that that's exactly the opinion I've formed.

Would you like me to -- I could restate what I believe, but I don't think that's exactly how I would state it, no.

QUESTIONS BY MS. BRANSCOME:

Q. Okay. So then yes or no: Has consensus been reached in the scientific community that cosmetic talc can cause

Page 191

ovarian cancer through a chronic inflammatory process?

A. I don't believe I formed the opinion either way, that it's yes or no, because I haven't tried to -- I haven't tried to form the opinion about what the -- in other words, I haven't -- I can't say for every scientist out there.

I certainly can tell you what I believe based on what the consensus of science says about mechanisms underlying cancer and the consistency of those mechanisms with talc, and then I have an opinion about what I believe that information says.

I do believe my opinions, however, are consistent with some consensus statements, such as the issue on the mechanism is consistent with consensus opinion reached by IARC, where they discuss the inflammatory process as an underlying biologically plausible mechanism that can lead to ovarian cancer.

I think it's consistent with the Canadian risk assessment where they

Page 192

discuss those issues.

I think it's consistent with -- I don't know if the ACOG statement goes that far on mechanism, but it does talk about ovarian cancer. That's a recent statement.

And I believe it's consistent with some of the -- I believe my opinions are consistent with some of the opinions reached by others in science, but that's the only way I can answer that for you.

Q. Okay. Because you have not, one way or the other, done an evaluation of whether or not chronic inflammatory process is a biological mechanism on which the scientific community has reached general consensus with respect to the causation of ovarian cancer; is that correct?

MR. MEADOWS: Objection.

THE WITNESS: I can't tell you that -- I can't tell you that every body that's looked at it, but I have tried to point you to evidence that I believe is consistent with that.

For example, the IARC would be a good example of consensus on

Page 193

biologic mechanism because they have a whole part of their assessment of non-asbestiform talc and perineal cancer -- of perineal use and ovarian cancer that discusses mechanism. And that is consistent with what I have said. So there is a consensus opinion.

But I guess what I'm saying to you is I can't tell you that all -- all people who have put statements have come to that exact opinion. But there aren't that many places out there that are addressing that issue as far as the consensus on a mechanism. There's more statements about the relationship between ovarian cancer and talc use than there are drilling down to what the mechanism must be.

QUESTIONS BY MS. BRANSCOME:

Q. Okay.

A. So that's the issue. It's a little -- it's a little hard to answer that yes or no because of that.

Page 194

Q. Okay. When we talk about the idea of biologic -- a biologically plausible mechanism, what is your understanding of the term "plausible" in that expression?
A. When I use the word "biologically plausible mechanism" or "biologic plausibility," I'm using it consistent with what Bradford Hill uses, that's it's the idea that the evidence that available makes -- the evidence that available supports a pathway where you can go to exposure to response.
So in other words, there's a -- the biological information is consistent with how we know cancer can develop. That's the response we're looking at. And the exposure we're looking at is known to produce those kind of biologic events.
So as a result, based upon knowing that there's a consistency between the data that we have on the -- on the exposure and the data that we have on the way cancer can occur, those things -- those things align. So that makes it biologically plausible that that could occur.

Page 195

Q. But you would agree that biological plausibility suggests that it is a plausible explanation, but it may not have been established as the definitive pathway by which a disease is caused, correct?
MS. PARFITT: Objection. Form.
THE WITNESS: Well, I would agree that in the discussion of biologic plausibility in the Bradford Hill paper that is true. But if you look at people's discussion of the use of -- I want to say "biological mechanism" rather than the word "biologic plausibility," because really as a toxicologist I'm trying to understand whether there's a biologic mechanism that makes sense. Those are words I like to use. Does it make sense that this exposure could lead to this response.
And that involved looking at the mechanistic data or the data on the way toxic responses are produced by talc, and whether or not they align with the types of toxic insults that

Page 196

are known to be able to produce, specifically, ovarian cancer.
QUESTIONS BY MS. BRANSCOME:
Q. Is it your opinion that IARC, for example, has concluded that the biological mechanism by which talc may cause ovarian cancer is chronic inflammation?
MS. PARFITT: Objection.
THE WITNESS: I don't know that they have used -- they've described it quite that way, but they do describe what they believe is the biologically plausible mechanism. Because they do organize and use within the definitions of how they describe some things that are consistent with what Bradford Hill uses.
QUESTIONS BY MS. BRANSCOME:
Q. Okay. And obviously you're familiar with the IARC evaluation of talc with respect to the possibility of causing ovarian cancer, correct?
A. Yeah. If you mean the recent one, yes, the most recent assessment.
Q. Yes.

Page 197

And that IARC has in fact classified cosmetic talc not containing asbestos as possibly carcinogenic to humans, correct?
A. It's a possible human carcinogen 2B, that's correct.
Q. Okay. And if a product is listed in the 2B category, does that necessarily mean the product, in your view, is carcinogenic?
A. Not always, because that comes down to an assessment of -- then you're putting together a -- a risk assessment that looks at -- looks at -- across the information that you have available. And that may be that -- that the -- the possible is all you can say, or it may be that you believe that the information -- there's enough information there to take it further.
Has a possibility -- that's what I said, they do a hazard assessment. They rank things on hazard based on -- on unlikely -- not enough evidence, less -- the possibility, the probability or it's known.
Q. In your opinion, is your

characterization of the risk of Johnson's baby powder or talcum powder products with respect to ovarian cancer, are you in the MDL characterizing that risk as a higher level of risk than what IARC characterized it, or do you agree with the 2B characterization of possibly carcinogenic?

MS. PARFITT: Objection. Form.

THE WITNESS: So I'm not IARC, so I don't try to second-guess there. They have reached a conclusion, and I use that as part of my weight of the evidence. So I haven't formed the opinion they're right or wrong.

But I have done a different assessment. My assessment, first off, includes more information than IARC had, so as a result, I have formed the conclusion that I believe that it's more likely than not that exposure to -- perineal exposure to talc body powders increases the risk of ovarian cancer in women who use that product.

And I will put the caveat this has to be chronic use or repeated use,

because I've gone -- I've said that many times.

So that -- that is my opinion. So that's a different statement and a different assessment than what IARC does.

But -- so I don't disagree with their possible -- I weigh that, but I believe the evidence for the risk assessment shows me that it's more likely than not that this -- this exposure will increase the risk above a background risk for women who are using this product.

QUESTIONS BY MS. BRANSCOME:

Q. And how do you define chronic or repeated use?

A. Well, that is variable within the literature. For me, chronic is exposure -- if as a toxicologist, I would typically say chronic use is years of use. It doesn't have to be daily, but it would be years. That's the most common description you see in toxicology, so I would say that's fair. That's a fair assessment of my

opinion.

Q. Is there a threshold of the use of Johnson & Johnson's talcum powder products below which there is no increased risk, in your opinion, of ovarian cancer?

A. We have not identified that threshold. That's what's missing within the -- the literature that exists today. So I can't tell you whether or not with only a thousand applications over a lifetime that is -- is not enough for every individual or not, but certainly I do believe that the -- that the exposure has to be habit, routine, chronic, something that is done maybe not on a daily basis but on a routine basis in a woman's life.

So that is consistent, I think, with the literature.

MS. BRANSCOME: Okay. We can go off the record.

VIDEOGRAPHER: We are going off the record at 12:36 p.m.

(Off the record at 12:36 p.m.)

VIDEOGRAPHER: We are back on the record at 1:35 p.m.

QUESTIONS BY MS. BRANSCOME:

Q. Good afternoon again, Dr. Plunkett.

A. Good afternoon.

Q. I want to talk a little bit about the Health Canada assessment.

We talked about this before, but this is something that you reviewed after you completed your report which has been marked as Exhibit 4, correct?

A. Yes, and I wanted to tell you, I did not bring all those documents printed. I apologize. So there is a separate Health Canada draft risk assessment that I didn't print.

Q. Okay. So when you're referring to the Health Canada analysis, what document are you specifically referring to?

A. So I'm referring to the -- the combined documents, but there are times when you've asked me questions that I've been referring -- and I tried to say, I believe, Taher.

But, yes, some of the questions you asked me when I said Health Canada, I was

Page 202

talking about the combined documents, which would include their -- I guess it's called a draft risk assessment document, yeah, which refers to this document but is a separate -- is their own separate statement.

Q. As you sit here today, what is your understanding of the current position that has been articulated in the collection of documents that you refer to as Health Canada with respect to any potential relationship between cosmetic talc and ovarian cancer?

A. So that's why I did print out the small one, because I think it summarized it. So here, if you look at this Exhibit 6, it makes specific conclusions or draws -- makes statements. And essentially it talks about talc being a possible risk of ovarian cancer, but then it gives women specific advice about what to do in order to minimize exposure to the products, and some of that was relevant as well.

Just one reason I printed it out, it has to do with either choosing an alternative product or avoiding genital

Page 203

exposure to talc.

And let me see the exact words that they use, but --

Q. Before you do that, do you agree with the characterization that cosmetic talc presents a possible risk of ovarian cancer?

A. No, I don't think that's my opinion. I think my opinion is stronger than that.

But are you talking about my causation analysis opinion or just my risk assessment opinion?

Q. I'm asking about any opinion you intend to offer in the MDL.

A. Okay. So I will not be giving the causation analysis opinion, so that -- I will take that off the table.

So I think my opinion is a little stronger because I say that the exposure to the perineal -- the talc by perineal application in women increases the risk. So I'm not saying it's a possible risk. I'm actually -- I believe that it increases the risk. And I do believe that

Page 204

there is a association between those two things, the exposure and the response, which is more than a possible association, if you want to use those words.

But my assessment that I've done is not exactly the same, for example, as IARC does, which is more of just a hazard assessment.

Q. Right.

So I'm focusing my questions now on your risk assessment as compared to the documents that you've supplied us with with respect to Health Canada. And if I understand it correctly, are you stating that your opinion with respect to the relationship between cosmetic talc and ovarian cancer, you believe that it is an association that is stronger than a possible risk; is that correct?

A. Well, I don't say it's a possible risk; I say there is an increased risk. So I think it's a different statement, yes, absolutely.

Of course, I'm not Health Canada, so, you know, they have a framework

Page 205

upon which they make decisions, and I'm doing an analysis based on what I have done. And so it's not exactly the same, although some of the same documents and information is weighed within -- and then that's when you have the issue of what Health Canada does versus what they rely upon.

But this Taher risk assessment is just one piece of information that Health Canada has weighed in their assessment if you read their -- their draft risk assessment.

Q. So the question I have about the Taher risk assessment, earlier you were referring to the fact that you have only seen a quantitative assessment of the weight of particular components of scientific evidence in evaluating epidemiological studies; is that correct?

A. So that's what I typically see, yes. And I don't know that -- I've never seen it. But the typical approach would be to use it there as opposed to using it in the context of a human health risk assessment based on animal in vitro data.

Q. All right. Are you familiar

with something called the Klimisch scoring system?
A. I don't know if I am now. You'll need to show me what it is you're referring to. The name doesn't ring a bell, no.
Q. Okay. So it's not something that you've used in the past?
A. No, not that I recall using.
Q. All right.
A. Unless it has another name, and that's why I'm asking you.
Q. All right. So if you have actually -- it's the document in front of you that we've already marked as Deposition Exhibit 5, I believe.
A. Yes.
Q. And that is the Taher study that we were discussing and is cited by the Health Canada risk assessment.
If you turn to page 5 -- well, actually beginning on page 4, do you see there is a section entitled "Literature Search and Identification of Relevant Nonhuman Studies"?

Do you see that?
A. Yes.
Q. And this is related to an analysis that these authors performed on potentially relevant animal and in vitro studies, correct?
A. Yes, that is true.
Q. All right. And it states here that "all retrieved studies were examined for relevance, reliability and overall quality using the Klimisch scoring system."
Do you see that?
A. Yes, I do see that. So I have seen that before. I just didn't -- I didn't recall it.
Q. Okay. And so would you agree that it is possible and in fact has been done in a study that you rely on to apply a quantitative scoring system to animal and in vitro studies, particularly in the context of looking at the relationship between talc and ovarian cancer?
A. Well, I didn't say it was impossible. I said I don't believe it's routine based on my experience.

So, yes, if they stated they've done -- we'd have to pull the supplementary materials out, but I recall them doing scoring based on epi studies but not on the -- all of the animal studies that they talk about. But we can pull it out and look. I could be wrong.
Q. Okay. Did you review the supplementary material 7, 8 and 9?
A. Yes, I did, and we'd have to pull them out because I don't recall the details.
Q. All right. We may take a look at those in a minute.
It talks about them classifying the animal and in vitro studies into four categories of reliability.
Do you see that?
A. Yes.
Q. So did you make any attempt, when you were reviewing the various studies in reaching your opinion about the potential risk of talc in causing ovarian cancer, did you make any attempt to separate out the different pieces of evidence into categories

of reliability like the authors of this paper have done?
A. I didn't do it exactly the way they did it, but I certainly do do that as part of my screening.
I told you one of the characteristics or one of the assessments I make is whether I believe the data is reliable data that I can -- that I can use in a weight of the evidence. So I make a -- and when I talk about reliability, I'm talking then about things such as I mentioned, peer review, whether or not there is statistical analysis, whether or not the study is designed in a way that's consistent with general principles of toxicology, control groups or not control groups.
Those kinds of things I do -- I do consider when I am assessing the use of a study or not.
Q. Is it your testimony here today that contained within your report that's marked as Exhibit 4, I could find categorization of reliability of each of the pieces of scientific literature that you have

Page 210

included in your weight of the evidence analysis? Is that your testimony today?
A. No, that's not what I'm telling you, no.
Q. Okay. So you would agree that you did not -- first of all, did you develop categories of reliability in which you separated the particular scientific studies into as part of your weight of the evidence analysis?
A. I do look at -- I do categorize studies based upon my assessment of their reliability and their ability to be used to answer the question I'm asking, but I -- I already told you, I didn't do it the way it's set out here. I didn't have these specific five categories, no. That's not what I did.
Q. Okay. Other than the CIR 2013 publication, which you have said that you do not find reliable and you assign little weight to it, can you point me to another place in Exhibit 4 where you assign a specific category of weight that you have given to a particular study that you include in your weight of the evidence analysis?

Page 211

A. If what you're asking me is do I make a specific statement next to each study that I discuss about little weight or great weight, no, I don't do that, if that's what you're asking me.
Q. Okay. As part of the collection of documents that relate to Health Canada that was provided to us as part of your new reliance list, did you review a document entitled weight of the evidence -- or "Weight of evidence: General principles and current applications of Health Canada"?
A. Yes, I've seen that.
(Plunkett Exhibit 8 marked for identification.)
QUESTIONS BY MS. BRANSCOME:
Q. All right. We will mark this as Plunkett Deposition Exhibit Number 8.
All right. The document that I just handed you that's marked as Plunkett Deposition Exhibit Number 8, are you familiar with that document, Dr. Plunkett?
A. Yep, I've seen this before.
Q. Is this listed among the new materials that have been added to your

Page 212

reliance list?
A. I believe it was, yes.
Q. Okay. And so for this one I just want to direct your attention to the conclusion section -- well, let me ask you first: How does this document relate to the collection of documents with respect to Health Canada that you identified as relevant to your opinion?
A. It was one of the materials that they rely upon or they cite. That's the reason I pulled it. It was -- I pulled documents that they provided on the website that were cited.
Q. Okay. And if you could turn to page 11 of that document, there's a conclusion section. The first sentence of the third paragraph reads, "The given -- given the context-specific nature of each risk assessment and the diversity of tools and criteria applicable, transparent documentation of the specific application of the WOE approach is especially important."
Did I read that correctly?
A. Yes, you did.

Page 213

Q. And is your understanding of WOE that it is weight of evidence?
A. Yes, that's correct.
Q. Do you agree with this statement?
A. In a regulatory context, I do believe that that is true, because within the regulatory context when they do the risk assessment, there's a need to understand why decisions are made. So, absolutely, in a regulatory context, I would agree that this kind of transparency is even being adopted by EPA.
Q. And is it your opinion then that a different level of transparency is needed for expert testimony in court?
A. No, that's not what I'm saying. I'm saying that's a different process. And that's what part of this process is. It's understanding the ability to provide a dialog about what was done.
So as a result, this is something that is common to the work that I've done in the past. Even in a nonlitigation context with my regulatory

clients, doing a risk assessment doesn't necessarily involve the same level of detail that a regulatory -- a regulator would apply to the transparency of the assessment. Not to say that it couldn't be done, but it's just -- I would say it's not necessarily typical.

Q. So this specifically refers to transparent documentation.

Do you see that?

A. Yes.

Q. Would you agree that the report that you have produced in the MDL does not have documentation of the specific application of the weight of evidence approach?

MS. PARFITT: Objection. Excuse me, objection. Form.

THE WITNESS: I disagree to an extent because I did attempt to provide in my report a description of the methods that I used and the resources that I've relied upon for a discussion of how those methods are used.

And then in addition to that, I've attempted to lay out for you in my report a discussion of the pieces of evidence that I've relied upon, including some -- for some of those -- that's one of the reasons I got so detailed in the section on migration and providing you an analysis of each of the papers that I relied upon and what I thought was important within them that led to my -- the formation of my opinions.

So I disagree to some extent.

QUESTIONS BY MS. BRANSCOME:

Q. Okay. Turning back to what Taher did in classifying different studies into different categories of reliability. Have you done that type of analysis in the past where you have separated out different studies into different categories of weight or reliability as part of an overall analysis?

A. Well, I do that every time I do a weight of the evidence when I separate into categories first based upon the type of

study. In other words, as I discussed many times in deposition, when you're talking about doing a human health risk assessment, there's certain types of data that are most relevant. I mean, when they use the word "reliable" -- I don't know that many of these studies have the same level of reliability as far as peer review, but they're -- for example, on the issue of migration, it's my opinion that the data from the human studies is a more reliable or relevant source of information. And I've laid out why, because of differences in the anatomy, things like that, with the data.

Q. Are you familiar with the term "binning exercise"?

A. Yes, I am. And that is certainly something that I have used in other aspects of work that I have done.

Q. Did you do a binning exercise in rendering your opinions and what you've provided to us in the context of your opinions in the MDL?

A. Yes, that's the exercise I start with. I'm binning them into human,

animal, mechanistic, in vitro data. That's the first bins.

In fact, in the copper work we did, that's what we did. We separated the data into in vitro/only mechanistic information, animal studies, did we have human studies.

And we also looked at studies -- we had a separate bin of exposures like I do. I have studies that just address the issue of exposure potentially.

So, yes, it's -- it's consistent with doing that. It's -- essentially binning is just separating the information into groups based on what questions those -- those data can answer.

Q. Okay. Have you ever -- do you ever separate them into bins based on the level of weight that you would give a particular study?

A. I do that when I'm analyzing each of the studies within that group or that bin. That's what I do. I give them -- in my weight -- in my analysis, I weigh those studies based upon my judgment on the

relevance, the reliability, the power of the study, the statistical analysis that's done, the inclusion in animal studies, in particular, of controls. Those are all parts of that analysis that I do. So, yes, I do do that.

And then in -- there have been exercises that I've done in the past with other individuals where we may have taken a yellow sticky note and put down on top of it animal data with exposure information, animal data without exposure information. That's the process that I'm doing when I am looking across the data. I'm separating those pieces of data into groups and what types of questions they can answer.

So that is consistent with what I do when I do a weight of analysis approach in the work that I do in both nonlitigation and litigation context.

Q. Okay. But we have no specific documentation of the different ratings that you gave the various pieces of evidence that you included in your weight of the evidence analysis, aside from occasional references to

giving something less or more weight, correct?

A. Well, I certainly -- I told you I have not given numerical values that you're asking me, but I've attempted to do that when I have described them in groups, when I talk about human versus animal versus in vitro. Because I've already told you, I believe, it's my opinion that certain types of information are more informative than others. And so the more informative it is, the more weight you're giving it in -- obviously in your analysis.

But it is a different exercise than what is described here. And here I'm pointing to Exhibit 8. And it's a different exercise, obviously, than what a regulatory body is required to do where they are trying to come up with ways to increase the transparency when no one can go and actually talk to each of the regulators individually to understand what their thinking was.

Q. Okay. Returning to biological mechanism for a minute, why doesn't inflammation generally, including chronic

inflammation, cause ovarian cancer?

A. Because it doesn't change the phenotype of the cell. It has to -- the -- and I discuss that. You have to -- you have to set up a chronic inflammatory process that leads to changes within the cellular phenotype to go from a cell that is -- that is -- is dividing normally to a cell that isn't.

So it's -- it's the same issue that you address even in a study in animals. Why do not all animals exposed to -- exposed to a chemical develop tumors. It's the idea that something has to be initiated beyond the exposure or maybe beyond inflammation to lead to the series of events.

And so, yes, it's recognized that you can get inflammation, and inflammation can go down the road in becoming a carcinogenic process, or inflammation can no longer -- can stay where it is. It doesn't progress beyond just a chronic inflammatory process.

Q. And so if you had a study that demonstrated that a particular agent causes

inflammation, you would need more information in order to make the conclusion that that agent can in fact cause cancer, correct?

MR. MEADOWS: Objection.

THE WITNESS: You would look for more informative information, exactly, which is why, when I've talked about the individual constituents in the context of consistency on mechanism for cancer, I've pointed to documents where that information has been discussed.

So like when I talk about asbestos or cobalt or I point to the -- for example, the IARC assessment where they go through that -- that discussion of the fact that there's not just data showing that a biologically plausible mechanism may be inflammation, but there's also data to show that that can lead to tumor development as well.

QUESTIONS BY MS. BRANSCOME:

Q. Okay. How does talc change the phenotype of the ovarian cell?

A. So this is one of the details we don't know, other than generally it's changing the phenotype to go from a normal cell to a tumor cell. That is being observed. When you find the presence of the tumor, that is what you're observing.

Q. Does pure talc with no other constituent components, can it change the phenotype of an ovarian cell?

MR. MEADOWS: Objection.

THE WITNESS: So that's a difficult question to answer with certainty because of the fact that I don't believe that we have assurance that any of the studies are done with essentially pure talc.

However, in the studies that claim to have been done with pure talc -- for example, the NTP study claims to have been done with pure talc. So if that is pure talc, truly is, then that study is an example of evidence for the chronic inflammatory process leading to preneoplastic lesions that are setting down the road

mechanism towards cancer.

So there are data out there. The problem you have, I believe, in the literature is whether or not, based on the discussion that is becoming apparent now with sensitivity and ability to take the natural product and actually determine exactly what's in it, that I don't think there is the ability to assure that any -- any of these studies with the samples of talc they're using is absolutely, 100 percent, only platy talc. I think there's -- there's some concern about that. But certainly you will take -- you have to take what is discussed within the study as evidence from what they're claiming.

So many of the studies say we used asbestos-free talc or platy -- pure platy talc and we got a toxic response.

QUESTIONS BY MS. BRANSCOME:

Q. Would it be possible to design an experiment -- and now I'm talking about an

in vitro or an animal experiment -- by which you would expose either cells or animal to talc with different constituent products to identify or separate out the individual effects of the components? Is that a study that you could design as a toxicologist?

A. I think that would be difficult to do, but I'm not saying impossible to do. And here's the -- there are some very specific considerations you'd have to put into that design.

I would argue that some of that is already available, where we have studies that have looked at the dose-response effects for toxicity with cobalt, with chromium, with asbestos.

When you get to asbestos and talc, it's more problematic because then the question is what is -- what is it? What are the specific characteristics in all the different studies of exactly what the asbestos was versus exactly what the talc was.

But I think you could attempt to do that, and then the question would be,

being able to use that data not so much to -- not so much to identify a dose response for a certain insult, but to look at the fact -- look at potency differences across the compounds. And then there's the issue of then looking at additivity when you know you have a complex mixture.

So that could be done, but, again, it would be difficult to do based on what we know about talc, being able to really know that -- you would have to really be very careful that what it is that you're looking at is -- is not containing any of those things that we unfortunately know co-occur with constituents within the natural product.

But no one has done those studies. I point that out. I haven't seen that study that you're asking for. I have not seen somebody do that.

Q. And a study like that would be relevant in evaluating the potency of the individual constituents and what might actually be the driving factor for phenotypic change, correct?

A. Not necessarily. I would argue

that we already have an answer to that by looking at the data that's been collected on the complex mixture itself. So the issue would be why -- the question is what do you gain by being able to say that we're only pointing to this constituent or that constituent. That isn't what is occurring.

What people are exposed to is the complex mixture, not just each one of those individual components. To me this is not a case of asbestos-only exposure. This is a case of exposure to consumer products that are talc that may have within them at any given time -- and data indicates that there are substantial chance that asbestos may be in -- is in certain of these products.

But my opinions are not dependent on there being asbestos there at a particular level or copper there -- or, I'm sorry, cobalt there at a particular level because my opinions are based on the observations we have on the complex product as it exists.

Q. And you recognize that different types of talc and different talc

products have different constituent components in different amounts, correct?

A. Some can. I agree with that. That is true.

So if you're being broad, as in pharmaceutical-grade versus industrial-grade or chemical-grade, yeah, because they'll have a purity level assigned.

But as far as what the -- what the components are, it isn't always defined even specifically within that.

Q. Okay. And does the presence of oxidative stress in a tissue indicate that cancer will develop in that tissue?

A. Will definitively develop? Not -- I don't think you could say definitively develop, but it's certainly in the biologically plausible mechanism that's been understood to lead to chronic inflammation and also has been linked to cancer.

So that's the issue of not necessarily saying it has to be there, but it certainly is something that is observed routinely in cases where carcinogenesis has

been linked to an inflammatory response. Oxidative stress is often a triggering mechanism.

Q. Does the body have protective mechanisms that limit tissue damage from oxidative stress?

A. Yes, which is why not everybody that's exposed to any particular chemical is going to get cancer. Some people will respond better. Some cells will respond better. Some individuals in a population at one time in their life may respond better.

Q. You would agree that in vitro studies do not account for the body's natural defenses outside of what exists at the cellular level, correct?

A. Depends on the in vitro study that's being done and whether or not there is components added.

So I've seen studies done where they take cells and then add extra levels of glutathione to try to protect the cells from certain stressors that could lead to damage, but I agree with you that an isolated cell on its own is a different microenvironment than

an intact tissue, which is a different environment than an intact animal, which is even different than an intact human being. Yes, they're all -- you look at those levels of evidence or those types of evidence differently, depending upon the end points you're collecting.

Q. And so you would give lower weight to an in vitro study as compared to an in vivo study, for example?

A. Depends on the question you're asking. I would give a lot of weight if the question is what do I know -- if I want to try to understand the biologically plausible mechanism, some of those in vitro studies are some of the most important, because it's the only ones that allow us to answer a question.

If the question is higher level about what is the evidence to show that there's an increased risk overall for cancer or a hazard for cancer, then certainly you need to have more than an in vitro study.

So as -- so on -- if you want to layer it up, obviously, if all you had was in vitro data, you'd have much less

confidence in the conclusions you can draw unless you had some in vivo data. In vivo data is going to allow you to interpret the in vitro data.

So certainly there would be more weight given in that assessment to the fact that you had in vivo data.

Q. And so when you made the statement that, for instance, you always give more weight to human data, is that true, or does that also depend?

A. Well, it depends on whether you have human data. So if I have human data and I have a doubt, any doubts at all, about whether or not the exposure-response relationship would be affected by the way the animal studies are designed, then, yes, I would give more weight to the human studies.

In a case, however, such as inhalation exposure assessments where there -- it's much better, actually, to do an animal study where we can do a dose response across different sizes of particles and actually observe lesions as they develop over time, which is why I love -- I love the NTP

93 study of interim sacrifices, looking at that issue. That data is very reliable in order to understand the risk of lung damage as compared to a human study where we don't have those serial time points, doses that are defined tightly.

So -- and the relevance between those kinds of initial lung injury in certain animals versus humans match fairly well.

That's my problem, though, in the case with the perineal exposure. I'm saying to you, because of the route of contact -- we need to be able to get it there to the tissue -- the human data is extremely important.

Q. So is it fair to say that in some circumstances animal data gets more weight than human data and in other circumstances human data gets more weight than animal data? It is circumstance dependent?

A. I would put it a different way. I would say in some cases animal data is weighted in a similar manner to human data. I don't necessarily say it would get more

weight, but it could if you only had one crappy human study, one really badly designed human study, and I had a GLP quality cancer bioassay then, absolutely. I mean, IARC does this. They look at that animal data and say, "This one tells us -- answers the questions we want to answer, and this very poorly designed case series isn't going to allow us to do that."

So you could, but I would say it's more the other issue, that you look at animal and human more on an equal basis if the relevance and the extrapolation can be done reliably.

And that's the question you have to ask, can I extrapolate from animals to humans in a reliable manner.

Q. Okay. Would you agree that the response to cosmetic talc can vary depending on tissue type in the body?

A. Yes, I would say that that is true, whether or not there's certain protective barriers in place, for example, yes.

Q. And so in order to draw

conclusions based on a study of one cell type's reaction to cosmetic talc to another, you would need to understand the differences in similarities between those two cell types, correct?

MS. PARFITT: Objection.

THE WITNESS: It's a different question. So you were asking me about -- I didn't think you were just asking about cells. I thought you were asking me about like routes of exposure, dermal versus inhalation. Those things differ.

Cell types may or may not. That may or may not be true. Because if two cells -- two different cell types in the body share similar characteristics as far as the -- for example, if they're both epithelial cells or mesothelial cells, those type of cells you would expect to respond the same way.

But I would agree that, for example, a neuronal cell versus a GI cell versus a liver cell, there could

be differences in how they would respond, yes, and so you would -- you would look at those things individually.

QUESTIONS BY MS. BRANSCOME:

Q. And so it's important to understand the differences and the similarities between the different cell types before drawing conclusions using studies from different cell types?

MS. PARFITT: Objection.

MR. MEADOWS: Objection.

THE WITNESS: I certainly think you should consider the cell types that are being used and whether or not those cell types are ones that are relevant to your risk assessment question you're asking, yes.

QUESTIONS BY MS. BRANSCOME:

Q. Okay. You would agree as a toxicologist, dose is an important part of a toxicological analysis of an agent, correct?

A. If you're doing risk, yes. If you're only doing hazard, it may not be as important. It depends upon the question

you're asking about hazard.

Do you want me to explain?

Q. I do want you to explain the difference between a risk analysis and a hazard analysis.

A. Okay. So in an initial hazard analysis, if the question is, is there a hazard associated with exposure, let's say, by inhalation, it may not matter whether it was a high dose or a low dose study. Both of those can identify hazard.

Then you ask the question: Is there a dose-response relationship? That's the next step beyond hazard.

So hazard is -- to me is identifying the end points that you're going to monitor for toxicity, sort of the target organs, those things, and so whether or not there's a dose-response study available, it wouldn't be as important.

But certainly when you go to that next step to assess risk, you'd like to be able to see whether or not there is a dose-response relationship in the effect that you're assessing.

Q. Okay. And in your -- in your report, as part of your risk assessment that you did in the MDL -- this is paragraph 12 on page 8.

A. Yes, I'm there.

Q. Okay. You state about two-thirds of the way down the paragraph that "weight of the evidence methods were critical to defining the literature that identified the hazards of talc exposure as well as defining the dose-response relationship between talc exposure and the risk of adverse health effects."

Did I read that correctly?

A. You did. That's correct.

Q. All right. Is it your view that in the case you have reached an opinion that defines the dose-response relationship between talc exposure and the risk of ovarian cancer?

A. It depends what you mean by define. I can tell you what I mean in this sentence, and maybe that would help you.

Q. Dr. Plunkett, it is your report. And so I am asking you, using your

own definition of "define," have you rendered an opinion that defines the dose-response relationship between talc exposure and the risk of ovarian cancer?

A. I have formed opinions about the dose-response relationship generally, but unfortunately -- I answered that question for you earlier when you asked me, I think, about is there -- I don't know if you used the word "threshold," but I did.

So the available information doesn't allow us to identify an ultimate threshold, for example, in the case of women exposed to talc perineally and their -- and their development of ovarian cancer.

Instead, in defining the dose response, what we can do with the data -- and that is what I attempted to do. This is where you look at defining the dose response in the animal studies, which we can look at, or defining dose response in cell studies, showing that as the dose increases, the hazard and the risk increase. So risk actually you quantify. There's a certain response at this dose and a different

response at the next dose, or have we plateaued, that the responses are the same as dose increases.

So that, I did do that as part of my assessment, trying to define the dose as far as how that linked to the responses in each of the studies I looked at.

Q. You would agree, though, that some studies did not show a dose relationship between talc and ovarian cancer or the clinical signs that were indicative of the potential for development into ovarian cancer, correct?

MS. PARFITT: Objection.

THE WITNESS: If you're talking about the human data; is that what you're referring to? Or are you talking about all -- any of the data?

QUESTIONS BY MS. BRANSCOME:

Q. Any of the data.

A. So I would disagree on the animal data. I think on the animal data they often -- most of the animal studies I've relied upon have looked at more than one dose or at least looked a no exposure versus a

dose, and most of them have looked at more than one dose.

In the case of the human studies, unfortunately, some of those studies were not designed to be able to define dose. In other words, the questions weren't asked, for example, of the individuals even in the prospective studies. Some of those included -- did not include the information collected on frequency and duration of use.

So if it's not collected, obviously, I don't have it to look at. And that's one of the limitations of human epidemiological investigations, is that it often is not designed appropriately to look at dose response.

Q. Is it your opinion that there are no studies looking at talc and the risk of ovarian cancer in which the authors of the study have concluded there was no clear pattern of increased risk with dose?

MS. PARFITT: Objection.

THE WITNESS: No, that's not what I've said. No. It's very possible that an individual paper

or -- that they may make a -- an author may make a statement, but I'm talking about looking -- this is weight of the evidence. I'm looking across. And I'm saying, across the data, when I look at the human data versus the animal data, for example, versus in vitro studies, the in vitro studies and the animal studies allow you to look at dose response for talc toxicity.

The -- even the animal studies allow you to look at dose response for development of precancerous lesions, you're on the way to cancer, for example, in the NTP studies.

And then in the human studies, some of those studies are designed such that the authors could draw conclusions about dose response and some are not.

Even in some of the studies where they attempted to look at dose response, some of the authors indicate they don't see an effect. So that is

true. And part of that may be driven by the design of the study, the number of individuals in the study, the way that the questions were asked. There's limitations on the way that information is collected.

If you want to look at each study, we can, but --

QUESTIONS BY MS. BRANSCOME:

Q. So my question to you, whether you agree or disagree with the author's conclusion, is simply that if you look at the overall animal and human studies that you cite in your report or have considered on your reliance list that look at a potential dose-response relationship for talc toxicity, do some of those studies conclude that there is not a dose-response relationship?

MS. PARFITT: Objection.

THE WITNESS: I disagree for talc toxicity, but I would say if you're going to limit it to the issue of the ovarian cancer response, I would agree. I have seen that in some of the studies.

Page 242

I think talc toxicity, I don't know if anybody has made the comment -- I would doubt it -- that there is no dose response for toxic effects of talc.
QUESTIONS BY MS. BRANSCOME:
Q. Okay. You discuss in your report -- wait a moment. It's in paragraph 58 on page 38. And I just want to make sure I understood what you were citing here.
In paragraph 58 you state that "It is important to remember that administration of even a single dose of talc in animals has been shown to produce adverse effects locally at the site of the exposure."
What are you referring to there?
A. Acute doses. In other words, in studies that have described installation of a single dose of talc in some form into a tissue, that they are observing adverse responses.
An example of that may be the -- I think it's Hamilton. Is that the

Page 243

one where they stilled it into the ovaries with a single dose?
Q. So these are large-dose exposures?
A. Well, not all --
Q. Or are they, I should say?
A. I don't know that they all are, no. There are -- there are -- I don't think I have attempted to quantify large in this sentence.
What I'm stating here is not an issue of large versus small. It's an issue of the fact that there are toxic effects with single exposures. And I'm just making the comment -- this has to do with hazard, right? It's the idea even a single dose -- or a single exposure you can get irritant, inflammatory reactions at the site of exposure. And that's all I'm trying to say. That's why I'm citing as reviewed by EPA. I believe EPA even makes a very similar statement.
Q. Okay. Do you take into account -- there are some studies for which -- at least my reading of your report

Page 244

is that you give them less weight because you believe that the individuals who conducted the study had been paid by either a company or agencies that had some investment in the outcome of the study; is that correct?
A. Is that my opinion?
Q. Yes.
A. For any particular study, you'll need to show me what you're pointing to. I do have opinions about some of the work by Drs. Huncharek and Muscat, yes. I think I address that specifically, and that has -- that's not so much to do with my weight of the evidence; that has more to do with transparency and what was being disseminated to the public and disseminated to the FDA as far as evaluations.
That's a different issue than the weight of -- the weight of -- the weight of the evidence assessment for risk. I think those were separate.
Q. So then I'll ask you that.
In doing your weight of the evidence analysis for risk, have you discounted the weight that you've given to

Page 245

any particular piece of scientific evidence based off of potential affiliations of the authors?
A. I certainly did with the CIR review document. I've already told you that. And that's because I have evidence that shows it's not just an affiliation issue, but it's actually -- it's more -- it's more important than that.
Q. Are there any other examples?
A. I think that's the only one right now as I sit here that I can tell you that I had identified as carrying little weight because of an issue of either authorship or input in the way it was described.
There are certainly studies within my weight of the evidence evaluation, some of which were performed by industry. I certainly look at that issue, but unless I have -- have a reason to believe that there's an inherent bias based on something I know, they go into the weight of the evidence without making a correction for that.
In many cases that I work in

Page 246

litigation, I will find situations like the situation here with Huncharek and Muscat where I have, for example -- I think this came up in the Risperdal litigation for me. It's the idea that there was a series of papers put out by an individual investigator where documents that I could get access to show me that indeed their analysis was not done by them but it was ghostwritten by somebody else. So that gives me pause, although I would never have known that unless I had access to internal documents.

So initial weight of the evidence I did not discount it, but then I went back and had to reevaluate the role those studies played in my overall assessment.

Q. Do you take into account in any way in evaluating the weight of a study if it is conducted by someone who serves as an expert on behalf of the plaintiffs in the active litigation?

A. It would be the same -- same issue. I certainly consider it as part of what I look at, but just like if they were an

Page 247

expert for the defense versus an expert for the plaintiff, you judge that information based on what you know. And if I don't have information to discount it, I will not discount it.

But absolutely, I understand. Just as people we all -- look at some of the things I've published where I have said my work was sponsored by the American Chemistry Council. You know, people -- that's why you disclose the conflicts. You put it there so people can weigh it if they want, but it doesn't mean you discount the work automatically.

And so I think for any paper, plaintiff, defense, whoever it is that's writing it, you need to consider it based on the information you have. And if you believe that you have information to indicate that there's some issue with the reliability of the analysis, then absolutely you consider that.

Q. So, for example, when you rely on Dr. Longo's characterization of the constituent components in samples that he has

Page 248

tested, that he reports are Johnson's baby powder, did you also consider the work that was done by experts that have been retained on behalf of the defendants to characterize the components of Johnson's baby powder? Do you give them equal weight?

A. So I haven't seen a variety of the documents that you're talking about, so -- because I have not worked in the litigation cases that have involved asbestos only. So -- which I think is where those documents are.

In the litigation I -- in the litigation I worked in, I am aware of what other experts on both sides have said. I don't believe I've seen an analysis from a defense expert that is -- that is like Dr. Longo's, at least in the litigation I've worked in. Certainly I would consider that and look at that if it's available, and I would consider it.

I would point out, Dr. Longo's analysis is not the piece of evidence that you start with, though. You start with what I discuss in the published literature first,

Page 249

because there are published documents out there in the literature that describe exactly what Dr. Longo is now describing.

Q. What published documents are those?

A. Those are Dr. Blount's reports in 1991, which is before the litigation came about, is my understanding.

There's also -- there's five or six. I can tell you the paragraph.

Q. For Johnson's baby powder, I would be interested in that, yes.

A. So I -- I'll have to look and see if it's Johnson's baby powder only, but certainly there is other evidence on the issue of asbestos contamination and specifically in talc.

So I -- you want me to find the paragraph for you?

Q. Please. If you think there is published literature documenting asbestos in Johnson's baby powder, I would like to see that.

A. So this is my paragraph 32. And I'd have to pull each of these articles

Page 250

out because I don't recall what each of them says. But I'm pointing to Paoletti, Blount, Mattenklott, Moon, Gordon, Anderson, Rohl, Pooley and Rowlands, Blejer and Arlon, Cralley, Millman.
And then I cite -- and then of course the next piece of evidence is there are actually documents from J&J and Imerys that show detection of asbestos or asbestos-like minerals in talc.
Q. As you sit here today, can you identify which of these published articles that you list in paragraph 32 relate to Johnson's baby powder?
A. I would have to pull them to answer that.
Q. Okay.
A. As I sit here, I'd have to pull them. But I would refer you -- I know at least some of them do based on the statement I've made, but...
Q. So you did not make an attempt in this paper to identify which products were being analyzed in these specific articles. It's not indicated on the face of this

Page 251

paragraph, correct?
A. I don't tell you on the face, but you if read the sentence I said, "When commercially available, talcum powder products were analyzed, including powders sold by Johnson & Johnson. The data has shown that the powders contained varied levels" -- and I'm saying "fibers," so it's just asbestos -- "including fibers that stated to be asbestos."
So to tell you which of those, I'd have to pull them. And I apologize, I didn't bring them all with me.
Q. Have you been provided -- you're aware that Dr. Blount's paper does not identify Johnson's baby powder in the face of the article, correct?
A. I believe that's true. You'd have to go to her deposition, I believe, where she's given -- where she discusses what the source of that was, and maybe even a -- there may even be a separate document, actually, not a deposition, that was -- that was in the files of Johnson & Johnson that goes along with that, but I'd have to go

Page 252

look.
Q. Have you reviewed Dr. Blount's deposition?
A. I have reviewed a -- something by Dr. Blount. Whether it was trial testimony or deposition, I have seen something, yes, that she has said regarding this issue.
Q. To the extent that there is confusion about whether or not a sample tested by Dr. Blount is in fact Johnson's baby powder, would you reduce the weight that you give that particular piece of evidence in evaluating whether asbestos has been present in Johnson's baby powder?
MS. PARFITT: Objection. Form.
MR. MEADOWS: Objection.
THE WITNESS: I don't know reduce the weight because -- because there's -- there are plenty of documents here that talk about that.
I would consider it -- certainly it would -- it's not so much weight. It's a different bin. We'll call it a bin, a different bin of

Page 253

information. There's information on talc powders generally, and then there's some information that's specific to certain body powders.
So certainly -- would I pay attention if they identified it? Yes.
But in the statement I'm making here, I'm not claiming that every one of these is relating to just the powder sold by Johnson & Johnson. This is across the available information that's public and then also the information that's available in the files of Johnson & Johnson.
QUESTIONS BY MS. BRANSCOME:
Q. What is your definition of asbestos?
A. My definition of asbestos is exactly what the different documents describe it typically. It's a fibrous mineral, typically. It occurs in a variety of different forms. Most of the times they'll say "asbestos." Sometimes they'll say "chrysotile." Sometimes they'll say "tremolite." Sometimes they'll say

Page 254

"anthophyllite." Those are the three most common ones I see. But those are all mineral forms of asbestos.

So just like IARC puts those all within one bin, I'm putting those all in one bin because they have a similar toxicity profile.

Q. Is it your view that each of the different types of asbestos has the same toxicity profile?

A. They all have the same ability to cause cancer, but they have different potencies. So they do have -- there will be some differences in the dose response and the potency of them, but certainly they've all been linked as being carcinogens by IARC.

And I would agree, when you look at their data, there is data and evidence to indicate that.

Q. Which type of asbestos is the most potent?

A. For which end point? For lung cancer? I believe chrysotile is. For other end points, I'd have to go look. I mean, chrysotile is the sharp -- is the sharp --

Page 255

the sharded-type structure.

But there's data on fibrous -- the fiber -- the fibrous forms of asbestos rather than the -- or the amphibole forms of asbestos as opposed to chrysotile, which is the serpentine form.

Q. Do you consider yourself an expert in asbestos?

A. Not in --

MS. PARFITT: Objection.

THE WITNESS: Not the geology of asbestos, no.

I have expertise in toxicology as it relates to interpretation of the data related to asbestos. I have never give -- given testimony in a case on asbestos, but it's something I've studied in the past in my work as a toxicologist, not as a testifying expert.

QUESTIONS BY MS. BRANSCOME:

Q. What role does your analysis of the possibility that there may be asbestos in Johnson's talcum powder products play in your risk assessment in the MDL?

Page 256

A. Has to do with the fact that we have a complex mixture that has multiple carcinogenic substances.

And asbestos is important from the aspect of the way that it has been assessed even by regulatory bodies, the idea that even very low levels of fibers pose a cancer hazard and a cancer risk in individuals have been shown to be carcinogenic.

So that's what I'm saying about potency of asbestos is different than potency of some other carcinogens that you might look at. But the importance of it is it's a complex mixture, talc, body powders, a complex mixture that includes constituents that are known human carcinogens as well as some that are -- been ranked other ways by regulatory bodies.

Q. If Johnson's talcum powder products do not contain asbestos, does that change your opinion with respect to the risk they pose with respect to ovarian cancer?

A. No, and I think that was very clear if you looked at my first report. So

Page 257

even -- there's -- I don't think in any of my reports I've opined that without looking at the complex mixture that we wouldn't be here.

In other words, I have not opined that if it doesn't have -- if it doesn't have asbestos, it's not a risk. I have not opined that, and I don't believe that, because I think there is independent risk for the fact that we have a complex mixture of talc that has been tested and shown to be carcinogenic.

It's my opinion, I told you -- maybe it wasn't you. I may have told this yesterday, I'm sorry, to Mr. Smith that I believe that there is evidence to show that there is a significant exposure to asbestos based on the data that's been collected.

But certainly, you know, in some -- the data has shown that in the assays that have been done or the analyses that have been done that you can't say that talc is asbestos-free.

Q. Well, so --

A. So --

Q. -- the question I have

specifically relates to ovarian cancer.
Is it your view that through an exposure route that is relevant for ovarian cancer, that the use of Johnson's talcum products involve a substantial exposure to asbestos?
A. I believe based on the use of the products that -- where the data has been collected that there would be a substantial exposure to asbestos, regardless of how you're exposed, perineal -- perineally or by inhalation.
Q. What is your basis for reaching that conclusion?
A. It's looking at the number of fibers that have been detected in the products, in looking at the -- the widespread nature of the presence of asbestos fiber -- asbestos in the talcum powder products and the fact that even though it's at a very low level by their -- their level of detection, again, can't be said to be asbestos-free.
So regardless of whether it's talc that's being applied perineally or a talc that you're inhaling while you're

applying it perineally, the fibers are still going to be present within that talc.
Q. Have you or anyone done an analysis of the dose of asbestos to which someone might be exposed perineally?
A. I haven't done a specific calculation, no.
Q. Has anyone done that calculation?
MS. PARFITT: Objection. Form.
QUESTIONS BY MS. BRANSCOME:
Q. That you have seen?
MS. PARFITT: Objection.
THE WITNESS: I'm trying to remember whether I saw that done in any of the documents related to Dr. Longo.
I don't know. I'd have to go look.
QUESTIONS BY MS. BRANSCOME:
Q. Okay. So as you sit here today, can you give an opinion to a scientific degree of certainty, reasonable degree of scientific certainty, that an individual would be exposed to a dose of

asbestos above background through the perineal use of Johnson's talcum powder products?
MR. MEADOWS: Objection.
MS. PARFITT: Objection.
THE WITNESS: I don't think that's the opinion I have formed to date, but certainly the opinion I have formed is that the data I have seen indicates that you can't separate out talc without asbestos versus talc with asbestos in the information that's been collected. Because there's -- all -- the information that's been collected has shown there's no evidence that asbestos-free talc is available.
If by asking that question you're trying to say that it's the asbestos alone that's causing the cancer, that is not my opinion. So that is when the dose issue would become very important for asbestos.
QUESTIONS BY MS. BRANSCOME:
Q. Okay.

A. So that's -- so that's a different question I have not answered.
Q. And in reaching your opinion that there is no evidence that asbestos-free talc exists, you have not been provided with the reports by the defense experts, including Dr. Matthew Sanchez, analyzing Johnson's talcum powder products for the presence or absence of asbestos, correct?
MS. PARFITT: Objection. Form.
I think you're aware that the MDL expert reports have not yet been provided to us.
MS. BRANSCOME: Yeah.
MS. PARFITT: I'm just making a point.
THE WITNESS: I have not seen a report by Dr. Sanchez. I assume I will, because typically after -- later in the litigation, once all experts have been deposed or revealed, I'm usually given defense expert reports and their deposition testimony. So I expect to see that; I just haven't seen it yet.

Page 262

QUESTIONS BY MS. BRANSCOME:
Q. And you haven't seen it in any of the cases in which you've rendered an opinion, correct, not just the MDL?
A. Well, none of the cases that I have worked in have involved the issue of looking for asbestos exposure.
The cases I have worked on have been talking about talc exposure that may include asbestos as a constituent, but it wasn't focused on asbestos exposure.
So, no, none of the cases I worked on have provided testimony in that area.
You understand what I'm saying?
Q. Let me just make it clear. You have not, in any of the cases in which you have offered opinions with respect to the contents of talc, been provided with an expert report or testimony by Dr. Sanchez about what he did or did not find in Johnson's talcum powder products with respect to asbestos?
MS. PARFITT: Objection. Form.
THE WITNESS: So I can't tell

Page 263

you that I have not. I don't recall it. That's all I can say. I don't recall that name.
QUESTIONS BY MS. BRANSCOME:
Q. It's certainly not something you discuss in your report, correct?
A. No, I do not. And I don't know that it's in my reliance materials. That's why I'd ask you to look there, because if it's in my reliance materials, then I've seen it.
Q. Okay.
A. And I mean big reliance material list, not my reference list.
Q. All right. With respect to the other potential constituents of talc, have you done any analysis to provide an answer as to how much -- what dose of chromium, for example, an individual might be exposed to through the perineal use of Johnson's talcum powder products over a lifetime?
A. No, and I have -- well, I know it's a separate deposition. We discussed this yesterday. No, I have not done a -- a calculation of a potential dose with perineal

Page 264

application for any of the heavy metals. So the three that I've mentioned, no, I have not done that calculation.
Q. You would agree, based on your training and experience as a toxicologist, that in order for an agent -- and we can talk specifically about a metal -- to present a risk of cancer it needs to be bioaccessible, correct?
A. If by bioaccessible you are not limiting that definition to solubilized into the blood and carried systematically, yes, I would agree with that. Bioaccessible meaning it has to be in a form that can somehow interact with the tissue, yes, I agree with that. But it could be as simple as tissue contact versus needing to be solubilized.
Q. Okay. Is silica bioaccessible?
A. It depends on the form of the silica. So silica particles can be bioaccessible if inhaled and found on the surface of the lung. That can cause injury at the site of the lung. So that's an accessibility to that particular tissue that it contacts.

Page 265

Q. We talked earlier -- it's somewhat related to bioaccessibility, but we talked about the way in which different particles might move specifically through the genital tract in women.
Do you recall that?
A. Yes. A general discussion.
Q. Yes.
And when you testified that starch and talc might not move at the same rate, do you have an opinion as to which might move more quickly through the tract?
A. I haven't formed that opinion, no.
Q. Okay. And do both talc and starch particles remain in the body for the same length of time?
A. I haven't done an analysis to see if the data tells us what the -- what the differences might be. I would expect there to be differences, which is what I told you earlier, because I would expect the starch to be able to be solubilized, where I would not necessarily expect the talc to act in that same manner.

Q. Is cornstarch capable of causing an inflammatory process?
A. It can. It is -- but it is -- it's a different level of risk for inflammatory responses than is talc, just by its chemical nature.
Q. Have you done an analysis in your report that examines the differences between the inflammatory response that can be triggered by talc as opposed to cornstarch?
A. I haven't analyzed inflammatory response. Instead, what I've done is done a comparison of what the toxicity -- the differences in the toxicity potential have been described in medical literature, and I cite -- I have a paragraph where I cite to some sources that talk about the differences in the toxicity potential or biocompatibility of starch versus talc.
Q. Now, I had a question about your supplemental report that was marked as Exhibit 3 to the deposition.
At paragraph 67...
A. Okay.
Q. You identify here six heavy

metals - arsenic, chromium, lead, cobalt, cadmium and nickel - that in your supplemental report dated August 29, 2018, you say have been reported across lots of talc powders.
Do you see that?
A. Are you in -- now you're in my MDL report or here?
Q. No.
A. Oh, so where are you? I'm sorry.
Q. Same report. It's the sentence that begins at the bottom of page 6.
A. Okay. Hold on.
About that they have varied at the levels --
Q. Yes. So you identify six different types of heavy metals.
Do you see that there?
A. Yes, I do.
Q. Okay. And the question I had for you was that in your report in the MDL, if you look at paragraph 36 --
A. Yes.
Q. -- you identify -- you identify

only three heavy metals: chromium, cobalt and nickel.
Do you see that?
A. Yes.
Q. Why did you remove three of the heavy metals?
A. It's not so much removing. Those three heavy metals that I focused on in my MDL report are ones that have been talked about with a similar mechanism of action as far as irritation and biologic -- biologic plausibility mechanism being irritation and inflammation.
So that's why I focus on those three, which may not -- which is not necessarily the case for some of the others, even though they're also -- have a carcinogenic hazard, pose a risk.
Q. So in your -- as part of your risk assessment that you performed in the MDL, are you offering the opinion that to the extent they exist in any of the Johnson talcum powder products, that arsenic, lead --
A. Cadmium.
Q. -- and cadmium play any role in

the risk of developing ovarian cancer?
A. That is not an opinion that I would be offering in the MDL.
Q. Okay. Now, you talk about these heavy metals having been classified by different agencies as either known probable or possible human carcinogens, correct?
A. You're in my MDL report again?
Q. Oh, yes.
A. Okay. I'm sorry. Okay. Let me get there.
Yeah, I do have that discussion. I'm just trying to find it.
Q. Sure.
A. Okay. Yes, I'm there.
Q. Is it your view, based on your expertise, that because a compound can cause one type of cancer, it can cause all types of cancer?
A. No, not necessarily. It depends on the -- well, it depends on a couple of things. It depends on what's been studied. Have all types of cancer even been studied. And then it also -- it also depends upon, I believe, the route of exposure as

Page 270

well. So can it get to where it could cause that, could it distribute there. And then in addition to that, what data has been collected. Is there enough data, for example, to show that there's extrapolation from animals to humans in the types of tumors or is it -- or if we have good human data, then we would focus on the types of cancers that you're seeing in humans, for example.

Q. Okay. But you recognize even where there is complete data some compounds can cause one type of cancer and they are incapable of causing another type, correct?

MS. PARFITT: Objection. Form.

THE WITNESS: I don't know about incapable, but I would agree that you certainly would see -- you could potentially see different observations.

If you're talking about animals versus humans, or are you talking about --

QUESTIONS BY MS. BRANSCOME:

Q. If humans.

A. Based on what you had seen in

Page 271

the animals; is that what you're asking me?

Q. Yes.

A. Yes. So, yes, there is not always a one-to-one concordance. So that's why -- that's why I made the comment that it's important to have some human data or experience, so that you can put in context the data you collected in animals.

I would say to you there are certain kinds of tumors in animals, for example, that are shown to be not relevant at all to human risk assessment. Like four stomach tumors in rats is an example. I've dealt with that one a lot.

Q. What types of cancer -- type or types of cancer are the basis for the classification of chromium as a known human carcinogen by IARC?

A. So I have to pull it out, but I believe that there may be some GI cancers and maybe some skin cancers, but I'm not sure. I've got it pull it out. It's been a while since I've looked at it.

Q. Okay. Have you done an analysis to evaluate whether or not the types

Page 272

you can extrapolate with scientific basis from one type of cancer cause to ovarian cancer with respect to the heavy metals specifically?

A. Well, I haven't attempted to that, because I haven't attempted to define a independent risk for each of those metals individually.

The issue -- the issue I have with those metals is -- there's a paragraph here where I talk about pathogenesis of carcinogenesis, where I talk about different stages of cancer development and the fact that inflammatory responses may be operating at all those different stages.

So the issue is you have potential -- you have compounds that are known to produce cancer or have been shown to have a potential risk of cancer. They share a similar mechanism to talc, so as a result of that, they factor into your risk assessment as far as there being an exposure to a mixture.

But on the issue of ovarian cancer, I'm looking at the data that's been

Page 273

collected on talc itself, which would be talc with the constituents that could include the metals. But certainly I'm not saying that it is -- without the presence of one or the other of these there would be no risk of ovarian cancer. I'm not saying that either.

Q. So my question is, though, can you point me either to scientific literature directly documenting that these heavy metals can cause ovarian cancer or to scientific literature that enables you to extrapolate from the types of cancer that they are known or believed to cause to ovarian cancer?

A. So I -- on the issue of can I point you to the data on ovarian cancer, I'd have to go back. I can't answer that without looking at the assessments.

But on the other -- second question you asked me, that's the question I was just trying to answer before. It's the idea that regardless of where the cancer is developing, the fact that these compounds have the ability to stimulate similar toxic responses in tissues could lead to a -- setting up a situation where the -- where the

Page 274

tissue is primed for cancer development.
Q. And do you have --
A. And so that --
Q. Sorry.
A. And that has to do with the basic science of carcinogenesis when you look at underlying mechanisms, especially with tissue contact, direct tissue contact, with irritants or inflammatory processes.
But I would -- I am not -- I have not formed the opinion, again, that with or without either one of these that I would expect ovarian cancer to be the target. I'm saying that ovarian cancer risk is increased based on exposure to talc, which includes a variety of constituents.
Q. Okay. And do you cite anywhere in your report to studies documenting -- I know you said you'd need to go look at them, but I'm asking if it's in your report anywhere a discussion of any studies showing that the particular heavy metals that you cite as potential constituents of Johnson & Johnson's products have been demonstrated to increase a risk for ovarian cancer on their

Page 275

own?
A. So, no, I haven't addressed that in my report. And again, I think that's inconsistent with the way I'm using these data. But that's fine. I mean, no, I haven't done a specific assessment of ovarian cancer risk with each of those metals individually.
Q. I would ask the same questions for the different fragrance constituents that you allege in your report are potential carcinogens.
Have you done any analysis, and can you point me to any scientific studies that establish that those particular compounds are capable of causing ovarian cancer?
A. No, I haven't done that analysis, but, again, general principles of toxicology and cancer risk assessment, when you look at the presence of multiple -- excuse me, multiple carcinogens with similar mechanisms of action, you would assume in your risk assessment that those risks could be additive.

Page 276

So, again, that's what I'm pointing to and why I have cited the data.
Q. Now, you talked about -- when we were discussing mechanism, you said that inflammation alone is not necessarily sufficient to cause cancer, correct?
A. Yes, I did.
Q. All right. Do you have scientific studies that show that any of the heavy metals or the fragrance constituents that you identify as potential carcinogens create -- generate phenotypic changes like you discussed were next for the formation of cancer?
A. I believe that data is available on nickel. I need to go back and look at chromium and cobalt, but I do believe with nickel you'll find similar data on tissue irritation and inflammatory processes.
Nickel is also a sensitizer, so it has interaction with the immune system, so I do believe that for nickel you can find some of that data.
Q. Okay. But as you sit here today, can you point me into any of that

Page 277

that's discussed in your report?
A. No specific discussion other than, again, all -- the IARC -- I'm citing to the IARC assessments, and the IARC assessments for each of those discuss carcinogenesis and a biologically plausible mechanism being linked to the ability of these compounds to induce oxidative stress and/or inflammatory processes.
Q. Okay. In your opinion, you talk about the mixture of constituents that are involved in talc.
Have you done any analysis to look at how the different constituents interact with each other?
A. Well, yes, that's my issue at looking at underlying mechanism.
But are you asking me -- I certainly don't have a -- the only studies that I have to rely upon on the interaction of the mixture is the actual studies on the powders themselves, where we know that the powders contain constituents other than just platy talc.
Q. Okay. And do the constituents

Page 278

need to have the same underlying potential carcinogenic mechanism for them to have an additive effect?
A. By general principles of toxicology, yes, you look at mode -- mode of action or mechanism of action before you apply that additivity principle to the cancer risk assessment.
Q. And so as you sit here, you believe there have been scientific documentation that nickel might operate through the same biological mechanism as you purport talc to operate, but you're not sure about the other heavy metals or the fragrance constituents; is that correct?
MS. PARFITT: Objection.
THE WITNESS: For the fragrance constituents, I'd definitely have to pull because I haven't looked at that individual assessment in a while.
For these three, what I do know is that they do share the ability to at least induce oxidative stress.
What I can't recall for chromium and for cobalt is whether

Page 279

they're taking it the next step from oxidative stress to inflammatory process. I believe that they do, but I'd have to check, whereas I know nickel has been shown to lead to an inflammatory process after oxidative stress has been induced.
QUESTIONS BY MS. BRANSCOME:
Q. And you would agree, even more than requiring an inflammatory process, you would actually have to see that these compounds can generate phenotypic changes, correct?
MS. PARFITT: Objection.
THE WITNESS: Well, we know they do because they've been shown to be carcinogenic. If you've been shown to be carcinogenic, you've done a phenotypic change in the cell from a normal cell to a cancer cell.
So we know they have the capability to induce tumors, or cancer, all three of those, at least in animals if not in humans as well, because two of them are known human.

Page 280

So those two -- we'd have human data to show that.
But on the issue of cobalt, it may only be -- I need to go back and look, but it may indeed just be animal data.
QUESTIONS BY MS. BRANSCOME:
Q. And so your basis for that would be the IARC classification?
Is that where I would go to look if I wanted to look at it after this deposition?
A. I'd go to the IARC reviews. I'd go to those three which I believe I have cited down here for you and given you where to go to find them.
Q. Okay. You discuss in your report -- and if you'd like to reference it, it's paragraph 69 on page 47 -- the concept of genotoxic and nongenotoxic carcinogens.
Do you recall that?
A. Yes.
Q. And as you sit here today, is it your opinion that talc is more likely a nongenotoxic carcinogen?

Page 281

A. As the direct insult, yes. And I would like to -- I would like to point out that in the literature -- the reason I have this paragraph here is because in the literature in the past, in the area of chemicals, it's been -- toxicologists have attempted to put two bins, direct genotoxic insult versus nondirect genotoxic. It doesn't mean you can't get a genotoxic event after the initiation.
So I want to make sure you understand that. I'm not saying that there is no possibility of this chemical in its -- in its process of inducing cancer leading to indirect genotoxicity, but I'm talking about the direct mechanism at the site of the cell.
So talc, for example, has been shown to not be genotoxic in cells. And so that's why I believe, then, when I look at the rest of the data that fits, that it fits the definition of a nongenotoxic carcinogen by its initial mechanisms to induce cancer.
Q. Okay. And if talc is, in fact, a nongenotoxic carcinogen, it would suggest that there is likely a threshold dose below

Page 282

which it does not have a carcinogenic effect, correct?

MS. PARFITT: Objection.

THE WITNESS: It is possible, and that's the problem. In order to fully assess that, you would have to have the data to prove it.

But that's the assumption. You assume with nongenotoxic carcinogens that you could identify a level where you wouldn't turn on that indirect mechanism. So that -- yes, that is true.

QUESTIONS BY MS. BRANSCOME:

Q. And you have not been able to identify, nor can you point to, scientific literature that identifies a threshold -- a threshold dose for talc with respect to its carcinogenic potential for ovarian cancer, correct?

A. Not a specific dose, but I think that's why I mentioned to you -- and I -- I think that's why Canada, when you look at their document, they talk about discouraging routine use generally. So it's

Page 283

the issue of what -- single use of a body powder or an occasional use is a different risk assessment than routine use.

So if you want to talk about thresholds that way, that's very imprecise, but you could do that. You can talk about whether or not there -- I do believe there's a different risk profile for one or two uses of talc body powder versus a risk profile of somebody who uses it routinely, because I think that fits that threshold definition. It's the idea that you have limited availability for enough particles to migrate to lead to the tissue toxicity that it cannot be recovered from or repair.

Q. You're familiar with the concept of the precautionary principle, correct?

A. Yes.

Q. All right. And you understand that Health Canada may have made recommendations with respect to product usage that are purely precautionary, correct?

MS. PARFITT: Objection. Form.

THE WITNESS: I disagree that's

Page 284

what they've done, but is it possible that they would do it? Any regulatory agency, it's possible they could do it, yes.

QUESTIONS BY MS. BRANSCOME:

Q. Do you have any information with respect to Health Canada's decision-making, other than what you have read on the face of the documents?

A. That is all I have to look at is what is provided on the website.

Q. Okay. And so the statement that you think Health Canada was suggesting a dose threshold by their statement of discouraging routine use, you're basing that entirely on what you read on the piece of paper, correct?

MS. PARFITT: Objection. Form.

THE WITNESS: Well, that's what they state. So, yes, I'm -- I am telling you what I see on their website. If that's what you're asking me, yes, that is true.

QUESTIONS BY MS. BRANSCOME:

Q. Okay. Can you point me --

Page 285

well, do you discuss -- have you looked at, as part of your opinion specifically in the MDL, the studies exploring a potential link between asbestos and ovarian cancer? Just asbestos.

A. Some of the studies, yes, but I have not -- I have not done a separate risk assessment just for asbestos by itself, because I have not assumed that there is asbestos-only exposure.

Does that make sense?

But I do cite -- for example, I cite to some of the early literature on -- so this -- I guess where this opinion comes in is on hazard and warning. So in the warnings I talk about when it was known that asbestos was linked with cancer, because the warning standard is not causation proven but the identification of the potential. And so that is in my report on warnings, but that is not within my discussion of the weight of the evidence for risk assessment of the talc product.

Q. Okay.

A. Does that make sense?

Page 286

Q. Uh-huh.
For example, have you rendered an opinion about what dose of asbestos exposure would be necessary to cause ovarian cancer in an individual?
A. No, I have not formed that opinion at this time.
Q. Okay. Do you have an opinion about the background level of asbestos to which individuals are exposed with no increased risk of any type of cancer?
A. No, I do not have an opinion. I do believe others do, but I do not.
Q. Okay. You may have been asked some of these questions before, but I will keep them brief.
Have you ever published any articles that state that talc causes ovarian cancer?
A. No, I have not.
Q. Have you ever publicly expressed the opinion that talc increases the risk of ovarian cancer outside of literature?
A. No. My work has been in the -- in the courtroom.

Page 287

MS. BRANSCOME: I think we can take a break.
VIDEOGRAPHER: We are going off the record at 2:57 p.m.
(Off the record at 2:57 p.m.)
VIDEOGRAPHER: We are back on the record at 3:13 p.m.
MS. BRANSCOME: Dr. Plunkett, I have no more questions for you on behalf of Johnson & Johnson, subject to your counsel doing a direct of any kind.
THE WITNESS: Sure. Thank you.
EXAMINATION
QUESTIONS BY MS. BOCKUS:
Q. Good afternoon, Dr. Plunkett. You and I have met before. My name is Jane Bockus, and as you know, I represent Imerys in this case.
A. Yes.
Q. Correct?
I want to go back to just touch briefly on a couple of issues that have already been addressed.
Would you agree that IARC has

Page 288

not classified any of the heavy metals that you've identified in your MDL report as carcinogenic to the ovary?
A. So the answer is I'd have to look. I don't recall that, but I'd have to look to confirm.
Q. Okay.
A. That's the answer I believe I gave a few minutes ago, yes.
Q. So if I look at the IARC website, then I can confirm whether or not they have identified any of those as carcinogenic to the ovary?
A. Not so much the web -- well, the website or the actual documents. I think I would actually point you to the actual monograph --
Q. To the monograph.
A. -- because there may be evidence in there of ovarian cancer as being seen in studies. And I'd have to go look.
Q. Okay. That was not part of your consideration here, correct?
A. So ovarian cancer is part of my consideration, but I didn't -- in this part

Page 289

of my evaluation I'm trying to -- trying to describe these metals. And this is really about mechanism of biologic plausibility and the fact that these two things can go together, and then the concept of additivity is they're on hazard. The idea if you have a cancer hazard generally and you have similar mode of action, regardless of the tissue, you would be expected to have a potential additive effect when you do a risk assessment.
So that's my use of that data, which is why I didn't do a separate ovarian cancer assessment for each of the each constituents but just on powder.
Q. And you discuss that topic on page 47, paragraph 68, of your report, correct, the -- whether there's an additive effect?
And you cite to Casarett and Doull. I don't know if I'm pronouncing those names correctly.
A. I'm sorry, on what page?
Q. I'm on page 47, paragraph 68.
A. Okay. Sorry. I should know

where it is, but...
Okay. I'm there, yes. Okay.
Yes, I do cite to a chapter in Casarett and Doull, yes.
Q. Okay. And Casarett and Doull is a resource that you cite to for a couple of different toxicological principles that you discuss in your -- in your report, correct?
A. Yes, because it's one of the most well-recognized textbooks that is used across different either universities or schools or even in regulatory agencies.
I would also say I cite EPA 2000 there. I'm not citing just Casarett, but I am citing Casarett as well as an EPA guidance document.
Q. In Casarett and Doull, do they actually discuss talcum powder in Chapter 2, or is it more just the concept of the potential of the effects when you have two different chemicals that you're exposed to at once or three or four?
A. It's the latter. It's the -- because you'll notice the title is

"Principles of Toxicology," so it's the general chapter teaching principles for risk assessment and toxicology as used in risk assessment.
Q. And whether there is an additive effect of, say, talc and nickel, that's something that an experiment could be designed to study, correct?
MS. PARFITT: Objection.
THE WITNESS: If you're talking generally for cancer and not worried about the issue of ovarian cancer, if you're talking about cancer, like doing an inhalation experiment to look what happens to the lung, that you could do.
The problem with the animal studies and ovarian cancer due to perineal exposure is it's very difficult to understand how you design a study to expose the animals that way reliably in the way that humans are exposed.
But generally you could study -- you might even be able to do

a genetically susceptible mouse study to hurry the process along to look at, but you might not be able to do it through perineal exposure. You might have to do it through another route such as either inhalation or maybe even you could -- you could look at it through intraperitoneal injections, for example.
QUESTIONS BY MS. BOCKUS:
Q. Well, and what the textbook talks about is the fact that you need to study it to find out whether the effects are additive, whether the effects are something that multiply the risk, you know, so that the two together are greater than either one alone, or do the effects offset each other and reduce the risk, correct?
A. That is discussed there --
MS. PARFITT: Objection.
THE WITNESS: -- which is why I've cited the EPA document. Because the EPA document addresses the issue of mixtures, and this is the issue of mode of action. If you have chemicals

that you're looking at on the issue of additivity or no effect, you will -- you look at that issue of how they're affecting the tissue and underlying mechanism.
But the only way to look at the magnitude absolutely of how the risk would change is by doing an experiment. That is true.
QUESTIONS BY MS. BOCKUS:
Q. And to your knowledge, that experiment has never been done; is that correct?
A. I can't guarantee that it's only been done for nickel and talc alone, but I would -- I would state that based on -- there are studies out there that have been done where they've used the body powder that we know have metals -- a variety of things within it that are not just platy talc, but those experiments are that kind of data.
But as far as gathering dose-response information or teasing out individual components, that is not available.
Q. Do you agree that dose response

is the fundamental principle of toxicology that underpins the effects that chemicals can have on living organisms?

A. When you're talking general toxicology, yes, I think it's talked about in the textbook.

Q. And you agree that it is the dose of the chemical and the pattern of exposure that determines whether a chemical produces an adverse effect on an organism, not simply the presence of the chemical?

A. For a typical dose-response relationship for non -- for nongenotoxic events, absolutely, I would agree that is probably true. And I don't mean nongeno -- noncancer events.

In the issue of cancer biology, some of those issues don't hold all the time. In other words, there are certain chemicals and certain ways of looking at cancer risk assessment where you can't assume where the threshold is or identify what a safe dose would be. But certainly I agree on the issue of noncancer risk assessment generally, or general end points of toxicity, that is true.

Q. And again, do you agree that in general toxicology the effects that might be reported at high doses will not occur at lower doses if the concentration at the site of action falls below the threshold for toxicity?

A. Yes, that could -- that could be possible, yes.

Q. And do you agree that evidence-based toxicology and epidemiology dictates that the dose of the chemical is the critical factor when examining the risk posed by a chemical, not just its presence even in the human body?

A. I would say that's generally true, yes, which is why I have attempted to look at the dose-response relationship as well as the prevalence of the contact.

Q. And with regard to the human studies that you cite, would you agree that none of the studies that you cite in your report that have to do with migration of particles within the genital tract of the female involve applications to the perineum or outside of the genital tract?

A. That is true with the exception of Parmley and Woodruff, which addresses this issue of --

MS. PARFITT: Objection.

THE WITNESS: Talks about the issue of exposure from the outside to the inside.

But the data that is collected with the different studies they have deposited at some point -- at some position within the vagina, that is true.

QUESTIONS BY MS. BOCKUS:

Q. And that is not how talc is deposited in women who use it regularly in their daily routine, correct?

MS. PARFITT: Objection. Misstates the evidence.

THE WITNESS: So I would say that depends on what women are doing. Perineal application, for example, application on the underwear, can lead to contact of the vaginal opening depending on the woman.

For example, a woman who has

a -- had many children has a tract that is stretched. There, indeed, you can have more direct contact than you can with a very tight -- so I would say it depends on the woman and it depends on the situation.

But I do think it's generally accepted, based on my review of the literature, that there is the opportunity for exposure internally from perineal application.

QUESTIONS BY MS. BOCKUS:

Q. And if I understand what you testified to earlier today and yesterday, you don't have any data that would advise on -- out of the talc that is deposited in the underwear, what percentage of it makes it into the reproductive tract?

A. That's the data that's missing, that is true. And unfortunately, no one has done a study. It would be -- if there was a way to do that, it would be interesting to do that. I just don't see how you design that study, especially knowing the hazard of talc at this point. I think that would be a

Page 298

difficult study to get approval for.
Q. And do you have an opinion as to whether it is even correct that each day that a woman uses talc in her underwear, that some of the talc makes its way to the ovary?
MS. PARFITT: Objection. Form.
THE WITNESS: Have I -- can I quantify that?
No, I haven't quantified it. I think I got asked that earlier. I can't quantify the amount that gets there. Or, I'm sorry, I may have misheard the start of your question. I apologize.
QUESTIONS BY MS. BOCKUS:
Q. Yeah, I'm really asking: Do you have an opinion as to whether it happens every single time a woman applies talc to her perineal area? Does some of that talc make it to her ovary?
MR. MEADOWS: Objection.
MS. PARFITT: Objection.
THE WITNESS: I don't think I stated it quite that way, but certainly I think the opportunity is

Page 299

there with every application. And of course it would depend upon the amount of time that the contact may be in place. But the opportunity is there.
So, for example, if you applied it to your underwear and 30 minutes later you go to the bathroom, it's very possible that you will have wiped away, and so that that application may have taken an opportunity away. But I do believe that the opportunity is there based on the literature I have seen.
And so I haven't formed the opinion, though, that it's absolutely every time. My opinion, I think, is based on the fact that I believe that there is data to indicate that exposure occurs, and that with routine, continual habit, sort of a habit exposure, that indeed that there was some migration that occurs.
QUESTIONS BY MS. BOCKUS:
Q. And is it fair to say that you don't have an opinion as to whether that

Page 300

migration occurs every day, once a week, once a month?
MS. PARFITT: Objection. Form.
THE WITNESS: I haven't formulated my point -- my opinion quite that way; however, I do believe that it is something that is going to happen routinely with exposure. I do believe that migration is something that is going on routinely with application.
So with applications, I do believe that that is, but I can't tell you that this amount has migrated on this particular day with this particular application, no. That -- the data that we have collected is not there to allow us to do that.
QUESTIONS BY MS. BOCKUS:
Q. How do you define the word "routinely" as you're using it in that answer?
A. So that would be the idea of repeated exposures, you know, within a week, within a month, within a year. So not --

Page 301

routine to me would not be -- would not be applying it once a month one month, waiting six months, doing it again, and then not doing it until the next year.
Again, it's the idea -- some people may -- routine may be during the hot season of the year, they're routinely getting daily exposures when it's warm, and during the cold weather not applying. But then the next year doing -- that's a routine for them and their habits based on their pattern of exposure.
Again, we know that talc, when it -- when it migrates and gets into the body, we have data to show that it is -- it is able to persist in the body. The fact that you may have not been exposed for three months because it was cold doesn't mean that you -- that that changes the fact that you're still at risk with additional exposures the next -- the next time that that habit becomes -- comes into place.
So I think there's multiple exposure patterns that are possible, but when I use routine, it's something that people are

doing throughout their -- a period of their life. And so it would be something that happens either on a weekly basis for a good part of the year. I haven't defined it with a particular number, though, no.
Q. And my question had to do with out of the number of times a given woman -- or an average woman uses talc, what percentage of the time does talc make its way into her reproductive tract?
A. So I don't think that anybody -- anybody can point to a piece of data that tells you that, but, again, it's based upon the anatomy, I would expect there to be the potential each time it's applied.
And on your question on routine, when I'm talking routine, I'm looking at not just frequency but also duration. So when I'm talking about dose, it's the fact that they do it on a repeated basis for a number of -- a period of years as well.
That's what the data shows in the human studies. It's not something, again, that may have been done routinely for

one year, but it does appear to be something that's done more -- longer term than that.
But we can't give a number. We have no threshold. We don't know exactly what that minimum number is.
Q. Do you think that the minimum number is greater than a year?
MS. PARFITT: Objection. Form.
THE WITNESS: I haven't formed that opinion, no.
QUESTIONS BY MS. BOCKUS:
Q. Do you think it's greater than a month?
MR. MEADOWS: Objection.
THE WITNESS: Greater than a month?
QUESTIONS BY MS. BOCKUS:
Q. Yes.
A. One month in their life?
Q. One month in their life, where they're using it every day for a month.
A. So I haven't formed that opinion at this point in time, but I'd say it's more likely to occur when you do it more than a month. But I haven't formed an

opinion on a set number, no. I can't -- can't point you a specific number.
I'm not doing case-specific, so I've not looked at any of those pieces of information for any given plaintiff.
Q. And I'm just trying to get the threshold.
A. Uh-huh.
Q. As I understand it, that is part of a toxicological evaluation, is the threshold below which there's not an issue.
So I think you've said you don't know if it's less than a year, but you think it's more likely than not that it's greater than one month.
MR. MEADOWS: Objection.
QUESTIONS BY MS. BOCKUS:
Q. Is that fair?
A. No, that's not exactly what I'm saying. I'm saying we don't know the threshold. So as a result, I'm not of the opinion that it absolutely can't -- it only has to be this long.
What I'm saying to you is per general principles of toxicology and based on

the human data that we have, it indicates that it's more frequent than just one month, but I can't tell you that it's absolutely not possible.
That's where -- I do think when you're talking about those kinds of patterns, that's a case-specific issue for individuals, because I think that would have to be considered for each individual. But certainly as a toxicologist, I'm using the words "routine," "repeated," "longer duration," "chronic exposure." And when I defined "chronic" earlier, I talked about years of exposure versus just one month.
That would be consistent with what I have said, yes, but I'm not -- I -- I certainly don't want to rule out that there couldn't be somebody out there that could show something different, because it may very well be that there are people that you can identify with the presence of talc in their ovaries and all of their other case-specific things that could -- could make that pattern a -- make someone be able to draw a case-specific, reliable conclusion.

But that's not my role. I don't do case-specific.

Q. And I am simply trying to get the parameters of your opinions with regard to the amount of talc use one would need to have before you would feel comfortable -- well, that in your opinion would be sufficient to create a toxic environment.

MR. MEADOWS: Objection.

THE WITNESS: Well, that's a different question. So toxic environment could be with a much shorter time exposure, okay?

QUESTIONS BY MS. BOCKUS:

Q. Right.

A. So but if you're talking about -- the opinion that I have formed has to do with an increased risk of ovarian cancer. So with that opinion, that's the description, I believe, I was giving this morning. It's the idea that the data that I've seen indicates that my opinion that perineal use of talc body powder products increases your risk for ovarian cancer above that background level that you know exists.

That opinion is based on data that is -- is -- the supporting data would indicate that it has to be a habit, routine, a chronic exposure. And so as a toxicologist, I've tried to put that in context.

I don't know what else to tell you. That's the opinions I have formed to date.

Q. A chronic -- a habit, routine, a chronic exposure for years?

A. Well, chronic --

MR. MEADOWS: Objection.

THE WITNESS: -- is defined as years, typically, by a toxicologist, and so that's what I -- that's what I told you.

QUESTIONS BY MS. BOCKUS:

Q. Shifting to your regulatory opinions, you would agree that Imerys is a raw material supplier to J&J; is that correct?

MR. MEADOWS: Objection.

THE WITNESS: I would call them an ingredient supplier, yes.

QUESTIONS BY MS. BOCKUS:

Q. Okay. An ingredient supplier.

And you agree that Imerys does not sell any products to the general public, correct?

MR. MEADOWS: Objection.

THE WITNESS: I don't know that's definitely true, but I'm not aware that they do.

QUESTIONS BY MS. BOCKUS:

Q. And what Imerys supplies to Johnson & Johnson is not a finished cosmetic that is ready to be sold on the market, correct?

MR. MEADOWS: Objection.

MS. PARFITT: Objection.

THE WITNESS: I don't know that I can answer that except in the context of Johnson & Johnson's baby powder, SHOWER TO SHOWER® and Shimmer, it's my understanding that Johnson & Johnson mixes -- has some fragrance added to the talc.

I don't believe Imerys does that, but I don't know for sure.

So based on what I know -- I'm telling you what I know, and I would call them, again, an ingredient supplier, and I would call Johnson & Johnson a cosmetic manufacturer.

Does that answer the question?

QUESTIONS BY MS. BOCKUS:

Q. It does.

Would you agree that the minerals that you have identified in your report, that the documents that you have seen, would classify their -- to the extent that they are ever in the powder, that they're trace ingredients?

MS. PARFITT: Objection.

MR. MEADOWS: Objection.

THE WITNESS: So which ingredients are you referring to?

So some of the metals, no, are not trace ingredients.

Are you talking about the -- are you talking about the -- like the presence of tremolite or the presence of chrysotile --

QUESTIONS BY MS. BOCKUS:
Q. No. No, I'm sorry. I'm talking about the three metals that you identify in your report. Those are trace elements that are -- that are sometimes detected in the studies of the -- of the talc.
MR. MEADOWS: Objection.
THE WITNESS: It's not how I would say it. I would say they're heavy metal components that are naturally occurring within the product that are sometimes -- sometimes detectable at levels that are reported as trace based on the detection limit within the analysis, but at other times they're not listed as trace. They're actually listed with a specific amount.
So that's what -- how I would define what I call trace. Usually that's how it will be reported in the lab, trace, which means below the limit of quantification, but it's there. You're detecting it.

I would agree that -- that there are other descriptions of heavy metals in the heavy metal literature that talk about trace amounts being found in -- naturally occurring in food, for example, and I agree that that does occur. But in the case of this product, we actually have often -- we actually have a -- a limit that is set for acceptability in the specification.
And so I would think it's more proper to call it a level of the heavy metal that is allowable by the purity specifications set by the product. And sometimes those levels may be above, and most of the times those levels are below, which is why it's cleared. Because I've seen some analyses where different products may have been, I guess, turned away or considered not acceptable based on the analysis of certain types of minerals or metals.

QUESTIONS BY MS. BOCKUS:
Q. Have you seen any studies where women's blood has reflected the presence of nickel or cobalt or chromium?
MR. MEADOWS: Objection.
QUESTIONS BY MS. BOCKUS:
Q. Who are parts of these studies -- these ovarian cancer studies?
MR. MEADOWS: Objection.
THE WITNESS: The epidemiological literature you're asking me?
QUESTIONS BY MS. BOCKUS:
Q. Yes, ma'am.
A. It's possible in the Nurses' Health Study that we can go to that, because I know they do collect some heavy metal levels. I've done that for other clients on other issues.
Most of the others, I doubt that we have heavy metal levels in blood. But certainly there are levels of heavy metal in blood, especially things like lead, for example, that we have very limited capacity to eliminate.

So whether or not you carry around a significant body burden of a heavy metal in your blood is somewhat driven by the exposure pattern you get. It's something that's commonly -- or can you excrete it quickly or not. So...
Q. And are you familiar with any studies that have suggested that the use of body powders leads to a heavy burden of nickel, chromium or cobalt in the blood?
A. So I have not seen such analysis done, no, I have not.
Q. In paragraph 67 of your report, which is on page 46 -- I'm sorry, on -- oh, I'm sorry. Paragraph 64, I apologize.
A. No. No, that's fine.
Q. It's on page 44.
You cite to two abstracts --
A. Yes.
Q. -- one by Fletcher and one by Fletcher and Saed.
Do you consider these abstracts to be reliable sources of data?
A. They're not as reliable at all as a peer-reviewed article. So there's a

difference in the weight you give an abstract, absolutely.

However, knowing the papers that Dr. Saed has actually published in the peer-reviewed literature, I have -- I have mentioned them in here because I do believe that they are -- they are pieces of information that are highly relevant to some of the issues raised in other cellular studies, and so that's why they're here. But certainly I do not give them the same weight as in my assessment of overall risk.

And I would say that I had the same opinions on risk before I had these studies. Because in my original reports, obviously, I have gone further than risk and talked about cause, and I didn't have the Fletcher studies.

The Fletcher studies are more on the issue of biologic plausibility and mechanism versus being important underpinnings, for example, for a hazard assessment.

Q. Is there any way that someone reading your report could tell that you

attribute less weight to the abstracts by Saed and Fletcher just by reading your report?

MR. MEADOWS: Objection.

THE WITNESS: I don't know if they could or not. Hopefully they would based upon where they appear in the report. They're not cited a lot of other places, but they certainly are cited.

So that's why I'm here today, though. You're asking me these questions; I'm telling you. That's how I look at these studies. That's all I can say.

I haven't -- I haven't, certainly, as I've told you, given things numerical weight throughout my report.

QUESTIONS BY MS. BOCKUS:

Q. Looking at paragraph 118...

Well, when you were preparing your report, were you careful with the language that you used in it to be precise and accurate?

A. I attempted to do that. I can't tell that you there isn't something in here I've missed. But, yes, I read this report six or seven times before I finalized it, trying to make sure that the language I was using was an accurate reflection of the opinion I'm expressing.

But it's possible, if you want to point to something that you want to ask me about, I can tell you whether or not that was something that I would change.

Q. So on page 77, paragraph 118 in the middle of it, you say, "Based on the knowledge available by the 1950s, talc body powders manufactured and sold by Imerys and Johnson & Johnson."

And that's the question that I have for you.

A. I see what you're saying.

Q. Was Imerys selling anything to Johnson & Johnson in the 1950s?

MR. MEADOWS: Objection.

THE WITNESS: I'm thinking. It's possible they did not. That may be true.

QUESTIONS BY MS. BOCKUS:

Q. Well, and actually --

A. You know what? When I wrote this sentence, I assumed that they did, but if that is not true, then certainly this sentence should be just Johnson & Johnson.

Q. Well, earlier in your report, in a footnote you indicate that Imerys began supplying talc to Johnson & Johnson in 1989 or the late 1980s.

Do you remember making that notation?

A. So let me look. So if that's an inconsistency, then that should change. Let me look.

Q. And that's all I want to know, if it's an inconsistency, should it change.

A. If it is an inconsistency -- certainly if Imerys was not selling talc to Johnson & Johnson in 19 -- the 1950s, then -- then certainly Johnson & Johnson's products would not -- would not be affected by Imerys' activity.

However, if Imerys is selling talc to anyone that makes a consumer product

Page 318

in the 1950s, then -- or a precursor company to Imerys is making talc that's selling for body powder to somebody other than Johnson & Johnson, then that opinion would still hold.

So -- but I certainly agree, I think I -- you're right, I think I have a statement about the link between the two in '89. So in that case, then certainly the -- the link here would be related to Johnson & Johnson's products.

Q. Okay. Yeah.

A. Whether or not -- if they weren't sourced from Imerys, then that's a separate duty on a product, not this product.

Q. If you look on the bottom of page 7, I think you'll see the footnote I was referencing.

And with regard to your last answer, you don't have any information as to whether Imerys existed and, if it did, what -- who its customers were in 1950s, correct?

A. I don't believe I do, no.

MS. BOCKUS: I think that's all that I have. Thank you.

Page 319

MR. LOCKE: I've got a few questions.

EXAMINATION

QUESTIONS BY MR. LOCKE:

Q. Doctor, my name's Tom Locke. I represent the Personal Care Products Council. We met a couple of times before, I think.

A. I apologize, I don't recall your name at least. The face looked familiar, though. I apologize.

Q. I try to maintain a low profile.

I have relatively few questions. I wanted to ask you overall about your opinion.

Would you agree that reasonable scientists can disagree with your opinion that talc increases the risk of ovarian cancer?

A. I'd say I wouldn't say it quite that way. I'd say that I agree that scientists can disagree on conclusions they draw, depending on the -- depending on the way that they have assessed.

So certainly based on a

Page 320

complete assessment the way I did, then I would agree that other people could come to a different conclusion, absolutely.

So I think it depends what you mean by "reasonable scientist." But I would agree that individuals can look at the same body of data and, based on their judgment and experience, based on looking at that same body of data, could come to a different conclusion, yes. That's true.

Q. You've been involved in this talc litigation for at least a couple of years, right?

A. Yes.

Q. And you know that various defendants have offered experts who disagree with your conclusions, right?

A. Some of my conclusions, yes. I don't know that there is somebody that's in the litigation that does exactly what I do across all the opinions I've expressed, but, yes, certain parts of my opinions there are other experts I'm aware of, yes.

Q. Well, they -- you're aware that there are defense experts who disagree with

Page 321

your opinion that talc increases the risk of ovarian cancer; is that correct?

A. Yes, I -- I am aware of that fact.

Q. And in your review of the records that go back or the scientific materials that go back 35 years or more, you've seen that there's disagreement regarding that issue; is that correct?

A. So what documents are you referring to? Are you asking me about a specific -- just the published medical literature? Are you asking about documents like internal company documents, reviews by others? What are you asking me about?

Q. Well, let's focus on the published medical literature.

There are scientists who have disagreed with your opinion; is that correct?

MS. PARFITT: Objection.

THE WITNESS: I'm not aware of a paper in the published medical literature that has done the exact assessment I have done.

So I am aware of the fact,

however, that there are individual papers by scientists that, for example, have concluded that there is no association between exposure to talc perineally and ovarian cancer, yes. Individual papers, I am aware of that, but that's different than what I have done.
QUESTIONS BY MR. LOCKE:
Q. Let me just ask you about what you were requested to do on behalf of plaintiff's counsel.
Plaintiff's counsel asked you to provide opinions related to the human health hazards posed by exposure to talcum powder products and how those hazards relate to the regulatory requirements for marketing cosmetic ingredients and cosmetic products in the United States; is that correct?
MR. MEADOWS: Objection.
THE WITNESS: I didn't write that, but that sounds like an accurate reflection of what -- what we -- what I have done at least in parts of my report, yes.

QUESTIONS BY MR. LOCKE:
Q. Well, if you look at your report, I think you go to part where you were asked to provide -- and I just pulled it from what you said.
A. So I did write it, I apologize. It didn't sound like me.
Q. It started with "to provide opinions related to the human health hazards" and so forth, so I just wanted to make sure we're clear on that.
A. Sure.
Q. So does that sound right in terms of what you were asked to do?
A. I said I -- certainly those are the kinds of things that I was definitely asked to do. I was asked to do two basic -- two basic things, which was having to do with toxicology and risk assessment, and then a separate issue related to regulatory concerns.
So, yes, those are the two basic, I guess, buckets of information and documents that I reviewed and opinions I've expressed, and I think that's consistent with

what I've been doing in the litigation.
Q. Okay. As to that second bucket, the US regulatory requirements for marketing cosmetic ingredients and products, that's not relevant to the scientific question whether talc may cause ovarian cancer; am I right?
A. No. I disagree with that based on the fact that a company that markets a cosmetic product is required to do a safety assessment. And if in that safety assessment issues relate to cancer or ovarian cancer and the use of talc, then those two things are related.
But I would agree that -- that doing a risk assessment like I've done is a separate issue from doing a safety assessment for a product, because there's actually even a lesser standard for an issue of looking at a safety assessment for a product versus actually forming the opinion that there is an increased risk of cancer with exposure to talc.
Q. Now, did IARC in 2006, did it look at the US regulatory process in

considering whether talc may cause ovarian cancer?
MR. MEADOWS: Objection.
THE WITNESS: I don't think I understand what you mean. It's not a US regulatory process, no, if that's what you're asking me.
They have a -- they have a discussion of what the products are, which is part of the way they're sold. But I don't think they're discussing the duty of a company under the regulatory process, no, that's a separate issue.
QUESTIONS BY MR. LOCKE:
Q. So their analysis of whether talc may cause ovarian cancer, that's different than the analysis of whether a company may have a duty, whatever that duty may be?
MR. MEADOWS: Objection.
THE WITNESS: It's a different process, absolutely. IARC is a separate, independent body that does an assessment looking at the issue of

cancer hazard and looking at whether or not there is sufficient evidence to categorize that hazard, whereas a duty of a company under the regulatory situation is broader than just cancer hazard; it's a whole different thing. It's what you do internally before you market a product. Totally different.

And so certainly when I -- that's why I have separate sections in my report, and that's why I even have -- I've had discussions about the difference between the regulatory standard for warning versus the assessment of risk that may be required in order to start to produce a -- identify a association or an increased risk or even if you did a causation analysis. Totally different type of exercise.

QUESTIONS BY MR. LOCKE:

Q. Do you first, in that exercise, look at the scientific issue of whether talc may cause ovarian cancer?

A. Are you asking me in either of

these exercises?

Q. Well, let's say when you're getting to -- you mentioned the duty to warn. So if you're looking at the duty to warn, do you first have to look at does talc cause ovarian cancer?

MR. MEADOWS: Objection.

THE WITNESS: That's not the question you asked. No. I would argue, based on the regulations, if you look at the standard, the question is, is there evidence to indicate that there is a chance, there is a potential -- not that it does, but is there a potential for that type of hazard to be posed to consumers who use the product.

It's a possibility versus being a -- I'm taking it beyond possibility when I'm doing my assessment for increased risk. And I talked about that this morning, and I can't remember her last name. The Johnson -- I apologize. But I -- with Johnson & Johnson. I talked about

this is a different assessment and different standard. It's a much lower standard on cosmetics for what needs to be done as far as warning.

Now, when a company comes and initiates a safety assessment on their product, before they even think about what am I going to warn, they should be doing a comprehensive assessment of safety based on what's available publicly, knowing what others have reported and then what data they've collected.

If they don't have data at all on the safety of the product, then the product has to say that. We don't know. We do not know if this product is safe. And that's one of the things that is allowed under FDA -- under FDA regulations as well.

But essentially some -- some assessment must be done to understand from the perspective of the company that this product is safe for consumers to use as -- under the

directions of use.

So in the case of this, it would be a body powder being used on the body surface but also perineally because -- because that was an exposure pattern that was understood.

QUESTIONS BY MR. LOCKE:

Q. Okay. You described two different buckets. They're independent assessments; is that correct?

MR. MEADOWS: Objection.

THE WITNESS: Initially that's where I started, and now I'm talking two different duties. There's a duty to warn, but there's first a duty to collect information before you market it. It's your premarket safety assessment.

QUESTIONS BY MR. LOCKE:

Q. Okay. I'm not actually talking about the manufacturer's duty. I wanted to just first address your scientific analysis.

That's a separate question that led you to your opinion on the -- your opinion that talc increases the risk of

ovarian cancer, correct?
MR. MEADOWS: Objection.
THE WITNESS: Yes, that's what I described. And I thought you were talking about duty of the company, and so I apologize. I didn't mean to go off on a tangent.
If you want to focus just on the risk assessment -- is that what you want to do? -- that's what I'm doing.
QUESTIONS BY MR. LOCKE:
Q. No, I just want to understand, those are two different things, though, right?
A. Those are two different -- those are two different tasks that I undertook, yes. I undertook a risk assessment task to form opinions based on what I can say about risk, and then I separately -- and I had done this earlier on the issue of warnings, looking at what do we know about the product and whether or not -- and when did we know it, and what should consumers have been warned about based on the

safety information that was available over time.
Q. The risk assessment task, that's what you mean by your analysis that talc increases the risk of ovarian cancer?
A. That's correct.
Q. You could have stopped at that, but then you performed an additional task; is that right?
A. Well, actually, no, because the first task I actually started with was the regulatory task. When I first started getting involved in the litigation very -- before I wrote my first report, one of the first things I was looking at was the issue of the duty of the manufacturer to provide warnings.
And then after that, I expanded that role to be an inclusion as well of a causation analysis.
And then now I'm not doing a full causation analysis in this litigation, but I'm using essentially some of the same information to provide you with a description of a -- a health risk assessment, which was

also sort of -- that's a piece along the way to doing a causation analysis, but it's not the same.
Q. Your opinion regarding the FDA's responsibilities and functions, that's not related to your opinion that talc may cause an increased risk in ovarian cancer; is that correct?
MR. MEADOWS: Objection.
THE WITNESS: I don't think that's true the way you're asking that question, because I don't know how you divorce the fact that as a -- in a regulatory assessment, if I identify cancer hazard, I have identified a duty to warn. That's certainly something that should be warned about when I understand that there's not only the potential, but I believe there's an increased risk.
But I would agree with you that in my report, I'm laying out for you even different bodies of information that -- as I step through it.
Does that make sense to you?

QUESTIONS BY MR. LOCKE:
Q. Not really.
A. I'm sorry.
Q. I'm talking about your scientific analysis here, not your regulatory analysis.
To do your scientific analysis, you looked at scientific materials, right?
A. Yes, but I do the same thing for my regulatory analysis. That's why I'm confused. I -- to me they are connected.
But I would agree with you, I had an analysis. Let's just talk about that, my analysis on risk assessment and my opinions that I've expressed. Those are laid out in a separate section of my report, absolutely. So we could talk about that if you'd like.
Q. Well, I just want to understand, and I think I do now, that's a separate issue from your regulatory opinion?
A. It's not a separate issue. That's where I'm having trouble with your language.
It's a separate task because,

for example, I may have only been asked, but I wasn't, to just describe whether or not, as a human risk assessor and toxicologist, there is a hazard or a risk posed by the product, and I could stop there.

But I was asked, based on -- based on my experience working in the area of regulatory toxicology but also on regulatory issues for clients where I give advice, I was asked to look at how does that scientific information impact what the company should be doing.

And so that's -- that's why I'm saying you can't divorce them, because the warning issue I'm talking about is intimately tied into the human health risk assessment results.

Q. So do you consider yourself primarily here as a warning expert?

MR. MEADOWS: Objection.

THE WITNESS: I consider that one of my roles, yes, absolutely.

It depends upon how individual cases, individual attorneys, will -- will ask -- decide to use me. For

example, I have been used in one trial to only talk about the toxicology. Other trials, I've talked about toxicology as well as regulatory issues. So I think it just depends on the case.

In the MDL, I am prepared, however, to come to talk at a trial on the regulatory system that guides cosmetics as well as provide opinions that talk about what are the hazards of talc, what is the toxicology of talc, what do -- how can you be exposed to talc, that migration issue, and then my opinions about whether or not I believe that there is an increased risk of ovarian cancer.

So I would be -- be prepared to talk about both of those things. That's why I said I do think I'm a little different than some of the other experts that you may encounter, for example, in the defense side, where someone may just do regulatory or somebody may just do toxicology.

But I practice in both those areas in my consulting practice and in my experience.

QUESTIONS BY MR. LOCKE:

Q. Let me ask you a few questions about your cosmetic ingredient review statements, CIR.

We can agree to call it that, right?

A. Yes, that's fine.

Q. In parts of your report, you cite the CIR as an authoritative source on cosmetic ingredients; is that correct?

A. So where are you looking at, the background information on the CIR?

Yes, they certainly are a source of information that FDA relies upon as far as assessments, yes, that's true.

Q. Well, and on page -- or paragraph 35, page 23, you cite to the CIR on, for example, chemicals purportedly in cosmetics. You have a footnote there.

A. So --

Q. I believe it's footnote 31.

A. Yes, I have looked at -- looked

at the CIR as a source of information because many of the chemicals, many of the ingredients within the fragrance of Johnson & Johnson, the only available information may be found within the CIR that's publicly available.

Q. And you rely on the report of Dr. Cralley; is that correct?

MR. MEADOWS: Objection.

MS. PARFITT: Objection.

QUESTIONS BY MR. LOCKE:

Q. You reference Appendix D to your report. I believe if you stay on the same page you'll see that, the same paragraph.

A. I wouldn't say I rely on the report of Dr. Cralley because I form my opinions independent of Dr. Cralley, but certainly his -- I believe if you go to his reports, his report is supportive of my opinions in this area.

Q. Did you read his report?

A. I have read it now, but I did not read it before I -- before I formed my opinions in this particular paragraph, yes.

Page 338

Q. I'm a little confused because you're citing to his report.
You read it or you didn't read it before you wrote this paragraph?
A. I read it before I wrote the paragraph. I didn't read it before I had formed the opinion. Do you understand what I'm saying?
I did my review of the irritant chemicals independently before I looked at Dr. Cralley's report. So I had formed the opinion that -- of the chemicals I had searched for that this is what I identified. And that's what this is talking about, right?
I'm saying here that of the more than 100 chemicals included, over 70 percent are compounds linked with some level of irritant hazard. That was done on my own.
Then, if you go to look at Dr. Cralley's report, I cite it here because it's consistent. That is, his report provides support additionally for the statement I'm making.
So I'm not relying on his

Page 339

conclusions to make my opinion, but it's certainly -- I am citing it here as it being a piece of evidence that is consistent with my opinions.
Q. Sorry, I seem to have messed up my microphone. I'll try to hold it for a little bit then.
Do you disagree with Dr. Cralley's report?
A. I have not formed an opinion that I agree or disagree. He -- with his -- I believe he has information that is consistent with the opinion I'm expressing in the sentence, however.
Q. And do you know that Dr. Cralley repeatedly cites to the CIR as an authoritative source regarding cosmetic ingredients?
A. I don't know that he uses that exact language, but he does cite to it, yes, in his report. Certainly he does.
Q. More than 20 times, right?
A. That, I have not counted. I can't tell you that. But he does, just like I do, as a source of information when there

Page 340

is no other source available.
Q. Okay. In your report you state that the CIR process is administered independent of the FDA.
But the FDA is on the CIR steering committee; is that correct?
A. That is correct.
Q. You don't mention that in your report, although you mention others who were on the CIR steering committee, correct?
A. Yes, there's a paragraph where I talk about others, yes.
Q. But you don't mention that the FDA is on the steering committee?
A. I believe I -- I believe I've been asked that question before, and I said yes, but certainly in this report I don't believe I state that, that is true.
Q. CIR solicits input from the public; is that correct?
MS. PARFITT: Objection.
THE WITNESS: I would say they solicit input from industry, yes.
QUESTIONS BY MR. LOCKE:
Q. Well --

Page 341

A. But they -- and they do have a public comment period, which is mainly input from industry.
But I agree that they do -- and if what you're referring to is a public comment period, yes, there is that for the documents.
Q. You can go on the website and see what ingredients CIR is going to review, right?
A. Yes, you can.
Q. Have you done that?
A. Yes, I've done it many times before.
Q. Okay. And did you submit comments on talc in 2012?
A. No, I did not.
Q. Okay. You could -- the public can submit comments many times during the process of an ingredient review; is that correct?
A. There are different -- different stages of the draft document. Is that what you're asking me? Yes, that can be done.

Page 342

Q. Well, even before it's a draft, CIR is soliciting information about the ingredient to include in the initial materials provided to the expert panel; isn't that correct?
A. Technically I believe that is true, but I would disagree that that is something that happens routinely. But I would agree that -- I would say technically you may be -- that is something that could occur, yes, but that is not the situation, for example, in the case of talc.
Q. Why not?
A. Based upon what I have seen described as how the review was done, and that has to do with the testimony of different -- or different documents that I've reviewed and the testimony of individuals related to this document.
Q. Well, Dr. Cramer could have submitted comments to the CIR regarding talc, couldn't he?
MR. MEADOWS: Objection.
MS. PARFITT: Objection.
THE WITNESS: You'd have to ask

Page 343

Dr. Cramer if he was aware that they were reviewing it. I can't answer that for Dr. Cramer.
But if he was aware of it, certainly -- if you're aware of the process going on and the timing of it, certainly you can submit comments. I'm not disagreeing with you on that. That is true.
QUESTIONS BY MR. LOCKE:
Q. CIR publishes in advance what it's going to review; isn't that correct?
A. What is coming up for review?
Q. Yes.
A. Yes, things that are proposed for the next meeting, yes, that's true.
Q. And you could submit comments to the first draft of the CIR report; isn't that correct?
A. I would agree that that is possible to happen, yes.
Q. And you can submit comments before the final report is drafted, correct?
A. Yes, as long as it's still in draft form, yes, those comments can be

Page 344

submitted.
Q. And CIR meetings are open to the public, right?
A. That is true, they are open to the public, but in my experience it -- they are not meetings that are heavily attended by the public but indeed are -- tend to be meetings attended by industry stakeholders within the ingredients that are being reviewed.
Q. You know Mr. Steinberg here. He was a plaintiff's expert for a while?
A. I don't know him personally, but I know his name and I know he was a plaintiff's expert, yes.
Q. You know he attended the talc meeting, right?
A. Yes, I believe he was working with indus -- he works with industry, so I believe indeed he did attend that meeting.
Q. You're not claiming he was working with any industry member regarding talc, are you?
A. That's not what I stated. I know he's a consultant to the cosmetic

Page 345

industry, so it doesn't surprise me. And I believe he lives in the area, so it doesn't surprise me that he attended.
I haven't spoken to him about any of that, though, so I have no specific details of that.
Q. Transcripts of the meeting are available to the public, right?
A. You can download the transcripts, yes.
Q. They're on the website?
A. That's what I said. You can download. I'm sorry.
Q. Okay.
A. Yes, you can download them from the website.
Q. Did you submit comments to the CIR regarding talc?
A. No, I did not.
Q. Why not?
A. I wasn't aware of the process that was going on in the draft form at the time.
Q. Why is that?
A. I was not following the CIR for

Page 346

talc at that particular time. I have a lot of other clients and a lot of other issues that go on on a routine basis, and I -- I literally would not have time to follow every assessment they do, considering that they do thousands of chemicals.

Q. Did you know of the CIR prior to your retention by plaintiff's counsel?

A. Yes. In fact, I -- one of the journals that I receive, International Journal of Toxicology, maybe, publishes many of their safety assessments. So I certainly am, yes.

I was aware -- when I was at Eviron, I was aware of the existence of CIR.

Q. Have you ever provided prior to this litigation -- and by "this litigation" I mean any aspect of the talc litigation -- an expert opinion on cosmetics' ingredients?

A. You're asking me in any other litigation on a cosmetic ingredient?

I'm thinking back to the cases I've worked on. Not as a -- not as a testifying expert.

At Eviron, though, we worked on

Page 347

litigation involving cosmetic ingredients, thought I was not the testifying expert.

Q. In your report you talk about the percentage of -- or the number of ingredients that the CIR listed as unsafe.

Do you recall that?

A. Yes. I mean, if you want me to verify the number, I need to go there. But, yes.

Q. You don't mention that CIR has put limitations on approximately 50 percent of the ingredients that it has reviewed, do you?

A. I don't mention that, but they do. They have -- they have -- when they have a statement about safety, they will -- they will often talk about the limitations from the safe use based on either concentration or even maybe route of exposure, that is true.

Q. Why don't you do that? Why didn't you include that in your report?

A. No particular reason. I mean, the point I'm trying to make is really the workload that's going on here and the impossibility of the task of providing the

Page 348

same level of review of any of these ingredients as can be provided -- as was provided by the IARC.

And so, again, that's one of the comparisons I'm doing. I'm talking about the difference in the time, the effort, the difference in the independence of the reviews. And so that -- when I'm talking about, those numbers, that's what I'm focusing on. I'm focusing on the fact that you have so many reviews in a very short period of time, with a one-expert panel, it's impossible for that level of analysis and review to be anywhere near what IARC panels do, and also nowhere near the level of review that I have done based on the number of documents that I have analyzed and looked at. So it's a different type of review.

Q. Let me ask you a few questions because you have criticized the panel.

You would agree with that, correct?

A. Yes. Oh, absolutely. This particular analysis I have. I have made some general criticisms of the overall process,

Page 349

and then I made some specific criticisms of this particular review.

Q. And one of your criticisms is that the CIR -- I think you said two CIR expert panelists had conflicts of interest; is that correct?

A. Yes, that -- they did, that were not -- that were not -- I believe not understood even by Dr. Andersen at that time. I think these are things brought up to him that he was not aware of.

Q. All right. Now, you read his testimony in one of the trials in California, right?

A. Yes, that's the -- in fact, that's the source of the information where I'm citing to those names of those individuals. I think I refer to that, his trial testimony.

Q. And didn't he, though, say, well, he didn't view it as a conflict of interest because the money wasn't going to them personally, it was going to their organizations?

A. He did make that statement,

yes.
Q. And you disagree with that statement?
A. I don't -- I mean, his testimony is what it is.
Are you asking me do I disagree that that's a conflict of interest?
I disagree that you shouldn't disclose that as a potential conflict in the documents that are produced, just like I do when I write an article and I disclose that I've had funding. I don't say what the funding specifically paid for, but I've had funding or support from this industry individual or that industry individual. It's -- it's something that just is about transparency.
Q. So when you write articles, you say that you've been paid a lot of money by plaintiffs' lawyers?
MR. MEADOWS: Objection.
MS. PARFITT: Objection.
THE WITNESS: Well, I haven't written an article that overlaps with an issue that I've addressed in

plaintiffs' litigation, but I certainly have given my conflict of interest statements that relate to the issue in the article.
I do that -- I've done that with -- on my work -- several of my -- several of my assessments talking about risks of pesticides. I've done it with the work that I've done that that's been sort of, I guess, policy-type work on behalf of the American Chemistry Council.
So absolutely I do.
QUESTIONS BY MR. LOCKE:
Q. Okay. You don't think it's relevant that you receive 50 percent of your money solely from plaintiffs' products liability lawyers?
MR. MEADOWS: Objection.
MS. PARFITT: Objection. Form.
THE WITNESS: If it has nothing to do with the issue that I'm addressing in the paper, no, I do not think that.
But when you're accepting money

from an industry or a company that has to do with the issue you're looking at, yes, a conflict -- a conflict of interest absolutely needs to be described.
QUESTIONS BY MR. LOCKE:
Q. And that would -- well, let me just ask you: You're not an ethicist, are you?
A. No, I'm not trained as an ethicist.
Q. And you're not a lawyer, are you?
A. Well, no, but I have passed the patent bar, but I'm not trained as a lawyer.
Q. That doesn't make you an ethicist, right?
A. No, it does not.
Q. Okay. Let's talk about one of the people you criticized, Dr. Wilma Bergfeld.
Did you know she was the first woman who was the president -- to be the president of the American Academy of Dermatology?

A. No, I don't know her personally, so, no, I did not know that.
Q. Did you investigate her at all when you criticized her?
A. I wasn't criticizing her, I was criticizing the CIR process for failing to disclose the conflicts of interest of individuals that were involved in their assessment.
I certainly am not giving personal criticism to either of those individuals.
Q. You would agree that the American Academy of Dermatology is a reputable organization?
A. I haven't formed an opinion one way or the other; however, I'm aware of them, and certainly I know individuals that are members of it, yes.
Q. Are those individuals reputable people?
MS. PARFITT: Objection.
THE WITNESS: They are people that practice medicine that certainly I would go see. I mean, you're asking

me if I formed a very specific opinion about them as individuals, and I haven't done that.
QUESTIONS BY MR. LOCKE:
Q. Do you have any reason to believe that the American Academy of Dermatology is disreputable?
A. No. Again, I haven't formed an opinion one way or the other. I'm aware of the organization, and it certainly is one that is -- has within its members a number of people that I know that practice in dermatology.
Q. Did you know that Dr. Bergfeld was the first woman to be president of the Cleveland Academy of Medicine?
A. To the what? What was the first word?
Q. Cleveland Academy of Medicine?
A. No. Again, I'm not aware of her CV specifically, other than what may have been discussed -- it's possible her -- I know her affiliation will be listed in some of the documents as to where she is today, but I do not know her CV and her history.

Q. Are you aware that she was the first president -- or she was a president of the American Society of Dermatopathology?
A. No. Same thing. If I'm not aware of her CV, I wouldn't know that.
Q. How about that she was the former chair to the FDA's drug -- FDA's Dermatology and Ophthalmology Advisory Committee?
A. Same answer. I don't know her CV, so I have no knowledge.
Q. Is it your opinion that Dr. Bergfeld was not qualified to chair the CIR panel that considered talc?
A. I don't think I formed that specific opinion. Instead, what I have -- the opinions I formed relate to the overall makeup of the panel that failed to include individuals with expertise that were -- that are really key to assessing the safety of talc. And that had to do with the issues of, as I discuss it, epidemiology -- oh, I'm sorry, I think I need to put this back -- period -- sorry. In the area of epidemiology is one that I talked about it specifically,

and also gynecological -- gynecological sciences on the issue of migration.
Q. You're not a epidemiologist, are you?
A. Not by training. It's a tool I use all the time, but I'm not an epidemiologist by training.
Q. And panel members on the CIR, they might have used the same tool that you're using to form your opinion about talc, correct?
MR. MEADOWS: Objection.
THE WITNESS: Based on what I've reviewed from the minutes and the write-up, I would disagree that that is -- they have done -- they've used the tools in the same way I have. I disagree with that.
QUESTIONS BY MR. LOCKE:
Q. No, but I'm saying their epidemiology could be the same background that you have. You haven't reviewed who they are, so you really don't really know.
MR. MEADOWS: Objection.
THE WITNESS: Well, I do

know -- I do know Dr. Klaassen, who I believe was on the panel as a toxicologist. He is not somebody that -- he is not somebody that I understand does a significant amount of evaluation in risk assessment for epidemiological studies. He has done some of that, yes, I agree, but it's different training than mine.
QUESTIONS BY MR. LOCKE:
Q. You're better qualified than he is?
A. No, that's not what I'm saying. I'm saying it's different background.
The question that I heard you ask me, I believe, was directed towards the differences in my background versus somebody else's.
And I'm saying that I'm not aware that he has the same background I do, but there is not -- there was not somebody on the panel that had specific expertise and analysis of epidemiological studies as an epidemiologist. And I think that's important in this case where you're analyzing in a

Page 358

causation analysis a wide variety of studies. So I do think it's important.
Q. You're not a gynecological oncologist, are you?
A. No, I'm not. But again, that would have been an important expertise to have on the panel when --
Q. And yet you formed your opinion with --
MR. MEADOWS: Hold on.
MR. LOCKE: No. No. Go ahead. You can ask follow-up questions if you want.
MR. MEADOWS: You're interrupting her.
MR. LOCKE: Well, I've got a limited amount of time, and I've got to keep moving.
MR. MEADOWS: Well --
MR. LOCKE: They're very long answers to questions that I'm not asking. So I -- you follow up if you would like with your questions, but I got to keep moving.
MR. MEADOWS: Well, I'm sorry,

Page 359

but you're not going to be allowed to interrupt her.
MR. LOCKE: Okay. Then we'll go longer. If she's going to answer questions I'm not asking, then I need to go -- I need to be able to go longer.
MR. MEADOWS: You're not going to be allowed to interrupt her. That's just the bottom line.
QUESTIONS BY MR. LOCKE:
Q. You're not a gynecological oncologist, right?
A. I'm not trained as a gynecologic oncologist, that is true.
Q. You're not a medical doctor, correct?
A. I am not a physician, that is correct.
Q. Let's talk about the citizens petition.
The FDA frequently seeks scientific information from cosmetic manufacturers; is that correct?
A. First part of the question?

Page 360

I'm sorry.
Q. The FDA frequently seeks information, scientific information, from cosmetic manufacturers; is that correct?
A. I don't understand what you mean by "frequently seeks." They rely on cosmetic manufacturers to do their own safety assessments.
Is that what you're referring to?
Q. Well, they ask PCPC to comment on scientific issues, correct?
A. Yes, I would agree that that interaction has happened, but that's not where the responsibility lies. But I agree, they have.
Q. I'm not asking about responsibility. I'm asking: Has the FDA asked cosmetic manufacturers for scientific information?
A. Yes, they have in this case. I discuss some of that, yes.
Q. And they do that frequently, right? Not just in this case, but generally?
A. I can't answer that for all

Page 361

situations. I have seen it happen before, yes.
Q. The FDA asked, for example, for then CTFA to cosponsor the 1994 workshop on talc, correct?
A. Yes, they did.
Q. The FDA knew that the report prepared by Dr. Huncharek and Dr. Muscat was based on PCPC's retention of those consultants, correct?
A. So what are you -- what time period are you talking about?
Q. Well, now, there was only one time that Drs. Huncharek and Muscat submitted a report to the FDA regarding talc, correct?
A. So I need to look to confirm that. Which time period are you talking about?
Q. 2009. Citizens petition.
A. Oh, that is true. In the citizens petition, that is true, yes. But I -- but...
Q. I mean, it says in the letter, "We're submitting a report written by Drs. Huncharek and Muscat," correct?

A. In the cover letter from the CRE?
Q. From -- not CRE, from PCPC.
A. Okay. So let -- I need to -- I need to refresh my memory on the way the submissions were made. I apologize.
Do you remember which paragraph that you're referring to?
Q. Well, it's throughout your report you're talking about the citizens petition.
A. So it's my recollection, based upon the documents that I have seen, that it was not a transparent process at all times that Drs. Huncharek and Muscat were being identified as independent consultants and were not ones that were being actually paid by the industry for some of the work that they did. And I think that's discussed in my report.
Q. Well, let's break that down.
A. If you want me to confirm the issue of the 2009 -- if you will point me to where you say I discuss this, I will confirm that or not.

Q. Well, let me break it down.
Citizens petition submitted in 2008, right?
A. Well, there were two: one in 1994 and another -- I'm sorry, 1992, and another in 2008.
Q. Well, there are actually several more than that, but let's just focus on the 2008.
In 2008, a citizens petition was submitted?
A. Yes, that is true.
Q. And PCPC responded to that citizens petition in 2009, correct?
A. They submitted comments. Is that what you're asking me? Yes, they did.
Q. Yes.
And that was a cover letter, correct?
A. A cover letter -- that's all it was was a cover letter?
Q. Well, attached to the cover letter was a report from Drs. Huncharek and Muscat?
A. Yes, that is true.

Q. And you're not aware of any other document indicating that PCPC ever hired Drs. Huncharek or Muscat?
A. So that's where I'll need to go back and look at the documents, because -- that I have discussed. So I need to find that on my paragraph.
If you want to go off the record for a minute so I don't waste your time, I will look.
Q. Sure.
A. It's up to you. Or we can stay on the record.
MR. LOCKE: I'm fine going off.
VIDEOGRAPHER: We are going off the record at 4:23 p.m.
(Off the record at 4:23 p.m.)
VIDEOGRAPHER: We are back on the record at 4:25 p.m.
QUESTIONS BY MR. LOCKE:
Q. The question I asked: Are you aware of any other document indicating that PCPC ever hired Dr. Huncharek and Muscat other than for the 2009 response or submission to the citizens petition?

A. I would have to pull this document, but in paragraph 90 I make a statement: A 2005 response written by Dr. Muscat says -- this is not '09, this is 2005, and Dr. Huncharek critiqued the work of Dr. Cramer, who also failed to disclose the financial relation -- I'll start over.
Okay. So I'm sorry to repeat myself, but there was a little noise.
You asked 2009. So the other time period I have in my report in paragraph 90 talks about 2005, but I'd have to pull this document.
But I am citing to the deposition of Dr. Loretz, who was a PCPC employee, so I think I would need to pull this in order to confirm.
But I see depositions of her and Dr. Nicholson as talking about them failing to disclose the financial relationship between their work and industry.
Q. So if Dr. Loretz did not testify that PCPC had retained Drs. Huncharek and Muscat in 2005, you'd have no other evidence?

Page 366

A. I can't answer that definitively, but this is what I would point you to. So I'd have to pull these documents to confirm, but I have -- both paragraphs 89 and 90 address these general issues for you, but I think that's the sentence and the documents that I think would be relevant. But I'd have to pull them to fully answer your question.
Q. The reason I ask the question is because you frequently say "the cosmetics industry" without identifying a party or a person. And -- well, I'll just leave it at that.
A. And I guess the reason I'm saying I need to -- I'm questioning that it doesn't have to do with PCPC is because I am citing to a deposition of their employee. So I need to -- I would -- to affirm it, though, I'd need to -- I don't want to say that 100 percent the answer to your question is this is the evidence, but I believe that I would need to go here to confirm one way or the other. But certainly I would -- this raises suspicion about that for me.

Page 367

Q. You have no evidence that PCPC ever retained the Center for Regulatory Effectiveness; is that correct?
A. I believe my evidence is hiring through Imerys, but let me look to make sure that is true.
Q. Why don't you look at page -- or I'm sorry, paragraph 95, page 63.
A. That's where I am. That's where I am, so let me read what I have here because it's been a while since I've read this paragraph.
So the question is, do I have in evidence this paragraph that PCPC directly hired the CRE?
No, that is not provided by this paragraph.
Q. Okay.
A. However, in this paragraph, based on these documents that I'm seeing and I'm -- my memory of what is discussed, certainly I believe PCPC would have been aware of the interaction of CRE at these time points when I'm talking about this event -- these events.

Page 368

Q. What evidence do you have of that?
A. Based upon the close interaction between PCPC, Imerys and Johnson & Johnson throughout these time periods when different actions were being taken to comment or to submit information on behalf of industry.
Q. Do you have a single document you can point to or is that an assumption?
A. That is something I seem to remember based on my review of these documents, but if you need a document, I would have to -- have to go and look for it.
Q. Sitting here today, you can't recall?
A. I can't give you a specific document as I sit here today, no.
MR. LOCKE: I have no further questions.
MR. MEADOWS: Yeah, short break. Maybe we're done, maybe we're not.
VIDEOGRAPHER: We are going off the record at 4:30 p.m.

Page 369

(Off the record at 4:30 p.m.)
VIDEOGRAPHER: We are back on the record at 4:45 p.m.
CROSS-EXAMINATION
QUESTIONS BY MS. PARFITT:
Q. All right. Dr. Plunkett, good afternoon. I know it's been a long day.
Dr. Plunkett, you were asked throughout the course of the day about different constituents which are part of the talcum powder products.
Do you recall those questions?
A. Yes.
Q. All right. If -- without going through each and every one of different constituents that we've talked about that are contained or could be contained in the talcum powder products, if they are present, do those various constituents present and provide biologically plausible evidence that talcum powder products can increase the risk of ovarian cancer?
MS. BOCKUS: Object to the form.
THE WITNESS: Yes, which is --

I think I have a couple of paragraphs where I talk about that issue. It has to do -- there's other information as well, but that is a key piece of that information. And I focused on mode of action and additivity. That's on mechanism, biologic plausibility.

So the fact that you have a variety of constituents that have a known cancer hazard that share a mode of action, that increases your confidence in the biologic plausibility of that relationship between ovarian cancer and exposure to talc body powders, yes.

MS. PARFITT: Thank you. I have no further questions. Thank you very much, Dr. Plunkett. And a happy holiday to you.

THE WITNESS: Thank you.

MS. BRANSCOME: I have no questions.

MS. BOCKUS: No questions.

VIDEOGRAPHER: The time now is 4:47 p.m. This concludes the

deposition, and we are going off the record.

(Deposition concluded at 4:47 p.m.)

– – – – – – –

CERTIFICATE

I, CARRIE A. CAMPBELL, Registered Diplomate Reporter, Certified Realtime Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, Laura Plunkett, Ph.D., DABT was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

________________________

CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
California Certified Shorthand Reporter #13921
Missouri Certified Court Reporter #859
Illinois Certified Shorthand Reporter #084-004229
Texas Certified Shorthand Reporter #9328
Kansas Certified Court Reporter #1715
Notary Public

Dated: 12/20/18

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

ACKNOWLEDGMENT OF DEPONENT

I,_____________________, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

______________________________________
Laura Plunkett, Ph.D., DABT DATE

Subscribed and sworn to before me this _______ day of _______________, 20 _____.
My commission expires: _______________

Notary Public

-------
ERRATA
-------

PAGE LINE CHANGE/REASON

| PAGE | LINE | CHANGE/REASON |
| --- | --- | --- |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |

-------
LAWYER'S NOTES
-------

| PAGE | LINE | |
| --- | --- | --- |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |

**A**

**a.m** 1:15 6:7 25:10,11,13 94:23,24 95:1 99:22,23,25
**abbreviation** 108:4
**ability** 46:12 64:23 70:5,10 72:10 185:5 210:13 213:20 223:7,10 254:11 273:23 277:7 278:22 372:10
**able** 39:8 42:15 51:17 61:3 70:22 92:23 123:19 125:6 158:23 172:18 172:22 196:1 225:1,10 226:5 231:13 235:23 239:5 265:23 282:15 291:25 292:3 301:16 305:24 359:6
**absence** 261:9
**absolutely** 60:18 72:6,24 171:9 204:23 213:10 223:12 232:4 247:6,21 293:7 294:14 299:15 304:22 305:3 314:2 320:3 325:23 333:17 334:22 348:23 351:13 352:4
**abstract** 314:2
**abstracts** 313:18 313:22 315:1
**Academy** 352:24 353:14 354:6,16,19
**acceptability** 311:10
**acceptable** 119:25 311:22
**accepted** 78:15 98:13 297:8
**accepting** 351:25
**access** 57:13 121:17 123:18 144:11 163:12 164:13 246:7 246:12
**accessibility** 264:24
**account** 95:17 100:5 131:12 131:19,22 228:14 243:24 246:18
**accumulated** 30:8
**accurate** 66:13 66:15 315:25 316:6 322:22 373:18
**acknowledge** 105:18
**ACKNOWLE...** 374:1
**ACOG** 192:3
**act** 265:24
**action** 268:10 275:23 278:6,6 289:8 292:25 295:5 370:6,11 372:12,14
**actions** 368:6
**active** 27:12 246:22
**activities** 31:6
**activity** 317:23
**actual** 26:1 66:2 103:13 108:23 121:18 166:22 170:15 277:21 288:15,16
**acute** 126:5 128:12,13,16 178:9 179:14 179:21 242:19
**add** 21:2 53:19 228:21
**added** 47:10 54:14 68:1 122:6 146:13 211:25 228:19 308:23
**addition** 53:15 123:14 215:1 270:3
**additional** 10:3 10:7 17:20 20:22 21:2,6 21:10,12,14,18 21:20 27:5 32:12 33:14 55:14 68:15,16 81:12 82:15 94:7 97:14 146:17 301:20 331:8
**additionally** 338:23
**additive** 275:25 278:3 289:10 289:18 291:6 292:14
**additivity** 146:14 167:3 225:6 278:7 289:5 293:2 370:6
**address** 29:5 30:20 73:23 78:5 134:17 179:2 182:24 217:10 220:11 244:12 329:22 366:5
**addressed** 97:10 275:2 287:24 350:25
**addresses** 103:17 105:4 108:7 292:23 296:2
**addressing** 130:25 193:14 351:23
**adds** 168:19
**adequate** 112:14 112:18
**administered** 340:3
**administration** 242:14
**admit** 134:24
**admitting** 134:24
**adopted** 213:12
**advance** 122:5 343:11
**adverse** 128:2 139:4 140:16 140:20 236:12 242:15,22 294:10
**advertising** 44:8
**advice** 44:13 45:10,12,25 46:2,5,8,13 202:20 334:9
**advise** 45:17 297:15
**advising** 45:13
**Advisory** 355:8
**affect** 72:10 99:3 125:25 128:1 150:7 168:18
**affiliated** 26:9
**affiliation** 245:7 354:23
**affiliations** 245:2
**affirm** 366:19
**afternoon** 19:5 201:2,4 287:16 369:7
**age** 7:21
**agencies** 244:4 269:6 290:13
**agency** 43:18,22 284:3
**agent** 38:15,17 39:20 220:25 221:3 234:22 264:6
**ago** 28:25 288:9
**agree** 45:21 59:5 73:13 78:9 81:25 91:20 106:20 135:24 142:24 152:2 154:13 157:2 159:2,8 173:15 175:2,8 179:7 179:13,15 180:2,4 181:3 195:1,8 198:6 203:5 207:16 210:5 213:4,11 214:12 227:3 228:13,24 232:18 233:23 234:20 238:8 241:11,24 254:17 264:4 264:13,15 270:16 279:9 287:25 293:25 294:7,14,23 295:1,9,20 307:20 308:3 309:9 311:1,6 318:5 319:16 319:21 320:2,6 324:15 332:21 333:12 336:8 339:11 341:4 342:9 343:20 348:21 353:13 357:8 360:13 360:15
**ahead** 13:5,13 13:15 358:11
**air** 177:14,16
**al** 4:20
**Alabama** 2:6

**Alexandria** 2:10
**align** 194:24 195:24
**allege** 275:11
**alleged** 126:21
**Allen** 2:2 3:18
**allow** 82:18 144:3 158:9 172:6 182:13 185:23 229:17 230:3 232:8 237:12 240:9 240:13 300:18
**allowable** 311:14
**allowed** 328:19 359:1,9
**allows** 36:6 41:6 176:17
**alternative** 202:25
**America** 3:5
**American** 247:9 351:12 352:24 353:14 354:6 355:3
**amount** 298:11 299:2 300:14 306:5 310:19 357:5 358:17
**amounts** 129:11 178:5,7,21 227:2 311:4
**amphibole** 255:4
**analyses** 257:20 311:20
**analysis** 8:10 31:24 34:7 35:4,6,15,16 36:22 38:4,12 41:18 70:25 71:9,14,21 72:4 74:15,17 74:19 75:2,10 90:10 91:21 93:14 95:5 96:4 113:17 114:12 116:25 117:25 119:15 124:5 131:12 131:16 137:4,7 139:12 143:1,4 143:9,10 144:3 144:8,14 161:5 161:24 162:4 162:22,23 163:8 164:16 165:20 176:9 176:10,20 177:1,1 185:16 201:17 203:12 203:17 205:2 207:4 209:14 210:2,10,25 215:8,18,22 217:24 218:2,5 218:18,25 219:13 234:22 235:4,5,7 244:24 246:8 247:21 248:16 248:23 255:22 259:4 263:17 265:18 266:7 271:25 275:13 275:19 277:13 310:16 311:23 313:12 325:16 325:18 326:19 329:22 331:4 331:20,22 332:2 333:5,6 333:7,10,13,14 348:13,24 357:23 358:1
**analyze** 36:23
**analyzed** 138:2 250:24 251:5 266:11 348:17
**analyzing** 141:14 154:16 217:21 261:7 357:25
**anatomy** 216:13 302:14
**and/or** 128:2 277:9
**Andersen** 349:9
**Anderson** 250:3
**Angeles** 2:23
**animal** 36:14 37:15 68:5 69:13 71:25 88:4,14 101:10 101:16,25 104:5 115:4 117:9 118:6,9 142:6 156:16 172:18 182:11 205:24 207:5 207:19 208:5 208:16 217:1,6 218:3,11,11 219:7 224:1,2 229:2 230:17 230:22 231:17 231:20,23 232:5,12 237:20 238:22 238:22,23 240:7,9,12 241:13 280:5 291:17
**animals** 101:12 101:18 220:11 220:12 231:9 232:16 242:15 270:6,20 271:1 271:8,10 279:24 291:21
**answer** 24:16,18 24:22 25:1 37:6 40:20 42:16 50:21 51:9 56:3 60:4 68:13 78:6 83:8 88:25 92:23 93:20,23 94:15,17 96:25 112:3 136:5 139:19 140:5 141:4 146:23 159:22 192:10 193:24 210:14 217:16 218:16 222:12 226:1 229:17 232:7 250:16 263:17 273:16,20 288:4,8 300:22 308:18 309:6 318:19 343:2 355:10 359:4 360:25 366:1,8 366:21
**answered** 45:2 90:14 93:19 139:9 141:8 237:7 261:2
**answering** 134:18
**answers** 88:22 232:6 358:21 374:5
**anthophyllite** 254:1
**anticipate** 176:23
**Antonio** 3:4
**anybody** 45:15 84:12 160:25 242:2 302:12 302:12
**apart** 76:14
**apologize** 11:15 64:8 105:10 201:13 251:12 298:14 313:15 319:8,10 323:6 327:24 330:6 362:6
**app** 185:18
**apparent** 223:6
**appear** 28:5 68:3 303:1 315:7
**APPEARAN...** 4:3
**appears** 65:19 172:10
**appendix** 63:22 63:22 337:12
**apples** 120:8
**applicable** 212:21
**application** 36:17 37:3 64:24 67:10,16 175:13 177:17 181:20 184:12 184:20 185:19 186:8 203:22 212:22 214:15 264:1 296:21 296:22 297:11 299:1,9 300:11 300:16
**applications** 5:1 200:10 211:12 295:24 300:12
**applied** 92:21 99:8 149:12 173:16 183:3 186:7 258:24 299:5 302:15
**applies** 41:17 91:10,13 298:18
**apply** 38:25 40:1 90:10 160:21 207:18 214:3 278:7
**applying** 259:1 301:2,9
**approach** 79:11 205:21 212:23 214:16 218:18
**appropriate** 30:11 45:18 47:5,16,25 48:20 49:9 50:2,19 51:20 52:19 373:6
**appropriately**

239:15
**approval** 186:4 298:1
**approximately** 347:11
**approximation** 69:4
**area** 30:14 35:12 54:24 59:21 61:16,16 62:4 131:1 262:14 281:5 298:19 334:7 337:21 345:2 355:24
**areas** 54:15 56:22,22 58:13 58:14,15 61:21 61:24 81:17 94:7 336:1
**argue** 182:5 224:12 225:25 327:10
**argument** 188:19
**arising** 181:1
**Arlon** 250:4
**Arndt** 3:20 6:3
**arrived** 12:10
**arsenic** 267:1 268:23
**article** 26:7 27:10 60:10 63:4 68:19 69:4,12 99:4 135:21 251:17 313:25 350:11 350:24 351:4
**articles** 25:23 26:1,4 27:6,22 59:12,15,24 60:20 61:6,18 62:16 63:11,18 64:2 68:15,16 71:23 83:9 87:13 98:11,11 100:14 103:21 121:20 122:19 122:21 124:4 133:9 137:4 184:2 249:25 250:12,24 286:18 350:18
**articulated** 202:8
**asbestiform** 147:1,2,15 148:24 149:17 151:6 161:12 161:22 162:13
**asbestos** 57:21 146:13 148:3,3 148:5,11,11 162:14 163:17 197:3 221:14 224:16,17,22 226:15,18 248:10 249:16 249:21 250:9 251:9,10 252:14 253:17 253:18,23 254:3,9,20 255:3,5,8,12 255:15,17,23 256:4,12,21 257:6,16 258:6 258:10,18,19 259:4 260:1,11 260:12,20,23 261:9 262:7,10 262:11,23 285:4,5,8,16 286:3,9
**asbestos-free** 223:20 257:22 258:22 260:16 261:4
**asbestos-like** 250:10
**asbestos-only** 226:11 285:10
**ASHCRAFT** 2:8
**aside** 11:20 23:24 161:13 180:3 218:25
**asked** 18:6 29:5 29:19 30:3,6 30:19 31:20 44:7 45:1 50:17 53:17 54:19 55:1,6 62:15,19 82:7 89:1,2 92:9,24 93:4,12 94:6 96:15 154:23 174:6 182:1 201:21,25 237:8 239:6 241:4 273:19 286:14 298:10 322:13 323:4 323:14,17,17 327:9 334:1,6 334:10 340:16 360:19 361:3 364:21 365:10 369:8
**asking** 23:16 25:17 28:8,11 28:15 39:25 40:2 41:16 48:25 49:3 50:6,7,15,24 71:6,8,11,12 102:9 110:1,3 113:23 134:5 144:2 145:4,5 168:2 176:15 203:14 206:12 210:14 211:1,5 219:5 225:18 229:12 233:8 233:10,11 234:18 235:1 236:25 260:18 271:1 274:20 277:18 284:22 298:16 312:12 315:12 321:11 321:13,15 325:7 326:25 332:11 341:24 346:20 350:6 353:25 358:22 359:5 360:17 360:18 363:16
**aspect** 256:5 346:18
**aspects** 34:2 216:19
**asphyxiate** 178:24
**asphyxiation** 178:18,20
**assays** 257:19
**assess** 52:25 140:2 185:23 235:22 282:6
**assessed** 256:6 319:24
**assessing** 35:21 115:4 153:16 209:19 235:25 355:20
**assessment** 4:22 16:12 17:8 31:5 34:20 35:11,13,24 36:12,14,18,20 36:21 38:3,11 39:3 40:24 49:21 74:11 75:21,22 76:1 76:25 77:1 78:11 79:3,5,6 81:5 82:9 85:22 87:6,22 89:6 99:13 107:3 114:20 115:8,13,17,24 117:19 120:10 120:11 122:1 122:23,25 123:2,5 126:12 127:4,12 135:16 136:6 138:7,19 141:6 141:22 149:10 150:7,22 153:9 153:12 154:24 154:24 155:2 157:16 159:23 165:21 169:23 170:21 171:8,9 171:10 173:7 191:25 193:2 196:24 197:12 197:13,21 198:16,16 199:5,10,25 201:6,14 202:3 203:13 204:5,8 204:11 205:8 205:10,11,13 205:15,23 206:20 210:12 212:20 213:9 214:1,4 216:3 221:16 230:6 234:17 236:2 238:5 244:20 246:17 255:25 268:20 271:12 272:22 275:6 275:20,24 278:8,20 283:3 285:8,22 289:11,14 291:3,4 294:21 294:24 314:12 314:23 320:1 321:24 323:19 324:11,11,16 324:17,20 325:25 326:15 327:20 328:1,6 328:9,22 329:18 330:9 330:19 331:3 331:25 332:14 333:14 334:16 346:5 353:9 357:6
**assessment's**

**assessments** 85:9 99:9 115:21 117:5 149:19 209:7 230:20 273:17 277:4,5 329:10 336:18 346:12 351:7 360:8
**assessor** 143:16 167:6 334:3
**assign** 78:12 82:21 95:24 97:3,6 105:19 106:10,17 210:20,22
**assigned** 79:7 89:3 96:5 134:12 227:8
**assisted** 25:18 25:21
**associated** 47:6 80:3 154:17 157:3 178:15 235:8
**association** 4:19 38:23 112:15 112:17,18,22 119:5 204:1,3 204:17 322:4 326:17
**assume** 89:9 148:10 261:18 275:23 282:9 294:21
**assumed** 285:9 317:4
**assumption** 282:8 368:10
**assurance** 222:14
**assure** 223:10
**attach** 180:14
**attached** 5:3 363:22 373:11 374:7
**attaching** 180:19
**attack** 180:21
**attempt** 88:25 132:9 160:6 161:10,19 171:1 172:12 182:2 187:13 208:20,24 214:20 224:24 250:22
**attempted** 165:13 215:2 219:5 237:18 240:23 243:9 272:5,6 281:7 295:16 316:1
**attempts** 130:15
**attend** 344:20
**attended** 344:6 344:8,16 345:3
**attending** 11:13
**attention** 84:17 212:4 253:6
**attorney** 24:8,14 54:5 372:11,13 373:15
**attorney's** 25:4 53:17
**attorney-client** 23:23
**attorney/client** 54:4
**attorneys** 12:8 12:10 18:13 22:14 23:17 25:16,16 53:24 54:19 116:8 334:24
**attribute** 315:1
**August** 4:15 14:16 20:3,9 267:3
**author** 27:5 105:7 240:2
**author's** 16:14 241:11
**authoritative** 336:12 339:17
**authorities** 66:19 81:22
**authority** 45:9 82:8
**authors** 105:21 105:21 117:19 135:1 207:4 209:1 239:19 240:19,24 245:3
**authorship** 245:15
**automatically** 247:14
**availability** 283:13
**available** 21:11 21:13,15 53:23 54:16 62:2 67:3 73:23 86:17 90:25 115:20 118:2 121:22 138:4 139:1 140:2 141:12 156:23 165:23 170:5 172:6,14 187:24 194:10 194:11 197:15 224:13 235:19 237:11 248:20 251:4 253:11 253:13 260:17 276:16 293:24 316:14 328:10 331:1 337:4,6 340:1 345:8
**average** 302:8
**avoid** 129:10
**avoiding** 202:25
**aware** 68:10 108:1,5,10,11 109:8 120:24 122:10 131:20 136:9 142:14 154:8 177:17 177:19 178:17 187:25 248:14 251:15 261:11 308:9 320:23 320:24 321:3 321:21,25 322:6 343:1,4 343:5 345:21 346:14,15 349:11 353:17 354:9,20 355:1 355:5 357:20 364:1,22 367:23

**B**

**baby** 8:11 10:25 19:9 34:12,18 37:2,2 40:12 41:3 80:4 117:2,24 124:7 126:14 133:21 141:1 143:3 144:7,19 150:25 151:4 153:23 155:17 157:4 160:23 161:13 167:19 169:10 170:8 173:20 176:4 176:23 180:5 188:11 198:2 248:1,5 249:11 249:14,22 250:14 251:16 252:12,15 308:19
**back** 15:2,16 17:14 25:12 29:23 32:7 51:11,25 52:3 61:8 63:18 68:20 69:6 74:11 94:25 99:24 118:12 136:14 137:15 137:17,20 146:7 188:6,23 200:24 215:15 246:15 273:16 276:16 280:4 287:6,22 321:6 321:7 346:22 355:23 364:5 364:18 369:2
**background** 157:13 160:4 171:21 172:11 199:13 260:1 286:9 306:25 336:15 356:21 357:14,17,20
**badly** 232:2
**bar** 352:15
**barriers** 232:23
**based** 18:3 20:24 22:10 28:23 29:11 30:22 32:19 36:8,14 39:5 39:11 40:21 41:23 44:18 48:6,11 49:14 50:22 71:15 82:15 83:21 85:8 86:6,19 87:14 92:10 94:18 98:24 105:15 116:5 117:13 118:3,6 121:5 125:6 126:12 140:1 144:7 146:23 150:14 154:1 156:24 169:23 172:16,22 173:16 174:2 182:7,19 185:6 187:22 191:10 194:19 197:22 205:2,24 207:25 208:4 210:12 215:25 217:15,18,25 223:5 225:9

226:21 233:1 245:2,22 247:3 247:17 250:20 257:17 258:7 264:4 269:16 270:25 274:15 293:16 297:8 299:12,17 301:11 302:14 304:25 307:1 309:1 310:15 311:22 315:7 316:13 319:25 320:7,8 324:8 327:10 328:10 330:19,25 334:6,7 342:14 347:18 348:16 356:13 361:9 362:12 367:20 368:3,12
**basic** 35:25 36:18 38:7 79:21 274:6 323:17,18,23
**basing** 49:25 284:15
**basis** 50:18,25 61:11 98:16 150:12 155:5 200:15,15 232:12 258:13 271:16 272:1 280:8 302:3,21 346:3
**Bates** 22:6 58:25
**bathroom** 299:7
**Baylen** 2:14
**bear** 47:4
**Beasley** 2:2 3:18
**Beattie** 2:4 6:22 6:22 18:17
**beauty** 145:7
**becoming** 220:19 223:6
**began** 23:7 31:24 317:8
**beginning** 206:22
**begins** 64:2 267:13
**behalf** 7:24 8:6 53:11 246:21 248:4 287:10 322:11 351:11 368:7
**belief** 31:25 71:22
**believe** 10:1 15:25 17:25 18:1 19:15,24 20:12 29:11 31:12 32:8 33:16 39:9 41:1 48:3 62:1 66:14,19 71:16 81:4,16 82:3 83:9 89:23 93:19 95:11 96:19 98:9,17 100:8 105:24 106:1,3 108:21 109:3,12,13 110:15 111:1 119:8 120:8,14 134:17 139:9 141:23 143:15 143:24 157:12 157:23 158:13 158:23 160:18 162:6,9 163:18 163:20 173:6 175:12 181:15 182:1,9,16,25 183:4 185:4 187:21 188:20 189:5,6,14 190:19 191:3 191:10,14,16 192:6,7,23 196:12 197:18 198:19 199:9 200:12 201:22 203:24,25 204:17 206:16 207:24 209:8 212:2 213:7 219:8 222:14 223:3 243:21 244:2 245:21 247:18 248:16 251:18,19 254:23 257:7 257:15 258:7 269:25 271:20 276:15,17,22 278:10 279:3 280:14 281:19 283:7 286:13 288:8 299:11 299:17 300:6,9 300:13 306:20 308:24 314:6 318:23 332:19 335:16 336:24 337:13,19 339:12 340:15 340:15,18 342:6 344:18 344:20 345:2 349:8 354:6 357:2,16 366:22 367:4 367:22
**believed** 122:14 273:13
**bell** 206:5
**beneficiation** 131:13 132:1
**Bergfeld** 352:21 354:14 355:13
**best** 110:20 159:21 372:9
**better** 110:18 228:10,11,12 230:21 357:11
**beyond** 220:14 220:15,22 235:14 327:19
**bias** 245:22
**big** 263:13
**biggest** 182:22
**bill** 10:20 11:24 12:1
**billed** 11:24
**billing** 10:3,7,15 17:18 19:23 20:14,15,17 62:22
**bin** 118:8,9,10 217:9,23 252:24,25,25 254:5,6
**binning** 216:16 216:20,25 217:14
**bins** 118:8 217:2 217:18 281:7
**bioaccessibility** 265:2
**bioaccessible** 264:8,10,13,18 264:21
**bioassay** 232:4
**biocompatibil...** 266:18
**biologic** 34:4 37:13 77:9 88:9 179:8 193:1 194:2,7 194:18 195:9 195:14,16 268:11,11 289:3 314:20 370:7,12
**biological** 106:2 124:14 179:9 188:10,25 189:16 192:14 194:14 195:2 195:12 196:6 219:23 278:12
**biologically** 42:10,11 189:8 191:22 194:2,6 194:24 196:12 221:19 227:18 229:14 277:6 369:20
**biology** 294:17
**biopsies** 186:2
**bit** 31:11 35:21 37:8 38:10 39:16 42:18 53:5 81:18 95:4 165:5 201:5 339:7
**Blejer** 250:4
**blood** 264:12 312:3,21,23 313:3,10
**Blount** 163:4,15 250:2 252:5,11
**Blount's** 162:9 249:6 251:15 252:2
**board** 105:14
**Bockus** 3:1 4:6 7:10,10 94:12 287:15,18 292:10 293:10 296:13 297:12 298:15 299:23 300:19 303:11 303:17 304:17 306:14 307:18 308:1,10 309:7 310:1 312:1,6 312:13 315:20 317:1 318:24 369:23 370:23
**bodies** 31:16 65:5 67:11 161:1 173:11 256:6,19 332:23
**body** 21:23,24 22:4 36:5 41:17,18,19 63:20 67:15 78:22 118:21 121:14 125:18 128:18,19 129:15 130:14 146:20 150:10

154:11 161:20 162:25 164:8 170:3 173:9 175:21 192:21 198:21 219:18 228:4 232:20 233:17 253:4 256:15 265:16 283:1,9 293:18 295:14 301:15 301:16 306:23 313:2,9 316:14 318:3 320:7,9 325:24 329:3,4 370:15
**body's** 228:14
**bottle** 145:3
**bottom** 267:13 318:15 359:10
**Bouquet** 142:22 143:2,14 144:5 144:8,13 145:13 163:21 164:2,10
**Bradford** 74:14 74:17,18,21 75:2,9 114:20 159:14 194:8 195:9 196:17
**brand** 164:8
**brands** 162:24
**Branscome** 2:21 4:5 7:14,15 8:2 8:6,15 13:14 13:19 16:18 17:11 23:19 24:10,21 25:2 25:6,14 28:16 29:15 32:14 33:11 39:14 40:3 43:1 45:7 49:4,24 50:16 51:15 53:3 56:14 59:4 73:12 74:9 75:6 87:1 88:19 90:2 91:6 93:10,24 94:20 95:2 96:17 99:19 100:1 106:8 107:7,21 111:6 111:16,24 113:24 118:23 121:19 127:13 130:8 131:24 133:3 134:8 135:19 137:2 137:14 139:7 140:3 142:11 144:1,20 145:15 146:1 155:11 156:20 158:11 160:1 161:3 162:20 164:6,15 166:1 167:15 171:16 174:4,13 176:8 180:1 181:9 183:11 185:15 187:11 188:1,8 190:22 193:21 196:3,18 199:15 200:19 201:1 211:16 215:14 221:23 223:23 234:5 234:19 238:19 241:9 242:6 253:15 255:21 259:11,20 260:24 261:14 262:1 263:4 270:23 279:8 280:7 282:14 284:5,24 287:1 287:8 370:21
**break** 76:14 94:12,19 100:12,20 169:17 287:2 362:21 363:1 368:22
**breaking** 137:24
**brief** 286:16
**briefly** 17:16 287:23
**bring** 9:23 10:2 16:11 157:15 201:12 251:13
**bringing** 105:12
**brings** 77:22 155:1
**broad** 227:5
**broader** 29:14 134:6 326:5
**broke** 140:7
**broken** 100:18
**brought** 16:20 169:19 349:10
**bucket** 324:3
**buckets** 323:23 329:9
**bullet** 15:19,21
**bullets** 135:9
**burden** 313:2,9
**bursal** 101:19

**C**

**C** 2:1
**cadmium** 267:2 268:24,25
**calculate** 36:15
**calculating** 88:14
**calculation** 259:7,9 263:25 264:3
**California** 1:18 2:23 349:13 372:19
**call** 30:14 35:14 54:3 64:6,7 77:1 92:6 118:7 124:16 252:25 307:24 309:3,4 310:21 311:13 336:8
**called** 20:16 26:9 35:11 53:17 63:18 107:23 108:2 151:2 202:2 206:1
**calling** 112:16
**calls** 24:16
**Campbell** 1:16 7:18 372:3,17
**Canada** 5:2 16:13 17:5 117:20 201:6 201:14,17,25 202:10 204:13 204:25 205:6 205:10 206:20 211:8,12 212:8 282:23 283:21 284:13
**Canada's** 4:21 284:7
**Canadian** 78:25 79:4 87:12 89:11 90:21 91:19,20 93:14 191:25
**canal** 180:9
**cancer** 4:20,23 4:25 34:13,19 34:19 36:13,15 37:4 40:14 41:4 57:1,1,2 57:21 61:17,18 61:20,20 62:9 80:5 86:22 88:15 107:9,12 107:17 108:6,8 109:18 110:5,7 110:13,24,25 111:2 112:6,8 112:24 113:10 119:6 124:6 125:10,12 127:21,23 149:19 151:21 156:11,15,18 157:6,9 158:3 160:4 165:10 169:4 171:23 173:21 176:3 179:10,23 180:25 181:12 188:13 189:1 189:18 190:2 190:12 191:1 191:12,23 192:5,17 193:4 193:5,18 194:15,23 196:2,7,22 198:3,23 200:5 202:12,19 203:7 204:16 207:22 208:23 220:1 221:3,10 223:1 227:14 227:21 228:9 229:20,21 232:3 236:20 237:4,15 238:10,13 239:19 240:15 241:23 254:12 254:23 256:8,8 256:23 258:1,4 260:21 264:8 269:1,18,19,23 270:12 271:15 271:16 272:2,3 272:13,18,19 272:25 273:6 273:10,12,13 273:15,21 274:1,13,14,25 275:7,17,20 276:6,14 278:7 279:20,23 281:14,22 282:19 285:4 285:17 286:5 286:11,19,23 288:20,24 289:7,14 291:11,12,13 291:18 294:17 294:20 306:19

306:24 312:8
319:19 321:2
322:5 324:7,12
324:12,22
325:2,17 326:1
326:5,24 327:6
330:1 331:5
332:7,15
335:17 369:22
370:10,14
**cancers** 270:8
271:20,21
**capability**
140:19 279:22
**capable** 181:25
266:1 275:16
**capacity** 312:24
**carcinogen**
197:6 271:18
280:25 281:21
281:24
**carcinogenesis**
227:25 272:12
274:6 277:6
**carcinogenic**
88:10 148:7
197:3,10 198:7
220:20 256:3
256:10 257:11
268:18 278:2
279:17,18
282:1,19 288:3
288:13
**carcinogenicity**
151:9
**carcinogens**
254:16 256:13
256:17 269:7
275:12,22
276:11 280:20
282:9
**Care** 3:10 7:4
31:1 319:6
**careful** 225:12
315:23
**carefully** 373:4
**Caroline** 3:12

7:5
**caroline.tinsle...**
3:13
**Carrie** 1:16 7:17
372:3,17
**carried** 264:12
**carry** 170:23
313:1
**carrying** 245:13
**Casarett** 289:20
290:4,5,15,16
290:18
**case** 10:10,24
19:16,18 32:17
40:12,14 60:13
85:13 91:14
96:12,14 97:11
97:18 116:8
122:8 126:24
173:17 226:11
226:12 230:19
231:11 232:8
236:17 237:13
239:3 255:17
268:16 287:19
311:7 318:8
329:2 335:6
342:12 357:25
360:21,24
**case-by-case**
98:16 155:5
**case-control**
79:16 113:3
**case-specific**
304:3 305:7,22
305:25 306:2
**cases** 1:7 11:2,5
11:9,19 19:19
29:14 33:21,23
78:18,19 82:6
82:10 85:16
92:15 116:19
134:25 135:5
178:16 179:17
227:25 231:23
245:25 248:10
262:3,5,8,12

262:17 334:24
346:22
**Cashmere**
142:22 143:2
143:14 144:5,7
144:12 145:13
163:21 164:2
164:10
**categories** 31:20
56:19,21 138:8
208:17,25
210:7,17
215:17,20,25
**categorization**
209:24
**categorize**
141:13 210:11
326:3
**category** 151:6
197:8 210:23
**causation** 34:1,7
35:1,6,15,15
36:21 37:21
38:4,11 39:2
41:18 79:11
119:14 192:16
203:12,17
285:18 326:19
331:20,22
332:2 358:1
**cause** 34:3 37:3
75:14 110:15
110:16,22
128:9 189:1,18
190:11,25
196:6 220:1
221:3 254:12
264:22 269:17
269:18 270:1
270:12 272:2
273:10,13
276:6 286:4
314:17 324:6
325:1,17
326:24 327:5
332:7
**caused** 181:12

195:5
**causes** 34:13
38:15 110:25
220:25 286:18
**causing** 157:6
196:21 208:23
260:20 266:2
270:13 275:16
**caveat** 198:24
**cell** 220:3,7,8
221:25 222:4,4
222:9 228:24
233:1,4,14,16
233:24,25,25
234:8,10,14,16
237:21 279:19
279:20,20
281:16
**cells** 224:2
228:10,21,22
233:10,16,20
233:20,21
281:18
**cellular** 220:6
228:16 314:9
**Center** 367:2
**certain** 12:15
15:11 34:2
38:2 44:15
53:18 77:17
78:14,17,18
84:19 99:1
114:15 125:2
131:7 140:15
140:16 150:1
151:4 152:17
153:3,5 159:17
175:10 190:1
216:4 219:9
225:3 226:16
228:23 231:8
232:22 237:24
253:4 271:10
294:19,20
311:23 320:22
**certainly** 25:24
32:20 38:1,7

40:23 42:5,23
51:25 59:22
70:18 71:13
73:4,24 74:20
76:24 79:13,20
81:25 83:17,19
85:7 86:5
87:12 89:22,22
91:25 98:17
99:11 101:3
116:20 119:17
123:20 128:23
129:25 130:12
135:12 136:9
137:23 138:1
138:16 143:12
143:13 144:13
149:9 150:3,6
150:21 153:10
153:13 155:22
158:21,24
160:20 162:2,3
167:5,9 168:5
169:13 172:23
173:8 175:18
177:19,24
178:1 179:21
184:7 185:22
187:23 191:9
200:12 209:4
216:18 219:3
223:15 227:17
227:24 229:21
230:5 234:13
235:21 245:4
245:17,20
246:24 248:19
249:15 252:23
253:5 254:15
257:18 260:8
263:5 270:17
273:3 277:19
294:23 298:25
305:10,17
312:22 314:11
315:9,17 317:5
317:19,21

318:5,8 319:25 323:15 326:9 332:16 336:16 337:19 339:2 339:21 340:17 343:5,7 346:12 351:2 353:10 353:18,24 354:10 366:24 367:22
**certainty** 37:21 41:3 157:24 173:6,18 185:8 186:16 222:13 259:23,24
**CERTIFICA...** 372:1
**Certified** 1:17 1:19,20 372:3 372:4,18,19,20 372:20,21,22
**certify** 372:4,7 372:11 374:4
**cervical** 180:9
**cetera** 170:7
**CFR** 46:21 47:2 47:25
**chair** 355:7,13
**chance** 226:15 327:13
**change** 36:8 81:11,14,25 82:14 168:16 220:2 221:24 222:8 225:24 256:22 279:19 293:8 316:11 317:14,17
**CHANGE/RE...** 375:3
**changed** 109:21 110:10 164:18 164:21 165:9
**changes** 45:19 81:15 88:9 165:2 220:6 276:12 279:12 301:19 373:10 374:6
**changing** 53:5 55:12 222:3
**chapter** 76:9 290:3,19 291:2
**characteristic** 148:12
**characteristics** 70:4 71:25 92:11 131:7 132:10 134:20 147:25 148:1 148:19 149:6 209:7 224:20 233:18
**characterizati...** 198:1,6 203:5 247:24
**characterize** 37:18 70:14 75:18 119:16 188:10 248:4
**characterized** 198:5
**characterizing** 198:4
**chart** 89:16,21
**check** 279:4
**chemical** 220:13 228:8 266:6 281:13 294:8,9 294:11 295:11 295:13
**chemical-grade** 227:7
**chemicals** 166:5 166:10,25 167:8 281:6 290:22 292:25 294:2,19 336:21 337:2 338:10,12,16 346:6
**Chemistry** 247:9 351:12
**children** 178:6 178:22 297:1
**Chinese** 136:23
**choose** 20:18 119:25
**choosing** 130:24 202:24
**chose** 46:11 106:10 118:13
**chosen** 174:1
**Chris** 6:24
**CHRISTOPH...** 2:13
**chromium** 224:15 263:18 267:1 268:1 271:17 276:17 278:25 312:4 313:10
**chronic** 72:20 126:6 128:12 179:15,22,23 186:25 187:17 189:20 190:4 190:12 191:1 192:13 196:7 198:25 199:16 199:19,21 200:14 219:25 220:5,22 222:23 227:19 305:12,13 307:4,10,11,12
**chronological** 14:5
**chronologically** 62:10
**chrysotile** 253:24 254:23 254:25 255:5 309:24
**ciliary** 180:10
**CIR** 31:10 49:20 57:8,22 65:10 65:23 66:2,6 66:12,22 67:7 67:14 95:4,17 95:25 96:21 97:13 99:14 100:4 120:3,10 120:24 121:21 122:3,3 210:18 245:4 336:7,12 336:15,20 337:1,5 339:16 340:3,5,10,19 341:9 342:2,21 343:11,18 344:2 345:18 345:25 346:7 346:15 347:5 347:10 349:4,4 353:6 355:14 356:8
**circumstance** 98:18 231:20
**circumstances** 91:11 97:5 155:14 231:17 231:19
**citation** 27:16 66:13,15 67:21 99:1
**cite** 33:14 48:16 48:25 65:21 68:24 76:6,6 76:16,17 85:23 118:13 123:20 126:20 133:4 141:21 142:20 212:11 241:14 250:6 266:16 266:16 274:17 274:23 285:12 285:13 289:20 290:3,6,14 295:20,21 313:18 336:12 336:20 338:21 339:20
**cited** 12:14 15:19 16:1,9 17:3 20:23 21:23 22:2 33:15,18 54:22 63:11,18 64:8 64:13 66:12 68:16,17,19 77:19 82:25 90:19 118:18 120:18 121:18 176:19 177:11 206:19 212:14 276:2 280:15 292:22 315:8 315:10
**cites** 339:16
**citing** 66:19 69:12,16 73:1 139:14 141:23 242:10 243:20 277:3 290:15 290:16 338:2 339:2 349:17 365:14 366:18
**citizens** 359:20 361:19,21 362:10 363:2 363:10,14 364:25
**claim** 188:11 222:18
**claimed** 96:19
**claiming** 223:18 253:8 344:21
**claims** 222:20
**clarify** 63:24
**classification** 271:17 280:9
**classified** 197:2 269:5 288:1
**classify** 309:12
**classifying** 208:15 215:16
**clause** 47:15 50:1,9
**clear** 78:25 87:3 239:20 256:25 262:16 323:11
**cleared** 311:19
**Cleveland** 354:16,19

**client** 52:8
**clients** 44:6 214:1 312:18 334:9 346:2
**clinical** 238:11
**clipboard** 26:13
**close** 368:3
**co-occur** 225:14
**coating** 175:15
**cobalt** 221:14 224:15 226:20 267:1 268:1 276:17 278:25 280:3 312:4 313:10
**cohort** 113:3
**cold** 301:9,18
**collect** 312:17 329:16
**collected** 70:14 77:9 226:2 239:10,11 241:6 257:17 258:9 260:13 260:15 270:4 271:8 273:1 296:8 300:17 328:13
**collecting** 229:7
**collection** 202:8 211:7 212:7
**combination** 168:22
**combine** 65:20
**combined** 201:20 202:1
**come** 17:14 58:16 85:8 98:19 99:10 117:6 121:13 146:15 193:12 219:19 320:2,9 335:8
**comes** 123:12 197:11 285:14 301:22 328:5
**comfortable** 306:6
**coming** 84:22 179:6 343:13
**commencement** 372:4
**commencing** 1:15
**comment** 48:18 242:3 243:15 271:5 341:2,6 360:11 368:6
**comments** 27:17 341:16,19 342:21 343:7 343:17,22,25 345:17 363:15
**Commerce** 2:5
**commercially** 251:4
**commission** 374:17
**committee** 340:6,10,14 355:9
**common** 48:2 115:3 140:12 199:23 213:23 254:2
**commonly** 313:5
**communicatio...** 23:17
**community** 98:14 106:23 114:15 115:2 182:9 183:1 190:11,25 192:15
**companies** 31:3 31:22 32:1 43:13 46:3 51:5
**company** 30:9 30:23 43:4,15 44:1,16,19,23 45:9,15,22,23 46:4,9,11,12 50:8 56:18,25 57:12,17 58:5 59:8 123:3,8 123:13 136:19 144:11 158:8 161:8 165:1 166:21 167:25 177:12 244:3 318:1 321:14 324:9 325:12 325:19 326:4 328:5,23 330:5 334:11 352:1
**compare** 144:4 156:18 176:21
**compared** 33:5 164:4 204:11 229:9 231:4
**comparison** 161:25 176:11 176:16,18 177:13 266:13
**comparisons** 348:5
**compilation** 61:10
**complete** 28:14 59:6 73:2 170:12 270:11 320:1
**completed** 91:22 93:15 201:9
**completely** 163:3 179:8
**completing** 23:8
**complex** 125:17 146:12,17 151:24 152:2 153:7 167:8 168:21 169:15 225:7 226:3,9 226:22 256:2 256:15,16 257:3,9
**compliance** 44:1 44:24 46:11
**complicated** 129:3
**component** 127:19 132:2 149:21 169:12 171:15
**components** 132:2 146:17 152:13 163:1 164:17 166:4 167:19 168:8 169:6,18,25 170:6 171:3 174:19 190:1 205:16 222:8 224:5 226:10 227:2,10 228:19 247:25 248:5 293:24 310:11
**compound** 39:13 269:17
**compounds** 34:6 189:21 225:5 270:11 272:17 273:22 275:16 277:8 279:12 338:17
**comprehensive** 328:9
**computer** 26:19 56:9,13
**concentration** 295:4 347:18
**concept** 280:19 283:17 289:5 290:20
**concern** 223:14
**concerned** 52:21
**concerns** 48:10 323:21
**conclude** 241:17
**concluded** 196:5 239:20 322:3 371:3
**concludes** 370:25
**conclusion** 24:17 40:25 96:5 97:4,6 98:20 170:2 189:7 198:11 198:19 212:5 212:17 221:2 241:12 258:14 305:25 320:3 320:10
**conclusions** 41:7 85:8 95:25 97:12,14 98:4 98:21 99:11,15 99:16 119:22 138:12 140:1 141:19 152:11 168:17,18 202:16 230:1 233:1 234:9 240:20 319:22 320:17,18 339:1
**concordance** 271:4
**conditions** 39:12
**conducted** 58:5 181:18 244:2 246:20
**confidence** 40:7 230:1 370:12
**CONFIDENT...** 1:9
**confirm** 14:9,17 14:24 74:13 106:6 181:18 288:6,11 361:16 362:22 362:24 365:17 366:4,23
**conflict** 349:21 350:7,9 351:2 352:3,3
**conflicts** 247:11 349:5 353:7
**confused** 333:11 338:1
**confusion** 64:9

252:10
**connected** 333:11
**connection** 10:17,23 108:8
**consensus** 181:11 190:10 190:24 191:10 191:17,19 192:16,25 193:7,15
**consider** 24:11 27:6 30:2 42:6 42:20 93:8 95:7 96:6 97:1 97:7,7,19 100:14 115:16 115:22 122:23 132:25 135:6 151:7 155:4 167:4 209:19 234:14 246:24 247:17,21 248:2,19,21 252:22 255:7 313:22 334:18 334:21
**consideration** 38:24 39:1 288:23,25
**considerations** 36:24 87:16 114:21 224:10
**considered** 35:18 87:5 89:5,17 96:20 107:11 120:17 120:25 167:12 177:2 241:14 305:9 311:22 355:14
**considering** 48:9 124:5 165:22 325:1 346:5
**consistency** 41:9 87:25 119:18 145:9 152:23 153:3 156:4 159:15 173:12 191:12 194:20 221:10
**consistent** 49:16 49:18,19 79:14 88:10 90:22 119:9 130:2 172:25 187:6 190:2 191:17 191:19,24 192:2,6,8,23 193:6 194:8,14 196:16 200:17 209:15 217:13 218:17 305:15 323:25 338:22 339:3,13
**consistently** 41:12
**constituent** 150:1 152:4,12 152:14 163:1 164:17 167:18 169:6 170:6 174:19 222:8 224:3 226:6,7 227:1 247:25 262:10
**constituents** 29:22,25 127:15 164:3 164:20 169:18 189:22 221:9 225:15,22 256:16 263:16 273:2 274:16 274:23 275:10 276:10 277:11 277:14,23,25 278:15,18 289:15 369:10 369:16,19 370:9
**consultant** 45:22 344:25
**consultants** 361:10 362:16
**consulting** 336:2
**consumer** 35:12 125:20 126:13 126:23 127:9 127:17 129:4 129:13,15 131:15 132:4 132:11,22 137:9 142:21 144:5 153:20 154:5,14 155:23 156:2 157:19 158:15 159:4 161:13 164:20 172:15 175:5,21 176:14,23 178:3,11 180:6 226:12 317:25
**consumers** 30:11 167:13 327:16 328:25 330:25
**contact** 187:16 231:13 264:17 274:8,8 295:18 296:23 297:3 299:3
**contacts** 264:25
**contain** 10:15 13:23 59:6 145:18,21 256:21 277:23
**contained** 9:15 10:13 33:7 66:10 75:17 122:18 209:22 251:7 369:17 369:17
**containing** 197:2 225:13
**contains** 74:25 93:13 166:10
**contamination** 249:16
**contend** 100:4 121:1 169:9
**content** 26:24
**contents** 262:19
**context** 93:22 115:19 205:23 207:20 213:6,8 213:11,25 216:22 218:20 221:9 271:7 307:6 308:19
**context-specific** 212:19
**continual** 299:20
**contribute** 104:3
**contributes** 104:8,12
**control** 209:16 209:17
**controls** 83:13 218:4
**conversation** 168:7
**convince** 82:3
**copies** 14:2 18:8
**copper** 117:11 117:11,14,16 117:25 217:3 226:19
**copy** 13:21 16:11,20 111:7 111:10
**cornstarch** 72:18 266:1,10
**correct** 10:11 14:19 15:1 19:16 20:5 22:16,22 23:10 34:14 35:1 43:5,22,23 46:13 47:12,20 47:21 51:22 59:9 60:23,24 63:6 67:22 69:19,22 73:16 74:15 75:3,12 78:13 79:8 80:11 84:2,6 84:10 85:24 86:5 87:7 91:23 93:16 95:6,13 96:1 96:21 105:22 107:9,13 108:3 108:9 109:10 113:18 118:15 118:25 119:6 121:23 124:7 124:15 126:14 126:24 133:12 134:7 136:2 142:13,17,18 142:22 144:23 152:5,15 159:6 161:5 164:10 164:12 166:8 170:9 171:4,19 173:21 174:8 175:6 178:18 179:11 180:15 180:24 192:17 195:5 196:22 197:4,6 201:10 204:19 205:18 207:6 213:3 219:2 221:3 225:24 227:2 228:16 233:5 234:22 236:15 238:13 244:5 251:1,17 261:9 262:4 263:6 264:9 269:7 270:13 276:6 278:15 279:13 282:2,20 283:18,23 284:17 287:21 288:23 289:18 290:9 291:8 292:18 293:13 296:16 298:3

307:22 308:5
308:14 318:22
321:2,9,19
322:19 329:10
330:1 331:6
332:8 336:13
337:8 340:6,7
340:10,20
341:21 342:5
343:12,19,23
348:22 349:6
356:11 359:17
359:19,24
360:4,12 361:5
361:10,15,25
363:14,19
367:3 374:5
**correction** 245:24
**corrections** 373:4,7 374:6
**correctly** 63:3 112:25 113:1,5 204:14 212:24 236:14 289:22
**correspondence** 27:13
**cosmetic** 43:9,11 44:11 46:10 47:3 133:11 134:14 135:11 140:18,25 142:2,3,13,15 142:20 145:20 150:25 161:20 162:25 164:8 184:12,19 185:17 187:17 188:12,25 189:17 190:11 190:25 197:2 202:11 203:5 204:16 232:19 233:2 308:12 309:5 322:18 322:18 324:4 324:10 336:6 336:13 339:17 344:25 346:21 347:1 359:23 360:4,7,19
**cosmetic-grade** 135:14 138:17
**cosmetics** 30:7 43:12 44:2,25 46:17 161:16 328:3 335:10 336:22 366:11
**cosmetics'** 346:19
**cosponsor** 361:4
**Council** 3:10 7:4 31:2 247:10 319:6 351:12
**counsel** 2:19,24 3:5,10,15 6:16 122:10 287:11 322:12,13 346:8 372:12 372:13
**counted** 339:23
**couple** 100:9 269:22 287:23 290:6 319:7 320:12 370:1
**course** 204:24 250:7 299:2 369:9
**court** 1:1,20 6:12 7:17 39:19 137:20 213:16 372:20 372:22 373:19
**courtroom** 286:25
**cover** 31:11 70:2 362:1 363:18 363:20,21,22
**covered** 32:9 61:24,25 74:12
**covering** 59:21
**Cralley** 250:5 337:8,17,18 339:16
**Cralley's** 338:11 338:21 339:9
**Cramer** 342:20 343:1,3 365:6
**crappy** 232:2
**CRE** 362:2,3 367:15,23
**create** 276:12 306:8
**criteria** 212:21
**critical** 236:8 295:12
**criticism** 353:11
**criticisms** 348:25 349:1,3
**criticize** 88:7
**criticized** 84:1,9 348:20 352:20 353:4
**criticizing** 353:5 353:6
**critiqued** 365:5
**cross** 56:1 180:11
**CROSS-EXA...** 369:4
**crosses** 40:7
**CROW** 2:2
**CTFA** 31:2 361:4
**ctisi@levinla...** 2:13
**current** 5:1 202:7 211:12
**currently** 44:7
**customers** 318:21
**CV** 354:21,25 355:5,11

**D**

**D** 3:19 337:12
**DABT** 1:13 4:13 4:15,17 7:20 372:5 374:12
**daily** 178:10 187:5 199:22 200:15 296:16 301:8
**damage** 178:21 228:5,23 231:3
**data** 36:4,5,12 36:14,22,23 37:8,16 38:25 41:6,10 61:17 70:19 76:14 77:5,8 84:19 88:2 92:21 101:9,10 104:16 106:24 107:24 114:2 114:19 115:21 118:9,10 119:17 120:12 124:9 138:5 140:9,11 145:7 145:7 151:1 153:19,19 157:16,17 158:7,13 163:12,13,14 170:5 171:3,7 172:6,8,8,13 172:16,23,23 173:10 174:3 177:3 182:16 182:17 187:24 194:21,22 195:22,22 205:24 209:8,9 216:4,10,14 217:1,5,16 218:11,12,14 218:15 221:18 221:21 223:2 225:1 226:2,14 229:25 230:2,3 230:4,7,10,13 230:13 231:2 231:14,17,18 231:19,20,23 231:24 232:5 237:17 238:16 238:18,20,22 238:22 240:6,6 240:7 251:6 254:18,18 255:2,15 257:17,19 258:8 260:9 265:19 270:3,4 270:7,11 271:6 271:8 272:25 273:15 275:5 276:2,15,18,23 280:1,6 281:20 282:7 289:12 293:21 296:8 297:15,19 299:18 300:17 301:15 302:13 302:23 305:1 306:21 307:1,2 313:23 320:7,9 328:12,14
**database** 53:16 53:25 55:24 56:2,5,10 57:13,18 58:23 79:19,23 117:11
**databases** 54:8 58:5
**date** 1:16 6:6 9:11 111:14,19 260:8 307:9 372:9 373:9 374:12
**dated** 9:10 14:8 14:15,21 19:14 267:3 372:23
**dates** 57:7,8
**Daubert** 8:10
**day** 80:10 298:3 300:1,15 303:21 369:7,9 374:16
**days** 122:5 373:15
**DC** 3:9
**deal** 52:11 69:21

125:3 155:23
**dealing** 49:15 51:5 61:17,19 131:10 156:1
**deals** 168:20
**dealt** 54:18 57:13 145:12 271:14
**deaths** 178:16 178:18
**December** 1:8 6:6 10:20 11:1 111:17
**decide** 26:20 42:4 334:25
**decided** 60:2
**decision** 45:5 56:15 67:20
**decision-maki...** 43:21,25 44:23 45:8 284:8
**decisions** 97:16 205:1 213:10
**deemed** 373:18
**Defendant** 2:24 3:5,10 7:24
**defendants** 248:4 320:16
**defense** 85:14 247:1,16 248:17 261:6 261:22 320:25 335:23
**defenses** 228:15
**define** 39:24 48:19 169:11 199:16 236:22 237:1 238:5 239:5 272:6 300:20 310:21
**defined** 227:10 231:6 302:4 305:13 307:14
**defines** 236:18 237:2
**defining** 236:9 236:11 237:16 237:19,21
**definitely** 85:10 95:15 153:12 278:18 308:8 323:16
**definition** 48:2,4 128:20 237:1 253:16,18 264:11 281:21 283:11
**definitions** 196:15
**definitive** 195:4
**definitively** 189:2,5 227:15 227:17 366:2
**degree** 41:2 157:23 173:18 185:8 186:15 259:23,24
**demonstrate** 183:14
**demonstrated** 69:14 220:25 274:24
**demonstrating** 73:14
**departure** 117:12
**depend** 96:14 230:11 299:2
**dependent** 155:8 226:18 231:21
**depending** 137:1 150:11 229:6 232:19 296:24 319:23 319:23
**depends** 96:11 96:12,13 97:9 128:11 152:16 154:22 168:5 170:16 175:7 228:17 229:11 230:12 234:25 236:21 264:19 269:21,21,22 269:24 296:20 297:5,6 320:4 334:23 335:5
**deponent** 6:14 374:1
**deposed** 261:21
**deposes** 7:23
**deposing** 373:14
**deposit** 184:22
**deposited** 184:13 185:20 296:10,15 297:16
**deposition** 1:12 4:11 5:3 6:8 8:9,17 9:8,10 9:16 10:4,8,9 10:14 11:4,6 11:13,15,21 12:2,3,5 13:1 14:6,11,14,25 15:6,6,9 16:22 17:13,17 19:24 20:4 22:18 35:10 111:9 112:5 122:5 206:15 211:18 211:21 216:2 251:19,23 252:3,6 261:23 263:23 266:22 280:12 365:15 366:18 371:1,3 373:3,12,16,17
**depositions** 18:8 92:15 94:2 108:19 136:18 365:18
**deps@golkow...** 1:22
**dermal** 233:12
**dermatology** 352:25 353:14 354:7,13 355:8
**Dermatopath...** 355:3
**describe** 28:12 28:13 29:16 37:24 43:11 47:23 77:14 86:9 91:16 101:16 102:7 103:2 104:14 105:10 112:15 117:5 135:1,21 144:17 148:6 148:18 149:5 185:3 189:19 196:11,15 249:2 253:19 289:2 334:2
**described** 21:24 31:15 45:10 48:8 49:17 51:13 56:25 58:16 79:3 103:23 104:6 104:11 130:12 143:11,12,14 145:3 148:5 152:19 164:25 196:10 219:6 219:15 242:20 245:16 266:15 329:8 330:4 342:15 352:5
**describes** 141:15
**describing** 49:19 83:22 87:22 119:23 120:13 133:17 142:3 184:4 249:3
**description** 4:10 74:25 135:4 199:23 214:21 306:20 331:24
**descriptions** 89:24 90:18 102:6 156:3 311:2
**design** 182:2,19 223:24 224:6 224:11 241:2 291:20 297:23
**designed** 42:15 209:15 230:17 232:2,8 239:5 239:15 240:18 291:8
**desirable** 132:11
**detail** 9:18 66:23 70:3 90:9 93:13 94:3 128:5 166:4 214:2
**detailed** 215:7
**details** 93:22 109:25 120:21 132:7 208:12 222:1 345:6
**detect** 42:19
**detectable** 310:14
**detected** 170:24 258:16 310:6
**detecting** 310:25
**detection** 151:1 151:3 250:9 258:21 310:15
**determine** 38:15 162:5 163:8 223:8
**determines** 294:9
**determining** 36:5 86:18
**develop** 176:2 179:10 194:15 210:6 220:13 227:14,15,17 230:24
**developed** 182:12
**developing** 269:1 273:22
**development** 24:24 221:22 237:15 238:12

240:14 272:13 274:1
**dialog** 213:20
**diapering** 177:15
**dictates** 295:11
**die** 178:23
**differ** 233:13
**difference** 67:2 72:17,21,24 146:9 168:17 235:4 314:1 326:13 348:6,7
**differences** 71:9 71:14 72:5 79:15 82:25 84:16 101:11 101:18 103:11 148:24 156:14 164:24 216:13 225:4 233:3 234:1,7 254:14 265:20,21 266:8,14,17 357:17
**different** 20:21 22:10 29:7,8,9 29:25 30:16,18 30:23 31:6,8 32:11 34:5,20 35:5,21,23 37:5,20 38:1,9 38:10 39:1 45:24 46:7 50:14 55:19 57:5,5 58:24 62:24 66:21,21 70:20 71:7 75:25 76:13,20 78:7 81:18 83:25 84:13,14 84:23 85:3,5,6 85:8,23 87:15 90:10,10 99:10 99:11 114:8 115:25 119:22 120:5,12 123:7 123:9 125:2,3 126:1 133:9 136:8,24,25 137:5,6 139:5 139:13,22,24 140:9,11 142:13,16 146:5 152:12 152:24 156:15 161:12,21 162:24 174:18 174:19 175:16 177:20 178:8 179:8,16 189:13 198:15 199:4,5 204:22 208:25 213:15 213:18 215:16 215:17,19,20 218:22 219:14 219:16 224:3 224:21 226:25 226:25 227:1,2 228:25 229:1,3 230:23 231:22 233:7,16 234:8 234:10 237:25 244:18 252:24 252:25 253:19 253:22 254:9 254:12 256:12 261:2 265:3 266:4 267:18 269:6 270:18 272:12,15 275:10 277:14 283:2,8 290:7 290:12,22 296:9 305:19 306:11 311:20 320:3,9 322:7 325:18,22 326:6,8,19 328:1,2 329:9 329:14 330:14 330:16,17 332:23 335:21 341:22,23 342:17,17 348:18 357:9 357:14 368:6 369:10,15
**differentiate** 165:13
**differently** 37:9 41:22 81:24 84:20 85:12 229:6
**difficult** 182:18 186:3 222:12 224:7 225:9 291:20 298:1
**dig** 67:3
**Diplomate** 1:17 372:3,18
**direct** 8:1 46:23 76:3 212:4 274:8 281:1,7 281:16 287:11 297:3
**directed** 53:10 54:10 74:6 162:4 163:8 357:16
**directions** 329:1
**directly** 43:17 59:20 76:8 273:9 367:14
**disagree** 73:25 85:16,17 120:2 127:2 143:22 199:7 214:19 215:13 238:21 241:11,20 283:25 319:17 319:22 320:16 320:25 324:8 339:8,11 342:7 350:2,6,8 356:15,18
**disagreed** 321:19
**disagreeing** 343:8
**disagreement** 321:8
**disclose** 247:11 350:9,11 353:7 365:6,20
**discount** 246:14 247:4,5,13
**discounted** 244:25
**discouraging** 282:25 284:15
**discovery** 21:12 54:18
**discuss** 67:15,18 83:17 98:6 100:6 102:22 103:1 104:25 113:9,13 118:14 119:13 121:21 124:13 126:4 132:23 133:8 140:22 146:10 178:14 187:9 189:12 191:20 192:1 211:3 220:4 242:7 248:25 263:6 277:5 280:17 285:1 289:16 290:8 290:19 355:22 360:22 362:24
**discussed** 17:19 22:9 35:9 42:17 54:8 65:4 67:10 77:10 91:4 108:18 138:20 148:10 149:20 152:25 154:2 171:17 176:19 181:15 216:1 221:12 223:16 263:23 276:13 277:1 292:19 354:22 362:19 364:6 367:21
**discusses** 123:17 146:4 193:5 251:20
**discussing** 54:24 57:1,20 62:14 100:22 104:2 105:8 116:17 120:4 132:15 206:19 276:4 325:11
**discussion** 66:20 77:25 90:20 102:11,13 103:14,19,22 138:24 147:13 148:16 162:11 180:24 195:8 195:11 214:24 215:3 221:17 223:5 265:7 269:13 274:21 277:2 285:21 325:9
**discussions** 26:23 89:25 154:9 326:12
**disease** 38:15 195:5
**disreputable** 354:7
**disseminated** 30:22 244:16 244:16
**dissemination** 123:4,8
**distinguish** 149:17
**distinguishing** 148:18
**distress** 126:7 129:12
**distribute** 270:2
**District** 1:1,1 6:12,12
**diversity** 212:20
**dividing** 220:8
**divorce** 332:13

334:14
**Doc** 26:9
**doctor** 319:5 359:16
**document** 1:6 8:19,23 9:1,7 16:20,25 17:2 49:3 51:18,19 53:20 54:22 55:5 59:19 64:4,5,7 66:17 75:2 77:11,14 79:1 80:16 81:9 83:17 90:22 91:19 92:3,5 111:11 113:14 170:17 177:11 201:17 202:3,4 206:14 211:10,19,22 212:6,16 245:5 251:22 282:24 290:17 292:22 292:23 341:23 342:19 364:2 364:22 365:2 365:13 368:9 368:13,18
**documentation** 10:6 48:18 82:16 212:22 214:9,14 218:22 278:11
**documenting** 249:21 273:9 274:18
**documents** 9:23 10:13 12:13,14 15:11,19,22,25 17:15,21 20:22 21:3,6,10,18 21:20 22:13 27:4 29:1 30:24 32:12,18 33:15,17 51:12 52:1 53:12,21 53:22,25 54:7 54:15,21 55:14 55:21,25 56:18 56:20,24 58:3 58:3,17,21,22 59:1,8 76:17 76:21 77:18 83:3 86:8 91:5 108:24 109:6 118:13 123:16 129:19 130:1 130:10 144:11 148:9 154:10 161:6,8 164:25 165:1 201:12 201:20 202:1,9 204:12 205:4 211:7 212:7,13 221:11 246:7 246:12 248:8 248:12 249:1,4 250:8 252:21 253:19 259:16 284:9 288:15 309:11 321:10 321:13,14 323:24 341:7 342:17 348:17 350:10 354:24 362:13 364:5 366:3,7 367:20 368:13
**doing** 33:25 34:7 38:4 53:15 74:10 79:11 94:8 115:5,24 116:3,5 119:14 123:3 130:13 155:21 157:10 169:14 171:24 181:25 205:1 208:3 214:1 216:3 217:13 218:13 234:23 234:24 244:23 287:11 291:14 293:8 296:20 301:3,4,10 302:1 304:3 324:1,16,17 327:20 328:9 330:11 331:21 332:2 334:12 348:5 373:8
**dose** 187:8,14 225:2 230:22 234:21 235:10 235:10 237:16 237:19,21,22 237:25 238:1,3 238:5,9,24 239:1,2,5,16 239:21 240:10 240:13,20,23 242:4,14,21 243:2,16 254:14 259:4 259:25 260:22 263:18,25 281:25 282:18 282:21 284:14 286:3 293:25 294:8,22 295:11 302:19
**dose-response** 224:14 235:13 235:19,24 236:11,18 237:2,6 241:16 241:18 293:23 294:12 295:17
**doses** 231:5 242:19 295:3,4
**doubt** 230:14 242:3 312:20
**doubts** 230:14
**Doull** 289:21 290:4,5,18
**download** 123:19 345:9 345:13,15
**dozens** 97:25
**Dr** 6:14 8:4 12:23 13:20 14:7,10,15,17 14:22 23:18,20 24:11 25:4,15 34:11,23 44:22 46:7 50:17 63:25 80:2 87:2 88:20 93:11 94:1 95:3 102:10 105:17 110:3 111:11 112:4 113:6 117:18 139:8 140:21 162:7,9 163:4 163:19 167:24 177:15 201:3 211:22 236:24 247:24 248:18 248:22 249:3,6 251:15 252:2,5 252:11 259:17 261:7,18 262:20 287:8 287:16 314:4 337:8,17,18 338:11,21 339:9,16 342:20 343:1,3 349:9 352:20 354:14 355:13 357:1 361:8,8 364:23 365:4,5 365:6,15,19,22 369:6,8 370:18
**draft** 20:19 74:21 201:14 202:3 205:11 341:23 342:1 343:18,25 345:22
**drafted** 32:20 46:16,18 343:23
**drafting** 23:12 24:2 26:1 66:1 68:10 80:19
**draw** 41:6 140:1 168:17 170:2 230:1 232:25 240:19 305:24 319:23
**drawing** 138:11 141:20 152:11 234:9
**drawn** 98:4 168:19
**draws** 97:13 202:16
**Dreessen** 135:21
**drew** 99:16
**drilling** 193:19
**driven** 116:15 241:1 313:3
**driving** 225:23
**Drs** 244:11 361:14,24 362:15 363:23 364:3 365:23
**drug** 355:7
**drugs** 189:22
**Duces** 4:12
**due** 128:17 291:18
**duly** 7:21 372:5
**duration** 239:10 302:19 305:12
**dust** 15:16
**duties** 329:14
**duty** 318:14 325:12,19,19 326:3 327:3,4 329:14,15,21 330:5 331:16 332:16
**DYKEMA** 3:1

**E**

**E** 2:1,1 3:1,19 3:19
**earlier** 9:2 20:2 62:13 63:3 68:17 74:12 104:18 205:13 237:8 265:1,22 297:14 298:10

305:13 317:7 330:21
**early** 20:12 23:3 80:20 179:6 285:13
**easily** 72:8
**East** 3:3
**easy** 62:7
**Eberl** 15:21
**Edelstam** 68:4 69:2 70:23 73:14,20
**editor** 27:9,13 27:17
**effect** 34:3 140:20 145:20 235:24 240:25 278:3 282:1 289:10,19 291:6 293:2 294:10
**Effectiveness** 367:3
**effects** 29:24 77:9 124:14 132:1 139:4 146:19 153:3 156:4 169:25 190:3 224:5,14 236:13 242:5 242:16 243:13 290:21 292:13 292:14,17 294:2 295:2
**effort** 348:6
**Egli** 16:6
**eight** 11:10,17 96:20 97:24 98:2,5 100:2,5 100:13,25 102:5 104:18 104:22 120:25 121:20 183:23
**either** 9:2 31:16 36:6 41:7 51:17 55:5 61:18 82:17
114:19 132:21 136:22 191:4 202:24 224:2 244:3 245:14 269:6 273:6,8 274:12 290:12 292:6,16 302:3 326:25 347:18 353:11
**elements** 152:4 152:15 310:5
**elicit** 23:22
**eliminate** 312:25
**ELLIS** 2:21 3:12
**else's** 357:18
**emphasis** 47:10
**emphasize** 47:19
**employed** 75:16
**employee** 45:21 365:16 366:18 372:11,13
**employees** 136:19
**enable** 26:6
**enables** 273:11
**encompassing** 108:22
**encounter** 335:22
**ended** 136:1,7 141:1
**ends** 31:15 80:21 131:14 132:3
**England** 27:10
**English** 48:2
**engulf** 150:18,18
**engulfed** 125:7
**ensure** 130:17
**entire** 43:10 105:2 171:14 171:19
**entirely** 179:16 284:16
**entirety** 57:25
**entitled** 206:23 211:10
**entity** 147:23
**environment** 103:15 229:2 306:8,12
**environmental** 105:5
**EPA** 65:10,22 213:13 243:20 243:21 290:14 290:16 292:22 292:23
**epi** 42:14,21 106:24 173:10 173:13 208:4
**epidemiological** 41:20 79:9 106:23 114:2,6 114:19 115:16 116:1 172:7,8 205:17 239:14 312:11 357:7 357:23
**epidemiologist** 41:16 84:20 85:1 356:3,7 357:24
**epidemiology** 37:11 38:25 81:17,18 89:11 106:4 115:2 295:10 355:22 355:24 356:21
**epithelial** 233:19
**equal** 232:12 248:6
**errata** 373:6,9 373:11,14 374:7 375:1
**escape** 180:12
**especially** 61:16 212:23 274:7 297:24 312:23
**essentially** 12:12
77:3,21 116:11 154:10 202:17 217:14 222:16 328:21 331:23
**establish** 185:17 275:15
**established** 189:3 195:4
**establishes** 71:1
**et** 4:20 170:7
**ethicality** 182:23
**ethicist** 352:8,11 352:17
**ethics** 73:22 187:22
**evaluate** 37:8 104:15 271:25
**evaluated** 32:17 37:8 66:5
**evaluating** 40:11 44:1,24 96:8 127:16 137:4 205:17 225:21 246:19 252:14
**evaluation** 27:2 65:25 105:7 169:22 174:2 192:12 196:20 245:18 289:1 304:10 357:6
**evaluations** 244:17
**evening** 12:9
**event** 184:5 281:9 367:24
**events** 128:2 194:18 220:16 294:14,16 367:25
**eventually** 80:22 81:9
**everybody** 228:7
**evidence** 5:1 21:14 37:11
38:8,14 39:5 42:5,24 67:2 70:9 73:21 75:24 76:10 77:13,17,20 78:3,10,13 80:6 81:6,13 83:7 84:13 85:23 86:10,23 87:4,6,14 88:5 88:18 89:4,6 89:16 90:5,11 90:19 96:7 97:2,19 98:24 103:5 104:3 105:11,16 107:2 112:15 112:17,21 113:16,17 114:12 115:16 116:1,10,15 117:8 120:19 135:7 139:23 139:25 143:19 155:2 159:11 172:9,21 173:2 173:9 174:16 176:16,17,20 177:2 192:22 194:9,10 197:23 198:13 199:9 205:16 208:25 209:10 210:1,9,25 211:10,11 213:2 214:15 215:4,24 218:23,24 222:23 223:17 229:5,5,19 236:8 240:4 244:14,20,24 245:1,6,18,23 246:14 248:23 249:15 250:7 252:13 254:19 257:15 260:16

261:4 285:22 288:20 296:18 326:2 327:12 339:3 365:25 366:22 367:1,4 367:14 368:1 369:20
**evidence-based** 295:10
**Eviron** 346:15 346:25
**evolved** 109:21
**exact** 65:18,19 110:16 167:17 193:12 203:2 321:23 339:20
**exactly** 47:13 67:24 69:24 73:10 82:5 89:14 134:18 168:11 178:25 190:16,20 204:6 205:3 209:3 221:7 223:8 224:21 224:22 249:2 253:19 303:4 304:19 320:20
**examination** 8:1 287:14 319:3 372:5
**EXAMINATI...** 4:4
**examine** 161:11 161:20
**examined** 207:9
**examines** 266:8
**examining** 295:12
**example** 27:3 36:16,19 37:9 38:16 40:16 51:21 56:23 58:19 59:18 60:13 61:16 62:12 70:24 72:7 76:22 78:12 79:5 80:10 82:2 83:24 86:20,24 87:11 88:3 89:16 97:23 101:8 102:20 114:10 117:3 123:16 125:5 133:5 134:14 135:5,8,20 142:22 143:2 148:5 149:16 151:8,18 155:15 163:15 163:21 165:4 167:20 173:19 175:8,12 177:3 192:24,25 196:5 204:6 216:9 221:15 222:19,22 229:10 232:23 233:19,24 237:13 239:7 240:7,16 242:24 246:3 247:23 263:19 270:5,9 271:11 271:13 281:17 285:12 286:2 292:9 296:21 296:25 299:5 311:6 312:24 314:22 322:3 334:1 335:1,23 336:21 342:12 361:3
**examples** 245:10
**exception** 81:16 172:7 178:4 296:1
**exclusively** 54:13 176:3
**excrete** 313:5
**excuse** 214:18 275:22
**exercise** 86:11 120:6 216:16 216:20,24 219:14,17 326:20,22
**exercises** 218:8 327:1
**exerted** 31:22
**exhibit** 8:13,18 9:8 14:6,11,14 14:18,20,25 15:7 16:16,22 17:9,14 19:23 20:4 22:21 23:9,13 24:13 25:19 26:25 28:5 29:2 46:24 53:6 64:3,19 65:14 66:11 75:3,12 75:18 76:5 90:8 93:16 95:11 111:4,9 111:13 112:5 113:12 155:14 201:10 202:15 206:16 209:23 210:22 211:14 211:18,21 219:16 266:22
**Exhibits** 4:9 5:3 13:17 28:1,4 33:7 57:24
**exist** 43:10 150:20 268:22
**existed** 318:20
**existence** 346:15
**exists** 151:12 169:20 200:8 226:23 228:15 261:5 306:25
**exit** 180:22
**expanded** 331:18
**expect** 72:8,20 73:7,10 178:1 233:21 261:24 265:20,22,24 274:13 302:14
**expected** 175:9 289:9
**experience** 37:18 39:6 44:4 46:10 48:7 49:14 50:3,23,25 51:5,22 77:23 84:23 105:13 115:11 116:5 207:25 264:5 271:7 320:8 334:7 336:3 344:5
**experiencing** 99:8
**experiment** 223:25 224:1 291:7,14 293:9 293:12
**experiments** 181:18 293:21
**expert** 4:11,13 4:14,16 12:25 13:5 14:7,15 14:21 15:5 20:19 23:8 24:24 130:22 137:3 139:11 148:23 213:16 246:21 247:1,1 248:17 255:8 255:20 261:12 261:22 262:20 334:19 342:4 344:12,15 346:19,24 347:2 349:5
**expertise** 255:13 269:17 355:19 357:22 358:6
**experts** 29:8 85:14 148:17 181:16 248:3 248:15 261:6 261:20 320:16 320:23,25 335:22
**expires** 374:17
**explain** 35:7,22 41:13 49:2 93:21 100:11 120:6 121:7 135:18 174:15 235:2,3
**explains** 133:22
**explanation** 59:7 195:3
**explore** 94:6
**exploring** 285:3
**expose** 224:2 291:21
**exposed** 156:10 176:24 187:15 220:12,12 226:8 228:8 237:14 258:11 259:5,25 263:19 286:10 290:22 291:23 301:17 335:14
**exposure** 16:4 36:8 37:2,16 39:11 41:3 52:23,24 76:14 77:6 78:7 81:1 112:12,21,23 117:15 132:23 133:16 160:19 174:20 175:3 175:11,20,23 175:25 176:12 176:21 177:14 177:16 178:3,5 178:10,11 179:21,22,24 194:12,16,22 195:19 198:20 198:21 199:12 199:20 200:13 202:21 203:1 203:21 204:2

217:11 218:11 218:12 220:15 226:11,12 230:20 231:11 233:12 235:8 236:10,12,19 237:3 238:25 242:16 243:17 243:19 257:16 258:3,5,10 262:7,9,11 269:25 272:22 274:15 285:10 286:4 291:19 292:4 294:9 296:6 297:10 299:19,21 300:8 301:12 301:24 305:12 305:14 306:13 307:4,11 313:4 322:4,15 324:22 329:6 347:19 370:14
**exposure-resp...** 230:15
**exposures** 217:9 243:4,14 300:24 301:8 301:20
**expressed** 109:23 286:22 320:21 323:25 333:15
**expressing** 166:19 316:7 339:13
**expression** 194:4
**extent** 55:20 183:8 214:20 215:13 252:9 268:22 309:12
**extra** 228:21
**extrapolate** 232:16 272:1 273:11
**extrapolation** 232:13 270:5
**extremely** 50:10 80:15 97:19 99:18 100:10 100:14 138:18 231:14

**F**

**F** 3:8
**face** 250:25 251:2,16 284:9 319:9
**fact** 12:24 15:3 32:1 34:17 62:14 66:24 67:15 75:7 79:1 88:6 91:18 100:18 108:2,6 125:17 128:17 129:2,3 134:23,25 136:10 150:23 151:24 167:25 168:20 177:20 179:3 197:1 205:14 207:17 217:3 221:3,17 222:13 225:3 230:7 243:13 252:11 256:1 257:9 258:20 272:13 273:22 281:23 289:4 292:12 299:17 301:16,19 302:20 321:4 321:25 324:9 332:13 346:9 348:10 349:15 370:8
**factor** 36:16 88:15 110:18 111:2 157:9 158:3 169:3 171:23 225:23 272:21 295:12
**factors** 112:14 156:15
**factory** 175:15
**fail** 373:17
**failed** 95:17 355:18 365:6
**failing** 97:7 353:6 365:20
**fails** 96:6
**failure** 97:1,18
**fair** 23:6 60:19 122:17 199:25 199:25 231:16 299:24 304:18
**fairly** 128:19 231:9
**fall** 23:3
**fallopian** 4:23 103:16 180:11 180:22 181:8 181:13 183:17
**falls** 295:5
**familiar** 107:8 107:22 118:24 123:21 130:19 131:25 132:7,8 147:4 166:7 196:20 205:25 211:21 216:15 283:16 313:7 319:10
**far** 11:10 39:6 66:20 77:5 84:21 88:14 92:22 107:5 117:7 128:1 130:23 145:3 146:19 149:9 165:2 167:7 170:13 171:11 192:4 193:15 216:8 227:9 233:18 238:6 244:17 268:11 272:22 293:22 328:4 336:18
**fax** 1:22
**FDA** 43:12 44:1 44:24 47:23 74:4 244:17 328:19,19 336:17 340:4,5 340:14 359:22 360:2,18 361:3 361:7,15
**FDA's** 332:5 355:7,7
**feel** 121:8 129:14 306:6
**feels** 94:16
**felt** 59:19
**female** 103:11 183:16 184:3 295:24
**fiber** 147:22 150:5,6 255:3 258:18
**fibers** 251:8,9 256:7 258:16 259:1
**fibrous** 124:23 124:24 126:1 146:9 147:14 148:24 149:14 150:14 151:2 151:19 161:11 161:22 253:20 255:2,3
**figure** 103:7
**figures** 103:9
**file** 80:17
**filed** 12:7 16:10 18:2 23:4
**files** 57:12,12 251:24 253:14
**filter** 129:8
**fimbriae** 180:12
**final** 37:1 138:11 153:11 172:14 174:11 343:23
**finalized** 316:4
**finally** 42:4
**financial** 365:7 365:20
**financially** 372:13
**find** 57:18 78:4 84:8 133:6 146:3,6 155:25 177:7 209:23 210:20 222:5 246:1 249:18 262:21 269:13 276:18,22 280:16 292:13 364:6
**finding** 41:8 42:10,13 55:25
**findings** 67:19 91:3 172:25
**fine** 14:3 275:5 313:16 336:10 364:14
**finer** 129:14
**fines** 130:20 131:3,5
**fingerprint** 145:5
**finish** 94:13
**finished** 44:18 127:6 308:12
**first** 7:21 11:5 15:19 16:14 19:13,18 28:24 28:25 32:5,17 32:17 33:16 36:1,2 48:1 52:2 53:9 54:11 56:17 61:8,11 65:21 87:21 112:19 137:12,18 147:11 198:16 210:6 212:6,17 215:25 217:2 248:25 256:25 326:22 327:5 329:15,22 331:11,12,14 331:15 343:18

352:22 354:15 354:18 355:2 359:25
**fits** 41:11 281:20 281:20 283:11
**five** 210:17 249:9
**flags** 13:24
**Fletcher** 313:20 313:21 314:18 314:19 315:2
**Florida** 2:14
**fluids** 72:9
**FLW** 1:5
**focus** 58:12 94:5 151:20 153:14 155:22 268:14 270:8 321:16 330:8 363:8
**focused** 22:18 37:12 58:17 262:11 268:8 370:5
**focusing** 36:18 56:23 77:12 125:9 129:17 168:7 179:23 204:10 348:10 348:10
**folder** 26:17
**follow** 46:12 67:6 117:22 346:4 358:22
**follow-up** 358:12
**followed** 113:17
**following** 25:3 40:8 66:25 345:25
**follows** 7:25 46:4
**food** 311:6
**footnote** 317:8 318:16 336:22 336:24
**foregoing** 372:8 374:4
**foreign** 128:19 150:10
**forgot** 11:16
**form** 49:10 73:17 75:11 87:8 89:19 90:12 91:24 99:5 105:23 106:13 107:15 116:11,18 118:16 121:3 121:15 126:25 130:7 133:25 137:11 141:2 145:23 147:20 150:14,15 153:4 154:20 157:7 159:7 160:10 162:1 171:5 180:16 185:6 186:11 186:22 187:18 191:6 195:6 198:8 214:18 242:21 252:16 255:6 259:10 261:10 262:24 264:14,19 270:14 283:24 284:18 298:6 300:3 303:8 330:19 337:17 343:25 345:22 351:20 356:10 369:24 374:6
**formal** 113:17
**formation** 215:11 276:13
**formed** 32:19 66:15 125:14 145:24 146:2 151:22,24 166:17 167:10 176:6 181:14 184:15,17,21 184:25 186:24 190:17 191:3 198:13,18 237:5 260:7,9 265:13 274:11 286:6 299:14 303:9,22,25 306:17 307:8 337:24 338:7 338:11 339:10 353:16 354:1,8 355:15,17 358:8
**former** 355:7
**formerly** 31:2
**forming** 53:13 61:7 80:1 85:24 89:17 103:4 324:21
**forms** 73:20 130:17 148:4,4 253:22 254:3 255:3,4
**formulated** 300:5
**Forrest** 10:9,14
**forth** 75:1 323:10 372:9
**found** 41:8 91:18 100:10 264:21 311:5 337:5
**foundations** 161:17
**four** 1:13 172:5 208:16 271:12 290:23
**Fourth** 3:13
**fragrance** 166:4 167:22 168:6,8 169:7 275:10 276:10 278:14 278:17 308:22 337:3
**frame** 20:13 54:23
**framework** 204:25
**free** 26:15
**frequency** 184:18 185:19 186:10 239:10 302:18
**frequent** 305:2
**frequently** 359:22 360:2,6 360:23 366:11
**Friday** 9:4
**front** 13:21 206:14
**full** 34:7 35:15 57:25 119:14 163:12 331:22
**fully** 282:6 366:8
**functions** 332:5
**fundamental** 294:1
**funding** 350:12 350:13,14
**further** 65:24 67:4 93:21 141:16 197:19 314:16 368:19 370:17 372:7 372:11

G

**G** 3:19
**gain** 226:5
**game** 122:17
**Gardner** 68:4
**gather** 78:3,7
**gathering** 77:5 293:22
**general** 5:1 27:23 30:18 33:25 34:25 35:14 75:14 78:15 125:24 126:8 151:6 154:9 192:15 209:16 211:11 265:7 275:19 278:4 291:2 294:4,25 295:2 304:25 308:4 348:25 366:5
**generally** 29:20 57:2 61:20 64:23 70:10 72:25 77:20 81:23 98:13 101:12 126:9 127:22 130:21 139:15 219:25 222:2 237:6 253:2 282:25 289:7 291:11 291:24 294:24 295:15 297:7 360:24
**generate** 276:12 279:12
**generates** 27:4
**genetically** 292:1
**genital** 37:3 68:7 69:10,15 70:6 72:1 73:16 110:13 202:25 265:5 295:23 295:25
**genotoxic** 280:20 281:7,8 281:9,18
**genotoxicity** 281:15
**geologist** 149:8
**geology** 132:15 255:11
**GEREL** 2:8
**getting** 31:15 54:2 301:7 327:3 331:13
**ghostwritten** 246:9
**GI** 233:24 271:20
**give** 26:12 34:25 46:2,8 51:21 60:25 80:7 83:8 84:5 85:5

88:22 92:12 93:5 98:4,12 98:20 101:4,22 102:18 103:20 103:24 110:9 114:5,18 120:3 133:23 138:17 140:23 141:7 155:6,14 217:19,23 229:8,12 230:9 230:18 244:1 248:6 252:13 255:16 259:22 303:3 314:1,11 334:9 368:17
**given** 27:5 60:16 89:23 94:1 99:2 109:5 121:14 127:14 154:16 166:22 174:10 210:24 212:18,19 219:4 226:14 230:6 244:25 251:20 255:16 261:22 280:15 302:7 304:5 315:17 351:2 374:5
**gives** 50:25 99:15 202:19 246:10
**giving** 8:9 46:1 83:21 104:4,5 105:6 107:5 114:11 115:25 120:9 141:5,6 158:1 171:22 171:23 203:16 219:1,12 306:20 353:10
**globally** 142:16
**GLP** 88:3 232:3
**glutathione** 228:22
**go** 13:5,13,14 25:7 26:15 32:6 35:20 36:25 37:5 38:9 45:6 49:11 51:11,25 52:3 55:24 56:10 57:18 61:5 66:24 68:20 75:25 76:11 77:3,15 94:20 102:15 104:15 106:24 109:24 120:19 123:19 130:23 141:16 146:7 152:21 153:13 159:13 178:22 188:2 194:11 200:20 219:20 220:7,19 221:16 222:3 235:21 245:23 251:19,25 254:24 259:18 273:16 274:19 276:16 280:4 280:10,13,14 280:16 287:22 288:21 289:4 299:7 312:16 321:6,7 323:3 330:6 337:19 338:20 341:8 346:3 347:8 353:25 358:11 359:4,6,6 364:4,8 366:23 368:14
**goal** 36:23
**goes** 42:23 121:6 192:3 251:25
**going** 13:7 24:18 25:10 40:25 55:12 80:15 81:1,6 85:10 94:15,22 99:21 101:24 118:1 131:10 132:14 135:15 136:14 148:18 167:8 175:23 188:3 200:21 228:9 230:3 232:8 235:16 241:22 259:2 287:3 300:7,10 328:8 341:9 343:6,12 345:22 347:24 349:22,23 359:1,4,8 364:14,15 368:24 369:14 371:1
**Golkow** 1:21 3:20 6:4
**Golomb** 2:16,17 7:1,1 19:5
**Gonzales** 118:14 120:1,14,16
**Gonzalez** 118:25
**good** 8:3 58:8 100:17 168:10 192:25 201:2,4 270:7 287:16 302:3 369:6
**Gordon** 250:3
**government** 17:4
**grabbed** 121:25
**grade** 135:11 140:15,18,18 142:8
**great** 211:4
**greater** 38:14 125:1 178:2 292:16 303:7 303:12,15 304:15
**group** 122:2 131:6 217:22
**grouped** 118:6
**groups** 209:17 209:17 217:15 218:15 219:6
**guarantee** 293:14
**guess** 18:20 30:13 56:22 101:15,21 143:22 147:24 149:11 178:10 193:9 202:2 285:14 311:21 323:23 351:10 366:15
**guidance** 49:3 49:13 51:12 61:1 76:17 290:17
**guidelines** 186:5
**guides** 335:9
**gynecologic** 359:15
**gynecological** 182:9,25 356:1 356:1 358:3 359:12

**H**

**H** 3:19
**habit** 187:5 200:13 299:20 299:21 301:21 307:3,10
**habits** 101:13 301:11
**Hamilton** 242:25
**hand** 53:1 83:16
**handed** 8:20 9:7 111:12 211:20
**handing** 8:16 111:10
**handled** 122:3
**handles** 122:3
**Hang** 23:14
**happen** 69:3 97:4 181:6 300:8 343:21 361:1
**happened** 27:22 31:6 45:14 46:2 360:14
**happens** 27:10 27:14 82:13 85:9,18 291:15 298:17 302:3 342:8
**happy** 370:18
**hard** 193:24
**hazard** 36:1,2 37:15 47:6 48:14,14 77:1 77:2 82:2,4 143:19 153:9 165:21 167:2 168:12,14 169:12,19 170:23 171:8 171:10 197:21 197:22 204:7 229:21 234:24 235:1,5,6,8,11 235:14,15 237:23 243:15 256:8 268:18 285:15 289:6,7 297:24 314:22 326:1,3,6 327:16 332:15 334:4 338:18 370:10
**hazards** 15:15 178:14 236:10 322:15,16 323:9 335:11
**he'll** 26:15
**head** 52:4
**health** 4:21 5:2 15:15 36:3,20 47:6 48:13 107:3 115:7 166:11 178:14 201:6,13,17,25 202:9 204:13 204:24 205:6,9 205:23 206:20 211:7,12 212:8

216:3 236:13 283:21 284:7 284:13 312:16 322:15 323:9 331:25 334:16
**heard** 357:15
**heavily** 344:6
**heavy** 146:13 169:9 170:7 264:1 266:25 267:18 268:1,6 268:8 269:5 272:3 273:9 274:22 276:10 278:14 288:1 310:11 311:2,3 311:13 312:17 312:21,22 313:2,9
**held** 1:13 6:8
**help** 25:23 236:23
**helpful** 13:4,12 84:9 94:3 112:1
**helping** 151:15
**helps** 111:20
**hereinbefore** 372:9
**high** 88:4,16 235:10 295:3
**higher** 175:4 198:4 229:18
**highlight** 80:14 80:17
**highlightings** 13:24 16:25
**highly** 314:8
**Hill** 36:24 38:24 74:15,17,18,21 75:2,9 114:20 159:14 194:8 195:10 196:17
**hired** 364:3,23 367:15
**hiring** 367:4
**historically** 29:23
**history** 354:25
**hold** 24:4 267:14 294:18 318:4 339:6 358:10
**holiday** 370:19
**honed** 79:24
**honestly** 61:24
**HONIK** 2:16
**Hope** 2:23
**hopefully** 34:8 315:6
**hospital** 178:22
**hot** 301:6
**Hotel** 1:14
**hour** 19:3
**hours** 11:10,18 18:20,21 19:4 88:21
**Houston** 26:8
**human** 15:15 36:3,20 37:18 71:25 96:20 100:7 101:9,24 104:4 107:3 115:7,20 118:6 118:9 119:8,17 142:2 153:19 153:19 157:16 157:17 158:13 160:7 172:23 172:23 182:16 186:5 187:22 197:5 205:23 216:3,10,25 217:7 219:7 229:3 230:10 230:13,13,18 231:4,14,18,19 231:24 232:2,3 232:12 238:16 239:3,13 240:6 240:17 241:13 256:17 269:7 270:7 271:6,12 271:17 279:25 280:1 295:14 295:19 302:24 305:1 322:14 323:9 334:3,16
**humans** 101:12 101:14,18 117:14 182:13 197:3 231:9 232:17 270:6,9 270:21,24 279:24 291:22
**Huncharek** 244:11 246:2 361:8,14,25 362:15 363:23 364:3,23 365:5 365:23
**hundred** 166:25
**hurry** 292:2
**husband** 25:23 26:4,23 62:15 62:19

**I**

**IARC** 31:12 65:10,22 76:25 148:6 149:16 151:8 191:20 192:24 196:4 196:20 197:1 198:5,9,17 199:5 204:7 221:15 232:4 254:4,16 271:18 277:3,4 277:4 280:9,13 287:25 288:10 324:24 325:23 348:3,14
**idea** 44:12 46:4 48:8 86:16 90:23 118:8,9 125:22 126:5,7 149:25 152:20 160:18 166:5 194:2,9 220:13 243:16 246:5 256:6 273:21 283:12 289:6 300:23 301:5 306:21
**identification** 8:14 9:13 13:18 16:17 17:10 111:5 206:24 211:15 285:19
**identified** 9:17 17:23 23:12 24:13 25:24 26:25 33:2 53:20 54:1 65:10 75:3 83:25 113:11 122:11 147:24 147:25 148:1 158:16 170:20 200:6 212:8 236:9 245:13 253:6 288:2,12 309:10 332:15 338:13 362:16
**identifies** 37:14 282:17
**identify** 6:16 9:6 13:2 15:7 27:5 55:15,24 59:8 68:15 77:1 95:10 96:19 100:3 133:10 139:22,23 144:15 154:3 156:14 160:6 168:14 224:4 225:2 235:11 237:12 250:12 250:23 251:16 266:25 267:17 267:25,25 276:11 282:10 282:16 294:22 305:21 310:4 326:17 332:14
**identifying** 53:12 61:6 117:12 141:14 156:7 235:16 366:12
**ignore** 46:13
**Illinois** 1:18 372:20
**imagine** 46:14
**Imerys** 3:5 7:9 7:11 30:25 58:22 144:16 250:8 287:18 307:20 308:3 308:11,24 316:15,20 317:8,19,24 318:2,13,20 367:5 368:4
**Imerys'** 317:22
**immediate** 178:20
**immediately** 178:24
**immune** 276:21
**impact** 334:11
**imperative** 373:13
**importance** 101:1 104:10 104:23 105:6 256:14
**important** 21:1 30:5 50:10 81:4 84:25 93:22 97:20 99:12,18 100:10,15,23 103:3,6 104:9 104:19 105:3 122:14 135:15 138:18 141:18 143:18 150:19 152:3,6,11,13 152:22 159:12 167:17 168:3 169:8,21 212:23 215:10 229:16 231:15

234:6,21,25 235:20 242:13 245:8 256:4 260:23 271:6 314:21 357:24 358:2,6
**impossibility** 347:25
**impossible** 186:4 207:24 224:8 348:13
**imprecise** 283:5
**in-depth** 71:14 71:21 72:4
**inaccurate** 67:13
**incapable** 270:13,16
**include** 11:12 60:14 87:13 120:1 150:22 202:2 210:24 239:9 262:10 273:2 342:3 347:21 355:18
**included** 122:1 210:1 218:24 239:9 338:16
**includes** 86:22 87:15 151:25 198:17 256:16 274:15
**including** 11:14 29:21 62:18 71:18 215:5 219:25 251:5,9 261:6
**inclusion** 218:3 331:19
**inconsistency** 317:14,17,18
**inconsistent** 113:4 275:4
**increase** 37:10 39:18 40:15,19 158:4 171:21 172:1 199:12 219:19 237:23 274:25 369:21
**increased** 36:11 37:10,23 39:11 39:17 112:23 146:16 156:8 157:12,22,25 158:14 159:17 160:3 172:2,4 172:10 173:1,3 173:5,12,19 174:7,8 200:4 204:21 229:20 239:21 274:14 286:11 306:18 324:22 326:18 327:21 332:7 332:20 335:17
**increases** 34:18 35:4 38:17 39:20 40:13 41:4 157:18 198:22 203:22 203:25 237:22 238:3 286:22 306:24 319:18 321:1 329:25 331:5 370:11
**increasing** 169:3
**independence** 348:7
**independent** 51:18 257:8 272:7 325:24 329:9 337:18 340:4 362:16
**independently** 338:10
**INDEX** 4:1
**indicate** 227:13 240:24 247:19 254:19 299:18 307:3 317:8 327:12
**indicated** 63:3 250:25
**indicates** 113:2 160:12 180:21 226:14 260:10 305:1 306:22
**indicating** 364:2 364:22
**indicative** 179:18 238:11
**indirect** 281:15 282:11
**individual** 29:21 120:12 127:9 127:15 152:14 169:17 171:15 173:8,9 183:22 189:23 200:11 221:8 224:4 225:22 226:10 239:25 246:6 259:25 263:19 278:20 286:5 293:24 305:9 322:1,6 334:23 334:24 350:15 350:15
**individual's** 180:7 185:21
**individually** 100:21 149:7 154:8 158:25 171:12 219:21 234:4 272:8 275:8
**individuals** 25:18 78:14 85:11 115:13 121:13 131:9 159:5 218:9 228:11 239:7 241:3 244:2 256:9 286:10 305:7 320:6 342:18 349:18 353:8,12,18,20 354:2 355:19
**induce** 277:8 278:23 279:22 281:22
**induced** 279:7
**inducing** 281:14
**indus** 344:19
**industrial** 133:12 134:13 135:11 140:18 142:8 155:16
**industrial-gra...** 145:18 227:6
**industry** 31:14 124:1 245:19 340:23 341:3 344:8,19,22 345:1 350:14 350:15 352:1 362:18 365:21 366:12 368:8
**inert** 183:15 184:10 185:4
**inflammation** 61:19 126:6 127:24 128:2,9 128:13 140:14 196:7 219:25 220:1,15,18,19 220:20 221:1 221:20 227:20 268:13 276:5
**inflammatory** 128:16 168:25 189:20 190:4 190:12 191:1 191:21 192:13 220:5,23 222:23 228:1 243:18 266:2,5 266:9,11 272:14 274:9 276:19 277:9 279:2,6,10
**influence** 31:4 31:22
**influenced** 32:1
**influences** 123:7
**information** 10:12 15:15 17:18,20 23:22 26:5 30:8,12 30:21 35:18,21 37:14 39:8,10 41:11 54:4 70:13 74:3 76:15 78:2,4,8 79:23 80:14 82:15 86:18 91:1 92:8,11 103:3,4,23 104:8 106:2 118:3 121:14 122:22 123:4,9 127:15 134:13 135:13,17 138:13,17,25 141:15,18 143:5 158:24 159:3 162:6 164:14 165:23 165:24 166:20 167:13 168:3 170:10,11 180:20 185:23 191:14 194:14 197:15,18,19 198:17 205:4,9 216:12 217:6 217:15 218:11 218:12 219:10 221:1,6,12 237:11 239:9 241:6 247:2,4 247:18,19 253:1,1,3,12 253:13 260:12 260:14 284:6 293:23 304:5 314:8 318:19 323:23 329:16 331:1,24 332:23 334:11 336:15,17 337:1,4 339:12 339:25 342:2 349:16 359:23 360:3,3,20

368:7 370:3,5
**informative** 84:10 100:23 101:6 219:10 219:11 221:6
**informed** 95:18
**ingredient** 52:21 125:21 132:21 307:25 308:2 309:3 336:6 341:20 342:3 346:21
**ingredients** 44:10,15,17 125:18 127:10 144:4 168:22 309:14,18,20 322:18 324:4 336:13 337:3 339:18 341:9 344:9 346:19 347:1,5,12 348:2
**inhalation** 175:4 175:20,24 176:4 177:5,14 177:25 178:2,6 180:3 230:20 233:12 235:9 258:12 291:14 292:6
**inhaled** 264:21
**inhaling** 178:7 258:25
**inherent** 245:22
**initial** 21:15,16 55:9,11 56:24 64:16 65:25 82:1 231:8 235:6 246:13 281:22 342:3
**initially** 54:11 55:2,3 329:12
**initiate** 128:16
**initiated** 88:11 220:14
**initiates** 328:6
**initiation** 281:10
**injections** 292:8
**injury** 178:19 231:8 264:22
**input** 44:8 45:5 45:11 245:15 340:19,23 341:2
**insertions** 101:14
**inside** 105:6 296:7
**installation** 242:20
**instance** 79:5 230:9
**instances** 53:10 62:15 84:4,8 184:22
**Institute** 4:25 107:9,17 108:6 110:6,24 112:6 113:10
**instruct** 24:18
**instructing** 24:22,25
**instructions** 25:4 373:1
**insult** 225:3 281:1,8
**insults** 195:25
**intact** 229:1,2,3
**intend** 203:15
**intended** 23:22
**intending** 33:24 34:11 43:3
**intention** 130:4
**interact** 264:15 277:15
**interaction** 276:21 277:20 360:14 367:23 368:4
**interactions** 31:3,13
**interchangeably** 75:23
**interest** 349:5 349:22 350:7 351:3 352:4 353:7
**interested** 88:22 94:8 249:12 372:13
**interesting** 121:25 140:10 178:13 297:22
**interim** 231:1
**internal** 30:23 144:11 246:12 321:14
**internally** 67:9 67:16 297:10 326:7
**International** 346:10
**interpret** 230:3
**interpretation** 49:7 50:1 51:1 255:14
**interpreted** 50:11
**interpreting** 50:18 51:19
**interrupt** 359:2 359:9
**interrupting** 358:15
**interruptions** 136:24
**interval** 40:7
**intimately** 334:15
**intraperitoneal** 292:8
**introduced** 8:4
**introductory** 124:17
**invented** 115:14
**investigate** 353:3
**investigations** 239:14
**investigator** 246:6
**investment** 244:4
**involve** 24:23 154:14 214:2 258:5 295:24
**involved** 11:3 23:11 24:1 25:16 44:16 66:1 140:12 195:21 248:10 262:6 277:12 320:11 331:13 353:8
**involving** 19:9 153:20 347:1
**irrelevant** 143:23
**irritant** 166:6,11 167:2 243:17 338:9,18
**irritants** 274:9
**irritation** 127:24 128:3 140:14 167:7 168:23,24 179:19 268:11 268:12 276:19
**isolated** 228:24
**ISRTP** 31:7
**issue** 37:10 42:19 49:22 52:10,17 53:1 57:21 64:12 65:4 67:18 69:17 73:4,5 73:23 74:8 78:17 81:18 83:6 86:15 87:18 92:16 95:19 96:7 97:15 99:7,13 103:17 105:4 107:23 109:23 123:2,6,11,23 124:8 126:23 132:25 142:1,1 146:15 150:16 154:9 163:17 165:17 167:3 180:18 182:3 182:17 186:25 187:8 191:18 193:14,23 205:6 216:9 217:11 220:10 225:5 226:3 227:22 231:2 232:11 241:22 243:12,12 244:18 245:7 245:14,20 246:24 247:20 249:16 252:8 260:22 262:6 272:9,9,16,24 273:14 277:16 280:3 283:1 291:12 292:23 292:24 293:1,3 294:17,23 296:3,6 304:11 305:7 314:20 321:9 323:20 324:17,19 325:14,25 326:23 330:22 331:15 333:21 333:22 334:15 335:14 350:25 351:4,22 352:2 356:2 362:23 370:2
**issued** 24:12 109:9 110:24 113:11
**issues** 30:20 67:1,5 72:18 97:17 117:13 123:10 182:22 182:22 192:1 287:23 294:18 312:19 314:9 324:12 334:9

335:5 346:2 355:21 360:12 366:5
**issuing** 56:17
**It'll** 69:6
**Italian** 136:22
**Iturrulde** 16:6

**J**

**J** 3:2
**J&J** 58:21 250:8 307:21
**Jacob** 3:20 6:3
**Jane** 3:1 7:10 287:17
**jbockus@dyk...** 3:2
**Jean** 164:9
**Jersey** 1:1 6:13
**Johnson** 1:3,3 2:24,25 6:9,10 7:13,13,15,15 7:24,24 8:6,7 10:18,18,24,25 11:19,20 21:9 21:10 30:24,24 30:25,25 34:17 129:18 130:3 132:4 137:9,10 139:16,16 144:16,16,18 144:18 148:9 154:6,6,15,15 154:18 158:18 158:19 160:5,5 160:9 161:23 161:23 164:4 164:19 165:8 180:6 189:17 200:3 251:6,6 251:24,24 253:10,10,14 253:14 268:22 274:23 287:10 287:10 308:12 308:12,19,21 308:22 309:4,5 316:16,16,21 316:21 317:6,6 317:9,9,20,20 317:21 318:3,4 318:9 327:24 327:25,25 337:3,4 368:4 368:5
**Johnson's** 8:11 19:9 34:12,18 40:12 80:4 117:2,24 124:7 126:13 129:18 129:20 130:3 132:4 133:21 136:1 141:1 143:3 144:6 148:9 153:23 154:11,18 155:17 157:4 160:9,23 161:13 163:20 164:4,18,19 165:8 167:19 169:10 170:8 173:20 176:4 176:23 180:5,6 188:11 189:18 198:1 200:3 248:1,5 249:11 249:14,22 250:14 251:16 252:11,15 255:24 256:20 258:4 260:2 261:7 262:22 263:20 274:24 308:19 317:21 318:10
**joined** 19:4
**Journal** 27:11 346:11
**journals** 27:12 346:10
**judge** 87:13 247:2
**judgment** 39:5 77:23 84:12,14 84:24,24 86:16 99:7 105:13 156:24 217:25 320:7
**judgments** 86:23,24 88:17
**June** 20:12 111:19

**K**

**Kansas** 1:20 372:22
**KATIE** 3:18
**keep** 18:9 55:4 80:5,24 81:8 286:16 358:18 358:24
**key** 56:21 57:2 97:16 169:2 355:20 370:4
**Kimberly** 2:21 7:14 8:5
**kimberly.bra...** 2:22
**kind** 30:13 76:13 81:8 82:9 83:10 114:16 160:17 160:21 194:18 213:12 287:12 293:21
**kinds** 36:16,22 43:16 57:8,14 58:15 92:25 98:15 101:20 175:15 185:24 187:20 209:18 231:8 271:10 305:6 323:16
**KIRKLAND** 2:21
**Klaassen** 357:1
**Klimisch** 206:1 207:11
**knew** 57:18,19 57:20 361:7
**know** 19:23 29:7 34:4 37:17,24 40:9 46:1 51:9 55:16 56:3,6 57:7,19 58:7 59:2 60:5 63:10,16,22 68:12 69:3 70:7 81:1 82:23 85:6,7 85:13 89:20 91:9 92:15 98:25 104:13 105:9 107:18 109:12 110:16 119:3,12 120:23 121:9 122:15,16 130:11 134:17 136:11,17 139:18 140:5,8 143:21 145:2 146:24 150:25 155:8 168:10 168:11 169:13 182:7 183:23 189:23,25 190:3,15 192:3 194:15 196:9 204:25 205:20 206:3 216:6 222:2 225:6,10 225:11,14 229:13 237:9 242:2 243:7 245:22 247:3 247:10 250:19 252:18 257:18 259:18 263:7 263:22 270:15 274:19 277:22 278:21 279:4 279:15,21 287:18 289:21 289:25 292:15 293:19 300:24 301:13 303:4 304:13,20 306:25 307:7 308:7,17,25 309:1,2 312:17 315:5 317:3,16 320:15,19 328:17,17 330:23,24 332:12 339:15 339:19 344:11 344:13,14,14 344:16,25 346:7 352:22 353:1,2,18 354:12,14,22 354:25 355:5 355:10 356:23 357:1,1 369:7
**knowing** 144:21 194:20 297:24 314:3 328:11
**knowledge** 34:5 293:11 316:14 355:11
**known** 29:24 31:2 56:25 128:1 170:23 178:15 184:5 185:4 194:17 196:1 197:24 246:11 256:17 269:6 271:17 272:18 273:12 279:25 285:16 370:10
**Krewski** 117:18
**Kunz** 68:19

**L**

**lab** 310:23
**label** 47:3
**labeled** 166:11
**labeling** 44:9 51:8 52:16
**laboratory** 181:22 182:20
**laid** 40:22 59:10

87:11 113:21 154:7 158:25 164:23 216:12 333:15
**landing** 181:12
**language** 28:4 45:18,19 46:21 47:2,20 48:2 48:16 49:7 50:18 52:10 110:16 315:24 316:5 333:24 339:20
**large** 44:19 53:22 61:23 128:17,21 129:11 130:4 178:5,7,21 243:9,12
**large-dose** 243:3
**larger** 21:25 22:7 68:23 125:8,25 128:13 129:1
**late** 9:3 317:10
**Laura** 1:12 4:13 4:14,16 6:14 7:20 14:15 372:5 374:12
**law** 39:19
**lawful** 7:21
**lawyer** 352:12 352:15
**LAWYER'S** 376:1
**lawyers** 350:20 351:18
**lay** 66:22 77:16 77:24 79:19 98:3 134:19 135:9 138:25 153:2 158:20 215:2
**layer** 229:24
**laying** 151:11 332:22
**lays** 76:12 92:5
**lead** 97:2 191:23 195:19 220:15 221:22 227:19 228:23 267:1 268:23 273:24 279:5 283:14 296:22 312:23
**leader** 107:12
**leading** 107:19 107:20 222:24 281:14
**leads** 129:12 220:6 313:9
**leave** 366:13
**led** 215:11 329:24
**legal** 24:16
**length** 265:17
**lesions** 222:25 230:24 240:14
**lesser** 324:19
**let's** 14:4 16:21 20:10 21:5 63:7,24 70:23 102:18 110:21 128:7 151:20 180:3 184:18 188:16 189:11 235:8 321:16 327:2 333:13 352:19 359:20 362:21 363:8
**letter** 27:13,17 361:23 362:1 363:18,20,21 363:23
**letters** 27:8
**level** 37:20 39:17 117:15 121:8 132:2 145:20,22 159:17 198:4 213:15 214:2 216:7 217:19 226:19,20 227:8 228:16 229:18 258:21 258:21 266:4 282:10 286:9 306:25 311:13 338:18 348:1 348:13,15
**levels** 161:11 166:22 168:15 175:11 176:12 176:21 228:21 229:4 251:8 256:7 267:16 310:14 311:16 311:18 312:18 312:21,22
**LEVIN** 2:12
**LHG** 1:5
**liabilities** 73:9
**liability** 1:5 351:18
**libraries** 26:12
**library** 26:10,11 62:22 63:1
**lies** 360:15
**life** 187:5 200:16 228:12 302:2 303:19,20
**lifetime** 185:17 185:20 187:17 200:10 263:21
**Lily** 164:9
**limit** 170:15 228:5 241:22 310:15,24 311:9
**limitations** 79:16 239:13 241:5 347:11 347:17
**limited** 169:7 283:12 312:24 358:17
**limiting** 264:11
**line** 359:10 375:3 376:3
**lingering** 183:9
**link** 61:19 99:17 109:17 110:12 110:12 285:3 318:7,9
**linked** 42:12 167:2 227:20 228:1 238:6 254:16 277:7 285:17 338:17
**linking** 57:4 58:20
**lipsticks** 161:17
**list** 22:1,6,8 55:10,13 59:13 59:25 60:1,15 60:20 61:2 63:6,12,13,17 63:21 64:1,2,7 64:11 68:23 83:3 108:16,21 108:22 109:2,4 118:19 120:15 122:6,7,9,18 211:9 212:1 241:15 250:13 263:14,14
**listed** 55:10 59:13 63:5 108:15,17 111:1 197:8 211:24 310:17 310:18 347:5 354:23
**listened** 32:21
**literally** 346:4
**literature** 25:22 57:16 61:14 62:3,18 68:24 71:15 77:25 78:11 79:2,7 79:10 82:25 85:5 90:24 97:8 103:10 121:23 125:2 126:21 128:22 128:24 132:18 132:20 133:1 133:15 134:20 134:22 135:6 139:3 147:13 148:3,8,14,22 149:12,14,15 150:22 151:13 151:16 152:18 152:21,23 153:8 154:2 170:3 180:25 182:8 187:14 199:19 200:8 200:18 206:23 209:25 223:4 236:9 248:25 249:2,21 266:15 273:8 273:11 281:3,5 282:17 285:13 286:23 297:9 299:12 311:3 312:11 314:5 321:13,17,23
**litigation** 1:5,21 3:20 6:4 10:17 12:7 19:9 29:4 131:9 218:20 246:1,4,22 248:10,13,14 248:18 249:7 261:20 320:12 320:20 324:1 331:13,22 346:17,17,18 346:21 347:1 351:1
**litigations** 29:9
**little** 31:11 38:10 39:16 42:18 44:19 45:23 53:5 61:1,25 67:4 81:18 84:5 95:4,24 96:6 97:3,6,20 99:2 120:3,9 121:2 193:24,24 201:5 203:20 210:20 211:3

245:13 335:21 338:1 339:7 365:9
**liver** 233:25
**lives** 345:2
**living** 81:9 294:3
**LLC** 3:15,15 7:6 7:7
**LLP** 2:8,21 3:7 3:12
**Loansome** 26:9
**local** 26:10
**locally** 242:16
**Locke** 3:7 4:7 7:3,3 111:14 111:21 319:1,4 319:5 322:9 323:1 325:15 326:21 329:7 329:19 330:12 333:1 336:4 337:11 340:24 343:10 351:14 352:6 354:4 356:19 357:10 358:11,16,20 359:3,11 364:14,20 368:19
**long** 18:18 179:4 304:23 343:24 358:20 369:7
**long-term** 72:20 178:19
**longer** 95:6 220:21 303:2 305:11 359:4,7
**Longo** 163:19 177:15 249:3 259:17
**Longo's** 162:7 247:24 248:18 248:22
**look** 19:22 21:13 22:3 27:19 29:23 31:2 36:22 49:12 51:11 52:1,3 53:24 56:18 60:4,6 62:9,10 68:20,25 72:16 75:15 78:25 79:13 82:24 83:11 84:15 85:11 91:1 92:3,4,10,16 92:25 96:22 97:23 98:10 105:1,25 106:5 109:19 110:17 110:19 117:4 118:18 119:7 119:10 130:16 133:14 134:1 143:10 145:2 146:7 150:17 153:18 155:25 159:10,12,14 159:24 160:8 160:16 162:7 162:16 166:24 170:22 172:21 174:20 177:6 182:3,17 183:21 189:22 195:11 202:15 208:6,13 210:11 221:5 225:3,4 229:4 232:5,11 234:3 237:19,20 239:12,15 240:6,10,13,23 241:7,12,15 245:20 246:25 247:7 248:20 249:13 252:1 254:18,24 256:13 259:19 263:9 267:23 274:6,19 275:21 276:17 277:14 278:5 280:5,11,11 281:19 282:23 284:10 288:5,6 288:10,21 291:14 292:2,7 293:3,6 295:17 315:14 317:13 317:15 318:15 320:6 323:2 324:25 326:23 327:5,11 334:10 338:20 361:16 364:5 364:10 367:5,7 368:14
**looked** 15:4,8,18 15:20 16:5,6,9 17:3 52:15,16 69:25 70:19 73:3,5 98:1 109:11 123:21 142:9 159:20 161:1 163:11 163:16,22 165:17 173:11 175:13 179:20 185:22 187:8 192:21 217:8 224:14 238:7 238:24,25 239:1 256:25 271:23 278:19 285:1 304:4 319:9 333:8 336:25,25 338:10 348:17
**looking** 19:7 31:21 32:18 36:4 37:15 40:5,6 48:7 49:21 52:11,20 53:19,21 54:21 55:13 61:15,21 64:18 68:13 74:7 76:8 78:6 80:21 81:22 83:16 86:7,16 88:1,9 93:2 112:9,11 115:18 117:2 117:11 119:4 119:17 123:13 131:5 132:17 138:12 141:11 142:6 145:9 152:2 153:5 162:12 169:14 170:18 171:13 194:16,17 195:21 207:21 218:13 225:6 225:12 226:2 231:1 239:18 240:3,4 257:2 258:15,17 262:7 272:25 273:17 277:17 293:1 294:20 302:18 315:21 320:8 324:19 325:25 326:1 327:4 330:22 331:15 336:14 352:2
**looks** 41:17,18 41:19 197:14 197:14
**Loretz** 365:15 365:22
**Los** 2:23
**lot** 27:10 44:19 61:10 79:1 170:12 182:6 229:12 271:14 315:8 346:1,2 350:19
**lots** 62:9 267:4
**Louis** 1:15 3:14 6:9 19:19 20:21
**love** 230:25,25
**low** 145:22 235:10 256:7 258:20 319:11
**lower** 68:6 69:15 73:15 183:16 229:8 295:4 328:2
**lung** 125:5 178:20 179:19 231:3,8 254:22 264:22,23 291:15
**lungs** 178:19

**M**

**M** 3:12 4:13,15 4:16
**ma'am** 312:14
**macrophage** 125:7
**macrophages** 150:17
**magnitude** 293:7
**main** 97:12
**maintain** 319:11
**maintained** 59:25 62:16
**majority** 74:2 141:22 142:23 160:13 184:9
**makeup** 355:18
**making** 37:1 44:17 74:5 173:2 243:14 245:24 253:7 261:15 317:11 318:2 338:24
**male** 103:12
**manner** 231:24 232:17 265:25
**manual** 76:10
**manufactured** 137:9 139:15 154:5,15 158:18 160:5 164:19 165:9 316:15
**manufacturer** 309:5 331:16
**manufacturer's**

329:21
**manufacturers**
144:12 359:24
360:4,7,19
**mark** 8:17 13:5
13:13,15 14:1
14:4,13,21
16:22 17:12
111:8 211:17
**marked** 8:13
13:18 14:10,18
14:24 16:16
17:9 20:4
22:21 23:9
25:19 28:1
53:6 90:8
93:15 95:11
111:4,12
155:13 201:10
206:15 209:23
211:14,20
266:21
**market** 2:18
43:16 154:12
160:17 161:4,9
308:13 326:8
329:16
**marketed** 43:14
**marketing** 1:4
6:10 322:17
324:4
**markets** 324:9
**marking** 14:6
**markings** 13:23
16:24
**match** 231:9
**material** 61:10
82:19 175:14
208:9 263:14
307:21
**materials** 9:17
20:24 21:19
45:6 57:25
68:14,22 82:20
83:23 108:18
122:6,10,11
175:15 208:3

211:25 212:10
263:8,10 321:7
333:8 342:4
**Mattenklott**
250:3
**matter** 21:14
60:8 186:1
235:9
**Matthew** 261:7
**MDL** 1:4 8:10
11:8,21 13:8
14:23 22:19,20
23:1,7 24:3,12
29:4,10,17
31:21 32:21
33:4,10,20,24
34:1,8,12 35:1
58:1 61:7,9,15
65:14 66:11
74:14,21 75:1
82:18 83:1
85:15,24 87:6
89:7,18 91:23
113:11 115:17
116:24 117:23
118:15 139:12
157:2 160:3
188:15 198:3
203:15 214:13
216:23 236:3
255:25 261:12
262:4 267:8,22
268:9,21 269:3
269:8 285:3
288:2 335:7
**Meadows** 2:3
6:18,18 13:12
18:16 23:14
24:4,15,25
28:21 32:3
38:19 39:22
40:17 51:2
56:7 58:6 86:2
93:17 94:10,13
106:12 131:17
132:5 134:15
136:3 139:17

143:7 144:9,24
154:21 155:18
166:14 173:22
174:9 179:12
180:17 183:8
192:18 221:4
222:10 234:12
252:17 260:4
298:21 303:14
304:16 306:9
307:13,23
308:6,15
309:16 310:8
312:5,9 315:4
316:22 322:20
325:3,21 327:7
329:11 330:2
332:9 334:20
337:9 342:23
350:21 351:19
356:12,24
358:10,14,19
358:25 359:8
368:21
**mean** 11:8 13:9
21:19 28:7,12
28:13 38:5,6
39:24 41:13
53:14 56:3
58:11 70:17
72:4 83:23
85:10 89:21
105:10 109:25
116:2,12,22
120:18 124:22
127:7 131:19
131:23 135:16
137:17 152:17
154:25 181:21
183:18 189:4,5
196:23 197:9
216:5 232:4
236:21,22
247:13 254:24
263:13 275:5
281:9 294:15
301:18 320:5

325:5 330:6
331:4 346:18
347:7,22 350:4
353:25 360:6
361:23
**meaning** 47:24
189:9 264:13
**means** 50:19
99:1 118:20
127:3 310:23
**meant** 35:8
140:6
**measurement**
177:16
**meat** 30:2
**mechanism**
88:11 140:12
179:8,10
188:11,25
189:9,16,24
191:19,22
192:4,14 193:1
193:5,16,19
194:3,6 195:13
195:17 196:6
196:13 219:24
221:10,20
223:1 227:18
228:3 229:15
268:10,12
272:20 276:4
277:7,17 278:2
278:6,12
281:16 282:12
289:3 293:5
314:21 370:7
**mechanisms**
146:20 189:13
191:11,13
228:5 274:7
275:23 281:22
**mechanistic**
195:22 217:1,5
**medical** 26:10
27:12 62:2
147:13 157:24
266:15 321:12

321:17,22
359:16
**medicine** 26:11
27:11 353:24
354:16,19
**meet** 114:23
**meeting** 12:8,9
18:14,17,19,24
19:1 343:16
344:17,20
345:7
**meetings** 31:7
344:2,6,8
**member** 344:22
**members**
353:19 354:11
356:8
**memory** 12:16
362:5 367:21
**mention** 90:3
119:20,21
147:5 168:9
340:8,9,13
347:10,14
**mentioned**
18:12,23 31:19
33:19 35:3
118:21 121:21
148:13 163:4,5
209:12 264:2
282:22 314:6
327:3
**mesh** 129:7,7
130:13
**mesothelial**
233:20
**messed** 339:5
**met** 18:13
287:17 319:7
**Meta-Analysis**
4:19
**metal** 264:7
310:11 311:3
311:14 312:17
312:21,22
313:3
**metals** 146:14

264:1 267:1,18 268:1,6,8 269:5 272:3,7 272:10 273:3,9 274:22 275:7 276:10 278:14 288:1 289:2 293:19 309:19 310:3 311:3,24
**methodologic...** 155:12
**methodology** 75:16,19 76:4 90:21 114:24 116:23 117:1 117:22 173:16
**methods** 214:22 214:24 236:8
**METHVIN** 2:2
**Michelle** 2:8 6:20
**microenviron...** 228:25
**microns** 124:25 124:25 125:1
**microphone** 339:6
**middle** 316:13
**migrate** 64:24 68:6 69:14 70:5,22 72:11 73:15 182:10 185:5 283:13
**migrated** 300:14
**migrates** 181:19 183:5 186:16 301:14
**migrating** 185:11
**migration** 66:5 67:9,15 69:10 69:17,21,24,25 71:2,10,17 73:24 74:6 81:2 95:19 97:12,15 100:6 182:13 184:3 215:7 216:9 295:22 299:22 300:1,9 335:14 356:2
**migratory** 71:24
**MILES** 2:3
**miller** 178:1
**milling** 132:24
**million** 158:5,5
**millions** 53:22 53:22
**Millman** 250:5
**mind** 14:1 38:8
**mine** 130:24 136:22,23,23 142:8 145:6 357:9
**mined** 131:14 135:22 142:15
**miner** 175:8 178:1
**mineral** 253:20 254:2
**minerals** 250:10 309:10 311:23
**mines** 136:25 142:16 150:1
**minimize** 202:20
**minimum** 303:5 303:6
**mining** 132:24 135:11 175:16
**minute** 208:14 219:24 364:9
**minutes** 288:9 299:6 356:14
**misheard** 298:13
**missed** 137:19 316:3
**missing** 200:7 297:19
**Missouri** 1:15 1:19 3:14 6:9 372:20
**misstates** 86:1 163:3 186:12 296:18
**mistake** 69:8
**mistaken** 108:24
**MITCHELL** 2:12
**mixes** 308:22
**mixture** 125:18 146:12,17 151:25 152:2,5 152:8 153:7 167:9 168:21 169:15,16 225:7 226:3,9 256:2,15,16 257:3,10 272:23 277:11 277:21
**mixtures** 292:24
**mode** 278:5,5 289:8 292:25 370:5,10
**model** 182:12
**modified** 65:20
**molecular** 189:24
**moment** 12:19 74:13 99:20 242:8
**Monday** 9:4 12:8,11 18:13 18:15,17
**money** 349:22 350:19 351:17 351:25
**monitor** 235:17
**monkey** 182:23
**monkeys** 182:21 182:23
**monograph** 288:17,18
**monographs** 149:17
**Montgomery** 2:6
**month** 11:1,10 11:18 300:2,25 301:2,2 303:13 303:16,19,20 303:21,25 304:15 305:2 305:14
**months** 301:3,18
**Moon** 250:3
**morning** 8:3 306:21 327:22
**morphology** 147:24 149:6
**motion** 180:10
**mouse** 292:1
**move** 70:10 73:10 125:6 180:9 183:15 265:4,10,12
**moved** 112:14
**movement** 71:5 73:6 74:8 103:14 105:4 183:20,25 184:10
**moving** 358:18 358:24
**mparfitt@ash...** 2:9
**multiple** 27:4 169:24 256:2 275:21,22 301:23
**multiply** 292:15
**Muscat** 244:11 246:2 361:8,14 361:25 362:15 363:24 364:3 364:23 365:4 365:24

**N**

**N** 2:1
**N.W** 3:8
**name** 6:3 8:5 16:14 19:17 80:25 119:3 126:18 206:5 206:11 263:3 287:17 319:9 327:23 344:14
**name's** 319:5
**names** 149:12 289:22 349:17
**narrow** 11:6 28:18 33:20 57:7
**narrower** 61:25
**Nate** 164:9
**nation's** 107:12
**National** 4:24 26:11 107:9,16 108:6 110:5,24 112:6 113:9
**natural** 223:7 225:15 228:14
**naturally** 310:12 311:5
**nature** 48:19 55:22 133:12 212:19 258:18 266:6
**NCI** 110:4 113:16
**NCRA** 372:18
**near** 348:14,15
**necessarily** 21:22 116:18 197:9 214:2,6 225:25 227:23 231:25 265:24 268:16 269:20 276:5
**necessary** 47:5 47:16,25 48:19 49:8 50:2,19 51:19 52:19 286:4 373:4
**need** 9:12 39:18 39:23 45:17 52:17 62:3 105:25 110:19 119:10 146:6 151:12 206:4 213:9 221:1 229:22 231:13

233:3 244:9 247:17 274:19 276:16 278:1 280:4 292:12 306:5 347:8 355:23 359:5,6 361:16 362:4,5 364:4,6 365:16 366:16,19,20 366:23 368:13
**needed** 48:15 213:16
**needing** 264:17
**needs** 52:12 94:17 167:11 264:8 328:3 352:4
**negative** 42:3
**negatives** 79:18
**neither** 372:11 372:12
**neuronal** 233:24
**never** 43:21 52:8 58:8 205:20 246:11 255:16 293:12
**new** 1:1 6:13 27:10 33:5,10 54:15,15,18 55:16 61:15,23 62:4 78:23 135:23,25 140:24 211:9 211:24
**news** 122:19,21 123:11
**newspaper** 124:3
**Newton** 16:7
**nice** 101:16 168:10
**Nicholson** 365:19
**nickel** 267:2 268:2 276:16 276:18,20,22 278:11 279:5
291:6 293:15 312:4 313:10
**night** 16:7 18:24
**NIH** 26:11
**nine** 183:24
**noise** 365:9
**non** 294:13
**non-asbestifor...** 147:15 148:25 149:18 151:7 193:3
**noncancer** 294:16,24
**nondirect** 281:8
**nongeno** 294:15
**nongenotoxic** 280:20,25 281:21,24 282:9 294:13
**Nonhuman** 206:25
**nonlitigation** 213:25 218:19
**nontremolite** 149:23
**normal** 222:3 279:20
**normally** 220:8
**North** 1:14
**Notary** 372:22 374:19
**notation** 317:12
**notations** 16:25
**note** 82:24 218:10
**noted** 373:10 374:7
**notes** 80:16 81:8 376:1
**notice** 4:11 9:9 9:16 17:17 141:24 173:4 290:25
**November** 4:17 14:22 22:20
**NRC** 76:11
**NTP** 31:8 57:6
88:3,24 142:4 222:19 230:25 240:16
**number** 9:8 14:7 14:11,14,18,20 14:25 15:7 16:23 17:14 20:4 96:22 111:9 112:6 122:19 126:20 133:5,8 142:16 158:2 172:3 174:7,11 185:13 189:12 211:18,21 241:2 258:15 302:5,7,21 303:3,5,7 304:1,2 347:4 347:8 348:16 354:11
**numbers** 22:6 58:25 100:17 177:20,21 348:9
**numerical** 86:11 87:3,10 89:3 101:2 103:24 105:14,19 106:10 107:6 114:18 115:9 134:4 141:7 160:22 219:4 315:18
**Nurses'** 312:15

**O**

**O** 3:19
**object** 28:9 183:10 369:23
**objection** 23:14 24:15 28:21 32:3 33:8 38:19 39:22 40:17 45:1 48:22 49:10 50:5 51:2,3,23
58:6 72:2 73:17 75:5 85:25 86:2 87:8 89:19 90:12 91:24 93:17 94:10,14 96:9 99:5 105:23 106:12 106:13 107:14 113:19 118:16 121:3 126:25 130:6 131:17 132:5 133:25 134:15 136:3 137:11 139:17 141:2 143:7,8 144:9,24,25 145:23 154:20 154:21 155:18 157:7 159:7 160:10 162:1 163:2 164:11 165:11 166:13 171:5 173:22 174:9 176:5 179:12 180:16 184:24 186:11 187:18 190:14 192:18 195:6 196:8 198:8 214:17,18 221:4 222:10 233:6 234:11 234:12 238:14 239:22 241:19 252:16,17 255:10 259:10 259:13 260:4,5 261:10 262:24 270:14 278:16 279:14 282:3 283:24 284:18 291:9 292:20 296:4,17 298:6 298:21,22 300:3 303:8,14 304:16 306:9
307:13,23 308:6,15,16 309:15,16 310:8 312:5,9 315:4 316:22 321:20 322:20 325:3,21 327:7 329:11 330:2 332:9 334:20 337:9,10 340:21 342:23 342:24 350:21 350:22 351:19 351:20 353:22 356:12,24
**objections** 18:2
**observations** 184:8 226:22 270:19
**observe** 230:24
**observed** 222:5 227:24
**observing** 222:6 242:22
**obviously** 28:24 41:21 57:16 83:4 93:6 122:15 135:13 153:17 196:19 219:12,17 229:24 239:12 314:16
**occasional** 218:25 283:2
**occupation** 175:7
**occupational** 174:21,25 175:2,10,19 176:13,22 177:22 178:11
**occupationally** 132:23
**occur** 71:10 175:25 179:1 184:5 194:23 194:25 295:3

303:24 311:7 342:11
**occurring** 226:7 310:12 311:5
**occurs** 131:13 186:10 253:21 299:19,22 300:1
**October** 4:13 14:8 19:14 21:4
**offer** 34:11 43:3 203:15
**offered** 33:6 34:24 60:12 262:18 320:16
**offering** 33:3 60:3 157:2 268:21 269:3
**office** 53:17 56:13
**official** 14:2
**offset** 292:17
**oh** 60:9 69:9 267:10 269:9 313:14 348:23 355:22 361:20
**okay** 8:22 9:5 10:5,22 11:9 12:19 14:1 18:12,23 19:7 20:18 22:12,17 23:6,11 25:9 26:3,22 27:20 27:24 29:16 32:15 33:12 39:15 43:2,7 44:4 46:16 53:4 55:4 56:7 60:19 61:5 62:13 63:2,14 64:15,18 65:13 66:9 68:9 69:2 69:20 74:23 75:15 76:2 77:12 78:21 80:1 84:4 85:19 89:13 91:12,17 94:9 95:10,16,23 96:18 100:2 107:22 109:1,8 110:22 113:15 114:25 115:10 115:15,15,23 116:23 118:12 119:4,24 121:20 122:4 124:3,11,13,19 126:11,19 127:14 128:4 131:11 133:4 133:18 137:22 140:4 142:25 145:16 146:2 146:25 147:11 147:19 151:14 152:1,10 153:25 156:21 158:12 161:10 162:21 164:7 165:7 166:2,14 170:4 173:15 174:14 175:1 180:2,17 181:10,17 182:4 186:6 187:12 188:1 189:11 190:23 192:11 193:22 194:1 196:19 197:7 200:19 201:16 203:16 206:7 207:16 208:8 210:5,18 211:6 212:3,15 215:15 217:17 218:21 219:23 221:24 227:12 232:18 234:20 235:6 236:1,6 242:7 243:23 250:17 259:21 260:25 263:12 264:18 265:15 266:24 267:14 267:21 269:4 269:10,10,15 270:10 271:24 274:17 276:24 277:10,25 280:17 281:23 284:12,25 285:24 286:8 286:14 288:7 288:22 289:25 290:2,2,5 306:13 308:2 318:11 324:2 329:8,20 340:2 341:15,18 345:14 351:15 352:19 359:3 362:4 365:8 367:18
**old** 18:8
**older** 15:17 111:2
**OLVEY** 2:21
**omission** 98:25 121:1
**omitted** 96:16 98:8,10,19
**once** 43:15 60:1 67:3 187:3 261:20 290:23 300:1,1 301:2
**oncologist** 358:4 359:13,15
**one-expert** 348:12
**one-to-one** 271:4
**ones** 16:2 26:21 53:25 70:13,18 76:19 81:3 101:5,6 119:23 122:12 123:21 138:19 148:6 170:24 229:17 234:16 254:2 268:9 362:17
**online** 26:12
**open** 344:2,4
**opening** 296:23
**operate** 278:11 278:13
**operating** 272:14
**Ophthalmology** 355:8
**opine** 31:20 33:24
**opined** 33:22 257:2,5,7
**opinion** 34:12 34:17 35:1 37:1,22,22 39:19 41:1 43:3 66:22 70:3 86:19 95:8,21 125:13 125:15 128:6 128:10 144:6 145:25 146:3 147:19 149:1 151:19,22,23 160:2 164:2 166:17,18 167:10 175:23 176:1,7 181:14 182:11 183:6 184:11,15,17 184:21 185:1,6 185:7 186:6,22 186:24 188:24 189:15 190:9 190:16 191:4,6 191:14,20 193:8,12 196:4 197:25 198:14 199:3 200:1,5 203:9,9,12,13 203:14,17,19 204:15 208:22 212:9 213:14 216:10 219:9 236:17 237:2 239:17 244:6 256:22 257:12 259:22 260:7,8 260:21 261:3 262:4 265:11 265:13 268:21 269:2 274:11 277:10 280:24 285:2,14 286:3 286:7,8,12,22 298:2,17 299:15,16,25 300:5 303:10 303:23 304:1 304:22 306:7 306:17,19,22 307:1 316:7 318:4 319:15 319:17 321:1 321:19 324:21 329:24,25 332:4,6 333:21 338:7,12 339:1 339:10,13 346:19 353:16 354:1,9 355:12 355:16 356:10 358:8
**opinions** 10:24 21:22 22:10 28:3 29:19 30:13 32:6,18 32:23 33:3,6 33:10 34:2 53:13 60:3,12 61:7 66:16 75:1,17 76:5 80:2 81:11,24 82:14 85:17,17 85:24 89:6,17 109:22 110:2 116:13 125:16 151:17 157:1 174:11 191:16 192:7,8 215:12 216:21,23 226:17,21

237:5 244:10 262:18 306:4 307:8,20 314:14 320:21 320:22 322:14 323:9,24 330:19 333:15 335:10,15 337:18,21,25 339:4 355:17
**opportunity** 297:10 298:25 299:4,10,11
**opposed** 54:10 134:13 140:24 205:22 255:5 266:10
**oral** 4:11 9:9
**oranges** 120:8
**order** 1:9 14:5 26:6 30:10 36:25 38:14 39:18 48:13 52:1 82:20,22 82:24 92:23 106:17 114:22 202:20 221:2 231:3 232:25 264:6 282:5 326:16 365:17
**ordered** 62:23
**ore** 130:24
**organism** 294:10
**organisms** 294:3
**organization** 353:15 354:10
**organizations** 349:24
**organize** 196:14
**organs** 117:13 146:19 235:18
**original** 20:23 21:2 22:4 29:12 32:7,9 54:22 68:14,18 68:23 74:19 83:1,2 314:15 373:14
**originally** 19:15
**outcome** 35:5,19 38:18 39:21 40:13 244:5
**outline** 80:22 90:9 188:14
**outlines** 126:8
**outside** 105:5 116:18 117:1 141:24 228:15 286:23 295:25 296:6
**ovarian** 4:20,23 34:13,19 37:4 40:14 57:1,21 61:18,20 80:4 108:8 109:18 110:7,13,25 111:2 112:8,24 119:6 124:6 125:10,12 127:21,23 151:21 156:11 157:6 160:4 165:10 169:3 173:21 176:2 179:10,23 180:25 181:11 188:13 189:1 189:18 190:12 191:1,23 192:5 192:17 193:4 193:17 196:2,7 196:22 198:3 198:22 200:5 202:12,18 203:6 204:16 207:22 208:23 220:1 221:25 222:9 236:19 237:4,15 238:10,12 239:19 241:23 256:23 258:1,3 269:1 272:2,24 273:6,10,13,15 274:13,14,25 275:6,16 282:19 285:4 286:4,18,23 288:20,24 289:13 291:12 291:18 306:18 306:24 312:8 319:18 321:2 322:5 324:6,12 325:1,17 326:24 327:6 330:1 331:5 332:7 335:17 369:22 370:14
**ovaries** 64:25 180:7,12,14 181:2,20 182:14 183:5 183:17 184:14 184:23 185:21 186:9,20 187:16 243:1 305:22
**ovary** 101:19 181:8 288:3,13 298:5,20
**overall** 54:6 71:17 73:21 81:4 85:9 120:10,15 123:2 125:20 126:12,23 127:12,16 141:19 143:18 150:7 159:11 168:17,18 169:21 173:2 187:14 207:10 215:21 229:20 241:13 246:16 314:12 319:14 348:25 355:17
**overdose** 178:9
**overlap** 28:13 28:14 33:17 35:18
**overlapped** 11:25
**overlaps** 350:24
**overview** 30:6
**overwhelming** 154:12
**overwritten** 80:21
**owns** 44:19
**oxidative** 227:13 228:2,6 277:8 278:23 279:2,6

**P**

**P** 2:1,1 3:19
**P.A** 2:12
**P.C** 2:3,16
**p.m** 188:4,5,7 200:22,23,25 287:4,5,7 364:16,17,19 368:25 369:1,3 370:25 371:3
**page** 4:2,10 53:8 53:9 64:3,20 65:15 100:3 112:10 147:9 183:12 206:21 206:22 212:16 236:4 242:9 267:13 280:19 289:17,23,24 313:14,17 316:12 318:16 336:19,20 337:14 367:7,8 375:3 376:3
**pages** 374:5
**paid** 244:3 350:13,19 362:17
**panel** 95:17 96:1 96:21 97:13 100:4 120:24 121:11,13 342:4 348:12 348:20 355:14 355:18 356:8 357:2,22 358:7
**panel's** 121:22
**panelists** 349:5
**panels** 348:14
**Paoletti** 250:2
**PAPANTONIO** 2:12
**paper** 15:20 71:4,16 72:15 73:1 81:3,3 93:12 103:16 105:3 117:10 138:3 162:10 195:10 209:1 239:25 247:15 250:23 251:15 284:17 321:22 351:23
**papers** 15:17 80:13,13 104:2 104:7 117:18 138:3,8 149:22 182:8 215:9 246:6 314:3 322:2,6
**paragraph** 15:13,24 16:1 46:24 53:7,9 54:8 64:16,19 65:15 66:10 68:1,17 75:7 76:18 77:19 78:23 80:25 90:20 92:4 95:12,16 100:17 102:19 103:2 124:12 124:14,17 126:4 133:6 134:21 147:8 147:12 150:16 166:3 168:7 177:5 183:12 188:18,20 190:7 212:18

236:3,7 242:9 242:12 249:10 249:19,24 250:13 251:1 266:16,23 267:23 272:10 280:19 281:4 289:17,24 313:13,15 315:21 316:12 336:20 337:15 337:25 338:4,6 340:11 362:7 364:7 365:2,12 367:8,12,14,17 367:19
**paragraphs** 12:15,17,25 13:3 15:4,7,10 15:11 22:5 75:8 90:7 100:13 120:18 366:4 370:1
**parameters** 306:4
**parentheses** 65:9 133:10
**parenthetical** 66:12
**Parfitt** 2:8 6:20 6:20 28:9 33:8 45:1 48:22 49:10 50:5 51:3,23 72:2 73:17 75:5 85:25 87:8 89:19 90:12 91:24 96:9 99:5 105:23 107:14 113:19 118:16 121:3 126:25 130:6 133:25 137:11 141:2 143:8 144:25 145:23 154:20 157:7 159:7 160:10 162:1 163:2 164:11 165:11 166:13 171:5 176:5 180:16 184:24 186:11 187:18 190:14 195:6 196:8 198:8 214:17 233:6 234:11 238:14 239:22 241:19 252:16 255:10 259:10 259:13 260:5 261:10,15 262:24 270:14 278:16 279:14 282:3 283:24 284:18 291:9 292:20 296:4 296:17 298:6 298:22 300:3 303:8 308:16 309:15 321:20 337:10 340:21 342:24 350:22 351:20 353:22 369:5 370:16
**Parmley** 16:5 102:20,22 105:2 296:2
**part** 26:18 30:5 30:5 40:5 49:1 52:2,9 66:5 67:14 76:22 78:2 87:5 89:5 93:9 103:4 107:2 108:20 109:5 115:16 116:14 122:24 123:6,24 124:5 137:3,12 141:6 152:8 153:9 159:23 170:21 171:7,8,9 173:1 177:1 188:19,19 193:2 198:12 209:5 210:9 211:6,8 213:19 215:21 234:21 236:2 238:4 241:1 246:24 268:19 285:2 288:22,24,25 302:4 304:10 323:3 325:10 359:25 369:10
**participate** 25:25
**particle** 69:17 69:18 70:12 72:12 74:8 93:4 124:24 125:8,11,25 126:1,2 128:8 128:14 150:5 150:15
**particles** 70:1,4 70:9,16,18,21 71:19 95:19 125:24 126:9 127:20,25 128:13,23,24 129:1,14,22 130:5 183:15 183:25 184:3 184:10 185:5 185:10 230:23 264:20 265:4 265:16 283:13 295:23
**particular** 26:7 35:5 38:17 39:20 40:11 47:11 50:9 54:7 77:14 78:13 79:7 87:4 89:4 96:5 97:3,18 98:23 102:5,24 103:20 104:22 120:4 125:21 128:8 132:20 133:23 137:7 145:6 174:7 185:1 205:16 210:8,24 217:20 218:4 220:25 226:19 226:20 228:8 244:8 245:1 252:13 264:24 274:22 275:15 300:15,16 302:5 337:25 346:1 347:22 348:24 349:2
**particularly** 20:22 101:6 104:19 117:2 175:3 207:20
**particulate** 71:17
**parties** 372:12
**partly** 116:14
**parts** 59:17 218:4 312:7 320:22 322:24 336:11
**party** 366:12
**pass** 180:7
**passage** 181:6
**passed** 352:14
**patent** 15:18,22 352:15
**pathogenesis** 272:11
**pathway** 175:20 175:23 194:11 195:4
**patients** 183:20 183:24,24,25 184:9
**pattern** 41:10 52:23 71:2,10 164:3 170:22 239:21 294:8 301:11 305:23 313:4 329:6
**patterns** 301:24 305:6
**pause** 99:19 246:10
**pay** 62:25 84:17 253:5
**PCPC** 31:1,23 32:2 58:24 360:11 362:3 363:13 364:2 364:23 365:15 365:23 366:17 367:1,14,22 368:4
**PCPC's** 122:2 361:9
**PDF** 80:17
**PDQ** 108:7 109:9,17 110:4 113:10,16
**PDQ)-Health** 4:24
**PDQs** 108:2 111:3
**Pecan** 3:3
**peer** 116:11 209:12 216:8
**peer-reviewed** 83:12 87:17 90:25 92:17 313:25 314:5
**pending** 11:3
**Pennsylvania** 2:18
**Pensacola** 2:14
**people** 16:13 18:7 73:3 85:7 85:14,16 88:7 160:8,22 186:20 187:2,3 193:11 226:8 228:9 247:7,10 247:12 301:6 301:25 305:20 320:2 352:20 353:21,23 354:12
**people's** 195:11
**percent** 40:16

40:20 121:5 145:19 167:1 172:10 173:1,5 173:14,19 174:7,8 223:13 338:17 347:11 351:16 366:21
**percentage** 54:6 161:21 297:17 302:9 347:4
**percentages** 166:22 167:18 168:1 169:5,8 170:6 183:19
**perform** 53:10
**performance** 129:15
**performed** 55:6 55:7 181:22 207:4 245:19 268:20 331:8
**performing** 122:23
**perineal** 4:19 67:10,16 112:12,20,23 119:5 175:24 177:16 183:3 184:12,19 185:18 186:8 193:3,4 198:21 203:21,22 231:11 258:11 260:2 263:20 263:25 291:19 292:4 296:21 297:11 298:19 306:23
**perineally** 185:12 186:21 187:5 237:14 258:11,24 259:1,5 322:5 329:4
**perineum** 180:8 181:20 182:14 295:24
**period** 21:9 82:9 179:4 302:1,21 341:2,6 348:12 355:24 361:12 361:17 365:11
**periods** 57:6 368:5
**peritoneal** 4:23 180:11,13
**peritoneum** 180:23
**persist** 301:16
**person** 84:18 366:13
**personal** 3:10 7:4 31:1 49:6 50:2,22,25 51:22 319:6 353:11
**personally** 181:17 344:13 349:23 353:2
**perspective** 328:23
**PERTAINS** 1:7
**pesticides** 351:8
**petition** 359:21 361:19,21 362:11 363:2 363:10,14 364:25
**ph** 1:22
**Ph.D** 1:13 4:13 4:15,17 7:20 372:5 374:12
**phagocytosis** 180:13
**pharmaceutic...** 227:6
**phenotype** 220:3,7 221:25 222:3,9
**phenotypic** 225:23 276:12 279:12,19
**Philadelphia** 2:18
**physical** 26:18
**physician** 107:23 359:18
**piece** 78:1 84:19 85:4 119:16 120:12 155:1 168:20 172:9 173:9 176:15 205:9 245:1 248:23 250:7 252:13 284:16 302:12 332:1 339:3 370:4
**pieces** 76:20 77:17 78:13 79:7 80:5 81:12 85:23 87:4 89:4 90:5 90:11 97:8 115:25 116:10 121:23 122:21 125:2 126:20 139:24 208:25 209:25 215:3 218:14,23 304:4 314:7
**place** 83:14 102:11,12 115:3 131:21 210:22 232:23 299:4 301:22 372:9
**places** 46:23 193:13 315:9
**plaintiff** 247:2 247:16 304:5
**plaintiff's** 322:12,13 344:12,15 346:8
**plaintiffs** 2:19 6:19,21,23,25 7:2 22:15 246:21
**plaintiffs'** 4:11 350:20 351:1 351:17
**plate** 129:22
**plateaued** 238:2
**platy** 124:24 130:4,16,18 146:9 150:5,15 223:13,20,21 277:24 293:20
**plausibility** 34:4 194:7 195:2,9 195:14 268:12 289:3 314:20 370:7,13
**plausible** 189:8 191:22 194:2,4 194:6,25 195:3 196:13 221:19 227:18 229:14 277:6 369:20
**play** 117:7 125:11 127:20 146:15 169:19 255:24 268:25
**played** 246:16
**please** 6:16 25:8 27:18 249:20 373:3,8
**plenty** 252:20
**pleurodesis** 126:5 128:15 129:9
**Plunkett** 1:13 4:13,15,17 6:15 7:20 8:4 8:13,17 9:8 12:23 13:17,20 14:6,7,10,15 14:17,22 16:16 16:22 17:9,13 23:18,20 24:11 25:4,15 34:11 34:23 44:22 46:7 50:17 63:25 80:2 87:2 88:20 93:11 94:1 95:3 102:10 105:17 110:3
111:4,9,11 112:4 113:6 139:8 140:21 167:24 201:3 211:14,18,20 211:22 236:24 287:8,16 369:6 369:8 370:18 372:5 374:12
**point** 24:17 25:6 49:5 50:3,12 52:5 56:16 59:20 66:17 67:23,24 71:1 71:21 84:2 90:7 100:16 102:3,10,21 134:21,23 138:14 139:10 140:22 146:21 162:22 163:23 165:14 176:7 176:10 177:4 181:7 192:22 210:21 221:14 225:17 248:22 254:22 261:16 273:8,15 275:14 276:25 281:2 282:16 284:25 288:16 296:10 297:25 300:5 302:12 303:23 304:2 316:9 347:23 362:23 366:2 368:10
**pointed** 109:4 221:11
**pointing** 86:9 91:5 152:19 190:7 219:16 226:6 244:9 250:2 276:2
**points** 31:9 86:13,14 117:12 165:16

229:6 231:5 235:16 254:24 294:25 367:24
**policy-type** 351:11
**Pooley** 250:4
**pools** 78:8
**poorly** 232:7
**population** 159:19 228:11
**populations** 157:19 158:14
**portion** 112:1
**portions** 47:11
**PORTIS** 2:3
**pose** 256:7,23 268:18
**posed** 143:20 295:12 322:15 327:16 334:4
**position** 28:2,7 43:21,25 44:23 66:4,7 109:16 110:2,5,10,10 110:23 112:5 117:21 120:22 145:17 166:9 202:7 296:11
**positive** 42:2
**positives** 79:18
**possession** 17:22
**possibility** 196:21 197:20 197:24 255:23 281:13 327:18 327:19
**possible** 56:4,11 62:21 68:21 98:18 109:17 155:5,7 186:7 197:5,16 199:8 202:18 203:6 203:23 204:3 204:18,21 207:17 223:24 239:25 269:7 282:4 284:1,3 295:8 299:8 301:24 305:4 312:15 316:8 316:24 343:21 354:22
**possibly** 61:1 197:3 198:7
**potencies** 254:13
**potency** 36:15 88:15 156:15 156:18 157:9 158:3 171:23 225:4,21 254:15 256:12 256:12
**potent** 254:21
**potential** 37:16 77:6 108:7 127:25 151:20 157:5 165:8,14 166:6 167:7 168:25 178:2 189:13 202:10 208:22 238:12 241:15 245:2 263:16,25 266:14,18 272:17,19 274:23 275:11 276:11 278:1 282:19 285:3 285:19 289:9 290:21 302:15 327:14,15 332:19 350:9
**potentially** 207:5 217:11 270:18
**powder** 1:3 4:22 8:11 10:25 19:10 29:21 34:13,18 37:2 37:2 40:13 41:3 80:4 117:3,24 124:7 125:19 126:14 133:21 141:1 143:3 144:7,19 151:4 153:23 155:17 157:4 160:24 161:14 162:11 167:19 169:10 170:8 173:20 175:22 176:4,24 178:7 180:5 184:12 188:12 198:2,2 200:3 248:2,5 249:11,14,22 250:14 251:4 251:16 252:12 252:15 253:10 255:24 256:20 258:19 260:2 261:8 262:22 263:21 268:23 283:2,9 289:15 290:19 293:18 306:23 308:20 309:13 318:3 322:16 329:3 369:11,18,21
**powders** 129:16 130:14 150:25 154:11 161:21 162:25 164:9 175:14 198:22 251:5,7 253:2 253:4 256:15 267:5 277:22 277:23 313:9 316:15 370:15
**power** 42:19 218:1
**practice** 115:8 116:4 336:1,2 353:24 354:12
**practices** 1:4 6:11 114:15
**precancerous** 240:14
**precautionary** 283:17,23
**precise** 74:23 315:24
**precursor** 318:1
**predicate** 31:25
**predominant** 175:21,22
**premarket** 329:17
**preneoplastic** 222:24
**prep** 11:25
**preparation** 11:25 13:1 15:5,8 20:16
**prepare** 12:4
**prepared** 335:7 335:18 361:8
**preparing** 25:18 315:22
**presence** 163:18 222:5 227:12 258:18 261:8 273:4 275:21 294:11 295:13 305:21 309:23 309:23 312:3
**present** 3:17 18:14,25 188:13 252:14 259:2 264:7 369:18,19
**presentation** 20:25
**presents** 145:19 203:6
**president** 352:23,24 354:15 355:2,2
**Presumably** 80:9
**pretty** 27:12 66:23
**prevalence** 295:18
**prevent** 47:5 48:13 114:11 115:23 116:2
**Prevention** 4:24
**primarily** 166:3 334:19
**primary** 4:23 136:10
**primed** 274:1
**principal** 136:21
**principle** 126:8 278:7 283:17 294:1
**principles** 5:1 36:1 125:24 209:16 211:11 275:19 278:4 290:7 291:1,2 304:25
**print** 201:15 202:13
**printed** 17:6 111:17 201:12 202:23
**printout** 4:21 17:4
**prior** 10:8 56:17 68:2,3,10 75:9 90:4 96:25 346:7,16 372:4
**privilege** 23:23 54:5
**privileged** 23:25
**probability** 197:24
**probable** 269:6
**probably** 9:11 11:10,23 18:20 19:2 23:5 54:17 60:25 294:15
**problem** 223:3 231:10 282:5 291:17
**problematic** 224:18
**problems** 146:11
**process** 27:23 30:7 31:4,8,10

31:23 32:5 35:11,14,25 36:18 37:1 38:1 43:10 45:16 57:6,8 57:22 59:7 60:7 66:1 67:14 76:25 77:16,22 78:1 78:16 79:21 83:7 92:5,7,7 93:9 98:24 104:14 105:11 105:14 113:22 115:14 116:11 118:1,5,11 121:6 122:3 131:13 132:8 138:7 153:14 189:21 190:1,5 191:2,21 192:13 213:18 213:19 218:13 220:5,20,23 222:24 266:2 279:3,6,10 281:14 292:2 324:25 325:6 325:13,23 340:3 341:20 343:6 345:21 348:25 353:6 362:14
**processed** 131:6
**processes** 38:9 274:9 276:19 277:9
**processing** 130:22 131:10 132:16
**PROCTOR** 2:12
**produce** 44:11 140:19 168:25 190:4 194:17 196:1 242:15 272:18 326:16
**produced** 10:8 10:13 14:23 17:19,24 19:8 19:14,15 20:2 20:8 22:19,25 24:2 54:18 57:24 58:1 74:25 82:17 91:21 122:7 139:11 178:21 190:3 195:23 214:13 350:10
**produces** 294:10
**product** 1:5 24:8 24:14 29:22 30:12 36:9 37:16 43:15 47:4,7 48:9,12 48:12,21 49:9 50:20 52:12,22 54:5 56:2 125:20 126:13 126:18 127:6,9 129:4 132:10 132:12,22 137:9 138:4,14 144:4 145:8 153:15,20 154:5,15 155:24 156:2 157:20 158:15 158:18 162:12 163:9,10,10 165:4 166:10 169:22,24 171:14,15,19 172:15 175:6 178:4 179:4 197:7,9 198:23 199:14 202:25 223:8 225:15 226:22 283:22 285:23 310:12 311:8,15 317:25 318:14 318:14 324:10 324:18,20 326:8 327:17 328:7,15,16,17 328:24 330:23 334:4
**production** 66:2
**products** 1:4 3:10 6:10 7:4 29:21 31:1,18 35:12 44:9,12 44:18 49:15 51:6 52:16 126:23 127:17 128:15 129:10 129:13,18,21 130:5,14 131:15 132:4 133:19 136:2,7 139:15 142:21 143:11,17 154:11,19 160:5,9 161:13 161:23 164:19 164:20,24 165:9,22 180:6 187:1 188:12 189:18 198:2 200:3 202:21 224:3 226:12 226:16 227:1 250:23 251:5 255:24 256:21 258:5,8,17,19 260:3 261:8 262:22 263:21 268:23 274:24 306:23 308:4 311:20 317:21 318:10 319:6 322:16,18 324:4 325:9 351:17 369:11 369:18,21
**Professional** 4:24
**profile** 39:13 86:21 150:24 254:7,10 283:8 283:9 319:12
**profiles** 169:20
**progress** 220:22
**project** 82:1,7 82:11
**prominent** 99:14
**promoted** 44:11
**promotion** 44:8
**pronouncing** 16:15 289:21
**proper** 83:13 311:13
**properly** 42:16
**properties** 124:21 146:18 148:7 153:5
**proposed** 343:15
**proposing** 179:9
**proposition** 69:13
**propounded** 374:6
**prospective** 79:17 239:8
**protect** 228:22
**protected** 23:23 54:4
**protective** 1:9 228:4 232:23
**prove** 282:7
**proven** 285:18
**provide** 18:3 26:5 27:3 29:19 30:6,11 44:8 51:17 87:3,10 122:9 213:20 214:21 263:17 322:14 323:4,8 331:16 331:24 335:10 369:20
**provided** 9:1 10:3 21:10,11 50:21 55:20 85:21 89:15 121:14 122:16 167:25 177:2 211:8 212:13 216:22 251:14 261:5,13 262:13,19 284:11 342:4 346:16 348:2,3 367:16
**provides** 338:23
**providing** 34:2 44:12 45:10,12 167:13 215:8 347:25
**PTI** 3:15,15 7:6 7:6
**public** 116:18 123:3,8 132:19 244:16 253:12 308:4 340:20 341:2,5,18 344:3,5,7 345:8 372:22 374:19
**publication** 76:2 77:15 116:13 116:21 117:1 210:19
**publications** 107:23 117:5
**publicly** 30:22 57:15 62:2 90:25 118:2 121:22 286:21 328:11 337:5
**published** 17:7,8 62:2,11 78:11 91:21 92:1 93:14 103:9 108:7 117:10 117:17,18 147:12 152:18 162:10 163:14 163:16 247:8 248:25 249:1,4 249:21 250:12 286:17 314:4

321:12,17,22
**publishes** 343:11 346:11
**pull** 20:15 60:10 61:2 62:15 76:19 93:3,5 110:8 119:2,10 172:19 183:22 208:2,6,11 249:25 250:15 250:18 251:12 271:19,22 278:19 365:1 365:13,16 366:3,8
**pulled** 15:24 59:20 63:4 212:12,12 323:4
**pulling** 27:9 104:8 129:25
**pure** 142:4 222:7,16,18,20 222:21 223:21
**purely** 283:23
**purities** 139:6
**purity** 135:4 227:8 311:14
**purport** 278:13
**purportedly** 336:21
**purpose** 8:10 22:18 133:13
**purposes** 9:5 16:21 17:13
**PURSUANT** 1:9
**put** 22:5 26:13 26:16 51:7,7 58:21 62:8 78:14 80:16,25 83:13 136:17 179:4 193:11 198:24 218:10 224:10 231:22 246:6 247:11 271:7 281:7 307:5 347:11 355:23
**puts** 254:4
**putting** 118:3 135:10 138:21 197:13 254:5
**puzzle** 168:20

**Q**

**qualified** 355:13 357:11
**qualitative** 89:15,21,23 114:5
**qualitatively** 36:7
**qualities** 139:5
**quality** 88:3,4 88:16 91:1 92:22 207:10 232:3
**quantification** 36:13 157:21 170:16 310:24
**quantified** 298:9
**quantify** 36:6 77:2 86:4 88:13 168:12 168:13,15 171:2 172:13 172:22 187:13 237:24 243:9 298:8,11
**quantifying** 156:6 157:3,11 157:25 171:11 171:12,18,20 171:25
**quantitative** 78:12 85:21 114:6,11 115:24 205:15 207:19
**queries** 107:24
**question** 15:3 24:6 25:1 28:10,18 37:6 42:16 44:21 46:6 48:24 52:2 55:18,21 58:8 67:7 68:1 71:17 78:5 83:15 88:25 89:2 90:4 92:9 92:24 93:1,3 93:11,20 94:6 94:16,17 96:15 102:2 103:18 104:17 112:4 113:8 120:8 126:19 127:18 134:3,9,18 136:8 137:13 137:21 139:9 154:23 155:3 174:6 178:14 182:24 183:9 205:12 210:14 222:12 224:19 224:25 226:4 229:11,13,17 229:18 232:15 233:8 234:18 234:25 235:7 235:12 237:7 241:10 257:25 260:18 261:2 266:20 267:21 273:7,19,19 298:13 302:6 302:16 306:11 309:6 316:17 324:6 327:9,11 329:23 332:12 340:16 357:15 359:25 364:21 366:9,10,21 367:13
**questioning** 366:16
**questions** 8:2,15 13:19 16:18 17:11 22:10 23:19,21 24:10 24:19,23 25:2 25:14,17 28:16 29:15 32:14 33:11 39:14 40:3 43:1 45:7 49:4,24 50:16 51:15 53:3 56:14 59:4 67:7 73:12 74:9 75:6 87:1 88:19 90:2 91:6 93:10,24 95:2 96:17 100:1 106:8 107:7,21 111:6 111:24 113:24 118:23 121:19 127:13 130:8 131:24 133:3 134:8 135:19 137:2 139:7 140:3 142:11 144:1,20 145:15 146:1 155:11 156:20 158:11 160:1 161:3 162:20 164:6,15 166:1 167:15 171:16 174:4,13 176:8 180:1 181:9 183:11 185:15 187:11 188:8 190:22 193:21 196:3,18 199:15 201:1 201:21,24 204:10 211:16 215:14 217:16 218:16 221:23 223:23 232:6 234:5,19 238:19 239:6 241:4,9 242:6 253:15 255:21 259:11,20 260:24 262:1 263:4 270:23 275:9 279:8 280:7 282:14 284:5,24 286:15 287:9 287:15 292:10 293:10 296:13 297:12 298:15 299:23 300:19 303:11,17 304:17 306:14 307:18 308:1 308:10 309:7 310:1 312:1,6 312:13 315:13 315:20 317:1 319:2,4,14 322:9 323:1 325:15 326:21 329:7,19 330:12 333:1 336:4,5 337:11 340:24 343:10 348:19 351:14 352:6 354:4 356:19 357:10 358:12,21,23 359:5,11 364:20 368:20 369:5,12 370:17,22,23 374:6
**quick** 106:5,7 177:6
**quickly** 177:7 265:12 313:6
**quite** 37:25 70:8 79:22 130:12 196:11 298:24 300:6 319:20
**quote** 95:24
**quote/unquote** 70:15 142:7 175:10

**R**

**R** 2:1 3:19,19
**rabbits** 69:11

**RAFFERTY** 2:12
**raised** 314:9
**raises** 178:13 366:25
**range** 125:4 128:25 129:5 173:13
**ranges** 125:3
**rank** 100:25 101:2 197:22
**ranked** 256:18
**ranking** 101:22 103:24 113:18 114:2,22
**rankings** 107:6 114:18 115:9 134:4 141:8
**rate** 265:11
**ratings** 218:22
**rats** 271:13
**raw** 307:21
**reach** 76:4 180:7 186:8
**reached** 95:25 181:11 189:7 189:14 190:10 190:24 191:20 192:8,15 198:11 236:17
**reaches** 96:4
**reaching** 75:16 89:6 160:2 186:20 208:22 258:13 261:3
**reaction** 140:17 233:2
**reactions** 140:16 179:18 243:18
**reactive** 150:10
**read** 32:22 34:9 34:16 59:14,17 59:21 60:1,22 64:10,12 71:23 77:21 80:9,13 81:12 83:21 90:16,17 100:22 102:14 112:25 113:1,5 120:15 137:14 137:16,20 138:6 169:1 205:11 212:24 236:14 251:3 284:9,16 316:3 337:22,23,24 338:3,3,5,6 349:12 367:10 367:11 373:3 374:4
**reading** 52:18 59:18 60:2,11 81:2 183:7 243:25 314:25 315:2
**reads** 47:3 212:18
**ready** 13:10 308:13
**real** 54:15 62:7 106:5 177:6
**realize** 60:11
**really** 37:12 57:24 59:20 98:15 106:6 129:10 154:25 195:15 225:10 225:11 232:2 289:2 298:16 333:2 347:23 355:20 356:23 356:23
**realm** 24:9
**Realtime** 1:18 372:3,18
**reason** 73:1 97:10,13 98:1 202:23 212:12 245:21 281:3 347:22 354:5 366:10,15 373:5
**reasonable** 41:2 157:23 173:17 185:7 186:15 259:23 319:16 320:5
**reasons** 120:9 153:18 170:20 215:6
**recall** 9:3 50:12 51:14 120:21 162:17 174:22 206:9 207:15 208:3,11 250:1 263:1,3 265:6 278:24 280:21 288:5 319:8 347:6 368:16 369:12
**receipt** 373:15
**receive** 346:10 351:16
**received** 122:4
**recognize** 8:19 61:3 111:11 128:18 140:8 226:24 270:10
**recognized** 220:17
**recognizing** 138:2
**recollection** 362:12
**recommendat...** 283:22
**record** 6:2 9:6 10:15 16:21 17:13 19:23 25:7,10,11,13 55:8,9,20,22 56:12 94:21,23 94:24 95:1 99:22,23,25 111:8 188:2,4 188:5,7 200:20 200:22,23,25 287:4,5,7 364:9,13,16,17 364:19 368:25 369:1,3 371:2
**records** 14:2 55:4 62:16,22 62:25 136:14 321:6
**recovered** 283:15
**redo** 74:20
**reduce** 252:12 252:19 292:18
**reevaluate** 246:15
**refer** 13:7 16:13 21:21 22:13 35:13 131:8 161:22 202:9 250:19 349:18
**reference** 9:16 22:5 46:20,22 49:1 64:11 75:9 76:10 93:13 118:19 158:12 263:14 280:18 337:12
**referenced** 12:23 15:3 46:9 91:17 167:24
**references** 63:18 64:8 218:25
**referencing** 318:17
**referring** 13:6 15:12 22:14 43:8 64:1,2,22 89:10 116:8 148:11 161:15 201:16,18,19 201:22 205:14 206:5 238:17 242:17 309:18 321:11 341:5 360:9 362:8
**refers** 64:22 202:4 214:8
**refine** 81:24 82:4
**reflect** 20:14
**reflected** 312:3
**reflection** 316:6 322:23
**refresh** 12:15 362:5
**refreshed** 15:16
**refuse** 24:22
**regard** 84:16 123:3 295:19 306:4 318:18
**regarding** 252:7 321:9 332:4 339:17 342:21 344:22 345:18 361:15
**regardless** 71:20 140:14 145:8 153:4 159:18 181:6 258:10 258:23 273:21 289:8
**Registered** 1:17 372:3,18
**regularly** 296:15
**regulation** 43:12 46:10,18 48:17 49:1
**regulations** 30:10 43:5,7,9 44:2,14,24 46:17 48:4 327:10 328:20
**regulator** 214:3
**regulators** 31:16 32:2 219:21
**regulatory** 30:7 30:13 31:23 43:18,22 47:23 65:5 67:11 81:21 82:8 213:6,8,11,25 214:3 219:17 256:6,19 284:2 290:13 307:19 322:17 323:20 324:3,25 325:6

325:13 326:4 326:13 331:12 332:14 333:5 333:10,21 334:8,8 335:4 335:9,24 367:2
**relate** 11:21 19:11 28:20,22 29:2,3 46:17 52:25 76:20 101:14 126:22 127:3,3 129:19 133:9 137:5,8 139:15 140:23 140:25 162:24 178:17 211:7 212:6 250:13 322:16 324:12 351:3 355:17
**related** 8:11 10:6,25 29:19 30:9,20 31:17 50:20 68:5 123:11 125:17 134:12 135:21 165:20 207:3 255:15 259:16 265:2 318:9 322:14 323:9 323:20 324:14 332:6 342:19
**relates** 77:7 127:11 132:18 143:2 149:1 155:9,15 255:14 258:1
**relating** 253:9
**relation** 365:7
**relationship** 27:25 34:3 110:7 112:7 193:17 202:11 204:15 207:21 230:16 235:13 235:24 236:11 236:18 237:3,6 238:9 241:16 241:18 294:13 295:17 365:21 370:13
**relative** 146:4 152:14 372:11 372:12
**relatively** 319:13
**relevance** 70:16 84:22 92:8 153:8,10 207:10 218:1 231:7 232:13
**relevancy** 118:4
**relevant** 36:3 54:7 60:2,12 69:17,23 71:16 76:8 78:4 80:16 83:10,15 96:7 97:1,8 101:24 123:1,1 127:4,11,16 131:15 135:17 138:9 141:11 150:24 153:12 182:17 202:22 206:24 207:5 212:8 216:5,11 225:21 234:17 258:3 271:11 314:8 324:5 351:16 366:7
**reliability** 66:16 67:19 83:11 84:21 118:4 207:10 208:17 209:1,11,24 210:7,13 215:17,21 216:7 218:1 247:20
**reliable** 42:8 66:20 83:9 95:7 209:9 210:20 216:6 216:11 231:2 232:17 305:25 313:23,24
**reliably** 42:9 232:14 291:22
**reliance** 20:24 21:18 22:1,8 55:10,13 59:13 59:25 60:1,15 60:20 63:5,12 63:13,21 64:1 64:6 68:14,22 83:2 108:16,21 108:22 109:2,4 120:15 122:7 211:9 212:1 241:15 263:8 263:10,13
**relied** 70:19 74:3 109:6 130:1 162:23 174:24 214:23 215:4,9 238:24
**relies** 336:17
**rely** 41:5,5 105:22 156:23 160:8 205:7 207:18 212:11 247:23 277:20 337:7,16 360:6
**relying** 45:4 143:5 338:25
**remain** 265:16
**remember** 242:13 259:15 317:11 327:23 362:7 368:12
**remove** 45:17 65:23 67:21 268:5
**removed** 109:13
**removing** 268:7
**render** 37:21,22 39:19
**rendered** 144:6 237:1 262:3 286:2
**rendering** 216:21
**repair** 283:15
**repeat** 12:20 365:8
**repeated** 198:25 199:17 300:24 302:20 305:11
**repeatedly** 339:16
**repetition** 87:24
**rephrase** 161:18
**replicate** 58:4 58:10 98:23
**replicated** 47:2 75:11
**report** 4:13,14 4:16 12:15 13:8 14:7,15 14:21 15:5 16:4,9,10 17:3 19:13,21 20:2 20:8,17,19,23 21:2,16,24,25 22:4,9,20,25 23:4,7,8,12 24:2,12,19,24 25:19,21 26:2 26:24 28:25 29:12 30:17 32:7,10,11,21 32:24 34:8,9 34:16 46:21 53:6 54:23 55:11 56:17,24 59:6 61:9,15 63:11,17,20 64:14,16 65:14 65:25 66:3,11 66:22 67:8,24 68:3,14,18,23 74:18,22,24 75:20 76:12 80:20,23 81:10 82:17 83:1,21 84:1 86:3 90:8 91:22 93:15 95:11 99:14 100:3,12 102:3 102:10,22 104:21 113:10 118:14,15,19 118:22 119:13 119:15 121:18 122:8,13 123:11,12,24 124:12 133:8 133:22 134:10 138:6 139:11 140:22 141:20 142:20 143:6 146:3 147:5,9 154:3,4 155:13 158:16,21 159:1 169:1 176:11 182:16 183:2,7 185:3 187:10 188:15 189:14 201:9 209:22 214:12 214:21 215:3 236:2,25 241:14 242:8 243:25 256:25 261:18 262:20 263:6 266:8,21 267:3,8,12,22 268:9 269:8 274:18,20 275:3,11 277:1 280:18 285:20 288:2 289:17 290:8 295:22 309:11 310:4 313:13 314:25 315:3,8,19,23 316:4 317:7 322:25 323:3 326:11 331:14 332:22 333:16 336:11 337:7 337:13,17,20 337:22 338:2 338:11,21,22 339:9,21 340:2 340:9,17

343:18,23 347:3,21 361:7 361:15,24 362:10,20 363:23 365:11
**reported** 42:7 87:20 117:23 160:16 170:14 177:22 178:16 183:20 267:4 295:3 310:14 310:22 328:12
**reporter** 1:17,18 1:19,20 7:17 137:20 372:3,4 372:4,18,18,19 372:20,20,21 372:22
**reports** 12:6,7 12:25 13:5,15 13:21 19:8,11 27:25 28:20 29:13 33:16 57:23 61:11,17 63:10 68:11 74:20 75:9 85:15 178:5 179:5 248:1 249:6 257:2 261:6,12,22 314:15 337:20
**represent** 287:18 319:6
**representative** 133:20
**representing** 22:15
**reproductive** 70:11 71:18 95:20 101:11 101:15 103:11 103:12 183:16 184:4 297:18 302:10
**reputable** 353:15,20
**request** 9:17,24 18:10 26:14
**requested** 322:11
**requests** 17:17 17:23
**required** 30:10 37:21 43:4 219:18 324:10 326:16
**requirement** 49:8 114:22
**requirements** 114:23 322:17 324:3
**requiring** 279:10
**research** 107:12
**resource** 290:6
**resources** 214:23
**respect** 17:20 28:3 31:7,8 43:3,25 44:2,5 44:25 48:20 53:12 62:17 69:2 70:5 80:4 106:1,3 109:17 110:6 112:7 117:23 125:12 127:21,23 128:7 129:21 144:6 151:17 151:21 157:5 162:25 165:10 170:7 171:2,18 172:14 173:20 179:11 192:16 196:21 198:3 202:10 204:13 204:15 212:7 256:22,23 262:18,22 263:15 272:3 282:18 283:22 284:7
**respectfully** 139:8
**respective** 80:7
**respiratory** 126:6 129:12
**respond** 228:10 228:10,12 233:21 234:2
**responded** 363:13
**response** 9:24 76:15 77:5,7 78:7 90:3 126:2 128:17 128:19 150:10 169:1 179:14 187:8 190:13 194:12,16 195:20 204:2 223:22 225:2 228:1 230:22 232:19 237:17 237:19,21,25 238:1 239:16 240:10,13,20 240:24 241:23 242:4 254:14 266:9,12 293:25 364:24 365:3
**responses** 72:21 195:23 238:2,6 242:23 266:5 272:14 273:24
**responsibilities** 332:5
**responsibility** 360:15,18
**responsive** 17:22
**rest** 281:20
**restate** 190:19
**result** 98:2 119:15 132:9 153:8 169:14 170:17,17 194:19 198:18 213:22 272:20 304:21
**results** 113:3 184:13 334:17
**retained** 248:3 365:23 367:2
**retention** 346:8 361:9
**retrieval** 25:24 63:1
**retrieve** 25:23 26:6,21 27:18
**retrieved** 26:4 60:17,17 207:9
**retrieves** 26:14
**Retrograde** 69:9
**return** 74:12 373:13
**returning** 17:16 96:24 118:12 219:23
**Reuters** 123:12 123:16
**revealed** 261:21
**review** 4:18 26:1 30:23 32:19 53:12 56:20 57:6 59:8 61:7 63:5 65:5 67:11 71:15 78:1 82:8,15 82:22,24 83:5 85:4 98:11 111:25 116:11 121:16 156:24 160:12 182:8 184:2 208:8 209:13 211:9 216:8 245:5 297:8 321:5 336:6 338:9 341:9,20 342:15 343:12 343:13 348:1 348:14,15,18 349:2 368:12
**reviewed** 9:21 12:6,24 21:3 32:13 67:5 79:24 80:6 82:20 90:6 108:13 110:4 116:9,16 120:20 122:13 129:17,19 151:8 163:24 177:12 183:14 201:8 243:20 252:2,4 323:24 342:18 344:10 347:12 356:14 356:22
**reviewing** 31:17 58:2 81:19 82:19 133:1 208:21 343:2
**reviews** 81:21 82:2 98:14 280:13 321:14 348:8,11
**revisit** 182:6
**rgolomb@gol...** 2:17
**Richard** 2:17 7:1
**right** 8:3,4,25 9:14 10:12 12:2,22 15:2 16:19 17:12 18:18 19:7,20 20:1 21:17 23:2,5 34:22 40:10 41:25 46:20 47:1,14 59:12 63:13 67:24,25 69:24 82:5 89:14 95:3 96:23,24 102:1 107:11 108:1,5 109:15 111:25 112:19 113:2 119:11 124:11 126:16 133:6 134:6 178:24,25 188:22 198:14

204:9 205:25 206:10,13 207:8 208:13 211:17,19 236:16 243:15 245:12 263:15 276:8 283:20 306:15 318:6 320:13,17 323:13 324:7 330:15 331:9 333:8 336:9 338:14 339:22 341:10 344:3 344:17 345:8 349:12,14 352:17 359:13 360:24 363:3 369:6,14
**ring** 206:5
**risk** 4:20,21 16:12 17:8 34:18 35:5,11 35:24 36:6,8 36:11,12,13,17 36:20 37:10,15 37:19,23 38:2 38:3,10,17 39:3,10,17,20 40:13,23 41:4 74:11 75:21,25 76:9,24 77:2 80:3 85:1,2 88:13,18 107:3 110:18 111:2 112:23 115:7 115:13,17,21 117:5,13,13,19 122:23,24 123:5 124:6 125:12 127:12 138:7 141:21 143:16 146:16 149:19 150:7 153:11 154:24 155:2 156:7,10 157:3,12,13,15 157:19,25 158:4,14 159:17 160:3 165:8,14,21 167:5 168:13 169:3,23 170:21 171:2,8 171:13,13,18 172:2,10,13 173:1,3,5,7,12 173:19 174:8,8 188:13 191:25 197:13 198:1,4 198:5,22 199:9 199:12,13 200:4 201:14 202:3,18 203:6 203:12,23,24 203:25 204:11 204:18,21,22 205:8,11,13,23 206:20 208:23 212:20 213:8 214:1 216:3 229:20 231:3 234:17,23 235:4,22 236:2 236:12,19 237:4,23,23 239:18,21 244:20,24 255:25 256:8 256:22 257:6,9 264:8 266:4 268:18,20 269:1 271:12 272:7,19,21 273:5 274:14 274:25 275:7 275:20,24 278:8 283:3,8 283:9 285:7,22 286:11,23 289:10 291:2,3 292:15,18 293:7 294:20 294:24 295:12 301:20 306:18 306:24 314:12 314:14,16 319:18 321:1 323:19 324:16 324:22 326:15 326:18 327:21 329:25 330:9 330:18,20 331:3,5,25 332:7,20 333:14 334:3,4 334:16 335:17 357:6 369:21
**risks** 143:20 154:17 275:24 351:8
**Risperdal** 246:4
**road** 2:9 220:19 222:25
**robust** 128:19
**robustness** 88:2
**Rohl** 250:3
**role** 29:10,14,17 33:20,20 75:14 99:14 124:1 125:10 127:20 246:15 255:22 268:25 306:1 331:19
**roles** 334:22
**route** 52:24 231:12 258:3 269:25 292:5 347:19
**routes** 233:11
**routine** 115:8 178:3 184:7 200:13,15 207:25 282:25 283:3 284:15 296:16 299:20 301:1,6,10,25 302:17,17 305:11 307:3 307:10 346:3
**routinely** 106:21 106:22 114:17 183:5,15,18 187:4 227:25 283:10 300:8 300:10,21 301:7 302:25 342:8
**Rowlands** 250:4
**Royston** 3:15 7:6
**rsullivan@dy...** 3:3
**rule** 4:16 305:17
**rules** 106:17
**Ryan** 2:4 3:2 6:22 7:8
**Ryan.Beattie...** 2:5

**S**

**S** 2:1
**sac** 101:19
**sacrifices** 231:1
**Saed** 313:21 314:4 315:2
**safe** 117:15 294:22 328:18 328:24 347:18
**safety** 30:12,21 31:5 35:13 36:21 49:21 53:1 75:22 97:17 99:17 324:10,11,17 324:20 328:6 328:10,15 329:17 331:1 346:12 347:16 355:20 360:7
**sake** 111:8
**Sales** 1:4 6:10
**sample** 129:4 131:5 170:12 252:10
**samples** 151:4 163:21 179:20 223:11 247:25
**sampling** 170:14 186:1
**San** 3:4
**Sanchez** 261:7 261:18 262:20
**sat** 74:21
**save** 80:12
**saved** 56:9
**saw** 179:18 259:15
**saying** 45:4 106:9 123:13 143:23 149:3,4 150:12 158:2 159:10 173:24 193:9 203:23 213:17,18 224:8 227:23 231:12 240:5 251:8 256:11 262:15 273:3,6 274:14 281:12 304:20,20,24 316:19 334:14 338:8,15 356:20 357:13 357:14,19 366:16
**says** 7:23 104:10 109:20 110:21 129:24 191:11 191:15 250:2 361:23 365:4
**scenarios** 179:24
**Schedule** 9:18 9:21,25 17:18 17:23
**schools** 290:13
**science** 31:14,15 31:17 105:16 191:11 192:9 274:6
**sciences** 356:2
**scientific** 41:2 62:18 65:5 67:11 76:10

80:6 81:12 96:7 97:2,8 98:13 99:4 121:23 122:22 124:9 134:22 173:18 182:8 183:1 185:8 186:16 190:10 190:24 192:15 205:16 209:25 210:8 245:1 259:23,24 272:1 273:8,10 275:14 276:9 278:10 282:16 321:6 324:5 326:23 329:22 333:5,7,8 334:10 359:23 360:3,12,19
**scientifically** 30:8
**scientist** 77:22 191:8 320:5
**scientists** 84:13 99:10 104:15 105:12 107:4 114:16,17,18 319:17,22 321:18 322:2
**scope** 117:8
**scoring** 206:1 207:11,19 208:4
**screen** 92:8
**screening** 209:5
**se** 124:10
**search** 26:12 27:4,19 53:18 59:10 62:4,7 90:24 121:11 206:24
**searched** 338:13
**searches** 25:22 26:20 53:11,16 54:6,12,17 55:5,23 57:5 58:4 61:14,23 62:17,19
**searching** 54:12 54:20
**season** 301:7
**Seasons** 1:14
**second** 23:15 24:5 52:6 69:7 188:2 273:18 324:2
**second-guess** 198:10
**section** 16:3 66:25 100:20 105:2 112:10 112:13,20 123:25 124:1,2 126:21 133:7 139:21 140:6 179:2 188:15 206:23 212:5 212:17 215:7 333:16
**sections** 30:15 30:17 326:10
**see** 9:11,19 16:19 18:11 20:10 30:16 34:8 39:18 47:1,8,17 51:12 64:21 65:1,7,11,18 66:20 79:2 87:10,24 102:18 110:21 115:3,3 123:22 134:2 136:6 147:17 149:24 151:3 154:2 156:5 159:16 163:14 166:25 177:7,10,21 188:16 199:24 203:2 205:19 206:22 207:1 207:12,13 208:18 214:10 235:23 240:25 249:14,22 254:2 261:24 265:19 267:6 267:19 268:3 270:17,18 279:11 284:21 297:23 316:19 318:16 337:14 341:9 353:25 365:18
**seeing** 63:19 170:24 270:9 367:20
**seeks** 359:22 360:2,6
**seen** 8:22 21:7 42:6 48:3 78:18 85:14 106:20,22 107:1 110:14 110:15 111:22 115:1 123:18 129:23 130:1,9 148:12,21 149:21 151:1 153:4 154:10 161:6 170:13 176:12,13 177:13 187:13 205:14,21 207:14 211:13 211:23 225:17 225:19 228:20 241:24 248:7 248:16 252:6 259:12 260:9 261:17,25 262:2 263:10 270:25 288:21 299:13 306:22 309:12 311:19 312:2 313:11 321:8 342:14 361:1 362:13
**segregate** 59:1 145:12
**select** 129:6,6 130:4
**selecting** 141:13
**selection** 130:13
**sell** 308:4
**selling** 316:20 317:19,24 318:2
**Seminary** 2:9
**sense** 40:19 182:6 195:17 195:19 285:11 285:25 332:25
**sensitivity** 223:6
**sensitizer** 276:20
**sent** 63:21
**sentence** 47:11 47:15 64:21 65:3,19 66:10 67:8 112:20 147:11 212:17 236:23 243:10 251:3 267:12 317:4,6 339:14 366:6
**sentences** 65:21
**separate** 30:4 48:4 63:12,21 64:4,5,7 124:8 139:5 177:1 201:13 202:4,5 208:24 215:24 217:9,18 224:4 244:21 251:22 260:10 263:23 285:7 289:13 318:14 323:20 324:17 325:14 325:24 326:10 329:23 333:16 333:21,22,25
**separated** 210:8 215:19 217:4
**separately** 12:1 13:11 330:21
**separating** 217:14 218:14
**serial** 231:5
**series** 220:16 232:8 246:5
**serpentine** 255:6
**served** 33:21
**serves** 246:20
**service** 26:8
**Services** 1:21 3:20 6:5
**set** 29:8,11 30:17 31:4,21 36:14 55:23 56:19 75:1 84:24 106:16 117:14 146:7 180:3 188:18 210:16 220:5 304:1 311:10 311:15 372:9
**setting** 11:20 23:24 35:25 148:20 174:21 175:2 176:13 176:22 222:25 273:25
**settle** 182:24
**settled** 182:25
**seven** 88:21 316:4
**SEYFARTH** 3:7
**shape** 127:25
**sharded-type** 255:1
**share** 146:18 154:12 160:17 161:5,9 233:17 272:19 278:22 370:10
**sharp** 254:25,25
**SHAW** 3:7
**sheet** 373:6,9,11 373:14 374:7
**Shifting** 307:19
**Shimmer** 126:17 157:5

161:14 308:20
**short** 12:9 348:11 368:21
**shorter** 306:13
**Shorthand** 1:19 372:4,19,20,21
**shot** 28:18
**show** 103:8 150:4 159:16 172:8 206:4 221:21 229:19 238:9 244:9 246:8 250:9 257:15 270:5 276:9 280:2 301:15 305:19
**showed** 177:2 183:25
**SHOWER** 126:14,14 157:4,4 161:14 161:14 308:20 308:20
**showing** 42:7 68:5 103:8 157:17 172:24 184:10 221:18 237:22 274:21
**shown** 41:23 70:22 153:6 242:15 251:7 256:9 257:11 257:19 260:15 271:11 272:18 279:5,16,17 281:18
**shows** 36:7 41:10 70:9 71:5 103:13 145:7 151:1 158:13 169:24 199:10 245:6 302:23
**sick** 178:23
**side** 335:23
**sides** 248:15
**sign** 373:8
**signal** 173:12
**significance** 40:6 41:24 42:14,23 92:20
**significant** 33:17 41:8 42:11,12 91:3 133:5 157:18 172:24 257:16 313:2 357:5
**signing** 373:9
**signs** 238:11
**silica** 264:18,20 264:20
**similar** 54:21 70:4,12 71:2 71:24 79:23 117:7 118:11 144:23 145:2 153:15 169:25 231:24 233:17 243:21 254:6 268:10 272:20 273:23 275:22 276:18 289:7
**similarities** 233:4 234:8
**simple** 36:11 264:16
**simply** 26:5 38:16 67:8 89:2 93:12 106:9 110:3 113:9 139:2 144:2 241:12 294:11 306:3
**single** 242:14,21 243:2,14,16,17 283:1 298:18 368:9
**sit** 34:10,23 51:16 60:21 74:16 110:23 119:11 120:22 145:16 162:21 176:1 188:9 202:6 245:12
250:11,18 259:21 276:24 278:9 280:23 368:18
**site** 64:24 180:21 242:16 243:18 264:23 281:16 295:4
**sitting** 18:16 368:15
**situation** 96:11 96:18 97:22 246:2 273:25 297:6 326:5 342:11
**situations** 246:1 361:1
**six** 18:20,21 97:24 98:1,5 172:5 249:10 266:25 267:17 301:3 316:4
**size** 92:23 124:20 125:3,4 125:7,10,15,23 127:19,25 128:7,8 129:6 129:21 150:11
**sizes** 124:24 128:14 129:5 230:23
**skin** 271:21
**slightly** 46:6 55:18 65:20
**small** 129:10 202:14 243:12
**smaller** 125:4 126:2 129:6,14 177:21
**Smith** 2:22 7:12 7:12 42:18 257:14
**Society** 355:3
**sold** 48:13 138:15 251:6 253:10 308:13 316:15 325:10
**solely** 351:17
**solicit** 340:23
**soliciting** 342:2
**solicits** 340:19
**solubilized** 72:8 264:11,17 265:23
**soluble** 72:12
**somebody** 173:25 225:19 246:10 283:10 305:18 318:3 320:19 335:25 357:3,4,17,21
**somewhat** 265:2 313:3
**sorry** 11:8 12:21 19:6 137:13 226:20 257:14 267:11 269:10 274:4 289:23 289:25 298:12 310:2 313:14 313:15 333:3 339:5 345:13 355:23,24 358:25 360:1 363:5 365:8 367:8
**sort** 15:14 30:1 30:2 37:13 85:21 178:9 235:17 299:20 332:1 351:10
**sound** 323:7,13
**sounds** 96:23 322:22
**source** 133:11 136:10,15 216:11 251:21 336:12,17 337:1 339:17 339:25 340:1 349:16
**sourced** 318:13
**sources** 130:16 136:21 137:6
139:13 144:17 162:18 167:7 266:17 313:23
**sourcing** 137:1
**South** 2:14,23 3:13
**space** 180:11,13 373:6
**specialist** 47:24
**species** 68:6 182:20
**specific** 12:24 15:4 22:20 29:5 39:25 50:4 51:1,21 56:19 71:9 76:22 82:21 91:10 93:2 103:17 105:4 109:22 110:9 116:10 123:10 123:10 124:18 125:15 129:18 141:21 147:24 148:15 159:4 164:3 166:17 168:1 172:3 174:11 185:13 189:16 202:16 202:19 210:16 210:23 211:2 212:22 214:14 218:21 224:10 224:20 250:24 253:4 259:6 275:6 277:2 282:21 304:2 310:19 321:12 345:5 349:1 354:1 355:16 357:22 368:17
**specifically** 11:22 15:8 21:23 22:8,19 22:25 43:8 46:22,23 50:13 69:21 77:12

91:13 97:10 100:6 102:2 113:13 118:21 119:23 125:9 135:2 151:20 153:22 154:4 154:18 158:17 160:7 163:9 189:12,17 196:2 201:18 214:8 227:11 244:12 249:17 258:1 264:7 265:4 272:4 285:2 350:13 354:21 355:25
**specification** 311:11
**specifications** 129:20 165:3 311:15
**speed** 73:11
**spent** 10:23 11:13,18,20 12:1
**spoken** 345:4
**sponsored** 247:9
**St** 1:14 3:14 6:9 19:19 20:21
**stages** 272:13,15 341:23
**stakeholders** 344:8
**standard** 49:20 116:4 185:10 186:17 285:18 324:19 326:14 327:11 328:2,3
**standards** 38:7
**starch** 69:10,25 70:1 71:2,6,10 71:23 72:6,7 72:13 73:7 93:4,7 265:10 265:16,22 266:19
**start** 8:16 31:25 57:10 60:11 62:10 80:19 81:21 82:1,11 90:23 93:19 127:24 128:7 189:11 216:25 248:24,24 298:13 326:16 365:7
**started** 8:5 19:25 32:5,17 32:23 54:12 59:18 60:2 74:17 95:4 163:7 323:8 329:13 331:11 331:12
**starting** 15:13 102:19 138:25
**starts** 35:25
**state** 53:8 70:8 84:5 95:17,23 135:4 147:12 164:1 173:6 183:2 190:20 236:6 242:12 284:20 286:18 293:16 340:2 340:18 373:5
**stated** 28:3 34:20 109:16 112:5 183:13 208:1 251:10 298:24 344:24
**statement** 36:10 42:9 47:4 48:15 52:18 110:9,25 173:3 192:3,5 199:4 202:5 204:22 211:2 213:5 230:9 240:2 243:22 250:20 253:7 284:12 284:14 318:7 338:24 347:16 349:25 350:3 365:3
**statements** 17:6 35:20 74:5 110:12 191:18 193:11,16 202:17 336:7 351:3
**states** 1:1 6:11 47:15 49:13 65:4 67:9 112:21 207:8 322:19
**stating** 134:25 204:14 243:11
**statistical** 40:1,5 41:8,24 42:13 42:22 92:19 209:13 218:2
**statistically** 91:2 92:19 157:18 158:14 172:24
**statistics** 92:20
**stay** 220:21 337:13 364:12
**steering** 340:6 340:10,14
**Steinberg** 344:11
**stenographica...** 372:8
**step** 36:2 139:21 139:25 188:23 189:23 235:14 235:22 279:1 332:24
**steps** 75:25 76:13 77:3,4
**sticky** 218:10
**stilled** 243:1
**stimulate** 273:23
**stomach** 271:13
**stop** 82:11 334:5
**stopped** 331:7
**stopping** 116:3
**story** 178:9
**strategy** 58:12
**streams** 27:8
**Street** 1:14 2:5 2:14,18,23 3:3 3:8,13
**strength** 38:13 38:22,23 39:4
**strengths** 102:15
**stress** 227:13 228:2,6 277:8 278:23 279:2,7
**stressors** 228:23
**stretched** 297:2
**stronger** 203:9 203:20 204:18
**structure** 59:11 124:20 125:11 125:16,23 127:19 255:1
**studied** 70:22 159:5 255:18 269:23,24
**studies** 41:20,21 41:22 68:2,5,9 69:13 73:22 74:6 81:19 83:12,25 84:6 87:25 91:2 95:18 96:20 97:24 98:6 99:1 100:2,5,9 100:25 101:4 101:24,25 102:5,7,16 104:5,18,22 105:19 106:4 106:19 113:4 114:8,22 115:5 115:5,9 117:10 119:18,21 120:4,25 127:8 133:24 138:16 140:23,24 141:21,23 142:3,4,5,6,19 143:13 145:12 152:17 154:4 154:14 155:1 155:10,23 156:1,25 158:8 158:9,17,22 159:3,9,16,18 160:7,7 163:16 172:25 173:13 174:23 175:10 175:16,19 177:18,22 178:4 183:14 183:22 184:9 185:24 187:7 187:20 205:17 206:25 207:6,9 207:20 208:4,5 208:16,21 210:8,12 215:16,20 216:7,10 217:6 217:7,9,10,22 217:25 218:3 222:15,17 223:11,19 224:13,21 225:17 228:14 228:20 229:15 230:17,18 234:9 237:20 237:21 238:7,9 238:23 239:4,4 239:8,18 240:8 240:9,9,12,16 240:17,18,22 241:13,17,25 242:20 243:24 245:17 246:16 274:18,21 275:14 276:9 277:19,21 285:3,6 288:21 291:18 293:17 295:20,21 296:9 302:24 310:6 312:2,8 312:8 313:8 314:10,15,18

314:19 315:14 357:7,23 358:1
**study** 36:19 42:14,15 69:3 69:20 73:4,14 73:20 79:17 84:9 87:19 88:4,8,8,14,16 89:25 92:17,22 96:4 99:2 102:13,14,24 104:4,10,11,25 114:7,10 118:15,25 119:8 120:2 134:12 145:10 152:12 155:9 155:15,16 156:17 159:19 160:12,23 170:17 172:18 175:13,17 182:19 206:18 207:18 209:14 209:20 210:24 211:3 216:1 217:20 218:2 220:11,24 222:19,22 223:17 224:5 225:18,20 228:17 229:9 229:10,22 230:22 231:1,4 232:2,3 233:1 235:10,19 239:20 241:2,3 241:8 244:3,5 244:8 246:19 291:8,21,25 292:1,13 297:21,24 298:1 312:16
**studying** 73:25
**subject** 43:12 287:10 373:10
**subjects** 100:7
**submission** 364:25
**submissions** 362:6
**submit** 341:15 341:19 343:7 343:17,22 345:17 368:7
**submitted** 10:16 10:20 116:13 116:21,25 342:21 344:1 361:14 363:2 363:11,15
**submitting** 361:24
**Subscribed** 374:15
**subsidiaries** 44:20
**substance** 35:4 40:12 103:14 147:23 374:7
**substances** 70:21 72:22 105:5 256:3
**substantial** 226:15 258:5,9
**substantive** 26:24
**substituted** 174:6
**successfully** 182:12
**suffice** 43:20
**sufficient** 40:15 276:6 306:8 326:2
**suggest** 281:24
**suggested** 51:20 313:8
**suggesting** 114:7 284:13
**suggests** 195:2
**Suite** 2:9,14,18 3:3,13
**Sullivan** 3:2 7:8 7:8
**summarized** 202:14
**summary** 83:18
**summer** 20:11 21:5
**supplemental** 4:14 14:14 20:2,8,17,19 23:4,8 32:10 266:21 267:3
**supplementary** 208:2,9
**supplied** 204:12
**supplier** 307:21 307:25 308:2 309:4
**supplies** 308:11
**supplying** 317:9
**support** 21:21 22:9 112:18,22 139:14 338:23 350:14
**supported** 184:8
**supporting** 37:11 48:17 307:2
**supportive** 337:20
**supports** 194:11
**sure** 19:17 24:7 27:21 56:4 63:8 78:24 109:12 120:23 121:5 123:17 177:9 242:10 269:14 271:21 278:13 281:11 287:13 308:25 316:5 323:10 323:12 364:11 367:5
**surety** 121:8
**surface** 180:14 180:19 264:22 329:4
**surprise** 345:1,3
**surprised** 79:22
**survey** 139:2
**susceptible** 292:1
**suspended** 177:14
**suspicion** 366:25
**sustained** 140:17
**swear** 7:18
**sworn** 7:21 372:5 374:15
**system** 26:10 87:15 90:4,9 90:14 91:10,13 91:18 92:6 113:18 206:2 207:11,19 276:21 335:9
**Systematic** 4:18
**systematically** 264:12

**T**

**T** 3:7
**T-a-h-e-r** 16:14
**table** 79:19 86:4 87:12 89:11 203:18
**Taher** 4:20 16:14 201:23 205:8,13 206:18 215:16
**take** 28:17 36:12 70:23 94:19 103:4 128:7 131:22 160:15 188:22 197:19 203:18 208:13 223:7,15,16 228:21 243:23 246:18 287:2
**taken** 110:6 131:11 218:9 299:10 368:6 372:8
**takes** 26:13 102:11,12
**talc** 3:5 4:19 15:16 17:6 29:25,25 30:21 31:5 57:22 62:8 64:23 65:6 66:5 67:9 67:12,16 68:6 69:14,18,21,24 70:12 71:3,11 71:19,24 72:6 72:11,19 73:8 73:15,25 74:7 77:10,10 86:21 93:7 95:19 97:17 100:6 108:8 109:18 110:7,13,25 112:7,12,20,23 119:5 124:14 124:20 125:3 125:11 126:22 127:19 128:8 129:4,13 130:4 130:16,18,23 131:14 132:3 133:9,10 134:13,14 135:2,3,14,22 135:25 136:11 136:15 137:5,6 137:8 138:10 138:18 139:4 139:13,14 140:24,25 142:2,3,4,7,13 142:15,21 143:1,3,20 144:17,22 145:18,20 146:5 147:1,3 147:14,14,15 147:15,20 148:13,24,25 148:25 149:13 149:14,16,18

149:18,21,23
149:24 151:2
151:19 152:24
153:5 155:16
159:4 161:11
161:12,20,23
162:14,18,25
163:18 164:8
164:17 174:18
174:20 175:14
177:14,17
178:15 179:11
180:4,6 181:12
181:19 182:13
183:3 184:12
184:13,19,22
185:10,18,20
186:7,19
187:14,17
188:12,25
189:1,17 190:3
190:4,11,25
191:13 193:3
193:18 195:24
196:6,20 197:2
198:21 202:11
202:18 203:1,6
203:21 204:16
207:21 208:23
221:24 222:7
222:16,19,21
222:21 223:12
223:13,20,21
224:3,18,22
225:10 226:13
226:25,25
232:19 233:2
236:10,12,19
237:3,14
238:10 239:18
240:10 241:16
241:21 242:1,5
242:14,21
249:17 250:10
253:2 256:15
257:10,21
258:24,25
259:2 260:11
260:11,16
261:5 262:9,19
263:16 265:10
265:15,24
266:5,10,19
267:5 272:20
273:1,1 274:15
277:12,24
278:13 280:24
281:17,23
282:18 283:9
285:22 286:18
286:22 291:6
293:15,20
296:14 297:16
297:24 298:4,5
298:18,19
301:13 302:8,9
305:21 306:5
306:23 308:23
310:7 316:14
317:9,19,25
318:2 319:18
320:12 321:1
322:5 324:6,13
324:23 325:1
325:17 326:23
327:5 329:25
331:5 332:6
335:12,13,14
341:16 342:12
342:21 344:16
344:23 345:18
346:1,18
355:14,21
356:10 361:5
361:15 370:15
**talc's** 86:21
**talcum** 1:3 4:22
29:20 198:2
200:3 251:4
255:24 256:20
258:4,19 260:2
261:8 262:22
263:20 268:23
290:19 322:15
369:11,17,21
**talk** 13:9,9
31:11 34:4,16
75:21 77:19
79:15,17 85:2
100:20 101:4
107:1 112:12
119:1 123:7
124:19 128:25
138:11 146:11
146:14,25
147:2 149:13
149:22 150:17
153:11 161:8
162:18 164:24
166:2,3,5
184:2 192:4
194:1 201:5
208:6 209:11
219:6,21
221:13 252:21
264:6 266:17
269:4 272:11
272:12 277:11
282:24 283:4,6
285:16 311:4
333:13,17
335:2,8,11,19
340:12 347:3
347:17 352:19
359:20 370:2
**talked** 43:2 88:5
95:14 138:21
146:8 148:21
165:5 173:11
174:17 186:23
201:7 221:8
265:1,3 268:9
276:3 294:5
305:13 314:17
327:21,25
335:3 355:25
369:16
**talking** 15:14
16:4 27:23
63:8,13 84:25
86:8 95:4
128:12 153:21
156:12 167:12
167:21,22
168:6 175:22
177:25 202:1
203:11 209:11
216:2 223:25
238:15,18
240:3 248:8
262:9 270:20
270:21 281:15
291:10,13
294:4 302:17
302:19 305:6
306:16 309:21
309:22 310:3
329:13,20
330:5 333:4
334:15 338:14
348:5,8 351:7
361:12,17
362:10 365:19
367:24
**talks** 17:5 71:5
72:17 73:5
103:10,13
128:24 139:3
149:14,15
202:17 208:15
292:12 296:5
365:12
**tangent** 330:7
**target** 117:13
146:19 168:22
235:17 274:13
**task** 330:19
331:3,8,11,12
333:25 347:25
**tasks** 330:17
**teaching** 291:2
**teasing** 293:23
**technically**
342:6,9
**Tecum** 4:12
**Ted** 2:3 6:18
**Ted.Meadows...**
2:4
**tell** 7:22 12:17
52:4 53:2 59:3
60:25 68:25
76:19 78:24
100:21 101:9
101:22 102:8
109:20 119:8
121:7 123:25
129:24 136:16
139:19 141:17
153:2 155:20
169:18 182:15
188:17 191:9
192:19,20
193:10 200:9
201:11 236:22
245:12 249:10
251:2,11
262:25 300:13
305:3 307:7
314:25 316:2
316:10 339:24
**telling** 52:7,15
105:1 138:9
172:4 186:14
210:3 284:21
309:2 315:13
**tells** 62:23 83:5
232:6 265:19
302:13
**ten** 11:11,18
183:23,24
184:20,20
**tend** 344:7
**term** 130:19
131:3,4 146:25
183:4 194:4
216:15 303:2
**termed** 34:25
**terms** 27:24
74:10 75:23
101:19 147:14
150:10 151:10
157:8 159:13
171:21 187:15
323:14
**test** 40:1 127:8

160:8 181:22
**tested** 132:19 139:24 248:1 252:11 257:10
**testified** 265:9 297:14
**testify** 365:23 372:5
**testifying** 255:19 346:24 347:2
**testimony** 30:5 32:22 86:1 108:20,23 109:5,7 136:18 163:3 186:12 209:21 210:2 213:16 252:6 255:16 261:23 262:13,20 342:16,18 349:13,19 350:5 372:8
**testing** 142:20 170:5 182:13 182:21 186:5 187:23
**tests** 144:7 181:18
**Texas** 1:19 3:4 372:21
**textbook** 292:11 294:6
**textbooks** 290:11
**thank** 7:16 111:21 287:13 318:25 370:16 370:17,20
**theory** 181:19
**thing** 10:1 16:8 63:9 326:6 333:9 355:4
**things** 18:3,5 22:1,7 29:6 30:5 36:16 43:13,16 45:13 45:13 52:24 53:18 57:9,14 57:15,22 61:12 62:5 63:19 80:25 83:14 85:11 88:23 91:4 92:25 93:5 98:15,19 101:13,20 103:7 125:8 133:12 140:9 140:11 146:13 150:19 151:25 153:6 159:15 160:16,17 161:16 163:19 163:22,24 169:16 179:1 181:5,5 184:6 194:23,24 196:16 197:22 204:2 209:12 209:18 216:13 225:14 233:13 234:3 235:18 247:8 269:22 289:4 293:19 305:23 312:23 315:18 323:16 323:18 324:13 328:18 330:14 331:15 335:19 343:15 349:10
**think** 18:6 28:6 30:16 31:10 32:21 33:9,13 34:15 38:20 41:15 48:23 49:16 50:11 52:6 58:11,13 58:16 61:22 66:23 68:18 72:23 76:6 80:15 82:23 83:19 84:15,17 90:13 91:15 93:22 95:14 96:10,13,16 97:9 99:6 100:21 101:3,5 101:9,23,23 103:1 104:9 106:15 119:21 123:24 125:14 126:3,9,17 136:4 139:20 141:17 145:1 146:8,23 151:11 153:1 160:25 162:6 162:17 163:6 164:23 165:5 166:15,16,18 167:9,10 169:2 174:16 176:25 177:5 181:3,4 182:5,15 183:13 185:2 186:14,18 188:15,18 189:5,7 190:7 190:20 191:24 192:2 200:17 202:14 203:8,9 203:19 204:22 223:9,13 224:7 224:24 227:16 233:9 234:13 237:8 238:22 242:1,25 243:8 244:12,20 245:11 246:3 247:15 248:11 249:20 256:24 257:1,8 260:6 261:11 275:3 282:22,23 283:11 284:13 287:1 288:15 294:5 297:7,25 298:10,23,25 299:16 301:23 302:11 303:6 303:12 304:12 304:14 305:5,8 311:12 318:6,6 318:16,24 319:7 320:4 323:3,25 325:4 325:11 328:7 332:10 333:20 335:5,20 349:4 349:10,18 351:15,24 355:15,23 357:24 358:2 362:19 365:16 366:6,7 370:1
**thinking** 37:5 120:6 219:22 316:23 346:22
**third** 126:18 212:18
**third-party** 51:18
**thirty** 373:15
**THOMAS** 2:12 3:7
**thoroughly** 94:16
**thought** 21:1 38:21 58:9 77:25 92:2 100:23 108:19 108:20 215:10 233:10 330:4 347:2
**thousand** 158:6 200:10
**thousands** 346:6
**three** 12:7 13:5 13:6,15,21 19:8,11 27:25 254:1 264:2 268:1,5,8,15 278:21 279:23 280:14 290:23 301:17 310:3
**threshold** 39:17 39:24 200:2,7 237:10,13 281:25 282:17 282:18 283:11 284:14 294:22 295:5 303:4 304:7,11,21
**thresholds** 283:5
**throw** 143:13
**tie** 49:8
**tied** 334:16
**tight** 297:4
**tightly** 231:6
**time** 6:7 10:4,22 11:12,15,20,25 12:1 17:7 20:13,20 21:3 21:9 24:6 29:23 31:9 32:20,23 34:6 56:16 57:6,20 59:16 66:17 84:2 109:21,21 110:11 131:14 136:16,24 139:1 163:11 164:21 165:10 165:15,17,24 170:8,24,25 176:7 177:8 179:5 215:23 226:14 228:12 230:25 231:5 265:17 286:7 294:18 298:18 299:3,16 301:21 302:9 302:15 303:23 306:13 331:2 345:23 346:1,4 348:6,12 349:9 356:6 358:17 361:11,14,17 364:10 365:11 367:23 368:5 370:24 372:9
**timeline** 15:14 138:22

**times** 62:24 82:10 114:4 172:5,5,5 184:20,21 199:2 201:20 216:2 253:22 302:7 310:17 311:17 316:4 319:7 339:22 341:13,19 362:14
**timing** 28:24 343:6
**Tinsley** 3:12 7:5 7:5
**Tisi** 2:13 6:24,24 19:3,4
**tissue** 125:5 126:1 128:1 140:13 179:17 227:13,14 228:5 229:1 231:14 232:20 242:22 264:15 264:16,24 274:1,8,8 276:19 283:14 289:8 293:4
**tissues** 273:24
**title** 69:3 290:25
**tlocke@seyfar...** 3:8
**today** 8:8 12:5 23:21 34:10,23 51:16,20 60:21 88:21 109:10 109:11,20 110:23 119:12 120:23 145:16 149:2 162:22 176:2 188:9 200:8 202:6 209:21 210:2 250:11 259:22 276:25 280:23 297:14 315:11 354:24 368:15 368:18
**today's** 6:6 13:1 15:5 22:18
**told** 58:11 103:24 171:22 185:12 209:6 210:15 219:3,8 245:5 257:12 257:13 265:21 307:17 315:17
**Tom** 7:3 319:5
**tool** 75:24 77:13 356:5,9
**tools** 81:7 212:20 356:17
**top** 52:3 184:1 218:10
**topic** 54:24 58:13,14 64:23 97:2 124:18 289:16
**topics** 29:5 30:18 33:2,5 33:22 53:5 58:15
**Totally** 326:8,19
**touch** 287:22
**toxic** 29:24 125:4 145:20 146:18 151:19 153:3 195:23 195:25 223:21 242:4 243:13 273:23 306:8 306:11
**toxicities** 34:6
**toxicity** 39:13 86:21 126:2,22 127:17,20 128:1 139:14 140:13 146:5 149:1,10,13 150:4,24 151:17 152:14 169:20 224:15 235:17 240:11 241:16,21 242:1 254:6,10 266:13,14,18 283:14 294:25 295:6
**toxicokinetics** 65:6 67:12
**toxicological** 114:10 167:3 234:22 290:7 304:10
**toxicologist** 72:5 84:18,25 126:10 143:16 145:17 150:19 152:3 166:23 167:16 168:3 170:1 181:24 195:15 199:20 224:6 234:21 255:19 264:5 305:10 307:5 307:15 334:3 357:3
**toxicologists** 72:25 85:4 115:4 281:6
**toxicology** 29:20 76:9 77:10 81:20,23 125:25 182:21 199:24 209:16 255:13 275:20 278:5 291:1,3 294:1,5 295:2 295:10 304:25 323:19 334:8 335:2,4,12,25 346:11
**trace** 309:14,20 310:4,15,17,21 310:23 311:4
**track** 56:5,11 80:5,24
**tract** 68:7 69:10 69:15 70:6,11 71:18 72:1 73:16 95:20 101:15 103:12 103:12 183:16 184:4 265:5,12 295:23,25 297:1,18 302:10
**tracts** 101:11
**trail** 55:16
**trained** 86:7 115:12 352:10 352:15 359:14
**training** 39:6 77:23 84:23 99:7 105:12 115:12 264:5 356:5,7 357:9
**transcript** 372:8 373:16,17
**transcription** 374:5
**transcripts** 345:7,10
**transition** 124:17
**transparency** 213:12,15 214:4 219:20 244:15 350:17
**transparent** 212:21 214:9 362:14
**tremolite** 135:10 145:19,21,21 147:16,20,21 147:22 148:10 148:11,12,13 148:25 149:20 149:22 150:6,8 151:3,21 162:15 253:25 309:23
**tremolite-cont...** 149:23
**trial** 20:25 21:19 21:21 22:7,11 22:13 32:22 109:23 138:20 165:6 186:23 252:5 335:1,8 349:19
**trials** 20:21 335:3 349:13
**tried** 91:15 92:12 141:3 155:19 160:21 174:15 185:2 191:5,5 192:22 201:22 307:5
**triggered** 146:20 266:10
**triggering** 228:2
**trimellitic** 135:22,25
**trouble** 333:23
**true** 59:11 67:17 73:11 74:22 75:4 79:10 84:3,11 105:25 106:1,3 107:20 118:20 127:10 136:11 157:9 164:7 171:24 174:5,12 177:23 195:10 207:7 213:7 227:4 230:10 232:22 233:15 241:1 251:18 282:13 284:23 293:9 294:15 294:25 295:16 296:1,12 297:20 308:8 316:25 317:5 320:10 332:11 336:18 340:18 342:7 343:9,16 344:4 347:19 359:15 361:20 361:21 363:12 363:25 367:6
**truly** 222:21
**truth** 7:22,22,23 372:6,6,6

**try** 61:2 77:24 93:20,21 98:23 102:15 129:9 141:17 145:11 152:9 162:4 163:8 198:10 228:22 229:14 319:11 339:6
**trying** 28:19 53:2 57:11 73:2 78:5 106:15 117:14 119:16 128:5 130:15 133:6 151:14,16 153:14 155:22 156:14 169:11 195:15 219:18 238:5 243:19 259:14 260:19 269:13 273:20 289:1,1 304:6 306:3 316:5 347:23
**tube** 4:23 180:22 181:8
**tubes** 103:16 180:11 181:2 181:13 183:17
**Tucker** 3:12,18 18:16
**tumor** 221:22 222:4,6
**tumors** 181:1 220:13 270:6 271:10,13 279:22
**turn** 53:7 64:15 65:14 124:12 206:21 212:15 282:11
**turned** 311:21
**Turning** 215:15
**two** 19:4 28:25 33:16 35:19 65:21 68:2 72:22 85:3 172:4 204:1 233:4,16,16 279:25 280:1 281:7 283:8 289:4 290:21 292:16 313:18 318:7 323:17 323:18,22 324:13 329:8 329:14 330:14 330:16,17 349:4 363:4
**two-thirds** 236:7
**type** 55:22 81:3 84:19 116:25 133:16 135:2 138:3 140:13 140:20 145:8 147:22 159:4 162:11 172:20 215:18,25 232:20 233:20 254:20 269:18 270:12,13 271:15 272:2 286:11 326:20 327:15 348:18
**type's** 233:2
**types** 35:17 43:13 51:6 70:20 77:4 106:18 114:8 137:5,7 139:13 139:22 140:16 142:13 143:17 146:5,19 149:11 152:17 152:24 156:4 156:16 161:16 169:25 174:18 179:5 195:25 216:4 218:15 219:9 226:25 229:5 233:4,14 233:17 234:8 234:10,14,16 254:9 267:18 269:18,23 270:6,8 271:15 271:16,25 273:12 311:23
**typical** 178:10 182:20 205:21 214:7 294:12
**typically** 36:25 42:12 52:14 63:11,17 80:12 80:12 107:5 114:14 122:22 199:21 205:19 253:20,21 261:19 307:15

**U**

**Uh-huh** 122:20 286:1 304:8
**Uhl** 19:16
**ultimate** 127:17 237:12
**ultimately** 132:3 133:20 140:25
**underlying** 34:5 37:13 191:11 191:21 274:7 277:17 278:1 293:4
**underpinnings** 314:22
**underpins** 294:2
**understand** 23:25 28:6,19 32:22 33:1,3 48:24 57:11,17 67:1 82:19 83:20,20 88:20 93:25 94:2 102:4,23 104:21 113:15 114:3 117:15 128:5 133:15 134:11 142:12 148:17 150:20 151:12,15,15 151:16 152:4,7 152:13,22 155:13 167:17 169:2,8 170:4 175:1,19 195:16 204:14 213:9 219:22 229:14 231:3 233:3 234:7 247:6 262:15 281:12 283:20 291:20 297:13 304:9 325:5 328:22 330:13 332:18 333:20 338:7 357:5 360:5
**understanding** 8:8,12 10:6,19 19:10 21:8 22:17 29:17,18 34:24 35:2 40:4 44:13 47:22 55:19 98:12 101:5 108:25 109:16 116:15 123:15 125:23 130:3 131:2,4 132:14 133:18 136:20 150:2 154:1 169:5 194:3 202:7 213:1,20 249:8 308:21
**understands** 45:15
**understood** 63:2 182:10 227:19 242:10 329:6 349:9
**undertook** 330:18,18
**underwear** 296:22 297:17 298:4 299:6
**unethical** 185:25
**unfortunately** 59:16 74:2 166:21 170:11 185:24 225:14 237:7 239:4 297:20
**Union** 3:15 7:6
**unique** 103:9
**United** 1:1 6:11 322:19
**universities** 290:12
**unsafe** 347:5
**up-to-date** 10:15
**update** 62:8
**updated** 61:21 111:19
**updating** 61:14 62:5
**upper** 68:7 69:15 73:15
**upright** 101:12 101:13
**upwards** 95:20
**usage** 283:22
**use** 4:19 21:21 26:8 27:23 37:11 38:7 44:11 48:2 49:23 58:14 75:22 76:13 80:3,17 81:8,9 88:16 90:18 105:12 110:13 110:18 113:22 114:16,21,23 115:12 117:14 119:5 127:2 153:20 160:4 171:3 173:20 175:5,22,24 178:3,12 179:11 183:4,4 185:17 187:1,4 187:17 193:4 193:18 194:5

195:11,18 196:14 198:12 198:23,25,25 199:17,21,21 200:2 203:3 204:4 205:22 209:9,19 216:5 225:1 239:10 258:4,7 260:2 263:20 282:25 283:1,2,3 284:15 289:12 296:15 301:25 306:5,23 313:8 324:13 327:17 328:25 329:1 334:25 347:18 356:6
**uses** 78:16 184:19 194:8 196:17 283:8 283:10 298:4 302:8 339:19
**usually** 18:7,10 63:16 64:6 93:20 261:22 310:21
**uterus** 180:9

**V**

**V** 2:13 3:19
**VA** 2:10
**vagina** 103:15 180:8 296:11
**vaginal** 296:23
**Valley** 164:9
**valuable** 88:8
**value** 87:4,10 106:10 160:22
**values** 78:12 79:6 89:3 105:19 219:4
**variable** 199:18
**varied** 251:7 267:15
**varies** 128:22 134:22
**variety** 21:6 58:23 70:20 248:7 253:21 274:16 293:19 358:1 370:9
**various** 55:5 208:21 218:23 320:15 369:19
**vary** 232:19
**vast** 160:13
**venturing** 24:8
**verbatim** 372:8
**verify** 347:8
**Vermont** 136:22
**Version** 4:24
**versus** 38:11,11 67:4 72:18 76:14 79:16 83:1 85:1 101:12,13,16 101:25 118:6 120:10 125:7 126:6 140:18 146:9 150:15 151:6 163:9,10 165:1,2 170:15 175:21 178:10 179:14,22 181:2 205:7 219:7,7 224:22 227:6 231:9 233:12,24,25 238:25 240:7,8 243:12 247:1 260:11 264:17 266:19 270:21 281:8 283:9 305:14 314:21 324:20 326:14 327:18 357:17
**Vetner** 16:6
**videographer** 6:1,4 7:16 25:9 25:12 94:22,25 99:21,24 188:3 188:6 200:21 200:24 287:3,6 364:15,18 368:24 369:2 370:24
**videotaped** 1:12 4:11 9:10
**view** 33:5 38:13 49:6 84:18,20 96:3 97:20 127:14 165:7 181:10 189:1 197:9 236:16 254:8 258:2 269:16 349:21
**vitro** 115:5 117:9 118:10 142:5 205:24 207:5,20 208:16 217:1 219:7 224:1 228:13,17 229:9,15,22,25 230:4 240:8,8
**vitro/only** 217:5
**vivo** 229:10 230:2,2,7

**W**

**wait** 242:8
**waiting** 301:2
**walk** 13:16
**wander** 137:18
**want** 8:16 12:16 12:20 13:9 20:10,11 24:7 27:6 30:14 41:12 60:5 72:16 74:12 78:24 94:19 100:10 102:18 106:5 109:24 110:8 119:1 120:6 121:7 123:24 129:15 135:18 148:15 149:4,5 150:3 153:11 162:15 169:13 177:4,8 183:22 188:16 195:12 201:5 204:4 212:4 229:13,23 232:7 235:2,3 241:7 242:9 247:12 249:18 281:11 283:4 287:22 305:17 316:8,9 317:16 330:8,10,13 333:19 347:7 358:13 362:22 364:8 366:20
**wanted** 19:10 56:18,20 57:17 61:6 105:18 133:14 159:13 201:11 280:11 319:14 323:10 329:21
**warm** 301:8
**warn** 327:3,4 328:8 329:15 332:16
**warned** 165:18 330:25 332:17
**warning** 47:4 48:14,14 52:13 52:17 153:11 166:12 179:2,3 285:15,17 326:14 328:4 334:15,19
**warnings** 51:7 141:25 165:18 285:15,20 330:22 331:17
**Washington** 3:9
**wasn't** 15:10 21:14 59:20 62:3 119:14 123:19 171:22 257:13 262:11 334:2 345:21 349:22 353:5
**waste** 177:8 364:9
**water** 117:16
**way** 34:20 35:20 36:7 37:5,25 38:10,21 40:21 49:13 51:13 55:14 56:10 58:2 70:8 73:19 78:22 79:12 86:7 89:9 94:18 98:22 101:1,16 105:15 110:20 115:6 130:12 131:12 137:25 138:24 140:8 142:10 144:14 144:21,22 146:4,23 151:7 156:10 158:1 159:21 161:25 171:3 172:19 173:7 176:21 185:1 191:4 192:9,12 194:22 195:23 196:11 209:3 209:15 210:15 230:16 231:22 233:22 236:7 240:15 241:3,5 245:15 246:19 256:5 265:3 275:4 283:5 291:21,22 293:6 297:22 298:5,24 300:6 302:9 314:24 319:21,24 320:1 325:10 332:1,11 353:17 354:9 356:17 362:5 366:23
**ways** 58:24 78:10 80:24 219:19 256:18

294:20
**we'll** 11:6 17:12 39:15 70:2 166:3 252:24 359:3
**we're** 13:8 24:7 63:8 64:18 78:25 84:22 94:22 194:16 194:17 226:5 323:11 361:24 368:22,22
**we've** 22:21 138:20,21 174:17 206:15 369:16
**weakened** 110:11
**weaknesses** 102:16
**weather** 301:9
**web** 288:14
**website** 17:5 109:9 212:13 284:11,22 288:11,15 341:8 345:11 345:16
**websites** 26:16 123:19
**WEDNESDAY** 1:8
**week** 9:3,3 300:1,24
**weekly** 302:3
**weigh** 38:8 106:19 199:8 217:24 247:12
**weighed** 135:12 184:6 205:5,10
**weight** 5:1 41:21 42:4,24 73:21 75:24 77:13,20 78:3,10 80:7 82:21 83:7,21 84:5,12 85:5,7 85:22 86:10,23 87:6,14 88:5 88:17 89:5,24 90:10,18 93:6 95:25 96:6 97:3,6,21 98:4 98:7,9,21 99:2 101:8 102:4,23 103:5,20,22 104:3,5,12 105:11,15 107:2 112:17 112:21 113:16 114:6,12,12 115:25 117:8 120:4,10,11,19 121:2 133:23 134:11 135:7 140:23 141:4,5 143:18 154:16 155:6,16 172:21 173:2 198:12 205:15 209:10 210:1,9 210:21,23,25 211:3,4,10,11 213:2 214:15 215:20,24 217:19,24 218:18,24 219:1,12 229:9 229:12 230:6 230:10,18 231:18,19 232:1 236:8 240:4 244:1,14 244:19,19,19 244:23,25 245:14,18,23 246:13,19 248:6 252:12 252:19,24 285:21 314:1 314:11 315:1 315:18
**weighted** 77:17 231:24
**weighting** 41:22 90:5 98:23 99:3 116:9
**well-controlled** 172:18
**well-recognized** 290:11
**went** 12:12,13 15:16 61:1,8 61:12 77:4 123:9 246:15
**weren't** 21:11 21:22 22:1,8 60:2 83:3 163:19 239:6 318:13
**wide** 358:1
**widespread** 258:17
**William** 2:22 7:12
**Wilma** 352:20
**wiped** 299:8
**witness** 7:19 28:11,22 32:4 33:9 38:20 39:23 40:18 45:3 48:23 49:11 50:6 51:4,24 56:8 58:7 72:3 73:18 86:3 87:9 89:20 90:13 91:25 93:18 96:10 99:6 105:24 106:14 107:16 111:18,22 113:20 118:17 121:4 127:1 131:18 132:6 134:1,16 136:4 137:12,16,22 139:18 141:3 143:9 144:10 145:1,24 154:22 155:19 157:8 159:8 160:11 162:2 163:6 164:12 165:12 166:15 171:6 173:23 174:10 176:6 179:13 180:18 184:25 186:13 187:19 190:15 192:19 195:7 196:9 198:9 214:19 221:5 222:11 233:7 234:13 238:15 239:23 241:20 252:18 255:11 259:14 260:6 261:17 262:25 270:15 278:17 279:15 282:4 283:25 284:19 287:13 291:10 292:21 296:5 296:19 298:7 298:23 300:4 303:9,15 306:10 307:14 307:24 308:7 308:17 309:17 310:9 312:10 315:5 316:23 321:21 322:21 325:4,22 327:8 329:12 330:3 332:10 334:21 340:22 342:25 350:23 351:21 353:23 356:13 356:25 369:25 370:20 373:1
**WOE** 212:23 213:2
**woman** 296:24 296:25 297:5 298:4,18 302:7 302:8 352:23 354:15
**woman's** 200:16
**women** 37:4 41:4 70:11 185:11 186:1 198:23 199:13 202:19 203:22 237:13 265:5 296:15,20
**women's** 312:3
**Woodruff** 16:5 102:21,22 105:3 296:2
**word** 57:2 59:22 60:22 64:11,13 110:18 127:3 157:22 172:1 187:4 194:5 195:13 216:5 237:9 300:20 354:18
**words** 22:3 34:15 45:14 53:20 56:22 58:20 126:3 136:13 137:18 146:16 149:11 156:8 169:15 183:21 187:2 191:7 194:13 195:18 203:2 204:4 216:1 239:6 242:19 257:4 294:19 305:11
**work** 10:16 18:22 19:21 20:7 22:24 23:7 24:8,14 26:2 29:9 44:7 45:24 54:5 56:2 69:5 74:14 82:1,7 121:22 162:8 213:23 216:19 217:3 218:19 244:11 245:25 247:9,13 248:2 255:18 286:24

351:6,9,11 362:18 365:5 365:21
**worked** 20:20 43:17 50:8 52:9 248:9,14 248:19 262:6,8 262:13 346:23 346:25
**working** 10:23 11:19 45:22 82:11 116:19 334:7 344:18 344:22
**workload** 347:24
**works** 344:19
**workshop** 361:4
**worried** 291:11
**wouldn't** 73:7,9 73:18 81:25 92:6 99:3 122:16 235:20 257:3 282:11 319:20 337:16 355:5
**write** 80:18 81:1 322:21 323:6 350:11,18
**write-up** 356:15
**writing** 25:21 32:24 74:17 247:17
**written** 90:15 91:9,12 104:21 121:15 350:24 361:24 365:3
**wrong** 16:15 198:14 208:7
**wrote** 21:15 317:3 331:14 338:4,5

**X**

**Y**

**yeah** 40:9 196:23 202:3 227:7 261:14 269:12 298:16 318:11 368:21
**year** 20:3 54:14 54:17,25 62:11 102:25 300:25 301:4,7,10 302:4 303:1,7 304:13
**years** 28:25 31:5 82:10 108:11 136:21 199:21 199:23 302:21 305:14 307:11 307:15 320:13 321:7
**yellow** 80:14,17 218:10
**Yep** 211:23
**yesterday** 10:9 10:14 11:21 12:2,9 13:10 17:19 19:5 35:9 42:18 186:24 257:14 263:24 297:14
**yesterday's** 11:15 19:24
**York** 135:23,25 140:24

**Z**

**0**

**01** 40:16,19
**084-004229** 372:21
**09** 365:4

**1**

**1** 4:11 8:13,18 9:8 29:2 40:7 158:5
**1:35** 200:25
**10** 53:7 54:8 64:20 124:25 129:11 158:5 174:7
**10:41** 94:23,24
**10:56** 95:1
**100** 3:13 223:13 338:16 366:21
**11** 212:16
**11:00** 99:22,23
**11:01** 99:25
**111** 4:23
**112** 3:3
**118** 315:21 316:12
**12** 112:10 236:3
**12/20/18** 372:23
**12:23** 188:4,5
**12:24** 188:7
**12:36** 200:22,23
**13** 4:13,14,16 76:18 77:19 78:23 90:20 92:4
**13921** 372:19
**14** 111:17
**16** 4:17,18 14:22 22:20
**16-2738** 1:4
**17** 4:21
**1715** 372:22
**18** 112:10
**1800** 3:3
**1835** 2:18
**1894** 136:14
**19** 1:8 6:6 147:9 317:20
**19103** 2:18
**1948** 15:21
**1950s** 316:14,21 317:20 318:1 318:21
**1980s** 317:10
**1981** 68:4
**1989** 317:9
**1991** 249:7
**1992** 65:10,22 363:5
**1994** 361:4 363:5
**1997** 68:4 69:3 70:23

**2**

**2** 4:3,13 13:17 14:7,11 28:1,4 29:2,2 33:7 57:24 64:19 290:19
**2:57** 287:4,5
**20** 174:8 339:22 374:16
**200** 129:7 130:13
**2000** 290:15
**20004** 3:9
**2005** 365:3,5,12 365:24
**2006** 324:24
**2008** 363:3,6,9 363:10
**2009** 361:19 362:23 363:14 364:24 365:10
**2010** 65:10,22
**2012** 341:16
**2013** 65:10,23 66:6,12 67:14 95:5 96:21 120:3,3 210:18
**2015** 19:25
**2016** 4:13 14:8 19:15 21:4,12 65:25 118:14 118:25 120:1
**2018** 1:8 4:15,17 6:7 14:16,22 20:3,9,13 21:5 22:21 23:3 111:17,19 267:3
**202** 3:9
**21** 46:21 47:2,25 64:16,19
**210** 3:4
**211** 5:1
**213** 2:24
**215** 2:19
**218** 2:5
**22** 46:24 111:19
**22311** 2:10
**23** 336:20
**25** 128:25
**26** 4:16
**269-2343** 2:6
**278-4449** 2:19
**28** 65:15
**287** 4:6
**29** 4:15 14:16 20:3 183:12 267:3
**2900** 2:18
**2B** 197:6,8 198:6
**2nd** 1:14

**3**

**3** 4:14 13:17 14:14,18 20:4 23:9 28:1,4 29:3 33:7 57:24 266:22
**3:13** 287:7
**30** 147:8,12 172:10 173:1,5 173:14,19 299:6 373:15
**31** 124:12 336:24
**314** 3:14
**316** 2:14
**319** 4:7
**32** 249:24 250:13
**32502** 2:14
**333** 2:23
**334** 2:6
**35** 166:3 321:7 336:20
**36** 267:23
**36104** 2:6
**37** 100:3 134:21
**38** 15:13 242:9

**39** 16:1

**4**

**4** 4:16 13:17 14:20,25 15:7 22:21 23:13 24:13 25:19 26:25 28:1,5 46:24 53:6 57:24 64:3 65:14 66:11 75:3,12,18 76:5 90:8 93:16 95:11 113:12 155:14 201:10 206:22 209:23 210:22
**4:23** 364:16,17
**4:25** 364:19
**4:30** 368:25 369:1
**4:45** 369:3
**4:47** 370:25 371:3
**40** 64:3
**400** 129:7
**43** 65:15 66:10 68:1,17 183:12
**435-7000** 2:15
**44** 103:2 313:17
**46** 313:14
**463-2400** 3:9
**47** 280:19 289:17,24
**4900** 2:9

**5**

**5** 4:13,18 14:8 16:3,16,23 19:14 86:13 124:25 206:16 206:21
**50** 347:11 351:16
**554-5500** 3:4
**56** 95:12,16
**571-4965** 3:14
**58** 242:9,12

**6**

**6** 4:21 17:9,14 86:14 202:15 267:13
**600** 2:14 3:13
**63** 367:8
**63102** 3:14
**64** 313:15
**65** 188:18 190:7
**650** 2:9
**67** 188:21 190:8 266:23 313:13
**68** 289:17,24
**680-8370** 2:24
**69** 280:19

**7**

**7** 4:23 53:8,9 111:4,9,13 112:6 124:2 208:9 318:16
**70** 145:19 167:1 338:17
**703** 2:10
**70s** 165:1
**740.1** 46:21 47:3 47:25
**75** 125:1 128:25
**77** 316:12
**78205** 3:4

**8**

**8** 4:5,11 5:1 208:9 211:14 211:18,21 219:16 236:4
**80s** 165:2
**850** 2:15
**859** 372:20
**877.370.3377** 1:22
**89** 318:8 366:4

**9**

**9** 208:9
**9:12** 1:15 6:7
**9:30** 25:10,11
**9:32** 25:13
**90** 365:2,12 366:5
**90071** 2:23
**90s** 31:7
**917.591.5672** 1:22
**93** 231:1
**931-5500** 2:10
**9328** 372:21
**95** 367:8
**975** 3:8
**99.9** 121:5
**999** 1:14

# Exhibit 18

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION**

***THIS DOCUMENT RELATES TO ALL CASES***

**MDL NO. 16-2738 (FLW) (LHG)**

**RULE 26 EXPERT REPORT OF**
**ARCH CARSON, MD, PHD**

Date: November 16, 2018

Arch Carson, MD, PhD

## Talcum Powder and Ovarian Cancer

1.  Introduction

I was asked to explain the relationship between the regular perineal use of talc-based personal hygiene products and the subsequent development of ovarian cancer in their users. I intend this report to explain this relationship.  I will describe ovarian cancer, what is known about its natural history, and will present statistics regarding its incidence, prevalence and fatality.  I will then describe what talc is and why talcum powder is used in personal care products.  I will then present the scientific evidence linking talc-based personal hygiene products and their components with cancer, and will show how the various components of this evidence, along with other data, lead me to conclude that regular perineal application of talcum powder products causes ovarian cancer in some users, and raises the risk of ovarian cancer in all users.

2.  Qualifications

I am a physician who specializes in the practice of medical toxicology.  I am currently an Associate Professor at the University of Texas School of Public Health in Houston and the Program Director of the Occupational and Environmental Medicine Residency training program at the University of Texas Health Science Center at Houston. I received my medical degree from the Ohio State University and a doctor of philosophy degree in Toxicology from the Kettering Laboratory at the University of Cincinnati. I am board certified by the American Board of Preventive Medicine in Occupational Medicine, and have been in the continuous practice of medical toxicology since 1991. My professional activities have included patient care, basic and applied research, teaching of medical students, graduate students and post-graduate medical trainees, and professional consulting.  I have been a program director of the NIOSH-funded Education and Research Center at the University of Texas for 19 of the last 21 years.  Other major collaborations include as Liaison for the World Health Organization Collaborating Centre in Occupational Health and as environmental exposure consultant to the MD Anderson Cancer Center in Houston.  My curriculum vitae is attached to this report as Exhibit A.

3.  Information reviewed and methodology employed

In the preparation of this report, I have reviewed relevant published scientific and medical literature, reports and documents produced in the process of litigation, and various other documents and websites that I believed to be pertinent to the refinement or extension of my professional opinions.  I applied the same methodology and scientific rigor in this research that I use in my academic and clinical practice.  Documents and other sources which I considered in reaching my opinions are listed in Exhibit B, "Materials and Data Considered."

4.  What is ovarian cancer?
    a.  What is cancer?

    All types of cancer involve the uncontrolled growth and accumulation or dissemination of cells that originated from normal cells, but have been altered so that they behave differently.  The many cells of a single cancer that result from this change are typically all derived from a single progenitor cell, and represent a clone of cells.  When this clone

reaches sufficient numbers, the cells themselves may develop into a recognizable "mass" that is called a tumor. Tumors may cause symptoms and other health problems simply by taking up space and putting pressure on neighboring structures or blocking important fluid channels or nerves, thus disrupting normal functions of the body. Still other cancers can proliferate into the blood stream. As the number of cancerous cells increase, the biochemically active substances that they produce can also become a problem resulting in abnormal biological responses throughout the body. Some substances that might become a problem in this way include normal or abnormal hormones, enzymes, antibodies, and proteins. Cancerous cells are considered malignant if they lose their normal tendency to stop proliferating when they have filled a space or the bounds of their particular tissue type, referred to as contact inhibition. Malignant cells ignore these boundary cues and may invade other tissue spaces and organs with devastating results. They may also migrate via the blood stream or other routes to distant sites within the body where they set up a new location of tumor growth and tissue invasion. This process is called metastasis. Typically, cancers are not diagnosed until they produce sufficient symptoms or biochemical abnormalities that lead to an exhaustive diagnostic search resulting in their discovery. Occasionally, cancers are discovered accidentally as part of another investigation, e.g. a chest x-ray may find an asymptomatic lung cancer; a blood test may disclose a telltale abnormality. Still fewer cancers are discovered before they cause health problems through screening tests that are sensitive and specific enough to detect common cancers at a preclinical and hopefully highly treatable stage, e.g. routine colonoscopies to detect colon cancer, or PSA blood tests to detect prostate cancer.

b. Carcinogenesis-a two-step process

The process of normal cells becoming cancer cells is generally recognized as resulting from a two-step process.

**Initiation**. During initiation, a change is produced at one or more places in the DNA of a cell's chromosomes. Because the DNA represents the genetic code that becomes duplicated and passed along to cells that arise from it, when that cell divides to produce two cells, the change to the genetic code is also duplicated and is present in both of them.

Normally, the abnormal cell that results from a change in the genetic code cannot survive because its cellular machinery is also abnormal and poorly or non-functional. Less often, if the cell is able to survive in the body, it is still abnormal and deformed, and is recognized by the body's immune system as alien. The immune system attacks it and destroys it, and it does not survive. In the very rare instance that an alteration to the genetic material results in a survivable hereditary change that is not fatal, and which can escape the surveillance of the body's immune system, the resulting clone may live and persist. (Coussens LM, 2002)

**Promotion** - Once a cancer clone has been produced, it is at risk for being discovered and destroyed by the body's immune system, or failing to thrive in an environment for which it is not suited. Promotion is the process by which the cancer clone is shielded

from the body's defenses and is stimulated to undergo rapid growth, transforming a microscopic cancer clone into a self-sustaining symptomatic cancer over time. (Ferrante D, 2007) (Coussens LM, 2002)

Most known carcinogenesis events occur by the two-step process and involve a long latent period between the moment of the alteration in the genetic material and the recognition that a cancer is present. In human cancers, this latent period is often several months to many years in length. The latency period for ovarian cancer, generally, and for cancers induced by environmental agents is usually quite long, often >20 years. (Nadler DL, 2014) Promotion occurs throughout the latent period and stimulates the growing cancerous cells to become a recognizable cancer. A third stage in the natural history of a cancer, referred to as Progression, involves maturation, differentiation or de-differentiation and accumulation of transcriptional changes that solidify the tumor's growth rate and invasiveness. Some carcinogenic substances are initiators and some are promotors, and still others are called complete carcinogens because they are capable of initiation and promotion.

c. Ovarian cancer

Ovarian cancer is a group of cancers that arise in the ovary or in adjacent tissues. It is estimated that about 22,240 women will receive a new diagnosis of ovarian cancer and about 14,070 women will die from ovarian cancer in the United States in 2018. (American Cancer Society, n.d.) (Torre LA, 2018) Ovarian cancer ranks fifth in cancer deaths among women, and first due to cancers of the female reproductive system. Most ovarian cancers are not discovered until they have reached an advanced stage and have spread to sites elsewhere in the body. Because advanced ovarian cancers are more difficult to treat, they have a high fatality rate. For these reasons, any effective prevention of ovarian cancer or reduction in ovarian cancer risk can have a significant impact on this disease and can save many women's lives.

There are several recognized forms of ovarian cancer that are distinguished by the specific tissues from which they arise, or the microscopic characteristics of the tumor cells themselves. About 85% to 90% of malignant ovarian cancers are epithelial ovarian carcinomas, and the majority of these are of the serous type (American Cancer Society, n.d.) (Prat, 2015). Ovarian, fallopian tube, and peritoneal cancers have a similar clinical presentation and are treated similarly, and current evidence suggests that they may have a common origin, supporting a common staging system (Soong TR, 2018).

Despite significant advances in cancer diagnosis and therapies over the past several decades, there have been few changes in the incidence or fatality rates for ovarian cancer. Consequently, it is worth considering preventable environmental causes of the ovarian cancer epidemic. (Woodruff, 1979) (LA Torre, 2018)

5. What is talc?
    a. General

Talc is a hydrated magnesium silicate mineral produced through a metamorphic geological process and having the generalized chemical formula $Mg_3Si_4O_{10}(OH)_2$. Some substitution of atoms occurs in variations of talc found in nature. Small amounts of Aluminum (Al) or Titanium (Ti) can substitute for Silicon, and small amounts of Iron (Fe), Manganese (Mn), Aluminum (Al) and Calcium (Ca) can substitute for Magnesium. This produces slight variations in the color, hardness and chemical properties of the mineral. Talc is the softest mineral on the Mohs Hardness Scale. (King, n.d.) It is essentially insoluble in water, but is slightly soluble in dilute mineral acids. The process seems to involve the extraction of magnesium and other cations leaving only the silicate as silicic acid and silica.

The commercial value of talc stems from its crystalline structure. Most talc is present in natural deposits as the platy form of talc, in which the talc crystals are arrange in large flat sheets running parallel to one another. These sheets are attracted to each other by weak Van der Waals forces that can be easily overcome by mechanical forces, causing the sheets to slide on each other. On the macro scale, this property gives talc its characteristic slippery feeling on the skin. The platy structure also gives talc its ability to absorb moisture and oil. Some talc is found as a fibrous crystalline structure, similar to some asbestos, also a magnesium silicate mineral. In fact, these two minerals are closely related in terms of their formation and composition. Talc deposits are often intermingled with asbestos and vice versa. (Rohl, 1974) (Rohl AN, 1976) (National Institute for Occupational Safety and Health, 2011) (Lockey, 1981)

b. Talcum Powder and Cancer.

Numerous studies have examined the cancer causing characteristics of talc. (Wild, 2006) Talc has caused cancer when implanted in various tissues and under the skin in laboratory animals. It causes inflammation and fibrotic reaction, including the chemotaxis of inflammatory immune cells, and accelerated growth and division of cells in the involved tissues (Okada, 2007). This is a normal body process that leads to the thwarting of infection and rapid healing, but in the absence of tissue injury, accelerated growth and cell division has the effect of amplifying and propagating viable genetic mutations, leading to cancer. Talc particles have been repeatedly demonstrated in ovarian tumor tissues (Henderson WJ C. J., 1971) (Henderson WJ T. H., 1979) and in inflammatory tissue in otherwise normal ovaries (Mostafa SAM, 1985). In 2006, the International Agency for Research on Cancer (IARC) evaluated the published evidence for the carcinogenicity of talc, not containing asbestiform fibers, when inhaled into the respiratory system and when applied to the perineum in personal hygiene activities. The agency concluded that talcum powder is a “possible human carcinogen” (Group 2B) when applied to the perineum, meaning that there is insufficient evidence of carcinogenesis in humans, but strong evidence in other mammalian species. IARC also concluded that there was insufficient evidence of carcinogenicity by the inhalation route (Group 3). (International Agency for Research on Cancer, 2010) Since that time,

numerous other studies have added to the data on this issue. A recent meta-analysis showed that talc workers do have an excess of lung cancers. (Chang C-J, 2017)

When implanted under the skin or into tissues of laboratory animals, talcum powder induces an inflammatory response. This reaction involves the chemotaxis of inflammatory cells of the immune system, lymphocytes, neutrophils and macrophages, the release of cytokines that promote membrane permeability and stimulate cell division. As this reaction matures over time, granulomas may begin to develop. All of this signifies that talcum powder is an effective and potent promotor of already initiated genetic alterations. (Fletcher NM M. I., 2018) (Fletcher NM S. G., 2018) (Saed GM, 2017) (Radić I, 1988) (Okada, 2007) Other studies have demonstrated the ability of these same reactions to satisfy the carcinogenic initiation step, characterizing talcum powder as a complete carcinogen. (Shukla A, 2009) (Fletcher NM M. I., 2018)

c. What about asbestos and other components in talc and talc-based products?

Talcum powder products in the marketplace have been shown to contain asbestos. (Paoletti L, 1984) (VanOrden D, 2000) (VanGosen BS, 2004) (Longo WE, 2017) Asbestos is conclusively recognized as a cause of ovarian cancers. The IARC Working Group concluded that "a causal association between exposure to asbestos and cancer of the ovary was clearly established, based on five strongly positive cohort mortality studies of women with heavy occupational exposure to asbestos, (International Agency for Research on Cancer, 2012)" and "studies showing that women and girls with environmental, but not occupational exposure to asbestos had positive, though non-significant, increases in both ovarian cancer incidence and mortality. (Acheson ED, 1982) (Fox, 1982) (Berry G, 2000) (Newhouse ML, 1972) (Reid A H. J., 2008) (Reid A S. A., 2009) (Pira E, 2005) (Magnani C, 2008) (Bertolotti M, 2008) (Ferrante D, 2007) (Germani D, 1999) (Rösler JA, 1994) The classification determined by IARC included all forms of asbestos and talc containing asbestiform fibers (fibrous talc). I have seen evidence that Johnson & Johnson's talcum powder products contain asbestos and fibrous talc.[1]

d. Carcinogenic metals in talcum powder

In addition to other related minerals, talcum powder may contain varying amounts of chromium, cobalt and nickel, metal ions that are recognized as cancer causing. These ions leach out of the talcum powder slowly over time, resulting in continuous, low-level exposure of the surrounding tissues to carcinogenic metals. (Jurinski JB, 2001) I have seen evidence that Johnson & Johnson's talcum powder products contain nickel (Group 1

[1] Ex. 28, Hopkins Dep. (Aug. 16 & 17, 2018; Oct. 26, 2018; and Nov. 5, 2018); Ex. 47, Pier Dep. (Sept. 12 & 13, 2018); Expert Report of William E. Longo, PhD and Mark W. Rigler, PhD (Nov. 14, 2018)

human carcinogen), chromium (Group 1 human carcinogen), and cobalt (Group 2B-possible human carcinogen).[2]

e. Other potentially cancer-causing constituents

Johnson & Johnson's Baby Powder and Shower to Shower contain numerous ingredients that have been added to the products, i.e. fragrance chemicals, some of which have been shown to produce cancer in laboratory animals. These substances are likely to be present in very small or trace quantities, and likely present a lower level of risk than the major components, by mass. Nonetheless, any additional risks are added as part of a total risk profile. I have reviewed the report of Dr. Michael Crowley and agree with his conclusions that these chemicals may contribute to the inflammatory properties, toxicity, and potential carcinogenicity of the products.[3]

6. Epidemiology linking talcum powder and ovarian cancer

Many research studies have shown a strong association between talcum powder exposure and the development of ovarian cancer. (Langseth H, 2008) (Terry KL, 2013) (Schildkraut JM, 2016) (Trabert, 2016) (Berge W, 2017) (Cramer Daniel W, 2016) (Penninkilampi R, 2018)

a. What evidence links exposure to talcum powder products with ovarian cancer?

Multiple epidemiological studies have examined the link between the personal hygiene use of talc containing products and the occurrence of ovarian cancers (Booth M, 1989) (Cook LS K. M., 1997) (Cook LS e. a., 1997) (Cramer DW, 1982) (Whittemore AS, 1988) (Harlow BL W. B., 1989) (Chen Y, 1992) (Harlow BL C. D., 1992) (Rosenblatt KA, 1992) (Hartge P, 1988) (Tzonou A, 1993) (Chang S, 1997) (Heller DS, 1996) (Penninkilampi R, 2018). Talcum powder causes proliferation of human (Prat, 2015) ovarian cells in culture (Buz'Zard AR, 2007), and causes these cells to express reactive oxygen species (ROS) (Buz'Zard AR, 2007).

The research investigating the link between talcum powder exposure and ovarian cancer has been reviewed as a scientific whole at multiple stages. (Harlow BL H. P., 1995) (Ness Roberta B, 1999) (Muscat JE, 2008) (Terry KL, 2013) (Berge W, 2017) (Penninkilampi R, 2018)

Laboratory, animal and human studies support the conclusions that talc causes ovarian cancer, and have filled in the blanks that establish biological plausibility and scientific coherence. (Jaiswal M, 2000) (Balkwill Fran, 2001) (Okada, 2007) (Saed Ghassan M, 2017) (Harper, 2019)

7. Talcum powder product use

[2] Ex. 47, Pier Dep. (Sept. 12 & 13, 2018)

[3] Expert Report of Michael Crowley, PhD (Nov. 12, 2018).

Numerous studies have interviewed women regarding their personal practices of application of talc-based powders to the perineal area.  Due to variations in these practices, it has been difficult to estimate dose in order to evaluate the dose response relationship for ovarian cancer.  It is also difficult to exactly estimate the quantity of talcum powder administration during personal hygiene activities.  For studies that attempted to determine amount of exposure, most relied on a method of estimating the frequency of application and/or the duration of those practices, then simply multiplying to reach a total number of applications over time. (Harlow BL H. P., 1995) (Langseth H, 2008)  A review of studies of perineal talcum powder or cornstarch application suggests that the use of cornstarch instead of talcum powder reduces the risk of ovarian cancer. (Whysner J, 2000)

8.  Other evidence

   a.  Transport of talc-containing materials from the perineum to the upper reproductive tract and body cavities has been shown to occur with startling regularity and with respect to a wide variety of particulate materials. (Egli GE, 1961) (Venter PF, 1979) (Blumenkrantz MJ, 1981) (Halme J, 1984) (Sjösten ACE, 2004)  Clearly, sufficient particulate materials applied routinely to the perineum have ready access and in sufficient quantities to produce biological responses in internal tissues, including the ovaries and surrounding structures.  There are a limited number of animal studies suggesting that this transport does not occur.  (National Toxicology Program, 1993)  These are not as compelling as the human evidence because of anatomical and physiological differences between animals and humans in this regard, as well as the overwhelming evidence in humans.

9.  Conclusions and opinions

The following conclusions and opinions are expressed with respect to reasonable medical and scientific certainty and I have applied reliable scientific principles and methods to the facts in reaching them. These opinions are based upon the documents and literature reviewed and cited herein, and also upon my own professional training and experience in practice of medicine and medical toxicology.

   **I.    Talcum powder products sold for personal hygiene use are carcinogenic.**

Talcum powder is immunogenic, producing chronic inflammation in the tissues in which it sequesters, with the attraction of lymphocytes and macrophages and the ongoing local release of pro-inflammatory cytokines and reactive oxygen species.  Further, all talcum powder has some component of mineral fibers that are toxic to macrophages and intensify the inflammatory response and stimulate cell growth and proliferation.  The presence of asbestos, fibrous talc, carcinogenic metals and other chemicals further intensify this effect.  Cohort and case-control studies have shown statistically significant associations between talc-based powder use and ovarian cancers.  The presence of carcinogenic metals such as, chromium, cobalt and nickel, and toxic fragrance components in commercial talcum powder products, adds to their carcinogenic potency. Talcum powder is a complete carcinogen and can both initiate and promote the development of cancers in the tissues in which it sequesters.

## II. Perineal use of talcum powder products for feminine hygiene purposes results in direct exposure to the female reproductive tract.

A proportion of talcum powder from personal hygiene applications to the perineum is transported or migrates through the reproductive tract, through the patent fallopian tubes, onto the ovaries and into the pelvic cavity. Talc particles have been identified in reproductive system structures of women who utilize talc powders. These include the uterine cervix, the endometrium, the fallopian tubes and the ovaries. Inhalation is likely a secondary route of exposure.

## III. Common carcinogenic constituents of talcum powder products participate in and add to the carcinogenic process.

Naturally occurring carcinogenic components of talcum powder, i.e. asbestos, chromium, nickel, and cobalt, are liberated in bodily fluids and tissues and are free to exert their carcinogenic effects. Added substances that are toxic or carcinogenic, i.e. fragrance chemicals, may also contribute to these effects. This process is the most intense where the duration is the longest. Because the ovaries have no intrinsic elimination system, the transport of talc particles and their constituents reaches the ovaries where it stalls and sequesters. For these reasons, ovarian tissue is most at risk for the carcinogenic effect of these substances.

## IV. Regular perineal application of talcum powder products causes epithelial ovarian cancer in some users, and raises the risk of ovarian cancer in all users.

Multiple case-control and cohort epidemiological studies have looked at the relationship between the perineal use of talc-based powders and the eventual development of epithelial ovarian cancer. Most, but not all, of these studies show a consistent positive relationship. When confounding and bias are exhaustively considered, the positive association remains. I conclude that the apparent cause and effect relationship between perineal talcum powder use and ovarian cancer is real, amounting to about a 30% increased risk of ovarian cancer in talcum powder product users. At the current rate of ovarian cancer diagnosis and mortality, elimination of this source of risk could result in over 3,000 lives saved in the U.S. each year.

In 1965, Sir Austin Bradford Hill published what has come to be recognized as the best collection of factors to consider for the assessment of scientific evidence that relates the causation of disease to environmental exposures (Hill, 1965). These factors include: (1) Strength of association, (2) Consistency of the evidence, (3) Specificity, (4) Temporality, (5) Biological gradient, (6) Plausibility, (7) Coherence, (8) Experiment, and (9) Analogy. Below I provide my evaluation of the scientific evidence with respect to the Hill factors.

**Strength of association** –Many epidemiological studies have attempted to examine the association between perineal use of talcum powder products and ovarian cancer. Most of these have been case-control studies, where women diagnosed with ovarian cancer are paired with others of similar demographic background who do not have ovarian cancer. All of these women are interviewed about their past practices and exposures, including the use of talcum powder products. The resulting data are analyzed to compute an odds ratio (OR) that describes the

likelihood of those with cancer having had greater exposure to talcum powder than those who did not. Cohort studies selected populations of women, assessing them for many factors, including perineal talcum powder use, and followed them over time counting the occurrences of ovarian cancers. These studies were than able to compute a relative risk (RR) of exposure to talcum powder resulting in ovarian cancers. Of more than 25 case-control studies in the literature, the heavy majority showed positive and significant ORs for perineal talcum powder use and ovarian cancer. The three cohort studies did not find a significant relative risk of perineal talcum powder exposure leading to ovarian cancer, but did show positive non-significant trends. Several research groups have looked at the totality of the research evidence, evaluated the published study reports, and have reanalyzed those data on a common playing field through meta-analyses. Taken in their totality, and accounting for sources of bias and differing statistical treatments, these epidemiological studies support a strong association between the perineal use of talcum powder and ovarian cancer.

**Consistency of the evidence –** As stated above, the majority of epidemiological studies that have investigated the link between perineal talcum powder use and ovarian cancer have reported positive associations. These studies are consistent in their findings of a relationship between perineal use of talcum powder products and the development of ovarian cancer. Further, recent meta-analyses of previously published studies have verified the comparability of the research methods used and the consensus of conclusions.

**Specificity –** Specificity is the concept that a specific disease, rather than a host of diseases, is produced by a particular exposure, and that the exposure is a principal cause of the disease. Although talcum powder is known to cause non-specific inflammation in many tissues where its residues locate, the stimulation of ovarian cancer is particularly associated with the presence of talc in the ovaries and fallopian tubes. Of known factors associated with ovarian cancer, i.e. nulliparous state, early menarche, late menopause, oral contraceptive use, living in the twentieth century and beyond, perineal talcum powder exposure is proving to be prominent among them.

**Temporality –** If a particular exposure is the cause of a particular disease, then the onset of exposure should precede the onset of the disease. Studies investigating the link between perineal talcum powder exposure and ovarian cancer are designed to compare those with prior exposure to those who are not exposed, and so the scientific evidence supports this consideration.

**Biological gradient –** A basic toxicological principle is that a greater exposure intensity will result in a larger proportion of those exposed expressing the toxic effect, in this case ovarian cancer. In order to determine the intensity of a long-term environmental exposure, typically a measure of frequency or quantity of use is multiplied by the duration of such use. This allows categorization of exposure levels and comparisons. Although some studies have failed to find evidence of a dose-response relationship, several more recent reports have shown a clear dose-response when the number of subjects rose to a level producing sufficient statistical power to allow the analysis after subdivision of subjects into pertinent categorical groups, and frequency and duration were measured (Schildkraut JM, 2016) (Cramer Daniel W, 2016) (Wu, et al., 2009).

**Plausibility –** This factor expects the rational presentation of a mechanism whereby the exposure in question leads to the disease. Thus, if no such mechanism can be proposed, it is less likely that causation will be supported. In the case of ovarian cancer, the mechanism supported in the literature is as follows: Talcum powder products are applied to the perineal area in the course of routine personal hygiene practices. This element is supported by the existence of these products in the marketplace for many years and the statements of subjects interviewed for the purpose of conducting the scientific research discussed elsewhere in this report. Portions of the applied powders are transferred via active processes or passive mass action movements into the female reproductive tract, some making it all the way to the distal fallopian tubes, the ovary surfaces and the pelvic and peritoneal cavities. This element is supported by the observations that particulate materials of differing variety can make their ways along these pathways to the listed destinations, and the finding and confirmation of talc particles in normal ovarian tissues and ovarian tumor tissues at the time of oophorectomy or autopsy. Once reaching the target tissues, talcum powder and its constituents initiate carcinogenesis via multiple means, including, inflammation with chemotaxis of inflammatory cells, liberation of cytokines, and reactive oxygen species, inactivation of TP53 genetic modulator, inhibition of DNA repair, and long-term promotion of genetic mutations via continuous inflammation and cellular growth stimulation.

**Coherence –** The proposed cause and effect relationship should not "seriously conflict with the generally known facts of the natural history and biology of the disease."(Hill, 1965) The proposal that talcum powder product use results in the occurrence of ovarian cancer is entirely consistent with what is known about other factors related to ovarian cancer, i.e. early menarche, late menopause, pregnancies, breastfeeding history, oral contraceptive use, etc. All are factors that influence the local inflammatory environment of the ovary and its surroundings and have the potential to promote existing transcriptional errors and mutations.

**Experiment –** Interventions, such as tubal ligation that decreases the incidence of ovarian cancer by blocking the exposure route, offers experimental support for this mechanism. The use of cornstarch-based dusting powders as a substitute for talcum powder products offers additional experimental support.

**Analogy –** Have there been other environmental exposures that have been associated with ovarian cancers that act via similar mechanisms? Talcum powder is somewhat unique in terms of its delivery mechanism. But beyond that, the case of asbestos exposure is similar. Asbestos exposure has resulted in excesses of ovarian cancers in exposed women, although the route of exposure is thought to be by inhalation. Nonetheless, asbestos is a mineral very similar both chemically and structurally to talc that has been found in the ovary and peritoneal cavity of exposed women. The mechanisms of carcinogenesis for both asbestos and talc are similar and analogous. Further, talc-based products contain asbestos and non-asbestos mineral fibers having carcinogenic potential.

When considering these factors, I gave the most weight to the compelling strength of association and consistency, as well as the well-described biologic mechanism.

The currently available scientific research, when considered in its totality, demonstrates a cause and effect relationship between the use of talcum powder products and the development of epithelial ovarian cancer. This opinion is reinforced by my consideration of the Hill factors for the assessment of causation.

In reviewing the scientific and medical literature on talcum powder product use, I also performed a risk assessment and considered whether perineal use of those products poses a safety risk to consumers. This involved careful consideration of the epidemiological literature, data on the dose-response relationship and exposure, as well as the nature of these products, which are used primarily for personal care. I also considered evidence of the toxicity of these products, for which repeated testing and analyses have shown to contain carcinogens.

In considering the weight of this epidemiologic, toxicologic, and mechanistic evidence, across multiple studies, time, demographics, and researchers, demonstrating a consistent association between perineal use of talcum powder products and ovarian cancer, it is my opinion that talcum powder products increase the risk of ovarian cancer and pose a significant health hazard.

In conclusion, it is my opinion that the perineal use of talcum powder products causes ovarian cancer in some users and increases the risk of ovarian cancer in all users of these products.

All of my opinions in this report are provided with respect to a reasonable degree of medical and scientific certainty. I reserve the right to amend or supplement my report as new information becomes available.

**References**

Acheson ED, G. M. (1982). Mortality of two groups of women who manufactured gas masks from chrysotile and crocidolite asbestos: a 40-year follow-up. *British Journal of Industrial Medicine*, *39*, 344-348.

American Cancer Society. (n.d.). *Key Statistics for Ovarian Cancer*. Retrieved October 31, 2018, from American Cancer Society: https://www.cancer.org/cancer/ovarian-cancer/about/key-statistics.html

American Cancer Society. (n.d.). *What Is Ovarian Cancer?* Retrieved 10 31, 2018, from American Cancer Society: https://www.cancer.org/cancer/ovarian-cancer/about/what-is-ovarian-cancer.html

Balkwill Fran, M. A. (2001). Inflammation and cancer: back to Virchow? *The Lancet*, *357*, 540-545.

Berge W, e. a. (2017). Genital use of talc and risk of ovarian cancer: a meta-analysis. *European Journal of Cancer Prevention*.

Berry G, N. M. (2000). Mortality from all cancers of asbestos factory workers in east London 1933-80. *Occupational and Environmental Medicine*, *57*, 782-785. doi:0.1136/oem.57.11.782

Bertolotti M, F. D. (2008). Mortality in the cohort of the asbestos cement workers in the Eternit plant in Casale Monferrato (Italy). *Epidemiol Prev, 32*, 218-228.

Blumenkrantz MJ, G. N. (1981). Retrograde menstruation in women undergoing chronic peritineal dialysis. *57*(5), 667-670.

Booth M, B. V. (1989). Risk factors for ovarian cancer: a case-control study. *British Journal of Cancer, 60*, 592-598.

Buz'Zard AR, L. B. (2007). Pycnogenol reduces talc-induced neoplastic transformation in human ovarian cell cultures. *Phytotherapy Research, 21*, 579-586.

Chang C-J, e. a. (2017). Occupational exposure to talc increases the risk of lung cancer: a meta-analysis of occupational cohort studies. *Canadian Respiratory Journal, 2017*(1270608), 1-12. Retrieved from https://doi.org/10.1155/2017/1270608

Chang S, R. H. (1997). Perineal talc exposure and risk of ovarian carcinoma. *Cancer, 79*, 2396-2401.

Chen Y, W. P. (1992). Risk factors for epithelial ovarian cancer in Beijing, China. *International Journal of Epidemiology, 21*, 23-29.

Cook LS, e. a. (1997). Erratum in "Perineal powder exposure and the risk of ovarian cancer". *American Journal of Epidemiology, 148*, 410.

Cook LS, K. M. (1997). Perineal powder exposure and the risk of ovarian cancer. *American Journal of Epidemiology, 145*, 459-465.

Coussens LM, Z. W. (2002). Inflammation and cancer. *Nature, 420*(6917), 860–867. doi:10.1038/nature01322

Cramer Daniel W, V. A. (2016). The Association Between Talc Use and Ovarian Cancer: A Retrospective Case–Control Study in Two US States. *Epidemiology, 27*, 334-346.

Cramer DW, W. W. (1982). Ovarian cancer and talc: A case-control study. *Cancer, 50*, 372-376.

Egli GE, M. N. (1961). The transport of carbon particles in the human female reproductive tract. *Fertility anfd Sterility, 12*(2), 151-155.

Ferrante D, B. M. (2007). Cancer mortality and incidence of mesothelioma in a cohort of wives of asbestos workers in Casale Monferrato. *Environmental Health Perspectives, 115*, 1401-1405.

Fletcher NM, M. I. (2018). Talcum powder enhances oxidative stress in ovarian cancer cells. *Presented at the 65th meeting of the Society for Reproductive Investigation, San Diego California.*

Fletcher NM, S. G. (2018). Talcum powder enhances cancer antigen 125 in ovarian cancer cells and normal ovarian epithelial cells. *Presented at the 65th meeting of the Society for Reproductive Investigation, San Diego California.*

Fox, A. W. (1982). Mortality of female gas mask assemblers. *British Journal of Industrial Medicine, 39*, 34-38.

Germani D, B. S. (1999). Cohort and mortality study of women compensated for asbestosis in Italy. *American Journal of Industrial Medicine, 36*, 129-134. doi:10.1002/(SICI)1097-0274(199907)36:1<129::AID-AJIM18>3.0.CO;2-9

Halme J, e. a. (1984). Retrograde menstruation in healthy women and in patients with endometriosis. *Obstetrics and Gynecology, 64*(2), 151-154.

Harlow BL, C. D. (1992). Perineal exposure to talc and ovarian cancer risk. *Obstetrics and Gynecology, 80*, 19-26.

Harlow BL, H. P. (1995). A review of perineal talc exposure and risk of ovarian cancer. *Regulatory Toxicology and Pharmacology, 21*, 254-260.

Harlow BL, W. B. (1989). A case–control study of borderline ovarian tumors: the influence of perineal exposure to talc. *American Journal of Epidemiology, 130,* 390-394.

Harper, S. (2019). Talc induces a pro-oxidant state in normal and ovarian cancer cells through gene point mutations in key redox enzymes. *pending publication*.

Hartge P, H. R. (1988). Talc and ovarian cancer [letter]. *JAMA, 250*, 1844.

Heller DS, W. C. (1996). The relationship between perineal cosmetic talc usage and ovarian talc particle burden. *American Journal of Obstetrics and Gynecology, 174*, 1507-1510.

Henderson WJ, C. J. (1971). Talc and carcinoma of the ovary and cervix. *Journal of Obstetrics and Gynaecology of the British Commonwealth, 78*, 266-272.

Henderson WJ, T. H. (1979). Talc in normal and malignant tissue. *The Lancet*, 499.

Hill, A. (1965). The environment and disease: Association or causation. *Proceedings of the Royal Society of Medicine, 58*(5), 295-300.

International Agency for Research on Cancer. (2010). *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Volume 93 - Carbon Black, Titanium Dioxide, and Talc.* Lyon, Freance.

International Agency for Research on Cancer. (2012). Arsenic, Metals, Fibres and Dusts, Vol 100C, A review of human carcinogens. In IARC, *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans.* Lyon, France: World Health Organization.

Jaiswal M, L. N. (2000). Inflammatory cytokines induce DNA damage and inhibit DNA repair in cholangiocarcinoma cells by a nitric oxide-dependent mechanism. *Cancer Res, 60*, 184-190.

Jurinski JB, R. J. (2001). Biodurability of talc. *American Mineralogist, 86*(4), 392-399.

King, H. M. (n.d.). *Talc: The Softest Mineral*. Retrieved 10 31, 2018, from Geology.com: https://geology.com/minerals/talc.shtml

LA Torre, B. T. (2018). Ovarian Cancer Statistics, 2018. *CA A Cancer Journal for Clinicians, 68*, 284–296.

Langseth H, H. S. (2008). Perineal use of talc and risk of ovarian cancer. *J Epidemiol Community Health, 62*, 358-360. doi:10.1136/jech.2006.047894

Lockey, J. (1981). Nonasbestos fibrous minerals. *Clinics in Chest Medicine, 2*(2), 203-218.

Longo WE, M. R. (2017). *Analysis of Johnson and Johnson Baby Powder and Valiant Shower To Shower Talc Products for Amphibole (Tremolite) Asbestos: Expert Report.* Materials Analytical Services, LLC, Atlanta .

Magnani C, F. D.-A. (2008). Cancer risk after cessation of asbestos exposure: a cohort study of Italian asbestos cement workers. *Occupational and Environmental Medicine, 65*, 164-170. doi:10.1136/oem.2007.032847

Mostafa SAM, e. a. (1985). Foreign body granulomas in normal ovaries. *Obstetrics and Gynecology, 66*(5), 701-702.

Muscat JE, H. M. (2008). Perineal Talc Use and Ovarian Cancer: A Critical Review. *Eur J Cancer Prev., 17*(2), 139-146. doi:10.1097/CEJ.0b013e32811080ef

Nadler DL, I. Z. (2014). Estimating Cancer Latency Times Using a Weibull Model. *Advances in Epidemiology, 2014*, 1-8. doi:10.1155/2014/746769

National Institute for Occupational Safety and Health. (2011). *Asbestos fibers and other elongate mineral particles: State of the science and roadmap for research.* NIOSH Current Intelligence Bulletin No. 62.

National Toxicology Program. (1993). *Toxicology and Carcinogenesis Studies of Talc (CAS No 14807-96-6)(NonAsbestiform) in F344/N.Rats and B6C3F1 Mice (Inhalation Studies) (1993).* Washington: USDHHS.

Ness Roberta B, C. C. (1999). Possible role of ovarian epithelial inflammation in ovarian cancer. *Journal of the National Cancer Institute, 91*, 1459-1467.

Newhouse ML, B. G. (1972). A study of the mortality of female asbestos workers. *British Journal of Industrial Medicine, 29*, 134-141.

Okada, F. (2007). Beyond foreign-body-induced carcinogenesis: Impact of reactive oxygen species derived from inflammatory cells in tumorigenic conversion and tumor progression. *International Journal of Cancer, 121*, 2364–2372.

Paoletti L, S. C. (1984). Evaluation by Electron Microscopy Techniques of Asbestos Contamination in Industrial, Cosmetic, and Pharmaceutical Talcs. *Regulatory Toxicology and Pharmacology, 4*, 222-235.

Penninkilampi R, E. G. (2018). Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis. *Epidemiology, 29*, 41-49. doi:10.1097/EDE.0000000000000745

Pira E, P. C. (2005). Cancer mortality in a cohort of asbestos textile workers. *British Journal of Cancer, 92*, 580-586. doi:10.1038/sj.bjc.6602240

Prat, J. (2015). Abridged Republication of FIGO’s Staging Classification for Cancer of the Ovary, Fallopian Tube, and Peritoneum. *Cancer, 121*, 3452-3454.

Radić I, e. a. (1988). Immunosuppression induced by talc granulomatosis in the rat. *Clin Exp Immunol, 73*, 316-321.

Reid A, H. J. (2008). The mortality of women exposed environmentally and domestically to blue asbestos at Wittenoom, Western Australia. *Occupational and Environmental Medicine, 65*, 743-749. doi:10.1136/oem.2007.035782

Reid A, S. A. (2009). Gynecologic and breast cancers in women after exposure to blue asbestos at Wittenoom. *Cancer Epidemiol Biomarkers Prev, 18*, 140-147. doi:10.1158/1055-9965.EPI-08-0746

Rohl AN, e. a. (1976). Consumer talcums and powders: mineral and chemical characterization. *Journal of Toxicology and Environmental Health, 2*, 255-284.

Rohl, A. (1974). Asbestos in talc. *Environmental Health Perspectives, 9,* 129-132.

Rosenblatt KA, S. M. (1992). Mineral fiber exposure and the development of ovarian cancer. *Gynecological Oncology, 45*, 20-25.

Rösler JA, W. H. (1994). Mortality rates in a female cohort following asbestos exposure in Germany. *Journal of Occupational Medicine, 36*, 889–893.

Saed Ghassan M, D. M. (2017). Updates of the role of oxidative stress in the pathogenesis of ovarian cancer. *Gynecologic Oncology, 145*, 595-604. doi:http://dx.doi.org/10.1016/j.ygyno.2017.02.033

Saed GM, D. M. (2017). Updates on the role of oxidative stress in the pathogenesis of ovarian cancer. *Gynecologic Oncology, 145*, 595-602.

Schildkraut JM, A. S.-S. (2016). Association between Body Powder Use and Ovarian Cancer: The African American Cancer Epidemiology Study (AACES). *Cancer Epidemiology, Biomarkers & Prevention, 25*(10), 1411–1417. doi:10.1158/1055-9965.EPI-15-1281

Shukla A, e. a. (2009). Alterations in gene expression in human mesothelial cells correlate with mineral pathogenicity. *American Journal of Respiratory Cell and Molecular Biology, 41*, 114-123.

Sjösten ACE, H. E. (2004). Retrograde migration of glove powder in the human female genital tract. *Human Reproduction, 19*(4), 991-995. doi:10.1093/humrep/deh156

Soong TR, H. B. (2018). Evidence for lineage continuity between early serous proliferations (ESPs) in the Fallopian tube and disseminated high-grade serous carcinomas. *Journal of Pathology, 246*(3), 344-351. doi:10.1002/path.5145

Terry KL, e. a. (2013). Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. *Cancer Prevention Research*, *6*(8), 811-821.

Torre LA, B. T. (2018). Ovarian Cancer Statistics, 2018. *CA Cancer J Clin, 68*, 284-296.

Trabert, B. (2016). Body Powder and Ovarian Cancer Risk—What Is the Role of Recall Bias? *Cancer Epidemiology, Biomarkers and Prevention, 25*(10), 1369-1370.

Tzonou A, P. A. (1993). Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer. *International Journal of Cancer, 55*, 408-410.

VanGosen BS, L. H. (2004). *A USGS Study of Talc Deposits and Associated Amphibole Asbestos Within Mined Deposits of the Southern Death Valley Region, California.* United States Geological Survey. Retrieved from https://pubs.usgs.gov/of/2004/1092/

VanOrden D, L. R. (2000). *Weight Percent Compositional Analysis of Seven RTV Talc Samples. Analytical Report to R. T. Vanderbilt Company, Inc. 22 November 2000.* Submitted to Public Comments Record – C. W. Jameson, National Toxicology Program, 10th ROC Nominations "Talc (containing asbestiform fibers)". 4 December 2000., National Toxicology Program.

Venter PF, M. I. (1979). Migration of a particulate radioactive tracer from the vagina to the peritoneal cavity and ovaries. *S Afr Med. J, 55*, 917-919.

Whittemore AS, W. M. (1988). Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. *American Journal of Epidemiology, 128*, 1228-1240.

Whysner J, M. M. (2000). Perineal application of talc and cornstarch powders: Evaluation of ovarian cancer risk. *Am J Obstel Gynocol, 182*, 720-724.

Wild, P. (2006). Lung cancer risk and talc not containing asbestiform fibres: a review of the epidemiological evidence. *Occup Environ Med, 63*, 4-9. doi:10.1136/oem.2005.020750

Woodruff, J. (1979). The pathogenesis of ovarian neoplasias. *The Johns Hopkins Medical Journal, 144*(4), 117-120.

# Exhibit A

Curriculum Vitae

Arch I Carson MD PhD

Occupational Medicine and Medical Toxicology

4922 Braesvalley Dr.
Houston TX 77096
Telephone 713 446 7793
arch.carson@earthlink.net

**Biosketch**

Arch "Chip" Carson, MD, PhD is a physician (The Ohio State University), board certified in Occupational Medicine (American Board of Preventive Medicine), who holds a Doctor of Philosophy degree in Toxicology (University of Cincinnati, Kettering Laboratory). He has served on the faculty of the University of Cincinnati and the New York University Medical Center and joined the faculty of the University of Texas School of Public Health in 1992 in its Environmental Sciences Discipline and Occupational and Environmental Health and Aerospace Medicine Module. He is Associate Professor of Occupational Health, directs the Occupational and Environmental Medicine Residency Program and is a member of the research team of the Southwest Center for Occupational and Environmental Health, a NIOSH Education and Research Center, and WHO Collaborating Centre in Occupational Health. He maintains a clinical practice of occupational medicine and medical toxicology. In his more recent role as Medical Director for the University of Texas Medical Branch in Galveston, he is responsible for the health monitoring and care of more than 15,000 employees. He is a frequent consultant to governments, corporations and the legal community on matters related to industrial chemical exposure, toxicology and environmental justice. His research interests include: environmental and occupational chemical exposures, inhalation injuries, metal exposures and cancer, and professional training in occupational medicine.

**Professional Activities/Employment**

2017-18 University of Texas Medical Branch, Galveston, Assistant Clinical Professor of Preventive Medicine and Family Medicine

2017-18 University of Texas Medical Branch, Galveston, Medical Director, Employee Health Services.

2017-18 Enbridge Corporation, Houston Texas, Medical Director, Employee Health Services.

2010-18 University of Texas Health Science Center, Houston, Associate Professor of Occupational Health.

2010-18 University of Texas Health Science Center at Houston, Program Director, Occupational and Environmental Medicine Residency.

1991-18 Private practice of Occupational Medicine and Toxicology, New York, Texas and Ohio.

2011-18 Spectra Energy Corporation, Houston Texas, Medical Director, Employee Health Services.

1997-13 Texas Medical Center Inc., Houston Texas, Medical Director, Employee Health Services.

1992-08 University of Texas School of Public Health, Assistant Professor of Occupational Medicine and Environmental Sciences.

1998-08 University of Texas Health Science Center at Houston, Program Director, Occupational and Environmental Medicine Residency.

2003-08 Southwest Center for Occupational and Environmental Health, Principal Investigator and Director, Diller Phosgene Exposure Incident Registry of the American Chemistry Council.

2000-06 Chevron Phillips Chemical Company, Houston Texas, Corporate Medical Director.

2003-05 U.S. Department of Energy Office of Worker Advocacy Physician Review Panel Appointee.

1997-04 Southwest Center for Occupational and Environmental Health, Principal Investigator, City of Houston Lead Poisoning Epidemiology Project.

1992-03 UT Health Services, University of Texas Houston Health Science Center, Attending Physician, Occupational Medicine and Toxicology.

1997-01 University of Houston Downtown, Medical Director, Student Health Service.

1998-99 University of Texas School of Public Health, Convener of the Occupational/Environmental Health and Aerospace Medicine Module.

1992-97 Respiratory Consultants of Houston, PA, Attending Physician, Occupational Medicine and Toxicology.

1992-95 Exxon Chemical Americas, Baytown Polymer Center and Basic Chemicals Technology, Baytown TX, Consultant Physician.

1990-91 New York University Medical Center, Bellevue Hospital, Tisch Hospital, and Manhattan VA Hospital, New York NY, Dept. of Medicine, Clinical Instructor.

1982-90 Chemical Information Services Inc, Cincinnati OH, Associate in Toxicology.

1978-87 University of Cincinnati College of Medicine, Cincinnati OH, Instructor and Lecturer, Adjunct Assistant Professor of Industrial Toxicology.

1974-79 University of Cincinnati College of Medicine, Kettering Laboratory, Cincinnati OH, Research Technologist in Occupational Medicine and Clinical Studies.

1969-74 Millstone Inc., Cincinnati OH, Design Engineer, environmental control systems.

**Educational Background**

2002 Certificate of Board Eligibility, Medical Toxicology, American Board of Preventive Medicine/American Board of Emergency Medicine

1992 Certificate of Training - Residency in Occupational Medicine University of Texas Health Science Center at Houston, School of Public Health, and Southwest Center for Occupational and Environmental Health, Houston TX, 1992.

1991 Certificate of Training - Postgraduate Internship in Internal Medicine, New York University Medical Center and Bellevue Hospital Center, New York NY.

1990 MD - Ohio State University College of Medicine, Columbus OH.

1987 PhD - Kettering Laboratory, University of Cincinnati College of Medicine, Cincinnati OH, awarded in the field of "Environmental Health – Toxicology."

1973 BS - University of Cincinnati College of Arts and Sciences Cincinnati OH. Awarded in "Biological Sciences with Concentration in Engineering."

1969 Rensselaer Polytechnic Institute, Troy NY. Management Engineering

1968 Villa Madonna College, Covington KY. Certificate in Contemporary Physics.

**Fellowships**

2011-13 UTHealth, Health Educators Fellowship, University of Texas Health Science Center at Houston.

1983-85 American Lung Association Fellowship in Lung Research (Inhalation Toxicology), American Lung Association of Southwestern Ohio, Grant.

1981-82 Owens Corning Fiberglas, Graduate Research Fellowship in Combustion Toxicology.

1979-80 National Institute for Occupational Safety and Health, Centers for Disease Control, Doctoral Fellowship in Industrial Toxicology.

**Certifications**

2012 License to practice medicine, State of Ohio 35.098635

2010 Certified Healthy Homes Specialist – National Environmental Health Association.

2002 Board Eligibility, Medical Toxicology, American Board of Preventive Medicine/American Board of Emergency Medicine.

1994 Board Certification, Occupational Medicine, American Board of Preventive Medicine.

1992 License to practice medicine, State of Texas J2524.

1991 License to practice medicine, State of New York 186563.

1982 Emergency Hazard Response, Environmental and Industrial Chemical Accident Management, U.S. Environmental Protection Agency.

1979 Pulmonary Function Testing for Occupational Surveillance, NIOSH #003.

**Professional Community Service**

2013-18 University of Texas Health Science Center at Houston, Steering Committee on Interprofessional Collaboration

2013-18 University of Texas Health Science Center at Houston, Chemical Safety Committee.

1998-18 Association of Environmental and Occupational Clinics/ATSDR community resource on toxic exposures and health consequences, Federal Region VI.

1997-18 City of Houston Biological, Chemical and Radiation Emergency Preparedness Program. Medical Toxicology On-Call Advisor to the Houston Medical Strike Team.

1998-18 Association of Occupational and Environmental Medicine Residency Directors. Chairman 2005-2006

2010-18
1997-08 University of Texas Health Science Center at Houston, Graduate Medical Education Committee

2010-18
1994-08 University of Texas Health Science Center, Houston, Community/Press Resource and Speaker via Public Information Office, (Toxic Exposures and Environmental Health).

1996-18 American College of Occupational and Environmental Medicine, Council on Academic Affairs and Co-chair, Academic Section 2004-2006. Occupational Medicine Residency Directors Committee, Chair 2006-2007, Appointed Member, Taskforce on the Future of Occupational Medicine Education 2005-2007. Appointed Co-chair, Taskforce on the Future of Occupational Medicine Education 2013-2015.

1996-18 Texas College of Occupational and Environmental Medicine. Secretary/Treasurer-2004-5, President Elect-2005-6, President-2006-7, Past President 2007-8.

2003-12 Boy Scouts of America, Sam Houston Council, Registered Adult Leader and Merit Badge Counselor.

2005-08 University of Texas School of Public Health, Practice Council Co-chair

2003-05 U.S. Department of Energy Office of Worker Advocacy Physician Review Panel Appointee.

1996-00 American Public Health Association, Occupational Health Subcommittee

1994-96 Advisory Board, National Environmental Education and Training Center (NEETC), Curriculum Development Committee.

1981-85 Tri-State Air Committee Inc., Cincinnati OH, (voluntary air quality organization) Scientific Advisor, Elected to Board of Directors in 1982, President and Chairman 1984-85.

1981-85 American Lung Association of Southwestern Ohio, Cincinnati OH, (voluntary health organization) speakers bureau.

1982-83 City of Cincinnati, Appointment to Occupational Health Scientific Liaison Board (municipal advisory committee).

1981-83 Cincinnati Area Toxic Substances Coalition, Cincinnati OH, (coalition of business, voluntary, and labor organizations with interest in environmental toxic substance issues) Cofounder and Chairman.

1982-83 Ohio River Valley Committee on Occupational Safety and Health, Cincinnati OH, (organized labor coalition) Scientific Resource Committee.

1972-82 Walnut Hills-Evanston Medical Center, Cincinnati OH, (primary care center) Board of Directors.

**Professional Societies**

1991-18 American College of Occupational and Environmental Medicine.

1991-18 Texas College of Occupational and Environmental Medicine

2007-18 Texas Public Health Association.

2006-18 International Congress on Occupational Health.

2003-18 American College of Medical Toxicology.

2002-06 Society of Occupational and Environmental Health.

2001-06 American Conference of Governmental Industrial Hygienists.

1994-00 American Public Health Association.

1983-87 American Industrial Hygiene Association.

1983-87 Society of Toxicology.

1980-85 American Thoracic Society, Associate Member and Participant in Occupational and Environment Scientific Session.

**Publications**

Anderson F, **Carson A**, Whitehead L and Burau K Age, Race and Gender Spatiotemporal Disparities of COPD Emergency Room Visits in Houston, Texas. Occupational Diseases and Environmental Medicine. 3:1-9, 2015. http://dx.doi.org/10.4236/odem.2015.31001.

Anderson F, **Carson A**, Whitehead L and Burau K. Spatiotemporal Analysis of the Effect of Ozone and Fine Particulate on CVD Emergency Room Visits in Harris County, Texas. Open Journal of Air Pollution, 3:87-99, 2014. http://dx.doi.org/10.4236/ojap.2014.34009.

Calcote, JC, **Carson, A**, Peskin, MF, Emery, RJ. An assessment of post-disaster psychological stress in hazardous waste operations and emergency response (HAZWOPER) workers. Disaster Med Public Health Preparedness. 7:452-460, 2013. PMID 24274124.

Delclos GL, Tullis LA, **Carson A**. The services industry.  In Occupational and Environmental Lung Diseases. Tarlo SM, Cullinan, Nemery B eds. 2010 pp.258-271. Wiley-Blackwell, West Sussex, UK.

Pugach S, Clarkson T, (**Carson A**). Prenatal mercury exposure and postnatal outcome: clinical case report and analysis. Clin Toxicol 47:366-370, 2009.

Pauluhn J, **Carson A**, Costa DL, Gordon T, Kodavanti U, Last JA, Matthay MA, Pinkerton KE and Sciuto AM. Workshop summary: phosgene-induced pulmonary toxicity revisited: appraisal of early and late markers of pulmonary injury from animal models with emphasis on human significance. Inhalation Toxicology. 19(10):789-810, 2007.

Delclos GL, Gimeno D, Arif AA, Burau KD, **Carson A**, Lusk C, Stock T, Symanski E, Whitehead LW, Zock JP, Benavides FG and Anto JM. Occupational risk factors and asthma among health care professionals, American Journal of Respiratory & Critical Care Medicine. 175(7):667-75, 2007.

Savely SM, **Carson A** and Delclos GL. "A survey of the implementation status of environmental management systems in U.S. colleges and universities" J Cleaner Production, 15(7) 650-659, 2007.

Savely SM, **Carson A** and Delclos GL. "An environmental management system implementation model for U.S. colleges and universities" J Cleaner Production, 15(7) 660-670, 2007.

Delclos GL, Arif AA, Aday L, **Carson A**, Lai D, Lusk C, Stock T, Symanski E, Whitehead LW, Benavides FG and Anto JM. Validation of an asthma questionnaire for use in healthcare workers. Occupational & Environmental Medicine. 63(3):173-9, 2006.

Delclos GL, Bright KA, **Carson A**, Felknor SA, Mackey TA, Morandi MT, Schulze LJH and Whitehead LW. "A global survey of occupational health competencies and curriculum" International Journal of Occupational and Environmental Health; 11:181-194, 2005.

Nooka A, Duonghi L, **Carson A**, Hassan M. Assessing Occupational Risk for Pancreatic Cancer by Chemical Exposures and Work History: A Case-Control study at MD Anderson Cancer Center. American Association for Cancer Research, Orlando. March, 2004.

Mitchell CS, Moline J, Avery AN, Baker D, Blessman JE, **Carson A**, Cosby O, Darcey D, Ducatman A, Emmett EA, Forst L, Gerr F, Gochfeld M, Guidotti TL, Harber P, Hu H, Hegmann KT, Kipen HM, Levin J, McGrail MP, Meyer JD, Mueller KL, Prince S, Rubin R, Schwerha JJ, Sprince NL, Taiwo O and Upfal M. In response to the 2002, vol. 22, no. 4 article entitled "The rise and fall of occupational medicine in the United States" [Letter] Am J Preventive Med. 23(4):307-9, 2002.

**Carson A** and Delclos GL. "The Respiratory System," in Modern Industrial Hygiene: Volume II – Biological Aspects, JL Perkins, ed. 2003, American Conference of Governmental Industrial Hygienists, Cincinnati.

**Carson A**, Colombo S and Alavi. A, City of Houston Childhood Lead Poisoning Prevention Program: Case Density and Impact Analysis, March 31, 2000, Technical Report (Principal Investigator).

Townsend MC, Lockey JE, Velez H, **Carson A**, Cowl CT, Delclos GL, Gerstenhaber BJ, Harber PI, Horvath EP, Jolly AT, Jones SH, Knackmuhs GG, Lindesmith LA, Markham TN, Raymond LW, Rosenberg DM, Sherson D, Smith DD, and Wintermeyer SF. ACOEM Position Statement – "Spirometry in the Occupational Setting" JOEM; 42: 228-245, 2000.

Bright K, Delclos G, **Carson A**, Felknor S, Mackey T, Morandi M, Schultz L and Whitehead L. A Global Study of Occupational Health Competencies and Curricula, Report to the World Health Organization, March, 2000, Southwest Center for Occupational and Environmental Health.

**Carson A**, Guevara E, Delclos GL, Murray KA, Burau KD, Morandi MT, Felknor SA, ("A Study of General Health of Workers of the Industrial Complex of Barrancabermeja") in [Compendium on Occupational Health in the Petroleum Industry of Colombia: Technical and Scientific Report of the "Occupational Health in the Petroleum Industry" Project], 1999 Pan American Health Organization (co-author).

**Carson A**, Hangoc V and Bahrainwala M, City of Houston Childhood Lead Poisoning Prevention Program: Case Density and Impact Analysis, June 30, 1999, Technical Report (Principal Investigator).

**Carson A**, Spears B, and Burau K, City of Houston Childhood Lead Poisoning Prevention Program: Case Density and Impact Analysis, June 30, 1998, Technical Report (Principal Investigator).

**Carson A**, Detry M, Spears B, and Burau K, City of Houston Childhood Lead Poisoning Prevention Program: Case Density and Impact Analysis, June 30, 1997, Technical Report (Principal Investigator).

Delclos GL and **Carson A**, "Acute Gaseous Exposures," in Occupational and Environmental Respiratory Diseases, P Harber, M Schenker, and J Balmes eds. 1995, Mosby Yearbook Pub., St. Louis.

**Carson A**, "Respiratory Effects of Exposure to Fresh Smokes from Pyrolytic Decomposition of Styrene Plastic in Rats." Doctoral Dissertation, University of Cincinnati Kettering Laboratory, 1987.

**Carson A**, "A Dynamic Method for the Generation of Fresh Smokes From Combustion or Pyrolytic Decomposition of Structural Materials." Doctoral Dissertation, University of Cincinnati Kettering Laboratory, 1987.

Samuels SJ, Lemasters GK and **Carson A**, "Statistical Methods for Describing Occupational Exposure Measurements," Am. Ind. Hyg. Assoc. J., 46:427-433, 1985.

Lemasters GK, **Carson A** and Samuels SJ, "Occupational Styrene Exposure for Twelve Product Categories in the Reinforced-Plastics Industry," Am. Ind. Hyg. Assoc. J., 46:434-441, 1985.

Lockey JE, Brooks SM, Jarabek AM, Khoury PR, McKay RT, **Carson A**, Morrison JA, Wiot JF and Spitz HB. "Pulmonary changes after exposure to vermiculite contaminated with fibrous tremolite" Am Rev Respir Dis. 129(6):952-8, 1984.

Lockey JE, Jarabek A, **Carson A**, McKay R, Harber P, Khoury P, Morrison J, Wiot J, Spitz H and Brooks SM, "Pulmonary Hazards from Vermiculite," in Health Issues Related to Metal and Nonmetallic Mining, WL Wagner, W Rom and P Merchant eds. 1983, Butterworth's, Boston.

Vinegar A and **Carson A**, "Pulmonary Function Changes in Chinese Hamsters Exposed Six Months to Diesel Exhaust," Environ Int, 5:369-371, 1981.

Lockey JE, Jarabek A, **Carson A**, McKay R, Harber P,. Khoury P, Morrison J, Prior J and Brooks SM, "Health Effects of Vermiculite Exposure," Am Rev Respir Dis, 123:133, 1981 abstract.

Lockey JE, Jarabek A, **Carson A**, McKay R, Harber P, Khoury P, Morrison J and Brooks SM, "Single-Breath Diffusing Capacity (DLCOsb) in a Working Population," Am Rev Respir Dis, 123:132, 1981 abstract.

Vinegar A, **Carson A** and Pepelko WE, "Pulmonary Function Changes in Chinese Hamsters Exposed to Diesel Exhaust," in Health Effects of Diesel Engine Emissions, Vol. 2, WE Pepelko, RM Danner and NA Clarke eds, 1980, US Environmental Protection Agency, Washington.

**Carson A**, Vinegar A, Leng J and Cooper G, "Effects of Chronic Exposure to some Diesel Exhaust Components on Lung Function in Rats," Fed Proc, 39:1091, 1980 abstract.

Elia VJ, Anderson LA, MacDonald TJ, **Carson A**, Buncher CR and Brooks SM, "Determination of Urinary Mandelic and Phenylglyoxylic Acids in Styrene Exposed Workers and a Control Population," Am Ind Hyg Assoc J, 41:922-926, 1980.

Brooks SM, Anderson LA, Emmett E, **Carson A**, Tsay JY, Elia VJ, Buncher CR and Karbowsky R, "The Effects of Protective Equipment on Styrene Exposure in Workers in the Reinforced Plastics Industry," Arch Environ Health, 35:287-294, 1980.

Brooks SM, Zipp T, Barber M and **Carson A**, "Measurement of Maximal Expiratory Flow Rates in Cigarette Smokers Using Gases of High and Low Densities," Am Rev Respir Dis, 118:75-81, 1978.

# Exhibit B

**LITERATURE:**

"A Survey of the Long-Term Effects of Talc and Kaolin Pleurodesis." *British Journal of Diseases of the Chest* 73 (1979): 285–88.

Acencio, Milena M. P., Evaldo Marchi, Lisete R. Teixeira, Bruna Rocha Silva, Juliana Sanchez Silva, Carlos Sergio Rocha Silva, Vanessa Adelia Alvarenga, Leila Antonangelo, Francisco Suso Vargas, and Vera Luiza Capelozzi. "Talc Particles and Pleural Mesothelium Interface Modulate Apoptosis and Inflammation." *Pathology* 46, no. S2 (2014): S76.

ACGIH. Product: Asbestos: TLV(R) Chemical Substances 7th Edition Documentation. Accessed August 16, 2018.

ACGIH. 2017 TLVs and BEIs: ACGIH. Accessed August 16, 2018.

Acheson, E D, M J Gardner, E C Pippard, and L P Grime. "Mortality of Two Groups of Women Who Manufactured Gas Masks from Chrysotile and Crocidolite Asbestos: A 40-Year Follow-Up." *British Journal of Industrial Medicine* 39, no. 4 (November 1982): 344–48.

Akhtar, Mohd Javed, Maqusood Ahamed, M.A. Majeed Khan, Salman A. Alrokayan, Iqbal Ahmad, and Sudhir Kumar. "Cytotoxicity and Apoptosis Induction by Nanoscale Talc Particles from Two Different Geographical Regions in Human Lung Epithelial Cells." *Environmental Toxicology* 29 (2014): 394–406.

Akhtar, Mohd Javed, Sudhir Kumar, Ramesh Chandra Murthy, Mohd Ashquin, Mohd Imran Khan, Govil Patil, and Iqbal Ahmad. "The Primary Role of Iron-Mediated Lipid Peroxidation in the Differential Cytotoxicity Caused by Two Varieties of Talc Nanoparticles on A549 Cells and Lipid Peroxidation Inhibitory Effect Exerted by Ascorbic Acid." *Toxicology in Vitro: An International Journal Published in Association with BIBRA* 24, no. 4 (June 2010): 1139–47.

American Cancer Society. "Key Statistics for Ovarian Cancer."

American Cancer Society. "What Is Ovarian Cancer?,"

Anderson, Garnet L., Howard L. Judd, Andrew M. Kaunitz, David H. Barad, Shirley A. A. Beresford, Mary Pettinger, James Liu, S. Gene McNeeley, Ana Maria Lopez, and Women's Health Initiative Investigators. "Effects of Estrogen plus Progestin on Gynecologic Cancers and Associated Diagnostic Procedures: The Women's Health Initiative Randomized Trial." *JAMA* 290, no. 13 (October 1, 2003): 1739–48.

Antoniou, A., P. D. P. Pharoah, S. Narod, H. A. Risch, J. E. Eyfjord, J. L. Hopper, N. Loman, et al. "Average Risks of Breast and Ovarian Cancer Associated with BRCA1 or BRCA2 Mutations Detected in Case Series Unselected for Family History: A Combined Analysis of 22 Studies." *American Journal of Human Genetics* 72, no. 5 (May 2003): 1117–30.

Arellano-Orden, Elena, Auxiliadora Romero-Falcon, Jose Martin Juan, Manuel Ocana Jurado, Francisco Rodriguez-Panadero, and Ana Montes-Worboys. "Small Particle-Size Talc Is Associated with Poor Outcome and Increased Inflammation in Thoracoscopic Pleurodesis." *Respiration* 86 (2013): 201–9.

Armstrong, Deborah K., Brian Bundy, Lari Wenzel, Helen Q. Huang, Rebecca Baergen, Shashikant Lele, Larry J. Copeland, Joan L. Walker, Robert A. Burger, and Gynecologic Oncology Group. "Intraperitoneal Cisplatin and Paclitaxel in Ovarian Cancer." *The New England Journal of Medicine* 354, no. 1 (January 5, 2006): 34–43.

"ATSDR - Toxicological Profile: Asbestos." Accessed August 16, 2018.

Baldwin, Lauren A., Bin Huang, Rachel W. Miller, Thomas Tucker, Scott T. Goodrich, Iwona

Podzielinski, Christopher P. DeSimone, Fred R. Ueland, John R. van Nagell, and Leigh G. Seamon. "Ten-Year Relative Survival for Epithelial Ovarian Cancer:" *Obstetrics & Gynecology* 120, no. 3 (September 2012): 612–18.

Balkwill, Fran, and Alberto Mantovani. "Inflammation and Cancer: Back to Virchow?" *The Lancet* 357, no. 9255 (February 2001): 539–45.

Bartrip, P.W. "History of Asbestos Related Disease." *Postgrad Med J* 80 (2004): 72–76.

Beck, B. D., H. A. Feldman, J. D. Brain, T. J. Smith, M. Hallock, and B. Gerson. "The Pulmonary Toxicity of Talc and Granite Dust as Estimated from an in Vivo Hamster Bioassay." *Toxicology and Applied Pharmacology* 87, no. 2 (February 1987): 222–34.

Begg, Melissa D., and Dana March. "Cause and Association: Missing the Forest for the Trees." *American Journal of Public Health* 108, no. 5 (May 2018): 620.

Belotte, Jimmy, Nicole M. Fletcher, Awoniyi O. Awonuga, Mitchell Alexis, Husam M. Abu-Soud, Ghassan M. Saed, Michael P. Diamond, and Mohammed G. Saed. "The Role of Oxidative Stress in the Development of Cisplatin Resistance in Epithelial Ovarian Cancer." *Reproductive Sciences* 21, no. 4 (2014): 503–8.

Belotte, Jimmy, Nicole M. Fletcher, Mohammed G. Saed, Mohammed S. Abusamaan, Gregory Dyson, Michael P. Diamond, and Ghassan M. Saed. "A Single Nucleotide Polymorphism in Catalase Is Strongly Associated with Ovarian Cancer Survival." *PloS One* 10, no. 8 (2015).

Berge, Wera, Kenneth Mundt, Hung Luu, and Paolo Boffetta. "Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis." *European Journal of Cancer Prevention*, January 2017, 1.

Berge. "Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis." *European Journal of Cancer Prevention: The Official Journal of the European Cancer Prevention Organisation (ECP)* 27, no. 3 (2018): 248–57.

Berry, G., M. L. Newhouse, and J. C. Wagner. "Mortality from All Cancers of Asbestos Factory Workers in East London 1933-80." *Occupational and Environmental Medicine* 57, no. 11 (November 2000): 782–85.

Bertolotti, Marinella, Daniela Ferrante, Dario Mirabelli, Mario Botta, Marinella Nonnato, Annalisa Todesco, Benedetto Terracini, and Corrado Magnani. "[Mortality in the cohort of the asbestos cement workers in the Eternit plant in Casale Monferrato (Italy)]." *Epidemiologia E Prevenzione* 32, no. 4–5 (October 2008): 218–28.

Blank, M M, N Wentzensen, M A Murphy, A Hollenbeck, and Y Park. "Dietary Fat Intake and Risk of Ovarian Cancer in the NIH-AARP Diet and Health Study." *British Journal of Cancer* 106, no. 3 (January 31, 2012): 596–602.

Blejer, H. and Robert Arlon. "Talc: A Possible Occupational and Environmental Carcinogen." *Journal of Occupational Medicine* No. 15(2) (February 1973): 92-97.

Blount, A M. "Amphibole Content of Cosmetic and Pharmaceutical Talcs." *Environmental Health Perspectives* 94 (August 1991): 225–30.

Bluemel, Piza, and Zischka-Konorsa, W. "Animal experimental investigations of tissue reactions to starch and talcum powder after intraperitoneal application." *Wiener klinische Wochenschrift* 74, no. 1 (January 1962).

Blumenkrantz, M. J., N. Gallagher, R. A. Bashore, and H. Tenckhoff. "Retrograde Menstruation in Women Undergoing Chronic Peritoneal Dialysis." *Obstetrics and Gynecology* 57, no. 5 (May 1981): 667–70.

Boorman, G. A., and J. C. Seely. "The Lack of an Ovarian Effect of Lifetime Talc Exposure in

F344/N Rats and B6C3F1 Mice." *Regulatory Toxicology and Pharmacology: RTP* 21, no. 2 (April 1995): 242–43.

Booth, M., V. Beral, and P. Smith. "Risk Factors for Ovarian Cancer: A Case-Control Study." *British Journal of Cancer* 60, no. 4 (October 1989): 592–98.

Bottazzi, Barbara, Elio Riboli, and Alberto Mantovani. "Aging, Inflammation and Cancer." *Seminars in Immunology*, November 5, 2018.

Brand, K.G., Lance C. Buoen, Kenneth H. Johnson, and Inge Brand. "Etiological Factors, Stages, and the Role of the Foreign Body in Foreign Body Tumorigenesis: A Review." *Cancer Research* No. 35 (February 1975): 279-286.

Brand, K.G. "Cancer Associated with Asbestosis, Schistosomiasis, Foreign Bodies, and Scars." *Cancer: A Comprehensive Treatise* 2nd Edition. Etiology: Chemical and Physical Carcinogenesis. Plenum Press. (1982).

Brand, K.G. "Solid State Carcinogenesis." *Barbury Report 25: Nongenotoxic Mechanisms in Carcinogensis.* (1987).

Brodeur, Paul. "The Magic Mineral." *The New Yorker* October 12, 1968.

Bunderson-Schelvan, Melisa, Jean C. Pfau, Robert Crouch, and Andrij Holian. "Nonpulmonary Outcomes of Asbestos Exposure." *Journal of Toxicology and Environmental Health. Part B, Critical Reviews* 14, no. 1–4 (2011): 122–52.

Burn, John, Anne-Marie Gerdes, Finlay Macrae, Jukka-Pekka Mecklin, Gabriela Moeslein, Sylviane Olschwang, Diane Eccles, et al. "Long-Term Effect of Aspirin on Cancer Risk in Carriers of Hereditary Colorectal Cancer: An Analysis from the CAPP2 Randomised Controlled Trial." *Lancet (London, England)* 378, no. 9809 (December 17, 2011): 2081–87.

Butterworth, B.E., J.A.A Popp, R.B. Connolly and T.L. Goldsworthy. "Chemically Induced Cell Proliferation in Carcinogenesis." *Mechanisms of Carcinogenesis in Risk Identification.* (1992): 279-305.

Buz'Zard, Amber R., and Benjamin H. S. Lau. "Pycnogenol® Reduces Talc-Induced Neoplastic Transformation in Human Ovarian Cell Cultures." *Phytotherapy Research* 21, no. 6 (June 2007): 579–86.

Caldwell, Carlyle G., White Thomas Aubrey, William L. George, and James J. Eberl. Medical dusting powder. United States US2626257A, filed May 21, 1952, and issued January 20, 1953.

Camargo, M. Constanza, Leslie T. Stayner, Kurt Straif, Margarita Reina, Umaima Al-Alem, Paul A. Demers, and Philip J. Landrigan. "Occupational Exposure to Asbestos and Ovarian Cancer: A Meta-Analysis." *Environmental Health Perspectives* 119, no. 9 (September 2011): 1211–17.

Carr, C.J. "Talc: Consumer Uses and Health Perspectives" 21 (1995): 211–15.

Chan, Andrew T., Edward L. Giovannucci, Jeffrey A. Meyerhardt, Eva S. Schernhammer, Gary C. Curhan, and Charles S. Fuchs. "Long-Term Use of Aspirin and Nonsteroidal Anti-Inflammatory Drugs and Risk of Colorectal Cancer." *JAMA* 294, no. 8 (August 24, 2005): 914–23.

Chang, Che-Jui, Yu-Kang Tu, Pau-Chung Chen, and Hsiao-Yu Yang. "Occupational Exposure to Talc Increases the Risk of Lung Cancer: A Meta-Analysis of Occupational Cohort Studies." *Canadian Respiratory Journal*, 2017.

Chang, Stella, and Harvey A. Risch. "Perineal Talc Exposure and Risk of Ovarian Carcinoma." *Cancer* 79, no. 12 (June 15, 1997): 2396–2401.

Chen, F., K. Gaitskell, M. J. Garcia, A. Albukhari, J. Tsaltas, and A. A. Ahmed. “Serous Tubal Intraepithelial Carcinomas Associated with High-Grade Serous Ovarian Carcinomas: A Systematic Review.” *BJOG: An International Journal of Obstetrics and Gynaecology* 124, no. 6 (May 2017): 872–78.

Chen, Lee-May, and Jonathan S Berek. “Overview of Epithelial Carcinoma of the Ovary, Fallopian Tube, and Peritoneum.” *UpToDate*, 2018.

Chen, L-M, et al. “Epithelial Carcinoma of the Ovary, Fallopian Tube, and Peritoneum: Epidemiology and Risk Factors - UpToDate,” 2018.

Chen, Xi, Gerd A. Müller, Marianne Quaas, Martin Fischer, Namshik Han, Benjamin Stutchbury, Andrew D. Sharrocks, and Kurt Engeland. “The Forkhead Transcription Factor FOXM1 Controls Cell Cycle-Dependent Gene Expression through an Atypical Chromatin Binding Mechanism.” *Molecular and Cellular Biology* 33, no. 2 (January 2013): 227–36.

Chen, Y., P. C. Wu, J. H. Lang, W. J. Ge, P. Hartge, and L. A. Brinton. “Risk Factors for Epithelial Ovarian Cancer in Beijing, China.” *International Journal of Epidemiology* 21, no. 1 (February 1992): 23–29.

Chien, Jeremy, Hugues Sicotte, Jian-Bing Fan, Sean Humphray, Julie M. Cunningham, Kimberly R. Kalli, Ann L. Oberg, et al. “TP53 Mutations, Tetraploidy and Homologous Recombination Repair Defects in Early Stage High-Grade Serous Ovarian Cancer.” *Nucleic Acids Research* 43, no. 14 (August 18, 2015): 6945–58.

Chittenden, B. G., G. Fullerton, A. Maheshwari, and S. Bhattacharya. “Polycystic Ovary Syndrome and the Risk of Gynaecological Cancer: A Systematic Review.” *Reproductive Biomedicine Online* 19, no. 3 (September 2009): 398–405.

Cibula, D., M. Widschwendter, O. Májek, and L. Dusek. “Tubal Ligation and the Risk of Ovarian Cancer: Review and Meta-Analysis.” *Human Reproduction Update* 17, no. 1 (January 1, 2011): 55–67.

Cibula, David, Martin Widschwendter, Michael Zikan, and Ladislav Dusek. “Underlying Mechanisms of Ovarian Cancer Risk Reduction after Tubal Ligation.” *Acta Obstetricia Et Gynecologica Scandinavica* 90, no. 6 (June 2011): 559–63.

CIMBA, Georgia Chenevix-Trench, Roger L Milne, Antonis C Antoniou, Fergus J Couch, Douglas F Easton, and David E Goldgar. “An International Initiative to Identify Genetic Modifiers of Cancer Risk in BRCA1 and BRCA2 Mutation Carriers: The Consortium of Investigators of Modifiers of BRCA1 and BRCA2 (CIMBA).” *Breast Cancer Research* 9, no. 2 (December 2007).

Cohen, Samuel M., and Lora L. Arnold. “Chemical Carcinogenesis.” *Toxicological Sciences* 120, no. suppl_1 (March 1, 2011): S76–92.

Colditz, Graham A. “Cancer Prevention.” *UpToDate*, 2018.

Collaborative Group on Epidemiological Studies of Ovarian Cancer, V. Beral, R. Doll, C. Hermon, R. Peto, and G. Reeves. “Ovarian Cancer and Oral Contraceptives: Collaborative Reanalysis of Data from 45 Epidemiological Studies Including 23,257 Women with Ovarian Cancer and 87,303 Controls.” *Lancet* 371, no. 9609 (January 26, 2008): 303–14.

Collaborative Group On Epidemiological Studies Of Ovarian Cancer, V. Beral, K. Gaitskell, C. Hermon, K. Moser, G. Reeves, and R. Peto. “Menopausal Hormone Use and Ovarian Cancer Risk: Individual Participant Meta-Analysis of 52 Epidemiological Studies.” *Lancet (London, England)* 385, no. 9980 (May 9, 2015): 1835–42.

Committee on Practice Bulletins–Gynecology, Committee on Genetics, Society of Gynecologic Oncology. "Practice Bulletin No 182: Hereditary Breast and Ovarian Cancer Syndrome." *Obstetrics and Gynecology* 130, no. 3 (2017): e110–26.

Compton, Sarah A., Sezgin Ozgür, and Jack D. Griffith. "Ring-Shaped Rad51 Paralog Protein Complexes Bind Holliday Junctions and Replication Forks as Visualized by Electron Microscopy." *The Journal of Biological Chemistry* 285, no. 18 (April 30, 2010): 13349–56.

Cook, Linda S., Mary L. Kamb, and Noel S. Weiss. "Perineal Powder Exposure and the Risk of Ovarian Cancer." *American Journal of Epidemiology* 145, no. 5 (March 1, 1997): 459–65.

Cook, LS. "Erratum in 'Perineal Powder Exposure and the Risk of Ovarian Cancer'." *American Journal of Epidemiology* 148, no. 410 (1997).

Coussens, Lisa M., and Zena Werb. "Inflammation and Cancer." *Nature* 420, no. 6917 (December 19, 2002): 860–67.

Cralley, L. J., M. M. Key, D. H. Groth, W. S. Lainhart, and R. M. Ligo. "Fibrous and Mineral Content of Cosmetic Talcum Products." *American Industrial Hygiene Association Journal* 29, no. 4 (August 1968): 350–54.

Cramer, D. W. "Perineal Talc Exposure and Subsequent Epithelial Ovarian Cancer: A Case-Control Study." *Obstetrics and Gynecology* 94, no. 1 (July 1999): 160–61.

Cramer, D. W., R. F. Liberman, L. Titus-Ernstoff, W. R. Welch, E. R. Greenberg, J. A. Baron, and B. L. Harlow. "Genital Talc Exposure and Risk of Ovarian Cancer." *International Journal of Cancer. Journal International Du Cancer* 81, no. 3 (May 5, 1999): 351–56.

Cramer, D. W., W. R. Welch, R. E. Scully, and C. A. Wojciechowski. "Ovarian Cancer and Talc: A Case-Control Study." *Cancer* 50, no. 2 (July 15, 1982): 372–76.

Cramer, Daniel W., Linda Titus-Ernstoff, John R. McKolanis, William R. Welch, Allison F. Vitonis, Ross S. Berkowitz, and Olivera J. Finn. "Conditions Associated with Antibodies Against the Tumor-Associated Antigen MUC1 and Their Relationship to Risk for Ovarian Cancer." *Cancer Epidemiology Biomarkers & Prevention* 14, no. 5 (May 1, 2005): 1125–31.

Cramer, Daniel W., Allison F. Vitonis, Kathryn L. Terry, William R. Welch, and Linda J. Titus. "The Association between Talc Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US States." *Epidemiology (Cambridge, Mass.)*, December 17, 2015.

Cramer, Daniel, et al. "The Association Between Talc Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US States." *Epidemiology (Cambridge, Mass.)* 27, no. 3 (May 2016): 334–46.

Cramer, Daniel W., William R. Welch, Ross S. Berkowitz, and John J. Godleski. "Presence of Talc in Pelvic Lymph Nodes of a Woman with Ovarian Cancer and Long-Term Genital Exposure to Cosmetic Talc." *Obstetrics and Gynecology* 110, no. 2 Pt 2 (August 2007): 498–501.

Cramer, Daniel W., William R. Welch, Robert E. Scully, and Carol A. Wojciechowski. "Ovarian Cancer and Talc. A Case-Control Study." *Cancer* 50, no. 2 (July 15, 1982): 372–76.

Crum, Christopher P, Jonathan Bijron, and Brooke E. Howitt. "Pathogenesis of Ovarian, Fallopian Tubal, and Peritoneal Serous Carcinomas." *UpToDate*, 2018.

Crusz, Shanthini M., and Frances R Balkwill. "Inflammation and Cancer: Advances and New Agents." *Nature Reviews Clinical Oncology* 12 (October 2015): 584–96.

Curtis D. Klaassen, and John Doull. *Casarett and Doull's Toxicology : The Basic Science of*

*Poisons*. 8th Edition. McGraw-Hill Education, 2013.

Danforth, Kim N., Shelley S. Tworoger, Jonathan L. Hecht, Bernard A. Rosner, Graham A. Colditz, and Susan E. Hankinson. "Breastfeeding and Risk of Ovarian Cancer in Two Prospective Cohorts." *Cancer Causes & Control: CCC* 18, no. 5 (June 2007): 517–23.

Demirer, Ersin, Christian F. Ghattas, Mohamed O. Radwan, and Elamin M. Elamin. "Clinical and Prognostic Features of Erionite-Induced Malignant Mesothelioma." *Yonsei Med J* 56(2) (2015): 311-323.

Devaja, Omer. *Ovarian Cancer   From Pathogenesis to Treatment*. IntechOpen, 2018.

Ding, Yuan C., Lesley McGuffog, Sue Healey, Eitan Friedman, Yael Laitman, Shani-Paluch-Shimon, Bella Kaufman, et al. "A Nonsynonymous Polymorphism in IRS1 Modifies Risk of Developing Breast and Ovarian Cancers in BRCA1 and Ovarian Cancer in BRCA2 Mutation Carriers." *Cancer Epidemiology, Biomarkers & Prevention: A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 21, no. 8 (August 2012): 1362–70.

Dixon, Suzanne C., Christina M. Nagle, Nicolas Wentzensen, Britton Trabert, Alicia Beeghly-Fadiel, Joellen M. Schildkraut, Kirsten B. Moysich, et al. "Use of Common Analgesic Medications and Ovarian Cancer Survival: Results from a Pooled Analysis in the Ovarian Cancer Association Consortium." *British Journal of Cancer* 116, no. 9 (April 25, 2017): 1223–28. https://doi.org/10.1038/bjc.2017.68.

Dodson, R. F., M. O'Sullivan, C. J. Corn, and S. P. Hammar. "Quantitative Comparison of Asbestos and Talc Bodies in an Individual with Mixed Exposure." *American Journal of Industrial Medicine* 27, no. 2 (February 1995): 207–15.

Donaldson, Ken. "The Inhalation Toxicology of *p*-aramid Fibrils." *Critical Reviews in Toxicology*, No. 39(6) (2009): 487-500.

Donaldson, Ken, Fiona A. Murphy, Rodger Duffin, Craig A. Poland. "Asbestos, Carbon Nanotubes and the Pleural Mesothelium: A Review of the Hypothesis Regarding the Role of Long Fibre Retention in the Parietal Pleura, Inflammation and Mesothelioma." *Particle and Fibre Toxicology* No. 7 (2010): 5.

D.R. Petterson. "JNJ 000251888," April 26, 1973.

Dubeau, L., and R. Drapkin. "Coming into Focus: The Nonovarian Origins of Ovarian Cancer." *Annals of Oncology: Official Journal of the European Society for Medical Oncology* 24 Suppl 8 (November 2013): viii28–35. https://doi.org/10.1093/annonc/mdt308.

Eberl, J. J., and W. L. George. "Comparative Evaluation of the Effects of Talcum and a New Absorbable Substitute on Surgical Gloves." *American Journal of Surgery* 75, no. 3 (March 1948): 493–97.

Egli, G. E., and M. Newton. "The Transport of Carbon Particles in the Human Female Reproductive Tract." *Fertility and Sterility* 12 (April 1961): 151–55.

Eng, Kevin H., J. Brian Szender, John Lewis Etter, Jasmine Kaur, Samantha Poblete, Ruea-Yea Huang, Qianqian Zhu, et al. "Paternal Lineage Early Onset Hereditary Ovarian Cancers: A Familial Ovarian Cancer Registry Study." *PLoS Genetics* 14, no. 2 (February 2018): e1007194. https://doi.org/10.1371/journal.pgen.1007194.

"Expert Report of Michael Crowley, Ph.D., In Re: Talcum Powder Prod. Liab. Litig., MDL No. 2738," November 12, 2018.

Fasching, Peter A., Simon Gayther, Leigh Pearce, Joellen M. Schildkraut, Ellen Goode, Falk Thiel, Georgia Chenevix-Trench, et al. "Role of Genetic Polymorphisms and Ovarian Cancer Susceptibility." *Molecular Oncology* 3, no. 2 (April 2009): 171–81.

https://doi.org/10.1016/j.molonc.2009.01.008.

Fathalla, M. F. "Incessant Ovulation and Ovarian Cancer - a Hypothesis Re-Visited." *Facts, Views & Vision in ObGyn* 5, no. 4 (2013): 292–97.

Fathalla, M. F. "Incessant Ovulation--a Factor in Ovarian Neoplasia?" *Lancet* 2, no. 7716 (July 17, 1971): 163.

FDA. "Ltr to Samuel S. Epstein, M.D., RE: Docket Numbers 94P-0420 and FDA-2008-P-0309-0001 /CP," April 1, 2017.

Fedak, Kristen M., Autumn Bernal, Zachary A. Capshaw, and Sherilyn Gross. "Applying the Bradford Hill Criteria in the 21st Century: How Data Integration Has Changed Causal Inference in Molecular Epidemiology." *Emerging Themes in Epidemiology* 12, no. 14 (2015).

"Federal Register Vol. 81, No.243, December 19, 2016 FDA Ban on Surgical Gloves." Accessed August 16, 2018.

Ferguson, Lynnette R. "Chronic Inflammation and Mutagenesis." *Mutation Research* 690, no. 1–2 (August 7, 2010): 3–11.

Fernandes, José Veríssimo, Ricardo Ney Oliveira Cobucci, Carlos André Nunes Jatobá, Thales Allyrio Araújo de Medeiros Fernandes, Judson Welber Veríssimo de Azevedo, and Josélio Maria Galvão de Araújo. "The Role of the Mediators of Inflammation in Cancer Development." *Pathology & Oncology Research* 21, no. 3 (July 2015): 527–34.

Ferrante, Daniela, Marinella Bertolotti, Annalisa Todesco, Dario Mirabelli, Benedetto Terracini, and Corrado Magnani. "Cancer Mortality and Incidence of Mesothelioma in a Cohort of Wives of Asbestos Workers in Casale Monferrato, Italy." *Environmental Health Perspectives* 115, no. 10 (October 2007): 1401–5.

Ferrer, Jaume, Juan F. Montes, Maria A. Villarino, Richard W. Light, and José García-Valero. "Influence of Particle Size on Extrapleural Talc Dissemination after Talc Slurry Pleurodesis." *Chest* 122, no. 3 (September 2002): 1018–27.

Fields, L., et al. "Gynecologic Cancer." Excerpt. *Clinical Oncology* 2001.

Fiume, Monice M., Ivan Boyer, Wilma F. Bergfeld, Donald V. Belsito, Ronald A. Hill, Curtis D. Klaassen, Daniel C. Liebler, et al. "Safety Assessment of Talc as Used in Cosmetics." *International Journal of Toxicology* 34, no. 1 suppl (July 1, 2015): 66S-129S.

Fletcher, Nicole M., Jimmy Belotte, Mohammed G. Saed, Ira Memaj, Michael P. Diamond, Robert T. Morris, and Ghassan M. Saed. "Specific Point Mutations in Key Redox Enzymes Are Associated with Chemoresistance in Epithelial Ovarian Cancer." *Free Radical Biology and Medicine* 102 (2017): 122–32.

Fletcher, Nicole M., Zhongliang Jiang, Rouba Ali-Fehmi, Nancy K. Levin, Jimmy Belotte, Michael A. Tainsky, Michael P. Diamond, Husam M. Abu-Soud, and Ghassan M. Saed. "Myeloperoxidase and Free Iron Levels: Potential Biomarkers for Early Detection and Prognosis of Ovarian Cancer." *Cancer Biomarkers* 10 (2012 2011): 267–75.

Fletcher, Nicole, Memaj, Ira, and Saed, Ghassan. "Talcum Powder Enhances Oxidative Stress in Ovarian Cancer Cells." *Reproductive Sciences*, February 28, 2018.

Fletcher, NM, and GM Saed. "Talcum Powder Enhances Cancer Antigen 125 Levels in Ovarian Cancer Cells." *Presented at the 65th Meeting of the Society for Reproductive Investigation, San Diego, California*, 2018.

Folkins, Ann K., Elke A. Jarboe, Jonathan L. Hecht, Michael G. Muto, and Christopher P. Crum. "Chapter 24 - Assessing Pelvic Epithelial Cancer Risk and Intercepting Early Malignancy." In *Diagnostic Gynecologic and Obstetric Pathology (Third Edition)*,

844–64. Philadelphia: Content Repository, 2018.

Ford, D., D.F. Easton, M. Stratton, S. Narod, D. Goldgar, P. Devilee, D.T. Bishop, et al. "Genetic Heterogeneity and Penetrance Analysis of the BRCA1 and BRCA2 Genes in Breast Cancer Families." *The American Journal of Human Genetics* 62, no. 3 (March 1998): 676–89.

Frank, Czul and Lascano Jorge. "An Uncommon Hazard: Pulmonary Talcosis as a Result of Recurrent Aspiration of Baby Powder." *Respiratory Medicine CME* No. 4 (2011): 109-111.

Freedman, Ralph S, Michael Deavers, Jinsong Liu, and Ena Wang. "Peritoneal Inflammation – A Microenvironment for Epithelial Ovarian Cancer (EOC)." *Journal of Translational Medicine* 2, no. 23 (2004).

Friebel, Tara M., Susan M. Domchek, and Timothy R. Rebbeck. "Modifiers of Cancer Risk in BRCA1 and BRCA2 Mutation Carriers: Systematic Review and Meta-Analysis." *Journal of the National Cancer Institute* 106, no. 6 (June 2014): dju091.

Frost, G. "The Latency Period of Mesothelioma among a Cohort of British Asbestos Workers (1978-2005)." *British Journal of Cancer* 109, no. 7 (October 1, 2013): 1965–73.

Galea, Sandro, and Roger D. Vaughan. "Moving Beyond the Cause Constraint: A Public Health of Consequence, May 2018." *American Journal of Public Health* 108, no. 5 (May 2018): 602–3.

Gates, Margaret A., Bernard A. Rosner, Jonathan L. Hecht, and Shelley S. Tworoger. "Risk Factors for Epithelial Ovarian Cancer by Histologic Subtype." *American Journal of Epidemiology* 171, no. 1 (January 1, 2010): 45–53.

Gates, Margaret A., Shelley S. Tworoger, Kathryn L. Terry, Linda Titus-Ernstoff, Bernard Rosner, Immaculata De Vivo, Daniel W. Cramer, and Susan E. Hankinson. "Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer." *Cancer Epidemiology, Biomarkers & Prevention: A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 17, no. 9 (September 2008): 2436–44.

Genofre, Eduardo H., Francisco S. Vargas, Milena M. P. Acencio, Leila Antonangelo, Lisete R. Teixeira, and Evaldo Marchi. "Talc Pleurodesis: Evidence of Systemic Inflammatory Response to Small Size Talc Particles." *Respiratory Medicine* 103, no. 1 (January 2009): 91–97.

Germani, D., S. Belli, C. Bruno, M. Grignoli, M. Nesti, R. Pirastu, and P. Comba. "Cohort Mortality Study of Women Compensated for Asbestosis in Italy." *American Journal of Industrial Medicine* 36, no. 1 (July 1999): 129–34.

Gertig, D. M., D. J. Hunter, D. W. Cramer, G. A. Colditz, F. E. Speizer, W. C. Willett, and S. E. Hankinson. "Prospective Study of Talc Use and Ovarian Cancer." *Journal of the National Cancer Institute* 92, no. 3 (February 2, 2000): 249–52.

Ghio, Andrew J., Joleen M. Soukup, Lisa A. Dailey, Judy H. Richards, Jennifer L. Turi, Elizabeth N. Pavlisko, and Victor L. Roggli. "Disruption of Iron Homeostasis in Mesothelial Cells after Talc Pleurodesis." *American Journal of Respiratory Cell and Molecular Biology* 46, no. 1 (January 1, 2012): 80–86.

Gibbs, A.E., F.D. Pooley, M. Griffiths, R. Mitha, J.E. Craighead, J.R. Ruttner. "Talc Pneumoconiosis: A Pathologic and Mineralogic Study." *Human Pathology* 23, No. 12, (December 1992): 1344-1354.

Gloyne, S. R. "Two Cases of Squamous Carcinoma of the Lung Occurring in Asbestosis."

*Tubercle* 17 (1935): 5–10.

Godard, B., W. D. Foulkes, D. Provencher, J. S. Brunet, P. N. Tonin, A. M. Mes-Masson, S. A. Narod, and P. Ghadirian. "Risk Factors for Familial and Sporadic Ovarian Cancer among French Canadians: A Case-Control Study." *American Journal of Obstetrics and Gynecology* 179, no. 2 (August 1998): 403–10.

Gondal, M., et al. "Detection of Tox Metals (Lead and Chromium) in Talcum Powder Using Laser Induced Breakdown Spectroscopy." *Applied Optics* 51, No. 30, (October 2012): 7395-7401.

Gonzalez, Kelly D., Katie A. Noltner, Carolyn H. Buzin, Dongqing Gu, Cindy Y. Wen-Fong, Vu Q. Nguyen, Jennifer H. Han, et al. "Beyond Li Fraumeni Syndrome: Clinical Characteristics of Families with P53 Germline Mutations." *Journal of Clinical Oncology: Official Journal of the American Society of Clinical Oncology* 27, no. 8 (March 10, 2009): 1250–56.

Gonzalez, Nicole L., Katie M. O'Brien, Aimee A. D'Aloisio, Dale P. Sandler, and Clarice R. Weinberg. "Douching, Talc Use, and Risk of Ovarian Cancer." *Epidemiology (Cambridge, Mass.)* 27, no. 6 (2016): 797–802.

Goodman, Marc T, Galina Lurie, Pamela J Thompson, Katharine E McDuffie, and Michael E Carney. "Association of Two Common Single-Nucleotide Polymorphisms in the CYP19A1 Locus and Ovarian Cancer Risk." *Endocrine-Related Cancer* 15, no. 4 (December 2008): 1055–60.

Gordon, Ronald E., Sean Fitzgerald, and James Millette. "Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women." *International Journal of Occupational and Environmental Health* 20, no. 4 (October 2014): 318–32.

Graham, J., and R. Graham. "Ovarian Cancer and Asbestos." *Environmental Research* 1, no. 2 (October 1967): 115–28.

Graham, and Jenkins. "Value of Modified Starch as a Substitute for Talc." *Lancet (London, England)* 1, no. 6708 (March 22, 1952): 590–91.

Green, A., D. Purdie, C. Bain, V. Siskind, P. Russell, M. Quinn, and B. Ward. "Tubal Sterilisation, Hysterectomy and Decreased Risk of Ovarian Cancer. Survey of Women's Health Study Group." *International Journal of Cancer. Journal International Du Cancer* 71, no. 6 (June 11, 1997): 948–51.

Grivennikov, Sergei I., Florian R. Greten, and Michael Karin. "Immunity, Inflammation, and Cancer." *Cell* 140, no. 6 (March 19, 2010): 883–99.

Gross, A. J., and P. H. Berg. "A Meta-Analytical Approach Examining the Potential Relationship between Talc Exposure and Ovarian Cancer." *Journal of Exposure Analysis and Environmental Epidemiology* 5, no. 2 (June 1995): 181–95.

Hall, J. M., M. K. Lee, B. Newman, J. E. Morrow, L. A. Anderson, B. Huey, and M. C. King. "Linkage of Early-Onset Familial Breast Cancer to Chromosome 17q21." *Science (New York, N.Y.)* 250, no. 4988 (December 21, 1990): 1684–89.

Halme, J., M. G. Hammond, J. F. Hulka, S. G. Raj, and L. M. Talbert. "Retrograde Menstruation in Healthy Women and in Patients with Endometriosis." *Obstetrics and Gynecology* 64, no. 2 (August 1984): 151–54.

Hamilton, T. C., H. Fox, C. H. Buckley, W. J. Henderson, and K. Griffiths. "Effects of Talc on the Rat Ovary." *British Journal of Experimental Pathology* 65, no. 1 (February 1984): 101–6.

Hanahan, Douglas and Robert A. Weinberg. "Hallmarks of Cancer: The Next Generation." *Cell*

144, (March 4, 2011): 646-674.

Hankinson, S. E., D. J. Hunter, G. A. Colditz, W. C. Willett, M. J. Stampfer, B. Rosner, C. H. Hennekens, and F. E. Speizer. "Tubal Ligation, Hysterectomy, and Risk of Ovarian Cancer. A Prospective Study." *JAMA* 270, no. 23 (December 15, 1993): 2813–18.

Hannenhalli, Sridhar, and Klaus H. Kaestner. "The Evolution of Fox Genes and Their Role in Development and Disease." *Nature Reviews. Genetics* 10, no. 4 (April 2009): 233–40.

Harlow, B. L., D. W. Cramer, D. A. Bell, and W. R. Welch. "Perineal Exposure to Talc and Ovarian Cancer Risk." *Obstetrics and Gynecology* 80, no. 1 (July 1992): 19–26.

Harlow, B. L., and P. A. Hartge. "A Review of Perineal Talc Exposure and Risk of Ovarian Cancer." *Regulatory Toxicology and Pharmacology: RTP* 21, no. 2 (April 1995): 254–60.

Harlow, B. L., and N. S. Weiss. "A Case-Control Study of Borderline Ovarian Tumors: The Influence of Perineal Exposure to Talc." *American Journal of Epidemiology* 130, no. 2 (August 1989): 390–94.

Harper, Amy K, and Ghassan Saed. ""Talc Induces a pro-Oxidant State in Normal and Ovarian Cancer Cells through Genetic Point Mutations in Key Redox Enzymes," Accepted for Presentation at SGO Meeting," In Press 2019.

Hartge, P., R. Hoover, L. P. Lesher, and L. McGowan. "Talc and Ovarian Cancer." *JAMA: The Journal of the American Medical Association* 250, no. 14 (October 14, 1983): 1844.

Hasselbalch, Hans Carl. "Chronic Inflammation as a Promotor of Mutagenesis in Essential Thrombocythemia, Polycythemia Vera and Myelofibrosis. A Human Inflammation Model for Cancer Development?" *Leukemia Research* 37, no. 2 (February 2013): 214–20.

Havrilesky, Laura J., Patricia G. Moorman, William J. Lowery, Jennifer M. Gierisch, Remy R. Coeytaux, Rachel Peragallo Urrutia, Michaela Dinan, et al. "Oral Contraceptive Pills as Primary Prevention for Ovarian Cancer: A Systematic Review and Meta-Analysis." *Obstetrics and Gynecology* 122, no. 1 (July 2013): 139–47.

Heller, D. S., R. E. Gordon, and N. Katz. "Correlation of Asbestos Fiber Burdens in Fallopian Tubes and Ovarian Tissue." *American Journal of Obstetrics and Gynecology* 181, no. 2 (August 1999): 346–47.

Heller, D. S., R. E. Gordon, C. Westhoff, and S. Gerber. "Asbestos Exposure and Ovarian Fiber Burden." *American Journal of Industrial Medicine* 29, no. 5 (May 1996): 435–39.

Heller, D. S., C. Westhoff, R. E. Gordon, and N. Katz. "The Relationship between Perineal Cosmetic Talc Usage and Ovarian Talc Particle Burden." *American Journal of Obstetrics and Gynecology* 174, no. 5 (May 1996): 1507–10.

Henderson, W. J., T. C. Hamilton, M. S. Baylis, C. G. Pierrepoint, and K. Griffiths. "The Demonstration of the Migration of Talc from the Vagina and Posterior Uterus to the Ovary in the Rat." *Environmental Research* 40, no. 2 (August 1986): 247–50.

Henderson, W. J., T. C. Hamilton, and K. Griffiths. "Talc in Normal and Malignant Ovarian Tissue." *The Lancet* (March 3, 1979): 499.

Henderson, W. J., C. A. Joslin, A. C. Turnbull, and K. Griffiths. "Talc and Carcinoma of the Ovary and Cervix." *The Journal of Obstetrics and Gynaecology of the British Commonwealth* 78, no. 3 (March 1971): 266–72.

Hernán, Miguel A. "The C-Word: Scientific Euphemisms Do Not Improve Causal Inference From Observational Data." *American Journal of Public Health* 108, no. 5 (May 2018): 616–19.

Hill, Austin Bradford. "The Environment and Disease: Association or Causation?" *Proceedings*

*of the Royal Society of Medicine* 58, no. 5 (May 1965): 295–300.

Hillegass, Jedd M., Arti Shukla, Maximilian B. MacPherson, Jeffrey P. Bond, Chad Steele, and Brooke T. Mossman. "Utilization of Gene Profiling and Proteomics to Determine Mineral Pathogenicity in a Human Mesothelial Cell Line (LP9/TERT-1)." *Journal of Toxicology and Environmental Health. Part A* 73, no. 5 (January 2010): 423–36.

Hollinger, Mannfred. "Pulmonary Toxicity of Inhaled and Intravenous Talc." *Toxicology Letters* 52 (1990): 121-127.

Horowitz, Neil S., Austin Miller, Bunja Rungruang, Scott D. Richard, Noah Rodriguez, Michael A. Bookman, Chad A. Hamilton, Thomas C. Krivak, and G. Larry Maxwell. "Does Aggressive Surgery Improve Outcomes? Interaction between Preoperative Disease Burden and Complex Surgery in Patients with Advanced-Stage Ovarian Cancer: An Analysis of GOG 182." *Journal of Clinical Oncology: Official Journal of the American Society of Clinical Oncology* 33, no. 8 (March 10, 2015): 937–43.

Houghton, Serena C., Katherine W. Reeves, Susan E. Hankinson, Lori Crawford, Dorothy Lane, Jean Wactawski-Wende, Cynthia A. Thomson, Judith K. Ockene, and Susan R. Sturgeon. "Perineal Powder Use and Risk of Ovarian Cancer." *Journal of the National Cancer Institute* 106, no. 9 (September 2014).

Huncharek, Michael, J. F. Geschwind, and Bruce Kupelnick. "Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies." *Anticancer Research* 23, no. 2C (April 2003): 1955–60.

Huncharek, Michael, Joshua Muscat, Adedayo Onitilo, and Bruce Kupelnick. "Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies." *European Journal of Cancer Prevention: The Official Journal of the European Cancer Prevention Organisation (ECP)* 16, no. 5 (October 2007): 422–29.

Hunn, Jessica, and Gustavo C. Rodriguez. "Ovarian Cancer: Etiology, Risk Factors, and Epidemiology." *Clinical Obstetrics and Gynecology* 55, no. 1 (March 2012): 3–23.

IARC. "Mechanisms of Fibre Carcinogens." *IARC Scientific Publications.* No. 140. 1996.

IARC. "IARC Monographs on the Evaluation of Carcinogenic Risks to Humans – IARC: Asbestos," 1977.

IARC. "IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 58. Beryllium, Cadmium, Mercury, and Exposures in the Glass Manufacturing Industry," 1993.

IARC. "IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Volume 93 Carbon Black, Titanium Dioxide, and Talc." *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans / World Health Organization, International Agency for Research on Cancer* 93 (2010): 1–413.

IARC. "IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Volume 100C," 2012.

IARC. "IARC Monographs on the Evaluation of the Carcinogenic Risk of Chemicals to Humans: Silica and Some Silicates." IARC, 1987.

IARC. "IARC Monographs on the Evaluation of the Carcinogenic Risks to Humans.   Overall Evaluations of Carcinogenicity: An Updating of IARC Monographs Volumes 1-42. Supplement 7," 1987.

IARC, International Agency for Research on Cancer, and World Health Organization, eds.

*Carbon Black, Titanium Dioxide, and Talc*. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, v. 93. Lyon, France: Geneva: International Agency for Research on Cancer; Distributed by WHO Press, 2010.

"Inflammation: A Hidden Path to Breaking the Spell of Ovarian Cancer." *Cell Cycle* 8, no. 19 (2009): 3107–11.

Institute of Medicine (US) Committee on Asbestos: Selected Health Effects. *Asbestos: Selected Cancers*. The National Academies Collection: Reports Funded by National Institutes of Health. Washington (DC): National Academies Press (US), 2006.

Isaacs, Claudine, and Beth N Peshkin. "Management of Patients at High Risk for Breast and Ovarian Cancer." *UpToDate*, 2018.

Iturralde, M., and P. F. Venter. "Hysterosalpingo-Radionuclide Scintigraphy (HERS)." *Seminars in Nuclear Medicine* 11, no. 4 (October 1981): 301–14.

J. Lightfoot, G.A. Kingston, and F.D. Pooley. "An Examination of Italian Mine Samples and Relevant Powders," 1972.

Jaiswal, M., N. F. LaRusso, L. J. Burgart, and G. J. Gores. "Inflammatory Cytokines Induce DNA Damage and Inhibit DNA Repair in Cholangiocarcinoma Cells by a Nitric Oxide-Dependent Mechanism." *Cancer Research* 60, no. 1 (January 1, 2000): 184–90.

"JANSSEN-000056 P-23 (Pltf_MISC_00000321) Ortho Diaphragm Information," n.d.

Jasuja, S. et al. "Cosmetic Talc-Related Pulmonary Granulomatosis." *Journal of Investigative Medicine High Impact Case Reports* (July-September 2017): 1–4.

Jaurand, M. C. "Mechanisms of Fiber-Induced Genotoxicity." *Environmental Health Perspectives* 105 Suppl 5 (September 1997): 1073–84.

Jaurand, M. C. "Particulate-State Carcinogenesis: A Survey of Recent Studies on the Mechanisms of Action of Fibres." *IARC Scientific Publications*, no. 90 (1989): 54–73.

Jaurand, MC. "Mechanisms of Fibre Genotoxicity." In *Mechanisms in Fibre Carcinogensis*. New York: Plenum Press, 1991.

Jervis, Sarah, Honglin Song, Andrew Lee, Ed Dicks, Jonathan Tyrer, Patricia Harrington, Douglas F. Easton, Ian J. Jacobs, Paul P. D. Pharoah, and Antonis C. Antoniou. "Ovarian Cancer Familial Relative Risks by Tumour Subtypes and by Known Ovarian Cancer Genetic Susceptibility Variants." *Journal of Medical Genetics* 51, no. 2 (February 2014): 108–13.

Jia, D, Y Nagaoka, S Orsulic, and M Katsumata. "Inflammation Is a Key Contributor to Ovarian Cancer Cell Seeding." *Scientific Reports* 8, no. 12394 (August 17, 2018).

Jiang, Zhongliang, Nicole M. Fletcher, Rouba Ali-Fehmi, Michael P. Diamond, Husam M. Abu-Soud, Adnan R. Munkarah, and Ghassan M. Saed. "Modulation of Redox Signaling Promotes Apoptosis in Epithelial Ovarian Cancer Cells." *Gynecologic Oncology* 122, no. 2 (August 2011): 418–23.

John M. DeSesso. "Exponent Talc Defense Presentation Toxic Talc?" January 18, 2018.

Jones, Richard E., and Kristin H. Lopez. "Human Reproductive Biology - 4th Edition Chapter 9 - Gamete Transport and Fertilization." In *Human Reproductive Biology*, Third., 159–73. San Diego: Academic Press, 2006.

Jordan, SJ, KL Cushing-Haugen, KG Wicklund, JA Doherty, and MA Rossing. "Breast Feeding and Risk of Epithelial Ovarian Cancer." *Cancer Causes & Control: CCC* 23, no. 6 (June 2012): 919–27.

Jordan, Susan J., Victor Siskind, Adèle C Green, David C. Whiteman, and Penelope M. Webb. "Breastfeeding and Risk of Epithelial Ovarian Cancer." *Cancer Causes & Control: CCC*

21, no. 1 (January 2010): 109–16.

Jordan, Susan J., David C. Whiteman, David M. Purdie, Adèle C. Green, and Penelope M. Webb. "Does Smoking Increase Risk of Ovarian Cancer? A Systematic Review." *Gynecologic Oncology* 103, no. 3 (December 2006): 1122–29.

Jurinski, Joseph B., and J. Donald Rimstidt. "Biodurability of Talc." *American Mineralogist* 86, no. 4 (April 2001): 392–99.

Kane, AB, P Boffetta, R Saracci, and JD Wilbourn. "Mechanisms of Fibre Carcinogenesis." IARC, 1996.

Kang, N., D. Griffin, and H. Ellis. "The Pathological Effects of Glove and Condom Dusting Powders." *Journal of Applied Toxicology* 12, no. 6 (December 1992): 443–49.

Kanterman, J., Moshe Sade-Feldman, Michal Baniyash. "New Insights into Chronic Inflammation-Induced Immunosuppression." *Seminars in Cancer Biology* 22 (2012): 307– 318.

Karageorgi, Stalo, Margaret A. Gates, Susan E. Hankinson, and Immaculata De Vivo. "Perineal Use of Talcum Powder and Endometrial Cancer Risk." *Cancer Epidemiology, Biomarkers & Prevention: A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 19, no. 5 (May 2010): 1269–75.

Kasper, C. S., and P. J. Chandler. "Possible Morbidity in Women from Talc on Condoms." *JAMA: The Journal of the American Medical Association* 273, no. 11 (March 15, 1995): 846–47.

Kauff, Noah D., Nandita Mitra, Mark E. Robson, Karen E. Hurley, Shaokun Chuai, Deborah Goldfrank, Eve Wadsworth, et al. "Risk of Ovarian Cancer in BRCA1 and BRCA2 Mutation-Negative Hereditary Breast Cancer Families." *Journal of the National Cancer Institute* 97, no. 18 (September 21, 2005): 1382–84.

Keal, E.E. "Asbestosis and Abdominal Neoplasms." *The Lancet* (December 3, 1960): 1211-1260.

Keskin, Nadi, Yasemin Aktan Teksen, Esra Gürlek Ongun, Yusuf Ozay, and Halil Saygili. "Does Long-Term Talc Exposure Have a Carcinogenic Effect on the Female Genital System of Rats? An Experimental Pilot Study." *Archives of Gynecology and Obstetrics* 280, no. 6 (December 2009): 925–31.

Khan, Mohd Imran, AmoghA. Sahasrabuddhe, Govil Patil, Mohd Javed Akhtar, Mohd Ashquin, and Iqbal Ahmad. "Nano-Talc Stabilizes TNF- $\alpha$ m-RNA in Human Macrophages." *Journal of Biomedical Nanotechnology* 7, no. 1 (January 1, 2011): 112–13.

King, HM. "Talc: The Softest Mineral.,"

King, Talmadge. "Asbestos-Related Pleuropulmonary Disease." Edited by Kevin Flaherty. *UpToDate*, 2018.

Kiraly, Orsolya, Guanyu Gong, Werner Olipitz, Sureshkumar Muthupalani, and Bevin P. Engelward. "Inflammation-Induced Cell Proliferation Potentiates DNA Damage-Induced Mutations In Vivo." *PLoS Genetics*, February 3, 2015.

Kissler, Stefan, Ernst Siebzehnruebl, Joachim Kohl, Anja Mueller, Nadja Hamscho, Regine Gaetje, Andre Ahr, Achim Rody, and Manfred Kaufmann. "Uterine Contractility and Directed Sperm Transport Assessed by Hysterosalpingoscintigraphy (HSSG) and Intrauterine Pressure (IUP) Measurement." *Acta Obstetricia Et Gynecologica Scandinavica* 83, no. 4 (April 2004): 369–74.

Klampfer, Lidija. "Cytokines, Inflammation and Colon Cancer." *Current Cancer Drug Targets*

11, no. 4 (May 2011): 451–64.

Knudson, A. G. "Mutation and Cancer: Statistical Study of Retinoblastoma." *Proceedings of the National Academy of Sciences of the United States of America* 68, no. 4 (April 1971): 820–23.

Kunz, G., D. Beil, H. Deiniger, A. Einspanier, G. Mall, and G. Leyendecker. "The Uterine Peristaltic Pump. Normal and Impeded Sperm Transport within the Female Genital Tract." *Advances in Experimental Medicine and Biology* 424 (1997): 267–77.

Kurman, Robert J., and Ie-Ming Shih. "Molecular Pathogenesis and Extraovarian Origin of Epithelial Ovarian Cancer. Shifting the Paradigm." *Human Pathology* 42, no. 7 (July 2011): 918–31.

Kurman, Robert J. "The Dualistic Model of Ovarian Carcinogenesis." *The American Journal of Pathology* 186, no. 4 (April 1, 2016): 733–47.

Kurman, Robert J., "The Origin and Pathogenesis of Epithelial Ovarian Cancer: A Proposed Unifying Theory." *The American Journal of Surgical Pathology* 34, no. 3 (March 2010): 433–43.

Kurta, Michelle L., Kirsten B. Moysich, Joel L. Weissfeld, Ada O. Youk, Clareann H. Bunker, Robert P. Edwards, Francesmary Modugno, Roberta B. Ness, and Brenda Diergaarde. "Use of Fertility Drugs and Risk of Ovarian Cancer: Results from a US-Based Case-Control Study." *Cancer Epidemiology, Biomarkers & Prevention: A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 21, no. 8 (August 2012): 1282–92.

La Vecchia. "Ovarian Cancer: Epidemiology and Risk Factors." *European Journal of Cancer Prevention* 26 (2017): 55–62.

Lambert, C., et al. "A Case-Control Study of Mesothelioma in Minnesota Iron Ore (Taconite) Miners." *Occup Environ Med* 73 (2016):103–109.

Lancaster, Johnathan M., C. Bethan Powell, Lee-may Chen, and Debra L. Richardson. "Society of Gynecologic Oncology Statement on Risk Assessment for Inherited Gynecologic Cancer Predispositions." *Gynecologic Oncology* 136, no. 1 (January 2015): 3–7.

Landen, Charles N., Michael J. Birrer, and Anil K. Sood. "Early Events in the Pathogenesis of Epithelial Ovarian Cancer." *Journal of Clinical Oncology: Official Journal of the American Society of Clinical Oncology* 26, no. 6 (February 20, 2008): 995–1005.

Langseth, H., S. E. Hankinson, J. Siemiatycki, and E. Weiderpass. "Perineal Use of Talc and Risk of Ovarian Cancer." *Journal of Epidemiology and Community Health* 62, no. 4 (April 2008): 358–60.

Langseth, H., B.V. Johansen, J.M. Nesland, and K. Kjaerheim. "Asbestos Fibers in Ovarian Tissue from Norwegian Pulp and Paper Workers." *International Journal of Gynecological Cancer* 17, no. 1 (January 2007): 44–49.

Langseth, Hilde, and Kristina Kjaerheim. "Ovarian Cancer and Occupational Exposure among Pulp and Paper Employees in Norway." *Scandinavian Journal of Work, Environment & Health* 30, no. 5 (October 2004): 356–61.

Lanphear, B. P., and C. R. Buncher. "Latent Period for Malignant Mesothelioma of Occupational Origin." *Journal of Occupational Medicine.: Official Publication of the Industrial Medical Association* 34, no. 7 (July 1992): 718–21.

Lee, Jennifer S., Esther M. John, Valerie McGuire, Anna Felberg, Kimberly L. Ostrow, Richard A. DiCioccio, Frederick P. Li, Alexander Miron, Dee W. West, and Alice S. Whittemore. "Breast and Ovarian Cancer in Relatives of Cancer Patients, with and without BRCA

Mutations." *Cancer Epidemiology, Biomarkers & Prevention: A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 15, no. 2 (February 2006): 359–63.

Leikauf, George. "Toxic Responses of the Respiratory System." Chapter 15. 2013.

Levanon, Keren, Christopher Crum, and Ronny Drapkin. "New Insights into the Pathogenesis of Serous Ovarian Cancer and Its Clinical Impact." *Journal of Clinical Oncology* 26, no. 32 (November 10, 2008): 5284–93

Levy-Lahad, E., and E. Friedman. "Cancer Risks among BRCA1 and BRCA2 Mutation Carriers." *British Journal of Cancer* 96, no. 1 (January 15, 2007): 11–15.

Levy, Stuart. "Pulmonary Reactions to Other Occupational Dusts and Fumes." *Occupational Medicine*. 3rd Edition. Mosby. 1994.

Lin, Hui-Wen, Ying-Yueh Tu, Shiyng Yu Lin, Wei-Ju Su, Wei Li Lin, Wei Zer Lin, Shen-Chi Wu, and Yuen-Liang Lai. "Risk of Ovarian Cancer in Women with Pelvic Inflammatory Disease: A Population-Based Study." *The Lancet. Oncology* 12, no. 9 (September 2011): 900–904.

Liou, Geou-Yarh, and Peter Storz. "Reactive Oxygen Species in Cancer." *Free Radical Research* 44, no. 5 (May 2010): 476–96.

Liu, D. T., and A. Hitchcock. "Endometriosis: Its Association with Retrograde Menstruation, Dysmenorrhoea and Tubal Pathology." *British Journal of Obstetrics and Gynaecology* 93, no. 8 (August 1986): 859–62.

Lo-Ciganic, Wei-Hsuan, Janice C. Zgibor, Clareann H. Bunker, Kirsten B. Moysich, Robert P. Edwards, and Roberta B. Ness. "Aspirin, Nonaspirin Nonsteroidal Anti-Inflammatory Drugs, or Acetaminophen and Risk of Ovarian Cancer." *Epidemiology (Cambridge, Mass.)* 23, no. 2 (March 2012): 311–19.

Lockey, J. E. "Nonasbestos Fibrous Minerals." *Clinics in Chest Medicine* 2, no. 2 (May 1981): 203–18.

Longo, D. L., and R. C. Young. "Cosmetic Talc and Ovarian Cancer." *Lancet* 2, no. 8138 (August 18, 1979): 349–51.

Luan, Nan-Nan, Qi-Jun Wu, Ting-Ting Gong, Emily Vogtmann, Yong-Lai Wang, and Bei Lin. "Breastfeeding and Ovarian Cancer Risk: A Meta-Analysis of Epidemiologic Studies1234." *The American Journal of Clinical Nutrition* 98, no. 4 (October 2013): 1020–31.

Lundin, Eva, Laure Dossus, Tess Clendenen, Vittorio Krogh, Kjell Grankvist, Marianne Wulff, Sabina Sieri, et al. "C-Reactive Protein and Ovarian Cancer: A Prospective Study Nested in Three Cohorts (Sweden, USA, Italy)." *Cancer Causes & Control: CCC* 20, no. 7 (September 2009): 1151–59.

Madsen, Cecilie, Louise Baandrup, Christian Dehlendorff, and Susanne K. Kjaer. "Tubal Ligation and Salpingectomy and the Risk of Epithelial Ovarian Cancer and Borderline Ovarian Tumors: A Nationwide Case-Control Study." *Acta Obstetricia Et Gynecologica Scandinavica* 94, no. 1 (January 2015): 86–94.

Magnani, C., D. Ferrante, F. Barone-Adesi, M. Bertolotti, A. Todesco, D. Mirabelli, and B. Terracini. "Cancer Risk after Cessation of Asbestos Exposure: A Cohort Study of Italian Asbestos Cement Workers." *Occupational and Environmental Medicine* 65, no. 3 (March 2008): 164–70.

Mäki-Nevala, Satu, Virinder Kaur Sarhadi, Aija Knuuttila, Ilari Scheinin, Pekka Ellonen, Sonja Lagström, Mikko Rönty, et al. "Driver Gene and Novel Mutations in Asbestos-Exposed

Lung    Adenocarcinoma and Malignant Mesothelioma Detected    by Exome Sequencing." *Lung* 194, no. 1 (February 2016): 125–35.

Mallen, Adrianne R., Mary K. Townsend, and Shelley S. Tworoger. "Risk Factors for Ovarian Carcinoma." *Hematology/Oncology Clinics of North America*, September 2018.

Mandel, J., et al. "A Review of Mortality Associated with Elongate Mineral Particle (EMP) Exposure in Occupational Epidemiology Studies of Gold, Talc, and Taconite Mining." *American Journal of Industrial Medicine* 59 (2016): 1047-1060.

Mannino, David M. "Cigarette Smoking and Other Possible Risk Factors for Lung Cancer." *UpToDate*, 2018.

Mattenklott, M. "Asbestos in Talc Powders and Soapstone – The Present State." *Gefahrstoffe-Reinhalt.* Luft 67 No. 7/8 (2007): 287-291.

McCullough, Marie. "Condom Makers Stop Using Talc." *Asbury Park Press*. January 16, 1996.

McCullough, Marie. "Women's Health Concerns Prompt Condom Makers to Stop Using Talc." *Jersey Journal*. April 17, 1996, City Edition.

McLaughlin-Drubin, Margaret E., and Karl Munger. "Viruses Associated with Human Cancer." *Biochimica et Biophysica Acta* 1782, no. 3 (March 2008): 127–50.

McLemore, Miaskowski, Chen Aouizerat, and Dodd. "Epidemiological and Genetic Factors Associated With Ovarian Cancer." *Cancer Nursing* 32, no. 4 (2009): 281–88.

Melaiu, Ombretta, Federica Gemignani, and Stefano Landi. "The Genetic Susceptibility in the Development of Malignant Pleural Mesothelioma." *Journal of Thoracic Disease* 10, no. Suppl 2 (January 2018): S246–52.

Meng, Qingsong, Weixue Sun, John Jiang, Nicole M. Fletcher, Michael P. Diamond, and Ghassan M. Saed. "Identification of Common Mechanisms between Endometriosis and Ovarian Cancer." *Journal of Assisted Reproduction and Genetics* 28 (2011): 917–23.

Merritt, Melissa A., Adèle C. Green, Christina M. Nagle, Penelope M. Webb, Australian Cancer Study (Ovarian Cancer), and Australian Ovarian Cancer Study Group. "Talcum Powder, Chronic Pelvic Inflammation and NSAIDs in Relation to Risk of Epithelial Ovarian Cancer." *International Journal of Cancer. Journal International Du Cancer* 122, no. 1 (January 1, 2008): 170–76.

Miller, Diane M, and Jessica N. McAlpine. "Opportunistic Salpingectomy for Ovarian, Fallopian Tubal, and Peritoneal Carcinoma Risk Reduction." *UpToDate*, 2018.

Mills, Paul K., Deborah G. Riordan, Rosemary D. Cress, and Heather A. Young. "Perineal Talc Exposure and Epithelial Ovarian Cancer Risk in the Central Valley of California." *International Journal of Cancer. Journal International Du Cancer* 112, no. 3 (November 10, 2004): 458–64.

Milne, R. L., and A. C. Antoniou. "Genetic Modifiers of Cancer Risk for BRCA1 and BRCA2 Mutation Carriers." *Annals of Oncology: Official Journal of the European Society for Medical Oncology* 22 Suppl 1 (January 2011): i11-17.

Milne, Roger L., and Antonis C. Antoniou. "Modifiers of Breast and Ovarian Cancer Risks for BRCA1 and BRCA2 Mutation Carriers." *Endocrine-Related Cancer* 23, no. 10 (2016): T69-84.

Moller, Danielsen, and Roursgaard Jantzen. "Oxidatively Damaged DNA in Animals Exposed to Particles." *Critical Reviews in Toxicology* 43, no. 2 (2013): 96–118.

Moon, Min Chaul, Jung Duck Park, Byung Soon Choi, So Young Park, Dong Won Kim, Yong Hyun Chung, Naomi Hisanaga, and Il Je Yu. "Risk Assessment of Baby Powder Exposure through Inhalation." *Toxicological Research* 27, no. 3 (September 2011):

137–41.

Moorman, Patricia G. “Scientific Review of the Epidemiologic Evidence on Talc Use and Ovarian Cancer,” February 2018.

Moorman, Patricia G., Rachel T. Palmieri, Lucy Akushevich, Andrew Berchuck, and Joellen M. Schildkraut. “Ovarian Cancer Risk Factors in African-American and White Women.” *American Journal of Epidemiology* 170, no. 5 (September 1, 2009): 598–606.

Moskowitz, Robert. “Talc Pneumoconiosis: A Treated Case.” *Chest* 58, No.1 (July 1970): 37-41.

Mostafa, S. A., C. B. Bargeron, R. W. Flower, N. B. Rosenshein, T. H. Parmley, and J. D. Woodruff. “Foreign Body Granulomas in Normal Ovaries.” *Obstetrics and Gynecology* 66, no. 5 (November 1985): 701–2.

Murphy, Megan A., Britton Trabert, Hannah P. Yang, Yikyung Park, Louise A. Brinton, Patricia Hartge, Mark E. Sherman, Albert Hollenbeck, and Nicolas Wentzensen. “Non-Steroidal Anti-Inflammatory Drug Use and Ovarian Cancer Risk: Findings from the NIH-AARP Diet and Health Study and Systematic Review.” *Cancer Causes & Control: CCC* 23, no. 11 (November 2012): 1839–52.

Muscat, J. E., and M. S. Huncharek. “Causation and Disease: Biomedical Science in Toxic Tort Litigation.” *Journal of Occupational Medicine.: Official Publication of the Industrial Medical Association* 31, no. 12 (December 1989): 997–1002.

Nadler, Diana L., and Igor G. Zurbenko. “Estimating Cancer Latency Times Using a Weibull Model,” 2014, 8.

Nam, Key and Douglas R. Gracey. “Pulmonary Talcosis from Cosmetic Talcum Powder.” *JAMA* 221, No. 5 (1972): 492-493.

Narod, Steven A. “Talc and Ovarian Cancer.” *Gynecologic Oncology* 141, no. 3 (2016): 410–12.

National Cancer Institute, Surveillance, Epidemiology, and End Results Program. “Cancer Stat Facts: Ovarian Cancer,” 2018.

National Cancer Institute. “NCI Dictionary of Cancer Terms: Pleurodesis.”

“National Toxicology Program (NTP) Technical Report (NTP TR 421) on the Toxicology and Carcinogenesis Studies of Talc in F344/N Rats and B6C3F1 Mice.” National Institutes of Health, 1993.

Nelson, Heather H., and Karl T. Kelsey. “The Molecular Epidemiology of Asbestos and Tobacco in Lung Cancer.” *Oncogene* 21, no. 48 (October 21, 2002): 7284–88.

Ness, R. B., and C. Cottreau. “Possible Role of Ovarian Epithelial Inflammation in Ovarian Cancer.” *JNCI Journal of the National Cancer Institute* 91, no. 17 (September 1, 1999): 1459–67.

Ness, R. B., J. A. Grisso, C. Cottreau, J. Klapper, R. Vergona, J. E. Wheeler, M. Morgan, and J. J. Schlesselman. “Factors Related to Inflammation of the Ovarian Epithelium and Risk of Ovarian Cancer.” *Epidemiology (Cambridge, Mass.)* 11, no. 2 (March 2000): 111–17.

Ness, Roberta B., Daniel W. Cramer, Marc T. Goodman, Susanne Krûger Kjaer, Kathy Mallin, Berit Jul Mosgaard, David M. Purdie, Harvey A. Risch, Ronald Vergona, and Anna H. Wu. “Infertility, Fertility Drugs, and Ovarian Cancer: A Pooled Analysis of Case-Control Studies.” *American Journal of Epidemiology* 155, no. 3 (February 1, 2002): 217–24.

Neutra, Raymond Richard, Carl F. Cranor, and David Gee. “The Use and Misuse of Bradford Hill in U.S. Tort Law.” *Jurimetrics J.*, 2018, 127–62.

Newhouse, M. L., G. Berry, J. C. Wagner, and M. E. Turok. “A Study of the Mortality of Female Asbestos Workers.” *British Journal of Industrial Medicine* 29, no. 2 (April 1972): 134–41.

Nick, Alpa M., Robert L. Coleman, Pedro T. Ramirez, and Anil K. Sood. "A Framework for a Personalized Surgical Approach to Ovarian Cancer." *Nature Reviews. Clinical Oncology* 12, no. 4 (April 2015): 239–45.

NIOSH. "Asbestos Fibers and Other Elongated Mineral Particles: State of the Science and Roadmap for Research (Revised Draft)," January 2009.

NIOSH. "Fiber Exposure during Use of Baby Powders, Report No. IWS-36-6.," July 1972.

NIOSH. 2011 Current Intelligence Bulletin No. 62," 2011.

NIOSH. "Pocket Guide to Chemical Hazards: Asbestos." Publication No. 2005-149 (September 2007).

Norquist, Barbara M., Maria I. Harrell, Mark F. Brady, Tom Walsh, Ming K. Lee, Suleyman Gulsuner, Sarah S. Bernards, et al. "Inherited Mutations in Women With Ovarian Carcinoma." *JAMA Oncology* 2, no. 4 (April 2016): 482–90.

NTP. "Report on Carcinogens: Asbestos." 14th Edition. 2016.

NTP. "NTP Technical Report on the Toxicology and Carcinogenesis Studies of Benzophenone (CAS No. 119-61-9) In F344/N Rats and B6C3F1 Mice," February 2006.

NTP. "NTP Toxicology and Carcinogenesis Studies of Talc (CAS No. 14807-96-6)(NonAsbestiform) in F344/N.Rats and B6C3Fl Mice (Inhalation Studies)," 1993.

Oberdörster, Günter, Eva Oberdörster, and Jan Oberdörster. "Nanotoxicology: An Emerging Discipline Evolving from Studies of Ultrafine Particles." *Environmental Health Perspectives* 113, no. 7 (July 2005): 823–39. https://doi.org/10.1289/ehp.7339.

Okada, Futoshi. "Beyond Foreign-Body-Induced Carcinogenesis: Impact of Reactive Oxygen Species Derived from Inflammatory Cells in Tumorigenic Conversion and Tumor Progression." *International Journal of Cancer* 121, no. 11 (December 1, 2007): 2364–72.

Paoletti, L., S. Caiazza, G. Donelli, and F. Pocchiari. "Evaluation by Electron Microscopy Techniques of Asbestos Contamination in Industrial, Cosmetic, and Pharmaceutical Talcs." *Regulatory Toxicology and Pharmacology: RTP* 4, no. 3 (September 1984): 222–35.

Park, Hyo K., Joellen M. Schildkraut, Anthony J. Alberg, Elisa V. Bandera, Jill S. Barnholtz-Sloan, Melissa Bondy, Sydnee Crankshaw, et al. "Benign Gynecologic Conditions Are Associated with Ovarian Cancer Risk in African-American Women: A Case–Control Study." *Cancer Causes & Control*, September 29, 2018.

Parmar, M. K. B., J. A. Ledermann, N. Colombo, A. du Bois, J.-F. Delaloye, G. B. Kristensen, S. Wheeler, et al. "Paclitaxel plus Platinum-Based Chemotherapy versus Conventional Platinum-Based Chemotherapy in Women with Relapsed Ovarian Cancer: The ICON4/AGO-OVAR-2.2 Trial." *Lancet (London, England)* 361, no. 9375 (June 21, 2003): 2099–2106.

Parmley, T. H., and J. D. Woodruff. "The Ovarian Mesothelioma." *American Journal of Obstetrics and Gynecology* 120, no. 2 (September 15, 1974): 234–41.

*Pathology of Asbestos-Associated Diseases*, 2011.

Pearce, Celeste Leigh, Claire Templeman, Mary Anne Rossing, Alice Lee, Aimee M Near, Penelope M Webb, Christina M Nagle, et al. "Association between Endometriosis and Risk of Histological Subtypes of Ovarian Cancer: A Pooled Analysis of Case–Control Studies." *The Lancet Oncology* 13, no. 4 (April 2012): 385–94. https://doi.org/10.1016/S1470-2045(11)70404-1.

Pejovic, Tanja, and Farr Nezhat. "Missing Link: Inflammation and Ovarian Cancer." *The Lancet.*

*Oncology* 12, no. 9 (September 2011): 833–34.

Pelling, D., and J. G. Evans. "Long-Term Peritoneal Tissue Response in Rats to Mould-Release Agents and Lubricant Powder Used on Surgeons' Gloves." *Food and Chemical Toxicology: An International Journal Published for the British Industrial Biological Research Association* 24, no. 5 (May 1986): 425–30.

Penninkilampi, Ross, and Guy D. Eslick. "Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis." *Epidemiology (Cambridge, Mass.)* 29, no. 1 (January 2018): 41–49.

Peshkin, B., et al. "Genetic Counseling and Testing for Hereditary Breast and Ovarian Cancer - UpToDate," 2018. https://www.uptodate.com/contents/genetic-counseling-and-testing-for-hereditary-breast-and-ovarian-cancer?search=Genetic%20counseling%20and%20testing%20for%20hereditary%20breast%20and%20ovarian%20cancer&source=search_result&selectedTitle=1~150&usage_type=default&display_rank=1.

Peshkin, B. "Overview of Hereditary Breast and Ovarian Cancer Syndromes - UpToDate," 2018. https://www.uptodate.com/contents/overview-of-hereditary-breast-and-ovarian-cancer-syndromes?search=Overview%20of%20hereditary%20breast%20and%20ovarian%20cancer%20syndromes&source=search_result&selectedTitle=1~150&usage_type=default&display_rank=1.

Peshkin, B. "Prevalence of BRCA1 and BRCA2 Mutations and Associated Cancer Risks - UpToDate," 2018. https://www.uptodate.com/contents/prevalence-of-brca1-and-brca2-mutations-and-associated-cancer-risks?search=prevalence-of-brca1-and-brca2-mu%E2%80%A6search_result%26selectedTitle%3D1~73%26usage_type%3Ddefault%26display_rank%3D1&source=search_result&selectedTitle=2~150&usage_type=default&display_rank=2.

Phillips, J. C., P. J. Young, K. Hardy, and S. D. Gangolli. "Studies on the Absorption and Disposition of 3H-Labelled Talc in the Rat, Mouse, Guinea-Pig and Rabbit." *Food and Cosmetics Toxicology* 16, no. 2 (April 1978): 161–63.

Pira, E, C Pelucchi, L Buffoni, A Palmas, M Turbiglio, E Negri, P G Piolatto, and C La Vecchia. "Cancer Mortality in a Cohort of Asbestos Textile Workers." *British Journal of Cancer* 92, no. 3 (February 2005): 580–86.

Pira, Enrico, Canzio Romano, Francesco S. Violante, Andrea Farioli, Giovanna Spatari, Carlo La Vecchia, and Paolo Boffetta. "Updated Mortality Study of a Cohort of Asbestos Textile Workers." *Cancer Medicine* 5, no. 9 (2016): 2623–28.

Porro, F. W., and N. M. Levine. "Pathology of Talc Pneumoconiosis with Report of an Autopsy." *Northern New York Medical Journal* 3 (April 1946): 23–25.

Pott, R., and K. H. Friedrichs. "Tumors in Rats Following i.p. Injection of Fiberform Dusts." *Naturwissenschaften* 59 (n.d.): 318–24.

Prat, Jaime, and FIGO Committee on Gynecologic Oncology. "Abridged Republication of FIGO's Staging Classification for Cancer of the Ovary, Fallopian Tube, and Peritoneum." *Cancer* 121, no. 19 (October 1, 2015): 3452–54.

Pukkala, Eero, Jan Ivar Martinsen, Elsebeth Lynge, Holmfridur Kolbrun Gunnarsdottir, Pär Sparén, Laufey Tryggvadottir, Elisabete Weiderpass, and Kristina Kjaerheim. "Occupation and Cancer - Follow-up of 15 Million People in Five Nordic Countries." *Acta Oncologica (Stockholm, Sweden)* 48, no. 5 (2009): 646–790.

Purdie, D., A. Green, C. Bain, V. Siskind, B. Ward, N. Hacker, M. Quinn, G. Wright, P. Russell,

and B. Susil. "Reproductive and Other Factors and Risk of Epithelial Ovarian Cancer: An Australian Case-Control Study. Survey of Women's Health Study Group." *International Journal of Cancer. Journal International Du Cancer* 62, no. 6 (September 15, 1995): 678–84.

Purdie, David M., Christopher J. Bain, Victor Siskind, Penelope M. Webb, and Adèle C. Green. "Ovulation and Risk of Epithelial Ovarian Cancer." *International Journal of Cancer. Journal International Du Cancer* 104, no. 2 (March 20, 2003): 228–32.

Radic, I, I Vucak, J Milosevic, A Marusic, S Vukicevic, and M Marusic. "Immunosuppression Induced by Talc Granulomatosis in the Rat." *Clinical and Experimental Immunology* 73, no. 2 (August 1988): 316–21.

Ramus, Susan J., Antonis C. Antoniou, Karoline B. Kuchenbaecker, Penny Soucy, Jonathan Beesley, Xiaoqing Chen, Lesley McGuffog, et al. "Ovarian Cancer Susceptibility Alleles and Risk of Ovarian Cancer in BRCA1 and BRCA2 Mutation Carriers." *Human Mutation* 33, no. 4 (April 2012): 690–702.

Rasool, Nabila, Amanda Nickles Fader, Leigh Seamon, Nikki L. Neubauer, Fadi Abu Shahin, Heather A. Alexander, Kathleen Moore, et al. "Stage I, Grade 3 Endometrioid Adenocarcinoma of the Endometrium: An Analysis of Clinical Outcomes and Patterns of Recurrence." *Gynecologic Oncology* 116, no. 1 (January 2010): 10–14.

Rayburn, Elizabeth R., Scharri J. Ezell, and Ruiwen Zhang. "Anti-Inflammatory Agents for Cancer Therapy." *Molecular and Cellular Pharmacology* 1, no. 1 (2009): 29–43.

Rebbeck, Timothy R., Nandita Mitra, Fei Wan, Olga M. Sinilnikova, Sue Healey, Lesley McGuffog, Sylvie Mazoyer, et al. "Association of Type and Location of BRCA1 and BRCA2 Mutations with Risk of Breast and Ovarian Cancer." *JAMA* 313, no. 13 (April 7, 2015): 1347–61.

"Reference Manual on Scientific Evidence" Third Edition (2011).

Rehman, Ghana, et al. "Determination of Toxic Heavy Metals in Different Brands of Talcum Powder." *International Journal of Applied and Natural Sciences (IJANS);* Vol. 2, Issue 2; (May 2013): 45-52.

Reid, A., J. Heyworth, N. de Klerk, and A. W. Musk. "The Mortality of Women Exposed Environmentally and Domestically to Blue Asbestos at Wittenoom, Western Australia." *Occupational and Environmental Medicine* 65, no. 11 (November 2008): 743–49.

Reid, A., N. de Klerk, and A. W. Musk. "Does Exposure to Asbestos Cause Ovarian Cancer? A Systematic Literature Review and Meta-Analysis." *Cancer Epidemiology Biomarkers & Prevention* 20, no. 7 (July 1, 2011): 1287–95.

Reid, A., N. H. de Klerk, C. Magnani, D. Ferrante, G. Berry, A. W. Musk, and E. Merler. "Mesothelioma Risk after 40 Years since First Exposure to Asbestos: A Pooled Analysis." *Thorax* 69, no. 9 (September 2014): 843–50.

Reid, Alison, Amanda Segal, Jane S. Heyworth, Nicholas H. de Klerk, and Arthur W. Musk. "Gynecologic and Breast Cancers in Women after Exposure to Blue Asbestos at Wittenoom." *Cancer Epidemiology, Biomarkers & Prevention: A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 18, no. 1 (January 2009): 140–47.

Reid, Brett M., Jennifer B. Permuth, and Thomas A. Sellers. "Epidemiology of Ovarian Cancer: A Review." *Cancer Biology & Medicine* 14, no. 1 (February 2017): 9–32.

Reinhold, Robert. "Panel Finds Danger to the Environment from Technology." *New York Times*; (December 29, 1968).

Reuter, Simone, Subash C. Gupta, Madan M. Chaturvedi, and Bharat B. Aggarwal. “Oxidative Stress, Inflammation, and Cancer: How Are They Linked?” *Free Radical Biology and Medicine* 49, no. 11 (December 1, 2010): 1603–16.

Rice, Megan S., Susan E. Hankinson, and Shelley S. Tworoger. “Tubal Ligation, Hysterectomy, Unilateral Oophorectomy, and Risk of Ovarian Cancer in the Nurses’ Health Studies.” *Fertility and Sterility* 102, no. 1 (July 2014): 192-198.e3. https://doi.org/10.1016/j.fertnstert.2014.03.041.

Ring, Kari L., Christine Garcia, Martha H. Thomas, and Susan C. Modesitt. “Current and Future Role of Genetic Screening in Gynecologic Malignancies.” *American Journal of Obstetrics and Gynecology* 217, no. 5 (2017): 512–21.

Riska, A., J. I. Martinsen, K. Kjaerheim, E. Lynge, P. Sparen, L. Tryggvadottir, E. Weiderpass, and E. Pukkala. “Occupation and Risk of Primary Fallopian Tube Carcinoma in Nordic Countries.” *International Journal of Cancer* 131, no. 1 (July 1, 2012): 186–92. https://doi.org/10.1002/ijc.26337.

Roggli, Victor L., Robin T. Vollmer, Kelly J. Butnor, and Thomas A. Sporn. “Tremolite and Mesothelioma.” *Annals of Occupational Hygiene* 46, no. 5 (July 1, 2002): 447–53.

Rohl, A. N. “Asbestos in Talc.” *Environmental Health Perspectives* 9 (December 1974): 129–32.

Rohl, A. N., A. M. Langer, I. J. Selikoff, A. Tordini, R. Klimentidis, D. R. Bowes, and D. L. Skinner. “Consumer Talcums and Powders: Mineral and Chemical Characterization.” *Journal of Toxicology and Environmental Health* 2, no. 2 (November 1976): 255–84.

Roodhouse Gloyne, S. “Two Cases of Squamous Carcinoma of the Lung Occurring in Asbestosis.” *Tubercle* 17, no. 1 (October 1935): 5-IN2.

Rosalind A. Eeles, Christine D. Berg, and Jeffery S. Tobias. *Cancer Prevention and Screening: Concepts, Principles and Controversies*. 1st ed. Accessed August 21, 2018. Rosenblatt, K. A., M. Szklo, and N. B. Rosenshein. “Mineral Fiber Exposure and the Development of Ovarian Cancer.” *Gynecologic Oncology* 45, no. 1 (April 1992): 20–25.

Rosenblatt, Karin A., Noel S. Weiss, Kara L. Cushing-Haugen, Kristine G. Wicklund, and Mary Anne Rossing. “Genital Powder Exposure and the Risk of Epithelial Ovarian Cancer.” *Cancer Causes & Control: CCC* 22, no. 5 (May 2011): 737–42.

Rösler, J. A., H. J. Woitowitz, H. J. Lange, R. H. Woitowitz, K. Ulm, and K. Rödelsperger. “Mortality Rates in a Female Cohort Following Asbestos Exposure in Germany.” *Journal of Occupational Medicine.: Official Publication of the Industrial Medical Association* 36, no. 8 (August 1994): 889–93.

Ross, M. “Geology, Asbestos, and Health.” *Environmental Health Perspectives* 9 (December 1974): 123–24.

Rothman, Kenneth J., Sander Greenland, and Timothy L. Lash. *Modern Epidemiology*. Lippincott Williams & Wilkins, 2008.

Saed, Ghassan M., Rouba Ali-Fehmi, Zhong L. Jiang, Nicole M. Fletcher, Michael P. Diamond, Husam M. Abu-Soud, and Adnan R. Munkarah. “Myeloperoxidase Serves as a Redox Switch That Regulates Apoptosis in Epithelial Ovarian Cancer.” *Gynecologic Oncology* 116, no. 2 (February 2010): 276–81. https://doi.org/10.1016/j.ygyno.2009.11.004.

Saed, Ghassan M., Michael P. Diamond, and Nicole M. Fletcher. “Updates of the Role of Oxidative Stress in the Pathogenesis of Ovarian Cancer.” *Gynecologic Oncology* 145, no. 3 (June 2017): 595–602. https://doi.org/10.1016/j.ygyno.2017.02.033.

Saed, Ghassan M., Nicole M. Fletcher, Michael P. Diamond, Robert T. Morris, Nardhy Gomez-Lopez, and Ira Memaj. “Novel Expression of CD11b in Epithelial Ovarian

Cancer: Potential Therapeutic Target." *Gynecologic Oncology* 148, no. 3 (2018): 567–75.

Saed, Ghassan M., Robert T. Morris, and Nicole M. Fletcher. *New Insights into the Pathogenesis of Ovarian Cancer: Oxidative Stress*, 2018.

Schelz, John P. "The Detection of Chrysotile Asbestos at Low Levels in Talc by Differential Thermal Analysis." *Thermochimica Acta*, 8 (1974) 197-204.

Schenken, Robert S. "Endometriosis: Pathogenesis, Clinical Features, and Diagnosis." *UpToDate*, 2018.

Schildkraut, Joellen M., Sarah E. Abbott, Anthony J. Alberg, Elisa V. Bandera, Jill S. Barnholtz-Sloan, Melissa L. Bondy, Michele L. Cote, et al. "Association between Body Powder Use and Ovarian Cancer: The African American Cancer Epidemiology Study (AACES)." *Cancer Epidemiology, Biomarkers & Prevention: A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 25, no. 10 (2016): 1411–17.

Seeler, Albert O., M.D. "Toxic Hazards, Talc Pneumoconiosis." *The New England Journal of Medicine;* Vol. 261, No. 21 (Nov. 19, 1959) 1084-1085.

"SEER Cancer Statistics Review, 1975-2015, National Cancer Institute, Bethesda, MD, Based on November 2017 SEER Data Submission, Posted to the SEER Web Site," April 2018.

Selikoff, Irving J., et al. "Asbestos Exposure and Neoplasia." *JAMA*, Vol. 188, No. 1 (April 6, 1964) 142-146.

Shan, Weiwei, and Jinsong Liu. "Inflammation: A Hidden Path to Breaking the Spell of Ovarian Cancer." *Cell Cycle* 8, no. 19 (2009): 3107–11.

Shukla, Arti, Maximilian B. MacPherson, Jedd Hillegass, Maria E. Ramos-Nino, Vlada Alexeeva, Pamela M. Vacek, Jeffrey P. Bond, Harvey I. Pass, Chad Steele, and Brooke T. Mossman. "Alterations in Gene Expression in Human Mesothelial Cells Correlate with Mineral Pathogenicity." *American Journal of Respiratory Cell and Molecular Biology* 41, no. 1 (July 2009): 114–23.

Shushan, A., O. Paltiel, J. Iscovich, U. Elchalal, T. Peretz, and J. G. Schenker. "Human Menopausal Gonadotropin and the Risk of Epithelial Ovarian Cancer." *Fertility and Sterility* 65, no. 1 (January 1996): 13–18.

Singh, Naveena, C. Blake Gilks, Lynn Hirschowitz, Sean Kehoe, Iain A. McNeish, Dianne Miller, Raj Naik, Nafisa Wilkinson, and W. Glenn McCluggage. "Primary Site Assignment in Tubo-Ovarian High-Grade Serous Carcinoma: Consensus Statement on Unifying Practice Worldwide." *Gynecologic Oncology* 141, no. 2 (2016): 195–98.

Sjösten, A. C. E., H. Ellis, and G. a. B. Edelstam. "Retrograde Migration of Glove Powder in the Human Female Genital Tract." *Human Reproduction* 19, no. 4 (April 1, 2004): 991–95.

Soini, Tuuli, Ritva Hurskainen, Seija Grénman, Johanna Mäenpää, Jorma Paavonen, and Eero Pukkala. "Cancer Risk in Women Using the Levonorgestrel-Releasing Intrauterine System in Finland." *Obstetrics and Gynecology* 124, no. 2 Pt 1 (August 2014): 292–99.

Soong, Thing Rinda, Brooke E. Howitt, Alexander Miron, Neil S. Horowitz, Frank Campbell, Colleen M. Feltmate, Michael G. Muto, et al. "Evidence for Lineage Continuity between Early Serous Proliferations (ESPs) in the Fallopian Tube and Disseminated High-Grade Serous Carcinomas." *The Journal of Pathology*, July 25, 2018.

Stanton, M. F., M. Layard, A. Tegeris, E. Miller, M. May, E. Morgan, and A. Smith. "Relation of Particle Dimension to Carcinogenicity in Amphibole Asbestoses and Other Fibrous Minerals." *Journal of the National Cancer Institute* 67, no. 5 (November 1981): 965–75.

Starman, Daniel H., Leslie A. Litzky, and Larry R. Kaiser. "Epidemiology of Malignant Pleural

Mesothelioma." *UpToDate*, 2018.

Steiling, W., J. F. Almeida, H. Assaf Vandecasteele, S. Gilpin, T. Kawamoto, L. O'Keeffe, G. Pappa, K. Rettinger, H. Rothe, and A. M. Bowden. "Principles for the Safety Evaluation of Cosmetic Powders." *Toxicology Letters*, August 17, 2018.

Steiling, W., M. Bascompta, P. Carthew, G. Catalano, N. Corea, A. D'Haese, P. Jackson, et al. "Principle Considerations for the Risk Assessment of Sprayed Consumer Products." *Toxicology Letters* 227, no. 1 (May 16, 2014): 41–49.

Stewart, Louise M., C. D'Arcy J. Holman, Patrick Aboagye-Sarfo, Judith C. Finn, David B. Preen, and Roger Hart. "In Vitro Fertilization, Endometriosis, Nulliparity and Ovarian Cancer Risk." *Gynecologic Oncology* 128, no. 2 (February 2013): 260–64.

Stewart, Louise M., Katrina Spilsbury, Susan Jordan, Colin Stewart, C. D'Arcy J. Holman, Aime Powell, Joanne Reekie, and Paul Cohen. "Risk of High-Grade Serous Ovarian Cancer Associated with Pelvic Inflammatory Disease, Parity and Breast Cancer." *Cancer Epidemiology* 55 (August 2018): 110–16.

Straif, Kurt. "Update of the Scientific Evidence on Asbestos and Cancer." presented at the International Conference on Environmental and Occupational Determinants of Cancer: Interventions for Primary Prevention, Asturias (Avilés, Gijón), Spain, March 17, 2011.

Suzui, Masumi, et al. "Multiwalled Carbon Nanotubes Intratracheally Instilled into the Rat Lung Induce Development of Pleural Malignant Mesothelioma and Lung Tumors." *Cancer Sci*, 107 (2016) 924-935.

"Talc." *IARC Monographs on the Evaluation of the Carcinogenic Risk of Chemicals to Humans* 42 (1987): 185–224.

Tarchi, M., D. Orsi, P. Comba, M. De Santis, R. Pirastu, G. Battista, and M. Valiani. "Cohort Mortality Study of Rock Salt Workers in Italy." *American Journal of Industrial Medicine* 25, no. 2 (February 1994): 251–56.

Terry, Kathryn L., Stalo Karageorgi, Yurii B. Shvetsov, Melissa A. Merritt, Galina Lurie, Pamela J. Thompson, Michael E. Carney, et al. "Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls." *Cancer Prevention Research (Philadelphia, Pa.)* 6, no. 8 (August 2013): 811–21.

Tewari, Devansu, James J. Java, Ritu Salani, Deborah K. Armstrong, Maurie Markman, Thomas Herzog, Bradley J. Monk, and John K. Chan. "Long-Term Survival Advantage and Prognostic Factors Associated with Intraperitoneal Chemotherapy Treatment in Advanced Ovarian Cancer: A Gynecologic Oncology Group Study." *Journal of Clinical Oncology: Official Journal of the American Society of Clinical Oncology* 33, no. 13 (May 1, 2015): 1460–66.

Thai, T. H., F. Du, J. T. Tsan, Y. Jin, A. Phung, M. A. Spillman, H. F. Massa, et al. "Mutations in the BRCA1-Associated RING Domain (BARD1) Gene in Primary Breast, Ovarian and Uterine Cancers." *Human Molecular Genetics* 7, no. 2 (February 1998): 195–202.

Thomas, Charles A., and Major G. Seelig. Powder lubricated surgeon's rubber glove. United States US2621333A, filed June 27, 1947, and issued December 16, 1952.

Torre, Lindsey A., Britton Trabert, Carol E. DeSantis, Kimberly D. Miller, Goli Samimi, Carolyn D. Runowicz, Mia M. Gaudet, Ahmedin Jemal, and Rebecca L. Siegel. "Ovarian Cancer Statistics, 2018." *CA: A Cancer Journal for Clinicians* 68, no. 4 (July 2018): 284–96.

Trabert, Britton. "Body Powder and Ovarian Cancer Risk – What Is the Role of Recall Bias?" *Cancer Epidemiology, Biomarkers & Prevention: A Publication of the American*

*Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 25, no. 10 (October 2016): 1369–70.

Trabert, Britton, Ligia Pinto, Patricia Hartge, Troy Kemp, Amanda Black, Mark E. Sherman, Louise A. Brinton, et al. "Pre-Diagnostic Serum Levels of Inflammation Markers and Risk of Ovarian Cancer in the Prostate, Lung, Colorectal and Ovarian Cancer (PLCO) Screening Trial." *Gynecologic Oncology* 135, no. 2 (November 2014): 297–304.

Trabert, Britton, Elizabeth M Poole, Emily White, Kala Visvanathan, Hans-Olov Adami, Garnet L Anderson, Theodore M Brasky, et al. "Analgesic Use and Ovarian Cancer Risk: An Analysis in the Ovarian Cancer Cohort Consortium." *JNCI: Journal of the National*

Trabert, Britton, Elizabeth M. Poole, Emily White, Kala Visvanathan, Hans-Olov Adami, Garnet L. Anderson, Theodore M. Brasky, et al. "Analgesic Use and Ovarian Cancer Risk: An Analysis in the Ovarian Cancer Cohort Consortium." *Journal of the National Cancer Institute* 111, no. 2 (2019).

Tsilidis, K K, N E Allen, T J Key, L Dossus, A Lukanova, K Bakken, E Lund, et al. "Oral Contraceptive Use and Reproductive Factors and Risk of Ovarian Cancer in the European Prospective Investigation into Cancer and Nutrition." *British Journal of Cancer* 105, no. 9 (October 25, 2011): 1436–42.

Tsilidis, Konstantinos K., Naomi E. Allen, Timothy J. Key, Laure Dossus, Rudolf Kaaks, Kjersti Bakken, Eiliv Lund, et al. "Menopausal Hormone Therapy and Risk of Ovarian Cancer in the European Prospective Investigation into Cancer and Nutrition." *Cancer Causes & Control: CCC* 22, no. 8 (August 2011): 1075–84.

Tworoger, Shelley S., Kathleen M. Fairfield, Graham A. Colditz, Bernard A. Rosner, and Susan E. Hankinson. "Association of Oral Contraceptive Use, Other Contraceptive Methods, and Infertility with Ovarian Cancer Risk." *American Journal of Epidemiology* 166, no. 8 (October 15, 2007): 894–901.

Tzonou, A., A. Polychronopoulou, C. C. Hsieh, A. Rebelakos, A. Karakatsani, and D. Trichopoulos. "Hair Dyes, Analgesics, Tranquilizers and Perineal Talc Application as Risk Factors for Ovarian Cancer." *International Journal of Cancer. Journal International Du Cancer* 55, no. 3 (September 30, 1993): 408–10.

US EPA. "Health Assessment Document for Talc. | National Technical Reports Library - NTIS." -600/8-91/217, 1992.

Vallyathan, N. Val, Ph.D., et al. "Pulmonary Pathology in Workers Exposed to Nonasbestiform Talc." *Human Pathology*, Vol. 12, No. 1 (January 1981) 28-35.

Van Gosen, B. S., H.A. Lowers, S.J. Sutley, and C.A. Gent. "Using the Geologic Setting of Talc Deposits as an Indicator of Amphibole Asbestos Content." *Environmental Geology* 45, no. 7 (2004): 20.

Van Huisstede, A., et al. "Talcosis Due to Abundant Use of Cosmetic Talcum Powder." *European Respiratory Review*, Vol. 19, No. 116 (2010) 165-168.

Vanderhyden, Barbara C, Tanya J Shaw, and Jean-François Ethier. "Animal Models of Ovarian Cancer." *Reproductive Biology and Endocrinology: RB&E* 1 (October 7, 2003): 67.

VanOrden, D. "Weight Percent Compositional Analysis of Seven RTV Talc Samples. Analytical Report to R. T. Vanderbilt Company, Inc. Submitted to Public Comments Record – C. W. Jameson, National Toxicology Program, 10th ROC Nominations 'Talc (Containing Asbestiform Fibers)'. 4 December 2000., National Toxicology Program.," November 22, 2000.

Vasama-Neuvonen, K., E. Pukkala, H. Paakkulainen, P. Mutanen, E. Weiderpass, P. Boffetta, N.

Shen, T. Kauppinen, H. Vainio, and T. Partanen. “Ovarian Cancer and Occupational Exposures in Finland.” *American Journal of Industrial Medicine* 36, no. 1 (July 1999): 83–89.

Vasey, Paul A., Gordon C. Jayson, Alan Gordon, Hani Gabra, Rob Coleman, Ronnie Atkinson, David Parkin, et al. “Phase III Randomized Trial of Docetaxel-Carboplatin versus Paclitaxel-Carboplatin as First-Line Chemotherapy for Ovarian Carcinoma.” *Journal of the National Cancer Institute* 96, no. 22 (November 17, 2004): 1682–91.

Venkatesan, Priya. “Possible X Chromosome-Linked Transmission of Ovarian Cancer.” *The Lancet. Oncology* 19, no. 4 (April 2018): e185.

Venter, P. F., and M. Iturralde. “Migration of a Particulate Radioactive Tracer from the Vagina to the Peritoneal Cavity and Ovaries.” *South African Medical Journal = Suid-Afrikaanse Tydskrif Vir Geneeskunde* 55, no. 23 (June 2, 1979): 917–19.

Verdoodt, Freija, Christian Dehlendorff, Søren Friis, and Susanne K. Kjaer. “Non-Aspirin NSAID Use and Ovarian Cancer Mortality.” *Gynecologic Oncology* 150, no. 2 (2018): 331–37. https://doi.org/10.1016/j.ygyno.2018.06.018.

Vicus, Danielle, Amy Finch, Barry Rosen, Isabel Fan, Linda Bradley, Ilana Cass, Ping Sun, et al. “Risk Factors for Carcinoma of the Fallopian Tube in Women with and without a Germline BRCA Mutation.” *Gynecologic Oncology* 118, no. 2 (August 1, 2010): 155–59. https://doi.org/10.1016/j.ygyno.2010.03.009.

Vineis, Paolo, Phyllis Illari, and Federica Russo. “Causality in Cancer Research: A Journey through Models in Molecular Epidemiology and Their Philosophical Interpretation.” *Emerging Themes in Epidemiology* 14, no. 7 (2017).

Virta, RL. “The Phase Relationship of Talc and Amphiboles in a Fibrous Talc Sample.” IH; Report of Investigations, 1985. https://www.cdc.gov/niosh/nioshtic-2/10004328.html.

Vitonis, Allison F., Linda Titus-Ernstoff, and Daniel W. Cramer. “Assessing Ovarian Cancer Risk When Considering Elective Oophorectomy at the Time of Hysterectomy.” *Obstetrics and Gynecology* 117, no. 5 (May 2011): 1042–50.

Wang, Chunpeng, Zhenzhen Liang, Xin Liu, Qian Zhang, and Shuang Li. “The Association between Endometriosis, Tubal Ligation, Hysterectomy and Epithelial Ovarian Cancer: Meta-Analyses.” *International Journal of Environmental Research and Public Health* 13, no. 11 (November 14, 2016): 1138.

Wang, Dingzhi, et al. “Immunosuppression Associated with Chronic Inflammation in the Tumor Microenvironment.” *Carcinogenesis*, Vol. 36, No. 10 (2015): 1085-1093.

Wang, Xiaorong, Sihao Lin, Ignatius Yu, Hong Qiu, Yajia Lan, and Eiji Yano. “Cause-Specific Mortality in a Chinese Chrysotile Textile Worker Cohort.” *Cancer Science* 104, no. 2 (February 2013): 245–49.

Watson, Ian R., Koichi Takahashi, P. Andrew Futreal, and Lynda Chin. “Emerging Patterns of Somatic Mutations in Cancer.” *Nature Reviews. Genetics* 14, no. 10 (October 2013): 703–18.

Wehner, A. P., A. S. Hall, R. E. Weller, E. A. Lepel, and R. E. Schirmer. “Do Particles Translocate from the Vagina to the Oviducts and Beyond?” *Food and Chemical Toxicology: An International Journal Published for the British Industrial Biological Research Association* 23, no. 3 (March 1985): 367–72.

Wehner, A. P., R. E. Weller, and E. A. Lepel. “On Talc Translocation from the Vagina to the Oviducts and Beyond.” *Food and Chemical Toxicology: An International Journal Published for the British Industrial Biological Research Association* 24, no. 4 (April

1986): 329–38.

Weiss, W. “Cigarette Smoking and Lung Cancer Trends. A Light at the End of the Tunnel?” *Chest* 111, no. 5 (May 1997): 1414–16.

Wells, I.P., et al. “Pulmonary Disease Caused By the Inhalation of Cosmetic Talcum Powder.” *British Journal of Radiology*, Vol. 52, No. 619; (July 1979) 586-588.

Wentzensen, Nicolas, Elizabeth M. Poole, Britton Trabert, Emily White, Alan A. Arslan, Alpa V. Patel, V. Wendy Setiawan, et al. “Ovarian Cancer Risk Factors by Histologic Subtype: An Analysis from the Ovarian Cancer Cohort Consortium.” *Journal of Clinical Oncology: Official Journal of the American Society of Clinical Oncology* 34, no. 24 (20 2016): 2888–98.

Werner, I. “Presence of Asbestos in Talc Samples.” *Atemschutzinform* 21, no. 5 (1982).

West, Sophie D., et al. “Pleurodesis for Malignant Pleural Effusions: Current Controversies and Variations in Practices.” *Curr Opin Pulm Med 10, Diseases in the Pleura*, (2004) 305-310.

Whiteman, David C., Michael F. G. Murphy, Linda S. Cook, Daniel W. Cramer, Patricia Hartge, Polly A. Marchbanks, Philip C. Nasca, Roberta B. Ness, David M. Purdie, and Harvey A. Risch. “Multiple Births and Risk of Epithelial Ovarian Cancer.” *Journal of the National Cancer Institute* 92, no. 14 (July 19, 2000): 1172–77.

Whittemore, A. S., R. Harris, and J. Itnyre. “Characteristics Relating to Ovarian Cancer Risk: Collaborative Analysis of 12 US Case-Control Studies. IV. The Pathogenesis of Epithelial Ovarian Cancer. Collaborative Ovarian Cancer Group.” *American Journal of Epidemiology* 136, no. 10 (November 15, 1992): 1212–20.

Whittemore, A. S., M. L. Wu, R. S. Paffenbarger, D. L. Sarles, J. B. Kampert, S. Grosser, D. L. Jung, S. Ballon, and M. Hendrickson. “Personal and Environmental Characteristics Related to Epithelial Ovarian Cancer. II. Exposures to Talcum Powder, Tobacco, Alcohol, and Coffee.” *American Journal of Epidemiology* 128, no. 6 (December 1988): 1228–40.

Whysner, J., and M. Mohan. “Perineal Application of Talc and Cornstarch Powders: Evaluation of Ovarian Cancer Risk.” *American Journal of Obstetrics and Gynecology* 182, no. 3 (March 2000): 720–24.

Wignall, B.K., and A.J. Fox. “Mortality of Female Gas Mask Assemblers.” *British Journal of Industrial Medicine* 39, no. 1 (1982): 34–38.

Wild, P. “Lung Cancer Risk and Talc Not Containing Asbestiform Fibres: A Review of the Epidemiological Evidence.” *Occupational and Environmental Medicine* 63, no. 1 (January 2006): 4–9.

Wolff, Henrik, Tapio Vehmas, Panu Oksa, Jorma Rantanen, and Harri Vainio. “Asbestos, Asbestosis, and Cancer, the Helsinki Criteria for Diagnosis and Attribution 2014: Recommendations.” *Scandinavian Journal of Work, Environment & Health* 41, no. 1 (January 2015): 5–15.

Wong, C., R. E. Hempling, M. S. Piver, N. Natarajan, and C. J. Mettlin. “Perineal Talc Exposure and Subsequent Epithelial Ovarian Cancer: A Case-Control Study.” *Obstetrics and Gynecology* 93, no. 3 (March 1999): 372–76.

Woodruff, J. D. “The Pathogenesis of Ovarian Neoplasia.” *The Johns Hopkins Medical Journal* 144, no. 4 (April 1979): 117–20.

Wright, H. R., J. C. Wheeler, J. A. Woods, J. Hesford, P. Taylor, and R. F. Edlich. “Potential Toxicity of Retrograde Uterine Passage of Particulate Matter.” *Journal of Long-Term*

*Effects of Medical Implants* 6, no. 3–4 (1996): 199–206.
Wu, A. H., C. L. Pearce, C.-C. Tseng, and M. C. Pike. “African Americans and Hispanics Remain at Lower Risk of Ovarian Cancer Than Non-Hispanic Whites after Considering Nongenetic Risk Factors and Oophorectomy Rates.” *Cancer Epidemiology Biomarkers & Prevention* 24, no. 7 (July 1, 2015): 1094–1100.
Wu, Anna H., Celeste L. Pearce, Chiu-Chen Tseng, and Malcolm C. Pike. “African Americans and Hispanics Remain at Lower Risk of Ovarian Cancer Than Non-Hispanic Whites after Considering Nongenetic Risk Factors and Oophorectomy Rates.” *Cancer Epidemiology, Biomarkers & Prevention: A Publication of the American Association for Cancer Research, Cosponsored by the American Society of Preventive Oncology* 24, no. 7 (July 2015): 1094–1100.
Wu, Anna H., Celeste L. Pearce, Chiu-Chen Tseng, Claire Templeman, and Malcolm C. Pike. “Markers of Inflammation and Risk of Ovarian Cancer in Los Angeles County.” *International Journal of Cancer. Journal International Du Cancer* 124, no. 6 (March 15, 2009): 1409–15.
Wu, Song, Wei Zhu, Patricia Thompson, and Yusuf A. Hannun. “Evaluating Intrinsic and Non-Intrinsic Cancer Risk Factors.” *Nature Communications* 9, no. 1 (August 28, 2018): 3490.
Yan, Bin, Yuanlin Peng, and Chuan-Yuan Li. “Molecular Analysis of Genetic Instability Caused by Chronic Inflammation.” *Methods in Molecular Biology (Clifton, N.J.)* 512 (2009): 15–28.
Yan, Bin, Huili Wang, Zahid Rabbani, Yulin Zhao, Wenrong Li, Yuqing Yuan, Fang Li, Mark W. Dewhirst, and Chuan-Yuan Li. “Tumor Necrosis Factor-a Is a Potent Endogenous Mutagen That Promotes Cellular Transformation.” *Cancer Research* 66 (December 15, 2006): 11565.
“You Can Steer Clients to Condoms Free from Potentially Harmful Talc: Condom Companies Agree to Produce without the Dry Lubricant.” *Contraceptive Technology Update* 16, no. 11 (November 1995): 133–44.
Zazenski, R., W. H. Ashton, D. Briggs, M. Chudkowski, J. W. Kelse, L. MacEachern, E. F. McCarthy, M. A. Nordhauser, M. T. Roddy, and N. M. Teetsel. “Talc: Occurrence, Characterization, and Consumer Applications.” *Regulatory Toxicology and Pharmacology: RTP* 21, no. 2 (April 1995): 218–29.
Zervomanoklakis, I, H.W. Ott, D Hadziomerovic, V. Mattle, B.E. Seeber, I. Virgolini, D. Heute, S. Kissler, G. Leyendecker, and L. Wildt. “Physiology of Upward Transport in the Human Female Genital Tract.” *Annals of New York Acadamy of Sciences* 1101, no. 1 (2007): 1–20.
Zhao, Weixing, Justin B. Steinfeld, Fengshan Liang, Xiaoyong Chen, David G. Maranon, Chu Jian Ma, Youngho Kwon, et al. “BRCA1-BARD1 Promotes RAD51-Mediated Homologous DNA Pairing.” *Nature* 550, no. 7676 (19 2017): 360–65.

**DEPOSITIONS, TRANSCRIPTS AND REPORTS:**

Affidavit of Laura Plunkett, PhD 02.22.18
Deposition of Alice Blount in the Ingham v. J&J Matter on 04.13.18
Deposition of Annie Awanais Yessian on 07.13.2017

Deposition and Exhibits of Pat Downey Dated 8.7.18-8.8.18
Deposition and Exhibits of John Hopkins Dated 8.16.18-8.17.18, 10.17.18 and 11.05.18
Deposition and Exhibits of Susan Nicholson Dated 7.26.18-7.27.18
Deposition and Exhibits of Julie Pier Dated 9.12.18-9.13.18
Ingham v. J&J Volume 11 (Egilman, Koman, Martinez, Packard) 6-14-18
Ingham v. J&J Volume 14A (Madigan, Williams) 6-20-18
Ingham v. JJ Volume 24A (Warner Huh, MD) 7.5.18
Ingham v. JJ Volume 24B (Warner Huh, MD) 7.5.18
John J. Godleski Expert Report for Brower Matter Dated 6.23.18
Lanzo Plaintiffs MIL re Imerys Spoliation and Concealment of Talc Samples
Laura Plunkett - Supplemental Expert Brower Report
Longo Analysis of J&J's Historical Talc Samples from the 1960's
Longo Analysis of J&J's Historical Talc Samples from the 1970's
Longo Analysis of J&J's Historical Talc Samples from the 1980's
Longo Analysis of J&J's Historical Talc Samples from the 1990's
Longo Analysis of J&J's Baby Powder Historical Samples - Asian - October 2018
Longo Analysis of J&J's BP Talc Products for Amphibole (Tremolite) Asbestos 8.2.17
Longo Analysis Report_Exhibit BB_04.28.2017
Longo MAS Project 14-1852 Below the Waist Application of Johnson's BP 9.2017
Longo Process Blanks for the Analysis of J&J's Products from the 60's to 90's for Asbestos
Longo TEM Analysis of Historical 1978 Johnson's BP Sample for Amphibole Asbestos 2.16.18
Longo Verification of Lee Poye's TEM Analysis of J&J's Historical Vermont Talc 11.5.18
Michael Crowley Expert Report Dated 11.12.18
Report of Results: MVA11730 Investigation of Italian Talc Samples for Asbestos 08.01.2017
RJLEE-001497
Thomas Dydek Brower Expert Report Dated 8.16.18 (corrected on 8.20.18)
Thomas Dydek Educational Report_FINAL (4-9-2018)
Thomas Dydek MDL Educational Report Dated 4.9.18

**OTHER SOURCES:**

American Cancer Society Ovarian Cancer Statistics
ATSDR Toxicological Profile for Asbestos
EPA Chemical Assessment Summary for Asbestos - 2017
EPA Guidelines for Carcinogen Risk Assessment - March 2005
EPA Health Assessment Document for Talc - 1992
Exhibit 1 - ATTORNEYS' EYES ONLY
Exhibit 2 - ATTORNEYS' EYES ONLY
Exhibit 3 - ATTORNEYS' EYES ONLY
FDA 4-1-2014   Response Letter to Epstein Denying Petition
Fitzgerald Analysis of J&J Baby Powder #1 and #2 Dated July 26, 2017
IARC Monograph 100C - Arsenic, Metals, Fibres, and Dusts - Excerpts
IARC Monograph 14 - Asbestos - 1977

IARC Monograph 2 - Some Inorganic and Organometallic Compounds - 1973
IARC Monograph 68 - Silica, Some Silicates, Coal Dust and Para-Aramid Fibrils - 1997
IARC Monograph 74 - Surgical Implants and Other Foreign Bodies - 1999
IARC Monograph 82 - Some Traditional Herbal Medicines, Some Mycotoxins, Naphthalene and Styrene - 2002
IARC Monograph 86 - Cobalt in Hard Minerals and Cobalt Sulfate, Gallium Arsenide, Indium Phosphide and Vanadium Pentoxide - 2006
IARC Monograph 87 - Inorganic and Organic Lead Compounds – 2006

IMERYS013188
IMERYS045182
IMERYS045184
IMERYS048311
IMERYS051370
IMERYS053387
IMERYS090653
IMERYS098115
IMERYS105215
IMERYS210136
IMERYS210729
IMERYS219720
IMERYS286445
IMERYS304036
IMERYS340454
IMERYS340798
IMERYS342524
IMERYS406170
IMERYS422289
IMERYS 088907
IMERYS 284935
IMERYS137677-IMERYS137690
IMERYS209971
IMERYS241866
IMERYS248877
IMERYS255101
IMERYS255224
IMERYS255384
IMERYS255394
IMERYS255395
IMERYS279884
IMERYS279968
IMERYS281335
IMERYS281776
IMERYS324700
IMERYS-A_0011817
IMERYS-A_0015663

J&J History
J&J S2s and BP Product Analysis - 1972
JNJ 000087928
JNJ 000088570
JNJ 000285351
JNJ000025132
JNJ000062359
JNJ000062436
JNJ000063608
JNJ000063951
JNJ000064544
JNJ000064762; JNJ000265171
JNJ000065264
JNJ000065601
JNJ000087710
JNJ000087716
JNJ000089413
JNJ000231304
JNJ000237076
JNJ000237379
JNJ000239723
JNJ000239730
JNJ000245002
JNJ000246437
JNJ000251888
JNJ000260697
JNJ000277941
JNJ000291914
JNJ000291916
JNJ000314315
JNJ000314406
JNJ000347962
JNJ000347962
JNJ000521616
JNJ000000704
JNJ000011150
JNJ000016645

JNJ000019415
JNJ000025132
JNJ000026987
JNJ000046293
JNJ000245678
JNJ000245762
JNJ000251888
JNJ000260700
JNJ000261010
JNJ000265536
JNJ000279507
JNJ000348778
JNJ000404860
JNJ000460665
JNJ000526750
JNJ000886067
JNJAZ55_000000577
JNJAZ55_000000905
JNJAZ55_000004563
JNJAZ55_000008177
JNJL61_000014431
JNJMX68_000003728
JNJMX68_000012858
JNJMX68_000013019
JNJNL61_000079334
PCPC_MDL00062175
Pltf_MISC_00000272 (JANSSEN-000001-19)
NIOSH Occupation Respiratory Diseases September 1986
NIOSH Preliminary Report on Fiber Exposure During Use of Baby Powders - 1972
NTP Technical Report on the Toxicology and Carcinogenesis Studies of Talc (CAS No. 14807-96-6)- 1993
NTP Toxicology and Carcinogenesis Studies of Talc in F344/N Rats and B6C3F Mice Report No. 421
P-468
Read-the-Letter-from-the-FDA-on-Cosmetics
The Birth of Our Baby Products _ Kilmer House
WCD 002478 - Exhibit 32 Waldstreicher

**Arch Carson, MD, PhD Legal Testimony, 2015-2018**

Elaine Hale and Kenneth Dorsey parker, Jr. v. Centerpoint Energy Houston Electric, LLC; in the 55th District Court of Harris County, Texas.
2016 Harris County, TX for Plaintiff

Danny Henderson and Linda Henderson; Magdaleno Flores and Maria Flores; Shari Waldrop; and Bryan Thomas v. Magnablend, Inc., Nugreen Specialty, Inc., Nugreen Solutions, Inc., and Enviro Tech Inc.; in the 40th District Court of Ellis County, Texas.
2015 Ellis County, TX for Defendant

Edgar Guadalupe Solis v. Eastman Chemical Company, Texas Operations, Tradebe Environmental Services, Inc. d/b/a Tradebe Industrial Services LLC; in the 234th District Court of Harris County, Texas.
2015 Harris County, TX for Defendant

Arch I. Carson, MD, PhD
Professional Consultation Fee Schedule

| | |
|---|---|
| Evidence-base research, report preparation, documentation, conference | $450/hr |
| Interview, physical examination or medical testing of patients | 450/hr |
| Review of documents | 450/hr |
| Testimony at deposition or trial plus expenses | 450/hr |
| Inspection, examination or sampling of physical evidence or sites | 450/hr |
| Travel<br>(Travel maximum $4,000 per diem, plus expenses) | 200/hr |
| Laboratory analyses/studies | at cost |
| Overhead and Supplies | at cost |

# Exhibit 19

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW JERSEY

------------------------ )
IN RE JOHNSON & JOHNSON )
TALCUM POWDER PRODUCTS )
MARKETING, SALES ) MDL NO.
PRACTICES, AND PRODUCTS ) 16-2738 (FLW) (LHG)
LIABILITY LITIGATION )
)
------------------------ )
)
THIS DOCUMENT RELATES TO )
ALL CASES )
)
------------------------

—— —— ——

Saturday, January 19, 2019

—— —— ——

Videotaped Deposition of ARCH I. "CHIP" CARSON, M.D., Ph.D., held at the Marriott Houston Medical Center, 6580 Fannin Street, Houston, Texas, commencing at 9:02 a.m., on the above date, before Michael E. Miller, Fellow of the Academy of Professional Reporters, Certified Court Reporter, Registered Diplomate Reporter, Certified Realtime Reporter and Notary Public.

—— —— ——

GOLKOW LITIGATION SERVICES
877.370.DEPS | fax 917.591.5672
deps@golkow.com

A P P E A R A N C E S:

BEASLEY ALLEN, PC
BY: P. LEIGH O'DELL, ESQUIRE
leigh.odell@beasleyallen.com
MARGARET M. THOMPSON, ESQUIRE
margaret.thompson@beasleyallen.com
234 Commerce Street
Montgomery, Alabama 36103-4160
(334) 269-2343
Counsel for Plaintiffs' Steering Committee

BURNS CHAREST LLP
BY: AMANDA KLEVORN, ESQUIRE
aklevorn@burnscharest.com
365 Canal Street
Suite 1170
New Orleans, Louisiana 70130
(504) 799-2845
Counsel for Plaintiffs

TUCKER ELLIS LLP
BY: MICHAEL C. ZELLERS, ESQUIRE
michael.zellers@tuckerellis.com
515 South Flower Street
42nd Floor
Los Angeles, California 90071
(213) 430-3400
Counsel for Johnson & Johnson Defendants

DRINKER BIDDLE & REATH, LLP
BY: KATHERINE MCBETH, ESQUIRE
katherine.mcbeth@dbr.com
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103
(215) 988-2706
Counsel for Johnson & Johnson Defendants

A P P E A R A N C E S:

DYKEMA GOSSETT PLLC
BY: JANE E. BOCKUS, ESQUIRE
jbockus@dykema.com
112 East Pecan Street
Suite 1800
San Antonio, Texas 78205
(210) 554-5500
Counsel for Imerys Talc America

COUGHLIN DUFFY LLP
BY: JONATHAN F. DONATH, ESQUIRE
jdonath@coughlinduffy.com
350 Mount Kemble Avenue
Morristown, New Jersey 07962
(973) 267-0058
Counsel for Imerys Talc America

TUCKER ELLIS LLP
BY: CAROLINE M. TINSLEY, ESQUIRE
caroline.tinsley@tuckerellis.com
100 South Fourth Street, Suite 600
St. Louis, MO 63102
(216) 696-3675
Counsel for PTI Royston LLC and PTI Union LLC

SEYFARTH SHAW, LLP
BY: RENEE B. APPEL, ESQUIRE
rappel@seyfarth.com
975 F Street, N.W.
Washington, D.C. 20004-1454
(202) 463-2400
Counsel for Personal Care Products

VIDEOGRAPHER:
DOUG OVERSTREET,
Golkow Litigation Services

INDEX

| | |
|---|---|
| APPEARANCES | 2 |
| PROCEEDINGS | 8 |
| EXAMINATION OF ARCH I. "CHIP" CARSON, M.D., Ph.D.: | |
| BY MR. ZELLERS | 9 |
| BY MS. BOCKUS | 284 |
| BY MS. APPEL | 343 |
| CERTIFICATE | 364 |
| ERRATA | 366 |
| ACKNOWLEDGMENT OF DEPONENT | 367 |
| LAWYER'S NOTES | 368 |

DEPOSITION EXHIBITS
ARCH I. "CHIP" CARSON, M.D., Ph.D.
January 19, 2019

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 10 |
| Exhibit 2 | 11/16/18 Carson Expert Report | 15 |
| Exhibit 3 | Carson Curriculum Vitae | 21 |
| Exhibit 4 | Listing of Literature Reviewed | 21 |
| Exhibit 5 | 2019 Longo et al Publication | 26 |
| Exhibit 6 | 2019 Fletcher et al Publication | 26 |
| Exhibit 7 | Undated Taher et al Publication | 26 |
| Exhibit 8 | 1952 Graham et al Publication | 29 |
| Exhibit 9 | 12/18 Health Canada Draft Screening Assessment | 30 |
| Exhibit 10 | 1/1/14 FDA Letter to Epstein | 31 |
| Exhibit 11 | 1991 Blount et al Publication | 32 |
| Exhibit 12 | 1974 Parmley et al Publication | 32 |
| Exhibit 13 | USB Drive Containing Materials Reviewed | 36 |
| Exhibit 14 | 8/1/00 Health Canada Decision-Making Framework | 98 |

DEPOSITION EXHIBITS

| | | |
|---|---|---|
| Exhibit 15 | Handwritten List of Materials Reviewed by Dr. Carson | 124 |
| Exhibit 16 | 1979 Chappell et al Publication | 130 |
| Exhibit 17 | 2011 Reid et al Publication | 159 |
| Exhibit 18 | 2011 Camargo et al Publication | 163 |
| Exhibit 19 | 2013 Terry et al Publication | 192 |
| Exhibit 20 | 2016 Cramer et al Publication | 195 |
| Exhibit 21 | IARC Classification Groups Document | 225 |
| Exhibit 22 | 2017 Berge et al Publication | 243 |
| Exhibit 23 | 2007 Langseth et al Publication | 247 |
| Exhibit 24 | 2016 Schildkraut et al Publication | 271 |
| Exhibit 25 | Excerpt from IARC Monograph 93 | 289 |

REFERENCED EXHIBITS

| NUMBER | | PAGE |
|---|---|---|
| Exhibit Hopkins-28 | ...................... | 148 |
| Exhibit Pier-47 | ...................... | 148 |
| Exhibit P-346 | ...................... | 28 |

--o0o--

PROCEEDINGS

(January 19, 2019 at 9:02 a.m.)

THE VIDEOGRAPHER: We are now on the record. My name is Doug Overstreet. I'm the videographer for Golkow Litigation Services. Today is January 19th, 2019. The time is 9:02 a.m.

This video deposition is being held in Houston, Texas in the matter of Talcum Powder Litigation MDL No. 2738.

The deponent is Dr. Chip Carson.

Will counsel please identify themselves for the record.

MS. O'DELL: Leigh O'Dell, Beasley Allen, for the plaintiffs.

DR. THOMPSON: Margaret Thompson, Beasley Allen, for the plaintiffs.

MS. KLEVORN: Amanda Klevorn, Burns Charest, for the plaintiffs.

MR. ZELLERS: Michael Zellers

for the Johnson & Johnson defendants.

MS. McBETH: Katherine McBeth, Drinker Biddle & Reath, for the Johnson & Johnson defendants as well.

MS. BOCKUS: Jane Bockus for Imerys.

MR. DONATH: Jonathan Donath from Coughlin Duffy for Imerys.

MS. APPEL: Renée Appel from Seyfarth Shaw for Personal Care Products.

MS. TINSLEY: Caroline Tinsley, Tucker Ellis, for PTI Union, LLC and PTI Royston, LLC.

THE VIDEOGRAPHER: The court reporter today is Mr. Mike Miller, and he will now swear in the witness.

ARCH I. "CHIP" CARSON, M.D., Ph.D.,
having been duly sworn,
testified as follows:

EXAMINATION

BY MR. ZELLERS:

Q. Can you state your name, please.

Page 10

A. Arch Carson.
Q. You are a physician; is that right?
A. I am.
Q. A medical toxicologist?
A. Yes.
Q. We are here today to take your deposition in the talc MDL litigation proceedings; is that right?
A. As far as I know, yes.
Q. You are an expert witness for the plaintiffs in that litigation; is that right?
A. Yes.
Q. Did you receive a notice of deposition, which we'll mark as Exhibit 1, to appear here today?
(Carson Deposition Exhibit 1 marked.)
A. Yes, I received a copy of this document.
MS. O'DELL: And, Michael, just for the record, we just reassert all our previously served objections to

Page 11

the notice.
MR. ZELLERS: Thank you.
BY MR. ZELLERS:
Q. You have given deposition testimony in the past; is that right?
A. I have.
Q. On how many occasions?
A. Probably 30, 35.
Q. You are familiar with the procedures we're going to follow today?
A. More or less, I think.
Q. If at any time I ask you a question and you don't understand it, tell me you don't understand it and I'll repeat it or rephrase it to try to make it clear to you.
Can you do that?
A. Yes.
Q. If you answer a question that I ask or that any of the counsel ask, we're going to assume that you understood it; is that fair?
MS. O'DELL: Object to form.
A. That's fair.
///

Page 12

BY MR. ZELLERS:
Q. As best we can, let me finish my question before you start to give your answer. I'll do the same and allow you to finish your answer before I ask you another question so our court reporter can take down what each of us say.
Can you do that?
A. Yes.
Q. In response to the notice of deposition, which we've marked as Exhibit 1, have you brought with you certain documents here today?
A. I have a collection of documents that in part respond to these requests, yes.
Q. Do you have any documents in your possession that are responsive to the notice of deposition, Exhibit 1, that you have not brought here today?
A. I would have to go through these things one by one, but --
Q. You didn't do that before we came here today?

Page 13

A. I did, but the plaintiffs' attorneys --
MS. O'DELL: Let me just stop you, Dr. Carson, just because discussing what we've discussed is not within the purview of this deposition. That's privileged. Let me just say --
THE WITNESS: All right.
MS. O'DELL: -- Dr. Carson, in response to the notice, has brought with him copies of the cited materials in his report, and that's in the binder that is to his left.
He's brought with him copies of certain documents that were listed on his materials considered list. He doesn't have a physical copy of everything on his materials considered list.
I brought today a thumb drive that has a copy of all the items on his materials considered list. If you would like access to that, it's available to you.

And then in addition, he has brought some additional materials that he has reviewed since the service of his report.

The only other item, as I recall, on the notice of deposition request for documents that has not been brought to the deposition is copies of invoices and Dr. Carson has not sent us an invoice. That's why we don't have a copy.

So to try to short-circuit this, just to make sure since we made decisions about what's produced and what's not, I'll just say all that for the record. And if you'd like that, you're welcome to it.

BY MR. ZELLERS:

Q. Dr. Carson, you heard Ms. O'Dell describe what you brought here today. Is all of that accurate?

A. It is.

Q. Are you aware of there being any documents or materials that are

responsive to the deposition notice that you have not brought with you here today?

A. No.

Q. I'm trying to understand what counsel for plaintiffs, Ms. O'Dell, has said, so let me ask you some questions.

You have brought with you today in a binder some of the cited materials in your report; is that right?

A. Yes. This is intended to be a complete set of the cited references, with one exception.

Q. When you say cited references --

A. From my report.

Q. Your expert report, we will mark as Exhibit 2.

(Carson Deposition Exhibit 2 marked.)

BY MR. ZELLERS:

Q. Is Deposition Exhibit 2 your report in this matter?

A. It is. It also has attachments.

Q. I'll ask you about the attachments in a moment.

Does this report, Deposition Exhibit 2, contain all of the opinions that you intend to offer at any trial or hearing of this matter?

A. In general, it contains all of my opinions. I expect to expand on those opinions possibly in this deposition or in the future.

Q. Today's my opportunity to ask you what your opinions are in this matter.

As of today, are the opinions that you expressed to us set forth at any trial or hearing in this matter, are they contained in your report, Exhibit 2?

A. I have seen information that has become available recently that I did not have at that time this report was finalized, and I have modified my opinions very slightly as a result of that information.

Q. How have you modified your opinions?

A. My opinions have essentially

been strengthened as they relate to the causation question between perineal talcum powder use and the occurrence of ovarian cancers.

Q. Other than you believing that your opinions are strengthened with respect to the association between perineal talcum powder use and ovarian cancer, have your opinions changed at all since you prepared your report, Exhibit 2?

A. No.

Q. Are there any new or additional opinions as of today that you expect to testify to at trial or any hearing of this matter other than your report, Exhibit 2, and as you have qualified that report by stating that your opinions on association are stronger today?

A. No.

MS. O'DELL: Object to the form.

BY MR. ZELLERS:

Q. Okay. Your report has a list of references that begin on page 11.

Do you see that?
A. Yes.
Q. What are the references? What do they relate to? And by that, I mean -- I'm just trying to understand what this list is.
A. This is a list of references from which I gleaned information that were important to my forming opinions regarding the question that was given to me, and they contribute to pieces of the report in various ways.
They don't represent a complete review that I made in preparing my report, but all are important in some way in terms of coming to my conclusions.
Q. Are the references that you list in your report from page 11 up and through page 16, are those the materials that you are relying on in terms of your opinions that you're expressing in your report?
MS. O'DELL: Objection to form.
A. Yes.
///

BY MR. ZELLERS:
Q. What, then, is the difference between the references to your report and Exhibit B, which has a caption, Literature?
A. The Exhibit B represents a larger set of documents, including scientific literature, technical reports, and so forth that I reviewed in preparation of my report and the formation of my opinions; but they did not contain information that I felt necessary to cite in my report.
Q. The literature that you cite to as Appendix B of your report are materials that you reviewed but are not the materials that you're specifically relying on. The materials that you're specifically relying on are set forth in your references list; is that right?
MS. O'DELL: Excuse me. Object to the form, misstates his testimony.
A. My opinions are based on my total review of the literature as well as my training, my professional experience and many other factors.

I produced a report that I thought was responsive to the question that was given to me by the plaintiffs' attorneys, and within that report I felt it necessary to cite specific key references that contributed to items in that report.
BY MR. ZELLERS:
Q. And those are --
MS. O'DELL: Excuse me, sir. Are you finished, Dr. Carson?
THE WITNESS: Yes.
MS. O'DELL: Okay. Sorry.
BY MR. ZELLERS:
Q. Those are the items that you've listed under References; is that right?
A. Yes.
Q. Literature are other materials that you have reviewed but didn't rise to the level of you citing them as a reference for your report, correct?
A. That is correct, but they do contribute information that I utilize in terms of the whole to formulate my opinions.
Q. Let me mark several of the

attachments to your report as separate exhibits.
(Carson Deposition Exhibit 3 marked.)
BY MR. ZELLERS:
Q. Exhibit 3 is your curriculum vitae that was attached to your report; is that right?
A. Yes.
(Carson Deposition Exhibit 4 marked.)
BY MR. ZELLERS:
Q. Exhibit 4 is a copy of your literature list that we just discussed that is in your report; is that right?
A. Yes.
MS. O'DELL: Thank you.
BY MR. ZELLERS:
Q. The one difference with Exhibit 4, your literature list that's attached to your report as Appendix B is not numbered. I've gone ahead and numbered the pages on Exhibit 4, your literature list, in case we want to refer to a specific page.

Today, when I refer to products, talc products, baby powder or Shower to Shower, I'm referring to the baby powder product manufactured by Johnson & Johnson Consumer Products Inc. and the Shower to Shower product formerly manufactured by Johnson & Johnson Consumer Products Inc.

Do you understand that?

A. Yes.

Q. Is your report, Exhibit 2, accurate?

A. I believe so.

Q. Do you believe it's complete?

A. In terms of its focus, yes.

Q. What do you mean in terms of its focus?

A. It covers specific aspects of a larger question, and regarding those specific aspects, I believe it is complete.

Q. It covers the aspects of the question that you intend to offer opinions on, correct?

A. That is correct.

Q. What is the question that was

given to you by counsel for plaintiffs in this litigation?

A. The question is do the -- does the habitual use of talcum powder products cause ovarian cancer.

Q. Were you given any other questions to answer or opine on in this litigation?

A. Not specifically.

Q. What do you understand habitual use of talcum powder to refer to?

A. It means routine use, periodic use.

Q. Over any period of time?

A. Over an extended period of time.

Q. What is an extended period of time?

A. Months or years.

Q. Any other definition that you have of habitual use?

A. No.

Q. Today, in response to the notice of deposition, you did bring the

binder of materials; is that right?

A. Yes.

Q. The binder of materials, did you prepare that, or was it prepared for you?

A. Well, I uploaded documents to a share file, and the plaintiffs' attorneys were kind enough to print those for me and assemble them in the binder.

Q. In addition, you have brought with you a stack of eight or so additional references that you have on the table in front of you; is that right?

A. Yes.

Q. Are those materials that were cited either as references in your report or in the literature section of your report?

A. I think they're all included in one or the other of those lists.

Q. Your testimony under oath is that all of the additional materials you brought here today are referred to either in your reference list, which is -- begins at page 11 of your report, or your literature list, which we've marked as Exhibit 4 and is

Exhibit B to your report; is that right?

MS. O'DELL: Objection to the form.

Go ahead.

A. There are a couple of new articles here that were not available at the time that I submitted my report, and I believe the literature list was also created.

BY MR. ZELLERS:

Q. Were those new materials provided to you by plaintiffs' counsel or are those materials that you did some type of literature search and found?

A. One of them was provided to me by plaintiffs' counsel, but I was aware that it was coming. And -- actually, two of them were provided by plaintiffs' counsel.

Q. All right. The two additional documents that were provided to you by plaintiffs' counsel, can you show those to me?

A. Okay. One is the Longo report.

Q. We will mark as Deposition Exhibit 5 the Longo report dated

January 15th of 2009 [sic].

(Carson Deposition Exhibit 5 marked.)

A. The other is the recent Fletcher, et al article.

(Carson Deposition Exhibit 6 marked.)

BY MR. ZELLERS:

Q. The Fletcher article dated January 3rd of 2019 we'll mark as Exhibit 6. This is an article from Reproductive Sciences; is that right?

A. Yes. And I actually have a third.

Q. All right. You have a third article that was provided to you by plaintiffs' counsel?

A. Yes.

(Carson Deposition Exhibit 7 marked.)

BY MR. ZELLERS:

Q. Let's mark that as Deposition Exhibit 7. Can you tell us what article that is?

A. This is a meta-analysis. It's -- the title is Systematic Review and Meta-Analysis of the Association Between Perineal Use of Talc and Risk of Ovarian Cancer. The lead author is Mohamed Taher.

Q. The Taher paper we have marked as Exhibit 7; is that right?

A. Yes.

Q. This is something that you were provided by plaintiffs' counsel; is that right?

A. Yes.

Q. Exhibit 6, Reproductive Sciences, are you familiar with that journal?

A. I'm aware that it exists.

Q. Do you review that journal on a regular basis as a part of your clinical and research activities?

A. No, I don't.

Q. Is Reproductive Sciences a peer-reviewed journal?

A. I believe it is.

Q. The Exhibit 6 has as a corresponding author, Dr. Saed, S-A-E-D, a

Ph.D.; is that right?

A. Yes.

Q. What additional articles have you brought here with you today separate and apart from your binder of materials?

A. There's a copy of the IARC monographs preamble.

Q. For what purpose did you bring that article?

A. This discusses the general process that IARC uses in approaching a putative carcinogenic material.

Q. That has previously been marked as Plaintiff Exhibit P-346 in another proceeding; is that right?

A. I don't know.

Q. Well, the document we're looking at has that exhibit sticker on it; is that right?

A. It does.

Q. What else have you brought here with you today?

A. This is an article from The Lancet from 1952 titled Value of Modified

Starch as a Substitute for Talc, and the first author is J.D.P. Graham.

Q. Why did you bring that article?

A. This is an older article that discusses the suitability of substituting cornstarch materials for talc due to perceived issues with talc.

Q. Is this an article that you had cited previously, either in your references or your list of literature?

A. I did not cite it in my report. I don't know -- I don't recall if it's in the literature list or not.

(Carson Deposition Exhibit 8 marked.)

BY MR. ZELLERS:

Q. Why did you decide to bring that with you here today?

A. It is in the literature list.

I ran across it last night, and I thought I might need to refer to it during the deposition.

Q. What other documents or materials have you brought other than your

binder of materials?
A. I have here a copy of the recent Canadian position on the safety of talcum powder and its relationship to ovarian cancer.
Q. When did you review that document?
A. A couple weeks ago, I think.
Q. Is that a document that you were provided by plaintiffs' counsel?
A. It was.
Q. Can I see the document, please? We'll mark the draft screening assessment from Health Canada dated December 18th of 2018 as Exhibit 9.
(Carson Deposition Exhibit 9 marked.)
BY MR. ZELLERS:
Q. Any other documents?
A. I have a copy of the letter from the FDA from April 1st, 2014 responding to positions -- petitions for labeling.
Q. This is a letter that has a stamp on it on the first page, April 1st,

2014, from -- or strike that -- to Dr. Epstein from the FDA; is that right?
A. Yes.
Q. Let's mark that as Exhibit 10.
(Carson Deposition Exhibit 10 marked.)
BY MR. ZELLERS:
Q. What else?
A. I have an article authored by A.M. Blount which is titled Amphibole Content of Cosmetic and Pharmaceutical Talcs that was published in Environmental Health Perspectives in 1991.
Q. Is that a journal that you review on a regular basis as part of either your clinical practice or your research activities?
A. That one I do look at pretty much.
Q. Is this an article you were aware of back in 1991?
A. No. At least I don't recall.
Q. Is it fair that your review of this literature, the literature relating to

talcum powder and ovarian cancer, is something that you undertook when you were retained by plaintiffs' counsel and asked to address the question they gave to you?
A. Yes, it is.
Q. We will mark the article by Blount as Exhibit 11.
(Carson Deposition Exhibit 11 marked.)
BY MR. ZELLERS:
Q. And you have one more; is that right?
A. Yes, one more, which is -- this is an article from the American Journal of Obstetrics and Gynecology from 1974 titled The Ovarian Mesothelioma. It's authored by Parmley and Woodruff.
Q. We'll mark that as Exhibit 12.
(Carson Deposition Exhibit 12 marked.)
BY MR. ZELLERS:
Q. Exhibit 12, is this an article that was cited previously by you in either your references or your literature list?

A. Yes.
Q. For what -- strike that.
Is this a document that you chose to bring today or were you provided it by plaintiffs' counsel?
A. This is another one I ran across last night and decided to bring along to the depo.
Q. Same questions with respect to the Blount article, Exhibit 11: Is this an article you cite in your references or literature?
A. In the literature, yes.
Q. For what purpose have you brought this with you today?
A. I thought I might want to refer to it in response to questions here.
Q. Exhibit 10, the letter from the FDA to Dr. Epstein, April of 2014, for what purpose have you brought that here with you today?
A. I thought I might want to refer to it in response to questioning.
Q. The documents that you have

brought here with you today are documents that you wanted to have available to try to respond to the questions that I may ask you?
A. Yes.
Q. These documents you all believe -- strike that.
The documents that you've identified and you've brought with you -- have brought with you today, you believe those are supportive of the opinions that you are rendering in this matter; is that right?
A. Yes.
Q. The documents on your literature list, what we have marked as Exhibit 4, are those documents that were provided to you by plaintiffs' counsel?
A. Some were.
Q. The documents on this list that were not provided by plaintiffs' counsel, did you find those through a literature search?
A. Yes.
Q. Are you able to distinguish for us which documents on your literature list, Exhibit 4, came from plaintiffs' counsel and

which items on the literature list you came up with?
A. To some extent.
Q. So if we went through item by item, you believe you could distinguish between what was provided to you by plaintiffs and what you found on your own?
A. For some, but not all of them.
Q. Have you reviewed all of the materials that are listed on your literature list?
A. I have reviewed all of them, yes.
Q. Have you reviewed all of the materials that are on your reference list?
A. Yes.
Q. The materials on your reference list, is it the same that some were provided to you by plaintiffs' counsel and some you found on your own?
A. I think there may be one or two references that I didn't have before I saw them in the share file that may have been provided by plaintiffs' counsel, but I

wouldn't be able to tell you for sure. I'm sure I ran across these in my own literature search.
Q. Deposition Exhibit 13, we will mark the thumb drive that plaintiffs' counsel has brought here today.
(Carson Deposition Exhibit 13 marked.)
BY MR. ZELLERS:
Q. Do you, Dr. Carson, have an understanding of what's on the thumb drive we've marked as Exhibit 13?
A. My understanding is this is copies of the documents on the literature list.
Q. When were you first retained by anyone regarding the talc/ovarian cancer litigation?
A. In October of 2018.
Q. Who contacted you?
A. I was contacted by an attorney named Russ Abney.
Q. Who is Mr. Abney, if you know?
A. Mr. Abney is a lawyer who used

to work in the Houston area and with whom I had some dealings years ago; and since that time he has become involved in this talc litigation in some way, was aware of me as a potential expert witness, and contacted me regarding my interest and availability.
Q. What matters have you worked on with Mr. Abney in the past?
A. I think it would have been back in the 1990s, and I frankly don't recall what cases we worked on, but there were one or maybe two cases.
Q. When in October of 2018 were you contacted by Mr. Abney?
MS. O'DELL: Object to the form.
A. I believe it was either the 14th or 15th of October.
BY MR. ZELLERS:
Q. How do you remember with that precision?
A. I have an e-mail that relates to a phone call which was our initial contact.

Q. Mr. Abney at some point asked you to address the question that you told us before: Does the habitual use of talcum powder cause ovarian cancer?
Is that right?
MS. O'DELL: Object to the form.
A. Well, he talked to me generally about the case that was proceeding, and I discussed with him what my understanding of those things was and what the kind of opinions I would be able to render would be. And he suggested that he set up a meeting between me and members of plaintiffs' counsel.
BY MR. ZELLERS:
Q. When Mr. Abney called you middle of October of 2018, talcum powder and any relationship or association that it may have to ovarian cancer had not been a focus of your research or study; is that right?
A. That's right.
Q. It had not been a part of your clinical practice, right?

A. That's correct.
Q. When did you meet with the larger group of plaintiffs' counsel?
A. I believe we had a telephone meeting on the 16th of October. I'm not sure. I have to --
Q. That's -- right now I just want estimates.
A. Okay.
Q. And so I don't -- as long as you're reasonably comfortable that it was in that time frame.
A. It was mid October.
Q. That's fine.
When were you asked the question that the plaintiffs' lawyers wanted you to try to answer in this litigation?
A. Well, after the meeting we parted ways and then made contact again a few days later, and I was told that they were interested in me going ahead and doing a review and starting to establish opinions.
Q. What do you mean by they authorized you or were comfortable with you

doing a review? What does that mean?
A. Well, I felt that I was hired as a witness at that point and that's when I would begin my billable hours on this case.
Q. When was that? Sometime in later October of -- late October of 2018?
A. It was within a few days after our first meeting, still in October.
Q. What did you do to answer the question? What was your methodology?
A. Well, initially I decided to do a general literature search on the question to see what research had been performed, what reports had been written, what the quality of that research was.
Q. When did you start that?
A. Immediately. I was curious.
I began to assemble the available literature and review it on a piecemeal basis through the subsequent time period; the next couple of weeks I reviewed a lot of it.
Q. What did you search for when you did this general literature search?

A. I searched under various search terms, including "talc," including "ovarian cancer," the relationship between the two. As I became more familiar with the literature, I expanded that search into other topics.
As I became -- I was already aware of issues related to the inclusion of asbestos in talc deposits, and so I expanded my search into that part of the literature that relates to asbestos in talc or asbestos in ovarian cancer.
As I felt my opinions would need to extend into cancer and carcinogenesis in general, I did some search into ovarian cancer specifically and general carcinogenesis to see what the current state of the art was regarding that in the literature.
I looked at some issues of mining practices.
I looked at the Johnson & Johnson website. There's a webpage regarding talc and ovarian cancer that I looked at.

I looked through old notes and lecture files that I had for information that I've used or accessed previously in my professional capacity for information that was pertinent.

Just a very dendritic kind of extensive search.

Q. You reviewed these materials that you have told us about and then did you prepare your report?

A. At that point I -- well, the literature review took several stages. Typically when you perform a review like this, you end up with a -- I do a very general sort of approach to a review, so I get much more than will be pertinent to my review eventually.

I find that a valuable approach because it allows me to find things I wouldn't otherwise find or look for or know to look for.

And then I'm able to cull through that information and discard pieces of the search materials that are not relevant

or interesting to me and then refine my search and redo it, extending it into different areas that have now become pertinent in my opinion, until I satisfy myself that I have pretty much covered the waterfront so to speak in terms of a literature review.

Q. You did your literature review. You reviewed the Johnson & Johnson website and the other materials that you have told us about.

Did you then formulate your opinions and set them down in your report which we marked as Exhibit 2?

A. I did. I began writing as I reviewed the literature and continued to take notes which, through a continuous editing process, eventually became my report.

Q. Did you prepare your report?

A. I did.

Q. Did anyone assist you in the preparation of your report?

A. No one assisted me in the preparation of my report. I did receive

review of draft versions of my report and comments, in particular --

Q. Don't tell me about the comments.

A. Okay.

Q. I don't want to know what the lawyers may have told you.

Did the comments come from the lawyers for plaintiffs or did they come from other people?

A. They came from the lawyers. They also came from a few of my colleagues.

Q. Did you share your report with some of your colleagues?

A. I let a few people read it and I talked to them about it.

Q. Are the opinions your opinions?

A. Yes, they are.

Q. Have you told me, you know, generally what you have done to formulate your opinions in this matter?

A. Yes, I think so.

Q. You did all of this over a 30-day period; is that right?

A. Yes.

Q. All right. You have no invoices, correct?

A. That's correct.

Q. Is it typical that you'll work on a matter for some number of months and not generate any invoices?

A. Yes.

Q. You are billing your time at what rate?

A. $450 per hour.

Q. Can you estimate for us the number of hours that you have spent doing your literature review, formulating your opinions, and writing your report?

A. There's still some tallying I need to do from my calendar, but it's between 150 and 180 hours.

Q. Does that include your meetings and communications with plaintiffs' counsel?

A. Yes, that's up until today.

Q. Other than meeting with Mr. Abney or talking with Mr. Abney -- did you ever meet with Mr. Abney face-to-face?

A. No.
Q. What other plaintiff lawyers have you met with or talked with as part of your formulating your opinions and doing your literature review?
A. We've had a number of conference calls where there were several of these attorneys' colleagues on the line, but in terms of in-person meetings, those have been with Ms. O'Dell and Ms. Thompson, Dr. Thompson.
Q. How many meetings have you had with Ms. O'Dell?
A. Three.
Q. How many meetings have you had with Dr. Thompson?
A. Three.
Q. Did you know Dr. Thompson before you were retained in this matter?
A. I did not.
Q. Any other plaintiff lawyers in this litigation that you are aware of -- strike that.
Any other plaintiff lawyers in

this matter that you've had communications with other than what you have told us?
A. No.
Q. Do you have any social relationship with any of the plaintiffs' counsel?
A. No.
Q. Your relationship with Dr. Thompson is just the three meetings that you have been involved in with her?
A. Well, we've exchanged e-mail communications, but other than that, no.
Q. Have you met with or talked with any other expert witness for plaintiffs?
A. No, I have not.
Q. Do you know who Thomas Dydek is?
A. Yes.
Q. Who is Thomas Dydek?
A. He is a toxicologist.
Q. Where does he practice?
A. I don't recall.
Q. Have you had any discussions with Dr. Dydek?

A. I have not had any discussions with Dr. Dydek. We may have met previously, but I don't recall.
Q. Any previous meeting with Dr. Dydek, did it relate to this litigation?
A. No.
Q. Did it relate to expert witness work that you were doing?
A. No.
Q. Do you know what the relationship is, if any, between Dr. Thompson and Dr. Dydek?
A. I don't know of any relationship outside of his work as an expert witness in related litigation.
Q. Dr. Crowley, do you know Michael Crowley?
A. I know of Dr. Crowley.
Q. Did you know of Dr. Crowley before you were retained in the talcum powder litigation?
A. No.
Q. Have you ever met with Dr. Crowley?

A. I have not.
Q. Ever talked with Dr. Crowley?
A. I have not.
Q. You reviewed his report as part of your review in this matter; is that right?
A. That's correct.
Q. Do you know who any of the other experts are in this litigation for plaintiffs?
A. Well, I know there are a number of people who have generated reports that I have also reviewed.
Q. What reports have you reviewed from plaintiffs' other experts?
A. Well, I've reviewed several reports from Dr. Longo, who's done work on the presence of asbestos in talc products and related things. I think he's the only other expert that I'm aware of at this point.
Q. Well, you're aware of Dr. Crowley?
A. Well, Dr. Crowley, Dr. Longo, and Dr. Dydek that you mentioned before.
Q. Have you reviewed any reports

or transcripts from Dr. Dydek?
A. Yes, I reviewed an expert report that he provided before I got involved in this case.
Q. Did you review that report before you prepared your report?
A. Yes.
Q. Did you review Dr. Crowley's report before you prepared your report?
A. Yes.
Q. And you reviewed Dr. Longo's report before you prepared your report; is that right?
A. I've reviewed one report. There was another one that became available after.
Q. The second report is what you brought here with you today and we marked as Exhibit 5; is that right?
A. Yes.
Q. Any other plaintiff experts that you're aware of?
A. Not that I can think of, no.
Q. Any other reports from

plaintiffs' experts that you have reviewed?
A. Well, there's a -- there is an article that's been submitted for publication which I consider a piece of the scientific literature. You mentioned Dr. Saed earlier, and I know that he has a relationship with this case as well.
Q. What is his relationship with this case, Dr. Saed?
A. He's provided some work at the request of the attorneys here.
Q. Have you reviewed that work?
A. That's the subject of several articles he's published previously, he and his colleagues, as well as the additional one that I brought today.
Q. Other than the articles that you have listed on your reference and literature list and the Saed article that you brought with you today, are you aware of any other work that Dr. Saed has done in this matter?
A. No.
Q. Any other plaintiff experts

that you're aware of?
A. No.
Q. Are you aware of any of the experts for defendants in the talcum powder litigation?
A. No.
Q. Have you reviewed any reports from any of the experts in the talcum powder litigation?
A. I have not.
Q. Have you reviewed any of the transcripts of defense experts in the talcum powder litigation?
A. I've reviewed some deposition transcripts of various witnesses.
Q. Those witnesses are all listed in either your references or your literature; is that right?
A. Yes.
Q. Did you review the entire transcripts of the witnesses that you've identified?
A. I think for the most part I would say yes.

Q. Did you review the exhibits to those depositions?
A. Yes. If they were provided to me, I did, yes.
Q. Did you believe that it was your job to do an independent assessment as to whether or not the habitual use of talcum powder causes or can cause ovarian cancer?
MS. O'DELL: Object to the form.
A. Could you repeat the question, please.
BY MR. ZELLERS:
Q. Sure.
Plaintiffs asked you to -- strike that.
Plaintiffs' counsel asked you to answer that question; is that right?
A. Yes.
Q. You understood that they were looking to develop an association or a causal relationship between the habitual use of talcum powder and ovarian cancer, correct?
A. Yes.

MS. O'DELL: Object to the form.

Excuse me, I'm sorry, gentlemen. Give me just one second to object if I need to.

THE WITNESS: Sure.

MS. O'DELL: Thank you.

BY MR. ZELLERS:

Q. Did you consider the literature and the sources that refuted that association or causal relationship?

A. I tried to consider all the available literature.

Q. When you wrote your report setting forth your opinions, did you set forth the sources that refuted the propositions you were making?

A. I cited several sources that on the surface might seem to refute my opinions.

Q. And you believe that is contained in your report which we marked as Exhibit 2; is that right?

A. Yes.

Q. Have you been involved in any

other talcum powder litigation other than this talc MDL matter that Mr. Abney talked to you about?

A. No, I haven't.

Q. In the 30 to 35 occasions that you've testified in the past, have any of those been on issues relating to talcum powder and any association between talcum powder and ovarian cancer?

A. No.

Q. You are not an expert in asbestos, correct?

MS. O'DELL: Object to the form.

A. I'm an occupational medicine physician, and I have a significant amount of awareness and training regarding asbestos as it relates to occupational exposures and general environmental exposures, but I don't consider myself an asbestos expert.

BY MR. ZELLERS:

Q. What percentage of your time do you spend working as a consultant? And I'm talking about your professional time.

A. Probably 5%.

Q. What percent of your income comes from the work that you do as a consultant?

A. Of course it varies quite a bit from moment to moment, but it would be less than 10%.

Q. Have you ever testified at trial?

A. Yes.

Q. On how many occasions?

A. Probably ten.

Q. The 30 to 35 depositions that you've given previously, those have been in the context of you providing litigation consulting services; is that right?

A. In terms of expert testimony, yes.

Q. The trial appearances that you've made, are those also in your capacity as an expert witness?

A. Yes.

Q. Have you been involved in other litigations?

A. Yes.

Q. What other litigations have you been involved in as an expert?

A. Well, I've been asked to provide opinions and testify in a number of cases, most of which involved personal injury in the occupational setting or environmental exposures.

Q. Has the majority of your expert work in the occupational setting and for environmental exposures been on behalf of plaintiffs?

A. No, it's been split about 50/50, plaintiff and defense.

Q. Have you ever been retained in a case involving cosmetic products?

A. No.

Q. Your curriculum vitae that we marked as Exhibit 3, is it correct and up to date?

A. It was up to date at the time of submission of my report in the end of 2018.

Q. What additions need to be made

or corrections need to be made to your CV, Exhibit 3, to bring it up to date?
A. Well, I've terminated a relationship with the University of Texas Medical Branch in Galveston where I was their -- the medical director of their Employee Health Services Clinic. I continue to be -- serve as an assistant clinical professor of preventive medicine and family medicine at that institution.
I have terminated my relationship with the Enbridge Corporation as their medical director.
The Spectra Energy entry, which is about the seventh on the list of professional activities, is also terminated as that was a company that was merged and became Enbridge.
Q. Any other corrections or updates to your curriculum vitae that we've marked as Exhibit 3?
A. No.
Q. Why are you no longer serving as medical director, Employee Health Services

with the University of Texas?
MS. O'DELL: Objection to form.
A. That was a contract that I had through the University of Texas Houston College of Nursing that provided those services to UTMB, and UTMB decided to make a change and go with another contractor.
BY MR. ZELLERS:
Q. Why are you no longer serving as medical director for Spectra Energy Corporation and Enbridge Corporation?
A. Well, Spectra Energy no longer exists; it became Enbridge Corporation. And in October of 2018, I determined that I did not -- I no longer had sufficient time to provide that service.
Q. Your undergraduate degree was in biologic sciences with a concentration in engineering; is that right?
A. Yes.
Q. You received a Ph.D. in toxicology; is that right?
A. Yes.
Q. And then later an M.D. degree;

is that right?
A. Yes.
Q. What percentage of your time is spent in the clinical practice of medicine?
A. Currently I see patients one-half day a week and work as a supervisor of the occupational medicine residents for additional time during the week, so clinical activities would be about probably 12 hours a week.
Q. Do you see or treat women for gynecologic cancer?
A. I do not.
Q. You have never worked for a company that manufactures cosmetic products, correct?
A. That's correct.
Q. You're not a gynecologist or an oncologist, correct?
A. That's correct.
Q. You're not a cancer biologist?
MS. O'DELL: Object to the form.
A. That's correct.

BY MR. ZELLERS:
Q. You are not a geologist, mineralogist or microscopist?
A. That's correct.
Q. You're not an epidemiologist?
A. Well, I may be considered an epidemiologist simply by my appointment as an associate professor in the Department of Epidemiology at the School of Public Health here in Houston.
Q. Do you have any professional education in the field -- well, strike that.
Have you ever published or conducted a meta-analysis?
A. I have conducted meta-analyses. I've not published them.
Q. You did not do any type of fellowship in epidemiology, correct?
A. That's correct.
Q. You're not board certified in epidemiology; is that right?
A. I don't believe there is a board certification in epidemiology.
Q. You're not a biostatistician or

a pulmonologist?
A. That's correct.
Q. You're not a material scientist?
A. That's correct.
Q. Nor are you a pathologist?
A. Correct.
Q. You've never been involved in any pathological exam or research relating to ovarian cancer; is that right?
MS. O'DELL: Object to the form.
A. I'm not sure exactly what you mean by your question.
BY MR. ZELLERS:
Q. Sure. Let me withdraw that.
You've never been involved in terms of the research relating to ovarian cancer, correct?
A. Not specifically, no.
Q. You've never authored any literature or publications relating to talcum powder?
A. No.

Q. Or relating to ovarian cancer, correct?
A. No.
Q. Okay. What journals -- well, strike that.
You have never published on fragrance chemicals; is that right?
MS. O'DELL: Object to the form.
A. That's correct.
BY MR. ZELLERS:
Q. Never done any research on fragrance chemicals, correct?
A. I've done some work with fragrance chemicals and health effects that are associated with them, but I have not -- I would not classify that as research or publication.
Q. You had no opinions regarding talcum powder or any of its constituent components before getting involved in this litigation; is that right?
MS. O'DELL: Object to the form.

A. I think I had opinions about talcum powder and its constituents, but if you could be more specific, I might be able to give you a more specific answer.
BY MR. ZELLERS:
Q. Did you ever, before getting involved in this litigation in October of 2018, do research -- strike that.
You've never published on talcum powder, correct?
A. That's correct.
Q. You have never published on the constituent components of talcum powder, correct?
A. That may not be the case. I've done work in some other minerals which have resulted in publications, for example, vermiculite, which have touched on the issues of asbestos, association with talc, association with other minerals, but never specifically regarding talc.
Q. Are those publications on your CV?
A. They are.

Q. That we marked as Exhibit 3?
A. Yes.
Q. Okay. Have you ever communicated with the FDA regarding talcum powder?
A. I've not.
Q. Have you ever communicated with Health Canada regarding talcum powder?
A. No.
Q. When did you first start preparing your report which we've marked as Exhibit 2?
A. Well, I began a literature review immediately after talking to Mr. Abney.
Q. My question, I guess, is: When did you start writing your report?
A. Well, technically I started writing my report after I was retained by plaintiffs' counsel.
Q. Late October, early November 2018?
MS. O'DELL: Object to the form, misstates his prior testimony.

A. In October of 2018.
BY MR. ZELLERS:
Q. Have you reviewed any of the deposition transcripts of any of the experts that have been deposed in this litigation?
A. Yes.
Q. What deposition transcripts of experts have you reviewed?
A. Oh, of experts? No, I have not reviewed -- well, I've reviewed -- I've reviewed expert depositions, but I don't know what case they were deposed in, but it relates to talcum powder and ovarian cancer issue.
Q. What expert depositions have you reviewed?
A. They're all cited in the literature exhibit.
Q. All of the deposition transcripts that you've reviewed are cited in Exhibit 4?
A. I think any of the transcripts that I review are -- reviewed are probably included in here.

Q. Are you aware of reviewing any transcripts that you did not include in your literature statement?
A. I'm not aware, but I can't tell you as I'm sitting here right now whether all of those are included in this literature statement or not.
Q. You -- looking at page --
MS. O'DELL: I'm sorry. Go ahead.
BY MR. ZELLERS:
Q. Are there any that you believe you have reviewed that are not included in the literature statement?
A. Well, let me just see here.
There are --
MS. O'DELL: I think they're at the end, Dr. Carson.
THE WITNESS: At the very end.
A. Beginning on page 27 is a list of the depositions, transcripts and reports that I've reviewed, which include some of the expert witnesses, but again, I would have to say I'm -- I'm sort of unaware of the nuts

and bolts of what goes on legally in this case. I know there are multiple lawsuits, and I'm not sure which ones those -- these are pertinent to.
BY MR. ZELLERS:
Q. My question is a little different and I hope pretty simple: In addition to the depositions, transcripts and reports that you have listed on pages 27 and 28 of Exhibit 4, your literature list, are there any additional depositions or transcripts that you've reviewed?
A. Pardon me for a moment while I review this.
(Document review.)
A. No, I'm not aware that there are.
BY MR. ZELLERS:
Q. Your testimony earlier was that you have reviewed each of those depositions in their entirety; is that right?
A. Yes.
Q. You have also reviewed the exhibits to those depositions; is that right?

A. If they were made available to me, I've looked at all those exhibits as well.
Q. On page 27 of Exhibit 4, who is Annie Yessaian?
A. On page 24?
Q. Strike that. I'm sorry. On page 27 of Exhibit 4 --
A. I see.
Q. -- at the bottom, who is Annie Yessaian?
A. I don't recall.
Q. You reviewed her entire transcript and you don't recall who she is?
A. I don't.
Q. Well, go to the next page. Who is Pat Downey?
A. I believe Pat Downey is an operative of the Imerys company.
Q. Do you know what Mr. Downey's position is?
A. It's a supervisory position regarding -- regarding quality of the talc product.

Q. Who is John Hopkins?
A. John Hopkins is an official, I believe, of -- I'm not sure -- of Johnson & Johnson, I believe, who has some oversight of talc quality as well.
Q. Susan Nicholson, who is she?
A. I don't recall.
Q. Who is Julie Pier?
A. Julie Pier is another scientist who works for Imerys, who is responsible for testing and quality.
Q. In your clinical and academic practice, do you typically rely upon depositions of company witnesses or experts?
MS. O'DELL: Object to the form.
A. If there's pertinent information in there that leads me to other areas or helps me formulate my opinions, then yes.
BY MR. ZELLERS:
Q. In the papers and publications that you have identified in your curriculum vitae, Exhibit 3, do you ever recall citing

to company witness deposition testimony?
A. I don't typically cite deposition testimonies in published papers.
Q. You cite to various company documents. This is on pages 29 to 30 of Exhibit 4, your list of literature; is that right?
A. Yes.
Q. Did you rely on these documents in formulating your opinions?
A. Yes.
Q. Were these documents selected for you by plaintiffs' counsel?
A. Yes, they were.
Q. Are you able to identify what each of the documents are?
MS. O'DELL: Based on the Bates number?
MR. ZELLERS: Based on the Bates numbers.
A. No, I am not. I would have to look at each individual document to refresh my memory as to what it contains.
///

BY MR. ZELLERS:
Q. Once you looked at these documents, the Imerys documents and the documents produced by the Johnson & Johnson companies, did you ask plaintiffs' counsel for any additional documents?
A. I did not. My understanding is that most of these are reports, testing reports, and most of them are positive results regarding the presence of asbestos or fibers in the product. And I know that there were many others that may not have shown positive results that I did not look at.
Q. Did you ask the plaintiff attorneys to show you or provide you with the testing documentation that showed an absence of asbestos or asbestos fibers in the talcum powder?
A. Regarding the test results that are equivalent to these that were negative, no, I did not request those.
Q. Did you review documents relating to any fragrance chemicals that are contained in or that you believe are

contained in the talcum powder?
A. Yes. I did review some lists and, of course, Dr. Crowley's report.
Q. Do you have any idea or understanding as to the amount or amounts of the fragrance chemicals that are contained in the talcum powder in either the Johnson & Johnson Consumer company talcum powder that's involved in this litigation?
MS. O'DELL: Object to the form.
MR. ZELLERS: Let me withdraw that.
BY MR. ZELLERS:
Q. Do you know or have any understanding as to the amounts of fragrance chemicals that are in the talcum powder?
A. I do not have the specific formulation or quantities of those substances that contributed to the products.
Q. Do --
MS. O'DELL: Excuse me.
MR. ZELLERS: Ms. O'Dell, please, I'm going to let the doctor

finish.

MS. O'DELL: In that instance, I don't know that he was, and so if he was, my apologies.

MR. ZELLERS: It's okay.

MS. O'DELL: I've been on my best behavior today, as you know, so -- but I don't want the witness to feel as if they're being cut off, and because Dr. Carson is a very polite gentlemen, he would let you interrupt him.

MR. ZELLERS: Of course.

MS. O'DELL: And I don't think that's fair.

So, Dr. Carson, if you're finished, great. If you're not, you may continue.

A. Well, I was going to say that my opinion is that there are very small quantities of those substances that contribute to the fragrance component.

BY MR. ZELLERS:

Q. Do you know how those

quantities of fragrance chemicals may have changed over the years?

A. My understanding is they have not changed dramatically, but there have been certain substitutions over time.

Q. Do you agree that to the extent that you have reviewed internal documents, either of Imerys or from Johnson & Johnson companies, that you have only reviewed the documents that were hand-selected by the plaintiff lawyers for you to review?

MS. O'DELL: Object to the form.

A. I agree that the only documents that I've reviewed regarding the internal products of Johnson & Johnson or Imerys are the ones that were provided by the plaintiffs' attorneys.

BY MR. ZELLERS:

Q. Do you know what percentage of the documents that have been produced in this litigation by the Johnson & Johnson companies and by Imerys you have reviewed?

A. Well, based on my general

understanding of business practices and these types of industries, I've reviewed an extremely small percentage of those.

Q. Is it your practice in your academic work or your clinical research work to rely on internal company documents?

A. Yes, it is.

Q. Do you rely on internal company documents when you publish papers?

A. In some cases.

Q. Can you tell me in what cases or instances you have relied on internal company documents in your publications?

A. Well, for example, I did -- I was involved in some research work in conjunction with NIOSH at the O.M. Scott Company at Marysville, Ohio, where we did a -- we performed a research in the company and relied on some internal documents in terms of gauging concentrations, industrial hygiene records and so forth, in order to draw conclusions that were pertinent to those publications.

Q. Was that data or were those

internal communications that you relied on?

A. They were both.

Q. What is the publication on your CV where you relied on those materials?

A. Well, let me see here. I think the first author -- looking back here -- the first author would be Jim Lockey.

Q. Looking at page 6?

A. It's on page 6, and the -- there are two publications there. One is Pulmonary Changes After Exposure to Vermiculite Contaminated With Fibrous Tremolite that appeared in the American Review of Respiratory Disease in 1984.

There's another publication which is a book chapter called Pulmonary Hazards From Vermiculite that appeared in a book titled Health Issues Related to Metal and Nonmetallic Mining.

Q. Do you agree that when you have been provided only a small subset of the documents of a company relating to a particular product, that those documents can potentially be misleading?

MS. O'DELL: Object to the form.
A. I don't agree that that's the case because I am capable of understanding that it's a subset of available information, and I can make a reliable determination on the pertinence of that material regardless.
BY MR. ZELLERS:
Q. Without looking at any other documents or any documents that may put the documents you were provided in context?
MS. O'DELL: Object to the form.
A. It depends on the specific case, but I would say in most cases, yes.
BY MR. ZELLERS:
Q. In this case, it was not necessary for you to look at any documents other than those specific documents the plaintiffs provided to you; is that your testimony?
MS. O'DELL: Object to the form.
A. Regarding the contribution to

my opinions, I would say, yes, it was not necessary.
BY MR. ZELLERS:
Q. Did you do any independent investigation to reach your opinions, other than the literature search and review of websites that you told us about earlier?
A. Other than just general discussion with colleagues, no.
Q. Did any of the colleagues that you spoke with provide you with any substantive support for your opinions?
A. Not that I can recall. It was mostly just helpful feedback.
Q. The colleagues that you spoke with were who?
A. Various colleagues in my department or in the School of Public Health.
Q. Who?
A. Well, Dr. George Delclos, who is a pulmonologist; Dr. Brett Perkison, who is an occupational medicine physician; Roberta Ness, who is an epidemiologist.
Q. Roberta Ness is in your

department?
A. She's in my department, yes.
Q. You understand she's a lawyer -- strike that.
You understand she's an expert for the plaintiffs in this litigation?
A. I didn't know that.
Q. Dr. Ness never told you that she was an expert witness for plaintiffs in this matter?
A. No, we didn't discuss this case. We only discussed the issue.
Q. Any other colleagues that you discussed your report and opinions with?
MS. O'DELL: Object to the form.
A. I think I shared some of my thinking with the occupational medicine residents as a group and asked them to consider certain issues in the case.
BY MR. ZELLERS:
Q. Did they contribute to your review and analysis and opinions?
A. We had an interesting

discussion, but I don't think that changed my opinions in any way.
Q. The opinions that you're expressing in this case are your opinions; is that right?
A. That's correct.
Q. Your opinions you set forth in your report beginning on page 7; is that right?
A. Let me refer to my report, if you don't mind.
MS. O'DELL: Object to the form.
A. I would say -- I would say in answer to that question that, yes, my opinions do begin on page 7 of the report.
BY MR. ZELLERS:
Q. Your first opinion set forth on page 7 is that talcum powder is immunogenic and carcinogenic; is that right?
A. Yes.
MS. O'DELL: Excuse me.
BY MR. ZELLERS:
Q. Your second opinion is that

perineal use of talcum powder results in direct exposure to the ovaries either via inhalation or migration through the female reproductive tract, correct?

A. I would not phrase the opinion in that way, but in general, that is my opinion, yes.

Q. How would you phrase your second opinion?

A. I think my second opinion relates mostly to the direct exposure to the reproductive tract that perineal use of talcum powder produces.

Q. Are you opining as to inhalation as an exposure of talcum powder to women's ovaries?

MS. O'DELL: Object to the form.

A. Only as a secondary route of exposure.

BY MR. ZELLERS:

Q. Is it part of your opinions or do you defer to other experts on inhalation?

A. I would include that as my

opinion.

Q. So you're testifying here today that the perineal use of talcum powder results in direct exposure to the ovaries through migration through the female reproductive tract and that inhalation also results in exposure of talcum powder to the ovaries; is that right?

A. That is correct, but my basic opinion is that perineal use of talcum powder exposes the entire reproductive tract, including the pelvic cavity. So it's a bit more extensive than your phrasing.

Q. Your third opinion is very similar to your first opinion, except that here you add that it's your opinion that the ovaries are particularly susceptible to the carcinogenicity of talcum powder because they have, in your words, "no intrinsic elimination system"; is that right?

A. That's correct.

Q. Is that something you came up with on your own, no intrinsic elimination system?

MS. O'DELL: Object to the form.

A. It's an anatomical fact. The physiology of the reproductive system does not provide the ovaries with the kind of clearance system that, for example, the lungs would have for inhaled exposures.

BY MR. ZELLERS:

Q. The words "no intrinsic elimination system," are those your words or are those words that you've seen reported in another study or another paper?

A. I think that's a fairly generic description, that those are my words.

Q. Your fourth opinion is that you believe that the epidemiological studies on talcum powder and ovarian cancer show about a 30% increased risk; is that right?

A. Correct.

MS. O'DELL: Object to the form.

BY MR. ZELLERS:

Q. As you told us at the outset, those are all still your opinions, although

you do believe even stronger that there is a causal association between talcum powder and ovarian cancer; is that right?

A. That's correct.

Q. Have you published on your theory that baby powder causes ovarian cancer?

A. No.

Q. Do you have plans to do that?

A. Not presently.

Q. Have you conducted any tests or experiments to confirm your theory that talc migrates to the ovaries?

MS. O'DELL: Object to the form.

A. These are conclusions that I have drawn based on published literature. I wouldn't characterize them as a theory. I think they're pretty much established fact.

BY MR. ZELLERS:

Q. I'm going to ask you about all these opinions, and so we'll go through the literature and determine -- or at least I'll ask you questions about why you think that

some of these matters are established fact.
My question is: Did you do any tests or experiments as part of your review and analysis in this matter?
A. I did not.
Q. Did you do any tests or experiments relating to your opinion that talc causes cancer via inflammation?
A. I did not.
Q. Can you identify any article that identifies inflammation anywhere in a woman's reproductive tract that results from external genital talc application?
MS. O'DELL: Object to the form.
A. I think there are a number of published articles that allude to that relationship and draw a fairly strong conclusion that it exists.
MS. O'DELL: Mike, excuse me, and I'm sorry to interrupt. We've been going over an hour and a half. Are you at a point where we can take just a short break for...

MR. ZELLERS: Sure, we can. Let me just ask these couple of questions, and then we'll take a break.
MS. O'DELL: Sure.
BY MR. ZELLERS:
Q. So please identify for me any articles that you have reviewed that identify inflammation anywhere in a woman's reproductive tract resulting from external genital talc application.
MS. O'DELL: Objection to form.
A. I think -- I think the research evidence that includes the epidemiology piece, which is limited to external application of talcum powder, has significant enough correspondence with the biological experimentation literature that it allows us to draw those conclusions.
BY MR. ZELLERS:
Q. I understand you've drawn some conclusions here, and I'm going to ask you about these conclusions.
But what my question is: Are

you aware of any article that identifies inflammation in a woman's reproductive tract resulting from external genital talc application?
MS. O'DELL: Object to the form.
A. I would say that the studies which have looked at that have relied on the result of internal application to show migration. There have been studies that have shown inflammation as the result of talc, and in my opinion, external application is the same as internal application in the reproductive tract.
BY MR. ZELLERS:
Q. I don't mean to be argumentative, and I don't want to be, but can you name me an article that identifies inflammation in a woman's reproductive tract resulting from external genital talc application?
MS. O'DELL: Objection, asked and answered.
A. I can't specifically.

MR. ZELLERS: Let's take a break.
THE VIDEOGRAPHER: We're off the record, 10:37, end of Tape 1.
(Recess taken, 10:37 a.m. to 10:55 a.m.)
THE VIDEOGRAPHER: We're on the record at 10:55, beginning of Tape 2.
BY MR. ZELLERS:
Q. Dr. Carson, two of the things that you have reviewed since authoring your report in November of 2018 that you believe support your conclusions in this matter and your opinions in this matter are the draft screening assessment from Health Canada, which we marked as Exhibit 9, and the Taher paper, which has been marked as Exhibit 7; is that right?
A. Yes.
Q. Have you looked into what other public health authorities, other than Health Canada, have had to say about talc and ovarian cancer?
A. Yes, I have.

Page 90

Q. Did you -- strike that.
Are you familiar with the Center for Disease Control in the United States?
A. Yes.
Q. Did you review the CDC and its position on any relationship between talcum powder and ovarian cancer?
A. That may have been part of my review, but I don't specifically recall now what the CDC has on that issue.
Q. CDC does not list talc or talcum powder as a risk factor for ovarian cancer, correct?
A. It's quite possible.
Q. Mayo Clinic and a number of medical centers do not list talc as a risk factor for ovarian cancer, correct?
A. That may be true.
Q. Did you consider, or are you familiar with the National Cancer Institute?
A. I am.
Q. National Cancer Institute is a leading health authority in the United

Page 91

States; is that right?
A. Yes.
Q. Particularly in the area of cancer and materials that may or may not be carcinogenic; is that right?
A. Well, the National Cancer Institute is responsible for guiding national research policies as it relates to cancers, and that's one of their considerations is substances that may be related to cancer.
Q. When you reviewed what the National Cancer Institute has determined with respect to talcum powder and whether or not it is a risk factor for ovarian cancer, what did you find?
A. The most recent publication that I viewed discounts the relationship.
Q. In fact, the National Cancer Institute has concluded that the weight of the evidence does not support an association between perineal talc exposure and increased risk of ovarian cancer; is that right?
MS. O'DELL: Are you reading a quote from the document?

Page 92

MR. ZELLERS: I'm asking the doctor a question.
MS. O'DELL: Okay.
MR. ZELLERS: So --
MS. O'DELL: That's specific language, and if you have specific language that you're reading from the report or you've taken from the report, I would just ask that you show the doctor.
MR. ZELLERS: Ms. O'Dell, I have my question. I'm asking my question. The doctor can either answer my question or not answer my question. I'm not reading from a document. I'm reading from my notes.
MS. O'DELL: I object to the form of the question. I think it's unfair.
MR. ZELLERS: Can you answer that question, Doctor?
A. I would agree that that restates the general opinion of the NCI as published, but in order to verify the

Page 93

specific wording, I would need to look at the document.
BY MR. ZELLERS:
Q. Why would you rely on Health Canada but not these other public health organizations, including Center for Disease Control and the National Cancer Institute?
A. Well, there are a number of reasons. There are lots of public health organizations. Many of them have different interests and different approaches in the way that they address problems. For example, discussing the National Cancer Institute, its primary focus is on research and treatments regarding cancers, not necessarily causes, but it is a funder of basic research in the United States.
Health Canada is an organization whose charge is to -- is to synthesize public health-related positions based on evidence and disseminate those to public -- the public through various healthcare organizations or agencies. And

for that reason, I think it's important to look at the different focus.

Also, the Health Canada report is a more contemporaneous report, which has been based on more recent science than has been considered either by the NCI or some of the other public health organizations.

Q. The NCI's most recent update to its publication was January of 2019; is that right?

MS. O'DELL: Object to the form.

A. It's current in terms of its publication. I don't know that it's January of '19; it may be. But it's still not based on the most recently available literature.

BY MR. ZELLERS:

Q. But Health Canada is; is that right?

A. Health Canada is based on more recent literature than the NCI position.

Q. Health Canada and its assessment is based upon the meta-analysis by Taher that we've marked as Exhibit 7; is that

right?

A. It is.

MS. O'DELL: Object to the form.

BY MR. ZELLERS:

Q. You have reviewed that paper and you believe it supports and strengthens your opinions in this case; is that right?

A. Yes.

Q. Does the National Cancer Institute review the peer-reviewed literature as it relates to risk factors for ovarian cancer?

A. They have a number of committees that are set up for that purpose, and it is -- it's a committee approach which is handled by a committee chairperson. The National Cancer Institute itself has some oversight of that process, but they defer to the committee chairs.

Q. You understand that the Health Canada assessment is a draft; is that right?

A. Yes.

Q. You understand that it's at the

very beginning of the public comment period, correct?

A. Yes.

Q. You agree that Health Canada can take up to two years to either take action or no action at all; is that right?

A. I don't know that to be the case, but it very well could be.

Q. How did you come to learn of the Health Canada risk assessment?

A. I believe the attorneys let me know about it.

Q. The attorneys for plaintiffs in this matter that retained you?

A. Yes.

Q. Were you involved in the Health Canada risk assessment prior to its publication?

A. No.

Q. Have you submitted any comments to Health Canada?

A. Not yet.

Q. Do you intend to submit comments to Health Canada?

A. I might.

Q. What comments do you intend to submit to Health Canada?

A. I haven't formulated them yet.

Q. Outside of litigation, do you generally rely on draft assessments by regulatory agencies?

MS. O'DELL: Object to the form.

A. Yes.

BY MR. ZELLERS:

Q. Are you familiar with the precautionary principle?

A. I am.

Q. What is the precautionary principle?

A. The precautionary principle states that changes should take place in the face of a potential hazard until that hazard is proved not to exist. It's a general precept that's used in the EU, for example, and very different from the one that operates in this country.

Q. The principle in this country

is that there needs to be scientific evidence in order to take action; is that right?
MS. O'DELL: Object to the form.
A. Yes, that's correct.
BY MR. ZELLERS:
Q. The precautionary principle says even before there's full or complete scientific demonstration of cause and effect, it is appropriate to take a precautionary approach; is that right?
A. That's right.
Q. The Health Canada follows -- strike that.
Health Canada follows and has adopted a precautionary approach; is that right?
A. Yes.
Q. Please review Deposition Exhibit 14.
(Carson Deposition Exhibit 14 marked.)
BY MR. ZELLERS:
Q. Deposition Exhibit 14 is the

Health Canada Decision-Making Framework for Identifying, Assessing and Managing Health Risk.
Do you see that?
A. Yes.
Q. If you go to page 5 of Exhibit 14 --
MS. O'DELL: Feel free to take -- review the document if you're not familiar with it, Dr. Carson.
BY MR. ZELLERS:
Q. One of the underlying principles in the Health Canada decision-making framework is use a precautionary approach; is that right?
A. That's right.
Q. If we go to page 8, Health Canada defines the use of a precautionary approach, and looking at the second sentence: A precautionary approach to decision-making emphasizes the need to take timely and appropriate preventative action, even in the absence of a full scientific demonstration of cause and effect.

Did I read that correctly?
A. You did.
Q. Is that your understanding of what a precautionary approach is?
A. Yes. In general, the precautionary principle can be restated that an ounce of prevention is worth a pound of cure.
Q. Health Canada does not require a finding of causation such as required in litigation matters in this country, the United States; is that right?
A. In order to adopt a document that has a significant effect on general public health practices, no, it does not.
Q. The Taher paper, that's another paper that you have reviewed since you published your report; is that right?
A. Which paper? I'm sorry.
Q. This is what we've marked as Exhibit 7. You brought it with you here today?
A. Okay. Yes.
Q. You've read the Taher 2018

manuscript; is that right?
A. Yes.
Q. Where did you obtain that manuscript from?
A. This was obtained directly from one of the coauthors on this study to the plaintiffs' attorneys, who passed it along to me.
Q. So one of the coauthors on this study gave it to the plaintiffs' counsel, who then gave it to you; is that right?
A. That's correct.
Q. Who was the author of this publication, Exhibit 7, that provided the paper to plaintiffs' counsel, if you know?
A. I don't recall.
Q. But one of these authors; is that right?
A. It would -- yes.
Q. Why did you not include this paper on either your reliance list or your literature list?
A. I didn't have it at the time that those were formulated.

Q. Did you have access to the appendices and supplemental tables that are referred to in the Taher 2018 publication which we've marked as Exhibit 7?
A. The ones that are not in this -- in this document or --
Q. Yes.
A. Those -- I have not thoroughly examined those, but I do have access to them.
Q. How do you have access to those appendices and supplemental tables?
A. They were also provided to me by plaintiffs' counsel.
Q. Has the Taher publication, which we've marked as Exhibit 7, been peer reviewed?
A. It's in the process. This is a manuscript that's just been accepted for publication, so it has gone through peer review.
Q. It has gone through peer review --
A. That's my understanding.
Q. -- and Exhibit 7 is the article

that you believe will be published; is that right?
A. This is a -- this is a working manuscript which has gone through at least part of the peer-review process. There may be minor edits that occur to this, but this is substantially the final article.
Q. How do you know that?
A. That's the general process of submitting publications to peer-reviewed article -- journals.
Q. How do you know -- I'm sorry, did you finish?
A. I'm finished.
Q. How did you know the status of the peer-review process with respect to Exhibit 7?
A. Because it's been accepted for publication.
Q. How do you know that?
A. That, I was told by the plaintiffs' attorneys.
Q. And you've accepted that; is that right?

A. Yes, I have.
Q. Do you know any of the authors of this paper, Exhibit 7?
A. No, I don't.
Q. Do you know the source of funding for this paper?
A. I -- I think the sources of funding are mentioned in here.
Q. Other than what's mentioned in the paper, Exhibit 7, do you have any knowledge as to the sources of funding?
A. There's a combination of sources. In part, this work is funded through the plaintiffs' attorneys.
Q. Have you communicated with any of the authors of this paper?
A. No.
Q. Do you know the credentials of any of the authors of this paper?
A. I haven't investigated that.
Q. In your epidemiological work outside of litigation, do you rely on articles that are funded at least in part by plaintiffs' counsel in litigation?

A. If the articles represent good science, I don't really pay much attention or worry about the funding source.
Q. Do you know what conflicts of interest any of the authors have?
A. I don't know specifically. I can't recall if they're outlined in here. But the -- those are also evaluated based on the peer-review process.
Q. Do you know whether some of the authors are serving as consultants to plaintiffs' counsel in this litigation?
A. I know that -- no, I don't know that. Excuse me, I gave an incorrect answer.
Q. Sure. Correct it, please.
A. I mentioned that part of the funding for this research came from plaintiffs' counsel, and I'm not -- I don't know that that's the case. I was thinking of another research report when I said that.
Q. Do you know whether or not, at least in part, funding for this paper, the Taher paper, came from plaintiffs' counsel?
A. No, I don't.

Q. Taher, this paper, Exhibit 7, concludes that asbestos contamination does not explain ovarian cancer, correct?
A. It does come to that general conclusion.
Q. That's a different conclusion than you have formulated in this matter; is that right?
A. No, it's not.
Q. You agree that asbestos contamination does not explain ovarian cancer; is that right?
A. It doesn't completely explain ovarian cancer.
Q. Does it explain ovarian cancer?
MS. O'DELL: Objection, asked and answered.
A. I -- I don't believe it completely explains ovarian cancer, no.
BY MR. ZELLERS:
Q. Turn to page 41 of Exhibit 7. Look at the last three lines of the paper. The authors of the Taher publication state: The similarity of findings between studies

published prior to and after this point suggest asbestos contamination does not explain the positive association between perineal use of talc powder and the risk of ovarian cancer.
Did I correctly state their conclusion?
A. Well, there was a final clause of the sentence, but yes, you correctly read that.
Q. The Taher authors also discussed the lack of consistency among the various talcum powder studies; is that right?
MS. O'DELL: Object to the form.
A. I'm sorry, could you repeat that question?
BY MR. ZELLERS:
Q. Sure.
You looked at the Bradford Hill factors in formulating your opinion; is that right?
A. Yes.
Q. One of the Bradford Hill

factors is consistency; is that right?
A. Yes.
Q. You, in fact, are opining in this case that there is consistency among the talcum powder ovarian cancer studies and publications; is that right?
A. Yes.
Q. The authors of the Taher paper disagree with that conclusion; is that right?
MS. O'DELL: Object to the form.
A. I don't think they disagree with that.
BY MR. ZELLERS:
Q. Turn to page 25, Table 2. This is, again, something that you have reviewed in preparation for your deposition; is that right?
A. Well, I didn't review it in preparation for the deposition, but I've reviewed it recently.
Q. At the request of plaintiffs' counsel, correct?
A. Yes.

Q. Table 2 is a summary of evidence for each of the Hill criteria of causation as applied to perineal application of talc and ovarian cancer.
Do you see that?
A. Yes.
Q. Under Consistency, they state that 15 out of 30 studies reported positive and significant associations; is that right?
A. Yes.
Q. 15 out of 30, that's 50%, right?
A. Yes.
Q. 50% is no better than a coin toss; is that right?
MS. O'DELL: Object to the form.
A. Well, I would have to also mention that the majority of those 30 studies found positive associations. These are the ones that showed positive associations that rose to the level of statistical significance.
///

BY MR. ZELLERS:
Q. If an association is not statistically significant, then it can be due to chance; is that right?
A. But if it's due to chance over and over and over again, and you keep getting a positive association, that argues very strongly against the chance as being the only factor.
Q. Can you answer my question: A lack of a statistically significant association is consistent with or can be consistent with no risk, correct?
MS. O'DELL: Objection to form, asked and answered.
A. If you're referring to an individual study, that might be the case; however, when considering the Bradford Hill criterion of consistency, you look at the overall body of the literature and what it tells you.
There's an obvious statistical trend toward positive connection between talcum powder perineal application and the

occurrence of ovarian cancer, and the more evidence that mounts, the more strongly that association is proven.
BY MR. ZELLERS:
Q. Would you say that 15 out of 30 means there are consistent results across studies?
A. I think I've just explained to you how I believe there are consistent results across studies.
Q. The authors of the Taher paper also conclude that they do not find a consistent dose-response in the papers that look at perineal application of talc and ovarian cancer; is that right?
MS. O'DELL: Object to the form.
A. Well, what they actually say is that about half of the epidemiological studies assess only one level of talc exposure, ever versus never. So it's not possible from those studies to establish a biological gradient.
However, there are a number of

studies that have shown a biological gradient at -- especially in relation to some of the subtypes of ovarian cancer.
BY MR. ZELLERS:
Q. And I'm going to ask you about those questions, but right now I'm just asking you about the Taher paper.
A. Well, I'm trying to just completely answer your question.
Q. I'm asking you about the Taher paper. You understand?
A. Yes. This is all from the Taher paper that I read you.
Q. Section 3.3.1 talks about evidence from human studies. That's on page 20; is that right?
A. Yes.
Q. This section talks about whether or not there is a consistent dose-response found in those studies; is that right?
MS. O'DELL: What sentence are you pointing to?
MR. ZELLERS: I'm asking the

doctor questions based upon his review of the paper, Ms. O'Dell.
MS. O'DELL: Okay. Feel free to review it, Doctor, if you need to.
THE WITNESS: I'm just taking a look at this section.
BY MR. ZELLERS:
Q. And if it helps you, look on page 21, lines 174 through 177.
(Document review.)
BY MR. ZELLERS:
Q. I only want to ask you about two sentences. Are you ready for me to ask you my question?
A. Just one moment, please.
Q. Sure.
(Document review.)
THE WITNESS: All right, I'm ready for your question.
BY MR. ZELLERS:
Q. The Taher paper states that many of the studies only reported on the ovarian cancer risk assessing one exposure category and that exposure response analyses

were not done in all studies; is that right?
A. Yes.
Q. When conducted, findings from trend analyses were not consistent; is that correct?
MS. O'DELL: Object to the form.
A. Yes.
BY MR. ZELLERS:
Q. All right. With respect -- I'm done with that paper.
You discuss your opinion number 1 on page 7 of your report; is that right?
A. Yes.
Q. You first state on page 7 that you believe talcum powder is immunogenic and produces chronic inflammation in the tissues; is that right?
A. Yes.
Q. You state that other components in talcum powder, including mineral fibers, asbestos, fibrous talc, carcinogenic metals and other chemicals intensify the

inflammatory response and stimulate cell growth and proliferation; is that right?
A. Yes.
Q. Other than asbestos, what mineral fibers in talc intensify the inflammatory response?
A. Well, the endogenous fibrous talc fibers also intensify the response.
Q. Other than asbestos and fibrous talc fibers, what mineral fibers in talc do you believe intensify the inflammatory response?
A. I'm not really able to answer that question because I don't have a specific opinion about it. I'm not a geologist.
Q. Are the other chemicals that you refer to in this section fragrance chemicals?
A. Yes.
Q. Any others?
A. None that are intentionally added.
Q. You claim, again on page 7, that talcum powder produces chronic

inflammation in the tissues in which it sequesters; is that right?
A. Yes.
Q. Assuming for the moment that talc can reach the ovaries, is it your opinion that talc produces chronic inflammation in the ovaries and that this somehow leads to ovarian cancer?
A. It is my opinion that talc produces chronic inflammation in the epithelial tissues of the ovaries and surrounding epithelial tissues and leads to both carcinogenesis initiation and promotion.
Q. There are no reports in the literature of externally applied talc leading to inflammation, granulomas, fibrosis or adhesions anywhere along a woman's reproductive tract, correct?
MS. O'DELL: Object to the form, asked and answered.
A. Well, that's similar to the question that you asked earlier, and although I'm not aware of experimental reports that specifically jive with that condition,

certainly there are a lot of theoretical reports that have been published.
For example, Dr. Ness' article from '99 lays out the theory of inflammation and relates that to talc exposure from perineal application.
BY MR. ZELLERS:
Q. This is your colleague, Dr. Ness; is that right?
A. Ness, and Coussens, when she was at Pittsburgh.
Q. Dr. Ness, you showed her your report and asked for her comments; is that right?
A. I didn't show her the report.
Q. Well, you talked to her about and showed her your conclusions and your opinions; is that right?
A. No, I talked to her about the paper.
Q. Her paper?
A. Yes.
Q. Did you share with her that you were going to be an expert for the plaintiffs

in this litigation?
A. No, I didn't.
Q. Did she wonder or ask why it was that you were researching or looking into this issue?
A. She -- I think she may have, yeah.
Q. And what did you tell her?
A. I told her I had been recently asked to look into it.
Q. Did you tell her that you'd been asked to look into it by counsel for plaintiffs in the talc litigation?
A. No, I didn't.
Q. And that never came up; is that right?
A. It didn't.
Q. And she never talked to you or told you about her experience and her work as counsel -- strike that, as an expert for plaintiffs; is that your testimony?
A. Yes. It was a very brief conversation.
Q. If up to 50% of all U.S. women

have used genital talc, shouldn't there be studies which have shown inflammation, granulomas, fibrosis or adhesions in a woman's reproductive tract?
MS. O'DELL: Object to the form.
A. Well, there are studies that show those things.
BY MR. ZELLERS:
Q. Please, tell me the published studies that demonstrate inflammation, granulomas, fibrosis or adhesions in a woman's reproductive tract from externally applied talc?
A. Well, you're adding a new condition now.
Q. I'm sorry if I didn't add that before.
A. There are multiple studies that show inflammation and other inflammatory reactions in connection with the occurrence of ovarian cancer.
The piece that you're now asking for is the external application of

talc relating to that, and to my knowledge, there are no experimental reports or case reports that can document that at the current time.
Q. Granulomas, fibrosis and adhesions do not cause ovarian cancer, correct?
MS. O'DELL: Object to the form.
A. The inflammatory process that is intimately connected with granuloma formation may well be the same process that results in mutation and promotion of ovarian cancer. So I -- I could not agree completely with your statement.
BY MR. ZELLERS:
Q. Is there a good scientific basis today to opine that granulomas, fibrosis or adhesions cause ovarian cancer?
MS. O'DELL: Object to the form.
A. No, I don't think they cause ovarian cancer.
///

BY MR. ZELLERS:
Q. Would you agree that not all inflammatory conditions lead to cancer?
A. Yes.
Q. It's true that all of us experience inflammatory reactions of one sort or another, including chronic conditions, that do not lead to cancer, correct?
A. That's correct. Although there is a strong relationship between inflammatory processes and the occurrence of cancers, and some of those inflammatory diseases that you're referring to also have associations with increased rates of cancers.
MR. ZELLERS: Move to strike as nonresponsive.
BY MR. ZELLERS:
Q. Rheumatoid arthritis is an inflammatory condition; is that right?
A. Yes, it is.
Q. Does it increase the risk of ovarian cancer?
A. I think I -- it does -- it's not associated with ovarian cancer, but I

think it may be associated with other cancers.

Q. Does -- strike that.

Is psoriasis an inflammatory condition?

A. Generally, it is.

Q. Is it associated with an increased risk of ovarian cancer?

A. Not that I'm aware.

Q. In your report you state that inflammation is a normal body process that leads to the thwarting of infection and rapid healing; is that right?

A. That's correct.

Q. If your inflammation theory is correct, why doesn't inflammation generally, such as in pelvic inflammatory disease, cause ovarian cancer?

A. It may do so.

Q. You are opining under oath here that pelvic inflammatory disease causes ovarian cancer?

A. I think there are experts who have concluded that.

Q. What study are you relying on for that opinion or statement?

A. That's not part of the opinions that I've been asked to consider in this -- in this case.

Q. As you sit here, can you cite me a publication or a study that finds that pelvic inflammatory disease causes ovarian cancer?

MS. O'DELL: Object to the form.

A. Well, I have -- I have a list of studies that relate inflammation to ovarian cancer and other cancers.

BY MR. ZELLERS:

Q. Can you name me a study or a publication?

A. Okay. I think I have my list here.

Q. You brought other materials with you?

A. I brought this list.

Q. All right. Well, what list are you pulling out of your pocket?

A. This is a list that I've put together of some of the studies I've considered and how they relate to things I might testify to today.

Q. Why did you not tell me about your list that you brought with you today before now?

A. Well, I'm telling you about it now.

Q. My question is why did you not, when I asked you what you brought to the deposition today, not take the list out and show us the list?

A. I didn't think of it.

Q. Okay. We'll mark your list as Deposition Exhibit 15.

(Carson Deposition Exhibit 15 marked.)

BY MR. ZELLERS:

Q. These are a number of notes, four pages of notes. Are these all your notes?

A. Yes.

Q. First page has got a section of

articles on asbestos and ovarian cancer; is that right?

A. Yes.

Q. It also has inflammation and cancer and a number of studies; is that right?

A. Yes.

Q. Second page has got cohort, where you've listed out the four cohort studies; is that right?

A. Yes.

Q. Beneath that are the meta-analyses where you've listed those out and made some notes on those, correct?

A. Yes.

Q. The back page of the second page has got a listing of a number of the case-control studies, correct?

A. Yes. Those are duplicated on another page.

Q. The third page has got a section on migration and studies that you're looking at for that proposition, correct?

A. Correct.

Q. Underneath that, ovarian cancer risk; is that right?
A. Yes.
Q. Underneath that, talc and other cancer; is that right?
A. Yes.
Q. And then on the last page, page 4, is a listing of the case-control studies with the odds ratios and confidence intervals; is that right?
A. For the most part, yes.
Q. All right. So looking now at your list of studies that you have prepared, which study demonstrates or supports the proposition that pelvic inflammatory disease causes ovarian cancer?
A. Looking through here, I don't have that item specifically in my notes, but I'm just using my notes to refresh my memory about the individual research report. I think the Coussens and Werb paper from 2010 talks about general mechanisms of inflammation in relation to the occurrence of ovarian cancer.

And there's the Ness and Cottreau paper from '99.
Okada has discussed it in the 2007 paper. And there's a paper from 2001 which is Balkwill and Mantovani which discusses the relationship between talc and ovarian cancer and also discusses the relationship to other sources of inflammation.
Q. Each of those papers that you've identified you believe state that pelvic inflammatory disease is a cause of ovarian cancer, correct?
MS. O'DELL: Object to the form.
A. Well, I don't think they state that in so many words, but if you read the paper and you understand that -- what pelvic inflammatory disease is and its relationship to inflammatory processes in general, yes, that's what they're saying.
BY MR. ZELLERS:
Q. Doctor, my question to you was: Are you aware of any papers in which the

authors conclude that pelvic inflammatory disease causes ovarian cancer? Do you believe each of the authors in the studies that you've identified, that their studies stand for that proposition?
MS. O'DELL: Object to form, asked and answered.
A. I think all of the studies that I've identified for this question do allude to that, yes.
BY MR. ZELLERS:
Q. That pelvic inflammatory disease causes ovarian cancer, correct?
A. That it is a -- it's a factor, yes.
Q. It's a cause. That's what they state in those papers, right?
MS. O'DELL: Object to the form.
BY MR. ZELLERS:
Q. That's your testimony?
MS. O'DELL: Excuse me, misstates his testimony. Object to the form.

A. I would say it's a factor and leave it at that.
BY MR. ZELLERS:
Q. All right. Are you familiar with pleurodesis?
A. I am.
Q. Does a pleurodesis cause cancer?
A. It is not known to, although it might.
Q. Are you familiar with the study, 1979, A survey of the long-term effects of talc and kaolin pleurodesis?
A. Can tell me who the author of that was?
Q. Sure. The author is -- this is from the Research Committee of the British Thoracic Association. The members of the subcommittee were Chappell, Johnson, Charles, Wagner, Seal, Berry and Nicholson.
Are you familiar with that paper?
A. I'm not familiar with the paper. I may have looked at it in the past.

Q. We'll take a look at it. We'll mark it as Deposition Exhibit 16.
(Carson Deposition Exhibit 16 marked.)
A. Thank you.
MS. O'DELL: Thank you.
BY MR. ZELLERS:
Q. This was a study that looked at the association between pleurodesis and lung cancer; is that right?
A. Yes.
Q. It's a study that you cite on page 1 of your literature list; is that right?
A. Okay. Yes.
Q. So you've read it; is that right?
A. I have.
Q. You've considered it; is that right?
A. Yes.
Q. They looked at 210 patients that underwent a pleurodesis with talc or kaolin 14 to 40 years before; is that right?

A. That's correct.
Q. And they found that there was no increased incidence of lung cancer and no cases of mesothelioma; is that right?
A. That's correct.
Q. Why don't -- well, strike that.
You're aware of the studies that have looked at antiinflammatory drugs and aspirin use with respect to whether or not they're associated with -- let me withdraw that.
Are you familiar with the NSAID and aspirin use studies relating to the incidence of ovarian cancer in chronic users?
A. I'm familiar with some of those, yes.
Q. If your theory is correct that inflammation causes ovarian cancer, then you would expect that the studies of NSAIDs and aspirin use, antiinflammatory drugs that reduce inflammation, would consistently reduce the incidence of ovarian cancer, correct?
MS. O'DELL: Object to the

form.
A. I think that was the hypothesis of those research reports.
BY MR. ZELLERS:
Q. And, in fact, the NSAID studies do not find a consistent causal reduction in the risk of ovarian cancer; is that right?
A. I think that's correct.
Q. In your report you also state that studies show that use of cornstarch instead of talcum powder reduces the risk of ovarian cancer; is that right?
A. Yes.
Q. If inflammation causes cancer, why would cornstarch be a superior alternative to talc?
A. The reason is that cornstarch, being a biological product, is much -- it does have a rapid clearance from the body, even when sequestered, in comparison with a mineral substance like talc.
Q. Well, in fact, cornstarch causes or increases the risk of inflammation, granulomas, fibrosis and adhesions, correct?

A. It may, yes.
Q. Just like you claim talcum powder increases the risk of inflammation, granulomas, fibrosis and adhesions; is that right?
MS. O'DELL: Object to the form.
A. I think you are -- you're parsing terms here. That list of things were your words. I was agreeing with the relationship between talc and inflammation in ovarian epithelial tissue and the production or granulomas. I did not discuss the relationship between talc and adhesions or fibrosis. There was one other thing on your list.
BY MR. ZELLERS:
Q. Well, in fact, the FDA has banned the use of cornstarch as a powder for lubricating surgical gloves; is that right?
A. It has, but that's not the reason.
Q. Well, the reason that they banned the use of cornstarch is because it

presented an unreasonable and substantial risk of illness or injury and that that risk cannot be corrected or eliminated by labeling, correct?

A. I don't know the specific language. It looks like you're reading from a Federal Register document.

The main reason that cornstarch has been banned as a lubricant in gloves is because of the potential for transmission of primarily respiratory problems through inhalation, mostly by co-workers, not by patients.

Q. You do agree that cornstarch has been banned by the FDA for use in surgical gloves; is that right?

A. All powdered gloves have been essentially banned from hospitals and operating rooms now.

Q. You also talk about inflammation and oxidative stress; is that right?

A. Yes.

Q. Does the presence of oxidative

stress in a tissue indicate that cancer will develop in that tissue?

A. No.

Q. If exposure to a substance causes oxidative stress in certain tissue, does that mean exposure of all other tissues to that substance will cause oxidative stress in those tissues?

A. Not necessarily.

Q. Does the body have protective mechanisms that can limit tissue damage from oxidative stress?

A. Yes.

Q. Do all substances that cause oxidative stress also cause cancer?

A. I'm not sure the answer to that question is known.

Q. Are there any studies or publications that indicate that oxidative stress is involved in the development of ovarian cancer?

A. If I can define the term "oxidative stress," I could give you an answer to that, that question.

Q. Why do you have to have a special definition of "oxidative stress"? I'm asking simply: Is there a publication or a study which documents that oxidative stress is involved in the development of ovarian cancer?

MS. O'DELL: Object to the form.

A. Sure.

BY MR. ZELLERS:

Q. And what paper are you going to point me to?

A. Well, I'll point you to the Ness paper to begin with, because it was one of the earlier papers that related oxidative stress from talc to the occurrence of ovarian cancer. But the relationship between inflammation, which essentially is the source of the oxidative stress, and cancer goes all the way back into the 19th Century in terms of its proposal as a rationale.

Q. Is oxidative stress a variation of inflammation as you're using that term relating to a potential cause of ovarian

cancer?

A. It's a component of inflammation.

Q. As a toxicologist, how would you define fibrous talc?

A. Fibrous talc is a form of talc that is conformed into elongated structures that have an aspect ratio of length greater than width that is different from the majority of talc which is the platy form.

Q. Do you consider yourself to be an expert on fibrous talc?

A. No, I don't.

Q. Do you consider yourself to be an expert on oxidative stress?

A. I have dealt a lot with issues of oxidative stress and health effects resulting from it.

Q. Do you consider yourself to be an expert in oxidative stress?

MS. O'DELL: Objection, asked and answered.

A. I'm not a specific expert in oxidative stress, but I can -- I can opine

regarding my professional understanding and training.
BY MR. ZELLERS:
Q. You've never been involved in terms of any research or publication on the subject of oxidative stress and any association with ovarian cancer, correct?
A. Not in terms of ovarian cancer, no.
Q. You have not been involved in any research or publication relating to the subject of inflammation and its association with ovarian cancer, correct?
A. No. All right. Yes, correct.
Q. Yes, it is correct? Okay.
You claim that the presence of asbestos and fibrous talc further intensifies the carcinogenic effect of talc; is that right?
A. Yes.
Q. Is that statement different from the statement directly above where you allege that asbestos and mineral fibers intensify the inflammatory response and

stimulate the cell growth and proliferation?
A. It's not different, no.
Q. Are your opinions dependent on talc containing carcinogenic asbestos and/or fibrous talc?
A. No.
Q. Do you believe that talcum powder without asbestos causes ovarian cancer?
A. I believe talcum powder causes ovarian cancer. I have not seen any research done on talcum powder that has been shown not to contain asbestos.
Q. Your assumption that you have made in formulating your opinions here is that talcum powder contains asbestos; is that right?
A. No.
Q. What assumption have you made as to whether or not talcum powder contains either asbestos or fibrous talc?
MS. O'DELL: Object to the form.
A. Looking at the research

reports, the epidemiology first, is looking at the relationship between perineal use of dusting powders, talcum powders and ovarian cancer.
Although there have been efforts in some of those studies to characterize the proportion or the ingredients that would be either asbestos or fibers, that's not done in all cases, and it's not ruled out in any cases.
The -- also, the research studies that have been performed, the testing, for example, of the products themselves are replete with reports of components of these powders that are fibrous in nature.
MR. ZELLERS: Move to strike as nonresponsive.
BY MR. ZELLERS:
Q. Do you believe that all talcum powder products that are on the market contain asbestos?
MS. O'DELL: Object to the form.

A. I don't know.
BY MR. ZELLERS:
Q. Does it matter to your opinion as to whether or not the talcum powder products, and particularly the talcum powder products involved in this case, contain asbestos?
A. I wouldn't have a way to be able to answer that yes or no.
Q. Do you -- strike that.
Have you reached a conclusion as to whether or not the talcum powder products involved in this case contain fibrous talc?
A. I think that most of them do.
Q. Does all of the talcum powder contain fibrous talc or just some of it?
A. Certainly a lot of it does.
Q. The basis for your conclusion that the talcum powder at issue in this case contains fibrous talc is the testing reports that plaintiffs' attorneys gave you?
MS. O'DELL: Object to the form.

A. Yes. Also Longo's publications and reports.
BY MR. ZELLERS:
Q. You have reviewed the Longo reports; is that right?
A. Yes.
Q. Have you ever met with him?
A. No.
Q. Do you know his qualifications?
A. I looked at his qualifications at one point, but I don't recall exactly what it is at this stage.
Q. Ever hear of him before this lawsuit, your getting involved in the talc litigation back in October of 2018?
A. No.
Q. Have you reviewed any of Longo's testing where he did not find asbestos?
A. I -- the only thing I've reviewed are what's present in those reports that I cited.
Q. Were you provided by counsel for plaintiffs with any testing reports from

Longo where he did not find asbestos?
A. There are some of those listed in his reports.
Q. Have you reviewed the FDA's testing of talcum powder products?
A. The FDA didn't really do much testing of talcum powder products.
Q. Have you reviewed the FDA's testing of talcum powder products?
MS. O'DELL: Objection, vague.
A. The only FDA testing that I looked at was the -- I have it referenced in my list, but the FDA, based on a recommendation, requested samples from various companies, I think nine different sources of talc. They received four and tested those. And based on their test method determined that there was not a -- not evidence of a significant hazard.
BY MR. ZELLERS:
Q. Have you made any effort to quantify the amount of any alleged contaminant in the Johnson & Johnson Consumer talcum powder?

MS. O'DELL: Object to the form.
A. That wasn't my charge. I defer to the other experts in this case.
BY MR. ZELLERS:
Q. Do you have an opinion on what type of asbestos you believe is in the talcum powder products at issue in this case?
A. Well, there have been various types shown, but I think for the most part it's tremolite and anthophyllite.
Q. Are you familiar with crocidolite?
A. Yes.
Q. Is crocidolite found in talcum powder or baby powder?
A. It's not commonly found in it.
Q. You believe that the asbestos -- types of asbestos that may be in the talcum powder at issue in this case is tremolite and acidolite [sic]?
MS. O'DELL: Objection.
A. Anthophyllite. There are others found, but you asked for most common.

BY MR. ZELLERS:
Q. Most common you believe are tremolite and anthophyllite?
A. Anthophyllite.
Q. Anthophyllite. Those two; is that right?
A. Yes.
Q. What types of asbestos are associated with ovarian cancer?
A. Well, I'll go back to my list again. Crocidolite is associated with ovarian cancer in the Acheson report from 1982, which was from female gas mask manufacturers in England who made gas masks during the period of the Second World War, and crocidolite is associated with that with a fairly high relative risk of 2.96. Chrysotile asbestos had also a positive relative risk of 1.74.
There was a study of factory workers and pipe laggers in east London, which is the Berry report from 2000, that showed a relative risk of 2.53, and those workers were exposed to primarily asbestos

cement products and plasters, so the --
Q. What type of asbestos, if you know?
A. That would have been primarily amphibole asbestos types, which would include crocidolite and tremolite and anthophyllite, amosite is in that category.
Bertolotti in 2008 published a report -- actually, there were several reports that resulted from the Eternit factory studies in Casale Monferrato in Italy, which was a plant that manufactured cement sheet and corrugated tubing, and there were a number of studies that showed elevated relative risks in persons exposed to asbestos in that work, and that would also have been amphibole asbestos types.
Q. The studies that you've recited for us, those are all occupational studies; is that right?
A. Yes. I've got a lot more.
Q. Well, and it's on your list, which we marked as Exhibit 15; is that right?
A. That's correct.

Q. All right. Those studies did not involve the perineal application of talcum powder products; is that right?
MS. O'DELL: Object to the form.
A. It was not a factor in the study.
BY MR. ZELLERS:
Q. Crocidolite and chrysotile asbestos has generally not been found in talcum powder products, correct?
A. In general, that's the case.
Q. Was there ever a point in time where you believe that the talcum powder products involved in this case were not contaminated with asbestos?
MS. O'DELL: Objection to form, vague as to time.
A. My understanding is that Imerys and their predecessors and Johnson & Johnson made significant efforts to reduce components of asbestos in their talc products over a number of years and made step-wise progress in doing that.

But based on my current understanding, I don't believe they've ever been totally successful in doing so.
So in answer to your question, which I think was, was there ever a point in time where you believe the talcum powder products involved in this case were not contaminated with asbestos, no.
BY MR. ZELLERS:
Q. You cite in your report, page 5, to two exhibits to the depositions of John Hopkins and Julie Pier in support of your opinion that talcum powder products contain asbestos; is that right?
A. That's correct.
Q. Looking at page 5, footnote 1, you cite to Exhibit Hopkins-28 in the Hopkins deposition and Exhibit Pier-47 in the Pier deposition; is that right?
A. That's correct.
Q. Are you aware that those exhibits were created by plaintiffs' counsel?
MS. O'DELL: Objection to form.
A. I didn't -- I -- I don't know

that and doesn't matter to me.
BY MR. ZELLERS:
Q. Do you know where the data in those exhibits come from?
A. Well, they come from the two persons who are testifying who have produced them from their -- mostly from their business records.
Q. Okay. So you believe that Exhibit Hopkins-28 to the Hopkins deposition and Exhibit Pier-47 to the Pier deposition come from the business records of the Johnson & Johnson Company and Imerys?
A. From the most part, there was a -- there was a table that was constructed during the deposition which was sort of a piece of summary information. I don't know if it's an exhibit to the deposition or if it's something separate from that, but it would not have been from business records, but occurred at the deposition itself.
MS. O'DELL: Excuse me, Dr. Carson, would you like to see a copy of exhibit -- of the Hopkins

Exhibit Hopkins-28 and Pier Exhibit Pier-47 in answering these questions?
THE WITNESS: If that's easy to do, yes.
MS. O'DELL: It's very easy to do. This is a copy of Exhibit Hopkins-28 of the Hopkins deposition and Exhibit Pier-47 of the Pier deposition.
THE WITNESS: Okay.
BY MR. ZELLERS:
Q. Dr. Carson?
A. Yes, sir.
Q. Did you make any effort to investigate the alternative explanations for the data that's contained in those two exhibits, Exhibit Hopkins-28 and Exhibit Pier-47?
A. Alternative explanations, I'm not sure what you mean by that.
Q. If the Johnson & Johnson company -- companies' scientists and Imerys' scientists opined that those tests don't

actually show asbestos, you have no expertise to dispute that, do you?
MS. O'DELL: Object to the form.
A. No, I don't have any personal expertise to dispute that.
BY MR. ZELLERS:
Q. Do you know whether or not any of the talc product that is identified on Exhibit Hopkins-28 and Exhibit Pier-47 was actually used in the talcum powder products that were sold by the Johnson & Johnson Consumer Products company?
MS. O'DELL: Objection to form.
A. I -- it's my understanding that some of these results, at least -- in particular from the Pier deposition, that some of these results were from testing that was done on material that had already been shipped and probably incorporated into products.
BY MR. ZELLERS:
Q. Do you know whether or not any of the talc that is referred to on the two

exhibits you're looking at, Exhibit Hopkins-28 and Exhibit Pier-47, were included in talcum powder product sold by J&J Consumer Products?
MS. O'DELL: Objection to the form, asked and answered.
A. No, I don't.
BY MR. ZELLERS:
Q. Have you confirmed -- strike that.
What amount of asbestos exposure is associated with ovarian cancer?
A. Any.
Q. Your testimony under oath is that any asbestos exposure is associated with ovarian cancer?
A. Any asbestos exposure and any perineal application of talcum powder is associated with an increased risk for ovarian cancer.
Q. The amount of asbestos contained -- or allegedly contained within the baby powder is of no consequence, correct?

MS. O'DELL: Object to the form.
A. No, it is of consequence, and a larger dose would be a greater hazard. But that doesn't mean that a low dose is not a hazard.
BY MR. ZELLERS:
Q. My question is: Do you know the amount of alleged asbestos exposure that's associated with ovarian cancer?
A. No.
Q. Do you know the type of ovarian cancer that asbestos is associated with?
MS. O'DELL: Object to the form.
A. It's associated mostly with the collection of epithelial ovarian cancers --
BY MR. ZELLERS:
Q. What --
A. -- primarily serous.
Q. Does the type of ovarian cancer vary based upon the type of asbestos?
A. Not that I'm aware of.
Q. You believe that all types of

asbestos can produce all types of ovarian cancer; is that correct?

MS. O'DELL: Object to the form.

A. I suspect that some forms of asbestos are much more carcinogenic than others, and that would be true for the ovaries as well as other structures in the body.

BY MR. ZELLERS:

Q. Are you able to distinguish for us what types of asbestos cause or are associated with what types of ovarian cancer?

A. I don't think I'm able to make those distinctions, but the studies I just read to you regarding the relationship between asbestos and ovarian cancer and the others on my list do indicate that there are, for example, in the Acheson study, there were -- there was a positive relationship between both crocidolite and chrysotile exposure, and the crocidolite had a greater effect on ovarian cancer than the chrysotile, but did not have -- they were both positive.

Q. What type of ovarian cancer?

A. That, I don't know at the moment. I could look in the paper and see if it's listed.

Q. There are a number of different types of ovarian cancer; is that right?

A. That's correct.

Q. You are not familiar with J&J Consumer Products' procedures for milling or mining; is that right?

MS. O'DELL: Object to the form.

A. I'm familiar with some of their procedures, yes.

BY MR. ZELLERS:

Q. Are you familiar with their testing of source mines?

A. To some extent.

MS. O'DELL: Object to the form.

BY MR. ZELLERS:

Q. Is it set forth in your report, or is that just background information that you looked at?

A. That's background information and my personal knowledge.

Q. You are not going to give an opinion on mines, mining or milling in this case; is that right?

A. Depends on the questions.

Q. Well, as you sit here today, do you intend to give opinions on talc mining, mines or milling?

A. It wasn't my intention, but if asked a question that I think I'm qualified to answer, I'll try to do it.

Q. Are you an expert on talc mining and milling?

A. I'm an expert on industrial processes in general, and if -- I have some personal understanding of talc mining and milling.

Q. Have you been personally involved in talc mining and milling?

A. I haven't been involved in it; I've observed it.

Q. Do you consider yourself to be an expert in talc mining and milling?

MS. O'DELL: Objection, asked and answered.

A. No, I don't.

BY MR. ZELLERS:

Q. You have no independent basis to say that cosmetic talc contains asbestos, correct?

MS. O'DELL: Object to the form.

A. What do you mean by independent basis?

BY MR. ZELLERS:

Q. You have not done any testing of talcum powder to determine whether it contains asbestos or not; is that right?

A. No. All of my understanding is based on other sources.

Q. And those other sources would be, in part, the testing that was done by Longo; is that right?

A. Yes, as well as the testing that's reported in the -- in the literature section as the Imerys test results and quality control materials.

Q. You're looking now back at the Pier Exhibit Pier-47 and the Hopkins Exhibit Hopkins-28; is that right?

A. I was actually referring to the Imerys documents that are referenced toward the end of the literature exhibit to my report, but certainly the Exhibit Pier-47 would be included there.

Q. You have no independent basis to say that cosmetic talcum powder contains fibrous talc, correct?

MS. O'DELL: Object to the form.

A. I have no independent basis, no.

BY MR. ZELLERS:

Q. You're familiar with the limitations of the research on a potential link between asbestos and ovarian cancer; is that right?

MS. O'DELL: Object to the form.

A. I'm familiar with some research limitations in that question, yes.

BY MR. ZELLERS:

Q. You agree that research on the potential relationship between asbestos and ovarian cancer has only considered a small number of cases; is that right?

MS. O'DELL: Object to the form.

A. Well, it's considered thousands of cases. Certainly in terms of the number of women who have experienced ovarian cancer it's small, but it's significant, and that's where we get research from that answers important questions.

BY MR. ZELLERS:

Q. Are you familiar with the Reid paper, 2011?

A. Yes, but it's been a while since I've looked at it.

Q. Well, I'll hand you a copy. We'll mark it as Exhibit 17.

(Carson Deposition Exhibit 17 marked.)

MS. O'DELL: Thank you.

///

BY MR. ZELLERS:

Q. The Reid paper that I've handed you, what we've marked as Exhibit 17, looks at the issue: Does exposure to asbestos cause ovarian cancer.

Is that right?

A. Yes.

Q. They talk about in terms of limitations on the first page, right-hand column, they say: Studies that have examined this issue have been limited for two major reasons.

Is that right?

A. Yes.

Q. Number one, small number of cases, much fewer women than men have been exposed to asbestos, particularly in more heavily exposed occupational settings where relative risks are higher; is that right?

A. Yes.

Q. How many of these studies -- well, strike that.

Would you agree that the studies in this area have been primarily

related to occupational exposure?

A. Primarily, yes.

Q. How many total women have been studied?

MS. O'DELL: Object to the form. In this study, in this paper, or are you talking about in general?

MR. ZELLERS: In general.

A. I don't know the answer to that.

BY MR. ZELLERS:

Q. How many women have been studied in nonoccupational studies?

A. Well, very few in comparison to the occupational studies.

Q. Are you aware of the difficulties that have existed over time in distinguishing between peritoneal mesothelioma and ovarian cancer?

A. Yes.

Q. What are those difficulties?

A. There is a potential misclassification of one as the other because they have very common habits. They look very

similar under light microscopy, and they're often difficult to distinguish, even by a pathologist, unless special tests are used.

Often these cases occur in places where they don't have the access to special test equipment that can definitively distinguish, and so they are classified and we move on.

Q. Another limitation of any studies in this area relate to the inability to account for nonoccupational risk factors for ovarian cancer other than age; is that right?

MS. O'DELL: Object to the form.

A. Are you reading also from this paper or --

BY MR. ZELLERS:

Q. I was looking now at the Camargo paper. Are you familiar with the Camargo paper?

A. If you have a copy of that, I'd like to look at it, if I'm going to answer questions about it.

Q. All right. This is a paper in 2011. We'll mark it as Exhibit 18.

(Carson Deposition Exhibit 18 marked.)

BY MR. ZELLERS:

Q. Here the authors also looked at the issue of occupational exposure to asbestos and ovarian cancer; is that right?

A. Yes.

Q. If you turn to page 216 -- I'm sorry, 1216, second-to-last paragraph before the conclusion: A further limitation of our analysis was its inability to account for nonoccupational risk factors for ovarian cancer other than age.

Is that identified by the authors as a limitation?

A. Yes, it is.

Q. Under -- if you go a page back, 1215, under Discussion, in the second paragraph, the authors talk about other studies that have been done in this area, including Edelman; is that right?

MS. O'DELL: If you need to

take a minute to refresh yourself on the page --

MR. ZELLERS: I'm looking under Discussion.

MS. O'DELL: -- please feel free to do that.

Excuse me, sir, I was talking. If you need to review the paper, Dr. Carson, please feel free to do that.

MR. ZELLERS: This doctor has given 35 depositions. He is perfectly capable of handling himself. He does not need your advice as we go along.

MS. O'DELL: Nor do I, Michael. So I'm going to deal with this witness in the way I choose, which is perfectly appropriate. If Dr. Carson needs to review the paper, he's going to review the paper. You may ask him questions, he'll be happy to respond.

MR. ZELLERS: Your job is not to coach the witness; your job is to make objections as to form or

foundation, not to make speaking objections and coaching of the witness.

MS. O'DELL: If you have a question, I'm sure Dr. Carson would be happy to address it.

MR. ZELLERS: I've asked him the question.

MS. O'DELL: Would you mind repeating the question, please?

MR. ZELLERS: Sure.

THE WITNESS: I don't remember the question.

MR. ZELLERS: Okay. I'll be happy to repeat it.

BY MR. ZELLERS:

Q. Dr. Carson, you've looked at this Camargo paper; is that right?

A. Yes.

Q. In their discussion, they talk about other research, including research done by Edelman; is that right?

A. Are you at the top of the middle column on --

Q. I'm looking under Discussion.
A. Yes.
Q. The first -- well, the second paragraph.
A. Second paragraph, yes.
Q. The magnitude of the pooled estimate is similar to that reported by Edelman; is that right?
A. Correct. Correct.
Q. Then they state: They concluded, however, that despite the positive and significant association, there was insufficient information to infer that ovarian cancers were caused by occupational exposure to asbestos because of concerns about tumor misclassification, inappropriate comparison populations and the failure to take into account for known risk factors.
Did I read that --
A. You read that correctly.
Q. All right. Are women who use talc perineally at greater risk of mesothelioma?
A. I can't say that they are, but

they may be.
Q. Wouldn't you expect to find higher rates of other cancers in women using talc like mesothelioma if they are being exposed to substantial amounts of asbestos?
A. Well, we may -- we may be seeing some mesotheliomas that are misclassified as ovarian cancers, or we may be seeing mesotheliomas and not relating talc application as a pertinent contributor to that case.
Q. You told us earlier that you thought that there may have been more asbestos in talcum powders in the 1970s; is that right?
MS. O'DELL: Objection to form.
A. I think I said there have been step-wise improvements, and I -- but I agree with that statement.
BY MR. ZELLERS:
Q. Shouldn't we have seen higher rates of ovarian cancer in the earlier studies --
MS. O'DELL: Object --

BY MR. ZELLERS:
Q. -- if your theory is correct?
MS. O'DELL: Object to the form.
A. There may have been higher rates of ovarian cancers, but you have to also understand that the latency period for ovarian cancer is pretty long. It's greater than 20 years, often as long as 40 years. And so we're still dealing with cancers that may have started back in the '70s.
BY MR. ZELLERS:
Q. Would you agree that exposure to asbestos through a perineal cosmetic talc use is different from the heavy occupational exposure that has primarily been researched?
MS. O'DELL: Objection to form.
A. Yes. I agree with that.
BY MR. ZELLERS:
Q. Are you an expert and knowledgeable about cleavage fragments?
A. I'm not.
Q. If I went through a series of questions and asked you to differentiate

between cleavage fragments and asbestos fibers, you would defer that to other experts?
A. I would.
Q. You also claim that the presence of carcinogenic metals, including chromium, cobalt and nickel in talc, adds to its carcinogenicity; is that right?
A. That is right.
Q. Do you have an opinion or knowledge as to the amounts of chromium, cobalt and nickel, if any, in talc?
A. Those metal elements are included as -- usually as impurities or in very small quantities in some deposits and are present in small amounts.
Q. Do you have any idea how much of these metals, if any, reaches a woman's ovaries each time they use talc?
A. I can't tell you how much, but I can tell you that some does, and it is -- it remains in the talc until long after it reaches the ovaries.
Q. Chromium, cobalt and nickel are

natural elements; is that right?
A. Yes.
Q. They are naturally in our bodies; is that right?
A. That's correct.
Q. They are present in food, drinking water, bottled water, vitamins; is that right?
A. To some extent.
Q. Do you have any evidence that the blood or tissue levels of any trace heavy metals are higher in genital talc users compared to nonusers?
MS. O'DELL: Object to the form.
A. I do not.
BY MR. ZELLERS:
Q. As we discussed when we talked about asbestos, you cannot evaluate the potential effects of exposure to a substance without factoring in the amount of exposure; is that right?
MS. O'DELL: Object to the form.

A. It's useful to factor in the amount if the amount is known. If the amount is not known, it's not necessarily required to draw conclusions.
BY MR. ZELLERS:
Q. In this case, you do not know the amount, be it chromium, cobalt and/or nickel; is that right?
MS. O'DELL: Objection to the form.
Excuse me. Dr. Carson, as you know, is not being offered as a case-specific expert, so that question sounds like a specific patient, and so I would -- that's my objection.
A. I do not know the amount, but my opinion is that any within the microenvironment of the inflammatory process that is occurring due to talc sequestration is contributing to the carcinogenic potential.
BY MR. ZELLERS:
Q. But you don't know for any individual plaintiff their level of exposure

to chromium, cobalt or nickel or any other heavy metal; is that right?
A. That is correct.
Q. That answer to that question would be true if I asked you about the different fragrance chemicals, correct?
MS. O'DELL: Object to the form.
A. Also true.
BY MR. ZELLERS:
Q. You did a risk assessment in this matter; is that right?
A. Yes.
Q. Do you agree that a complete and proper risk assessment involves four elements?
MS. O'DELL: Object to the form.
A. Not necessarily.
BY MR. ZELLERS:
Q. Well, you have to identify a potential hazard; is that right?
A. Yes.
Q. You've got to do some type of

dose-response assessment; is that right?
A. Not necessarily.
Q. You --
MS. O'DELL: Excuse me. If you finished -- if you need to, Dr. Carson, if you're not finished. If you're finished, fine. Sorry.
A. A qualitative risk assessment does not necessarily require a dose-response in order to reach valid conclusions.
BY MR. ZELLERS:
Q. It is not necessary to do a dose-response assessment as part of a risk assessment. Is that your testimony under oath?
A. It's not always necessary.
Q. Was it necessary in this case?
A. Well, I think there is an aspect of dose-response that was performed in the risk assessment process here.
Q. What dose-response assessment did you make with respect to chromium, cobalt and nickel and any other heavy metal?
A. There's no information

available to do a dose-response estimate for those metals.

Q. What information did you rely or use, if any, to make a dose-response assessment with respect to any fragrance chemicals?

MS. O'DELL: Objection, form.

A. There is no information available to do a dose-response estimate for the fragrances.

BY MR. ZELLERS:

Q. Did you do any type of exposure assessment in this case?

MS. O'DELL: Object to the form, vague.

A. I'm not sure exactly what you're -- what you're asking by exposure assessment.

BY MR. ZELLERS:

Q. Well, an exposure assessment is also part of a risk assessment; is that right?

A. In this risk assessment, I considered studies that are reported in the

scientific and medical literature which have reported the assessment of exposure in these cases in various forms, and I considered those exposure assessments as being valid as reported and considered them as a whole.

Q. Did you look at any exposure assessment specific to the alleged heavy metals contained in talcum powder?

MS. O'DELL: Object to the form.

A. No, I did not.

BY MR. ZELLERS:

Q. Did you look at any exposure assessment with respect to any fragrance chemicals contained within talcum powder?

MS. O'DELL: Object to the form.

A. With respect to the fragrance chemicals and the heavy metals, the only exposure assessment that I was able to do was verify that these things were present in materials.

The fragrances are always present in whatever form they were added in,

and the metals were there as the baseline component of the talc formation that they came from.

BY MR. ZELLERS:

Q. You do not know the amounts of either the heavy metals or the fragrance chemicals in the talcum powder at issue in this case, correct?

A. That's -- that's correct, I don't.

Q. You do not know -- well, strike that. I'll withdraw that.

You brought with you an IARC monograph; is that right?

A. I have a couple of them.

Q. All right.

MS. O'DELL: Are we going to -- are you going to move to --

MR. ZELLERS: We can take a break if you'd like.

MS. O'DELL: Yeah, it's been about an hour and a half.

MR. ZELLERS: Sure.

THE VIDEOGRAPHER: We're off

the record 12:32, end of Tape 2.

(Recess taken, 12:32 p.m. to 1:38 p.m.)

THE VIDEOGRAPHER: We're on the record, 1:38, beginning of Tape 3.

BY MR. ZELLERS:

Q. Dr. Carson, when we left, we were talking about the trace metals and fragrance chemicals in talcum powder, correct?

A. Yes.

Q. You do not know how much of these trace metals or fragrance chemicals reach the ovaries, correct?

A. I don't know specifically how much reaches it, but if I know it's a component of the talc, and if I know the talc reaches it, then I know some of the metals and the fragrances reach it.

Q. You don't know the component or the amount of either the trace metals or the fragrance chemicals in the baby powder, correct?

A. That's correct.

Q. You do not know the exposure of any of the women who are plaintiffs in this litigation to the talcum powder, correct?
MS. O'DELL: Individual women?
MR. ZELLERS: Yes, individual women.
A. I don't, no.
BY MR. ZELLERS:
Q. You brought with you an IARC monograph, and I think you've got several monographs that are on your literature list; is that right?
A. That's correct.
Q. Generally, IARC classifies chemicals and agents from Group 1, carcinogenic to humans, down to Group 4, probably not carcinogenic to humans; is that right?
A. That's correct.
Q. Does the classification of a substance as a known probable or possible carcinogen by IARC, and IARC is International Agency for Research on Cancer, or by the National Toxicology Program or the U.S.

Environmental Protection Agency, mean that the substance can cause all types of cancers in humans by any exposure route?
MS. O'DELL: Object to the form.
A. No.
BY MR. ZELLERS:
Q. There are different cancers that may be associated with different chemicals or agents; is that right?
A. And different routes of exposure.
Q. You can have an agent that is a carcinogen or a probable or possible carcinogen for one type of cancer, but not for another type of cancer, correct?
A. That's correct.
Q. You can have an agent or a chemical that's a carcinogen for one route of exposure for a chemical or agent but is not carcinogenic for a different route of exposure, correct?
MS. O'DELL: Objection to form.
A. Yes.

BY MR. ZELLERS:
Q. What -- would you agree that, in general, metals can differ in their toxicity and potential carcinogenicity based on their form?
A. Yes.
Q. Do you know the forms of chromium, nickel and cobalt detected in cosmetic talc?
A. There's -- metal ions are usually incorporated in the mineral lattice, and so they are part of the magnesium silicate crystal.
Q. I'm not sure if that answers my question, and if it does, I don't understand, so let me ask again.
Do you know the forms, and by that I mean valence state, of chromium or nickel or cobalt that have been detected in cosmetic talc?
A. Oh, the valence state?
Q. Yes, sir.
A. I don't know specifically, but that's dependent on the surrounding structure

that the metals are contained in, and metals can assume a different valence state depending on the redox environment.
Q. You are not, at least in this litigation today, expressing any opinion as to the valence state of chromium that may be found in cosmetic talc, correct?
MS. O'DELL: Object to the form.
A. No, I'm not.
BY MR. ZELLERS:
Q. Your second opinion is that the perineal use of talcum powder results in direct exposure to the ovaries either via inhalation or migration through the female reproductive tract; is that right?
A. Well, it's primarily through the female reproductive tract. The inhalation exposure would be a secondary route.
Q. Let me ask you a couple of questions about inhalation exposure.
You do not cite any studies in the body of your report evidencing that

Page 182

talcum powder can reach the ovaries through inhalation, correct?
MS. O'DELL: Object to the form.
A. That is correct, although there -- yes, that's correct.
BY MR. ZELLERS:
Q. You have never performed any study yourself pertaining to whether inhaled talc can migrate to the ovaries; is that right?
A. I have not, although it has been used as an explanation of how talc particles might have reached the ovaries in persons who did not have another form of exposure.
Q. If inhalation is the exposure path for talc, shouldn't the lungs bear more of a burden?
A. Yes.
Q. Why, then, isn't there an epidemic of mesothelioma in women who use talcum powder?
A. Because the primary route is

Page 183

perineal via the reproductive tract.
Q. You discuss that on page 7 of your report; is that right?
A. Yes.
Q. You cite a number of studies for the proposition that talc can be transported from the perineum to the upper reproductive tract and body cavity; is that right?
A. That's correct.
Q. None of the articles that you cite actually looked at whether talc can migrate from perineal application through the fallopian tubes to the ovaries, did they?
A. Let me just refresh my memory for a moment here. Egli was carbon black. Venter was radioactive technetium labeled albumin. Let me see. Blumenkrantz -- I have my notes here.
Yeah, I can't remember what the substance was in Blumenkrantz. Sjösten, starch -- yeah, Blumenkrantz was retrograde menstruation. Halme was talc.
Q. Which study was talc?

Page 184

A. The -- I'm sorry. The Heller study was talc, which I didn't cite here. Halme was a retrograde menstruation study via the fallopian tubes, and Sjösten was starch particles.
Q. The only study -- and this is not one that you cited, but you've now referred to that involved talc, was Heller; is that right?
A. Well, it looked at -- it didn't look at transport inasmuch as it looked at the presence of talc particles in the ovaries and found them with or without the history of talc powder use.
Q. Heller looked at 24 patients; is that right?
A. I don't know, but that sounds about right.
Q. Half of them had a history of using talc products, half did not?
MS. O'DELL: Object to form.
A. That's correct.
BY MR. ZELLERS:
Q. Heller found talc in the

Page 185

tissues of all 24 patients; is that right?
A. That is correct.
Q. I believe we covered this before, but just to confirm: There are no published articles that you're aware of that show granulomas, fibrosis or adhesions anywhere in the reproductive tract of a woman as a result of external genital talc application, correct?
MS. O'DELL: Object to the form.
A. I believe that's the case, although there have been granulomas found in some cases of cancer where they reported having used talc.
BY MR. ZELLERS:
Q. Of the cases or the studies you cited here, Egli, that involved just three women, correct?
A. That was just -- that was an experimental study of the transport of carbon particles.
Q. The women were in a lithotomy position; is that right?

A. That's correct.
Q. And that means that they had their legs up in the air, correct?
A. Correct.
Q. Those conditions -- well, strike that.
They were injected with oxytocin; is that right?
A. It is.
Q. That was to aid in the transport of the particles, correct?
MS. O'DELL: Object to the form.
A. I believe that was the author's theory.
BY MR. ZELLERS:
Q. Those are different circumstances or conditions from a woman who would apply a talc to her genital area standing up, correct?
A. Well, they are, but I'm not sure that that position is really pertinent to the migration of particles through the reproductive tract.

Q. Is it your pos- -- is it your testimony that if a woman is in a lithotomy position with their legs up into the air, that that is comparable with respect to the migration of talc to a woman who's standing up and using it in her perineal region?
A. It may be.
Q. Are you an expert on that?
A. I'm not.
Q. The authors in Egli, they stated it was possible that the study observed false positives due to sample contamination because they failed to use liquid or filter blanks as negative controls, correct?
A. I don't recall that, but that may be the case.
Q. You refer to a study by Venter. That involved a radioactive particulate matter, correct?
A. Yes.
Q. Did not involve talc particles, correct?
A. The point of the study was --

of all these studies -- that they were using various particles that could be detected at the other end, and so this was an attempt to do an experimental study which would cause no harm that would give them an answer regarding transport through the reproductive tract.
Q. In this study, particles were introduced into the reproductive tract, not externally; is that right?
MS. O'DELL: Object to the form.
A. That is correct.
BY MR. ZELLERS:
Q. Women were given Pitocin to stimulate uterine contractions; is that right?
A. That's the same as oxytocin.
Q. And that's a yes, correct?
A. Yes.
Q. Again, as with the Egli study, the women were inverted in the Trendelenburg position with their head down, legs up when the particles were administered; is that right?

A. I believe so.
Q. Is it possible that the radionuclides can leach from the particles?
A. I don't know the answer to that, but it was radioactive technetium that was bound to albumin.
Q. The Sjösten study that you cite, that did not use -- involve the perineal use of talc, but an exam with a force to the cervix; is that right?
A. Excuse me. An exam with what?
Q. So it involved an exam with force to the cervix?
MS. O'DELL: Object to the form.
A. Well, this was -- this was done as an experimental study on women who were scheduled to get hysterectomies and they did it on some women one day prior to the hysterectomy and another group of women four days prior to the hysterectomy, and they used gloves that were powdered with starch and gloves that were not powdered with starch.
And so they had what's called a

Latin square design, and they were able at the point of the hysterectomy of taking samples of the fallopian tubes and washing them to determine whether or not particles were found in the tubes.

BY MR. ZELLERS:

Q. What they actually found was that, whether the women were examined with gloves with the starch particles or not, they found starch particles in both, both groups, correct?

A. It is true.

Q. Tubal ligation, you refer to tubal ligation and use that or purport to say that that supports your migration theory, correct?

A. It does.

Q. Your testimony is that for patients who have had a tubal ligation, that they are at a lesser risk of the talc -- let me withdraw that.

Explain to us very briefly why you believe that tubal ligation supports your migration theory.

A. If the pathway of exposure of the ovaries that results in ovarian cancer is via the reproductive tract, then tubal ligation, which closes off the fallopian tubes, would interrupt that pathway and result in reduced exposure; therefore, you would expect a reduced incidence of cancer in those women.

Q. In fact, though, that is not what has been reported or at least that has not been consistently reported in the studies; is that right?

A. Well, it actually has been a positive factor in a number of the epidemiologic studies that have looked at the ovarian cancer incidence and have been able to include tubal ligation as a historical factor in their analysis.

Q. Did you look at the Terry 2013 meta-analysis?

A. Yes.

Q. You cite that in support of your positions in this case; is that right?

A. I did.

Q. In fact, in Terry -- well, and let me mark it for you so you've got it in front of you.

THE WITNESS: Okay. I'm going to move this binder for the time being, if you don't mind.

MR. ZELLERS: Oh, yes, I'll hand you the articles that I refer to, but if you need it, just pull it out.

THE WITNESS: Thank you.

(Carson Deposition Exhibit 19 marked.)

BY MR. ZELLERS:

Q. Deposition Exhibit 19 is the 2013 Terry meta-analysis that you referred to in your report; is that right?

A. Yes.

Q. That's a pooled analysis of eight studies; is that right?

A. Yes.

Q. Okay. This pooled analysis of eight studies relating to genital powder use and the risk of ovarian cancer shows no variation in the risk in talc users based on

whether they had a tubal ligation or hysterectomy; is that right?

A. I think that's the conclusion of the authors here, but it's not the conclusion of the individual authors of the studies who did the original investigations.

Q. Well, it is the conclusion of the authors based upon their meta-analysis of eight studies; is that right?

MS. O'DELL: Object to the form.

A. Let me just check that.

(Document review.)

A. Yes.

BY MR. ZELLERS:

Q. If you look at pages 819, carried over to 820, I'm reading: Our finding of slightly attenuated associations following exclusion of women with powder exposure after tubal ligation or hysterectomy are not supportive of this hypothesis, but risk estimates in this subgroup analysis may have randomly differed from those including all women because of the reduction in sample

size.
Is that right?
A. Yes.
Q. Essentially, looking at these eight studies in this meta-analysis, Terry did not find that exposure to genital powder applications that occurred before tubal ligation or hysterectomy made any substantive difference in the results; is that right?
A. Yes, but the point is that the authors didn't find that it did not make a difference either. They -- they ended up with a study with reduced numbers that they couldn't make determinations about.
Q. If, though, the migration theory is correct, you would expect that there would be a reduction in the incidence of ovarian cancer for women who have had a tubal ligation or hysterectomy; is that right?
MS. O'DELL: Object to the form.
A. Yes, that is correct.
///

BY MR. ZELLERS:
Q. And that was not found in the Terry meta-analysis that you cite; is that right?
MS. O'DELL: Object to the form.
A. That is correct, but it was found in the baseline studies that were, in part, included in this meta-analysis.
BY MR. ZELLERS:
Q. Are you -- you also cite the Cramer study, 2016; is that right?
A. Yes.
Q. I've got a few questions for you on the Cramer study, but let me just ask, since we're at this part right now.
Do you have the Cramer study? I'll hand it to you.
A. If you have a copy, I'd appreciate it.
MR. ZELLERS: Sure. We'll mark the Cramer study as Exhibit 20.
(Carson Deposition Exhibit 20 marked.)

THE WITNESS: Thank you.
MS. O'DELL: Thank you.
BY MR. ZELLERS:
Q. This is also a study, Exhibit 20, Cramer 2016, that you cite as supportive of your opinions in this case, correct?
A. Correct.
Q. Cramer actually looked at whether or not there was any greater association of talc use and ovarian cancer and whether or not women who had a tubal ligation or hysterectomy had a reduced incidence of the disease; is that correct?
A. Yes.
Q. Turn to page 337, and then it carries over to 339. They're talking -- they, being the authors -- of their results, and I'm reading just at the very bottom of 337, carried over to 339: By test for interaction, column 3, the association was significantly greater for women who were African-American, had no personal history of breast cancer, had a tubal ligation or

hysterectomy.
Is that right?
MS. O'DELL: Object to the form.
A. Beginning on page 337?
BY MR. ZELLERS:
Q. Yes.
A. I'm sorry, if you could --
Q. Sure. At the very end of 337.
A. Okay.
Q. So they're looking at --
A. Oh, by tests for interaction.
Q. Yes.
A. Yeah.
Q. So if your migration theory is correct, you would expect there to be a lower incidence of ovarian cancer in women who have had a tubal ligation or hysterectomy, correct?
MS. O'DELL: Object to the form.
A. That is correct.
BY MR. ZELLERS:
Q. All right. Cramer finds by

test for interaction the association was significantly greater for women who -- and then I'm skipping African-American, but I'm coming down to -- have a tubal ligation or hysterectomy.

Is that correct?

A. Yes.

Q. All right. If talcum powder migrates from the perineal region to the ovaries, shouldn't exposure to -- exposure to talc be far greater in concentration in the rectal, vulvar, vaginal, cervical and uterine tissues which are closer to the area of initial exposure?

MS. O'DELL: Objection to form.

A. Well, the acute exposure would be greater.

BY MR. ZELLERS:

Q. You would expect because the acute exposure is greater, that there should be inflammation caused in these organs and areas, correct?

A. No. The inflammation and oxidative stress is an ongoing process that

has to develop over time, and it occurs on a chronic basis in areas where foreign bodies locate and reside. And talc and talcum powder are examples of foreign bodies that have the right characteristics to cause chemotaxis in reactive oxygen species and oxidative status.

Q. Well, in fact, there would be chronic exposure, so if we're dealing with, as you described in the very beginning, which you were asked, to look at the habitual use of talcum powder, that would create exposure on a chronic basis to the rectal area and tissues, vulvar, vaginal, cervical and uterine tissues; is that right?

MS. O'DELL: Object to the form.

A. I suspect if one doesn't bathe, that would be more of an issue, but most people bathe regularly as well.

BY MR. ZELLERS:

Q. And bathing regularly eliminates any exposure in the rectal, vulvar, vaginal, cervical and uterine tissues

to talcum powder?

MS. O'DELL: Object to the form.

A. It doesn't -- it doesn't eliminate exposure, but it does remove residual exposure, as does sweating, other body secretions and so forth.

BY MR. ZELLERS:

Q. Are you aware of any studies that show inflammation or oxidative stress as a result of genital talc use in the rectal, vulvar, vaginal, cervical and uterine tissues?

A. No, I'm not.

Q. Under your theory or belief that talcum powder travels from the perineal region to the ovaries through the woman's reproductive tract, talcum powder must travel past the labia, through the vagina, through the cervix, and then to the uterus; is that right?

A. That's correct.

Q. And then the powder travels through the uterus and into the fallopian

tubes to reach the ovaries; is that right?

A. Yes.

Q. On what studies are you relying to say that talcum powder affects the body differently when it's applied to the perineal region and travels to the cervix compared to when it is applied directly to the cervix?

A. I don't think --

MS. O'DELL: Object to the form.

A. -- there is much of a difference.

BY MR. ZELLERS:

Q. You would expect there to be a comparable similar result whether talcum powder is applied directly to the cervix through the use of dusting of a diaphragm as there is to the use of talcum powder in the genital areas; is that right?

A. That is correct. I think the two differ probably in terms of quantity very significantly. But other than that, they would be the same.

Q. When applied to the perineal

region, talcum powder would also be in close contact with a woman's urethra; is that right?
A. Yes.
Q. Substances, and in your view, talcum powder, are capable of traveling up the urethra; is that right?
MS. O'DELL: Object to the form.
A. The urethra has a sphincter which prevents transport beyond that point.
BY MR. ZELLERS:
Q. Women get urinary tract infections when bacteria travels up the urethra; is that right?
A. That's correct.
Q. Studies, though, do not show an increase in bladder cancer with talcum powder use; is that right?
A. I don't believe that talcum powder transports in any appreciable amount up the urethra into the bladder.
Q. Studies do not show an increase in rectal cancer with talcum powder use, do

they?
A. No.
Q. Are you aware that that IARC -- and you're familiar with IARC, right?
A. Yes.
Q. Are you aware that IARC rejects this migration theory and calls the evidence weak?
MS. O'DELL: Object to the form.
A. The IARC has made that statement in their -- I think the 2006 review that resulted in their recent monograph, but I think they're about to reconsider that.
BY MR. ZELLERS:
Q. Well, they also have stated that in 2010; is that right?
A. Well, that's the --
MS. O'DELL: Object to the form.
A. That's the monograph from the 2006 review.
BY MR. ZELLERS:
Q. Why do you believe that they're

about to reconsider that?
A. Because the chatter is that this is something that's on their radar screen currently.
Q. What chatter are you aware of? And what is chatter?
A. It's discussion among -- within the scientific and healthcare community of things that are on the drawing board for IARC.
Q. Do you know whether or not IARC -- well, strike that.
IARC has not changed its position that the migration theory and evidence for the migration theory is weak; is that right?
MS. O'DELL: Object to the form.
A. They have not changed their position that was published in the 2010 monograph.
BY MR. ZELLERS:
Q. All right. You have heard chatter that they may look at it again; is

that right?
A. Yes.
Q. Other than this chatter, you're unaware of any other -- well, strike that.
You're unaware of any change in IARC's position with respect to migration, correct?
A. Well, an example of what I'm talking about is the Health Canada report, which has contradicted what is found in the IARC monograph and is more current and considers information that will probably go into the next IARC review.
MR. ZELLERS: Move to strike as nonresponsive.
BY MR. ZELLERS:
Q. Does IARC review and rely on draft assessments in formulating their positions?
A. IARC relies on primary studies.
Q. Not draft assessments, correct?
A. Well, the draft assessment that I guess you're referring to, the Health Canada draft assessment, is derived from

primary studies, the same ones that will be considered by IARC.

Q. All right. As of today, IARC's published position is that evidence of a migration theory of talcum powder migrating to the ovaries is weak, correct?

A. Yes.

Q. Have you conducted any tests or experiments with respect to your theory or position that talc migrates to the ovaries through the reproductive tract?

A. No, I haven't.

Q. How much talc actually reaches the ovaries in your opinion?

A. I can't answer that question because the dose has not been quantified.

Q. Does it only reach the ovaries during certain times?

A. I don't believe so. I think there are many circumstances whereby that migration pathway is functional, and in my belief, the pathway from the perineum to the cervix is pretty much an open channel, and then it continues to be open pretty much all

the way into the pelvic cavity.

Q. You are not a specialist in women's health issues, correct?

MS. O'DELL: Object to the form.

A. Well, I'm a doctor. I've examined a lot of women.

BY MR. ZELLERS:

Q. Are you --

MS. O'DELL: Excuse me. Are you finished, sir?

THE WITNESS: Yes, I'm finished.

MS. O'DELL: Okay.

BY MR. ZELLERS:

Q. Are you an expert in the women's reproductive tract?

A. I've taken it apart and put it back together again in medical school, and in other settings I've done OB/GYN rotations. I've participated in pelvic surgeries. I understand the anatomy.

Q. There are physicians who are specialists in the female reproductive tract;

is that right?

A. That is correct.

Q. You are not one of those physicians, correct?

A. I don't claim to be a specialist in gynecology.

Q. Your third opinion is that the ovaries lack an intrinsic elimination system; is that right?

A. That's correct.

Q. Is "intrinsic elimination system" a recognized term of art that's used by gynecologists?

A. I don't think so. It was just the term I used to describe the situation.

Q. Is "intrinsic elimination system" a term of art used by oncologists?

A. The same answer.

Q. Have you seen published studies that use that term?

A. I don't know. I suspect I could have. It's apparently a small number of ways to describe that in a few words.

Q. You do not cite to any studies

in the body of your report to support your theory that the ovaries do not have an intrinsic elimination system, correct?

A. That's correct.

Q. You have not conducted any tests to show that exposure to the ovaries to particulate matter, if any, is longer than exposure to other parts of the female anatomy; is that right?

MS. O'DELL: Object to the form.

A. I have not conducted any such tests.

BY MR. ZELLERS:

Q. Is the cervix more or less sensitive to the impact of foreign particles than the ovaries?

MS. O'DELL: Object to the form.

A. I think that the important point is the residence time that exists, and the cervix is not presented with things for an extended time like the ovaries are in relation to things like talc. But it is

sensitive.
BY MR. ZELLERS:
Q. All right. Your fourth theory -- or strike that.
Your fourth opinion is that the epidemiological studies show a positive relationship between regular perineal application of talcum powder and ovarian cancer; is that right?
A. That's correct.
Q. The studies that you reference in this opinion are referred to on pages 6 and 7 of your report; is that right?
MS. O'DELL: Object to the form.
A. Most of them, yes.
BY MR. ZELLERS:
Q. You conclude that when confounding and bias are exhaustively considered -- and do you believe you've done that here?
A. I am restating what authors of the primary studies have done. I'm evaluating the consistency of the evidence,

not the basic evidence itself.
Q. The apparent cause and effect relationship between perineal talcum powder use and ovarian cancer amounts to about a 30% increased risk of ovarian cancer in talcum powder users.
Is that your opinion in this case?
A. It is.
Q. And that is your opinion from reviewing the epidemiologic studies that you cite in your report?
A. Yes.
Q. When epidemiologists refer to the statistical power of a study, what are they referring to?
A. Statistical power refers to the ability of a study design, if carried out, to detect a signal in the data of a particular magnitude.
Q. In plain English, statistical power is the likelihood that a study will detect an effect when there is an effect to be detected; is that fair?

A. Yes.
MS. O'DELL: Object to the form.
BY MR. ZELLERS:
Q. Are you familiar with the term "person-years" as it relates to epidemiological study?
A. Yes, I am.
Q. What is -- strike that.
How are person-years calculated?
A. They are calculated by -- in relation to an exposure or to an existing treatment, they're calculated by multiplying the duration of the treatment or exposure in years by the number of people being studied. And that -- the result is person-years.
Q. Can you explain the difference between high-grade serous and low-grade serous cancer?
A. High-grade serous cancer has a -- is less differentiated and has a greater propensity for metastasis and invasion.
Q. Are you aware that the

epidemiological literature shows that these are very different cancers?
A. They behave quite differently, yes.
Q. Do you know what publication bias is?
A. Yes.
Q. What is publication bias?
A. Publication bias is the tendency to -- to spin a certain argument in -- in order to influence acceptance of publications.
Q. Is that a recognized issue in the field of epidemiology, at least as you've observed?
A. It's a -- it's not necessarily recognized in the field of epidemiology. It exists in all scientific endeavors.
Q. Is it something that you and other physicians and experts and scientists need to be aware of?
A. Yes. I think we're all exposed to the effects of that and warned about it as we go through our careers.

Q. When I asked you early on what your methodology was, you looked at the published literature, you looked at some websites I think that you told us about earlier, and then you performed a risk assessment and considered whether perineal use of talc products poses a safety risk to consumers; is that right?

MS. O'DELL: Object to the form.

A. Well, that's a gross oversimplification of the risk assessment process that I performed.

The review of the literature, which was based on the question that I was asked to address, was a fairly exhaustive one which incorporated a search for every pertinent publication that was available and included multiple languages.

It then was -- proceeded into a distillation of the facts that were -- that were claimed based on those individual studies and investigations, and a comparison of those, one with another, eventually

considering them all as a whole to arrive at conclusions that addressed the question.

BY MR. ZELLERS:

Q. That was your methodology; is that right?

A. That is the methodology, yes.

Q. Did you consider the Bradford Hill criteria or factors in reaching your conclusions and opinions in this matter?

A. That's part of the methodology which is outlined in my report.

Q. In analyzing the Bradford Hill criteria, did you conduct a meta-analysis of the available data to reach a conclusion about the relative risk?

A. No, I did not.

Q. Why didn't you conduct a meta-analysis for this case?

A. I did not have the time to do a meta-analysis in this case, first of all. Secondly, there have been a number of other meta-analyses performed, and I had those results available to me in addition to various reviews of the literature that have

been published as well. And I felt that was sufficient to be able to produce this report that addressed the question I was asked.

Q. As you told us earlier, you have never published a meta-analysis on any topic; is that right?

A. That's correct.

Q. You cite to some of the available studies on talcum powder use in ovarian cancer, but not to all of the studies, correct?

MS. O'DELL: Object to the form.

A. That's true.

BY MR. ZELLERS:

Q. What was your reasoning for focusing on certain studies and excluding other studies?

A. The studies that I referenced were those that had specific aspects that directly influenced my report or my conclusions or that I felt were illustrative of comments I was making in the report, and that's why they were referenced.

All of the studies may not have risen to that -- the level of requiring being referenced, but pretty much all the studies are included in the literature that I reviewed.

Q. You cite in the report the studies that were favorable or supportive of your opinions, correct?

A. Well, I cited a number of studies, not all of which were favorable to my overall opinions, at least not on the surface.

Q. Did you cite all of the studies that you believe in one way or another support your opinions in this case?

A. I don't think so.

Q. You believe there are additional studies that support your opinions that you did not cite?

A. They're in the literature list.

Q. Did you cite the opinions that refuted -- strike that.

Did you cite the studies that refuted your opinions in this matter?

A. I cited some studies that had opinions that -- or that had conclusions that did not necessarily agree with mine, but I don't think they refuted my conclusions.
Q. Do you believe the standard for proving causation in the scientific literature is the same one that applies in this litigation?
MS. O'DELL: Object to the form.
A. I don't know that.
BY MR. ZELLERS:
Q. A document you brought here today was an FDA letter?
A. Yeah, I think you marked it.
Q. I did mark it. Why don't you see if you could find it so I can ask you a couple of questions about it.
A. There it is. That one?
Q. Yes. Exhibit 10 is an FDA letter dated April 1st of 2014 to a Dr. Epstein; is that right?
A. Yes.
Q. That is a document that you

reviewed and considered as part of your analysis of this case; is that right?
A. Yes.
Q. Do you believe that that exhibit, Exhibit 10, is supportive of your opinions in this matter?
A. I don't think it's very supportive. It's -- it's in response to a proposal from a citizens voluntary agency to provide more stringent labeling on talcum powder products, and the agency rejected the -- that petition.
Q. The FDA is the regulatory body in the United States that oversees food, drug and cosmetics; is that right?
MS. O'DELL: Object to the form.
A. Yes.
BY MR. ZELLERS:
Q. This letter -- strike that.
In this letter the FDA goes through and analyzes some of the Bradford Hill factors; is that right?
A. I'd have to look at this in

more detail to be able to answer that specifically.
Q. Well, essentially, based upon its analysis as of 2014, the FDA concluded that causation had not been established as between genital talcum powder use and ovarian cancer or an increased risk of ovarian cancer, correct?
A. Well, it said that an updated review failed to identify any new compelling literature data or new scientific evidence. I don't think they indicate here that they actually did a standard review of that literature.
Q. Well, take a look, if you will, at page 4. The FDA sets forth its epidemiology and etiology findings; is that right?
A. Yes.
Q. The FDA has a number of very capable physicians, scientists, toxicologists, pharmacologists and medical professionals; is that right?
MS. O'DELL: Object to the

form.
A. I don't know if they're still working, but they have good people on staff.
BY MR. ZELLERS:
Q. And just so, a year or two or three, if this transcript is ever reviewed, we are in the midst of a shutdown of at least portions of the government; is that right?
A. That's correct.
Q. And that is what your comment was directed to, correct?
A. That is correct.
Q. On page 4 the FDA states: After consideration of the scientific literature submitted in support of both citizens' petitions, FDA found.
And then, number 2, that several of the studies acknowledge biases in the study design and no single study has considered all the factors that potentially contribute to ovarian cancer, including selection bias and/or uncontrolled confounding that result in spurious positive associations between talc use and ovarian

cancer risk.
Did I read that correctly?
A. You did read it correctly.
Q. Does that appear to be at least one of the conclusions of the FDA after considering the scientific literature as of early 2014?
MS. O'DELL: Object to the form.
A. Yes, that is listed as an FDI finding -- FDA finding.
BY MR. ZELLERS:
Q. The FDA noted that a dose-response -- strike that.
The FDA noted that dose-response evidence is lacking; is that right?
A. A dose-response --
Q. Two things. The FDA notes that there's a lack of consistency in the study results, correct?
MS. O'DELL: Where are you reading? I'm sorry.
MR. ZELLERS: I'm looking at

Conclusion 3.
THE WITNESS: Point 3.
A. They found that the case-control studies did not demonstrate a consistent positive association across studies; although some studies have found small positive associations between talc and ovarian cancer, but lower confidence limits are often close to 1, and dose-response evidence is lacking.
BY MR. ZELLERS:
Q. That was FDA's conclusion number 3 based upon its review of the scientific literature; is that right?
MS. O'DELL: Object to the form.
A. It's correct. It's not a valid interpretation of the statistical results, but that was one of their findings.
BY MR. ZELLERS:
Q. Well, that was their finding. You disagree at least in part with their finding; is that right?
MS. O'DELL: Object to the

form.
A. That is correct.
BY MR. ZELLERS:
Q. You are a paid expert for the plaintiffs in this litigation; is that right?
A. That is correct.
Q. To your knowledge, the FDA is not paid -- well, let me withdraw that.
A. I wouldn't go out on a limb there.
Q. Number 4, Conclusion 4, a cogent biological mechanism by which talc might lead to ovarian cancer is lacking. Exposure to talc does not account for all cases of ovarian cancer and there was no scientific consensus on the proportion of ovarian cancer cases that may be caused by talc exposure.
Was that a conclusion of the FDA based upon its review of the epidemiologic literature?
MS. O'DELL: Object to the form.
A. Yes, it was, and it's one that

I also disagree with.
BY MR. ZELLERS:
Q. IARC also considered the Bradford Hill considerations; is that right?
A. Yes, it did.
Q. IARC rejected classification of talc as a carcinogenic, instead assigning it to the classification of possibly carcinogenic to humans; is that correct?
A. That's correct.
Q. We've already discussed the IARC categories briefly, but let's mark a document from the IARC website as to the classifications, Exhibit 21.
(Carson Deposition Exhibit 21 marked.)
BY MR. ZELLERS:
Q. Tell me if you recognize that.
A. Yes.
Q. Exhibit 21 is from the IARC website, and it goes through the classifications of different agents that have been made by the International Agency for Research on Cancer; is that right?

A. Yes, that's correct.
Q. It has studied and included 120 agents in the Group 1 category, which is carcinogenic to humans, correct?
A. That's correct.
Q. That's the only category in which IARC finds sufficient evidence in humans, correct?
MS. O'DELL: Object to the form.
A. That's the category that represents substances for which there is sufficient and irrefutable evidence of human carcinogenesis.
BY MR. ZELLERS:
Q. It lists 82 agents in Group 2A as being probably carcinogenic to humans; is that right?
A. That's correct.
Q. IARC is certainly willing to declare agents as either a known or probable carcinogen; is that right?
A. That's correct.
Q. There is only one agent in

Group 4, probably not carcinogenic to humans, correct?
A. Yes. I thought that number had gone up recently, but the date here is November 2018, so some may have been moved back into Group 3.
Q. So out of the over 1,000 agents that IARC has reviewed, it's only placed one agent in the Group 4 category, probably not carcinogenic; is that right?
A. That's correct.
Q. There is no Group 5, not carcinogenic; is that right?
A. That's correct.
Q. With genital talc, IARC Group 2B designation -- well, strike that.
Genital talc is listed as an IARC Group 2B designated substance; is that right?
A. That's correct.
Q. That's based on limited evidence in humans, which means that IARC cannot rule out chance, bias or confounding with reasonable confidence, correct?

MS. O'DELL: Object to the form.
A. I think limited evidence also refers to just the number of studies that have been performed as well as the quality of the studies.
BY MR. ZELLERS:
Q. Well, based upon the evidence that is available, the studies that are available, a 2B designation by IARC means that IARC cannot rule out chance, bias or confounding with reasonable confidence, correct?
MS. O'DELL: Objection, asked and answered.
A. Not always the case.
BY MR. ZELLERS:
Q. That's part of the definition, isn't it?
A. I don't believe it applies to every agent or every evaluation.
Q. Well, I'll not take the time to go through the IARC definitions; if we at the end of the day have extra time, we'll go back

and we'll take a look.
What else is in the Class 2B, possibly carcinogenic. Ginkgo biloba, is that something you're aware of that's in that category?
MS. O'DELL: Object to the form.
A. That's a biological material.
BY MR. ZELLERS:
Q. Pickled vegetables?
A. That may be in Group 2B.
Q. Occupational carpentry and joinery?
MS. O'DELL: Objection to form.
A. That's wood dust exposure.
BY MR. ZELLERS:
Q. Also 2B; is that right?
A. Wood dust itself is Group 1. The occupation is Group 2B.
Q. Let me ask you about some individual Bradford Hill criteria. On page 10 of your report, you state that you gave the most weight to strength of association, consistency and biologic

plausibility; is that right?
A. That's correct.
Q. How much weight did you give to the other six factors?
A. Sufficient.
Q. Why did you put less weight on those?
A. Because the strength of association, the consistency of the evidence and the biological plausibility of perineal talc, talcum powder application as responsible for the occurrence of ovarian cancer was compelling.
Q. FDA focused on dose, correct?
A. Yes.
Q. You did not; is that right?
A. That's right.
Q. The first Bradford Hill factor that you focused on was strength of association.
What association does the literature report between talc use and ovarian cancer?
A. Overall, evaluating the

universe of research, epidemiologic research that's been done on this, it shows an average 30% increase in ovarian cancer risk for those who regularly apply talcum powder to the perineum.
Q. Regular application of talcum powder means what?
A. It -- I believe that it means daily or thereabouts.
Q. In what form of application?
A. Talcum powder.
Q. In what amount?
A. Whatever is necessary or desired by the user.
Q. Does that vary from woman to woman?
A. It does.
Q. Did you make any attempt to assess what regular use of talcum powder was?
MS. O'DELL: Object to the form.
A. There have been a couple of attempts to try to quantify what -- what that means. I think for the most part they've

been failed attempts, but they have been attempts to estimate the quantity of powder that you start with and the amount that results in the application to the perineum by using models and actually doing some measurements and recording activities.
BY MR. ZELLERS:
Q. You did not do any modeling or any assessment of the quantity of baby powder that was involved with daily use; is that right?
A. No, I relied on those others.
Q. When you say 30% increased risk, that's a 1.3 odds ratio; is that right?
A. That's correct.
Q. And that comes largely from the case-control studies, correct?
MS. O'DELL: Object to the form.
A. Yes, but it's also consistent with some of the information from the cohort studies.
BY MR. ZELLERS:
Q. Epidemiologists consider a 1.3

odds ratio in a case-control study to be a weak or modest association; is that right?
MS. O'DELL: Object to the form.
A. That's correct.
BY MR. ZELLERS:
Q. Where here we're talking only about statistical associations, not causation, correct?
MS. O'DELL: Object to the form.
A. Well, association eventually becomes causation when the -- when the evidence mounts to a point where it becomes recognized by all of the players that this is what's going on.
A 30% increase may be classified by epidemiologists as weak or modest, but if you look at the number of women in this country who die each year from this fatal disease, that represents about 3,000 lives that could potentially be saved through prevention.
Q. There is not a --

Page 234

MS. BOCKUS: Excuse me, I need to object as nonresponsive.
MR. ZELLERS: Yes, join.
BY MR. ZELLERS:
Q. There is not a consensus at this time with respect to any causation relating to genital talc and ovarian cancer, is there?
MS. O'DELL: Objection to the form.
A. I believe that that consensus is building.
BY MR. ZELLERS:
Q. FDA -- that's not FDA's position, correct?
MS. O'DELL: Object to the form.
A. Not at the moment.
BY MR. ZELLERS:
Q. That's not the position of the National Cancer Institute; is that right?
A. That's correct.
Q. That's not the position of the CDC; is that correct?

Page 235

A. That's correct.
Q. IARC does not refer to any association between perineal talc use and ovarian cancer as a strong association, does it?
MS. O'DELL: Object to the form.
A. It calls it a Group 2B carcinogen, which is fairly significant.
BY MR. ZELLERS:
Q. Well, we discussed a few minutes ago that if an agent is a Group 2B carcinogen, that is based on limited evidence in humans; is that right?
A. That's correct.
Q. All right. Your opinions on strength of association, do they apply equally to all forms of ovarian cancer?
A. No, they don't. These apply to the epithelial ovarian cancer spectrum.
Q. Your opinions in terms of there being a -- well, let me withdraw that.
We've agreed that 1.3 is not a strong association, at least insofar as

Page 236

epidemiologists are concerned, correct?
MS. O'DELL: Object to -- object to the form.
A. It's an increased risk that translates into human lives, so it depends on your point of view.
MS. BOCKUS: Object to form -- I mean, sorry, nonresponsive, move to strike.
MR. ZELLERS: Join.
MS. O'DELL: Oppose.
DR. THOMPSON: Agreed.
BY MR. ZELLERS:
Q. The 1.3 relative risk that you believe generally applies, that would relate to epithelial cancers; is that right?
A. Yes.
Q. That's what you're limiting your opinions to in this case, correct?
MS. O'DELL: Object to the form.
A. Well, these opinions relate to several of the cancers that have shown increases in these background epidemiologic

Page 237

studies, which include the epithelial ovarian cancers, including the serous; the borderline cancers are also showing increases in some of the studies. So it's the group of those cancers, yes.
BY MR. ZELLERS:
Q. The cohort studies, prospective cohort studies, have not shown an association between talc and ovarian cancer, correct?
MS. O'DELL: Object to the form.
A. They have in some subtypes.
BY MR. ZELLERS:
Q. There was an initial description with respect to the first Nurses' study that was not supported in the update of that study; is that correct?
A. The Nurses' Health Study?
Q. Yes.
A. Yes, that's correct.
Q. Let's look at a different criteria, consistency. The literature does not show a consistent association between talc use and ovarian cancer, correct?

MS. O'DELL: Object to the form.

A. I believe that, in fact, research shows -- does show a consistent pattern.

BY MR. ZELLERS:

Q. The cohort studies do not show an association between talc use and ovarian cancer as we just discussed, correct?

A. The basic cohort studies that look at all of the subjects and all of the cancers together typically do not rise to the level of significance.

Q. The hospital-based case-control studies collectively do not show an association between talc use and ovarian cancer, correct?

A. I sort of discount the distinction between the hospital-based studies and the community-based studies. I'm not sure whether there are valid reasons to consider those differently.

Q. We've discussed earlier that you are not an epidemiologist; is that right?

MS. O'DELL: Object to the form, misstates his testimony.

A. I don't think I necessarily agreed to that characterization because I deal a lot with epidemiologic work. I'm a faculty member in the Department of Epidemiology at the University of Texas School of Public Health, and some may consider me an epidemiologist.

BY MR. ZELLERS:

Q. Do you consider yourself an expert in epidemiology?

A. No.

Q. Do you agree -- well, do you agree that hospital-based case-control studies are less susceptible to selection bias than population-based case-control studies?

A. It depends on the methodology that's used to recruit the study subjects.

Q. With hospital-based case-controlled studies, you're more likely to be comparing hospitalized patients to hospitalized patients rather than comparing

ill patients in the community to healthy people in the community, correct?

A. In some cases that might be correct, but I'm not sure that's any -- in any sort of world an advantage.

Q. Well, shouldn't there be consistency if the Bradford Hill criteria is to be -- well, strike that.

In applying the Bradford Hill criteria of consistency, there should be consistency across different types of studies, cohort studies, hospital-based case-control studies, and population-based case-control studies, correct?

MS. O'DELL: Object to the form.

A. That's correct.

BY MR. ZELLERS:

Q. Isn't the absence of an association in the cohort studies especially significant in that the study design for the cohort studies reduces the likelihood of recall bias?

A. There are many forms of bias

that study designers need to consider in the process of designing a study, and there are even more types of bias that are discovered after a study has begun.

You can fault case-control studies for being particularly sensitive to recall bias, but many of these authors who perform these studies indicated that they were well aware of that bias potential and took measures to avoid it.

The same thing can be said about cohort studies. They suffer from other forms of bias, misclassification in particular. They may also suffer from the fact that they are extremely expensive, have long duration, and require very large numbers of subjects in order to carry them out and are frequently underpowered and unable to arrive at the conclusions that they seek for that reason.

MR. ZELLERS: Move to strike as nonresponsive.

BY MR. ZELLERS:

Q. Is it possible that recall bias

explains the difference between the cohort studies and the retrospective case-control studies?

MS. O'DELL: Object to form, asked and answered.

A. I don't believe that that is the case.

BY MR. ZELLERS:

Q. Is it possible?

MS. O'DELL: Objection.

A. Theoretically it would be possible.

BY MR. ZELLERS:

Q. Are you familiar with the Berge -- Berge 2017 study?

A. Yes.

Q. Is that a study that you cite and reviewed and rely on?

A. It was a meta-analysis.

Q. Is that a meta-analysis that you cite, review and have relied upon?

A. Yes.

Q. Take a look, if you will, at Exhibit 22.

(Carson Deposition Exhibit 22 marked.)

THE WITNESS: Thank you.

MS. O'DELL: Thank you.

BY MR. ZELLERS:

Q. You're familiar with this meta-analysis; is that right?

A. Yes.

Q. The authors conclude that information bias from retrospective self-report of talc use is a possible explanation for the association detected in case-control studies; is that right?

MS. O'DELL: I'm sorry, are you reading from a certain page?

MR. ZELLERS: I am.

MS. O'DELL: Can you direct it to us, please?

THE WITNESS: Could you tell us where that is?

MR. ZELLERS: Sure.

BY MR. ZELLERS:

Q. Take a look if you will on page 6, the right-hand column, third

paragraph. Reading from the second full paragraph, the authors discuss the fact that the association between genital talc use and risk of ovarian cancer is present in case-control but not in cohort studies, can be attributed to bias in the former type of studies; is that right?

MS. O'DELL: Object to the form.

A. That's what it says.

BY MR. ZELLERS:

Q. Then continuing down: Information bias from retrospective self-report of talc use is a possible explanation for the association detected in case-control studies.

Is that right?

A. That's what it says.

Q. What was your methodology for discounting the effect of recall bias in the population-based case-control studies?

A. The fact that several authors discussed the possibility of recall bias and incorporated methodology for avoiding recall

bias, for example, placing parallel questions that should be affected in the same way, and still showed a positive result for talc and ovarian cancer is one reason.

The other has to do with consistency of the results, and although you've stated that from these various documents, including this quotation, that the case-control studies showed positive associations but the cohort studies did not, I would -- I would refute that by saying that all of the -- the vast majority of all of the studies show a positive odds ratio or relative risk, even if they don't rise to the level of significance.

If these results were obtained simply by chance, you would expect an equal number of positive results and negative results, but we don't have that here. We have practically all positive results with three or four outliers.

And so --

Q. We looked at the Taher paper early on in this deposition where Taher

concluded that 15 out of the 30 case-control studies reported a statistically significant association between genital talc use and ovarian cancer, correct?

A. That's correct, but you're not -- you're not talking about the other 15.

Q. The hospital-based case-control studies collectively do not show a statistically significant association between talc use and ovarian cancer, correct?

MS. O'DELL: Object to the form.

A. I don't know that that is the case.

BY MR. ZELLERS:

Q. You don't know that it's not the case; you'd have to go back and relook at the studies, fair?

A. I'd have to look through here, which I'm happy to do if you want me to, but I don't believe that that's the case.

Q. In fact, the author, you cite the Langseth paper, a 2008 paper, as supportive of your position; is that right?

A. Yes.

Q. I'll mark that Deposition Exhibit 23.

A. I think it was 2004, was it not?

Q. Well, I'm going to hand it to you and we can look at it together.

(Carson Deposition Exhibit 23 marked.)

A. Okay.

BY MR. ZELLERS:

Q. You're familiar with the Langseth paper; is that right?

A. Yes.

(Comments off the stenographic record.)

BY MR. ZELLERS:

Q. Langseth and the authors concluded that the current body of experimental and epidemiological evidence is insufficient to establish a causal association between perineal use of talc and ovarian cancer risk; is that right?

And I'm looking at the second

page.

MS. O'DELL: Object to the form.

BY MR. ZELLERS:

Q. Is that the conclusion of the authors?

A. What I'm reading here is on balance, the epidemiological evidence suggests that the use of cosmetic talc in the perineal area may be associated with ovarian cancer risk. The mechanism of carcinogenicity may be related to inflammation.

Q. Take a look at the paragraph on the right-hand side under Proposal to Research Community. I'm looking at the second page of the Langseth article.

Are you there?

A. Yes, I am.

Q. The authors state: The current body of experimental and epidemiological evidence is insufficient to establish a causal association between perineal use of talc and ovarian cancer risk.

Is that right?

MS. O'DELL: Object to the form.

A. That's what it says.

BY MR. ZELLERS:

Q. Experimental research is needed to better characterize deposition, retention and clearance of talc to evaluate the ovarian carcinogenicity of talc.

Is that what the authors state?

A. Well, that's what it says, but it says much more. In fact, the editors of the journal, in the section on the next page that is titled What This Study Adds, say: Epidemiological evidence suggests that the use of cosmetic talc in the perineal area may be associated with ovarian cancer risk. The IARC has classified this use of talc as possibly carcinogenic to human beings, Group 2B. The mechanism of carcinogenicity may be related to inflammation. This paper focused on the high degree of consistency in the studies accomplished so far and what should be the focus in future studies.

So I --

Q. And then the conclusion is what I read, that: The current body of experimental and epidemiological evidence is insufficient to establish a causal association between perineal use of talc and ovarian cancer risk.

Correct?

MS. O'DELL: Object to the form.

A. That is what it says, but this was accepted in 2007, which was now 12 years ago.

BY MR. ZELLERS:

Q. Let me ask you about the cohort studies. They involved a much greater number of women than the case-controlled studies; is that right?

MS. O'DELL: Object to the form.

A. Well, they did not involve more cases, but they involved more women because in order to do a cohort study, you have to start with a huge group of people and wait

for them to develop cancers, and then count those cancers.

BY MR. ZELLERS:

Q. What was your methodology for weighing the power of the cohort studies versus the case-control studies?

A. The cohort studies, it wasn't apparent in every research report exactly how they had done their sample size calculations and power determinations, but in many cases the lack of arriving at conclusions was simply due to an inability to detect an effect in the cohort studies, not that they detected that there was not an effect. And that's unfortunately a disadvantage of an underpowered study.

Q. Is it your testimony that the cohort studies are underpowered?

A. I think by and large most cohort studies are underpowered and -- because power calculations are based on chance. Investigators are sort of spinning the roulette wheel and hoping that the number that they want comes up. In some cases that

doesn't happen.

Q. Is it your testimony that the cohort studies relating to genital talc use and ovarian cancer are spinning the roulette wheel?

MS. O'DELL: Object to the form.

A. In terms of the power of the studies to detect a meaningful difference among the subjects, yes.

BY MR. ZELLERS:

Q. That's your testimony as an expert in this case; is that right?

A. It is my testimony that cohort studies, including these, are chronic -- or quite often underpowered simply because of the expense associated with performing these studies.

Q. What analysis did you do to conclude that the cohort studies in this area, the four cohort studies, are underpowered?

A. Like I just mentioned to you, I read the studies and looked at their

conclusions, and their conclusions were not that the effect didn't exist, but they couldn't detect it.

MR. ZELLERS: Let's go off the record because we need to change our tape.

THE VIDEOGRAPHER: We're off the record at 3:06, end of Tape 3.

(Recess taken, 3:06 p.m. to 3:19 p.m.)

THE VIDEOGRAPHER: We're on the record at 3:19, beginning of Tape 4.

BY MR. ZELLERS:

Q. Dr. Carson, you are not a statistician, correct?

A. That's correct.

Q. You are not a biostatistician; is that right?

A. That's right.

Q. Do you agree that some of the case-control studies have shown statistically significant findings and others have not?

A. I do agree that.

Q. If a study does not show a

statistically significant association, it could mean that no risk exists, as we've discussed; is that right?
A. That's correct.
Q. What methodology did you use to weigh the lack of statistical significance across studies?
MS. O'DELL: Object to the form.
A. Across all of the case-control studies?
BY MR. ZELLERS:
Q. Yes.
A. I simply treated them as isolated research designs that were done on different populations in different places with different considerations. They were not necessarily comparable, like apples to apples or oranges to oranges; they were very different studies in most cases, and so I felt it was important to allow their findings to stand on their own.
Q. I want to talk to you about dose-response. That's another of the

Bradford Hill criteria; is that right?
A. That's correct.
Q. Which studies show a dose-response, talc exposure and ovarian cancer?
A. Let me see here. I'm looking at my notes. The Harlow study from 1992 showed a dose-response, and the Cramer 2016 study showed a dose trend with strong odds ratios for premenopausal women and hormone therapy-treated women with greater than 24 years of exposure.
The Schildkraut study, also a case-controlled study of 2016, showed a dose-response.
Q. There are a number of studies that did not show a dose-response; is that right?
A. It's correct. They did not necessarily show there was not a dose-response. They just, as I was mentioning before, were unable to detect a dose-response.
Q. Do you have your report in

front of you?
A. I do.
I would also add that the Penninkilampi meta-analysis also found a dose-response.
Q. Do you mention Penninkilampi at all in your report?
A. It's cited.
Q. In the body of your report?
A. I think it's in there somewhere.
Q. You believe it is; is that right?
A. I do.
Q. Well, I'll ask you a couple of questions about it then.
Before I do, let's talk a little bit more about your report. So go to page 7. You state at the very top of that page that it has been difficult to estimate dose in order to evaluate the dose-response relationship for ovarian cancer; is that right?
A. That's correct.

Q. You state that it also has been difficult to exactly estimate the quantity of talcum powder administration during personal hygiene activities; is that right?
A. That's correct.
Q. Let's look at a couple of the studies that you believe do, in fact, show a dose-response. The Penninkilampi, that's a meta-analysis, 2018; is that right?
A. That's correct.
Q. That study does not consider or include the Gertic 2010 cohort study; is that right?
A. I -- I'd have to look at the table, but yes, that one may be left out.
Q. Well, that's a significant study to leave out of an analysis, isn't it?
MS. O'DELL: Object to the form.
THE WITNESS: I'm getting there.
(Document review.)
THE WITNESS: Apologies, I have binder block here.

MS. O'DELL: You need help?
THE WITNESS: Okay.
BY MR. ZELLERS:
Q. And I misspoke. I meant to refer to Gates, the updated Nurses' study. So Gates 2010.
A. Yes, it appears that Gates is not included in the -- in the spectrum of studies considering; the Gertic study does appear.
Q. Gates 2010 is an important cohort study in this area, would you agree?
MS. O'DELL: Object to the form.
A. It's important, but I think it may be considered one of the ones that suffered from power issues. It wasn't able to determine a relative risk in the population that it assessed.
BY MR. ZELLERS:
Q. There are a number of the case-control studies that did not determine a relative risk, at least of statistical significance, correct?

A. Well, they determined odds ratios, which is the equivalent of relative risk for a case-control study.
Q. And in a number of those case-control studies, at least 15 out of the 30 relative risk was not -- or strike that -- statistical significance was not achieved in the study; is that right?
MS. O'DELL: Object to the form.
A. That's correct.
BY MR. ZELLERS:
Q. Let's look at the Cramer paper. We've talked about this earlier.
A. Which one, the 2016?
Q. Exhibit 20, yes, 2016.
A. Okay.
Q. This is another study that you cite as being supportive of your dose-response opinion; is that right?
A. Yes.
Q. Tell me when you have it.
A. I think you may have picked up my copy or the copy that I was looking at.

Q. This is my highlighted copy, so I'm sure it wasn't yours.
A. I'm sorry.
Q. That's all right. We'll -- take your time.
A. Here we are.
Q. Got it, Exhibit 20?
A. I think so.
Q. Do you have the Cramer study in front of you?
A. I do.
Q. It's a retrospective case-control study published in 2016; is that right?
A. That's correct.
Q. If we look at the table of results on page 337, Table 1.
Do you see that?
A. Yes.
Q. This table shows the risk of ovarian cancer for women who use talc, talcum powder, daily; is that right?
MS. O'DELL: Object to the form.

A. It does.
BY MR. ZELLERS:
Q. And it's four different periods of time; one year, one to five years, five to 20 years and more than 20 years; is that right?
A. That's correct.
Q. There was only statistical significance found for the time period of one to five years of use and more than 20 years of use; is that right?
A. For the first group, the -- for those who reported months year of use -- months per year of use.
Q. Well, for the first group, which was equivalent to one year of daily use, there was no statistical significance; is that right?
MS. O'DELL: Object to the form.
A. That -- well, the -- there was a positive odds ratio with a nonsignificant 95% confidence interval.
///

BY MR. ZELLERS:
Q. Meaning that if you look at this study, that it is certainly possible that because there is not statistical significance, there could be a finding of no risk, correct, no increased risk?
A. That's a possibility.
Q. Then if we go to the next period, we do show a dose-response for talcum powder use in the year -- years one to five; is that right?
A. Well, one to five years of daily use, yes.
Q. But then when we look at five to 20 years of daily use, there is not a statistically significant association; is that right?
A. That's correct.
Q. But then when we go to greater than 20 years, we do find a statistical association; is that right?
A. That's correct.
Q. If, in fact, there was a true dose-response relationship, you would expect

to see that dose-response relationship in each of these groups; is that right?
MS. O'DELL: Object to the form.
A. It's more like we see in the group directly below that, where you start out with an odds ratio which is not significant but positive, and then reach a significant odds ratio at one to five years of daily use and a higher amount of significance with five to 20 years of daily use, and still a significant odds ratio, which is about the same level, at greater than 20 years of daily use.
BY MR. ZELLERS:
Q. Is that a yes to my question, that if you do have a true dose-response relationship, you would expect to see that dose-response continue throughout each of the periods?
MS. O'DELL: Object to the form.
A. Well, it would be nice if you did that, but epidemiologic data is very

dirty, and it doesn't always work out quite that cleanly.
BY MR. ZELLERS:
Q. All right. Do you -- well, let me withdraw that.
Confounding. You considered and talk about confounding as another one of the Bradford Hill criteria; is that right?
MS. O'DELL: Object to the form.
A. Confounding, by that you mean specificity?
BY MR. ZELLERS:
Q. Well, I thought your -- I thought you said in your methodology that you applied the Bradford Hill criteria.
A. That's correct.
Q. Is confound -- strike that.
Is confounding an issue in interpreting epidemiologic studies?
A. Yes.
Q. Do you agree that there is confounding in these studies?
A. I'm sure there's confounding in

these studies.
Q. You're familiar with that term, right?
A. Yes.
Q. That's where the presence of another association confuses the relationship between the exposure and the disease being studied; is that right?
A. That's correct.
Q. For example, if you're studying the association between coffee and pancreatic cancer, you need to be mindful of whether cigarette smoking is more common in coffee drinkers than the rest of the population, fair?
A. Yes.
Q. Coffee -- or strike that.
Cigarette smoking could be a confounder in that situation?
A. Possible.
Q. Because if more coffee drinkers are smokers than non-coffee drinkers, an association between coffee drinking and pancreatic cancer might be due to the

smoking, not the coffee drinking; fair?
A. That would be a good description of confounding.
Q. Confounding can distort results in epidemiological studies; is that right?
A. It can.
Q. Do you agree that residual confounding is possible in every observational study?
A. Yes, I think there's some form of confounding that's present in every observational study.
Q. It's possible that unmeasured confounders may be present in every observational study; is that right?
A. That's correct. Not just unmeasured confounders, but unrecognized confounders.
Q. It's impossible to say that all known and unknown confounding factors have been controlled for in any given study; is that right?
A. I also agree with that.
Q. Many new factors possibly

involved in ovarian cancer risk are just being published in the literature, correct?
MS. O'DELL: Object to the form.
A. I believe that is true.
BY MR. ZELLERS:
Q. For example, history of chlamydia infection, have you read about that possibly being involved in ovarian cancer risk?
A. I haven't read that specifically. I was thinking more about the new information regarding genetic susceptibilities.
Q. Also, weight gain during adolescence, is that another relatively new possible ovarian cancer risk factor?
MS. O'DELL: Object to the form.
A. It is, but obesity has been recognized as a cofactor for many years.
BY MR. ZELLERS:
Q. History of chlamydia infection, weight gain during adolescence, those were

not controlled for in any of the talc/ovarian cancer studies, were they?
A. Not that I'm aware of.
Q. Are you aware that studies that show a relationship between talc and ovarian cancer did not account for confounders?
A. I think it's possible that many of those studies did not account for all potential confounders, but they made attempts to.
Q. For example, Terry 2013, we talked about that earlier; is that right?
A. Yes.
Q. Terry 2013, that meta-analysis did not adjust for hormone replacement therapy usage, correct?
A. Yes.
Q. If hormone replacement therapy is a risk factor for ovarian cancer, then the Terry 2013 meta-analysis did not account for that potential confounding factor, correct?
MS. O'DELL: Object to the form.
A. Correct.

BY MR. ZELLERS:
Q. You cannot say whether the odds ratio of the Terry 2013 study would have been lower if the authors had adjusted for hormone replacement therapy usage, correct?
A. I cannot say that. Yes.
Q. Recall bias. You're familiar with recall bias?
A. I am.
Q. That is also a concern in every retrospective study, correct?
A. Yes.
Q. Recall bias can distort a scientific evaluation of whether an exposure is actually related to a disease; is that right?
A. Yes, it can.
Q. For example, recall bias could distort results if women with ovarian cancer were more likely to remember their exposure to talc than women without ovarian cancer; is that right?
MS. O'DELL: Object to the form.

A. That's correct.
BY MR. ZELLERS:
Q. The effects of recall bias can be very real; is that right?
MS. O'DELL: Object to the form.
A. I'm not sure what you mean by very real.
BY MR. ZELLERS:
Q. Well, let's look at one of the studies that you cite. You cited the Schildkraut study in your report and you referred to it a bit earlier as supporting dose-response; is that right?
A. Yes.
Q. That's a study by Schildkraut and others titled Association Between Body Powder Use and Ovarian Cancer, the African-American Cancer Epidemiologic -- or Epidemiology Study.
Is that right?
A. Yes.
Q. I've got it here for you.
A. Okay.

(Carson Deposition Exhibit 24 marked.)
BY MR. ZELLERS:
Q. Deposition Exhibit 24 is the Schildkraut study, 2016, correct?
(Pause.)
BY MR. ZELLERS:
Q. Did you say correct?
A. I think I did. I'm sorry.
Q. That's all right. I may have missed it.
Exhibit 24 is the Schildkraut 2016 study; is that right?
A. Yes.
Q. This is one of the studies that you cite to and that you relied on in forming your opinions; is that right?
A. Yes.
Q. The study looked at, among other things, what impact, if any, lawsuit filings in 2014 had on whether women recalled using talc in the past, correct?
A. I believe so.
Q. The authors thought that the

publicity from lawsuits might influence the participants' recall of prior body powder use; is that right?
A. This was a recent study, so that was more likely.
Q. If you look on page 2, right-hand side, last paragraph that starts "Covariates include."
Do you see that?
A. Yes.
Q. And I'm reading about two-thirds of the way down: Two class action lawsuits were filed in 2014 concerning possible carcinogenic effects of body powder which may have influenced recall of use; therefore, year of interview 2014 or later, yes/no, was concluded as a covariate in the logistic regression models.
Is that correct?
A. That's correct.
Q. So go to page 4, Table 2. This is the adjusted odds ratio for the associations between mode, frequency and duration of body powder use in ovarian

cancer; is that right?
A. Yes.
Q. The second column shows the number of cases, and that would be women with ovarian cancer; is that right?
A. That's correct.
Q. The third column shows the controls; that's the women who do not have ovarian cancer, correct?
A. Yes.
Q. Looking at this data before 2014, before the lawsuits, the percentage of controls, meaning women without ovarian cancer, said they used talc on their genitals was 34%; is that right?
So those are women who were interviewed before 2014.
A. Yes. Any genital use controls, 34%.
Q. And the controls, again, are women without ovarian cancer.
A. That's correct.
Q. The percentage of cases, meaning women with ovarian cancer, that were

Page 274

interviewed before 2014 that said they used talc on their genitals was 36.5%; is that right?
A. That's correct.
Q. So roughly the same reporting of genital talc use between women with and without ovarian cancer occurred for those women interviewed before the lawsuits were filed; is that right?
A. That's correct.
Q. Then look at what happened after the lawsuits were filed in 2014. For women interviewed after 2014, the percent of women without ovarian cancer that said they used talc on their genitals was 34.4%; is that right?
A. That's correct.
Q. So based on this data, the lawsuits had essentially no effect on how many of the women without ovarian cancer, the controls, remembered or recalled using baby powder; is that right?
A. Well, the percentage is the same in both cases.

Page 275

Q. It went from 34% to 34.4%; is that right?
A. That's correct.
Q. For women with ovarian cancer, before the lawsuits were filed, 36.5% of them said they recalled using baby powder; is that right?
A. That's right.
Q. But after the lawsuits were filed, the percent of women with ovarian cancer who said they used baby powder went up to 51.5%; is that right?
A. That is also correct.
Q. Is that a significant increase from 36.5%?
A. I don't know, but it seems like it might be.
Q. So after the lawsuits were filed, the percent of women with ovarian cancer who said they used baby powder jumped significantly; is that right?
MS. O'DELL: Object to the form.
A. Well, that's -- that is true.

Page 276

BY MR. ZELLERS:
Q. In this study, lawsuit filings appears to have affected how many women with ovarian cancer remembered using talc on their genitals but basically had no effect on the memory of women without ovarian cancer; is that right?
MS. O'DELL: Object to the form.
A. You can't say that this is -- this demonstrates recall bias. It could.
BY MR. ZELLERS:
Q. These findings could be an example of the potential effect of recall bias; is that right?
MS. O'DELL: Object to the form.
A. That is correct.
BY MR. ZELLERS:
Q. So pre-2014 there was an odds ratio of 1.19 with the confidence interval ranging from .87 to -- strike that -- from .87 to 1.63, so there is not statistical significance pre-2014; is that right?

Page 277

A. Probably not.
Q. If the study had been terminated as of 2014, prior to the lawsuits being filed, then the results of the study would have been that genital talc use was not statistically significantly associated with an increased risk of ovarian cancer; is that right?
MS. O'DELL: Object to the form.
A. Yes.
BY MR. ZELLERS:
Q. Did you make an attempt to account for this potential recall bias in weighing the Schildkraut study?
A. The authors did that for me by including the period of the interview as a cofactor in the logistic regression models. It accounts for this difference that you see on the table.
Q. You do agree there was no statistically significant finding of an odds ratio prior to 2014, the data collected through that time; is that right?

A. In the -- in the data collected on those -- let me see here. In the data collected on those 351 cases and corresponding controls, there was not a significant odds ratio.

Q. I want to go back and ask you a few questions about some of the things I had talked to you before about.

In terms of this chatter about IARC, who has told you this?

A. There are a number of environmental websites and -- that also operate on social media that discuss this kind of thing.

Q. So there's social media websites that have talked about at least the possibility of IARC revisiting the issue?

A. Yes, among many other things.

Q. I asked you earlier about cornstarch, and you believe that cornstarch is rapidly cleared from the body, including the ovaries; is that right?

MS. O'DELL: Object to the form.

A. Yes.

BY MR. ZELLERS:

Q. What is the mechanism by which you believe that cornstarch is rapidly cleared from the body, including the ovaries?

A. It's primarily composed of carbohydrate with a small amount of structural material, probably cellulose, and those materials are broken down in body fluids fairly rapidly and dissolved and become part of the general milieu of the body.

Q. Does cornstarch create inflammation in the body?

A. Yes.

Q. You testified that the latency period for ovarian cancer is between 20 and 40 years; is that right?

A. Roughly, yes.

Q. What is the basis for you saying that?

A. There are a number of factors that influence that, but there are organizations that have determined latency

factors -- or latency periods for a number of different types of cancers and tumors based on the incidence data and what is known about the natural progression of those tumors over time.

I can't recall at the moment exactly where I determined the latency period for ovarian cancer to be between 20 and 40 years.

We do have a paper that's referenced here that discusses the determination of latency periods and includes ovarian cancer as one of the tumors that it determines a latency period for, and it uses a mathematical formula with various factors plugged into it to calculate that.

In that particular article, the latency factor -- period was very long. I think it was 44 years on the average.

Q. You do not have personal expertise in terms of the latency period for ovarian cancer, correct?

A. I have -- I've calculated latency periods as an exercise when I was in

graduate school, but that's not something I normally do. I usually defer to the -- those who have published latency periods for that information.

Q. You are recalling that at least in some of the study or studies that you've reviewed that the latency period for ovarian cancer is 20 to 40 years, correct?

A. Yes.

Q. Are you able to tell us which study or studies you're relying on for that information?

A. I'd have to go through my list to find it. Do you mind if I take a moment to do that?

Q. Define "a moment."

A. Well, however long it takes me to find it in that list, but --

Q. Let me see if I can shortcut it.

Do you believe that the latency period for ovarian cancer is something you've written out in one of your handwritten notes?

A. I don't believe so.

Q. It would be -- where would it be?

MS. O'DELL: If you need a moment to review either your report or your materials list, you know --

THE WITNESS: I don't believe that particular piece of information is in my report, but it's -- I think I could come up with it fairly quickly if I --

BY MR. ZELLERS:

Q. All right. Go ahead. Find for us the study or studies you're relying on for the latency period of ovarian cancer.

A. Okay. If I'm lucky, I may hit on it here.

(Document review.)

A. It's the Diana Nadler and Igor Zurbenko paper Estimating Cancer Latency Times Using the Weibull Model.

BY MR. ZELLERS:

Q. You're looking at Exhibit 4, your literature list; is that right?

A. Yes.

Q. What page of Exhibit 4 are you looking at?

A. Page 17 in the Ns.

Q. Are you finished?

A. There may be others in the list, but you asked me to cite one. You want me to continue looking?

Q. No, I -- that is sufficient for my purposes. Thank you.

Dr. Carson, there have been some studies where talc particles had been observed or reported in the ovaries of women who have had perineal talc use; is that right?

A. Yes.

Q. Heller was one of the studies that we talked about, correct?

A. Correct.

Q. In those studies, there has not been inflammation noted; is that right?

A. No, there -- that's not been an important finding.

MR. ZELLERS: I have no further questions for you.

MS. BOCKUS: If you want to pass me your microphone, I think I can stay here. I'm not going to pass him that many exhibits.

MR. ZELLERS: I'm happy to help you.

MS. BOCKUS: Thank you.

EXAMINATION

BY MS. BOCKUS:

Q. Dr. Carson, my name is Jane Bockus. I'm not certain I actually introduced myself to you this morning, but I represent Imerys in this litigation.

Do you understand that?

A. I do.

Q. Before Mr. Abney contacted you about preparing a report that would explain the relationship between regular perineal use of talc based on personal hygiene products and subsequent development of ovarian cancer, is that anything that you had researched before that date?

MS. O'DELL: Object to the form.

A. I don't think Mr. Abney -- well, he may have been that detailed in our discussion. But in response to your question, that's not a specific question I had researched in the past, although I had researched related kinds of issues.

BY MS. BOCKUS:

Q. So would it be fair to say that the opinions contained in your report are all opinions that you have come to as a result of doing the research at the request of Mr. Abney and others in the plaintiffs' lawyer group?

MS. O'DELL: Object to the form.

A. Yes.

BY MS. BOCKUS:

Q. Okay. And I'm going to apologize right now. I'll be jumping around because most of my outline has already been covered, so let me just get you to look at your report, if I could, and I'm going to ask you some questions about it.

Turn to page 4, and

paragraph (b), the first sentence reads: Numerous studies have examined the cancer-causing characteristics of talc.
Do you see that?
A. Yes.
Q. And you identified Wilde as your source for that statement, correct?
A. That is correct.
Q. Isn't it correct that the Wild study actually exonerated talc as having cancer-causing characteristics?
A. That was a conclusion of the author, but the reason it's cited there is because that's an example of the investigation of the relationship.
Q. Okay. But in that study, they -- he concluded that talc alone did not cause cancer, correct?
A. As I recall, that was the general conclusion, yes.
Q. Okay. Then in the next couple of sentences, you say that talc has caused cancer when implanted in various tissues and under the skin in laboratory animals. It

causes inflammation and fibrotic reaction, including the chemotaxis of inflammatory immune cells and accelerated growth and division of cells in the involved tissue.
And you cite Okada 2007 for that proposition; is that correct?
A. That's correct.
Q. But Okada wasn't even looking at talc, was it?
A. Let me see here. Okada was looking at inflammation as -- as the endpoint in the various components of inflammation which I talked about here, the chemotaxis of inflammatory immune cells, accelerated growth division in the involved tissues.
Q. But what you say is that talc causes. When you say "it," you're referring to talc, correct? It causes inflammation and fibrotic reaction; isn't that what you're saying in this sentence?
A. It is talc, yes.
Q. Okay. And yet, Okada, the study that you cite for that proposition, doesn't look at talc at all, does it?

A. No.
Q. And then going on, you talk about the fact that there in that same paragraph, if you go down, you talk about IARC and the fact that IARC concluded that talcum powder use by women for feminine hygiene is a possible human carcinogen; that's not a classification of talc as a carcinogen, correct?
MS. O'DELL: Object to the form.
A. It is within the spectrum of carcinogens.
BY MS. BOCKUS:
Q. It's possible.
A. That's correct.
Q. And then you say that -- meaning that there is insufficient evidence of carcinogenesis in humans, but strong evidence in other mammalian species.
Can you tell me where in IARC it says that there is strong evidence that talc causes ovarian cancer in other mammalian species?

A. I think the issue is not specifically ovarian cancer; the issue is cancer. And that's the point of view of IARC, and that's what's alluded to here.
Q. So this is the one exhibit I'm going to hand you, if I can get that one marked by my assistant.
MR. ZELLERS: Exhibit 25.
(Carson Deposition Exhibit 25 marked.)
MS. O'DELL: This is a page out of the monograph?
MS. BOCKUS: Yes.
MS. O'DELL: Are you going to identify it?
MS. BOCKUS: And he can look it up in his whole monograph. I just pulled the page for simplicity.
MS. O'DELL: So feel free to do that, Doctor.
MS. BOCKUS: Yes, page 412.
BY MS. BOCKUS:
Q. So looking at Exhibit 25, this is a page from the IARC monograph where it

Page 290

talks about the data -- the evidence that they have and the evidence that they reviewed.
Do you see that?
A. That's correct.
Q. And what they actually state with regard to experimental evidence is that there is limited evidence in experimental animals for the carcinogenicity of talc not containing asbestos or asbestiform fibers.
Correct?
MS. O'DELL: Object to the form.
BY MS. BOCKUS:
Q. Did I read it incorrectly?
A. No, I just lost you for a moment.
Q. It's one sentence. Go ahead and take your time and read it.
A. Yes, I agree with that. They found that inhaled talc, which does not contain asbestos or asbestiform fibers, is Group 3.
Q. That wasn't my question. I'm

Page 291

talking about experimental animals because that's what -- you state in your report that IARC found strong evidence in animals, and yet the part of IARC that I know of where they're addressing the animal data with regard to talc is what I handed you in Section 6.2, and it states there's limited evidence, correct?
MS. O'DELL: Objection.
A. It states that there's limited evidence -- I need to find this section in the monograph. Just bear with me for a moment. It's page 412?
(Document review.)
A. Okay. I seem to be missing that part of the monograph.
MS. O'DELL: Do you have the 93 monograph?
THE WITNESS: Where's the -- this is 100C, and this is 93. Okay. Here it is. All right. Okay.
A. Okay. The entire monograph is designed to evaluate carcinogenic risk, and it looks at three different species, carbon

Page 292

black, titanium dioxide and talc.
So regarding talc, the overall point of view here is whether or not it produces cancer, not just ovarian cancer, not just lung cancer, but any cancer.
And so I'm not sure that that responds to your question.
BY MS. BOCKUS:
Q. No. My question was: You state in your report that IARC found strong evidence in animals, and I want to know where you believe that statement occurs in the IARC monograph, or do you know?
MS. O'DELL: And if you need a minute to look, feel free to do that.
A. Well, I can say that it might take me a while to look for it, but I can say that that's the basic definition of Group 2B, is limited evidence in humans and compelling evidence in animals or other --
BY MS. BOCKUS:
Q. Tell me where you're looking at that definition of 2B.
A. Let me see here.

Page 293

Q. We earlier marked the... Exhibit 21, I think.
A. Well, I have this other exhibit, which is the preamble from another situation; it's Exhibit P-346, and...
Q. Well, let me just ask a different question, rather than looking at the preamble.
A. All right.
Q. Because that's kind of overarching.
A. It is.
Q. To know what IARC found with regard to talc and the evidence in animal models, wouldn't it be more appropriate to look at what they actually said about talc in the animal studies?
A. Yes.
MS. O'DELL: Objection, form.
A. I would agree that that's the case.
BY MS. BOCKUS:
Q. And to your knowledge, nowhere did they find strong evidence of

cancer-causing potential of talc in animal studies, correct?

MS. O'DELL: Objection to form.

A. Well -- well, it says on that page there's limited evidence in experimental animals, so I'll agree that at least in this location it does not say strong evidence.

BY MS. BOCKUS:

Q. And without going through the entire monograph, you don't know where that language came from, is that fair, that you used in your report?

MS. O'DELL: Object. Excuse me. Object to the form. I think he was pointing -- directing you to the preamble and you withdrew your question, but --

MS. BOCKUS: Well, let me just ask a qualifying question.

BY MS. BOCKUS:

Q. Does the preamble in any way address their findings with regards to talc?

A. No, the preamble addresses the methodology that's used by the IARC agency in

addressing all the substances that they evaluate.

Q. Okay.

A. And that's usually where I pull things like that.

MS. O'DELL: Are you finished, Doctor?

THE WITNESS: Unless I'm going to continue to search for this.

BY MS. BOCKUS:

Q. I don't need for you to look in the preamble, because I'm really only interested in their findings as to talc, not their overarching methodology, that sort of thing.

A. Okay. But it's important to point out that this particular monograph is an evaluation of the carcinogenicity of talc that does not contain asbestos or asbestiform fibers, so --

Q. Correct. Which was, from their view, the talc that was included in all of the studies that they reviewed, correct?

MS. O'DELL: Objection,

misstates the evidence.

A. I believe that was their assumption.

BY MS. BOCKUS:

Q. Okay. The studies that you reference in support of the notion that asbestos in -- that may or may not exist in body powder contributes to cause ovarian cancer, none of the studies that you cite to have referenced an application of a product to the perineum of the women and girls study, correct?

MS. O'DELL: Object to the form.

THE WITNESS: I have a -- I apologize greatly, but I lost the track. Could you repeat that question.

MS. BOCKUS: That's totally understandable because it was a little bit convoluted.

MS. O'DELL: Do you mind if we get the realtime running again? We're just off track here.

MS. BOCKUS: That's okay.

BY MS. BOCKUS:

Q. I'm looking on page 5. Do you see on page 5 of your report, sir, paragraph (c)?

A. Yes.

Q. And there you cite one, two, three, four, five, six, seven, eight, nine, 10, 11, 12 studies, correct?

A. Yes.

Q. Do you speak Italian?

A. I can read it pretty well.

Q. Is that what you did for the Bertolotti study?

A. The Bertolotti study. Yes, I read most of it. I may have kibitzed with some of my colleagues about the meaning of a few words.

Q. At any rate, all of these studies have to do with heavy occupational exposure to asbestos, correct?

MS. O'DELL: Object to the form.

A. Yes.

BY MS. BOCKUS:
Q. And you don't have any information how the dose of asbestos to which these women were exposed during their heavy occupational exposure compares to any exposure to asbestos from the use of body powder, correct?
A. Well, I think these were not all occupational exposures, but I do not have information regarding things like the route of exposure, no.
Q. Do you have any information regarding the dose?
A. No, I don't.
Q. Do you have any information that would compare the dose of asbestos to which the women in these studies were exposed --
A. Well, in some of the studies --
Q. Wait, I haven't finished my question.
A. Sorry.
Q. -- to any alleged dose of asbestos in body powder?

Can you make any comparison whatsoever to the amount of asbestos to which these women were exposed to any exposure by any woman who has used a Johnson & Johnson body powder?
MS. O'DELL: Object to the form.
A. I don't think I'm able to make that kind of comparison.
BY MS. BOCKUS:
Q. Okay. There are ways to study whether two toxins combined increase a risk more than exposure to a single toxin, whether it -- whether one offsets the risk of one of the toxins or whether you add them together, even multiply them together, right?
A. Yes.
Q. Has any such study ever been done with regard to talc and the heavy metals that you identify in your report?
A. Not specifically a study to look at the combined contribution, but we know a lot about the mechanism of action of the metals in particular in the

microenvironment, and based on what we know about the mechanism of action of talc as well and even asbestos, they're all similar, and for that reason would be expected to be additive.
Q. But the study hasn't been done even in a petri dish, has it?
MS. O'DELL: Object to the form.
A. I don't know if there's something in progress or not, but that's the kind of study that is currently being looked at. Combined exposures is the -- sort of the hallmark of research these days in toxicology.
BY MS. BOCKUS:
Q. Do you know of anyone who's looking at that question?
A. I don't.
Q. Okay. Have any of the heavy metals that you have identified been identified as carcinogenic to the ovary by IARC?
A. No.

Q. I want you to turn to page 7 now, if you would, please, on other evidence. And you've talked about this paragraph a fair amount already, and I don't want to repeat any of the prior questions.
But I want to ask you about the statement in that first sentence, where you say that transport of talc-containing materials from the perineum to the upper reproductive tract and body cavities has been shown to occur with startling regularity. And I want to stop right there.
If I recall your testimony correctly, none of these studies even look at the transport of talc-containing materials from the perineum to the upper reproductive tract; isn't that correct?
MS. O'DELL: Object to the form.
A. Well, it is true that most of the research that's been done in this area has been done on materials that have been instilled into the vagina or the posterior fornix, but I think and it's my opinion that

application to the perineum is equivalent to that.
Q. Do you have an opinion as to what percentage of the talcum powder applied in a daily dusting to the perineum makes its way to the vagina?
A. No, I don't know.
Q. Do you have an opinion as to what percentage of the talc that, in your opinion, would make its way to the vagina would actually make its way to the cervix?
A. I don't know that either.
Q. And out of the talc that makes its way to the cervix, what percentage makes it past the cervix into the uterus?
A. That, I don't know either.
Q. Do you have any reason to believe that talc would migrate with more frequency or rapidity than sperm?
MS. O'DELL: Objection to form.
A. No, I don't have reason to believe that would be the case.
BY MS. BOCKUS:
Q. Would you agree, in fact, that

it is unlikely that talc, an inert particle, would travel as quickly or in the same percentages as sperm through the reproductive tract?
MS. O'DELL: Object to the form.
A. I think the transport time is roughly the same for any particulate matter, including sperm.
BY MS. BOCKUS:
Q. Do you have any studies to support that opinion?
A. Well, we know -- we know the -- we know the velocity of motile sperm; it's very slow. And we have studies that have shown the progression of particles through the fallopian tubes at at least that fast a rate, possibly faster.
And so the motility of sperm is slower than the rate at which it passes through the female reproductive system, so there are obviously other mechanisms at play other than sperm motility.
Q. To your knowledge, were any of

those studies that you list here done in women who were standing up?
A. The studies that I list in other evidence?
Q. Yes.
A. I think not.
Q. In fact, were any of them done in women who were inclined with their head elevated over their hips?
A. No.
Q. So my question is: Where do you get the term "startling regularity" with regard to the transport of talc from outside a woman's body to the upper reproductive tract?
MS. O'DELL: Object to the form.
A. The propensity of evidence of rapid transport of particulate material regarding -- regardless of its composition.
BY MS. BOCKUS:
Q. Particulate material inserted well into a woman's vagina whose hips are above her head, correct?

MS. O'DELL: Objection to form.
A. Well, we have other studies too. We have the powdered glove examination studies, things of that nature, that are a little bit different.
BY MS. BOCKUS:
Q. And you believe they support your conclusion that talc is transported from the perineum to the upper reproductive tract with startling regularity?
A. I think that's a valid conclusion supported by the evidence, yes.
Q. I'm turning to page 8 now, and the number that you have here -- and you've repeated it a couple of times today -- about your opinion that the elimination of talc as a risk could result in over 3,000 lives saved in the U.S. each year.
How did you come to that conclusion?
A. Well, I'm referring to talcum powder here --
Q. Okay. Sure.
A. -- which is the complete

Page 306

product.

I came to that conclusion based on the number of new cases of ovarian cancer that are diagnosed in the United States each year and the number of ovarian cancer deaths that occur each year.

And essentially, of 21,000 or so cases of -- new cases of ovarian cancer, there are corresponding 14,000 or more deaths each year, so that's a two-thirds fatality rate if you look over time.

The -- at 30% increase in the risk of -- or a 30% increase in the risk of cancer applied in reverse, that is reducing those -- that 30% increased risk from the use of perineal application of talcum powder could result in the prevention of as many as 3,000 lives, depending on the prevalence of use.

Q. Would that calculation require that 100% of the women in the U.S. be using talcum powder on a daily basis?

A. It would require a hundred percent of the women in the U.S. to stop

Page 307

using talcum powder on a daily basis.

Q. That wasn't my question.

In order to attribute --

A. Well, my answer to your question then is no.

Q. In order to attribute 30% of all ovarian cancer deaths to the use of talcum powder -- let me back up.

The data that you have that you've cited is talking about the percentage of women -- the percentage of women who use talcum powder who are diagnosed with ovarian cancer, correct?

MS. O'DELL: Object to the form.

A. It is the total number of new diagnoses per year.

BY MS. BOCKUS:

Q. Okay.

A. I think last year was 22,000-something.

Q. But that number, 22,000, 100% of those women did not use talcum powder, correct?

Page 308

A. There may not have been use of talcum powder in all those women, that's correct.

Q. Do you have any notion as to what percent of those women may have used talcum powder?

A. Based on these various studies, it seems to vary between 30 and 60%. It's more so in the U.S., Australia and the U.K.

Q. Do you have an opinion as to how regularly a women needs to use talcum powder before her risk of ovarian cancer is increased by 30%?

A. Well, based on the epidemiology studies, that risk occurs in the population in general from ever use as opposed to never use, and so it would depend on the individual woman.

Each person has an individual susceptibility and individual characteristics and would probably have an individual use pattern. So I couldn't say for any individual woman.

Q. And that's not what I'm asking

Page 309

for. I'm really asking for in general, because that's what epidemiology is, correct? It's not talking about an individual woman, right?

A. That's correct, it's describing it in the population.

Q. So in the population, in the studies that you've reviewed, what is the minimum number of days per month, or however you want to describe it, that a woman would need to use talcum powder before she would be included in the group that you believe have a 30% increased risk of ovarian cancer?

MS. O'DELL: Object to the form.

A. The only qualifier that I've been able to come up with and that I've used in this report is the regular use of talcum powder.

BY MS. BOCKUS:

Q. Okay.

A. And that is going to vary over a broad range. It would be periodically daily to several times a week would be

regular use.

Q. And over how many years must a woman use talcum powder on a regular basis before her risk of ovarian cancer is increased to 30% --

MS. O'DELL: Object to the form.

BY MS. BOCKUS:

Q. -- in your opinion?

MS. BOCKUS: Sorry.

A. Some of the studies have focused on usage periods as short as one year, but most have studied longer periods of use and separated use into things like decades or accumulated total person-years based on reports of the women, multiplying frequency by time.

So again, it would depend on the individual, but the research reports hover around five to ten years of regular use, resulting in significant odds ratios.

BY MS. BOCKUS:

Q. As I understand it in toxicology, one of the basic tenets is that

it's the dose that makes the poison, correct?

A. That's correct.

Q. That water can kill you if you drink too much of it, right?

A. Theoretically.

Q. In a short period of time.

And so I'm trying to find out what you have determined is the threshold of risk is -- for talcum powder use by women. Do you have an opinion as to at what point a threshold has been reached where the use of talcum powder by women in their perineal region increases their risk?

A. I think any use of carcinogenic materials or any exposure to carcinogenic materials increases the risk somewhat. A greater exposure, based on the "dose makes the poison" principle, would result in a greater risk.

And we know from toxicologic studies that intense exposures can sometimes accelerate the process and even shorten the latency period of a carcinogenic event.

So my opinion is that there is

no threshold of exposure for risk; that we are -- we are right to use a zero threshold approach until we know more about the possibility of a threshold below which exposure would be safe. At the current time we don't have that information.

Q. Do you believe that there probably is a threshold below which use is safe?

A. In the carcinogenic process, which we haven't really talked about in this session today, there is an insult to a cell which affects the genetic material, the DNA. And there are built-in repair mechanisms that the cell has for fixing that problem that occurred, a mutation, for example.

These kinds of insults are happening to cells all the time, not just from carcinogens in our environment, but just from natural occurrences, even endogenous biochemical reactions cause these problems.

The question is: Is the repair process sufficient to undo what's been done? And an exposure to environmental carcinogens,

that repair process is often overwhelmed so that it cannot catch up with the damage that's being created, and a tumor is born, basically.

That is where the concept of threshold comes from. Have we overwhelmed the repair or not, and we don't have enough research evidence or scientific evidence to be able to define that line at this point.

Q. Has there ever been a study that showed that talcum powder caused DNA damage in normal ovarian epithelial tissue?

A. Well, we do have the studies that have recently been produced by Fletcher and Saed that show the inflammatory process is influenced by talc, and this is nonfibrous talc, that result in mutagenic events that are available for promotion, and there are biomarkers that have also been established for that.

Q. The studies by Saed did not demonstrate DNA mutation, did they?

MS. O'DELL: Object to the form.

A. I think they actually did.
BY MS. BOCKUS:
Q. That's your reading of them?
A. Yes.
Q. What Saed did is he placed talc on cultured ovarian cancer cells, correct?
A. Yes.
Q. And that actually -- what he recorded was an elevation in the CA-125?
A. That's one of the things he did. He also measured -- he did a number of genetic studies. He did transcribed RNA. He located individual SNPs, which are single nucleotide polymorphisms, in the genetic material.
And he found that as a result of that treatment, those mutations altered the effectiveness of antioxidant enzymes that are part of the protection mechanism and shield the repair process of the cell from further damage.
Q. Let's go back to the CA-125.
MS. O'DELL: If you need to pull the paper out, Doctor, just, if

you want to take a moment and do that. I know you were searching for it while you were talking.
THE WITNESS: Yes, I think I have it right here.
MS. BOCKUS: These are just general questions that I'm going to ask you.
MS. O'DELL: You still may get the paper out.
MS. BOCKUS: Do whatever you want to do.
THE WITNESS: You can go ahead. I'm...
BY MS. BOCKUS:
Q. What controls did Saed use? Did he use any controls? In other words, did he place a known foreign object that was not -- that was known not to be a carcinogen on the cultured ovarian cells to see if there was a difference?
MS. O'DELL: Can you just pause just for a minute, let the doctor pull out the exhibit?

THE WITNESS: I'm sorry, it appears that I do need to get the original paper here. There it is. Okay. Thank you.
(Document review.)
BY MS. BOCKUS:
Q. Can you answer the question: Did Saed have any either positive or negative controls that he used in his experiments?
MS. O'DELL: Object to the form.
A. I think he did, but I'd like to actually find it in here so I can give you the specifics.
Well, he used normal cells and epithelial ovarian cancer cells, and one was the control for the other. He treated them in the same way.
BY MS. BOCKUS:
Q. Let me ask a different question.
What I'm asking is: Did he use, say, glass beads to see if -- as a control to the talc? Did he have anything

that he was controlling the cells' reaction to against the talc?
A. I don't believe so.
Q. That would be important in an experiment of this nature, would you not agree with that?
MS. O'DELL: Object to the form.
A. Well, he did utilize normal and cancerous cells, which would theoretically act as a control in that experiment.
BY MS. BOCKUS:
Q. That's not my question. I'm really asking about another element that he is exposing the cells to, both the normal and the cancerous cells.
MS. O'DELL: Objection to form.
BY MS. BOCKUS:
Q. To see if the reaction was just a reaction to a foreign body versus talc specifically.
Did he do that?
MS. O'DELL: Object to the form.

A. I don't believe that he provided a control exposure as part of this experiment.
BY MS. BOCKUS:
Q. And you would agree that there are many things that will increase a CA-125, correct?
MS. O'DELL: Object to the form.
A. Yes, it's an acute-phase reactant.
BY MS. BOCKUS:
Q. Pregnancy can increase somebody's CA-125?
A. That's correct.
Q. And with regard to the SNPs, that is not the same thing as a test showing mutation, correct?
MS. O'DELL: Object to the form.
BY MS. BOCKUS:
Q. It's a surrogate.
A. Well, it's because there was transcribed RNA that was used to determine

their presence, and the -- it's just part of their procedure, but it identifies genetic alterations. And those genetic alterations transformed into differential enzyme activities.
Q. Do you know whether there are standard tests for genotoxicity and mutagenicity?
A. There are lots of standard tests, yes.
Q. And Saed didn't use any of those, did he?
MS. O'DELL: Object to the form.
A. Well, he went directly to cells in culture to see what happened when they were treated with talc.
BY MS. BOCKUS:
Q. Does the amount of talc that Saed used compare in any way to the amount of talc that may reach a woman's ovary from perineal application?
MS. O'DELL: Object to the form.

A. I don't specifically know.
BY MS. BOCKUS:
Q. There's no way to know that, is there?
A. No, there's not.
Q. Let me find my -- there we go.
The Saed paper that you were looking at just a minute ago, it has something printed across it. What does that say?
A. In blue here?
Q. Uh-huh.
A. "For Peer Review."
Q. Okay. So it hasn't yet been peer reviewed; is that correct?
MS. O'DELL: Object to the form.
A. It's been submitted.
BY MS. BOCKUS:
Q. So does that mean it has not yet been peer reviewed?
MS. O'DELL: Object to the form.
A. I think it's been accepted for

publication.
BY MS. BOCKUS:
Q. But the copy you have says on it "For Peer Review," correct?
A. That's correct.
Q. In the paragraph that we were looking at earlier, where you were talking about the startling regularity, later on in the paragraph you state that there is clearly -- sufficient particulate materials applied routinely to the perineum have ready access and in sufficient quantities to produce biologic responses in internal tissues.
What internal tissues have you seen any study recording a biologic response to talc from?
That was such a bad question, I'm going to ask it again.
What internal tissues are you referring to there?
A. Well, it says including -- including ovaries and surrounding structures. By surrounding structures, I'm referring to

the fallopian fimbriae and the epithelium of the cavity.

Q. So -- and I know we've been through this already, but to your knowledge, there are no studies reporting biologic responses to talc in the vagina, correct?

A. Not that I'm aware.

Q. You're not aware of any studies reporting biologic responses to talc in the cervix, correct?

A. Correct.

Q. Are you aware of any studies reporting biologic response to the uterus?

A. No.

Q. Are you aware of any studies reporting a biologic response in the fallopian tubes?

MS. O'DELL: Object to the form.

A. Well, I don't -- I'm not aware of studies that draws a direct correlation between exposure to talc and reaction in the fallopian tubes.

///

BY MS. BOCKUS:

Q. Okay. Is the ovary attached to the fallopian tube?

A. It is -- it's in the proximity. It's not directly attached.

Q. And what surrounds the ovary?

A. There's a structure that -- the ovary itself?

Q. Yes.

A. There's an epithelial membrane around the ovary, and --

Q. And then what touches the epithelial membrane?

A. Well, the fimbriae of the fallopian tubes surround that and the rest of it is just sort of space.

Q. Space. Is the space filled with fluid?

A. It is.

Q. And is that fluid kind of moving around?

A. All the time.

Q. All the time.

So things that come through the

fallopian tube goes into that fluid and just gets moved around all the time; is that correct?

MS. O'DELL: Objection. Excuse me. Objection, form.

A. Well, there's a fairly direct presentation of the ovary, so there's not a large space there, but there is a space. And whatever goes into that space remains there. Some of it may come back out.

BY MS. BOCKUS:

Q. Does the fallopian tube move around during the month?

MS. O'DELL: Object to the form.

A. I don't know.

MS. BOCKUS: I'm almost finished. I'm going through all the things that I've crossed off.

BY MS. BOCKUS:

Q. So I understand you correctly, you have not identified a nonthreshold dose of talc; is that correct?

MS. O'DELL: Object to the

form.

A. You mean a dose that is below a safe threshold?

BY MS. BOCKUS:

Q. Correct.

A. No, I have not.

Q. Did you make any attempt to extrapolate a de minimis risk level?

MS. O'DELL: Object to the form.

A. I did not. It would be nice to be able to do that, considering that most of us have had talcum powder exposures of one sort or another during our lives. And it's something that seems to have been felt to be very useful.

So it would be nice to be able to do that exercise, but I haven't -- I have not been prevented -- presented with the information to approach that, nor am I aware of anyone else who's been able to do it.

BY MS. BOCKUS:

Q. What information would you need that you don't have?

A. Well, we'd need -- we'd need dose information, first of all, which we don't have, to combine with the epidemiologic results.

We need to define the mechanistic issues better than they are currently, and at that point I think we would be able to make some strong conclusions regarding potential thresholds of hazardous doses.

Q. You would agree that the great majority of women who use talcum powder on a regular basis are never diagnosed with ovarian cancer, correct?

A. I think that's true.

Q. And it's also true that the majority of women diagnosed with ovarian cancer have never used talcum powder on a regular basis, correct?

MS. O'DELL: Object to the form.

A. I think it's a majority, but there's a significant number who have.

///

BY MS. BOCKUS:

Q. But the majority have not, correct?

A. I would say more than 50% have not.

Q. And would you agree that -- let me back up.

When is the last time you conducted a pelvic exam?

A. I haven't done one in a couple of years.

Q. Under what circumstances did you do it two years ago?

A. I see patients regularly, and in some cases, pelvic exams are either requested or indicated by the issue.

Q. It's not something you do on a regular basis, correct?

A. It's not.

Q. And you do not -- what percentage of your patients are women?

A. Probably half, maybe a little less than half.

Q. How do patients come to see

you? In other words, are they referred by other people?

A. I have primarily a referral practice in toxicology.

Q. In toxicology? And so what types of patients are referred to you?

A. I have patients who are either workplace-related patients who have had chemical or other substance exposures. I also have a number of environmental exposure patients that I see.

And I also have a number of -- I also see a number of patients for general routine surveillance activities or required exams by regulation, either for licensure or certification.

Q. Are you sent patients where the patient is trying to figure out why they got some disease?

A. Sometimes. Usually the patient comes and tells me why they got the disease, and I go -- I talk to them about the possibilities, and we look at ways of confirming that or refuting it, or in many

cases, altering to a correct path of diagnostic investigation.

Q. So sometimes a patient comes to you and says: I was exposed to this chemical and that's why I can't breathe?

A. Yes.

Q. And you do an investigation, and sometimes you say: You know what, that chemical has nothing to do with why you can't breathe?

A. Sometimes that's the case.

MS. O'DELL: Are you finished, sir? Are you finished?

A. Well, I just wanted to add --

BY MS. BOCKUS:

Q. Sure.

A. -- that although many times it is the case, and often the patient does understand that connection quite well, usually from a very closely connected cause and effect kind of relationship. It's when things are stretched out much more in time, and there is a likely suspect that may be an innocent bystander, that they may get

confused.
Q. Have you ever been referred a patient to determine why they have ovarian cancer?
A. No.
Q. Do you know of any methodology accepted in the medical community for determining why an individual woman has developed ovarian cancer?
MS. O'DELL: Object to the form.
A. Other than genetic testing that identifies specific risks and history taking that might identify other known risk factors for that woman, there is -- I don't believe that there is any good or prescribed procedure for making that determination, and there is no reasonable screening test that can find that cancer when it is at an early stage.
BY MS. BOCKUS:
Q. Do you believe that obesity causes ovarian cancer?
A. It certainly seems to be

related to the occurrence of ovarian cancer from a statistical point of view.
Q. What is the increase in a woman's risk of ovarian cancer if she's obese compared to a nonobese woman?
A. In terms of numbers?
Q. Yes, sir.
A. I don't know the -- I don't know the numbers.
Q. What other risk factors are you familiar with for ovarian cancer?
A. Well, certainly work with asbestos is a risk factor, and we have a number of studies that have shown women working in the asbestos industry or women who are married to asbestos workers and have secondary exposure presumably from that are at risk for ovarian cancer.
There are --
Q. Let me stop you just one second.
A. Yes.
Q. What percentage -- what is their relative risk or what is the odds ratio

for that population of women?
A. Well, it varies depending on the research study that has been done, but I've seen odds ratios or relative risks all the way from 1 or even below to very high numbers, like 20 to 50.
Q. 20.0, is that what you're saying?
A. Yes, 20.0.
Q. Not 1.2, but 20.0?
A. Correct.
Q. Okay.
A. Which is a -- which would be 20 times the normal risk without the exposure.
Q. Okay. So we've got obesity and heavy exposure to asbestos. Any other risk factors that you're familiar with?
MS. O'DELL: Objection -- excuse me. Objection, misstates the doctor's testimony.
You may answer.
THE WITNESS: Okay.
A. Other risk factors for ovarian cancer would include things like early

menarche, late menopause, never being pregnant. These are some of the more common risk factors that are identified.
There are genetic risk factors that are known, like the BRCA mutations, which confer an increased risk. Family history.
BY MS. BOCKUS:
Q. Do you know the odds ratios of any of the risk factors that you just identified of never having children, having early menarche or late menopause?
A. Right offhand, I don't know what those odds ratios -- the range of those are.
Q. Do you know if any of those odds ratios exceed 1.3?
A. I think they do.
Q. Does that lead you to conclude that those things cause ovarian cancer?
A. It certainly argues for that. The -- there's a risk factor that derives from something. You need a mechanism to fill in the blank.

But also, some of these risk factors are so common in the population that we can concoct large cohort studies that will have -- can have very low relative risks, like on the order of 1.3 or even lower, and still a significant result.

So the more common a factor is, the easier it is to do the research and the more likely you'll get a finding that's relevant to interpretation.

Q. What pushes a talc particle from the perineum into the vagina?

A. Probably mostly the law of mass action. It simply goes of its own volition. These small particles are always in motion through molecular forces, and they simply move in all directions, and some of them move in that direction.

Q. Would that be true for any small particles applied to a woman's perineum?

A. Yes.

Q. Are you board certified in medical toxicology?

A. I'm not. I started practicing medical toxicology before there was a board in the specialty, and I've been grandfathered into the profession as a member of the American College of Medical Toxicology.

Q. How long did you talk to Dr. Ness about her paper?

A. About her paper, probably a minute and a half. About all kinds of other things, for a while.

Q. What other kinds of things?

A. Mostly personal things that had nothing to do with talc or this case.

Q. How long do you think that conversation was?

A. Well, with Dr. Ness, nothing lasts very long, so I would say ten minutes at the most.

Q. Okay. Did you call her?

A. No. She's -- she comes and goes in the same building where I office, and my office is just on the opposite side of the floor of hers, and I see her sometimes in passing or in the elevator.

Q. So you think you just ran into her?

A. Yeah.

Q. The other people that you identified that you discussed your report with, did you ask them to read your report?

A. I asked them to look at parts of it, early drafts of it to let me know if they thought I was making sense.

Q. And did they offer you comments and suggestions for changes in your paper?

A. Not really. Mostly they gave me a pat on the back and said: I think you're doing a good job, just sort of beef this part up, and what do you mean by this, maybe I could rephrase that. That sort of thing.

Q. Did they give you written suggestions?

A. No, these were all verbal comments.

Q. Had you given them a hard copy of the portions of your report that you wanted them to comment on?

A. Yes.

Q. And they didn't redline it or make -- draw arrows or anything like that for you?

A. I think actually George Delclos did draw some -- or make some notes on there and hand it back to me, and I incorporated those into my electronic version.

Q. Do you still have George's notes to you?

A. No, I don't.

Q. Is he the only one out of the people that you asked to look at it who gave you handwritten notes?

A. Yes, I think so.

Q. Have you seen the term "intrinsic elimination system" regarding the ovary in any of the publications that you've read?

A. I don't know, I may have.

Q. Can you think of one in particular that discusses that characteristic of -- that you believe relates to the ovary?

A. Well, the migration papers

discuss migration to the ovary. It would probably be a talc paper, though. I don't recall seeing it anywhere.

Q. Did you consult any gynecologic textbooks?

A. No, I didn't. I may have looked at some diagrams on the Internet.

Q. Okay. Did you consult any gynecologic oncology textbooks?

A. Not textbooks, no.

Q. Do you know the position of the Society of Gynecologic Oncologists on the question of whether does talc increase a woman's risk for ovarian cancer?

A. No, I don't.

Q. Would that be important to you to know their position?

A. No, I don't think so.

Q. Do you know the position of ACOG on whether the use of -- perineal use of talc increases a woman's risk of ovarian cancer?

A. I don't know that either. That's not something I've looked at.

Q. Would that be important to you?

A. No.

Q. Do you have any scientific text that suggests that an inert particle resides on the ovary longer than it does in the cervix?

A. Well, I have -- I have a paper that relates to the time for dissolution of a particle in biological fluids, which would go to the length of time a particle of talc remains in the ovary once it gets there.

But I don't have -- I don't know that I have a scientific paper that specifically says that it stays in the ovary longer than it stays in the cervix.

Q. You testified that you understand there have been some attempts to quantify the amount of talc, I guess from a single use, that ends up on the perineum.

Did I understand that correctly?

A. Yes.

Q. Can you tell me what those attempts are, who did them, where did you see

that?

A. Well, I saw this actually when I first started this process, and I think Dr. Longo was involved in that activity, where they modeled the -- the application of talcum powder and did some calculations based on the amount of substance that was used, and they measured it in things like shakes and -- and then quantified the amount that was lost from the container to determine what an application amount was.

I don't think they were able to go beyond that point in the modeling process.

Q. You didn't see anything that Dr. Longo did that attempted to quantify the amount of talcum powder from a single shake that ended up on a woman's perineum, did you?

MS. O'DELL: Object to the form.

A. I -- you know, I don't know the answer to that, simply because I don't recall, but I wouldn't be surprised that there was an attempt made to do that. But beyond that, I don't think anything would be

successful.

These were clothed subjects, so that adds another factor to the calculation.

BY MS. BOCKUS:

Q. Is that the only experiment that you're familiar with that you've seen anywhere that attempts to quantify the amount of talcum powder from a single use that ends up actually on a woman's perineum?

A. There was another part of that study where they applied it to underwear with the same sort of calculation process. It was all part of the same modeling process.

Q. And do you recall what percentage of the talc applied to the underwear ended up adhered to the woman's perineum?

MS. O'DELL: Object to the form.

A. I don't think -- I don't think they measured the amount that adhered to the perineum. I think what they were interested in was proximity.

///

BY MS. BOCKUS:

Q. Okay. Can you tell me the names of the environmental websites that have been talking about IARC revisiting their classification of talc?

A. There are -- there are a number of Twitter feeds and websites that carry on this kind of discussion. Science Interest is one of them. I think IARC Watch is another one. I have -- I get e-mails about some of these and end up going into them for a period of time and seeing if they have anything interesting going on. Some of them are searchable.

And then I get e-mails from the ones that I visit about other ones. So I spend as much of my time deleting these e-mails without reading them as I do actually viewing the material.

Q. So fair to say this is just chatter you've seen on the Internet in these different chat rooms or Twitter accounts that you visit from time to time?

A. It's all Internet based, yes.

MS. BOCKUS: Okay. I think that's all I have. Thank you.

MS. O'DELL: Why don't we take a short break. We've been going about two hours.

MR. ZELLERS: Do you have questions?

MS. APPEL: I do, but --

MS. O'DELL: Yeah, do you have --

MS. APPEL: I don't have a lot.

MS. O'DELL: Okay. Sure. Why don't you go ahead, and then we'll take a break. We have been going about two hours, but, Renée, please.

If you're okay, Doctor.

THE WITNESS: I'm fine.

EXAMINATION

BY MS. APPEL:

Q. It's been a while since we did introductions, so just as a reminder, my name is Renée Appel and I'm here on behalf of Seyfarth Shaw and I represent Personal Care Products, counsel.

A. Uh-huh.

Q. And echoing what my colleagues have said today, if there's at any point I ask a question that you do not understand, just stop me and ask me to rephrase it or let me know otherwise, okay?

A. I will.

Q. Thanks.

So going back shortly to your scope of work, do you teach any coursework on talc or ovarian cancer?

A. I teach some general courses. Up until last spring I taught a general environmental health course for graduate students in the Master of Public Health program at the School of Public Health, and in that course we did touch on things like environmental exposures that would include minerals of various varieties, but it was very cursory.

Q. And was that curriculum specific to environmental and industrial products or minerals as opposed to consumer products?

A. We actually did touch on other consumer products as well in terms of the significant environmental problem that we have currently, but -- regarding the huge volume of personal care products that goes into our aqueous waste stream and how that's affecting the aquatic environment as well as groundwater and so forth.

As a matter of fact, in that course, as part of the culmination of the course, there are student workgroups that develop presentations on a particular topic, and the topic of personal care products has been a favorite choice for the last several years.

Q. But your curriculum did not include talc among those products?

MS. O'DELL: Object to the form.

A. I think talc may have been represented as an individual mineral on a slide that listed many minerals.

BY MS. APPEL:

Q. Earlier today you had mentioned

a shared file. Is that shared file something that you created or plaintiffs' counsel created?

A. It's something that I think plaintiffs' counsel created for me to be able to send them documents and receive documents, and it's a Dropbox share file. It's -- at this point I think it might be mine. I'm not sure just exactly who's in charge of that or runs it, but it comes directly into my Dropbox file.

I know I had to boost my subscription to Dropbox in order to hold the 2 gigabytes of data from -- that we were putting into there.

Q. Is there anything from that Dropbox file that you relied upon in forming your opinion in your report that you have not already provided to defense counsel?

A. No, everything that was in that Dropbox that I've relied upon has been identified here.

Q. Who prepared Exhibit B to your report?

A. Exhibit B was a list of articles from the research literature included in the Dropbox that -- that I think does not -- I don't know whether it includes the referenced articles from my report or not, but they were all part of the same collection of research articles and supplemental documents.

Q. And my question, Dr. Carson, was: Who prepared that exhibit?

A. The exhibit was prepared by the plaintiffs' attorneys.

Q. You testified earlier that you have spent approximately 150 to 180 hours in your expert retention work; is that correct?

A. Correct.

Q. Can you estimate what portion of that time was spent researching versus what portion of time was spent actually drafting your expert report?

A. Those two things are in some ways difficult to separate because I would -- I was writing my report the entire time that I was reviewing the research materials and

accumulating information in the draft as a result of my review of the literature.

So if I had to separate things out, I would say that, by far, the -- most of the time has been spent in reading articles and reviewing them and comparing them with other articles, and a comparatively small amount of time has been spent in drafting the report.

Although there were some strings of activity which was all report drafting basically, I would say probably 85 to 90% was research, seeking articles, reading them, reviewing them, and comparing them.

Q. And you also testified earlier today that you discarded information not relevant or interesting to you.

How did you make that determination?

MS. O'DELL: Objection to the form.

A. The things that I discarded did not seem to fit into my gestalt of the

understanding of this question and the opinions that I wanted to express. They may have been interesting information and useful for some purposes, but not for this particular report.

BY MS. APPEL:

Q. Was some of that information that you discarded based on relevancy or that you determined was not of interest information that may have been different than your opinions?

A. No. I didn't discard any research because the opinions provided differed from my own. These were things that really were irrelevant to the question.

I remember finding an awful lot of geological research stuff that just didn't have any relevance to the question.

Because I used such broad search terms, I ended up pulling in a whole lot of things that were not necessary or useful, and those just went in the trash.

Q. You testified earlier that you have not treated any patients with ovarian

cancer; is that correct?
A. Not knowingly, not because of ovarian cancer.
Q. Have you ever diagnosed any patients with ovarian cancer?
A. I think when I was in medical school or residency, I probably participated in that on several patients.
Q. Have you ever instructed a patient not to use talcum powder products?
A. I hadn't up until a month or two ago, but I've been asking people about -- about their talcum powder use just as sort of a curiosity in mentioning that there might be a risk.
Q. Do you ask that of all your patients?
A. I would say no, I don't usually ask the men that, but I probably should.
Q. And have the responses to those inquiries of your female patients and their talcum product use, has that been used at all to inform your opinions in this case?
A. I don't think so. There have

been very few that I have asked that question in the last month or so. I've had a limited clinic schedule during this period of time. We had the holidays and other things, so I haven't seen that many patients.
And of those I've asked about it, it seems about half of the women have had a history of using talcum powder.
Q. And of those women that are using -- have told you that they have used talcum powder, are those women diagnosed with ovarian cancer?
A. No.
Q. So suffice to say the inquiry that you've asked of your female patients concerning their talcum use has nothing to do with the question that you've been posed in this particular litigation?
MS. O'DELL: Object to the form.
A. Actually, that's the only reason I've been asking them. It's not something that came to mind earlier. I have an environmental exposure survey that I

usually administer to my patients, and I have plans to add that as a question in my environmental exposure survey. Which I haven't done already, but will as soon as I get the opportunity.
BY MS. APPEL:
Q. You testified earlier today that you do not believe there was ever a point where talcum powder did not contain asbestos, correct?
A. Yes.
Q. So in forming your opinion in your report, you've assumed that the talcum powder does contain asbestos, correct?
MS. O'DELL: Object to the form.
A. Well, I think the asbestos contribution to this whole issue is important and significant. I think there's good evidence that whatever we call talcum powder is carcinogenic and responsible for ovarian cancer -- as a cause of ovarian cancer, but I can't say -- I can't say based on looking at a can of talcum powder whether or not it has

asbestos in it or how much.
BY MS. APPEL:
Q. Have you formed an opinion, Dr. Carson, on whether there's a relationship between pure talc and ovarian cancer?
MS. O'DELL: Objection to form.
A. My opinion is there is, but that's based on the research reports that have been done using so-called pure talc, talcum powder, and I am -- I -- my opinion is that it's unlikely that those test substances actually are pure talc.
BY MS. APPEL:
Q. So again, Dr. Carson, in forming your opinions, you have done so on the belief that all the talc powder products or just pure talc do, in fact, contain asbestos?
MS. O'DELL: Objection to form.
A. It is my opinion that all talcum powder products do contain a certain amount of asbestos, even if it's extremely small.
My opinions have been formed

based on research that has been done on available talcum powder products, so I guess the research would have been done using some small quantity of asbestos in all of those studies.

BY MS. APPEL:

Q. You also testified today, Dr. Carson, that you have found in your research that there is a dose-response relationship between talcum powder products and ovarian cancer, correct?

A. Well, a number of the research studies, the epidemiology studies have shown positive and statistically significant trends.

Q. And those trends that you're relying on, Dr. Carson, actually only relate to duration and frequency, correct?

MS. O'DELL: Objection to form.

A. Yes, they do relate to duration and frequency, which is the only surrogate we have for dose.

BY MS. APPEL:

Q. So in forming your opinion,

Dr. Carson, you have not determined a level of harmful exposure to talcum powder products that causes ovarian cancer?

A. That's correct.

Q. And you did not conduct a dose assessment between talcum powder products and ovarian cancer, correct?

MS. O'DELL: Objection to form.

A. Well, I did not conduct a dose-response, but I am of the opinion that there's no safe threshold for exposure to a carcinogen until such a threshold is identified.

BY MS. APPEL:

Q. And does that include Category 2B particles as well --

MS. O'DELL: Objection.

BY MS. APPEL:

Q. -- that it's a possible carcinogen?

MS. O'DELL: Objection to form.

A. It includes the talc that was discussed in the IARC report. Those conclusions have nothing to do with how it's

classified by IARC.

BY MS. APPEL:

Q. But it's your opinion that a possible carcinogen -- strike that.

It's your opinion that any dose of a possible carcinogen can cause cancer?

MS. O'DELL: Objection to form.

A. Yes, I think there is a potential for any dose of a carcinogen to cause a cancer. There's also the principle that the lower the dose, the less likely it is, the lower the risk is for developing a cancer.

BY MS. APPEL:

Q. And your opinion extends to those particles that have not been identified as carcinogens, but may just be possible carcinogens?

A. I think talc has been identified as a carcinogen.

Q. So you disagree with the IARC classification?

A. The IARC 2B classification is a carcinogenic classification.

Q. But you recognize and -- that there are different types of categories that IARC has?

A. Yes.

Q. And that -- it's that talc that does not contain asbestos was not, in fact, categorized as a Group 1, correct?

A. That's correct.

Q. So is it your opinion, then, looking at other 2B-classified particles by IARC, that any exposure to pickled vegetables would cause cancer?

A. We know that there are a number of carcinogens that are regularly present in things like the food that we eat. We have a rule that says that those things should not be included in food items unless they have passed a particular exemption process.

Pickled vegetables are something that people have been familiar with and have been using for hundreds of years, and things like talcum powder are things that have been used for -- well, at least a hundred years, but probably considerably

Page 358

longer.

And whether or not those things are carcinogens, there are people who still find enough value to offset that factor in their own lives and they can make their own decisions regarding their exposure.

It's a similar concept to people who choose to smoke. Although smoking is an addictive behavior, people are aware that it causes disease, including cancer, and yet they continue to smoke.

We continue to eat grilled meats, even -- most of us know now that grilled meats contain polycyclic aromatic hydrocarbons that are known carcinogens, some of them Group 1 carcinogens, and yet, we continue that practice and revel in it even. That's just part of what we do as human beings.

The issue with talc is a complicated question in my mind. I think I'm straying a bit from your -- from your question, but baby powder, for example, is something that has a very -- very dear sort

Page 359

of relationship to many people.

The experience with that from the time you were a baby until you grow up and have your own children involves a lot of the use of baby powder in many, many households. That's a difficult relationship to break. It's psychological as much as it is knowledge based.

So as we go through the decades, we get a little safer and safer as we begin to peel these habits, these dangerous habits away from our lives and accept better lifestyles.

MR. ZELLERS: Move to strike as nonresponsive.

MS. APPEL: Respectfully --

MS. BOCKUS: Is he finished?

MR. ZELLERS: I don't think so.

THE WITNESS: I can go on.

BY MS. APPEL:

Q. Yeah. My question was more narrow, and I was analogizing your opinion as to talcum powder and was asking about other 2B classifications, and my example --

Page 360

A. Pickled vegetables.

Q. -- I had was pickled vegetables, and the question was whether or not is your opinion that any consumption of pickled vegetables causes cancer?

MS. O'DELL: Objection to form.

A. I believe the primary form of cancer that's potentially related with pickled vegetables is stomach cancer, and there is a slight increase in risk with consumption of pickled vegetables for everybody who does it.

BY MS. APPEL:

Q. Okay. And what about gasoline or exhaust?

A. Gasoline meaning the fuel?

Q. Yes.

A. Well, gasoline used to contain a significant amount of benzene, which was a -- determined to be a carcinogenic substance. In recent years, most of the benzene has been removed from gasoline, so now there's very little benzene in vapors that are expressed.

Page 361

But there's a small amount. So when you inhale gasoline vapors, you are also exposing yourself to a very small amount of a carcinogenic substance.

As far as exhaust is concerned, diesel exhaust in particular has -- contains particles that have been identified through various bioassays to be carcinogenic. So diesel exhaust is regulated as a carcinogenic material, even though we continue to be exposed.

Q. And it's your opinion that any exposure that we all incur related to exhaust will cause us cancer?

MS. O'DELL: Objection to form.

A. It will cause an increase in risk of cancer. Doesn't necessarily cause cancer in everybody.

BY MS. APPEL:

Q. Okay. Are you aware that Saed has been hired by plaintiffs' counsel in this litigation?

A. I am. And when I misspoke earlier today regarding the Taher paper, I

was thinking of the Saed paper.
Q. Okay. Last question: Counsel was asking you about the migration process, and you mentioned that in the course of particles moving up the track, that some of it may come back out even after it reaches the fluid surrounding the ovaries, correct?
A. Yes.
Q. So if particles have the ability to come back out, that means that there is, in fact, some form of an intrinsic elimination system.
A. Well, if this is all based on mass action, it would not necessarily be an intrinsic elimination system, and I believe that talc particles, once they produce an inflammatory response, they become sequestered within that inflammatory milieu and no longer are available for movement back out into the fluid.
I'm sure there's some small percentage of them that are an exception to that, but for the majority, that would be the case.

MS. APPEL: Okay. That's all I have. Thank you, Dr. Carson.
MS. TINSLEY: I don't have any questions.
MS. O'DELL: Okay. Why don't we take a short break.
THE VIDEOGRAPHER: Off the record at 5:37, end of Tape 4.
(Recess taken, 5:37 p.m. to 5:44 p.m.)
THE VIDEOGRAPHER: We're on the record at 5:44, beginning of Tape 5.
MS. O'DELL: Dr. Carson, I don't have any questions, so this will conclude your deposition.
MR. ZELLERS: Thank you, Doctor.
THE VIDEOGRAPHER: Going off the record, 5:44. End of deposition, end of Tape 5.
(Proceedings recessed at 5:45 p.m.)
--o0o--

CERTIFICATE

I, MICHAEL E. MILLER, Fellow of the Academy of Professional Reporters, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Court Reporter and Notary Public, do hereby certify that prior to the commencement of the examination, ARCH I. "CHIP" CARSON, M.D., Ph.D. was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that pursuant to FRCP Rule 30, signature of the witness was not requested by the witness or other party before the conclusion of the deposition.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

______________________________
MICHAEL E. MILLER, FAPR, RDR, CRR
Fellow of the Academy of Professional Reporters
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
Certified Court Reporter

Notary Public in and for the
State of Texas
My Commission Expires: 7/9/2020

Dated: January 22, 2019

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

ERRATA

PAGE LINE CHANGE

____ ____ ______________________________

REASON: ____________________________

____ ____ ______________________________

REASON: ____________________________

____ ____ ______________________________

REASON: ____________________________

____ ____ ______________________________

REASON: ____________________________

____ ____ ______________________________

REASON: ____________________________

____ ____ ______________________________

REASON: ____________________________

____ ____ ______________________________

REASON: ____________________________

____ ____ ______________________________

REASON: ____________________________

____ ____ ______________________________

REASON: ____________________________

____ ____ ______________________________

REASON: ____________________________

____ ____ ______________________________

REASON: ____________________________

ACKNOWLEDGMENT OF DEPONENT

I, ARCH I. "CHIP" CARSON, M.D., Ph.D., do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

______________________________________

ARCH I. "CHIP" CARSON, M.D., Ph.D. DATE

Subscribed and sworn to before me this _______ day of ______________, 20 _____.

My commission expires: _______________

______________________________

Notary Public

LAWYER'S NOTES

PAGE LINE

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

**A**

**a.m**
1:16 8:2,8 31:10 89:5,6
**ability**
211:18 362:10 364:9
**able**
34:22 36:1 38:12 42:22 64:3 71:15 115:13 141:9 154:11,14 175:20 190:1 191:16 216:2 220:1 258:17 281:10 299:8 309:17 313:9 325:12,17 325:21 326:8 340:12 346:5
**Abney**
36:22,23,24 37:8 37:14 38:1,17 45:23,23,24 55:2 65:15 284:16 285:1,12
**absence**
72:16 99:23 240:19
**academic**
70:12 76:5
**Academy**
1:18 364:2,19
**accelerate**
311:22
**accelerated**
287:3,14
**accept**
359:13
**acceptance**
213:11
**accepted**
102:18 103:18,23 250:12 320:24 330:7
**access**
13:23 102:1,9,10 162:5 321:12
**accessed**
42:3
**accomplished**
249:23
**account**
162:11 163:13 166:18 224:14 268:6,8,20 277:14
**accounts**
277:19 342:22
**accumulated**
310:15
**accumulating**
348:1
**accurate**
14:21 22:11 365:19
**Acheson**
145:12 154:19
**achieved**
259:7
**acidolite**
144:21
**acknowledge**
221:18
**ACKNOWLED...**
4:12 367:1
**ACOG**
338:20
**act**
317:11
**action**
96:6,6 98:2 99:22 272:12 299:23 300:2 334:14 362:14 364:14,16
**activities**
27:18 31:17 58:16 60:9 232:6 257:4 319:5 328:14
**activity**
340:4 348:11
**acute**
198:16,20
**acute-phase**
318:10
**add**
83:16 119:17 256:3 299:15 329:14 352:2
**added**
115:22 175:24
**addictive**
358:9
**adding**
119:15
**addition**
14:1 24:9 68:8 215:23
**additional**
14:2 17:12 24:10 24:20 25:18 28:3 51:15 60:8 68:11 72:6 217:18
**additions**
57:24
**additive**
300:5
**address**
32:4 38:2 93:13 165:6 214:16 294:22
**addressed**
215:2 216:3
**addresses**
294:23
**addressing**
291:5 295:1
**adds**
169:7 249:14 341:3
**adhered**
341:16,21
**adhesions**
116:17 119:3,12 120:6,19 132:24 133:4,14 185:6
**adjust**
268:15
**adjusted**
269:4 272:22
**administer**
352:1
**administered**
188:23
**administration**
257:3
**adolescence**
267:16,24
**adopt**
100:13
**adopted**
98:16
**advantage**
240:5
**advice**
164:14
**African-American**
196:23 198:3 270:19
**age**
162:12 163:15
**agencies**
93:24 97:7
**agency**
178:23 179:1 219:9 219:11 225:23 294:24
**agent**
179:13,18,20 226:24 227:9 228:21 235:12
**agents**
178:15 179:10 225:22 226:3,16 226:21 227:7
**ago**
30:8 37:2 235:12 250:13 320:8 327:13 350:12
**agree**
75:6,14 77:20 78:3 92:22 96:4 106:10 120:14 121:2 134:14 159:2 160:23 167:18 168:13,18 172:14 180:2 218:3 239:14,15 253:20 253:23 258:12 264:22 266:7,23 277:21 290:20 293:20 294:6 302:24 317:6 318:5 326:11 327:6
**agreed**
235:23 236:12 239:4
**agreeing**
133:10
**ahead**
21:22 25:4 39:21 67:10 282:12 290:18 315:13 343:13
**aid**
186:10
**air**
186:3 187:3
**aklevorn@burns...**
2:9
**al**
5:9,10,12,13,18,19 6:4,6,7,8,10,13,14 6:16 26:5
**Alabama**
2:5
**albumin**
183:18 189:6
**allege**
138:23
**alleged**
143:22 153:9 175:7 298:23
**allegedly**
152:22
**Allen**
2:2 8:18,20
**allow**
12:4 254:21
**allows**
42:19 87:18
**allude**
86:17 128:9
**alluded**
289:4
**alterations**
319:3,3
**altered**

314:17
**altering**
329:1
**alternative**
132:16 150:16,20
**Amanda**
2:8 8:22
**America**
3:5,10
**American**
32:14 77:13 335:5
**amosite**
146:7
**amount**
55:16 73:5 143:22 152:11,21 153:9 170:21 171:2,2,2 171:7,16 177:21 202:21 231:12 232:3 263:10 279:7 299:2 301:4 319:19,20 339:18 340:7,9,11,16 341:7,21 348:8 353:22 360:19 361:1,3
**amounts**
73:5,16 167:5 169:11,16 176:5 211:4
**amphibole**
31:10 146:5,17
**analogizing**
359:22
**analyses**
113:24 114:4
**analysis**
80:23 86:4 163:13 191:18 192:18,21 193:22 219:2 220:4 252:19 257:17
**analyzes**
219:22
**analyzing**
215:12
**anatomical**
84:3
**anatomy**
207:22 209:9
**and/or**
139:4 171:7 221:22
**Angeles**
2:15
**animal**
291:5 293:14,17 294:1
**animals**
286:24 290:9 291:1 291:3 292:11,20 294:6
**Annie**
69:5,10
**answer**
11:18 12:4,5 23:7 39:17 40:9 53:18 64:4 81:15 92:14 92:14,20 105:14 110:10 112:9 115:13 135:16,24 141:9 148:4 156:12 161:9 162:23 172:4 188:5 189:4 206:15 208:18 220:1 307:4 316:7 332:21 340:21
**answered**
88:23 106:17 110:15 116:20 128:7 137:22 152:6 157:2 228:15 242:5
**answering**
150:2
**answers**
159:12 180:14 367:5
**anthophyllite**
144:11,23 145:3,4 145:5 146:6
**antiinflammatory**
131:8,20
**antioxidant**
314:18
**Antonio**
3:4
**apart**
28:5 207:18
**apologies**
74:4 257:23
**apologize**
285:19 296:16
**apparent**
211:2 251:8
**apparently**
208:22
**appear**
10:17 222:4 258:10
**appearances**
4:2 56:19
**appeared**
77:13,17
**appears**
258:7 276:3 316:2
**Appel**
3:17 4:8 9:9,9 343:8,11,19,22 345:23 349:6 352:6 353:2,13 354:6,23 355:14 355:18 356:2,14 359:16,20 360:13 361:19 363:1
**appendices**
102:2,11
**Appendix**
19:13 21:21
**apples**
254:18,18
**application**
86:13 87:11,16 88:4,9,12,13,21 109:3 110:24 111:14 117:6 119:24 147:2 152:18 167:10 183:13 185:9 210:8 230:11 231:6,10 232:4 296:10 302:1 306:16 319:22 340:5,11
**applications**
194:7
**applied**
109:3 116:15 119:14 201:5,7,16 201:24 264:16 302:4 306:14 321:11 334:20 341:11,15
**applies**
218:7 228:20 236:15
**apply**
186:19 231:4 235:17,19
**applying**
240:9
**appointment**
61:7
**appreciable**
202:21
**appreciate**
195:20
**approach**
42:15,18 95:16 98:11,16 99:15,19 99:20 100:4 312:3 325:20
**approaches**
93:12
**approaching**
28:11
**appropriate**
98:10 99:22 164:18 293:15 365:6
**approximately**
347:14
**April**
30:21,24 33:19 218:21
**aquatic**
345:7
**aqueous**
345:6
**Arch**
1:13 4:5 5:1 9:18 10:1 364:5 367:4 367:12
**area**
37:1 91:3 160:24 162:10 163:22 186:19 198:13 199:13 248:10 249:16 252:21 258:12 301:21
**areas**
43:3 70:19 198:22 199:2 201:19
**argues**
110:7 333:21
**argument**
213:10
**argumentative**
88:17
**aromatic**
358:14
**arrive**
215:1 241:19
**arriving**
251:11
**arrows**
337:3
**art**
41:18 208:12,17
**arthritis**
121:18
**article**
26:5,9,11,16,24 28:9,23 29:3,4,8 31:9,20 32:6,14 32:22 33:10,11 51:3,19 86:10 88:1,18 102:24 103:7,11 117:3 248:17 280:17
**articles**
25:6 28:3 51:14,17 86:17 87:8 104:23 105:1 125:1 183:11 185:5 192:8 347:2,5,7 348:5,7,13

**asbestiform**
290:10,22 295:19
**asbestos**
41:9,11,11 49:17 55:12,17,20 64:19 72:10,17,17 106:2 106:10 107:2 114:23 115:4,9 125:1 138:17,23 139:4,8,13,16,21 140:8,22 141:7 142:19 143:1 144:7,19,19 145:8 145:18,24 146:2,5 146:15,17 147:10 147:16,22 148:8 148:14 151:1 152:11,15,17,21 153:9,13,22 154:1 154:6,12,17 157:6 157:15 158:19 159:3 160:4,17 163:8 166:15 167:5,14 168:14 169:1 170:19 290:10,22 295:19 296:7 297:21 298:3,6,16,24 299:2 300:3 331:13,15,16 332:16 352:10,14 352:17 353:1,18 353:22 354:4 357:6
**asked**
32:3 38:1 39:15 53:15,17 57:4 80:19 88:22 106:16 110:15 116:20,22 117:13 118:10,12 123:4 124:11 128:7 137:21 144:24 152:6 156:11 157:1 165:7 168:24 172:5 199:11 214:1,16 216:3 228:14 242:5 278:19 283:6 336:7 337:13 351:1,6,15
**asking**
92:1,12 112:7,10 112:24 119:24 136:3 174:17 308:24 309:1 316:22 317:14 350:12 351:22 359:23 362:3
**aspect**
137:8 173:19
**aspects**
22:17,19,20 216:20
**aspirin**
131:9,13,20
**assemble**
24:8 40:18
**assess**
111:20 231:19
**assessed**
258:19
**assessing**
99:2 113:23
**assessment**
5:15 30:13 53:6 89:15 94:23 95:22 96:10,17 172:11 172:15 173:1,8,13 173:14,20,21 174:5,13,18,20,21 174:23 175:2,7,14 175:20 205:22,24 214:6,12 232:9 355:6
**assessments**
97:6 175:4 205:18 205:21
**assigning**
225:7
**assist**
43:21
**assistant**
58:8 289:7
**assisted**
43:23
**associate**
61:8
**associated**
63:16 121:24 122:1 122:7 131:10 145:9,11,16 152:12,15,19 153:10,13,16 154:13 179:9 248:10 249:17 252:17 277:6
**association**
17:7,17 27:3 38:19 53:21 54:10 55:8 64:19,20 85:2 91:20 107:3 110:2 110:7,12 111:3 129:18 130:9 138:7,12 166:12 196:11,21 198:1 223:5 229:24 230:9,20,21 233:2 233:12 235:3,4,17 235:24 237:8,23 238:8,16 240:20 243:12 244:3,15 246:3,9 247:22 248:23 250:6 254:1 262:16,21 265:6,11,23 270:17
**associations**
109:9,20,21 121:13 193:18 221:24 223:7 233:8 245:10 272:23
**assume**
11:20 181:2
**assumed**
352:13
**Assuming**
116:4
**assumption**
139:14,19 296:3
**attached**
21:7,21 323:2,5 365:12 367:7
**attachments**
15:24 16:2 21:1
**attempt**
188:3 231:18 277:13 325:7 340:23
**attempted**
340:15
**attempts**
231:23 232:1,2 268:9 339:17,24 341:7
**attention**
105:2
**attenuated**
193:18
**attorney**
36:21 364:13,15 365:16
**attorneys**
13:2 20:3 24:6 51:11 72:15 75:18 96:11,13 101:7 103:22 104:14 141:22 347:12
**attorneys'**
46:8
**attribute**
307:3,6
**attributed**
244:6
**Australia**
308:9
**author**
27:5,24 29:2 77:6,7 101:13 129:14,16 246:22 286:13
**author's**
186:14
**authored**
31:9 32:16 62:21
**authoring**
89:11
**authorities**
89:21
**authority**
90:24
**authorized**
39:24
**authors**
101:17 104:2,16,19 105:5,11 106:23 107:11 108:8 111:11 128:1,3 163:6,17,21 187:10 193:4,5,8 194:11 196:18 210:22 241:7 243:9 244:2,22 247:18 248:6,20 249:10 269:4 271:24 277:16
**availability**
37:6
**available**
13:24 16:18 25:6 34:2 40:19 50:15 54:13 69:1 78:5 94:16 174:1,9 214:18 215:14,23 216:9 228:9,10 313:18 354:2 362:19
**Avenue**
3:8
**average**
231:2 280:19
**avoid**
241:10
**avoiding**
244:24
**aware**
14:23 25:15 27:15 31:21 37:4 41:8 46:22 49:19,20 50:22 51:20 52:1 52:3 67:1,4 68:16 88:1 116:23 122:9 127:24 131:7 148:21 153:23 161:16 185:5 200:9 203:3,6 204:5 212:24

213:21 229:4 241:9 268:3,4 322:7,8,12,15,20 325:20 358:9 361:20
**awareness** 55:17
**awful** 349:16

**B**

**b** 3:17 19:4,5,13 21:21 25:1 286:1 346:23 347:1
**baby** 22:2,3 85:6 144:16 152:23 177:22 232:9 274:21 275:6,11,20 358:23 359:3,5
**back** 31:21 37:9 77:6 125:16 136:20 142:15 145:10 158:1 163:19 168:11 207:19 227:6 228:24 246:17 278:6 307:8 314:22 324:10 327:7 336:13 337:7 344:9 362:6,10,19
**background** 155:23 156:1 236:24
**bacteria** 202:14
**bad** 321:18
**balance** 248:8
**Balkwill** 127:5
**banned** 133:19,24 134:9,15 134:18
**based** 19:21 71:17,19 75:24 85:17 93:22 94:5,15,20,23 105:8 113:1 143:13,17 148:1 153:22 157:17 180:4 192:24 193:8 214:15,22 220:3 223:13 224:20 227:21 228:8 235:13 251:21 274:18 280:2 284:19 300:1 306:2 308:7 308:14 310:16 311:17 340:6 342:24 349:8 352:23 353:8 354:1 359:8 362:13
**baseline** 176:1 195:8
**basic** 83:9 93:17 211:1 238:10 292:18 310:24
**basically** 276:5 313:4 348:12
**basis** 27:17 31:15 40:20 120:18 141:19 157:5,11 158:9,14 199:2,13 279:20 306:22 307:1 310:3 326:13,19 327:18
**Bates** 71:17,20
**bathe** 199:18,20
**bathing** 199:22
**beads** 316:23
**bear** 182:18 291:12
**Beasley** 2:2 8:18,20
**beef** 336:14
**began** 40:18 43:15 65:13
**beginning** 67:20 81:8 89:8 96:1 177:5 197:5 199:10 253:12 363:12
**begins** 24:22
**begun** 241:4
**behalf** 57:11 343:22
**behave** 213:3
**behavior** 74:7 358:9
**beings** 249:19 358:19
**belief** 200:15 206:22 353:16
**believe** 22:12,13,19 25:8 27:22 34:6,9 35:5 37:17 39:4 53:5 54:20 61:22 67:12 69:18 70:3,4 72:24 84:16 85:1 89:12 95:7 96:11 103:1 106:18 111:9 114:17 115:11 127:11 128:3 139:7,10 140:20 144:7,18 145:2 147:14 148:2,6 149:9 153:24 185:3,12 186:14 189:1 190:23 202:20 203:24 206:19 210:20 217:14,17 218:5 219:4 228:20 231:8 234:11 236:15 238:3 242:6 246:21 256:12 257:7 267:5 271:23 278:20 279:4 281:21,24 282:6 292:12 296:2 302:18,22 305:7 309:12 312:7 317:3 318:1 330:15,22 337:23 352:8 360:7 362:15
**believing** 17:5
**Beneath** 125:12
**benzene** 360:19,22,23
**Berge** 6:13 242:15,15
**Berry** 129:20 145:22
**Bertolotti** 146:8 297:14,15
**best** 12:2 74:7 364:9
**better** 109:14 249:7 326:6 359:13
**beyond** 202:11 340:13,24
**bias** 210:19 213:6,8,9 221:22 227:23 228:11 239:17 240:23,24 241:3,7 241:9,13,24 243:10 244:6,13 244:20,23 245:1 269:7,8,13,18 270:3 276:11,15 277:14
**biases** 221:18
**Biddle** 2:19 9:3
**billable** 40:4
**billing** 45:9
**biloba** 229:3
**binder** 13:13 15:8 24:1,3,8 28:5 30:1 192:5 257:24
**bioassays** 361:8
**biochemical** 312:21
**biologic** 59:18 229:24 321:13,16 322:5,9 322:13,16
**biological** 87:17 111:23 112:1 132:18 224:12 229:8 230:10 339:9
**biologist** 60:21
**biomarkers** 313:19
**biostatistician** 61:24 253:17
**bit** 56:5 83:12 256:18 270:13 296:21 305:5 358:22
**black** 183:16 292:1
**bladder** 202:18,22
**blank** 333:24
**blanks** 187:14
**block** 257:24
**blood** 170:11
**Blount**

5:18 31:10 32:7 33:10
**blue**
320:11
**Blumenkrantz**
183:18,21,22
**board**
61:20,23 204:9 334:23 335:2
**Bockus**
3:2 4:7 9:5,5 234:1 236:7 284:1,7,9 284:11 285:7,17 288:14 289:13,16 289:21,22 290:14 292:8,21 293:22 294:8,18,20 295:10 296:4,19 297:1,2 298:1 299:10 300:16 302:23 303:10 304:21 305:6 307:18 309:20 310:8,10,22 314:2 315:6,11,15 316:6 316:19 317:12,18 318:4,12,21 319:18 320:2,19 321:2 323:1 324:11,17,20 325:4,22 327:1 329:15 330:21 333:8 341:4 342:1 343:1 359:17
**bodies**
170:4 199:2,4
**body**
110:20 122:11 132:19 135:10 154:9 181:24 183:8 200:7 201:4 209:1 219:13 247:19 248:21 250:3 256:9 270:17 272:2,14 272:24 278:21 279:5,9,12,14 296:8 298:6,24 299:5 301:10 304:14 317:20
**bolts**
68:1
**book**
77:16,18
**boost**
346:12
**borderline**
237:2
**born**
313:3
**bottled**
170:7
**bottom**
69:10 196:19
**bound**
189:6
**Bradford**
107:20,24 110:18 215:7,12 219:22 225:4 229:21 230:18 240:7,9 255:1 264:8,16
**Branch**
58:5
**BRCA**
333:5
**break**
86:24 87:4 89:2 176:20 343:4,14 359:7 363:6
**breast**
196:24
**breathe**
329:5,10
**Brett**
79:21
**brief**
118:22
**briefly**
190:22 225:12
**bring**
23:24 28:8 29:3,17 33:4,7 58:2
**British**
129:17
**broad**
309:23 349:19
**broken**
279:9
**brought**
12:12,20 13:10,14 13:20 14:2,8,20 15:2,7 24:9,21 28:4,21 29:24 33:15,20 34:1,8,9 36:6 50:18 51:16 51:20 100:21 123:20,22 124:6 124:11 176:13 178:9 218:13
**building**
234:12 335:21
**built-in**
312:14
**burden**
182:19
**Burns**
2:8 8:23
**business**
76:1 149:7,12,20
**bystander**
329:24

**C**

**c**
2:1,13 3:1 297:5
**CA-125**
314:9,22 318:6,14
**calculate**
280:16
**calculated**
212:11,12,14 280:23
**calculation**
306:20 341:3,12
**calculations**
251:9,21 340:6
**calendar**
45:17
**California**
2:15
**call**
37:23 335:19 352:20
**called**
38:17 77:16 189:24
**calls**
46:7 203:7 235:8
**Camargo**
6:7 162:20,21 165:18
**Canada**
5:15,22 30:14 65:8 89:15,22 93:5,19 94:3,18,20,22 95:22 96:4,10,17 96:21,24 97:3 98:13,15 99:1,13 99:18 100:9 205:9 205:24
**Canadian**
30:3
**Canal**
2:9
**cancer**
17:8 23:5 27:5 30:5 32:1 36:17 38:4 38:20 41:3,12,14 41:16,24 53:8,23 55:9 60:12,21 62:10,19 63:1 66:13 84:17 85:3 85:7 86:8 89:23 90:8,14,18,21,23 91:4,6,10,12,14 91:18,22 93:7,14 95:10,13,18 106:3 106:12,14,15,19 107:5 108:5 109:4 111:1,15 112:3 113:23 116:8 119:22 120:6,14 120:19,23 121:3,8 121:22,24 122:8 122:18,22 123:9 123:14 125:1,5 126:1,5,16,24 127:7,13 128:2,13 129:8 130:10 131:3,14,18,22 132:7,12,14 135:1 135:15,21 136:6 136:17,19 137:1 138:7,8,13 139:9 139:11 140:4 145:9,12 152:12 152:16,20 153:10 153:13,21 154:2 154:13,17,23 155:1,6 158:19 159:4,10 160:5 161:19 162:12 163:8,15 167:22 168:8 178:23 179:15,16 185:14 191:2,7,16 192:23 194:18 196:11,24 197:17 202:18,24 210:9 211:4,5 212:20,21 216:10 220:7,8 221:21 222:1 223:8 224:13,15,17 225:24 230:13,23 231:3 234:7,21 235:4,18,20 237:9 237:24 238:9,17 244:4 245:4 246:4 246:10 247:23 248:11,24 249:17 250:7 252:4 255:5 256:22 260:21 265:12,24 267:1,9 267:17 268:2,6,19 269:19,21 270:18 270:19 273:1,5,9 273:14,21,24 274:7,14,20 275:4 275:11,20 276:4,6 277:7 279:17 280:8,13,22 281:8 281:22 282:14,19 284:20 286:18,23 288:23 289:2,3 292:4,4,5,5 296:9

306:3,5,8,14
307:7,13 308:12
309:13 310:4
314:6 316:16
326:14,18 330:4,9
330:19,23 331:1,4
331:11,18 332:24
333:20 338:14,22
344:11 350:1,3,5
351:12 352:22,22
353:5 354:11
355:3,7 356:6,10
356:13 357:12
358:10 360:5,8,9
361:14,17,18

**cancer-causing**
286:3,11 294:1

**cancerous**
317:10,16

**cancers**
17:4 91:8 93:16
121:11,14 122:2
123:14 153:17
166:14 167:3,8
168:6,10 179:2,8
213:2 236:16,23
237:2,3,5 238:12
251:1,2 280:2

**capable**
78:4 164:13 202:6
220:21

**capacity**
42:4 56:20

**caption**
19:4

**carbohydrate**
279:7

**carbon**
183:16 185:21
291:24

**carcinogen**
178:22 179:14,15
179:19 226:22
235:9,13 288:7,9
315:19 355:12,20
356:4,6,9,20

**carcinogenesis**
41:14,17 116:13
226:14 288:19

**carcinogenic**
28:12 81:20 91:5
114:23 138:18
139:4 154:6 169:6
171:20 178:16,17
179:21 225:7,9
226:4,17 227:1,10
227:13 229:3
249:19 272:14
291:23 300:22
311:14,15,23
312:10 352:21
356:24 360:20
361:4,8,9

**carcinogenicity**
83:18 169:8 180:4
248:12 249:9,20
290:9 295:18

**carcinogens**
288:13 312:19,24
356:17,18 357:14
358:3,15,16

**care**
3:20 9:10 343:23
345:5,13

**careers**
213:24

**carefully**
365:4

**Caroline**
3:12 9:12

**caroline.tinsley...**
3:13

**carpentry**
229:12

**carried**
193:17 196:20
211:18

**carries**
196:17

**carry**
241:17 342:7

**Carson**
1:14 4:5 5:1,5,6 6:3
8:14 9:18 10:1,18
13:4,9 14:9,19
15:18 20:10 21:3
21:10 26:2,6,19
29:14 30:16 31:5
32:8,19 36:7,10
67:18 74:10,16
89:10 98:21 99:10
124:17 130:3
149:23 150:13
159:21 163:3
164:9,18 165:5,17
171:11 173:6
177:7 192:11
195:23 225:15
243:1 247:8
253:14 271:1
283:10 284:10
289:9 347:9 353:4
353:14 354:8,17
355:1 363:2,13
364:5 367:4,12

**Casale**
146:11

**case**
21:24 38:9 40:4
50:4 51:7,9 57:16
64:15 66:12 68:2
78:4,15,17 80:12
80:20 81:4 95:8
96:8 105:19 108:4
110:17 120:2
123:5 141:6,13,20
144:4,8,20 147:12
147:15 148:7
156:5 167:11
171:6 173:17
174:13 176:8
185:12 187:17
191:23 196:6
211:8 215:18,20
217:15 219:2
228:16 236:19
242:7 246:14,17
246:21 252:13
293:21 302:22
329:11,18 335:13
350:23 362:24

**case-control**
125:18 126:8 223:4
232:17 233:1
238:14 239:15,17
240:13,14 241:5
242:2 243:13
244:5,16,21 245:9
246:1,7 251:6
253:21 254:10
258:22 259:3,5
260:13

**case-controlled**
239:22 250:17
255:14

**case-specific**
171:13

**cases**
1:8 37:11,12 57:6
76:10,11 78:15
131:4 140:9,10
159:5,9 160:16
162:4 175:3
185:14,17 224:15
224:17 240:3
250:22 251:10,24
254:20 273:4,23
274:24 278:3
306:3,8,8 327:15
329:1

**catch**
313:2

**categories**
225:12 357:2

**categorized**
357:7

**category**
113:24 146:7 226:3
226:6,11 227:9
229:5 355:16

**causal**
53:21 54:11 85:2
132:6 247:21
248:23 250:5

**causation**
17:2 100:10 109:3
218:6 220:5 233:9
233:13 234:6

**cause**
23:5 38:4 53:8 98:9
99:24 120:6,19,22
122:17 127:12
128:16 129:7
135:7,14,15
136:24 154:12
160:5 179:2 188:4
199:5 211:2
286:18 296:8
312:21 329:20
333:20 352:22
356:6,10 357:12
361:14,16,17

**caused**
166:14 198:21
224:17 286:22
313:11

**causes**
53:8 85:6 86:8
93:16 122:21
123:8 126:16
128:2,13 131:18
132:14,23 135:5
139:8,10 287:1,17
287:18 288:23
330:23 355:3
358:10 360:5

**cavities**
301:10

**cavity**
83:12 183:8 207:1
322:2

**CDC**
90:6,11,12 234:24

**cell**
115:1 139:1 312:12
312:15 314:20

**cells**
287:3,4,14 312:18
314:6 315:20
316:15,16 317:10
317:15,16 319:15

**cells'**
317:1

**cellulose**
279:8

**cement**
146:1,13
**Center**
1:15 90:3 93:6
**centers**
90:17
**Century**
136:20
**certain**
12:12 13:15 75:5 80:20 135:5 206:18 213:10 216:17 243:15 284:11 353:21
**certainly**
117:1 141:18 158:7 159:9 226:20 262:3 330:24 331:12 333:21
**CERTIFICATE**
4:10 364:1
**certification**
61:23 328:16
**certified**
1:19,20 61:20 334:23 364:3,3,20 364:20
**certify**
364:4,7,10,13 367:4
**cervical**
198:12 199:14,24 200:12
**cervix**
189:10,13 200:20 201:6,7,16 206:23 209:15,22 302:11 302:14,15 322:10 339:6,15
**chairperson**
95:17
**chairs**
95:20
**chance**
110:4,5,8 227:23 228:11 245:17 251:22
**change**
59:7 205:5 253:5 366:2
**changed**
17:9 75:2,4 81:1 204:13,19
**changes**
77:11 97:18 336:11 365:11 367:6
**channel**
206:23
**Chappell**
6:4 129:19
**chapter**
77:16
**characteristic**
337:22
**characteristics**
199:5 286:3,11 308:20
**characterization**
239:4
**characterize**
85:18 140:7 249:7
**Charest**
2:8 8:23
**charge**
93:20 144:3 346:9
**Charles**
129:19
**chat**
342:22
**chatter**
204:2,5,6,24 205:3 278:9 342:21
**check**
193:12
**chemical**
179:19,20 328:9 329:4,9
**chemicals**
63:7,13,15 72:23 73:6,17 75:1 114:24 115:16,18 172:6 174:6 175:15,19 176:7 177:9,13,22
178:15 179:10
**chemotaxis**
199:6 287:2,13
**children**
333:11 359:4
**Chip**
1:13 4:5 5:1 8:13 9:18 364:5 367:4 367:12
**chlamydia**
267:8,23
**choice**
345:14
**choose**
164:17 358:8
**chose**
33:4
**chromium**
169:7,11,24 171:7 172:1 173:22 180:8,18 181:6
**chronic**
114:18 115:24 116:6,10 121:7 131:14 199:2,9,13 252:15
**chrysotile**
145:18 147:9 154:21,23
**cigarette**
265:13,18
**circumstances**
186:18 206:20 327:12
**cite**
19:11,12 20:5 29:11 33:11 71:2 71:4 123:6 130:12 148:10,17 181:23 183:5,12 184:2 189:8 191:22 195:3,11 196:5 208:24 211:12 216:8 217:6,13,19 217:21,23 242:17 242:21 246:22 259:19 270:11
271:16 283:6 287:5,23 296:9 297:7
**cited**
13:11 15:8,11,13 24:15 29:9 32:23 54:18 66:17,20 142:22 184:7 185:18 217:9 218:1 256:8 270:11 286:13 307:10
**citing**
20:19 70:24
**citizens**
219:9
**citizens'**
221:16
**claim**
115:23 133:2 138:16 169:5 208:5
**claimed**
214:22
**class**
229:2 272:12
**classification**
6:11 178:20 225:6 225:8 288:8 342:5 356:22,23,24
**classifications**
225:14,22 359:24
**classified**
162:7 233:18 249:18 356:1
**classifies**
178:14
**classify**
63:17
**clause**
107:8
**cleanly**
264:2
**clear**
11:15
**clearance**
84:6 132:19 249:8
**cleared**
278:21 279:5
**clearly**
321:10
**cleavage**
168:21 169:1
**clinic**
58:7 90:16 351:3
**clinical**
27:17 31:16 38:24 58:8 60:4,8 70:12 76:5
**close**
202:1 223:9
**closely**
329:20
**closer**
198:13
**closes**
191:4
**clothed**
341:2
**co-workers**
134:12
**coach**
164:23
**coaching**
165:2
**coauthors**
101:6,9
**cobalt**
169:7,12,24 171:7 172:1 173:22 180:8,19
**cofactor**
267:21 277:18
**coffee**
265:11,13,17,21,23 266:1
**cogent**
224:12
**cohort**
125:8,9 232:21 237:7,8 238:7,10 240:12,20,22 241:12 242:1 244:5 245:10

250:15,23 251:5,7 251:13,18,20 252:3,14,20,21 257:12 258:12 334:3
**coin** 109:14
**colleague** 117:8
**colleagues** 44:12,14 46:8 51:15 79:9,10,15 79:17 80:13 297:17 344:2
**collected** 277:23 278:1,3
**collection** 12:14 153:17 347:7
**collectively** 238:15 246:8
**College** 59:5 335:5
**column** 160:10 165:24 196:21 243:24 273:3,7
**combination** 104:12
**combine** 326:3
**combined** 299:12,22 300:13
**come** 44:8,9 96:9 106:4 149:4,5,12 282:9 285:10 305:19 309:17 323:24 324:10 327:24 362:6,10
**comes** 56:3 232:16 251:24 313:6 328:21 329:3 335:20 346:10
**comfortable** 39:11,24
**coming** 18:16 25:16 198:4
**commencement** 364:4
**commencing** 1:16
**comment** 96:1 221:10 336:24
**comments** 44:2,4,8 96:20,24 97:2 117:13 216:23 247:15 336:10,21
**Commerce** 2:4
**commission** 364:22 367:17
**committee** 2:6 95:16,17,20 129:17
**committees** 95:15
**common** 144:24 145:2 161:24 265:13 333:2 334:2,7
**commonly** 144:17
**communicated** 65:4,7 104:15
**communications** 45:20 47:1,12 77:1
**community** 204:8 240:1,2 248:16 330:7
**community-based** 238:20
**companies** 72:5 75:9,22 143:15
**companies'** 150:23
**company** 58:17 60:15 69:19 70:14 71:1,4 73:8 76:6,8,13,17,18 77:22 149:13 150:23 151:13
**comparable** 187:4 201:15 254:18
**comparatively** 348:7
**compare** 298:16 319:20
**compared** 170:13 201:6 331:5
**compares** 298:5
**comparing** 239:23,24 348:6,14
**comparison** 132:20 161:14 166:17 214:23 299:1,9
**compelling** 220:10 230:13 292:19
**complete** 15:11 18:13 22:13 22:19 98:8 172:14 305:24
**completely** 106:13,19 112:9 120:14
**complicated** 358:21
**component** 74:22 137:2 176:2 177:17,20
**components** 63:21 64:13 114:21 140:15 147:21 287:12
**composed** 279:6
**composition** 304:20
**concentration** 59:18 198:11
**concentrations** 76:20
**concept** 313:5 358:7
**concern** 269:10
**concerned** 236:1 361:5
**concerning** 272:13 351:16
**concerns** 166:15
**conclude** 111:12 128:1 210:18 243:9 252:20 333:19 363:15
**concluded** 91:19 122:24 166:11 220:4 246:1 247:19 272:17 286:17 288:5
**concludes** 106:2
**conclusion** 86:19 106:5,6 107:7 108:9 141:11,19 163:12 193:3,5,7 215:14 223:1,12 224:11 224:19 248:5 250:2 286:12,20 305:8,12,20 306:2 364:12
**conclusions** 18:16 76:22 85:16 87:19,22,23 89:13 117:17 171:4 173:10 215:2,9 216:22 218:2,4 222:5 241:19 251:11 253:1,1 326:8 355:24
**concoct** 334:3
**condition** 116:24 119:16 121:19 122:5
**conditions** 121:3,7 186:5,18
**conduct** 215:13,17 355:5,9
**conducted** 61:14,15 85:11 114:3 206:8 209:5 209:12 327:9
**confer** 333:6
**conference** 46:7
**confidence** 126:9 223:8 227:24 228:12 261:23 276:21
**confirm** 85:12 185:4
**confirmed** 152:9
**confirming** 328:24
**conflicts** 105:4
**conformed** 137:7
**confound** 264:18
**confounder** 265:19
**confounders** 266:14,17,18 268:6 268:9
**confounding** 210:19 221:23 227:23 228:12 264:6,7,11,19,23 264:24 266:3,4,8 266:11,20 268:21
**confused** 330:1
**confuses** 265:6
**conjunction** 76:16
**connected** 120:11 329:20
**connection** 110:23 119:21 329:19

**consensus** 224:16 234:5,11
**consequence** 152:23 153:3
**consider** 51:4 54:9,12 55:20 80:20 90:20 123:4 137:11,14,19 156:23 215:7 232:24 238:22 239:9,11 241:1 257:11
**considerably** 357:24
**consideration** 221:14
**considerations** 91:9 225:4 254:17
**considered** 13:16,18,22 61:6 94:6 124:3 130:19 159:4,8 174:24 175:3,5 206:2 210:20 214:6 219:1 221:20 225:3 258:16 264:6
**considering** 110:18 215:1 222:6 258:9 325:12
**considers** 205:12
**consistency** 107:12 108:1,4 109:7 110:19 210:24 222:20 229:24 230:9 237:22 240:7,10 240:11 245:6 249:22
**consistent** 110:12,13 111:6,9 111:13 112:19 114:4 132:6 223:5 232:20 237:23 238:4
**consistently** 131:21 191:11
**constituent** 63:20 64:13
**constituents** 64:2
**constructed** 149:15
**consult** 338:4,8
**consultant** 55:23 56:4
**consultants** 105:11
**consulting** 56:16
**consumer** 22:5,7 73:8 143:23 151:13 152:4 155:9 344:23 345:2
**consumers** 214:8
**consumption** 360:4,11
**contact** 37:24 39:19 202:2
**contacted** 36:20,21 37:5,14 284:16
**contain** 16:4 19:10 139:13 140:22 141:6,13 141:17 148:14 290:22 295:19 352:9,14 353:17 353:21 357:6 358:14 360:18
**contained** 16:16 54:21 72:24 73:1,6 150:17 152:22,22 175:8 175:15 181:1 285:9
**container** 340:10
**containing** 5:21 139:4 290:10
**contains** 16:7 71:23 139:16 139:20 141:21 157:6,15 158:10 361:6
**contaminant** 143:23
**contaminated** 77:12 147:16 148:8
**contamination** 106:2,11 107:2 187:13
**contemporaneous** 94:4
**Content** 31:10
**context** 56:15 78:11
**continue** 58:7 74:18 263:19 283:7 295:9 358:11,12,17 361:10
**continued** 43:16
**continues** 206:24
**continuing** 244:12
**continuous** 43:17
**contract** 59:3
**contractions** 188:15
**contractor** 59:7
**contradicted** 205:10
**contribute** 18:11 20:22 74:22 80:22 221:21
**contributed** 20:5 73:20
**contributes** 296:8
**contributing** 171:20
**contribution** 78:24 299:22 352:18
**contributor** 167:10
**control** 90:3 93:7 157:24 316:17,24 317:11 318:2
**controlled** 266:21 268:1
**controlling** 317:1
**controls** 187:14 273:8,13,18 273:20 274:21 278:4 315:16,17 316:9
**conversation** 118:23 335:15
**convoluted** 296:21
**copies** 13:11,14 14:9 36:14
**copy** 10:20 13:17,21 14:11 21:13 28:6 30:2,20 149:24 150:7 159:19 162:22 195:19 259:24,24 260:1 321:3 336:22
**cornstarch** 29:6 132:10,15,17 132:22 133:19,24 134:8,14 278:20 278:20 279:4,13
**Corporation** 58:12 59:11,11,13
**correct** 20:20,21 22:22,23 39:1 45:3,4 49:6 53:23 55:12 57:19 60:16,17,19,20,24 61:4,18,19 62:2,5 62:7,19 63:2,10 63:13 64:10,11,14 81:6 82:4 83:9,21 84:19 85:4 90:14 90:18 96:2 98:5 101:12 105:15 106:3 108:23 110:13 114:5 116:18 120:7 121:8,9 122:14,16 125:14,18,23,24 127:13 128:13 131:1,5,17,23 132:8,24 134:4 138:7,13,14,15 146:24 147:11 148:15,20 152:24 154:2 155:7 157:7 158:11 166:9,9 168:2 170:5 172:3 172:6 176:8,9 177:10,14,23,24 178:3,13,19 179:16,17,22 181:7 182:2,5,6 183:10 184:22 185:2,9,19 186:1 186:3,4,11,20 187:15,20,23 188:12,18 190:11 190:16 194:16,23 195:7 196:7,8,14 197:16,19,22 198:6,22 200:22 201:20 202:16 205:7,21 206:6 207:3 208:2,4,10 209:3,4 210:10 216:7,11 217:8 220:8 221:9,11,12 222:21 223:17 224:2,6 225:9,10 226:1,4,5,8,19,23 227:2,11,14,20,24 228:13 230:2,14 232:15,17 233:5,9 234:15,22,24

235:1,15 236:1,19 237:9,17,20,24 238:9,17 240:2,4 240:14,17 246:4,5 246:10 250:8 253:15,16 254:4 255:2,19 256:24 257:5,10 258:24 259:11 260:15 261:7 262:6,18,22 264:17 265:9 266:16 267:2 268:16,21,24 269:5,11 270:1 271:5,8,22 272:19 272:20 273:6,9,22 274:4,10,17 275:3 275:13 276:18 280:22 281:8 283:17,18 286:7,8 286:9,18 287:6,7 287:18 288:9,16 290:5,11 291:8 294:2 295:21,23 296:12 297:9,21 298:7 301:17 304:24 307:13,24 308:3 309:2,5 311:1,2 314:6 318:7,15,18 320:15 321:4,5 322:6,10,11 324:3 324:23 325:5 326:14,19 327:3 327:18 329:1 332:11 347:15,16 350:1 352:10,14 354:11,18 355:4,7 357:7,8 362:7 367:5

**corrected**
134:3

**corrections**
58:1,19 365:4,7 367:6

**correctly**
100:1 107:6,9 166:20 222:2,3 301:14 324:21 339:21

**correlation**
322:21

**correspondence**
87:17

**corresponding**
27:24 278:4 306:9

**corrugated**
146:13

**cosmetic**
31:11 57:16 60:15 157:6 158:10 168:14 180:9,20 181:7 248:9 249:16

**cosmetics**
219:15

**Cottreau**
127:2

**Coughlin**
3:7 9:8

**counsel**
2:6,11,16,22 3:5,10 3:15,20 8:15 11:19 15:5 23:1 25:11,15,17,20 26:17 27:10 30:10 32:3 33:5 34:16 34:19,24 35:19,24 36:5 38:15 39:3 45:20 47:6 53:17 65:20 71:13 72:5 101:10,15 102:13 104:24 105:12,18 105:23 108:23 118:12,20 142:23 148:22 343:24 346:2,5,19 361:21 362:2 364:14,15

**count**
251:1

**country**
97:23,24 100:11 233:20

**couple**
25:5 30:8 40:21 87:2 176:15 181:21 218:18 231:22 256:15 257:6 286:21 305:15 327:10

**course**
56:5 73:3 74:13 344:14,17 345:10 345:11 362:4

**courses**
344:12

**coursework**
344:10

**court**
1:1,19 9:15 12:6 364:3,20 365:20

**Coussens**
117:10 126:21

**covariate**
272:17

**Covariates**
272:8

**covered**
43:5 185:3 285:21

**covers**
22:17,20

**Cramer**
6:10 195:12,15,17 195:22 196:5,9 197:24 255:8 259:13 260:9

**create**
199:12 279:13

**created**
25:8 148:22 313:3 346:2,3,5

**credentials**
104:18

**criteria**
109:2 215:8,13 229:21 237:22 240:7,10 255:1 264:8,16

**criterion**
110:19

**crocidolite**
144:13,15 145:11 145:16 146:6 147:9 154:21,22

**crossed**
324:19

**Crowley**
48:16,17,18,19,24 49:2,21,22

**Crowley's**
50:8 73:3

**CRR**
364:18

**crystal**
180:13

**cull**
42:22

**culmination**
345:10

**culture**
319:16

**cultured**
314:6 315:20

**cure**
100:8

**curiosity**
350:14

**curious**
40:17

**current**
41:17 94:13 120:3 148:1 205:11 247:19 248:20 250:3 312:5

**currently**
60:5 204:4 300:12 326:7 345:4

**curriculum**
5:6 21:6 57:18 58:20 70:23 344:21 345:16

**cursory**
344:20

**cut**
74:9

**CV**
58:1 64:23 77:4

**D**

**D.C**
3:19

**daily**
231:9 232:10 260:22 261:16 262:13,15 263:10 263:11,14 302:5 306:22 307:1 309:24

**damage**
135:11 313:2,12 314:21

**dangerous**
359:12

**data**
76:24 149:3 150:17 211:19 215:14 220:11 263:24 273:11 274:18 277:23 278:1,2 280:3 290:1 291:5 307:9 346:14

**date**
1:17 57:20,21 58:2 227:4 284:22 364:8 365:9 367:12

**dated**
25:24 26:9 30:14 218:21 364:23

**day**
60:6 189:19 228:24 367:16

**days**
39:20 40:7 189:21 300:14 309:9 365:16

**de**
325:8

**deal**
164:16 239:5

**dealing**
168:10 199:9

**dealings**
37:2

**dealt**
137:16
**dear**
358:24
**deaths**
306:5,9 307:7
**decades**
310:15 359:10
**December**
30:14
**decide**
29:17
**decided**
33:7 40:11 59:6
**decision-making**
5:23 99:1,14,20
**decisions**
14:14 358:6
**declare**
226:21
**deemed**
365:19
**defendants**
2:17,22 9:1,4 52:4
**defense**
52:12 57:14 346:19
**defer**
82:23 95:19 144:3 169:2 281:2
**define**
135:22 137:5 281:16 313:9 326:5
**defines**
99:18
**definition**
23:20 136:2 228:18 292:18,23
**definitions**
228:23
**definitively**
162:6
**degree**
59:17,24 249:22
**Delclos**
79:20 337:5
**deleting**
342:17
**demonstrate**
119:11 223:4 313:22
**demonstrates**
126:14 276:11
**demonstration**
98:9 99:23
**dendritic**
42:6
**department**
61:8 79:18 80:1,2 239:6
**depend**
308:17 310:18
**dependent**
139:3 180:24
**depending**
181:3 306:18 332:2
**depends**
78:14 156:6 236:5 239:19
**depo**
33:8
**deponent**
4:12 8:13 367:1
**deposed**
66:5,12
**deposing**
365:15
**deposition**
1:13 5:1,4 6:1 8:9 10:8,16,18 11:4 12:11,19 13:6 14:6,8 15:1,18,21 16:4,9 21:3,10 23:24 25:24 26:2 26:6,19,23 29:14 29:22 30:16 31:5 32:8,19 36:4,7 52:14 66:4,7,19 71:1,3 98:20,21 98:24 108:17,20 124:12,16,17 130:2,3 148:18,19 149:10,11,16,18 149:21 150:9,10 151:17 159:21 163:3 192:11,14 195:23 225:15 243:1 245:24 247:3,8 249:7 271:1,4 289:9 363:15,19 364:12 365:3,13,17,18
**depositions**
53:2 56:13 66:11 66:15 67:21 68:8 68:11,20,24 70:14 148:11 164:12
**deposits**
41:9 169:15
**deps@golkow.com**
1:24
**derived**
205:24
**derives**
333:22
**describe**
14:20 208:15,23 309:10
**described**
199:10
**describing**
309:5
**description**
5:3 84:14 237:15 266:3
**design**
190:1 211:18 221:19 240:21
**designated**
227:18
**designation**
227:16 228:10
**designed**
291:23
**designers**
241:1
**designing**
241:2
**designs**
254:15
**desired**
231:14
**despite**
166:11
**detail**
220:1
**detailed**
285:2
**detect**
211:19,23 251:12 252:9 253:3 255:22
**detected**
180:8,19 188:2 211:24 243:12 244:15 251:14
**determination**
78:6 280:12 330:17 348:20
**determinations**
194:14 251:10
**determine**
85:23 157:14 190:4 258:18,22 318:24 330:3 340:10
**determined**
59:14 91:12 143:18 259:1 279:24 280:7 311:8 349:9 355:1 360:20
**determines**
280:14
**determining**
330:8
**develop**
53:21 135:2 199:1 251:1 345:12
**developed**
330:9
**developing**
356:12
**development**
135:20 136:5 284:20
**diagnosed**
306:4 307:12 326:13,17 350:4 351:11
**diagnoses**
307:17
**diagnostic**
329:2
**diagrams**
338:7
**Diana**
282:18
**diaphragm**
201:17
**die**
233:20
**diesel**
361:6,9
**differ**
180:3 201:21
**differed**
193:23 349:14
**difference**
19:2 21:19 194:9 194:12 201:12 212:18 242:1 252:9 277:19 315:21
**different**
43:3 68:7 93:11,12 94:2 97:22 106:6 137:9 138:21 139:2 143:15 155:5 168:15 172:6 179:8,9,11 179:21 181:2 186:17 213:2 225:22 237:21 240:11 254:16,16 254:17,20 261:3 280:2 291:24 293:7 305:5 316:20 342:22 349:10 357:2
**differential**
319:4
**differentiate**
168:24
**differentiated**
212:22
**differently**

201:5 213:3
238:22
**difficult**
162:2 256:20 257:2
347:22 359:6
**difficulties**
161:17,21
**dioxide**
292:1
**Diplomate**
1:20 364:3,19
**direct**
82:2,11 83:4
181:14 243:17
322:21 324:6
**directed**
221:11
**directing**
294:15
**direction**
334:18
**directions**
334:17
**directly**
101:5 138:22 201:7
201:16 216:21
263:6 319:15
323:5 346:10
**director**
58:6,13,24 59:10
**dirty**
264:1
**disadvantage**
251:15
**disagree**
108:9,12 223:22
225:1 356:21
**discard**
42:23 349:12
**discarded**
348:17,23 349:8
**discount**
238:18
**discounting**
244:20
**discounts**
91:17

**discovered**
241:3
**discuss**
80:11 114:12
133:13 183:2
244:2 278:13
338:1
**discussed**
13:5 21:14 38:10
80:12,14 107:12
127:3 170:18
225:11 235:11
238:9,23 244:23
254:3 336:5
355:23
**discusses**
28:10 29:5 127:6,7
280:11 337:22
**discussing**
13:5 93:14
**discussion**
79:9 81:1 163:20
164:4 165:20
166:1 204:7 285:3
342:8
**discussions**
47:23 48:1
**disease**
77:14 90:3 93:7
122:17,21 123:8
126:15 127:12,19
128:2,13 196:14
233:21 265:7
269:15 328:19,21
358:10
**diseases**
121:12
**dish**
300:7
**dispute**
151:2,6
**disseminate**
93:22
**dissolution**
339:8
**dissolved**
279:10

**distillation**
214:21
**distinction**
238:19
**distinctions**
154:15
**distinguish**
34:22 35:5 154:11
162:2,7
**distinguishing**
161:18
**distort**
266:4 269:13,19
**DISTRICT**
1:1,1
**division**
287:4,15
**DNA**
312:13 313:11,22
**doctor**
73:24 92:2,10,13
92:21 113:1,4
127:23 164:11
207:6 289:20
295:7 314:24
315:23 343:16
363:17
**doctor's**
332:20
**document**
1:7 6:12 10:21
28:17 30:7,9,12
33:3 68:15 71:22
91:24 92:16 93:2
99:9 100:13 102:6
113:10,17 120:3
134:7 193:13
218:13,24 225:13
257:22 282:17
291:14 316:5
**documentation**
72:16
**documents**
12:12,15,17 13:15
14:7,24 19:6 24:5
25:19 29:23 30:19
33:24 34:1,5,7,13

34:15,18,23 36:14
71:5,9,12,16 72:3
72:3,4,6,22 75:7
75:10,14,21 76:6
76:9,13,19 77:22
77:23 78:10,10,11
78:18,19 136:4
158:5 245:8 346:6
346:6 347:8
**doing**
39:21 40:1 45:13
46:4 48:8 147:24
148:3 232:5
285:11 336:14
365:8
**Donath**
3:7 9:7,7
**dose**
153:4,5 206:16
230:14 255:9
256:21 298:3,13
298:16,23 311:1
311:18 324:22
325:2 326:2
354:22 355:5
356:5,9,11
**dose-response**
111:13 112:20
173:1,9,13,19,21
174:1,4,9 222:14
222:16,18 223:9
254:24 255:4,8,15
255:17,21,23
256:5,21 257:8
259:20 262:9,24
263:1,17,19
270:14 354:9
355:10
**doses**
326:10
**Doug**
3:23 8:4
**Downey**
69:17,18
**Downey's**
69:20
**Dr**

6:3 8:13,19 13:4,9
14:9,19 20:10
27:24 31:2 33:19
36:10 46:11,16,18
47:9,24 48:2,5,11
48:12,16,18,19,24
49:2,16,21,22,22
49:23 50:1,8,11
51:5,9,21 67:18
73:3 74:10,16
79:20,21 80:8
89:10 99:10 117:3
117:9,12 149:23
150:13 164:9,18
165:5,17 171:11
173:6 177:7
218:22 236:12
253:14 283:10
284:10 335:7,16
340:4,15 347:9
353:4,14 354:8,17
355:1 363:2,13
**draft**
5:15 30:13 44:1
89:14 95:22 97:6
205:18,21,22,24
348:1
**drafting**
347:20 348:8,12
**drafts**
336:8
**dramatically**
75:4
**draw**
76:22 86:18 87:19
171:4 337:3,6
**drawing**
204:9
**drawn**
85:17 87:21
**draws**
322:21
**drink**
311:4
**Drinker**
2:19 9:3
**drinkers**

265:14,21,22
**drinking**
170:7 265:23 266:1
**drive**
5:21 13:20 36:5,11
**Dropbox**
346:7,11,13,17,21 347:3
**drug**
219:14
**drugs**
131:8,20
**due**
29:6 110:3,5 171:19 187:12 251:12 265:24
**Duffy**
3:7 9:8
**duly**
9:19 364:5
**duplicated**
125:19
**duration**
212:15 241:16 272:24 354:18,20
**dust**
229:15,18
**dusting**
140:3 201:17 302:5
**Dydek**
47:16,19,24 48:2,5 48:12 49:23 50:1
**DYKEMA**
3:2

**E**

**E**
1:17 2:1,1 3:1,1,2 364:2,18
**e-mail**
37:22 47:11
**e-mails**
342:10,15,18
**earlier**
51:5 68:19 79:7 116:22 136:15 167:12,22 214:5 216:4 238:23 259:14 268:12 270:13 278:19 293:1 321:7 345:24 347:13 348:16 349:23 351:23 352:7 361:24
**early**
65:21 214:1 222:7 245:24 330:19 332:24 333:12 336:8
**easier**
334:8
**east**
3:3 145:21
**EASTERN**
1:1
**easy**
150:4,6
**eat**
357:15 358:12
**echoing**
344:2
**Edelman**
163:23 165:22 166:8
**editing**
43:17
**editors**
249:12
**edits**
103:6
**education**
61:12
**effect**
98:9 99:24 100:14 138:18 154:23 211:2,23,23 244:20 251:13,14 253:2 274:19 276:5,14 329:21
**effectiveness**
314:18
**effects**
63:15 129:13 137:17 170:20 213:23 270:3 272:14
**effort**
143:21 150:15
**efforts**
140:6 147:21
**Egli**
183:16 185:18 187:10 188:20
**eight**
24:10 192:19,22 193:9 194:5 297:8
**either**
24:15,21 29:9 31:15 32:23 37:17 52:17 73:7 75:8 82:2 92:13 94:6 96:5 101:21 139:21 140:8 176:6 177:21 181:14 194:12 226:21 282:4 302:12,16 316:8 327:15 328:7,15 338:23
**electronic**
337:8
**element**
317:14
**elements**
169:13 170:1 172:16
**elevated**
146:14 304:9
**elevation**
314:9
**elevator**
335:24
**eliminate**
200:5
**eliminated**
134:3
**eliminates**
199:23
**elimination**
83:20,23 84:10 208:8,11,16 209:3 305:16 337:17 362:12,15
**Ellis**
2:13 3:12 9:13
**elongated**
137:7
**emphasizes**
99:21
**employee**
58:7,24 364:13,15
**Enbridge**
58:12,18 59:11,13
**endeavors**
213:18
**ended**
194:12 340:17 341:16 349:20
**endogenous**
115:7 312:20
**endpoint**
287:11
**ends**
339:19 341:8
**Energy**
58:14 59:10,12
**engineering**
59:19
**England**
145:14
**English**
211:21
**entire**
52:20 69:13 83:11 291:22 294:10 347:23
**entirety**
68:21
**entry**
58:14
**environment**
181:3 312:19 345:7
**environmental**
31:12 55:19 57:7 57:11 179:1 278:12 312:24 328:10 342:3 344:14,18,22 345:3 351:24 352:3
**enzyme**
319:4
**enzymes**
314:18
**epidemic**
182:22
**epidemiologic**
191:15 211:11 224:21 231:1 236:24 239:5 263:24 264:20 270:19 326:3
**epidemiological**
84:16 104:21 111:19 210:6 212:7 213:1 247:20 248:8,21 249:15 250:4 266:5
**epidemiologist**
61:5,7 79:23 238:24 239:9
**epidemiologists**
211:14 232:24 233:18 236:1
**epidemiology**
61:9,18,21,23 87:14 140:1 213:14,17 220:17 239:7,12 270:20 308:14 309:2 354:13
**epithelial**
116:11,12 133:12 153:17 235:20 236:16 237:1 313:12 316:16 323:10,13
**epithelium**
322:1
**Epstein**
5:17 31:2 33:19 218:22
**equal**

**equal**
245:17
**equally**
235:18
**equipment**
162:6
**equivalent**
72:20 259:2 261:16 302:1
**errata**
4:11 365:6,9,11,15 366:1 367:7
**especially**
112:2 240:20
**ESQUIRE**
2:2,3,8,13,19 3:2,7 3:12,17
**essentially**
16:24 134:18 136:18 194:4 220:3 274:19 306:7
**establish**
39:22 111:22 247:21 248:22 250:5
**established**
85:19 86:1 220:5 313:19
**estimate**
45:12 166:7 174:1 174:9 232:2 256:20 257:2 347:17
**estimates**
39:8 193:22
**Estimating**
282:19
**et**
5:9,10,12,13,18,19 6:4,6,7,8,10,13,14 6:16 26:5
**Eternit**
146:10
**etiology**
220:17
**EU**
97:21
**evaluate**
170:19 249:8 256:21 291:23 295:2
**evaluated**
105:8
**evaluating**
210:24 230:24
**evaluation**
228:21 269:14 295:18
**event**
311:23
**events**
313:17
**eventually**
42:17 43:18 214:24 233:12
**everybody**
360:12 361:18
**evidence**
87:14 91:20 93:22 98:1 109:2 111:2 112:15 143:19 170:10 203:7 204:15 206:4 210:24 211:1 220:11 222:16 223:10 226:7,13 227:22 228:3,8 230:9 233:14 235:13 247:20 248:8,22 249:15 250:4 288:18,20 288:22 290:1,2,7 290:8 291:3,8,11 292:11,19,20 293:14,24 294:5,7 296:1 301:2 304:4 304:18 305:12 313:8,8 352:20
**evidencing**
181:24
**exactly**
62:13 142:11 174:16 251:8 257:2 280:7 346:9
**exam**
62:9 189:9,11,12 327:9
**examination**
4:5 9:21 284:8 305:3 343:18 364:4
**examined**
102:9 160:10 190:8 207:7 286:2
**example**
64:17 76:14 84:6 93:13 97:21 117:3 140:13 154:19 205:8 245:1 265:10 267:7 268:11 269:18 276:14 286:14 312:16 358:23 359:24
**examples**
199:4
**exams**
327:15 328:15
**exceed**
333:17
**exception**
15:12 362:22
**Excerpt**
6:17
**exchanged**
47:11
**excluding**
216:17
**exclusion**
193:19
**excuse**
19:19 20:9 54:3 73:22 81:22 86:20 105:14 128:22 149:22 164:7 171:11 173:4 189:11 207:10 234:1 294:13 324:4 332:19
**exemption**
357:18
**exercise**
280:24 325:18
**exhaust**
360:15 361:5,6,9 361:13
**exhaustive**
214:16
**exhaustively**
210:19
**exhibit**
5:4,5,6,7,9,10,12 5:13,15,16,18,19 5:21,22 6:2,4,6,7 6:8,10,11,13,14 6:16,17 7:3,5,6 10:16,18 12:11,19 15:17,18,21 16:4 16:16 17:10,15 19:4,5 21:3,6,10 21:13,20,23 22:10 24:24 25:1,24 26:2,6,10,19,23 27:7,13,23 28:14 28:18 29:14 30:15 30:16 31:4,5 32:7 32:8,18,19,22 33:10,18 34:15,24 36:4,7,12 43:14 50:19 54:22 57:19 58:2,21 65:1,12 66:18,21 68:10 69:4,8 70:24 71:6 89:16,17 94:24 98:20,21,24 99:7 100:21 101:14 102:4,15,24 103:17 104:3,10 106:1,21 124:16 124:17 130:2,3 146:23 148:17,18 149:10,11,18,24 150:1,2,8,9,18,19 151:10,10 152:2,2 158:2,3,6,7 159:20,21 160:3 163:2,3 192:11,14 195:22,23 196:5 218:20 219:5,5 225:14,15,20 242:24 243:1 247:3,8 259:16 260:7 271:1,4,12 282:22 283:1 289:5,8,9,23 293:2,4,5 315:24 346:23 347:1,10 347:11
**exhibits**
5:1 6:1 7:1 21:2 53:1 68:24 69:2 148:11,22 149:4 150:18 152:1 284:4
**exist**
97:20 253:2 296:7
**existed**
161:17
**existing**
212:13
**exists**
27:15 59:13 86:19 209:21 213:18 254:2
**exonerated**
286:10
**expand**
16:8
**expanded**
41:5,9
**expect**
16:8 17:13 131:19 167:2 191:7 194:16 197:16 198:19 201:14 245:17 262:24 263:18
**expected**
300:4
**expense**
252:17
**expensive**
241:15
**experience**

19:23 118:19 121:6 359:2
**experienced** 159:10
**experiment** 317:5,11 318:3 341:5
**experimental** 116:23 120:2 185:21 188:4 189:17 247:20 248:21 249:6 250:4 290:7,8 291:1 294:5
**experimentation** 87:18
**experiments** 85:12 86:3,7 206:9 316:9
**expert** 5:5 10:11 15:16 37:5 47:14 48:7 48:14 49:19 50:2 55:11,20 56:17,21 57:3,9 66:11,15 67:23 80:5,9 117:24 118:20 137:12,15,20,23 156:13,15,24 168:20 171:13 187:8 207:16 224:4 239:12 252:13 347:15,20
**expertise** 151:1,6 280:21
**experts** 49:8,14 50:21 51:1 51:24 52:4,8,12 66:4,8,9 70:14 82:23 122:23 144:4 169:3 213:20
**expires** 364:22 367:17
**explain** 106:3,11,13,15 107:3 190:22 212:18 284:17
**explained** 111:8
**explains** 106:19 242:1
**explanation** 182:13 243:12 244:15
**explanations** 150:16,20
**exposed** 145:24 146:15 160:17,18 167:5 213:22 298:4,18 299:3 329:4 361:11
**exposes** 83:11
**exposing** 317:15 361:3
**exposure** 77:11 82:2,11,15 82:20 83:4,7 91:21 111:21 113:23,24 117:5 135:4,6 152:12,15 152:17 153:9 154:22 160:4 161:1 163:7 166:15 168:13,16 170:20,21 171:24 174:12,17,20 175:2,4,6,13,20 178:1 179:3,12,20 179:22 181:14,19 181:22 182:16,17 191:1,6 193:20 194:6 198:10,10 198:14,16,20 199:9,12,23 200:5 200:6 209:6,8 212:13,15 224:14 224:18 229:15 255:4,12 265:7 269:14,20 297:21 298:5,6,11 299:3 299:13 311:15,17 312:1,5,24 318:2 322:22 328:10 331:17 332:14,16 351:24 352:3 355:2,11 357:11 358:6 361:13
**exposures** 55:18,19 57:8,11 84:7 298:9 300:13 311:21 325:13 328:9 344:18
**express** 349:2
**expressed** 16:14 360:24
**expressing** 18:21 81:4 181:5
**extend** 41:14
**extended** 23:15,17 209:23
**extending** 43:2
**extends** 356:15
**extensive** 42:7 83:13
**extent** 35:3 75:6 155:18 170:9
**external** 86:13 87:10,15 88:3,12,20 119:24 185:8
**externally** 116:15 119:13 188:9
**extra** 228:24
**extrapolate** 325:8
**extremely** 76:3 241:15 353:22

**F**

**F** 3:7,18
**face** 97:19
**face-to-face** 45:24
**fact** 84:3 85:19 86:1 91:18 108:3 132:5 132:22 133:18 191:9 192:1 199:8 238:3 241:15 244:2,22 246:22 249:12 257:7 262:23 288:3,5 302:24 304:7 345:9 353:17 357:6 362:11
**factor** 90:13,18 91:14 110:9 128:14 129:1 147:6 171:1 191:14,18 230:18 267:17 268:19,21 280:18 331:13 333:22 334:7 341:3 358:4
**factoring** 170:21
**factors** 19:24 95:12 107:21 108:1 162:11 163:14 166:18 215:8 219:23 221:20 230:4 266:20,24 279:22 280:1,15 330:14 331:10 332:17,23 333:3,4,10 334:2
**factory** 145:20 146:11
**facts** 214:21
**faculty** 239:6
**fail** 365:18
**failed** 187:13 220:10 232:1
**failure** 166:17
**fair** 11:21,23 31:23 74:15 211:24 246:18 265:15 266:1 285:8 294:11 301:3 342:20
**fairly** 84:13 86:18 145:17 214:16 235:9 279:10 282:9 324:6
**fallopian** 183:14 184:4 190:3 191:4 200:24 303:17 322:1,17 322:23 323:3,15 324:1,12
**false** 187:12
**familiar** 11:9 27:14 41:4 90:2,21 97:12 99:10 129:4,11,21 129:23 131:12,15 144:12 155:8,13 155:16 158:17,23 159:15 162:20 203:4 212:5 242:14 243:6 247:12 265:2 269:7 331:11 332:17 341:6 357:20
**family** 58:9 333:6
**Fannin** 1:15
**FAPR** 364:18
**far** 10:10 198:11 249:23 348:4 361:5

**fast**
303:17
**faster**
303:18
**fatal**
233:21
**fatality**
306:10
**fault**
241:5
**favorable**
217:7,10
**favorite**
345:14
**fax**
1:23
**FDA**
5:16 30:21 31:2 33:19 65:4 133:18 134:15 143:6,11 143:13 218:14,20 219:13,21 220:4 220:16,20 221:13 221:16 222:5,11 222:13,15,19 224:7,20 230:14 234:14
**FDA's**
143:4,8 223:12 234:14
**FDI**
222:10
**Federal**
134:7
**feedback**
79:14
**feeds**
342:7
**feel**
74:9 99:8 113:3 164:5,9 289:19 292:15
**Fellow**
1:18 364:2,19
**fellowship**
61:18
**felt**
19:10 20:4 40:2 41:13 216:1,22 254:21 325:15
**female**
82:3 83:5 145:13 181:15,18 207:24 209:8 303:21 350:21 351:15
**feminine**
288:6
**fewer**
160:16
**fibers**
72:11,17 114:22 115:5,8,10,10 138:23 140:9 169:2 290:10,22 295:20
**fibrosis**
116:16 119:3,12 120:5,19 132:24 133:4,15 185:6
**fibrotic**
287:1,19
**fibrous**
77:12 114:23 115:7 115:9 137:5,6,12 138:17 139:5,21 140:15 141:14,17 141:21 158:11
**field**
61:12 213:14,17
**figure**
328:18
**file**
24:6 35:23 346:1,1 346:7,11,17
**filed**
272:13 274:9,12 275:5,10,19 277:4
**files**
42:2
**filings**
271:21 276:2
**fill**
333:23
**filled**
323:17
**filter**
187:14
**fimbriae**
322:1 323:14
**final**
103:7 107:8
**finalized**
16:19
**financially**
364:15
**find**
34:20 42:18,19,20 91:15 111:12 132:6 142:18 143:1 167:2 194:6 194:11 218:17 262:20 281:14,18 282:12 291:11 293:24 311:7 316:13 320:6 330:19 358:4
**finding**
100:10 193:18 222:11,11 223:21 223:23 262:5 277:22 283:22 334:9 349:16
**findings**
106:24 114:3 220:17 223:19 253:22 254:21 276:13 294:22 295:13
**finds**
123:7 197:24 226:7
**fine**
39:14 173:7 343:17
**finish**
12:2,5 74:1 103:13
**finished**
20:10 74:17 103:14 173:5,6,7 207:11 207:13 283:4 295:6 298:20 324:18 329:12,13 359:17
**first**
29:2 30:24 36:16 40:8 65:10 77:6,7 81:18 83:15 114:16 124:24 140:1 160:9 166:3 215:20 230:18 237:15 261:12,15 286:1 301:7 326:2 340:3
**fit**
348:24
**five**
261:4,4,10 262:10 262:12,14 263:9 263:11 297:8 310:20
**fixing**
312:15
**Fletcher**
5:10 26:5,9 313:14
**floor**
2:15 335:23
**Flower**
2:14
**fluid**
323:18,20 324:1 362:7,20
**fluids**
279:10 339:9
**FLW**
1:5
**focus**
22:14,16 38:20 93:15 94:2 249:24
**focused**
230:14,19 249:22 310:12
**focusing**
216:17
**follow**
11:10
**following**
193:19
**follows**
9:20 98:13,15
**food**
170:6 219:14 357:15,17
**footnote**
148:16
**force**
189:10,13
**forces**
334:16
**foregoing**
364:7 367:5
**foreign**
199:2,4 209:16 315:18 317:20
**form**
11:22 17:21 18:22 19:20 25:3 37:16 38:7 53:10 54:2 55:14 59:2 60:23 62:12 63:9,24 65:24 70:16 73:11 75:13 78:2,13,23 80:16 81:13 82:18 84:2,21 85:15 86:15 87:12 88:6 92:18 94:12 95:4 97:9 98:4 107:15 108:11 109:17 110:14 111:17 114:7 116:20 119:6 120:9,21 123:11 127:15 128:6,19,24 132:1 133:7 136:8 137:6 137:10 139:23 140:24 141:24 144:2 147:5,17 148:23 151:4,14 152:6 153:2,15 154:4 155:12,20 157:9 158:13,22 159:7 161:6 162:15 164:24 167:16 168:4,17 170:15,24 171:10 172:8,18 174:7,15 175:10,17,24 179:5,23 180:5

181:9 182:4,15 184:21 185:11 186:13 188:11 189:15 193:11 194:22 195:6 197:4,21 198:15 199:17 200:3 201:10 202:9 203:10,20 204:18 207:5 209:11,19 210:15 212:3 214:10 216:13 218:10 219:17 221:1 222:9 223:16 224:1,23 226:10 228:2 229:7,14 231:10 231:21 232:19 233:4,11 234:10 234:17 235:7 236:3,7,21 237:11 238:2 239:2 240:16 242:4 244:9 246:12 248:3 249:3 250:10,20 252:7 254:9 257:19 258:14 259:10 260:24 261:20 263:4,22 264:10 266:10 267:4,19 268:23 269:24 270:6 275:23 276:9,17 277:10 278:24 284:24 285:15 288:11 290:13 293:19 294:3,14 296:14 297:23 299:7 300:9 301:19 302:20 303:6 304:17 305:1 307:15 309:15 310:7 313:24 316:11 317:8,17 317:24 318:9,20 319:14,24 320:17 320:23 322:19 324:5,15 325:1,10 326:21 330:11 340:19 341:19 345:19 348:22 351:20 352:16 353:6,19 354:19 355:8,21 356:7 360:6,7 361:15 362:11 367:6

**formation**
19:9 120:12 176:2

**formed**
353:3,24

**former**
244:6

**formerly**
22:6

**forming**
18:9 271:16 346:17 352:12 353:15 354:24

**forms**
154:5 175:3 180:7 180:17 235:18 240:24 241:13

**formula**
280:15

**formulate**
20:23 43:12 44:20 70:19

**formulated**
97:4 101:24 106:7

**formulating**
45:14 46:4 71:10 107:21 139:15 205:18

**formulation**
73:19

**fornix**
301:24

**forth**
16:14 19:7,17 54:15,16 76:21 81:7,18 155:22 200:7 220:16 345:8 364:9

**found**
25:13 35:7,20 109:20 112:20 131:2 144:15,17 144:24 147:10 181:7 184:13,24 185:13 190:5,7,10 195:2,8 205:10 221:16 223:3,6 256:4 261:9 290:21 291:3 292:10 293:13 314:16 354:8

**foundation**
165:1

**four**
124:21 125:9 143:16 172:15 189:20 245:21 252:21 261:3 297:8

**fourth**
3:13 84:15 210:3,5

**fragments**
168:21 169:1

**fragrance**
63:7,13,15 72:23 73:6,16 74:22 75:1 115:17 172:6 174:5 175:14,18 176:6 177:9,13,22

**fragrances**
174:10 175:23 177:19

**frame**
39:12

**framework**
5:23 99:1,14

**frankly**
37:10

**FRCP**
364:11

**free**
99:8 113:3 164:6,9 289:19 292:15

**frequency**
272:23 302:19 310:17 354:18,21

**frequently**
241:18

**front**
24:12 192:3 256:1 260:10

**fuel**
360:16

**full**
98:8 99:23 244:1

**functional**
206:21

**funded**
104:13,23

**funder**
93:17

**funding**
104:6,8,11 105:3 105:17,22

**further**
138:17 163:12 283:23 314:21 364:7,10,13

**future**
16:10 249:24

**G**

**gain**
267:15,24

**Galveston**
58:5

**gas**
145:13,14

**gasoline**
360:14,16,18,22 361:2

**Gates**
258:5,6,7,11

**gauging**
76:20

**general**
16:7 28:10 40:12 40:24 41:15,16 42:15 55:19 75:24 79:8 82:6 92:23 97:20 100:5,14 103:9 106:4 126:22 127:20 147:12 156:16 161:7,8 180:3 279:11 286:20 308:16 309:1 315:7 328:13 344:12,13

**generally**
38:8 44:20 97:6 122:6,16 147:10 178:14 236:15

**generate**
45:7

**generated**
49:11

**generic**
84:13

**genetic**
267:13 312:13 314:12,14 319:2,3 330:12 333:4

**genital**
86:13 87:11 88:3 88:20 119:1 170:12 185:8 186:19 192:22 194:6 200:11 201:19 220:6 227:15,17 234:7 244:3 246:3 252:3 273:18 274:6 277:5

**genitals**
273:14 274:2,15 276:5

**genotoxicity**
319:7

**gentlemen**
54:4 74:11

**geological**
349:17

**geologist**
61:2 115:15

**George**
79:20 337:5

**George's**
337:9

**Gertic**
257:12 258:9
**gestalt**
348:24
**getting**
63:21 64:6 110:6 142:14 257:20
**gigabytes**
346:14
**Ginkgo**
229:3
**girls**
296:11
**give**
12:3 54:4 64:4 135:23 156:3,8 188:5 230:3 316:13 336:18
**given**
11:4 18:10 20:3 23:1,6 56:14 164:12 188:14 266:21 336:22 367:5
**glass**
316:23
**gleaned**
18:8
**glove**
305:3
**gloves**
133:20 134:9,16,17 189:22,23 190:9
**go**
12:21 25:4 59:7 67:9 69:16 85:22 99:6,17 145:10 163:19 164:14 205:12 213:24 224:9 228:23,24 246:17 253:4 256:18 262:8,19 272:21 278:6 281:13 282:12 288:4 290:18 314:22 315:13 320:6 328:22 339:9 340:13 343:13 359:9,19
**goes**
68:1 136:19 219:21 225:21 324:1,9 334:14 335:21 345:5
**going**
11:10,20 39:21 73:24 74:19 85:21 86:22 87:22 112:5 117:24 136:11 156:3 162:23 164:16,19 176:17 176:18 192:4 233:16 247:6 284:3 285:18,22 288:2 289:6,14 294:9 295:8 309:22 315:7 321:19 324:18 342:11,13 343:4 343:14 344:9 363:18
**Golkow**
1:23 3:23 8:6
**good**
105:1 120:17 221:3 266:2 330:16 336:14 352:19
**GOSSETT**
3:2
**government**
221:8
**gradient**
111:23 112:1
**graduate**
281:1 344:14
**Graham**
5:13 29:2
**grandfathered**
335:3
**granuloma**
120:11
**granulomas**
116:16 119:3,12 120:5,18 132:24 133:4,13 185:6,13
**great**
74:17 326:11
**greater**
137:8 153:4 154:22 166:22 168:8 196:10,22 198:2 198:11,17,20 212:22 250:16 255:11 262:19 263:13 311:17,19
**greatly**
296:16
**grilled**
358:12,14
**gross**
214:11
**groundwater**
345:8
**group**
39:3 80:19 178:15 178:16 189:20 226:3,16 227:1,6 227:9,12,16,18 229:11,18,19 235:8,12 237:4 249:20 250:24 261:12,15 263:6 285:13 290:23 292:18 309:12 357:7 358:16
**groups**
6:11 190:10 263:2
**grow**
359:3
**growth**
115:2 139:1 287:3 287:14
**guess**
65:16 205:23 339:18 354:2
**guiding**
91:7
**gynecologic**
60:12 338:4,9,12
**gynecologist**
60:18
**gynecologists**
208:13
**gynecology**
32:15 208:6

**H**

**habits**
161:24 359:11,12
**habitual**
23:4,10,21 38:3 53:7,22 199:11
**half**
86:22 111:19 176:22 184:19,20 327:22,23 335:9 351:7
**hallmark**
300:14
**Halme**
183:23 184:3
**hand**
159:19 192:8 195:18 247:6 289:6 337:7
**hand-selected**
75:10
**handed**
160:2 291:6
**handled**
95:17
**handling**
164:13
**handwritten**
6:2 281:23 337:14
**happen**
252:1
**happened**
274:11 319:16
**happening**
312:18
**happy**
164:21 165:6,15 246:20 284:5
**hard**
336:22
**Harlow**
255:7
**harm**
188:5
**harmful**
355:2
**hazard**
97:19,19 143:19 153:4,6 172:22
**hazardous**
326:9
**Hazards**
77:17
**he'll**
164:21
**head**
188:22 304:8,24
**healing**
122:13
**health**
5:15,22 30:14 31:12 58:7,24 61:9 63:15 65:8 77:18 79:18 89:15 89:21,22 90:24 93:5,6,10,19 94:3 94:7,18,20,22 95:21 96:4,10,16 96:21,24 97:3 98:13,15 99:1,2 99:13,17 100:9,15 137:17 205:9,23 207:3 237:18 239:8 344:14,15 344:16
**health-related**
93:21
**healthcare**
93:24 204:8
**healthy**
240:1
**hear**
142:13
**heard**
14:19 204:23
**hearing**
16:6,15 17:14
**heavily**
160:18

**heavy**
168:15 170:11 172:2 173:23 175:7,19 176:6 297:20 298:4 299:19 300:20 332:16
**held**
1:14 8:10
**Heller**
184:1,8,15,24 283:16
**help**
258:1 284:5
**helpful**
79:14
**helps**
70:19 113:8
**hereinbefore**
364:9
**high**
145:17 249:22 332:5
**high-grade**
212:19,21
**higher**
160:19 167:3,21 168:5 170:12 263:10
**highlighted**
260:1
**Hill**
107:20,24 109:2 110:18 215:8,12 219:23 225:4 229:21 230:18 240:7,9 255:1 264:8,16
**hips**
304:9,23
**hired**
40:2 361:21
**historical**
191:17
**history**
184:13,19 196:23 267:7,23 330:13 333:7 351:8
**hit**
282:15
**hold**
346:13
**holidays**
351:4
**hope**
68:7
**hoping**
251:23
**Hopkins**
70:1,2 148:12,17 149:10,24 150:8 158:2
**Hopkins-28**
7:4 148:17 149:10 150:1,8,18 151:10 152:2 158:3
**hormone**
255:10 268:15,18 269:4
**hospital-based**
238:14,19 239:15 239:21 240:12 246:7
**hospitalized**
239:23,24
**hospitals**
134:18
**hour**
45:11 86:22 176:22
**hours**
40:4 45:13,18 60:9 343:5,15 347:14
**households**
359:6
**Houston**
1:15,16 8:10 37:1 59:4 61:10
**hover**
310:20
**huge**
250:24 345:4
**human**
112:15 226:13 236:5 249:19 288:7 358:18
**humans**
178:16,17 179:3 225:9 226:4,8,17 227:1,22 235:14 288:19 292:19
**hundred**
306:23 357:24
**hundreds**
357:21
**hydrocarbons**
358:15
**hygiene**
76:21 257:4 284:19 288:7
**hypothesis**
132:2 193:21
**hysterectomies**
189:18
**hysterectomy**
189:20,21 190:2 193:2,20 194:8,19 196:13 197:1,18 198:5

**I**

**IARC**
6:11,17 28:6,11 176:13 178:9,14 178:22,22 203:3,4 203:6,11 204:10 204:12,13 205:11 205:13,17,20 206:2 225:3,6,12 225:13,20 226:7 226:20 227:8,15 227:18,22 228:10 228:11,23 235:2 249:18 278:10,17 288:5,5,21 289:4 289:24 291:3,4 292:10,12 293:13 294:24 300:23 342:4,9 355:23 356:1,21,23 357:3 357:11
**IARC's**
205:6 206:3
**idea**
73:4 169:17
**identified**
34:8 52:22 70:23 127:11 128:4,9 151:9 163:16 286:6 300:21,22 324:22 333:3,11 336:5 346:22 355:13 356:16,20 361:7
**identifies**
86:11 88:1,18 319:2 330:13
**identify**
8:15 71:15 86:10 87:7,8 172:21 220:10 289:15 299:20 330:14
**Identifying**
99:2
**Igor**
282:18
**ill**
240:1
**illness**
134:2
**illustrative**
216:22
**Imerys**
3:5,10 9:6,8 69:19 70:10 72:3 75:8 75:16,23 147:19 149:13 157:23 158:5 284:13
**Imerys'**
150:23
**immediately**
40:17 65:14
**immune**
287:3,14
**immunogenic**
81:19 114:17
**impact**
209:16 271:20
**imperative**
365:14
**implanted**
286:23
**important**
18:9,15 94:1 159:13 209:20 254:21 258:11,15 283:22 295:16 317:4 338:16 339:1 352:18
**impossible**
266:19
**improvements**
167:18
**impurities**
169:14
**in-person**
46:9
**inability**
162:10 163:13 251:12
**inappropriate**
166:16
**inasmuch**
184:11
**incidence**
131:3,14,22 191:7 191:16 194:17 196:14 197:17 280:3
**inclined**
304:8
**include**
45:19 67:2,22 82:24 101:20 146:5 191:17 237:1 257:12 272:8 332:24 344:18 345:17 355:15
**included**
24:17 66:24 67:6 67:13 152:3 158:8 169:14 195:9 214:19 217:4 226:2 258:8 295:22 309:12

347:3 357:17
**includes**
87:14 280:12 347:4 355:22
**including**
19:6 41:2,2 83:12 93:6 114:22 121:7 163:23 165:21 169:6 193:23 221:21 237:2 245:8 252:15 277:17 278:21 279:5 287:2 303:9 321:22,23 358:10
**inclusion**
41:8
**income**
56:2
**incorporated**
151:20 180:11 214:17 244:24 337:7
**incorrect**
105:14
**incorrectly**
290:15
**increase**
121:21 202:18,23 231:3 233:17 275:14 299:12 306:12,13 318:6 318:13 331:3 338:13 360:10 361:16
**increased**
84:18 91:21 121:14 122:8 131:3 152:19 211:5 220:7 232:13 236:4 262:6 277:7 306:15 308:13 309:13 310:5 333:6
**increases**
132:23 133:3 236:24 237:3 311:13,16 338:21
**incur**
361:13
**independent**
53:6 79:4 157:5,10 158:9,14
**INDEX**
4:1
**indicate**
135:1,19 154:18 220:12
**indicated**
241:8 327:16
**individual**
71:22 110:17 126:20 171:24 178:4,5 193:5 214:22 229:21 308:17,19,20,21 308:23 309:3 310:19 314:13 330:8 345:21
**industrial**
76:20 156:15 344:22
**industries**
76:2
**industry**
331:15
**inert**
303:1 339:4
**infection**
122:12 267:8,23
**infections**
202:14
**infer**
166:13
**inflammation**
86:8,11 87:9 88:2 88:11,19 114:18 116:1,7,10,16 117:4 119:2,11,20 122:11,15,16 123:13 125:4 126:23 127:9 131:18,21 132:14 132:23 133:3,11 134:21 136:18,23 137:3 138:12 198:21,23 200:10 248:13 249:21 279:14 283:20 287:1,11,12,18
**inflammatory**
115:1,6,11 119:20 120:10 121:3,6,10 121:12,19 122:4 122:17,21 123:8 126:15 127:12,19 127:20 128:1,12 138:24 171:18 287:2,14 313:15 362:17,18
**influence**
213:11 272:1 279:23
**influenced**
216:21 272:15 313:16
**inform**
350:23
**information**
16:17,21 18:8 19:10 20:22 42:2 42:4,23 70:18 78:5 149:17 155:23 156:1 166:13 173:24 174:3,8 205:12 232:21 243:10 244:13 267:13 281:4,12 282:7 298:3,10,12,15 312:6 325:20,23 326:2 348:1,17 349:3,7,10
**ingredients**
140:8
**inhalation**
82:3,15,23 83:6 134:12 181:15,19 181:22 182:2,17
**inhale**
361:2
**inhaled**
84:7 182:9 290:21
**initial**
37:23 198:14 237:14
**initially**
40:11
**initiation**
116:13
**injected**
186:7
**injury**
57:6 134:2
**innocent**
329:24
**inquiries**
350:21
**inquiry**
351:14
**inserted**
304:22
**insofar**
235:24
**instance**
74:2
**instances**
76:12
**instilled**
301:23
**Institute**
90:21,23 91:7,12 91:19 93:8,14 95:11,18 234:21
**institution**
58:10
**instructed**
350:9
**INSTRUCTIONS**
365:1
**insufficient**
166:13 247:21 248:22 250:5 288:18
**insult**
312:12
**insults**
312:17
**intend**
16:5 22:21 96:23 97:2 156:8
**intended**
15:10
**intense**
311:21
**intensifies**
138:17
**intensify**
114:24 115:5,8,11 138:24
**intention**
156:10
**intentionally**
115:21
**interaction**
196:21 197:12 198:1
**interest**
37:6 105:5 342:8 349:9
**interested**
39:21 295:13 341:22 364:15
**interesting**
43:1 80:24 342:13 348:18 349:3
**interests**
93:12
**internal**
75:7,15 76:6,8,12 76:19 77:1 88:9 88:13 321:14,15 321:20
**International**
178:22 225:23
**Internet**
338:7 342:21,24
**interpretation**
223:18 334:10
**interpreting**
264:20
**interrupt**
74:11 86:21 191:5
**interval**
261:23 276:21
**intervals**

126:10
**interview** 272:16 277:17
**interviewed** 273:17 274:1,8,13
**intimately** 120:11
**intrinsic** 83:19,23 84:9 208:8,11,16 209:3 337:17 362:11,15
**introduced** 188:8 284:12
**introductions** 343:21
**invasion** 212:23
**inverted** 188:21
**investigate** 150:16
**investigated** 104:20
**investigation** 79:5 286:15 329:2 329:7
**investigations** 193:6 214:23
**Investigators** 251:22
**invoice** 14:10
**invoices** 14:9 45:3,7
**involve** 147:2 187:22 189:8 250:21
**involved** 37:3 47:10 50:3 54:24 56:23 57:3 57:6 62:8,17 63:21 64:7 73:9 76:15 96:16 135:20 136:5 138:4,10 141:6,13 142:14 147:15 148:7 156:20,21 184:8 185:18 187:19 189:12 232:10 250:16,22 267:1,9 287:4,15 340:4
**involves** 172:15 359:4
**involving** 57:16
**ions** 180:10
**irrefutable** 226:13
**irrelevant** 349:15
**isolated** 254:15
**issue** 66:14 80:12 90:11 118:5 141:20 144:8,20 160:4,11 163:7 176:7 199:19 213:13 264:19 278:17 289:1,2 327:16 352:18 358:20
**issues** 29:7 41:8,20 55:7 64:18 77:18 80:20 137:16 207:3 258:17 285:6 326:6
**Italian** 297:11
**Italy** 146:12
**item** 14:5 35:4,5 126:18
**items** 13:21 20:6,14 35:1 357:17

**J**

**J&J** 152:3 155:8
**J.D.P** 29:2
**Jane** 3:2 9:5 284:10
**January** 1:11 5:2 8:2,7 26:1 26:10 94:9,14 364:23
**jbockus@dykem...** 3:3
**jdonath@coughl...** 3:8
**Jersey** 1:1 3:9
**Jim** 77:7
**jive** 116:24
**job** 53:6 164:22,23 336:14
**John** 70:1,2 148:12
**Johnson** 1:3,3 2:16,16,22,22 9:1,1,4,4 22:4,5,7 22:7 41:22,23 43:9,9 70:3,4 72:4 72:4 73:7,8 75:8,8 75:16,16,22,22 129:19 143:23,23 147:20,20 149:13 149:13 150:22,22 151:12,12 299:4,4
**join** 234:3 236:10
**joinery** 229:13
**Jonathan** 3:7 9:7
**journal** 27:14,16,21 31:14 32:14 249:13
**journals** 63:4 103:11
**Julie** 70:8,9 148:12
**jumped** 275:20
**jumping** 285:19

**K**

**kaolin** 129:13 130:24
**Katherine** 2:19 9:2
**katherine.mcbet...** 2:20
**keep** 110:6
**Kemble** 3:8
**key** 20:5
**kibitzed** 297:16
**kill** 311:3
**kind** 24:7 38:11 42:6 84:5 278:14 293:10 299:9 300:12 323:20 329:21 342:8
**kinds** 285:6 312:17 335:9 335:11
**Klevorn** 2:8 8:22,22
**know** 10:10 28:16 29:12 36:23 42:20 44:6 44:19 46:18 47:16 48:10,13,16,18,19 49:7,10 51:6 66:11 68:2 69:20 72:11 73:15 74:3 74:7,24 75:20 80:7 94:14 96:7 96:12 101:15 103:8,12,15,20 104:2,5,18 105:4 105:6,10,13,13,19 105:21 134:5 141:1 142:9 146:3 148:24 149:3,17 151:8,23 153:8,12 155:2 161:9 171:6 171:12,16,23 176:5,11 177:12 177:15,16,17,18 177:20 178:1 180:7,17,23 184:17 189:4 204:11 208:21 213:5 218:11 221:2 246:13,16 275:16 282:5 291:4 292:11,13 293:13 294:10 299:23 300:1,10 300:17 302:7,12 302:16 303:13,13 303:14 311:20 312:3 315:2 319:6 320:1,3 322:3 324:16 329:8 330:6 331:8,9 333:9,13,16 336:8 337:20 338:11,17 338:19,23 339:13 340:20,20 344:6 346:12 347:4 357:13 358:13
**knowingly** 350:2
**knowledge** 104:11 120:1 156:2 169:11 224:7 293:23 303:24 322:4 359:8
**knowledgeable** 168:21
**known** 129:9 135:17 166:18 171:2,3 178:21 226:21 266:20 280:3 315:18,19 330:14 333:5 358:15

**L**

**labeled**
183:17
**labeling**
30:22 134:4 219:10
**labia**
200:19
**laboratory**
286:24
**lack**
107:12 110:11 208:8 222:20 251:11 254:6
**lacking**
222:16 223:10 224:13
**laggers**
145:21
**Lancet**
28:24
**Langseth**
6:14 246:23 247:13 247:18 248:17
**language**
92:6,7 134:6 294:11
**languages**
214:19
**large**
241:16 251:19 324:8 334:3
**largely**
232:16
**larger**
19:6 22:18 39:3 153:4
**lasts**
335:17
**late**
40:6 65:21 333:1 333:12
**latency**
168:7 279:16,24 280:1,7,12,14,18 280:21,24 281:3,7 281:21 282:14,19 311:23
**Latin**
190:1
**lattice**
180:11
**law**
334:13
**lawsuit**
142:14 271:20 276:2
**lawsuits**
68:2 272:1,13 273:12 274:8,12 274:19 275:5,9,18 277:3
**lawyer**
36:24 80:4 285:13
**LAWYER'S**
4:13 368:1
**lawyers**
39:16 44:7,9,11 46:2,21,24 75:11
**lays**
117:4
**leach**
189:3
**lead**
27:5 121:3,8 224:13 333:19
**leading**
90:24 116:15
**leads**
70:18 116:8,12 122:12
**learn**
96:9
**leave**
129:2 257:17
**lecture**
42:2
**left**
13:13 177:7 257:15
**legally**
68:1
**legs**
186:3 187:3 188:22
**Leigh**
2:2 8:17
**leigh.odell@beas...**
2:3
**length**
137:8 339:10
**lesser**
190:20
**let's**
26:22 31:4 89:1 225:12 237:21 253:4 256:17 257:6 259:13 270:10 314:22
**letter**
5:16 30:20,23 33:18 218:14,21 219:20,21
**level**
20:19 109:22 111:20 171:24 217:2 238:13 245:15 263:13 325:8 355:1
**levels**
170:11
**LHG**
1:5
**LIABILITY**
1:5
**licensure**
328:15
**lifestyles**
359:13
**ligation**
190:13,14,19,23 191:4,17 193:1,20 194:8,19 196:13 196:24 197:18 198:4
**light**
162:1
**likelihood**
211:22 240:22
**limb**
224:9
**limit**
135:11
**limitation**
162:9 163:12,17
**limitations**
158:18,24 160:9
**limited**
87:15 160:11 227:21 228:3 235:13 290:8 291:7,10 292:19 294:5 351:2
**limiting**
236:18
**limits**
223:8
**line**
46:8 313:9 366:2 368:3
**lines**
106:22 113:9
**link**
158:19
**liquid**
187:14
**list**
6:2 13:16,19,22 17:23 18:5,7,18 19:17 21:14,20,23 24:22,24 25:8 29:10,13,19 32:24 34:14,18,23 35:1 35:11,15,18 36:15 51:19 58:15 67:20 68:10 71:6 90:12 90:17 101:21,22 123:12,18,22,23 124:1,6,12,13,15 126:13 130:13 133:9,16 143:13 145:10 146:22 154:18 178:11 217:20 281:13,18 282:5,23 283:6 304:1,3 347:1
**listed**
13:15 20:15 35:10 51:18 52:16 68:9 125:9,13 143:2 155:4 222:10 227:17 345:22
**listing**
5:7 125:17 126:8
**lists**
24:18 73:2 226:16
**literature**
5:7 19:4,7,12,22 20:17 21:14,20,23 24:16,23 25:8,13 29:10,13,19 31:24 31:24 32:24 33:12 33:13 34:14,20,23 35:1,10 36:2,14 40:12,19,24 41:5 41:10,19 42:12 43:7,8,16 45:14 46:5 51:5,19 52:17 54:9,13 62:22 65:13 66:18 67:3,6,14 68:10 71:6 79:6 85:17 85:23 87:18 94:16 94:21 95:11 101:22 110:20 116:15 130:13 157:22 158:6 175:1 178:11 213:1 214:3,14 215:24 217:4,20 218:7 220:11,14 221:15 222:6 223:14 224:21 230:22 237:22 267:2 282:23 347:2 348:2
**lithotomy**
185:23 187:2
**litigation**
1:5,23 3:23 8:6,11 10:8,12 23:2,8 36:18 37:4 39:17 46:22 48:5,15,21 49:8 52:5,9,13 55:1 56:15 63:22 64:7 66:5 73:9 75:22 80:6 97:5 100:11 104:22,24 105:12 118:1,13

142:15 178:3 181:5 218:8 224:5 284:13 351:18 361:22
**litigations**
56:24 57:2
**little**
68:6 256:18 296:20 305:5 327:22 359:10 360:23
**lives**
233:22 236:5 305:17 306:18 325:14 358:5 359:12
**LLC**
3:15,15 9:13,14
**LLP**
2:8,13,19 3:7,12,17
**locate**
199:3
**located**
314:13
**location**
294:7
**Lockey**
77:7
**Logan**
2:20
**logistic**
272:18 277:18
**London**
145:21
**long**
39:10 168:8,9 169:22 241:16 280:18 281:17 335:6,14,17
**long-term**
129:12
**longer**
58:23 59:9,12,15 209:7 310:13 339:5,15 358:1 362:19
**Longo**
5:9 25:22,24 49:16 49:22 142:4 143:1 157:20 340:4,15
**Longo's**
50:11 142:1,18
**look**
31:18 42:20,21 71:22 72:13 78:18 93:1 94:2 106:22 110:19 111:14 113:6,8 118:10,12 130:1 155:3 161:24 162:23 175:6,13 184:11 191:19 193:16 199:11 204:24 219:24 220:15 229:1 233:19 237:21 238:11 242:23 243:23 246:19 247:7 248:14 257:6,14 259:13 260:16 262:2,14 270:10 272:6 274:11 285:21 287:24 289:16 292:15,17 293:16 295:11 299:22 301:14 306:11 328:23 336:7 337:13
**looked**
41:20,22,24 42:1 69:2 72:2 88:8 89:20 107:20 129:24 130:8,22 131:8 142:10 143:12 155:24 159:18 163:6 165:17 183:12 184:10,11,15 191:15 196:9 214:2,3 245:23 252:24 271:19 300:12 338:7,24
**looking**
28:18 53:21 67:8 77:6,8 78:9 99:19 118:4 125:23 126:12,17 139:24 140:1 148:16 152:1 158:1 162:19 164:3 166:1 194:4 197:11 222:24 247:24 248:16 255:6 259:24 273:11 282:22 283:2,7 287:8,11 289:23 292:22 293:7 297:3 300:18 320:8 321:7 352:23 357:10
**looks**
134:6 160:3 291:24
**Los**
2:15
**lost**
290:16 296:16 340:9
**lot**
40:22 117:1 137:16 141:18 146:21 207:7 239:5 299:23 343:11 349:16,21 359:4
**lots**
93:10 319:9
**Louis**
3:14
**Louisiana**
2:10
**low**
153:5 334:4
**low-grade**
212:19
**lower**
197:16 223:8 269:4 334:5 356:11,12
**lubricant**
134:9
**lubricating**
133:20
**lucky**
282:15
**lung**
130:9 131:3 292:5
**lungs**
84:6 182:18

**M**

**M**
2:3 3:12
**M.D**
1:14 4:5 5:1 9:18 59:24 364:5 367:4 367:12
**magnesium**
180:12
**magnitude**
166:6 211:20
**main**
134:8
**major**
160:11
**majority**
57:9 109:19 137:10 245:12 326:12,17 326:22 327:2 362:23
**making**
54:17 216:23 330:17 336:9
**mammalian**
288:20,23
**Managing**
99:2
**Mantovani**
127:5
**manufactured**
22:4,6 146:12
**manufacturers**
145:14
**manufactures**
60:15
**manuscript**
101:1,4 102:18 103:4
**Margaret**
2:3 8:19
**margaret.thomp...**
2:4
**mark**
10:16 15:17 20:24 25:23 26:10,22 30:13 31:4 32:6 32:18 36:5 124:15 130:2 159:20 163:2 192:2 195:21 218:16 225:12 247:2
**marked**
10:19 12:11 15:19 21:4,11 24:24 26:3,7,20 27:6 28:13 29:15 30:17 31:6 32:9,20 34:14 36:8,12 43:14 50:18 54:21 57:19 58:21 65:1 65:11 89:16,17 94:24 98:22 100:20 102:4,15 124:18 130:4 146:23 159:22 160:3 163:4 192:12 195:24 218:15 225:16 243:2 247:9 271:2 289:7,10 293:1
**market**
140:21
**MARKETING**
1:4
**married**
331:16
**Marriott**
1:14
**Marysville**
76:17
**mask**
145:13
**masks**
145:14
**mass**
334:13 362:14
**Master**
344:15

**material**
28:12 62:3 78:7 151:19 229:8 279:8 304:19,22 312:13 314:15 342:19 361:10
**materials**
5:21 6:3 13:11,16 13:18,22 14:2,24 15:8 18:19 19:13 19:14,16 20:17 24:1,3,14,20 25:10,12 28:5 29:6,24 30:1 35:10,15,17 42:8 42:24 43:10 77:4 91:4 123:20 157:24 175:22 279:9 282:5 301:9 301:15,22 311:15 311:16 321:11 347:24
**mathematical**
280:15
**matter**
8:10 15:22 16:6,12 16:15 17:15 34:11 44:21 45:6 46:19 47:1 49:5 51:22 55:2 80:10 86:4 89:13,14 96:14 106:7 141:3 149:1 172:12 187:20 209:7 215:9 217:24 219:6 303:8 345:9
**matters**
37:7 86:1 100:11
**Mayo**
90:16
**McBETH**
2:19 9:2,2
**MDL**
1:4 8:11 10:8 55:2
**mean**
18:4 22:15 39:23 40:1 62:14 88:16 135:6 150:21 153:5 157:10 179:1 180:18 236:8 254:2 264:11 270:7 320:20 325:2 336:15
**meaning**
262:2 273:13,24 288:18 297:17 360:16
**meaningful**
252:9
**means**
23:12 111:6 186:2 227:22 228:10 231:7,8,24 362:10
**meant**
258:4
**measured**
314:11 340:8 341:21
**measurements**
232:6
**measures**
241:10
**meats**
358:13,14
**mechanism**
224:12 248:11 249:20 279:3 299:23 300:2 314:19 333:23
**mechanisms**
126:22 135:11 303:22 312:14
**mechanistic**
326:6
**media**
278:13,15
**medical**
1:15 10:5 58:5,6,13 58:24 59:10 90:17 175:1 207:19 220:22 330:7 334:24 335:2,5 350:6
**medicine**
55:15 58:9,10 60:4 60:7 79:22 80:18
**meet**
39:2 45:24
**meeting**
38:13 39:5,18 40:8 45:22 48:4
**meetings**
45:19 46:9,12,15 47:9
**member**
239:6 335:4
**members**
38:14 129:18
**membrane**
323:10,13
**memory**
71:23 126:19 183:15 276:6
**men**
160:16 350:19
**menarche**
333:1,12
**menopause**
333:1,12
**menstruation**
183:23 184:3
**mention**
109:19 256:6
**mentioned**
49:23 51:5 104:8,9 105:16 252:23 345:24 362:4
**mentioning**
255:22 350:14
**merged**
58:17
**mesothelioma**
32:16 131:4 161:19 166:23 167:4 182:22
**mesotheliomas**
167:7,9
**met**
46:3 47:13 48:2,23 142:7
**meta-analyses**
61:15 125:13 215:22
**meta-analysis**
27:1,3 61:14 94:23 191:20 192:15 193:8 194:5 195:3 195:9 215:13,18 215:20 216:5 242:19,20 243:7 256:4 257:9 268:14,20
**metal**
77:18 169:13 172:2 173:23 180:10
**metals**
114:23 169:6,18 170:12 174:2 175:8,19 176:1,6 177:8,13,18,21 180:3 181:1,1 299:19,24 300:21
**metastasis**
212:23
**method**
143:17
**methodology**
40:10 214:2 215:4 215:6,10 239:19 244:19,24 251:4 254:5 264:15 294:24 295:14 330:6
**Michael**
1:17 2:13 8:24 10:22 48:17 164:15 364:2,18
**michael.zellers@...**
2:14
**microenvironment**
171:18 300:1
**microphone**
284:2
**microscopist**
61:3
**microscopy**
162:1
**mid**
39:13
**middle**
38:18 165:24
**midst**
221:7
**migrate**
182:10 183:13 302:18
**migrates**
85:13 198:9 206:10
**migrating**
206:5
**migration**
82:3 83:5 88:10 125:22 181:15 186:23 187:5 190:15,24 194:15 197:15 203:7 204:14,15 205:6 206:5,21 337:24 338:1 362:3
**Mike**
9:16 86:20
**milieu**
279:11 362:18
**Miller**
1:17 9:16 364:2,18
**milling**
155:9 156:4,9,14 156:18,20,24
**mind**
81:11 165:9 192:6 281:14 296:22 351:23 358:21
**mindful**
265:12
**mine**
218:3 346:8
**mineral**
114:22 115:5,10 132:21 138:23 180:11 345:21
**mineralogist**
61:3
**minerals**
64:16,20 344:19,23

345:22
**mines**
155:17 156:4,9
**minimis**
325:8
**minimum**
309:9
**mining**
41:21 77:19 155:10 156:4,8,14,17,20 156:24
**minor**
103:6
**minute**
164:1 292:15 315:23 320:8 335:9
**minutes**
235:12 335:17
**misclassification**
161:23 166:16 241:13
**misclassified**
167:8
**misleading**
77:24
**missed**
271:11
**missing**
291:15
**misspoke**
258:4 361:23
**misstates**
19:20 65:24 128:23 239:2 296:1 332:19
**MO**
3:14
**mode**
272:23
**Model**
282:20
**modeled**
340:5
**modeling**
232:8 340:13 341:13
**models**
232:5 272:18 277:18 293:15
**modest**
233:2,19
**modified**
16:20,22 28:24
**Mohamed**
27:5
**molecular**
334:16
**moment**
16:2 56:6,6 68:13 113:15 116:4 155:3 183:16 234:18 280:6 281:14,16 282:4 290:17 291:13 315:1
**Monferrato**
146:11
**monograph**
6:18 176:14 178:10 203:13,21 204:21 205:11 289:12,17 289:24 291:12,16 291:18,22 292:13 294:10 295:17
**monographs**
28:7 178:11
**Montgomery**
2:5
**month**
309:9 324:13 350:11 351:2
**months**
23:19 45:6 261:13 261:14
**morning**
284:12
**Morristown**
3:9
**motile**
303:14
**motility**
303:19,23
**motion**
334:15
**Mount**
3:8
**mounts**
111:2 233:14
**move**
121:15 140:17 162:8 176:18 192:5 205:14 236:8 241:21 324:12 334:17,17 359:14
**moved**
227:5 324:2
**movement**
362:19
**moving**
323:21 362:5
**multiple**
68:2 119:19 214:19
**multiply**
299:16
**multiplying**
212:14 310:16
**mutagenic**
313:17
**mutagenicity**
319:8
**mutation**
120:13 312:16 313:22 318:18
**mutations**
314:17 333:5

**N**

**N**
2:1 3:1
**N.W**
3:18
**Nadler**
282:18
**name**
8:4 9:23 88:18 123:16 284:10 343:21
**named**
36:22
**names**
342:3
**narrow**
359:22
**national**
90:21,23 91:6,7,12 91:18 93:7,14 95:10,18 178:24 234:21
**natural**
170:1 280:4 312:20
**naturally**
170:3
**nature**
140:16 305:4 317:5
**NCI**
92:23 94:6,21
**NCI's**
94:8
**NCRA**
364:19,20
**necessarily**
93:16 135:9 171:3 172:19 173:2,9 213:16 218:3 239:3 254:18 255:20 361:17 362:14
**necessary**
19:11 20:4 78:18 79:2 173:12,16,17 231:13 349:21 365:4
**need**
29:21 41:14 45:17 54:5 57:24 58:1 93:1 99:21 113:4 163:24 164:8,14 173:5 192:9 213:21 234:1 241:1 253:5 258:1 265:12 282:3 291:11 292:14 295:11 309:11 314:23 316:2 325:23 326:1,1,5 333:23
**needed**
249:6
**needs**
98:1 164:19 308:11
**negative**
72:20 187:14 245:18 316:8
**neither**
364:13,14
**Ness**
79:23,24 80:8 117:9,10,12 127:1 136:14 335:7,16
**Ness'**
117:3
**never**
60:14 62:8,17,21 63:6,12 64:9,12 64:20 80:8 111:21 118:15,18 138:4 182:8 216:5 308:16 326:13,18 333:1,11
**new**
1:1 2:10 3:9 17:12 25:5,10 119:15 220:10,11 266:24 267:13,16 306:3,8 307:16
**nice**
263:23 325:11,17
**Nicholson**
70:6 129:20
**nickel**
169:7,12,24 171:8 172:1 173:23 180:8,19
**night**
29:20 33:7
**nine**
143:15 297:8
**NIOSH**
76:16
**non-coffee**
265:22
**nonfibrous**
313:16

**Nonmetallic**
77:19
**nonobese**
331:5
**nonoccupational**
161:13 162:11 163:14
**nonresponsive**
121:16 140:18 205:15 234:2 236:8 241:22 359:15
**nonsignificant**
261:22
**nonthreshold**
324:22
**nonusers**
170:13
**normal**
122:11 313:12 316:15 317:9,15 332:14
**normally**
281:2
**Notary**
1:21 364:4,21 367:20
**noted**
222:13,15 283:20 365:11 367:7
**notes**
4:13 42:1 43:17 92:16 124:20,21 124:22 125:14 126:18,19 183:19 222:19 255:7 281:23 337:6,10 337:14 368:1
**notice**
5:4 10:15 11:1 12:10,19 13:10 14:6 15:1 23:24
**notion**
296:6 308:4
**November**
65:22 89:12 227:5
**Ns**
283:3
**NSAID**
131:12 132:5
**NSAIDs**
131:19
**nucleotide**
314:14
**number**
5:3 7:2 45:6,13 46:6 49:10 57:5 71:18 86:16 90:16 93:9 95:14 111:24 114:13 124:20 125:5,17 146:14 147:23 155:5 159:5,9 160:15,15 183:5 191:14 208:22 212:16 215:21 217:9 220:20 221:17 223:13 224:11 227:3 228:4 233:19 245:18 250:16 251:23 255:16 258:21 259:4 273:4 278:11 279:22 280:1 305:14 306:3,5 307:16,22 309:9 314:11 326:23 328:10,12 328:13 331:14 342:6 354:12 357:13
**numbered**
21:22,22
**numbers**
71:20 194:13 241:16 331:6,9 332:6
**Numerous**
286:2
**Nurses'**
237:15,18 258:5
**Nursing**
59:5
**nuts**
67:24

**O**

**O'Dell**
2:2 8:17,17 10:22 11:22 13:3,9 14:20 15:5 17:20 18:22 19:19 20:9 20:12 21:17 25:2 37:15 38:6 46:10 46:13 53:9 54:1,7 55:13 59:2 60:22 62:11 63:8,23 65:23 67:9,17 70:15 71:17 73:10 73:22,23 74:2,6 74:14 75:12 78:1 78:12,22 80:15 81:12,22 82:17 84:1,20 85:14 86:14,20 87:5,12 88:5,22 91:23 92:3,5,11,17 94:11 95:3 97:8 98:3 99:8 106:16 107:14 108:10 109:16 110:14 111:16 112:22 113:2,3 114:6 116:19 119:5 120:8,20 123:10 127:14 128:6,18 128:22 130:6 131:24 133:6 136:7 137:21 139:22 140:23 141:23 143:10 144:1,22 147:4,17 148:23 149:22 150:6 151:3,14 152:5 153:1,14 154:3 155:11,19 157:1,8 158:12,21 159:6,23 161:5 162:14 163:24 164:5,15 165:4,9 167:16,24 168:3 168:17 170:14,23 171:9 172:7,17 173:4 174:7,14 175:9,16 176:17 176:21 178:4 179:4,23 181:8 182:3 184:21 185:10 186:12 188:10 189:14 193:10 194:21 195:5 196:2 197:3 197:20 198:15 199:16 200:2 201:9 202:8 203:9 203:19 204:17 207:4,10,14 209:10,18 210:14 212:2 214:9 216:12 218:9 219:16 220:24 222:8,22 223:15 223:24 224:22 226:9 228:1,14 229:6,14 231:20 232:18 233:3,10 234:9,16 235:6 236:2,11,20 237:10 238:1 239:1 240:15 242:4,10 243:4,14 243:17 244:8 246:11 248:2 249:2 250:9,19 252:6 254:8 257:18 258:1,13 259:9 260:23 261:19 263:3,21 264:9 267:3,18 268:22 269:23 270:5 275:22 276:8,16 277:9 278:23 282:3 284:23 285:14 288:10 289:11,14 289:19 290:12 291:9,17 292:14 293:19 294:3,13 295:6,24 296:13 296:22 297:22 299:6 300:8 301:18 302:20 303:5 304:16 305:1 307:14 309:14 310:6 313:23 314:23 315:9,22 316:10 317:7,17,23 318:8 318:19 319:13,23 320:16,22 322:18 324:4,14,24 325:9 326:20 329:12 330:10 332:18 340:18 341:18 343:3,9,12 345:18 348:21 351:19 352:15 353:6,19 354:19 355:8,17 355:21 356:7 360:6 361:15 363:5,13
**O.M**
76:16
**o0o--**
7:9 363:23
**oath**
24:19 122:20 152:14 173:15
**OB/GYN**
207:20
**obese**
331:4
**obesity**
267:20 330:22 332:15
**object**
11:22 17:20 19:19 37:15 38:6 53:9 54:1,5 55:13 60:22 62:11 63:8 63:23 65:23 70:15 73:10 75:12 78:1 78:12,22 80:15 81:12 82:17 84:1 84:20 85:14 86:14

88:5 92:17 94:11 95:3 97:8 98:3 107:14 108:10 109:16 111:16 114:6 116:19 119:5 120:8,20 123:10 127:14 128:6,18,23 131:24 133:6 136:7 139:22 140:23 141:23 144:1 147:4 151:3 153:1,14 154:3 155:11,19 157:8 158:12,21 159:6 161:5 162:14 167:24 168:3 170:14,23 172:7 172:17 174:14 175:9,16 179:4 181:8 182:3 184:21 185:10 186:12 188:10 189:14 193:10 194:21 195:5 197:3,20 199:16 200:2 201:9 202:8 203:9,19 204:17 207:4 209:10,18 210:14 212:2 214:9 216:12 218:9 219:16 220:24 222:8 223:15,24 224:22 226:9 228:1 229:6 231:20 232:18 233:3,10 234:2,16 235:6 236:2,3,7 236:20 237:10 238:1 239:1 240:15 242:4 244:8 246:11 248:2 249:2 250:9 250:19 252:6 254:8 257:18 258:13 259:9 260:23 261:19 263:3,21 264:9 267:3,18 268:22 269:23 270:5 275:22 276:8,16 277:9 278:23 284:23 285:14 288:10 290:12 294:13,14 296:13 297:22 299:6 300:8 301:18 303:5 304:16 307:14 309:14 310:6 313:23 315:18 316:10 317:7,23 318:8,19 319:13,23 320:16 320:22 322:18 324:14,24 325:9 326:20 330:10 340:18 341:18 345:18 351:19 352:15

**objection**
18:22 25:2 59:2 87:12 88:22 106:16 110:14 137:21 143:10 144:22 147:17 148:23 151:14 152:5 157:1 167:16 168:17 171:9,15 174:7 179:23 198:15 228:14 229:14 234:9 242:10 291:9 293:19 294:3 295:24 302:20 305:1 317:17 324:4,5 332:18,19 348:21 353:6,19 354:19 355:8,17,21 356:7 360:6 361:15

**objections**
10:24 164:24 165:2

**observational**
266:9,12,15

**observed**
156:22 187:12 213:15 283:12

**Obstetrics**
32:15

**obtain**
101:3

**obtained**
101:5 245:16

**obvious**
110:22

**obviously**
303:22

**occasions**
11:7 55:5 56:11

**occupation**
229:19

**occupational**
55:15,18 57:7,10 60:7 79:22 80:18 146:19 160:18 161:1,15 163:7 166:14 168:15 229:12 297:20 298:5,9

**occur**
103:6 162:4 301:11 306:6

**occurred**
149:21 194:7 274:7 312:16

**occurrence**
17:3 111:1 119:21 121:11 126:23 136:16 230:12 331:1

**occurrences**
312:20

**occurring**
171:19

**occurs**
199:1 292:12 308:15

**October**
36:19 37:13,18 38:18 39:5,13 40:6,6,8 59:14 64:7 65:21 66:1 142:15

**odds**
126:9 232:14 233:1 245:13 255:9 259:1 261:22 263:7,9,12 269:2 272:22 276:20 277:22 278:5 310:21 331:24 332:4 333:9,14,17

**offer**
16:5 22:21 336:10

**offered**
171:12

**offhand**
333:13

**office**
335:21,22

**official**
70:2

**offset**
358:4

**offsets**
299:14

**Oh**
66:9 180:21 192:7 197:12

**Ohio**
76:17

**Okada**
127:3 287:5,8,10 287:22

**okay**
17:23 20:12 25:22 39:9 44:5 63:4 65:3 74:5 92:3 100:23 113:3 123:18 124:15 130:15 138:15 149:9 150:11 165:14 192:4,21 197:10 207:14 247:10 258:2 259:17 270:24 282:15 285:18 286:16,21 287:22 291:15,20,21,22 295:3,16 296:5 297:1 299:11 300:20 305:23 307:19 309:21 316:4 320:14 323:2 332:12,15 332:22 335:19 338:8 342:2 343:1 343:12,16 344:6 360:14 361:20 362:2 363:1,5

**old**
42:1

**older**
29:4

**once**
72:2 339:11 362:16

**oncologist**
60:19

**oncologists**
208:17 338:12

**oncology**
338:9

**one-half**
60:6

**ones**
68:3 75:17 102:5 109:21 206:1 258:16 342:16,16

**ongoing**
198:24

**open**
206:23,24

**operate**
278:13

**operates**
97:22

**operating**
134:19

**operative**
69:19

**opine**
23:7 120:18 137:24

**opined**
150:24

**opining**

82:14 108:3 122:20
**opinion**
43:4 74:20 81:18 81:24 82:5,7,9,10 83:1,10,14,15,16 84:15 86:7 88:12 92:23 107:21 114:12 115:15 116:6,9 123:2 141:3 144:6 148:13 156:4 169:10 171:17 181:5,12 206:14 208:7 210:5,12 211:7,10 259:20 301:24 302:3,8,10 303:12 305:16 308:10 310:9 311:10,24 346:18 352:12 353:3,7,10 353:20 354:24 355:10 356:3,5,15 357:9 359:22 360:4 361:12
**opinions**
16:5,8,9,12,13,20 16:23,24 17:6,9 17:13,17 18:9,20 19:9,21 20:23 22:21 34:10 38:12 39:22 41:13 43:13 44:17,17,21 45:15 46:4 54:15,19 57:5 63:19 64:1 70:19 71:10 79:1 79:5,12 80:14,23 81:2,3,4,7,16 82:22 84:24 85:22 89:14 95:8 117:18 123:3 139:3,15 156:8 196:6 215:9 217:8,11,15,18,21 217:24 218:2 219:6 235:16,21 236:19,22 271:17 285:9,10 349:2,11 349:13 350:23 353:15,24
**opportunity**
16:11 352:5
**Oppose**
236:11
**opposed**
308:16 344:23
**opposite**
335:22
**oranges**
254:19,19
**order**
76:21 92:24 98:2 100:13 173:10 213:11 241:17 250:23 256:21 307:3,6 334:5 346:13
**organization**
93:20
**organizations**
93:6,11,24 94:7 279:24
**organs**
198:21
**original**
193:6 316:3 365:15
**Orleans**
2:10
**ounce**
100:7
**outliers**
245:21
**outline**
285:20
**outlined**
105:7 215:11
**outset**
84:23
**outside**
48:14 97:5 104:22 304:13
**ovarian**
17:3,8 23:5 27:4 30:4 32:1,16 38:4 38:20 41:2,12,15 41:24 53:8,23 55:9 62:10,18 63:1 66:13 84:17 85:3,6 89:23 90:8 90:13,18 91:14,22 95:12 106:3,11,14 106:15,19 107:5 108:5 109:4 111:1 111:15 112:3 113:23 116:8 119:22 120:6,13 120:19,23 121:22 121:24 122:8,18 122:22 123:8,14 125:1 126:1,16,24 127:7,13 128:2,13 131:14,18,22 132:7,12 133:12 135:21 136:5,16 136:24 138:7,8,13 139:8,11 140:3 145:9,12 152:12 152:16,19 153:10 153:12,17,21 154:1,13,17,23 155:1,6 158:19 159:4,10 160:5 161:19 162:12 163:8,14 166:14 167:8,22 168:6,8 191:2,16 192:23 194:18 196:11 197:17 210:8 211:4,5 216:10 220:6,7 221:21,24 223:8 224:13,15 224:17 230:12,23 231:3 234:7 235:4 235:18,20 237:1,9 237:24 238:8,16 244:4 245:4 246:4 246:10 247:23 248:10,24 249:8 249:17 250:7 252:4 255:4 256:22 260:21 267:1,9,17 268:5 268:19 269:19,21 270:18 272:24 273:5,9,13,21,24 274:7,14,20 275:4 275:10,19 276:4,6 277:7 279:17 280:8,13,22 281:7 281:22 282:14 284:20 288:23 289:2 292:4 296:8 306:3,5,8 307:7 307:12 308:12 309:13 310:4 313:12 314:6 315:20 316:16 326:14,17 330:3,9 330:23 331:1,4,11 331:18 332:23 333:20 338:14,21 344:11 349:24 350:3,5 351:12 352:21,22 353:5 354:11 355:3,7
**ovaries**
82:2,16 83:4,8,17 84:5 85:13 116:5 116:7,11 154:8 169:19,23 177:14 181:14 182:1,10 182:14 183:14 184:12 191:2 198:10 200:17 201:1 206:6,10,14 206:17 208:8 209:2,6,17,23 278:22 279:5 283:12 321:23 362:7
**ovary**
300:22 319:21 323:2,6,8,11 324:7 337:18,23 338:1 339:5,11,14
**overall**
110:20 217:11 230:24 292:2
**overarching**
293:11 295:14
**oversees**
219:14
**oversight**
70:4 95:19
**oversimplification**
214:12
**Overstreet**
3:23 8:5
**overwhelmed**
313:1,6
**oxidative**
134:21,24 135:5,7 135:12,15,19,23 136:2,4,15,19,22 137:15,17,20,24 138:6 198:24 199:7 200:10
**oxygen**
199:6
**oxytocin**
186:8 188:17

**P**

**P**
2:1,1,2 3:1,1
**P-346**
7:7 28:14 293:5
**p.m**
177:2,3 253:9,10 363:9,10,22
**page**
5:3 7:2 17:24 18:18 18:19 21:24 24:23 30:24 67:8,20 69:4,6,8,16 77:8,9 81:8,16,19 99:6 99:17 106:21 108:15 112:16 113:9 114:13,16 115:23 124:24 125:8,16,17,20,21 126:7,8 130:13 148:11,16 160:9 163:10,19 164:2 183:2 196:16 197:5 220:16

243:15,24 248:1 248:17 249:13 256:19,20 260:17 272:6,21 283:1,3 285:24 289:11,18 289:21,24 291:13 294:5 297:3,4 301:1 305:13 366:2 368:3
**pages**
21:23 68:9 71:5 124:21 193:16 210:12 367:5
**paid**
224:4,8
**pancreatic**
265:11,24
**paper**
27:6 84:12 89:17 95:6 100:16,17,19 101:15,21 104:3,6 104:10,16,19 105:22,23 106:1 106:22 108:8 111:11 112:7,11 112:13 113:2,21 114:11 117:20,21 126:21 127:2,4,4 127:18 129:22,24 136:11,14 155:3 159:16 160:2 161:6 162:17,20 162:21 163:1 164:8,19,20 165:18 245:23 246:23,23 247:13 249:21 259:13 280:10 282:19 314:24 315:10 316:3 320:7 335:7 335:8 336:11 338:2 339:7,13 361:24 362:1
**papers**
70:22 71:3 76:9 111:13 127:10,24 128:17 136:15 337:24
**paragraph**
163:11,21 166:4,5 244:1,2 248:14 272:7 286:1 288:4 297:5 301:3 321:6 321:9
**parallel**
245:1
**Pardon**
68:13
**Parmley**
5:19 32:17
**parsing**
133:9
**part**
12:15 27:17 31:15 38:23 41:10 46:3 49:4 52:23 82:22 86:3 90:9 103:5 104:13,23 105:16 105:22 123:3 126:11 144:10 149:14 157:19 173:13 174:21 180:12 195:9,16 215:10 219:1 223:22 228:18 231:24 279:11 291:4,16 314:19 318:2 319:1 336:15 341:10,13 345:10 347:6 358:18
**parted**
39:19
**participants'**
272:2
**participated**
207:21 350:7
**particle**
303:1 334:11 339:4 339:9,10
**particles**
182:14 184:5,12 185:22 186:11,23 187:22 188:2,7,23 189:3 190:4,9,10 209:16 283:11 303:16 334:15,20 355:16 356:16 357:10 361:7 362:5,9,16
**particular**
44:2 77:23 151:17 211:19 241:14 280:17 282:7 295:17 299:24 337:22 345:12 349:5 351:18 357:18 361:6
**particularly**
83:17 91:3 141:5 160:17 241:6
**particulate**
187:19 209:7 303:8 304:19,22 321:10
**parties**
364:14
**parts**
209:8 336:7
**party**
364:11
**pass**
284:2,3
**passed**
101:7 357:18
**passes**
303:20
**passing**
335:24
**pat**
69:17,18 336:13
**path**
182:18 329:1
**pathological**
62:9
**pathologist**
62:6 162:3
**pathway**
191:1,5 206:21,22
**patient**
171:14 328:18,20 329:3,18 330:3 350:10
**patients**
60:5 130:22 134:13 184:15 185:1 190:19 239:23,24 240:1 327:14,21 327:24 328:6,7,8 328:11,13,17 349:24 350:5,8,17 350:21 351:5,15 352:1
**pattern**
238:5 308:22
**pause**
271:6 315:22
**pay**
105:2
**PC**
2:2
**Pecan**
3:3
**peel**
359:11
**peer**
102:15,19,21 320:13,15,21 321:4
**peer-review**
103:5,16 105:9
**peer-reviewed**
27:21 95:11 103:10
**pelvic**
83:12 122:17,21 123:8 126:15 127:12,18 128:1 128:12 207:1,21 327:9,15
**Penninkilampi**
256:4,6 257:8
**Pennsylvania**
2:21
**people**
44:10,15 49:11 199:20 212:16 221:3 240:2 250:24 328:2 336:4 337:13 350:12 357:20 358:3,8,9 359:1
**perceived**
29:7
**percent**
56:2 274:13 275:10 275:19 306:24 308:5
**percentage**
55:22 60:3 75:20 76:3 273:12,23 274:23 302:4,9,14 307:10,11 327:21 331:23 341:15 362:22
**percentages**
303:3
**perfectly**
164:12,18
**perform**
42:13 241:8
**performed**
40:13 76:18 140:12 173:19 182:8 214:5,13 215:22 228:5
**performing**
252:17
**perineal**
17:2,7 27:4 82:1,12 83:3,10 91:21 107:4 109:3 110:24 111:14 117:6 140:2 147:2 152:18 168:14 181:13 183:1,13 187:6 189:9 198:9 200:16 201:5,24 210:7 211:3 214:6 230:10 235:3 247:22 248:10,23 249:16 250:6 283:13 284:18 306:16 311:12 319:22 338:20
**perineally**
166:22

**perineum**
183:7 206:22 231:5 232:4 296:11 301:9,16 302:1,5 305:9 321:11 334:12,21 339:19 340:17 341:9,17 341:22
**period**
23:14,15,17 40:21 44:24 96:1 145:15 168:7 261:9 262:9 277:17 279:17 280:7,14,18,21 281:7,22 282:14 311:6,23 342:11 351:3
**periodic**
23:12
**periodically**
309:23
**periods**
261:3 263:20 280:1 280:12,24 281:3 310:12,13
**peritoneal**
161:18
**Perkison**
79:21
**person**
308:19
**person-years**
212:6,10,17 310:15
**personal**
3:20 9:10 57:6 151:5 156:2,17 196:23 257:3 280:20 284:19 335:12 343:23 345:5,13
**personally**
156:19
**persons**
146:15 149:6 182:15
**Perspectives**
31:13
**pertaining**
182:9
**pertinence**
78:7
**pertinent**
42:5,16 43:4 68:4 70:17 76:22 167:10 186:22 214:18
**petition**
219:12
**petitions**
30:22 221:16
**petri**
300:7
**Ph.D**
1:14 4:5 5:1 9:18 28:1 59:21 364:5 367:4,12
**Pharmaceutical**
31:11
**pharmacologists**
220:22
**Philadelphia**
2:21
**phone**
37:23
**phrase**
82:5,8
**phrasing**
83:13
**physical**
13:17
**physician**
10:2 55:16 79:22
**physicians**
207:23 208:4 213:20 220:21
**physiology**
84:4
**picked**
259:23
**pickled**
229:10 357:11,19 360:1,2,5,9,11
**piece**
51:4 87:15 119:23 149:17 282:7
**piecemeal**
40:20
**pieces**
18:11 42:23
**Pier**
70:8,9 148:12,18 149:11 150:1,10 151:17 158:2
**Pier-47**
7:5 148:18 149:11 150:2,9,19 151:10 152:2 158:2,7
**pipe**
145:21
**Pitocin**
188:14
**Pittsburgh**
117:11
**place**
97:18 315:18 364:8
**placed**
227:8 314:5
**places**
162:5 254:16
**placing**
245:1
**plain**
211:21
**plaintiff**
28:14 46:2,21,24 50:21 51:24 57:14 72:14 75:11 171:24
**plaintiffs**
2:11 8:18,21,23 10:12 15:5 23:1 35:7 44:9 47:14 49:9 53:15 57:12 78:20 80:6,9 96:13 117:24 118:13,21 142:24 178:2 224:5
**plaintiffs'**
2:6 13:1 20:3 24:6 25:11,15,17,20 26:17 27:10 30:10 32:3 33:5 34:16 34:19,24 35:19,24 36:5 38:14 39:3 39:16 45:20 47:5 49:14 51:1 53:17 65:20 71:13 72:5 75:18 101:7,10,15 102:13 103:22 104:14,24 105:12 105:18,23 108:22 141:22 148:22 285:12 346:2,5 347:12 361:21
**plans**
85:9 352:2
**plant**
146:12
**plasters**
146:1
**platy**
137:10
**plausibility**
230:1,10
**play**
303:22
**players**
233:15
**please**
8:15 9:24 30:12 53:12 73:24 87:7 98:19 105:15 113:15 119:10 164:5,9 165:10 243:18 301:2 343:15 365:3,8
**pleurodesis**
129:5,7,13 130:9 130:23
**PLLC**
3:2
**plugged**
280:16
**pocket**
123:24
**point**
38:1 40:3 42:11 49:19 86:23 107:1 136:12,13 142:11 147:13 148:5 187:24 190:2 194:10 202:11 209:21 223:2 233:14 236:6 289:3 292:3 295:17 311:10 313:9 326:7 331:2 340:13 344:3 346:8 352:9
**pointing**
112:23 294:15
**poison**
311:1,18
**policies**
91:8
**polite**
74:10
**polycyclic**
358:14
**polymorphisms**
314:14
**pooled**
166:6 192:18,21
**population**
258:19 265:14 308:15 309:6,7 332:1 334:2
**population-based**
239:17 240:13 244:21
**populations**
166:17 254:16
**portion**
347:17,19
**portions**
221:8 336:23
**pos-**
187:1
**posed**
351:17
**poses**
214:7
**position**
30:3 69:21,22 90:7 94:21 185:24

186:22 187:3 188:22 204:14,20 205:6 206:4,10 234:15,20,23 246:24 338:11,17 338:19
**positions** 30:22 93:21 191:23 205:19
**positive** 72:9,13 107:3 109:8,20,21 110:7 110:23 145:18 154:20,24 166:11 191:14 210:6 221:23 223:5,7 245:3,9,13,18,20 261:22 263:8 316:8 354:14
**positives** 187:12
**possession** 12:18
**possibilities** 328:23
**possibility** 244:23 262:7 278:17 312:4
**possible** 90:15 111:22 178:21 179:14 187:11 189:2 241:24 242:9,12 243:11 244:14 262:3 265:20 266:8,13 267:17 268:7 272:14 288:7,15 355:19 356:4,6,17
**possibly** 16:9 225:8 229:3 249:19 266:24 267:9 303:18
**posterior** 301:23
**potential** 37:5 97:19 134:10 136:24 158:18 159:3 161:22 170:20 171:21 172:22 180:4 241:9 268:9,21 276:14 277:14 294:1 326:9 356:9
**potentially** 77:24 221:20 233:22 360:8
**pound** 100:7
**powder** 1:4 8:11 17:3,8 22:2,4 23:4,11 30:4 32:1 38:4,18 48:20 52:4,8,13 53:8,23 55:1,8,9 62:23 63:20 64:2 64:10,13 65:5,8 66:13 72:18 73:1 73:7,8,17 81:19 82:1,13,15 83:3,7 83:10,18 84:17 85:2,6 87:16 90:8 90:13 91:13 107:4 107:13 108:5 110:24 114:17,22 115:24 132:11 133:3,19 139:8,10 139:12,16,20 140:21 141:4,5,12 141:16,20 143:5,7 143:9,24 144:8,16 144:16,20 147:3 147:11,14 148:6 148:13 151:11 152:3,18,23 157:14 158:10 175:8,15 176:7 177:9,22 178:3 181:13 182:1,23 184:14 192:22 193:19 194:6 198:8 199:4,12 200:1,16,18,23 201:4,16,18 202:1 202:6,18,21,24 206:5 210:8 211:3 211:6 216:9 219:11 220:6 230:11 231:4,7,11 231:19 232:2,9 257:3 260:22 262:10 270:18 272:2,14,24 274:22 275:6,11 275:20 288:6 296:8 298:7,24 299:5 302:4 305:22 306:16,22 307:1,8,12,23 308:2,6,12 309:11 309:19 310:3 311:9,12 313:11 325:13 326:12,18 340:6,16 341:8 350:10,13 351:8 351:11 352:9,14 352:20,24 353:10 353:16,21 354:2 354:10 355:2,6 357:22 358:23 359:5,23
**powdered** 134:17 189:22,23 305:3
**powders** 140:3,3,15 167:14
**power** 211:15,17,22 251:5 251:10,21 252:8 258:17
**practically** 245:20
**practice** 31:16 38:24 47:21 60:4 70:13 76:4 328:4 358:17
**practices** 1:5 41:21 76:1 100:15
**practicing** 335:1
**pre-2014** 276:20,24
**preamble** 28:7 293:4,8 294:16,21,23 295:12
**precautionary** 97:13,15,17 98:7 98:10,16 99:15,18 99:20 100:4,6
**precept** 97:21
**precision** 37:21
**predecessors** 147:20
**Pregnancy** 318:13
**pregnant** 333:2
**premenopausal** 255:10
**preparation** 19:8 43:22,24 108:17,20
**prepare** 24:4 42:10 43:19
**prepared** 17:9 24:4 50:6,9,12 126:13 346:23 347:10,11
**preparing** 18:14 65:11 284:17
**prescribed** 330:16
**presence** 49:17 72:10 134:24 138:16 169:6 184:12 265:5 319:1
**present** 142:21 169:16 170:6 175:21,24 244:4 266:11,14 357:14
**presentation** 324:7
**presentations** 345:12
**presented** 134:1 209:22 325:19
**presently** 85:10
**presumably** 331:17
**pretty** 31:18 43:5 68:7 85:19 168:8 206:23,24 217:3 297:12
**prevalence** 306:18
**preventative** 99:22
**prevented** 325:19
**prevention** 100:7 233:23 306:17
**preventive** 58:9
**prevents** 202:11
**previous** 48:4
**previously** 10:24 28:13 29:9 32:23 42:3 48:2 51:14 56:14
**primarily** 134:11 145:24 146:4 153:20 160:24 161:2 168:16 181:17 279:6 328:3
**primary** 93:15 182:24 205:20 206:1 210:23 360:7
**principle** 97:13,16,17,24 98:7 100:6 311:18 356:10

**principles**
99:13
**print**
24:7
**printed**
320:9
**prior**
65:24 96:17 107:1 189:19,21 272:2 277:3,23 301:5 364:4
**privileged**
13:7
**probable**
178:21 179:14 226:21
**probably**
11:8 56:1,12 60:9 66:23 151:20 178:17 201:21 205:12 226:17 227:1,9 277:1 279:8 308:21 312:8 327:22 334:13 335:8 338:2 348:12 350:7,19 357:24
**problem**
312:15 345:3
**problems**
93:13 134:11 312:21
**procedure**
319:2 330:17
**procedures**
11:10 155:9,14
**proceeded**
214:20
**proceeding**
28:15 38:9
**proceedings**
4:3 8:1 10:9 363:21
**process**
28:11 43:18 95:19 102:17 103:5,9,16 105:9 120:10,12 122:11 171:18 173:20 198:24 214:13 241:2 311:22 312:10,23 313:1,15 314:20 340:3,13 341:12 341:13 357:18 362:3
**processes**
121:11 127:20 156:16
**produce**
154:1 216:2 321:13 362:16
**produced**
14:14 20:1 72:4 75:21 149:6 313:14
**produces**
82:13 114:18 115:24 116:6,10 292:4
**product**
22:4,6 69:24 72:11 77:23 132:18 151:9 152:3 296:10 306:1 350:22
**production**
133:12
**products**
1:4,5 3:20 9:11 22:2,2,5,7 23:4 49:17 57:16 60:15 73:20 75:16 140:13,21 141:5,6 141:13 143:5,7,9 144:8 146:1 147:3 147:11,15,22 148:7,13 151:11 151:13,21 152:4 184:20 214:7 219:11 284:19 343:24 344:23,24 345:2,5,13,17 350:10 353:16,21 354:2,10 355:2,6
**Products'**
155:9
**profession**
335:4
**professional**
1:18 19:23 42:4 55:24 58:16 61:11 138:1 364:2,19
**professionals**
220:23
**professor**
58:9 61:8
**program**
178:24 344:16
**progress**
147:23 300:11
**progression**
280:4 303:16
**proliferation**
115:2 139:1
**promotion**
116:13 120:13 313:18
**propensity**
212:23 304:18
**proper**
172:15
**proportion**
140:7 224:16
**proposal**
136:21 219:9 248:15
**proposition**
125:23 126:15 128:5 183:6 287:6 287:23
**propositions**
54:17
**propounded**
367:6
**prospective**
237:7
**protection**
179:1 314:19
**protective**
135:10
**proved**
97:20
**proven**
111:3
**provide**
57:5 59:16 72:15 79:11 84:5 219:10
**provided**
25:11,14,17,19 26:16 27:10 30:10 33:4 34:16,19 35:6,18,24 50:3 51:10 53:3 59:5 75:17 77:21 78:11 78:20 101:14 102:12 142:23 318:2 346:19 349:13
**providing**
56:15
**proving**
218:6
**proximity**
323:4 341:23
**psoriasis**
122:4
**psychological**
359:7
**PTI**
3:15,15 9:13,14
**public**
1:21 61:9 79:18 89:21 93:5,10,21 93:23,23 94:7 96:1 100:15 239:8 344:15,16 364:4 364:21 367:20
**publication**
5:9,11,12,14,18,20 6:5,6,7,9,10,13,15 6:16 51:3 63:18 77:3,15 91:16 94:9,14 96:18 101:14 102:3,14 102:19 103:19 106:23 123:7,17 136:3 138:5,11 213:5,8,9 214:18 321:1
**publications**
62:22 64:17,22 70:22 76:13,23 77:10 103:10 108:6 135:19 142:1 213:12 337:18
**publicity**
272:1
**publish**
76:9
**published**
31:12 51:14 61:13 61:16 63:6 64:9 64:12 71:3 85:5 85:17 86:17 92:24 100:18 103:1 107:1 117:2 119:10 146:8 185:5 204:20 206:4 208:19 214:3 216:1,5 260:13 267:2 281:3
**pull**
192:9 295:4 314:24 315:23
**pulled**
289:18
**pulling**
123:24 349:20
**Pulmonary**
77:11,16
**pulmonologist**
62:1 79:21
**pure**
353:5,9,12,17
**purport**
190:14
**purpose**
28:8 33:14,20 95:15
**purposes**
283:9 349:4
**pursuant**
364:10
**purview**

13:6
**pushes**
334:11
**put**
78:10 124:1 207:18 230:6
**putative**
28:12
**putting**
346:15

**Q**

**qualifications**
142:9,10
**qualified**
17:16 156:11
**qualifier**
309:16
**qualifying**
294:19
**qualitative**
173:8
**quality**
40:14 69:23 70:5 70:11 157:24 228:5
**quantified**
206:16 340:9
**quantify**
143:22 231:23 339:18 340:15 341:7
**quantities**
73:19 74:21 75:1 169:15 321:13
**quantity**
201:21 232:2,9 257:2 354:4
**question**
11:13,18 12:3,6 17:2 18:10 20:2 22:18,21,24 23:3 32:4 38:2 39:16 40:10,12 53:11,18 62:14 65:16 68:6 81:15 86:2 87:24 92:2,12,13,14,15 92:18,21 107:17 110:10 112:9 113:14,19 115:14 116:22 124:10 127:23 128:9 135:17,24 148:4 153:8 156:11 158:24 165:5,8,10 165:13 171:13 172:4 180:15 206:15 214:15 215:2 216:3 263:16 285:4,4 290:24 292:7,9 293:7 294:17,19 296:18 298:21 300:18 304:11 307:2,5 312:22 316:7,21 317:13 321:18 338:13 344:4 347:9 349:1 349:15,18 351:1 351:17 352:2 358:21,23 359:21 360:3 362:2
**questioning**
33:23
**questions**
15:6 23:7 33:9,17 34:3 85:24 87:3 112:6 113:1 150:3 156:6 159:13 162:24 164:21 168:24 181:22 195:14 218:18 245:1 256:16 278:7 283:24 285:23 301:5 315:7 343:7 363:4 363:14 367:6
**quickly**
282:9 303:2
**quite**
56:5 90:15 213:3 252:16 264:1 329:19
**quotation**
245:8
**quote**
91:24

**R**

**R**
2:1 3:1
**radar**
204:3
**radioactive**
183:17 187:19 189:5
**radionuclides**
189:3
**ran**
29:20 33:6 36:2 336:1
**randomly**
193:23
**range**
309:23 333:14
**ranging**
276:22
**rapid**
122:12 132:19 304:19
**rapidity**
302:19
**rapidly**
278:21 279:4,10
**rappel@seyfarth...**
3:18
**rate**
45:10 297:19 303:18,20 306:11
**rates**
121:14 167:3,22 168:6
**ratio**
137:8 232:14 233:1 245:13 261:22 263:7,9,12 269:3 272:22 276:21 277:23 278:5 331:24
**rationale**
136:21
**ratios**
126:9 255:10 259:2 310:21 332:4 333:9,14,17
**RDR**
364:18
**reach**
79:5 116:5 173:10 177:14,19 182:1 201:1 206:17 215:14 263:8 319:21
**reached**
141:11 182:14 311:11
**reaches**
169:18,23 177:16 177:18 206:13 362:6
**reaching**
215:8
**reactant**
318:11
**reaction**
287:1,19 317:1,19 317:20 322:22
**reactions**
119:21 121:6 312:21
**reactive**
199:6
**read**
44:15 100:1,24 107:9 112:13 127:17 130:16 154:16 166:19,20 222:2,3 250:3 252:24 267:8,11 290:15,19 297:12 297:16 336:6 337:19 365:3 367:4
**reading**
91:23 92:7,15,16 134:6 162:16 193:17 196:19 222:23 243:15 244:1 248:7 272:11 314:3 342:18 348:5,14
**reads**
286:1
**ready**
113:13,19 321:12
**real**
270:4,8
**really**
105:2 115:13 143:6 186:22 295:12 309:1 312:11 317:14 336:12 349:15
**realtime**
1:21 296:23 364:3 364:20
**reason**
94:1 132:17 133:22 133:23 134:8 241:20 245:4 286:13 300:4 302:17,21 351:22 365:5 366:4,6,8 366:10,12,14,16 366:18,20,22,24
**reasonable**
227:24 228:12 330:18
**reasonably**
39:11
**reasoning**
216:16
**reasons**
93:10 160:12 238:21
**reassert**
10:23
**Reath**
2:19 9:3
**recall**
14:6 29:12 31:22 37:10 47:22 48:3 69:12,14 70:7,24 79:13 90:10 101:16 105:7

142:11 187:16 240:23 241:7,24 244:20,23,24 269:7,8,13,18 270:3 272:2,15 276:11,14 277:14 280:6 286:19 301:13 338:3 340:22 341:14
**recalled** 271:21 274:21 275:6
**recalling** 281:5
**receipt** 365:16
**receive** 10:15 43:24 346:6
**received** 10:20 59:21 143:16
**Recess** 89:5 177:2 253:9 363:9
**recessed** 363:21
**recited** 146:18
**recognize** 225:18 357:1
**recognized** 208:12 213:13,17 233:15 267:21
**recommendation** 143:14
**reconsider** 203:14 204:1
**record** 8:4,16 10:23 14:16 89:4,8 177:1,5 247:16 253:5,8,12 363:8,12,19
**recorded** 314:9
**recording** 232:6 321:16
**records** 76:21 149:8,12,20
**recruit** 239:20
**rectal** 198:12 199:13,23 200:11 202:24
**redline** 337:2
**redo** 43:2
**redox** 181:3
**reduce** 131:21,22 147:21
**reduced** 191:6,7 194:13 196:13
**reduces** 132:11 240:22
**reducing** 306:14
**reduction** 132:6 193:24 194:17
**refer** 21:24 22:1 23:11 29:21 33:16,22 81:10 115:17 187:18 190:13 192:8 211:14 235:2 258:5
**reference** 20:19 24:22 35:15 35:17 51:18 210:11 296:6
**referenced** 7:1 143:12 158:5 216:19,24 217:3 280:11 296:10 347:5
**references** 15:11,14 17:24 18:3,7,17 19:3,17 20:5,15 24:11,15 29:9 32:24 33:11 35:22 52:17
**referral** 328:3
**referred** 24:21 102:3 151:24 184:8 192:15 210:12 270:13 328:1,6 330:2
**referring** 22:3 110:16 121:13 158:4 205:23 211:16 287:17 305:21 321:21,24
**refers** 211:17 228:4
**refine** 43:1
**refresh** 71:22 126:19 164:1 183:15
**refute** 54:19 245:11
**refuted** 54:10,16 217:22,24 218:4
**refuting** 328:24
**regard** 290:7 291:6 293:14 299:19 304:13 318:16
**regarding** 18:9 22:18 36:17 37:6 41:18,23 55:17 63:19 64:21 65:4,8 69:23,23 72:10,19 75:15 78:24 93:16 138:1 154:16 188:5 267:13 292:2 298:10,13 304:20 326:9 337:17 345:4 358:6 361:24
**regardless** 78:7 304:20
**regards** 294:22
**region** 187:6 198:9 200:17 201:6 202:1 311:13
**Register** 134:7
**Registered** 1:20 364:3,19
**regression** 272:18 277:18
**regular** 27:17 31:15 210:7 231:6,19 284:18 309:18 310:1,3,20 326:13,19 327:18
**regularity** 301:11 304:12 305:10 321:8
**regularly** 199:20,22 231:4 308:11 327:14 357:14
**regulated** 361:9
**regulation** 328:15
**regulatory** 97:7 219:13
**Reid** 6:6 159:15 160:2
**rejected** 219:11 225:6
**rejects** 203:6
**relate** 17:1 18:4 48:5,7 123:13 124:3 162:10 236:15,22 354:17,20
**related** 41:8 48:15 49:18 77:18 91:10 136:15 161:1 248:12 249:21 269:15 285:6 331:1 360:8 361:13
**relates** 1:7 37:22 41:11 55:18 66:13 82:11 91:8 95:12 117:5 212:6 337:23 339:8
**relating** 31:24 55:7 62:9,18 62:22 63:1 72:23 77:22 86:7 120:1 131:13 136:24 138:11 167:9 192:22 234:7 252:3
**relation** 112:2 126:23 209:24 212:13
**relationship** 30:4 38:19 41:3 47:5,8 48:11,14 51:6,8 53:22 54:11 58:4,12 86:18 90:7 91:17 121:10 127:6,8,19 133:11,14 136:17 140:2 154:16,20 159:3 210:7 211:3 256:22 262:24 263:1,18 265:6 268:5 284:18 286:15 329:21 353:4 354:10 359:1,6
**relative** 145:17,19,23 146:15 160:19 215:15 236:14 245:14 258:18,23 259:2,6 331:24 332:4 334:4 364:13,14
**relatively** 267:16
**relevance** 349:18
**relevancy** 349:8
**relevant** 42:24 334:10

348:18
**reliable**
78:6
**reliance**
101:21
**relied**
76:12,19 77:1,4 88:8 232:12 242:21 271:16 346:17,21
**relies**
205:20
**relook**
246:17
**rely**
70:13 71:9 76:6,8 93:4 97:6 104:22 174:3 205:17 242:18
**relying**
18:20 19:15,16 123:1 201:3 281:11 282:13 354:17
**remains**
169:22 324:9 339:11
**remember**
37:20 165:12 183:20 269:20 349:16
**remembered**
274:21 276:4
**reminder**
343:21
**remove**
200:5
**removed**
360:22
**render**
38:12
**rendering**
34:11
**RENEE**
3:17
**Renée**
9:9 343:15,22
**repair**
312:14,22 313:1,7 314:20
**repeat**
11:14 53:11 107:16 165:15 296:17 301:4
**repeated**
305:15
**repeating**
165:10
**rephrase**
11:15 336:16 344:5
**replacement**
268:15,18 269:5
**replete**
140:14
**report**
5:5 13:12 14:4 15:9 15:15,16,22 16:3 16:16,19 17:10,15 17:16,23 18:11,14 18:18,21 19:3,8 19:11,13 20:1,4,6 20:20 21:1,7,15 21:21 22:10 24:15 24:16,23 25:1,7 25:22,24 29:11 42:10 43:13,18,19 43:22,24 44:1,13 45:15 49:4 50:3,5 50:6,9,9,12,12,14 50:17 54:14,21 57:22 65:11,17,19 73:3 80:14 81:8 81:10,16 89:12 92:8,9 94:3,4 100:18 105:20 114:13 117:13,15 122:10 126:20 132:9 145:12,22 146:9 148:10 155:22 158:7 181:24 183:3 192:16 205:9 209:1 210:13 211:12 215:11 216:2,21,23 217:6 229:22 230:22 251:8 255:24 256:7,9,18 270:12 282:4,8 284:17 285:9,22 291:2 292:10 294:12 297:4 299:20 309:18 336:5,6,23 346:18,24 347:5 347:20,23 348:9 348:11 349:5 352:13 355:23
**reported**
84:11 109:8 113:22 157:22 166:7 174:24 175:2,5 185:14 191:10,11 246:2 261:13 283:12
**reporter**
1:19,20,21 9:16 12:6 364:3,3,3,19 364:20,20
**Reporters**
1:19 364:2,19
**reporting**
274:5 322:5,9,13 322:16
**reports**
19:7 40:14 49:11 49:13,16,24 50:24 52:7 67:21 68:9 72:8,9 116:14,23 117:2 120:2,3 132:3 140:1,14 141:21 142:2,5,21 142:24 143:3 146:10 310:16,19 353:8
**represent**
18:13 105:1 284:13 343:23
**represented**
345:21
**represents**
19:5 226:12 233:21
**reproductive**
26:11 27:13,20 82:4,12 83:6,11 84:4 86:12 87:10 88:2,14,19 116:18 119:4,13 181:16 181:18 183:1,8 185:7 186:24 188:6,8 191:3 200:18 206:11 207:17,24 301:10 301:16 303:3,21 304:14 305:9
**request**
14:7 51:11 72:21 108:22 285:11
**requested**
143:14 327:16 364:11
**requests**
12:16
**require**
100:9 173:9 241:16 306:20,23
**required**
100:10 171:3 328:14
**requiring**
217:2
**research**
27:18 31:16 38:21 40:13,15 62:9,18 63:12,17 64:8 76:5,15,18 87:13 91:8 93:15,17 105:17,20 126:20 129:17 132:3 138:5,11 139:11 139:24 140:11 158:18,23 159:2 159:12 165:21,21 178:23 225:24 231:1,1 238:4 248:16 249:6 251:8 254:15 285:11 300:14 301:21 310:19 313:8 332:3 334:8 347:2,7,24 348:13 349:13,17 353:8 354:1,3,9,12
**researched**
168:16 284:21 285:5,6
**researching**
118:4 347:18
**reside**
199:3
**residence**
209:21
**residency**
350:7
**residents**
60:7 80:19
**resides**
339:4
**residual**
200:6 266:7
**respect**
17:6 33:9 91:13 103:16 114:10 131:9 173:22 174:5 175:14,18 187:4 205:6 206:9 234:6 237:15
**Respectfully**
359:16
**respiratory**
77:14 134:11
**respond**
12:15 34:3 164:21
**responding**
30:21
**responds**
292:7
**response**
12:10 13:10 23:23 33:17,23 113:24 115:1,6,8,12 138:24 219:8 285:3 321:16 322:13,16 362:17
**responses**
321:13 322:6,9

350:20
**responsible**
70:10 91:7 230:12
352:21
**responsive**
12:18 15:1 20:2
**rest**
265:14 323:15
**restated**
100:6
**restates**
92:23
**restating**
210:22
**result**
16:21 88:9,11
185:8 191:6
200:11 201:15
212:17 221:23
245:3 285:10
305:17 306:17
311:19 313:17
314:16 334:6
348:2
**resulted**
64:17 146:10
203:13
**resulting**
87:10 88:3,20
137:18 310:21
**results**
72:10,13,19 82:1
83:4,7 86:12
111:6,10 120:13
151:16,18 157:23
181:13 191:2
194:9 196:18
215:23 222:21
223:18 232:4
245:6,16,18,19,20
260:17 266:4
269:19 277:4
326:4
**retained**
32:3 36:16 46:19
48:20 57:15 65:19
96:14

**retention**
249:7 347:15
**retrograde**
183:22 184:3
**retrospective**
242:2 243:10
244:13 260:12
269:11
**return**
365:14
**revel**
358:17
**reverse**
306:14
**review**
18:14 19:22 27:2
27:16 30:6 31:15
31:23 39:22 40:1
40:19 42:12,13,15
42:17 43:7,8 44:1
45:14 46:5 49:5
50:5,8 52:20 53:1
65:14 66:23 68:14
68:15 72:22 73:2
75:11 77:14 79:6
80:23 86:3 90:6
90:10 95:11 98:19
99:9 102:20,22
108:19 113:1,4,10
113:17 164:8,19
164:20 193:13
203:12,22 205:13
205:17 214:14
220:10,13 223:13
224:20 242:21
257:22 282:4,17
291:14 316:5
320:13 321:4
348:2
**reviewed**
5:8,21 6:3 14:3
19:8,14 20:18
35:9,12,14 40:21
42:8 43:9,16 49:4
49:12,13,15,24
50:2,11,14 51:1
51:12 52:7,11,14

66:3,8,10,10,11
66:16,20,23 67:13
67:22 68:12,20,23
69:13 75:7,9,15
75:23 76:2 87:8
89:11 91:11 95:6
100:17 102:16
108:16,21 142:4
142:17,21 143:4,8
217:5 219:1 221:6
227:8 242:18
281:7 290:3
295:23 309:8
320:15,21
**reviewing**
67:1 211:11 347:24
348:6,14
**reviews**
215:24
**revisiting**
278:17 342:4
**Rheumatoid**
121:18
**right**
10:3,9,13 11:5 13:8
15:9 19:18 20:15
21:8,15 24:1,12
25:1,18 26:12,15
27:7,11 28:1,15
28:19 31:2 32:12
34:11 38:5,21,22
38:24 39:7 44:24
45:2 49:5 50:13
50:19 52:18 53:18
54:22 56:16 59:19
59:22 60:1 61:21
62:10 63:7,22
67:5 68:21,24
71:7 81:5,9,20
83:8,20 84:18
85:3 89:18 91:1,5
91:22 94:10,19
95:1,8,22 96:6
98:2,11,12,17
99:15,16 100:12
100:18 101:1,11
101:18 103:2,24

106:8,12 107:13
107:22 108:1,6,9
108:18 109:9,12
109:15 110:4
111:15 112:6,16
112:21 113:18
114:1,10,14,19
115:2 116:2 117:9
117:14,18 118:16
121:19 122:13
123:23 125:2,6,10
126:2,5,10,12
128:17 129:4
130:10,14,17,20
130:24 131:4
132:7,12 133:5,20
134:16,22 138:14
138:19 139:17
142:5 145:6
146:20,23 147:1,3
148:14,19 155:6
155:10 156:5
157:15,20 158:3
158:20 159:5
160:6,13,19
162:13 163:1,8,23
165:18,22 166:8
166:21 167:15
169:8,9 170:1,4,8
170:22 171:8
172:2,12,22 173:1
174:22 176:14,16
178:12,18 179:10
181:16 182:11
183:3,9 184:9,16
184:18 185:1,24
186:8 188:9,16,24
189:10 191:12,23
192:16,19 193:2,9
194:2,9,20 195:4
195:12,16 197:2
197:24 198:8
199:5,15 200:21
201:1,19 202:3,7
202:15,19 203:4
203:17 204:16,23
205:1 206:3 208:1

208:9 209:9 210:3
210:9,13 214:8
215:5 216:6
218:22 219:2,15
219:23 220:18,23
221:8 222:17
223:14,23 224:5
225:4,24 226:18
226:22 227:10,13
227:19 229:17
230:1,16,17
232:11,14 233:2
234:21 235:14,16
236:16 238:24
243:7,13 244:7,17
246:24 247:13,23
249:1 250:18
252:13 253:18,19
254:3 255:1,18
256:13,23 257:4,9
257:13 259:8,20
260:4,14,22 261:6
261:11,18 262:11
262:17,21 263:2
264:4,8 265:3,8
266:5,15,22
268:12 269:16,22
270:4,14,21
271:10,13,17
272:3 273:1,5,15
274:3,9,16,22
275:2,7,8,12,21
276:7,15,24 277:8
277:24 278:22
279:18 282:12,23
283:14,20 285:19
291:21 293:9
299:16 301:12
309:4 311:4 312:2
315:5 333:13
**right-hand**
160:9 243:24
248:15 272:7
**rise**
20:18 238:12
245:14
**risen**

217:2
**risk**
27:4 84:18 90:13 90:17 91:14,22 95:12 96:10,17 99:3 107:4 110:13 113:23 121:21 122:8 126:2 132:7 132:11,23 133:3 134:2,2 145:17,19 145:23 152:19 162:11 163:14 166:18,22 172:11 172:15 173:8,13 173:20 174:21,23 190:20 192:23,24 193:22 211:5 214:5,7,12 215:15 220:7 222:1 231:3 232:14 236:4,14 244:4 245:14 247:23 248:11,24 249:17 250:7 254:2 258:18,23 259:3,6 260:20 262:6,6 267:1,10 267:17 268:19 277:7 291:23 299:12,14 305:17 306:13,13,15 308:12,15 309:13 310:4 311:9,13,16 311:19 312:1 325:8 330:14 331:4,10,13,18,24 332:14,16,23 333:3,4,6,10,22 334:1 338:14,21 350:15 356:12 360:10 361:17
**risks**
146:15 160:19 330:13 332:4 334:4
**RNA**
314:12 318:24
**Roberta**
79:23,24
**rooms**
134:19 342:22
**rose**
109:22
**rotations**
207:20
**roughly**
274:5 279:19 303:8
**roulette**
251:23 252:4
**route**
82:19 179:3,19,21 181:20 182:24 298:10
**routes**
179:11
**routine**
23:12 328:14
**routinely**
321:11
**Royston**
3:15 9:14
**rule**
227:23 228:11 357:16 364:11
**ruled**
140:10
**running**
296:23
**runs**
346:10
**Russ**
36:22

**S**

**S**
2:1 3:1
**S-A-E-D**
27:24
**Saed**
27:24 51:5,9,19,21 313:15,21 314:5 315:16 316:8 319:11,20 320:7 361:20 362:1
**safe**
312:5,9 325:3 355:11
**safer**
359:10,10
**safety**
30:3 214:7
**SALES**
1:4
**sample**
187:12 193:24 251:9
**samples**
143:14 190:3
**San**
3:4
**satisfy**
43:4
**Saturday**
1:11
**saved**
233:22 305:17
**saw**
35:22 340:2
**saying**
127:21 245:11 279:21 287:20 332:8
**says**
98:8 244:10,18 249:4,11,12 250:11 288:22 294:4 321:3,22 329:4 339:14 357:16
**schedule**
351:3
**scheduled**
189:18
**Schildkraut**
6:16 255:13 270:12 270:16 271:5,12 277:15
**school**
61:9 79:18 207:19 239:8 281:1 344:16 350:7
**science**
94:5 105:2 342:8
**sciences**
26:12 27:14,20 59:18
**scientific**
19:6 51:4 98:1,9 99:23 120:17 175:1 204:8 213:18 218:6 220:11 221:14 222:6 223:14 224:16 269:14 313:8 339:3,13
**scientist**
62:4 70:9
**scientists**
150:23,24 213:20 220:21
**scope**
344:10
**Scott**
76:16
**screen**
204:4
**screening**
5:15 30:13 89:15 330:18
**Seal**
129:20
**search**
25:13 34:20 36:3 40:12,23,24 41:1 41:5,10,15 42:7 42:24 43:2 79:6 214:17 295:9 349:20
**searchable**
342:14
**searched**
41:1
**searching**
315:2
**second**
50:17 54:4 81:24 82:9,10 99:19 125:8,16 145:15 163:20 166:3,5 181:12 244:1 247:24 248:17 273:3 331:21
**second-to-last**
163:11
**secondary**
82:19 181:19 331:17
**Secondly**
215:21
**secretions**
200:7
**section**
24:16 112:14,18 113:6 115:17 124:24 125:22 157:23 249:13 291:7,11
**see**
18:1 30:12 40:13 41:17 60:5,11 67:15 69:9 77:5 99:4 109:5 149:23 155:3 183:18 218:17 255:6 260:18 263:1,5,18 272:9 277:19 278:2 281:19 286:4 287:10 290:4 292:24 297:4 315:20 316:23 317:19 319:16 327:14,24 328:11,13 335:23 339:24 340:14
**seeing**
167:7,9 338:3 342:12
**seek**
241:19
**seeking**
348:13
**seen**
16:17 84:11 139:11 167:21 208:19 321:16 332:4 337:16 341:6

342:21 351:5
**selected**
71:12
**selection**
221:22 239:16
**self-report**
243:11 244:14
**send**
346:6
**sense**
336:9
**sensitive**
209:16 210:1 241:6
**sent**
14:10 328:17
**sentence**
99:19 107:9 112:22 286:1 287:20 290:18 301:7
**sentences**
113:13 286:22
**separate**
21:1 28:4 149:19 347:22 348:3
**separated**
310:14
**sequestered**
132:20 362:18
**sequesters**
116:2
**sequestration**
171:19
**series**
168:23
**serous**
153:20 212:19,20 212:21 237:2
**serve**
58:8
**served**
10:24
**service**
14:3 59:16
**services**
1:23 3:23 8:6 56:16 58:7,24 59:6
**serving**
58:23 59:9 105:11
**session**
312:12
**set**
15:11 16:14 19:6 19:17 38:13 43:13 54:15 81:7,18 95:15 155:22 364:9
**sets**
220:16
**setting**
54:15 57:7,10
**settings**
160:18 207:20
**seven**
297:8
**seventh**
58:15
**Seyfarth**
3:17 9:10 343:23
**shake**
340:16
**shakes**
340:8
**share**
24:6 35:23 44:13 117:23 346:7
**shared**
80:17 346:1,1
**Shaw**
3:17 9:10 343:23
**sheet**
146:13 365:6,9,12 365:15 367:7
**shield**
314:20
**shipped**
151:20
**short**
86:24 310:12 311:6 343:4 363:6
**short-circuit**
14:12
**shortcut**
281:19
**shorten**
311:22
**shortly**
344:9
**show**
25:20 72:15 84:17 88:9 92:9 117:15 119:8,20 124:13 132:10 151:1 185:6 200:10 202:17,23 209:6 210:6 237:23 238:4,7,15 245:13 246:8 253:24 255:3,17,20 257:7 262:9 268:5 313:15
**showed**
72:16 109:21 117:12,17 145:23 146:14 245:3,9 255:8,9,14 313:11
**Shower**
22:3,3,5,6
**showing**
237:3 318:17
**shown**
72:12 88:11 112:1 119:2 139:12 144:10 236:23 237:8 253:21 301:11 303:16 331:14 354:13
**shows**
192:23 213:1 231:2 238:4 260:20 273:3,7
**shutdown**
221:7
**sic**
26:1 144:21
**side**
248:15 272:7 335:22
**sign**
365:8
**signal**
211:19
**signature**
364:11
**significance**
109:23 238:13 245:15 254:6 258:24 259:7 261:9,17 262:5 263:11 276:24
**significant**
55:16 87:16 100:14 109:9 110:3,11 143:19 147:21 159:11 166:12 235:9 240:21 246:2,9 253:22 254:1 257:16 262:16 263:8,9,12 275:14 277:22 278:5 310:21 326:23 334:6 345:3 352:19 354:14 360:19
**significantly**
196:22 198:2 201:22 275:21 277:6
**signing**
365:10
**silicate**
180:13
**similar**
83:15 116:21 162:1 166:7 201:15 300:3 358:7
**similarity**
106:24
**simple**
68:7
**simplicity**
289:18
**simply**
61:7 136:3 245:17 251:12 252:16 254:14 334:14,16 340:21
**single**
221:19 299:13 314:13 339:19 340:16 341:8
**sir**
20:9 150:14 164:7 180:22 207:11 297:4 329:13 331:7
**sit**
123:6 156:7
**sitting**
67:5
**situation**
208:15 265:19 293:5
**six**
230:4 297:8
**size**
194:1 251:9
**Sjösten**
183:21 184:4 189:7
**skin**
286:24
**skipping**
198:3
**slide**
345:22
**slight**
360:10
**slightly**
16:20 193:18
**slow**
303:15
**slower**
303:20
**small**
74:20 76:3 77:21 159:4,11 160:15 169:15,16 208:22 223:7 279:7 334:15,20 348:7 353:23 354:4 361:1,3 362:21
**smoke**
358:8,11
**smokers**
265:22
**smoking**

265:13,18 266:1
358:8
**SNPs**
314:13 318:16
**so-called**
353:9
**social**
47:4 278:13,15
**Society**
338:12
**sold**
151:12 152:3
**somebody's**
318:14
**somewhat**
311:16
**soon**
352:4
**sorry**
20:12 54:3 67:9
69:7 86:21 100:19
103:12 107:16
119:17 163:11
173:7 184:1 197:8
222:23 236:8
243:14 260:3
271:9 298:22
310:10 316:1
**sort**
42:15 67:24 121:6
149:16 238:18
240:5 251:22
295:14 300:13
323:16 325:14
336:14,16 341:12
350:13 358:24
**sounds**
171:14 184:17
**source**
104:5 105:3 136:18
155:17 286:7
**sources**
54:10,16,18 104:7
104:11,13 127:8
143:16 157:17,18
**South**
2:14 3:13

**space**
323:16,17,17 324:8
324:8,9 365:6
**speak**
43:6 297:11
**speaking**
165:1
**special**
136:2 162:3,6
**specialist**
207:2 208:6
**specialists**
207:24
**specialty**
335:3
**species**
199:6 288:20,24
291:24
**specific**
20:5 21:24 22:17
22:18 64:3,4
73:18 78:14,19
92:5,6 93:1
115:14 134:5
137:23 171:14
175:7 216:20
285:4 330:13
344:22
**specifically**
19:15,16 23:9
41:16 62:20 64:21
88:24 90:10 105:6
116:24 126:18
177:15 180:23
220:2 267:12
289:2 299:21
317:21 320:1
339:14
**specificity**
264:12
**specifics**
316:14
**Spectra**
58:14 59:10,12
**spectrum**
235:20 258:8
288:12

**spend**
55:23 342:17
**spent**
45:13 60:4 347:14
347:18,19 348:5,8
**sperm**
302:19 303:3,9,14
303:19,23
**sphincter**
202:10
**spin**
213:10
**spinning**
251:22 252:4
**split**
57:13
**spoke**
79:11,15
**spring**
344:13
**spurious**
221:23
**square**
2:20 190:1
**St**
3:14
**stack**
24:10
**staff**
221:3
**stage**
142:12 330:20
**stages**
42:12
**stamp**
30:24
**stand**
128:5 254:22
**standard**
218:5 220:13 319:7
319:9
**standing**
186:20 187:5 304:2
**starch**
29:1 183:22 184:4
189:22,23 190:9
190:10

**start**
12:3 40:16 65:10
65:17 232:3
250:24 263:6
**started**
65:18 168:11 335:1
340:3
**starting**
39:22
**startling**
301:11 304:12
305:10 321:8
**starts**
272:7
**state**
9:23 41:17 106:23
107:6 109:7
114:16,21 122:10
127:11,16 128:17
132:9 166:10
180:18,21 181:2,6
229:22 248:20
249:10 256:19
257:1 290:6 291:2
292:10 321:9
364:22 365:5
**stated**
187:11 203:16
245:7
**statement**
67:3,7,14 120:15
123:2 138:21,22
167:19 203:12
286:7 292:12
301:7
**states**
1:1 90:4 91:1 93:18
97:18 100:12
113:21 219:14
221:13 291:7,10
306:4
**stating**
17:16
**statistical**
109:22 110:22
211:15,17,21
223:18 233:8

254:6 258:23
259:7 261:8,17
262:4,20 276:23
331:2
**statistically**
110:3,11 246:2,9
253:21 254:1
262:16 277:6,22
354:14
**statistician**
253:15
**status**
103:15 199:7
**stay**
284:3
**stays**
339:14,15
**Steering**
2:6
**stenographic**
247:15
**stenographically**
364:8
**step-wise**
147:23 167:18
**sticker**
28:18
**stimulate**
115:1 139:1 188:15
**stomach**
360:9
**stop**
13:3 301:12 306:24
331:20 344:5
**straying**
358:22
**stream**
345:6
**Street**
1:15 2:4,9,14 3:3
3:13,18
**strength**
229:23 230:8,19
235:17
**strengthened**
17:1,6
**strengthens**

95:7
**stress**
134:21 135:1,5,7 135:12,15,20,23 136:2,4,16,19,22 137:15,17,20,24 138:6 198:24 200:10
**stretched**
329:22
**strike**
31:1 33:2 34:6 46:23 53:16 61:12 63:5 64:8 69:7 80:4 90:1 98:14 118:20 121:15 122:3 131:6 140:17 141:10 152:9 160:22 176:11 186:6 204:12 205:4,14 210:4 212:9 217:22 219:20 222:14 227:16 236:9 240:8 241:21 259:6 264:18 265:17 276:22 356:4 359:14
**stringent**
219:10
**strings**
348:11
**strong**
86:18 121:10 235:4 235:24 255:9 288:19,22 291:3 292:10 293:24 294:7 326:8
**stronger**
17:18 85:1
**strongly**
110:8 111:2
**structural**
279:8
**structure**
180:24 323:7
**structures**
137:7 154:8 321:23 321:24
**student**
345:11
**students**
344:15
**studied**
161:4,13 212:16 226:2 265:8 310:13
**studies**
84:16 88:7,10 106:24 107:13 108:5 109:8,19 111:7,10,20,22 112:1,15,20 113:22 114:1 119:2,7,11,19 123:13 124:2 125:5,10,18,22 126:9,13 128:3,4 128:8 131:7,13,19 132:5,10 135:18 140:6,12 146:11 146:14,18,19 147:1 154:15 160:10,21,24 161:13,15 162:10 163:22 167:23 174:24 181:23 183:5 185:17 188:1 191:12,15 192:19,22 193:6,9 194:5 195:8 200:9 201:3 202:17,23 205:20 206:1 208:19,24 210:6 210:11,23 211:11 214:23 216:9,11 216:17,18,19 217:1,3,7,10,13 217:18,23 218:1 221:18 223:4,6,6 228:4,6,9 232:17 232:22 237:1,4,7 237:8 238:7,10,15 238:20,20 239:16 239:18,22 240:12 240:12,13,14,20 240:22 241:6,8,12 242:2,3 243:13 244:5,7,16,21 245:9,10,13 246:2 246:8,18 249:23 249:24 250:16,17 251:5,6,7,13,18 251:20 252:3,9,15 252:18,20,21,24 253:21 254:7,11 254:20 255:3,16 257:7 258:9,22 259:5 264:20,23 265:1 266:5 268:2 268:4,8 270:11 271:15 281:6,11 282:13 283:11,16 283:19 286:2 293:17 294:2 295:23 296:5,9 297:9,20 298:17 298:19 301:14 303:11,15 304:1,3 305:2,4 308:7,15 309:8 310:11 311:21 313:13,21 314:12 322:5,8,12 322:15,21 331:14 334:3 354:5,13,13
**study**
38:21 84:12 101:6 101:10 110:17 123:1,7,16 126:14 129:12 130:8,12 136:4 145:20 147:7 154:19 161:6 182:9 183:24 184:2,3,6 185:21 187:11,18 187:24 188:4,7,20 189:7,17 194:13 195:12,15,17,22 196:4 211:15,18 211:22 212:7 221:19,19 222:20 233:1 237:16,17 237:18 239:20 240:21 241:1,2,4 242:15,17 249:14 250:23 251:16 253:24 255:7,9,13 255:14 257:11,12 257:17 258:5,9,12 259:3,8,18 260:9 260:13 262:3 266:9,12,15,21 269:3,11 270:12 270:16,20 271:5 271:13,19 272:4 276:2 277:2,4,15 281:6,11 282:13 286:10,16 287:23 296:11 297:14,15 299:11,18,21 300:6,12 313:10 321:16 332:3 341:11
**studying**
265:10
**stuff**
349:17
**subcommittee**
129:19
**subgroup**
193:22
**subject**
51:13 138:6,12 365:10
**subjects**
238:11 239:20 241:17 252:10 341:2
**submission**
57:22
**submit**
96:23 97:3
**submitted**
25:7 51:3 96:20 221:15 320:18
**submitting**
103:10
**Subscribed**
367:15
**subscription**
346:13
**subsequent**
40:20 284:20
**subset**
77:21 78:5
**substance**
132:21 135:4,7 170:20 178:21 179:2 183:21 227:18 328:9 340:7 360:21 361:4 367:7
**substances**
73:19 74:21 91:10 135:14 202:5 226:12 295:1 353:11
**substantial**
134:1 167:5
**substantially**
103:7
**substantive**
79:12 194:8
**Substitute**
29:1
**substituting**
29:5
**substitutions**
75:5
**subtypes**
112:3 237:12
**successful**
148:3 341:1
**suffer**
241:12,14
**suffered**
258:17
**suffice**
351:14
**sufficient**
59:15 216:2 226:7 226:13 230:5 283:8 312:23 321:10,12

**suggest**
107:2
**suggested**
38:13
**suggestions**
336:11,19
**suggests**
248:9 249:15 339:4
**suitability**
29:5
**Suite**
2:10,20 3:4,13
**summary**
109:1 149:17
**superior**
132:15
**supervisor**
60:6
**supervisory**
69:22
**supplemental**
102:2,11 347:8
**support**
79:12 89:13 91:20 148:12 191:22 209:1 217:15,18 221:15 296:6 303:12 305:7
**supported**
237:16 305:12
**supporting**
270:13
**supportive**
34:10 193:21 196:6 217:7 219:5,8 246:24 259:19
**supports**
95:7 126:14 190:15 190:23
**sure**
14:13 36:1,2 39:6 53:14 54:6 62:13 62:16 68:3 70:3 87:1,5 105:15 107:19 113:16 129:16 135:16 136:9 150:21 165:5,11 174:16 176:23 180:14 186:22 195:21 197:9 238:21 240:4 243:21 260:2 264:24 270:7 292:6 305:23 329:16 343:12 346:9 362:21
**surface**
54:19 217:12
**surgeries**
207:21
**surgical**
133:20 134:16
**surprised**
340:22
**surrogate**
318:22 354:21
**surround**
323:15
**surrounding**
116:12 180:24 321:23,24 362:7
**surrounds**
323:6
**surveillance**
328:14
**survey**
129:12 351:24 352:3
**Susan**
70:6
**susceptibilities**
267:14
**susceptibility**
308:20
**susceptible**
83:17 239:16
**suspect**
154:5 199:18 208:21 329:23
**swear**
9:17
**sweating**
200:6
**sworn**
9:19 364:5 367:15
**synthesize**
93:21
**system**
83:20,24 84:4,6,10 208:8,12,17 209:3 303:21 337:17 362:12,15
**Systematic**
27:2

**T**

**table**
24:11 108:15 109:1 149:15 257:15 260:16,17,20 272:21 277:20
**tables**
102:2,11
**Taher**
5:12 27:5,6 89:16 94:24 100:16,24 102:3,14 105:23 106:1,23 107:11 108:8 111:11 112:7,10,13 113:21 245:23,24 361:24
**take**
10:7 12:6 43:16 86:23 87:3 89:1 96:5,5 97:18 98:2 98:10 99:9,21 124:12 130:1 164:1 166:18 176:19 220:15 228:22 229:1 242:23 243:23 248:14 260:5 281:14 290:19 292:17 315:1 343:3,14 363:6
**taken**
89:5 92:8 177:2 207:18 253:9 363:9 364:8
**takes**
281:17
**talc**
3:5,10 10:8 22:2 27:4 29:1,6,7 37:3 41:2,9,11,24 49:17 55:2 64:19 64:21 69:23 70:5 85:12 86:8,13 87:11 88:3,11,20 89:22 90:12,17 91:21 107:4 109:4 111:14,20 114:23 115:5,8,10,10 116:5,6,9,15 117:5 118:13 119:1,14 120:1 126:4 127:6 129:13 130:23 132:16,21 133:11 133:14 136:16 137:5,6,6,10,12 138:17,18 139:4,5 139:21 141:14,17 141:21 142:14 143:16 147:22 151:9,24 156:8,13 156:17,20,24 157:6 158:11 166:22 167:4,9 168:14 169:7,12 169:19,22 170:12 171:19 176:2 177:17,17 180:9 180:20 181:7 182:10,13,18 183:6,12,23,24 184:2,8,12,14,20 184:24 185:8,15 186:19 187:5,22 189:9 190:20 192:24 196:11 198:11 199:3 200:11 206:10,13 209:24 214:7 221:24 223:7 224:12,14,18 225:7 227:15,17 230:11,22 234:7 235:3 237:9,24 238:8,16 243:11 244:3,14 245:3 246:3,10 247:22 248:9,24 249:8,9 249:16,18 250:6 252:3 255:4 260:21 268:5 269:21 271:22 273:14 274:2,6,15 276:4 277:5 283:11,13 284:19 286:3,10,17,22 287:9,16,18,21,24 288:8,23 290:9,21 291:6 292:1,2 293:14,16 294:1 294:22 295:13,18 295:22 299:19 300:2 302:9,13,18 303:1 304:13 305:8,16 313:16 313:17 314:5 316:24 317:2,20 319:17,19,21 321:17 322:6,9,22 324:23 334:11 335:13 338:2,13 338:21 339:10,18 341:15 342:5 344:11 345:17,20 353:5,9,12,16,17 355:22 356:19 357:5 358:20 362:16
**talc-containing**
301:8,15
**talc/ovarian**
36:17 268:1
**Talcs**
31:11
**talcum**
1:4 8:11 17:2,7 23:4,11 30:4 32:1 38:3,18 48:20

52:4,8,12 53:7,23 55:1,7,8 62:22 63:20 64:2,10,13 65:4,8 66:13 72:17 73:1,7,8,17 81:19 82:1,13,15 83:3,7,10,18 84:17 85:2 87:16 90:7,13 91:13 107:13 108:5 110:24 114:17,22 115:24 132:11 133:2 139:7,10,12 139:16,20 140:3 140:20 141:4,5,12 141:16,20 143:5,7 143:9,24 144:7,15 144:20 147:3,11 147:14 148:6,13 151:11 152:3,18 157:14 158:10 167:14 175:8,15 176:7 177:9 178:3 181:13 182:1,23 198:8 199:3,12 200:1,16,18 201:4 201:15,18 202:1,6 202:18,20,24 206:5 210:8 211:3 211:5 216:9 219:10 220:6 230:11 231:4,6,11 231:19 257:3 260:21 262:9 288:6 302:4 305:21 306:16,22 307:1,8,12,23 308:2,6,11 309:11 309:18 310:3 311:9,12 313:11 325:13 326:12,18 340:6,16 341:8 350:10,13,22 351:8,11,16 352:9 352:13,20,24 353:10,21 354:2 354:10 355:2,6
357:22 359:23

**talk**
134:20 160:8 163:21 165:20 254:23 256:17 264:7 288:2,4 328:22 335:6

**talked**
38:8 44:16 46:3 47:13 49:2 55:2 117:16,19 118:18 170:18 259:14 268:12 278:8,16 283:17 287:13 301:3 312:11

**talking**
45:23 55:24 65:14 161:7 164:7 177:8 196:17 205:9 233:7 246:6 291:1 307:10 309:3 315:3 321:7 342:4

**talks**
112:14,18 126:22 290:1

**tallying**
45:16

**tape**
89:4,8 177:1,5 253:6,8,12 363:8 363:12,20

**taught**
344:13

**teach**
344:10,12

**technetium**
183:17 189:5

**technical**
19:7

**technically**
65:18

**telephone**
39:4

**tell**
11:13 26:23 36:1 44:3 67:4 76:11 118:8,11 119:10 124:5 129:14 169:20,21 225:18 243:19 259:22 281:10 288:21 292:22 339:23 342:2

**telling**
124:8

**tells**
110:21 328:21

**ten**
56:12 310:20 335:17

**tendency**
213:10

**tenets**
310:24

**term**
135:22 136:23 208:12,15,17,20 212:5 265:2 304:12 337:16

**terminated**
58:3,11,16 277:3

**terms**
18:15,20 20:23 22:14,15 41:2 43:6 46:9 56:17 62:18 76:20 94:13 133:9 136:20 138:5,8 159:9 160:8 201:21 235:21 252:8 278:9 280:21 331:6 345:2 349:20

**Terry**
6:8 191:19 192:1 192:15 194:5 195:3 268:11,14 268:20 269:3

**test**
72:19 143:17 157:23 162:6 196:20 198:1 318:17 330:18 353:11

**tested**
143:17

**testified**
9:20 55:6 56:8 279:16 339:16 347:13 348:16 349:23 352:7 354:7

**testify**
17:14 57:5 124:4 364:5

**testifying**
83:2 149:6

**testimonies**
71:3

**testimony**
11:5 19:20 24:19 56:17 65:24 68:19 71:1 78:21 118:21 128:21,23 152:14 173:14 187:2 190:18 239:2 251:17 252:2,12 252:14 301:13 332:20 364:8

**testing**
70:11 72:8,16 140:13 141:21 142:18,24 143:5,7 143:9,11 151:18 155:17 157:13,19 157:21 330:12

**tests**
85:11 86:3,6 150:24 162:3 197:12 206:8 209:6,13 319:7,10

**Texas**
1:16 3:4 8:10 58:4 59:1,4 239:7 364:22

**text**
339:3

**textbooks**
338:5,9,10

**Thank**
11:2 21:17 54:7 130:5,6 159:23 192:10 196:1,2 243:3,4 283:9 284:7 316:4 343:2 363:2,16

**Thanks**
344:8

**theoretical**
117:1

**theoretically**
242:11 311:5 317:10

**theory**
85:6,12,18 117:4 122:15 131:17 168:2 186:15 190:15,24 194:16 197:15 200:15 203:7 204:14,15 206:5,9 209:2 210:4

**therapy**
268:16,18 269:5

**therapy-treated**
255:11

**thereabouts**
231:9

**thing**
133:15 142:20 241:11 278:14 295:15 318:17 336:17

**things**
12:22 38:11 42:19 49:18 89:10 119:8 124:3 133:9 175:21 204:9 209:22,24 222:19 271:20 278:7,18 295:5 298:10 305:4 310:14 314:10 318:6 323:24 324:19 329:22 332:24 333:20 335:10,11 335:12 340:8 344:17 347:21

348:3,23 349:14 349:21 351:4 357:15,16,22,22 358:2
**think**
11:11 24:17 30:8 35:21 37:9 44:22 49:18 50:23 52:23 64:1 66:22 67:17 74:14 77:5 80:17 81:1 82:10 84:13 85:19,24 86:16 87:13,13 92:18 94:1 104:7 108:12 111:8 118:6 120:22 121:23 122:1,23 123:18 124:14 126:21 127:16 128:8 132:2,8 133:8 141:15 143:15 144:10 148:5 154:14 156:11 167:17 173:18 178:10 193:3 201:8,20 203:12 203:14 206:19 208:14 209:20 213:22 214:4 217:16 218:4,15 219:7 220:12 228:3 231:24 239:3 247:4 251:19 256:10 258:15 259:23 260:8 266:10 268:7 271:9 280:19 282:8 284:2 285:1 289:1 293:2 294:14 298:8 299:8 301:24 303:7 304:6 305:11 307:20 311:14 314:1 315:4 316:12 320:24 326:7,15,22 333:18 335:14 336:1,13 337:5,15 337:21 338:18 340:3,12,24 341:20,20,22 342:9 343:1 345:20 346:4,8 347:3 350:6,24 352:17,19 356:8 356:19 358:21 359:18
**thinking**
80:18 105:19 267:12 362:1
**third**
26:14,15 83:14 125:21 208:7 243:24 273:7
**thirty**
365:16
**Thomas**
47:16,19
**Thompson**
2:3 8:19,20 46:10 46:11,16,18 47:9 48:11 236:12
**Thoracic**
129:18
**thoroughly**
102:8
**thought**
20:2 29:21 33:16 33:22 167:13 227:3 264:14,15 271:24 336:9
**thousands**
159:8
**three**
46:14,17 47:9 106:22 185:18 221:6 245:21 291:24 297:8
**threshold**
311:8,11 312:1,2,4 312:8 313:6 325:3 355:11,12
**thresholds**
326:9
**thumb**
13:20 36:5,11
**thwarting**
122:12
**time**
8:7 11:12 16:19 23:14,16,18 25:7 37:3 39:12 40:20 45:9 55:22,24 57:21 59:15 60:3 60:8 75:5 101:23 120:4 147:13,18 148:6 161:17 169:19 192:5 199:1 209:21,23 215:19 228:22,24 234:6 260:5 261:4 261:9 277:24 280:5 290:19 303:7 306:11 310:17 311:6 312:5,18 323:22 323:23 324:2 327:8 329:22 339:8,10 342:12 342:17,23,23 347:18,19,23 348:5,8 351:3 359:3 364:8
**timely**
99:21
**times**
206:18 282:20 305:15 309:24 329:17 332:14
**Tinsley**
3:12 9:12,12 363:3
**tissue**
133:12 135:1,2,5 135:11 170:11 287:4 313:12
**tissues**
114:18 116:1,11,12 135:6,8 185:1 198:13 199:14,15 199:24 200:13 286:23 287:15 321:14,15,20
**titanium**
292:1
**title**
27:2
**titled**
28:24 31:10 32:15 77:18 249:14 270:17
**today**
8:6 9:16 10:7,17 11:10 12:13,20,24 13:20 14:21 15:2 15:7 16:13 17:13 17:18 22:1 23:23 24:21 28:4,22 29:18 33:4,15,21 34:1,9 36:6 45:21 50:18 51:16,20 74:7 83:2 100:22 120:18 124:4,6,12 156:7 181:5 206:3 218:14 305:15 312:12 344:3 345:24 348:17 352:7 354:7 361:24
**Today's**
16:11
**told**
38:2 39:20 42:9 43:10 44:7,19 47:2 79:7 80:8 84:23 103:21 118:9,19 167:12 214:4 216:4 278:10 351:10
**top**
165:23 256:19
**topic**
216:6 345:12,13
**topics**
41:6
**toss**
109:15
**total**
19:22 161:3 307:16 310:15
**totally**
148:3 296:19
**touch**
344:17 345:1
**touched**
64:18
**touches**
323:12
**toxicity**
180:4
**toxicologic**
311:20
**toxicologist**
10:5 47:20 137:4
**toxicologists**
220:22
**toxicology**
59:22 178:24 300:15 310:24 328:4,5 334:24 335:2,5
**toxin**
299:13
**toxins**
299:12,15
**trace**
170:11 177:8,13,21
**track**
296:17,24 362:5
**tract**
82:4,12 83:6,11 86:12 87:10 88:2 88:14,19 116:18 119:4,13 181:16 181:18 183:1,8 185:7 186:24 188:6,8 191:3 200:18 202:13 206:11 207:17,24 301:10,17 303:4 304:15 305:9
**training**
19:23 55:17 138:2
**transcribed**
314:12 318:24

**transcript**
69:14 221:6 364:7 365:17,18
**transcription**
367:5
**transcripts**
50:1 52:12,15,21 66:4,7,20,22 67:2 67:21 68:8,12
**transformed**
319:4
**translates**
236:5
**transmission**
134:10
**transport**
184:11 185:21 186:11 188:6 202:11 301:8,15 303:7 304:13,19
**transported**
183:7 305:8
**transports**
202:21
**trash**
349:22
**travel**
200:18 303:2
**traveling**
202:6
**travels**
200:16,23 201:6 202:14
**treat**
60:11
**treated**
254:14 316:17 319:17 349:24
**treatment**
212:14,15 314:17
**treatments**
93:15
**tremolite**
77:13 144:11,21 145:3 146:6
**trend**
110:23 114:4 255:9
**Trendelenburg**
188:21
**trends**
354:15,16
**trial**
16:6,15 17:14 56:9 56:19
**tried**
54:12
**true**
90:19 121:5 154:7 172:5,9 190:12 216:14 262:23 263:17 267:5 275:24 301:20 326:15,16 334:19
**truth**
364:5,6,6
**try**
11:15 14:12 34:2 39:17 156:12 231:23
**trying**
15:4 18:5 112:8 311:7 328:18
**tubal**
190:13,14,19,23 191:3,17 193:1,20 194:7,19 196:12 196:24 197:18 198:4
**tube**
323:3 324:1,12
**tubes**
183:14 184:4 190:3 190:5 191:5 201:1 303:17 322:17,23 323:15
**tubing**
146:13
**Tucker**
2:13 3:12 9:13
**tumor**
166:16 313:3
**tumors**
280:2,4,13
**turn**
106:21 108:15 163:10 196:16 285:24 301:1
**turning**
305:13
**Twitter**
342:7,22
**two**
25:16,18 35:21 37:12 41:3 77:10 89:10 96:5 113:13 145:5 148:11 149:5 150:17 151:24 160:11 201:21 221:5 222:19 272:12 297:7 299:12 327:13 343:5,15 347:21 350:12
**two-thirds**
272:12 306:10
**type**
25:12 61:17 144:7 146:2 153:12,21 153:22 155:1 172:24 174:12 179:15,16 244:6
**types**
76:2 144:10,19 145:8 146:5,17 153:24 154:1,12 154:13 155:6 179:2 240:11 241:3 280:2 328:6 357:2
**typical**
45:5
**typically**
42:13 70:13 71:2 238:12

**U**

**U.K**
308:9
**U.S**
118:24 178:24 305:18 306:21,24 308:9
**Uh-huh**
320:12 344:1
**unable**
241:18 255:22
**unaware**
67:24 205:4,5
**uncontrolled**
221:22
**Undated**
5:12
**undergraduate**
59:17
**underlying**
99:12
**Underneath**
126:1,4
**underpowered**
241:18 251:16,18 251:20 252:16,22
**understand**
11:13,14 15:4 18:5 22:8 23:10 80:3,5 87:21 95:21,24 112:11 127:18 168:7 180:15 207:22 284:14 310:23 324:21 329:19 339:17,20 344:4
**understandable**
296:20
**understanding**
36:11,13 38:10 72:7 73:5,16 75:3 76:1 78:4 100:3 102:23 138:1 147:19 148:2 151:15 156:17 157:16 349:1
**understood**
11:20 53:20
**undertook**
32:2
**underwear**
341:11,16
**underwent**
130:23
**undo**
312:23
**unfair**
92:19
**unfortunately**
251:15
**Union**
3:15 9:13
**United**
1:1 90:3,24 93:18 100:12 219:14 306:4
**universe**
231:1
**University**
58:4 59:1,4 239:7
**unknown**
266:20
**unmeasured**
266:13,17
**unreasonable**
134:1
**unrecognized**
266:17
**update**
94:8 237:16
**updated**
220:9 258:5
**updates**
58:20
**uploaded**
24:5
**upper**
183:7 301:9,16 304:14 305:9
**urethra**
202:2,7,10,15,22
**urinary**
202:13
**usage**
268:16 269:5 310:12
**USB**
5:21
**use**
17:3,8 23:4,11,12

23:13,21 27:4 38:3 53:7,22 82:1 82:12 83:3,10 99:14,18 107:4 131:9,13,20 132:10 133:19,24 134:15 140:2 166:21 168:15 169:19 174:4 181:13 182:22 184:14 187:13 189:8,9 190:14 192:22 196:11 199:11 200:11 201:17,18 202:19 202:24 208:20 211:4 214:7 216:9 220:6 221:24 230:22 231:19 232:10 235:3 237:24 238:8,16 243:11 244:3,14 246:3,10 247:22 248:9,23 249:16 249:18 250:6 252:3 254:5 260:21 261:10,11 261:13,14,17 262:10,13,15 263:10,12,14 270:18 272:3,15 272:24 273:18 274:6 277:5 283:13 284:18 288:6 298:6 306:15,19 307:7 307:11,23 308:1 308:11,16,17,21 309:11,18 310:1,3 310:14,14,21 311:9,11,14 312:2 312:8 315:16,17 316:23 319:11 326:12 338:20,20 339:19 341:8 350:10,13,22 351:16 359:5

**useful** 171:1 325:16 349:3 349:22
**user** 231:14
**users** 131:14 170:12 192:24 211:6
**uses** 28:11 280:14
**usually** 169:14 180:11 281:2 295:4 328:20 329:20 350:18 352:1
**uterine** 188:15 198:12 199:15,24 200:12
**uterus** 200:20,24 302:15 322:13
**utilize** 20:22 317:9
**UTMB** 59:6,6

**V**

**vagina** 200:19 301:23 302:6,10 304:23 322:6 334:12
**vaginal** 198:12 199:14,24 200:12
**vague** 143:10 147:18 174:15
**valence** 180:18,21 181:2,6
**valid** 173:10 175:4 223:17 238:21 305:11
**valuable** 42:18
**value** 28:24 358:4
**vapors** 360:23 361:2
**variation** 136:22 192:24
**varies** 56:5 332:2
**varieties** 344:19
**various** 18:11 41:1 52:15 71:4 79:17 93:23 107:13 143:15 144:9 175:3 188:2 215:24 245:7 280:15 286:23 287:12 308:7 344:19 361:8
**vary** 153:22 231:15 308:8 309:22
**vast** 245:12
**vegetables** 229:10 357:11,19 360:1,3,5,9,11
**velocity** 303:14
**Venter** 183:17 187:18
**verbal** 336:20
**verbatim** 364:7
**verify** 92:24 175:21
**vermiculite** 64:18 77:12,17
**version** 337:8
**versions** 44:1
**versus** 111:21 251:6 317:20 347:18
**video** 8:9
**videographer** 3:22 8:3,5 9:15 89:3,7 176:24 177:4 253:7,11 363:7,11,18
**Videotaped** 1:13
**view** 202:5 236:6 289:3 292:3 295:22 331:2
**viewed** 91:17
**viewing** 342:19
**visit** 342:16,23
**vitae** 5:6 21:7 57:18 58:20 70:24
**vitamins** 170:7
**volition** 334:14
**volume** 345:5
**voluntary** 219:9
**vulvar** 198:12 199:14,24 200:12

**W**

**Wagner** 129:20
**wait** 250:24 298:20
**want** 21:24 33:16,22 39:7 44:6 74:8 88:17 113:12 246:20 251:24 254:23 278:6 283:6 284:1 292:11 301:1,4,6 301:12 309:10 315:1,12
**wanted** 34:2 39:16 329:14 336:24 349:2
**War** 145:15
**warned** 213:23
**washing** 190:3
**Washington** 3:19
**wasn't** 144:3 156:10 251:7 258:17 260:2 287:8 290:24 307:2
**waste** 345:6
**Watch** 342:9
**water** 170:7,7 311:3
**waterfront** 43:6
**way** 18:15 37:4 81:2 82:6 93:12 136:20 141:8 164:17 207:1 217:14 245:2 272:12 294:21 302:6,10 302:11,14 316:18 319:20 320:3 332:5
**ways** 18:12 39:19 208:23 299:11 328:23 347:22
**we'll** 10:16 26:10 30:13 32:18 85:22 87:3 124:15 130:1,1 159:20 163:2 195:21 228:24 229:1 260:4 343:13
**we're** 11:10,19 28:17

89:3,7 168:10 176:24 177:4 195:16 199:9 213:22 233:7 253:7,11 296:23 363:11
**we've**
12:11 13:5 24:24 36:12 46:6 47:11 58:20 65:11 86:21 94:24 100:20 102:4,15 160:3 225:11 235:23 238:23 254:2 259:14 322:3 332:15 343:4
**weak**
203:8 204:15 206:6 233:2,18
**webpage**
41:23
**website**
41:23 43:9 225:13 225:21
**websites**
79:7 214:4 278:12 278:16 342:3,7
**week**
60:6,8,10 309:24
**weeks**
30:8 40:21
**Weibull**
282:20
**weigh**
254:6
**weighing**
251:5 277:15
**weight**
91:19 229:23 230:3 230:6 267:15,24
**welcome**
14:17
**went**
35:4 168:23 275:1 275:11 319:15 349:22
**Werb**
126:21
**whatsoever**
299:2
**wheel**
251:23 252:5
**width**
137:9
**Wild**
286:9
**Wilde**
286:6
**willing**
226:20
**withdraw**
62:16 73:12 131:11 176:12 190:21 224:8 235:22 264:5
**withdrew**
294:16
**witness**
9:17 10:11 13:8 20:11 37:5 40:3 47:14 48:7,15 54:6 56:21 67:19 71:1 74:8 80:9 113:5,18 150:4,11 164:16,23 165:3 165:12 192:4,10 196:1 207:12 223:2 243:3,19 257:20,23 258:2 282:6 291:19 295:8 296:15 315:4,13 316:1 332:22 343:17 359:19 364:11,11 365:1
**witnesses**
52:15,16,21 67:23 70:14
**woman**
185:7 186:18 187:2 187:5 231:15,16 299:4 308:18,23 309:3,10 310:3 330:8,15 331:5
**woman's**
86:12 87:9 88:2,19 116:17 119:4,13 169:18 200:17 202:2 304:14,23 319:21 331:4 334:20 338:14,21 340:17 341:9,16
**women**
60:11 118:24 159:10 160:16 161:3,12 166:21 167:3 178:2,4,6 182:22 185:19,23 188:14,21 189:17 189:19,20 190:8 191:8 193:19,24 194:18 196:12,22 197:17 198:2 202:13 207:7 233:20 250:17,22 255:10,11 260:21 269:19,21 271:21 273:4,8,13,16,21 273:24 274:6,8,13 274:14,20 275:4 275:10,19 276:3,6 283:12 288:6 296:11 298:4,17 299:3 304:2,8 306:21,24 307:11 307:11,23 308:2,5 308:11 310:16 311:9,12 326:12 326:17 327:21 331:14,15 332:1 351:7,9,11
**women's**
82:16 207:3,17
**wonder**
118:3
**wood**
229:15,18
**Woodruff**
32:17
**wording**
93:1
**words**
83:19 84:9,10,11 84:14 127:17 133:10 208:23 297:18 315:17 328:1
**work**
37:1 45:5 48:8,14 49:16 51:10,12,21 56:3 57:10 60:6 63:14 64:16 76:5 76:5,15 104:13,21 118:19 146:16 239:5 264:1 331:12 344:10 347:15
**worked**
37:7,11 60:14
**workers**
145:21,24 331:16
**workgroups**
345:11
**working**
55:23 103:3 221:3 331:15
**workplace-related**
328:8
**works**
70:10
**world**
145:15 240:5
**worry**
105:3
**worth**
100:7
**wouldn't**
36:1 42:20 85:18 141:8 167:2 224:9 293:15 340:22
**writing**
43:15 45:15 65:17 65:19 347:23
**written**
40:14 281:23 336:18
**wrote**
54:14

**X**

**Y**

**yeah**
118:7 176:21 183:20,22 197:14 218:15 336:3 343:9 359:21
**year**
221:5 233:20 261:4 261:13,14,16 262:10 272:16 305:18 306:5,6,10 307:17,20 310:13
**years**
23:19 37:2 75:2 96:5 130:24 147:23 168:9,9 212:16 250:12 255:12 261:4,5,5 261:10,10 262:10 262:12,15,20 263:9,11,14 267:21 279:18 280:9,19 281:8 310:2,20 327:11 327:13 345:15 357:21,24 360:21
**yes/no**
272:17
**Yessaian**
69:5,11

**Z**

**Zellers**
2:13 4:6 8:24,24 9:22 11:2,3 12:1 14:18 15:20 17:22 19:1 20:7,13 21:5 21:12,18 25:9 26:8,21 29:16 30:18 31:7 32:10 32:21 36:9 37:19 38:16 53:13 54:8 55:21 59:8 61:1 62:15 63:11 64:5 66:2 67:11 68:5

68:18 70:21 71:19 72:1 73:12,14,23 74:5,13,23 75:19 78:8,16 79:3 80:21 81:17,23 82:21 84:8,22 85:20 87:1,6,20 88:15 89:1,9 92:1 92:4,11,20 93:3 94:17 95:5 97:11 98:6,23 99:11 106:20 107:18 108:14 110:1 111:4 112:4,24 113:7,11,20 114:9 117:7 119:9 120:16 121:1,15 121:17 123:15 124:19 127:22 128:11,20 129:3 130:7 132:4 133:17 136:10 138:3 140:17,19 141:2 142:3 143:20 144:5 145:1 147:8 148:9 149:2 150:12 151:7,22 152:8 153:7,18 154:10 155:15,21 157:4 157:12 158:16 159:1,14 160:1 161:8,11 162:18 163:5 164:3,11,22 165:7,11,14,16 167:20 168:1,12 168:19 170:17 171:5,22 172:10 172:20 173:11 174:11,19 175:12 176:4,19,23 177:6 178:5,8 179:7 180:1 181:11 182:7 184:23 185:16 186:16 188:13 190:6 192:7,13 193:15 195:1,10,21 196:3 197:6,23 198:18 199:21 200:8 201:13 202:12 203:15,23 204:22 205:14,16 207:8 207:15 209:14 210:2,17 212:4 215:3 216:15 218:12 219:19 221:4 222:12,24 223:11,20 224:3 225:2,17 226:15 228:7,17 229:9,16 232:7,23 233:6 234:3,4,13,19 235:10 236:10,13 237:6,13 238:6 239:10 240:18 241:21,23 242:8 242:13 243:5,16 243:21,22 244:11 246:15 247:11,17 248:4 249:5 250:14 251:3 252:11 253:4,13 254:12 258:3,20 259:12 261:2 262:1 263:15 264:3,13 267:6,22 269:1 270:2,9 271:3,7 276:1,12 276:19 277:12 279:2 282:11,21 283:23 284:5 289:8 343:6 359:14,18 363:16

**zero**
312:2

**Zurbenko**
282:19

**0**

**07962**
3:9

**1**

**1**
5:4 10:16,18 12:11 12:19 89:4 114:13 130:13 148:16 178:15 223:9 226:3 229:18 260:17 332:5 357:7 358:16

**1,000**
227:7

**1.19**
276:21

**1.2**
332:10

**1.3**
232:14,24 235:23 236:14 333:17 334:5

**1.63**
276:23

**1.74**
145:19

**1/1/14**
5:16

**1:38**
177:3,5

**10**
5:4,16 31:4,5 33:18 218:20 219:5 229:22 297:9

**10%**
56:7

**10:37**
89:4,5

**10:55**
89:6,8

**100**
3:13

**100%**
306:21 307:22

**100C**
291:20

**11**
5:18 17:24 18:18 24:23 32:7,8 33:10 297:9

**11/16/18**
5:5

**112**
3:3

**1170**
2:10

**12**
5:19 32:18,19,22 60:9 250:12 297:9

**12/18**
5:15

**12:32**
177:1,2

**120**
226:2

**1215**
163:20

**1216**
163:11

**124**
6:2

**13**
5:21 36:4,7,12

**130**
6:4

**14**
5:22 98:20,21,24 99:7 130:24

**14,000**
306:9

**148**
7:3,5

**14th**
37:18

**15**
5:5 6:2 109:8,11 111:5 124:16,17 146:23 246:1,6 259:5

**150**
45:18 347:14

**159**
6:6

**15th**
26:1 37:18

**16**
6:4 18:19 130:2,3

**16-2738**
1:5

**163**
6:7

**16th**
39:5

**17**
6:6 159:20,21 160:3 283:3

**174**
113:9

**177**
113:9

**18**
6:7 163:2,3

**180**
45:18 347:14

**1800**
3:4

**18th**
30:14

**19**
1:11 5:2 6:8 8:2 94:15 192:11,14

**19103**
2:21

**192**
6:8

**195**
6:10

**1952**
5:13 28:24

**1970s**
167:14

**1974**
5:19 32:15

**1979**
6:4 129:12

**1982**
145:13

**1984**
77:14

**1990s**
37:10

**1991**
5:18 31:13,21

**1992**
255:7

**19th**
8:7 136:20
**1st**
30:21,24 218:21

**2**

**2**
4:2 5:5 15:17,18,21 16:4,16 17:10,15 22:10 43:14 54:22 65:12 89:8 108:15 109:1 177:1 221:17 272:6,21 346:14
**2.53**
145:23
**2.96**
145:17
**20**
6:10 112:16 168:9 195:22,23 196:5 259:16 260:7 261:5,5,10 262:15 262:20 263:11,14 279:17 280:8 281:8 332:6,13 367:16
**20.0**
332:7,9,10
**2000**
2:20 145:22
**20004-1454**
3:19
**2001**
127:4
**2004**
247:4
**2006**
203:12,22
**2007**
6:14 127:4 250:12 287:5
**2008**
146:8 246:23
**2009**
26:1
**2010**
126:21 203:17 204:20 257:12 258:6,11
**2011**
6:6,7 159:16 163:2
**2013**
6:8 191:19 192:15 268:11,14,20 269:3
**2014**
30:21 31:1 33:19 218:21 220:4 222:7 271:21 272:13,16 273:12 273:17 274:1,12 274:13 277:3,23
**2016**
6:10,16 195:12 196:5 255:8,14 259:15,16 260:13 271:5,13
**2017**
6:13 242:15
**2018**
30:15 36:19 37:13 38:18 40:6 57:23 59:14 64:8 65:22 66:1 89:12 100:24 102:3 142:15 227:5 257:9
**2019**
1:11 5:2,9,10 8:2,7 26:10 94:9 364:23
**202**
3:19
**21**
5:6,7 6:11 113:9 225:14,15,20 293:2
**21,000**
306:7
**210**
3:5 130:22
**213**
2:16
**215**
2:21
**216**
3:14 163:10
**22**
6:13 242:24 243:1 364:23
**22,000**
307:22
**22,000-something**
307:21
**225**
6:11
**23**
6:14 247:3,8
**234**
2:4
**24**
6:16 69:6 184:15 185:1 255:12 271:1,4,12
**243**
6:13
**247**
6:14
**25**
6:17 108:15 289:8 289:9,23
**26**
5:9,10,12
**267-0058**
3:9
**269-2343**
2:5
**27**
67:20 68:9 69:4,8
**271**
6:16
**2738**
8:12
**28**
7:6 68:10
**284**
4:7
**289**
6:17
**29**
5:13 71:5
**2A**
226:16
**2B**
227:16,18 228:10 229:2,11,17,19 235:8,12 249:20 292:18,23 355:16 356:23 359:24
**2B-classified**
357:10

**3**

**3**
5:6 21:3,6 57:19 58:2,21 65:1 70:24 177:5 196:21 223:1,2,13 227:6 253:8 290:23
**3,000**
233:22 305:17 306:18
**3.3.1**
112:14
**3:06**
253:8,9
**3:19**
253:10,12
**30**
5:15 11:8 55:5 56:13 71:5 109:8 109:11,19 111:5 246:1 259:6 308:8 364:11 365:16
**30-day**
44:24
**30%**
84:18 211:4 231:3 232:13 233:17 306:12,13,15 307:6 308:13 309:13 310:5
**31**
5:16
**32**
5:18,19
**334**
2:5
**337**
196:16,20 197:5,9 260:17
**339**
196:17,20
**34%**
273:15,19 275:1
**34.4**
274:15 275:1
**343**
4:8
**35**
11:8 55:5 56:13 164:12
**350**
3:8
**351**
278:3
**36**
5:21
**36.5**
274:2 275:5,15
**36103-4160**
2:5
**364**
4:10
**365**
2:9
**366**
4:11
**367**
4:12
**368**
4:13
**3rd**
26:10

**4**

**4**
5:7 21:10,13,20,23 24:24 34:15,24 66:21 68:10 69:4 69:8 71:6 126:8 178:16 220:16 221:13 224:11,11 227:1,9 253:12 272:21 282:22

283:1 285:24 363:8
**40**
130:24 168:9 279:18 280:9 281:8
**41**
106:21
**412**
289:21 291:13
**42nd**
2:15
**430-3400**
2:16
**44**
280:19
**450**
45:11
**463-2400**
3:19

**5**

**5**
5:9 25:24 26:2 50:19 99:6 148:11 148:16 227:12 297:3,4 363:12,20
**5%**
56:1
**5:37**
363:8,9
**5:44**
363:10,12,19
**5:45**
363:22
**50**
332:6
**50%**
109:11,14 118:24 327:4
**50/50**
57:14
**504**
2:11
**51.5**
275:12
**515**
2:14
**554-5500**
3:5

**6**

**6**
5:10 26:6,10 27:13 27:23 77:8,9 210:12 243:24
**6.2**
291:7
**60%**
308:8
**600**
3:13
**63102**
3:14
**6580**
1:15
**696-3675**
3:14

**7**

**7**
5:12 26:19,23 27:7 81:8,16,19 89:17 94:24 100:21 101:14 102:4,15 102:24 103:17 104:3,10 106:1,21 114:13,16 115:23 183:2 210:13 256:19 301:1
**7/9/2020**
364:22
**70130**
2:10
**70s**
168:11
**78205**
3:4
**799-2845**
2:11

**8**

**8**
4:3 5:13 29:14 99:17 305:13
**8/1/00**
5:22
**819**
193:16
**82**
226:16
**820**
193:17
**85**
348:12
**87**
276:22,23
**877.370.DEPS**
1:23

**9**

**9**
4:6 5:15 30:15,16 89:16
**9:02**
1:16 8:2,8
**90%**
348:13
**90071**
2:15
**917.591.5672**
1:23
**93**
6:18 291:17,20
**95%**
261:23
**973**
3:9
**975**
3:18
**98**
5:22
**988-2706**
2:21
**99**
117:4 127:2

# Exhibit 20

THIRD EDITION

# MODERN EPIDEMIOLOGY

**Kenneth J. Rothman**
Vice President, Epidemiology Research
RTI Health Solutions
Professor of Epidemiology and Medicine
Boston University
Boston, Massachusetts

**Sander Greenland**
Professor of Epidemiology and Statistics
University of California
Los Angeles, California

**Timothy L. Lash**
Associate Professor of Epidemiology and Medicine
Boston University
Boston, Massachusetts

Wolters Kluwer Health | Lippincott Williams & Wilkins
Philadelphia • Baltimore • New York • London
Buenos Aires • Hong Kong • Sydney • Tokyo

*Acquisitions Editor:* Sonya Seigafuse
*Developmental Editor:* Louise Bierig
*Project Manager:* Kevin Johnson
*Senior Manufacturing Manager:* Ben Rivera
*Marketing Manager:* Kimberly Schonberger
*Art Director:* Risa Clow
*Compositor:* Aptara, Inc.

**© 2008 by LIPPINCOTT WILLIAMS & WILKINS**
**530 Walnut Street**
**Philadelphia, PA 19106 USA**
**LWW.com**

All rights reserved. This book is protected by copyright. No part of this book may be reproduced in any form or by any means, including photocopying, or utilized by any information storage and retrieval system without written permission from the copyright owner, except for brief quotations embodied in critical articles and reviews. Materials appearing in this book prepared by individuals as part of their official duties as U.S. government employees are not covered by the above-mentioned copyright.

Printed in the USA

---

**Library of Congress Cataloging-in-Publication Data**
Rothman, Kenneth J.
    Modern epidemiology / Kenneth J. Rothman, Sander Greenland, and Timothy L. Lash. – 3rd ed.
        p. ; cm.
    2nd ed. edited by Kenneth J. Rothman and Sander Greenland.
    Includes bibliographical references and index.
    ISBN-13: 978-0-7817-5564-1
    ISBN-10: 0-7817-5564-6
    1. Epidemiology–Statistical methods. 2. Epidemiology–Research–Methodology. I. Greenland, Sander, 1951-    II. Lash, Timothy L.    III. Title.
    [DNLM: 1. Epidemiology. 2. Epidemiologic Methods. WA 105 R846m 2008]
    RA652.2.M3R67 2008
    614.4–dc22                                                          2007036316

---

Care has been taken to confirm the accuracy of the information presented and to describe generally accepted practices. However, the authors, editors, and publisher are not responsible for errors or omissions or for any consequences from application of the information in this book and make no warranty, expressed or implied, with respect to the currency, completeness, or accuracy of the contents of the publication. Application of this information in a particular situation remains the professional responsibility of the reader.

The publishers have made every effort to trace copyright holders for borrowed material. If they have inadvertently overlooked any, they will be pleased to make the necessary arrangements at the first opportunity.

To purchase additional copies of this book, call our customer service department at (800) 638-3030 or fax orders to 1-301-223-2400. Lippincott Williams & Wilkins customer service representatives are available from 8:30 am to 6:00 pm, EST, Monday through Friday, for telephone access. Visit Lippincott Williams & Wilkins on the Internet: http://www.lww.com.

10 9 8 7 6 5 4 3 2 1

CHAPTER 2

# Causation and Causal Inference

Kenneth J. Rothman, Sander Greenland, Charles Poole, and Timothy L. Lash

**Causality 5**
A Model of Sufficient Cause and Component Causes 6
The Need for a Specific Reference Condition 7
Application of the Sufficient-Cause Model to Epidemiology 8
Probability, Risk, and Causes 9
Strength of Effects 10
Interaction among Causes 13
Proportion of Disease due to Specific Causes 13
Induction Period 15
Scope of the Model 17
Other Models of Causation 18
**Philosophy of Scientific Inference 18**
Inductivism 18
Refutationism 20
Consensus and Naturalism 21
Bayesianism 22
Impossibility of Scientific Proof 24
**Causal Inference in Epidemiology 25**
Tests of Competing Epidemiologic Theories 25
Causal Criteria 26

## CAUSALITY

A rudimentary understanding of cause and effect seems to be acquired by most people on their own much earlier than it could have been taught to them by someone else. Even before they can speak, many youngsters understand the relation between crying and the appearance of a parent or other adult, and the relation between that appearance and getting held, or fed. A little later, they will develop theories about what happens when a glass containing milk is dropped or turned over, and what happens when a switch on the wall is pushed from one of its resting positions to another. While theories such as these are being formulated, a more general causal theory is also being formed. The more general theory posits that some events or states of nature are causes of specific effects. Without a general theory of causation, there would be no skeleton on which to hang the substance of the many specific causal theories that one needs to survive.

Nonetheless, the concepts of causation that are established early in life are too primitive to serve well as the basis for scientific theories. This shortcoming may be especially true in the health and social sciences, in which typical causes are neither necessary nor sufficient to bring about effects of interest. Hence, as has long been recognized in epidemiology, there is a need to develop a more refined conceptual model that can serve as a starting point in discussions of causation. In particular, such a model should address problems of multifactorial causation, confounding, interdependence of effects, direct and indirect effects, levels of causation, and systems or webs of causation (MacMahon and Pugh, 1967; Susser, 1973). This chapter describes one starting point, the sufficient-component cause model (or sufficient-cause model), which has proven useful in elucidating certain concepts in individual mechanisms of causation. Chapter 4 introduces the widely used potential-outcome or counterfactual model of causation, which is useful for relating individual-level to population-level causation, whereas Chapter 12 introduces graphical causal models (causal diagrams), which are especially useful for modeling causal systems.

Except where specified otherwise (in particular, in Chapter 27, on infectious disease), throughout the book we will assume that disease refers to a nonrecurrent event, such as death or first occurrence of a disease, and that the outcome of each individual or unit of study (e.g., a group of persons) is not affected by the exposures and outcomes of other individuals or units. Although this assumption will greatly simplify our discussion and is reasonable in many applications, it does not apply to contagious phenomena, such as transmissible behaviors and diseases. Nonetheless, all the definitions and most of the points we make (especially regarding validity) apply more generally. It is also essential to understand simpler situations before tackling the complexities created by causal interdependence of individuals or units.

## *A MODEL OF SUFFICIENT CAUSE AND COMPONENT CAUSES*

To begin, we need to define *cause.* One definition of the cause of a specific disease occurrence is an antecedent event, condition, or characteristic that was necessary for the occurrence of the disease at the moment it occurred, given that other conditions are fixed. In other words, a cause of a disease occurrence is an event, condition, or characteristic that preceded the disease onset and that, had the event, condition, or characteristic been different in a specified way, the disease either would not have occurred at all or would not have occurred until some later time. Under this definition, if someone walking along an icy path falls and breaks a hip, there may be a long list of causes. These causes might include the weather on the day of the incident, the fact that the path was not cleared for pedestrians, the choice of footgear for the victim, the lack of a handrail, and so forth. The constellation of causes required for this particular person to break her hip at this particular time can be depicted with the sufficient cause diagrammed in Figure 2–1. By *sufficient cause* we mean a complete causal mechanism, a minimal set of conditions and events that are sufficient for the outcome to occur. The circle in the figure comprises five segments, each of which represents a causal component that must be present or have occured in order for the person to break her hip at that instant. The first component, labeled A, represents poor weather. The second component, labeled B, represents an uncleared path for pedestrians. The third component, labeled C, represents a poor choice of footgear. The fourth component, labeled D, represents the lack of a handrail. The final component, labeled U, represents all of the other unspecified events, conditions, and characteristics that must be present or have occured at the instance of the fall that led to a broken hip. For etiologic effects such as the causation of disease, many and possibly all of the components of a sufficient cause may be unknown (Rothman, 1976a). We usually include one component cause, labeled U, to represent the set of unknown factors.

All of the component causes in the sufficient cause are required and must be present or have occured at the instance of the fall for the person to break a hip. None is superfluous, which means that blocking the contribution of any component cause prevents the sufficient cause from acting. For many people, early causal thinking persists in attempts to find single causes as explanations for observed phenomena. But experience and reasoning show that the causal mechanism for any effect must consist of a constellation of components that act in concert (Mill, 1862; Mackie, 1965). In disease etiology, a sufficient cause is a set of conditions sufficient to ensure that the outcome will occur. Therefore, completing a sufficient cause is tantamount to the onset of disease. Onset here may refer to the onset of the earliest stage of the disease process or to any transition from one well-defined and readily characterized stage to the next, such as the onset of signs or symptoms.

***FIGURE 2–1*** ● Depiction of the constellation of component causes that constitute a sufficient cause for hip fracture for a particular person at a particular time. In the diagram, A represents poor weather, B represents an uncleared path for pedestrians, C represents a poor choice of footgear, D represents the lack of a handrail, and U represents all of the other unspecified events, conditions, and characteristics that must be present or must have occured at the instance of the fall that led to a broken hip.

Consider again the role of the handrail in causing hip fracture. The absence of such a handrail may play a causal role in some sufficient causes but not in others, depending on circumstances such as the weather, the level of inebriation of the pedestrian, and countless other factors. Our definition links the lack of a handrail with this one broken hip and does not imply that the lack of this handrail by itself was sufficient for that hip fracture to occur. With this definition of cause, no specific event, condition, or characteristic is sufficient by itself to produce disease. The definition does not describe a complete causal mechanism, but only a component of it. To say that the absence of a handrail is a component cause of a broken hip does not, however, imply that every person walking down the path will break a hip. Nor does it imply that if a handrail is installed with properties sufficient to prevent that broken hip, that no one will break a hip on that same path. There may be other sufficient causes by which a person could suffer a hip fracture. Each such sufficient cause would be depicted by its own diagram similar to Figure 2–1. The first of these sufficient causes to be completed by simultaneous accumulation of all of its component causes will be the one that depicts the mechanism by which the hip fracture occurs for a particular person. If no sufficient cause is completed while a person passes along the path, then no hip fracture will occur over the course of that walk.

As noted above, a characteristic of the naive concept of causation is the assumption of a one-to-one correspondence between the observed cause and effect. Under this view, each cause is seen as "necessary" and "sufficient" in itself to produce the effect, particularly when the cause is an observable action or event that takes place near in time to the effect. Thus, the flick of a switch appears to be the singular cause that makes an electric light go on. There are less evident causes, however, that also operate to produce the effect: a working bulb in the light fixture, intact wiring from the switch to the bulb, and voltage to produce a current when the circuit is closed. To achieve the effect of turning on the light, each of these components is as important as moving the switch, because changing any of these components of the causal constellation will prevent the effect. The term *necessary cause* is therefore reserved for a particular type of component cause under the sufficient-cause model. If any of the component causes appears in every sufficient cause, then that component cause is called a "necessary" component cause. For the disease to occur, any and all necessary component causes must be present or must have occurred. For example, one could label a component cause with the requirement that one must have a hip to suffer a hip fracture. Every sufficient cause that leads to hip fracture must have that component cause present, because in order to fracture a hip, one must have a hip to fracture.

The concept of complementary component causes will be useful in applications to epidemiology that follow. For each component cause in a sufficient cause, the set of the other component causes in that sufficient cause comprises the complementary component causes. For example, in Figure 2–1, component cause A (poor weather) has as its complementary component causes the components labeled B, C, D, and U. Component cause B (an uncleared path for pedestrians) has as its complementary component causes the components labeled A, C, D, and U.

## THE NEED FOR A SPECIFIC REFERENCE CONDITION

Component causes must be defined with respect to a clearly specified alternative or reference condition (often called a *referent*). Consider again the lack of a handrail along the path. To say that this condition is a component cause of the broken hip, we have to specify an alternative condition against which to contrast the cause. The mere presence of a handrail would not suffice. After all, the hip fracture might still have occurred in the presence of a handrail, if the handrail was too short or if it was old and made of rotten wood. We might need to specify the presence of a handrail sufficiently tall and sturdy to break the fall for the absence of that handrail to be a component cause of the broken hip.

To see the necessity of specifying the alternative event, condition, or characteristic as well as the causal one, consider an example of a man who took high doses of ibuprofen for several years and developed a gastric ulcer. Did the man's use of ibuprofen cause his ulcer? One might at first assume that the natural contrast would be with what would have happened had he taken nothing instead of ibuprofen. Given a strong reason to take the ibuprofen, however, that alternative may not make sense. If the specified alternative to taking ibuprofen is to take acetaminophen, a different drug that might have been indicated for his problem, and if he would not have developed the ulcer had he used acetaminophen, then we can say that using ibuprofen caused the ulcer. But ibuprofen did not cause

his ulcer if the specified alternative is taking aspirin and, had he taken aspirin, he still would have developed the ulcer. The need to specify the alternative to a preventive is illustrated by a newspaper headline that read: "Rare Meat Cuts Colon Cancer Risk." Was this a story of an epidemiologic study comparing the colon cancer rate of a group of people who ate rare red meat with the rate in a group of vegetarians? No, the study compared persons who ate rare red meat with persons who ate highly cooked red meat. The same exposure, regular consumption of rare red meat, might have a preventive effect when contrasted against highly cooked red meat and a causative effect or no effect in contrast to a vegetarian diet. An event, condition, or characteristic is not a cause by itself as an intrinsic property it possesses in isolation, but as part of a causal contrast with an alternative event, condition, or characteristic (Lewis, 1973; Rubin, 1974; Greenland et al., 1999a; Maldonado and Greenland, 2002; see Chapter 4).

## *APPLICATION OF THE SUFFICIENT-CAUSE MODEL TO EPIDEMIOLOGY*

The preceding introduction to concepts of sufficient causes and component causes provides the lexicon for application of the model to epidemiology. For example, tobacco smoking is a cause of lung cancer, but by itself it is not a sufficient cause, as demonstrated by the fact that most smokers do not get lung cancer. First, the term *smoking* is too imprecise to be useful beyond casual description. One must specify the type of smoke (e.g., cigarette, cigar, pipe, or environmental), whether it is filtered or unfiltered, the manner and frequency of inhalation, the age at initiation of smoking, and the duration of smoking. And, however smoking is defined, its alternative needs to be defined as well. Is it smoking nothing at all, smoking less, smoking something else? Equally important, even if smoking and its alternative are both defined explicitly, smoking will not cause cancer in everyone. So who is susceptible to this smoking effect? Or, to put it in other terms, what are the other components of the causal constellation that act with smoking to produce lung cancer in this contrast?

Figure 2–2 provides a schematic diagram of three sufficient causes that could be completed during the follow-up of an individual. The three conditions or events—A, B, and E—have been defined as binary variables, so they can only take on values of 0 or 1. With the coding of A used in the figure, its reference level, $A = 0$, is sometimes causative, but its index level, $A = 1$, is never causative. This situation arises because two sufficient causes contain a component cause labeled "$A = 0$," but no sufficient cause contains a component cause labeled "$A = 1$." An example of a condition or event of this sort might be $A = 1$ for taking a daily multivitamin supplement and $A = 0$ for taking no vitamin supplement. With the coding of B and E used in the example depicted by Figure 2–2, their index levels, $B = 1$ and $E = 1$, are sometimes causative, but their reference levels, $B = 0$ and $C = 0$, are never causative. For each variable, the index and reference levels may represent only two alternative states or events out of many possibilities. Thus, the coding of B might be $B = 1$ for smoking 20 cigarettes per day for 40 years and $B = 0$ for smoking 20 cigarettes per day for 20 years, followed by 20 years of not smoking. E might be coded $E = 1$ for living in an urban neighborhood with low average income and high income inequality, and $E = 0$ for living in an urban neighborhood with high average income and low income inequality.

$A = 0$, $B = 1$, and $E = 1$ are individual component causes of the sufficient causes in Figure 2–2. $U_1$, $U_2$, and $U_3$ represent sets of component causes. $U_1$, for example, is the set of all components other than $A = 0$ and $B = 1$ required to complete the first sufficient cause in Figure 2–2. If we decided not to specify $B = 1$, then $B = 1$ would become part of the set of components that are causally complementary to $A = 0$; in other words, $B = 1$ would then be absorbed into $U_1$.

Each of the three sufficient causes represented in Figure 2–2 is minimally sufficient to produce the disease in the individual. That is, only one of these mechanisms needs to be completed for

***FIGURE 2–2*** ● Three classes of sufficient causes of a disease (sufficient causes I, II, and III from left to right).

disease to occur (sufficiency), and there is no superfluous component cause in any mechanism (minimality)—each component is a required part of that specific causal mechanism. A specific component cause may play a role in one, several, or all of the causal mechanisms. As noted earlier, a component cause that appears in all sufficient causes is called a *necessary* cause of the outcome. As an example, infection with HIV is a component of every sufficient cause of acquired immune deficiency syndrome (AIDS) and hence is a necessary cause of AIDS. It has been suggested that such causes be called "universally necessary," in recognition that every component of a sufficient cause is necessary for that sufficient cause (mechanism) to operate (Poole 2001a).

Figure 2–2 does not depict aspects of the causal process such as sequence or timing of action of the component causes, dose, or other complexities. These can be specified in the description of the contrast of index and reference conditions that defines each component cause. Thus, if the outcome is lung cancer and the factor B represents cigarette smoking, it might be defined more explicitly as smoking at least 20 cigarettes a day of unfiltered cigarettes for at least 40 years beginning at age 20 years or earlier (B = 1), or smoking 20 cigarettes a day of unfiltered cigarettes, beginning at age 20 years or earlier, and then smoking no cigarettes for the next 20 years (B = 0).

In specifying a component cause, the two sides of the causal contrast of which it is composed should be defined with an eye to realistic choices or options. If prescribing a placebo is not a realistic therapeutic option, a causal contrast between a new treatment and a placebo in a clinical trial may be questioned for its dubious relevance to medical practice. In a similar fashion, before saying that oral contraceptives increase the risk of death over 10 years (e.g., through myocardial infarction or stroke), we must consider the alternative to taking oral contraceptives. If it involves getting pregnant, then the risk of death attendant to childbirth might be greater than the risk from oral contraceptives, making oral contraceptives a preventive rather than a cause. If the alternative is an equally effective contraceptive without serious side effects, then oral contraceptives may be described as a cause of death.

To understand prevention in the sufficient-component cause framework, we posit that the alternative condition (in which a component cause is absent) prevents the outcome relative to the presence of the component cause. Thus, a preventive effect of a factor is represented by specifying its causative alternative as a component cause. An example is the presence of A = 0 as a component cause in the first two sufficient causes shown in Figure 2–2. Another example would be to define a variable, F (not depicted in Fig. 2–2), as "vaccination (F = 1) or no vaccination (F = 0)". Prevention of the disease by getting vaccinated (F = 1) would be expressed in the sufficient-component cause model as causation of the disease by not getting vaccinated (F = 0). This depiction is unproblematic because, once both sides of a causal contrast have been specified, causation and prevention are merely two sides of the same coin.

Sheps (1958) once asked, "Shall we count the living or the dead?" Death is an event, but survival is not. Hence, to use the sufficient-component cause model, we must count the dead. This model restriction can have substantive implications. For instance, some measures and formulas approximate others only when the outcome is rare. When survival is rare, death is common. In that case, use of the sufficient-component cause model to inform the analysis will prevent us from taking advantage of the rare-outcome approximations.

Similarly, etiologies of adverse health outcomes that are conditions or states, but not events, must be depicted under the sufficient-cause model by reversing the coding of the outcome. Consider spina bifida, which is the failure of the neural tube to close fully during gestation. There is no point in time at which spina bifida may be said to have occurred. It would be awkward to define the "incidence time" of spina bifida as the gestational age at which complete neural tube closure ordinarily occurs. The sufficient-component cause model would be better suited in this case to defining the event of complete closure (no spina bifida) as the outcome and to view conditions, events, and characteristics that prevent this beneficial event as the causes of the adverse condition of spina bifida.

## PROBABILITY, RISK, AND CAUSES

In everyday language, "risk" is often used as a synonym for probability. It is also commonly used as a synonym for "hazard," as in, "Living near a nuclear power plant is a risk you should avoid." Unfortunately, in epidemiologic parlance, even in the scholarly literature, "risk" is frequently used for many distinct concepts: rate, rate ratio, risk ratio, incidence odds, prevalence, etc. The more

specific, and therefore more useful, definition of *risk* is "probability of an event during a specified period of time."

The term *probability* has multiple meanings. One is that it is the relative frequency of an event. Another is that probability is the tendency, or propensity, of an entity to produce an event. A third meaning is that probability measures someone's degree of certainty that an event will occur. When one says "the probability of death in vehicular accidents when traveling >120 km/h is high," one means that the proportion of accidents that end with deaths is higher when they involve vehicles traveling >120 km/h than when they involve vehicles traveling at lower speeds (frequency usage), that high-speed accidents have a greater tendency than lower-speed accidents to result in deaths (propensity usage), or that the speaker is more certain that a death will occur in a high-speed accident than in a lower-speed accident (certainty usage).

The frequency usage of "probability" and "risk," unlike the propensity and certainty usages, admits no meaning to the notion of "risk" for an individual beyond the relative frequency of 100% if the event occurs and 0% if it does not. This restriction of individual risks to 0 or 1 can only be relaxed to allow values in between by reinterpreting such statements as the frequency with which the outcome would be seen upon random sampling from a very large population of individuals deemed to be "like" the individual in some way (e.g., of the same age, sex, and smoking history). If one accepts this interpretation, whether any actual sampling has been conducted or not, the notion of individual risk is replaced by the notion of the frequency of the event in question in the large population from which the individual was sampled. With this view of risk, a risk will change according to how we group individuals together to evaluate frequencies. Subjective judgment will inevitably enter into the picture in deciding which characteristics to use for grouping. For instance, should tomato consumption be taken into account in defining the class of men who are "like" a given man for purposes of determining his risk of a diagnosis of prostate cancer between his 60th and 70th birthdays? If so, which study or meta-analysis should be used to factor in this piece of information?

Unless we have found a set of conditions and events in which the disease does not occur at all, it is always a reasonable working hypothesis that, no matter how much is known about the etiology of a disease, some causal components remain unknown. We may be inclined to assign an equal risk to all individuals whose status for some components is known and identical. We may say, for example, that men who are heavy cigarette smokers have approximately a 10% lifetime risk of developing lung cancer. Some interpret this statement to mean that all men would be subject to a 10% probability of lung cancer if they were to become heavy smokers, as if the occurrence of lung cancer, aside from smoking, were purely a matter of chance. This view is untenable. A probability may be 10% conditional on one piece of information and higher or lower than 10% if we condition on other relevant information as well. For instance, men who are heavy cigarette smokers and who worked for many years in occupations with historically high levels of exposure to airborne asbestos fibers would be said to have a lifetime lung cancer risk appreciably higher than 10%.

Regardless of whether we interpret probability as relative frequency or degree of certainty, the assignment of equal risks merely reflects the particular grouping. In our ignorance, the best we can do in assessing risk is to classify people according to measured risk indicators and then assign the average risk observed within a class to persons within the class. As knowledge or specification of additional risk indicators expands, the risk estimates assigned to people will depart from average according to the presence or absence of other factors that predict the outcome.

## *STRENGTH OF EFFECTS*

The causal model exemplified by Figure 2–2 can facilitate an understanding of some key concepts such as *strength of effect* and *interaction.* As an illustration of strength of effect, Table 2–1 displays the frequency of the eight possible patterns for exposure to A, B, and E in two hypothetical populations. Now the pie charts in Figure 2–2 depict classes of mechanisms. The first one, for instance, represents all sufficient causes that, no matter what other component causes they may contain, have in common the fact that they contain $A = 0$ and $B = 1$. The constituents of $U_1$ may, and ordinarily would, differ from individual to individual. For simplification, we shall suppose, rather unrealistically, that $U_1$, $U_2$, and $U_3$ are always present or have always occured for everyone and Figure 2–2 represents all the sufficient causes.

**TABLE 2–1**

**Exposure Frequencies and Individual Risks in Two Hypothetical Populations According to the Possible Combinations of the Three Specified Component Causes in Fig. 2–1**

| Exposures | | | | | Frequency of Exposure Pattern | |
|---|---|---|---|---|---|---|
| A | B | E | Sufficient Cause Completed | Risk | Population 1 | Population 2 |
| 1 | 1 | 1 | III | 1 | 900 | 100 |
| 1 | 1 | 0 | None | 0 | 900 | 100 |
| 1 | 0 | 1 | None | 0 | 100 | 900 |
| 1 | 0 | 0 | None | 0 | 100 | 900 |
| 0 | 1 | 1 | I, II, or III | 1 | 100 | 900 |
| 0 | 1 | 0 | I | 1 | 100 | 900 |
| 0 | 0 | 1 | II | 1 | 900 | 100 |
| 0 | 0 | 0 | none | 0 | 900 | 100 |

Under these assumptions, the response of each individual to the exposure pattern in a given row can be found in the response column. The response here is the risk of developing a disease over a specified time period that is the same for all individuals. For simplification, a deterministic model of risk is employed, such that individual risks can equal only the value 0 or 1, and no values in between. A stochastic model of individual risk would relax this restriction and allow individual risks to lie between 0 and 1.

The proportion getting disease, or incidence proportion, in any subpopulation in Table 2–1 can be found by summing the number of persons at each exposure pattern with an individual risk of 1 and dividing this total by the subpopulation size. For example, if exposure A is not considered (e.g., if it were not measured), the pattern of incidence proportions in population 1 would be those in Table 2–2.

As an example of how the proportions in Table 2–2 were calculated, let us review how the incidence proportion among persons in population 1 with B = 1 and E = 0 was calculated: There were 900 persons with A = 1, B = 1, and E = 0, none of whom became cases because there are no sufficient causes that can culminate in the occurrence of the disease over the study period in persons with this combination of exposure conditions. (There are two sufficient causes that contain B = 1 as a component cause, but one of them contains the component cause A = 0 and the other contains the component cause E = 1. The presence of A = 1 or E = 0 blocks these etiologic mechanisms.) There were 100 persons with A = 0, B = 1, and E = 0, all of whom became cases because they all had $U_1$, the set of causal complements for the class of sufficient causes containing A = 0 and

**TABLE 2–2**

**Incidence Proportions (IP) for Combinations of Component Causes B and E in Hypothetical Population 1, Assuming That Component Cause A Is Unmeasured**

| | B = 1, E = 1 | B = 1, E = 0 | B = 0, E = 1 | B = 0, E = 0 |
|---|---|---|---|---|
| **Cases** | 1,000 | 100 | 900 | 0 |
| **Total** | 1,000 | 1,000 | 1,000 | 1,000 |
| **IP** | 1.00 | 0.10 | 0.90 | 0.00 |

**TABLE 2–3**

**Incidence Proportions (IP) for Combinations of Component Causes B and E in Hypothetical Population 2, Assuming That Component Cause A Is Unmeasured**

| | B = 1, E = 1 | B = 1, E = 0 | B = 0, E = 1 | B = 0, E = 0 |
|---|---|---|---|---|
| **Cases** | 1,000 | 900 | 100 | 0 |
| **Total** | 1,000 | 1,000 | 1,000 | 1,000 |
| **IP** | 1.00 | 0.90 | 0.10 | 0.00 |

B = 1. Thus, among all 1,000 persons with B = 1 and E = 0, there were 100 cases, for an incidence proportion of 0.10.

If we were to measure strength of effect by the difference of the incidence proportions, it is evident from Table 2–2 that for population 1, E = 1 has a much stronger effect than B = 1, because E = 1 increases the incidence proportion by 0.9 (in both levels of B), whereas B = 1 increases the incidence proportion by only 0.1 (in both levels of E). Table 2–3 shows the analogous results for population 2. Although the members of this population have exactly the same causal mechanisms operating within them as do the members of population 1, the relative strengths of causative factors E = 1 and B = 1 are reversed, again using the incidence proportion difference as the measure of strength. B = 1 now has a much stronger effect on the incidence proportion than E = 1, despite the fact that A, B, and E have no association with one another in either population, and their index levels (A = 1, B = 1 and E = 1) and reference levels (A = 0, B = 0, and E = 0) are each present or have occured in exactly half of each population.

The overall difference of incidence proportions contrasting E = 1 with E = 0 is (1,900/2,000) − (100/2,000) = 0.9 in population 1 and (1,100/2,000) − (900/2,000) = 0.1 in population 2. The key difference between populations 1 and 2 is the difference in the prevalence of the conditions under which E = 1 acts to increase risk: that is, the presence of A = 0 or B = 1, but not both. (When A = 0 *and* B = 1, E = 1 completes all three sufficient causes in Figure 2–2; it thus does not increase anyone's risk, although it may well shorten the time to the outcome.) The prevalence of the condition, "A = 0 or B = 1 but not both" is 1,800/2,000 = 90% in both levels of E in population 1. In population 2, this prevalence is only 200/2,000 = 10% in both levels of E. This difference in the prevalence of the conditions sufficient for E = 1 to increase risk explains the difference in the strength of the effect of E = 1 as measured by the difference in incidence proportions.

As noted above, the set of all other component causes in all sufficient causes in which a causal factor participates is called the *causal complement* of the factor. Thus, A = 0, B = 1, $U_2$, and $U_3$ make up the causal complement of E = 1 in the above example. This example shows that the strength of a factor's effect on the occurrence of a disease in a population, measured as the absolute difference in incidence proportions, depends on the prevalence of its causal complement. This dependence has nothing to do with the etiologic mechanism of the component's action, because the component is an equal partner in each mechanism in which it appears. Nevertheless, a factor will appear to have a strong effect, as measured by the difference of proportions getting disease, if its causal complement is common. Conversely, a factor with a rare causal complement will appear to have a weak effect.

If strength of effect is measured by the ratio of proportions getting disease, as opposed to the difference, then strength depends on more than a factor's causal complement. In particular, it depends additionally on how common or rare the components are of sufficient causes in which the specified causal factor does *not* play a role. In this example, given the ubiquity of $U_1$, the effect of E = 1 measured in ratio terms depends on the prevalence of E = 1's causal complement and on the prevalence of the conjunction of A = 0 and B = 1. If many people have both A = 0 and B = 1, the "baseline" incidence proportion (i.e., the proportion of not-E or "unexposed" persons getting disease) will be high and the proportion getting disease due to E will be comparatively low. If few

people have both A = 0 and B = 1, the baseline incidence proportion will be low and the proportion getting disease due to E = 1 will be comparatively high. Thus, strength of effect measured by the incidence proportion ratio depends on more conditions than does strength of effect measured by the incidence proportion difference.

Regardless of how strength of a causal factor's effect is measured, the public health significance of that effect does not imply a corresponding degree of etiologic significance. Each component cause in a given sufficient cause has the same etiologic significance. Given a specific causal mechanism, any of the component causes can have strong or weak effects using either the difference or ratio measure. The actual identities of the components of a sufficient cause are part of the mechanics of causation, whereas the strength of a factor's effect depends on the time-specific distribution of its causal complement (if strength is measured in absolute terms) plus the distribution of the components of all sufficient causes in which the factor does not play a role (if strength is measured in relative terms). Over a span of time, the strength of the effect of a given factor on disease occurrence may change because the prevalence of its causal complement in various mechanisms may also change, even if the causal mechanisms in which the factor and its cofactors act remain unchanged.

## INTERACTION AMONG CAUSES

Two component causes acting in the same sufficient cause may be defined as *interacting causally* to produce disease. This definition leaves open many possible mechanisms for the interaction, including those in which two components interact in a direct physical fashion (e.g., two drugs that react to form a toxic by-product) and those in which one component (the *initiator* of the pair) alters a substrate so that the other component (the *promoter* of the pair) can act. Nonetheless, it excludes any situation in which one component E is merely a cause of another component F, with no effect of E on disease except through the component F it causes.

Acting in the same sufficient cause is not the same as one component cause acting to produce a second component cause, and then the second component going on to produce the disease (Robins and Greenland 1992, Kaufman et al., 2004). As an example of the distinction, if cigarette smoking (vs. never smoking) is a component cause of atherosclerosis, and atherosclerosis (vs. no atherosclerosis) causes myocardial infarction, both smoking and atherosclerosis would be component causes (cofactors) in certain sufficient causes of myocardial infarction. They would not necessarily appear in the same sufficient cause. Rather, for a sufficient cause involving atherosclerosis as a component cause, there would be another sufficient cause in which the atherosclerosis component cause was replaced by all the component causes that brought about the atherosclerosis, including smoking. Thus, a sequential causal relation between smoking and atherosclerosis would not be enough for them to interact synergistically in the etiology of myocardial infarction, in the sufficient-cause sense. Instead, the causal sequence means that smoking can act indirectly, through atherosclerosis, to bring about myocardial infarction.

Now suppose that, perhaps in addition to the above mechanism, smoking reduces clotting time and thus causes thrombi that block the coronary arteries if they are narrowed by atherosclerosis. This mechanism would be represented by a sufficient cause containing both smoking and atherosclerosis as components and thus would constitute a synergistic interaction between smoking and atherosclerosis in causing myocardial infarction. The presence of this sufficient cause would not, however, tell us whether smoking also contributed to the myocardial infarction by causing the atherosclerosis. Thus, the basic sufficient-cause model does not alert us to indirect effects (effects of some component causes mediated by other component causes in the model). Chapters 4 and 12 introduce potential-outcome and graphical models better suited to displaying indirect effects and more general sequential mechanisms, whereas Chapter 5 discusses in detail interaction as defined in the potential-outcome framework and its relation to interaction as defined in the sufficient-cause model.

## PROPORTION OF DISEASE DUE TO SPECIFIC CAUSES

In Figure 2–2, assuming that the three sufficient causes in the diagram are the only ones operating, what fraction of disease is caused by E = 1? E = 1 is a component cause of disease in two of the sufficient-cause mechanisms, II and III, so all disease arising through either of these two mechanisms is attributable to E = 1. Note that in persons with the exposure pattern A = 0, B = 1, E = 1, all three

sufficient causes would be completed. The first of the three mechanisms to be completed would be the one that actually produces a given case. If the first one completed is mechanism II or III, the case would be causally attributable to E = 1. If mechanism I is the first one to be completed, however, E = 1 would not be part of the sufficient cause producing that case. Without knowing the completion times of the three mechanisms, among persons with the exposure pattern A = 0, B = 1, E = 1 we cannot tell how many of the 100 cases in population 1 or the 900 cases in population 2 are etiologically attributable to E = 1.

Each of the cases that is etiologically attributable to E = 1 can also be attributed to the other component causes in the causal mechanisms in which E = 1 acts. Each component cause interacts with its complementary factors to produce disease, so each case of disease can be attributed to every component cause in the completed sufficient cause. Note, though, that the attributable fractions added across component causes of the same disease do not sum to 1, although there is a mistaken tendency to think that they do. To illustrate the mistake in this tendency, note that a necessary component cause appears in every completed sufficient cause of disease, and so by itself has an attributable fraction of 1, without counting the attributable fractions for other component causes. Because every case of disease can be attributed to every component cause in its causal mechanism, attributable fractions for different component causes will generally sum to more than 1, and there is no upper limit for this sum.

A recent debate regarding the proportion of risk factors for coronary heart disease attributable to particular component causes illustrates the type of errors in inference that can arise when the sum is thought to be restricted to 1. The debate centers around whether the proportion of coronary heart disease attributable to high blood cholesterol, high blood pressure, and cigarette smoking equals 75% or "only 50%" (Magnus and Beaglehole, 2001). If the former, then some have argued that the search for additional causes would be of limited utility (Beaglehole and Magnus, 2002), because only 25% of cases "remain to be explained." By assuming that the proportion explained by yet unknown component causes cannot exceed 25%, those who support this contention fail to recognize that cases caused by a sufficient cause that contains any subset of the three named causes might also contain unknown component causes. Cases stemming from sufficient causes with this overlapping set of component causes could be prevented by interventions targeting the three named causes, or by interventions targeting the yet unknown causes when they become known. The latter interventions could reduce the disease burden by much more than 25%.

As another example, in a cohort of cigarette smokers exposed to arsenic by working in a smelter, an estimated 75% of the lung cancer rate was attributable to their work environment and an estimated 65% was attributable to their smoking (Pinto et al., 1978; Hertz-Picciotto et al., 1992). There is no problem with such figures, which merely reflect the multifactorial etiology of disease. So, too, with coronary heart disease; if 75% of that disease is attributable to high blood cholesterol, high blood pressure, and cigarette smoking, 100% of it can still be attributable to other causes, known, suspected, and yet to be discovered. Some of these causes will participate in the same causal mechanisms as high blood cholesterol, high blood pressure, and cigarette smoking. Beaglehole and Magnus were correct in thinking that if the three specified component causes combine to explain 75% of cardiovascular disease (CVD) and we somehow eliminated them, there would be only 25% of CVD cases remaining. But until that 75% is eliminated, any newly discovered component could cause up to 100% of the CVD we currently have.

The notion that interventions targeting high blood cholesterol, high blood pressure, and cigarette smoking could eliminate 75% of coronary heart disease is unrealistic given currently available intervention strategies. Although progress can be made to reduce the effect of these risk factors, it is unlikely that any of them could be completely eradicated from any large population in the near term. Estimates of the public health effect of eliminating diseases themselves as causes of death (Murray et al., 2002) are even further removed from reality, because they fail to account for all the effects of interventions required to achieve the disease elimination, including unanticipated side effects (Greenland, 2002a, 2005a).

The debate about coronary heart disease attribution to component causes is reminiscent of an earlier debate regarding causes of cancer. In their widely cited work, *The Causes of Cancer*, Doll and Peto (1981, Table 20) created a table giving their estimates of the fraction of all cancers caused by various agents. The fractions summed to nearly 100%. Although the authors acknowledged that any case could be caused by more than one agent (which means that, given enough agents, the attributable

fractions would sum to far more than 100%), they referred to this situation as a “difficulty” and an “anomaly” that they chose to ignore. Subsequently, one of the authors acknowledged that the attributable fraction could sum to greater than 100% (Peto, 1985). It is neither a difficulty nor an anomaly nor something we can safely ignore, but simply a consequence of the fact that no event has a single agent as the cause. The fraction of disease that can be attributed to known causes will grow without bound as more causes are discovered. Only the fraction of disease attributable to a single component cause cannot exceed 100%.

In a similar vein, much publicity attended the pronouncement in 1960 that as much as 90% of cancer is environmentally caused (Higginson, 1960). Here, “environment” was thought of as representing all nongenetic component causes, and thus included not only the physical environment, but also the social environment and all individual human behavior that is not genetically determined. Hence, environmental component causes must be present to some extent in every sufficient cause of a disease. Thus, Higginson’s estimate of 90% was an underestimate.

One can also show that 100% of any disease is inherited, even when environmental factors are component causes. MacMahon (1968) cited the example given by Hogben (1933) of yellow shanks, a trait occurring in certain genetic strains of fowl fed on yellow corn. Both a particular set of genes and a yellow-corn diet are necessary to produce yellow shanks. A farmer with several strains of fowl who feeds them all only yellow corn would consider yellow shanks to be a genetic condition, because only one strain would get yellow shanks, despite all strains getting the same diet. A different farmer who owned only the strain liable to get yellow shanks but who fed some of the birds yellow corn and others white corn would consider yellow shanks to be an environmentally determined condition because it depends on diet. In humans, the mental retardation caused by phenylketonuria is considered by many to be purely genetic. This retardation can, however, be successfully prevented by dietary intervention, which demonstrates the presence of an environmental cause. In reality, yellow shanks, phenylketonuria, and other diseases and conditions are determined by an interaction of genes and environment. It makes no sense to allocate a portion of the causation to either genes or environment separately when both may act together in sufficient causes.

Nonetheless, many researchers have compared disease occurrence in identical and nonidentical twins to estimate the fraction of disease that is inherited. These twin-study and other heritability indices assess only the relative role of environmental and genetic causes of disease in a particular setting. For example, some genetic causes may be necessary components of every causal mechanism. If everyone in a population has an identical set of the genes that cause disease, however, their effect is not included in heritability indices, despite the fact that the genes are causes of the disease. The two farmers in the preceding example would offer very different values for the heritability of yellow shanks, despite the fact that the condition is always 100% dependent on having certain genes.

Every case of every disease has some environmental and some genetic component causes, and therefore every case can be attributed both to genes and to environment. No paradox exists as long as it is understood that the fractions of disease attributable to genes and to environment overlap with one another. Thus, debates over what proportion of all occurrences of a disease are genetic and what proportion are environmental, inasmuch as these debates assume that the shares must add up to 100%, are fallacious and distracting from more worthwhile pursuits.

On an even more general level, the question of whether a given disease does or does not have a “multifactorial etiology” can be answered once and for all in the affirmative. All diseases have multifactorial etiologies. It is therefore completely unremarkable for a given disease to have such an etiology, and no time or money should be spent on research trying to answer the question of whether a particular disease does or does not have a multifactorial etiology. They all do. The job of etiologic research is to identify components of those etiologies.

## *INDUCTION PERIOD*

Pie-chart diagrams of sufficient causes and their components such as those in Figure 2–2 are not well suited to provide a model for conceptualizing the *induction period*, which may be defined as the period of time from causal action until disease initiation. There is no way to tell from a pie-chart diagram of a sufficient cause which components affect each other, which components must come before or after others, for which components the temporal order is irrelevant, etc. The crucial

information on temporal ordering must come in a separate description of the interrelations among the components of a sufficient cause.

If, in sufficient cause I, the sequence of action of the specified component causes must be A = 0, B = 1 and we are studying the effect of A = 0, which (let us assume) acts at a narrowly defined point in time, we do not observe the occurrence of disease immediately after A = 0 occurs. Disease occurs only after the sequence is completed, so there will be a delay while B = 1 occurs (along with components of the set $U_1$ that are not present or that have not occured when A = 0 occurs). When B = 1 acts, if it is the last of all the component causes (including those in the set of unspecified conditions and events represented by $U_1$), disease occurs. The interval between the action of B = 1 and the disease occurrence is the induction time for the effect of B = 1 in sufficient cause I.

In the example given earlier of an equilibrium disorder leading to a later fall and hip injury, the induction time between the start of the equilibrium disorder and the later hip injury might be long, if the equilibrium disorder is caused by an old head injury, or short, if the disorder is caused by inebriation. In the latter case, it could even be instantaneous, if we define it as blood alcohol greater than a certain level. This latter possibility illustrates an important general point: Component causes that do not change with time, as opposed to events, all have induction times of zero.

Defining an induction period of interest is tantamount to specifying the characteristics of the component causes of interest. A clear example of a lengthy induction time is the cause–effect relation between exposure of a female fetus to diethylstilbestrol (DES) and the subsequent development of adenocarcinoma of the vagina. The cancer is usually diagnosed between ages 15 and 30 years. Because the causal exposure to DES occurs early in pregnancy, there is an induction time of about 15 to 30 years for the carcinogenic action of DES. During this time, other causes presumably are operating; some evidence suggests that hormonal action during adolescence may be part of the mechanism (Rothman, 1981).

It is incorrect to characterize a disease itself as having a lengthy or brief induction period. The induction time can be conceptualized only in relation to a specific component cause operating in a specific sufficient cause. Thus, we say that the induction time relating DES to clear-cell carcinoma of the vagina is 15 to 30 years, but we should not say that 15 to 30 years is the induction time for clear-cell carcinoma in general. Because each component cause in any causal mechanism can act at a time different from the other component causes, each can have its own induction time. For the component cause that acts last, the induction time equals zero. If another component cause of clear-cell carcinoma of the vagina that acts during adolescence were identified, it would have a much shorter induction time for its carcinogenic action than DES. Thus, induction time characterizes a specific cause–effect pair rather than just the effect.

In carcinogenesis, the terms *initiator* and *promotor* have been used to refer to some of the component causes of cancer that act early and late, respectively, in the causal mechanism. Cancer itself has often been characterized as a disease process with a long induction time. This characterization is a misconception, however, because any late-acting component in the causal process, such as a promotor, will have a short induction time. Indeed, by definition, the induction time will always be zero for at least one component cause, the last to act. The mistaken view that diseases, as opposed to cause–disease relationships, have long or short induction periods can have important implications for research. For instance, the view of adult cancers as "diseases of long latency" may induce some researchers to ignore evidence of etiologic effects occurring relatively late in the processes that culminate in clinically diagnosed cancers. At the other extreme, the routine disregard for exposures occurring in the first decade or two in studies of occupational carcinogenesis, as a major example, may well have inhibited the discovery of occupational causes with very long induction periods.

Disease, once initiated, will not necessarily be apparent. The time interval between irreversible disease occurrence and detection has been termed the *latent period* (Rothman, 1981), although others have used this term interchangeably with induction period. Still others use *latent period* to mean the total time between causal action and disease detection. We use *induction period* to describe the time from causal action to irreversible disease occurrence and *latent period* to mean the time from disease occurrence to disease detection. The latent period can sometimes be reduced by improved methods of disease detection. The induction period, on the other hand, cannot be reduced by early detection of disease, because disease occurrence marks the end of the induction period. Earlier detection of disease, however, may reduce the apparent induction period (the time between causal action and disease detection), because the time when disease is detected, as a practical matter, is

usually used to mark the time of disease occurrence. Thus, diseases such as slow-growing cancers may appear to have long induction periods with respect to many causes because they have long latent periods. The latent period, unlike the induction period, is a characteristic of the disease and the detection effort applied to the person with the disease.

Although it is not possible to reduce the induction period proper by earlier detection of disease, it may be possible to observe intermediate stages of a causal mechanism. The increased interest in biomarkers such as DNA adducts is an example of attempting to focus on causes more proximal to the disease occurrence or on effects more proximal to cause occurrence. Such biomarkers may nonetheless reflect the effects of earlier-acting agents on the person.

Some agents may have a causal action by shortening the induction time of other agents. Suppose that exposure to factor $X = 1$ leads to epilepsy after an interval of 10 years, on average. It may be that exposure to a drug, $Z = 1$, would shorten this interval to 2 years. Is $Z = 1$ acting as a catalyst, or as a cause, of epilepsy? The answer is both: A catalyst is a cause. Without $Z = 1$, the occurrence of epilepsy comes 8 years later than it comes with $Z = 1$, so we can say that $Z = 1$ causes the onset of the early epilepsy. It is not sufficient to argue that the epilepsy would have occurred anyway. First, it would not have occurred at that time, and the time of occurrence is part of our definition of an event. Second, epilepsy will occur later only if the individual survives an additional 8 years, which is not certain. Not only does agent $Z = 1$ determine when the epilepsy occurs, it can also determine whether it occurs. Thus, we should call any agent that acts as a catalyst of a causal mechanism, speeding up an induction period for other agents, a cause in its own right. Similarly, any agent that postpones the onset of an event, drawing out the induction period for another agent, is a preventive. It should not be too surprising to equate postponement to prevention: We routinely use such an equation when we employ the euphemism that we "prevent" death, which actually can only be postponed. What we prevent is death at a given time, in favor of death at a later time.

## SCOPE OF THE MODEL

The main utility of this model of sufficient causes and their components lies in its ability to provide a general but practical conceptual framework for causal problems. The attempt to make the proportion of disease attributable to various component causes add to 100% is an example of a fallacy that is exposed by the model (although MacMahon and others were able to invoke yellow shanks and phenylketonuria to expose that fallacy long before the sufficient-component cause model was formally described [MacMahon and Pugh, 1967, 1970]). The model makes it clear that, because of interactions, there is no upper limit to the sum of these proportions. As we shall see in Chapter 5, the epidemiologic evaluation of interactions themselves can be clarified, to some extent, with the help of the model.

Although the model appears to deal qualitatively with the action of component causes, it can be extended to account for dose dependence by postulating a set of sufficient causes, each of which contains as a component a different dose of the agent in question. Small doses might require a larger or rarer set of complementary causes to complete a sufficient cause than that required by large doses (Rothman, 1976a), in which case it is particularly important to specify both sides of the causal contrast. In this way, the model can account for the phenomenon of a shorter induction period accompanying larger doses of exposure, because a smaller set of complementary components would be needed to complete the sufficient cause.

Those who believe that chance must play a role in any complex mechanism might object to the intricacy of this seemingly deterministic model. A probabilistic (stochastic) model could be invoked to describe a dose–response relation, for example, without the need for a multitude of different causal mechanisms. The model would simply relate the dose of the exposure to the probability of the effect occurring. For those who believe that virtually all events contain some element of chance, deterministic causal models may seem to misrepresent the indeterminism of the real world. However, the deterministic model presented here can accommodate "chance"; one way might be to view chance, or at least some part of the variability that we call "chance," as the result of deterministic events that are beyond the current limits of knowledge or observability.

For example, the outcome of a flip of a coin is usually considered a chance event. In classical mechanics, however, the outcome can in theory be determined completely by the application of physical laws and a sufficient description of the starting conditions. To put it in terms more familiar

to epidemiologists, consider the explanation for why an individual gets lung cancer. One hundred years ago, when little was known about the etiology of lung cancer; a scientist might have said that it was a matter of chance. Nowadays, we might say that the risk depends on how much the individual smokes, how much asbestos and radon the individual has been exposed to, and so on. Nonetheless, recognizing this dependence moves the line of ignorance; it does not eliminate it. One can still ask what determines whether an individual who has smoked a specific amount and has a specified amount of exposure to all the other known risk factors will get lung cancer. Some will get lung cancer and some will not, and if all known risk factors are already taken into account, what is left we might still describe as chance. True, we can explain much more of the variability in lung cancer occurrence nowadays than we formerly could by taking into account factors known to cause it, but at the limits of our knowledge, we still ascribe the remaining variability to what we call chance. In this view, chance is seen as a catchall term for our ignorance about causal explanations.

We have so far ignored more subtle considerations of sources of unpredictability in events, such as chaotic behavior (in which even the slightest uncertainty about initial conditions leads to vast uncertainty about outcomes) and quantum-mechanical uncertainty. In each of these situations, a random (stochastic) model component may be essential for any useful modeling effort. Such components can also be introduced in the above conceptual model by treating unmeasured component causes in the model as random events, so that the causal model based on components of sufficient causes can have random elements. An example is treatment assignment in randomized clinical trials (Poole 2001a).

### *OTHER MODELS OF CAUSATION*

The sufficient-component cause model is only one of several models of causation that may be useful for gaining insight about epidemiologic concepts (Greenland and Brumback, 2002; Greenland, 2004a). It portrays qualitative causal mechanisms within members of a population, so its fundamental unit of analysis is the causal mechanism rather than a person. Many different sets of mechanisms can lead to the same pattern of disease within a population, so the sufficient-component cause model involves specification of details that are beyond the scope of epidemiologic data. Also, it does not incorporate elements reflecting population distributions of factors or causal sequences, which are crucial to understanding confounding and other biases.

Other models of causation, such as potential-outcome (counterfactual) models and graphical models, provide direct representations of epidemiologic concepts such as confounding and other biases, and can be applied at mechanistic, individual, or population levels of analysis. Potential-outcome models (Chapters 4 and 5) specify in detail what would happen to individuals or populations under alternative possible patterns of interventions or exposures, and also bring to the fore problems in operationally defining causes (Greenland, 2002a, 2005a; Hernán, 2005). Graphical models (Chapter 12) display broad qualitative assumptions about causal directions and independencies. Both types of model have close relationships to the structural-equations models that are popular in the social sciences (Pearl, 2000; Greenland and Brumback, 2002), and both can be subsumed under a general theory of longitudinal causality (Robins, 1997).

## PHILOSOPHY OF SCIENTIFIC INFERENCE

Causal inference may be viewed as a special case of the more general process of scientific reasoning. The literature on this topic is too vast for us to review thoroughly, but we will provide a brief overview of certain points relevant to epidemiology, at the risk of some oversimplification.

### *INDUCTIVISM*

Modern science began to emerge around the 16th and 17th centuries, when the knowledge demands of emerging technologies (such as artillery and transoceanic navigation) stimulated inquiry into the origins of knowledge. An early codification of the scientific method was Francis Bacon's *Novum Organum,* which, in 1620, presented an inductivist view of science. In this philosophy, scientific reasoning is said to depend on making generalizations, or inductions, from observations to general laws of nature; the observations are said to induce the formulation of a natural law in the mind of

the scientist. Thus, an inductivist would have said that Jenner's observation of lack of smallpox among milkmaids induced in Jenner's mind the theory that cowpox (common among milkmaids) conferred immunity to smallpox. Inductivist philosophy reached a pinnacle of sorts in the canons of John Stuart Mill (1862), which evolved into inferential criteria that are still in use today.

Inductivist philosophy was a great step forward from the medieval scholasticism that preceded it, for at least it demanded that a scientist make careful observations of people and nature rather than appeal to faith, ancient texts, or authorities. Nonetheless, in the 18th century the Scottish philosopher David Hume described a disturbing deficiency in inductivism. An inductive argument carried no logical force; instead, such an argument represented nothing more than an *assumption* that certain events would in the future follow the same pattern as they had in the past. Thus, to argue that cowpox caused immunity to smallpox because no one got smallpox after having cowpox corresponded to an unjustified assumption that the pattern observed to date (no smallpox after cowpox) would continue into the future. Hume pointed out that, even for the most reasonable-sounding of such assumptions, there was no logical necessity behind the inductive argument.

Of central concern to Hume (1739) was the issue of causal inference and failure of induction to provide a foundation for it:

> Thus not only our reason fails us in the discovery of the ultimate connexion of causes and effects, but even after experience has inform'd us of their constant conjunction, 'tis impossible for us to satisfy ourselves by our reason, why we shou'd extend that experience beyond those particular instances, which have fallen under our observation. We suppose, but are never able to prove, that there must be a resemblance betwixt those objects, of which we have had experience, and those which lie beyond the reach of our discovery.

In other words, no number of repetitions of a particular sequence of events, such as the appearance of a light after flipping a switch, can prove a causal connection between the action of the switch and the turning on of the light. No matter how many times the light comes on after the switch has been pressed, the possibility of coincidental occurrence cannot be ruled out. Hume pointed out that observers cannot perceive causal connections, but only a series of events. Bertrand Russell (1945) illustrated this point with the example of two accurate clocks that perpetually chime on the hour, with one keeping time slightly ahead of the other. Although one invariably chimes before the other, there is no direct causal connection from one to the other. Thus, assigning a causal interpretation to the pattern of events cannot be a logical extension of our observations alone, because the events might be occurring together only because of a shared earlier cause, or because of some systematic error in the observations.

Causal inference based on mere association of events constitutes a logical fallacy known as *post hoc ergo propter hoc* (Latin for "after this therefore on account of this"). This fallacy is exemplified by the inference that the crowing of a rooster is necessary for the sun to rise because sunrise is always preceded by the crowing.

The *post hoc* fallacy is a special case of a more general logical fallacy known as the *fallacy of affirming the consequent.* This fallacy of confirmation takes the following general form: "We know that if H is true, B must be true; and we know that B is true; therefore H must be true." This fallacy is used routinely by scientists in interpreting data. It is used, for example, when one argues as follows: "If sewer service causes heart disease, then heart disease rates should be highest where sewer service is available; heart disease rates are indeed highest where sewer service is available; therefore, sewer service causes heart disease." Here, H is the hypothesis "sewer service causes heart disease" and B is the observation "heart disease rates are highest where sewer service is available." The argument is logically unsound, as demonstrated by the fact that we can imagine many ways in which the premises could be true but the conclusion false; for example, economic development could lead to both sewer service and elevated heart disease rates, without any effect of sewer service on heart disease. In this case, however, we also know that one of the premises is not true—specifically, the premise, "If H is true, B must be true." This particular form of the fallacy exemplifies the problem of *confounding*, which we will discuss in detail in later chapters.

Bertrand Russell (1945) satirized the fallacy this way:

> 'If p, then q; now q is true; therefore p is true.' E.g., 'If pigs have wings, then some winged animals are good to eat; now some winged animals are good to eat; therefore pigs have wings.' This form of inference is called 'scientific method.'

## REFUTATIONISM

Russell was not alone in his lament of the illogicality of scientific reasoning as ordinarily practiced. Many philosophers and scientists from Hume's time forward attempted to set out a firm logical basis for scientific reasoning.

In the 1920s, most notable among these was the school of logical positivists, who sought a logic for science that could lead inevitably to correct scientific conclusions, in much the way rigorous logic can lead inevitably to correct conclusions in mathematics. Other philosophers and scientists, however, had started to suspect that scientific hypotheses can never be proven or established as true in any logical sense. For example, a number of philosophers noted that scientific statements can only be found to be consistent with observation, but cannot be proven or disproven in any "airtight" logical or mathematical sense (Duhem, 1906, transl. 1954; Popper 1934, transl. 1959; Quine, 1951). This fact is sometimes called the problem of *nonidentification* or *underdetermination* of theories by observations (Curd and Cover, 1998). In particular, available observations are always consistent with several hypotheses that themselves are mutually inconsistent, which explains why (as Hume noted) scientific theories cannot be logically proven. In particular, consistency between a hypothesis and observations is no proof of the hypothesis, because we can always invent alternative hypotheses that are just as consistent with the observations.

In contrast, a valid observation that is inconsistent with a hypothesis implies that the hypothesis as stated is false and so refutes the hypothesis. If you wring the rooster's neck before it crows and the sun still rises, you have disproved that the rooster's crowing is a necessary cause of sunrise. Or consider a hypothetical research program to learn the boiling point of water (Magee, 1985). A scientist who boils water in an open flask and repeatedly measures the boiling point at 100°C will never, no matter how many confirmatory repetitions are involved, prove that 100°C is always the boiling point. On the other hand, merely one attempt to boil the water in a closed flask or at high altitude will refute the proposition that water always boils at 100°C.

According to Popper, science advances by a process of elimination that he called "conjecture and refutation." Scientists form hypotheses based on intuition, conjecture, and previous experience. Good scientists use deductive logic to infer predictions from the hypothesis and then compare observations with the predictions. Hypotheses whose predictions agree with observations are confirmed (Popper used the term "corroborated") only in the sense that they can continue to be used as explanations of natural phenomena. At any time, however, they may be refuted by further observations and might be replaced by other hypotheses that are more consistent with the observations. This view of scientific inference is sometimes called *refutationism* or *falsificationism.* Refutationists consider induction to be a psychologic crutch: Repeated observations did not in fact induce the formulation of a natural law, but only the belief that such a law has been found. For a refutationist, only the psychologic comfort provided by induction explains why it still has advocates.

One way to rescue the concept of induction from the stigma of pure delusion is to resurrect it as a psychologic phenomenon, as Hume and Popper claimed it was, but one that plays a legitimate role in hypothesis formation. The philosophy of conjecture and refutation places no constraints on the origin of conjectures. Even delusions are permitted as hypotheses, and therefore inductively inspired hypotheses, however psychologic, are valid starting points for scientific evaluation. This concession does not admit a logical role for induction in confirming scientific hypotheses, but it allows the process of induction to play a part, along with imagination, in the scientific cycle of conjecture and refutation.

The philosophy of conjecture and refutation has profound implications for the methodology of science. The popular concept of a scientist doggedly assembling evidence to support a favorite thesis is objectionable from the standpoint of refutationist philosophy because it encourages scientists to consider their own pet theories as their intellectual property, to be confirmed, proven, and, when all the evidence is in, cast in stone and defended as natural law. Such attitudes hinder critical evaluation, interchange, and progress. The approach of conjecture and refutation, in contrast, encourages scientists to consider multiple hypotheses and to seek crucial tests that decide between competing hypotheses by falsifying one of them. Because falsification of one or more theories is the goal, there is incentive to depersonalize the theories. Criticism leveled at a theory need not be seen as criticism of the person who proposed it. It has been suggested that the reason why certain fields of science advance rapidly while others languish is that the rapidly advancing fields are propelled by scientists

who are busy constructing and testing competing hypotheses; the other fields, in contrast, "are sick by comparison, because they have forgotten the necessity for alternative hypotheses and disproof" (Platt, 1964).

The refutationist model of science has a number of valuable lessons for research conduct, especially of the need to seek alternative explanations for observations, rather than focus on the chimera of seeking scientific "proof" for some favored theory. Nonetheless, it is vulnerable to criticisms that observations (or some would say their interpretations) are themselves laden with theory (sometimes called the *Duhem-Quine thesis*; Curd and Cover, 1998). Thus, observations can never provide the sort of definitive refutations that are the hallmark of popular accounts of refutationism. For example, there may be uncontrolled and even unimagined biases that have made our refutational observations invalid; to claim refutation is to assume as true the unprovable theory that no such bias exists. In other words, not only are theories underdetermined by observations, so are refutations, which are themselves theory-laden. The net result is that logical certainty about either the truth or falsity of an internally consistent theory is impossible (Quine, 1951).

## CONSENSUS AND NATURALISM

Some 20th-century philosophers of science, most notably Thomas Kuhn (1962), emphasized the role of the scientific community in judging the validity of scientific theories. These critics of the conjecture-and-refutation model suggested that the refutation of a theory involves making a choice. Every observation is itself dependent on theories. For example, observing the moons of Jupiter through a telescope seems to us like a direct observation, but only because the theory of optics on which the telescope is based is so well accepted. When confronted with a refuting observation, a scientist faces the choice of rejecting either the validity of the theory being tested or the validity of the refuting observation, which itself must be premised on scientific theories that are not certain (Haack, 2003). Observations that are falsifying instances of theories may at times be treated as "anomalies," tolerated without falsifying the theory in the hope that the anomalies may eventually be explained. An epidemiologic example is the observation that shallow-inhaling smokers had higher lung cancer rates than deep-inhaling smokers. This anomaly was eventually explained when it was noted that lung tissue higher in the lung is more susceptible to smoking-associated lung tumors, and shallowly inhaled smoke tars tend to be deposited higher in the lung (Wald, 1985).

In other instances, anomalies may lead eventually to the overthrow of current scientific doctrine, just as Newtonian mechanics was displaced (remaining only as a first-order approximation) by relativity theory. Kuhn asserted that in every branch of science the prevailing scientific viewpoint, which he termed "normal science," occasionally undergoes major shifts that amount to scientific revolutions. These revolutions signal a decision of the scientific community to discard the scientific infrastructure rather than to falsify a new hypothesis that cannot be easily grafted onto it. Kuhn and others have argued that the consensus of the scientific community determines what is considered accepted and what is considered refuted.

Kuhn's critics characterized this description of science as one of an irrational process, "a matter for mob psychology" (Lakatos, 1970). Those who believe in a rational structure for science consider Kuhn's vision to be a regrettably real description of much of what passes for scientific activity, but not prescriptive for any good science. Although many modern philosophers reject rigid demarcations and formulations for science such as refutationism, they nonetheless maintain that science is founded on reason, albeit possibly informal common sense (Haack, 2003). Others go beyond Kuhn and maintain that attempts to impose a singular rational structure or methodology on science hobbles the imagination and is a prescription for the same sort of authoritarian repression of ideas that scientists have had to face throughout history (Feyerabend, 1975 and 1993).

The philosophic debate about Kuhn's description of science hinges on whether Kuhn meant to describe only what has happened historically in science or instead what ought to happen, an issue about which Kuhn (1970) has not been completely clear:

> Are Kuhn's [my] remarks about scientific development. . . to be read as descriptions or prescriptions? The answer, of course, is that they should be read in both ways at once. If I have a theory of how and why science works, it must necessarily have implications for the way in which scientists should behave if their enterprise is to flourish.

The idea that science is a sociologic process, whether considered descriptive or normative, is an interesting thesis, as is the idea that from observing how scientists work we can learn about how scientists ought to work. The latter idea has led to the development of *naturalistic* philosophy of science, or "science studies," which examines scientific developments for clues about what sort of methods scientists need and develop for successful discovery and invention (Callebaut, 1993; Giere, 1999).

Regardless of philosophical developments, we suspect that most epidemiologists (and most scientists) will continue to function as if the following classical view is correct: The ultimate goal of scientific inference is to capture some objective truths about the material world in which we live, and any theory of inference should ideally be evaluated by how well it leads us to these truths. This ideal is impossible to operationalize, however, for if we ever find any ultimate truths, we will have no way of knowing that for certain. Thus, those holding the view that scientific truth is not arbitrary nevertheless concede that our knowledge of these truths will always be tentative. For refutationists, this tentativeness has an asymmetric quality, but that asymmetry is less marked for others. We may believe that we know a theory is false because it consistently fails the tests we put it through, but our tests could be faulty, given that they involve imperfect reasoning and sense perception. Neither can we know that a theory is true, even if it passes every test we can devise, for it may fail a test that is as yet undevised.

Few, if any, would disagree that a theory of inference should be evaluated at least in part by how well it leads us to detect errors in our hypotheses and observations. There are, however, many other inferential activities besides evaluation of hypotheses, such as prediction or forecasting of events, and subsequent attempts to control events (which of course requires causal information). Statisticians rather than philosophers have more often confronted these problems in practice, so it should not be surprising that the major philosophies concerned with these problems emerged from statistics rather than philosophy.

## *BAYESIANISM*

There is another philosophy of inference that, like most, holds an objective view of scientific truth and a view of knowledge as tentative or uncertain, but that focuses on evaluation of knowledge rather than truth. Like refutationism, the modern form of this philosophy evolved from the writings of 18th-century thinkers. The focal arguments first appeared in a pivotal essay by the Reverend Thomas Bayes (1764), and hence the philosophy is usually referred to as Bayesianism (Howson and Urbach, 1993), and it was the renowned French mathematician and scientist Pierre Simon de Laplace who first gave it an applied statistical format. Nonetheless, it did not reach a complete expression until after World War I, most notably in the writings of Ramsey (1931) and DeFinetti (1937); and, like refutationism, it did not begin to appear in epidemiology until the 1970s (e.g., Cornfield, 1976).

The central problem addressed by Bayesianism is the following: In classical logic, a deductive argument can provide no information about the truth or falsity of a scientific hypothesis unless you can be 100% certain about the truth of the premises of the argument. Consider the logical argument called *modus tollens:* "If H implies B, and B is false, then H must be false." This argument is logically valid, but the conclusion follows only on the assumptions that the premises "H implies B" and "B is false" are true statements. If these premises are statements about the physical world, we cannot possibly know them to be correct with 100% certainty, because all observations are subject to error. Furthermore, the claim that "H implies B" will often depend on its own chain of deductions, each with its own premises of which we cannot be certain.

For example, if H is "Television viewing causes homicides" and B is "Homicide rates are highest where televisions are most common," the first premise used in *modus tollens* to test the hypothesis that television viewing causes homicides will be: "If television viewing causes homicides, homicide rates are highest where televisions are most common." The validity of this premise is doubtful—after all, even if television does cause homicides, homicide rates may be low where televisions are common because of socioeconomic advantages in those areas.

Continuing to reason in this fashion, we could arrive at a more pessimistic state than even Hume imagined. Not only is induction without logical foundation, *deduction* has limited scientific utility because we cannot ensure the truth of all the premises, even if a logical argument is valid.

The Bayesian answer to this problem is partial in that it makes a severe demand on the scientist and puts a severe limitation on the results. It says roughly this: If you can assign a degree of certainty, or personal probability, to the premises of your valid argument, you may use any and all the rules of probability theory to derive a certainty for the conclusion, and this certainty will be a logically valid consequence of your original certainties. An inescapable fact is that your concluding certainty, or *posterior probability*, may depend heavily on what you used as initial certainties, or *prior probabilities*. If those initial certainties are not the same as those of a colleague, that colleague may very well assign a certainty to the conclusion different from the one you derived. With the accumulation of consistent evidence, however, the data can usually force even extremely disparate priors to converge into similar posterior probabilities.

Because the posterior probabilities emanating from a Bayesian inference depend on the person supplying the initial certainties and so may vary across individuals, the inferences are said to be subjective. This subjectivity of Bayesian inference is often mistaken for a subjective treatment of truth. Not only is such a view of Bayesianism incorrect, it is diametrically opposed to Bayesian philosophy. The Bayesian approach represents a constructive attempt to deal with the dilemma that scientific laws and facts should not be treated as known with certainty, whereas classic deductive logic yields conclusions only when some law, fact, or connection is asserted with 100% certainty.

A common criticism of Bayesian philosophy is that it diverts attention away from the classic goals of science, such as the discovery of how the world works, toward psychologic states of mind called "certainties," "subjective probabilities," or "degrees of belief" (Popper, 1959). This criticism, however, fails to recognize the importance of a scientist's state of mind in determining what theories to test and what tests to apply, the consequent influence of those states on the store of data available for inference, and the influence of the data on the states of mind.

Another reply to this criticism is that scientists already use data to influence their degrees of belief, and they are not shy about expressing those degrees of certainty. The problem is that the conventional process is informal, intuitive, and ineffable, and therefore not subject to critical scrutiny; at its worst, it often amounts to nothing more than the experts announcing that they have seen the evidence and here is how certain they are. How they reached this certainty is left unclear, or, put another way, is not "transparent." The problem is that no one, even an expert, is very good at informally and intuitively formulating certainties that predict facts and future events well (Kahneman et al., 1982; Gilovich, 1993; Piattelli-Palmarini, 1994; Gilovich et al., 2002). One reason for this problem is that biases and prior prejudices can easily creep into expert judgments. Bayesian methods force experts to "put their cards on the table" and specify explicitly the strength of their prior beliefs and why they have such beliefs, defend those specifications against arguments and evidence, and update their degrees of certainty with new evidence in ways that do not violate probability logic.

In any research context, there will be an unlimited number of hypotheses that could explain an observed phenomenon. Some argue that progress is best aided by severely testing (empirically challenging) those explanations that seem most probable in light of past research, so that short-comings of currently "received" theories can be most rapidly discovered. Indeed, much research in certain fields takes this form, as when theoretical predictions of particle mass are put to ever more precise tests in physics experiments. This process does not involve mere improved repetition of past studies. Rather, it involves tests of previously untested but important predictions of the theory. Moreover, there is an imperative to make the basis for prior beliefs criticizable and defensible. That prior probabilities can differ among persons does not mean that all such beliefs are based on the same information, nor that all are equally tenable.

Probabilities of auxiliary hypotheses are also important in study design and interpretation. Failure of a theory to pass a test can lead to rejection of the theory more rapidly when the auxiliary hypotheses on which the test depends possess high probability. This observation provides a rationale for preferring "nested" case-control studies (in which controls are selected from a roster of the source population for the cases) to "hospital-based" case-control studies (in which the controls are "selected" by the occurrence or diagnosis of one or more diseases other than the case-defining disease), because the former have fewer mechanisms for biased subject selection and hence are given a higher probability of unbiased subject selection.

Even if one disputes the above arguments, most epidemiologists desire some way of expressing the varying degrees of certainty about possible values of an effect measure in light of available data. Such expressions must inevitably be derived in the face of considerable uncertainty about

methodologic details and various events that led to the available data and can be extremely sensitive to the reasoning used in its derivation. For example, as we shall discuss at greater length in Chapter 19, conventional confidence intervals quantify only random error under often questionable assumptions and so should not be interpreted as measures of total uncertainty, particularly for nonexperimental studies. As noted earlier, most people, including scientists, reason poorly in the face of uncertainty. At the very least, subjective Bayesian philosophy provides a methodology for sound reasoning under uncertainty and, in particular, provides many warnings against being overly certain about one's conclusions (Greenland 1998a, 1988b, 2006a; see also Chapters 18 and 19).

Such warnings are echoed in refutationist philosophy. As Peter Medawar (1979) put it, "I cannot give any scientist of any age better advice than this: the intensity of the conviction that a hypothesis is true has no bearing on whether it is true or not." We would add two points. First, the intensity of conviction that a hypothesis is false has no bearing on whether it is false or not. Second, Bayesian methods do not mistake beliefs for evidence. They use evidence to modify beliefs, which scientists routinely do in any event, but often in implicit, intuitive, and incoherent ways.

## IMPOSSIBILITY OF SCIENTIFIC PROOF

Vigorous debate is a characteristic of modern scientific philosophy, no less in epidemiology than in other areas (Rothman, 1988). Can divergent philosophies of science be reconciled? Haack (2003) suggested that the scientific enterprise is akin to solving a vast, collective crossword puzzle. In areas in which the evidence is tightly interlocking, there is more reason to place confidence in the answers, but in areas with scant information, the theories may be little better than informed guesses. Of the scientific method, Haack (2003) said that "there is less to the 'scientific method' than meets the eye. Is scientific inquiry categorically different from other kinds? No. Scientific inquiry is continuous with everyday empirical inquiry—only more so."

Perhaps the most important common thread that emerges from the debated philosophies is that proof is impossible in empirical science. This simple fact is especially important to observational epidemiologists, who often face the criticism that proof is impossible in epidemiology, with the implication that it is possible in other scientific disciplines. Such criticism may stem from a view that experiments are the definitive source of scientific knowledge. That view is mistaken on at least two counts. First, the nonexperimental nature of a science does not preclude impressive scientific discoveries; the myriad examples include plate tectonics, the evolution of species, planets orbiting other stars, and the effects of cigarette smoking on human health. Even when they are possible, experiments (including randomized trials) do not provide anything approaching proof and in fact may be controversial, contradictory, or nonreproducible. If randomized clinical trials provided proof, we would never need to do more than one of them on a given hypothesis. Neither physical nor experimental science is immune to such problems, as demonstrated by episodes such as the experimental "discovery" (later refuted) of cold fusion (Taubes, 1993).

Some experimental scientists hold that epidemiologic relations are only suggestive and believe that detailed laboratory study of mechanisms within single individuals can reveal cause–effect relations with certainty. This view overlooks the fact that *all* relations are suggestive in exactly the manner discussed by Hume. Even the most careful and detailed mechanistic dissection of individual events cannot provide more than associations, albeit at a finer level. Laboratory studies often involve a degree of observer control that cannot be approached in epidemiology; it is only this control, not the level of observation, that can strengthen the inferences from laboratory studies. And again, such control is no guarantee against error. In addition, neither scientists nor decision makers are often highly persuaded when only mechanistic evidence from the laboratory is available.

All of the fruits of scientific work, in epidemiology or other disciplines, are at best only tentative formulations of a description of nature, even when the work itself is carried out without mistakes. The tentativeness of our knowledge does not prevent practical applications, but it should keep us skeptical and critical, not only of everyone else's work, but of our own as well. Sometimes etiologic hypotheses enjoy an extremely high, universally or almost universally shared, degree of certainty. The hypothesis that cigarette smoking causes lung cancer is one of the best-known examples. These hypotheses rise above "tentative" acceptance and are the closest we can come to "proof." But even

these hypotheses are not “proved” with the degree of absolute certainty that accompanies the proof of a mathematical theorem.

## CAUSAL INFERENCE IN EPIDEMIOLOGY

Etiologic knowledge about epidemiologic hypotheses is often scant, making the hypotheses themselves at times little more than vague statements of causal association between exposure and disease, such as “smoking causes cardiovascular disease.” These vague hypotheses have only vague consequences that can be difficult to test. To cope with this vagueness, epidemiologists usually focus on testing the negation of the causal hypothesis, that is, the null hypothesis that the exposure does *not* have a causal relation to disease. Then, any observed association can potentially refute the hypothesis, subject to the assumption (auxiliary hypothesis) that biases and chance fluctuations are not solely responsible for the observation.

### *TESTS OF COMPETING EPIDEMIOLOGIC THEORIES*

If the causal mechanism is stated specifically enough, epidemiologic observations can provide crucial tests of competing, non-null causal hypotheses. For example, when toxic-shock syndrome was first studied, there were two competing hypotheses about the causal agent. Under one hypothesis, it was a chemical in the tampon, so that women using tampons were exposed to the agent directly from the tampon. Under the other hypothesis, the tampon acted as a culture medium for staphylococci that produced a toxin. Both hypotheses explained the relation of toxic-shock occurrence to tampon use. The two hypotheses, however, led to opposite predictions about the relation between the frequency of changing tampons and the rate of toxic shock. Under the hypothesis of a chemical agent, more frequent changing of the tampon would lead to more exposure to the agent and possible absorption of a greater overall dose. This hypothesis predicted that women who changed tampons more frequently would have a higher rate than women who changed tampons infrequently. The culture-medium hypothesis predicts that women who change tampons frequently would have a lower rate than those who change tampons less frequently, because a short duration of use for each tampon would prevent the staphylococci from multiplying enough to produce a damaging dose of toxin. Thus, epidemiologic research, by showing that infrequent changing of tampons was associated with a higher rate of toxic shock, refuted the chemical theory in the form presented. There was, however, a third hypothesis that a chemical in some tampons (e.g., oxygen content) improved their performance as culture media. This chemical-promotor hypothesis made the same prediction about the association with frequency of changing tampons as the microbial toxin hypothesis (Lanes and Rothman, 1990).

Another example of a theory that can be easily tested by epidemiologic data relates to the observation that women who took replacement estrogen therapy had a considerably elevated rate of endometrial cancer. Horwitz and Feinstein (1978) conjectured a competing theory to explain the association: They proposed that women taking estrogen experienced symptoms such as bleeding that induced them to consult a physician. The resulting diagnostic workup led to the detection of endometrial cancer at an earlier stage in these women, as compared with women who were not taking estrogens. Horwitz and Feinstein argued that the association arose from this detection bias, claiming that without the bleeding-induced workup, many of these cancers would not have been detected at all. Many epidemiologic observations were used to evaluate these competing hypotheses. The detection-bias theory predicted that women who had used estrogens for only a short time would have the greatest elevation in their rate, as the symptoms related to estrogen use that led to the medical consultation tended to appear soon after use began. Because the association of recent estrogen use and endometrial cancer was the same in both long- and short-term estrogen users, the detection-bias theory was refuted as an explanation for all but a small fraction of endometrial cancer cases occurring after estrogen use. Refutation of the detection-bias theory also depended on many other observations. Especially important was the theory’s implication that there must be a huge reservoir of undetected endometrial cancer in the typical population of women to account for the much greater rate observed in estrogen users, an implication that was not borne out by further observations (Hutchison and Rothman, 1978).

The endometrial cancer example illustrates a critical point in understanding the process of causal inference in epidemiologic studies: Many of the hypotheses being evaluated in the interpretation of epidemiologic studies are auxiliary hypotheses in the sense that they are independent of the presence, absence, or direction of any causal connection between the study exposure and the disease. For example, explanations of how specific types of bias could have distorted an association between exposure and disease are the usual alternatives to the primary study hypothesis. Much of the interpretation of epidemiologic studies amounts to the testing of such auxiliary explanations for observed associations.

## CAUSAL CRITERIA

In practice, how do epidemiologists separate causal from noncausal explanations? Despite philosophic criticisms of inductive inference, inductively oriented considerations are often used as criteria for making such inferences (Weed and Gorelic, 1996). If a set of necessary and sufficient causal criteria could be used to distinguish causal from noncausal relations in epidemiologic studies, the job of the scientist would be eased considerably. With such criteria, all the concerns about the logic or lack thereof in causal inference could be subsumed: It would only be necessary to consult the checklist of criteria to see if a relation were causal. We know from the philosophy reviewed earlier that a set of sufficient criteria does not exist. Nevertheless, lists of causal criteria have become popular, possibly because they seem to provide a road map through complicated territory, and perhaps because they suggest hypotheses to be evaluated in a given problem.

A commonly used set of criteria was based on a list of considerations or "viewpoints" proposed by Sir Austin Bradford Hill (1965). Hill's list was an expansion of a list offered previously in the landmark U.S. Surgeon General's report *Smoking and Health* (1964), which in turn was anticipated by the inductive canons of John Stuart Mill (1862) and the rules given by Hume (1739). Subsequently, others, especially Susser, have further developed causal considerations (Kaufman and Poole, 2000).

Hill suggested that the following considerations in attempting to distinguish causal from noncausal associations that were already "perfectly clear-cut and beyond what we would care to attribute to the play of chance": (1) strength, (2) consistency, (3) specificity, (4) temporality, (5) biologic gradient, (6) plausibility, (7) coherence, (8) experimental evidence, and (9) analogy. Hill emphasized that causal inferences cannot be based on a set of rules, condemned emphasis on statistical significance testing, and recognized the importance of many other factors in decision making (Phillips and Goodman, 2004). Nonetheless, the misguided but popular view that his considerations should be used as criteria for causal inference makes it necessary to examine them in detail.

### Strength

Hill argued that strong associations are particularly compelling because, for weaker associations, it is "easier" to imagine what today we would call an unmeasured confounder that might be responsible for the association. Several years earlier, Cornfield et al. (1959) drew similar conclusions. They concentrated on a single hypothetical confounder that, by itself, would explain entirely an observed association. They expressed a strong preference for ratio measures of strength, as opposed to difference measures, and focused on how the observed estimate of a risk ratio provides a minimum for the association that a completely explanatory confounder must have with the exposure (rather than a minimum for the confounder–disease association). Of special importance, Cornfield et al. acknowledged that having only a weak association does not rule out a causal connection (Rothman and Poole, 1988). Today, some associations, such as those between smoking and cardiovascular disease or between environmental tobacco smoke and lung cancer, are accepted by most as causal even though the associations are considered weak.

Counterexamples of strong but noncausal associations are also not hard to find; any study with strong confounding illustrates the phenomenon. For example, consider the strong relation between Down syndrome and birth rank, which is confounded by the relation between Down syndrome and maternal age. Of course, once the confounding factor is identified, the association is diminished by controlling for the factor.

These examples remind us that a strong association is neither necessary nor sufficient for causality, and that weakness is neither necessary nor sufficient for absence of causality. A strong association

bears only on hypotheses that the association is entirely or partially due to unmeasured confounders or other source of modest bias.

### *Consistency*

To most observers, consistency refers to the repeated observation of an association in different populations under different circumstances. Lack of consistency, however, does not rule out a causal association, because some effects are produced by their causes only under unusual circumstances. More precisely, the effect of a causal agent cannot occur unless the complementary component causes act or have already acted to complete a sufficient cause. These conditions will not always be met. Thus, transfusions can cause infection with the human immunodeficiency virus, but they do not always do so: The virus must also be present. Tampon use can cause toxic-shock syndrome, but only rarely, when certain other, perhaps unknown, conditions are met. Consistency is apparent only after all the relevant details of a causal mechanism are understood, which is to say very seldom. Furthermore, even studies of exactly the same phenomena can be expected to yield different results simply because they differ in their methods and random errors. Consistency serves only to rule out hypotheses that the association is attributable to some factor that varies across studies.

One mistake in implementing the consistency criterion is so common that it deserves special mention. It is sometimes claimed that a literature or set of results is inconsistent simply because some results are "statistically significant" and some are not. This sort of evaluation is completely fallacious even if one accepts the use of significance testing methods. The results (effect estimates) from a set of studies could all be identical even if many were significant and many were not, the difference in significance arising solely because of differences in the standard errors or sizes of the studies. Conversely, the results could be significantly in conflict even if all were all were nonsignificant individually, simply because in aggregate an effect could be apparent in some subgroups but not others (see Chapter 33). The fallacy of judging consistency by comparing $P$-values or statistical significance is not eliminated by "standardizing" estimates (i.e., dividing them by the standard deviation of the outcome, multiplying them by the standard deviation of the exposure, or both); in fact it is worsened, as such standardization can create differences where none exists, or mask true differences (Greenland et al., 1986, 1991; see Chapters 21 and 33).

### *Specificity*

The criterion of specificity has two variants. One is that a cause leads to a single effect, not multiple effects. The other is that an effect has one cause, not multiple causes. Hill mentioned both of them. The former criterion, specificity of effects, was used as an argument in favor of a causal interpretation of the association between smoking and lung cancer and, in an act of circular reasoning, in favor of ratio comparisons and not differences as the appropriate measures of strength. When ratio measures were examined, the association of smoking to diseases looked "quantitatively specific" to lung cancer. When difference measures were examined, the association appeared to be nonspecific, with several diseases (other cancers, coronary heart disease, etc.) being at least as strongly associated with smoking as lung cancer was. Today we know that smoking affects the risk of many diseases and that the difference comparisons were accurately portraying this lack of specificity. Unfortunately, however, the historical episode of the debate over smoking and health is often cited today as justification for the specificity criterion and for using ratio comparisons to measure strength of association. The proper lessons to learn from that episode should be just the opposite.

Weiss (2002) argued that specificity can be used to distinguish some causal hypotheses from noncausal hypotheses, when the causal hypothesis predicts a relation with one outcome but no relation with another outcome. His argument is persuasive when, in addition to the causal hypothesis, one has an alternative noncausal hypothesis that predicts a nonspecific association. Weiss offered the example of screening sigmoidoscopy, which was associated in case-control studies with a 50% to 70% reduction in mortality from distal tumors of the rectum and tumors of the distal colon, within the reach of the sigmoidoscope, but no reduction in mortality from tumors elsewhere in the colon. If the effect of screening sigmoidoscopy were not specific to the distal colon tumors, it would lend support not to all noncausal theories to explain the association, as Weiss suggested, but only to those noncausal theories that would have predicted a nonspecific association. Thus, specificity can

come into play when it can be logically deduced from the causal hypothesis in question and when nonspecificity can be logically deduced from one or more noncausal hypotheses.

### *Temporality*

Temporality refers to the necessity that the cause precede the effect in time. This criterion is inarguable, insofar as any claimed observation of causation must involve the putative cause C preceding the putative effect D. It does *not*, however, follow that a reverse time order is evidence against the hypothesis that C can cause D. Rather, observations in which C followed D merely show that C could not have caused D in these instances; they provide no evidence for or against the hypothesis that C can cause D in those instances in which it precedes D. Only if it is found that C cannot precede D can we dispense with the causal hypothesis that C *could* cause D.

### *Biologic Gradient*

Biologic gradient refers to the presence of a dose–response or exposure–response curve with an expected shape. Although Hill referred to a "linear" gradient, without specifying the scale, a linear gradient on one scale, such as the risk, can be distinctly nonlinear on another scale, such as the log risk, the odds, or the log odds. We might relax the expectation from linear to strictly monotonic (steadily increasing or decreasing) or even further merely to monotonic (a gradient that never changes direction). For example, more smoking means more carcinogen exposure and more tissue damage, hence more opportunity for carcinogenesis. Some causal associations, however, show a rapid increase in response (an approximate threshold effect) rather than a strictly monotonic trend. An example is the association between DES and adenocarcinoma of the vagina. A possible explanation is that the doses of DES that were administered were all sufficiently great to produce the maximum effect from DES. Under this hypothesis, for all those exposed to DES, the development of disease would depend entirely on other component causes.

The somewhat controversial topic of alcohol consumption and mortality is another example. Death rates are higher among nondrinkers than among moderate drinkers, but they ascend to the highest levels for heavy drinkers. There is considerable debate about which parts of the J-shaped dose–response curve are causally related to alcohol consumption and which parts are noncausal artifacts stemming from confounding or other biases. Some studies appear to find only an increasing relation between alcohol consumption and mortality, possibly because the categories of alcohol consumption are too broad to distinguish different rates among moderate drinkers and nondrinkers, or possibly because they have less confounding at the lower end of the consumption scale.

Associations that do show a monotonic trend in disease frequency with increasing levels of exposure are not necessarily causal. Confounding can result in a monotonic relation between a noncausal risk factor and disease if the confounding factor itself demonstrates a biologic gradient in its relation with disease. The relation between birth rank and Down syndrome mentioned earlier shows a strong biologic gradient that merely reflects the progressive relation between maternal age and occurrence of Down syndrome.

These issues imply that the existence of a monotonic association is neither necessary nor sufficient for a causal relation. A nonmonotonic relation only refutes those causal hypotheses specific enough to predict a monotonic dose–response curve.

### *Plausibility*

Plausibility refers to the scientific plausibility of an association. More than any other criterion, this one shows how narrowly systems of causal criteria are focused on epidemiology. The starting point is an epidemiologic association. In asking whether it is causal or not, one of the considerations we take into account is its plausibility. From a less parochial perspective, the entire enterprise of causal inference would be viewed as the act of determining how plausible a causal *hypothesis* is. One of the considerations we would take into account would be epidemiologic associations, if they are available. Often they are not, but causal inference must be done nevertheless, with inputs from toxicology, pharmacology, basic biology, and other sciences.

Just as epidemiology is not essential for causal inference, plausibility can change with the times. Sartwell (1960) emphasized this point, citing remarks of Cheever in 1861, who had been commenting on the etiology of typhus before its mode of transmission (via body lice) was known:

> It could be no more ridiculous for the stranger who passed the night in the steerage of an emigrant ship to ascribe the typhus, which he there contracted, to the vermin with which bodies of the sick might be infested. An adequate cause, one reasonable in itself, must correct the coincidences of simple experience.

What was to Cheever an implausible explanation turned out to be the correct explanation, because it was indeed the vermin that caused the typhus infection. Such is the problem with plausibility: It is too often based not on logic or data, but only on prior beliefs. This is not to say that biologic knowledge should be discounted when a new hypothesis is being evaluated, but only to point out the difficulty in applying that knowledge.

The Bayesian approach to inference attempts to deal with this problem by requiring that one quantify, on a probability (0 to 1) scale, the certainty that one has in prior beliefs, as well as in new hypotheses. This quantification displays the dogmatism or open-mindedness of the analyst in a public fashion, with certainty values near 1 or 0 betraying a strong commitment of the analyst for or against a hypothesis. It can also provide a means of testing those quantified beliefs against new evidence (Howson and Urbach, 1993). Nevertheless, no approach can transform plausibility into an objective causal criterion.

### *Coherence*

Taken from the U.S. Surgeon General's *Smoking and Health* (1964), the term *coherence* implies that a cause-and-effect interpretation for an association does not conflict with what is known of the natural history and biology of the disease. The examples Hill gave for coherence, such as the histopathologic effect of smoking on bronchial epithelium (in reference to the association between smoking and lung cancer) or the difference in lung cancer incidence by sex, could reasonably be considered examples of plausibility, as well as coherence; the distinction appears to be a fine one. Hill emphasized that the absence of coherent information, as distinguished, apparently, from the presence of conflicting information, should not be taken as evidence against an association being considered causal. On the other hand, the presence of conflicting information may indeed refute a hypothesis, but one must always remember that the conflicting information may be mistaken or misinterpreted. An example mentioned earlier is the "inhalation anomaly" in smoking and lung cancer, the fact that the excess of lung cancers seen among smokers seemed to be concentrated at sites in the upper airways of the lung. Several observers interpreted this anomaly as evidence that cigarettes were not responsible for the excess. Other observations, however, suggested that cigarette-borne carcinogens were deposited preferentially where the excess was observed, and so the anomaly was in fact consistent with a causal role for cigarettes (Wald, 1985).

### *Experimental Evidence*

To different observers, experimental evidence can refer to clinical trials, to laboratory experiments with rodents or other nonhuman organisms, or to both. Evidence from human experiments, however, is seldom available for epidemiologic research questions, and animal evidence relates to different species and usually to levels of exposure very different from those that humans experience. Uncertainty in extrapolations from animals to humans often dominates the uncertainty of quantitative risk assessments (Freedman and Zeisel, 1988; Crouch et al., 1997).

To Hill, however, experimental evidence meant something else: the "experimental, or semi-experimental evidence" obtained from reducing or eliminating a putatively harmful exposure and seeing if the frequency of disease subsequently declines. He called this the strongest possible evidence of causality that can be obtained. It can be faulty, however, as the "semi-experimental" approach is nothing more than a "before-and-after" time trend analysis, which can be confounded or otherwise biased by a host of concomitant secular changes. Moreover, even if the removal of exposure does causally reduce the frequency of disease, it might not be for the etiologic reason hypothesized. The draining of a swamp near a city, for instance, would predictably and causally reduce the rate of yellow fever or malaria in that city the following summer. But it would be a mistake to call this observation the strongest possible evidence of a causal role of miasmas (Poole, 1999).

### *Analogy*

Whatever insight might be derived from analogy is handicapped by the inventive imagination of scientists who can find analogies everywhere. At best, analogy provides a source of more elaborate hypotheses about the associations under study; absence of such analogies reflects only lack of imagination or experience, not falsity of the hypothesis.

We might find naive Hill's examples in which reasoning by analogy from the thalidomide and rubella tragedies made it more likely to him that other medicines and infections might cause other birth defects. But such reasoning is common; we suspect most people find it more credible that smoking might cause, say, stomach cancer, because of its associations, some widely accepted as causal, with cancers in other internal and gastrointestinal organs. Here we see how the analogy criterion can be at odds with either of the two specificity criteria. The more apt the analogy, the less specific are the effects of a cause or the less specific the causes of an effect.

### *Summary*

As is evident, the standards of epidemiologic evidence offered by Hill are saddled with reservations and exceptions. Hill himself was ambivalent about their utility. He did not use the word *criteria* in the speech. He called them "viewpoints" or "perspectives." On the one hand, he asked, "In what circumstances can we pass from this observed *association* to a verdict of *causation*?" (emphasis in original). Yet, despite speaking of verdicts on causation, he disagreed that any "hard-and-fast rules of evidence" existed by which to judge causation: "None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a sine qua non" (Hill, 1965).

Actually, as noted above, the fourth viewpoint, temporality, is *a sine qua non* for causal explanations of observed associations. Nonetheless, it does not bear on the hypothesis that an exposure is capable of causing a disease in situations as yet unobserved (whether in the past or the future). For suppose every exposed case of disease ever reported had received the exposure after developing the disease. This reversed temporal relation would imply that exposure had not caused disease among these reported cases, and thus would refute the hypothesis that it had. Nonetheless, it would *not* refute the hypothesis that the exposure is *capable* of causing the disease, or that it had caused the disease in unobserved cases. It would mean only that we have no worthwhile epidemiologic evidence relevant to that hypothesis, for we had not yet seen what became of those exposed before disease occurred relative to those unexposed. Furthermore, what appears to be a causal sequence could represent reverse causation if preclinical symptoms of the disease lead to exposure, and then overt disease follows, as when patients in pain take analgesics, which may be the result of disease that is later diagnosed, rather than a cause.

Other than temporality, there is no necessary or sufficient criterion for determining whether an observed association is causal. Only when a causal hypothesis is elaborated to the extent that one can predict from it a particular form of consistency, specificity, biologic gradient, and so forth, can "causal criteria" come into play in evaluating causal hypotheses, and even then they do not come into play in evaluating the general hypothesis per se, but only some specific causal hypotheses, leaving others untested.

This conclusion accords with the views of Hume and many others that causal inferences cannot attain the certainty of logical deductions. Although some scientists continue to develop causal considerations as aids to inference (Susser, 1991), others argue that it is detrimental to cloud the inferential process by considering checklist criteria (Lanes and Poole, 1984). An intermediate, refutationist approach seeks to transform proposed criteria into deductive tests of causal hypotheses (Maclure, 1985; Weed, 1986). Such an approach helps avoid the temptation to use causal criteria simply to buttress pet theories at hand, and instead allows epidemiologists to focus on evaluating competing causal theories using crucial observations. Although this refutationist approach to causal inference may seem at odds with the common implementation of Hill's viewpoints, it actually seeks to answer the fundamental question posed by Hill, and the ultimate purpose of the viewpoints he promulgated:

> What [the nine viewpoints] can do, with greater or less strength, is to help us to make up our minds on the fundamental question—is there any other way of explaining the set of facts before us, is there any other answer equally, or more, likely than cause and effect? (Hill, 1965)

The crucial phrase "equally or more likely than cause and effect" suggests to us a subjective assessment of the certainty, or probability of the causal hypothesis at issue relative to another hypothesis. Although Hill wrote at a time when expressing uncertainty as a probability was unpopular in statistics, it appears from his statement that, for him, causal inference is a subjective matter of degree of personal belief, certainty, or conviction. In any event, this view is precisely that of subjective Bayesian statistics (Chapter 18).

It is unsurprising that case studies (e.g., Weed and Gorelick, 1996) and surveys of epidemiologists (Holman et al., 2001) show, contrary to the rhetoric that often attends invocations of causal criteria, that epidemiologists have *not* agreed on a set of causal criteria or on how to apply them. In one study in which epidemiologists were asked to employ causal criteria to fictional summaries of epidemiologic literatures, the agreement was only slightly greater than would have been expected by chance (Holman et al., 2001). The typical use of causal criteria is to make a case for a position for or against causality that has been arrived at by other, unstated means. Authors pick and choose among the criteria they deploy, and define and weight them in *ad hoc* ways that depend only on the exigencies of the discussion at hand. In this sense, causal criteria appear to function less like standards or principles and more like values (Poole, 2001b), which vary across individual scientists and even vary within the work of a single scientist, depending on the context and time. Thus universal and objective causal criteria, if they exist, have yet to be identified.

CHAPTER 8

# Case-Control Studies

Kenneth J. Rothman, Sander Greenland, and Timothy L. Lash

**Common Elements of Case-Control Studies 113**
- Pseudo-frequencies and the Odds Ratio 113
- Defining the Source Population 114
- Case Selection 115
- Control Selection 115
- Common Fallacies in Control Selection 117
- Sources for Control Series 117
- Other Considerations for Subject Selection 120

**Variants of the Case-Control Design 122**
- Nested Case-Control Studies 122
- Case-Cohort Studies 123
- Density Case-Control Studies 124
- Cumulative ("Epidemic") Case-Control Studies 125
- Case-Only, Case-Specular, and Case-Crossover Studies 125
- Two-Stage Sampling 127
- Proportional Mortality Studies 127
- Case-Control Studies with Prevalent Cases 127

The use and understanding of case-control studies is one of the most important methodologic developments of modern epidemiology. Conceptually, there are clear links from randomized experiments to nonrandomized cohort studies, and from nonrandomized cohort studies to case-control studies. Case-control studies nevertheless differ enough from the scientific paradigm of experimentation that a casual approach to their conduct and interpretation invites misconception. In this chapter we review case-control study designs and contrast their advantages and disadvantages with cohort designs. We also consider variants of the basic case-control study design.

Conventional wisdom about case-control studies is that they do not yield estimates of effect that are as valid as measures obtained from cohort studies. This thinking may reflect common misunderstandings in conceptualizing case-control studies, which will be clarified later. It may also reflect concern about biased exposure information and selection in case-control studies. For example, if exposure information comes from interviews, cases will usually have reported the exposure information after learning of their diagnosis. Diagnosis may affect reporting in a number of ways, for example, by improving memory, thus enhancing sensitivity among cases, or by provoking more false memory of exposure, thus reducing specificity among cases. Furthermore, the disease may itself cloud memory and thus reduce sensitivity. These phenomena are examples of *recall bias*. Disease cannot affect exposure information collected before the disease occurred, however. Thus exposure information taken from records created before the disease occurs will not be subject to recall bias, regardless of whether the study is a cohort or a case-control design.

Conversely, cohort studies are not immune from problems often thought to be particular to case-control studies. For example, while a cohort study may gather information on exposure for an entire source population at the outset of the study, it still requires tracing of subjects to ascertain

exposure variation and outcomes. If the success of this tracing is related to the exposure and the outcome, the resulting selection bias will behave analogously to that often raised as a concern in case-control studies (Greenland, 1977; Chapter 12). Similarly, cohort studies sometimes use recall to reconstruct or impute exposure history (retrospective evaluation) and are vulnerable to recall bias if this reconstruction is done after disease occurrence. Thus, although more opportunity for recall and selection bias may arise in typical case-control studies than in typical prospective cohort studies, each study must be considered in detail to evaluate its vulnerability to bias, regardless of its design.

Conventional wisdom also holds that cohort studies are useful for evaluating the range of effects related to a single exposure, whereas case-control studies provide information only about the one disease that afflicts the cases. This thinking conflicts with the idea that case-control studies can be viewed simply as more efficient cohort studies. Just as one can choose to measure more than one disease outcome in a cohort study, it is possible to conduct a set of case-control studies nested within the same population using several disease outcomes as the case series. The case-cohort study (see below) is particularly well suited to this task, allowing one control group to be compared with several series of cases. Whether or not the case-cohort design is the form of case-control study that is used, case-control studies do not have to be characterized as being limited with respect to the number of disease outcomes that can be studied.

For diseases that are sufficiently rare, cohort studies become impractical and case-control studies become the only useful alternative. On the other hand, if exposure is rare, ordinary case-control studies are inefficient, and one must use methods that selectively recruit additional exposed subjects, such as special cohort studies or two-stage designs. If both the exposure and the outcome are rare, two-stage designs may be the only informative option, as they employ oversampling of both exposed and diseased subjects.

As understanding of the principles of case-control studies has progressed, the reputation of case-control studies has also improved. Formerly, it was common to hear case-control studies referred to disparagingly as "retrospective" studies, a term that should apply to only some case-control studies and applies as well to some cohort studies (see Chapter 6). Although case-control studies do present more opportunities for bias and mistaken inference than cohort studies, these opportunities come as a result of the relative ease with which a case-control study can be mounted. Because it need not be extremely expensive or time-consuming to conduct a case-control study, many studies have been conducted by naive investigators who do not understand or implement the basic principles of valid case-control design. Occasionally, such haphazard research can produce valuable results, but often the results are wrong because basic principles have been violated. The bad reputation once suffered by case-control studies stems more from instances of poor conduct and overinterpretation of results than from any inherent weakness in the approach.

Ideally, a case-control study can be conceptualized as a more efficient version of a corresponding cohort study. Under this conceptualization, the cases in the case-control study are the same cases as would ordinarily be included in the cohort study. Rather than including all of the experience of the source population that gave rise to the cases (the study base), as would be the usual practice in a cohort design, controls are selected from the source population. Wacholder (1996) describes this paradigm of the case-control study as a cohort study with data missing at random and by design. The sampling of controls from the population that gave rise to the cases affords the efficiency gain of a case-control design over a cohort design. The controls provide an estimate of the prevalence of the exposure and covariates in the source population. When controls are selected from members of the population who were at risk for disease at the beginning of the study's follow-up period, the case-control odds ratio estimates the risk ratio that would be obtained from a cohort design. When controls are selected from members of the population who were noncases at the times that each case occurs, or otherwise in proportion to the person-time accumulated by the cohort, the case-control odds ratio estimates the rate ratio that would be obtained from a cohort design. Finally, when controls are selected from members of the population who were noncases at the end of the study's follow-up period, the case-control odds ratio estimates the incidence odds ratio that would be obtained from a cohort design. With each control-selection strategy, the odds-ratio calculation is the same, but the measure of effect estimated by the odds ratio differs. Study designs that implement each of these control selection paradigms will be discussed after topics that are common to all designs.

## COMMON ELEMENTS OF CASE-CONTROL STUDIES

In a cohort study, the numerator and denominator of each disease frequency (incidence proportion, incidence rate, or incidence odds) are measured, which requires enumerating the entire population and keeping it under surveillance—or using an existing registry—to identify cases over the follow-up period. A valid case-control study observes the population more efficiently by using a control series in place of complete assessment of the denominators of the disease frequencies. The cases in a case-control study should be the same people who would be considered cases in a cohort study of the same population.

### *PSEUDO-FREQUENCIES AND THE ODDS RATIO*

The primary goal for control selection is that the exposure distribution among controls be the same as it is in the source population of cases. The rationale for this goal is that, if it is met, we can use the control series in place of the denominator information in measures of disease frequency to determine the ratio of the disease frequency in exposed people relative to that among unexposed people. This goal will be met if we can sample controls from the source population such that the ratio of the number of exposed controls ($B_1$) to the total exposed experience of the source population is the same as the ratio of the number of unexposed controls ($B_0$) to the unexposed experience of the source population, apart from sampling error. For most purposes, this goal need only be followed within strata of factors that will be used for stratification in the analysis, such as factors used for restriction or matching (Chapters 11, 15, 16, and 21).

Using person-time to illustrate, the goal requires that $B_1$ has the same ratio to the amount of exposed person-time ($T_1$) as $B_0$ has to the amount of unexposed person-time ($T_0$), apart from sampling error:

$$\frac{B_1}{T_1} = \frac{B_0}{T_0}$$

Here $B_1/T_1$ and $B_0/T_0$ are the control sampling rates—that is, the number of controls selected per unit of person-time. Suppose that $A_1$ exposed cases and $A_0$ unexposed cases occur over the study period. The exposed and unexposed rates are then

$$I_1 = \frac{A_1}{T_1} \quad \text{and} \quad I_0 = \frac{A_0}{T_0}$$

We can use the frequencies of exposed and unexposed controls as substitutes for the actual denominators of the rates to obtain exposure-specific case-control ratios, or *pseudo-rates:*

$$\text{Pseudo-rate}_1 = \frac{A_1}{B_1}$$

and

$$\text{Pseudo-rate}_0 = \frac{A_0}{B_0}$$

These pseudo-rates have no epidemiologic interpretation by themselves. Suppose, however, that the control sampling rates $B_1/T_1$ and $B_0/T_0$ are equal to the same value $r$, as would be expected if controls are selected independently of exposure. If this common sampling rate $r$ is known, the actual incidence rates can be calculated by simple algebra because, apart from sampling error, $B_1/r$ should equal the amount of exposed person-time in the source population and $B_0/r$ should equal the amount of unexposed person-time in the source population: $B_1/r = B_1/(B_1/T_1) = T_1$ and $B_0/r = B_0/(B_0/T_0) = T_0$. To get the incidence rates, we need only multiply each pseudo-rate by the common sampling rate, $r$.

If the common sampling rate is not known, which is often the case, we can still compare the sizes of the pseudo-rates by division. Specifically, if we divide the pseudo-rate for exposed by the pseudo-rate for unexposed, we obtain

$$\frac{\text{Pseudo-rate}_1}{\text{Pseudo-rate}_0} = \frac{A_1/B_1}{A_0/B_0} = \frac{A_1/[(B_1/T_1)T_1]}{A_0/[(B_0/T_0)T_0]} = \frac{A_1/(r \cdot T_1)}{A_0/(r \cdot T_0)} = \frac{A_1/T_1}{A_0/T_0}$$

In other words, the ratio of the pseudo-rates for the exposed and unexposed is an estimate of the ratio of the incidence rates in the source population, provided that the control sampling rate is independent of exposure. Thus, using the case-control study design, one can estimate the incidence rate ratio in a population without obtaining information on every subject in the population. Similar derivations in the following section on variants of case-control designs show that one can estimate the risk ratio by sampling controls from those at risk for disease at the beginning of the follow-up period (case-cohort design) and that one can estimate the incidence odds ratio by sampling controls from the noncases at the end of the follow-up period (cumulative case-control design). With these designs, the pseudo-frequencies correspond to the incidence proportions and incidence odds, respectively, multiplied by common sampling rates.

There is a statistical penalty for using a sample of the denominators rather than measuring the person-time experience for the entire source population: The precision of the estimates of the incidence rate ratio from a case-control study is less than the precision from a cohort study of the entire population that gave rise to the cases (the source population). Nevertheless, the loss of precision that stems from sampling controls will be small if the number of controls selected per case is large (usually four or more). Furthermore, the loss is balanced by the cost savings of not having to obtain information on everyone in the source population. The cost savings might allow the epidemiologist to enlarge the source population and so obtain more cases, resulting in a better overall estimate of the incidence-rate ratio, statistically and otherwise, than would be possible using the same expenditures to conduct a cohort study.

The ratio of the two pseudo-rates in a case-control study is usually written as $A_1B_0/A_0B_1$ and is sometimes called the *cross-product ratio*. The cross-product ratio in a case-control study can be viewed as the ratio of cases to controls among the exposed subjects ($A_1/B_1$), divided by the ratio of cases to controls among the unexposed subjects ($A_0/B_0$). This ratio can also be viewed as the odds of being exposed among cases ($A_1/A_0$) divided by the odds of being exposed among controls ($B_1/B_0$), in which case it is termed the *exposure odds ratio*. While either interpretation will give the same result, viewing this odds ratio as the ratio of case-control ratios shows more directly how the control group substitutes for the denominator information in a cohort study and how the ratio of pseudo-frequencies gives the same result as the ratio of the incidence rates, incidence proportion, or incidence odds in the source population, if sampling is independent of exposure.

One point that we wish to emphasize is that *nowhere* in the preceding discussion did we have to assume that the disease under study is “rare.” In general, the rare-disease assumption is *not* needed in case-control studies. Just as for cohort studies, however, neither the incidence odds ratio nor the rate ratio should be expected to be a good approximation to the risk ratio or to be collapsible across strata of a risk factor (even if the factor is not a confounder) unless the incidence proportion is less than about 0.1 for every combination of the exposure and the factor (Chapter 4).

## DEFINING THE SOURCE POPULATION

If the cases are a representative sample of all cases in a precisely defined and identified population and the controls are sampled directly from this source population, the study is said to be *population-based* or a *primary* base study. For a population-based case-control study, random sampling of controls may be feasible if a population registry exists or can be compiled. When random sampling from the source population of cases is feasible, it is usually the most desirable option.

Random sampling of controls does not necessarily mean that every person should have an equal probability of being selected to be a control. As explained earlier, if the aim is to estimate the incidence-rate ratio, then we would employ longitudinal (density) sampling, in which a person’s control selection probability is proportional to the person’s time at risk. For example, in a case-control study nested within an occupational cohort, workers on an employee roster will have been followed for varying lengths of time, and a random sampling scheme should reflect this varying time to estimate the incidence-rate ratio.

When it is not possible to identify the source population explicitly, simple random sampling is not feasible and other methods of control selection must be used. Such studies are sometimes called studies of *secondary* bases, because the source population is identified secondarily to the definition of a case-finding mechanism. A secondary source population or “secondary base” is therefore a source population that is defined from (secondary to) a given case series.

Case 3:16-md-02738-MAS-RLS Document 9888-5 Filed 05/29/19 Page 384 of 424 PageID: 65700

Consider a case-control study in which the cases are patients treated for severe psoriasis at the Mayo Clinic. These patients come to the Mayo Clinic from all corners of the world. What is the specific source population that gives rise to these cases? To answer this question, we would have to know exactly who would go to the Mayo Clinic if he or she had severe psoriasis. We cannot enumerate this source population, because many people in it do not know themselves that they would go to the Mayo Clinic for severe psoriasis, unless they actually developed severe psoriasis. This secondary source might be defined as a population spread around the world that constitutes those people who would go to the Mayo Clinic if they developed severe psoriasis. It is this secondary source from which the control series for the study would ideally be drawn. The challenge to the investigator is to apply eligibility criteria to the cases and controls so that there is good correspondence between the controls and this source population. For example, cases of severe psoriasis and controls might be restricted to those in counties within a certain distance of the Mayo Clinic, so that at least a geographic correspondence between the controls and the secondary source population could be assured. This restriction, however, might leave very few cases for study.

Unfortunately, the concept of a secondary base is often tenuously connected to underlying realities, and it can be highly ambiguous. For the psoriasis example, whether a person would go to the Mayo Clinic depends on many factors that vary over time, such as whether the person is encouraged to go by his regular physician and whether the person can afford to go. It is not clear, then, how or even whether one could precisely define, let alone sample from, the secondary base, and thus it is not clear that one could ensure that controls were members of the base at the time of sampling. We therefore prefer to conceptualize and conduct case-control studies as starting with a well-defined source population and then identify and recruit cases and controls to represent the disease and exposure experience of that population. When one instead takes a case series as a starting point, it is incumbent upon the investigator to demonstrate that a source population can be operationally defined to allow the study to be recast and evaluated relative to this source. Similar considerations apply when one takes a control series as a starting point, as is sometimes done (Greenland, 1985a).

## CASE SELECTION

Ideally, case selection will amount to a direct sampling of cases within a source population. Therefore, apart from random sampling, all people in the source population who develop the disease of interest are presumed to be included as cases in the case-control study. It is not always necessary, however, to include all cases from the source population. Cases, like controls, can be randomly sampled for inclusion in the case-control study, so long as this sampling is independent of the exposure under study within strata of factors that will be used for stratification in the analysis. To see this, suppose we take only a fraction, $f$, of all cases. If this fraction is constant across exposure, and $A_1$ exposed cases and $A_0$ unexposed cases occur in the source population, then, apart from sampling error, the study odds ratio will be

$$\frac{A_1/B_1}{A_0/B_0} = \frac{fA_1/(r \cdot T_1)}{fA_0/(r \cdot T_0)} = \frac{A_1/T_1}{A_0/T_0}$$

as before. Of course, if fewer than all cases are sampled ($f < 1$), the study precision will be lower in proportion to $f$.

The cases identified in a single clinic or treated by a single medical practitioner are possible case series for case-control studies. The corresponding source population for the cases treated in a clinic is all people who would attend that clinic and be recorded with the diagnosis of interest if they had the disease in question. It is important to specify "if they had the disease in question" because clinics serve different populations for different diseases, depending on referral patterns and the reputation of the clinic in specific specialty areas. As noted above, without a precisely identified source population, it may be difficult or impossible to select controls in an unbiased fashion.

## CONTROL SELECTION

The definition of the source population determines the population from which controls are sampled. Ideally, selection will involve direct sampling of controls from the source population. Based on the

principles explained earlier regarding the role of the control series, many general rules for control selection can be formulated. Two basic rules are that:

1. Controls should be selected from the same population—the source population—that gives rise to the study cases. If this rule cannot be followed, there needs to be solid evidence that the population supplying controls has an exposure distribution identical to that of the population that is the source of cases, which is a very stringent demand that is rarely demonstrable.
2. Within strata of factors that will be used for stratification in the analysis, controls should be selected independently of their exposure status, in that the sampling rate for controls ($r$ in the previous discussion) should not vary with exposure.

If these rules and the corresponding case rules are met, then the ratio of pseudo-frequencies will, apart from sampling error, equal the ratio of the corresponding measure of disease frequency in the source population. If the sampling rate is known, then the actual measures of disease frequency can also be calculated. (If the sampling rates differ for exposed and unexposed cases or controls, but are known, the measures of disease frequency and their ratios can still be calculated using special correction formulas; see Chapters 15 and 19.) For a more detailed discussion of the principles of control selection in case-control studies, see Wacholder et al. (1992a, 1992b, 1992c).

When one wishes controls to represent person-time, sampling of the person-time should be constant across exposure levels. This requirement implies that the sampling *probability* of any person as a control should be proportional to the amount of person-time that person spends at risk of disease in the source population. For example, if in the source population one person contributes twice as much person-time during the study period as another person, the first person should have twice the probability of the second of being selected as a control. This difference in probability of selection is automatically induced by sampling controls at a steady rate per unit time over the period in which cases are sampled (*longitudinal* or *density* sampling), rather than by sampling all controls at a point in time (such as the start or end of the follow-up period). With longitudinal sampling of controls, a population member present for twice as long as another will have twice the chance of being selected.

If the objective of the study is to estimate a risk or rate ratio, it should be possible for a person to be selected as a control and yet remain eligible to become a case, so that person might appear in the study as both a control and a case. This possibility may sound paradoxical or wrong, but it is nevertheless correct. It corresponds to the fact that in a cohort study, a case contributes to both the numerator and the denominator of the estimated incidence.

Suppose the follow-up period spans 3 years, and a person free of disease in year 1 is selected as a potential control at year 1. This person should in principle remain eligible to become a case. Suppose this control now develops the disease at year 2 and now becomes a case in the study. How should such a person be treated in the analysis? Because the person did develop disease during the study period, many investigators would count the person as a case but not as a control. If the objective is to have the case-control odds ratio estimate the incidence odds ratio, then this decision would be appropriate. Recall, however, that if a follow-up study were being conducted, each person who develops disease would contribute not only to the numerator of the disease risk or rate but also to the persons or person-time tallied in the denominator. We want the control group to provide estimates of the relative size of the denominators of the incidence proportions or incidence rates for the compared groups. These denominators include all people who later become cases. Therefore, each case in a case-control study should be eligible to be a control before the time of disease onset, each control should be eligible to become a case as of the time of selection as a control, and a person selected as a control who later does develop the disease and is selected as a case should be included in the study both as a control and as a case (Sheehe, 1962; Miettinen, 1976a; Greenland and Thomas, 1982; Lubin and Gail, 1984; Robins et al., 1986a). If the controls are intended to represent person time and are selected longitudinally, similar arguments show that a person selected as a control should remain eligible to be selected as a control again, and thus might be included in the analysis repeatedly as a control (Lubin and Gail, 1984; Robins et al., 1986a).

## COMMON FALLACIES IN CONTROL SELECTION

In cohort studies, the study population is restricted to people at risk for the disease. Some authors have viewed case-control studies as if they were cohort studies done backwards, even going so far as to describe them as "trohoc" studies (Feinstein, 1973). Under this view, the argument was advanced that case-control studies ought to be restricted to those at risk for exposure (i.e., those with exposure opportunity). Excluding sterile women from a case-control study of an adverse effect of oral contraceptives and matching for duration of employment in an occupational study are examples of attempts to control for exposure opportunity. If the factor used for restriction (e.g., sterility) is unrelated to the disease, it will not be a confounder, and hence the restriction will yield no benefit to the validity of the estimate of effect. Furthermore, if the restriction reduces the study size, the precision of the estimate of effect will be reduced (Poole, 1986).

Another principle sometimes used in cohort studies is that the study cohort should be "clean" at start of follow-up, including only people who have never had the disease. Misapplying this principle to case-control design suggests that the control group ought to be "clean," including only people who are healthy, for example. Illness arising after the start of the follow-up period is not reason to exclude subjects from a cohort analysis, and such exclusion can lead to bias; similarly controls with illness that arose after exposure should not be removed from the control series. Nonetheless, in studies of the relation between cigarette smoking and colorectal cancer, certain authors recommended that the control group should exclude people with colon polyps, because colon polyps are associated with smoking and are precursors of colorectal cancer (Terry and Neugut, 1998). Such an exclusion actually reduces the prevalence of the exposure in the controls below that in the source population of cases and hence biases the effect estimates upward (Poole, 1999).

## SOURCES FOR CONTROL SERIES

The following methods for control sampling apply when the source population cannot be explicitly enumerated, so random selection is not possible. All of these methods should only be implemented subject to the reservations about secondary bases described earlier.

### Neighborhood Controls

If the source population cannot be enumerated, it may be possible to select controls through sampling of residences. This method is not straightforward. Usually, a geographic roster of residences is not available, so a scheme must be devised to sample residences without enumerating them all. For convenience, investigators may sample controls who are individually matched to cases from the same neighborhood. That is, after a case is identified, one or more controls residing in the same neighborhood as that case are identified and recruited into the study. If neighborhood is related to exposure, the matching should be taken into account in the analysis (see Chapter 16).

Neighborhood controls are often used when the cases are recruited from a convenient source, such as a clinic or hospital. Such usage can introduce bias, however, for the neighbors selected as controls may not be in the source population of the cases. For example, if the cases are from a particular hospital, neighborhood controls may include people who would not have been treated at the same hospital had they developed the disease. If being treated at the hospital from which cases are identified is related to the exposure under study, then using neighborhood controls would introduce a bias. As an extreme example, suppose the hospital in question were a U.S. Veterans Administration hospital. Patients at these hospitals tend to differ from their neighbors in many ways. One obvious way is in regard to service history. Most patients at Veterans Administration hospitals have served in the U.S. military, whereas only a minority of their neighbors will have done so. This difference in life history can lead to differences in exposure histories (e.g., exposures associated with combat or weapons handling). For any given study, the suitability of using neighborhood controls needs to be evaluated with regard to the study variables on which the research focuses.

### Random-Digit Dialing

Sampling of households based on random selection of telephone numbers is intended to simulate sampling randomly from the source population. *Random-digit dialing*, as this method has been called (Waksberg, 1978), offers the advantage of approaching all households in a designated area,

even those with unlisted telephone numbers, through a simple telephone call. The method requires considerable attention to details, however, and carries no guarantee of unbiased selection.

First, case eligibility should include residence in a house that has a telephone, so that cases and controls come from the same source population. Second, even if the investigator can implement a sampling method so that every telephone has the same probability of being called, there will not necessarily be the same probability of contacting each eligible control subject, because households vary in the number of people who reside in them, the amount of time someone is at home, and the number of operating phones. Third, making contact with a household may require many calls at various times of day and various days of the week, demanding considerable labor; many dozens of telephone calls may be required to obtain a control subject meeting specific eligibility characteristics (Wacholder et al., 1992b). Fourth, some households use answering machines, voicemail, or caller identification to screen calls and may not answer or return unsolicited calls. Fifth, the substitution of mobile telephones for land lines by some households further undermines the assumption that population members can be selected randomly by random-digit dialing. Finally, it may be impossible to distinguish accurately business from residential telephone numbers, a distinction required to calculate the proportion of nonresponders.

Random-digit-dialing controls are usually matched to cases on area code (in the United States, the first three digits of the telephone number) and exchange (the three digits following the area code). In the past, area code and prefix were related to residence location and telephone type (land line or mobile service). Thus, if geographic location or participation in mobile telephone plans was likely related to exposure, then the matching should be taken into account in the analysis. More recently, telephone companies in the United States have assigned overlaying area codes and have allowed subscribers to retain their telephone number when they move within the region, so the correspondence between assigned telephone numbers and geographic location has diminished.

### *Hospital- or Clinic-Based Controls*

As noted above, the source population for hospital- or clinic-based case-control studies is not often identifiable, because it represents a group of people who would be treated in a given clinic or hospital if they developed the disease in question. In such situations, a random sample of the general population will not necessarily correspond to a random sample of the source population. If the hospitals or clinics that provide the cases for the study treat only a small proportion of cases in the geographic area, then referral patterns to the hospital or clinic are important to take into account in the sampling of controls. For these studies, a control series comprising patients from the same hospitals or clinics as the cases may provide a less biased estimate of effect than general-population controls (such as those obtained from case neighborhoods or by random-digit dialing). The source population does not correspond to the population of the geographic area, but only to the people who would seek treatment at the hospital or clinic were they to develop the disease under study. Although the latter population may be difficult or impossible to enumerate or even define very clearly, it seems reasonable to expect that other hospital or clinic patients will represent this source population better than general-population controls. The major problem with any nonrandom sampling of controls is the possibility that they are not selected independently of exposure in the source population. Patients who are hospitalized with other diseases, for example, may be unrepresentative of the exposure distribution in the source population, either because exposure is associated with hospitalization, or because the exposure is associated with the other diseases, or both. For example, suppose the study aims to evaluate the relation between tobacco smoking and leukemia using hospitalized cases. If controls are people who are hospitalized with other conditions, many of them will have been hospitalized for conditions associated with smoking. A variety of other cancers, as well as cardiovascular diseases and respiratory diseases, are related to smoking. Thus, a control series of people hospitalized for diseases other than leukemia would include a higher proportion of smokers than would the source population of the leukemia cases.

Limiting the diagnoses for controls to conditions for which there is no prior indication of an association with the exposure improves the control series. For example, in a study of smoking and hospitalized leukemia cases, one could exclude from the control series anyone who was hospitalized with a disease known to be related to smoking. Such an exclusion policy may exclude most of the potential controls, because cardiovascular disease by itself would represent a large proportion of hospitalized patients. Nevertheless, even a few common diagnostic categories should suffice to

find enough control subjects, so that the exclusions will not harm the study by limiting the size of the control series. Indeed, in limiting the scope of eligibility criteria, it is reasonable to exclude categories of potential controls even on the suspicion that a given category might be related to the exposure. If wrong, the cost of the exclusion is that the control series becomes more homogeneous with respect to diagnosis and perhaps a little smaller. But if right, then the exclusion is important to the ultimate validity of the study.

On the other hand, an investigator can rarely be sure that an exposure is not related to a disease or to hospitalization for a specific diagnosis. Consequently, it would be imprudent to use only a single diagnostic category as a source of controls. Using a variety of diagnoses has the advantage of potentially diluting the biasing effects of including a specific diagnostic group that is related to the exposure, and allows examination of the effect of excluding certain diagnoses.

Excluding a diagnostic category from the list of eligibility criteria for identifying controls is intended simply to improve the representativeness of the control series with respect to the source population. Such an exclusion criterion does not imply that there should be exclusions based on disease history (Lubin and Hartge, 1984). For example, in a case-control study of smoking and hospitalized leukemia patients, one might use hospitalized controls but exclude any who are hospitalized because of cardiovascular disease. This exclusion criterion for controls does not imply that leukemia cases who have had cardiovascular disease should be excluded; only if the cardiovascular disease was a cause of the hospitalization should the case be excluded. For controls, the exclusion criterion should apply only to the cause of the hospitalization used to identify the study subject. A person who was hospitalized because of a traumatic injury and who is thus eligible to be a control would not be excluded if he or she had previously been hospitalized for cardiovascular disease. The source population includes people who have had cardiovascular disease, and they should be included in the control series. Excluding such people would lead to an underrepresentation of smoking relative to the source population and produce an upward bias in the effect estimates.

If exposure directly affects hospitalization (for example, if the decision to hospitalize is in part based on exposure history), the resulting bias cannot be remedied without knowing the hospitalization rates, even if the exposure is unrelated to the study disease or the control diseases. This problem was in fact one of the first problems of hospital-based studies to receive detailed analysis (Berkson, 1946), and is often called Berksonian bias; it is discussed further under the topics of selection bias (Chapter 9) and collider bias (Chapter 12).

### *Other Diseases*

In many settings, especially in populations with established disease registries or insurance-claims databases, it may be most convenient to choose controls from people who are diagnosed with other diseases. The considerations needed for valid control selection from other diagnoses parallel those just discussed for hospital controls. It is essential to exclude any diagnoses known or suspected to be related to exposure, and better still to include only diagnoses for which there is some evidence indicating that they are unrelated to exposure. These exclusion and inclusion criteria apply only to the diagnosis that brought the person into the registry or database from which controls are selected. The history of an exposure-related disease should not be a basis for exclusion. If, however, the exposure directly affects the chance of entering the registry or database, the study will be subject to the Berksonian bias mentioned earlier for hospital studies.

### *Friend Controls*

Choosing friends of cases as controls, like using neighborhood controls, is a design that inherently uses individual matching and needs to be evaluated with regard to the advantages and disadvantages of such matching (discussed in Chapter 11).

Aside from the complications of individual matching, there are further concerns stemming from use of friend controls. First, being named as a friend by the case may be related to the exposure status of the potential control (Flanders and Austin, 1986). For example, cases might preferentially name as friends their acquaintances with whom they engage in specific activities that might relate to the exposure. Physical activity, alcoholic beverage consumption, and sun exposure are examples of such exposures. People who are more reclusive may be less likely to be named as friends, so their exposure patterns will be underrepresented among a control series of friends. Exposures more common to extroverted people may become overrepresented among friend controls. This type of

bias was suspected in a study of insulin-dependent diabetes mellitus in which the parents of cases identified the controls. The cases had fewer friends than controls, had more learning problems, and were more likely to dislike school. Using friend controls could explain these findings (Siemiatycki, 1989).

A second problem is that, unlike other methods of control selection, choosing friends as controls cedes much of the decision making about the choice of control subjects to the cases or their proxies (e.g., parents). The investigator who uses friend controls will usually ask for a list of friends and choose randomly from the list, but for the creation of the list, the investigator is completely dependent on the cases or their proxies. This dependence adds a potential source of bias to the use of friend controls that does not exist for other sources of controls.

A third problem is that using friend controls can introduce a bias that stems from the overlapping nature of friendship groups (Austin et al., 1989; Robins and Pike, 1990). The problem arises because different cases name groups of friends that are not mutually exclusive. As a result, people with many friends become overrepresented in the control series, and any exposures associated with such people become overrepresented as well (see Chapter 11).

In principle, matching categories should form a mutually exclusive and collectively exhaustive partition with respect to all factors, such as neighborhood and age. For example, if matching on age, bias due to overlapping matching groups can arise from *caliper matching,* a term that refers to choosing controls who have a value for the matching factor within a specified range of the case's value. Thus, if the case is 69 years old, one might choose controls who are within 2 years of age 69. Overlap bias can be avoided if one uses nonoverlapping age categories for matching. Thus, if the case is 69 years old, one might choose controls from within the age category 65 to 69 years. In practice, however, bias due to overlapping age and neighborhood categories is probably minor (Robins and Pike, 1990).

### *Dead Controls*

A dead control cannot be a member of the source population for cases, because death precludes the occurrence of any new disease. Suppose, however, that the cases are dead. Does the need for comparability argue in favor of using dead controls? Although certain types of comparability are important, choosing dead controls will misrepresent the exposure distribution in the source population if the exposure causes or prevents death in a substantial proportion of people or if it is associated with an uncontrolled factor that does. If interviews are needed and some cases are dead, it will be necessary to use proxy respondents for the dead cases. To enhance comparability of information while avoiding the problems of taking dead controls, proxy respondents can also be used for those live controls matched to dead cases (Wacholder et al., 1992b). The advantage of comparable information for cases and controls is often overstated, however, as will be addressed later. The main justification for using dead controls is convenience, such as in studies based entirely on deaths (see the discussion of proportional mortality studies below and in Chapter 6).

## *OTHER CONSIDERATIONS FOR SUBJECT SELECTION*

### *Representativeness*

Some textbooks have stressed the need for representativeness in the selection of cases and controls. The advice has been that cases should be representative of all people with the disease and that controls should be representative of the entire nondiseased population. Such advice can be misleading. A case-control study may be restricted to any type of case that may be of interest: female cases, old cases, severely ill cases, cases that died soon after disease onset, mild cases, cases from Philadelphia, cases among factory workers, and so on. In none of these examples would the cases be representative of all people with the disease, yet perfectly valid case-control studies are possible in each one (Cole, 1979). The definition of a case can be quite specific as long as it has a sound rationale. The main concern is clear delineation of the population that gave rise to the cases.

Ordinarily, controls should represent the source population for cases (within categories of stratification variables), rather than the entire nondiseased population. The latter may differ vastly from the source population for the cases by age, race, sex (e.g., if the cases come from a Veterans Administration hospital), socioeconomic status, occupation, and so on—including the exposure of interest.

One of the reasons for emphasizing the similarities rather than the differences between cohort and case-control studies is that numerous principles apply to both types of study but are more evident in the context of cohort studies. In particular, many principles relating to subject selection apply identically to both types of study. For example, it is widely appreciated that cohort studies can be based on special cohorts rather than on the general population. It follows that case-control studies can be conducted by sampling cases and controls from within those special cohorts. The resulting controls should represent the distribution of exposure across those cohorts, rather than the general population, reflecting the more general rule that controls should represent the source population of the cases in the study, not the general population.

### *Comparability of Information Accuracy*

Some authors have recommended that information obtained about cases and controls should be of comparable or equal accuracy, to ensure nondifferentiality (equal distribution) of measurement errors (Miettinen, 1985a; Wacholder et al., 1992a; MacMahon and Trichopoulos, 1996). The rationale for this principle is the notion that nondifferential measurement error biases the observed association toward the null, and so will not generate a spurious association, and that bias in studies with nondifferential error is more predictable than in studies with differential error.

The comparability-of-information (equal-accuracy) principle is often used to guide selection of controls and collection of data. For example, it is the basis for using proxy respondents instead of direct interviews for living controls whenever case information is obtained from proxy respondents. In most settings, however, the arguments for the principle are logically inadequate. One problem, discussed at length in Chapter 9, is that nondifferentiality of exposure measurement error is far from sufficient to guarantee that bias will be toward the null. Such guarantees require that the exposure errors also be *independent* of errors in other variables, including disease and confounders (Chavance et al., 1992; Kristensen, 1992), a condition that is not always plausible (Lash and Fink, 2003b). For example, it seems likely that people who conceal heavy alcohol use will also tend to understate other socially disapproved behaviors such as heavy smoking, illicit drug use, and so on.

Another problem is that the efforts to ensure equal accuracy of exposure information will also tend to produce equal accuracy of information on other variables. The direction of overall bias produced by the resulting nondifferential errors in confounders and effect modifiers can be larger than the bias produced by differential error from unequal accuracy of exposure information from cases and controls (Greenland, 1980; Brenner, 1993; Marshall and Hastrup, 1996; Marshall et al., 1999; Fewell et al., 2007). In addition, unless the exposure is binary, even independent nondifferential error in exposure measurement is not guaranteed to produce bias toward the null (Dosemeci et al., 1990). Finally, even when the bias produced by forcing equal measurement accuracy is toward the null, there is no guarantee that the bias is less than the bias that would have resulted from using a measurement with differential error (Greenland and Robins, 1985a; Drews and Greenland, 1990; Wacholder et al., 1992a). For example, in a study that used proxy respondents for cases, use of proxy respondents for the controls might lead to greater bias than use of direct interviews with controls, even if the latter results in greater accuracy of control measurements.

The comparability-of-information (equal accuracy) principle is therefore applicable only under very limited conditions. In particular, it would seem to be useful only when confounders and effect modifiers are measured with negligible error and when measurement error is reduced by using equally accurate sources of information. Otherwise, the bias from forcing cases and controls to have equal measurement accuracy may be as unpredictable as the effect of not doing so and risking differential error (unequal accuracy).

### *Number of Control Groups*

Situations arise in which the investigator may face a choice between two or more possible control groups. Usually, there will be advantages for one group that are missing in the other, and vice versa. Consider, for example, a case-control study based on a hospitalized series of cases. Because they are hospitalized, hospital controls would be unrepresentative of the source population to the extent that exposure is related to hospitalization for the control conditions. Neighborhood controls would not suffer this problem, but might be unrepresentative of persons who would go to the hospital if they had the study disease. So which control group is better? In such situations, some

have argued that more than one control group should be used, in an attempt to address the biases from each group (Ibrahim and Spitzer, 1979). For example, Gutensohn et al. (1975), in a case-control study of Hodgkin disease, used a control group of spouses to control for environmental influences during adult life but also used a control group of siblings to control for childhood environment and sex. Both control groups are attempting to represent the same source population of cases, but have different vulnerabilities to selection biases and match on different potential confounders.

Use of multiple control groups may involve considerable labor, so is more the exception than the rule in case-control research. Often, one available control source is superior to all practical alternatives. In such settings, effort should not be wasted on collecting controls from sources likely to be biased. Interpretation of the results will also be more complicated unless the different control groups yield similar results. If the two groups produced different results, one would face the problem of explaining the differences and attempting to infer which estimate was more valid. Logically, then, the value of using more than one control group is quite limited. The control groups can and should be compared, but a lack of difference between the groups shows only that both groups incorporate similar net bias. A difference shows only that at least one is biased, but does not indicate which is best or which is worst. Only external information could help evaluate the likely extent of bias in the estimates from different control groups, and that same external information might have favored selection of only one of the control groups at the design stage of the study.

#### *Timing of Classification and Diagnosis*

Chapter 7 discussed at length some basic principles for classifying persons, cases, and person-time units in cohort studies according to exposure status. The same principles apply to cases and controls in case-control studies. If the controls are intended to represent person-time (rather than persons) in the source population, one should apply principles for classifying person-time to the classification of controls. In particular, principles of person-time classification lead to the rule that controls should be classified by their exposure status as of their selection time. Exposures accrued after that time should be ignored. The rule necessitates that information (such as exposure history) be obtained in a manner that allows one to ignore exposures accrued after the selection time. In a similar manner, cases should be classified as of time of diagnosis or disease onset, accounting for any built-in lag periods or induction-period hypotheses. Determining the time of diagnosis or disease onset can involve all the problems and ambiguities discussed in the previous chapter for cohort studies and needs to be resolved by study protocol before classifications can be made.

As an example, consider a study of alcohol use and laryngeal cancer that also examined smoking as a confounder and possible effect modifier, used interviewer-administered questionnaires to collect data, and used neighborhood controls. To examine the effect of alcohol and smoking while assuming a 1-year lag period (a 1-year minimum induction time), the questionnaire would have to allow determination of drinking and smoking habits up to 1 year before diagnosis (for cases) or selection (for controls).

Selection time need not refer to the investigator's identification of the control, but instead may refer to an event analogous to the occurrence time for the case. For example, the selection time for controls who are cases of other diseases can be taken as time of diagnosis for that disease; the selection time of hospital controls might be taken as time of hospitalization. For other types of controls, there may be no such natural event analogous to the case diagnosis time, and the actual time of selection will have to be used.

In most studies, selection time will precede the time data are gathered. For example, in interview-based studies, controls may be identified and then a delay of weeks or months may occur before the interview is conducted. To avoid complicating the interview questions, this distinction is often ignored and controls are questioned about habits in periods dating back from the interview.

## VARIANTS OF THE CASE-CONTROL DESIGN

### *NESTED CASE-CONTROL STUDIES*

Epidemiologists sometimes refer to specific case-control studies as *nested* case-control studies when the population within which the study is conducted is a fully enumerated cohort, which allows formal

random sampling of cases and controls to be carried out. The term is usually used in reference to a case-control study conducted within a cohort study, in which further information (perhaps from expensive tests) is obtained on most or all cases, but for economy is obtained from only a fraction of the remaining cohort members (the controls). Nonetheless, many population-based case-control studies can be thought of as nested within an enumerated source population. For example, when there is a population-based disease registry and a census enumeration of the population served by the registry, it may be possible to use the census data to sample controls randomly.

## CASE-COHORT STUDIES

The *case-cohort study* is a case-control study in which the source population is a cohort and (within sampling or matching strata) every person in this cohort has an equal chance of being included in the study as a control, regardless of how much time that person has contributed to the person-time experience of the cohort or whether the person developed the study disease. This design is a logical way to conduct a case-control study when the effect measure of interest is the ratio of incidence proportions rather than a rate ratio, as is common in perinatal studies. The average risk (or incidence proportion) of falling ill during a specified period may be written

$$R_1 = \frac{A_1}{N_1}$$

for the exposed subcohort and

$$R_0 = \frac{A_0}{N_0}$$

for the unexposed subcohort, where $R_1$ and $R_0$ are the incidence proportions among the exposed and unexposed, respectively, and $N_1$ and $N_0$ are the initial sizes of the exposed and unexposed subcohorts. (This discussion applies equally well to exposure variables with several levels, but for simplicity we will consider only a dichotomous exposure.) Controls should be selected such that the exposure distribution among them will estimate without bias the exposure distribution in the source population. In a case-cohort study, the distribution we wish to estimate is among the $N_1 + N_0$ cohort members, not among their person-time experience (Thomas, 1972; Kupper et al., 1975; Miettinen, 1982a).

The objective is to select controls from the source cohort such that the ratio of the number of exposed controls ($B_1$) to the number of exposed cohort members ($N_1$) is the same as the ratio of the number of unexposed controls ($B_0$) to the number of unexposed cohort members ($N_0$), apart from sampling error:

$$\frac{B_1}{N_1} = \frac{B_0}{N_0}$$

Here, $B_1/N_1$ and $B_0/N_0$ are the control sampling fractions (the number of controls selected per cohort member). Apart from random error, these sampling fractions will be equal if controls have been selected independently of exposure.

We can use the frequencies of exposed and unexposed controls as substitutes for the actual denominators of the incidence proportions to obtain “pseudo-risks”:

$$\text{Pseudo-risk}_1 = \frac{A_1}{B_1}$$

and

$$\text{Pseudo-risk}_0 = \frac{A_0}{B_0}$$

These pseudo-risks have no epidemiologic interpretation by themselves. Suppose, however, that the control sampling fractions are equal to the same fraction, $f$. Then, apart from sampling error, $B_1/f$ should equal $N_1$, the size of the exposed subcohort; and $B_0/f$ should equal $N_0$, the size of the unexposed subcohort: $B_1/f = B_1/(B_1/N_1) = N_1$ and $B_0/f = B_0/(B_0/N_0) = N_0$. Thus, to get the

incidence proportions, we need only multiply each pseudo-risk by the common sampling fraction, $f$. If this fraction is not known, we can still compare the sizes of the pseudo-risks by division:

$$\frac{\text{Pseudo-risk}_1}{\text{Pseudo-risk}_0} = \frac{A_1/B_1}{A_0/B_0} = \frac{A_1/[(B_1/N_1)N_1]}{A_0/[(B_0/N_0)N_0]} = \frac{A_1/fN_1}{A_0/fN_0} = \frac{A_1/N_1}{A_0/N_0}$$

In other words, the ratio of pseudo-risks is an estimate of the ratio of incidence proportions (risk ratio) in the source cohort if control sampling is independent of exposure. Thus, using a case-cohort design, one can estimate the risk ratio in a cohort without obtaining information on every cohort member.

Thus far, we have implicitly assumed that there is no loss to follow-up or competing risks in the underlying cohort. If there are such problems, it is still possible to estimate risk or rate ratios from a case-cohort study, provided that we have data on the time spent at risk by the sampled subjects or we use certain sampling modifications (Flanders et al., 1990). These procedures require the usual assumptions for rate-ratio estimation in cohort studies, namely, that loss-to-follow-up and competing risks either are not associated with exposure or are not associated with disease risk.

An advantage of the case-cohort design is that it facilitates conduct of a set of case-control studies from a single cohort, all of which use the same control group. As a sample from the cohort at enrollment, the control group can be compared with any number of case groups. If matched controls are selected from people at risk at the time a case occurs (as in risk-set sampling, which is described later), the control series must be tailored to a specific group of cases. If common outcomes are to be studied and one wishes to use a single control group for each outcome, another sampling scheme must be used. The case-cohort approach is a good choice in such a situation.

Case-cohort designs have other advantages as well as disadvantages relative to alternative case-control designs (Wacholder, 1991). One disadvantage is that, because of the overlap of membership in the case and control groups (controls who are selected may also develop disease and enter the study as cases), one will need to select more controls in a case-cohort study than in an ordinary case-control study with the same number of cases, if one is to achieve the same amount of statistical precision. Extra controls are needed because the statistical precision of a study is strongly determined by the numbers of distinct cases and noncases. Thus, if 20% of the source cohort members will become cases, and all cases will be included in the study, one will have to select 1.25 times as many controls as cases in a case-cohort study to ensure that there will be as many controls who never become cases in the study. On average, only 80% of the controls in such a situation will remain noncases; the other 20% will become cases. Of course, if the disease is uncommon, the number of extra controls needed for a case-cohort study will be small.

## DENSITY CASE-CONTROL STUDIES

Earlier, we described how case-control odds ratios will estimate rate ratios if the control series is selected so that the ratio of the person-time denominators $T_1/T_0$ is validly estimated by the ratio of exposed to unexposed controls $B_1/B_0$. That is, to estimate rate ratios, controls should be selected so that the exposure distribution among them is, apart from random error, the same as it is among the person-time in the source population or within strata of the source population. Such control selection is called *density sampling* because it provides for estimation of relations among incidence rates, which have been called *incidence densities*.

If a subject's exposure may vary over time, then a case's exposure history is evaluated up to the time the disease occurred. A control's exposure history is evaluated up to an analogous index time, usually taken as the time of sampling; exposure after the time of selection must be ignored. This rule helps ensure that the number of exposed and unexposed controls will be in proportion to the amount of exposed and unexposed person-time in the source population.

The time during which a subject is eligible to be a control should be the time in which that person is also eligible to become a case, if the disease should occur. Thus, a person in whom the disease has already developed or who has died is no longer eligible to be selected as a control. This rule corresponds to the treatment of subjects in cohort studies. Every case that is tallied in the numerator of a cohort study contributes to the denominator of the rate until the time that the person

becomes a case, when the contribution to the denominator ceases. One way to implement this rule is to choose controls from the set of people in the source population who are at risk of becoming a case at the time that the case is diagnosed. This set is sometimes referred to as the *risk set* for the case, and this type of control sampling is sometimes called *risk-set sampling.* Controls sampled in this manner are matched to the case with respect to sampling time; thus, if time is related to exposure, the resulting data should be analyzed as matched data (Greenland and Thomas, 1982). It is also possible to conduct unmatched density sampling using probability sampling methods if one knows the time interval at risk for each population member. One then selects a control by sampling members with probability proportional to time at risk and then randomly samples a time to measure exposure within the interval at risk.

As mentioned earlier, a person selected as a control who remains in the study population at risk after selection should remain eligible to be selected once again as a control. Thus, although it is unlikely in typical studies, the same person may appear in the control group two or more times. Note, however, that including the same person at different times does not necessarily lead to exposure (or confounder) information being repeated, because this information may change with time. For example, in a case-control study of an acute epidemic of intestinal illness, one might ask about food ingested within the previous day or days. If a contaminated food item was a cause of the illness for some cases, then the exposure status of a case or control chosen 5 days into the study might well differ from what it would have been 2 days into the study.

## *CUMULATIVE ("EPIDEMIC") CASE-CONTROL STUDIES*

In some research settings, case-control studies may address a risk that ends before subject selection begins. For example, a case-control study of an epidemic of diarrheal illness after a social gathering may begin after all the potential cases have occurred (because the maximum induction time has elapsed). In such a situation, an investigator might select controls from that portion of the population that remains after eliminating the accumulated cases; that is, one selects controls from among noncases (those who remain noncases at the end of the epidemic follow-up).

Suppose that the source population is a cohort and that a fraction $f$ of both exposed and unexposed noncases is selected to be controls. Then the ratio of pseudo-frequencies will be

$$\frac{A_1/B_1}{A_0/B_0} = \frac{A_1/f(N_1 - A_1)}{A_0/f(N_0 - A_0)} = \frac{A_1/(N_1 - A_1)}{A_0/(N_0 - A_0)}$$

which is the incidence odds ratio for the cohort. This ratio will provide a reasonable approximation to the rate ratio, provided that the proportions falling ill in each exposure group during the risk period are low, that is, less than about 20%, and that the prevalence of exposure remains reasonably steady during the study period (see Chapter 4). If the investigator prefers to estimate the risk ratio rather than the incidence rate ratio, the study odds ratio can still be used (Cornfield, 1951), but the accuracy of this approximation is only about half as good as that of the odds-ratio approximation to the rate ratio (Greenland, 1987a). The use of this approximation in the cumulative design is the primary basis for the mistaken teaching that a rare-disease assumption is needed to estimate effects from case-control studies.

Before the 1970s, the standard conceptualization of case-control studies involved the cumulative design, in which controls are selected from noncases at the end of a follow-up period. As discussed by numerous authors (Sheehe, 1962; Miettinen, 1976a; Greenland and Thomas, 1982), density designs and case-cohort designs have several advantages outside of the acute epidemic setting, including potentially much less sensitivity to bias from exposure-related loss-to-follow-up.

## *CASE-ONLY, CASE-SPECULAR, AND CASE-CROSSOVER STUDIES*

There are a number of situations in which cases are the only subjects used to estimate or test hypotheses about effects. For example, it is sometimes possible to employ theoretical considerations to construct a prior distribution of exposure in the source population and use this distribution in place of an observed control series. Such situations arise naturally in genetic studies, in which basic

laws of inheritance may be combined with certain assumptions to derive a population or parental-specific distribution of genotypes (Self et al., 1991). It is also possible to study certain aspects of joint effects (interactions) of genetic and environmental factors without using control subjects (Khoury and Flanders, 1996); see Chapter 28 for details.

When the exposure under study is defined by proximity to an environmental source (e.g., a power line), it may be possible to construct a *specular* (hypothetical) control for each case by conducting a "thought experiment." Either the case or the exposure source is imaginarily moved to another location that would be equally likely were there no exposure effect; the case exposure level under this hypothetical configuration is then treated as the (matched) "control" exposure for the case (Zaffanella et al., 1998). When the specular control arises by examining the exposure experience of the case outside of the time in which exposure could be related to disease occurrence, the result is called a *case-crossover study*.

The classic *crossover* study is a type of experiment in which two (or more) treatments are compared, as in any experimental study. In a crossover study, however, each subject receives both treatments, with one following the other. Preferably, the order in which the two treatments are applied is randomly chosen for each subject. Enough time should be allocated between the two administrations so that the effect of each treatment can be measured and can subside before the other treatment is given. A persistent effect of the first intervention is called a *carryover effect*. A crossover study is only valid to study treatments for which effects occur within a short induction period and do not persist, i.e., carryover effects must be absent, so that the effect of the second intervention is not intermingled with the effect of the first.

The *case-crossover* study is a case-control analog of the crossover study (Maclure, 1991). For each case, one or more predisease or postdisease time periods are selected as matched "control" periods for the case. The exposure status of the case at the time of the disease onset is compared with the distribution of exposure status for that same person in the control periods. Such a comparison depends on the assumption that neither exposure nor confounders are changing over time in a systematic way.

Only a limited set of research topics are amenable to the case-crossover design. The exposure must vary over time within individuals rather than stay constant. Eye color or blood type, for example, could not be studied with a case-crossover design because both are constant. If the exposure does not vary within a person, then there is no basis for comparing exposed and unexposed time periods of risk within the person. Like the crossover study, the exposure must also have a short induction time and a transient effect; otherwise, exposures in the distant past could be the cause of a recent disease onset (a carryover effect).

Maclure (1991) used the case-crossover design to study the effect of sexual activity on incident myocardial infarction. This topic is well suited to a case-crossover design because the exposure is intermittent and is presumed to have a short induction period for the hypothesized effect. Any increase in risk for a myocardial infarction from sexual activity is presumed to be confined to a short time following the activity. A myocardial infarction is an outcome that is well suited to this type of study because it is thought to be triggered by events close in time. Other possible causes of a myocardial infarction that might be studied by a case-crossover study would be caffeine consumption, alcohol consumption, carbon monoxide exposure, drug exposures, and heavy physical exertion (Mittleman et al., 1993), all of which occur intermittently.

Each case and its control in a case-crossover study is automatically matched on all characteristics (e.g., sex and birth date) that do not change within individuals. Matched analysis of case-crossover data controls for all such fixed confounders, whether or not they are measured. Subject to special assumptions, control for measured time-varying confounders may be possible using modeling methods for matched data (see Chapter 21). It is also possible to adjust case-crossover estimates for bias due to time trends in exposure through use of longitudinal data from a nondiseased control group (case-time controls) (Suissa, 1995). Nonetheless, these trend adjustments themselves depend on additional no-confounding assumptions and may introduce bias if those assumptions are not met (Greenland, 1996b).

There are many possible variants of the case-crossover design, depending on how control time periods are selected. These variants offer trade-offs among potential for bias, inefficiency, and difficulty of analysis; see Lumley and Levy (2000), Vines and Farrington (2001), Navidi and Weinhandl (2002), and Janes et al. (2004, 2005) for further discussion.

Case 3:16-md-02738-MAS-RLS Document 9888-5 Filed 05/29/19 Page 396 of 424 PageID: 65712

## TWO-STAGE SAMPLING

Another variant of the case-control study uses two-stage or two-phase sampling (Walker, 1982a; White, 1982b). In this type of study, the control series comprises a relatively large number of people (possibly everyone in the source population), from whom exposure information or perhaps some limited amount of information on other relevant variables is obtained. Then, for only a subsample of the controls, more detailed information is obtained on exposure or on other study variables that may need to be controlled in the analysis. More detailed information may also be limited to a subsample of cases. This two-stage approach is useful when it is relatively inexpensive to obtain the exposure information (e.g., by telephone interview), but the covariate information is more expensive to obtain (say, by laboratory analysis). It is also useful when exposure information already has been collected on the entire population (e.g., job histories for an occupational cohort), but covariate information is needed (e.g., genotype). This situation arises in cohort studies when more information is required than was gathered at baseline. As will be discussed in Chapter 15, this type of study requires special analytic methods to take full advantage of the information collected at both stages.

## PROPORTIONAL MORTALITY STUDIES

Proportional mortality studies were discussed in Chapter 6, where the point was made that the validity of such studies can be improved if they are designed and analyzed as case-control studies. The cases are deaths occurring within the source population. Controls are not selected directly from the source population, which consists of living people, but are taken from other deaths within the source population. This control series is acceptable if the exposure distribution within this group is similar to that of the source population. Consequently, the control series should be restricted to categories of death that are not related to the exposure. See Chapter 6 for a more detailed discussion.

## CASE-CONTROL STUDIES WITH PREVALENT CASES

Case-control studies are sometimes based on prevalent cases rather than incident cases. When it is impractical to include only incident cases, it may still be possible to select existing cases of illness at a point in time. If the prevalence odds ratio in the population is equal to the incidence-rate ratio, then the odds ratio from a case-control study based on prevalent cases can unbiasedly estimate the rate ratio. As noted in Chapter 4, however, the conditions required for the prevalence odds ratio to equal the rate ratio are very strong, and a simple general relation does not exist for age-specific ratios. If exposure is associated with duration of illness or migration out of the prevalence pool, then a case-control study based on prevalent cases cannot by itself distinguish exposure effects on disease incidence from the exposure association with disease duration or migration, unless the strengths of the latter associations are known. If the size of the exposed or the unexposed population changes with time or there is migration into the prevalence pool, the prevalence odds ratio may be further removed from the rate ratio. Consequently, it is always preferable to select incident rather than prevalent cases when studying disease etiology.

As discussed in Chapter 3, prevalent cases are usually drawn in studies of congenital malformations. In such studies, cases ascertained at birth are prevalent because they have survived with the malformation from the time of its occurrence until birth. It would be etiologically more useful to ascertain all incident cases, including affected abortuses that do not survive until birth. Many of these, however, do not survive until ascertainment is feasible, and thus it is virtually inevitable that case-control studies of congenital malformations are based on prevalent cases. In this example, the source population comprises all conceptuses, and miscarriage and induced abortion represent emigration before the ascertainment date. Although an exposure will not affect duration of a malformation, it may very well affect risks of miscarriage and abortion.

Other situations in which prevalent cases are commonly used are studies of chronic conditions with ill-defined onset times and limited effects on mortality, such as obesity, Parkinson's disease, and multiple sclerosis, and studies of health services utilization.

# Exhibit 21

# Ovarian Cancer and Talc

## A Case-Control Study

DANIEL W. CRAMER, MD,*†‡ WILLIAM R. WELCH, MD,§ ROBERT E. SCULLY, MD,ǁ AND CAROL A. WOJCIECHOWSKI, RN‡

**Opportunities for genital exposure to talc were assessed in 215 white females with epithelial ovarian cancers and in 215 control women from the general population matched by age, race, and residence. Ninety-two (42.8%) cases regularly used talc either as a dusting powder on the perineum or on sanitary napkins compared with 61 (28.4%) controls. Adjusted for parity and menopausal status, this difference yielded a relative risk of 1.92 ($P < 0.003$) for ovarian cancer associated with these practices. Women who had regularly engaged in both practices had an adjusted relative risk of 3.28 ($P < 0.001$) compared to women with neither exposure. This provides some support for an association between talc and ovarian cancer hypothesized because of the similarity of ovarian cancer to mesotheliomas and the chemical relation of talc to asbestos, a known cause of mesotheliomas. The authors also investigated opportunities for potential talc exposure from rubber products such as condoms or diaphragms or from pelvic surgery. No significant differences were noted between cases and controls in these exposures, although the intensity of talc exposure from these sources was likely affected by variables not assessed in this study.**

***Cancer* 50:372–376, 1982.**

THE POSSIBILITY that ovarian cancer may be caused by exposure to certain hydrous magnesium silicates such as talc and asbestos has been raised by several researchers.[1-3] The lack of epidemiologic studies regarding this hypothesis prompted us to investigate talc exposure in a case-control study of ovarian cancer.

From the Departments of *Obstetrics, †Gynecology, and §Pathology, Boston Hospital for Women, Division of the Brigham and Women's Hospital, the ‡Department of Epidemiology, Harvard School of Public Health and the ǁDepartment of Pathology, Massachusetts General Hospital, Harvard Medical School, Boston, Massachusetts.

Supported by Grant Number 5-RO1 CA24209, awarded by the National Institutes of Health, DHEW.

Address for reprints: Dr. Cramer, Department of Obstetrics and Gynecology, Brigham and Women's Hospital, Boston, MA 02115.

This study could not have occurred without the generous participation of many clinicians and institutions in the greater Boston area including: Dr. Emanuel Friedman of the Beth Israel Hospital, Drs. Robert Knapp and Thomas Griffiths of the Brigham and Women's Hospital and Sidney Farber Cancer Institute, Dr. Arthur Hassett of the Brockton Hospital, Dr. Joel Rankin of the Framingham Union Hospital, Dr. Edward Copenhaver of the Lahey Clinic Foundation, Dr. James Nelson of the Massachusetts General Hospital, Dr. Clement Yahia of the New England Deaconess Hospital, Dr. Lalita Gandbhir of the Pondville Hospital, Dr. James Whelton of Saint Elizabeth's Hospital, Dr. Stephen Alpert of the Salem Hospital, Dr. Richard Hunter of the University of Massachusetts Medical School. The superb clerical and technical assistance of Ms. Eileen McManus, Ms. Sally Cassells, and Ms. Christine Peters is also gratefully acknowledged.

Accepted for publication December 29, 1981.

### Methods

The cases studied were women with ovarian cancer, diagnosed between November 1978 and September 1981 and identified through the pathology logs or tumor boards of twelve participating hospitals in the Greater Boston area. The study was restricted to English-speaking residents of Massachusetts ranging in age from 18 to 80 years. During the study period, 297 eligible cases were identified. Physicians denied permission to contact their patients in 13 instances. Fourteen patients declined to participate, and 14 other patients had died or moved before they could be contacted.

For each of the 256 interviewed cases, slides of the surgical specimens were reviewed by two authors (W.R.W. or R.E.S). Eighteen cases were excluded as nonovarian primaries. Each ovarian tumor was classified according to the Histological Classification of Ovarian Tumors of the World Health Organization.[4] The present analysis was restricted to 215 white women with epithelial cancers, including 39 with tumors of borderline malignancy and their matched controls.

Control cases were identified through the Massachusetts Town Books, annual publications that list residents by name, age, and address. Controls were selected randomly from those women who matched cases by precinct of residence, race, and age within two years. Additionally, it was required that a subject be excluded

0008-543X/82/0715/0372 $0.75 © American Cancer Society

P2.0055

as a control if she had had a bilateral salpingo-oophorectomy, but subjects were not excluded because of prior hysterectomy or other types of pelvic operations. Women who had had pelvic operations were generally confident in their knowledge of whether their ovaries had been removed, but the nature of the operations could not be verified by hospital records in each instance. Women whose statements could not be verified were included or excluded on the basis of their recollection of the surgery. The 215 controls in this study were eventually obtained from a total of 475 potential controls identified through the Town Books. Fifty-six (12%) of the total could not be reached because they had moved, died, or had disconnected or unlisted phones. Twenty-nine (6%) of the total were ineligible because of a history of bilateral salpingo-oophorectomy, while 20 (4%) were of the wrong age or race or did not speak English. Of the total potential controls, 155 (33%) refused to participate. If the 215 cases are characterized as to ease of matching, 121 (56%) cases were matched with no refusals, 58 (27%) were matched after one refusal, and 36 (17%) were matched only after two or more refusals.

Interviews were conducted personally to assess a number of factors from the menstrual and reproductive history, medical and family history, and environmental exposures. This report will deal only with the results of several questions related to potential or definite talc exposure by way of contraceptive practices, operations, or perineal hygiene. Subjects were stratified by potential confounders described below, and adjusted relative risks associated with these exposures were calculated by the Mantel-Haenszel procedure as adapted by Rothman and Boice.[5] To accommodate other confounders as well as the matched design in the data collection, logistic analysis for matched data as described by Breslow *et al.*[6] was also employed.

## Results

The average age (and standard error of the mean, SEM) for cases was 53.2 (1.0) years and for controls, 53.5 (1.0) years. Table 1 shows other characteristics of subjects. Controls were comparable to cases in educational level and religion. Cases and controls differed significantly in marital status and parity with parity being the more important discriminator between them. Sixty-four percent of the cases were postmenopausal at the time of diagnosis, whereas 60% of controls were postmenopausal. Of these, 15 cases and 20 controls had had an artificial menopause. Parity and menopausal status were considered important potential confounders in this analysis and were adjusted for as described above.

Relative risks associated with potential talc exposure from contamination on rubber products are explored in Table 2. Although surgical gloves of recent vintage are dusted with starch, talc contamination may still be found.[7] Thus, a history of pelvic operations (appendectomy, cesarean section, hysterectomy, and other operations on internal genital organs other than bilateral salpingo-oophorectomy) was determined in cases and controls. Excluding operations associated with the diagnosis or treatment of the ovarian cancer among the cases, no excess in the occurrence of pelvic operations was noted. The greatest opportunity for talc exposure from surgery occurred before 1950, when talc was the

TABLE 1. Characteristics of Cases and Controls

| | Cases (Total = 215) | | Controls (Total = 215) | |
|---|---|---|---|---|
| Characteristic | No. | % | No. | % |
| Educational level (completed college) | 48 | 22.3 | 49 | 22.8 |
| Religion (Roman Catholic) | 126 | 58.6 | 128 | 59.5 |
| Marital status (never married) | 46 | 21.4 | 24 | 11.2 |
| Nulliparous | 78 | 36.3 | 39 | 18.1 |
| Menopausal status (postmenopausal*) | 137 | 63.7 | 129 | 60.0 |

* Postmenopausal at time of diagnosis for cases or for interview for controls.

TABLE 2. Relative Risks (RR) for Common Epithelial Ovarian Cancers Associated with Potential Talc Exposure from Contamination on Rubber Products

| | Cases | | Controls | | | | |
|---|---|---|---|---|---|---|---|
| Exposure | Total | No. (%) with exposure | Total | No. (%) with exposure | Crude RR | Adjusted RR* | 95% Confidence limits |
| Pelvic surgery | 215 | 78 (36.3) | 215 | 75 (34.9) | 1.06 | 1.17 | (0.76-1.79) |
| Pelvic surgery (prior to 1950) | 215 | 51 (23.7) | 215 | 48 (22.3) | 1.08 | 1.12 | (0.69-1.82) |
| Use of condoms† | 169 | 19 (11.2) | 191 | 30 (15.7) | 0.68 | 0.77 | (0.41-1.44) |
| Use of diaphragm† | 169 | 37 (21.9) | 191 | 35 (18.3) | 1.24 | 1.19 | (0.69-2.05) |

* Adjusted for parity (nulliparous, parous) and menopausal status (pre- and postmenopausal).

† Restricted to subjects who had ever been married.

TABLE 3. Relative Risks (RR) Associated with Using Talc for Storage Among Diaphragm Users* by Duration of Use of Diaphragm

| | Cases | | Controls | | | | |
|---|---|---|---|---|---|---|---|
| Duration of diaphragm use | Total | No. (%) who used talc on diaphragm | Total | No. (%) who used talc on diaphragm | Crude RR | Adjusted RR† | 95% Confidence limits |
| Total diaphragm use less than five years | 13 | 6 (46.2) | 21 | 8 (38.1) | 1.39 | 1.82 | (0.42–8.00) |
| Total diaphragm use five or more years | 27 | 16 (59.3) | 19 | 11 (57.9) | 1.06 | 1.23 | (0.36–4.17) |
| All users | 40 | 22 (55.0) | 40 | 19 (47.5) | 1.35 | 1.56 | (0.62–3.88) |

* Includes all women who used diaphragm regardless of marital status.

† Adjusted for parity and menopausal status.

predominantly used dusting powder for surgical gloves. However, no significant excess of pelvic operations prior to 1950 was observed for cases.

The patients (cases) who, at sometime, had been married, chose condoms less frequently and diaphragms more frequently for contraception than the control group, but neither difference was statistically significant. Condom use is not necessarily associated with talc exposure. Not all brands of condoms are dusted with talc, and lubricants could affect the shedding of talc from the condom. Unfortunately, details on specific brands of condoms were not obtained. Similarly, talc exposure is not a necessary consequence of diaphragm use. We inquired specifically about the practice of dusting the diaphragm with talc for storage after use (Table 3). Among all subjects who had used a diaphragm, there was no significant excess of cases who regularly stored their diaphragm using talc, nor was any greater risk associated with this practice observed among women who had used the diaphragm for longer durations. Before the risk from this exposure can be adequately assessed, greater detail is needed including frequency of use and whether the powder was washed off prior to use. Furthermore, contraceptive jellies used with the diaphragm could affect the transport of talc in the genital tract.

Hygienic practices involving talc were also studied. Specifically, we inquired whether women had regularly used talc as a dusting powder on the perineum or regularly dusted sanitary napkins with talc (Table 4). Ninety-two (42.8%) of the cases had talc exposure by either or both of these routes compared with 61 (28.4%) of the controls. The adjusted relative risk was 1.92 ($P < 0.003$) with 95% confidence limits of 1.27–2.89 compared to subjects who had neither exposure. Sixty (27.9%) cases and 48 (22.3%) controls had either used talc for dusting or on napkins but not both. This difference yielded an adjusted relative risk of 1.55, which was of borderline significance ($P = 0.06$). The greatest risk occurred in women who had both exposures (use on the perineum and on napkins) compared to women who had neither exposure. Thirty-two (14.9%) of cases were in this category compared with 13 (6.0%) controls, for an adjusted relative risk of 3.28 ($P < .001$) and 95% confidence limits of 1.68–6.42. The histologic characteristics of tumors developing in women with perineal exposure to talc did not differ significantly from those in women without perineal exposure to talc (Table 5). In addition, the proportion of cases with tumors of borderline malignancy was identical among those with and without perineal exposure to talc. Twenty-two (18%) of 123 cases without the exposure had tumors of bor-

TABLE 4. Relative Risks (RR) for Common Epithelial Ovarian Cancers Associated with Talc Exposure in Perineal Hygiene

| | | | Types of perineal exposure | | |
|---|---|---|---|---|---|
| | No perineal exposure | Any perineal exposure | As dusting powder but not on napkins | On napkins but not as dusting powder | Both on napkins and as dusting powder |
| Cases (Total = 215) | 123 (57.2%) | 92 (42.8%) | 43 (20.0%) | 17 (7.9%) | 32 (14.9%) |
| Controls (Total = 215) | 154 (71.6%) | 61 (28.4%) | 34 (15.8%) | 14 (6.5%) | 13 (6.0%) |
| Crude rr | 1 | 1.89 | 1.58 | 1.52 | 3.08 |
| Adjusted RR* | — | 1.92 | 1.55 | | 3.28 |
| 95% confidence limits | — | (1.27–2.89) | (0.98–2.47) | | (1.68–6.42) |

* Adjusted for parity and menopausal status.

P2.0055.3

derline malignancy compared to 17 (18%) of 92 with the talc exposure.

**Discussion**

The argument linking talc and ovarian cancer includes four elements: the chemical relationship between talc and asbestos, asbestos as a cause of pleural and peritoneal mesotheliomas, the possible relation between epithelial ovarian cancers and mesotheliomas, and the ability of talc to enter the pelvic cavity. The mineral talc is a specific hydrous magnesium silicate chemically related to several asbestos group minerals and occurring in nature with them. Generic "talc" is seldom pure and may be contaminated with asbestos, particularly in powders formulated prior to 1976.[8,9]

Epidemiologic studies have clearly linked lung cancer and pleural and peritoneal mesotheliomas with asbestos exposure.[10] An excess of similar pulmonary lesions has been reported in talc workers and seems to be correlated with the amount of asbestos contamination in the talc deposits worked.[11] Graham and Graham[1] were able to induce ovarian neoplasms in guinea pigs with asbestos and suggested that ovarian cancer could be related to asbestos exposure, noting the similarity between mesotheliomas and ovarian cancers. Parmley and Woodruff[12] further emphasized this similarity and popularized the pelvic contamination theory, which proposed that environmental carcinogens might enter the pelvic cavity via the genital tract. Years earlier it had been observed that inert carbon particles placed in the vagina immediately prior to hysterectomy could be recovered from the fallopian tubes.[13] Although greeted with skepticism, the finding of talc particles embedded in normal and abnormal ovaries suggests that talc is a substance that can enter the pelvic cavity via the vagina.[2]

Although no consensus concerning the risks of talc has emerged from letters, editorial and articles,[3,14-16] participants in the discussion have agreed upon the need for epidemiologic studies of ovarian cancer and talc exposure. In this case-control study of ovarian cancer of the epithelial variety, we investigated several sources of potential talc exposure. Among these, the only significant finding was an association between ovarian cancer and hygienic practices involving the use of talc on the perineum. It is especially notable that women who regularly had both dusted their perineum with talc and had used it on sanitary napkins had more than a threefold increase in risk compared to women with neither exposure. Several potential biases must be considered in interpreting this association.

The observation by Wynder *et al.*[17] that menstrual characteristics may differ between women with ovarian cancer and controls might suggest that such differences may confound the association between perineal use of talc and ovarian cancer. We found that menstrual characteristics of cases and controls were virtually identical in this study. Fifty-three (24.7%) cases complained of moderate or severe dysmenorrhea compared to 56 (26.0%) controls. Twenty-five (11.6%) cases complained of irregular periods compared to 32 (14.9%) controls. The average numbers (and SEM) of days of flow and cycle length were, respectively, 4.9 (0.1) and 28.9 (0.3) days for cases and 4.9 (0.1) and 29.6 (0.3) days for controls.

TABLE 5. Characteristics of Ovarian Cancer in Women with and without Perineal Exposure to Talc

| | No perineal use of talc | Any perineal use of talc |
|---|---|---|
| | No. (%) | No. (%) |
| Serous | 66 (53.7) | 45 (48.9) |
| Mucinous | 16 (13.0) | 14 (15.2) |
| Endometrioid and clear cell | 32 (26.0) | 24 (26.1) |
| Other and undifferentiated | 9 (7.3) | 9 (9.8) |
| Total | 123 (100) | 92 (100) |

Since entry of talc into the pelvic cavity is prevented by hysterectomy or tubal ligation, it might also be argued that the inclusion of subjects with pelvic surgery in the analysis may obviate any association between talc and ovarian cancer. It should be noted that such surgery generally occurred near the end of reproductive life for both cases and controls, probably after most significant talc exposure had already occurred. The exclusion of such subjects from the analysis did not substantially alter the observed associations. For example, the adjusted relative risk for the use of talc both on the perineum and sanitary napkins was 2.79 ($P < 0.003$) in the group without pelvic surgery compared to 3.28 observed for the entire group.

In terms of other confounders, the association persisted after adjustment for menopausal status and parity. We also applied multivariate logistic regression for paired observations.[6] The maximum likelihood estimate of relative risk associated with any perineal use of talc was 1.61 ($P = 0.03$) with 95% confidence limits of 1.04–2.49 after simultaneous adjustment for religion, marital status, educational level, ponderal index, age at menarche, exact parity, oral contraceptive or menopausal hormone use, and smoking.

Our sample of cases represents more than 50% of ovarian cancer cases diagnosed in Boston residents in the study period. Therefore, it is difficult to conceive of a plausible bias in the selection of cases that would yield this excess use of talc. There is reason for concern that the high refusal rate among the controls may have introduced a selection bias among the controls. But,

when we restricted the analysis to the 121 cases who were matched without a control refusal, we again found a significant association between talc use and ovarian cancer. For women who had used talc both in dusting and on the perineum we found an adjusted relative risk of 2.44 ($P < 0.05$). Interviewer bias is also unlikely to explain the association. Of the 18 women who were initially interviewed as ovarian cancer cases but later excluded as having metastatic tumors to the ovary, only one (5.6%) had both perineal and napkin exposure as compared with 15% in cases and 6% in controls.

Experimental data which might bear on the carcinogenicity of talc come primarily from models using pleural implantation of various minerals in rats.[18] These data suggest that carcinogenicity is dependent primarily upon the shape of the particles with long thin fibers such as those occurring in crocidolite asbestos being most carcinogenic. Talc consists primarily of plates but may contain fibers, although voluntary guidelines to limit the content of asbestisform fibers in consumer talcums were proposed by the cosmetics industry in 1976.[19]

If talc is involved in the etiology of ovarian cancer, it is not clear whether this derives from the asbestos content of talc or from the uniqueness of the ovary which might make it susceptible to carcinogenesis from both talc and other particulates. With ovulation entrapment of the surface epithelium of the ovary into the ovarian stroma occurs. If present, talc or other particulates might be incorporated into these inclusion cysts. Apparently implantation of foreign bodies into the lumens of epithelial lined organs provides a favorable environment for carcinogenesis.[20] Alternatively, talc might serve to stimulate entrapment of the surface epithelium and act in the same way that "incessant ovulation" has been proposed as an etiologic factor for ovarian cancer.[21] Given the histologic and clinical diversity of ovarian cancer, talc exposure is unlikely to be the only cause. Undoubtedly, reproductive experiences such as pregnancies and, perhaps, oral contraceptive use play a role in its etiology.[21-23] The possibility that talc exposure interacts with these variables deserves further investigation.

It is hoped that this report will stimulate further study of talc exposure in relation to ovarian cancer. Animal studies would be helpful to determine whether and under what circumstances ovarian tumors may be induced by various talc preparations. Epidemiologic studies should focus on opportunities for excessive vaginal contamination with talc such as when it is repeatedly used in perineal dusting powders or sprays and in or on tampons, sanitary napkins, or other products intended for intravaginal use. More precise details on the exact nature and frequency of the exposure and the amount and specific brand of powder used are essential. Opportunities for talc exposure are widespread and pervasive,[24] but that should not discourage epidemiologists from studying this potentially important exposure in relation to ovarian cancer.

## REFERENCES

1. Graham J, Graham R. Ovarian cancer and asbestos. *Environ Res* 1967; 1:115-128.
2. Henderson WJ, Joslin CAF, Turnbull AC, Griffiths K. Talc and carcinoma of the ovary and cervix. *J Obstet Gynaecol Br Commonw* 1971; 78:266-272.
3. Longo DL, Young RC. Cosmetic talc and ovarian cancer. *Lancet* 1979; ii:349-351.
4. Serov SF, Scully RE, Sobin LH. International Histological Classification of Tumours, No. 9. Histological Typing of Ovarian Tumours. Geneva, World Health Organization, 1973.
5. Rothman KJ, Boice JD. Epidemiologic analysis with a programmable calculator. NIH Publication No. 79-1649, 1979.
6. Breslow NE, Day NE, Halvorsen KT, Prentice RL, Sabai C. Estimation of multiple relative risk functions in matched case-control studies. *Am J Epidemiol* 1978; 108:299-307.
7. Henderson WJ, Hamilton TC, Griffiths K. Talc in normal and malignant ovarian tissue. *Lancet* 1979; i:499.
8. Cralley LJ, Key MM, Groth DH, Lainhart WS, Ligo RM. Fibrous and mineral content of cosmetic talcum products. *Am Ind Hyg Assoc J* 1968; 350-354.
9. Rohl AN, Langer AM, Selikoff IJ, Tordini A, Klimentidis R. Consumer talcums and powders: Mineral and chemical characterization. *J Toxicol Environ Health* 1976; 2:255-284.
10. Selikoff IJ, Hammond EC (eds.). Health hazards of asbestos exposure. *Ann NY Acad Sci.* 1979; 330:1-179.
11. Kleinfeld M, Messite J, Zaki MH. Mortality experiences among talc workers: A follow-up study. *J Occup Med* 1974; 16:345-349.
12. Parmley TH, Woodruff JD. The ovarian mesothelioma. *Am J Obstet Gynecol* 1974; 120:234-241.
13. Egli GE, Newton M. The transport of carbon particles in the human female reproductive tract. *Fertil Steril* 1961; 12:151-155.
14. Anonymous. Cosmetic talc powder. *Lancet* 1977; i:1348.
15. Newhouse ML. Cosmetic talc and ovarian cancer. *Lancet* 1979; ii:528.
16. Roe FJC. Controversy: Cosmetic talc and ovarian cancer. *Lancet* 1979; ii:744.
17. Wynder EL, Dodo H, Barber HRK. Epidemiology of cancer of the ovary. *Cancer* 1969; 23:352-370.
18. Stanton MF, Layard M, Tegeris A, *et al.* Relation of particle dimension to carcinogenicity in amphibole asbestoses and other fibrous minerals. *J Natl Cancer Institute* 1981; 67:965-975.
19. C.T.F.A. Specification. Talc, cosmetic: Cosmetic, toiletry, and fragrance association, Inc. Issue 10-17, 1976.
20. Brand KG, Johnson KH, Buoen LC. Foreign body tumorigenesis. *CRC Crit Rev Toxicol* 1976; 4(Oct):353-394.
21. Casagrande JT, Pike MC, Ross RK, Louie EW, Roy S, Henderson BE. Incessant ovulation and ovarian cancer. *Lancet* 1979, ii:170-172.
22. Newhouse ML, Pearson RM, Fullerton JM, Boesen EAM, Shannon HS. A case control study of carcinoma of the ovary. *Br J Prev Soc Med* 1977; 31:148-153.
23. McGowan L, Parent L, Lednar W, Norris HJ. The woman at risk for developing ovarian cancer. *Gynecol Oncol* 1979; 7:325-344.
24. Blejer JP, Arlon R. Talc: A possible occupational and environmental carcinogen. *J Occup Med* 1973; 15:92-97.

# Exhibit 22

diabetologists and in major medical centers where funduscopic examination is done routinely and competently. However, in the office of the primary care physicians, where most diabetics in this country receive much of their care, annual examination of the fundi through *dilated* pupils regrettably is performed infrequently if at all. Given that circumstance, an abnormal tourniquet test result demands a competent funduscopic examination to rule out proliferative retinopathy, often by referral to an ophthalmologist. I wish to emphasize that I am not advocating that the tourniquet test replace regular funduscopic examination.

If Drs Aaby and Zegarra have a cost-effective strategy to ensure adequate annual examination of the 11 million diabetics in the United States "by a physician who can recognize early proliferative diabetic retinopathy," I would happily endorse it and discard the tourniquet test; until then, the tourniquet test will identify nine of every ten patients with diabetic retinopathy who need to be referred to such a physician. Many of these patients' conditions are currently undiagnosed until loss of vision occurs.

Decrease in capillary fragility with improved diabetic control noted in several patients was not meant to imply regression of diabetic retinopathy. Histological study, however, may confirm that the tourniquet test does accurately reflect the progression or regression of diabetic dermal microangiopathy. At present, the vascular or platelet abnormality causing capillary fragility in diabetes is unknown. I am currently involved in a study correlating the tourniquet test with fluorescein retinal angiography in those patients who do not have identifiable diabetic retinopathy on ophthalmoscopic examination.

William A. Reynolds, MD
Western Montana Clinic
Missoula

1. Cartwright GE: *Diagnostic Laboratory Hematology*, ed 4. New York, Grune & Stratton Inc, 1968, p 367.
2. Stobbe H, Rürup C: Zum Nachweis von Kapillarschaden im Rahmen der Mikroangiopathie-Diagnostik beim Diabetes mellitus mittels Strauversuchs. *Schweiz Med Wochenschr* 1979;109:1808-1810.
3. Rodriguez R, Root HF: Capillary fragility and diabetic retinitis. *N Engl J Med* 1948;238:391-397.

## Talc and Ovarian Cancer

*To the Editor.*—Cramer and co-workers[1] recently reported observing an association between talc use and risk of ovarian cancer. We therefore examined data on talc use that two of us (L.M. and L.P.L.) had collected as part of a case-control interview study of epithelial ovarian cancer conducted from 1974 to 1977 in the Washington, DC, area.[2] The cases were 197 women with pathologically confirmed primary epithelial ovarian cancers treated in participating hospitals. The controls were 197 women treated at the same hospitals for conditions other than gynecologic, psychiatric, or malignant diseases or pregnancy. The controls were frequency matched to the cases on age, race, and hospital. The interviewers asked questions about reproductive and sexual history, medical history, drug use, and other exposures. Questions about talc use were added to the questionnaire after the study began, so 135 cases and 171 controls were asked about talc exposure.

Estimated Relative Risk of Ovarian Cancer, According to Reported Use of Talc

| | Cases | Controls | Estimated Relative Risk | 95% Confidence Interval |
|---|---|---|---|---|
| No talc mentioned | 62 | 61 | 1.0 | . . . |
| Any talc mentioned | 67 | 100 | 0.7 | 0.4-1.1 |
| No diaphragm used | 92 | 118 | 1.0 | . . . |
| Diaphragm used, no talc | 14 | 11 | 1.6 | 0.7-3.7 |
| Diaphragm, with talc | 25 | 41 | 0.8 | 0.4-1.4 |
| No body talc | 77 | 84 | 1.0 | . . . |
| Some body talc | 54 | 78 | 0.8 | 0.5-1.2 |
| "All over" | 37 | 57 | 0.7 | 0.4-1.2 |
| Genital* | 7 | 3 | 2.5 | 0.7-10.0 |
| Legs only | 1 | 0 | . . . | . . . |
| Not genital | 6 | 8 | 0.8 | 0.3-2.5 |
| Unknown where | 3 | 10 | 0.3 | 0.1-1.2 |

*On genitals, sanitary napkins, or underwear.

The reported talc use among cases and controls is given in the Table. We estimated the relative risk to talc users as 0.7 (95% confidence interval [CI]=0.4 to 1.1). The estimate was unaffected by adjustment for race, age, and gravidity. Neither women who used talc on their diaphragms nor those who used it as body powder seemed to be at excess risk. Women who used talc as a body powder were asked how they used it. Among the ten who specifically mentioned use on sanitary napkins, underwear, or the genital area, the relative risk was estimated as 2.5, but the small number of exposed women yielded an unreliable estimate (95% CI=0.7 to 10.0).

Our data thus indicate no overall association between talc use and risk of ovarian cancer. Although a small group of women who specifically reported genital use of body talcum powders showed an excess relative risk, use of talc on a diaphragm, which would be the closest exposure to the ovaries, did not seem to elevate risk.

Chance, bias in selection or observation, or confounding may have influenced these estimates. One important potential bias to consider in this and Cramer's study is a difference between cases and controls in recollecting or reporting talcum powder use, especially in the genital area. Talc exposure was not a major focus of this study, and few data are available to assess the likelihood of recall bias. Such a bias could stem from cases' heightened awareness or from the fact that controls were interviewed in the hospital while most cases were interviewed at home. On the other hand, the questions about talc use were rather simple and unambiguous. Also, we noted that cases and controls were equally likely to report douching. Since reporting of use of douches might be subject to the same recall biases as talc use, this observation suggests that little recall bias operated. Another possible interpretation of our findings of no apparent effect of using talc on the diaphragm but some effect of perineal use of powder is that talc itself does not increase risk of ovarian cancer but that patients with ovarian cancer have or perceive a greater need for using body powder in the genital area, for reasons related either to the biology of the disease or to life-style. We agree with Cramer and co-workers that other epidemiologic data will be useful.

Patricia Hartge, MSc
Robert Hoover, MD
National Cancer Institute
Bethesda, Md

Linda P. Lesher, MPH
Larry McGowan, MD
George Washington University
Medical Center
Washington, DC

1. Cramer DW, Welch WR, Scully RE, et al: Ovarian cancer and talc. *Cancer* 1982;50:372-376.
2. McGowan L, Parent L, Lednar W, et al: The woman at risk for developing ovarian cancer. *Gynecol Oncol* 1979;7:325-344.

Downloaded From: http://jama.jamanetwork.com/ by Brittany Scott on 11/05/2014

# Exhibit 23

AMERICAN JOURNAL OF EPIDEMIOLOGY
Vol. 128, No. 6
Printed in U.S.A.
Copyright © 1988 by The Johns Hopkins University School of Hygiene and Public Health
All rights reserved

# PERSONAL AND ENVIRONMENTAL CHARACTERISTICS RELATED TO EPITHELIAL OVARIAN CANCER

## II. EXPOSURES TO TALCUM POWDER, TOBACCO, ALCOHOL, AND COFFEE

ALICE S. WHITTEMORE,[1] MARION L. WU,[1] RALPH S. PAFFENBARGER, JR.,[1] DORIEN L. SARLES,[1] JAMES B. KAMPERT,[1] STELLA GROSSER,[1] DEXTER L. JUNG,[1] SAMUEL BALLON,[2] AND MICHAEL HENDRICKSON[3]

**Whittemore, A. S. (Stanford U. School of Medicine, Dept. of Health Research and Policy, Stanford, CA 94305-5092), M. L. Wu, R. S. Paffenbarger, Jr., D. L. Sarles, J. B. Kampert, S. Grosser, D. L. Jung, S. Ballon, and M. Hendrickson. Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. *Am J Epidemiol* 1988;128:1228–40.**

**Vaginal exposures to talc and other particulates may play an etiologic role in epithelial ovarian cancer. Surgical sterilization may protect against ovarian cancer by blocking entry of such particulates into the peritoneal cavity. The authors assessed histories of talcum powder use, tubal sterilization, and hysterectomy with ovarian conservation in 188 women in the San Francisco Bay Area with epithelial ovarian cancers diagnosed in 1983–1985 and in 539 control women. To investigate the roles of blood-borne environmental exposures on ovarian cancer risk, they assessed lifetime consumption of coffee, tobacco, and alcohol in these women. Of the 539 controls, 280 were hospitalized women without overt cancer, and 259 were chosen from the general population by random digit telephone dialing. Ninety-seven (52%) of the cancer patients habitually used talcum powder on the perineum, compared with 247 (46%) of the controls. Adjusted for parity, the relative risk (RR) = 1.40, $p = 0.06$. There were no statistically significant trends with increasing frequency or duration of talc use, and patients did not differ from controls in use of talc on sanitary pads and/or contraceptive diaphragms. Fewer ovarian cancer patients (7%) than controls (13%) reported prior fallopian tube ligation (RR, adjusted for parity, = 0.56, $p = 0.06$), and fewer patients (20%) than controls (28%) reported prior hysterectomy (RR = 0.66, $p = 0.05$). The protective effect of hysterectomy was confined to those who underwent this surgery 10 or more years prior to interview and to those who had not undergone prior tubal sterilization. Consumption of cigarettes and alcohol did not differ between cases and controls. By contrast, 11 (6%) cases never regularly consumed coffee, compared with 31 (11%) hospital controls and 26 (10%) population controls (RR, adjusted for smoking, = 2.2, $p = 0.03$, for the comparison using all controls). Overall, ovarian cancer risk among women who had drunk coffee for more than 40 years was 3.4 times that of women who had never regularly consumed coffee ($p < 0.01$). However, the data exhibited no clear trends in risk with increasing consumption. Although risk ratios relating duration of coffee drinking to ovarian cancer were unaffected by adjustment for several characteristics, further study is needed to exclude potential confounding by other unmeasured characteristics.**

**alcohol drinking; coffee; environmental exposure; hysterectomy; ovarian neoplasms; talc; tobacco; sterilization, tubal**

---

Received for publication May 29, 1987, and in final form April 11, 1988.

[1] Department of Health Research and Policy, Stanford University School of Medicine, Stanford, CA.

Several investigators have hypothesized a carcinogenic role for exposures of the ovarian epithelium to environmental agents that enter the pelvic cavity through the vaginal canal (1–7). Attention has focused on hydrous magnesium silicates such as talc and asbestos because of the similarity between epithelial ovarian cancers and mesotheliomas, which are caused by exposure to asbestos. The hypothesis predicts that talcum powder use on the perineum, on sanitary napkins, and on contraceptive devices increases ovarian cancer risk. It also predicts that tubal sterilization and hysterectomy without bilateral oophorectomy protect against the disease by preventing environmental carcinogens from contacting the ovarian epithelium.

There are few data regarding these predicted consequences of the hypothesis. Cramer et al. (8) reported that ovarian cancer patients were significantly more likely than nonhospitalized control women to use talcum powder on the perineum or on sanitary napkins. However, Hartge et al. (9) found no statistically significant differences in prior talc use between cases and a series of hospital controls. A cohort study (10) of women who had undergone tubal ligation noted four ovarian cancers versus 1.45 expected, after 22,000 person-years of follow-up ($p = 0.06$). The four published case-control studies that have examined the effects of hysterectomy without bilateral oophorectomy found cases to have a lower prevalence of hysterectomy than controls, indicating that hysterectomy is associated with decreased risk of ovarian cancer (11–14). Weiss and Harlow (15) suggested that this association may be due to screening for malignant or premalignant ovarian conditions at hysterectomy by physicians who do not routinely remove the ovaries. According to this hypothesis, women who pass such screening would have reduced subsequent ovarian cancer risk when compared with women who were not subjected to hysterectomy.

Data relating ovarian cancer to consumption of coffee, tobacco, and alcohol also are sparse and conflicting. One case-control study has shown a statistically significant association between coffee consumption and increased risk of epithelial ovarian cancer (16). This study compared cases with hospitalized control women, whose current coffee consumption may not represent that of women in the general population. Four other studies using hospitalized controls (17–20) and one using nonhospitalized controls (21) found weak, nonsignificant positive associations between risk of this disease and amount of usual coffee consumption at interview. It is important to determine to what extent these conflicting findings may be due to differences in recent coffee consumption between hospitalized and population-based control groups or to other sources of bias.

Cigarette smoking has been associated with increased ovarian cancer risk in one prospective study (22) but was unassociated with it in several case-control studies (16, 17, 21). Indeed, the case-control studies have found small (nonsignificant) reductions in risk among smokers. Generally, such studies have found no relation between alcohol consumption and ovarian cancer, although a recent large study found a reduction in risk associated with heavy drinking (23).

We present the results of a case-control study of histologically verified epithelial ovarian carcinoma in which cases' prior histories of talc use, tubal ligation, hysterectomy without bilateral oophorectomy, and consumption of coffee, tobacco, and alcohol were compared with those of women from the general population, as well as with those of hospitalized control women. All subjects reported lifetime habits of talc use, coffee drinking, cigarette smoking, and alcohol consumption. Sum-

[2] 444 High Street, Palo Alto, CA.

[3] Department of Pathology, Stanford University School of Medicine, Stanford, CA.

Reprint requests to Dr. Alice S. Whittemore, Stanford University School of Medicine, Department of Health Research and Policy, HRP Building, Stanford, CA 94305-5092.

This work was supported by NIH Grant CA 35067.

mary measures of lifetime exposures are evaluated in relation to ovarian cancer risk.

## MATERIALS AND METHODS

### *Study subjects*

Cases were residents of northern California aged 18 to 74 years who were diagnosed during the period January 1983 to December 1985 at one of the seven hospitals in Santa Clara County or at the University of California, San Francisco, Medical Center. The present report is restricted to 188 women with primary epithelial ovarian cancer.

Two groups of control women were selected. The first group consisted of women who were hospitalized in one of the hospitals to which cases were admitted. The second group was selected from the general population using random digit dialing telephone contacts. Both groups of women were matched to cases on age (within five-year intervals), race (white, black, oriental), and additional criteria described in the accompanying paper (24). A total of 188 ovarian cancer patients, 280 hospital controls, and 259 population-based controls participated.

### *Exposure data and statistical analysis*

Study subjects participated in structured interviews in their homes conducted by trained interviewers to assess menstrual and reproductive history, medical and family history, and environmental exposures. Subjects were asked whether they had ever used talcum powder on the perineum, on sanitary pads, or on diaphragms. Subjects who responded affirmatively to any of these questions were asked about frequency and duration of use. Subjects also were asked whether they had ever drunk more than 10 cups of coffee in any one year. Subjects who responded affirmatively reported the ages when coffee drinking started and stopped, the total number of years of coffee drinking, and the number of cups usually consumed per day or per week either currently or prior to stopping. Similar questions were asked about cigarette smoking, provided that the subject had smoked at least 100 cigarettes during her life, and about consumption of alcoholic beverages, provided that she had ever consumed more than 10 such beverages in any one year.

Eligibility criteria, participation rates, and details of the statistical analysis are provided in the accompanying paper (24). Odds ratios are called relative risks, and all $p$ values are two-tailed.

## RESULTS

Characteristics of the cases are compared with those of the two control groups in table 1. Population controls were somewhat younger, better educated, and more likely to be premenopausal than were cases and hospital controls. Furthermore, cases were less likely to have used oral contraceptives and had an earlier age at menarche and

TABLE 1

*Characteristics of study participants, San Francisco Bay Area, 1983–1985*

| Characteristic | Cases ($n$ = 188) (%) | Controls: Hospital ($n$ = 280) (%) | Controls: Population ($n$ = 259) (%) |
|---|---|---|---|
| Age (years) | | | |
| <40 | 10 | 10 | 15 |
| 40–49 | 30 | 29 | 29 |
| 50–59 | 26 | 28 | 27 |
| 60+ | 35 | 33 | 29 |
| Race | | | |
| White | 95 | 97 | 94 |
| Education (years) | | | |
| >12 | 59 | 59 | 67 |
| No. of term pregnancies* | | | |
| 0 | 21 | 17 | 10 |
| 1–3 | 60 | 59 | 67 |
| 4+ | 19 | 24 | 23 |
| Age (years) at menarche | | | |
| 12 or less | 48 | 44 | 46 |
| Menopausal status | | | |
| Premenopausal | 34 | 32 | 41 |
| Natural menopause | 45 | 33 | 38 |
| Surgical menopause | 22 | 35 | 21 |
| Oral contraceptives | | | |
| Ever used | 46 | 50 | 58 |

* 20 or more weeks gestation.

fewer term pregnancies than either control group. The latter findings are reported in detail in the companion paper (24).

Relative risks associated with talc use, tubal ligation, and hysterectomy were similar when cases were compared with hospital controls and with population controls. Therefore, for these variables, we report results only for cases versus the combined group of all controls.

*Talc use*

A greater proportion of cases (52 per cent) than controls (46 per cent) reported prior use of talcum powder on the perineum (relative risk (RR) = 1.40, $p = 0.06$). However, there was little difference between cases and controls in use of talc on sanitary pads and diaphragms, with relative risks of 0.93 ($p = 0.76$) and 0.95 ($p = 0.86$), respectively. Table 2 shows the distributions of cases and controls and relative risks for talc use directly on the perineum, on sanitary pads, and on contraceptive diaphragms, singly and in combination. The table provides no evidence of elevated risk associated with more than one form of talc use. None of the women in the study reported prior occupational exposures to talc or asbestos fibers.

We next examined whether risk increased with increased duration or frequency of use of talcum powder on the perineum. Since tubal ligation and hysterectomy prevent contact between the ovarian epithelium and exogenous agents in the vaginal canal, we excluded any perineal talc use after the date of tubal ligation or hysterectomy in calculating duration of use. As seen in table 3, 55 per cent of cases versus 59 per cent of controls reported such use for less than one year. The risk for talc use between one and nine years, relative to that among users of shorter duration, was 1.60 ($p = 0.05$). However, an increasing dose-response pattern was not apparent, with risk among long-term users of 10 or more years only 1.11 times that of the nonusers or users of less than one year ($p = 0.61$). According to the logistic model fit to the data, the overall increase in risk for any 10-year increase in duration of use was 1.01 ($p = 0.56$).

TABLE 3

*Ovarian cancer risk by length of talcum powder use on the perineum,* San Francisco Bay Area, 1983–1985*

| Years of talc use* | Cases | | Controls | | Relative risk† | 95% confidence interval |
|---|---|---|---|---|---|---|
| | n | % | n | % | | |
| None | 103 | 55 | 320 | 59 | 1.00 | |
| 1–9 | 34 | 18 | 72 | 13 | 1.60 | 1.00–2.57 |
| 10+ | 50 | 27 | 147 | 27 | 1.11 | 0.74–1.65 |
| Unknown | 1 | 1 | 0 | 0 | | |
| Total | 188 | 100 | 539 | 100 | | |

* Prior to tubal ligation or hysterectomy.
† Adjusted for parity.

TABLE 2

*Ovarian cancer risk by type of talcum powder use, San Francisco Bay Area, 1983–1985*

| Type of talc use | Cases | | Controls | | Relative risk* | 95% confidence interval |
|---|---|---|---|---|---|---|
| | n | % | n | % | | |
| None | 75 | 40 | 230 | 43 | 1.00 | |
| Perineum only | 22 | 12 | 55 | 10 | 1.45 | 0.81–2.60 |
| Sanitary pads only | 5 | 3 | 28 | 5 | 0.62 | 0.21–1.80 |
| Diaphragm only | 9 | 5 | 19 | 4 | 1.50 | 0.63–3.58 |
| Any two of perineum, pads, and diaphragm | 67 | 36 | 168 | 31 | 1.36 | 0.91–2.04 |
| All three of perineum, pads, and diaphragm | 1 | 1 | 9 | 2 | 0.35 | 0.04–2.94 |
| Incomplete data | 9 | 5 | 30 | 6 | | |
| Total | 188 | 100 | 539 | 100 | | |

* Adjusted for parity and oral contraceptive use.

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

The relation between ovarian cancer risk and usual frequency of talc use on the perineum is shown in table 4. Women who used talc an average of one to 20 times per month were not at significantly altered risk from those who used it less frequently (RR = 1.27, $p = 0.29$). Those who customarily used talc on the perineum 20 or more times per month were at 1.45 times the risk of women in the lowest use category ($p = 0.09$). The overall increase in risk associated with 30 applications per month was 1.30 ($p = 0.19$).

*Tubal ligation and hysterectomy*

To investigate further the hypothesis of a role for vaginal exposure to environmental carcinogens in the etiology of ovarian cancer, we examined the effect of tubal ligation and hysterectomy on risk for the disease. Seven per cent of cases and 13 per cent of controls reported a history of tubal ligation (RR = 0.53, $p = 0.05$). Relative risks for tubal ligation were less than one among nulliparous, uniparous, and multiparous women, indicating that the protective effect of such surgery on ovarian cancer risk cannot be explained by confounding due to its greater prevalence among parous women who are at reduced risk of the disease. The overall reduction in risk associated with tubal ligation, adjusted for parity, was 0.56 ($p = 0.07$).

Cases with tubal ligation tended to undergo this surgery at younger ages (mean age (± standard error) = 31.9 years (±0.5)) than did controls (34.2 years (±0.1)). This difference does not support the hypothesis that early tubal ligation confers greater protection to the ovaries by early termination of exposure from the vaginal canal. Relative to women without this surgery, the risk for women with tubal ligation within 10 years of interview was 0.35 (95 per cent confidence interval (CI) 0.12–1.02), while the risk for women who underwent the surgery more than 10 years before interview was 0.69 (95 per cent CI 0.32–1.50).

Table 5 shows that hysterectomized women experienced 0.66 times the risk of those without such surgery ($p = 0.05$), but it does not show any trend of decreasing protection with time since hysterectomy. Such a trend would be expected if the protective effect of hysterectomy reflected merely the removal of high-risk women from the hysterectomized population via selective oophorectomy as suggested by Weiss and Harlow (15). On the contrary, table 5 shows that protection is limited to women hysterectomized 10 or more years prior to interview. Overall, cases and controls did not differ significantly in the ages at which hysterectomy was performed. The mean age at hysterectomy among cases with such prior surgery was 40.1 years (± 0.3), while the corresponding age for controls was 39.7 years (±0.1).

The hypothesis that hysterectomy protects against ovarian cancer by blocking

TABLE 4

*Ovarian cancer risk by usual frequency of talcum powder use on the perineum, San Francisco Bay Area, 1983–1985*

| Applications of talc per month | Cases | | Controls | | Relative risk* | 95% confidence interval |
|---|---|---|---|---|---|---|
| | n | % | n | % | | |
| None | 97 | 52 | 312 | 58 | 1.00 | |
| 1–20 | 41 | 22 | 114 | 21 | 1.27 | 0.82–1.96 |
| 20+ | 44 | 23 | 101 | 19 | 1.45 | 0.94–2.22 |
| Unknown | 6 | 3 | 12 | 2 | | |
| Total | 188 | 100 | 539 | 100 | | |
| Overall trend for 30 uses per month | | | | | 1.30 | 0.88–1.92 |

* Adjusted for parity.

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

exogenous agents' access to the ovaries predicts that such surgery confers no benefit on women whose ovaries are already protected by prior tubal ligation. Table 5 shows relative risks associated with hysterectomy among women with and without prior tubal ligation. As predicted, hysterectomy failed to protect women who had undergone prior tubal ligation (RR = 2.56, $p = 0.45$), but it did protect those who had not (RR = 0.57, $p = 0.02$).

Table 6 shows the effects of perineal talc use separately among women with and without prior tubal ligation or hysterectomy. The highest risk was experienced by talc users without such surgery. The risk in

TABLE 5

*Ovarian cancer risk after hysterectomy without bilateral oophorectomy, by time between hysterectomy and interview and by absence or presence of prior tubal ligation, San Francisco Bay Area, 1983–1985*

| | Cases | | Controls | | Relative risk | 95% confidence interval |
|---|---|---|---|---|---|---|
| | n | % | n | % | | |
| No hysterectomy | 151 | 80 | 389 | 72 | 1.00 | |
| Hysterectomy | 37 | 20 | 150* | 28 | 0.66 | 0.43–1.00 |
| Time (years) between hysterectomy and interview | | | | | | |
| 1–9 | 15 | 8 | 42 | 8 | 1.01 | 0.54–1.89 |
| 10–19 | 11 | 6 | 66 | 12 | 0.47 | 0.24–0.92 |
| 20+ | 11 | 6 | 41 | 8 | 0.63 | 0.31–1.29 |
| No prior tubal ligation | | | | | | |
| No hysterectomy | 141 | 81† | 333 | 71† | 1.00 | |
| Hysterectomy | 33 | 19 | 135 | 29 | 0.57 | 0.36–0.90 |
| Prior tubal ligation | | | | | | |
| No hysterectomy | 10 | 71‡ | 56 | 79‡ | 1.00 | |
| Hysterectomy | 4 | 29 | 15 | 21 | 2.56 | 0.23–29.12 |

* Date of hysterectomy was unknown for one woman.
† Per cent of cases or controls with no prior tubal ligation.
‡ Per cent of cases or controls with prior tubal ligation.

TABLE 6

*Ovarian cancer risk by perineal talc use and by history of surgical sterilization,† San Francisco Bay Area, 1983–1985*

| Talc use | Surgical sterilization† | Cases | | Controls | | Relative risk‡ | 95% confidence interval |
|---|---|---|---|---|---|---|---|
| | | n | % | n | % | | |
| No | No | 70 | 37 | 182 | 34 | 1.00 | |
| Yes | No | 71 | 38 | 151 | 28 | 1.33 | 0.88–2.01 |
| No | Yes | 21 | 11 | 110 | 20 | 0.50* | 0.29–0.88 |
| Yes | Yes | 26 | 14 | 96 | 18 | 0.75 | 0.43–1.29 |
| No | Total | 91 | 48 | 292 | 54 | 1.00 | |
| Yes | Total | 97 | 52 | 247 | 46 | 1.37§ | 0.97–1.95 |
| Total | No | 141 | 75 | 333 | 62 | 1.00 | |
| Total | Yes | 47 | 25 | 206 | 38 | 0.53*,‖ | 0.36–0.79 |

* $p < 0.01$.
† Tubal ligation or hysterectomy.
‡ Adjusted for parity.
§ Adjusted for parity and surgical sterilization.
‖ Adjusted for parity and talc use.

LUZ004812

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

this group was 1.33 times that of women with neither history of talc use nor history of surgery ($p = 0.18$). By contrast, risk was lowest among women with a history of tubal ligation or hysterectomy who never regularly applied talc to the perineum (RR = 0.50, $p = 0.02$).

Table 6 shows that, regardless of talc use, women who underwent either tubal ligation or hysterectomy without bilateral oophorectomy experienced a risk of 0.53 ($p = 0.002$) compared with women without such surgery.

Cases and controls did not differ significantly in the prevalence of barrier contraceptive use, devices that prevent entry of semen into the peritoneal cavity. Risks for women who had used diaphragms and condoms were 0.81 ($p = 0.22$) and 0.91 ($p = 0.59$), respectively, relative to risk among nonusers. There was no trend in risk with exposure of the ovaries to semen, defined as sexually active time before tubal ligation or hysterectomy, minus duration of use of condoms and diaphragms.

*Coffee, tobacco, and alcohol*

Table 7 shows the distribution of cases and controls and relative risks by coffee consumption status (ever vs. never). The relative risk for any coffee consumption, adjusted for cigarette smoking, was 2.21 for both control groups combined ($p = 0.03$). The relative risk was 2.13 ($p = 0.06$) for cases versus hospital controls and 1.59 ($p = 0.24$) for cases versus population controls. The corresponding unadjusted relative risks were 2.03 for combined controls, 1.90 for hospital controls, and 1.51 for population controls (not shown).

Table 7 also shows that risk among coffee drinkers increases with increasing duration of coffee consumption. This trend is evident in both the comparison based on hospital controls and the one based on population controls. Overall, smoking-adjusted cancer rates among women who had consumed coffee for more than 40 years were 3.4 times those of women who had never consumed coffee ($p < 0.01$). Among coffee drinkers, each additional 10 years of coffee drinking conferred an 11 per cent increase in risk, according to the logistic function fit to the data ($p = 0.37$). These findings could be confounded by age despite the matching within five-year age groups. However, the results were similar when age was added to the regressions as a continuous variable.

Relations between ovarian cancer risk and amount of usual coffee consumption are shown in table 8. The table provides no evidence for a positive trend in risk with

TABLE 7

*Ovarian cancer risk by years of coffee consumption, San Francisco Bay Area, 1983–1985*

| Years of coffee consumption | Cases | | Controls | | | | Relative risk† | | | 95% confidence interval‡ |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Hospital | | Population | | Cases vs. hospital controls | Cases vs. population controls | Cases vs. all controls | |
| | n | % | n | % | n | % | | | | |
| None | 11 | 6 | 31 | 11 | 26 | 10 | 1.00 | 1.00 | 1.00 | |
| Any | 177 | 94 | 249 | 89 | 233 | 90 | 2.13 | 1.59 | 2.21 | 1.10–4.41 |
| 1–14 | 18 | 10 | 27 | 10 | 34 | 13 | 1.57 | 0.65 | 1.45 | 0.59–3.57 |
| 15–24 | 32 | 17 | 43 | 15 | 36 | 14 | 1.81 | 1.69 | 2.18 | 1.00–4.79 |
| 25–39 | 62 | 33 | 105 | 38 | 98 | 38 | 2.36 | 1.70 | 2.26 | 1.06–4.85 |
| 40+ | 65 | 35 | 73 | 26 | 64 | 25 | 3.45* | 2.54 | 3.41* | 1.46–7.96 |
| Unspecified | 0 | 0 | 1 | 0 | 1 | 0 | | | | |
| Overall trend per 10 years among coffee drinkers | | | | | | | 1.16 | 1.14 | 1.11 | 0.89–1.38 |

* $p < 0.01$.
† Adjusted for smoking (lifelong nonsmoker vs. ever smoker).
‡ Cases versus all controls.

Protected Document – Subject to Protective Order

frequency of coffee drinking, regardless of the control group used for comparison. Frequency was measured as usual number of cups consumed per day prior to disease onset for cases and hospital controls who were current coffee drinkers, and as usual number of cups per day prior to stopping for former coffee drinkers. The test for trend of increasing risk with increasing frequency among those who consumed coffee was not significant ($p = 0.91$).

Similarly, table 9 shows no trend in risk with total cups of coffee consumed prior to disease onset (cases and hospital controls) or prior to interview (population controls). We estimated total coffee consumption by multiplying each woman's reported duration of coffee consumption in years by her usual frequency of consumption in cups per day times 365. Among coffee drinkers, the test for trend in risk with increasing total consumption yielded a $p$ value of 0.56.

Relative risks corresponding to the above measures of coffee consumption were unchanged by adjustment for other variables potentially associated with ovarian cancer including educational level, parity, oral contraceptive use, estimated years of ovu-

TABLE 8

*Ovarian cancer risk by usual frequency of coffee consumption,* San Francisco Bay Area, 1983–1985*

| Cups/day | Cases | | Controls | | | | Relative risk† | | | 95% confidence interval‡ |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Hospital | | Population | | Cases vs. hospital controls | Cases vs. population controls | Cases vs. all controls | |
| | *n* | % | *n* | % | *n* | % | | | | |
| 0 | 11 | 6 | 31 | 11 | 26 | 10 | 1.00 | 1.00 | 1.00 | |
| 1 | 50 | 27 | 62 | 22 | 58 | 22 | 2.21 | 1.86 | 2.42 | 1.15–5.09 |
| 2–3 | 73 | 39 | 94 | 34 | 98 | 38 | 2.13 | 1.63 | 2.26 | 1.09–4.66 |
| 4+ | 54 | 29 | 93 | 33 | 77 | 30 | 2.02 | 1.56 | 2.07 | 0.97–4.38 |
| Overall trend per cup/day among coffee drinkers | | | | | | | 1.01 | 1.01 | 1.01 | 0.93–1.08 |

* Prior to stopping for ex-drinkers, and prior to hospitalization for current drinkers, among cases and hospital controls.

† Adjusted for smoking (lifelong nonsmoker vs. ever smoker).

‡ Cases versus all controls.

TABLE 9

*Ovarian cancer risk by estimated total cups of coffee consumed, San Francisco Bay Area, 1983–1985*

| Cup-years* of coffee consumption | Cases | | Controls | | | | Relative risk† | | | 95% confidence interval‡ |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Hospital | | Population | | Cases vs. hospital controls | Cases vs. population controls | Cases vs. all controls | |
| | *n* | % | *n* | % | *n* | % | | | | |
| 0 | 11 | 6 | 31 | 11 | 26 | 10 | 1.00 | 1.00 | 1.00 | |
| 1–30 | 41 | 22 | 50 | 18 | 60 | 23 | 2.30 | 1.54 | 2.30 | 1.09–4.86 |
| 31–60 | 32 | 17 | 46 | 16 | 32 | 12 | 2.21 | 2.30 | 2.64 | 1.21–5.75 |
| 61–90 | 27 | 14 | 38 | 14 | 32 | 12 | 2.03 | 1.96 | 2.46 | 1.10–5.51 |
| 90+ | 77 | 41 | 114 | 41 | 108 | 42 | 2.42 | 1.60 | 2.28 | 1.08–4.78 |
| Unknown | 0 | 0 | 1 | 0 | 1 | 0 | | | | |
| Overall trend per 10 cup-years among coffee drinkers | | | | | | | 1.01 | 1.01 | 1.01 | 0.99–1.03 |

* One cup-year equals 365 cups of coffee.

† Adjusted for smoking (lifelong nonsmoker vs. ever smoker).

‡ Cases versus all controls.

Protected Document – Subject to Protective Order

lation, and duration of contraceptive-free marriage.

The risk for cigarette smoking relative to lifelong nonsmoking, adjusted for coffee consumption, was 0.73 ($p = 0.08$) for the comparison based on combined control groups. Corresponding relative risks for the hospital and population comparisons were 0.65 ($p = 0.04$) and 0.84 ($p = 0.39$), respectively. Unadjusted relative risks and confidence intervals were similar. While the odds ratios associated with smoking were less than unity, few of them achieved statistical significance.

Cases did not differ from either control group in the prevalence of prior alcohol consumption. For the comparison based on all controls, the relative risk was 0.74 ($p = 0.14$). Furthermore, there was no evidence of a trend in risk with increasing duration or amount of alcohol consumption. Women who drank heavily (20 or more drinks per week) had a risk 0.66 times that of nondrinkers, but the reduction was not statistically significant ($p = 0.34$). None of these observations were altered by adjustment for cigarette smoking or coffee consumption.

## Discussion

### *Genital exposures to talc and other agents*

The rationale for suspecting talc as an ovarian carcinogen derives from its chemical relation to and natural occurrence with asbestos. Asbestos causes pleural and peritoneal mesotheliomas (25), which are histologically similar to epithelial ovarian carcinomas (6). Graham and Graham (2) showed that, in guinea pigs and rabbits, asbestos can induce ovarian epithelial hyperplasia similar to early epithelial tumors in women. Evidence suggesting a role for vaginal exposure to particulates in human ovarian carcinogenesis is twofold. First, Egli et al. (26) demonstrated that nonmotile inert carbon particles deposited in the vagina prior to hysterectomy can be recovered in the fallopian tubes. Second, Henderson and coworkers have found talc particles embedded in both normal and malignant ovarian tissue (27, 28). While these findings indicate that vaginal exposure to particulates can lead to deposition on the ovaries, they do not implicate such exposure in ovarian carcinogenesis, and data relating directly to this possibility are needed.

In a comparison of epithelial ovarian cancer cases and nonhospitalized controls in Boston, Cramer et al. (8) reported a relative risk of 1.92 ($p < 0.003$) for epithelial ovarian cancer associated with use of talcum powder on the perineum or on sanitary pads. By contrast, the results of a case-control study in Washington, DC (9) and those of the present study show neither a strong nor a consistent association between genital talcum powder exposure and ovarian cancer. In the present data, regular use of talc on the perineum was associated with only a marginally significant elevation in relative risk. Furthermore, there were no clear differences between cases and controls when other forms of genital talc exposure were considered, either singly or in combination. Although the data show a trend of increasing risk with increasing frequency of perineal exposure, the trend is not statistically significant, and there is no trend with duration of exposure. Thus, while these data do not exonerate talc as an ovarian carcinogen, neither do they provide strong evidence to implicate it.

Several sources of bias must be considered as possible explanations for the lack of strong findings related to talc, including the study's failure to interview all eligible ovarian cancer patients and a completely random sample of controls, as well as the potential pitfalls of combining the two control groups. Another source of bias is confounding by differential talc use among women with characteristics predictive of ovarian cancer. However, such confounding seems unlikely. For example, although Wynder et al. (14) reported that certain menstrual characteristics differ between women with ovarian cancer and controls,

we and others (8, 13) found no significant differences between cases and controls in any of several menstrual characteristics examined, including history of amenorrhea, irregular menstrual cycles, and midcycle pain.

An additional source of bias is random error in reported talc use, which tends to attenuate relative risk estimates. Some error seems likely. Nevertheless, there seems only a small probability that these data contain reporting errors large enough to obscure the twofold increase in risk noted by Cramer et al. (8) for talc use on the perineum and on sanitary pads. Further epidemiologic studies are needed to clarify the role of talc as carcinogen, cocarcinogen, or promoter of epithelial ovarian carcinogenesis.

Indirect evidence in support of an etiologic role for vaginal exposures to some exogenous substances derives from the reduced risk associated here with fallopian tube sterilization and hysterectomy, procedures that block entry to the pelvic area through the reproductive tract. Apart from talc and asbestos, vaginally introduced substances that may initiate or promote ovarian cancer include other particulates, semen, spermicidal foams or creams, and douche solutions. We are unaware of data implicating any of these substances.

The reduced risk associated in these data with prior tubal sterilization is inconsistent with the results of a historical prospective study of 666 women who had undergone tubal ligation (10). These women experienced a slight, marginally significant increase in ovarian cancer risk. However, the study involved only four cases of ovarian cancer.

Women tend to undergo tubal sterilization during the height of their reproductive years (on average, in the early fourth decade of life, for the present data). By contrast, hysterectomy is generally performed at the end of the reproductive years, probably after a large fraction of genital exposures have already occurred. It is therefore noteworthy that the protective effects of hysterectomy noted here were limited to surgery 10 or more years prior to interview. This finding fails to support the conjecture of Weiss and Harlow (15) that the protection of hysterectomy is an artifact due to selective removal of precancerous ovaries at the time of surgery. If such selection explained the association, one would expect to find, as those authors did, a decrease in the level of protection with increasing years since surgery. However, the present data show just the opposite trend. They also indicate that the benefits of hysterectomy are confined to women without prior tubal sterilization, a finding that supports an etiologic role for genital exposures to the ovaries.

Other explanations are possible for the protective effects of tubal ligation and hysterectomy, if the effects are not due to chance or bias. For example, these procedures may alter the levels and/or the cyclic variations of estrogen, progesterone, or the gonadotropins. Tubal sterilization has been shown to reduce subsequent serum and urinary estrogen levels, possibly by inducing localized hypertension at the ovary (29, 30). Some data (30, 31) suggest that hysterectomy with ovarian conservation also may reduce estrogen production. Elevated estrogen levels have been linked to breast cancer and could be involved in ovarian carcinogenesis, although there are few data to support this possibility (32, 33). Tubal sterilization and hysterectomy may protect by reducing ovarian estrogen exposure. Alternatively, some forms of tubal sterilization have been associated with subsequent increased frequency of abnormal or anovulatory cycles (34, 35). Since estimated number of ovulations has been associated with increased ovarian cancer risk (36, 37), tubal sterilization may protect by suppressing ovulation.

### *Coffee, tobacco, and alcohol*

The present data provide some support for the hypothesis that coffee drinking in-

Case 3:16-md-02738-MAS-RLS Document 9888-5 Filed 05/29/19 Page 416 of 424 PageID: 65732

NOTICE: THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. CODE)

creases risk for epithelial ovarian cancer. Comparison of cases versus the combined group of both hospitalized and population-based controls suggests that current or former coffee drinkers experience double the risk of nondrinkers. The relative risk based on comparison of cases versus only the population-based controls was smaller (RR = 1.59) and did not achieve statistical significance. Nevertheless, its magnitude suggests that coffee may be implicated in increased risk for the disease.

The hypothesis is also supported by the dose-response relation noted between risk and duration of coffee drinking among those who had ever drunk coffee. Compared with risks for nondrinkers, smoking-adjusted risks increased from 1.45 for fewer than 15 years of coffee drinking to 3.41 for 40 or more years of consumption. Trends of increasing risk with increasing years of coffee drinking were evident in both hospital and population-based control comparisons and in both smoking-adjusted and unadjusted analyses.

Yet, no trends were evident with increasing amount of usual coffee consumption in cups per day, or with total lifetime consumption, estimated by multiplying reported years of consumption by reported amount of usual consumption prior to illness or cessation of coffee drinking. Instead, risk remained approximately constant at two to three times that of nondrinkers, regardless of amount consumed. This lack of dose response is consistent with the negative findings of other studies (17–20) for trend in risk with increasing coffee consumption at time of interview. The absence of trend noted here may be due to inaccuracies in reported usual consumption as a measure of average coffee drinking frequency. Such inaccuracies (if similar in magnitude between cases and controls) could mask evidence of a dose-response relation. The observed patterns of trend with duration of coffee drinking and lack of trend with frequency of consumption and total consumption would be consistent with a causal relation if women tended to report their duration of coffee drinking more accurately than they reported the amount they usually consumed.

The present observation of increased ovarian cancer risk among coffee drinkers could be due to several sources of bias. The first possibility is differences between cases and controls in some measured or unmeasured characteristics that are correlated with coffee drinking. Body size is an unlikely source of such confounding, because cases and controls were similar in several assessments of weight, height, and weight for height, as related to body size both at age 20 and in recent years. Relative risks for coffee consumption were not altered in multivariate analyses with other variables found to be predictive of ovarian cancer. These include parity, oral contraceptive use, and duration of contraceptive-free marriage.

Potential confounding by dietary factors must also be considered. Cramer et al. (21) found a statistically significant trend of increasing risk with increasing consumption of animal fat, after adjusting for body weight and parity. Absence of data on dietary fat consumption in the present study precludes examination of potential confounding by this factor.

Second, the stronger association noted when cases were compared with hospital controls could be explained by reduced coffee consumption among these controls after the onset of subclinical disease manifestations. However, a statistically significant trend in risk with years of coffee drinking was also noted when cases were compared with population controls. Furthermore, the two sets of controls had similar prevalences of prior regular coffee drinking. Therefore, the possibility of selection bias among hospital controls seems unlikely to explain the observations.

Third, cases may have overreported their coffee consumption relative to controls. However, this explanation also seems unlikely, in view of the absence of evidence

for such reporting bias in cases' reports of tobacco and alcohol consumption.

To date, seven case-control studies have examined the relation between coffee and ovarian cancer (16–21, and the present study). Of these, two (the present study and one in Italy (16)) found statistically significant elevations of risk among coffee drinkers, with relative risks ranging from 1.5 to 2.0. The remaining five studies, one in Greece (17) and four in the United States (18–21), found slightly and nonsignificantly elevated risks associated with coffee consumption. These disparities are not easily explained by differences in coffee constituents or in women among the different study areas.

It is difficult to propose biologically plausible causal mechanisms to explain the positive associations, if the associations are not due to bias or chance. Coffee consumption has been shown to increase urinary excretion of catecholamines (38–41), suggesting that coffee increases the activity of the adrenal medulla. Coffee consumption also may increase adrenal production of androstenedione. Since peripheral aromatization of androstenedione to estrone forms the primary source of estrogen in postmenopausal women (41), coffee consumption may alter ovarian cancer risk by increasing estrogen production after the menopause. Such a mechanism is speculative, however, in view of the sparsity of data implicating estrogens in ovarian carcinogenesis (32, 33).

Cigarette smoking was associated nonsignificantly with reduced ovarian cancer risk. This finding agrees with those of other case-control studies (16, 17, 21) but disagrees with an increased ovarian cancer risk found in a prospective study of women who smoke (22). The present data show no relation between ovarian cancer risk and duration of cigarette smoking.

The data also provide no evidence for any relation between alcohol consumption and ovarian cancer risk, which is consistent with results of other studies that have examined this issue (17, 20, 21). One large study (23) found that women who consumed 20 or more drinks per week had half the risk of women who did not drink. We also found reduced risk associated with such heavy drinking, but the association did not achieve statistical significance. The lack of significance may be due to small numbers in the present study; thus, the relation of alcohol consumption to ovarian cancer should be examined in larger series.

## References

1. Blejer JP, Arlon R. Talc: a possible occupational and environmental carcinogen. J Occup Med 1973;15:92–7.
2. Graham J, Graham R. Ovarian cancer and asbestos. Environ Res 1967;1:115–18.
3. Henderson WJ, Joslin CAF, Turnbull AC, et al. Talc and carcinoma of the ovary and cervix. J Obstet Gynaecol Br Cwlth 1971;78:266–72.
4. Longo DL, Young RC. Cosmetic talc and ovarian cancer. Lancet 1979;2:349–51.
5. Newhouse ML. Cosmetic talc and ovarian cancer. (Letter). Lancet 1979;2:528.
6. Parmley TH, Woodruff JD. The ovarian mesothelioma. Am J Obstet Gynecol 1974;120:234–41.
7. Roe FJC. Controversy: cosmetic talc and ovarian cancer. (Letter). Lancet 1979;2:744.
8. Cramer DW, Welch WR, Scully RE, et al. Ovarian cancer and talc: a case-control study. Cancer 1982;50:372–6.
9. Hartge P, Hoover R, Lesher LP, et al. Talc and ovarian cancer. (Letter). JAMA 1983;250:1844.
10. Koch M, Starreveld AA, Hill BG, et al. The effect of tubal ligation on the incidence of epithelial cancer of the ovary. Cancer Detect Prev 1984; 7:241–5.
11. Annegers JF, Strom H, Decker DG, et al. Ovarian cancer: incidence and case-control study. Cancer 1979;43:723–9.
12. Cramer DW, Hutchison GB, Welch WR, et al. Determinants of ovarian cancer risk. I. Reproductive experiences and family history. JNCI 1983; 71:711–16.
13. McGowan L, Parent L, Lednar W, et al. The woman at risk for developing ovarian cancer. Gynecol Oncol 1979;7:325–44.
14. Wynder EL, Dodo H, Barber HRK. Epidemiology of cancer of the ovary. Cancer 1969;23:352–70.
15. Weiss NS, Harlow BL. Why does hysterectomy without bilateral oophorectomy influence the subsequent incidence of ovarian cancer? Am J Epidemiol 1986;124:856–8.
16. La Vecchia C, Franceschi S, Decarli A, et al. Coffee drinking and the risk of epithelial ovarian cancer. Int J Cancer 1984;33:559–62.
17. Tzonou A, Day NE, Trichopoulos D, et al. The epidemiology of ovarian cancer in Greece: a case-control study. Eur J Cancer Clin Oncol 1984; 20:1045–52.
18. Miller DR, Rosenberg L, Kaufman DW, et al.

Case 3:16-md-02738-MAS-RLS Document 9888-5 Filed 05/29/19 Page 418 of 424 PageID: 65734

LUZ004818

Epithelial ovarian cancer and coffee drinking. Int J Epidemiol 1987;16:13–17.
19. Hartge P, Lesher LP, McGowan L, et al. Coffee and ovarian cancer. Int J Cancer 1982;30:531–2.
20. Byers T, Marshall J, Graham S, et al. A case-control study of dietary and nondietary factors in ovarian cancer. JNCI 1983;71:681–6.
21. Cramer DW, Welch WR, Hutchison GB, et al. Dietary animal fat in relation to ovarian cancer risk. Obstet Gynecol 1984;63:833–8.
22. Doll R, Gray R, Hafner B, et al. Mortality in relation to smoking: 22 years' observations on female British doctors. Br Med J 1980;1:967–71.
23. Gwinn ML, Webster LA, Lee NC, et al. Alcohol consumption and ovarian cancer risk. Am J Epidemiol 1986;123:759–66.
24. Wu ML, Whittemore AS, Paffenbarger RS Jr, et al. Personal and environmental characteristics related to epithelial ovarian cancer. I. Reproductive and menstrual events and oral contraceptive use. Am J Epidemiol 1988;128:1216–27.
25. Berry G, Newhouse ML. Mortality of workers manufacturing friction materials using asbestos. Br J Ind Med 1983;40:1–7.
26. Egli GE, Newton M. The transport of carbon particles in the human female reproductive tract. Fertil Steril 1961;12:151–5.
27. Henderson WJ, Joslin CAF, Turnbull AC, et al. Talc and carcinoma of the ovary and cervix. J Obstet Gynaecol Br Cwlth 1971;78:266–72.
28. Henderson WJ, Hamilton TC, Griffiths K. Talc in normal and malignant ovarian tissue. Lancet 1979;1:499.
29. Cattanach J. Oestrogen deficiency after tubal ligation. Lancet 1985;1:847–9.
30. Corson SL, Levinson CJ, Batzer FR, et al. Hormonal levels following sterilization and hysterectomy. J Reprod Med 1981;26:363–9.
31. Beavis ELG, Brown JB, Smith MA. Ovarian function after hysterectomy with conservation of the ovaries in pre-menopausal women. J Obstet Gynaecol Br Cwlth 1969;76:969–78.
32. Cramer DW, Welch WR. Determinants of ovarian cancer risk. II. Inferences regarding pathogenesis. JNCI 1983;71:717–21.
33. Weiss NS, Lyon JL, Krishnamurthy S, et al. Noncontraceptive estrogen use and the occurrence of ovarian cancer. JNCI 1982;68:95–8.
34. DeStefano F, Perlman JA, Peterson HB, et al. Long-term risk of menstrual disturbances after tubal sterilization. Am J Obstet Gynecol 1985;152:835–41.
35. Radwanska E, Headley SK, Dmowski P. Evaluation of ovarian function after tubal sterilization. J Reprod Med 1982;27:376–84.
36. Casagrande JT, Louie EW, Pike MC, et al. "Incessant ovulation" and ovarian cancer. Lancet 1979;2:170–3.
37. Risch HA, Weiss NS, Lyon JL, et al. Events of reproductive life and the incidence of epithelial ovarian cancer. Am J Epidemiol 1983;117:128–39.
38. Levi L. The effect of coffee on the function of the sympathoadrenomedullary system in man. Acta Med Scand 1967;181:431–8.
39. Bellet S, Roman L, DeCastro O, et al. Effect of coffee ingestion on catecholamine release. Metabolism 1969;18:288–91.
40. Edman CD, MacDonald PC. The role of extraglandular estrogen in women in health and disease. In: James VHT, Serio M, Giusti G, eds. The endocrine function of the human ovary. New York: Academic Press, 1976:135–40.
41. Klimmer F, Neidhart B, Legeler T, et al. Influence of coffee on the excretion of noradrenaline and adrenaline in urine. Int Arch Occup Environ Health 1984;54:325–34.

Protected Document – Subject to Protective Order

# Exhibit 24

Case 3:16-md-02738-MAS-RLS Document 9888-5 Filed 05/29/19 Page 420 of 424 PageID: 65736

AMERICAN JOURNAL OF EPIDEMIOLOGY
Vol. 130, No. 2
Copyright © 1989 by The Johns Hopkins University School of Hygiene and Public Health
All rights reserved
Printed in U.S.A.

# Brief Original Contributions

## A CASE-CONTROL STUDY OF BORDERLINE OVARIAN TUMORS: THE INFLUENCE OF PERINEAL EXPOSURE TO TALC

BERNARD L. HARLOW AND NOEL S. WEISS

**Harlow, B. L. (Harvard Medical School, Brigham and Women's Hospital, Boston, MA 02115), and N. S. Weiss. A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc. *Am J Epidemiol* 1989;130:390–4.**

**The authors interviewed 116 female residents of western Washington State with serous and mucinous borderline ovarian tumors diagnosed between 1980 and 1985 and questioned them on their use of hygienic powders. A sample of 158 control women from the same counties were identified through random digit dialing and were interviewed as well. Neither the perineal application of baby powder nor the perineal application of cornstarch was associated with an appreciably altered risk of borderline ovarian tumors. However, women who used deodorizing powders alone or in combination with other talc-containing powders had 2.8 times the risk (95% confidence interval 1.1–11.7) of women who had not had perineal exposure to powder. These results suggest that future studies of ovarian tumors in relation to the application of talc-containing powders should consider ascertaining the specific type(s) of powder used.**

**ovarian neoplasms; talc**

In light of the marked differences in age-specific incidence and patient survival between borderline and malignant epithelial ovarian tumors (1), we conducted a case-control study of borderline ovarian tumors to determine whether etiologic differences between these low-grade tumors and their malignant counterparts exist as well. As part of this study, we sought to investigate the possible etiologic role of perineal exposure to talc.

Interest in talc as a potential ovarian carcinogen has grown from reports of occupational asbestos exposure and ovarian cancer (2–4). Mineral talc, similar in chemical composition to various asbestos minerals, is the common base for most dusting powders that women may apply to the perineum, sanitary napkins, or diaphragms prior to storage (5). Presently, three epidemiologic studies have examined the association between talc exposure and ovarian cancer (6–8).

### MATERIALS AND METHODS

The Seattle-Puget Sound Cancer Surveillance System classifies borderline ovarian tumors according to the World Health Organization *International Classification of Diseases for Oncology* (ICD-O) (9). Female residents of three urban counties of western Washington State diagnosed as having a serous or mucinous borderline ovarian tumor (ICD-O codes 8,440–8,481) were identified from the files of this population-based cancer reporting system. Included were white women aged 20–79 years whose tumors were diagnosed during the years

Received for publication August 4, 1988, and in final form February 28, 1989.
From the Department of Epidemiology, School of Public Health and Community Medicine, University of Washington, Seattle, WA, and the Division of Public Health Sciences, Fred Hutchinson Cancer Research Center, Seattle, WA.
Reprint requests to Dr. Bernard L. Harlow, Obstetrics and Gynecology Epidemiology Center, Harvard Medical School, Brigham and Women's Hospital, 221 Longwood Avenue, Boston, MA 02115.
The authors thank Dr. Daniel W. Cramer for his helpful advice and comments.

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)
JNJ 000018353

1980–1985. Among those tumors subject to an independent pathology review (73 per cent), 83 of 88 (94 per cent) were confirmed as borderline ovarian tumors. Given the high degree of histologic agreement, we chose to include the additional 33 cases whose tumors had not been reviewed. Through random digit dialing, we identified a control group of white women who were similar to the cases with respect to age and county of residence. Controls who had undergone bilateral oophorectomy were excluded from the analysis. Further details of the study methods are described elsewhere (10).

Reproductive, sexual, and medical histories and information on perineal exposure to talc were obtained during an in-person interview. An open-ended question asked women to specify the type(s), but not the brand name(s), of powder they had used for perineal application after bathing, on sanitary napkins, and for diaphragm storage prior to diagnosis (or a similar date for controls). Affirmative responses were categorized either as one or more of three talc-containing powders (baby powder, deodorizing powder, and other or unspecified talcum or "dusting" powders) or as cornstarch.

We were successful in obtaining interviews from 116 cases (68 per cent of those eligible) and 158 controls (74 per cent of those eligible). A detailed discussion of response rates can be found elsewhere (10). Since previous studies (including ours) have reported an association of ovarian cancer risk in relation to reproductive history and exogenous female hormones, we controlled for age, parity, and the use of oral contraceptives during the analysis, by means of stratification (11).

## Results

Women who reported any perineal use of dusting powders—either after bathing, on sanitary napkins, or for diaphragm storage—had an adjusted relative risk of 1.1 for developing a borderline ovarian tumor (95 per cent confidence interval (CI) 0.7–2.1) (table 1). We further examined this association according to both the specific method of exposure to dusting powders and the type of powder used. The analysis by method of use indicates that a smaller proportion of cases than controls used talc-containing powder or cornstarch for diaphragm storage. The risk associated with the use of talc-containing powders or cornstarch after bathing was 1.2 (95 per cent CI 0.6–2.6). Women who reported any use of talc-containing powder or cornstarch on sanitary napkins had a risk about double (relative risk (RR) = 2.2, 95 per cent CI 0.8–19.8) that of women who reported no talc use. This risk was the same for women who reported applying powder both after bathing and to sanitary napkins. No increase in risk was present among short- and long-term diaphragm users, the risk was not modified by the use of cornstarch versus other talc-containing powders, and there was no variation in risk with increasing number of days of use (not shown).

When we compared cases and controls by the type of powder used, there was no excess risk of borderline tumors among women who applied cornstarch, baby powder, or unspecified talcum powder alone or in combination to the perineum. However, women who applied deodorizing powders with or without baby powder (only baby powder was reported as a second powder in women who used deodorizing powders) had nearly three times the risk of developing a borderline ovarian tumor compared with women who reported no perineal use of powder (RR = 2.8, 95 per cent CI 1.1–11.7).

When we examined the type of powder used according to the method of application, the excess risk due to the use of deodorizing powders was present regardless of whether it was applied after bathing or to sanitary napkins. No subjects reported any use of deodorizing powders for diaphragm storage.

## Discussion

Our results of perineal exposure to talc—no association among women who applied talcum powder to diaphragms, but a modest increase in risk among women who applied

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

TABLE 1

*Perineal use of talc-containing powder and cornstarch among women with borderline ovarian tumors and their matched controls, by method of use and by type of powder used, western Washington State, 1980–1985*

| | Cases (n = 116) | Controls (n = 158) | Crude RR* | Adjusted RR† | 95% CI* |
|---|---|---|---|---|---|
| No perineal exposure to powder | 67 | 94 | 1.0‡ | | |
| Any perineal exposure to powder | 49 | 64 | 1.1 | 1.1 | 0.7–2.1 |
| Method of use | | | | | |
| Diaphragm storage only | 8 | 21 | 0.5 | 0.5 | 0.2–1.4 |
| Diaphragm storage only or with other methods | 11 | 27 | 0.6 | 0.5 | 0.2–1.3 |
| After bathing only | 24 | 30 | 1.1 | 1.2 | 0.6–2.6 |
| After bathing only or with other methods | 34 | 37 | 1.3 | 1.3 | 0.8–2.7 |
| Sanitary napkins only | 7 | 4 | 2.5 | 2.2 | 0.8–19.8 |
| Sanitary napkins only or with other methods | 14 | 10 | 2.0 | 1.9 | 0.9–6.9 |
| After bathing and on sanitary napkins | 7 | 4 | 2.5 | 2.2 | 0.8–19.8 |
| Type of powder used | | | | | |
| Cornstarch only (no combined use) | 4 | 7 | 0.8 | 0.8 | 0.2–3.8 |
| Baby powder only | 18 | 31 | 0.8 | 0.8 | 0.4–1.9 |
| Baby powder only or combined use | 22 | 34 | 0.9 | 0.9 | 0.5–2.0 |
| Talc, unspecified (no combined use) | 13 | 19 | 1.0 | 1.0 | 0.4–2.4 |
| Deodorizing powder only | 10 | 4 | 3.5 | 3.5 | 1.2–28.7 |
| Deodorizing powder only or combined use | 14 | 7 | 2.8 | 2.8 | 1.1–11.7 |
| Method and type of powder used | | | | | |
| Any powder use after bathing | | | | | |
| Any use of deodorizing powder | 10 | 5 | 2.8 | 3.1 | 0.8–10.9 |
| No use of deodorizing powder | 24 | 32 | 1.1 | 1.1 | 0.5–2.4 |
| Any powder use on sanitary napkins | | | | | |
| Any use of deodorizing powder | 8 | 4 | 2.8 | 2.6 | 0.9–22.4 |
| No use of deodorizing powder | 6 | 6 | 1.4 | 1.5 | 0.4–6.5 |

* RR, relative risk; CI, confidence interval.

† Adjusted for age (20–39, 40–59, or 60–79 years), parity (nulliparous or parous), and use of oral contraceptives (ever or never).

‡ Reference group.

talc-containing powders to the perineum or to sanitary napkins—are consistent with those previously reported in studies of malignant ovarian tumors. Cramer et al. (6) observed a 50 per cent excess risk among women who used dusting powders or who applied talc-containing powders to sanitary napkins, and a relative risk of 3.3 among women who applied both. No association was found with use of talcum powder for diaphragm storage. Hartge et al. (7) also found no excess risk among users of talc for diaphragm storage, but they did report an association with perineal application (seven cases, three controls; RR = 2.5, 95 per cent CI 0.7–10.0). Whittemore et al. (8) reported a 40 per cent excess in risk of ovarian cancer associated with perineal exposure only and a modest increase in risk with increasing numbers of applications per month.

An association between talc use and ovarian neoplasms seems biologically plausible, since particulates contaminating the vaginal area may migrate into the pelvic cavity and since particles of talc have been observed within ovarian tissue (12–15). It is also conceivable that the excess risk as-

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

sociated with application of talc to the perineum and to sanitary napkins that was seen in the three prior studies, none of which inquired about the type of powder, could have been due to a strong association restricted to the use of deodorizing powders. The lack of an increased risk among women who used talc-containing powder on diaphragms (both in our study and in the previous studies) supports this hypothesis, since deodorizing powder was infrequently used for diaphragm storage. Furthermore, differential asbestos contamination among different types of cosmetic talcum powders cannot be ruled out. Until 1976, US-manufactured cosmetic talcum powders were required to contain at least 90 per cent mineral talc, but until 1968, some products marked as cosmetic talcum powders did not conform to these guidelines (16, 17). In 1976, a study of 21 consumer talcum powders labeled as baby powders, facial powders, or body powders obtained from retail stores in New York City between 1971 and 1975 reported that 10 contained concentrations of asbestiform tremolite and anthophyllite ranging from 0.2 per cent to 14 per cent (4).

Although it is difficult to explain the lack of association among women who used baby powder exclusively, according to the product labels baby powder is reported to contain only talc and no other minerals or deodorizing substances. The product labels from deodorizing powders, body powders, and perfumed dusting powders, on the other hand, indicate that they contain deodorizing substances and a variety of other free and bonded silicas (potentially high in asbestiform fibers (18)) in addition to talc.

We suggest caution when interpreting the results of this study. The elevated risk among women who specifically used *deodorizing* powders could have been due to chance or applicable only to borderline, not malignant, ovarian tumors. We believe the latter possibility to be unlikely, since the risk associated with the use of any talc-containing powder was similar to that reported in previous studies of women with malignant ovarian tumors. In addition, because of refusals and other reasons for nonparticipation, we were unable to include approximately 30 per cent of potentially eligible cases and controls. Since nonparticipants were similar to participants with respect to certain characteristics such as age and county of residence, we have no reason to believe that there was any dissimilarity in their use of talc-containing powders.

Given the clues provided by this study regarding the possible importance of deodorizing powders, it would be advisable for future studies to elicit information on the brand names of talc-containing powders and the timing and duration of use of each type of talc-containing powder. Although these data need replication, they raise the possibility that the risk of ovarian tumors in women who apply deodorizing powder to the perineum may not relate to talc per se but rather to asbestos contamination and/or a substance or substances used specifically for deodorization.

References

1. Harlow BL, Weiss NS, Lofton S. The epidemiology of borderline ovarian tumors. JNCI 1987;78:71–4.
2. Graham J, Graham R. Ovarian cancer and asbestos. Environ Res 1967;1:115–28.
3. Longo DL, Young RC. Cosmetic talc and ovarian cancer. Lancet 1979;2:349–51.
4. Blejer HP, Arlon R. Talc: a possible occupational and environmental carcinogen. J Occup Med 1973;15:92–7.
5. Rohl AN, Langer AM, Selikoff IJ, et al. Consumer talcums and powders: mineral and chemical characterization. J Toxicol Environ Health 1976;2:255–84.
6. Cramer DW, Welch WR, Scully RE, et al. Ovarian cancer and talc. Cancer 1982;50:372–6.
7. Hartge P, Hoover R, Lesher LP, et al. Talc and ovarian cancer. (Letter). JAMA 1983;250:1844.
8. Whittemore AS, Wu ML, Paffenbarger RS, et al. Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. Am J Epidemiol 1989;128:1228–40.
9. World Health Organization. International classification of diseases for oncology. Geneva: World Health Organization, 1976.
10. Harlow BL, Weiss NS, Roth G, et al. A case-control study of borderline ovarian tumors: repro-

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

Case 3:16-md-02738-MAS-RLS Document 9888-5 Filed 05/29/19 Page 424 of 424 PageID: 65740

ductive history and exposure to exogenous female hormones. Cancer Res 1988;48:5849–52.

11. Mantel N, Haenzel W. Statistical aspects of the analysis of data from retrospective studies of disease. JNCI 1959;22:719–48.
12. Eglie GE, Newton MD. The transport of carbon particles in the human female reproductive tract. Fertil Steril 1961;12:151–5.
13. Venter PF, Iturralde M. Migration of particulate radioactive tracer from the vagina to the peritoneal cavity and ovaries. S Afr Med J 1979;55:917–19.
14. Henderson WJ, Joslin CAF, Turnbull AC, et al. Talc and carcinoma of the ovary and cervix. J Obstet Gynecol 1971;78:266–72.
15. Henderson WJ, Hamilton TC, Griffiths K. T in normal and malignant ovarian tissue. Lan 1979;1:499.
16. Hildick-Smith GY. The biology of talc. Br J I Med 1976;33:217–29.
17. Cralley LJ, Key MM, Groth DH, et al. Fibr and mineral content of cosmetic talcum produ Am Ind Hyg Assoc J 1968;29:350–4.
18. Paoletti L, Calazza S, Donelli G, et al. Evaluati by electron microscopy techniques of asbes contamination in industrial, cosmetic, and ph maceutical talcs. Regul Toxicol Pharmacol 19 4:222–35.

NOTICE: THIS MATERIAL MAY PROTECTED BY COPYRIGHT LAW (TITLE 17 U.S. Code)

JNJ 000018357