# Exhibit 58

# REVIEWS
# Six Persistent Research Misconceptions

*Kenneth J. Rothman, DrPH[1,2]*

[1]Research Triangle Institute, Research Triangle Park, NC, USA; [2]Boston University School of Public Health, Boston, MA, USA.

Scientific knowledge changes rapidly, but the concepts and methods of the conduct of research change more slowly. To stimulate discussion of outmoded thinking regarding the conduct of research, I list six misconceptions about research that persist long after their flaws have become apparent. The misconceptions are: 1) There is a hierarchy of study designs; randomized trials provide the greatest validity, followed by cohort studies, with case–control studies being least reliable. 2) An essential element for valid generalization is that the study subjects constitute a representative sample of a target population. 3) If a term that denotes the product of two factors in a regression model is not statistically significant, then there is no biologic interaction between those factors. 4) When categorizing a continuous variable, a reasonable scheme for choosing category cut-points is to use percentile-defined boundaries, such as quartiles or quintiles of the distribution. 5) One should always report P values or confidence intervals that have been adjusted for multiple comparisons. 6) Significance testing is useful and important for the interpretation of data. These misconceptions have been perpetuated in journals, classrooms and textbooks. They persist because they represent intellectual shortcuts that avoid more thoughtful approaches to research problems. I hope that calling attention to these misconceptions will spark the debates needed to shelve these outmoded ideas for good.

KEY WORDS: study design; data interpretation; epidemiologic methods; representativeness; evaluation of interaction; multiple comparisons; percentile boundaries; statistical significance testing.

J Gen Intern Med 29(7):1060–4

DOI: 10.1007/s11606-013-2755-z

© The Author(s) 2014. This article is published with open access at Springerlink.com

A surprising number of misconceptions persist in the conduct of research involving human subjects. Some persist despite teachings to the contrary, and some because of teachings that should be to the contrary. To spark discussion of these issues, I list here six persistent research misconceptions, and offer a capsule summary of the problems with each of them.

Received November 01, 2013
Revised November 27, 2013
Accepted December 18, 2013
Published online January 23, 2014

1060

**Misconception 1.** *There is a hierarchy of study designs; randomized trials provide the greatest validity, followed by cohort studies, with case–control studies being least reliable.*

Randomized trials, though often considered the "gold standard" of study types, are not perfect, even in concept. Furthermore, the premise that the comparative validity of study results can be inferred from the type of study is wrong.

Although some believe that evidence from a randomized trial is as compelling as a logical proof, no empirical finding can provide absolute certainty. If randomized trials were perfect, how could they give divergent results? In fact, they are subject to various errors.[1] Obviously there is random error, as one would expect from a study based on random assignment. But there is also systematic error, or bias. For example, randomized trials are usually analyzed using the "intent to treat" principle, which compares the groups that are initially assigned by randomization, regardless of any subsequent non-adherence. Non-adherence results in underestimation of any treatment effect. This bias is usually considered acceptable because it is outweighed by the advantages achieved by random assignment. Underestimation of effects, however, is not acceptable in a safety trial aimed at uncovering adverse effects of the treatment. Another important source of bias in a randomized trial comes from errors in assessing the outcome, such as undercounting of outcome events. Also, even if randomization provides a balance of risk factors between groups at the start of the trial, with extended follow-up, the study groups may become progressively imbalanced through differential attrition or changes in risk factor distributions. With long-term trials, the benefits of random assignment may therefore fade with time.

In short, trials are far from perfect. Furthermore, both cohort and case–control studies will yield valid results when properly designed and carried out. Therefore, mindlessly ascribing greater validity to a study based on a hierarchy of designs[2,3] is fallacious. For example, the relation between cigarette smoking and lung cancer is well established, based on findings from cohort and case–control studies. The connection was never shown clearly in a randomized trial. It is not easy to assign people randomly to smoke or not smoke; however, when smoking cessation was studied as part of a multi-pronged intervention in the randomized Multiple Risk Factor Intervention Trial,[4] those who were

urged to cease smoking actually developed more lung cancer than those who did not receive the cessation encouragement. The results of the trial did not overthrow the findings of the many cohort and case–control studies conducted without randomization. Rather, the discrepancy was ascribed to problems with the trial.

In another high-profile example, results from large cohort studies[5,6] indicated that risk of coronary heart disease was reduced among postmenopausal hormone users, but later results from two randomized trials indicated either no association or an increased risk.[7,8] The reaction in the scientific community and the popular press[9] was to discredit the results from the cohort studies, presuming that they had been refuted by the randomized trials. Many continue to believe that interpretation, but in an elegant reanalysis, Hernan et al.[10] showed that the study populations in the cohort studies and the randomized trials were different, and that the effects of postmenopausal hormone use varied greatly according to age and time since menopause. When studies were restricted to new users of hormones, Hernan et al. showed that differences in the distribution of age and time since menopause could explain all of the apparent discrepancies. Although it is common to ascribe such discrepancies to inherent weaknesses of the nonexperimental studies, it is simplistic to assign validity based on a presumed hierarchy of study types.[11]

Similarly, discrepancies between cohort studies and case–control studies should not be explained away superficially by a presumed validity advantage for cohort studies over case–control studies. Properly designed case–control studies will produce the same results as properly designed cohort studies. When conflicts arise, they could stem from problems in either or both types of study. Although case–control studies have long been disparaged as being backwards versions of cohort studies, starting from disease and tracing back to possible causes, epidemiologists today understand case–control studies to be conceptually identical to cohort studies, apart from an efficiency gain that comes from sampling the denominators rather than conducting a complete census. Indeed, the efficiency gain may allow more resources for exposure assessment or case validation in case–control studies, resulting in less bias than in corresponding cohort studies of the same relation.

Those who view case–control studies as backwards versions of cohort studies sometimes make the false analogy that the controls should closely resemble the cases, except that they lack the case-defining disease. In fact, the control group in a case–control study is intended to be a sample of the population denominator that gives rise to the cases, a substitute for the full denominators obtained in a cohort study. Thus, the control group should resemble the entire study population, rather than the cases.[12,13] When properly designed, case–control studies can achieve the same excellent validity as properly designed cohort studies,

whereas a poorly designed trial can be unreliable. The type of study should not be taken as a guide to a study's validity.

Misconception 2. *An essential element of making valid generalizations from a study is that the study subjects constitute a representative sample of a target population.*

This misconception is tied to the view that scientific generalization involves the mechanical extrapolation of results from a sample to its source population. But that describes statistical generalization; scientific generalization is different: it is the process of constructing a correct statement about the way nature works.

Scientific generalization is the ultimate goal of scientific inquiry, but a prerequisite is designing a study that has internal validity, which is enhanced by keeping all disturbing variables constant. When have we heard of animal researchers who seek a statistically representative sample of animals? Instead, their operating principle is nearly the opposite of seeking representativeness. Thus, biologists studying mice prefer to study mice that are homogeneous with respect to genes and environment, and that differ only in respect to the experimentally manipulated variable. Unlike the statistical generalization of opinion polls or survey sampling, which merely calls for extrapolation from sample to source population, scientific generalization proceeds by informed guesses, but only from the secure platform of a valid study. Consequently, studies are stronger if they limit variability of confounding factors, as opposed to seeking representativeness. Doll and Hill[14] studied the mortality of male British physicians in relation to their smoking habits. Their findings were considered broadly generalizable despite the fact that their study population was unrepresentative of the general population of tobacco users with regard to sex, race, ethnicity, social class, nationality and many other variables.

When there is a legitimate question about whether an overall association varies by subgroup of some third variable, such as age or ethnic group, it may be necessary to include people drawn from a broad range of values of that third variable, but even then it is counterproductive for the study population to be representative of the source population for that variable. The goal in that case would be to include study subjects distributed evenly across the range, or in a distribution that enhances overall study efficiency. A sample that is representative of the source population will be suboptimal.[15,16]

Misconception 3. *If a term that denotes the product of two factors in a regression model is not statistically significant, then there is no biologic interaction between those factors.*

"Biologic" is meant here broadly, to encompass biochemical, psychological, behavioral and physical interactions. The

problem is that interaction is usually evaluated through regression models, in which the product term addresses statistical interaction rather than biologic interaction.

Biologic interaction refers to two or more causes acting in the same mechanism, with effects that are mutually dependent. It describes a state of nature. If basic effects are measured as changes in disease risk, synergistic (i.e. positive) biologic interaction is present when the joint effect of two causal factors is more than the sum of their effects acting separately.[17] In contrast, statistical interaction does not describe nature; it describes a mathematical model. It is typically assessed with a product term for two variables in a regression model. Its magnitude depends on the choice of measures and scale of measurement. Statistical interaction implies only that the basic functional form of a specific mathematical model is not an apt description of the relation among variables. Two factors that show biologic interaction may or may not exhibit statistical interaction, depending on the model used.

Product terms in regression models have units that can defy interpretation. If one variable is fat consumption, measured in grams per day, and another variable is pack-years of cigarettes smoked, what is the interpretation of a variable that has units of grams/day multiplied by pack-years? The challenge of interpreting such product term coefficients has fostered a focus on the p value accompanying the coefficient, rather than the magnitude of the coefficient itself. Focusing on the pvalue, or on whether the coefficient of a product term is statistically significant, only worsens the problem of mistaking statistical interaction for biologic interaction (see misconception 6). A more meaningful assessment of interaction would be to focus on the proportion of cases of a disease that one could attribute to biologic interaction.[17,18]

Consider a simple example from the TREAT trial (Trial to Reduce Cardiovascular Events with Aranesp Therapy),[19] which evaluated the risk of stroke among 4,038 patients with diabetes mellitus, chronic kidney disease, and anemia randomized to receive darbepoetin alfa or placebo. Among patients without a history of stroke, the risk of stroke during the study period was 2 % among patients receiving placebo and 4 % among patients receiving darbepoeitin alfa. Among patients with a history of stroke, the corresponding risks were 4 % and 12 %. The authors noted that the risk increase was greater for darbepoeitin alfa among those with a history of stroke, but they dismissed this interaction because the product term in a logistic regression model was not statistically significant. The increased risk attributable to darbepoeitin alfa was 2 % in the patients without a history of stroke and 8 % among patients with a history of stroke, indicating strong biologic interaction between darbepoeitin alfa and history of stroke. If the risks were merely additive, the risk would be 6 % among those with both risk factors, instead of the actual 12 %. Thus, half of the risk among those with both risk factors

appears attributable to biologic interaction, despite the authors' claim that there was no interaction.

Misconception 4. *When categorizing a continuous variable, a reasonable scheme for choosing category cut-points is to use percentile-defined boundaries, such as quartiles or quintiles of the distribution.*

There are two reasons why using percentiles is a poor method for choosing category boundaries. First, these boundaries may not correspond to the parts of the distribution where biologically meaningful changes occur. Suppose you were conducting a study of vitamin C intake and scurvy risk in the U.S. If you decided to categorize vitamin C intake by quintiles, you would find that the entire relation between vitamin C consumption and scurvy was confined to the lowest quintile, and within that category, to only a small proportion of people who were outliers in their low vitamin C intake. 10 mg/day of vitamin C can prevent scurvy, but those consuming less than that represent a fraction of 1 % of the population in the U. S.[20] Using percentile-based categories would make it impossible to find the effect of inadequate vitamin C intake on scurvy risk, because all intake above 10 mg/d is essentially equivalent. If we routinely use percentile cut-points, we may not know if we are facing the same problem as we would face in the study of vitamin C and scurvy. A more effective alternative would be to begin with many narrow categories, merging neighboring categories until meaningful breaks in risk become evident.

The second problem with percentile-based categories is the difficulty in comparing results across studies, because categories across studies using percentile category boundaries are unlikely to correspond. This problem can be averted by expressing boundary points in terms of the natural units of the variable (such as mg/d for vitamin C intake). It is also useful to report within-category means or medians.

Misconception 5. *One should always report P values or confidence intervals that have been adjusted for multiple comparisons.*

Traditional adjustments for multiple comparisons involve inflating the P value or the width of a confidence interval according to the number of comparisons conducted. If one is analyzing biological data that are replete with actual associations, the premise for traditional adjustments is shaky and the adjustments are difficult to defend. The concern for multiple comparisons stems from fear of finding falsely significant findings (type I errors in the lingo of statistics). In misconception 6, we discuss the problems with using statistical significance testing for data analysis in the first place. But before considering those problems, let us consider the rationale for adjusting reported results for multiple comparisons.

Despite the fact that a single significance test is intended to have a 5 % probability (at the conventionally used level) of being significant when the null hypothesis is true, and

Case 3:16-md-02738-MAS-RLS   Document 9889-4   Filed 05/29/19   Page 5 of 355 PageID: 66228

therefore multiple tests when properly carried out should each have this property, there is a concern that when making multiple tests, the probability of a spurious result is increased. Of course, as the number of tests increases, the probability that one or more of them would be falsely positive increases, but that is only because many tests are being conducted. Adjustments for multiple comparisons will reduce these type I errors, but they do so at the expense of increasing type II errors, which are nonsignificant test results in the presence of a real association. When observed associations are all the result of chance, type I errors can occur, but type II errors cannot occur. Conversely, when the observed associations all reflect actual relationships, type II errors can occur, but type I errors cannot. Thus, the context of any analysis has fundamental implications regarding the interpretation of the data. In particular, it is absurd to make adjustments that reduce type I errors at the expense of increasing type II errors without some evaluation of the estimated relative cost and frequency of each type of error.

If scientists were put to work studying random numbers instead of biologic data, all the significant results they reported would represent type I errors, and adjustments for multiple comparisons would make sense; some skeptics believe that studies of genome-wide association scans may approximate this situation.[21] But when scientists are studying biological relations rather than random numbers, the premise that type I errors are the major concern may be wrong.[22] A more rigorous evaluation of the need for multiplicity adjustments would begin with an assessment of the tenability of the thesis that the data are essentially random numbers. If one is studying experiments on psychic phenomena, skepticism about the results might lend support to multiplicity adjustments. If one is studying physiologic effects of pharmaceutical agents, real associations are to be expected and the adjustments are more difficult to defend. Studying single nucleotide polymorphisms in relation to a given disease might be a middle ground. One approach to this issue that is theoretically more defensible is a Bayesian approach, which assigns prior credibility to various levels of association and adjusts by using Bayes' theorem to calculate posterior credibility.[23,24]

Misconception 6. *Significance testing is useful and important for the interpretation of data*.

Significance testing has led to far more misunderstanding and misinterpretation than clarity in interpreting study results.[25–28] A significance test is a degraded version of the P value, a statistic that blends precision with effect size, thus confusing two essential aspects of data interpretation. Measuring effect size and its precision as separate tasks is a more direct and clearer approach to data interpretation.

For research studies that aim to measure associations, and infer whether they reflect causal connections, focusing on the magnitude of these associations ought to be the primary goal: estimation of effects is decidedly preferable to statistical testing. Ideally, a study estimates the magnitude of the effect size, and analyzes the possible errors that might have distorted it. Systematic errors such as confounding from measured factors can be dealt with through analytic methods; other systematic errors, such as the effects of measurement error or selection bias, can be addressed through sensitivity analyses (also known as bias analysis). Random error is typically expressed through confidence intervals, giving a range of parameter values that are consistent with the data to a specified level.

It is unfortunate that a confidence interval, from which both an estimate of effect size and its measurement precision can be drawn, is typically used merely to judge whether it contains the null value or not, thus converting it to a significance test. Significance tests are a poor classification scheme for study results; strong effects may be incorrectly interpreted as null findings because authors fallaciously interpret lack of statistical significance to imply lack of effect, or weak effects may be incorrectly interpreted as important because they are statistically significant. Rather than be used as surrogate significance tests, confidence intervals ought to be interpreted as quantitative measures indicating magnitude of effect size and degree of precision, with little attention paid to the precise location of the boundaries of the confidence interval. This advice is backed by the Uniform Requirements for Manuscripts Submitted to Biomedical Journals, but nevertheless often overlooked even by reviewers and editors whose journals support the requirements.[29]

Many misconceptions derive from reliance on statistical significance testing. The focus on the statistical significance of interaction terms instead of measuring interaction, as discussed above, is one example. The evaluation of dose–response trends simply by declaring that there is or is not a significant trend, rather than expressing the magnitude and ideally the shape of that trend, is another. Yet another is the advice sometimes offered to calculate the power of a study when reporting results, especially if those results are not statistically significant. Reporting the power of a study as part of the results is called "post-hoc" power calculation.[30] Power calculations are based on a hypothesis about the level of association that is to be distinguished from a null association, but when the study results are on hand, there is no longer any need to hypothesize about the magnitude of the association, because you now have an estimate of it. A confidence interval for the estimated association conveys all the relevant information; nothing further is to be gained from a power calculation.

The unfortunate consequence of the focus on statistical significance testing has been to foster a dichotomous view of relationships that are better assessed in quantitative terms. This distinction is more than a nicety. Every day there are important, regrettable and avoidable misinterpretations of data that results from the confusing fog of

statistical significance testing. Most of these errors could be avoided if the focus were shifted from statistical testing to estimation.

## CONCLUSION

Why do such important misconceptions about research persist? To a large extent these misconceptions represent substitutes for more thoughtful and difficult tasks. It is simpler to resolve a discrepancy between a trial and a nonexperimental study in favor of the trial, without undertaking the laborious analysis that Hernan et al. did.[10] It is easy to declare that a result is not statistically significant, falsely implying that there is no indication of an association, rather than to consider quantitatively the range of associations that the data actually support. These misconceptions involve taking the low road, but when that road is crowded with others taking the same path, there may be little reason to question the route. Indeed, these misconceptions are often perpetuated in journals, classrooms and textbooks. I believe that the best prospect for improvement is to raise consciousness about the issues, with reasoned debate. Max Planck once said, "A new scientific truth does not triumph by convincing its opponents and making them see the light, but rather because its opponents eventually die, and a new generation grows up that is familiar with it."[31] To the extent that this cynical view is correct, we can expect to see outmoded concepts fade away slowly at best. I hope that calling attention to these misconceptions will spark the needed debates and be a catalyst for change.

*Acknowledgements: I received helpful criticism from Susana Perez, Andrea Margulis, Manel Pladevall, and Jordi Castellsague.*

*Conflict of Interest: The author declares no conflict of interest.*

*Corresponding Author: Kenneth J. Rothman, DrPH; Research Triangle Institute, Research Triangle Park, NC, USA (e-mail: KRothman@rti.org).*

*Open Access This article is distributed under the terms of the Creative Commons Attribution License which permits any use, distribution, and reproduction in any medium, provided the original author(s) and the source are credited.*

## REFERENCES

1. **Hernán MA, Hernández-Díaz S, Robins JM.** Randomized trials analyzed as observational studies. Ann Intern Med. 2013;159:560–2. doi:10.7326/0003-4819-159-8-201310150-00709

2. **Ioannidis JPA.** Why most published research findings are false. PLoS Med. 2005;2(8):e124.

3. **Hiatt WR.** Observational studies of drug safety–aprotinin and the absence of transparency. N Engl J Med. 2006;355:2171–3.

4. **Shaten BJ, Kuller LH, Kjelsberg MO, Stamler J, Ockene JK, Cutler JA, Cohen JD.** Lung cancer mortality after 16 years in MRFIT participants in intervention and usual-care groups. Multiple Risk Factor Intervention Trial. Ann Epidemiol 1997;7:125–36.

5. **Grodstein F, Manson JE, Colditz GA, et al.** A prospective, observational study of postmenopausal hormone therapy and primary prevention of cardiovascular disease. Ann Intern Med. 2000;133:933–41.

6. **Varas-Lorenzo C, García-Rodríguez LA, Pérez-Gutthann S, et al.** Hormone replacement therapy and incidence of acute myocardial infarction. Circulation. 2000;101:2572–8.

7. **Hulley S, Grady D, Bush T, Furberg C, Herrington D, Riggs B, Vittinghoff E.** Randomized trial of estrogen plus progestin for secondary prevention of coronary heart disease in postmenopausal women. Heart and Estrogen/progestin Replacement Study (HERS) Research Group. JAMA. 1998;280:605–13. doi:10.1001/jama.280.7.605.

8. **Manson JE, Hsia J, Johnson KC, et al.** Estrogen plus progestin and the risk of coronary heart disease. N Engl J Med. 2003;349:523–34.

9. **Taubes G.** Do we really know what makes us healthy? New York Times, September 16, 2007.

10. **Hernán MA, Alonso A, Logan R, Grodstein F, Michels K, Willett WC, Manson JE, Robins JM.** Observational studies analyzed like randomized experiments: an application to postmenopausal hormone therapy and coronary heart disease. Epidemiology. 2008;19:766–79. doi:10.1097/EDE.0b013e3181875e61

11. **Concato J.** Observational versus experimental studies: what's the evidence for a hierarchy? NeuroRx. 2004;1:341–7.

12. **Vandenbroucke JP, Pearce N.** Case–control studies: basic concepts. Int J Epidemiol. 2012;41:1480–9. doi:10.1093/ije/dys147.

13. **Rothman KJ.** Chapter 5, Types of Epidemiologic Studies, in *Epidemiology, An Introduction,* 2nd Edition. Oxford University Press, New York, 2012.

14. **Doll R, Hill AB.** The mortality of doctors in relation to their smoking habits: a preliminary report. Br Med J. 1954;ii:1451–5.

15. **Rothman KJ, Gallacher J, Hatch EE.** Why representativeness should be avoided. Int J Epidemiol. 2013;42:1012–4. doi:10.1093/ije/dys223

16. **Rothman KJ, Gallacher J, Hatch EE.** When it comes to scientific inference, sometimes a cigar is just a cigar. Int J Epidemiol. 2013;42:1026–8. doi:10.1093/ije/dyt124

17. **Rothman KJ.** Chapter 11, Measuring Interaction, in *Epidemiology, An Introduction,* 2nd Edition. Oxford University Press, New York, 2012.

18. **Knol MJ, van der Tweel I, Grobbee DE, Numans ME, Geerlings MI.** Estimating interaction on an additive scale between continuous determinants in a logistic regression model. Int J Epidemiol. 2007;36:1111–8.

19. **Skali H, Parving HH, Parfrey PS, Burdmann EA, Lewis EF, Ivanovich P, Keithi-Reddy SR, McGill JB, McMurray JJ, Singh AK, Solomon SD, Uno H, Pfeffer MA.** TREAT Investigators: Stroke in patients with type 2 diabetes mellitus, chronic kidney disease, and anemia treated with Darbepoetin Alfa: the trial to reduce cardiovascular events with Aranesp therapy (TREAT) experience. Circulation. 2011;124:2903–8.

20. Dietary Reference Intakes for Vitamin C, Vitamin E, Selenium, and Carotenoids. Institute of Medicine, The National Academies Press, Washington, D. C., 2000.

21. **Dudbridge F, Gusnanto A.** Estimation of significance thresholds for genomewide association scans. Genet Epidemiol. 2008;32:227–34.

22. **Rothman KJ.** No adjustments are needed for multiple comparisons. Epidemiology. 1990;1:43–6.

23. **Greenland S, Robins J.** Empirical-Bayes adjustments for multiple comparisons are sometimes useful. Epidemiology. 1991;2:244–51.

24. **Greenland S, Poole C.** Empirical-Bayes and semi-Bayes approaches to occupational and environmental hazard surveillance. Arch Environ Health. 1994;48:9–16.

25. **Rothman KJ.** A show of confidence (editorial). N Engl J Med. 1978;299:1362–3.

26. **Poole C.** Beyond the confidence interval. Am J Public Hlth. 1987;77:195–9.

27. **Rothman KJ.** Significance questing (Editorial). Ann Int Med. 1986;105:445–7.

28. **Gelman A, Stern H.** The difference between "Significant" and "Not Significant" is not itself statistically significant. Amer Statistician. 2006;60:328–31.

29. Uniform Requirements for Manuscripts Submitted to Biomedical Journals, http://www.icmje.org/manuscript_1prepare.html (accessed May 2, 2013)

30. **Smith AH, Bates MN.** Confidence limit analyses should replace power calculations in the interpretation of epidemiologic studies. Epidemiology. 1992;3:449–52.

31. **Planck M.** *Scientific Autobiography and Other Papers,* Philosophical Library, New York, 1968, trans. F. Gaynor (New York, 1949), pp. 33–34

Copyright of JGIM: Journal of General Internal Medicine is the property of Springer Science & Business Media B.V. and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

# Exhibit 59

Anne McTiernan, Ph.D.

0    01



2                    IN THE UNITED STATES DISTRICT COURT

3

4                    FOR THE DISTRICT OF NEW JERSEY

5

6

7

8                                              )

9       IN RE: JOHNSON & JOHNSON TALCUM        )

10      POWDER PRODUCTS MARKETING, SALES       )

11      PRACTICES, AND PRODUCTS LIABILITY      ) MDL No. 2738 (FLW)(LHG)

12      LITIGATION                             )

13                                              )

14                                              )

15

16

17            VIDEOTAPED DEPOSITION OF ANNE MCTIERNAN, PH.D.

18

19                        January 28, 2019

20

21                        Seattle, Washington

22

23

24

25

Anne McTiernan, Ph.D.

Page 2

```
 1              APPEARANCES
 2   For Johnson & Johnson:
 3        Bart H. Williams, Esquire
         Susan Gutierrez, Esquire
 4        Proskauer Rose LLP
         2029 Century Park East
 5        Suite 2400
         Los Angeles, CA  90067-3010
 6        310.284.4520
         310.557.2193 Fax
 7        Bwilliams@proskauer.com
         sgutierrez@proskauer.com
 8
         Benjamin S. Halperin, Esquire
 9        Skadden Arps Slate Meagher & Flom LLP
         4 Times Square
10        New York, NY  10036
         212.735.2453
11        917.777.2453 Fax
         Benjamin.halperin@skadden.com
12
     For Plaintiffs:
13
         Michelle A. Parfitt, Esquire
14        Ashcraft & Gerel, LLP
         1825 K Street NW
15        Suite 700
         Washington, D.C.  20006
16        202.803.7077
         Mparfitt@ashcraftlaw.com
17
         Cynthia L. Garber, Esquire
18        Robinson Calcagnie, Inc.
         19 Corporate Plaza Drive
19        Newport Beach, CA  92660
         649.720.1288
20        949.456.0037 Fax
         Cgarber@robinsonfirm.com
21
         Richard M. Golomb, Esquire
22        Golomb & Honik, PC
         1835 Market Street
23        Suite 2900
         Philadelphia, PA  19103
24        215.985.9177
         215.985.4169 Fax
25        rgolomb@golombhonik.com
```

Page 3

```
 1   APPEARANCES (CONTINUED)
 2
 3      For Imerys:
 4        Nancy M. Erfle, Esquire
         Gordon & Rees Scully Mansukhani, LLP
 5        121 SW Morrison Street
         Suite 1575
 6        Portland, OR  97204
         503.222.1075
 7        503.616.3600 Fax
         Nerfle@grsm.com
 8
 9      For PTI Union, LLC and PTI Royston:
10        Michael Anderton, Esquire
         Tucker Ellis LLP
11        950 Main Avenue
         Suite 1100
12        Cleveland, Ohio  44113-7213
         216.696.4835
13        216.592.5009 Fax
         Michael.anderton@tuckerellis.com
14
15      For Personal Care Products Council:
16        Thomas T. Locke, Esquire
         Seyfarth Shaw LLP
17        975 F Street NW
         Washington, D.C.  20004-1454
18        202.828.5376
         202.641.9276 Fax
19        Tlocke@seyfarth.com
20
21
22      Also present:  Anthony Bocci, Videographer
23
24
25
```

Page 4

```
 1              EXAMINATION INDEX
 2   EXAMINATION BY:                    PAGE NO.
 3   MR. WILLIAMS                         10
 4   MS. ERFLE                           299
 5   MS. PARFITT                         305
 6
 7              EXHIBIT INDEX
 8   EXHIBIT NO.    DESCRIPTION        PAGE NO.
 9
10   Exhibit No. 1    Notice of oral and videotaped    15
                  deposition of Anne McTiernan
11                and duces tecum.
12   Exhibit No. 1A   Plaintiff's steering            21
                  committee's response and
13                objections to the notice of
                  oral and videotaped
14                deposition of Anne McTiernan
                  and duces tecum.
15
16   Exhibit No. 2    "Rule 26 expert report of       19
                  Anne McTiernan, MD, PHD,"
17                dated 11/16/18.
18   Exhibit No. 3    "Additional materials to        63
                  Dr. Anne McTiernan."
19   Exhibit No. 4    World Cancer Research Fund       69
                  and American Institute for
20                Cancer Research, "Ovarian
                  cancer 2014 report."
21
22   Exhibit No. 5    World Cancer Research Fund       82
                  and American Institute for
23                Cancer Research, "Diet,
                  nutrition, physical activity
24                and ovarian cancer - Revised
                  2018."
25
```

Page 5

```
 1          EXHIBIT INDEX (CONTINUED)
 2
 3   Exhibit No. 6    World Cancer Research Fund       83
                  International, CUP panel web
 4                page excerpt, "CUP expert
                  panel."
 5   Exhibit No. 7    World Cancer Research Fund       98
                  web page excerpt, "Myths and
 6                controversies about what
                  causes cancer."
 7
 8   Exhibit No. 8    American Institute for Cancer   103
                  Research, "GMOs and other hot
 9                topics."
10   Exhibit No. 9    Hutch News, "How to reduce      105
                  the odds of getting cancer."
11   Exhibit No. 10   World Cancer Research Fund      110
                  and American Institute for
12                Cancer Research, "Judging the
                  evidence."
13
14   Exhibit No. 11   "Language from CUP judging      138
                  the evidence report quoted
15                without citation in
                  Dr. McTiernan's expert
16                report."
17   Exhibit No. 12   Article, "Information bias in   164
                  epidemiological studies with
18                a special focus on obstetrics
                  and gynecology."
19   Exhibit No. 13   Article, "Prospective study    167
                  of talc use and ovarian
20                cancer."
21   Exhibit No. 14   Article, "Genital talc         169
                  exposure and risk of ovarian
22                cancer."
23   Exhibit No. 15   Article, "Perineal talc use    180
                  and ovarian cancer."
24
25
```

Page 6

EXHIBIT INDEX (CONTINUED)

Exhibit No. 16   Article, "Genital use of talc      192
                 and risk of ovarian cancer: A
                 meta-analysis."

Exhibit No. 16A  Article, "Genital use of talc      197
                 and risk of ovarian cancer: A
                 meta-analysis."

Exhibit No. 17   Study, "Systematic review and      203
                 meta-analysis of the
                 association between perineal
                 use of talc and risk of
                 ovarian cancer."

Exhibit No. 18   Article, "The relationship         232
                 between perineal cosmetic
                 talc usage and ovarian talc
                 particle burden"

Exhibit No. 19   Collection of tests from           260
                 John Hopkins' deposition, his
                 Exhibit No. 24.

Exhibit No. 20   Collection of tests from           263
                 John Hopkins' deposition, his
                 Exhibit No. D-1, including
                 "The whole story."

Exhibit No. 21   "IARC monographs on the            274
                 evaluation of carcinogenic
                 risks to humans.  Volume 93 -
                 Carbon black, titanium
                 dioxide, and talc," Lyon,
                 France, 2010.

Exhibit No. 22   Article, "Perineal use of          279
                 talc and risk of ovarian
                 cancer."

Exhibit No. 23   Testing document from              302
                 Ms. Pier's deposition, Pier
                 Exhibit No. 47.

Exhibit No. 24   Copies of Dr. McTiernan's          303
                 invoices to Ms. Parfitt.

Page 7

EXHIBIT INDEX (CONTINUED)

Exhibit No. 25   Rule 26 expert report of Anne      304
                 McTiernan, MD, PHD, dated
                 November 16, 2018.

Exhibit No. 26   "Draft screening assessment,"      306
                 dated December 2018.

Page 8

BE IT REMEMBERED that on Monday, January 28, 2019, at 1301 Second Avenue, Suite 2000, Seattle, Washington, at 9:11 a.m., before Terilynn Simons, Certified Court Reporter, CCR, RMR, CRR, CLR, appeared ANNE MCTIERNAN, PH.D., the witness herein;

WHEREUPON, the following proceedings were had, to wit:

<<<<<< >>>>>>

VIDEOGRAPHER:  We are now on the record.  My name is Anthony Bocci.  I am a videographer for Golkow Litigation Services.  Today's date is 1/28/2019, and the time is 9:11 a.m.

This video deposition is being held at 1301 Second Avenue, Suite 2000, Seattle, Washington 98101 in the matter of In Re Johnson & Johnson Talcum Powder Products Marketing Sales Practices and Products Liability Litigation, for the United States District Court, District of New Jersey.

The deponent is Dr. Anne McTiernan.

Will Counsel please identify themselves for the record.

MS. PARFITT:  Good morning.  Michelle Parfitt, counsel for the plaintiffs.

Page 9

MS. GARBER:  Good morning.  Cynthia Garber on behalf of the plaintiffs.

MR. GOLOMB:  Richard Golomb on behalf of Plaintiffs.

MS. ERFLE:  Nancy Erfle on behalf of Imerys Talc America.

MR. LOCKE:  Tom Locke from Personal Care Products Council.

MR. ANDERTON:  Michael Anderton for PTI Royston, LLC and PTI Union, LLC.

MR. HALPERIN:  Benjamin Halperin for Johnson & Johnson.

MS. GUTIERREZ:  Susan Gutierrez for Johnson & Johnson.

MR. WILLIAMS:  And Bart Williams for Johnson & Johnson.

VIDEOGRAPHER:  Thank you.

Will the court reporter now please swear in the witness.

ANNE MCTIERNAN, PH.D.,  having been first duly sworn
                by the Certified Court Reporter,
                testified as follows:
/////
/////

Anne McTiernan, Ph.D.

| Page 10 | |
|---|---|

EXAMINATION

1   BY MR. WILLIAMS:
2   Q   Good morning, Dr. McTiernan.
3   A   Good morning.
4   Q   We just met this morning.  My name is Bart Williams, and
5       I represent Johnson & Johnson in this matter, which is
6       pending in the District of New Jersey Federal Court.
7           Are you aware of that?
8   A   Yes.
9   Q   Have you ever had your deposition taken before?
10  A   Never.
11  Q   The way this will work is I'll ask you questions.
12      Counsel may interpose objections to my questions.  There
13      will be no judge here ruling on the objections, and after
14      the objections, if any, you are supposed to answer the
15      question.
16          Do you understand that?
17  A   Yes.
18  Q   My understanding is that you have provided us with a USB
19      drive; is that correct?
20  A   Michelle Parfitt provided you with that drive, yes.
21  Q   Are you aware of what's on that drive?
22  A   Yes.  It's all the documents that I've used in forming my
23      opinion.
24  Q   Are all of the files on the USB drive documents that you

Page 11

1       considered in connection with your opinions in this case?
2   A   Yes.
3   Q   Are there any other files on the USB drive?
4   A   Not to my knowledge there are no other files.
5   Q   Can you be a little bit more particular about what types
6       of documents, categories of documents, are contained on
7       the drive?
8   A   So these will be scientific manuscripts published in
9       peer-reviewed journals.
10          They will be some expert testimony.
11          There was government reports, and I don't have the
12      full list right in front of me, so there are hundreds of
13      these things, but in general classifications, I think
14      that is-- that covers it generally.
15  Q   Those are all the things you recall at this time?
16  A   That's what I recall.
17          My report should be on there as well, my CV, and
18      government reports of-- other expert reports-- if I
19      mentioned that.
20  Q   Let me stop you there.
21  A   Yeah.
22  Q   Does the USB drive contain all of the materials that were
23      just recently produced to the defense in the case a few
24      days ago, which were entitled, "Additional materials"
25      that you had reviewed?

Page 12

1       MS. PARFITT:  If I may, I am not sure
2   that Dr. McTiernan knows that.
3       The additional materials, they are not, to my
4   knowledge, on that thumb drive.
5       It was a list of some additional materials.  I'm not
6   sure that she's reviewed them all, and please feel free
7   to make that inquiry, if you will, but I don't believe,
8   Mr. Williams, they may be included on that thumb drive.
9       That thumb drive should include the report, the
10  references to the report.
11      MR. WILLIAMS:  Okay.
12  Q   (By Mr. Williams)  Dr. McTiernan, when were you first
13      approached about any involvement in talcum powder
14      litigation?
15  A   It should have been 2016.
16  Q   And by whom were you approached?
17  A   By Ms. Parfitt.
18  Q   Michelle Parfitt, counsel who is--
19  A   Yes.
20  Q   One thing I should have told you, in order for the court
21      reporter to take down everything that is said, you need
22      to wait until I'm completely finished--
23  A   Oh, sorry.
24  Q   --with my question.
25      You should take a pause and then answer the

Page 13

1       question, okay?
2   A   Mm-hm, okay.
3   Q   Otherwise, she has to cut off part of the question, write
4       down your partial answer, and then the rest of my
5       question.
6           Do you understand that?
7   A   Okay, yes.
8   Q   So the first person who approached you was Michelle
9       Parfitt?
10  A   Yes.
11  Q   Do you remember--
12  A   For this-- yes, for this litigation, yes.
13  Q   When in 2016 did Ms. Parfitt approach you?
14  A   I don't have that in my head.
15          We should have a record of that first interaction.
16  Q   I will just get your memory for a--
17          Was it winter, spring, summer or fall?
18  A   It would be late summer.
19  Q   Did Ms. Parfitt contact you at your place of business?
20  A   She approached me first by an e-mail at my institutional
21      e-mail address, yes.
22  Q   And what is that e-mail address?
23  A   At that time it was probably still amctiern@fhcrc.
24          My institution has changed the middle part to
25      FredHutch, so I believe she did the first one.

Anne McTiernan, Ph.D.

Page 14

1    Either one goes to the same place.
2  Q  Have you known Ms. Parfitt or any of the other
3    plaintiffs' lawyers prior to their contacting you?
4  A  No, I did not.
5  Q  How long after Ms. Parfitt first contacted you did you
6    agree to work with them in connection with the talcum
7    powder litigation?
8  A  It was approximately two months, and my institution
9    requires that I get permission for doing such consulting,
10   so the process took approximately two months before I
11   received approval.
12 Q  As of late summer 2016, when Ms. Parfitt first contacted
13   you, what institution are you talking about?
14 A  Oh, so Fred Hutch Cancer Research Center in Seattle.
15 Q  And if it took two months, that would mean that it was
16   late summer, early fall when you had received approval;
17   is that correct?
18 A  I believe, yes.
19 Q  And that's late summer, early fall of 2016, right?
20 A  I believe, yes.
21 Q  How much per hour are you billing for the literature
22   review and preparation for your report in this matter?
23 A  That was $450 an hour.
24 Q  At what rate are you charging for your time spent
25   providing deposition testimony?

Page 15

1  A  $650.
2  Q  Is that the same amount that you would charge for hearing
3    testimony if you were to testify at the Daubert, and
4    that's D-A-U-B-E-R-T, hearing in the summer of 2019?
5  A  Yes.
6  Q  Do you charge for travel related to your work as an
7    expert witness, separate and apart from any work that you
8    may do while traveling?
9  A  I have not previously been an expert witness, so I can't
10   give you an answer on what I usually do.
11 Q  So this is the very first time in your career where you
12   have served as an expert witness; is that correct?
13 A  That's right.
14           (Exhibit No. 1 marked
15            for identification.)
16
17 Q  (By Mr. Williams)  We have marked as Deposition Exhibit
18   No. 1 the deposition notice, and we will hand that out to
19   you through your counsel.
20        MS. PARFITT:  I believe you have that,
21   Anthony, the first notice.
22 Q  (By Mr. Williams)  Do you have Exhibit No. 1, the
23   deposition notice, in front of you?
24 A  Yes.
25 Q  Is this something you have seen before?

Page 16

1  A  Yes.
2  Q  When did you first see this?
3  A  Approximately a month ago.
4  Q  In response to this deposition notice, which lists
5    certain categories of documents, have you brought any
6    documents with you here today?
7  A  We have documents for reports that were available only
8    recently, so too recent to have them on the thumb drive,
9    so these include the Health Canada report, weight of
10   evidence, the screening-- the draft screening assessment,
11   risk management scope, information sheet, key messages,
12   and a "Draft systematic review of meta-analysis" by
13   Taher, so it's a signed manuscript.
14 Q  Anything else?
15 A  These others are all in my list of documents.  These are
16   just copies of them.
17 Q  So just let me clear that up.
18        You have just mentioned that there are some reports
19   in--
20 A  The Health Canada report.
21 Q  Let me just take them one at a time.
22 A  I'm sorry.
23 Q  You listed the Health Canada report, correct?
24 A  Yes.
25 Q  Something called the draft screening assessment?

Page 17

1  A  So these are all part of the Health Canada report.
2    These are the components of it.
3        A screening assessment document, weight of evidence
4    document, a document called "Risk management scope," one
5    called-- the title is, "Talc - potential risk of lung
6    effects and ovarian cancer."  I am calling it key
7    messages because that's the first title underneath that.
8        There's a talc information sheet.
9        And a government of Canada talc sheet.
10       It looks like it's a public messages sheet.
11       The last thing is a systematic review of
12   meta-analysis of the association between perineal use of
13   talc and risk of ovarian cancer by Taher, et al.
14 Q  And let me ask you to go a little bit more slowly when
15   you read today so that the court reporter can get it
16   down.
17       Is that okay with you?
18 A  Yes.
19 Q  Is it accurate to say that the items you have just listed
20   were not in your possession at the time that you prepared
21   your report that has been provided in this case?
22 A  That is correct.
23       They were published after that period.
24 Q  Is it accurate to say that none of the materials that you
25   have in front of you now were able to inform the opinions

Anne McTiernan, Ph.D.

Page 18

1   that you expressed in the report, which predated your
2   receipt of those materials?
3   A  The Health Canada report, that is true for.
4        However, the other documents that I have here, one
5   is a paper that I cited from Blount.
6        One is information from the FDA website, which is--
7   I was able to access before doing my report.
8        Then the last thing is-- I'm sorry, that is a
9   deposition of Dr. Blount held last April, so I had access
10  to that earlier as well.
11  Q  Let's do this, we previously went through a list of
12  materials, most of which related to the Health Canada
13  report.
14       Do you remember that?
15  A  Yes.
16  Q  Other than that set of materials that you previously
17  described, is everything in the blue folder that's in
18  front of you, that you have brought with you today, a
19  duplicate of another report that has already been
20  produced to us?
21  A  Yes.
22       There was also one list here of additional
23  materials, so that should have been-- additional
24  materials to Dr. McTiernan, and that should be in your
25  list of what you have as well.

Page 19

1   Q  We are going to mark a copy of that additional materials
2   list in a moment, but for now, is it accurate that at the
3   time that you prepared your report in this case, which
4   was submitted to us in November of 2018, you had not
5   reviewed the additional materials list materials that you
6   have just pointed to?
7   A  That is correct.
8        Those were not available at that time.
9   Q  Let's mark as Exhibit No. 2 to the deposition a copy of
10  your expert report from November of 2018.
11       I think your counsel already has that.
12            (Exhibit No. 2 marked
13              for identification.)
14
15  Q  (By Mr. Williams)  Is the document marked Exhibit No. 2 a
16  copy of the expert report that you prepared in this case?
17  A  Yes, it is.
18  Q  It's dated November 16th, 2018?
19  A  Yes.
20  Q  You have a copy of that report in front of you that you
21  are holding right now; is that right?
22  A  Yes.
23  Q  Does the copy that you are holding right now have notes
24  on it?
25  A  Yes, it does.

Page 20

1   Q  We will take a look at that during a break and perhaps
2   get a copy of it.
3   A  Okay.
4   Q  When were the notes that you have written on your expert
5   report written on the report?
6   A  In the past week.
7        I realized, as I was reviewing and preparing, that I
8   had not used a program that would give the full name of
9   the references, so to aid in my review, I wrote in the
10  first author of the documents, the manuscripts that I was
11  referring to.
12       Everything listed here is-- that I've written is the
13  first author of an article, and then I've also underlined
14  a few places to jog my memory.
15  Q  Other than what you've just described, are there any
16  other notations that appear on the report document?
17  A  No, not to my knowledge, no.
18  Q  Did you bring with you today any invoices reflecting
19  statements that you have given to plaintiffs' counsel for
20  payment?
21  A  I did not bring them myself, but I believe you have them.
22       MS. PARFITT:  We did-- we have them.
23       If we can just take a look at them-- they were just
24  sent this morning to us, to my office, so if I could have
25  a chance to look through them, and maybe after the break

Page 21

1   we can get them marked.
2        Would that be appropriate?
3            MR. WILLIAMS:  That's fine.
4            MS. PARFITT:  The only other thing I
5   ask, Mr. Williams, could we perhaps note the Exhibit 1A,
6   the objection to the notice of depo?
7            MR. WILLIAMS:  Sure.
8            MS. PARFITT:  Thank you.
9            (Exhibit No. 1A marked
10             for identification.)
11
12  Q  (By Mr. Williams)  Your counsel-- we have premarked as
13  Exhibit No. 1A the objections that were served by
14  Plaintiffs' counsel to the deposition notice that we
15  provided.
16       Have you seen that before?
17       It's in front of you now.
18  A  This, no, I have not.
19  Q  So you have never seen the objections?
20  A  No, I have not.
21  Q  Did counsel consult with you at all at the time that was
22  prepared?
23  A  No.
24  Q  Let's go back to the point in time when you first spoke
25  with plaintiffs' counsel.

Anne McTiernan, Ph.D.

Page 22

1     You said Ms. Parfitt reached out to you by e-mail at
2   your institution, which was the Fred Hutch Institution;
3   is that right?
4   A  Yes.
5   Q  Was anyone else on the phone?
6   A  No.
7   Q  How long was that call?
8   A  I don't remember.
9     I think it was brief, but I don't remember.
10  Q  And you said "I think" that it took a few months for the
11    process at your institution to be completed; is that
12    right?
13  A  Yes.
14  Q  How long after that first approach by Ms. Parfitt in the
15    summer, late summer, of 2016 did you decide that you
16    would in fact want to serve as an expert in this matter?
17  A  I decided within a week that I would be interested, but I
18    am required to do this process at my institution which
19    involves informing my division director and the senior
20    vice presidents of the institution as well as the
21    president, and in aiding that, our legal counsel reviews
22    all of these requests to do such consulting.
23    So that process happened to take a while.
24    This time, I'm not sure.  I think somebody was on
25    vacation, so that's why it took two months, so during--

Page 23

1   in order to start the process, I had to be interested in
2   doing this, so that's why I did it, but I couldn't firmly
3   say I could do it until they gave me approval.
4   Q  In that week's period of time, between the time
5     Ms. Parfitt first contacted you and the time that you
6     made the decision to participate in this litigation as an
7     expert, what, if any, documents relating to talcum powder
8     and ovarian cancer did you review?
9   A  I had already known some of the literature, some of the--
10    for example, the pooled analysis by Terry, et al., I had
11    already reviewed that in the past, and I think I did some
12    preliminary searches through Medline to see what the
13    available data were, but I did not do a systematic
14    review.
15    I was not able to share that with the counsel, who
16    was Ms. Parfitt at this point, because I wasn't able to
17    officially consult, but I was curious.  I wanted to know
18    what the data was looking like, what papers were
19    available.
20  Q  Other than the Terry 2013 article that you mentioned and
21    some preliminary searches that you did on Medline, is
22    there anything else you did in that week's period of
23    time?
24  A  In that week?  I don't recall anything else in that
25    period.

Page 24

1   Q  When you say you did preliminary searches on Medline, can
2     you recall any articles that you came up with?
3   A  I previously had already reviewed for the New York
4     Times-- when they contacted me about my scientific
5     opinion or my clinical opinion of this matter, I had been
6     given two of the cohort study papers, one by Gertig, et
7     al., and one by Houghton, et al., and so I briefly
8     reviewed those, and-- as well as the Terry case-control
9     study in order to talk with the New York Times, so I knew
10    about those papers.
11    In the epidemiology field, we often see things over
12    time.
13    This has been something that has been studied for
14    quite a few years, so I've been aware of the issue but
15    have not done a systematic review and not done a causal
16    analysis, was not a focus of my research at that point.
17  Q  At the time that you agreed to participate as an expert
18    in this litigation, is it accurate to say that the
19    studies that you had reviewed included the Terry 2013
20    analysis, the Gertig cohort study, the Houghton cohort
21    study, you had reviewed as all those things before you
22    decided to participate; is that true?
23  A  I had read those, yes.
24  Q  And you can't remember anything else, as you sit here
25    right now, that you had reviewed before you made that

Page 25

1   decision?
2   A  I can't remember others.
3   Q  Were there others or not?
4   A  I can't remember.
5     I believe that I only looked at those two cohort
6     studies and the Terry pooled analysis.
7   Q  Let me ask you to focus on Exhibit No. 2, your report.
8     Do you have that in front of you?
9   A  Yes.
10  Q  Does that report contain all of the opinions that you
11    intend to offer at any hearing on this matter?
12  A  Yes, unless-- so you are talking about any future-- any
13    future questioning I face in the court?
14    If there's more research that is published by that
15    time, I would want to know about it to see if it affects
16    my opinion or what the research is.
17    As a scientist I would want to keep up to date, but
18    for right now, this is my scientific opinion, what's in
19    this report.
20  Q  Today is my opportunity to ask you questions about your
21    opinions in this matter.
22    You understand that, right?
23  A  Yes.
24  Q  Have you modified your opinions in this litigation beyond
25    the opinions set forth in Exhibit No. 2?

Anne McTiernan, Ph.D.

Page 26

1  A  No, I have not.
2  Q  Are there any few or additional opinions that you expect
3     to testify to at any hearing in this matter, other than
4     what is contained in your report, Exhibit No. 2?
5  A  Nothing that I foresee, that I expect.
6  Q  Did you personally type the report that's marked as
7     Exhibit No. 2?
8  A  Yes, I did.
9  Q  Did anyone assist you in the preparation of your report?
10 A  The only assistance I had was occasionally if I couldn't
11    get a paper myself, through my own institutional library,
12    then we have an administrative assistant that I can ask
13    for that, and I believe I asked for a couple of papers
14    through that source.
15       There were a couple of times when I asked
16    Ms. Parfitt's firm if they had a paper.  This was quite a
17    few months after that period, perhaps half a year or
18    longer by the time I asked them.
19 Q  When did you start drafting the litigation report marked
20    as Exhibit No. 2?
21 A  That would have been winter of 2016 to spring of 2017.
22 Q  Since you typed the report yourself, am I right that you
23    have a file of it either at home or on your office
24    computer?
25 A  Yes, on my home computer.

Page 27

1  Q  From start to finish did you work in the same file to
2     draft this report or did you have different files or
3     drafts?
4  A  I copied different drafts as a way of backing up.
5  Q  Have you maintained the drafts, the iterations, as it
6     went along?
7  A  Yes.
8  Q  How many hours would you say you have spent preparing the
9     litigation report since the winter of 2016 to the spring
10    of 2017 when you started writing it?
11 A  I would say approximately 240 hours.
12 Q  And on what do you base that estimate?
13 A  On invoices that I submitted through December 2018, plus
14    an additional 25 hours since that time.
15 Q  I take it from your last answer, that up through December
16    2018 you billed 240 hours total; is that accurate?
17 A  No.
18       As of December 2018 I believe it was 211 hours.
19 Q  And is that 211 hours the total amount of time that you
20    have spent grappling with the issues in this litigation
21    or is that just the time that you have spent writing the
22    report?
23       MS. PARFITT:  Objection; form.
24    You may answer.
25       THE WITNESS:  It was since the time I

Page 28

1     was given approval to work on this, so anything I read
2     before that, I did not charge my time.
3  Q  (By Mr. Williams)  Is it accurate to say that the 240
4     hours reflects all of the hours, through today, that you
5     have spent on this matter?
6  A  Yes.
7  Q  And you broke it down to 211 hours through December 2018
8     and another 25 hours since that time, correct?
9  A  Approximately 25 since that time, yeah.
10 Q  Let me ask you to look at your report and refer you to
11    Pages 78 through 84.
12       You identify 127 documents or other materials as
13    references, correct?
14 A  Yes.
15 Q  Are those the materials that you are relying on to form
16    the basis of your opinions in this case?
17 A  Yes, although there are different materials that I was
18    able to review after the report was done, and they help
19    support my opinion.
20 Q  And are those additional materials, materials that we
21    have already discussed this morning?
22 A  Yes.
23 Q  Did the Plaintiffs' lawyers provide you with any of the
24    references that are contained in Nos. 1 through 127?
25 A  I believe some of them provided if it was one that I

Page 29

1     couldn't obtain on my own.
2        A few of the mechanistic studies, I believe.
3  Q  If you can identify them by number, that would be good.
4  A  Yeah.
5        Well, certainly some of the depositions I had no-- I
6     did not access myself, so No. 77, 78, 79.
7        The Longo reports, so 79 through 83.
8        84 as well they provided.
9  Q  Anything else?
10 A  I am trying to search.
11       They sent me some of the IARC monographs, but I had
12    access previously to them myself, so I'm not sure which
13    way you would want to count that, if I accessed the IARC
14    myself online, but that-- Ms. Parfitt also sent their
15    copy of it, so from two sources I had the same things.
16       These are the IARC monographs, "The evaluation of
17    carcinogenic effects," No. 40 and 42.
18       I think there was a third IARC report.
19 Q  Would that be No. 74?
20 A  Yes.
21 Q  Other than items 40, 42, 74, and 75 through 84, are there
22    any other materials that were provided to you by
23    plaintiffs' counsel?
24 A  I am searching here.
25       Some of the mechanistic studies they were able to

Anne McTiernan, Ph.D.

Page 30

1  provide when I couldn't get them myself, and some of
2  these journals were journals that were difficult to get,
3  so I believe 85 and 90.
4  Q  Had you identified Items 85 and 90 prior to the time they
5  were provided to you or did Counsel simply provide them
6  to you?
7  A  No, I don't think they-- no, they didn't simply provide
8  them to me.
9     At the time that I added these, these were added
10 toward the end of the time that I was preparing the
11 report.
12    I was able to see some other expert reports.  One
13 was a gynecologist -- I believe it was Plunkett -- who
14 mentioned that there were-- that-- the issue of
15 transporting had some additional references that I did
16 not have.
17    I had, originally, some mechanism-related papers
18 related to migration of talcum powder products through
19 the vaginal tract, and I didn't-- there were some
20 additional ones here that I had not known about.
21    I believe Egli and Sjosten were two-- sorry, 85 and
22 90.
23 Q  References 77 through 84 appear to be deposition
24 transcript exhibits and expert reports in litigation.
25    Do you see that?

Page 31

1  A  Yes.
2  Q  Have you reviewed all of those transcripts?
3  A  I skimmed 77 and 78 and looked at some of the exhibits
4  that they had with them.
5     I skimmed Longo, but I read through the November
6  and-- this is another one-- these are not dated here-- of
7  February and November.
8  Q  Let's take them one a time on Longo.
9     No. 79 says Longo, Rigler, April 2017.
10    Did you review that?
11 A  Only skimming that.
12    For all of these, I looked at the summary in the
13 beginning, which presented the numbers of samples that
14 were tested and the numbers that were considered to have
15 asbestos.
16 Q  So you only reviewed the summaries; is that accurate?
17 A  Summaries, yes.
18 Q  And that applies to 77 through 83?
19 A  Through 83, yes.
20 Q  Take a look at Page 84 of your litigation report.
21    Do you have that in front of you?
22 A  Yes.
23 Q  It lists here, "Additional materials and data
24 considered," and it lists thereafter 113 items.
25    Do you see that?

Page 32

1  A  Yes.
2  Q  Have you read all of those items?
3  A  Not in full.
4     Do you want me to go through them one at a time?
5  Q  Let me just ask you generally, what's the difference
6  between the references to your report and the items
7  listed as additional materials and data considered?  Why
8  did you spread them out like that?
9  A  These up to 127 were available at the time that I was
10 actively writing my report.
11    Some of these other documents came along later and
12 were available to me, so the counsel did provide them.
13    Some of them were-- some of them were earlier, these
14 Fletcher papers on-- on some of the mechanistic work was
15 done earlier.
16    Many of these are-- to my knowledge they were
17 exhibits that were available from the case from the law
18 firm.
19    One of these is a repeat.  38 was listed originally.
20    I think there's a little bit of variability here.
21 Q  Let me stop you there for a moment.
22 A  Yes.
23 Q  Did you read each of the 113 items in their entirety?
24 A  No, I did not.
25 Q  In describing the difference between the additional

Page 33

1  materials and data considered and the 127 references that
2  we've already gone over, is it accurate to say that the
3  additional materials were all provided by plaintiffs'
4  counsel?
5     MS. PARFITT:  Objection to form.
6     THE WITNESS:  It's not true.
7     Some of these I had myself--
8  Q  (By Mr. Williams)  Could you please identify all of the
9  items on here, of the 113 items, that you had yourself
10 prior to them being provided by plaintiffs' counsel?
11 A  Okay.  No. 2, American Cancer Society, I accessed their
12 website several times.
13    31 is a Hartge paper on talc and ovarian cancer, so
14 I accessed that myself.
15    This isn't a Hartge paper title, so that's one
16 problem, one reason I'm struggling here, so I assume that
17 this is another review that she has written, Hartge, but
18 I'm not sure if it's the same as the paper that I
19 referenced as one of my case-control studies that are
20 referenced.
21    The same issue with 33, 34 because I did reference
22 Henderson, these are migration papers, so I'm not sure
23 about that.
24    No. 37 I do consider.  It was a subset of the other
25 Huncharek review, so I did see this earlier.  I just did

Anne McTiernan, Ph.D.

Page 34

1    not reference it for my report.
2        38 is the same IARC monograph paper-- work that is
3    referenced in the paper.
4        Institute of Medicine I was not able to review.
5        These other things look like they are Johnson &
6    Johnson or-- no-- other industry documents.
7    Q   Let me stop you there for a moment.
8        Remember, my question is simply:
9        Of the 113 items, please just list the numbers that
10   you had before they were provided by Plaintiffs' counsel.
11   That's all I need.
12   A   Okay.  Sorry.
13       67 I had previously, 79, 80, 87, 88, 89, 90, 91.
14       92 I believe I referenced earlier, so 92, 93, 94,
15   100-- can you remind me, is this for-- to distinguish
16   what was in my report or what I obtained on my own?
17   Q   What you obtained on your own.
18   A   Okay.  103 I obtained on my own.
19       That's it.
20   Q   All of the items, other than those that you just listed,
21   were provided to you by Plaintiffs' counsel, correct?
22   A   I believe so, yes.
23   Q   You did not read each and every page of the materials
24   that were provided to you by Plaintiffs' counsel; is that
25   true?

Page 35

1    A   I did not, that's true.
2    Q   Let me direct your attention to No. 47 through 65 on the
3    list that begin with the letters JNJ.
4        Do you see that?
5    A   Yes.
6    Q   Do you understand that these are internal Johnson &
7    Johnson documents?
8        Is that right?
9    A   I believe you.
10       I don't know what they are from looking at just the
11   numbers.  I would have to reference back to my documents.
12   Q   No. 40 through 46 all start with the word Imerys,
13   I-M-E-R-Y-S.
14       Do you see those?
15   A   Yes.
16   Q   Do you understand those to be internal Imerys documents?
17   A   Again, I would have to look and see what they look like.
18   Q   Did you ask Plaintiffs' counsel to provide you with the
19   Imerys and Johnson & Johnson documents?
20   A   No, I did not.
21   Q   So they just gave those to you?
22   A   I asked to see what available evidence there was, and
23   the-- the evidence that had been collected for the case
24   in general, so that was a very general question, and they
25   provided these.

Page 36

1    Q   Is that how you phrased it, "what available evidence
2    there was"?
3    A   As the questions came along of various-- of parts of
4    data-- so this came up with a question of what other
5    constituents are there in Johnson & Johnson Baby Powder
6    and Shower to Shower, and I relied first on published
7    data from Blount and Gordon, but I was interested in what
8    other testing had been done to see what are the
9    constituents, because otherwise there's no information,
10   but it was a very general question.  I didn't know what
11   was available.
12   Q   In response to that question that you just described, the
13   items that are listed here and the numbers that I just
14   gave you, 40 through 47 for Imerys-- excuse me, 40
15   through 46 for Imerys, and 47 through 65 for Johnson &
16   Johnson, are the only documents that were provided to
17   you?
18       MS. PARFITT:  Objection.
19       THE WITNESS:  For that, I would also
20   have received Longo, but one issue is I don't know-- from
21   looking at these numbers, I don't have them memorized
22   what they are.
23       I would have to look them up.
24       I do know that the Longo reports are the results of
25   testing of constituents of the products.

Page 37

1    Q   (By Mr. Williams)  And as you sit here today, you do not
2    know whether or not the documents that are listed in
3    References 40 through 65 are in fact authentic documents
4    of Johnson & Johnson or of Imerys, right, one way or the
5    other?
6        MS. PARFITT:  Objection; form.
7        THE WITNESS:  I don't have memorized
8    what these are.
9    Q   (By Mr. Williams)  Pardon me?
10   A   I don't have memorized what these are, what these numbers
11   refer to.
12   Q   With respect to any of the internal company documents
13   that you have reviewed from either Imerys or Johnson &
14   Johnson, as you sit here now, you do not know whether any
15   of those documents are in fact authentic Johnson &
16   Johnson or Imerys documents, correct?
17       MS. PARFITT:  Objection; form.
18       THE WITNESS:  When I looked at any of
19   these documents that were provided, they had stickers on
20   them, I noticed, like-- so exhibit numbers, so I assumed
21   these were exhibit numbers for some litigation.
22       That's all I know.
23   Q   (By Mr. Williams)  Are you relying on any of those
24   internal company documents to form the basis of your
25   opinions in this case?

Anne McTiernan, Ph.D.

1    MS. PARFITT:  Objection; form, vague.

2    THE WITNESS:  I looked through them.

3    I did not read them in enough detail to have them form

4    the primary basis of my opinion.

5    Q  (By Mr. Williams)  Do they form something other than a

6    primary basis for your opinion?

7    A  They added to some-- to consideration of what might be

8    contained in these products.

9    Q  Do you have any idea what percentage of the entire

10   document production from Johnson & Johnson these 18

11   documents comprised?

12   A  I do not.

13   Q  When you asked Counsel to provide you with what some of

14   the evidence was with respect to the question you were

15   being asked to consider, did you ask for both evidence

16   that tends to show that, for example, Johnson's Baby

17   Powder contains asbestos, and for evidence that it does

18   not contain asbestos?

19   A  I asked about totality of evidence.

20   I didn't use the words, "Please show me where it

21   contains and where it doesn't."

22   One thing I'm interested in is if something contains

23   it, that's very concerning to me, so whether it's 50

24   samples out of 100 that have asbestos in it, I would be

25   concerned, but if it's only five, so even if more

1    negative samples were provided, and there's only five

2    that are positive, that's still concerning.

3    Q  Were you provided any negative samples?

4    A  I did see evidence that some were negative, yes.

5    Q  Where did you see that?

6    A  I saw that in the Longo report, so there was-- each

7    report had a different percent that were positive.

8    Some were 50 percent positive, some 66 or 70 percent

9    positive, so that means the inverse, 30 to 50 percent

10   were negative, did not have asbestos.

11   Also, from my perusal of the Johnson & Johnson and

12   Imerys documents that seem to be exhibits, it looked like

13   there were some, but sometimes it was small amounts but

14   sometimes it was larger, but that some contamination or

15   inclusion of asbestos, but many times not.

16   There was also an FDA website that was able to look

17   at where they only tested, however, two products, two

18   bottles of Johnson & Johnson, and those were both

19   negative.

20   Q  In the normal course of your work outside of litigation,

21   do you review internal company documents for any reason?

22   A  No, not-- I would not have a reason to do that.

23   Q  When setting out to conduct research on a medical or

24   other scientific question, outside of litigation, have

25   you ever sought internal company documents related to the

1    question at issue?

2    MS. PARFITT:  Objection; form.

3    THE WITNESS:  No, I don't-- well, it

4    depends how you define a company, because occasionally if

5    you're doing a full review of the scientific literature,

6    you may-- for example, if you are doing a meta-analysis,

7    they want to request data from other sources that aren't

8    yet in the public domain, and if that study happens to be

9    run through a company, then that could have happened.

10   I can't say it's common.

11   Typically we look at published data-- published

12   scientific data from scientific opinions.

13   Q  (By Mr. Williams)  When drafting a publication on a

14   medical or a scientific question, have you ever sought

15   internal company documents related to the subject matter?

16   MS. PARFITT:  Objection; asked and

17   answered.

18   THE WITNESS:  So I'm curious, is that

19   the same question as before?  Did you just ask that

20   question-- are you asking it again?

21   Q  (By Mr. Williams)  I'll ask it another way.

22   A  Okay.

23   Q  Out of the multiple hundreds of publications that your

24   resume lists with you as an author, how many cite to

25   internal company documents?

1    MS. PARFITT:  Objection; form.

2    THE WITNESS:  I believe that none do.

3    Most of my papers are with data from my own studies.

4    Q  (By Mr. Williams)  Now, you were asked in this matter to

5    review the current state of scientific literature

6    regarding talcum powder products and to opine on whether

7    those products cause ovarian cancer.

8    Is that accurate?

9    A  Yes.  I was asked to do a causal analysis and to form an

10   opinion on the association between use of talcum powder

11   products and risk of ovarian cancer.

12   Q  Were you given any other questions to answer or opine on?

13   A  So I'm just looking at your question.  I'm sorry.

14   I think this summarizes the question I was asked to

15   answer.

16   Q  You were not retained to provide an opinion about whether

17   or not talc can cause pleural or peritoneal mesothelioma,

18   were you?

19   A  I was not, no.

20   Q  And you are not in fact providing an opinion on that

21   subject?

22   A  I am not.

23   Q  Did you in fact review what you believe to be the current

24   state of scientific literature regarding the question of

25   whether talc can cause ovarian cancer?

Anne McTiernan, Ph.D.

Page 42

1    A  Yes, I believe I did.
2    Q  Did you consider literature and sources that refuted an
3       association or causal association between talc and
4       ovarian cancer?
5    A  Yes, I did.
6       I looked at the entirety of literature as I knew
7       it-- as I was able to find it.
8    Q  Did you consider literature and sources that have
9       concluded that the totality of the scientific evidence is
10      insufficient to find a causal association between talc
11      and ovarian cancer?
12              MS. PARFITT:  Objection; form.
13              THE WITNESS:  Yes.
14   Q  (By Mr. Williams)  When you wrote your report setting
15      forth your opinions in this case, did you identify the
16      sources that refuted the propositions that you were
17      making?
18   A  Those papers would have been part of my report, yes.
19   Q  So is it your testimony that the report that you have in
20      front of you, Exhibit No. 2, actually identifies the
21      sources that refuted the propositions that you were
22      making?
23   A  Yes.
24      If these were papers that included data-- so I use
25      data-- I reviewed the data from these studies, and

Page 43

1       regardless of what those studies concluded, I included
2       them in the report.
3    Q  Did you discuss in your report the part or parts within
4       those sources that refuted the propositions you were
5       making, including the data?
6    A  I believe that I discussed in general that-- whether
7       there is evidence of a causal relationship between talcum
8       powder product use and risk of ovarian cancer.
9       I did not, for each paper, reiterate what they
10      concluded.  I looked at their data.
11   Q  If there were parts of a study, for instance, that did
12      not support one of your opinions, did you make a note of
13      that in your report?
14              MS. PARFITT:  Objection; form.
15              THE WITNESS:  If the studies did not
16      show an association between talcum powder product use and
17      risk of ovarian cancer, I included those data, yes.
18      I included it both in the content of the report as
19      well as in the data table that I included at the end of
20      the report, and I included those data.
21   Q  (By Mr. Williams)  If those data did not, for instance,
22      show a dose response related to exposure to talcum powder
23      and the incidence of ovarian cancer, did you note in your
24      report where the data did not support dose response?
25   A  I did note that.

Page 44

1       It's in the table, and in the report I did note
2       where there was a dose response note-- I did note whether
3       there was a dose response seen in the paper.
4       I can't-- let me see, I can look through-- I'm not
5       sure if you want me to look through for each--
6    Q  We'll do that a little later.
7    A  Okay.
8    Q  Let me ask you now to turn to Page 68 of your report with
9       the heading that says, "Conclusion."
10   A  (Witness complies.)
11   Q  Do you have that in front of you?
12   A  Yes.
13   Q  Does that conclusion accurately summarize your opinion in
14      this case on the question of whether or not perineal use
15      of talcum powder products can cause ovarian cancer?
16   A  Yes.
17   Q  Now, your opinion is stated to a, quote, "medical and
18      scientific degree of certainty," closed quote.
19      Do you see that?
20   A  Yes.
21   Q  What do you mean by the use of the term "degree" in that
22      sentence?
23   A  I would say a high degree.
24      I don't put percentages on my opinion.  It's not
25      typical in my field to do that, but I would say with a

Page 45

1       high degree of certainty that based on the totality of
2       evidence, that use of talcum powder products can cause
3       ovarian cancer.
4    Q  Do you believe that perineal use of talcum powder
5       products manufactured today, in 2019, can cause ovarian
6       cancer?
7    A  So talcum powder products, yes.
8       There's no evidence that it would have changed.
9       The evidence from the epidemiologic studies were
10      from people's use decades previously, but then looking at
11      contents of talcum powder products over time it looks
12      like they continue to have constituents that could be
13      carcinogenic, as well as talcum powder by itself has been
14      shown to be carcinogenic, and so I believe that if
15      somebody was using them today, they could still have the
16      same potential for developing ovarian cancer as if they
17      used them 50 years ago.
18   Q  So the answer to my question is that you believe that
19      perineal use of talcum powder products manufactured
20      today, in 2019, can cause ovarian cancer, correct?
21   A  Yes-- yes.
22   Q  Did you reach the opinion, to a degree of medical and
23      scientific certainty, that perineal use of talcum powder
24      products can cause ovarian cancer before or after you
25      were hired by Plaintiffs' counsel?

Anne McTiernan, Ph.D.

Page 46

1  A  After I had conducted a full systematic review of the
2     epidemiology data and mechanistic data, including
3     biologic evidence, and then done a causal analysis,
4     that's when I concluded that these products could
5     increase-- could cause ovarian cancer.
6  Q  So the answer is after you were hired by Plaintiffs'
7     counsel; is that correct?
8             MS. PARFITT:  Objection; misstates her
9     testimony, asked and answered.
10  Q  (By Mr. Williams)  I am looking for a temporal answer.
11     So my question is:
12         Did you reach your conclusions before or after you
13     were retained by Plaintiffs' counsel?
14             MS. PARFITT:  Objection; form, asked
15     and answered.
16             THE WITNESS:  It was after I had done
17     the causal analysis.
18  Q  (By Mr. Williams)  And that was after you were retained?
19             MS. PARFITT:  Objection.
20             THE WITNESS:  That was after I did the
21     causal analysis, which was after I began this project
22     with Counsel.
23  Q  (By Mr. Williams)  Did you consider whether some brands
24     of talcum powder products can cause ovarian cancer but
25     others may not?

Page 47

1  A  The epidemiology data were insufficient to determine
2     whether any particular brand was used by women, except
3     for one study, Cramer, in 2016.
4         It's my understanding that Johnson & Johnson
5     products had the vast proportion of the market share over
6     time, but I did not come to a conclusion that any
7     particular product was causing this.
8         All I know is that use of these products by these
9     women over time increased their risk for ovarian cancer
10     and that it can cause ovarian cancer.
11  Q  So it is your opinion that genital perineal use of
12     Johnson's Baby Powder specifically can cause ovarian
13     cancer, correct?
14  A  Yes, given that it's been shown to contain asbestos,
15     given that it contains talc, which has been shown to be
16     carcinogenic, then I would say yes, it could be-- it
17     could be a cause of ovarian cancer.
18  Q  Let me tease that out a little bit.
19         If the product did not contain asbestos, is it your
20     testimony that-- is it your opinion that genital perineal
21     use of Johnson's Baby Powder can cause ovarian cancer
22     without containing asbestos?
23  A  Yes, even without asbestos, my opinion is that talc can
24     increase risk of ovarian cancer, that there are
25     biological mechanisms, and so that these products could

Page 48

1     cause ovarian cancer.
2  Q  And that is true whether it's Johnson's Baby Powder or
3     any other talcum powder product?
4             MS. PARFITT:  Objection; form.
5             THE WITNESS:  Yes.
6  Q  (By Mr. Williams)  Is it your opinion that genital
7     perineal use of Shower to Shower product specifically can
8     cause ovarian cancer?
9  A  To my knowledge it includes both talc, and some percent
10     may include asbestos and other constituents, and so that
11     would be my opinion, yes.
12  Q  And same question:
13         Even if Shower to Shower product did not contain
14     asbestos, it is your conclusion that because it contains
15     talc, it can cause ovarian cancer, correct?
16  A  Yes.
17  Q  And it's your testimony here today that it has been
18     established, to a degree of medical and scientific
19     certainty, that that is the case?
20  A  Yes.
21  Q  Is it your testimony today that it is accepted in the
22     medical and scientific field that talcum powder causes
23     ovarian cancer?
24             MS. PARFITT:  Objection; form.
25             THE WITNESS:  I would say that many

Page 49

1     scientists, many clinicians do believe that it can cause
2     ovarian cancer.
3  Q  (By Mr. Williams)  My question is different.
4         My question is whether or not, Dr. McTiernan, it is
5     accepted in the medical and scientific community today
6     that exposure to talcum powder causes ovarian cancer.
7  A  And I think I'm having trouble with the word "accepted,"
8     so I am not sure specifically what you mean that it was
9     "accepted."
10         Who it is accepted by, does somebody have
11     guidelines, is somebody giving advice to the public--
12     there are lots of different organizations that you could
13     call "the medical field," so I think that's why I'm
14     having some trouble there.
15         To me it's a question that's not specific enough for
16     me to figure out how to answer it.
17  Q  Well, it's one thing if there is a person in the medical
18     or scientific field who holds an opinion and quite
19     another to say that something is generally accepted in
20     the medical and scientific community that a substance
21     causes cancer; isn't that right?
22             MS. PARFITT:  Objection; form.
23             THE WITNESS:  Yeah, I still have a
24     problem with the word "accepted" because I work in many
25     other areas, and I have seen that there are so many

Anne McTiernan, Ph.D.

Page 50

1  different opinions by clinicians, by scientists about
2  associations, and then it comes to the point of policy
3  and coming up with guidelines.
4      That's why I am having a little problem answering a
5  question of whether it's accepted.
6      I think that for me what I can come up with is this
7  is my opinion from the research that I've done.
8      I can't speak for other medical groups of whatever
9  you are talking about.
10     I'm not sure which groups you are talking about.
11 Q  (By Mr. Williams)  Wouldn't it be accurate to say,
12 Dr. McTiernan, that it is, at best, inconsistent in terms
13 of the medical and scientific community as to whether or
14 not exposure to talcum powder in the perineal area causes
15 ovarian cancer?
16         MS. PARFITT:  Objection; form.
17         THE WITNESS:  Oh, I would say that any
18 exposure, any medical treatment, any medical prevention
19 method is going to be inconsistent, and I do know that
20 IARC has classified talc, even talc without asbestos, as
21 a possible carcinogen, and they have a pretty high bar
22 for whether they're going to consider something a
23 carcinogen, and they were talking about ovarian cancer
24 specifically.
25 Q  (By Mr. Williams)  We'll talk about that a little bit

Page 51

1  later, but let me go back to my question.
2      My question is whether or not it is at best
3  inconsistent, in terms of looking across the available
4  medical and scientific information regarding an
5  association between talcum powder and causing ovarian
6  cancer, to conclude that in fact talcum powder exposure
7  in the perineal area causes ovarian cancer; isn't that
8  true?
9          MS. PARFITT:  Objection; form.
10         THE WITNESS:  So I think I would feel
11 a little better if you are talking now about across the
12 evidence or across all of this research, all of these
13 studies, and there were-- there have been 24 to 25
14 case-control cohort studies that have looked at this
15 information, and when you look at them in totality,
16 either meta-analysis or pooled analysis, you really see
17 clear evidence that ovarian cancer risk is higher in
18 people who have-- and statistically significantly higher
19 in people who have used these products.
20 Q  (By Mr. Williams)  Let me ask you, for purposes of my
21 question, to focus on the medical and scientific
22 community, okay, not your personal opinion of the data.
23     With respect to your survey of the medical and
24 scientific community and its analysis of whether or not
25 exposure to talcum powder in the perineal area actually

Page 52

1  causes ovarian cancer, isn't it accurate to say that that
2  survey is at best inconsistent as to that conclusion?
3          MS. PARFITT:  Objection; form,
4  misstates her testimony-- excuse me, it doesn't misstate
5  her testimony.  It's been asked and answered, clearly.
6          THE WITNESS:  I think-- I think from
7  what you're asking is I've surveyed the medical community
8  and scientific community, which I have not.  I have not
9  surveyed them.
10     My job was to review studies to look at the
11 epidemiologic data.  That was my primary purpose.
12     Then to look at biological mechanisms.
13     And then to do a causal analysis.
14     I did not contact and survey the medical community
15 in this field, which could be vast because we are talking
16 about gynecology, prevention, government bodies,
17 epidemiology-- I just did not-- I was not asked to do
18 that and I did not do that.
19 Q  (By Mr. Williams)  In forming your opinion that perineal
20 talc use can cause ovarian cancer, did you calculate how
21 much talc is needed to cause ovarian cancer?
22 A  I looked at that.  I was not able to determine because
23 there's no-- no study has been able to collect
24 information in enough depth to know how much the
25 individual woman used, exactly how much in a particular

Page 53

1  day she used, and what was the content of the particular
2  bottle that she used or the bottle she used over time,
3  and many of the studies did not also even include enough
4  information to look at how frequently or how often they
5  did, but once they did, then you could see if you had
6  people that used it more often for a longer period of
7  time, that's when there was even a great increase in
8  risk, and that would be a dose response effect.
9 Q  Is the answer to my question "no," you did not calculate
10 how much talc is needed to cause ovarian cancer?
11         MS. PARFITT:  Objection; form, asked
12 and answered.
13 Q  (By Mr. Williams)  I am not asking for the reasons.
14     I am just asking for the bottom line.
15     The bottom line is that you did not calculate how
16 much talc is needed to cause ovarian cancer, correct?
17         MS. PARFITT:  Objection; form.
18         THE WITNESS:  It was not possible to
19 determine exactly how much talcum powder product was
20 used, so therefore it's not possible to determine how
21 much of each dose particular-- of a particular product
22 increases risk.
23 Q  (By Mr. Williams)  In your mind is there a dose of talc
24 that does not cause ovarian cancer when applied
25 perineally?

Anne McTiernan, Ph.D.

Page 54

1  A  There's no evidence that there's any lower threshold
2     than--
3  Q  I-- I'm sorry.  I didn't mean to cut you off.
4  A  So the question is there a dose of--
5  Q  Is there a dose of talc that does not cause ovarian
6     cancer when applied perineally?
7  A  There's no evidence that there's any lower limit to a
8     dose-- to these products that could increase risk.
9  Q  It is your testimony here today that a single dose from a
10    single perineal application of talc is enough to cause
11    ovarian cancer based upon your review of the studies?
12 A  The studies did not give that level of detail, of whether
13    somebody used one dose in terms of ovarian cancer risk.
14       However, if you think of the biology, if this one
15    dose was introduced perineal, then could move up through
16    the vagina, through the cervix and the uterus, and get to
17    just as far as the fallopian tubes, if it sits in there
18    and causes an inflammatory reaction, theoretically one
19    dose could be enough.
20       Typically in epidemiologic studies we look for dose
21    response, so if somebody is using something longer, more
22    time, more frequently, that increases the chance that
23    some of that content could get up into her perineal--
24    sorry, her peritoneal, fallopian tubes, ovaries, but
25    there's no reason that one dose couldn't do that.

Page 55

1     We do know from the biology that one dose of talc
2     injected either into the pleura or into the lungs can
3     cause an inflammatory response.
4  Q  When you say "theoretically one dose could be enough,"
5     you are speculating; are you not?
6          MS. PARFITT:  Objection; misstates her
7     testimony, form.
8          THE WITNESS:  I am saying that we know
9     from other evidence, the biology, that if one dose is
10    injected into the pleura, and I'm talking humans, or
11    inhaled into the lungs, one dose can cause an
12    inflammatory response, so that's why I believe one dose
13    could cause a response in the peritoneal area-- sorry, in
14    the fallopian tube or ovarian area.
15 Q  (By Mr. Williams)  You used the phrase "theoretically one
16    dose could be enough," did you not, in your answer a few
17    moments ago?
18 A  I said that because it would be unethical to introduce
19    one dose of this substance into the fallopian tubes or
20    ovary area, so you couldn't test that in a human
21    directly.
22 Q  My question is different, ma'am.
23       My question is that you are the person in the room
24    who used the phrase "theoretically one dose could be
25    enough" just a few moments ago, correct?

Page 56

1          MS. PARFITT:  Objection; asked and
2     answered.
3          She has responded.
4          THE WITNESS:  I am saying I couldn't
5     find data from the studies about one dose, the effect of
6     one dose on ovarian cancer, but I am saying that one dose
7     could cause inflammation.
8  Q  (By Mr. Williams)  When you said "theoretically one dose
9     could be enough," you were speculating, correct?
10         MS. PARFITT:  Objection; asked and
11    answered, and she has given you the answer, Mr. Williams.
12         THE WITNESS:  I am saying I don't have
13    the data to say exactly.
14 Q  (By Mr. Williams)  You don't have the data to say one way
15    or the other?
16         MS. PARFITT:  Objection; misstates her
17    testimony.
18         THE WITNESS:  I don't have the data on
19    ovarian cancer and one dose.
20         MS. PARFITT:  Mr. Williams, without
21    breaking any train of thought, we have gone about an hour
22    and 15 minutes.  Maybe in an appropriate place, we could
23    take a minute, but I don't want to break your stride.
24         MR. WILLIAMS:  In a minute.  Thank
25    you.

Page 57

1  Q  (By Mr. Williams)  When you said a few moments ago that
2     you believe that even one dose could cause inflammation,
3     based upon your review of the science, have you reviewed
4     scientific literature, any study that says talcum powder
5     causes inflammation, which inflammation causes ovarian
6     cancer?
7  A  The evidence that I was able to look at, because you can
8     not do-- ethically you cannot do a clinical trial where
9     you expose women to talcum powder products in one group
10    and a placebo in another and then follow them forward for
11    30 or 40 years to see if you develop ovarian cancer--
12    because that trial cannot be done, we have to look at
13    different lines of evidence, so we look at the
14    epidemiology, we look at whether materials can be
15    introduced into the peritoneal area and make their way up
16    through the vaginal tract and get to the fallopian tubes
17    or ovaries, and then we know that inflammation does
18    increase risk for ovarian cancer.
19       There have been many studies that show that
20    individuals with high levels of inflammatory markers in
21    their blood, for example, have increased risk for ovarian
22    cancer, and people with inflammatory conditions, again,
23    endometriosis, are at an increased risk for ovarian
24    cancer.
25 Q  Does all inflammation cause cancer, ma'am?

Anne McTernan, Ph.D.

Page 58

1  A  It's not clear that all does, but it certainly increases
2     risk.
3  Q  So the answer is "no," not all inflammation causes
4     cancer?
5           MS. PARFITT:  Objection; misstates her
6     testimony.
7           THE WITNESS:  I am saying that the
8     inflammation-- increased inflammation is associated with
9     increased risk for cancer.
10 Q  (By Mr. Williams)  What types of cancer?
11 A  For example, some inflammatory conditions like Crohn's
12    disease increases risk for colon cancer.
13       Individuals with rheumatoid arthritis have increased
14    risk for lymphoma.
15       Those inflammatory markers that I mentioned, like
16    C-reactive protein and to interleukin 6 or 8, if those
17    are increased, all those are can increase risk for breast
18    cancer, ovarian cancer, colon cancer, and other cancers.
19 Q  Now, you have a medical degree, correct?
20 A  Mm-hm.
21 Q  Is that a "yes"?
22 A  Yes.
23 Q  And you held a license to practice medicine in the state
24    of Washington from July of 1991 to February 18th of 2018;
25    is that right?

Page 59

1  A  I apologize, it's still active.  I still have a license.
2  Q  And you held what's known as a DEA license that allows
3     one to prescribe medicines?
4  A  Yes.
5  Q  Is that still active?
6  A  That's still active, yes.
7  Q  Is it accurate to say that you have never been a
8     gynecological oncologist?
9  A  That's accurate.
10 Q  Now, you have written two articles about how diet and
11    exercise affect women after they have been diagnosed with
12    gynecologic cancer, correct?
13 A  At least two, yeah.
14 Q  None of the articles that you've written on that topic
15    studied what causes or may cause gynecological cancers;
16    is that true?
17 A  That's correct.
18 Q  Can we agree that you have never written any
19    peer-reviewed, published article or study on the causes
20    of ovarian cancer?
21 A  If we're talking about an overall general article, that's
22    true.
23       However, we have a paper in press that is looking at
24    the association of physical activity with various
25    cancers, and ovarian cancer was one that was included

Page 60

1     there.
2        The work I do for the World Cancer Research Fund
3     looks at association of diet and physical activity and
4     obesity, and risk of cancer and ovarian cancer is one of
5     those.
6  Q  I didn't mean to include the work you have done on the
7     World Cancer Research Fund.  I meant separately published
8     articles of the sort that are referenced on your CV.
9        Did you understand that to be my question?
10 A  Yes.
11       So the first one is in press for 2019, for March of
12    2019, and ovarian was one of those cancers.
13 Q  And where is that to be published?
14 A  Medicine & Science in Sports & Exercise.
15 Q  Have you ever given any lectures regarding talcum powder
16    products and ovarian cancer?
17 A  No, I have not.
18 Q  Have you ever given any presentations regarding talcum
19    powder products and ovarian cancer?
20 A  No, I have not.
21 Q  Have you ever posted on social media at all regarding
22    talcum powder products and ovarian cancer?
23 A  I don't believe so.
24 Q  Have you ever written any textbook chapters regarding
25    talcum powder products and ovarian cancer?

Page 61

1  A  No, I haven't.
2  Q  You are not and were not ever an oncologist of any kind?
3  A  No.
4  Q  You are not a pathologist, correct?
5  A  No.
6  Q  You are not a cancer biologist, right?
7  A  No.
8  Q  You are not a toxicologist?
9  A  No.
10 Q  You are not an industrial hygienist?
11 A  No.
12 Q  Prior to being hired by the Plaintiffs' lawyers in talc
13    litigation, you had not personally conducted research on
14    talcum powder product use and risk for ovarian cancer,
15    true?
16          MS. PARFITT:  Objection; misstates her
17    testimony, form.
18          THE WITNESS:  Let me look at the--
19    prior to being hired-- it depends on what you consider
20    research because I had read some articles, but I had not
21    produced a report in that area.
22 Q  (By Mr. Williams)  Let me put it this way:
23       You have published several manuscripts on
24    gynecologic cancers, including the prevention of ovarian
25    cancer in women at high genetic risk, correct?

Anne McTiernan, Ph.D.

Page 62

1  A  Yes.
2  Q  And you have published manuscripts regarding the effects
3     of weight and exercise on the risk for ovarian cancer,
4     correct?
5  A  Yes.
6  Q  But you have not personally conducted research on talcum
7     powder use and risk for ovarian cancer, correct?
8     MS. PARFITT:  Objection.
9        THE WITNESS:  The report that I've
10    just prepared I would say is research because it was a
11    systematic review.
12 Q  (By Mr. Williams)  Let me have you look at Exhibit No. 2,
13    your report, and then we'll take a break in a minute.
14 A  (Witness complies.)
15 Q  Could you turn to Page 6, please?
16    The first full paragraph on Page 6 begins by saying,
17    "Although I have not personally conducted research on
18    talcum powder product use and risk for ovarian cancer, I
19    have published several manuscripts," and it goes on.
20    Do you see that?
21 A  Yes.
22 Q  Is the first clause in that sentence true or not true?
23 A  Yes, that's true.
24 Q  Let's just mark, before we take a break, these other
25    items we said we were going to mark.

Page 63

1     First is Exhibit No. 3, we would like to mark it,
2     "Additional materials to Dr. Anne McTiernan."
3        (Exhibit No. 3 marked
4         for identification.)
5
6  Q  (By Mr. Williams)  Now, I think you told us that the
7     additional materials that you brought here today support
8     your opinions; is that correct?
9  A  Yes.
10 Q  Other than believing that those materials you brought
11    today support your opinions with respect to the
12    association between perineal talcum powder use and
13    ovarian cancer, have your opinions changed at all since
14    you first prepared your report that we've marked as
15    Exhibit No. 2?
16 A  No, they have not.
17    MR. WILLIAMS:  Thanks.  Let's take a
18    quick break, about ten minutes.
19    VIDEOGRAPHER:  Going off the record,
20    the time is 10:28 a.m.
21    (Recess 10:28 to 10:40 a.m.)
22
23    VIDEOGRAPHER:  The time is 10:40 a.m.
24    We are back on the record.  This is the start of Media
25    Unit 2.

Page 64

1  Q  (By Mr. Williams)  Dr. McTiernan, before you were ever
2     retained as a paid consultant for this litigation in the
3     fall of 2016, you had written literally hundreds of
4     articles for peer-reviewed journals.
5        Is that true?
6  A  Yes.
7  Q  You have worked on comprehensive written reports for the
8     U.S. government in your career?
9  A  Yes.
10 Q  Can you just describe very briefly, if you would, the
11    types?
12 A  The U.S. government, I did two reports on physical
13    activity and cancer risk and survival, 2008 and 2018, so
14    this was the-- it's called a physical activity guidelines
15    advisory committee, and for that we relied on
16    meta-analyses.  We did not do our own research.
17    I've also over the years done grant reviews for the
18    government.  I have reviewed their intramural program, so
19    that means their science, have reviewed their science,
20    and I have prepared reports years ago for National Cancer
21    Institute for-- I've done grant reviews for other
22    country's governments.
23    That's my governmental service.
24    I was on-- sorry, the United States government
25    still-- grant reviews for the Department of Defense and

Page 65

1     the National Institute of Health.
2  Q  Let me ask you to look in your report, Exhibit No. 2, at
3     Page No. 7.
4     In the section of your report entitled, "Overall
5     approach," you write, in the second sentence, "I drew
6     upon my years of experience with synthesizing and
7     interpreting large numbers of epidemiologic studies for
8     comprehensive reports, including work for the U.S.
9     government," and we have gone through that, right?
10 A  Mm-hm.
11 Q  Is that a "yes"?
12 A  Yes.  Sorry.
13 Q  You go on to say, "the World Health Organization,
14    International Agency for Research on Cancer"-- IARC,
15    correct?
16 A  Yes.
17 Q  --"and the World Cancer Research Fund," correct?
18 A  Yes.
19 Q  And you have drawn upon your experience with all of those
20    organizations in setting forth your conclusions here?
21 A  Yes.
22 Q  And that's what you write in your report?
23 A  Yes.
24 Q  And you write that your opinions are based on the
25    published epidemiologic evidence, including original

Anne McTiernan, Ph.D.

1    case-control and cohort studies, systematic reviews,
2    meta-analyses, and pooled analyses on the topic of talcum
3    powder products exposure and a risk of ovarian cancer,
4    correct?
5    A  Yes, that's what I wrote.
6    Q  Okay.  For the World Cancer Research Fund, you are a
7    member of the advisory panel of experts that guides
8    interpretation of meta-analyses and systematic reviews of
9    nutrition, physical activity, obesity, and risk for many
10   cancers, correct?
11   A  Yes, that's correct.
12   Q  On Page 5, if you flip one page earlier, you reference,
13   in the section of your report citing your credentials,
14   the work that you have done for the World Cancer Research
15   Fund, right?
16   A  Yes.
17   Q  In the middle of the page on Page 5 of Exhibit No. 2 you
18   say, "For the World Cancer Research Fund, I am a member
19   of the advisory panel of experts that guides
20   interpretation of meta-analyses and systematic reviews of
21   nutrition, physical activity, obesity, and risk for many
22   cancers, including ovarian cancer," right?
23   A  Yes.
24   Q  And you have a link there to an ovarian cancer 2014
25   report that you did, right?

1    A  Yes.
2    Q  And that--
3    A  Maybe I could correct that.
4        I'm on the advisory panel.  I don't prepare those
5    reports.
6        I help interpret them, but it's the World Cancer
7    Research Fund scientists-- sorry, Imperial College does
8    the meta-analyses and the systematic reviews, and then
9    the World Cancer Research Fund has scientists that write
10   the reports.
11       As an advisory committee member, I give opinions
12   on-- with the rest of the committee on-- and we summarize
13   what we think we are seeing in those-- in the data.
14   Q  So just to make sure that I understand the process, the--
15   you mentioned that there are staff members, I suppose,
16   from Imperial College who actually write the reports?
17   A  The staff members-- the scientists from Imperial College
18   do the meta-analyses.  They collect the data from all
19   available studies, and they prepare data tables, and
20   there are scientists at World Cancer Research Fund-- so
21   it's a funding organization and a scientific
22   organization, so their scientists write the reports.
23       For some of these cancers they also contract to
24   the-- to IARC, to scientists there who will write some of
25   the background epidemiology and the biology of particular

1    cancers.
2        I can't say who wrote them because I never quite
3    know who exactly did what-- what one person did the main
4    report drafting.
5    Q  As a panel member, you read the reports though, right?
6    A  Yes.
7    Q  As a panel member you make recommendations based on the
8    reports, don't you?
9    A  Say it again--
10   Q  As a panel member--
11   A  You make recommendations-- that means to them or to--
12   Q  To the public.
13       Let me rephrase the question.
14       As a panel member for the World Cancer Research
15   Fund, the WCRF, you read the reports that are prepared by
16   that organization and make recommendations to the public
17   based upon those reports, right?
18   A  I do read the reports.  I give input because I'm part of
19   a panel.  It doesn't mean I can drive exactly what gets
20   sent there.
21       When the public recommendations come out, we are
22   given a set of guidelines that if there are
23   recommendations that are developed, they will be
24   standardized, and we are asked to follow those standards.
25       I cannot develop my own standards for what

1    recommendations or what statements are made to the public
2    from that.
3                    (Exhibit No. 4 marked
4                    for identification.)
5
6    Q  (By Mr. Williams)  Let me have you take a look at what
7    we've marked as Exhibit No. 4, which is a copy of this
8    report that you provided a link to in your report at Page
9    5.
10       Page 5 of your report in this case, Exhibit No. 2--
11   Dr. McTiernan, can I have your attention?
12   A  Yes.
13   Q  In the report that you wrote for this case at Page No. 5,
14   you provided a link.
15       Do you see that?
16   A  Yes.
17   Q  That link is to a report that you are holding in your
18   hand, which is a 2014 ovarian cancer report, "Food,
19   nutrition, physical activity, and prevention of ovarian
20   cancer" that was prepared by the World Cancer Research
21   Fund, right?
22   A  Correct.
23   Q  In the bottom right-hand corner of the page do you see
24   there's a logo for something called the Continuous Update
25   Project?

Anne McTiernan, Ph.D.

Page 70

1  A  Yes.
2  Q  That is the "CUP" for short?
3  A  Yes.
4  Q  You helped to oversee the CUP as part of its expert
5     panel, true?
6  A  I'm on an advisory committee for this project.
7  Q  Take a look at Page 20 of Exhibit No. 4-- actually, Page
8     19, the acknowledgments section.
9        Do you have that in front of you?
10 A  Yes.
11 Q  And that lists the panel members, correct?
12 A  Correct.
13 Q  And amongst the ten panelists, you are listed, right?
14 A  Yes.
15 Q  And the chair is Alan Jackson from the University of
16    Southampton in Southampton, UK, right?
17 A  Correct.
18 Q  You are still on the CUP panel today, are you?
19 A  It's not clear.
20    I am advising on survivorship issues.
21    It's not clear if this panel will continue.
22    My term on it finished very recently, and we are
23    renegotiating who is going to be on it and what it's
24    going to look like for the future.
25 Q  In 2018--

Page 71

1  A  I was a part of it, yes--
2  Q  You need to let me finish.
3        In 2018 you were a part of the panel, correct?
4  A  Correct.
5  Q  Let's take a look at Page 1 of Exhibit No. 4, which
6     describes the mission with reference to the World Cancer
7     Research Fund Global Network.
8        It says, "Our mission: Today the World Cancer
9     Research Fund Global Network continues," and it mentions
10    funding, interpreting the accumulated scientific
11    literature in the field, and educating people about
12    choices, correct?
13 A  Correct.
14 Q  And then at the bottom of Page 1 it references the World
15    Cancer Research Fund Global Network, and in that
16    paragraph it references, among others, the American
17    Institute for Cancer Research, which is the AICR, right?
18 A  Yes.
19 Q  And on the first-- the cover page of this document, you
20    see the AICR is referenced up at the top with the World
21    Cancer Research Fund, right?
22 A  Yes.
23 Q  As a member of the panel, you concluded that
24    developmental factors leading to greater linear growth,
25    which is marked by adult-attained height, are a

Page 72

1     convincing cause of ovarian cancer; is that true?
2  A  Can you point to where you see this?
3  Q  Page 5.
4        I will direct your attention to the bottom of the
5     page.
6        It says, "The CUP panel judges as follows," right?
7  A  Yes.
8  Q  And it says the CUP panel-- that's the panel that you sit
9     on, right?
10 A  Yes.
11 Q  That isn't the people who write it and that isn't the
12    people who review the science.  That's you, right?
13 A  Correct.
14 Q  And it says that "The evidence that developmental factors
15    leading to greater linear growth (marked by adult
16    attained height) are a cause of ovarian cancer is
17    convincing."
18       That's what the panel wrote, correct, or
19    recommended?
20 A  That's correct.
21 Q  Strike that.
22       That's what the panel "judged," is the word that's
23    used, correct?
24 A  Correct.
25 Q  Is that another way of saying that factors that make some

Page 73

1     people taller than others cause ovarian cancer?
2            MS. PARFITT:  Objection; form.
3            THE WITNESS:  This panel did not do a
4     full causal analysis.
5        It does-- its purpose is quite different from the
6     purpose of the report I prepared on talcum powder
7     products and ovarian cancer risk.
8        The purpose is not to establish causality but rather
9     to come up with guidelines for those variables that can
10    be interpreted into-- can be interpreted into guidelines.
11       There is a set of information on how these different
12    categories are formed, for convincing, probable
13    associations, and then later what can be done for that,
14    what kind of recommendations can be made to the public.
15           MR. WILLIAMS:  Move to strike that as
16    nonresponsive, Doctor, if we were in court, and I will do
17    that now for the record.
18 Q  (By Mr. Williams)  I would like to ask you to answer my
19    question.
20       My question is whether that first paragraph there,
21    under the "CUP panel judges as follows," is that
22    paragraph another way of saying that factors that make
23    some people taller than others cause ovarian cancer?
24           MS. PARFITT:  Objection; form, asked
25    and answered.

Anne McTiernan, Ph.D.

Page 74

1    THE WITNESS: So I still want to
2    under-- state that we didn't do a full causal analysis,
3    but there is a statement here that says these are
4    causes-- the panel considers the strength strong enough
5    that adult height and body fatness are causes of ovarian
6    cancer.
7    Q  (By Mr. Williams)  Does "greater linear growth" mean
8    height?
9    A  It may not mean-- so this particular variable is never
10   measured.
11      You don't have the data in a population to look at
12   linear growth over time, and so they were looking at just
13   by adult height.
14      Because adult height can be-- have so many variables
15   associated with it -- genetic, nutrition -- they didn't
16   want to assume that it's only genetic association that is
17   driving the risk of cancer, so that's why they're talking
18   about growth, but it's a difficult variable because you
19   can't tell which cause the eventual adult height and
20   which of those parts are associated with ovarian cancer
21   or any cancer.
22   Q  You keep saying "they"-- saying "they" in your answers.
23      This is you.  This is the CUP panel that made that
24   judgment that is set forth in Paragraph No. 1, true or
25   not true?

Page 75

1    A  Correct, it was the panel.
2       MS. PARFITT:  Objection.
3    Q  (By Mr. Williams)  The second paragraph says, "Greater
4    body fatness, which the panel interprets to be marked by
5    the body mass index, is probably a cause of ovarian
6    cancer."
7       Do you see that?
8    A  Yes.
9    Q  That was a judgment made by the panel upon which you sit,
10   correct?
11   A  Correct.
12   Q  The third paragraph says, "The evidence suggesting that
13   lactation protects against ovarian cancer is limited."
14      That too was a panel judgment made by the panel upon
15   which you sit, right?
16   A  Correct.
17   Q  The panel that you were on, at least as of 2018, was
18   primarily looking at causes of ovarian cancer related to
19   diet and exercise; is that accurate?
20   A  The panel only looks at those related variables.
21      Lactation is included because it has some
22   nutritional components, but all of the variables that
23   this organization looks at and-- that's their mission.
24      The nutrition-related variables is what they look at.
25   Q  But the panel report that is in front of you, Exhibit

Page 76

1    No. 4, was not exclusively related to diet and exercise,
2    was it?
3    A  I believe it was.
4    Q  Let me see if I can help you there.
5       You consider causes of ovarian cancer other than
6    those relating to diet and exercise, true?
7          MS. PARFITT:  Objection; form.
8          THE WITNESS:  From my knowledge the
9    meta-analysis work was focused on nutrition variables,
10   physical activity variables, and obesity-related
11   variables, all because they are related to nutrition, as
12   well as lactation because that's also a nutrition-related
13   variable.
14   Q  (By Mr. Williams)  Your panel wrote about causes of
15   ovarian cancer other than those relating to diet and
16   exercise, true?
17          MS. PARFITT:  Objection; form.
18          THE WITNESS:  The panel did not-- I
19   will have to look and see what they said about other
20   causes, but the panel was focused on, in terms of the
21   meta-analysis, the new data that they are presenting, is
22   all related to nutrition, physical activity, and diet.
23   Q  (By Mr. Williams)  Whether it's new data-- strike that.
24      First of all, Doctor, you said "they" again.
25      You mean you, you mean "our panel," correct?

Page 77

1    A  When I say "they," the meta-analysis, I did not do the
2    meta-analysis.
3       the meta-analysis was done by Imperial College.
4       The meta-analysis was contracted by World Cancer
5    Research Fund to Imperial College to do those
6    meta-analysis.
7       What the panel did is-- we're a group of scientists.
8    We review those data once they're done.
9    Q  You review the data once it's done?
10   A  Once it's done.
11   Q  And you make recommendations as a panel member, correct?
12   A  We make judgments.
13      The recommendations are a combination of us and
14   WCRF.
15   Q  One of the judgments that is-- strike that.
16      On Page 7 of the document, Exhibit No. 4, there is a
17   listing entitled, "Other established causes."
18      Do you see that?
19   A  Yes.
20   Q  And those are established causes of ovarian cancer,
21   correct?
22   A  Correct.
23   Q  That paragraph--
24   A  Sorry, say that again.
25   Q  The other established causes that are being referred to

Anne McTiernan, Ph.D.

| Page 78 |
| --- |

1  here are established causes of ovarian cancer, correct?
2  MS. PARFITT: Objection; form.
3  Q  (By Mr. Williams)  Do you understand my question?
4  A  I do.
5  What I'm trying to say-- what I want to say here is
6  there was no systematic review done here.
7  This was information that was largely taken from the
8  second expert report and repeated here, so this was data
9  from 2007-- information from 2007, and there was no--
10  except for lactation, among all these variables there was
11  no new review done by the panel.
12  This was the knowledge at the time of the second
13  annual report, 2007, of variables that are-- that the
14  2007 expert panel thought were related to ovarian cancer.
15  Q  Hold on, Doctor.
16  In 2014, which is the date of this document, you
17  were sitting on the World Cancer Research Fund's panel,
18  correct?
19  A  Correct.
20  Q  The panel reviews the results of the epidemiological
21  analysis that is done by others, correct?
22  A  Reviews the data, the meta-analysis from the nutrition
23  variables, yes.
24  Q  And then it sets forth judgments and it writes the text
25  that appears in this document, correct?

| Page 79 |
| --- |

1  A  The panel did not write this text.
2  The panel-- the World Cancer Research Fund wrote
3  this text.
4  Q  Are you disavowing Page 7, third paragraph, "Other
5  established causes," that's set forth other established
6  causes for ovarian cancer?
7  MS. PARFITT: Objection; form,
8  misstates her testimony.
9  THE WITNESS: The question was am I
10  disavowing-- I am not disavowing.
11  I am saying it was not written by our panel.
12  We reviewed it.  We had opportunity to have input,
13  but we were not the final authors of this section.
14  Q  (By Mr. Williams)  When you read the section, did you
15  say, "Wait a minute, you haven't included anything in
16  here about talc causing ovarian cancer"?
17  Did you tell anybody that?
18  A  I don't recall doing that.
19  At the time I had not done a full analysis of
20  ovarian cancer risk factors.
21  Q  When you say that you don't recall doing it, are you
22  saying it might have happened, it might not have
23  happened, or are you saying that it did not happen?
24  A  It did not happen.
25  Q  This document does not include talc as a cause or

| Page 80 |
| --- |

1  probable cause of ovarian cancer, true?
2  A  If you're talking about this paragraph, I don't see it
3  there.
4  Q  And this paragraph does not describe talc as a risk
5  factor for ovarian cancer, such as hormone replacement
6  therapy, correct?
7  A  Talcum powder products are not mentioned there, correct.
8  Q  This 2004 CUP report-- strike that.
9  Did this 2014 CUP report come out before or after
10  Plaintiffs' counsel hired you as an expert in this case?
11  A  This came out before I was hired.
12  This was a 2014 report.
13  We may have downloaded this recently.
14  The way these reports work is the work for the
15  meta-analysis is done, and then the panel reviews the
16  data, and then a report is drafted and published online
17  at that time, so if it says, "2014," then it would have
18  been online in 2014, would have been public then.
19  Q  And there have been reports that have been prepared by
20  the World Cancer Research Fund and the American Institute
21  for Cancer Research since this 2014 report, right?
22  MS. PARFITT: Objection to the form.
23  THE WITNESS: Different cancers would
24  have been since then.
25  I don't have memorized exactly when the different

| Page 81 |
| --- |

1  years came out.
2  In-- last spring, and I think it was 2018, but it
3  could have been 2017, there was a final report of WCRF
4  that included all of these reports, but this was not
5  changed at that time.
6  The final report that came out was more of a global
7  summary and global nutrition recommendations, but these
8  all-- that's why it's called the Continuous Update
9  Project, because these things are updated at various
10  points and then they become part of that final report,
11  2017, 2018.
12  This is why I was-- I said that the panel may be
13  reconstituted, because we finished one set of cancers,
14  one set of reports.
15  Q  (By Mr. Williams)  The whole idea of the CUP reports is
16  that they get updated continuously, right?
17  MS. PARFITT: Objection; form.
18  THE WITNESS: The ovarian cancer was
19  not updated after 2014.
20  Is that your question?
21  Q  (By Mr. Williams)  Are you sure about that?
22  A  From my knowledge it was not updated.
23  Q  Take a look at Page 2 of Exhibit No. 4 that you have.
24  At the top of Page 2 it says, "Please cite the
25  report as follows," and it gives instructions about how

Anne McTiernan, Ph.D.

| Page 82 | Page 84 |
|---|---|

**Page 82**

1     the report should be cited, correct?

2   A   Yes.

3   Q   It's accurate to say that the expectation of the

4     publication of this report is that it may be cited by

5     others, right?

6   A   Yes.

7   Q   That's why you have this at the top of Page No. 2,

8     correct?

9   A   Yes.

10   Q   Let me show you another document, which we'll mark as

11     Exhibit No. 5.

12            (Exhibit No. 5 marked

13             for identification.)

14

15   Q   (By Mr. Williams) Exhibit No. 5, for the record, is a

16     multi-page document that says, "Diet, nutrition, physical

17     activity and ovarian cancer - revised 2018" on the cover

18     page.

19     Do you see that?

20   A   Yes.

21   Q   The CUP expert panel that you sat on through 2018 issued

22     this collection of reports entitled, "Diet, nutrition,

23     physical activity and cancer, a global perspective,"

24     right?

25   A   Yes.

**Page 83**

1   Q   This is the most recent version of the Continuous Update

2     Project report that we were just looking at, right?

3   A   Yes.

4   Q   Let me show you another document, which is-- we'll mark

5     as Exhibit No. 6.

6            (Exhibit No. 6 marked

7             for identification.)

8

9   Q   (By Mr. Williams) I will ask you to keep Exhibit No. 5

10     nearby.

11     Exhibit No. 6, I will represent to you, is the CUP

12     panel web page, which we printed out on January 7th,

13     2019.

14     Are you pictured in the picture there?

15   A   Yes.

16   Q   Is that you five people over from the right?

17   A   Yes.

18   Q   Above the photo that you appear in, do you see where it

19     says, "In 2018 the expert panel, chaired by Professor

20     Alan Jackson, issued our latest cancer prevention

21     recommendations as part of the World Cancer Research

22     Fund/American Institute for Cancer Research third expert

23     report, 'Diet, nutrition, physical activity and cancer: a

24     global perspective."

25     That's what it says, correct?

**Page 84**

1   A   Correct.

2   Q   The CUP expert panel that you sat on through last year is

3     in fact the body that issues these reports, like Exhibit

4     No. 5, correct?

5   A   Correct.

6   Q   Now let me have you look at Exhibit No. 5, which is the

7     2018 CUP report.

8     I will just quickly refer you to Page 4.

9     On Page 4 there's a heading that says, "Our

10     Continuous Update Project, CUP"-- do you see that?

11   A   Yes.

12          MS. PARFITT: Give her just one

13     moment.

14   Q   (By Mr. Williams) And then the second paragraph says,

15     "An independent panel of experts carries out ongoing

16     evaluations of this evidence, and their findings form the

17     basis of the WCRF network's cancer prevention

18     recommendations."

19     Do you see that?

20   A   Yes.

21   Q   That's referring to your panel, correct?

22   A   Yes.

23   Q   And if you look at the back of this document that's on

24     Page 21, in the acknowledgments section, it lists the

25     panel members.

**Page 85**

1     I've counted. There are now nine panelists as of

2     2018, and you are listed as one, correct?

3   A   You are looking at-- sorry, which?

4   Q   Page 21 of Exhibit No. 5.

5     Do you see it listed there on Page 21?

6   A   Yes.

7   Q   Now, please go back to Page 6 of Exhibit No. 5, the 2018

8     report of the World Cancer Research Fund.

9     Under the box "Summary of panel judgments," do you

10     see there that the same conclusions that were set forth

11     in the 2014 report concerning the panel judgments are set

12     forth?

13   A   So you are talking about this table--

14   Q   If you look in the lower left-hand corner of the page, it

15     has Page No. 6.

16     Are you looking at the 2018--

17   A   It says, "Summary of panel judgments."

18   Q   Correct, and do you see the box that's underneath there

19     with subheadings?

20   A   Yeah.

21     One thing to point out is that this table, which is

22     the summary-- so you are in Exhibit No. 5 ? It says,

23     "2014," so it's the exact same as this 2014 report.

24   Q   Ma'am, I am not even looking at that page.

25   A   Okay.

Anne McTiernan, Ph.D.

Page 86

1  Q  I am asking you to look at Page 6.
2  A  Page 6.
3  Q  Which says, "The summary of the panel judgments."
4  A  Okay.
5  Q  In that summary of the panel judgments it sets forth the
6     same conclusions that were contained in the 2014 report
7     regarding linear growth, body fatness, and lactation,
8     correct?
9  A  That's correct.
10 Q  There's no reference to talcum powder here either,
11    correct?
12 A  That's correct.
13 Q  As of 2018 you had been retained as an expert by the
14    plaintiffs' lawyers in this litigation; is that correct?
15       MS. PARFITT:  Objection; form.
16       THE WITNESS:  The summaries are
17    regarding the data analyzed by WCRF on nutrition
18    variables.
19       They do not consider-- they do not do systematic
20    reviews for other ovarian cancer risk factors, only
21    nutrition variables.
22 Q  (By Mr. Williams)  Let me ask you to go to Page 3.
23       Again in your last answer you said "they."
24       You are a panelist for this organization, correct?
25 A  Yes, I am a panelist, but I don't-- I am not in a

Page 87

1     position to choose what WCRF decides to contract out for
2     analyses.
3        They contract with the Imperial College of what the
4     focus is going to be: nutrition, physical activity, diet.
5        It's my-- I have the ability to refuse to be on the
6     panel, to decline if I don't want to be involved with
7     nutrition, physical activity, and obesity research
8     because that's the mission.  The mission are those
9     variables, not to do systematic reviews on other risk
10    factors.
11       We don't do anything on cigarette smoking or other
12    types of carcinogens, for example.
13       We only do nutrition, physical activity,
14    obesity-related variables.
15 Q  To be clear, this CUP update on ovarian cancer came out
16    in 2018, which is after you were retained by plaintiff
17    lawyers to opine on whether or not talc could cause
18    ovarian cancer.
19       Is that true or not true?
20       MS. PARFITT:  Objection; form, asked
21    and answered.
22 Q  (By Mr. Williams)  I am looking for a temporal answer.
23       This--
24       MS. PARFITT:  Same objection.
25 Q  (By Mr. Williams)  This update on ovarian cancer came out

Page 88

1     in 2018, which is after you had been retained by
2     plaintiff lawyers to opine on whether or not talc could
3     cause ovarian cancer, true or not true?
4        MS. PARFITT:  Objection; form, asked
5     and answered.
6        THE WITNESS:  I want to be able to
7     answer this to try to make it more clear.
8        If you see on the cover, it says, "2014."
9        This is the 2014 report that was added to all of the
10    other reports.
11       Some were developed in 2011, some in 2017.
12       We did not redo the meta-analyses.  We did not redo
13    the entire report.
14       They were added together.
15       The World Cancer Research Fund for the first two
16    reports did all of the work at one time and came up with
17    books, so the most recent one was 2007.
18       This time they decided to do reports on a rolling
19    basis.  That's why Ovarian came out in 2014, but that
20    their final-- when they put it all together, they
21    celebrate, come out with big systematic-- sorry, summary
22    guidelines for the public for preventing cancer-related
23    nutrition, physical activity, things that people can do--
24    that was all added together in 2018, but this ovarian
25    report was from 2014.

Page 89

1        MR. WILLIAMS:  I will move to strike
2     that as nonresponsive.
3  Q  (By Mr. Williams)  Dr. McTiernan, on the first page of
4     this document it says it was revised in 2018.
5        This document that's in front of you now was
6     published in 2018, wasn't it?
7        MS. PARFITT:  Objection; form.
8        She has been asked and answered it.
9        You have limited time, Mr. Williams, so I suggest
10    you listen to her answer.
11 Q  (By Mr. Williams)  This document was published in 2018,
12    yes or no?
13       MS. PARFITT:  Objection; form, asked
14    and answered.
15       THE WITNESS:  This document was
16    published along with all of the other documents, but the
17    document was prepared in 2014.
18       It's a report in 2014.
19 Q  (By Mr. Williams)  What year was this document published?
20       MS. PARFITT:  The document speaks for
21    itself.  Objection; form.
22       THE WITNESS:  It says, "Revised 2018."
23 Q  (By Mr. Williams)  2018 was after you were retained by
24    Plaintiffs' counsel, correct?
25       MS. PARFITT:  Objection; form,

Anne McTiernan, Ph.D.

| Page 90 |
| --- |

1 mischaracterizes her testimony.
2 Q (By Mr. Williams) You may answer, Doctor.
3          MS. PARFITT: Objection; form.
4     Answer as best you can.
5          THE WITNESS: Yes, 2018 is after I was
6 retained.
7 Q (By Mr. Williams) It was a couple years after you had
8    been retained, right?
9 A That's correct.
10 Q Could you list for me all of the members of the panel who
11    served with you on the World Cancer Research Fund whom
12    you told, "We need to update this to state that talc,
13    which is something that people can use or not use, is
14    something that they should not use because it causes
15    ovarian cancer"?
16    List for me the people who are listed on Page 21, as
17    fellow panel members, all of the people that you have
18    told that.
19 A I didn't talk with others about other risk factors for
20    ovarian cancer because we were using the same report
21    unchanged from 2014.
22 Q Is the answer that there's no one?
23          MS. PARFITT: Objection; misstates her
24    testimony.
25 Q (By Mr. Williams) Is the answer that there is no one

| Page 91 |
| --- |

1    there?
2          MS. PARFITT: Objection; form,
3    misstates her testimony.
4 Q (By Mr. Williams) You may answer.
5 A Correct.
6          MS. PARFITT: You may answer.
7 Q (By Mr. Williams) Is the answer correct?
8 A Correct.
9          MS. PARFITT: Objection.
10          MR. WILLIAMS: Counsel, I am entitled
11    to an answer to the question.
12          MS. PARFITT: You can, and I'm
13    entitled to object to the form.
14          MR. WILLIAMS: But you are objecting
15    over her answer.
16          MS. PARFITT: No, I am objecting-- she
17    is answering quite quickly. I am trying to object before
18    she answers, but after you.
19          MR. WILLIAMS: Fair enough.
20          MS. PARFITT: Thanks.
21 Q (By Mr. Williams) Please turn to the second-to-last page
22    of this 2018 CUP report, which is entitled, "Our cancer
23    prevention recommendations."
24    It is a purple page. It is the inside cover of the
25    pamphlet.

| Page 92 |
| --- |

1          This says, "Our cancer prevention recommendations."
2          When it says "our" there, that refers to the panel
3    on which you sat in 2018, correct?
4 A This is correct.
5          This is a separate document.
6          It must have been from the ovarian report because
7    this is-- there are separate recommendations based on all
8    of the cancers.
9 Q The panel does not recommend limiting or stopping the use
10    of talcum powder, correct?
11 A The panel did not look at all potential carcinogens.
12          The panel looked and developed recommendations based
13    on nutrition, physical activity, and obesity-related
14    variables.
15 Q Is the answer that it does not list talc?
16          MS. PARFITT: Objection; form.
17          THE WITNESS: It does not list talc,
18    but it doesn't list other carcinogens as well.
19 Q (By Mr. Williams) Please turn to Page 8.
20    I am referring to Page 8 of the 2018 CUP report.
21    I will direct your attention to Section 4 at the top
22    that says, "Other established causes."
23    Do you see that?
24 A Yes.
25 Q Not bearing children is listed as something that may be

| Page 93 |
| --- |

1    seen as a cause of ovarian cancer, correct?
2 A Correct.
3 Q Early menarche or age of first period is listed as
4    something that your panel concluded may be seen as a
5    cause of ovarian cancer, true?
6 A It wasn't a panel conclusion. We weren't asked to judge
7    data.
8          This was written up as a background for other
9    potential causes.
10          There were no data that was reviewed by the panel.
11 Q The heading is, "Other established causes," right?
12 A Right.
13          WCRF prefers to use that language. I'm not sure I
14    would have used that.
15 Q Talc is not listed as an established cause, correct?
16 A It is not.
17          It looks like the paragraph was unchanged from 2014.
18    It was not updated.
19          This report, from my knowledge, is the same in 2014
20    as this-- as what's called "Revised," but I believe it's
21    the same report.
22 Q Did you, as a member of this expert panel, conclude that
23    talc could be seen as a cause of ovarian cancer?
24 A This expert panel didn't consider talc.
25 Q Is the answer "no"?

Anne McTiernan, Ph.D.

Page 94

1      MS. PARFITT:  Objection; form--
2      THE WITNESS:  All I can say is we
3   didn't consider-- we didn't review the literature.  We
4   didn't do-- review any of these other variables in
5   totality.
6   Q   (By Mr. Williams)  Is there any reason why you don't do
7      that?
8   A   We were tasked at looking at nutrition, physical
9      activity, and obesity-related variables.
10   Q   Tasked by whom?
11   A   By WCRF, World Cancer Research Fund.
12   Q   Did the World Cancer Research Fund say that you could not
13      look into talc?
14      MS. PARFITT:  Objection; form.
15      THE WITNESS:  They did-- in our
16   personal lives, that we could look into any variable you
17   wanted to, but for this purpose of this panel, we were
18   only looking at and evaluating the meta-analysis, which
19   was focused on physical activity, diet, and nutrition
20   variables.
21   Q   (By Mr. Williams)  Let me ask you to turn to Page 7 of
22      the CUP report.
23   A   Which one?
24   Q   Page 7 of the 2018 report, Exhibit No. 5.
25   A   Okay.

Page 95

1   Q   Do you see the heading that says, "Pathogenesis"?
2   A   Yes.
3   Q   Do you see where in the second paragraph the panel
4      concluded that the-- quote, "Most ovarian cancers occur
5      spontaneously, although five to ten percent of cases
6      develop due to a genetic disposition," Closed quote?
7      Do you see that?
8   A   I see that, and above that I see that "The epithelial
9      cells are subjected to a unique pro-inflammatory
10      microenvironment, which can increase the rate of DNA
11      damage, thus affecting cancer risk."
12      In this case the word "spontaneous" just means "as
13      opposed to genetics."
14      Spontaneous cancers mean they can be caused by
15      anything else, including environment, but not solely due
16      to an inherited genetic predisposition.
17   Q   Do you agree that most ovarian cancers occur
18      spontaneously?
19   A   I believe most are caused by environmental causes as for
20      many other cancers.
21      I am using the word "spontaneous."  I mean "non
22      solely genetic."
23      Cancer is a genetic disease, but the familial
24      genetic-inherited cancers account for only about five to
25      ten percent of ovarian cancers, similar to many other

Page 96

1   cancers.
2      "Spontaneous" means something else caused it.
3   Q   However you define "spontaneous," do you agree that most
4      ovarian cancers occur spontaneously?
5      MS. PARFITT:  Objection; form.
6      THE WITNESS:  I agree that most-- I
7   would not use that word myself because it can be
8   misconstrued by nonscientists.
9      "Spontaneous" means "nongenetically inherited," so I
10   would say environmental, that most cancers-- most ovarian
11   cancers are caused by something in the environment, some
12   exposure.
13   Q   (By Mr. Williams)  Did you tell someone to take out the
14      word "spontaneously"?
15   A   I don't recall.
16      We did have an opportunity in 2014 to edit these
17   various reports.
18      None of us had final say on exactly what came out of
19   the report.
20      We did go through a process of editing.
21   Q   When you had the opportunity to edit the report in 2014,
22      did you ask someone to take out the word "spontaneously"?
23   A   I don't recall.
24   Q   When you say you don't recall, are you saying it may have
25      happened, it may not have happened?

Page 97

1   A   It may have happened, it may not.
2      I apologize, I don't recall.
3   Q   And after you make such a recommendation as a panelist,
4      who decides what gets put in?
5   A   The World Cancer Research Fund.  The scientific officers
6      would decide.
7   Q   They would listen to the input and then decide one way or
8      the other?
9   A   Yes.
10   Q   In 2014 the Gertig 2000 and Terry 2013 studies on talc,
11      that you reviewed in 2016, had already been published,
12      correct?
13   A   I am hesitating because I don't remember when this exact
14      writing was.
15      If it's a 2014 report, that's when it came out.
16      It could have been being written within 2013, so at
17      the time I was not doing research on all of the variables
18      related to ovarian cancer, so I can't say what was
19      published at that time.
20   Q   2014 is after 2013, correct?
21   A   That's correct.
22   Q   If Gertig was published in 2000, Gertig would have been
23      published prior to the time that this exhibit, the 2014
24      version of this exhibit, was published, correct?
25   A   Published but perhaps not when it was prepared, that's

Anne McTiernan, Ph.D.

Page 98

1  what I'm saying.
2  Q  If the Terry study was published in 2013, it would have
3     been published prior to the time that the 2014 version of
4     the World Cancer Research Fund would have been published,
5     correct?
6  A  It would have been published prior to publication, not
7     necessarily prior to report preparation.
8  Q  Have you ever been on the World Cancer Research Fund web
9     page?
10 A  Yes, I have.
11 Q  Let me show you what we've marked as Exhibit No. 7 or
12    what we will mark as Exhibit No. 7 to your deposition.
13                   (Exhibit No. 7 marked
14                    for identification.)
15
16 Q  (By Mr. Williams)  Exhibit No. 7 is the World Cancer
17    Research Fund web page.
18       We printed this out as of January 8th, 2019.
19       It's a five-page document, and the portion that we
20    printed out is "Myths and controversies about what causes
21    cancer."
22       Do you see that?
23 A  Yes, I do.
24 Q  There is only one World Cancer Research Fund, to your
25    knowledge, correct?

Page 99

1  A  That's correct.
2  Q  The World Cancer Research Fund, the organization for whom
3     you have served as an advisory panel member for years,
4     tries to advise the public about potential causes for
5     cancer, correct?
6            MS. PARFITT:  Objection; form.
7            THE WITNESS:  Their focus is on
8     nutrition, physical activity, and obesity variables.
9        That's what they advise on.  That's what their
10    recommendations are.
11 Q  (By Mr. Williams)  The World Cancer Research Fund tries
12    to debunk myths about what has been established as a
13    cause of cancer, correct?
14           MS. PARFITT:  Objection; form.
15           THE WITNESS:  Before I answer that, I
16    would like to know if this is a Blount post.
17       If it's not-- it's not something that has come
18    before the World Cancer Research Fund.
19       We would never investigate or were never asked to
20    comment on these particular issues.
21 Q  (By Mr. Williams)  I will represent to you that the
22    address that is listed at the bottom of the page, which
23    includes
24    www.wcrf-uk.org/uk/preventing-cancer/cancer-risk-factors-
25    and it goes on, is, in fact, where you get-- where you go

Page 100

1  if you are trying to get to the World Cancer Research
2  Fund website.
3      Will you accept that representation, ma'am?
4  A  It looks like it comes from their website.
5      I am not clear on who developed this or-- it
6  certainly didn't have oversight by our committee.
7      Our committee was tasked at looking at the data from
8  the meta-analysis and systematic review.
9      None of these variables-- none of the variables
10 here, except perhaps coffee, were considered by my panel.
11     My panel does not oversee all World Cancer Research
12 Fund.  There are other groups that oversee them.
13     I do not.
14     I oversee-- sorry, I participate on one panel that
15 focuses on nutrition, physical activity, and diet
16 meta-analyses.
17 Q  Take a look at Page 2 of this document, which is Exhibit
18 No. 7.
19     At the top of the page it says, "Cosmetics and
20 toiletries."
21     Do you see that?
22 A  I do.
23 Q  It says, "Most studies have found no link between cancer
24 and the chemicals used in cosmetic and toiletry products,
25 such as moisturizers, shampoos, deodorants, and

Page 101

1  toothpastes.  The majority of countries have strict
2  regulations to ensure these products are safe."
3      Do you see that?
4  A  Yes.
5  Q  It goes on, second paragraph, "Some studies have found a
6  link between talcum powder, talc, and ovarian cancer, but
7  there is not enough evidence to be certain of this.  Even
8  if there were an increased risk, scientists estimate it
9  would be small.  Not smoking, followed by maintaining a
10 healthy weight through eating a healthy diet and keeping
11 active, are the most effective ways to reduce your cancer
12 risk."
13     Did I read that right?
14 A  Yes, you did.
15 Q  Do you disagree with that statement of the World Cancer
16 Research Fund?
17 A  I do.
18     I am surprised it's there.
19 Q  Is it accurate to say that your opinion in this case that
20 the state of known scientific evidence establishes that
21 perineal use of talc causes ovarian cancer conflicts with
22 the conclusion set forth on the website of the World
23 Cancer Research Fund that there is not enough evidence to
24 be certain that there is a link between talcum powder use
25 and ovarian cancer?

Page 102

1    MS. PARFITT: Objection; form,
2    misstates the document.
3        THE WITNESS: I do disagree.
4    Q (By Mr. Williams) Your opinion in this case conflicts
5    with the--
6    A Yes, my opinion conflicts--
7    Q You need to wait until I'm done, ma'am if you would.
8    A Okay.
9    Q Your opinion in this case, as set forth in your report,
10   conflicts with the conclusions set forth specifically
11   regarding talcum powder on the World Cancer Research Fund
12   website, correct?
13       MS. PARFITT: Objection to the form.
14       THE WITNESS: Yes, that's correct.
15   Q (By Mr. Williams) The American Institute for Cancer
16   Research tries to advise the public regarding potential
17   causes of cancer; is that right?
18       MS. PARFITT: Objection; form,
19   misstates her testimony.
20       THE WITNESS: The American Institute
21   for Cancer Research is part of the World Cancer Research
22   Foundation, and they have the same mission, to focus on
23   nutrition, physical activity, and obesity in relation to
24   cancer risk and survival.
25   Q (By Mr. Williams) Did you know that the American

Page 103

1    Institute for Cancer Research includes a page on its
2    website discussing whether different exposures can cause
3    cancer?
4    A I would have to see it, but no, I do not follow whatever
5    page you're talking about.
6        I don't know what you're referring to.
7            (Exhibit No. 8 marked
8            for identification.)
9
10   Q (By Mr. Williams) Let me show you what we've marked as
11   Exhibit No. 8.
12       Exhibit No. 8 is a three-page document, which is a
13   printout of the website of the AICR. The address is
14   listed at the bottom of Page 1 of Exhibit No. 8.
15       You are familiar with the American Institute for
16   Cancer Research?
17   A Yes, I am.
18       It is a part of the World Cancer Research Fund.
19   Q I would like you to look at the first page of Exhibit
20   No. 8.
21       There is a listing that says, "GMOs and other hot
22   topics," and then there are seven different topics that
23   are set forth, the fifth of which is cosmetics and
24   toiletries.
25       Do you see that?

Page 104

1    A Yes.
2    Q And the second paragraph that's listed there on Exhibit
3    No. 8 is identical to the paragraph that we just went
4    over in Exhibit No. 7 relating to talcum powder and
5    ovarian cancer; is that right?
6    A Yes, I see that.
7    Q Is it accurate to say that your opinion in this case,
8    that the state of known scientific evidence establishes
9    that perineal use of talc causes ovarian cancer,
10   conflicts with the conclusion of the American Institute
11   for Cancer Research, that there is not enough evidence to
12   be certain that there is a link between talc use and
13   ovarian cancer?
14       MS. PARFITT: Objection; form.
15       THE WITNESS: Yes, I disagree with
16   what they have written here.
17   Q (By Mr. Williams) You have never told anyone from the
18   AICR, I take it, that you disagree?
19       MS. PARFITT: Objection; form.
20       THE WITNESS: I did not know that they
21   had this on their website.
22       I think I will talk to them now.
23   Q (By Mr. Williams) Let me direct your attention to a new
24   document, which is an article from Hutch News that refers
25   to you.

Page 105

1    We'll mark it as Exhibit No. 9.
2            (Exhibit No. 9 marked
3            for identification.)
4
5    Q (By Mr. Williams) This is an article that was published
6    on May 25th, 2018, correct?
7        It's a commentary written by you?
8    A Yes. It was edited by-- our communications department
9    edited it, so I authored it, but they adjusted it.
10   Q May 25, 2018 was at least a year and a half after you had
11   been retained by plaintiffs' counsel for this engagement,
12   correct?
13       MR. LOCKE: We haven't seen Exhibit
14   No.--
15   Q (By Mr. Williams) Did you hear my question?
16   A No-- yes.
17   Q You're quoted in this article-- strike that.
18       The title of your article is, "How to reduce the
19   odds of getting cancer," right?
20   A Yes.
21   Q You are quoted in this article as saying there are steps
22   people can take to absolutely cut their risk of getting
23   cancer, true?
24   A Yes.
25   Q Directly under the title there's a quote that says,

Anne McTiernan, Ph.D.

Page 106

1   "There are steps you can take that will absolutely cut
2   your risk, says Fred Hutch's doctor Anne McTiernan, who
3   contributed to a new report on diet, nutrition, physical
4   activity and cancer," did I read that right?
5   A  Yes.
6   Q  Now, at the time that you were writing this commentary, I
7   take it that you were not limited in any way in what you
8   could talk about as a way that someone could cut their
9   risk of getting cancer?
10      No one was editing your words, true?
11  A  That's not true.
12     The communications department has final say on what
13  goes out from our institution, so I don't have full
14  leeway of what went out.
15     They had asked me to write about something, with
16  their help, their editing, on the new report by the World
17  Cancer Research Fund, so it focused primarily on
18  nutrition, physical activity, and diet information.
19  Q  Are you suggesting that you could not have referenced
20  talcum powder or stopping the use of talcum powder as it
21  relates to your view of ovarian cancers, ma'am?
22  A  I am saying I was asked to focus on these variables in
23  this new report.
24     Fred Hutchinson is-- the communications department
25  is a news program-- sorry, a news service-- they call

Page 107

1   themselves a news service, and they wanted me to talk
2   about new results.
3      I added-- I did add to try to avoid other
4   carcinogens, and I specifically mentioned air pollution
5   and asbestos as some things that affect many different
6   cancers, but I was primarily tasked to talk about
7   nutrition, physical activity, and diet, and especially
8   since that was a new report.
9      That's why this article is focused on that.
10  Q  Did you identify talc use as an actual or probable
11  carcinogen of any kind of cancer in this article?
12  A  This was not focused on any particular risk factor, so I
13  was talking about very generic environmental causes of
14  cancer, and I can see that I did mention asbestos as an
15  example, but I did not list all of the cancer-causing
16  chemicals that can be encountered.
17  Q  In terms of your day-to-day research activities, those
18  are in the field of epidemiology, correct?
19  A  Epidemiology and clinical trials.
20     Some people consider that clinical research, and
21  some consider it epidemiology, but I'm an epidemiologist
22  and an internist.
23  Q  When it comes to assessing cause, epidemiology, your
24  field, is only one part of the causation analysis; is
25  that true?

Page 108

1      MS. PARFITT:  Objection; form.
2      THE WITNESS:  When we do a causation
3   analysis as epidemiologists, we primarily rely on results
4   in humans and especially epidemiology, but we also look
5   to see if there are plausible biologic mechanisms that
6   can link what we see in the human data, in terms of
7   exposure to risk of disease, so we do look at biological
8   mechanisms as well.
9   Q  (By Mr. Williams)  Much of epidemiologic observational
10  research in cancer focuses on determining the
11  associations between an exposure and an outcome, true or
12  not true?
13  A  Yes, that's true.
14  Q  The mere existence of an association does not itself
15  prove a cause and effect relationship between the
16  exposure and the disease, right?
17  A  The existence of an association is typically part of the
18  scientific data we would use in order to determine if
19  it's a cause and effect, and there could be some-- some
20  associations that would be so difficult to explain
21  otherwise, that you would understand that that has to be
22  a cause, but typically in the epidemiology of cancer, we
23  are looking at both the results in human, human
24  population studies, epidemiology studies, but we also
25  look at plausible biologic mechanisms.

Page 109

1   Q  Association is not synonymous with causation, is it,
2   ma'am?
3   A  Association, correct, it's not exactly the same as
4   causation.
5   Q  As you read the epidemiologic literature as part of your
6   work in this matter, you considered the Bradford Hill
7   aspects of causal inference, right?
8   A  That's correct.
9   Q  The continuous research project, for which you serve as a
10  panel member, also uses the Bradford Hill criteria as the
11  basis for its systematic review analyses, true?
12  A  The World Cancer Research Fund has a modified version of
13  Bradford Hill.
14     Most groups that are looking at these types of
15  variables, and are looking at developing public
16  recommendations, will use some kind of modification of
17  Bradford-Hill-like criteria, so the World Cancer Research
18  Fund has developed criteria that are very different in
19  some way from other epidemiology studies, and
20  particularly because they're focused on nutrition, and
21  nutrition is a variable different from other types of
22  exposures in terms of developing them.
23     They also have further developed those criteria for
24  survivorship, so it's not exactly a Bradford Hill
25  analysis.

Anne McTiernan, Ph.D.

| Page 110 |
| --- |

1  Q  The Bradford Hill criteria are the basis for the
2  Continuous Update Project systematic review analyses and
3  the criteria for judging the evidence, true or not true?
4       MS. PARFITT:  Objection; form, asked
5  and answered.
6       THE WITNESS:  I would say Bradford
7  Hill criteria were considered in developing the
8  guidelines for the systematic review interpretation.
9       (Exhibit No. 10 marked
10      for identification.)
11
12  Q  (By Mr. Williams)  Let me have you look at what we've
13  marked as Exhibit No. 10.
14      Exhibit No. 10 is a multi-page document from the
15  World Cancer Research Fund entitled, "Judging the
16  evidence," and dated 2018.
17      Do you recognize this document?
18  A  Yes, I do.
19  Q  This document was published at a time when you were
20  serving as a panelist for the World Cancer Research Fund?
21  A  It was developed before then, but it was published again
22  at that time, yes.
23  Q  Let me have you look at Page 4.
24      Page 4 sets forth how to cite the third expert
25  report ; does it not?

| Page 111 |
| --- |

1  A  How to cite the whole report, yes.
2  Q  It was contemplated at the time that this document,
3  "Judging the evidence," was published, that it could be
4  cited by experts, correct?
5       MS. PARFITT:  Objection; form.
6       THE WITNESS:  Yes.
7  Q  (By Mr. Williams)  Look at Page 5, if you would.
8  A  (Witness complies.)
9  Q  Page 5 under the title, "Introduction," the second full
10  paragraph, I will direct you to the last sentence.  It
11  says, "The Bradford Hill criteria are the basis for the
12  Continuous Update Project, CUP, systematic review
13  analyses and the criteria for judging evidence."
14      Do you see that?
15  A  Yes, I do.
16  Q  Is that an accurate statement?
17  A  I would say it's the beginning because they did change,
18  and it spanned quite a bit compared to Bradford Hill.
19      Bradford Hill's speech, when he developed it and
20  when the result was published in the World Society of
21  Medicine, was very basic, did not have the many criteria
22  that World Cancer Research Fund uses, and their criteria,
23  the way they developed it, beyond Bradford Hill, was
24  because of the nutrition-related variables.
25  Q  Is it an accurate statement or not, ma'am?

| Page 112 |
| --- |

1  That was my question.
2       MS. PARFITT:  Mr. Williams, if I could
3  just say, she is a doctor, if we could refer to her as
4  "Doctor."
5       MR. WILLIAMS:  I'm sorry.  Pardon me.
6  Q  (By Mr. Williams)  Dr. McTiernan, excuse me, is that last
7  sentence of the second paragraph on Page 5 accurate or
8  not?
9       MS. PARFITT:  Thank you.
10      Objection.
11      THE WITNESS:  When I said "basis," I
12  would say it's the beginning because it was revised quite
13  a bit.
14      I will add to that.
15      There are things in this document, in this
16  evidence-- "Judging the evidence" document that go much
17  beyond what Bradford Hill aspects considered and are much
18  more specific to these types of variables.
19  Q  (By Mr. Williams)  Let me have you turn to-- let's take a
20  look back at the exhibit that we marked as Exhibit No. 5.
21      Exhibit No. 5 is the 2018 revised report.
22      Do you have that in front of you?
23  A  Yes.
24  Q  This document at Page 9 sets forth the methodology for
25  the report.

| Page 113 |
| --- |

1       Do you see that on Page 9?
2  A  Yes.
3  Q  And it says, "Through this process," and this is the
4  third paragraph on that page.  "Through this process the
5  CUP ensures that everyone, including policy-makers,
6  health professionals, and members of the public, has
7  access to the most up-to-date information on how to
8  reduce the risk of developing cancer."
9       Do you see that?
10  A  No-- so you are on Page 9?
11      Which paragraph?
12  Q  I'm sorry, Page 4.  I misspoke.
13      MS. PARFITT:  Thank you.
14  Q  (By Mr. Williams)  Pardon me, ma'am-- Doctor.
15      Page 4, third paragraph, under "Our Continuous
16  Update Project."
17      Do you see that?
18  A  Yes.
19  Q  The whole purpose of the continuous update process is to
20  try to ensure that members of the public have access to
21  the most up-to-date information on how to reduce the risk
22  of developing cancer, correct?
23      MS. PARFITT:  Objection; misstates the
24  document.
25      THE WITNESS:  If you are looking at

Anne McTiernan, Ph.D.

Page 114

1  that sentence, you would also have to put it in context
2  of what this report is.
3      It's related to diet, nutrition, physical activity
4  and cancer.
5      It is not all potential causes of cancer that an
6  individual could modify in order to reduce risk.
7      We are talking only about diet, nutrition, and
8  physical activity.
9  Q  (By Mr. Williams)  Let's look at Page No. 9 of this
10  exhibit.
11      At the end of the first paragraph, under the
12  heading, "Methodology," it says, halfway down that
13  paragraph, "The literature search was restricted to
14  Medline and included only randomized controlled trials,
15  cohort and case-control studies.  Due to their
16  methodological limitations, case-control studies were not
17  analyzed in the Ovarian Cancer SLR 2013."
18      Do you see that?
19  A  Yes.
20  Q  And "SLR" refers to "systematic literature review"?
21  A  Yes, it does.
22  Q  When you were considering the literature in your work for
23  the World Cancer Research Fund to determine what causes
24  cancer, it is accurate that your panel did not look at
25  any case-control studies?

Page 115

1  A  That's not true for the entire work that we did.
2      For some of the cancers and some of the exposures we
3  did include case-control studies; for example, arsenic
4  and some other carcinogens.
5      When I mentioned that the Bradford Hill aspects were
6  extended for this analysis, it is particularly because of
7  nutrition variables.
8      Nutrition variables are very difficult to ascertain
9  for exposure because as opposed to the use of talcum
10  powder products, which might be used once or twice a day,
11  nutrition variables are occurring sometimes 50 to 100
12  times a day.
13      The amount that people eat, what they're eating, how
14  often they're eating, the variables are so difficult to
15  collect, that the results from case-control studies are a
16  concern to some investigators.
17      Many epidemiologists disagree with this choice of
18  what World Cancer Research Fund decided to do.
19      When it says-- however, I should also mention when
20  it says, "analyzed," that's analyzed for the
21  meta-analysis.
22      The World Cancer Research Fund, when they do the
23  systematic reviews, also looks for pooled analyses and
24  meta-analyses, and they present them in the SLR, and
25  reports will have information from those other reports,

Page 116

1  and those can have case-control studies in them.
2      It's just that when they do their meta-analyses,
3  which is actually looking at data from the various
4  studies, they make the choice for nutrition variables to
5  focus on cohort studies for some cancers and some
6  exposures.
7      As I mentioned, arsenic, there was some other
8  exposures, like very hot teas that were studied in
9  case-control studies, so that's not a complete sentence--
10  statement for all of the projects.
11      MR. WILLIAMS:  I move to strike that
12  as nonresponsive.
13  Q  (By Mr. Williams)  My question to you is this:
14      The last sentence under "Methodology" on Page 9 of
15  this exhibit, Exhibit No. 5, says that "Due to their
16  methodological limitations, case-control studies were not
17  analyzed in the Ovarian Cancer SLR 2013."
18      That's what it says, right?
19  A  And I was explaining what it means.
20  Q  You would agree with me that each study design, cohort
21  study, case-control study, other types of studies, has
22  its advantages and limitations, correct?
23  A  That's true.
24  Q  And you would agree that the hierarchy of epidemiological
25  evidence places cohort studies above case-control

Page 117

1  studies?
2      MS. PARFITT:  Objection; form.
3      THE WITNESS:  I would say the
4  hierarchy of epidemiology evidence depends entirely on
5  the question under review.
6      If you have an exposure, which is very difficult to
7  measure and which can change over time or which you are
8  trying to determine lifetime exposure, then often it's
9  more-- it's easier to do that in a case-control study.
10      The case-control studies that were reviewed for the
11  talcum powder product used and ovarian cancer risk
12  primarily used interview questionnaires, so an
13  interviewer spending time, sometimes several hours with a
14  patient in control, to determine lifetime exposures.
15      The cohort studies, however, typically, and
16  especially the three cohort studies that were included in
17  this review and that have been published on ovarian
18  cancer and talcum powder products, those studies were
19  designed to look at multiple diseases.
20      Nurses' Health Study was started to--
21  Q  (By Mr. Williams)  Ma'am, I am going to have to cut you
22  off because-- look, when I ask you questions, I need you
23  to answer the question that I've asked.  Otherwise, you
24  could just talk for a half an hour, so if you would,
25  please, Doctor, just focus on the question that I'm

Page 118

1  asking you.
2     The question that I'm asking you is:
3     As a matter of epidemiological practice in your line
4  of work, is it true or not true that cohort studies-- excuse me,
5  that cohort studies are placed higher in the hierarchy
6  than case-control studies?
7     If the answer is that's not true, please just say
8  it's not true.
9        MS. PARFITT:  Objection to form; asked
10  and answered.
11        THE WITNESS:  I think-- yeah, I did
12  try to answer that before.  I will try to do it better
13  this time.
14     For one thing, I am not sure what hierarchy you are
15  referring to, but what I'm saying is that depending on
16  the question, one type of study could be preferable to
17  another, but in general all of the studies provide
18  information, and we look at the totality of evidence.
19  Q  (By Mr. Williams)  So it is your view that there is no
20  generally accepted hierarchy of epidemiological evidence?
21        MS. PARFITT:  Objection; form,
22  misstates her testimony.
23        THE WITNESS:  I think it depends
24  entirely on what the question is.
25  Q  (By Mr. Williams)  Let's look at Exhibit No. 10, which is

Page 119

1  the "Judging the evidence" document from 2018 from the
2  World Cancer Research Fund, and I will direct your
3  attention to the seventh page.
4     At the bottom of Page 7 of this exhibit, Exhibit
5  No. 10, it has a section that says, "Study design," that
6  says, "Each study design has its advantages and
7  limitations.  The hierarchy of epidemiological evidence
8  places cohort studies above case-control studies, with
9  ecological studies and case reports at the bottom.
10     "There are merits in considering a number of
11  different study designs.  Cohort studies are likely to be
12  the main source of evidence owing to the long latent
13  period for cancer to develop and also to their
14  prospective design"--
15  A  I'm sorry, can you say where you're reading from?
16        MS. PARFITT:  7.  He's right here.
17        THE WITNESS:  Okay.
18  Q  (By Mr. Williams)  And I've read through that heading,
19  "Study design," through to the last sentence that says,
20  "However, in some circumstances case-control studies and
21  ecological studies may also make a useful contribution to
22  the evidence," and it refers to Section 7.
23     Do you see that?
24  A  Yes.
25  Q  Now, we are going to go to Section 7 in a minute, but my

Page 120

1  question to you now is:
2     Is it your testimony that there is in fact no
3  generally accepted hierarchy of epidemiological evidence
4  that places cohort studies above case-control studies?
5        MS. PARFITT:  Objection.
6        THE WITNESS:  And I would again say it
7  depends entirely on the question, the scientific
8  question.
9  Q  (By Mr. Williams)  Here this references that cohort
10  studies are likely to be the main source of evidence
11  owing to the long latent period for cancer and owing to
12  their prospective design.
13     Those are the two concepts that it mentions in that
14  sentence, correct?
15  A  That's what that mentions, yes.
16  Q  And the latent period for cancer refers to the fact that
17  exposure to a substance can sometimes take some time
18  before cancer is developed, right?
19  A  That's correct.
20  Q  That's the latency period?
21  A  Yes.
22  Q  And the idea of a prospective cohort study is that people
23  are asked about their-- what they do and put on and in
24  their bodies right now when they are healthy, and then
25  they are followed along, correct?

Page 121

1  A  That's correct.
2  Q  Okay.  And retrospective case-control studies are
3  backwards-looking where people are asked questions after
4  they have contracted a disease and they are asked to
5  recall what they put on and in their bodies, true?
6  A  So that is typical.
7     Cohort studies, by the way, could also ask
8  retrospectively what somebody had done over their
9  lifetime.
10     In this particular case, with talcum powder
11  products, they did, but I have seen many studies do that.
12     They can do a lifetime exposure, and then if-- the
13  better cohort studies focused on certain-- depending on
14  the question, they update their data so that then you
15  could have a lifetime exposure variable from a cohort
16  study.
17     For the-- in terms of long latent period for cancer,
18  case-control studies, if they're asking about lifetime
19  exposure and collecting that information, that would not
20  be an issue or a problem for case-control studies.
21  Q  Let me have you turn to Section No. 7, which is on Page
22  21.
23     That's the section that's referred to at the end of
24  the page we were just looking at, the study design
25  section referring to Section 7, so I want to go there.

Anne McTiernan, Ph.D.

Page 122

1    Do you have Page 21 in front of you?
2  A  Yeah.
3  Q  In the left-hand column under Section 7, "Evidence
4    collated for the Continuous Update Project," at the very
5    bottom, it has the sentence that says, "The first stage
6    of the SLRs was a comprehensive search using a
7    standardized search strategy for the scientific
8    literature for randomized trials and cohort studies
9    published since 2006 using Medline. Because case-control
10   studies are particularly prone to recall (and other)
11   bias, they were not routinely reviewed"--
12 A  Where are you again? Okay. Sorry.
13       MS. PARFITT: Just give her a moment,
14   Mr. Williams, to catch up.
15 Q  (By Mr. Williams) Do you see where I am?
16 A  Yes.
17 Q  In the right-hand column of Page 21 it says, "Because
18   case-control studies are particularly prone to recall
19   (and other) bias, they were not routinely reviewed.
20   "However, if there were no or very few RCTs or
21   cohort studies, they were included."
22   Do you see that?
23 A  Yes.
24 Q  In the case of talc and ovarian cancer, as of 2018, is it
25   accurate to say that there are five cohort studies that

Page 123

1    you have had the benefit of reviewing?
2  A  That is not correct.
3    In the three cohort studies, one of which had three
4    publications with different numbers of cases in them--
5    there are three cohort studies.
6  Q  So if we count the study that has three different cohort
7    studies within it, and then add the other two cohort
8    studies, we would get to five; would we not?
9       MS. PARFITT: Objection; form.
10      THE WITNESS: I repeat, the three
11   cohort studies, just that one of them has three
12   publications.
13 Q  (By Mr. Williams) And do you consider three cohort
14   studies, one of which had three separate sets of data, to
15   be insufficient to do an analysis of whether talc causes
16   ovarian cancer?
17      MS. PARFITT: Objection; form.
18      THE WITNESS: I would consider those
19   three-- what I would do is look at the individual studies
20   of those three studies. I would look at how the data
21   were collected and whether you can get the information
22   that you want to look at your question, before deciding
23   that they were sufficient on their own.
24 Q  (By Mr. Williams) Every single cohort study that you
25   looked at in this case, for your work in this litigation,

Page 124

1    showed that there was no statistically significant
2    relationship between talc use and ovarian cancer,
3    correct?
4       MS. PARFITT: Objection; form.
5       THE WITNESS: One of those studies did
6    show a statistically significant association with use of
7    talcum powder products and risk of serous ovarian cancer,
8    and that was the Gertig study, but I also did an analysis
9    showing there was insufficient number of cases in all
10   three of those studies in order to find a statistically
11   significant result.
12   The driver of statistical significance is the number
13   of cases in a study, regardless of whether it's a cohort
14   study or case-control study.
15 Q  (By Mr. Williams) We will get to the number of cases in
16   a moment, but with respect to the Gertig study, you are
17   aware and came across in your review, because you
18   referenced them in your report, that that Gertig study
19   was updated in 2008 and 2010 under the name "Gates,"
20   correct?
21      MS. PARFITT: Objection; form.
22      THE WITNESS: 2008 I would not call an
23   update.
24   It only included 200 cases from the Nurses' Health
25   Study. It also included other cases from the New England

Page 125

1    case-control study, so when you look at just the Nurses'
2    Health Study, part of it was only 200 cases, and it is
3    very difficult to determine which cases those were.
4    The second update wasn't an update, but at that time
5    they ended up looking at a different variable, a
6    different comparison.
7    The first study compared no use, never-users, to
8    users of different categories.
9    The second-- the third study compared-- combined
10   never-users with use of less than once a week, so you
11   have a very different comparison, so I think that was--
12   that was concerning.
13   It's not clear it's a real update-- the data aren't
14   really there.
15   That third study also didn't focus just on talc.
16   Talc was just one of the variables in the study.
17 Q  (By Mr. Williams) To the extent that the 2010 study by
18   Gates, that update-- first of all, the 2010 update wasn't
19   an update.
20   You just said that yourself, correct, Doctor?
21      MS. PARFITT: Objection.
22      THE WITNESS: It was an update of
23   cases.
24   It is not clear it was an update of the data.
25 Q  (By Mr. Williams) True or not true, the 2010 Gates

Anne McTiernan, Ph.D.

Page 126

1 update did not show a statistically significant increased
2 risk of serous invasive ovarian cancer?
3        MS. PARFITT:  Objection.
4        THE WITNESS:  It did not show a
5 statistically significant association, correct.
6 Q  (By Mr. Williams)  Can you identify any cohort study that
7 concluded that there was a statistically significant
8 overall association between talc and ovarian cancer?
9        MS. PARFITT:  Objection; form.
10        THE WITNESS:  So you are talking about
11 for talc and any type of epithelial ovarian cancer?
12 Q  (By Mr. Williams)  Any statistically significant overall
13 association between talc and ovarian cancer.
14 A  That's correct, I didn't have sufficient sample size to
15 do it.
16 Q  The answer to my question is that you cannot identify any
17 cohort study concluding that there was a statistically
18 significant overall association between talc and ovarian
19 cancer, correct?
20        MS. PARFITT:  Objection to form; asked
21 and answered.
22 Q  (By Mr. Williams)  You may answer, Doctor.
23 A  So my answer is the same, that statistical significance
24 is not seen because the sample size is too small.
25 Q  Is there any other reason why statistical significance

Page 127

1 was not seen besides the sample size being too small?
2 A  Sample size is one of the major drivers.
3        The other thing is there is a lot of variability
4 around the point estimate, the relative risk.
5        When you see a sample size that's that small, that's
6 the major thing you start thinking about.
7 Q  Other than sample size and variability, is there any
8 other factor that you believe makes the cohort studies
9 unreliable?
10 A  I don't think I used the world "unreliable."  I used the
11 word "not statistically significant."
12        MS. PARFITT:  Objection.
13 Q  (By Mr. Williams)  Other than sample size and
14 variability, is there anything else that bears upon
15 statistical significance that is important?
16        MS. PARFITT:  Objection; form.
17        You are referring to the collective group of cohort
18 studies?
19        THE WITNESS:  The statistical
20 significance-- you are not talking about the effects.
21 You are talking about statistical significance.  Those
22 are the things that would drive it, in my opinion.
23        MR. WILLIAMS:  Counsel, I am going to
24 go to a different topic.
25        Do you want to take lunch now?  Do you want to go

Page 128

1 12:30?  What's your pleasure?
2        MS. PARFITT:  Can we go off the
3 record?
4        MR. WILLIAMS:  Let's go off the
5 record.
6        VIDEOGRAPHER:  Going off record, the
7 time is 12:07 p.m.
8        (Recess 12:07 to 12:0 p.m.)
9
10        VIDEOGRAPHER:  We are back on the
11 record.  The time is 12:09 p.m.
12 Q  (By Mr. Williams)  Dr. McTiernan, would you agree that if
13 you had only looked at the cohort studies in this case,
14 like it is suggested is appropriate in the World Cancer
15 Research Fund "Judging the evidence" document, Exhibit
16 No. 10, that you would not have been table to opine that
17 talcum powder causes ovarian cancer?
18        MS. PARFITT:  Objection; form.
19        THE WITNESS:  First I want to respond
20 by characterizing the World Cancer Research Fund
21 document, that they're referring to nutrition variables,
22 so that is why they consider case-control studies to be a
23 much lower hierarchy than cohort studies.
24        In terms of what was seen in the cohort studies, we
25 did see, with the Nurses' Health Study, elevated risk of

Page 129

1 serous cancer.
2        We also saw in the two cohort studies elevated risk
3 that was not statistically significant, and I-- my
4 opinion is that's because the sample size was small.
5        In answer, two of the three cohort studies did show
6 elevated risk of ovarian cancer, but they were not
7 statistically significant, with the exception to the
8 serous subtype in the Nurses' Health Study.
9 Q  (By Mr. Williams)  Have you completed your answer?
10 A  Yes.
11 Q  The only type of cancer for which there was a
12 statistically significant finding in one of the studies
13 related to serous invasive ovarian cancer, correct?
14 A  Only one type showing statistical significance around
15 that relative risk, yes.
16 Q  And that was the Gertig 2000 study?
17 A  Yes.
18        The--
19 Q  Ma'am, you have answered my question.
20        Was the Gertig 2000 study the only study where there
21 was a statistically significant finding that serous
22 invasive ovarian cancer was associated with talc use?
23        MS. PARFITT:  Objection; form.
24        THE WITNESS:  For the cohort studies,
25 yes, that's correct.

Anne McTiernan, Ph.D.

Page 130

1  Q  (By Mr. Williams)  I take it you and I disagree as to
2     whether or not the Gates 2010 update showed that that
3     previously seen statistically significant increased risk
4     for serous invasive cancer went away?
5        You think it did not go away.  I represented to you
6     that the study says that it did go away, right?
7           MS. PARFITT:  Objection; form.
8           THE WITNESS:  My issue with them is
9     not-- is that different comparisons were made.
10       The first one looked at never-use versus ever-use--
11  Q  (By Mr. Williams)  You have already explained that,
12     ma'am--
13          MS. PARFITT:  Please allow her to
14     complete.
15          THE WITNESS:  I am just referring to
16     my answer.
17       The second study, the 2010 Gates study, was then
18     comparing never-user plus less than once a week use
19     versus greater use, so it's a different comparison.
20     That's going to dampen, going to lower the relative risk
21     by putting some of the users in with the nonusers.
22  Q  (By Mr. Williams)  The Gates 2010 study did not show a
23     statistically significant increased risk for serous
24     invasive ovarian cancer, true or not true?
25          MS. PARFITT:  Objection; form, asked

Page 131

1     and answered.
2           THE WITNESS:  It showed a six percent
3     increase in risk that was not statistically significant,
4     and it's not comparing nonusers to users.  It's comparing
5     nonusers plus less-than-once-a-week users to more-often
6     users.
7  Q  (By Mr. Williams)  Let me ask you to look, Doctor, at
8     Exhibit No. 10--
9  A  Which one?
10  Q  Exhibit No. 10, the, "Judging the risk" document from
11     2018-- excuse me, "Judging the evidence."
12       I misspoke.
13       First, I haven't done this yet, but if you look at
14     Page 30, the acknowledgments section, it lists you as a
15     panel member for this review, correct?
16  A  Yes.
17  Q  It is true that you relied very heavily on this document,
18     that is Exhibit No. 10, in drafting your report for this
19     case?
20          MS. PARFITT:  Objection; misstates
21     testimony.
22          THE WITNESS:  I did not draft this
23     report.
24       Is that what you mean?
25       The World Cancer-- so you are talking about the

Page 132

1     World Cancer Research report or my report?
2  Q  (By Mr. Williams)  I am referring to--
3  A  For the talcum powder products--
4  Q  I'll restate the question.
5        For purposes of preparing your report, Exhibit No. 2
6     for this deposition, which is the report you prepared for
7     this litigation-- do you have that in mind?
8  A  Yes.
9  Q  It is true that you relied heavily on Exhibit No. 10, the
10     "Judging the evidence" document, in preparing your
11     report, which is Exhibit No. 2?
12          MS. PARFITT:  Objection; form.
13          THE WITNESS:  I didn't rely heavily.
14     I cited it as some of the methods of reviewing
15     meta-analyses.  I used some of the methods that I used
16     for that as well as what was used for the government
17     physical activity guidelines, but I did not use this
18     entirely.
19        In terms of determining causality, I used-- I went
20     back to the original Bradford Hill aspects, listed
21     aspects, to determine causality.  I did not use the
22     guidelines for the CUP analysis in determining whether
23     the association that's seen between talcum powder
24     products and risk of ovarian cancer meets criteria for
25     causal.

Page 133

1  Q  (By Mr. Williams)  Let me be very specific about what I
2     mean.
3        When you were typing up Exhibit No. 2, your report
4     for this case, you literally had this exhibit, Exhibit
5     No. 10, next to you as you typed?
6          MS. PARFITT:  Objection.
7  Q  (By Mr. Williams)  True or not true?
8          MS. PARFITT:  Objection; form.
9          THE WITNESS:  It's not true.
10  Q  (By Mr. Williams)  Is it your testimony that you prepared
11     your report without any reference at all to any part of
12     Exhibit No. 10?
13  A  I did reference it.  It's one of the references here.
14  Q  Show me that, if you would.
15  A  I think-- I used-- I included the website.
16  Q  You included the website for the 2014 report on Page 5 of
17     your report, but if you did refer to this document,
18     Exhibit No. 10, in your references or anywhere else,
19     please let me know where that is.
20  A  So I don't see it if I did.
21  Q  Have you completed your answer?
22  A  What was the question again?
23  Q  I was asking you to point out for me--
24  A  Did I refer to it or did I reference it?
25       I may not have referenced it.

Anne McTiernan, Ph.D.

Page 134

1    I thought I had.
2        Yeah, I just have the website here.
3  Q  Let me refer you to your report in this case, Exhibit
4    No. 2, and ask you to turn to Page 10.
5        You have a heading that says, "The science of
6    epidemiology" at Page 10.
7        Do you see that?
8  A  Yes.
9  Q  And with the first paragraph there, starting about a
10    third of the way into the paragraph, you write,
11    "Epidemiological research describes and seeks to explain
12    the distribution of health and disease within human
13    populations."
14        Did I read that correctly?
15  A  Yes.
16  Q  And skipping a sentence, you write, "This type of
17    investigation is known as observational.  By relating
18    differences in circumstances and behavior to differences
19    in the incidence of disease, associations are identified
20    that may or may not be causal."
21        Is that what it says?
22  A  Yes.
23  Q  And then the first sentence of the next paragraph says,
24    "In epidemiological studies, an exposure is a factor or
25    condition that may or may not influence the risk of

Page 135

1    disease," right?
2  A  Yes.
3  Q  Throughout your report you included a lot of citations to
4    works that you relied upon, correct?
5  A  Yes.
6  Q  Your reference section includes, I think we said, 127
7    citations, right?
8  A  Yes.
9  Q  You did not provide a citation for any of the sentences
10    that we just read, right?
11  A  That is not here, no.
12  Q  And by that I mean there is no reference to a footnote,
13    there is no reference to any of the 127 items in the back
14    of your report, correct?
15  A  That's correct.
16  Q  Now, turn back to the "Judging the evidence" document,
17    which we marked as Exhibit No. 10, and I will ask you to
18    turn to Page 6 under the heading, "Epidemiological
19    evidence."
20        Right underneath that heading the "Judging the
21    evidence" document from the World Cancer Research Fund
22    says, and I'm quoting, "Epidemiological research
23    describes and seeks to explain the distribution of health
24    and disease within human populations," and I will stop
25    there.

Page 136

1    Is it accurate to say that the sentences that are
2    set forth under that heading, "Epidemiological evidence,"
3    are identical to sentences found in your report on Page
4    10, with one exception, that there is a sentence that
5    appears in your report that does not appear on Page 6 of
6    Exhibit No. 10?
7        MS. PARFITT:  Object to the form of
8    the question.
9        THE WITNESS:  I think you are talking
10    about the sentences up here.
11  Q  (By Mr. Williams)  I am actually talking about the three
12    sentences that I read from Page 10 of your report, two
13    sentences from the first paragraph, and one sentence, the
14    first sentence from the second paragraph.
15        Those three sentences are identical, word for word,
16    to the sentences that appear on Page 6 of Exhibit No. 10?
17        MS. PARFITT:  Objection; form.
18  Q  (By Mr. Williams)  Correct?
19  A  Yes.
20  Q  Now, just so we're clear, did you provide the people who
21    wrote the text of the World Cancer Research Fund a copy
22    of your expert report in this case when this document,
23    "Judging the evidence" was prepared?
24  A  No, they did not get a copy of this.
25        Nobody has seen it, other than Ms. Parfitt and her

Page 137

1    colleagues.
2  Q  So to this day there is nobody from the WCRF who has seen
3    your expert report in this litigation, correct?
4  A  That's correct.
5  Q  So the way this work was, you had in front of you Exhibit
6    No. 10, and you prepared-- took out sentences from the
7    WCRF document and included them word for word in your
8    report, correct?
9        MS. PARFITT:  Objection; form.
10        THE WITNESS:  I can't recall where I
11    took this.
12        I have many different documents where I have
13    information about what epidemiology is.
14        If I took it from here, I should have cited it, but
15    I can't recall where exact sentences came from.
16  Q  (By Mr. Williams)  Wherever you took it from--
17  A  I should have cited it.
18  Q  Whether it was the "Judging the evidence" document or
19    someplace else, you didn't cite it?
20  A  I should have cited it, you're right.
21  Q  Now, we went through your expert report and the
22    Continuous Update Project's "Judging the evidence"
23    document, Exhibit No. 10, and we put the text side by
24    side for various sections for ease of reference, and I'm
25    going to pass those out to you, and we'll mark it as

Anne McTiernan, Ph.D.

Page 138

1    Exhibit No. 11.
2        We will give it to Counsel.
3            (Exhibit No. 11 marked
4            for identification.)
5
6    Q  (By Mr. Williams)  Now, what we set forth here are a
7        total of 13 different places where the language from the
8        "Judging the evidence" report was used word for word,
9        with some exceptions, in your report.
10       Do you see that?
11       I am not asking you to agree or disagree, but let me
12       ask you to see that there are 13 different examples where
13       the language is either word for word or roughly word for
14       word used in your report, taking language that also
15       appears in the "Judging the evidence" report.
16       Do you see that?
17       Take your time to look through there.
18           MS. PARFITT:  Objection to form.
19           THE WITNESS:  I can see that some of
20       these are very common epidemiologic terms.
21   Q  (By Mr. Williams)  Let's look for a little-- why don't
22       you put that to one side for a moment and let me just ask
23       you some other questions, and then we'll take lunch.
24       I want to discuss a few places where it appears that
25       you copied from the "Judging the evidence" document and

Page 139

1        made some changes.
2            MS. PARFITT:  And I will object to the
3        form of that.
4        Please continue.
5    Q  (By Mr. Williams)  In describing what a pooled analysis
6        is in the Continuous Update Project report, and I will
7        refer you to Exhibit No. 10 at Page 11, in the right-hand
8        column--
9            MS. PARFITT:  Just give us a moment--
10           THE WITNESS:  Exhibit No. 10?
11   Q  (By Mr. Williams)  Right, Exhibit No. 10 at Page 11 on
12       the right-hand column.
13       There is a heading that says-- there's a paragraph
14       that begins, "Pooled analysis," last paragraph on the
15       page.
16       Do you see that?
17   A  Mm-hm.
18   Q  Is that a "yes"?
19   A  Yes.
20   Q  In Exhibit No. 10, which is the "Judging the evidence"
21       document, it says, "Pooled analysis is a type of
22       meta-analysis in which original individual-level data
23       from various published epidemiological studies of a
24       similar type - usually prospective cohort studies - are
25       combined and re-analyzed.

Page 140

1        "The combination of data from multiple studies
2        creates a larger data set and increased statistical
3        power."
4        Did I read that right from Exhibit No. 10?
5    A  Yes.
6    Q  Now, when you prepared your litigation report, you copied
7        a lot of the language verbatim into your litigation
8        report but made a few changes.
9        Have you noticed those?
10           MS. PARFITT:  Objection to that form.
11   Q  (By Mr. Williams)  Let me refer you to Exhibit No. 2,
12       Page 22 of your report.
13       Exhibit No. 2, Page 22.
14       I would ask you to keep Exhibit No. 2, Page 22 open
15       and keep Page 11 of Exhibit No. 10 open, and put them
16       side by side.
17       Referring you now to Page 22 of Exhibit No. 2, the
18       first full paragraph on that page says, "Pooled analysis
19       is a type of meta-analysis where original
20       individual-level data from various published and/or
21       unpublished epidemiological studies are combined and
22       re-analyzed."
23       Did I read that correctly from your report?
24   A  Yes.
25   Q  Now, when you wrote your report, the only difference

Page 141

1        between the language that's set forth in Exhibit No. 10,
2        in that first sentence, the only language that is added
3        is "and/or unpublished."
4        Do you see that?
5    A  Yes.
6    Q  So while the Exhibit No. 10, the "Judging the evidence"
7        document that was put out by the World Cancer Research
8        Fund, when they described a pooled analysis, they didn't
9        say anything about unpublished studies, true?
10   A  So again--
11   Q  Pardon me?
12       I am asking you to look at Exhibit No. 10, Page 11.
13   A  Right.
14   Q  Right-hand column.
15   A  Right.
16   Q  That sentence does not say anything about "and/or
17       unpublished," does it?
18   A  Right-- yes, it doesn't.
19   Q  And then in that sentence, if you go back to Page 22 of
20       your report, after you added "and/or unpublished
21       epidemiological studies," you took out some information,
22       did you not, some words?
23   A  What are you referring to that I took out?
24   Q  Well, the words that you took out were, dash, "Usually
25       prospective cohort studies," dash, right?

Anne McTiernan, Ph.D.

Page 142

1    Actually, you also took out the words "of a similar
2    type," so let me restate the question.
3        In your report you took out the words "of a similar
4    type - usually prospective cohort studies"-- and I will
5    put a closed quote there.
6        You took those words out, right?
7   A  So, again, I can't remember every place-- because when I
8    write projects, I do take sections from things that I've
9    previously been involved with, since I'm considered on
10   this panel and it's considered as something I'm involved
11   with.  I should have cited it, but I would be citing
12   something that I'm part of.
13       This-- it's not true that pooled analyses is only
14   prospective cohort studies, and it is not even true that
15   it's usually.
16       Many pooled analyses of case-control studies-- there
17   are many pulled analyses of clinical trials, so when
18   they're saying, "usually prospective cohort studies,"
19   they're referring for what they usually-- for their data
20   or WCRF data, are usually prospective for the nutrition
21   variables, so that's what they specified there.
22  Q  The words "of a similar type - usually prospective cohort
23   studies," do not appear in your report.
24       Can we agree on that?
25           MS. PARFITT:  Objection; form.

Page 143

1            THE WITNESS:  It wouldn't be relevant
2    because I am talking generally about pooled analysis, and
3    it's individual data from-- it could be any type of
4    studies.
5        I mentioned it could be clinical trials.  There are
6    many pooled analyses of clinical trials.
7        It could be cohort studies, it could be case-control
8    studies.
9        And sometimes the cohorts and case-control studies
10   will be combined together where the cohort studies are
11   nested case-control studies, so it could be a combination
12   of two different types.
13           MR. WILLIAMS:  I move to strike that
14   as nonresponsive.
15  Q  (By Mr. Williams) Doctor, my question is this:
16       The words "of a similar type - usually prospective
17   cohort studies," those words do not appear in your
18   report.
19       Can we agree on that?
20           MS. PARFITT:  Objection; form, asked
21   and answered.
22           THE WITNESS:  I agree they don't
23   appear in my report.
24  Q  (By Mr. Williams) So the Continuous Update Project
25   document stated that you should only pool published

Page 144

1    studies, but you changed that language for your
2    litigation report to include "unpublished studies,"
3    right?
4            MS. PARFITT:  Objection; form.
5            THE WITNESS:  The Continuous Update
6    Project did make a decision to use only published data
7    because it did not have the personal power to get
8    unpublished.
9        It is typical in pooled analysis and sometimes in
10   meta-analyses to look for additional data if it's known
11   to exist, even if it's not published.
12       This is true for clinical trial pooled analyses,
13   case-control pooled analyses, and cohort pulled analyses.
14       It is not surprising at all that-- it was not
15   unusual to see that in the Terry pooled analysis there
16   were three studies that were previously unpublished that
17   were added to the published data for that pooled
18   analysis.
19       I've seen this for one of the pooled analyses we
20   relied on for the physical activity guidelines committee,
21   and so it's a common method.
22       As long as you use the same criteria to determine if
23   that study has valid data, then it's quite customary to
24   include it in a pooled analysis.
25  Q  (By Mr. Williams)  The only pooled analysis that you

Page 145

1    looked at for this litigation was Terry 2013, correct?
2            MS. PARFITT:  Objection; form.
3            THE WITNESS:  It's the only one that
4    characterizes a pooled analysis.
5        There were some of the case-control studies that
6    added together more than one study.
7        The second study of the Nurses' Health Study was a
8    pooled analysis of Nurses' Health cases and New England
9    case-control studies, so that was a pooled study that
10   involved just two sets of studies.
11  Q  (By Mr. Williams)  The only pooled analysis that you
12   cited in your paragraph on Page 22, referencing Item 39,
13   which I'll represent to you is the Terry 2013 study, the
14   only pooled analysis that you studied in your report on
15   Page 22 is the Terry study, correct?
16  A  I cited that singly because it was large enough.
17       My point is that it's large enough to be able to
18   look at some of these associations.
19  Q  And that Terry 2013 study pooled eight case-control
20   studies, correct?
21  A  That's correct.
22       It's a pooling project that has been done for many
23   other variables as well.
24  Q  Doctor, we will be here all day and it will go late into
25   the night.

Anne McTiernan, Ph.D.

Page 146

1    I would ask you to answer just the question that I
2 ask.
3    The question that I'm asking you now is:
4    The Terry 2013 pooled eight case-control studies,
5 correct?
6    That's all I'm asking.
7 A  That's correct.
8 Q  You deviated from the Continuous Update Project's
9 definition of a pooled analysis, which is on Page 11 of
10 Exhibit No. 10, in order to accommodate a study that you
11 found helpful for the plaintiffs in this case, correct?
12    MS. PARFITT:  Objection; form,
13 completely misstates her testimony and her opinions.
14    You may answer.
15    THE WITNESS:  The Continuous Update
16 Project definition was discussing studies related to
17 nutrition, and the Continuous Update Project decided to
18 only look at cohort studies for some of the relationships
19 they were addressing.
20    I believe this is why this sentence was written in
21 that way, but it is not true that pooled analyses are
22 usually prospective cohorts.
23    If you look at pooled analyses in general, many of
24 them are clinical trials, they are done in the treatment
25 area, many of them are case-control studies, and many can

Page 147

1 be cohort studies.
2 Q  (By Mr. Williams)  Let me ask my question this way:
3    Doctor, could you point us to some learned treatise,
4 study, summary of studies that uses the formulation for
5 pooled analysis word for word that is set forth on Page
6 22 of your report; that is, could you point us to some
7 source that says that pooled analyses is a type of
8 meta-analysis that includes published and unpublished
9 studies and that simultaneously does not reference
10 prospective cohort studies?
11    Is there something that you can point us to that
12 uses the formulation for pooled analysis that you've set
13 forth?
14    MS. PARFITT:  Objection; form.
15    THE WITNESS:  I'm a little bit
16 confused by the question, but--
17 Q  (By Mr. Williams)  Let me stop you there because if
18 you're confused, it does me no good.
19    I will restate it.
20    Your paragraph here on Page 22 has one, and only
21 one, citation, and that's to 39, the Terry 2013 study,
22 correct?
23 A  That's correct.
24 Q  There are no other citations of any sort in that
25 paragraph, correct?

Page 148

1 A  That's correct.
2 Q  My question to you then is:
3    Can you point us to any reference material anywhere
4 that uses word for word the formulation for pooled
5 analyses that you have set forth in the first two
6 sentences of that paragraph?
7 A  So I think you're asking about pooled analyses that
8 include studies that are not published; is that correct?
9 Q  I am asking the question that I asked.
10    I will restate it one more time.
11    Can you point us--
12    MR. WILLIAMS:  Counsel, I would as
13 that you not point to anything.
14    MS. PARFITT:  I am just trying-- there
15 is a monitor, for the Ladies and Gentlemen of the Jury,
16 in front of the doctor, and I am just reminding her to
17 look at the monitor, but you can--
18    MR. WILLIAMS:  I think that's
19 inappropriate.
20 Q  (By Mr. Williams)  But, Doctor, here is my question
21 again:
22    The first full paragraph on Page 22 describes pooled
23 analyses.  I'm referring you to the first two sentences
24 there-- are you with me so far?
25 A  Yes.

Page 149

1 Q  Looking at those sentences word for word, and I mean
2 every word in both of those two sentences-- are you still
3 with me?
4 A  Yes.
5 Q  Okay.  Looking at those two sentences, can you point us
6 to any reference material that you have reviewed anywhere
7 that describes pooled analyses using the words, and I
8 mean word for word, as you set it forth here in the first
9 two sentences of Paragraph No. 22?
10    MS. PARFITT:  Objection; form.
11 Q  (By Mr. Williams)  You either can or you can't.
12    The answer is yes, the answer is no.
13    I just need to know--
14 A  Since I wrote that sentence, I am not sure where else it
15 would be.
16    If I was going to cite-- no, I can't.
17    I wrote that sentence.
18 Q  Okay.  What we do know is that the description of pooled
19 analysis in Exhibit No. 10, which is the World Cancer
20 Research Fund "Judging the evidence" document that has,
21 on Page 2, a description of how one is to cite to it,
22 what we do know is that that document describes pooled
23 analysis as including published epidemiological studies
24 of a similar type, usually prospective cohort studies,
25 right?

Anne McTiernan, Ph.D.

Page 150

1         MS. PARFITT:  Objection; form.
2         THE WITNESS:  And I disagree with that
3    characterization of pooled studies.
4         MR. WILLIAMS:  Why don't we take a
5    lunch break.
6         VIDEOGRAPHER:  Going off the record.
7    The time is 12:40 p.m.
8              (Lunch recess 12:40 to 1:21 p.m.)
9
10        VIDEOGRAPHER:  We are going on the
11   record at 1:21 p.m.
12        This is the start of Media Unit 3.
13   Q  (By Mr. Williams)  Good afternoon, Doctor.
14        This morning there have been several occasions when
15   I've used the word "ma'am," and I really apologize, and I
16   mean no disrespect.  I am going to try to use the word
17   "Doctor."
18        It's just how I was raised, and I apologize, but I
19   do understand that that can be disrespectful.  I don't
20   mean that at all.
21   A  No problem.  Thanks.
22   Q  In response to several of my questions earlier today
23      about the various World Cancer Research Fund and CUP
24      reports that we have marked as Exhibits 4, 5, and 10,
25      there have been several times when you have made

Page 151

1    reference to your view that the focus of those reports
2    was on nutrition, physical activity, and diet.
3         Do you recall that that has happened occasionally?
4    A  Yes.
5    Q  If you could take out Exhibit No. 5, which is the 2018
6       report of the WCRF-- and I will ask you to turn to Page
7       8.
8         Section 4, "Other established causes," Page 8-- do
9       you have that in front of you, ma'am?
10   A  Yes.
11   Q  Section No. 4 is entitled, "Other established causes,"
12      and let me-- while you have that in front of you, let me
13      ask:
14        Not bearing children is listed as something that
15      this report says may be a cause of ovarian cancer,
16      correct?
17   A  It says, "May be seen as protective against ovarian
18      cancer," yes.
19   Q  Well, actually, it says-- I will just read it.  The
20      second sentence says, "Not bearing children increases the
21      risk of and may be seen as a cause of ovarian cancer,"
22      and it goes on to say, "The reverse also applies:  Bearing
23      children reduces the risk of and may be seen as
24      protective against ovarian cancer."
25        Do you see that?

Page 152

1    A  That's correct.
2    Q  Now, early menarche or age of first-- a woman first
3       having her period is also listed as something that may be
4       seen as a cause of ovarian cancer in this paragraph,
5       right?
6    A  Yes.
7    Q  Can we agree that early menarche, not bearing children,
8       and late natural menopause are not related to nutrition,
9       physical activity, or diet?
10   A  This paragraph is related to background, and it's talking
11      about menstrual cycles during a woman's lifetime.  That's
12      why it's talking about all of those variables related to
13      early menarche, late menopause.
14        I am not sure why whoever wrote this focused in on
15      that, on a woman's menstrual cycle.
16        They did not do a full systematic review of the risk
17      factors for ovarian cancer.
18        I can see from what was written here--
19   Q  Whether you consider it to be a full systematic review or
20      not, my question is:
21        Early menarche, not bearing children, and late
22      natural menopause are not, in and of themselves, related
23      to nutrition, physical activity, or diet, right?
24   A  And the whole report was not-- was to discuss and
25      interpret and summarize meta-analyses-- for all of the

Page 153

1    cancers, different writers put in paragraphs about some
2    general factors about the cancers, and there was no
3    effort to do a systematic review, so these are not causal
4    analyses that were listed here.
5         I don't know why these particular ones were picked.
6    They're missing some.
7         They're missing endometriosis, for example, as well
8    as talcum powder.
9         They are missing public inflammatory disease, so it
10   is not a full review.
11        For some reason they picked just some
12   menstrual-related variables to mention here.
13   Q  Now, again, you said, "they."
14        Once this draft was prepared, you have testified
15   this morning that the panel, on which you are a member,
16   reviews and makes judgments based upon the draft that is
17   received, right?
18   A  In-- the 2014 draft.
19        To my knowledge it was not changed.
20        We did not see another update to review prior to the
21   2018 publication of everything together.
22        This was a 2014 document and it was on the website
23   in 2014.
24   Q  I want the record to be clear the document that I'm
25   referring you to right now, the Exhibit No. 5 to your

Anne McTiernan, Ph.D.

Page 154

1  deposition, is the revised document dated 2018.
2      We have that clear, right?
3  A  Yes, but it also says, "2014" on the label for ovarian
4      cancer.
5  Q  It does, but it also says that it was revised and
6      published in 2018, right?
7      I don't want to argue with you, but it does say that
8      was revised and published in 2018, true?
9          MS. PARFITT: Objection; form.
10 Q  (By Mr. Williams) Go ahead.
11 A  To my knowledge, the content was not changed.
12     I am not sure exactly why it was called "Revised,"
13     except that everything was put together and the
14     recommendations were added to this obviously, the overall
15     cancer recommendations, but to my knowledge the
16     meta-analysis for the nutrition variables and all were
17     not updated.
18     Clearly this review of other potential causes was
19     not updated, so in my mind it's the 2014 report.
20 Q  Now, let me focus you back on the lack of connection
21     between early menarche, nutrition, and physical activity,
22     and diet, okay?
23     Whether you believe this was a complete analysis or
24     not, the fact is that this report, which is marked as
25     Exhibit No. 5, does discuss menarche, not bearing

Page 155

1      children, and late menopause, right?
2          MS. PARFITT: Objection; form.
3          THE WITNESS: It does include those,
4      and it's missing other risk factors for ovarian cancer.
5  Q  (By Mr. Williams) So the statement "Epidemiological
6      principles" in this report, and those that we looked at
7      in other exhibits, Exhibit 4 and Exhibit No. 10, do apply
8      to your analysis of talc and ovarian cancer in this case,
9      right?
10     They do apply to things that are not limited to
11     nutrition, physical activity, and diet, correct?
12         MS. PARFITT: Objection; form,
13     misstates her testimony.
14         THE WITNESS: I am curious, what is
15     the statement "epidemiologic principles"? Are you
16     referring to something in this ovarian cancer report?
17 Q  (By Mr. Williams) Let me ask it this way:
18     Why is it that nutrition is a totally separate
19     context than talc?
20     Explain, if you would, to the Court, who is the
21     person who is going to review this-- describe to the
22     Court how nutrition is a separate context than talc, with
23     particular attention, Dr. McTiernan, to the notion that
24     nutrition, what someone eats and takes into their body,
25     is a modifiable behavior in the same manner that using

Page 156

1      talc or not using talc is a modifiable behavior.
2      If you would, with your answer, as you describe how
3      you think these are unrelated and different contexts, how
4      is it that those contexts are different for purposes of
5      the analysis that you have done in this case?
6          MS. PARFITT: Objection; form.
7          THE WITNESS: So this is an issue
8      about measuring the exposure.
9      If you ask about talcum powder product use, you
10     typically are asking about something that is used once or
11     twice a day.
12     Somebody may just use one product. Perhaps they use
13     more, but they're not going to be using as many variables
14     as in nutrition.
15     Assessing nutrition is extremely difficult.
16     Assessing nutrition for a lifetime is even more
17     difficult, and so this is why for case-control studies
18     nutrition analyses are very difficult to do if you are
19     trying to ask somebody retrospectively, "What did you eat
20     when you were in your 20s?"
21     You can ask somebody whether they used some products
22     in their 20s and expect their recall to be much better
23     than what they ate 30, 40 years ago because we are always
24     talking about decades of latency between exposure and
25     development of ovarian cancer.

Page 157

1      Case-control studies can be done for numbers of
2      exposures, and they can be-- characterize exposure very
3      well, but nutrition is a special case.
4      Some epidemiologists still do do case-control
5      studies of nutrition, but some, like-- because there are
6      so many cohort studies available in nutrition, some
7      epidemiologists prefer to look at that, especially when
8      you're looking at a cancer that has a long latency
9      period, and so you are looking for long integral between
10     when the exposure happened and when the cancer occurred.
11 Q  (By Mr. Williams) Have you completed your answer?
12 A  Pardon me?
13 Q  Have you completed your answer?
14 A  Yes.
15 Q  Anything else that you want to add about the differences
16     between the context of nutritional and dietary concerns
17     versus the use of talcum powder?
18 A  I think that's it.
19 Q  Okay. Why is it harder to remember-- strike that.
20     Why would it be harder for me or anyone else to
21     remember the types of foods I ate in my teens or my 20s
22     as compared to whether I used talcum powder during a
23     particular time in my life?
24 A  When you ask people about nutrition, you don't just ask
25     one question, "How often did you eat beef?"

Anne McTiernan, Ph.D.

Page 158

1    You are asking them for multiple types of foods, how
2    often they ate it, how much they ate it.
3    We often use food frequency questionnaires that can
4    be 12 pages long, each with about 20 to 30 items on them,
5    and to ask about-- somebody to recall that much
6    information retrospectively is more difficult than to ask
7    them to recall using one item.
8    Medications, we can often get information
9    retrospectively, like hormone therapy. We can ask that
10   about that case-control studies and help the woman
11   remember, but because it was one pill that the woman had
12   to take per day, it is an easier thing to remember than
13   50 to 100 variables that you have to remember with a
14   dietary recall.
15 Q  Do you think it would be easier for a woman to recall
16   that she used talcum powder during her 20s than it would
17   be for her to recall that she ate red meat in her 20s?
18 A  I think it would be easier in the sense that people are
19   going to remember something that intimate, how often--
20   whether they used it or not, and we don't ask people just
21   one question, "Did you eat red meat?"
22   We ask them hundreds of questions of what they ate.
23 Q  Do you ask hundreds of questions about red meat?
24 A  We don't usually do studies with just red meat.
25   We do studies where we are asking about entire

Page 159

1    dietary pattern.
2    I don't know of any study that asks just that one
3    question.
4 Q  These studies that relate to talcum powder refer often to
5    multiple products and substances that a person puts on or
6    in her body; do they not?
7    MS. PARFITT: Objection; form.
8    THE WITNESS: From the questionnaires
9    that I've looked at from these studies, when they're
10   available, they are much simpler questions, and often
11   they were assisted with remembering by in-person
12   interview or telephone interview with someone that is
13   helping them remember what they did during that period of
14   life.
15   That can be used for a simple question, simple
16   exposure.
17   For diet, it's much more difficult.
18 Q  (By Mr. Williams) I understand that some questionnaires
19   may be longer than others, but with respect to an
20   individual question, that is whether someone ate red meat
21   in their 20s or someone used talcum powder in their 20s,
22   do you really see those questions as-- one of those
23   questions as more complicated than the other, taken
24   individually?
25   MS. PARFITT: Objection to the form.

Page 160

1    THE WITNESS: I think if you wanted to
2    see if-- if you had just that one question, what somebody
3    ate, what meat they ate, a case-control study would be
4    just fine, you could ask somebody what they ate in the
5    past if it's just one variable.
6    If you're asking them to remember 50 to 100
7    variables, it's much more difficult.
8 Q  (By Mr. Williams) Have we exhausted all of the reasons
9    why you believe that the context of this Exhibit No. 5,
10   this CUP update, is totally different, as you said, than
11   the context of the talc-related studies?
12   Is there anything else that you need to add to your
13   answer?
14 A  I can't think of anything.
15 Q  Pardon me?
16 A  I can't think of anything, no.
17 Q  Let me change topics slightly.
18   As an epidemiologist, you are familiar with a type
19   of bias called confounding, right?
20 A  Yes.
21 Q  Confounding is a type of bias that occurs when a third
22   variable interferes with a true relationship between an
23   exposure and an outcome, right?
24 A  Yes.
25 Q  Those are the words you used in your report, right?

Page 161

1 A  Mm-hm.
2 Q  "Yes"?
3 A  Yes.
4 Q  A confounder is one that is related both to the risk
5    disease and to the exposure, correct?
6 A  That's correct.
7 Q  The classic example that you use in your report is people
8    who carry matches are more likely to develop lung cancer
9    than individuals who do not carry matches, right?
10 A  Correct.
11 Q  In that example, the cause and effect relationship, the
12   true one, is not between matches and lung cancer, but
13   rather between smoking and lung cancer, correct?
14 A  Correct.
15 Q  Correlation does not equal causation, correct?
16   The two do not equate?
17 A  I wouldn't go from one to the other, so-- this just means
18   that there's another variable explaining an association
19   in the first example, which is confounding.
20 Q  Do you believe that correlation and causation mean one in
21   the same thing when you are dealing with epidemiological
22   studies?
23 A  I don't usually use the word "correlation."
24   Association is one thing we look at when we're
25   trying to determine if there's a causal relationship.

Anne McTiernan, Ph.D.

| Page 162 |
| --- |

1  Q  What I'm juxtaposing is correlation on the one hand and
2     causation on the other.
3        Do you have my question in mind?
4  A  I see it here, yes.
5  Q  Do you believe that correlation is identical to
6     causation?
7              MS. PARFITT:  Objection; asked and
8     answered.
9              THE WITNESS:  I think by "correlation"
10    you mean "association."
11  Q  (By Mr. Williams)  I mean a correlation between two
12     variables.
13              MS. PARFITT:  Objection; form.
14              THE WITNESS:  Yeah, I think
15     correlation is one way that two variables can be related,
16     and causation is a much more complicated analysis.
17  Q  (By Mr. Williams)  Same question with respect to
18     association.
19        Does association equate with causation?
20  A  I would say the same thing, association is part of causal
21     analysis.
22  Q  So in a paper studying the association between
23     match-carrying, for example, and lung cancer, you would
24     need to adjust for smoking before making any conclusions
25     about the risk estimates, true?

| Page 163 |
| --- |

1  A  I think usually we would want to look at it the other
2     way.
3        If you're looking at-- you wouldn't adjust for it
4     necessarily.  You might make sure to be aware that it's
5     part of the causal-- part of the pathway.
6        If you totally adjust for it, then it might make the
7     relationship disappear, so perhaps it's not the best
8     explanatory variable to use-- the best example, but the
9     premise is that there can be a second variable that can
10    be interfering with the relationship, which is why we
11    adjust for things that can potentially be related to both
12    the exposure and to the disease.
13  Q  And the second variable in the example that I used and
14     that you used in your report was that variable of whether
15     someone smokes?
16  A  Yes.
17  Q  In addition to the variable of their having matches
18     often, right?
19  A  Yes.
20  Q  And one of the studies that you gave us this morning is a
21     study written by Ulrik, U-L-R-I-K S. Kesmodel,
22     K-E-S-M-O-D-E-L.
23        Do you remember giving that one to us this morning?
24  A  Is this in the list?
25  Q  It was in the-- I'm sorry, it was identified on the list

| Page 164 |
| --- |

1     that Counsel gave you and produced to us on January 25th,
2     a few days ago.
3        Do you see that on the list?
4  A  No.
5        Which list is this?
6              MS. PARFITT:  If I may, Counsel, I
7     will hand her Exhibit No. 3.
8              THE WITNESS:  Oh, Kesmodel?
9              MR. WILLIAMS:  Yes.
10              THE WITNESS:  Yes.
11  Q  (By Mr. Williams)  So Kesmodel is one of the studies that
12     was provided to us, Defense counsel, by Plaintiffs'
13     counsel on January 25th, correct?
14  A  Is that the date?
15  Q  That's the date we received it.  I will represent that to
16     you.
17  A  Okay.
18  Q  Have you read that study?
19  A  Yes.
20  Q  We'll mark that as Exhibit No. 12.
21              (Exhibit No. 12 marked
22              for identification.)
23     /////
24  Q  (By Mr. Williams)  I will just refer you quickly to the
25     abstract on the first page of Exhibit No. 12, the

| Page 165 |
| --- |

1     Kesmodel study.
2        About three-quarters of the way down, the abstract
3     paragraph, it says, "Misclassification of confounders is
4     an issue that needs special attention by researchers, as
5     failure to measure accurately one or more strong
6     confounders may seriously bias the observed results."
7        Did I read that correctly from the abstract?
8  A  Yes.
9  Q  In the case of talcum powder use and the epidemiological
10     studies that you've reviewed, a confounder is one that is
11     related to ovarian cancer and perineal talc use, correct?
12  A  Correct, within that data set, yes.
13  Q  You agree that high body mass index, or BMI, is an
14     established risk factor for ovarian cancer, true?
15  A  It is a risk factor, yes.
16  Q  And the WCRF document that we looked at this morning,
17     that actually said that body mass index is probably a
18     cause of ovarian cancer.
19        Do you remember that this morning?
20              MS. PARFITT:  Objection.
21              THE WITNESS:  Yes.
22  Q  (By Mr. Williams)  Body mass index is a measure of weight
23     as compared to a measurement of height, right?
24  A  Yes.
25  Q  Now, the Continuous Update Project, for which you served

Anne McTiernan, Ph.D.

| Page 166 |
| --- |

1  as a panel member, has actually concluded that body mass
2  index is a probable cause.
3       That was Exhibit No.-- I believe it was Exhibit
4  No. 5 from this morning.
5       Do you remember that?
6  A  I believe so.
7       Yes.
8  Q  In May 2018, after you were hired by Plaintiffs' lawyers
9  in the talc litigation, you wrote an article concluding
10  that there was strong evidence that being overweight or
11  obese increased the risk for cancers.
12       Do you remember that?
13       That was Exhibit No. 9 that we talked about this
14  morning.
15             MS. PARFITT:  Sorry, Exhibit No. 9?
16             MR. WILLIAMS:  Yes.
17             THE WITNESS:  The article--
18  Q  (By Mr. Williams)  The article that had your picture on
19  it this morning, Exhibit No. 9 that we showed you--
20  A  Oh, press--
21  Q  It's 9.
22       On the second page in the first paragraph it says
23  that the latest report found strong evidence that being
24  overweight or obese increased the risk for a number of
25  things, and one of the things that is mentioned is cancer

| Page 167 |
| --- |

1  of the ovary, right?
2             MS. PARFITT:  Objection.
3             THE WITNESS:  Yes.
4  Q  (By Mr. Williams)  Okay.  Talc use is associated with
5  higher body mass index, true?
6  A  I have not investigated that.
7       I did not do a review on body mass index and talc
8  use.
9  Q  The observation that talc use is associated with higher
10  body mass index is something that was noted in many of
11  the studies that you reviewed for purposes of your work,
12  right?
13             MS. PARFITT:  Objection.
14             THE WITNESS:  I didn't focus on body
15  mass index and talc use.
16  Q  (By Mr. Williams)  Let me ask--
17  A  If you have something to point to, we can look at it.
18  Q  Let's look at the Gertig 2000 study.  We have talked
19  about that one today.
20       This is going to be Exhibit No. 13.
21             (Exhibit No. 13 marked
22                  for identification.)
23  /////
24  Q  (By Mr. Williams)  Do you have the Gertig study in front
25  of you, what we have marked as Exhibit No. 13?

| Page 168 |
| --- |

1  A  Yes.
2  Q  Let me direct you to Page 250, which should be the second
3  page of the copy that was handed to you, the left-hand
4  column, first paragraph, last sentence-- hold on.  I am
5  trying to find the citation.
6       Under the results section on that page, Page 250, do
7  you see that first paragraph?
8  A  Yes.
9  Q  The last sentence there says, "Talc use was associated
10  with higher body mass index and inversely associated with
11  current cigarette smoking."
12       Do you see that?
13  A  Yes.
14  Q  Talc use, this study found, was associated with higher
15  body mass index, true?
16       That's what it says?
17  A  It doesn't give us any statistics on it, but if you look
18  at the table, you can see a slight association, yes.
19  Q  Well, Table No. 1 does give us some information, correct?
20             MS. PARFITT:  Objection; form.
21             THE WITNESS:  It doesn't give us any P
22  values of how different it was.  It doesn't give us
23  percents, but-- yeah.
24  Q  (By Mr. Williams)  Okay.  And do you remember that in the
25  Cramer 1999 paper, that you rely upon, said that

| Page 169 |
| --- |

1  characteristics, such as body odor or excessive
2  perspiration, might predispose to both talc use and
3  ovarian cancer, but adjusting for BMI should control for
4  those effects.
5       Do you remember that?
6             MS. PARFITT:  Counsel, do you have a
7  copy of Cramer 1999 or could we get that?
8             MR. WILLIAMS:  I am just asking if she
9  remembers it now, and if she doesn't--
10             THE WITNESS:  I don't recall.  I would
11  have to look at it.
12             (Exhibit No. 14 marked
13                  for identification.)
14
15  Q  (By Mr. Williams)  We will mark the Cramer 1999 study as
16  Exhibit No. 14.
17       I will direct your attention to the page that has in
18  the upper right-hand corner "355," the left-hand column,
19  second paragraph, the one that begins with, "Regarding
20  potential."
21       About midway down that paragraph it says,
22  "Characteristics such as body odor or excessive
23  perspiration might represent subtle constitutional
24  features that might predispose to both talc use and
25  ovarian cancer, but adjusting for BMI should control for

Anne McTiernan, Ph.D.

| Page 170 |
| --- |

1  these effects."
2      Do you see that?
3  A  Yes.
4  Q  Does it make sense to you, separate and apart from these
5      studies that I've shown you, that people who use talc on
6      their bodies, including people who use talc in their
7      perineal area, do so to absorb sweat and other moisture?
8  A  I didn't do a survey of why people use this.
9          It's not clear that only people who sweat and have
10     body odor are choosing to use body powders, so this isn't
11     a substantiated sentence.
12         I'm not quite clear.
13         One statement it has about-- that it may predispose
14     to ovarian cancer, I don't know of any literature
15     associating body odor or perspiration for risk of or even
16     early diagnosis of ovarian cancer, so I'm confused by
17     that.
18 Q  Well, let me ask you to make an assumption then.
19         If you make an assumption for me that BMI increases
20     the risk for ovarian cancer, and you further make the
21     assumption that more talc users have high BMI than
22     nontalc users, do you believe that studies looking at
23     talc and ovarian cancer should adjust for BMI?
24             MS. PARFITT:  Objection; form,
25     misstates the evidence.

| Page 171 |
| --- |

1             THE WITNESS:  So we see in one study--
2  I did not do a full review of all these studies, and I
3  don't believe the data was available in all of them the
4  way the Nurses' Health Study presented, which showed body
5  moss index-- in all of the studies, and I didn't do a
6  survey to look at the association between body mass index
7  and talc use.
8      I can see from these data in the Gertig study that
9  it wasn't a confounder.
10     They adjusted for it, but if you look at Table No. 2
11 in the Gertig paper, the age-adjusted relative risk is
12 very similar to the multivariate adjusted relative risk.
13     The multivariate adjusted relative risk included
14 body mass index, so this tells me that it's unlikely to
15 be any or extremely little confounding when you see such
16 a similar result for age-adjusted relative risk as you do
17 for multivariate relative risk.
18 Q  Just so we are clear, you are looking right now at
19 Exhibit No. 13, the Gertig study?
20 A  Sorry.  Yes.
21 Q  Table No. 1 on Page 250, correct?
22 A  Table 1 and Table 2.
23     Table 1 shows the association of BMI versus talc
24 use.
25     Table 2 shows the relative risk, age adjusted and

| Page 172 |
| --- |

1  multivariate adjusted.
2      If it was confounding from any of these variables
3  that they adjusted for, you would see very big
4  differences or much more marked than you see between
5  age-adjusted relative risk and multivariate adjusted
6  relative risk.
7  Q  Now, have you done the analysis to determine whether or
8      not BMI was associated with greater talc use or whether
9      BMI was associated as a confounder in terms of causing a
10     higher odds ratio or risk ratio in the Gertig study?
11 A  Did I personally do any statistics on these?  I didn't
12     have the data to do the statistics, but you can see that
13     its multivariate relative risk is so similar to
14     age-adjusted relative risk.  That means that it is not
15     confounding in the data.
16 Q  Did you do that analysis as part of your work?
17             MS. PARFITT:  Objection; asked and
18     answered.
19             THE WITNESS:  I am doing it right now.
20 Q  (By Mr. Williams)  Did you--
21 A  Since you pointed it out.
22 Q  Did you do that analysis as part of your work--
23 A  When I presented relative risk, I tended to present the
24     most adjusted relative risk I could find, I believe.
25     That's what I tried to do.

| Page 173 |
| --- |

1  Q  You reviewed three cohort studies in connection with your
2      report, according to you, because you count Gates 2008
3      and Gates 2010 as part of Gertig, correct?  So that
4      counts as one, right?
5  A  I believe those cases-- those two other cases that were
6      in the second-- you are talking about the second Nurses'
7      Health Study, the Gates 2008?  I believe those 2010 were
8      in the first one, but they're never quite clear.
9  Q  Let me start over.
10 A  Sorry.
11 Q  I don't want to quibble with you.
12     You reviewed Gertig 2000, Houghton 2014, and
13 Gonzalez 2016, correct?
14 A  That's correct.
15 Q  You also reviewed Gates 2008 and Gates 2010, correct?
16 A  Correct.
17 Q  Each one of those studies found no overall statistically
18     significant association between perineal talc use and
19     ovarian cancer?
20             MS. PARFITT:  Objection.
21 Q  (By Mr. Williams)  I am not asking about serous invasive,
22     as you went to before.
23     I am talking about overall perineal task use.
24             MS. PARFITT:  Objection.
25 Q  (By Mr. Williams)  Correct?

Anne McTiernan, Ph.D.

1      MS. PARFITT: Objection; form.

2      THE WITNESS: And the sample sizes

3  were too small to be able to determine statistical

4  significance with that level of relative risk.

5  Q  (By Mr. Williams)  It was a consistent finding of those

6  cohort studies that there was not a statistically

7  significant association between perineal talc use overall

8  and ovarian cancer, right?

9      MS. PARFITT: Objection; form, asked

10  and answered.

11      THE WITNESS: The studies were not

12  large enough.

13      There were not enough cases to determine statistical

14  significance or to have a statistically significant

15  result.

16  Q  (By Mr. Williams)  Is it your testimony that those

17  studies found a statistically significant association

18  overall between perineal talc use and ovarian cancer?

19      MS. PARFITT: Objection; form.

20      Counsel, that has been asked now about three or four

21  times.

22      I think she has given an answer.

23      I know you don't like it, but she has responded.

24  Q  (By Mr. Williams)  Are you saying that those studies

25  found a statistically significant association between

1  perineal talc use and ovarian cancer?

2      MS. PARFITT: Objection, form.

3      Again, a fifth time asked and answered.

4      THE WITNESS: I am saying that they

5  did not have a large enough sample size to find a

6  statistically significant association.

7  Q  (By Mr. Williams)  Identify for us on the record any

8  cohort study that concluded that there was a

9  statistically significant overall association between

10  talc and ovarian cancer.

11  A  I can't identify any.

12  Q  In forming your opinions in this litigation, did you take

13  note of the fact that each of those cohort studies

14  accounted for body mass index or BMI?

15  A  I believe I did not go through specific-- I am sure I

16  didn't go through specific confounding variables.

17      I just noted that they adjusted for potential

18  confounders and presented the most adjusted variable.

19  Q  Your written report does not take note of the fact that

20  each of the cohort studies you reviewed accounted for

21  body mass index, did it?

22      MS. PARFITT: Objection; form.

23      THE WITNESS: No, I didn't note one

24  particular variable for adjustment.

25  Q  (By Mr. Williams)  Without reviewing the studies, are you

1  able to tell us, as you sit here, how many of the

2  case-control studies that you read and reviewed and are

3  relying on in this case do not adjust for body mass

4  index?

5      MS. PARFITT: Objection; form.

6      THE WITNESS: No, I did not count

7  that.

8  Q  (By Mr. Williams)  Why not?

9      MS. PARFITT: I'm sorry, what was the

10  question?

11  Q  (By Mr. Williams)  Why not?

12      MS. PARFITT: Objection.

13      THE WITNESS: I was tasked to look at

14  the overall association.

15      I did not look at specific confounders for each of

16  the studies.

17  Q  (By Mr. Williams)  So if there were a confounder that

18  could impact the answer to the question of whether

19  perineal use of talcum powder causes cancer, you didn't

20  look at it?

21      MS. PARFITT: Objection; form,

22  misstates the testimony.

23      THE WITNESS: There could be

24  confounding variables in any type of research that may or

25  may not be available.

1      I noticed in the Gertig study, the data that we just

2  talked about, that body mass index was not a confounder,

3  so that gives me some-- at least in one data set, that it

4  wasn't an issue, nor would the other variables adjusted

5  for have been confounders because the multivariate

6  relative risk is so similar to the age-adjusted relative

7  risk.

8  Q  (By Mr. Williams)  Did the Gertig study conclude what you

9  just said?

10  A  I think I just presented it.

11  Q  While you are reading, Doctor, I just want to be clear

12  with what my question is.

13      My question is:

14      Did-- strike that.

15      Where in the Gertig study did the Gertig study say

16  or conclude that BMI is not a confounder for talc use?

17  A  It's a general epidemiologic principle that if you see

18  similar results for the multivariate relative risk that

19  you see with just a-- either an unadjusted or in this

20  case age-adjusted relative risk, that the confounding

21  variables that were adjusted for in the multivariate are

22  unlikely to be confounders.

23      If they were, the data would look different.

24  Q  Have you completed your answer?

25  A  Yes.

Anne McTiernan, Ph.D.

Page 178

1    Q   Did the Gertig study expressly state that BMI is not a
2        confounder for talc?
3            MS. PARFITT: Objection; asked and
4        answered.
5            THE WITNESS: I don't see that they
6        said that, but the data are showing it to me.
7    Q   (By Mr. Williams)  In forming your opinions in this
8        litigation, you did not do any analysis of whether the
9        studies that you relied upon adjusted for body mass
10       index, correct?
11   A   I didn't enumerate that, no.
12   Q   I would like to ask you about another type of study, the
13       meta and the pooled analyses.
14           You rely significantly on those study types,
15       correct?
16   A   That's correct.
17   Q   For the meta and the pooled analysis, the ones with the
18       combined data, you believe that the summary relative
19       risks for any talc use versus no talc use were
20       consistent, true?
21   A   Yes, I want to look at the--
22   Q   For reference, in your report, Exhibit No. 2 at Page 56.
23   A   I want to look at the papers too.
24   Q   I am just asking about your report, not the papers yet.
25           As far as your report is concerned, you believe that

Page 179

1        the summary of relative risks for any talc use versus no
2        talc use are consistent, right?
3    A   And where are you, Page 56?
4    Q   Page 56, the top paragraph, middle of the paragraph,
5        sentence starting with, "The summary relative risks,"
6        about four lines down.
7    A   "Were quite consistent," yes, I wrote that.
8    Q   Are there other ways in which the meta and the pooled
9        analyses are consistent, in your opinion?
10   A   I am not sure what you're asking.
11   Q   Well, in addition to the notion that the relative risks
12       were quite consistent, in your opinion, across the meta
13       and the pooled analyses, were there any other ways in
14       which those meta and pooled analyses were consistent, any
15       other hallmarks of a consistency, other than the relative
16       risk rates that you found notable?
17   A   I think if you could give some examples-- one--
18   Q   I am just asking you for your expert opinion.
19   A   One thing that is consistent is that for the two
20       meta-analyses that are most recent, which is why I put
21       most weight on them, they have all of the previous
22       studies included, is that they included the same study,
23       so that's similar between those two meta-analyses,
24       Penninkilampi and Berge.
25           The pooled analysis was a subset of those

Page 180

1        case-control studies, the eight case-control studies,
2        plus three previous and published studies.
3    Q   You did not perform your own meta-analysis, right?
4    A   No, I didn't.
5    Q   One of the reasons you did not perform your own
6        meta-analysis was because you believe that there were
7        two, in your words, excellent meta-analyses that had
8        recently been published, Penninkilampi and Berge,
9        correct?
10   A   Correct.
11   Q   "Penninkilampi" is spelled P-E-N-N-I-N-K-I-L-A-M-P-I.
12           That was from 2018, correct?
13   A   Yes.
14   Q   And the Berge analysis, B-E-R-G-E, was from 2017?
15   A   Yes.
16   Q   You believe that those two studies are consistent with
17       one another?
18   A   Yes, they have very similar results.
19   Q   Do you believe they support your opinion in the case that
20       perineal talcum powder can cause ovarian cancer?
21   A   Yes.
22   Q   Let me show you the Penninkilampi study.  We'll mark it
23       as Exhibit No. 15, I believe.
24           (Exhibit No. 15 marked
25           for identification.)

Page 181

1
2    Q   (By Mr. Williams)  Do you recognize Exhibit No. 15,
3        Penninkilampi 2018, as one of the two studies that you
4        described as excellent and supportive of your opinions?
5    A   Yes.
6    Q   Do you know the source or sources of funding for this
7        paper?
8    A   No, I don't.
9    Q   Do you personally know who the author is?
10   A   No, I don't.
11   Q   Do you know what, if any, conflicts of interest any of
12       the authors may have?
13   A   I am just looking to see.
14           They claim no conflicts of interest.
15   Q   Do you know whether some of the authors are serving as
16       consultants to Plaintiffs' counsel in this litigation?
17   A   No, I don't.
18   Q   Do you have any criticisms of the Penninkilampi 2018
19       meta-analysis?
20           MS. PARFITT:  Objection; form.
21           THE WITNESS:  I think the only issue
22       that I see are based on all of the-- all of the
23       meta-analyses had this issue that depends on what results
24       were available from the source studies, so if there
25       weren't many studies that could do-- that could look at

Anne McTiernan, Ph.D.

Page 182

1    subgroups, for example, or if there weren't enough--
2    wasn't enough information to do dose response-- but by
3    doing a meta-analysis, you have the best chance of being
4    able to look at these because in the individual study
5    those variables are-- the numbers of people within
6    particular subgroups is going to be too small to be able
7    to do an analysis.
8  Q  (By Mr. Williams)  Did you do an independent verification
9    of the data that the Penninkilampi study reports in--
10   strike that.
11       Did you do an independent verification that the data
12   that this study reports is indeed accurate?
13  A  Did I do a meta-analysis myself on statistics?  I did
14   not.
15  Q  No, just whether the data that is reported accurately
16   reflects what was reported in the study's records.
17  A  So there was a supplementary data table for this, I
18   assume.
19       I am pretty sure I looked at that and then compared
20   the relative risk that I abstracted onto my data table,
21   and I believe they were similar, but I don't see
22   supplementary data here.
23  Q  Take a look at Page 46 of the document in the lower
24   left-hand corner, Page 46 of Exhibit No. 15.
25       Do you see that the Penninkilampi study includes,

Page 183

1    for each study, a purported odds ratio, a lower limit and
2    an upper limit?
3  A  Yes.
4  Q  Did you go back to the individual studies to verify that
5    the numbers were recorded accurately?
6  A  I didn't compare the lower and upper limit of the
7    confidence interval.
8  Q  Would it be important to you, in determining that a study
9    is excellent, that the authors accurately report the odds
10   ratio and the confidence intervals?
11  A  I think that would be useful, but for a meta-analysis,
12   the data that goes into it, to my knowledge, are the odds
13   ratios and the sample size, so I am not sure what
14   variable-- which particular study you're talking about is
15   not reported correctly.
16  Q  I am asking you whether it's important, not just whether
17   it's notable.
18       Would it be important to you, in determining--
19   concluding that a study is excellent, that the authors
20   accurately report the odds ratios and the confidence
21   intervals; that is, if they get it wrong, that's not the
22   sign of an excellent study, right?
23       MS. PARFITT:  Objection; form.
24       THE WITNESS:  I think in many studies
25   there may be occasional data that are transformed not

Page 184

1    correctly that are implemented.
2       What I'm most intrigued by, all the cohort studies I
3    reviewed, all seven of them, come up with just about the
4    same overall relative risk of ever-use of talcum powder
5    products and risk of ovarian cancer.  It is consistently
6    1.25 to 1.3, and that tells me that this is a robust
7    finding because you see it in so many of these studies.
8  Q  (By Mr. Williams)  Would you expect the association for
9    long-term perineal talc use, say more than ten years, to
10   be greater than, the same, or less than the association
11   for any talc use, which could include a single use?
12  A  I would say it depends on what the individual study had
13   in terms of sample size within categories.
14       It really depends on sample size, and it depends on
15   what the data look like.
16       It's a difficult question to answer.
17  Q  Take a look at Page 46, Figure No. 2 of the Penninkilampi
18   study, Exhibit No. 15.
19       Do you see the explanation of the tables in Figure
20   No. 2?
21       Do you see that Table A refers to odds ratios for
22   any perineal talc use?
23  A  Yes.
24  Q  And the odds ratio for the combined data, the data for
25   any talc use in Table A, is 1.31?

Page 185

1       Do you see that?
2  A  Yes.
3  Q  Now look at Table B.
4       Do you see that this table refers to long-term
5    perineal talc use?
6  A  Yes.
7  Q  The odds ratio for that combined data, the data for
8    long-term use, is 1.25.
9       Do you see that?
10  A  Yes.
11  Q  So as between Penninkilampi's reported overall
12   association for any talc use, on the one hand, and its
13   reporting for long-term talc use on the other, which one
14   reflects a higher risk rate or odds ratio?
15  A  I would say they're very similar, 1.31 and 1.25, because
16   the confidence interval include both, the confidence
17   interval in the top, 1.24 to 1.39, also includes the
18   bottom odds ratio of 1.25.  That tells me they're very
19   similar.
20  Q  Doctor, I am just asking you a simple question.
21       I asked you which one reflects a higher risk rate.
22       MS. PARFITT:  Objection; form, asked
23   and answered.
24       THE WITNESS:  I am answering as an
25   epidemiologist.

Anne McTernan, Ph.D.

| Page 186 |
|---|

1    We would see those answers as quite similar.

2   Q  (By Mr. Williams) So epidemiologists would say that 1.31

3    and 1.25, with the confidence intervals there, are the

4    same?

5   A  I wouldn't say they're the same.

6   Q  So which one--

7        MS. PARFITT:  Counsel, please let her

8    finish.

9       Thank you.

10       THE WITNESS:  We wouldn't say they're

11    the same, but we would state they could be similar.

12    1.31 is clearly larger than 1.25, but they could

13    be-- because of those confidence intervals, they could be

14    similar numbers.

15   Q  (By Mr. Williams) When you evaluated the Penninkilampi

16    study, did you take note that the authors omitted certain

17    cohort data?

18       MS. PARFITT:  Objection; form.

19       THE WITNESS:  I noted that they

20    included one paper from each study, which is really

21    important.

22    If you include more than one paper from each study,

23    then you're over-counting or counting cases or noncases a

24    second time.

25    It's really important to only have one cohort

| Page 187 |
|---|

1    represented in each of these meta-analyses.

2   Q  (By Mr. Williams) But if there had been additional

3    cohorts after the first cohort, wouldn't it make sense to

4    use the last one rather than the first?

5       MS. PARFITT:  Objection; form.

6       THE WITNESS:  I think you are talking

7    about the Nurses' Health Study.

8   Q  (By Mr. Williams) I am.

9   A  Whether they included the first one or the third one,

10    because the second one wouldn't do them any good.  There

11    are only 200 cases.  We don't know how they picked those.

12    The third one, as I mentioned earlier, the problem

13    with the third one is it used a different comparison to--

14    than the first one.

15    They are not comparing no-use versus ever-use.

16    They're comparing no-use plus less-than-once-a-week

17    versus higher levels, so you want to compare, as much as

18    possible, nonusers versus users, which is-- they are

19    trying to look at any ovarian-- sorry, any perineal talc

20    use in the Category A would be more accurate to use the

21    first Nurses' Health Study.

22   Q  Should I take your last answer to mean that you believe

23    it is a good thing that the Gates 2000 study was omitted

24    from the Penninkilampi analysis?

25       MS. PARFITT:  Objection; form,

| Page 188 |
|---|

1    misstates her testimony.

2       THE WITNESS:  I would say because of

3    the variable used, it was reasonable that they picked the

4    Gonzalez, the first one.

5    If the data had been collected in an identical way,

6    then the third one would have been incorporated.

7   Q  (By Mr. Williams) Did the study explain that that was

8    the reason why they omitted the Gates 2010 study?

9   A  I can't remember.

10    I think they had an appendix.

11    They talk about an appendix here with their

12    rationale.

13   Q  We can check it later, but as you sit here today, can you

14    remember any reference to--

15   A  I can't recall--

16   Q  Let me finish the question, if I could.

17    Doctor, can you remember any reference, as you sit

18    here, to the notion that they noted, in Penninkilampi,

19    that they were not using the data from Gates 2010?

20       MS. PARFITT:  If you need to consult

21    the document, please do.

22       MR. WILLIAMS:  My question is not

23    asking her to read it.

24   Q  (By Mr. Williams) My question is whether you remember

25    it?

| Page 189 |
|---|

1       MS. PARFITT:  Without reading the

2    document, do you recall?

3       THE WITNESS:  I don't recall.

4   Q  (By Mr. Williams) Take a look at Figure No. 2, Table C

5    of Page 46 of that study.

6    Do you see that it describes the purported

7    association for increased risk of serous ovarian cancers?

8   A  Yes.

9   Q  And that's reporting the original Berge study from 2010,

10    right?

11   A  2000? Berge 2000?

12   Q  Excuse me, not 2010.  Pardon me.

13    2000-- Berge 2000?

14   A  Yes.

15   Q  As you sit there, you don't know-- you don't recall any

16    explanation for the omission of the Gates 2010 data,

17    right?

18       MS. PARFITT:  Objection; form.

19       MR. WILLIAMS:  I'm sorry, did I get an

20    answer to that one?

21       MS. PARFITT:  No.  She-- I think she

22    is reading the document.

23       THE WITNESS:  Sorry.

24       MS. PARFITT:  Take your time.

25       MR. WILLIAMS:  My question-- well,

Anne McTiernan, Ph.D.

Page 190

1 hold on.
2     Counsel, that just eats up the time.
3 Q  (By Mr. Williams)  I am asking-- Doctor--
4         MS. PARFITT:  Counsel, you asked--
5         MR. WILLIAMS:  Let me finish--
6         MS. PARFITT:  Let me finish.
7     You asked her in the middle of a question-- she
8 hasn't answered it.
9     Your question is right there.
10    She hadn't answered it.
11    She is reading the document.  That's reflected on
12 the camera.
13    Give her-- if you want an answer to the question,
14 give her an opportunity--
15 Q  (By Mr. Williams)  Here is the problem, Doctor--
16        MR. WILLIAMS:  Are you done, Counsel?
17        MS. PARFITT:  I am.
18 Q  (By Mr. Williams)  Here is the problem, Doctor:
19    If I ask a question that is separate and apart from
20 the document in front of you, and you choose to just read
21 the entire document, all of our time is lost, so when I
22 specifically ask you what you remember as you sit there,
23 I would ask you not to read the document because that's
24 not part of the question.
25    Is that okay with you?

Page 191

1         MS. PARFITT:  Counsel, that's actually
2 not okay as a question.
3     If the question is asking if this is a memory
4 contest-- when she has the document in front of her, why
5 aren't you allowing her to refer to the document?
6     It's not a memory contest.
7 Q  (By Mr. Williams)  Here is my question, Doctor:
8     As you sit here, do you remember, one way or the
9 other, whether the Penninkilampi study explains why it
10 omitted any reference to the data from the Gates 2010
11 report--
12        MS. PARFITT:  And I'm going to again
13 object.
14    Counsel, if she needs to look-- are you suggesting
15 she can't look at the document to refresh her
16 recollection?  Is that what you want the record to
17 reflect.
18 Q  (By Mr. Williams)  You may answer, Doctor.
19        MS. PARFITT:  Take your time, Doctor.
20        THE WITNESS:  Looking at the methods
21 here, I don't see that they've mentioned here why they
22 chose particular studies.
23    I do know that it's standard for meta-analysis to
24 only include one study from a cohort.
25    If you included more than one, it would be

Page 192

1 considered improper-- improper methodology.
2     Usually these meta-analyses, and I believe they had
3 it too, usually they will have supplementary data that's
4 available also that will give more of their methods and
5 the search terms, and I don't see that in what you've
6 provided here today.
7 Q  (By Mr. Williams)  Let me ask you to look at the Berge
8 study from 2017.  We will mark that as Exhibit No. 16.
9         (Exhibit No. 16 marked
10        for identification.)
11
12 Q  (By Mr. Williams)  Do you recognize Exhibit No. 16, which
13 is the Berge 2017 study, as the other of the two
14 meta-analyses that you described as excellent?
15 A  Yes.
16 Q  Please turn to Page 9 of the study.
17    I direct your attention to the left-hand column, the
18 last paragraph before "Acknowledgments."
19    Do you see that?
20 A  Yes.
21 Q  The Berge study says, "Several aspects of our results,
22 including the heterogeneity of results between
23 case-control and cohort studies and the lack of a dose
24 response with duration and frequency of use, however, do
25 not support a causal interpretation of the association."

Page 193

1     Do you see that conclusion?
2 A  Yes, I do.
3 Q  The author's conclusion that the reported association did
4 not support a causal interpretation, is the opposite of
5 the conclusion that you would come up with in this case,
6 correct?
7         MS. PARFITT:  Objection; form.
8         THE WITNESS:  That's correct.
9 Q  (By Mr. Williams)  If you would, keep the Berge 2017
10 paper out.
11    I will also ask you to refer for a moment to your
12 own report, which is Exhibit No. 2, and specifically Page
13 75.
14    There is a table, Table No. 3, of data that you
15 compiled about the various meta-analyses.
16    Do you see that table?
17 A  Yes.
18 Q  And Berge 2017 is the second one that is referenced?
19 A  Yes.
20 Q  The right-most column of your table is called, "Dose
21 response," correct?
22 A  Yes.
23 Q  And I'm going to talk a little more about dose response
24 later, but for now can we agree that under the "Dose
25 response" column for Berge 2017, you wrote, "Yes," for

Anne McTiernan, Ph.D.

Page 194

1  duration and frequency-- did you write that?
2  A  Yes.
3  Q  And then you wrote a colon, and you went on to reflect
4     that each ten-year increase in genital talc use was
5     associated with a 16 percent increase in relative risk,
6     and each increase of one application per week was
7     associated with a five percent increase in relative risk.
8        Do we have that right?
9  A  Yes.
10 Q  Now, if you would, please, turn back to the Berge study.
11    Can you just-- we couldn't find it.  Maybe you can,
12    and this one I do want you to look through it.
13    Would you please point out where the figures we just
14    discussed from your table are actually reflected in the
15    study?
16    I'm sure it's there.  We just couldn't find it.
17 A  I am not finding it.
18       MS. PARFITT:  Counsel, I can make it
19 quicker, so we can save on time.
20    Do you want me to show her where it is or have her
21 keep looking?
22       MR. WILLIAMS:  I actually prefer that
23 that not be what we do.
24       MS. PARFITT:  All right.  I am just
25 trying to move time along.

Page 195

1  Q  (By Mr. Williams)  If you could turn to Page 6 of the
2     Berge meta-analysis, in the left-hand side, Table No. 3
3     there, it says there-- it has a table in Table No. 3 that
4     lists the duration of frequency, "Ever use of genital
5     talc - results of meta-analysis."
6        Do you see that?
7  A  Yes, Table No. 3?
8  Q  Right.
9        It says, "Duration, ten years," and then there's a
10    risk ratio of 0.97, with a confidence interval that drops
11    below 1.0.
12       Do you see that?
13 A  It looks like you have a different version than I have.
14 Q  Do I?
15 A  Yeah.
16    Yours is-- my table looks different.
17    That's odd.
18 Q  Are you looking at the-- I see, you are comparing-- just
19    for the record, you are comparing what we gave you as
20    Exhibit No. 16 with something in a notebook.
21    Which notebook are you looking in?
22 A  My data-- all the references that I used.
23 Q  Okay.
24 A  I am just wondering--
25 Q  Are there different versions of it?

Page 196

1        MS. PARFITT:  Counsel, there are.
2     If I can help, there's two Berge papers.  One talks
3  about the dose response and one does not, and I think you
4  handed her the copy about-- that does not address the
5  dose response, and the one she has in her binder
6  addresses the dose response, both 2018 and very
7  confusing, but--
8        MR. WILLIAMS:  So they are two
9  different studies entirely?
10       MS. PARFITT:  No, they are actually
11 very, very close, but one addressed the dose response and
12 one did not.
13    One, Doctor-- just for clarify, the one that
14 Mr. McTiernan has in her notebook and that you all have
15 in your reference material is Exhibit No.-- Reference
16 No.-- what is that?
17       THE WITNESS:  35.
18       MS. PARFITT:  35 in the notebook,
19 which is the Berge study that deals with the dose
20 response.
21    The one you handed her is the Berge that does not
22 address the dose response or indicated there was no
23 trend.
24       MR. WILLIAMS:  Let's mark for the
25 record the one that Dr. McTiernan has in her hand as

Page 197

1  Exhibit No. 16A.
2        MS. PARFITT:  Very good.
3        (Exhibit No. 16A marked
4         for identification.)
5
6        MR. WILLIAMS:  Do you happen to have
7  another copy of that one?
8        MS. PARFITT:  Yeah, I can check.
9        MR. WILLIAMS:  Thank you.
10 Q  (By Mr. Williams)  If you could look at Exhibit No. 16,
11    and turn to Page 7.
12 A  So we are back to the other one?
13 Q  The original--
14 A  That I did not reference?
15 Q  Exhibit No. 16.
16    Do you have that in front of you?
17 A  Page 7?
18 Q  Page 7, the right-hand column.
19    Do you see in the right-hand column it says, "The
20    presence or absence of a dose response is an important
21    aspect to consider in assessing the plausibility of the
22    causal nature of an association observed in a
23    meta-analysis"?
24    Did I read that right?
25 A  Yes, and the other version says the same thing.

Anne McTiernan, Ph.D.

Page 198

1  Q  Okay.  It goes on to say, I believe in both versions,
2     "Although the numbers of studies included in the analysis
3     of duration and frequency of genital talc use was not
4     very large, and the exclusion of the reference category
5     from the dose response analysis might have reduced the
6     power of this analysis, the lack of a dose response --
7     irrespective on an analytical approach chosen to combine
8     categorical results across studies -- is a potentially
9     important and novel contribution of this meta-analysis."
10        Did I read that right?
11 A  Except the next version does not say, "lack of"-- if you
12    read the paragraph from 16A, it does not say "lack of
13    dose response."
14        You have that right there.
15        They have taken out that.
16        They must have replaced this table with a corrected
17    table, because that does show dose response in Table
18    No. 3.
19 Q  So Table No. 3 in the two different versions of the Berge
20    study are different?
21 A  Yes.
22        That's why I was so confused.
23        My data and my table was identical-- I abstracted
24    this.
25        MS. PARFITT:  "This" being 16A?

Page 199

1         THE WITNESS:  16A, the version I used,
2     and that's the version that was on the website and my
3     library.
4  Q  (By Mr. Williams)  Did you at any time read this study
5     that was marked as Exhibit No. 16?
6  A  No.
7  Q  And how did you access the version at 16A?
8  A  This one I would have gotten from my Fred Hutch library.
9  Q  Let me have you look at Exhibit No. 16A.
10        Do you have Page 9 in front of you?
11        Can you turn to that page, just before the
12    acknowledgments?
13 A  Okay.
14 Q  And this is the conclusion paragraph.
15        Do you see that it begins, "In conclusion"?
16 A  Yes.
17 Q  In the 16A version that you have in front of you they
18    wrote, "Several aspects of our results, including the
19    heterogeneity of results between case-control and cohort
20    studies, however, do not support a causal interpretation
21    of the association."
22        Do you see that?
23 A  Yes.
24 Q  And that was the conclusion of the Berge study from 2017
25    in both versions 16 and 16A, correct?

Page 200

1         MS. PARFITT:  Objection; form.
2         THE WITNESS:  And I tend to look at
3     data, not necessarily what somebody has written as their
4     conclusion.
5     The data to me show that there is an increased risk
6     of ovarian cancer with use of talcum powder products, and
7     I think their data show it very clearly, and they have
8     shown dose response relationships as well.
9  Q  (By Mr. Williams)  My question to you is a little bit
10    different.
11        My question is:
12        You disagree-- strike that.
13        You disagree with the conclusion reached by the
14    authors of the Berge study in that last sentence of their
15    report that finds heterogeneity between the results of
16    case-control and cohort studies, correct?
17        MS. PARFITT:  Objection; form,
18    misstates her testimony.
19        THE WITNESS:  So you are only asking
20    about the first part of that sentence not the causal
21    interpretation, but the first part; is that correct?
22 Q  (By Mr. Williams)  I am asking about the entirety of the
23    sentence.
24 A  The entirety of the sentence?
25        So yes, there was heterogeneity between the

Page 201

1     case-control and cohort studies, but no, I do not think
2     that that detracts from the causal association.
3  Q  What was the heterogeneity and the results between the
4     case-control and the cohort studies that you observed?
5  A  There was a smaller increase in risk with the
6     case-control studies.
7  Q  How much smaller?
8  A  Quite a bit.
9         The relative risk was 1.02 in the cohort studies,
10    1.26 in the case-control studies.
11 Q  And you conclude, based upon your own analysis, totally
12    separate from the Berge study-- you conclude, based on
13    your own analysis, that that disparity, 1.02 for the
14    cohorts, 1.26 for the case-control studies, constitutes
15    heterogeneity between those two types of studies?
16        MS. PARFITT:  Objection; misstates her
17    testimony.
18        She says she relied on the data.
19        MR. WILLIAMS:  Counsel, I would ask
20    you not to coach.
21        MS. PARFITT:  I am not coaching.
22        Let the record reflect I am not coaching.  I am
23    making it clear.
24        THE WITNESS:  I agreed that there's
25    heterogeneity between those two sets of results, but that

Anne McTiernan, Ph.D.

Page 202

1    it does not subtract from the causal interpretation.
2        The other thing I note when I look at a figure like
3    this, Figure No. 2 in that Berge paper, that almost all
4    of the relative risks to the right of the line; "the
5    line" being the line where the relative risk would be one
6    or no effect.
7        It's unusual to see so many studies with the
8    relative risk over on the right side.
9        I review a lot of meta-analyses, so this is unusual
10   to see that level of consistency.
11   Q  (By Mr. Williams)  So just so we're clear, you disagree
12   with the second half, the second clause of the final
13   sentence in the Berge study, but you agree with the first
14   portion, correct?
15               MS. PARFITT:  Objection; form,
16   misstates her testimony.
17               THE WITNESS:  I agree that the cohort
18   studies have lower relative risks than do the
19   case-control studies, yes.
20   Q  (By Mr. Williams)  And you agree that that makes them
21   heterogeneous, correct?
22               MS. PARFITT:  Objection; form.
23   Q  (By Mr. Williams)  Those two different types of studies?
24               MS. PARFITT:  Objection; form.
25               THE WITNESS:  That's part of the

Page 203

1    definition of "heterogeneity," is to see differences.
2    Q  (By Mr. Williams)  Let me ask you some questions about
3    the Taher 2018 study.
4        We will mark that study as Exhibit No. 17.
5               (Exhibit No. 17 marked
6                 for identification.)
7
8    Q  (By Mr. Williams)  The Taher 2018 study is not one of the
9    articles that you originally included in your reference
10   list, right?
11   A  That's correct.
12       It was made public after my report was submitted.
13   Q  It is included in the additional materials to Dr. Anne
14   McTiernan, a listing that we marked earlier today?
15   A  Yes.
16   Q  Have you read the entire transcript?
17   A  Yes, I have.
18   Q  Did you have access to this article before it was
19   published?
20   A  It's not published.  It's a draft manuscript.
21   Q  Do you have access to the appendixes or supplemental
22   tables that are referenced in the publication?
23   A  Yes.
24       I don't have them with me, but I did have access.
25   Q  How did you have access to them?

Page 204

1    A  Ms. Parfitt sent them.
2    Q  Did she--
3    A  I am trying to remember if there was a website as well.
4    Q  Do you know how she obtained them?
5               MS. PARFITT:  Objection; form.
6               THE WITNESS:  I do not know.
7    Q  (By Mr. Williams)  Are you relying on the Taher 2018
8    study for your opinion in this litigation?
9    A  I am not relying on the study, but it did add to my-- it
10   does substantiate my opinion.
11       It's very similar results to what we saw in the
12   other meta-analyses.
13   Q  Is the Taher 2018 article peer-reviewed?
14   A  Not to my knowledge, but I don't know what process it
15   went through to get to this point.
16   Q  Do you know one way or the other whether it has been
17   accepted for publication?
18   A  I don't know.
19   Q  Do you know the source or sources of funding for the
20   Taher 2018 article?
21   A  I think it said Health Canada, but--
22   Q  Other than the reference to Health Canada-- it references
23   a contract with Health Canada.
24       Other than that, do you have any knowledge as to the
25   sources of funding?

Page 205

1               MS. PARFITT:  Objection; form.
2               THE WITNESS:  All I know is source of
3    funding is Health Canada, what it says in the paper.
4    Q  (By Mr. Williams)  Do you personally know any of the
5    authors who are listed on the first page?
6    A  No, I don't.
7    Q  Have you discussed your opinion on talc and ovarian
8    cancer with any of those authors?
9    A  No, I haven't.
10   Q  Do you know what conflicts of interest, if any, the
11   authors may have?
12               MS. PARFITT:  Objection; form.
13               THE WITNESS:  No, I don't.
14   Q  (By Mr. Williams)  Do you know whether some of the
15   authors are serving as consultants to the plaintiffs in
16   this litigation?
17   A  No, I don't.
18   Q  Were you asked to be a co-author of that paper?
19   A  No, I wasn't.
20   Q  Did you provide comments to it?
21   A  No, I didn't.
22   Q  Did the authors ever consult you in any way in connection
23   with their publication?
24   A  No, they didn't.
25   Q  Did you attend the National Cancer Institute directors'

Anne McTiernan, Ph.D.

Page 206

1    meeting in Lyon, France on July 11, 2013 of last year,
2    2018?
3    A    No, I didn't.
4    Q    The Taher study contains a meta-analysis, right?
5    A    That's correct.
6    Q    If you turn to Page 28, Page 28 calculates or reports an
7         overall relative risk of 1.28 with a confidence interval
8         of 1.20 to 1.37, right?
9    A    It's written there-- okay, yes.
10   Q    If you turn to Page 49, under the heading, "Conclusion,"
11        the very last sentence says, in part, "The present
12        comprehensive evaluation of all currently available
13        relevant data indicates that perineal exposure to talc
14        powder is a possible cause of ovarian cancer in humans,"
15        right?
16   A    Yes, I see that.
17   Q    Do you agree that the 2018 paper represents a
18        comprehensive evaluation of all currently available
19        relative data?
20   A    It appeared to be a relevant meta-analysis.
21             As you mentioned, it's not peer-reviewed.
22             I would like to see it be peer-reviewed, but it has
23        a remarkably similar relative risk of the other
24        meta-analyses that I've reviewed that were peer-reviewed,
25        so not only the most recent comprehensive ones but also

Page 207

1    the previous meta-analyses.
2    Q    Do you agree with the conclusion of the authors in Taher
3         2018 that perineal exposure to talcum powder is a
4         possible cause of ovarian cancer in humans?
5    A    I believe that it is a cause of ovarian cancer in humans.
6    Q    My question is different.
7             My question is whether you agree with the conclusion
8         of the authors, what they wrote here, which is that
9         perineal exposure to talcum powder is a possible cause of
10        ovarian cancer in humans.
11   A    And I am saying I would use a stronger statement than
12        that.
13             I would say these data support a causal association
14        with cancer, ovarian cancer.
15   Q    So you disagree with them?
16   A    Yes.
17   Q    It would be faster if you just do that upfront.
18   A    I like to be exact.  Sorry.
19   Q    Just so we're clear, you disagree with the conclusion of
20        the authors in the Taher study, that talcum powder is a
21        possible cause of ovarian cancer in humans, right?
22   A    I believe that talcum powder product use is the cause of
23        ovarian cancer in humans, based on my review.
24   Q    The conclusion in this Taher 2018 article is the same as
25        that-- as the conclusion that was reached in the IARC,

Page 208

1    International Association for Research of Cancer, 2010
2    monograph with respect to perineal use of talc, right?
3             MS. PARFITT:  Objection; form.
4             THE WITNESS:  2010 monograph was from
5    data up until 2007, so they did not have the benefit of
6    the last ten years.
7             I believe IARC would have given a stronger
8    characterization of talcum powder applied to the perineum
9    if they were to review the data today, but they did
10   categorize talcum applied to the perineum as a possible
11   carcinogen Grade 2B.
12   Q    (By Mr. Williams)  I would move to strike that as
13        nonresponsive, Doctor, but my question is:
14             You are speculating when you say what IARC would or
15        would not have done; are you not?
16             MS. PARFITT:  Objection--
17             THE WITNESS:  Correct.
18   Q    (By Mr. Williams)  In fact, and point of fact, in 2010
19        IARC, in the 2010 monograph, reached a conclusion that
20        perineal exposure to talcum powder is a possible cause of
21        ovarian cancer, and they put it in Group 2B, right?
22             MS. PARFITT:  Objection; form.
23             THE WITNESS:  Using data that they had
24   available and through 2007, then yes, they classified it
25   that way in 2B.

Page 209

1    Q    (By Mr. Williams)  Do you have any criticisms of the
2         Taher 2018 meta-analysis?
3    A    As I mentioned before, it has remarkable similar results
4         to the other meta-analyses, so that gave me some
5         confidence.
6             I was a little curious why they picked-- I think
7         it's some of the supplementary tables.
8             They picked relative risk for some of the-- a couple
9         of the studies that I would not have picked, and some of
10        the meta-analyses did not pick-- when many of the studies
11        have presented data, it's a little difficult to tell
12        which of the data are the most basic, meaning no use of
13        talcum powder products to the perineum versus any use,
14        and sometimes it's difficult to determine which is the
15        correct relative risk to pick, odds ratio, but I don't
16        have that here, don't have the supplemental data here.
17   Q    Other than what you've just expressed, do you have any
18        other criticisms?
19   A    I didn't see other concerns.
20             I think Table No. 2, the summary for the Bradford
21        Hill criteria of causation, they--
22   Q    Could you give me the page?
23   A    I'm sorry, Page 25, Table No. 2.
24   Q    Thank you.
25   A    The question I had there is when they looked at strengths

Anne McTiernan, Ph.D.

1    of association, they looked across individual studies and

2    didn't take into account the meta-analyses, so I think

3    they could have used their own data as well as the other

4    meta-analyses, and they could have mentioned that there

5    as part of strengths of association.

6  Q  Have you now listed all of your criticisms of the study?

7  A  Yes, I believe so.

8  Q  Do you believe it was improper of the authors of this

9    study to include both the Wu 2009 and the Wu 2015 studies

10    in the meta-analysis, as reflected on Page 29?

11  A  I would have to look back and see if those are the same--

12    if they include some of the same cases.

13  Q  If they included the same cases, then for the reasons you

14    described earlier today, you would criticize this study

15    because there would be double counting, right?

16         MS. PARFITT:  Objection.

17         THE WITNESS:  Yes.

18  Q  (By Mr. Williams)  Please turn to Page 3 on-- Figure

19    No. 3 on Page 39.

20       It says, underneath that table, "Figure No. 3:

21    Ovarian cancer risk estimates at increasing levels of

22    exposure to talc, as reported from multiple studies."

23       Do you see that?

24  A  Yes.

25  Q  Does Figure No. 3 provide evidence of a dose-response

1    relationship, in your opinion?

2  A  I don't think I could evaluate that because I don't see

3    an explanation of where they get that data from.

4  Q  Let me ask you to look back on-- at Page 29-- actually,

5    Page 25. Excuse me.

6       Do you see where it says, "Consistency:  15 out of

7    30 studies reported positive and significant associations

8    reported in:" and then there's a colon and four bullet

9    points?

10       Do you see that?

11  A  Yes.

12  Q  15 out of 30 is 50 percent of the case-control studies,

13    right-- 15 out of 30 is 50 percent of the total number of

14    studies reported, right?

15         MS. PARFITT:  Objection; form.

16         THE WITNESS:  Yes, that would be 50

17    percent.

18  Q  (By Mr. Williams)  And 50 percent of the studies did not

19    find a positive significant association that was

20    statistically significant, correct?

21         MS. PARFITT:  Objection; form,

22    misstates the data.

23         THE WITNESS:  You are asking me if

24    that's what it stated?

25         MR. WILLIAMS:  Yes.

1         THE WITNESS:  That's what they stated,

2    yes.

3  Q  (By Mr. Williams)  And the importance of statistical

4    significance is-- strike that.

5       Statistical significance is evaluated in order for

6    epidemiologists and other researchers to try to rule out

7    chance, right?

8  A  Statistical significance depends largely on sample size,

9    and it's merely a probability, so if you have a P value

10    of 0.05, it means you have a five percent chance of

11    making an error.

12       There's nothing magical about 0.05.

13       0.06 could be a very relevant study as well.

14       Statistical significance is often determined-- it's

15    often thought to be statistically significant if the P

16    value is less than or equal to 0.05.

17       As I said, it's not magical.

18       It really depends on sample size, so when I look at

19    studies, I look at the totality of evidence, I look at

20    consistency, and I look at whether the relative risk is

21    above one consistently.

22  Q  What I'm trying to get at, Doctor, is whether-- is the

23    purpose of statistical significance.

24       Will you agree with me, and you can say "no," you

25    can say "yes," you can say "maybe," but do you agree with

1    me or not that the purpose of evaluating statistical

2    significance is to try to rule out the possibility that

3    results are a result of chance?

4  A  I would modify that.

5       I would say you would look at a statistical test in

6    order to determine what is the likelihood that chance

7    explained your result.

8       I wouldn't say the word "rule out," because, as I

9    mentioned, a P value of 0.06 could be as relevant as a P

10    value of 0.05.

11       It really depends on the sample size.

12  Q  You are familiar with IARC ratings?

13       You mentioned them earlier today, right?

14  A  Yes.

15  Q  And you know that IARC ratings for Group 2B, which is

16    what IARC found for talc in 2006, I think, was that talc

17    should be listed as a possible cause of ovarian cancer,

18    correct?

19         MS. PARFITT:  Objection; misstates the

20    document.

21         THE WITNESS:  Maybe I should reframe

22    my answer.

23       My understanding is a classification 2B means a

24    possible carcinogen.

25  Q  (By Mr. Williams)  Okay.  And as you sit there, can you

Anne McTiernan, Ph.D.

| Page 214 |
|---|
| 1  tell us what the definition of a Group 2B substance is, |
| 2  according to IARC? |
| 3  A  I don't have that memorized. |
| 4      I do know that there are different panels set up for |
| 5  each carcinogen, and there is an overall group that helps |
| 6  the scientists to decide what classification to put |
| 7  something in, but that-- it's not a clear-cut, |
| 8  necessarily. |
| 9      The scientific panel has to look at the totality of |
| 10  evidence as they decide what level of evidence they have. |
| 11  Q  Does it sound familiar to you that in assigning a Group |
| 12  2B status for talcum powder, that the IARC team concluded |
| 13  that chance, bias, and confounding factors could not be |
| 14  ruled out? |
| 15  A  I don't have the document in front of me. |
| 16      I would need to look at that. |
| 17      Do we have it? |
| 18  Q  We do, and I will get to it in a minute. |
| 19      I am asking you, as you sit here, do you have any |
| 20  memory that the way that IARC analyzes whether a |
| 21  substance is in Group 2B or some other grouping, is that |
| 22  if chance, bias, and confounding factors cannot be ruled |
| 23  out, then the substance should be in Group 2B? |
| 24          MS. PARFITT:  Objection; form. |
| 25      Again, object to the memory aspect of this. |

| Page 215 |
|---|
| 1      If there's a document available, you should show it |
| 2  to her. |
| 3          THE WITNESS:  And I can't remember. |
| 4  Q  (By Mr. Williams)  One reason that you have stated for |
| 5  the lack of statistical significance in cohort studies is |
| 6  the sample size in those studies, correct? |
| 7  A  The number of cases, the sample size of cases, yes. |
| 8  Q  Right. |
| 9      So now in your last answer, you are distinguishing |
| 10  between the total sample size on the one hand and the |
| 11  number of cases of cancer on the other, correct? |
| 12  A  Yes. |
| 13  Q  What's important for your analysis, in terms of sample |
| 14  size, is the number of cancer cases? |
| 15  A  That's correct. |
| 16  Q  You believe that the number of cases affects the |
| 17  statistical power of the studies? |
| 18  A  Yes. |
| 19  Q  Doctor, let me ask you about your report though. |
| 20      If you could look at Exhibit No. 2, Page 48, do you |
| 21  see there in the middle of the page it says, "I interpret |
| 22  the lack of statistical significance in some source |
| 23  studies as being due to the small sample sizes of many of |
| 24  these studies"? |
| 25  A  Yes. |

| Page 216 |
|---|
| 1  Q  There you refer to sample size as opposed to the number |
| 2  of cases, did you not, in that sentence that I just read |
| 3  you? |
| 4  A  The reason I'm hesitating is I do two sample size |
| 5  calculations. |
| 6      In here I am talking about calculation-- I was |
| 7  talking about the sample sizes from case-control studies, |
| 8  and after this link that I provide, the calculation |
| 9  showed the minimum number of cases in controls need to be |
| 10  931 each, and then there's another place where I |
| 11  calculate the cohort sizes. |
| 12  Q  Can we stay here for just one moment on Page 48? |
| 13  A  Yes. |
| 14  Q  First of all, you performed what is known as a power |
| 15  calculation to determine the sample size that you |
| 16  believed is required for a study? |
| 17  A  That's correct. |
| 18  Q  And you place particular importance, you told me a moment |
| 19  ago, on the number of cancer cases total, correct? |
| 20  A  That's correct. |
| 21  Q  Based on your calculation, you concluded that the minimum |
| 22  number of cases would need to be 931, correct? |
| 23  A  That's correct, to have-- to have good power to detect |
| 24  relative risk of 1.3 with statistical significance of |
| 25  0.05. |

| Page 217 |
|---|
| 1  Q  You also concluded that the minimum number of controls |
| 2  would need to be 931, correct? |
| 3  A  That's the simplest model. |
| 4      Different case-control studies will have different |
| 5  numbers, and that can affect the power one way or the |
| 6  other. |
| 7      I just did a simple calculation, but you could have |
| 8  power increased by having a small number more of controls |
| 9  or a small number of more cases, so it depends on how-- |
| 10  how it ends up working out, but this is the simplest |
| 11  model. |
| 12  Q  The point you were making in performing your power |
| 13  calculation was that meta-analyses, with their larger |
| 14  combined sample sizes, can be used to overcome that lack |
| 15  of statistical power; is that true? |
| 16  A  Yes. |
| 17  Q  One of the two meta-analyses that you called excellent |
| 18  combine data from three of the cohort studies to arrive |
| 19  at a single risk estimate. |
| 20      Do you remember that? |
| 21  A  No, I don't. |
| 22      Which study? |
| 23  Q  Let me ask you to look at the 2017 Berge analysis, and |
| 24  let's use Exhibit No. 16A. |
| 25          MS. PARFITT:  Not cutting you off |

Anne McTiernan, Ph.D.

## Page 218

1  right now, but maybe when you get to a good place, we can
2  take a break.
3       MR. WILLIAMS:  Okay.  Sure.
4  Q  (By Mr. Williams)  Do you have Exhibit No. 16A in front
5  of you?
6  A  I do.
7  Q  And I would like to have you focus on Page-- I believe
8  it's 7, Figure No. 2.
9       Do you see where the authors list the three cohort
10  studies they analyzed?
11  A  Yes.
12  Q  Gates 2010, Houghton 2014, Gonzalez 2016?
13  A  Hold on a minute.
14  Q  And "Houghton" is--
15  A  Sorry.
16       (Phone interruption)  I was getting a call on this.
17  I am going to turn it off.
18  Q  Do you see in the middle of Page 7 the reference to
19  Gates, Houghton, and Gonzalez?
20       Do you see the reference in Figure No. 2, middle of
21  the page, that says, "Cohort studies," and it references
22  those three studies?
23  A  Yes.
24  Q  And "Houghton," for the record, is H-O-U-G-H-T-O-N.
25       Now, look back one page to Page 6 of Exhibit

## Page 219

1  No. 16A, and take a look at the paragraph starting at the
2  top of the right column.
3       Do you see that one?
4  A  Yes.
5  Q  About halfway down that paragraph the authors state as
6  follows, "It should be noted that the cohort studies
7  included in the meta-analysis comprised a total of 429
8  cases of ovarian cases exposed to genital talc and 943
9  unexposed cases: the statistical power of the
10  meta-analysis of these cohort studies to detect a risk
11  ratio of 1.25, similar to the result of the meta-analysis
12  of case-control studies, was 0.99.  Thus, low power of
13  cohort studies cannot be invoked as explanation of the
14  heterogeneity of results."
15       Did I read that correctly?
16  A  Yes, you did.
17  Q  Now, they reference here in the Berge study-- strike
18  that.  Let me start over.
19       The Berge study is one of the two meta-analyses that
20  you said is an excellent study, correct?
21  A  Yes.
22  Q  And what they list here on Page No. 6 is 429 cases of
23  ovarian cancer and 943 unexposed cases.
24       Is that correct?
25  A  Yes.

## Page 220

1  Q  If you add those two numbers together, what do you get?
2  A  I don't know exactly-- over 1300.
3  Q  1300 is more than 931, correct?
4  A  Yes.
5  Q  900 and 1300-- to be precise, it's 1372.  You add those
6  two numbers together.
7       1372 cancer cases is well above the 931 that you
8  calculated would be necessary to find statistical
9  significance, right?
10  A  Yes.
11  Q  And because of the nature of cohort studies, there were
12  also many times that the number of women who did not get
13  ovarian cancer-- right-- that's a separate number?
14  A  What did you say about the cohort studies?
15  Q  In addition to the cases where women ultimately,
16  unfortunately, were diagnosed with cancer, the 1372,
17  there are many times that number of women who were
18  followed along in their lives who did not get ovarian
19  cancer, correct?
20  A  Yes.
21  Q  So this meta-analysis is sufficient, under your power
22  calculation, to be able to find a statistically
23  significant association, true?
24  A  Yes, and that's why overall we see 1.22 is statistically
25  significant.

## Page 221

1  Q  Please explain.
2  A  Pardon?
3  Q  Please explain your answer.
4  A  The overall relative risk of 1.22, the confidence
5  interval is 1.13 to 1.3-- you see the overall
6  statistically significant effect.
7  Q  That wasn't what they concluded for the cohort studies
8  though, correct?
9       The cohort studies had the following on page-- I am
10  looking at Page 7, Figure No. 2.
11       The cohort studies, for Gates it was 1.12, for
12  Gonzalez it was 0.73-- excuse me, I misspoke.
13       For Gates it was 1.06, for Houghton it was 1.12, and
14  for Gonzalez the relative risk was 0.73, correct?
15  A  0.73, yes.
16  Q  So if you look at the cohort studies, separate and apart
17  from the case-control studies that are listed above, we
18  can agree that the relative risk is nowhere near 1.22?
19       MS. PARFITT:  Objection; form.
20  Q  (By Mr. Williams)  Right?
21       MS. PARFITT:  Objection; form.
22       THE WITNESS:  Yeah, I think the-- the
23  way I look at the meta-analysis, is I look at all of the
24  studies together.
25       I don't just look at one particular type separate

Page 222

1  from others, but as an example, the Houghton study, which
2  had about 400 cases, I believe, the Women's Health
3  Initiative, with a relative risk of 1.12, if they had had
4  900 cases, that probably would have been a statistically
5  significant result, so that's what the power calculation
6  does.
7      In this case you have the Gonzalez-- the sister
8  study is what brings the relative risk down closer to one
9  because you do have one negative result there, but
10  overall, looking at all of the meta-analyses-- all of the
11  studies together, you see definitely a trend towards a
12  relative risk consistently above one.
13  Q  (By Mr. Williams)  Now-- have you completed your answer?
14  A  Yes.
15  Q  You just mentioned a moment ago that with a relative risk
16     of 1.12, if they had 900 cases, they probably would have
17     been a statistically significant-- that probably would
18     have been a statistically significant result.
19        When you say that that probably would have been the
20     case in the women's health study, you're speculating
21     there, aren't you?
22            MS. PARFITT:  Objection; form.
23            THE WITNESS:  I am speculating from my
24     previous experience with working with the Women's Health
25     Initiative, that with very large numbers of cases if you

Page 223

1     have-- even with small relative risk you will have a
2     statistically significant result, an amount, that you
3     would correct on speculating what would be seen with this
4     particular data set.
5  Q  (By Mr. Williams)  Let me ask you to focus on Page 7 of
6     the exhibit and Figure No. 2, again, and the cohort
7     studies for Exhibit No. 16A, the Berge study.
8        You see there's a subtotal there for the cohort
9     studies at the bottom of the table, right?
10  A  Yes.
11  Q  The combined relative risk for the cohort studies is
12     1.02, no statistical significance, correct?
13  A  Correct.
14  Q  The confidence interval combined for those was 0.85 to
15     1.20, correct?
16  A  Correct.
17  Q  If you had been basing your analysis on the cohort
18     studies and not on an analysis of the case-control
19     studies, you would not have been able to reach your
20     conclusion that use of talc is a cause of ovarian cancer,
21     true?
22            MS. PARFITT:  Objection; form,
23     misstates the evidence.
24            THE WITNESS:  I looked at the totality
25     of evidence and looked at all of the epidemiologic data

Page 224

1     that was available at the time, and in total that's what
2     I look at.
3        The issue with the cohort studies are that the
4     information on talcum powder product use was collected at
5     one point in time.  It was never updated, and it was not
6     retrospective, so we don't know what-- lifetime use in
7     those cohort studies.
8  Q  (By Mr. Williams)  We'll take a break in a moment, but my
9     question before the break is this:
10        I was asking, for purposes of my question, for you
11     to exclude case-control studies from your analysis.
12        My question was:
13        If you were doing an analysis that had been based on
14     the cohort studies, and not on your analysis of the
15     case-control study relative risks, you would not have
16     been able to conclude that perineal use of talc causes
17     ovarian cancer with a 1.02 relative risk that is not
18     statistically significant, right?
19            MS. PARFITT:  Objection; form,
20     misstates her testimony and her opinions.
21            THE WITNESS:  I think that's
22     speculative because I wouldn't have ignored the
23     significant amount of data from case-control studies.
24  Q  (By Mr. Williams)  On the question of whether or not the
25     difference between case-control and cohort studies may be

Page 225

1     due to sample size and resulting low power, you come to
2     the opposite conclusion as the authors of the Berge 2017
3     study that you are relying upon, correct?
4            MS. PARFITT:  Objection; form,
5     misstates her testimony.
6            THE WITNESS:  I am not sure why you
7     come to that.
8        I have the opposite conclusion.
9  Q  (By Mr. Williams)  Well, the authors of the Berge study
10     concluded that-- the authors of the Berge study concluded
11     that low power of cohort studies cannot be invoked as an
12     explanation of the heterogeneity of results, right?
13        That's what they wrote?
14  A  That's what they wrote.
15  Q  On the question of whether or not the difference between
16     case-control and cohort studies may be due to sample size
17     and resulting low power, you come to the opposite
18     conclusion as the authors of the Berge study, correct?
19            MS. PARFITT:  Objection; form.
20            THE WITNESS:  I don't remember coming
21     to the opposite conclusion.
22        I have opposite-- I have alternative reason why I
23     think the cohort studies could have lower relative risk
24     than the case-control studies, and-- which I've just
25     stated about the way the exposures are collected.

Anne McTiernan, Ph.D.

| Page 226 | Page 228 |
|---|---|

**Page 226**

1  Q  (By Mr. Williams)  In your report, Dr. McTiernan, you
2     dealt with the heterogeneity issue between the relative
3     risk findings for case-controls versus the relative risk
4     findings for cohorts.
5        You dealt with that disparity by doing a power
6     calculation and concluding that you needed 931 cases in
7     order to have sufficient power.
8        That's what you said, right?
9  A  A study-- I was talking about individual studies.
10       I wasn't talking about the combined group of cohort
11    studies.
12 Q  What the authors said on Page 6 of Exhibit No. 16A was,
13    "Thus, low power of cohort studies cannot be invoked as
14    an explanation of the heterogeneity of results."
15       They said that, right?
16 A  Yes, and I think they mean the cohort studies combined.
17 Q  I'm sorry?
18 A  They're talking about the cohort studies combined.
19       I'm talking about individual studies.
20 Q  And you disagree with that conclusion, true or not true?
21       MS. PARFITT:  Objection; form.
22       THE WITNESS:  I think that they're
23    correct in what they're saying, that they had sufficient
24    power to find a relative risk if it was there, if the
25    study was done directly when they added those three

**Page 227**

1     studies together, but I'm saying there were alternative
2     reasons why the relative risk is lower, so there's two
3     issues, the relative risk and the power and statistical
4     significance, and the relative risk for two of those
5     studies is over one.
6        They used Gates-- Gertig had a little bit different
7     level, but the data was collected in very different ways
8     for cohort studies than case-control studies.
9        Another problem with the cohort studies is that they
10    did not follow the women for very long, on average, which
11    was the case of 12 studies that have lifetime exposure,
12    so the cohort studies may have not had all of the cases
13    develop that were going to be developed, so there are
14    reasons-- but it's two different reasons: the effect
15    size, which is the relative risk, and the statistical
16    significance, which is the P value or the confidence
17    intervals.
18 Q  (By Mr. Williams)  With respect to the issue of power,
19    you said you needed to get to 931 cases, right?
20       MS. PARFITT:  Objection; form.
21       THE WITNESS:  I calculated 91-- 931
22    for an individual study.
23 Q  (By Mr. Williams)  And in these cases, if you combine the
24    cohort studies, the total number of cases, they are far
25    in excess of that number, right?

**Page 228**

1       MS. PARFITT:  Objection; form.
2       THE WITNESS:  You are talking about
3     this-- yes.
4  Q  (By Mr. Williams)  In your last answer or two answers
5     ago, you referenced the fact that two of the cohort
6     studies had relative risks above one.
7        Do you remember saying that?
8  A  Yes.
9  Q  You are referring to Gates, which was 1.06, and Houghton,
10    which is 1.12, correct?
11 A  Correct.
12 Q  The other relative risk was 0.73, correct?
13 A  Correct.
14 Q  If it had been statistically significant, that would show
15    a protective effect from the use of talc, correct?
16       MS. PARFITT:  Objection; form.
17       THE WITNESS:  Correct.
18 Q  (By Mr. Williams)  Do you think that relative risks of
19    1.06 and 1.12 are weak? strong? moderate?
20       How would you characterize those numbers?
21       MS. PARFITT:  Objection; form.
22       THE WITNESS:  I tend to look at the
23    number of what they are, rather than giving an adjective
24    to it.
25       I believe one possibility for these cohort studies

**Page 229**

1     to have lower relative risk is because of the less
2     accuracy in collecting the exposure.
3        It tends to reduce the point estimate, which is the
4     relative risk, if the exposure data is not collected with
5     as much refinement as you can see in-- as we've seen in
6     some of the other studies.
7  Q  (By Mr. Williams)  Why would it reduce the number rather
8     than raise the number?
9        Couldn't it do either?
10 A  I am not sure exactly why, but it tends to do that-- by
11    having incomplete information about an exposure, it tends
12    to lower the relative risk.
13 Q  Can you point us to any treatise, any study, any analysis
14    that makes that point?
15 A  Yes.
16 Q  That you just made?
17 A  Yes.
18 Q  Go ahead.
19 A  I have a reference.
20 Q  And then I promise we'll take a break.
21 A  Flegal, Brownie, and Haas, so Reference No. 45--
22 Q  And you are referring to Reference No. 45 from your
23    report?
24 A  Yes, Reference No. 45.
25       MS. PARFITT:  Counsel, with your

Anne McTiernan, Ph.D.

Page 230

1    permission, I will hand her my--
2              MR. WILLIAMS:  Please.
3    Q   (By Mr. Williams)  For the record, are you looking,
4    Dr. McTiernan, to the portion of the Flegal, F-L-E-G-A-L,
5    study, Item No. 45 on your reference list, to try to find
6    something that supports your conclusion that a lack of--
7    I can't remember how you put it, but a lack of sufficient
8    questions in a cohort study leads to a lower risk ratio?
9    A   So I'll read from the abstract, the first two sentences,
10   "In epidemiologic studies individuals may be
11   misclassified with respect to exposure to a risk factor
12   for disease.
13         "Such misclassification causes the relative risk of
14   disease associated with exposure in the population to be
15   biassed toward the null value."
16   Q   And what is it that you believe caused people-- strike
17   that.
18        I take it you conclude here that the cohort studies
19   somehow misclassified some of the women who were
20   participating in the study?
21   A   In the Nurses' Health Study women were asked in 1982, at
22   one point, whether they used these products, and it was
23   never updated, and it did not ask about their lifetime
24   use before that.
25        The Women's Health Initiative asked if they had ever

Page 231

1    used it when they entered the study, so that was between
2    1992 and 1996.
3         It was not updated either.
4         It didn't have a full lifetime exposure collected,
5    so really you only have one point in time for those two.
6         One of them-- one of them asked about years of use
7    and one asked about frequency, but neither asked about
8    both.
9         This is a typical underestimate of exposure when
10   you're asking people just at one point in time and not
11   updating and not going back in time.
12   Q   Anything else you want to add?
13   A   No.
14             MR. WILLIAMS:  Let's take a break.
15             VIDEOGRAPHER:  Going off the record,
16   the time is 3:19 p.m.
17             (Recess 3:19 to 3:39 p.m.)
18
19             VIDEOGRAPHER:  We are back on the
20   record.  This is the start of Media 4.  The time is 3:39
21   p.m.
22   Q   (By Mr. Williams)  Dr. McTiernan, do you have Exhibit
23   No. 2 in front of you, your report?
24   A   Yes.
25   Q   Could you turn to Page 28.

Page 232

1         At the bottom of Page 28, the last sentence that
2    carries over, you wrote, "It should be noted that ovarian
3    talc particle burden may not be influenced by number of
4    applications of perineal talc usage, and therefore the
5    typical dose response relationship may not be necessary
6    for establishing causality between perineal talcum powder
7    product use and the risk for ovarian cancer."
8         What's the basis for that statement?
9    A   I think I addressed that a little bit this morning, that
10   if a woman is exposed to perineal talc and it moves up to
11   the fallopian tube or ovarian area, all she would need is
12   potentially one dose to then set up inflammation.
13        The more that she's exposed to, that suggests the
14   more likelihood of having the talc move up to that area,
15   so we do look at dose responses to help support this
16   association, but it still seems possible that a smaller
17   number of doses could still increase risk.
18        The reference that I used here, 64, Heller, do we
19   have that available?
20             (Exhibit No. 18 marked
21              for identification.)
22
23   Q   (By Mr. Williams)  And we will mark the Heller study as
24   Exhibit No. 18.
25        If you could, just point me to the page that you're

Page 233

1    referring to.
2    A   So, yes, if you look at-- just looking at Table No. 1,
3    this is 12 women who reported talc use.
4         You can see the talc counts weren't necessarily
5    correlated with the lifetime talc applications, and this
6    is estimated by a woman's report.
7         So even women that have a smaller number of
8    applications could have a very high talc count.
9    Q   Have you finished your answer?
10   A   Yes.
11   Q   Couldn't that very high talc count be as a result of the
12   fact that talc is all over the environment, not just from
13   talcum powder but from things we eat, places we go,
14   contamination?
15        Couldn't it be explained by that?
16             MS. PARFITT:  Objection; form.
17             THE WITNESS:  It seems like a likely
18   way for talc to be present in the ovaries is through
19   movement up through the genital tract.
20        There is some data suggesting that, yes, talc could
21   migrate through the lymph system, but there's much more
22   data showing that particles can move-- inert particles
23   can move through the genital tract up through the
24   fallopian tubes and to the ovaries in both animals and
25   humans.

Anne McTiernan, Ph.D.

Page 234

1 Q (By Mr. Williams) Do you remember that the Heller study
2    looked at groups of women that both used talcum powder in
3    the perineal area and women who did not?
4 A Yes. It was about half and half, and--
5 Q Hold on. Let me ask the question.
6 A Sorry.
7 Q You do remember that it looked at both groups of women,
8    those who used talc and those who did not, correct?
9 A Yes.
10 Q And then it looked at their ovaries to determine which
11    ones had any evidence of talcum powder.
12    Do you remember that?
13 A Yes.
14 Q And do you remember that the Heller study concluded that
15    there were more women who had talcum powder in their
16    ovaries who had never used talcum powder in the perineal
17    area than there were women who had talc in their ovaries
18    who had reported use of talcum powder in the perineal
19    area?
20    Do you recall that?
21    MS. PARFITT: Objection.
22    THE WITNESS: What I see in the table
23    is a one point different, five versus six.
24    They were able then to contact the mothers of these
25    women to find out whether the women had been exposed as

Page 235

1    babies, if they had been diapered with talc, and you
2    could see quite a few-- three additional that did have
3    genital exposure from talc use as babies.
4 Q (By Mr. Williams) Dr. McTiernan, what is the latency
5    period for ovarian cancer?
6 A It's decades, so it's thought to be-- it could be 30, 40
7    years.
8 Q Isn't it 20 or 30 years?
9    MS. PARFITT: Objection; form.
10    THE WITNESS: It's not clear if it's
11    exactly that, but it could be much longer.
12 Q (By Mr. Williams) Well, take a look at the ages of the
13    women in Table No. 2.
14    Do you see those ages?
15    Wouldn't those women have had to have been diapered
16    in their 30s and 40s, by your analysis?
17 A No, I see one woman is 59, so that would have been a long
18    period.
19    One is 40.
20    One is 64.
21 Q If a woman were 59 and the latency period were 40 years,
22    that would mean that she would have had to have been
23    diapered when she was 19, right?
24 A The latency could have been longer in some.
25    There's also a possibility of other exposure to

Page 236

1    their genital area that she didn't record, she didn't
2    recall.
3 Q You're speculating now, aren't you?
4    MS. PARFITT: Objection.
5 Q (By Mr. Williams) Are you not speculating right now?
6 A I don't know. They don't have data saying that the woman
7    misrepresented.
8 Q What we do have data on is the ages of the women who had
9    talc in their ovaries, correct?
10 A Yes.
11 Q And who were part of this study, right?
12 A Yes.
13 Q The notion that the fact that they were diapered as
14    babies with talcum powder could be an explanation for how
15    they had talc in their ovaries doesn't hold up, does it,
16    if the ages of the women are, with two exceptions, people
17    who are in their 60s and 50s and 40s, right?
18    MS. PARFITT: Objection; form,
19    misstates the data.
20    THE WITNESS: I don't know if we have
21    data that can show that, but if talc has migrated up and
22    is in the peritoneal area, it sits there. I don't know
23    how it would be removed.
24    It doesn't seem implausible to me that it could
25    remain there for years.

Page 237

1 Q (By Mr. Williams) Do you have any opinion on how long
2    talc particles stay in a woman's ovary, assuming it can
3    get to an ovary?
4 A I have no data to show me one way or the other.
5 Q What we do know from the Heller study though is in Table
6    No. 3 for those women who reported talc use, five of the
7    12 had talc in their ovary, correct?
8 A That's correct.
9 Q And six of the women, who reported no talc use, six of
10    the 12 had talc in their ovaries, correct?
11 A That's correct.
12 Q Now, you cited Heller as a basis for-- strike that.
13    You criticized the cohort studies earlier today for
14    asking only at one point in time whether women used
15    talcum powder.
16    Do you recall that testimony?
17 A Yes, in the sense that it may underreport by asking about
18    one period in time.
19 Q But you also just testified a few moments ago and you
20    testified earlier today that one-time exposure is
21    sufficient to support the conclusion that talc causes
22    ovarian cancer, right?
23 A I don't recall saying that, and I did say that-- I
24    thought I just said that the women may not have
25    remembered using it.

Anne McTiernan, Ph.D.

Page 238

1    The ones that said they didn't, they may have not
2    remembered, and that is underreporting.
3  Q  But wouldn't asking the question whether-- one time
4    whether a woman ever used talcum powder be enough to give
5    the cohort studies the ability to analyze whether there
6    was an overall statistically significant association, if
7    in fact one existed, given your testimony that all it
8    takes is one exposure?
9  A  I think-- sorry, are you talking about my testimony of
10   one exposure in order to cause ovarian cancer?
11 Q  Yes.
12 A  There may be other reasons women could say it could not
13   report use of talc-- they may not remember it.
14     They may not feel comfortable reporting it.
15     In these cohort studies there were some subjects
16   that were not included because they didn't report use.
17     One of the cohort studies didn't include about 500
18   women because they didn't have information, they didn't
19   answer the question.
20 Q  You are speculating now, aren't you?
21     MS. PARFITT:  Objection; form.
22     THE WITNESS:  We can look at the
23   cohort studies to see what the numbers were that didn't
24   remember.
25 Q  (By Mr. Williams)  Is it your testimony that use of--

Page 239

1    strike that.
2      Do you have an understanding, as you sit there, as
3    to whether or not use of talcum powder in the perineal
4    area is a habitual activity or something that is done
5    once and never again?
6  A  I don't think we have data showing one way or the other.
7  Q  Do you believe that there are no studies that talk at all
8    about whether or not this is a habit, the use-- and by
9    "this," I mean the use of talcum powder in the perineal
10   area?
11 A  I didn't review that.
12     The studies talked about what proportion of people
13   were using talc at the time that they were interviewed.
14     I noticed the Women's Health Initiative is 40
15   percent were using it.  I think Nurses' Health Study was
16   about 50 percent using it, whereas the sister study, a
17   very small percent, they were interviewed more recently
18   or they answered questions more recently.
19     I don't recall the studies determining whether
20   somebody had used it once versus several times or a
21   habitual use versus nonhabitual use.
22 Q  So the cohort studies that started in 1982, is it your
23   testimony that those women started using talcum powder in
24   1982?
25     MS. PARFITT:  Objection.

Page 240

1      THE WITNESS:  I would have to look at
2    the question again, but they were asked at one point if
3    they were using, and--
4  Q  (By Mr. Williams)  Weren't they asked in some of the
5    cohort studies whether they ever used talcum powder?
6  A  One of them did and one didn't, so I would have to look
7    back.
8  Q  Regardless of which one is which, which one said, "Look
9    back" or which one side, "Are you currently using," isn't
10   the point that if talcum powder use in the perineal area
11   is a habitual thing that women did and do after
12   showering, after exercising-- after being out in the
13   world, if they're hot, if it is something that is
14   habitually done, then is there any reason to believe that
15   when a woman reports that she has used talcum powder,
16   that she's only done it one time?
17     MS. PARFITT:  Objection; form.
18     THE WITNESS:  I don't know the answer
19   to that.  I haven't seen the data.
20 Q  (By Mr. Williams)  Earlier today you were asked questions
21   about cohort study methodology, and I believe you said
22   that one of the problems with the cohort studies is that
23   they ask about a lot of substances and not just talcum
24   powder.
25     Do you recall saying that?

Page 241

1  A  Yes.
2  Q  And isn't it true-- strike that.
3      Isn't it true that a number of the cohort studies
4    ask about multiple substance-- strike that.
5      Isn't it true that a number of the case-control
6    studies ask about a number of substances?
7      MS. PARFITT:  Objection; form.
8      THE WITNESS:  Without having the
9    questionnaires for all of the case-control studies, I
10   can't answer about exactly what they asked about other
11   variables.
12     Certainly case-control studies, many of the ones
13   included, asked about several different potential
14   exposures in relation to ovarian cancer.
15     They were designed to look at ovarian cancer.
16     The cohort studies, however, were designed to look
17   at exposures related to cardiovascular disease, various
18   cancers, osteoporosis, arthritis, cognition, so there are
19   many, many different forms that these women filled out,
20   and the Women's Health Initiative in the cohort study,
21   they were completing forms every year with different
22   types of information collected.
23     At baseline, which is the only time when talc was
24   collected, they had multiple forms that they had to
25   complete.

Anne McTiernan, Ph.D.

Page 242

1  Q  (By Mr. Williams)  What is it about asking about multiple
2     substances and not just talcum powder that makes that
3     practice in some cohort studies unreliable, in your view?
4  A  It could make it unreliable, but it certainly is fatigue,
5     how many questions can somebody answer accurately.
6        The cohort studies were self-administered forms, so
7     the woman had no prompting, no additional help with
8     remembering.
9        The two studies that I could find, the actual
10    questionnaire, the Nurses' Health Study and the Women's
11    Health Initiative, they're very short and simple
12    questions without going through any information about
13    what they might have been doing at different time points
14    in their life.
15       The Nurses' Health Study had one little question
16    about five categories to fill in, so something that's
17    that short can underestimate the level of exposure.
18 Q  Does being fatigued make a woman check the box saying
19    that she used talc or does it make her not check the box
20    saying that she used talc?
21 A  I don't know.
22 Q  Then what does fatigue have to do with it?
23 A  If it makes the result less accurate, whichever way it
24    goes, the misclassification, as we just talked about,
25    that then can drive the relative risk lower towards the

Page 243

1     null.
2  Q  But it also can drive it higher, right, depending on
3     which way it goes?
4        MS. PARFITT:  Objection; form.
5        THE WITNESS:  Not usually from this
6     classification.  It usually drives it towards the null.
7  Q  (By Mr. Williams)  Your opinion that perineal talc use
8     can cause ovarian cancer is based on what you describe as
9     a statistically significant elevated risk, right?
10 A  That's correct, overall, looking at the meta-analysis and
11    the pooled analysis.
12 Q  And that statistically significant elevated risk estimate
13    is in combined data in the meta-analysis, correct?
14 A  Correct, adding the studies together.
15 Q  By combining the data, you are referring to meta-analyses
16    and pooled analyses, right?
17 A  Yes.
18 Q  Your opinion of that combined data is based upon
19    statistical significance, correct?
20 A  Partly.  It's based also on consistency across the
21    individual studies and also the effect size consistently
22    being elevated in most of the studies.
23 Q  You do agree that when you do not combine the data,
24    meaning when you look at the individual sourced studies
25    from which the meta-analyses are performed, the data is

Page 244

1     not all statistically significant, right?
2        MS. PARFITT:  Objection; form,
3     misstates her testimony.
4        THE WITNESS:  When you look at studies
5     that were small, the smaller, older studies tended to be
6     less likely to have statistical significance, and the
7     newer, larger studies were more likely to be
8     statistically significant.
9  Q  (By Mr. Williams)  You agree that simply combining data
10    into meta or pooled analyses does not entirely eliminate
11    the underlying flaws of the individual studies, true?
12 A  Yes, when you combine data, then the individual study's
13    data still stand.
14       What you're doing by combining data is smoothing out
15    variability across studies and increasing sample size.
16 Q  Take a look at the Berge study, 16A, that we were looking
17    at earlier, and take a look at Figure No. 2.
18       That's the Forest plot, right?
19 A  Yes.
20 Q  This breaks out the case-control and the cohort studies
21    analyzed for the meta-analysis, right?
22 A  Yes.
23 Q  There's a combined relative risk for the case-controls
24    and the cohort combined, and that is the 1.22 indicated
25    at the bottom of the table, right?

Page 245

1  A  That's correct.
2        MR. LOCKE:  Excuse me, can we just
3     take a quick break?
4        VIDEOGRAPHER:  Going off the record,
5     the time is 3:59 p.m.  Please stand by.
6        (Recess 3:59 to 4:00 p.m.)
7
8        VIDEOGRAPHER:  We are back on the
9     record.  The time is 4 p.m.
10 Q  (By Mr. Williams)  Dr. McTiernan, do you have the Berge
11    study, Exhibit No. 16A, in front of you?
12 A  Yes.
13 Q  And you are looking at the Forest plot?
14 A  Yes.
15 Q  I would like to focus you on the case-control studies.
16       I have counted the total number there.
17       I count 24 total.
18       Is that what you count?
19 A  Yes.
20 Q  If we look at those studies that have a confidence
21    interval that crosses over 1.0, there are 12 of them,
22    correct?
23 A  Yes, the earlier studies do.
24 Q  And that means that there are 12 that are not
25    statistically significant, correct?

Anne McTiernan, Ph.D.

Page 246

1  A  Yes.
2  Q  So as between just the case-control studies, the 24
3     listed here, at best only 50 percent of them or 12 of
4     them reflect a statistically significant association,
5     true?
6         MS. PARFITT:  Objection; form.
7         THE WITNESS:  And, again, that's
8     largely based on sample size.
9         The earlier studies tended to be smaller than the
10    older ones-- sorry, than the more recent ones, which the
11    sample size drives statistical significance.
12 Q  (By Mr. Williams)  It is accurate that 12 of the
13    case-control studies did not find a statistically
14    significant association, true or not true?
15        MS. PARFITT:  Objection; form, asked
16    and answered.
17        THE WITNESS:  The sample size drives
18    the statistical significance, and the larger, more recent
19    studies, were more likely to be statistically
20    significant.
21        The smaller, older studies, were more likely to be
22    not statistically significant.
23 Q  (By Mr. Williams)  The combined risk estimate for the 24
24    case-control studies came out to a statistically
25    significant number, correct?

Page 247

1  A  That's correct.
2  Q  The combined risk estimate for the cohort studies, on the
3     other hand, did not come out to a statistically
4     significant number, right?
5  A  That's correct.
6  Q  Can we agree that on the question of statistical
7     significance, the combined risk estimate for the
8     case-control studies are not consistent with the combined
9     risk estimate for the cohort studies?
10        MS. PARFITT:  Objection; form, asked
11    and answered, misstates her prior testimony.
12        You may answer.
13        THE WITNESS:  The combined cohort
14    study not only was not significant, the relative risk was
15    1.02.
16 Q  (By Mr. Williams)  I don't believe you answered my
17    question.
18        My question is:
19        Can we agree that a question of statistical
20    significance, just that question, the combined risk
21    estimate for the case-control studies are not consistent
22    with the combined risk estimate for the cohort studies
23    because for the cohort studies the result was not
24    statistically significant, and for the case-control
25    studies the combined estimate was statistically

Page 248

1     significant?
2         MS. PARFITT:  Objection; form, asked
3     and answered.
4  Q  (By Mr. Williams)  Am I right?
5  A  My response is that they showed different results, not
6     just the statistical significance being different, but
7     the point estimate is different.
8  Q  Let me put it this way:
9         On the question of statistical significance, yes or
10    no, are the results-- the combined results of the
11    case-controls consistent with the combined results on the
12    cohort studies or not, yes or no?
13        MS. PARFITT:  Objection; form, asked
14    and answered.
15        THE WITNESS:  So I think I answered
16    before, the statistical significance was different and
17    they showed different results.
18 Q  (By Mr. Williams)  And the different results that they
19    showed was that one, the cohorts, was not statistically
20    significant, and the case-controls, overall, were
21    statistically significant, correct?
22        MS. PARFITT:  Objection; form, asked
23    and answered multiple times.
24        THE WITNESS:  So I answered more
25    fully, I think, than just statistical significance.

Page 249

1         I answered both about the relative risk, which is
2     the point estimate, and the statistical significance, so
3     the point estimate was 1.02 in the cohort studies, not
4     statistically significant.
5         It was 1.26 in the case-control studies, and that
6     was statistically significant.
7  Q  (By Mr. Williams)  Perhaps that's where the issue is.
8         For purposes of my question, I am asking you to
9     limit your analysis to the question of statistical
10    significance.
11        Are you with me so far?
12 A  I understand what you're saying.
13 Q  With respect to statistical significance, with respect to
14    that issue, is it your testimony that the case-control
15    studies, which find that there is a statistically
16    significant positive odds ratio or relative risk, and the
17    cohort studies, which do not collectively have a positive
18    relative risk, is it your testimony that those are
19    consistent with respect to the issue of statistical
20    significance?
21        MS. PARFITT:  Objection; form, asked
22    and answered, hopefully for the last time.
23        THE WITNESS:  And I think I don't look
24    at statistical significance in the same way for a
25    relative risk of 1.02 as I do for 1.26, but there is

Anne McTiernan, Ph.D.

| Page 250 | Page 252 |

**Page 250**

1 something remarkable here, is that the upper limit of the
2 confidence interval for the cohort studies is almost up
3 to the relative risk for the case-control studies, so the
4 statistical significance test tells us the relative risk
5 could be as high as 1.2, so even though you call it
6 nonstatistically significant, it's still within 95
7 percent chance that it's up at 1.2.
8 Q  (By Mr. Williams)  Are they both statistically
9 significant or not, the case-controls or the-- and the
10 cohort studies?
11         MS. PARFITT:  Objection; form, asked
12 and answered.
13     Counsel, I do believe she is trying to answer the
14 question.
15     This is about the tenth time.
16 Q  (By Mr. Williams)  You may answer.
17         MS. PARFITT:  Give your response
18 again.
19         THE WITNESS:  I think I'm sorry, but I
20 don't think of something as just looking at the
21 statistical significance.
22     I always look at both the relative risk and the
23 statistical significance.
24     Repeating, the relative risk is only 1.2 for the
25 cohort studies.

**Page 251**

1     The confidence interval includes one, so that would
2 be considered not statistically significant, but it
3 ranges up to 1.2, which means the relative risk could be
4 as high as 1.2 for the cohort studies.
5 Q  (By Mr. Williams)  You're speculating; are you not?
6         MS. PARFITT:  Objection; form.
7         THE WITNESS:  I'm interpreting--
8         MS. PARFITT:  Misstates your
9 testimony.
10         THE WITNESS:  I am interpreting what
11 the 95 percent confidence intervals mean.
12     It's not a speculation.
13 Q  (By Mr. Williams)  Is the answer that you are not able to
14 answer my question as phrased when I limit the question
15 to an analysis of statistical significance?
16         MS. PARFITT:  Objection; form.
17     She has answered your question completely.
18     Let's move on, Mr. Williams.
19     You are not going to get a different answer.
20     You can use up the remaining of your time if you
21 would like, but she has answered the question.
22 Q  (By Mr. Williams)  You may answer, Doctor.
23         MS. PARFITT:  You are asking questions
24 10, 15 times--
25 Q  (By Mr. Williams)  You may answer.

**Page 252**

1     Just so we can remember, my question to you is:
2     Are you unable to answer my question because I am
3 limiting the question to talk about statistical
4 significance and whether those findings are consistent or
5 inconsistent?
6         MS. PARFITT:  Objection; form.
7     Answer his question.
8     You have answered multiple times.
9         THE WITNESS:  I think my answer is I
10 don't look at just statistical significance.  I look at
11 point estimate as well.
12 Q  (By Mr. Williams)  Are you an expert in asbestos?
13 A  No, I'm not an expert in asbestos.
14 Q  Are you an expert in geology?
15 A  No.
16 Q  Mineralogy?
17 A  No.
18 Q  Can you distinguish between an asbestiform fiber on the
19 one hand and a cleavage fragment on the other?
20 A  No.
21 Q  Can you distinguish between an asbestiform and a
22 nonasbestiform fiber?
23 A  No.
24 Q  Are you an expert in microscopy?
25 A  In which?

**Page 253**

1 Q  Microscopy.
2 A  No.
3 Q  Are you qualified to analyze bulk samples of baby powder
4 using different types of microscopes?
5 A  No, I'm not.
6 Q  Are you qualified to perform any of the following tests
7 for purposes of analyzing a talcum powder sample:
8     X-ray defraction?
9 A  Are you going to list them or do you want me to say
10 "no"--
11 Q  You can answer them one at a time.
12 A  No.
13 Q  Polarized light microscopy?
14 A  No.
15 Q  Transmission electron microscopy?
16 A  No.
17 Q  In your work do you review and analyze other people's
18 defraction patterns or readouts or images or other
19 results of microscopic testing for-- of talcum powder for
20 asbestos, the presence of asbestos?
21 A  Are you talking about looking at the details of their
22 sampling?
23 Q  Correct.
24 A  To determine the method?  No, I would not do that.
25 Q  Regardless of the method, have you ever personally tested

Anne McTiernan, Ph.D.

| Page 254 |
|---|
| 1    any talcum powder product for asbestos? |
| 2   A   No. |
| 3   Q   Have you ever been to a talc mine? |
| 4   A   No. |
| 5   Q   How about a talc mill? |
| 6   A   No. |
| 7   Q   Do you know how talc is selected from a mine, sorted, |
| 8    sterilized, processed before it is ever put into a bottle |
| 9    of Johnson's Baby Powder? |
| 10   A   No, I don't. |
| 11   Q   Do you know what methods are used to test the cosmetic |
| 12    talc in Johnson's Baby Powder products for asbestos? |
| 13   A   Are you talking about what your company methods are to |
| 14    test? |
| 15   Q   Whether it was the company's methods or someone else's-- |
| 16   A   No. |
| 17   Q   Do you know how many methods were used over the years to |
| 18    test cosmetic talc in Johnson's Baby Powder products for |
| 19    asbestos? |
| 20   A   In some of the documents I've reviewed, I have seen |
| 21    mention of several types, but I couldn't-- I am not an |
| 22    expert in them. |
| 23   Q   Do you know how often cosmetic talc, in Johnson's Baby |
| 24    Powder products, were tested for asbestos? |
| 25   A   By anybody, I don't know. |

| Page 255 |
|---|
| 1   Q   Is it your opinion that at one point in time or another, |
| 2    Johnson's Baby Powder products contained asbestos? |
| 3     I think you told us you believe that's true, |
| 4    correct? |
| 5   A   Yes, that is my opinion. |
| 6   Q   I will rephrase. |
| 7     Is it your opinion that Johnson's Baby Powder |
| 8    products sold today contain asbestos? |
| 9      MS. PARFITT: Objection; form, asked |
| 10    and answered. |
| 11      THE WITNESS: I believe from the |
| 12    evidence I've seen, there was asbestos as recently |
| 13    as samples tested in the 2000s. |
| 14    I don't know for 2019. |
| 15    I haven't seen any reports on that. |
| 16   Q   (By Mr. Williams) And am I right-- if you take a look at |
| 17    Page 57 of your report, Exhibit No. 2, and I'm referring |
| 18    you to the bottom of the page, the last paragraph, does |
| 19    that paragraph summarize your opinion that asbestos has |
| 20    been found in Johnson's Baby Powder products |
| 21    specifically? |
| 22   A   So are you talking about the whole paragraph? |
| 23   Q   Correct. |
| 24     You mention Reference No. 75 and Reference No. 76 as |
| 25    supporting the idea that published data as recently as |

| Page 256 |
|---|
| 1    2014 have shown that present-day talcum powder products |
| 2    include several types of asbestos, and you cite two |
| 3    sources, right? |
| 4   A   Yes. |
| 5   Q   And those are Gordon 2014 and Blount 1991? |
| 6   A   That's correct. |
| 7   Q   You also cite to Exhibit No. 47 of the deposition of |
| 8    Imerys witness Julie Pier, P-I-E-R. |
| 9     Do you remember that? |
| 10   A   Yes. |
| 11   Q   And to Exhibit No. 24 to the deposition of Johnson & |
| 12    Johnson witness John Hopkins, correct? |
| 13   A   Yes. |
| 14   Q   You also have cited to five litigation reports. Those |
| 15    are referenced as 79 to 83, which were prepared by |
| 16    Dr. William Longo, right? |
| 17   A   Yes. |
| 18   Q   Are you in fact relying upon Gordon 2014, Blount 1991, |
| 19    Pier Exhibit No. 47, Hopkins Exhibit No. 24, and the five |
| 20    Longo reports for your opinion that asbestos has been |
| 21    found specifically in Johnson's Baby Powder products? |
| 22   A   I would have to look at Gordon again to see what that |
| 23    said about Johnson & Johnson. |
| 24     Blount did identify one of the components as baby |
| 25    powder. |

| Page 257 |
|---|
| 1     Pier and Hopkins were Johnson & Johnson products, |
| 2    and Longo tested products from-- my understanding from |
| 3    the report, from Johnson & Johnson. |
| 4   Q   Other than the materials that we just identified, are you |
| 5    relying on anything else to support your opinion that |
| 6    asbestos has been found specifically in Johnson's Baby |
| 7    Powder products? |
| 8   A   No. |
| 9   Q   "No," you are not relying on anything else? |
| 10   A   No, I'm not. |
| 11   Q   Are you aware that at the time they authored the article |
| 12    identified as Reference No. 75 -- that's the Gordon 2014 |
| 13    report -- that each of the three authors had been a paid |
| 14    expert for the plaintiffs' lawyers in talcum powder |
| 15    litigation? |
| 16   A   I believe they said that in their disclosures. |
| 17     Do we have 75 available? |
| 18   Q   While they are looking for that, Doctor, do you recall |
| 19    whether they identified in the Gordon 2014 article, and |
| 20    by "they," I mean the authors, did they identify whether |
| 21    they were plaintiff experts; that is, experts retained by |
| 22    plaintiffs in litigation? |
| 23   A   It says, "Attorneys for the litigation process." |
| 24   Q   It does not say whether it's Plaintiff or Defendant, |
| 25    correct? |

Anne McTiernan, Ph.D.

| Page 258 | Page 260 |
|---|---|

**Page 258**

1  A  I don't see it here--
2  Q  I'm sorry, what was--
3  A  It doesn't say for the plaintiff or the defense.  It
4     doesn't say which.
5  Q  Do you know, one way or the other, whether the product
6     tested in that article was Johnson's Baby Powder?
7  A  No, I can't recall if I saw it.
8     My paragraph didn't talk about Johnson & Johnson,
9     just talked about talcum powder products.
10 Q  Okay.  Let me ask you to assume, for purposes of my next
11    question, that the product that is referred to in the
12    Gordon article was not Johnson's Baby Powder.
13    Will you make that assumption for purposes only of
14    my question?
15 A  Okay.
16 Q  Okay.  How would an article about a different talcum
17    powder product than the ones that are at issue in this
18    case support your opinion that perineal use of Johnson's
19    Baby Powder products cause ovarian cancer?
20    MS. PARFITT:  Objection; form.
21    THE WITNESS:  My opinion was-- from my
22 report, my opinion was that talcum powder product use of
23 any source increases risk of ovarian cancer.
24 Q  (By Mr. Williams)  Okay.  With respect to the Blount
25    article, 1991, Reference No. 76 in your report is the

**Page 259**

1     article by author A.M. Blount.
2     Do you recall that?
3  A  Yes.
4  Q  What information from the Blount 1991 article are you
5     relying on for your opinion that the contaminated
6     products mentioned in that article refer to Johnson's
7     Baby Powder products?
8  A  So there was a table with unidentified samples labelled A
9     to O, and I is indicated as-- somewhere it's written as
10    baby powder, I believe.
11    Then from litigation there was some indication of
12    what these different samples were, and so that one was
13    identified as Johnson & Johnson Baby Powder.
14 Q  Did you review the entirety of Dr. Blount's deposition?
15 A  No.  I skimmed part of it.  I didn't review-- I skimmed
16    part of it.  I didn't read the total deposition.
17 Q  Did you read the part of the deposition where Dr. Blount
18    testified that the bottle of Johnson's Baby Powder that
19    she brought to the deposition could not possibly be the
20    bottle of talc that she identified as Sample No. 1 in her
21    1991 article?
22 A  You mean Sample 1 or Sample I?
23 Q  Sample I, thank you.
24    It's Roman I or I.
25 A  I didn't read that, no.

**Page 260**

1  Q  Let me ask you about John Hopkins.
2     You referenced having read some documents that bore
3     his name, correct?
4  A  Yes.
5  Q  Let's mark as Exhibit No. 19 a document that I believe
6     was Reference No. 78 in your report.
7     (Exhibit No. 19 marked
8     for identification.)
9
10 Q  (By Mr. Williams)  Do you recognize this as the document
11    in your report that you cited in support of your opinion
12    that talcum powder products contained asbestos?
13 A  Yes.
14 Q  It is Exhibit No. 24, you see there, with the little tab,
15    to John Hopkins' August 17, 2018 deposition, correct?
16 A  Okay.  Here it says "19."
17 Q  What says 19?
18 A  I have Exhibit No. 19 for this one, 24 for the--
19 Q  Correct.
20    Just so you know, for this deposition it's Exhibit
21 No. 19.
22    For Mr. Hopkins' deposition it was Exhibit No. 24.
23    Do you understand?
24 A  Yes.
25 Q  Is this one of the documents that Plaintiffs' counsel

**Page 261**

1     sent to you without your asking?
2     MS. PARFITT:  Objection; form.
3     THE WITNESS:  They did send it to me.
4     I don't recall if I asked for it or not.
5  Q  (By Mr. Williams)  Do you have any idea if the three
6     pages of testing contained in Mr. Hopkins' Exhibit No. 24
7     is representative of all the testing that was done on
8     Johnson & Johnson talcum powder products?
9  A  I don't, but I would be concerned about any bottles
10    having asbestos in them.
11 Q  Do you have a problem with the notion that the seller of
12    talcum powder products tests for asbestos?
13    MS. PARFITT:  Objection; form.
14    THE WITNESS:  Do I have a problem with
15 the notion that the seller tests--
16 Q  (By Mr. Williams)  I'll rephrase it.
17 A  No, I don't have a problem.
18 Q  And the reason you don't have a problem is that the
19    seller of a product could, in all good faith, seek to
20    determine whether or not a particular mine where they're
21    getting the product contains asbestos, right?
22    MS. PARFITT:  Objection; form.
23    THE WITNESS:  Okay.
24 Q  (By Mr. Williams)  So the mere fact-- what I'm getting at
25    is:

Anne McTiernan, Ph.D.

Page 262

1    The mere fact that a company tests to determine
2    whether or not there is asbestos, for example, in a mine
3    where they are mining for talcum powder, that fact, in
4    and of itself, is not repugnant to you in any way,
5    correct?
6    A  No.
7         MS. PARFITT:  Objection; form.
8    Q  (By Mr. Williams)  It is not repugnant to you, for
9    example, for a car company to test whether cars of a
10   particular make and model have brakes that work, right?
11   A  Correct.
12   Q  The fact that they test for brakes does not mean that the
13   brakes do not work, right?
14   A  Correct.
15   Q  The fact that they test for brakes doesn't mean that the
16   product that is actually sold to people does not have
17   brakes that can stop a car, right?
18        MS. PARFITT:  Objection; form.
19        THE WITNESS:  There are a couple of
20   negatives there.  I'm just getting a little confused.
21   Q  (By Mr. Williams)  I will start over.
22        The mere fact that a car company tests its makes and
23   models to see whether the brakes work does not mean that
24   the cars that are ultimately sold have brakes that do not
25   work?

Page 263

1    A  Correct.
2    Q  Do you know whether this Exhibit No. 24 that's in front
3    of you, from Dr. Hopkins, represents final or preliminary
4    test results?
5         MS. PARFITT:  Objection; form.
6         THE WITNESS:  Final or preliminary?
7    Can you explain that, meaning-- what do you mean by
8    those two?
9    Q  (By Mr. Williams)  Do you know the difference between a
10   preliminary test and a final test?
11   A  I mean, in terms of what it means for the company, I
12   don't know what final or preliminary would mean in terms
13   of their testing procedures.
14   Q  Do you know, one way or the other, if any of the results
15   were updated or corrected?
16        MS. PARFITT:  Objection; form.
17        THE WITNESS:  Updated for a particular
18   sample or updated for all of their products?
19   Q  (By Mr. Williams)  Either.
20   A  I think I'm confused.
21        I see what was tested for this, and it says Shower
22   to Shower, medicated powder, baby powder, so I would
23   assume that that's an actual product.
24        (Exhibit No. 20 marked
25              for identification.)

Page 264

1
2    Q  (By Mr. Williams)  Let me show you what we've marked as
3    Exhibit No. D-1-- Exhibit No. 20.  Pardon me.
4         MS. PARFITT:  Counsel, I have not seen
5    this before.
6         Can you represent to us what this is?
7         MR. WILLIAMS:  I will in a second.
8    Q  (By Mr. Williams)  Have you ever seen this document,
9    Dr. McTiernan, what's been marked as Exhibit No. 20?
10   A  I don't think so-- well--
11   Q  Did Plaintiffs' counsel provide this to you?
12   A  I don't recall.
13   Q  Let me represent to you that this is Exhibit No. D-1,
14   D-1, to John Hopkins October 17, 2018 deposition.
15        Will you accept that representation?
16   A  Yes.
17   Q  You see the tab number that has-- it bears a deposition
18   tab number just like your deposition has exhibits with
19   tabs?
20   A  Yes.
21   Q  Do you see that Exhibit D-1 appears to contain the same
22   information as Hopkins' Exhibit No. 24, which you were
23   provided by Plaintiffs' counsel, except there's an
24   additional column that says "The whole story"?
25   A  I think there's an awful lot of information here.

Page 265

1    Q  Let's take a couple-- let's take the first one at the top
2    of the page.
3         Under "The whole story," it says, "Tremolite is not
4    asbestos."
5         Do you see that?
6    A  Yes.
7    Q  And you don't know, as you sit here, whether tremolite is
8    or is not asbestos, right?
9         MS. PARFITT:  Objection; misstates her
10   testimony.
11        THE WITNESS:  I am confused about that
12   because IARC states that tremolite is asbestos, so--
13   Q  (By Mr. Williams)  We'll get to that in a minute.
14        Is it your testimony that the IARC monograph does
15   not make any distinction between a mineral known as
16   tremolite and one known as tremolite asbestos?
17        MS. PARFITT:  Objection; form,
18   misstates her testimony.
19        THE WITNESS:  I don't recall.  We
20   would have to read it.
21   Q  (By Mr. Williams)  You don't remember one way or another?
22   A  No.
23   Q  Do you see the last line on the first page refers to, in
24   this same document, Exhibit No. 20 to your deposition,
25   D-1 to Dr. Hopkins' deposition, it refers to trace

Anne McTiernan, Ph.D.

| Page 266 | Page 268 |
|---|---|

**Page 266**

1    amounts of fibrous minerals, but "The whole story" column
2    indicates that that does not mean asbestos.
3            MS. PARFITT:  Objection.
4        Is that what it says?
5        Is that the question?
6    Q  (By Mr. Williams)  Do you see that that's what it says?
7    A  It says, "Fibrous minerals does not mean asbestos," so--
8        is it fibrous talc?  That could be carcinogenic as well.
9        Is that correct?
10   Q  Do you know the difference between fibrous talc and
11       fibrous minerals?
12   A  I couldn't distinguish myself.  I'm not a mineralogist,
13       no.
14   Q  What's the basis for your testimony?
15       I think you were suggesting a moment ago that
16       fibrous talc is somehow carcinogenic.
17       Is that what you were suggesting?
18   A  I believe that IARC considers that it could be, so I
19       would have to look at the IARC report again to fully
20       report.
21   Q  So the basis for your testimony then is that you believe
22       that IARC states that fibrous talc is carcinogenic?
23   A  Yes, but I need to look at the report again.
24   Q  Okay.  You are relying on five litigation reports
25       authored or co-authored by Dr. Longo as part of his paid

**Page 267**

1    expert work for plaintiff lawyers in talcum powder
2    litigation, correct?
3            MS. PARFITT:  Objection; form.
4            THE WITNESS:  Correct.
5    Q  (By Mr. Williams)  Do you know-- do you think the chain
6        of custody is important when it comes to samples that are
7        being tested for asbestos?
8        Do you know what I mean when I say "chain of
9        custody"?
10   A  Why don't you explain it.
11   Q  Sure.
12       I will ask you to assume that "chain of custody"
13       refers to who has custody of a particular substance or
14       item that is going to be tested from the time that it
15       existed at its source to the time that it is tested.
16       Do you understand what I mean?
17   A  Yes.
18   Q  Do you know where Dr. Longo got the samples that he
19       tested?
20   A  I understood from the summaries in the beginnings of
21       these reports that he received the samples from Johnson &
22       Johnson.
23   Q  All of the samples?
24   A  I would have to look at the individual reports to
25       determine that.

**Page 268**

1    Q  Do you know one way or the other whether the samples that
2        Dr. Longo tested were open and unsealed when he received
3        them?
4    A  I don't recall reading that.
5        I would have to look at the report again.
6    Q  Do you know that Dr. Longo did not personally test any of
7        the samples he reports on in the litigation documents
8        that you relied on in the case?
9            MS. PARFITT:  Objection; misstates the
10       record.
11           THE WITNESS:  I just read the summary
12       report, which looked like his company did the testing.
13   Q  (By Mr. Williams)  Please turn to Page 57 of your report.
14       I want to focus your attention on the fourth
15       paragraph there that starts with the word "Asbestos."
16   A  Yes.
17   Q  Does that paragraph accurately summarize the bases of
18       your opinion that asbestos is established as a cause of
19       epithelial ovarian cancer?
20   A  Yes.
21   Q  You cite the 2011 Camargo, C-A-M-A-R-G-O, and the 2011
22       Reid, R-E-I-D, meta-analyses in support of your opinion
23       that asbestos is a cause of ovarian cancer, correct?
24   A  Yes.
25   Q  Those are References 71 and 72, right?

**Page 269**

1    A  Yes.
2    Q  You also cite Ferrante, F-E-R-R-A-N-T-E, a 2017 pooled
3        analysis, in support of your opinion that asbestos is a
4        cause of ovarian cancer, right?
5    A  Yes.
6    Q  You also cite to the IARC 2012 monograph on asbestos, an
7        article by members of the IARC working group, correct?
8    A  Yes.
9    Q  Other than those materials, are you relying on anything
10       else to support your opinion that asbestos is a cause of
11       ovarian cancer?
12   A  No, I don't believe so, and I did not do a full
13       systematic search with causal analysis for asbestos.
14       I only did that for talcum powder products.
15   Q  Why didn't you do one for asbestos?
16   A  I wasn't asked to.
17   Q  Were you asked to include a discussion of asbestos in
18       your report at all-- excuse me--
19   A  I was asked to respond about mechanisms-- sorry, to talk
20       about mechanisms that may be explaining the association
21       between talcum powder products and ovarian cancer risk,
22       and when I looked at mechanisms, I often would see the
23       potential for asbestos being included in talcum powder
24       products, so I wanted to include that as one possible
25       mechanism, especially given that asbestos is a known

Anne McTiernan, Ph.D.

| Page 270 |
|---|

1  carcinogen.

2  Q  Let me focus your attention on Page 57 of your report,

3     Exhibit No. 2, to the last sentence in that fourth

4     paragraph that says, "IARC concluded that asbestos,

5     fibrous talc, chromium, and nickel are Group 1 human

6     carcinogens.  IARC also classified cobalt as a 2B

7     'possible' carcinogen."

8        Do you see that?

9  A  Yes.

10 Q  Do you believe that Johnson's Baby Powder products

11    contained chromium, nickel, and cobalt?

12 A  I would have to review some of these documents that

13    talked about these--

14 Q  What are you relying on?

15        MS. PARFITT:  Please let her finish

16    the answer.

17        MR. WILLIAMS:  I'm sorry.

18        THE WITNESS:  I would need to review

19    the documents in the report responding to that.

20 Q  (By Mr. Williams)  Are those heavy metals, the three

21    metals I mentioned, the metals that you believe are or

22    have ever been present in Johnson's Baby Powder products?

23        MS. PARFITT:  Objection; form.

24        THE WITNESS:  Again, I would have to

25    review the documents.

| Page 271 |
|---|

1  Q  (By Mr. Williams)  As you sit here today, you are not

2     able to tell us what the heavy metals are that are

3     supposedly contained in Johnson's Baby Powder?

4        MS. PARFITT:  Objection; misstates her

5     testimony, form.

6        THE WITNESS:  I would want to review

7     the documents.

8  Q  (By Mr. Williams)  Let me ask you this:

9        Is it your opinion today, Doctor, that Johnson's

10    Baby Powder products contain chromium, nickel, and

11    cobalt?

12 A  Again, I would need to look at the documents to see what

13    was found.

14 Q  So you can't state whether you have that opinion or not?

15        MS. PARFITT:  Objection.  She needs to

16    look at the document.

17        What documents do you need to see?

18        THE WITNESS:  I would want to see-- I

19    guess Longo-- whoever was looking at these to see what

20    was there, but my paragraph did not talk about Johnson &

21    Johnson.

22    My paragraph talked about talcum powder products

23    having these constituents.

24 Q  (By Mr. Williams)  That's my point.

25        So as you sit here today, based on your review, do

| Page 272 |
|---|

1  you have evidence, do you believe that Johnson's Baby

2  Powder in particular contains chromium, nickel, and

3  cobalt?

4        MS. PARFITT:  Objection.

5        THE WITNESS:  I don't have evidence

6  one way or the other.

7  I did not look at that.

8  I looked at the general comments that talcum

9  powder products could contain these metals.

10 I did not look at Johnson & Johnson.

11 Q  (By Mr. Williams)  Thank you.

12    Are any of your opinions dependent on the assumption

13    that the chemicals in the fragrance that goes into

14    Johnson's Baby Powder products are carcinogenic?

15 A  I read one review by Dr. Crowley (Phonetic) who indicated

16    that there were quite a few fragrances in these products

17    that fall into the classification of carcinogenicity.

18    Without that data, my opinion would still stand.

19 Q  Dr. Crowley is another expert Plaintiffs' witness that

20    Plaintiffs' counsel has paid in connection with talc

21    litigation, correct?

22        MS. PARFITT:  Objection; form.

23        THE WITNESS:  To my knowledge, yes.

24 Q  (By Mr. Williams)  Have you ever met or spoken with

25    Dr. Crowley?

| Page 273 |
|---|

1  A  No, I have not.

2  Q  Are you relying on Dr. Crowley's litigation report for

3     your opinion that perineal use of Johnson's Baby Powder

4     products can cause ovarian cancer?

5  A  Yes, I have looked at his report.

6  Q  What chemicals did Dr. Crowley identify as fragrance

7     constituents contained in Johnson's Baby Powder products?

8  A  There were many.

9     I would have to see the report.

10    Do you have it?

11 Q  I don't want to take the time to do that.

12    Let me just ask you this:

13    Did you do anything to independently verify whether

14    those constituents are, in fact, contained in Johnson's

15    Baby Powder products?

16 A  No, I did not.

17 Q  We have talked a little bit about IARC today, and I want

18    to ask you some questions about that.

19    You are familiar with the International Agency for

20    Research on Cancer, right?

21 A  Yes, I am.

22 Q  You have done work with them?

23 A  Yes.

24 Q  IARC has five different categories it places substances

25    into with respect to whether they are or may be

Anne McTiernan, Ph.D.

## Page 274

1    carcinogenic, correct?

2    A  I can't respond to whether it's exactly five or not.

3       I have looked at these-- do we have a list of them?

4    Q  Sure.

5       It is-- we'll mark it as Exhibit No. 21.

6          (Exhibit No. 21 marked

7           for identification.)

8

9    Q  (By Mr. Williams)  This is the IARC monograph on talc.

10   A  2012?

11   Q  This one is 2010.

12   A  2010, okay.

13   Q  Let me refer you to Page 35 of the document.

14      Do you see "Group 2B" listed there?

15   A  Yes.

16   Q  That is where the agent is possibly carcinogenic to

17      humans, and then there is a fairly long description of

18      what that means.

19      Do you see that?

20   A  Yes.

21   Q  And it is your understanding that talc has been listed as

22      a Group 2B substance?

23   A  Yes.

24      You are using data up to 2006, yes.

25   Q  Of the almost 1000 substances that IARC has reviewed, do

## Page 275

1    you know how many have been classified as Group 4, which

2    is on the next page, "The agent is probably not

3    carcinogenic to humans"?

4    A  No, I haven't.

5    Q  If I were to represent to you that there was one, and

6       only one, substance that they have reviewed that was put

7       into Group 4, would that surprise you?

8          MS. PARFITT:  Objection; form.

9          THE WITNESS:  It would not surprise me

10      because they probably are only looking at things that are

11      potentially carcinogenic.

12   Q  (By Mr. Williams)  You mentioned earlier today that IARC

13      sets a high bar for listing something as a Group 2B

14      possible substance.

15      Do you remember saying that?

16   A  I don't, but I believe you.

17   Q  What was the basis for your statement that IARC sets a

18      high bar as opposed to some other level bar for

19      determining whether a substance is a Group 2B substance?

20   A  From my understanding, they do a systematic review.  They

21      set up a panel of scientists, and then they do a

22      systematic review, including studies from humans and

23      animals, and they did this for-- for talcum powder

24      products-- for talc, they did it up to 2006, and they did

25      not do meta-analysis, but they did do a systematic

## Page 276

1    review.

2    Q  Okay.  And let me refer you to Page 35 again, under Group

3       2B where that's the definition of the agent being

4       possibly carcinogenic to humans.

5       Do you see that?

6    A  Yes.

7    Q  It says, "This category is used for agents for which

8       there is limited evidence of carcinogenicity in humans

9       and less than sufficient evidence of carcinogenicity in

10      experimental animals."

11      Did I read that right?

12   A  Yes.

13   Q  Do you remember, as you sit there, the definition of

14      "limited evidence of carcinogenicity" under IARC's

15      definitions?

16   A  No, I don't.

17   Q  Take a look at Page 31.

18      On Page 31 of Exhibit No. 21, there is a definition

19      at the bottom of the page for "limited evidence of

20      carcinogenicity," right?

21   A  Yes.

22   Q  And it says, "A positive association has been observed

23      between exposure to the agent and cancer for which a

24      causal interpretation is considered by the working group

25      to be credible, but chance, bias, or confounding could

## Page 277

1    not be ruled out with reasonable confidence."

2       Did I read that right?

3    A  Yes.

4    Q  Remember earlier today we were talking about chance,

5       bias, and confounding factors needing to be ruled out in

6       order to move something from a Group 2B designation to a

7       higher designation, and you said, "I would have to look

8       at the IARC monograph"?

9       Do you remember that?

10   A  Yes.

11   Q  Now that we are looking at the IARC monograph, and you

12      see the definition of "limited evidence of

13      carcinogenicity," will you agree with me now that in

14      order for something to move up from this Level 2B, where

15      there's limited evidence of carcinogenicity in humans, to

16      some higher level, one would need to rule out or

17      specifically the IARC group would need to rule out

18      chance, bias, and confounding?

19         MS. PARFITT:  Objection; form.

20         THE WITNESS:  Yes, because they state

21      that in the category above, "Sufficient."

22   Q  (By Mr. Williams)  And when you say "yes," "yes," they

23      would have to rule out all of those things, correct?

24   A  Yes, with reasonable confidence.

25   Q  Now, as we sit here today, IARC still lists talc as a 2B

Anne McTiernan, Ph.D.

Page 278

1   substance, correct?
2           MS. PARFITT:  Objection; form.
3           THE WITNESS:  IARC has not updated
4   their 2006 data, correct.
5   Q   (By Mr. Williams)  Therefore the most recent update lists
6   talc as a Group 2B substance, correct?
7           MS. PARFITT:  Objection; form.
8           THE WITNESS:  Using data up to 2006,
9   yes.
10  Q   (By Mr. Williams)  You keep saying, "using data up to
11  2006."
12      Do you have any basis for-- strike that.
13      You testified earlier today that you believe that
14  IARC would set a higher designation if they had the
15  results of studies since 2006, correct?
16  A   I believe it would be reasonable to expect that, given
17  that there's more studies published since that time.
18  Q   And when you say that you believe it would be reasonable
19  to expect that, you expected it, right?
20          MS. PARFITT:  Objection.
21          THE WITNESS:  I can't say what a panel
22  of scientists would say if it was faced with reviewing
23  the literature.
24      All I can say is the literature-- all I can say is
25  the literature has been increased significantly in the

Page 279

1   last ten years.
2   Q   (By Mr. Williams)  And what study are you referring to or
3   studies are you referring to?
4   A   So some of the larger case-control studies that were
5   published in recent years, the two meta-analyses, and the
6   pooled analysis.
7   Q   Anything else?
8   A   In terms of epidemiology, that's it.
9   Q   Let me show you to one of the studies that has been done
10  since the IARC monograph was first drafted in 2006.
11      We'll mark it as Exhibit No. 22.
12          (Exhibit No. 22 marked
13              for identification.)
14
15  Q   (By Mr. Williams)  The Langseth study, which is Exhibit
16  No. 22, is one of the studies there you rely upon,
17  correct?
18  A   That's correct.
19  Q   Let me ask you to turn to Page 360, which is the-- I
20  believe the last page of the study.
21      Do you see that there are 34 publications cited as
22  references to the Langseth article?
23  A   Yes.
24  Q   For the record, "Langseth" is L-A-N-G-S-E-T-H.
25      The Langseth study was one of the meta-analyses that

Page 280

1   you relied upon in preparing your report, correct?
2   A   Yes.
3   Q   It was published in 2008?
4   A   Yes.
5   Q   That is two years after IARC met to discuss talc?
6   A   Yes.
7   Q   Three of the four authors of this meta-analysis were
8   participants in the IARC working group.
9       Do you remember that?
10  A   Yes.
11  Q   If you look at the last page of this exhibit, Exhibit
12  No. 22, there's an acknowledgments section on Page 360.
13      It says, "The work reported in this paper was
14  initiated while SH, JS, and EW were part of an IARC
15  monograph working group of the International Agency for
16  Research on Cancer, Lyon, France."
17      Do you see that?
18  A   Yes.
19  Q   So after the working group determined, and by that I mean
20  the IARC working group determined, that chance, bias, or
21  confounding could not be ruled out as an explanation for
22  the reported association between talc and ovarian cancer,
23  three of the members of that working group continued
24  their work in this article, correct?
25          MS. PARFITT:  Objection; form,

Page 281

1   misstates the substance of this article.
2           THE WITNESS:  Yes.
3   Q   (By Mr. Williams)  You may answer.
4   A   Yes.
5   Q   Does this paper report the perineal use of talc in fact
6   causes ovarian cancer?
7   A   I don't see that they did a full causal analysis in this
8   paper, but I see that they have a pooled odds ratio of
9   1.35, which is statistically significant.
10      Yeah, 1.35.
11  Q   You read this study, right?
12  A   Yes.
13  Q   Let's take a look at Page 359.
14      Under the heading "Proposal to research community,"
15  do you see that?
16  A   Yes.
17  Q   Right underneath that it says, "The current body of
18  experimental and epidemiological evidence is insufficient
19  to establish a causal association between perineal use of
20  talc and ovarian cancer risk."
21      Did I read that right?
22  A   Yes.
23  Q   Can you and I agree that that is the opposite of the
24  conclusion that you are intending to express in this
25  litigation?

Anne McTiernan, Ph.D.

1    MS. PARFITT: Objection; form.

2    THE WITNESS: Using information

3  available to 2018, I do have a different opinion than

4  these investigators did in using their data up to 2006.

5  Q  (By Mr. Williams)  They-- strike that.

6    They would have information up until the time they

7  published this study, the Langseth study, right, which

8  was done in 2008?

9    MS. PARFITT: Objection.

10    THE WITNESS: Not necessarily up until

11  this date.

12    It takes a while to get-- it was accepted in 2007,

13  so their data are going to be studies probably only up to

14  2006, if the paper was already written and accepted in

15  2007, October.

16  Q  (By Mr. Williams)  After this Langseth paper was

17  published, there were large cohort studies, prospective

18  studies, that were published, true?

19  A  They were small in terms of the number of cases.

20    They came from large cohorts, but the number of

21  cases were small.

22  Q  Are you referring to the cohort studies that were

23  published in 2008, 2010, and 2014?

24    MS. PARFITT: Objection; form.

25    THE WITNESS: Two thousand-- yes-- how

1  many cases do we have?

2    I think we covered that earlier, the number of cases

3  that would be needed.

4    So Women's Health Initiative published in 2014 had

5  429 cases.

6    The sister study in 2016 had 154.

7    The Nurses' Health Study, which the problem with

8  that was they weren't-- they changed their categories

9  with exposure, but that one did have a larger number,

10  797.

11  Q  (By Mr. Williams)  You remember earlier today we went

12  through the whole discussion of whether or not there was

13  sufficient number of cases, right?

14  A  And that was a different discussion that was about the

15  pooled analysis-- sorry, the meta-analysis of the cohort

16  studies.

17    It wasn't about these individual studies.

18  Q  Let me talk to you now about the meta-analysis of those

19  studies that were conducted that are cohort studies.

20    Do you have those in mind?

21  A  Yes.

22  Q  Do you wish to change any of the testimony that you gave

23  earlier today concerning the-- whether or not there was a

24  sufficient number of cases, as part of the pooled

25  analysis, for the cohort studies to have power if

1  combined?

2    MS. PARFITT: Objection; form.

3    THE WITNESS: I don't think we had-- I

4  don't think we discussed that particular-- and we didn't

5  do a power analysis with the numbers that they had, but

6  together they had-- what was it, 900, so they probably

7  were powered with a relative risk of 1.3.

8  Q  (By Mr. Williams)  Well, whatever that testimony was, it

9  was.

10    Let me ask you this:

11    It is a fact that after the IARC monograph-- strike

12  that.

13    After-- it is a fact that after the data that

14  underlay the IARC monograph, after the Langseth study was

15  published in 2008, there were additional cohort studies

16  that were published, correct?

17  A  As well as about eight case-control studies.

18    Quite a few studies were published after.

19  Q  And based upon that, you speculate that if IARC were to

20  undertake an analysis of whether talc is causally

21  associated with ovarian cancer, that you believe that

22  they would change their mind?

23    MS. PARFITT: Objection; form.

24    THE WITNESS: I speculate it would be

25  reasonable for a scientific panel to come up with a

1  different classification after reviewing the new human

2  data that have been available the last ten years.

3    MR. WILLIAMS: Let's take one final

4  break, if we can.

5    VIDEOGRAPHER: Going off the record,

6  the time is 4:54 p.m.

7    (Recess 4:54 to 5:09 p.m.)

8

9    VIDEOGRAPHER: We are back on the

10  record. The time is 5:09 p.m.

11  Q  (By Mr. Williams)  Dr. McTiernan, just a few more minutes

12  from me, and then we have just a couple minutes of

13  questioning from Imerys counsel, but I have to do it. I

14  have to have you grab the Berge study one more time,

15  Exhibit No. 16A.

16    Earlier today, this afternoon actually, we had a

17  discussion about statistical significance, and I was

18  trying to focus you on statistical significance as it

19  relates to the cohort studies that are listed on page--

20  listed in Figure No. 2 on Page 7 of Exhibit No. 16A.

21    Do you have that in front of you?

22  A  Yes.

23  Q  And you'll recall that I focused you on the subtotal for

24  cohort studies with regard to what the relative risk was

25  and the confidence interval, and you noted that it was

Anne McTiernan, Ph.D.

Page 286

1    1.02 as a relative risk with a confidence interval that
2    goes all the way up to 1.20.
3        Do you recall that?
4  A  Yes.
5  Q  And when I made the point that it was lacking statistical
6    significance, you said, "But the confidence interval
7    includes one, so that would not be statistically
8    significant, but it ranges up to 1.2, which means that
9    the relative risk could be as high as 1.2 for the cohort
10   study."
11       Do you recall saying that?
12 A  Correct.
13 Q  It is equally true, based on the confidence interval
14   reported on Page 7, that the relative risks could be as
15   low as 0.85, correct?
16 A  That's correct.
17 Q  And with respect to each of the case-control studies that
18   did not find statistical significance, first you see
19   Cramer in 1982, that one that had a 0.70 relative risk--
20   you see that one?
21 A  Yes.
22 Q  That one had a low--
23 A  That's Hartge.
24 Q  That's Hartge, pardon me.  I shouldn't have said
25   "Cramer."

Page 287

1        Let me start again.
2        The first case-control study that did not have a
3    statistically significant relative risk was Hartge 1983,
4    right?
5  A  Yes.
6  Q  And its lower confidence interval, the low side of that,
7    was 0.83, correct?
8  A  You're looking at Whittemore, but I think you're talking
9    about Hartge.
10 Q  Sorry, 0.40.
11 A  Yes.
12 Q  So the relative risk for Hartge could go as low as 0.40,
13   right?
14 A  Yes.
15 Q  The relative risk for Whittemore could go as low as 0.83,
16   right?
17 A  Yes.
18       What it means is a 95 percent chance that the risk
19   is within that range, 0.83 up to 1.74.
20 Q  So it could be as high as 1.74 for Whittemore or as low
21   as 0.83?
22 A  That's correct.
23 Q  And for Booth, the low point was 0.80, correct?
24 A  Yes.
25 Q  And for the next one, Harlow & Weiss, 1989, the low end

Page 288

1    of the confidence interval was 0.70, correct?
2  A  Yes.
3        One thing that all of these studies had in common is
4    they were very small, and you get a very wide confidence
5    interval with these small studies.
6        You notice the larger studies, the confidence
7    intervals, such as Cramer 2016, was 1.14 up to 1.5.
8    That's a much more narrow confidence interval, and that's
9    because it's a larger study.
10 Q  So let's focus now on what we were focused on this
11   afternoon, which is the cohort studies.
12       With respect to the cohort studies, in the aggregate
13   the low point was 0.85, correct?
14 A  That's correct.
15 Q  And those cohort studies, we established earlier today,
16   have a total number of cases that exceeded 1300, right?
17 A  Correct.
18 Q  That's all I need on that.
19       I wanted to ask you about one of the Bradford Hill
20   elements or factors, the one that has to do with
21   biological plausibility, okay?
22 A  Mm-hm.
23 Q  Is that a "yes"?
24 A  Yes.
25 Q  Okay.  So can you cite a single study, animal or human,

Page 289

1    that traces externally applied talc up through the
2    reproductive organs to the ovaries?
3            MS. PARFITT:  Objection; form.
4            THE WITNESS:  So the question is
5    externally applied talc?
6            MR. WILLIAMS:  Correct.
7            THE WITNESS:  So in humans that would
8    be unethical to do to see if that can move up to the
9    ovaries.
10       In terms of animals-- so in animals, talc was placed
11   in the vaginas, and it moved within four days up to the
12   ovaries.
13 Q  (By Mr. Williams)  And which study is that?
14 A  That's on Henderson 86.
15 Q  Okay.  Thank you.
16       Anything else?
17 A  Let me see.
18       In terms of humans, quite a few have been done with
19   particles of similar size to talc, which was thought to
20   be-- let me try to find where I have these.
21       So it wouldn't have the ethical issue, so inert
22   particles of carbon black were placed in women's vaginas
23   and were found to move in 30 minutes in two of three
24   patients, and that's the Egli study.
25 Q  Which one is that?

Anne McTernan, Ph.D.

Page 290

1   A  Egli, E-G-L-I.
2   Q  Anything else?
3   A  There was a surgical glove study with starch.
4       There was one radioactive tracer labelled human
5   albumin microspheres placed in-- there was--
6   radio-labelled albumin was placed in women's vaginas one
7   day before pelvic surgery, and of 14 women, nine showed
8   radioactivity in the fallopian tubes.
9   Q  Which study was that?
10  A  So that was the Venter, V-E-N-T-E-R.
11      One study on migration of talc-- sorry, no,
12  evaluated powder, so this was a starch powder on surgical
13  gloves that were used to perform pelvic exam in advance
14  of surgery, and they found statistically significant-- so
15  this is the Sjosten study.  It's S-J-O-S-T-E-N.
16  Q  Anything else?
17  A  And that's in terms of migration for humans and animals,
18  I believe.
19  Q  So is it accurate to say that not one of the studies that
20  you just mentioned -- Egli, Venter, Sjosten or Henderson
21  -- involves tracing externally applied talc in the
22  perineal area up through the reproductive organs through
23  the ovaries?
24  A  There are no such studies in humans, that's correct.
25      It would be unethical to apply it externally and

Page 291

1   follow it up through the pelvic organs.
2   Q  Same with the animals though, none of the animal studies
3   that you just mentioned, or the only animal study you
4   mentioned, does not deal with externally applied talc
5   moving up through the reproductive organs through the
6   ovaries, correct?
7       MS. PARFITT:  Object to form.
8       THE WITNESS:  They're vaginally
9   applied.
10  Q  (By Mr. Williams)  In the vagina, correct?
11  A  Into the vagina, yes.
12  Q  So you and I can agree that there is a difference between
13  the outer area and inside the vagina?
14      MS. PARFITT:  Objection.
15      THE WITNESS:  There are plenty of ways
16  for which anything on the external part of the peroneum
17  can move into the vagina.
18  Q  (By Mr. Williams)  There's not one study that you've
19  cited for humans that involved particles other than talc
20  or any known toxic substance.
21      There are articles that inject into the vagina the
22  particles and they see what happens, right?
23  A  Mm-hm.
24  Q  Is that "yes"?
25  A  Yes.

Page 292

1   Q  But none of the studies that you mentioned involve
2   reviewing perineal use external to the vagina and
3   followed the talc up through the reproductive organs,
4   true or not true?
5   A  That's correct.
6   Q  Can you cite any published study concluding that
7   particles on the outside of the vagina can migrate inside
8   and up the genital tract to the ovary?
9   A  I don't believe it was cited in my report.
10  Q  Assuming for a moment that talcum powder can reach the
11  ovaries, is it your opinion that talcum powder produces
12  chronic inflammation that somehow leads to ovarian
13  cancer?
14  A  Yes, it is my opinion that it can cause chronic
15  inflammation and it doesn't need to reach the ovaries.
16      Many cancers, especially serous cancers, are thought
17  to begin in the fallopian tubes, and they would need to
18  rise as high as that.
19  Q  So inflammation is the biological mechanism that you
20  believe is plausible for perineal talc use to cause
21  ovarian cancer, correct?
22  A  I believe it's one very plausible mechanism.
23  Q  There are no reports in the literature of externally
24  applied talcum powder products leading to inflammation,
25  granulomas, fibrosis, or adhesions anywhere along a

Page 293

1   woman's reproductive tract, correct?
2       MS. PARFITT:  Objection; form.
3       THE WITNESS:  Again, it's the ethics
4   of applying something that could potentially be
5   carcinogenic to see what would occur.
6   Q  (By Mr. Williams)  Can you identify any study that shows
7   inflammation, granulomas, fibrosis, or adhesions anywhere
8   along a woman's reproductive tract as a result of her
9   external genital talcum powder application?
10  A  I don't think I cited any such studies.
11  Q  Can you identify any published animal study where talcum
12  powder actually caused ovarian cancer in the animal?
13  A  There have been studies that showed that talc can lead to
14  cyst formation and epithelial changes in rats.
15  Q  Which study is that?
16  A  That is 122.
17      Hamilton.
18  Q  Any other studies?
19  A  Say that again?
20  Q  You said "Hamilton," right?
21  A  Hamilton, 1984.
22  Q  Any other studies?
23  A  Oh, and a mouse study, which is 123, Van Dyke.
24  Q  123?
25  A  123, yes, that talc can cause super NI generation and

Anne McTiernan, Ph.D.

Page 294

1   release from mouth to macrophages (phonetic).
2   Q   Anything else?
3   A   I am just looking.
4       So you are talking about ovarian tumors.
5       The NTP, the National Toxicology Program, has also
6   done rat studies and found that exposure to talc cause--
7   it was an inhalation study, caused clear evidence of
8   carcinogenesis in females in terms of cancer of the
9   adrenal gland and the lung and possible carcinogenic
10  activity in males.
11  Q   What was the date of that NTP study?
12  A   NTP study?  That was No. 124.
13      1993.
14  Q   Are you familiar with the methodology of that study?
15  A   I have read the study, yes.
16  Q   And you know that the rats were subjected to talcum
17  powder pumped into a cage-- a closed cage, I think it
18  was, six hours a day, five days a week, for their entire
19  lives, right?
20  A   Yes.
21  Q   Do you think that that has applicability to human beings
22  using talcum powder in their homes?
23          MS. PARFITT:  Objection; form.
24          THE WITNESS:  Using talcum powder in--
25  Q   (By Mr. Williams)  In their homes.

Page 295

1   A   I think the correlation would be a larger concentrated
2   dose being introduced into the genital tract, and if the
3   talc is carcinogenic to animals and wasn't seen in the
4   control animals, then it's still reporting.
5   Q   Did the 1993 NTP study in fact report any ovarian cancer
6   in the female rats or mice?
7   A   I don't believe that these rats developed ovarian cancer.
8       They did not develop ovarian cancer.
9   Q   Not one of them did, correct?
10  A   No.
11      It may not be an ovarian cancer model.
12  Q   Did the 1993 NTP study report any neoplastic changes in
13  the ovaries of the female rats or mice?
14  A   Not to my knowledge.
15      Again, it's not a model for ovarian cancer.
16  Q   Can we agree that the NTP 1993 rat and mouse study does
17  not in fact show that talc causes inflammation, which
18  inflammation leads to neoplastic change or cancer in an
19  animal's ovaries?
20          MS. PARFITT:  Objection; form.
21          THE WITNESS:  I don't have the study
22  in front of me.
23      I don't recall that they did the full mechanistic
24  study.
25  Q   (By Mr. Williams)  Do you recall that the NTP expressly

Page 296

1   concluded that the 1993 rat study was not applicable or
2   appropriate for application to humans?
3           MS. PARFITT:  Objection; misstates the
4   evidence.
5   Q   (By Mr. Williams)  I'm sorry, I misspoke.
6       Are you aware that the FDA concluded that the 1993
7   NTP study was not applicable to human beings?
8           MS. PARFITT:  Objection; misstates the
9   evidence in the case.
10          THE WITNESS:  I would have to see both
11  the FDA statement and the NTP.
12  Q   (By Mr. Williams)  Can you identify-- strike that.
13      I want to distinguish between a study, an animal
14  study, where talcum powder caused inflammation on the one
15  hand, with an animal study that found that talcum powder
16  caused ovarian cancer.
17      Do you have that distinction that I'm making in
18  mind?
19      Do you have the distinction I'm making in mind?
20  A   I'm just reading through my report.
21  Q   Inflammation on the one hand, ovarian cancer on the
22  other.
23      I am trying to make that distinction.
24      Do you have that distinction in mind?
25      When you say "yes," I'll ask you a question.

Page 297

1   A   So in Genofre's, G-E-N-O-F-R-E, study, in animal models,
2   injection of talc into the pleura causes local and
3   systemic inflammatory response, so it includes elevated
4   levels of C-reactive protein and interleukin 6, and CEGF
5   and TGF beta, and several of these are associated with
6   increased risk of ovarian cancer in humans, including
7   C-reactive protein and interleukin 8.
8   Q   Did that study that you are referring to, the Genofre,
9   G-E-N-O-F-R-E, 2009 study, are you saying that that study
10  showed that talc caused inflammation that led to
11  neoplastic or cancerous changes in the animals?
12  A   This was a model looking at inflammation.
13  Q   And did that study show that talc application to the
14  animal caused inflammation that led to cancerous changes?
15  A   To my knowledge, it stopped at the inflammatory response.
16  Q   None of the studies that you are relying upon -- Genofre
17  -- compared C-reactive proteins, and that's C hyphen
18  reactive proteins, or IL 8 levels between perineal talc
19  users and nontalc users, correct?
20          MS. PARFITT:  Objection; form.
21          THE WITNESS:  I don't know about
22  research that has looked at that.
23      I do know that women with high levels of C-reactive
24  protein or interleukin 8 are at an increased risk of
25  developing ovarian cancer.

Anne McTiernan, Ph.D.

Page 298

1  Q  (By Mr. Williams)  None of the studies that you rely on
2     concluded that C-reactive proteins or IL 8 levels can
3     cause a local inflammatory response in the ovary,
4     correct?
5              MS. PARFITT:  Objection; form.
6              THE WITNESS:  C-reactive protein and
7     interleukin 8 are the inflammatory response.
8        They are the products that are made during
9     inflammatory response, to my knowledge.
10 Q  (By Mr. Williams)  Was that an inflammatory response in
11    the ovary?
12 A  It was blood-- the epidemiologic studies you are talking
13    about was in blood.
14 Q  Can you identify any published study concluding that
15    increased C-reactive protein levels leads to ovarian
16    cancer in humans?
17 A  Yes, I have that.
18        I am looking for it.
19        I thought that I had reference to meta-analysis of
20    C-reactive protein and risk of ovarian cancer, but it's
21    not showing up.
22 Q  Can you identify any published study concluding that the
23    C-reactive protein levels are greater in perineal talc
24    users than nonperineal talc users?
25 A  I did not look at that.

Page 299

1  Q  Can you identify any published study concluding that the
2     interleukin, and that's I-N-T-E-R-L-E-U-K-I-N, dash 8
3     levels are greater in perineal talc users than
4     nonperineal talc users?
5  A  I did not look at that.
6              MR. WILLIAMS:  That's all the
7     questions I have, Doctor.  Thank you very much.
8        Let's go off the record.
9              VIDEOGRAPHER:  Going off the record,
10    the time is 5:33 p.m.  Please stand by.
11            (Recess 5:33 to 5:35 p.m.)
12
13             VIDEOGRAPHER:  We are back on the
14    record.  The time is 5:35 p.m.
15
16
17            EXAMINATION
18 BY MS. ERFLE:
19 Q  Dr. McTiernan, again, my name is Nancy Erfle.  I
20    represent Imerys Talc America, and you understand that's
21    a different defendant than Johnson & Johnson, correct?
22 A  Yes, I do.
23 Q  And do you understand the role in this litigation, what
24    their role is?
25 A  No.  You can explain it.

Page 300

1  Q  Okay.  That they, for a period of time, supplied the raw
2     material talc to Johnson & Johnson for the baby powder.
3        Are you aware of that?
4  A  I was aware that they did supply.
5        I don't know anything about when or how much, no.
6  Q  Okay.  So just a couple areas of questions:
7        There were some questions that Mr. Williams asked
8     you regarding chromium, nickel, and cobalt, and you said
9     you do not know if those were contained in the Johnson &
10    Johnson powder specifically.
11       Do you recall that?
12 A  I do recall saying that.
13 Q  Okay.  Same question as to Imerys.
14       You do not know if Imerys raw talc specifically
15    contained chromium, nickel, or cobalt, do you?
16 A  I would have to look.
17       I know that the Pier deposition had some information
18    at least about some of the talc.
19       Do we have that?
20             MS. PARFITT:  Give us one moment.
21       Do you want to have her identify--
22             MS. ERFLE:  Please do.
23             THE WITNESS:  So this is Exhibit
24    No. 47 of Pier testimony, 9/13/18.
25 Q  (By Ms. Erfle)  That's great.  Let's look at that.

Page 301

1        So you have that in front of you?
2  A  Yes.
3  Q  And what about that indicates that there is chromium,
4     nickel, or cobalt in the raw material specifically
5     provided to Johnson & Johnson?
6  A  So these samples are all from Imerys--
7  Q  Do you know that to be the case?
8  A  That was my understanding, that that was the case, and I
9     see Exhibit No. 38, chromium, cobalt, and nickel in a
10    Johnson & Johnson sample.
11 Q  Okay.  Do you know-- can you say-- how do you know that
12    that's a J&J sample?
13 A  This is what is stated by the expert witness, to my
14    understanding.
15 Q  So you've done no independent work yourself to confirm
16    what these are or what these samples are, correct?
17 A  That's correct.
18       I am relying on this testimony.
19 Q  So you don't know if these were actually samples that
20    went into a Johnson & Johnson bottle that reached a
21    consumer, correct?
22             MS. PARFITT:  Objection; form.
23 Q  (By Ms. Erfle)  You can answer.
24 A  Correct.
25 Q  And you don't know if any of these items listed in

Anne McTiernan, Ph.D.

| Page 302 |
| --- |

1    Exhibit No. 47 of Ms. Pier's exhibit-- Exhibit No. 47
2    from Ms. Pier's prior testimony, if any of that actually
3    went to a competitor or was a competitor's product not
4    Imerys, correct?
5            MS. PARFITT: Objection; form.
6            THE WITNESS: Correct, I don't know
7    from this data.
8    Q  (By Ms. Erfle) And you don't know from Exhibit No. 47
9    from Ms. Pier's prior deposition, that you are looking at
10   now, if any of that talc came from mines that were never
11   actually used for Johnson & Johnson product, correct?
12           MS. PARFITT: Objection; form.
13           THE WITNESS: Well, this does state
14   "Johnson & Johnson company" on two of the samples that
15   have chromium, cobalt, and nickel.
16   Q  (By Ms. Erfle) But, again, you don't know if that
17   actually ever reached into a product that became body
18   powder from Johnson & Johnson that went to a consumer,
19   correct?
20           MS. PARFITT: Objection; form.
21           THE WITNESS: Correct.
22              (Exhibit No. 23 marked
23               for identification.)
24   Q  (By Ms. Erfle) And just to make the record clear, let's
25   put in as Exhibit No. 23 the Julie Pier document that you

| Page 303 |
| --- |

1    are looking at, so we make sure it's a little clearer.
2        So all the questions I just asked you,
3    Dr. McTiernan, about the Julie Pier Exhibit No. 47, it's
4    also the same document as we've marked as Exhibit No. 23
5    to your deposition, correct?
6    A  I can't read the whole thing, but it looks the same--
7    it's the same number.
8    Q  I will represent to you that that's another copy of it,
9    but it's marked as Exhibit No. 23 to this deposition,
10   okay?
11   A  Okay.
12   Q  Are you okay with that?
13   A  Yes.
14              (Exhibit No. 24 marked
15               for identification.)
16
17   Q  (By Ms. Erfle) Last thing I want to do is put in as
18   Exhibit No. 24-- Dr. McTiernan, can you please look at
19   that and identify that for the record, Exhibit No. 24?
20   A  These are invoices that I submitted to Ms. Parfitt's firm
21   for work up until December 2018.
22   Q  Okay. So let's mark as Exhibit No.-- and are those a
23   complete copy of all invoices that you would have
24   incurred from the time you began your work on this
25   litigation up until December of 2018?

| Page 304 |
| --- |

1    A  It should be, yes.
2              (Exhibit No. 25 marked
3               for identification.)
4
5    Q  (By Ms. Erfle) Let's mark as Exhibit No. 25 this-- can
6    you identify that for the record?
7    A  This is a copy of my report with notes on it.
8        Yeah, it's a copy of my report, expert report, of
9    November 16th, 2018.
10   Q  And it's the one with your handwritten notes?
11   A  Yes.
12   Q  Okay. One last question:
13       Do you have an invoice that you've generated from
14   December of 2018 through today, which is January 28th,
15   2019?
16   A  Not yet.
17   Q  Okay. And once you generate that invoice, will you
18   please give it to your counsel and make sure that they
19   provide it to us?
20   A  Mm-hm.
21   Q  Is that a "yes"?
22   A  Yes. Yes.
23           MS. ERFLE: Okay. That's all I have.
24           MR. GOLOMB: How much time do you have
25   left--

| Page 305 |
| --- |

1            MR. LOCKE: I don't think there's any
2    more time.
3            MR. GOLOMB: How much time is there on
4    that disc?
5            VIDEOGRAPHER: I have another like 15
6    minutes.
7            MS. PARFITT: Can we take a short
8    break, and we'll come back?
9            VIDEOGRAPHER: Okay. The time is 5:42
10   p.m. We are going off the record.
11              (Recess 5:42 to 5:50 p.m.)
12
13           VIDEOGRAPHER: We are back on the
14   record. The time is 5:50 p.m. This is Media Unit No. 5.
15
16
17              EXAMINATION
18   BY MS. PARFITT:
19   Q  Dr. McTiernan, good evening. I just have a few questions
20   for you for the Ladies and Gentlemen of the Jury.
21       Dr. McTiernan, have you had an opportunity to review
22   the Canadian draft screening assessment by Health Canada?
23   A  I did, yes.
24   Q  And have you had an opportunity to review the entire
25   report?

Page 306

1 A Yes, I did.
2 Q All right. And who sponsored that study?
3 A It was Health Canada.
4 (Exhibit No. 26 marked
5 for identification.)
6
7 Q (By Ms. Parfitt) All right. I am going to have marked
8 as Exhibit No. 26, Dr. McTiernan, a copy of just the
9 draft screening assessment, dated December 2018, and,
10 again, ask if you will identify that.
11 A Yes, Exhibit No. 26.
12 Q That is one of the documents you have reviewed?
13 A Yes.
14 Q Have you reviewed any other documents that are part of
15 the Health Canada assessment of talc?
16 A There was several other documents that were available.
17 These were drafted by the Health Canada for
18 information sheets for the public, and one that is called
19 "Talc: potential risk of lung effects and ovarian
20 cancer," another is a talc information sheet, a third is
21 on talc, and, again it's also information for the public
22 of how to minimize exposure, so they are already planning
23 what the public health messages will be.
24 One is a risk management scope, and this is to do
25 with the regulatory decisions, and also the Canadian

Page 307

1 weight of evidence general principles and current
2 applications at Health Canada.
3 Q Now--
4 MR. LOCKE: Objection; nonresponsive,
5 move to strike.
6 Q (By Ms. Parfitt) Dr. McTiernan, the information from
7 Health Canada was made available to you, I believe you
8 testified, after your report was submitted in November
9 2018; is that correct?
10 A That's correct.
11 Q All right. And the date, again, of the Health Canada
12 assessment was December 2018, correct?
13 A Yes, correct.
14 Q So at the time you submitted your report in the
15 multidistrict litigation, you did not have access to the
16 Health Canada report, correct?
17 A Correct.
18 Q All right. Now, have you-- do you have an opinion, to a
19 reasonable degree of scientific certainty, as to whether
20 or not Health Canada has opined that talcum powder
21 products can cause ovarian cancer?
22 MR. WILLIAMS: Objection; lacks
23 foundation, calls for speculation.
24 THE WITNESS: Health Canada does, in
25 several places, firmly state that talcum powder-- that

Page 308

1 talc can cause ovarian cancer.
2 Q (By Ms. Parfitt) Specifically what are you referring to,
3 if you will?
4 A So on-- are there page numbers on here-- on Page 21 of
5 the draft-- document called, "Draft screening
6 assessment," in the fourth paragraph down, the third
7 line, it says, "Further, available data are indicative of
8 a causal effect."
9 Another-- also, on Page 29, third paragraph down,
10 states that "On the basis of information presented in
11 this draft screening assessment, it is proposed to
12 conclude that talc meets the criteria under Paragraph
13 No. 64C of CEPA as it is entering or may enter the
14 environment in a quantity or concentrations or under
15 conditions that constitute or may constitute a danger in
16 Canada to human life or health."
17 Also in the beginning on Page Roman Numeral No. III,
18 it states in the fifth paragraph, "The meta-analyses of
19 the available human studies in the peer-reviewed
20 literature indicate a consistent and statistically
21 significant positive association between perineal
22 exposure to talc and ovarian cancer. Further, available
23 data are indicative of a causal effect."
24 Q Dr. McTiernan, from reviewing the draft screening
25 assessment performed by Health Canada, were you able to

Page 309

1 determine whether or not they did indeed perform a
2 causality assessment?
3 MR. WILLIAMS: Lacks foundation, calls
4 for speculation.
5 THE WITNESS: They did do a full
6 causal analysis that includes information from
7 toxicology, animal studies of the biologic information,
8 perineal exposure to talc, and then the human studies.
9 I am looking for where they did their full
10 causation.
11 So they then determined characteristic of risk to
12 human health, and then came up with their conclusions
13 about what-- that further available data are indicative
14 of a causal effect.
15 Q (By Ms. Parfitt) What methodology did they employ?
16 A They did methodology that was similar to what I did for
17 my report.
18 They reviewed the epidemiologic data from a
19 meta-analysis.
20 They reviewed the data-- the literature on animal
21 studies.
22 They reviewed toxicology.
23 They reviewed information in how talc can be-- can
24 reach the ovary areas, and from that came up with their
25 conclusions.

Anne McTiernan, Ph.D.

| Page 310 |
|---|
1  Q  Was part of the Health Canada causality assessment a
2     study by the name of Tair (phonetic)?
3  A  Yes.  That was the meta-analysis that they reviewed.
4  Q  Okay.  And that was just one part--
5  A  That was the primary meta-analyses-- the most recent
6     meta-analysis that I reviewed.
7  Q  And that was just one part of the Health Canada
8     assessment; is that correct?
9  A  Exactly.
10 Q  Dr. McTiernan, you were asked by counsel for J&J whether
11    or not it would be repugnant for a company to test their
12    talcum powder products for asbestos.
13       Do you remember that question?
14 A  I believe the question was posed-- I would have to review
15    the question again.
16       I believe there was something about brakes and
17    another--
18 Q  Let me just--
19 A  I think the category was talcum testing for asbestos.
20 Q  I believe the question was whether-- first, whether it
21    was repugnant for a company to test for asbestos, whether
22    J&J would be repugnant for them to test-- to actually do
23    testing of their product.
24       Do you recall that?
25 A  Yes.

| Page 311 |
|---|
1  Q  And he then asked you whether it was repugnant if a brake
2     company also tested to determine whether or not their
3     products' brakes failed.
4        Do you remember that?
5  A  Yes.
6  Q  In your opinion would it be repugnant for a company, if
7     they found that the brakes had failed, to not inform the
8     public?
9  A  Yes.
10          MR. WILLIAMS:  Incomplete
11    hypothetical.
12          MR. LOCKE:  Just note my objection.
13 Q  (By Ms. Parfitt)  Similarly, would it be repugnant of a
14    manufacturing company or a supplier who tested their
15    product and found asbestos to not warn or communicate
16    with the public and the medical and scientific field
17    about the fact that their product had asbestos?
18          MR. WILLIAMS:  Same objection.
19          MS. ERFLE:  Objection; also lacks
20    foundation.
21          THE WITNESS:  Yes.
22          MS. PARFITT:  I have no further
23    questions, Dr. McTiernan.  Thank you.
24          MR. WILLIAMS:  I think that's it--
25    actually-- that's fine.

| Page 312 |
|---|
1          VIDEOGRAPHER:  This marks the end of
2  today's video deposition.  The time is 5:59 p.m.
3          (Deposition concluded at 5:59 p.m.)
4          (Signature reserved.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| Page 313 |
|---|
1  STATE OF WASHINGTON )   I, Terilynn Simons, CCR, RMR, CRR
                       ) ss a certified court reporter
2  County of Pierce   )   in the State of Washington, do
                          hereby certify:
3
4
5      That the foregoing deposition of ANNE MCTIERNAN, PH.D.
   was taken before me and completed on January 28, 2019, and
6  thereafter was transcribed under my direction; that the
   deposition is a full, true and complete transcript of the
7  testimony of said witness, including all questions, answers,
   objections, motions and exceptions;
8      That the witness, before examination, was by me duly
   sworn to testify the truth, the whole truth, and nothing but
9  the truth, and that the witness reserved the right of
   signature;
10
       That I am not a relative, employee, attorney or counsel
11 of any party to this action or relative or employee of any
   such attorney or counsel and that I am not financially
12 interested in the said action or the outcome thereof;
13     That I am herewith securely sealing the said deposition
   and promptly delivering the same to Bart H. Williams.
14
       IN WITNESS WHEREOF, I have hereunto set my signature on
15 the 30th day of January, 2019.
16
17
18
19     _____
       Terilynn Simons, CCR, RMR, CRR
20     Certified Court Reporter No. 2047
       (Certification expires 07/07/19.
21
22
23
24
25

Anne McTiernan, Ph.D.

Page 314

```
 1        - - - - - -
          E R R A T A
 2        - - - - - -
 3   PAGE  LINE  CHANGE
 4   ____ ____ _____
 5     REASON: _____
 6   ____ ____ _____
 7     REASON: _____
 8   ____ ____ _____
 9     REASON: _____
10   ____ ____ _____
11     REASON: _____
12   ____ ____ _____
13     REASON: _____
14   ____ ____ _____
15     REASON: _____
16   ____ ____ _____
17     REASON: _____
18   ____ ____ _____
19     REASON: _____
20   ____ ____ _____
21     REASON: _____
22   ____ ____ _____
23     REASON: _____
24   ____ ____ _____
25     REASON: _____
```

Page 315

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
           I,_____, do
 3   hereby certify that I have read the
     foregoing pages, and that the same
 4   is a correct transcription of the answers
     given by me to the questions therein
 5   propounded, except for the corrections or
     changes in form or substance, if any,
 6   noted in the attached Errata Sheet.
 7
     _____
 8   ANNE MCTIERNAN, PH.D.      DATE
 9
10
11
12
13
14
     Subscribed and sworn
15   to before me this
     _____ day of _____, 20____.
16
     My commission expires:_____
17
18   _____
     Notary Public
19
20
21
22
23
24
25
```

Exhibit 60

# Introduction to Meta-Analysis

## Michael Borenstein

*Biostat, Inc, New Jersey, USA.*

## Larry V. Hedges

*Northwestern University, Evanston, USA.*

## Julian P. T. Higgins

*MRC, Cambridge, UK.*

## Hannah R. Rothstein

*Baruch College, New York, USA.*



A John Wiley and Sons, Ltd., Publication

P2.0084

This edition first published 2009
© 2009 John Wiley & Sons, Ltd

*Registered office*

John Wiley & Sons Ltd, The Atrium, Southern Gate, Chichester, West Sussex, PO19 8SQ, United Kingdom

For details of our global editorial offices, for customer services and for information about how to apply for permission to reuse the copyright material in this book please see our website at www.wiley.com.

The right of the author to be identified as the author of this work has been asserted in accordance with the Copyright, Designs and Patents Act 1988.

Reprinted April and June 2009, March 2010, January 2011, Novenber 2011, December 2012

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, except as permitted by the UK Copyright, Designs and Patents Act 1988, without the prior permission of the publisher.

Wiley also publishes its books in a variety of electronic formats. Some content that appears in print may not be available in electronic books.

Designations used by companies to distinguish their products are often claimed as trademarks. All brand names and product names used in this book are trade names, service marks, trademarks or registered trademarks of their respective owners. The publisher is not associated with any product or vendor mentioned in this book. This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold on the understanding that the publisher is not engaged in rendering professional services. If professional advice or other expert assistance is required, the services of a competent professional should be sought.

*Library of Congress Cataloging-in-Publication Data*

Introduction to meta-analysis / Michael Borenstein . . . [et al.].
    p.   ;  cm.
  Includes bibliographical references and index.
  ISBN 978-0-470-05724-7 (cloth)
  1. Meta-analysis.   I. Borenstein, Michael.
  [DNLM: 1. Meta-Analysis as Topic.   WA 950 I614 2009].
  R853.M48I58 2009
  610.72—dc22
                                            2008043732

A catalogue record for this book is available from the British Library.

ISBN: 978-0-470-05724-7 (H/B)

Set in 10.5/13pt Times by Integra Software Services Pvt. Ltd, Pondicherry, India
Printed and bound by CPI Group (UK) Ltd, Croydon, CR0 4YY

4                                              Introduction

## Impact of Statin Dose
## On Death and Myocardial Infarction



| Study Name | Risk Ratio | Relative Weight | Risk ratio and 95% confidence interval | P-value |
|---|---|---|---|---|
| Prove-it | 0.84 | 13% | | 0.106 |
| A to Z | 0.86 | 19% | | 0.096 |
| TNT | 0.80 | 31% | | 0.002 |
| Ideal | 0.89 | 37% | | 0.069 |
| Summary | 0.85 | 100% | | 0.000 |

0.80        1.0        1.25
Favours high dose      Favours std dose

**Figure 1.1** High-dose versus standard-dose of statins (adapted from Cannon *et al.*, 2006).

work with the effect sizes to assess the consistency of the effect across studies and to compute a summary effect.

The effect size could represent the impact of an intervention, such as the impact of medical treatment on risk of infection, the impact of a teaching method on test scores, or the impact of a new protocol on the number of salmon successfully returning upstream. The effect size is not limited to the impact of interventions, but could represent *any relationship* between two variables, such as the difference in test scores for males versus females, the difference in cancer rates for persons exposed or not exposed to second-hand smoke, or the difference in cardiac events for persons with two distinct personality types. In fact, what we generally call an *effect size* could refer simply to the estimate of a single value, such as the prevalence of Lyme disease.

In this example the effect size is the risk ratio. A risk ratio of 1.0 would mean that the risk of death or MI was the same in both groups, while a risk ratio less than 1.0 would mean that the risk was lower in the high-dose group, and a risk ratio greater than 1.0 would mean that the risk was lower in the standard-dose group.

The effect size for each study is represented by a square, with the location of the square representing both the direction and magnitude of the effect. Here, the effect size for each study falls to the left of center (indicating a benefit for the high-dose group). The effect is strongest (most distant from the center) in the *TNT* study and weakest in the *Ideal* study.

Note. For measures of effect size based on ratios (as in this example) a ratio of 1.0 represents no difference between groups. For measures of effect based on differences (such as mean difference), a difference of 0.0 represents no difference between groups.

effect size to the right of center indicates that control patients were more likely to survive.

The plot serves to highlight the following points.

- The effect sizes are reasonably consistent from study to study. Most fall in the range of 0.50 to 0.90, which suggests that it would be appropriate to compute a summary effect size.
- The summary effect is a risk ratio of 0.79 with a 95% confidence interval of 0.72 to 0.87 (that is, a 21% decrease in risk of death, with 95% confidence interval of 13% to 28%). The $p$-value for the summary effect is 0.0000008.
- The confidence interval that bounds each effect size indicates the precision in that study. If the interval excludes 1.0, the $p$-value is less than 0.05 and the study is statistically significant. Six of the studies were statistically significant while 27 were not.

In sum, the treatment reduces the risk of death by some 21%. And, this effect was reasonably consistent across all studies in the analysis.

Over the course of this volume we explain the statistical procedures that led to these conclusions. Our goal in the present chapter is simply to explain that meta-analysis does offer these mechanisms, whereas the narrative review does not. The key differences are as follows.

## STATISTICAL SIGNIFICANCE

One of the first questions asked of a study is the statistical significance of the results. The narrative review has no mechanism for synthesizing the $p$-values from the different studies, and must deal with them as discrete pieces of data. In this example six of the studies were statistically significant while the other 27 were not, which led some to conclude that there was evidence against an effect, or that the results were inconsistent (see vote counting in Chapter 28). By contrast, the meta-analysis allows us to combine the effects and evaluate the statistical significance of the summary effect. The $p$-value for the summary effect is $p = 0.0000008$.

While one might assume that 27 studies failed to reach statistical significance because they reported small effects, it is clear from the forest plot that this is not the case. In fact, the treatment effect in many of these studies was actually *larger* than the treatment effect in the six studies that *were* statistically significant. Rather, the reason that 82% of the studies were not statistically significant is that these studies had small sample sizes and low statistical power. In fact, as discussed in Chapter 29, most had power of less than 20%. By contrast, power for the meta-analysis exceeded 99.9% (see Chapter 29).

As in this example, if the goal of a synthesis is to test the null hypothesis, then meta-analysis provides a mathematically rigorous mechanism for this purpose. However, meta-analysis also allows us to move beyond the question of

P2.0084.4

statistical significance, and address questions that are more interesting and also more relevant.

## CLINICAL IMPORTANCE OF THE EFFECT

Since the point of departure for a narrative review is usually the $p$-values reported by the various studies, the review will often focus on the question of whether or not the body of evidence allows us to reject the null hypothesis. There is no good mechanism for discussing the magnitude of the effect. By contrast, the meta-analytic approaches discussed in this volume allow us to compute an estimate of the effect size for each study, and these effect sizes fall at the core of the analysis.

This is important because the effect size is what we care about. If a clinician or patient needs to make a decision about whether or not to employ a treatment, they want to know if the treatment reduces the risk of death by 5% or 10% or 20%, and this is the information carried by the effect size. Similarly, if we are thinking of implementing an intervention to increase the test scores of students, or to reduce the number of incarcerations among at-risk juveniles, or to increase the survival time for patients with pancreatic cancer, the question we ask is about the magnitude of the effect. The $p$-value can tell us only that the effect is not zero, and to report simply that the effect is not zero is to miss the point.

## CONSISTENCY OF EFFECTS

When we are working with a collection of studies, it is critically important to ask whether or not the effect size is consistent across studies. The implications are quite different for a drug that consistently reduces the risk of death by 20%, as compared with a drug that reduces the risk of death by 20% on average, but that increases the risk by 20% in some populations while reducing it by 60% in others.

The narrative review has no good mechanism for assessing the consistency of effects. The narrative review starts with $p$-values, and because the $p$-value is driven by the size of a study as well as the effect in that study, the fact that one study reported a $p$-value of 0.001 and another reported a $p$-value of 0.50 does not mean that the effect was larger in the former. The $p$-value of 0.001 *could* reflect a large effect size but it could also reflect a moderate or small effect in a large study (see the GISSI-1 study in Figure 2.1, for example). The $p$-value of 0.50 *could* reflect a small (or nil) effect size but could also reflect a large effect in a small study (see the Fletcher study, for example).

This point is often missed in narrative reviews. Often, researchers interpret a nonsignificant result to mean that there is no effect. If some studies are statistically significant while others are not, the reviewers see the results as conflicting. This problem runs through many fields of research. To borrow a phrase from Cary Grant's character in *Arsenic and Old Lace*, we might say that it practically gallops.

the results, and therefore we should not assume a common effect size. Therefore, in these cases the random-effects model is more easily justified than the fixed-effect model.

Additionally, the goal of this analysis is usually to generalize to a range of scenarios. Therefore, if one did make the argument that all the studies used an identical, narrowly defined population, then it would not be possible to extrapolate from this population to others, and the utility of the analysis would be severely limited.

## A caveat

There is one caveat to the above. If the number of studies is very small, then the estimate of the between-studies variance ($\tau^2$) will have poor precision. While the random-effects model is still the appropriate model, we lack the information needed to apply it correctly. In this case the reviewer may choose among several options, each of them problematic.

One option is to report the separate effects and *not* report a summary effect. The hope is that the reader will understand that we cannot draw conclusions about the effect size and its confidence interval. The problem is that some readers will revert to vote counting (see Chapter 28) and possibly reach an erroneous conclusion.

Another option is to perform a fixed-effect analysis. This approach would yield a descriptive analysis of the included studies, but would not allow us to make inferences about a wider population. The problem with this approach is that (a) we do want to make inferences about a wider population and (b) readers will make these inferences even if they are not warranted.

A third option is to take a Bayesian approach, where the estimate of $\tau^2$ is based on data from outside of the current set of studies. This is probably the best option, but the problem is that relatively few researchers have expertise in Bayesian meta-analysis. Additionally, some researchers have a philosophical objection to this approach.

For a more general discussion of this issue see *When does it make sense to perform a meta-analysis* in Chapter 40.

## MODEL SHOULD NOT BE BASED ON THE TEST FOR HETEROGENEITY

In the next chapter we will introduce a test of the null hypothesis that the between-studies variance is zero. This test is based on the amount of between-studies variance observed, relative to the amount we would expect if the studies actually shared a common effect size.

Some have adopted the practice of starting with a fixed-effect model and then switching to a random-effects model if the test of homogeneity is statistically significant. This practice should be strongly discouraged because the decision to use the random-effects model should be based on our understanding of whether or not all studies share a common effect size, and not on the outcome of a statistical test (especially since the test for heterogeneity often suffers from low power).

## CHAPTER 28

# Vote Counting – A New Name for an Old Problem

Introduction
Why vote counting is wrong
Vote counting is a pervasive problem

## INTRODUCTION

One question we often ask of the data is whether or not it allows us to reject the null hypothesis of no effect. Researchers who address this question using a narrative review need to synthesize the $p$-values reported by the separate studies. Since these are discrete pieces of information and the narrative review provides no statistical mechanism for synthesizing these values, narrative reviewers often resort to a process called vote counting. Under this process the reviewer counts the number of statistically significant studies and compares this with the number of statistically nonsignificant studies.

In some cases this process has been formalized, such that one actually counts the number of significant and nonsignificant $p$-values and picks the winner. In some variants, the reviewer would look for a clear majority rather than a simple majority. Or, the reviewer might not work directly with the $p$-values, but with the discussion section of the papers which are based on the $p$-values.

One might think that summarizing $p$-values through a vote-counting procedure would yield more accurate decision than any one of the single significance tests being summarized. This is not generally the case, however. In fact, Hedges and Olkin (1980) showed that the power of vote-counting considered as a statistical decision procedure can not only be lower than that of the studies on which it is based, the power of vote counting can tend toward zero as the number of studies increases. In other words, vote counting is not only misleading, it tends to be *more* misleading as the amount of evidence (the number of studies) increases!

*Introduction to Meta-Analysis*   M. Borenstein, L. V. Hedges, J. P. T. Higgins, H. R. Rothstein
© 2009, John Wiley & Sons, Ltd

In any event, the idea of vote counting is fundamentally flawed and the variants on this process are equally flawed (and perhaps even more dangerous, since the basic flaw is less obvious when hidden behind a more complicated algorithm or is one step removed from the *p*-value). Our goal in this chapter is to explain why this is so, and to provide a few examples.

## WHY VOTE COUNTING IS WRONG

The logic of vote counting says that a significant finding is evidence that an effect exists, while a nonsignificant finding is evidence that an effect is absent. While the first statement is true, the second is not. While a nonsignificant finding *could* be due to the fact that the true effect is nil, it can also be due simply to low statistical power.

Put simply, the *p*-value reported for any study is a function of the observed effect size and the sample size. Even if the observed effect is substantial, the *p*-value will not be significant unless the sample size is adequate. In other words, as most of us learned in our first statistics course, *the absence of a statistically significant effect is not evidence that an effect is absent*.

For example, suppose five randomized controlled trials (RCTs) had been performed to test the impact of an intervention, and that none were statistically significant (the *p*-value in each case is 0.265) as illustrated in Figure 28.1. The vote count is 5 to 0 against an effect, and one might assume that the intervention has no effect.

By contrast, the meta-analysis (Figure 28.1), by combining the information into a single analysis, allows us to perform a proper test of the null. Not only is this approach valid, but the test of the summary effect is often much more powerful than tests performed on any of the separate studies. When we merge the data, the effect size stays the same, but the confidence interval narrows and no longer includes the null. The *p*-value for each study alone is 0.265, but the *p*-value for the summary effect is



**Figure 28.1** The *p*-value for each study is > 0.20 but the *p*-value for the summary effect is < 0.02.

0.013. Clearly, the absence of significance in each study is due to a lack of precision rather than a small effect.

For purposes of explaining why vote counting is a bad idea, we could end the chapter here. However, because vote counting in its various forms is so pervasive, we will expand on this idea to show how the basic mistake that underlies vote counting affects much of the literature, and how meta-analysis can help address this problem.

## VOTE COUNTING IS A PERVASIVE PROBLEM

While the term vote counting is associated with narrative reviews it can also be applied to the single study, where a significant $p$-value is taken as evidence that an effect exists, and a nonsignificant $p$-value is taken as evidence that an effect does not exist. Numerous surveys in a wide variety of substantive fields have repeatedly documented the ubiquitous nature of this mistake.

In medicine, for example, Freiman, Chalmers, Smith and Kuebler (1978) surveyed reports of controlled clinical trials that had been published in a number of medical journals (primarily *The Lancet*, the *New England Journal of Medicine*, and the *Journal of the American Medical Association* during the period 1960–1977), and selected 71 that had reported negative results. The authors found that if the true drug effect had been in the region of 50% (e.g. a mortality rate of 30% for placebo vs. 15% for drug), median power would have been 60%. In other words, even if the drug cut the mortality rate in half there was still a 40% probability that the study would have failed to obtain a statistically significant result.

The authors went on to make the following point: Despite the fact that power was terribly low, in most cases the absence of statistical significance was interpreted as meaning that the drug *was not effective*. They wrote: 'The conclusion is inescapable that many of the therapies discarded as ineffective after inconclusive "negative" trials may still have a clinically meaningful effect' (p. 694). In fact, it is possible (or likely) that some of the therapies discarded on this basis might well have had very substantial therapeutic effects.

In the social sciences Cohen (1962) surveyed papers published in the *Journal of Abnormal and Social Psychology* in 1960. Mean power to detect a small, medium, or large effect, respectively, was 0.18, 0.48, and 0.83. Cohen noted that despite the low power, when the studies with *negative* results are published, readers tend to interpret the absence of statistical significance as evidence that the treatment has been proven ineffective.

In the years that followed a kind of cottage industry developed of publishing papers that documented the fact of low power in any number of journals in the area of behavioral research. Many of these are cited in Sedlmeier and Gigerenzer (1989) and Rossi (1990). Similar papers were published to document the same problem in the field of medicine (Borenstein, 1994; Hartung, Cottrell & Giffen, 1983; Phillips,

254                                    Other Issues

Scott, & Blasczcynski, 1983; Reed & Slaichert, 1981; Reynolds, 1980) and psychiatry (Kane & Borenstein, 1985).

Sedlmeier and Gigerenzer (1989) published a paper entitled *Do studies of statistical power have an effect on the power of statistical studies?* They found that in the 25 years since Cohen's initial survey power had not changed in any substantive way. Similarly, Rossi (1990) reviewed papers published in 1982 in the *Journals of Abnormal Psychology*, *Consulting and Clinical Psychology*, and *Personality and Social Psychology*. Mean power to detect small, medium, and large effects, respectively, was 0.17, 0.57, and 0.83.

This led one of the current authors (Borenstein, 2000) to propose four theorems, as follows.

1. Power in many fields of research is abysmally low.
2. Rule (1) appears to be impervious to change.
3. The absence of significance should be interpreted as *more information is required* but is interpreted in error as meaning *no effect exists*.
4. Rule (3) appears to be impervious to change.

In a sense, then, vote counting did not originate with the narrative review. Rather, the basic mistake has existed for decades, where it found a home in primary research. When the field moved on to narrative reviews, this basic mistake was named and codified but remained basically unchanged.

There is, however, one important difference. When we are working with a single study and we have a nonsignificant result we don't have any way of knowing whether or not the effect is real. The nonsignificant *p*-value could reflect either the fact that the true effect is nil *or* the fact that our study had low power. While we caution against accepting the former (that the true effect is nil) we cannot rule it out.

By contrast, when we use meta-analysis to synthesize the data from a series of studies we can often identify the true effect. And in many cases (for example if the true effect is substantial and is consistent across studies) we can assert that the nonsignificant *p*-value in the separate studies was due to low power rather than the absence of an effect.

In the streptokinase meta-analysis on page 10, for example, it is clear that the treatment does reduce the risk of death. It is fair to say that the reason that 27 studies had nonsignificant *p*-values was *not* because the treatment had no effect, but rather was because of low statistical power. (In the next chapter we actually compute the power for the streptokinase studies.)

### Moving beyond the null

In this chapter we have shown that *if our goal* is to test the null hypothesis, then meta-analysis (unlike the narrative review) provides a statistically sound mechanism for this purpose. However, we want to emphasize that meta-analysis allows us

*to move beyond a test of the null.* It allows us to assess the magnitude of the effect (which is often a more relevant question) and to determine whether or not the effect size is consistent across studies.

---

**SUMMARY POINTS**

- Vote counting is the process of counting the number of studies that are statistically significant and comparing this with the number that are not statistically significant.
- Vote counting treats a nonsignificant $p$-value as evidence that an effect is absent. In fact, though, small, moderate, and even large effect sizes may yield a nonsignificant $p$-value due to inadequate statistical power. Therefore, vote counting is never a valid approach.

---

unpublished, research lies dormant in the researchers' filing cabinets, and has led to the use of the term *file drawer problem* for meta-analysis.

### Response

Since published studies are more likely to be included in a meta-analysis than their unpublished counterparts, there is a legitimate concern that a meta-analysis may overestimate the true effect size.

Chapter 30 (entitled *Publication Bias*) explores this question in some detail. In that chapter we discuss methods to assess the likely amount of bias in any given meta-analysis, and to distinguish between analyses that can be considered robust to the impact of publication bias from those where the results should be considered suspect.

We must remember that publication bias is a problem for any kind of literature search. The problem exists for the clinician who searches a database to locate primary studies about the utility of a treatment. It exists for persons performing a narrative review. And, it exists for persons performing a meta-analysis. Publication bias has come to be identified with meta-analysis because meta-analysis has the goal of providing a more accurate synthesis than other methods, and so we are concerned with biases that will interfere with this goal. However, it would be a mistake to conclude that this bias is not a problem for the narrative review. There, it is simply easier to ignore.

### MIXING APPLES AND ORANGES

### Criticism

A common criticism of meta-analysis is that researchers combine different kinds of studies (*apples and oranges*) in the same analysis. The argument is that the summary effect will ignore possibly important differences across studies.

### Response

The studies that are brought together in a meta-analysis will inevitably differ in their characteristics, and the difficulty is deciding just how similar they need to be. The decision as to which studies should be included is always a judgment, and people will have different opinions on the appropriateness of combining results across studies. Some meta-analysts may make questionable judgments, and some critics may make unreasonable demands on similarity.

We need to remember that meta-analyses almost always, by their very nature, address broader questions than individual studies. Hence a meta-analysis may be thought of as asking a question about fruit, for which both apples and oranges (and indeed pears and melons) contribute valuable information. One of the strengths of meta-analysis is that the consistency, and hence generalizability, of findings from one type of study to the next can be assessed formally.

Of course, we always need to remember that we are dealing with different kinds of fruit, and to anticipate that effects may vary from one kind to the other. It is a further strength of meta-analysis that these differences, if identified, can be investigated formally. Assume, for example, that a treatment is very effective for patients with acute symptoms but has no effect for patients with chronic symptoms. If we were to combine data from studies that used both types of patients, and conclude that the treatment was modestly effective (on average), this conclusion would not be accurate for either kind of patient. If we were to restrict our attention to studies in only patients with acute symptoms, or only patients with chronic symptoms, we could report how the treatment worked with one type of patient, but could only speculate about how it would have worked with the other type. By contrast, a meta-analysis that includes data for both types of patients may allow us to address this question empirically.

## GARBAGE IN, GARBAGE OUT

### Criticism

The often-heard metaphor *garbage in, garbage out* refers to the notion that if a meta-analysis includes many low-quality studies, then fundamental errors in the primary studies will be carried over to the meta-analysis, where the errors may be harder to identify.

### Response

Rather than thinking of meta-analysis as a process of *garbage in, garbage out* we can think of it as a process of waste management. A systematic review or meta-analysis will always have a set of inclusion criteria and these should include criteria based on the quality of the study. For trials, we may decide to limit the studies to those that use random assignment, or a placebo control. For observational studies we may decide to limit the studies to those where confounders were adequately addressed in the design or analysis. And so on. In fact, it is common in a systematic review to start with a large pool of studies and end with a much smaller set of studies after all inclusion/exclusion criteria are applied.

Nevertheless, the studies that do make it as far as a meta-analysis are unlikely to be perfect, and close attention should be paid to the possibility of bias due to study limitations. A meta-analysis of a collection of studies that is each biased in the same direction will suffer from the same bias and have higher precision. In this case, performing a meta-analysis can indeed be more dangerous than not performing one.

However, as noted in the response to the previous criticism about *apples and oranges*, a strength of meta-analysis is the ability to investigate whether variation in characteristics of studies is related to the size of the effect. Suppose that ten studies used an acceptable method to randomize patients while another ten used a questionable method. In the analysis we can compare the effect size in these two subgroups, and determine whether or not the effect size actually differs between

the two. Note that such analyses (those comparing effects in different subgroups) can have very low power so need to be interpreted carefully, especially when there are not many studies within subgroups.

## IMPORTANT STUDIES ARE IGNORED

### Criticism

Whereas the *garbage in, garbage out* problem relates to the inclusion of studies that perhaps should not be included, a common complementary criticism is that important studies were left out. The criticism is often leveled by people who are uncomfortable with the findings of a meta-analysis. For example, a meta-analysis to assess the effects of antioxidant supplements (beta-carotene, vitamin A, vitamin C, vitamin E, and selenium) on overall mortality was met with accusations on the web site of the Linus Pauling Institute (Oregon State University) that in this 'flawed analysis of flawed data' the authors looked at 815 human clinical trials of antioxidant supplements, but only 68 were included in the meta-analysis.

### Response

We have explained that systematic reviews and meta-analyses require explicit mechanisms for deciding which studies to include and which ones to exclude. These eligibility criteria are determined by a combination of considerations of relevance and considerations of bias, and are typically decided before the search for studies is implemented. Studies should be sufficiently similar to yield results that can be interpreted, and sufficiently free of bias to yield results that can be believed. For both purposes, judgments are required, and not all meta-analysts or readers would reach the same judgments on each occasion. Importantly, in meta-analysis the criteria are transparent and are described as part of the report.

## META-ANALYSIS CAN DISAGREE WITH RANDOMIZED TRIALS

### Criticism

LeLorier *et al.* (1997) published a paper in which they pointed out that meta-analyses sometimes yield different results than large scale randomized trials. Specifically, they located cases in the medical literature where someone had performed a meta-analysis, and someone else subsequently performed a large scale randomized trial that addressed the same question (e.g. *Does the treatment work?*). The authors reported that the results of the meta-analysis and the randomized trial *matched* (both were statistically significant, or neither was statistically significant) in about 66% of cases, but did not match (one was statistically significant but the other was not) in the remaining 34%. Since randomized trials are generally accepted as the gold standard they conclude that some 34% of these meta-analyses were wrong, and that meta-analyses in general cannot be trusted.

# Exhibit 61

Ovid: Genital use of talc and risk of ovarian cancer: a meta-analysis.

http://ovidsp.tx.ovid.com/sp-3.31.1b/ovidweb.cgi

Case 3:16-md-02738-MAS-RLS    Document 9889-4    Filed 05/29/19    Page 105 of 355 PageID: 66328



**European Journal of Cancer Prevention**

Issue: Volume 27(3), May 2018, p 248–257

Copyright: Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

Publication Type: [Review Article: Gynecological Cancer]

Hide Cover

[Review Article: Gynecological Cancer]

# Genital use of talc and risk of ovarian cancer: a meta-analysis

Berge, Wera[a]; Mundt, Kenneth[b]; Luu, Hung[c]; Boffetta, Paolo[d]

## Author Information

[a]Faculty of Medicine, University of Dresden, Dresden, Germany

[b]Ramboll Environ, Amherst, Massachusetts

[c]University of South Florida College of Public Health, Tampa, Florida

[d]Icahn School of Medicine at Mount Sinai, Tisch Cancer Institute, New York, New York, USA

Correspondence to Paolo Boffetta, MD, MPH, Icahn School of Medicine at Mount Sinai, Tisch Cancer Institute, One Gustave L. Levy Place, Box 1130, New York, NY 10029, USA Tel: +1 212 824 7378; fax: +1 212 849 2566; e-mail: paolo.boffetta@mssm.edu

Received August 31, 2016

Accepted December 20, 2016

## Abstract

Some epidemiological studies suggest an association between genital use of talc powders and increased risk of ovarian cancer, but the evidence is not consistent. We performed a meta-analysis of epidemiological studies to formally evaluate this suspected association. A systematic search was conducted in Medline, Embase, and Scopus, leading to the identification of 24 case–control studies and three cohort studies. In the meta-analysis, we used a random-effect model to calculate summary estimates of the association between genital use of talc and occurrence of ovarian cancer. We assessed potential sources of between-study heterogeneity and presence of publication bias. The summary relative risk (RR) for ever use of genital talc and ovarian cancer was 1.22 [95% confidence interval (CI): 1.13–1.30]. The RR for case–control studies was 1.26 (95% CI: 1.17–1.35) and for cohort studies was 1.02 (95% CI: 0.85–1.20, $P_{heterogeneity}$=0.007). Serous carcinoma was the only histologic type for which an association was detected (RR: 1.24; 95% CI: 1.15–1.34). There was a weak trend in RR with duration and frequency of genital talc use. This meta-analysis resulted in a weak but statistically significant association between genital use of talc and ovarian cancer, which appears to be limited to serous carcinoma with suggestion of dose-response. The heterogeneity of results by study design however, detracts from a causal interpretation of this association.
.

## Introduction

Case 3:16-md-02738-MAS-RLS   Document 9889-4   Filed 05/29/19   Page 106 of 355 PageID:
66329

With over 22 000 new cases diagnosed and about 14 000 deaths every year in the USA alone, ovarian cancer ranks as the fifth as a cause of neoplastic death among women. It accounts for more deaths than from any other cancer of the female reproductive system, although incidence numbers decreased since the mid-1980s (American Cancer Society, 2016). Most ovarian cancers are detected at a later stage and have limited prospects of cure. This is mainly because of the lack of a screening method for its detection at an early stage and resistance against chemotherapy. The etiology of the disease is not fully understood, although researchers have identified several risk factors, including a family history of ovarian or breast cancer, advanced age, white race, nulliparity, obesity, education level, and endometriosis (Kim et al., 2014). In addition, breast feeding, tubal ligation, and oral contraceptive use have been reportedly associated with reduced risk (Webb et al., 2008). Ovarian cancer is a heterogeneous disease that comprises four major histologic types; serous carcinoma is the most common form (50%), followed by mucinous, endometrioid, and clear cell carcinoma. Each type, with the exception of clear cell carcinoma, is divided into grades of malignancy (Wang et al., 2005). On the basis of limited data, there appears to be some heterogeneity in risk factors for specific histologic types (Chiaffarino et al., 2007; Gates et al., 2010).

An association between exposure to asbestos and increased risk of ovarian cancer has been reported (Reid et al., 2011), but it remains unclear whether this might reflect misclassification of peritoneal mesothelioma, a disease linked to high exposure to asbestos, or direct action of asbestos fibers on the ovary (Merino, 2010).

Talc is a naturally occurring mineral that is commonly used in bath and body powders as well as other cosmetic products. Talc naturally occurs as soft crystals that give it a soft, slippery feel, absorbency, softness, and resistance to clumping. It is often applied to sanitary napkins, condoms, or underwear, as well as directly to the genital area. To our knowledge, accurate estimates of prevalence of cosmetic talc use in the genital area are not available. However, the use of powders for female hygiene, including body or deodorizing powders containing cosmetic talc has been reported to be as high as 50% in some regions (International Agency for Research on Cancer (IARC), 2010), including parts of North America, Australia, and the UK.

Since 1982, when the first case–control study reported an association between genital talc and ovarian cancer, interest in genital talc use and risk of ovarian cancer has grown (Cramer et al., 1982). The use of talcum powder in the genital area had been suggested as a potential risk factor for ovarian cancer based, in part, on a possible structural analogy with asbestos (Cramer et al., 1982) or the possible contamination by asbestos of some talcum powders in the past (Cralley et al., 1968). However, the structural similarities between asbestos minerals in the crystalline fiber form (i.e. asbestos habit) and structures seen microscopically in talcum that resemble fibers such as 'ribbons' of talc crystals or cleavage fragments of talc or other minerals, are few. Furthermore, talcum powders for domestic use in the USA have been virtually asbestos-free since the 1970s (Rohl et al., 1976).

Several more recent case–control studies have reported associations between ovarian cancer and self-reported genital talcum powder use. However, the association between talc use and ovarian cancer risk reported in case–control studies has not been limited to studies in which genital talcum powder use occurred before cosmetic products were known to be asbestos-free. It has been suggested that talcum powder may be directly carcinogenic to the ovaries, provided that talc particles may be able to travel through the female reproductive system to the ovaries (Heller et al., 1996). In one study, talc-like particles were detected more frequently in ovarian tumors than in normal human ovarian tissue, although the authors of this study emphasized that this study could not determine whether these particles actually caused the malignancy (Henderson et al., 1979).

Results of epidemiological studies reported during the last three decades have not been consistent (Huncharek et al., 2007; Terry et al., 2013; Houghton et al., 2014). It remains unclear whether a statistical association exists, and, if so, whether it can be interpreted as reflecting some form of bias or a causal relationship. We performed a systematic review and meta-analysis aiming at providing stronger evidence in favor or against the hypothesis of a causal association between genital talc use and risk of ovarian cancer.

## Methods

We performed a systematic review and meta-analysis on the association between genital talc powder use and the risk of ovarian cancer. Our work was performed according to the Preferred Reporting Items for Systematic Reviews and Meta-Analyses guidelines (Liberati et al., 2009). A study protocol was developed in advance, outlining the procedure and methods (available upon request).

### Search strategy

Case 3:16-md-02738-MAS-RLS    Document 9889-4    Filed 05/29/19    Page 107 of 355 PageID: 66330

A series of literature searches was conducted in June 2016 using the electronic databases Medline (by PubMed), Embase, and Scopus. There was no limitation on year of publication. We included relevant studies that met the following criteria: papers had to be published in peer-reviewed journals as an original report; had to present novel information on the relation between genital powder use and ovarian cancer, and had to be written in English, German, Italian, French or Spanish. As there are different types of genital powders, we defined genital powder as any type of powder that is applied to the genital, rectal or perineal area, such as talc, baby, deodorizing, cornstarch, or powder of unknown type. We excluded review articles, abstracts, editorials or letters to the editor not including original data, and other studies not meeting the selection criteria.

The following keywords were used for the searches on Medline and Scopus: 'perineal powder' or 'talcum powder' or 'genital powder' and 'ovarian cancer.' For Embase we used the following combination of keywords: 'perineum' or 'talc' and 'ovarian cancer.' In addition, all references cited in the identified papers and reviews were hand-searched for potentially relevant studies that were not captured by the electronic database search.

### Study selection

Titles and abstracts were examined independently by two of the authors (W.B., P.B.). Duplicates and irrelevant references were eliminated. In case of disagreement or doubt the abstracts or articles were discussed until consensus was reached. In case of overlap of results between publications the selection of results was on the basis of the largest population or most detailed analysis, resulting in the exclusion of some publications which were superseded by more recent reports (Harlow et al., 1992; Cramer et al., 1999; Pike et al., 2004).

### Data extraction

All data of the included studies were extracted by one author (W.B.) and checked by another author (P.B.). Possible disagreements were discussed and solved.

The following data were extracted from each study for the meta-analysis: first author and publication year; study design; study region; period of enrollment; survey instrument; assessment of ovarian cancer; age range; numbers of women with ovarian cancer and those without in case–control studies; numbers of cases of ovarian cancer, sample size and a number of person-years in cohort studies; adjustment for potential confounding factors; outcome by talc exposure (yes/no); duration (years); frequency (times/week); timing of use (early/late); type of talc exposure (sanitary napkin, diaphragm, genital deodorant, cornstarch, use by the partner); endometriosis; surgery (hysterectomy and/or tubal ligation); number of powder applications; characteristics of the participants; and tumor histology and behavior.

### Quality assessment

Every included article was scored for its quality according to a standardized checklist. We used the Newcastle–Ottawa Scale (NOS) case–control checklist and the NOS cohort study checklist for both study types, respectively (Stang, 2010). The NOS assesses three dimensions of quality: selection, comparability, and exposure (for a case–control study) or outcome (for a cohort study). It assigns a maximum of four points for selection, two points for comparability, and three points for exposure or outcome. Studies with at least seven points were considered of high quality (Supplementary Table 1, Supplemental digital content 1,
http://links.lww.com/EJCP/A138
and Table 2, Supplemental digital content 2,
http://links.lww.com/EJCP/A139
).

### Statistical analyses

Case 3:16-md-02738-MAS-RLS   Document 9889-4   Filed 05/29/19   Page 108 of 355 PageID: 66331

The measure of association of interest was the relative risk (RR) for prospective cohort studies, and the odds ratio (OR) for the case–control studies, with corresponding 95% confidence intervals (CIs). The main meta-analysis compared ever versus never use of genital talc; additional analyses addressed use of powder on sanitary napkins and diaphragms, two potential sources of talc exposure. If results were reported only by categories of exposure, indicators of ever talc use were derived using fixed-effect meta-analyses. Risk estimates were abstracted from each study for comparable exposure categories. An overall pooled RR was then estimated, together with its 95% CI, on the basis of individual estimates from each study. Each study was given a weight on the basis of the inverse of the variance of the effect estimate. We pooled data on different exposures when at least four studies provided sufficient data. A random-effects model was used in the meta-analyses comprising multiple studies, because of the heterogeneity in study design and analysis (DerSimonian and Laird, 1986). The $I^2$-statistic was used to assess the percentage of between-study variability that is because of heterogeneity rather than chance (Higgins et al., 2003).

Stratified meta-analyses were conducted for ever genital use of talc according to study design (case–control vs. cohort studies), as well as tumor histology and behavior. Because of the fact that cosmetic talc may have been contaminated by asbestos before the 1970s, when voluntary guidelines were adopted, we compared the results on use in an 'early' and in a 'late' period: the exact cut-point varied across the studies but in general referred to 1970 or 1980.

Meta-regression analyses were performed to obtain overall risk estimates for duration (RR for 10-year increase in duration) and frequency of genital talc use (RR for one time/week increase in frequency), for the studies reporting at least three categories of duration or frequency of use. Study-specific slopes were first derived from the natural logarithm of the risk estimates within each study; in a second step the slopes were pooled using a random-effects model.

The presence and extent of publication bias were assessed visually using funnel plots and evaluated statistically using the Egger's test (Egger et al., 1997). A cumulative meta-analysis was also performed by repeating the calculation of the summary RR and CI (on the basis of a random-effects model) each year a new study was published. When an article superseded a previous article from the same study, the results reported in the earlier report were replaced by the new results.

Analyses were performed using the commands *metan*, *glst*, *metafunnel*, and *metabias* of the statistical software STATA, version 14 (StataCorp, 2015).

## Results

The process of selection of relevant studies is shown in Fig. 1. The electronic searches resulted in a total of 435 articles, of which 150 overlapped between searches. After the exclusion of the duplicates and the addition of two articles identified through the review of the lists of references of eligible articles, we screened the titles of abstracts of 287 articles, and excluded 227 which appeared not to be relevant. We then reviewed the full text of the remaining 60 articles, and excluded 32 (17 commentaries, reviews or meta-analysis; three letters to the editor without original results, six reports of studies of ovarian cancer without results on talc use, and six articles whose results were superseded by subsequent publications). The remaining 28 articles, comprising three cohort studies, 24 case–control studies, and one pooled analysis of eight of the 24 case–control studies, were included in the review and meta-analysis.

Case 3:16-md-02738-MAS-RLS   Document 9889-4   Filed 05/29/19   Page 109 of 355 PageID: 66332



Fig. 1. Flow chart for the selection of studies to include in the meta-analysis.

Table 1 shows selected characteristics of the 28 articles included in the review, which provided the 27 risk estimates included in the meta-analysis [the pooled analysis (Terry et al., 2013) did not provide an independent risk estimate]. For three of the case–control studies included in the pooled analysis (Goodman et al., 2008; Moorman et al., 2009; Lo-Ciganic et al., 2012) results on genital talc use had not been reported in the original publications and were abstracted from the pooled analysis (Terry et al., 2013). Twenty studies were conducted in the USA, two in Australia, two in Canada, one in Great Britain, one in China, and one in Greece. Potential confounding factors including age, parity, history of tubal ligation or hysterectomy, and use of oral contraceptive were adjusted for in most studies, although there were differences in the specific adjustments across studies. Six of the 24 case–control studies were hospital-based with the remainder being population-based.

| References | Country | Study type | Age range | N ca/co | Potential confounders | Inclusion in meta-analyses | Overlap between publications |
|---|---|---|---|---|---|---|---|
| Cramer et al. (1982) | USA | CCC | 18–80 | 215/215 | Ps, MS | E, N, D | |
| Hartge et al. (1983) | USA | HCC | NA | 135/171 | – | E, D | |
| Whitemore et al. (1988) | USA | HCC | 18–74 | 188/539 | Ps, OC | E, N, D, Du, F | |
| Booth et al. (1989) | UK | HCC | 20–64 | 235/451 | SES | E, F | |
| Harlow and Weiss (1989) | USA | CCC | 20–79 | 116/158 | Ps, OC | E, N, D | |
| Chen et al. (1992) | China | CCC | NA | 112/224 | Ps, Ed | E | |
| Harlow et al. (1992) | USA | CCC | 18–76 | 235/239 | Ps, Ed, MS, BMI | E, H, B, F, Du, T, N, D | |
| Rosenblatt et al. (1992) | USA | HCC | All | 77/46 | – | E, N, D | |
| Tzonou et al. (1993) | Greece | HCC | <75 | 189/200 | Ps, Ed, BMI, AMe, MS, AFB, Tob, Cof, Alc, Med, HD | E | |
| Purdie et al. (1995) | Australia | CCC | 18–79 | 824/860 | Ps | E | |
| Chang and Risch (1997) | Canada | CCC | 35–79 | 450/564 | OC, NPr, BF, TL, Hya, FH | Du, T, N | Included in Terry et al. (2013) |
| Cook et al. (1997) | USA | CCC | 20–79 | 313/422 | – | E, H, Du, N, D | |
| Godard et al. (1998) | Canada | CCC | 20–84 | 170/170 | – | E | |
| Wong et al. (1999) | USA | HCC | NA | 499/755 | Ps, OC, Tob, FH, AMe, MS, Inc, Ed, TL, Hya | E, Du, N | |
| Ness et al. (2000) | USA | CCC | 20–69 | 767/1367 | NPr, FH, OC, TL, Hya, BF | E, Du, N, D | |
| Mills et al. (2004) | USA | CCC | 18 + | 256/1122 | OC, BF | E, H, B, F, Du, T | |
| Goodman et al. (2008) | USA | CCC | 18 + | 387/602 | NA | Du | Included in Terry et al. (2013) |
| Merritt et al. (2008) | Australia | CCC | 18–79 | 1576/1509 | Ps, Ed, OC | | Included in Terry et al. (2013) |
| Moorman et al. (2009) | USA | CCC | 20–74 | 1086/1057 | – | | Included in Terry et al. (2013) |
| Gates et al. (2010) | USA | Cohort | 30–55 | 721/– | Ps, BMI, PA, Tob, FH, BF, OC, TL, Hya, Amp, HRT | E, H, F*, N* | |
| Rosenblatt et al. (2011) | USA | CCC | 35–74 | 812/1313 | NPr, OC | Du, T, N, D | Included in Terry et al. (2013) |
| Lo-Ciganic et al. (2012) | USA | CCC | 25 + | 902/1802 | NA | | Included in Terry et al. (2013) |
| Terry et al. (2013) | USA, Canada, Australia | | | | Ps, OC, TL, BMI | E, H, B | Pooled data from Chang and Risch (1997), Goodman et al. (2008), Moorman et al. (2009), Rosenblatt et al. (2011), Lo-Ciganic et al. (2012), Merritt et al. (2008) |
| Houghton et al. (2014) | USA | Cohort | 50–79 | 429/– | Ps, OC, HRT, FH, ALB, BMI, Tob, TL, MS, AMe, HRT, BMI, Inc, Ed, NPr, OC, TL, End, FH | E, H, N, D, DU | |
| Wu et al. (2015) | USA | CCC | 18–74 | 1701/2391 | | E, T* | |
| Cramer et al. (2016) | USA | CCC | 18–80 | 2041/2100 | | E, H, B, F, Du, D | |
| Gonzalez et al. (2016) | USA, Puerto Rico | Cohort | 35–74 | 154/– | BMI, OC, MS, TL, Hys | E | |
| Schildkraut et al. (2016) | USA | CCC | 20–79 | 584/745 | Ps, Ed, OC, BMI, TL, FH | E, H, Du, F | |

N ca/co, number of cases and controls (only cases for cohort studies); AFB, age at first birth; ALB, age at last birth; AMe, age at menarche; AMp, age at menopause; B, tumor behavior; BF, breast feeding; CCC, community-based case–control study; D, diaphragm use; Du, duration of use; E, ever use; Ed, education; F, frequency of use; FH, family history of breast and ovarian cancer; H, histologic type; HCC, hospital-based case–control study; HD, hair dye use; HRT, hormone replacement therapy; Hya, hysterectomy; Inc, income; Med, use of medications; MS, menopausal status; N, sanitary napkin use; NA, not available; NPr, number of pregnancies; OC, oral contraceptive use; Ps, parity; SES, socioeconomic status; T, timing of use; TL, tubal ligation.

*Results abstracted from Gertig et al. (2000).
*Results abstracted Wu et al. (2009).

Table 1 Selected characteristics of the studies included in the meta-analysis

Case 3:16-md-02738-MAS-RLS   Document 9889-4   Filed 05/29/19   Page 110 of 355 PageID: 66333

The results of the meta-analysis are reported in Table 2. We used the results reported in the meta-analysis by Terry et al. (2013) for six of the original eight studies (Chang and Risch, 1997; Goodman et al., 2008; Merritt et al., 2008; Moorman et al., 2009; Rosenblatt et al., 2011; Lo-Ciganic et al., 2012), while for the remaining two studies (Cramer et al., 1999; Pike et al., 2004) we used the more extensive results reported in subsequent publications (Wu et al., 2015; Cramer et al., 2016).

| | Number of risk estimates | RR | 95% CI | p-het |
|---|---|---|---|---|
| Overall | 27 | 1.22 | 1.13–1.30 | 0.02 |
| Study design | | | | |
| Cohort studies | 3 | 1.02 | 0.85–1.20 | 0.2 |
| Case–control studies | 24 | 1.26 | 1.17–1.35 | 0.08 |
| Hospital-based case–control studies | 6 | 1.34 | 1.16–1.51 | 0.8 |
| Community-based case–control studies | 18 | 1.24 | 1.13–1.35 | 0.03 |
| Histology | | | | |
| Serous carcinoma | 13 | 1.24 | 1.15–1.34 | 0.4 |
| Mucinous carcinoma | 12 | 0.96 | 0.73–1.18 | 0.8 |
| Endometrial carcinoma | 12 | 1.15 | 0.91–1.39 | 0.1 |
| Clear cell carcinoma | 8 | 0.98 | 0.72–1.23 | 0.8 |
| Behavior | | | | |
| Invasive | 9 | 1.20 | 1.08–1.31 | 0.2 |
| Borderline | 9 | 1.27 | 1.09–1.44 | 0.9 |
| Period of exposure[a] | | | | |
| Early | 5 | 1.18 | 0.99–1.37 | 0.2 |
| Late | 5 | 1.31 | 1.03–1.61 | 0.2 |
| Specific sources of talc exposure | | | | |
| Sanitary napkin | 12 | 1.00 | 0.84–1.16 | 0.5 |
| Diaphragm | 11 | 0.75 | 0.63–0.88 | 0.8 |

CI, confidence interval; p-het, *P*-value of test for interstudy heterogeneity; RR, relative risk.
[a]Cut-points between periods vary across studies but in general refer to 1970 or 1980.

Table 2 Ever use of genital talc – results of meta-analysis

The meta-analysis of all 27 risk estimates for ever use of genital talc yielded a summary RR of 1.22 (95% CI: 1.13–1.30). The forest plot of these results is shown in Fig. 2. When the meta-analysis was stratified according to study design, an association with ever genital talc use was detected in case–control studies (RR: 1.26; 95% CI: 1.17–1.35), but not in cohort studies (RR: 1.02; 95% CI: 0.85–1.20). The *P*-value of the test for heterogeneity of results according to study design was 0.007. Furthermore, hospital-based case–control studies resulted in a higher summary RR than community-based case–control studies (*P*=0.3, for heterogeneity between the two groups of case–control studies).

Case 3:16-md-02738-MAS-RLS   Document 9889-4   Filed 05/29/19   Page 111 of 355 PageID: 66334



Fig. 2. Forest plot of results on ever use of genital talc and risk of ovarian cancer. CI, confidence interval.

The meta-analysis stratified by tumor behavior did not reveal a difference between results for borderline (RR: 1.27; 95% CI: 1.09–1.44) and invasive ovarian cancer (RR: 1.20; 95% CI: 1.08–1.31). The analysis stratified by histology, however, identified an association between ever genital use of talc and serous carcinoma (RR: 1.24; 95% CI: 1.15–1.34, on the basis of 13 case–control studies and no cohort studies). No significant associations were detected for endometrial (RR: 1.15; 95% CI: 0.91–1.39), mucinous (RR: 0.96; 95% CI: 0.73–1.18) or clear cell (RR: 0.98; 95% CI: 0.72–1.23) carcinomas. The *P*-value of the test of heterogeneity between histologic types was 0.04. Only two cohort studies reported histology-specific results, showing neither a difference between types nor stronger association for serous carcinoma (results not shown in detail). Three of the studies (Mills et al., 2004; Rosenblatt et al., 2011; Cramer et al., 2016) reported results for serous carcinoma stratified by tumor behavior: they did not suggest any difference (RR=1.39, for borderline serous carcinoma; 95% CI: 1.04–1.74; RR: 1.32, for invasive serous carcinoma; 95% CI: 0.97–1.67; $P_{heterogeneity}$=0.5).

Use of talcum powder in the 'early' period showed weakly increased risk of ovarian cancer (RR: 1.18; 95% CI: 0.99–1.37), whereas the RR for use in the 'late' period was slightly higher but less precisely estimated (RR: 1.31; 95% CI: 1.03–1.61). The *P*-value of the test for heterogeneity between groups of studies was 0.37.

Use of sanitary napkins or diaphragms was not associated with an increased risk of ovarian cancer (RR: 1.00; 95% CI: 0.84–1.16; and RR: 0.75; 95% CI: 0.63–0.88, respectively).

We conducted additional analyses after stratifying the studies according to whether the results were adjusted for key potential confounders (use of oral contraceptives and hormone replacement therapy, socioeconomic status/education, BMI; see Table 1 for details), but found no evidence of heterogeneity (results not shown in detail).

The results of the analysis by duration and frequency of genital talc use are reported in Table 3. A 10-year increase in genital talc use was associated with a RR of 1.16 (95% CI 1.07-1.26; 12 studies), whereas the RR for an increase of one application per week was 1.05 (95% CI 1.04-1.07; 7 studies).

|  | Number of risk estimates | RR | 95% CI |
|---|---|---|---|
| Duration (10 years) | 12 | 1.16 | 1.07–1.26 |
| Frequency (1 time/week) | 7 | 1.05 | 1.04–1.07 |

CI, confidence interval; p-het, RR, relative risk.

Table 3 Duration and frequency of use of genital talc – results of meta-analysis

The funnel plot of the results of ever genital talc use is shown in Fig. 3. Visual inspection of the plot suggests no serious publication bias: this conclusion is supported by the result of the Egger test (P=0.7). The results of the cumulative meta-analysis (Fig. 4) suggest that after the publication of a few initial studies with inconsistent results, the summary RR stabilized with values in the range of 1.20–1.25.



Fig. 3. Funnel plot of results on ever use of genital talc and risk of ovarian cancer. RR, relative risk.

Case 3:16-md-02738-MAS-RLS   Document 9889-4   Filed 05/29/19   Page 113 of 355 PageID: 66336



Fig. 4. Cumulative meta-analysis of results on ever use of genital talc and risk of ovarian cancer. CI, confidence interval; RR, relative risk.

## Discussion

Ovarian cancer, unless diagnosed and treated early, remains a highly lethal disease and the identification of modifiable risk factors is an important component of the strategy for its control. The primary aim of this meta-analysis was to determine whether talcum powder use in the female genital area is a potential risk factor for ovarian cancer. Previous meta-analyses (Huncharek et al., 2003; Langseth et al., 2008) were only on the basis of a fraction of currently available studies, and had limited ability to explore potential sources of heterogeneity in results.

This meta-analysis suggests that genital powder use is associated with a small increased risk of developing ovarian cancer; however, this positive association appears to be limited to the serous histologic type, and to case–control studies. This estimate is somewhat lower than that of previous meta-analyses (Huncharek et al., 2003; Langseth et al., 2008): in our cumulative meta-analysis we confirmed the trend toward lower overall risk estimates as more evidence accumulated.

An important feature of the present meta-analysis is the inclusion of several cohort studies, which enabled an analysis stratified by study design. This analysis provided evidence of heterogeneity of results between the two groups of studies, with an association generally detected in case–control studies but not in cohort studies. It should be noted that the cohort studies included in the meta-analysis comprised a total of 429 cases of ovarian cases exposed to genital talc and 943 unexposed cases: the statistical power of the meta-analysis of these cohort studies to detect a RR of 1.25, similar to the result of the meta-analysis of case–control studies, was 0.99. Thus, low power of cohort studies cannot be invoked as explanation of the heterogeneity of results.

The fact that the association between genital talc use and risk of ovarian cancer is present in case–control, but not in cohort studies, can be attributed to bias in the former type of studies (Kopec and Esdaile, 1990; Rothman et al., 2008). Selection bias might have played a role in the results of some of the case–control studies (e.g. those with low response rate, or those hospital-based, which resulted in a nonsignificantly higher summary risk estimate than community-based studies); in addition, information bias from retrospective self-report of talc use is a possible explanation for the association detected in case–control studies. In particular, some of the most recent case–control studies (Cramer et al., 2016; Schildkraut et al., 2016) have reported particularly strong associations (RR>1.4) for ever use of talc. These results may have occurred at least in part because of participants' knowledge about the latest controversies about talc use and ovarian cancer risk spread by the media (Muscat and Huncharek, 2008).

Case 3:16-md-02738-MAS-RLS    Document 9889-4    Filed 05/29/19    Page 114 of 355 PageID: 66337

The results of the analysis by histologic type of ovarian cancer pointed toward an association with serous carcinoma, but not with the other main types (i.e. endometrial, mucinous, and clear cell carcinoma). Several studies have suggested heterogeneity in risk factors of different histologic types, which are characterized by distinctive molecular and genetic profiles (Kurian et al., 2005; Gates et al., 2010; Gilks, 2010). However, no results are available on whether the association between asbestos exposure and ovarian cancer risk varies by histologic type (Camargo et al., 2011; Reid et al., 2011). The finding that the association between genital talc use and ovarian cancer may vary by histologic type detracts from the hypothesis of report bias as an explanation of the findings of case–control studies, as this type of bias would likely operate for all histologic types of the disease. Caution should however be warranted in the interpretation of these findings, as the test for heterogeneity between groups was of borderline statistical significance, and the evidence for heterogeneity derives only from case–control studies.

The presence or absence of a dose–response is an important aspect to consider in assessing the plausibility of the causal nature of an association observed in a meta-analysis. The number of studies included in the analysis of duration and frequency of genital talc use was not very large, and the modest association between both duration and frequency of use of talc may reflect a true relationship, or recall bias or confounding, and analyses based on larger datasets would be required is a potentially important and novel contribution of this meta-analysis.

We aimed at analyzing the results on genital use of talc according to time-periods; this analysis was limited by different cut-points used by various authors to define time intervals of exposure. In general, however, we were able to distinguish an 'early' and a 'late' period, with the limit between the two running between 1970 and 1980, and we found a statistically significant association only for 'late' use. This result goes against the hypothesis that a stronger association (if any) would be seen among those more likely to have used talcum powders in a time period in which contamination with asbestos fibers was possible (Rohl et al., 1976).

Our study suffers from limitations common to meta-analyses of observational studies: neither the definition of the exposure of interest (genital talc use) nor the strategy for adjustment for potential confounders were fully consistent across studies. Also, there were limitations not specific to our study, including the self-reported information on the main exposure of interest, with no external validation data, the predominance of retrospective case–control studies, and the small number of studies providing results by histologic type or quantitative measures of genital talc use. It is difficult to assess the combined effect of the potential sources of bias, as they might have operated in different directions on the estimate of the association between talc use and ovarian cancer. The stratified analyses we conducted did not point toward the presence of residual confounding (i.e. higher risk estimates for unadjusted compared with adjusted results).

The biological basis and plausibility of a possible carcinogenic effect of talc on the ovaries is still not understood and remains questionable. The similarity of physicochemical characteristics of talc and asbestos has been proposed to explain a carcinogenic effect of the former (Cramer et al., 1982). However, although both talc and various forms of asbestos minerals belong to the family of silicates, they are morphologically distinct. It is the fibrous form of asbestos which determines its carcinogenic potential (Stanton et al., 1981; Huncharek, 1986; Mossman and Gee, 1989). Talc is not fibrous or crystalline (International Agency for Research on Cancer (IARC), 2010), and in-vitro studies have shown that talc is not genotoxic (Wehner, 1994). This is supported by the evidence that exposure to talc not contaminated with asbestiform fibers is not associated with increased risk of lung cancer or mesothelioma in occupational cohorts (International Agency for Research on Cancer (IARC), 2010). The occupational cohorts supporting this conclusion comprise mostly men, and therefore provide no evidence in favor or against the hypothesis of a role of occupational talc exposure as an ovarian carcinogen, but the likelihood that talc could selectively cause ovarian cancer but not lung cancer or mesothelioma at high concentrations in talc miners and millers appears to be low. Furthermore, there is no evidence that occupational exposure to talc, for example, in the pulp and paper industry, entails an increased risk of ovarian cancer (Langseth and Kjaerheim, 2004).

In conclusion, our meta-analysis identified a small but statistically significant association between genital talc use and risk of ovarian cancer; however, this association was limited to the serous histologic type, and to case–control studies. The results by histologic type might argue for specificity of the association, in the absence, however, of a biologic rationale for an effect on serous carcinoma compared with other types. Several aspects of our results, including the heterogeneity of results between case–control and cohort studies, however, do not support a causal interpretation of the association.

**Acknowledgements**

Case 3:16-md-02738-MAS-RLS   Document 9889-4   Filed 05/29/19   Page 115 of 355 PageID: 66338

The project was supported by internal resources of the institutions involved.

**Conflicts of interest**

There are no conflicts of interest.

## References

American Cancer Society (2016). Cancer facts and figures 2016. Atlanta, GA: American Cancer Society. [Context Link]

Booth M, Beral V, Smith P (1989). Risk factors for ovarian cancer: a case–control study. Br J Cancer 60:592–598.

Camargo MC, Stayner LT, Straif K, Reina M, Al-Alem U, Demers PA, et al (2011). Occupational exposure to asbestos and ovarian cancer: a meta-analysis. Environ Health Perspect 119:1211–1217.   Full Text | [Context Link]

Chang S, Risch HA (1997). Perineal talc exposure and risk of ovarian carcinoma. Cancer 79:2396–2401. [Context Link]

Chen Y, Wu PC, Lang JH, Ge WJ, Hartge P, Brinton LA (1992). Risk factors for epithelial ovarian cancer in Beijing, China. Int J Epidemiol 21:23–29.

Chiaffarino F, Parazzini F, Bosetti C, Franceschi S, Talamini R, et al (2007). Risk factors for ovarian cancer histotypes. Eur J Cancer 43:1208–1213. [Context Link]

Cook LS, Kamb ML, Weiss NS (1997). Perineal powder exposure and the risk of ovarian cancer. Am J Epidemiol 145:459–465.

Cralley LJ, Key MM, Groth DH, Lainhart WS, Ligo RM (1968). Fibrous and mineral content of cosmetic talcum products. Am Ind Hyg Assoc J 29:350–354. [Context Link]

Cramer DW, Welch WR, Scully RE (1982). Ovarian cancer and talc: a case control study. Cancer 50:372–376. [Context Link]

Cramer DW, Liberman RF, Titus-Ernstoff L, Welch WR, Greenberg ER, Baron JA, et al (1999). Genital talc exposure and risk of ovarian cancer. Int J Cancer 81:351–356. [Context Link]

Cramer DW, Vitonis AF, Terry KL, Welch WR, Titus LJ (2016). The association between talc use and ovarian cancer. A retrospective case–control study in two US states. Epidemiol 27:334–346. [Context Link]

DerSimonian R, Laird N (1986). Meta-analysis in clinical trials. Control Clin Trials 7:177–188. [Context Link]

Egger M, Smith GD, Schneider M, Minder C (1997). Bias in meta-analysis detected by a simple, graphical test. BMJ 315:629–634. [Context Link]

Gates MA, Rosner BA, Hecht JL, Tworoger SS (2010). Risk factors for epithelial ovarian cancer by histologic type. Am J Epidemiol 171:45–53.   Buy Now | [Context Link]

Gertig DM, Hunter DJ, Cramer DW, Colditz GA, Speizer FE, Willett EC, et al (2000). Prospective study of talc use and ovarian cancer. J Natl Cancer Inst 92:249–252.   Buy Now |

Gilks CB (2010). Molecular abnormalities in ovarian cancer subtypes other than high-grade serous carcinoma. J Oncol 2010:740968. [Context Link]

Godard B, Foulkes WD, Provencher D, Brunet JS, Tonin PN, Mes-Masson AM, et al (1998). Risk factors for familial and sporadic ovarian cancer among French Canadians: a case–control study. Am J Obstet Gynecol 179:403–410.   Buy Now |

Case 3:16-md-02738-MAS-RLS    Document 9889-4    Filed 05/29/19    Page 116 of 355 PageID:
66339

Gonzalez NL, O'Brien KM, D'Aloisio AA, Sandler DP, Weinberg CR (2016). Douching, talc use and risk of ovarian cancer. Epidemiol 27:797–802.

Goodman MT, Lurie G, Thompson PJ, McDuffie KE, Carney ME (2008). Association of two common single-nucleotide polymorphisms in the CYP19A1 locus and ovarian cancer risk. Endocr Relat Cancer 15:1055–1060. [Context Link]

Harlow BL, Weiss NS (1989). A case–control study of borderline ovarian tumors: the influence of perineal exposure to talc. Am J Epidemiol 130:390–394.

Harlow BL, Cramer DW, Bell DA, Welch WR (1992). Perineal exposure to talc and ovarian cancer risk. Obstet Gynecol 80:19–26.   Buy Now  [Context Link]

Hartge P, Hoover R, Lesher LP, McGowan L (1983). Talc and ovarian cancer. JAMA 250:1844.

Heller DS, Westhoff C, Gordon RE, Katz N (1996). The relationship between perineal cosmetic talc usage and ovarian talc particle burden. Am J Obstet Gynecol 174:1507–1510.   Buy Now  [Context Link]

Henderson WJ, Hamilton TC, Griffiths K (1979). Talc in normal and malignant ovarian tissue. Lancet 1:499. [Context Link]

Higgins JPT, Thompson SG, Deeks JJ, Altman DG (2003). Measuring inconsistency in meta-analyses. BMJ 327:557–560. [Context Link]

Houghton SC, Reeves KW, Hankinson SE, Crawford L, Lane D, Wactawski-Wende J, et al (2014). Perineal powder use and risk of ovarian cancer. J Natl Cancer Inst 106dju208. [Context Link]

Huncharek M (1986). The biomedical and epidemiological characteristics of asbestos-related diseases: a review. Yale J Biol Med 59:435–451. [Context Link]

Huncharek M, Geschwind JF, Kupelnick B (2003). Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11 933 subjects from sixteen observational studies. Anticancer Res 23:1955–1960. [Context Link]

Huncharek M, Muscat J, Onitilo A, Kupelnick B (2007). Use of cosmetic talc on contraceptive diaphragms and risk of ovarian cancer: a meta-analysis of nine observational studies. Eur J Cancer Prev 16:422–429.   Buy Now  [Context Link]

International Agency for Research on Cancer (IARC). (2010). Talc not containing asbestiform fibres. IARC monographs on the evaluation of carcinogenic risks to humans. Lyon, France: IARC. 277–413. [Context Link]

Kim HS, Kim TH, Chung HH, Song YS (2014). Risk and prognosis of ovarian cancer in women with endometriosis: a meta-analysis. Br J Cancer 110:1878–1890. [Context Link]

Kopec JA, Esdaile JM (1990). Bias in case–control studies. A review. J Epidemiol Comm Health 44:179–186. [Context Link]

Kurian AW, Balise RR, McGuire V, Whittemore AS (2005). Histologic types of epithelial ovarian cancer: have they different risk factors? Gynecol Oncol 96:520–530. [Context Link]

Langseth H, Kjaerheim K (2004). Ovarian cancer and occupational exposure among pulp and paper employees in Norway. Scand J Work Environ Health 30:356–361. [Context Link]

Langseth H, Hankinson SE, Siemiatycki J, Weiderpass E (2008). Perineal use of talc and risk of ovarian cancer. J Epidemiol Community Health 62:358–360. [Context Link]

Liberati A, Altman DG, Tetzlaff J, Mulrow C, Gøtzsche PC, Ioannidis JP, et al (2009). The PRISMA statement for reporting

systematic reviews and meta-analyses of studies that evaluate health care interventions: explanation and elaboration. J Clin Epidemiol 62:e1–e34. [Context Link]

Lo-Ciganic WH, Zgibor JC, Bunker CH, Moysich KB, Edwards RP, Ness RB (2012). Aspirin, non-aspirin non-steroidal anti-inflammatory drugs, or acetaminophen and risk of ovarian cancer. Epidemiol 23:311–319. [Context Link]

Merino MJ (2010). Malignant mesothelioma mimicking ovarian cancer. Int J Surg Pathol 18 (**Suppl**):178S–180S.   Buy Now | [Context Link]

Merritt M, Green A, Nagle C, Webb P, Group ACSaAOCS (2008). Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer. Int J Cancer 122:170–176.   Buy Now | [Context Link]

Mills PK, Riordan DG, Cress RD, Young HA (2004). Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. Int J Cancer 112:458–464. [Context Link]

Moorman PG, Palmieri RT, Akushevich L, Berchuck A, Schildkraut JM (2009). Ovarian cancer risk factors in African–American and White women. Am J Epidemiol 170:598–606.   Buy Now | [Context Link]

Mossman BT, Gee JBL (1989). Asbestos related diseases. N Engl J Med 320:1721–1730. [Context Link]

Muscat JE, Huncharek MS (2008). Perineal talc use and ovarian cancer: a critical review. Eur J Cancer Prev 17:139–146.   Buy Now | [Context Link]

Ness RB, Grisso JA, Cottreau C, Klapper J, Vergona R, Wheeler JE, et al (2000). Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. Epidemiol 11:111–117.

Pike MC, Pearce CL, Peters R, Cozen W, Wan P, Wu AH (2004). Hormonal factors and the risk of invasive ovarian cancer: a population-based case–control study. Fertil Steril 82:186–195. [Context Link]

Purdie P, Green A, Bain C, Siskind V, Ward B, Hacker N, et al (1995). Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case–control study. Int J Cancer 62:678–684.

Reid A, de Klerk N, Musk AW (2011). Does exposure to asbestos cause ovarian cancer? A systematic literature review and meta-analysis. Cancer Epidemiol Biomarkers Prev 20:1287–1295. [Context Link]

Rohl AN, Langer AM, Selikoff IJ (1976). Consumer talcums and powders: mineral and chemical characteristics. J Toxicol Environ Health 2:225–284. [Context Link]

Rosenblatt KA, Szklo M, Rosenheim NB (1992). Mineral fiber exposure and the development of ovarian cancer. Gynecol Oncol 45:20–25.

Rosenblatt KA, Weiss NS, Cushing-Haugen KL, Wicklind KG, Rossing MA (2011). Genital powder exposure and the risk of epithelial ovarian cancer. Cancer Causes Control 22:737–742. [Context Link]

Rothman KJ, Greenland S, Lash TL (2008). Modern epidemiology, 3rd ed. Philadelphia, PA: Lippincott-Wolters-Kluwer. [Context Link]

Schildkraut JM, Abbott SE, Alberg AJ, Bandera EV, Barnholtz-Sloan J, Bondy ML, et al (2016). Association between body powder use and ovarian cancer: the African American Cancer Epidemiology Study (AACES). Cancer Epidemiol Biomarkers Prev 25:1411–1417. [Context Link]

Stang A (2010). Critical evaluation of the Newcastle–Ottawa scale for the assessment of the quality of nonrandomized studies in meta-analyses. Eur J Epidemiol 25:603–605. [Context Link]

Stanton MF, Layard M, Tegeris A, Miller E, May M, Morgan E, et al (1981). Relation of particle dimension to carcinogenicity in amphibole asbestoses and other fibrous minerals. J Natl Cancer Inst 67:965–975. [Context Link]

StataCorp (2015). STATA/SE Vers 140 for Windows. College Station, TX: StataCorp. [Context Link]

Terry KL, Karageorgi S, Shvetsov YB, Merritt MA, Lurie G, Thompson PJ, et al (2013). Genital powder use and risk of ovarian cancer: a pooled analysis of 8525 cases and 9859 controls. Cancer Prev Res 6:811–821. [Context Link]

Tzonou A, Polychronopoulou A, Hsieh CC, Rebelakos A, Karakatsani A, Trichopoulos D (1993). Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer. Int J Cancer 55:508–510.

Wang V, Li C, Lin M, Welch W, Bell D, Wong YF, et al (2005). Ovarian cancer is a heterogeneous disease. Cancer Gen Cytogen 161:170–173. [Context Link]

Webb P, Gertig D, Hunter DAdami HO, Hunter D, Trichopoulos D (2008). Ovarian cancer. Textbook of cancer epidemiology, 2nd ed. New York, NY: Oxford University Press. 494–516. [Context Link]

Wehner AP (1994). Biological effects of cosmetic talc. Food Chem Toxicol 32:1173–1184. [Context Link]

Whittemore AS, Wu ML, Paffenbarger RS Jr, Sarles DL, Kampert JB, Grosser S, et al (1988). Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. Am J Epidemiol 128:1228–1240.

Wong C, Hempling RE, Piver S, Natarajan N, Mettlin CJ (1999). Perineal talc exposure and subsequent epithelial ovarian cancer: a case–control study. Obstet Gynecol 93:372–376.   Buy Now

Wu A, Pearce CL, Tseng CC, Templeman C, Pike MC (2009). Markers of inflammation and risk of ovarian cancer in Los Angeles County. Int J Cancer 124:1409–1415.   Buy Now

Wu A, Pearce CL, Tseng CC, Pike MC (2015). African Americans and Hispanics remain at lower risk of ovarian cancer than non-hispanic Whites after considering nongenetic risk factors and oophorectomy rates. Cancer Epidemiol Biomarkers Prev 24:1094–1100. [Context Link]

Keywords: meta-analysis; ovarian cancer; talc

# IMAGE GALLERY

Select All                                        Export Selected to PowerPoint



☐ Fig. 1

☐ Table 1



☐ Table 2



☐ Table 3

☐ Fig. 3

☐ Fig. 2



☐ Fig. 4

Back to Top

About Us    Contact Us    Privacy Policy    Terms of Use

© 2018 Ovid Technologies, Inc. All rights reserved.    OvidSP_UI03.31.01.212, SourceID 114488

# Exhibit 62

ORIGINAL ARTICLE

# Perineal Talc Use and Ovarian Cancer

## *A Systematic Review and Meta-Analysis*

*Ross Penninkilampi, and Guy D. Eslick*

**Background:** It has been posited that there is an association between perineal talc use and the incidence of ovarian cancer. To date, this has only been explored in observational studies.

**Objectives:** To perform a meta-analysis to evaluate the association between perineal talc use and risk of ovarian cancer.

**Methods:** Studies were identified using six electronic databases. Observational studies involving at least 50 cases of ovarian cancer were eligible for inclusion. We analyzed the association between ovarian cancer, including specific types, and any perineal talc use, long-term (>10 years) use, total lifetime applications, and use on diaphragms or sanitary napkins. A subgroup analysis was performed, stratifying by study design and population.

**Results:** We identified 24 case–control (13,421 cases) and three cohort studies (890 cases, 181,860 person-years). Any perineal talc use was associated with increased risk of ovarian cancer (OR = 1.31; 95% CI = 1.24, 1.39). More than 3600 lifetime applications (OR = 1.42; 95% CI = 1.25, 1.61) were slightly more associated with ovarian cancer than <3600 (OR = 1.32; 95% CI = 1.15, 1.50). An association with ever use of talc was found in case–control studies (OR = 1.35; 95% CI = 1.27, 1.43), but not cohort studies (OR = 1.06; 95% CI = 0.90, 1.25). However, cohort studies found an association between talc use and invasive serous type ovarian cancer (OR = 1.25; 95% CI = 1.01, 1.55). We found an increased risk of serous and endometrioid, but not mucinous or clear cell subtypes.

**Conclusions:** In general, there is a consistent association between perineal talc use and ovarian cancer. Some variation in the magnitude of the effect was found when considering study design and ovarian cancer subtype.

(*Epidemiology* 2018;29: 41–49)

Submitted July 12, 2017; accepted August 27, 2017.

From the Whiteley-Martin Research Centre, Discipline of Surgery, The University of Sydney, Nepean Hospital, Penrith, NSW, Australia.

This manuscript is original, has not been previously published in whole or in part, and is not under consideration for publication elsewhere. Neither animals nor human subjects were used in this research.

All authors have read the manuscript, agree that the work is ready for submission, and accept the contents of the manuscript.

The authors report no conflicts of interest.

**SDC** Supplemental digital content is available through direct URL citations in the HTML and PDF versions of this article (www.epidem.com).

Correspondence: Guy D. Eslick, The Whiteley-Martin Research Centre, Discipline of Surgery, The University of Sydney, Nepean Hospital, Level 3, Clinical Building, PO Box 63, Penrith, NSW 2751, Australia. E-mail: guy.eslick@sydney.edu.au.

Copyright © 2017 Wolters Kluwer Health, Inc. All rights reserved.

ISSN: 1044-3983/18/2901-0041
DOI: 10.1097/EDE.0000000000000745

Ovarian cancer is the gynecologic cancer associated with the highest mortality in the United States, in 2012 being the fifth highest cause of cancer death in women with 14,404 deaths in that country.[1] The National Cancer Institute's Surveillance, Epidemiology, and End Results Program (SEER) predicts that in the United States, in 2016, there will be 22,280 incidences of newly diagnosed ovarian cancer, and 14,240 deaths caused by ovarian cancer based on age-adjusted data from 2009 to 2013.[2] The 5-year survival statistics for ovarian cancer are poor, largely because patients usually present with advanced disease, which is less amenable to curative therapy.[3] SEER estimates that only 15% of patients present with disease localized to the ovary, which contributes to a 5-year survival of 46.2%.[2] It is imperative to develop public health programs, which either reduce the incidence of ovarian cancer or detect it at an earlier stage, to reduce the burden of this disease.

Routine pelvic examinations, transvaginal ultrasonography, and tumor markers have been trialed as potential screening tools for ovarian cancer, but are limited in their usefulness. The cancer marker cancer antigen 125 (CA-125, also known as mucin 16) has been found to be elevated in 80% of all ovarian carcinomas, but this falls to 50% in women in which the cancer is localized only to the ovary, where it is most amenable to treatment.[4] As CA-125 has a low sensitivity and limited specificity, it is not recommended as a screening test for women without clinical symptoms.[5] Ultrasound has a reasonable sensitivity but poor specificity and positive predictive value, particularly as it is poor at distinguishing between benign and malignant masses.[6] While the search for an effective screening regimen for ovarian cancer continues, the importance of primary prevention becomes paramount.

Talcum powder is made of talc, a hydrated magnesium silicate, and is used to absorb moisture on the body. Some women choose to dust talc on the perineum, or apply it to diaphragms or sanitary napkins, to reduce friction, keep the skin dry, reduce odor, and prevent rashes. The potential association between perineal talc use and ovarian cancer has been discussed for decades. The first investigation of this association was performed by Cramer et al[7] in 1982, when the investigators found a relative risk of 1.92 (95% CI = 1.27, 2.89) for ovarian cancer when women either dusted the perineum with talc powder or used it on sanitary napkins. Since this time, there has been substantial interest in and research into this association.

Copyright © 2017 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

In the present context, the association between talc use and ovarian cancer takes on considerable relevance, as the pharmaceutical and consumer products company Johnson & Johnson has recently had damages levied to the total of US$717 million against them in five law suits. In these cases, juries decided that the use of talcum powder caused or contributed to the development of the plaintiff's ovarian cancer. The evidence for the association between perineal talc use and ovarian cancer is based on the body of knowledge from observational studies, and most of these have been retrospective case–control studies prone to recall bias. Hence, while perineal talc use has not been shown to be safe, in a similar regard, a certain causal link between talc use and ovarian cancer has not yet been established.[8,9]

In 2013, a pooled analysis was performed for eight population-based case–control studies, and found a modest increased risk (OR = 1.24) of ovarian carcinoma associated with perineal talc use.[10] In 2007, a meta-analysis was performed of nine observational studies; however, this study only examined the use of talc on contraceptive diaphragms.[11] The overall finding of this meta-analysis was that the use of talc on contraceptive diaphragms was not associated with ovarian cancer. Meta-analyses have been performed on this subject before; however, the most recent was in 2008,[9] and since this time, the results of a number of large case–control studies and two cohort studies[12,13] have been published. Hence, there is a need to update the literature, particularly considering pending litigation against Johnson & Johnson by other claimants, and Johnson & Johnson's potential plans to appeal the previous decisions. Furthermore, producers of talcum powder products continue to sell these products without any warning labels regarding perineal use and potential associations with ovarian cancer. Hence, there is a need for clarification, to allow women to be adequately informed of the risk of use of these products, possibly preventing future harm.

This paper aims to review the literature and provide an overall risk estimate for the association between perineal talc use and ovarian carcinoma. We will also perform subgroup analyses by the method of talc application, the duration of talc use, the total number of perineal talc applications, and the type of ovarian cancer developed to further elucidate the relationship between talc use and ovarian carcinoma.

## METHODS

### Study Protocol

We followed the Preferred Reporting Items for Systematic reviews and Meta-Analyses (PRISMA) guidelines.[14] R.P. performed a systematic search of the databases MEDLINE (from 1950), PubMed (from 1946), Embase (from 1949), the Cumulative Index to Nursing and Allied Health Literature (CINAHL), LILACS, and the Cochrane Central Register of Controlled Trials through 22 August 2017 to identify relevant articles. The search used the terms ("talc" OR "talcum powder") AND ("ovarian cancer" OR "ovarian carcinoma"), which were searched as text word and as exploded medical subject headings where possible. We also searched the reference lists of relevant articles for appropriate studies. No language restrictions were used in either the search or study selection. We did not search for unpublished literature.

### Study Selection

We included studies that met the following inclusion criteria: (1) the study investigated the perineal use of talc in relation to risk of development of ovarian cancer; (2) the study reported adverse events as an odds ratio (OR), or the data were presented such that an OR could be calculated; (3) the 95% confidence interval (CI) was reported, or the data were presented such that the CI could be calculated; and (4) the study involved a minimum of 50 cases. We excluded studies that did not meet the inclusion criteria.

### Data Extraction

One of us (R.P.) performed data extraction using a standardized data extraction form, collecting information on the publication year, study design, number of cases, number of controls, total sample size, population type, country, mean age, number of adjusted variables, the risk estimates or data used to calculate the risk estimates, CIs or data used to calculate CIs, and the type of ovarian cancer. R.P. assessed the quality of the studies using the Newcastle-Ottawa Scale (NOS); however, no studies were excluded on the basis of NOS score.[15] Authors were not contacted for missing data. Adjusted ratios were extracted in preference to nonadjusted ratios; however, where ratios were not provided, R.P. calculated unadjusted ORs and CIs.

### Statistical Analysis

One of us (G.D.E.) calculated pooled ORs and 95% CIs for the effect of any perineal talc use with all ovarian cancers using a random effects model.[16] Analyses were also performed based on the method of administration (diaphragm, sanitary napkins), duration of use, and type of ovarian cancer developed (all mucinous, mucinous invasive, mucinous borderline, all serous, serous invasive, serous borderline, endometrioid, clear cell). For long-term talc use, we extracted the odds ratio for the group with the longest duration of talc exposure compared with controls, provided that group used talc for a minimum duration of 10 years. For overall lifetime talc applications, groups within each study were divided into either <3600 lifetime applications, equivalent to less than approximately 10 years of daily use, or >3600 applications. Where a group from a study did not completely fit into this dichotomy, we placed it into the category it most closely fit. Details on the categorization of individual groups are available in eTable 1 (http://links.lww.com/EDE/B261). Odds ratios were pooled for invasive serous, invasive mucinous, borderline serous, and borderline mucinous tumors individually. However, as many studies reported only all mucinous or all serous in a single

*© 2017 Wolters Kluwer Health, Inc. All rights reserved.*

Copyright © 2017 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

group, we also ran analyses for risk associated with all mucinous and all serous tumors. Where a study reported separately as borderline and serous, both odds ratios were included separately in the meta-analysis, to ensure all available data were considered.

We tested heterogeneity with Cochran's $Q$ statistic, with $P < 0.10$ indicating heterogeneity, and quantified the degree of heterogeneity using the $I^2$ statistic, which represents the percentage of the total variability across studies which is due to heterogeneity. $I^2$ values of 25%, 50%, and 75% corresponded to low, moderate, and high degrees of heterogeneity, respectively.[17] We quantified publication bias using the Egger's regression model,[18] with the effect of bias assessed using the fail-safe number method. The fail-safe number was the number of studies that we would need to have missed for our observed result to be nullified to statistical nonsignificance at the $P < 0.05$ level. Publication bias is generally regarded as a concern if the fail-safe number is less than $5n + 10$, with n being the number of studies included in the meta-analysis.[19] All analyses were performed with Comprehensive Meta-analysis (version 3·0; Biostat, Englewood, NJ; 2014).

## RESULTS

### Study Characteristics

We performed a broad literature search of electronic databases, identifying 363 citations for review (Figure 1). Initially, 318 studies were discarded, with many being narrative reviews, duplicates, animal studies, opinion pieces, editorials, or otherwise irrelevant. Forty-five citations were selected for full-text review. Of these, three were excluded due to being associated with endometrial rather than ovarian cancer, two were meta-analyses, five were duplications of data from the same study, one involved non-perineal application of talc, and seven were otherwise irrelevant. No studies were excluded for failing to report an odds ratio or for not providing the necessary raw data from which an odds ratio could be derived. Some studies provided only the raw data, i.e., the number of cases and controls with and without perineal talc use. This allowed an unadjusted odds ratio to be calculated, which was then included in the analysis. Overall, 27 studies were selected. Note that Wu et al[33] (2015) include results from Wu et al[36] (2009); however, only Wu et al[36] (2009) reported on non-perineal talc use, total lifetime applications, and long-term talc use. Hence data were extracted from Wu et al[33] (2015) for the "any perineal use" outcome, and from Wu et al[36] (2009) for the three other outcomes previously mentioned. Hence, while 27 studies were included in the analysis, only 26 were included in the any perineal use analysis. Three studies were cohort studies, including 890 cases and 181,860 person-years.[12,13,20] The remaining 26 studies were case–control studies, with a total of 13,421 cases and 19,314 controls. The case–control studies are described in eTable 1 (http://links.lww.com/EDE/B261), while the cohort studies are described in eTable 2 (http://links.



**FIGURE 1.** PRISMA flowchart for literature search and study selection.

lww.com/EDE/B261). In total, studies involving 14,311 cases of ovarian cancer were included in this review.

The quality of the studies was assessed using the Newcastle-Ottawa Scale (NOS), which involves separate assessment tools for both case–control and cohort studies.[15] The highest score awarded was 8/10, and the lowest was 5/10. The mean score was 7.0. Almost all studies lost points because the exposure to talc was ascertained through self-report rather than an independently verified source, and because the interviewer was not blinded to cases and controls. Many studies also failed to specifically describe that their chosen controls did not have a personal history of previous ovarian cancer. It may be the case that this was done, but not reported in the study methods. Generally, case ascertainment and matching controls based on age and other factors, often geographical location or ethnicity, were well performed in the reviewed studies. The breakdown of individual study scores is included in Tables 1 and 2. Overall, the quality of studies included in

© 2017 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2017 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

*Penninkilampi and Eslick*                                    *Epidemiology* • Volume 29, Number 1, January 2018

**TABLE 1.** Summary of Pooled Effect Sizes for Examined Outcome Variables

| | No. Studies | Effect Size OR (95% CI) | Heterogeneity $I^2$ | Heterogeneity $P$ | Publication Bias $P$ |
|---|---|---|---|---|---|
| Method of talc use | | | | | |
| Any perineal | 26 | 1.31 (1.24, 1.39) | 10.52 | 0.31 | 0.09 |
| Any non-perineal | 5 | 1.24 (1.01, 1.51) | 66.84 | 0.02 | 0.86 |
| Diaphragm | 8 | 0.84 (0.68, 1.05) | 14.76 | 0.31 | 0.64 |
| Sanitary napkins | 12 | 1.15 (0.94, 1.41) | 43.82 | 0.05 | 0.17 |
| Length of talc use | | | | | |
| Long-term use (>10 years) | 12 | 1.25 (1.10, 1.43) | 45.11 | 0.04 | 0.31 |
| <3600 total applications | 5 | 1.32 (1.15, 1.50) | 1.83 | 0.41 | 0.20 |
| >3600 total applications | 5 | 1.42 (1.25, 1.61) | 12.59 | 0.33 | 0.40 |
| Type of ovarian cancer | | | | | |
| All serous | 10 | 1.32 (1.22, 1.43) | 0.00 | 0.75 | 0.44 |
| Serous invasive | 5 | 1.32 (1.13, 1.54) | 25.10 | 0.25 | 0.75 |
| Serous borderline | 3 | 1.39 (1.09, 1.78) | 0.00 | 0.94 | 0.83 |
| All mucinous | 9 | 1.12 (0.94, 1.33) | 5.79 | 0.39 | 0.79 |
| Mucinous invasive | 2 | 1.34 (0.48, 3.79) | 69.39 | 0.07 | NA[a] |
| Mucinous borderline | 3 | 1.18 (0.76, 1.81) | 34.07 | 0.22 | 0.96 |
| Endometrioid | 8 | 1.35 (1.14, 1.60) | 0.00 | 0.61 | 0.78 |
| Clear cell | 3 | 1.02 (0.75, 1.39) | 0.00 | 0.78 | 0.22 |

[a]NA = not applicable; no publication bias ... result available when there are fewer than three studies in the analysis.

this review was reasonably high. No studies were excluded from the review based on NOS score.

All studies reported at least an odds ratio for any perineal use of talc and its association with ovarian cancer. As previously described, Wu et al[36] (2009) was not included in this analysis to prevent duplication of data. Five studies reported on only non-perineal exposure. Additionally, eight studies provided data for use of talc on a diaphragm, and 12 for sanitary napkins. Twelve studies provided an odds ratio for long-term talc use and its association with ovarian cancer; however, the chosen threshold for long term was variable, from more than 10 years to more than 37.4 years. Five studies reported on the total number of talc applications. It was frequently necessary to report different groups from a single study separately to perform the meta-analysis of this outcome, with the groupings being described specifically in eTable 1 (http://links.lww.com/EDE/B261). Ten studies reported odds ratios for all serous ovarian cancers, five reported for serous invasive cancers, and three reported for serous borderline cancers. Similarly, nine reported for all mucinous cancers, two for mucinous invasive, and three for mucinous borderline. Eight studies reported odds ratios for endometrioid ovarian cancer, and three reported for clear cell ovarian cancer.

## Quantitative Data Synthesis

The results of the initial pooling of data from all studies are summarized in Table 1. Pooling of data revealed an increased risk of ovarian cancer associated with any perineal use of talc (Figure 2A; OR = 1.31; 95% CI = 1.24, 1.39). Use of talc long term (>10 years) was also associated with an increased ovarian cancer risk (Figure 2B; OR = 1.25; 95% CI = 1.10, 1.43). Both <3600 total lifetime applications (OR = 1.32; 95% CI = 1.15, 1.50) and >3600 lifetime applications (OR = 1.42; 95% CI = 1.25, 1.61) of talc were associated with an increased risk of ovarian cancer, with a slightly higher risk in the group with greater usage. Talc use on diaphragms or on sanitary napkins was not individually associated with increased risk of ovarian cancer. Any perineal talc use was associated with any serous (Figure 2C; OR = 1.32; 95% CI = 1.22, 1.43), serous invasive (OR = 1.32; 95% CI = 1.13, 1.54), serous borderline (OR = 1.39; 95% CI = 1.09, 1.78), and endometrioid (Figure 2D; OR = 1.35; 95% CI = 1.14, 1.60) subtypes of ovarian cancer, but not the other subtypes.

We performed a subgroup analysis stratifying by study design. It is important to note that there were only three cohort studies, each of which did not report on all the assessed associations. For any perineal talc use, only case–control studies showed an association with ovarian cancer (Figure 2A; OR = 1.35; 95% CI = 1.27, 1.43), while no association was noted for cohort studies (OR = 1.06; 95% CI = 0.90, 1.25). For the other associations assessed, the results are reported in Table 2. In cohort studies, the only association found was between perineal talc use and the incidence of serous invasive cancer subtypes (OR = 1.25; 95% CI = 1.01, 1.55). For borderline serous, borderline mucinous, invasive mucinous, and clear cell ovarian cancer subtypes, no cohort studies provided data for the association and hence the odds ratios reported in eTable 2 (http://links.lww.com/EDE/B261) are derived entirely from case–control studies. The only outcome reported in all three cohort studies was any perineal talc use; hence the available data from prospective studies were limited.

A subgroup analysis related to study population setting, i.e., in the hospital or in the general population, was performed for any perineal talc application. Generally, hospital-based studies were older (pre-2000) than the community-based studies. There were seven hospital-based studies, all of which were case–control studies. There were 20 population-based studies, including 17 case–control studies and all three cohort studies. There was no difference between the pooled results for hospital- and population-based studies (OR = 1.22 vs. 1.33), respectively.

There was heterogeneity in the analysis of non-perineal applications of talc ($I^2 = 66.84$; $P = 0.02$). There was no heterogeneity for any of the other outcome measures in either the meta-analysis of all available studies or the subgroup analyses. There was no publication bias in the meta-analysis of any genital talc exposure and ovarian cancer, which included all the studies in the review, except Wu et al[36] (2009) (Figure 3; $P = 0.09$). The result for publication bias for each of the individual analyses is included in Table 1.

*© 2017 Wolters Kluwer Health, Inc. All rights reserved.*

Copyright © 2017 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

**TABLE 2.** Summary of Pooled Effect Sizes in Subgroup Analysis by Study Design

| | Case–Control Studies (n = 24) | | | | Cohort Studies (n = 3) | | | |
| | | Effect Size | Heterogeneity | | | Effect Size | Heterogeneity | |
| | No. Studies | OR (95% CI) | $I^2$ | $P$ | No. Studies | OR (95% CI) | $I^2$ | $P$ |
|---|---|---|---|---|---|---|---|---|
| Method of talc use | | | | | | | | |
| Any perineal use | 23 | 1.35 (1.27, 1.43) | 0.00 | 0.77 | 3 | 1.06 (0.90, 1.25) | 18.89 | 0.29 |
| Non-perineal use | 5 | 1.24 (1.01, 1.51) | 66.84 | 0.02 | 0 | NA | NA | NA |
| Diaphragm | 7 | 0.81 (0.61, 1.08) | 21.92 | 0.26 | 1 | 0.92 (0.68, 1.24) | 0.00 | 1.00 |
| Sanitary napkin | 10 | 1.27 (0.98, 1.65) | 40.49 | 0.09 | 2 | 0.93 (0.77, 1.13) | 0.00 | 0.77 |
| Length of talc use | | | | | | | | |
| Long-term use | 11 | 1.29 (1.13, 1.47) | 40.53 | 0.08 | 1 | 0.98 (0.75, 1.29) | 0.00 | 1.00 |
| <3600 total applications | 5 | 1.32 (1.15, 1.50) | 1.83 | 0.41 | 0 | NA | NA | NA |
| >3600 total applications | 5 | 1.42 (1.25, 1.61) | 12.59 | 0.33 | 0 | NA | NA | NA |
| Type of ovarian cancer | | | | | | | | |
| All serous | 12 | 1.34 (1.23, 1.47) | 0.00 | 0.71 | 2 | 1.19 (0.97, 1.47) | 0.00 | 0.61 |
| Serous invasive | 3 | 1.36 (1.05, 1.75) | 47.96 | 0.15 | 2 | 1.25 (1.01, 1.55) | 0.00 | 0.33 |
| Serous borderline | 3 | 1.39 (1.09, 1.78) | 0.00 | 0.94 | 0 | NA | NA | NA |
| All mucinous | 9 | 1.15 (0.93, 1.41) | 21.03 | 0.26 | 2 | 0.96 (0.61, 1.53) | 0.00 | 0.84 |
| Mucinous invasive | 2 | 1.34 (0.48, 3.79) | 69.39 | 0.07 | 0 | NA | NA | NA |
| Mucinous borderline | 3 | 1.18 (0.76, 1.81) | 34.07 | 0.21 | 0 | NA | NA | NA |
| Endometrioid | 6 | 1.39 (1.16, 1.66) | 0.00 | 0.52 | 2 | 1.09 (0.66, 1.80) | 0.00 | 0.48 |
| Clear cell | 3 | 1.02 (0.75, 1.39) | 0.00 | 0.78 | 0 | NA | NA | NA |

NA = not applicable; no cohort studies reported on the relevant associations.

## DISCUSSION

The present meta-analysis reports a positive association between perineal talc use and ovarian cancer, specifically of the serous and endometrioid histologic subtypes. The mechanism by which perineal talc use may increase the risk of ovarian cancer is uncertain. It has been previously proposed that talc, as a foreign body, may ascend from the vagina through to the uterine tubes and instigate a chronic inflammatory response, which may predispose to the development of ovarian cancer. It is argued that cellular injury, oxidative stress, and local increase in inflammatory mediators such as cytokines and prostaglandins may be mutagenic and hence promote carcinogenesis.[21] In support of this hypothesis, it has been found that hysterectomy or bilateral tubal ligation, in which ovarian exposure to inflammatory mediators would be significantly curtailed, is associated with a reduced risk of ovarian cancer.[22–24] However, the use of non-steroidal anti-inflammatory drugs (NSAIDs) is not inversely associated with the incidence of ovarian cancer, as may be expected if the etiology was related to chronic inflammation.[25,26] It has also been found that human epithelial ovarian cells have an unusually low expression of cyclooxygenase-1 (COX-1) and cyclooxygenase-2 (COX-2), which would reduce their sensitivity to the action of NSAIDs.[27] The potential mechanism by which genital talc is associated with an increased risk of ovarian cancer hence remains unclear.

An important finding of this study is that talc use appears to be associated with increased risk of serous ovarian cancer, of both invasive and borderline types, and not with mucinous ovarian cancer. Additionally, endometrioid ovarian cancers but not clear cell cancers were significantly associated with perineal talc use. Intriguingly, a meta-analysis examining the effects of tubal ligation of ovarian cancer risk found a reduced risk of the same subtypes of ovarian cancer as mentioned here: serous and endometrioid, but not mucinous.[24] If chronic inflammation due to ascending foreign bodies is indeed the mechanism by which talc use is associated with increased ovarian cancer risk, then these results fit the picture. The results for non-perineal application of talc were still positive but of lower magnitude, supporting the hypothesis of ascending foreign bodies causing chronic inflammation. It is plausible that non-perineal application of talc may cause increased risk through, e.g., the respiratory tract. Unfortunately, the evidence remains insufficient to understand the mechanism with any reasonable certainty.

We also found a slightly greater increased risk of ovarian cancer with >3600 lifetime applications compared with those with <3600 lifetime applications. The number of lifetime applications is a more valid measure of the patient's exposure to perineal talc than either duration or frequency of use alone. This finding also supports the chronic inflammatory hypothesis, as repeated exposure would induce a longer period of chronic inflammation, and therefore should increase the predisposition to the development of ovarian cancer. It is notable that these data were only available from

© 2017 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2017 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

*Penninkilampi and Eslick*                                                                 *Epidemiology* • Volume 29, Number 1, January 2018



**FIGURE 2.** A, Any perineal talc use is associated with an increased risk of any ovarian cancer (OR = 1.31; 95% CI = 1.24, 1.39). B, Long-term perineal talc use (>10 years use) is associated with an increased risk of any ovarian cancer, but of a lower magnitude than any perineal use (OR = 1.25; 95% CI = 1.10, 1.43). C, Any perineal talc use is associated with an increased risk of serous ovarian cancers (OR = 1.32; 95% CI = 1.22, 1.43). D, Any perineal talc use is associated with an increased risk of endometrioid type ovarian cancers (OR = 1.35; 95% CI = 1.14, 1.60).

case–control studies, as the three cohort studies did not sufficiently record duration and frequency of use to be included in the analysis. This retrospective finding is therefore prone to recall bias.

This meta-analysis had several strengths. None of the analyses in this review had statistically significant heterogeneity, except for non-perineal application, which indicates consistency in the direction and magnitude of the effect size between individual studies, and strengthening the reliability of the pooled effect sizes. Another strength of this review is

the large number of overall cases (n = 14,311), improving the power of the meta-analysis to detect a relatively small effect size, as occurred in this case. Another strength of this review is that the included studies were of relatively high quality as assessed through the NOS, reducing the potential for bias in the conclusions drawn. The NOS revealed that the most common limitations of the included case–control studies were the failure to blind interviewers to case–control status of subjects in the interview, and reliance on memory and self-report for collection of data on perineal talc use.

© 2017 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2017 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



**FIGURE 3.** Funnel plot for the meta-analysis of studies examining any perineal talc use and risk of ovarian cancer ($P = 0.09$).

A limitation of this study is that it pools nonrandomized studies, primarily case–control studies. The retrospective nature of case–control studies introduces the potential for recall bias. In this case, it is entirely possible that patients with ovarian cancer may be more aware of their previous talc use and hence be more likely to report higher past use. It is possible to attempt to overcome this by blinding the participants to the nature of the study, usually by asking spurious questions; however, the effectiveness of this approach may be limited.[28] Many of the studies in this review recorded data about talc use as part of a more extensive questionnaire focused on other associations, which may reduce the potential for recall bias. However, since the initiation of lawsuits in 2014, there has been extensive media coverage regarding this association, and the potential for recall bias in case–control studies conducted since then may be exacerbated.

Cohort studies are useful in that they are prospective; however, the low incidence of ovarian cancer results in relatively small number of cases even in large cohorts, as seen in the three cohort studies included in this review.[29] Considering potential exposure misclassification issues in case–control studies, the effect for any perineal talc use was very weak in a small number of cohort studies. However, an association between talc use and serous invasive ovarian cancer was found.

Of the studies in this review, case–control studies achieved much large number of cases, in some instances in excess of 2000 cases and a similar number of age-matched controls, which provide greater statistical power for the detection of an effect size of small magnitude. Hence while case–control studies are low-level evidence, they have been preferred in the investigation of the association between talc use and ovarian cancer. They also have the important advantage of not requiring 15 or more years of follow-up, as is necessary for a cohort study to sufficient detect cases of ovarian cancer relative to certain exposures. One potential way to overcome this limitation in future studies is to ensure that talc use is always included in questionnaires of any cohort studies investigating ovarian cancer. It is important not only that talc use be investigated but also the precise location, duration, and frequency of use. As it stands, a meta-analysis of observational studies such as the present study provides the highest level of evidence practically feasible for this research question.

## CONCLUSIONS

The results of this review indicate that perineal talc use is associated with a 24%–39% increased risk of ovarian cancer. While the results of case–control studies are prone to recall bias, especially with intense media attention following the commencement of litigation in 2014, the confirmation of an association in cohort studies between perineal talc use and serous invasive ovarian cancer is suggestive of a causal association. Additional epidemiologic evidence from prospective

© 2017 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2017 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

studies with attention to effects within ovarian cancer subtype is warranted. There is a substantial need for further research on a potential mechanism by which ovarian cancer may be caused by talc, as this will allow a causal relationship to be established or rejected with more certainty. However, particularly because of the dearth of screening tests available for this high-mortality cancer, it is important that research into this association continue as it is a potential avenue for cancer prevention.

## REFERENCES

1. Siegel RL, Miller KD, Jemal A. Cancer statistics, 2016. *CA Cancer J Clin*. 2016;66:7–30.
2. SEER. SEER stat fact sheet: ovary cancer. Accessed 8 May 2016. https://seer.cancer.gov/statfacts/html/ovary.html.
3. Holschneider CH, Berek JS. Ovarian cancer: epidemiology, biology, and prognostic factors. *Semin Surg Oncol*. 2000;19:3–10.
4. Jelovac D, Armstrong DK. Recent progress in the diagnosis and treatment of ovarian cancer. *CA Cancer J Clin*. 2011;61:183–203.
5. Sölétormos G, Duffy MJ, Othman Abu Hassan S, et al. Clinical use of cancer biomarkers in epithelial ovarian cancer: updated guidelines from the European Group on Tumor Markers. *Int J Gynecol Cancer*. 2016;26:43–51.
6. van Nagell JR Jr, Hoff JT. Transvaginal ultrasonography in ovarian cancer screening: current perspectives. *Int J Womens Health*. 2013;6:25–33.
7. Cramer DW, Welch WR, Scully RE, Wojciechowski CA. Ovarian cancer and talc: a case-control study. *Cancer*. 1982;50:372–376.
8. Huncharek M, Muscat J. Perineal talc use and ovarian cancer risk: a case study of scientific standards in environmental epidemiology. *Eur J Cancer Prev*. 2011;20:501–507.
9. Langseth H, Hankinson SE, Siemiatycki J, Weiderpass E. Perineal use of talc and risk of ovarian cancer. *J Epidemiol Community Health*. 2008;62:358–360.
10. Terry KL, Karageorgi S, Shvetsov YB, et al; Australian Cancer Study (Ovarian Cancer); Australian Ovarian Cancer Study Group; Ovarian Cancer Association Consortium. Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. *Cancer Prev Res (Phila)*. 2013;6:811–821.
11. Huncharek M, Muscat J, Onitilo A, Kupelnick B. Use of cosmetic talc on contraceptive diaphragms and risk of ovarian cancer: a meta-analysis of nine observational studies. *Eur J Cancer Prev*. 2007;16:422–429.
12. Houghton SC, Reeves KW, Hankinson SE, et al. Perineal powder use and risk of ovarian cancer. *J Natl Cancer Inst* 2014;106:dju208.
13. Gonzalez NL, O'Brien KM, D'Aloisio AA, Sandler DP, Weinberg CR. Douching, talc use, and risk of ovarian cancer. *Epidemiology*. 2016;27:797–802.
14. Moher D, Liberati A, Tetzlaff J, Altman DG; PRISMA Group. Preferred reporting items for systematic reviews and meta-analyses: the PRISMA statement. *Int J Surg*. 2010;8:336–341.
15. Wells GA, Shea B, O'Connell D, et al. The Newcastle-Ottawa Scale (NOS) for assessing the quality of nonrandomised trials in meta-analyses. 2000. Accessed 2 September 2017. http://www.ohri.ca/programs/clinical_epidemiology/oxford.asp
16. DerSimonian R, Laird N. Meta-analysis in clinical trials. *Control Clin Trials*. 1986;7:177–188.
17. Higgins JP, Thompson SG, Deeks JJ, Altman DG. Measuring inconsistency in meta-analyses. *BMJ*. 2003;327:557–560.
18. Egger M, Davey Smith G, Schneider M, Minder C. Bias in meta-analysis detected by a simple, graphical test. *BMJ*. 1997;315:629–634.
19. Orwin RG. A fail-safe N for effect size in meta-analysis. *J Educ Stat*. 1983;8:157–159.
20. Gertig DM, Hunter DJ, Cramer DW, et al. Prospective study of talc use and ovarian cancer. *J Natl Cancer Inst*. 2000;92:249–252.
21. Ness RB, Cottreau C. Possible role of ovarian epithelial inflammation in ovarian cancer. *J Natl Cancer Inst*. 1999;91:1459–1467.
22. Weiss NS, Harlow BL. Why does hysterectomy without bilateral oophorectomy influence the subsequent incidence of ovarian cancer? *Am J Epidemiol*. 1986;124:856–858.
23. Irwin KL, Weiss NS, Lee NC, Peterson HB. Tubal sterilization, hysterectomy, and the subsequent occurrence of epithelial ovarian cancer. *Am J Epidemiol*. 1991;134:362–369.
24. Cibula D, Widschwendter M, Májek O, Dusek L. Tubal ligation and the risk of ovarian cancer: review and meta-analysis. *Hum Reprod Update*. 2011;17:55–67.
25. Bonovas S, Filioussi K, Sitaras NM. Do nonsteroidal anti-inflammatory drugs affect the risk of developing ovarian cancer? A meta-analysis. *Br J Clin Pharmacol*. 2005;60:194–203.
26. Merritt MA, Green AC, Nagle CM, Webb PM; Australian Cancer Study (Ovarian Cancer); Australian Ovarian Cancer Study Group. Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer. *Int J Cancer*. 2008;122:170–176.
27. Rodríguez-Burford C, Barnes MN, Oelschlager DK, et al. Effects of nonsteroidal anti-inflammatory agents (NSAIDs) on ovarian carcinoma cell lines: preclinical evaluation of NSAIDs as chemopreventive agents. *Clin Cancer Res*. 2002;8:202–209.
28. Mann CJ. Observational research methods. Research design II: cohort, cross sectional, and case-control studies. *Emerg Med J*. 2003;20:54–60.
29. Narod SA. Talc and ovarian cancer. *Gynecol Oncol*. 2016;141:410–412.
30. Schildkraut JM, Abbott SE, Alberg AJ, et al. Association between body powder use and ovarian cancer: The African American Cancer Epidemiology Study (AACES). *Cancer Epidemiol Biomarkers Prev*. 2016;25:1411–1417.
31. Cramer DW, Xu H. Epidemiologic evidence for uterine growth factors in the pathogenesis of ovarian cancer. *Ann Epidemiol*. 1995;5:310–314.
32. Cramer DW, Vitonis AF, Terry KL, Welch WR, Titus LJ. The association between talc use and ovarian cancer: a retrospective case-control study in two US states. *Epidemiology*. 2016;27:334–346.
33. Wu AH, Pearce CL, Tseng CC, Pike MC. African Americans and Hispanics remain at lower risk of ovarian cancer than non-Hispanic Whites after considering nongenetic risk factors and oophorectomy rates. *Cancer Epidemiol Biomarkers Prev*. 2015;24:1094–1100.
34. Kurta ML, Moysich KB, Weissfeld JL, et al. Use of fertility drugs and risk of ovarian cancer: results from a U.S.-based case-control study. *Cancer Epidemiol Biomarkers Prev*. 2012;21:1282–1292.
35. Rosenblatt KA, Weiss NS, Cushing-Haugen KL, Wicklund KG, Rossing MA. Genital powder exposure and the risk of epithelial ovarian cancer. *Cancer Causes Control*. 2011;22:737–742.
36. Wu AH, Pearce CL, Tseng CC, Templeman C, Pike MC. Markers of inflammation and risk of ovarian cancer in Los Angeles County. *Int J Cancer*. 2009;124:1409–1415.
37. Mills PK, Riordan DG, Cress RD, Young HA. Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. *Int J Cancer*. 2004;112:458–464.
38. Ness RB, Grisso JA, Cottreau C, et al. Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. *Epidemiology*. 2000;11:111–117.
39. Wong C, Hempling RE, Piver MS, Natarajan N, Mettlin CJ. Perineal talc exposure and subsequent epithelial ovarian cancer: a case-control study. *Obstet Gynecol*. 1999;93:372–376.
40. Godard B, Foulkes WD, Provencher D, et al. Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study. *Am J Obstet Gynecol*. 1998;179:403–410.
41. Green A, Purdie D, Bain C, et al. Tubal sterilisation, hysterectomy and decreased risk of ovarian cancer. Survey of Women's Health Study Group. *Int J Cancer*. 1997;71:948–951.
42. Cook LS, Kamb ML, Weiss NS. Perineal powder exposure and the risk of ovarian cancer. *Am J Epidemiol*. 1997;145:459–465.
43. Chang S, Risch HA. Perineal talc exposure and risk of ovarian carcinoma. *Cancer*. 1997;79:2396–2401.
44. Shushan A, Paltiel O, Iscovich J, Elchalal U, Peretz T, Schenker JG. Human menopausal gonadotropin and the risk of epithelial ovarian cancer. *Fertil Steril*. 1996;65:13–18.
45. Purdie D, Green A, Bain C, et al. Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study. Survey of Women's Health Study Group. *Int J Cancer*. 1995;62:678–684.
46. Tzonou A, Polychronopoulou A, Hsieh CC, Rebelakos A, Karakatsani A, Trichopoulos D. Hair dyes, analgesics, tranquilizers and peri-

© 2017 Wolters Kluwer Health, Inc. All rights reserved.

Copyright © 2017 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

neal talc application as risk factors for ovarian cancer. *Int J Cancer*. 1993;55:408–410.

47. Rosenblatt KA, Szklo M, Rosenshein NB. Mineral fiber exposure and the development of ovarian cancer. *Gynecol Oncol*. 1992;45:20–25.

48. Chen Y, Wu PC, Lang JH, Ge WJ, Hartge P, Brinton LA. Risk factors for epithelial ovarian cancer in Beijing, China. *Int J Epidemiol*. 1992;21:23–29.

49. Booth M, Beral V, Smith P. Risk factors for ovarian cancer: a case-control study. *Br J Cancer*. 1989;60:592–598.

50. Harlow BL, Weiss NS. A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc. *Am J Epidemiol*. 1989;130:390–394.

51. Whittemore AS, Wu ML, Paffenbarger RS Jr, et al. Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. *Am J Epidemiol*. 1988;128:1228–1240.

52. Hartge P, Hoover R, Lesher LP, McGowan L. Talc and ovarian cancer. *JAMA*. 1983;250:1844.

*© 2017 Wolters Kluwer Health, Inc. All rights reserved.*

Copyright © 2017 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

# Exhibit 63

# Systematic Review and Meta-Analysis of the Association between Perineal Use of Talc and Risk of Ovarian Cancer

Mohamed Kadry Taher[A, B, C], Nawal Farhat[A, B, C], Nataliya A. Karyakina[A, B], Nataliya Shilnikova[A, B], Siva Ramoju[A], Christopher A. Gravel[B, C, D], Kanaan Krishnan[A], Donald Mattison[A], Daniel Krewski[A, B, C]

A.  **Risk Sciences International,** *251 Laurier Ave W, Suite 700, Ottawa, ON K1P 5J6, Canada*

B.  **McLaughlin Centre for Population Health Risk Assessment, Faculty of Medicine, University of Ottawa,** *600 Peter Morand Crescent, Ottawa, ON, K1G 5Z3, Canada*

C.  **School of Epidemiology and Public Health, University of Ottawa,** *600 Peter Morand Crescent, Ottawa, ON, K1G 5Z3, Canada*

D.  **Department of Epidemiology, Biostatistics and Occupational Health, McGill University,** *1020 Pine Avenue West, Montreal, Qc, H3A 1A2, Canada*

**Corresponding Author:**   *Dr. Mohamed Kadry Taher (*Mohamed.Taher@uOttawa.ca*)*

**Corresponding Address:** *600 Peter Morand Crescent, Room 216, Ottawa, ON, K1G 5Z3, Canada*

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

20  **Abstract**

21  Over the past four decades, there has been increasing concern that perineal use of talc

22  powder, a commonly used personal care product, might be associated with an

23  increased risk of ovarian cancer.

24  **Objectives:** To systematically review all available human epidemiological data on the

25  relationship between perineal use of talc powder and ovarian cancer, with consideration

26  of other relevant experimental evidence.

27  **Methodology:** We identified 30 human studies for qualitative assessment of evidence,

28  including 27 that were retained for further quantitative analysis.

29  **Results:** A positive association between perineal use of talc powder and ovarian cancer

30  was found [OR: 1.28 (95% CI: 1.20 - 1.37)]. A significant risk was noted in Hispanics

31  and Whites, in women applying talc to underwear, in pre-menopausal women and in

32  post-menopausal women receiving hormonal therapy. A negative association was noted

33  with tubal ligation.

34  **Conclusion:** Perineal use of talc powder is a possible cause of human ovarian cancer.

35  **Keywords:** Talc; ovarian cancer; perineal; epidemiological studies; systematic review;

36  meta-analysis; toxicological studies.

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

## 1. Introduction

Ovarian cancer is a common gynecologic cancer among women in developed countries, occurring at low rates among young women but increasing with age [1]. The annual incidence rate of ovarian cancer during the period 2005 – 2009 was 12.7/100,000 women, varying by ethnicity. The majority of ovarian cancers are diagnosed at an advanced stage, with 61% having distant metastases at diagnosis. Hereditary risk factors for ovarian cancer, specifically BRCA1 gene mutations, increase the risk above 35 years of age by about 2-3%.

In recent decades, there has been increasing concern that perineal exposure to talc, a commonly used personal care product, might be associated with an increased risk of ovarian cancer.  However, the data describing this association is somewhat inconsistent. Perineal application of talc among women varies by geographic location (Supplementary Material I), with prevalence of use generally higher in Canada, the US and the UK compared to Greece, China and Israel [2].

In order to better characterize the potential ovarian cancer risk associated with perineal use of talc, we conducted a systematic review and meta-analysis of peer-reviewed human studies on this issue. We also examined additional in-vitro or in-vivo toxicological studies, which shed light on possible biological mechanisms that might support an association between and ovarian cancer.

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

## 2. Materials and Methods

### 2.1.  Literature Search and Identification of Relevant Human Studies

A comprehensive, multi-step search strategy was used to to identify relevant studies on talc from multiple bibliographic databases, relevant national and international agencies and other grey literature sources (Supplementary Material II). Specifically, conducted a systematic search for all original studies involving human subjects that examined the association of genital/perineal use of talc powder and risk of ovarian cancer, including studies identified in a previous review by Berge et al. [3]. This review followed the PRISMA guidelines, and more specific guidance provided by the Cochrane Collaboration [4] (see Supplementary Material II for details).

Included studies were individually evaluated and scored by two reviewers (MT and NF), as detailed in the Table 1 and Supplementary Material XI. Studies included in previous reviews by both Berge et al. [3] and Penninkilampi et al [5] are compared in Supplementary Material I.

The quality of included studies  was assessed using the Newcastle-Ottawa Scale (NOS) [6], as detailed in Supplementary Material IV. We used a cut-off point of 7+ stars to represent studies of higher quality.

### 2.2.  Literature Search and Identification of Relevant Non-Human Studies

We conducted a (non-systematic) review of relevant non-human studies identified in three major bibliographic databases to identify potentially relevant animal

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

77   and in vitro studies (Supplementary Material V). Only studies that focused on perineal

78   exposure to talc powder were included. For outcomes, studies that focused on any type

79   of cancer including ovarian cancer and perineal exposure were considered. All retrieved

80   studies were examined for relevance, reliability and overall quality using the Klimisch

81   scoring system [7, 8]  (Supplementary Material VII, VIII and IX).

82        Studies are classified into one of the following four categories of reliability: 1)

83   reliable without restriction, 2) reliable with restrictions, 3) not reliable and 4) not

84   assignable. Additionally, category (5) is assigned to special studies focusing on

85   pharmacologic or mechanistic investigations.

86

87   **2.3.   Hazard Characterization**

88        Epidemiological studies included in the systematic review were qualitatively

89   assessed to examine their potential to inform a weight of evidence analysis. Findings

90   from these studies were evaluated with respect to study design, exposure and outcome

91   ascertainment, as well as potential sources of bias and confounding.

92        Animal studies were evaluated for evidence on the association between perineal

93   application of talc and ovarian cancer. Additional information on mechanism of action

94   and toxicokinetics derived from in-vitro and in-vivo studies was used in evaluating

95   biological plausibility.

96        We evaluated the overall weight of scientific evidence by performing a qualitative

97   evaluation of the findings collected from epidemiological studies as well as non-human

98   studies, using the Hill criteria [9].

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

99

## 2.4.   Quantitative Meta-Analysis

101     We conducted a meta-analysis of the risk of ovarian cancer in relation to perineal

102     use of talc using quantitative risk estimates reported in 27 original studies, comprising

103     three cohort studies and twenty-four case-control studies (included in Table 1). Studies

104     that had analyzed overlapping study populations were assessed on a case-by-case

105     basis for inclusion into the meta-analysis. The level of detail in the reported findings,

106     including sample size and publication date, were considered when deciding which study

107     to include in the case of overlap (Supplementary Material XIV).

108     Maximally adjusted odds ratios (ORs), hazard ratios (HRs) or relative risks (RRs)

109     – measures that are largely comparable because of the relatively low rate of occurrence

110     of ovariaion cancer – were extracted from the original studies. Details of the meta-

111     analytic methods are provided in Supplementary Material XIV.

112

113

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

114    **Table 1: Characteristics and overall findings of all included studies (N=30).**

| Study (Location) | Sample Size (Cases/ Controls or Cases/ Total Cohort) | Age (Years) | Subgroup Analyses | Exposure-Response Assessment | Overall Author Conclusion | NOS[1] |
|---|---|---|---|---|---|---|
| *Case-control studies* | | | | | | |
| **Booth et al.\* (1989), UK [10]** | 235/451 | Range: 20-65 Mean: 52.4 (cases); 51.4 (controls) | Frequency | No trend found | Possible association with >weekly use. | 5 |
| **Chang and Risch (1997), Canada [11]** | 450/564 | Range: 35-79 Mean: 57.2 (cases); 57.5 (controls) | Ever use Frequency Duration Time of use Type of use | Possible exposure-response with frequency and duration of use | Positive association | 7 |

---

[1] Newcastle-Ottawa Scale (NOS) score for each of the listed studies as assessed in our review

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

| Study (Location) | Sample Size (Cases/ Controls or Cases/ Total Cohort) | Age (Years) | Subgroup Analyses | Exposure-Response Assessment | Overall Author Conclusion | NOS[1] |
|---|---|---|---|---|---|---|
| | | | Pelvic surgery Histology | | | |
| Chen et al.* (1992), China [12] | 112/224 | Mean: 48.5 (cases); 49.0 (controls) | Ever use; | No trend analysis conducted | Positive association with use >3 months | 6 |
| Cook et al. (1997), USA [13] | 313/422 | Range: 20-79 | Ever use Duration Type of use Histology Lifetime applications | No trend found | Positive association. | 7 |
| Cramer et al. (1982), USA [14] | 215/215 | Range: 18-80 Mean ± SD: 53.2 ± 1.0 (cases); 53.5 ± 1.0 (controls) | Ever use Type of use Pelvic surgery | No trend analysis conducted | Positive association | 6 |

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

8

| Study (Location) | Sample Size (Cases/ Controls or Cases/ Total Cohort) | Age (Years) | Subgroup Analyses | Exposure-Response Assessment | Overall Author Conclusion | NOS[1] |
|---|---|---|---|---|---|---|
| Cramer et al. (2016), USA [15] | 2,041/2,100 | Range: 18-80 | Ever use; Frequency; Duration; Type of use; Histology; Type of powder; Pelvic surgery; Ethnicity; Age at first use; Time since last exposure; | Significant trend for years since exposure, frequency and duration of use, and number of lifetime applications | Positive association | 7 |
| Gates et al. (2008), USA [16] | New England Case Control (NECC): 1,175/1,202 Nurses' Health | Mean ± SD: 51 ±13 (NECC); Mean ± SD: 51 ±8 (NHS) | Ever use; Frequency; | Significant trend for frequency of use | Positive association | 7 |

| Study (Location) | Sample Size (Cases/ Controls or Cases/ Total Cohort) | Age (Years) | Subgroup Analyses | Exposure-Response Assessment | Overall Author Conclusion | NOS[1] |
|---|---|---|---|---|---|---|
| | Study (NHS): 210/600 | | | | | |
| **Godard et al. (1998), Canada [17]** | 153/152 | Mean: 53.7 | Ever use; Sporadic/familial | No trend analysis conducted | No association | 5 |
| **Green et al. (1997), Australia [18]** | 824/860 | Range: 18-79 | Ever use; Pelvic surgery; | No trend found | Positive association | 7 |
| **Harlow et al. (1989), USA [19]** | 116/158 | Range: 20-79 | Ever use; Type of use; Type of powder; | No trend analysis conducted | No association | 7 |
| **Harlow et al. (1992), USA [20]** | 235/239 | Range: 18-76 | Ever use; Frequency; Duration; Type of use; | Significant trend for monthly frequency of use | Positive associations in certain subgroups (talc used before 1960, women <50 | 7 |

| Study (Location) | Sample Size (Cases/ Controls or Cases/ Total Cohort) | Age (Years) | Subgroup Analyses | Exposure-Response Assessment | Overall Author Conclusion | NOS[1] |
|---|---|---|---|---|---|---|
| | | | Method of use; Histology; Tumor grade; Type of powder; Lifetime applications; Age of first use; Pelvic surgery; | | years old, women with 1 or 2 live births) | |
| Hartge et al. (1983), USA [21] | 135/171 | Mean: 52.1 (cases); 52.2 (controls) | Ever use; | No trend analysis conducted | No association | 5 |
| Kurta et al. (2012), USA [22] | 902/1,802 | Range: No range reported (age 25+) | Ever use; | No trend analysis conducted | Positive association | 6 |
| Langseth & Kjaerheim (2004), Norway [23] | 46/179 | Not reported | Ever use, | No trend analysis conducted | No association | 4 |

| Study (Location) | Sample Size (Cases/ Controls or Cases/ Total Cohort) | Age (Years) | Subgroup Analyses | Exposure-Response Assessment | Overall Author Conclusion | NOS[1] |
|---|---|---|---|---|---|---|
| **Merritt et al. (2008), Australia [24]** | 1,576/1,509 | Range: 18-79 Mean: 57.8 (cases); 56.4 (controls) | Ever use; Duration; Histology; Pelvic surgery; Age at diagnosis; | No trend found | Positive association strongest for serous and endometrioid subtypes. | 7 |
| **Mills et al. (2004), USA [25]** | 249/1,105 | Mean ± SD: 56.6 (cases); 55 (controls) | Ever use; Frequency; Duration; Year of first use; Histology; Pelvic surgery; Time of use; Tumor behavior; Cumulative use; | No trend found | Positive association for invasive and serous invasive tumors. | 6 |

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

12

| Study (Location) | Sample Size (Cases/ Controls or Cases/ Total Cohort) | Age (Years) | Subgroup Analyses | Exposure-Response Assessment | Overall Author Conclusion | NOS[1] |
|---|---|---|---|---|---|---|
| **Moorman et al. (2009), USA [26]** | African-American: 143/189; White 943/868 | Range: 20-74 | Ever use; Ethnicity; | No trend analysis conducted | No association | 6 |
| **Ness et al. (2000), USA [27]** | 767/1,367 | Range: 20-69 | Ever use; Duration; Method of use; | No trend found | Positive association for any method of use. | 6 |
| **Rosenblatt et al. (1992), USA [28]** | 77/46 (analyzed) | Range: ≤30 – 80≥ | Ever use; Duration; Type of use; Pelvic surgery; | Positive trend for duration of use since tubal ligation | Possible association | 4 |
| **Rosenblatt et al. (2011), USA [29]** | 812/1,313 | Range: 35-74 | Ever use; Lifetime number of applications; Duration; | No trend found | Possible association | 7 |

| Study (Location) | Sample Size (Cases/ Controls or Cases/ Total Cohort) | Age (Years) | Subgroup Analyses | Exposure-Response Assessment | Overall Author Conclusion | NOS[1] |
|---|---|---|---|---|---|---|
| | | | Year of first use; Age of first use; Age of last use; Time of use; Type of use; Histology; | | | |
| **Schildkraut et al. (2016), USA [30]** | 584/745 | Range: 20-79 | Ever use; Frequency; Duration; Histology; Lifetime applications; Menopausal status; | Significant trend with frequency and duration of use, and number of lifetime applications | Positive association | 8 |
| **Tzonou et al. (1993), Greece [31]** | 189/200 | Range: <70 | Ever use; | No trend analysis conducted | No association | 5 |

| Study (Location) | Sample Size (Cases/ Controls or Cases/ Total Cohort) | Age (Years) | Subgroup Analyses | Exposure-Response Assessment | Overall Author Conclusion | NOS[1] |
|---|---|---|---|---|---|---|
| Whittemore et al. (1988), USA [32] | 188/539 | Range: 18-74 | Ever use; Frequency; Duration; Type of use; Pelvic surgery; | No trend found | Could neither implicate nor exonerate talc as an ovarian carcinogen | 4 |
| Wong et al. (1999, 2009), USA [33, 34] | 462/693 | Mean: 54.9 | Ever use; Type of use; Duration; Pelvic surgery; | No trend found | No association | 4 |
| Wu et al. (2015), USA [35] | 1,701/2,391 | Range: 18-79 | Ever use; Ethnicity; | No trend analysis conducted | Positive association among Hispanics and non-Hispanic whites, but not African Americans. | 7 |

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

| Study (Location) | Sample Size (Cases/ Controls or Cases/ Total Cohort) | Age (Years) | Subgroup Analyses | Exposure-Response Assessment | Overall Author Conclusion | NOS[1] |
|---|---|---|---|---|---|---|
| **Wu et al. (2009), USA [34]** | 609/688 | Range: 18-74 | Ever use; Frequency; Duration; Type of use; Histology; Time of use; Cancer stage; | Significant trend for frequency and duration of use, and number of lifetime applications | Positive association | 7 |
| ***Cohort studies*** | | | | | | |
| **Gates et al. (2010)\*, USA [36]** | 797/108,870 | Range: 30-55 | ≥/week vs <1/week; Histology; | No trend analysis conducted | Possible association that varies by histological subtype. No association with mucinous tumors. | 7 |

| Study (Location) | Sample Size (Cases/ Controls or Cases/ Total Cohort) | Age (Years) | Subgroup Analyses | Exposure-Response Assessment | Overall Author Conclusion | NOS[1] |
|---|---|---|---|---|---|---|
| Gertig et al. (2000), USA [37] | 307/78,630 | Range: 30-55 (at cohort entry) | Ever use; Frequency; Histology; Race; | No trend found | Possible association (modest increase for serous invasive subtype) | 5 |
| Gonzalez et al. (2016), USA [38] | 154/41,654 | Range: 35-74 Median: 57.8 | Ever use; Time of use; | No trend analysis conducted | No association | 6 |
| Houghton et al. (2014), USA [39] | 429/61,285 | Range: 50-79 Mean: 63.3 | Ever use; Duration; Type of use; Histology; | No trend found | No association | 7 |

*\* Study assessed for qualitative evidence but not included in the meta-analysis*

115

---

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

## 3. Results

### 3.1.   Evidence from Human Studies

The multiple database search for original human studies yielded 656 references. Although grey literature search yielded another 477 references, only 5 were judged relevant the present analysis. Automatic followed by manual removal of duplicates identified 282 references for screening and review.

Multi-level screening and full-text examination resulted in the in the inclusion of 30 studies for further qualitative/quantitative analyses (Supplementary Materials X and XI). A detailed PRISMA flow diagram is shown in Figure 1 [40]. Key characteristics of the included 26 case-control studies and four cohort studies are summarized in Table 1.

Twenty-one of the thirty studies were carried out in the USA, with the remaining studies conducted in Europe (n=4), Canada (n=2), Australia (n=2) and China (n=1). Forty percent (n=12) of the studies were relatively recent, published in the last decade, with the remaining studies published between 1982 and 2006. The study populations generally included adult women. Several studies analyzed data from populations initially recruited for other purposes, such as the Nurses' Health Study (NHS) [15, 36, 37] and Women's Health Initiative (WHI) [39].

The number of ovarian cancer patients analyzed varied from as few as 46 cases [23] to 22,041 cases [15]. Twenty-seven out of the 30 included studies assessed the association between ever use of perineal talc use and ovarian cancer. Subgroup

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

18

136    analyses examining the effect of frequency and duration of use, type of use, period of

137    use and other factors varied among these studies (Table 1).



138

139    Figure 1: PRISMA Flow Diagram

140         Sixty three percent (n=19) of the studies concluded the presence of a positive

141    association between perineal exposure to talc powder and ovarian cancer risk [10-16,

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

142    18, 20, 22, 24, 25, 27-30, 34-36]. Ten studies concluded the absence of an association

143    [17, 19, 21, 23, 26, 31, 33, 37-39]. Only one study could not reach a clear conclusion on

144    the presence or absence of an association [32]. Many of the included studies reported

145    variability in some of the analyzed subgroups regarding possible association between

146    exposure to talk powder and risk of ovarian cancer. Supplementary Material X presents

147    the findings and details of all the studies included in the analysis, while Supplementary

148    Material XI summarizes the strengths and limitations of each of these studies as

149    identified by the original study authors and by us.

150

151    ## 3.2.   Evidence from Non-Human studies

152    After removal of duplicates, the bibliographic database searches on non-human

153    studies initially yielded 1,165 references. The 51 retained animal studies focusing on the

154    carcinogenicity of talc, mechanism of action, and toxicokinetics are summarized in

155    Supplementary Material XII.

156

157    ## 3.3.   Hazard Characterization

158    ### 3.3.1.  Evidence from Human Studies

159    The case-control studies generally included adult women participants. Cases

160    were commonly selected from registries or hospital records, and included all eligible

161    subjects within a specific geographic region and diagnosed with ovarian cancer within a

162    predetermined time period. Controls were generally matched to cases by age and

163    residence. All the included studies compared the risk of ovarian cancer in ever vs never

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

20

164  users of talc (perineal application). However, several of the studies also included

165  subgroup analyses to examine the potential effect of frequency of use, duration of use,

166  tumor histology, ethnicity, method of use, lifetime number of applications, year of first

167  use, and menopausal status. Some authors concluded that the risk of ovarian cancer is

168  limited to [or stronger in] certain subgroups (weekly talc users, premenopausal women)

169  or for specific histology types (notably serous tumors).

170      Studies reported effect estimates adjusted for a variety of potential confounders

171  (see detailed tables in Supplementary Material X & XI). Age and parity were considered

172  the two most important variables that could introduce potential bias, based on prior

173  literature: few studies reported findings that were not adjusted for these two variables.

174  As many of the studies only reported on the ovarian cancer risk assessing only one

175  exposure category (comparing only ever vs never users of talc), exposure-response

176  analyses were not done in all studies. When conducted, findings from trend analyses

177  were not consistent.

178

179  **3.3.2.  Evidence from Non-Human Studies**

180      The following aspects were considered in the weight of evidence assessment of

181  ovarian cancer and perineal exposure to talc:

182  - hazards arising from the physical and chemical properties of talc, including

183    potential structure-activity relationship indicative of carcinogenic potential;

184  - the toxicokinetics of talc and the ability to migrate from the perineal area to ovaries

185    and quantity at the actual target site (the tissue dose);

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

21

186      • evidence on ovarian cancer reported in animal studies; and

187      • findings from in vitro studies suggestive of mechanism of action of carcinogenic

188        effect.

189        While the data from the animal studies considered various routes of talc

190   administration are inconsistent [41-46], there are observations from in vivo and in vitro

191   studies which support the potential for local carcinogenic action of talc on fallopian,

192   ovarian and peritoneal epithelium [27, 47-53].

193        The results from the *in vitro* studies are informative for mechanisms of action of

194   possible carcinogenicity. Smith and colleagues [54] identified 10 key characteristics

195   (KCs) commonly exhibited by established human carcinogens.

196        Oxidative stress (KC 6) and inflammation (KC 5) in cell cultures induced by talc

197   have been reported by several authors [48], corresponding to two of the 10 key

198   characteristics (KCs) described by Smith et al. [54].  Several authors suggested

199   additional potential mechanisms of action through cell proliferation (KC 10) and changes

200   in gene expression, presumably facilitated by oxidative stress and dysregulated

201   antioxidant defense mechanisms [49, 55].

202        Chronic perineal or vaginal exposures of animals to talc do not directly affect

203   ovulation or steroidal hormone levels, but can induce chronic local inflammation, which

204   has been suggested as a risk factor for ovarian cancer [56]. Mechanism of action

205   studies suggested that talc can complex iron on the surface and disrupt iron

206   homeostasis, associated with oxidant generation, macrophage distress and leukotriene

---

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

207   released by macrophages in the surrounding cells resulting in the inflammatory

208   response which could act as a tumor promoter in both animals and humans [48, 50, 51].

209        The changes seen in cultured cells after exposure to talc [50, 51] are consistent

210   with those inflammatory and proliferative processes in the lungs seen in laboratory

211   animals after inhalation exposure in a 1993 study conducted by the US National

212   Toxicology Program [47]. In female rats, hyperplasia of alveolar epithelium was

213   associated with inflammatory response and occurred in or near foci of inflammation [47].

214   The severity of the fibrous granulomatous inflammation in the lungs increased with

215   increased talc concentrations and exposure duration and a significant association was

216   observed between inflammation and fibrosis in the lungs and the incidence of

217   pheochromocytomas in this study [47]. Overall, the avaialbe experimental data suggest

218   irritation, followed by oxidative stress and inflammation, may play be involved in local

219   carcinogenic effects of talc in the ovaries.

220        Local inflammation of the epithelial ovarian surface in rats following by injection

221   of a suspension of talc particles demonstrated the development of foreign body

222   granulomas surrounding talc particles and large ovarian bursal cysts [53]. It is generally

223   accepted that benign and malignant ovarian epithelial tumors arise from surface

224   epithelium and its cystic derivatives, and surface epithelial cysts have a greater

225   propensity to undergo neoplasia than does the surface epithelium itself [57]. Evidence

226   of neoplasms of epithelial origin, nuclear atypia, or mitotic activity in the surface

227   epithelium was not found in this study; however, focal areas of papillary changes in the

228   surface epithelium consistent with the histological signs of premalignancy were

229   observed in 40% of treated animals [53].

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

230        Data on talc migration in the genital tract of animals is inconsistent, but could not

231    exclude such possibility [58-61]. Some studies have reported lack of neutron-activated

232    talc migration from the vagina to the ovaries in cynomolgus monkeys [58], but talc

233    particles were identified in the ovaries of rats that received intrauterine instillation of talc

234    [60]. Radioactivity was not found in the ovaries of rabbits dosed intravaginally with

235    tritium-labelled talc, but was detected in cervix and fallopian tubes [59-61]. In studies in

236    humans, Henderson and colleagues [62] examined  tumor tissue of female patients with

237    ovarian and cervical tumors. The authors detected talc particles in histological samples

238    from 10 of 13 ovarian tumors, 12 of 21 cervical tumors and in 5 samples of 12 normal

239    ovarian tissues [62].

240        Historically, the concern for talc carcinogenicity has been associated with its

241    contamination by asbestos fibers (tremolite) [63], which is considered carcinogenic to

242    humans [2]. Talc, including baby powder, available in the US, contains only U.S.

243    Pharmacopeia (USP) grade pure talc [64]. Talcum powder has been asbestos-free

244    since the 1976 where the specifications for cosmetic talc were developed [65].

245

246    **3.3.3.  Weight of evidence for carcinogenicity**

247        Based on our evaluation of the weight of multiple lines of evidence, we concluded

248    that perineal application of talc is a possible casue of cancer ovarian cancer in humans.

249    In 2010 the Internatial Agency for Research on Cancer [2] categorized perineal use of

250    talc-based body powder (not containing asbestos or asbestiform fibers) as "possibly

251    carcinogenic to humans (Group 2B)" [66].

---

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

24

252      Table 2 summarizes the available evidence for the association of ovarian cancer

253      with perineal application of talc, organized around the nine Hill criteria [9]. Additoinal

254      details of this evaluation are given in Supplementary Material XIII.

255

256

257      **Table 2: Summary of evidence for each of the Hill Criteria of causation, as applied**

258      **to perineal application of talc and ovarian cancer**

| Criterion | Summary of Evidence |
|---|---|
| **Strength of association** | • Out of the 30 epidemiological studies, six reported positive association of statistical significance with a risk value (relative risk or odds ratio) of 1.5 or greater<br>• None of the cohort studies (n=3) found statistically significant association |
| **Consistency** | Fifteen out of thirty studies reported positive and significant associations reported in:<br><br>• Different ethnicities (Caucasians, African Americans, and Latin Americans);<br>• Over four decades (1982 - 2016);<br>• Mostly in studies from the United States but also in other countries (Canada, Australia and China)<br>• Case-control studies but not in cohort studies |
| **Specificity** | • Overall, the perineal talc exposure is specifically associated with cancer of the ovary and not other organs<br>• No evidence of other target organs (e.g., liver) being associated with perineal application of talc (via systemic exposure) |

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

| Criterion | Summary of Evidence |
|---|---|
| | • Thirteen studies included analyses by histologic type of ovarian cancer, and eight of them found a significant increase in the risk of serous ovarian cancer in talc users |
| **Temporality** | • In all case-control studies reporting positive outcome, the participants recalled that exposure to talc preceded the reported outcome<br><br>• In cohort studies, the follow up period could have been inadequate (<15 years) to detect a potential association between talc exposure and ovarian cancer |
| **Biological gradient (exposure-response)** | • About half of the epidemiological studies assessed only one level of talc exposure (ever vs never usage)<br><br>• Of the 12 studies reporting a positive association, six studies found significant exposure-response trend, particularly with medium and high frequency usage groups Regarding duration of use/exposure to talc, several studies reported the greatest risk in the 20+ years of use exposure group, followed by the 10-20 years' group, then the <10 years' group |
| **Biological plausibility** | • Particles of talc appear to migrate into the pelvis and ovarian tissue causing irritation and inflammation<br><br>• Transport of talc via perineal stroma and presence in ovaries documented<br><br>• Chronic inflammatory response and alteration in local immunogenicity are possible mechanisms |
| **Coherence** | • Results from talc epidemiology studies are coherent with the current knowledge on the risk factors for ovarian cancer (e.g., factors/physiological states associated with greater frequency and duration of ovulation are associated with increased risk of ovarian cancer) |

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

| Criterion | Summary of Evidence |
|---|---|
| | • Many (but not all) case-control studies reported lower risk of ovarian cancer in women who underwent pelvic surgery or tubal ligation (which disrupts the pathway and movement of talc from lower to upper genital tract) & suppressed ovulation |
| **Experimental evidence** | • Perineal application of talc has not been tested in an animal model of ovarian cancer<br>• The single animal cancer bioassay with talc conducted by the US National Toxicology Program was only by the inhalation route<br>• Rodent models may be of limited relevance because of ovulations occurring only or mainly during the breeding season and the rarity of ovarian epithelial tumors in these animals and ovaries are variously enclosed in an ovarian bursa. |
| **Analogy** | • Talc and asbestos are both silicate minerals<br>• Talc has been variably contaminated with asbestos (tremolite and anthophyllite; until 1976, talcum powders were only required to contain at least 90% mineral talc)<br>• The pleural and peritoneal mesotheliomas caused by asbestos are histologically similar to epithelial ovarian cancer associated with talc<br>• In animal models, asbestos induces ovarian epithelial hyperplasia similar to early epithelial tumors reported in women with past use of talc |

259

260

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

261 **3.4.   Meta-Analysis**

262        The use of genital talc was associated with a significant increase in the risk of

263 epithelial ovarian cancer, with an overall odds ratio [OR] based on our meta-analysis of

264 1.28 (95% confidence interval [CI]: 1.20 to 1.37 P<0.0001, $I^2$= 33%), as presented in

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

28

265  Figure 2. This result is comparable to those of earlier meta-analyses conducted by other

266  investigators [3, 5, 67-69] as shown in Supplementary Material I.



267

268  **FIGURE 2: Forest plot of the meta-analysis results on perineal use of talc and**

269  **risk of ovarian cancer**

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

270

271       An increased risk is more apparent in Hispanics and Whites, in women applying

272 talc to underwear, in pre-menopausal women and post-menopausal women receiving

273 hormonal therapy, as well as for the serous and endometrioid types of ovarian cancer

274 (Table 3 and Supplementary Material XIV). A negative association was noted with tubal

275 ligation. Our analysis pooled risk estimates from 27 original studies including 3 cohort

276 studies and 24 case-control studies, spanning across four decades (1982-2016) and

277 including a total of 16,352 cases and 19,808 controls from different ethnicities.

278       In assessing heterogeneity among included studies, most subgroup analyses

279 reported an $I^2$ statistic ranging between 0%-40%, which will have only a minimal impact

280 on the analysis [4]. Only three subgroup analyses (ethnicity, menopausal state, and

281 pelvic surgery) reported an $I^2$ statistic of 77%-78%, where considerable heterogeneity

282 might have had an impact on the results [4]. (See Table 3 and Supplementary Material

283 XIV for a listing of $I^2$ statistic values for the different subgroup analyses)

284       Whereas case-control studies showed a significant increase in the risk of ovarian

285 cancer for ever vs never users of talc powder [OR: 1.32 (95% CI: 1.24 to 1.40), P <

286 0.00001, $I^2$= 22%], cohort studies failed to show a significant increase in risk [OR: 1.06

287 (95% CI: 0.9 to 1.25), P= 0.49, $I^2$= 17%]. Thirteen out of 24 case-control studies (54%)

288 showed a statistically significant association, whereas none of the 3 cohort studies

289 showed a significant overall association between ever vs never genital talc exposure

290 and risk of ovarian cancer.

---

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

291     Subgroup analysis by study quality (NOS≥7 vs NOS<7) did not show any

292     significant differences in the overall pooled risk estimate. Similarly, there were no

293     differences among subgroup analysis conducted by decade of publication. A significant

294     association was observed for population-based studies [OR: 1.34 (95% CI: 1.27 to

295     1.41), P < 0.00001, $I^2$= 0%], but for enlisting hospital-based controls [OR: 0.96 (95% CI:

296     0.78 to 1.17), P= 0.66, $I^2$= 0%].

297     We conducted influence analysis to examine the impact of individual studies on

298     the results of our meta-analysis. No appreciable changes were observed regarding the

299     overall association of perineal talc exposure and the risk of ovarian cancer in response

300     to the exclusion of any one study. Detailed results from the influence analysis are

301     provided (Supplementary Material XIV).

302     Subgroup analysis based on ethnicity indicated that Hispanic women using talc

303     showed the most significant increase in risk of ovarian cancer [OR: 1.70 (95% CI: 1.17

304     to 2.47), P = 0.005, $I^2$= 0%], followed by White women [OR: 1.28 (95% CI: 1.10 to 1.49],

305     P= 0.001, $I^2$= 56%). African-American women showed a non-significant association with

306     ovarian cancer in [OR: 1.67 (95% CI: 0.90 to 3.10), P= 0.1, $I^2$= 48%].

307     Analyzing exposure by frequency of talc use, talc exposure was stratified into

308     three groups: high (once daily for >25 days/month), medium (once daily for 10–25

309     days/month) and low (once daily for 1–<10 days/month). The OR for the high-use group

310     was higher in the high-use group compared to the other two groups (medium and low-

311     use groups). Duration of talc use was stratified into three groups: <10 years, 10 – <20

312     years, and 20+ years. The overall odds ratio of the <10 years' group was lower than the

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

31

313   OR for the 10 – <20 years' group. On the other hand, the OR for the 20+ years' group

314   was lower and not statistically significant. However, this OR was based on two studies

315   that showed considerable heterogeneity ($I^2$=75%). Examining the method of application

316   of talc, application to the underwear subgroup had a statistically significant OR, which

317   was the highest among all subgroups. Diaphragm use showed an expected, yet non-

318   significant, negative association with ovarian cancer, which may be due to its action

319   blocking the ascent of talc particles up the reproductive tract.

320          Pooled risk estimates were statistically significant for two histological types of

321   ovarian cancer: serous tumors [OR: 1.38 (95% CI: 1.22 to 1.56), P < 0.00001, $I^2$= 0%]

322   and endometrioid tumors [OR: 1.39 (95% CI: 1.05 to 1.82), P= 0.03, $I^2$= 2%]. The

323   mucinous type showed a non-significant association [OR: 1.05 (95% CI: 0.85 to 1.29),

324   P= 0.41, $I^2$= 23%], while there were not sufficient studies to examine the other types of

325   ovarian cancers. Regarding tumor behavior, there was no appreciable difference

326   between invasive [OR: 1.38 (95% CI: 1.15 to 1.65), P= 0.0004, $I^2$= 0%] and borderline

327   [OR: 1.43 (95% CI: 1.08 to 1.89), P= 0.01, $I^2$= 19%] grades of ovarian cancer.

328   Borderline serous tumors showed slightly greater risk [OR: 1.39 (95% CI: 1.09 to 1.78),

329   P= 0.008, $I^2$= 0%] compared to the serous invasive grade [OR: 1.32 (95% CI: 1.13 to

330   1.54), P= 0.0004, $I^2$= 24%], while both showed a significant association with perineal

331   talc exposure. However, the mucinous tumors showed a non-significant association with

332   talc exposure, with invasive grades being associated with a greater risk [OR: 1.34 (95%

333   CI: 0.48 to 3.79), P= 0.58, $I^2$= 70%] compared to the borderline grade [OR: 1.18 (95%

334   CI: 0.76 to 1.82), P < 0.46, $I^2$= 34%].

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

335       Among post-menopausal women, those receiving hormonal therapy showed the

336   greatest risk [OR: 2.28 (95% CI: 1.72 to 3.01), P < 0.00001, $I^2$= 0%], followed by pre-

337   menopausal women [OR: 1.42 (95% CI: 1.16 to 1.75), P= 0.0008, $I^2$= 0%], and then

338   post-menopausal women not receiving hormonal therapy [OR: 1.05 (95% CI: 0.84 to

339   1.32), P= 0.66, $I^2$= 25%]. This subgroup analysis suggests that hormonal factors,

340   especially estrogens influence the risk of developing ovarian cancer among

341   postmenopausal women who have perineal talc exposure.

342       Women with prior ligation of the Fallopian tubes showed a significant reduction in

343   risk [OR: 0.64 (95% CI: 0.45 to 0.92), P= 0.02, $I^2$= 19%] against ovarian cancer

344   compared to hysterectomy [OR: 0.89 (95% CI: 0.54 to 1.46), P= 0.65, $I^2$= 61%],

345   whereas both surgeries combined showed no effect [OR: 1.06 (95% CI: 0.78 to 1.42),

346   P= 0.72, $I^2$= 61%]. This might be attributed to the fact that tubal ligation is usually

347   performed at an earlier age, thus preventing entry of talc into the reproductive tract

348   earlier and prolonged exposure to talc, compared to hysterectomy that is performed

349   later in life where a higher exposure has already taken place. In a recent meta-analysis

350   [70], the authors reported a negative association of tubal ligation (27 studies) and

351   hysterectomy (15 studies) with the risk of ovarian cancer: this negative association was

352   more apparent in women who had the surgery at an earlier age. A highly plausible

353   mechanism for this association, as suggested by the authors, involves blocking of

354   ascent of agents such as talc to the ovaries.

355       A summary of results of our meta-analysis is shown in Table 3. Forest plots of all

356   sub-group analyses are provided in Supplementary Material XIV.

---

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

357

358

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

34

359    **Table 3: Results of the subgroup analysis of talc exposure and ovarian cancer**

| Outcome or Subgroup | Studies | Effect Estimate [95% CI] | Heterogeneity $I^2$ Statistic [p-value] |
|---|---|---|---|
| **1.  Talc use** | | | |
| Ever vs. Never | 27 | 1.28 [1.20, 1.37] | 33% [< 0.00001] |
| Ethnicity | 3 | | 77% [0.08] |
| *African Americans* | 3 | 1.67 [0.90, 3.10] | 48% [0.10] |
| *Hispanics* | 2 | 1.70 [1.17, 2.47] | 0% [0.005] |
| *Whites* | 3 | 1.28 [1.11, 1.49] | 56% [0.001] |
| *Asians* | 1 | 0.04 [0.01, 0.16] | N/A |
| **2.  Study Assessment** | | | |
| 2.1. Study Design | 27 | | 33% [< 0.00001] |
| *Case-Control* | 24 | 1.32 [1.24, 1.40] | 22% [< 0.00001] |
| *Cohort* | 3 | 1.06 [0.90, 1.25] | 17% [0.49] |
| 2.2. Type of Controls | 24 | | 22% [< 0.00001] |
| *Hospital-based* | 4 | 0.96 [0.78, 1.17] | 0% [0.66] |
| *Population-based* | 19 | 1.34 [1.27, 1.41] | 0% [< 0.00001] |
| *Combined* | 1 | 1.45 [0.81, 2.60] | N/A |
| 2.3. Quality Score (NOS) | 27 | | 33% [< 0.00001] |
| *NOS >=7* | 12 | 1.32 [1.25, 1.40] | 0% [< 0.00001] |
| *NOS <7* | 15 | 1.21 [1.05, 1.39] | 47% [0.009] |
| 2.4. Publication Year | 27 | | 33% [< 0.00001] |
| *1980-1989* | 4 | 1.23 [0.81, 1.88] | 66% [0.33] |
| *1990-1999* | 8 | 1.30 [1.13, 1.50] | 24% [0.0003] |
| *2000-2009* | 8 | 1.25 [1.14, 1.37] | 18% [< 0.00001] |
| *2010 and beyond* | 7 | 1.31 [1.18, 1.45] | 44% [< 0.00001] |
| **3.  Talc Exposure** | | | |
| 3.1. Frequency of Use | 7 | | 35% [< 0.00001] |
| *Low* | 5 | 1.22 [0.96, 1.54] | 54% [0.10] |
| *Medium* | 2 | 1.22 [0.98, 1.53] | 0% [0.08] |
| *High* | 7 | 1.39 [1.22, 1.58] | 23% [< 0.00001] |
| 3.2. Duration of Use | 6 | | 5% [0.0008] |
| *<10 Years* | 5 | 1.22 [1.03, 1.45] | 0% [0.02] |

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

| Outcome or Subgroup | Studies | Effect Estimate [95% CI] | Heterogeneity $I^2$ Statistic [p-value] |
|---|---|---|---|
| *10 - <20 Years* | 2 | 1.42 [1.02, 1.99] | 0% [0.04] |
| *20+ Years* | 2 | 1.19 [0.71, 1.98] | 75% [0.51] |
| 3.3. Method of Use | 13 | | 52% [0.001] |
| *Sanitary Napkin* | 11 | 1.12 [0.91, 1.39] | 50% [0.29] |
| *Diaphragm* | 10 | 0.87 [0.72, 1.05] | 25% [0.14] |
| *Underwear* | 2 | 1.70 [1.27, 2.28] | 0% [0.0004] |
| *Male Condom* | 3 | 0.99 [0.73, 1.32] | 0% [0.92] |
| **4. Tumor Histology** | | | |
| 4.1. Tumor Histology | 8 | | 23% [< 0.00001] |
| *Serous* | 7 | 1.38 [1.22, 1.56] | 0% [< 0.00001] |
| *Mucinous* | 5 | 1.05 [0.85, 1.29] | 23% [0.41] |
| *Endometrioid* | 6 | 1.39 [1.05, 1.82] | 2% [0.03] |
| *Clear Cell* | 1 | 0.63 [0.15, 2.65] | |
| **5. Tumor Behavior** | | | |
| 5.1. All Grades | 4 | | 0% [< 0.00001] |
| *All Invasive* | 3 | 1.38 [1.15, 1.65] | 0% [0.0004] |
| *All Borderline* | 4 | 1.43 [1.08, 1.89] | 19% [0.01] |
| 5.2. Serous | 5 | | 0% [< 0.00001] |
| *Serous Invasive* | 5 | 1.32 [1.13, 1.54] | 24% [0.00004] |
| *Serous Borderline* | 3 | 1.39 [1.09, 1.78] | 0% [0.008] |
| 5.3. Mucinous | 3 | | 38% [0.40] |
| *Mucinous Invasive* | 2 | 1.34 [0.48, 3.79] | 70% [0.58] |
| *Mucinous Borderline* | 3 | 1.18 [0.76, 1.82] | 34% [0.46] |
| 5.4. Endometrioid | 1 | | N/A |
| *Endometrioid* Invasive | 1 | 1.38 [1.06, 1.80] | |
| 5.5. Clear Cell | 1 | | N/A |
| *Clear Cell Invasive* | 1 | 1.01 [0.65, 1.57] | |
| **6. Modifiers** | | | |
| 6.1. Menopausal State | 2 | | 78% [0.007] |
| *Pre-menopausal* | 2 | 1.42 [1.16, 1.75] | 0% [0.0008] |
| *Post-Menopausal (HT)* | 2 | 2.28 [1.72, 3.01] | 0% [< 0.00001] |
| *Post-Menopausal (no HT)* | 2 | 1.05 [0.84, 1.32] | 25% [0.66] |

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

| Outcome or Subgroup | Studies | Effect Estimate [95% CI] | Heterogeneity $I^2$ Statistic [p-value] |
|---|---|---|---|
| 6.2. Pelvic Surgery | 7 | | 78% [0.35] |
| *Tubal Ligation* | 3 | 0.64 [0.45, 0.92] | 19% [0.02] |
| *Hysterectomy* | 4 | 0.89 [0.54, 1.46] | 61% [0.65] |
| *Combined* | 4 | 1.06 [0.78, 1.42] | 61% [0.72] |

360

361   **\* NOS:** Newcastle-Ottawa Scale for quality scoring of observational studies

362   **\*\* Low:** Once daily for 1 – <10 days/month; **Medium:** Once daily for 10 –25 days/month; **High:** Once

363   daily for >25 days/month

364

## 3.5.   Exposure-Response Assessment

366        The effect of increasing frequency or duration of perineal use of talc and the risk

367   of ovarian cancer was assessed in the majority of the studies included in this review.

368   Conflicting findings were reported on the nature of the exposure-response relationship:

369   11 studies concluded that there is no exposure-response, five studies reported a

370   significant positive trend with either frequency or duration of talc use, and two studies

371   concluded that there might be an exposure-response. The remaining twelve studies did

372   not perform or report on trend analyses.

373        Findings from the seven studies that indicated a potential increased risk of

374   ovarian cancer associated with increasing use of talc are presented in Table 4. The

375   study by Cramer et al. [15] provides the strongest evidence of an exposure-response

376   relationship and could be considered as a key study for exposure-response

377   assessment. The data used in this study were generated from the Nurses' Health Study

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

378    originally conducted by Belanger et al. [71], a well-designed high quality cohort study of

379    the factors affecting women's health. The results of this study show an increased risk of

380    ovarian cancer at the three highest exposure categories in this study, with the risk at the

381    lowest exposure level [OR: 1.15 (95% CI: 0.89 to 1.47)] being numerically, although not

382    significantly, elevated. Other studies in Table 4 have provided findings in support of an

383    exposure response based on increasing number of talc applications [20, 30, 34].

384        In order to permit more direct comparisons of the exposure-response findings

385    from these studies, and whenever the original study data permits, we standardized

386    exposure measurements into talc-years as shown in Figure 3. Data points were

387    selected from studies after excluding potential data points that are lacking precise

388    information on the level of exposure to talc. The mid-point of the exposure categories in

389    the exposure-response studies was used for exposure-response assessment.

390        Overall, the graphical results shown in this Figure 3 suggest a possible

391    increasing trend in ovarian cancer risk with increasing cumulative exposure to talc;

392    however, there is also a high degree of uncertainty surrounding many of the individual

393    risk estimates. (A formal statistical test for trend was not attempted because of the high

394    degree of heterogeneity among studies noted previously in our meta-analysis discussed

395    in section 3.4.)

396

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

38

397



398

399

400 **Figure 3: Ovarian cancer risk estimates at increasing levels of exposure to talc, as**
401 **reported from multiple studies**

402

403

404

For information contact Dr. Donald R. Mattison; 301 801 1541. dmattison@risksciences.com
Materials submitted to Health Canada, Materials submitted to journal for peer review

405   **Table 4: Summary of studies that reported ORs for increasing number of lifetime perineal talc applications**

| Study | Stratification | Reported Exposure-Response Strata | aOR* | 95% CI |
|---|---|---|---|---|
| Schildkraut et al. (2016) [30] | Lifetime genital powder | <3,600 applications, any genital use vs (never use) | 1.16 | [0.83, 1.63] |
| | | >3,600 applications, any genital use vs (never use) | 1.67 | [1.23, 2.26] |
| Whittemore et al. (1988) [32] | Overall trend | Overall trend for 30 uses per month | 1.3 | [0.88, 1.92] |
| Wu et al. (2009) [34] | By total times of talc use | ≤ 5,200 times vs nonuse | 1.2 | [0.77, 1.88] |
| | | 5,201 – 15,600 times vs nonuse | 1.38 | [0.87, 2.20] |
| | | 15,601 – 52,000 times vs nonuse | 1.34 | [0.89, 2.02] |
| | | > 52,000 times | 1.99 | [1.34, 2.96] |
| Mills et al. (2004) [25] | By cumulative use (frequency × duration) | First quartile (lowest exposure) | 1.03 | [0.59, 1.80] |
| | | Second quartile | 1.81 | [1.10, 2.97] |
| | | Third quartile | 1.74 | [1.11, 2.73] |
| | | Fourth quartile (highest exposure) | 1.06 | [0.62, 1.83] |
| Rosenblatt et al. (2011) [29] | By lifetime number of applications of perineal powder after bathing | 1-1,599 applications | 1.21 | [0.71, 2.06] |
| | | 1,600-4,799 applications | 2.08 | [1.32, 3.27] |
| | | 4,800-9,999 applications | 0.87 | [0.50, 1.53] |
| | | ≥10,000 applications | 0.87 | [0.48, 1.57] |
| Cramer et al. (2016) [15] | By total genital applications | ≤360 total genital applications | 1.15 | [0.89, 1.47] |
| | | 361-1,800 total genital applications | 1.36 | [1.06, 1.75] |
| | | 1,801-7,200 total genital applications | 1.41 | [1.10, 1.80] |
| | | >7,200 total genital applications | 1.39 | [1.11, 1.75] |
| Harlow et al. (1992) [20] | Total Lifetime Perineal Applications* | < 1,000 applications | 1.3 | [0.7, 2.7] |
| | | 1,000 - 10,000 applications | 1.5 | [0.9, 2.4] |
| | | >10,000 applications | 1.8 | [1.0, 3.0] |

406   * aOR: adjusted odds ratio

407   ** 10,000 applications are equivalent to daily use for 30 year

## 4.  Discussion

The present analysis of the association between perineal use of talc powder and ovarian cancer risk considered four decades of scientific work exploring the epidemiological associations and non-human studies. The motivation for this review is based on two questions: what do human epidemiology studies of perineal talc exposure reveal about potential ovarian carcinogenicity, and what do in-vitro and in-vivo studies suggest about potential mechanisms of toxicity?

A systematic review of the human epidemiology studies was conducted to address the first question. Thirty observational epidemiologic studies were identified and assessed for quality using the NOS [6]. In parallel with the review of human epidemiological evidence, a (non-systematic) review of evidence exploring in vitro and in vivo toxicology data on talc was conducted to explore how talc might produce biological changes. This latter review provides some insights concerning possible mechanisms of talc toxicity, including oxidative stress, immune system alterations and inflammatory responses. However, it also indicates that talc is not genotoxic. In total, the epidemiology studies suggest that perineal exposure to talc powder is a possible human ovarian carcinogen but there are concerns that the actual exposure experienced by these women over the past 40-50 years is not well understood. As reported by Langesth and colleagues [67], there had been some concern that asbestos-contaminated talc powder that was produced prior to 1976 might have been a confounder; however, the similarity of findings between studies published prior to and after this point suggests asbestos contamination does not explain the positive association between perineal use of talc powder and risk of ovarian cancer [25, 27].

431        Human observational studies have inherent limitations that could bias the

432    findings. Potentially important sources of bias reported in the included studies include:

433    1) selection bias due to low response rates from cases and controls or from limiting

434    subjects to English-speaking women of two specific races, and 2) exposure

435    misclassification due to recall bias inherent in case control studies. Other limitations

436    included small sample sizes in some studies, small numbers of subjects in subgroup

437    analyses, lack of information on duration of talc use in many studies that only compared

438    ever vs never users, as well as lack of information on the talc content of the different

439    brands of genital powders used. In two of the three cohort studies, the follow-up period

440    between exposure assessment and end of study could have been inadequate to detect

441    a potential association between talc exposure and ovarian cancer. Houghton et al. [39]

442    reported a mean follow up of 12.4 years, while Gates et al. [36] followed a cohort of

443    women for 24 years. However, Gertig et al. [37] and Gonzalez et al. [38] noted that one

444    of their main limitations is the relatively short follow up periods that may not be

445    adequate to detect a potential association between talc exposure and ovarian cancer.

446    For example, studies of smoking and ovarian cancer suggest that follow-up periods as

447    long as four decades improve recognition of the carcinogenic effects of smoking [72];

448    longer follow up periods may also improve characterization of the association between

449    talc and ovarian cancer. In this regard, the minimum latency period for radiation-induced

450    ovarian cancer among Hiroshima atomic bomb survivors has been reported to range

451    from 15 to 20 years [73, 74]. Common strengths reported in most studies were the

452    selection of population controls in many of the case control studies and having relatively

453    large sample sizes that allowed a multitude of stratified analyses.

454       Effect estimates in this meta-analysis were pooled from 24 case control studies

455    and 3 cohort studies, and refer to ever vs never use of perineal talc. Pooling by study

456    design showed a notably higher risk estimate for case-control [OR: 1.32 (95% CI: 1.24

457    to 1.40), P < 0.00001, $I^2$= 22%] compared to cohort studies [OR: 1.06 (95% CI: 0.9 to

458    1.25), P= 0.49, $I^2$= 17%]. Although the reasons for this are unclear, the difference could

459    potentially be due to issues relating to latency, study power, or exposure

460    misclassification.

461       Although cohort study designs are efficient for examining diseases with a long

462    latency period, it is essential that the period between talc exposure and the cancer

463    diagnosis be sufficiently long. Gonzalez et al. [38] suggested that the latency period for

464    ovarian cancer is between 15 to 20 years. In the cohort studies included in this review,

465    Houghton et al. [39] reported a mean follow up of 12.4 years while Gates et al. [36]

466    followed a cohort of women for 24 years. Gertig et al. [37] and Gonzalez et al. [38]

467    noted that one of their studies' main limitations was the relatively short follow up periods

468    that may not be adequate to detect a potential association between talc exposure and

469    ovarian cancer.

470       In addition, cohort studies included may have been underpowered to detect an

471    odds ratio (relative risk) of 1.3 estimated from the case control studies. This was noted

472    by Narod et al. [75], who suggest that cohorts of at least 200,000 women would be

473    needed to reach statistical significance if the true odds ratio is 1.3. The cohort studies

474    included in this review included much smaller cohort sizes, ranging between 41,654 and

475    78,630 women.

476    Finally, in cohort studies, talc exposure was assessed at cohort entry and was

477    used as a measure of chronic talc use during follow up. It is possible that women who

478    were not exposed to perineal talc at the time of cohort entry began using talc at a later

479    time, and vice versa, possibly introducing non-differential misclassification of exposure,

480    which could bias the risk estimate towards the null value of unity. Conversely, in the

481    presence of differential exposure misclassification, a bias away from the null hypothesis

482    could accentuate differences between the cohort and case-control studies.

483

484    **4.1.   Exposures and outcomes**

485    All epidemiological studies included in our review evaluated the association

486    between the perineal application of talc and subsequent diagnosis of ovarian cancer.

487    Perineal vs body exposure is an important distinction, as the movement of talc is

488    thought to follow an ascending path from the perineum through the vagina, uterus and

489    fallopian tubes to the ovarian (as well as fallopian tube and peritoneal) epithelium.

490    Ovarian cancer is a common gynecologic malignancy in developed and

491    developing countries. Risk factors for ovarian cancer include age, infertility,

492    nulligravidity, endometriosis, hereditary ovarian cancer, tobacco and asbestos.

493    Protective factors for ovarian cancer include oral contraceptives, bilateral tubal

494    ligation, salpingo-oophorectomy, hysterectomy, and breast feeding [76]. It is a difficult

495    cancer to diagnose early, with approximately 60% of the individuals diagnosed after the

496    cancer has metastasized from the pelvic region, where this cancer begins. In the meta-

497    analysis, comparing ovarian cancer risk among women who used talc versus those who

44

498     never used talc (using both case-control and cohort designs), we observed an

499     approximate 30% increase in ovarian cancer risk in the group who used talc. The most

500     common type of ovarian cancer seen in the general population, and among the women

501     exposed to talc were of epithelial origin, most common histologic type (accounting for

502     about 95% of all cases in the general population), and of serous morphology, the most

503     common subtype (comprising about 75% in the general population).

504         The cell-type of origin and morphology of talc induced ovarian cancer is similar to

505     that observed in typical ovarian cancer with approximately 95% derived from epithelium

506     (from fallopian tube fimbriae, ovarian or peritoneal) with serous tumors as the most

507     common subtype. Like most ovarian cancers, those associated with talc exposure are

508     typically diagnosed late in the course of the disease (~60% are diagnosed after the

509     disease has spread outside of the pelvis). This late diagnosis complicates our

510     understanding of the history and origin of the disease.

511         Demographic factors were analyzed using subgroup analysis where possible,

512     and these were generally consistent with what has been previously observed with

513     respect to ethnicity and risk of ovarian cancer. Additionally, these data also provide

514     support for a mechanism of ovarian cancer induction working via an inflammatory

515     pathway associated with oxidative stress [27, 77, 78].

516         A small number of studies explored the issue of ethnicity: Asians (1 study),

517     Hispanics (2 studies), and African-Americans and Whites (3 studies each). Among

518     these studies the risk for talc associated ovarian cancer was 1.70 (Hispanics), 1.67

519     (African Americans), 1.28 (Whites) and 0.04 (Asians). These risk factors compare with

520     the demographics of ovarian cancer in the US population with an overall prevalence of

521    ovarian cancer of 12.7/100,000 among Whites 13.4/100,00, Hispanics 11.3/100,000,

522    African Americans 9.8/100,000, and Asians 9.8/100,000. The difference in US

523    prevalence and risk of talc induced ovarian cancer among Hispanics and African

524    Americans may provide further evidence concerning exposures or mechanism of action

525    [76].

526         A variety of factors were assessed with respect to the studies contributing to the

527    meta-analysis, including study quality (NOS) and publication year. In general, the risk of

528    talc associated ovarian cancer was similar among studies with an NOS ≥7 or NOS <7.

529    Year of publication also failed to demonstrate a significant impact on reported talc risk

530    estimates.

531

532    **4.2.   Exposure metrics**

533         Given that the epidemiological studies indicate that talc is a possible human

534    carcinogen, we next evaluated the studies to identify those comparing differences in

535    exposure. The initial assessment exploring frequency of use, utilized a qualitative

536    exposure metric: low, medium and high. Ovarian cancer was observed to increase

537    between the medium and high exposure groups, consistent with an exposure-response

538    relationship. Several studies explored duration of use (years) and risk of ovarian cancer;

539    20+ years (2 studies),10 (5 studies), 10/20 (2 studies), and observed that the risk was

540    greatest in the 20+ year exposure group, followed by lower risk in the 10/20 year and

541    <10-year exposure groups.

542         Several studies explored the route of exposure or approach to talc application on

543    ovarian cancer risk, including; hysterectomy, bilateral tubal ligation, diaphragm,

544    underwear, sanitary napkin, as these can provide insight into differences in exposure of

545    the fallopian tube, ovarian and peritoneal epithelium. Use of a diaphragm, as well as

546    tubal ligation act to interrupt exposure of perineal talc to reproductive tract. In contrast,

547    application to underwear and sanitary napkin exposure will provide broader exposures.

548    As hypothesized, the use of diaphragm and bilateral tubal ligation decreased ovarian

549    cancer risk [22].

550

## 4.3.  Modifying Factors

552        Modifiers of the risk of ovarian cancer, either associated with talc exposure, or a

553    spontaneous disease, can provide clues to potential mechanisms of causation.

554    Menopausal status and use of hormones can modify the risk for ovarian cancer. For

555    example, among post-menopausal women receiving hormonal therapy the risk for

556    ovarian cancer is greater than those who are premenopausal and those who are post-

557    menopausal not receiving hormone therapy. It has also been observed that women

558    receiving fertility treatment who do not become pregnant are at greater risk for ovarian

559    cancer [22]. These data suggest that hormonal status (elevated estrogens and/or

560    gonadotropins) plays a role in the mechanism of action of talc associated ovarian

561    cancer.

562        Subgroup analyses in the meta-analysis indicated that interruption of the

563    pathway from perineum to pelvis (as with bilateral tubal ligation or use of diaphragm)

564    decreased risk for ovarian cancer. This supports the hypothesis that talc acts by local

565    action on the ovary. Given the data developed in non-human studies suggesting an

566    inflammatory response of epithelial cells to talc, and histological observations

567 corroborating those observations, additional support for an inflammatory pathway

568 leading to ovarian cancer is provided. One study recently explored the use of anti-

569 inflammatory drugs and observed a decreased risk for ovarian cancer, also supporting

570 the importance of an inflammatory pathway with oxidative stress [77].

571

**Systematic review of evidence based on human studies on talc and ovarian cancer**

30 relevant studies identified and data abstracted;
further, assigned quality scores using Newcastle-Ottawa Scale.

**Review of evidence based on non-human studies on talc and ovarian cancer**

48 relevant studies identified and abstracted data;
further, assigned quality scores using Klimisch Scoring system.

**Qualitative evaluation of the weight of evidence for the carcinogenicity of talc**

Using the Bradford-Hill Criteria for weight of evidence evaluation, perineal application of talc
can be considered possibly carcinogenic to humans

**Quantitative evaluation of the association between talc and ovarian cancer**

Based on meta-analysis of 27 studies, perineal exposure to talc was associated with a significant increase
of the risk of epithelial ovarian cancer (OR=1.28; 95% CI: 1.20-1.37)

**Integration of findings**

Currently available scientific and epidemiological data suggest that perineal application of talc may be a
risk factor for ovarian cancer in some population subgroups.

572

573 **Figure 4: Detailed process flow for assessment of talc carcinogenicity**

574

575    ## 5.  Conclusion

576         We conducted an extensive search, examination, assessment and analysis of

577    evidence from published human and non-human original as well as all published

578    reviews that considered the association between genital/perineal use of talc powder and

579    risk of ovarian cancer. The steps followed in conducting this review are summarized in

580    Figure 4, along with the key findings at each step. Consistent with previous evaluations

581    the IARC in 2010 [2], and subsequent evaluations by individual investigators [3, 5, 69],

582    the present comprehensive evaluation of all currently available relevant data indicates

583    that perineal exposure to talc powder is a possible cause of ovarian cancer in humans.

584

585    ## 6.  Source of Funding

586         This work was supported by Health Canada as part of their Chemicals

587    Management Plan via contract # 4600001163 to Risk Sciences International (RSI),

588    Ottawa, ON, Canada.

589

590    ## 7.  Acknowledgments and Declarations

591         All authors who contributed to both this study and manuscript report no conflict of

592    interest in relation to the planning for and conducting this study as well as the

593    preparation of this manuscript. Although the research project and manuscript

594    preparation were conducted under contract to Health Canada, the views and

595    conclusions presented in this article are those of the authors alone.

596        D. Krewski is the Natural Sciences and Engineering Council of Canda Chair in

597    Risk Science at the University of Ottawa, and Chief Risk Scientist for Risk Sciences

598    International (RSI), a Canadian company established in 2006 in partnership with the

599    University of Ottawa (www.riskciences.com). Dr. Mohamed Kadry Taher, Ms. Nawal

600    Farhat, and Dr. Donald Mattison report personal fees from RSI in relation to this work. A

601    preliminary version of this paper was presented at the National Cancer Institute

602    Directors' Meeting held in Lyon, France on July 11-13, 2018 and benefited from

603    comments provided by international experts attending that meeting.

604

605

606

## 8. References

[1] R. Siegel, J. Ma, Z. Zou, A. Jemal, Cancer statistics, 2014, CA: A Cancer Journal for Clinicians 64(1) (2014) 9-29.

[2] IARC/International Agency for Research on Cancer, Carbon black, titanium dioxide, and talc, IARC Monogr Eval Carcinog Risks Hum 93 (2010) 1-413.

[3] W. Berge, K. Mundt, H. Luu, P. Boffetta, Genital use of talc and risk of ovarian cancer: a meta-analysis, European journal of cancer prevention : the official journal of the European Cancer Prevention Organisation (ECP)  (2017).

[4] J. Higgins, S. Green, Cochrane Handbook for Systematic Reviews of Interventions, 2011. www.cochrane-handbook.org.

[5] R. Penninkilampi, G.D. Eslick, Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis, Epidemiology 29(1) (2018) 41-49.

[6] G. Wells, B. Shea, D. O'Connell, J. Peterson, V. Welch, M. Losos, P. Tugwell, The Newcastle-Ottawa Scale (NOS) for assessing the quality of nonrandomised studies in meta-analyses, 2008. http://www.ohri.ca/programs/clinical_epidemiology/oxford.asp. (Accessed May 8 2017).

[7] H.J. Klimisch, M. Andreae, U. Tillmann, A systematic approach for evaluating the quality of experimental toxicological and ecotoxicological data, Regulatory toxicology and pharmacology : RTP 25(1) (1997) 1-5.

625   [8] K. Schneider, M. Schwarz, I. Burkholder, A. Kopp-Schneider, L. Edler, A. Kinsner-Ovaskainen,

626   T. Hartung, S. Hoffmann, "ToxRTool", a new tool to assess the reliability of toxicological data,

627   Toxicology letters 189(2) (2009) 138-44.

628   [9] A.B. Hill, The Environment and Disease: Association or Causation?, Proceedings of the Royal

629   Society of Medicine 58 (1965) 295-300.

630   [10] M. Booth, V. Beral, P. Smith, Risk factors for ovarian cancer: a case-control study, Br J

631   Cancer 60(4) (1989) 592-8.

632   [11] S. Chang, H.A. Risch, Perineal talc exposure and risk of ovarian carcinoma, Cancer 79(12)

633   (1997) 2396-401.

634   [12] Y. Chen, P.C. Wu, J.H. Lang, W.J. Ge, P. Hartge, L.A. Brinton, Risk factors for epithelial

635   ovarian cancer in Beijing, China, International journal of epidemiology 21(1) (1992) 23-9.

636   [13] L.S. Cook, M.L. Kamb, N.S. Weiss, Perineal powder exposure and the risk of ovarian

637   cancer.[Erratum appears in Am J Epidemiol 1998 Aug 15;148(4):410], American Journal of

638   Epidemiology 145(5) (1997) 459-65.

639   [14] D.W. Cramer, W.R. Welch, R.E. Scully, C.A. Wojciechowski, Ovarian cancer and talc: a case-

640   control study, Cancer 50(2) (1982) 372-6.

641   [15] D.W. Cramer, A.F. Vitonis, K.L. Terry, W.R. Welch, L.J. Titus, The Association Between Talc

642   Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US States, Epidemiology

643   27(3) (2016) 334-46.

644    [16] M.A. Gates, S.S. Tworoger, K.L. Terry, L. Titus-Ernstoff, B. Rosner, I.d. Vivo, D.W. Cramer,

645    S.E. Hankinson, Talc use, variants of the GSTM1, GSTT1, and NAT2 genes, and risk of epithelial

646    ovarian cancer, Cancer Epidemiol Biomarkers Prev 17(9) (2008) 2436-2444.

647    [17] B. Godard, W.D. Foulkes, D. Provencher, J.S. Brunet, P.N. Tonin, A.M. Mes-Masson, S.A.

648    Narod, P. Ghadirian, Risk factors for familial and sporadic ovarian cancer among French

649    Canadians: a case-control study, Am J Obstet Gynecol 179(2) (1998) 403-10.

650    [18] A. Green, D. Purdie, C. Bain, V. Siskind, P. Russell, M. Quinn, B. Ward, Tubal sterilisation,

651    hysterectomy and decreased risk of ovarian cancer. Survey of Women's Health Study Group,

652    International Journal of Cancer 71(6) (1997) 948-51.

653    [19] B.L. Harlow, N.S. Weiss, A case-control study of borderline ovarian tumors: the influence of

654    perineal exposure to talc, American Journal of Epidemiology 130(2) (1989) 390-4.

655    [20] B.L. Harlow, D.W. Cramer, D.A. Bell, W.R. Welch, Perineal exposure to talc and ovarian

656    cancer risk, Obstet Gynecol 80(1) (1992) 19-26.

657    [21] P. Hartge, R. Hoover, L.P. Lesher, L. McGowan, Talc and ovarian cancer, JAMA : the journal

658    of the American Medical Association 250(14) (1983) 1844.

659    [22] M.L. Kurta, K.B. Moysich, J.L. Weissfeld, A.O. Youk, C.H. Bunker, R.P. Edwards, F. Modugno,

660    R.B. Ness, B. Diergaarde, Use of fertility drugs and risk of ovarian cancer: results from a U.S.-

661    based case-control study, Cancer Epidemiol Biomarkers Prev 21(8) (2012) 1282-92.

662     [23] H. Langseth, K. Kjaerheim, Ovarian cancer and occupational exposure among pulp and

663     paper employees in Norway, Scand J Work Environ Health 30(5) (2004) 356-61.

664     [24] M.A. Merritt, A.C. Green, C.M. Nagle, P.M. Webb, Australian Cancer Study, Australian

665     Ovarian Cancer Study Group, Talcum powder, chronic pelvic inflammation and NSAIDs in

666     relation to risk of epithelial ovarian cancer, International Journal of Cancer 122(1) (2008) 170-6.

667     [25] P.K. Mills, D.G. Riordan, R.D. Cress, H.A. Young, Perineal talc exposure and epithelial

668     ovarian cancer risk in the Central Valley of California, International Journal of Cancer 112(3)

669     (2004) 458-64.

670     [26] P.G. Moorman, R.T. Palmieri, L. Akushevich, A. Berchuck, J.M. Schildkraut, Ovarian cancer

671     risk factors in African-American and white women, Am J Epidemiol 170(5) (2009) 598-606.

672     [27] R.B. Ness, J.A. Grisso, C. Cottreau, J. Klapper, R. Vergona, J.E. Wheeler, M. Morgan, J.J.

673     Schlesselman, Factors related to inflammation of the ovarian epithelium and risk of ovarian

674     cancer, Epidemiology 11(2) (2000) 111-7.

675     [28] K.A. Rosenblatt, M. Szklo, N.B. Rosenshein, Mineral fiber exposure and the development of

676     ovarian cancer, Gynecologic Oncology 45(1) (1992) 20-25.

677     [29] K.A. Rosenblatt, N.S. Weiss, K.L. Cushing-Haugen, K.G. Wicklund, M.A. Rossing, Genital

678     powder exposure and the risk of epithelial ovarian cancer, Cancer Causes Control 22(5) (2011)

679     737-42.

680   [30] J.M. Schildkraut, S.E. Abbott, A.J. Alberg, E.V. Bandera, J.S. Barnholtz-Sloan, M.L. Bondy,

681   M.L. Cote, E. Funkhouser, L.C. Peres, E.S. Peters, A.G. Schwartz, P. Terry, S. Crankshaw, F.

682   Camacho, F. Wang, P.G. Moorman, Association between Body Powder Use and Ovarian Cancer:

683   The African American Cancer Epidemiology Study (AACES), Cancer Epidemiol Biomarkers Prev

684   25(10) (2016) 1411-1417.

685   [31] A. Tzonou, A. Polychronopoulou, C.C. Hsieh, A. Rebelakos, A. Karakatsani, D. Trichopoulos,

686   Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian

687   cancer, International Journal of Cancer 55(3) (1993) 408-10.

688   [32] A.S. Whittemore, M.L. Wu, R.S. Paffenbarger Jr, D.L. Sarles, J.B. Kampert, S. Grosser, D.L.

689   Jung, S. Ballon, M. Hendrickson, Personal and environmental characteristics related to epithelial

690   ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee, American Journal

691   of Epidemiology 128(6) (1988) 1228-1240.

692   [33] C. Wong, R.E. Hempling, M.S. Piver, N. Natarajan, C.J. Mettlin, Perineal talc exposure and

693   subsequent epithelial ovarian cancer: a case-control study, Obstet Gynecol 93(3) (1999) 372-6.

694   [34] A.H. Wu, C.L. Pearce, C.C. Tseng, C. Templeman, M.C. Pike, Markers of inflammation and

695   risk of ovarian cancer in Los Angeles County, International Journal of Cancer 124(6) (2009)

696   1409-15.

697   [35] A.H. Wu, C.L. Pearce, C.C. Tseng, M.C. Pike, African Americans and Hispanics Remain at

698   Lower Risk of Ovarian Cancer Than Non-Hispanic Whites after Considering Nongenetic Risk

699   Factors and Oophorectomy Rates, Cancer Epidemiol Biomarkers Prev 24(7) (2015) 1094-100.

700   [36] M.A. Gates, B.A. Rosner, J.L. Hecht, S.S. Tworoger, Risk factors for epithelial ovarian cancer

701   by histologic subtype, Am J Epidemiol 171(1) (2010) 45-53.

702   [37] D.M. Gertig, D.J. Hunter, D.W. Cramer, G.A. Colditz, F.E. Speizer, W.C. Willett, S.E.

703   Hankinson, Prospective study of talc use and ovarian cancer, J Natl Cancer Inst 92(3) (2000)

704   249-52.

705   [38] N.L. Gonzalez, K.M. O'Brien, A.A. D'Aloisio, D.P. Sandler, C.R. Weinberg, Douching, Talc Use,

706   and Risk of Ovarian Cancer, Epidemiology 27(6) (2016) 797-802.

707   [39] S.C. Houghton, K.W. Reeves, S.E. Hankinson, L. Crawford, D. Lane, J. Wactawski-Wende,

708   C.A. Thomson, J.K. Ockene, S.R. Sturgeon, Perineal powder use and risk of ovarian cancer, J Natl

709   Cancer Inst 106(9) (2014).

710   [40] D. Moher, K.F. Schulz, D.G. Altman, The CONSORT statement: revised recommendations for

711   improving the quality of reports of parallel-group randomised trials, Clinical oral investigations

712   7(1) (2003) 2-7.

713   [41] J.C. Wagner, G. Berry, T.J. Cooke, R.J. Hill, F.D. Pooley, J.W. Skidmore, Animal experiments

714   with talc, in: W.H. Walton, B. McGovern (Eds.), Inhaled Particles IV, Part 2, Pergamon Press,

715   Oxford, UK, 1977, pp. 647–654.

716   [42] A.P. Wehner, T.M. Tanner, R.L. Buschbom, Absorption of ingested talc by hamsters, Food

717   and cosmetics toxicology 15(5) (1977) 453-55.

718   [43] F. Bischoff, G. Bryson, Talc at Rodent Intrathoracic, Intraperitoneal, and Subcutaneous

719   Sitse, Proceedings of The American Association for Cancer Research, American Association for

720   Cancer Research Public Ledger Bldg, Suite 816, 150 S. Independence Mall W., Philadelphia, PA

721   19106, 1976, pp. 1-1.

722   [44] J. Jagatic, M.E. Rubnitz, M.C. Godwin, R.W. Weiskopf, Tissue response to intraperitoneal

723   asbestos with preliminary report of acute toxicity of heart-treated asbestos in mice, Environ Res

724   1(3) (1967) 217-30.

725   [45] M. Ozesmi, T.E. Patiroglu, G. Hillerdal, C. Ozesmi, Peritoneal mesothelioma and malignant

726   lymphoma in mice caused by fibrous zeolite, Br J Ind Med 42(11) (1985) 746-9.

727   [46] W. Gibel, K. Lohs, K.H. Horn, G.P. Wildner, F. Hoffmann, [Experimental study on

728   cancerogenic activity of asbestos filters (author's transl)], Archiv fur Geschwulstforschung 46(6)

729   (1976) 437-42.

730   [47] NTP/National Toxicology Program, NTP Toxicology and Carcinogenesis Studies of Talc (CAS

731   No. 14807-96-6)(Non-Asbestiform) in F344/N Rats and B6C3F1 Mice (Inhalation Studies), Natl

732   Toxicol Program Tech Rep Ser, 1993, pp. 1-287.

733   [48] M.M. van den Heuvel, H.J. Smit, S.B. Barbierato, C.E. Havenith, R.H. Beelen, P.E. Postmus,

734   Talc-induced inflammation in the pleural cavity, Eur Respir.J 12(6) (1998) 1419-1423.

735   [49] A.R. Buz'Zard, B.H.S. Lau, Pycnogenol® reduces talc-induced neoplastic transformation in

736   human ovarian cell cultures, Phytotherapy Research 21(6) (2007) 579-586.

737    [50] A.J. Ghio, T.P. Kennedy, A.R. Whorton, A.L. Crumbliss, G.E. Hatch, J.R. Hoidal, Role of

738    surface complexed iron in oxidant generation and lung inflammation induced by silicates, The

739    American journal of physiology 263(5 Pt 1) (1992) L511-8.

740    [51] A.J. Ghio, J.M. Soukup, L.A. Dailey, J.H. Richards, J.L. Turi, E.N. Pavlisko, V.L. Roggli,

741    Disruption of iron homeostasis in mesothelial cells after talc pleurodesis, Am J Respir Cell Mol

742    Biol 46(1) (2012) 80-86.

743    [52] N. Nasreen, D.L. Hartman, K.A. Mohammed, V.B. Antony, Talc-induced expression of C-C

744    and C-X-C chemokines and intercellular adhesion molecule-1 in mesothelial cells, Am J Respir

745    Crit Care Med 158(3) (1998) 971-8.

746    [53] T.C. Hamilton, H. Fox, C.H. Buckley, W.J. Henderson, K. Griffiths, Effects of talc on the rat

747    ovary, British journal of experimental pathology 65(1) (1984) 101-6.

748    [54] M.T. Smith, K.Z. Guyton, C.F. Gibbons, J.M. Fritz, C.J. Portier, I. Rusyn, D.M. DeMarini, J.C.

749    Caldwell, R.J. Kavlock, P.F. Lambert, S.S. Hecht, J.R. Bucher, B.W. Stewart, R.A. Baan, V.J.

750    Cogliano, K. Straif, Key Characteristics of Carcinogens as a Basis for Organizing Data on

751    Mechanisms of Carcinogenesis, Environmental health perspectives 124(6) (2016) 713-21.

752    [55] A. Shukla, M.B. MacPherson, J. Hillegass, M.E. Ramos-Nino, V. Alexeeva, P.M. Vacek, J.P.

753    Bond, H.I. Pass, C. Steele, B.T. Mossman, Alterations in gene expression in human mesothelial

754    cells correlate with mineral pathogenicity, Am J Respir Cell Mol Biol 41(1) (2009) 114-23.

755    [56] R.B. Ness, C. Cottreau, Possible role of ovarian epithelial inflammation in ovarian cancer, J

756    Natl Cancer Inst 91(17) (1999) 1459-67.

757     [57] R.E. Scully, Pathology of ovarian cancer precursors, J Cell Biochem Suppl 23 (1995) 208-18.

758     [58] A.P. Wehner, R.E. Weller, E.A. Lepel, On talc translocation from the vagina to the oviducts

759     and beyond, Food and chemical toxicology : an international journal published for the British

760     Industrial Biological Research Association 24(4) (1986) 329-38.

761     [59] A.P. Wehner, C.L. Wilkerson, W.C. Cannon, R.L. Buschbom, T.M. Tanner, Pulmonary

762     deposition, translocation and clearance of inhaled neutron-activated talc in hamsters, Food and

763     cosmetics toxicology 15(3) (1977) 213-24.

764     [60] W.J. Henderson, T.C. Hamilton, M.S. Baylis, C.G. Pierrepoint, K. Griffiths, The

765     demonstration of the migration of talc from the vagina and posterior uterus to the ovary in the

766     rat, Environ Res 40(2) (1986) 247-50.

767     [61] J.C. Phillips, P.J. Young, K. Hardy, S.D. Gangolli, Studies on the absorption and disposition of

768     3H-labelled talc in the rat, mouse, guinea-pig and rabbit, Food Cosmet.Toxicol 16(2) (1978) 161-

769     163.

770     [62] W.J. Henderson, C.A. Joslin, A.C. Turnbull, K. Griffiths, Talc and carcinoma of the ovary and

771     cervix, J Obstet Gynaecol Br Commonw 78(3) (1971) 266-72.

772     [63] A.N. Rohl, A.M. Langer, I.J. Selikoff, A. Tordini, R. Klimentidis, D.R. Bowes, D.L. Skinner,

773     Consumer talcums and powders: mineral and chemical characterization, J Toxicol Environ

774     Health 2(2) (1976) 255-84.

775     [64] USP/United States Pharmacopeia Convention, Talc USP. Revision Bulletin Official: August 1,

776     2011. Available at:

777     http://www.usp.org/sites/default/files/usp/document/harmonization/excipients/m80360talc.p

778     df. (Accessed 25 September 2018).

779     [65] J. Nikitakis, G. McEwen Jr, CTFA compendium of cosmetic ingredient composition:

780     Specifications, Washington, DC: CTFA (now known as the Personal Care Products Council)

781     (1990).

782     [66] IARC/International Agency for Research on Cancer, Formaldehyde, 2-butoxyethanol and 1-

783     tert-butoxypropan-2-ol, IARC Monogr Eval Carcinog Risks Hum 88 (2006) 1.

784     [67] H. Langseth, S.E. Hankinson, J. Siemiatycki, E. Weiderpasse, Perineal use of talc and risk of

785     ovarian cancer, Journal of Epidemiology and Community Health 62(4) (2008) 358-360.

786     [68] M. Huncharek, J.F. Geschwind, B. Kupelnick, Perineal application of cosmetic talc and risk

787     of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen

788     observational studies, Anticancer Res 23(2C) (2003) 1955-60.

789     [69] K.L. Terry, S. Karageorgi, Y.B. Shvetsov, M.A. Merritt, G. Lurie, P.J. Thompson, M.E. Carney,

790     R.P. Weber, L. Akushevich, W.H. Lo-Ciganic, K. Cushing-Haugen, W. Sieh, K. Moysich, J.A.

791     Doherty, C.M. Nagle, A. Berchuck, C.L. Pearce, M. Pike, R.B. Ness, P.M. Webb, S. Australian

792     Cancer, G. Australian Ovarian Cancer Study, M.A. Rossing, J. Schildkraut, H. Risch, M.T.

793     Goodman, C. Ovarian Cancer Association, Genital powder use and risk of ovarian cancer: a

794   pooled analysis of 8,525 cases and 9,859 controls, Cancer Prevention Research 6(8) (2013) 811-

795   21.

796   [70] M.S. Rice, M.A. Murphy, S.S. Tworoger, Tubal ligation, hysterectomy and ovarian cancer: A

797   meta-analysis, Journal of ovarian research 5(1) (2012) 13.

798   [71] C.F. Belanger, C.H. Hennekens, B. Rosner, F.E. Speizer, The nurses' health study, The

799   American journal of nursing 78(6) (1978) 1039-40.

800   [72] P.D. Terry, A.B. Miller, J.G. Jones, T.E. Rohan, Cigarette smoking and the risk of invasive

801   epithelial ovarian cancer in a prospective cohort study, European journal of cancer (Oxford,

802   England : 1990) 39(8) (2003) 1157-64.

803   [73] S. Tokuoka, K. Kawai, Y. Shimizu, K. Inai, K. Ohe, T. Fujikura, H. Kato, Malignant and benign

804   ovarian neoplasms among atomic bomb survivors, Hiroshima and Nagasaki, 1950-80, J Natl

805   Cancer Inst 79(1) (1987) 47-57.

806   [74] K.-H. Tung, L.R. Wilkens, A.H. Wu, K. McDuffie, A.M. Nomura, L.N. Kolonel, K.Y. Terada,

807   M.T. Goodman, Effect of anovulation factors on pre-and postmenopausal ovarian cancer risk:

808   revisiting the incessant ovulation hypothesis, American journal of epidemiology 161(4) (2005)

809   321-329.

810   [75] S.A. Narod, Talc and ovarian cancer, Gynecologic Oncology 141(3) (2016) 410-2.

811   [76] L.-m. Chen, J.S. Berek, Epithelial carcinoma of the ovary, fallopian tube, and peritoneum:

812   Epidemiology and risk factors, UpToDate, 2014.

813    [77] W.H. Lo-Ciganic, J.C. Zgibor, C.H. Bunker, K.B. Moysich, R.P. Edwards, R.B. Ness, Aspirin,

814    nonaspirin nonsteroidal anti-inflammatory drugs, or acetaminophen and risk of ovarian cancer,

815    Epidemiology 23(2) (2012) 311-319.


816    [78] B. Trabert, L. Pinto, P. Hartge, T. Kemp, A. Black, M.E. Sherman, L.A. Brinton, R.M. Pfeiffer,

817    M.S. Shiels, A.K. Chaturvedi, A. Hildesheim, N. Wentzensen, Pre-diagnostic serum levels of

818    inflammation markers and risk of ovarian cancer in the prostate, lung, colorectal and ovarian

819    cancer (PLCO) screening trial, Gynecologic Oncology 135(2) (2014) 297-304.

820

Exhibit 64

Rebecca Smith-Bindman, M.D.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF NEW JERSEY

 3

 4   _____

 5                                         )

     IN RE:  JOHNSON & JOHNSON TALCUM      )

 6   POWDER PRODUCTS MARKETING, SALES      )

     PRACTICES, AND PRODUCTS LIABILITY     )

 7   LITIGATION                            )

                                           )  MDL No.

 8                                         )  2738 (FLW)(LHG)

                                           )

 9   _____)

10

11

12              VIDEOTAPED DEPOSITION OF

13              REBECCA SMITH-BINDMAN, M.D.

14               San Francisco, California

15              Thursday, February 7, 2019

16                      Volume I

17

18

19

20

21

22

23   Reported by:

     MARY J. GOFF

24   CSR No. 13427

25
```

Rebecca Smith-Bindman, M.D.

| | Page 2 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | Videotaped Deposition of REBECCA |
| 6 | SMITH-BINDMAN, M.D., Volume I, taken on behalf of |
| 7 | Johnson & Johnson, at Levin Simes Abrams LLP, |
| 8 | 1700 Montgomery Street, Suite 250, San Francisco, |
| 9 | California 94111, beginning at 9:20 a.m. and ending |
| 10 | at 4:01 p.m., on February 7, 2019, before MARY J. |
| 11 | GOFF, California Certified Shorthand Reporter No. |
| 12 | 13427. |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 3 |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | For Plaintiffs |
| 4 | Beasley Allen Law Firm |
| 5 | BY: P. LEIGH O'DELL |
| 6 | MARGARET M. THOMPSON, MD, JD, MPAff |
| 7 | Attorney at Law |
| 8 | 218 Commerce Street |
| 9 | Montgomery, Alabama 36103 |
| 10 | leigh.odell@beasleyallen.com |
| 11 | 334-269-2343 |
| 12 | For Plaintiffs |
| 13 | Robinson Calcagnie, Inc. |
| 14 | BY: CYNTHIA L. GARBER |
| 15 | Attorney at Law |
| 16 | 19 Corporate Plaza Drive |
| 17 | Newport Beach, California 92660 |
| 18 | cgarber@robinsonfirm.com |
| 19 | For Plaintiffs |
| 20 | Wilentz, Goldman & Spitzer P.A. |
| 21 | Daniel R. Lapinski |
| 22 | Attorney at Law |
| 23 | 90 Woodbridge Center Drive, |
| 24 | Suite 900 Box 10 |
| 25 | Woodbridge, New Jersey 07095-0958 |

| | Page 4 |
|---|---|
| 1 | APPEARANCES (continued): |
| 2 | For Plaintiffs |
| 3 | Restaino Law LLC |
| 4 | BY: JOHN M. RESTAINO JUNIOR |
| 5 | Attorney at Law |
| 6 | 130 Forest Street |
| 7 | Denver, Colorado 80220 |
| 8 | jrestaino@restainollc.com |
| 9 | 720-891-7921 |
| 10 | |
| 11 | |
| 12 | For Defendant Johnson & Johnson |
| 13 | Tucker Ellis LLP |
| 14 | BY: MICHAEL C. ZELLERS |
| 15 | Attorney at Law |
| 16 | 515 South Flower Street |
| 17 | 42nd Floor |
| 18 | Los Angeles, California 90071 |
| 19 | michael.zellers@tuckerellis.com |
| 20 | 213-430-3301 |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 5 |
|---|---|
| 1 | APPEARANCES (continued): |
| 2 | For Defendant Johnson & Johnson |
| 3 | Skadden, Arps, Slate, Meagher & Flom, LLP. |
| 4 | BY: BENJAMIN HALPERIN |
| 5 | Attorney at Law |
| 6 | 4 Times Square |
| 7 | New York, New York 10036 |
| 8 | benjamin.halperin@skadden.com |
| 9 | 212-735-2453 |
| 10 | |
| 11 | |
| 12 | For Defendant Imerys |
| 13 | Dykema |
| 14 | BY: JANE BOCKUS |
| 15 | Attorney at Law |
| 16 | 112 E. Pecan Street |
| 17 | Suite 1800 |
| 18 | San Antonio, Texas 78205 |
| 19 | jbockus@dykema.com |
| 20 | 210-554-5549 |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 6

1   APPEARANCES (continued):
2   For Defendant Imerys
3       Gordon & Rees LLP
4       BY:  JENNIFER A. FOSTER
5       Attorney at Law
6       816 Congress Avenue
7       Suite 1510
8       Austin, Texas 78701
9       jfoster@gordonrees.com
10      512-391-0197
11
12
13  For Defendant PCPC, Personal Care Products Council
14      Seyfarth Shaw, LLP
15      BY:  JAMES R. BILLINGS-KANG
16      Attorney at Law
17      975 F Street, NW
18      Washington, D.C. 20004
19      jbillingskang@seyfarth.com
20      202-828-5356
21
22
23
24
25

Page 7

1   APPEARANCES (continued):
2
3   For Defendants PTI Union, LLC and PTI Royston, LLC
4       Tucker Ellis LLP
5       BY:  CAROLINE M. TINSLEY
6       Attorney at Law
7       100 South 4th Street`
8       Suite 600
9       St. Louis, Missouri, 63102
10      caroline.tinsley@tuckerellis.com
11
12  Videographer:
13      Joseph Morgas
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1                   INDEX
2   WITNESS                     EXAMINATION
3   REBECCA SMITH-BINDMAN, M.D.
4   Volume I
5
6           BY MR. ZELLERS          12
7
8   NUMBER          DESCRIPTION          PAGE
9   Exhibit 1   Notice of Oral and Videotaped      24
                Deposition
10
11  Exhibit 2   Rule 26 Expert Report of          25
                Rebecca Smith-Bindman, MD
12
13  Exhibit 3   IMERYS list, Amended Expert Report   30
14
15  (Exhibit 4-11, premarked Hopkins Exhibit 28
16  (Spreadsheet) premarked Pier 47 (Exhibit Number
17  list) and unmarked article "Pycnogenol Reduces
18  Talc-induced Neoplastic Transformation in Human
19  Ovarian Cell Cultures" (Pltf_MISC_00000046) are
20  contained in the blue folder)
21
22  Exhibit 4   Reproductive Sciences             34
23
        Exhibit 5   Safety Assessment article      35
24
25

Page 9

1   EXHIBITS CONTINUED:                 PAGE
2   Exhibit 6   IARC Monographs, Volume 93        35
3
4   Exhibit 7   J&J article by Owen Dyer, BMJ     36
5
6   Exhibit 8   IARC Volumes 1-123               36
7
8   Exhibit 9   "On Talc Translocation from the   36
                Vagina" article
9
10  Exhibit 10  Alterations in Gene Expression    37
                article
11
12  Exhibit 11  Draft Screening Assessment, 12/18  38
13
14  Exhibit 12  (Binder) Talc Articles I          39
15
16  Exhibit 13 (Binder) Talc Articles II          39
                (Exhibit 21 is inside Exhibit 13)
17
18  Exhibit 14  CV of Smith-Bindman, MD           53
19  Exhibit 15  List of articles              54
20  Exhibit 16  9/24/18 e-mail string             76
                forest plots
21
22  Exhibit 17  Rule 26 Expert Report of          90
                Smith-Bindman, MD
23
24  Exhibit 18  The Association Between Talc Use   95
                and Ovarian Cancer article
25

Page 10

1  EXHIBITS CONTINUED:                    PAGE
2  Exhibit 19  NCI, SEER Training Modules    130
        Risk Factors
3
4  Exhibit 20  NCI article, Ovarian, Fallopian    132
        Tube and Primary Peritoneal
5       Cancer Prevention PDQ-Health
        Professional Version
6
7  Exhibit 21  Handwritten notes              156
        (Inside Binder Exhibit 13)
8
9  Exhibit 22  Genital Talc Exposure and Risk    179
        of Ovarian Cancer article
10
11 Exhibit 23  Genital Powder Exposure article  179
12
13 Exhibit 24  9/29/18 e-mail string           184
14
15 Exhibit 25  Perineal Talc Exposure article   189
16
17 Exhibit 26  Letter to Samuel Epstein, MD    203
18
19 Exhibit 27  IARC Agents Classified by IARC   206
        Monographs, Volumes 1-123
20
21
22
23
24
25

Page 11

1           San Francisco, California
2              February 7, 2019
3                 9:20 a.m.
4
5           REBECCA SMITH-BINDMAN, M.D.,
6  being first duly sworn or affirmed to testify to the
7  truth, the whole truth, and nothing but the truth,
8  was examined and testified as follows:
9           THE VIDEOGRAPHER:  We are now on the
10 record.  My name is Joseph morgue.  I'm a
11 videographer for Golkow Litigation Services.
12         Today's date is February 7, 2019.  The
13 time on the video monitor is 9:20 a.m.
14         This video deposition is being held at
15 1700 Montgomery Street, Suite 250, San Francisco,
16 California, in the matter In Re: Johnson & Johnson
17 Talcum Powder Products Marketing, Sales Practices,
18 and Products Liability Litigation, for the United
19 States District Court, for the District of
20 New Jersey.
21         The deponent is Dr. Rebecca Smith-Bindman.
22 Counsel will be noted on the stenographic record.
23 The court reporter is Mary Goff.  She will now
24 administer the oath.
25

Page 12

1         REBECCA SMITH-BINDMAN, M.D., VOLUME I,
2  being first duly sworn or affirmed to testify to the
3  truth, the whole truth, and nothing but the truth,
4  was examined and testified as follows:
5         EXAMINATION BY COUNSEL FOR THE DEFENDANTS
6  BY MR. ZELLERS:
7     Q   State your name.
8     A   Rebecca Smith-Bindman.
9     Q   Dr. Bindman, we are here today to take
10 your deposition in the talcum powder MDL litigation.
11 Are you aware of that?
12    A   I am.
13    Q   Have you been deposed before?
14    A   I have.
15    Q   On how many occasions?
16    A   Three to four times.
17    Q   Have you ever testified at trial?
18    A   I have.
19    Q   On how many occasions?
20    A   One.
21    Q   You are generally familiar with the rules
22 we're going to follow here today?
23    A   I am.
24    Q   If at any time I ask you a question or any
25 counsel asks you a question that you don't

Page 13

1  understand, please don't answer it.  Tell us you
2  don't understand, and we'll rephrase the question or
3  repeat it so it's clear to you.
4         Can you do that?
5     A   I can.
6     Q   If you answer a question, is it fair for
7  us to assume that you understood it?
8     A   It is.
9     Q   Please don't guess or speculate as to any
10 answers.  If you don't know the answer to a question
11 or it would call you to guess or speculate, tell us.
12        Can you do that?
13    A   I can.
14    Q   If at any time you need to take a break as
15 we proceed through the day, please tell us.  And
16 once we finish whatever line of questioning we're
17 involved with, then we will take a break.
18    A   Okay.
19    Q   Tell us the times that you have been
20 deposed.  When is the last time you were deposed?
21    A   I think approximately six years ago.
22    Q   What was the litigation or the matter?
23    A   I have been deposed a few times.  I'm not
24 sure which happened when --
25    Q   That's fine.

Page 14

1    A   -- but I can tell you in general what they
2    were about.
3    Q   Tell us -- the three to four times that
4    you have been deposed, will you tell us what each of
5    those matters was?
6    A   Yes.  I am in addition to being an
7    epidemiologist, I'm a clinical radiologist.  And
8    each of those cases had to do with diagnosis and
9    communication within medical malpractice cases.
10       One case had to do with a delayed
11   diagnosis of breast cancer and not communicating
12   results.
13       One case had to do with a misdiagnosis of
14   a first trimester pregnancy loss.
15       One case had to do with misdiagnosis of a
16   complication of a twin/twin pregnancy.  I think
17   those are the cases I was deposed in.
18   Q   All of the cases in which you have been
19   deposed previously have been medical malpractice
20   cases?
21   A   Yes.
22   Q   Were those cases in which you had provided
23   treatment to a patient or were they cases in which
24   you were an expert witness independent of that
25   particular plaintiff?

Page 15

1    A   For each of those cases, I was an expert
2    witness.  I had never personally been involved in a
3    medical malpractice cases.
4    Q   Were each of those cases in the
5    San Francisco area or where were they located?
6    A   None of those cases were in the
7    San Francisco area.  One of them was in Huntsville
8    Alabama, one was in Northern California, and one was
9    in Southern California.
10   Q   Do you remember the names of any of those
11   cases?
12   A   I do not.
13   Q   Do you remember the name of the lawyer or
14   lawyers that you worked with in those cases?
15   A   I do not.
16   Q   Did you testify in those cases on behalf
17   of the plaintiff or on behalf of a defendant?
18   A   They were split.  So I have been involved
19   in cases on both slides.
20   Q   Well, my understanding is you have been
21   involved in three prior litigations; is that right
22   --
23       MS. O'DELL:  Object to the form.
24   Q   (BY MR. ZELLERS) -- in which you served as
25   an expert witness and were deposed?

Page 16

1    A   And -- and I was deposed.
2        MS. O'DELL:  Excuse me.
3    Q   (BY MR. ZELLERS) Yes.  So three prior
4    litigations in which you served as an expert and you
5    were deposed; is that right?
6    A   I --
7        MS. O'DELL:  Object to the form.  I think
8    she said four, but --
9        MR. ZELLERS:  Well, she said three to
10   four.  But then when she was telling us about those
11   cases --
12   A   -- so I remember what was fourth case was.
13   Q   (BY MR. ZELLERS) All right.  What was the
14   fourth case?
15   A   There was a case of delay in the diagnosis
16   of an ovarian cancer.
17   Q   Where was that case?
18   A   Somewhere in the middle of the country.
19   Q   When did you testify in that case?
20   A   I -- I only testified in a single case.
21   So it -- do you mean deposed?
22   Q   Yes.  When were you deposed in that case?
23   A   I -- sometime between -- all of the cases
24   were sometime between six and 12 years ago.  I'm
25   not --

Page 17

1    Q   All right.  Did --
2    A   -- sure I remember the years.
3    Q   The case in which you testified as an
4    expert witness in the delay of diagnosis of ovarian
5    cancer, were you testifying for the defense or for
6    the plaintiff?
7    A   I believe that case was for the defense.
8    Q   Do you remember the name of the plaintiff?
9    A   I do not.
10   Q   Do you remember the name of the defendant?
11   A   I do not.
12   Q   Do you remember the name of the attorney
13   who retained you?
14   A   I do not.
15   Q   Do you remember where in the middle of the
16   country that case was pending?
17   A   I do not.
18   Q   You stated that you have testified one
19   time at trial; is that right?
20   A   Yes.
21   Q   Where did you testify at trial?
22   A   That was Huntsville -- the Fayetteville,
23   Alabama case.
24   Q   In that case, did you testify for the
25   plaintiff or the defense?

Rebecca Smith-Bindman, M.D.

Page 18

1    A    For the plaintiff.
2    Q    Do you remember how long ago it was?
3    A    In the ballpark of seven or eight years
4 ago.
5    Q    The Northern California case that you gave
6 deposition testimony in that -- in, was that for the
7 plaintiff or the defense?
8    A    I don't remember.
9    Q    Southern California, that medical
10 malpractice case, did you testify for the plaintiff
11 or the defense?
12   A    Can I go back?  I -- I do remember.
13        So the Northern California case was the
14 plaintiff.  The Southern California case was the
15 defense.
16   Q    Do you remember the attorneys that you
17 worked with in the Northern California case?
18   A    I do not.
19   Q    The Southern California case?
20   A    I do not.
21   Q    Do you remember the name of any of the
22 parties in any of the cases in which you have either
23 given deposition testimony in or trial testimony in?
24   A    I do not.
25   Q    Today I'm going to ask you questions about

Page 19

1 talcum powder or baby powder.  Can we agree that
2 when I refer during the deposition to products, to
3 talc products, talcum powder products, baby powder,
4 or Shower to Shower at issue in this MDL, that I am
5 referring to the baby powder product manufactured by
6 Johnson & Johnson Consumer Products, Inc., and the
7 Shower to Shower product that was formerly
8 manufactured by Johnson & Johnson Consumer Products,
9 Inc.?
10   A    Yes.
11   Q    How would you define the area of expertise
12 in which you were offering opinions in this case,
13 "this case" being the talc MDL?
14   A    I was asked to provide an expert review in
15 the area of epidemiology, ovarian cancer and its
16 causes, the health effects of talc powder products.
17 I think those are the main areas.
18   Q    Are -- are you testifying today as an
19 epidemiologist?
20   A    Yes.
21        MS. O'DELL:  Object to --
22   A    Am --
23        MS. O'DELL:  -- the form.
24   A    -- I bringing expertise to that?
25   Q    (BY MR. ZELLERS) Yes.

Page 20

1    A    Yes.
2    Q    You are not testifying here today as a
3 radiologist; is that right?
4        MS. O'DELL:  Object to the form.
5    A    I think some of my experiences as a
6 radiologist are highly relevant to my expertise, and
7 so there are some questions that I think that that
8 is very relevant.
9    Q    (BY MR. ZELLERS) Are there any areas in
10 which you anticipate providing expert testimony in
11 this litigation, other than in the areas of
12 epidemiology and radiology?
13        MS. O'DELL:  Object to the form.
14   A    I mentioned ovarian cancer.  So risk
15 factors for ovarian cancer falls into epidemiology.
16        The mechanism of ovarian cancer, the
17 pathophysiology, the biological processes are not
18 technically epidemiology.  They're related, and so
19 some of my opinions, I think, would fall into that
20 category.
21   Q    (BY MR. ZELLERS) How would you define that
22 area of expertise for which you are providing expert
23 opinions?
24        MS. O'DELL:  Object to the form.
25   Q    (BY MR. ZELLERS) We have got that you are

Page 21

1 going to provide expert opinions relating to
2 epidemiology.  You're going to provide expert
3 opinions relating to radiology.
4        Are there any other areas that you intend
5 to provide expert opinions in?
6        MS. O'DELL:  Other than what she has just
7 described?
8    Q    (BY MR. ZELLERS) Well, other than
9 epidemiology and radiology.
10        MS. O'DELL:  Object to the form.  She gave
11 another -- a host -- a suite of things she expected
12 to testify on, but --
13        MR. ZELLERS:  And so --
14        MS. O'DELL:  -- I'll object to the form.
15        MR. ZELLERS:  -- yeah, thank you.
16   A    Could you repeat back to me what I have
17 already said?
18   Q    (BY MR. ZELLERS) No.  I'm asking you what
19 you are going to provide expert testimony in, what
20 you consider yourself to be an expert in.
21        I understand epidemiology, and I
22 understand the epidemiology opinions you are going
23 to give, relate to whether or not talcum powder is
24 associated with ovarian cancer, whether or not
25 talcum powder causes ovarian cancer, so I believe

Rebecca Smith-Bindman, M.D.

Page 22

1 those are epidemiology-based opinions.
2      I also understand that you have a -- your
3 training and your background is in radiology and
4 that you will provide, to the extent relevant,
5 radiology opinions.
6      But you're not testifying here today as a
7 gynecologic oncologist, are you?
8   A   I am not.
9   Q   You are not testifying here today as an
10 expert in asbestos; is that fair?
11     MS. O'DELL:  Object to the form.
12   A   I am going to provide opinions, if asked,
13 about the health effects of asbestos.
14   Q   (BY MR. ZELLERS) Are you an expert or do
15 you consider yourself to be an expert in asbestos?
16     MS. O'DELL:  Object to the form.
17   A   The question is about asbestos, in
18 general, and I consider myself an expert on the
19 health effects of asbestos.
20   Q   (BY MR. ZELLERS) Does that mean that you
21 are an expert in asbestos or simply looking at
22 studies that have evaluated the epidemiology of
23 asbestos and asbestos exposure to certain
24 conditions?
25     MS. O'DELL:  Object to the form.

Page 23

1   A   I think there are a lot of acts -- aspects
2 of asbestos, so I would absolutely not consider
3 myself an expert on the geology of asbestos or in
4 the mechanism of mining asbestos.
5      But I would consider myself an expert on
6 the changes to the body that can be the result of
7 exposure to asbestos in the context of epidemiology
8 studies, but also in the context of molecular
9 changes, cellular changes like that.
10     And -- and those technically are probably
11 not in the category of epidemiology, but would
12 overlap other areas of my training and experience,
13 such as pathology and...
14   Q   You are not an expert in the testing of
15 asbestos; is that fair?
16   A   I -- I would, yes, agree.
17   Q   You are not an expert in the different
18 forms and types of asbestos --
19   A   I --
20   Q   -- correct?
21   A   -- I -- correct.
22   Q   Okay.
23   A   I'm not an expert in those types of --
24   Q   You are --
25   A   -- asbestos.

Page 24

1   Q   -- not an expert -- well -- and let me
2 withdraw that.
3      You have produced an expert report in this
4 case; is that right?
5   A   I have.
6   Q   Let's mark a couple of things at the
7 outset.
8      Deposition Exhibit 1 is copy of the Notice
9 of Deposition.
10     (Exhibit 1 was marked for identification
11 and is attached to the transcript.)
12     MS. O'DELL:  Thank you.
13   Q   (BY MR. ZELLERS) Have you seen the Notice
14 of Deposition prior to today?
15   A   Yes, I have.
16   Q   Have you either brought with you or
17 through counsel have they brought all of the
18 materials that you believe are responsive to the
19 Deposition Notice?
20     MR. ZELLERS:  And, Ms. O'Dell, I recognize
21 that you have objected to the Deposition Notice and
22 the record will reflect that.
23     MS. O'DELL:  And just so I have a chance
24 to say something, we'll just reassert those
25 objections now.

Page 25

1      Dr. Smith-Bindman has brought with her
2 documents subject to our objections.
3      MR. ZELLERS:  And I would really like
4 Dr. Smith-Bindman to answer the question.
5      MS. O'DELL:  I'm sure she's ready to do
6 that.
7   A   To the best of my knowledge, I have
8 responded or brought or provided all of --
9   Q   (BY MR. ZELLERS) You --
10   A   -- those items.
11   Q   -- you are not aware of items that are
12 called for in the Deposition Notice, what we have
13 marked as Exhibit 1 that have not been produced or
14 not available here today; is that right?
15   A   That's correct.
16   Q   Ms. O'Dell and I spoke earlier about your
17 invoices, and apparently you do have some invoices
18 relating to your work in this matter.  At some point
19 today we'll collect those and we will mark those.
20     (Exhibit 2 was marked for identification
21 and is attached to the transcript.)
22   Q   (BY MR. ZELLERS) Deposition Exhibit 2 is
23 your report in this matter; is that right?
24     MS. O'DELL:  Thank you.
25   A   Okay.  Yes.

Page 26

1    Q   (BY MR. ZELLERS) Does your report in this
2  matter, Deposition Exhibit 2, contain all of the
3  opinions that you intend to offer at trial or at any
4  hearing in this matter?
5    A   The report summarizes my opinions.  I have
6  written in the report.  As new information comes
7  available, I may take that into account as well.
8        So when we began, counsel mentioned a few
9  additional papers that I had seen since the time my
10  report was written.  And so those are -- are --
11  won't -- have not changed my views, but those are
12  not necessarily referenced in this report.
13    Q   In terms of your opinions and the opinions
14  that you expect to render in this matter, either at
15  trial or any hearing, those opinions are contained
16  in your report which we marked as Exhibit 2,
17  correct?
18        MS. O'DELL:  Object to the form.
19    A   I have not, since writing my report, seen
20  any documents that have changed my opinions.
21        But as I continue to keep up with the
22  published literature, my opinions may reflect
23  changing documents that I have seen since the time
24  my report was generated.
25

Page 27

1    Q   (BY MR. ZELLERS) All I can do is ask you
2  questions today.  As of today, does your report
3  contain the opinions that you expect to provide at
4  any trial or hearing in this matter?
5    A   Yes, they do.
6    Q   My understanding from one of your prior
7  answers is that you have reviewed some additional
8  materials since you prepared and signed your report
9  on or about November 15 of 2018; is that right?
10    A   That is correct.
11    Q   Those materials, you believe, support the
12  opinions that you have put in your report, but have
13  not changed your opinions; is --
14    A   It --
15    Q   -- that right?
16    A   -- that's correct.
17    Q   What new or additional materials have you
18  reviewed and considered since preparing your report
19  on November 15, 2018?
20    A   So I have seen a draft of a publication --
21  submitted for publication by Dr. Saed about the
22  cellular and molecular changes to cell lines of
23  being exposed to various talcum powder products,
24  which I think is an important paper that has
25  influenced my views.

Page 28

1    Q   Okay.  Right now all I want to do is get a
2  list of what you have looked at and considered since
3  you prepared your report.
4    A   I have seen an updated testing report by
5  Mr. Longo.
6        I have seen a report and deposition by
7  Mr. Cooke.  I -- I think those are the...
8    Q   You -- counsel for Plaintiffs, Ms. O'Dell,
9  told me before the deposition that you also have
10  looked at a health assessment from Health Canada or
11  a risk assessment; is -- is that correct?
12    A   Yes, that's correct.
13    Q   All right.  Did you also look at a
14  meta-analysis that was performed or at least the
15  draft of a meta-analysis by the first name, author,
16  Thayer (phonetic)?
17    A   I -- I saw that report briefly.
18    Q   Anything else that you have reviewed
19  and/or considered that is not included in the
20  materials that you reference either in your list of
21  references or in your Materials Considered List?
22    A   There was also a series of reports in --
23  in The New York Times and Reuters and a summary of
24  that in the BMJ, which I have seen since I have
25  issued my report.

Page 29

1    Q   Are you basing any of your opinions on the
2  Reuters or New York Times articles?
3    A   Those reports support my opinions, but no,
4  I'm not basing my report on -- on those.
5    Q   Ms. O'Dell also provided me with a list
6  materials that she has represented that you have
7  reviewed since you prepared your report.
8        It's a series of Imerys documents.  It's
9  one J&J produced document.  And then the last item
10  listed is an Amended Expert Report of Robert Cooke.
11        Have you reviewed those materials since
12  preparing your report?
13    A   So yes, the -- the Mr. Cooke report, which
14  is one I mentioned.  Yes, I have seen the Imerys
15  report.  And I can't remember what you said, the
16  Johnson & Johnson?
17    Q   Are those additional documents or
18  materials that you have reviewed since preparing
19  your report?
20    A   I'm sorry.  I understand the question.  I
21  don't remember what the Johnson & Johnson material
22  was.
23    Q   I --
24    A   You listed it.  I just don't --
25    Q   -- well, I didn't --

Page 30

1    A    -- remember that.
2    Q    -- list it.  This was a list that was
3    prepared and provided to me by counsel for
4    Plaintiffs so --
5         MS. O'DELL:  But I don't think he
6    characterized the documented in any way other than
7    the Bates number, so -- so it's a J&J document --
8    A    What is that item?
9         MS. O'DELL:  -- that's just the Bates
10   number for that particular document.  And it's
11   the -- test results that you reviewed yesterday.
12   A    Yes.
13        (Exhibit 3 was marked for identification
14   and is attached to the transcript.)
15   Q    (BY MR. ZELLERS) Are all of the documents
16   contained on Exhibit 3, the -- a listing that was
17   put together by counsel for the Plaintiffs,
18   documents that you reviewed yesterday in preparation
19   for your deposition today?
20   A    Yes.
21   Q    Are those documents that were selected by
22   plaintiffs' counsel to show you to help prepare you
23   for the deposition?
24        MS. O'DELL:  Object to the form.
25   A    The document are ones that I asked for to

Page 31

1    see testing results, both positive and negative,
2    from Johnson & Johnson.  So I requested documents
3    that would show that, and I believe that's what each
4    of these were provided for.
5    Q    When did you make that request to
6    plaintiffs' counsel?
7         MS. O'DELL:  And Mr. Zellers is -- he can
8    ask you when you made the request.  In terms of the
9    specifics of the request or conversations with
10   counsel, those would be protected, and I would
11   instruct you not to -- to disclose those.
12   A    To not say when I read the request?
13        MS. O'DELL:  You can say when you gave the
14   request.  But the substance of the request or the
15   substance of the discussions, I would have ask you
16   not to --
17   A    Okay.
18        MS. O'DELL:  -- testify to those.
19   Q    (BY MR. ZELLERS) My question again is:
20   When did you make the request for the documents that
21   are identified on Exhibit 3?
22   A    I believe it was a few weeks ago.
23   Q    You made a request for testing documents
24   of talcum powder used in Johnson & Johnson Consumer,
25   Inc., baby powder or former Shower to Shower powder;

Page 32

1    is that right?
2    A    Yes, I did.
3         MS. O'DELL:  Object to the form.
4    Q    (BY MR. ZELLERS) You asked for documents
5    that were both positive and negative relating that
6    testing; is that right?
7    A    Yes.
8    Q    Do you believe that you have now seen, as
9    part of your review, all documents relating to the
10   testing of Johnson's baby powder and/or Shower to
11   Shower powder?
12   A    I --
13        MS. O'DELL:  Object to the form.
14   A    -- I do not believe I have seen the
15   entirety of the testing results.
16   Q    (BY MR. ZELLERS) Was it your request that
17   you see whatever pertinent documents that were
18   relating to the testing of the baby powder?
19   A    It was not my request.  I wanted to
20   understand, in general, what kind of testing had
21   been done.  I -- I was not planning to delve into
22   the entirety of testing.
23   Q    Any other materials that you have reviewed
24   prior -- strike that -- subsequent to preparing your
25   report, which we marked as Exhibit 2?

Page 33

1    A    None that come to mind.
2    Q    You have brought with you here today
3    several notebooks and it looks like a blue folder;
4    is that right?
5    A    Yes.
6    Q    What is contained in the blue folder that
7    you brought here today?
8    A    Primarily in the blue folder are either
9    additional documents that I have reviewed since I
10   wrote my report, but also a few documents that -- in
11   preparation for the deposition, I went through my
12   report and pulled some articles to look at in
13   greater depth, and so I brought those with --
14   Q    So --
15   A    -- me.
16   Q    -- in the blue folder are materials that
17   you pulled out to have available for the deposition
18   today for your use as needed in responding to
19   questions that were asked?
20   A    Yes, that's correct.
21   Q    Can I see you blue folder, please?  And,
22   Dr. Smith-Bindman, have you taken any medications
23   that impair your ability to answer questions today?
24   A    I have not.
25   Q    All right.  The first document in your

Page 34

1 blue folder is a document, "Reproductive Sciences"
2 at the top, "Molecular basis Supporting the
3 Association of Talcum Powder Use with Increased Risk
4 of Ovarian Cancer."
5         The first named author is Nicole Fletcher.
6         And is this the article by Dr. Saed that
7 you sold me about?
8     A   Yes, it is.
9     Q   There are a number of notes and
10 highlighting that are contained in the document.
11 Are all of those your notes and highlighting?
12    A   They are.
13    Q   We'll mark your copy of Dr. Saed's paper
14 as Exhibit 4.
15        (Exhibit 4 was marked for identification
16 and is attached to the transcript.)
17    Q   (BY MR. ZELLERS) The next paper in your
18 blue folder that you brought here today is a
19 document with the first named author, Fiume,
20 F I U M E. The title is "Safety Assessment of Talc
21 as Used in Cosmetics."
22        It appeared in the International Journal
23 of Toxicology.  Again, there's highlighting in the
24 document and underlying lining.
25        Did you do the highlighting and did you do

Page 35

1 the underlining in this document?
2     A   Yes, I did.
3     Q   We'll mark that document, your copy, as
4 Exhibit 5.
5         (Exhibit 5 was marked for identification
6 and is attached to the transcript.)
7     Q   (BY MR. ZELLERS) I see here that there is
8 the IARC monograph dated 2010 on the evaluation of
9 carcinogenic risk to humans.
10        The bottom part of page 1 is torn off.  Do
11 you know why that is?
12    A   I do not.
13    Q   All right.  So the first page gives a date
14 reference of 2010.  The second page gives -- well,
15 it also lists a 2006 date and a 2010 date.  There is
16 highlighting throughout.
17        Whose highlighting is contained in the
18 document that we'll mark as Exhibit 6?
19    A   That would be mine.
20        (Exhibit 6 was marked for identification
21 and is attached to the transcript.)
22    Q   (BY MR. ZELLERS) We then have a news
23 article from the British Medical Journal that was
24 published December 28 of 2008.  It's just a one-page
25 document with underlining and writing on it.

Page 36

1         Are those your notations?
2     A   Yes, they are.
3     Q   All right.  We'll mark that as Exhibit 7.
4         (Exhibit 7 was marked for identification
5 and is attached to the transcript.)
6         (Exhibit 8 was marked for identification
7 and is attached to the transcript.)
8     Q   (BY MR. ZELLERS) Exhibit 8 are the
9 classifications of the International Agency for
10 Research on Cancer or IARC.
11        Are you generally familiar with the IARC
12 classifications relating to the carcino --
13 carcinogenicity of different agents?
14    A   I am.
15    Q   The next document in your folder that also
16 has some underlining and highlighting is on "Talc
17 Translocation from the Vagina to the Oviducts and
18 Beyond."
19        (Exhibit 9 was marked for identification
20 and is attached to the transcript.)
21    Q   (BY MR. ZELLERS) This is an article that
22 was published in 1985.  The first named author is
23 A.P. Wehner.
24        Is this also a document that you brought
25 here today?

Page 37

1     A   It is.
2     Q   The highlighting in the document, is that
3 your document -- strike that.
4         Is that your highlighting?
5     A   It -- it is.
6     Q   Are all of these documents either on your
7 reference list or on your Materials Considered List,
8 other than what you told us about at the start of
9 the deposition?
10    A   Yes.
11    Q   We have Deposition Exhibit 47 from the
12 Pier deposition.  I will not mark that.
13        We have an article here by Shukla,
14 S H U K L A, "Alterations in Gene Expression in
15 Human Mesothelial Cells Correlate with Mineral
16 Pathogenicity."
17        (Exhibit 10 was marked for identification
18 and is attached to the transcript.)
19    Q   (BY MR. ZELLERS) Is that a document that
20 you brought here today?
21    A   Yes, it is.
22    Q   Are the highlights and writing on that
23 document yours?
24    A   Yes, they are.
25    Q   You have an article by Biz'Zard that was

Page 38

1  published in -- is that -- Phytotherapy Research,
2  2007; is that right?
3     A   Yes.
4     Q   There do not appear to be any handwriting
5  on that document, so I won't mark it.
6        We have got the Hopkins Deposition
7  Exhibit 28.  There's no highlighting on that
8  document.
9        And then we have the "Draft Screening
10 Assessment" from Health Canada dated December 2018.
11       Is the highlighting in that document
12 yours?
13    A   Yes, it is.
14    Q   All right.  We'll mark that as
15 Deposition Exhibit 11.
16       (Exhibit 11 was marked for identification
17 and is attached to the transcript.)
18    Q   (BY MR. ZELLERS) Have we covered all of
19 the documents that you have brought with you today
20 in your blue folder?
21    A   Yes.
22    Q   All right.  Let me see your two notebooks
23 that you also have brought with you today.  One
24 notebook is "Talc Articles I."  The second notebook
25 is "Talc Articles II."

Page 39

1        Are all of the articles that are contained
2  in these two notebooks, articles that are contained
3  either on your reference list or on your reliance
4  materials list?
5     A   Yes, they are.
6     Q   As I go through this quickly, it appears
7  that there is underlining and highlighting of the
8  articles that you have brought here today; is that
9  right?
10    A   Yes, it is.
11    Q   Is all of the highlighting and underlining
12 and marking, are those your highlights and marking?
13    A   Yes, they are.
14    Q   Who prepared the notebooks?  And let's
15 mark Talc Articles I, the entire notebook as
16 Exhibit 12.
17       (Exhibit 12 was marked for identification
18 and is attached to the transcript.)
19    Q   (BY MR. ZELLERS) Talc Articles II, the
20 entire notebook, as Exhibit 13.
21       (Exhibit 13 was marked for identification
22 and is attached to the transcript.)
23    Q   (BY MR. ZELLERS) Who prepared Exhibits 12
24 and 13 for you?
25    A   I did.

Page 40

1     Q   Did you have any staff that helped you in
2  terms of your review of materials and preparation of
3  your report other -- other than Dr. Hall?
4     A   I had a copy editor -- once I had a draft
5  of my report -- review it.
6     Q   Who is your copy editor?
7     A   Her name is Chris Tachibana.
8     Q   And where is she employed?
9     A   She is a freelance medical copy editor.
10    Q   What role did she play in your review and
11 analysis of materials and your -- the preparation of
12 your report?
13    A   So she played no role in the review -- or
14 the drafting of the report, but she reviewed a draft
15 near the end for grammatical issues to remove
16 redundancy.
17       She's someone I work with a great deal for
18 my medical publications, and so --
19    Q   You have worked with her in the past -- I
20 --
21    A   That's right --
22    Q   -- is that right?
23    A   -- yes.
24    Q   Is she here in the San Francisco area?
25    A   She is not.

Page 41

1     Q   Where is she located?
2     A   She splits her time between Seattle,
3  Washington, and Germany.
4     Q   She charges for her services; is that
5  right?
6     A   She does.
7     Q   Are those charges that you paid or that
8  were paid by plaintiffs' counsel?
9     A   They have not yet been paid, but the plan
10 is for her to submit those invoices.  And it will
11 come out of my fees, but will be paid by the
12 counsel.
13    Q   All right.  When you submit invoices,
14 will -- the charges for the copy editor, will those
15 be included in your invoice to plaintiffs' counsel?
16    A   My plan is for it to come out of my fee.
17 So I am paying for it, but it should be literally
18 paid by counsel, since I'm not able to pay and
19 deduct taxes or pay taxes or -- or so -- or...
20    Q   All right.  You will pay it out of your
21 pocket and will not include it on your statement to
22 plaintiffs' counsel; is that right?
23    A   That's correct.
24    Q   Approximately how much have you paid or
25 will you pay to your copy editor?

Page 42

1    A   I believe the total is in the ballpark of
2  about 1,500 or $1,700.
3    Q   How about Dr. hall?  Are her fees being
4  paid by you or are they being paid by plaintiffs'
5  counsel?
6    A   Her fees are being paid by counsel.
7    Q   Dr. Hall either has or will submit her own
8  separate invoice relating to her work on this
9  matter?
10   A   Yes.
11   Q   Has she already done that?
12   A   I believe she has submitted it.  I -- I'm
13  not 100 percent sure.
14   Q   Do you know what Dr. Hall's fees are at
15  least through the present time relating to her work
16  on this matter?
17   A   I believe the amount is in the ballpark of
18  the same 1,500 to $2,000.
19   Q   You believe, though, that Dr. Hall either
20  has or will be submitting invoice -- an invoice
21  separately for her work to plaintiffs' counsel; is
22  that right?
23   A   Yes.
24   Q   You have submitted invoices; is that
25  right?

Page 43

1    A   I have.
2    Q   When were you first retained in this
3  matter -- well, strike that.
4        When were you first contacted with
5  respect to this litigation, the talcum powder MDL?
6    A   My recollection is mid-2017.
7    Q   Who contacted you in mid-2017?
8    A   I was initially contacted by a law firm
9  that i believe was helping the law firms find expert
10  witnesses and asked if I would be willing to speak
11  with them to see if this could be something that I
12  would be interested in doing.
13   Q   What law firm or lawyer contacted you
14  initially in mid-2017?
15   A   I -- I don't remember that initial
16  contact.
17   Q   You don't remember the name of the lawyer
18  or the law firm that initially contacted you in this
19  matter?
20   A   The initial law firm basically asked me if
21  I would be willing to speak to these lawyers, and I
22  do not know the name of that lawyer who originally
23  contacted me.
24   Q   Did you ever speak to that lawyer again?
25   A   No.

Page 44

1    Q   What did that lawyer tell you or ask you
2  about this engagement?
3    A   They told me that there was a -- a case
4  that they would like some epidemiology research on
5  and that they thought I would be a very good fit and
6  would I be willing to speak with them.
7        I don't believe they even told me what the
8  content of -- of the case was about, but rather,
9  that it was a case.  And the role that they were
10  seeking was as an epidemiologist, not as a
11  radiologist or on the medical care.
12   Q   Was this a phone call or an e-mail or how
13  did they contact you?
14   A   I believe it was a short e-mail followed
15  by a short phone call.
16   Q   I mean, do you keep those e-mails?  And if
17  at some point we ask for them to be produced, is
18  that something you could do?
19   A   For the particular e-mail that you are
20  asking about, I cannot find it.  So I don't have
21  that.  I looked.
22   Q   You were contacted by a lawyer or law
23  firm, asked if you would be willing.
24        You said you would be willing without even
25  knowing what the matter related to?

Page 45

1    A   I didn't say I would be willing to be an
2  expert.  I said I would be willing to have a
3  conversation with the lawyers to learn about the
4  case.
5    Q   Were you told at that time that the case
6  related to talcum powder?
7    A   I was not.
8    Q   Were you told at that time that the
9  medical issue in the case related to ovarian cancer?
10   A   I do not believe I was.
11   Q   What is the next contact then that you had
12  with any lawyer relating to this matter?
13   A   So then a phone call was set up between
14  myself and, I believe it was, three lawyers involved
15  in this litigation and told about the -- what the --
16  what the case was about and told what they were
17  looking for to see if I would be interested in
18  speaking with them.
19        And that lead to an in-person meeting
20  where we then discussed what the case was about.
21   Q   When was the phone call with the three
22  attorneys?
23   A   All of this was in mid-2017, June-July
24  time frame.
25   Q   The same question.  When was the in-person

Page 46

1  meeting?
2     A   Within that same -- maybe a month later,
3  but same time frame.
4     Q   Was the in-person -- strike that.
5         Where was the in-person meeting?
6     A   It was in my office in San Francisco.
7     Q   Who were the three attorneys that you
8  spoke with initially over the phone and then met
9  with in person?
10    A   So Dr. Thompson was one; John Restaino was
11 one; and a third lawyer whose name is alluding me.
12    Q   Was it a man or a woman?
13    A   A woman.
14    Q   Is it a lawyer that you have had any
15 further contact with or communications with?
16    A   Yes.
17    Q   But you can't remember her name?
18    A   I can't.  But if we give it a minute, I
19 think I will be able to.
20    Q   Well, if you do remember it at some point
21 today, let us know.
22        When you had the phone call with
23 Ms. Thompson and with Mr. Restaino and this third
24 lawyer in the in-person meeting, what did they ask
25 you to do?

Page 47

1     A   They asked me if I would be willing to do
2  a comprehensive and unbiased review of the
3  literature around talcum powder products and ovarian
4  cancer.
5     Q   Did they ask you to do anything else?
6     A   Well, they asked if I would be willing to
7  be an expert witness in this case.
8     Q   Anything else?
9     A   Nothing else that I can recall.
10    Q   You said you would do a review of the
11 literature, correct?
12    A   I -- yes --
13    Q   You --
14    A   -- I did.
15    Q   -- you said that you would be willing to
16 serve as an expert for Plaintiffs, correct?
17        MS. O'DELL:  Object to the form.
18    A   I -- I hesitated on the last question
19 because I was very upfront and clear that I was
20 willing to do a review, but that I did not know this
21 field in any great depth and that I would only be
22 interested in doing that if I was permitted to do
23 the review the same as I do in my other scientific
24 work and that I didn't know if my conclusion would
25 support my becoming an expert on their behalf.

Page 48

1     Q   (BY MR. ZELLERS) You understood they
2  represented the Plaintiffs in this litigation --
3     A   Yes.
4     Q   -- is that right?
5     A   Yes.
6     Q   You told them that you would be willing to
7  do the review.  You did not at that point agree to
8  serve as an expert witness for the Plaintiffs; is
9  that fair?
10    A   That's fair.
11    Q   Did you then go and do your review,
12 literature review?
13    A   Yes, I did.
14    Q   You, at least at that point in time, had
15 never previously done any research or review
16 relating to talcum powder or relating to any
17 potential association between talcum powder,
18 perineal talcum powder use, and ovarian concern; is
19 that right?
20    A   That's correct.
21        MS. O'DELL:  Object to the form.
22    Q   (BY MR. ZELLERS) You went out and reviewed
23 the literature; is that right?
24    A   Yes.
25    Q   Did plaintiff's counsel, the two lawyers

Page 49

1  that you met -- well, strike that.
2         The three lawyers you met with, did they
3  provide you with some articles to get started with?
4     A   They provided access to a database, a
5  Dropbox, where they had a large number of articles
6  that they made available to me.
7     Q   You reviewed those articles.  Did you then
8  have another meeting or communication with the
9  plaintiffs' lawyers?
10        MS. O'DELL:  Object to the form.
11    A   I had several meetings with the lawyers
12 over the subsequent year.
13    Q   (BY MR. ZELLERS) Eventually were you
14 asked, you know, to render an opinion on a topic or
15 topics?
16        MS. O'DELL:  Object to the form.
17    A   I -- I was asked to draft a report of my
18 review of the -- the literature and the data that
19 were available.
20    Q   (BY MR. ZELLERS) At this time were there
21 any new lawyers that you were meeting with on the
22 plaintiffs' side or was it still the three original
23 lawyers?
24    A   They were -- I -- I believe those would
25 be -- I think there was one additional lawyer

Rebecca Smith-Bindman, M.D.

Page 50

1  that --
2     Q   Do you remember his or her name?
3     A   Her name.  Breanne was her first name.
4     Q   Do you know Breanne's last name?
5     A   Maybe Cope or something that's similar to
6  Cope.
7     Q   You reviewed the articles.  You were asked
8  then by Plaintiffs to write up something relating to
9  the articles; is that right?
10    A   Yes.
11       MS. O'DELL:  Object to the form.
12    Q   (BY MR. ZELLERS) At some point did either
13  you suggest or the plaintiff lawyers ask you to form
14  certain opinions relating to this matter?
15       MS. O'DELL:  Object to the form.
16    A   I'm not -- I'm not sure what you mean,
17  "form opinions."
18    Q   (BY MR. ZELLERS) You met with the lawyers;
19  is that right, after you had done your literature
20  review?
21    A   Yes.
22    Q   You had not yet agreed to be an expert
23  witness for the Plaintiffs; is that right?
24    A   Yes.
25    Q   After you had done your literature review,

Page 51

1  did the plaintiffs' lawyer say:  Well,
2  Dr. Smith-Bindman, do you have an opinion as to
3  whether or not there's an association between
4  perineal talcum powder use and ovarian cancer?
5     A   I don't remember any such conversation.
6  I -- I think from the very beginning the lawyers
7  were guessing that I was going to feel strongly that
8  there's a strong association.  So I don't remember
9  being retained as an expert after my report came
10  out.
11       At -- at some point I think it became
12  clear to them when I explained my views that they
13  would like to have me be an expert.
14       But I don't remember a particular
15  conversation where they asked me to -- where they
16  linked my being an expert to the finished product of
17  the report.  By the time I drafted the report, they
18  knew that they had wanted me to be an expert in this
19  case.
20    Q   All right.  At -- at some point after you
21  had reviewed the literature and you sat and you
22  talked with plaintiffs' counsel, you became an
23  expert witness for the Plaintiffs; is that right?
24    A   Yes.
25    Q   Are you able to time that for us any

Page 52

1  better than what you have already done?
2     A   No.
3     Q   As part of serving as an expert for
4  Plaintiffs, you did an -- either A -- do you call it
5  a systematic review or a meta-analysis?  What do you
6  call that?
7     A   I call it a systematic review.
8     Q   What's the difference between a systematic
9  review and a meta-analysis?
10    A   I -- I don't think there's any difference.
11  They're -- they're both trying to describe an
12  unbiased, quantitative review of the medical
13  literature.
14    Q   Did -- your systematic review that you
15  did, you did that after you had done this review of
16  the literature, fair?
17       MS. O'DELL:  Object to the form.
18    A   My systematic review grew out of my
19  reading the literature and realizing that there was
20  a real gap, which I thought needed to be filled.
21  And I chose to do that.
22    Q   (BY MR. ZELLERS) I will today, you know,
23  ask you some more detailed questions about that.
24  Let me make sure I have covered by basics here.
25       Your report includes as attachments, a

Page 53

1  list of references; is that right?
2     A   Yes, it does.
3     Q   What is meant to be included in the
4  references that appear and are attached to your
5  report, pages 42 through 47?
6     A   Those are references that I have cited
7  specifically in my report.
8     Q   In addition along with your report, you
9  provided a curriculum vitae; is that right?
10    A   Yes.
11    Q   We'll mark that as Exhibit 14.
12       (Exhibit 14 was marked for identification
13  and is attached to the transcript.)
14       MS. O'DELL:  Thank you.
15    Q   (BY MR. ZELLERS) The curriculum vitae that
16  is attached as -- strike that -- that you provided
17  with your report and that we have marked as
18  Exhibit 14, is that complete and up to date?
19    A   Yes, it is.
20    Q   Any additions or corrections that need to
21  be made to that?
22    A   There are some details of recent
23  publications that are not provided in this, but
24  those are relatively minor changes.
25    Q   Are any of -- the details to publications

Rebecca Smith-Bindman, M.D.

Page 54

1  that you would update your curriculum vitae to, do
2  any of those relate to this matter or to the
3  opinions you're giving here today?
4      A   They do not.
5      Q   Deposition Exhibit 15 is also a document
6  that was provided along with your report.  It
7  appears to be a reliance list; is that right?
8      MS. O'DELL:  Object to the form.  Thank
9  you.
10      (Exhibit 15 was marked for identification
11  and is attached to the transcript.)
12      A   Yes, it is.
13      Q   (BY MR. ZELLERS) What is included on the
14  reliance list which we have marked as a Exhibit 14?
15      A   This is a broad list of --
16      THE COURT REPORTER:  15.
17      Q   (BY MR. ZELLERS) Oh, I'm sorry.  Yes let
18  me ask that question again.
19      What documents are listed and included on
20  the reliance list which we have marked as
21  Exhibit 15?
22      A   That is a broader list of documents.  It
23  includes documents that I may have read, but I
24  didn't believe needed to be cited.
25      It also includes documents that counsel

Page 55

1  provided to me that -- that may or may not have been
2  closely read.
3      So it includes both articles I know very
4  many, as well as additional documents I may not have
5  as deep of a knowledge of.
6      Q   Was -- Deposition Exhibit 15, was that
7  prepared by you or was that prepared by counsel?
8      A   That was prepared by counsel.
9      Q   Have you reviewed all of the references
10  and materials that are listed out on Deposition
11  Exhibit 15?
12      A   I -- I do not know.  I would have to go
13  through them one at a time to know if I had reviewed
14  all of them.
15      Q   Can you easily tell us which of the
16  materials listed on Exhibit 15, your reliance list,
17  were provided by you and which were provided by
18  counsel?
19      MS. O'DELL:  Objection.  Objection to
20  form.  I think the documents and materials
21  considered -- materials and data considered list.
22      MR. ZELLERS:  Well, there's no caption at
23  the top.  I have tried to be as descriptive as I can
24  with the witness on it.
25      MS. O'DELL:  I think it's referred to in

Page 56

1  the report in that manner, but just to clarify.
2      A   No, I could not easily go through and pick
3  out which ones were ones that I provided to them or
4  which ones they provided to me.
5      Q   (BY MR. ZELLERS) All right.  Are you aware
6  -- do you know who Dr. Judith Wolf is?
7      A   No, I do not.  I know the name, but not
8  the person.
9      Q   Are you aware that your reliance list or
10  additional Materials Considered List, what we have
11  marked as Exhibit 15, is identical to the Materials
12  Considered List that was attached to Dr. Wolf's
13  report?
14      A   I -- I don't know who Dr. Wolf is, nor do
15  I know her reliance list.
16      Q   All right.  Exhibit 15 is a reliance list
17  or Materials Considered List that was prepared by
18  counsel for Plaintiffs; is that right?
19      A   It was the list provided to me.
20      Q   You may have reviewed some of these
21  documents -- or you have reviewed some of these
22  documents, but potentially not all of these
23  documents --
24      MS. O'DELL:  Object to the form.
25      Q   (BY MR. ZELLERS) -- fair?

Page 57

1      A   Yes.
2      Q   Looking at your report, Deposition
3  Exhibit 2 -- and let me withdraw that.
4      Have we covered now all of the documents
5  that you have either reviewed and relied upon in
6  preparing your opinions in this matter and your
7  report, which we marked as Exhibit 2, or that were
8  made available to you and you may or may not have
9  looked at them?
10      MS. O'DELL:  Object to the form.
11      A   Yes.
12      Q   (BY MR. ZELLERS) Is your report,
13  Exhibit 2, accurate?
14      A   Yes, it is.
15      Q   Is your report, Exhibit 2, complete, other
16  than perhaps citing to some of the documents that
17  you reviewed after preparing your report that we
18  identified earlier today?
19      A   Yes, it is.
20      Q   There were -- withdraw that.
21      You have a fee schedule.  You're charging
22  a thousand dollars an hour to review materials and
23  talk with the lawyers in this matter and provide
24  opinions; is that right?
25      A   Yes.

Rebecca Smith-Bindman, M.D.

Page 58

1    Q   I kind of got sidetracked in terms of
2  asking you about the Plaintiff lawyers that you met
3  with.
4        We had gotten up to your meeting with
5  Ms. Thompson, with Mr. Restaino, with a lawyer
6  perhaps with the first name of Breanne; is that
7  correct?
8    A   Yep.
9    Q   Have you remembered the fourth lawyer yet?
10   A   I -- I have not.  Can -- can I call a
11 friend?
12   Q   No.  No, need to call a friend.
13       What other Plaintiff lawyers have you met
14 with relating to your work as a plaintiff expert for
15 the MDL litigation?
16   A   There are no others that I recall.
17   Q   We have other lawyers here today.  You met
18 them --
19   A   I apologize.
20   Q   -- at least in the last day or two?
21   A   Yes.
22   Q   Well, don't apologize to me.  You probably
23 hurt their feelings.
24       Did you meet all of the lawyers who are
25 here today at some point?

Page 59

1    A   Yes, I did.
2    Q   Some of them you have met just in the last
3  couple of days as you prepared for the deposition;
4  is that right?
5    A   That's correct.
6    Q   Other than the lawyers who are present in
7  the room today for Plaintiffs, have you met with any
8  other lawyers or communicated with any other lawyers
9  that you believe represent the Plaintiffs in this
10 litigation?
11   A   I have not.
12   Q   What did you do to prepare for your
13 deposition here today?
14   A   My primary preparation was to review my
15 report and to reaccess references that I included in
16 my report to make sure that I was aware of the
17 details or -- or relevant...
18   Q   What else did you do to prepare for your
19 deposition here today?
20   A   I also met with the lawyers yesterday to
21 review the process of the deposition and so forth.
22   Q   How long did you meet with the lawyers
23 yesterday?
24   A   We met most of the day yesterday.
25   Q   Other than meeting with the lawyers for

Page 60

1  most of the day yesterday, did you have any other
2  meetings or conversations with the lawyers for the
3  Plaintiffs to prepare for your deposition?
4    A   Yes, I did.  So today is Thursday.
5  Wednesday, we met for most of the day.  And I met
6  with Dr. Thompson for an hour or so on Wednesday as
7  well.
8    Q   All right.  Any other --
9        MS. O'DELL:  I think the days may be mixed
10 up.  You said "Wednesday" twice.
11   A   I apologize.  So Tuesday, we met at the
12 end of the day for an hour and then most of the day
13 yesterday, Wednesday, and then today.  Thank you.
14   Q   (BY MR. ZELLERS) Any other meetings or
15 communications with counsel for Plaintiffs to
16 prepare for the deposition here today?
17   A   Any other in-person meetings or --
18   Q   Or phone calls in which there was, you
19 know, discussion about preparing for the deposition.
20   A   I believe over -- well, I had asked to
21 reschedule this deposition.  So there were a couple
22 of e-mails related to that.
23       I also had asked for a couple of
24 additional documents to help ensure that I was
25 seeing all materials that I felt were relevant to

Page 61

1  the case.
2    Q   Are those the materials that were on
3  Exhibit 3 that we talked about at the very
4  beginning?
5    A   Yes, they are.
6    Q   Anything else that you did with the
7  lawyers in terms of preparing for your deposition
8  here today?
9    A   No.
10       MS. O'DELL:  Dr. Smith-Bindman, feel free
11 to testify regarding meetings, when they happened,
12 phone calls, et cetera, but not the substance of
13 those discussions.
14   A   Okay.
15       MS. O'DELL:  Thank you.
16   Q   (BY MR. ZELLERS) Any others?
17   A   None that I can remember.
18   Q   Ms. Thompson -- did you know Ms. Thompson
19 before she initially called you and then came and
20 sat down to meet with you?
21   A   Initially, you --
22   Q   Yes.
23   A   -- mean?  No, I did not.
24   Q   Had you ever worked with Ms. Thompson on
25 any other litigation?

Page 62

1    A    No.
2    Q    Other than the talcum powder litigation
3  that we're here deposing you in, have you worked on
4  other litigations for either defendants or
5  plaintiffs?
6        MS. O'DELL:  Other than the ones she has
7  testified to?
8    Q    (BY MR. ZELLERS) Well, other than, yes,
9  the cases.
10   A    No, I have not.
11   Q    You have served as an expert witness in
12  other matters in which you did not provide
13  deposition testimony; is that right?
14       MS. O'DELL:  Object to the form.
15   A    There are a small number of additional
16  medical malpractice cases that I was also involved
17  with which would have settled before I was asked to
18  take a deposition.
19   Q    (BY MR. ZELLERS) My question is:  Have you
20  ever testified or consulted with either plaintiffs
21  or defense in -- in a product liability litigation
22  like this?
23   A    I have not.
24   Q    Have you ever provided testimony in a
25  matter relating to a consumer product?

Page 63

1    A    I have not.
2    Q    Have you ever been retained as an expert
3  or provided testimony in a matter relating to
4  asbestos?
5    A    I have not.
6    Q    Mr. Restaino -- had you ever met
7  Mr. Restaino before that initial phone call and
8  meeting back in mid-2017?
9    A    I had not.
10   Q    When I look at your invoices, will they
11  generally outline the times that you had meetings
12  and communications with Plaintiff lawyers?
13   A    Yes, they will.
14   Q    Will they also outline whatever work
15  that -- and I don't mean work, but at least dates as
16  to when you began your systematic review or
17  meta-analysis?
18   A    The work that I did will be itemized.  I'm
19  not sure if I break down writing the report versus
20  doing the systematic review into separate buckets,
21  but it might.
22   Q    The invoices will start with sometime in
23  mid-2017, when you started meeting with the lawyers;
24  is that right?
25   A    Yes.

Page 64

1    Q    Do the invoices go through the time that
2  you prepared your opinions and report as of
3  November 15 of 2018?
4    A    Yes, they will.
5    Q    All right. Is that where they end?
6    A    They would also include some hours that I
7  have worked reviewing the material since that time.
8  Although, I don't believe I have submitted those
9  reports -- those invoices, but I certainly can.
10   Q    So my question is:  How much time have you
11  spent on this matter since your last invoice?  Can
12  you estimate that for us?
13   A    I would guess in the ballpark of 10 hours,
14  not including the time I met with the lawyers
15  yesterday -- not this week.  Excluding the time this
16  week.
17   Q    How much time did you spend this week in
18  addition to that 10 hours with the lawyers in
19  preparing yourself to provide deposition testimony?
20   A    In the ballpark of another 10 hours.
21   Q    Have you been served or been asked to
22  serve as an expert witness or consultant in any
23  other talcum powder litigation or matters?
24   A    I have not.
25   Q    What percent of your professional time do

Page 65

1  you spend working as a consultant?
2    A    A small amount.  Probably less than
3  5 percent.
4    Q    What percent of your income is from
5  consulting on litigation matters?
6        MS. O'DELL:  For a particular year or time
7  period or average, just --
8    Q    (BY MR. ZELLERS) Well, the last couple of
9  years.
10   A    In the last couple of years, a -- a small
11  amount.  Probably 5 or 10 percent.
12   Q    What is the largest percent of your income
13  that has related to consulting on litigation
14  matters?
15       And what I'm asking you to do is to look
16  back.  And what was the high point in terms of
17  income that you received from consulting on
18  medical/legal matters?
19   A    Probably the 10 percent that I cited.
20   Q    Have you ever attended a convention or a
21  meeting with plaintiff lawyers and other plaintiff
22  experts?
23   A    I have not.
24   Q    Never?
25   A    A meeting of lawyers?

Rebecca Smith-Bindman, M.D.

Page 66

1    Q   Yes, a meeting of lawyers --
2    A   Never.
3    Q   -- and plaintiff experts.
4    A   Never.
5    Q   All right.  Have you --
6    A   I didn't know there was such a thing.
7    Q   Do you know any of the experts that have
8  also been retained by the Plaintiffs in this
9  litigation?
10    A   I don't know them personally, but I -- I
11  have seen their names.  And their names are the
12  same -- some of the names are names that are
13  familiar to me.
14    Q   Have you communicated with any of the
15  other experts for Plaintiffs?
16    A   I have not.
17    Q   Have you reviewed reports from any of the
18  experts for Plaintiffs?
19    A   I have reviewed a handful of them --
20    Q   What --
21    A   -- yes.
22    Q   -- reports of other plaintiff experts have
23  you reviewed?
24    A   I reviewed Dr. Cooke's report.  I reviewed
25  Mr. Longo's report.  I reviewed an ob --

Page 67

1  obstetrician gynecologist report.
2    Q   Do you remember who?
3    A   Clarke perhaps or something like Clarke.
4        MS. O'DELL:  If you need to refer to your
5  report or your materials, feel free to do that.
6    A   Okay.  I think Mr. Cralley's (phonetic)
7  report.
8    Q   (BY MR. ZELLERS) Do you know any of those
9  experts personally?
10    A   I do not.
11    Q   All right.  You have never communicated
12  with any of those experts; is that right?
13    A   I have not.
14    Q   You have just reviewed their reports; is
15  that right?
16    A   That's correct.
17    Q   Have you reviewed any deposition testimony
18  or portions of depositions of plaintiff experts in
19  this matter?
20    A   I have reviewed small pieces of several of
21  them.
22    Q   Okay.  What experts have you reviewed a --
23  small pieces of their deposition?
24    A   Dr. Moorman's testimony or deposition, I
25  saw some of.

Page 68

1    Q   What others?
2    A   Mr. Cooke's deposition, I believe.
3    Q   What others?  Did you put in your report,
4  the names of other experts that you reviewed their
5  deposition testimony of?
6    A   I -- I -- I'm checking if -- if I have.
7  I...
8    Q   Well, you have a recollection of reviewing
9  --
10    A   -- I -- I don't have a recollection of any
11  others that I have looked at.
12    Q   Do you know who David Kessler is?
13    A   I do.
14    Q   How do you know Dr. Kessler?
15    A   I --
16        MS. O'DELL:  Object to the form.
17    A   -- Dr. Kessler is a faculty member at
18  UCSF.
19    Q   (BY MR. ZELLERS) Do you know him
20  personally?
21    A   Not well, but enough to say hello.
22    Q   Been at meetings with him?
23    A   I have.
24    Q   You understand that he's an expert for the
25  Plaintiffs?

Page 69

1    A   I -- I have been told that.
2    Q   Have you had any discussions with
3  Dr. Kessler at all relating to this matter, the
4  talcum powder matter?
5    A   I have not.
6    Q   Have you participated in any projects --
7  medical/legal projects with Dr. Kessler --
8    A   I --
9    Q   -- in the past?
10    A   -- I have not.
11    Q   Have you heard of a documentary called
12  "The Bleeding Edge"?
13    A   I have.
14    Q   Did you participate in the documentary
15  called "The Bleeding Edge"?
16    A   I did.
17    Q   You understand that Dr. Kessler also
18  participated in that; is that right?
19    A   I -- yes.
20    Q   That is a documentary related to what?
21    A   A medical devices, primarily.
22    Q   Have you served as a consultant or expert
23  in medical device matters?
24    A   I have not.
25    Q   Pharmaceutical matters?

Page 70

1    A   I have not.
2    Q   How was it then that you were retained or
3  ended up participating in "The Bleeding Edge"
4  documentary?
5        MS. O'DELL:  Object to the form.
6    A   I -- I'm not sure if you have had a chance
7  to see the documentary or not, but my role in it
8  is -- is pretty off topic.
9        And so at an initial incarnation of that
10 documentary, they had thought about focusing on an
11 issue where I do do research, radiation for medical
12 imaging.
13       It no longer fits into their new topic,
14 but somehow they kept a quote of me in that film.
15   Q   Did -- Dr. Kessler, was he the one
16 responsible for putting that documentary together?
17   A   I -- no, I don't -- I don't believe he
18 was.
19   Q   Were you paid for your work in
20 participating in that documentary?
21   A   No I was not.
22   Q   All right.  Jane Hall, she assisted you
23 with your systematic review.  Is -- is that the
24 right way you would characterize it, a systematic
25 review?

Page 71

1    A   Yes, the systematic review -- you asked
2  the difference between a meta-analysis.  It sort of
3  implies a certain scientific review -- rigor when
4  you call it a systematic review, so that's how I
5  like to think about it.
6    Q   You think systematic review implies more
7  scientific rigor than meta-analysis?
8    A   I think it's a subtle distinction, but
9  yes, I do.
10   Q   Well, you communicated and hired Jane hall
11 to assist you; is that right?
12   A   Yes, I did.
13   Q   Have you produced all of your
14 communications and materials with Jane Hall?
15   A   I have.
16   Q   How did you come in contact with Dr. Hall?
17   A   I work closely with an emergency medicine
18 researcher, and I have assisted him in several
19 systematic reviews.
20       And I knew he had a biostatistician who
21 generated the kind of graphics and analysis that I
22 wanted.  And so I reached out to him, and he
23 introduced me to Dr. Hall.
24   Q   You had never worked with Dr. Hall prior
25 to performing your systematic review --

Page 72

1    A   I had --
2    Q   -- in this case --
3    A   -- not.
4    Q   -- is that right?
5    A   That's correct.
6    Q   Have you worked with other
7  biostatisticians in the past?
8    A   I have.
9    Q   Why did you decide you needed to work with
10 a new biostatistician for this litigation?
11   A   The primary work that I needed was to do a
12 few graphs and figures, and so I wanted someone who
13 was both an expert in that and who I thought could
14 respond relatively quickly.
15       I have on my team, several
16 biostatisticians who are part of my research group,
17 but they don't have particularly relevant expertise
18 in generating these graphs.
19       And it would have required them to acquire
20 some skills, and so I wanted someone who focuses
21 specifically on this who could do that.
22   Q   Did you review any work from Dr. Hall
23 before you hired her?
24   A   I have been involved in systematic reviews
25 that she contributed to that I was very impressed

Page 73

1  with.  And so --
2    Q   So what other --
3    A   -- I reached out.
4    Q   -- sorry.  I didn't mean to interrupt you.
5        What other systematic reviews have you
6  been involved with Dr. Hall?
7    A   Actually, two of them.  One of them is on
8  a treatment for kidney stones.  Ralph Wang is the
9  senior author.
10       And the second was a systematic review
11 around the diagnosis of and treatment for pulmonary
12 embolism that also Dr. Wang was the leader on.
13   Q   Did you ever meet with Dr. Hall with
14 respect to this work in person?
15   A   I never met with her related to anything.
16 It was all by electronic communication.
17   Q   Did you ever talk with her over the phone?
18   A   Yes.  We spoke a few times.
19   Q   Did you take notes of your conversations
20 with Dr. Hall?
21   A   Not that I recall.
22   Q   You did have e-mails with Dr. Hall --
23   A   Yes.
24   Q   -- is that right?
25   A   Yes.

Page 74

1    Q   Do you have receipts for the work that
2 Dr. Hall performed for you?
3        MS. O'DELL:  Object to the form.
4    A   Like an invoice receipt?
5    Q   (BY MR. ZELLERS) Yes, an invoice receipt.
6    A   No, I do not.
7    Q   You ended up paying her rush fees so that
8 she would do the work and the analysis more quickly;
9 is that right?
10       MS. O'DELL:  Object to the form.
11   A   I -- I remember telling her I didn't mind
12 her rush fee.  But -- but all of the invoicing was
13 done directly with counsel.
14   Q   (BY MR. ZELLERS) Well, Dr. Hall came to
15 you and said:  You know, it's going to take X amount
16 of time to do a thorough analysis?
17   A   Yes.
18   Q   She did offer to rush the analysis --
19   A   Yes.
20   Q   -- when you told her you needed it?
21   A   Yes.
22   Q   And your recollection is she, you know,
23 did rush the analysis and -- got it done within
24 a couple of days?
25       MS. O'DELL:  Object to the form.

Page 75

1    A   I believe the analysis actually took a
2 couple of weeks.
3        But I was very open to paying her rush
4 fee.  I thought her fee was extraordinarily
5 reasonable, and so it just made it easier for me to
6 get it done quickly rather than to delay.
7    Q   (BY MR. ZELLERS) You defer to the e-mails
8 and the documents as to the timing of when you
9 requested that she rush the analysis and when she
10 provided it to you; is that right?
11       MS. O'DELL:  Object to the form.
12   A   I believe my documents would be correct
13 about when I asked for stuff and when it was done,
14 yes.
15       MS. O'DELL:  Excuse me, Mike.  We have
16 been going about an hour and 20 minutes.  Is this a
17 good time to take a quick break?
18       MR. ZELLERS:  Absolutely.
19       THE VIDEOGRAPHER:  We are off the record.
20 The time is 10:40 a.m.  This is the end of Disc 1.
21       (A break was taken from 10:40 a.m. to
22 11:10 a.m.)
23       THE VIDEOGRAPHER:  We are back on the
24 record.  This marks the beginning of Disc No. 2 in
25 the deposition of Dr. Rebecca Smith-Bindman.  The

Page 76

1 time is 11:10 a.m.
2    Q   (BY MR. ZELLERS) Dr. Smith-Bindman, I'm
3 handing you Deposition Exhibit 16, which is an
4 e-mail chain.  The very first e-mail, meaning the
5 last e-mail at the top of page 1, is Jane Hall --
6 from Jane Hall, September 24, 2018, at 8:04 a.m. to
7 you.
8        (Exhibit 16 was marked for identification
9 and is attached to the transcript.)
10   Q   (BY MR. ZELLERS) Will you take a look at
11 that and tell us if that is a printout of some of
12 your e-mail exchanges with Dr. Hall?
13   A   Yes.
14   Q   If we go to the very first e-mail in the
15 chain, it appears that you contacted Dr. Hall on
16 Wednesday, September 19, 2018, in the afternoon,
17 3:21 p.m., and told her that you were interested
18 primarily in generating a forest plot with a summary
19 estimate and test for heterogeneity; is that right?
20   A   Yes.
21   Q   That was your initial contact with
22 Dr. Hall; is that right?
23   A   Yes.
24   Q   You contacted your referring person,
25 Ralph, on the e-mail; is that right?

Page 77

1    A   Yes.
2    Q   All right.  You told -- the next day you
3 had some exchanges of e-mails with Dr. Hall.  You
4 told Dr. Hall that because you were doing a review
5 for a legal case, you did not need the detail that
6 you would need for a paper; is that right?
7        MS. O'DELL:  Object to the form.
8    A   Can you tell me where you're reading?
9    Q   (BY MR. ZELLERS) Sure.  I'm reading on
10 page 2 of Exhibit 16, the very last e-mail.  This is
11 from you on September 20 of 2018.
12       You thanked Dr. Hall for her willingness
13 to help.
14       "As Ralph mentioned, I am doing a review
15 for a legal case and don't need quite the detail I
16 would usually need for a paper."
17       Is that what you told Dr. Hall?
18   A   Yes, it is.
19   Q   As of -- well, you communicated with
20 Dr. Hall on Friday, September 21st, in the
21 morning.  This is the very last e-mail on page 1 of
22 Exhibit 16.
23       You asked her to send you whatever she was
24 doing sooner rather than later because you needed to
25 get your report finished ASAP; is that right?

Page 78

1    MS. O'DELL:  Object to the form.  I think
2  you misstated date on the e-mail but --
3    Q   (BY MR. ZELLERS) Well, I'm sorry.  Let me
4  ask that question again.  On Friday morning,
5  September 21, 2018, you told Dr. Hall that you
6  needed her information as soon as possible because
7  you had to finish your report ASAP; is that right?
8    A   Yes.
9    Q   Dr. Hall got back to you that day and
10  said, you know, I'll do my best.  But if you want, I
11  can rush the work, if you're willing to pay time and
12  a half.
13    You then got back to her on Monday
14  morning, September 24, and said:  Yes, I'll pay the
15  rush fee, and I would like your work as soon as
16  possible.
17    Is that right?
18    MS. O'DELL:  Object to the form.  Object
19  to the form.
20    A   I -- I think you're paraphrasing what it
21  says.  The -- the idea was she said that if I paid
22  the rush, she could have some money to defray
23  childcare cost during --
24    Q   (BY MR. ZELLERS) Right.  And --
25    A   -- that time, and I agreed to do that.

Page 79

1    Q   Exactly.  And she said back to you:  Okay.
2  By the end of -- so this is on a Monday.  She said
3  you'll have the work product from her Wednesday at
4  the earliest, probably Thursday.
5    "I should have at least two sets of plots
6  today, and I'll send them to you as they are
7  output."
8    Is that right?
9    A   Yes.
10    Q   You have produced all of your e-mails and
11  communications with Dr. Hall in this matter; is that
12  right?
13    A   I have.  You're not showing me all of
14  those communications; is that right?
15    Q   I haven't yet.
16    A   Okay.
17    Q   I'm going to show you some more.
18    A   Yes.
19    Q   But my question to you is:  Included in
20  the production, at least you have included all of
21  your communications --
22    A   Yes.
23    Q   -- with Dr. Hall --
24    A   Yes.
25    Q   -- is that right?

Page 80

1    A   Yes.
2    Q   Have you communicated about this
3  litigation with anyone other than the plaintiffs'
4  counsel that you have told us about with Dr. Hall?
5  Anyone else?
6    MS. O'DELL:  Object to the form.
7    A   I -- you asked me if I have mentioned this
8  litigation to anyone else?
9    Q   (BY MR. ZELLERS) Well, let's start there.
10  Have you mentioned this litigation to anyone else?
11    A   I have.
12    Q   Who have you mentioned this litigation to?
13    A   I have certainly mentioned it to my
14  husband.
15    Q   Other than your husband?
16    A   And then I have mentioned it to several
17  close friends.
18    Q   Your husband is a physician; is that
19  right?
20    A   He is.
21    Q   Did he provide any professional input to
22  you related to your review of this matter?
23    A   No, he did not.
24    Q   The close friends that you mentioned this
25  to, did they provide any input or assistance or

Page 81

1  direction to you relating to this matter?
2    A   No.
3    Q   I asked you before if you read any of the
4  depositions of the plaintiff experts.  Have you
5  discussed generally with plaintiffs' counsel, the
6  deposition testimony that's been given by other
7  plaintiff experts in this litigation?
8    MS. O'DELL:  I would instruct you not to
9  answer that question.
10    MR. ZELLERS:  I disagree, but we'll
11  reserve that issue.
12    Q   (BY MR. ZELLERS) Was there anything that
13  you asked plaintiffs' counsel to provide to you in
14  connection with your review or for preparation of
15  your report that you were not provided with?
16    A   So most of the documents that I included
17  in my report, I found by doing an independent search
18  online.
19    There were several items that I didn't
20  find that I wanted to review as well.  And so some
21  of the items that I asked counsel for were items
22  that I couldn't find through scientific research
23  that I asked them to provide.
24    Q   And you have told us about those
25  documents, and those are listed out on Exhibit 3; is

Page 82

1 that right?
2    A   That's correct.
3    Q   My question was a little bit different.
4       Is there anything that you asked for from
5 plaintiffs' counsel that they were not able to or did
6 not provide to you?
7       MS. O'DELL:  Object to the form.
8    A   I -- I can't think of anything that fits
9 into that question.
10    Q   (BY MR. ZELLERS) Take a look at your
11 reliance list, which we have marked as Deposition
12 Exhibit 15.
13       Do you have that in front of you?
14    A   I have my copy of the reliance list.  I
15 don't have your Exhibit 15 in front of me.
16    Q   If you have your copy -- does it start
17 with page 1?
18    A   Yes, it does.
19    Q   At the very top --
20    A   Yes.
21    Q   -- the first item is "A Survey of The
22 Long-Term Effects"?
23    A   Yes.
24    Q   If you turn to pages 11 and 12, there's a
25 series of documents that begin with "IMERYS"

Page 83

1 followed by numbers.
2       Do you see that?
3    A   I do.
4    Q   Do you know whether or not you reviewed
5 some or all of those Imerys-produced documents as
6 part of your review in this matter?
7    A   If those reflect Imerys testing documents
8 then yes, I did review at least some of them.  I
9 can't be sure all of them.
10    Q   Do you know whether or not these documents
11 relate to Imerys testing?
12    A   I have reviewed at least a half dozen
13 Imerys testing documents.
14    Q   In --
15    A   I believe that's what these are, but I --
16 I'm not sure.
17    Q   There are a number of Imerys documents
18 that are listed on Exhibit 3, which you identified
19 as testing documents; is that right?
20    A   Yes.
21    Q   Do you know if you reviewed any Imerys
22 documents other than the documents that are listed
23 out on Exhibit 3?
24       MS. O'DELL:  Can you just make a --
25 Exhibit 3, would you remind --

Page 84

1       MR. ZELLERS:  Sure.  Exhibit 3 is the list
2 you gave me today of -- of the documents that
3 Dr. Smith-Bindman reviewed in addition to whatever
4 else is marked.
5       MS. O'DELL:  -- I see.  I see.
6       MR. ZELLERS:  So there's a -- it's a list
7 of Bates-stamped documents.
8       MS. O'DELL:  Yes.
9       MR. ZELLERS:  There's 10 or 12 Imerys
10 documents.  There's one J&J Bates-stamped document
11 --
12       MS. O'DELL:  Right.
13       MR. ZELLERS:  -- and then there's the, I
14 think, expert report or --
15       MS. O'DELL:  Right.
16       MR. ZELLERS:  -- deposition of Dr. Cooke
17 listed?
18       MS. O'DELL:  Right.  Okay.  I just object
19 to the form of the question.  And -- and --
20    A   Could I --
21       MS. O'DELL:  -- then --
22    A   -- see Exhibit 3?
23       MS. O'DELL:  -- yes.  And then I would --
24 Counsel, permit me -- there was a question related
25 to Exhibit 3.  I thought you were referring to the

Page 85

1 materials list, and so I'm going to assert my
2 objection a little bit late.
3       MR. ZELLERS:  Okay.  I just want to move
4 forward.
5       MS. O'DELL:  I know that you do.
6       MR. ZELLERS:  Yes.
7       MS. O'DELL:  I just want to be clear.
8 Because Exhibit 3 that we provided were additional
9 materials that Dr. Smith-Bindman asked for and
10 reviewed in addition to the Materials Considered.  I
11 don't want the record to be unclear.  So --
12       MR. ZELLERS:  Well --
13       MS. O'DELL:  -- I have noted my objection.
14       MR. ZELLERS:  -- and the record is clear
15 that Dr. Smith-Bindman did not review all of the
16 materials listed in the Materials Considered List,
17 Exhibit 15.  But that testimony will stand as it is.
18       My question just is:  In addition to the
19 documents that I was told about this morning that
20 you believe are testing documents, do you know
21 whether you reviewed any other Imerys-produced
22 documents, and specifically the ones that are
23 itemized on pages 11 and 12 of your Materials
24 Considered List?
25    A   I would need to see those documents to

Page 86

1  know if I reviewed them.  The names are awfully
2  nonspecific.
3      Q   With respect to the Imerys documents -- or
4  Imerys-produced documents that are identified in
5  Exhibit 15, which is your Materials Considered List,
6  do you know how those were compiled?
7      MS. O'DELL:  Object to the form.
8      A   You're asking me where this list came
9  from?
10     Q   (BY MR. ZELLERS) I think you have told us
11 the list came from plaintiffs' counsel; is that
12 right?
13     A   Yes.
14     Q   My question then, I guess, is more
15 precise.  Do you know how plaintiffs' counsel
16 compiled this list of Imerys-produced documents or
17 how they selected those documents?
18     A   I know I had a lot of back and forth in
19 generating this list with actually Breanne at the
20 time.  I sent her a lot of documents that I had
21 looked at that I hadn't cited that she added to the
22 list.
23         These were ones that she added to the
24 list, and I don't remember what they were.
25     Q   I'm going to ask my question again.  Do

Page 87

1  you know how -- these documents, the documents that
2  are on pages 11 and 12 of your Materials Considered
3  List that begin with the "Imerys" name, do you know
4  how they were compiled?
5      A   No.
6      Q   All right.  The same question.  If you
7  look on page 13 of your Materials Considered List,
8  there's a series of documents that have J&J and then
9  a number; is that right?
10     A   Yes.
11     Q   You, as we sit here, do not know what
12 those documents relate to; is that right?
13     A   That's correct.
14     MS. O'DELL:  Object to the form.
15     Q   (BY MR. ZELLERS) You do not know how this
16 listing of J&J documents was compiled; is that
17 right?
18     A   That's correct.
19     Q   These are documents produced by Imerys and
20 by Johnson & Johnson companies as part of this
21 overall list of materials that were available, you
22 know, for you to review; is that right?
23     MS. O'DELL:  Object to the form.
24     A   Yes.
25     Q   (BY MR. ZELLERS) Outside of your work in

Page 88

1  litigation -- so when you do your research work or
2  when you do your publishing work -- do you rely on
3  documents that are picked by someone else that may
4  not represent the full body of evidence?
5      MS. O'DELL:  Object to the form.
6      A   In my work, I review whatever data are
7  available.  And sometimes those data are identified
8  by me and sometimes they have been given to me by
9  other sources to review.
10     Q   (BY MR. ZELLERS) Is that a -- a yes or a
11 no?  And let me withdraw that.
12         The documents that we have looked at in
13 your reliance list Materials Considered List that
14 begin with Imerys and begin with J&J, your
15 understanding, those are documents that have been
16 produced by the Defendants in this litigation; is
17 that right?
18     A   Yes.
19     Q   Do you know what percentage of the overall
20 documents that have been produced by Johnson &
21 Johnson companies and by Imerys, these documents
22 that are listed in Exhibit 15, represent?
23     MS. O'DELL:  Object to the form.
24     A   Are you asking me if the handful of
25 documents from Johnson & Johnson that are in this

Page 89

1  list reflect all of the documents ever created at
2  Johnson & Johnson or all relevant documents or --
3      Q   (BY MR. ZELLERS) Do you have any idea?
4      A   No, no idea.
5      Q   This is a handful of documents that have
6  been listed out by plaintiffs' counsel for you; is
7  that right?
8      A   Yes.
9      MS. O'DELL:  Object to the form.
10     A   Yes.
11     Q   (BY MR. ZELLERS) All right.  In your
12 report you cite two exhibits from the depositions of
13 several witnesses.  There's an exhibit from a
14 deposition of John Hopkins.
15         Do you know who John Hopkins is?
16     A   I know what the document is, but I -- I
17 don't know what -- who John Hopkins is.
18     Q   Do you know what company he works for?
19     A   I do not.
20     Q   Do you know what his position or title is?
21     MS. O'DELL:  Object to the form.
22     Q   (BY MR. ZELLERS) You're looking in your
23 materials at the exhibit that you were provided from
24 his deposition; is that right?
25     A   Yes.  I -- I -- I do not --

Page 90

1    Q   Have --
2    A   -- see.
3    Q   -- you read any portion of the deposition
4  of John Hopkins?
5    A   I have not.
6    Q   Have you reviewed any other exhibits from
7  the deposition of John Hopkins?
8    A   I have not.
9    Q   Do you know who Julie Pier is?
10   A   I believe I do.
11   Q   Who is Julie Pier?
12   A   I -- I'm just checking.  I -- I -- I got a
13 few names wrong earlier, so I want to just check
14 if --
15   Q   Well, you're going back now and you are
16 looking at your report?
17   A   Yes.
18   Q   And you have annotated your report, I
19 guess, that you are using here today; is that right?
20   A   Yes.
21   Q   Why don't we -- just so we have a complete
22 record, we'll mark your annotated report as
23 Exhibit 17.
24   A   Yes.
25       (Exhibit 17 was marked for identification

Page 91

1  and is attached to the transcript.)
2    A   And -- and I would like to clarify based
3  on some of my notes.  But -- so I think Dr. Hopkins
4  oversaw testing for -- for talc products at J&J.
5    Q   (BY MR. ZELLERS) Is that a note that you
6  have on your report?
7    A   It is.
8    Q   All right.  That's a note that you put on
9  your report in preparation for your deposition
10 today?
11       MS. O'DELL:  Object to the form.
12   A   It's a note I put on my report when I was
13 reviewing my report and the documents I'm citing and
14 so forth.
15   Q   (BY MR. ZELLERS) Who is Julie Pier?  Do
16 you know who she is?
17   A   I'm -- what I believe -- although, I don't
18 see that I made a note of it -- is that she was
19 someone who did testing from one of the New York
20 hospitals of -- of the talc powder products.
21   Q   Do you know anything more than that about
22 Julie Pier or who she worked for or what her role
23 with respect to talcum powder was?
24   A   Now that I am remembering where I -- I --
25 no, I don't really know those things.

Page 92

1    Q   All right.  You were provided -- just as
2  you were for the exhibit from the deposition of John
3  Hopkins, you were provided with the exhibit that you
4  are reviewing from Julie Pier's deposition; is that
5  right?
6        MS. O'DELL:  Object to the form.
7    A   No, I don't -- well, I -- I don't believe
8  that's why I know who she is.
9        I -- I believe The New York Times story
10 and the Reuters story discussed her deposition.  So
11 I don't remember reading her deposition.  But I --
12 if I'm not confusing her with someone else, I think
13 that's where I learned about her testing.
14   Q   (BY MR. ZELLERS) Okay.  You're a couple of
15 questions ahead of me here.  No. 1, the exhibit
16 that's in your blue folder from the deposition of
17 Julie Pier, that was provided to you for review by
18 counsel for Plaintiffs; is that right?
19   A   Thank you for that reminder.  That's the
20 Imerys document.  Yes.  Yes.
21   Q   I'm going to go back to my question.
22   A   Yes.
23   Q   The exhibit from Julie Pier's deposition,
24 that was provided to you for review by plaintiffs'
25 counsel; is that right?

Page 93

1    A   Yes.
2        MS. O'DELL:  Object to the form.
3    Q   (BY MR. ZELLERS) You have not reviewed the
4  deposition transcript of Ms. Pier; is that right?
5    A   Not that I recall.
6    Q   You have not reviewed any exhibit -- other
7  exhibits to her deposition; is that right?
8    A   That is correct.
9    Q   Are you aware that the two exhibits that
10 you were provided by counsel for Plaintiffs -- one
11 from the deposition of John Hopkins and one from the
12 deposition of Julie Pier -- that those exhibits were
13 prepared by plaintiffs' experts for this litigation?
14       MS. O'DELL:  Object to the form.  I think
15 you referred to plaintiffs' experts.  I think you
16 misspoke.  You said they were prepared by
17 plaintiffs' experts.
18       MR. ZELLERS:  Well -- and I will ask it
19 again then.
20   Q   (BY MR. ZELLERS) Are you aware that the
21 exhibits that were provided to you -- one from
22 Ms. Pier's deposition and one from the Hopkins
23 deposition -- are exhibits that were prepared by
24 Plaintiffs in this litigation?
25       MS. O'DELL:  Object to the form.

Rebecca Smith-Bindman, M.D.

Page 94

1    A   I was provided these documents from a
2  prior case.  I don't know who prepared them or where
3  they came from.  I -- they were provided to me by
4  counsel.
5    Q   (BY MR. ZELLERS) Let me ask you just a
6  couple of background questions from your review of
7  the literature in this case.  You have reviewed a
8  lot of literature relating to talcum powder and
9  talcum powder use by women in the perineal region;
10  is that right?
11    A   Yes, I have.
12    Q   I think you say in your report that you
13  reviewed upwards of 40 studies in papers relating to
14  that.  Does that sound about right?
15    MS. O'DELL:  Object to the form.
16    A   Upward of 40 studies that provided primary
17  new data.  There were probably hundreds of papers I
18  reviewed on the topic.
19    Q   (BY MR. ZELLERS) From that review, do you
20  agree that most women who use talcum powder in their
21  perineal region begin that use before age 30?
22    A   I don't know the -- when -- I -- I think a
23  lot of women start use when they're young.  I would
24  have to check my report if I have cites as to when
25  they began using talcum powder products.

Page 95

1    Q   (BY MR. ZELLERS) Well, take a look, if you
2  will, at Deposition Exhibit 18, which is a report by
3  Cramer.
4    (Exhibit 18 was marked for identification
5  and is attached to the transcript.)
6    Q   (BY MR. ZELLERS) He's the first named
7  author.  This is the 2016 study --
8    MS. O'DELL:  Thank you.
9    Q   (BY MR. ZELLERS) -- report.  Are you --
10    MS. O'DELL:  Are we at 18?
11    MR. ZELLERS:  18.
12    Q   (BY MR. ZELLERS) You're familiar with the
13  paper we have marked as Deposition Exhibit 18; is
14  that right?
15    A   Yes, I am.
16    Q   I do want to ask you questions a later
17  about that.  But for purposes of this question when
18  do most women who use talcum power -- powder in
19  their perineal region begin, go to page 336 of
20  Exhibit 18 and specifically Table 1.
21    A   Yes.
22    Q   One of the categories that is reported
23  here in Table 1 is "Age First Used Genital Powder";
24  is that right?
25    A   Yes.

Page 96

1    Q   And if we looked at the data for when and
2  the age that women were when they first used genital
3  powder, at least from this study by Dr. Cramer, it
4  appears that the vast majority of women began using
5  talcum powder in their genital area before age 30;
6  is that right?
7    A   In this publication.
8    Q   Do you recall any other publications
9  that -- that you reviewed that provided contrary
10  information?
11    A   The question you're asking me is not one
12  that I spent a lot of time thinking about and so
13  can't recall -- sort of across the hundreds of
14  papers I read and 50 that talked about the
15  association -- what time the age of first use was.
16    I -- I see Dr. Cramer's experience is that
17  women do report beginning use earlier, but I --
18  there's no way for me to know if that's a reflection
19  of his sampling, the place he studied the women, and
20  so forth.
21    Q   At least on that point, you would refer to
22  Dr. Cramer, fair?
23    MS. O'DELL:  Object to the form.
24    A   I -- I would defer to a comprehensive
25  review of the literature to come up with that view.

Page 97

1    My -- my guess would be that Dr. Cramer
2  believes his numbers in his population, but I -- but
3  I don't know that that's the truth in other
4  populations.
5    Q   (BY MR. ZELLERS) Well, let me ask you
6  another question.  On average from the studies that
7  you reviewed, do women who use talcum powder in
8  their perineal region continue that use for over
9  20 years?
10    MS. O'DELL:  Object to the form.
11    A   My recollection of the literature is that
12  most publications could not assess or did not ask in
13  detailed enough form for how long women used it.
14    I -- I -- again, it's possibly a question
15  that could be answered from the literature, but I
16  don't recall knowing that answer from my review of
17  the literature.
18    Q   (BY MR. ZELLERS) Did you review the Wu
19  2015 paper?
20    A   I did.
21    Q   Do you have that in one of your notebooks?
22    A   I will have it in here.
23    Q   That makes it easy.
24    A   2009 or --
25    Q   '15.  No.  The 2015 Wu paper.

Rebecca Smith-Bindman, M.D.

1    A    Yes, I do.
2    Q    Turn to page 1097, Table 2.
3    A    Could you -- unfortunately, the page --
4  the version I have is a free download, and it
5  doesn't have the same page --
6    Q    How --
7    A    -- numbers.
8    Q    -- about -- can you find Table 2?  It's
9  the a table that's captioned "Prevalence of Risk
10 Factors in Non-Hispanic white, Hispanic, and
11 African-American Control."
12   A    Yes, I have that paper.
13   Q    All right.  So if you look at the
14 controls, at the very bottom of that section, it
15 gives a mean number of years of talc use among
16 users; is that right?
17   A    Yes.
18   Q    And whether we're looking at non-Hispanic
19 whites, Hispanics, or African-Americans, at least
20 the number of years of talc use that's reported is
21 greater than 20 years for each of those groups; is
22 that right?
23   A    In --
24        MS. O'DELL:  Object to the form.
25   A    -- in Dr. Wu's paper, there is reported

1  that the mean number of years is greater than 20.
2    Q    (BY MR. ZELLERS) If we look down at the
3  group below, the number of cases, the mean number of
4  years of talc use among users is greater than
5  20 years, also for each of those groups; is that
6  right?
7        MS. O'DELL:  Object to the form.
8    A    Dr. Wu found that the average number of
9  years was greater than 20, yes.
10   Q    (BY MR. ZELLERS) All right.  You have
11 never published on, you know, any topic relating to
12 talcum powder or any association between talcum
13 powder and ovarian cancer; is that right?
14   A    I have not.
15   Q    Your opinion is that women exposed to
16 perineal talcum powder products on a regular basis
17 have about a 50 percent increase in their subsequent
18 risk of developing serous invasive cancer; is that
19 correct?
20   A    Yes, that is my opinion.
21   Q    You also opine in your report that there
22 is a causal association between genital talcum
23 powder use and ovarian cancer generally; is that
24 right?
25        MS. O'DELL:  Object to the form.

1    A    Yes.
2    Q    (BY MR. ZELLERS) Are you able to tell us
3  how far before you prepared your report, November 15
4  of 2018, that you formed those conclusions?
5        MS. O'DELL:  Object to the form.
6    A    I spent considerable hours during 2018
7  reviewing the literature.  And over the course of
8  that year, my opinions started to solidify when I
9  saw the evidence that strongly supported that
10 ovarian cancer is caused by talcum powder products.
11 I --
12   Q    (BY MR. ZELLERS) And --
13   A    -- I -- I believe that my final systematic
14 review was for me important to -- to confirm that
15 association.  And that wasn't done -- that wasn't
16 completed until my report was basically -- close to
17 when my report had to be drafted.
18   Q    The systematic review that you did was in
19 and around September and October of 2018; is that
20 right?
21   A    I believe the final statistical analysis
22 was then, but my -- my systematic review went on for
23 many months.
24   Q    Well, your systematic review, at least
25 insofar as Dr. Hall assisted you, was in September

1  of 2018; is that right?
2        MS. O'DELL:  Object to the form.
3    A    The systematic review that I described in
4  my report has a lot of components.  So one component
5  is to do a complete comprehensive review of -- of
6  what's been published.
7        And that involved doing the search,
8  according -- obtaining all the papers, and then
9  reviewing the bibliography of all of those papers.
10       Then reviewing all those papers critically
11 and then abstracting data for those papers.  Kind of
12 towards the tail end of that review is to
13 statistically combine the studies.
14       Dr. Hall was involved both in abstracting
15 the data as a second set of eyes and in doing the
16 statistical summary.  But I reached out to her after
17 all of those initial points were completed.  So that
18 went on for many months.
19   Q    (BY MR. ZELLERS) Is it the objective of a
20 systematic review to bring clarity to a research
21 question by combining like-with-like data?
22       MS. O'DELL:  Object to the form.
23   A    The purpose of the systematic review is to
24 take individual papers that may not have enough
25 statistical power to provide by themselves,

Page 102

1  individual results that are meaningful.  And if the
2  methodology is combinable, to pool the sample size
3  to get greater statistical power to come up with a
4  conclusion.
5        But your question about combining like
6  with like is -- is -- very important.
7    Q    (BY MR. ZELLERS) In order for research to
8  be useful, it must be valid, correct?
9    A    Yes.
10   Q    Inaccurate and incomplete reporting of
11 methods can make research unreasonable and unusable;
12 is that right?
13       MS. O'DELL:  Object to the form.
14   A    I -- I -- I think there are separate
15 phases of research that need happen.  I think the
16 reporting of methodology is so that other people can
17 duplicate your results, understand your results.
18       But in and of themselves, the reporting
19 does not influence the reliability of the -- of the
20 research.
21   Q    (BY MR. ZELLERS) Is reporting of
22 methodology important?
23   A    I -- I think reporting of methodology so
24 that other people can duplicate the results is
25 important.

Page 103

1        So if -- if I move ahead as I'm planning
2  to publish my systematic review, then I would
3  include greater details about the methodology so
4  that other investigators could duplicate my work,
5  should -- should they so choose.
6    Q    At least as of now, other scientists or
7  epidemiologists would not be able to reproduce what
8  you have done based upon your report --
9        MS. O'DELL:  Object --
10   Q    (BY MR. ZELLERS) -- correct?
11       MS. O'DELL:  -- object to the form.
12   A    I am -- I am not sure that that's the
13 case.
14   Q    (BY MR. ZELLERS) Do you think that all of
15 the steps that you followed in terms of preparing
16 your systematic review are set forth in your report?
17       MS. O'DELL:  Object to the form.
18   A    I think the path that I followed in this
19 review and the method that I used is a method that I
20 have used in a number of other published systematic
21 reviews.
22       And so to the degree that people could
23 sort of say:  Well, this is what Dr. Smith-Bindman
24 does in a review -- she focuses on stratified
25 results -- these are the methods that have done --

Page 104

1  been done, I tried, in writing my report, to
2  highlight the details of what would be needed to
3  understand my result.
4        But I have not, for example, included
5  certain details that you would typically put in a
6  journal article.
7        So in a journal article, you would always
8  publish the version of SAS or R that was used for
9  the report.  I -- I would not have included that.
10       And -- and I believe some of the documents
11 I shared with you that Dr. Hall provided to me on
12 the methodology were included in the e-mail to me.
13       And I may not have included it in the
14 report, thinking that the reader would not -- you,
15 for example, would be interested in some of those
16 biostatistical nuances.
17       But when I publish it, I would put those
18 in because the readership might care about them.
19   Q    You talked, I believe, a minute ago about
20 abstracting data; is that right?
21   A    Yes.
22   Q    Is data abstraction one of the most
23 important steps in conducting a meta-analysis or a
24 systematic review?
25       Would you agree with that?

Page 105

1    A    I would agree with that.
2    Q    Would you agree that the accuracy of the
3  data abstraction is very important to the validity
4  of the analysis?
5    A    I think one of the hallmarks of doing a
6  systematic review is, in fact, to have several
7  people abstract the data points so that you can be
8  assured that there are -- that they're done as
9  accurately as possible, with the understanding of a
10 single data abstraction by a single person can never
11 be perfect.
12       And so the more people that abstract and
13 review, the greater the accuracy of the data.
14   Q    Your data abstraction was not perfect,
15 correct?
16   A    It was not.
17       MS. O'DELL:  Object to the form.
18   Q    (BY MR. ZELLERS) The data abstraction that
19 was done by Dr. Hall was not perfect; is that right?
20       MS. O'DELL:  Object to the form.
21   A    That is correct.
22   Q    (BY MR. ZELLERS) If data is misrepresented
23 -- well, strike that.
24       Are you familiar with the
25 term "misrepresentation"?

Page 106

1    MS. O'DELL:  Object to the form.
2    A   I -- I will admit I'm not sure what the
3 context is you're asking --
4    Q   (BY MR. ZELLERS) Well --
5    A   -- about.
6    Q   -- let me try to put it in another context
7 or at least ask a question that may get to what I am
8 trying to get to.
9         If data is misrepresented from the
10 original study, the analysis -- the systematic
11 review or the meta-analysis can be comprised,
12 correct?
13    A   Yes, I agree.
14    Q   Inaccuracy and misrepresentation of data
15 are considered violations of generally accepted
16 standards of research; is that right?
17    MS. O'DELL:  Object to the form.
18    A   Misrepresentation of data suggests to me
19 that there's some malicious or devious attempt where
20 occasionally there are sometimes simple errors in
21 abstraction when you write down the No. 5 and, in
22 fact, the number really is .5.
23         And often when abstracting data, it's not
24 so much an error of writing down 5 or .5, but it's
25 choosing which number in that manuscript reflects

Page 107

1 what you are really trying to capture and get at.
2         So typically there are more than one way
3 to abstract data. It's why it's not -- it -- it's
4 why it's not simply having multiple people so they
5 don't make typos or small extraction mistakes, but
6 rather, that they're making similar choices.
7         And so misrepresentation, the way you have
8 asked it, makes it sound like there's some malicious
9 attempt to get it wrong or to -- to manipulate it
10 rather than the wrong number was chosen for either a
11 simple error or because there was a choice and the
12 choice was not made in a way that two people would
13 agree. And so...
14    Q   (BY MR. ZELLERS) There can be differences
15 in the way different folks go about doing a research
16 project or a meta-analysis or a systematic review;
17 is that right?
18    A   Yes.
19    Q   In order for someone to reproduce or
20 replicate what another epidemiologist or scientist
21 has done, they need to see the steps that the
22 scientist or epidemiologist followed; is that right?
23    A   That is --
24    MS. O'DELL:  Object to the --
25    A   -- correct.

Page 108

1    MS. O'DELL:  -- form.
2    Q   (BY MR. ZELLERS) Go back to my question.
3 And -- and with the background that you have given
4 and with your qualification, do you agree that
5 inaccuracy and misrepresentation are considered
6 violations of generally accepted standards of
7 research?
8    MS. O'DELL:  Object to the form.  If you
9 don't understand the question, you may ask him to
10 rephrase it.  If --
11    A   I --
12    MS. O'DELL:  -- you understand --
13    A   -- I --
14    MS. O'DELL:  -- the question, feel free to
15 answer it.
16    A   -- I felt like I had answered the question
17 that I understood, so it -- perhaps I'm not
18 understanding your question.
19    Q   (BY MR. ZELLERS) Are you able to answer
20 that question?
21    A   Yes.  I think that misrepresentation of
22 data is not how I would describe an error in
23 abstraction of data or in a difference of opinion
24 about what value reflects the data point you were
25 looking for.  I wouldn't consider that a

Page 109

1 misrepresentation of data.
2    Q   Understood.  Let me ask my question once
3 more.
4    A   Okay.
5    Q   Misrepresentation of data would be a
6 violation of generally accepted standards of
7 research, correct?
8    A   I agree that misrepresentation of data
9 would be a violation of research.
10    Q   A causal analysis cannot be determined
11 based on a single piece of evidence, but requires
12 consideration of the totality of relevant evidence.
13         Do you agree with that?
14    A   I would say in the field of epidemiology,
15 it's unusual to have a single piece of evidence.
16 But I think in some circumstances a single piece of
17 evidence can establish causality.  Not typically in
18 epidemiology work.
19    Q   What do you mean in your report by "causal
20 association"?
21    A   So in my report, I did research as -- sort
22 of as I outlined in my Table of Contents of, you
23 know, number of different areas.
24    Q   Okay.  And I'm going to ask you about
25 those.  Right now my question just --

Page 110

1 A  No.
2 Q  -- is --
3 A  I understand.  I --
4 Q  What --
5 A  -- understand.
6 Q  -- do you mean when you say "causal
7 association"?
8 A  No.  I -- I understand.  I -- I apologize.
9 I was not getting there quite quickly enough.
10 Q  That's all right.
11 A  So I did research on several topics that I
12 thought were highly relevant to coming up with a
13 causal determination, and I put those different
14 pieces of research and expertise together in terms
15 of the causality by specifically looking at the
16 Bradford Hill criteria.
17 Q  I -- and I'm going to get to eventually, I
18 hope, why you came up with whatever opinion you came
19 up with.
20     Right now I'm just trying to understand
21 what you mean when you use the words "causal
22 association."
23     MS. O'DELL:  Object to the form.  Is there
24 a specific case in her report that --
25 Q  (BY MR. ZELLERS)  Sure.  "Conclusion."

Page 111

1 Page 41 of the report, In conclusion, substantial
2 evidence supports a strong, positive, and causal
3 association between ovarian cancer and genital
4 exposure to talcum powder products.
5     I just want to know what you mean when you
6 say "causal association."
7     MS. O'DELL:  I think she answered your
8 question.
9     But you may answer him, if you understand
10 it.
11 A  I -- I think that the -- the four
12 sentences just above that says that, Summary
13 consideration of causality of talc powder products
14 and ovarian cancer using the Bradford Hill.
15     So I -- I -- I believe, using this
16 framework, the Bradford Hill, the components of the
17 Bradford Hill demonstrate that ovarian cancer is
18 caused by regular talcum powder exposure based on
19 the strength of the association, based on the
20 consistency, the temporality of -- of the components
21 of my analysis.
22 Q  (BY MR. ZELLERS)  Do you believe that
23 perineal use of talcum powder by women on a regular
24 basis causes ovarian cancer?
25 A  Yes, I do.

Page 112

1 Q  Is that what you mean by "causal
2 association"?
3 A  Yes, it is.
4 Q  What are the other causes of ovarian
5 cancer?
6 A  So there's a whole long list of risk
7 factors for ovarian cancer.
8 Q  What is the difference between a risk
9 factor and a cause?
10 A  A risk factor is something that puts you
11 at increased risk, increases the probability that
12 you will get ovarian cancer.  And there are
13 innumerable mechanisms and ways that that can go
14 about.
15     But often -- not entirely, but often, you
16 don't think of risk factors as being things that you
17 can alter.  That's not entirely true.
18     There are some risk factors.  For example,
19 the use of -- well, the -- the most commonly cited
20 risk factor for cancer in general is smoking, and
21 that's clearly something that can be started or
22 ended, that can be changed.
23     But often you think of risk factors as
24 things that can't be changed.  So elevation in age,
25 inherited genetics.

Page 113

1     So those things lead to ovarian cancer,
2 the risk factors that I describe in my report.  But
3 most of them are not things that you can influence.
4 Some of them are, but most of them are not.
5     Where talcum powder products -- the use of
6 perineal talcum powder products -- products is
7 something that can be changed.  That -- that is a
8 behavior, and so I think that's the distinction that
9 I would make.
10 Q  A risk factor is something that increases
11 the potential risk of a disease, but cannot be
12 changed, correct?
13     MS. O'DELL:  Object to the form.
14 A  I -- I said that it's often something that
15 can't be changed.  But -- but again, there are risk
16 factors that, by convention, we consider risk
17 factors, but that are modifiable.
18 Q  (BY MR. ZELLERS)  All right.
19 A  And I gave smoking as an example.
20 Q  A cause of a disease is something that can
21 be modified; is -- is that correct?
22 A  It --
23     MS. O'DELL:  Object to the form.
24 A  -- again, it is often used that way.
25 Q  (BY MR. ZELLERS)  What makes a factor cross

Rebecca Smith-Bindman, M.D.

Page 114

1  the line from being a risk factor to being a cause?
2      A   I -- I think what I was suggesting is it's
3  a blurry distinction.  I think it's by convention
4  things that cannot be modified be typically thought
5  as risk factors.  Things that can be modified are
6  generally thought about as being in the causal
7  family -- pathway.
8      But there's no distinction that you can
9  separate something that increases your risk of
10 something versus something that causes it.  The --
11 the causal pathways could be the exact same causal
12 pathways in both situations.
13     Q   What other causes are there of ovarian
14 cancer?
15     A   So I'm guessing from what I have just said
16 that you are asking about causes and risk factors or
17 would you like them to be --
18     Q   Well, do you use "risk factor" and "cause"
19 interchangeably or are they different?
20     MS. O'DELL:  Object to the form; asked and
21 answered.
22     A   I -- I believe that by convention we
23 typically describe risk factors that are things that
24 cannot be altered.
25     But technically there is no difference

Page 115

1  between factors, covariants that influence your
2  cancer risk that you can change or not.  So I can
3  tell you the list of things that fall into those two
4  categories.
5      Q   (BY MR. ZELLERS) All right.  What I want
6  to know is:  Based upon your review and your
7  research over the past year or so, other than
8  perineal use of talcum powder on a regular basis,
9  what other causes of ovarian cancer are there?
10     A   So in my report on page 11, I write that,
11 Numerous risk factors are identified for ovarian
12 cancer.  Unfortunately, few can be modified by
13 therapies or lifestyle changes.  Risk factors
14 include personal or family history of -- of cancer,
15 inherited mutations, BRC1 and BRC2, advanced age,
16 white, race, education, endometriosis.
17     Other factors that may increase --
18 increase ovarian cancer due to estrogen exposure
19 include having no pregnancies or advanced age at
20 first birth, obesity, post menopausal hormone
21 therapy.
22     Several factors I list are associated with
23 a decreased risk of ovarian cancer such as breast
24 feeding or multiple pregnancies, oral
25 contraceptions, tubal ligation, or hysterectomy.

Page 116

1  Smoking is a possible risk factor.
2      So all of those are in the category of
3  risk factors for ovarian cancer.
4      Q   My question goes to cause.  Based upon
5  your review of the literature over the past year,
6  what other causes of ovarian cancer have you
7  identified, if any?
8      MS. O'DELL:  Objection to form; asked and
9  answered.
10     A   There are other contributors to ovarian
11 cancer like pelvic inflammatory disease, which I
12 think was on the list of what I just noted.
13     There are no other modifiable factors that
14 I would put on the list of things that cause ovarian
15 cancer other than exposure to talc powder products.
16     Q   (BY MR. ZELLERS) Based upon your review of
17 the literature in terms of a cause for ovarian
18 cancer, the only cause that you have identified is
19 the regular perineal use of talcum powder by women,
20 correct?
21     MS. O'DELL:  Object to the form.
22 Misstates her testimony.
23     A   I believe I just said that pelvic
24 inflammatory disease increases the risk of ovarian
25 cancer.

Page 117

1      Q   (BY MR. ZELLERS) Is pelvic in --
2      MS. O'DELL:  Excuse me.  I'm sorry.  Were
3  you finished, Dr. Smith-Bindman?  I mean, if you're
4  not, you -- you may continue.  If so, I apologize --
5      A   I --
6      MS. O'DELL:  -- for interrupting you both.
7      A   -- I was going to add that endometriosis
8  has been noted also as a contributor to --
9      Q   (BY MR. ZELLERS) Is -- are you finished?
10     A   -- I am.
11     Q   Okay.  Is pelvic inflammatory disease a
12 cause of ovarian cancer?
13     A   I -- I -- you -- you keep asking me the
14 same question, and I don't understand the
15 distinction that you are asking me to make between
16 something that causes cancer and something that's a
17 risk factor.
18     In both situation -- situations there is a
19 probability of getting a disease versus not getting
20 a disease.  There's no 100 percent association, and
21 so most people, as an analogy who smoke cigarettes,
22 do not get lung cancer.  It's fewer than 15 percent.
23     Does smoking cause lung cancer?  Yes.  Is
24 it a risk factor for lung cancer?  Yes.  Is it a
25 single pathway that everyone who smokes, gets lung

Rebecca Smith-Bindman, M.D.

Page 118

1 cancer?  No.
2        So I -- you're asking me to make a
3 distinction that I don't make in my head, so I'm --
4 I'm not sure -- all of the things I suggested as
5 risk factors in some women will cause them to have
6 cancer.
7    Q    You are opining in this case that the
8 regular perineal use of talcum powder causes ovarian
9 cancer, correct?
10   A   Yes, I am.
11   Q   My question is:  Does pelvic inflammatory
12 disease cause ovarian cancer?
13   A   In some women, pelvic inflammatory disease
14 will cause cancer.
15   Q   You -- you would list a pelvic
16 inflammatory disease as a cause of ovarian cancer;
17 is that your testimony?
18       MS. O'DELL:  Objection, asked and
19 answered.
20   A   I would include pelvic inflammatory
21 disease with all the other ovarian cancer risk
22 factors like BRCA1 and 2 as being one of a large
23 number of contributors and risk factors for ovarian
24 cancer.
25       There -- there is not -- no other

Page 119

1 exposure -- a modifiable exposure that I can think
2 of that leads to getting ovarian cancer or causing
3 ovarian cancer.
4    Q    (BY MR. ZELLERS) In -- in your practice as
5 a radiologist, you do not evaluate what caused an
6 individual patient's ovarian cancer; is that right?
7        MS. O'DELL:  Object to the form.
8    A   As a -- a radiologist, I do not.
9    Q    (BY MR. ZELLERS) You don't diagnose what
10 caused any individual patient's ovarian cancer; is
11 that right, in your practice -- your medical
12 practice.
13       MS. O'DELL:  Objection, asked and
14 answered.
15   A   I -- I -- I do not.  I diagnose ovarian
16 cancer.  I diagnosis pelvic inflammatory disease.
17 But in an individual patient, I wouldn't tell a
18 patient why they got ovarian cancer.
19   Q    (BY MR. ZELLERS) You -- you have not, at
20 least as of this time, published on your theory that
21 there is a causal association between genital talcum
22 powder exposure and ovarian cancer; is that right?
23       MS. O'DELL:  Object to the form.
24   A   I have not published on my conclusion that
25 talcum powder products causes ovarian cancer.

Page 120

1    Q    (BY MR. ZELLERS) Have you done anything to
2 advise the health community about your belief that
3 there is a causal association between talcum powder
4 use and ovarian cancer?
5    A   I have mentioned to you that I have spoken
6 about my review to several individuals, several
7 close mentors of mine in leadership roles within the
8 healthcare community.  So I --
9    Q   Who?
10   A   -- not -- not individuals I am willing to
11 name.
12   Q   You won't tell me who you have talked to
13 about your belief or your theory that there's a
14 causal association between genital talcum powder use
15 and ovarian cancer?
16   A   I would prefer not to share that
17 information.
18   Q   Have you contacted any public health
19 authorities such as the FDA or the National Cancer
20 Institute?
21   A   I have not.
22   Q   Have you written any type of an op-ed or
23 other news article on this topic?
24   A   Not yet.  I have not.
25   Q   You have done that in the past; is that

Page 121

1 right?
2    A   Had -- you're asking if I have written
3 op-eds on areas I have done research?
4    Q   Yes.
5    A   Yes, I have.
6    Q   Back in 2014, you did an op-ed in The New
7 York Times relating to CT scans; is that right?
8    A   Yes, I did.
9    Q   All right.  You concluded or at least put
10 in the op-ed, In 2007, CT scans will cause 29,000
11 excess cancer cases and 14,500 excess deaths; is
12 that right?
13   A   I don't have it in front of me.  But it
14 looks like you do, and so I'm going to guess that
15 that's correct.
16   Q   Well, does that sound right to you?
17   A   It does sound right.
18   Q   You put in that editorial or op-ed that in
19 your opinion, 3 percent to 5 percent of all future
20 cancers may result from exposure to medical imaging
21 such as CT scans; is that right?
22       MS. O'DELL:  And if you have a
23 recollection and -- and you -- and your memory
24 confirms those -- those facts, please feel free to
25 testify to it.  If you need to see the op-ed, then

1 I'm sure counsel would be willing to put it in front
2 of you.
3     A    That particular statistic, I don't have to
4 see. I know that static --
5     Q    (BY MR. ZELLERS) All right.
6     A    -- so yes.
7     Q    You are familiar with the Center for
8 Disease Control, correct?
9     A    Yes, I am.
10     Q    The CDC or Center for Disease Control is a
11 reputable organization; is that right?
12         MS. O'DELL:  Object to the form.
13     A    I think they're a very reputable
14 organization.
15     Q    (BY MR. ZELLERS) You have served on
16 several committees for the CDC in the past; is that
17 right?
18     A    I currently work on several committees
19 with them.
20     Q    Do the doctors and scientists in the CDC
21 work hard to protect women's health, based on your
22 experience?
23     A    Yes, they do.
24     Q    In forming your opinions in this case, did
25 you consider the risk factors that the CDC

1 recognizes for ovarian cancer?
2     A    From my report, I read an enormous number
3 of articles, and I spent considerably time
4 considering those articles from a data point of
5 view.
6         And I did not, for the most part, weigh
7 other organization's summaries if they were not
8 quantitative and very explicit in what reviews they
9 did, what literature they included.
10         And sometimes they -- organizations did do
11 that, but did not do nearly as -- a comprehensive
12 job. So I -- I would not have relied on any
13 professional organization's reviews unless they were
14 quantitative the way -- the way my own were?
15         MR. ZELLERS:  Move to strike as
16 nonresponsive.
17     Q    (BY MR. ZELLERS) Let me ask the question
18 again. In forming your opinions in this case, did
19 you consider the risk factors that the CDC
20 recognizing for ovarian cancer?
21         MS. O'DELL:  Object to the form.
22     A    I saw documents on their websites that
23 list risk factors, and no individual organization's
24 summaries, either for patients or for clinicians,
25 formed a very large piece of my opinion. It was one

1 of many pieces of information I used.
2     Q    (BY MR. ZELLERS) Are you aware that in
3 their patient-facing websites, as well as their
4 publicly available information about ovarian cancer,
5 the CDC does not identify perineal use of talcum
6 powder as a risk factor for ovarian cancer?
7     A    Yes, I do remember seeing that.
8     Q    You don't have any reason to believe that
9 the folks at the CDC have not kept up to date with
10 talc and ovarian cancer epidemiology, do you?
11         MS. O'DELL:  Object to the form.
12     A    I believe that the comprehensiveness of
13 the review that I did and the amount of time that I
14 put into this review, as I have in -- in many other
15 reviews, requires a very deep dive into the
16 literature.
17         And I do not believe that the CDC has
18 funding or resources to do that kind of deep dive.
19 And so typically what they do is sort of review some
20 things that have been published. Most things, they
21 don't end up reviewing.
22         And so I have no reason to believe anyone
23 at the CDC deliberately didn't do a comprehensive
24 review of the literature, but -- nor do I have any
25 evidence that they did a comprehensive review of the

1 literature.
2     Q    (BY MR. ZELLERS) Do you have any personal
3 knowledge one way or the other as to the extent of
4 the review of the science and literature that the
5 CDC did in compiling its list of risk factors for
6 ovarian cancer?
7     A    I --
8         MS. O'DELL:  Object to the form.
9     A    -- I would have to refresh my memory by
10 looking at their -- their website and documents. If
11 you provided those, I could.
12     Q    (BY MR. ZELLERS) My question is: Do you
13 have any personal knowledge one way or the other as
14 to what the CDC has done with respect to a review of
15 the scientific literature in compiling its list of
16 risk factors for ovarian cancer?
17     A    I don't know offhand what they did. And I
18 don't recall when looking at their website, what
19 references they listed.
20         I think if their reference list included a
21 very short -- small number of references, I would
22 have concluded that they had not done a very
23 comprehensive review.
24     Q    (BY MR. ZELLERS) My question is: Do you
25 have any personal knowledge as to what the CDC did

Rebecca Smith-Bindman, M.D.

Page 126

1 or did not do with respect to its review of the
2 literature?
3   A   Again, I don't know off the top of my
4 head.  But I know I went to their website, and I
5 don't --
6   Q   Other than looking at their website, do
7 you have any personal knowledge?
8   A   No, I do not.
9   Q   All right.  Have you communicated to
10 anyone at the CDC that you disagree with their
11 position?
12   A   I -- I'm laughing at the nature of the
13 question.  There wouldn't be anyone at the CDC to
14 disagree with.
15   Q   There -- there's no one at the CDC that
16 you, as a concerned radiologist, could go to and
17 say:  Hey, I think that you should list perineal
18 talc use as a risk factor for ovarian cancer?
19     MS. O'DELL:  Object to the form.
20   Q   (BY MR. ZELLERS) There's no one you could
21 talk to at the CDC about that?
22   A   I -- I would -- I would have to confirm
23 that that -- I have been -- I -- I study
24 environmental carcinogens.
25     And you pointed out my New York Times

Page 127

1 op-ed that put a message out there that said:  I
2 think this is an environmental carcinogen.
3     And I have spoken about that topic in many
4 forms.  I have testified before Congress several
5 times.  I testified to the FDA.  I have spoken to
6 CMS.
7     All of that took years to get people to
8 hear those messages.  It was not that:  Oh, I see
9 there's a problem here.  Let me just tell the top
10 person to do that.
11     And -- and so I'm -- you're suggesting
12 there's someone at the CDC that I could call and
13 say:  Oh, by the way, I think that's an important
14 topic.  I appreciate your giving me that idea.  I
15 will move forward once I publish a paper on this
16 topic.
17     But -- but that's not nearly as -- as
18 simple as you're suggesting in your question.
19 There's a naiveness there that there's someone at
20 the CDC who would -- who takes responsibility for
21 what they do and -- on all of their websites and you
22 can sort of give them feedback on that.
23   Q   You believe I'm being naive to think that
24 there's a person responsible at the CDC for
25 compiling a list of risk factors for ovarian cancer?

Page 128

1     MS. O'DELL:  Object to the form.
2   A   Naive to suggest that a single person
3 could just call them and say:  I have looked at this
4 topic, and you should change what you are doing.
5   Q   (BY MR. ZELLERS) Are you familiar with the
6 National Institute of Health?
7   A   I am.
8   Q   You have received funding from the
9 National Institute of Health; is that right?
10   A   I have.
11   Q   Do you know that the National Institute of
12 Health does not list talc use as a risk factor for
13 ovarian cancer?
14     MS. O'DELL:  Object to form.
15   A   Again, I -- yeah, I know that the NCI, PDQ
16 that writes reports for patients and clinicians
17 about risk factors for cancer has a report on risk
18 factors for ovarian cancer and that they conclude
19 that there's inadequate evidence for talc.
20   Q   (BY MR. ZELLERS) Inadequate evidence,
21 correct?
22   A   I -- I -- I wasn't finished.
23   Q   Please finish.
24   A   So they don't stand -- just to clarify,
25 for the National Institute of Health.  It's a very

Page 129

1 prestige body.  It's an organization within a small
2 part of the NCI.
3     I know it well, because I served on that
4 committee for many years.  I know the process
5 whereby they review the literature and created a
6 whole a bunch of standards within what they do
7 around that.
8     And I looked and saw that they updated
9 their summary of talc in 2018.  And -- and yet,
10 within that summary, they do list the references
11 that they cite, and they omit a large number of
12 references that are recent.
13     So I do know their conclusion.  I do not
14 agree with their conclusion.  And there were large
15 gaps in their literature.  And that update was very
16 recent.
17     I -- I told you I don't know the
18 leadership at the CDC, and they don't have a
19 process.  But I do know the leadership on this
20 committee and -- and will point out their omissions
21 to this committee.
22   Q   Well, I haven't gotten to the National
23 Cancer Institute yet.
24     My question was:  Do you know that NIH,
25 the National Institute of Health, does not list use

Rebecca Smith-Bindman, M.D.

Page 130

1 of talcum powder as a risk factor for ovarian
2 cancer?
3     A   So I -- I -- I don't know what -- I'm
4 sorry.  I don't know what you're talking about,
5 the --
6     Q   All right.
7     A   -- NIH.
8     Q   Take a look, if you will, at Deposition
9 Exhibit 19, which is captioned NIH steer -- or
10 "SEER, S E E R, Training Modules" and has got "Risk
11 Factors" at the top.
12         (Exhibit 19 was marked for identification
13 and is attached to the transcript.)
14         MS. O'DELL:  Thank you.
15     A   So SEER is also a part of National Cancer
16 Institute.  It's the surveillance epidemiology --
17         MR. LAPINSKI:  Have her wait for a
18 question.
19         MS. O'DELL:  Sorry.  Just wait for his
20 question.  Yeah, thanks, Dan.
21     Q   (BY MR. ZELLERS) You recognize Exhibit 19
22 as a training module from NIH and specifically from
23 the National Cancer Institute; is that right?
24     A   So this says at the top "SEER Training
25 Modules."

Page 131

1         I don't know what this is.  I know SEER
2 quite well.  It's the National Cancer Registries.
3 But I -- I don't -- don't know what this training
4 module is.  But I do see that you are showing me
5 some risk factors.
6     Q   Talc is not listed as a risk factor for
7 ovarian cancer in this document, Exhibit 19, that
8 was updated in June of 2018 from NIH and the
9 National Cancer Institute; is that right?
10     A   I -- I want to sort of explain my
11 confusion.  The SEER, Surveillance, Epidemiology,
12 and End Result, program does not train or educate
13 individuals typically using documents like this.
14         Often this is for cancer abstractors to
15 know what information they're asking their
16 abstractors to collect.
17         I -- I don't know what this is, but it
18 doesn't look to me like something that's identifying
19 risk factors as much as asking medical chart
20 abstractors to write down information that they're
21 collecting as part of their data.
22     Q   My question is very simple.  This is a
23 list that at the top says "Risk Factors."
24         The introductory statement says, The main
25 risk and protective factors for ovarian cancers

Page 132

1 include modifiable and nonmodifiable parameters.
2         Is that right?  And then it lists out
3 nonmodifiable parameters and modifiable parameters;
4 is that right?
5     A   Yes, that's what this --
6     Q   Talcum --
7     A   -- says.
8     Q   -- powder use is not listed, correct?
9     A   Correct.
10     Q   All right.  Take a look, if you will --
11 and this is the document that you were talking about
12 a moment ago -- at Deposition Exhibit 20.
13         (Exhibit 20 was marked for identification
14 and is attached to the transcript.)
15     Q   (BY MR. ZELLERS) This is the "National
16 Cancer Institute Review of Ovarian, Fallopian Tube,
17 and Primary Peritoneal Cancer Prevention PDQ"; is
18 that right?
19     A   Yes, it is.
20     Q   This is the document that you told us a
21 few minutes ago that you disagree with the
22 conclusion; is that right?
23         And specifically if you go to page 5 of 9
24 under "Perineal Talc Exposure," the statement from
25 the National Cancer Institute in this document is

Page 133

1 that the weight of evidence does not support an
2 association between perineal talc exposure and an
3 increased risk of ovarian cancer.  Results from
4 case-control and cohort studies are inconsistent.
5         Is that right?
6     A   That is what they conclude.
7     Q   This was updated, if you looked at the
8 last page, page 9 of 9, on January 4 of 2019; is
9 that right?
10         MS. O'DELL:  Object to the form.
11     A   Can you show me where it's been updated?
12     Q   (BY MR. ZELLERS) Sure.  Look at the very
13 last page.  In bold, "Updated January 4, 2019"; is
14 that right?
15     A   It does say that --
16     Q   All right.
17     A   -- yes.
18     Q   Are there limitations on epidemiological
19 data?
20     A   Yes, there are.
21     Q   Do you agree that epi -- epidemiologic
22 data alone cannot permit a determination regarding
23 causation?
24     A   I'm sorry.  Can you just --
25     Q   Do you need me to say it again or can you

Rebecca Smith-Bindman, M.D.

Page 134

1 read it off the screen?
2    A   I can read it off the screen.  I think
3 epidemiologic data can provide an enormous amount of
4 information about causation.  But there are other
5 considerations that would have to be also taken into
6 account to also support that.
7    Q   Can epidemiologic data alone permit a
8 determination regarding causation?
9    MS. O'DELL:  Object to the form.
10    A   I think epidemiologic data can be used in
11 combination with other data to determine causality,
12 but by itself cannot be used alone to determine
13 causality.
14    Q   (BY MR. ZELLERS) The current epidemiologic
15 data, as it exists, does not enable someone to
16 distinguish between brands of cosmetic talc
17 products; is that right?
18    MS. O'DELL:  Object to the form.
19    A   I would agree.
20    Q   (BY MR. ZELLERS) You can't tell in any of
21 the 40 plus studies that you reviewed, that the
22 women who were involved in those studies used talc
23 products manufactured by Johnson & Johnson
24 Consumer, Inc., or by another company; is that
25 right?

Page 135

1    MS. O'DELL:  Object to the form.
2    A   I -- I would agree that most of the papers
3 that I read did not specify what the source of the
4 baby powder was.
5    Q   (BY MR. ZELLERS) Based on the analysis
6 that you have done, you're not able to draw an
7 opinion specifically about an increased risk of
8 ovarian cancer that is tied to a particular brand of
9 talcum powder, correct?
10    MS. O'DELL:  Object to the form.
11    A   My impression is that a large proportion
12 of the talcum powder products that are available
13 happen to be made by Johnson & Johnson, but I do not
14 know for any given study -- for most of the studies,
15 at least, what kind of talcum powder it was.
16    Q   (BY MR. ZELLERS) Okay.  Is your impression
17 that you just shared with us, you know, based on
18 information you have received from plaintiffs'
19 counsel?
20    MS. O'DELL:  Object to the form.  Don't --
21 don't discuss what's been provided by -- let me say
22 that again.
23    Don't -- don't discuss conversations with
24 plaintiffs' counsel.  Thank you.
25    A   I -- my impression is based on seeing an

Page 136

1 awful lot of Johnson & Johnson baby powder over the
2 last 50 plus years.  And -- and I am --
3    Q   (BY MR. ZELLERS) And --
4    A   -- not sure whether there's lots of other
5 dominant players in the space.  I -- I don't know
6 that.
7    My impression is that Johnson -- baby
8 powder baby is a Johnson & Johnson a product very,
9 very often.
10    Q   But you have not done any type of survey
11 --
12    A   I have --
13    Q   -- or analysis?
14    A   -- I have not.
15    Q   If the biological mechanism by which a
16 talcum powder product can increase the risk of
17 ovarian cancer is because of a particular
18 contaminant or collection of contaminants, but that
19 contaminant or collection of contaminants does not
20 exist in all talcum powder products, will the
21 epidemiologic evidence that exists today allow you
22 to see that distinction?
23    MS. O'DELL:  Object to the form.
24    A   You're asking about contaminants of talcum
25 powder products.  My understanding from what I have

Page 137

1 reviewed is that the components of talcum powder
2 products include asbestos, include fibrous talc,
3 include heavy metals, include fragrances.
4    Let's get rid of the header -- the --
5 the fragrances.  Just the heavy metals, the
6 asbestos, and the fibrous talc.  My understanding is
7 that those are in the same mines as the platy talc,
8 which is the desired part of talc.
9    To the degree that those are all part and
10 parcel of the same product, they're not -- I
11 wouldn't think of them as contaminants.  I would
12 think of them as just part of the product.
13    And so to the degree that that product
14 cannot be separated, I would be concerned that any
15 talcum powder products have all of the above.
16    I separated fragrance, because that's
17 something that's added.  That's not mined directly.
18 But the other items, my understanding is that's part
19 of the talc.
20    Q   You don't know one way or the other
21 whether talcum powder products contain asbestos, do
22 you?
23    MS. O'DELL:  Object to the form.
24    A   You're asking me to opine whether talcum
25 powder products contain asbestos?

Rebecca Smith-Bindman, M.D.

Page 138

1  Q   (BY MR. ZELLERS) Yes.
2  A   Yes, I -- I feel very certain that talcum
3  powder products, at least over many years, contained
4  asbestos.
5  Q   Is that part of your opinion in this case?
6  A   Yes, it is.
7  Q   Is it your opinion in this case that
8  talcum powder products contain trace amounts of
9  heavy metals?
10  A   Yes, it is.
11  Q   Is it also part of your opinion in this
12  case that talcum powder products contain different
13  fragrance chemicals?
14  A   Yes, it is.
15  Q   Do you have any opinion as to how many
16  fragrance chemicals are contained in talcum powder
17  manufactured by a Johnson & Johnson company at any
18  time?
19  MS. O'DELL: Object to the form. With
20  regard to "opinion."
21  A   I have seen long lists of chemicals and
22  fragrances that are contained.
23  I'm not familiar enough with -- with the
24  testing that was done to understand how that's
25  changed over time in a Johnson & Johnson product

Page 139

1  versus other talcum powder products.
2  Q   (BY MR. ZELLERS) Do you have any opinion
3  or knowledge as to the amount or concentration of
4  particular fragrance chemicals that are contained in
5  talcum powder manufactured by Johnson & Johnson?
6  A   I -- I do not.
7  Q   Do you have any opinion or knowledge as to
8  the amount or concentration of trace chemicals
9  -- strike that -- trace heavy metals that may be
10  contained in talcum powder manufactured by Johnson &
11  Johnson?
12  A   I have seen reports of the amounts that --
13  you know, sort of in the ballpark of hundreds to
14  thousands of parts per million.
15  But I'm not an expert in understanding
16  those numbers in comparison to the concentrations in
17  other things that we're exposed to. They're much
18  higher. They're orders of magnitudes higher, but
19  I'm not an expert to understand how those different
20  concentrations might be expected to have an
21  influence on talc.
22  Q   The same question with respect to
23  asbestos. Do you have any opinion or knowledge as
24  to the amount or concentration of asbestos that you
25  believe is contained in any talcum powder

Page 140

1  manufactured by Johnson & Johnson?
2  MS. O'DELL: Object to the form. to the
3  form.
4  A   So unlike the question about heavy metals
5  where it sort -- there are traces of heavy metals in
6  other things to which we're exposed regularly, like
7  water. We don't expect any concentrations of
8  asbestos in products that we're exposed to.
9  And so put in that context, while I'm not
10  an expert in the mineralogy, the numbers that I have
11  seen are tens of thousands to millions of fibers
12  that might be in grams of product seem like an awful
13  lot of units or dose of -- of asbestos or fibrous
14  talc.
15  MR. ZELLERS: Move to strike as
16  nonresponsive.
17  Q   (BY MR. ZELLERS) You do not have personal
18  knowledge as to any amounts or concentrations of
19  asbestos in talcum powder manufactured by Johnson &
20  Johnson --
21  MS. O'DELL: Objection.
22  Q   (BY MR. ZELLERS) -- correct?
23  MS. O'DELL: Objection, asked and
24  answered.
25  A   I have seen several reports of Johnson &

Page 141

1  Johnson products that have been tested for
2  concentrations of asbestos or asbestiform talc that
3  have concentrations shown kind of in ranges of a
4  tenth of a percent or, as I mentioned, tens of
5  thousands or mid -- millions of fibers.
6  And those have been tested by -- by
7  several different people, but coming up with units
8  of dose within Johnson & Johnson talcum powder
9  products.
10  Q   (BY MR. ZELLERS) You're not a geologist,
11  correct?
12  A   I am not a geo --
13  Q   You're --
14  A   -- logist.
15  Q   -- not a mineralogist, correct?
16  A   I am not.
17  Q   You have reviewed some expert reports from
18  Dr. Longo; is that right?
19  A   Among others, yes.
20  Q   You have reviewed some testing reports.
21  Some purportedly show that there is asbestos present
22  in talcum powder and some that show that there's not
23  asbestos in talcum powder; is that right?
24  MS. O'DELL: Object to the form.
25  A   I have seen a lot of reports that have

**Page 142**

1 shown the presence of talcum powder containing
2 asbestos and fibrous talc.
3     You listed some of those, the Longo
4 reports, a bunch of publications in the literature
5 such as Blount's.
6     I have seen some testing from Dr. Hopkins,
7 from Imerys, from Cooke. I have also seen some
8 negative reports.
9     Q   (BY MR. ZELLERS) The answer to my question
10 is: Yes, you have seen testing that purportedly
11 shows there to be some asbestos in the J&J
12 manufactured talcum powder and you have seen reports
13 that, you know, indicate there's not asbestos in the
14 talcum powder; is that fair?
15     A   The way that you have described it makes
16 it seem like I have seen comprehensive reports that
17 have shown in totality there is asbestos and reports
18 that have shown there's not. I haven't seen that.
19     Q   All right.
20     A   I have seen reports that have shown in
21 totality there are. I have seen individual samples
22 that have shown there's not asbestos in those
23 individual samples.
24     But I haven't seen a systematic report
25 that have shown in, for example, a large number of

**Page 143**

1 specimens, none had asbestos. I haven't seen that.
2     Q   You have seen, at least in large part, the
3 information that's been provided to you by
4 plaintiffs' attorneys; is that right?
5     MS. O'DELL: Object to the form. to the
6 form.
7     A   I think some of the public -- published
8 literature was not provided by plaintiff attorneys
9 and some has been, such as the Longo reports.
10     MR. ZELLERS: All right.
11     MS. O'DELL: Mike, we have been going
12 about an hour and 30 minutes. And our lunch is
13 here, so is this a good time.
14     MR. ZELLERS: Sure --
15     MS. O'DELL: -- for a break?
16     MR. ZELLERS: -- of course.
17     THE VIDEOGRAPHER: This marks the end of
18 Disc 2. We are off the record at 12:37 p.m.
19     (A break was taken from 12:37 p.m. to
20 1:36 p.m.)
21     THE VIDEOGRAPHER: We are back on the
22 record. This marks the beginning of Disc No. 3 in
23 the deposition of Dr. Rebecca Smith-Bindman. The
24 time is 1:36 p.m.
25     MR. ZELLERS: Dr. Smith-Bindman, let's go

**Page 144**

1 off the record for a moment.
2     THE VIDEOGRAPHER: We're off the record at
3 1:36 p.m.
4     (A break was taken from 1:36 p.m. to
5 1:37 p.m.)
6     THE VIDEOGRAPHER: We are back on the
7 record. The time is 1:37 p.m.
8     Q   (BY MR. ZELLERS) Dr. Smith-Bindman, you
9 had recalled, I believe, the name of the fourth
10 plaintiff lawyer that you met with?
11     A   Carmen Scott.
12     Q   I want to ask you some questions about the
13 systematic review that you did. You have not
14 published that, correct?
15     A   I have not.
16     Q   If at any point you do publish your
17 systematic review, would you disclose that you are a
18 paid expert for the Plaintiffs in the talcum powder
19 litigation?
20     A   Yes, I would.
21     Q   You would expect any expert who is paid to
22 perform a review or who has a study funded by
23 Plaintiffs to make that disclosure, correct?
24     MS. O'DELL: Object to the form.
25     A   My understanding from my experience is

**Page 145**

1 that different journals require different
2 disclosures. So if you're paid by someone, you
3 typically would have to disclose, but the detail
4 would -- would vary by journal.
5     Q   (BY MR. ZELLERS) What methodology or
6 methodologies did you use to arrive at your opinion
7 that regular use of talcum powder increases a
8 woman's risk of developing invasive serous cancer by
9 about 50 percent?
10     A   So I would say there were two parts. The
11 first part is my systematic review of the published
12 literature. I think I mentioned earlier that I have
13 published several systematic reviews.
14     And the mechanism of perform -- performing
15 those systematic reviews are both ones that I have
16 personally used and ones that I was involved in
17 developing the methodology as part of my work on the
18 Cochrane collaboration.
19     So it involves doing a very standardized
20 search, creating an approach for abstracting data,
21 abstracting the data. An approach that I used for
22 summarizing the data, which usually is looking at
23 stratified results, results in sort of specific
24 categories as opposed to broad categories.
25 Statistically summarizing the results and showing

Rebecca Smith-Bindman, M.D.

Page 146

1  them.
2      So part of my conclusion was based on my
3  own systematic review.  And then part of my
4  conclusion was based on my review of the published
5  literature on the actual epidemiology data, as well
6  as other considerations that went into consideration
7  of the Bradford Hill criteria such as mechanistic
8  data and any other requirements of Bradford Hill.
9      Q   Tell us step by step how you performed
10  your systematic review or analysis.  And now I'm
11  referring to the meta-analysis or meta-analysis-like
12  review that you did.
13      A   Okay.  So I would just like to do a slight
14  preamble to that, which is that the direction that
15  my review took was partly informed by having read
16  through a number of articles on the topic.  So
17  determining sort of where there was a gap, what was
18  the most important area to focus on.  So that sort
19  of was the background.
20      And then for the review, the literature
21  search is the first step.  So you want to broadly
22  identify all relevant literature, published and
23  unpublished, to include.
24      And that includes searching on several
25  databases -- PubMed was -- Medline were -- Embase,

Page 147

1  Scopus were -- were databases that I started my
2  search.
3      I included in the report some of the
4  keywords I used, keywords including "ovarian cancer,
5  talc, perineal powder, genital powder."
6      So I generated a long list of articles
7  that I retrieved and then reviewed the references
8  for each of those articles, which usually doesn't
9  identify a lot more articles, but usually identifies
10  a few that I may have missed in my search, but that
11  other people have found in their reviews or
12  systematic reviews.  So the first step was to
13  identify the literature.
14      Q   What was the next step?  And again, I'm
15  focused on your methodology for the systematic
16  review or analysis that you did, as reflected in
17  your report?
18      A   So the second step is:  Identified a large
19  number of publications, but some of them may not
20  have been particularly relevant.
21      For example, they may have sounded in the
22  title like they were primary data, but they may have
23  actually only been review data.
24      So Step 2 is to review the abstracts for
25  all of those identified articles and then to go

Page 148

1  through those and to review to make sure that they
2  had primary data.
3      So I was only interested in studies that
4  had primary data, which meant that review articles
5  or editorials or letters to the editors or opinion
6  pieces were dropped from that list.
7      So then I had data that were -- I had
8  studies that had primary data, so that became my
9  list of articles.
10      And -- and then I created a data
11  abstraction form for what variables I wanted to
12  include.  So some variables are the number of cases;
13  the number of controls; the kind of study design
14  whether it was a case-control study or another
15  design.
16      It included -- included the groups that I
17  cared most about.  So you mentioned serous cancer,
18  so I included what kind of histologies they looked
19  at.
20      I included in my initial data form,
21  variables that I ended up not using in my review
22  because I didn't have enough data.
23      So in my initial draft of variables that I
24  might like to abstract was the relationship in pre
25  versus postmenopausal women.

Page 149

1      But when I ended up reviewing articles,
2  there just was not -- not enough data there to make
3  sense of, so I created a data abstraction form.
4      I then went one by one through the
5  articles which I organized and abstracted the data
6  that I had set out to do.
7      And in the course of doing that, I would
8  ensure that the participants that were described in
9  those reports were, in fact, unique subjects.
10      So within this field, just like many
11  fields, people sometimes publish an individual
12  patient in more than one study.  And -- and you
13  don't want to include that, if you can.
14      So as part of my review was to determine
15  how independent the patients were and to make a note
16  if there was overlap.
17      I also didn't mention some of the features
18  that I abstracted.  But it wasn't just the primary
19  result, which was what was the adjusted odds ratio
20  or risk ratio associated with exposure to talcum
21  powder products, but it was also -- what I was most
22  interested in is quantifying that exposure to a
23  degree that had not been present in all the
24  individual reviews that I had previously said.  So I
25  was interested primarily in abstracting data on

Page 150

1 regular exposure to talcum powder.
2        So when I went through the articles, I
3 noted whether -- what the point estimates were, but
4 also whether they had information on all of the
5 things that were in my database.
6        I went through and abstracted data several
7 times.
8    Q   Okay.  Well, that's --
9    A   Oh.
10       MS. O'DELL:  She may not be done but --
11   Q   (BY MR. ZELLERS) Well, I understand.  So
12 I'm just trying to go through your methodology here.
13       So after you abstracted the data and
14 included it or put it on your data abstraction form
15 for each study, what was the next step in your
16 systematic review?
17       MS. O'DELL:  So just continue on, Doctor,
18 what your process was.
19   A   Okay.  Well -- so the next step was to
20 decide which -- which of those papers might have
21 been missing data.
22       So once I abstracted the data, there were
23 gaps almost certainly in the data.  And so I -- I
24 just wanted to emphasize -- I was starting to say
25 this earlier -- that I -- I went back to the papers

Page 151

1 and tried to sort of ensure that I was consistently
2 pulling the data in my database requirement for
3 every study.
4        After I did that, the next step would be
5 to combine the data statistically.  And that would
6 be to pro -- perform steps to figure out how the
7 data can be -- could be combined.
8        And that required looking at issues of
9 consistency across the studies or heterogeneity and
10 then to make sure that the sub analysis that I
11 wanted to do -- the stratified analysis that I
12 wanted to do could be done based on whether I had
13 data for each of those studies in the stratified
14 category.
15       So as an example, I wanted to make sure
16 that I -- I had whatever information was in the
17 paper that could then go to the next step of
18 analysis.
19       And so that's when, actually, I reached
20 out to a biostatistician with -- expert in the
21 biostatistical aspect to do two things:  To both
22 double-check my numbers and ensure that the numbers
23 that -- had been abstracted correctly and then to do
24 the biostatistical analysis and generate the
25 graphical representation of the data.

Page 152

1    Q   That's what Dr. Hall did; is that right?
2    A   That is what Dr. Hall did.  I should have
3 a caveat there.  We -- she absolutely lead that part
4 of the analysis, but I reviewed every step of that
5 very carefully.
6        And there were several places that I --
7 I -- I saw errors in some of the calculations that
8 we went back and forth on to correct those
9 calculation errors.
10   Q   Have you completed your methodology or the
11 different steps in your methodology?
12       MS. O'DELL:  In terms of the
13 meta-analysis?
14   Q   (BY MR. ZELLERS) Yes.  In terms of the
15 systematic review or meta-analysis that you did.
16   A   I believe I have highlighted all the
17 steps.
18   Q   You tried or did correct any errors in
19 calculations or numbers by Dr. Hall; is that right?
20       MS. O'DELL:  Object to the form.
21   A   Yes, I did.
22   Q   (BY MR. ZELLERS) Did anyone else review
23 your calculations and Dr. Hall's calculations?
24   A   No.  Just the two of us.
25       You said something, that I corrected some

Page 153

1 of her numbers.  I -- she also corrected some of my
2 numbers.
3        It was a bi-directional two set of eyes on
4 all of the analysis --
5    Q   I --
6    A   -- and abstractions.
7    Q   -- essentially what you did is you
8 analyzed the studies.  You abstracted data on each
9 of the studies on your Data Abstraction Form,
10 correct?
11   A   Yes.
12   Q   Have you produced your Data Abstraction
13 Forms to us for review?
14   A   I -- I believe I have.
15   Q   All right.  You have them available; is
16 that right?
17   A   Yes.
18   Q   And this would be a form for each of the
19 studies in which you went through and you abstracted
20 data; is that right?
21   A   It's --
22       MS. O'DELL:  Object to the form.  Sorry.
23 Go ahead.
24   A   -- yeah, it's -- it's an electronic
25 database.  It's an Excel file.

Page 154

1    Q   (BY MR. ZELLERS) But there would be a form
2  or an Excel sheet for each of the studies where you
3  abstracted the data; is that right?
4        MS. O'DELL:  Object to the form.
5    A   There's an Excel sheet with each study
6  listed as a separate line of data and many, many
7  rows -- columns for each -- it's not a physical
8  piece of paper and...
9    Q   (BY MR. ZELLERS) But it's something that
10  could be printed out; is that right?
11    A   Yes.
12    Q   All right.  Did you develop any type of
13  protocol setting forth the different steps that you
14  followed to do your systematic analysis that you
15  have told us about?
16    A   The protocol that I followed for these
17  steps is a very well-established, well-published --
18  including by myself from any prior reviews --
19  protocols.
20    Q   My question is:  Did you write down
21  anywhere, the protocol that you followed for doing
22  this particular systematic review?
23        MS. O'DELL:  Object to the form.
24    A   I did not specifically write down for this
25  review that I would do a literature search or

Page 155

1  abstract data and record points and then do the
2  analysis.
3    Q   (BY MR. ZELLERS) What you have done in
4  your systematic review is a subgroup analysis of
5  those studies that you thought should be included;
6  is that fair?
7    A   I call it a stratified analysis rather
8  than a subgroup analysis.  Usually a subgroup
9  analysis is usually used to describe only limiting
10  to certain groups of patients as opposed to some
11  questions.  So I -- I'm not sure that there's a
12  distinction but...
13    Q   Well, you -- whether we call it a subgroup
14  or whether we call it a stratified analysis, you
15  went through the studies to try to find the studies
16  that would give you information on women who were
17  regular users, as you defined "regular users," and
18  who developed invasive serous ovarian cancer,
19  correct?
20        MS. O'DELL:  Object to the form.
21    A   Yes, that's what I did.
22        When you asked about whether I have a
23  protocol written down, I have written that I was
24  going to abstract information about regular use of
25  talc powder products defined as closely as three

Page 156

1  times week or more as possible and that I would
2  focus on invasive serous cancer wherever possible.
3        And so if that -- if that's what you mean
4  by my "protocol," then yes, that was written down
5  ahead of time.
6    Q   (BY MR. ZELLERS) I'm confused.  Do you
7  define -- well -- and No. 1, did you produce that
8  protocol?
9    A   So I have -- I have my notes and -- which
10  was part of the documents that you saw earlier
11  today.
12    Q   The notes, you would describe as your
13  protocol or an outline of your methodology?
14    A   Yes.
15    Q   All right.  We'll mark your notes, which
16  are your protocol, as Exhibit 21.
17        (Exhibit 21 was marked for identification
18  and is attached to the transcript.)
19    Q   (BY MR. ZELLERS) And it's just the one
20  side sheet; is that right?
21    A   I believe I provided other documents in
22  the datasheet that also has the notes of what group
23  I was focusing on in e-mails that I have sent you.
24    Q   That would be other materials that you
25  have produced; is --

Page 157

1    A   That's --
2    Q   -- the right?
3    A   -- correct.
4    Q   To your knowledge, there's nothing that
5  you have not produced --
6    A   No.
7    Q   -- relating -- hold --
8    A   Okay.
9    Q   -- on.  Let me finish.
10        There's nothing, to your knowledge, that
11  you have not produced relating to your analysis; is
12  that right?
13    A   That's correct.
14    Q   I was confused.  I thought you stated a
15  moment ago that you defined "regular use" as the use
16  of talcum powder three times a week or more.
17        Is that your definition of "regular use"?
18    A   I --
19        MS. O'DELL:  Object to the form.
20    A   -- I describe the definition in my report
21  on page 32.  And --
22    Q   (BY MR. ZELLERS) My question just is:  Is
23  that the correct definition or did you use a
24  different definition of "regular use"?
25        MS. O'DELL:  Object to the form.  You may

Page 158

1 describe your --
2    A   So I -- I --
3       MS. O'DELL:  -- definition.
4    A   -- have listed how I have defined it.  And
5 it's a little bit more -- more nuanced than what you
6 have just asked me to confirm.
7    Q   (BY MR. ZELLERS) What is your definition
8 of "regular use" with respect to the systematic
9 review and analysis that you did?
10    A   So I have written, Regular use was defined
11 ideally as daily or at least more than three uses
12 per week.
13    Q   More than three uses a week; is that
14 right?
15    A   I -- I wasn't finished.  May I finish?
16    Q   Sure.
17    A   "I also accepted studies that defined
18 "use" as regular where the description made it clear
19 that this was regular use.
20       A study that reported regular use, but
21 defined it as less -- as used less frequency --
22 at -- use of less than as -- frequency were not
23 included.
24       Regular use was selected to differentiate
25 occasional use, which may include one-time

Page 159

1 infrequent use or used along a particular time of a
2 woman's menstrual cycle from sustained use.
3       Studies that ask participants a single
4 question about every use of talc without further
5 quantification of exposure were not included for the
6 summary.
7       For example, Perdue reported that 52 to
8 57 percent of women ever using talc without further
9 quantification was not included."
10       THE COURT REPORTER:  Please slow down.
11    Q   (BY MR. ZELLERS) Okay.
12    A   Yes.
13    Q   Doctor, I just wanted to know your
14 definition of "regular use."
15    A   I -- I -- I have spent considerable time
16 both writing my definition and applying it to --
17    Q   What --
18    A   -- the papers.
19    Q   -- what page --
20       MS. O'DELL:  Excuse me, sir.  If you were
21 asking for the page, she can direct you to the page
22 --
23    Q   (BY MR. ZELLERS) What page --
24    A   So --
25       MS. O'DELL:  Doctor --

Page 160

1    A   -- page --
2       MS. O'DELL:  -- go ahead.
3    A   -- 32.
4    Q   (BY MR. ZELLERS) You have defined "regular
5 use" in your report on page 32; is that right?
6    A   Yes.
7    Q   What is Dr. Hall's field of expertise?
8    A   She is a biostatistician who is -- does a
9 lot of summaries of systematic review.
10    Q   You are not a biostatistician; is that
11 right?
12    A   I did a two-year post-graduate fellowship
13 in the Department of Epidemiology and Biostatistics,
14 have taken many courses in biostatistician --
15 biostatistics, and have thought classes in biostatu
16 --
17    Q   Do you con --
18    A   -- statistics.
19    Q   -- do you consider yourself to be an
20 expert biostatistician?
21    A   I consider myself an expert in
22 biostatistics.
23    Q   And Dr. Hall is also an expert in
24 biostatistics; is that right?
25    A   Yes.

Page 161

1    Q   Do you know -- well, did you conduct your
2 systematic review and analysis using the PRISMA
3 standards?
4    A   Yes.
5    Q   And those are the preferred reporting
6 items for systematic reviews and meta-analyses; is
7 that right?
8    A   Yes.
9    Q   What materials did you provide to Dr. Hall
10 to assist you with your review?
11    A   I provided her with the data abstraction
12 table that had information about each of the
13 included studies.
14    Q   The data abstraction table that you
15 prepared; is that right?
16    A   Yes.
17    Q   What specifically did Dr. Hall do to
18 assist you?
19    A   She did two things.  She personally
20 reabstracted data from all of the publications.
21 Most of those publications she found on her own.
22 But for a couple, she was not able to find them, and
23 I provided electronic versions of them.
24       And then she statistically combined and
25 compared the study to assess for heterogeneity to

Page 162

1 calculate forest plots and summary-weighted
2 estimates.
3    Q    What could Dr. Hall do with respect to
4 your analysis that you could not?
5    A    I did not know how to use the software to
6 generate the graphs.  And I thought that by the time
7 I learned how to use that software, it would be a
8 lot more efficient for her to generate them.
9    Q    What did you do to check Dr. Hall's work
10 to make sure it was accurate?
11   A    Dr. Hall sent me back my data abstraction
12 database where she had double-checked all of my
13 numbers and sent -- I think there were several data
14 points where she had questions about either whether
15 I abstracted the right number or put it in the right
16 category.
17        And of all of the items that she had
18 suggestions -- I think it was a small number -- I
19 went back to the original article to -- to confirm
20 or refute whether I agreed with her changes or not.
21 Sort of a way to -- by consensus to decide what the
22 right answer was.  That was part of what I did.  I
23 --
24   Q    How -- did you finish?
25   A    -- no.

Page 163

1    Q    All right.  Well, finish.
2    A    She also generated -- she -- we went back
3 and forth.  She had a bunch of questions.
4        But she also generated summary estimates.
5 And there were a bunch of categories that I asked
6 her to do.  Some of those summary estimates, to me,
7 seemed like they didn't totally make essence.
8        So one analysis used seven studies and one
9 used nine, but it had the same final odds ratio out
10 to three digits.  And it should have been the same
11 result perhaps, but not out to three digits.
12       So I went through those and sort of said:
13 Look, can you redouble-check this to make sure that
14 the weighting was correct?
15       And in one or two cases she came back and
16 said:  No, the weighting was not correct.
17       So I rechecked every graph and every
18 number that she generated.
19   Q    Ultimately, you identified -- let me
20 withdraw that.
21       You reviewed the studies; you did your
22 data abstraction; and you formulated your research
23 question or questions for the systematic review,
24 correct?
25       MS. O'DELL:  Object to the form.

Page 164

1    A    I would not do it in that order.  I -- I
2 generated the research questions first.
3    Q    (BY MR. ZELLERS) You generated the
4 research questions after doing the initial
5 literature review you told us about this morning,
6 correct?
7    A    I --
8        MS. O'DELL:  Object to the form.
9    A    -- yes.
10   Q    (BY MR. ZELLERS) All right.  You
11 identified ten studies that discuss what you define
12 as "regular talc powder product use and risk of
13 ovarian cancer," and those are what you list on a
14 page 33 of your report; is that right?
15   A    That's close to correct.  I would include
16 in that another study, the Terry study, which is a
17 large study that pulls data from a bunch of other
18 component studies -- you can see on the top of
19 page 34 -- whether or not Terry was included or
20 excluded.  The results were basically identical.
21   Q    I'm just looking at your report.  Your
22 report, on page 33, in Figure 2, you identify ten
23 studies that discuss what you define as "regular
24 talc powder product use and risk of ovarian cancer,"
25 correct?

Page 165

1        MS. O'DELL:  Object to the form.
2    A    So that -- that paragraph is continued on
3 page 34, the next page at the top which says, The
4 primary analysis of this excluded Terry, but the
5 results were nearly identical if Terry was included.
6    Q    (BY MR. ZELLERS) You could have included
7 Terry as part of Figure 2, and that would have been
8 an 11th study; is that right?
9    A    Yes, that's correct.
10   Q    Why did you not include Terry in your
11 analysis and -- in Figure 2?
12   A    Terry included, within its -- within her
13 assembled papers, other patients that are already
14 included in Figure 2.
15       And including Terry would have listed --
16 would have weighted some patients more than once.
17   Q    Is there, to your knowledge, any
18 duplication or overlap in the patients for the ten
19 studies that you list in Figure 2 on page 33 of your
20 report?
21   A    To the degree that I could eliminate
22 overlap, I did.
23   Q    Is there overlap in some of the patients
24 and some of the studies?
25   A    I would have to look at it again to remind

Rebecca Smith-Bindman, M.D.

Page 166

1  myself if there is any overlap.  I -- I don't
2  believe there is.
3        And any overlap, I made every effort to
4  get rid of.  I would have to look at those papers a
5  little bit more closely to remember if there was any
6  overlap.
7        I -- I know there was a lot of overlap if
8  I included Terry, which is why that was an important
9  exclusion.
10     Q   How did you identify these ten studies
11  that you list in Figure 2?
12     A   So I -- I did not identify those studies.
13  That was what -- Dr. Hall used the data that I
14  provided -- to identify which studies had the --
15  appropriate data to look at -- look at this.
16     Q   How did Dr. Hall identify these ten
17  studies as being the ones to include in Figure 2?
18     A   These were the studies that had data on
19  daily talc powder -- powder products.
20     Q   You only used subsets of data from these
21  ten studies -- those ten studies listed in
22  Figure 2 -- to reach your conclusions, correct?
23        MS. O'DELL:  Object to the form.
24     A   I don't remember offhand if I used all of
25  the data from these studies or subsets of data from

Page 167

1  these studies to reach my conclusion.
2        There were only data from these ten
3  studies included in this figure, but I'm not sure if
4  I used all of the data from those studies or
5  subsets, as you asked.
6     Q   (BY MR. ZELLERS) Would you agree that only
7  two of the ten studies in Figure 2 demonstrates
8  statistical significance?
9     A   I would agree that taken altogether, these
10  studies show statistical significance.  But I think
11  you're asking if they weren't taken together, if the
12  original studies were used, would those individual
13  studies show statistical significance?  Is that what
14  you are asking?
15     Q   No.  You have listed out ten studies in
16  Figure 2; is that correct?
17     A   Yes.
18     Q   You are not aware whether you used all of
19  data from those studies for your systematic review
20  and analysis or subsets of the data, correct?
21        MS. O'DELL:  Object to the form.
22     A   Yes, that is correct.
23     Q   (BY MR. ZELLERS) Would you agree that only
24  two of the ten studies in Figure 2 demonstrate
25  statistical significance?

Page 168

1     A   I -- I would not -- the individual studies
2  are shown with the confidence interval around those
3  point estimates.
4        One way to establish statistical
5  significance is -- is that statistically different
6  within an individual study than one.
7        But I don't believe that only two of these
8  show statistical significance as a group of studies.
9  So if you're asking if two don't overlap one, then I
10  would agree with you.  If you're asking if these
11  together show statistical --
12     Q   (BY MR. ZELLERS) I'm going to ask you --
13        MS. O'DELL:  Excuse me.  Sorry.  Let her
14  finish.  Sorry.
15     Q   (BY MR. ZELLERS) Did you finish?
16     A   I -- I'm trying to understand if you're
17  asking me if the original studies here show -- or
18  if -- just each line by itself.
19     Q   If we go line by line for these ten
20  studies, only two of these ten studies demonstrate
21  statistical significance; is that right?
22     A   Yes.
23     Q   Yet you conclude by looking at all ten of
24  the studies that there is statistical significance;
25  is that right?

Page 169

1     A   So the way you're asking the question
2  suggests that when you're combining studies in a
3  systematic review, you care about the initial sample
4  size of the question.
5        And so I conclude taken as a group of
6  studies, the individual sample size or power of the
7  individual associations is not sufficient to come up
8  with a narrow confidence interval.
9        And the width of the confidence interval
10  suggests that while the point estimate is greater
11  than one, the confidence interval overlaps one,
12  meaning you can't be sure if it's significantly
13  significant.
14        But the purpose of the systematic review
15  is to combine those studies together.  So combining
16  them together gives a very powerful, positive
17  estimate that's very different than one.
18     Q   Okay.
19        MR. ZELLERS:  Move to strike as
20  nonresponsive.
21     Q   (BY MR. ZELLERS) My question is:  When you
22  looked at the ten studies together, you determined
23  that there was statistical significance; is that
24  right?
25     A   Yes.

Rebecca Smith-Bindman, M.D.

Page 170

1    Q   How did you make that calculation?  How
2  did you calculate statistical significance from
3  those ten studies?
4        MS. O'DELL:  Object to the form.  I
5  believe she has already answered that, but you may
6  describe that again, Doctor.
7    A   So the software that was used, is that
8  what you are asking?
9    Q   (BY MR. ZELLERS) I want to know how it is
10  that you calculated that these ten studies -- eight
11  of which did not demonstrate statistical
12  significance when they were looked at together --
13  were statistically significant?
14    A   So I need to provide you with just a
15  little background on the field of systematic reviews
16  to answer that question.
17    Q   All right.  Well, try to be as direct as
18  you can, because I have only got a certain amount of
19  time.
20        Are you able to answer the question?
21    A   Absolutely.
22    Q   Then please tell us how you calculated
23  statistical significance for the RE model.
24    A   So we looked at adjusted odds ratios of
25  each of the studies.  We weighted them based on the

Page 171

1  standard errors for each of them and calculated sort
2  of an overlying association when basically the size
3  of each study, the point estimate of each study were
4  taken into consideration.
5        So taking them altogether, it allows the
6  summary estimate, if you look, to have a much
7  narrower confidence interval than the individual
8  study.
9        So you use the weight of all the studies
10  to combine the -- to give you a summary estimate.
11    Q   Where can I see the weighting and the
12  calculation that you did to come up with the
13  statistically significant number?
14    A   So the -- the name of the software we used
15  was in Metafor package in R.  "R" is a program.
16        The data set that I provided to you of the
17  extracted database, if you put those numbers -- if
18  anyone puts those numbers in the Metafor package in
19  R and instructs the software that you want to apply
20  a -- linear mixed models to study that data set, you
21  will get the exact same estimate that I got.
22    Q   And I will be able to see that from the
23  documents that you have produced; is that right?
24    A   Absolutely.
25    Q   How did you calculate the confidence

Page 172

1  interval around the odds ratio for each of these ten
2  studies?
3        MS. O'DELL:  Object to the form.
4    A   So most of the studies, if not all of
5  those, would have had published adjusted odds ratios
6  in the original calculations.
7        I believe one of the studies, the Gertig,
8  was an adjusted risk ratio, not an odds ratio, which
9  had a bit of back-and-forth discussion with the
10  biostatistician.
11        And we decided they were essentially
12  equivalent.  But the other ones would have been
13  extracted from the initial studies.
14    Q   The confidence intervals for the ten
15  studies on -- in Figure 2, page 33 of your report
16  came from the studies themselves?
17    A   Yes.
18    Q   Were there any other selection criteria
19  that you used to identify these ten studies, other
20  than what you have testified to?
21    A   No.
22    Q   Of the 43 or so studies that had primary
23  data, are these the only studies, other than Terry,
24  that discuss regular use of talc?
25    A   So I am just looking for where my fullest

Page 173

1  of studies is in the report.  I think it's pages 23
2  and 24.
3        The fullest of studies that I looked at
4  included -- I think there were seven systematic
5  reviews.  So the systematic reviews did not
6  contribute to the -- they were not eligible for --
7  for -- for my own review because they didn't have
8  primary data, and they would overlap.
9        And the same thing with -- well, the
10  Terry, we know about.  So it was only the other
11  studies that were eligible.
12    Q   These ten studies that you list in
13  Figure 2 are the only studies that you reviewed that
14  discuss regular use of talc, and that's why you
15  included them here; is that right?
16        MS. O'DELL:  Object to the form.
17    A   No, that's -- that's not what I said.
18        The systematic reviews I read and had
19  data, many of them, on regular use of talc.
20        But those were not included in my
21  systematic review because that would have had
22  overlap of -- of -- of patients.  So they were not
23  included because it overlapped patients.
24    Q   (BY MR. ZELLERS) Which studies were those
25  seven?

Rebecca Smith-Bindman, M.D.

Page 174

1    A   So they're listed on page 23 as systematic
2  reviews.  So Penninkilampi and Berge and the IARC
3  and Langseth and Huncharek and Gross and Harlow.
4        The reason Terry was pulled out from that
5  to possibly include was because Terry provided new
6  data points that weren't included in the component
7  studies, and so I wanted to make sure not to miss
8  those patients.
9        But these other systematic reviews were
10 all covered in the other primary studies that I
11 included.
12   Q   Why did you not include the Cramer study,
13 1999?
14   A   Cramer was one of the authors that had a
15 lot of patients that kept appearing in subsequent
16 publications.  So he published the same patients
17 more than once, so --
18   Q   What analysis did you do to determine that
19 there was overlap between any of the patients
20 reported on by Cramer in 1999 and any of the ten
21 studies that you did choose to include?
22   A   I went through -- I think there's a
23 separate page in my data fields that's just
24 attributed to the Cramer studies -- and wrote down
25 what years of enrollment the patients were.

Page 175

1        And to the best I could, I identified the
2  cohorts and then pulled them out to only identify
3  all patients once, which -- which is the reason I
4  hesitated to say there was no overlap.
5        But I did my best to only include every
6  patient once.  And --
7    Q   Okay.
8    A   -- Cramer got his own worksheet because it
9  was trickier to figure out.
10   Q   Cramer 1999 you did not include in your
11 systematic review because you analyzed that paper
12 and the other studies and determined that there was
13 overlap; is that right?
14   A   I didn't quite say that.  I'm saying that
15 I was very careful not to include overlap patients.
16 I don't know why Cramer 1999 didn't make it into the
17 review.
18   Q   I --
19   A   I don't know if he didn't have regular use
20 of talc or -- I -- I -- you know, I would have to --
21 to figure out why it wasn't included.
22   Q   Well, take a look at the Cramer 1999
23 paper, which we'll mark as Exhibit 22.
24       (Exhibit 22 was marked for identification
25 and is attached to the transcript.)

Page 176

1    Q   (BY MR. ZELLERS) If you turn to --
2        MS. O'DELL:  I'll take that.
3    Q   (BY MR. ZELLERS) -- turn to Table 2 on
4  page 353, the bottom table -- at the bottom of the
5  table.
6    A   Yes.
7    Q   Do you see data with respect to "frequency
8  of use per month"?
9    A   Yes.
10   Q   That's the type of study and the type of
11 information that you did include in your systematic
12 review; is that right?
13   A   Yes.
14   Q   Is it fair to say that as you sit here
15 today, you just don't remember why you did not
16 include Cramer 1999?
17       MS. O'DELL:  Object to the form.
18   A   In looking at this, you have convinced me
19 it's not because he doesn't have frequency of use,
20 because there is frequency of use in here.  I do not
21 know why it didn't make it into the final database.
22       But I'm looking at my paper from Cramer
23 from 2016, "The Association Between Talc Use and
24 Ovarian Cancer, a Retrospective Case-control Study."
25       He describes -- this is on page 334 of

Page 177

1  that other article -- that data came from three
2  enrollment phases.
3        And my notes on the side say "minus Cramer
4  '99," suggesting -- I don't mind showing you my
5  notes -- showing that there's overlap with Cramer
6  '99 --
7    Q   Okay.
8    A   -- so.
9    Q   You -- do you believe that the reason you
10 did not include Cramer 1999 is because there was
11 overlap with the patients included in Cramer 2016 or
12 you're not sure?
13   A   Yes.
14       MS. O'DELL:  Object to the form.
15   Q   (BY MR. ZELLERS) Which one is it?
16       MS. O'DELL:  Object to the form.
17   A   I -- I do not know why it wasn't included,
18 but I believe there was overlap with 2016, is why it
19 was not included.
20   Q   (BY MR. ZELLERS) You also did not include
21 Rosenblatt 2011 in your systematic review; is that
22 right?
23   A   Rosenblatt was included in the review.
24 But on much -- it looks like it didn't make it into
25 the final graph or the final group of ten.

1    Q   Why did it not make it into the final
2 graph or group of ten?
3    A   So I don't -- let me just say I don't
4 remember why Rosenblatt was not included.
5       I specifically asked the biostatistician
6 to do the analysis with and without Rosenblatt, and
7 I believe the reason was -- I believe is that -- the
8 quality of Rosenblatt seems very poor, and I can't
9 remember why.
10       But I asked her to do the analysis with
11 and without Rosenblatt.  I asked her to do, I think,
12 four different analyses with and without Terry, with
13 and without Rosenblatt.
14       My recollection is it had no impact.  But
15 I do not remember why I asked her with the quality
16 issue -- I would have to go back to my database to
17 remember why I asked her to do it both ways.
18    Q   Rosenblatt contained information over --
19 or strike that -- including a lifetime number of
20 applications and included information on more than
21 10,000 lifetime applications, correct?
22    A   Yes.
23    Q   All right.
24    A   Well, I -- I'm -- I'm looking for it.
25 Yeah, I'm guessing that --

1    Q   Here is a --
2       MS. O'DELL:  Don't -- don't.  Excuse me --
3 yeah, don't guess.  Just if you know.
4    A   -- I --
5    Q   (BY MR. ZELLERS) Exhibit 23 is Rosenblatt.
6    A   I have got the paper.
7       MS. O'DELL:  Yeah.  Feel free to take a
8 moment.  And if you need your original spreadsheets
9 to answer any of these detailed questions, then we
10 can pull those out for you --
11    A   Okay.
12       MS. O'DELL:  -- if counsel does not have a
13 copy for you.
14    Q   (BY MR. ZELLERS) Just for the record,
15 Exhibit 23 is Rosenblatt.
16       (Exhibit 23 was marked for identification
17 and is attached to the transcript.)
18    Q   (BY MR. ZELLERS) As you sit here, do you
19 know what the difference in results were if
20 Rosenblatt was included in your systematic review or
21 not?
22    A   I -- I do.
23       MS. O'DELL:  Object to the form.
24    Q   (BY MR. ZELLERS) Okay.  What is --
25    A   I do.

1    Q   -- the difference in result?
2    A   It -- it had no impact on the overall --
3    Q   Was --
4    A   -- results.
5    Q   -- it exactly the same?
6    A   It was within a decimal fraction of a
7 percent the same.
8    Q   Can you tell us what the result was with
9 Rosenblatt included?
10    A   It was the same with and without
11 Rosenblatt included --
12    Q   Is --
13    A   -- within a hundredth of a percent.
14    Q   Did you produce that calculation for us?
15    A   Within the files that I shared, it is
16 included in the forest plot tables that Dr. Hall
17 generated.
18    Q   Go to Figure 2, if you will, in your
19 report, page 33.  Do you have that?
20       MS. O'DELL:  If you need to see the -- the
21 data that you produced, Doctor, the Excel
22 spreadsheets --
23    A   Oh, that would be great.
24       MS. O'DELL:  -- okay.  And I -- I'm going
25 to hand you my computer.  But it's --

1    A   Can I --
2       MS. O'DELL:  -- it's the data --
3    A   -- this is what I shared with you.
4       MS. O'DELL:  -- and that's what she is
5 discussing.
6    Q   (BY MR. ZELLERS) Yeah.  I have a question
7 pending.  If you can answer my -- if you need to
8 look at your counsel's computer to answer my
9 question, you can.
10       But my question is:  Will you look at
11 Figure 2 on page 33 of your report.
12       MS. O'DELL:  Just hang on.  Just -- what
13 I'm showing the doctor is data that -- the tables
14 that she has been discussing, but you have not
15 provided to her, which would be the fair way to
16 examine here on them.
17       But this is the -- the information that
18 was produced to Defendants for purposes of
19 Dr. Smith-Bindman's, you know, deposition.  So if
20 you need that, just -- you may refer to it.
21    Q   (BY MR. ZELLERS) Are you ready,
22 Dr. Smith-Bindman?
23    A   I'm close to ready, but not quite.
24    Q   I -- I'm not sure what you are doing.
25       MS. O'DELL:  Well, she is looking at the

Page 182

1  calculation that you were just asking her about.
2      Q    (BY MR. ZELLERS) I have finished those
3  questions.  She has answered those questions.  I'm
4  asking a new question.  Or I would like to.
5      A    Okay.  Thank you.
6          MS. O'DELL:  You're welcome.  If you need
7  to see any of the tables --
8      A    Okay.
9          MS. O'DELL:  -- Doctor, I have all that
10  has been produced right here.
11      A    Fantastic.
12      Q    (BY MR. ZELLERS) Okay.
13  Dr. Smith-Bindman -- Bindman, looking at Figure 2,
14  looking at the confidence intervals that you have
15  listed for each of those ten studies, are you aware
16  that not one of those confidence intervals for any
17  of the ten studies are actually listed in or come
18  from the study publications?
19          MS. O'DELL:  Object to the form.
20      A    I am not aware of that.
21      Q    (BY MR. ZELLERS) In fact, did you
22  recalculate the confidence interval for each of
23  these studies?
24      A    The confidence intervals and the point
25  estimate are adjusted confidence intervals and odds

Page 183

1  ratios, so you -- you can't recalculate them from
2  the data in the paper.
3      Q    My -- my question is:  Who calculated
4  these confidence intervals that appear in Figure 2?
5  Did you calculate those confidence intervals?
6      A    To the best of my knowledge, these
7  confidence intervals came from the primary
8  publications.
9      Q    And -- and I will represent to you that I
10  have looked at all of the primary publications and
11  the confidence intervals that you have listed in
12  Figure 2.  None of those confidence intervals come
13  from the publication.
14          So do you have any idea as to how these
15  confidence intervals were calculated?
16          MS. O'DELL:  If there's --
17      A    You would have to show me --
18          MS. O'DELL:  Yes.
19      A    -- those -- those disagreements for me to
20  --
21      Q    (BY MR. ZELLERS) Well, let's --
22      A    -- to know what we're looking at.
23      Q    -- let's -- I'll get to that in just a
24  second.  Let me show you a couple of documents.
25  Deposition Exhibit 24.

Page 184

1          (Exhibit 24 was marked for identification
2  and is attached to the transcript.)
3      Q    (BY MR. ZELLERS) Is this another e-mail
4  exchange between you and Dr. Hall?  Is that yes?
5      A    I'm so sorry.  I didn't hear your
6  question.
7      Q    Sure.  My question is:  Is this an e-mail
8  exchange between you and Dr. Hall?
9      A    Yes.
10      Q    If you look at the e-mail at the bottom of
11  the second-to-last page, Dr. Hall writes you on
12  Monday, September 24, 2018, at 11:42, and tells you
13  that she is encountering obstacles; is that right?
14          And I'm sorry.  It's the third-to-last
15  page is where that e-mail starts.
16      A    I see what you are saying.  She has a note
17  at the bottom of the page.
18      Q    She tells you she's encountering
19  obstacles?
20      A    Yes.
21      Q    She asks you a number of questions?
22      A    Yes.
23      Q    No. 1 is that there's missing proportion
24  information and the data is missing.
25          If you go down to 1B, she says, Where the

Page 185

1  raw numbers are not available, I would do my best to
2  estimate unless you have access to them and can send
3  them to me.
4          How did you respond to that question?
5      A    Can't we see what my answers were?
6      Q    Sure.  Where are you answers?  If you, in
7  any of the documents that have been produced, can
8  show us how you answered these questions, that would
9  be helpful.
10          MS. O'DELL:  Object to the form.
11      A    I would like to just clarify something in
12  her request, which is she is not asking me in this
13  case for an estimate of the odds ratios or the
14  confidence intervals, even although though it seems
15  like she is.
16          What she is asking for is an estimate of
17  the sample size in terms of the N of cases and N of
18  controls that can be used for weighting those
19  studies in generating the summary estimate.
20          So that's where she's trying to fill in
21  the blanks, not for the odds ratios or confidence
22  intervals, but to calculate -- calculate --
23  calculate how -- how much weight it should be in the
24  summary statistic.
25      Q    (BY MR. ZELLERS) How did you respond to

Page 186

1 her first question where she advised you that there
2 was missing proportion information and her proposal
3 that "where the raw numbers are not available, I'll
4 do my best to estimate, unless you have access to
5 them and can send them to me"?
6      MS. O'DELL:  Object to the form; asked and
7 answered.
8      A   I did not have, other than going to the
9 papers, any additional information to supplement.
10      Q   (BY MR. ZELLERS) Okay.  No. 2 --
11      MS. O'DELL:  Are you finished, Doctor?
12      A   Say it again.
13      MS. O'DELL:  Are you finished?
14      A   No.
15      MS. O'DELL:  Okay.
16      A   And so, again, she's not asking me about
17 the abstraction.  She's asking me if a study
18 reported, for example, that there were a hundred
19 patients with serous carcinoma or if there were
20 150 patients altogether, it reported the odds ratios
21 for serous carcinoma, but may not have specified in
22 the table how many cases of serous carcinoma there
23 were, could she estimate that proportion when we had
24 the point estimate we needed.
25      We had the odds ratio we needed, but she

Page 187

1 needed to know how many serous cancers there were to
2 weight it.
3      And I would have told her, when the raw
4 numbers for those missing proportions were not
5 available, to do her best to estimate those.
6      Q   (BY MR. ZELLERS) Did you respond to this
7 e-mail?
8      A   I sent you all of the documents that I had
9 for our correspondence.
10      Q   Okay.
11      A   I certainly could look again to see if I
12 have an answer to this.  Or it could be that we
13 discussed the answers on the telephone.
14      Q   No. 2 --
15      A   Let me just see if we have -- if it says.
16 I think we spoke on the telephone.
17      Q   Do you have any notes of that telephone
18 conversation?
19      A   No, I don't.
20      Q   All right.  No. 2, when she told you that
21 she was unable to calculate the associated
22 95 percent confidence intervals without the
23 variants, which is not reported and she gave you
24 three options, which option did you tell her to
25 follow, if any?

Page 188

1      MS. O'DELL:  Object to the form.
2      A   We discussed this at length, and she ended
3 up going with Option 3, using relative risk as an
4 underestimation of the odds ratios, but
5 approximately equal because of the rareness of the
6 disease.
7      Q   (BY MR. ZELLERS) So she adopted, at your
8 suggestion, the option that she states,
9 understanding that relative risk may considerably
10 underestimate odds ratios; is that right?
11      A   Yes, it is.
12      Q   And you advised her -- for No. 3, how did
13 you advise her when she told you that she was unable
14 to calculate the true -- or truly estimate for any
15 talc use and suggested that you consider pooling the
16 results from rarely, monthly, weekly, and daily?
17      MS. O'DELL:  Object to the form.  Are you
18 talking about No. 3?  It's not clear.
19      A   So the option that we did for that choice
20 is actually neither Option 1 or Option 2.
21      The focus of the review that she completed
22 was, in fact, on daily talc use.  It's not different
23 than she suggested.
24      But she used the numbers that were
25 incorrectly categorized as any talc use instead to

Page 189

1 represent daily talc use, so that -- that data point
2 was moved for the daily talc use category.
3      Q   Let me show you the Chang paper.  This is
4 one of the papers that you cite both in Figure 2 and
5 again on Figure 3; is that right?
6      A   Yes.
7      Q   All right.  Here's the Chang paper which
8 we have marked as Exhibit 25.
9      A   Oh.
10      (Exhibit 25 was marked for identification
11 and is attached to the transcript.)
12      Q   (BY MR. ZELLERS) Do you have that in front
13 of you?
14      A   I do.
15      Q   Okay.  Show us -- you see in Figure 2,
16 that Chang is listed twice, and it has a confidence
17 interval of .51 to 1.39.
18      Do you see that?
19      A   You said it's listed twice?
20      Q   I'm sorry.  It was -- it's listed in
21 Figure 2 and then you list it again in Figure 3; is
22 that right?
23      A   Yes.
24      Q   All right.  The first question is:  Where
25 in the Chang publication do you get a confidence

Page 190

1 interval of .51 to 1.39?
2    A   Hum?  So the point estimate that I
3 think -- I need to look at the paper a little more
4 closely.
5        So the number I see in this paper is
6 instead of being .51 to 1.39 is .61 to 1.49 is about
7 ten points higher.
8    Q   All right.  You don't know where, for
9 Figure 2, the confidence interval of .51 to 1.39
10 came from, correct?
11    A   I -- I do not.  It's so close to the
12 publication -- the publication that I'm not sure if
13 it reflects a data abstraction error or if it was --
14 I think that's probably what it -- what it does, but
15 I'm not sure.
16    Q   The Chang paper involved 450 patients with
17 borderline and invasive ovarian carcinoma; is that
18 right?
19    A   Say it one more time for me.
20    Q   Sure.  The Chang paper --
21    A   Yeah.
22    Q   -- Exhibit 25, involved a total of
23 450 patients with borderline and invasive ovarian
24 carcinoma; is that right?
25    A   Yes.

Page 191

1    Q   You used or Dr. Hall used, in your
2 analysis, only 41 of those 450 patients because
3 those are the only ones that had greater than
4 25 times of use per month, correct?
5    A   So I would need to look at my datasheet to
6 know how many made it into the analysis, but I
7 believe you're correct, that there were
8 approximately 10 percent that were frequent users.
9    Q   How did you determine, just looking at the
10 Chang paper, how many of those 41 had invasive
11 serous ovarian cancer?
12        MS. O'DELL:  If you need to look at your
13 datasheets --
14    A   Please.
15        MS. O'DELL:  Which --
16    A   That would be great.
17        MS. O'DELL:  -- which data -- tell -- data
18 summary, is that what --
19    A   Yeah --
20        MS. O'DELL:  -- you are --
21    A   -- that should be it.
22        MS. O'DELL:  Okay.  This is both --
23 both -- both of the spreadsheets are there, so just
24 --
25    A   Okay.  So I don't have all of my detailed

Page 192

1 notes here, but I believe what I did for Chang is
2 that Chang's numbers are included in the Terry
3 report where she used the data that were published,
4 as well as the supplemental data that were provided
5 by Chang.
6        And within the supplemental data, Terry
7 did a stratified analysis that provided additional
8 information on serous cancer that was not actually
9 in the original Chang report.
10        And those are the data that made it into
11 what is under Chang in this systematic review.
12    Q   (BY MR. ZELLERS) Okay.
13    A   So they're data from Chang's work and
14 following Chang's methods.  They happen not to be
15 published in Chang's original report, but rather
16 included in the Terry report from -- from 2013.
17        And Terry -- the paper that I am talking
18 about for Terry is genital powder use and risk of
19 ovarian cancer, a pooled analysis of 8,500 cases and
20 ninety-eight hundred fifty-nine controls.
21        And then within that describes within the
22 methods, getting extra data for studies describing
23 the regular use and then breaking down the results
24 into whether or not it was invasive borderline,
25 invasive serous, and so forth --

Page 193

1    Q   So --
2    A   -- so that's where those numbers came
3 from.
4    Q   You believe that if I looked at the Terry
5 paper, I would be able to tell of these 41 cases
6 that have greater than 25 uses per month, which of
7 those cases involved invasive serous ovarian cancer,
8 correct?
9        MS. O'DELL:  Object to the form.
10    A   I believe the -- I believe the number of
11 cases is specified in the Terry paper that I would
12 have to look at to find that -- that number.
13    Q   (BY MR. ZELLERS) All right.  Let me ask
14 you a few questions.
15    A   Yes.
16    Q   In the Chang paper --
17    A   Yes.
18    Q   -- the authors do not define "regular use"
19 as daily, do they?
20    A   What Chang says in the original
21 publication is questions about regular talc use and
22 type of talc use, as well as duration and frequency
23 could be derived or included; dusting or powdering
24 behavior considered improved regular application of
25 talc to the perineum after showering or bathing and

Rebecca Smith-Bindman, M.D.

Page 194

1 dusting.
2      And then that was categorized, I believe
3 by Terry, as regular use when she got supplemental
4 data.
5    Q   Okay. In the Chang paper, the authors do
6 not define "regular use" as daily use, correct?
7      MS. O'DELL: Object to the form; asked and
8 answered.
9    A   The Chang paper explicitly says "regular
10 use." In the original publication, they don't
11 define it.
12   Q   (BY MR. ZELLERS) They do not include
13 information in the Chang paper about how many times
14 per week women used talcum powder, correct?
15     MS. O'DELL: Object to the form.
16   A   In -- in Table 2 of Chang, they define it
17 as less than ten, ten to 25, or greater than 25
18 times per week.
19   Q   (BY MR. ZELLERS) Where do you see that?
20   A   In Chang?
21   Q   Yes. I'm looking at the same table, and I
22 think it's per month.
23   A   Per month.
24   Q   Okay. And that's the only data that's
25 provided with respect to use is the number of

Page 195

1 monthly applications, correct?
2    A   Yes.
3    Q   The authors of Chang did not arrive at a
4 specific odds ratio for serous invasive cancer based
5 on frequency of use, correct?
6    A   The Chang data was used by Terry to
7 calculate frequency of use for serous and invasive
8 by supplementing the original data that they had
9 from additional data from Chang as a participant in
10 the OCAC consortium.
11     So additional data from that study was
12 shared with Terry, which is what we used in our
13 analysis.
14   Q   If we look at Chang in Table 3, they
15 describe a histologic type of invasive; is that
16 right, in Table 3, page 2399?
17   A   Yes.
18   Q   They also describe serous; is that right?
19   A   Yes.
20   Q   In the Chang data, what's the difference
21 between invasive and serous?
22   A   I'm -- I'm sorry. In lot -- in Table 3
23 you're asking what those different entries mean?
24   Q   Yes.
25   A   "Invasive" presumably includes other types

Page 196

1 of invasive besides just serous.
2    Q   Do you know that?
3    A   I -- I don't think they specify what's
4 included in that. I have to add up the total to see
5 if they are overlapping or not overlapping.
6      Could you add -- could you add that for
7 me? Actually, the total should be -- they're
8 overlapping. 360, 460. Yeah, they're overlapping.
9 Yeah.
10   Q   What do you mean, "they're overlapping"?
11   A   Invasive and borderline should add up to
12 the total.
13     And then serous mucin -- mucinous and
14 endometrioid should add up to the total, except to
15 the degree that they are missing information.
16   Q   Looking at the questions that Dr. Hall
17 asked you --
18   A   Yes.
19   Q   -- in Exhibit 24, you would agree that
20 there were number of assumptions that you and she
21 made in order to complete your systematic review; is
22 that right?
23   A   Absolutely.
24   Q   Is there anywhere that you have written
25 down, you know, what the assumptions were that you

Page 197

1 and Dr. Hall arrived at, at least in part in
2 response to her questions?
3    A   So for some of the issues, it took me
4 quite a bit of remembering to remember that we used
5 some of the extracted data from more than one
6 source.
7      We have notes in our data form of what the
8 source of the data was, so it would say in some of
9 the data I said -- under Chang, it would say "in a
10 column from Terry."
11   Q   My question --
12   A   So that -- that -- so to answer the
13 assumption of where the data came from, it's in my
14 data spreadsheet. I just -- I just didn't remember
15 that we pulled data.
16   Q   My -- my question is a little different I
17 --
18   A   Okay.
19   Q   -- think. In terms of all of the
20 questions that Dr. Hall asked you and all of the
21 assumptions that would need to be made so that
22 estimates could be arrived at, do you have either
23 your protocol or a listing of the assumptions that
24 were made by you and by Dr. Hall in -- at least in
25 part in response to the question she raised?

Page 198

1    MS. O'DELL:  Objection, asked and
2  answered.  Respond.
3    A   I am under the impression that they're
4  documented within our e-mail exchanges, but I do not
5  have a protocol with each of these decisions that
6  are laid out.
7    Q   (BY MR. ZELLERS) I -- my best source would
8  be the e-mail exchanges that you had with Dr. Hall,
9  correct?
10    MS. O'DELL:  Object to the form.
11    Q   (BY MR. ZELLERS) Is that right?
12    A   Yes.
13    Q   Okay.  Once you did your ten studies that
14  are in Figure 2 -- and those were just the --
15  the studies that you chose to include, as you have
16  told us, showing odds of ovarian cancer associated
17  with regular use of talcum powder -- you further
18  refined the studies or narrowed down the studies to
19  four which you state plot or who the odds of ovarian
20  cancer associated with regular use of talcum powder
21  and invasive serous cancer; is that right?
22    MS. O'DELL:  Object to the form.
23    A   With the caveat that when -- when I laid
24  out our stratified analysis on page 32, it says, My
25  review focused on invasive serous cancer where

Page 199

1  possible, but also included all invasive cancer.
2    Q   (BY MR. ZELLERS) What did you do to get
3  from the ten studies that you list in Figure 2 to
4  the four studies that you list in Figure 3?
5    A   Figure 2 is ovarian cancer with regular
6  use, and Figure 3 is invasive serous cancer.
7    If there was not invasive serous but there
8  was just invasive, they also might be in this.  I
9  would have to review these four studies to know if
10  it was invasive or invasive serous.
11    Q   Do you know, as you sit here, what you did
12  to go from the ten studies in Figure 2 to the four
13  studies in Figure 3?
14    MS. O'DELL:  Object to the form.
15    A   In the data set that I sent to you and
16  sent to Dr. Hall, they would -- there were different
17  sets of complete data.  And the Figure 3 had data
18  for invasive or invasive serous cancer; whereas,
19  Figure 2 had -- included invasive and noninvasive.
20    So it would just be where there were data
21  available in the data worksheet.  I -- I was not
22  involved in making the selection to go from one to
23  the other.  It was just where there were data that
24  were abstracted from the papers.
25    Q   (BY MR. ZELLERS) Where did you get the

Page 200

1  confidence interval for the -- let's say the Chang
2  data that you list in Figure 3?
3    A   I'm going to have to look into the exact
4  calculation of the confidence interval.
5    The question that you asked me about Chang
6  for the first table is very close to the one that's
7  published -- so close -- that I'm not sure how it
8  would be different.
9    I don't -- I thought these were abstracted
10  from the paper.  And I would have to go back and
11  talk to Dr. Hall about how they were calculated.
12    I thought they were calculated, but I -- I
13  may be -- I may be wrong.  They may have been in
14  some way reestimated.
15    So again, similar with this, these numbers
16  are close to the ones that are in this paper, but
17  are slightly off, and I'm not sure why.
18    So I would have to go back to the data
19  that I abstracted and then the data that she sent me
20  back for the final tables to see why they were
21  different.
22    Q   Okay.
23    A   But they're -- they're different to a --
24  such a slight degree that -- and I'm not really sure
25  where that difference came from.

Page 201

1    Q   Were there any other analyses that you or
2  Dr. Hall con -- conducted that are not included in
3  your report?
4    A   I had asked Dr. Hall, I believe, to look
5  at -- at several analyses that are all in the data
6  that I shared with you.
7    The sensitivity analysis for Terry and the
8  sensitivity analysis for the Rosen [sic] study are
9  in the data I sent you, but are not summarized in
10  the report.
11    MS. O'DELL:  And by "the data," you're
12  talking about the spreadsheets --
13    A   Yes.
14    MS. O'DELL:  -- that you provided?
15    A   Yes.  There -- there are more analyses
16  that were done that you haven't seen.  But they --
17  they were analysis for four analyses.
18    I just see two here.  So I -- there were
19  two others.  I think it was including Terry and
20  including Rosenblatt, I think, are the other two.
21    But you have all of the -- there were no
22  other analyses except those four that she completed.
23    MS. O'DELL:  Excuse me, Mike.  I'm sorry.
24  We're right at 3:00 p.m.  When you get to a stopping
25  point, can we take a break?

Rebecca Smith-Bindman, M.D.

1      MR. ZELLERS: All right. Let's stop.
2  We're stopping for the day; is that right?
3      MS. O'DELL: Let's -- let me speak with
4  Dr. Smith-Bindman on the break and then I'll let you
5  know.
6      MR. ZELLERS: All right.
7      THE VIDEOGRAPHER: We're off the record at
8  2:59 p.m.
9      (A break was taken from 2:59 p.m. to
10  3:11 p.m.)
11      THE VIDEOGRAPHER: We are back on the
12  record. This marks the beginning of Disc No. 4 in
13  the deposition of Dr. Rebecca Smith-Bindman. The
14  time is 3:11 p.m.
15      Q    (BY MR. ZELLERS) Dr. Smith-Bindman, what
16  methodology, if anything different, did you use to
17  arrive at your opinion that there was a causal
18  association between genital talcum powder use and
19  ovarian cancer?
20      A    I used the Bradford Hill criteria.
21      Q    Are you familiar with the Bradford Hill
22  criteria?
23      A    I am. Yes, I am.
24      Q    You're familiar that over time FDA has
25  gone through and done various analyses with respect

1  to perineal talcum powder use and any association
2  with ovarian cancer; is that right?
3      MS. O'DELL: Object to the form.
4      A    I -- I have seen some documents by the
5  FDA.
6      Q    (BY MR. ZELLERS) And the FDA, back in
7  2014, did a review and analysis of the epidemiology
8  at that time; is that right?
9      MS. O'DELL: Object to the form.
10      A    Could you show me that document?
11      Q    (BY MR. ZELLERS) Sure. This is a document
12  that we'll mark as Exhibit 26.
13      (Exhibit 26 was marked for identification
14  and is attached to the transcript.)
15      Q    (BY MR. ZELLERS) It's a document from the
16  FDA. It's got a date stamp at the top --
17      MS. O'DELL: Thank you.
18      Q    (BY MR. ZELLERS) -- April 1 of 2014.
19      Is this one of the documents that you have
20  reviewed in connection with your expert work in this
21  matter?
22      A    Yes, it is.
23      Q    Turn, if you will, to page 4 of that
24  document. Do you see that?
25      A    Yes.

1      Q    The FDA, in 2014, reviewed the
2  epidemiology and etiology findings relating to
3  ovarian cancer and the genital application of talc;
4  is that right?
5      MS. O'DELL: Object to the form.
6      A    Yes.
7      Q    (BY MR. ZELLERS) The FDA noted that
8  selection bias and/or uncontrolled confounding
9  result in spurious positive associations between
10  talc use and ovarian cancer; is that right?
11      MS. O'DELL: Object to the form.
12      A    The FDA concluded that some of the studies
13  had biases. Yes, they did.
14      Q    (BY MR. ZELLERS) And if we look at No. 2,
15  the FDA states, No single study has considered all
16  the factors that potentially contribute to ovarian
17  cancer, including selection biased and/or
18  uncontrolled confounding that result in spurious
19  positive associations between talc use and ovarian
20  cancer risk.
21      Is that right?
22      A    That is what the FDA concluded.
23      Q    The FDA also noted that there was a lack
24  of consistency in the study results; is that right?
25      A    That is what the FDA concluded.

1      Q    And specifically the FDA concludes,
2  Results of case-control studies do not demonstrate a
3  consistent, positive association across studies; is
4  that right?
5      MS. O'DELL: I think it says something
6  further than that.
7      A    Can I just add something? This -- the FDA
8  did some review that I don't know the details of.
9  And this is their summary of that review, which I
10  don't know the details of, yes.
11      Q    (BY MR. ZELLERS) The FDA, at least in this
12  review, stated that dose response evidence is
13  lacking; is that right?
14      And I am looking at the end of Point No. 3
15  on page 4.
16      A    That is what the FDA concluded.
17      Q    And looking at Point No. 4, the FDA found
18  that a cogent biological mechanism was lacking; is
19  that right?
20      A    That is what the FDA concluded.
21      Q    You have reviewed IARC; is that right?
22  And I think in your blue folder here you have
23  included some IARC documents?
24      A    I have included IARC work reflecting
25  analysis through 2006 and then more recently

Page 206

1 through -- through 2010, each published a few years
2 after that.
3    Q    IARC has gone through and addressed the
4 Bradford Hill considerations with respect to the
5 classification of genital talc; is that right?
6        MS. O'DELL:  Object to the form.
7    A    Can you remind me which analysis you're
8 referring to?
9    Q    (BY MR. ZELLERS) Well, let's start with
10 the classifications.  Take a look at Exhibit 27, if
11 you will.
12        (Exhibit 27 was marked for identification
13 and is attached to the transcript.)
14    Q    (BY MR. ZELLERS) Are these the IARC
15 classifications for its determination --
16        MS. O'DELL:  Thank you.
17    Q    (BY MR. ZELLERS) -- as to the
18 carcinogenicity -- carcinogenicity of different
19 agents?
20    A    Yes.
21    Q    And you're generally familiar with these
22 classifications; is that right?
23    A    I am.
24    Q    Group 1, these are the agents that IARC
25 has determined are carcinogenic to humans, correct?

Page 207

1    A    Yes.
2    Q    And that's the only category in which IARC
3 finds sufficient evidence in humans; is that right?
4        MS. O'DELL:  Object to the form.
5    A    That's how they define that category.
6    Q    (BY MR. ZELLERS) IARC puts 82 agents in
7 Group 2A probably carcinogenic to humans; is that
8 right?
9    A    That is correct.
10    Q    So IARC has gone through and has evaluated
11 many, many, many agents and has determined that
12 there are over 200 agents in both the Group 1
13 category and also the Group 2A category, correct?
14    A    Yes.
15    Q    There's only one agent in Group 4,
16 probably not carcinogenic to humans; is that right?
17        MS. O'DELL:  Object to the form.
18    A    Yes, that's correct.
19    Q    (BY MR. ZELLERS) So out of the over a
20 thousand agents that IARC has reviewed, it's only
21 placed one agent in Group 4 probably not
22 carcinogenic; is that right?
23        MS. O'DELL:  Object to the form.
24    A    To be considered by IARC, there has to be
25 data to suggest there's some potential harm.  And to

Page 208

1 prove that something is safe is -- is next to
2 impossible --
3    Q    (BY MR. ZELLERS) Right.
4    A    -- and so that's why that category is
5 not -- is used.  Category 3 and four can, for the
6 sake of discussion, be considered the same.
7    Q    And that's why there's no Group 5, not
8 carcinogenic; is that right?
9    A    Yes.
10    Q    Correct?  Now, with genital talc, IARC has
11 determined that it is appropriately placed in the
12 "to be" category; is that right?
13        MS. O'DELL:  Object to the form.
14    A    I -- I would take a slight pause to that
15 consideration.  I think that in the first review
16 when they have looked at platy talc, they consider
17 it a "to be" possibly carcinogenic to humans.
18        Whereas, in the report looking at asbestos
19 and fibrous talc, which also counts in the same
20 category as asbestos, the -- that is in the category
21 that's a Group 1 carcinogenic to humans.
22    Q    (BY MR. ZELLERS) IARC has determined that
23 genital talc is a group to be possibly carcinogenic
24 to humans; is that right?
25        MS. O'DELL:  Object to the form.

Page 209

1 Misstates her testimony.
2    A    So in their initial review -- in their
3 earlier review, they concluded that genital talc is
4 possibly carcinogenic to humans.
5        In the more recent 2012, they discuss that
6 cosmetics are the primary sources of exposure to
7 talc in the general population; that perineal
8 application is the primary route and that fibrous
9 talc, which is part of talc, is actually Group 1
10 carcinogenic.
11    Q    (BY MR. ZELLERS) All right.  Show me the
12 IARC designation of genital talc as a Group 1
13 carcinogenic.
14        MS. O'DELL:  Object to the form.
15    A    Genital talc contains platy talc, as well
16 as fibrous talc, as well as asbestiform contaminated
17 talc, and they consider any fibrous talc to be a
18 Group 1 carcinogen.
19    Q    (BY MR. ZELLERS) Show me where the
20 perineal application of genital talc has been
21 determined by IARC to be a Group 1 carcinogen.
22        MS. O'DELL:  Object to the form.  Would
23 you like to see the IARC?
24    A    Can you show me the IARC report?
25    Q    (BY MR. ZELLERS) No.  I would like you --

Rebecca Smith-Bindman, M.D.

Page 210

1 you're the one who is testifying.
2    A   I just don't have the document in front of
3 me. How would you like me to show it to you?
4    Q   I -- I would like you to show me where
5 genital talc has been found by IARC to be a Group 1
6 carcinogen.
7        MS. O'DELL: Object to the form. So was
8 that not -- excuse me, Doctor. Is that not
9 something you're going to put in front of her?
10    Q   (BY MR. ZELLERS) I -- I have my
11 information. And my IARC review says that they have
12 classified genital talc as a group to be possibly
13 carcinogenic to humans.
14    A   Do you have the 2012 --
15        MS. O'DELL: Yes. Let me just get it for
16 you, Doctor. Give me a moment to see what number it
17 is in your references.
18    Q   (BY MR. ZELLERS) As your counsel is
19 looking for that document, can we agree that the "to
20 be" designation with IARC is based on limited
21 evidence in humans, which means IARC cannot rule out
22 chance, bias, or confounding with reasonable
23 confidence?
24    A   In their original assessment of talc in
25 2010 where they classified it as to be, the "to be"

Page 211

1 designation means that it's possibly carcinogenic,
2 which is a very high bar for them to put them in
3 that category, but could also be due to chance.
4    Q   Okay. Also, in class "to be" as possibly
5 carcinogenic is ginkgo biloba; is that right?
6    A   I -- I have no idea.
7    Q   Occupational carpentry and joinery; is
8 that right?
9    A   I -- I -- I have no idea.
10    Q   Pickled --
11    A   I --
12    Q   -- vegetables?
13    A   I think pickled vegetables are pretty
14 carcinogenic, but I -- I don't know what IARC thinks
15 of them.
16    Q   Do you believe that the standard for
17 prove -- proving causation in the scientific
18 literature is the same as the one that applies in
19 litigation?
20    A   Yes, I do.
21    Q   Do you want to show me what your counsel
22 has provided you?
23    A   Yes.
24    Q   And I am looking for the finding that IARC
25 that genital talc use is a Group 1 carcinogen.

Page 212

1    A   So this is the monograph -- the
2 monograph -- the IARC monograph on the evaluation of
3 carcinogenic risks -- arsenic metals, fibrous and
4 dust, volume 100C. So --
5    Q   I'm looking for perineal talc.
6    A   No. No. I know. I understand.
7    Q   Okay.
8    A   I'm just telling you where I'm -- I'm
9 going to be pulling this from. And I'm looking at
10 the section under "Asbestos." And under the Pier --
11 the -- the section under "Asbestos, it talks, under
12 1.C --
13    Q   What page?
14    A   -- 230. And I will read several sections
15 of it. This section says, Talc particles are
16 normally plate-like. These particles are viewed on
17 edge under the microscope.
18        THE COURT REPORTER: I have to have you
19 slow down when you read.
20    A   I'm so sorry. May appear to be fibers.
21 Talc may also form true mineral fibers that are
22 asbestiform in habit.
23        In some talc deposits, tremolite,
24 anthophyllite, and actinolite may occur. Talc
25 containing asbestiform fibers is a term that has

Page 213

1 been used inconsistently.
2        I'm -- I'm just seeing where the --
3    Q   (BY MR. ZELLERS) That's okay. And I am
4 looking for the statement or the finding that
5 genital talc -- cosmetic genital talc has been
6 determined by IARC to be a Group 1 carcinogen.
7    A   So I'm in the section --
8        MS. O'DELL: Object to the form.
9    A   -- on the talc and asbestiform talc. And
10 under 1.65, "Human Exposure," under "A," it says,
11 Exposure of the general population: Consumer
12 products, cosmetics, pharmaceuticals are the primary
13 source of exposure to talc for the general
14 population. Inhalation and dermal contact through
15 perineal application are the primary routes of
16 exposure.
17    Q   (BY MR. ZELLERS) Where does IARC conclude
18 that perineal talc use, cosmetic talc, is a Group 1
19 carcinogen?
20        MS. O'DELL: Object to the form.
21    A   As late as 1973, talc products contained
22 detectable levels of chrysotile asbestos, tremolite,
23 or anthophyllite role. And it's possible they
24 remained on the market in some places for some time
25 after that. And these are asbestiform in habit.

Page 214

1    It goes on to cite a whole lot of other
2 places, Blount and so forth.
3    And then in this same document they
4 categorize the asbestos and asbestiform fibers as
5 being a Group 1 carcinogen.
6    Q   (BY MR. ZELLERS) I'm going to ask you
7 about asbestos and I'm going to ask you about
8 asbestiform fibers.
9    What I want to know is:  Where does IARC,
10 in the publication you're looking at, categorize
11 cosmetic talc applied perineal -- to the perineal
12 region as a Group 1 carcinogen?
13    MS. O'DELL:  Object to the form.
14    A   They're telling us in this document that
15 asbestos and asbestiform talc are Group 1
16 carcinogens.
17    They're telling us at the cite -- the --
18 the most common exposure is consumer products.  And
19 inhalation and dermal contact with perineal
20 application of talc powders are the primary routes
21 of exposure.
22    Q   (BY MR. ZELLERS) Where does IARC state
23 that perineal use of cosmetic talc is a Group 1
24 carcinogen?
25    MS. O'DELL:  Object to the form.

Page 215

1    A   So IARC is telling us which compounds are
2 Group 1 carcinogens.
3    Q   (BY MR. ZELLERS) Where does it state that
4 the perineal use of cosmetic talc is a Group 1
5 carcinogen?
6    MS. O'DELL:  Object to the form.  She has
7 already stated that three times.
8    MR. ZELLERS:  Well, I haven't heard it
9 yet --
10    MS. O'DELL:  Yes.
11    MR. ZELLERS:  -- Counsel.
12    MS. O'DELL:  Yes, you -- she has described
13 it to you three times or four times maybe.  And so
14 she has --
15    MR. ZELLERS:  Counsel --
16    MS. O'DELL:  -- answered your question.
17    MR. ZELLERS:  -- please don't coach the
18 witness.  Just --
19    MS. O'DELL:  -- I'm not -- I'm not --
20    MR. ZELLERS:  -- object to form, if you
21 want to object to form.
22    MS. O'DELL:  -- well, don't harass the
23 witness, which -- that's what I am --
24    MR. ZELLERS:  I'm not harassing the
25 witness.

Page 216

1    MS. O'DELL:  As I'm not coaching the
2 witness.  So you can ask the questions, but you
3 can't raise your voice and -- and continue --
4    MR. ZELLERS:  We have a video record.
5    MS. O'DELL:  -- yes, we do.
6    MR. ZELLERS:  No one here would say that
7 I'm raising my voice to the witness or behaving in
8 any way other than professionally.
9    A   I'm looking for the executive summary.
10 It's just taking a while in this very large document
11 to -- I see the problem.
12    The copy of this document, I'm missing my
13 first few pages.
14    Q   (BY MR. ZELLERS) Okay.
15    A   It starts at 30 -- 31.
16    THE COURT REPORTER:  Did you say "few" or
17 "first three"?
18    A   I think I'm missing the first 30 pages.
19    Q   (BY MR. ZELLERS) All right.  Let --
20    A   So --
21    Q   -- me move on then.
22    A   -- okay.
23    Q   Strength of association is a Bradford Hill
24 criteria -- is that -- criterion; is that right?
25    A   Yes, it is.

Page 217

1    Q   You -- one of the studies you reviewed was
2 Langseth; is that right?
3    A   Yes, it is.
4    Q   Langseth reviewed the overall pooled odds
5 of cancer and found that there was an odds ratio of
6 1.35 across the studies; is that right?
7    A   I'm going to look for it, but --
8    Q   Okay.  I --
9    A   -- it sounds about right.
10    Q   -- I will hand you Langseth.
11    A   I have it.
12    Q   If you take a look at page 359,
13 Figure 1 -- do you see that -- do you know Langseth?
14    A   I do.
15    Q   Langseth looks at the case-control
16 studies, both the population-based and the
17 hospital-based; is that right?
18    A   He looked at the studies that had a -- he
19 had available when this was established a decade
20 ago, yes.
21    Q   And -- and he lists out 20 case-control
22 studies, correct?
23    A   14?
24    Q   I'm looking at the chart above Figure 1.
25 And you think there's only 14 studies there?

Page 218

1   A   Oh, I apologize.  I thought you were
2  talking about the population-based studies.
3       No.  You're absolutely right.  20 studies.
4   Q   And of those 20 studies, only ten have
5  statistical significance; is that right?
6   A   The original studies with the sample size
7  they had, ten seemed to have difference than one.
8   Q   Of the 20 studies -- the 20 case-control
9  studies that were available and were studied by
10  Langseth, only ten had statistically significant
11  results; is that right?
12       MS. O'DELL:  Object to the form.
13   A   Again, he is combining them together.  But
14  in the original form when they were not combined,
15  there are ten in their original form that had
16  statistical differences than one.  They could
17  exclude one.
18   Q   (BY MR. ZELLERS) Half of the studies did
19  not have statistically significant results; is that
20  right?
21   A   The original studies had wide confidence
22  intervals.  And the original studies, before they
23  were combined, many of them overlapped one.
24   Q   Is the answer yes to my question?
25       MS. O'DELL:  She has answered your

Page 219

1  question.
2       MR. ZELLERS:  Well, I -- I don't know.  I
3  haven't heard an answer.
4       MS. O'DELL:  You have heard a complete
5  answer.
6   A   You're asking me to look at the results in
7  Figure 1 --
8   Q   (BY MR. ZELLERS) Yes.
9   A   -- which are meant to combine results.
10  But they also had the individual original study
11  sample size and show that about half of them overlap
12  one.
13   Q   Half is no better than a coin toss,
14  correct?
15       MS. O'DELL:  Object to the form.
16   A   It's an interesting question.  But if
17  you're looking for something, is there an
18  association with an exposure with cancer, a random
19  selection of that, you would expect to find very few
20  positive associations.
21       To find half is an enormous association to
22  find from random studies if there was no
23  association.
24   Q   (BY MR. ZELLERS) Do you believe that based
25  upon the Langseth paper and analysis, that there is

Page 220

1  a causal association between perineal use of talc
2  and ovarian cancer?
3       MS. O'DELL:  Objection to form.
4   A   The Langseth study is one review.  And as
5  I describe in my report, it seems like a well-done
6  review, although it does not provide the kind of
7  details that I would hope it would provide given
8  sort of the stature of some of the people who were
9  involved in writing the report.
10       That being said, this systematic review
11  suggests that there's an association between
12  perineal talc exposure and ovarian cancer.
13   Q   You --
14   A   By itself, I don't think it provides
15  enough data to have causality, but it provides good
16  evidence that there's an association.
17   Q   You understand that your interpretation of
18  this study is different and broader than the
19  authors' interpretation of the data, correct?
20       MS. O'DELL:  Object to the form.
21   A   One of the author's conclusion that I
22  found quite compelling was in -- on page 358 in the
23  second paragraph -- in the second column --
24   Q   (BY MR. ZELLERS) Can you answer my
25  question?

Page 221

1       MS. O'DELL:  She has answered your
2  question.  Don't --
3       MR. ZELLERS:  Well, I don't think she is
4  answering my question.
5   A   I think you are asking me about what the
6  authors conclude.
7   Q   (BY MR. ZELLERS) I asked if your
8  conclusion was broader than the authors' --
9       MS. O'DELL:  And she is telling you what
10  the authors' conclusions are.  You may finish,
11  Doctor.
12   A   What -- what Langseth says is that, Eight
13  of the population-based case-control studies were
14  identified by the Arforthinger (phonetic) as being
15  the most informative in terms of the size of the
16  studies, whether the studies were population-based
17  participation rates and adjustment for confounding
18  variables.  These selected studies -- among these
19  eight studies, the prevalence of use of talc was 16
20  to --
21       THE COURT REPORTER:  I can't hear.
22   A   -- sorry.  The selected studies included
23  at least 188 cases and had participation rates
24  ranging up to 75 percent.  Among these eight
25  studies, the prevalence of peritoneal use of

Rebecca Smith-Bindman, M.D.

| Page 222 |
|---|

1 talc-based body powder among controls ranged from 16
2 to 52 percent.
3        The relative risk of ovarian cancer among
4 body powder users were homogeneous across the set of
5 eight studies, each of which indicated a 30 to
6 60 percent increase in risk.
7        Among the other 12 case-control studies,
8 most also reported relative risk of this magnitude
9 or higher.
10       So I think the authors of this concluded
11 that the better studies showed a very strong
12 association.  And -- and I -- I'm not sure what
13 conclusion of the authors you're asking me to
14 disagree with.
15    Q   (BY MR. ZELLERS) Okay.  Doctor, take a
16 look at "Proposal to Research Community" on the
17 right-hand side of page 359.
18       Do you see that?
19    A   I do.
20    Q   I'm going to read this, and you tell me if
21 I read it correctly.
22       "The current body of experimental and
23 epidemiological evidence is insufficient to
24 establish a causal association between perineal use
25 of talc and ovarian cancer risk.

| Page 223 |
|---|

1        Experimental research is needed to better
2 characterize deposition, retention, and clearance of
3 talc to evaluate the ovarian carcinogenicity of
4 talc."
5        Did I read that correctly?
6    A   Not only did you read that correctly, I
7 would agree with that based on data available in
8 2008.
9        So you asked me if I thought this study by
10 itself evaluated causality.
11       And this study did not discuss the
12 deposition, the retention, or clearance.  And I
13 think those factors are crucial to understanding the
14 causality.
15    Q   Okay.
16    A   And that's new since --
17    MR. ZELLERS:  Move --
18    A   -- 2008.
19    MR. ZELLERS:  -- to strike as not --
20    MS. O'DELL:  She is --
21    MR. ZELLERS:  -- she finished.
22    MS. O'DELL:  -- she did not finish.
23    MR. ZELLERS:  Did you finish?
24    A   I was close enough.
25    MR. ZELLERS:  All right.  Move to strike

| Page 224 |
|---|

1 as nonresponsive.
2        My question was:  Did I read that
3 correctly?
4    A   You read that text correctly.
5    Q   All right.  You conclude in your report
6 with respect to strength of association that because
7 a very large number of ovarian cancers are caused by
8 talcum powder and talcum powder provides no
9 better -- no medical benefit, the Hill criterion of
10 strength of association is important and met.
11       Is that right?
12    A   I don't think that's exactly right.  I --
13 I think all of the things I believe are in there
14 somewhere, but that's not quite what I would be --
15    Q   I --
16    A   -- report.
17    Q   -- I'm just reading from page 38 of your
18 report.  Do you believe that because a very large
19 number of ovarian cancers are caused by talcum
20 powder and talcum powder provides no medical
21 benefit, the Hill criterion of strength of
22 association is important and is met?
23    MS. O'DELL:  Object to the form.  I don't
24 think you read that --
25    A   I --

| Page 225 |
|---|

1    MS. O'DELL:  -- the report correctly.  But
2 if you were intending to read from her report
3 verbatim, I don't believe that was correct.
4    MR. ZELLERS:  Counsel, please, just object
5 to form, if you have an objection.
6    MS. O'DELL:  I have an objection.
7    A   Could you -- again, you -- the -- what I
8 believe has been -- within your statement, but
9 that's not the reason I believe that the Bradford
10 Hill criteria are met.
11    Q   (BY MR. ZELLERS) Well, let me ask you a
12 question.
13    A   Yes.
14    Q   In your discussion of the Bradford Hill
15 criterion of strength of association, you include
16 Table 7, which is entitled "An Estimate of the
17 Number of Ovarian Cancers and Invasive Serous
18 Cancers Caused by Regular Use of Perineal Talc
19 Powder Products"; is that right?
20    A   Yes.
21    Q   Is that a calculation that you did to try
22 to determine whether or not there is strength of
23 association?
24    A   No, but that's not why I included that.
25    Q   Well, is it included in your "Strength of

1 Association" section?
2     A   It is included in the strength of
3 association to demonstrate how -- an odds ratio of
4 1.5, how many patients could be impacted on that.
5         So one of the questions is: Is there a
6 strong association? And the second, which is really
7 quite a different question, is: What's the
8 magnitude of that association?
9         And sometimes the magnitude of the
10 association is mistakenly used as an approximation
11 of the strength of the association.
12         And I was trying to disentangle the
13 strength of the association. How truly do we know
14 they're associated with -- if it is associated, how
15 big of an impact would it have?
16         And so the purpose of Table 7 is not in
17 any way to demonstrate the strengths of the
18 association, which is a requirement to assess for
19 Bradford Hill --
20     Q   Would your --
21         MR. LAPINSKI:  She's not finished --
22     A   -- but how many --
23         MR. LAPINSKI:  -- Counsel.
24     A   -- but --
25         MR. ZELLERS:  Okay.  Counsel, one lawyer

1 can object.  Okay.  I don't want all of you
2 objecting.
3         MR. LAPINSKI:  Don't -- don't raise your
4 voice to me.
5         MR. ZELLERS:  No.  I don't want all of you
6 objecting.
7         MR. LAPINSKI:  Counsel, if you want to
8 make a statement --
9         MR. ZELLERS:  Yeah --
10         MR. LAPINSKI:  -- make a statement.
11         MR. ZELLERS:  -- I'm making a statement
12 that I do not want --
13         MR. LAPINSKI:  That's --
14         MR. ZELLERS:  -- the whole group of
15 lawyers --
16         MR. LAPINSKI:  -- and you --
17         MR. ZELLERS:  -- on the Plaintiffs' side
18 objecting.
19         MR. LAPINSKI:  -- I'm sitting directly
20 across the table from you.  And I can hear you, and
21 I have heard you all day.
22         MR. ZELLERS:  Okay.
23         MR. LAPINSKI:  I have heard you carry on
24 the way you have carried on all day.  There's no
25 reason to raise your voice to me.  I can hear you

1 fine.
2         MR. ZELLERS:  Please don't interrupt
3 the --
4         MS. O'DELL:  That's --
5         MR. ZELLERS:  -- deposition.
6         MR. LAPINSKI:  -- better.  Thank you.
7         MR. ZELLERS:  Ms. O'Dell is doing a
8 fabulous job of making objections --
9         MR. LAPINSKI:  Yes, she is.
10         MR. ZELLERS:  -- for all of you.
11     Q   (BY MR. ZELLERS) Okay.  Doctor.  You were
12 trying --
13         MS. O'DELL:  Excuse me.  I don't -- still
14 don't think she was finished.
15         MR. ZELLERS:  Okay.
16         MS. O'DELL:  So you may continue, Doctor.
17 If you were finished, great.  If you weren't, you
18 may finish your answer.
19     A   I -- I'm going to have to say I -- I -- so
20 the -- the -- Table 7 is an illustration of the
21 number of women who would be impacted.
22         And the point was to explain that the
23 strength of the association is separate from the
24 number of women impacted.  But indeed, it
25 illustrates how important the number of women

1 impacted is.
2     Q   Let's go through your math.
3     A   Yes.
4     Q   So the table, Table 7, includes several
5 assumptions; is that right?
6     A   A great number of assumptions.
7     Q   You ran the data, assuming that 10 percent
8 of the female population in the United States used
9 talcum powder products regularly, as you define
10 "regularly"; is that right?
11     A   Just to clarify, I -- I demonstrated what
12 the impact would be if we estimated the number of
13 women at 10 percent.
14     Q   You did the same calculation for
15 20 percent and 30 percent; is that right?
16     A   Yes, I did.
17     Q   You don't actually know what percentage of
18 women use talcum powder products regularly --
19     A   I --
20     Q   -- correct?
21     A   -- I do not.
22     Q   All right.  The calculation -- or your
23 conclusion is that .14 percent of women exposed to
24 talcum powder products have invasive serous cancer.
25 And I am looking at your 10 percent assumption that

Page 230

1  you make.
2      Did you mean .14 or did you mean for that
3  to be 14 percent?
4      A   So I -- I take your correction as a -- as
5  correct.
6      Q   Okay.
7      A   I do mean 14 percent, but -- but it's not
8  the way you have interpreted it.
9      The -- the -- the calculation -- the
10 columns are the percent of invasive cancer that is
11 attributable to talcum powder, not the proportion of
12 cancer -- the proportion of women exposed who will
13 develop cancer.  Those are very different.
14     Q   I'm not sure I understand.  Your column
15 here says, The percent of invasive serous cancer in
16 women exposed to talcum powder products; is that
17 right?
18     A   That is correct.
19     Q   Okay.  The universe of talcum powder
20 products, which you're estimating here -- and I
21 understand it's an estimation -- is 10 percent of
22 the population; is that right?
23     MS. O'DELL:  Object to the form.
24     A   I -- I -- I -- I'm estimating in this
25 table that 10 percent of women use talcum powder --

Page 231

1      Q   (BY MR. ZELLERS) Right.
2      A   -- products in the U.S.
3      Q   There are approximately -- what do you say
4  -- 30 --
5      A   311 million.
6      Q   -- all right.  So 311 million.  And you
7  are estimating for purposes of this exercise that
8  31,100,000 are regular users; is that right?
9      A   Yes.
10     Q   And what you are trying to determine is of
11 those 31,100,000, what percent of regular talc users
12 will have invasive serous cancer, correct?
13     A   Yes.
14     Q   And you have calculated 14 percent; is
15 that right?
16     A   No.
17     Q   It's wrong, right?
18     A   The way you are describing it is wrong.
19 But I can give you an example to help you understand
20 that table.
21     Q   Well --
22     A   The number of cancers, we're talking about
23 31 million women or women who were exposed to
24 cancers.
25     I'm not saying 13 -- 14 percent of those

Page 232

1  women get ovarian cancer.  That would be five
2  million women.
3      I'm saying if we look at the world of
4  invasive serous cancers in the United States, there
5  will be in the ballpark of 11,000 serous cancers
6  every year in the United States.
7      Of those, 14 percent of those will occur
8  in regular users of talc powders.  86 percent will
9  occur in nonregular talc users.
10     So you're interpreting what is listed as a
11 column percent.  It says, Percent of invasive serous
12 cancer in women exposed to talc products.
13     You're interpreting that as if I'm saying
14 that the women exposed, that 15 percent of them will
15 get ovarian cancer.
16     Q   And in fact, if -- if your caption is
17 right, if we really are looking at the percent of
18 invasive serous cancer in women exposed to talcum
19 powder products, it would be less than .01 percent,
20 right?
21     A   Um --
22     MS. O'DELL:  Object to the form.
23     A   -- you -- you're asking me how many women
24 with exposure will end up getting?
25     Q   (BY MR. ZELLERS) Yes.

Page 233

1      A   So that's a -- a good number.  It's not
2  one I presented, but certainly one I can estimate,
3  which is -- if we're talking about 31 million women
4  who have regular exposure and of those who will
5  get -- I'm scribbling on my exhibit.  I hope that's
6  okay.  Is that okay?  One, two, three -- one, two,
7  three.  One -- one out of -- one out of 3,000 women
8  will get --
9      Q   So --
10     A   -- ovarian cancer.
11     Q   -- approximately .01 percent, correct?
12     A   That sounds pretty good, actually.
13     Q   All right.  Dose response.  A significant
14 number of the talcum powder studies that you looked
15 at do not show a dose response or fail to account
16 for dose response altogether; is that right?
17     A   In my summary of dose response on page 39,
18 I note that Penninkilampi, one of the large
19 meta-analyses, which I think is the most
20 comprehensive review, talks about dose response.
21     I didn't cite here -- and it was an
22 oversight -- Berge, another large comprehensive
23 meta-analysis, also shows dose response.
24     So the two systematic reviews showed dose
25 response.  I also list Terry as showing dose

Page 234

1 response. That's the pool data of a large number of
2 studies. Those are, you know, both quite -- I -- I
3 have covered most of the publications, so those show
4 dose response.
5        There are a few others that I show. There
6 are definitely a bunch that do not address the issue
7 of dose response, but -- but I wouldn't characterize
8 it as most do not.
9    Q   Well, you state on page 40 of your report
10 with respect to dose response, The results are
11 inconsistent and more importantly are not considered
12 or assessed in most of the published studies.
13       That was your conclusion with respect to
14 dose response; is that right?
15    A   You are going to have to tell me where
16 you're reading. What I'm reading says, In summary,
17 most, but not all, studies of talcum powder products
18 in ovarian cancer show a dose response.
19       THE COURT REPORTER: Slow down when you
20 read, please.
21    A   I'm so sorry.
22       In summary, most, but not all, studies of
23 talcum powder products in ovarian cancer show a dose
24 response. Most do.
25       But the results are inconsistent and more

Page 235

1 importantly are not considered assessed in most --
2 that -- that should not say "most." It should say
3 "in many of the published studies."
4    Q   (BY MR. ZELLERS) All right. So you would
5 amend your report from "most" to "many; is that
6 right?
7    A   I -- I used "most" twice in the same
8 sentence as meaning different things. So yes, I --
9    Q   Go --
10    A   -- it was an error.
11    Q   -- Gertig 2000 study found that there was
12 no increase in risk of ovarian cancer with
13 increasing frequency of use; is that right?
14    A   I would have to check that, but I'm happy
15 to do so. I believe that's correct.
16    Q   Hunchcharek 2003 found that the data
17 showed a lack of clear dose response relationship,
18 making the relative risk of questionable validity;
19 is that right?
20    A   Which -- which one?
21    Q   Sure. Huncharek 2003, page 19 of 55.
22    A   Wait. This one is 2011. I don't -- I
23 don't think I have that one.
24    Q   All right. Consistency. Consistency is
25 another factor that you looked at; is that right?

Page 236

1    A   Yes.
2    Q   Would you agree that generally when you
3 looked at the published studies, that they showed an
4 association of around 1.3 between perineal talc use
5 and ovarian cancer?
6    A   I think many of the studies showed an
7 association of about 1.3 of any talc use. Not
8 quantifying the amount of exposure.
9    Q   But would you agree that an an -- that
10 epidemiologists generally consider a 1.3 odds ratio
11 in a case-control study to be a weak or modest
12 association?
13       MS. O'DELL: Object to the form.
14    A   I am -- I am unaware what -- of what most
15 epidemiologists think.
16    Q   (BY MR. ZELLERS) Have you seen any peer
17 reviewed literature on talc and ovarian cancer that
18 states that 1.3 is a strong association?
19    A   I mean, Penninkilampi concludes there's a
20 consistent association between perineal talc -- talc
21 use and ovarian cancer.
22       And I'm just looking for how he quantifies
23 that. He concludes the results indicate that
24 perineal talc use is associated with a 24 to
25 39 percent increased risk of ovarian cancer.

Page 237

1       He doesn't quantify it as weak or strong,
2 but there's a suggestion that a 39 percent increase
3 is important. But he -- he doesn't quantify it. So
4 I would have to look through the authors'
5 conclusions.
6    Q   Do you know who Penninkilampi is?
7    A   I do not.
8    Q   Do you know that he is a medical student?
9    A   I'm very impressed. He did a beautiful
10 review.
11    Q   Do you know who Guy Eslick is, the other
12 author on that paper?
13    A   I do not.
14    Q   Do you know if he's an expert for the
15 Plaintiffs in the talc litigation?
16    A   I -- I do not.
17       MS. O'DELL: Object to the form.
18    Q   (BY MR. ZELLERS) Does Mr. Eslick disclose
19 or identify that he is working for or has worked for
20 Plaintiffs in the talc litigation?
21    A   I might -- I don't know the answer to
22 that.
23    Q   You would expect that if that was true,
24 that there would be a disclosure of that; is that
25 right?

Page 238

1     A   I --
2         MS. O'DELL:  Object to the form.
3     A    -- it's published in a very high-impact,
4  high-quality medical journal, and I would suspect
5  that that would be required of that journal.
6         But -- but I -- I -- I -- I don't -- I --
7  I don't know that journal's requirements, but I
8  would suspect that they would require reporting
9  funding.
10    Q   You --
11    A   It says -- I'm sorry.  It says, The
12 authors report no conflicts of interest and have not
13 reported funding.
14        And typically when you have to reporting
15 conflicts of interest in the same area, you also
16 report funding, and I don't see any of that.
17    Q   The cohort studies.  There are four cohort
18 studies; is that right?
19    A   Yes.
20    Q   All right.  You rely only on the Gertig
21 study, the 2000 study; is that right --
22        MS. O'DELL:  Object to the form.
23    Q   (BY MR. ZELLERS) -- of those four?
24        MS. O'DELL:  Excuse me.  Object to the
25 form.

Page 239

1     A   My report summarizes all four of them, and
2  that all went into the weight of my report.
3         In terms of being included in any
4  systematic review, only one of them was included in
5  the systematic review.
6     Q   (BY MR. ZELLERS) If you looked just at the
7  cohort studies --
8     A   Yes.
9     Q    -- you would not find a statistically
10 significant association between perineal talc use
11 and ovarian cancer, correct?
12        MS. O'DELL:  Object to the form.
13    A   I --
14        MS. O'DELL:  Excuse me.  When -- when you
15 get to a good stopping point, it would be good to
16 take a break --
17        MR. ZELLERS:  Okay.
18        MS. O'DELL:  -- but whenever you're -- if
19 you have a few more minutes, that's fine, but
20 whenever you get to a good point.
21    A    -- so I summarize my view of the cohort
22 studies, which are not exactly what you -- what you
23 just summarized -- the way you just summarized them
24 on page 21.
25        So I think that often the cohort studies

Page 240

1  are summarized the way you summarized them.  And I
2  think if you look at them a little more closely, I
3  would not make that conclusion.  So --
4     Q   For the reasons set forth in your report?
5     A   It's in my report.
6         MR. ZELLERS:  All right.  Let's take a
7  break.
8         THE VIDEOGRAPHER:  We're off the record.
9  The time is 3:58 p.m.
10        (A break was taken from 3:58 p.m. to
11 3:58 p.m.)
12        (Next portion not on video record.)
13        MR. ZELLERS:  So we are back on the
14 written record, but not the video record.  My
15 understanding is that, you know, we are taking a
16 break as an accommodation to the witness, and that
17 that's fine, but that, you know, you are not going
18 to use this time to further meet and prepare the
19 witness based upon the questions I asked today.
20        MS. O'DELL:  Correct.  There's --
21 there's -- Dr. Smith-Bindman is taking this break
22 because she is still recovering from her concussion.
23        There will be no meeting with
24 Dr. Smith-Bindman.  I do want to point out counsel
25 for J&J seems to have dictated this requirement in

Page 241

1  order to accommodate the witness's situation.
2         But I would just note the deposition
3  protocol has no such restriction, and -- and so
4  that -- to that degree, I would say we have no
5  intent to prepare the witness any further.
6         But we're not restricted from talking to
7  the witness, and I don't want the record to suggest
8  otherwise.
9         MR. ZELLERS:  We will see you tomorrow.
10        MS. O'DELL:  Thank you.
11        THE VIDEOGRAPHER:  We are back on the
12 record at 4:01 p.m, and this is the end of Disc
13 No. 4 in today's testimony of Dr. Rebecca
14 Smith-Bindman.  The time is 4:01 p.m.
15
16        (TIME NOTED:  4:01 p.m.)
17
18
19
20
21
22
23
24
25

Rebecca Smith-Bindman, M.D.

Page 242

```
 1
 2
 3
 4       I, REBECCA SMITH-BINDMAN, M.D., VOLUME I, do
 5   hereby declare under penalty of perjury that I have
 6   read the foregoing transcript; that I have made any
 7   corrections as appear noted, in ink, initialed by
 8   me, or attached hereto; that my testimony as
 9   contained herein, as corrected, is true and correct.
10       EXECUTED this_____ day of_____,
11   20____, at_____, _____.
                  (City)          (State)
12
13
14       _____
         REBECCA SMITH-BINDMAN, M.D.
15             VOLUME I
16
17
18
19
20
21
22
23
24
25
```

Page 244

```
 1       ERRATA SHEET
 2       Golkow Litigation Services
 3   1650 Market Street, One Liberty Plaza, 51st Floor
 4       Philadelphia, Pennsylvania 19103
 5           877-370-3377
 6       CASE:  Talcum Powder Litigation
 7   PAGE  LINE  FROM              TO
 8   ___|____|_____|_____
 9   ___|____|_____|_____
10   ___|____|_____|_____
11   ___|____|_____|_____
12   ___|____|_____|_____
13   ___|____|_____|_____
14   ___|____|_____|_____
15   ___|____|_____|_____
16   ___|____|_____|_____
17   ___|____|_____|_____
18   ___|____|_____|_____
19   ___|____|_____|_____
20       _____
21       REBECCA SMITH-BINDMAN, M.D., VOLUME I
22   Subscribed and sworn to before me
23   this _____ day of _____, 2019.
24   _____
25       Notary Public
```

Page 243

```
 1       I, MARY J. GOFF, CSR No. 13427, Certified
 2   Shorthand Reporter of the State of California,
 3   certify;
 4       That the foregoing proceedings were taken
 5   before me at the time and place herein set forth, at
 6   which time the witness declared under penalty of
 7   perjury; that the testimony of the witness and all
 8   objections made at the time of the examination were
 9   recorded stenographically by me and were thereafter
10   transcribed under my direction and supervision; that
11   the foregoing is a full, true, and correct
12   transcript of my shorthand notes so taken and of the
13   testimony so given;
14       That before completion of the deposition,
15   review of the transcript (  ) was (XX) was not
16   requested:   (  ) that the witness has failed or
17   refused to approve the transcript.
18       I further certify that I am not financially
19   interested in the action, and I am not a relative or
20   employee of any attorney of the parties, nor of any
21   of the parties.
22       I declare under penalty of perjury under the
23   laws of California that the foregoing is true and
24   correct, dated this    day of      , 2019.
25           MARY J. GOFF
```

Rebecca Smith-Bindman, M.D.

Page 245

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

_____

                                     )
IN RE:  JOHNSON & JOHNSON TALCUM   )
POWDER PRODUCTS MARKETING, SALES   )
PRACTICES, AND PRODUCTS LIABILITY  )
LITIGATION                         )
                                     )  MDL No.
                                     )  2738 (FLW)(LHG)
                                     )
_____)

VIDEOTAPED DEPOSITION OF

REBECCA SMITH-BINDMAN, M.D.

San Francisco, California

Friday, February 8, 2019

Volume II

Reported by:
MARY J. GOFF
CSR No. 13427

Rebecca Smith-Bindman, M.D.

|  | Page 246 |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | Videotaped Deposition of REBECCA |
| 6 | SMITH-BINDMAN, M.D., Volume II, taken on behalf of |
| 7 | Johnson & Johnson, at Levin Simes Abrams LLP, |
| 8 | 1700 Montgomery Street, Suite 250, San Francisco, |
| 9 | California 94111, beginning at 9:26 a.m. and ending |
| 10 | at 12:48 p.m., on February 8, 2019, before MARY J. |
| 11 | GOFF, California Certified Shorthand Reporter No. |
| 12 | 13427. |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 248 |
|---|---|
| 1 | APPEARANCES (continued): |
| 2 | |
| 3 | For Defendant Johnson & Johnson |
| 4 | Tucker Ellis LLP |
| 5 | BY:  MICHAEL C. ZELLERS |
| 6 | Attorney at Law |
| 7 | 515 South Flower Street |
| 8 | 42nd Floor |
| 9 | Los Angeles, California 90071 |
| 10 | michael.zellers@tuckerellis.com |
| 11 | 213-430-3301 |
| 12 | |
| 13 | |
| 14 | For Defendant Johnson & Johnson |
| 15 | Skadden, Arps, Slate, Meagher & Flom, LLP. |
| 16 | BY:  BENJAMIN HALPERIN |
| 17 | Attorney at Law |
| 18 | 4 Times Square |
| 19 | New York, New York 10036 |
| 20 | benjamin.halperin@skadden.com |
| 21 | 212-735-2453 |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 247 |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | For Plaintiffs |
| 4 | Beasley Allen Law Firm |
| 5 | BY:  P. LEIGH O'DELL |
| 6 | MARGARET M. THOMPSON, MD, JD, MPAff |
| 7 | Attorney at Law |
| 8 | 218 Commerce Street |
| 9 | Montgomery, Alabama 36103 |
| 10 | leigh.odell@beasleyallen.com |
| 11 | 334-269-2343 |
| 12 | For Plaintiffs |
| 13 | Robinson Calcagnie, Inc. |
| 14 | BY:  CYNTHIA L. GARBER |
| 15 | Attorney at Law |
| 16 | 19 Corporate Plaza Drive |
| 17 | Newport Beach, California 92660 |
| 18 | cgarber@robinsonfirm.com |
| 19 | For Plaintiffs |
| 20 | Wilentz, Goldman & Spitzer P.A. |
| 21 | Daniel R. Lapinski |
| 22 | Attorney at Law |
| 23 | 90 Woodbridge Center Drive, |
| 24 | Suite 900 Box 10 |
| 25 | Woodbridge, New Jersey 07095-0958 |

|  | Page 249 |
|---|---|
| 1 | APPEARANCE (continued): |
| 2 | For Defendant Imerys |
| 3 | Dykema |
| 4 | BY:  JANE BOCKUS |
| 5 | Attorney at Law |
| 6 | 112 E. Pecan Street |
| 7 | Suite 1800 |
| 8 | San Antonio, Texas 78205 |
| 9 | jbockus@dykema.com |
| 10 | 210-554-5549 |
| 11 | |
| 12 | For Defendant Imerys |
| 13 | Gordon & Rees LLP |
| 14 | BY:  JENNIFER A. FOSTER |
| 15 | Attorney at Law |
| 16 | 816 Congress Avenue |
| 17 | Suite 1510 |
| 18 | Austin, Texas 78701 |
| 19 | jfoster@gordonrees.com |
| 20 | 512-391-0197 |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

2 (Pages 246 to 249)

Rebecca Smith-Bindman, M.D.

Page 250

1   APPEARANCES (continued):
2   For Defendant PCPC, Personal Care Products Council
3       Seyfarth Shaw, LLP
4       BY:  JAMES R. BILLINGS-KANG
5       Attorney at Law
6       975 F Street, NW
7       Washington, D.C. 20004
8       jbillingskang@seyfarth.com
9       202-828-5356
10
11
12
13
14  For Defendants PTI Union, LLC and PTI Royston, LLC
15      Tucker Ellis LLP
16      BY:  CAROLINE M. TINSLEY
17      Attorney at Law
18      100 South 4th Street`
19      Suite 600
20      St. Louis, Missouri, 63102
21      caroline.tinsley@tuckerellis.com
22
23  Videographer:
24      Andrew Graves
25

Page 252

1   EXHIBITS CONTINUED:                        PAGE
2   Exhibit 34  Does Exposure to Asbestos Cause    324
                Ovarian Cancer article
3
4   Exhibit 35  Occupational Exposure to Asbestos   327
                article
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 251

1               INDEX
2   WITNESS                      EXAMINATION
3   REBECCA SMITH-BINDMAN, M.D.
4   Volume II
5
6           BY MR. ZELLERS        254, 372
7           BY MS. O'DELL          354
8           BY MR. BILLINGS-KANG   347
9           BY MS. BOCKUS          331, 369
10
11  NUMBER      DESCRIPTION              PAGE
12  Exhibit 28  6/1/17 Letter, Invoice      259
13
14  Exhibit 29  Bill, Invoice 147           261
15
16
17  Exhibit 30  Perineal Use of Talc and Risk   276
                of Ovarian Cancer article
18
19
20  Exhibit 31  Influence of Aspirin and nonaspirin  297
                NSAID Use article
21
22  Exhibit 32  Article, Talc               317
23
24  Exhibit 33  Invoice, Tachibana, UCSF, 10/18  319
25

Page 253

1               San Francisco, California
2               February 8, 2019
3               9:26 a.m.
4
5           THE VIDEOGRAPHER:  We are now on the
6   record.  My name is Andrew Graves.  I'm a
7   videographer for Golkow Litigation Services.
8   Today's date is February 8, 2019.  The time is
9   9:26 a.m.
10          This video deposition is being held at
11  1700 Montgomery Street, Suite 250, San Francisco,
12  California, In the Matter of In Re: Johnson &
13  Johnson Talcum Powder Products Marketing, Sales
14  Practices, and Products Liability Litigation, for
15  the United States District Court, District of
16  New Jersey.
17          The deponent is Rebecca Smith-Bindman,
18  Ph.D., Volume II.
19          Would counsel please identify yourselves.
20          MR. ZELLERS:  Can we waive that since we
21  were all here yesterday?
22          THE VIDEOGRAPHER:  Okay.  The court
23  reporter is Mary Goff, and she will now swear in the
24  witness.
25

3 (Pages 250 to 253)

Rebecca Smith-Bindman, M.D.

Page 254

1     REBECCA SMITH-BINDMAN, M.D., VOLUME II,
2    being first duly sworn or affirmed to testify to the
3    truth, the whole truth, and nothing but the truth,
4    was examined and testified as follows:
5        EXAMINATION BY COUNSEL FOR THE DEFENDANTS
6    BY MR. ZELLERS:
7        Q   Good morning.
8        A   Good morning.
9        Q   Dr. Smith-Bindman, did you do anything to
10   prepare -- or further prepare for your deposition
11   since the time we concluded yesterday and this
12   morning?
13       A   I did two things. I reviewed my report
14   again, and I called the biostatistician who worked
15   on my meta-analysis to review a few of the details.
16       Q   You called Dr. Hall?
17       A   I did.
18       Q   When was the last time that you had talked
19   with Dr. Hall before yesterday?
20       A   Speaking to her at the time of -- that she
21   did the analysis. And I -- I think there was an
22   e-mail or two over the last several weeks asking for
23   her CV or something like that, but not any
24   meaningful conversation.
25       Q   Have you produced the e-mails -- the

Page 255

1    recent e-mails with Dr. Hall?
2        A   I -- I'm not sure if I produced the one
3    asking for her CV, but the -- and actually, I don't
4    remember when I asked her for that. I might have
5    presented --
6        MS. O'DELL: I think that's part of the
7    production --
8        Q   (BY MR. ZELLERS) How --
9        MS. O'DELL: -- but -- excuse me.
10       Q   (BY MR. ZELLERS) How long did you speak
11   with Dr. Hall yesterday?
12       A   About 15 -- 10-15 minutes.
13       Q   Did you make any written notes?
14       A   I -- I think I scribbled in my usual
15   scribble place.
16       Q   What notes did you make from your
17   conversation with Dr. Hall yesterday after the first
18   session of your deposition?
19       A   So -- so I did -- I did -- I did jot some
20   notes on my meta-analysis. But mostly I asked her
21   to clarify how she did the calculations of the
22   numbers that are shown in the figures.
23          I was struggling to understand why the
24   numbers and the figures were not exactly the same as
25   the ones that you showed me in the published

Page 256

1    manuscript.
2          I was quite surprised that they weren't
3    exactly the same. They were not meaningfully
4    different, but there was a very slight shift in
5    the ones that are in my report.
6          I mean, I asked Dr. Jane why that was the
7    case. And in fact, the numbers are calculated using
8    the standard errors in the confidence intervals and
9    the sample size which very slightly shifts it from
10   the reported numbers.
11          So you were correct when you said the
12   numbers are not exactly the same, and she explained
13   that that's why that's the case.
14       Q   Are the numbers that were contained in
15   Figure -- Figures 2 and 3 in your report, estimates?
16       MS. O'DELL: Object to the form.
17       A   The numbers are calculated. So I -- I
18   think by that, you mean estimates.
19       Q   (BY MR. ZELLERS) Did you do the
20   calculations?
21       A   No. She -- she did them.
22       Q   Do we --
23       THE COURT REPORTER: Can you raise your
24   voice for me, please?
25       A   Yes, I can. I apologize.

Page 257

1        Q   (BY MR. ZELLERS) Do we have her work
2    product as to the calculations that were made?
3        A   In the documents that I shared, she
4    specified the -- the software that she used, the
5    program that she used.
6          In fact, the way of estimating it, it's
7    actually in my report as well. And so yes, it's
8    explained there, and it's in all of the documents
9    that I shared with you.
10       Q   Her calculations are contained in the
11   documents that are shared; is that right?
12       A   Yes.
13       Q   The numbers that you got from the Terry
14   study, those came from the Terry publication; is
15   that right?
16       A   Yes.
17       Q   Any additional notes you made from your
18   discussion with Dr. Hall, other than what you have
19   generally told us about?
20       A   No. Just that.
21       Q   The notes that you added to your annotated
22   report from your discussion with Dr. Hall, which we
23   marked as Exhibit 17, those notes are on which page
24   or pages?
25       A   Page 33 and 34.

4  (Pages 254 to 257)

Rebecca Smith-Bindman, M.D.

Page 258

```
1         Q   It looks like you made those notes in an
2    aqua pen is -- is that right, or --
3         A   Yes.
4         Q   -- I --
5         A   Yes.
6         Q   Okay.
7         A   Yes, absolutely.
8         Q   Any --
9         A   I would say teal, but...
10        Q   Well, I think you're probably more correct
11   than I am.
12            Any other notes that you had from your
13   discussion with Dr. Hall?
14        A   No.
15        Q   Any other communications that you had with
16   Dr. Hall, other than your 10- or 15-minute phone
17   conversation yesterday afternoon or evening?
18        A   No.
19        Q   Did you communicate with Dr. Hall via
20   e-mail or any way other than just the phone call?
21        A   No.
22        Q   Did you communicate with anyone else
23   between the time we finished yesterday and this
24   morning about the subject matter that we're here to
25   talk about?
```

Page 259

```
1         A   No.
2         Q   At the start of the session today, counsel
3    for Plaintiffs, Ms. O'Dell, provided me with copies
4    of your invoices.
5             I'm going to hand you what we have marked
6    as Exhibit 28.  It is a five-page exhibit.
7             The first page is a cover letter.  It
8    looks like an engagement or general engagement
9    letter from you to -- you say Mr. Carmen Scott.
10   Is it a Ms. Carmen Scott?
11            (Exhibit 28 was marked for identification
12   and is attached to the transcript.)
13        A   It is.
14        Q   All right.  That was on June 1 of 2017.
15   The last invoice is November 13 of 2018; is that
16   right?
17        A   I'm sorry.  What was the question?  Is
18   this --
19        Q   The question is:  Are those all of our
20   invoices that you have generated thus far in the
21   talcum powder MDL litigation?
22        A   I -- I think I mentioned that there are --
23   I haven't submitted anything beyond this, but that
24   there are additional hours that I recorded after
25   this.
```

Page 260

```
1         Q   What do you -- well, I will take that as a
2    yes, that at least through November 13, 2018, that
3    Deposition Exhibit 28 are all of your invoices --
4         A   Yeah.
5         Q   -- is that right?
6         A   Yes.
7         Q   Those invoices total approximately
8    160 hours.  Does that sound right?
9         A   160?
10        Q   160.
11        A   I'm -- I'm going to believe you.
12        Q   Well, and anyone can go and check my math.
13            How many hours do you estimate that you
14   have spent up until today on this matter both doing
15   additional work, reviewing those additional studies
16   and materials we talked about yesterday, preparing
17   for the deposition, meeting with counsel for
18   Plaintiffs?
19            MS. O'DELL:  Since the last invoice?
20            MR. ZELLERS:  Since the last invoice is
21   what I had intended to ask.
22            MS. O'DELL:  Yeah.  Thank you.
23        A   I -- I think approximately 25 hours.
24        Q   (BY MR. ZELLERS) In addition, we were
25   provided with a two-page exhibit which are two
```

Page 261

```
1    invoices from Jane Hall, which total around $3,000.
2             (Exhibit 29 was marked for identification
3    and is attached to the transcript.)
4         Q   (BY MR. ZELLERS) Can you look at
5    Exhibit 29 and verify for us that those are the
6    e-mails -- strike that -- that those are the
7    invoices for the work that was done by Dr. Hall?
8         A   I -- I -- I believe so.
9         Q   Are you aware of any additional invoices
10   beyond that?
11        A   I'm not.
12        Q   Do you have any invoices from your copy
13   editor, Ms. Tachibana?
14        A   She sent me an invoice, which I forwarded
15   to counsel.
16        Q   All right.  How much was that invoice for?
17        A   I think it was about $1,500.
18        Q   How much an hour does Ms. Tachibana
19   charge?
20        A   I think it's about a hundred dollars an
21   hour.
22        Q   Was that for all of the work that she did
23   with respect to your report?
24        A   Yes.  There was no other work other than
25   that 15 -- it might have been $1,700.
```

5 (Pages 258 to 261)

Rebecca Smith-Bindman, M.D.

Page 262

1    MS. O'DELL:  Excuse me.  I'm sorry, Mike.
2 I apologize for not copying that.  We're going to
3 make a copy, and I will provide it to your
4 momentarily at --
5    MR. ZELLERS:  Very good.  We'll mark it
6 before the conclusion of the deposition.  Thank you.
7    Q    (BY MR. ZELLERS) Do you have your report
8 in front of you?  You can use your annotated
9 version, No. -- Exhibit 17.  We also marked your
10 report as Exhibit 2.
11    A    Yes.
12    Q    Do you have that in front of you?
13    A    I do.
14    Q    Go to page 17, if you will, please.
15    MR. LAPINSKI:  Counsel, you said page 17?
16    MR. ZELLERS:  Yes, page 17.
17    A    Yes.
18    Q    (BY MR. ZELLERS) On page 17, you make a
19 number of general statements about the advantages
20 and disadvantages of case control and cohort
21 studies; is that right?
22    A    Yes.
23    Q    There are no citations there.  Is this
24 based and those statements based on your general
25 knowledge?

Page 263

1    A    Yes.  This is based on Epi 101, sort of...
2    Q    You make a statement in the middle
3 paragraph on page 17 where you talk about "cohort
4 studies."
5    And you state that they rarely focus on a
6 single narrowly defined question and that that's an
7 important limitation of cohort studies.
8    Do you see that?
9    A    I do.
10    Q    Can you cite to any other epidemiologists
11 who agree with you on that point?
12    A    So it's very well known the cost of doing
13 a cohort study is often very large, and so the topic
14 that's often the central focus of the cohort study
15 is very, very well done.
16    It's the ancillary topics that often get
17 short shrift.  And so that -- I -- I could probably
18 find this explained in any basic textbook.
19    And -- and I -- I apologize for not citing
20 it.  This is sort of just very well-known general
21 concepts of study design.
22    Q    Can you cite to any published literature
23 that states that cohort studies are unlikely to
24 detect real associations for this reason?
25    MS. O'DELL:  Are you reading a particular

Page 264

1 paragraph, Mike?  I have lost track.
2    MR. ZELLERS:  I was asking about the
3 specific statement in the middle paragraph of
4 page 17 relating to cohort studies and the
5 limitation that they rarely focus on a single
6 narrowly defined question.
7    MS. O'DELL:  Yes.  Thank you.
8    Q    (BY MR. ZELLERS) But my question now is --
9    A    Yes.
10    Q    -- whether or not Dr. Smith-Bindman, as
11 you sit here, can cite any published literature that
12 states the cohort studies are unlikely to detect a
13 real association -- or unlikely to detect real
14 associations for this reason.
15    A    I --
16    MS. O'DELL:  Excuse me.  Are you
17 quoting -- when you say "unlikely to detect real
18 associations for this reason," is that reading --
19 are you reading from her report or is that just --
20    MR. ZELLERS:  No.  That's my question.
21    MS. O'DELL:  -- okay.  Sorry.
22    MR. ZELLERS:  And if it's not very
23 articulate --
24    A    I -- I think cohort -- cohort studies are
25 able to detect real associations, if they ask about

Page 265

1 those associations.
2    If they don't ask about it, then it
3 can't -- then -- then it doesn't have an ability to
4 measure it.
5    So what I am saying here is that cohort
6 studies don't have the capacity to go in depth and
7 ask.
8    I think all of the cohort studies that I
9 reviewed for -- for this review discuss the lack of
10 detail in the cohort question, meaning that it's not
11 that the study design was the problem.  It was that
12 they just didn't have the right predicter
13 information being assessed.
14    Q    Despite this limitation -- or in your
15 view, limitation of cohort studies, you did include
16 the Gertig 2000 cohort study in your systematic
17 review; is that right?
18    A    I did.  I just want to clarify the answer.
19 Cohort studies are a very strong study design that I
20 like very much and that I have used and currently
21 I'm -- I'm using in study designs.
22    It's rather if the study design uses a
23 cohort, which is a good design, doesn't have enough
24 detail, because that's not the focus, that
25 doesn't -- it can't be used to answer other

6  (Pages 262 to 265)

Rebecca Smith-Bindman, M.D.

Page 266

1    questions easily.
2         So I think in general I like cohort
3    designs very much, and I think it's a very powerful
4    study design. But if you haven't asked the right
5    questions, it's hard to the expand it.
6         So I did -- I read all of the cohorts on
7    this topic.
8         Q   And you concluded that the Gertig cohort
9    study, you know, asked the right information or had
10   sufficient information for you to include it both in
11   your general systematic review and in your more
12   focused systematic review which you set forth as
13   Figures 2 and 3 in your report, correct?
14        A   That's correct. That -- those -- those
15   were looking at regular use, and I thought the
16   Gertig was the cohort that allowed me to understand
17   regular use of perineal talc.
18        Q   Gertig was based on the Nurses' Health
19   Study; is that right?
20        A   Yes.
21        Q   Gertig and the authors do recognize that
22   the biologic evidence for the association of talc
23   and ovarian cancer is incomplete, correct?
24        MS. O'DELL:  Object to the form.
25        A   I -- I don't have it in front of me, but

Page 267

1    it may be that they reported as of 2000, they didn't
2    have evidence of the biologic mechanism. I --
3         Q   And I will ask you about biologic
4    mechanism before we conclude here today.
5         You did not, though -- well, let me
6    withdraw that.
7         There was a follow-up cohort study to
8    Gertig 2000, and that was the Gates 2010 cohort
9    study; is that right?
10        A   Yes.
11        Q   That had a longer follow-up than Gertig;
12   is that right?
13        A   Yes.
14        Q   It was an analysis of the data collected
15   in the Nurses' Health Study; is that right?
16        MS. O'DELL:  Object to the form.
17        A   It was analysis of some of the data
18   collected in the -- in the Nurses' Health Study, but
19   they did not report the variable in such a way that
20   would allow you to understand or to quantify the
21   exposure as opposed to the first cohort study which
22   did.
23        So the latter study, they -- they had the
24   data, which is why I'm answering it this way. They
25   clearly had it, because the data hadn't change, and

Page 268

1    yet they didn't report it that way.
2         They only reported on any exposure to talc
3    powder products. And that is a very vague
4    definition as opposed to the frequency of use.
5         And for that reason, I couldn't tell in --
6    in nearly the same detail as I could for the earlier
7    study, the -- the exposure. They just chose not to
8    present it that way.
9         Q   The Gates 2010 cohort study did include
10   over a hundred thousand women; is that right?
11        A   The Gates?
12        Q   Yes.
13        A   It was large, but I need to check the
14   actual numbers.
15        Q   Here. Let me hand it to --
16        A   I have it. I have it.
17        Q   Do you have it?
18        A   Yeah.
19        Q   Okay. And I am looking at page 47. And
20   it's quoting the Nurses' Health Study as involving
21   close to 109,000 --
22        A   I'm not sure.
23        Q   -- women?
24        A   I'm not sure. I'm looking at the -- the
25   Gates -- are you asking about Gates or Gertig?

Page 269

1         Q   I'm asking about Gates 2010.
2         A   In mine it says $221,000 woman with 924
3    epithelial ovarian cancer.
4         Am I looking in the wrong place?
5         Q   No. I -- and then if you look further, it
6    talks about -- at least in the Nurses' Health Study,
7    there being 108,870 women; is that right?
8         A   Yes.
9         Q   The women in the national health study,
10   which was the basis for both the Gertig 2000 cohort
11   study and Gates 2010 cohort study, those women were
12   followed from 1976 to 2006, so for 30 years --
13        A   Yes.
14        Q   -- is that right?
15        A   Yes.
16        Q   And -- and after following these hundred
17   thousand women -- or over hundred thousand women for
18   three decades, the authors in Gates 2010 concluded
19   that the data did not show a statistically
20   significant relationship between talcum powder use
21   and any type of epithelial ovarian cancer; is -- is
22   that right?
23        A   The Gates authors concluded that there was
24   no association between any talcum powder product
25   use, and it was not significant in ovarian cancer,

Rebecca Smith-Bindman, M.D.

Page 270

1    yes.
2       Q   Another short study that you did not
3    include in your systematic review was the Houghton
4    study; is that right?
5          MS. O'DELL:  Object to form.
6       A   Yes, that is true.
7       Q   (BY MR. ZELLERS) The Houghton study was
8    based on -- or is also called the Women's Health
9    Initiative Study; is that right?
10      A   Yes, it is.
11      Q   That involved 61,000 women; is that right?
12      A   That is correct.
13      Q   Houghton 2014 did not find a statistically
14   significant relationship between perineal talc use
15   and ovarian cancer among women who had ever used
16   talc; is that right?
17      A   That is what they concluded.
18      Q   Or among women who had fewer than nine
19   years of perineal talc use, correct?
20      A   Correct.
21      Q   Or among women who had more than 10 years
22   of perineal talc use, correct?
23      A   Can you say that last part?
24      Q   Sure.
25      A   Sorry.

Page 271

1       Q   Houghton 2014, that cohort study --
2       A   Okay.  No.  I -- yes, that is correct.
3       Q   And also, they did not find a
4    statistically significant relationship between
5    perineal talc use -- strike that.
6          They also did not find a statistically
7    significant relationship between the use of talcum
8    powder on sanitary napkins or diaphragms on -- and
9    ovarian cancer; is that right?
10      A   That's correct.
11      Q   Houghton does report on duration of use at
12   least more than 10 years of use; is that right?
13      A   Yes.
14      Q   But would you consider women who use
15   talcum powder for more than 10 years to be frequent
16   talc users?
17         MS. O'DELL:  Object to form.
18      A   So you're asking if duration of use can be
19   equated with frequency of use, and -- and I would
20   very strongly disagree that those are equivalent.
21         And that is the primary reason that I
22   discount the results of the Gonzalez and Houghton
23   and Gates studies.
24         Because frequency of use, meaning to use
25   it once a month or once a year, is not the same as

Page 272

1    using it on a -- on a frequent basis, so I think the
2    duration is very different measure.
3       Q   We talked yesterday about your definition
4    of "regular use," and you pointed me to your report
5    where you give an extensive discussion of that.
6          Do you remember?
7       A   I do.
8       Q   Did -- your definition of "regular use,"
9    was that every psychometrically tested to
10   demonstrate any validity or reliability?
11         MS. O'DELL:  Object to the form.
12      A   Of -- are you asking about the reliability
13   of the way we defined it --
14      Q   (BY MR. ZELLERS) Yes.
15      A   -- or about the concept?
16      Q   No.  About the way you defined it.
17      A   I believe we explained in the report that
18   we tried to approximate regular use, frequency use
19   by being at least three times a week and as close to
20   daily as possible.
21         But in terms of -- if that is -- I -- I'm
22   not -- we have not validated that in different
23   studies or --
24      Q   That's something that you came up with; is
25   that right?

Page 273

1       A   Yeah.
2          MS. O'DELL:  Object to the form.
3       A   Yes, it is.
4       Q   (BY MR. ZELLERS) Gonzalez.  You criticize
5    Gonzalez in your report for combining various types
6    of use.  Do you recall that generally?  So that's
7    page 21 where --
8       A   No.  I'm -- I'm on my report.  My -- my
9    hesitation is it's not so much that I'm criticizing
10   the study.  It's rather it doesn't contribute to
11   answering the question that I was asking, which was:
12   Does regular perineal talc exposure increase the
13   risk?
14         It doesn't mean that the questions they
15   have asked are not interesting questions.  They were
16   just not the ones I was focusing on.
17      Q   Why would combining various types of use,
18   bias the results in favor of not detecting an
19   association?
20         I guess from your statement it -- it may
21   well not bias the results; is that right?  It just
22   was just a different question --
23      A   It's just a different question.
24      Q   -- than what --
25      A   I --

8  (Pages 270 to 273)

Rebecca Smith-Bindman, M.D.

1    Q   -- you were looking at?
2    A   -- I believe that you want to have as
3  narrow a definition, in my belief, of meta-analysis
4  as possible to understand when you're pooling
5  results, make sure -- something you said -- you're
6  combining apples to apples.
7        And I think one would expect that any
8  potential -- potential exposure to talcum powder
9  would matter what skin or surface or cell line or
10 tissue you're putting against, and you wouldn't
11 necessarily expect the same result in a cervical
12 exposure or a diaphragm exposure or a vaginal
13 exposure.
14       You -- you might have an association of
15 those places.  You might not.  I just think it's a
16 different question.
17   Q   All of the cohort studies were prospective
18 as opposed to retrospective; is that right?
19   A   Yes.
20   Q   Prospective studies are not subject to
21 recall bias like retrospective studies, correct?
22   A   Yes, that's true.
23   Q   They're also not subject to the same
24 selection bias as retrospective studies, correct?
25       MS. O'DELL:  Object to the form.

1    A   In general, case-control studies are often
2  plagued with selection bias, but they don't have to
3  be.
4    Q   (BY MR. ZELLERS) Well, recall bias can
5  distort a scientific evaluation of whether an
6  exposure is actually related to a disease, correct?
7    A   Yes.
8    Q   So for example, recall bias could distort
9  results if women with ovarian cancer were more
10 likely to remember their exposure to talc than women
11 without ovarian cancer; is that right?
12   A   That is a theoretical risk.
13   Q   In fact, in your report on page 17, you
14 acknowledge that the risk of bias is greater for
15 case-control studies as opposed to cohort studies;
16 is that right?
17   A   Yes.
18   Q   Recall bias could explain the fact that
19 some retrospective case-control studies have found a
20 statistically significant relationship between
21 talcum powder and ovarian cancer, but the cohort
22 studies have not, correct?
23   A   That is a theoretical risk.  To do that
24 you would need to have some knowledge in the
25 population that influenced that recall bias, but

1  absolutely that's a possibility.
2    Q   You also looked at both the hospital-based
3  and the population-based case-control studies; is
4  that right?
5    A   I did.
6    Q   None of the hospital-based case-control
7  studies show a statistically significant association
8  between talc use and ovarian cancer, correct?
9    A   I -- I'm not sure --
10   Q   Take a look at --
11   A   -- where you're getting that from.
12   Q   I will show you the Langseth paper from
13 2008, which you cite and we talked about yesterday.
14 Let's mark this as Exhibit 30.
15       (Exhibit 30 was marked for identification
16 and is attached to the transcript.)
17   A   I have it.  I have it.
18   Q   (BY MR. ZELLERS) All right.  Now -- and
19 let me just -- I'll put it in the record there.
20       MS. O'DELL:  Thank you.
21   Q   (BY MR. ZELLERS) If you look at the
22 Langseth paper, on the second page, Figure 1, they
23 list out all of the population -- or at least a
24 great number of the population-based and
25 case-control studies and the hospital-based

1  case-control studies; is that right?
2    A   Yes, they do.
3    Q   (BY MR. ZELLERS) At least among the
4  hospital-based case-control studies that are
5  identified by Langseth in Figure 1, it appears that
6  there's six hospital-based case-control studies.
7        None of those hospital-based case-control
8  studies show a statistically significant
9  association, correct?
10       MS. O'DELL:  Object to the form.
11   A   We discussed this yesterday.  But if
12 you're asking if the individual hospital-based
13 studies overlap one, then they overlap one.
14   Q   (BY MR. ZELLERS) They do not overlap one?
15   A   The -- the hospital-based studies do
16 overlap one.
17   Q   Okay.  The population-based case-control
18 studies, which are up above in our
19 Langseth Figure 1, some of those -- if we look at
20 the individual studies -- show statistical
21 significance, and some of those do not; is that
22 right?
23   A   I'm -- I'm hesitant to be as definitive
24 about using the confidence interval that are
25 presented here as being a reflection of statistical

9 (Pages 274 to 277)

Rebecca Smith-Bindman, M.D.

1  significance.
2      All of them are shifted to the right.  All
3  of them have a positive association.  And the
4  confidence interval for some of them overlap one.
5      But taken as a group, there's statistical
6  significance for the entirety of the population --
7  of the population of studies that he looked at.
8      Q   As we did discuss yesterday, if you look
9  at the population-based studies individually, at
10  least based upon what's reported by Langseth in his
11  Figure 1, some demonstrate statistical significance
12  and some do not; is that right?
13      A   I -- again, it's -- they're slightly --
14  it's -- it's not the only -- the confidence interval
15  overlapping one is sort of what I consider a
16  quick-and-dirty way to answer statistical
17  significance.
18          It's not exactly that way.  But some of
19  them clearly suggest statistical significance.  I
20  think ten of them.  And four of them suggest not
21  statistical significance.  So the individual
22  studies.  But it's a little more complicated than
23  that.
24      Q   Would you agree that if a study does not
25  show statistical significance, that it could mean

1  that no risk exists?
2      A   If --
3          MS. O'DELL:  Object to the form.
4      A   -- an individual study shows no
5  statistical significance, it means -- with all
6  research -- that the most likely truth is the point
7  estimate, which is whatever that point estimate is,
8  but that you could not exclude chance as one of the
9  possible causes for the results.
10      Q   (BY MR. ZELLERS) If we looked just at the
11  population-based case-control studies and the
12  hospital-based case-control studies that are shown
13  by Langseth in Figure 1, there is an inconsistency
14  between the two in that each of the individual
15  hospital-based case-control studies have confidence
16  intervals which overlap one, and many of the
17  population-based or at least some of the
18  population-based studies do not, correct?
19      A   I -- I do not believe there is
20  inconsistency between the pooled odds ratio for
21  population-based studies, which has a confidence
22  interval that overlaps the confidence intervals for
23  the pooled odd ratio for the hospital-based studies.
24          So using the approach that you are
25  suggesting of using confidence intervals, the way to

1  tell if things are different or the -- or
2  indistinguishable, the confidence interval for the
3  pooled odds ratio for the population-based studies
4  goes from 1.29 to 1.52, so the truth is likely in
5  that range, where the truth for the hospital-based
6  studies is 0.92 to 1.63.  They overlap.
7          And so I would interpret that using this
8  sort of quick approach is that there's not a
9  statistical difference between the summary of the
10  pooled odd ratio based on the type of populations
11  that were recruited.
12          Again, the point estimates are a little
13  bit different for sure, 1.4 versus 1.12.  But the
14  confidence intervals overlap, suggesting that
15  they're not -- they're not different.
16      Q   You are familiar with selection bias; is
17  that right?
18      A   I am.
19      Q   Would you agree that the hospital-based
20  case-control studies may be less susceptible to
21  selection bias than population-based case-control
22  studies?
23          MS. O'DELL:  Object to the form.
24      A   I -- I would not agree with that.  In
25  general, you think about hospital-based studies as

1  being potentially a great deal more bias.
2          Now, that -- with that caveat, it depends
3  on how you found your cases and your controls.
4          But in general, you want to find
5  population-based cases and controls, I believe,
6  rather than hospital-based.  But it matters how they
7  are recruited.
8      Q   Hospital-based control studies are
9  comparing hospitalized patients to hospitalized
10  patients; is that right?
11      A   I -- I -- in this case, yes, I think
12  that's --
13      Q   And --
14      A   -- how they define it.
15      Q   -- in population based studies, you're
16  more likely to be comparing ill people to healthy
17  people; is that right?
18      A   Again, it -- it depends on how you're
19  selecting.  If you're selecting patients who are
20  sick in the hospital and comparing that to healthy
21  patients who are outpatient population based, that
22  would be the kind of bias that you are describing.
23  That would be the worst.
24          But if you're, in fact, comparing
25  relatively comparable population-based cases and

10 (Pages 278 to 281)

Rebecca Smith-Bindman, M.D.

1   controls, then I don't agree that hospital-based
2   controls are -- are better.
3       Q  Penninkilampi.  One of the studies that
4   you talked to us about yesterday was Penninkilampi
5   2018; is that right?
6       A  Yes.
7       Q  Penninkilampi 2018 did not include the
8   Gates 2010 cohort study; is that right?
9       A  That's correct.
10      Q  Did you verify that the data that
11  Penninkilampi reports is accurate?
12      A  I did not.  Did I go back and validate
13  their individual abstracted data?
14      Q  Yeah.
15      A  I did not.
16      Q  In determining that a study is of high
17  quality, would it be important to you that the
18  authors are accurately reporting the odds ratios and
19  confidence intervals?
20      A  Data accuracy is important to me.  And --
21  and I would look towards the journal peer review
22  process to have done that, yes.
23      Q  If -- if there were errors in reporting of
24  the odds ratios or the confidence intervals, that
25  could call into question the reliability of the

1   study; is that right?
2           MS. O'DELL:  Object to the form.
3       A  Yes, that's definitely possible.
4       Q  (BY MR. ZELLERS) Penninkilampi 2018, that
5   study specifically states that a certain causal link
6   between talc use and ovarian cancer has not been
7   established, correct?
8           MS. O'DELL:  Object to the form.
9       A  I don't remember them concluding that.
10  But if you tell me where --
11      Q  (BY MR. ZELLERS) Sure.
12      A  -- it is --
13      Q  Look at page 42, at the end of first
14  paragraph.
15      A  Well, perineal talc use has not been shown
16  to be safe.  In a similar regard, a certain causal
17  link between the use and ovarian cancer has not been
18  established --
19      Q  And you --
20      A  -- is what --
21      Q  -- okay.
22      A  -- Penninkilampi says.
23      Q  And I think you omitted the word "talc."
24  But their specific statement is, A certain causal
25  link between talc use and ovarian cancer has not yet

1   been established; is that right?
2       A  That is what they say.
3       Q  Meta-analyses or systematic analyses, that
4   can combine the work of other published studies into
5   one study; is that right?
6       A  Yes.
7       Q  If there are biases and confounding in the
8   underlying studies, the meta-analysis or the
9   systematic review or analysis will reflect the
10  biases and confounding; is that right?
11          MS. O'DELL:  Object to the form.
12      A  Any biases in the papers will not go away
13  by combining them.  I'm not sure what you mean by
14  "the confounding."  If -- if a paper has an
15  accounting for confounding?
16      Q  (BY MR. ZELLERS) Let me ask you another
17  question.  A proper meta-analysis or systematic
18  review must analyze the sources of heterogeneity
19  across the studies; is that right?
20      A  Yes.
21      Q  And a proper meta-analysis or systematic
22  review must examine the methodology of each of the
23  underlying studies, correct?
24      A  Yes.
25      Q  You have given some opinions -- or at

1   least you state some opinions relating to the
2   biological mechanisms of cancer; is that right?
3       A  Yes.
4       Q  The biological mechanisms of cancer are
5   not your area of expertise; is that correct?
6           MS. O'DELL:  Object to the form.
7       A  I'm knowledgeable about the biological
8   mechanism of cancer as a scientist, as a physician,
9   as a cancer epidemiologist.
10      Q  (BY MR. ZELLERS) Would you agree that
11  there are others who are more closely involved in
12  the area of biologic plausibility as it relates to
13  the perineal use of talcum powder and ovarian
14  cancer?
15          MS. O'DELL:  Object to the form.
16      A  I believe there are others who have more
17  expertise directly in that area than I do.
18      Q  (BY MR. ZELLERS) Your opinion is that
19  talcum powder travels from the perineal region to
20  the ovaries through the women's reproductive tract;
21  is that right?
22      A  Yes.
23      Q  If talcum powder can make this migration,
24  can other substances make the same migration?
25      A  Yes.

Rebecca Smith-Bindman, M.D.

Page 286

1    Q   Sand from the beach?
2    A   I don't know if there's evidence of sand
3  from the beach.
4    Q   Toilet paper particles?
5    A   I -- I -- I do not know if there's
6  evidence of that.
7    Q   There are no human studies that
8  demonstrate the migration of any particulate matter
9  from outside the peri -- peritoneum to the ovaries,
10  correct?
11      MS. O'DELL:  Object to the form.
12    A   When you say "demonstrate," do you mean
13  active demonstration or a suggestion that it has
14  gone that route?
15    Q   (BY MR. ZELLERS) Active -- active
16  demonstration.
17    A   So there are no studies that I know of
18  that have taken talcum powder and then documented
19  its movement through -- to the ovaries.
20    Q   Or any particulate from outside the
21  perineum to the ovaries, correct?
22      MS. O'DELL:  Object to the form.
23    A   I -- I don't know of any sort of active
24  studies that have watched it moved.  It's rather the
25  studies have found the particulate matter at its

Page 287

1  destination and then have supposed it had to travel
2  there in some way.
3    Q   (BY MR. ZELLERS) None of the studies that
4  you cite in your report actually looked at whether
5  talcum powder can migrate from perineal application
6  through the fallopian tubes to the ovaries, correct?
7    A   Correct.
8      MS. O'DELL:  Object to the form.
9    Q   (BY MR. ZELLERS) You also cannot cite any
10  article that shows granulomas, fibrosis, or
11  adhesions anywhere up the reproductive tract of a
12  women as result of her external genital talc
13  application; is -- is that right?
14    A   Yes.
15    Q   If talcum powder migrates from the
16  perineal region to the ovaries, shouldn't exposure
17  to talc be far greater in concentration in the
18  rectal, vulvar, vaginal, cervical, and uterine
19  tissues which are closer to the area of initial
20  exposure?
21      MS. O'DELL:  Object to the form.
22    A   I think that assumes that proximity and
23  concentration, which you would expect which would
24  fall off with more distance, is the only factor that
25  would determine concentrations when, in fact, there

Page 288

1  are a lot of other factors such as sphincters or the
2  type of mucosa that it is or mucous barriers that
3  might have a very strong relationship to the
4  concentration of talc.
5      So the rectum and the bladder have
6  sphincters, the mucosa and the vagina and the
7  bladder and rectum are very different than the
8  mucosa of the ovary.  The endometrium has different
9  tissue.
10      So I agree with you that you would expert
11  proximity would be one factor that might affect
12  concentration.  But the characteristics of the
13  tissue, the barriers, the physical or mucosal could
14  be expected to have a much bigger impact.
15    Q   No studies that you're aware of show
16  inflammation as a result of genital talc use in the
17  rectal, vulvar, vaginal, cervical, and uterine
18  tissues; is that right?
19    A   I do not know of those studies.
20    Q   And no studies show a link between
21  external genital talc use and rectal, vulvar,
22  vaginal, cervical, or uterine cancer; is that right?
23      MS. O'DELL:  Object to the form.
24    A   That is correct.
25    Q   (BY MR. ZELLERS) You have not done an

Page 289

1  expert review of the inflammation evidence yourself;
2  is that fair?
3      MS. O'DELL:  Object to the form.
4    A   I -- I have done a lot of reading of the
5  inflammation literature.  I'm not sure how I would
6  define it as an expert or not an expert -- expert
7  review.
8    Q   (BY MR. ZELLERS) You do know that not all
9  inflammatory conditions lead to cancer, correct?
10    A   There's a lot of literature about certain
11  inflammation that causes chronic -- in particular a
12  lot of different kind of cancers, more publications
13  about acute inflammation that does not lead to
14  cancer.
15      But yes, there are both cancers that are
16  very susceptible to inflammation or caused by it and
17  some that are not.
18    Q   Chronic inflammation.  There are many
19  chronic inflammatory conditions that do not lead to
20  cancer; is that right?
21    A   Yes.
22    Q   Do you agree that an agent can be a
23  carcinogenic for one type of cancer, but not for
24  others?
25    A   Yes.

12 (Pages 286 to 289)

Rebecca Smith-Bindman, M.D.

Page 290

1    Q   Rheumatoid arthritis, that is a chronic
2  inflammation condition, but it does not increase the
3  risk of my ovarian cancer, correct?
4    A   Correct.
5    Q   The same with psoriasis; is that right?
6    A   Not that I know of.
7    Q   Page 41 of your report, you conclude that,
8  Regular exposure to talcum powder products causes
9  ovarian cancer in some women.
10       Do you see that?
11   A   I do.
12   Q   Is there a certain amount of talcum powder
13  that a product must contain to cause inflammation?
14       MS. O'DELL:  Object to the form.
15   A   I -- I -- I do not know of evidence that
16  quantifies the amount of exposure that's necessary
17  that a published literature supports the amount
18  women use is an amount that leads to cancer, but
19  I -- I don't know if there's a minimum threshold
20  or...
21   Q   (BY MR. ZELLERS) Do you consider
22  cornstarch to be a talcum powder product that causes
23  inflammation?
24       MS. O'DELL:  Object to the form.
25   A   Talcum powder -- cornstarch -- talcum

Page 291

1  powder causes inflammation.  Cornstarch can also
2  cause inflammation.
3       I believe cornstarch tends to be an acute
4  inflammatory process rather than a chronic
5  inflammation process.  But --
6    Q   (BY MR. ZELLERS) You --
7    A   -- I -- I wouldn't consider cornstarch to
8  be a talcum powder --
9    Q   Is --
10   A   -- product.
11   Q   -- is there a study that you can point me
12  to that states that any inflammation from cornstarch
13  is acute and not chronic?
14       MS. O'DELL:  Object to the form.
15   A   There's a literature about cornstarch
16  leading to acute inflammation, for example, in the
17  surgical literature when it was on surgical gloves
18  or on physical exams which has led to its being
19  removed so -- so as to reproduce acute inflammatory
20  processes.
21   Q   (BY MR. ZELLERS) My question to you is:
22  Are you aware of any literature that states that
23  cornstarch is not associated with a chronic
24  inflammatory condition?
25       MS. O'DELL:  Object to the form.

Page 292

1    A   In a few of the papers I reviewed -- not
2  very many of them, but a few of them had a small
3  proportion of women who were exposed to cornstarch
4  rather than talc powder products.
5       I -- I think it -- they had negative
6  results, but they were small -- a small number of
7  women, so I wouldn't use that to prove that it's
8  safe.
9       But I don't know of any literature that
10  suggests cornstarch is carcinogenic.
11   Q   Your opinion that talcum powder products
12  cause inflammation is not based on the determination
13  that there is a threshold amount of talcum powder
14  that will be required to be in the product before
15  you can conclude that the product will cause chronic
16  inflammation; is -- is that right?
17       MS. O'DELL:  Object to the form.
18   A   I -- I -- I think I would like to agree.
19  I'm just not sure exactly of -- what I am agreeing
20  to.  So I -- I don't know any level --
21       MS. O'DELL:  That's always --
22   A   -- of --
23       MS. O'DELL:  -- a good sign you should --
24   A   -- I -- I can't --
25       MS. O'DELL:  -- be --

Page 293

1    A   -- I can't tell exactly what the -- what
2  the question is.
3       I -- there -- I don't know -- I don't know
4  an amount of talcum powder that would make a product
5  safe.
6    Q   (BY MR. ZELLERS) Do you believe that
7  cornstarch is a superior alternative to talc?
8    A   I believe that talcum powder products will
9  increase women's risk of cancer, and I would avoid
10  using it as a woman or as a doctor counseling my
11  patients.
12   Q   Well --
13   A   I don't have views that cornstarch is a
14  carcinogenic product.  So in terms of any potential
15  risk-benefit relationship of cornstarch has the same
16  value in terms of absorbency and much fewer risk of
17  harm, then if that's the question, then I think
18  cornstarch is preferable.
19   Q   There are no reports in the literature of
20  externally applied talc leading to inflammation,
21  granulomas, fibrosis, or adhesions anywhere along a
22  women's reproductive tract, correct?
23       MS. O'DELL:  Objection, asked and
24  answered.
25   A   Not that I know of.

13 (Pages 290 to 293)

Rebecca Smith-Bindman, M.D.

Page 294

1    Q    (BY MR. ZELLERS) On page 12 of your report
2 you state, The most widely accepted mechanism for
3 initiation, promotion, and progression of ovarian
4 cancer is tissue inflammation, leading to a series
5 of responses that result in cancer.
6        Do you see that statement?
7    A  I do.
8    Q   You do not cite any support in your report
9 for that proposition, correct?
10       MS. O'DELL:  Object to the form.
11   A   I -- I think my -- that first paragraph
12 was sort of an introduction to that section.  So
13 then I go on to cite, I -- I think, the supporting
14 evidence within the next few paragraphs.
15   Q   (BY MR. ZELLERS) You would agree that
16 research regarding whether chronic inflammation can
17 cause ovarian cancer is ongoing, correct?
18   A   It's an active area of research.
19   Q   Are you familiar with a paper published by
20 Melissa Merritt in 2008, entitled "Talcum Powder
21 Chronic Pelvic Inflammation and NSAIDS in Relation
22 to Risk of Epithelial Ovarian Cancer"?
23   A   I am.
24   Q   It's included in your reliance materials
25 on page 17; is that right?

Page 295

1    A   Can you tell me the title again?  Yeah.
2 Okay.
3    Q   Sure.  Do you have that or I can --
4    A   No.
5    Q   -- mark it?
6    A   No, I have it.
7    Q   If you go to page 174 of the Merritt
8 paper -- and tell me when you're --
9    A   I'm there.
10   Q   -- there -- at the bottom of the first
11 paragraph of the discussion, the authors conclude,
12 These results, in combination with previous studies,
13 suggest that chronic inflammation is unlikely to
14 play a major role in the development of ovarian
15 cancer.
16      Is that right?  Did I read that correctly?
17   A   Using the results that they had available
18 on the data in 2007, that is what Dr. Merritt
19 concluded.
20   Q   You also discuss in your report -- well,
21 let me withdraw that.
22      You're familiar with NSAIDS, nonsteroidal
23 antiinflammatory agents; is that right --
24   A   Yes, I am.
25   Q   -- and aspirin?  Those medicines reduce

Page 296

1 inflammation; is that right?
2    A   Yes, they do.
3    Q   If inflammation is a mechanism for ovarian
4 cancer, you would expect women who use NSAIDS or
5 aspirin to have a lower risk of ovarian cancer,
6 correct?
7        MS. O'DELL:  Object to the form.
8    A   Other things being equal, you might expect
9 that if you could measure inflammation or influence
10 it by using NSAIDS, that that might be associated.
11 That is true.
12   Q   (BY MR. ZELLERS) The literature, though,
13 is mixed in terms of whether or not the use of
14 NSAIDS or aspirin actually reduce the risk of
15 ovarian cancer; is that right, or the incidence of
16 --
17   A   So --
18   Q   -- ovarian cancer?
19   A   I have reviewed those papers and would
20 agree with you that some seem to suggest one
21 direction, some others.  I haven't quantified them
22 together or tried to summarize them.
23      But I would agree.  There doesn't seem to
24 be a consistent message in that literature.
25   Q   One of those papers is -- that's included

Page 297

1 in your reliance list is the Verdoodt 2017 paper; is
2 that right?  That's V E R D O O D T.
3    A   I am going to have to defer to seeing
4 that.
5    Q   Okay.  Let me --
6    A   I believe --
7    Q   -- show you --
8    A   -- it's on my list.
9    Q   -- I will mark that paper as Exhibit 31.
10      (Exhibit 31 was marked for identification
11 and is attached to the transcript.)
12   A   Thank you.
13   Q   (BY MR. ZELLERS) And turn, if you will, to
14 page 5 under "Discussion" on the first paragraph.
15   A   And just to confirm, this is -- I -- I
16 have read this.  This is a review article, right?
17   Q   Yes.
18   A   Okay.
19   Q   So on page 5 under "Discussion," the first
20 sentence, the authors state, The sparse and
21 equivocal results for the association between NSAID
22 use and mortality among ovarian and endometrial
23 cancer patients preclude any firm conclusions at
24 this point.
25      Is that right?

14 (Pages 294 to 297)

Rebecca Smith-Bindman, M.D.

Page 298

1      A   That is what this author concludes.  I'm
2  trying to see what references he used for that, but
3  that is what he concludes.
4      Q   Okay.  And this is an article that was
5  published in 2017, correct?
6      A   Yes.
7      Q   Yesterday counsel for plaintiffs indicated
8  that you have -- in addition to the materials in
9  your report -- reviewed a 2018 chapter by Saed and
10  the Harper and Saed 2019 abstract; is that right?
11      A   I -- I reviewed several of his abstracts
12  and -- and a recent paper, yes.
13      Q   Do you know that Dr. Saed is a paid expert
14  for the Plaintiffs in this litigation?
15      A   I know he's a very well-respected
16  scientist that they have supported in his research.
17      Q   Is that a yes?
18          MS. BOCKUS:  I object.  Nonresponsive.
19          MS. O'DELL:  Mike, excuse me.
20          MR. ZELLERS:  Sure.
21          MS. O'DELL:  You said the 2019 abstract.
22  Did you mean the abstract or the manuscript, just to
23  make sure I'm following the conversation?
24          MR. ZELLERS:  I -- I believe I mean the
25  abstract.  But we mean whatever the doctor has in

Page 299

1  her file that we marked yesterday.
2          THE COURT REPORTER:  Who objected down
3  there?
4          MS. BOCKUS:  Jane Bockus.
5          MS. O'DELL:  I think what she had in her
6  file was the manuscript.  So I think that's what you
7  marked as an exhibit, but I don't want there to be
8  confusion.
9      Q   (BY MR. ZELLERS)  You have reviewed several
10  publications within the last year or two from
11  Dr. Saed --
12      A   Yes.
13      Q   -- is that right?
14      A   Yes, I have.
15          THE COURT REPORTER:  Wait.
16          MR. ZELLERS:  All right.  Are you okay,
17  Ms. Court Reporter?
18          THE COURT REPORTER:  Yes.  I just have to
19  have you wait until the end of the question, please.
20      Q   (BY MR. ZELLERS)  Let me re-ask my --
21      A   Please.
22      Q   -- question.  Did you know that Dr. Saed
23  is a paid expert for the Plaintiffs in this
24  litigation?
25      A   Yes, I do.

Page 300

1      Q   Have you spoken with Dr. Saed?
2      A   I have not.
3      Q   Have you requested any information from
4  Dr. Saed?
5      A   I have not.
6      Q   The Saed study just looked at immortalized
7  cell lines; is that right?
8      A   Yes, I believe that's how the cell lines
9  were --
10      Q   Are --
11      A   -- defined.
12      Q   -- are you -- are you aware that Dr. Saed
13  testified that the cells were modified with a
14  virus to make them keep undergoing division in vitro?
15      A   I -- I'm aware that that's what happens to
16  cell lines.  I -- I don't believe I saw his
17  deposition to say that.
18      Q   Are you aware that Dr. Saed testified that
19  the P53 gene was turned off in those cells?
20      A   No, I'm not aware.
21      Q   Are you aware based upon your reading that
22  the loss of the P53 protein contributes to
23  unrestrained cellular proliferation?
24          MS. O'DELL:  Object to the form.
25      A   I -- I believe that the reason you have

Page 301

1  controls in experiment is to account for the
2  underlying expression in turnover cells so you can
3  compare something you do to the cell versus the
4  baseline in order to account for the baseline,
5  whatever it is, proliferation of the cell or
6  apoptosis levels or expression of oxidants or
7  antioxidants.
8          So I -- I -- the way you're asking the
9  question is -- is:  Are you comparing this cell line
10  to living cells in context?
11          And I would agree with you that this cell
12  line is different than living cells in context.
13          But if you're asking if it's a valid
14  comparison to do the experiment in this cell line,
15  it is because you are doing an intervention to those
16  cells that has a control group.
17          And so this cell line has a different
18  behavior than a -- a living cell does, but provides
19  a comparison group.
20      Q   (BY MR. ZELLERS)  What methodology did you
21  use to apply Dr. Saed's results to normal cells in
22  actual organs?
23      A   So --
24          MS. O'DELL:  Object to the form.
25      A   -- in some of the work that I do around a

15 (Pages 298 to 301)

Rebecca Smith-Bindman, M.D.

1    different environmental carcinogen -- radiation, for
2    example -- we look at changes of expression, certain
3    enzymes in cells to radiation to understand what
4    that damage does in terms of expression of relevant
5    genes, cell proliferation, and things like that.
6         So I take his research to mean that I can
7    understand the changes to pro oxidants to
8    antioxidants to apoptosis to gene expression in the
9    cell.  Not that I can come up with the exact
10   quantification in a patient that would correspond to
11   it, but rather, what mechanisms will be stimulated
12   by the talc.
13        So to answer your question, I -- it tells
14   me what parts of the cell are sensitive to it, but
15   not the quantity that might lead to that
16   sensitivity.
17        Q   (BY MR. ZELLERS) Can you cite any data
18   showing that the concentrations of exposure used in
19   the Saed study are the same as would be encountered
20   with the use of cosmetic talc in the perineal
21   region?
22        A   I cannot.  That's what I was trying to
23   express.
24        Q   Can you cite any data showing that the
25   level of concentration of exposure used in the Saed

1    develop enough mutations to develop into cancer.
2         But the greater the oxidative stress for
3    cancer like ovarian cancer, the greater the chance
4    of inducing cancer.
5         Q   Can you cite me to any study that says
6    that?
7             MS. O'DELL:  Object to the form.
8         A   Any study that says that there's a dose
9    response related to the amount of stress and the
10   member -- numbers of cancers?
11        Q   (BY MR. ZELLERS) That supports, yes, your
12   statement and your position.
13        A   I -- the data that I am thinking of -- and
14   I'm not sure if it's quite the same as the question
15   that you're asking -- is the number of gene
16   mutations is higher in cancer cells than it is in
17   noncancer cells.  So --
18            THE COURT REPORTER:  In noncancer?
19        A   In non -- cancer cells have many more
20   genetic mutations than noncancer cells.
21            Both have generic mutations.  And the
22   environment of having more oxidative stress is
23   associated with getting more mutations --
24        Q   (BY MR. ZELLERS) If -- if it's --
25        A   -- but --

1    study has ever occurred in women with perineal talc
2    use?
3             MS. O'DELL:  Object to the form.
4         A   I want to clarify my answer.  I don't know
5    those data.
6         Q   (BY MR. ZELLERS) Would you agree that
7    reactive oxygen species are a normal part of cell
8    physiology?
9         A   Yes.
10        Q   Do all substances that cause oxidative
11   stress also cause cancer?
12        A   I think you care about the balance of
13   oxidative, pro oxidative, antioxidative levels.
14            That being said, I do not know that every
15   instance where you have more pro oxidative leads to
16   cancer.  I know of some where it does.  I don't know
17   if it always does.
18        Q   Does the presence of oxidative stress in a
19   tissue indicate that cancer will develop in that
20   tissue?
21        A   I think I mentioned this yesterday, that
22   there's a sense of a probability.  So the
23   probability will likely increase.
24            But most cells, thankfully, will repair
25   and -- that damage, and so most cells will not

1         Q   -- are you finished?
2         A   -- I -- I am.
3         Q   Okay.  If -- if exposure to a substance
4    causes oxidative stress in certain tissue, does that
5    mean that the substance will cause oxidative stress
6    in all types of tissues?
7         A   No.
8         Q   Does the body have a protective mechanism
9    that can limit tissue damage from oxidative stress?
10        A   Yes.
11        Q   Are there any publications that you are
12   aware of that indicate that oxidative stress is
13   involved in the development of ovarian cancer?
14        A   We discussed earlier that inflammation
15   increases oxidative stress such as pelvic
16   inflammatory disease leads to oxidative stress.
17            And pelvic inflammatory disease is
18   associated and leads to ovarian cancer.  But I'm not
19   sure if that's answers the question that you are...
20        Q   Well, if I had more time, we would discuss
21   that at greater length.  You're familiar with the
22   term "confounding" is that right?
23        A   I -- I -- Yes, I'm --
24        Q   All right.
25        A   -- familiar with that term.

Rebecca Smith-Bindman, M.D.

1   Q   Confounding is where the presence of
2   another association confuses the relationship
3   between the exposure and the disease being studied;
4   is -- is that right?
5   A   Yes.
6   Q   Confounding can distort results in
7   epidemiological studies; is that right?
8   A   Yes.
9   Q   Would you agree that residual confounding
10  is possible in every observational study?
11  A   Yes.
12  Q   It's also -- strike that.
13       It's possible that unmeasured confounders
14  may be present in every observational study,
15  correct?
16  A   Yes.
17  Q   It's impossible to say that all known and
18  unknown confounding factors have been controlled for
19  in any given study; is that right?
20  A   Yes.
21  Q   Would you agree that there are new factors
22  that are being discussed that are possibly involved
23  with ovarian cancer that are just being published in
24  the literature such as a history of chlamydia
25  infection and a history of weight gain during

1   adolescence?
2       MS. O'DELL:  Object to the form.
3   A   Chlamydia infection would be the most
4   common infection of PID, and so that's something
5   that I just mentioned.  I'm not sure that that's
6   such a new one.
7       And weight gain during adolescence is
8   something that's of interest across a range of
9   cancers, like breast cancer.  I don't know it
10  personally around ovarian cancer, but...
11  Q   (BY MR. ZELLERS) Those factors that we
12  just talked about generally have not been controlled
13  for in any of the published talcum powder ovarian
14  cancer studies; is that right?
15  A   I -- the PID, I -- I think, has it in a
16  paper or two.  And -- and the weight gain, I -- I
17  don't -- I have never seen that one.
18  Q   We talked yesterday about the Berge study.
19  Do you remember that?
20  A   I do.
21  Q   And you talk about Berge on page 25 of
22  your report.
23       What do you mean when you say, A second
24  limitation of Berge is that the included studies
25  adjusted for a variety of covariates, although this

1   is unavoidable in this type of summary.  The large
2   difference in general between adjusted and crude
3   results emphasizes the importance of adjustments
4   when estimating particular risk?
5       THE COURT REPORTER:  When estimating?
6       MR. ZELLERS:  Particular risk.
7   A   Are you asking what I meant by that?
8   Q   (BY MR. ZELLERS) Yes.  What did you mean
9   by that?
10  A   Okay.  I -- I would say my sentence is not
11  as clear as it should have been.  What I mean -- and
12  I'm not really sure why I pointed this out just for
13  Berge -- it's really a general -- is that the
14  studies they included, adjusted for different
15  covariants.
16       They didn't all adjust for the same
17  covariates.  So a variety of covariates, meaning
18  they didn't all adjust for the exact same
19  covariates.
20       But this is unavoidable in this type of
21  study.  So I was just saying that some of the
22  included studies adjusted for A, B and C; and others
23  were adjusted for B, C, and D; and others D, E, and
24  F.
25  Q   Huncharek, page 26.  Do you see that

1   reference where you talk about that study?
2   A   Yes.
3   Q   You say that the difference between a
4   relative risk of 1.19 and 1.38 is small; is that
5   right?
6       MS. O'DELL:  You're talking about 2007 or
7   2003?
8   Q   (BY MR. ZELLERS) Whichever --
9   A   Which page?
10  Q   -- so page 26 --
11      MS. O'DELL:  They're both on the same
12  page.
13  Q   (BY MR. ZELLERS) I think I'm looking at
14  the one at the bottom.
15      MS. O'DELL:  Okay.  All right.  2003?
16      MR. ZELLERS:  Yes.
17  Q   (BY MR. ZELLERS) So are you with me?  Are
18  you looking at your last couple of lines there on
19  page 26?
20  A   Yes.
21  Q   And you do say that the difference between
22  a relative risk of 1.19 and 1.38 is small; is that
23  right?
24  A   It -- odds ratios --
25  Q   Yeah.

17 (Pages 306 to 309)

Rebecca Smith-Bindman, M.D.

1    A  -- but yes.
2    Q   All right.  And -- and so a difference in
3    odds ratios of .19, you would consider that to be a
4    small difference?
5         MS. O'DELL:  Object to the form.
6    A   You're asking why I said those differences
7    are small?
8    Q   (BY MR. ZELLERS) No.  Well, what I guess
9    what I want to know is:  Would you agree that the
10   difference between an odds ratio of 1.0 and 1.2 is
11   small?
12        MS. O'DELL:  Object to the form.
13   A   I think the question of whether or not you
14   have a difference of absolute odds of .2 along
15   different values means the same thing.  And I would
16   say it doesn't mean the same thing.
17        So if you have an odds ratio as an example
18   of 4.7 versus 4.9, they're kind of the same number.
19   If you have a number that's 1.0 versus 1.2, those
20   are not the same number.
21        So I don't think you would want to assume
22   the shift in the absolute magnitude of the
23   difference in odds.  I often published difference in
24   odds ratios of .2 is stable.
25        But I think is -- your point is well taken

1    that that's not a trivial difference.  I was just
2    saying in the context of a systematic review, those
3    are both very strong, positive associations, and
4    that's a relatively minor difference.
5    Q   (BY MR. ZELLERS) An odds ratio range of
6    1.19 to 1.38 is much closer to an odds ratio of 1.0
7    to 1.2 than it is to an odds ratio of 4.5 to 4.7,
8    correct?
9    A   I -- I think that's a valid -- a valid
10   comparison.
11   Q   On page 26, 27, there's a carryover there,
12   but you state that the population controls are more
13   likely relevant and valid than hospital controls.
14        What's your support for that?
15   A   It's what we discussed earlier.  I -- I
16   think population-based controls are -- are better
17   than hospital-based controls.
18   Q   With respect to your systematic review,
19   did you attempt to identify gaps or flaws in the
20   underlying studies?
21   A   I reviewed the individual studies and set
22   forth criteria that I thought were required for
23   inclusion.
24   Q   What were those criteria?  Are those
25   contained in your forms that we talked about --

1    A   Yeah.
2    Q   -- yesterday?
3    A   So the most important -- as it points out
4    here in -- in Huncharek, the next sentence of where
5    we are, is that this review looked at any exposure
6    rather than quantifying.
7         And I think the primary concern that I had
8    was that any exposure is a very vague definition.
9    And I thought it was much more important to have a
10   meaningful measure of exposure.
11        So the studies that I primarily included
12   were ones that had quantification of the exposure,
13   but also had some other requirements.
14        I -- I -- I want to say that my systematic
15   review was one piece of the information that I
16   considered, but my summary estimate in the
17   systematic review that I completed had the same
18   conclusion as all these other systematic reviews.
19        In the ballpark, it just gave me greater
20   confidence that we were truly looking at regular
21   exposure rather than any exposure.
22        Now, we know that the most common exposure
23   is regular exposure.  That's the -- the more
24   important -- most common.
25   Q   Take a look at page 39 in your report

1    where you discuss temporality; is that right?
2    A   Yes.
3    Q   You say that women may use talc when
4    undergoing ovarian cancer treatment.
5         Do you see that?
6    A   Yes.
7    Q   What is your support for that or what is
8    that statement based on?
9    A   I -- I think it's based on my clinical
10   experience that postop patients often will use
11   talcum powder products for systematic relief of
12   symptoms that could be related to the surgical
13   procedure itself.
14   Q   All right.  Asbestos.  Are your opinions
15   in this case dependent on talcum powder containing
16   asbestos?
17   A   No, they're not.
18   Q   Are your opinions in this case dependent
19   on talcum powder containing trace amounts of metals?
20        MS. O'DELL:  Object to the form.
21   A   No, they're not.
22   Q   (BY MR. ZELLERS) Are your opinions in this
23   case dependent upon talcum powder containing any
24   particular fragrance chemical?
25   A   No, they're not.

Rebecca Smith-Bindman, M.D.

Page 314

1    Q   Do you believe that talcum powder, which
2  does not contain asbestos, causes ovarian cancer?
3    A   I don't have any data on which to conclude
4  based on epidemiologic evidence that there is such a
5  product, so I don't know that there is any product
6  that has been studied that doesn't contain asbestos
7  and fibrous talc.
8    I think in a laboratory setting, people
9  have studied products that they describe as being
10  asbestos free, and those products do cause cellular
11  damage.
12    But from an epidemiologic perspective,
13  which is primarily the data I looked at, all of the
14  products that have been studied, I believe contain
15  asbestos and fibrous talc.
16    Q   You have made an assumption or it is your
17  belief that all talcum powder products contain
18  asbestos; is that right?
19    MS. O'DELL:  Object to the form.
20    A   My belief is that many talcum powder
21  products contain asbestos or --
22    Q   (BY MR. ZELLERS) If --
23    A   -- fibrous.
24    Q   -- if your assumption about contamination
25  of talcum powder products with asbestos were not

Page 315

1  true, would that change your opinions in this case?
2    MS. O'DELL:  Object to the form.
3    A   In -- in this case, it would not.  I --
4  I -- the epidemiologic evidence is very strong that
5  exposure to talcum powder products, whatever it
6  contains, is carcinogenic.
7    Q   (BY MR. ZELLERS) You have looked at
8  several reports from Dr. Longo; is that right?
9    A   I have.
10    Q   You're aware he is a paid litigation
11  expert; is that right?
12    A   Yes, I am.
13    Q   You're aware he wrote his reports for the
14  purpose of this litigation and that those reports
15  have not been published; is that right?
16    A   I -- I know that he has generated a report
17  for this, yes.
18    Q   Do you know if any defense ex -- strike
19  that.
20    Do you know if any defense experts have
21  addressed or responded to Dr. Longo's litigation
22  reports?
23    MS. O'DELL:  I would object to the form.
24  There's been no defense reports in this case, as you
25  know.

Page 316

1    A   I -- I haven't seen any.
2    Q   (BY MR. ZELLERS) Have you requested any?
3    MS. O'DELL:  Object to the form.  There
4  have been no defense expert reports in this case.
5    MR. ZELLERS:  Counsel, please object to
6  form.  There have been many defense expert reports
7  in the talcum powder litigation generally.
8    But my question was whether or not she has
9  seen anything, so she can -- I think she has already
10  answered.
11    Q   (BY MR. ZELLERS) Is that right?  Have you
12  answered the question?
13    MS. O'DELL:  Object to the form.
14    A   I have asked to seen reports.  No.  I have
15  asked to seen testing results.  I have not asked to
16  seen reports.
17    Q   (BY MR. ZELLERS) Have you seen testing
18  results from the FDA and its testing of talcum
19  powder?
20    A   I have.
21    Q   The FDA did some testing in 2010.  Did you
22  see those results?
23    A   I did.
24    MS. O'DELL:  Do you need a break or are
25  you good or --

Page 317

1    A   I actually would love a -- a break.  I
2  don't mind going a few more minutes, if that would
3  be good or -- but otherwise, I would love a break.
4    MS. O'DELL:  Whenever is a good time.
5    MR. ZELLERS:  Sure.  I'll just finish
6  this.
7    Q   (BY MR. ZELLERS) I'll hand you the
8  exhibit, Exhibit 32.
9    (Exhibit 32 was marked for identification
10  and is attached to the transcript.)
11    Q   (BY MR. ZELLERS) Is that --
12    A   Thank you.
13    Q   -- the -- at least some of the testing by
14  the FDA that you have seen?
15    A   Yes, it is.
16    Q   That testing was done by an independent
17  laboratory; is that right?
18    A   I -- I -- I don't know that, but I believe
19  you.
20    Q   Take --
21    MS. O'DELL:  Do you have a copy for me?
22    MR. ZELLERS:  Oh, I'm so sorry.  I have
23  that, yes.  Sorry.
24    MS. O'DELL:  Thanks.
25    Q   (BY MR. ZELLERS) If you go to the second

19 (Pages 314 to 317)

Rebecca Smith-Bindman, M.D.

Page 318

1    page, the second paragraph, We contracted with AMA
2    Analytical Services of Lanham, Maryland, to conduct
3    this laboratory service -- or strike that -- survey.
4        Do you see that?
5    A   I don't.  I'm on the right page.
6    Q   On the second page.
7    A   The second page.
8    Q   The second paragraph, the second --
9    A   Yes.
10   Q   -- sentence --
11   A   -- yes.  Yes.  Thank you.
12   Q   All right.
13   A   Yes.
14   Q   And at least based upon this report, no
15   asbestos was detected in the talcum powder that was
16   tested; is that right?
17   A   In the reports that they show, which
18   might -- my understanding is that they had two
19   samples of baby powder, talcum powder in this.  And
20   that in those two specimens using the testing method
21   they used, they didn't find evidence of asbestos.
22       MR. ZELLERS:  All right.  Let's take a
23   break.
24       THE VIDEOGRAPHER:  The time is 10:47 a.m.
25   We are now off the record.

Page 319

1        (A break was taken from 10:47 a.m. to 1
2    11:00.)
3        THE VIDEOGRAPHER:  It's 11:00 a.m.  We are
4    now back on the record.  Here begins Media No. 2 of
5    the deposition of Dr. Rebecca Smith-Bindman, Ph.D.,
6    Volume II.
7    Q   (BY MR. ZELLERS) Dr. Smith-Bindman, I was
8    handed the invoice for Chris Tachibana, which we
9    have marked as Exhibit 33.
10       (Exhibit 33 was marked for identification
11   and is attached to the transcript.)
12   Q   (BY MR. ZELLERS) Is that the invoice that
13   your copy editor provided to you?
14   A   Yes.
15   Q   Are there any other invoices that you have
16   received from her?
17   A   No.
18   Q   Do you expect there to be any other work
19   that Ms. Tachibana does with respect to your report?
20   A   Not with respect to my report.
21       If I move ahead to publish these results,
22   then I would likely reach out to her to help -- as
23   well.
24       THE COURT REPORTER:  To help?
25   A   If we choose to publish the results, I

Page 320

1    would like -- she edits all of my publications
2    before I submit them.
3    Q   (BY MR. ZELLERS) When we left the last
4    session, I asked you about asbestos and whether or
5    not asbestos is contained in talcum powder.
6        Is there any amount of asbestos that would
7    be safe in talcum powder products?
8    A   And the simple answer would be no, I don't
9    think there's any amount that would be safe in
10   talcum powder products.
11   Q   All right.  Is there any amount of trace
12   metals that would be safe in talcum powder products?
13       MS. O'DELL:  Object to the form.
14   A   I believe there would be amounts of trace
15   metals that would be acceptable.
16   Q   (BY MR. ZELLERS) Are there any amounts of
17   fragrance chemicals that would be safe in talcum
18   powder products?
19   A   I believe there would be in certain
20   categories.  And in others, there would not.
21   Q   There have been no fragrance chemicals, to
22   your knowledge, that have been found in a study to
23   be associated with ovarian cancer, correct?
24       MS. O'DELL:  Object to the form.
25   A   I -- I know of no -- no such exploration.

Page 321

1    Q   (BY MR. ZELLERS) Do you have an opinion on
2    what type of asbestos is in talcum powder products?
3    A   I believe asbestos is sort of a family of
4    chemicals.  I think there are six that kind of get
5    grouped together.  I think all of them have been
6    identified in talcum powder products, but I don't
7    know the distribution of the different kinds.
8    Q   What type of asbestos is associated with
9    ovarian cancer?  And by that question, you believe
10   that there's six subtypes of asbestos --
11       MS. O'DELL:  Object to the form.
12   Q   (BY MR. ZELLERS) -- is that generally your
13   understanding?
14   A   It's generally my understanding.
15   Q   Are -- are you able to give us any
16   opinions with respect to what type or types of
17   asbestos is associated with ovarian cancer?
18   A   The -- the strongest summary of the
19   relationship that I know about is in the IARC 2012
20   reports.
21       And those are from a number of different
22   studies, including some cohort studies and case
23   control studies.
24       To my knowledge, I don't know that they
25   have divided them by the type of mineral silicate

20 (Pages 318 to 321)

Rebecca Smith-Bindman, M.D.

1    fibers that were in those studies.
2        Q    What amount of asbestos exposure is
3    associated with ovarian cancer?
4            MS. O'DELL: Object to the form.
5        A    To the best of my knowledge, the amount
6    that's contained within talc powder products is
7    probably associated with -- the amount that's in
8    there is probably the -- cancer.
9        Q    (BY MR. ZELLERS) Can you be any more
10   definitive?
11       A    The talcum powder products that women have
12   used is associated with ovarian cancer.  And I
13   believe that to know how much asbestos it takes to
14   cause cancer, the easiest way to answer that is to
15   quantify how much asbestos is within the --
16   the powder products.
17           So I'm not in any way an expert on this.
18   But in the Longo report, it talked about an average
19   of 50,000 particles of asbestos being in each
20   gram of -- on average in each gram of baby powder
21   products.
22           And he estimates that in a container, that
23   would be millions of particles, which seems like a
24   large number to me, but -- so I don't know the
25   amount that would be required to be carcinogenic,

1    but that's the amount that they were exposed to that
2    was carcinogenic.
3        Q    What type of ovarian cancer is asbestos
4    associated with?
5            MS. O'DELL: Object to the form.
6        A    I think the most stable estimate of the
7    association of talcum powder products with ovarian
8    cancer is for all ovarian cancer and the
9    meta-analysis that others did.  And my summary
10   estimate was for all ovarian cancer -- epithelial
11   ovarian cancer, I should say.
12           In my more limited review, I focused on
13   serous cancer, because I think as the most common
14   cancer -- the most common invasive cancer, it's the
15   one where there's enough statistical power to
16   quantify the association, so I think the data are
17   the most compelling for serous ovarian cancer.
18           But the overall meta-analysis looks at any
19   cancer, and that's what we did as well.
20       Q    You -- you looked at talcum powder,
21   correct?
22       A    Talcum powder products, yes.
23       Q    You did not undertake a Bradford Hill
24   analysis of the literature on asbestos and ovarian
25   cancer, correct?

1        A    I did not.
2        Q    Would you agree that research on the
3    potential relationship between asbestos and ovarian
4    cancer has only considered a small number of cases?
5            MS. O'DELL: Object to the form.
6        A    I think the IARC review on the
7    occupational exposures to asbestos had quite a
8    number of cancers, but I would have to go back to
9    those studies to remember the number.
10       Q    (BY MR. ZELLERS) Did you review the Reid
11   2011 study?
12       A    I believe that's one that I -- I reviewed.
13       Q    Do you need me to hand that to you if --
14       A    Yes --
15       Q    -- ask you a couple of questions about it?
16       A    -- please.
17       Q    Now, in the Reid 2011 paper, which we will
18   mark as Exhibit 34 --
19       A    And is that one of the studies that
20   Camargo included in -- I think it is -- in his
21   systematic review?  Yeah.  So this is a different
22   systematic review.
23           (Exhibit 34 was marked for identification
24   and is attached to the transcript.)
25       Q    (BY MR. ZELLERS) Do you recognize

1    Exhibit 34?
2        A    No.
3        Q    Okay.  Well, Exhibit 34 is a study and --
4    and a review by the first named author, Allison
5    Reid.
6            "Does Exposure to Asbestos Cause Ovarian
7    Cancer?"
8        A    I -- I have seen this paper.
9        Q    All right.
10       A    I'm sorry.  I didn't remember.  So sorry.
11       Q    If you look at her conclusions -- or the
12   author's conclusions on the right-hand side of the
13   first page -- so I'm --
14       A    Yes.
15       Q    -- looking right here --
16       A    Yes.
17       Q    -- the relationship between asbestos
18   exposure and ovarian cancer is not well
19   understood -- is not as well understood as -- as
20   that of asbestos-related diseases.  Studies that
21   have examined this issue have been limited for two
22   major reasons.
23           No. 1, there's a small number of cases.
24   And No. 2, there's difficulties with diagnosis and
25   specifically distinguishing between peritoneal

21 (Pages 322 to 325)

Rebecca Smith-Bindman, M.D.

1    mesothelioma and ovarian cancer; is -- is that
2    right?
3        MS. O'DELL:  Object to the form.
4        A   So this -- those are the conclusions that
5    she makes.  But I -- I want just to explain what she
6    means by "small number of cases."
7        She's comparing it to the number of men
8    exposed to asbestos.  Just there -- there are many
9    more men exposed to asbestos than -- than women
10   exposed to asbestos.
11       So I think -- I mean, I -- I think it's a
12   challenge, but I -- wouldn't say that there are a
13   small number of cases.
14       MR. ZELLERS:  Move to strike as
15   nonresponsive.
16       Q   (BY MR. ZELLERS) Would you agree that most
17   of the studies that have been done and the data that
18   exists relates to occupational exposure of asbestos
19   and ovarian cancer?
20       A   Yes.  I --
21       Q   All right.
22       A   -- yes.
23       Q   You looked at the Camargo paper 2011; is
24   that right?
25       A   Yes.

1        Q   That study points out that there's an
2    inability to account for nonoccupational risk
3    factors for ovarian cancer in these studies other
4    than age; is that right?
5        MS. O'DELL:  If -- if you remember.  If
6    you need to see --
7        A   I -- I don't remember.
8        Q   (BY MR. ZELLERS) All right.  Do you have
9    the Camargo paper in front --
10       A   I --
11       Q   -- of you or would you like me to give it
12   to you?
13       A   -- please.
14       Q   Camargo 2011, we will mark as deposition
15   Exhibit 35.
16       (Exhibit 35 was marked for identification
17   and is attached to the transcript.)
18       A   Thank you.
19       Q   (BY MR. ZELLERS) Do you have that in front
20   of you now?
21       MS. O'DELL:  Thank you.
22       A   Yes, I do.
23       Q   (BY MR. ZELLERS) Camargo.  Take a look, if
24   you will, you know, on page 1216.  The second
25   paragraph above "Conclusion," does Camargo and the

1    author state, Further limitation of our analysis was
2    its inability to account for nonoccupational risk
3    factors for ovarian cancer other than age?
4        A   Yes, I do see that.
5        Q   On page 25 -- I'm sorry -- 1215.  So the
6    page before the second paragraph under "Discussion,"
7    they talk about Edelman 1992; is that right?
8        A   Yes.
9        Q   And the authors state, They concluded,
10   however, that despite the positive and significant
11   association, there was insufficient information to
12   infer that ovarian cancers were caused by
13   occupational exposure to asbestos --
14       A   I -- I'm sorry.  I --
15       Q   Sure.
16       A   -- I -- I'm lost.  Where are we?
17       Q   Okay.  So do you see under "Discussion" --
18       A   Yes.
19       Q   -- the second paragraph --
20       A   Yes.
21       Q   -- I believe the second sentence?  It
22   says, They concluded.
23       Are you with me?
24       A   Yes.  They are describing another
25   meta-analysis --

1        Q   Yes.
2        A   -- they concluded, yes.
3        Q   This -- this is a review of different meta
4    --
5        A   Yeah.
6        Q   -- analyses; is that right?
7        A   Yes.
8        Q   And they're describing Edelman 1992.  And
9    they state, They concluded, however, that despite
10   the positive and significant association, there was
11   insufficient information to infer that ovarian
12   cancers were caused by occupational exposure to
13   asbestos because of concerns about tumor
14   misclassification, inappropriate comparison
15   populations, and the failure to take into account
16   for known risk factors.
17       Is that right?
18       A   You're reading from Camargo, who is
19   quoting from a discussion by Edelman, so that --
20   that's what it says.  I -- I don't -- I don't know
21   that that's what Edelman says, but -- but yes,
22   that's the...
23       Q   Wouldn't you expect to find higher rates
24   of other cancers in women using talc, like
25   mesothelioma, if they are being exposed to

Rebecca Smith-Bindman, M.D.

<table>
<tr><td>

**Page 330**

1 substantial amounts of asbestos?
2     MS. O'DELL: Object to the form.
3     A   I -- I'm confused.  I'm confused.  Are you
4 saying women exposed to asbestos are not getting
5 mesothelioma?
6     Q   (BY MR. ZELLERS) Well, let me ask it this
7 way:  Are -- are women who use talc in the perineal
8 region at greater risk of mesothelioma?
9     A   I do not know studies that have said that.
10     Q   Are women who use talc in the perineal
11 region at greater risk of asbestosis?
12     A   In the lungs?
13     Q   Yes.
14     A   I -- I do not know those studies.
15     Q   With respect to fragrance chemicals, you
16 have no evidence that the blood or tissue levels of
17 any trace metals are higher in genital talc users
18 compared to nonusers, correct?
19     A   I -- I don't know that literature at all.
20     Q   And you have no knowledge as to either the
21 amount or concentration of different fragrance
22 chemicals in the baby powder, correct?
23     A   I -- I do not.
24     MR. ZELLERS:  Okay.  I have no further
25 questions.  My colleagues may have some questions.

</td><td>

**Page 332**

1     Q   Okay.  So when -- if you answered a
2 question, is it because you believe you understood
3 it and that you felt able to answer it?
4     A   Yes.
5     MS. O'DELL:  Object to the form.
6     Q   (BY MS. BOCKUS) Okay.  So before being
7 hired in this case, you had not really looked at the
8 association between talc and ovarian cancer; is that
9 fair?
10     A   That's correct.
11     Q   The person who wrote to you first, do you
12 remember if it was a male or a female, the attorney?
13     A   I think it was a woman.
14     Q   Okay.  And have you -- tell me what search
15 you have done to locate that person's name.
16     A   I could probably search some more.  I --
17 I -- my correspondence with these lawyers that I
18 have a document of on my computer is from July.
19     But Mike reminded me that I must have met
20 with them in June.  So I could go through -- there
21 are ways I can access older e-mails to look if
22 that's important to you.  I'm happy to try and find
23 that person.
24     Q   I just was curious.  There -- because you
25 have nothing in the published literature about the

</td></tr>
<tr><td>

**Page 331**

1     MS. BOCKUS:  Could we go off the record
2 for just a minute to move the microphone down?
3     THE VIDEOGRAPHER:  The time is 11:16 a.m.
4 We are off the record.
5     (A break was taken from 1:16 a.m. to 11:17
6 a.m.)
7     THE VIDEOGRAPHER:  The time is 11:17 a.m
8 we are now back on the record.
9     EXAMINATION BY COUNSEL FOR THE DEFENDANTS
10 BY MS. BOCKUS:
11     Q   Good morning, Doctor.  I introduced myself
12 yesterday, I hope.  I'm not sure I did.  I'm Jane
13 Bockus.  I represent Imerys in this matter.
14     How are you feeling today?
15     A   I'm good.  Thank you.
16     Q   Have you gone back to work full time since
17 your skiing accident?
18     A   I am primarily a researcher, so I get to
19 choose my own hours.  So I have gone back to work
20 full time, but I often leave work a little earlier
21 and take a rest.
22     Q   Has your injury from your skiing accident
23 affected your ability to answer all the questions
24 you have been asked in the last day and a half?
25     A   It has not.

</td><td>

**Page 333**

1 etiology of ovarian cancer, correct?
2     A   I do not.  And I will tell you I asked the
3 person who contacted me what the case was about, was
4 it an area of my expertise.
5     And the person who contacted me, I think,
6 was someone who knew of me from another case.  And
7 it was my researching abilities, not my content
8 expertise, that led her to reach out to me.
9     Q   Okay.  So it was with the understanding
10 that you would start a whole new area of research in
11 order to answer the question; is that correct?
12     MS. O'DELL:  Object to the form.
13     A   Yes.
14     Q   (BY MS. BOCKUS) Okay.  In fact, when you
15 appeared before congress, you stated that you're a
16 clinical radiologist and you conduct research
17 focusing on -- or focused on assessing the risk and
18 benefits of medical imaging, correct?
19     A   If -- if you have my testimony there, I'm
20 going to believe you.
21     Q   And when you have given interviews or have
22 written opinion pieces, you identify yourself as
23 primarily a radiologist who focuses on evaluating
24 the risks and benefits of medical imaging, correct?
25     MS. O'DELL:  Object to the form.

</td></tr>
</table>

23 (Pages 330 to 333)

Rebecca Smith-Bindman, M.D.

Page 334

1      A   So I have given a lot of interviews, and I
2  often identify as a professor of epidemiology and
3  biostatistics.  I'm not sure what interview that you
4  are looking at.
5          I often -- often introduce myself as a
6  professor of obstetrics, gynecology, and
7  reproductive sciences.
8          And my guess is that whomever is
9  publishing the interview will choose to present me
10 in a way that they think highlights my skill.
11         But -- but my -- I'm a professor in
12 radiology and epidemiology and biostatistics,
13 obstetrics, gynecology, and a member of the Philip
14 R. Lee Institute for Health Policies Studies.
15         So I -- I get presented with whichever of
16 those first the presenter thinks might highlight my
17 expertise.
18     Q   Are you board-certified in obstetrics and
19 gynecology?
20     A   I'm not.
21     Q   The Bradford Hill criteria, the first
22 consideration is the "strength of the association";
23 is that correct?
24     A   First criteria?  Yes.
25     Q   What do you consider to be a strong

Page 335

1  association?
2      A   So it overlaps a little bit with the
3  second concept of Bradford Hill in the consistency
4  of -- of the data.
5          But where the association is meaningfully
6  and legitimately documented across study designs and
7  patient populations such that the association is
8  believable and meaningful, not necessarily
9  associated with a particular point estimate of
10 association, if that's the question.
11         I don't have any particular number.  It's
12 rather the entirety of the relationship, that it's a
13 meaningful quantifiable association.
14     Q   Do you teach epidemiology?
15     A   I do.
16     Q   Can you identify textbooks that you find
17 reliable on the subject of epidemiology?
18     A   The textbook that I often use to teach
19 epidemiology is a book -- I -- I'm not sure if the
20 authorship has changed over the years, but by holly
21 Cummings that talks about principles of
22 epidemiology.  It's sort of the clearest version
23 that I know.
24         And -- and they -- and I haven't looked
25 this particular question up, but they wouldn't talk

Page 336

1  about a quantitative association, but rather, the
2  biases and legitimacy of the association.
3      Q   Are you familiar with the text "Analysis
4  of Case-Control Studies" by Breslow and Day?
5      A   I -- I -- yes.
6      Q   Do you find that to be a reliable text on
7  the subject of the analysis of case-control studies?
8          MS. O'DELL:  Object to the form.
9      A   I -- I don't know that chapter or section
10 enough to answer that question without looking at
11 it.
12     Q   (BY MS. BOCKUS) But you're familiar with
13 their work?
14     A   Yes.
15     Q   And they're well-respected
16 epidemiologists?
17     A   Yes.
18         MS. O'DELL:  Object to the form.
19     Q   (BY MS. BOCKUS) You make a statement in
20 your report on page 12 that the most widely accepted
21 mechanism for initiation, promotion, and progression
22 of ovarian cancer is tissue inflammation leading to
23 a series of responses that result in cancer.
24         And you have talked about that sentence a
25 bit with Mr. Zellers already.

Page 337

1          Did you do a survey of the literature to
2  determine what was the most widely accepted
3  mechanism for initiation of ovarian cancer?
4      A   I did.
5      Q   And did you do a survey of the cancer
6  biology literature?
7          MS. O'DELL:  Object to the form.
8      A   What was the first literature you asked me
9  about?
10     Q   (BY MS. BOCKUS) The literature that
11 supported your statement that the most widely
12 accepted mechanism was inflammation.
13         And you said you did a survey on the
14 inflammation literature -- or I mean on the
15 etiology -- let me start all over again.
16         Have you done a survey on articles that
17 discuss the likely mechanism for the etiology of
18 ovarian cancer?
19     A   Yes, I have .
20     Q   Have you -- have you -- did your survey
21 include the literature on the cancer biology --
22     A   Yes.
23     Q   -- of --
24     A   Yes, it did.
25     Q   -- of ovarian cancer?

24 (Pages 334 to 337)

Rebecca Smith-Bindman, M.D.

Page 338

1    A   Yes, it did.
2    Q   And did you find that as the issue of
3   inflammation as an initiator of ovarian cancer is
4   not a settled question?
5        MS. O'DELL:  Object to the form.
6    A   I -- I would acknowledge that -- that none
7   of it is settled.  It's just the most widely
8   accepted, most widely supported, most wide -- widely
9   enhanced view supported by the data, but I don't
10  think the issue is settled.
11   Q   (BY MS. BOCKUS) In fact, there's still
12  considerable research going on on the subject --
13   A   Yes --
14   Q   -- correct?
15   A   -- I think there is.
16   Q   In the next paragraph you talk about, for
17  example, this is the middle -- there are
18  well-described and accepted causal pathways
19  linking in -- linking inflammation to bladder
20  cancer, gastric cancer, colon cancer, et cetera.
21        You would agree and you identify the
22  inflammatory sometimes virus or whatever that's --
23  that's well described and accepted for all of the
24  different cancers that you list there, correct?
25        For example, you identify toxic chemicals

Page 339

1   for the etiology of bladder cancer, correct?
2        MS. O'DELL:  Object to the form.
3    Q   (BY MS. BOCKUS) Do you see where I'm
4   reading?
5    A   I -- I don't see where you're reading
6   exactly, but -- but I agree with you that I have
7   given examples where we know the cause of the
8   inflammation for many of those cancers.
9    Q   (BY MS. BOCKUS) You would agree that there
10  is no equivalent literature linking ovarian cancer
11  to talcum powder use, correct?
12        MS. O'DELL:  Object to the form.
13   A   I think there's a strong literature on
14  components of the analysis.  But I think for several
15  of the examples I have given, the data are a little
16  bit clearer and further along.
17        So path -- HPV and cervical cancer has a
18  longer historical data collection period when we
19  have them --
20   Q   (BY MS. BOCKUS) And --
21   A   -- identified.  So I think that's your
22  question.
23   Q   -- so the strength of the association
24  between HPV virus and cervical cancer is much, much
25  stronger than any association that's been reported

Page 340

1   with body powder use and ovarian cancer, correct?
2        MS. O'DELL:  Object to the form.
3    A   I -- I'm going to go back to say that I --
4   I don't know what the strength of the association is
5   with -- with these individual cancers.
6        I -- I don't know if it's a 20 percent
7   increase or a 500 percent increase, except for the
8   one that I gave the example of of bladder cancer.
9        So for bladder cancer, I gave two examples
10  that cause inflammation of the bladder.  One being
11  toxic chemicals and the second being cigarette
12  smoking.
13        The toxic chemicals have a very strong
14  relative risk of 200 or 300, where I think smoking
15  has a relative risk of more like 1.3.
16        And so I -- I -- I don't know it for these
17  other cancers.  But at least for bladder cancer,
18  which I think is -- I think the second most common
19  cancer and cigarette smoke is -- I think the
20  association in the ballpark of 1.3.
21        I think I have it in here.  But -- so for
22  most of these, I don't know what that number is.
23        MS. BOCKUS:  I'm going to object as
24  nonresponsive.
25   Q   (BY MS. BOCKUS) Because the question I

Page 341

1   asked was about the HPV virus and cervical cancer --
2    A   I don't --
3    Q   -- correct?
4    A   -- know the -- the relative --
5    Q   All right.
6    A   -- risk for that. But I -- I thought I
7   said the only one I do know is the bladder cancer
8   numbers.
9    Q   Has your methodology in determining what
10  studies to include and what studies to exclude been
11  peer reviewed in any way, shape, or form?
12   A   It has not.
13   Q   Has your math --
14   A   Oh, I'm sorry.  Has my methodology been
15  peer reviewed?
16   Q   In -- in this particular case, the method
17  --
18   A   Okay.  The method has been peer reviewed.
19  But in this particular case, it has not.
20   Q   So no one has looked over your report and
21  determined whether your decision -- and as I
22  understand it, it was your decision alone, correct,
23  as to whether to include data from a particular
24  study or not --
25   A   Again --

25 (Pages 338 to 341)

Rebecca Smith-Bindman, M.D.

Page 342

1    Q   -- and --
2    A   -- it was a decision between myself and
3  the -- and -- and -- and Dr. Hall --
4    Q   So --
5    A   -- just the two of us.
6    Q   -- okay.  So did Dr. Hall participate in
7  the decision-making process as to which of the
8  case-control studies and the cohort studies to
9  include and which to exclude?
10   A   It -- so it's -- it's a -- the answer is
11 partly and partly not.
12        So in terms of whether the studies were
13 included in the final analysis, Dr. Hall was
14 involved in that decision.
15        But in terms of setting up the question to
16 begin with, she was not involved in that.  I -- I
17 set that up.
18   Q   So other than you and Dr. Hall, has anyone
19 been involved in the process of determining which
20 studies were going to be involved in -- in -- were
21 going to be included in your systematic review and
22 which were not?
23   A   Nobody else.
24   Q   Okay.  And has anyone other than you and
25 Dr. Hall even checked your work for transcription

Page 343

1  errors?
2        MS. O'DELL:  Object to the form.
3    A   No.
4    Q   (BY MS. BOCKUS) And has anyone other than
5  you and Dr. Hall checked your work for mathematical
6  errors?
7    A   No.
8    Q   You excluded all of the data from the
9  cohort studies with the exception of the earliest
10 reported data from the Nurses' Health Study; is that
11 correct?
12   A   Yes.
13        MS. O'DELL:  Object to the form.
14   Q   (BY MS. BOCKUS) Did you run the -- the --
15 the numbers to determine if there would be a
16 difference if you included the data from all the
17 cohort studies and if you excluded them?
18   A   So the requirement to be in our review was
19 to have a measure of regular use of talcum powder
20 products, and those other studies didn't have
21 something to plug into that equation.
22        So -- so I didn't have a number from those
23 studies to include in a sensitivity analysis.  They
24 -- they didn't report regular use, so I -- I
25 couldn't do what you are asking me to have done.

Page 344

1    Q   Would you agree that you're -- at this
2  point in time your report is not yet ready to be
3  submitted for peer review?
4        MS. O'DELL:  Object to the form.
5    A   I would agree that the description in this
6  report needs more detail, more -- to submit it to
7  peer review.  Not necessarily different work, but
8  definitely different detail and description.
9    Q   (BY MS. BOCKUS) Have you satisfied
10 yourself that the studies that you did include do
11 not overlap with regard to patients; that you
12 haven't counted the same patients multiple times?
13   A   I -- I am comfortable that I did my best
14 to do that.  But I know there were some cases where
15 I felt like I wasn't 100 percent sure.
16   Q   And you would agree that by -- including
17 the same cases and controls multiple times could
18 skew the -- the data?
19        MS. O'DELL:  Object to the form.
20   A   I think that that theoretically is a
21 concern of mine, which is why I try to you exclude
22 them if there was overlap.
23        On a practical level, the benefit of
24 pooling data from multiple sources is that the final
25 summary is less sensitive to any individual result,

Page 345

1  let alone some patients that might overlap.
2        But I agree with you that you want to
3  avoid that because of that concern.
4    Q   (BY MS. BOCKUS) All right.  Would you turn
5  to page 35 of your study.  And I am looking at
6  the -- right in the middle of the page, the
7  paragraph that starts with the word, Further talc
8  particles.
9        But I'm going to the last sentence in the
10 paragraph.
11        "The greater frequency at which talc
12 particles are discovered in ovarian cancerous tissue
13 than in normal ovarian tissue further supports that
14 these target -- particles may be causing cancer."
15        You don't have a source for that.  You
16 don't cite to any study.  And I would like to know
17 where you got that information.
18        MS. O'DELL:  Objection to the form.
19   A   I would have to review Heller and
20 Henderson.  No.  Henderson is just cancer.
21        So I would have to review -- review
22 Heller, but that -- I -- I -- I don't remember what
23 the -- cite of it.  I would have to look at the
24 articles that I cite in that paragraph and see if I
25 could remember.

Rebecca Smith-Bindman, M.D.

Page 346

1      Q   (BY MS. BOCKUS) The next statement has to
2  do with the reduction in incidence of ovarian cancer
3  after tubal ligation or hysterectomy?
4      A   Yes.
5      Q   Is it not correct that that statement is
6  true for both women who have used talcum powder
7  product and who -- let me ask a better question.
8          Here you're talking about that the
9  elevated -- that studies that look at the risk of
10 ovarian cancer associated with powder products
11 report a reduction in risk after hysterectomy or
12 tubal ligation, correct?
13     A   Yes.
14     Q   Isn't that also true in the general
15 population for all women, that there -- whether they
16 have used talcum powder products or not, that their
17 risk of ovarian cancer is reduced by hysterectomy or
18 oophorectomy --
19     A   Yes.
20     Q   -- or tubal ligation?  I'm sorry.
21     A   Yes.  It's even more reduced by
22 oophorectomy.
23     Q   Well, sure.  I misspoke.
24         MS. BOCKUS:  I believe that's all the
25 questions I have.  Thank you.

Page 347

1          MS. O'DELL:  Why don't we go off the
2  record.  I'm sorry.  Do you --
3          MR. ZELLERS:  No.
4          MR. BILLINGS-KANG:  I may have two or
5  three questions.
6          MS. O'DELL:  Oh, sorry, James.  Yeah,
7  please.
8          THE VIDEOGRAPHER:  We are still on?
9          MS. O'DELL:  Yes.
10         THE VIDEOGRAPHER:  Do we want to go off?
11         MR. BILLINGS-KANG:  Yeah.
12         MS. BOCKUS:  We need to go off to move the
13 mic.
14         THE VIDEOGRAPHER:  The time is 11:37 a.m.
15 We are going off the record.
16         (A break was taken from 11:37 a.m. to
17 11:40 a.m.)
18         THE VIDEOGRAPHER:  The time is 11:40 a.m.
19 We are now back on the record.
20         EXAMINATION BY COUNSEL FOR THE DEFENDANTS
21 BY MR. BILLINGS-KANG:
22     Q   Good morning, Dr. Smith-Bindman.  How are
23 you?
24     A   Good.
25     Q   My name is James Billings-Kang.  I'm an

Page 348

1  attorney who represents Defendant Personal Care
2  Products Council.
3          So for purposes of this deposition when I
4  reference "Personal Care Products Council," I mean
5  PCPC or CPFA or any of its predecessors.  Is that
6  okay?
7      A   Yes.
8      Q   So I want to turn to Exhibit 15, which is
9  your reference list.  And that reference list is
10 Exhibit B of your expert report; is that correct?
11     A   Yes.
12     Q   And if you can turn to page 19 of that
13 reference list.  And just let me know when you're
14 there.
15     A   I am there.
16     Q   And if you go about 75 percent of the way
17 down, there's a reference to a PCPC document.
18         Do you see that?
19     A   Yes.
20     Q   Do you happen to know what that document
21 is?
22     A   I do not.
23     Q   Did you rely on this document --
24     A   You would have to --
25         MS. O'DELL:  Object to the form.  Excuse

Page 349

1  me.  Object to the form.  If -- if --
2      A   -- you would have to tell me what it is to
3  know if --
4          MS. O'DELL:  -- or show it to her if
5  you --
6          MR. BILLINGS-KANG:  Sure.
7          MS. O'DELL:  -- have a question about it.
8      Q   (BY MR. BILLINGS-KANG) But for purposes of
9  formulating your opinion in the expert report, did
10 you rely on any PCPC-produced documents?
11         MS. O'DELL:  Object to the form.
12     A   You would have to show --
13         MS. O'DELL:  Put --
14     A   -- it to me.
15         MS. O'DELL:  -- just put it in front of
16 her if you're going to ask her a question about it
17 so she can --
18     Q   (BY MR. BILLINGS-KANG) I'm just asking:
19 Based on your memory, do you recall using any
20 PCPC-produced document to formulate your opinion.
21         MS. O'DELL:  I would -- I would just
22 object to the form.
23     Q   (BY MR. BILLINGS-KANG) That's --
24         MS. O'DELL:  None of --
25     Q   (BY MR. BILLINGS-KANG) -- that's fine.

27 (Pages 346 to 349)

Rebecca Smith-Bindman, M.D.

1  You can answer --
2      MS. O'DELL:  None of that --
3    Q   (BY MR. BILLINGS-KANG) -- yes or no, if
4  you remember.
5      MS. O'DELL:  -- none of us would be
6  expected to remember a document based on a Bates
7  number.
8    Q   (BY MR. BILLINGS-KANG) Well, I'm asking
9  her just generally PCPC-produced documents, if she
10  relied on any of those --
11      MS. O'DELL: Objection.
12    Q   (BY MR. BILLINGS-KANG) -- to formulate her
13  opinion?
14      MS. O'DELL:  Object to the form.  I'm
15  putting that --
16      MR. BILLINGS-KANG:  Sure.
17      MS. O'DELL:  -- that Bates number in front
18  of her.  And if you --
19      MR. BILLINGS-KANG:  Sure.
20      MS. O'DELL:  -- remember, you remember.
21    A   This is a document that lists different
22  research studies that have been done over time.  Is
23  that the document that we're --
24    Q   (BY MR. BILLINGS-KANG) Well, I -- I'm not
25  too sure.  This is a document you listed in the

1  reference list.
2    A   I -- I'm just trying to make sure that I'm
3  looking at the document that you are --
4    Q   According to your counsel, this is what's
5  been identified on page 19 of the reference list.
6    A   I -- I do not remember this document.
7  This --
8    Q   Okay.
9    A   -- document is just a list of studies.
10    Q   So you do not recall whether you relied on
11  this document in formulating your opinion?
12    A   My --
13      MS. O'DELL:  Object to the form.
14    A   -- opinion is not based on the -- on a --
15  a list of studies.
16    Q   (BY MR. BILLINGS-KANG) Okay.  So that's --
17  that's a -- that's a yes, you do not -- you did not
18  rely on this document in formulating your opinion?
19    A   I -- I don't remember seeing this
20  document.  As I'm going through this document, there
21  are a lot of studies that I reviewed that I did rely
22  on.
23      So I don't know if you're asking me if I
24  relied specifically on some of the items in here
25  that I have relied on or the -- this document

1  itself.
2    Q   Just --
3    A   I don't remember --
4    Q   -- the document --
5    A   -- seeing --
6    Q   -- itself.
7    A   -- this -- I don't remember seeing this
8  document.
9    Q   Okay.  You can -- you can put that away.
10  And I will go to your expert report that's
11  Exhibit 2, page 14.  Just let me know when --
12    A   I'm there.
13    Q   -- you're there.  And this -- the first
14  paragraph under "Asbestos," it's about halfway in
15  that first paragraph beginning with, Because of
16  concern that asbestos was present in talcum powder
17  products in the known carcinogenicity of asbestos,
18  it has been reported that voluntarily guidelines
19  were established by the cosmetic industry in 1976 to
20  limit the content of asbestos fibers in commercial
21  talc preparations.
22      Did I read that correctly?
23    A   You did.
24    Q   And these are your words, correct?
25    A   Yes, they are.

1    Q   And what did you mean by "voluntarily
2  guidelines"?
3    A   I -- I have read a lot about the
4  guidelines.  And it -- the idea was that the
5  industry decided to self-regulate and to do what
6  they could to remove the asbestos, is my
7  understanding of what that was as opposed to being
8  required to submit testing to document that they had
9  done so.
10    Q   And -- and what did you rely upon for this
11  particular sentence?
12    A   This particular sentence is repeated in --
13  in at least half of the papers that I have read that
14  are epidemiology papers.
15      It's repeated in all of the news studies.
16  It's repeated in reports by consumer organizations,
17  by the FDA, by the recent Canadian report, which I
18  didn't have in hand.
19      But it's something that I -- I have read a
20  lot -- a great deal, that there were voluntarily
21  standards that were established by the industry.
22    Q   And so did you read any publication or
23  whatever reliance materials that you had that
24  described these guidelines as anything else other
25  than voluntarily guidelines?

Rebecca Smith-Bindman, M.D.

1    A   I -- I -- I did not.  I looked for
2    documents like that.  I was not able to find them.
3    Required -- requirements, I was not able to find.
4          MR. BILLINGS-KANG:  Okay.  That's all I
5    have.
6          MS. O'DELL:  Why don't we take a short
7    break.
8          THE VIDEOGRAPHER:  The time is 11:45 a.m.
9    We are now off the record.
10         (A break was taken from 11:45 a.m. to
11   12:15 p.m.)
12         THE VIDEOGRAPHER:  The time is 12:15 p.m.
13   We are now back on the record.
14         EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
15   BY MS. O'DELL:
16    Q   Dr. Smith-Bindman, I have just a few
17   questions for you.  First, during all of your work
18   in this case, was it your understanding that you
19   were serving as an expert consultant?
20    A   Yes.
21    Q   And you know, throughout the early
22   meetings in June, I believe, of 2017, where you met
23   with Plaintiffs' counsel, did Plaintiffs' counsel
24   provide information regarding their theories of the
25   talcum powder litigation?

1          MR. ZELLERS:  Objection, form.
2     Q   (BY MS. O'DELL) Let me strike that and
3    start again.  Did your meta-analysis replicate what
4    had been published in the literature?
5     A   The --
6          MR. ZELLERS:  Form.
7     A   -- the results of my meta-analysis and the
8    previous ones are nearly identical.  So yes, it was
9    a very close replication.
10    Q   (BY MS. O'DELL) And you have mentioned
11   your intent to publish your -- your meta-analysis,
12   your systematic review.  And I believe you testified
13   that in the published version, you would add
14   additional detail.
15         What did you mean by that?
16    A   So the analysis that I have done is
17   complete.  But the presentation of the results in a
18   paper would require more beautiful graphics, would
19   require explaining our inclusion and exclusion
20   criteria more fully than I did in this published
21   report.  Things like that.
22         And that actually is a substantial part of
23   the writing of a scientific paper, sort of
24   explaining every step of what you did, and so I
25   would have to do more of that to publish this study.

1     A   Yes.
2     Q   And have you been paid by Plaintiffs'
3    counsel for all the work that you have billed in
4    this case?
5     A   Yes, I have.
6     Q   Okay.  You have been asked a number of
7    questions about the meta-analysis, the systematic
8    review that you performed on the regular use of --
9    of talcum powder.
10         Would you have reached your opinions in
11   this case without having performed that analysis?
12    A   My systematic review ended up with the
13   same estimates as all of the other
14   well-done systematic reviews.
15         And it was very helpful for me to confirm
16   the results.  But yes, it's the same as the other
17   studies, and so my -- my conclusion about the
18   causality of talcum powder products and ovarian
19   cancer would be exactly the same, even without mine.
20         It just made me a little more comfortable
21   that I was certain about the -- the results
22   presented by other people.
23    Q   And in a sense, the analysis that you did
24   replicated the work that had been published in the
25   -- in the literature?

1     Q   Is there sufficient detail in the -- in
2    your report regarding your methodology, as well as
3    in the documentation provided in the spreadsheets
4    to -- for someone to replicate the work that you
5    have done?
6          MR. ZELLERS:  Objection, form.
7     A   I believe that if someone used the
8    software that we said and had the inclusion criteria
9    that we led out -- set out, that they would get the
10   -- the same results as we got.
11         And I think the fact that our review
12   provides the same results as other systematic
13   reviews sort of, you know, also supports that.  But
14   yes, I think someone could easily replicate our --
15   our analysis.
16    Q   (BY MS. O'DELL) Okay.  You were asked a
17   number of -- before I do that, let me ask you:  Can
18   there be multiple causes of ovarian cancer?
19    A   Absolutely.  I -- I describe in the
20   report, a whole number of different risk factors for
21   ovarian cancer.
22    Q   And in a -- in a patient -- hypothetically
23   in a patient who has a BRCA1 mutation, possibly has
24   other risk factors for ovarian cancer, and also uses
25   talcum powder products, under those circumstances,

Rebecca Smith-Bindman, M.D.

Page 358

1  would talcum powder products be a contributing cause
2  of her cancer?
3         MR. ZELLERS:  Objection, form.
4     A   I think patients can have multiple risk
5  factors and causes of -- of cancer.  Some causes,
6  you would imagine, would be quite synergistic.
7         So having both together would be worse
8  than twice having either of those alone.  So it
9  would be worse than having -- it -- it would be more
10 than double the initial, because they would be
11 basically enhancing.
12        So if -- if some risk factors caused lots
13 of oxidative stress and another enhanced that
14 oxidative stress and prevented repair or cell
15 apoptosis, you would get even more impact.
16        So yes, I would say multiple risk factors
17 for most diseases occur concurrently, and sometimes
18 they enhance or are synergistic.
19    Q   (BY MS. O'DELL) Can asbestos be inhaled
20 and cause ovarian cancer?
21        MR. ZELLERS:  Objection, form; foundation.
22    A   Absolutely.  The -- the IARC 2012 report
23 was primarily on the basis of inhalation of
24 asbestos.
25    Q   (BY MS. O'DELL) Can fibrous talc be

Page 359

1  inhaled and cause ovarian cancer?
2     A   I --
3         MR. ZELLERS:  Objection, form; foundation.
4     A   -- yes.
5     Q   (BY MS. O'DELL) And what's your basis for
6  that statement?
7         MR. ZELLERS:  Same objections.  None of
8  this was in her report.  None of this has been in
9  her opinions.
10        These are all new opinions.  So inhalation
11 has not been any part of her testimony or her
12 opinion.
13        MS. O'DELL:  Inhalation is mentioned in
14 her report.
15    A   I -- I -- you know, the -- the chapter on
16 asbestos and occupational exposure and IARC report
17 is -- is about inhalation.
18        I'm not sure if I -- I was explicit about
19 the route, but that is where the data come from for
20 asbestos, as well as fibrous talc.
21        And those articles talk about the fact
22 that there might be other exposures in addition, but
23 they're primarily inhalation studies.
24        MR. ZELLERS:  Again, object to what the
25 defense views as a completely new opinion that was

Page 360

1  not disclosed in Dr. Smith-Bindman's expert report.
2     A   Can I read?  Just on page 14, The results
3  were consistent, significant, and documented a
4  strong and compelling causal association between
5  exposure to asbestos and ovarian cancer largely
6  result in the association from cohort studies of
7  women with substantial occupational exposures.
8         That -- that was the --
9     Q   (BY MS. O'DELL) Okay.  Let me -- let me
10 ask you to -- to turn, Dr. Smith-Bindman, to the
11 Langseth paper that was marked as Exhibit 30 by
12 counsel for J&J.
13        And specifically to turn to page 2 of the
14 paper to Figure 1.
15    A   Yes.
16    Q   You were asked a number of questions about
17 whether the studies that had confidence intervals
18 that cross one were essentially by chance.  In other
19 words, they -- they did not speak to a potential
20 increased risk in ovarian cancer as a result of
21 talcum powder use.
22        Are the -- what's your analysis of those
23 studies and whether, as counsel put it, it was
24 equivalent to a coin toss?
25    A   So if there was no relationship between

Page 361

1  ovarian cancer and exposure to talcum powder
2  products, you would expect the forest plot in
3  Figure 1 to have half of the point estimates be
4  above one, saying there's a risk; and half of the
5  point estimates being below one, saying there isn't
6  a risk.
7         In fact, every one of the studies on this
8  table is at or above one.  It's to the right.  So to
9  get that by chance is highly, highly, highly
10 unlikely.
11        The best estimate is -- the point estimate
12 in all of those are very different than one.
13        And so to call that by chance doesn't make
14 sense.  The fact that for an individual study, the
15 confidence interval overlap one doesn't mean it's by
16 chance.
17        So again, by chance would mean half the
18 studies have a positive association, half have a
19 protective.
20        And in fact, every one of the studies has
21 a value that's either substantially greater than one
22 or just a little greater than one.
23    Q   Okay.  You were asked questions about
24 starting -- in reference to the Langseth paper you
25 were asked questions about the -- the pooled odds

30  (Pages 358 to 361)

Rebecca Smith-Bindman, M.D.

Page 362

1   ratio for hospital-based studies and the focus on
2   that finding being that it was not a statistically
3   significant increased risk.
4         Did the Berge paper also look at a pooled
5   analysis of the hospital-based studies?
6     A   She did.  If you look at Table 2, Table 2
7   shows the results of the case-control studies that
8   were hospital based versus community based.
9         And those individual group of
10  hospital-based studies are statistically
11  significant.
12        But I would point out that in this case
13  the -- they report the relative risk of a hospital
14  based versus community based.  They're relatively
15  similar.  They're both significant, and they're
16  relatively similar, which is what I concluded from
17  Langseth.  They're very similar.
18    Q   Okay.  You were asked about studies
19  relating to migration.  And the specific -- the
20  specific question, as I wrote it down was:  Is there
21  a study that demonstrates talc on the -- applied to
22  the perineum, traveling to the -- or migrating to
23  the ovary, and you said, No.
24        What evidence are you relying on to
25  support your opinion that talcum powder can migrate

Page 363

1   when applied -- applied to the genital area to the
2   ovary?
3     A   So I was asked a very narrow question, is
4   there a study that talks about transport from the
5   perineum.
6         But in fact, there is extensive evidence
7   that particles from the perineum could get to the
8   ovary and do get to the ovary.
9         And part of that is the perineum is
10  basically equivalent to the vagina.  It is one open
11  system to the ovary.
12        And so my evidence for that is
13  several-fold.  First, I'm a clinical radiologist,
14  and I do a lot of procedures in women where I am
15  putting catheters in the vagina and injecting fluid
16  that goes to the uterus, to the tubes.  I watch the
17  fluid spill.  It's a wide-open system.
18        Occasionally patients have complications
19  that don't let me do that, and I might inject fluid
20  literally on the perineum to get a backlash to the
21  ovaries.  And it's a wide-open connected system.
22        All of our textbooks talk about it being a
23  bi-directional system.  You know, infection goes
24  both directions.  Retrograde menstruation and
25  menstruation go both directions.

Page 364

1         There have been studies of sperm, both
2   living and dead, going in both directions.  So it's
3   not just the mobile sperm, but the dead sperm.
4         Carbon particles -- you know, a tiny
5   study -- but have been shown to move -- radioactive
6   material has been seen to move.  Material on gloves
7   has been seen.
8         So it's a wide-open system.  The idea that
9   we think of that as being a barrier system is just
10  false.
11        Now, I don't know of an individual study
12  that has put talc on the perineum.  I think that's,
13  unfortunately, not an ethical study to do.  And I
14  don't know of such a study or why you would do such
15  a study.
16        But to think that there's any barrier
17  between the perineum and the vagina makes no sense
18  whatsoever.
19    Q   Let me transition to talk about
20  inflammation for a moment, and specifically
21  inflammation as a cause of ovarian cancer first.
22        What evidence are you relying on to
23  support your opinion that inflammation -- chronic
24  inflammation causes ovarian cancer?
25    A   Okay.  So there's an enormous amount of

Page 365

1   literature that understands what we see when there's
2   inflammation, what kind of changes you see on a
3   cellular level.
4         So you see increase in pro oxidation, a
5   reduction in antioxidation.  You see increase in
6   cell turnover, reduction in cell death, expression
7   of inflammatory agents, cellular changes at the DNA
8   level that leads to greater expression.
9         We -- we understand those pathways.  And
10  those pathways occur both with talc exposure and in
11  the setting of things that cause ovarian cancer.
12        So I -- in my reference list, I reference
13  a whole bunch of references -- Saed references,
14  Shawn (phonetic) references, Ness references.
15  There's really enormous numbers of references.
16        I -- in my documents I have Shukla
17  references, Buz'Zard references, Hamilton references
18  that talk away sort of these inflammatory pathways
19  and biologic mechanisms that lead to changes that go
20  along with inflammation.
21    Q   I know you have reviewed Dr. Saed's
22  research in regard to whether talcum powder causes
23  inflammation in vitro.
24        First, let me ask you this:  Does
25  Dr. Saed's work support the conclusion that

31 (Pages 362 to 365)

Rebecca Smith-Bindman, M.D.

| Page 366 | Page 368 |
|---|---|

**Page 366**

1  Johnson's baby powder causes inflammation?
2      MR. ZELLERS:  Objection, form.
3      A   So Saed specifically looked at Johnson
4  baby powder, so his results specifically pertained
5  to Johnson baby powder.
6          He looked at several different measures
7  that -- I have just mentioned inflammation.  So he
8  looked specifically at oxidative stress, the up
9  regulation or down regulation of --
10          THE COURT REPORTER:  The?
11      A   -- up regulation or pro oxidants, down
12  regulation of antioxidants.  He looked at cell
13  proliferation.  He looked at SNPS point mutations
14  that are associated with this.
15          THE COURT REPORTER:  Snips?
16      A   S N P S, SNPS.
17          THE COURT REPORTER:  Because you're facing
18  that way, and the mic is here.  Thanks.
19      A   And showed substantial changes to talcum
20  powder to all of these.  I -- I was really quite
21  impressed with the consistency in these markers of
22  inflammation.
23          Some of them overlap clinical markers we
24  use.  Like CA125 went up very strongly just like it
25  goes up for ovarian cancer.

**Page 367**

1          So he very clearly showed this.  And the
2  results he showed were not different than those that
3  Shukla showed, that Buz'Zard showed, that -- the
4  expression in genes.
5          He -- he just had it in a very compelling
6  experiment where he showed dose response, where he
7  showed the control didn't have the changes, but that
8  the talc powder products did have the changes.
9          And so he identified, in this cellular
10  cell line model, all of the changes that you would
11  expect from inflammation.  So I think the results
12  were very compelling.
13          I -- I was asked if kind of that
14  experiment has any relevance in humans.  And I would
15  say it would be nice to do that experiment in
16  humans.
17          But you can't do that experiment in
18  humans.  And that's what --
19          THE COURT REPORTER:  Wait.
20      A   -- you can't do such an experiment in
21  humans.  So -- so that is what sort of cellular
22  studies are -- are meant to approximate.
23          There's no direct translation, so how much
24  you put in the cell versus how much you put in the
25  patient, I -- you know, I don't know how you would

**Page 368**

1  do that.  That's beyond me.  But that's what this
2  whole model is, to try to help you understand what
3  the effect mechanistically is from these changes.
4      Q   (BY MS. O'DELL) And is the use of that
5  model in scientific research generally accepted?
6      A   Highly.
7          MR. ZELLERS:  Objection, form.
8      A   My understanding is that is the basis for
9  much of the research that comes -- that happens at
10  my research institution.
11      Q   (BY MS. O'DELL) Just to make sure that the
12  record is clear, Dr. Smith-Bindman, in -- I asked
13  the question:  Is the use of that model in
14  scientific research generally accepted?  I'm not
15  sure your answer came through.  What's your answer?
16          MR. ZELLERS:  For your -- just objection,
17  form.  Go ahead.
18      A   Yes.  I -- I said that that's a very
19  common model at UCSF.
20      Q   Okay.
21          MS. O'DELL:  I have nothing further.
22  Thank you.
23          MR. ZELLERS:  Let's take a break for a
24  couple of minutes.
25          THE VIDEOGRAPHER:  The time is 12:34 p.m.

**Page 369**

1  We are now off the record.
2          (A break was taken from 12:34 p.m. to
3  12:41 p.m.)
4          THE VIDEOGRAPHER:  The time is 12:41 p.m.
5  We are now back on the record.
6          EXAMINATION BY COUNSEL FOR THE DEFENDANTS
7  BY MS. BOCKUS:
8      Q   Doctor, you made a comment about the fact
9  that there can be a synergistic effect between
10  different risk factors; is that correct?
11      A   Yes.
12      Q   That is something that can be studied,
13  correct?
14      A   Yes.
15      Q   There are studies that can be designed to
16  determine whether there's a synergistic effect
17  between, say, BRCA mutation carriers and women who
18  have regularly used talcum powder --
19      A   Yes.
20      Q   -- correct?
21          That study has not been done, correct?
22      A   Not that I know of.
23      Q   In fact, are you familiar or aware of any
24  studies that have looked for a synergistic effect
25  between regular talc use and any other risk factors

Rebecca Smith-Bindman, M.D.

Page 370

1    for ovarian cancer?
2         MS. O'DELL:  Object to the form.
3         A   I would have to look through my papers
4    with that question in mind.  I know some of the
5    papers have looked at BRCA, but I can't remember if
6    they sort of stratified the results by -- with or
7    without BRCA, so I -- I'm not sure of the answer to
8    that.
9             I was more speaking about, from work that
10   I do, the idea of synergy between risk factors.  And
11   one of those is BRCA and radiation exposure.  So
12   I -- I -- I meant generally it can be the case.  I
13   didn't mean to suggest we know what it is for this.
14        Q   (BY MS. BOCKUS)  Okay.  Then you spoke
15   about the female reproductive system being a
16   wide-open system.
17            What procedure are you doing when you are
18   putting fluid on a women's perineum to see if it
19   goes to the ovaries?
20        A   I apologize.  So the primary procedures
21   would be a hysterosonogram, which we're putting
22   water into the uterus and the tubes mostly to look
23   for patency.
24            But it turns out we end up needing to do
25   procedures in postop patients, not infrequently,

Page 371

1    where we might be looking for connections between
2    different structures, preop or postop.
3             In the ballpark of 10 percent of women to
4    20 percent have cervical stenosis, and you can't
5    catheterize.
6             Or there might be some reason we don't
7    want to catheterize or put the tubes in the vagina.
8    We might put the tube directly on the perineum and
9    see if we can create kind of a -- a way to keep,
10   let's say, a balloon in place and then inject in a
11   retrograde fashion.
12            So it feels like it comes out probably
13   every couple of months.  But we're actually pretty
14   far from the cervix.  And we're injecting usually
15   water or sometimes contrast and then looking mostly
16   with ultrasound, but sometimes with fluoroscopy.
17        Q   And when you say "inject," that means with
18   some degree of pressure, you're putting the water or
19   other fluid into the vagina?
20        A   There is some degree of pressure, yes.
21        Q   And when you do that, is the patient's
22   head lower than her hips?
23        A   Not -- not usually, no.
24        Q   Is she on her back?
25        A   Yes.

Page 372

1        Q   Do you know if anything about what you
2    just described has any correlation to the way in
3    which women use talcum powder in their perineal
4    region?
5         MS. O'DELL:  Object to the form.
6         A   I -- I don't know what -- how women use
7    talcum powder on their perineum.
8         Q   (BY MS. BOCKUS)  Do you know what
9    percentage of sperm that are placed in a women's
10   vagina make it to the ovaries?
11        A   Only from child cartoons that make it seem
12   like it's a competitive race.  But percentagewise, I
13   don't know.
14        Q   Do you have any reason to believe that
15   talc makes it from the vagina to the ovaries in
16   greater percentage than sperm?
17        A   I -- I -- I would guess that that's not
18   the case.
19        MS. BOCKUS:  That's all I have.
20        MR. ZELLERS:  I have just a couple.
21        EXAMINATION BY COUNSEL FOR THE DEFENDANTS
22   BY MR. ZELLERS:
23        Q   Dr. Smith-Bindman, did you discuss with
24   Plaintiffs' counsel, calling Dr. Hall on our break
25   between yesterday's first session and today's

Page 373

1    session?
2         MS. O'DELL:  I'm going to ask -- ask
3    you -- instruct you not to answer questions
4    regarding discussions with counsel.
5         MR. ZELLERS:  The defense agreed to split
6    this deposition of Dr. Smith-Bindman over two days
7    on the expressed condition that the extended break
8    not be used for preparation.
9             The witness and Plaintiffs' counsel
10   violated that understanding.  Further, it's entirely
11   inappropriate for an expert witness to consult with
12   a consulting expert during a break.
13            We move to strike all of
14   Dr. Smith-Bindman's testimony and will take the
15   issue to court.
16        MS. O'DELL:  The record is clear that
17   counsel did not speak with Dr. Smith-Bindman last
18   night.  There was no preparation done between the
19   conclusion of the deposition yesterday and the
20   beginning of the deposition this morning.  I think
21   the record has been clear on that.
22            That was -- we agreed to do that.  We had
23   not -- we were not compelled to do that.  Because as
24   counsel is aware, the deposition protocol allows
25   both parties, when they're putting up their

33 (Pages 370 to 373)

Rebecca Smith-Bindman, M.D.

Page 374

1  respective witnesses, to confer with the witness.
2      And we did confer with Dr. Smith-Bindman
3  prior to the deposition this morning for about
4  10 minutes, and that's perfectly within our rights,
5  and so we would oppose any such motion.
6      MR. ZELLERS:  Done?  We are concluded.
7      THE VIDEOGRAPHER:  The time is 12:48 p.m.
8  We are now off the record.
9      (TIME NOTED:  12:48 p.m..)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 376

1      I, MARY J. GOFF, CSR No. 13427, Certified
2  Shorthand Reporter of the State of California,
3  certify;
4      That the foregoing proceedings were taken
5  before me at the time and place herein set forth, at
6  which time the witness declared under penalty of
7  perjury; that the testimony of the witness and all
8  objections made at the time of the examination were
9  recorded stenographically by me and were thereafter
10  transcribed under my direction and supervision; that
11  the foregoing is a full, true, and correct
12  transcript of my shorthand notes so taken and of the
13  testimony so given;
14      That before completion of the deposition,
15  review of the transcript ( ) was (XX) was not
16  requested:  ( ) that the witness has failed or
17  refused to approve the transcript.
18      I further certify that I am not financially
19  interested in the action, and I am not a relative or
20  employee of any attorney of the parties, nor of any
21  of the parties.
22      I declare under penalty of perjury under the
23  laws of California that the foregoing is true and
24  correct, dated this   day of     , 2019.
25      _____

Page 375

1
2
3
4      I, REBECCA SMITH-BINDMAN, M.D., do hereby
5  declare under penalty of perjury that I have read
6  the foregoing transcript; that I have made any
7  corrections as appear noted, in ink, initialed by
8  me, or attached hereto; that my testimony as
9  contained herein, as corrected, is true and correct.
10      EXECUTED this_____ day of_____,
11  20____, at_____, _____.
          (City)        (State)
12
13
14      _____
          REBECCA SMITH-BINDMAN, M.D.
15      VOLUME II
16
17
18
19
20
21
22
23
24
25

Page 377

1          ERRATA SHEET
2        Golkow Litigation Services
3   1650 Market Street, One Liberty Plaza, 51st Floor
4       Philadelphia, Pennsylvania 19103
5          877-370-3377
6      CASE:  Talcum Powder Litigation
7  PAGE LINE FROM          TO
8  ___|____|_____|_____|_____|
9  ___|____|_____|_____|_____|
10 ___|____|_____|_____|_____|
11 ___|____|_____|_____|_____|
12 ___|____|_____|_____|_____|
13 ___|____|_____|_____|_____|
14 ___|____|_____|_____|_____|
15 ___|____|_____|_____|_____|
16 ___|____|_____|_____|_____|
17 ___|____|_____|_____|_____|
18 ___|____|_____|_____|_____|
19 ___|____|_____|_____|_____|
20 _____
21      REBECCA SMITH-BINDMAN, M.D., VOLUME II
22 Subscribed and sworn to before me
23 this _____ day of _____, 2019.
24 _____
25      Notary Public

34 (Pages 374 to 377)

Rebecca Smith-Bindman, M.D.

Page 378

## A

**a.m**
246:9 253:3,9
318:24 319:1,3
331:3,5,6,7
347:14,16,17,18
354:8,10
**abilities**
333:7
**ability**
265:3 331:23
**able**
264:25 321:15
332:3 354:2,3
**Abrams**
246:7
**absolute**
310:14,22
**absolutely**
258:7 276:1 357:19
358:22
**absorbency**
293:16
**abstract**
298:10,21,22,25
**abstracted**
282:13
**abstracts**
298:11
**acceptable**
320:15
**accepted**
294:2 336:20 337:2
337:12 338:8,18
338:23 368:5,14
**access**
332:21
**accident**
331:17,22
**account**
301:1,4 327:2
328:2 329:15
**accounting**
284:15
**accuracy**
282:20

**accurate**
282:11
**accurately**
282:18
**acknowledge**
275:14 338:6
**action**
376:19
**active**
286:13,15,15,23
294:18
**actual**
268:14 301:22
**acute**
289:13 291:3,13,16
291:19
**add**
356:13
**added**
257:21
**addition**
260:24 298:8
359:22
**additional**
257:17 259:24
260:15,15 261:9
356:14
**addressed**
315:21
**adhesions**
287:11 293:21
**adjust**
308:16,18
**adjusted**
307:25 308:2,14,22
308:23
**adjustments**
308:3
**adolescence**
307:1,7
**advantages**
262:19
**affect**
288:11
**affirmed**
254:2
**afternoon**

258:17
**age**
327:4 328:3
**agent**
289:22
**agents**
295:23 365:7
**agree**
263:11 278:24
280:19,24 282:1
285:10 288:10
289:22 292:18
294:15 296:20,23
301:11 303:6
306:9,21 310:9
324:2 326:16
338:21 339:6,9
344:1,5,16 345:2
**agreed**
373:5,22
**agreeing**
292:19
**ahead**
319:21 368:17
**Alabama**
247:9
**Allen**
247:4
**Allison**
325:4
**allow**
267:20
**allowed**
266:16
**allows**
373:24
**alternative**
293:7
**AMA**
318:1
**amount**
290:12,16,17,18
292:13 293:4
304:9 320:6,9,11
322:2,5,7,25
323:1 330:21
364:25

**amounts**
313:19 320:14,16
330:1
**analyses**
284:3 329:6
**analysis**
254:21 267:14,17
284:9 323:24
328:1 336:3,7
339:14 342:13
343:23 355:11,23
356:16 357:15
360:22 362:5
**Analytical**
318:2
**analyze**
284:18
**ancillary**
263:16
**Andrew**
250:24 253:6
**Angeles**
248:9
**annotated**
257:21 262:8
**answer**
265:18,25 278:16
302:13 303:4
320:8 322:14
331:23 332:3
333:11 336:10
342:10 350:1
368:15,15 370:7
373:3
**answered**
293:24 316:10,12
332:1
**answering**
267:24 273:11
**answers**
305:19
**antiinflammatory**
295:23
**antioxidants**
301:7 302:8 366:12
**antioxidation**
365:5

**antioxidative**
303:13
**Antonio**
249:8
**apologize**
256:25 262:2
263:19 370:20
**apoptosis**
301:6 302:8 358:15
**appear**
375:7
**APPEARANCE**
249:1
**APPEARANCES**
247:1 248:1 250:1
**appeared**
333:15
**appears**
277:5
**apples**
274:6,6
**application**
287:5,13
**applied**
293:20 362:21
363:1,1
**apply**
301:21
**approach**
279:24 280:8
**approve**
376:17
**approximate**
272:18 367:22
**approximately**
260:7,23
**aqua**
258:2
**area**
285:5,12,17 287:19
294:18 333:4,10
363:1
**Arps**
248:15
**arthritis**
290:1
**article**

Rebecca Smith-Bindman, M.D.

Page 379

251:17,20,22
252:2,4 287:10
297:16 298:4
**articles**
337:16 345:24
359:21
**articulate**
264:23
**asbestos**
252:2,4 313:14,16
314:2,6,10,15,18
314:21,25 318:15
318:21 320:4,5,6
321:2,3,8,10,17
322:2,13,15,19
323:3,24 324:3,7
325:6,17 326:8,9
326:10,18 328:13
329:13 330:1,4
352:14,16,17,20
353:6 358:19,24
359:16,20 360:5
**asbestos-related**
325:20
**asbestosis**
330:11
**asked**
255:4,20 256:6
266:4,9 273:15
293:23 316:14,15
316:15 320:4
331:24 333:2
337:8 341:1 355:6
357:16 360:16
361:23,25 362:18
363:3 367:13
368:12
**asking**
254:22 255:3 264:2
268:25 269:1
271:18 272:12
273:11 277:12
301:8,13 304:15
308:7 310:6
343:25 349:18
350:8 351:23
**aspirin**

251:20 295:25
296:5,14
**assessed**
265:13
**assessing**
333:17
**associated**
291:23 296:10
304:23 305:18
320:23 321:8,17
322:3,7,12 323:4
335:9 346:10
366:14
**association**
264:13 266:22
269:24 273:19
274:14 276:7
277:9 278:3
297:21 306:2
323:7,16 328:11
329:10 332:8
334:22 335:1,5,7
335:10,13 336:1,2
339:23,25 340:4
340:20 360:4,6
361:18
**associations**
263:24 264:14,18
264:25 265:1
311:3
**assume**
310:21
**assumes**
287:22
**assumption**
314:16,24
**attached**
259:12 261:3
276:16 297:11
317:10 319:11
324:24 327:17
375:8
**attempt**
311:19
**attorney**
247:7,15,22 248:6
248:17 249:5,15

250:5,17 332:12
348:1 376:20
**Austin**
249:18
**author**
298:1 325:4 328:1
**author's**
325:12
**authors**
266:21 269:18,23
282:18 295:11
297:20 328:9
**authorship**
335:20
**available**
295:17
**Avenue**
249:16
**average**
322:18,20
**avoid**
293:9 345:3
**aware**
261:9 288:15
291:22 300:12,15
300:18,20,21
305:12 315:10,13
369:23 373:24

---

**B**

**B**
308:22,23 348:10
**baby**
318:19 322:20
330:22 366:1,4,5
**back**
282:12 319:4 324:8
331:8,16,19 340:3
347:19 354:13
369:5 371:24
**backlash**
363:20
**balance**
303:12
**balloon**
371:10
**ballpark**

312:19 340:20
371:3
**barrier**
364:9,16
**barriers**
288:2,13
**based**
262:24,24 263:1
266:18 270:8
278:10 280:10
281:15,21 292:12
300:21 313:8,9
314:4 318:14
349:19 350:6
351:14 362:8,8,14
362:14
**baseline**
301:4,4
**basic**
263:18
**basically**
358:11 363:10
**basis**
269:10 272:1
358:23 359:5
368:8
**Bates**
350:6,17
**beach**
247:17 286:1,3
**Beasley**
247:4
**beautiful**
356:18
**beginning**
246:9 352:15
373:20
**begins**
319:4
**behalf**
246:6
**behavior**
301:18
**belief**
274:3 314:17,20
**believable**
335:8

**believe**
260:11 261:8
272:17 274:2
279:19 281:5
285:16 291:3
293:6,8 297:6
298:24 300:8,16
300:25 314:1,14
317:18 320:14,19
321:3,9 322:13
324:12 328:21
332:2 333:20
346:24 354:22
356:12 357:7
372:14
**benefit**
344:23
**benefits**
333:18,24
**BENJAMIN**
248:16
**benjamin.halper...**
248:20
**Berge**
307:18,21,24
308:13 362:4
**best**
322:5 344:13
361:11
**better**
282:2 311:16 346:7
**beyond**
259:23 261:10
368:1
**bi-directional**
363:23
**bias**
273:18,21 274:21
274:24 275:2,4,8
275:14,18,25
280:16,21 281:1
281:22
**biases**
284:7,10,12 336:2
**bigger**
288:14
**Bill**

251:14
**billed**
355:3
**Billings-Kang**
250:4 251:8 347:4
347:11,21,25
349:6,8,18,23,25
350:3,8,12,16,19
350:24 351:16
354:4
**biologic**
266:22 267:2,3
285:12 365:19
**biological**
285:2,4,7
**biology**
337:6,21
**biostatistician**
254:14
**biostatistics**
334:3,12
**bit**
280:13 335:2
336:25 339:16
**bladder**
288:5,7 338:19
339:1 340:8,9,10
340:17 341:7
**blood**
330:16
**board-certified**
334:18
**Bockus**
249:4 251:9 298:18
299:4,4 331:1,10
331:13 332:6
333:14 336:12,19
337:10 338:11
339:3,9,20 340:23
340:25 343:4,14
344:9 345:4 346:1
346:24 347:12
369:7 370:14
372:8,19
**body**
305:8 340:1
**book**

335:19
**bottom**
295:10 309:14
**Box**
247:24
**Bradford**
323:23 334:21
335:3
**BRCA**
369:17 370:5,7,11
**BRCA1**
357:23
**break**
316:24 317:1,3
318:23 319:1
331:5 347:16
354:7,10 368:23
369:2 372:24
373:7,12
**breast**
307:9
**Breslow**
336:4
**bunch**
365:13
**Buz'Zard**
365:17 367:3

— C —

**C**
248:5 308:22,23
**CA125**
366:24
**Calcagnie**
247:13
**calculated**
256:7,17
**calculations**
255:21 256:20
257:2,10
**California**
245:15 246:9,11
247:17 248:9
253:1,12 376:2,23
**call**
258:20 282:25
361:13

**called**
254:14,16 270:8
**calling**
372:24
**Camargo**
324:20 326:23
327:9,14,23,25
329:18
**Canadian**
353:17
**cancer**
251:17 252:2
266:23 269:3,21
269:25 270:15
271:9 275:9,11,21
276:8 283:6,17,25
285:2,4,8,9,14
288:22 289:9,14
289:20,23 290:3,9
290:18 293:9
294:4,5,17,22
295:15 296:4,5,15
296:18 297:23
303:11,16,19
304:1,3,3,4,16,19
305:13,18 306:23
307:9,10,14 313:4
314:2 320:23
321:9,17 322:3,8
322:12,14 323:3,8
323:8,10,11,13,14
323:14,17,19,25
324:4 325:7,18
326:1,19 327:3
328:3 332:8 333:1
336:22,23 337:3,5
337:18,21,25
338:3,20,20,20
339:1,10,17,24
340:1,8,9,17,19
341:1,7 345:14,20
346:2,10,17
355:19 357:18,21
357:24 358:2,5,20
359:1 360:5,20
361:1 364:21,24
365:11 366:25

370:1
**cancerous**
345:12
**cancers**
289:12,15 304:10
307:9 324:8
328:12 329:12,24
338:24 339:8
340:5,17
**capacity**
265:6
**Carbon**
364:4
**carcinogen**
302:1
**carcinogenic**
289:23 292:10
293:14 315:6
322:25 323:2
**carcinogenicity**
352:17
**care**
250:2 303:12 348:1
348:4
**Carmen**
259:9,10
**CAROLINE**
250:16
**caroline.tinsley...**
250:21
**carriers**
369:17
**carryover**
311:11
**cartoons**
372:11
**case**
256:7,13 262:20
281:11 313:15,18
313:23 315:1,3,24
316:4 321:22
332:7 333:3,6
341:16,19 354:18
355:4,11 362:12
370:12 372:18
377:6
**case-control**

275:1,15,19 276:3
276:6,25 277:1,4
277:6,7,17 279:11
279:12,15 280:20
280:21 336:4,7
342:8 362:7
**cases**
281:3,5,25 324:4
325:23 326:6,13
344:14,17
**categories**
320:20
**catheterize**
371:5,7
**catheters**
363:15
**causal**
283:5,16,24 338:18
360:4
**causality**
355:18
**cause**
252:2 290:13 291:2
292:12,15 294:17
303:10,11 305:5
314:10 322:14
325:6 339:7
340:10 358:1,20
359:1 364:21
365:11
**caused**
289:16 328:12
329:12 358:12
**causes**
279:9 289:11 290:8
290:22 291:1
305:4 314:2
357:18 358:5,5
364:24 365:22
366:1
**causing**
345:14
**caveat**
281:2
**cell**
274:9 300:7,8,16
301:3,5,9,11,14

Rebecca Smith-Bindman, M.D.

301:17,18 302:5,9
302:14 303:7
358:14 365:6,6
366:12 367:10,24
**cells**
300:13,19 301:2,10
301:12,16,21
302:3 303:24,25
304:16,17,19,20
**cellular**
300:23 314:10
365:3,7 367:9,21
**Center**
247:23
**central**
263:14
**certain**
283:5,16,24 289:10
290:12 302:2
305:4 320:19
355:21
**Certified**
246:11 376:1
**certify**
376:3,18
**cervical**
274:11 287:18
288:17,22 339:17
339:24 341:1
371:4
**cervix**
371:14
**cetera**
338:20
**cgarber@robins...**
247:18
**challenge**
326:12
**chance**
279:8 304:3 360:18
361:9,13,16,17
**change**
267:25 315:1
**changed**
335:20
**changes**
302:2,7 365:2,7,19

366:19 367:7,8,10
368:3
**chapter**
298:9 336:9 359:15
**characteristics**
288:12
**charge**
261:19
**check**
260:12 268:13
**checked**
342:25 343:5
**chemical**
313:24
**chemicals**
320:17,21 321:4
330:15,22 338:25
340:11,13
**child**
372:11
**chlamydia**
306:24 307:3
**choose**
319:25 331:19
334:9
**chose**
268:7
**Chris**
319:8
**chronic**
289:11,18,19 290:1
291:4,13,23
292:15 294:16,21
295:13 364:23
**cigarette**
340:11,19
**circumstances**
357:25
**citations**
262:23
**cite**
263:10,22 264:11
276:13 287:4,9
294:8,13 302:17
302:24 304:5
345:16,23,24
**citing**

263:19
**City**
375:11
**clarify**
255:21 265:18
303:4
**clear**
308:11 368:12
373:16,21
**clearer**
339:16
**clearest**
335:22
**clearly**
267:25 278:19
367:1
**clinical**
313:9 333:16
363:13 366:23
**close**
268:21 272:19
356:9
**closely**
285:11
**closer**
287:19 311:6
**cohort**
262:20 263:3,7,13
263:14,23 264:4
264:12,24,24
265:5,8,10,15,16
265:19,23 266:2,8
266:16 267:7,8,21
268:9 269:10,11
271:1 274:17
275:15,21 282:8
321:22 342:8
343:9,17 360:6
**cohorts**
266:6
**coin**
360:24
**colleagues**
330:25
**collected**
267:14,18
**collection**

339:18
**colon**
338:20
**combination**
295:12
**combine**
284:4
**combining**
273:5,17 274:6
284:13
**come**
302:9 359:19
**comes**
368:9 371:12
**comfortable**
344:13 355:20
**comment**
369:8
**Commerce**
247:8
**commercial**
352:20
**common**
307:4 312:22,24
323:13,14 340:18
368:19
**communicate**
258:19,22
**communications**
258:15
**community**
362:8,14
**comparable**
281:25
**compare**
301:3
**compared**
330:18
**comparing**
281:9,16,20,24
301:9 326:7
**comparison**
301:14,19 311:10
329:14
**compelled**
373:23
**compelling**

323:17 360:4 367:5
367:12
**competitive**
372:12
**complete**
356:17
**completed**
312:17
**completely**
359:25
**completion**
376:14
**complicated**
278:22
**complications**
363:18
**components**
339:14
**computer**
332:18
**concentration**
287:17,23 288:4,12
302:25 330:21
**concentrations**
287:25 302:18
**concept**
272:15 335:3
**concepts**
263:21
**concern**
312:7 344:21 345:3
352:16
**concerns**
329:13
**conclude**
267:4 290:7 292:15
295:11 314:3
**concluded**
254:11 266:8
269:18,23 270:17
295:19 328:9,22
329:2,9 362:16
374:6
**concludes**
298:1,3
**concluding**
283:9

Rebecca Smith-Bindman, M.D.

**conclusion**
262:6 312:18
327:25 355:17
365:25 373:19
**conclusions**
297:23 325:11,12
326:4
**concurrently**
358:17
**condition**
290:2 291:24 373:7
**conditions**
289:9,19
**conduct**
318:2 333:16
**confer**
374:1,2
**confidence**
256:8 277:24 278:4
278:14 279:15,21
279:22,25 280:2
280:14 282:19,24
312:20 360:17
361:15
**confirm**
297:15 355:15
**confounders**
306:13
**confounding**
284:7,10,14,15
305:22 306:1,6,9
306:18
**confused**
330:3,3
**confuses**
306:2
**confusion**
299:8
**congress**
249:16 333:15
**connected**
363:21
**connections**
371:1
**consider**
271:14 278:15
290:21 291:7

310:3 334:25
**considerable**
338:12
**consideration**
334:22
**considered**
312:16 324:4
**consistency**
335:3 366:21
**consistent**
296:24 360:3
**consult**
373:11
**consultant**
354:19
**consulting**
373:12
**consumer**
353:16
**contacted**
333:3,5
**contain**
290:13 314:2,6,14
314:17,21
**contained**
256:14 257:10
311:25 320:5
322:6 375:9
**container**
322:22
**containing**
313:15,19,23
**contains**
315:6
**contamination**
314:24
**content**
333:7 352:20
**context**
301:10,12 311:2
**continued**
248:1 249:1 250:1
252:1
**contracted**
318:1
**contrast**
371:15

**contribute**
273:10
**contributes**
300:22
**contributing**
358:1
**control**
262:20 281:8
301:16 321:23
367:7
**controlled**
306:18 307:12
**controls**
281:3,5 282:1,2
301:1 311:12,13
311:16,17 344:17
**conversation**
254:24 255:17
258:17 298:23
**copies**
259:3
**copy**
261:12 262:3
317:21 319:13
**copying**
262:2
**cornstarch**
290:22,25 291:1,3
291:7,12,15,23
292:3,10 293:7,13
293:15,18
**Corporate**
247:16
**correct**
256:11 258:10
266:13,14,23
270:12,19,20,22
271:2,10 274:21
274:24 275:6,22
276:8 277:9
279:18 282:9
283:7 284:23
285:5 286:10,21
287:6,7 288:24
289:9 290:3,4
293:22 294:9,17
296:6 298:5

306:15 311:8
320:23 323:21,25
330:18,22 332:10
333:1,11,18,24
334:23 338:14,24
339:1,11 340:1
341:3,22 343:11
346:5,12 348:10
352:24 369:10,13
369:20,21 375:9
376:11,24
**corrected**
375:9
**corrections**
375:7
**correctly**
295:16 352:22
**correlation**
372:2
**correspond**
302:10
**correspondence**
332:17
**cosmetic**
302:20 352:19
**cost**
263:12
**Council**
250:2 348:2,4
**counsel**
253:19 254:5 259:2
260:17 261:15
262:15 298:7
316:5 331:9
347:20 351:4
354:14,23,23
355:3 360:12,23
369:6 372:21,24
373:4,9,17,24
**counseling**
293:10
**counted**
344:12
**couple**
309:18 324:15
368:24 371:13
372:20

**court**
245:2 253:15,22
256:23 299:2,15
299:17,18 304:18
308:5 319:24
366:10,15,17
367:19 373:15
**covariants**
308:15
**covariates**
307:25 308:17,17
308:19
**cover**
259:7
**CPFA**
348:5
**create**
371:9
**criteria**
311:22,24 334:21
334:24 356:20
357:8
**criticize**
273:4
**criticizing**
273:9
**cross**
360:18
**crude**
308:2
**CSR**
245:24 376:1
**Cummings**
335:21
**curious**
332:24
**currently**
265:20
**CV**
254:23 255:3
**CYNTHIA**
247:14

---

**D**

**D**
297:2,2 308:23,23
**D.C**

Rebecca Smith-Bindman, M.D.

250:7
**daily**
272:20
**damage**
302:4 303:25 305:9
    314:11
**Daniel**
247:21
**data**
267:14,17,24,25
    269:19 282:10,13
    282:20 295:18
    302:17,24 303:5
    304:13 314:3,13
    323:16 326:17
    335:4 338:9
    339:15,18 341:23
    343:8,10,16
    344:18,24 359:19
**date**
253:8
**dated**
376:24
**day**
331:24 336:4
    375:10 376:24
    377:23
**days**
373:6
**dead**
364:2,3
**deal**
281:1 353:20
**death**
365:6
**decades**
269:18
**decided**
353:5
**decision**
341:21,22 342:2,14
**decision-making**
342:7
**declare**
375:5 376:22
**declared**
376:6

**Defendant**
248:3,14 249:2,12
    250:2 348:1
**Defendants**
250:14 254:5 331:9
    347:20 369:6
    372:21
**defense**
315:18,20,24 316:4
    316:6 359:25
    373:5
**defer**
297:3
**define**
281:14 289:6
**defined**
263:6 264:6 272:13
    272:16 300:11
**definitely**
283:3 344:8
**definition**
268:4 272:3,8
    274:3 312:8
**definitive**
277:23 322:10
**degree**
371:18,20
**demonstrate**
272:10 278:11
    286:8,12
**demonstrates**
362:21
**demonstration**
286:13,16
**dependent**
313:15,18,23
**depends**
281:2,18
**deponent**
253:17
**deposition**
245:13 246:5
    253:10 254:10
    255:18 260:3,17
    262:6 300:17
    319:5 327:14
    348:3 373:6,19,20

373:24 374:3
    376:14
**depth**
265:6
**describe**
314:9 357:19
**described**
338:23 353:24
    372:2
**describing**
281:22 328:24
    329:8
**description**
251:11 344:5,8
**design**
263:21 265:11,19
    265:22,23 266:4
**designed**
369:15
**designs**
265:21 266:3 335:6
**despite**
265:14 328:10
    329:9
**destination**
287:1
**detail**
265:10,24 268:6
    344:6,8 356:14
    357:1
**details**
254:15
**detect**
263:24 264:12,13
    264:17,25
**detected**
318:15
**detecting**
273:18
**determination**
292:12
**determine**
287:25 337:2
    343:15 369:16
**determined**
341:21
**determining**

282:16 341:9
    342:19
**develop**
303:19 304:1,1
**development**
295:14 305:13
**diagnosis**
325:24
**diaphragm**
274:12
**diaphragms**
271:8
**difference**
280:9 308:2 309:3
    309:21 310:2,4,10
    310:14,23,23
    311:1,4 343:16
**differences**
310:6
**different**
256:4 272:2,22
    273:22,23 274:16
    280:1,13,15 288:7
    288:8 289:12
    301:12,17 302:1
    308:14 310:15
    321:7,21 324:21
    329:3 330:21
    338:24 344:7,8
    350:21 357:20
    361:12 366:6
    367:2 369:10
    371:2
**difficulties**
325:24
**direct**
367:23
**direction**
296:21 376:10
**directions**
363:24,25 364:2
**directly**
285:17 371:8
**disadvantages**
262:20
**disagree**
271:20

**disclosed**
360:1
**discount**
271:22
**discovered**
345:12
**discuss**
265:9 278:8 295:20
    305:20 313:1
    337:17 372:23
**discussed**
277:11 305:14
    306:22 311:15
**discussion**
257:18,22 258:13
    272:5 295:11
    297:14,19 328:6
    328:17 329:19
**discussions**
373:4
**disease**
275:6 305:16,17
    306:3
**diseases**
325:20 358:17
**distance**
287:24
**distinguishing**
325:25
**distort**
275:5,8 306:6
**distribution**
321:7
**District**
245:2,3 253:15,15
**divided**
321:25
**division**
300:14
**DNA**
365:7
**doctor**
293:10 298:25
    331:11 369:8
**document**
332:18 348:17,20
    348:23 349:20

Rebecca Smith-Bindman, M.D.

Page 384

350:6,21,23,25
351:3,6,9,11,18
351:20,20,25
352:4,8 353:8
**documentation**
357:3
**documented**
286:18 335:6 360:3
**documents**
257:3,8,11 349:10
350:9 354:2
365:16
**doing**
260:14 263:12
301:15 370:17
**dollars**
261:20
**dose**
304:8 367:6
**double**
358:10
**Dr**
254:9,16,19 255:1
255:11,17 256:6
257:18,22 258:13
258:16,19 261:7
264:10 295:18
298:13 299:11,22
300:1,4,12,18
301:21 315:8,21
319:5,7 342:3,6
342:13,18,25
343:5 347:22
354:16 360:1,10
365:21,25 368:12
372:23,24 373:6
373:14,17 374:2
**Drive**
247:16,23
**duly**
254:2
**duration**
271:11,18 272:2
**Dykema**
249:3

---

**E**

---

**E**
249:6 297:2 308:23
**e-mail**
254:22 258:20
**e-mails**
254:25 255:1 261:6
332:21
**earlier**
268:6 305:14
311:15 331:20
**earliest**
343:9
**early**
354:21
**easiest**
322:14
**easily**
266:1 357:14
**Edelman**
328:7 329:8,19,21
**editor**
261:13 319:13
**edits**
320:1
**effect**
368:3 369:9,16,24
**either**
330:20 358:8
361:21
**elevated**
346:9
**Ellis**
248:4 250:15
**emphasizes**
308:3
**employee**
376:20
**encountered**
302:19
**ended**
355:12
**endometrial**
297:22
**endometrium**
288:8
**engagement**
259:8,8

**enhance**
358:18
**enhanced**
338:9 358:13
**enhancing**
358:11
**enormous**
364:25 365:15
**entirely**
373:10
**entirety**
278:6 335:12
**entitled**
294:20
**environment**
304:22
**environmental**
302:1
**enzymes**
302:3
**Epi**
263:1
**epidemiologic**
314:4,12 315:4
**epidemiological**
306:7
**epidemiologist**
285:9
**epidemiologists**
263:10 336:16
**epidemiology**
334:2,12 335:14,17
335:19,22 353:14
**epithelial**
269:3,21 294:22
323:10
**equal**
296:8
**equated**
271:19
**equation**
343:21
**equivalent**
271:20 339:10
360:24 363:10
**equivocal**
297:21

**ERRATA**
377:1
**errors**
256:8 282:23 343:1
343:6
**essentially**
355:13 360:18
**established**
283:7,18 284:1
352:19 353:21
**estimate**
260:13 279:7,7
312:16 323:6,10
335:9 361:11,11
**estimates**
256:15,18 280:12
322:22 355:13
361:3,5
**estimating**
257:6 308:4,5
**et**
338:20
**ethical**
364:13
**etiology**
333:1 337:15,17
339:1
**evaluating**
333:23
**evaluation**
275:5
**evening**
258:17
**evidence**
266:22 267:2 286:2
286:6 289:1
290:15 294:14
314:4 315:4
318:21 330:16
362:24 363:6,12
364:22
**ex**
315:18
**exact**
302:9 308:18
**exactly**
255:24 256:3,12

278:18 292:19
293:1 339:6
355:19
**examination**
251:2 254:5 331:9
347:20 354:14
369:6 372:21
376:8
**examine**
284:22
**examined**
254:4 325:21
**example**
275:8 291:16 302:2
310:17 338:17,25
340:8
**examples**
339:7,15 340:9
**exams**
291:18
**exception**
343:9
**exclude**
279:8 341:10 342:9
344:21
**excluded**
343:8,17
**exclusion**
356:19
**excuse**
255:9 262:1 264:16
298:19 348:25
**EXECUTED**
375:10
**exhibit**
251:12,14,17,20,22
251:24 252:2,4
257:23 259:6,6,11
260:3,25 261:2,5
262:9,10 276:14
276:15 297:9,10
299:7 317:8,8,9
319:9,10 324:18
324:23 325:1,3
327:15,16 348:8
348:10 352:11
360:11

Rebecca Smith-Bindman, M.D.

**EXHIBITS**
252:1
**exists**
279:1 326:18
**expand**
266:5
**expect**
274:7,11 287:23
296:4,8 319:18
329:23 361:2
367:11
**expected**
288:14 350:6
**experience**
313:10
**experiment**
301:1,14 367:6,14
367:15,17,20
**expert**
288:10 289:1,6,6,6
298:13 299:23
315:11 316:4,6
322:17 348:10
349:9 352:10
354:19 360:1
373:11,12
**expertise**
285:5,17 333:4,8
334:17
**experts**
315:20
**explain**
275:18 326:5
**explained**
256:12 257:8
263:18 272:17
**explaining**
356:19,24
**explicit**
359:18
**exploration**
320:25
**exposed**
292:3 323:1 326:8
326:9,10 329:25
330:4
**exposure**

252:2,4 267:21
268:2,7 273:12
274:8,12,12,13
275:6,10 287:16
287:20 290:8,16
302:18,25 305:3
306:3 312:5,8,10
312:12,21,21,22
312:23 315:5
322:2 325:6,18
326:18 328:13
329:12 359:16
360:5 361:1
365:10 370:11
**exposures**
324:7 359:22 360:7
**express**
302:23
**expressed**
373:7
**expression**
301:2,6 302:2,4,8
365:6,8 367:4
**extended**
373:7
**extensive**
272:5 363:6
**external**
287:12 288:21
**externally**
293:20

_____
**F**
**F**
250:6 308:24
**facing**
366:17
**fact**
256:7 257:6 275:13
275:18 281:24
287:25 333:14
338:11 357:11
359:21 361:7,14
361:20 363:6
369:8,23
**factor**
287:24 288:11

**factors**
288:1 306:18,21
307:11 327:3
328:3 329:16
357:20,24 358:5
358:12,16 369:10
369:25 370:10
**failed**
376:16
**failure**
329:15
**fair**
289:2 332:9
**fall**
287:24
**fallopian**
287:6
**false**
364:10
**familiar**
280:16 294:19
295:22 305:21,25
336:3,12 369:23
**family**
321:3
**far**
259:20 287:17
371:14
**fashion**
371:11
**favor**
273:18
**FDA**
316:18,21 317:14
353:17
**February**
245:16 246:10
253:2,8
**feeling**
331:14
**feels**
371:12
**felt**
332:3 344:15
**female**
332:12 370:15
**fewer**

270:18 293:16
**fibers**
322:1 352:20
**fibrosis**
287:10 293:21
**fibrous**
314:7,15,23 358:25
359:20
**Figure**
256:15 276:22
277:5,19 278:11
279:13 360:14
361:3
**figures**
255:22,24 256:15
266:13
**file**
299:1,6
**final**
342:13 344:24
**financially**
376:18
**find**
263:18 270:13
271:3,6 281:4
318:21 329:23
332:22 335:16
336:6 338:2 354:2
354:3
**finding**
362:2
**fine**
349:25
**finish**
317:5
**finished**
258:23 305:1
**firm**
247:4 297:23
**first**
254:2 255:17 259:7
267:21 283:13
294:11 295:10
297:14,19 325:4
325:13 332:11
334:16,21,24
337:8 352:13,15

354:17 363:13
364:21 365:24
372:25
**five-page**
259:6
**flaws**
311:19
**Flom**
248:15
**Floor**
248:8 377:3
**Flower**
248:7
**fluid**
363:15,17,19
370:18 371:19
**fluoroscopy**
371:16
**FLW**
245:9
**focus**
263:5,14 264:5
265:24 362:1
**focused**
266:12 323:12
333:17
**focuses**
333:23
**focusing**
273:16 333:17
**follow-up**
267:7,11
**followed**
269:12
**following**
269:16 298:23
**follows**
254:4
**foregoing**
375:6 376:4,11,23
**forest**
361:2
**form**
256:16 266:24
267:16 270:5
271:17 272:11
273:2 274:25

Rebecca Smith-Bindman, M.D.

Page 386

277:10 279:3
280:23 283:2,8
284:11 285:6,15
286:11,22 287:8
287:21 288:23
289:3 290:14,24
291:14,25 292:17
294:10 296:7
300:24 301:24
303:3 304:7 307:2
310:5,12 313:20
314:19 315:2,23
316:3,6,13 320:13
320:24 321:11
322:4 323:5 324:5
326:3 330:2 332:5
333:12,25 336:8
336:18 337:7
338:5 339:2,12
340:2 341:11
343:2,13 344:4,19
345:18 348:25
349:1,11,22
350:14 351:13
356:1,6 357:6
358:3,21 359:3
366:2 368:7,17
370:2 372:5
**forms**
311:25
**formulate**
349:20 350:12
**formulating**
349:9 351:11,18
**forth**
266:12 311:22
376:5
**forwarded**
261:14
**FOSTER**
249:14
**found**
275:19 281:3
286:25 320:22
**foundation**
358:21 359:3
**four**

278:20
**fragrance**
313:24 320:17,21
330:15,21
**Francisco**
245:15 246:8 253:1
253:11
**free**
314:10
**frequency**
268:4 271:19,24
272:18 345:11
**frequent**
271:15 272:1
**Friday**
245:16
**front**
262:8,12 266:25
327:9,19 349:15
350:17
**full**
331:16,20 376:11
**fully**
356:20
**further**
254:10 269:5 328:1
330:24 339:16
345:7,13 368:21
373:10 376:18

**G**

**gain**
306:25 307:7,16
**gaps**
311:19
**GARBER**
247:14
**gastric**
338:20
**Gates**
267:8 268:9,11,25
268:25 269:1,11
269:18,23 271:23
282:8
**gene**
300:19 302:8
304:15

**general**
259:8 262:19,24
263:20 266:2,11
275:1 280:25
281:4 308:2,13
346:14
**generally**
257:19 273:6
307:12 316:7
321:12,14 350:9
368:5,14 370:12
**generated**
259:20 315:16
**generic**
304:21
**genes**
302:5 367:4
**genetic**
304:20
**genital**
287:12 288:16,21
330:17 363:1
**Gertig**
265:16 266:8,16,18
266:21 267:8,11
268:25 269:10
**getting**
276:11 304:23
330:4
**give**
272:5 321:15
327:11
**given**
284:25 306:19
333:21 334:1
339:7,15 376:13
**gloves**
291:17 364:6
**go**
260:12 262:14
265:6 282:12
284:12 294:13
295:7 317:25
324:8 331:1
332:20 340:3
347:1,10,12
348:16 352:10

363:25 365:19
368:17
**goes**
280:4 363:16,23
366:25 370:19
**Goff**
245:23 246:11
253:23 376:1
**going**
259:5 260:11 262:2
297:3 317:2
333:20 338:12
340:3,23 342:20
342:21 345:9
347:15 349:16
351:20 364:2
373:2
**Goldman**
247:20
**Golkow**
253:7 377:2
**Gonzalez**
271:22 273:4,5
**good**
254:7,8 262:5
265:23 292:23
316:25 317:3,4
331:11,15 347:22
347:24
**Gordon**
249:13
**gram**
322:20,20
**granulomas**
287:10 293:21
**graphics**
356:18
**Graves**
250:24 253:6
**great**
276:24 281:1
353:20
**greater**
275:14 287:17
304:2,3 305:21
312:19 330:8,11
345:11 361:21,22

365:8 372:16
**group**
278:5 301:16,19
362:9
**grouped**
321:5
**guess**
273:20 310:8 334:8
372:17
**guidelines**
352:18 353:2,4,24
353:25
**gynecology**
334:6,13,19

**H**

**half**
331:24 353:13
361:3,4,17,18
**halfway**
352:14
**Hall**
254:16,19 255:1,11
255:17 257:18,22
258:13,16,19
261:1,7 342:3,6
342:13,18,25
343:5 372:24
**HALPERIN**
248:16
**Hamilton**
365:17
**hand**
259:5 268:15 317:7
324:13 353:18
**handed**
319:8
**happen**
348:20
**happens**
300:15 368:9
**happy**
332:22
**hard**
266:5
**harm**
293:17

**Harper**
298:10
**head**
371:22
**health**
266:18 267:15,18
268:20 269:6,9
270:8 334:14
343:10
**healthy**
281:16,20
**held**
253:10
**Heller**
345:19,22
**help**
319:22,24 368:2
**helpful**
355:15
**Henderson**
345:20,20
**hereto**
375:8
**hesitant**
277:23
**hesitation**
273:9
**heterogeneity**
284:18
**high**
282:16
**higher**
304:16 329:23
330:17
**highlight**
334:16
**highlights**
334:10
**highly**
361:9,9,9 368:6
**Hill**
323:23 334:21
335:3
**hips**
371:22
**hired**
332:7

**historical**
339:18
**history**
306:24,25
**holly**
335:20
**hope**
331:12
**hospital**
281:20 311:13
362:8,13
**hospital-based**
276:2,6,25 277:4,6
277:7,12,15
279:12,15,23
280:5,19,25 281:6
281:8 282:1
311:17 362:1,5,10
**hospitalized**
281:9,9
**Houghton**
270:3,7,13 271:1
271:11,22
**hour**
261:18,21
**hours**
259:24 260:8,13,23
331:19
**HPV**
339:17,24 341:1
**human**
286:7
**humans**
367:14,16,18,21
**Huncharek**
308:25 312:4
**hundred**
261:20 268:10
269:16,17
**hypothetically**
357:22
**hysterectomy**
346:3,11,17
**hysterosonogram**
370:21

———— **I** ————

**IARC**
321:19 324:6
358:22 359:16
**idea**
353:4 364:8 370:10
**identical**
356:8
**identification**
259:11 261:2
276:15 297:10
317:9 319:10
324:23 327:16
**identified**
277:5 321:6 339:21
351:5 367:9
**identify**
253:19 311:19
333:22 334:2
335:16 338:21,25
**II**
245:17 246:2 251:4
253:18 254:1
319:6 375:15
377:21
**ill**
281:16
**imagine**
358:6
**imaging**
333:18,24
**Imerys**
249:2,12 331:13
**immortalized**
300:6
**impact**
288:14 358:15
**importance**
308:3
**important**
263:7 282:17,20
312:3,9,24 332:22
**impossible**
306:17
**impressed**
366:21
**inability**
327:2 328:2

**inappropriate**
329:14 373:11
**incidence**
296:15 346:2
**include**
265:15 266:10
268:9 270:3 282:7
337:21 341:10,23
342:9 343:23
344:10
**included**
294:24 296:25
307:24 308:14,22
312:11 324:20
342:13,21 343:16
**including**
321:22 344:16
**inclusion**
311:23 356:19
357:8
**incomplete**
266:23
**inconsistency**
279:13,20
**increase**
273:12 290:2 293:9
303:23 340:7,7
365:4,5
**increased**
360:20 362:3
**increases**
305:15
**independent**
317:16
**INDEX**
251:1
**indicate**
303:19 305:12
**indicated**
298:7
**indistinguishable**
280:2
**individual**
277:12,20 278:21
279:4,14 282:13
311:21 340:5
344:25 361:14

362:9 364:11
**individually**
278:9
**inducing**
304:4
**industry**
352:19 353:5,21
**infection**
306:25 307:3,4
363:23
**infer**
328:12 329:11
**inflammation**
288:16 289:1,5,11
289:13,16,18
290:2,13,23 291:1
291:2,5,12,16
292:12,16 293:20
294:4,16,21
295:13 296:1,3,9
305:14 336:22
337:12,14 338:3
338:19 339:8
340:10 364:20,21
364:23,24 365:2
365:20,23 366:1,7
366:22 367:11
**inflammatory**
289:9,19 291:4,19
291:24 305:16,17
338:22 365:7,18
**influence**
251:20 296:9
**influenced**
275:25
**information**
265:13 266:9,10
300:3 312:15
328:11 329:11
345:17 354:24
**infrequently**
370:25
**inhalation**
358:23 359:10,13
359:17,23
**inhaled**
358:19 359:1

Rebecca Smith-Bindman, M.D.

**initial**
287:19 358:10
**initialed**
375:7
**initiation**
294:3 336:21 337:3
**Initiative**
270:9
**initiator**
338:3
**inject**
363:19 371:10,17
**injecting**
363:15 371:14
**injury**
331:22
**ink**
375:7
**instance**
303:15
**Institute**
334:14
**institution**
368:10
**instruct**
373:3
**insufficient**
328:11 329:11
**intended**
260:21
**intent**
356:11
**interest**
307:8
**interested**
376:19
**interesting**
273:15
**interpret**
280:7
**interval**
277:24 278:4,14
   279:22 280:2
   361:15
**intervals**
256:8 279:16,22,25
   280:14 282:19,24

**intervention**
301:15
**interview**
334:3,9
**interviews**
333:21 334:1
**introduce**
334:5
**introduced**
331:11
**introduction**
294:12
**invasive**
323:14
**invoice**
251:12,14,24
   259:15 260:19,20
   261:14,16 319:8
   319:12
**invoices**
259:4,20 260:3,7
   261:1,7,9,12
   319:15
**involved**
270:11 285:11
   305:13 306:22
   342:14,16,19,20
**involving**
268:20
**issue**
325:21 338:2,10
   373:15
**items**
351:24

─────── **J** ───────

**J**
245:23 246:10
   376:1
**J&J**
360:12
**James**
250:4 347:6,25
**Jane**
249:4 256:6 261:1
   299:4 331:12
360:17

**jbillingskang@se...**
250:8
**jbockus@dykem...**
249:9
**JD**
247:6
**JENNIFER**
249:14
**Jersey**
245:3 247:25
   253:16
**jfoster@gordonr...**
249:19
**Johnson**
245:6,6 246:7,7
   248:3,3,14,14
   253:12,13 366:3,5
**Johnson's**
366:1
**jot**
255:19
**journal**
282:21
**July**
332:18
**June**
259:14 332:20
   354:22

─────── **K** ───────

**keep**
300:14 371:9
**kind**
281:22 289:12
   310:18 321:4
   365:2 367:13
   371:9
**kinds**
321:7
**knew**
333:6
**know**
266:9 286:2,5,17
   286:23 288:19
   289:8 290:6,15,19
   292:9,20 293:3,3
   293:25 298:13,15

299:22 303:4,14
303:16,16 307:9
310:9 312:22
314:5 315:16,18
315:20,25 317:18
320:25 321:7,19
321:24 322:13,24
327:24 329:20
330:9,14,19
335:23 336:9
339:7 340:4,6,16
340:22 341:4,7
344:14 345:16
348:13,20 349:3
351:23 352:11
354:21 357:13
359:15 363:23
364:4,11,14
365:21 367:25,25
369:22 370:4,13
372:1,6,8,13
**knowledge**
262:25 275:24
320:22 321:24
322:5 330:20
**knowledgeable**
285:7
**known**
263:12 306:17
329:16 352:17

─────── **L** ───────

**L**
247:14
**laboratory**
314:8 317:17 318:3
**lack**
265:9
**Langseth**
276:12,22 277:5,19
278:10 279:13
360:11 361:24
362:17
**Lanham**
318:2
**Lapinski**
247:21 262:15

**large**
263:13 268:13
   308:1 322:24
**largely**
360:5
**Law**
247:4,7,15,22
   248:6,17 249:5,15
   250:5,17
**laws**
376:23
**lawyers**
332:17
**lead**
289:9,13,19 302:15
   365:19
**leading**
291:16 293:20
   294:4 336:22
**leads**
290:18 303:15
   305:16,18 365:8
**leave**
331:20
**led**
291:18 333:8 357:9
**Lee**
334:14
**left**
320:3
**legitimacy**
336:2
**legitimately**
335:6
**LEIGH**
247:5
**leigh.odell@beas...**
247:10
**length**
305:21
**let's**
276:14 318:22
   368:23 371:10
**letter**
251:12 259:7,9
**level**
292:20 302:25

Case 3:16-md-02738-MAS-RLS   Document 9889-4   Filed 05/29/19   Page 301 of 355 PageID: 66524
Rebecca Smith-Bindman, M.D.

Page 389

344:23 365:3,8
**levels**
301:6 303:13
330:16
**Levin**
246:7
**LHG**
245:9
**Liability**
245:7 253:14
**Liberty**
377:3
**ligation**
346:3,12,20
**limit**
305:9 352:20
**limitation**
263:7 264:5 265:14
265:15 307:24
328:1
**limited**
323:12 325:21
**line**
274:9 301:9,12,14
301:17 367:10
377:7
**lines**
300:7,8,16 309:18
**link**
283:5,17,25 288:20
**linking**
338:19,19 339:10
**list**
276:23 297:1,8
338:24 348:9,9,13
351:1,5,9,15
365:12
**listed**
350:25
**lists**
350:21
**literally**
363:20
**literature**
263:22 264:11
289:5,10 290:17
291:15,17,22

292:9 293:19
296:12,24 306:24
323:24 330:19
332:25 337:1,6,8
337:10,14,21
339:10,13 355:25
356:4 365:1
**litigation**
245:8 253:7,14
259:21 298:14
299:24 315:10,14
315:21 316:7
354:25 377:2,6
**little**
278:22 280:12
331:20 335:2
339:15 355:20
361:22
**living**
301:10,12,18 364:2
**LLC**
250:14,14
**LLP**
246:7 248:4,15
249:13 250:3,15
**locate**
332:15
**long**
255:10
**longer**
267:11 339:18
**Longo**
315:8 322:18
**Longo's**
315:21
**look**
261:4 269:5 276:10
276:21 277:19
278:8 282:21
283:13 302:2
312:25 325:11
327:23 332:21
345:23 346:9
362:4,6 370:3,22
**looked**
276:2 278:7 279:10
287:4 300:6 312:5

314:13 315:7
323:20 326:23
332:7 335:24
341:20 354:1
366:3,6,8,12,13
369:24 370:5
**looking**
266:15 268:19,24
269:4 274:1
309:13,18 312:20
325:15 334:4
336:10 345:5
351:3 371:1,15
**looks**
258:1 259:8 323:18
**Los**
248:9
**loss**
300:22
**lost**
264:1 328:16
**lot**
288:1 289:4,10,12
334:1 351:21
353:3,20 363:14
**lots**
358:12
**Louis**
250:20
**love**
317:1,3
**lower**
296:5 371:22
**lungs**
330:12

---

**M**

**M**
247:6 250:16
**M.D**
245:14 246:6 251:3
254:1 375:4,14
377:21
**magnitude**
310:22
**major**
295:14 325:22

**male**
332:12
**manuscript**
256:1 298:22 299:6
**MARGARET**
247:6
**mark**
262:5 276:14 295:5
297:9 324:18
327:14
**marked**
257:23 259:5,11
261:2 262:9
276:15 297:10
299:1,7 317:9
319:9,10 324:23
327:16 360:11
**markers**
366:21,23
**Market**
377:3
**Marketing**
245:7 253:13
**Mary**
245:23 246:10
253:23 376:1
**Maryland**
318:2
**material**
364:6,6
**materials**
260:16 294:24
298:8 353:23
**math**
260:12 341:13
**mathematical**
343:5
**matter**
253:12 258:24
260:14 274:9
286:8,25 331:13
**matters**
281:6
**MD**
247:6
**MDL**
245:8 259:21

**Meagher**
248:15
**mean**
256:6,18 273:14
278:25 284:13
286:12 298:22,24
298:25 302:6
305:5 307:23
308:8,11 310:16
326:11 337:14
348:4 353:1
356:15 361:15,17
370:13
**meaning**
265:10 271:24
308:17
**meaningful**
254:24 312:10
335:8,13
**meaningfully**
256:3 335:5
**means**
279:5 310:15 326:6
371:17
**meant**
308:7 367:22
370:12
**measure**
265:4 272:2 296:9
312:10 343:19
**measures**
366:6
**mechanism**
267:2,4 285:8
294:2 296:3 305:8
336:21 337:3,12
337:17
**mechanisms**
285:2,4 302:11
365:19
**mechanistically**
368:3
**Media**
319:4
**medical**
333:18,24
**medicines**

295:25
**meeting**
260:17
**meetings**
354:22
**Melissa**
294:20
**member**
304:10 334:13
**memory**
349:19
**men**
326:7,9
**menstruation**
363:24,25
**mentioned**
259:22 303:21
   307:5 356:10
   359:13 366:7
**Merritt**
294:20 295:7,18
**mesothelioma**
326:1 329:25 330:5
   330:8
**message**
296:24
**met**
332:19 354:22
**meta**
329:3
**Meta-analyses**
284:3
**meta-analysis**
254:15 255:20
   274:3 284:8,17,21
   323:9,18 328:25
   355:7 356:3,7,11
**metals**
313:19 320:12,15
   330:17
**method**
318:20 341:16,18
**methodology**
284:22 301:20
   341:9,14 357:2
**mic**
347:13 366:18

**MICHAEL**
248:5
**michael.zellers@...**
248:10
**microphone**
331:2
**middle**
263:2 264:3 338:17
   345:6
**migrate**
287:5 362:25
**migrates**
287:15
**migrating**
362:22
**migration**
285:23,24 286:8
   362:19
**Mike**
262:1 264:1 298:19
   332:19
**millions**
322:23
**mind**
317:2 370:4
**mine**
269:2 344:21
   355:19
**mineral**
321:25
**minimum**
290:19
**minor**
311:4
**minute**
331:2
**minutes**
255:12 317:2
   368:24 374:4
**misclassification**
329:14
**Missouri**
250:20
**misspoke**
346:23
**mixed**
296:13

**mobile**
364:3
**model**
367:10 368:2,5,13
   368:19
**modified**
300:13
**moment**
364:20
**momentarily**
262:4
**Montgomery**
246:8 247:9 253:11
**month**
271:25
**months**
371:13
**morning**
254:7,8,12 258:24
   331:11 347:22
   373:20 374:3
**mortality**
297:22
**motion**
374:5
**move**
319:21 326:14
   331:2 347:12
   364:5,6 373:13
**moved**
286:24
**movement**
286:19
**MPAff**
247:6
**mucosa**
288:2,6,8
**mucosal**
288:13
**mucous**
288:2
**multiple**
344:12,17,24
   357:18 358:4,16
**mutation**
357:23 369:17
**mutations**

304:1,16,20,21,23
   366:13

———————
**N**

**N**
366:16
**name**
253:6 332:15
   347:25
**named**
325:4
**napkins**
271:8
**narrow**
274:3 363:3
**narrowly**
263:6 264:6
**national**
269:9
**nearly**
268:6 356:8
**necessarily**
274:11 335:8 344:7
**necessary**
290:16
**need**
268:13 275:24
   316:24 324:13
   327:6 347:12
**needing**
370:24
**needs**
344:6
**negative**
292:5
**Ness**
365:14
**never**
307:17
**new**
245:3 247:25
   248:19,19 253:16
   306:21 307:6
   333:10 359:10,25
**Newport**
247:17
**news**

353:15
**nice**
367:15
**night**
373:18
**nine**
270:18
**non**
304:19
**nonaspirin**
251:20
**noncancer**
304:17,18,20
**nonoccupational**
327:2 328:2
**nonresponsive**
298:18 326:15
   340:24
**nonsteroidal**
295:22
**nonusers**
330:18
**normal**
301:21 303:7
   345:13
**Notary**
377:25
**noted**
374:9 375:7
**notes**
255:13,16,20
   257:17,21,23
   258:1,12 376:12
**November**
259:15 260:2
**NSAID**
251:20 297:21
**NSAIDS**
294:21 295:22
   296:4,10,14
**number**
251:11 262:19
   276:24 292:6
   304:15 310:18,19
   310:20 321:21
   322:24 324:4,8,9
   325:23 326:6,7,13

Rebecca Smith-Bindman, M.D.

335:11 340:22
343:22 350:7,17
355:6 357:17,20
360:16
**numbers**
255:22,24 256:7,10
256:12,14,17
257:13 268:14
304:10 341:8
343:15 365:15
**Nurses'**
266:18 267:15,18
268:20 269:6
343:10
**NW**
250:6

**O**

**O**
297:2,2
**O'Dell**
247:5 251:7 255:6
255:9 256:16
259:3 260:19,22
262:1 263:25
264:7,16,21
266:24 267:16
270:5 271:17
272:11 273:2
274:25 276:20
277:10 279:3
280:23 283:2,8
284:11 285:6,15
286:11,22 287:8
287:21 288:23
289:3 290:14,24
291:14,25 292:17
292:21,23,25
293:23 294:10
296:7 298:19,21
299:5 300:24
301:24 303:3
304:7 307:2 309:6
309:11,15 310:5
310:12 313:20
314:19 315:2,23
316:3,13,24 317:4

317:21,24 320:13
320:24 321:11
322:4 323:5 324:5
326:3 327:5,21
330:2 332:5
333:12,25 336:8
336:18 337:7
338:5 339:2,12
340:2 343:2,13
344:4,19 345:18
347:1,6,9 348:25
349:4,7,11,13,15
349:21,24 350:2,5
350:11,14,17,20
351:13 354:6,15
356:2,10 357:16
358:19,25 359:5
359:13 360:9
368:4,11,21 370:2
372:5 373:2,16
**object**
256:16 266:24
267:16 270:5
271:17 272:11
273:2 274:25
277:10 279:3
280:23 283:2,8
284:11 285:6,15
286:11,22 287:8
287:21 288:23
289:3 290:14,24
291:14,25 292:17
294:10 296:7
298:18 300:24
301:24 303:3
304:7 307:2 310:5
310:12 313:20
314:19 315:2,23
316:3,5,13 320:13
320:24 321:11
322:4 323:5 324:5
326:3 330:2 332:5
333:12,25 336:8
336:18 337:7
338:5 339:2,12
340:2,23 343:2,13
344:4,19 348:25

349:1,11,22
350:14 351:13
359:24 370:2
372:5
**objected**
299:2
**objection**
293:23 345:18
350:11 356:1
357:6 358:3,21
359:3 366:2 368:7
368:16
**objections**
359:7 376:8
**observational**
306:10,14
**obstetrics**
334:6,13,18
**Occasionally**
363:18
**occupational**
252:4 324:7 326:18
328:13 329:12
359:16 360:7
**occur**
358:17 365:10
**occurred**
303:1
**odd**
279:23 280:10
**odds**
279:20 280:3
282:18,24 309:24
310:3,10,14,17,23
310:24 311:5,6,7
361:25
**Oh**
317:22 341:14
347:6
**okay**
253:22 258:6
264:21 268:19
271:2 277:17
283:21 295:2
297:5,18 298:4
299:16 305:3
308:10 309:15

325:3 328:17
330:24 332:1,6,14
333:9,14 341:18
342:6,24 348:6
351:8,16 352:9
354:4 355:6
357:16 360:9
361:23 362:18
364:25 368:20
370:14
**older**
332:21
**omitted**
283:23
**once**
271:25,25
**ones**
255:25 256:5
273:16 312:12
356:8
**ongoing**
294:17
**oophorectomy**
346:18,22
**open**
363:10
**opinion**
285:18 292:11
321:1 333:22
349:9,20 350:13
351:11,14,18
359:12,25 362:25
364:23
**opinions**
284:25 285:1
313:14,18,22
315:1 321:16
355:10 359:9,10
**oppose**
374:5
**opposed**
267:21 268:4
274:18 275:15
353:7
**order**
301:4 333:11
**organizations**

353:16
**organs**
301:22
**outpatient**
281:21
**outside**
286:9,20
**ovarian**
251:17 252:2
266:23 269:3,21
269:25 270:15
271:9 275:9,11,21
276:8 283:6,17,25
285:13 290:3,9
294:3,17,22
295:14 296:3,5,15
296:18 297:22
304:3 305:13,18
306:23 307:10,13
313:4 314:2
320:23 321:9,17
322:3,12 323:3,7
323:8,10,11,17,24
324:3 325:6,18
326:1,19 327:3
328:3,12 329:11
332:8 333:1
336:22 337:3,18
337:25 338:3
339:10 340:1
345:12,13 346:2
346:10,17 355:18
357:18,21,24
358:20 359:1
360:5,20 361:1
364:21,24 365:11
366:25 370:1
**ovaries**
285:20 286:9,19,21
287:6,16 363:21
370:19 372:10,15
**ovary**
288:8 362:23 363:2
363:8,8,11
**overall**
323:18
**overlap**

Rebecca Smith-Bindman, M.D.

277:13,13,14,16
278:4 279:16
280:6,14 344:11
344:22 345:1
361:15 366:23
**overlapping**
278:15
**overlaps**
279:22 335:2
**oxidants**
301:6 302:7 366:11
**oxidation**
365:4
**oxidative**
303:10,13,13,15,18
304:2,22 305:4,5
305:9,12,15,16
358:13,14 366:8
**oxygen**
303:7

**P**

**P**
247:5 366:16
**P.A**
247:20
**p.m**
246:10 354:11,12
368:25 369:2,3,4
374:7,9
**P53**
300:19,22
**page**
251:11 252:1
257:23,25 259:7
262:14,15,16,18
263:3 264:4
268:19 273:7
275:13 276:22
283:13 290:7
294:1,25 295:7
297:14,19 307:21
308:25 309:9,10
309:12,19 311:11
312:25 318:1,5,6
318:7 325:13
327:24 328:5,6

336:20 345:5,6
348:12 351:5
352:11 360:2,13
377:7
**pages**
257:24
**paid**
298:13 299:23
315:10 355:2
**paper**
276:12,22 284:14
286:4 294:19
295:8 297:1,9
298:12 307:16
324:17 325:8
326:23 327:9
356:18,23 360:11
360:14 361:24
362:4
**papers**
284:12 292:1
296:19,25 353:13
353:14 370:3,5
**paragraph**
263:3 264:1,3
283:14 294:11
295:11 297:14
318:1,8 327:25
328:6,19 338:16
345:7,10,24
352:14,15
**paragraphs**
294:14
**part**
255:6 270:23 303:7
356:22 359:11
363:9
**participate**
342:6
**particles**
286:4 322:19,23
345:8,12,14 363:7
364:4
**particular**
263:25 289:11
308:4,6 313:24
335:9,11,25

341:16,19,23
353:11,12
**particulate**
286:8,20,25
**parties**
373:25 376:20,21
**partly**
342:11,11
**parts**
302:14
**patency**
370:23
**path**
339:17
**pathways**
338:18 365:9,10,18
**patient**
302:10 335:7
357:22,23 367:25
**patient's**
371:21
**patients**
281:9,10,19,21
293:11 297:23
313:10 344:11,12
345:1 358:4
363:18 370:25
**PCPC**
250:2 348:5,17
**PCPC-produced**
349:10,20 350:9
**Pecan**
249:6
**peer**
282:21 341:11,15
341:18 344:3,7
**pelvic**
294:21 305:15,17
**pen**
258:2
**penalty**
375:5 376:6,22
**Penninkilampi**
282:3,4,7,11 283:4
283:22
**Pennsylvania**
377:4

**people**
281:16,17 314:8
355:22
**percent**
340:6,7 344:15
348:16 371:3,4
**percentage**
372:9,16
**percentagewise**
372:12
**perfectly**
374:4
**performed**
355:8,11
**peri**
286:9
**perineal**
251:17 266:17
270:14,19,22
271:5 273:12
283:15 285:13,19
287:5,16 302:20
303:1 330:7,10
372:3
**perineum**
286:21 362:22
363:5,7,9,20
364:12,17 370:18
371:8 372:7
**period**
339:18
**peritoneal**
325:25
**peritoneum**
286:9
**perjury**
375:5 376:7,22
**person**
332:11,23 333:3,5
**person's**
332:15
**Personal**
250:2 348:1,4
**personally**
307:10
**perspective**
314:12

**pertained**
366:4
**Ph.D**
253:18 319:5
**Philadelphia**
377:4
**Philip**
334:13
**phone**
258:16,20
**phonetic**
365:14
**physical**
288:13 291:18
**physician**
285:8
**physiology**
303:8
**PID**
307:4,15
**piece**
312:15
**pieces**
333:22
**place**
255:15 269:4
371:10 376:5
**placed**
372:9
**places**
274:15
**plagued**
275:2
**plaintiffs**
247:3,12,19 259:3
260:18 298:7,14
299:23 354:14
**Plaintiffs'**
354:23,23 355:2
372:24 373:9
**plausibility**
285:12
**play**
295:14
**Plaza**
247:16 377:3
**please**

253:19 256:24
262:14 299:19,21
316:5 324:16
327:13 347:7
**plot**
361:2
**plug**
343:21
**point**
263:11 279:6,7
280:12 291:11
297:24 310:25
335:9 344:2 361:3
361:5,11 362:12
366:13
**pointed**
272:4 308:12
**points**
312:3 327:1
**Policies**
334:14
**pooled**
279:20,23 280:3,10
361:25 362:4
**pooling**
274:4 344:24
**population**
275:25 276:23
278:6,7 281:15,21
311:12 346:15
**population-based**
276:3,24 277:17
278:9 279:11,17
279:18,21 280:3
280:21 281:5,25
311:16
**populations**
280:10 329:15
335:7
**position**
304:12
**positive**
278:3 311:3 328:10
329:10 361:18
**possibility**
276:1
**possible**

272:20 274:4 279:9
283:3 306:10,13
**possibly**
306:22 357:23
**postop**
313:10 370:25
371:2
**potential**
274:8,8 293:14
324:3 360:19
**potentially**
281:1
**powder**
245:7 253:13
259:21 268:3
269:20,24 271:8
271:15 274:8
275:21 285:13,19
285:23 286:18
287:5,15 290:8,12
290:22,25 291:1,8
292:4,11,13 293:4
293:8 294:20
307:13 313:11,15
313:19,23 314:1
314:17,20,25
315:5 316:7,19
318:15,19,19
320:5,7,10,12,18
321:2,6 322:6,11
322:16,20 323:7
323:20,22 330:22
339:11 340:1
343:19 346:6,10
346:16 352:16
354:25 355:9,18
357:25 358:1
360:21 361:1
362:25 365:22
366:1,4,5,20
367:8 369:18
372:3,7 377:6
**power**
323:15
**powerful**
266:3
**practical**

344:23
**Practices**
245:7 253:14
**preclude**
297:23
**predecessors**
348:5
**predicter**
265:12
**preferable**
293:18
**preop**
371:2
**preparation**
373:8,18
**preparations**
352:21
**prepare**
254:10,10
**preparing**
260:16
**presence**
303:18 306:1
**present**
268:8 306:14 334:9
352:16
**presentation**
356:17
**presented**
255:5 277:25
334:15 355:22
**presenter**
334:16
**pressure**
371:18,20
**pretty**
371:13
**prevented**
358:14
**previous**
295:12 356:8
**primarily**
312:11 314:13
331:18 333:23
358:23 359:23
**primary**
271:21 312:7

370:20
**principles**
335:21
**prior**
374:3
**pro**
302:7 303:13,15
365:4 366:11
**probability**
303:22,23
**probably**
258:10 263:17
322:7,8 332:16
371:12
**problem**
265:11
**procedure**
313:13 370:17
**procedures**
363:14 370:20,25
**proceedings**
376:4
**process**
282:22 291:4,5
342:7,19
**processes**
291:20
**produced**
254:25 255:2
**product**
257:2 269:24
290:13,22 291:10
292:14,15 293:4
293:14 314:5,5
346:7
**production**
255:7
**products**
245:7,7 250:2
253:13,14 268:3
290:8 292:4,11
293:8 313:11
314:9,10,14,17,21
314:25 315:5
320:7,10,12,18
321:2,6 322:6,11
322:16,21 323:7

323:22 343:20
346:10,16 348:2,4
352:17 355:18
357:25 358:1
361:2 367:8
**professor**
334:2,6,11
**program**
257:5
**progression**
294:3 336:21
**proliferation**
300:23 301:5 302:5
366:13
**promotion**
294:3 336:21
**proper**
284:17,21
**proportion**
292:3
**proposition**
294:9
**prospective**
274:17,20
**protective**
305:8 361:16
**protein**
300:22
**protocol**
373:24
**prove**
292:7
**provide**
262:3 354:24
**provided**
259:3 260:25
319:13 357:3
**provides**
301:18 357:12
**proximity**
287:22 288:11
**psoriasis**
290:5
**psychometrically**
272:9
**PTI**
250:14,14

Rebecca Smith-Bindman, M.D.

**Public**
377:25
**publication**
257:14 353:22
**publications**
289:12 299:10
305:11 320:1
**publish**
319:21,25 356:11
356:25
**published**
255:25 263:22
264:11 284:4
290:17 294:19
298:5 306:23
307:13 310:23
315:15 332:25
355:24 356:4,13
356:20
**publishing**
334:9
**purpose**
315:14
**purposes**
348:3 349:8
**put**
276:19 349:13,15
352:9 360:23
364:12 367:24,24
371:7,8
**putting**
274:10 350:15
363:15 370:18,21
371:18 373:25

—— **Q** ——

**quality**
282:17
**quantifiable**
335:13
**quantification**
302:10 312:12
**quantified**
296:21
**quantifies**
290:16
**quantify**

267:20 322:15
323:16
**quantifying**
312:6
**quantitative**
336:1
**quantity**
302:15
**question**
259:17,19 263:6
264:6,8,20 265:10
273:11,22,23
274:16 282:25
284:17 291:21
293:2,17 299:19
299:22 301:9
302:13 304:14
305:19 310:13
316:8,12 321:9
332:2 333:11
335:10,25 336:10
338:4 339:22
340:25 342:15
346:7 349:7,16
362:20 363:3
368:13 370:4
**questions**
266:1,5 273:14,15
324:15 330:25,25
331:23 346:25
347:5 354:17
355:7 360:16
361:23,25 373:3
**quick**
280:8
**quick-and-dirty**
278:16
**quite**
256:2 304:14 324:7
358:6 366:20
**quoting**
264:17 268:20
329:19

—— **R** ——

**R**
247:21 250:4 297:2

334:14
**race**
372:12
**radiation**
302:1,3 370:11
**radioactive**
364:5
**radiologist**
333:16,23 363:13
**radiology**
334:12
**raise**
256:23
**range**
280:5 307:8 311:5
**rarely**
263:5 264:5
**rates**
329:23
**ratio**
279:20,23 280:3,10
310:10,17 311:5,6
311:7 362:1
**ratios**
282:18,24 309:24
310:3,24
**re-ask**
299:20
**reach**
319:22 333:8
**reached**
355:10
**reactive**
303:7
**read**
266:6 295:16
297:16 352:22
353:3,13,19,22
360:2 375:5
**reading**
263:25 264:18,19
289:4 300:21
329:18 339:4,5
**ready**
344:2
**real**
263:24 264:13,13

264:17,25
**really**
308:12,13 332:7
365:15 366:20
**reason**
263:24 264:14,18
268:5 271:21
300:25 371:6
372:14
**reasons**
325:22
**Rebecca**
245:14 246:5 251:3
253:17 254:1
319:5 375:4,14
377:21
**recall**
273:6 274:21 275:4
275:8,18,25
349:19 351:10
**received**
319:16
**recognize**
266:21 324:25
**record**
253:6 276:19
318:25 319:4
331:1,4,8 347:2
347:15,19 354:9
354:13 368:12
369:1,5 373:16,21
374:8
**recorded**
259:24 376:9
**recruited**
280:11 281:7
**rectal**
287:18 288:17,21
**rectum**
288:5,7
**reduce**
295:25 296:14
**reduced**
346:17,21
**reduction**
346:2,11 365:5,6
**Rees**

249:13
**reference**
309:1 348:4,9,9,13
348:17 351:1,5
361:24 365:12,12
**references**
298:2 365:13,13,14
365:14,15,17,17
365:17
**reflect**
284:9
**reflection**
277:25
**refused**
376:17
**regard**
283:16 344:11
365:22
**regarding**
294:16 354:24
357:2 373:4
**region**
285:19 287:16
302:21 330:8,11
372:4
**regular**
266:15,17 272:4,8
272:18 273:12
290:8 312:20,23
343:19,24 355:8
369:25
**regularly**
369:18
**regulation**
366:9,9,11,12
**Reid**
324:10,17 325:5
**related**
275:6 304:9 313:12
**relates**
285:12 326:18
**relating**
264:4 285:1 362:19
**Relation**
294:21
**relationship**
269:20 270:14

Case 3:16-md-02738-MAS-RLS   Document 9889-4   Filed 05/29/19   Page 307 of 355 PageID: 66530
Rebecca Smith-Bindman, M.D.

Page 395

271:4,7 275:20
288:3 293:15
306:2 321:19
324:3 325:17
335:12 360:25
**relative**
309:4,22 340:14,15
341:4 362:13
376:19
**relatively**
281:25 311:4
362:14,16
**relevance**
367:14
**relevant**
302:4 311:13
**reliability**
272:10,12 282:25
**reliable**
335:17 336:6
**reliance**
294:24 297:1
353:23
**relied**
350:10 351:10,24
351:25
**relief**
313:11
**rely**
348:23 349:10
351:18,21 353:10
**relying**
362:24 364:22
**remember**
255:4 272:6 275:10
283:9 307:19
324:9 325:10
327:5,7 332:12
345:22,25 350:4,6
350:20,20 351:6
351:19 352:3,7
370:5
**reminded**
332:19
**remove**
353:6
**removed**

291:19
**repair**
303:24 358:14
**repeated**
353:12,15,16
**replicate**
356:3 357:4,14
**replicated**
355:24
**replication**
356:9
**report**
254:13 256:5,15
257:7,22 261:23
262:7,10 264:19
266:13 267:19
268:1 271:11
272:4,17 273:5,8
275:13 287:4
290:7 294:1,8
295:20 298:9
307:22 312:25
315:16 318:14
319:19,20 322:18
336:20 341:20
343:24 344:2,6
346:11 348:10
349:9 352:10
353:17 356:21
357:2,20 358:22
359:8,14,16 360:1
362:13
**reported**
245:23 256:10
267:1 268:2
278:10 339:25
343:10 352:18
**reporter**
246:11 253:23
256:23 299:2,15
299:17,18 304:18
308:5 319:24
366:10,15,17
367:19 376:2
**reporting**
282:18,23
**reports**

282:11 293:19
315:8,13,14,22,24
316:4,6,14,16
318:17 321:20
353:16
**represent**
331:13
**represents**
348:1
**reproduce**
291:19
**reproductive**
285:20 287:11
293:22 334:7
370:15
**requested**
300:3 316:2 376:16
**require**
356:18,19
**required**
292:14 311:22
322:25 353:8
354:3
**requirement**
343:18
**requirements**
312:13 354:3
**research**
279:6 294:16,18
298:16 302:6
324:2 333:10,16
338:12 350:22
365:22 368:5,9,10
368:14
**researcher**
331:18
**researching**
333:7
**residual**
306:9
**respect**
261:23 311:18
319:19,20 321:16
330:15
**respective**
374:1
**responded**

315:21
**response**
304:9 367:6
**responses**
294:5 336:23
**rest**
331:21
**result**
274:11 287:12
288:16 294:5
336:23 344:25
360:6,20
**results**
271:22 273:18,21
274:5 275:9 279:9
292:6 295:12,17
297:21 301:21
306:6 308:3
316:15,18,22
319:21,25 355:16
355:21 356:7,17
357:10,12 360:2
362:7 366:4 367:2
367:11 370:6
**retrograde**
363:24 371:11
**retrospective**
274:18,21,24
275:19
**review**
254:15 265:9,17
266:11,12 270:3
282:21 284:9,18
284:22 289:1,7
297:16 311:2,18
312:5,15,17
323:12 324:6,10
324:21,22 325:4
329:3 342:21
343:18 344:3,7
345:19,21,21
355:8,12 356:12
357:11 376:15
**reviewed**
254:13 265:9 292:1
296:19 298:9,11
299:9 311:21

324:12 341:11,15
341:18 351:21
365:21
**reviewing**
260:15
**reviews**
312:18 355:14
357:13
**Rheumatoid**
290:1
**right**
257:11,15 258:2
259:14,16 260:5,8
261:16 262:21
265:12,17 266:4,9
266:19 267:9,12
267:15 268:10
269:7,14,22 270:4
270:9,11,16 271:9
271:12 272:25
273:21 274:18
275:11,16 276:4
276:18 277:1,22
278:2,12 280:17
281:10,17 282:5,8
283:1 284:1,5,10
284:19 285:2,21
287:13 288:18,22
289:20 290:5
292:16 294:25
295:16,23 296:1
296:15 297:2,16
297:25 298:10
299:13,16 300:7
305:22,24 306:4,7
306:19 307:14
309:5,15,23 310:2
313:1,14 314:18
315:8,11,15
316:11 317:17
318:5,12,16,22
320:11 325:9,15
326:2,21,24 327:4
327:8 328:7 329:6
329:17 341:5
345:4,6 361:8
**right-hand**

Case 3:16-md-02738-MAS-RLS   Document 9889-4   Filed 05/29/19   Page 308 of 355 PageID: 66531
Rebecca Smith-Bindman, M.D.

Page 396

rights
374:4
risk
251:17 273:13
275:12,14,23
279:1 290:3 293:9
293:16 294:22
296:5,14 308:4,6
309:4,22 327:2
328:2 329:16
330:8,11 333:17
340:14,15 341:6
346:9,11,17
357:20,24 358:4
358:12,16 360:20
361:4,6 362:3,13
369:10,25 370:10
risk-benefit
293:15
risks
333:24
Robinson
247:13
role
295:14
route
286:14 359:19
Royston
250:14
run
343:14

**S**

S
366:16,16
Saed
298:9,10,13 299:11
299:22 300:1,4,6
300:12,18 302:19
302:25 365:13
366:3
Saed's
301:21 365:21,25
safe
283:16 292:8 293:5
320:7,9,12,17

Sales
245:7 253:13
sample
256:9
samples
318:19
San
245:15 246:8 249:8
253:1,11
sand
286:1,2
sanitary
271:8
satisfied
344:9
saw
300:16
saying
265:5 308:21 311:2
330:4 361:4,5
says
269:2 283:22 304:5
304:8 328:22
329:20,21
sciences
334:7
scientific
275:5 356:23 368:5
368:14
scientist
285:8 298:16
Scott
259:9,10
scribble
255:15
scribbled
255:14
search
332:14,16
second
276:22 307:23
317:25 318:1,6,7
318:8,8 327:24
328:6,19,21 335:3
340:11,18
section
294:12 336:9

see
263:8 290:10 294:6
298:2 308:25
313:5 316:22
318:4 327:6 328:4
328:17 339:3,5
345:24 348:18
365:1,2,4,5
370:18 371:9
seeing
297:3 351:19 352:5
352:7
seen
307:17 316:1,9,14
316:15,16,17
317:14 325:8
364:6,7
selecting
281:19,19
selection
274:24 275:2
280:16,21
self-regulate
353:5
sense
303:22 355:23
361:14 364:17
sensitive
302:14 344:25
sensitivity
302:16 343:23
sent
261:14
sentence
297:20 308:10
312:4 318:10
328:21 336:24
345:9 353:11,12
series
294:4 336:23
serous
323:13,17
service
318:3
Services
253:7 318:2 377:2
serving

354:19
session
255:18 259:2 320:4
372:25 373:1
set
266:12 311:21
342:17 357:9
376:5
setting
314:8 342:15
365:11
settled
338:4,7,10
several-fold
363:13
Seyfarth
250:3
shape
341:11
shared
257:3,9,11
Shaw
250:3
Shawn
365:14
SHEET
377:1
shift
256:4 310:22
shifted
278:2
shifts
256:9
short
263:17 270:2 354:6
shorthand
246:11 376:2,12
show
269:19 276:7,12
277:8,20 278:25
288:15,20 297:7
318:17 349:4,12
showed
255:25 366:19
367:1,2,3,3,6,7
showing
302:18,24

shown
255:22 279:12
283:15 364:5
shows
279:4 287:10 362:7
shrift
263:17
Shukla
365:16 367:3
sick
281:20
side
325:12
sign
292:23
significance
277:21 278:1,6,11
278:17,19,21,25
279:5
significant
269:20,25 270:14
271:4,7 275:20
276:7 277:8
328:10 329:10
360:3 362:3,11,15
silicate
321:25
Simes
246:7
similar
283:16 362:15,16
362:17
simple
320:8
single
263:6 264:5
sit
264:11
six
277:6 321:4,10
size
256:9
Skadden
248:15
skew
344:18
skiing

325:12

Case 3:16-md-02738-MAS-RLS   Document 9889-4   Filed 05/29/19   Page 309 of 355 PageID: 66532
Rebecca Smith-Bindman, M.D.

Page 397

331:17,22
**skill**
334:10
**skin**
274:9
**Slate**
248:15
**slight**
256:4
**slightly**
256:9 278:13
**small**
292:2,6,6 309:4,22
310:4,7,11 324:4
325:23 326:6,13
**Smith-Bindman**
245:14 246:6 251:3
253:17 254:1,9
264:10 319:5,7
347:22 354:16
360:10 368:12
372:23 373:6,17
374:2 375:4,14
377:21
**Smith-Bindman's**
360:1 373:14
**smoke**
340:19
**smoking**
340:12,14
**Snips**
366:15
**SNPS**
366:13,16
**software**
257:4 357:8
**sorry**
259:17 262:1
264:21 270:25
317:22,23 325:10
325:10 328:5,14
341:14 346:20
347:2,6
**sort**
263:1,20 278:15
280:8 286:23
294:12 321:3

335:22 356:23
357:13 365:18
367:21 370:6
**sound**
260:8
**source**
345:15
**sources**
284:18 344:24
**South**
248:7 250:18
**sparse**
297:20
**speak**
255:10 360:19
373:17
**speaking**
254:20 370:9
**species**
303:7
**specific**
264:3 283:24
362:19,20
**specifically**
283:5 325:25
351:24 360:13
364:20 366:3,4,8
**specified**
257:4
**specimens**
318:20
**spent**
260:14
**sperm**
364:1,3,3 372:9,16
**sphincters**
288:1,6
**spill**
363:17
**Spitzer**
247:20
**split**
373:5
**spoke**
370:14
**spoken**
300:1

**spreadsheets**
357:3
**Square**
248:18
**St**
250:20
**stable**
310:24 323:6
**standard**
256:8
**standards**
353:21
**start**
259:2 333:10
337:15 356:3
**starting**
361:24
**starts**
345:7
**state**
263:5 285:1 294:2
297:20 311:12
328:1,9 329:9
375:11 376:2
**stated**
333:15
**statement**
263:2 264:3 273:20
283:24 294:6
304:12 313:8
336:19 337:11
346:1,5 359:6
**statements**
262:19,24
**states**
245:2 253:15
263:23 264:12
283:5 291:12,22
**statistical**
277:20,25 278:5,11
278:16,19,21,25
279:5 280:9
323:15
**statistically**
269:19 270:13
271:4,6 275:20
276:7 277:8 362:2

362:10
**stenographically**
376:9
**stenosis**
371:4
**step**
356:24
**stimulated**
302:11
**stratified**
370:6
**Street**
246:8 247:8 248:7
249:6 250:6,18
253:11 377:3
**strength**
334:22 339:23
340:4
**stress**
303:11,18 304:2,9
304:22 305:4,5,9
305:12,15,16
358:13,14 366:8
**strike**
261:6 271:5 306:12
315:18 318:3
326:14 356:2
373:13
**strong**
265:19 288:3 311:3
315:4 334:25
339:13 340:13
360:4
**stronger**
339:25
**strongest**
321:18
**strongly**
271:20 366:24
**structures**
371:2
**struggling**
255:23
**studied**
306:3 314:6,9,14
369:12
**studies**

260:15 262:21
263:4,7,23 264:4
264:12,24 265:6,8
265:15,19 271:23
272:23 274:17,20
274:21,24 275:1
275:15,15,19,22
276:3,7,25 277:1
277:4,6,8,13,15
277:18,20 278:7,9
278:22 279:11,12
279:15,18,21,23
280:3,6,20,22,25
281:8,15 282:3
284:4,8,19,23
286:7,17,24,25
287:3 288:15,19
288:20 295:12
306:7 307:14,24
308:14,22 311:20
311:21 312:11
321:22,22,23
322:1 324:9,19
325:20 326:17
327:3 330:9,14
334:14 336:4,7
341:10,10 342:8,8
342:12,20 343:9
343:17,20,23
344:10 346:9
350:22 351:9,15
351:21 353:15
355:17 359:23
360:6,17,23 361:7
361:18,20 362:1,5
362:7,10,18 364:1
367:22 369:15,24
**study**
257:14 263:13,14
263:21 265:11,16
265:19,21,22
266:4,9,19 267:7
267:9,15,18,21,23
268:7,9,20 269:6
269:9,11,11 270:2
270:4,7,9 271:1
273:10 278:24

Case 3:16-md-02738-MAS-RLS   Document 9889-4   Filed 05/29/19   Page 310 of 355 PageID: 66533
Rebecca Smith-Bindman, M.D.

Page 398

279:4 282:8,16
283:1,5 284:5
291:11 300:6
302:19 303:1
304:5,8 306:10,14
306:19 307:18
308:21 309:1
320:22 324:11
325:3 327:1 335:6
341:24 343:10
345:5,16 356:25
361:14 362:21
363:4 364:5,11,13
364:14,15 369:21
**subject**
258:24 274:20,23
335:17 336:7
338:12
**submit**
320:2 344:6 353:8
**submitted**
259:23 344:3
**Subscribed**
377:22
**substance**
305:3,5
**substances**
285:24 303:10
**substantial**
330:1 356:22 360:7
366:19
**substantially**
361:21
**subtypes**
321:10
**sufficient**
266:10 357:1
**suggest**
278:19,20 295:13
296:20 370:13
**suggesting**
279:25 280:14
**suggestion**
286:13
**suggests**
292:10
**Suite**

246:8 247:24 249:7
249:17 250:19
253:11
**summarize**
296:22
**summary**
280:9 308:1 312:16
321:18 323:9
344:25
**superior**
293:7
**supervision**
376:10
**support**
294:8 311:14 313:7
362:25 364:23
365:25
**supported**
298:16 337:11
338:8,9
**supporting**
294:13
**supports**
290:17 304:11
345:13 357:13
**supposed**
287:1
**sure**
255:2 268:22,24
270:24 274:5
276:9 280:13
283:11 284:13
289:5 292:19
295:3 298:20,23
304:14 305:19
307:5 308:12
317:5 328:15
331:12 334:3
335:19 344:15
346:23 349:6
350:16,19,25
351:2 359:18
368:11,15 370:7
**surface**
274:9
**surgical**
291:17,17 313:12

**surprised**
256:2
**survey**
318:3 337:1,5,13
337:16,20
**susceptible**
280:20 289:16
**swear**
253:23
**sworn**
254:2 377:22
**symptoms**
313:12
**synergistic**
358:6,18 369:9,16
369:24
**synergy**
370:10
**system**
363:11,17,21,23
364:8,9 370:15,16
**systematic**
265:16 266:11,12
270:3 284:3,9,17
284:21 311:2,18
312:14,17,18
313:11 324:21,22
342:21 355:7,12
355:14 356:12
357:12

---

**T**

**T**
297:2
**table**
361:8 362:6,6
**Tachibana**
251:24 261:13,18
319:8,19
**take**
260:1 276:10 302:6
312:25 317:20
318:22 327:23
329:15 331:21
354:6 368:23
373:14
**taken**

246:6 278:5 286:18
310:25 319:1
331:5 347:16
354:10 369:2
376:4,12
**takes**
322:13
**talc**
251:17,22 266:17
266:22 268:2
270:14,16,19,22
271:5,16 273:12
275:10 276:8
283:6,15,23,25
287:12,17 288:4
288:16,21 292:4
293:7,20 302:12
302:20 303:1
313:3 314:7,15
322:6 329:24
330:7,10,17 332:8
345:7,11 352:21
358:25 359:20
362:21 364:12
365:10 367:8
369:25 372:15
**talcum**
245:6 253:13
259:21 269:20,24
271:7,15 274:8
275:21 285:13,19
285:23 286:18
287:5,15 290:8,12
290:22,25,25
291:8 292:11,13
293:4,8 294:20
307:13 313:11,15
313:19,23 314:1
314:17,20,25
315:5 316:7,18
318:15,19 320:5,7
320:10,12,17
321:2,6 322:11
323:7,20,22
339:11 343:19
346:6,16 352:16
354:25 355:9,18

357:25 358:1
360:21 361:1
362:25 365:22
366:19 369:18
372:3,7 377:6
**talk**
258:25 263:3
307:21 309:1
328:7 335:25
338:16 359:21
363:22 364:19
365:18
**talked**
254:18 260:16
272:3 276:13
282:4 307:12,18
311:25 322:18
336:24
**talking**
309:6 346:8
**talks**
269:6 335:21 363:4
**target**
345:14
**teach**
335:14,18
**teal**
258:9
**tell**
268:5 280:1 283:10
293:1 295:1,8
332:14 333:2
349:2
**tells**
302:13
**temporality**
313:1
**ten**
278:20
**tends**
291:3
**term**
305:22,25
**terms**
272:21 293:14,16
296:13 302:4
342:12,15

**Terry**
257:13,14
**tested**
272:9 318:16
**testified**
254:4 300:13,18
356:12
**testify**
254:2
**testimony**
333:19 359:11
373:14 375:8
376:7,13
**testing**
316:15,17,18,21
317:13,16 318:20
353:8
**Texas**
249:8,18
**text**
336:3,6
**textbook**
263:18 335:18
**textbooks**
335:16 363:22
**Thank**
260:22 262:6 264:7
276:20 297:12
317:12 318:11
327:18,21 331:15
346:25 368:22
**thankfully**
303:24
**Thanks**
317:24 366:18
**theoretical**
275:12,23
**theoretically**
344:20
**theories**
354:24
**thing**
310:15,16
**things**
254:13 280:1 296:8
302:5 356:21
365:11

**think**
254:21 255:6,14
256:18 258:10
259:22 260:23
261:17,20 264:24
265:8 266:2,3
272:1 274:7,15
278:20 280:25
281:11 283:23
287:22 292:5,18
293:17 294:11,13
299:5,6 303:12,21
307:15 309:13
310:13,21,25
311:9,16 312:7
313:9 314:8 316:9
320:9 321:4,5
323:6,13,16 324:6
324:20 326:11,11
332:13 333:5
334:10 338:10,15
339:13,14,21
340:14,18,18,19
340:21 344:20
357:11,14 358:4
364:9,12,16
367:11 373:20
**thinking**
304:13
**thinks**
334:16
**THOMPSON**
247:6
**thought**
266:15 311:22
312:9 341:6
**thousand**
268:10 269:17,17
**three**
269:18 272:19
347:5
**threshold**
290:19 292:13
**time**
253:8 254:11,18,20
258:23 305:20
317:4 318:24

331:3,7,16,20
344:2 347:14,18
350:22 354:8,12
368:25 369:4
374:7,9 376:5,6,8
**times**
248:18 272:19
344:12,17
**TINSLEY**
250:16
**tiny**
364:4
**tissue**
274:10 288:9,13
294:4 303:19,20
305:4,9 330:16
336:22 345:12,13
**tissues**
287:19 288:18
305:6
**title**
295:1
**today**
259:2 260:14 267:4
331:14
**today's**
253:8 372:25
**Toilet**
286:4
**told**
257:19
**topic**
263:13 266:7
**topics**
263:16
**toss**
360:24
**total**
260:7 261:1
**toxic**
338:25 340:11,13
**trace**
313:19 320:11,14
330:17
**track**
264:1
**tract**

285:20 287:11
293:22
**transcribed**
376:10
**transcript**
259:12 261:3
276:16 297:11
317:10 319:11
324:24 327:17
375:6 376:12,15
376:17
**transcription**
342:25
**transition**
364:19
**translation**
367:23
**transport**
363:4
**travel**
287:1
**traveling**
362:22
**travels**
285:19
**treatment**
313:4
**tried**
272:18 296:22
**trivial**
311:1
**true**
270:6 274:22
296:11 315:1
346:6,14 375:9
376:11,23
**truly**
312:20
**truth**
254:3,3,3 279:6
280:4,5
**try**
332:22 344:21
368:2
**trying**
298:2 302:22 351:2
**tubal**

346:3,12,20
**tube**
371:8
**tubes**
287:6 363:16
370:22 371:7
**Tucker**
248:4 250:15
**tumor**
329:13
**turn**
297:13 345:4 348:8
348:12 360:10,13
**turned**
300:19
**turnover**
301:2 365:6
**turns**
370:24
**twice**
358:8
**two**
254:13,22 260:25
279:14 299:10
307:16 318:18,20
325:21 340:9
342:5 347:4 373:6
**two-page**
260:25
**type**
269:21 280:10
288:2 289:23
308:1,20 321:2,8
321:16,25 323:3
**types**
273:5,17 305:6
321:16

_____

**U**

**UCSF**
251:24 368:19
**ultrasound**
371:16
**unavoidable**
308:1,20
**undergoing**
300:14 313:4

Rebecca Smith-Bindman, M.D.

**underlying**
284:8,23 301:2
  311:20
**understand**
255:23 266:16
  267:20 274:4
  302:3,7 341:22
  365:9 368:2
**understanding**
318:18 321:13,14
  333:9 353:7
  354:18 368:8
  373:10
**understands**
365:1
**understood**
325:19,19 332:2
**undertake**
323:23
**unfortunately**
364:13
**Union**
250:14
**United**
245:2 253:15
**unknown**
306:18
**unmeasured**
306:13
**unrestrained**
300:23
**use**
251:17,20 262:8
  266:15,17 268:4
  269:20,25 270:14
  270:19,22 271:5,7
  271:11,12,14,18
  271:19,24,24
  272:4,8,18,18
  273:6,17 276:8
  283:6,15,17,25
  285:13 288:16,21
  290:18 292:7
  296:4,13 297:22
  301:21 302:20
  303:2 313:3,10
  330:7,10 335:18

339:11 340:1
343:19,24 355:8
360:21 366:24
368:4,13 369:25
372:3,6
**users**
271:16 330:17
**uses**
265:22 357:24
**usual**
255:14
**usually**
371:14,23
**uterine**
287:18 288:17,22
**uterus**
363:16 370:22

———————
### V
**V**
297:2
**vagina**
288:6 363:10,15
  364:17 371:7,19
  372:10,15
**vaginal**
274:12 287:18
  288:17,22
**vague**
268:3 312:8
**valid**
301:13 311:9,9,13
**validate**
282:12
**validated**
272:22
**validity**
272:10
**value**
293:16 361:21
**values**
310:15
**variable**
267:19
**variety**
307:25 308:17
**various**

273:5,17
**Verdoodt**
297:1
**verify**
261:5 282:10
**version**
262:9 335:22
  356:13
**versus**
280:13 301:3
  310:18,19 362:8
  362:14 367:24
**video**
253:10
**videographer**
250:23 253:5,7,22
  318:24 319:3
  331:3,7 347:8,10
  347:14,18 354:8
  354:12 368:25
  369:4 374:7
**Videotaped**
245:13 246:5
**view**
265:15 338:9
**views**
293:13 359:25
**violated**
373:10
**virus**
300:13 338:22
  339:24 341:1
**vitro**
300:14 365:23
**voice**
256:24
**Volume**
245:17 246:6 251:4
  253:18 254:1
  319:6 375:15
  377:21
**voluntarily**
352:18 353:1,20,25
**vulvar**
287:18 288:17,21

———————
### W

**wait**
299:15,19 367:19
**waive**
253:20
**want**
265:18 274:2 281:4
  299:7 303:4 310:9
  310:21 312:14
  326:5 345:2
  347:10 348:8
  371:7
**Washington**
250:7
**wasn't**
344:15
**watch**
363:16
**watched**
286:24
**water**
370:22 371:15,18
**way**
257:6 258:20
  267:19,24 268:1,8
  272:13,16 278:16
  278:18 279:25
  287:2 301:8
  322:14,17 330:7
  334:10 341:11
  348:16 366:18
  371:9 372:2
**ways**
332:21
**We'll**
262:5
**we're**
258:24 262:2
  350:23 370:21
  371:13,14
**week**
272:19
**weeks**
254:22
**weight**
306:25 307:7,16
**well-described**
338:18

**well-done**
355:14
**well-known**
263:20
**well-respected**
298:15 336:15
**went**
366:24
**weren't**
256:2
**whatsoever**
364:18
**whichever**
309:8 334:15
**wide**
338:8
**wide-open**
363:17,21 364:8
  370:16
**widely**
294:2 336:20 337:2
  337:11 338:7,8,8
**Wilentz**
247:20
**withdraw**
267:6 295:21
**witness**
251:2 253:24 373:9
  373:11 374:1
  376:6,7,16
**witnesses**
374:1
**woman**
269:2 293:10
**women**
268:10,23 269:7,9
  269:11,17,17
  270:11,15,18,21
  271:14 275:9,10
  287:12 290:9,18
  292:3,7 296:4
  303:1 313:3
  322:11 326:9
  329:24 330:4,7,10
  332:13 346:6,15
  360:7 363:14
  369:17 371:3

Case 3:16-md-02738-MAS-RLS   Document 9889-4   Filed 05/29/19   Page 313 of 355 PageID: 66536
Rebecca Smith-Bindman, M.D.

Page 401

**women's**
270:8 285:20 293:9
293:22 370:18
372:9
**Woodbridge**
247:23,25
**word**
283:23 345:7
**words**
352:24 360:19
**work**
257:1 260:15 261:7
261:22,24 284:4
301:25 319:18
331:16,19,20
336:13 342:25
343:5 344:7
354:17 355:3,24
357:4 365:25
370:9
**worked**
254:14
**worse**
358:7,9
**worst**
281:23
**wouldn't**
274:10 291:7 292:7
326:12 329:23
335:25
**writing**
356:23
**written**
255:13 333:22
**wrong**
269:4
**wrote**
315:13 332:11
362:20

372:3,6

**X**
**XX**
376:15

**Y**
**Yeah**

260:4,22 268:18
273:1 282:14
295:1 309:25
312:1 324:21
329:5 347:6,11
**year**
271:25 299:10
**years**
269:12 270:19,21
271:12,15 335:20
**yesterday**
253:21 254:11,19
255:11,17 258:17
258:23 260:16
272:3 276:13
277:11 278:8
282:4 298:7 299:1
303:21 307:18
312:2 331:12
373:19
**yesterday's**
372:25
**York**
248:19,19

**Z**
**Zellers**
248:5 251:6 253:20
254:6 255:8,10
256:19 257:1
260:20,24 261:4
262:5,7,16,18
264:2,8,20,22
270:7 272:14
273:4 275:4
276:18,21 277:3
277:14 279:10
283:4,11 284:16
285:10,18 286:15
287:3,9 288:25
289:8 290:21
291:6,21 293:6
294:1,15 296:12
297:13 298:20,24
299:9,16,20
301:20 302:17
303:6 304:11,24

307:11 308:6,8
309:8,13,16,17
310:8 311:5
313:22 314:22
315:7 316:2,5,11
316:17 317:5,7,11
317:22,25 318:22
319:7,12 320:3,16
321:1,12 322:9
324:10,25 326:14
326:16 327:8,19
327:23 330:6,24
336:25 347:3
356:1,6 357:6
358:3,21 359:3,7
359:24 366:2
368:7,16,23
372:20,22 373:5
374:6

**0**
**0.92**
280:6
**07095-0958**
247:25

**1**
**1**
259:14 276:22
277:5,19 278:11
279:13 319:1
325:23 360:14
361:3
**1,500**
261:17
**1,700**
261:25
**1.0**
310:10,19 311:6
**1.12**
280:13
**1.19**
309:4,22 311:6
**1.2**
310:10,19 311:7
**1.29**
280:4

**1.3**
340:15,20
**1.38**
309:4,22 311:6
**1.4**
280:13
**1.52**
280:4
**1.63**
280:6
**1:16**
331:5
**10**
247:24 270:21
271:12,15 371:3
374:4
**10-**
258:16
**10-15**
255:12
**10/18**
251:24
**10:47**
318:24 319:1
**100**
250:18 344:15
**10036**
248:19
**101**
263:1
**108,870**
269:7
**109,000**
268:21
**11:00**
319:2,3
**11:16**
331:3
**11:17**
331:5,7
**11:37**
347:14,16
**11:40**
347:17,18
**11:45**
354:8,10
**112**

249:6
**12**
294:1 336:20
**12:15**
354:11,12
**12:34**
368:25 369:2
**12:41**
369:3,4
**12:48**
246:10 374:7,9
**1215**
328:5
**1216**
327:24
**13**
259:15 260:2
**13427**
245:24 246:12
376:1
**14**
352:11 360:2
**147**
251:14
**15**
255:12 261:25
348:8
**15-minute**
258:16
**1510**
249:17
**160**
260:8,9,10
**1650**
377:3
**17**
257:23 262:9,14,15
262:16,18 263:3
264:4 275:13
294:25
**1700**
246:8 253:11
**174**
295:7
**1800**
249:7
**19**

Rebecca Smith-Bindman, M.D.

247:16 310:3
348:12 351:5
**19103**
377:4
**1976**
269:12 352:19
**1992**
328:7 329:8

**2**

**2**
256:15 262:10
266:13 310:14,24
319:4 325:24
352:11 360:13
362:6,6
**20**
340:6 371:4 375:11
**200**
340:14
**2000**
265:16 267:1,8
269:10
**20004**
250:7
**2003**
309:7,15
**2006**
269:12
**2007**
295:18 309:6
**2008**
276:13 294:20
**2010**
267:8 268:9 269:1
269:11,18 282:8
316:21
**2011**
324:11,17 326:23
327:14
**2012**
321:19 358:22
**2014**
270:13 271:1
**2017**
259:14 297:1 298:5
354:22

**2018**
259:15 260:2 282:5
282:7 283:4 298:9
**2019**
245:16 246:10
253:2,8 298:10,21
376:24 377:23
**202-828-5356**
250:9
**21**
273:7
**210-554-5549**
249:10
**212-735-2453**
248:21
**213-430-3301**
248:11
**218**
247:8
**221,000**
269:2
**25**
260:23 307:21
328:5
**250**
246:8 253:11
**254**
251:6
**259**
251:12
**26**
308:25 309:10,19
311:11
**261**
251:14
**27**
311:11
**2738**
245:9
**276**
251:17
**28**
251:12 259:6,11
260:3
**29**
251:14 261:2,5
**297**

251:20

**3**

**3**
256:15 266:13
**3,000**
261:1
**30**
251:17 269:12
276:14,15 360:11
**300**
340:14
**31**
251:20 297:9,10
**317**
251:22
**319**
251:24
**32**
251:22 317:8,9
**324**
252:2
**327**
252:4
**33**
251:24 257:25
319:9,10
**331**
251:9
**334-269-2343**
247:11
**34**
252:2 257:25
324:18,23 325:1,3
**347**
251:8
**35**
252:4 327:15,16
345:5
**354**
251:7
**36103**
247:9
**369**
251:9
**372**
251:6

**39**
312:25

**4**

**4**
248:18
**4.5**
311:7
**4.7**
310:18 311:7
**4.9**
310:18
**41**
290:7
**42**
283:13
**42nd**
248:8
**47**
268:19
**4th**
250:18

**5**

**5**
297:14,19
**50,000**
322:19
**500**
340:7
**512-391-0197**
249:20
**515**
248:7
**51st**
377:3

**6**

**6/1/17**
251:12
**600**
250:19
**61,000**
270:11
**63102**
250:20

**7**

**75**
348:16
**78205**
249:8
**78701**
249:18

**8**

**8**
245:16 246:10
253:2,8
**816**
249:16
**877-370-3377**
377:5

**9**

**9:26**
246:9 253:3,9
**90**
247:23
**900**
247:24
**90071**
248:9
**924**
269:2
**92660**
247:17
**94111**
246:9
**975**
250:6

# Exhibit 65

## C H A P T E R    N I N E

# *Gamete Transport and Fertilization*

Copyright Elsevier 2019 This book belongs to Margaret Thompson

## Introduction

The process of *fertilization*, or *conception*, involves fusion of the nucleus of a male gamete (sperm) and a female gamete (ovum) to form a new individual. Because each gamete is haploid (N), fertilization restores the normal diploid (2N) chromosomal complement. Fertilization, however, is more than the simple fusion of gametes in that it is preceded by and requires a series of precisely timed events. Once sperm are deposited in the female reproductive tract, they travel a relatively long distance and overcome several obstacles before reaching the ovum. Similarly, the ovum travels through a portion of the female reproductive tract before it is fertilized. Not only do the gametes move to the appropriate regions of the female tract, but they undergo important physical and biochemical maturations that are a prerequisite for fertilization. Abnormalities in these maturational or transport processes, as well as in fertilization itself, can lead to infertility, spontaneous abortion (miscarriage), or birth defects.

## Semen Release

After leaving the epididymides, sperm enter the vasa deferentia, which are long paired ducts serving as sperm storage and transport organs (see Chapter 4). Secretions of the male sex accessory glands (*seminal plasma*) mix with the sperm during ejaculation to form *semen* or *seminal fluid*. It has been theorized that the entire reserve of sperm in the epididymides and vasa deferentia would be depleted if an adult male had 2.4 ejaculations per day for 10 consecutive days. However, this normally does not occur, even with such Herculean ejaculation frequency because new sperm are produced continuously by the testes—about 200 million per day! Thus, frequent ejaculation is not an effective method of contraception.

Semen is released in three stages. Before male orgasm, a small amount of semen comes from the bulbourethral glands. In the second stage, the majority of semen is released; most of the seminal plasma of this stage comes from the seminal vesicles and prostate gland. In the third stage, another small amount of fluid produced by the seminal vesicles is exuded. Most of the sperm are expelled in the second stage, but some sperm are present in the semen of the first and third stages. Because sperm are present in the first stage, pregnancy can occur without male orgasm, which is one reason why *coitus interruptus* (withdrawal of the penis before ejaculation) is not an efficient method of birth control (see Chapter 14).

Copyright Elsevier 2019 This book belongs to Margaret Thompson

# Contents of Seminal Plasma

Seminal plasma contains several substances, but the precise function of many of these components is not known. We do know, however, that some of them have roles in the maintenance, maturation, and transport of sperm. Water is present, which serves as a liquid vehicle for the sperm and seminal plasma constituents. Mucus from the bulbourethral glands serves as a lubricant for the passage of semen through the male reproductive tract. The prostate gland and the bulbourethral glands both secrete buffers, which neutralize the acidity in the male urethra and in the vagina. Some nutrients for sperm are present in the seminal plasma deposited in the vagina, the major ones being the sugar fructose and citric acid (from the seminal vesicles). *Carnitine*, concentrated from the blood by the epididymis, is also found in the seminal plasma. This chemical is involved in the metabolism of fatty acids, with the metabolites being used as another nutrient source for the sperm. Another constituent of seminal plasma secreted by the epididymis is *glycerylphosphocholine*. The enzyme *diesterase* in the uterus hydrolyzes (breaks down) this molecule, and the products of this digestion are used by the sperm as nutrients. Other enzymes secreted by the prostate gland and seminal vesicles are involved in the clotting and subsequent liquefaction of semen in the vagina. Human seminal plasma contains extremely high amounts of zinc (which may have antibacterial activity), and men with low zinc content tend to have a higher incidence of infertility. Finally, some kinds of prostaglandins are secreted into the seminal plasma, mostly by the seminal vesicles. Prostaglandins in seminal plasma may be involved in sperm transport. Finally, seminal plasma contains ATP, and men with low semen ATP levels tend to have lower fertility. Table 9-1 summarizes the sources of the major components of seminal plasma.

**Table 9-1** Some Characteristics of Human Semen

General properties
  Creamy texture: gray to yellow color
  Average volume: 2.5–3.5 ml after 3 days of abstinence (range, 2–6 ml)
  Fertility index (minimum qualifications for male fertility):
  1. At least 20 million sperm/ml
  2. At least 40% sperm must show vigorous swimming
  3. At least 60% sperm must have normal shape and size
  pH: 7.35–7.50 (slightly basic)

Sources and major components of seminal plasma

| Epididymis (a slight amount) | Seminal vesicles (about two-thirds of total volume) | Prostate gland (about one-third of total volume) | Bulbourethral glands (a few drops) |
|---|---|---|---|
| Water | Water | Water | Water |
| Carnitine (a nutrient) | Fructose (a nutrient) | Bicarbonate buffers (neutralize vaginal pH) | Buffers (neutralize vaginal pH) |
| Glycerylphosphocholine (a nutrient) | Fibrinogen (clots semen) | Fibrinogenase (clots semen) | |
| | Ascorbic acid (a nutrient) | Fibrinolytic enzyme (liquifies semen) | Mucus (lubrication) |
| | Most of the prostaglandins (contract the vas deferens) | Citric acid (a nutrient) | |
| | | A little prostaglandin | |

Copyright Elsevier 2019 This book belongs to Margaret Thompson

# Sperm Number and Structure

The number of sperm in a single ejaculate ranges from 40 million to 500 million (the average is about 182 million sperm). A male produces about 1 billion sperm (Fig. 9-1) for every ovum ovulated by a woman. Many ejaculated sperm (about 30%), however, are structurally or biochemically abnormal and are either dead or incapable of fertilizing; these are reabsorbed by the female reproductive tract or are lost through the vagina. For a male to be minimally fertile, his sperm count should be at least 20 million sperm/ml of semen; 40% of these sperm must swim and 60% should be of normal shape and size (Table 9-1).

Some evidence shows that human sperm count has declined over recent decades (see Chapter 4). One study suggests that the sperm count in healthy men has dropped 1% per year in the past 50 years. However, other studies contradict this idea, and whether there has been a worldwide decline in male fertility remains controversial. It is clear, however, that geographical differences in average sperm count exist. Differences in sperm production of men living in disparate regions of the world may reflect genetic, cultural, or environmental differences.

A healthy human sperm is 40 to 250 $\mu$m long and is composed of the following structures (Fig. 9-2): neck, midpiece, and tail. The *sperm head* contains an elongated haploid nucleus surrounded by a nuclear membrane. External to the nucleus is a membrane-bound vesicle called the *acrosome*. It fits closely over the tip of the sperm head like a cap, and the *inner acrosomal membrane* lies external to the nuclear membrane while the *outer acrosomal membrane* is just inside the sperm cell *plasma membrane*. The acrosome is filled with enzymes important in the penetration of the ovum. The short sperm neck is followed by the sperm midpiece, which contains mitochondria that generate energy for tail movement. The midpiece and sperm tail represent a flagellum, with the "9 + 2" arrangement of microtubules. This provides the propulsive force, allowing locomotion of the sperm cell as it moves toward the egg and during egg penetration. A human sperm cell is 60–70 $\mu$m in length.



**Figure 9-1**   Photomicrograph of human sperm swimming in seminal fluid. The sperm heads shine because of a fluorescent dye.

Copyright Elsevier 2019 This book belongs to Margaret Thompson



**Figure 9-2**   Sperm structure.

## Sperm Transport and Maturation in the Female Reproductive Tract

Let us now follow the sperm cells on their journey through the female reproductive tract to the point of fertilization in the oviduct, a distance of about 15 cm (6 in.). The sperm are first deposited in the vagina; they then pass up this cavity and through the cervix into the uterus, up the uterus, through the junction between the uterus and oviduct (uterotubal junction), and up the isthmus of the oviduct to the usual area of fertilization in the oviduct: the ampullary–isthmic junction. Many of the millions of deposited sperm are lost during this journey, and only about 100 to 1000 reach the oviduct, with 20 to 200 reaching the egg itself. In addition, the sperm must undergo maturational processes during their journey, which give them the capacity to move and to fertilize an ovum.

### Vaginal Sperm

About 1 min after deposition in the vagina, the semen becomes thicker and less liquid. This *semen coagulation* is brought about by the enzyme *fibrinogenase*

Copyright Elsevier 2019 This book belongs to Margaret Thompson

in the seminal plasma, which converts the protein *fibrinogen* to *fibrin*, another protein. The major function of this coagulation may be to prevent sperm loss from the vagina. After about 20 min, however, the semen again liquefies. This *semen liquefaction*, which is caused by a *fibrinolytic enzyme* in the seminal plasma, stimulates some sperm to swim more rapidly and to reach the cervix. Even though semen liquefaction has not yet occurred, some sperm make it into the cervix and even into the uterus within a few minutes of deposition in the vagina.

The environment in the vagina is usually acidic (about pH 4.2), and this level of acidity inhibits sperm motility. The presence of semen in the vagina, however, increases the vaginal pH to a basic 7.2, which in turn increases sperm motility.

During coitus, female orgasm is accompanied by muscular contractions of the vaginal walls (see Chapter 8), and these contractions create a pressure in the vagina that is higher than that in the uterus. Sperm movement through the cervix may be aided by this pressure differential. Sperm, however, can move up the female tract without female orgasm.

## Cervical Sperm

The cervical canal is lined by a complicated series of narrow folds and crypts and is blocked by a sticky mass of cervical mucus and tiny cervical fibers (see Chapter 3). In most stages of the menstrual cycle, the mucus is thick and fibers within it are densely packed. Shortly before ovulation, however, the rise in circulating estrogen levels causes the mucus to become more liquid and the gaps between the cervical fibers to widen. These gaps orient so that channels are formed. When the sperm enter the mucus, they line up in these channels almost in single file and pass through the cervix at a speed of about 1.2–3.0 mm per minute.

The cervical fibers may serve as a network upon which the sperm tails exert force, beating with a spiral motion and thus propelling the sperm upward. Also, these fibers may be of such dimension and length that they vibrate in rhythm with the tail beat frequency of normal sperm; this may allow normal sperm to move through the cervix, whereas sperm with abnormal or absent tail beats are detained. These latter sperm then die and are reabsorbed or lost from the body. Other sperm enter *cervical crypts* (deep recesses in the cervical wall), where they die or are lost, or they may remain alive as a reservoir of sperm that later may enter the uterus. Fewer than 1 million of the original 182 million sperm make it through the cervix.

## Uterine Sperm

Upon leaving the cervix, the sperm travel up the uterus to the uterotubal junction. The uterine fluid is watery but sparse in humans, and the sperm essentially "climb" up the uterine lumen by beating their tails. The swimming rate of sperm (about 3 mm/min), however, cannot account for their traveling a distance of about 15 cm in the 30 min after ejaculation. Also, dead sperm reach the oviduct at about the same time as do live sperm. Thus, sperm tail beating probably is not important during sperm transport through the uterus so it

Copyright Elsevier 2019 This book belongs to Margaret Thompson

must be the muscle contraction and movement of cilia in the female reproductive tract that facilitate sperm transport.

Mechanical stimulation of the cervix by the penis during coitus causes release of the hormone oxytocin from a woman's posterior pituitary gland. This hormone quickly travels via the blood to the uterus and increases the force of rhythmic uterine muscle contractions. These contractions act as waves to help the sperm move to the uterotubal junction. Prostaglandins in the seminal fluid may also cause uterine muscles to contract, but this is unlikely as very little if any seminal fluid enters the uterus through the cervix. The main function of the prostaglandins in seminal fluid is probably to contract the muscles of the vasa deferentia, thus aiding sperm passage during ejaculation.

The presence of sperm in the uterus initiates a massive invasion of white blood cells (*leukocytes*) into the uterine lumen. These cells then begin to engulf the dead or dying sperm that have not yet moved up to the uterotubal junction. No more than a few thousand sperm reach this junction.

The uterotubal junction is a muscular, tightly constricted region separating the uterus from the oviduct (see Chapter 2). Sperm enter the narrow opening of this junction and move through it at a relatively slow rate. Thus, the uterotubal junction allows the gradual entrance of sperm into the isthmus of the oviduct. About half of the sperm enter the wrong oviduct, and only a few hundred make it to the general proximity of the waiting egg.

## Transport of the Sperm and Ovum in the Oviduct

Sperm tail beating is reduced, and the sperm "wait" in the isthmus for ovulation to occur. Other sperm previously residing in cervical crypts are also released around the time of ovulation. After ovulation, several sperm move up to the ovum, and fertilization by a single sperm usually occurs at the point where the isthmus joins the wider oviductal ampulla (ampullary–isthmic junction). Other sperm swim up the ampulla, through the infundibulum, and are lost in the body cavity.

Once ovulation has occurred, the infundibulum (funnel-shaped free end) of the oviduct moves to the ovary and envelops the ovulated ovum along with fluid derived from the ovulated follicle. Movement of the infundibulum is accomplished by the contraction of muscles in the membrane supporting the oviduct. Cilia are present in the wall of the fimbria (the edge of the infundibulum) and these beat toward the uterus. Thus, when the infundibulum envelops the ovary, the beating of the cilia moves the ovum into the ampulla of the oviduct. Cilia in the ampulla and isthmus of the oviduct also beat in a uterine direction, which sets up a flow of fluid toward the uterus.

The muscles of the oviduct also exhibit waves of muscular contraction after ovulation. These waves travel in the direction of the uterus and, along with the cilia, help the ovum move down the oviduct. Both ciliary beating and muscular contraction in the oviduct are influenced by ovarian sex hormones. Estrogens increase cilia number, and progesterone increases ciliary beating and egg transport.

A factor involved in the opposite movement of egg and sperm may be the direction of ciliary beating in the oviduct. Oviductal cilia exist in deep recesses in which cilia beat toward the ovary and on ridges where these cilia beat

Copyright Elsevier 2019 This book belongs to Margaret Thompson

toward the uterus. Sperm may travel in these recesses, whereas the ovum may be propelled along the ridges. The presence of considerable amounts of mucus in the oviducts for 3 to 4 days after ovulation may serve as a medium for sperm transport. This mucus is gone when the fertilized ovum (embryo) travels down the oviduct to the uterus, as discussed in Chapter 10.

## Sperm Capacitation and Activation

Freshly ejaculated human sperm are not capable of fertilization. A period in the female reproductive tract is necessary before sperm can fertilize an oocyte. Thus, during their journey, sperm gain the ability to fertilize an egg (a process called *sperm capacitation*). *Calmodulin*, a protein in seminal plasma, may also play a role in sperm capacitation. This protein (or another epididymidal secretion) may give the sperm the ability to be capacitated later on when they are in the uterus.

In general, the present scientific opinion is that capacitation involves removal or modification of molecules (glycoproteins) associated with the sperm head that stabilize the sperm plasma membrane. These molecules suppress the ability of sperm to fertilize. Alteration or removal of these inhibitory molecules allows the sperm to respond to signals that trigger the acrosome reaction, an important step in the fertilization process. Capacitation also increases the vigor or tail movements of the sperm (*hyperactivation*), propelling it toward the egg more effectively.

What substances in the female reproductive tract render the sperm capable of fertilization? One possibility is that molecules in follicular fluid escaping from the ovulating follicle play a role in sperm capacitation. Follicular fluid contributes only a small part of the oviductal fluid. Studies of mammals have demonstrated that two components of follicular fluid, progesterone and the protein albumin, facilitate the acrosome reaction. Calcium in follicular fluid increases the vigor of sperm tail beating. It is not clear if these substances are present in humans, although follicular fluid does activate human sperm. If operative in humans, they may have their effect when the sperm penetrates the cumulus oophorus (see later), which surrounds the ovum and is bathed in follicular fluid. A recent discovery is that follicular fluid, or the egg itself, produces a chemical that attracts human sperm (see HIGHLIGHT box 9-1). Another study suggests that mammalian sperm move toward the egg along a thermal gradient. The site of fertilization is slightly warmer than more proximal portions of the oviduct, and mature sperm have a preference for moving toward warmer fluid (*thermotaxis*). Sperm may be guided by temperature during most of their journey through the fallopian tube and then respond to chemical cues as they near the egg. In the future, we may expand our concept of sperm capacitation to include acquisition of the ability to detect chemical and/or thermal cues.

### When Can Fertilization Occur?

Most references state that sperm live about 72 h and that an egg is fertilizable for 24 to 48 h. Thus, the fertile time in a menstrual cycle would be about 4 to 5 days,

Copyright Elsevier 2019 This book belongs to Margaret Thompson

## Chapter 9, Box 1: Does the Human Egg Court Sperm?

Out of the millions of sperm deposited in the vagina during ejaculation, only 20 to 200 will reach close proximity to the egg in the oviduct, and yet the competition among sperm to be the one that fertilizes the ovulated egg is not finished. Part of the future of a sperm (to become part of a new embryo or to die as a haploid failure) could depend on its response to "courtship" by the egg and/or its surrounding fluid.

The sperm of algae, mosses, ferns, and some invertebrate animals are attracted to the egg chemically, but until recently only one case of such attraction has been described in a vertebrate animal. The egg of the herring (a teleost fish) is covered by a zona pellucida-like coat (the "chorion"), and the chorion cannot be penetrated by sperm swimming in the surrounding water unless it locates a small opening in it. This opening, the micropyle, secretes a chemical that activates and attracts sperm to it. However, until recently, there had been no evidence that the human egg attracts sperm. The pervading theory had been that the human sperm present in the vicinity of the egg bump into it by chance.

A new finding, however, suggests that the human egg produces a chemical that attracts sperm and influences their swimming motion. If follicular fluid from a large grafian follicle is placed at one end of a chamber, sperm will accumulate at that end, whereas they will not respond to a control fluid. The quantities of estradiol or progesterone in the fluid do not influence this response, but only some and not all follicles have fluid that works. A good correlation also exists between the fertilizability of an egg and the ability of its surrounding fluid to attract sperm. Control fluid previously containing an egg also attracts sperm, so it appears that this signal comes from the egg, not the surrounding follicular cells.

When sperm are exposed to the egg signal, they swim in a circle instead of in a straight line, which would increase their chances of contacting the egg. Interestingly, not all sperm are attracted to the egg; some could care less and some even swim away from the egg! A human sperm has about 20 chemical receptor molecules on its head, and maybe some sperm have not formed the receptor(s) used in this chemical orientation to the egg or perhaps they are abnormal in other ways. Nevertheless, they will not be the chosen one! Many questions still remain. What is the chemical that attracts sperm? Why do some eggs produce the chemical and some not? Why do some sperm respond whereas others do not? Does the chemical cause more sperm to move up the oviduct leading to the egg instead of the "empty" oviduct? Do X and Y sperm behave differently in response to this chemical? Could an inhibitor of this chemical be used as a new contraceptive agent? Only time will tell.



Six human sperm were placed in a fluid-filled chamber. Their starting position is represented by the numbers 1 through 6. Then, either follicular fluid from a human Graafian follicle or fluid exposed to a human egg was injected at the lower left-hand corner (F). Arrowed lines then indicate the path swum by each sperm. Note that sperm 2 through 6 turned and headed toward F. Sperm number 1, however, was not interested. (Adapted from Ralt *et al.* (1991).)

with ovulation occurring at about the middle of this time period. A recent study, however, has cast suspicion on this theory. This study found that conception can only occur in a 6-day period, i.e., during the 5 days before ovulation or on the day of ovulation. Therefore, some sperm live for 6 days and the egg lasts 12 to 24 h (or the change in cervical mucus after ovulation halts sperm transport).

Copyright Elsevier 2019 This book belongs to Margaret Thompson

## The Process of Fertilization

Once a sperm and ovum are in the region of the ampullary–isthmic junction of the oviduct (Fig. 9-3), fertilization occurs. In the fertilization process, a sperm first penetrates between the cells constituting the cumulus oophorus and then through the zona pellucida and into the perivitelline space. The sperm then enters the oocyte through its cell membrane (the *vitelline membrane*). The following is a discussion of what happens during each of these processes, and Figs. 9-4 and 9-5 depict these processes. The entire process of fertilization takes about 24 h.

### Sperm Passage through the Cumulus Oophorus

The ovulated ovum is surrounded by the cumulus oophorus, which is a sphere of loosely packed follicle cells (Fig. 9-4). Appropriately, cumulus oophorus means "egg-bearing little cloud." As a sperm enters the cumulus oophorus, the enzyme *hyaluronidase* on the sperm head dissolves hyaluronic acid, a major component of the cementing material found between the cells of the cumulus oophorus as well as between other cells in the body. Enzymatic dissolution of hyaluronic acid allows the swimming sperm to penetrate the cumulus oophorus and to reach the zona pellucida.



**Figure 9-3**   Diagram of the human ovary, oviduct, and part of the uterus showing fertilization: (1) Follicle in ovary is ready to ovulate; (2) new corpus luteum; (3) ovulated ovum is arrested in second meiotic division (note the first polar body); (4) formation of second polar body after fertilization; (5) fusion of egg and sperm pronuclei; and (6) beginning of first mitotic division of zygote.

Copyright Elsevier 2019 This book belongs to Margaret Thompson



**Figure 9-4**   Illustration of the barriers around the recently ovulated ovum through which the capacitated sperm must pass to reach the perivitelline space and achieve activation and fertilization of the ovum.

## Sperm Passage through the Zona Pellucida

The zona pellucida is an extracellular matrix composed of three glycoproteins termed ZP1, ZP2, and ZP3. Receptors on the sperm plasma membrane attach to ZP3. This ZP3 receptor binding allows the sperm to adhere to the zona pellucida and is a critical step in fertilization. It triggers the sperm head to undergo the *acrosome reaction*. An influx of calcium and a rise in pH and cAMP levels within the sperm head cause exocytosis of the acrosomal vesicle. That is, the plasma membrane of the sperm fuses with the outer acrosomal membrane, forming many small openings to the acrosome. Contents of the acrosome, which are hydrolytic enzymes, spill out and degrade the zona pellucida near the sperm head. This forms a tunnel in the zona, through which the sperm begins to move (Fig. 9-5).

Degradation of the sperm plasma membrane causes the loss of ZP3 receptors. However, now the inner acrosomal membrane is exposed, and it appears to have receptors for another zona pellucida glycoprotein called ZP2. This ZP2 binding maintains the contact between egg and sperm. The sperm tail continues to beat vigorously, helping the sperm penetrate through the zona pellucida and make contact with the plasma membrane of the egg. Once the sperm has penetrated the zona pellucida, it moves through a narrow, oblique path into the *perivitelline space* (the area between the zona pellucida and the vitelline membrane, see Fig. 9-4). Penetration of the human zona pellucida by a sperm takes less than 10 min under experimental conditions.

Copyright Elsevier 2019 This book belongs to Margaret Thompson



**Figure 9-5**   Stages of fertilization. Capacitated sperm have already passed through the cumulus oophorus surrounding the egg; for clarity, cumulus cells are not shown. (a) Proteins on the sperm plasma membrane bind to ZP3 molecules within the zona pellucida of the egg. (b) Zona binding triggers the acrosome reaction, in which the sperm plasma membrane fuses with the outer acrosomal membrane, causing exocytosis of acrosomal contents. (c) Acrosomal enzymes begin to dissolve a hole in the zona pellucida. This enzymatic degradation, accompanied by rapid sperm tail beating, moves the sperm through the zona. (d) Egg-binding proteins on the sperm cell surface bind to molecules on the egg cell membrane. (e) The sperm cell membrane fuses with the egg plasma membrane, allowing the sperm nucleus and centriole to enter the egg cytoplasm. (f) Egg and sperm pronuclei migrate toward each other in preparation for syngamy.

Case 3:16-md-02738-MAS-RLS   Document 9889-4   Filed 05/29/19   Page 327 of 355 PageID: 66550

Copyright Elsevier 2019 This book belongs to Margaret Thompson

### Sperm Attachment to the Egg Plasma Membrane

The sperm approaches the egg sideways instead of head on, and the sperm head now lies parallel to the egg cell surface within the narrow perivitelline space (Fig. 9-5). At this point, the posterior part of the sperm head attaches to the egg plasma membrane. The plasma membranes of sperm and ovum fuse, forming an opening into which the sperm nucleus, midpiece, and most of the tail sink into the egg cytoplasm. Scientists are actively investigating the molecules involved in egg–sperm adhesion and subsequent fusion. Finding the molecular basis of sperm–egg fusion may help us understand certain forms of infertility and could possibly lead to new contraceptives.

### The Cortical Reaction

Once a sperm has entered the egg, it is imperative that no other sperm be permitted to fertilize it. If additional sperm were allowed to enter the egg, the extra genetic material they carry would disrupt normal development, and the resulting polyploid embryo would die. To prevent *polyspermy* (fertilization by more than one sperm), the egg now mounts a defense. Just underneath the plasma membrane of the egg lie small, membrane-bound vesicles called *cortical granules*. At fertilization, there is a sudden, dramatic burst in available free calcium in the egg cytoplasm as it is released from cytoplasmic storage. The rise in calcium causes cortical granule membranes to fuse with the adjacent cell membrane. Thus, the cortical granules open to the exterior and release their contents into the perivitelline space. Included in the cortical granule contents are enzymes that act on constituents of the zona pellucida. These enzymes alter ZP2 and ZP3, destroying their receptor sites for the sperm head. Thus, no additional sperm can attach to the zona pellucida to gain access to the egg.

The cortical reaction is the first step in a series of biochemical and physical changes in the egg known as *egg activation*. These rapid changes begin just after fertilization and are preparations for early embryonic development. In addition to the cortical reaction, egg activation involves completion of meiosis, increase in egg metabolism, synthesis of protein, RNA, and DNA, and preparation for the first mitotic division. All of these essential first steps in development are dependent on the initial rise in free calcium. We do not know exactly how fertilization initiates a calcium rise in the egg. One theory (the *receptor hypothesis*) suggests that binding of a sperm to an egg receptor induces biochemical changes in the egg cytoplasm that cause release of stored calcium. An alternative idea (the *cytoplasmic factor hypothesis*) is that as the sperm enters the egg cytoplasm, it carries a factor that causes free calcium to be released. Laboratory experiments lend support for each of these hypotheses, but the actual mechanism that occurs during normal fertilization remains unknown.

### Completion of the Second Meiotic Division

The ovulated egg is arrested in the second meiotic division and still has a duplicated set of chromosomes. Before merging with sperm DNA, the egg must complete its second meiotic division and jettison one set of its chromosomes.

Copyright Elsevier 2019 This book belongs to Margaret Thompson



**Figure 9-6**   The nucleus of the ovulated egg is haploid and its chromosomes are arrested in the second meiotic division (1). The first polar body may divide into two small cells (1), one of which is pictured in further figures. Sperm penetration activates the egg so that the second meiotic division is completed (2, 3) and a second polar body is formed (4). The egg and sperm pronuclei then fuse (5) and the resultant diploid zygote now divides mitotically (6, 7) to form a two-cell embryo (8) consisting of two blastomeres. Note that only two chromosomes are shown in (1), even though there should be 23.

At fertilization, the rise in free calcium activates the egg nucleus to complete meiosis, and a second polar body is produced, removing the extra set of chromosomes from the egg. The second polar body can often be seen in the perivitelline space before it degenerates (Fig. 9-6).

## Formation and Fusion of Sperm and Egg Pronuclei

Soon after the sperm nucleus enters the egg, its nuclear membrane breaks down. The sperm DNA decondenses as a result of exposure to factors in the egg cytoplasm. A new membrane then forms to enclose the *sperm pronucleus*. Sperm and egg pronuclei begin to migrate toward each other, replicating their DNA as they move. As they approach each other, their nuclear membranes break down and the two duplicated sets of chromosomes aggregate. Syngamy (merging of the two haploid genomes) has now occurred, and the fertilized egg (*zygote*) is the beginning of a new individual. In mammals, it takes about 12 h from the beginning of egg activation to pronuclear fusion. The centrosome contributed by the sperm organizes a mitotic spindle, and chromosomes now begin to line up at the metaphase plate. The zygote next divides mitotically, and two identical daughter cells, termed blastomeres, are formed (Fig. 9-6). Embryonic development has commenced.

We have seen that the sperm contributes its haploid chromosomes and centrosome to the zygote. The sperm tail disintegrates in the egg cytoplasm. What happens to the sperm mitochondria? It has long been known that the approximately 100 mitochondria brought by each sperm into an egg disappear soon after fertilization. Recent studies have demonstrated how this occurs. During spermatogenesis, sperm mitochondria are tagged with a protein called *ubiquitin*, a molecule

Copyright Elsevier 2019 This book belongs to Margaret Thompson

used by all cells to mark proteins slated for destruction. These tagged paternal mitochondria are then destroyed and recycled by the egg after fertilization. Thus, all of our mitochondria are inherited from our mothers. Maternal inheritance of DNA-containing mitochondria has been a useful way to trace human origins.

---

### Chapter 9, Box 2: Sperm Hitchhikers

Deprived of all but a scant amount of cytoplasm during the latter stages of spermatogenesis, the human sperm has, until recently, been considered to contribute nothing to the ovum except for its nuclear DNA and centriole. However, we know that factors carried by the sperm play active roles in the fertilization process. Some men with sperm apparently normal in shape, motility, and abundance still are infertile if they lack these biochemical factors. From the text, you know that some of these factors are enzymes such as hyaluronidase and acrosomal, enzymes necessary to break through the layers of cumulus cells and the zona pellucida before reaching the egg surface. Also necessary are zona-binding proteins on the surface of the sperm cell membrane and inner acrosomal membrane. However, these are not all of the players in the process of fertilization, and some sperm "hitchhikers" may also be important for normal development of the egg and embryo.

For example, the sperm head contains a protein, *fertilin-β*, on its surface. After the sperm penetrates the zona pellucida, the tip of its head approaches the vitelline membrane. Then the head turns laterally so that one side of the sperm head attaches to the vitelline membrane (see text). Fertilin-β appears to mediate this lateral attachment. If this protein is absent, fertilization does not occur because sperm–oocyte binding is inhibited. Fertilin-deficient sperm also have a reduced ability to bind to the zona, and our understanding of the normal action of fertilin is still evolving.

When the sperm penetrates the egg, waves of stored calcium ions are released in the egg cytoplasm. This sudden increase in calcium triggers egg activation (cortical granule release and reinitiation of meiosis). Scientists have long speculated that the trigger for calcium release is carried by the sperm.

Researchers have found that the sea urchin sperm head contains an enzyme that can synthesize *nitric oxide*. This gas is injected into the egg at fertilization and can set off a calcium surge. It remains to be seen if a similar mechanism operates in humans. Study of human eggs has revealed that *phospholipase C* is carried by sperm into the egg. It also can cause the waves of calcium release and egg activation.

*Ribonucleic acid* (RNA) is produced when cells read the DNA sequences coded by the genes and transcribe these messages. During the later stages of spermatogenesis, sperm DNA becomes tightly compressed and gene expression ceases. However, scientists have found that sperm RNA is still present in the mature sperm even at fertilization. This is especially surprising because the sperm cytoplasm is virtually gone. Sperm cells contain an amazing repertoire of RNAs. It turns out that about 3000 of the 20,000–25,000 human genes are represented by sperm RNA. Some of the mRNAs represent known genes, others are unknown, and some of the RNAs do not code for proteins. Many types of mRNAs are found in the sperm cell nucleus.

Most of these 3000 transcripts are probably leftover RNA instructions for building the sperm cell during the process of spermatogenesis. However, scientists have identified six RNAs present in the spermatozoa but not in the unfertilized egg. They then asked if these transcripts are carried into the egg at fertilization. If the sperm delivers RNAs into the egg at fertilization, one would expect to find these RNA sequences in the sperm and in the zygote, but not in the unfertilized egg. Using cDNA probes, they found two sperm RNA sequences that are delivered to the egg at fertilization.

What happens to RNAs delivered by the sperm? Possibly they are simply destroyed by

*Continued on next page.*

The Process of Fertilization

Copyright Elsevier 2019 This book belongs to Margaret Thompson

*Chapter 9, Box 2 continued.*

the egg cytoplasm. However, it is also possible that these RNAs act as instructions for early embryonic development and that they are needed to launch the developmental program of the zygote. In fact, one of the mRNA transcripts delivered to the egg codes for *clusterin*, which has been implicated in cell–cell interactions, membrane recycling, and regulation of apoptosis (programmed cell death), processes central to embryonic development.

Preliminary evidence shows that the sperm of some infertile men lack some of the RNAs carried by sperm of fertile men. In fact, it is thought that a treatment that lowers or eliminates the RNAs from the sperm of fertile men may render them infertile, thus providing a potential male contraceptive method. Some scientists use the absence of male RNAs as a possible explanation of why embryonic development is so poor in most cases of cloning and in all cases of human parthenogenesis; neither process involves sperm. However, others cite the occasional success of cloning to argue against an important role for sperm RNAs.

As new sperm molecules are discovered, the role of the sperm has expanded from simply delivering a haploid genome to the egg to essential roles in the fertilization process and perhaps important roles in egg activation and early embryonic development as well.



Possible influences of the sperm cell on the egg and/or early embryo in addition to the contribution of its haploid nucleus. For clarity, the sperm cell is shown oriented at right angles to the egg cytoplasm.

Copyright Elsevier 2019 This book belongs to Margaret Thompson

## Chemical Inhibition of Fertilization

In the future, it may be possible to block fertilization by interfering with steps in the fertilization process. A search for vaccinations against sperm, egg, or the early embryo has long been underway. More recently, studies have focused on specific ways to thwart the actions of sperm cells, either by immobilizing them or by preventing them from undergoing the acrosome reaction, binding to the zona pellucida, or fusing with the egg cell membrane. Some of these potential future contraceptive methods are discussed in Chapter 14.

## Sex Ratios

As discussed in Chapter 5, the normal chromosome number in humans is 46 (2N, diploid). Females have 22 pairs of autosomes and two X chromosomes. Males have 22 pairs of autosomes and an X and Y chromosome. The genes for male sex determination are carried on the Y chromosome. Thus, embryos without a Y chromosome are female.

As a result of meiosis in the adult testis, one diploid male germ cell (spermatogonium) gives rise to four haploid spermatozoa (see Chapter 4). Two of these spermatozoa will have 22 autosomes and a Y chromosome, whereas the other two will have 22 autosomes and an X chromosome. If a Y-bearing sperm (22Y) fertilizes an ovum (with 22 autosomes and an X chromosome), the embryo will be male; if an X-bearing sperm (22X) fertilizes an ovum, the offspring will be female. Thus, given an equal chance of X and Y sperm to fertilize, the sex ratio of embryos should be 100:100 (Fig. 9-7). However, the ratio of male to female embryos at conception (the *primary sex ratio*) is about 120:100. This ratio is based on the sexes of early aborted embryos. It is assumed that this means a greater fertilization rate by Y sperm than X sperm, perhaps because Y sperm are lighter and faster swimmers than X sperm.



**Figure 9-7**   The chromosomal basis for the existence of an equal number of X and Y sperm, and thus a theoretical primary sex ratio of 100:100. As discussed in the text, this theoretical ratio is not borne out, and more embryos are male than female.

Copyright Elsevier 2019 This book belongs to Margaret Thompson

However, female embryos may die more frequently at an earlier age than male embryos or more X sperm may die in the female reproductive tract than Y sperm. The sex ratio of male births to female births (the *secondary sex ratio*) is 105:100. Thus, for reasons not yet understood, male fetuses suffer a greater mortality than female fetuses in the uterus.

## Sex Preselection

Couples who desire to choose the sex of their baby may now do so. A relatively new technology (the *microsort method*) is the most effective procedure yet devised at separating X-bearing and Y-bearing sperm. It takes advantage of the fact that the large X chromosome has considerably more DNA than the tiny Y chromosome. A sperm sample is first collected from the prospective father. Then, the sperm cells are treated with a fluorescent dye that attaches to DNA and glows under laser light. Sperm with more DNA, scientists reasoned, would glow more brightly. Although X sperm have only 2.8% more DNA than those carrying a Y chromosome, the difference in brightness is sufficient to be distinguished by a light detector. The tagged sperm are sent through a very narrow tube with a diameter wide enough to allow only one sperm cell at a time. As sperm move through the tube, they are illuminated by a laser beam. An automated mechanical sperm sorter then separates the sperm, sending X sperm down one tube and Y sperm into another. The sorted sperm can then be placed in the woman's uterus (artificial fertilization) or used for *in vitro* fertilization. Approximately 91% of sperm cells in the X-bearing tube contain an X chromosome. This procedure is only about 74% effective in selecting Y-bearing sperm. Thus, the results are not foolproof, but this method does improve the chances of producing an embryo of the desired sex, especially if a couple wishes to have a girl.

A more accurate method of ensuring the sex of a baby is *preimplantation genetic diagnosis (PGD)*, which is available at a limited number of clinics. It involves *in vitro* fertilization followed by embryo selection. The mother's eggs and father's sperm are collected, and the eggs are fertilized in the laboratory. After 3 days of development, a cell is carefully removed from each embryo and chromosomes are examined. Those carrying a Y chromosome are separated from non-Y-bearing embryos. Only embryos of the desired sex are implanted into the mother's uterus. Although nearly 100% accurate, this procedure is more invasive, expensive, and controversial than sperm-sorting techniques.

Why would parents wish to preselect the sex of their offspring? One reason would be to avoid sex-linked genetic diseases, which are more likely to occur in males. Parents may also wish to balance their families or they may simply prefer to have a child of a given sex. Some have expressed concerns that the ability to select a baby's sex may be the first step to "designer children" chosen for other traits such as height, IQ, athletic, or musical ability. Others fear that widespread sex selection would lead to a gender imbalance in society and cause social problems. In fact, a preference for baby boys in China has led to a significant shift in the sex ratio in some areas of the country. In such cultures where boys are valued more highly than girls, the ability to select sex before fertilization could avoid costly and ethically controversial practices such as amniocentesis (genetic screening for sex), selective abortion, and even infanticide. In the United States, sperm selection likely would not lead to overall gender imbalance, as family preference

Copyright Elsevier 2019 This book belongs to Margaret Thompson

for a girl or a boy baby is split more evenly. Finally, the ability to preselect a child's sex may help families limit their size. For example, using gender selection technology, a family with three boys could increase their likelihood of having a girl as their fourth and last child instead of continuing to have babies until a girl was conceived. However, the present high cost of the microsort and PGD methods likely will limit the practice of sex preselection in the foreseeable future.

## Multiple Embryos

Twins occur in about 1 of every 80 or 90 pregnancies. When two ova are released and each is fertilized by a different sperm, *fraternal twins* are produced. These twins are *dizygotic* (the products of two different zygotes) and can be the same or different sex. Fraternal twins, which are *nonidentical* and are as different from each other as are nontwin brothers and sisters, account for two-thirds of all twins. The incidence of dizygotic twins is influenced by race and by inherited factors from the mother (not the father). Fraternal twins are more common in older mothers.

*Identical twins*, which are rarer than fraternal twins, usually occur when an early embryo divides into two. These twins are *monozygotic* (derived from one zygote) and are identical genetically. The incidence of identical twins is not related to race, inheritance, or age of the mother. Rarely, identical twins are *conjoined* (i.e., they fail to separate completely during embryonic development). These are called *Siamese twins*, after the first publicized Siamese twins, "Chang" and "Eng" (1811–1874), born in Siam of Chinese extraction. They were united at the chest by a thick mass of flesh. Some Siamese twins have been separated surgically after birth. For more on twin pregnancies, see Chapter 10.

When the number of embryos is greater than two (e.g., triplets, quadruplets), all are usually of multizygotic origin; in a few cases, some are multizygotic and some are monozygotic.

## Parthenogenesis

Is it possible that an embryo can develop in a human female without previous fertilization? Embryonic development from an ovum not previously stimulated or penetrated by a sperm is called *parthenogenesis*. Such "virgin birth" is common in many insects, in some fish, amphibians, and reptiles, and in a strain of domestic turkeys. In addition, parthenogenetic mouse embryos can be produced in the laboratory, but they do not develop to term. There is no proven case of a parthenogenetic birth in humans. If parthenogenesis could occur, reduction division in the oocyte must not occur, the offspring would always be female, and the child would be genetically identical to the mother.

## Chromosomal Aberrations

Errors of meiosis or fertilization can produce embryos with chromosomal aberrations. More than 90% of these embryos are aborted spontaneously, usually within the first trimester. In fact, 42% of embryos or fetuses that are

Copyright Elsevier 2019 This book belongs to Margaret Thompson

aborted spontaneously have chromosomal abnormalities. A few fetuses with chromosomal defects, however, are born; about 1 out of every 100 newborns has such a defect. It must be emphasized that some of these disorders are not inherited in the strictest sense because the genes of the parents do not govern their occurrence.

In rare cases, one sperm will fertilize the ovum and a second sperm will fertilize the polar body. The two fertilized cells then form an embryo that is a genetic mosaic in that half of its cells will have a different genetic makeup from the other half. This condition also can occur when the haploid ovum divides into two cells and each cell is then fertilized by a separate sperm. If an X and a Y sperm were involved, half of the cells of an embryo would be male and half female, resulting in an intersex (see Chapter 5).

One kind of chromosomal aberration occurs when fertilization fails to activate the second meiotic division in the ovum. Thus, there is no egg pronucleus and the embryo develops with only one set of chromosomes (haploid) and genes of the male only. This process of embryonic formation is termed *androgenesis*. A similar situation occurs when the ovum pronucleus develops normally, but the sperm pronucleus does not form. In this case, called *gynogenesis*, the embryo also is haploid but has only the female's genes. Both of these conditions are lethal after only a few cell divisions in the embryo.

In contrast to the previously mentioned conditions, some embryos may develop with triploid cells (3N) that have 69 chromosomes (three complete sets). *Triploidy* can occur in at least three ways. First, sperm penetrating the ovum may be the product of a failure of reduction division during meiosis in the testis, and thus it has 46 instead of the normal 23 chromosomes. When this sperm fertilizes a haploid ovum, a triploid embryo develops. Second, even though mechanisms to prevent polyspermy are present, these mechanisms are not failsafe. Thus, two haploid sperm can penetrate a single ovum (polyspermy) and both of their pronuclei then fuse with the haploid ovum pronucleus. Finally, reduction division (meiosis) may not have occurred in the oocyte, and the resultant diploid female pronucleus then fuses with a haploid sperm pronucleus to produce a triploid zygote.

The excess dosage of genes in triploid embryos tends to be less destructive than when there are too few genes, as in androgenesis or gynogenesis. Most triploid embryos develop to about the third month of pregnancy before aborting spontaneously. The very few triploid fetuses that survive to term are malformed and are stillborn or die soon after birth. Less than 1% of all human embryos are triploid.

Another error in fertilization results in embryos with either one too many (47) or one too few (45) chromosomes in their cells; these conditions are collectively called *aneuploidy*. This happens when there is aberrant chromosome movement during the first or second meiotic division in the testis or ovary or in the first cleavage division of the zygote. That is, a pair of hromosomes fails to separate during division, with both members going to one daughter cell (*nondisjunction*). The resultant cell has 47 chromosomes, and the cell coming up short has only 45. Thus, the aneuploid condition can be either *monosomic* (45 chromosomes) or *trisomic* (47 chromosomes).

Most monosomic embryos abort spontaneously early in their development. An exception, however, is when monosomy for a sex chromosome occurs. That is, each cell has only a single sex chromosome, either an X or a Y. About 98% of

Copyright Elsevier 2019 This book belongs to Margaret Thompson

these embryos abort, but a few with one X (XO condition; Turner's syndrome) are born as sterile females with short stature and physical defects (see Chapter 5). Only 1 in 3500 living females has this syndrome.

Most trisomic embryos die in the second or third month of pregnancy and abort spontaneously; 20% of miscarried fetuses are trisomic. Some, however, are born with severe physical and mental defects. The most common trisomic condition in infants is *Down syndrome*, also called *Mongolism*, a condition in which the cells of the individual are trisomic for chromosome number 21. Children with Down syndrome exhibit abnormal body development and severe mental retardation.

For some as yet unknown reasons, the gametes of older men and women are more likely to produce trisomic embryos. The chances are 1 in 1000 for having a trisomic embryo for women under 35, but are 1 in 200 for 35-year-old women and 1 in 15 for 45-year-old women. Women over 35 have 15% of all babies but 50% of all Down's syndrome children. Therefore, it is recommended that women in their midthirties consider having the cells of their fetus examined by amniocentesis or chorionic villus biopsy (see Chapter 10) for evidence of chromosomal abnormalities. If certain chromosomal aberrations are found, induced abortion might be considered (see Chapter 15). It used to be thought that errors in meiosis in oocytes of older women were the main cause of trisomy. Recently, however, we have become aware that about one-fifth of trisomic infants are caused by chromosomal abnormalities in the sperm of older men.

As discussed in Chapter 5, nondisjunction of sex chromosomes can produce males with trisomic cells of an XXY or XYY makeup. In the former condition, Klinefelter's syndrome, males are sterile and have female-like breasts. About 1 out of 600 males is born with this condition. In the latter "supermale" condition (XYY), males are very tall and often have acne. These males tend to exhibit mental and social adjustment problems at a higher percentage than normal XY males. One in 2000 males has XYY cells. Some statistical evidence exists that the percentage of XYY males (1.8 to 12.0%) in penal institutions is greater than their percentage (0.14 to 0.38%) in the general population. Some controversy, however, surrounds these studies and it is not clear if the greater maladaptive behavior of XYY males is a direct result of their chromosomal abnormality or is due to social problems they had when growing up because of their unusual physical appearance. Apparently the elevated crime rate of XYY men is not related to aggression but may be related to low intelligence. Women with nondisjunction of the X chromosome have cells that are XXX. These women are female but sterile. Cases in which males have several X chromosomes (XXXY) are due to penetration of the ovum by more than one sperm.

Sometimes a gamete contains a chromosome with an extra piece from another chromosome attached to it; this is the result of *chromosomal translocation*. The chromosome from which the piece was taken thus suffers from *chromosomal deletion*. An example of a disorder resulting from chromosomal deletion is the *cri du chat* (French for "cry of the cat") syndrome, in which a piece of chromosome 5 is missing. These children are born with a small head, widely separated eyes, low-set ears, and mental retardation. When they cry, it sounds like a hungry kitten. Human kidney cancer has also been linked to an inherited chromosomal translocation in which a piece of chromosome 3 is hooked onto chromosome 8.

Copyright Elsevier 2019 This book belongs to Margaret Thompson

An inherited disorder of the X chromosome (*fragile X syndrome*) is the second leading cause of mental retardation. In these people, the X chromosome (in either sex) has an abnormally long, fragile arm. In this disorder, mental retardation is less severe in females than in males.

## Chapter Summary

After sperm mature in the epididymides, they move down the vasa deferentia. Seminal plasma consists of secretions from male sex accessory glands. These secretions are added to the sperm to form semen (seminal fluid), which leaves the male urethra during ejaculation. Seminal plasma contains substances necessary for sperm movement, maturation, and maintenance.

About 66 million sperm are present in each milliliter of semen. Some of these sperm are abnormal and die. A healthy sperm is made up of a head (nucleus plus acrosome), neck, midpiece, and tail. After insemination of the female, the sperm move through the vagina, cervix, uterus, and into the oviduct. While in the uterus and oviduct, sperm acquire the ability to fertilize (capacitation) and are activated so that their tails beat more rapidly. Meanwhile, the ovulated ovum moves down the oviduct, and the sperm and ovum meet at the ampullary–isthmic junction of the oviduct, where fertilization occurs.

Before penetrating the ovum, a sperm moves first through the cumulus oophorus and zona pellucida. As it binds to the ZP3 glycoprotein on the zona pellucida, it undergoes the acrosome reaction, during which the sperm acrosome releases enzymes that help dissolve the zona. Once the sperm enters the ovum, it causes the completion of oocyte meiosis and the cortical reaction, which produces changes in the zona pellucida that act as a barrier to polyspermy. The haploid sperm pronucleus and egg pronucleus then merge, and a zygote is formed. In the future, certain chemicals may be used to block fertilization as a method of birth control.

Chromosomal sex is determined at fertilization, and couples may now be able to choose their baby's sex. Identical twins (monozygotic twins) are formed when a single sperm fertilizes a single ovum, after which the embryo divides into two. Fraternal twins (dizygotic twins) are formed by the fertilization of two separate eggs and sperm. Although several nonmammalian animal species can have offspring without fertilization (parthenogenesis), this has not occurred in humans.

Chromosomal errors that occur before or during fertilization can result in formation of an embryo that is haploid, triploid, aneuploid, or containing one or more chromosomes with added or deleted genetic material. Most embryos with serious chromosomal errors die early in development, but some genetic errors cause mild to severe disorders in humans.

## Further Reading

Block, I. (1981). Sperm meets egg. *Sci. Digest* **89**(3), 96–99.

Fackelmann, K. (1998). It's a girl! Is sex selection the first step to designer children? *Sci. News* **154**, 350–351.

Hall, S. (2004). The good egg: Determining when life begins is complicated by a process that unfolds before a sperm meets an egg. *Discover* **25**, 30–39.

Copyright Elsevier 2019 This book belongs to Margaret Thompson

Ridley, M. (1993). A boy or a girl: Is it possible to load the dice? *Smithsonian Magazine* **24**(3), 113–124.

Travis, J. (2002). A man's job: A surprise delivery from sperm to egg. *Sci. News* **162**, 216–217.

Wassarman, P. M. (1988). Fertilization in mammals. *Sci. Am.* **259**(6), 78–85.

Wilcox, A. J., *et al*. (1995). Timing of sexual intercourse in relation to ovulation: Effects on the probability of conception, survival of pregnancy, and sex of the baby. *N. Engl. J. Med.* **333**, 1517–1521.

## Advanced Reading

Davis, D. L., *et al*. (1998). Reduced ratio of male to female births in several industrial countries: A sentinel health indicator? *J. Am. Med. Assoc.* **279**, 1018–1023.

Evans, J. P.L., and Florman, H. M. (2002). The state of the union: The cell biology of fertilization. *Nature Med.* **8**(S1), S57–S63.

Garbers, D. L. (1989). Molecular basis of fertilization. *Annu. Rev. Biochem.* **58**, 719–742.

Ostermeier, G. C., *et al*. (2002). Spermatozoal RNA profiles of normal fertile men. *Lancet* **360**, 772–777.

Ralt, D., *et al* (1991). Sperm attraction to a follicular factor(s) correlates with human egg fertilizability. *Proc. Natl. Acad. Sci. USA* **88**, 2840–2844.

Roldan, E. R. S., *et al*. (1994). Exocytosis in spermatozoa in response to progesterone and zona pellucida. *Science* **266**, 1578–1581.

Schatten, H., and Schatten, G. (eds.) (1989). "The Cell Biology of Fertilization." Academic Press, San Diego.

Schatten, H., and Schatten, G. (eds.) (1989). "The Molecular Biology of Fertilization." Academic Press, San Diego.

Simon, C. (2003). The role of estrogen in uterine receptivity and blastocyst implantation. *Trends Endocr. Metab.* **14**, 197–199.

Wassarman, P. M. (1987). The biology and chemistry of fertilization. *Science* **235**, 553–560.

# Exhibit 66

*Acta Obstet Gynecol Scand 2004: 83: 369–374*
*Printed in Denmark. All rights reserved*

*Copyright © Acta Obstet Gynecol Scand 2004*

**Acta Obstetricia et
Gynecologica Scandinavica**

───────────────── ORIGINAL ARTICLE ─────────────────

# Uterine contractility and directed sperm transport assessed by hysterosalpingoscintigraphy (HSSG) and intrauterine pressure (IUP) measurement

Stefan Kissler[1], Ernst Siebzehnruebl[1], Joachim Kohl[1], Anja Mueller[1], Nadja Hamscho[3], Regine Gaetje[2], Andre Ahr[2], Achim Rody[2] and Manfred Kaufmann[2]

From the [1]Division of Gynecologic Endocrinology and Reproductive Medicine, the [2]Department of Gynecology and Obstetrics and the [3]Institute of Nuclear Medicine, Johann Wolfgang Goethe-University, Frankfurt am Main, Germany

*Acta Obstet Gynecol Scand* 2004; 83: 369–374. © Acta Obstet Gynecol Scand 83 2004

*Background.* Uterine peristalsis sustains sperm transport and can be detected by hysterosalpingoscintigraphy (HSSG). This study is the first to be designed to investigate uterotubal transport function by HSSG and uterine contractility by intrauterine pressure measurement (IUP) consecutively on the same day in the periovulatory phase.
*Methods.* Twenty-one female subjects (mean age 28.4 years) without a gynecologic history were examined sequentially by HSSG and IUP on the same day to evaluate uterine contractility in relation to the utero-tubal transport function. In HSSG, intact transport function was visualized by the rapid uptake of $99^m$-technetium-marked albumin aggregates through the female genital tract. In IUP, the frequency of uterine contractions (UC/min), amplitude of uterine contractions and basal pressure tone were detected via a intrauterine catheter. HSSG and IUP were embedded in cycle monitoring with measurement of LH and estradiol.
*Results.* In HSSG, a positive transport of inert particles was assessed in 20 of 21 subjects, in 76% to the side of the dominant follicle or on both sides of the oviduct, and in 19% a strict contralateral transport could be observed. In only one subject (5%), no transport was assessed. The mean value of uterine contractions was 3.4 UC/min (SD ± 0.7), the mean amplitude was 12.0 mmHg (SD ± 4.25 mmHg). Basal pressure tone was 70.7 mmHg. There was a statistically significant correlation with estradiol levels: none of the subjects with less than 3 UC/min showed an estradiol level higher than 100 pg/mL; nearly every patient (one exception) with more than 3 UC/min had an estradiol level higher than 100 pg/mL ($p < 0.0001$, Fisher's exact test).
*Conclusions.* Intact periovulatory utero-tubal transport function can be documented by HSSG and is caused by directed uterine contractility, measured consecutively by IUP. Uterine contractility is influenced by rising estradiol levels. Directed uterine contractility and intact utero-tubal transport function are considered necessary for intact sperm transport, mainly to the side bearing the dominant follicle to maximize fertility.

*Key words:* intrauterine pressure; intrauterine contractility; HSSG; utero-tubal transport function

*Submitted 23 June, 2003*
*Accepted 8 September, 2003*

Uterine peristalsis is of critical importance in the process of reproduction and has been investigated mainly by transvaginal ultrasound examination (1,2). Uterine peristalsis only involves the stratum subvasculare of the myometrium and reveals cyclic changes in direction, frequency and intensity (3,4). During menstruation, contraction waves with the lowest

frequency are directed towards the cervix, while during the other phases of the cycle, with the highest frequency and intensity during the peri-ovulatory phase, cervico-fundal peristalsis prevails (3,5). Uterine contractions are involved in the expulsion of menstrual debris as well as in rapid directed sperm transport (6–9) and in the high fundal implantation of the embryo in the luteal phase.

Two methods have generally been used to assess uterine contractions (UC): one involves a record of changes in intrauterine pressure (IUP) using invasive probes that detect intraluminal variation of pressure produced by the UC (10–12). A less invasive technique has been invented in various forms of direct visualization of UC with transvaginal ultrasound, some from digitized scans. Ultrasound measurements usually provide information on the direction of UC propagation, which is difficult to detect in IUP recordings. In contrast, IUP measurement allows a quantification of the UC amplitude, especially in the periovulatory period.

Hysterosalpingoscintigraphy (HSSG) (13,14) can be used to investigate the utero-tubal transport mechanism of the female genital tract *in vivo* by means of technetium-labeled albumin macrospheres of the size of sperm that are placed in the posterior vaginal fornix. The ascension of these particles within the female genital tract can be observed by scintigraphy.

In this study, to our knowledge, this is the first time that uterine contractions have been measured in frequency and amplitude by IUP in the late follicular phase, and consecutively correlated with the utero-tubal transport mechanism assessed by HSSG on the same day.

## Material and methods

Twenty-one healthy patients (mean age 28.4 years) with a history of fertility or infertility due to severe andrologic factors were examined by HSSG and measurement of the IUP on the same day in the late follicular phase. All patients had ovulatory cycles and underwent a monitored cycle when HSSG and IUP were performed. Both examinations were undertaken successively on the same day. Ovulation was proven by an LH surge. All patients had proven patency of fallopian tubes by chromolaparoscopy or hysterosalpingosonography.

Exposure of the ovaries to radiation was calculated to be 0.8–1.4 cGy, with the mean exposure below a threshold of 1 cGy. By comparison, radiation exposure in the standard procedure of hysterosalpingography (HSG) is more than seven times higher, at 7.6 cGy.

The study was approved by the local ethics committee and patients gave their informed consent about HSSG and IUP and were strictly advised not to become pregnant during the diagnostic cycle in which HSSG was carried out.

### HSSG

HSSG is a well-established technique for evaluating the utero-tubal transport mechanism (7–9). The examination was performed as close as possible before ovulation in the late follicular phase. On the day of the examination, the size and the location of the dominant follicle were detected ultrasonographically. For HSSG, 10 MBq 99$^m$-technetium-marked macroalbuminaggregates (Solco MAA; Solco Basel AG, Birsfelden, Switzerland) with a size of 5–20 μm, which imitates the size of sperms, were diluted with 2 mL saline solution 0.9% and then administered in the posterior vaginal fornix of the supine patient. Serial scintigrams were taken by a gamma-camera. For quantitative evaluation of HSSG, 'regions of interest' (ROI) were determined in the area of both fallopian tubes to visualize the concentration of radioactivity in the area of the oviduct. By using ROIs, radioactivity can easily be attached to the compartment's uterine cavity or fallopian tubes. Taking into account the size and location of the dominant follicle, the results of HSSG can be classified as follows:

Ipsilateral: concentration of radioactivity on the side of the dominant follicle.

Contralateral: concentration of radioactivity on the opposite side of the dominant follicle.

Both sides: equal concentration of radioactivity on both sides.

No tubal transport (uterine cavity): concentration of radioactivity in the area of the uterine cavity without any further transport to the fallopian tubes.

### IUP

Each of the 21 women underwent IUP measurement directly after HSSG. IUP was recorded as follows: a rubber balloon-catheter (Ruesch 5 Ch., Ruesch AG®, Kernen, Germany) for intrauterine use was gently inserted into the uterine cavity and blocked with 0.5 mL of distilled water. Its hollow cavity was filled with sterile distilled water so that uterine contractions could easily be transferred to a transducer calibrated to convert mechanical to electrical signals. In none of the patients was cervical dilatation necessary, nor was a tenaculum used. Storage of data followed on a PC with specifically designed software (ScopeView, Metex®). The exact position of the rubber balloon was estimated in the lower third of the uterine cavity and controlled by transvaginal ultrasound. Recordings lasted 15–20 min.

In every patient the frequency of uterine contractions could be calculated by the number of oscillations per minute and expressed as the number of uterine contractions per minute (UC/min). The amplitude of contractions was expressed in mmHg and defined as the difference from the baseline pressure tone. Basal pressure tone was also detected in mmHg and expresses the basal myometrial activity in the late follicular phase.

In every patient LH and estradiol were measured on the day of the examination.

Documentation of data and statistical analysis was performed with SPSS for windows (SPSS Inc., Chicago, Illinois, USA) on a PC. Statistical significances were calculated with Fisher's exact test. A $p$-value <0.05 was considered to be statistically significant.

## Results

### HSSG

In 16 of 21 (76%) patients an ipsilateral positive transport to the side of the dominant follicle or transport towards both oviducts could be



*Fig. 1.* Hysterosalpingoscintigraphy: demonstration of radioactivity on the left side with a dominant follicle of 15 mm in diameter (ipsilateral demonstration). Compartment I, vagina; compartment II, uterine cavity; compartment III, oviduct. Positive transport mechanism can easily be detected in an early scan after 20 s.

observed (Fig. 1). In four patients (19%) the positive transport could be documented strictly on the contralateral side, in one patient (5%) no tubal transport could be observed (negative transport function). In summary, 20 of the 21 evaluated subjects had a positive transport function of the utero-tubal unit, sustained by uterine contractions. One patient showed a dominant follicle of 17 mm in diameter, an estradiol level of 125 pg/mL, and a contraction of 4.07 UC/min, but failed to build up an intact transport mechanism.

### IUP

In all patients uterine contractions could be easily observed (Fig. 2). The IUP measurement took place in the periovulatory phase directly following HSSG on the same day. Contractions varied between 1.8 and 5 UC/min.

The mean value of contractions in the periovulatory phase was 3.4 UC/min (SD ± 0.7).

The amplitude of contractions varied in range from 8 to 36 mmHg. The mean amplitude was 12.0 mmHg (SD ± 4.25 mmHg).

The basal pressure tone of the uterus reflects the basal isotonic contraction of this strong muscle containing smooth muscle fibers. In our patients the basal muscle tone was 70.7 mmHg (SD ± 15.7 mmHg) in the periovulatory phase (Table I).

Depending on the estradiol levels, uterine contractility reveals a statistically significant increase: none of the patients showing less than 3 UC/min had an estradiol level higher than 100 pg/mL (mean 63 pg/mL). By comparison, nearly every patient (one exception) with more than 3 UC/min had an estradiol level higher than 100 pg/mL (mean 201 pg/mL) (Table II, $p < 0.0001$).

### Discussion

Rhythmic contractions of the nonpregnant uterus have been demonstrated by invasive techniques in



*Fig. 2.* Contractility pattern demonstrated by IUP in the same patient (see Fig. 1). The patient showed a dominant follicle of 15 mm on the left side, LH peaked on the day of the examination, and the estradiol level was 120 pg/mL. A mean contractility of 3.3 UC/min was detected, with a mean pressure amplitude of 14.1 mmHg and the basal tone was 73.3 mmHg.

372    *S. Kissler et al.*

Table I. Results from intrauterine pressure measurement ($n = 21$) in the periovulatory phase

|  | Mean | Range |
|---|---|---|
| Frequency (UC/min) | 3.4 ($\pm 4.25$) | 1.8-5.0 |
| Amplitude (mmHg) | 12.0 ($\pm 4.25$) | 8.0-36.0 |
| Basal tone (mmHg) | 70.7 ($\pm 15.7$) | 36.0-96.7 |

different species including humans (10–12). From the end of menstruation until the late proliferative phase most researchers found small and frequent contractions in a retrograde direction (cervico-fundal). The main interest in these first studies was to evaluate uterine contractility during menstruation, which revealed slower and stronger contractions in an antegrade (fundo-cervical) direction.

Before the noninvasive technique of trans-abdominal or transvaginal ultrasonography appeared, the reasons for propagated uterine contractions in the late follicular phase remained enigmatic. Transvaginal studies (3–5) demonstrated a tremendous cyclic increase in frequency and amplitude of uterine contractions towards the fundus uteri throughout the late follicular phase and the periovulatory phase. This contractility pattern was reversed in the luteal phase. The authors presumed that these subendometrial contractions could be of importance concerning sperm transport.

Kunz et al. (8) reported for the first time a direct relationship between the increase in the frequency of uterine contractions assessed by transvaginal ultrasound and the percentage of ipsilateral transport of sperm-like material by HSSG. The mean value for uterine contractions in the preovulatory phase was constantly considered to be in the range 2.8–3.0 UC/min. This process was positively correlated with increasing estradiol levels, but the intrauterine pressure has not been recorded because of its invasive character. Nowadays, HSSG has been established for evaluating the integrity of the utero-tubal transport function (7–9,13,14).

Based upon the encouraging results of these studies, Kadanali et al. (6) reported similar results concerning utero-tubal transport capacity when

Table II. Dependence of uterine contractility on estradiol levels ($n = 21$)

| Frequency (UC/min) | Estradiol | |
|---|---|---|
|  | $<100$ pg/mL (mean 63 pg/mL) | $>100$ pg/mL (mean 201 pg/mL) |
| $<3$ | 8 | 0 |
| $\geq 3$ | 1 | 12 |

radioactive-labeled sperm were used compared to $99^m$-technetium-marked albumin macrospheres in patients bearing an intrauterine device (IUD) *in vivo*.

Therefore, there is even *in vivo* substantial evidence that the utero-tubal transport unit is responsible for intact sperm transport.

Contradictory results have also been published (15), although no information was given about the size and location of the dominant follicle and the estradiol levels of the patients examined. The majority of authors working with HSSG support this method as an important diagnostic tool for infertility workup.

To our knowledge, our study is the first to provide proof of an intact sperm transport mechanism assessed by HSSG in healthy women directly followed by IUP measurement. IUP recordings reveal strong and high-frequency contractions that are responsible for the integrity of the utero-tubal transport system.

Although we were not able to investigate the direction of the contraction waves by using only one inserted catheter, the aim of this study was to examine the amplitude, frequency and basal pressure tone in the decisive reproductive phase of the menstrual cycle, results that cannot be obtained by ultrasonographic examination alone.

Uterine contractility at various phases of the menstrual cycle by transvaginal ultrasound and IUP recordings on the same day was first published by Bulletti et al. (16). There was no difference between the measurement of ultrasonographic contractions and contractions measured by IUP recordings, which were 2.9 UC/min in the late follicular phase and 3.9 UC/min in the periovulatory phase. However, IUP recordings were only taken in five subjects.

Our data concerning uterine contractility measured by IUP confirm, in a higher number of subjects, the findings of Bulletti et al., who found a mean value of 3.9 UC/min in the periovulatory phase. Our data revealed 3.4 UC/min at that phase of the cycle. The only difference between the findings is a lower amplitude of uterine contractions (12.0 vs. 25.6 mmHg) and a higher basal tone (70.7 vs. 56.2 mmHg) in our patients. The higher basal tone might be due to the influence of the rubber balloons on the calculated tone pressure.

Failure of an intact utero-tubal transport function as assessed by negative HSSG (no tubal transport) (17) is associated with poor pregnancy rates and might reflect a dissynchronization of uterine wall movements (18).

We found a statistically significant relationship between rising estradiol levels and an increase in UC/min. None of our patients showed less than

3 UC/min if the estradiol level was higher than 100 pg/mL. This observation indicates that the integrity of utero-tubal transport function transport through the female genital tract is under the endocrine control of the dominant follicle.

As an outlook for further investigations, it would be interesting to perform IUP recordings in patients with endometriosis, as endometriosis and adenomyosis uteri can be regarded as a unique disease – the dislocation of the basal endometrium (19), which is linked with hyper- and dysperistalsis and impeded transport function in HSSG (20). There are data suggesting a higher basal tone of the uterus in patients with endometriosis (21). In patients with endometriosis, a high percentage of structural uterine wall abnormalities are described in transvaginal ultrasonography as well as in T2-weighed magnetic resonance imaging (MRI) (22).

Concerning uterine contractility, patients with endometriosis show a higher frequency, amplitude and basal pressure tone in IUP during menstruation than healthy controls (23). This confirms the results by transvaginal ultrasonography that patients with endometriosis predominantly show a retrograde contractility pattern (in the cervico-fundal direction) (24). These studies might indicate that an increase of cervico-fundal peristalsis might increase the amount of dislocated basal endometrium for intraperitoneal implantation.

Medical treatment studies to reduce uterine contractility are mainly performed in pregnant patients (25,26) but would certainly be of value in reducing dysregulated uterine contractility in patients with endometriosis.

To summarize, our data provide proof that uterine contractility with a mean value of 3.4 UC/min is under the control of the hormonal cycle and regulates the intact uterine transport function assessed by HSSG.

## References

1. Birnholz JC. Ultrasonic visualization of endometrial movement. Fertil Steril 1984; 41: 157–8.
2. de Vries K, Lyons EA, Ballard G, Levi CS, Lindsay DJ. Contractions of the inner third of the myometrium. Am J Obstet Gynecol 1990; 162: 679–82.
3. Lyons EA, Taylor PJ, Zheng XH, Ballard G, Levi CS, Kredenster JV. Characterization of subendometrial myometrial contractions throughout the menstrual cycle in normal fertile women. Fertil Steril 1991; 55: 771–4.
4. Abramowicz JS, Archer DF. Uterine endometrial peristalsis – a transvaginal ultrasound study. Fertil Steril 1990; 54: 451–4.
5. Fukuda M, Fukuda K. Uterine endometrial cavity movement and cervical mucus. Hum Reprod 1994; 9: 1013–16.
6. Kadanali S, Varoglu E, Komec D, Uslu H. Evaluation of active and passive transport mechanisms in genital tracts of IUD-bearing women with radionuclide hysterosalpingoscintigraphy. Contraception 2001; 63: 41–5.
7. Kissler S, Doeinghaus K, Becker W, Wildt L. Hysterosalpingoscintigraphic examination of the fallopian tube: a selective, unilateral transport mechanism. Contracept Fertil Steril 1995; 23: OC–286.
8. Kunz G, Beil D, Deininger H, Wildt L, Leyendecker G. The dynamics of rapid sperm transport through the female genital tract: evidence from vaginal sonography of uterine peristalsis and hysterosalpingoscintigraphy. Hum Reprod 1996; 11: 627–32.
9. Wildt L, Kissler S, Licht P, Becker W. Sperm transport in the human female genital tract and its modulation by oxytocin as assessed by hysterosalpingoscintigraphy, hysterotonography, electrohysterography and Doppler sonography. Hum Reprod Update 1998; 4: 655–66.
10. Hendricks CH. Inherent motility patterns and response characteristics of the nonpregnant human uterus. Am J Obst Gynecol 1966; 96: 824–43.
11. Cibils LA. Contractility of the nonpregnant human uterus. Obstet Gynecol 1967; 30: 441–61.
12. Matinez Gaudo M, Yoshiba T, Bentason LP. Propagated and non-propagated myometrial contractions in the normal menstrual cycle. Am J Obstet Gynecol 1973; 115: 107–11.
13. Iturralde M, Venter PF. Hysterosalpingo-radionuclide scintigraphy (HERS). Semin Nucl Med 1981; 11: 301–14.
14. Becker W, Steck T, Albert P. Hysterosalpingoscintigraphy: a simple and accurate method of evaluating fallopian tube patency. Nuklearmedizin 1988; 27: 252–7.
15. Lundberg S, Wramsby H, Bremmer S, Lundberg HJ, Asard PE. Radionuclide hysterosalpingography is not predictive in the diagnosis of infertility. Fertil Steril 1998; 69: 216–20.
16. Bulletti C, de Ziegler D, Polli V, Diotallevi L, Del Ferro E, Flamigni C. Uterine contractility during the menstrual cycle. Hum Reprod 2000; 15: 81–9.
17. Kissler S, Wildt L, Kohl J, Ahr A, Kaufmann M, Siebzehnruebl E. Gestörte utero-tubare Transportfunktion in der Hysterosalpingoszintigraphie als prädiktiver Funktionstest für die IVF-Therapie. [Disturbed utero-tubal transport in hysterosalpingoscintigraphy as a predictive functional test for IVF therapy.] (In German with English abstract.) Zentralbl Gynaekol 2002; 124: 418–22.
18. Eytan O, Halevi I, Har-Toov J, Wolman I, Elad D, Jaffa AJ. Characteristics of uterine peristalsis in spontaneous and induced cycles. Fertil Steril 2001; 76: 337–41.
19. Leyendecker G, Herbertz M, Kunz G, Mall G. Endometriosis results from the dislocation of basal endometrium. Hum Reprod 2002; 17: 2725–36.
20. Leyendecker G, Kunz G, Wildt L. Uterine hyperperistalsis and dysperistalsis as dysfunctions of the mechanism of rapid sperm transport in patients with endometriosis and infertility. Hum Reprod 1996; 11: 1542–51.
21. Mäkäräinen L. Uterine contractions in endometriosis: effects of operative and danazol treatment. J Obstet Gynecol 1988; 9: 134–8.
22. Kunz G, Beil D, Huppert P, Leyendecker G. Structural abnormalities of the uterine wall in women with endometriosis and infertility visualized by vaginal sonography and magnetic resonance imaging. Hum Reprod 2000; 15: 76–82.
23. Bulletti C, de Ziegler D, Polli V, del Ferro E, Palini S, Flamigni C. Characteristics of uterine contractility during menses in women with mild to moderate endometriosis. Fertil Steril 2002; 77: 1156–61.
24. Salamanca A, Beltran E. Subendometrial contractility in menstrual phase visualized by transvaginal sonography in patients with endometriosis. Fertil Steril 1995; 64: 193–5.

374    *S. Kissler et al.*

25. Kantas E, Cetin A, Kaya T, Cetin M. Effect of magnesium sulfate, isradipine and ritodrine on contractions of myometrium: pregnant human and rat. Acta Obstet Gynecol Scand 2002; 81: 825–30.

26. Husslein P. Development and clinical experience with the new evidence-based tocolytic atosiban. Acta Obstet Gynecol Scand 2002; 81: 633.

*Address for correspondence:*
Stefan Kissler
Department of Gynecology and Obstetrics
Division of Gynecologic Endocrinology and
Reproductive Medicine
Johann Wolfgang Goethe-University Frankfurt am Main
Theodor-Stern-Kai 7
60590 Frankfurt am Main
Germany
e-mail: stefan.kissler@kgu.de

# Exhibit 67

# The Transport of Carbon Particles in the
# Human Female Reproductive Tract

## G. E. Egli, M.D., and Michael Newton, M.D.

THE METHOD by which spermatozoa reach the oviduct remains an important problem in mammalian reproduction. Since spermatozoa possess motility, it has been widely assumed to be the most important factor. However, work in cows suggests that it may not be the chief means of transport. Thus, Vandemark and Moeller recovered spermatozoa from the oviduct 2½ min. after mating. This is far sooner than could be expected on the basis of the inherent motility and sense of direction of spermatozoa.

Work in animals indicates that muscular contractions of the reproductive tract may aid in the transport of spermatozoa and that the oxytocic hormone may play a part in this process. Vandemark and Hays[11] noted that a crescendo of uterine contractions took place before and during copulation in the cow. Furthermore, stimulation of the cow's genitalia produced a rise in intramammary pressure.[7] Normally such a change is brought about by the release of oxytocin from the posterior pituitary gland during the letdown or ejection reflex as the calf or milking machine is applied to the teat.[5] Finally, in-vitro studies by Vandemark and Hays[12] demonstrated that when oxytocin was added to the solution perfusing the isolated cow's uterus, the rate of transport of spermatozoa was increased.

Evidence that the same process occurs in humans is scanty. Because of the difficulty of using spermatozoa, inert particles have occasionally been employed experimentally. Amersbach placed a cap containing a suspension of carbon particles over the cervix. Following coitus he was able to recover

From the Department of Obstetrics and Gynecology, University of Mississippi School of Medicine, Jackson, Miss.

This study was supported in part by Grant S–59–14 from the Committee for Research in Problems of Sex, National Research Council.

particles from the cervical canal. Trapl had a patient insert carmine particles into the vagina immediately after intercourse. Twenty-four hr. later at laparotomy he found numerous particles in the uterine tubes. Furthermore, it has been suggested that there may be a sucking effect as a result of uterine contractions occurring at orgasm that pulls semen through the cervix into the uterus.[8] There is also some evidence that oxytocin is released at the time of orgasm in humans.[4, 9] However, the time relationships and precise mechanisms of transport of inert particles or spermatozoa have not been elucidated in humans. The paucity of information in this regard has been pointed out by Hartman in his excellent review article.

If human spermatozoa move at a rate of 3 mm./min.,[3] it should take a spermatozoon, moving on a direct course, at least 45 min., in the average woman, to travel from the cervix to the junction of the middle and outer thirds of the tube, where fertilization occurs. If the action of the uterine or other muscles of the reproductive tract is important in humans, then not only spermatozoa but also inert particles should reach the tube much sooner than this. The present study was designed to determine whether, under reasonably controlled conditions, carbon particles could be transported quickly from the vagina to the tubes.

## METHODS

It seemed desirable to set up, as far as possible, conditions that were optimal for rapid transport. Thus, patients were selected who required an elective abdominal hysterectomy that could be scheduled at or near the day of ovulation. They had to be of reproductive age, to have proved fertility, and to have relatively normal reproductive organs. A suspension of carbon particles in Dextran was made up so that the particles were similar in size to spermatozoa and that the solution was of the consistency of seminal fluid. This was done by mixing 30% Dextran with 4% bone black. In addition, it was decided to use intramuscular oxytocin to aid in the transport of the particles, because of the experimental evidence indicating its possible importance.

Three women fulfilling the above criteria were studied. In each instance the procedure was as follows: Soon after general anesthesia had been induced, the patient was placed in the lithotomy position with her head tilted downward at an angle of 15° from the horizontal. A speculum was introduced into the vagina, and 3–4 ml. of sterile carbon particles–Dextran suspension were deposited in the posterior fornix. At the same time 1 ml.

(10 U.) of oxytocin was given intramuscularly. The speculum was removed, and the patient was immediately returned to the supine flat position. Her abdomen was promptly opened, and before the uterus was manipulated, a suture was placed tightly around the tubes about 1 cm. lateral to the uterus. The tubes were excised and taken to the laboratory, where they were flushed with saline from the infundibular portion downward. The solution was collected on clean slides and examined under the microscope for carbon particles.

## RESULTS

The first patient was 32 yr. of age, gravida 6, para 6, and was at the fourteenth day of her cycle, which was usually about 28 days in length. Twenty-eight min. after the carbon-particle suspension had been deposited in the posterior fornix, the tubes were ligated and then excised. Many carbon particles were found in the washings from both tubes. On microscopic examination the endometrium was described as being early progestational.

The second patient was 30 yr. of age, gravida 6, para 6, and was at the twelfth day of her cycle, which was usually about 28 days in length. Thirty-four min. after the carbon-particle suspension had been deposited in the posterior fornix, the tubes were ligated and then excised. Carbon particles were recovered from both tubes. On microscopic examination the endometrium was described as being estrogenic.

The third patient was 41 yr. of age, gravida 8, para 7, aborta 1, and was at the thirteenth day of her cycle, which was usually about 28 days in length. She was a diabetic and had aborted three mo. previously. Twenty min. after the carbon-particle suspension had been deposited in the posterior fornix, the tubes were ligated and then excised. No carbon particles were found in the washings from either tube. On microscopic examination the endometrium was described as being early progestational.

## DISCUSSION

This study indicates that in two cases, under the conditions outlined, inert carbon particles, placed in the posterior fornix of the vagina, were found 28 and 34 min. later in both tubes. How they reached the tubes is a difficult question to answer. Certainly they did not proceed by their own movements. It is reasonable to suppose that some sort of movement of the uterus and/or tubes contributed to the transport of the particles.

Movements of the reproductive organs and particularly the uterus could be due to inherent motility, general body movements, the effect of anes-

thesia, or the influence of the injected oxytocin. The uterus undoubtedly possesses inherent motility. Conceivably this could be sufficient to aid the transport of particles into the tubes, although it might well have been decreased by the anesthesia used. Bodily movements were held to a minimum. The patients were on their backs at all times, and so virtually no opportunity for the suspension to enter the uterus or tubes by gravity was afforded. Manipulation consisted only of removing the speculum, returning the patient to the supine position, opening the abdomen, and ligating the tubes. The effect of anesthesia would be, in general, to reduce uterine motility: However, spasm of the cervix or uterotubal opening could have been relaxed by the anesthesia. The theory that oxytocin does contribute to the transport of particles is most attractive, but at the present time we have no proof of it. Further in-vivo and in-vitro experiments are being done in pursuit of a solution to this problem.

The fact that in one case transport of carbon particles to the tubes was not demonstrated is not surprising. One of several factors may have contributed to this. Possibly the hormonal conditions present in the uterus were not optimal.[2] The patient's recent abortion may have been important. Finally, it is conceivable that insufficient time was allowed for transport.

## SUMMARY AND CONCLUSIONS

Carbon particles, suspended in 30% Dextran, were placed in the vagina in three anesthetized women who were about to undergo elective abdominal hysterectomy at about the time of ovulation. At the same time oxytocin was injected intramuscularly. In two of the three women carbon particles were recovered from the tubes 28 and 34 min. later.

These data, together with other work in animals and humans, support the belief that the motility of spermatozoa is not the chief factor in sperm transport. Contractions of the muscle of the uterus or other reproductive organs may be very important, and it is possible that oxytocin may play a part in this process.

*The University of Mississippi Medical Center*
*Jackson, Miss.*

## REFERENCES

1. AMERSBACH, R. Sterility and frigidity. *München. med. Wchnschr.* 77:225, 1930.
2. BICKERS, W. Sperm migration and uterine contractions. *Fertil. & Steril.* 11:286, 1960.
3. BROWN, R. L. Rate of transport of spermia in human uterus and tubes. *Am. J. Obst. & Gynec.* 47:407, 1944.

4. CAMPBELL, B., and PETERSEN, W. E. Milk "let-down" and the orgasm in the human female. *Human Biol. 25*:165, 1954.

5. ELY, F., and PETERSEN, W. E. Factors involved in the ejection of milk. *J. Dairy Sc. 24*:211, 1941.

6. HARTMAN, C. G. How do sperms get into the uterus? *Fertil. & Steril. 8*:403, 1957.

7. HAYS, R. L., and VANDEMARK, N. L. Effect of stimulation of the reproductive organs of the cow on the release of an oxytocin-like substance. *Endocrinology 52*:634, 1953.

8. KINSEY, A. C., POMEROY, W. B., MARTIN, C. E., and GEBHARD, P. H. *Sexual Behavior in the Human Female.* Philadelphia, Saunders, 1953, p. 633.

9. PICKLES, V. R. Blood flow estimations as indices of mammary activity. *J. Obst. & Gynaec. Brit. Emp. 60*:301, 1953.

10. TRAPL, J. New views on the transport of ova and sperm in the female reproductive tract. *Zentralbl. Gynäk. 67*:547, 1943.

11. VANDEMARK, N. L., and HAYS, R. L. Uterine motility responses to mating. *Am. J. Physiol. 170*:518, 1952.

12. VANDEMARK, N. L., and HAYS, R. L. Sperm transport in the perfused genital tract of the cow. *Am. J. Physiol. 183*:510, 1955.

13. VANDEMARK, N. L., and MOELLER, A. N. Speed of spermatozoan transport in reproductive tract of estrous cow. *Am. J. Physiol. 165*:674, 1951.

# Exhibit 68

high. The few cases in which progestin therapy resulted in improvement of symptoms and relief of obstruction suggest that there may be a place for selective medical management. Patients who are young and wish to preserve their childbearing capacity may be considered initially for such treatment. Fertility potential is probably poor in this group of patients because of the extent of their pelvic endometriosis. Patients considered for medical management should be informed of the risks of permanent renal damage and treated with close surveillance of renal function.

## References

1. Cullen TS: Adenomyoma of the recto–vaginal septum. Bull Johns Hopkins Hosp 28:343, 1917
2. Moore JG, Hibbard LT, Growdon WA, et al: Urinary tract endometriosis: Enigmas in diagnosis and treatment. Obstet Gynecol 134:162, 1979
3. Stanley KE, Utz DC, Dockerty MB: Clinically significant endometriosis of the urinary tract. Surg Gynecol Obstet 120:491, 1965
4. Kerr SW: Endometriosis involving the urinary tract. Clin Obstet Gynecol 9:331, 1966
5. Klein RS, Cattolica EV: Ureteral endometriosis. Urology 13:477, 1979
6. Lavelle KJ, Melman AW, Cleary RE: Ureteral obstruction owing to endometriosis: Reversal with synthetic progesterone. Urology 116:965, 1976

Address reprint requests to:
*Paul G. McDonough, MD*
*Department of Obstetrics & Gynecology*
*Reproductive Endocrine Unit*
*Medical College of Georgia School of Medicine*
*Augusta, Georgia 30912*

*Accepted for publication April 18, 1980.*

Copyright © 1980 by The American College of Obstetricians and Gynecologists.

---

# RETROGRADE MENSTRUATION IN WOMEN UNDERGOING CHRONIC PERITONEAL DIALYSIS

*Michael J. Blumenkrantz, MD,*
*Nancy Gallagher, RN, Richard A. Bashore, MD,*
*and Henry Tenckhoff, MD*

Blood in the peritoneal dialysis catheter just before menstruation was regularly observed in 9 of 11 premenopausal women maintained on peritoneal dialysis for end-stage renal failure. Peritoneal bleeding at other times during the menstrual cycle was not seen in any of these patients. Likewise, peritoneal bleeding in men or nonmenstruating women on chronic peritoneal dialysis was exceedingly rare, was not periodic, and usually was due to recognizable causes. These observations suggest that retrograde menstrual bleeding into the peritoneal cavity is the rule rather than the exception in women on peritoneal dialysis and possibly in all menstruating women. Implications of this observation for the pathogenesis of endometriosis and dysmenorrhea are discussed. *(Obstet Gynecol 57:667, 1981)*

*From the Division of Kidney Diseases, University of Washington School of Medicine, and the Northwest Kidney Center, Seattle, Washington; the Department of Medical and Research Services, Veterans Administration—Wadsworth Medical Center, and the Departments of Obstetrics and Gynecology and of Medicine, UCLA School of Medicine, Los Angeles, California.*
*Submitted for publication May 8, 1980.*

The incidence of retrograde menstruation and its consequences have been the topic of extensive debate. Sampson[1] suggested that retrograde menstruation is the cause of external endometriosis, noting that blood was frequently observed escaping from the ostea of the fallopian tubes in menstruating women who were undergoing pelvic surgery. Novak questioned this theory on the grounds that retrograde menstruation was rare as compared to the observed frequency of endometriosis.[2,3] Watkins reported bloody fluid containing endometrial cells aspirating from the cul-de-sac during menstruation.[4] Other reports note the occasional appearance of blood in the pelvic cavity at the time of culdoscopy or pelvic surgery when performed during menstruation.[5-9]

This communication describes observations in menstruating women on maintenance peritoneal dialysis who were noted to have blood in the peritoneal catheters or in the effluent dialysate coincident with menstruation.

## Patients and Materials

The development of implantable Silastic catheters has made it possible to maintain selected patients with end-stage renal failure alive and well for extended periods by means of peritoneal dialysis.[10] A silicone rubber catheter is implanted through the abdominal wall with its intraabdominal section usually lying in the pelvic cavity. During intermittent peritoneal dialysis,

0029-7844/81/050667-04$02.50   **667**

sterile dialysate is pumped through the catheter into the peritoneal cavity, where it remains for a specified dwell period; then it is drained and replaced by fresh dialysate. This cycle is generally repeated every 30 minutes during a 12-hour overnight treatment period. Most patients require 3 treatments per week. The transparent external catheter segment is closed between treatments by a disposable rubber cap and represents a fluid-filled extension of the peritoneal cavity. The character of the peritoneal fluid in the catheter can be observed prior to dialysis or in the effluent of the initial dialysis cycle. Heparin was not routinely added to the dialysate in any of these patients. Bleeding into the peritoneal cavity is usually readily detectable by the presence of a red thread of sedimented red blood cells within the transparent external Silastic catheter segment. Occasionally blood is not apparent until the first exchange of dialysate is being drained.

The records of all women between the ages of 15 and 50 who were maintained on peritoneal dialysis were reviewed. A total of 11 women with a history of menstrual bleeding after initiation of maintenance peritoneal dialysis was identified (Table 1). All patients were interviewed to obtain a detailed menstrual history to supplement the official record. At the time of data collection 5 of the women were no longer on peritoneal dialysis; 3 had undergone successful renal transplantation and 2 had been switched to hemodialysis. At the time of the interview, patients 10 and 11 had only a vague recollection of their menstrual history.

The 11 patients had a mean age of 38.8 years (range, 15 to 44 years); all had been on maintenance home peritoneal dialysis and were followed at the University of Washington or the Northwest Kidney Center in Seattle. Uremic symptomatology was controlled in all these patients and they were as well as comparable patients undergoing hemodialysis. Eight of the 11 women had experienced cessation of menstruation prior to dialysis; 1 patient had primary amenorrhea, 4 were nulliparous, and 7 were multiparous.

Three of the 11 women who were on maintenance peritoneal dialysis at the time of the survey had peritoneal fluid collected on several occasions in the course of their menstrual cycles and when blood was in evidence. The fluid specimens were aspirated aseptically from the peritoneal catheter and placed into sterile glass flasks, which were sent immediately or after overnight refrigeration to the cytology laboratory for processing.

## Results

Eight of 11 women listed in Table 1 developed secondary amenorrhea coincident with the development of chronic renal failure. All 8 resumed menstruation after maintenance peritoneal dialysis was instituted. The mean time interval from the beginning of dialysis to resumption of menstruation was 7.7 months. Menstruation had not ceased in patients 6 and 11. Patient 7 had primary amenorrhea. Of the 9 patients who experienced resumption of menstruation or menarche after initiation of peritoneal dialysis, 5 were noted to have regular menses and 6 had irregular menses. With the exception of patients 10 and 11, both of whom had only 2 very scanty periods, all patients were noted to have small amounts of blood in their peritoneal catheter and/or in the effluent dialysate coincident with

**Table 1.** Menstrual History of Women Who Had Noted Blood in Catheter and/or Effluent Dialysate While Undergoing Maintenance Peritoneal Dialysis

| Patient | Age at onset of dialysis | Cessation of menstruation prior to dialysis | Months of dialysis until resumption of menstruation | Menstruation | | Blood in catheter and/or effluent dialysate |
|---|---|---|---|---|---|---|
| | | | | Regularity | Flow | |
| 1 | 17 | Yes | 3 | Regular | Moderate | Yes |
| 2 | 21 | Yes | 6 | Regular | Moderate | Yes |
| 3 | 40 | Yes* | 5 | Irregular | Heavy | Yes |
| 4 | 40 | Yes | 5 | Irregular | Scanty | Yes |
| 5 | 36 | Yes | 12 | Regular | Moderate | Yes |
| 6 | 34 | No | — | Irregular | Moderate | Yes |
| 7 | 15 | —† | 32 | Regular | Scanty | Yes |
| 8 | 44 | Yes | 2 | Regular | Moderate | Yes |
| 9 | 25 | Yes | 3 | Irregular | Heavy | Yes |
| 10 | 40 | Yes | — | Irregular | Scanty‡ | No |
| 11 | 27 | No | — | Irregular | Scanty‡ | No |

* Contraceptive injection.
† Primary amenorrhea.
‡ Only 2 periods.

the time of menstruation. Blood always appeared in the dialysate or in the catheter a few days prior to the onset of vaginal bleeding, and it usually persisted during the first day of menstrual flow. Patient 6 consistently noted blood in the peritoneal catheter 4 days before the onset of menstruation. In several of the patients the appearance of blood in the dialysate was the first sign of the return of menses after secondary amenorrhea. In patient 7, menarche was noted at the age of 19 by the appearance of peritoneal blood. This patient had started dialysis at the age of 15, at which time she had no secondary sexual development.

Six of the 11 patients (patients 1 through 5 and 7) eventually underwent laparotomy for nephrectomy and/or splenectomy prior to renal transplantation. In none of these patients was endometriosis noted at the time of abdominal surgery. Menstrual blood loss did not have a significant effect on hematocrit levels in these women, none of whom required blood transfusions once stabilized on peritoneal dialysis. Although numerous attempts were made in 3 of the patients to identify endometrial or tubular epithelial cells in the peritoneal effluent or aspirate, unequivocal evidence for such cells in any of the specimens was not obtained.

## Discussion

With advancing renal failure, as with other debilitating diseases, secondary amenorrhea often develops. Hemodialysis therapy has been reported to be associated with resumption of menstrual periods in some patients, menorrhagia in others, and persistent amenorrhea in a third group.[11,12]

In this series 11 women under the age of 45 who were treated with chronic peritoneal dialysis and who continued or resumed menstrual periods are reported. The presence of an implanted intraabdominal catheter afforded an opportunity to observe the character of peritoneal fluid over months or years. When patient 1 first noted blood in the effluent dialysate she was alarmed, and her physician was at a loss to explain the phenomenon. This first episode was not associated with vaginal bleeding. In subsequent months, blood staining of her peritoneal fluid occurred at regular intervals in association with vaginal bleeding. In the course of subsequent years the same phenomenon was observed in all women who resumed menstrual cycles while undergoing peritoneal dialysis. The 2 exceptions were patients 10 and 11, each of whom had only 2 periods with very scanty flow after initiation of dialysis. As both had undergone dialysis at home and neither was a good observer, it is conceivable that small amounts of peritoneal blood may have escaped their

attention. Resumption of periods was often indicated by blood in the effluent dialysate before vaginal bleeding occurred.[13] None of the women had a history of dysmenorrhea or showed evidence suggestive of pelvic endometriosis; this was verified in 6 of the 11 women during pretransplant laparotomy. In men and nonmenstruating women, blood in the peritoneal catheter or effluent dialysis is exceedingly rare and usually can be explained by a detectable anomaly such as peritonitis, intraabdominal malignancy, recent abdominal surgery, or tissue herniation into the implanted catheter with subsequent hemorrhage.

The authors think it highly unlikely that hormonal alterations or anatomic abnormalities associated with chronic renal failure or dialysis explain the high frequency and regular occurrence of blood in the peritoneal cavity coincident with the time of menstruation. Likewise, it would appear most unusual for mechanical irritation by the peritoneal catheter to occur exclusively in menstruating women and in association with menstrual flow. These observations suggest strongly that retrograde bleeding regularly occurs with menstruation in most if not all women on peritoneal dialysis and quite possibly in most menstruating women in the general population.

The current emphasis on prostaglandin as a possible cause of dysmenorrhea notwithstanding,[14] it remains intriguing to speculate on the role that retrograde menstruation may play in the pathogenesis of dysmenorrhea. If retrograde menstrual bleeding is the rule rather than the exception, then bleeding must be asymptomatic in most women as it was in these patients, none of whom has a history of dysmenorrhea. As most women do not experience dysmenorrhea, this lack of pain may be a reflection of low peritoneal reactivity to irritation by blood or other irritants. Variability in the pain threshold to intraabdominal blood is well known to surgeons confronted with hemoperitoneum and to gynecologists treating endometrial disease. Similarly, the present authors and others with extensive peritoneal dialysis experience have observed remarkable individual differences in abdominal pain response to acid peritoneal dialysis solutions. Thus, both the amount of blood spill and individual reactivity may be important modulating factors in the causation of dysmenorrhea. In this context, it may also be of interest to recall that retrograde bleeding usually occurred 1 or several days prior to the onset of vaginal bleeding and ceased when vaginal flow commenced, a pattern analogous to that of the pain prevalent in dysmenorrhea, especially in nulliparous women.

Cervical or other obstruction to free flow during the initial phase of menstruation may contribute to or aggravate abdominal spillage of blood and may help ex-

plain premenstrual pelvic congestion and its relief by establishment of cervical blood flow, especially in nulliparous women. Obstruction to free flow also appears to be associated with early establishment of pelvic endometriosis in teenagers,[15,16] an age group not normally affected by this disease.

The observation of frequent, perhaps regular retrograde menstruation in most women tends to support Sampson's theory of retrograde menstrual bleeding as the most likely and most frequent cause of pelvic endometriosis. Watkins[4] had rejected this notion because he believed retrograde bleeding was too infrequent to account for the incidence of endometriosis. However, it was Watkins who reported endometrial cells in the cul-de-sac of menstruating women, a finding supported by other workers in this field, most recently by Gahl,[17] who observed tubal epithelial cells in the peritoneal effluent of women undergoing peritoneal dialysis. Although retrograde bleeding does not explain why only some women develop endometriosis, these findings rebuke Watkins' objections to the spill–implantation theory of endometriosis.

### Addendum

Since the compilation of the data for this report, the authors have treated additional patients who menstruated while being maintained on peritoneal dialysis. All showed evidence of retrograde bleeding in the catheters or in the initial peritoneal effluent, except 1 patient who had undergone tubal ligation.

### References

1. Sampson JA: The development of the implantation theory for the origin of peritoneal endometriosis. Am J Obstet Gynecol 40:549, 1940
2. Novak E: The significance of uterine mucosa in the fallopian tube with a discussion of the origin of aberrant endometrium. Am J Obstet Gynecol 12:484, 1922
3. Novak E: Pelvic endometriosis and its treatment. Am J Surg 33:422, 1936
4. Watkins RE: Uterine replacement, retrograde menstruation and endometriosis. West J Surg 46:480, 1938
5. Watkins RE: The presence of endometrial cells in peritoneal fluid. J Pac Coast Soc Obstet 7:120, 1937
6. Ridley JH: The histiogenesis of endometriosis. Obstet Gynecol Surv 23:1, 1968
7. Leventhal JM: The place of culdoscopy and laparoscopy in diagnosis, Controversy in Obstetrics and Gynecology. Edited by DE Reid and D Christian. Philadelphia, Saunders, 1974, p 617
8. Goodall JR: A Study of Endometriosis. Second edition. Philadelphia, Lippincott, 1944, p 114
9. Geist SH: The viability of fragments of menstrual epithelium. Am J Obstet Gynecol 25:753, 1933
10. Tenckhoff H: Peritoneal dialysis today: A new look. Nephron 12:420, 1974
11. Goodwin NJ, Valenti C, Hall JE, et al: Effects of uremia and chronic hemodialysis on the reproductive cycle. Am J Obstet Gynecol 100:528, 1968
12. Rice GG: Hypermenorrhea in the young hemodialysis patient. Am J Obstet Gynecol 116:539, 1973
13. Tenckhoff H: Home peritoneal dialysis, Clinical Aspects of Uremia and Dialysis. Edited by SG Massry and AL Sellers. Springfield, IL, Thomas, 1976, p 611
14. Kistner RW: Gynecology: Principles and Practice. Third edition. Chicago, Year Book, 1979, pp 630–634
15. Fallas RE: Endometriosis. Demonstration for the Sampson theory by a human anomaly. Am J Obstet Gynecol 72:557, 1956
16. Schifrin BS, Erez S, Moore JG: Teenage endometriosis. Am J Obstet Gynecol 116:973, 1973
17. Gahl G: Personal communication, 1979

Address reprint requests to:
Richard A. Bashore, MD
Department of Obstetrics & Gynecology
The University of California Center for the Health Sciences
Los Angeles, CA 90024

Accepted for publication June 18, 1980.

Copyright © 1980 by The American College of Obstetricians and Gynecologists.

---

# Fatal case of cytomegalovirus pneumonitis in a postpartum woman

Stewart D. Lipton, PhD, James Bryant, MD, Farhad Saed, MD, and Graciano Fontillas, MT

From the Departments of Pathology and of Obstetrics and Gynecology, Edgewater Hospital, Chicago, Illinois.
Submitted for publication May 8, 1980.

This is the first reported fatal case of cytomegalic inclusion disease in a pregnant woman. The 28-year-old woman died after cesarean section for cephalopelvic disproportion. The diagnosis of cytomegalic inclusion disease was made at autopsy by finding enlarged pneumocytes with typical intranuclear inclusions, positive direct immunofluorescence on the lung tissue with antibody specific for cytomegalovirus, and retrospective serologic titers of 1:64 for the virus. The time of the infection is unclear, but the absence of infection in the newborn may suggest an onset late in pregnancy; there was no evidence of disease before labor and cesarean section. (Obstet Gynecol 57:670, 1981)