# Exhibit 129

*The* NEW ENGLAND JOURNAL *of* MEDICINE

---

### REVIEW ARTICLE

Dan L. Longo, M.D., *Editor*

# Mucinous Ovarian Carcinoma

Philippe Morice, M.D., Ph.D., Sebastien Gouy, M.D., Ph.D., and Alexandra Leary, M.D., Ph.D.

From the Departments of Gynecological Surgery and Medical Oncology (P.M., S.G., A.L.), INSERM Unit 981 (A.L.), and INSERM Unit 10-30 (P.M.), Gustave Roussy Cancer Campus, Villejuif, and University Paris-Sud (Paris XI), Le Kremlin Bicêtre (P.M.) — both in France. Address reprint requests to Dr. Morice at the Department of Gynecological Surgery, Gustave Roussy Cancer Campus, 94805 Villejuif CEDEX, France, or at philippe.morice@gustaveroussy.fr.

N Engl J Med 2019;380:1256-66.
DOI: 10.1056/NEJMra1813254
Copyright © 2019 Massachusetts Medical Society.

NEARLY 239,000 NEW CASES OF OVARIAN CANCER (AND 152,000 ASSOCIated deaths) are reported worldwide annually, with the highest incidence rates in North America and central and eastern Europe.[1,2] The most common histologic subtype is high-grade serous ovarian cancer (accounting for 65% of cases). Other histologic subtypes include low-grade serous, endometrioid, clear-cell, and mucinous ovarian cancers, as well as ovarian carcinosarcoma.[3-5] Mucinous ovarian cancer is a rare tumor, probably accounting for 3% of all epithelial ovarian cancers,[6,7] and often presents a diagnostic and therapeutic conundrum for oncologists. For decades, the management of mucinous ovarian cancer was based on guidelines developed for serous ovarian cancer. However, experience with mucinous ovarian cancer and an understanding of its biologic features have shown that it is a unique disease requiring unique management. This review highlights the distinguishing features of mucinous ovarian cancer and provides an update on its molecular landscape and surgical and medical management.

## A SEPARATE DISEASE ENTITY

The gene-expression profile of mucinous ovarian cancer is distinct from that of serous ovarian cancer.[7] Sixty-five to 80% of mucinous ovarian cancers are diagnosed at an early stage, according to the classification of the International Federation of Gynecology and Obstetrics (FIGO stage I, defined as a tumor confined to a single ovary) (Table S1 in the Supplementary Appendix, available with the full text of this article at NEJM.org).[8] Patients with serous ovarian cancer tend to present at an advanced stage, with intraperitoneal spread in more than 80% of cases (Table 1).[9,10] A potential explanation for this difference is that mucinous ovarian cancers are usually very large primary tumors (typically >15 cm in diameter) that generate symptoms while the disease is still localized to the ovary. Thus, the overall prognosis is much better for women with mucinous ovarian cancer than for those with other subtypes of epithelial ovarian cancer.[8] Five-year overall survival among patients with localized mucinous ovarian cancer exceeds 90%; by contrast, when mucinous ovarian cancer has spread to the peritoneum in the abdominal cavity or beyond (stage III or IV), the estimated median overall survival is between 12 and 33 months.[9,11-16]

Mucinous tumors are characteristically diagnosed in patients who are younger than patients in whom other epithelial ovarian cancers are diagnosed.[6,9] In a recent analysis of data from the Surveillance, Epidemiology, and End Results (SEER) cancer registry, 26% of mucinous ovarian cancers were diagnosed in women younger than 44 years.[9] Mucinous ovarian cancer is the most common histologic subtype in the subgroup of patients who are eligible for fertility-sparing surgery.[17,18]

The New England Journal of Medicine
Downloaded from nejm.org at UNIV OF SOUTH CAROLINA on May 11, 2019. For personal use only. No other uses without permission.
Copyright © 2019 Massachusetts Medical Society. All rights reserved.

**Table 1.** Epidemiologic, Clinical, and Pathological Features of Mucinous Ovarian Carcinoma as Compared with High-Grade Serous Ovarian Cancer.*

| Variable | Mucinous Ovarian Carcinoma (prevalence, 3%) | High-Grade Serous Ovarian Carcinoma (prevalence, 65%) |
|---|---|---|
| Age | | |
|     Median age at diagnosis (yr) | 53 | 61 |
|     <44 yr at presentation (%) | 26 | 7 |
| Early stage at diagnosis (%) | 65–80 | 5 |
| Tumor marker | CEA or CA 19-9 | CA-125 |
| Risk factors | Smoking | Nulliparity, early menarche, late menopause, germline *BRCA1* or *BRCA2* mutations |
| Rate of response to platinum-based chemotherapy (%) | 20–60 | >70 |
| Overall survival | | |
|     Stage 1, at 5 yr (%) | 92 | 84 |
|     Advanced stage, median (mo) | 12–33 | 35–60 |

* Some of the data presented in the table are from Ferlay et al.,[1] Reid et al.,[2] Peres et al.,[9] and Torre et al.[10] CEA denotes carcinoembryonic antigen.

In a series of 545 patients undergoing such surgery, 51% (280 patients) had mucinous ovarian cancer.[17]

Most serous ovarian cancers originate in the fimbria of the fallopian tubes.[19] Mucinous ovarian cancers appear to evolve in stepwise fashion from benign epithelium to a preinvasive lesion to carcinoma (Fig. 1).[3,5,20,21] Mucinous ovarian cancer is frequently mixed with areas of mucinous cystadenoma or precancerous lesions (borderline mucinous tumor, borderline tumor with intraepithelial carcinoma, microinvasive carcinoma, or a combination of such lesions). This continuum of malignant progression is in stark contrast to the development of serous ovarian cancer and is similar to the development of colorectal cancer. *KRAS* mutations are observed in 40 to 65% of mucinous carcinomas. The same *KRAS* mutation has been detected in the carcinoma foci and in surrounding borderline malignant and benign areas, suggesting that the mutation is an early founder event.[22-24] Other genomic alterations such as *HER2* amplification or *TP53* mutation are almost exclusively observed in the carcinomatous component of mucinous tumors, supporting the view that these alterations represent later events in malignant transformation.[23,24] Another hypothesis regarding the histogenesis of mucinous ovarian cancers is that they may be derived from transitional cells (Walthard cell nests are observed in 59% of mucinous neoplasms) or metaplasia at the fallopian tube–peritoneal junction.[25]

Risk factors for serous ovarian cancer include nulliparity, early menarche, late menopause, and germline *BRCA1* or *BRCA2* mutations, none of which are risk factors for mucinous ovarian cancer. The only clinical risk factor associated with mucinous ovarian cancer is tobacco smoking. A genomewide association study of 1644 mucinous ovarian cancers identified susceptibility alleles at 2q13, 2q31.1, and 19q13.2 (the potential candidate gene is *HOXD9* for locus 2q31.1).[26] The incidence of mucinous ovarian cancer decreased by 5% annually in the United States between 1995 and 2009 and has been stable since 2009.[10] These trends could be attributable to a decline in smoking or to improvements in the histologic diagnosis of mucinous ovarian cancer in the late 1990s and early 2000s.[10,27,28]

## DIAGNOSTIC CHALLENGE

Early reports probably overestimated the prevalence of mucinous ovarian cancer, with some studies reporting that they represented 10 to 15% of epithelial ovarian cancers.[9,29,30] However, a central pathological review of ovarian tumors

The New England Journal of Medicine
Downloaded from nejm.org at UNIV OF SOUTH CAROLINA on May 11, 2019. For personal use only. No other uses without permission.
Copyright © 2019 Massachusetts Medical Society. All rights reserved.

The NEW ENGLAND JOURNAL of MEDICINE



**Figure 1. Stages in the Progression of Mucinous Ovarian Tumors.**

Mucinous ovarian tumors develop on a continuum from benign epithelium to preinvasive (borderline) carcinoma to mucinous carcinoma. *KRAS* mutations are an early event, whereas other oncogenic alterations (*HER2* amplifications or *TP53* mutations) may be acquired later in the course of malignant transformation.

initially classified as primary ovarian mucinous carcinomas revealed that 50 to 70% were in fact metastases from other sites. According to different reports, the true proportion of ovarian epithelial cancers that are mucinous ovarian cancers is closer to 1 to 3%.[29,31]

### RULING OUT OVARIAN METASTASES FROM NONOVARIAN OCCULT PRIMARY CANCER

A combination of clinical, pathological, and immunohistochemical investigations is useful in distinguishing a primary mucinous ovarian tumor from metastatic disease to the ovary (Krukenberg tumor) (Fig. 2).[29,32,33] A comprehensive workup is performed to rule out an occult gastrointestinal primary cancer (on the basis of colonoscopy and upper gastrointestinal endoscopy, including endoscopic ultrasonography) or a cervical, breast, or uterine cancer.[29,32] These investigations are recommended if clinical or radiologic findings suggest a nonovarian primary cancer on the basis of tumor size (<10 cm

in diameter), the presence of bilateral tumors, peritoneal spread or another indication of advanced stage, or a combination of these findings (Fig. 2).[29]

### DIAGNOSING THE SUBTYPE OF MUCINOUS TUMOR

The diagnosis of mucinous ovarian carcinoma requires evidence of malignant proliferation covering an area of more than 10 mm$^2$ as determined on cross section. For decades, mucinous ovarian cancer was further classified as grade 1, 2, or 3 according to the presence or absence of nuclear atypia and the proportion of solid glandular component. However, in 2014, the World Health Organization (WHO) introduced a new diagnostic classification of mucinous ovarian carcinoma, with two categories according to the growth pattern: the expansile (confluent) subtype and the infiltrative subtype.[5] The expansile subtype is characterized by a confluent glandular growth pattern, with little intervening normal ovarian stroma (minimal or no stromal in-

The New England Journal of Medicine
Downloaded from nejm.org at UNIV OF SOUTH CAROLINA on May 11, 2019. For personal use only. No other uses without permission.
Copyright © 2019 Massachusetts Medical Society. All rights reserved.

MUCINOUS OVARIAN CARCINOMA



**Figure 2.** Overall Management of Mucinous Ovarian Tumors.

The first step in managing a primary mucinous ovarian tumor is to rule out mucinous metastasis to the ovary (a nonovarian primary mucinous cancer) on the basis of a combination of clinical and pathological features. Extensive sampling of these large heterogeneous tumors and review by an expert pathologist are required for accurate diagnosis. Once the diagnosis has been established, both staging and accurate histologic classification guide surgical and medical management. The plus signs in CK7+++, CK20+, and CDX2+ denote the intensity of positive staining on immunohistochemical analysis, with more plus signs indicating higher staining intensity. CT denotes computed tomography, EGD esophagogastroduodenoscopy, LDN lymphadenectomy, and PET positron-emission tomography.

vasion), whereas the infiltrative subtype is characterized by obvious evidence of destructive stromal invasion by malignant glands, cell nests, or individual cells and is often associated with a desmoplastic stromal reaction (Fig. 1).[5,34]

### PROGNOSTIC IMPLICATIONS OF THE WHO 2014 HISTOLOGIC CLASSIFICATION

The distinction between expansile and infiltrative subtypes is clinically important in stage I disease (Table 2), so surgical staging of these tumors is crucial.[3-38] The expansile growth pattern suggests a lower metastatic potential, and

several, albeit small, studies have confirmed that the risk of relapse for women with stage I expansile mucinous ovarian cancer is extremely low (3 recurrences were observed among 75 cases; 2 of the 3 were salvaged with secondary surgery).[34-38] Moreover, more than 95% of women with expansile mucinous ovarian cancers present with stage I disease.[34-38,40] Cases of the expansile subtype with peritoneal spread are very scarce (only 3 reported cases) (Table 2).[35,37] In contrast, infiltrative mucinous ovarian cancer is more aggressive, with at least 26% of women presenting with more advanced, nonlocalized

The New England Journal of Medicine
Downloaded from nejm.org at UNIV OF SOUTH CAROLINA on May 11, 2019. For personal use only. No other uses without permission.
Copyright © 2019 Massachusetts Medical Society. All rights reserved.

The NEW ENGLAND JOURNAL of MEDICINE

**Table 2. Clinical Characteristics and Outcomes of Mucinous Ovarian Cancer According to the Subtype.**

| Subtype and Study | Pathological Review | Total Enrollment | Stage IA | Stage IC | Higher Stage | Recurrences and Deaths |
|---|---|---|---|---|---|---|
| | | | *number of patients* | | | |
| **Expansile subtype** | | | | | | |
| Riopel et al.,[35] 1999 | Yes | 5 | 4* | | 1 at stage II | 1 recurrence at stage II |
| Lee and Scully,[34] 2000 | Yes | 12 (10 in follow-up) | 12 | 0 | 0 | 0 recurrences |
| Rodriguez and Prat,[36] 2002 | Yes | 15 (11 in follow-up) | 10 | 5 (4 at stage IC1, 1 at stage IC2) | 0 | 0 recurrences; 1 death from breast cancer |
| Muyldermans et al.,[37] 2013 | Yes | 23 | 11 | 10 | 2 at stage III | 2 recurrences at stage III† |
| Gouy et al.,[38] 2018 | Yes | 29 | 13 | 16 (9 at stage IC1, 5 at stage IC2, 2 at stage IC3) | Not included | 3 recurrences: 1 at stage IA, 1 at stage IC2, 1 at stage IC3; 1 death |
| Total | | 84 | 46 | 31 | 3 | 6 recurrences; 3 at stage I (3/81 [4%]), 3 at higher stage (3/3 [100%]) |
| **Infiltrative subtype** | | | | | | |
| Hoerl and Hart,[39] 1998 | | 19 | | 15‡ | 4 at stage III | 6 recurrences: 2 at stage I, 4 at higher stages; 5 deaths |
| Lee and Scully,[34] 2000 | | 13 (11 in follow-up) | 6 (5 in follow-up) | 0 | 3 at stage II, 3 at stage III, 1 at stage IV (5 in follow-up) | 6 recurrences: 1 at stage IA, 5 at higher stages; 6 deaths |
| Rodriguez and Prat,[36] 2002 | | 19 (15 in follow-up) | 8 | 3 | 1 at stage II, 6 at stage III, 1 at stage IV (6 in follow-up) | 9 recurrences: 1 at stage IC1, 2 at stage IC2, 1 at stage II, 4 at stage III, 1 at stage IV; 7 deaths§ |
| Muyldermans et al.,[37] 2013 | | 21 | 9 | 3 | 9 at stage III | 9 recurrences: 1 at stage IA, 1 at stage IC, 7 at stage III |
| Gouy et al.,[38] 2018 | | 35 | 20 | 15 (7 at stage IC1, 7 at stage IC2, 1 at stage IC3) | Not included | 6 recurrences: 2 at stage IA, 1 at stage IC1, 2 at stage IC2, 1 at stage IC3; 4 deaths¶ |
| Total | | 107 | 43 | 21 | 28 | 36 recurrences: 14 at stage I (14/79 [18%]) and 22 at stage III or IV (22/24 [92%]) |

* In this study, four patients with the expansile subtype had stage I disease that was not classified as either stage IA or stage IC.

† One additional patient with stage I disease died from acute myeloid leukemia while free of the ovarian disease.

‡ In this study, 15 patients with the infiltrative subtype had stage I disease that was not classified as either stage IA or IC.

§ One additional patient with stage I disease died from thyroid cancer while free of the ovarian disease. In the same series, two patients with recurrent infiltrative disease (one at stage III and one at stage IV) survived with persistent disease.

¶ One patient with a recurrence survived but with persistent disease.

The New England Journal of Medicine
Downloaded from nejm.org at UNIV OF SOUTH CAROLINA on May 11, 2019. For personal use only. No other uses without permission.
Copyright © 2019 Massachusetts Medical Society. All rights reserved.

disease at diagnosis; in 17 to 30% of patients who appear to have stage I disease, lymph-node metastases are detected (as compared with no women with expansile mucinous ovarian cancer).[34-39] Even if the cancer is diagnosed at an early stage, the prognosis for women with infiltrative mucinous ovarian cancer is much poorer, with fatal relapses reported for 15 to 30% of patients with stage I disease (Table 2).[34-38] Thus, the distinction between stage I expansile and stage I infiltrative subtypes is crucial, since it may influence indications for staging lymphadenectomy or adjuvant chemotherapy.

### SURGICAL MANAGEMENT

#### MANAGEMENT OF EARLY-STAGE MUCINOUS CARCINOMA

For young patients wishing to preserve their fertility, a unilateral salpingo-oophorectomy is usually proposed, with peritoneal staging procedures (cytology, peritoneal biopsies, and omentectomy). In older patients, bilateral salpingo-oophorectomy is preferred. The priority is to choose the best surgical approach (laparotomy or a minimally invasive laparoscopic approach) for minimizing the risk of perioperative tumor rupture. Such a rupture would alter the FIGO stage and influence both surgical and medical management of histologically confirmed mucinous ovarian cancer. Unilateral salpingo-oophorectomy is a reasonable approach in women with stage I disease who wish to preserve their fertility. The risk of recurrence is lower than that reported for women with stage I serous cancers (6% vs. 20%, P<0.001).[17,40] Only one study has evaluated the results of fertility-sparing surgery in women with the expansile subtype of mucinous ovarian cancer and those with the infiltrative subtype, and the results suggest that it could be safely used for both subtypes.[41]

A small fraction of patients with macroscopically normal findings on surgical exploration have microscopic peritoneal spread (positive cytologic results in 5.7% of cases or microscopic involvement of the omentum or peritoneal-biopsy specimen in 1.7% of cases) or appendiceal spread (metastasis in 1.1% of cases), but peritoneal or appendiceal spread remains a rare event as compared with disease spread in other epithelial subtypes (Table S2 in the Supplementary Appendix).[42,43]

The rate of nodal spread is very low in cases of apparent stage I mucinous ovarian cancer (<2%).[44,45] However, the higher rate of nodal involvement in stage I infiltrative mucinous ovarian cancer (17 to 30%) suggests that pelvic and para-aortic lymphadenectomy should be proposed for all patients with infiltrative disease, regardless of stage, but can be safely omitted for patients with stage I expansile disease.[37,42]

#### MANAGEMENT OF STAGE III OR IV MUCINOUS OVARIAN CANCER

The prognosis for women with stage III or IV mucinous ovarian cancer is poorer than the prognosis for women with other, more common subtypes (particularly serous or endometrioid ovarian cancer) and may be related to a poorer response to chemotherapy (Table S3 in the Supplementary Appendix).[11,16,30,46-48] Some authors have argued that this poor prognosis is due to the inherently aggressive biology of the tumor and the questionable technical feasibility of complete resection, raising doubts regarding the usefulness of an aggressive debulking surgery in women with stage III or IV mucinous ovarian cancer.[13] Conversely, in a series involving 50 patients with stage III or IV mucinous ovarian cancer, overall survival was increased by a factor of 3.8 among patients who underwent optimal debulking surgery.[47] Finally, in an analysis of three randomized trials involving 3126 patients (147 with mucinous ovarian cancer), the size of the residual disease was shown to significantly affect overall and event-free survival in a multivariate analysis of data for patients with mucinous ovarian cancer.[49] In conclusion, debulking surgery with the objective of a macroscopically complete resection remains a cornerstone of management for advanced mucinous ovarian cancer.

### MEDICAL MANAGEMENT

The prognosis for women with mucinous ovarian cancer depends on the stage of disease.[13,49] Overall survival is higher for the majority of patients presenting with stage I disease than for those with nonmucinous histologic subtypes (hazard ratio, 0.52; 95% confidence interval [CI], 0.30 to 0.92). However, the trend is the inverse for women with stage III or IV mucinous ovarian cancer, who have significantly lower overall sur-

The New England Journal of Medicine
Downloaded from nejm.org at UNIV OF SOUTH CAROLINA on May 11, 2019. For personal use only. No other uses without permission.
Copyright © 2019 Massachusetts Medical Society. All rights reserved.

vival than women with nonmucinous histologic subtypes (hazard ratio, 2.81; 95% CI, 2.47 to 3.21).[50] Retrospective series have confirmed lower response rates to first-line platinum-based chemotherapy (mainly carboplatin and paclitaxel) among women with mucinous ovarian cancer (13 to 60%) than among women with serous ovarian cancer (64 to 87%) (Table S3 in the Supplementary Appendix).[11,16,30,46-48,50]

Given the histologic similarities between primary mucinous ovarian cancer and gastrointestinal carcinomas and the in vitro synergy between oxaliplatin and fluorouracil in preclinical models of mucinous ovarian cancer, empirical use of chemotherapeutic regimens that are traditionally used for gastrointestinal cancers has been tested.[51,52] Gynecologic Oncology Group trial 0241 (involving European, Australian, Korean, and North American groups) was designed to study the activity of a colorectal cancer regimen in women with newly diagnosed metastatic mucinous ovarian cancer. A phase 3 trial randomly assigned women to receive treatment with either paclitaxel and carboplatin (control group) or the combination of capecitabine and oxaliplatin.[31] In addition, there was a secondary randomization in which women were assigned to receive bevacizumab or placebo in order to test the activity of antiangiogenesis therapy. The trial had slow accrual and was closed prematurely. Preliminary results based on the small group of patients (50) who underwent randomization showed no significant difference in progression-free survival among the treatment groups and confirmed a low objective response rate (10 of the 50 women, or 20%, had a response), regardless of the treatment regimen.[31]

Neoadjuvant treatment for advanced ovarian cancer has been tested in the European Organization for Research and Treatment of Cancer (EORTC) 55971 and CHORUS trials. The studies compared initial surgery with a strategy of neoadjuvant chemotherapy.[53,54] Patients with mucinous cancers accounted for only 1 to 3% of the patients, making it impossible to draw any conclusions.

There is a dearth of data from randomized clinical trials evaluating adjuvant chemotherapy in early-stage mucinous ovarian cancer. Various national and international guidelines provide statements about indications for adjuvant chemotherapy to help guide physicians, but these statements are not based on clear evidence of a benefit. The National Comprehensive Cancer Network (NCCN) guidelines recommend surgery alone for stage IA or IB mucinous ovarian cancer and adjuvant platinum-based chemotherapy (carboplatin and paclitaxel, or oxaliplatin with fluorouracil or capecitabine) for stage II or more advanced disease. In the case of stage IC mucinous ovarian cancer, the NCCN guidelines recommend either observation or adjuvant chemotherapy (www.nccn.org/patients/guidelines/ovarian/index .html#69/z).

Given the previously mentioned retrospective studies supporting the prognostic information provided by the growth pattern, other European guidelines have further refined treatment recommendations for stage I mucinous ovarian cancer according to the expansile versus infiltrative subtype (Fig. 2). For stage IA or IB expansile mucinous ovarian cancer, which is considered to be low risk, observation alone is recommended, whereas adjuvant chemotherapy is discussed for stage IC expansile mucinous ovarian cancer and is proposed for most cases of stage I infiltrative mucinous ovarian cancer, thus further underscoring the essential role of high-quality pathological review in the management of these rare tumors (www.ovaire-rare.org/TMRG/medecin/ adenocarcinome_mucineux.aspx) (Fig. 2C).[55]

## MOLECULAR LANDSCAPE OF MUCINOUS OVARIAN CANCER AND THERAPEUTIC OPPORTUNITIES

Serous ovarian cancers lack genomic alterations in typically actionable driver oncogenes such as *HER2*, *EGFR*, *ALK*, and *BRAF* but are characterized by defects in homologous recombination DNA-repair genes, such as *BRCA1* or *BRCA2*. This deficiency in homologous recombination has been successfully exploited with the use of poly(adenosine diphosphate–ribose) polymerase (PARP) inhibitors. This drug class represents the first targeted therapy with a demonstrated clinical benefit for women who have relapsed high-grade ovarian cancer. Mucinous ovarian cancers are not associated with *BRCA* mutations or defects in homologous recombination, making them unlikely to benefit from PARP inhibitors. However, they frequently display mutations or amplifications that might be targetable. The most frequent alterations are *KRAS* mutations (in 40 to

The New England Journal of Medicine
Downloaded from nejm.org at UNIV OF SOUTH CAROLINA on May 11, 2019. For personal use only. No other uses without permission.
Copyright © 2019 Massachusetts Medical Society. All rights reserved.

MUCINOUS OVARIAN CARCINOMA



**Figure 3. Proposed Individualized Investigational Approach to the Treatment of Metastatic or Relapsed Mucinous Ovarian Carcinoma.**
For patients with mucinous ovarian carcinoma that has metastasized or relapsed, molecular alterations identified by means of next-generation sequencing can be used to select matched treatments under investigation in clinical trials. FGFR2 denotes fibroblast growth factor receptor 2, HER2 human epidermal growth factor receptor 2, MSI microsatellite instability, PI3K phosphatidylinositol 3-kinase, and TKI tyrosine kinase inhibitor.

65% of cases), *c-MYC* amplifications (in 65%), *HER2* amplifications (in 20 to 38%), and *TP53* mutations (in 50 to 75%). In addition, other alterations have been identified at lower frequencies, such as homozygous deletions in *CDKN2A/B* (in 25% of cases), mutations in *PI3KCA* (in 13%), and mutations in *PTEN*, *BRAF*, *FGFR*, *KIT*, or *STK11* (in 2 to 5%).[23,24,56-60]

These genomic profiling studies allow mucinous ovarian cancers to be grouped into therapeutically relevant subsets (Fig. 3). For example, *KRAS* mutations and *HER2* amplifications tend to be mutually exclusive.[23,60] The subset of HER2 (human epidermal growth factor receptor 2)–positive tumors with wild-type *KRAS* may be particularly suited to HER2-directed therapies such as trastuzumab. Anecdotal objective responses have been described in case reports of patients with metastatic, *HER2*-amplified, mucinous ovarian cancer treated with either trastuzumab alone or trastuzumab combined with the oral tyrosine kinase inhibitor lapatinib.[61,62] The identification of *HER2* or *HER3* mutations in an additional 2 to 12% of patients could justify the inclusion of such patients in basket trials of HER inhibitors.[23,58]

*EGFR* amplification or mutations in *BRAF*, *FGFR*, or *STK11* have been detected in *HER2*-negative tumors with wild-type *KRAS*, suggesting that these tumors may be responsive to inhibitors of EGFR (epidermal growth factor receptor), BRAF, FGFR2 (fibroblast growth factor receptor), or mTOR (mammalian target of rapamycin), respectively. The absence of a *KRAS* mutation identifies a subset of patients with colorectal cancer who are more likely to benefit from the EGFR-inhibiting antibody, cetuximab. Preclinical studies have shown that cetuximab inhibits proliferation in mucinous ovarian cancer cell lines with wild-type *KRAS* and in a single in vivo model, whereas it has no antitumor effect in a model of *KRAS*-mutated mucinous ovarian cancer.[63]

Most mutations in the PI3K (phosphatidylinositol 3-kinase) pathway occur with a *KRAS* mutation, and preclinical studies have shown synergy between MEK (mitogen-activated protein kinase) and PI3K inhibition in mucinous ovarian cancer cell lines with *KRAS* mutations.[64] Although the number of patients was small, a phase 1 trial of molecularly guided therapies for rare subtypes of ovarian cancer showed encouraging objective responses to combined MEK and PI3K inhibition in patients with *KRAS*-mutated ovarian cancer.[65]

*TP53* mutations are detected at a remarkably high frequency in mucinous ovarian cancer (in 50 to 75% of cases).[23,66] APR-246 is a small molecule designed to restore wild-type p53 function, whereas the WEE1 inhibitor, AZD1775, abrogates

The New England Journal of Medicine
Downloaded from nejm.org at UNIV OF SOUTH CAROLINA on May 11, 2019. For personal use only. No other uses without permission.
Copyright © 2019 Massachusetts Medical Society. All rights reserved.

the G2-M cell-cycle checkpoint, selectively sensitizing p53-deficient cells to DNA-damaging agents.[67] Both agents are being investigated in clinical trials of *TP53*-mutated tumors.

Finally, defects in the mismatch-repair pathway of DNA repair that result in a tumor with microsatellite instability have been detected in 15 to 20% of patients with mucinous ovarian cancer.[68-70] Given that tumors with microsatellite instability have high mutation burdens and dense immune infiltrates that are characteristic of other tumor types that respond to immune-checkpoint inhibition, enthusiasm is high for testing inhibitors of PD-1 (programmed death 1) or PD-L1 (programmed death ligand 1) in the subset of mucinous ovarian cancers with microsatellite instability.[71]

## FUTURE DIRECTIONS

Important questions remain regarding the management of high-risk, localized mucinous ovarian cancer (stage I infiltrative subtype or stage IC expansile subtype). What are the criteria for selecting patients with high-risk stage I disease for adjuvant treatment? What is an ideal cytotoxic regimen? Will therapy that has some activity against gastrointestinal tumors have meaningful activity against mucinous ovarian cancer? In the future, targeted therapy may be worth testing in patients who have mucinous ovarian cancer with selected genetic alterations such as *HER2* mutations or microsatellite instability (Fig. 3).[72,73] The rarity of the tumor mandates international collaboration to evaluate new therapies in a timely fashion.

In line with these questions, the Fifth Ovarian Cancer Consensus Conference of the Gynecologic Cancer InterGroup identified four key areas for further research in mucinous ovarian cancer: improvement in the histologic criteria for diagnosis, definition of the optimal surgical and medical approaches to the management of high-risk localized disease, identification of an active cytotoxic regimen, and enrollment of patients in clinical trials of new therapeutics.[74]

Dr. Morice reports receiving advisory board fees from Roche, lecture fees from Johnson & Johnson, and fees for participating on a board from Clovis; Dr. Gouy, receiving consulting fees from Roche; and Dr. Leary, receiving fees for serving as chief investigator or principal investigator on clinical trials, travel support paid to her institution, and advisory board fees from AstraZeneca; fees for serving as principal investigator on clinical trials, travel support paid to her institution, and advisory board fees from Clovis; travel support and advisory board fees from Tesaro; advisory board fees from Gridstone, Seattle Genetics, and Biocad; grant support paid to her institution from Merus and Inivata; fees for serving as chief investigator or principal investigator on a clinical trial paid to her institution from Roche, Pfizer, MSD, BMS, and Pharmamar; and grant support paid to her institution, fees for serving as chief investigator on a clinical trial, and advisory board fees from GamaMabs. No other potential conflict of interest relevant to this article was reported.

Disclosure forms provided by the authors are available with the full text of this article at NEJM.org.

We thank Catherine Genestie, Patricia Pautier, and Jean Charles Soria for their comments and suggestions regarding an earlier draft of the manuscript.

## REFERENCES

**1.** Ferlay J, Soerjomataram I, Dikshit R, et al. Cancer incidence and mortality worldwide: sources, methods and major patterns in GLOBOCAN 2012. Int J Cancer 2015;136(5):E359-E386.

**2.** Reid BM, Permuth JB, Sellers TA. Epidemiology of ovarian cancer: a review. Cancer Biol Med 2017;14:9-32.

**3.** Prat J, D'Angelo E, Espinosa I. Ovarian carcinomas: at least five different diseases with distinct histological features and molecular genetics. Hum Pathol 2018; 80:11-27.

**4.** McCluggage WG. Morphological subtypes of ovarian carcinoma: a review with emphasis on new developments and pathogenesis. Pathology 2011;43:420-32.

**5.** Kurman RJ, Carcangiu ML, Herrington CS, Young RH. WHO classification of tumours of female reproductive organs. 4th ed. IARC. Lyon, France: International Agency for Research on Cancer, 2014:10-40.

**6.** Seidman JD, Horkayne-Szakaly I, Haiba M, Boice CR, Kurman RJ, Ronnett BM. The histologic type and stage distribution of ovarian carcinomas of surface epithelial origin. Int J Gynecol Pathol 2004;23: 41-4.

**7.** Heinzelmann-Schwarz VA, Gardiner-Garden M, Henshall SM, et al. A distinct molecular profile associated with mucinous epithelial ovarian cancer. Br J Cancer 2006;94:904-13.

**8.** Prat J. FIGO's staging classification for cancer of the ovary, fallopian tube, and peritoneum: abridged republication. J Gynecol Oncol 2015;26:87-9.

**9.** Peres LC, Cushing-Haugen KL, Köbel M, et al. Invasive epithelial ovarian cancer survival by histotype and disease stage. J Natl Cancer Inst 2019;111:60-8.

**10.** Torre LA, Trabert B, DeSantis CE, et al. Ovarian cancer statistics, 2018. CA Cancer J Clin 2018;68:284-96.

**11.** Hess V, A'Hern R, Nasiri N, et al. Mucinous epithelial ovarian cancer: a separate entity requiring specific treatment. J Clin Oncol 2004;22:1040-4.

**12.** Zaino RJ, Brady MF, Lele SM, Michael H, Greer B, Bookman MA. Advanced stage mucinous adenocarcinoma of the ovary is both rare and highly lethal: a Gynecologic Oncology Group study. Cancer 2011;117: 554-62.

**13.** Simons M, Ezendam N, Bulten J, Nagtegaal I, Massuger L. Survival of patients with mucinous ovarian carcinoma and ovarian metastases: a population-based Cancer Registry study. Int J Gynecol Cancer 2015;25:1208-15.

**14.** Mackay HJ, Brady MF, Oza AM, et al. Prognostic relevance of uncommon ovarian histology in women with stage III/IV epithelial ovarian cancer. Int J Gynecol Cancer 2010;20:945-52.

**15.** Bamias A, Psaltopoulou T, Sotiropoulou M, et al. Mucinous but not clear cell histology is associated with inferior sur-

The New England Journal of Medicine
Downloaded from nejm.org at UNIV OF SOUTH CAROLINA on May 11, 2019. For personal use only. No other uses without permission.
Copyright © 2019 Massachusetts Medical Society. All rights reserved.

16. Pectasides D, Fountzilas G, Aravantinos G, et al. Advanced stage mucinous epithelial ovarian cancer: the Hellenic Cooperative Oncology Group experience. Gynecol Oncol 2005;97:436-41.

17. Bentivegna E, Fruscio R, Roussin S, et al. Long-term follow-up of patients with an isolated ovarian recurrence after conservative treatment of epithelial ovarian cancer: review of the results of an international multicenter study comprising 545 patients. Fertil Steril 2015;104:1319-24.

18. Melamed A, Rizzo AE, Nitecki R, et al. All-cause mortality after fertility-sparing surgery for stage I epithelial ovarian cancer. Obstet Gynecol 2017;130:71-9.

19. Kurman RJ, Shih I-M. The origin and pathogenesis of epithelial ovarian cancer: a proposed unifying theory. Am J Surg Pathol 2010;34:433-43.

20. Jordan SJ, Green AC, Whiteman DC, Webb PM. Risk factors for benign, borderline and invasive mucinous ovarian tumors: epidemiological evidence of a neoplastic continuum? Gynecol Oncol 2007; 107:223-30.

21. Hunter SM, Gorringe KL, Christie M, Rowley SM, Bowtell DD, Campbell IG. Pre-invasive ovarian mucinous tumors are characterized by CDKN2A and RAS pathway aberrations. Clin Cancer Res 2012;18: 5267-77.

22. Pieretti M, Hopenhayn-Rich C, Khattar NH, Cao Y, Huang B, Tucker TC. Heterogeneity of ovarian cancer: relationships among histological group, stage of disease, tumor markers, patient characteristics, and survival. Cancer Invest 2002;20: 11-23.

23. Mackenzie R, Kommoss S, Winterhoff BJ, et al. Targeted deep sequencing of mucinous ovarian tumors reveals multiple overlapping RAS-pathway activating mutations in borderline and cancerous neoplasms. BMC Cancer 2015;15:415.

24. Chang KL, Lee MY, Chao WR, Han CP. The status of Her2 amplification and Kras mutations in mucinous ovarian carcinoma. Hum Genomics 2016;10:40.

25. Seidman JD, Khedmati F. Exploring the histogenesis of ovarian mucinous and transitional cell (Brenner) neoplasms and their relationship with Walthard cell nests: a study of 120 tumors. Arch Pathol Lab Med 2008;132:1753-60.

26. Kelemen LE, Lawrenson K, Tyrer J, et al. Genome-wide significant risk associations for mucinous ovarian carcinoma. Nat Genet 2015;47:888-97.

27. Lee KR, Young RH. The distinction between primary and metastatic mucinous carcinomas of the ovary: gross and histologic findings in 50 cases. Am J Surg Pathol 2003;27:281-92.

28. Collaborative Group on Epidemiological Studies of Ovarian Cancer. Ovarian cancer and smoking: individual participant meta-analysis including 28,114 women with ovarian cancer from 51 epidemiological studies. Lancet Oncol 2012; 13:936-45.

29. Seidman JD, Kurman RJ, Ronnett BM. Primary and metastatic mucinous adenocarcinomas in the ovaries: incidence in routine practice with a new approach to improve intraoperative diagnosis. Am J Surg Pathol 2003;27:985-93.

30. Shimada M, Kigawa J, Ohishi Y, et al. Clinicopathological characteristics of mucinous adenocarcinoma of the ovary. Gynecol Oncol 2009;113:331-4.

31. Gore MEH, Brady A, Penson W, et al. Multicenter trial of carboplatin/paclitaxel versus oxaliplatin/capecitabine, each with/without bevacizumab, as first line chemotherapy for patients with mucinous epithelial ovarian cancer. J Clin Oncol 2015; 33:5528. abstract.

32. Frumovitz M, Schmeler KM, Malpica A, Sood AK, Gershenson DM. Unmasking the complexities of mucinous ovarian carcinoma. Gynecol Oncol 2010;117:491-6.

33. McCluggage WG. Immunohistochemistry in the distinction between primary and metastatic ovarian mucinous neoplasms. J Clin Pathol 2012;65:596-600.

34. Lee KR, Scully RE. Mucinous tumors of the ovary: a clinicopathologic study of 196 borderline tumors (of intestinal type) and carcinomas, including an evaluation of 11 cases with 'pseudomyxoma peritonei.' Am J Surg Pathol 2000;24:1447-64.

35. Riopel MA, Ronnett BM, Kurman RJ. Evaluation of diagnostic criteria and behavior of ovarian intestinal-type mucinous tumors: atypical proliferative (borderline) tumors and intraepithelial, microinvasive, invasive, and metastatic carcinomas. Am J Surg Pathol 1999;23:617-35.

36. Rodríguez IM, Prat J. Mucinous tumors of the ovary: a clinicopathologic analysis of 75 borderline tumors (of intestinal type) and carcinomas. Am J Surg Pathol 2002;26:139-52.

37. Muyldermans K, Moerman P, Amant F, Leunen K, Neven P, Vergote I. Primary invasive mucinous ovarian carcinoma of the intestinal type: importance of the expansile versus infiltrative type in predicting recurrence and lymph node metastases. Eur J Cancer 2013;49:1600-8.

38. Gouy S, Saidani M, Maulard A, et al. Characteristics and prognosis of stage I ovarian mucinous tumors according to expansile or infiltrative type. Int J Gynecol Cancer 2018;28:493-9.

39. Hoerl HD, Hart WR. Primary ovarian mucinous cystadenocarcinomas: a clinicopathologic study of 49 cases with long-term follow-up. Am J Surg Pathol 1998; 22:1449-62.

40. Lee JY, Jo YR, Kim TH, et al. Safety of fertility-sparing surgery in primary mucinous carcinoma of the ovary. Cancer Res Treat 2015;47:290-7.

41. Gouy S, Saidani M, Maulard A, et al. Results of fertility-sparing surgery for expansile and infiltrative mucinous ovarian cancers. Oncologist 2018;23:324-7.

42. Gouy S, Saidani M, Maulard A, et al. Staging surgery in early-stage ovarian mucinous tumors according to expansile and infiltrative types. Gynecol Oncol Rep 2017;22:21-5.

43. Garcia-Soto AE, Boren T, Wingo SN, Heffernen T, Miller DS. Is comprehensive surgical staging needed for thorough evaluation of early-stage ovarian carcinoma? Am J Obstet Gynecol 2012;206(3): 242.e1-242.e5.

44. Morice P, Joulie F, Camatte S, et al. Lymph node involvement in epithelial ovarian cancer: analysis of 276 pelvic and paraaortic lymphadenectomies and surgical implications. J Am Coll Surg 2003;197: 198-205.

45. Hoogendam JP, Vlek CA, Witteveen PO, Verheijen R, Zweemer RP. Surgical lymph node assessment in mucinous ovarian carcinoma staging: a systematic review and meta-analysis. BJOG 2017;124: 370-8.

46. Alexandre J, Ray-Coquard I, Selle F, et al. Mucinous advanced epithelial ovarian carcinoma: clinical presentation and sensitivity to platinum-paclitaxel-based chemotherapy, the GINECO experience. Ann Oncol 2010;21:2377-81.

47. Karabuk E, Kose MF, Hizli D, et al. Comparison of advanced stage mucinous epithelial ovarian cancer and serous epithelial ovarian cancer with regard to chemosensitivity and survival outcome: a matched case-control study. J Gynecol Oncol 2013; 24:160-6.

48. Pisano C, Greggi S, Tambaro R, et al. Activity of chemotherapy in mucinous epithelial ovarian cancer: a retrospective study. Anticancer Res 2005;25:3501-5.

49. du Bois A, Reuss A, Pujade-Lauraine E, Harter P, Ray-Coquard I, Pfisterer J. Role of surgical outcome as prognostic factor in advanced epithelial ovarian cancer: a combined exploratory analysis of 3 prospectively randomized phase 3 multicenter trials: by the Arbeitsgemeinschaft Gynaekologische Onkologie Studiengruppe Ovarialkarzinom (AGO-OVAR) and the Groupe d'Investigateurs Nationaux Pour les Etudes des Cancers de l'Ovaire (GINECO). Cancer 2009;115:1234-44.

50. Kelemen LE, Köbel M. Mucinous carcinomas of the ovary and colorectum: different organ, same dilemma. Lancet Oncol 2011;12:1071-80.

51. Xu W, Rush J, Rickett K, Coward JI. Mucinous ovarian cancer: a therapeutic review. Crit Rev Oncol Hematol 2016;102: 26-36.

52. Sato S, Itamochi H, Kigawa J, et al.

The New England Journal of Medicine
Downloaded from nejm.org at UNIV OF SOUTH CAROLINA on May 11, 2019. For personal use only. No other uses without permission.
Copyright © 2019 Massachusetts Medical Society. All rights reserved.

Combination chemotherapy of oxaliplatin and 5-fluorouracil may be an effective regimen for mucinous adenocarcinoma of the ovary: a potential treatment strategy. Cancer Sci 2009;100:546-51.

**53.** Vergote I, Tropé CG, Amant F, et al. Neoadjuvant chemotherapy or primary surgery in stage IIIC or IV ovarian cancer. N Engl J Med 2010;363:943-53.

**54.** Kehoe S, Hook J, Nankivell M, et al. Primary chemotherapy versus primary surgery for newly diagnosed advanced ovarian cancer (CHORUS): an open-label, randomised, controlled, non-inferiority trial. Lancet 2015;386:249-57.

**55.** Colombo N, Sessa C, du Bois A, et al. ESMO–ESGO Consensus Conference on Ovarian Cancer: Pathology and molecular biology, early and advanced stages, borderline ovarian tumours and recurrent disease. Ann Oncol (in press).

**56.** Chay WY, Kwok LL, Tiong WN, et al. Mutational aberrations detected in mucinous epithelial ovarian cancer of Asian women. Int J Gynecol Cancer 2018;28: 428-36.

**57.** Li XS, Sun J, He XL. Expression of c-myc and mutation of the KRAS gene in patients with ovarian mucinous tumors. Genet Mol Res 2015;14:10752-9.

**58.** Lee YJ, Lee MY, Ruan A, et al. Multipoint Kras oncogene mutations potentially indicate mucinous carcinoma on the entire spectrum of mucinous ovarian neoplasms. Oncotarget 2016;7:82097-103.

**59.** Ryland GL, Hunter SM, Doyle MA, et al. Mutational landscape of mucinous ovarian carcinoma and its neoplastic precursors. Genome Med 2015;7:87.

**60.** Lin WL, Kuo WH, Chen FL, et al. Identification of the coexisting HER2 gene amplification and novel mutations in the

HER2 protein-overexpressed mucinous epithelial ovarian cancer. Ann Surg Oncol 2011;18:2388-94.

**61.** McAlpine JN, Wiegand KC, Vang R, et al. HER2 overexpression and amplification is present in a subset of ovarian mucinous carcinomas and can be targeted with trastuzumab therapy. BMC Cancer 2009;9:433.

**62.** Jain A, Ryan PD, Seiden MV. Metastatic mucinous ovarian cancer and treatment decisions based on histology and molecular markers rather than the primary location. J Natl Compr Canc Netw 2012;10:1076-80.

**63.** Sato N, Saga Y, Mizukami H, et al. Cetuximab inhibits the growth of mucinous ovarian carcinoma tumor cells lacking KRAS gene mutations. Oncol Rep 2012; 27:1336-40.

**64.** Inaba K, Oda K, Aoki K, et al. Synergistic antitumor effects of combination PI3K/mTOR and MEK inhibition (SAR245409 and pimasertib) in mucinous ovarian carcinoma cells by fluorescence resonance energy transfer imaging. Oncotarget 2016; 7:29577-91.

**65.** Spreafico A, Oza AM, Clarke BA, et al. Genotype-matched treatment for patients with advanced type I epithelial ovarian cancer (EOC). Gynecol Oncol 2017;144: 250-5.

**66.** Rechsteiner M, Zimmermann AK, Wild PJ, et al. TP53 mutations are common in all subtypes of epithelial ovarian cancer and occur concomitantly with KRAS mutations in the mucinous type. Exp Mol Pathol 2013;95:235-41.

**67.** Bridges KA, Chen X, Liu H, et al. MK-8776, a novel chk1 kinase inhibitor, radiosensitizes p53-defective human tumor cells. Oncotarget 2016;7:71660-72.

**68.** Segev Y, Pal T, Rosen B, et al. Risk factors for ovarian cancers with and without microsatellite instability. Int J Gynecol Cancer 2014;24:664-9.

**69.** Pal T, Permuth-Wey J, Kumar A, Sellers TA. Systematic review and meta-analysis of ovarian cancers: estimation of microsatellite-high frequency and characterization of mismatch repair deficient tumor histology. Clin Cancer Res 2008;14:6847-54.

**70.** Murphy MA, Wentzensen N. Frequency of mismatch repair deficiency in ovarian cancer: a systematic review. Int J Cancer 2011;129:1914-22.

**71.** Diaz LA, Marabelle A, Delord JP, et al. Pembrolizumab therapy for microsatellite instability high (MSI-H) colorectal cancer (CRC) and non-CRC. Presented at the annual meeting of the American Society of Clinical Oncology, Chicago, June 2–6, 2017. abstract (https://meetinglibrary.asco.org/record/144822/abstract).

**72.** Mueller JJ, Lajer H, Mosgaard BJ, et al. International study of primary mucinous ovarian carcinomas managed at tertiary medical centers. Int J Gynecol Cancer 2018;28:915-24.

**73.** Bassiouny D, Ismiil N, Dubé V, et al. Comprehensive clinicopathologic and updated immunohistochemical characterization of primary ovarian mucinous carcinoma. Int J Surg Pathol 2018;26: 306-17.

**74.** Leary AF, Quinn M, Fujiwara K, et al. Fifth Ovarian Cancer Consensus Conference of the Gynecologic Cancer Inter-Group (GCIG): clinical trial design for rare ovarian tumours. Ann Oncol 2017;28: 718-26.

*Copyright © 2019 Massachusetts Medical Society.*

**IMAGES IN CLINICAL MEDICINE**

The *Journal* welcomes consideration of new submissions for Images in Clinical Medicine. Instructions for authors and procedures for submissions can be found on the *Journal*'s website at NEJM.org. At the discretion of the editor, images that are accepted for publication may appear in the print version of the *Journal*, the electronic version, or both.

The New England Journal of Medicine
Downloaded from nejm.org at UNIV OF SOUTH CAROLINA on May 11, 2019. For personal use only. No other uses without permission.
Copyright © 2019 Massachusetts Medical Society. All rights reserved.

# Exhibit 130

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

DEANE BERG,                          )          CIV. 09-4179-KES
                                     )
        Plaintiff,                   )
                                     )
   vs.                               )          MEMORANDUM OPINION
                                     )            AND ORDER
JOHNSON & JOHNSON;                   )
JOHNSON & JOHNSON                    )
CONSUMER COMPANIES, INC.;            )
LUZENAC AMERICA, INC.;               )
JOHN DOES/JANE DOES 1-30;            )
UNKNOWN BUSINESSES                   )
AND/OR CORPORATIONS A-Z,             )
                                     )
        Defendants.                  )

        Defendants Johnson & Johnson and Johnson & Johnson Consumer

Companies, Inc. move for summary judgment on all of plaintiff's claims (Docket

149) and also move to exclude the testimony of four of plaintiff's experts

(Dockets 140, 143, 145, and 147). Defendant Luzenac America, Inc. joins in the

motions (Dockets 151, 153, 155, 156, and 157). For the following reasons,

defendants' motions to exclude are granted in part and denied in part.

Defendants' motion for summary judgment is denied.

## FACTUAL BACKGROUND

        Berg was diagnosed with ovarian cancer in December of 2006. She was 49

years old at the time. Prior to her diagnosis, Berg used Johnson & Johnson

products—Johnson's Baby Powder and Shower to Shower—to dust her

perineum for feminine hygiene purposes. She applied the products on a daily basis from 1975 until 2007.

Talc is one of the main ingredients in Johnson's Baby Powder and Shower to Shower. Talc is a naturally occurring mineral that is mined from the ground and used in various applications. Luzenac supplies talc to Johnson & Johnson.

Research has been ongoing studying how talc affects the female reproductive system for a number of years. For example, Dr. Daniel Cramer, one of Berg's proposed experts, published a study in 1982 that found that an association existed between the application of talc to a woman's genital area and the development of ovarian cancer. Defendants stayed current on the various studies that analyzed any potential hazards associated with talc.

Berg alleges that her application of talc to her perineum caused her ovarian cancer and brought this product liability action against defendants because their products did not include any warnings regarding the possible hazards of applying talc to a woman's perineum. Berg has identified four expert opinions in support of her claims.

First, Dr. Cramer is an epidemiologist and is prepared to testify that talc use in the genital area has a strong causal association with ovarian cancer. Further, Dr. Cramer's opinion is that Berg's frequent application of talc to her genital area was "the major cause of her invasive serous ovarian cancer[.]" Docket 148-1 at 18.

2

Second, Dr. Gary Rosenthal is a toxicologist and is prepared to testify about talc's immunotoxic potential and how such potential relates to ovarian cancer. His opinion is that Berg's frequent talc use "played a role in disease processes leading to her ovarian cancer." Docket 144-1 at 11.

Third, Dr. John Godleski is an expert in microscopy, and he examined tissues taken from Berg's reproductive system following her diagnosis of ovarian cancer. He is prepared to testify that talc particles were present in Berg's tissues.

Fourth, Dr. David R. Lenorovitz and Dr. Edward E. Karnes are experts in the field of forensic human factors and warnings. Their designation as experts is to: (1) ascertain if talc posed a hazard to the populace; (2) ascertain if any such hazard was open and obvious to a reasonable user; (3) determine if there was a feasible way to place a warning on the talc product; and (4) determine if there was a financially and technically reasonable alternative to talc. Docket 173 at 2.

## MOTIONS TO EXCLUDE EXPERT TESTIMONY

In this diversity action, federal law governs whether expert testimony is admissible. *Wagner v. Hesston Corp.*, 450 F.3d 756, 760 (8th Cir. 2006). Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. *Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012). The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

experience, training, or education, may testify thereto in the form of
an opinion or otherwise, if (1) the testimony is based upon
sufficient facts or data, (2) the testimony is the product of reliable
principles and methods, and (3) the witness has applied the
principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In applying Rule 702, the trial judge becomes a "gatekeeper"

who screens evidence to ensure its reliability and relevance. *Russell*, 702 F.3d

at 456. "The rule clearly is one of admissibility rather than exclusion."

*Sappington v. Skyjack, Inc.*, 512 F.3d 440, 448 (8th Cir. 2008). An expert's

opinion should be excluded "only if it is so fundamentally unsupported that it

can offer no assistance to the jury." *Id.*

The district court applies a three-part test when screening proposed

testimony for experts under Rule 702:

First, evidence based on scientific, technical, or other specialized
knowledge must be useful to the finder of fact in deciding the
ultimate issue of fact. This is the basic rule of relevancy. Second,
the proposed witness must be qualified to assist the finder of fact.
Third, the proposed evidence must be reliable or trustworthy in an
evidentiary sense, so that, if the finder of fact accepts it as true, it
provides the assistance the finder of fact requires.

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). To satisfy the

reliability requirement, the party offering the expert testimony must show by a

preponderance of the evidence "that the methodology underlying [the expert's]

conclusions is scientifically valid." *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th

Cir. 2010). In making the reliability determination, the court may consider:

(1) whether the theory or technique can be or has been tested; (2) whether the

4

theory or technique has been subjected to peer review or publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operations; and (4) whether the theory or technique is generally accepted in the scientific community. *Russell*, 702 F.3d at 456. Additional factors to consider include: "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alterative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008). "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject" these factors as the particular case demands. *Russell*, 702 F.3d at 456.

When making this inquiry, the court should focus on "principles and methodology, not on the conclusions that they generate." *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993)). At times, conclusions and methodology are not entirely distinct from one another, and the court "need not completely pretermit judicial consideration of an expert's conclusions." *Id.* With these principles in mind, the court will now address defendants' motions to exclude expert testimony.

## I.     Dr. Daniel Cramer

Defendants' sole argument in support of their motion to exclude

Dr. Cramer's testimony goes to the issue of whether his testimony is reliable.[1]

Defendants attack Dr. Cramer's testimony regarding both specific causation and

general causation, arguing that the testimony put forth to support each is not

reliable. For purposes of defendants' motion to exclude Dr. Cramer's testimony,

the court only considers whether the testimony is admissible and does not

consider whether it is sufficient to prove an element in plaintiff's case.[2] *See*

*Daubert*, 509 U.S. at 596 (noting the difference between admissibility and

sufficiency).

Dr. Cramer is the Professor of Obstetrics, Gynecology, and Reproductive

Biology at Harvard Medical School and is a practicing obstetrician and

gynecologist. He has a doctorate degree in epidemiology from the Harvard

School of Public Health.

Dr. Cramer's expert report relies on epidemiology[3] to address two issues:

(1) "the association between use of cosmetic talc powders in the genital area and

---

[1] It appears to be undisputed that Dr. Cramer is qualified to give expert testimony and that his testimony is relevant.

[2] Sufficiency is addressed in the portion of this order dealing with defendants' motion for summary judgment.

[3] Epidemiology is the "field of public health and medicine that studies the incidence, distribution, and etiology of disease in human populations." Reference Manual on Scientific Evidence 551 (3d ed. 2011), *available at* 2011 WL 7724261, *2.

ovarian cancer with regard to the likelihood that this is cause-and-effect" and (2) "the possible relevance of talc use to the occurrence of ovarian cancer in the specific case of Ms. Deane Berg[.]" Docket 148-1 at 3. The report concludes by opining that (1) there is a causal association between the use of talc and ovarian cancer, and (2) chronic talc use was the major cause of Berg's invasive serous ovarian cancer. *Id.* at 18.

Defendants make two arguments in support of their motion to exclude Dr. Cramer's testimony.[4] First, they argue that Dr. Cramer's report is inadmissible because it fails to rule out alternative causes of Berg's cancer. Second, they argue that Dr. Cramer's report is inadmissible because the odds ratios established in the report and Dr. Cramer's interpretations of those odds ratios stem from unreliable methods.

## A.     Ruling Out Alternative Causes

Defendants argue that Dr. Cramer's methodology is not reliable because he fails to rule out alternative causes of Berg's cancer. Defendants rely on these four Eighth Circuit Court of Appeals opinions to support their proposition that Dr. Cramer was required to rule out alternative causes of Berg's cancer:

*Barrett*, 606 F.3d 975; *Bland v. Verizon Wireless, (VAW) L.L.C.*, 538 F.3d 893 (8th

---

[4] Defendants argue extensively in their briefs that Dr. Cramer's testimony fails to establish either specific or general causation. Such arguments go to the sufficiency of Dr. Cramer's testimony and not the admissibility of it. Because a motion to exclude expert testimony is concerned only with admissibility, these arguments will not be addressed in this part of the order.

Case 3:16-md-02738-MAS-RLS   Document 9895-8   Filed 05/30/19   Page 21 of 565 PageID: 73523
Case 4:09-cv-04373-KES   Document 291   Filed 04/12/13   Page 8 of 44   PageID: 2923
71265

Cir. 2008); *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748 (8th Cir. 2006); and

*Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202 (8th Cir. 2000). None of these

cases, however, require an epidemiologist to rule out all alternative causes in

order for his testimony to be admissible.

In *Barrett*, the Eighth Circuit found that the district court did not abuse

its discretion when it limited the expert testimony of a toxicologist and a

treating physician. 606 F.3d at 981-82. The toxicologist conceded that she

lacked "significant scientific knowledge underpinning [her] opinion and that she

did not rule out alternative causes of [plaintiff's] injury. . . . Her opinion . . . was

admittedly based on assumption, without any scientific testing or exposure

analysis." *Id.* at 981. The treating physician was not allowed to testify about the

cause of the plaintiff's toxic exposure because he "assumed that [plaintiff] had

been injured by hydrogen sulfide gas exposure without any scientific verification

and without considering any alternative causes." *Id.* at 982. Neither expert

witness was offering epidemiologic evidence. Both experts had glaring

deficiencies in their opinions because they failed to do any scientific

verifications, relied on unsupported assumptions, and did not consider

alternative causes.

In *Bland*, the Eighth Circuit found that the district court did not abuse its

discretion by excluding a treating physician's expert testimony. 538 F.3d at

897-98. The treating physician intended to testify about the differential

diagnoses that he conducted. *Id.* at 897. "A differential diagnosis is a technique that identifies the cause of a medical condition by eliminating the likely causes until the most probable cause is isolated." *Bland*, 538 F.3d at 897. The treating physician's differential diagnosis was inadmissible because he failed to eliminate other possible causes. *Id.* The very nature of a differential diagnosis requires a consideration and elimination of other possible causes. By failing to consider other causes, a differential diagnosis cannot, by definition, be reliable. Thus, *Bland* stands for the proposition that an admissible differential diagnosis requires the expert to consider and eliminate other possible causes. *Bland* does not stand for the proposition that an expert offering epidemiologic evidence must rule out all other possible causes for his testimony to be admissible.

In *Marmo*, the Eighth Circuit found that the district court acted within the bounds of discretion when it precluded a toxicologist from testifying. 457 F.3d at 758. The toxicologist did not examine the plaintiff, did not inquire about other toxic exposures, did not exclude confounding factors, and "admitted that the causation standard she employed was not subject to expression in terms of a potential rate of error and was a much lower standard than medical causation." *Id. Marmo* does not support defendants' proposition that an expert offering epidemiologic evidence must rule out all other possible causes for his testimony to be admissible.

Lastly, in *Turner* the Eighth Circuit concluded that the district court did not abuse its discretion by excluding a treating physician's expert opinion. 229 F.3d at 1208-09. Just as in *Bland*, the treating physician's opinion was based on a differential diagnosis in which he "admitted that he made no attempt to consider all the possible causes, or to exclude each potential cause until only one remained, or to consider which of two or more non-excludable causes was the more likely to have caused the condition." *Id.* at 1208. Again, failing to properly administer a differential diagnosis resulted in an inadmissible differential diagnosis. But *Turner* does not require that an epidemiologist perform a differential diagnosis, which would require consideration of other possible causes.

After a review of these cases, the appropriate legal proposition created from these opinions is that an expert witness who performs a differential diagnosis must consider all other possible causes and exclude each potential cause until only one remains, or consider which of two or more non-excluded potential causes was the more likely to have caused the condition. Dr. Cramer, however, does not claim to have performed a differential diagnosis. Indeed, his testimony is based on epidemiology. Moreover, Dr. Cramer's report indicates that he did in fact consider other possible causes of Berg's cancer. Therefore, Dr. Cramer's opinion will not be excluded on the basis that he failed to rule out all alternative causes. *See In re Prempro Prod. Liab. Litig.*, 586 F.3d 547, 566 (8th

10

Case 3:16-md-02738-MAS-RLS   Document 9805-3   Filed 05/30/19   Page 24 of 565 PageID:
Case 4:09-cv-04179-KES-RSS   Document 197-3   Filed 04/12/13   Page 11 of 14   PageID # 2910
71268

Cir. 2009) (noting that an expert's "explanations as to conclusions not ruled out

went to weight and not admissibility").

### B.      Dr. Cramer's Methodology

Defendants' second argument goes to the general methodology applied by

Dr. Cramer. In his expert report, Dr. Cramer notes that, in general, there is an

odds ratio[5] of 1.33 between perineal talc use and ovarian cancer. Dr. Cramer

further asserts that a woman with Berg's characteristics has an odds ratio of

3.53. Defendants argue that the 3.53 odds ratio established in Dr. Cramer's

report comes from unreliable methods. The court begins its analysis by

addressing defendants' specific concerns with Dr. Cramer's findings and then

moves to a more general examination of the methodology employed by

Dr. Cramer.

First, defendants claim Dr. Cramer's testimony is unreliable because it

conflicts with existing scientific literature that shows the appropriate odds ratio

is more in line with the 1.33 figure that Dr. Cramer generated. But there is "no

requirement that published epidemiological studies supporting an expert's

opinion exist in order for the opinion to be admissible." *Bonner v. ISP Tech., Inc.,*

---

[5] An odds ratio "expresses in quantitative terms the association between
exposure to an agent and a disease." <u>Reference Manual on Scientific Evidence</u>
568 (3d ed. 2011), *available at* 2011 WL 7724261, *10-*11. Typically, if the
odds ratio equals 1.0, the risk in exposed individuals is the same as the risk in
unexposed individuals. *Id.* at 567. The greater the odds ratio the greater the
risk in exposed individuals. *Id.* For example, an odds ratio of 4.0 indicates that
the risk of disease in the exposed group is four times as high as the risk of
disease in the unexposed group. *Id.*

259 F.3d 924, 929 (8th Cir. 2001). Dr. Cramer's testimony will be admitted so long as his methodology is reliable even if his conclusions are novel. *See id.* ("The district court could not exclude scientific testimony simply because the conclusion was 'novel' if the methodology and the application of the methodology were reliable.").

Second, defendants argue that the testimony is unreliable because he "cherry-picked" data in order to form an opinion solely for purposes of litigation. "That an expert testifies based on research he has conducted independent of litigation provides important, objective proof that the research comports with the dictates of good science." *Lauzon*, 270 F.3d at 692. Dr. Cramer has been studying the association between talc use and ovarian cancer since at least 1982. He has published several articles on the subject over the past 30 years. While it is true that his specific findings relevant to this case were generated during the course of litigation, the methods he employed in reaching his conclusions are very similar to the methods used in his previous research. Indeed, the data he used to generate the odds ratios came mostly from his past research. The only difference between his past and present research seems to exist in how he categorized his data. Defendants label this "cherry-picking." The court views it as simply looking at the existing data from a different perspective. Therefore, the court concludes that although Dr. Cramer's opinion was

developed during the course of this litigation, the opinion "naturally flowed from [his] research."[6] *Polski*, 538 F.3d at 839.

Third, defendants assert that the testimony is unreliable because Dr. Cramer's conclusions conflict with his non-litigation research and also conflict internally. If Dr. Cramer's previous, or even present, research contradicts his testimony in this case, certainly defendants can challenge his credibility during cross-examination. *See Kuhn*, 686 F.3d at 627 (noting that when an expert offers testimony that conflicts with his opinion, the appropriate response from the court is to allow the opposing party to challenge the credibility of the expert). But unless his methodology is unreliable, the court will not preclude his testimony.

Defendants also identify alleged inconsistencies in Dr. Cramer's findings (i.e., noting a protective effect for limited talc application). Again, this is a criticism of Dr. Cramer's results, not his methodology. Defendants will have the chance at trial during cross examination to attack his results.

The court will now analyze Dr. Cramer's methodology from a broader perspective under the seven factors articulated by the Eighth Circuit in *Polski*

---

[6] Additionally, Dr. Cramer testified that he is attempting to get his latest findings published in a scientific journal. This is important because it shows that Dr. Cramer has a stake in his findings independent from this litigation. Suspicions would arise if an expert were to propose testimony for litigation and then refuse to stand behind those findings in the scientific community. That is not the case here.

and previously set forth herein, while also addressing additional issues raised by defendants.[7]

As indicated in his report, Dr. Cramer performed a case-control study[8] to generate his final conclusions. A case-control study is commonplace in the field of epidemiology. According to Dr. Cramer, there have been nineteen *published* case-control studies addressing the talc and ovarian cancer association since 1982.[9] Docket 148-1 at 5, 20-21. Thus, the technique of using a case-control study to assess the association between talc use and ovarian cancer has been both tested and subjected to peer review.

Defendants are quick to note that Dr. Cramer's *specific findings* have not been tested or peer reviewed, specifically pointing to Dr. Cramer's categorization that allowed for a determination of the "[a]ssociation between genital talc use

---

[7] The court has already discussed whether the expertise was developed for litigation or naturally flowed from the expert's research and found that it weighs in favor of admission. *Polski*, 538 F.3d at 839.

[8] "In case-control studies, the researcher begins with a group of individuals who have a disease (cases) and then selects a similar group of individuals who do not have the disease (controls). The researcher then compares the groups in terms of past exposures. If a certain exposure is associated with or caused the disease, a higher proportion of past exposure among the cases than among the controls would be expected." Reference Manual on Scientific Evidence 559 (3d ed. 2011), *available at* 2011 WL 7724261, *6.

[9] In other words, the technique of using a case-control study to analyze the association between talc use and genital cancer is generally accepted in the scientific community, even if the results of Dr. Cramer's specific study are outliers.

14

and ovarian cancer among non-Jewish serous invasive cases and controls without a family history of ovarian or early onset breast cancer, stratified by menopausal status." Docket 148-1 at 17. This is mostly an attack on the results and not the methodology, and as a result goes to the weight to be given to the evidence and not its admissibility. Even if one were to consider defendants' argument an attack on Dr. Cramer's methodology, their argument is unpersuasive. First, although Dr. Cramer's specific categorization has not been tested, there is no reason why testing cannot occur using either Dr. Cramer's data or alternative data. Second, as discussed above, Dr. Cramer is in the process of getting his findings published. Third, and perhaps most important, Dr. Cramer's categorization was his attempt to connect his research with the facts of the case. His technique makes sense under the facts of this case because it shows the odds ratio of a woman in Berg's position.

Defendants criticize Dr. Cramer's choice to exclude menopausal, non-Jewish women who do not have a history of ovarian or early onset breast cancer. But as Dr. Cramer explains, this decision was made because Berg is not Jewish, was premenopausal at the time of her diagnosis, and did not have a history of ovarian or early onset breast cancer.

Moreover, Dr. Cramer's categorization is also a recognition of alternative causes of ovarian cancer. As Dr. Cramer points out in his report, women who are Jewish or have a history of breast or ovarian cancer are at an increased risk

15

for ovarian cancer. Berg is neither Jewish nor has a history, family or personal,
of breast or ovarian cancer. Additionally, she tested negative for the full panel of
BRCA1 and BRCA2 mutations—additional factors that increase one's risk for
ovarian cancer.

Lastly, defendants argue that Dr. Cramer's theory of biological
plausibility[10] is unreliable, making his ultimate conclusions equally as
unreliable. Dr. Cramer s two models of biological plausibility. One model relies
on the assertion that talc induces inflammation, down regulates immunity, and
enhances ovarian tumor development. The second model theorizes that talc's
inflammatory properties lead to dysregulation of immunity that would otherwise
help suppress cancerous cells. Defendants assert that neither of these models
has been proven. But defendants have not shown that either model is
undoubtedly incorrect. In epidemiology, the "saliency of [biological plausibility]
varies depending on the extent of scientific knowledge about the cellular and
subcellular mechanisms through which the disease process works." Reference
Manual on Scientific Evidence 605 (3d ed. 2011), *available at* 2011 WL
7724261, *30. At times, "mechanism explanations are merely
hypothesized—although hypotheses are sometimes accepted" in showing

---

[10] Biological plausibility is the "[c]onsideration of existing knowledge
about human biology and disease pathology to provide a judgment about the
plausibility that an agent causes a disease." Reference Manual on Scientific
Evidence 620 (3d ed. 2011), *available at* 2011 WL 7724261, *38.

exposure can cause a disease. *Id.* Furthermore, Berg's toxicologist expert,

Dr. Rosenthal, is prepared to offer additional support for Dr. Cramer's models of

biological plausibility. Thus, Dr. Cramer's biological plausibility models are not

so fundamentally unsupported that they fail to assist the jury. *Sappington*, 512

F.3d at 448.

After a careful review of the record, the court concludes that Dr. Cramer's

expert testimony is reliable. Defendants can certainly attack his testimony at

trial. *See Kuhn*, 686 F.3d at 625 ("Vigorous cross examination, presentation of

contrary evidence, and careful instruction on the burden of proof are the

traditional and appropriate means of attacking shaky but admissible

evidence."). But his testimony will not be precluded based on the arguments

that defendants put forward.

## II.    Dr. Gary Rosenthal

Dr. Rosenthal is prepared to offer expert testimony on the issue of

"whether talc can be considered an immunotoxic[11] agent and the relevance of

this to the biological plausibility of talc as an agent capable of causing ovarian

cancer." Docket 144-1 at 3. Defendants argue that Dr. Rosenthal is not

qualified to offer his expert opinion and that his opinion is unreliable.[12]

---

[11] Immunotoxicology is a "branch of toxicology concerned with the effects of toxic agents on the immune system." Reference Manual on Scientific Evidence 682 (3d ed. 2011), *available at* 2011 WL 7724262, *27.

[12] The court assumes, for purposes of this motion, that Dr. Rosenthal's testimony is relevant.

## A.    Qualifications

"A witness can be qualified as an expert by knowledge, skill, experience, training or education, and it is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in this case." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2011) (internal quotations omitted). "The relative skill or knowledge of an expert goes to the weight of that witness's testimony, not its admissibility." *Loudermill v. Dow Chemical Co.*, 863 F.2d 566, 569 (8th Cir. 1988).

Dr. Rosenthal received his Ph.D. in environmental medicine from New York University. He has been certified as a toxicologist by the American Board of Toxicology since 1990. His research includes the study of the toxicity of various agents on the immune system, including mineral dusts. He has also studied causative and preventative measures of inflammation and cancer.

Defendants argue that because Dr. Rosenthal has no experience specifically with talc or ovarian cancer, he is not qualified. Such a narrow view of an expert's qualifications is not required under Rule 702. "Rule 702 only requires that an expert possess knowledge, skill, experience, training, or education sufficient to 'assist' the trier of fact, which is satisfied where expert testimony advances the trier of fact's understanding to any degree." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (internal quotations

18

omitted). Dr. Rosenthal has experience studying the toxicity of mineral dust on the immune system. His expert testimony addresses whether talc can be considered an immunotoxic agent. Further, Dr. Rosenthal has experience studying the causative and preventative measures of inflammation and cancer. His expert testimony also addresses the biological plausibility of talc as an agent capable of causing ovarian cancer. Thus, the court finds that Dr. Rosenthal's qualifications are sufficient to assist the trier of fact in deciding the issues in this case.

### B. Reliability

Dr. Rosenthal's expert report offers the following conclusions: (1) talc has immunotoxic[13] potential; (2) it is biologically plausible that talc-mediated neoplastic events[14] can be evoked through various mechanisms; (3) talc can translocate from the vagina, cervix, or fallopian tube to the ovary; (4) it is biologically plausible that Berg's daily talc use for over 30 years led to chronic inflammation in target tissues; (5) neoplastic events related to chronic inflammation and/or immune modulation would likely have been elicited in

---

[13] Immunotoxic means that the agent in question exerts toxicity toward the immune system or its components.

[14] A neoplastic event is a pathologic process that results in the formation and growth of abnormal tissue that grows by cellular proliferation more rapidly than normal and continues to grow after the stimuli that initiated the new growth cease. Stedman's Medical Dictionary 1288 (28th ed. 2006).

19

Berg; and (6) the foregoing would have played a role in disease processes leading to Berg's ovarian cancer. Docket 144-1 at 11.

Defendants argue that Dr. Rosenthal's biologically plausible opinions are merely speculative, untested, and unreliable. An examination of Dr. Rosenthal's methods is required to determine whether defendants' arguments have merit.

In reaching his conclusions, Dr. Rosenthal first addresses talc's physicochemical aspects. Docket 144-1 at 5. He asserts that talc's "poorly-soluble particulate nature" is significant because it allows talc "to be taken up by cells of the immune system . . . and transported to other parts of the body[.]" *Id.* He notes that talc shares this property with "other members of the mineral dust family, including silicates and asbestos." *Id.* He further notes that "an extensive literature exists showing that similar to asbestos and other mineral dusts, exposure to talc can result in cellular toxicity." *Id.* (citing published studies).

Dr. Rosenthal next addresses the biological evidence that supports his conclusions. He first asserts that the immune consequences of talc being "taken up" by cells "depends on the fate(s) of the cell and the engulfed talc particle." *Id.* at 6. Some fates result in the recruitment of other immune cells (because the body recognizes talc as a foreign particle) while others lead to an injury that

causes unique structures such as Giant cells[15] and granulomas.[16] *Id.* (citing published studies that show Giant cells and granulomas have been seen in response to talc exposure). Alternatively, the talc particle may be taken up by cells through the process of endocytosis.[17] Any of these "fates" may "play some part in the response to mineral dust deposition on mucosal surface and would be associated with measures of inflammation[.]" *Id.* at 7. Dr. Rosenthal notes that several "studies show markers of inflammation following talc exposure, including intravaginal delivery." *Id.* (citing several published articles).

    To further support his opinions, Dr. Rosenthal discusses studies that show how talc can affect the immune system. He notes several studies that show talc induces granulomas in a variety of different organs. He then cites an animal study that found talc-induced granulomas resulted in deficient cellular immune functions that "have been noted to precede cancer in man." *Id.* at 7. After discussing additional studies, Dr. Rosenthal generalizes that talc causes

---

[15] Giant cells granuloma is a "nonneoplastic lesion characterized by a proliferation of granulation tissue containing numerous multinucleated giant cells[.]" Stedman's Medical Dictionary 832 (28th ed. 2006).

[16] Granuloma is a "[t]erm applied to nodular inflammatory lesions[.]" Stedman's Medical Dictionary 831 (28th ed. 2006). "Granuloma formation is a special type of immune response to foreign agents, where the body produces a collection of immune and related cells in an attempt to wall off a foreign agent that has resisted digestion." Docket 144-1 at 7.

[17] Endocytosis is the "[i]nternalization of substances from the extracellular environment through the formation of vesicles formed from the plasma membrane." Stedman's Medical Dictionary 640 (28th ed. 2006).

two biologic responses—immune system suppression and inflammation—both of which have been found to be associated with cancer. *Id.* at 8-10. Moreover, he notes that the "intimate relationship between talc, inflammation, phagocytic cells,[18] and ovary-derived chemotactic factors[19] provides a mechanistic connection for talc translocation to the ovary where it can alter tissue homeostasis." *Id.* at 9.

To summarize, Dr. Rosenthal's report essentially provides that talc particles that are applied in the perineal area can move to the ovaries where they can be problematic for immune cells by causing chronic inflammation and/or immunity suppression. Chronic inflammation and immunity suppression have been shown to play roles in disease processes that lead to cancer. Based on Berg's thirty-plus years of perineal exposure to talc, it is likely that she would have experienced such chronic inflammation and/or immunity suppression in her ovaries, thus playing a "role in disease processes leading to her ovarian cancer." *Id.* at 11. Dr. Rosenthal relied on several published scientific articles as well as his own experience in immunotoxicology to form his conclusions.

---

[18] Phagocytic cells are cells that can ingest bacteria, foreign particles, and other cells. Stedman's Medical Dictionary 1470 (28th ed. 2006).

[19] Chemotactic factors are factors that cause movement of cells in response to chemicals, whereby the cells are attracted or repelled by substances exhibiting chemical properties. Stedman's Medical Dictionary 358 (28th ed. 2006).

Defendants attack Dr. Rosenthal's opinion from several perspectives. First, defendants challenge Dr. Rosenthal's comparison of talc with other mineral dusts, arguing that he is not qualified to discuss the relevant properties of the three mineral dusts. The main assertion that Dr. Rosenthal makes, however, is that talc, asbestos, and silica all have poorly-soluble particulate natures that encourage uptake by immune cells. It is this property, he opines, that would cause the three mineral dusts to act similar from an immunotoxicology perspective. *See, e.g.*, Reference Manual on Scientific Evidence 664 (3d ed. 2011) (noting toxicologists often compare the structures of different compounds to infer toxicity). Dr. Rosenthal only relies on *one* physical property that the three substances share. Defendants urge the court to require Dr. Rosenthal to be an expert on *all* physicochemical properties of each substance if he is to compare any of them. Such expansive expertise, however, is not required. If defendants have issue with the factual basis for his comparisons, they are welcome to challenge it at trial, but such a challenge goes to the weight to be given to the evidence, not its admissibility. *Bonner*, 259 F.3d at 929 ("[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility.").

Second, defendants argue that Dr. Rosenthal's reference to historic accounts of asbestos in cosmetic talc is unreliable. Regardless of its reliability, the court finds this part of Dr. Rosenthal's opinion to be irrelevant. Berg has not

23

alleged that asbestos was in the talc that allegedly caused her ovarian cancer. Instead, she argues that the talc itself caused her ovarian cancer. Thus, any reference to historic accounts of asbestos in cosmetic talc is irrelevant and is also likely to confuse the jury. As a result, Dr. Rosenthal is precluded from testifying about historic accounts of asbestos in cosmetic talc.

Third, defendants take issue with Dr. Rosenthal's assertions relating to cellular toxicity. The general crux of defendants' arguments deal with the factual basis of the opinion and not the methodology. Further, defendants misinterpret Dr. Rosenthal's opinion. When disputing Dr. Rosenthal's claim that talc causes cellular toxicity, defendants argue that cellular toxicity is a general term not necessarily related to cancer. Nowhere in Dr. Rosenthal's expert report does he make the assertion that all cellular toxicity causes cancer. Thus, defendants' argument lacks merit.

Fourth, defendants argue that Dr. Rosenthal's references to metallic components in talc make his entire opinion unreliable, noting his deposition testimony in which he states that the "combination of these compounds together in the context of talc have not been studied in a detailed way[.]" Docket 144-2 at 14. The court agrees that Dr. Rosenthal's reference that he "would not completely dismiss a potential role for contaminating immunotoxic metals" is an unreliable statement because Dr. Rosenthal did not provide an adequate basis in science to support it. Nevertheless, this statement is a small part of his

24

report and has little or nothing to do with the rest of his expert opinion. Thus, his references to metallic components do not make his entire opinion unreliable.

Fifth, defendants attack Dr. Rosenthal's efforts to show biologic plausibility. They argue that because Berg's tissues did not indicate that the specific mechanisms that Dr. Rosenthal offered were present, his testimony is irrelevant.[20] The court disagrees and finds that Dr. Rosenthal's offering of mechanisms that provide biologic plausibility to Berg's claim that talc caused her ovarian cancer are relevant.[21]

Sixth, defendants argue that Dr. Rosenthal's opinion should be excluded because of his word choices in his report. The court will not entertain such a meritless objection.

Defendants' seventh challenge is similar to its third. They argue that because one of the mechanisms (TNF-alpha[22]) that Dr. Rosenthal offers has not been conclusively proven to cause cancer, it is unreliable. This again misstates Dr. Rosenthal's report. The report asserts that talc has been shown to cause

---

[20] Defendants' argument goes to the sufficiency of specific causation rather than admissibility. This argument is more properly addressed as part of the motion for summary judgment.

[21] If defendants had conclusive proof that the mechanisms were not present, then such testimony would likely be irrelevant.

[22] TNF-alpha stands for tumor necrosis alpha, which is a pleiotropic cytokine synthesized widely throughout the female reproductive tract. Stedman's Medical Dictionary 698 (28th ed. 2006).

Case 3:16-md-02738-MAS-RLS Document 9805-3 Filed 05/30/19 Page 39 of 565 PageID:
Case 4:09-cv-04179-KES-RLS Document 197 Filed 04/12/19 Page 26 of 44 PageID # 2991
71283

inflammation through an increase in TNF-alpha. The report does not state that

TNF-alpha causes cancer—the basis for defendants' challenge.

Defendants' eighth challenge attacks the factual basis for Dr. Rosenthal's

opinion. First, they argue that one of the studies he relied on is a case report.

But their citation to *Glastetter v. Novartis Pharmaceuticals Corporation*, 252 F.3d

986 (8th Cir. 2001), is not dispositive. *Glastetter* simply states that "causal

attribution based on case studies must be regarded with caution." 252 F.3d at

990. Here, Dr. Rosenthal is not using case studies as the entire foundation for

his opinions, but just as one piece of the puzzle. Further, defendants argue that

Dr. Rosenthal's admission that there is a scientific debate about whether talc is

immunosuppresive precludes his testimony. This admission does not make his

opinion unreliable. *See Kuhn*, 686 F.3d at 625 ("Proponents of expert testimony

need not demonstrate that the assessments of their experts are correct, and

trial courts are not empowered to determine which of several competing

scientific theories has the best provenance.") (internal quotation omitted).

Defendants' ninth challenge is not actually a challenge at all. Instead,

defendants simply reference various statements made by Dr. Rosenthal in

relation to Dr. Cramer's theories.

Tenth, defendants take issue with Dr. Rosenthal's proffer that the

immunosuppressive effects of asbestos may contribute to malignancy by

decreasing natural killer cells. Dr. Rosenthal offers this statement to support

Case 3:16-md-02738-MAS-RLS   Document 9805-3   Filed 05/30/19   Page 40 of 565 PageID:
71284
Case 4:09-cv-04179-KES-RSS   Document 197   Filed 04/12/19   Page 27 of 44   PageID #: 2991

his conclusion that substances that have immunosuppressive effects play a role in the disease processes leading up to cancer development. He does not assert, as defendants suggest, that talc exposure decreases natural killer cells. Again, defendants' misstatement of Dr. Rosenthal's opinion makes their objection meritless.

Defendants' eleventh challenge shares many of the shortcomings as their previous challenges. Defendants muddle sufficiency with admissibility, arguing that Berg's medical records did not show evidence of inflammation and thus any theory of inflammation is irrelevant. They challenge the factual basis of Dr. Rosenthal's opinion, claiming his interpretation of various animal studies makes his opinion unreliable. Lastly, they take Dr. Rosenthal's reluctance to definitively state that talc exposure causes ovarian cancer to mean that his opinions are speculative and unreliable. Dr. Rosenthal's report, however, does not assert that talc exposure causes ovarian cancer. Instead, Dr. Rosenthal's report states that Berg's talc exposure "would have played a role in disease processes leading to her ovarian cancer." Docket 144-1 at 11.

In summary, the court finds that the majority of defendants' challenges to Dr. Rosenthal's expert testimony are unpersuasive. In making his ultimate conclusions, Dr. Rosenthal relied on his own expertise in the field of toxicology, his past research, and several other published scientific studies. Any gaps or limitations in Dr. Rosenthal's reasoning can be presented to the jury. *See Kuhn*,

27

686 F.3d at 632 ("The studies' limitations may be presented to the jury, and [the expert's] reliance on the studies may be tested through the traditional means of cross examination and presentation of contrary evidence."). Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### III.    Dr. John Godleski

Dr. Godleski reviewed histopathological[23] slides taken from Berg following her diagnosis of ovarian cancer using advanced microscopic methodologies. In his review of twenty-six slides, Dr. Godleski found three particles of talc. He asserts that his findings indicate that talc was present in Berg's ovary tumor. Dr. Godleski opines that the talc found in Berg's tissues "is evidence for a causal link between the presence of talc and the development of [her] ovarian cancer." Docket 141-1 at 4.

Defendants argue that Dr. Godleski is unqualified and that his opinions are irrelevant and unreliable.

### A.    Qualifications

Dr. Godleski is the head of Pulmonary Pathology at Brigham and Women's Hospital, a major teaching hospital of Harvard Medical School. He also

---

[23] Histopathology is the science or study dealing with the cytologic and histologic structure of abnormal or diseased tissue. Stedman's Medical Dictionary 893 (28th ed. 2006).

leads a research group at the Harvard School of Public Health. He earned his medical degree from the University of Pittsburgh School of Medicine where he did research using electron microscopy. He has published more than 140 papers related to pulmonary pathology including a number using analytical electron microscopy. He is a "recognized expert whose opinion is sought by pathologists from other hospitals in the diagnosis of foreign material in tissues throughout the body using scanning electron microscopy and energy dispersive X-ray analyses." Docket 141-1 at 2.

Defendants note that Dr. Godleski's background does not include determining the causes of ovarian cancer. They argue that Dr. Godleski has done limited research on the relationship between talc and ovarian cancer, that his knowledge of the causes of ovarian cancer is limited, and that he is not an epidemiologist. On the other hand, defendants do not dispute that Dr. Godleski is an expert at identifying foreign particles in human tissue. Because his testimony is limited to identifying foreign particles in human tissue, the court finds he is qualified to offer his expert opinion.

**B.     Relevancy**

Defendants argue that Dr. Godleski's opinions are irrelevant because he cannot tie the talc particles found in Berg's tissues to defendants' products. This argument goes to the sufficiency of the testimony, not the relevancy of it. Berg claims that talc from defendants' products caused her ovarian cancer.

Certainly, testimony that establishes that talc particles were found in Berg's ovary tumor is relevant to this case.

### C. Reliability

Defendants' reliability arguments are based on a mischaracterization of Dr. Godleski's expert opinion. Their arguments suggest that Dr. Godleski is opining that the talc particles he found caused Berg's ovarian cancer. Dr. Godleski's opinion stops well short of such a conclusion. His report notes that "the talc found in this case is evidence for a causal link between the presence of talc and the development of [Berg's] ovarian cancer." Docket 141-1 at 4. His opinion merely states the obvious: the talc found in Berg's tissues is evidence in this case.

Defendants again argue that Dr. Godleski is required to rule out alternative causes. Because Dr. Godleski is not opining that talc was the cause of Berg's ovarian cancer through a differential diagnosis, he need not rule out other potential causes of her cancer. The fact that he found particles other than talc goes to the sufficiency of his testimony. The remainder of defendants' arguments are based on their mischaracterization of Dr. Godleski's opinions and will not be addressed. Therefore, Dr. Godleski's expert testimony will not be excluded.

Case 3:16-md-02738-MAS-RLS Document 9835-3 Filed 05/30/19 Page 44 of 565 PageID:
71288
Case 4:09-cv-04179-KES Document 197 Filed 04/12/13 Page 31 of 44 PageID #: 2930

## IV.    Dr. David R. Lenorovitz and Dr. Edward E. Karnes

Dr. Lenorovitz and Dr. Karnes are prepared to provide expert testimony "addressing certain forensic human factors and warnings issues."[24] Docket 146-3 at 3. Defendants argue that the expert report goes far beyond the boundaries applicable to human factors experts. In addition, defendants argue that any proposed testimony that is related to human factors is unreliable.

### A.    Qualifications

The court begins its evaluation by addressing the experts' qualifications. Dr. Lenorovitz has 44 years of professional experience as a human factors engineer, ergonomist, and cognitive psychologist. He received his Ph.D. in human factors engineering from the State University of New York and is certified as a professional ergonomist by the Board of Certification in Professional Ergonomics. He has spent the last six years as a forensic human factors consultant with a special emphasis on warnings systems design, development, and warnings adequacy evaluation.

Dr. Karnes has 50 years of professional experience as a human factors professional. He received his Ph.D. in experimental psychology from Temple University and is board-certified. He has served as a human factors consultant for plaintiffs and defendants in several different legal cases. The majority of his

---

[24] According to Berg, forensic human factors and warnings is the "multidisciplinary field examining how humans interact with the world around them." Docket 173 at 1.

31

research has concerned the development of warnings and user understanding of safety issues associated with the use of consumer and industrial products.

Both experts are qualified to render an expert opinion within their field.

### B. Defendants' Challenges

Defendants first take issue with any attempt by the experts to offer testimony regarding defendants' intent as well as testimony regarding defendants' purported lobbying efforts. *See, e.g.*, Docket 146-3 at 14 ("The defendants have knowingly decided to ignore the hazard present in their products."); Docket 146-3 at 5 ("The defendants collaborated and joined forces with other 'talc-interested parties' to pool resources and fund . . . programs intended to . . . defeat any research study[.]"). Both Dr. Karnes and Dr. Lenorovitz admit that the basis for their opinions about defendants' intent and lobbying efforts comes from "reading the documents that were provided." Docket 146-2 at 20; 22. "Where the subject matter is within the knowledge or experience of lay people, expert testimony is superfluous." *Ellis v. Miller Oil Purchasing Co.*, 738 F.2d 269, 270 (8th Cir. 1984). There is no reason why the jury cannot review the same documents and form their own opinions about defendants' intent and lobbying efforts. Thus, Drs. Karnes and Lenorovitz are precluded from offering an expert opinion about defendants' intent or lobbying efforts because such testimony would be superfluous.

Next, defendants seek to preclude Drs. Karnes and Lenorovitz from testifying about any legal conclusions, e.g., any duties that defendants owed to Berg. Under South Dakota law, whether a duty exists is a question of law. *Bland v. Davison Cnty*, 507 N.W.2d 80, 81 (S.D. 1993). Any expert testimony on a legal conclusion will not assist the trier of fact and is thus inadmissible. *United States v. Wells*, 63 F.3d 745, 753 (8th Cir. 1995) ("[I]nstruction on the law is the function of the court, not a defense expert."), *rev'd on other grounds*, 519 U.S. 482 (1997); *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995) ("The legal conclusions were for the court to make. It was an abuse of discretion to allow the testimony."). Thus, Drs. Karnes and Lenorovitz are precluded from testifying about any duties or responsibilities that defendants allegedly owed to Berg.

Defendants also move the court to preclude any testimony Drs. Karnes and Lenorovitz may offer that is outside their expertise, such as the medical risks of ovarian cancer, whether talc is hazardous, and whether there is a feasible alternative product. "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 702. Thus, Drs. Karnes and Lenorovitz can form their opinions based on the testimony of other experts in this case. But Drs. Karnes and Lenorovitz cannot make unsupported statements that are outside of their field of expertise. *See Anderson v. Raymond Corp.*, 340 F.3d 520, 523 (8th Cir. 2003) (noting that

the district court did not abuse its discretion in deciding that an expert could not testify about matters outside of his expertise). In addition, the court need not admit cumulative evidence. Fed. R. Evid. 403. Any detailed description of testimony provided by Berg's other experts regarding the medical risks of ovarian cancer, whether talc is hazardous, and whether there is a feasible alternative product would certainly be cumulative because Drs. Karnes and Lenorovitz are not capable of offering their novel opinions in such areas as they are not qualified to do so. Therefore, the testimony of Drs. Karnes and Lenorovitz regarding these areas must be limited. For purposes of their testimony, Drs. Karnes and Lenorovitz may only "assume" that ovarian cancer has medical risks, talc is hazardous, and there is a feasible alternative product.[25] They cannot, however, go into detail on any of these subjects.

More generally, Berg asserts that Drs. Karnes and Lenorovitz were designated (1) to ascertain if talc posed a hazard to the populace; (2) to determine whether the hazard was open and obvious to a reasonable user; (3) to determine if there was a feasible way to place a warning on the talc product; and (4) to determine if there was a financially and technically reasonable alternative to talc. Docket 173 at 2. As discussed above, Drs. Karnes and

---

[25] This assumes that plaintiff will present evidence that there is a feasible alternative product.

34

Lenorovitz are not qualified to provide an opinion on whether talc is hazardous to the populace or whether there is a financially reasonable alternative to talc.

Moreover, Drs. Karnes and Lenorovitz cannot assist the jury on the issue of whether the alleged hazard was open and obvious to a reasonable user. The basis for Drs. Karnes and Lenorovitz concluding that the alleged hazard was not open and obvious is based solely on the fact that Berg, Dr. Karnes, and Dr. Lenorovitz were not aware of the hazard prior to this litigation. A jury can rely on its own common sense and experiences in forming its conclusion on whether the alleged hazard was open and obvious.

Therefore, the testimony of Drs. Karnes and Lenorovitz will be limited to whether there was a feasible way to place a warning on defendants' products.[26] The court will now turn to defendants' summary judgment motion.

## SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of her

---

[26] After reviewing the remainder of the report in light of the extensive limitations discussed above, the court finds that any additional proposed testimony outside of the issue of placing a warning on the product is not admissible because it is either cumulative or outside the expertise of Drs. Karnes and Lenorovitz.

Case 3:16-md-02738-MAS-RLS  Document 9805-3  Filed 05/30/19  Page 49 of 565 PageID:
71293
Case 4:09-cv-04179-KES-RSS  Document 197  Filed 04/12/13  Page 36 of 44 PageID #: 2941

case on which she bears the ultimate burden of proof. *Celotex Corp. v. Catrett*,
477 U.S. 317, 322-23 (1986). "The nonmoving party may not 'rest on mere
allegations or denials, but must demonstrate on the record the existence of
specific facts which create a genuine issue for trial.' " *Mosley v. City of
Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. County of
Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)).

Summary judgment is precluded if there is a dispute in facts that could
affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
248 (1986). For purposes of a summary judgment motion, the court views the
facts and the inferences drawn from such facts "in the light most favorable to
the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 588 (1986).

Because this is a diversity action, the court applies the law of the state in
which it sits. *Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir.
2007). Thus, South Dakota law applies to Berg's claims.[27]

## ANALYSIS

Defendants move for summary judgment on three grounds: (1) Berg's
experts do not present admissible evidence of causation and have failed to rule
out other potential causes; (2) there is no evidence that would impose upon

---

[27] The parties do not dispute that South Dakota law applies.

Case 3:16-md-02738-MAS-RLS Document 9805-1 Filed 05/30/19 Page 50 of 565 PageID:
71294
Case 4:09-cv-04179-KES-RBS Document 197 Filed 04/12/13 Page 37 of 44 PageID # 2841

defendants a duty to warn; and (3) Berg cannot demonstrate that defendants'
failure to warn caused her ovarian cancer.

## I.     Evidence of Causation

Defendants argue that Berg has not presented admissible evidence of
causation and thus all of her claims must fail. To survive summary judgment,
Berg must present evidence beyond unsupported conclusions and speculative
statements that defendants' products caused her injuries. *Burley v. Kytec
Innovative Sports Equip., Inc.*, 737 N.W.2d 397, 407-10 (S.D. 2007). Expert
testimony is ordinarily required to establish causation in a products liability
action, particularly in a toxic tort action. *Id.*; *see also Junk v. Terminix Int'l Co.*,
628 F.3d 439, 450 (8th Cir. 2010) ("To succeed in her claims, [plaintiff] needed
to present expert testimony showing that the [substance] could have caused
[the] injuries and that it did in fact cause those injuries.").

The majority of defendants' arguments rely on the assumption that the
court would grant their motions to exclude expert testimony analyzed above.
But because the court found that the majority of the expert testimony offered by
Berg is admissible, most of defendants' arguments are moot. The court will
nonetheless evaluate the admissible evidence that Berg has put forth to ensure
that she has met her burden of creating a genuine issue of fact on the causation
element.

As a preliminary matter, Berg asserts, and defendants do not dispute, that she began using talc in her genital area in 1975. She claims that the talc came from defendants' products—"Johnson's Baby Powder" and "Shower to Shower"—and that her use continued until 2007. It is undisputed that Berg was diagnosed with ovarian cancer in December of 2006.

Berg has put forth admissible expert testimony to support her claim that defendants' products caused her ovarian cancer. First, Dr. Cramer, an epidemiologist, opines generally that talc use in the genital area has a strong causal association with ovarian cancer. *See Glastetter*, 252 F.3d at 992 (noting that epidemiological evidence can assist in establishing causation). He goes further to opine that Berg's frequent application of talc to her genital area was "the major cause of her invasive serous ovarian cancer[.]" Docket 148-1 at 18. In forming his opinions, Dr. Cramer relied on various facts: Berg was pre-menopausal when she was diagnosed; she has no personal or family history of breast or ovarian cancer; she is not Jewish; she tested negative for the full panel of BRCA1 and BRCA2 mutations; and the odds ratio for someone with similar characteristics is 3.53.

Second, Dr. Rosenthal, a toxicologist, provides biologic plausibility to Dr. Cramer's opinions. *See Marmo*, 457 F.3d at 758 ("[A] toxicologist may testify that exposure to a chemical caused a person's symptoms and injuries."). He asserts that talc has immunotoxic potential and can evoke neoplastic events,

which may lead to ovarian cancer. Further, he claims that it is biologically plausible that Berg's frequent application of talc led to chronic inflammation and/or immune modulation of tissues and cells in her ovaries. Thus, he concludes that Berg's frequent genital application of talc "played a role in disease processes leading to her ovarian cancer." Docket 144-1 at 11.

Third, Dr. Godleski, an expert in microscopy, provides evidence that talc was actually present in the tissues that were removed from Berg's ovaries and fallopian tubes following her diagnosis. Lastly, Berg claims that had she known of any dangers involved in applying talc to her genital area, she would not have done so.

Defendants urge the court to grant summary judgment because Berg has not ruled out other potential causes of her ovarian cancer. But Berg is not required to "eliminate all other possible explanations of causation[.]" *Burley*, 737 N.W.2d at 407. She needs only to "set forth sufficient evidence establishing a causal connection between the [defendants' product] and the resulting injury." *Id.* The court finds that she has done so here. Determining the weight of the evidence Berg has put forth is an issue for the jury.

## II.     Duty to Warn

Defendants argue that Berg cannot move forward with her failure to warn claims because she has not established the existence of a duty to warn. The

court must separate Berg's failure to warn claims to address defendants' argument.

### A.    Strict Liability Failure to Warn

Defendants argue that they did not owe Berg a duty to warn because their product is not dangerous. "The issue under strict liability is whether the manufacturer's failure to adequately warn rendered the product unreasonably dangerous without regard to the reasonableness of the failure to warn judged by negligence standards." *Peterson v. Safway Steel Scaffolds Co.*, 400 N.W.2d 909, 912 (S.D. 1987). "[K]nowledge of the potential risk is imputed to the manufacturer." *Id.* Thus, defendants cannot defend "on grounds that, at the time of production, [they] neither knew nor could have known of the risk." *Id.* Thus, if Berg can establish at trial that a "danger existed associated with a foreseeable use of [defendants'] product," the duty to warn element is automatically satisfied for purposes of her strict liability failure to warn claim. *Burley*, 737 N.W.2d at 409.

### B.    Negligent Failure to Warn

To establish liability for negligent failure to warn, Berg must show, among other things, that defendants "knew or reasonably should have known that the product was dangerous or was likely to be dangerous when used in a reasonably foreseeable manner." *Id.* at 410. Defendants argue that there was and still is no duty to warn because there lacks any substantial evidence that

their products are dangerous. Additionally, defendants argue that any evidence that Berg puts forth that allegedly shows dangers associated with defendants' products falls short of creating a duty to warn.

Defendants' arguments are premature at this time. Defendants are correct in stating that under South Dakota law "the existence of a duty is a question of law to be determined by the court." *Janis v. Nash Finch Co.*, 780 N.W.2d 497, 500 (S.D. 2010). But in a negligent failure to warn case, whether defendants owed Berg a duty to warn depends, first, on whether defendants' products are unreasonably dangerous. *See Burley*, 737 N.W.2d at 410 (requiring plaintiff to show that the "manufacturer knew or reasonably should have known that the product was dangerous"). Indeed, if defendants' products are not dangerous, no warning would be necessary. Whether defendants' products are unreasonably dangerous is a factual determination for the jury. *See Peterson*, 400 N.W.2d at 914 ("[I]ssues of reasonableness and foreseeability . . . are usually jury issues."). Thus, the court cannot make its legal determination of whether a duty existed until the jury has the opportunity to determine if the products are dangerous. *See Reiss v. Komatsu America Corp.*, 735 F. Supp. 2d 1125, 1146 (D.N.D. 2010) ("The existence of a duty to warn is generally a preliminary question of law for the court, but if the existence of a duty depends

41

Case 3:16-md-02738-MAS-RLS   Document 9805-3   Filed 05/30/19   Page 55 of 565 PageID:
71299
Case 4:09-cv-04179-KES-RLS   Document 197   Filed 04/12/13   Page 42 of 44 PageID #: 2941

upon factual determinations, their resolution must be resolved by the trier of fact.").[28]

## III.   Proximate Cause

Defendants also argue that Berg has failed to put forth sufficient facts to show that defendants' failure to warn was the legal cause of her ovarian cancer. Defendants' argument raises the issue of when the duty to warn arose. They claim that even if a duty to warn exists, such duty arose much later than 1975—the year Berg began dusting her perineum with talc. Thus, defendants argue, Berg cannot prove that defendants' failure to warn was the legal cause of her cancer because the duty did not arise in time to prevent her cancer.

As discussed above, Berg's strict liability claim does not necessitate the finding that a duty existed. Moreover, the issue of *whether* a duty ever existed must first be determined in order to ascertain *when* such a duty arose. Even so, Berg has put forth evidence that defendants were aware of the alleged dangers of talc as early as 1971. Thus, there is a material issue of fact as to whether defendants "knew or reasonably should have known that the product was dangerous" as far back as 1971. *See Burley*, 737 N.W.2d at 410.

---

[28] Defendants' reliance on *Brech v. J.C. Penney Co.*, 698 F.2d 332, 334 (8th Cir. 1983), in support of their assertion that federal standards are relevant in determining if a duty to warn existed is misplaced. In review of District Court Judge Nichol's factual findings from a bench trial, the Eighth Circuit stated that "[a]lthough evidence that the gown surpassed federal standards is not necessarily conclusive proof that the garment was not *unreasonably dangerous*, it is nevertheless evidence which the court can consider on the issue." *Id.* (emphasis added).

Case 3:16-md-02738-MAS-RLS   Document 9895-3   Filed 05/30/19   Page 56 of 565 PageID:
71300
Case 4:09-cv-04179-KES   Document 197   Filed 04/12/13   Page 43 of 44   PageID #: 2948

In summary, Berg has put forth sufficient, admissible evidence to show that there exists genuine issues of material fact. Also, the court is unable to determine whether defendants owed Berg a duty to warn at this time. Thus, defendants' motion for summary judgment is denied.

## CONCLUSION

Dr. Cramer's expert opinion is admissible because it was the product of reliable methodologies, and he was not required, as an epidemiologist, to rule out all alternative causes of Berg's ovarian cancer. The majority of Dr. Rosenthal's opinions are admissible because he is qualified to render such opinions, and he used reliable methodologies in forming his opinions. Dr. Godleski's opinion is admissible because he is qualified, and the opinion is relevant and stems from reliable methodologies. Lastly, Dr. Lenorovitz and Dr. Karnes, as human factors experts, can only testify on the limited issue of whether there was a feasible way to place a warning on defendants' products.

Moreover, Berg has put forth sufficient evidence to show that there exists genuine issues of material fact that preclude summary judgment. Furthermore, the court is unable to determine whether defendants owed Berg a duty to warn at this time. Accordingly, it is

ORDERED that defendants' motion to exclude the testimony of Dr. Godleski (Dockets 140 & 153) is denied.

IT IS FURTHER ORDERED that defendants' motion to exclude the testimony of Dr. Rosenthal (Dockets 143 & 156) is granted in part and denied in part.

IT IS FURTHER ORDERED that defendants' motion to exclude the testimony of Dr. Lenorovitz and Dr. Karnes (Dockets 145 & 155) is granted in part and denied in part.

IT IS FURTHER ORDERED that defendants' motion to exclude the testimony of Dr. Cramer (Docket 147 & 151) is denied.

IT IS FURTHER ORDERED that defendants' motion for summary judgment (Docket 149) is denied.

Dated April 12, 2013.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

44

# Exhibit 131

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

MICHAEL BLAES on behalf of SHAWN    )
BLAES, Deceased,                    )
SAVANNA CREWS on behalf of          )
ANGELA DAWN HERSHMAN,               )    Cause No. 1422-CC09326-01
Deceased,                           )
DARLENE EVANS on behalf of ERON     )    Division 10
EVANS, Deceased,                    )
                                    )
                Plaintiffs,         )
                                    )
v.                                  )
                                    )
JOHNSON & JOHNSON, et al.,          )
                                    )
                Defendants.         )

**FILED**

JUN 1 2 2017

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY _____ DEPUTY

## ORDER

This cause is now before the Court on: (1) Motions for Summary Judgment filed by Defendant Johnson & Johnson, Defendant Johnson & Johnson Consumer, Inc. and Defendant Imerys Talc America, Inc.; and (2) Motions to Exclude the Testimony of Dr. Colditz, Dr. Cramer, Dr. Godleski, Dr. Ness, Dr. Omiecinski, Dr. Siemiatychi, Dr. Plunkett, Dr. Rosenthal, Dr. Chobanian and Mr. Steinberg filed by Defendant Johnson & Johnson, Defendant Johnson & Johnson Consumer, Inc. and Defendant Imerys Talc America, Inc.; and (3) Defendant Johnson & Johnson, Defendant Johnson & Johnson Consumer, Inc. and Defendant Imerys Talc America, Inc Motions to Transfer Venue or Continue the June 5, 2017 Trial Date Based on Jury Pool Taint.

The Court now rules as follows:

Defendant Johnson & Johnson, Defendant Johnson & Johnson Consumer, Inc. and Defendant Imerys Talc America, Inc.'s, Motions for Summary Judgment are **DENIED.**

Defendant Johnson & Johnson, Defendant Johnson & Johnson Consumer, Inc. and Defendant Imerys Talc America, Inc.'s Motions to Exclude the Testimony of Dr. Colditz, Dr.

1

ENTERED

JUN 1 2 2017

TSJ

Cramer, Dr. Godleski, Dr. Ness, Dr. Omiecinski , Dr. Siemiatychi, Dr. Plunkett,  Dr. Rosenthal,

Dr. Chobanian and Mr. Steinberg are **DENIED.**

Defendant Johnson & Johnson and Defendant Johnson & Johnson Consumer, Inc.'s and

Defendant Imerys Talc America, Inc.'s Motions to Transfer Venue or Continue the June 5, 2017

Trial Date Based on Jury Pool Taint is **DENIED**.


**SO ORDERED:**

Rex M. Burlison
Circuit Judge
Division 10

Dated: 6/12/2017

2

# Exhibit 132

State Court of Fulton County
**E-FILED**
16EV005534
3/26/2019 2:04 PM
LeNora Ponzo, Clerk
Civil Division

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

ANASTASIA BROWER, a minor, through her   )
legal guardian PAMELA RUSSELL, and   )
PAMELA RUSSELL, as the Executrix of the   )
Estate of Diane Brower, deceased,   )
     Plaintiff,   )
       )    CIVIL ACTION FILE
v.   )    NO. 16-EV-005534-E
       )
JOHNSON & JOHNSON, INC.; JOHNSON &   )
JOHNSON CONSUMER COMPANIES, INC.;   )
and IMERYS TALC AMERICA, INC.,   )
    Defendants.   )

### ORDER ON JOHNSON DEFENDANTS' MOTIONS TO EXCLUDE THE TESTIMONY OF DR. JAMES BARTER, DR. LAURA PLUNKETT, AND DR. JOHN GODLESKI

The matter is before the Court on Defendant Johnson & Johnson, Inc., and Johnson & Johnson Consumer Companies, Inc.'s ("Johnson Defendants'") motions to exclude the expert testimony of various witnesses, filed on October 30, 2019.[1]  Plaintiff filed responses in opposition to the motions to exclude on November 29, 2018.

### The *Daubert* Standard

Trial courts act as gatekeepers in assessing an expert witness' qualifications to testify and the relevancy and reliability of that expert's testimony.  Kumho Tire Co. v. Carmicheal, 526 U.S. 137, 141 (1999).   Motions to exclude testimony of an expert witness are properly granted "where there is no circumstance under which the evidence under scrutiny is likely to be admissible at trial."  Shiver v. Ga. & Fla. Railnet, Inc., 287 Ga. App. 828, 829 (2007) (quoting Gwinnett Co. v. Howington, 280 Ga. App. 347 (2006)).  Expert scientific or technical testimony is admissible only if it is both relevant and reliable.  Kumho Tire Co., at 137.  The test for determining the reliability of expert testimony is flexible and the *Daubert* factors, such as testing, peer review, error rates, and

---

[1] While the motion was filed by the Defendants, Defendant Imerys Talc America, Inc., filed a notice of bankruptcy on February 13, 2019 and this Court entered an order reserving rulings on all pending motions filed by Defendant Imerys Talc America, Inc.

acceptability within relevant scientific or technical communities, "neither necessarily nor exclusively appl[y] to all experts or in every case."  Id., at 142.

The determination of whether a witness is qualified to render an opinion as an expert is a legal determination for the trial court and is not disturbed by reviewing courts absent an abuse of discretion.  HNTB Ga., Inc., v. Hamilton-King, 287 Ga. 641, 642 (2010); Yount v. State, 249 Ga. App. 563, 565 (2001).  In considering the admissibility of expert testimony, a trial court should first consider whether the factors are reasonable measures of reliability in a given case before evaluating proffered expert testimony.  Kumho Tire Co., at 152.  The Georgia Court of Appeals has identified the "two methods by which [a] plaintiff in a chemical exposure case may show specific causation in a manner that satisfies the *Daubert* standard: (1) 'dose/response relationship' or 'threshold phenomenon;' and (2) 'differential diagnosis.'" Shiver v. Ga. & Fla. Railnet, Inc., 287 Ga. App. 828 (2007)(quoting Hardyman v. Norfolk & Western R. Co., 243 F3d 225, 263 (2001)).   In Hardyman, the Sixth Circuit Court of Appeals noted that Plaintiff's expert testified that "one simply could not quantify the level or dose of risk factors causative of [carpal tunnel syndrome] in a manner consistent with a dose/response relationship or threshold level."  Hardyman, at 262.  The Hardyman Court likened carpal tunnel syndrome and its unknown dose/response relationship with exposure to toxic substances:

> while precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure are beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation.

Hardyman, at 265-66(quoting Westberry v. Gislaved Bummi AB, 178 F.3d 257, 264 (4th Cir. 1999).

Finally, a critical distinction exists between the admissibility of expert testimony and its credibility as determined by the trier of fact: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 596 (1993).

**Dr. James Barter**

Defendant moves the Court to limit the expert testimony of Dr. James Barter on the grounds that he failed to rule in Ms. Brower's use of Johnson & Johnson as a possible cause of her ovarian cancer and his failure to rule out other risk factors associated with cancer.   Defendant's contentions go to the credibility of his testimony, not its admissibility.   Daubert, *supra*.   Accordingly, based upon review of the record and applicable law cited above, Defendants' motion to exclude the testimony of Dr. James Barter is DENIED.

**Dr. Laura Plunkett**

Defendant moves the Court to limit the expert testimony of Dr. Laura Plunkett on the basis that she does not have the requisite experience to testify about the causes of ovarian cancer, has never been a business executive or manager of product safety for a cosmetics company, and does not have legal training.   A review of the record indicates that Dr. Plunkett has significant experience as a board certified pharmacologist and toxicologist.   Accordingly, based upon the record as a whole and applicable law cited above, Defendants' motion to exclude the testimony of Dr. Laura Plunkett is DENIED.

**Dr. John Godleski**

Defendant moves the Court to exclude the expert testimony of Dr. John Godleski on the basis that his report fails to identify the methodology relied on in his conclusion. A review of the record indicates that Dr. Godleski's report details his methodology sufficiently in his report.   Accordingly, based upon the record as a whole and applicable law cited above, Defendants' motion to exclude the testimony of Dr. John Godleski is DENIED.

SO ORDERED this 26th day of March, 2019.

Jane Morrison, Judge
FULTON COUNTY STATE COURT

*Copies to Counsel via E-File Georgia.*

# Exhibit 134

Page 379

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

----------------------------x

IN RE JOHNSON & JOHNSON        ) MDL No.

TALCUM POWDER PRODUCTS         ) 16-2738 (FLW)(LHG)

MARKETING SALES PRACTICES,     )

AND PRODUCTS LIABILITY         )

LITIGATION                     )

                               )

THIS DOCUMENT RELATES TO       )

ALL CASES                      )

----------------------------x


V O L U M E   I I

VIDEOTAPED 30(b)(6) DEPOSITION OF DEFENDANT
PERSONAL CARE PRODUCTS COUNCIL
by and through its Designated Representative,

LINDA LORETZ, Ph.D.

WASHINGTON, D.C.

MONDAY, OCTOBER 1, 2018

9:09 A.M.


Reported by: Leslie A. Todd

Linda Loretz, Ph.D.

| Page 380 | | Page 382 | |
|---|---|---|---|
| 1 | Deposition of LINDA LORETZ, Ph.D., held at the | 1 | APPEARANCES (CONTINUED): |
| 2 | offices of: | 2 | |
| 3 | | 3 | MICHELLE A. PARFITT, ESQUIRE |
| 4 | | 4 | ASHCRAFT & GEREL, LLP |
| 5 | SEYFARTH SHAW LLP | 5 | 4900 Seminary Road, Suite 650 |
| 6 | 975 F Street, N.W. | 6 | Alexandria, Virginia 22311 |
| 7 | Washington, DC 20004 | 7 | (703) 997-1774 |
| 8 | | 8 | |
| 9 | | 9 | NICHOLAS J. KOHRS, ESQUIRE |
| 10 | | 10 | LUNDY, LUNDY, SOILEAU & SOUTH, LLP |
| 11 | | 11 | 501 Broad Street |
| 12 | Pursuant to notice, before Leslie Anne Todd, | 12 | Lake Charles, Louisiana 70601 |
| 13 | Court Reporter and Notary Public in and for the | 13 | (337) 439-0707 |
| 14 | District of Columbia, who officiated in | 14 | |
| 15 | administering the oath to the witness. | 15 | ON BEHALF OF PCPC AND THE WITNESS: |
| 16 | | 16 | THOMAS T. LOCKE, ESQUIRE |
| 17 | | 17 | SEYFARTH SHAW LLP |
| 18 | | 18 | 975 F Street, NW |
| 19 | | 19 | Washington, DC 20004 |
| 20 | | 20 | (202) 463-2400 |
| 21 | | 21 | |
| 22 | | 22 | |
| 23 | | 23 | |
| 24 | | 24 | |
| 25 | | 25 | |

| Page 381 | | Page 383 | |
|---|---|---|---|
| 1 | A P P E A R A N C E S | 1 | APPEARANCES (CONTINUED): |
| 2 | | 2 | |
| 3 | ON BEHALF OF THE PLAINTIFFS: | 3 | ON BEHALF OF JOHNSON & JOHNSON DEFENDANTS: |
| 4 | CHRISTOPHER V. TISI, ESQUIRE | 4 | KATHLEEN FRAZIER, ESQUIRE |
| 5 | LEVIN PAPANTONIO THOMAS MITCHELL | 5 | SHOOK, HARDY & BACON, LLP |
| 6 | RAFFERTY & PROCTOR, PA | 6 | 600 Travis Street |
| 7 | 316 S. Baylen Street, Suite 600 | 7 | Suite 3400 |
| 8 | Pensacola, Florida 32502 | 8 | Houston, Texas 77002-2926 |
| 9 | (850) 436-6250 | 9 | (713) 227-8008 |
| 10 | | 10 | |
| 11 | RICHARD M. GOLOMB, ESQUIRE | 11 | ON BEHALF OF THE IMERYS DEFENDANTS: |
| 12 | BENJAMIN ISSER, ESQUIRE | 12 | JONATHAN F. DONATH, ESQUIRE |
| 13 | GOLOMB & HONIK, P.C. | 13 | COUGHLIN DUFFY, LLP |
| 14 | 1835 Market Street, Suite 2900 | 14 | 350 Mount Kemble Avenue |
| 15 | Philadelphia, Pennsylvania 19103 | 15 | Morristown, New Jersey 07962 |
| 16 | (215) 985-9177 | 16 | (973) 267-0058 |
| 17 | | 17 | |
| 18 | TED MEADOWS, ESQUIRE | 18 | CATHERINE SLAVIN, ESQUIRE |
| 19 | P. LEIGH O'DELL, ESQUIRE | 19 | GORDON & REES SCULLY MANSUKHANI, LLP |
| 20 | RYAN BEATTIE, ESQUIRE | 20 | Three Logan Square |
| 21 | BEASLEY, ALLEN, CROW, METHVIN, PORTIS & | 21 | 1717 Arch Street, Suite 610 |
| 22 | MILES, P.C. | 22 | Philadelphia, Pennsylvania 19103 |
| 23 | 218 Commerce Street | 23 | (215) 717-4006 |
| 24 | Montgomery, Alabama 36104 | 24 | |
| 25 | (334) 269-2343 | 25 | |

2 (Pages 380 to 383)

Linda Loretz, Ph.D.

Page 384

1    APPEARANCES (CONTINUED):
2
3    ON BEHALF OF PTI:
4        JAMES W. MIZGALA, ESQUIRE
5        TUCKER ELLIS, LLP
6        233 South Wacker Drive
7        Suite 6950
8        Chicago, Illinois 60606-9997
9        (312) 624-6307
10
11   ALSO PRESENT:
12
13       KATIE TUCKER (Paralegal - Beasley Allen)
14       EMILY H. MANOSO, Staff Counsel, PCPC
15       THOMAS F. MYERS, Staff Counsel, PCPC
16
17       DANIEL HOLMSTOCK (Videographer)
18       JONATHAN VADERS (Technical Support)
19
20
21
22
23
24
25

Page 385

1            C O N T E N T S
2    EXAMINATION OF LINDA LORETZ, Ph.D.        PAGE
3    By Mr. Tisi                        392
4    By Mr. Golomb                      643
5
6
7
8
9            E X H I B I T S
10           (Attached to transcript)
11   LORETZ DEPOSITION EXHIBITS             PAGE
12   No. 41   Timeline (with handwritten entries) 401
13   No. 42   Petition Seeking a Cancer Warning on
14       Cosmetic Talc Products         404
15   No. 43   Letter to FDA from PCPC, Bates
16       P1.0164 to P1.0164.39          410
17   No. 44   Radiation Oncology Fax Transmittal
18       Form, Bates P1.004.1 to P1.004.9    430
19   No. 45   Article entitled "Perineal talc use
20       and ovarian cancer risk: A case
21       Study of scientific standards in
22       environmental epidemiology," Bates
23       P2.0007 to P2.0007.7           436
24
25

Page 386

1            E X H I B I T S
2            (Attached to transcript)
3    LORETZ DEPOSITION EXHIBITS             PAGE
4    No. 46   E-mail re Response to Citizen's
5        Petition on Talc / Latest Review
6        of the Data, Bates JNJ 000426011    452
7    No. 47   Draft Minutes Talc Interest Party
8        Task Force, April 12, 1994, Bates
9        JNJTALC000376526 to 000376528    462
10   No. 48   Letter to Mary Wolfe from CTFA,
11       Bates IMERYS 137977 to 137978    468
12   No. 49   Federal Register/Vol. 70, No. 200,
13       Bates MUSCAT000004007 to 000004013 470
14   No. 50   E-mail re Rothman Proposal for
15       Updating CTFA Submission of Comments
16       to the NTP, Bates JNJ 000391715 to
17       000391716            474
18   No. 51   Article entitled "Use of cosmetic
19       talc on contraceptive diaphragms and
20       risk of ovarian cancer: A meta-
21       analysis of nine observational
22       studies," Bates JNJ 000375876 to
23       000375883            479
24
25

Page 387

1            E X H I B I T S
2            (Attached to transcript)
3    LORETZ DEPOSITION EXHIBITS             PAGE
4    No. 52   Article entitled "Perineal talc
5        use and ovarian cancer: A critical
6        review," Bates IMERYS 154013 to
7        154020            479
8    No. 53   Screenshot from regulations.gov,
9        Personal Care Products Council -
10       Comment            483
11   No. 54   Letter to Samuel Epstein from
12       Department of Health and Human
13       Services, FDA, Bates P1.0154 to
14       P1.0154-7            486
15   No. 55   E-mail re Notes from Meeting with
16       FDA on Talc, Bates PCPC0005505 to
17       0005507            491
18   No. 56   Memorandum of Meeting, May 8, 2009,
19       Bates IMERYS 266294 to 266295    495
20   No. 57   E-mail re Meeting with J&J, Bates
21       IMERYS 250983 to 250984    512
22   No. 58   E-mail re Talc Citizen's Petition -
23       Next Steps, Bates JNJ 000488256 to
24       000488257            521
25

3 (Pages 384 to 387)

Linda Loretz, Ph.D.

Page 388

|  | EXHIBITS |  |
|---|---|---|
| 1 | E X H I B I T S | |
| 2 | (Attached to transcript) | |
| 3 | LORETZ DEPOSITION EXHIBITS | PAGE |
| 4 | No. 59   E-mail re IARC Dr. Huncharek | |
| 5 | comment, Bates JNJTALC000109051 to | |
| 6 | 000109060 | 577 |
| 7 | No. 60   Letter to Jill Cashen, Cancer | |
| 8 | Prevention Coalition, from John E. | |
| 9 | Bailey, Bates BCAL-BAILEY-00000518 | 592 |
| 10 | No. 61   Article entitled "A Meta-Analytical | |
| 11 | Approach Examining the Potential | |
| 12 | Relationship Between Talc Exposure | |
| 13 | and Ovarian Cancer," Bates JNJ | |
| 14 | 000018452 to 000018466 | 603 |
| 15 | No. 62   Memorandum re Meta Analysis, Bates | |
| 16 | PCPC_MDL00026152 to 00026194 | 603 |
| 17 | No. 63   American Health Foundation Grant | |
| 18 | Application, Bates JNJ 000023366 to | |
| 19 | 000023392 | 615 |
| 20 | No. 64   Draft letter never sent (in | |
| 21 | handwriting,) Bates JNJ 000024880 | 620 |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 389

| 1 | E X H I B I T S | |
|---|---|---|
| 2 | (Attached to transcript) | |
| 3 | LORETZ DEPOSITION EXHIBITS | PAGE |
| 4 | No. 65   Article entitled "Perineal | |
| 5 | Application of Cosmetic Tac and Risk | |
| 6 | of Invasive Epithelial Ovarian Cancer | |
| 7 | A Meta-Analysis of 11,933 Subjects | |
| 8 | from Sixteen Observational Studies," | |
| 9 | Bates JNJ 000018732 to 000018737 | 625 |
| 10 | No. 66   Defendants Personal Care Products | |
| 11 | Council's Second Supplemental | |
| 12 | Responses and Objections to | |
| 13 | Plaintiffs' Interrogatories | 630 |
| 14 | No. 67   Article entitled "Perineal Powder | |
| 15 | Exposure and the Risk of Ovarian | |
| 16 | Cancer," Bates IMERYS 146545 to | |
| 17 | 146551 | 631 |
| 18 | No. 68   (Retained by counsel.) | 633 |
| 19 | No. 69   Overview of Potential New Projects | |
| 20 | Examining the Talc/Ovarian Cancer | |
| 21 | Relationship, Bates IMERYS 272247 | |
| 22 | to 272250 | 639 |
| 23 | No. 70   PowerPoint presentation, Bates | |
| 24 | PCPC0052415 to 0052507 | 660 |
| 25 | | |

Page 390

| 1 | E X H I B I T S | |
|---|---|---|
| 2 | (Attached to transcript) | |
| 3 | LORETZ DEPOSITION EXHIBITS | PAGE |
| 4 | No. 71   Code of Federal Regulations, | |
| 5 | Title 21, Chapter 1, Subchapter G, | |
| 6 | Part 740 | 672 |
| 7 | No. 72   Article entitled "Ovarian Cancer | |
| 8 | Prevention (PDQ): Prevention - | |
| 9 | Patient Information (NCI)" | 678 |
| 10 | No. 73   E-mail string re missed Kelly phone | |
| 11 | call, Bates MBS-CRE000271 to 000272 | 682 |
| 12 | No. 74   Article entitled "Ovarian Cancer | |
| 13 | Prevention (PDQ): Prevention - | |
| 14 | Patient Information (NCI) | 687 |
| 15 | No. 75   Ovarian Cancer Prevention screenshot | 688 |
| 16 | No. 76   Ovarian Cancer Prevention screenshot | 690 |
| 17 | No. 77   "A Snapshot of Ovarian Cancer" | 693 |
| 18 | No. 78   "A Snapshot of Ovarian Cancer" | 696 |
| 19 | No. 79   "A Snapshot of Ovarian Cancer" | 697 |
| 20 | No. 80   Minutes, Ad Hoc Talc Task Force, | |
| 21 | Bates JNJ 000089586 | 713 |
| 22 | No. 81   Memorandum re Publication of Meta | |
| 23 | Analysis by Alan Gross, Bates | |
| 24 | JNJ 000011723 | 724 |
| 25 | | |

Page 391

| 1 | E X H I B I T S | |
|---|---|---|
| 2 | (Attached to transcript) | |
| 3 | LORETZ DEPOSITION EXHIBITS | PAGE |
| 4 | No. 82   Letter to Stephen Gettings from | |
| 5 | Alfred Wehner, Bates PCPC_MDL | |
| 6 | 00028675 | 731 |
| 7 | No. 83   Draft Minutes, Talc Interested Party | |
| 8 | Task Force, January 11, 1994 | 734 |
| 9 | No. 84   Letter to Alan Gross from M. | |
| 10 | Chudkowski, May 5, 1994, Bates | |
| 11 | JNJ 000023357 | 748 |
| 12 | No. 85   Memorandum re CTFA Response to | |
| 13 | Citizens Petition, January 11, | |
| 14 | 1995, Bates Pltf_PCPC_00002387 | 753 |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

4 (Pages 388 to 391)

Linda Loretz, Ph.D.

Page 392

1          P R O C E E D I N G S
2          ------------------
3          THE VIDEOGRAPHER:  The time is 9:09 a.m.
4    on October 1st, 2018.  This is video 1, Volume II,
5    in the continued deposition of Dr. Linda Loretz.
6          A reminder to the witness, she is still
7    under oath.
8          CROSS-EXAMINATION
9    BY MR. TISI:
10         Q   Good morning, Dr. Loretz.
11         A   Good morning.
12         Q   Just to remind the jury, what is --
13   please state your name, please.
14         A   Linda Loretz.
15         Q   Okay.  And you are a toxicologist?
16         A   Yes.
17         Q   Okay.  And you're here represented by
18   counsel?
19         A   Yes.
20         Q   My name is Chris Tisi.  I represent
21   women with ovarian cancer who claim that talcum
22   powder products like Johnson & Johnson baby powder
23   and Shower to Shower powder caused or contributed
24   to their ovarian cancer.
25         Do you understand that?

Page 393

1          A   Yes.
2          Q   Okay.  And by the terms "talcum powder
3    products," you understand that I mean cosmetic
4    talc used in those products?
5          A   Yes.
6          Q   Okay.  And if I had a bottle of either
7    Shower to Shower here or Johnson's Baby Powder,
8    what I'm referring to is everything that's in the
9    bottle.
10         Do you understand that?
11         A   Okay, yes.
12         Q   That includes fragrance, it includes
13   whatever is mined from the -- from the mine,
14   whatever in that bottle.
15         Do you understand?
16         A   Okay.
17         Q   I'm not talking about pure crystalline
18   talc.
19         A   Okay.
20         Q   Okay?  Unless I say otherwise.
21         Have we ever met before?
22         A   I don't believe so.
23         Q   Okay.  You know this is a continuation
24   of a 30(b)(6) deposition that we -- we propounded
25   on the Personal Care Products Council?

Page 394

1          A   Yes.
2          Q   Okay.  And a 30(b)(6) deposition, just
3    to get rid of all the legalese there, is a
4    deposition where the company puts forward a
5    witness to testify on behalf of the company.
6          You understand that?
7          A   Yes.
8          Q   And you understand that your testimony
9    is binding on the company?
10         A   Yes.
11         Q   Okay.  And you're speaking not only as
12   Dr. Loretz, but you're speaking on behalf of the
13   Personal Care Products Council?
14         A   Yes.
15         Q   And by the Personal Care Products
16   Council, you understand that we also mean an
17   organization called CTFA?
18         A   Correct.
19         Q   Okay.  And that's the predecessor name
20   for the Personal Care Products Council, and I
21   guess it was the Cosmetic Toiletry and
22   Fragrance --
23         A   Association.
24         Q   -- Association, correct?
25         A   Correct.

Page 395

1          Q   Yeah.  And you understand your testimony
2    is also binding on them as well?
3          A   Yes.
4          Q   Okay.  You also understand that you are
5    under oath, and your testimony -- testimony may be
6    played for the court or jury to consider amongst
7    all the other evidence in the case?
8          A   I do.
9          Q   Okay.  I'm going to hand you what I
10   would like to have marked as -- well, that has
11   been marked as Exhibit 1 to your prior deposition.
12   We don't have those exhibits here, but I do have a
13   copy of it.  I don't have a copy for all counsel.
14         You are here pursuant to that Second
15   Amended Notice of Deposition?
16         A   Okay, yes.
17         Q   Okay.  All right.
18         I'd like to talk to you a bit about what
19   was done to prepare for this portion of your
20   deposition.  Your deposition -- this is a
21   continuation of a deposition that happened I
22   believe in July.
23         A   Yes.
24         Q   Okay.  Between July and now, have you
25   interviewed or spoken to any other people -- let's

5 (Pages 392 to 395)

Linda Loretz, Ph.D.

Page 396

1  put your counsel aside for a moment -- any other
2  either employees, current or former employees, of
3  Personal Care Products Council?
4      A   No, just counsel.  Just my counsel
5  and --
6      Q   Have you spoken to any third-party
7  witnesses in this case, people -- for example,
8  employees of Johnson & Johnson, employees of -- of
9  Imerys, outside researchers?
10     A   Not about this case, no.
11     Q   Okay.  What additional work have you
12 done to prepare yourself or further prepare
13 yourself to testify to the topics contained in
14 that notice of deposition?
15     A   I met with my attorney for several days
16 reviewing records, minutes, e-mails, documents
17 related.
18     Q   Have you spoken to John Bailey at all?
19     A   No.
20     Q   Have you spoken to John Bailey at all
21 since -- you know who John Bailey is?
22     A   Yes.
23     Q   Have you spoken to John Bailey at all
24 since -- at any time in this process, including
25 before your first deposition?

Page 397

1      A   No.
2      Q   Have you spoken to any lawyers not your
3  own?
4      A   The PCPC lawyers, Tom Myers and Emily
5  Manoso, but beyond that, no.
6      Q   Okay.  Have you reviewed the notice of
7  deposition that I placed before you, Exhibit
8  No. 1, to refamiliarize yourself with the topics
9  we're here to discuss today?
10     A   I've reviewed it before.  I haven't
11 reviewed it very, very recently, but --
12     Q   Okay.  Is there any topic or topics in
13 that notice for which you have been designated
14 that you do not feel comfortable testifying to
15 today?  In other words, that you are not -- your
16 investigation is not complete and you don't have
17 information about the topics.
18     A   I mean, I guess I would just note that
19 obviously I wasn't here in the '80s, so I can only
20 go by the records that I have seen.  But beyond
21 that, no.
22     Q   I guess what I'm asking you, and this is
23 a process that is a little bit of a give and take
24 between you and me, and I -- I just want to ask
25 you, are there any categories there that you're

Page 398

1  not prepared to testify to today as -- fully?
2      A   Categories, I would say no.
3      Q   Okay.  Now, I'm going to ask you some
4  questions today relating to specific categories,
5  and I'll list them.
6          1(e), which is dissemination of medical
7  and scientific information on talcum powder and
8  ovarian cancer, 1(f), 1(g), 4(a), 4(c), and
9  categories 8 through 22.
10         I'm just doing that for the record, but
11 broadly they fall into two broad categories, and
12 I'm going to separate our questions to you into two
13 broad categories.  Okay?
14     A   Okay.
15     Q   And the broad categories are this:
16 Communications with the Food and Drug
17 Administration about talcum power products and
18 ovarian cancer, including, for example, the
19 Citizen's Petition issue.
20     A   Okay.
21     Q   Okay?
22     A   Yes.
23     Q   The one area that I will not cover that
24 will be covered by one of my colleagues is the CIR
25 report.

Page 399

1      A   Okay.
2      Q   So you won't hear CIR from me.
3          But other than that, the communications
4  with the FDA will be issues I'll be asking you
5  about.
6      A   Okay.
7      Q   The second part of it is -- will be
8  about consultants and studies, people with whom
9  you consulted and studies that were performed or
10 not performed at the direction of or with the
11 cooperation with PCPC.
12     A   Okay.
13     Q   Okay.  So just broadly speaking, the two
14 categories are communications with FDA except for
15 CIR, and consultants and -- and studies.
16     A   Okay.
17     Q   Okay?
18     A   Yes.
19     Q   All right.  So let's get started.
20         I want to talk about first
21 communications with the FDA, and I'd like to use
22 as kind of a fulcrum of our discussions the
23 Citizen's Petition, and you know what I mean by
24 the "Citizen's Petition"?
25     A   Yes.

6 (Pages 396 to 399)

Linda Loretz, Ph.D.

Page 400

1    Q   Okay.  To help us really understand
2  this, I prepared a timeline --
3        MR. LOCKE:  Counsel, can I just ask, I
4  mean there were a number of Citizen's Petitions.
5  Can you --
6        MR. TISI:  I'm going to be clear.
7        MR. LOCKE:  Okay.
8        MR. TISI:  I'm giving a timeline here,
9  and we'll --
10       MR. LOCKE:  Okay.
11       MR. TISI:  -- we'll do that.
12 BY MR. TISI:
13       Q   So to begin, I'm going to start with the
14 most recent Citizen's Petition, the one that was
15 filed in 2008.
16       A   Yes, mm-hmm.
17       Q   And you're familiar with that, correct?
18       A   Yes.
19       Q   And to help us understand the context in
20 which that Citizen's Petition was filed and what
21 it is, and we haven't explained it to the jury yet
22 and we will, I've prepared a little bit of a
23 timeline here.  And we're going to kind of mark
24 some things so that everybody understands the
25 historical context in which that petition was

Page 401

1  actually filed.
2        And I'm going to give a copy to counsel,
3  and we're going to hopefully fill this out
4  together, and you correct me if I'm wrong on
5  any -- on anything I write on here.
6        And we're going to mark this as Exhibit
7  No. 41.
8        (Exhibit No. 41 was marked for
9        identification.)
10 BY MR. TISI:
11       Q   And we may come back to this during the
12 course -- back and forth to this during the
13 deposition, so I'm going to ask you to kind of --
14 we'll kind of put it aside and bring it back and
15 all that.
16       And just for the members of the jury,
17 we've marked on here, we started with 1994, and
18 there's a reason why I've done that, which will
19 become apparent, and then there's the National
20 Toxicology Program 10th Report on Carcinogens
21 that's in the year 2000.
22       You know what I'm talking about?
23       A   Yes.
24       Q   Okay.  The IARC review which was 2005.
25 Correct?

Page 402

1        A   2006, no?
2        Q   2006.  Excuse me.
3        A   Yes.
4        Q   Yeah.  And the Cancer Coalition
5  Prevention citizens filed with the FDA, and that's
6  in 2008.
7        A   Yes.
8        Q   Okay.  And there were other things.
9  Those are already on the chart.  You agree with
10 those?
11       A   Yes.
12       Q   Okay.  Let's talk for a moment what your
13 understanding -- first of all, in the course of
14 your work with the PCPC, have you had occasions to
15 deal with Citizen's Petitions before, or is this
16 the only time that this happened?
17       A   Before this, this was probably the first
18 one.  I mean we -- we filed a Citizen's Petitions
19 ourselves that came after this.  Nothing to do
20 with talc.
21       Q   Right.  And so you're familiar with the
22 process?
23       A   Yes.
24       Q   Okay.  So would you tell the members of
25 the jury a little bit about what a Citizen's

Page 403

1  Petition is to the best of your understanding.
2        A   It's -- it's --
3        MR. LOCKE:  Objection.
4        THE WITNESS:  It's going to be a very
5  simple thing, because I -- I --
6  BY MR. TISI:
7        Q   Simple is -- simple is always better.
8        A   -- I have a lot of details.  I mean
9  it's -- it's -- someone can petition FDA to
10 request something through a process.  I believe
11 the process is probably spelled out in the Code of
12 Federal Regulations.  They can request something
13 to FDA, and then FDA has, I believe, an obligation
14 to respond within a certain amount of time,
15 although they can -- they can respond by saying
16 we've gotten it and we're reviewing it, and then
17 they need to eventually respond to it.
18       Q   And are there opportunities for other
19 interested parties to file comments to that
20 petition?
21       A   Yes.
22       Q   Okay.  And PCPC has on occasion actually
23 filed Citizen's Petitions themselves.
24       A   Yes.
25       Q   And we're aware that the -- a Citizen's

7 (Pages 400 to 403)

Linda Loretz, Ph.D.

Page 404

1  Petition was filed by a group called the Cancer
2  Prevention Coalition seeking a cancer warning on
3  cosmetic talc products in 2008. Correct?
4      A  Yes.
5      Q  Okay. And that was actually filed --
6  that was actually filed in May of 2008?
7      A  I don't remember.
8      Q  Okay. Let's see if I can help you here.
9          (Exhibit No. 42 was marked for
10             identification.)
11 BY MR. TISI:
12     Q  I'm going to hand you what I've had
13 marked as Exhibit No. 42.
14         Do you recognize this?
15     A  Yes.
16     Q  Okay. Is this the Citizen's -- is this
17 a Citizen's Petition that was filed on behalf of
18 the Cancer Prevention Coalition with the Food and
19 Drug Administration in -- on May 13th, 2008?
20     A  That's what it looks to be, yes.
21     Q  Okay. And you're familiar with that
22 document?
23     A  Yes.
24     Q  And --
25         MR. TISI: Can we bring this document

Page 405

1  up.
2  BY MR. TISI:
3      Q  The document in front of you, it was
4  filed by a Dr. Epstein. Do you know that?
5      A  Yes.
6      Q  Has anyone with PCPC ever sought to meet
7  with Dr. Epstein, if you know?
8      A  Not that I'm aware.
9      Q  And he was a professor of occupational
10 and environmental medicine at the University of
11 Illinois Chicago Medical Center. That's in the
12 first paragraph.
13         MR. LOCKE: Objection.
14         THE VIDEOGRAPHER: Counsel, can we go
15 off the record?
16         The time is 9:23 a.m. We're going off
17 the record.
18         (Technical difficulties.)
19         THE VIDEOGRAPHER: The time is 9:27
20 a.m., and we're back on the record.
21 BY MR. TISI:
22     Q  Just to reask the question, if you look
23 at the first paragraph, this Dr. Epstein
24 identifies himself as the professor emeritus of
25 occupational and environmental medicine,

Page 406

1  University of Illinois at Chicago School of Public
2  Health.
3      A  Correct. That's what it says.
4      Q  And he filed a petition, and it's
5  actually at the very top, it says: "A petition
6  seeking a cancer warning on cosmetic talc
7  products." Do you see that?
8      A  Yes.
9      Q  Okay. And is this -- and I think you
10 had indicated that nobody from Personal Care
11 Products Council had ever contacted Dr. Epstein to
12 talk to him about the basis for his petition.
13     A  Not that I'm aware.
14     Q  Okay. And in this document, he was --
15 and you're familiar with this document, right?
16     A  Yes.
17     Q  Okay. And Dr. Epstein, if I could
18 summarize, was writing about the potential link
19 between ovarian cancer and -- talcum powder
20 products and ovarian cancer, correct?
21     A  Right.
22     Q  And this issue was not a new issue, was
23 it?
24     A  No.
25     Q  Okay. The issue of the connection

Page 407

1  between talcum powder products and ovarian cancer
2  was one that went back into the 1970s, correct?
3      A  I think the '80s. I thought it was the
4  first paper published in 1982 that I'm aware of.
5      Q  Okay. Then that's what -- we'll use
6  that.
7          And if we can go back to our timeline,
8  if I wrote on top of here that -- concerns that --
9          MR. TISI: Off the record?
10         (A discussion was held off the record.)
11         MR. TISI: We do need to see that.
12         THE VIDEOGRAPHER: The time is 9:30 a.m.
13 We're going off the record.
14         (Pause in the proceedings.)
15         THE VIDEOGRAPHER: The time is 9:31 a.m.
16 We're back on the record.
17 BY MR. TISI:
18     Q  And, Dr. Loretz, I'm sorry for the
19 technical difficulties we're having here. I took
20 the break to write down what I think we agreed.
21         Beginning in about 1982, concerns were
22 raised that talcum powder products may cause or
23 contribute to ovarian cancer; is that correct?
24     A  That's correct.
25     Q  Okay. And starting in 1982, that issue

8 (Pages 404 to 407)

Linda Loretz, Ph.D.

Page 408

1    was an issue that was one that wasn't just one
2    that was raised and forgotten, it was an issue
3    that was persistently discussed in the medical and
4    scientific literature from that point forward.
5    Fair?
6        A   Yes.
7        Q   Okay.  So it was discussed in the '80s,
8    '90s, 2000s, and in fact, it's still being
9    discussed today.
10       A   Yes.
11       Q   And by 2008, which would have been about
12   20 -- two decades plus since those initial
13   reports, the Cancer Prevention Coalition filed a
14   petition to the FDA that asked the FDA to mandate,
15   require, that all talcum powder products have some
16   kind of warning for ovarian cancer.  True?
17       A   That's what the petition says, yes.
18       Q   Okay.  And so if you go to page 2 of the
19   letter.
20          MR. TISI:  Can you please go back?
21   BY MR. TISI:
22       Q   Section A, it says:  "Agency action
23   requested," and point number 1, it says:
24   "Immediately require cosmetic talcum powder
25   products to bear labels with a prominent warning

Page 409

1    such as 'Frequent talc application in the female
2    genital area is responsible for major risks of
3    ovarian cancer.'"
4          Do you see that?
5        A   Yes.
6        Q   Did I read that correctly?
7        A   That's what it says.
8        Q   Okay.  And Dr. Epstein also asked to be
9    heard by the FDA on this petition, correct?
10       A   That's what it says, yes.
11       Q   Okay.  So not only did he file a letter
12   requesting that the -- a warning be added to
13   talcum powder products, but he also wanted to meet
14   with them, correct?
15       A   That's what it says, yes.
16       Q   All right.  You became -- the Personal
17   Care Products Council became aware of this
18   petition -- do you remember when it became aware
19   of this petition?
20       A   I really don't.
21       Q   Okay.  Do you remember the circumstances
22   under which it became aware of this petition?
23       A   I don't remember the details, no.  I'm
24   sure it was -- I'm sure it was soon after it was
25   filed, but I don't remember the details.

Page 410

1        Q   Okay.  So taking off your hat of
2    Dr. Loretz and putting on your hat as Personal
3    Care Products Council, can you tell us when the
4    Personal Care Products Council first became aware
5    of this petition?
6        A   I'm sure it was soon after it was filed.
7        Q   So it was filed in May of 2008.  It
8    would have been approximately May of 2008.
9        A   Yes.  I believe so.
10       Q   All right.  Let's put that aside for a
11   moment.  We'll come back to that.
12          Now, in July of 2009, did the Personal
13   Care Products Council file a white paper with the
14   FDA or comments with the FDA opposing the Cancer
15   profession -- Prevention Coalition petition?
16       A   Yes.
17       Q   And that was filed on July 21st, 2009.
18   Correct?
19       A   I don't recall.
20       Q   Let me see if I can provide you with
21   what I have marked as Exhibit No. 43.
22          (Exhibit No. 43 was marked for
23          identification.)
24   BY MR. TISI:
25       Q   Is that the PCPC -- I'm sorry.

Page 411

1          Is this the response of the Personal
2    Care Products Council to the Epstein petition to
3    add a warning?
4        A   Yes.
5        Q   Okay.  Now, is it fair to say, and if
6    you go to the -- the position of the Personal Care
7    Products Council is the addition of a warning
8    label on products such as Johnson & Johnson's baby
9    powder and Shower to Shower would be inappropriate
10   and unnecessary?
11       A   You're reading that somewhere?
12       Q   It's the very last -- second to last
13   paragraph at the end.
14       A   Yes.
15       Q   And so just to make sure that we're kind
16   of 2000 -- at 30,000 feet, the petition was filed
17   asking for a warning.  The petition of the
18   Personal Care Products Council was no warning was
19   necessary.
20       A   That's correct.
21       Q   In this petition did the Personal Care
22   Products Council lay out the standard for when a
23   warning is appropriate, if you know?
24       A   I believe our response to the petition
25   was to look at the science on talcum powder and

9 (Pages 408 to 411)

Linda Loretz, Ph.D.

| Page 412 | Page 414 |
|---|---|

**Page 412**

1 ovarian cancer.
2    Q   Okay.  But the question that I asked is
3 a different one.
4      The standard of when a warning is
5 required is a standard that you're familiar with?
6    A   That sounds more like a legal concept,
7 so I'm not sure that I am.
8    Q   Well, does the Personal Care Products
9 Council provide a labeling manual for its members?
10    A   We do, but it's -- it's -- yes, it's a
11 summary of existing labeling requirements,
12 regulatory requirements.
13    Q   Right.  Does this petition --
14 Dr. Epstein asked for a label to be added,
15 correct?
16      MR. LOCKE:  Objection.
17      THE WITNESS:  Yes.
18 BY MR. TISI:
19    Q   And this opposes the addition of a
20 label, correct?
21      MR. LOCKE:  Objection.
22      THE WITNESS:  Yes.
23 BY MR. TISI:
24    Q   Did the Personal Care Products Council
25 in any way analyze or -- or discuss the standard

**Page 413**

1 for providing when a label -- to add a warning on
2 a cosmetic product is required?
3      MR. LOCKE:  Objection.
4      THE WITNESS:  We -- as I say, what we
5 did was we reviewed the science on ovarian cancer,
6 talcum powder, and our position is that there is
7 not evidence of a causative role, and therefore we
8 did not believe a -- a label is necessary.
9      MR. TISI:  Okay.  Move to strike.
10 BY MR. TISI:
11    Q   My question was a different one.
12      Does this opposition that was filed in
13 July of 2009 contain any discussion of what the
14 standard is?
15      MR. LOCKE:  Objection.
16      THE WITNESS:  No, it addresses the
17 science.
18 BY MR. TISI:
19    Q   Okay.  Do you know whether or not the
20 standard requires that causation be proven before
21 a warning be added?
22    A   I -- I think that sounds like a legal
23 question.  I -- I --
24    Q   I'm asking you since this was filed
25 on -- you're -- you're speaking here not as Linda

**Page 414**

1 Loretz.  You're speaking here as a -- as the
2 organization.
3    A   Okay.
4    Q   And the organization is responding to a
5 request to add a warning.  Right?
6    A   Yes.
7    Q   And the -- presumably -- I mean, maybe I
8 should ask you the question:  Did PCPC consult
9 with the requirements for adding a warning before
10 responding to this petition?
11      MR. LOCKE:  Objection.
12      THE WITNESS:  I -- I mean, we don't
13 agree with the petitioner's rationale for adding a
14 warning.
15 BY MR. TISI:
16    Q   I understand you -- you have a
17 difference in the weight of the evidence that
18 would support or not support a warning.
19      My question is, did you understand at
20 the time the standard for what -- what would
21 require a warning or not?
22      MR. LOCKE:  Objection.
23      THE WITNESS:  I think it was our
24 understanding this would not require a warning.
25 BY MR. TISI:

**Page 415**

1    Q   Well, what was the standard?
2      MR. LOCKE:  Objection.
3      THE WITNESS:  I'm not sure I understand
4 that question.
5 BY MR. TISI:
6    Q   Okay.  Did the standard require that --
7 and if you don't know the answer, you don't know
8 the answer, okay?
9      But does the standard for providing a
10 warning require that causation be proven, be
11 unequivocal?
12      MR. LOCKE:  Objection.  That's beyond
13 the scope.
14      You can answer in your personal
15 capacity.
16      THE WITNESS:  I'm not sure what you mean
17 by the standard for requiring a warning.
18 BY MR. TISI:
19    Q   Well, this is -- this is a response to a
20 request that a warning be added.
21    A   Correct.  Which FDA later said it
22 doesn't require a warning.
23    Q   That's not --
24      MR. TISI:  Move to strike.
25 BY MR. TISI:

10 (Pages 412 to 415)

Linda Loretz, Ph.D.

Page 416

1    Q   Okay.  My -- my -- my question is, did
2  the PCPC consult what the legal -- what the legal
3  standard was for when a warning is required?
4         MR. LOCKE:  Objection.
5         THE WITNESS:  I mean, I -- I -- I think
6  it's fair to say we have a lot of lawyers at PCPC,
7  and if they felt this were inappropriate from a
8  legal standpoint to have this position, we would
9  not have that position.
10  BY MR. TISI:
11    Q   Did they set out what the standard is in
12  the letter?  Is there anything in this letter --
13  first of all, who drafted this cover letter?
14    A   It was either myself or John Bailey.
15    Q   Okay.  Did you consult with -- either
16  one of you consult with what the standard is for
17  when a warning is required before writing this
18  letter?
19         MR. LOCKE:  Objection.
20         THE WITNESS:  I'm -- again, I'm not
21  quite sure when what you mean "when a warning was
22  required."  By whom?
23  BY MR. TISI:
24    Q   Well, you -- you know -- do you know
25  that warnings are added when a cosmetic product

Page 417

1  may cause -- there's evidence that they may cause
2  a potential harm?
3         MR. LOCKE:  Objection.  Beyond the
4  scope.
5         You can answer in your personal
6  capacity.
7         THE WITNESS:  I'm sorry.  What's the
8  question?
9  BY MR. TISI:
10    Q   Do you know that warnings can be added
11  voluntarily when there's evidence that the product
12  may cause a potential harm?
13         MR. LOCKE:  Same objection, and to form.
14         THE WITNESS:  And as our position being
15  that there was not support for that harm, we would
16  not have supported adding a voluntary label.
17  BY MR. TISI:
18    Q   I -- I understand.
19    A   We would not have said, yes, this should
20  be labeled.
21    Q   But should -- do you not understand what
22  the standard is for a label?
23         MR. LOCKE:  Objection.
24  BY MR. TISI:
25    Q   What is -- what is the -- what is the

Page 418

1  level of evidence that's required before a label
2  is added?
3         MR. LOCKE:  Objection.  Beyond the
4  scope.
5  BY MR. TISI:
6    Q   If you don't know, you don't know.
7    A   Yeah, I -- I guess I would say I don't
8  know, but I --
9    Q   That's fine.  But you wrote this letter
10  anyway, you or Dr. Bailey wrote this letter to the
11  FDA responding to requests for requiring a label.
12    A   Again, I would say certainly there was
13  awareness within PCPC, and it was felt that this
14  was appropriate as a response.
15    Q   Right.  And there was -- but there was
16  no discussion about what the standard is under the
17  Code of Federal Regulations in this -- in this
18  letter, correct?
19         MR. LOCKE:  Objection.
20         THE WITNESS:  And again, I would just
21  say our -- our view was that -- that there was not
22  a need for warning because of the lack of
23  evidence.
24  BY MR. TISI:
25    Q   Okay.  Well, as -- as we discussed

Page 419

1  before, this issue was one that was debated in the
2  medical and scientific community for almost 25
3  years before this petition was filed, correct?
4    A   It was a topic, yes.
5    Q   All right.  And some epidemiologists
6  looking at the evidence felt that there -- there
7  was sufficient evidence to raise a causal
8  inference, correct?
9         MR. LOCKE:  Objection.
10  BY MR. TISI:
11    Q   Including Dr. Epstein.
12         MR. LOCKE:  Objection.
13         THE WITNESS:  Dr. Epstein did, but I
14  think the literature, as we point out and as we
15  had our epidemiologists point out, that there is a
16  lot of inconsistency.
17  BY MR. TISI:
18    Q   Understood.  My -- I understand that's
19  your position.
20         My question, though, is a different one,
21  Dr. Loretz.  There were epidemiologists and -- and
22  scientists in the medical and scientific
23  communication who disagreed with the PCPC's view
24  of the sufficiency of the evidence.  This was an
25  active debate, correct?

11 (Pages 416 to 419)

Linda Loretz, Ph.D.

Page 420

1    MR. LOCKE: Objection.
2        THE WITNESS: That's probably fair to
3    say, and certainly Dr. Epstein disagreed.
4    BY MR. TISI:
5        Q   Right. And there were others. I mean
6    Dr. Cramer, another -- another doctor who you are
7    familiar with, wrote and published -- and
8    published in the literature several -- several of
9    the studies. You know that he felt and published
10   that there was an inference of causation, true?
11       MR. LOCKE: Objection.
12       THE WITNESS: I believe that would be
13   true, and then the -- there were epidemiologists
14   who did not agree with that.
15   BY MR. TISI:
16       Q   Fine. Okay. And that kind of
17   illustrates a point that I think is important to
18   make here.
19       Looking at the evidence that -- some of
20   which was summarized in this letter, reasonable --
21   scientists looking at the evidence could reach
22   different conclusions looking at that evidence,
23   and in fact, did reach different conclusions,
24   correct?
25       MR. LOCKE: Objection.

Page 421

1        THE WITNESS: Yeah, there were different
2    opinions.
3    BY MR. TISI:
4        Q   Okay. And there were different opinions
5    based upon the evidence, correct?
6        A   I don't want to go to what the -- what
7    the thoughts were, but I mean, there's a body of
8    scientific literature, yes.
9        Q   Right. And that's not unusual. You've
10   been in this business for -- for a while.
11   Scientists and doctors look at -- look at the
12   evidence, and some -- they can often disagree
13   about evidence, correct?
14       A   That's true.
15       Q   All right. All right. So let's put
16   this opposition to the Citizen's Petition on our
17   timeline here, and this was --
18       MR. TISI: Maybe we can switch back to
19   this.
20       THE VIDEOGRAPHER: It is. It's in
21   process.
22       MR. TISI: If I can see if I can write
23   it.
24   BY MR. TISI:
25       Q   This would be "PCPC opposition to

Page 422

1    Citizen's Petition," and that would be July 2009.
2    Okay?
3        A   Yes.
4        MR. LOCKE: I'm just going to object. I
5    mean it says "Comments" on it. It doesn't say
6    "opposition to," but --
7    BY MR. TISI:
8        Q   But I think -- I think the testimony was
9    this was in opposition to adding a warning,
10   correct?
11       A   Yes. We did not think a warning was
12   necessary.
13       Q   Okay. So let's put that aside for a
14   moment.
15       Oh, I'm sorry, before -- before we leave
16   this document, if you go to page 4 of 39 of this
17   document, you attach a report.
18       A   Yes.
19       Q   PCPC attaches a report. And this is a
20   report by a group called the Meta-Analysis
21   Research Group. Correct?
22       A   Yes.
23       Q   Okay. And that's a group that you're
24   familiar with?
25       A   Yes.

Page 423

1        Q   Okay. And it was prepared by a
2    Dr. Michael Huncharek?
3        A   Yes.
4        Q   And a Dr. Joshua Muscat?
5        A   Correct.
6        Q   And they both identify themselves as
7    being with the Meta-Analysis Research Group.
8        A   As well as other affiliations, but yes.
9        Q   All right. And we'll get into this in a
10   minute, but this report was initially written for
11   Johnson & Johnson, correct?
12       A   Yes.
13       Q   And it was then -- in fact, earlier
14   versions of this have "Prepared for Johnson &
15   Johnson." This version that was submitted to the
16   FDA says "Prepared for the Personal Care Products
17   Council." Correct?
18       A   That could be, yes.
19       Q   Okay. And it was actually prepared for
20   Johnson & Johnson, but --
21       A   Originally.
22       Q   Originally. It was not prepared for or
23   initiated by the Personal Care Products Council,
24   correct?
25       A   We took it over, though, yes.

12 (Pages 420 to 423)

Linda Loretz, Ph.D.

Page 424

1    Q   Right.
2    A   I mean, and submitted it, yes.
3    Q   All right.  But J&J did not submit the
4  report.  The Personal Care Products Council did.
5    A   Correct.
6    Q   Now, I think in your prior deposition
7  you said you had met Dr. Huncharek and Dr. Muscat
8  before, correct?
9    A   I'm not sure if I ever met
10  Dr. Huncharek.  I know I met Dr. Muscat once upon
11  a time.
12    Q   Okay.  Had you had occasion to
13  communicate with them either on teleconferences or
14  by e-mail?
15    A   I had spoken to Dr. Huncharek.
16    Q   Okay.  How often?
17    A   Once or twice.
18    Q   Okay.  Now, on page 6 of this document
19  is an introduction.  Do you see that?
20    A   Yes.
21    Q   It identifies -- the second paragraph
22  identifies this report as "an independent review
23  of the relevant data."  Do you see that?
24    A   Sorry, where?
25    Q   Second -- second paragraph, second to

Page 425

1  last sentence.
2    A   Okay.
3    Q   It identifies this as "an independent
4  review of the relevant data."
5    A   Okay.
6    Q   Do you see that?
7    A   Yes.
8    Q   Okay.  This was not an independent
9  review of the relevant data, was it?
10    MR. LOCKE:  Objection.
11    THE WITNESS:  I think it depends how you
12  define "independent."  I mean these -- the
13  epidemiologists that were retained -- I mean,
14  first of all, this was on behalf of our members,
15  not just J&J.  They initiated the contact and got
16  the report writing started.
17    I think independent in the sense that
18  these were the conclusions of these
19  epidemiologists.
20  BY MR. TISI:
21    Q   Right.  But this report was written with
22  Johnson & Johnson and Imerys's input, correct?
23    A   We probably had all of our members who
24  were interested are allowed -- you know, would
25  review it, but that doesn't mean we change the

Page 426

1  conclusions at all.  That's a --
2    Q   Right.  And in fact, these -- these
3  doctors, Meta-Analysis Research Group, had been
4  consultants to the talc industry before this,
5  correct?
6    A   They had --
7    MR. LOCKE:  Objection.
8  BY MR. TISI:
9    Q   I'm sorry.  You may answer the question.
10    A   They had, yes.  Or Dr. Muscat had
11  reviewed for NTP.
12    Q   Okay.  And you were aware through
13  Crowell & Moring that they were both retained to
14  provide information on NTP for the 12 -- 12th
15  review on carcinogens, correct?
16    MR. LOCKE:  Objection.
17    THE WITNESS:  I'm not sure if --
18  BY MR. TISI:
19    Q   You ever heard of Crowell & Moring?
20    A   I've heard of them, yes.
21    Q   Okay.  Do you know -- did you
22  communicate with them through Crowell & Moring?
23    A   Communicate with?
24    Q   Huncharek and Muscat.
25    A   Oh, no.  No.

Page 427

1    Q   Did you -- and you know that they
2  appeared as an industry representative for --
3  Dr. Muscat appeared at the IARC proceedings as an
4  industry member?
5    A   I do know that.
6    MR. LOCKE:  Well, wait -- wait one
7  second.  When you say "they appeared," who are you
8  referring to?
9    MR. TISI:  I said Dr. Muscat.
10    MR. LOCKE:  Okay.
11  BY MR. TISI:
12    Q   Are you aware of that?
13    A   I'm aware of that, yes.
14    Q   You know who Robert Glenn is, don't you?
15    A   I know who he is.
16    Q   Okay.  You know he is with Crowell &
17  Moring?
18    A   Yes.
19    Q   And you received e-mails from him,
20  correct?
21    A   Well, not in relation to this.
22    Q   Well, with relation to Huncharek and
23  Muscat, correct?
24    A   Only -- the only -- the only thing I
25  believe I received e-mails from him, just as a --

13 (Pages 424 to 427)

Linda Loretz, Ph.D.

Page 428

1  being copied was related to the IARC review.
2      Q   Okay.  And you also understand -- we'll
3  talk about this in a moment -- they let you know
4  that there were publications that were being
5  planned by Huncharek and Muscat, true?
6          MR. LOCKE:  Objection.
7          THE WITNESS:  I'm not sure.  I may have
8  known.
9  BY MR. TISI:
10     Q   Okay.  We'll talk about those.  We'll
11  talk about those.
12         But -- but the bigger picture, Doctor,
13  is that Huncharek and Muscat were people who had
14  been in communication with the talc industry going
15  back to at least 2000 and perhaps before.
16         MR. LOCKE:  Objection.
17         THE WITNESS:  Muscat in 2000, I'm
18  certainly aware of that.
19  BY MR. TISI:
20     Q   And you said you had spoken to Huncharek
21  as well.
22     A   I spoke to him I believe around the time
23  of this, I think.  I spoke to him once, I know
24  that, and I can't remember exactly when it was.
25     Q   Okay.  Now, prior to the talc -- prior

Page 429

1  to this publication, had you ever heard of the
2  Meta-Analysis Research Group ever?
3          MR. LOCKE:  When you refer to "this
4  publication," you mean Exhibit 43?
5          MR. TISI:  Correct.
6  BY MR. TISI:
7      Q   Let me -- let me rephrase the question,
8  because -- to be clear.
9          Prior to these comments that were
10  submitted to the FDA in July of 2009 under the
11  letterhead of Meta-Analysis Research Group, had
12  you ever had occasion to come across Meta-Analysis
13  Research Group before then?
14     A   I honestly don't know.  I believe
15  Dr. Muscat's affiliation was not that in 2000.
16     Q   It was American Health Foundation.
17     A   That's what I remember as well.
18     Q   Okay.  So my question is, did you --
19  prior to submitting this independent report on
20  behalf of the industry by a group called
21  Meta-Analysis Research Group, did PCPC do any due
22  diligence as to who Meta-Analysis Research Group
23  is and what their focus was?
24     A   I -- I think the assumption was that
25  they were doing meta-analysis, which I know is

Page 430

1  what Dr. Huncharek did.
2      Q   Okay.  Do you know whether or not they
3  were an organization that was a contract research
4  organization?  For example, do you know whether or
5  not they were litigation consultants?  Do you know
6  whether or not they were -- you know, what they
7  were?
8          MR. LOCKE:  Objection.
9          THE WITNESS:  I mean I think we were
10  familiar with them from doing this.  This to me --
11  so we know they did this kind of meta-analysis,
12  which again was something I know that both
13  Dr. Huncharek and Dr. Muscat did.  So...
14         MR. TISI:  I'm going to -- I'm going to
15  actually move to strike.
16  BY MR. TISI:
17     Q   My question was, do you know -- or did
18  you do any due diligence as to what Meta-Analysis
19  Research Group was?
20         MR. LOCKE:  Objection.
21         THE WITNESS:  No, because we knew who
22  the authors were.
23         (Exhibit No. 44 was marked for
24         identification.)
25  BY MR. TISI:

Page 431

1      Q   Okay.  I'm going to show you Exhibit
2  No. 44.
3          And I'm not concerned with the front
4  pages of it.  But with an attachment.
5          Here you go.
6          MR. TISI:  I'm sorry?  Oh, Tom, I'm
7  sorry, here you go.
8          MR. LOCKE:  Thank you.
9          MR. TISI:  Yep.
10  BY MR. TISI:
11     Q   And if you go to the last -- and I'll
12  just represent to you, this is a proposal from
13  Dr. Huncharek to Bob Glenn to do certain papers
14  and research on behalf of Imerys in 2004.
15         But attached to it --
16         MR. LOCKE:  Let's let the witness just
17  read it first a second, just flip through the
18  pages.
19         MR. TISI:  Oh, she can certainly do
20  that, Tom.
21  BY MR. TISI:
22     Q   And I'm going to ask you on the -- about
23  the brochure that's attached on page 5.
24     A   (Peruses document.)
25     Q   Since you took the time to read it, let

14 (Pages 428 to 431)

Linda Loretz, Ph.D.

Page 432

1    me just ask you the question.  Do you see that
2    this is a proposal to write two papers, one on
3    meta-analysis on diaphragms and one a critical
4    review of the talc literature?
5        A   Yes.
6        Q   Okay.  You know that they did publish
7    two articles relating to that very specific --
8    those two specific topics, correct?
9        A   I believe so, yes.
10       Q   Okay.  And so this is a proposal by --
11   by Dr. Huncharek to write such articles to
12   Mr. Glenn, who I will represent to you was with
13   the lawyers for Crowell & Moring for Imerys.
14       A   Okay.
15       Q   Okay.  Attached to that is a brochure
16   from the Meta-Analysis Research Group.  Do you see
17   that?
18       A   I guess this is --
19           MR. LOCKE:  Page 5.
20           THE WITNESS:  Okay.  Okay.
21   BY MR. TISI:
22       Q   Okay.  This is a brochure.  Did you
23   ever -- I think I -- I asked you before, but did
24   you ever ask -- first of all, the report that was
25   filed on behalf of the FDA, I believe your answers

Page 433

1    to interrogatories said it cost about $50,000.
2        A   I think that's correct, yeah.
3        Q   Okay.  Did PCPC pay that or did J&J?
4        A   I believe we did.
5        Q   Okay.  "We" meaning PCPC?
6        A   I'm sorry.  PCPC.
7        Q   On behalf of the talc industry?
8        A   Yes.
9        Q   And one of the things that the
10   Meta-Analysis Research Group identifies in the
11   first paragraph that they do is they assist major
12   pharmaceutical companies and other clients in,
13   quote, deciphering often complex, seemingly
14   contradictory, data using rigorous meta-analysis
15   methods.
16           Do you see that?
17       A   Yes.
18       Q   Do you see on the next page that it also
19   provides medical and legal consulting in
20   litigation?
21       A   That's what it says, yes.
22       Q   The expert witnesses.  Do you see that?
23       A   Yes.
24       Q   Do you know that both Dr. Huncharek and
25   Dr. Muscat became expert witnesses in talc

Page 434

1    litigation?
2        A   I'm not sure.  I knew that Dr. Muscat
3    was deposed, but I don't -- I don't think that's
4    the same as what you're asking.
5        Q   And so my question to you is, did it
6    matter to you when you were submitting this on
7    behalf of -- to the FDA as to whether or not these
8    consultants who -- were basically people who would
9    be involved in litigation?
10           MR. LOCKE:  Objection.  Do you mean --
11   BY MR. TISI:
12       Q   Did you think about that?
13           MR. LOCKE:  Do you mean -- when you say
14   "this," you're referring to Exhibit 43, the
15   comments?
16           MR. TISI:  Correct, in 2009.
17   BY MR. TISI:
18       Q   Did you want to know -- did you even
19   think to know whether or not these witnesses,
20   Dr. Huncharek and Dr. Muscat, would be considered
21   or groomed for being experts in litigation?
22           MR. LOCKE:  Objection.
23           THE WITNESS:  That's not --
24           MR. LOCKE:  Objection.  Did you mean to
25   say "these witnesses"?

Page 435

1            MR. TISI:  These -- yes, these doctors.
2            THE WITNESS:  We hired them for their
3    epidemiological expertise, and they're -- they
4    were not always favorable to us.  I mean they
5    also -- Dr. Huncharek published on hair dyes, and
6    it was -- it was not favorable.  So we -- we
7    consider them to be fair, and their scientist
8    arguments would stand.
9    BY MR. TISI:
10       Q   Okay.  Had you ever heard discussed --
11   now I'm asking you as Linda Loretz -- had you ever
12   discussed that if this case went into litigation
13   that Drs. Huncharek and Muscat would be
14   consultants or experts?
15           MR. LOCKE:  Objection.
16           THE WITNESS:  No.
17   BY MR. TISI:
18       Q   Okay.  Do you know that Meta-Analysis
19   Research Group went out of business shortly after
20   this --
21       A   I don't know.  I did not know that.
22       Q   Do you know that they became paid
23   litigation experts in 2010?
24       A   No.
25       Q   Now, are you aware that in 2011, after

15 (Pages 432 to 435)

Linda Loretz, Ph.D.

Page 436

1  the filing of this report to PCPC, that they took
2  their analysis that was paid for by PCPC and then
3  made some modifications, but for the most part,
4  published it as it was in the -- in the
5  literature?
6          MR. LOCKE:  Objection.
7          THE WITNESS:  I'm -- I think I'm aware
8  that there was a publication, but, no, I did not
9  know that was happening until after the fact -- we
10 did not know that that was happening until after
11 the fact.
12         (Exhibit No. 45 was marked for
13         identification.)
14 BY MR. TISI:
15     Q   I'm going to show you what I've had
16 marked as Exhibit No. 45.
17         And this is a --
18         (Phone interruption.)
19 BY MR. TISI:
20     Q   This is an article that I will represent
21 to you is very close to, if not identical in many
22 paragraphs, to the report that was filed on behalf
23 of PCPC.  Have you seen this before?
24     A   I've -- yes.
25     Q   It was published in 2011.  Correct?

Page 437

1      A   Accepted April 2011, so -- yes.
2      Q   Do you know -- do you know that there
3  was a -- actually a proposal to -- made to Imerys
4  that -- to turn this paper, "this" meaning the
5  report that was submitted by PCPC in July of 2009,
6  into a publication?
7      A   No.  We were not involved.
8      Q   Okay.  If you look at the back of the
9  article, do you know -- does it acknowledge PCPC
10 as having paid for this report?
11     A   No.
12     Q   Is there anything in that acknowledgment
13 that would indicate that at the time that this
14 article was published that they were paid
15 litigation experts for the lawyers representing
16 Johnson & Johnson?
17         MR. LOCKE:  Objection.
18         THE WITNESS:  No, not any
19 acknowledgments.
20 BY MR. TISI:
21     Q   So let's put this on our timeline here,
22 2011.  And I'll put "H&M publication, 2011."
23         Now, let's go back to the report that
24 was filed with the FDA.  And I would like to go
25 back to the Introduction section that we started

Page 438

1  talking about before.
2          And it's on page 3 of the report,
3  page 6 -- 6 of 9 of the letter.  Do you see that?
4      A   Yes.
5      Q   Okay.  The Introduction says:  "On
6  May 13th, 2008, Samuel Epstein, MD, chairman of
7  the Cancer Prevention Coalition, submitted a
8  Citizen's Petition to the Commissioner of the Food
9  and Drug Administration seeking placement of a
10 cancer warning label on talc products.  The
11 petition requests the Commissioner of the Food and
12 Drug require that all talcum powders bear labels
13 with warnings such as 'Frequent application of
14 talcum powder in the female genital area
15 substantially increases the risk of ovarian
16 cancer.'"
17         Did I read that correctly?
18     A   That's what it says.
19     Q   Okay.  The second paragraph -- so that
20 just -- and that's true, that that's -- that
21 paragraph is true, that's what Epstein did.
22     A   I would say yes.
23     Q   Okay.  Second paragraph is -- is your
24 response or the summary of your response.
25         "Given the multiple implications of such

Page 439

1  warning labels, the Personal Care Products Council
2  sought an evaluation of the validity of the
3  scientific facts underlying this request.  The
4  Meta-Analysis Research Group was retained to
5  provide an independent review of the relevant
6  data.  Below are the findings of that review."
7          Do you see that?
8      A   Yes.
9      Q   I'm curious about the statement saying
10 "the multiple implications of such warning
11 labels."  Do you see that?
12     A   Yes.
13     Q   Can you tell us on behalf of the PCPC
14 what the multiple implications of the warning
15 labels are that you were referring to?
16         MR. LOCKE:  Objection.  Obviously this
17 was written by doctors --
18         MR. TISI:  I'm -- I'm -- I am --
19 BY MR. TISI:
20     Q   What are the multiple implications that
21 were being considered there?
22     A   Again, this -- this was written not by
23 us.  I mean, I think it's pretty obvious that that
24 would have -- could have an impact -- I mean,
25 again, we didn't think a label was -- should be

16  (Pages 436 to 439)

Linda Loretz, Ph.D.

Page 440

1  required because we -- because of the science
2  behind it we believe was not supported, but
3  obviously would have an impact on -- on the
4  product if -- if it were.
5      Q   Okay.  The "impact on the product," what
6  do you mean?
7      A   Well, we -- we -- I mean it --
8      Q   Well, let me ask --
9      A   We don't think it should have a warning
10 if it's -- if we don't believe that it --
11     Q   Let me ask you some -- I didn't mean to
12 interrupt you.  Go finish, if you'd like.
13     A   No, just that if -- because we didn't --
14 we don't believe that the science shows causation,
15 we just did not believe you have a warning to
16 scare people off of something if it's not real.
17     Q   Okay.  So let me ask you -- I understand
18 your position that you did not think the evidence
19 supported a causal inference.
20         Putting that issue aside, the company
21 through its consultants assert -- make an
22 assertion that warnings labels would have
23 implications.  Do you see that?
24     A   Yes.
25     Q   And not only implications, have multiple

Page 441

1  implications.  Correct?
2      A   That's what it says.
3      Q   Okay.  And I'm curious as to what those
4  implications were from your perspective, from the
5  PCPC's perspective.
6          Was there concern ever expressed that
7  adding a warning would have an impact on the
8  members of the PCPC?  You've heard that, correct?
9      A   Yeah, again --
10     Q   Okay.
11     A   -- I think the reason that -- we would
12 not want that, though, is because we do believe
13 the science doesn't support the need for a
14 warning.
15     Q   I -- I understand.
16     A   It has to be part of the context of my
17 answer.
18     Q   I'm going -- Doctor, I'm going to ask
19 you a lot about this document, okay?  And we're
20 going to go through it probably more than you want
21 to.  Okay?
22     A   Sure.
23     Q   But before we do, I want to understand
24 the context in which it's written.  Okay?
25         And in the very first paragraph, other

Page 442

1  than stating what Dr. Epstein did, the first --
2  first sentence of that paragraph, you say that
3  the -- that your consultants on your behalf say:
4  "Given the multiple implications on such a warning
5  label, the Personal Care Products Council sought
6  an evaluation of the validity of the scientific
7  facts underlying this request."
8          So this statement is the predicate of
9  why the PCPC got this report in the first place,
10 correct?
11     A   Sure.
12     Q   Okay.  And so the predicate was that
13 there were multiple implications of that warning,
14 of a warning, should it be required.  And this, to
15 be clear, is a request that warning labels be
16 mandated.  Correct?
17     A   Correct.
18     Q   And you were aware that companies can
19 and in fact have voluntarily added a warning,
20 correct?
21     A   Sure.
22     Q   Okay.  So this is different than that.
23 I mean companies can voluntarily add a warning.
24     A   Yes.
25     Q   But this is in the absence of a company

Page 443

1  voluntarily adding a warning, they're going right
2  to the FDA and saying, The companies are not doing
3  it, and we're going to ask you -- require you to
4  do it.  Correct?
5      A   Yes.
6      Q   All right.  And the PCPC, as a predicate
7  for opposing that requirement, laid out that there
8  are multiple implications to requiring that
9  warning.  Correct?
10         MR. LOCKE:  Objection.
11         THE WITNESS:  That's what it says, yes.
12 BY MR. TISI:
13     Q   All right.  And the multiple -- the
14 implications are -- I mean let's -- let's I'm
15 going to lay out some for you and ask you whether
16 they were things that were discussed at the time.
17         Was one of the implications that it
18 would affect the commercial interests of the
19 members of the PCPC?
20     A   With the context being that we did not
21 believe that it truly had this risk, you do not
22 want to affect sales and so forth without --
23     Q   Okay.
24     A   -- if it's -- if there's no reason for
25 having a warning.

17 (Pages 440 to 443)

Linda Loretz, Ph.D.

Page 444

1    Q   Understood.  We're going to talk about
2  the reasons.
3    A   Okay.
4    Q   I just want to know the implications.
5    A   Okay.
6    Q   Right?
7    A   Yep.
8    Q   So the first implication would be -- and
9  I will write it on here, "Implications of
10 warnings.  1.  Sales."
11       Had you ever heard in the context --
12 since there were multiple implications, had you
13 ever heard in the context that providing a warning
14 after this being in the medical literature for 25
15 years would open up members to the potential --
16 for the reason why we're all here today, potential
17 lawsuits?
18    A   No.
19    Q   You never heard that?
20       MR. LOCKE:  Objection.
21       THE WITNESS:  We never talked about
22 that.
23 BY MR. TISI:
24    Q   Never talked about that at all?
25    A   No.

Page 445

1    Q   You never heard that -- that adding a
2  warning might -- might raise -- might cause people
3  to bring claims such as this?
4    A   We just talked about the science.
5    Q   I'm not -- I'm going to talk about the
6  science in a moment, okay?  We're going to get to
7  the science.
8       But oftentimes -- you're aware as a
9  scientist that oftentimes the reason why we do
10 disclosures in medical and scientific literature
11 is so that people could understand the biases or
12 potential biases or potential conflicts of
13 interest that the authors might have, correct?
14       MR. LOCKE:  Objection.
15       THE WITNESS:  Say it one more time.
16 BY MR. TISI:
17    Q   Medical articles oftentimes come with
18 disclosures about affiliations, conflicts of
19 interest.
20    A   Sure.
21    Q   And the reason why we do that --
22    A   Yes.
23    Q   -- is so that people reading those
24 articles can understand why -- perhaps biases that
25 the authors bring to the table, correct?

Page 446

1    A   Yes.
2    Q   All right.  And so what I'm trying to
3  explore with you is what potential -- and I'll put
4  it right on the table -- what potential biases
5  might have been present when this opposition was
6  sent to the FDA.  Okay?
7    A   Okay.
8    Q   All right.  So we'll talk about the
9  science and we'll talk -- but before we talk about
10 the science, I want to talk about the prism
11 through which you looked at the science.  Okay?
12    A   Okay.
13    Q   And one of the things that was a concern
14 to the members, we talked about sales.  Had you
15 ever heard of any concerns about litigation?
16    A   I can tell you that was not something we
17 ever discussed.
18    Q   Okay.  Is it something you understood?
19    A   Sure.  At some level, of course.
20    Q   Okay.  And if sales -- people stop
21 selling talc, and use corn starch, for example,
22 instead of talc, that may impact the membership of
23 the PCPC as well, correct?
24       MR. LOCKE:  Objection.
25       THE WITNESS:  I mean I didn't -- no,

Page 447

1  that's not -- that's not what I thought.  I mean
2  to me that -- that wouldn't really make sense.  I
3  mean if you have a product that's corn starch
4  instead of talc, it's still a product.  So I don't
5  think that's really relevant.
6  BY MR. TISI:
7    Q   Right.  But Imerys -- Imerys doesn't
8  manufacture corn starch, do they?
9    A   No, but I -- I guess --
10    Q   So they would fall out of the -- they
11 might fall out of the PCPC, correct?
12    A   I don't -- no, I never thought about,
13 and I don't think -- I never ever heard anybody
14 mention that.
15    Q   Any of the -- any other -- since there
16 were multiple implications, any other implications
17 you could think of as to why you sought to get
18 this independent evaluation to submit to the FDA
19 in opposition to letting women know there was a
20 potential for ovarian cancer based upon the
21 literature?
22    A   I think given --
23       MR. LOCKE:  Objection.
24       THE WITNESS:  -- given our position that
25 we don't believe there is a causal role, I don't

18 (Pages 444 to 447)

Linda Loretz, Ph.D.

Page 448

1  think you want to put warnings on products
2  suggesting that there's some harm when there's
3  not, scaring people or having people think that
4  some harm that they've experienced has something
5  to do with this when in fact it doesn't.
6  BY MR. TISI:
7      Q   So you were concerned about scaring
8  people.  With baby powder.
9      A   Yeah, a warning is --
10     Q   Okay.
11     A   -- is a scary thing, sure.
12     Q   And if -- if a woman was told that --
13  that talcum powder products, and we talked about
14  this for 25 years that was being discussed in the
15  medical literature, if they were concerned by
16  that, there were other alternatives on -- on the
17  shelves, right?  There was corn starch, correct?
18         MR. LOCKE:  Objection.
19         THE WITNESS:  Yeah, again, the context
20  to me is that if we did not believe that it was a
21  real risk, that's where you don't want to warn.
22  BY MR. TISI:
23     Q   And -- well, but that's my reason why I
24  asked you before what the standard was.  If the
25  standard was -- is the standard for warning that

Page 449

1  you have to be convinced of a real risk?
2         MR. LOCKE:  Objection.
3  BY MR. TISI:
4      Q   Or that there may be a risk.  What is
5  the standard for a warning, and did you even know
6  at the time you sent this to the FDA?
7         MR. LOCKE:  Objection.
8         THE WITNESS:  Again, I would just say
9  there were people within -- within PCPC who know a
10  lot more on this topic than I do, and --
11  BY MR. TISI:
12     Q   Did they --
13     A   -- the awareness of --
14     Q   Did you send this to the lawyers at the
15  PCPC, this letter?
16     A   This -- I can't recall exactly who read
17  it, but I can tell you that certainly, you know,
18  everything that -- when things like this happen,
19  they are -- it's known without the associate --
20  throughout the association at the higher levels.
21     Q   Now, prior to this time, did the PCPC
22  ever discuss either with the FDA or whether or not
23  it's members should voluntary add a warning or
24  precaution or informational statement about
25  cosmetic talc and the current state of the

Page 450

1  literature on ovarian cancer?
2      A   No.
3      Q   Okay.  Since 2009, did PCPC ever discuss
4  with its members whether or not its members should
5  voluntarily add an informational label or warning
6  label about perineal dusting with talcum powder
7  products?
8      A   No.
9      Q   Do you know that some talcum powder
10  products have in fact voluntarily added warnings
11  or information about the potential risk of talcum
12  powder products?
13     A   I didn't know that, but --
14     Q   Are you familiar with a company called
15  Belk -- Belcam Inc.?
16     A   No.
17     Q   Greenbriar?
18     A   No.
19     Q   Assured?
20     A   No.
21     Q   Okay.  There are members -- there are
22  people who actually manufacture talcum powder
23  products that are not members of the PCPC,
24  correct?
25     A   I would assume so.

Page 451

1      Q   Are you aware that some manufacturers
2  have stopped selling talcum powder products
3  altogether and use -- and just have decided to use
4  corn starch, correct?  Do you know that?
5         MR. LOCKE:  Objection.
6         THE WITNESS:  I guess I don't know that,
7  but I could find it plausible.
8  BY MR. TISI:
9      Q   Okay.  Let's get back to the response to
10  the Citizen's Petition.
11         Do you know -- we mentioned before, and
12  I just want to make sure that we understand, this
13  PCPC response was actually commissioned by
14  Johnson & Johnson in 2008, correct?
15     A   I believe they started the process
16  rolling, yes.
17     Q   Well, it's more than starting the
18  process.  The report was actually written for J&J.
19     A   I -- I -- yeah, I think when we got it,
20  it was -- it was --
21     Q   It was pretty --
22     A   The report had been -- was in pretty
23  good shape, yes.
24     Q   It was -- it was pretty much written by
25  the time you got it.

19  (Pages 448 to 451)

Linda Loretz, Ph.D.

Page 452

1    A  I believe so, yes.
2    Q  Did you understand this was a
3  collaborative response by J&J and Imerys
4  primarily?
5    A  I'm not sure that I did.
6    Q  Did other manufacturers -- there are
7  other manufacturers of talcum powder products,
8  correct?
9    A  There are certainly other people on our
10  Talc Task Force or the people with an interest in
11  talc.
12    Q  Do you know --
13    A  Other companies, rather.
14    Q  Do you know that -- whether they had
15  input into this PCPC response, or was it primarily
16  a J&J, with the assistance of Imerys, production?
17    A  I believe we would have sent it to other
18  people with interest.  I mean, that's our normal
19  process.
20    Q  Do you know whether that was happening?
21    A  I mean, I don't, but that would be our
22  normal process.
23        (Exhibit No. 46 was marked for
24        identification.)
25  BY MR. TISI:

Page 453

1    Q  So I'm going to show you what I've had
2  marked as Exhibit No. 46.  And it's a date -- and
3  you're not on this, but I'm doing this just to
4  kind of see if I can hone in the time frame.
5        This is an e-mail from Kathleen Wille.
6  Do you know who Kathleen Wille is?
7    A  Yes.
8    Q  Okay.  She works with J&J?
9    A  Yeah, I'm not sure if she's still there,
10  but yes.
11    Q  And it's entitled "Response to Citizens
12  Petition on Talc, Latest Review of the Data," and
13  its attachment is a J&J report.  Do you see that?
14    A  Yes.
15    Q  Okay.  And it says:  "This is the report
16  that we will -- that we will submit to FDA in
17  response to the Citizen's Petition.  We originally
18  commissioned the work; however, the trade
19  association will be the submitter."
20        Is that an accurate statement of what
21  happened?
22    A  I don't know, but I'm -- well, yes, they
23  commissioned it, and we -- we submitted it, that's
24  correct, yes.
25    Q  Okay.  Now, going back to the actual FDA

Page 454

1  submission, this was submitted by a PCPC employee
2  by the name of John Bailey.  I want to talk to you
3  a little bit about who John Bailey is and was.
4    A  Okay.
5    Q  Who is John Bailey?
6    A  He -- at the time of this, he was the
7  vice president of science -- the science
8  department.  He was my boss -- or, rather, the
9  executive vice president of the science department
10  at PCPC.
11    Q  Okay.  He previously worked at the FDA,
12  didn't he?
13    A  He did.
14    Q  And in fact, he was hired directly from
15  the FDA by PCPC.
16    A  That's correct.
17    Q  Okay.  And at the time that he left the
18  FDA in December of 2001, he was with what
19  division, do you know?
20    A  Office of Cosmetics and Colors.
21    Q  And at that time in 2001, the NTP had
22  actually deferred consideration of talc as a -- a
23  carcinogen, correct?
24    A  Yes.
25    Q  Okay.  And when we say "deferred," I

Page 455

1  want to stop and pause on that for a moment
2  because it -- I just want to make absolutely
3  clear, and we'll talk about this in a moment.
4        They deferred the question, they did not
5  decide the question.
6    A  That's what -- that was under the
7  official, what they did, yes.
8    Q  Okay.  And so in that context, PCPC just
9  immediately following that -- well, when it was
10  deferred, there was an understanding that the
11  issue might come up again.
12    A  Yes.
13    Q  And in fact, it did come up again,
14  correct?
15    A  Kind of.
16    Q  It came up with IARC?
17    A  Oh, it came up in other contexts, sure.
18    Q  Came up in IARC?
19    A  Yes.
20    Q  This issue -- and again, it bears
21  repeating because I want to make sure -- at all
22  times on this continuum, on this timeline, the
23  issue of talcum powder products causing or
24  contributing to ovarian cancer was an active
25  debate.  Sometimes more active, sometimes less

Linda Loretz, Ph.D.

Page 456

1  active. But this was something that was a concern
2  to your members throughout the entire time of this
3  timeline.
4          MR. LOCKE: Objection. Form.
5          THE WITNESS: It was being talked about
6  by someone.
7  BY MR. TISI:
8      Q   Right. And so in the context of hiring
9  Dr. Bailey, he was hired by -- by PCPC from the
10 division of the FDA, the Office of colors --
11 Cosmetics and Colors --
12     A   Cosmetics and Colors.
13     Q   -- that would interact with the cosmetic
14 industry on talc issues, correct?
15     A   As well as many other issues, yes.
16     Q   Right. And the person who took over was
17 a Dr. Katz?
18     A   Yes.
19     Q   And Dr. Katz worked for Dr. -- had
20 worked for Dr. Bailey at the time, correct?
21     A   I actually don't know that.
22     Q   All right. And he was the director of
23 that office, correct?
24     A   That's correct, yes.
25     Q   And when he left FDA in December of

Page 457

1  2001, he became -- he was hired in January of 2002
2  by PCPC.
3      A   I couldn't confirm those dates, but --
4      Q   Okay. And he interacted with the -- and
5  we're going to talk about this -- he's writing the
6  response to this petition that would go to the
7  very same division, the Office of Cosmetics and
8  Colors, that actually he ran while he was at the
9  FDA.
10     A   Yes, although I think the heart of our
11 submission is the scientific analysis.
12     Q   Right.
13     A   Not the cover letter, but the --
14     Q   But the cover letter -- the cover
15 letter -- well, let's -- let's call it what it is.
16 He actually sent the letter and he actually met
17 with you -- with you at the Office of Cosmetics
18 and Colors before this was filed in July.
19     A   Oh --
20     Q   There was a meeting at the FDA --
21     A   Correct.
22     Q   -- where you and Dr. Bailey went to the
23 FDA, previewed this document that Dr. Huncharek
24 and Muscat had provided, and then filed it
25 subsequently, correct?

Page 458

1          MR. LOCKE: Objection.
2          THE WITNESS: Yes.
3  BY MR. TISI:
4      Q   And he was -- he was going to the very
5  same office that he ran, correct?
6      A   In -- at that meeting there was more
7  than just the Office of Cosmetics and Colors.
8      Q   Well, we're going to talk about that.
9  But -- but the people who were -- the vast
10 majority of the people at that FDA employees were
11 people from the Office of Cosmetics and Colors.
12     A   I'm not sure about the vast majority,
13 but certainly there were people there, and that --
14 that may well be right.
15     Q   Including Dr. Katz.
16     A   Dr. Katz was there.
17     Q   And I want to put this on a timeline in
18 a moment, but Dr. Bailey left PCPC after this
19 petition -- this opposition was -- was correct,
20 filed?
21     A   He's -- he left, yes. I'm not sure
22 exactly -- the exact year, but yes.
23     Q   About 2011 -- 2010, 2011?
24     A   That sounds roughly right.
25     Q   Okay. So before we discuss the science

Page 459

1  that was provided by PCPC, and I told you we would
2  do that, let's see if we can pause here and put
3  together -- fill out our timeline a little bit
4  about the context of everything that happened.
5          First of all, we talked about the fact
6  that talcum powder products may cause or
7  contribute to ovarian cancer was a concern since
8  the early 1980s and it was debated throughout the
9  entire time, correct?
10         MR. LOCKE: Objection.
11         THE WITNESS: There were ongoing
12 happenings related to that topic, yes.
13 BY MR. TISI:
14     Q   Okay. Can we say -- can we use the word
15 "consistent" here? It was a consistent topic of
16 discussion in the medical and scientific
17 community?
18     A   There were a number of publications, but
19 I mean not every --
20     Q   I mean I'm not saying you woke up in the
21 morning and discussed it. I'm saying that within
22 this topic was a topic that was -- it wasn't just
23 a flash in the pan. It was something that was
24 discussed over the -- over this 25 years
25 represented by this chart.

21 (Pages 456 to 459)

Linda Loretz, Ph.D.

Page 460

```
 1          MR. LOCKE:  Objection.
 2          THE WITNESS:  Again, with the
 3   understanding that there were publications, but
 4   not all of them showed any sort of association --
 5   BY MR. TISI:
 6      Q    And some did.
 7      A    -- and some did and some -- and some did
 8   and some -- but there were a lot of weaknesses in
 9   the --
10      Q    Well, I mean, my question is that was an
11   active debate, correct, what those studies meant?
12          MR. LOCKE:  Objection.
13          THE WITNESS:  I guess that's fair to
14   say.
15   BY MR. TISI:
16      Q    Okay.  So can we write "Active debate
17   between scientists."  Is that okay?
18      A    Okay.
19          MR. LOCKE:  Objection.
20   BY MR. TISI:
21      Q    Is that accurate?
22          MR. LOCKE:  Same objection.
23          THE WITNESS:  I -- I suppose.
24   BY MR. TISI:
25      Q    Okay.  All right.  So, for example, some
```

Page 461

```
 1   like Dr. Cramer or Dr. Epstein on one hand thought
 2   there was -- that there was evidence of a causal
 3   association, and some people like Huncharek and
 4   Muscat thought there was not.
 5          MR. LOCKE:  Objection.
 6          THE WITNESS:  There were different
 7   opinions, yes.
 8   BY MR. TISI:
 9      Q    Based on the same literature.
10      A    Yes.
11      Q    Okay.  Now, another point before we put
12   things on a timeline, the PCPC knew that the FDA
13   had been concerned about the issue since at least
14   the 1990s, correct?
15          MR. LOCKE:  Objection.
16          THE WITNESS:  They responded before,
17   yes.
18   BY MR. TISI:
19      Q    But they were concerned about the issue.
20          MR. LOCKE:  Objection.
21          THE WITNESS:  I -- I guess, yes.  I
22   mean --
23   BY MR. TISI:
24      Q    Well, I mean don't guess.
25      A    Well --
```

Page 462

```
 1      Q    I'll show you a document, if I -- if I
 2   could, but that was an issue that PCPC knew and
 3   understood that the FDA was concerned about.
 4      A    They --
 5          MR. LOCKE:  Objection.
 6          THE WITNESS:  They had an interest and a
 7   concern with, okay.
 8          (Exhibit No. 47 was marked for
 9          identification.)
10   BY MR. TISI:
11      Q    I'm going to show you a document that
12   I've marked as Exhibit No. 47, and it's draft
13   minutes of the CTFA talc force.
14          And we're going to talk about this
15   later, but this is Exhibit No. -- I said 47?
16          MR. LOCKE:  Yes.
17   BY MR. TISI:
18      Q    Now you see why I used 1994 is on my --
19      A    Mm-hmm.
20      Q    -- on my timeline here.
21      A    Yes, right, but the -- the workshop,
22   yes.
23      Q    Okay.  And this was a workshop dated
24   April 12th, 1994, correct?
25      A    Yes.
```

Page 463

```
 1      Q    Okay.  It's actually written by a
 2   Stephen Gettings?
 3      A    Yes.
 4      Q    Who is Dr. Gettings?
 5      A    Dr. Gettings was my predecessor.
 6      Q    All right.  And this is a report of a
 7   meeting amongst -- this is the Talc Interested
 8   Party Task Force.  Among other things, Johnson &
 9   Johnson and the predecessor for Luzenac were
10   there.
11      A    Yes.
12      Q    Okay.  And I'm going to come back to
13   this in a minute when I talk about the second area
14   which we talked about, which is studies.
15      A    Okay.
16      Q    But -- but I'm just concerned with point
17   number 1.  It says:  "It was noted that the FDA
18   still appears to be concerned with the issue of
19   ovarian cancer as evidenced by their contact with
20   the NTP."
21          Do you see that?
22      A    Yes.
23      Q    Okay.  So at least as of this date,
24   you're aware that the FDA had some concerns about
25   talc and ovarian cancer.
```

22 (Pages 460 to 463)

Linda Loretz, Ph.D.

Page 464

1      A   Okay.
2      Q   Is that accurate?
3      A   I'm going to say yes.
4      Q   Okay.  So let's put this on our timeline
5   here, 1994.  And this would be "Task force with
6   the FDA, concern about ovarian cancer."
7         By the way, ovarian cancer, this is not
8   a trivial issue, is it?
9      A   No.
10     Q   And ovarian cancer is a -- ovarian
11  cancer is -- affects 20 -- 20,000 -- 20,000 women
12  a year get diagnosed with ovarian cancer, correct?
13     A   Yes.
14     Q   It has a high mortality rate.  Correct?
15     A   Yes.  Yes.
16     Q   Very serious.
17     A   Absolutely.
18     Q   And by contrast, baby powder is not a
19  necessary pharmaceutical, correct?
20        MR. LOCKE:  Objection.
21  BY MR. TISI:
22     Q   Is it fair to say you can live without
23  baby powder?
24        MR. LOCKE:  Objection.  Beyond the
25  scope.

Page 465

1   BY MR. TISI:
2      Q   Talcum powder.
3      A   Yes.
4      Q   Now, in 2000, we have the NTP 10th
5   Report on Carcinogen, and we talk about the word
6   "defer."
7         And I want to write that clearly because
8   my handwriting is terrible.
9         Okay.  And they deferred the question.
10     A   They did.  They did vote.  They voted,
11  but then they deferred.
12     Q   Right.
13     A   But they voted against listing seven to
14  three, but then they deferred.
15     Q   Well, there were different -- okay.
16  Since you raised that, let's -- you knew this was
17  going to happen.  I was not going to get into it,
18  but let's -- let's -- there were three committees
19  that looked at the -- looked at this, correct?
20     A   Mm-hmm.
21     Q   Two of them voted in favor of listing.
22     A   That's correct.
23     Q   And one voted against, correct?
24     A   Yes.
25     Q   Okay.  And that's kind of the issue I

Page 466

1   was talking before, people can look at the same
2   evidence and come to different conclusions,
3   correct?
4      A   I think there was some different
5   evidence.  I think it really was bringing forth
6   some things that were mistaken in the draft
7   report, particularly regarding mineralogy and --
8   and so forth.
9      Q   Right.  And one of the things -- one of
10  the things that was the basis of the deference is
11  that there was not a clear understanding of what
12  at that time was in talcum powder products.
13        MR. LOCKE:  Objection.
14        THE WITNESS:  I think there wasn't
15  also -- there was not a clear definition of -- in
16  fact, when they wanted to look at it again or
17  considered looking at it again, they changed the
18  name of what they were going to look at, because
19  it was hard -- it was not clear what they were
20  trying to look at, and that was something that got
21  discussion at the NTP, and I think that made a
22  difference and explains part of why there were
23  different conclusions from the first two review
24  groups.
25  BY MR. TISI:

Page 467

1      Q   All right.  And the third review group
2   was not unanimous, was it?
3      A   They -- they did do a vote.  I -- I've
4   been calling it seven to three against listing,
5   and then they -- and then they decided to defer
6   because there were --
7      Q   And again, that's -- that's -- that's
8   the kind of example that I'm talking about of even
9   if it was seven to three against listing talc,
10  there were three people who thought that it should
11  be listed, correct?
12     A   Sure.
13     Q   So this is -- this is kind of
14  crystalizing what we've been talking about, which
15  is different scientists can look at the evidence
16  and reach different conclusions, true?
17     A   Yes.
18     Q   And in fact, did reach different
19  conclusions, correct?
20     A   Yes.
21     Q   All right.  Okay.  So we put that on our
22  timeline here.
23        Now, prior to that last discussion --
24  prior to that deferral, that last meeting, the
25  PCPC actually drafted or commissioned a report,

23 (Pages 464 to 467)

Linda Loretz, Ph.D.

Page 468

1  correct?
2      A    You mean -- to be submitted to the
3  NTP --
4      Q    Yes.
5      A    -- for the meeting?  Yes.
6      Q    Yeah.  And I'm just going to identify
7  it because I don't want to go into it, but -- but
8  here is a copy of the actual letter, Exhibit
9  No. 48.
10         (Exhibit No. 48 was marked for
11          identification.)
12  BY MR. TISI:
13      Q    And one of the things that the -- and
14  this would have been -- we'll put it on our
15  timeline, this would have been December of 2000
16  and -- 2000.  So we will put "PCPC CFTA
17  submission."
18         And the only reason I bring this up is
19  Dr. Muscat is the very same doctor who --
20  Dr. Muscat wrote a report that was submitted to
21  NTP, correct?
22      A    That's correct.
23      Q    All right.  And it's the very same
24  Dr. Muscat that wrote the report with -- which was
25  a Citizen's Petition with Dr. Huncharek.

Page 469

1      A    It is.
2      Q    Okay.  So we're going to put "Muscat"
3  there.  Okay.
4         Now, Dr. Muscat was actually recommended
5  to the PCPC by Johnson & Johnson, correct?  Back
6  in 2000.
7      A    I think that's correct.
8      Q    So I don't have to use a document.  Is
9  that correct?  I'm happy to use the document,
10  but --
11      A    Okay.  Then I'm going to say I think --
12  yes, I believe that's correct.
13      Q    Okay.  We just cut ourselves five
14  minutes, so --
15      A    Yea.
16      Q    All right.  And just to kind of put it
17  again on our timeline, when did the -- when did
18  the NTP defer the issue of whether or not talc was
19  a carcinogen?
20      A    I believe they actually did it at their
21  actual meeting, which was in December of 2000.
22      Q    2000.  And -- you became aware of the
23  actual deferral in the CFR?  The Code of Federal
24  Regulations actually lists it as being --
25      A    Yeah, I mean I -- I thought they said

Page 470

1  that at the actual meeting, but I -- that's what I
2  recall.  I think we walked away knowing where they
3  came out, but I -- I could be wrong on that, but,
4  yes, it was confirmed then.  Certainly.
5         (Exhibit No. 49 was marked for
6          identification.)
7  BY MR. TISI:
8      Q    Okay.  And I'm going to hand you Exhibit
9  No. 40 -- 49.  And this is the Code of Federal
10  Regulations dated 2005.  But if you look at the
11  back, the last page with a 12 Bates stamp at the
12  end.
13      A    Okay.
14      Q    And it says the basis was the NTP
15  deferred -- do you see that "Basis for
16  nomination"?
17      A    Yes.
18      Q    It says:  "The NTP deferred
19  consideration of listing talc asbestiform and
20  non-asbestiform talc in the 10th RoC because its
21  2000 review of talc found that there's been
22  considerable confusion over the mineral nature and
23  consequences of talc, both containing asbestiform
24  fibers and not containing asbestiform fibers."
25         Do you see that?

Page 471

1      A    Yes.
2      Q    It further says:  "It became evident
3  that the literature on both forms of talc with few
4  exceptions provide inadequate characterization of
5  the adequate material under study," and you see --
6  and it just continues from there.
7         Do you see that?
8      A    Yes.
9      Q    Okay.  And so the question at that point
10  was deferred because there was a question as to
11  what was cosmetic talc.
12      A    Well, I mean this is where it was
13  withdrawn.
14      Q    No, withdrawn --
15      A    This is 2005.
16      Q    2005.  But in the basis for -- it talks
17  about what happened in the --
18      A    Oh, the deferral that they're referring
19  to, yes, correct.
20      Q    Okay.  All right.  And then in 12, in
21  the -- it was renominated in 2004, correct?
22      A    Right.
23      Q    Right.  And so I'm going to put year
24  "2004," I'm going to put "renominated NTP."  NTP.
25  My handwriting is terrible.

24  (Pages 468 to 471)

Linda Loretz, Ph.D.

Page 472

1     And -- but at that time it -- the IARC
2 had also taken up the issue, correct?
3     A   I'm not sure when I learned about IARC
4 taking up the issue, but I think they -- I mean,
5 so I'm not sure.
6     Q   Okay.  And IARC is what?
7     A   International Agency for Research on
8 Cancer.
9     Q   Is it a reputable organization?
10     A   It's an arm of the World Health
11 Organization.
12     Q   Is it one that in your view is one that
13 is -- does good science?
14     A   They have -- I mean, it's --
15     Q   You may disagree with them on occasion,
16 but do they do good science?
17     A   It's a closed process, and I think
18 they're considered reputable.  It is a very closed
19 process.
20     Q   When you say "closed," they don't have
21 people from industry who come in and -- and
22 participate, correct?
23     A   Well --
24     Q   People affiliated with industry cannot
25 sit on the panels, correct?  There are limitations

Page 473

1 into who can sit, correct?
2     MR. LOCKE:  Objection.
3     THE WITNESS:  That is true, but it's
4 also closed in the sense basically they decide on
5 a working group and that's the working group.  So
6 are those the best people always?  I mean, I think
7 there's that -- there's that question of -- you
8 know, it's like any process, it's --
9 BY MR. TISI:
10     Q   Have you ever seen an unqualified person
11 on an IARC panel?
12     A   I -- I mean, I really can't answer that.
13 You know.
14     Q   Okay.  All right.  So IARC review was in
15 2006, correct?
16     A   Yes.
17     Q   Okay.  And they considered the issue,
18 and they found that cosmetic talc would be a
19 possible carcinogen.  They looked at the evidence,
20 right?
21     MR. LOCKE:  Objection.
22     THE WITNESS:  They said limited
23 evidence.
24 BY MR. TISI:
25     Q   Okay.  But they categorized it as

Page 474

1 possible, correct?  To be.
2     A   Yes.
3     Q   Now, in 2005, you know that Dr. Muscat
4 and Huncharek were retained by Imerys and a law
5 firm to write a meta-analysis and a review paper
6 on talc, correct?
7     MR. LOCKE:  Objection.
8     THE WITNESS:  I don't think I knew that,
9 no.
10     MR. TISI:  Okay.  Let me show you what I
11 would like to have marked as Exhibit No. 50.
12     (Exhibit No. 50 was marked for
13     identification.)
14 BY MR. TISI:
15     Q   And I'm not concerned with the top
16 e-mail because that's not to you, but the bottom
17 e-mail is to you, correct?
18     A   Yes.
19     Q   Okay.  It's from Robert Glenn?
20     MR. LOCKE:  Let's let --
21     MR. TISI:  I'm going to.  I'm just going
22 to --
23     MR. LOCKE:  -- the witness just read it.
24     MR. TISI:  I'm going to have to -- I'm
25 just going to direct her to what it is before we

Page 475

1 do it, because if she didn't get it, then I'm not
2 going to go there.
3 BY MR. TISI:
4     Q   This is an e-mail to you from Robert
5 Glenn.
6     A   Okay.
7     Q   Do you see that?
8     A   Yes.
9     Q   And it's dated August 3rd, 19 -- 2005.
10     A   Okay.
11     Q   Okay.  And it's entitled "Rothman
12 Proposal for Updating CTFA Submission on Comments
13 to NTP."  Correct?
14     A   I'm sorry, where are you?
15     Q   It's the subject matter.
16     A   Yes.
17     Q   Okay.  And it's by Crowell & Moring LLP.
18 That's the law firm.
19     A   Okay.
20     Q   Do you see that?
21     A   Yes.
22     Q   So why don't you follow Mr. Locke's
23 advice and take a look at it, and I'll ask you
24 some questions.
25     A   (Peruses document.)

25 (Pages 472 to 475)

Linda Loretz, Ph.D.

Page 476

1     MR. TISI:  Actually, would this be a
2  good time for a break?
3     MS. FRAZIER:  Yes.
4     MR. TISI:  For you, I will do almost
5  anything.
6     THE VIDEOGRAPHER:  All right.  Off the
7  record, Counsel?
8     MS. FRAZIER:  Thank you.
9     THE VIDEOGRAPHER:  The time is 10:43
10 a.m.  We're going off the record.
11     (Recess.)
12     THE VIDEOGRAPHER:  The time is 10:58
13 a.m., and we are back on the record.
14 BY MR. TISI:
15    Q   Dr. Loretz, have you had an opportunity
16 to look at Exhibit No. 50, the e-mail from
17 Mr. Glenn at Crowell & Moring?
18    A   Yes.
19    Q   And Mr. Glenn worked for Crowell &
20 Moring, but you know that he's a toxicologist,
21 correct?
22    A   I probably knew that at the time.
23    Q   Okay.  And do you know that he was
24 also -- previous to working for the law firm
25 representing Imerys, do you know that he was also

Page 477

1  a prior president of the Industrial Minerals
2  Association of North America?
3     A   I don't -- that doesn't sound familiar.
4     Q   Okay.  So it talks to Mark Ellis at IMA
5  North America and to yourself.
6         And I'm interested in the first
7  paragraph.  The first paragraph says:  "As you may
8  know, we represent Luzenac America in assisting
9  them in preparation of comments to the NTP and
10 IARC regarding carcinogen classification of talc.
11 They have sponsored projects with Drs. Huncharek
12 and Muscat related to reviewing the literature on
13 talc and ovarian cancer, and conducting a
14 meta-analysis of talc and ovarian cancer."
15        Do you see that?
16    A   Yes.
17    Q   Okay.  So two different things,
18 reviewing the literature on talc and conducting a
19 meta-analysis.
20        Do you see that?
21    A   Yes.
22    Q   Okay.  It says:  "Both are nearing
23 completion, and in short, the results of the
24 meta-analysis do not find a relationship for usage
25 of talc on contraceptive diaphragms and ovarian

Page 478

1  cancer."
2         Do you see that?
3     A   Yes.
4     Q   Okay.  So it's talking about two
5  different papers, right?
6     A   Yes.
7     Q   Okay.  So does this refresh your
8  recollection as to whether or not you were aware
9  in the 2000s that Huncharek and Muscat were
10 actually consultants for the law firm representing
11 Imerys, which is -- is Luzenac.
12    A   I would say this would refresh my
13 memory, yes.
14    Q   Okay.  So we have on our chart here in
15 2005 -- 2006 is IARC review, 2005 -- and I'm going
16 to try to write real -- because on a break folks
17 told me my handwriting was abysmal.  So we have
18 "Huncharek, Muscat, two papers."  One a review
19 and, two, diaphragm.
20        Is that correct?  That's what that
21 document says?
22    A   What year are you putting that --
23    Q   2005.
24    A   Or it looks those -- yeah, I don't know
25 when -- the publication date, though.

Page 479

1     Q   Right.  The publications, actually you
2  know that they -- they actually published two
3  articles bearing on the very same topic
4  subsequently.
5     A   Yes, exactly.
6     Q   Okay.  And I'm going to identify them
7  again to put on our timeline.
8     A   Okay.
9         (Exhibit No. 51 was marked for
10        identification.)
11 BY MR. TISI:
12    Q   I'm going to attach Exhibit No. 51,
13 which is a meta-analysis on diaphragms.
14        Is that -- and that's dated 2006.  I'm
15 sorry, it's dated 2007.  Correct?
16    A   Correct.
17    Q   And I'm going to start using below the
18 line, so it's 2007.  And diaphragm publication,
19 I'll write "Huncharek and Muscat."
20        And what exhibit is that?  I wrote
21 that --
22    A   51.
23        (Exhibit No. 52 was marked for
24        identification.)
25 BY MR. TISI:

26  (Pages 476 to 479)

Linda Loretz, Ph.D.

Page 480

1    Q   Okay.  And then we have Exhibit No. 52
2  is a critical review article that they wrote.
3         And you're familiar with that article,
4  right?
5    A   Yes.
6    Q   And when I say you reviewed, you -- you
7  were familiar with it, you were familiar with it
8  at the time, right?
9    A   At the time of its --
10    Q   Publication.
11    A   I assume --
12    Q   Or shortly thereafter.
13    A   Yeah, I assume so, yes.
14    Q   So 2008, this is the critical review,
15  talc and ovarian cancer.  And this is 2008.  And
16  this is Exhibit 52.  And that's Huncharek and
17  Muscat.
18         Okay.  And so far we have Dr. Muscat
19  appearing in 2000.  Correct?
20    A   Yes.
21    Q   We have him working on papers in 2005
22  for the lawyers representing Imerys, correct?
23    A   Yes.
24    Q   Which you were aware of.
25         2007, they write a publication.  And

Page 481

1  then in 2008, they write a publication.  And
2  2009 -- '8 and '9, they're filing the petition --
3  they're drafting the response to the petition as
4  a, quote, independent review.  Right?
5    A   Yes.
6    Q   But the truth of the matter is, as we
7  showed on our timeline, is they had been a
8  consistent consultant not only for PCPC but for
9  other members of the PCPC throughout the 2000s,
10  correct?
11         MR. LOCKE:  Objection.
12         THE WITNESS:  I mean, they're -- they're
13  filing -- the filing that we did came through us.
14  That was very clear.
15  BY MR. TISI:
16    Q   Okay.  That's a different question.
17  Okay.  You identified this as an independent
18  review, right?
19    A   That -- yes.
20    Q   Okay.  But when I asked you before are
21  you sure they're independent, these -- these two
22  scientists had been paid consultants for not only
23  PCPC but the industry for at least 15 years before
24  this was filed, correct?
25         MR. LOCKE:  Objection.

Page 482

1         THE WITNESS:  And I guess I would again
2  say that independent in the sense that these are
3  their conclusions, but -- and submitted on behalf
4  of us, which was clear.
5  BY MR. TISI:
6    Q   Right.
7    A   On behalf of industry.
8    Q   But they had been long-time consultants
9  for the industry.  Correct?
10    A   They had been consulting before then,
11  yes.
12    Q   Okay.  For at least 15 -- on talc for at
13  least 15, 18 years, correct?
14         MR. LOCKE:  Objection.
15         THE WITNESS:  Where did you come up with
16  that?  2000 --
17  BY MR. TISI:
18    Q   2000 to 2008 -- I'm sorry.  2000 --
19    A   2009.
20    Q   Okay.  Let's say nine years, you're
21  right.  You're right.
22         All right.  So now let's move forward.
23  We talked about IARC.
24         So -- now, I want to again fill out the
25  timeline so the jury understands what's going on.

Page 483

1         2008, Dr. Epstein for the Cancer
2  Prevention Coalition files -- asks that warnings
3  be mandated, correct?
4    A   Correct.
5    Q   Your organization files an opposition to
6  that in July of 2009, correct?
7         MR. LOCKE:  Objection.
8         THE WITNESS:  Right.  We filed saying we
9  didn't think those warnings should be mandated.
10  BY MR. TISI:
11    Q   With the FDA.
12    A   Correct.
13    Q   Filed -- signed by Dr. Bailey, who used
14  to work at the FDA in the very division that would
15  be considering the petition, correct?
16    A   That's correct.
17    Q   Okay.  And do you know whether or not
18  any other organizations were even aware of this
19  petition to weigh in on it?  In other words, are
20  you aware of anybody else who filed a response to
21  the FDA -- I mean to the Citizen's Petition?
22    A   I may have known at the time, but I
23  don't recall now.
24         (Exhibit No. 53 was marked for
25         identification.)

27  (Pages 480 to 483)

Linda Loretz, Ph.D.

Page 484

1  BY MR. TISI:
2      Q   All right.  I went to the FDA website
3  and pulled a copy -- Exhibit 53, I pulled a copy
4  of it, and as I read it, the only comment that was
5  actually provided was by the PCPC.
6      Does that refresh your recollection?
7      A   As I say, I can't remember, but I have
8  no reason not to think that's true.
9      Q   Okay.  And just to kind of fill out a
10  timeline because I want to make it clear that I
11  don't want to hide anything from the jury here, in
12  2015, the petition was denied.
13      A   That's correct.
14      Q   So write "2005, FDA," and --
15      MR. TISI:  Do you have a copy of the
16  denial?  I'll attach that in a moment.
17  BY MR. TISI:
18      Q   And so from the outside, what the FDA
19  had before it was the Epstein petition and the
20  PCPC response.  Is that -- and then some four
21  years later or five years later, it denied the
22  petition.
23      MR. LOCKE:  Objection.
24      THE WITNESS:  Okay.
25  BY MR. TISI:

Page 485

1      Q   Is that -- is that correct?
2      MR. LOCKE:  Objection.
3      THE WITNESS:  As far as I know, yes.  As
4  I say --
5  BY MR. TISI:
6      Q   All right.  Is there anything -- do you
7  know why it took the FDA five years or six years
8  to actually act on this petition?
9      A   I don't.  I know that it typically takes
10  them years to respond to petitions, but I couldn't
11  say anything specific about this one.
12      Q   Well, petitions related to cosmetics, on
13  the scheme of things -- I mean you work with the
14  FDA, you know the FDA does a lot of different
15  things.  It deals with pharmaceutical drugs, it
16  deals with over-the-counter drugs, it deals with
17  the blood supply, it deals with a lot of different
18  things, correct?
19      A   Not the Office of Cosmetics and Colors,
20  but other parts of the FDA, sure.
21      Q   Right.  But the -- but the FDA as a --
22  as a whole -- I mean would it be fair to say that
23  on a scale of things, cosmetics are not as heavily
24  regulated or looked at as is, for example,
25  pharmaceutical drugs or over-the-counter drugs?

Page 486

1      A   That's true.
2      MR. LOCKE:  Objection.  Beyond the
3  scope.
4  BY MR. TISI:
5      Q   That's true, correct?
6      A   Yes.
7      MR. LOCKE:  Objection.
8  BY MR. TISI:
9      Q   And just for clarity of the record, the
10  denial letter from the FDA dated April 2014 -- I'm
11  sorry, it's dated 2014.
12      A   Yeah, it's '14.  I wasn't sure about
13  that.
14      Q   I stated 2015.  You know, you're
15  correct.  You're correct.  It's Exhibit No. 54.
16      (Exhibit No. 54 was marked for
17      identification.)
18  BY MR. TISI:
19      Q   Now, I want to talk about -- now that we
20  have our timeline out of the way, I want to talk
21  about the Citizen's Petition and the arguments you
22  made in them and the circumstances surrounding its
23  actual filing.  Okay?
24      A   Yes.
25      Q   Now, prior to the actual filing of

Page 487

1  the -- the opposition to this Citizen's Petition,
2  we'll just -- can I just call it "the opposition,"
3  and we know we're talking about something
4  containing the opposition to the Citizen's
5  Petition?
6      A   Yes.
7      Q   Prior to filing the PCPC's opposition in
8  July, and we looked at this earlier, you and --
9  when I say "you," I mean you personally -- you and
10  your colleagues at the PCPC and the companies
11  represented by the lawyers on this table went and
12  met with the FDA about the Citizen's Petition,
13  correct?
14      MR. LOCKE:  When?
15      THE WITNESS:  One other company as well.
16  BY MR. TISI:
17      Q   Unilever.
18      A   Unilever.
19      Q   Okay.  But certainly Johnson & Johnson
20  is by far the biggest contributor to -- in terms
21  of resources to the Talc Task Force, correct, in
22  terms of money?
23      MS. FRAZIER:  Objection.
24      MR. LOCKE:  Objection.
25      THE WITNESS:  I think what I've seen,

28 (Pages 484 to 487)

Linda Loretz, Ph.D.

| Page 488 |
|---|

1  they're the biggest contributor.
2  BY MR. TISI:
3      Q   I mean by a factor of a lot, correct?
4          MS. FRAZIER: Object to form.
5  BY MR. TISI:
6      Q   I mean, it's a big -- they're the --
7  they're the major funder of the Talc Task Force,
8  correct?
9          MS. FRAZIER: Object to form.
10          THE WITNESS: But they're not the only
11  funder.
12  BY MR. TISI:
13      Q   And in the top two or three is Imerys as
14  well, correct?
15      A   That's correct.
16      Q   Okay. So -- while there may be many
17  other members of the -- that have an interest in
18  talc, the two big gorillas in the room are J&J,
19  the manufacturer of talcum powder products like
20  Johnson & Johnson's baby powder and Shower to
21  Shower, and the mining company who provides that
22  talc for use in the product, correct?
23          MR. LOCKE: Objection.
24          MS. FRAZIER: Objection to form.
25          THE WITNESS: I mean we have --

| Page 489 |
|---|

1          THE REPORTER: Counsel, we can't hear
2  you down here.
3          MS. FRAZIER: No, it's okay. I was
4  just objecting to being called a gorilla.
5          MR. TISI: I'll call you a gorilla, but
6  let's rephrase the question. Okay?
7  BY MR. TISI:
8      Q   If you were to rank all of the -- I mean
9  I've seen lists somewhere between 20 and 30 people
10  who make or have an interest in talcum powder
11  products. Correct?
12      A   Yes.
13      Q   Okay. The major ones if you were to
14  rank them are going to be Johnson & Johnson,
15  correct?
16      A   It certainly is one of the companies
17  that has a major interest. There are other
18  companies and they get their say on calls and
19  meetings, et cetera.
20      Q   All right. Would it surprise you that
21  between the two of them, they provide -- Imerys
22  and Johnson & Johnson provide between 65 and 70
23  percent of the funding for the talc-related
24  activities of the PCPC?
25          MR. DONATH: Objection to form.

| Page 490 |
|---|

1          THE WITNESS: That sounds roughly right
2  from the numbers I've seen.
3  BY MR. TISI:
4      Q   Okay. And so the PCPC and Johnson &
5  Johnson and Imerys and Unilever went to go meet
6  with the FDA about the Citizen's Petition,
7  correct?
8      A   Yeah, I'm not sure if it was set up
9  specifically about the Citizen's Petition, but I
10  know that certainly got discussed. So yes.
11      Q   Well, we'll talk -- we're going to talk
12  about -- have you reviewed those -- those memos
13  before today?
14      A   I think I -- I reviewed the memo. I'm
15  not sure what all the discussion went into setting
16  up that meeting, but --
17      Q   Okay. Well, did you --
18      A   -- I don't disagree with that.
19      Q   But did you try to investigate that?
20  Because that's an important point. How did that
21  meeting get set up?
22      A   I know Dr. Bailey set it up.
23      Q   Dr. Bailey, the guy who used to work at
24  the division --
25      A   Correct.

| Page 491 |
|---|

1      Q   -- called the division he used to work
2  for to see if he could set up a meeting?
3      A   Yes.
4      Q   And that meeting occurred in May of
5  2009, correct?
6      A   I don't recall, but that sounds about
7  right.
8      Q   Okay. So the office -- there was a
9  meeting at the Office of Cosmetics and Colors set
10  up by Dr. Bailey who used to run that division,
11  correct?
12      A   Yes.
13      Q   And you were at that meeting?
14      A   Yes.
15      Q   And Dr. Bailey's former subordinate
16  Dr. Katz was at that meeting?
17      A   You've said she used to work for him.
18  I -- I have no reason not to believe you, but,
19  yes, she was there.
20      Q   Okay. And I'm going to attach
21  Dr. Bailey's report of that meeting, and I think
22  there's an error in it, but I'm going to correct
23  it and see if we can work through it together.
24          This is Exhibit No. 55.
25          (Exhibit No. 55 was marked for

29 (Pages 488 to 491)

Linda Loretz, Ph.D.

Page 492

1      identification.)
2  BY MR. TISI:
3      Q    And just I can correct the error so we
4  can correct it going forward.  It's from John
5  Bailey from Personal Care Council dated Monday,
6  May 11th, 2009.
7      Do you see that?
8      A    I'm sorry.  The -- oh, yes.
9      Q    The e-mail.
10     A    Right, the e-mail.
11     Q    It's to, among other things, you?
12     A    Yes.
13     Q    Okay.  And it's a -- meeting notes from
14  the meeting of the FDA on talc.
15     A    Yes.
16     Q    Okay.  And it says:  "All:  Below are my
17  attached notes from the FDA meeting on Friday."
18  Correct?
19     A    Yes.
20     Q    Okay.  And these were recounting a
21  note -- notes that happened that prior Friday,
22  correct?
23     A    Yes.
24     Q    And so the meeting with the FDA says
25  May 8th, 2008.  Do you see that?

Page 493

1      A    Yes.
2      Q    Okay.  Do you agree with me that it's
3  likely to be May 8th, 2009?
4      A    I do agree with you.
5      Q    Okay.  Okay.  And in other iterations of
6  this I see 2009, but just for the record and for
7  our timeline going back to it, the meeting
8  happened -- so I'm going to put "FDA meeting."
9  And I'm going to do that in red.
10     In 2000 -- in May of 2009, right?
11     A    Yes.
12     Q    "May '09."
13     And when I mentioned attendance for the
14  FDA, the Acting Commissioner was there.  Do you
15  see that?
16     A    Yes.
17     Q    Okay.  And the director for the Food
18  Safety and Applied Nutrition was there.  Correct?
19     A    Yes.
20     Q    But all the other people there,
21  including people that he didn't recognize, were
22  from the Office of Cosmetics and Colors?
23     A    That's what it says, yes.
24     Q    All right.  So when I asked you before
25  whether or not this was the primary -- the

Page 494

1  predominant number of people at this -- at this
2  meeting were from the office that Dr. Bailey ran,
3  the Office of Cosmetics and Colors, I was correct?
4      A    I would say you were correct, yes.
5      Q    Thank you.  I like being correct.
6      And you attended that meeting?
7      A    I did.
8      Q    Okay.  Have you seen the final -- now,
9  this is a fairly lengthy, several single-spaced
10  pages of notes about what happened at that
11  meeting?
12     A    Okay.  Yes.
13     Q    Do you see that?
14     A    Yes.
15     Q    Okay.  Have you seen the FDA version
16  of -- of that?
17     A    I think I have in my preparation for
18  this.
19     Q    Well, it says:  The action items from
20  the meeting.  "The FDA has to prepare notes of the
21  meeting."  It's at the very end, the last
22  paragraph.
23     A    Mm-hmm.
24     Q    The FDA notes I'm going to show you are
25  Exhibit 56.

Page 495

1      (Exhibit No. 56 was marked for
2      identification.)
3  BY MR. TISI:
4      Q    And the FDA meeting notes is like a
5  paragraph and two action items, correct?
6      A    Yes.
7      Q    Okay.  So the notes that we have of this
8  meeting are much more fulsome as recorded by
9  Dr. Bailey?
10     A    Yes.
11     Q    There's a lot more detail in them.
12     A    So it appears, yes.
13     Q    Okay.  And I asked you before whether or
14  not the purpose of this meeting was to discuss the
15  Citizen's Petition.  Do you remember that?
16     A    Yes.
17     Q    Okay.  And the first bullet point, it
18  says:  "A petition has been submitted by the FDA
19  requesting a warning and hearing."
20     Do you see that?
21     A    Yes.
22     Q    And the first paragraph, full paragraph
23  says:  "Dr. Katz opened the meeting."
24     And Dr. Katz at that point was the
25  director of the FDA Division of Cosmetics and

Linda Loretz, Ph.D.

Page 496

```
 1    Colors at that point, correct?
 2         A   Yes.
 3         Q   Okay.  By saying that:  "Counsel had
 4    requested the meeting, but she wanted to make the
 5    point that the FDA would not talk about the
 6    Citizen's Petition on talc as it was still under
 7    review."
 8             Do you see that?
 9         A   Actually, I'm sorry, where are you
10    exactly?  Oh, there we go.  Okay.
11         Q   Do you see that?
12         A   Yes.
13         Q   Okay.  Do you remember that
14    specifically, that she started out saying, you
15    know, Great you're all here, but we don't want to
16    discuss the Citizen's Petition?
17         A   I don't remember it, but I -- I accept
18    that is what happened.
19         Q   Okay.  But then Dr. Bailey corrected
20    her, and said -- "Dr. Bailey pointed out the
21    agenda that was provided was to discuss the
22    information related in the petition."
23             MR. LOCKE:  Objection.
24    BY MR. TISI:
25         Q   Correct?
```

Page 497

```
 1             MR. LOCKE:  Objection to form.
 2             THE WITNESS:  Well, that's what it says,
 3    yes.
 4    BY MR. TISI:
 5         Q   All right.  And in fact, you brought
 6    with you Dr. Muscat and Dr. Huncharek's
 7    opposition, the opposition that had not yet been
 8    filed?
 9         A   It was -- right, it was talked about.
10         Q   It was talked about, and it was
11    summarized for the FDA?
12         A   Yes, that's what it says.
13         Q   So the FDA says, We're not going to talk
14    about it, but then talked about it.
15             MR. LOCKE:  Objection.
16             THE WITNESS:  Well, it says that she
17    then -- Dr. Katz then clarified to say that you
18    can talk about it, but we're not going to discuss
19    its status.
20    BY MR. TISI:
21         Q   Okay.  So my question to you is, was
22    anybody from the --
23             Now, this meeting was set up by the --
24    by Dr. Bailey at the PCPC, correct?
25         A   Yes.  Or requested, yes.
```

Page 498

```
 1         Q   It was requested.  An agenda was
 2    provided to the FDA, correct?
 3         A   I think that's what it says.  I don't
 4    recall that, but --
 5         Q   Have you seen the agenda in connection
 6    with your preparation today?
 7         A   I don't think so.
 8         Q   Okay.  I didn't see it either.  It might
 9    be -- it might be around, but I just -- maybe I
10    just didn't see it.
11             Was anyone -- since the agenda, as
12    Dr. Bailey pointed out, was -- involved the
13    Citizen's Petition, right?
14         A   That's what it says, yes.
15         Q   I'm curious.  Did Dr. Bailey propose
16    that the guy who wrote the Citizen's Petition be
17    invited to the meeting?
18         A   I don't believe so, no.
19         Q   Do you know whether or not Dr. Epstein
20    or the -- any of the members of the American --
21    the Cancer Prevention Coalition were asked to
22    attend the meeting by the FDA or suggested by
23    PCPC?
24         A   Not that I'm aware.
25         Q   I mean you are interested in a fulsome
```

Page 499

```
 1    discussion of the science, right?
 2         A   I -- I think for this meeting we were --
 3    well, I guess the notes speak for themselves.
 4         Q   Well -- okay.  My question was, you've
 5    talked to me before -- you said before when I was
 6    asking you questions about this petition, you
 7    said, Well, we didn't think the science supported
 8    it.  Correct?
 9         A   Support the need for a warning, yes.
10         Q   Right.  But we all agreed that there was
11    a -- a debate in the medical and scientific
12    community about what the science meant, correct?
13         A   Yes.
14         Q   And that had been going on for decades,
15    correct?
16         A   Yes.
17         Q   Okay.  And you had a definite point of
18    view on the issue, correct?
19         A   Yes.
20         Q   On behalf of your members, right?
21         A   Yes.
22         Q   And somebody who had a different point
23    of view presented a petition to the FDA.  Correct?
24         A   Yes.
25         Q   And you asked for a meeting at the FDA
```

31 (Pages 496 to 499)

Linda Loretz, Ph.D.

Page 500

1    to discuss, among other things, that petition,
2    correct?
3        A    Yes.
4        Q    And you actually submitted an agenda.
5    True?
6        A    That's what it says.
7        Q    And the agenda was clear that you wanted
8    to discuss the petition, correct?
9        A    I would assume so based on what this
10   says on the subject matter.
11       Q    And you walked in prepared to discuss
12   the petition.  You even brought with you
13   Dr. Muscat and Dr. Huncharek's commissioned work
14   on behalf of the industry, correct?
15       A    That seems to be what it says, yes.
16       Q    And -- well, it's not only what it says,
17   it happened, correct?
18       A    Yes.
19       Q    And when you're testifying about PCPC --
20       A    Yes.
21       Q    -- this is one of the topics you were
22   prepared to talk about.
23       A    Okay.
24       Q    Right?
25       A    Yes.

Page 501

1        Q    So you walk in there, and did you say to
2    them, You know, we really want -- this is an
3    important issue, because we agreed that it's an
4    important issue.  Ovarian cancer and talc was an
5    important issue, right?
6        A    Yes.
7        Q    Did you say to them, You know, why don't
8    we get Dr. Epstein to come to this meeting so we
9    can have a fulsome discussion of the pros and cons
10   of what the science means?
11       A    I -- I think this was not a meeting
12   where that was -- this was not that meeting.  I
13   mean we knew where Dr. Epstein stood.
14       Q    Well, they knew where you stood too,
15   but you --
16       A    Right.
17       Q    -- you accepted a meeting anyway or you
18   asked for a meeting anyway to discuss the issues,
19   right?
20       A    Yes.
21            MR. LOCKE:  Objection.  Form.
22            THE WITNESS:  And they could have said
23   no, but they were willing to meet with us.
24   BY MR. TISI:
25       Q    The were willing to meet with you, but

Page 502

1    if you were really interested in the scientific
2    question, why not invite the -- why not say, Maybe
3    we should have Dr. Epstein come?
4        A    I think we knew where Dr. Epstein stood,
5    and we disagreed with him.
6        Q    Right.  So why not have him come to
7    present his position?
8        A    I don't think this was the meeting for
9    that.
10       Q    Okay.  And -- the FDA initially
11   expressed its reservation about the meeting,
12   correct?
13            MR. LOCKE:  Objection.
14   BY MR. TISI:
15       Q    It said -- it said -- initially said
16   that they didn't want to talk about the pending
17   Citizen's Petition, correct?
18            MR. LOCKE:  Objection.
19            THE WITNESS:  And then said that you can
20   talk to us, but we're not going to talk about --
21   BY MR. TISI:
22       Q    Because you were already there.
23       A    Well, they accepted the meeting, though.
24   So if there really was an agenda that -- I'm
25   sure it would have shown that, and they could have

Page 503

1    said -- I mean they would have asked what -- what
2    did we want to talk about.
3        Q    Right.  But the first sentence here
4    indicates a little bit of interpreting it fairly,
5    a little bit initial hesitation --
6        A    Sure.
7        Q    -- by the FDA to discussing a petition
8    with only one party there and without the other.
9    True?
10       A    Well --
11            MR. LOCKE:  Objection.
12   BY MR. TISI:
13       Q    True?
14            MR. LOCKE:  Objection.
15            THE WITNESS:  It's under advisement.  I
16   don't know if it's because --
17   BY MR. TISI:
18       Q    I got -- we got to get the objection in,
19   and then you got to answer.
20       A    Sorry.
21       Q    I'm sorry.  Go ahead.  I'm sorry.
22       A    Just I don't know that -- I think
23   probably their normal policy is they're not going
24   to talk about things that are under advisement.
25   So I don't know that it's because the other party

32  (Pages 500 to 503)

Linda Loretz, Ph.D.

Page 504

1  wasn't there or it's just -- we're working this
2  through, so we're not going to -- we're not going
3  to give you -- tell you where we stand right now.
4  You can talk to us.
5          And then later on she asked that we
6  submit, formally submit our information, which we
7  did.
8      Q    All right.  And asked you some follow-up
9  questions, true?
10     A    Yes.
11     Q    Okay.  Which you did?
12     A    Yes.
13     Q    Do you know whether or not the FDA ever
14  reached out to Dr. -- Dr. Epstein or anybody else
15  to say, Look, you know, we would like to get your
16  further input.  We met with -- with the industry
17  and their trade organization.  They raised some
18  issues about dose response, about contamination
19  with talc, about bio -- with asbestos, about
20  biologic plausibility, about all the issues that
21  were in the Citizen's Petition.  What is your
22  response to that?
23         Do you know if that was ever done by the
24  FDA?
25     A    I think some of reaching out to us, and

Page 505

1  the follow-up questions were ones that were
2  specific to industry, how do you source talc, that
3  kind of thing.  So -- so certainly that -- we have
4  to be the audience for that.
5      Q    Right.  My question is, do you know
6  whether or not in the four or five years between
7  the time that you all were meeting with the FDA
8  and the time they ultimately came down with a
9  conclusion, that anybody from the FDA ever reached
10  out to anybody on the other side of the debate and
11  said, Now we've heard from industry, we met with
12  J&J, we met with Imerys, we had Unilever there, we
13  had PCPC there.  We have some questions as to what
14  this data means too.  What is your response to
15  that?
16         Do you know whether that ever happened?
17     A    No.  But I would say their petition kind
18  of speaks, and then we have a response, and then
19  again some -- a lot of the industry questions were
20  regarding sourcing, the kind of things that were
21  real industry-only questions.
22     Q    But your petition spoke too, right?  You
23  had a -- you put a 30-page response --
24     A    Oh yes.
25     Q    -- by Huncharek and Muscat.

Page 506

1      A    Yes.
2      Q    Okay.  But you wanted to actually get in
3  the room and actually speak with them, right?
4      A    Yes.
5      Q    Okay.  You know, because -- because this
6  was important to your members, right?
7      A    Yes.
8      Q    Okay.  The American Cancer Coalition was
9  representing consumers, right?
10         MR. LOCKE:  Objection.
11  BY MR. TISI:
12     Q    Patients?
13         MR. LOCKE:  Objection.
14         THE WITNESS:  I'm not sure who they
15  represent, but -- yes.
16  BY MR. TISI:
17     Q    Was there anybody in that room on May 8,
18  2009, that represented patients, doctors,
19  consumers?
20         MR. LOCKE:  Other than the FDA?
21         THE WITNESS:  I was going to say the
22  Commissioner of the FDA, I would --
23  BY MR. TISI:
24     Q    I'm asking you other than the -- the FDA
25  was trying to decide a question.  Correct?

Page 507

1      A    Yes.
2      Q    A scientific question.  Right?
3      A    Yes.
4      Q    In fact, Dr. -- in here Dr. -- the
5  Acting Commissioner said --
6      A    Sharfstein.
7      Q    -- said he had only heard it because of
8  some Korean issue, Korean talc sourcing, correct?
9         MR. LOCKE:  Objection.
10         THE WITNESS:  I think that's in the
11  minutes.
12  BY MR. TISI:
13     Q    Right.  It was clear to you that -- that
14  they had not been really focused -- at least the
15  Commission had not really been focused on the
16  issue, correct?
17         MR. LOCKE:  You mean the Commissioner?
18         MR. TISI:  I'm asking the Commissioner.
19  BY MR. TISI:
20     Q    You were providing a lot of information
21  that they did not have.
22     A    Again, a lot --
23         MR. LOCKE:  Objection.
24         THE WITNESS:  -- of our information -- I
25  think their questions regarded, again industry,

33 (Pages 504 to 507)

Linda Loretz, Ph.D.

Page 508

1  again sourcing, how do you --
2  BY MR. TISI:
3       Q   That came up too.
4       A   Right, and that's -- you know, that's
5  not a question --
6       Q   But you came in with the epidemiology --
7  the first paragraphs here deal with the
8  epidemiology.
9          For example, it says:  "The Council
10 submission and the -- and the Citizen's Petition
11 were briefly summarized.  The response was
12 prepared by two epidemiologists, Dr. Michael
13 Huncharek and Dr. Muscat, with a cover letter from
14 the Council.  In their document Huskarek --
15 Huncharek and Muscat provide a summary of each of
16 the 12 publications cited in the petition."
17         Do you see all that?
18      A   Yes.
19      Q   "It was noted that half the publications
20 are either reviews or do not provide new data or
21 address aspects of ovarian cancer or talc but do
22 not provide a link between the two.  The
23 submission then provides an overall summary of
24 epidemiology relating to talc and ovarian cancer,
25 noting that the excess risk is small and often not

Page 509

1  statistically significant, overall lacks
2  dose-response relationship, or in some cases shows
3  an inverse dose-response relationship, lacks a
4  biological plausible mechanism, and that the
5  exposure data is limited."
6          There was a discussion of all that
7  stuff, right?
8       A   I'm not sure there was a discussion.  I
9  think, as I say, she -- it looks like Dr. Katz
10 said, You can tell us -- you can talk to us, but
11 we're really not going to engage in a discussion.
12         We gave this overall summary, and her
13 response was, Well, submit it, and then we can
14 consider it fully.
15      Q   Right.  But you were in the room and
16 Drs. Epstein and no other doctor who thought on
17 the other side of this debate was in the room.
18         MR. LOCKE:  Objection.
19 BY MR. TISI:
20      Q   Correct?
21      A   That's correct.
22      Q   Okay.  And also in the room was your
23 senior scientific person who knew all of the
24 people who he -- or most of the people at the
25 Office of Colors and Cosmetics with whom he

Page 510

1  previously worked, correct?
2       A   That's true.
3       Q   In fact, that's why you hired him,
4  right?  You hired him because of experience with
5  this particular department.
6       A   We hired him because of his -- I mean,
7  obviously the fact that he had FDA background
8  was -- was considered a good thing.
9       Q   In this department, correct?
10      A   Yes.
11      Q   And you hired him knowing full well that
12 talc was a very important issue that was coming --
13 what that might be dealt with by this department,
14 correct?
15         MR. LOCKE:  Objection.
16         THE WITNESS:  As far as I know, and I
17 had nothing to do with the hiring of Dr. Bailey,
18 it wasn't about a specific issue at all.  It
19 was -- I mean, the general fact was he had a
20 wonderful background with FDA and cosmetics, and
21 that made him a valuable employee to the Council,
22 to CTFA.
23 BY MR. TISI:
24      Q   Now, do you know whether or not prior to
25 this meeting --

Page 511

1       A   This meeting.
2       Q   This meeting, May 9th -- May 8th --
3       A   2009.
4       Q   -- 2009.
5          This was a formal meeting that was set
6  up by Dr. Bailey.  Correct?
7       A   I think you would call it that.
8       Q   Do you know whether this meeting was
9  posted to the website so that other people could
10 know it was happening, like the American -- the
11 Cancer Prevention Coalition?
12      A   I don't know.
13      Q   So they -- they wouldn't even know it
14 was happening so they could say, Hey, we'd like to
15 be in -- we'd like to be in the room?
16         MR. LOCKE:  Objection.
17 BY MR. TISI:
18      Q   Right?
19      A   Again, I don't know if it was posted.  I
20 really don't know.
21      Q   Do you know whether there were any
22 communications with the FDA about this issue
23 before this May meeting?
24      A   I'm not aware.
25      Q   Have you seen any documents that refer

34  (Pages 508 to 511)

Linda Loretz, Ph.D.

Page 512

1    to a call that was made, conversations that had
2    been had?
3        A   From -- related to the petition?
4        Q   Mm-hmm.
5        A   Sometime between when it was filed
6    and --
7        Q   Mm-hmm.
8        A   You can refresh my memory, but
9    nothing -- I'm not thinking of anything, no.
10       (Exhibit No. 57 was marked for
11       identification.)
12   BY MR. TISI:
13       Q   Let me show you Exhibit No. 57.
14       This is not a PCPC document.  I'm seeing
15   whether this refreshes your recollection.
16       Now, at the very bottom, and I -- I'm
17   going to ask you to read it, but I'm just going to
18   kind of set the table for you.
19       A   Very bottom of the second page?
20       Q   So first page.
21       A   Okay.
22       Q   There's an e-mail from Craig Bernard to
23   Mark Zamek at J&J -- I mean at Rio Tinto.  And Rio
24   Tinto is -- is Imerys as well, correct?
25       A   I believe so, yes.

Page 513

1        Q   And it's referring to a meeting with
2    J&J.  Do you see that?
3        A   Yes.
4        Q   Okay.  If you would read it to yourself,
5    please, and then we can --
6        A   Mm-hmm.
7        Q   -- we can go off the record if you want.
8    It doesn't matter to me, but you can read it to
9    yourself.
10       MR. TISI:  We can go off the record.
11       MR. LOCKE:  No.  Let's stay on the
12   record.
13       MR. TISI:  Okay.
14       THE WITNESS:  (Peruses document.)
15   BY MR. TISI:
16       Q   I'm really going to ask you about that
17   first big paragraph.
18       A   Okay.
19       Q   Okay.  First of all, the subject matter
20   is "Meeting with J&J," correct?
21       A   Yes.
22       Q   Okay.  And the first sentence says:
23   "You'll recall a couple of months ago we met with
24   a guy Bob Katsiouleris' office, and spoke about
25   the Citizen's Petition with the FDA that is

Page 514

1    requesting to have a warning label placed on
2    products containing" -- there is no word, but I
3    think it's --
4        A   Right.
5        Q   -- involving talc.
6        A   Right.
7        Q   "Here is an update on that activity.
8    Kathy Wille of J&J informed me that at a recent
9    science meeting in Washington, D.C., she had a
10   side conversation with a key figure from the FDA
11   cosmetic group responsible for responding to the
12   Citizen's Petition.  He indicated that the FDA
13   would rule against the petition and would
14   require -- would not require warning labels on
15   cosmetic products, but the FDA is looking for
16   scientific support from industry that would help
17   justify their position.  She suggested that there
18   be a collective group working to have comments
19   submitted to the FDA.  Principal among these
20   efforts will be comments that Dr. Muscat and
21   Huncharek are co-developing.
22       "In order to orchestrate the completion
23   of these comments, I have been asked by J&J to
24   meet with them, along with Muscat and Huncharek,
25   at their headquarters in New Jersey on Wednesday,

Page 515

1    November 19th, in order to review the comments
2    before being provided to Personal Care Products
3    Council."
4        Do you see that?
5        A   Yes.
6        Q   Okay.  I read that correctly, right?
7        A   I believe so, yes.
8        Q   All right.  This would suggest that
9    there was another informal contact with the office
10   of colors, fragrance and -- I'm sorry.  I'm
11   blanking.  Office of --
12       A   Cosmetic and Colors.
13       Q   -- Cosmetics and Colors.
14       Are you aware of it?  Does this refresh
15   your recollection?
16       MR. LOCKE:  Objection.
17   BY MR. TISI:
18       Q   Does this refresh your recollection?
19       A   No.
20       Q   If there was a side conversation about a
21   Citizen's Petition, in your experience being a
22   liaison with the FDA, would that be inappropriate?
23       MR. LOCKE:  Objection.
24       MS. FRAZIER:  Object to form.
25       MR. LOCKE:  Beyond the scope.

35 (Pages 512 to 515)

Linda Loretz, Ph.D.

Page 516

1    THE WITNESS:  I -- I mean I'm not a
2  liaison with the FDA.  I -- I don't know if this
3  is referring to the meeting that we had with the
4  FDA or a different meeting.
5  BY MR. TISI:
6    Q   Well, the date -- the date of it is
7  November 3rd, 2008, so this would have been a good
8  six months before your meeting --
9    A   Oh, okay.
10    Q   -- with the FDA.
11    A   Oh, I'm sorry.
12    I -- I mean I just can't comment on
13  this.  I don't know if this happened.  I don't
14  know if it was -- you know, if it's characterized
15  correctly.
16    Q   Well, I'm going to ask you this
17  question.  You don't have knowledge of it, I
18  accept you at your word.
19    If this happened, in your experience
20  having side conversations with FDA people about
21  issues that are pending before the FDA, is that
22  appropriate?
23    MR. LOCKE:  Objection.
24    MS. FRAZIER:  Object to form.
25    MR. LOCKE:  And beyond the scope.

Page 517

1    THE WITNESS:  I can't imagine an FDA
2  person saying something like -- I mean that would
3  seem to me --
4  BY MR. TISI:
5    Q   Wrong.
6    A   -- nothing I've ever seen.
7    Q   And it would be wrong, right?
8    MR. LOCKE:  Objection.
9    MS. FRAZIER:  Object to form.
10    MR. LOCKE:  Beyond the scope.
11    THE WITNESS:  Again, I don't know if
12  this is properly characterized or under- -- what
13  the understanding was.
14  BY MR. TISI:
15    Q   Okay.  All right.  Now, before we
16  discuss the FDA meeting any further from May of
17  2009, and the industry interpretation of evidence
18  actually filed in the white paper, when -- let's
19  talk about what happened before.
20    The petition was filed in the spring of
21  2008.  Do you know when it was that Dr. Bailey was
22  first contacted by J&S to participate in this
23  process?
24    MR. LOCKE:  Objection to form.
25    THE WITNESS:  I don't.  I mean, I think

Page 518

1  it was fairly late -- I mean, I think it was
2  reasonably close to when the comments were
3  submitted.
4  BY MR. TISI:
5    Q   Do you know?
6    A   No.
7    Q   Did you investigate that?
8    I mean, one of the categories very
9  specific in our notice of deposition were the
10  circumstances surrounding the Citizen's Petition.
11  Did you -- that's why I asked you in the early --
12    A   Mm-hmm.
13    Q   Did you interview or look specifically
14  at the notes pertaining to the Citizen's Petition
15  and perhaps speak to Dr. Bailey about what
16  happened?
17    A   Did I speak to him at the time?
18    MR. LOCKE:  Objection.  It's a compound
19  question.
20  BY MR. TISI:
21    Q   Okay.  Did you review all the documents
22  at your possession relating to the preparation of
23  the Citizen's Petition?
24    A   In preparation for this?
25    Q   Yes.

Page 519

1    A   I'm not sure.
2    Q   All right.  Did you ask to see the notes
3  from the other defendants that might help you
4  understand better what PCPC's role with respect to
5  the Citizen's Petition was?
6    A   No.
7    Q   Okay.  This is --
8    MR. LOCKE:  Let me just -- I want to
9  clarify, to the extent they were produced.
10  BY MR. TISI:
11    Q   Okay.  Like, for example, that one that
12  we just showed involved the Citizen's Petition.
13  Had you ever seen that before?
14    A   I -- no.
15    Q   Okay.  Did you speak to -- I mean the
16  two people that were involved in the process, as
17  best as I can tell, from PCPC were you and
18  Dr. Bailey.  Right?
19    A   That's probably correct, yes.
20    Q   Did you speak to Dr. Bailey?
21    A   No.
22    Q   So you don't know what -- what
23  communications he had, do you?
24    A   I --
25    MR. LOCKE:  Objection.

36 (Pages 516 to 519)

Linda Loretz, Ph.D.

Page 520

1    THE WITNESS: I can tell you what I
2  think my recollection is, that this was not a
3  longstanding thing.  This was a -- J&J had -- had
4  worked on having a -- Drs. Muscat and Huncharek
5  prepare a review, a current review of the
6  literature, and thought that that would be
7  appropriate to submit.  And I suspect that all
8  happened fairly soon before we actually submitted
9  it.
10 BY MR. TISI:
11   Q   Now, prior to this you had fairly
12 consistent -- on this issue, you were -- as best I
13 can tell from looking at the overall records that
14 were produced in this case, and you can correct me
15 if I'm wrong, as I look at the decade or so prior
16 to this, you were the primary contact on this
17 issue.
18   A   I would say myself and Dr. McEwen.
19   Q   Okay.  Dr. Bailey really wasn't hands on
20 with this issue over the -- as compared to you,
21 correct?
22   A   Well, I guess I think our -- you know,
23 our biggest involvement, PCPC's biggest
24 involvement, biggest effort related to NTP, and
25 Dr. Bailey wasn't there at the time.

Page 521

1    Q   Okay.  And the Citizen's Petition as
2  well.
3    A   Right, but it -- it wasn't -- we weren't
4  doing multiple submissions and presenting at
5  meetings, and that sort of stuff.  So it was --
6    Q   Right.  But in terms of -- and, you
7  know, we looked at examples here, but, you know,
8  you were kept up to date on the IARC issues, you
9  had been communicating with Bob Glenn at -- at --
10 I mean I've seen a bunch of them, I could pull
11 them out for you.
12        But to the extent that the -- the other
13 defendants in this case, J&J and Imerys, were
14 contacting PCPC about issues related to talc, you
15 were prime -- the primary person that would be
16 their liaison.
17   A   Probably.  That's probably true.
18   Q   Okay.  Until the Citizen's Petition
19 was -- was filed, do you know that they
20 contacted -- they wanted to contact Dr. Bailey?
21      MR. LOCKE:  Objection.
22      THE WITNESS:  No, I didn't.
23      (Exhibit No. 58 was marked for
24      identification.)
25 BY MR. TISI:

Page 522

1    Q   So let me show you an e-mail dated --
2  58, this is May 2008, right after the Citizen's
3  Petition was filed.  It's an internal -- this
4  would have been a whole year before the meeting at
5  the -- at the FDA.
6        And from Kathleen Wille, and it's an
7  internal document.  I don't expect that you would
8  have seen it in realtime.  But it's talking about
9  the Citizen's Petition and the next steps.
10       Do you see it?
11   A   I'm just reading through now.
12       (Peruses document.)  Okay.
13   Q   Okay.  And so just as you read this,
14 what's happening is the Citizen's Petition is
15 filed by Dr. Epstein, and there's kind of a
16 mobilization of effort in -- in how to respond to
17 that, and it's entitled "Next Steps."  Do you see
18 that?
19   A   I'm not sure where --
20   Q   Second page.
21   A   Yes.
22   Q   Okay.  And underneath that, one of the
23 things they -- two things -- there are three
24 things they identify.  Secure funding and engage
25 experts, and that would be Huncharek and Muscat

Page 523

1  that's named here, and PCPC ultimately paid for
2  that, right?
3    A   Yes.
4    Q   Okay.  Number 2, "Engage internal
5  stakeholders."  Do you know whether or not any
6  public relations people were -- were contacted in
7  connection with the Citizen's Petition?
8    A   I'm not aware --
9        MR. LOCKE:  Objection.  You're referring
10 to J&J -- you're asking the witness about J&J?
11       MR. TISI:  No, I did not.
12 BY MR. TISI:
13   Q   I asked, are you aware of any public
14 relations people for anybody that was contacted in
15 connection with this Citizen's Petition?
16   A   I guess I could only answer for PCPC,
17 and I'm not aware of any.
18   Q   Okay.  But the third is what I'm most
19 interested in, "Determine level of external
20 support."
21       The first is John Bailey.  It says:
22 "John Bailey of the Personal Care Products Council
23 is out of the office until the next week,
24 June 2nd.  We will ascertain their plans to
25 respond."

37 (Pages 520 to 523)

Linda Loretz, Ph.D.

Page 524

1      Do you see that?
2    A  Yes.
3    Q  Okay. It didn't say, We're contacting
4  Linda Loretz, are they?
5    A  That might be because it's Kathy Wille.
6  I mean it just kind of depends who within
7  Johnson & Johnson is -- is responding.
8    Q  So do you know whether or not in this
9  time frame -- this is a full year before the
10 meeting, more than -- with the FDA and more than a
11 year before the formal response was filed in July
12 of 2009.
13      Do you know whether or not at this time
14 frame, J&J had been able to contact Dr. Bailey,
15 who again had been the prior director of the
16 division?
17    A  Yeah, I don't know what discussions went
18 on with --
19    Q  I don't mean to be factitious about it,
20 but wouldn't it make sense to actually -- if you
21 are here to testify on that issue, to actually
22 speak to Dr. Bailey --
23      MR. LOCKE: Objection.
24 BY MR. TISI:
25    Q  -- about that issue?

Page 525

1      MR. LOCKE: Objection.
2      By the way, it also says, "We will then
3  ascertain their plans."
4      MR. TISI: I understand.
5      THE WITNESS: I mean, I don't think we
6  did anything on the petition until later, so I
7  kind of read into that that there was not a lot
8  going on at this point.
9  BY MR. TISI:
10   Q  Well, there was -- there's a couple of
11 things, right, that could go on? Number one is
12 actually responding to the petition. Number two
13 could actually be speaking to the FDA.
14      Do you know whether or not in this time
15 frame Dr. Bailey had spoken to anybody at the FDA?
16   A  I'm not aware that he had.
17   Q  And you've never taken the time
18 before -- before today, and we've had -- this is
19 the second day of deposition. You've had
20 depositions in other cases. You've never spoken
21 to him about this issue?
22   A  No.
23      MR. LOCKE: You're welcome to show her a
24 document if it -- can refresh her recollection.
25      MR. TISI: I'm sure I know the rules,

Page 526

1  Counsel.
2      MR. LOCKE: Okay, good.
3  BY MR. TISI:
4    Q  Tell me everything that you know
5  happened with respect to the development of the
6  response to the Citizen's Petition.
7      I know you said it was initiated by J&J.
8  Do you know that Imerys had some input -- we saw a
9  meeting that -- with Drs. Huncharek and Muscat
10 and -- and Imerys in November. Were you at that
11 meeting?
12   A  No.
13   Q  You know -- did you know it happened?
14   A  I don't believe so. If I -- I don't
15 recall it, no.
16   Q  Were you given an opportunity to review
17 the -- the Citizen's Petition that was actually
18 filed on -- on PCPC's behalf?
19   A  I -- I'm sure I was in the sense that
20 obviously if it was something we have had an issue
21 with, we wouldn't have submitted it. So I'm going
22 to say yes.
23   Q  And so when you say it was -- it was
24 drafted by somebody else, it went out under PCPC's
25 name, and to the extent that you're here as a

Page 527

1  representative of PCPC, you agree with everything
2  that's in that document.
3      MR. LOCKE: Objection.
4      THE WITNESS: What I'm saying is -- when
5  you say "drafted by somebody else," I mean it was
6  drafted by epidemiologists. So --
7  BY MR. TISI:
8    Q  Right. With the input of Imerys and
9  J&J, correct?
10   A  Well, I think -- I mean they're speaking
11 for themselves.
12   Q  But -- but --
13   A  I take that at face value.
14   Q  But the report was actually --
15      MR. LOCKE: Let her finish her answer,
16 please.
17 BY MR. TISI:
18   Q  You don't know what happened at the
19 meeting in -- in November when -- when Dr. Muscat
20 and Huncharek went to Skillman, New Jersey, and
21 met with J&J and Imerys, correct?
22   A  Because I wasn't there. I mean, I can
23 read the -- the submission. So --
24   Q  Right. And you don't know what edits
25 were made to the original document, do you?

38 (Pages 524 to 527)

Linda Loretz, Ph.D.

Page 528

1        MS. FRAZIER:  Object to form.
2        THE WITNESS:  No.
3  BY MR. TISI:
4        Q    And when a -- when a company -- I mean,
5  when a company commissions a report like this,
6  doesn't the company usually reserve the right to
7  review it and make comments and edits before it's
8  submitted?
9        MR. LOCKE:  Objection.  Beyond the
10  scope.
11  BY MR. TISI:
12        Q    Typically?
13        A    I mean that --
14        MR. LOCKE:  Objection.
15        THE WITNESS:  -- that brings up like us
16  doing that, PCPC, you know, talc, other topics,
17  whatever, and yes, but I think when you're hiring
18  reputable people, they're not going to let you
19  change their conclusions.  I mean, you might have
20  edits, typos, clarity needed.  I mean...
21  BY MR. TISI:
22        Q    Right.  Focus.
23        A    Yeah.
24        Q    Right.  But -- but -- I mean that
25  presumes that these are reputable people in part,

Page 529

1  don't you think?
2        MR. LOCKE:  Objection.
3        THE WITNESS:  It does.
4  BY MR. TISI:
5        Q    Did you -- did you do -- I mean that's
6  why I brought the brochure out there.  You didn't
7  do any due diligence as to who these people were
8  and what their stake was in this issue, did you?
9        MR. LOCKE:  Objection.  Mischaracterizes
10  testimony.
11        THE WITNESS:  Yeah.
12        MR. TISI:  Whose testimony?
13        MR. LOCKE:  Hers.
14  BY MR. TISI:
15        Q    Did you do any due diligence into who
16  Meta-Analysis Research Group is and to where they
17  got their major funding?
18        MR. LOCKE:  Objection.  Asked and
19  answered.  We've covered this.
20  BY MR. TISI:
21        Q    Did you do it?
22        A    We had worked with Dr. Muscat before.
23        Q    I -- I didn't ask you that question.
24  This was written on behalf of Meta-Analysis
25  Research Group, correct?  It's got the big logo

Page 530

1  that says "Meta-Analysis Research Group" across
2  the top, right?
3        A    Yes.
4        Q    Okay.  Did you do any due diligence as
5  to -- as to who Meta-Analysis Research Group was?
6        MR. LOCKE:  Objection.  Asked and
7  answered.
8        THE WITNESS:  We put faith in the
9  epidemiologists as knowledgeable epidemiologists.
10  BY MR. TISI:
11        Q    Okay.  Without doing your due diligence.
12        MR. LOCKE:  Objection.
13  BY MR. TISI:
14        Q    You did not investigate Dr. Huncharek
15  and Muscat and what their relationship was, where
16  their funding came from, and how much time they
17  spent on these issues, did you?
18        MR. LOCKE:  Objection.  Mischaracterizes
19  testimony, asked and answered.
20        THE WITNESS:  We accepted them because
21  of their epidemiology expertise.
22  BY MR. TISI:
23        Q    Did you have an opportunity to review
24  this before it went in?
25        A    As I say, I'm sure I did.

Page 531

1        Q    Okay.  Have you had any -- do you have
2  any dispute that this is PCPC's response, that
3  PCPC agrees with the content?
4        MR. LOCKE:  Objection.  Asked and
5  answered.  The witness testified it was submitted
6  by the two epidemiologists.
7        MR. TISI:  I -- I'm not going to ask you
8  to characterize it.  Your not under oath, Counsel.
9  I appreciate you schooling me, but honestly.
10  BY MR. TISI:
11        Q    Is this PCPC's document?
12        MR. LOCKE:  We're just going to stick
13  with the prior answer then.
14  BY MR. TISI:
15        Q    Is this PCPC's document?
16        MR. LOCKE:  Objection.  Asked and
17  answered.  Let's move on.
18        MR. TISI:  No, we're not moving on.  I
19  want an answer to that question.
20        MR. LOCKE:  You've answered -- she's
21  answered it three times.
22  BY MR. TISI:
23        Q    Do you -- do you -- is this PCPC's -- I
24  mean, for example, we read a sentence at the very
25  beginning in the Introduction section that says,

39 (Pages 528 to 531)

Linda Loretz, Ph.D.

Page 532

1    We --
2         MR. LOCKE:  You're talking about the
3    instruction that was written by the two
4    scientists?
5         MR. TISI:  The -- I don't know if that's
6    written by the two scientists.  That's my
7    question.
8         MR. LOCKE:  Well, it says "prepared" --
9         MR. TISI:  Honestly, Counsel.
10        MR. LOCKE:  No, honestly.
11        MR. TISI:  Honestly, I'm asking the
12   question.  Okay.  There's been a lot of
13   ghostwriting in this case.
14        MR. LOCKE:  Objection.
15   BY MR. TISI:
16   Q    "Given the multiple implications of such
17   warnings, the Personal Care Products Council
18   sought an evaluation of the validity of the
19   scientific facts underlying this request."  Right?
20        Do you know whether or not this
21   document, Exhibit No. 20 -- 43, is the report
22   submitted by PCPC and it is PCPC's position,
23   correct?
24        MR. LOCKE:  Objection.  Compound
25   question.

Page 533

1         THE WITNESS:  I believe this is the
2    document we submitted.
3    BY MR. TISI:
4    Q    Okay.  All right.  Let's talk about it
5    for a moment.
6         The summary provided by Dr. Bailey in
7    the cover letter says:  "The review concludes that
8    the weak epidemiologic association is unlikely to
9    be causal."
10        Do you see that?
11   A    Yes.
12        MR. LOCKE:  What page are you at?
13        MR. TISI:  Page 2, Dr. Bailey's letter.
14        MR. LOCKE:  Okay.
15   BY MR. TISI:
16   Q    Putting aside the characterization of
17   "weak," which we can talk about in a moment, do
18   you believe that there was an epidemiologic
19   association seen across studies?
20   A    It's not --
21        MR. LOCKE:  Objection.  Beyond the
22   scope.
23        THE WITNESS:  Not a hundred percent
24   consistent, no.
25   BY MR. TISI:

Page 534

1    Q    Not a hundred percent consistent, but
2    is --
3    A    But, yes.
4    Q    -- is a hundred percent consistency
5    required?
6    A    No.
7    Q    Okay.  So there was consistency across
8    studies.
9         Now, arguing against causal association,
10   Dr. Bailey, on behalf of the PCPC, which you are
11   here for --
12   A    Yes.
13   Q    -- says:  "There is a lack of a clear
14   dose-response relationship."  Correct?
15   A    Yes.
16   Q    And even posits that some epidemiologic
17   studies suggest an inverse association.  Correct?
18   A    Correct.
19   Q    Now, as a toxicologist, if you see an
20   inverse association with the disease, doesn't it
21   raise the suggestion that this is a protective --
22   may have a protective effect?
23        MR. LOCKE:  Objection.  Beyond the
24   scope, calls for expert testimony.
25   BY MR. TISI:

Page 535

1    Q    I mean there might be reasons why
2    that -- why that is seen, correct?
3         MR. LOCKE:  Same objection.
4         THE WITNESS:  In theory, that's possible
5    if there's consistency.
6    BY MR. TISI:
7    Q    I mean if this was a protective of
8    ovarian cancer, you may have found a miracle,
9    right?
10   A    Well, I would go into the causality.  It
11   would work the same way for protective effect.
12   Q    You didn't believe that there was an
13   inverse -- there was an inverse relationship
14   between ovarian cancer and talc, did you?
15   A    That's not what it says.  Some
16   studies --
17   Q    Suggest that.
18   A    -- showed that.
19   Q    And if that were really something that
20   was seen in some studies, as a toxicologist and as
21   somebody who represents the talc industry, that
22   would be something that would be really an
23   interest to you, wouldn't it?
24   A    I don't read it that way at all.  The
25   point of saying that some studies showed an

40  (Pages 532 to 535)

Linda Loretz, Ph.D.

Page 536

1   inverse relationship cast doubt on the causality.
2       Q   Okay.  Well, there are biases that might
3   suggest that -- why that would occur particularly
4   with a disease like cancer.  Are you familiar with
5   survival bias?  Have you ever heard of that?
6           MR. LOCKE:  Objection.  Beyond the
7   scope.
8           THE WITNESS:  I'm not sure what that
9   phrase means.
10  BY MR. TISI:
11      Q   Okay.  Did you ever -- on behalf of the
12  PCPC, did you ever ask whether or not there would
13  be explanations consistent with causation by which
14  you might see an inverse dose-response
15  relationship?
16      A   I think -- I mean, as far as the
17  scientist- -- the scientific analysis we left to
18  the epidemiologists.
19      Q   Well, I mean, pardon me for being -- for
20  being direct about this.
21          Before this was actually filed, you and
22  all of these -- these companies marched into the
23  FDA on the Citizen's Petition issue on May -- in
24  May of 2009 to talk about the epidemiology in
25  part.  Correct?

Page 537

1       A   I think the talk on that was fairly
2   limited.  I mean, the parts I remember from that
3   meeting had more to do with talking about sourcing
4   and that sort of thing.  I -- and again, as -- as
5   the meeting minutes say, FDA wasn't engaging us in
6   discussion.  They were going to let us say our
7   piece --
8       Q   Right.
9       A   -- and then said, Please submit that so
10  that we can actually read and consider it.
11      Q   And there was no opportunity for
12  doctor -- Dr. Epstein or anybody else to come in
13  and say, You know, okay, we saw that in the -- in
14  the medical literature.  This is a possible
15  explanation as to why that is.
16          MR. LOCKE:  Objection.
17  BY MR. TISI:
18      Q   There was no other opportunity in the
19  four years that this was pending for -- for
20  anybody to come in and say -- and say, You know
21  what, we -- we noted that there's an inverse
22  relationship, but these are possible explanations
23  for that --
24          MR. LOCKE:  Objection.
25  BY MR. TISI:

Page 538

1       Q   -- that are different than the
2   explanation that Drs. Muscat and Huncharek said on
3   the -- on behalf of the industry.
4       A   I think our --
5           MR. LOCKE:  Objection.
6           THE WITNESS:  I think our comments were
7   posted, though, so somebody could see that they
8   were --
9   BY MR. TISI:
10      Q   Do you know whether or not Dr. Epstein
11  or anybody else was contacted and say, These
12  are -- these are the contacts.  Do you want to
13  respond?  Do you know whether they even checked
14  the website?
15      A   Well, I don't, but they had the right to
16  check -- I mean --
17      Q   Right.
18      A   -- the same way as a Citizen Petition
19  would be posted, the comments received would be
20  posted.
21      Q   But not everybody has a former director
22  of the division that considers this work for them
23  like you did, correct?
24          MR. LOCKE:  Objection.
25  BY MR. TISI:

Page 539

1       Q   Do you know whether or not Epstein had
2   any connection with the FDA?
3           I mean, you have to admit having
4   Dr. Bailey is a pretty -- is a pretty good
5   connection to the FDA, don't you think?
6           MR. LOCKE:  Stop.  Which question do you
7   want her to answer?
8           MR. TISI:  That one.
9   BY MR. TISI:
10      Q   That's a pretty important connection to
11  the FDA, having somebody who worked for the
12  division, correct?
13          MR. LOCKE:  Objection.
14          THE WITNESS:  I mean, I think as I said
15  before, he was -- he was hired for his
16  understanding of the FDA, for his experience.
17  BY MR. TISI:
18      Q   Not his contacts?
19      A   For knowing the people, that's -- that's
20  okay.  That doesn't mean they're going to --
21      Q   Right.
22      A   -- do things differently because they
23  know the guy.
24      Q   Do you know -- do you know whether or
25  not Dr. Epstein's group had any similar

41 (Pages 536 to 539)

Linda Loretz, Ph.D.

Page 540

1  relationship with the FDA?
2      A   I -- I do not.
3      Q   So the next thing that Dr. Bailey on
4  behalf of the PCPC says that:  A plausible
5  econom- -- biologic mechanism is lacking to
6  explain a causal relationship."
7          Do you see that?
8      A   Yes.
9      Q   It talks about potential confounding
10  factors, correct?
11      A   Yes.
12      Q   And it talks about -- summarizes all
13  of -- all of the issues?
14      A   Yes.
15      Q   All right.  Now, one of the things that
16  the FDA was very concerned about at the meeting
17  that you attended with them was whether or not
18  cosmetic talc --
19          The stuff that comes in the bottle,
20  right?
21      A   Yes.
22      Q   -- had constituents that might explain
23  the increased relative risks.  They talk about
24  asbestos, correct -- for example, correct?
25      A   I think they talked about purity, yes.

Page 541

1      Q   Okay.  And -- and that's an important
2  issue, don't you think?
3      A   Sure.
4      Q   And one of the things that has made the
5  points that is made by Dr. Bailey on behalf of the
6  PCPC and Dr. Muscat and Huncharek is that there
7  was no biologically plausible mechanism because
8  talc is not known to be a carcinogen, pure talc.
9      A   Okay.
10      Q   Is that true?  I mean, I could point it
11  out.  Let's go to the page -- let's go.  Go to
12  page 25 of the -- of Dr. Huncharek's report --
13  Muscat and Huncharek's report.
14      A   Okay.
15      Q   Could you read -- let's put up the last
16  two paragraphs.
17          Are you there?  It's page 25 of -- 28 of
18  39.
19          Okay.  Now it says here:  "Initially
20  Cramer," and that's --
21      A   What page are you on?
22      Q   Page 20 -- it's 25 on the top.  It says
23  28 of 39.
24      A   28.  Okay.  Got it.
25      Q   And the third paragraph down, it says:

Page 542

1  "An additional limitation on existing literature
2  with the proposed talc/ovarian cancer association
3  is a lack of any known biological mechanism."
4          Do you see that?
5      A   I'm sorry.  Okay.  Now I'm -- on the
6  right paragraph, I think.  Yes.
7      Q   Okay.  Next paragraph down, and feel
8  free to read it if you wish.  I'm not -- I assume
9  you read this before you came in here today,
10  right?
11      A   Yes.
12      Q   Okay.  "He makes the point that
13  initially Cramer, et al.," -- and that's
14  Dr. Cramer we talked about before who published
15  epidemiology -- several epidemiology studies, in
16  fact, right?
17      A   Yes.
18      Q   He's one of the people who looked at the
19  medical literature and thought there was a causal
20  inference, right?
21          MR. LOCKE:  Objection.
22          THE WITNESS:  Yes.
23  BY MR. TISI:
24      Q   Okay.
25          -- "and sought to draw an analogy

Page 543

1  between talc and fibrous asbestos, the latter
2  being a known and well-described carcinogen."
3          First of all, that's true, right?
4      A   I'm sorry.  I'm --
5          MR. LOCKE:  What's your question?
6  BY MR. TISI:
7      Q   I said -- I said asbestos -- "fibrous
8  asbestos is a known and well-described
9  carcinogen."
10      A   Where does it say that?
11      Q   First sentence, the last full paragraph
12  starting "Initially."
13      A   Okay.  Oh, okay it.  Got it.  Sorry.
14  Very first sentence.
15      Q   And you agree with that, right, because
16  you sent that --
17      A   Yes.
18      Q   -- on behalf of the PCPC?  Okay.
19          And he makes the point at the end that:
20  "Prior to the 1970s, some products may have
21  contained some asbestos."  Correct?
22      A   Correct.
23      Q   And that's an argument you've heard over
24  and over and over again, right?
25      A   Yes.

42  (Pages 540 to 543)

Linda Loretz, Ph.D.

Page 544

1    Q   Okay.  And it says: "Clearly such
2  products could possibly represent a carcinogenic
3  risk secondary to asbestos contamination."
4  Correct?
5    A   That's what it says.
6    Q   Okay.  And so we can agree that asbestos
7  contamination could in fact be a basis of talcum
8  powder products -- a biologically plausible
9  mechanism by which talcum powder products may
10  cause ovarian cancer.  Correct?
11    MR. LOCKE:  Objection.  Beyond the
12  scope.
13    THE WITNESS:  Yeah, I mean, I think what
14  this is actually saying is -- is that's not talc
15  per se.
16  BY MR. TISI:
17    Q   Right.  But we're talking about --
18  that's why I made the point in the very beginning
19  of saying that -- we're talking about what's in
20  the bottle, right?
21    A   Right.
22    Q   And so if talcum powder products have
23  asbestos in it, that would be a biologically
24  plausible mechanism, and Drs. Huncharek and Muscat
25  assumed that there was none.  That was a predicate

Page 545

1  for their statement.
2    Because the next paragraph, it says:
3  "Since the early '70s, the relevant industries
4  voluntarily eliminated asbestos from contamination
5  from talc products."
6    Do you see that?
7    A   Yes.
8    Q   Okay.  So the assumption being that
9  there was no asbestos that had been eliminated,
10  correct?
11    A   That's what it says.
12    Q   Okay.  What does the word "elimination"
13  mean to you?
14    MR. LOCKE:  Objection.
15    THE WITNESS:  Well, it was the '70s when
16  the asbestos issue was raised, and there was a lot
17  of work by the industry to develop a specification
18  that -- that said that there would be no
19  detectable asbestos.
20  BY MR. TISI:
21    Q   Right.  And so the -- but my question
22  is, what does the word "elimination" mean to you?
23    MR. LOCKE:  Objection.
24    THE WITNESS:  I think in this context it
25  means no detectable asbestos.

Page 546

1  BY MR. TISI:
2    Q   Okay.  No detectable asbestos or no
3  asbestos?
4    A   I mean, there is a specification that's
5  no detectable.
6    Q   Different question.
7    My question is, are you representing to
8  the -- is this being represented to the FDA that
9  there is -- that asbestos was eliminated?
10    A   I mean, I think the FDA knows as much
11  about what's going on with asbestos because they
12  were involved in the -- in the specification
13  that --
14    Q   In the 1970s?
15    MR. LOCKE:  Let her --
16    THE WITNESS:  And understand there was a
17  detection limit.
18  BY MR. TISI:
19    Q   Honestly, that -- that's not my
20  question.  Okay?
21    MR. LOCKE:  Let her finish her answer,
22  and then you can ask --
23  BY MR. TISI:
24    Q   My question -- my question is this --
25  this report assumes that asbestos had been

Page 547

1  eliminated from talcum powder products since 1970.
2  True or not true?
3    MR. LOCKE:  Objection.
4    THE WITNESS:  I -- I think it's like
5  anything else, at some detection limit.  I mean
6  every contaminant has a detection limit.  So I
7  think that's implied.
8  BY MR. TISI:
9    Q   Okay.  And if asbestos -- let's assume
10  that you use the right test, right?  I mean, you
11  could use -- you could use a -- if you used the
12  wrong test and you don't -- it may go undetected,
13  right?
14    A   Well, as is true for any analysis.
15    Q   Correct.  Okay.
16    So my quest-- my question is when you
17  make the -- the statement does not say -- because
18  everybody had an opportunity to look at this
19  before it went in.
20    When this statement is made to the FDA,
21  it says asbestos had been eliminated.  True?
22    A   Again, I think you can argue that
23  that -- what that word -- what is meant by that
24  word here.
25    Q   Okay.  Well, we can agree that if there

43 (Pages 544 to 547)

Linda Loretz, Ph.D.

Page 548

1  was some asbestos in some -- in talcum powder
2  products, that would provide a biologically
3  plausible mechanism which would explain the
4  increased risk, right?
5        MR. LOCKE:  Objection.  Beyond the
6  scope.
7  BY MR. TISI:
8     Q   And that's what the FDA was asking
9  about, right?
10       MR. LOCKE:  Objection.
11 BY MR. TISI:
12    Q   Because on the May 8th -- let me
13 rephrase the question.
14       On the May 8th meeting with -- with you
15 all, and you made the point several times, in
16 addition to the epidemiology, the FDA wanted to
17 know just how pure talcum powder products were.
18    A   They wanted to know -- they raised
19 questions about sourcing and testing and how do
20 you find the mines and -- and that type of stuff.
21    Q   Because they wanted to know how -- well,
22 you knew the -- the reason why they were asking
23 that question because they wanted to know what was
24 in the bottle.
25    A   Yes.  They were trying to understand --

Page 549

1  right.
2     Q   Right.  This was not pharmaceutical
3  grade talc.  This was cosmetic talc, right?
4        MR. LOCKE:  Objection.
5        THE WITNESS:  I think it's basically the
6  same as pharmaceutical grade talc, but yes.
7  BY MR. TISI:
8     Q   But the point is there -- there are a
9  lot of things -- so -- so what the FDA really
10 wanted to drill down to here is -- I know you guys
11 talked about, you know, talc as a molecule and
12 whether or not it can cause ovarian cancer, and
13 you addressed that issue, but are there other
14 things in the bottle that might explain this
15 increased risk?  They asked you that question,
16 right?
17       MR. LOCKE:  Objection.
18       THE WITNESS:  And they asked us for
19 follow-up information, which -- which we provided.
20 BY MR. TISI:
21    Q   Now, one of the things we learned in
22 this litigation is that these folks down here, the
23 J&J and Imerys, had talc samples available to them
24 for decades.
25       MR. TISI:  Objection.

Page 550

1        MS. FRAZIER:  Object to form.
2  BY MR. TISI:
3     Q   Did you know that?
4     A   I'm not sure what that means.
5     Q   Meaning that they had talc samples from
6  the mines, from the -- from -- from -- that the
7  grade of talc that was used in the talcum powder
8  products to actual physical bottles that were
9  returned by consumers.
10       Did you know that?
11    A   I guess no, not really.
12    Q   I mean, one of the things -- if the FDA
13 was asking you questions about whether or not what
14 was in the bottle might contain things other than
15 pure talc, were you curious as the entity to say,
16 Hey, guys, do you have any samples around we can
17 test?
18    A   I mean, I --
19       MR. LOCKE:  Objection.
20       THE WITNESS:  -- think we had -- we had
21 worked with FDA and companies looking at that
22 question, if we're talking about asbestos back in
23 the '70s.
24 BY MR. TISI:
25    Q   Right.  And you also made the point that

Page 551

1  some of those specifications were decades old,
2  right?  And one of the things that Dr. Bailey
3  said, that they would be willing to look at -- at
4  tightening up those specifications, right?
5        MR. LOCKE:  Objection.
6        THE WITNESS:  I think he did.  I mean,
7  there was always an openness -- obviously, FDA was
8  welcome to do their own specification, but I don't
9  think methodologies had substantially changed.
10 BY MR. TISI:
11    Q   Well, do you know that?
12    A   Yes, actually, I think I could say I do.
13 I think our specification is essentially the same
14 as what the USP uses essentially.  And I know like
15 ASTM was looking at it, but they haven't changed
16 anything or promulgated a new specification.
17    Q   So the question -- the question that I
18 have here is, both the FDA and Dr. Bailey noted
19 that the -- that the standards that were adopted
20 in the 1970s were then decades old, correct?
21       MR. LOCKE:  Objection.
22       THE WITNESS:  Noted where?  At the
23 meeting?
24 BY MR. TISI:
25    Q   At the meeting.  It says here -- if you

44 (Pages 548 to 551)

Linda Loretz, Ph.D.

Page 552

1    go back to the meeting notes, it says --
2            MR. LOCKE:  Can you tell us which
3    exhibit you're referring to?
4            MR. TISI:  Exhibit No. 55.
5    BY MR. TISI:
6        Q   It says -- if you go to page 2, it says:
7    "Dr. Bailey mentioned that the Council published
8    specifications for talc as well as analytical
9    methodology for asbestos.  These are the ones most
10   often cited for the raw material.  He mentioned
11   these were developed almost 20 -- 20 years ago,
12   and that they would need to be checked for
13   verifications."
14           Do you see that?
15       A   Yes.
16       Q   Okay.  And so one of the things that the
17   FDA and -- and the PCPC were talking about is, are
18   our specifications for testing talc, are they
19   outdated?  Are they as stringent as they ought to
20   be?  Correct?
21           MR. LOCKE:  Object -- objection.
22           THE WITNESS:  That's what he's talking
23   about here, yes, but he's certainly saying that we
24   welcome FDA's --
25   BY MR. TISI:

Page 553

1        Q   Of course.
2        A   -- to weigh in, and --
3        Q   Right.  But the -- but the question is,
4    when these specifications were -- were developed
5    in the 1970s, the epidemiology studies hadn't come
6    out yet, right?  They didn't come out until 1982.
7    You made it clear that it was the early 1980s.
8        A   That's true, yes.
9        Q   Okay.  And so now you had a new
10   potential risk that was really raised by the
11   epidemiology studies, and one of the questions
12   that you had to answer is, are those a
13   biologically plausible mechanism, right?
14           MR. LOCKE:  Objection.
15           THE WITNESS:  Yes.
16   BY MR. TISI:
17       Q   Okay.  And in light of that, did you
18   ever go back and say, Do we need to tighten up our
19   standards and to use a different measurement that
20   would make sure that we had, using your terms in
21   here, "eliminated asbestos"?
22       A   I guess I'm just aware that basically
23   the methods -- methodology used is still what is
24   used today --
25       Q   Right.

Page 554

1        A   -- and is used by USP.
2        Q   Did you go back and see whether or not
3    there are other methods that would guarantee that
4    asbestos had been eliminated -- well, let me
5    rephrase the question for you.
6            Is -- is it a -- would you agree with me
7    that the goal here is to eliminate asbestos from
8    cosmetic talc?  You don't want any asbestos in
9    cosmetic talc.  Would you agree with that?
10       A   That's the ideal.
11       Q   That's the ideal.
12           Particularly since this is a product
13   that honestly there are other -- it's a cosmetic,
14   and there are other alternatives out there, right?
15           MR. LOCKE:  Objection.
16           THE WITNESS:  You don't need talc to
17   live, yes.
18   BY MR. TISI:
19       Q   Right.  And to the extent you do need it
20   to live, there's corn starch, right?
21           MR. LOCKE:  Objection.
22           THE WITNESS:  There's alternatives, yes.
23   BY MR. TISI:
24       Q   Right.  And so the question is, in light
25   of that, you don't want any asbestos, none, zero.

Page 555

1    You want it eliminated.  True?
2        A   You want it to be very low.  My
3    understanding is the methodologies that are used,
4    it's actually gotten lower in detection limits,
5    and we are using what -- again, the equivalent of
6    a USP method.
7        Q   Okay.  All right.  Now, let's talk about
8    other aspects of this report, if we could.
9            First of all, can you -- I asked you
10   whether or not -- on the asbestos issue, whether
11   or not the company had ever gone back and -- the
12   companies that were the primary people here had
13   ever gone back and actually tested samples that it
14   had in its possession that went back decades, and
15   you indicated you didn't even know they had them,
16   right?
17       A   Right.
18           MR. LOCKE:  Objection.
19   BY MR. TISI:
20       Q   Were you able to produce to the FDA any
21   testing records, any -- any literature, any
22   outside audit, anything, that went back and looked
23   at talc being tested to demonstrate the
24   truthfulness of what Drs. Huncharek and Muscat
25   assumed, that asbestos had been eliminated?  Or

45 (Pages 552 to 555)

Linda Loretz, Ph.D.

Page 556

1  did you just make the statement?
2      A   I mean there was a great deal of testing
3  that went on in the early '70s --
4      Q   Right.
5      A   -- to show it was not detectable, and
6  that's what the specification says.
7      Q   Got you.  From the 1970s.  Now you're
8  meeting with them in -- in May of 2008.  They're
9  asking you about asbestos.  Right?  So now we're
10  the '70s, '80s, '90s, 2000s, it's almost 30 years.
11         Between the 1970s and the 2000s, did you
12  come forward, either on your behalf or did any of
13  these companies come forward and say, Look, we're
14  going to show you proof that our talc from the
15  1970s forward did not have asbestos in it, or was
16  that statement just made?
17      A   I think it -- the basis of the statement
18  was, again, the work that had done -- been done in
19  the '70s to set up the specification.  It was the
20  discussions that followed with FDA to talk -- to
21  answer the questions about sourcing and testing.
22      Q   Agreed.
23      A   I think if you're taking "elimination"
24  to mean a literal zero, I can't think of any
25  contaminant that anybody can say is a literal

Page 557

1  zero.
2      Q   So do you know -- did you take into
3  account whether or not talcum -- talcum powder
4  products have fragrances, right?
5      A   Yes.
6      Q   Did you look at the fragrances in there
7  to see whether that provided a biologically
8  plausible mechanism?
9         MR. LOCKE:  When you say "look" -- "did
10  you look," are you referring --
11         MR. TISI:  PCPC.
12  BY MR. TISI:
13      Q   Did PCPC, when it provided this report
14  to the -- to the -- to the FDA talking about
15  biologic plausibility, there's no way this
16  happens, right?  When you said that to the FDA,
17  okay, did you consider whether or not what was in
18  the bottle contained other things that might
19  provide that mechanism?
20         MR. LOCKE:  Objection.
21         THE WITNESS:  I mean, I -- I think when
22  you're talking about fragrance, which we -- is
23  part of a lot of products, I mean, we do not think
24  of fragrances as being carcinogenic, not to
25  mention the whole thing about translocation, et

Page 558

1  cetera.  I mean, the --
2  BY MR. TISI:
3      Q   Well, the FDA on the translocation issue
4  said that that's definitely biologically
5  plausible.
6      A   They did say that.
7      Q   Okay.  So let's --
8      A   I'm not sure what their basis was
9  because they didn't reference, but they did say
10  that.
11      Q   Well, but you didn't reference proof
12  that there was -- okay.  Let's -- so let's be fair
13  here.  Okay.
14         You say the FDA didn't -- didn't
15  reference the support for a translocation.  Fine.
16         What is your reference that in the
17  1980s, 1990s and 2000s, there was no contaminants
18  in talc, talcum powder products, that were
19  potentially biologically plausible mechanisms that
20  would explain what we all agree is a trend towards
21  an increased risk seen in the epidemiology
22  studies?
23         MR. LOCKE:  Objection.
24         THE WITNESS:  I mean there was no
25  evidence for talc itself.  As I say, perfume

Page 559

1  fragrance is not regarded --
2  BY MR. TISI:
3      Q   You don't look at it.
4      A   -- as a carcinogen.
5      Q   You don't look at it.  Did you?
6      A   We --
7      Q   Has there been a lot of discussion
8  about -- let me --
9      A   Fragrance in general.  I mean it's used
10  in body lotion, it's used in -- as fragrance.
11  It's used in --
12      Q   Right, but it doesn't -- it doesn't --
13      A   It's not considered carcinogenic.
14      Q   -- it doesn't -- but is body lotion,
15  does that come in contact with your ovaries,
16  typically?  Are there any epidemiology -- are
17  there any epidemiologies that's --
18      A   The components of fragrance are not
19  regarded as --
20      Q   Did you look?
21      A   Look at?
22      Q   Every component that was in the bottle,
23  did you look at each one of them and see whether
24  or not there was things that could be in that
25  bottle that provided a biologically plausible --

46  (Pages 556 to 559)

Linda Loretz, Ph.D.

Page 560

1  or did you look solely at pure talc?
2      A   I guess the -- the main thing I think of
3  is fragrance, and certainly we've been concerned
4  with fragrance and have an understanding of what
5  fragrance materials are, and --
6      Q   Do you know whether or not -- did -- did
7  you ask them whether it contains nickel and
8  chromium and silica or any of those other --
9  talcum powder comes from the ground, right?
10     A   Yes.
11     Q   Okay.  And those are things that are
12  not -- that are not desirable in talc either,
13  right?
14     A   Correct.
15     Q   Okay.  So my question is, your whole
16  premise for this opposition for Citizen's
17  Petition -- Dr. Epstein wanted a warning on talcum
18  powder products, which is everything in the
19  bottle.  Right?
20     A   Yes.
21     Q   Your response focused on talc.  Correct?
22         MR. LOCKE:  Objection.
23         THE WITNESS:  Which makes up the vast
24  majority of the product.
25  BY MR. TISI:

Page 561

1      Q   The vast majority of the product but not
2  all of the product.  Correct?
3      A   I mean, we -- we have other lines of
4  evidence, and our -- and -- and the arguments that
5  we make are -- I mean, we're not alone in this.
6  We're consistent that there is --
7      Q   I understand.  But there are other
8  people who think differently than you, right?  You
9  say you're not alone.  There are other scientists
10  who look at the evidence and think differently
11  than you.
12     A   As -- as we've discussed.
13     Q   And they weren't in the room when you
14  were discussing with the FDA, were they?
15     A   But, again, I -- I don't think we were
16  even having --
17     Q   No, they were -- they were not in the
18  room.
19         MR. LOCKE:  Let her finish the question.
20  BY MR. TISI:
21     Q   They were not -- only you were in the
22  room.  And --
23     A   But we submitted this -- these are our
24  arguments; they get posted on the website.
25     Q   Okay.

Page 562

1      A   If somebody wanted to address our
2  arguments and disagree with them, they could do
3  so.
4      Q   Okay.  So let's talk about -- let's just
5  go here, because I think this will be -- and then
6  we'll just break for lunch.  I think it's lunch.
7  Yeah, we'll break for lunch.
8         If you go to page -- if you go to
9  page 21 of the Introduction.
10     A   This is 21 --
11     Q   I'm sorry, 24 of 39 if you're looking at
12  the --
13     A   24 of 39, okay.
14     Q   So at the very last, it talks about
15  experimental studies and clinical trials.  Do you
16  see that?
17         It says:  "In the contest of human
18  studies, experimental design has come to represent
19  the gold standard of cause and effect relationship
20  as the randomized clinical trial."
21     A   Yes.
22     Q   Okay.  First of all, would you agree
23  with me -- I mean, you've done this for a long
24  time -- you would agree with me that it would be
25  both unfeasible and unethical to conduct a

Page 563

1  clinical trial where the hypothesis was, Let's
2  give people talcum powder products and see whether
3  it causes ovarian cancer.
4      A   Right.  That's not how you do studies.
5      Q   You can't do it.
6      A   Right.
7      Q   So you can't -- so a clinical trial, if
8  anyone were to kind of march on into court and
9  say, You know, there were no clinical trials, you
10  would expect to see clinical trials on this?
11     A   Correct.  That's not how it's done.
12     Q   Right.  So the next question is they
13  have to rely on epidemiology research.  Do you see
14  that?
15     A   Yes.
16     Q   Okay.  And they lay out a methodology
17  here.  It says:  "An epidemiologist must observe
18  observational methods to cause and effect
19  relationship that preclude direct intervention on
20  manipulation of study subjects."
21         That's experiments, right?
22     A   Yes.
23     Q   All right.  "Because of that fact,
24  criteria for establishing cause and effect
25  relationship are inherently different when

47 (Pages 560 to 563)

Linda Loretz, Ph.D.

| Page 564 | Page 566 |
|---|---|

**Page 564**

1  utilizing epidemiologic methods versus
2  experimental ones."
3        Do you see that?
4    A   Yes.
5    Q   Okay.  And so what they're saying is,
6  Look, you can't do a clinical trial because it's
7  unworkable, unethical.  You just can't do it.  So
8  you got to do it a different way.
9    A   Yes.
10   Q   Okay.  And one of the ways that they do
11 it, they describe a -- a system or framework,
12 okay, and the framework is what we've called the
13 Bradford Hill criteria, and you've seen that
14 before?
15   A   Yes.
16   Q   And as somebody who's a scientist,
17 you're familiar with what that is?
18   A   Yes.
19   Q   Okay.  And just to be clear,
20 Dr. Huncharek and Muscat make it clear, but I want
21 to make clear that from -- PCPC agrees with it as
22 well, these are criteria that are not really
23 criteria.  They're -- they're considerations.
24   A   They're -- right.  Guidelines, I guess,
25 or -- right.

**Page 565**

1    Q   Right.  They're not things where you
2  kind of -- it's not like a menu where you check
3  off, Okay, we got this one, we got that one, we
4  got this one, right?
5    A   You use it for overall, right,
6  assessment.
7    Q   Right.  And they make that point.  They
8  say: "The Hill criteria, as they've become known,
9  are not simply a checklist of requirements that
10 must be met in order to determine a cause and
11 effect relationship."
12       And that's true, right?
13   A   Yes.
14   Q   Okay.  And so these factors, and I think
15 they have nine of them here, are factors that are
16 considered, correct?
17   A   Yes.
18   Q   And -- and kind of what we were talking
19 about before that I think is really important to
20 kind of -- why this has been a debate is because
21 different scientists looking at the evidence have
22 come to different conclusions about these
23 different factors.
24   A   Okay.
25   Q   Is that true?

**Page 566**

1    A   I -- that's reasonable.
2    Q   Okay.  And that's not unusual in
3  science.  Right?
4    A   Correct.  Scientists disagree.
5    Q   I mean, for years there was a debate
6  about whether cigarette smoking causes cancer,
7  right?
8        MR. LOCKE:  Objection.  Beyond the
9  scope.
10       THE WITNESS:  Yeah, before my time.  I
11 think I've always known it, but yes.
12 BY MR. TISI:
13   Q   Right.  But you know that there was a
14 debate for decades on that question.
15       MR. LOCKE:  Same objection.
16       THE WITNESS:  I really don't.  So...
17 BY MR. TISI:
18   Q   You don't know that?
19   A   No.
20   Q   You must be much younger than me.
21       But you do know that -- that it is not
22 unusual for scientists to look at a question,
23 apply these factors, and come out with different
24 conclusions, correct?
25   A   Yes.

**Page 567**

1    Q   And so these are not criteria so much,
2  these Hill factors, as they are a framework of
3  considerations.
4        MR. LOCKE:  Objection.  Beyond the
5  scope.
6  BY MR. TISI:
7    Q   True?
8    A   "Framework" is what it says here.
9    Q   And you agree with that?
10   A   Yes.
11   Q   They also say something here that I --
12 that I want to see whether you agree with and you
13 agreed with at the time.
14       On page 26 of 29 -- well, one of the
15 things they say here is -- actually, let's go
16 back.
17       It says: "Overview.  The possibility
18 that perineal talc exposure could be associated
19 with the development of ovarian cancer was
20 initially derived from a case controlled study
21 published in 1982."
22       Do you see that?
23   A   Yes.
24   Q   It's under "Overview."
25   A   Yeah, now I see it.

48  (Pages 564 to 567)

Linda Loretz, Ph.D.

Page 568

1    Q    "Since that time a number of additional
2    reports have addressed this question with most
3    showing odds ratio between 1.0 and 2.0."  Correct?
4    A    Yes.
5    Q    Okay.  That's -- that's between -- if we
6    were to -- and for jurors who don't understand
7    odds ratios, that's basically showing anything
8    from a 1 percent increase to 100 percent increase.
9    A    Correct.
10    Q    Okay.  2.0 would be a doubling of the
11    risk.
12    A    Correct.
13    Q    And that's what they call -- they call
14    this a weak effect.  Correct?
15    A    Yes.
16    Q    So just using the nomenclature that
17    Dr. Muscat and Huncharek used, they would
18    characterize something less than a hundred percent
19    doubling of the risk as being weak.
20    A    Per an epidemiology study, yes.
21    Q    Right.  But in practical reality, if you
22    find something that doubles your risk, that is a
23    clinically -- if it is a true cause, that's
24    clinically significant, correct?
25    A    If it --

Page 569

1        MR. LOCKE:  Objection.
2        THE WITNESS:  -- is a true cause.
3        MR. LOCKE:  Beyond the scope.
4    BY MR. LOCKE:
5    Q    If it is a true cause.  All right.
6        So now the question is, if you go to
7    page 23, they make the point, and they go out of
8    their way to make it, actually, because they say:
9    "It is important to point out that although an
10    association is weak" --
11        MR. LOCKE:  Just wait -- wait one
12    second.  You're referring to 23 at the top --
13        MR. TISI:  I'm sorry.  26 of 39,
14    correct.
15    BY MR. TISI:
16    Q    "It is important" -- it says on the
17    first full paragraph:  "It is important to point
18    out that although an association is weak" -- and
19    as they define "weak," that can include a doubling
20    of the risk, right?
21    A    Up to.
22    Q    Right.
23        -- "this does not rule out a causal
24    connection."  Do you agree with that?
25    A    That's what it says.

Page 570

1    Q    Do you agree with it?
2        MR. LOCKE:  Objection.  Beyond the
3    scope.
4    BY MR. TISI:
5    Q    On behalf of PCPC, is that something
6    that PCPC agreed with when they sent this to the
7    FDA?
8        MR. LOCKE:  Objection.  Beyond the
9    scope.
10        THE WITNESS:  We -- yes.
11    BY MR. TISI:
12    Q    Thank you.
13        Did PC -- they note down here that
14    obviously -- actually, let's skip that.
15        MR. LOCKE:  Is this a good time for a
16    lunch break?
17        MR. TISI:  Yeah, it's a good time to
18    break.
19        THE VIDEOGRAPHER:  The time is
20    12:32 p.m., and we're going off the record.
21        (Lunch recess.)
22        THE VIDEOGRAPHER:  The time is 1:12
23    p.m., and we are back on the record.
24    BY MR. TISI:
25    Q    Dr. Loretz, we were talking about the

Page 571

1    purity of talcum powder products that -- that's in
2    the bottle, and distinguishing it from talc in the
3    mine and et cetera, and before we took a break.
4    Do you remember that --
5    A    Yes.
6    Q    -- session?
7        I have a couple more questions about
8    that and the document, but before I do, the focus
9    of the PCPC response was to focus on the
10    carcinogenic -- carcinogenic -- I'm sorry, let me
11    say it again.
12        The focus of the biologic plausibility
13    aspect of Dr. Muscat and Huncharek's response was
14    focused on two things.  Number one, that talcum
15    powder products had been asbestos-free since
16    1970s, it had been eliminated.
17        Do you remember that?
18    A    Yes.
19    Q    Okay.  Number two is that pure talc did
20    not -- there was no evidence that pure talc was
21    a -- had a mechanism that would lend itself to the
22    suggestion that it was a cause of ovarian cancer.
23    Correct?
24    A    Right.
25    Q    Right.  So you were looking at asbestos,

49 (Pages 568 to 571)

Linda Loretz, Ph.D.

Page 572

1  not there anymore; and talc, not a problem.
2  Right?
3      A   Yes.
4      Q   Okay.  So -- but -- and we talked about
5  the question about whether or not talc really was
6  asbestos-free before the -- the break, and I'm not
7  going to go back into that again, but that was an
8  area of concern from the FDA's perspective, and
9  they raised it at the May meeting, May 2009.
10     A   And -- and I'm sure -- we responded by
11 letting them know that the testing that had been
12 done and continued to be done.
13     Q   Correct.  Using --
14     A   And their own testing as well that they
15 did.
16     Q   Using the 12 -- we'll talk about that in
17 a moment, but using the 20-year-old standards that
18 Dr. Bailey mentioned that they would be willing to
19 update.
20     A   Which --
21         MR. LOCKE:  Objection.
22 BY MR. TISI:
23     Q   Correct?
24     A   Which they -- which, again, are not
25 substantially different from what is used today

Page 573

1  by, for example, USP.
2      Q   Okay.  So we discussed asbestos and
3  talc, and I started getting into the question, but
4  you know what's in the bottle, it's not only
5  asbestos and talc.  Remember we started that
6  discussion before the break.
7      A   Yes.
8      Q   Okay.  And in fact, that had been
9  brought to your attention long before this
10 petition was filed that talcum powder products may
11 contain things that might or might not be
12 carcinogens.
13     A   Okay.
14     Q   Well, is that true?
15     A   I'm not sure what you're referring to.
16     Q   Well, I'm asking you that before I --
17     A   I mean in the specific --
18     Q   -- show you a document --
19     A   In the specification we have some limits
20 set for a few other possible contaminants.
21     Q   Well, had it ever been brought to your
22 attention that talcum -- you mentioned -- we
23 talked about fragrances, we talked about other
24 things.
25         Had it ever been brought to your

Page 574

1  attention that there are potentially other
2  components of talcum powder products, constituents
3  of talcum powder products, that need to be
4  considered when addressing the question as to
5  whether or not talcum powder products are a
6  potential cause of ovarian cancer?
7      A   Are you talking about constituent
8  ingredients or are you talking about constituent
9  impurities?
10     Q   Anything.  Anything in the --
11     A   I mean --
12     Q   You know, honestly, and I'm trying to be
13 -- I'm trying to be as expansive as I can in this
14 question.
15         What I'm saying is, if I go to Walmart
16 and pull a bottle of talcum powder, Johnson's Baby
17 Powder off the shelf, whether they're impurities
18 or whether they're intended ingredients or
19 whatever, there are other constituents in there
20 that have to be considered in the algorithm of
21 whether or not talcum powder products cause
22 ovarian cancer.  True?
23     A   There are impurities that are covered by
24 the specification, for example.
25     Q   Right.  But -- but so my -- my question,

Page 575

1  and I'm probably being inartful, so let me see if
2  I can phrase it.
3         We've previously discussed talcum powder
4  products as kind of this two-dimensional thing,
5  either it has asbestos or it doesn't have
6  asbestos.  Right?  So --
7      A   Okay.
8      Q   So I'm -- I'm kind of moving off that
9  because it's not that simple, is it?
10         MR. LOCKE:  Objection.
11 BY MR. TISI:
12     Q   The question about whether or not there
13 is a biologically plausible mechanism by -- that
14 would explain the epidemiology studies which
15 showed, as Dr. Huncharek and Muscat point --
16 pointed out, a risk between one and -- you know,
17 and a hundred percent, right?  One to two, what
18 you say is called mild.  The question should be
19 looked at comprehensively as to what is in the
20 bottle.
21         MR. LOCKE:  Objection.
22 BY MR. TISI:
23     Q   Right?
24     A   Yes, I'm not aware of anything that --
25     Q   Well, did you look?  I mean, the

Linda Loretz, Ph.D.

Page 576

1   question is this -- this report that was sent to
2   the FDA takes a very elemental view of the
3   question.  Prior to 1970, there was potential
4   contamination with asbestos.  It went out, and
5   what's left is talc.
6         MR. LOCKE:  Objection.
7   BY MR. TISI:
8      Q   And talc doesn't cause cancer.  That was
9   the essence of their argument, correct?
10        MR. LOCKE:  Objection.
11        THE WITNESS:  Well, no, I think there's
12  more in their arguments -- I mean --
13  BY MR. TISI:
14     Q   On the biologic plausibility issue, I
15  mean, they talked about dose-response and all that
16  stuff.  But I'm talking about on the biologic
17  plausibility, on the question of whether there is
18  a -- an explanation that makes sense as to why
19  there's this persistent increased risk, they
20  looked basically at asbestos in talc.
21        MR. LOCKE:  Objection.
22        THE WITNESS:  Yeah, I'm not sure what --
23  what other -- what else you wanted to be -- them
24  to address.
25  BY MR. TISI:

Page 577

1      Q   Well, are there other things, either
2   contaminants or intended ingredients, that should
3   be factored into the equation that were not
4   addressed by their -- had -- let me rephrase the
5   question.  And I'm sorry, I'm not being artful
6   here.
7         Are there other constituents within
8   cosmetic talc that should be -- should have been
9   considered on this biologically plausible
10  mechanism issue that were not?
11     A   I -- I -- no, I'm not aware of --
12     Q   Okay.  But no other constituents were in
13  fact considered, right?
14     A   There's a specification that covers
15  some.
16     Q   Okay.  Were you ever made aware prior to
17  this time that there were other potential
18  constituents that had been classified as a
19  carcinogen other than asbestos?
20     A   No.
21     Q   I'm going to show you what I would like
22  to have marked as Exhibit No. 59.
23        (Exhibit No. 59 was marked for
24        identification.)
25        MR. TISI:  I'm sorry, didn't mean to

Page 578

1   throw it at you.
2   BY MR. TISI:
3      Q   I'm really going to only ask you about
4   the first page.
5      A   Mm-hmm.
6      Q   So just for the record, what this is,
7   this is a document from IMA Europe.  What is IMA?
8      A   Industrial Minerals Association.
9      Q   So it's another trade group like the
10  PCPC?
11     A   Correct.
12     Q   Okay.  It represents talc --
13     A   Mineral manufacturers, and talc is a
14  subset of that.
15     Q   Okay.  And it's to Dr. Muscat, correct?
16     A   Yes.
17     Q   Okay.  Is this the same Dr. Muscat who
18  wrote the report a couple of years later for you?
19     A   Yes.
20     Q   Robert Glenn at Crowell & Moring.  R.
21  Glenn.
22     A   I'm sure it is there.  I don't see it.
23     Q   It's right after Joshua Muscat.
24     A   Yep.  Yes.
25     Q   R. Glenn, Crowell & Moring, that's the

Page 579

1   lawyers for --
2      A   Yes.
3      Q   -- they represent the lawyers for -- for
4   Imerys.
5         Linda Loretz is you?
6      A   Yes.
7      Q   Eric Turner, which is Luzenac, which is
8   Imerys?
9      A   Yes.
10     Q   Jocelyn Ferret, which is Luzenac --
11     A   Yes.
12     Q   -- Imerys?
13        So -- and cc'd was Steve Mann for --
14  from J&J.  You see that?
15     A   Yes.
16     Q   And it's entitled "IARC, Dr. Huncharek
17  Comment."  Do you see that?
18     A   Yes.
19     Q   Okay.  And this is February 13th, 2006.
20  This was during the IARC proceedings?
21     A   Okay.  Yes.
22     Q   Is that right?
23     A   I would assume so, yes.
24     Q   And it's an e-mail from IMA North
25  America to Joshua Muscat, who was the industry

51 (Pages 576 to 579)

Linda Loretz, Ph.D.

Page 580

1  representative at IARC at the time.
2      A   Correct.
3      Q   Yes?
4      A   Yes.
5      Q   And it says:  "What should be
6   acknowledged is the difference between cosmetic
7   talc grade, i.e., grade of talc, pure and
8   extremely white, sold by talc producers at the
9   gate of the mine" -- right?
10     A   Yes.
11     Q   -- "and cosmetic baby or body talc
12  powder, i.e., loose powder manufactured by
13  cosmetic manufacturers containing talc or corn
14  starch, and also in the case of other minerals,
15  kaolin, TiO2, and all case additives such as
16  perfumes and biocides, hexachlorophene in the
17  past, a Category 3 IARC carcinogen" -- I won't
18  even pronounce that -- imidazolidinyl urea" -- I
19  don't know how to pronounce that -- "triclosan, et
20  cetera.  See documents sent by Jocelyn Ferret this
21  morning."
22     A   Uh-huh.
23     Q   Okay.  And the point that's being made
24  here -- and, first of all, you got this.  The
25  point that's being made here is one of the things

Page 581

1   that really ought to be considered when you're
2   talking about talcum powder products and the risk
3   of ovarian cancer, you need to think about not
4   only what comes out of the mine but what's in the
5   bottle.
6          MR. LOCKE:  Objection.
7   BY MR. TISI:
8      Q   Right?
9      A   Okay.
10     Q   Well, I mean, I'm asking you whether you
11  agree with that or not.
12     A   I can agree with that without thinking
13  that this explains anything.
14     Q   Okay.
15     A   Yes.
16     Q   Okay.
17     A   I mean you think about -- when you think
18  about safety of a product --
19     Q   Well, I'll take it and I'll put it aside
20  then.
21     A   No, I'm just saying when you think about
22  safety of a product, you think about everything in
23  the product.  So...
24     Q   Well, that's right.  And -- and that's
25  kind of where I'm going here.

Page 582

1          When you filed your response to the
2   Citizen's Petition, and addressed the issue of
3   biologically plausible mechanisms, did you ask
4   Dr. Muscat and Huncharek to look at each of the
5   constituents in cosmetic talc sold in talcum
6   powder products and see whether or not they
7   individually or collectively might explain the
8   increased risk?
9      A   I think the other ingredients that are
10  used in talc are not carcinogenic.
11     Q   Well, did you -- what are the other
12  talcs -- did you ask J&J to provide you with a
13  list of -- list of products using talc?
14     A   List of ingredients used in talc?
15     Q   List of ingredients of talc.
16     A   No.
17     Q   Okay.  So how do you know that none of
18  them are carcinogenic?
19     A   We don't use carcinogens in cosmetics.
20     Q   You don't know what was in the talc that
21  you were talking about with -- with the FDA, do
22  you?
23          MR. LOCKE:  Objection.
24  BY MR. TISI:
25     Q   I mean -- I understand that

Page 583

1   aspirationally you don't want to have
2   carcinogen -- carcinogens in the talc that you
3   sell to women who may use them to dust themselves.
4   I -- I understand that that might be an
5   aspiration.
6          But in light of the fact that this issue
7   had been pending for decades, and now was firmly
8   before the FDA in the Citizen's Petition, do you
9   think that it might have been prudent to identify,
10  just as identified in this document I showed
11  you, Exhibit No. 59, what all the constituents are
12  in order to do a searching analysis of whether or
13  not there was something in the talc that might be
14  responsible for this increased risk?
15         MR. LOCKE:  Objection.
16         THE WITNESS:  I mean, I guess, you know,
17  I can look at this, and I recognize these
18  ingredients, and --
19  BY MR. TISI:
20     Q   Well, these are some of them and there
21  may be others.  I mean you -- what about did you
22  know how much silica was in the -- if any, was in
23  the talcum?
24     A   There's specifications.
25     Q   I understand the specifications.  Apart

52 (Pages 580 to 583)

Linda Loretz, Ph.D.

| Page 584 |
| --- |

1  from the specifications, do you know how much
2  silica there was?
3      A   No.
4      Q   Do you know how much magnesium there
5  was?
6      A   I'm not sure that's regarded as a
7  carcinogen.
8      Q   What about nickel?
9      A   I know there was at one point, there was
10  a report and it was our understanding, because
11  this is what we were told, that it was bound up in
12  the talc and not free nickel.
13      Q   Well, who told you that?
14      A   I think it was J&J.
15      Q   Okay.  What about -- what about
16  silica -- is nickel a carcinogen?
17      A   I don't believe it's recognized as an
18  ovarian carcinogen, but I'm -- I'm not an expert
19  on nickel cariogenicity.
20      Q   Okay.  If there -- if there was nickel,
21  it would be something that you would want to look
22  at, right?
23      A   I think it depends.
24          MR. LOCKE:  Objection.
25          THE WITNESS:  I mean --

| Page 585 |
| --- |

1  BY MR. TISI:
2      Q   Well, my -- my larger point here,
3  Doctor -- and, you know, I don't want to belabor
4  the issue -- is when you responded to the FDA, the
5  Citizen's Petition, there is nothing in this
6  response that addresses the potential of any
7  contaminants in the product, even ones that meet
8  specifications.  Is there?
9          MR. LOCKE:  Are you referring solely to
10  biological plausibility?
11  BY MR. TISI:
12      Q   On the biologic plausibility issue,
13  there's no discussion at all, nickel, chromium,
14  silica, asbestos to the extent that's in it since
15  the 1970s, there's no discussion of that, is
16  there?
17      A   Because those weren't recognized as
18  being risks.  Just as I state some of these are
19  not --
20      Q   Okay.  And that's -- it was not part of
21  Dr. Huncharek and -- and Muscat's analysis to the
22  FDA, right?
23          MR. LOCKE:  Objection.
24  BY MR. TISI:
25      Q   They did not mention those other

| Page 586 |
| --- |

1  constituents, right?
2      A   I believe that's true.
3      Q   And they did not talk about any of the
4  fragrance or any of the other issues that are in
5  there, correct?
6      A   For the same reason.
7      Q   Okay.  Talk about cobalt?
8      A   No.
9      Q   Arsenic?
10      A   There is a specification for arsenic.
11      Q   Right.  But saying something has a
12  specification does not mean that it's absent,
13  correct?
14      A   Right.  I mean there's a specification
15  set, I believe it's 3 parts -- I believe it's 3
16  parts per billion.
17      Q   Right.
18      A   So it could be up to that.
19      Q   So when you say something meets
20  specifications, the specifications are only as
21  good as the sensitivity and specificity of the
22  test that's being used.
23      A   Well, the specifications are designed to
24  set a level that would be acceptable, i.e., safe,
25  and the method that goes with that should be

| Page 587 |
| --- |

1  designed to --
2      Q   And did --
3      A   -- test at that level.
4      Q   And did you -- because you were involved
5  with working with those standards, right, and
6  helping develop those standards, right?
7      A   Oh, no, that was before my time.
8      Q   Okay.  Well, I didn't mean you.  I meant
9  PCPC.
10      A   PCPC, yeah, absolutely.
11      Q   I was putting the PCPC hat on.
12      A   Okay.  Sorry.  Got it.
13      Q   All of those specifications were
14  developed before the epidemiological studies on
15  ovarian cancer, true?
16      A   Developed but then updated, post.
17      Q   I guess my question is, did any of
18  those -- were any of those specifications, to your
19  knowledge, analyzed by PCPC in the context of
20  looking for biologically plausible mechanisms for
21  ovarian cancer?
22      A   I guess I'd go back to, I can see a
23  listing here that it just --
24      Q   I didn't ask you that question.  You
25  told me that you could answer the question without

Linda Loretz, Ph.D.

Page 588

1    looking at that document.
2        A   Okay.
3        Q   So I'm not looking at that document.
4        A   Okay.
5        Q   My question is, did you -- did PCPC in
6    the 2000s, while these epidemiological studies
7    were being published, analyze the specifications
8    for the elimination of these other constituents in
9    light of those epidemiology -- epidemiological
10   studies?
11       A   We -- no, we were not aware of other
12   contaminants and/or ingredients that seemed to
13   offer a biological plausible reason for the cause
14   of ovarian cancer.
15       Q   Well, cobalt might, right?  Did you look
16   at the cobalt -- cobalt standards in connection
17   with ovarian cancer -- your standards?
18       A   I was --
19           MR. LOCKE:  Objection.
20           THE WITNESS:  I would say we had no
21   information that the cobalt contamination was a
22   problem, and I'm not aware that cobalt has been
23   implicated in ovarian cancer, although --
24   BY MR. TISI:
25       Q   Arsenic.

Page 589

1        A   -- I'm not an expert.
2        Q   Arsenic.
3        A   There's a specification for that.
4        Q   Did you analyze that specification in
5    light of the -- the reported epidemiology results
6    of ovarian cancer in talc?
7        A   I feel pretty comfortable saying that
8    the specification would -- would be okay, and I'm
9    not aware that arsenic has been implicated as an
10   ovarian carcinogen.
11       Q   It didn't -- are they carcinogens?
12   Would it be something that would have been to be
13   looked at in light of the epidemiological studies?
14           MR. LOCKE:  Objection.
15           THE WITNESS:  I'm not sure that offers a
16   biologically plausible explanation.
17   BY MR. TISI:
18       Q   So the fact that something -- okay.
19   All right.  One other question.
20           (Counsel conferring.)
21       Q   All right.  Let's go to Exhibit No. --
22   okay.
23           Now, I just want to go back to something
24   I discussed earlier today and see if I can -- this
25   was the document I was having printed.  It's not

Page 590

1    quite here yet.
2        A   Okay.
3        Q   So we'll put it up on the screen and
4    have it.
5            Dr. Epstein had previously filed a
6    Citizen's Petition before the FDA in the 1990s on
7    this issue, correct?
8        A   Yes.
9        Q   And at that time who did that petition
10   go to, do you know?
11       A   John Bailey, I believe.
12       Q   While he was at the FDA?
13       A   I believe so, yes.
14       Q   And did the FDA ever respond to that?
15       A   Yes, they rejected that petition.
16       Q   Well, didn't they -- didn't Dr. Bailey
17   write a letter to Mr. -- to Dr. Epstein that
18   said -- and we'll bring it up here.
19           MR. TISI:  Can we bring it up, please?
20           MR. GOLOMB:  I don't --
21           MR. TISI:  Well, we'll attach it as an
22   exhibit.  No, that's it.  Oh, is that it?  No --
23   yeah.
24   BY MR. TISI:
25       Q   The last -- it's dated July 21st, 1995,

Page 591

1    and that's Dr. Bailey who wrote that --
2            MR. TISI:  Can you make that --
3    BY MR. TISI:
4        Q   -- and his response was --
5            MR. TISI:  Go the second paragraph,
6    please.
7            MR. GOLOMB:  Second one?
8            MR. TISI:  Mm-hmm.
9    BY MR. TISI:
10       Q   "The purpose of this is to advise you,
11   in accordance with 21 CFR 10.30(e)(2), that we
12   have not been able to reach a decision on your
13   petition within the first 180 days of the filing
14   of the petition because of limited availability of
15   resources and other agency priorities."
16           Is that accurate?
17       A   Yes.
18       Q   Okay.  And this Citizen's Petition, the
19   one we've been talking about all day, wasn't
20   responded to for five years.  Correct?
21       A   Yes.
22       Q   And that's the same division that
23   considered the first one, right?
24       A   Well, I'm not sure when the response
25   came to the first one.  I mean the 180 days and

54 (Pages 588 to 591)

Linda Loretz, Ph.D.

Page 592

1  that is -- I think it's pretty typical for
2  petitions that they, I believe, have some
3  obligation to respond, but that response can be to
4  say that we're not -- we're not done yet.
5            (Exhibit No. 60 was subsequently
6            marked for identification.)
7  BY MR. TISI:
8      Q   Okay.  I'm going to mark it as
9  Exhibit No. 60 when we get it.
10          So let me ask you this:  I'm going to go
11  through each year, and I'm going to ask you, you
12  responded to the FDA questions that they asked
13  you, correct, at this May 9th --
14     A   Yes.
15     Q   -- meeting?
16         Did PCPC in 2009, other than this
17  meeting, have any communications directly or
18  indirectly with FDA relating to asbestos in talc
19  other than responding to the questions?
20     A   You can refresh my memory if there's
21  any.  I -- I can't recall any.
22     Q   This is -- you can't recall any.
23         2009, did PCPC have any direct or
24  indirect communications with FDA regarding the
25  issue of talc and ovarian cancer?

Page 593

1          MR. LOCKE:  Other than what we've
2  discussed?
3          MR. TISI:  Other than what we -- I'm
4  sorry, I meant to say 2010.  I'm sorry.
5          THE WITNESS:  That's what I was confused
6  on.  I was trying to --
7  BY MR. TISI:
8      Q   Yeah, I'm sorry.
9      A   -- decide if you --
10     Q   Yeah.  No, no, it was --
11     A   Okay.  Got it.
12     Q   It was a mistake.
13     A   Okay.
14     Q   Just to be clear, let me -- I'm going to
15  go through each year --
16     A   Okay.
17     Q   -- and I want to find out what your
18  communications were in each year.
19     A   That's what I thought you were doing.
20  Okay.
21     Q   So 2010.
22     A   I want to be careful not to forget
23  something.  So the question was anything to do
24  with --
25     Q   Let's -- I want to ask you two separate

Page 594

1  questions.
2      A   Okay.
3      Q   The first question is going to be
4  communications with the FDA on talc and ovarian
5  cancer association or risk.
6          And the second question is going to be
7  on specifications for talc, and particularly with
8  regard to asbestos.  Okay?
9          So the first question, in 2010, do you
10  recall any question or any communications with FDA
11  regarding the issue of ovarian cancer and talc?
12     A   I don't recall any, no.
13     Q   Any communications with the FDA on any
14  specifications for issues relating to asbestos or
15  levels of asbestos in talc?
16     A   Not that I recall.
17     Q   Okay.  2011, same two questions.  If you
18  want, I'll separate them out.
19     A   I'm just trying to make sure I'm not
20  forgetting something.  I don't recall, no.
21     Q   2012?
22     A   And again, the question was on
23  asbestos --
24     Q   It was on the association between
25  ovarian cancer and talc or the asbestos levels or

Page 595

1  specifications for talc.
2      A   And did you say meetings?
3      Q   Any communications directly or
4  indirectly.
5      A   I guess --
6      Q   I guess what I'm trying to do in kind of
7  a summary fashion is to ask you about any
8  communications.  These are the ones that I've been
9  able to find.  I found -- you know, I can go
10  through your answers --
11     A   Mm-hmm.
12     Q   -- to the FDA questions and do that.
13     A   Mm-hmm.
14     Q   Other than that.
15     A   Yeah, and I'm just trying to be careful
16  so I'm being -- being accurate.
17     Q   Yeah.
18     A   And I can say I'm not aware of any.  I
19  know in 2000 -- when FDA, for example, did their
20  sampling plan, could someone in meeting with the
21  FDA on something else asked a question, how's it
22  going, you know, that's possible.  But a meeting
23  specific to that or something -- some deep
24  discussions or work on a specification, not that
25  I'm aware of.

Linda Loretz, Ph.D.

Page 596

1    Q   Okay.  Let me see if I can ask it this
2  way, since we got through 2011.
3        When is the next time, if ever, PCPC
4  directly or indirectly spoke to the FDA about talc
5  and ovarian cancer?
6    A   I'm just trying to think if I'm
7  forgetting anything.
8        I'm -- I'm not recalling.  Again, there
9  was the -- FDA did the assessment on the asbestos.
10 There could have been conversations.  I --
11   Q   Anything that you -- that you know of as
12 you sit here right now, anything to -- and are
13 prepared to testify to as a -- as a representative
14 of PCPC?
15   A   Not that I can think of.
16   Q   Okay.  When is the next time you talked
17 about asbestos levels in talcum powder products or
18 asbestos testing in talcum powder products, if
19 ever?
20       MR. LOCKE:  With the FDA?
21       MR. TISI:  With the FDA.
22       THE WITNESS:  Oh, we're aware that FDA
23 did their study, and we're aware, I mean, that our
24 members test in a -- on an ongoing basis.
25 BY MR. TISI:

Page 597

1    Q   Well, okay, let's -- since you raised
2  that issue, FDA did a sampling of -- of certain
3  products bought in the Washington, D.C. area, I
4  think they said five out of nine, they -- there
5  was -- that wasn't a study, was it?  That wasn't a
6  study, correct?
7    A   They -- they --
8        MR. LOCKE:  Objection.
9        THE WITNESS:  Yeah, that's not exactly
10 what they did.  They did -- I think they did from
11 suppliers, and then they did 30-some products off
12 the shelf.
13 BY MR. TISI:
14   Q   Right.  But they -- the FDA admitted
15 that that was not a --
16   A   The FDA said it's not exhaustive.
17   Q   It's not -- they -- they went further
18 than that.  They said it was not -- they could not
19 guarantee that this was a true sampling of talcum
20 powder products out there, correct?
21       MR. LOCKE:  Objection.
22       THE WITNESS:  They said it was not --
23 not a final answer, yes.
24 BY MR. TISI:
25   Q   Right.  And in that context, did you

Page 598

1  discuss with your members whether you had a more
2  fulsome survey that could be conducted either of
3  currently marketed products or of, you know,
4  samples that had been stored over time?
5    A   No, I think our answers -- when we
6  answered FDA to their questions about testing, et
7  cetera, I think -- I mean, that addressed it kind
8  of in an ongoing way.  So --
9    Q   Okay.  You basically said, We tested it
10 as we always did?
11   A   Yeah.
12   Q   So, as I understand it, from -- do you
13 know who Susan Nicholson is from J&J?
14   A   Nettesheim?
15   Q   No, Nicholson.
16   A   Oh, no.
17   Q   I understand that J&J had a meeting with
18 FDA in 2018.  Do you know anything about that?
19   A   That would be this year.
20   Q   That would be this year.
21   A   No.
22   Q   Do you know of any communications that
23 the company had with FDA about the lawsuits that
24 have been pending and verdicts that have been
25 obtained against the manufacturers of talc --

Page 599

1    A   I do not.
2    Q   -- and talc products?
3        MR. LOCKE:  Well, just to clarify, when
4  you say "the company," you're talking about J&J?
5        MR. TISI:  J&J.
6        THE WITNESS:  No.
7  BY MR. TISI:
8    Q   Or -- or Imerys.
9        Are you aware of any communications
10 about the lawsuits that have --
11   A   That those companies have had with FDA?
12   Q   Yes.
13   A   No.
14   Q   Okay.  So other -- the last meeting that
15 you know of that you had that was formally or
16 informally with the FDA on the issues of talcum
17 powder products and ovarian cancer was in May of
18 2008?
19       MR. LOCKE:  '9.
20       THE WITNESS:  '9.
21 BY MR. TISI:
22   Q   '9.  I'm doing what -- what Dr. Bailey
23 did.  Sorry.
24       Just to be clear, the last time that
25 you're aware of that PCPC had any direct contact

56 (Pages 596 to 599)

Linda Loretz, Ph.D.

Page 600

```
 1   with the FDA, either directly or indirectly, was
 2   the meeting in May of 2009, and any follow-up to
 3   that meeting that was requested by the FDA?
 4       A    Something specific to that topic.  As I
 5   say, it doesn't mean there weren't -- you know,
 6   when FDA unveiled their results about talc
 7   testing, it doesn't mean somebody didn't ask a
 8   question or whatever, but --
 9       Q    Well, do you know of any questions they
10   might have asked?
11       A    No, I don't.
12       Q    Okay.  Okay.
13       A    But, I mean, we have FDA, for example,
14   presents at kind of our meetings sometimes.  I
15   could see a question being asked.  I just --
16       Q    But you don't know of any.
17       A    No, I do not.
18       Q    All right.  So let's go to the second
19   question, the second area that I said we would
20   cover, which is studies and consultants.
21       A    Okay.
22       Q    I'm kind of done with the Citizens
23   Petitions --
24       A    Okay.
25       Q    -- and contacts with the FDA issue.
```

Page 601

```
 1       A    Okay.
 2       Q    Let's start in the 1990s.  I'm going to
 3   go back to Exhibit No. 47, which is the notes from
 4   April 12th, 1994.
 5       A    Okay.
 6       Q    And that's the task force document.
 7       A    Yes.
 8       Q    And just -- you may have mentioned this
 9   the last time in your deposition, and I'm sorry,
10   I'm trying not to retread old ground, but can you
11   tell us what the task force was?
12       A    So this is the Talc Interested Party
13   Task Force, so these are specifically people who
14   have an interest in talc and are willing to pay
15   for projects as well when required.  And these are
16   just the member companies, again, with an interest
17   in the topic.
18       Q    Okay.  And listed on this document are
19   Johnson & Johnson, Luzenac, American Westminster,
20   is that --
21       A    I don't know.
22       Q    I don't know that either.
23            -- Procter & Gamble Company, Cosmair,
24   Colgate Palmolive, Helene Curtis, and then CTFA,
25   which is PCPC.
```

Page 602

```
 1       A    Correct.
 2       Q    Now, if go to page 2, there's a section
 3   called "Manuscript Reviews."  Do you see that?
 4       A    Okay.  Yes.
 5       Q    And the second bullet point says:  "The
 6   meta-analysis manuscript -- manuscript prepared by
 7   Dr. Gross, "and it has a number, "was discussed.
 8   It was agreed on the scientific content of the
 9   manuscript was good, but the format lacked
10   clarity," and it goes on and on.  Do you see that?
11       A    Yes.
12       Q    Okay.  Are you familiar with the study
13   by Dr. Gross?
14       A    I saw the manuscript in my preparation
15   for this deposition.
16       Q    Now, I'm going to show you there was a
17   published article by Gross and Berg.  Have you
18   seen that?
19       A    I think that sounds familiar.
20       Q    May I see --
21            (Counsel conferring.)
22   BY MR. TISI:
23       Q    Okay.  I'm going to mark this as Exhibit
24   No. 61, and I'm actually going to give you 62,
25   which is I think the manuscript that you just may
```

Page 603

```
 1   have referred to.
 2            (Exhibit Nos. 61 and 62 were
 3            marked for identification.)
 4            MR. TISI:  Here is your copy.  And here
 5   is 62.
 6   BY MR. TISI:
 7       Q    Now, 61 is the published article,
 8   correct?
 9       A    Yes.
10       Q    And 62 is the internal report, right?
11       A    Oh, I'm sorry.  I haven't seen 62 yet.
12   Yes.
13       Q    So one is titled -- the memorandum is
14   entitled "Meta-Analysis."  Right?
15       A    Yes.
16       Q    Okay.  And you all paid, at least in
17   part, for this, right?
18       A    I believe so, yes.
19       Q    And if you go to the back, the draft
20   paper, the one that was not published, and you go
21   to page 33, it says:  "Financial support for this
22   study was provided in part by the Cosmetic
23   Toiletry and Fragrance Association."
24       A    Yes.
25       Q    Now --
```

57 (Pages 600 to 603)

Linda Loretz, Ph.D.

Page 604

1           MR. GOLOMB:  Wait, Chris, the document
2   is not up yet.
3   BY MR. TISI:
4      Q   If you go to page --
5           MR. GOLOMB:  That's the wrong document.
6           MR. TISI:  62, yeah.
7           Yeah, that's right, go to the very end.
8   It's the Bates 188.
9   BY MR. TISI:
10      Q   And the Acknowledgment section
11   acknowledges what I think you told us in your
12   interrogatories:  "The financial support for this
13   study is provided in part by the Cosmetic,
14   Toiletry and Fragrance Association, correct?
15      A   Yes.
16      Q   Okay.  Now, the report actually went
17   through peer review, right, and actually was
18   published?
19      A   It looks that way, yes.
20      Q   Yeah.  And when it was published, did
21   you ask -- did PCPC ask that their name be taken
22   off the acknowledgment?  Because they're not on
23   the acknowledgment of the published paper.
24      A   I see that J&J is.
25          I -- I don't know what happened on that

Page 605

1   funding.
2      Q   Well, let's go to the published paper
3   and see what the published paper says.  Okay?
4      A   Mm-hmm.
5      Q   The one that actually went through peer
6   review.  Right?
7      A   Yes.
8      Q   Okay.  First of all, and this -- so that
9   the jury understands, this is dated 1995.
10      A   Okay.
11      Q   This is some 10 -- 13 years before
12   the -- before the Citizen's Petition.
13      A   Okay.
14      Q   Right?
15      A   Yes.
16      Q   And so this is -- it says:  "The concern
17   that use of talc or talc" -- this is the first
18   sentence of the abstract -- "the concern that use
19   of talc or talc-containing substances in the
20   perineal region of women may subject them to an
21   increased risk of ovarian cancer has become an
22   important issue in the study of ovarian cancer."
23          Is that -- did I read that correct?
24      A   That's what it says, yes.
25      Q   And that's true, right?

Page 606

1      A   As we've discussed, yes.
2      Q   And that reflects -- and if you go back
3   to my chart here, my -- my timeline, this reflects
4   the concerns that talcum powder products may cause
5   ovarian cancer, and there was an active debate
6   among scientists.  That was the concept we talked
7   about earlier.
8      A   Yes.
9      Q   If you go to page --
10          MR. TISI:  I'm sorry?
11          (Counsel conferring.)
12      Q   Okay.  Let's go back to -- if you go to
13   page 192 of the study, the Discussion section.
14      A   I'm sorry.  Which one?
15          MR. LOCKE:  192.
16          THE WITNESS:  I know.  Which document?
17   BY MR. TISI:
18      Q   The actual published study.
19      A   Okay.
20      Q   The authors -- and these are people who
21   were hired by -- paid for by you all, right?
22      A   Again, I'm a little confused because it
23   says J&J.
24      Q   Okay.  But J&J was actually the -- you
25   know --

Page 607

1      A   Certainly part of, right, industry.
2      Q   Right.  So the discussion says:
3   "Existing evidence linking talc exposure to an
4   increased risk of ovarian cancer cannot be viewed
5   as scientifically conclusive based upon the
6   available epidemiological studies."  Right?
7      A   Mm-hmm.  Yes.
8      Q   Is it your view that the evidence must
9   be conclusive before women are told of the
10   potential risk in a cosmetic product?
11          MR. LOCKE:  Objection.  Beyond the scope
12   and to form.
13   BY MR. TISI:
14      Q   You may answer the question.  Must the
15   evidence be conclusive before women are told of
16   the potential risk?
17          MR. LOCKE:  Same objection.
18          THE WITNESS:  Yeah, I -- I --
19   BY MR. TISI:
20      Q   You know that the standard is that -- we
21   talked about this early on in the deposition --
22   the standard is warnings should be added when
23   there may be a risk, correct?
24          MR. LOCKE:  Objection.  Beyond the scope
25   and form.

58  (Pages 604 to 607)

Linda Loretz, Ph.D.

Page 608

1  BY MR. TISI:
2      Q    You're told -- you know that, right?
3          MR. LOCKE:  Same objection.
4  BY MR. TISI:
5      Q    You actually publish -- PCPC publishes a
6  labeling book for its members, correct?
7          MR. LOCKE:  Objection.
8          THE WITNESS:  The labeling book deals
9  with current labeling requirements.
10  BY MR. TISI:
11      Q    Right.  And you know that warnings
12  should be added when there may be a risk, correct?
13          MR. LOCKE:  Objection.  Beyond the scope
14  and to form.
15          THE WITNESS:  Yeah, that seems like a
16  legal labeling issue that's not anything --
17  BY MR. TISI:
18      Q    But you were responding to a Citizen's
19  Petition regarding labeling, right?  You were
20  responding to that?
21      A    We were responding to the science piece
22  of --
23      Q    Right.  And I asked you what the
24  standard was because doctor -- Dr. Epstein was
25  asking for a label change.  Right?

Page 609

1          MR. LOCKE:  You're asking her what you
2  asked her?
3  BY MR. TISI:
4      Q    No, I -- you know that Dr. Epstein was
5  asking for a label change to add a warning about a
6  potential risk, right?
7      A    I know that that's what he was asking
8  for, correct.
9      Q    And you responded and opposed that,
10  correct?
11          MR. LOCKE:  Objection.
12          THE WITNESS:  Based on the science.
13  BY MR. TISI:
14      Q    Right.  And I asked you before, did you
15  know the standard, correct?
16      A    And I think I said I didn't, that that
17  was a legal --
18      Q    Okay.  And so you responded to the
19  petition not knowing what the standard was.
20          MR. LOCKE:  Objection.
21          THE WITNESS:  We responded by offering
22  scientific -- expert epidemiologists' opinion on
23  what the epidemiology shows.
24  BY MR. TISI:
25      Q    Now, at the last sentence here, Dr. Berg

Page 610

1  says:  "However, all the meta-analysis arrive at a
2  relative risk rate of 1 with a 95 percent
3  confidence interval excluding the null."
4          That's basically saying that all the
5  meta-analysis done as of that time showed an
6  increased risk, correct?
7          MR. LOCKE:  Objection.
8          THE WITNESS:  Well, that's the
9  meta-analysis.  That's not the individual studies.
10  BY MR. TISI:
11      Q    The purpose of a meta-analysis is to
12  combine studies to increase the power of a study
13  to determine a risk, right?
14          MR. LOCKE:  Objection.
15          THE WITNESS:  I mean I'm not an
16  epidemiologist, but I would say, yes, that's their
17  basic purpose.
18  BY MR. TISI:
19      Q    And the last page on page 193, and this
20  is of a 1995 article funded by you all.
21          MR. LOCKE:  Objection.
22          THE WITNESS:  Oh, yeah, it's -- I'm not
23  sure what happened here.  The authors changed, the
24  things changed, and the -- acknowledgments
25  changed.  So I -- I don't want to say this was

Page 611

1  funded by PCPC.  That's not what it says.  And
2  there's definitely a change in authorship here, so
3  things changed.
4  BY MR. TISI:
5      Q    The last sentence says:  "The -- thus,
6  the body of knowledge found in the medical
7  literature does not unequivocally support the
8  hypothesis that talc use puts women at an
9  increased risk of ovarian cancer.  However, the
10  results of this meta-analysis do suggest the
11  possibility of an increased ovarian cancer due to
12  peritoneal -- perineal talc use."
13          Do you see that?
14      A    Yes.
15      Q    And these were the same authors at least
16  that were the people that you all hired to do a
17  meta-analysis, correct?
18      A    Well, I think we hired Dr. Gross, but I
19  don't think we hired Dr. Berg, so that's why I'm
20  saying I'm not sure.
21      Q    And Dr. Berg -- Dr. Berg, I will
22  represent to you, was -- was a doctoral student of
23  Dr. Gross.  And that's made clear in other
24  documents.
25      A    Okay.

Linda Loretz, Ph.D.

Page 612

1    Q   He was basically given coauthorship, but
2  it was really Dr. Gross.
3        So can you say -- these appear to be the
4  same.  This one is March 17, 1994.  This
5  meta-analysis -- published meta-analysis is 1995.
6  One says it's sponsored by J&J, the other one says
7  CTFA.
8        Do you agree that this is likely the
9  same study?
10   A   I think it looks like it's related, yes.
11   Q   Okay.  So this is one study that you
12  authored -- that you were involved with.
13       Let's go through another one.
14   MR. LOCKE:  Objection.
15 BY MR. TISI:
16   Q   Let's go back to the task force
17  document.  1994.
18       The last page, number 4 under the --
19  this is under a heading entitled "Future Research
20  Needs."  Do you see that?
21   A   The last page?
22   Q   If you go to page --
23   A   I see "Future Research Needs."
24   Q   Right.  And if you go to the last page,
25  number 4.

Page 613

1    A   Okay.
2    Q   Okay.  Do you see that?
3    A   Yes.
4    Q   It says -- I don't know who MNordhauser
5  is, but that seems to be a person, right?
6    A   I think it's Mary Ann Nordhauser.
7    Q   Okay.  She pointed out:  "The importance
8  of considering other research directions in which
9  the task force should be involved.  Ms. Nordhauser
10  suggested the task force consider sponsoring
11  further epidemiological studies.  It was noted
12  that Dr. Ernst Wynder discussed an outline of such
13  a research proposal at the ISRTP symposium.  Mike
14  Chudkowski agreed to discuss the developments of
15  such a proposal with Dr. Wynder."
16       Do you see that?
17   A   Yes.
18   Q   Okay.  And was it important during the
19  1990s for the CTFA and the members of the talc
20  task force to do research into the area that we've
21  been discussing, ovarian cancer and talc?
22   A   I guess I think it was discussed to see
23  if -- you know --
24   Q   Well, she says:  "The importance of
25  considering research directions."  Do you see

Page 614

1  that?
2    A   Yes.
3    Q   And at this time frame, as in others,
4  this was an important issue, right?  That's why
5  you guys were meeting.
6    A   That's what we were talking about, yes.
7    Q   And other than the Berg article which we
8  just discussed, are you aware of any industry-
9  sponsored epidemiological study or meta-analysis
10  that actually looked at the question specifically
11  of whether ovarian cancer and talc were related?
12   A   Industry study, no.
13   Q   Given the importance of the issue, don't
14  you find that a little odd?
15       MR. LOCKE:  Objection.
16 BY MR. TISI:
17   Q   It was discussed, right, should we do a
18  study?
19   A   Right.  I don't know what the follow-up
20  was, but, I mean, I guess the question is, is it
21  going to make a difference and is it going to be
22  criticized for being an industry study?
23   Q   Well, if the industry study found what
24  everyone else said, then everyone would be on the
25  same table, right?  They would all -- everyone

Page 615

1  would all agree.
2        MR. LOCKE:  Objection.
3  BY MR. TISI:
4    Q   Well, let me ask you this:  Are you
5  aware that Dr. Wynder did in fact propose a study?
6    A   I'm not aware.
7    Q   Do you know at the time you mentioned --
8  now doctor -- who is Dr. Wynder?
9    A   I don't know.
10   Q   Do you know Dr. Wynder was with the
11  American Health Foundation?
12   A   I guess I do now.
13   Q   You know the American Health Foundation
14  was the same foundation where Dr. Muscat worked?
15   A   Yes.
16   Q   Do you know that Dr. Muscat proposed an
17  epidemiology study to J&J to follow up exactly on
18  this issue in 1994, 1995?
19   A   No, I don't know that.  I mean, I
20  believe that.  I just don't know that.
21       (Exhibit No. 63 was marked for
22       identification.)
23 BY MR. TISI:
24   Q   I'm going to show you Exhibit No. 63.
25       Now, I'll represent to you, because I

Linda Loretz, Ph.D.

Page 616

1  don't like to misrepresent things, that the --
2  that this is a composite exhibit.  Okay.  If you
3  notice the top is a grant application, but if you
4  notice the Bates numbers are -- don't coincide
5  directly with the attachment.
6      We discussed it with Dr. Muscat the
7  other day, so there is -- this was a -- he used a
8  grant application to Johnson & Johnson, but the
9  actual proposal is attached.
10     A   Okay.
11     Q   Okay?
12     A   Yes.
13     Q   And you see that this is a proposal from
14 1994?
15     A   Yes.
16     Q   This would have been within six months
17 of the CTFA Talc Interested Party Task Force --
18     MR. DUFFY:  Counsel, can you confirm
19 that what's in these exhibits is a composite
20 exhibit --
21     MR. TISI:  Absolutely.  Absolutely.  It
22 is two documents.  The one is the actual
23 application itself.
24     MS. FRAZIER:  Are there any other copies
25 of that since --

Page 617

1      MR. TISI:  Yeah.  Yeah.
2      MR. DUFFY:  This one kind of came apart.
3      MR. TISI:  Okay.  It was testified to by
4  Dr. Muscat the other day, so they refer to the
5  same thing.
6      The first -- and just to be clear for
7  the record, the top exhibit is a grant application
8  entitled "Talcum Powder Use in Ovarian Cancer,
9  Joshua Muscat, Research Scientist," on behalf of
10 the American Health Foundation.
11     There is actually a letter that goes
12 along with it as well, and attached is that actual
13 proposal for case controlled study of talcum
14 powder use and ovarian cancer.
15     MR. DUFFY:  Thank you.
16     MR. TISI:  You're welcome.
17 BY MR. TISI:
18     Q   And I'll represent to you that both of
19 these documents are dated 2000 and -- actually,
20 1994.
21     A   Okay.
22     MR. LOCKE:  Well, one says, not the --
23 January 31st, 1995.
24     MR. TISI:  Okay.  The second one?
25     MR. LOCKE:  Yes.

Page 618

1      MR. TISI:  Okay.  I thought it was -- I
2  thought it was December 1994, but okay.
3      So -- and there's a -- there's actually
4  a letter sent to J&J listing this out, and I won't
5  go into detail about it.
6  BY MR. TISI:
7      Q   But my question is this appears to be a
8  follow-up --
9      MR. TISI:  Do you have a copy of that
10 letter?
11     Okay.  Could we take a break for one
12 minute while we get a copy of the letter?
13     THE VIDEOGRAPHER:  The time is 2:06 p.m.
14 We're going off the record.
15     (Recess.)
16     THE VIDEOGRAPHER:  The time is 2:16 p.m.
17 We're back on the record.
18 BY MR. TISI:
19     Q   Doctor, I don't want to belabor the
20 point because I know we've been going a little
21 while, and I've got to turn my time over to other
22 people.
23     But do you know whether or not J&J --
24 first of all, the study that you have in front of
25 you is a case controlled study.

Page 619

1      A   Okay.
2      Q   Do you -- well, do you see it?  It's
3  entitled "Proposal for a Case Controlled Study of
4  Talcum Powder Use in Ovarian Cancer."
5      MR. LOCKE:  If you go back to page 78 at
6  the bottom there.
7      THE WITNESS:  This one?  Yep.  Okay.  I
8  see it, yes.
9  BY MR. TISI:
10     Q   So there's a study -- this is actually a
11 study proposal, okay?
12     A   Yes.
13     Q   So just so we have the time frame down,
14 the -- in 1994, you all had a meeting.  There was
15 a suggestion that J&J follow up and see whether or
16 not an additional study could be done by
17 Dr. Wynder's group.  This is Dr. Wynder's group,
18 the American Health Foundation.  They proposed a
19 study, and the study was a case controlled study.
20     Does that appear to be true?
21     MR. LOCKE:  Objection.
22     THE WITNESS:  That appears to be true.
23 BY MR. TISI:
24     Q   Did -- now, the study, if you go back
25 one page, is about a $400,000 study.

61  (Pages 616 to 619)

Linda Loretz, Ph.D.

Page 620

```
 1        A   That's what it says, yes.
 2        Q   All right.  Now, I have a document
 3   here -- first of all, had you ever -- before
 4   coming here today, had you heard about this study
 5   or know anything about it?
 6        A   I don't believe so, no.
 7        Q   Okay.  I'm going to provide you with a
 8   document, page -- it's Exhibit No. 15, and it says
 9   "Draft Never Sent," but I'm curious as to whether
10   or not there was any other documents related to
11   that.
12            (Exhibit No. 64 was marked for
13            identification.)
14            MR. LOCKE:  This is also marked 63.
15            MR. TISI:  Right -- oh, I'm sorry.  Let
16   me -- what number are we at now?
17            MR. LOCKE:  64.
18            MR. TISI:  See without my -- so what's
19   the next one we're at?
20            MR. LOCKE:  64 is the one we're -- that
21   one should -- would be.
22            MR. TISI:  Thank you, Tom.
23   BY MR. TISI:
24        Q   Let me see if this somehow raises a --
25   the specter to you that perhaps maybe this was
```

Page 621

```
 1   discussed with Dr. Gettings.  First of all, this
 2   is --
 3            MR. GOLOMB:  Could we just get that
 4   document up on the screen?
 5            MR. TISI:  Yeah, May 5th -- it's 139.
 6   BY MR. TISI:
 7        Q   And it says -- it's a -- it's a letter,
 8   and it says "Draft Never Sent" on top.  So I don't
 9   want to -- I don't know whether you got it or you
10   didn't get it or you got another version of it or
11   whatever.  I haven't seen anything in the records
12   relating to this, but --
13        A   I haven't --
14        Q   -- I don't know whether or not anything
15   in your -- in your travels you may have found
16   something.
17            It says, Dr. Gettings:  "Dear Steve:
18   This provides you with a copy of a talc proposal
19   prepared by Dr. Joshua Muscat and Dr. Ernst Wynder
20   of the American Health Foundation.  They are
21   proposing a new more definitive epidemiology study
22   examining the hypothesized link between hygenic
23   use of cosmetic talcum powder and the incidence of
24   ovarian cancer.  It is a very carefully designed
25   study with special attention paid to -- paid to
```

Page 622

```
 1   many possible confounders which had previously
 2   been ignored.  The study will take two and a half
 3   years to complete and cost nearly $400,000."
 4            Did I read that so far?
 5        A   Yes.
 6        Q   "We at J&J have reviewed the proposal
 7   and believe the study could help clarify the many
 8   obvious shortcomings in the previously reported
 9   studies.  For as long as I've been on the Talc
10   Interested Party Task Force, we have discussed
11   ways to improve our understanding of cosmetic talc
12   use.  I think the task force should sponsor the
13   study as an industry initiative.  Would you please
14   poll the members about the idea and put this
15   subject on our upcoming task force meeting and
16   agenda?"
17            Do you see that?
18        A   Yes.
19        Q   And I read that correctly?
20        A   Yes.
21        Q   Okay.  Do you know whether or not J&J
22   ever brought to the attention of the -- the CTFA
23   the $400,000 well-designed, carefully designed
24   study that Dr. Muscat drafted when he was with the
25   American Health Foundation?
```

Page 623

```
 1            MS. FRAZIER:  Object to form.
 2            THE WITNESS:  I'm not aware.  I don't
 3   believe I've seen this or seen discussion of it.
 4   BY MR. TISI:
 5        Q   Is this the kind of study that the -- I
 6   mean, we talked about the fact that the CTFA and
 7   PCPC was very interested in the science
 8   surrounding talc.  Right?
 9        A   Yes.
10        Q   And have been interested for decades,
11   right?
12        A   Yes.
13        Q   Do you have any reason to believe that
14   such a study had been brought to the attention of
15   the CFTA that such a study would not have been
16   funded and done?
17        A   I really don't know.  I mean, I think
18   you really would have to -- yeah, I can't say
19   without having had that experience of bringing it
20   and asking who was willing to do the funding.
21        Q   Has anybody -- has J&J ever proposed a
22   study, in all of your experience with them, or
23   proposed an action that CTFA decided it was not
24   going to do, that you can think of?
25        A   We -- we -- I mean just overall, not
```

62 (Pages 620 to 623)

Linda Loretz, Ph.D.

Page 624

1    outside of the area of talc, I mean sometimes we
2    talk about studies and people either decide to do
3    them or not.
4        Q   Okay.  So -- but this study that was
5    proposed by Dr. Muscat to help understand the
6    issue was never sent to the members of the task
7    force to the best of your knowledge?
8        A   I'm -- I'm not aware of it.  I don't
9    believe I've seen this before.
10       Q   Do you know why -- I mean in all this
11   time, decades have gone by, and the -- the
12   company -- the companies involved in the task
13   force have never done an epidemiology study to
14   study perineal talc and ovarian cancer?
15       A   I guess I can't answer that.  I mean, I
16   guess the question could be, you know, would it
17   make a difference and would an industry study be
18   taken without it being assumed that it wasn't as
19   good as another study?  I don't know.  But I don't
20   know.
21       Q   Okay.  Well, that doesn't stop you all
22   from doing studies, does it?
23       A   Well, it doesn't, except that it -- I
24   mean it -- it becomes an issue.
25       Q   So you could always hire an outside

Page 625

1    group to do it, right, and not have any role in
2    the -- in the design of the study, no role in the
3    editing of the study, no role -- no approve --
4    approval or non-approval of the text, right?  I
5    mean there are times when that's done, right?
6        MR. LOCKE:  Objection.
7        THE WITNESS:  I guess I can't think of
8    anywhere we've done a study like that.
9    BY MR. TISI:
10       Q   Right.  Because you always want to know
11   what the authors are saying about a study you fund
12   before you agree that it gets published, right?
13       MR. LOCKE:  Objection.
14       THE WITNESS:  I mean, in general, yes,
15   if we're funding a study, we want to --
16   BY MR. TISI:
17       Q   So you're unaware of this particular
18   study and why it was and was not done.
19       A   Yes.  I don't believe I've seen it.
20       Q   Now, I'm going to show you a study that
21   was done by Dr. Huncharek, Exhibit No. --
22       MR. TISI:  Which exhibit are we on?
23       MR. LOCKE:  65.
24       MR. TISI:  Do you have a sticky?
25       (Exhibit No. 65 was marked for

Page 626

1        identification.)
2    BY MR. TISI:
3        Q   This is a 2003 study.  And I only have
4    one copy, but since I know it by heart, I'm not
5    going to need it.
6        Do you know whether or not this is a
7    study -- I assume you saw it.  You're familiar
8    with that study, it's a 2003 study by
9    Dr. Huncharek?
10       A   I -- yes.
11       Q   Is that a study that -- were you aware
12   of that study before it was published?
13       A   No.
14       Q   Okay.  Was -- was PCPC in any way made
15   aware of the study before it was published?
16       A   No.
17       Q   Okay.  Did PCPC -- we discussed the two
18   papers from Dr. Huncharek and Muscat that was in
19   the letter from -- the e-mail from Mr. Glenn.
20       A   Yes.
21       Q   I can attach those two studies here.
22       MR. TISI:  Do you have those two
23   studies?
24       (Counsel conferring.)
25       MR. TISI:  51 or 52, if you can get

Page 627

1    those.
2    BY MR. TISI:
3        Q   Now, other than being aware of them
4    before they were published, was PCPC involved in
5    any way with the review of these articles?
6        MR. LOCKE:  Objection.
7        THE WITNESS:  They were not.
8    BY MR. TISI:
9        Q   Do you know who Brooke Mossman is?
10       A   I have heard the name.  She's at
11   Vermont, and I know it, yes.
12       Q   University at Vermont?
13       A   I think so.
14       Q   Do you know that she was involved in
15   funded studies relating to the cellular response
16   to -- to both asbestos and talc?
17       A   That sounds familiar, yes.
18       Q   Do you know that those studies were
19   funded by IMA North America?
20       A   No.  I mean, I -- I have probably run
21   across that.  I know they were not funded by us,
22   but that --
23       Q   Okay.  And that was my question is, do
24   you know -- were you involved in any discussions
25   about funding any studies by Dr. Mossman?

63 (Pages 624 to 627)

Linda Loretz, Ph.D.

Page 628

1    A   He may have been asked about it. I'm
2  not sure, but we did not fund any.
3    Q   There was a study that Dr. Mossman
4  proposed. Are you familiar with the Shukla paper?
5    A   Not by that name.
6    Q   It's a Mossman -- it's a published
7  Mossman study.
8    A   Okay.
9    Q   Are you aware that Dr. Mossman had
10  proposed a follow-up study that industry declined
11  to fund?
12    A   That sounds familiar.
13    Q   Have you ever understood why a
14  company -- or what do you understand about that
15  study?
16    A   I -- I am hard-pressed to remember what
17  it was about.
18    Q   Do you understand that she wanted to
19  look at different kinds of talc and how it reacted
20  to ovarian cancer cells?
21    A   I -- I just don't remember.
22    Q   Do you know whether or not -- why PCPC
23  decided not to fund that study?
24    A   If that's as I remember, because that's
25  how I remembered, is there was one study, and we

Page 629

1  ask our people and -- if they want to fund, and
2  basically it's -- you know, either they do or they
3  don't, and we would not necessarily know, and nor
4  would -- nor would the reason be the same among
5  companies.
6    Q   Did you ever discuss with either J&J or
7  Imerys why they were not interested in funding
8  that follow-up study by Dr. Mossman?
9      MS. FRAZIER: Object to form.
10      THE WITNESS: Not that I recall.
11  BY MR. TISI:
12    Q   Now, let's go to -- I'd like to go to
13  the answers to interrogatories that were produced,
14  and I'm on my last page here.
15      Your counsel provided to us a set of --
16  a second set of supplemental interrogatories on
17  Friday.
18    A   Okay.
19    Q   Have you seen them?
20    A   I believe so, yes.
21      MR. LOCKE: Actually, I think it was
22  Thursday, but --
23      MR. TISI: Okay. It doesn't matter to
24  me. I worked all weekend anyway.
25      MR. LOCKE: Okay. Thank you.

Page 630

1      (Exhibit No. 66 was marked for
2      identification.)
3  BY MR. TISI:
4    Q   First of all, if you go to page 10, it
5  says -- actually, hold on a second.
6      Okay. On page 12, it says: "Around
7  April 1997, CTFA sought the assistance of
8  consultant epidemiologists to evaluate a study on
9  powder exposure and perineal cancer."
10    A   I'm sorry, page 12?
11    Q   Page 12.
12    A   Oh, second paragraph. Okay.
13    Q   Do you see that?
14    A   Yes.
15    Q   Do you know what study that refers to?
16    A   April '97. I should know.
17    Q   The only study I found is the Cooke
18  study. Does that sound familiar?
19    A   Oh, yeah. I think so.
20    Q   Would that have been the Cooke study?
21    A   I couldn't tell you off the top what
22  year the Cooke study was, but it would be --
23  because I'm not thinking of any other event, I
24  think it would be a single study that --
25    Q   I'm going to show you the Cooke study,

Page 631

1  and it's Exhibit No. 67.
2      (Exhibit No. 67 was marked for
3      identification.)
4  BY MR. TISI:
5    Q   And ask you whether you believe that
6  that's the case that you asked a consultant to
7  look at.
8    A   So again, I think this was before I was
9  at CTFA, which is why I don't know.
10    Q   Right.
11    A   But I know we had a couple of individual
12  studies assessed, so timingwise, I guess this
13  makes sense. So I would --
14    Q   This is my only opportunity --
15    A   That seems plausible.
16    Q   It's my only opportunity to really ask
17  questions of PCPC about this.
18      Do you believe that this is the study?
19    A   I mean, if I -- if I saw that there was
20  a -- if we -- yes. I'm going to go yes.
21    Q   Okay.
22      MR. LOCKE: Just for the record, we do
23  reference a document there that might shed light
24  on it in the interrogatory response.
25      MR. TISI: Yeah, and it's not -- it

64 (Pages 628 to 631)

Linda Loretz, Ph.D.

Page 632

1   wasn't helpful, candidly, but I can go back and
2   figure it out.
3   BY MR. TISI:
4       Q   It sought the assistance of consulting
5   epidemiologists to evaluate the article.  Do you
6   know which epidemiologists they were?
7       A   I don't.
8       Q   Do you know whether it was Dr. Muscat?
9       A   I don't think so.
10      Q   Do you know that Dr. Muscat wrote a
11  letter to the editor regarding the Cooke paper?
12      A   No, I don't -- I don't think I knew
13  that.  I -- I wasn't aware -- again, I wasn't
14  here, so --
15      Q   I understand.  I'm asking you with your
16  hat on as PCPC.
17      A   No, totally agree.  I just -- I'm just
18  saying I wasn't aware that we used Dr. Muscat
19  before 2000.
20      Q   Okay.  I'm going to show you -- I'm
21  going to put this -- and we will get an exhibit.
22          But here is a letter to the editor on
23  the --
24          MR. TISI:  Can you put it up?
25          (Counsel conferring.)

Page 633

1   BY MR. TISI:
2       Q   I'm going to put it up on the screen and
3   we'll just have to substitute it.
4          And this will be Exhibit No. 68.
5          (Exhibit No. 68 was marked for
6          identification.)
7   BY MR. TISI:
8       Q   And here is a letter to the editor in
9   1997 from Dr. Muscat and Dr. Wynder from the
10  American Health Foundation.
11         Do you see that on the screen?
12      A   Sort of, yes.
13      Q   I'm not going to ask you to comment on
14  it.
15      A   Right.
16      Q   I'm asking you do you believe that --
17  that -- I'm trying to understand.
18         Would Dr. Muscat and the American Health
19  Foundation have been the epidemiologists with whom
20  you likely consulted to critique the Cooke paper?
21      A   I guess I just would have to say that's
22  possible.
23         MR. TISI:  Okay.  Counsel, I'm going to
24  ask you, on behalf of PCPC, if you could clarify
25  that for us, if you don't mind.

Page 634

1          MR. LOCKE:  We will see.  Okay.
2   BY MR. TISI:
3       Q   Okay.  One last couple of questions, and
4   then I'm going to kind of be done with it.
5          I asked you whether or not the industry
6   or CTFA or individually the industry members had
7   done an epidemiology study studying ovarian cancer
8   and talc, and you had indicated that you were
9   unaware of any, correct?
10      A   That's correct.
11      Q   Are you aware of any study in which the
12  company did any toxicology studies on animals and
13  ovarian cancer?
14      A   The -- through CTFA, the -- it was the
15  monkey study was -- I guess two monkey studies or
16  one -- one pre-study, one study on translocation.
17      Q   Okay.  But none looking at cellular --
18  whether or not talc or any talc constituent causes
19  cellular changes in ovarian cancer cells in
20  animals?
21      A   I can't think of anything.
22      Q   Okay.  And that would be something that
23  certainly could be done, right?
24      A   I mean something --
25          MR. LOCKE:  Objection.

Page 635

1          THE WITNESS:  Yeah, something could be
2   done, but you'd have to -- I mean, one would need
3   to think about that further as to what could be
4   done, if it would make sense.  If it would, you
5   know, really shed any light on --
6   BY MR. TISI:
7       Q   Well, I mean, without being facetious,
8   you all had about 40 years to think about it.
9          The question is, did you ever talk with
10  amongst the members and say, Maybe we ought to do
11  an animal study seeing whether or not talcum
12  powder products or any constituent of those
13  products cause cellular changes in ovaries of any
14  particular animal?
15         MR. LOCKE:  Objection.
16         THE WITNESS:  I -- I'm not sure there
17  wasn't something done.  Not by us, but -- no, we
18  didn't -- we didn't do anything.
19  BY MR. TISI:
20      Q   Okay.  Any -- there was a discussion in
21  one of the -- in the e-mail that Mr. Glenn sent
22  you in 2005 asking whether or not CTFA would do a
23  dose-response study, because that was one of the
24  Bradford Hill criteria that you all thought didn't
25  -- didn't support causation, and asked whether you

65 (Pages 632 to 635)

Linda Loretz, Ph.D.

Page 636

1  would fund a study by Rothman or something that
2  could be published on dose-response.
3        Did you all discuss that?
4        MR. LOCKE:  Objection.
5        THE WITNESS:  We had Dr. Rothman's and
6  Dr. Samet's and Dr. Pastides' paper.
7  BY MR. TISI:
8    Q   From 2000?
9    A   His assessment.  And we -- right, he --
10 he did not propose reasonable terms that -- for us
11 to take that forward.
12   Q   Okay.  Could you explain that a little
13 more, because I'm not really sure --
14   A   He wanted to charge such an incredible
15 amount, it was far out of the ballpark of being
16 reasonable.
17   Q   Okay.  Well, I -- I'm still not
18 understanding.  Did he propose to do a follow-up
19 study to look at dose-response?
20   A   No.  No, it wasn't -- it wasn't that.
21 He was proposing to turn his -- the submission
22 that he was -- coauthored into a publication.
23   Q   Okay.  And how much did he charge -- did
24 he want to charge?
25   A   $100,000.

Page 637

1    Q   And you all decided thanks but no
2  thanks?
3    A   That's not a reasonable number.
4    Q   Okay.  And then in 2005, Luzenac came
5  back to you and said, you know, We really think
6  it's important to publish a study on dose-
7  response.  Would you consider it?
8        And that was -- we could pull it out,
9  but that was the e-mail we talked about Huncharek
10 and Muscat.  Do you remember that?
11   A   Yes.
12   Q   Did you go back to the well and say, you
13 know, Maybe you ought to publish it and do a
14 published study on dose-response?
15       MR. LOCKE:  Objection.
16       THE WITNESS:  No.  Again, we had the
17 assessment done, but we -- no, we did not go
18 forward to have that made into a publication.
19 BY MR. TISI:
20   Q   That publication was never subject to
21 peer review, was it?
22   A   No.  I mean it was -- it was a --
23   Q   I'm sorry.  Let me rephrase the
24 question.
25   A   Yeah.

Page 638

1    Q   That -- that report that was done by
2  Dr. Rothman and Pastides and Samet was never
3  submitted to a journal for peer review, was it?
4        MR. LOCKE:  Just to clarify, you're
5  talking about the 2000 NTP?
6        MR. TISI:  Correct.
7        THE WITNESS:  Correct.  It was submitted
8  to NTP.
9  BY MR. TISI:
10   Q   But it was never submitted for
11 publication in any peer-reviewed journal.
12   A   That's correct.
13   Q   Okay.  And you declined to support
14 that -- that submission for cost reasons, correct?
15   A   Only because it was very unreasonable.
16   Q   Okay.  Did you ever propose to
17 anybody -- did anyone ever propose to PCPC or
18 anybody else that a dose-response study actually
19 be undertaken?
20   A   I think that was talked about, and I
21 think there was concern that it was something that
22 had been done by somebody else, and should we be
23 doing that.  And again, when I say the cost was
24 high, it was just well out of the bounds of what
25 you would expect.  I mean it wasn't even close.

Page 639

1    Q   Well, let me ask you this, and I will
2  represent to you -- and I don't have a copy of it
3  right here.  Maybe I do.
4        This is Exhibit No. 69.
5        (Exhibit No. 69 was marked for
6        identification.)
7  BY MR. TISI:
8    Q   I will represent to you in 2009,
9  Drs. Huncharek and Muscat proposed all kinds of
10 studies that could be done to further eluciate --
11 elucidate the issue.  Smoking and ovarian risks,
12 hysterectomy and tubal ligation, completion and
13 publication of Rothman's dose-response analysis,
14 et cetera, and then they subsequently propose
15 their own dose-response study.
16       Do you know whether any of those were
17 brought -- any of these proposals were brought to
18 the PCPC?
19   A   I'm not aware that they were.
20   Q   Okay.  Do you currently have any studies
21 that you are -- have either considered -- well,
22 let me ask you this:  Other than the ones we've
23 discussed, can you think of any study that was
24 proposed to the PCPC or by the PCPC relating to
25 the -- any issue relating to ovarian cancer and

66 (Pages 636 to 639)

Golkow Litigation Services - 877.370.DEPS

Linda Loretz, Ph.D.

Page 640

1  talc?
2      A   I'm sorry, what was the first part of
3  your question?
4      Q   Do you know of any study that was either
5  proposed to the PCPC or by the PCPC relating to
6  any issue regarding talcum powder products and
7  ovarian cancer?
8      A   I mean, I guess the monkey study, and
9  then --
10     Q   No, that wasn't done.  That was
11 proposed.
12     A   Oh, that wasn't done.
13     Q   Yeah.
14     A   I think not a -- maybe not a hard core
15 -- well, the ones you've talked about, I mean the
16 Mossman.  But again, I'm not sure there's any that
17 came to proposal.  I mean, I guess it's the things
18 we're talking about now, right?
19     Q   Well, I'm asking if there's anything
20 else.
21     A   Right.
22     Q   I mean, I'm trying to understand what
23 you know.  Right?
24         So -- so are there -- I've tried to pull
25 out some things that --

Page 641

1      A   Right.
2      Q   -- I could see from the records.
3      A   Right.
4      Q   But I didn't live your life --
5      A   Right.
6      Q   -- so I don't know what -- what you
7  know.
8      A   Yeah.
9      Q   So the question I'm asking you is, do
10 you know whether or not, other than the studies
11 we've talked about today, are there any other
12 studies you can think that -- let's take them one
13 at a time -- that were proposed to the PCPC to do
14 that would investigate issues relating to ovarian
15 cancer and talc?
16     A   I would say what I'm aware of is the
17 group talked about kind of a brainstorming
18 session.  So not a proposal, not a fleshed-out
19 proposal, but is there something we can do.
20     Q   And what kind of studies were -- were
21 raised?
22     A   I mean, I think was there epidemiology
23 work that we could do that -- that would help,
24 kind of in a general sense.
25     Q   Okay.  And the answer was?

Page 642

1      A   We didn't do -- we didn't do one.  I
2  mean, there wasn't -- I guess it wasn't thought it
3  would help or would be seen favorably coming from
4  the industry or --
5      Q   Okay.  Any studies relating to the
6  purity of talc from potential carcinogens,
7  including asbestos, did you ever sponsor --
8  discuss any studies about that?
9      A   I mean, I think that goes back to when
10 the specification was being put in place and all
11 the testing was done, and then from then on, it
12 was an ongoing work that was done by the industry,
13 by the individual companies to --
14     Q   No, I -- you're thinking of something --
15 I'm not talking about testing.  I'm talking about
16 any publications done to validate and study
17 whether or not to test it was effective in
18 removing potential carcinogens, including
19 asbestos?
20     A   Any publication?
21     Q   Yeah.
22     A   I'm not --
23     Q   Or studies.
24     A   -- sure what you mean by publication.
25     Q   Or studies.  Surveys, studies, anything

Page 643

1  like that.
2      A   I think that we relied on --
3      Q   The tests themselves.
4      A   Right, that the companies were carrying
5  out ongoing.
6          MR. TISI:  All right.  If you want to
7  take a break, I think I'm done.
8          THE VIDEOGRAPHER:  The time is 2:44 p.m.
9  We're going off the record.
10         (Recess.)
11         THE VIDEOGRAPHER:  The time is 2:51 p.m.
12 We're back on the record.
13             CROSS-EXAMINATION
14 BY MR. GOLOMB:
15     Q   Good afternoon, Doctor.  I'm Richard
16 Golomb.  We met twice before.
17     A   Yes.
18     Q   I'm going to start where Mr. Tisi left
19 off, and I'm going to try not to repeat -- repeat
20 anything that he did, but I do want to clarify
21 some things of where he left off.
22         So the Rothman proposal was rejected, as
23 you said, because of the cost of that study,
24 correct?
25     A   I'm not sure really it was a proposal.

67 (Pages 640 to 643)

Linda Loretz, Ph.D.

Page 644

1 I think we had gone to them, and they just made it
2 clear that it was going to be very, very expensive
3 if we wanted -- so we didn't carry it as far as to
4 a proposal.
5     Q    Okay.  You said in response to
6 Mr. Tisi's question that it was approximately
7 $100,000.  Where did you get that number if not
8 from a proposal?
9     A    I -- I just -- just kind of a verbal.
10    Q    From who?
11    A    I think J&J actually went back and asked
12 him and -- and got a verbal on it.
13    Q    When -- and when was that?
14    A    It was after the NTP meeting.
15    Q    Okay.  And were you with -- with PCPC at
16 that time?
17    A    Yes.
18    Q    All right.  So that was shortly after
19 you went onboard with PCPC?
20    A    No, I started -- no, that was in 2000 --
21 or probably 2000 -- I'm sure it was 2001.
22    Q    Okay.
23    A    I started PCPC in 1997.
24    Q    All right.  And the Wynder/Muscat
25 proposal, why was that rejected?

Page 645

1     A    I -- I don't believe we ever saw that --
2 PCPC ever saw that.
3     Q    But at least one or more of your members
4 did?
5     A    That's what it -- it looked like that
6 J&J saw it, yes.
7     Q    And do you know why -- from your review
8 of the records, why that proposal was rejected?
9     A    No.  Again, I don't think we ever saw
10 it.
11    Q    Okay.  When you say "we," you say PCPC?
12    A    Sorry, PCPC.  I don't think PCPC ever
13 had that.
14    Q    Okay.  My question was a little bit
15 different.
16         While PCPC may not have seen the
17 proposal, one or more of your members did, and
18 rejected it, correct?
19    A    As far as I know the study didn't
20 happen, so --
21    Q    Right.
22    A    -- that would follow.
23    Q    And my question was, based on your
24 review of the documents that assisted you in your
25 preparation for your deposition today, did you

Page 646

1 learn why it was that one or more of your members
2 rejected the Wynder/Muscat study?
3     A    No.
4     Q    All right.  Now, in -- in addition to
5 Rothman and in addition to Wynder and in addition
6 to Muscat, there's a Dr. Wehner, correct, or
7 Wehner?
8     A    Wehner, yes.
9     Q    And that's spelled W-E-H-N-E-R?
10    A    Correct.
11    Q    All right.  And the Wynder/Muscat
12 proposal was sometime in the early to mid-'90s, is
13 that your understanding?
14    A    Whatever it was that I just saw.  As I
15 say, we never -- we -- PCPC didn't see it, so I
16 would rather look at what it was than try to go by
17 memory.
18    Q    Okay.  Well, let me ask you this:  You
19 have -- and I've asked you before about
20 Dr. Wehner, and you've reviewed some of the
21 documents from him as well, correct?
22    A    Yes.
23    Q    And those documents begin in the early
24 to mid-1990s, correct?
25    A    Dr. Wehner did the study at Battelle, so

Page 647

1 that was in the early '80s.
2     Q    Okay.  Well --
3     A    Or mid-'80s.
4     Q    -- he was --
5     A    Mid-'80s.
6     Q    -- he was retained by the CFTA in the
7 early '90s, correct?
8     A    In addition to doing that study, he was
9 retained in 2000, and he was retained at -- he --
10 I know we paid for his travel to the ISRTP
11 workshop, so that would be the '94.
12    Q    Okay.  And you -- you recall in
13 preparation for your deposition last time, you
14 told me that you reviewed some of the letters from
15 Dr. Wehner, correct?
16    A    Some of the letters?
17    Q    Letters.
18    A    I'm not sure what you mean my letters.
19    Q    Okay.  You don't know what I mean by a
20 letter?  A letter, it was a piece of paper that
21 was -- that came from Dr. Wehner to somebody at
22 the CFTA, do you recall that?
23    A    That was a proposal or --
24    Q    No, any letter.  Do you recall any
25 letter from Dr. Wehner to the CFTA?

68 (Pages 644 to 647)

Linda Loretz, Ph.D.

Page 648

1    A  I mean, we hired him, so we had
2  proposals, I guess.  So, yes, documents.
3    Q  Did -- it's really -- it's not a trick
4  question.  I'm just trying to understand that
5  you -- you in fact saw letters from Dr. Wehner to
6  the CFTA outlining what it is that he was
7  proposing that be done, correct?
8    A  I can think of at least one, yes.
9    Q  Okay.  And included in those letters
10  were also comments from Dr. Wehner about comments
11  that the CFTA -- that Luzenac at that time, the
12  predecessor of Imerys, some of the things that
13  they were going to say publicly about the defense
14  of talc and ovarian cancer, correct?  Do you
15  recall those?
16    A  I'm not sure what you mean.  I'm --
17    Q  Okay.  Do you recall in one of those
18  letters that Dr. Wehner, in addition to
19  Dr. Rothman, in addition to Dr. Wynder, in
20  addition to Dr. Muscat, that Dr. Wehner also
21  recommended that the CFTA and J&J and other
22  members of the CFTA at that time also conduct
23  their own study?
24    A  I'm not recalling specifically which
25  document you're talking about.

Page 649

1    Q  Okay.  Do you -- as you sit here today,
2  do you recall that -- whether or not it was in a
3  document or not, do you recall that Dr. Wehner
4  made a recommendation to the CFTA to do its own
5  study?
6    A  I'm not recalling that right now.
7    Q  And do you recall that in that letter
8  back in 1994 that Dr. Wehner also told the CFTA
9  that it would be easy to do and that the results
10  would be -- would come back within six months?  Do
11  you recall that?  Does that help refresh your
12  recollection?
13    A  Can you -- can you show me the document,
14  because I'm not sure what study you're talking
15  about.
16    Q  Okay.  Do --
17    A  Can you tell me what kind of study
18  he's -- he's --
19    Q  Do you recall Dr. Wehner recommending
20  any kind of study?
21    A  Well, I mean, he did a study for us, and
22  he did various assessments of the data, but I
23  think you're talking about something real
24  specific, and I --
25    Q  Do you recall Dr. Wehner recommending a

Page 650

1  case controlled study?
2    A  Maybe vaguely.
3    Q  Okay.  And do you recall -- does it help
4  refresh your recollection that in that letter
5  dated in 1994, that in addition to recommending
6  the study, Dr. Wehner put some parameters on it
7  and said it would be easy to do and that you could
8  get the results back within six months?
9    A  I think that sounds vaguely familiar,
10  but I don't remember the details of what -- what
11  he was proposing.
12    Q  And that study was never done, correct?
13    A  Again, I would really feel better seeing
14  what it is, so that -- but a study by doctor -- a
15  case controlled study by Dr. Wehner was never
16  done, no.
17    Q  Right.  And so -- and a case controlled
18  study by Dr. Wynder or Dr. Muscat was never done,
19  correct?
20    A  Again, PCPC was not even aware of that
21  proposal.
22    Q  Okay.  Isn't it true that none of these
23  studies were done because PCPC and its members
24  just didn't want to know the results?
25    MR. LOCKE:  Objection.

Page 651

1    THE WITNESS:  No.  I mean, we take the
2  direction of our members, and the members' reasons
3  for not funding would -- I mean, you would have to
4  ask them.
5  BY MR. GOLOMB:
6    Q  Okay.  So sitting here today, you don't
7  know why it is that Rothman, Wynder, Muscat and
8  Wehner were all rejected, their proposals.  Is
9  that what you're telling us?
10    MR. LOCKE:  Objection.
11    THE WITNESS:  I think the only thing I
12  could say would be the Rothman one, because that's
13  one thing we looked at, and we knew that -- again,
14  it's not all costs, but we were hoping for just a
15  reasonable, normal cost, and that I think -- I'm
16  sure we would have gone ahead, but it was in a
17  ballpark that was just not rational.
18  BY MR. GOLOMB:
19    Q  Okay.  And that ballpark was $100,000?
20    MR. LOCKE:  Objection.
21    THE WITNESS:  That -- that's my
22  recollection, yes.
23  BY MR. GOLOMB:
24    Q  All right.  And you are aware, are you
25  not, that -- that before that decision was made,

69 (Pages 648 to 651)

Linda Loretz, Ph.D.

Page 652

1  that Dr. Cramer had published on the association
2  between talc and ovarian cancer, correct?
3      A   In 1982, yes.
4      Q   Right.  He also published in 1992.
5      A   I know he published -- he was a coauthor
6  on the Gertig paper.
7      Q   Right.  And in that paper, in a footnote
8  in that paper he talks about the -- the numbers of
9  women who died from ovarian cancer.  Do you recall
10 that?
11     A   I do not.
12     Q   All right.  Tell me if this sounds
13 familiar: 22,000 women a year had ovarian cancer.
14 Does that sound familiar?
15     A   That sounds like what I heard this
16 morning too.
17     Q   Okay.  And 14,000 women a year die from
18 ovarian cancer.  Does that sound familiar?
19     A   That sounds about a number I would
20 expect from the --
21     Q   Okay.  And in Dr. Cramer's paper in
22 1992, he concludes that 10 percent of those women
23 die from a -- from talc and ovarian cancer.
24        MR. LOCKE:  Object --
25 BY MR. GOLOMB:

Page 653

1      Q   Do you recall that in the paper?
2         MR. LOCKE:  Objection.  Mischaracterizes
3  the paper.
4  BY MR. GOLOMB:
5      Q   Do you recall that?
6      A   I -- I recall something along those
7  lines.  It doesn't mean we agreed with that,
8  though.
9      Q   No, I understand.  But that's -- that
10 is what was reported in 1992 before the decision
11 was made not to do a study that was recommended
12 by Dr. Rothman, Dr. Wynder, Dr. Muscat and
13 Dr. Wehner?
14        MR. LOCKE:  Objection.
15        THE WITNESS:  I mean, I -- if that's
16 what was said in the paper, again, I don't -- I
17 would have to look back, and we didn't agree with
18 that.
19 BY MR. GOLOMB:
20     Q   All right.  So let me ask you about
21 Dr. Huncharek, and I'm not going to go through the
22 study again.  Mr. Tisi did that well.
23        When -- when did PCPC first retain
24 Dr. Huncharek for any reason?
25     A   I believe it was for the answer to the

Page 654

1  Citizen Petition.
2      Q   Which one?
3      A   The 2008, so the 2009 response.
4      Q   So as far as you know, Dr. Huncharek did
5  not do any work for PCPC before 2008?
6      A   I'm just trying to think and make sure
7  I'm not skipping anything.  I think that's
8  correct.
9      Q   Okay.  And how was it that Dr. Huncharek
10 was retained by PCPC or one of its members?
11     A   Again, it was --
12        MR. LOCKE:  Objection.
13        THE WITNESS:  -- J&J that reached out to
14 him first.  And they were familiar with him from
15 various work.
16 BY MR. GOLOMB:
17     Q   Who was it at J&J?
18     A   Who did I talk to at J&J at the time?  I
19 don't remember.
20     Q   Okay.  So in the -- in the deposition
21 notice -- and I hate to tell you we're still on
22 topic 1, there's only 17 more to go -- but it
23 refers to the Weinberg Group.  Do you know who the
24 Weinberg Group is?
25     A   Yes.

Page 655

1      Q   And who is the Weinberg Group?
2      A   Weinberg Group is a consulting group,
3  and we hired them at the time of the NTP report to
4  pull together a binder, organize all the
5  information, and then reach out to consulting
6  epidemiologists.
7      Q   All right.  And that was in 1999, 2000?
8      A   It was in 2000.
9      Q   All right.  And was -- did anybody from
10 the Weinberg Group talk to Dr. Huncharek at that
11 time, do you know?
12     A   Not that I'm aware of.
13     Q   Who did they talk to?
14     A   The people that were hired through the
15 Weinberg Group were Drs. Rothman, Pastides, and
16 Samet, Dr. Samuel Shapiro, and Dr. Muscat.
17     Q   All right.  And they are -- some or all
18 of them were the ones who then wrote the report
19 that was then submitted to the NTP?
20     A   There were three separate reports, and,
21 yes, those are the authors.  Three of them on one
22 and then individuals from Muscat and Shapiro.
23     Q   All right.  And then somebody actually
24 made the report to the NTP, correct?
25     A   Correct.

Linda Loretz, Ph.D.

Page 656

```
1          MR. LOCKE: Objection. This material
2   was covered at length by Mr. Meadows. These
3   questions have been asked and answered.
4          MR. GOLOMB: I don't -- I'm not sure if
5   that's true or not, but I -- I don't -- I only
6   have a couple of minutes on this, so it's not
7   going to take much time.
8          THE WITNESS: Dr. Rothman made a
9   presentation on -- on that that there -- the
10  report that the three of them put together, the
11  review that the three of them put together.
12  BY MR. GOLOMB:
13      Q   Okay.  And it was -- you're saying --
14      A   So Dr. Pastides, not Dr. Rothman.
15      Q   Okay.  It was not Dr. Rothman, correct?
16      A   That's correct, it was Dr. Pastides.
17      Q   In fact, you recall in your review of
18  documents that Dr. Rothman was kind of upset
19  that he wasn't able to make the presentation?  Do
20  you recall that?
21      A   Not really.
22      Q   Okay.  Burson-Marsteller, who is that?
23      A   I think they're a -- I think they do
24  work for PCPC on our website or on our -- perhaps
25  on cosmeticsinfo.org.  I think --
```

Page 657

```
1       Q   I'm sorry?
2       A   Perhaps on cosmeticsinfo.org.
3       Q   Who -- who are they?
4       A   I think they're people that help prepare
5   information, and they work with our Public Affairs
6   department.
7       Q   Okay.
8       A   I think.
9       Q   And so you're -- you're looking like you
10  don't know too much about them.
11      A   I don't know too much about them.
12      Q   All right.  Did you -- you reviewed
13  the -- the notice of deposition before you
14  testified?
15      A   Yes.
16      Q   And so you know under 1(f), it
17  specifically says that we're going to ask
18  questions about Burson-Marsteller?
19      A   Yes.
20      Q   Okay.  So did you prepare yourself to
21  answer questions about Burson-Marsteller?
22          MR. LOCKE: Why don't you ask her a
23  question about them.
24          MR. GOLOMB: Well, I did.
25          MR. LOCKE: And she answered.
```

Page 658

```
1   BY MR. GOLOMB:
2       Q   Okay.  That was an answer?
3       A   Yeah, I think they work on our website.
4   I think they work on putting messages together,
5   and they work with our Public Affairs people.
6       Q   Well, my question was who is
7   Burson-Marsteller?
8       A   It's a company.
9       Q   It's a company.  All right.  And is that
10  something you learned in your preparation for
11  today's deposition?
12      A   I had heard of them, the name before.
13      Q   All right.  Who is Nichols-Dezenhall?
14      A   Nichols-Dezenhall is a public affairs
15  company that did work for CTFA back some many
16  years ago.  I'm not sure that we've used them at
17  all in recent years.  They did a couple of focus
18  groups around the time of the NTP report on talc.
19  We use them I know for other things.
20      Q   When did you learn about the focus
21  groups?
22      A   In my preparation for this deposition.
23      Q   Okay.  Because you recall -- I was the
24  one who asked you about Nichols-Dezenhall before,
25  do you remember that?
```

Page 659

```
1          MR. LOCKE: When you say "before," what
2   do you mean?
3          THE WITNESS: Yeah.
4   BY MR. GOLOMB:
5       Q   In your prior deposition in July of
6   2018.
7       A   I -- I couldn't recall who it was, but I
8   do remember being asked about that, and I gave an
9   answer that was not quite accurate, and that's why
10  I made sure I was clarified on that after the
11  fact.
12      Q   All right.  So did you review your --
13  your deposition transcript from 2018 to help
14  prepare you today?
15      A   I -- I read over it to see if there were
16  any things that I was confused about and made sure
17  I had answers -- my answers correct.
18      Q   And I deposed you in -- I think it was
19  2016 as well, correct?
20      A   That's correct.
21      Q   Did you review that in preparation for
22  your deposition today?
23      A   Not today, no.
24      Q   I also after your deposition in July of
25  2018 and before today deposed Mr. Pollack.  You
```

Linda Loretz, Ph.D.

Page 660

1  know him, correct?
2      A   Yes.
3      Q   And just for the ladies and gentlemen of
4  the jury, can you explain who Mr. Pollack is.
5      A   Mark Pollack is -- I should know his
6  title, but he is an employee of the Personal Care
7  Products Council.  He reports directly to our CEO.
8  He has an executive VP title.  Perhaps it's for
9  membership.  I'm not sure.
10     Q   Okay.  And did you read Mr. Pollack's
11  deposition transcript?
12     A   I did not.
13     Q   All right.  Can we go to document 50 --
14  52415.
15         This was a composite document.  Which
16  has been marked as Exhibit 70.
17         (Exhibit No. 70 was marked for
18         identification.)
19  BY MR. GOLOMB:
20     Q   To me it appears to be a -- it's a PCPC
21  document, and to me it appears to be a PowerPoint
22  of some sort.
23         Have you seen this before?
24     A   I may have seen it in my preparation.
25  I'm not sure.

Page 661

1      Q   Okay.  Can you tell us what it is?
2      A   Well, it looks like it's kind of an
3  introduction to what is -- what is CTFA.
4  Obviously, this is older since we're now PCPC.
5         MR. LOCKE:  And just for the record, I
6  want to note it's missing quite a few pages, and
7  some pages -- well --
8         MR. TISI:  Right.  And for the record,
9  it was about a 50-page document, and the ones I
10  made copies of are the ones I'm asking questions
11  about.
12  BY MR. GOLOMB:
13     Q   Is there anything, based on your review
14  of those documents, that can tell us when this was
15  used?
16     A   No.  That's to say, only from CTFA that
17  tells you something.
18     Q   Right.  So when did CTFA change to PCPC?
19     A   Roughly 2006.
20     Q   Now, did you ever see this document
21  before you were preparing for this deposition?
22     A   I doubt it.
23     Q   So do you know who prepared it?
24     A   No.
25     Q   Let's go to the next document, which is

Page 662

1  52418.
2         Which is part of the same composite,
3  correct?
4      A   Yes, so it appears.
5      Q   And it says:  "Mission accomplished by
6  promoting," and then the first bullet point says:
7  "Voluntary industry self-regulation."
8         Is that still a primary mission of PCPC?
9      A   I guess I would probably say no in the
10  fact that we have been working on getting updated
11  regulations passed for the cosmetic industry for
12  the past 12 years.
13     Q   Well, let's go to the next document,
14  which is PCPC 52424.
15         And it says at the top "Self-regulation
16  Programs," and under the first bullet point it
17  says "CIR," correct?
18     A   Yes.
19     Q   All right.  And CIR is still a
20  self-regulatory program that is funded by the
21  PCPC, correct?
22     A   It is still funded by the PCPC, correct.
23     Q   And it's still a self-regulatory
24  program, correct?
25     A   I guess you could call it that.  I mean,

Page 663

1  we -- we undertook CIR because FDA didn't.  So...
2      Q   The next document in that same
3  PowerPoint is PCPC 52426.
4         Do you see that?
5      A   Yes.
6      Q   And it basically is talking about the --
7  the trade association obviously being at that time
8  CTFA, now PCPC, and some of the -- the member
9  services, correct?
10     A   Yes.
11     Q   And the first bullet point provides
12  current information?
13     A   Yes.
14     Q   The second extends your resources,
15  meaning that you can pull your resources like as
16  in a task force.
17     A   That's one way, yes.
18         MR. LOCKE:  Objection.
19  BY MR. GOLOMB:
20     Q   And then the third bullet point is --
21  allows you to influence industry policy and
22  action.  Correct?
23     A   Yes.
24     Q   And allows you to avoid direct
25  company-government confrontation.

72 (Pages 660 to 663)

Linda Loretz, Ph.D.

Page 664

1     A   That's what it says.
2     Q   Right.  So meaning that PCPC, or at that
3  time CFTA, kind of acted as the intermediary to
4  deal with the government confrontation?
5     A   For example, comments where the
6  companies would -- where we would coordinate
7  and -- and we would submit comments.
8     Q   Correct.  Or as in this case, where
9  the -- the CFTA would put its name on a document
10  so that J -- J&J didn't have to.
11        MR. LOCKE:  Objection.
12        THE WITNESS:  We were -- we were the
13  face of -- we were serving as the face of the
14  industry.
15  BY MR. GOLOMB:
16     Q   Right.  And in this case, though, you
17  were serving as the face of the industry at the
18  specific request of J&J, who said -- who basically
19  concurred with the report that they reviewed, but
20  suggested that it shouldn't be their name on it,
21  it should be your name on it, correct?
22        MR. LOCKE:  Objection.
23        THE WITNESS:  We had to agree with the
24  report as well.
25  BY MR. GOLOMB:

Page 665

1     Q   All right.  But that's to allow them to
2  avoid direct company-government confrontation,
3  correct?
4        MR. LOCKE:  Objection.
5        THE WITNESS:  I'm not sure that would be
6  confrontation, but -- but, yes, we were the face
7  of the industry.
8  BY MR. GOLOMB:
9     Q   All right.  And the next document is
10  52457.
11        This is essentially kind of describes
12  the differences, does it not, between cosmetic and
13  the pharmaceutical?
14     A   In some ways, yes.  And I have to say
15  this -- this is out of date.  I mean, we would not
16  produce something like this today.
17     Q   But it's still holds true, though.  You
18  may not produce it, but it still holds true.
19     A   Well, but -- no, what I'm saying is, for
20  example, in this legislation that we are
21  advocating for -- good manufacturing practices are
22  a part of that, just as an example.  So things
23  change.
24     Q   But one -- one of the things that still
25  holds true is that cosmetics have no prior FDA

Page 666

1  clearance required.
2     A   There's no premarket approval, that's
3  correct.
4     Q   As opposed to a pharmaceutical which
5  does.
6     A   That the active ingredients would be
7  approved, yes.
8     Q   Right.  Cosmetics have less rigorous
9  inspections --
10     A   Yes.
11     Q   -- than a pharmaceutical.
12        And cosmetics have no specific standards
13  for efficacy.
14     A   Well, cosmetics don't have efficacy the
15  same way that drugs do, so that just kind of
16  follows.
17     Q   Correct.  That's part of the
18  self-regulatory standard.
19     A   No, I mean, cosmetics are not -- they
20  don't affect the structure or function of the
21  body.  That's by definition.  So they don't have
22  efficacy in a way that a drug would.
23     Q   Let's turn to 52505.
24        Well, that's it, but it's upside down on
25  the screen.  There you go.

Page 667

1        So when this describes expert panels, it
2  talks about liaison members, and I assume, correct
3  me if I'm wrong, this is liaisoned from the -- at
4  the time the CFTA to various governmental
5  agencies, correct?
6        MR. LOCKE:  Objection.
7        THE WITNESS:  I'm sorry.  These are --
8  yeah, there's three liaison members that still
9  exist today.  One is from FDA, one is from
10  Consumer Federation of America, and one is
11  representing industry.
12  BY MR. GOLOMB:
13     Q   Right.  And these -- and so there was a
14  lot of talk about John Bailey today.
15     A   Yes.
16     Q   So this is at a time when John Bailey
17  was still at the FDA, correct?
18     A   Correct.
19     Q   And I want to understand the timeline of
20  this.  So with -- specifically with John Bailey.
21        The -- the first Citizens Petition was
22  in 1993, correct?
23     A   Yes.
24     Q   And that was at a time that John Bailey
25  was at the FDA, correct?

73 (Pages 664 to 667)

Linda Loretz, Ph.D.

Page 668

1      A   Yes.
2      Q   And as -- as we saw from the letter,
3  John Bailey at some point, representing the FDA,
4  wrote a letter not rejecting the Citizens Petition
5  but, rather, saying they didn't have the resources
6  to deal with it at that time, correct?
7      A   I think that was just the initial
8  response.
9      Q   The initial response in 1993, that's
10 what I'm talking about.
11     A   Right, which is -- but that's -- I mean,
12 that's how they respond to Citizens Petitions
13 initially, I think almost always.
14     Q   I'm not -- I'm not questioning it one
15 way or the other.  I'm just trying to understand
16 the timeline.
17     A   He wrote that initial letter in
18 response, yes.
19     Q   Right.  When he was -- when he was at
20 the FDA.
21     A   At FDA, Yes.
22     Q   And then he gets hired by the CFTA when?
23     A   Okay.  Let's see.  I started in '97.
24 It's like 2000 and -- let's see.  He took my
25 boss -- old boss's job in 2000 and --

Page 669

1      Q   If you can speak up so that the --
2      A   I'm just ruminating instead of silence.
3      Q   Yeah, I know, but if you're going to
4  ruminate out loud, you have to say it so the court
5  reporter can get it.
6      A   Just trying to figure out -- it would
7  have been roughly 2003, '2.
8      Q   Okay.  And between 1993 and 2002 or
9  2003, when Bailey came from the FDA to the CFTA,
10 there had been no response to the Citizens
11 Petition other than, We don't have the resources,
12 correct?
13         MR. LOCKE:  Objection.
14         THE WITNESS:  I thought there was a
15 response.
16 BY MR. GOLOMB:
17     Q   And what was the response?
18     A   I thought the initial one was rejected.
19     Q   Okay.  And is that something you saw
20 today?
21     A   No, I haven't seen it today.  We just
22 saw the latter one today, the 2008, that was
23 responded to in 2014.
24     Q   Right.  And that was after Bailey had
25 already come from the FDA --

Page 670

1      A   Correct.
2      Q   -- to the CFTA or the PCPC.
3      A   Correct.
4      Q   And that was after -- after he came to
5  the PCPC, and Bailey set up the meeting with the
6  FDA, correct?
7          MR. LOCKE:  Objection.  Asked and
8  answered.
9          THE WITNESS:  Right.  When he came to
10 the -- he eventually set up the meeting in 2009.
11 BY MR. GOLOMB:
12     Q   Right.  And after he set up the meeting
13 with his old subordinates, that's when the -- the
14 Citizens Petition was rejected, correct?
15         MR. LOCKE:  Objection.
16         THE WITNESS:  I think there were other
17 things that went on in the meantime.  For example,
18 the assessment of the talcs -- admittedly not
19 exhaustive, but the assessment of talcs for
20 asbestos.
21 BY MR. GOLOMB:
22     Q   Well, but at that point in 2008, there
23 had been 24 or more studies that already looked at
24 the association between talc and ovarian cancer,
25 and something like 18 of those studies showed a

Page 671

1  statistically significant association between talc
2  and ovarian cancer, correct?
3          MR. LOCKE:  Objection.
4          THE WITNESS:  I would say there were --
5  it's -- it's much more -- it's more complex than
6  that.  I mean, there were other issues, as have
7  been pointed out, of biologic plausibility, of
8  dose-response.  So it's a little -- not as
9  straightforward as that.
10 BY MR. GOLOMB:
11     Q   Well, understood.  I mean, we -- we -- I
12 think we can agree that during this period of time
13 between, you know, 1982 and 2008, that while there
14 were all these other studies that were coming out,
15 more than two dozen studies, most of which showed
16 the statistically significant association, while
17 at the same time Johnson & Johnson and the PCPC
18 were rejecting case controlled studies of their
19 own, but at that -- during that period of time,
20 industry chose, rather than doing its own study,
21 to do a critical analysis of the individual
22 studies, correct?
23         MR. LOCKE:  Objection.
24         THE WITNESS:  We did do critical
25 analyses of the individual studies, yes.

Linda Loretz, Ph.D.

Page 672

1  BY MR. GOLOMB:
2      Q    And -- but did not do its own study.
3      A    We did not do an epidemiology study.
4      Q    Mr. Tisi asked you before about the
5  standard, and I've asked you about this before, so
6  I'm not going to go into a lot of detail about it.
7          But it's a document which was previously
8  marked for identification as Plaintiff's Exhibit
9  324 --
10         MR. GOLOMB:  Okay.  That's fine.
11         -- which we will mark as Exhibit 71.
12         (Exhibit No. 71 was marked for
13         identification.)
14  BY MR. GOLOMB:
15     Q    All right.  This is the Code of Federal
16  Regulations, Title 21.  Are you familiar with
17  this?
18     A    Yes.
19     Q    Were you aware of this before I asked
20  you about it?
21     A    I -- I'm not familiar with specifically
22  these labeling requirements, and we don't get into
23  issues of labeling beyond telling our -- helping
24  our companies understand what current labeling
25  requirements are in our labeling manual.

Page 673

1      Q    Okay.  But I -- I've asked you about
2  this before, correct?  Do you recall that?
3      A    I -- I -- I don't recall specifically.
4      Q    All right.  This is the Code of Federal
5  Regulations, Title 21, Section 740.1,
6  "Establishment of Warning Statements."
7          Did I read that correctly?
8      A    Yes.
9      Q    And can you just read subsection (a) for
10  the jury, please.
11     A    "The label of a cosmetic product shall
12  bear a warning statement whenever necessary or
13  appropriate to prevent a health hazard that may be
14  associated with the product."
15     Q    "That may be associated with the
16  product," correct?
17     A    That's what it says.
18     Q    All right.  And that is a determination
19  of whether or not a company is going to label a
20  cosmetic product with a warning statement.  That
21  is a decision to be made by the company, correct?
22     A    That's --
23         MR. LOCKE:  Objection.
24         THE WITNESS:  That's not something --
25         MR. LOCKE:  Beyond the scope.

Page 674

1          THE WITNESS:  Yeah, we don't -- PCPC
2  does not get into labeling.
3  BY MR. GOLOMB:
4      Q    Right.  And as far as you know, the FDA
5  also doesn't tell a company what to put on a
6  label, correct?
7          MR. LOCKE:  Objection.  Beyond the
8  scope.
9          THE WITNESS:  I mean, the FDA opined on
10  the Citizens Petitions.
11  BY MR. GOLOMB:
12     Q    Well, but they don't tell the company
13  when -- when to put a label on and when not to,
14  correct?
15         MR. LOCKE:  Objection.  Beyond the
16  scope.
17         THE WITNESS:  I really don't know.
18  BY MR. GOLOMB:
19     Q    All right.  Did you at any time in
20  preparation for any of these depositions read the
21  testimony of Dr. Bailey?
22     A    I did not.
23     Q    Okay.  Were you aware that Dr. Bailey
24  has testified not in a -- in an ovarian cancer
25  case, but in an asbestos case where he discussed

Page 675

1  very specifically the role of the FDA in
2  cosmetics?
3          MR. LOCKE:  Objection.
4          You can answer.
5          THE WITNESS:  I mean, I knew he
6  testified.  I don't know any specifics beyond
7  that.
8  BY MR. GOLOMB:
9      Q    All right.  I want to move to topic 7,
10  which is the National Cancer Institute.
11         What is the National Cancer Institute?
12     A    It's a governmental agency.  I'm not
13  sure "agency" is the right word.  It's a
14  governmental body that I believe funds cancer
15  research.
16     Q    And what -- what, if any,
17  communications, directly or indirectly, does the
18  PCPC have with the NCI generally?
19     A    I'm not aware of any.
20     Q    At any time?
21     A    I'm not aware of any, no, at any time.
22     Q    All right.  Have you ever -- and I'm
23  not -- when I say "you," I'm talking about anybody
24  at PCPC because that's your role here today --
25     A    Yes.

75 (Pages 672 to 675)

Linda Loretz, Ph.D.

Page 676

1    Q   -- to testify on behalf of PCPC.
2         Have you had any contact with a member
3    organization, be it J&J, Luzenac, Rio Tinto,
4    Imerys, or any other member, where you have
5    learned that they've had contact with the NCI?
6    A   Not that I'm aware of.
7    Q   So when the NCI on a number of occasions
8    on their website identifies talc as a risk of
9    ovarian cancer, and then that was taken off the
10   website, you have no idea why?
11   A   Correct.
12        MR. LOCKE:  Objection.
13   BY MR. GOLOMB:
14   Q   Okay.  Were you -- were you aware of
15   that before I just told you that?
16   A   I was, and I can't remember how I became
17   aware of that.  I'm not sure I was ever aware that
18   it was on.  I was maybe aware that it was off.
19   But I -- I don't recall --
20   Q   Have you ever --
21   A   -- when I learned that.
22   Q   I'm sorry.  I didn't mean to interrupt.
23   A   Oh, no, since I don't -- I'm not aware
24   of when I learned that.  I mean, I just can't
25   remember.

Page 677

1    Q   Okay.  Have you ever looked at the NCI
2    website for any reason?
3    A   I think I looked at that having heard
4    about that.
5    Q   Well, you have a -- my word, not
6    yours -- I know we have previously gone through
7    the organizational chart in great detail, and
8    there was a Public Relations/Communications
9    department, correct?
10   A   On -- on our website?
11   Q   On PCPC.
12   A   We have -- yes.
13   Q   Right.  And in preparation for this
14   deposition, you were asked very specifically about
15   communications, directly or indirectly, with the
16   NCI concerning the risk of ovarian cancer caused
17   by application of talcum powder.
18   A   Okay.  Yes.
19   Q   And so in your role as a 30(b)(6)
20   witness, did you go to any of the employees within
21   the Communications department, Public Relations
22   department, whatever you call it, as well as
23   the -- the -- and again my word, not yours -- the
24   lobbying arm of PCPC to find out if they had any
25   communications with the NCI?

Page 678

1    A   I wouldn't have because I am absolutely
2    certain they would not do that without talking to
3    the Science department.
4    Q   And why do you say that?
5    A   Because that's just the way we work.  I
6    mean, when -- when the Public Affairs, for
7    example, is doing any kind of a science issue,
8    they're consulting with us.  They're not doing
9    that on their own.
10   Q   Let's go to the next document, which
11   we'll mark as Exhibit 72.
12        (Exhibit No. 72 was marked for
13        identification.)
14   BY MR. GOLOMB:
15   Q   And this again is --
16        (Counsel conferring.)
17   BY MR. GOLOMB:
18   Q   Yeah, it's been previously marked for
19   identification as P-72.  It's up on the screen.
20        (Counsel conferring.)
21   BY MR. GOLOMB:
22   Q   Now, this was the NCI website as of
23   September 15th, 2011.  You can see that from the
24   lower right-hand corner.  Do you see that?
25   A   Yes.

Page 679

1    Q   And this is the "Ovarian Cancer
2    Prevention, PDQ, Prevention Patient Information."
3    Do you see that?
4    A   Yes.
5    Q   Now, are you familiar with the PDQ?
6    A   Um --
7    Q   Not this one in particular.  A PDQ
8    generally.
9    A   I'm trying to -- I'm not sure I know
10   what it stands for.  I think, again, because I've
11   seen something along these lines, I --
12   Q   It's a Physician's Data Query.
13   A   Okay.
14   Q   Does that sound familiar?
15   A   Yeah, it does now.  Yeah.
16   Q   Okay.  And so in order to go on to the
17   website and go specifically to the PDQ, you have
18   to be a physician or scientist that has access.
19   Is that consistent with your understanding?
20        MR. LOCKE:  Objection.  Beyond the
21   scope.
22        THE WITNESS:  Yeah, I just wouldn't have
23   known that.
24   BY MR. GOLOMB:
25   Q   Okay.  And that's fine, by the way.  If

76 (Pages 676 to 679)

Linda Loretz, Ph.D.

Page 680

1    you don't know, it's --
2        A   Right.  I don't know.
3        Q   So that if a -- a woman who has ovarian
4    cancer and is claiming that she got her ovarian
5    cancer from the use of talcum powder, she would
6    not, unless she was a physician or a scientist,
7    have access to the PDQ.  Is that consistent with
8    your understanding?
9            MR. LOCKE:  Objection.  Beyond the
10   scope.
11           THE WITNESS:  I think only just from
12   what you just said, that access is limited to
13   physicians, so...
14   BY MR. GOLOMB:
15       Q   Okay.  Well, on the other hand, if
16   anybody went on to the NCI website, and in the
17   search box typed in "ovarian cancer," they would
18   get a -- a Snapshot of Ovarian Cancer.  Is that
19   consistent with your understanding?
20           MR. LOCKE:  Objection.  Beyond the
21   scope.
22           THE WITNESS:  I guess.  Again, I'm not
23   sure.
24   BY MR. GOLOMB:
25       Q   Okay.  So if you take a look at

Page 681

1    Exhibit -- what was it 72? -- if you take a look
2    at Exhibit 72 --
3        A   Okay.
4        Q   -- this is the PDQ on ovarian cancer
5    prevention, correct?
6            MR. LOCKE:  Just to be clear, it's
7    pages 1 and 3 of a seven-page document.
8            MR. GOLOMB:  Correct.  And that was to
9    show the cover page and the portions relevant to
10   talc.
11   BY MR. GOLOMB:
12       Q   So if you go to page 3 of that document,
13   in the middle of the document it refers to talc.
14   Do you see that?
15       A   I do see that.
16       Q   And it says:  "The use of talc may
17   increase the risk of ovarian cancer.  Talcum
18   powder dusted on the perineum, the area between
19   the vagina and the anus, may reach the ovaries by
20   entering the vagina."
21           Do you see that?
22       A   That's what it says, yes.
23       Q   Did I read that correctly?
24       A   Yes.
25       Q   So that was a -- posted on the PDQ of

Page 682

1    the NCI as of September 5th, 2011, correct?
2            MR. LOCKE:  Objection.  Beyond the
3    scope.
4            THE WITNESS:  September 15th, but yes.
5    BY MR. GOLOMB:
6        Q   2011.
7        A   That's -- that's the date of this
8    document, yes.
9        Q   Okay.  Now, let's go to the next
10   document, which is MBS-CRE271.
11           (Exhibit No. 73 was marked for
12           identification.)
13   BY MR. GOLOMB:
14       Q   Have you seen that before?
15       A   I saw it in preparation for this.
16       Q   Okay.  Do you need time to review it now
17   or --
18       A   Yes.
19       Q   -- or are you familiar with it?
20       A   No, I need time to review it.
21       Q   Go ahead.
22       A   (Peruses document.)  Okay.
23       Q   This is an e-mail exchange back in April
24   of 2013 between William Kelly, Jr., and Jim Tozzi,
25   correct?

Page 683

1        A   Correct.
2        Q   Who is William Kelly, Jr.?
3        A   He is with the CRE.
4        Q   And who is Jim Tozzi?
5        A   Also with CRE, I believe.
6        Q   And if you look at the middle e-mail on
7    page 1 of 2, from Jim Tozzi to Bill Kelly,
8    April 15th, 2013, at 11:12 a.m.  Do you see that?
9        A   Yes.
10       Q   It says -- the second -- the last line
11   on that e-mail says:  "Showing that the CIR as
12   unbiased and cleaning up material on the internet
13   is critical if they are going to calm down
14   lawsuits."
15       A   That's what it says.
16       Q   Do you know what he's referring to when
17   he says "cleaning up material on the internet"?
18           MR. LOCKE:  Objection.  Beyond the
19   scope.
20           THE WITNESS:  I don't.  We didn't see
21   this.  We never talked to them about this.
22   BY MR. GOLOMB:
23       Q   And do you know what he means by "calm
24   down lawsuits"?
25           MR. LOCKE:  Same objection.

77 (Pages 680 to 683)

Linda Loretz, Ph.D.

Page 684

1    THE WITNESS:  I mean, obviously he is
2  referring to litigation, I presume.  But --
3  BY MR. GOLOMB:
4    Q    Okay.  Well, are you aware one way or
5  the other as to whether or not there was any
6  litigation in which any of these companies were
7  sued as a result of the -- the relationship
8  between talc and ovarian cancer as of April 13 --
9  April 15th, 2013?
10    MR. LOCKE:  When you say "any of these
11  companies," to whom are you referring?
12    MR. GOLOMB:  J&J and Imerys and their
13  predecessors.
14    MR. LOCKE:  Objection.  Beyond the
15  scope.
16    THE WITNESS:  Yeah, I don't know the
17  dates of lawsuits, and I -- I just don't know.
18  BY MR. GOLOMB:
19    Q    Okay.  The -- on the bottom of the page,
20  there's an e-mail from William Kelly, Jr., to
21  Tozzi on April 15th, 2013, just 24 minutes before,
22  at 12:48 p.m.
23    Do you see that?
24    A    Yes.
25    Q    And if we look at the second paragraph

Page 685

1  that begins:  "The only account I am working on
2  currently is talc."  Do you see that?
3    A    Yes.
4    Q    And that is -- that's William Kelly, Jr.
5  saying that, correct?
6    A    Yes.
7    Q    And in the -- it says:  "The only
8  account I am working on currently is talc.  Of
9  course, I also want to write an article on the IQA
10  during the next six months as well as clean up the
11  Wikipedia entry on the IQA."
12    What is the IQA?
13    A    I have --
14    MR. LOCKE:  Objection.  Beyond the
15  scope.
16    THE WITNESS:  I don't know.
17  BY MR. GOLOMB:
18    Q    And then it refers to somebody named
19  Shripal.  Do you see that?
20    A    Yeah -- yes.
21    Q    Who is that?
22    A    Shripal is somebody at Imerys.
23    Q    Right, that's Shripal Sharma, correct?
24    MR. LOCKE:  Objection.
25    THE WITNESS:  I -- I mean, I would

Page 686

1  assume because it's an unusual name, that's who he
2  is talking about, yes.
3  BY MR. GOLOMB:
4    Q    All right.  And do you know -- do you
5  know Mr. Sharma?
6    A    I may have been on a phone call with him
7  once or twice, but I don't know if I've met him.
8    Q    All right.  Have you ever spoken to him
9  specifically about talc and its association with
10  ovarian cancer?
11    A    As I said, I may have been on a phone
12  call, and I can't remember context, but -- I mean,
13  it'd be on a conference call.  I don't believe
14  I've ever spoken to him one on one.
15    Q    All right.  And if we look at the last
16  sentence going on to the next, the first sentence
17  of the next page, it says:  "Shripal knows that we
18  engineered the CIR report from the outset."
19    Did I read that correctly?
20    A    That's what it says.
21    Q    And that's from one CRE employee to
22  another?
23    A    That's what it looks like.
24    Q    Let -- let's take a look at the next
25  document, which was previously marked for

Page 687

1  identification as Plaintiff's Exhibit P-225.
2    (Exhibit No. 74 was marked for
3    identification.)
4  BY MR. GOLOMB:
5    Q    This is another Ovarian Cancer
6  Prevention PDQ, correct?
7    A    Yes.
8    Q    And you'll see on the bottom right-hand
9  corner it's dated June 12, 2013.
10    A    Yes.
11    Q    Approximately two years after the last
12  one I showed you.
13    A    Approximately.
14    Q    And if you go on to the next page,
15  towards the bottom quarter of the page, it refers
16  to talc, correct?
17    A    I only have page 1.
18    Q    I'm going to hand you my copy and ask
19  you to turn to page 2.
20    Do you see the highlighted area?
21    A    Yes.
22    Q    Can you just read that for the jury,
23  please.
24    A    It says, quote:  "The use of talc may
25  increase the risk of ovarian cancer.  Talcum

78 (Pages 684 to 687)

Linda Loretz, Ph.D.

Page 688

1  powder dusted on the perineum, the area between
2  the vagina and the anus, may reach the ovaries by
3  entering the vagina."
4      Q   Okay.  And that was in June of 2013,
5  after the first of the lawsuits in the -- in these
6  cases were filed.  Are you aware of that?
7          MR. LOCKE:  Objection.  Beyond the
8  scope.
9          THE WITNESS:  I'm not aware of the
10 dates, no.
11 BY MR. GOLOMB:
12     Q   Okay.  Let me show you the next
13 document, which has been marked as P-384.
14         (Exhibit No. 75 was marked for
15         identification.)
16 BY MR. GOLOMB:
17     Q   This is another Ovarian Cancer
18 Prevention PDQ, correct?
19     A   Yes.
20     Q   All right.  And this is a little bit
21 different format taken from the website than
22 previous ones, correct?
23     A   Yes.
24     Q   And do you see the -- the date of this
25 in the bottom of the page?

Page 689

1      A   It's hard to read, but it's, I think,
2  August 18, 2014.
3      Q   And at the top of the page, it says:
4  "The following risk factors may increase the risk
5  of ovarian cancer."  Do you see that?
6      A   I do.
7      Q   And the -- the fifth risk factor there
8  is what?
9      A   It says --
10         MR. LOCKE:  Objection.  Beyond the
11 scope.
12 BY MR. GOLOMB:
13     Q   Is what?
14     A   It says "talc."
15     Q   And from the same document, page 2 of 3,
16 it specifically refers to talc, correct?
17         MR. LOCKE:  Objection.  Beyond the
18 scope.
19         THE WITNESS:  Yes.
20 BY MR. GOLOMB:
21     Q   And can you just read that for the jury,
22 please.
23     A   It says, quote:  "The use of talc may
24 increase the risk of ovarian cancer.  Talcum
25 powder dusted on the perineum, the area between

Page 690

1  the vagina and the anus, may reach the ovaries by
2  entering the vagina."
3      Q   Okay.  Thank you.
4          Let me show you the next document.
5          And this is a document which has been
6  previously marked for identification as P-385.
7          (Exhibit No. 76 was marked for
8          identification.)
9  BY MR. GOLOMB:
10     Q   Have you seen this document before?
11     A   Not that I know of, no.
12     Q   All right.  Now, you'll see at the
13 bottom this document was dated March 19th, 2015.
14 Do you see that?
15     A   Yes.
16     Q   And this is after the IARC report that
17 came out and declared talc a Class 2B carcinogen,
18 correct?
19         MS. FRAZIER:  Object to form.
20         MR. LOCKE:  Objection.  I'm not going to
21 direct the witness not to answer, but she's
22 testified she has not seen these exhibits
23 previously.  I'm -- there's a lack of foundation.
24 It's beyond the scope.
25         You can answer to the extent you can.

Page 691

1          THE WITNESS:  And so what was the
2  question?
3  BY MR. GOLOMB:
4      Q   This document is dated March 19th,
5  2015 --
6      A   Correct.
7      Q   -- which is after the IARC report came
8  out, correct?
9      A   Yes.
10     Q   The IARC report which announced that
11 the -- they concluded that talc was a Class 2B
12 carcinogen, correct?
13         MR. LOCKE:  Objection.
14         THE WITNESS:  Based on limited evidence.
15 BY MR. GOLOMB:
16     Q   And in fact, this Ovarian Cancer
17 Prevention PDQ that we're now referring to refers
18 to the IARC report, correct?
19         MR. LOCKE:  Objection.
20         THE WITNESS:  Yes.
21 BY MR. GOLOMB:
22     Q   And do you see at the bottom third of
23 the page, it says "Perineal Talc Exposure"?
24     A   Yes.
25         MR. LOCKE:  Objection.

79 (Pages 688 to 691)

Linda Loretz, Ph.D.

Page 692

BY MR. GOLOMB:
1
2      Q   Can you just read that for us, please.
3      A   It says, quote: "Based on solid
4   evidence, perineal application of talc is
5   associated with a small increased risk of ovarian
6   cancer. The International Agency for Research on
7   Cancer has concluded that perineal talc is a
8   possible carcinogen."
9      Q   And then it talks about the magnitude of
10   the effects, correct?
11      A   It does.
12      Q   And it says an odds ratio of 1.24,
13   correct?
14          MR. LOCKE: Objection.
15          THE WITNESS: That's what it says.
16   BY MR. GOLOMB:
17      Q   Meaning that there is nearly a 25
18   percent increased risk of harm, correct?
19          MR. LOCKE: Objection.
20          THE WITNESS: Well, there's a confidence
21   interval with that, but that's a -- that's what
22   the odds ratio is.
23   BY MR. GOLOMB:
24      Q   Right. And do you have enough
25   experience in epidemiology to understand that that

Page 693

1   is statistically significant?
2          MR. LOCKE: Objection. Beyond the
3   scope.
4          THE WITNESS: I think it depends --
5          MR. LOCKE: Calls for expert testimony.
6          THE WITNESS: Yeah, it depends on what
7   study you're looking at. And I -- I'm surprised
8   that they say "based on solid evidence," because
9   that was -- this finding was specifically based on
10   limited evidence was the conclusion.
11   BY MR. GOLOMB:
12      Q   Well, the National Cancer Institute
13   wrote "based on solid evidence," correct?
14      A   Yes.
15      Q   And you've never seen this before,
16   correct?
17      A   Yes.
18      Q   So you don't know what the National
19   Cancer Institute is basing their -- their
20   conclusion that it's based on solid evidence?
21      A   Yeah. Actually, you're right. I was
22   looking at the IARC sentence.
23      Q   Okay. Let's go to P-437.
24          (Exhibit No. 77 was marked for
25          identification.)

Page 694

BY MR. GOLOMB:
1
2      Q   Now, just to refresh your recollection
3   before you -- and I'll give you whatever time you
4   need -- when we were talking before about the PDQ,
5   I also referred to the snapshot. Do you recall
6   that?
7      A   Yes.
8      Q   And so this is a Snapshot of Ovarian
9   Cancer from the NCI website. Do you understand
10   that?
11          MR. LOCKE: Objection. Beyond the
12   scope, lack of foundation, form.
13          THE WITNESS: Yes.
14   BY MR. GOLOMB:
15      Q   And that's dated August 8th, 2016,
16   correct?
17          MR. LOCKE: Same objections.
18          THE WITNESS: Yes.
19   BY MR. GOLOMB:
20      Q   Have you -- have you seen this document
21   before?
22      A   Again, I -- well, I think I've seen
23   something from NCI once upon a time. It would
24   be -- I don't know what the date would be, so my
25   answer's going to be no.

Page 695

1      Q   Okay. And --
2          MR. LOCKE: I also want to note this is
3   just one of six pages.
4          MR. GOLOMB: Right. And this is the
5   page that refers to talc.
6   BY MR. GOLOMB:
7      Q   Do you see in the lower half portion of
8   that page, the Snapshot of Ovarian Cancer, under
9   Incidence and Mortality, it has risk factors for
10   ovarian cancer. Do you see that?
11      A   Yes.
12      Q   And if you go down to the fourth line,
13   do you see it says there "The use of talc"?
14      A   Yes.
15      Q   So as of August 8, 2016, on the Snapshot
16   of Ovarian Cancer, the NCI website tells people
17   that the use of talc is a risk factor, correct?
18          MS. FRAZIER: Objection to form.
19          MR. LOCKE: Objection.
20   BY MR. GOLOMB:
21      Q   For ovarian cancer.
22          MR. LOCKE: Lack of scope -- or beyond
23   the scope, lack of foundation, form.
24          THE WITNESS: This says risk factor for
25   ovarian cancer, and it includes in their list use

80 (Pages 692 to 695)

Linda Loretz, Ph.D.

Page 696

1    of talc.
2         MR. GOLOMB:  Okay.  Can we go to the
3    next document, please.
4    BY MR. GOLOMB:
5         Q   And just for the record, this is a
6    document which previously was marked for
7    identification as P-645.
8         (Exhibit No. 78 was marked for
9         identification.)
10   BY MR. GOLOMB:
11        Q   So this is another shot of the
12   website -- of the NCI website, A Snapshot of
13   Ovarian Cancer.  Correct?
14        A   Yes.
15        Q   And if you look at the bottom of the
16   page, it's dated October 14th, 2016, correct?
17        A   Yes.
18        Q   And if you look at the third full
19   paragraph, again it identifies the use of talc as
20   a risk factor, correct?
21        MR. LOCKE:  Objection.
22        THE WITNESS:  Yes.
23        MR. LOCKE:  Lack of foundation, scope,
24   form, and it's one page of six.
25        MS. FRAZIER:  Join.

Page 697

1    BY MR. GOLOMB:
2         Q   Okay.  Let's go to the next document.
3         MR. GOLOMB:  What's the number of this?
4         MR. LOCKE:  79.
5    BY MR. GOLOMB:
6         Q   Okay.  This is Exhibit 79.
7         (Exhibit No. 79 was marked for
8         identification.)
9    BY MR. GOLOMB:
10        Q   Again, this is another Snapshot of
11   Ovarian Cancer, which -- in which it continues to
12   identify the use of talc as a risk factor,
13   correct?
14        A   Along with --
15        MR. LOCKE:  Objection.  Same as before,
16   lack of foundation, form, beyond the scope, and
17   it's one page of six.
18        MS. FRAZIER:  Join.
19   BY MR. GOLOMB:
20        Q   Correct?
21        A   Along with many other factors, yes.
22        Q   Okay.  But the use of talc is a factor?
23        A   It is listed there.
24        Q   Okay.  So I don't think anybody is
25   disputing any of the other risk factors.  Have you

Page 698

1    heard that, that any of those other risk factors
2    are in dispute?
3         MR. LOCKE:  Objection.  Beyond the
4    scope.
5         THE WITNESS:  No.  I -- I've never heard
6    of tall height before, but that's just me.
7    BY MR. GOLOMB:
8         Q   But at least of -- again, this is dated
9    December 13th, 2017, on the Snapshot of Ovarian
10   Cancer, the NCI identifies the use of talc as a
11   risk factor, correct?
12        MR. LOCKE:  Same objection.
13        MR. DUFFY:  Beyond the scope.
14        MS. FRAZIER:  Same objection.
15        THE WITNESS:  That's what it says.
16   BY MR. GOLOMB:
17        Q   And so if I understand your -- your
18   testimony correctly, you have never seen any of
19   these PDQs before, correct?
20        A   I think at some point I probably saw a
21   PDQ.  I can't remember when or -- or what.  Again,
22   we -- we didn't have any contact at all with NCI
23   or any connection, but I know I heard about it at
24   some point.
25        Q   Okay.  And -- and did you -- did you

Page 699

1    learn at some point that after December 13th,
2    2017, that the NCI took the use of talc off of its
3    website?
4         A   I couldn't have told you what the date
5    was, but at some point I did learn that it was not
6    listed there.
7         Q   And how did you learn that?
8         A   I have no recall.  Again, we didn't -- I
9    mean, someone must have mentioned it to me at some
10   point or -- yeah, I don't know.
11        Q   Okay.  And did you learn about -- did
12   you know about its proximity to one of the trials
13   in this case?
14        A   No.
15        Q   Okay.  So until I -- I'm telling you
16   now, you were unaware that the NCI took the use of
17   talc off of its website just days before a trial
18   in one of these cases?
19        MR. LOCKE:  Objection.
20        MS. FRAZIER:  Object to form.
21        MR. LOCKE:  Beyond the scope.
22        And just for the record, PCPC wasn't a
23   defendant in that trial.
24        THE WITNESS:  No, I did not know that.
25   BY MR. GOLOMB:

81 (Pages 696 to 699)

Linda Loretz, Ph.D.

Page 700

1    Q   Okay.  So as you sit here today, you
2   recall that the NCI removed it from its website.
3   You don't remember how you -- how you learned
4   that, and you don't know how that got off the
5   website.  Is that your testimony?
6    A   Correct.
7    Q   Okay.  Let's talk about the Talc
8   Interested Party Task Force.  And I -- we've
9   talked a lot about this in the last deposition,
10   and so I'm going to try not to repeat myself.
11       But to be clear, there are various
12   records, some of which -- most of which refer to
13   the Talc Interested Party Task Force, some of
14   which refer to the Interested Party Task Force.
15   They're one and the same; is that correct?
16    A   That's correct.
17    Q   Do you know when the task force was
18   created?
19    A   I believe it was created in 19 -- maybe
20   '71, or early '70s.
21    Q   And why was it created?
22    A   In response to the finding of asbestos
23   or the reporting of asbestos in talc.
24    Q   Okay.  Well, was it the reporting of
25   asbestos or was it the reporting of talc in the

Page 701

1   ovarian tissue?
2    A   I thought it was the reporting of
3   asbestos.
4    Q   All right.  You -- you were asked
5   earlier by Mr. Tisi about the association between
6   talc and ovarian cancer, and I think -- correct me
7   if I'm wrong, I think you said that you -- that
8   "you," meaning PCPC, CFTA -- first learned about
9   that potential association in 1982 after the
10   Cramer study.  Was that your testimony?
11    A   I believe that's correct, yes.
12    Q   Are you familiar with the Henderson
13   study?
14    A   I do know what you are talking about,
15   yes.
16    Q   And that was in the early '70s, correct?
17    A   That sounds right.
18    Q   All right.  Was the Talc Interested
19   Party Task Force formed in response to the
20   Henderson study?
21    A   I believe it was formed in response to
22   the asbestos finding.
23    Q   All right.  And when you say "asbestos
24   finding," what are you referring to?
25    A   Well, I'm referring to the newspaper

Page 702

1   reports, and I know there was some question as to
2   what was actually found, but there were reports, I
3   believe in the newspaper, from findings out of --
4   I think it was Mount Sinai Hospital or -- anyway,
5   of the finding of asbestos in talc.
6    Q   And that was -- was that the finding of
7   asbestos in talc, that talc specifically being
8   found in the ovarian tissue?
9    A   No.  I thought it was just talc being
10   found in -- excuse me -- asbestos being found in
11   talcum products.
12    Q   Just generally?
13    A   Yes.
14    Q   All right.  And so you don't have a
15   recollection one way or the other as to what the
16   Henderson study concluded?
17    A   My recollection of the Henderson study
18   is that they were reporting the finding of talc in
19   ovaries, but I believe they also found them in
20   controlled women that hadn't been exposed to talc.
21   So it was --
22    Q   Okay.  And as you sit here today, do you
23   know one way or the other as to whether or not
24   the -- the Talc Interested Party Task Force was
25   created before or after the Henderson study?

Page 703

1       MR. LOCKE:  Objection.  Asked and
2   answered.
3       THE WITNESS:  As far as I'm aware, it
4   was created in response to the asbestos issue.
5   BY MR. GOLOMB:
6    Q   Okay.  Well, that -- but that wasn't my
7   question.  My question was, do you know one way or
8   the other as you sit here today -- because you
9   don't -- you don't know the chronology of the --
10   the asbestos finding and the Henderson study,
11   correct?
12       MR. LOCKE:  Objection.
13       THE WITNESS:  Yeah, I don't know the
14   year of the Henderson study.
15   BY MR. GOLOMB:
16    Q   Right.  But my question to you is a very
17   specific one, and that is, do you have a
18   recollection one way or the other as to whether or
19   not the Talc Interested Party Task Force was
20   created in response to the Henderson study?
21       MR. LOCKE:  Objection.  Asked and
22   answered.
23       THE WITNESS:  What's the question?  Was
24   it in response --
25       MR. GOLOMB:  Can you read back the

82 (Pages 700 to 703)

Linda Loretz, Ph.D.

Page 704

1    question, please.
2         THE WITNESS:  I believe no.
3    BY MR. GOLOMB:
4         Q    Okay.
5         A    I believe it was created in response to
6    the asbestos issue.
7         Q    And when you say "in response," what was
8    the purpose of it?
9         A    To address -- when there was the
10   finding, it was to look further into that to see
11   if it was real, and then ultimately to come up
12   with a specification so that -- to confirm that
13   there was no asbestos in talc.
14        Q    And -- and how is -- how is a task force
15   like that created?
16        A    So in general, if you -- I mean, if
17   there's a finding, then basically we inform our
18   members, and we look for interest in pursuing some
19   activities related to a -- a particular issue.
20   And in those -- those people again would, on their
21   own, that would be the group that would
22   decide where do we go from here, what do we do.
23        Q    Okay.  So it comes from you, meaning the
24   PCPC, rather than the members coming to you and
25   saying, you know, I just read something, this may

Page 705

1    be something that we need to create a task force
2    for?
3         A    Oh, no, it depends.  It can go either
4    way.  It can be us finding something.  It's
5    basically -- what our role would be then to
6    disseminate that information to see if there is
7    interest in forming a task force and -- and taking
8    on further activities.
9         Q    Okay.  And in the case of the Talc
10   Interested Party Task Force, was that something
11   where the -- the CFTA went through its members or
12   one of its members came to the CFTA?
13        A    I think I'd have to say I don't know.
14        Q    Did you go back and -- there's minutes
15   of these -- of these meetings, right?
16        A    Yes.
17        Q    So let me ask you generally, when the
18   idea is created to -- to create a task force, how
19   is it then implemented?
20        A    We would go out to -- in general, and
21   this is -- since this was years before, it's going
22   to be a little bit of a different setup that I'm
23   not going to be aware of, but we would go out to
24   committees where we think there might be interest,
25   we would try to spread the word as widely as we

Page 706

1    could where we think we might have members who are
2    interested, should know about this, and then see
3    if they're interested in again, you know, taking
4    on further activities related to a particular
5    topic.
6         Q    And when you say "further activities,"
7    what kind of activities?
8         A    It totally depends on what the task
9    force is.  Like I say, in the case of the talc-
10   asbestos issues, then it was putting together a
11   specification -- or, rather, there was a talc
12   specification, but adding in asbestos -- asbestos
13   to that specification and working on methods to --
14   for protection.
15        Q    And one of the, as you say, further
16   activities is the hiring of scientists, correct?
17        A    Well, it could be.
18        Q    Right.  And it was in the case of the
19   talc -- the talc task force, correct?
20        A    I'm not sure what you mean by "hiring of
21   scientists."
22        Q    Well, at some point in time in the -- in
23   response to the Citizens Petition, in response to
24   the NTP preliminary findings, the members of the
25   PCPC at that time, the CFTA, who were also a

Page 707

1    member of the Talc Interested Party Task Force,
2    funded the hiring of scientists and experts to
3    defend them in front of the NTP and to respond to
4    the -- to the Citizens Petition, correct?
5         A    That can be one of the activities that
6    we undertake, yes.
7         Q    But it's --
8         A    It can be doing a study, it could be
9    hiring a scientist or hiring a consultant, I
10   guess, to look at an issue.
11        Q    Okay.
12        A    It could be any number of things.
13        Q    Okay.  And -- and I think we can agree
14   that the -- the funding of the -- these task
15   force, and the talc task force in particular, is
16   not your bailiwick, so to speak, correct?
17        A    Yes.  I mean -- I mean, I could speak
18   generally to funding of task forces.  I mean,
19   obviously depending on how much funding is
20   available and where people's level of interest in
21   helps define what your future activities are.
22        Q    No, but I -- I understand that.  But my
23   question is, if I were to ask you specific
24   questions about the funding of the talc task
25   force, that is not your bailiwick.

83 (Pages 704 to 707)

Linda Loretz, Ph.D.

Page 708

1    A   That was Mark Pollack.
2    Q   Right. And so were you -- were you ever
3  shown the -- the chart that Mr. Pollack created
4  for us where -- for this litigation which
5  identifies how much was deposited into the account
6  of the Talc Interested Party Task Force over the
7  years?
8    A   I think I've seen that, yes.
9    Q   Okay. And so that was somewhere close
10  to half a million dollars, correct?
11    A   I mean that -- that sounds about right.
12    Q   And about 67 percent of that was funded
13  specifically by J&J and Imerys and the
14  predecessors of Imerys, correct?
15    A   That's what I heard this morning, yes,
16  and that sounds right, consistent.
17    Q   And I think you said something -- that
18  there were something like 18 or 20 different
19  members of the task force.
20    A   I'm not sure there's -- I don't think
21  there was more than that, but there was probably
22  close to that. Fifteen.
23    Q   All right. And so the other 16 or so
24  members of the task force put up a third of the
25  funding, and Imerys and J&J put up the balance?

Page 709

1    A   That -- that could be.
2    Q   Okay. And once the task force is -- is
3  created, what happens next?
4    A   Well, I mean, then they would get
5  together and talk about it, and what activities do
6  we undertake, what do we understand about this,
7  what questions, is there -- you know, what
8  follow-up is needed to understand what the issue
9  is, and where do we go from here. And then if it
10  comes to things that cost money, then it was like
11  going out and getting proposals or -- and seeing
12  what people want to do.
13    Q   Okay. And what happened in this case,
14  in the case of the Talc Interested Party Task
15  Force? When -- when was it first discussed
16  amongst its members?
17    A   Are you talking about 1971 when it was
18  first formed?
19    Q   Well, if that's when it was.
20    A   I mean, then there were discussions
21  ongoing about asbestos, and we need methodologies
22  so we can detect if there's asbestos in talc,
23  and -- and there was a great deal of activity
24  related to that, which included FDA activities as
25  well.

Page 710

1    Q   Well, as you -- as you said in your --
2  your testimony just earlier today, the -- you see
3  this -- whether it was the Henderson study or what
4  you said was that asbestos was found in the talc,
5  that the -- the CFTA then went to its members to
6  determine the level of interest for a task force,
7  correct?
8    A   I said that --
9        MR. LOCKE: Objection.
10        THE WITNESS: Yeah, I said that's how
11  generally it works. I mean, I'm not sure exactly
12  how that happened. But, yes, we -- we would want
13  to inform our members, because that's one of the
14  things we do, inform them what issues might be
15  related to them, and then we would generally
16  spread the word, is there interest, is there
17  something that, you know, we should form a task
18  force for. So I assume that's the way it went
19  there basically.
20  BY MR. GOLOMB:
21    Q   And people you think may be interested
22  are then in some form or fashion contacted?
23    A   Well, we would contact -- now -- now
24  certainly -- again, things were a little different
25  back then, but now we would contact through our

Page 711

1  committees. We have a Safety and Regulatory
2  Toxicology Committee. It's a very large committee
3  with a very large mailing list, so that gets to a
4  lot of people. We have a Scientific Advisory
5  Executive Committee now, it now has a different
6  name, but -- and again, there would be more people
7  we would contact. So we would make sure we spread
8  the word because we're just trying to make sure
9  everybody knows what's going on and see if they
10  have interest.
11    Q   And then at some point, whether it's
12  1971 or the way you do it now, once you assess
13  those responses, you have a meeting of some sort,
14  whether it's in person or telephone. Correct?
15    A   Generally, right, we -- then once we had
16  identified interested people, then we would want
17  to get that group together.
18    Q   Okay. And then the -- those interested
19  parties are identified, some employees of the CFTA
20  at the time are then kind of the ones in charge of
21  having that liaison with the members on that
22  particular task force, correct?
23        MR. LOCKE: Objection.
24        THE WITNESS: Yes. Somebody -- somebody
25  would -- from the association would be involved.

84 (Pages 708 to 711)

Linda Loretz, Ph.D.

Page 712

1  BY MR. GOLOMB:
2      Q   Okay.  And when this -- when this task
3  force was first created, who was that person from
4  the CFTA?
5      A   I believe it was -- at the time I think
6  we only had one science person, so it was Norm
7  Estrin.
8      Q   I'm sorry?
9      A   Norm Estrin, I believe.
10     Q   And then there was -- there was in some
11 form or fashion a meeting held of the prospective
12 interested parties?
13     A   Yes.  I mean, I looked at a lot -- a lot
14 of minutes and there were a lot of meetings held.
15     Q   Okay.  Did you see minutes from the --
16 from back -- dating back to 1971?
17     A   I don't know about '71.
18     Q   Well, when was the first --
19     A   I saw them back to the '70s.
20     Q   Okay.  Because I'll represent to you
21 that the first meeting minutes that we have which
22 refers to the, quote, ad hoc talc task force is
23 1982.
24         Were there minutes before that?
25     A   I know I saw documents relating to

Page 713

1  working on specifications.  I thought they were
2  minutes.  Maybe I'm wrong, but I know I saw
3  documents relating to that.
4      Q   Okay.  And the date of the first task
5  force minutes, which I'll show you in a minute,
6  are dated November 11th, 1982.  Do you recall
7  seeing minutes from November 11th, 1982?
8      A   I wouldn't recall a precise date.  I
9  know that there were minutes going into the '80s,
10 and that would have been after the Cramer study.
11 So...
12     Q   Right.  And that's -- that was my next
13 question.  That is a date which coincides shortly
14 after the Cramer study.
15     A   Okay.
16     Q   So is that consistent with your
17 recollection that there was minutes of the ad hoc
18 talc task force shortly after the Cramer study was
19 published?
20     A   I know that there was definitely -- that
21 the task force got together after the Cramer study
22 was published, yes.
23         (Exhibit No. 80 was marked for
24         identification.)
25 BY MR. GOLOMB:

Page 714

1      Q   Okay.  I'm showing you Exhibit 80, which
2  is the cover page of those minutes.
3         Take -- take whatever time you need just
4  to read that.
5      A   (Peruses document.)  Okay.
6      Q   Okay.  Now, when you have a -- a task
7  force like this, is somebody appointed as a -- as
8  a chairman of sorts of the committee?
9      A   It depends.  Sometimes yes, sometimes
10 no.
11     Q   What does it depend on?
12     A   The nature of the committee, the people
13 who are on it.
14     Q   Okay.  And do you recall in -- in this
15 particular case whether or not a chairman was
16 nominated and then agreed to?
17     A   You know, I recall in the case of going
18 back to the '70s when the specifications was going
19 on, I think there was a chair for that effort
20 around developing methodology.  I think there was
21 also a chair on kind of the more overarching talc,
22 not the -- I know I'm not answering your question.
23 I'm just trying to think here.
24         Do I recall if there was one here?  I
25 guess I'd have to say I don't recall.

Page 715

1      Q   Okay.  Is it -- is it consistent with
2  your recollection that there was maybe some
3  activity surrounding the asbestos issue in 1971,
4  and then no longer activity until 1982, when the
5  Cramer study came out?
6         MR. LOCKE:  Objection.
7         THE WITNESS:  No, there was activity in
8  the '70s relating to the asbestos and development
9  of -- of methodology that went well into the '70s.
10 BY MR. GOLOMB:
11     Q   Okay.  And would there have been various
12 meetings in the '70s, whether they were by
13 telephone or in person?
14     A   I believe that's correct, yes.
15     Q   And are -- whether the meeting is held
16 by telephone or in person, are there minutes of
17 those meetings?
18     A   Again, I'm -- I mean, I've seen things
19 on developments of them.  Were they minutes or
20 were they otherwise memos?  Off the top, I don't
21 know.  I thought they were minutes.  I could be
22 wrong.
23     Q   Okay.  And was a -- was a chairman of
24 this particular committee appointed before
25 November 11th, 1982?

85 (Pages 712 to 715)

Linda Loretz, Ph.D.

Page 716

1    A   Well, if there's a chairman appointed on
2  the asbestos -- on the earlier work, that doesn't
3  mean that would be the same chairman in 1982.
4    Q   Okay.  And do you know who Dr. Bruce
5  Semple is?
6    A   I think I've heard the name.  He's at --
7  I want to say P&G.
8    Q   I'm sorry?
9    A   I want to say Procter & Gamble, but I
10 could be wrong.
11   Q   Okay.  Well --
12   A   Only because I've seen the name.  I
13 don't believe I've met the person because that
14 would have been too long ago.
15   Q   If I told you there's a document that
16 says: "On November 11, 1982, nominations were
17 taken from the committee to elect a chairman.
18 After discussion, the task force agreed to elect a
19 chairman and a vice-chairman.  Dr. Bruce Semple
20 from Johnson & Johnson was unanimously elected
21 chairman.  Dr. Edward Jackson from Knoxville was
22 unanimously elected vice-chairman."
23       Would that refresh your recollection?
24       MR. LOCKE:  Objection.  Let the record
25 reflect that counsel is reading from pages that

Page 717

1  have not been shown to the witness, probably of
2  the very same minutes that we're seeing the cover
3  page of.
4  BY MR. GOLOMB:
5    Q   I will refer you to page 2, subsection 4
6  under Administrative Chairman, and take a look at
7  that and tell me if I read that accurately.
8    A   Yes, you read it accurately.
9    Q   Thank you.
10       Who is H. Joseph Sekerke, Ph.D.?
11   A   He is a -- was a CTFA employee
12 scientist.
13   Q   Okay.  So would he have been that person
14 that liaison that we discussed earlier of this
15 particular committee in 1982?
16   A   I think that would be likely.
17   Q   Okay.  And that's who these minutes were
18 signed by -- he just writes "Joe," Joe Sekerke.
19   A   It makes sense.  I mean, it -- again,
20 the science staff was very small at that point, so
21 that was up from one to two at least.  So that
22 makes sense.
23   Q   Okay.  And you mentioned that in -- in
24 1982, we agree that Dr. Semple was the chairman of
25 this committee, correct?

Page 718

1    A   Yes.
2    Q   All right.  And you -- you told us
3  earlier that you read the various minutes of this
4  committee to prepare for your deposition, correct?
5    A   I read some minutes from this committee,
6  yes, or this task force.
7    Q   All right.  And generally -- I'm sorry?
8    A   Task force, I guess we call it.
9    Q   Right.  And generally, what was the goal
10 of the task force back in November of 1982?
11   A   Well, I think just from the minutes, it
12 was -- the concern was the ovarian cancer issue,
13 just given that the study had come out, the Cramer
14 study.  And I know in minutes I've seen, and this
15 refers to them, a thought of doing a study to look
16 at translocation.  So I think that was certainly
17 one of the big discussion points.
18   Q   Okay.  And when you say "look at
19 translocation," what do you mean?
20   A   Trans -- talc can translocate from the
21 perineum to the ovary.
22   Q   Okay.  And what was -- what was done by
23 the CFTA back in 1982 in conjunction with the task
24 force to address that issue?
25   A   So there were -- I think it was actually

Page 719

1  two studies, although I think one was kind of a
2  beginner study leading to a bigger study with
3  monkeys using radio tracers, I think three
4  different radio tracers, that was implanted in the
5  monkey vaginas, and it was -- then it was assessed
6  whether they could -- the talc would translocate
7  to the ovary.
8    Q   Okay.  And then what was done next by
9  the task force or any of its members?
10   A   I -- I don't know what you mean.
11   Q   Well, do you know one way or the other
12 as to whether or not any of the members were then
13 sent out to go talk to Dr. Cramer about his -- his
14 paper?
15   A   I'm not sure.  If you can show me
16 documents that can refresh my memory.
17   Q   Well, I'm just asking you, based on your
18 understanding as you sit here today whether or not
19 Dr. Semple went to go talk to Dr. Cramer?
20   A   I don't remember.  I mean, I may well
21 have looked at those documents.  I just don't
22 remember.
23   Q   Okay.  And what else in the 1980s did
24 the task force do?
25   A   1980s -- sorry.  I just need to think.

86 (Pages 716 to 719)

Linda Loretz, Ph.D.

Page 720

1          I -- I don't remember.  I mean, I know
2    that was the big study that was done.
3        Q   I'm sorry.
4        A   That was the big study that was done.
5    Again, if you show me documents to refresh my
6    memory, that would be --
7        Q   All right.  And is it fair to say that
8    whether it's the -- the Talc Interested Party Task
9    Force or any other task force, that they don't
10   necessarily meet on a regular basis, but they meet
11   kind of depending on the activity of the -- that
12   would be interesting -- interested to the task
13   force?
14       A   That is correct, particularly with the
15   task force.  We have some standing committees that
16   meet regularly, but task force, almost by
17   definition, are responding to specific issues.
18       Q   Okay.  So do you know one way or on the
19   other as to whether or not there was a meeting of
20   the task force between November 11th, 1982, and
21   September 16th of 1993, which I'll represent to
22   you is the -- I'm sorry -- February 2nd, 1993,
23   which is -- I'll represent to you is the -- the
24   next minutes that we have?
25       MR. LOCKE:  Objection.

Page 721

1          THE WITNESS:  I -- I don't know.
2    BY MR. GOLOMB:
3        Q   All right.  Do you know, based on your
4    recollection of your preparation for this
5    deposition, as to whether or not there was
6    something that was going on between 1982 and 1992
7    that would have interested the task force?
8        A   I mean, I think -- I think there were
9    papers that were looked at, but I couldn't be more
10   specific than that at this point.  Again --
11       Q   Papers looked at by whom?
12       A   I think there may have been ovarian
13   cancer papers that were looked at.  But again, if
14   you can show me something to -- to help my memory,
15   that would be great, but -- I know there were big
16   things going on in '93, but --
17       Q   Okay.  And then as -- as you were
18   questioned earlier today by Mr. Tisi, Dr. Gross
19   was then hired in 1993, correct?
20       A   Was that '93?  Yes.
21       Q   All right.  And that's when he -- he
22   published his meta-analysis, correct?
23       A   Yes.
24       Q   And do you know one way or the other as
25   to whether or not Dr. Gross's paper or draft of

Page 722

1    his paper was circulated to the members of the
2    task force before it was published?
3        A   I believe it was.
4        Q   Okay.  And is it -- is it your -- your
5    experience that that is a -- an ethical
6    approach to the publication of a paper, to
7    circulate it to people who have a financial
8    interest in the outcome of the paper before it's
9    published in a scientific journal?
10       MR. LOCKE:  Objection to form and beyond
11   the scope.
12       THE WITNESS:  What -- what we -- the
13   comments that we're looking for are typos,
14   clarity.  We can't question the conclusion of the
15   authors, and when we're hiring ethical people,
16   they're not going to let us do that.
17   BY MR. GOLOMB:
18       Q   Okay.  So then -- so you have -- you --
19   the task force meets.  They agree on an approach,
20   in this case the approach is to -- is to contact
21   and retain Dr. Gross, give Dr. Gross kind of his
22   marching orders of what he is going to do.  He
23   goes out and does it.  The -- the money is then
24   funded by the task force comes from your
25   organization.  It's then circulated, and you meet

Page 723

1    to discuss the -- the -- what potential
2    typographical errors.  Is that your testimony?
3        MR. LOCKE:  Objection to form.
4        THE WITNESS:  No, that wasn't my
5    testimony.  I guess it would just be helpful if I
6    could see the documents.
7          I mean, we -- when we -- when we hire a
8    consultant, yes, we do look at -- and there are
9    areas that we have -- industry has knowledge that
10   a consultant may not.  We're hiring -- for
11   example, if we're hiring somebody who is an expert
12   epidemiologist, we can't question his epi- --
13   their epidemiology findings, but we may have more
14   knowledge about how talc is used by a consumer,
15   how -- you know, questions about analysis of talc,
16   purity of talc, mining, mineralogy.
17         So we're reviewing it as -- with some
18   expertise, and as well as saying, you know, if we
19   get a document back and we think there could be
20   more clarity, I mean, I think it's okay to say to
21   an author, Could you clarify a little more what
22   you mean here.
23   BY MR. GOLOMB:
24       Q   Well, does the -- does the document --
25   once the -- once the draft from the outside expert

87 (Pages 720 to 723)

Linda Loretz, Ph.D.

Page 724

1   is -- is written, does that paper then go to the
2   CTFA or does it go to one of the members?
3        A    Typically -- typically it would go -- if
4   CTFA is the one, or PCPC, is arranging that, then
5   it would come back to us, and then we would
6   distribute it to the task force.
7        Q    Okay.  Have you ever seen a situation
8   where an expert was hired and the draft went to an
9   industry member before it went to -- to the CTFA
10  and was circulated to its members?
11       A    Only --
12            MR. LOCKE:  Objection.
13            THE WITNESS:  Only the one we talked
14  about this morning.
15  BY MR. GOLOMB:
16       Q    Which one was that?
17       A    The Huncharek/Muscat review.
18       Q    Okay.  Let me show you the next
19  document.
20            MR. GOLOMB:  This is Exhibit 81.
21            (Exhibit No. 81 was marked for
22            identification.)
23  BY MR. GOLOMB:
24       Q    And for the record, this is a memorandum
25  dated September 22nd, 1993, from Stephen Gettings,

Page 725

1   Ph.D., to the Talc Interested Party Task Force.
2        First of all, let me just ask you for
3   the record, Dr. Gettings was the director of
4   toxicology at that time, correct?
5        A    Yes.
6        Q    And was there overlap between
7   Dr. Gettings being the director of toxicology and
8   the time that you came to the CTFA?
9        A    No.
10       Q    When did Dr. Gettings leave?
11       A    I -- well, I started in October of '97,
12  and he left soon before then.  He had actually
13  moved over to the legal department and was there
14  very briefly, and then he moved on to -- he went
15  to a member company.
16       Q    And who replaced Dr. Gettings?
17       A    I did.
18       Q    All right.  And so have you seen this
19  document before?
20       A    I don't know.  I want to say I don't
21  think so.
22       Q    Okay.  So this is a CF -- CFTA document
23  dated September 22nd, 1993, and you did not see
24  this in your preparation of now Day 3 of a
25  deposition?

Page 726

1        A    I -- I don't know.
2            MR. LOCKE:  Objection.
3   BY MR. GOLOMB:
4        Q    If you just read the second paragraph,
5   you'll see:  "It has been proposed that we arrange
6   for Dr. Gross to publish his analysis."  Do you
7   see that?
8        A    Yes.
9        Q    And then the next sentence says:
10  "Johnson & Johnson will arrange for preparation of
11  a first draft, which will then be reviewed by the
12  task force."  Correct?
13       A    Yes.
14       Q    Okay.  Is that the first time you've
15  ever seen anything like that where a member -- an
16  industry member gets the first draft of -- and
17  then they circulate it?
18            MR. LOCKE:  Objection.
19            MS. FRAZIER:  Object to form.
20            THE WITNESS:  Well, as I say, the one
21  this morning would be the other one, but "will
22  arrange for the preparation," so I guess they're
23  the interface with the consultant.  And then it
24  will go to the task force.  So I'm not sure if J&J
25  is reviewing the draft.  They're arranging for the

Page 727

1   draft to be prepared is how I'm reading this.
2   BY MR. GOLOMB:
3        Q    Okay.  So that -- that's how you read
4   "Johnson & Johnson will arrange for a preparation
5   of a first draft"?
6        A    Probably, yeah.  I don't -- I don't know
7   for sure.
8        Q    So you don't -- as you sit here, you
9   don't know one way or the other as to whether
10  Johnson & Johnson received that first draft?
11       A    No.
12       Q    And if so, you don't know what happened
13  to that first draft once it was reviewed by
14  somebody at Johnson & Johnson and then circulated
15  amongst the task force members, correct?
16            MS. FRAZIER:  Object to form.
17            MR. LOCKE:  Objection.
18            THE WITNESS:  Yeah, I don't know if J&J
19  reviewed the draft, it went straight to the task
20  force.
21  BY MR. GOLOMB:
22       Q    Okay.  And then it says if you -- quote
23  in big -- in capital letters, bold:  "If you DO
24  NOT AGREE with this proposed course of action,
25  please contact me by close of business, COB,

88 (Pages 724 to 727)

Linda Loretz, Ph.D.

Page 728

1  Monday, September 27th, 1993."  Correct?
2     A   That's what it says, yes.
3     Q   And are you aware one way or the other
4  as to whether or not anybody objected to that?
5     A   No, I would not be aware.
6     Q   And is it generally the -- the role at
7  the CFTA at the time that they review any document
8  before it's published?
9        MR. LOCKE:  Objection.
10        THE WITNESS:  I would say we -- we
11  generally review documents before they're
12  published, yes.
13  BY MR. GOLOMB:
14     Q   Okay.  And you told us one of the
15  reasons why you do that is to -- for grammatical
16  errors.  Why else would you -- why else would the
17  CFTA review publications of outside experts before
18  they're published?
19     A   I guess, again, I would just say that
20  there may be some expertise, some -- you know,
21  again, more knowledge of -- if somebody is writing
22  on talc, the industry knows best how it's used.
23  If there is any question of how it's sourced, that
24  kind of thing, whether it came up in this
25  document, I don't know, but there are certain

Page 729

1  areas of expertise.  Yeah, we're hiring them for
2  their epidemiology expertise.
3     Q   And do you -- do you know who it is that
4  paid for Dr. Gross's report?
5     A   I believe we did.
6     Q   When you say "we," you mean the PCPC?
7     A   I'm sorry.  PCPC, yes.
8     Q   At the time CTFA?
9     A   Yes.
10     Q   And that would be out of money that is
11  deposited into the task force account?
12     A   Yes.  That would be typical.
13     Q   The PCPC or its predecessor CTFA
14  wouldn't go out of pocket to pay for something
15  like this, right?  They would ask its members
16  first?
17     A   The activities of the interested
18  parties, that's what they are -- that's what
19  "interested party" refers to, people who are
20  willing to expend money, because you have to do
21  that to get certain things done.
22     Q   Okay.  And that so the -- the task force
23  members agree on a course of action, in this case
24  the course of action was to hire Dr. Gross.
25  Dr. Gross makes a proposal.  The task force then

Page 730

1  gathers in some form or fashion, or maybe there's
2  some leadership to the group, like Dr. Semple and
3  some others, that say, Okay, this is reasonable,
4  go ahead, and then the -- the CTFA can you tell us
5  a check.
6     A   We do a contract, and we would be the
7  ones who would pay, yes.
8     Q   Okay.  Have you ever seen a situation
9  where the -- the industry member pays for it
10  themselves?
11     A   Not in my experience, that's not how
12  it's worked.
13     Q   Okay.  And why do you do it that way?
14  Why do you have -- why is the money deposited into
15  the CTFA, and then a check written from the CTFA
16  to the expert, rather than the industry member pay
17  for it themselves?
18     A   Because it's multiple industry members.
19  So we're -- we're putting the industry resources
20  together, so we're the site where the money is
21  collected, and then we write one check to the
22  consultant.
23     Q   Okay.  Let me show you the next
24  document.
25        This is 82.

Page 731

1        (Exhibit No. 82 was marked for
2        identification.)
3  BY MR. GOLOMB:
4     Q   Now, this is a letter from Dr. Alfred
5  Wehner, correct?
6     A   Yes.
7     Q   And it says it's cc'd to M. Chudkowski,
8  correct?
9     A   Yes.
10     Q   Who is that?
11     A   Michael Chudkowski, he's a J&J person.
12     Q   And is there a reason why Mr. Chudkowski
13  was the sole member of the task force that was
14  copied on a letter from Dr. Wehner to Dr. Gettings
15  in November of 1993?
16     A   I think I need to read it first.
17     Q   Okay.
18     A   (Peruses document.)
19        I don't know.  I don't know if $1400 was
20  the whole amount, and this to me looks like this
21  is not the way we normally do things.  Normally,
22  the -- as I say, we pay them for an interested
23  party.  So I don't know why in this case J&J
24  was -- as asked being to pay.
25     Q   Okay.  Let's be clear about this.  Well,

89 (Pages 728 to 731)

Linda Loretz, Ph.D.

Page 732

1  first of all, based on the letter, J&J was not
2  asked to pay, correct?  J&J volunteered to pay.
3      A   Right.
4          MR. LOCKE:  Objection.  Form.
5  BY MR. GOLOMB:
6      Q   Right.  So it says:  "While you" -- it
7  says:  "I am enclosing" -- meaning Dr. Wehner, "I
8  am enclosing Dr. Gross's invoice in the amount of
9  $1400 for his professional services and expenses.
10  While you mentioned, and Mike Chudkowski
11  confirmed, that J&J would pay the costs for the
12  manuscript preparation, I believe it to be
13  appropriate for BEC to submit the invoice to CTFA
14  because CTFA requested the job."  Correct?
15      A   That's what it says.
16      Q   Right.  So they are -- although J&J has
17  volunteered to pay the full costs, at least of
18  that particular invoice, doctor -- Dr. Wehner is
19  suggesting that the -- that the check be cut by
20  the intermediary, CTFA, rather than coming from
21  Johnson & Johnson itself, correct?
22          MR. LOCKE:  Objection.
23          THE WITNESS:  He's saying he's
24  submitting the invoice to CTFA.  So he felt from
25  where he sat, it should come to CTFA.

Page 733

1  BY MR. GOLOMB:
2      Q   The invoice?
3      A   Because then he says he expects that
4  we're going -- that CTFA is going to forward the
5  invoice to J&J.
6      Q   Well, it says:  "When you forward the
7  invoice to J&J, please have them pay out the check
8  to Alan Gross and send it to them directly."
9          So J&J is paying directly.
10      A   That's what it says, yes.
11      Q   Okay.  And that's why that letter was
12  copied to Mr. Chudkowski, right, because --
13      A   Yes.
14      Q   -- he is with J&J, and J&J volunteered
15  to pay.
16      A   Correct.  So this is not, I would say,
17  the usual way that we pay.
18      Q   In fact, you've never seen it done that
19  way before or since, correct?
20          MR. LOCKE:  Objection.
21          THE WITNESS:  I think that's true.
22  BY MR. GOLOMB:
23      Q   Do you know what the Hankinson study is?
24      A   What year does it refer to?
25      Q   Well, I'm just asking if you know what

Page 734

1  the Hankinson study is.
2      A   I know that Dr. Hankinson was an author
3  on a couple of different studies.  She was -- she
4  was one of the coauthors on the Gertig study, but
5  she was also a coauthor on the Houghton study.
6      Q   Okay.  And which study -- if there was a
7  minutes draft -- draft of the minutes from January
8  of 1994, do you know which Hankinson study it
9  would be referring to?
10      A   I don't.  I'm trying to think what year
11  the Gertig study, and I'm -- I'm blanking on that.
12          (Exhibit No. 83 was marked for
13          identification.)
14  BY MR. GOLOMB:
15      Q   Okay.  Let me show you the Talc
16  Interested Party Task Force.  Now, this is -- it
17  says "Draft Minutes."  I'm not sure that we have
18  the final minutes, but it says "Draft Minutes,"
19  dated January 11th, 1994.
20          Have you seen this before?
21      A   I -- I can't recall exactly which
22  minutes I've seen.  If I read it, it might seem
23  familiar, but...
24      Q   Okay.  Did -- did you read what you
25  thought were all of the minutes of the task force

Page 735

1  to prepare for your deposition?
2      A   I read a lot of them.
3      Q   Okay.
4      A   This is why I thought Bruce Semple was
5  from Procter & Gamble because he moved over to it.
6  I think -- I believe I did read these.
7      Q   Okay.  And attached to that, which is
8  Bates-stamped J&J 15618, which is the second
9  page -- well, it's the second page of this
10  exhibit.  It's the third page of the full
11  document.  The second page just saying
12  "Adjournment" and the signature of Steve Gettings.
13          Do you see it says "Draft" on the next
14  page?
15      A   I'm sorry.  Oh, yes, it says "Draft."
16      Q   First of all, how were -- how were these
17  minutes created?  Why -- why are there draft
18  minutes?
19      A   Again, this is before my time.  I can
20  tell you how we do it now, but I think it was the
21  same then, is generally someone would draft
22  minutes, and then it would go out to the group so
23  people could look, and if they said, You know, I
24  remember this a little differently, or really you
25  should -- we talked about this too, and it doesn't

Linda Loretz, Ph.D.

Page 736

1    seem to be here.  Just so members would have a
2    chance to -- to input so that they were accurate.
3         Q    Okay.  And these minutes are dated
4    January 11th, 1994.  And if you look at page 2,
5    one of the topics that was discussed was ovarian
6    cancer.  Do you see that?
7         A    Yes.
8         Q    And it refers to the recent paper by
9    Dr. Hankinson, correct?
10        A    Yes.
11        Q    And under paragraph 2, it says "M.
12   Chudkowski."  Again, Michael Chudkowski from J&J,
13   correct?
14        A    Yes.
15        Q    It says: "Agreed to contact Dr. Gross
16   to discuss incorporation of the results of the
17   Hankinson study in his meta-analysis manuscript."
18            Do you see that?
19        A    Yes.
20        Q    So in this case you have a -- what
21   was -- what was Mr. Chudkowski's title at J&J?
22        A    Oh, I don't know.
23        Q    Was he -- was he an executive of some
24   sort?
25        A    I don't know.  I think he was a

Page 737

1    scientist.  I remember him being on phone calls,
2    but I'm not sure I ever knew his title.
3         Q    What kind of scientist was he?
4         A    I just know he participated on technical
5    phone calls, so...
6         Q    All right.  So a member of the -- an
7    industry member of the task force saw -- how was
8    the -- first of all -- strike that.
9            How was the Hankinson study distributed
10   amongst the task force members?
11        A    The fact that it says this 94TA03,
12   that's -- that was what we used to use, a system
13   we used to use.  We used to mail them out, so I --
14   that would -- in '94, I think that would probably
15   be correct, and we would number them accordingly
16   sequentially.
17        Q    Okay.  So it would be somebody -- just
18   so we're clear on this, somebody from the CTFA in
19   their role as whatever they do at the CTFA, would
20   see the Hankinson study, and then the Hankinson
21   study would be circulated to the members of the
22   task force?
23        A    It could be that.  It also could be a
24   member bringing something to our attention that we
25   would circulate.

Page 738

1         Q    Okay.  And do you know in this case how
2    the Hankinson study was identified?
3         A    No, I don't.
4         Q    And then there was a conference -- some
5    sort of conversation or communication between the
6    CTFA and the task force members about that study,
7    correct?
8         A    Yes.
9         Q    And Mr. Chudkowski then agreed to
10   contact Dr. Gross, who had been hired and was in
11   the process of drafting a -- essentially a report
12   in defense of the -- the industry from the
13   Citizens Petition that was filed in 1993, correct?
14        A    Yeah, I think that's right.  He was
15   doing a meta-analysis.  So...
16        Q    Okay.  And do -- are you aware one way
17   or the other as to whether or not there were any
18   other studies that were published in that
19   intervening time between the time that Dr. Gross
20   was hired and the time that he finalized this
21   report?
22        A    No, I'm not.
23        Q    Okay.  So you don't know one way or the
24   other as to whether or not there are other
25   reports, other papers other than the Hankinson

Page 739

1    study, which in fact confirm the association
2    between talc and ovarian cancer; is that correct?
3            MR. LOCKE:  Objection.
4            THE WITNESS:  There's also -- there's
5    reference here to another study as well.
6    BY MR. GOLOMB:
7         Q    Okay.  Do you know one way or the other
8    as to whether or not that study confirms the
9    association between talc and ovarian cancer?
10        A    I do not.
11        Q    Okay.  Are you -- are you familiar with
12   the NTP inhalation study?
13        A    Yes.
14        Q    And what did the NTP inhalation study
15   conclude?
16        A    It concluded that talc -- inhaled talc
17   was carcinogenic to female rats, caused lung
18   cancer.  There was no evidence of carcinogenicity
19   in male or female mice, and I believe it was
20   equivocal evidence in male rats.
21        Q    Okay.  And anything else?
22        A    That they concluded?
23        Q    Yeah.
24        A    Well, that was the main point, I guess.
25        Q    When was the last time you reviewed the

91 (Pages 736 to 739)

Linda Loretz, Ph.D.

Page 740

1    NTP inhalation study?
2        A   I didn't review the report.  I reviewed
3    assessments of it.
4        Q   And did you review Dr. Gross's
5    assessment?
6        A   I don't believe so.
7        Q   Okay.  So just we're -- so we're clear,
8    that study was in the early '90s, correct?
9        A   Yes.
10       Q   And it -- it may or may not have -- have
11   had an effect on Dr. Gross's ultimate conclusions,
12   correct?
13           MR. LOCKE:  Objection.
14           THE WITNESS:  I mean, I don't recall
15   that it did because it's not ovarian cancer.
16   It's -- it's -- the NTP study is an inhalation,
17   and it had to do with lung cancer and it was
18   discussed at length at the ISRTP.  So, I'm not
19   sure that -- Dr. Gross, I believe, was doing on
20   ovarian cancer.
21   BY MR. GOLOMB:
22       Q   Okay.  Is that something you're
23   surmising, or is that something that you reviewed
24   from the records?
25       A   I'm trying to remember about Dr. Gross's

Page 741

1    review, but those are two very separate issues,
2    so --
3        Q   Okay.  Well -- all right.  Have you --
4    you have -- prior to preparing for your
5    deposition, did you -- did you review the Gross
6    paper?
7        A   I reviewed -- I mean, by reviewed it --
8        Q   Read it.
9        A   Read it quickly.  I mean, there were
10   drafts, and I -- I looked at it, and I -- I'm
11   recalling them as being ovarian cancer.
12       Q   Okay.  And did you read it in
13   preparation for your deposition?
14       A   I read it quickly.
15       Q   Okay.  When you say "read it quickly,"
16   what does that mean?
17       A   I just mean there's a ton of papers out
18   there, and I certainly am not claiming to -- as I
19   sit here, that I read each and every one and could
20   recall the details of them.
21       Q   Well, there's -- there's a ton of
22   papers, and I think we -- we've already talked
23   about the numbers.  There are now in excess of 30
24   papers that were -- were written by -- by various
25   scientists to look at the association between talc

Page 742

1    and ovarian cancer, correct?
2        A   That's about right.
3        Q   Right.  But this is a paper, the Gross
4    paper was a paper that was where Dr. Gross was
5    specifically retained by industry members of the
6    CF -- CTFA.  That's a little bit different than
7    those other 30 papers, would you agree?
8        A   It is, yes.
9        Q   Okay.  And so are you -- are you telling
10   us that you looked at the Gross paper, reading it
11   quickly with the same care that you did with the
12   other now -- now more than 30 papers?
13           MR. LOCKE:  Objection.  If you have a
14   question about the Gross paper, ask the question.
15   It's not a memory test.  If you want to give her
16   the paper, go ahead.
17   BY MR. GOLOMB:
18       Q   Can you answer my question?
19       A   Yeah, I'm happy to look at it, because
20   again --
21       Q   Well, it's not a memory test.  I'm just
22   trying to -- my question is a very specific one
23   about the -- not about the content of the paper
24   but about the care in which you read the paper.
25           MR. LOCKE:  What difference does it

Page 743

1    make?
2            MR. GOLOMB:  Well, that's rhetorical.
3            THE WITNESS:  Your question --
4            MR. GOLOMB:  I'm not here to answer
5    questions.
6            THE WITNESS:  Your question, I thought,
7    was about NTP bioassay, which was an inhalation
8    assay looking at where lung tumors were found.
9    The Gross paper was about ovarian cancer.  So I --
10   I don't think it's in there, but if you want to
11   show me the paper and -- where that was opined on
12   as well, maybe it was.  I -- I just don't
13   remember.
14   BY MR. GOLOMB:
15       Q   All right.  Well, you -- you said, and
16   when I refer to "you," I'm referring to the CTFA,
17   because you may not have been around at that
18   point.
19       A   I wasn't.
20       Q   But the -- the draft -- in answer to
21   Mr. Tisi's question earlier today, the draft of
22   the -- the Gross paper was circulated amongst the
23   industry members of the CTFA, correct?
24       A   That's correct.
25       Q   Right.  And then it was reviewed by the

92 (Pages 740 to 743)

Linda Loretz, Ph.D.

Page 744

1  CTFA members, and the CTFA members then forwarded
2  comments.  Correct?
3       A   I presume so.  I didn't -- have not seen
4  those comments.
5       Q   Okay.  Let's take a look at the next
6  exhibit.
7           MR. LOCKE:  Why don't we take a break.
8  We've been going for an hour and --
9           MR. GOLOMB:  Sure.
10          MR. LOCKE:  -- almost 50 minutes.  I
11 think we've got about 44 minutes left.
12          MR. GOLOMB:  Okay.
13          THE VIDEOGRAPHER:  The time is 4:38 p.m.
14 We're going off the record.
15          (Recess.)
16          THE VIDEOGRAPHER:  The time is 4:49
17 p.m., and we're back on the record.
18 BY MR. GOLOMB:
19      Q   So we were -- we were talking about the
20 NTP inhalation study.  And correct me if I'm
21 wrong, you -- you testified that they -- as far as
22 you know, there would be no reason for that study
23 to be included in the paper and analyzed within
24 the paper.
25          Am I summarizing your testimony

Page 745

1  correctly?
2       A   As I recall, the --
3           MR. LOCKE:  Objection.
4           THE WITNESS:  The Gross paper, because
5  it dealt with ovarian, and the -- and the NTP was
6  inhalation lung cancer issue.
7  BY MR. GOLOMB:
8       Q   Okay.  So then I assume that there
9  would -- then there wouldn't be any reason -- and
10 based on what you told us before about kind of the
11 subjects, how subjects are treated within a paper,
12 and typographical or grammatical errors are edited
13 or whatnot, there wouldn't be any reason for an
14 industry member to tell the scientists what to
15 include in the paper, would there?
16      A   You're talking about a consulting
17 scientist?
18      Q   Yeah.
19      A   And would industry -- I mean, we would
20 obviously up front say, This is what we want you
21 to review.
22      Q   Right.
23      A   Or whatever -- whatever they're
24 preparing it on.  So I'm not sure what you mean by
25 tell them --

Page 746

1       Q   Okay.  Well, we -- we've already --
2  we've already gone through and -- and have agreed
3  that the consultant is hired, the consultant is
4  given marching orders on what to do, the
5  consultant goes out and does it.  The consultant
6  then circulates the paper, whether it goes
7  directly to an industry member, as it did in this
8  case, or to the CTFA.  It's then circulated to all
9  the industry members, they edit it.
10          Am I -- do I have it correct so far?
11          MR. LOCKE:  Objection to form.
12          THE WITNESS:  Well, I mean, they
13 would -- I wouldn't say they edit it.  They can
14 comment on it, and then CTFA -- generally the CTFA
15 liaison person or PCPC would compile comments, if
16 that makes sense.
17 BY MR. GOLOMB:
18      Q   Okay.  And would those comments include
19 telling the scientists include this or don't
20 include that?
21      A   I mean, in general, no.  I mean, if they
22 left off a -- didn't include a paper, for example,
23 or something like that, it could be a -- you know,
24 did you mean to exclude this paper or something
25 like that, but I -- but in general --

Page 747

1       Q   What about -- what about the other --
2  the vice versa of that, where they included a
3  paper and would an industry member say, Huh-uh,
4  take that one out?
5       A   Not -- I mean, not to better the
6  results.  You know, only if they included some
7  topic that seemed really off topic.  But, again,
8  we're choosing our consultants carefully, so we
9  don't think that's going to happen.
10      Q   Okay.  But if -- but if that did happen,
11 that would be a problem, wouldn't it?
12      A   If something were like poorly written or
13 something, I mean, you could see where, of course,
14 you could have a comment, but then you would have
15 chosen your consultant wrong.
16      Q   Okay.  But if -- if -- okay.
17          And if -- but if the consultant was
18 said -- told by an industry member, Include this
19 but don't include that --
20      A   No.
21      Q   -- you would see an ethical problem in
22 that if that happened?
23      A   Correct.  I mean --
24          MR. LOCKE:  Objection.  Beyond the
25 scope.

Linda Loretz, Ph.D.

Page 748

```
1          THE WITNESS:  Right.  If they're looking
2    at a topic, then they -- we would be hiring them
3    for their expertise, and they would be selecting
4    what -- what's relevant.
5          MR. GOLOMB:  Okay.  Can I have the next
6    document, please.
7          (Exhibit No. 84 was marked for
8          identification.)
9    BY MR. GOLOMB:
10   Q    This is Exhibit 84.
11         This is a letter dated May 5th, 1994,
12   from Michael Chudkowski.  Have you seen that
13   letter before?
14   A    I don't think so.
15   Q    So this is a letter on Johnson & Johnson
16   stationery dated May 4th, 1994, from Dr. Alan
17   Gross -- I mean to Dr. Alan Gross from --
18         MS. FRAZIER:  Do you have a copy of
19   that?
20         (A discussion was held off the record.)
21   BY MR. GOLOMB:
22   Q    -- from Michael Chudkowski, manager of
23   preclinical evaluations.  Do you see that?
24   A    To Michael Chudkowski.
25   Q    Do you see the signature line on the
```

Page 749

```
1    bottom of the page?
2    A    Yes, I do.
3    Q    Okay.  So it's a letter from Chudkowski
4    to Gross, correct?
5    A    Yes.
6    Q    And on the second full paragraph, it
7    says:  "Prior to submission, however, please
8    delete any reference to the NTP inhalation studies
9    conducted in rodents."
10         Did I read that correctly?
11   A    You did.  And the reason for that would
12   be this is a paper -- this is exactly what I was
13   saying, that it's on ovarian cancer and talc
14   exposure, that's humans.  Apparently he included
15   an inhalation study in rodents.  That's really off
16   topic.  So it's probably -- it doesn't -- it's not
17   relevant to the conclusion related to ovarian
18   cancer and talc exposure.
19   Q    Well, so you're -- you're saying that
20   only the clinical aspect would be relevant to, in
21   this case, the FDA who is looking at a -- at a
22   Citizens Petition rather than some animal study?
23         MR. LOCKE:  Objection.  Form.
24   BY MR. GOLOMB:
25   Q    You don't think it would be relevant for
```

Page 750

```
1    the FDA to see the results of an animal study?
2    A    Well, I think --
3          MR. LOCKE:  Same objection.
4          THE WITNESS:  -- the FDA knows the
5    results of the animal study.  That's not a
6    mystery.  I think this is a publication, which
7    perhaps read poorly because it went over into
8    another totally different area.  Nothing to do
9    with ovarian cancer, nothing to do with
10   epidemiology study.
11   BY MR. GOLOMB:
12   Q    Okay.  So you never talked to
13   Mr. Chudkowski about this, correct?
14   A    No.
15   Q    And you've never talked to Dr. Gross
16   about this?
17   A    No.
18   Q    So what -- you're surmising that they --
19   he -- doctor -- Mr. Chudkowski wants to take the
20   rodent study out of the paper because it's saving
21   the FDA time --
22         MR. LOCKE:  Object --
23   BY MR. GOLOMB:
24   Q    -- because they already know about it?
25         MR. LOCKE:  Objection.  There's no
```

Page 751

```
1    evidence that CTFA saw this at this time.
2          THE WITNESS:  And I -- I mean, the Gross
3    paper is not -- I mean, it's being published in a
4    journal.  I -- I -- this is why I was asking
5    because I was confused why two, so different
6    topics were in the same paper, and it sounded like
7    that was -- that it read that it would be better
8    to have a focus of your paper.
9    BY MR. GOLOMB:
10   Q    Okay.  So the -- but the -- but the
11   Gross paper is being sent to the FDA, and Mr. Tisi
12   went through it in great detail this morning, went
13   to the -- to the FDA to defend the industry
14   members against the Citizens Petition, which --
15   which showed a -- which showed evidence of an
16   association between talc and ovarian cancer,
17   correct?
18         MR. LOCKE:  Objection.
19         THE WITNESS:  I'm not aware the Gross
20   paper went to the FDA.  That was the Huncharek and
21   Muscat document.
22   BY MR. GOLOMB:
23   Q    Okay.  What was the purpose of the
24   Gross --
25   A    This was -- this was a publication.  It
```

94 (Pages 748 to 751)

Linda Loretz, Ph.D.

Page 752

1   was being published in the peer-reviewed
2   literature.
3       Q   By -- by industry members?
4       A   It was industry sponsored, yes.
5       Q   Right.  And so prior to the -- and I'm
6   reading this again: "Prior to submission,
7   however, please delete any reference to the NTP
8   inhalation study conducted in rodents."
9           That's what it says, correct?
10      A   Correct.  Because I think they were
11  asked to do a paper on ovarian cancer and talc
12  exposure.
13      Q   Okay.  And so are in vitro or in vivo
14  studies irrelevant to the analysis of the
15  association between talc and ovarian cancer?
16      A   I think it's a different topic, and I
17  think -- again, I'm kind of speculating here, but
18  I think this was a paper that was focused on
19  ovarian cancer -- cancer and talc exposure.
20      Q   In any event, Mr. Chudkowski, the
21  manager of preclinical evaluations from Johnson &
22  Johnson, was essentially telling Dr. Gross to
23  delete any reference to the NTP inhalation in this
24  letter, correct?
25      A   Because it was a very different --

Page 753

1           MR. LOCKE:  Objection.  Lack of
2   foundation, beyond the scope.
3           MS. FRAZIER:  Join.
4           THE WITNESS:  -- a very different type
5   of study, an animal study and an inhalation study.
6   It's very different.
7   BY MR. GOLOMB:
8       Q   Let me show you what's being marked as
9   Exhibit 85.
10          (Exhibit No. 85 was marked for
11          identification.)
12  BY MR. GOLOMB:
13      Q   This is a memorandum on CTFA stationery
14  dated January 11th, 1995, to the Talc Interested
15  Party Task Force from Stephen Gettings, director
16  of toxicology at the CTFA.  The subject is "The
17  CTFA response to the Citizens Petition."
18          Do you see that?
19      A   Yes.
20      Q   And this says "Requires Action."  Do you
21  see that?
22      A   Yes.
23      Q   And by require -- in the context of this
24  memo, "Requires Action" means review it and give
25  us back your comments.  Correct?

Page 754

1       A   It could mean, or it could mean -- no,
2   here it is.  "Review and be prepared to discuss at
3   a meeting."
4       Q   At the --
5       A   At an in-person meeting.
6       Q   At the January 18th, 1995 meeting of the
7   task force, correct?
8       A   Yes.
9       Q   And where -- underneath where it says
10  "Requires Action," it says: "The attached draft
11  document," and that is the report from -- is that
12  -- what paper is this referring to?
13      A   That's -- I would ask you that.  I'm not
14  sure.
15      Q   Okay.
16      A   I mean, this is the earlier --
17      Q   This is 1994.
18      A   Right.
19      Q   This is the same time period in which we
20  were talking about Dr. Gross's paper.
21      A   Right.
22          MR. LOCKE:  Wait.  This is 1995.
23          MR. GOLOMB:  19 -- January 11th, 1995.
24  The previous document that we just referred to was
25  1994.

Page 755

1           MR. LOCKE:  May 5th, 1994.
2           MR. GOLOMB:  Okay.
3   BY MR. GOLOMB:
4       Q   So, in any event, this says: "Subject:
5   CTFA Response to Citizens Petition," correct?
6       A   Yes.
7       Q   Okay.  And as you sit here today, do you
8   know who it was that wrote the response?
9       A   No.  I would need to see what the
10  attachment is.
11      Q   Okay.  It says: "The attached draft
12  document has been prepared by J&J in response to
13  the Citizens Petition by the Cancer Prevention
14  Coalition."  Correct?
15      A   Yes.
16      Q   And then attached to that --
17          MR. LOCKE:  Just for the record, this is
18  a document that says at the bottom "1 of 8," and
19  we only have one page.
20  BY MR. GOLOMB:
21      Q   Which is the cover page to the
22  memorandum that went to the members of the Talc
23  Interested Party Task Force.
24          Is that consistent with your
25  understanding?

95 (Pages 752 to 755)

Linda Loretz, Ph.D.

Page 756

1      MR. LOCKE:  Objection.
2      THE WITNESS:  That's how I would read
3  it.
4  BY MR. GOLOMB:
5      Q   Have you seen this document before?
6      A   I don't know.  I really need to see the
7  attachment.
8      Q   Okay.  I'm sorry, but I don't have
9  copies of the attachment, but here's the draft.
10     A   (Peruses document.)  Okay.
11     MR. LOCKE:  Since it's a J&J document,
12  I'd like to send it down to their counsel just to
13  see.
14  BY MR. GOLOMB:
15     Q   It's a -- just to be clear, it's a --
16  you've now had an opportunity to see that draft,
17  correct?
18     A   Yes.
19     Q   And have you seen that before?
20     A   I'm not sure.
21     Q   Okay.  Did you see the -- the cover
22  memorandum before?
23     A   If I had seen the cover, I would have
24  seen the document, so I think I'm saying --
25     Q   Okay.  And so --

Page 757

1      A   -- probably not, as I recall.
2      Q   So to be clear, in response to what
3  Mr. Locke just said, the draft is a -- and the
4  memorandum is a document which was produced by
5  J&J, but it's a document on CTFA letterhead,
6  correct?
7      A   Yes.
8      Q   Okay.  But you haven't seen that before?
9      MR. LOCKE:  Well, wait.
10  BY MR. GOLOMB:
11     Q   That you can recall as you sit here.
12     MR. LOCKE:  This has a C -- this has a
13  PCPC document and Bates number on it.  So it came
14  from PCPC's files.  But it says on the cover page,
15  "Prepared by J&J."  That's what I was referring
16  to.
17     MR. GOLOMB:  Okay.  Fair enough.
18     I think we're done for the day.  That's
19  the end of this subject, and we'll pick up
20  tomorrow morning.
21     MR. LOCKE:  Okay.
22     MR. GOLOMB:  Let's go off the record,
23  please.
24     THE VIDEOGRAPHER:  The time is
25  5:03 p.m., October 1st, 2018.  We're going off the

Page 758

1  record.  Completing today's videotaped session.
2      (Whereupon, the deposition of
3      LINDA LORETZ, Ph.D. was adjourned
4      at 5:03 p.m.)

Page 759

1      CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2      The undersigned Certified Shorthand Reporter
3  does hereby certify:
4      That the foregoing proceeding was taken before
5  me at the time and place therein set forth, at
6  which time the witness was duly sworn; That the
7  testimony of the witness and all objections made
8  at the time of the examination were recorded
9  stenographically by me and were thereafter
10  transcribed, said transcript being a true and
11  correct copy of my shorthand notes thereof; That
12  the dismantling of the original transcript will
13  void the reporter's certificate.
14      In witness thereof, I have subscribed my name
15  this date:  October 2, 2018.
16
17      _____
18      LESLIE A. TODD, CSR, RPR
19      Certificate No. 5129
20
21  (The foregoing certification of
22  this transcript does not apply to any
23  reproduction of the same by any means,
24  unless under the direct control and/or
25  supervision of the certifying reporter.)

96  (Pages 756 to 759)

Linda Loretz, Ph.D.

Page 760

```
 1              INSTRUCTIONS TO WITNESS
 2         Please read your deposition over carefully and
 3    make any necessary corrections.  You should state
 4    the reason in the appropriate space on the errata
 5    sheet for any corrections that are made.
 6    After doing so, please sign the errata sheet
 7    and date it.
 8         You are signing same subject to the changes
 9    you have noted on the errata sheet, which will be
10    attached to your deposition.  It is imperative
11    that you return the original errata sheet to the
12    deposing attorney within thirty (30) days of
13    receipt of the deposition transcript by you.  If
14    you fail to do so, the deposition transcript may
15    be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24
25
```

Page 762

```
 1           ACKNOWLEDGMENT OF DEPONENT
 2         I,_____, do hereby
 3    certify that I have read the foregoing pages, and
 4    that the same is a correct transcription of the
 5    answers given by me to the questions therein
 6    propounded, except for the corrections or changes
 7    in form or substance, if any, noted in the
 8    attached Errata Sheet.
 9
10    _____
11    LINDA LORETZ, Ph.D.            DATE
12
13
14    Subscribed and sworn to
15    before me this
16    _____day of_____,20___.
17    My commission expires:_____
18    _____
19    Notary Public
20
21
22
23
24
25
```

Page 761

```
 1              ------
 2              E R R A T A
 3              ------
 4    PAGE LINE CHANGE
 5    ____ ____ _____
 6    REASON: _____
 7    ____ ____ _____
 8    REASON: _____
 9    ____ ____ _____
10    REASON: _____
11    ____ ____ _____
12    REASON: _____
13    ____ ____ _____
14    REASON: _____
15    ____ ____ _____
16    REASON: _____
17    ____ ____ _____
18    REASON: _____
19    ____ ____ _____
20    REASON: _____
21    ____ ____ _____
22    REASON: _____
23    ____ ____ _____
24    REASON: _____
25
```

97 (Pages 760 to 762)

Linda Loretz, Ph.D.

**A**

**able** 524:14
  555:20 591:12
  595:9 656:19
**absence** 442:25
**absent** 586:12
**absolutely** 455:2
  464:17 587:10
  616:21,21
  678:1
**abstract** 605:18
**abysmal** 478:17
**accept** 496:17
  516:18
**acceptable**
  586:24
**accepted** 437:1
  501:17 502:23
  530:20
**access** 679:18
  680:7,12
**accomplished**
  662:5
**account** 557:3
  685:1,8 708:5
  729:11
**accurate** 453:20
  460:21 464:2
  591:16 595:16
  659:9 736:2
  760:15
**accurately** 717:7
  717:8
**acknowledge**
  437:9
**acknowledged**
  580:6
**acknowledges**
  604:11
**acknowledgm...**
  437:12 604:10
  604:22,23
  762:1
**acknowledgm...**
  437:19 610:24
**act** 485:8

**acted** 664:3
**Acting** 493:14
  507:5
**action** 408:22
  494:19 495:5
  623:23 663:22
  727:24 729:23
  729:24 753:20
  753:24 754:10
**active** 419:25
  455:24,25
  456:1 460:11
  460:16 606:5
  666:6
**activities** 489:24
  704:19 705:8
  706:4,6,7,16
  707:5,21 709:5
  709:24 729:17
**activity** 514:7
  709:23 715:3,4
  715:7 720:11
**actual** 453:25
  468:8 469:21
  469:23 470:1
  486:23,25
  550:8 606:18
  616:9,22
  617:12
**ad** 390:20
  712:22 713:17
**add** 411:3 413:1
  414:5 442:23
  449:23 450:5
  609:5
**added** 409:12
  412:14 413:21
  415:20 416:25
  417:10 418:2
  442:19 450:10
  607:22 608:12
**adding** 414:9,13
  417:16 422:9
  441:7 443:1
  445:1 706:12
**addition** 411:7

  412:19 548:16
  646:4,5,5
  647:8 648:18
  648:19,20
  650:5
**additional**
  396:11 542:1
  568:1 619:16
**additives** 580:15
**address** 508:21
  562:1 576:24
  704:9 718:24
**addressed**
  549:13 568:2
  577:4 582:2
  598:7
**addresses**
  413:16 585:6
**addressing**
  574:4
**adequate** 471:5
**adjourned** 758:3
**Adjournment**
  735:12
**administering**
  380:15
**Administration**
  398:17 404:19
  438:9
**Administrative**
  717:6
**admit** 539:3
**admitted** 597:14
**admittedly**
  670:18
**adopted** 551:19
**advice** 475:23
**advise** 591:10
**advisement**
  503:15,24
**Advisory** 711:4
**advocating**
  665:21
**affairs** 657:5
  658:5,14 678:6
**affect** 443:18,22

  666:20
**affiliated** 472:24
**affiliation**
  429:15
**affiliations**
  423:8 445:18
**afternoon**
  643:15
**agencies** 667:5
**agency** 408:22
  472:7 591:15
  675:12,13
  692:6
**agenda** 496:21
  498:1,5,11
  500:4,7 502:24
  622:16
**ago** 513:23
  552:11 658:16
  716:14
**agree** 402:9
  414:13 420:14
  493:2,4 527:1
  543:15 544:6
  547:25 554:6,9
  558:20 562:22
  562:24 567:9
  567:12 569:24
  570:1 581:11
  581:12 612:8
  615:1 625:12
  632:17 653:17
  664:23 671:12
  707:13 717:24
  722:19 727:24
  729:23 742:7
**agreed** 407:20
  499:10 501:3
  556:22 567:13
  570:6 602:8
  613:14 653:7
  714:16 716:18
  736:15 738:9
  746:2
**agrees** 531:3
  564:21

  ahead 503:21
  651:16 682:21
  730:4 742:16
**al** 542:13
**Alabama** 381:24
**Alan** 390:23
  391:9 733:8
  748:16,17
**Alexandria**
  382:6
**Alfred** 391:5
  731:4
**algorithm**
  574:20
**Allen** 381:21
  384:13
**allow** 665:1
**allowed** 425:24
**allows** 663:21,24
**alternatives**
  448:16 554:14
  554:22
**altogether** 451:3
**Amended**
  395:15
**America** 477:2,5
  477:8 579:25
  627:19 667:10
**American**
  388:17 429:16
  498:20 506:8
  511:10 601:19
  615:11,13
  617:10 619:18
  621:20 622:25
  633:10,18
**amount** 403:14
  636:15 731:20
  732:8
**analogy** 542:25
**analyses** 671:25
**analysis** 386:21
  388:15 390:23
  436:2 457:11
  536:17 547:14
  583:12 585:21

Case 3:16-md-02738-MAS-RLS   Document 9895-3   Filed 05/30/19   Page 164 of 565 PageID: 71408
Linda Loretz, Ph.D.

Page 764

639:13 671:21
723:15 726:6
752:14
**analytical** 552:8
**analyze** 412:25
588:7 589:4
**analyzed** 587:19
744:23
**and/or** 588:12
759:24
**animal** 635:11
635:14 749:22
750:1,5 753:5
**animals** 634:12
634:20
**Ann** 613:6
**Anne** 380:12
**announced**
691:10
**answer** 415:7,8
415:14 417:5
426:9 441:17
473:12 503:19
523:16 527:15
531:13,19
539:7 546:21
553:12 556:21
587:25 597:23
607:14 624:15
641:25 653:25
657:21 658:2
659:9 675:4
690:21,25
742:18 743:4
743:20
**answered**
529:19 530:7
530:19 531:5
531:17,20,21
598:6 656:3
657:25 670:8
703:2,22
**answering**
714:22
**answers** 432:25
595:10 598:5

629:13 659:17
659:17 762:5
**answer's** 694:25
**anus** 681:19
688:2 690:1
**anybody** 447:13
483:20 497:22
504:14 505:9
505:10 506:17
523:14 525:15
537:12,20
538:11 556:25
623:21 638:17
638:18 655:9
675:23 680:16
697:24 728:4
**anymore** 572:1
**anyway** 418:10
501:17,18
629:24 702:4
**apart** 583:25
617:2
**apparent** 401:19
**Apparently**
749:14
**appear** 612:3
619:20
**APPEARAN...**
382:1 383:1
384:1
**appeared** 427:2
427:3,7
**appearing**
480:19
**appears** 463:18
495:12 618:7
619:22 660:20
660:21 662:4
**application**
388:18 389:5
409:1 438:13
616:3,8,23
617:7 677:17
692:4
**Applied** 493:18
**apply** 566:23

759:22
**appointed** 714:7
715:24 716:1
**appreciate**
531:9
**approach**
388:11 722:6
722:19,20
**appropriate**
411:23 418:14
516:22 520:7
673:13 732:13
760:4
**approval** 625:4
666:2
**approve** 625:3
**approved** 666:7
**approximately**
410:8 644:6
687:11,13
**April** 386:8
437:1 462:24
486:10 601:4
630:7,16
682:23 683:8
684:8,9,21
**Arch** 383:21
**area** 398:23
409:2 438:14
463:13 572:8
597:3 600:19
613:20 624:1
681:18 687:20
688:1 689:25
750:8
**areas** 723:9
729:1
**argue** 547:22
**arguing** 534:9
**argument**
543:23 576:9
**arguments**
435:8 486:21
561:4,24 562:2
576:12
**arm** 472:10

677:24
**arrange** 726:5
726:10,22
727:4
**arranging** 724:4
726:25
**arrive** 610:1
**arsenic** 586:9,10
588:25 589:2,9
**artful** 577:5
**article** 385:19
386:18 387:4
388:10 389:4
389:14 390:7
390:12 436:20
437:9,14 480:2
480:3 602:17
603:7 610:20
614:7 632:5
685:9
**articles** 432:7,11
445:17,24
479:3 627:5
**asbestiform**
470:19,23,24
**asbestos** 504:19
540:24 543:1,7
543:8,21 544:3
544:6,23 545:4
545:9,16,19,25
546:2,3,9,11
546:25 547:9
547:21 548:1
550:22 552:9
553:21 554:4,7
554:8,25
555:10,25
556:9,15
571:25 573:2,5
575:5,6 576:4
576:20 577:19
585:14 592:18
594:8,14,15,23
594:25 596:9
596:17,18
627:16 642:7

642:19 670:20
674:25 700:22
700:23,25
701:3,22,23
702:5,7,10
703:4,10 704:6
704:13 706:10
706:12,12
709:21,22
710:4 715:3,8
716:2
**asbestos-free**
571:15 572:6
**ascertain** 523:24
525:3
**ASHCRAFT**
382:4
**aside** 396:1
401:14 410:10
422:13 440:20
533:16 581:19
**asked** 408:14
409:8 412:2,14
432:23 448:24
481:20 493:24
495:13 498:21
499:25 501:18
503:1 504:5,8
514:23 518:11
523:13 529:18
530:6,19 531:4
531:16 549:15
549:18 555:9
592:12 595:21
600:10,15
608:23 609:2
609:14 628:1
631:6 634:5
635:25 644:11
646:19 656:3
658:24 659:8
670:7 672:4,5
672:19 673:1
677:14 701:4
703:1,21
731:24 732:2

752:11
asking 397:22
  399:4 411:17
  413:24 434:4
  435:11 499:6
  506:24 507:18
  523:10 532:11
  548:8,22
  550:13 556:9
  573:16 581:10
  608:25 609:1,5
  609:7 623:20
  632:15 633:16
  635:22 640:19
  641:9 661:10
  719:17 733:25
  751:4
asks 483:2
aspect 571:13
  749:20
aspects 508:21
  555:8
aspiration 583:5
aspirationally
  583:1
assay 743:8
assert 440:21
assertion 440:22
assess 711:12
assessed 631:12
  719:5
assessment
  565:6 596:9
  636:9 637:17
  670:18,19
  740:5
assessments
  649:22 740:3
assist 433:11
assistance
  452:16 630:7
  632:4
assisted 645:24
assisting 477:8
associate 449:19
associated

567:18 673:14
673:15 692:5
association
  394:23,24
  449:20 453:19
  460:4 461:3
  477:2 533:8,19
  534:9,17,20
  542:2 569:10
  569:18 578:8
  594:5,24
  603:23 604:14
  652:1 663:7
  670:24 671:1
  671:16 686:9
  701:5,9 711:25
  739:1,9 741:25
  751:16 752:15
assume 450:25
  480:11,13
  500:9 542:8
  547:9 579:23
  626:7 667:2
  686:1 710:18
  745:8
assumed 544:25
  555:25 624:18
assumes 546:25
assumption
  429:24 545:8
Assured 450:19
ASTM 551:15
attach 422:17
  479:12 484:16
  491:20 590:21
  626:21
attached 385:10
  386:2 387:2
  388:2 389:2
  390:2 391:2
  431:15,23
  432:15 492:17
  616:9 617:12
  735:7 754:10
  755:11,16
  760:10 762:8

attaches 422:19
attachment
  431:4 453:13
  616:5 755:10
  756:7,9
attend 498:22
attendance
  493:13
attended 494:6
  540:17
attention 573:9
  573:22 574:1
  621:25 622:22
  623:14 737:24
attorney 396:15
  760:12
audience 505:4
audit 555:22
August 475:9
  689:2 694:15
  695:15
author 723:21
  734:2
authored 612:12
authors 430:22
  445:13,25
  606:20 610:23
  611:15 625:11
  655:21 722:15
authorship
  611:2
availability
  591:14
available 549:23
  607:6 707:20
Avenue 383:14
avoid 663:24
  665:2
aware 403:25
  405:8 406:13
  407:4 409:17
  409:18,22
  410:4 426:12
  427:12,13
  428:18 435:25
  436:7 442:18

445:8 451:1
463:24 469:22
478:8 480:24
483:18,20
498:24 511:24
515:14 523:8
523:13,17
525:16 553:22
575:24 577:11
577:16 588:11
588:22 589:9
595:18,25
596:22,23
599:9,25 614:8
615:5,6 623:2
624:8 626:11
626:15 627:3
628:9 632:13
632:18 634:11
639:19 641:16
650:20 651:24
655:12 672:19
674:23 675:19
675:21 676:6
676:14,17,17
676:18,23
684:4 688:6,9
703:3 705:23
728:3,5 738:16
751:19
awareness
  418:13 449:13
a.m 379:21
  392:3 405:16
  405:20 407:12
  407:15 476:10
  476:13 683:8

─────────
  **B**
B 385:9 386:1
387:1 388:1
389:1 390:1
391:1
baby 392:22
  393:7 411:8
  448:8 464:18

464:23 488:20
574:16 580:11
back 401:11,12
401:14 405:20
407:2,7,16
408:20 410:11
421:18 428:15
437:8,23,25
451:9 453:25
463:12 469:5
470:11 476:13
493:7 550:22
552:1 553:18
554:2 555:11
555:13,14,22
567:16 570:23
572:7 587:22
589:23 601:3
603:19 606:2
606:12 612:16
619:24 632:1
637:5,12 642:9
643:12 644:11
649:8,10 650:8
653:17 658:15
682:23 703:25
705:14 710:25
712:16,16,19
714:18 718:10
718:23 723:19
724:5 744:17
753:25
background
  510:7,20
BACON 383:5
Bailey 388:9
396:18,20,21
396:23 416:14
418:10 454:2,3
454:5 456:9,20
457:22 458:18
483:13 490:22
490:23 491:10
492:5 494:2
495:9 496:19

496:20 497:24
498:12,15
510:17 511:6
517:21 518:15
519:18,20
520:19,25
521:20 523:21
523:22 524:14
524:22 525:15
533:6 534:10
539:4 540:3
541:5 551:2,18
552:7 572:18
590:11,16
591:1 599:22
667:14,16,20
667:24 668:3
669:9,24 670:5
674:21,23
**Bailey's** 491:15
491:21 533:13
**bailiwick** 707:16
707:25
**balance** 708:25
**ballpark** 636:15
651:17,19
**based** 421:5
447:20 461:9
500:9 607:5
609:12 645:23
661:13 691:14
692:3 693:8,9
693:13,20
719:17 721:3
732:1 745:10
**basic** 610:17
**basically** 434:8
473:4 549:5
553:22 568:7
576:20 598:9
610:4 612:1
629:2 663:6
664:18 704:17
705:5 710:19
**basing** 693:19
**basis** 406:12

466:10 470:14
470:15 471:16
544:7 556:17
558:8 596:24
720:10
**Bates** 385:15,18
385:22 386:6,8
386:11,13,16
386:22 387:6
387:13,16,19
387:20,23
388:5,9,13,15
388:18,21
389:9,16,21,23
390:11,21,23
391:5,10,14
470:11 604:8
616:4 757:13
**Bates-stamped**
735:8
**Battelle** 646:25
**Baylen** 381:7
**BCAL-BAIL...**
388:9
**bear** 408:25
438:12 673:12
**bearing** 479:3
**bears** 455:20
**Beasley** 381:21
384:13
**BEATTIE**
381:20
**BEC** 732:13
**beginner** 719:2
**beginning**
407:21 531:25
544:18
**begins** 685:1
**behalf** 381:3
382:15 383:3
383:11 384:3
394:5,12
404:17 425:14
429:20 431:14
432:25 433:7
434:7 436:22

439:13 442:3
482:3,7 499:20
500:14 526:18
529:24 534:10
536:11 538:3
540:4 541:5
543:18 556:12
570:5 617:9
633:24 676:1
**belabor** 585:3
618:19
**Belcam** 450:15
**believe** 393:22
395:22 403:10
403:13 410:9
411:24 413:8
420:12 427:25
428:22 429:14
432:9,25 433:4
440:2,10,14,15
441:12 443:21
447:25 448:20
451:15 452:1
452:17 469:12
469:20 491:18
498:18 512:25
515:7 526:14
533:1,18
535:12 584:17
586:2,15,15
590:11,13
592:2 603:18
615:20 620:6
622:7 623:3,13
624:9 625:19
629:20 631:5
631:18 633:16
645:1 653:25
675:14 683:5
686:13 700:19
701:11,21
702:3,19 704:2
704:5 712:5,9
715:14 716:13
722:3 729:5
732:12 735:6

739:19 740:6
740:19
**Belk** 450:15
**BENJAMIN**
381:12
**Berg** 602:17
609:25 611:19
611:21,21
614:7
**Bernard** 512:22
**best** 403:1 473:6
519:17 520:12
624:7 728:22
**better** 403:7
519:4 650:13
747:5 751:7
**beyond** 397:5,20
415:12 417:3
418:3 464:24
486:2 515:25
516:25 517:10
528:9 533:21
534:23 536:6
544:11 548:5
566:8 567:4
569:3 570:2,8
607:11,24
608:13 672:23
673:25 674:7
674:15 675:6
679:20 680:9
680:20 682:2
683:18 684:14
685:14 688:7
689:10,17
690:24 693:2
694:11 695:22
697:16 698:3
698:13 699:21
722:10 747:24
753:2
**bias** 536:5
**biases** 445:11,12
445:24 446:4
536:2
**big** 488:6,18

513:17 529:25
718:17 720:2,4
721:15 727:23
719:2
**bigger** 428:12
**biggest** 487:20
488:1 520:23
520:23,24
**Bill** 683:7
**billion** 586:16
**binder** 655:4
**binding** 394:9
395:2
**bio** 504:19
**bioassay** 743:7
**biocides** 580:16
**biologic** 504:20
540:5 557:15
571:12 576:14
576:16 585:12
671:7
**biological** 509:4
542:3 585:10
588:13
**biologically**
541:7 544:8,23
548:2 553:13
557:7 558:4,19
559:25 575:13
577:9 582:3
587:20 589:16
**bit** 395:18
397:23 400:22
402:25 454:3
459:3 503:4,5
645:14 688:20
705:22 742:6
**blanking** 515:11
734:11
**blood** 485:17
**Bob** 431:13
513:24 521:9
**body** 421:7
559:10,14
580:11 611:6
666:21 675:14

Linda Loretz, Ph.D.

**bold** 727:23
**book** 608:6,8
**boss** 454:8
   668:25
**boss's** 668:25
**bottle** 393:6,9,14
   540:19 544:20
   548:24 549:14
   550:14 557:18
   559:22,25
   560:19 571:2
   573:4 574:16
   575:20 581:5
**bottles** 550:8
**bottom** 474:16
   512:16,19
   619:6 684:19
   687:8,15
   688:25 690:13
   691:22 696:15
   749:1 755:18
**bought** 597:3
**bound** 584:11
**bounds** 638:24
**box** 680:17
**Bradford**
   564:13 635:24
**brainstorming**
   641:17
**break** 407:20
   476:2 478:16
   562:6,7 570:16
   570:18 571:3
   572:6 573:6
   618:11 643:7
   744:7
**briefly** 508:11
   725:14
**bring** 401:14
   404:25 445:3
   445:25 468:18
   590:18,19
**bringing** 466:5
   623:19 737:24
**brings** 528:15
**broad** 382:11

398:11,13,15
**broadly** 398:11
   399:13
**brochure** 431:23
   432:15,22
   529:6
**Brooke** 627:9
**brought** 497:5
   500:12 529:6
   573:9,21,25
   622:22 623:14
   639:17,17
**Bruce** 716:4,19
   735:4
**bullet** 495:17
   602:5 662:6,16
   663:11,20
**bunch** 521:10
**Burson-Marst...**
   656:22 657:18
   657:21 658:7
**business** 421:10
   435:19 727:25

────────────
**C**
**C** 381:1 385:1
   392:1 757:12
**call** 390:11
   457:15 487:2
   489:5 511:7
   512:1 568:13
   568:13 662:25
   677:22 686:6
   686:12,13
   718:8
**called** 394:17
   404:1 422:20
   429:20 450:14
   489:4 491:1
   564:12 575:18
   602:3
**calling** 467:4
**calls** 489:18
   534:24 693:5
   737:1,5
**calm** 683:13,23

**cancer** 385:13
   385:20 386:20
   387:5 388:7,13
   389:6,16,20
   390:7,12,15,16
   390:17,18,19
   392:21,24
   398:8,18 402:4
   404:1,2,18
   406:6,19,20
   407:1,23
   408:13,16
   409:3 410:14
   412:1 413:5
   438:7,10,16
   447:20 450:1
   455:24 459:7
   463:19,25
   464:6,7,10,11
   464:12 472:8
   477:13,14
   478:1 480:15
   483:1 498:21
   501:4 506:8
   508:21,24
   511:11 535:8
   535:14 536:4
   542:2 544:10
   549:12 563:3
   566:6 567:19
   571:22 574:6
   574:22 576:8
   581:3 587:15
   587:21 588:14
   588:17,23
   589:6 592:25
   594:5,11,25
   596:5 599:17
   605:21,22
   606:5 607:4
   611:9,11
   613:21 614:11
   617:8,14 619:4
   621:24 624:14
   628:20 630:9
   634:7,13,19

   639:25 640:7
   641:15 648:14
   652:2,9,13,18
   652:23 670:24
   671:2 674:24
   675:10,11,14
   676:9 677:16
   679:1 680:4,5
   680:17,18
   681:4,17 684:8
   686:10 687:5
   687:25 688:17
   689:5,24
   691:16 692:6,7
   693:12,19
   694:9 695:8,10
   695:16,21,25
   696:13 697:11
   698:10 701:6
   718:12 721:13
   736:6 739:2,9
   739:18 740:15
   740:17,20
   741:11 742:1
   743:9 745:6
   749:13,18
   750:9 751:16
   752:11,15,19
   752:19 755:13
**candidly** 632:1
**capacity** 415:15
   417:6
**capital** 727:23
**carcinogen**
   454:23 465:5
   469:19 473:19
   477:10 541:8
   543:2,9 559:4
   577:19 580:17
   583:2 584:7,16
   584:18 589:10
   690:17 691:12
   692:8
**carcinogenic**
   544:2 557:24
   559:13 571:10

   571:10 582:10
   582:18 739:17
**carcinogenicity**
   739:18
**carcinogens**
   401:20 426:15
   573:12 582:19
   583:2 589:11
   642:6,18
**care** 379:16
   387:9 389:10
   393:25 394:13
   394:15,20
   396:3 406:10
   409:17 410:3,4
   410:13 411:2,6
   411:18,21
   412:8,24
   423:16,23
   424:4 439:1
   442:5 492:5
   515:2 523:22
   532:17 660:6
   742:11,24
**careful** 593:22
   595:15
**carefully** 621:24
   622:23 747:8
   760:2
**cariogenicity**
   584:19
**carry** 644:3
**carrying** 643:4
**case** 385:20
   395:7 396:7,10
   435:12 520:14
   521:13 532:13
   567:20 580:14
   580:15 617:13
   618:25 619:3
   619:19 631:6
   650:1,15,17
   664:8,16
   671:18 674:25
   674:25 699:13
   705:9 706:9,18

Case 3:16-md-02738-MAS-RLS   Document 9895-3   Filed 05/30/19   Page 168 of 565 PageID: 71412
Linda Loretz, Ph.D.

Page 768

709:13,14
714:15,17
722:20 729:23
731:23 736:20
738:1 746:8
749:21
**cases** 379:12
509:2 525:20
688:6 699:18
**Cashen** 388:7
**cast** 536:1
**categories**
397:25 398:2,4
398:9,11,13,15
399:14 518:8
**categorized**
473:25
**Category** 580:17
**CATHERINE**
383:18
**causal** 419:7
440:19 447:25
461:2 533:9
534:9 540:6
542:19 569:23
**causality** 535:10
536:1
**causation**
413:20 415:10
420:10 440:14
536:13 635:25
**causative** 413:7
**cause** 407:22
417:1,1,12
445:2 459:6
544:10 549:12
562:19 563:18
563:24 565:10
568:23 569:2,5
571:22 574:6
574:21 576:8
588:13 606:4
635:13
**caused** 392:23
677:16 739:17
**causes** 563:3

566:6 634:18
**causing** 455:23
**cc'd** 579:13
731:7
**cells** 628:20
634:19
**cellular** 627:15
634:17,19
635:13
**Center** 405:11
**CEO** 660:7
**certain** 403:14
431:13 597:2
678:2 728:25
729:21
**certainly** 418:12
420:3 428:18
431:19 449:17
452:9 458:13
470:4 487:19
489:16 490:10
505:3 552:23
560:3 607:1
634:23 710:24
718:16 741:18
**certificate** 759:1
759:13,19
**certification**
759:21
**Certified** 759:1
759:2
**certify** 759:3
762:3
**certifying**
759:25
**cetera** 489:19
558:1 571:3
580:20 598:7
639:14
**CF** 725:22 742:6
**CFR** 469:23
**CFTA** 468:16
623:15 647:6
647:22,25
648:6,11,21,22

649:4,8 664:3
664:9 667:4
668:22 669:9
670:2 701:8
705:11,12
706:25 710:5
711:19 712:4
718:23 725:22
728:7,17
**chair** 714:19,21
**chairman** 438:6
714:8,15
715:23 716:1,3
716:17,19,21
717:6,24
**chance** 736:2
**change** 425:25
528:19 608:25
609:5 611:2
661:18 665:23
761:4
**changed** 466:17
551:9,15
610:23,24,25
611:3
**changes** 634:19
635:13 760:8
762:6
**Chapter** 390:5
**characterizati...**
471:4 533:16
**characterize**
531:8 568:18
**characterized**
516:14 517:12
**charge** 636:14
636:23,24
711:20
**Charles** 382:12
**chart** 402:9
459:25 478:14
606:3 677:7
708:3
**check** 538:16
565:2 730:5,15
730:21 732:19

733:7
**checked** 538:13
552:12
**checklist** 565:9
**Chicago** 384:8
405:11 406:1
**choosing** 747:8
**chose** 671:20
**chosen** 747:15
**Chris** 392:20
604:1
**CHRISTOPH...**
381:4
**chromium** 560:8
585:13
**chronology**
703:9
**Chudkowski**
391:10 613:14
731:7,11,12
732:10 733:12
736:12,12
738:9 748:12
748:22,24
749:3 750:13
750:19 752:20
**Chudkowski's**
736:21
**cigarette** 566:6
**CIR** 398:24
399:2,15
662:17,19
663:1 683:11
686:18
**circulate** 722:7
726:17 737:25
**circulated** 722:1
722:25 724:10
727:14 737:21
743:22 746:8
**circulates** 746:6
**circumstances**
409:21 486:22
518:10
**cited** 508:16
552:10

**Citizen** 538:18
654:1
**citizens** 391:13
402:5 453:11
600:22 667:21
668:4,12
669:10 670:14
674:10 706:23
707:4 738:13
749:22 751:14
753:17 755:5
755:13
**Citizen's** 386:4
387:22 398:19
399:23,24
400:4,14,20
402:15,18,25
403:23,25
404:16,17
421:16 422:1
438:8 451:10
453:17 468:25
483:21 486:21
487:1,4,12
490:6,9 495:15
496:6,16
498:13,16
502:17 504:21
508:10 513:25
514:12 515:21
518:10,14,23
519:5,12 521:1
521:18 522:2,9
522:14 523:7
523:15 526:6
526:17 536:23
560:16 582:2
583:8 585:5
590:6 591:18
605:12 608:18
**claim** 392:21
**claiming** 680:4
741:18
**claims** 445:3
**clarified** 497:17
659:10

Linda Loretz, Ph.D.

**clarify** 519:9
  599:3 622:7
  633:24 638:4
  643:20 723:21
**clarity** 486:9
  528:20 602:10
  722:14 723:20
**Class** 690:17
  691:11
**classification**
  477:10
**classified** 577:18
**clean** 685:10
**cleaning** 683:12
  683:17
**clear** 400:6
  429:8 442:15
  455:3 466:11
  466:15,19
  481:14 482:4
  484:10 500:7
  507:13 534:13
  553:7 564:19
  564:20,21
  593:14 599:24
  611:23 617:6
  644:2 681:6
  700:11 731:25
  737:18 740:7
  756:15 757:2
**clearance** 666:1
**clearly** 465:7
  544:1
**clients** 433:12
**clinical** 562:15
  562:20 563:1,7
  563:9,10 564:6
  749:20
**clinically** 568:23
  568:24
**close** 436:21
  518:2 638:25
  708:9,22
  727:25
**closed** 472:17,18
  472:20 473:4

**Coalition** 388:8
  402:4 404:2,18
  408:13 410:15
  438:7 483:2
  498:21 506:8
  511:11 755:14
**coauthor** 652:5
  734:5
**coauthored**
  636:22
**coauthors** 734:4
**coauthorship**
  612:1
**COB** 727:25
**cobalt** 586:7
  588:15,16,16
  588:21,22
**Code** 390:4
  403:11 418:17
  469:23 470:9
  672:15 673:4
**coincide** 616:4
**coincides** 713:13
**Colgate** 601:24
**collaborative**
  452:3
**colleagues**
  398:24 487:10
**collected** 730:21
**collective** 514:18
**collectively**
  582:7
**colors** 454:20
  456:10,11,12
  457:8,18 458:7
  458:11 485:19
  491:9 493:22
  494:3 496:1
  509:25 515:10
  515:12,13
**Columbia**
  380:14
**combine** 610:12
**come** 401:11
  410:11 429:12
  445:17 455:11

  455:13 463:12
  466:2 472:21
  482:15 501:8
  502:3,6 537:12
  537:20 553:5,6
  556:12,13
  559:15 562:18
  565:22 566:23
  649:10 669:25
  704:11 718:13
  724:5 732:25
**comes** 540:19
  560:9 581:4
  704:23 709:10
  722:24
**comfortable**
  397:14 589:7
**coming** 510:12
  620:4 642:3
  671:14 704:24
  732:20
**comment** 387:10
  388:5 484:4
  516:12 579:17
  633:13 746:14
  747:14
**comments**
  386:15 403:19
  410:14 422:5
  429:9 434:15
  475:12 477:9
  514:18,20,23
  515:1 518:2
  528:7 538:6,19
  648:10,10
  664:5,7 722:13
  744:2,4 746:15
  746:18 753:25
**Commerce**
  381:23
**commercial**
  443:18
**commission**
  507:15 762:17
**commissioned**
  451:13 453:18

  453:23 467:25
  500:13
**Commissioner**
  438:8,11
  493:14 506:22
  507:5,17,18
**commissions**
  528:5
**committee** 711:2
  711:2,5 714:8
  714:12 715:24
  716:17 717:15
  717:25 718:4,5
**committees**
  465:18 705:24
  711:1 720:15
**communicate**
  424:13 426:22
  426:23
**communicating**
  521:9
**communication**
  419:23 428:14
  738:5
**communicatio...**
  398:16 399:3
  399:14,21
  511:22 519:23
  592:17,24
  593:18 594:4
  594:10,13
  595:3,8 598:22
  599:9 675:17
  677:15,21,25
**community**
  419:2 459:17
  499:12
**companies**
  433:12 442:18
  442:23 443:2
  452:13 487:10
  489:16,18
  536:22 550:21
  555:12 556:13
  599:11 601:16
  624:12 629:5

  642:13 643:4
  664:6 672:24
  684:6,11
**company** 394:4
  394:5,9 440:20
  442:25 450:14
  487:15 488:21
  528:4,5,6
  555:11 598:23
  599:4 601:23
  624:12 628:14
  634:12 658:8,9
  658:15 673:19
  673:21 674:5
  674:12 725:15
**company-gove...**
  663:25 665:2
**compared**
  520:20
**compile** 746:15
**complete** 397:16
  622:3
**Completing**
  758:1
**completion**
  477:23 514:22
  639:12
**complex** 433:13
  671:5
**component**
  559:22
**components**
  559:18 574:2
**composite** 616:2
  616:19 660:15
  662:2
**compound**
  518:18 532:24
**comprehensiv...**
  575:19
**concept** 412:6
  606:6
**concern** 441:6
  446:13 456:1
  459:7 462:7
  464:6 572:8

Linda Loretz, Ph.D.

605:16,18
638:21 718:12
concerned 431:3
448:7,15
461:13,19
462:3 463:16
463:18 474:15
540:16 560:3
concerning
677:16
concerns 407:8
407:21 446:15
463:24 606:4
conclude 739:15
concluded
691:11 692:7
702:16 739:16
739:22
concludes 533:7
652:22
conclusion
505:9 693:10
693:20 722:14
749:17
conclusions
420:22,23
425:18 426:1
466:2,23
467:16,19
482:3 528:19
565:22 566:24
740:11
conclusive 607:5
607:9,15
concurred
664:19
conduct 562:25
648:22
conducted 598:2
749:9 752:8
conducting
477:13,18
conference
686:13 738:4
conferring
589:20 602:21

606:11 626:24
632:25 678:16
678:20
confidence
610:3 692:20
confirm 457:3
616:18 704:12
739:1
confirmed 470:4
732:11
confirms 739:8
conflicts 445:12
445:18
confounders
622:1
confounding
540:9
confrontation
663:25 664:4
665:2,6
confused 593:5
606:22 659:16
751:5
confusion
470:22
conjunction
718:23
connection
406:25 498:5
523:7,15 539:2
539:5,10
569:24 588:16
698:23
cons 501:9
consequences
470:23
consider 395:6
435:7 509:14
537:10 557:17
613:10 637:7
considerable
470:22
consideration
454:22 470:19
considerations
564:23 567:3

considered
434:20 439:21
466:17 472:18
473:17 510:8
559:13 565:16
574:4,20 577:9
577:13 581:1
591:23 639:21
considering
483:15 613:8
613:25
considers
538:22
consistency
534:4,7 535:5
consistent
459:15,15
481:8 520:12
533:24 534:1
536:13 561:6
679:19 680:7
680:19 708:16
713:16 715:1
755:24
constituent
574:7,8 634:18
635:12
constituents
540:22 574:2
574:19 577:7
577:12,18
582:5 583:11
586:1 588:8
consult 414:8
416:2,15,16
consultant 481:8
630:8 631:6
707:9 723:8,10
726:23 730:22
746:3,3,5,5
747:15,17
consultants
399:8,15 426:4
430:5 434:8
435:14 440:21
442:3 478:10

481:22 482:8
600:20 747:8
consulted 399:9
633:20
consulting
433:19 482:10
632:4 655:2,5
678:8 745:16
consumer
667:10 723:14
consumers
506:9,19 550:9
contact 425:15
463:19 515:9
520:16 521:20
524:14 559:15
599:25 676:2,5
698:22 710:23
710:25 711:7
722:20 727:25
736:15 738:10
contacted
406:11 517:22
521:20 523:6
523:14 538:11
710:22
contacting
521:14 524:3
contacts 538:12
539:18 600:25
contain 413:13
550:14 573:11
contained
396:13 543:21
557:18
containing
470:23,24
487:4 514:2
580:13
contains 560:7
contaminant
547:6 556:25
contaminants
558:17 573:20
577:2 585:7
588:12

contamination
504:18 544:3,7
545:4 576:4
588:21
content 531:3
602:8 742:23
contest 562:17
context 400:19
400:25 441:16
441:24 443:20
444:11,13
448:19 455:8
456:8 459:4
545:24 587:19
597:25 686:12
753:23
contexts 455:17
continuation
393:23 395:21
continued 382:1
383:1 384:1
392:5 572:12
continues 471:6
697:11
continuum
455:22
contraceptive
386:19 477:25
contract 430:3
730:6
contradictory
433:14
contrast 464:18
contribute
407:23 459:7
contributed
392:23
contributing
455:24
contributor
487:20 488:1
control 759:24
controlled
567:20 617:13
618:25 619:3
619:19 650:1

Linda Loretz, Ph.D.

650:15,17
671:18 702:20
**conversation**
514:10 515:20
738:5
**conversations**
512:1 516:20
596:10
**convinced** 449:1
**Cooke** 630:17
630:20,22,25
632:11 633:20
**cooperation**
399:11
**coordinate**
664:6
**copied** 428:1
731:14 733:12
**copies** 616:24
661:10 756:9
**copy** 395:13,13
401:2 468:8
484:3,3,15
603:4 618:9,12
621:18 626:4
639:2 687:18
748:18 759:11
**core** 640:14
**corn** 446:21
447:3,8 448:17
451:4 554:20
580:13
**corner** 678:24
687:9
**correct** 394:18
394:24,25
400:17 401:4
401:25 404:3
406:3,20 407:2
407:23,24
409:9,14
410:18 411:20
412:15,20
415:21 418:18
419:3,8,25
420:24 421:5

421:13 422:10
422:21 423:5
423:11,17,24
424:5,8 425:22
426:5,15
427:20,23
429:5 432:8
433:2 434:16
436:25 441:1,8
442:10,16,17
442:20 443:4,9
445:13,25
446:23 447:11
448:17 450:24
451:4,14 452:8
453:24 454:16
454:23 455:14
456:14,20,23
456:24 457:21
457:25 458:5
458:19 459:9
460:11 461:14
462:24 464:12
464:14,19
465:19,22,23
466:3 467:11
467:19 468:1
468:21,22
469:5,7,9,12
471:19,21
472:2,22,25
473:1,15 474:1
474:6,17
475:13 476:21
478:20 479:15
479:16 480:19
480:22 481:10
481:24 482:9
482:13 483:3,4
483:6,12,15,16
484:13 485:1
485:18 486:5
486:15,15
487:13,21
488:3,8,14,15
488:22 489:11

489:15 490:7
490:25 491:5
491:11,22
492:3,4,18,22
493:18 494:3,4
494:5 495:5
496:1,25
497:24 498:2
499:8,12,15,18
499:23 500:2,8
500:14,17
502:12,17
506:25 507:8
507:16 509:20
509:21 510:1,9
510:14 511:6
512:24 513:20
519:19 520:14
520:21 527:9
527:21 529:25
532:23 534:14
534:17,18
535:2 536:25
538:23 539:12
540:10,24,24
543:21,22
544:4,10
545:10 547:15
551:20 552:20
560:14,21
561:2 563:11
565:16 566:4
566:24 568:3,9
568:12,14,24
569:14 571:23
572:13,23
576:9 578:11
578:15 580:2
586:5,13 590:7
591:20 592:13
597:6,20 602:1
603:8 604:14
605:23 607:23
608:6,12 609:8
609:10,15
610:6 611:17

634:9,10 638:6
638:7,12,14
643:24 645:18
646:6,10,21,24
647:7,15 648:7
648:14 650:12
650:19 652:2
654:8 655:24
655:25 656:15
656:16 659:17
659:19,20
660:1 662:3,17
662:21,22,24
663:9,22 664:8
664:21 665:3
666:3,17 667:2
667:5,17,18,22
667:25 668:6
669:12 670:1,3
670:6,14 671:2
671:22 673:2
673:16,21
674:6,14
676:11 677:9
681:5,8 682:1
682:25 683:1
685:5,23 687:6
687:16 688:18
688:22 689:16
690:18 691:6,8
691:12,18
692:10,13,18
693:13,16
694:16 695:17
696:13,16,20
697:13,20
698:11,19
700:6,15,16
701:6,11,16
703:11 706:16
706:19 707:4
707:16 708:10
708:14 710:7
711:14,22
715:14 717:25
718:4 720:14

721:19,22
725:4 726:12
727:15 728:1
731:5,8 732:2
732:14,21
733:16,19
736:9,13
737:15 738:7
738:13 739:2
740:8,12 742:1
743:23,24
744:2,20
746:10 747:23
749:4 750:13
751:17 752:9
752:10,24
753:25 754:7
755:5,14
756:17 757:6
759:11 762:4
**corrected**
496:19
**corrections**
760:3,5 762:6
**correctly** 409:6
438:17 515:6
516:15 622:19
673:7 681:23
686:19 698:18
745:1 749:10
**Cosmair** 601:23
**cosmetic** 385:14
386:18 389:5
393:3 394:21
404:3 406:6
408:24 413:2
416:25 449:25
456:13 471:11
473:18 514:11
514:15 515:12
540:18 549:3
554:8,9,13
577:8 580:6,11
580:13 582:5
603:22 604:13
607:10 621:23

Case 3:16-md-02738-MAS-RLS   Document 9895-3   Filed 05/30/19   Page 172 of 565 PageID: 71416
Linda Loretz, Ph.D.

Page 772

622:11 662:11
665:12 673:11
673:20
**cosmetics**
454:20 456:11
456:12 457:7
457:17 458:7
458:11 485:12
485:19,23
491:9 493:22
494:3 495:25
509:25 510:20
515:13 582:19
665:25 666:8
666:12,14,19
675:2
**cosmeticsinfo....**
656:25 657:2
**cost** 433:1 622:3
638:14,23
643:23 651:15
709:10
**costs** 651:14
732:11,17
**COUGHLIN**
383:13
**Council** 379:16
387:9 393:25
394:13,16,20
396:3 406:11
409:17 410:3,4
410:13 411:2,7
411:18,22
412:9,24
423:17,23
424:4 439:1
442:5 492:5
508:9,14
510:21 515:3
523:22 532:17
552:7 660:7
**Council's**
389:11
**counsel** 384:14
384:15 389:18
392:18 395:13

396:1,4,4
400:3 401:2
405:14 476:7
489:1 496:3
526:1 531:8
532:9 589:20
602:21 606:11
616:18 626:24
629:15 632:25
633:23 678:16
678:20 716:25
756:12
**couple** 513:23
525:10 571:7
578:18 631:11
634:3 656:6
658:17 734:3
**course** 401:12
402:13 446:19
553:1 685:9
727:24 729:23
729:24 747:13
**court** 379:1
380:13 395:6
563:8 669:4
760:15
**cover** 398:23
416:13 457:13
457:14,14
508:13 533:7
600:20 681:9
714:2 717:2
755:21 756:21
756:23 757:14
**covered** 398:24
529:19 574:23
656:2
**covers** 577:14
**co-developing**
514:21
**Craig** 512:22
**Cramer** 420:6
461:1 541:20
542:13,14
652:1 701:10
713:10,14,18

713:21 715:5
718:13 719:13
719:19
**Cramer's**
652:21
**CRE** 683:3,5
686:21
**create** 705:1,18
**created** 700:18
700:19,21
702:25 703:4
703:20 704:5
704:15 705:18
708:3 709:3
712:3 735:17
**criteria** 563:24
564:13,22,23
565:8 567:1
635:24
**critical** 387:5
432:3 480:2,14
671:21,24
683:13
**criticized** 614:22
**critique** 633:20
**CROSS-EXA...**
392:8 643:13
**CROW** 381:21
**Crowell** 426:13
426:19,22
427:16 432:13
475:17 476:17
476:19 578:20
578:25
**crystalizing**
467:14
**crystalline**
393:17
**CSR** 759:18
**CTFA** 386:10
386:15 391:12
394:17 462:13
475:12 510:22
601:24 612:7
613:19 616:17
622:22 623:6

623:23 630:7
631:9 634:6,14
635:22 658:15
661:3,16,18
663:8 717:11
724:2,4,9
725:8 729:8,13
730:4,15,15
732:13,14,20
732:24,25
733:4 737:18
737:19 738:6
742:6 743:16
743:23 744:1,1
746:8,14,14
751:1 753:13
753:16,17
755:5 757:5
**curious** 439:9
441:3 498:15
550:15 620:9
**current** 396:2
449:25 520:5
608:9 663:12
672:24
**currently** 598:3
639:20 685:2,8
**Curtis** 601:24
**cut** 469:13
732:19

|   |   |
|---|---|
| **D** | |

**D** 392:1
**DANIEL** 384:17
**data** 386:6
424:23 425:4,9
433:14 439:6
453:12 505:14
508:20 509:5
649:22 679:12
**date** 453:2
463:23 478:25
516:6,6 521:8
665:15 682:7
688:24 694:24
699:4 713:4,8

713:13 759:15
760:7 762:11
**dated** 462:23
470:10 475:9
479:14,15
486:10,11
492:5 522:1
590:25 605:9
617:19 650:5
687:9 690:13
691:4 694:15
696:16 698:8
713:6 724:25
725:23 734:19
736:3 748:11
748:16 753:14
**dates** 457:3
684:17 688:10
**dating** 712:16
**day** 525:19
591:9 616:7
617:4 725:24
757:18 762:16
**days** 396:15
591:13,25
699:17 760:12
**DC** 380:7
382:19
**deal** 402:15
508:7 556:2
664:4 668:6
709:23
**deals** 485:15,16
485:16,17
608:8
**dealt** 510:13
745:5
**Dear** 621:17
**debate** 419:25
455:25 460:11
460:16 499:11
505:10 509:17
565:20 566:5
566:14 606:5
**debated** 419:1
459:8

Linda Loretz, Ph.D.

**decade** 520:15
**decades** 408:12
  499:14 549:24
  551:1,20
  555:14 566:14
  583:7 623:10
  624:11
**December**
  454:18 456:25
  468:15 469:21
  618:2 698:9
  699:1
**decide** 455:5
  473:4 506:25
  593:9 624:2
  704:22
**decided** 451:3
  467:5 623:23
  628:23 637:1
**deciphering**
  433:13
**decision** 591:12
  651:25 653:10
  673:21
**declared** 690:17
**declined** 628:10
  638:13
**deemed** 760:15
**deep** 595:23
**defend** 707:3
  751:13
**defendant**
  379:16 699:23
**defendants**
  383:3,11
  389:10 519:3
  521:13
**defense** 648:13
  738:12
**defer** 465:6
  467:5 469:18
**deference**
  466:10
**deferral** 467:24
  469:23 471:18
**deferred** 454:22

454:25 455:4
455:10 465:9
465:11,14
470:15,18
471:10
**define** 425:12
  569:19 707:21
**definite** 499:17
**definitely** 558:4
  611:2 713:20
**definition**
  466:15 666:21
  720:17
**definitive**
  621:21
**delete** 749:8
  752:7,23
**demonstrate**
  555:23
**denial** 484:16
  486:10
**denied** 484:12
  484:21
**department**
  387:12 454:8,9
  510:5,9,13
  657:6 677:9,21
  677:22 678:3
  725:13
**depend** 714:11
**depending**
  707:19 720:11
**depends** 425:11
  524:6 584:23
  693:4,6 705:3
  706:8 714:9
**DEPONENT**
  762:1
**deposed** 434:3
  659:18,25
**deposing** 760:12
**deposited** 708:5
  729:11 730:14
**deposition**
  379:16 380:1
  385:11 386:3

387:3 388:3
389:3 390:3
391:3 392:5
393:24 394:2,4
395:11,15,20
395:20,21
396:14,25
397:7 401:13
424:6 518:9
525:19 601:9
602:15 607:21
645:25 647:13
654:20 657:13
658:11,22
659:5,13,22,24
660:11 661:21
677:14 700:9
718:4 721:5
725:25 735:1
741:5,13 758:2
760:2,10,13,14
**depositions**
  525:20 674:20
**derived** 567:20
**describe** 564:11
**describes** 665:11
  667:1
**design** 562:18
  625:2
**designated**
  379:17 397:13
**designed** 586:23
  587:1 621:24
  622:23
**desirable** 560:12
**detail** 495:11
  618:5 672:6
  677:7 751:12
**details** 403:8
  409:23,25
  650:10 741:20
**detect** 709:22
**detectable**
  545:19,25
  546:2,5 556:5
**detection** 546:17

547:5,6 555:4
**determination**
  673:18
**determine**
  523:19 565:10
  610:13 710:6
**develop** 545:17
  587:6
**developed**
  552:11 553:4
  587:14,16
**developing**
  714:20
**development**
  526:5 567:19
  715:8
**developments**
  613:14 715:19
**diagnosed**
  464:12
**diaphragm**
  478:19 479:18
**diaphragms**
  386:19 432:3
  477:25 479:13
**die** 652:17,23
**died** 652:9
**difference**
  414:17 466:22
  580:6 614:21
  624:17 742:25
**differences**
  665:12
**different** 412:3
  413:11 419:20
  420:22,23
  421:1,4 442:22
  461:6 465:15
  466:2,4,23
  467:15,16,18
  477:17 478:5
  481:16 485:14
  485:17 499:22
  516:4 538:1
  546:6 553:19
  563:25 564:8

565:21,22,23
566:23 572:25
628:19 645:15
688:21 705:22
708:18 710:24
711:5 719:4
734:3 742:6
750:8 751:5
752:16,25
753:4,6
**differently**
  539:22 561:8
  561:10 735:24
**difficulties**
  405:18 407:19
**diligence** 429:22
  430:18 529:7
  529:15 530:4
  530:11
**direct** 474:25
  536:20 563:19
  592:23 599:25
  663:24 665:2
  690:21 759:24
**direction** 399:10
  651:2
**directions** 613:8
  613:25
**directly** 454:14
  592:17 595:3
  596:4 600:1
  616:5 660:7
  675:17 677:15
  733:8,9 746:7
**director** 456:22
  493:17 495:25
  524:15 538:21
  725:3,7 753:15
**disagree** 421:12
  472:15 490:18
  562:2 566:4
**disagreed**
  419:23 420:3
  502:5
**disclosures**
  445:10,18

discuss 397:9
412:25 449:22
450:3 458:25
495:14 496:16
496:21 497:18
500:1,8,11
501:18 517:16
598:1 613:14
629:6 636:3
642:8 723:1
736:16 754:2
discussed 408:3
408:7,9 418:25
435:10,12
443:16 446:17
448:14 459:21
459:24 490:10
561:12 573:2
575:3 589:24
593:2 602:7
606:1 613:12
613:22 614:8
614:17 616:6
621:1 622:10
626:17 639:23
674:25 709:15
717:14 736:5
740:18
discussing 503:7
561:14 613:21
discussion
407:10 413:13
418:16 459:16
466:21 467:23
490:15 499:1
501:9 509:6,8
509:11 537:6
559:7 573:6
585:13,15
606:13 607:2
623:3 635:20
716:18 718:17
748:20
discussions
399:22 524:17
556:20 595:24

627:24 709:20
disease 534:20
536:4
dismantling
759:12
dispute 531:2
698:2
disputing
697:25
disseminate
705:6
dissemination
398:6
distinguishing
571:2
distribute 724:6
distributed
737:9
District 379:1,2
380:14
division 454:19
456:10 457:7
483:14 490:24
491:1,10
495:25 524:16
538:22 539:12
591:22
doctor 420:6
428:12 441:18
468:19 509:16
537:12 585:3
608:24 615:8
618:19 643:15
650:14 732:18
750:19
doctoral 611:22
doctors 421:11
426:3 435:1
439:17 506:18
document
379:11 404:22
404:25 405:3
406:14,15
422:16,17
424:18 431:24
441:19 457:23

462:1,11 469:8
469:9 475:25
478:21 508:14
512:14 513:14
522:7,12
525:24 527:2
527:25 531:11
531:15 532:21
533:2 571:8
573:18 578:7
583:10 588:1,3
589:25 601:6
601:18 604:1,5
606:16 612:17
620:2,8 621:4
631:23 648:25
649:3,13
660:13,15,21
661:9,20,25
662:13 663:2
664:9 665:9
672:7 678:10
681:7,12,13
682:8,10,22
686:25 688:13
689:15 690:4,5
690:10,13
691:4 694:20
696:3,6 697:2
714:5 716:15
723:19,24
724:19 725:19
725:22 728:7
728:25 730:24
731:18 735:11
748:6 751:21
754:11,24
755:12,18
756:5,10,11,24
757:4,5,13
documents
396:16 511:25
518:21 580:20
611:24 616:22
617:19 620:10
645:24 646:21

646:23 648:2
656:18 661:14
712:25 713:3
719:16,21
720:5 723:6
728:11
doing 398:10
429:25 430:10
443:2 453:3
521:4 528:16
530:11 593:19
599:22 624:22
638:23 647:8
671:20 678:7,8
707:8 718:15
738:15 740:19
760:6
dollars 708:10
DONATH
383:12 489:25
dose 504:18
637:6
dose-response
509:2,3 534:14
536:14 576:15
635:23 636:2
636:19 637:14
638:18 639:13
639:15 671:8
doubles 568:22
doubling 568:10
568:19 569:19
doubt 536:1
661:22
dozen 671:15
Dr 388:4 392:5
392:10 394:12
405:4,7,23
406:11,17
407:18 409:8
410:2 412:14
418:10 419:11
419:13,21
420:3,6 423:2
423:4 424:7,7
424:10,10,15

426:10 427:3,9
429:15 430:1
430:13,13
431:13 432:11
433:24,25
434:2,20,20
435:5 442:1
456:9,17,19,19
456:20 457:22
457:23 458:15
458:16,18
461:1,1 463:4
463:5 468:19
468:20,24,25
469:4 474:3
476:15 480:18
483:1,13
490:22,23
491:10,15,16
491:21 494:2
495:9,23,24
496:19,20
497:6,6,17,24
498:12,15,19
500:13,13
501:8,13 502:3
502:4 504:14
504:14 507:4,4
508:12,13
509:9 510:17
511:6 514:20
517:21 518:15
519:18,20
520:18,19,25
521:20 522:15
524:14,22
525:15 527:19
529:22 530:14
533:6,13
534:10 537:12
538:10 539:4
539:25 540:3
541:5,6,12
542:14 551:2
551:18 552:7
560:17 564:20

568:17 570:25
571:13 572:18
575:15 578:15
578:17 579:16
582:4 585:21
590:5,16,17
591:1 599:22
602:7,13
608:24 609:4
609:25 611:18
611:19,21,21
611:23 612:2
613:12,15
615:5,8,10,14
615:16 616:6
617:4 619:17
619:17 621:1
621:17,19,19
622:24 624:5
625:21 626:9
626:18 627:25
628:3,9 629:8
632:8,10,18
633:9,9,18
636:5,6,6
638:2 646:6,20
646:25 647:15
647:21,25
648:5,10,18,19
648:19,20,20
649:3,8,19,25
650:6,15,18,18
652:1,21
653:12,12,12
653:13,21,24
654:4,9 655:10
655:16,16
656:8,14,14,15
656:16,18
674:21,23
716:4,19,21
717:24 719:13
719:19,19
721:18,25
722:21,21
725:3,7,10,16

726:6 729:4,24
729:25 730:2
731:4,14,14
732:7,8,18
734:2 736:9,15
738:10,19
740:4,11,19,25
742:4 748:16
748:17 750:15
752:22 754:20
**draft** 386:7
388:20 391:7
462:12 466:6
603:19 620:9
621:8 721:25
723:25 724:8
726:11,16,25
727:1,5,10,13
727:19 734:7,7
734:17,18
735:13,15,17
735:21 743:20
743:21 754:10
755:11 756:9
756:16 757:3
**drafted** 416:13
467:25 526:24
527:5,6 622:24
**drafting** 481:3
738:11
**drafts** 741:10
**draw** 542:25
**drill** 549:10
**Drive** 384:6
**Drs** 435:13
477:11 509:16
520:4 526:9
538:2 544:24
555:24 639:9
655:15
**drug** 398:16
404:19 438:9
438:12 666:22
**drugs** 485:15,16
485:25,25
666:15

**due** 429:21
430:18 529:7
529:15 530:4
530:11 611:11
**DUFFY** 383:13
616:18 617:2
617:15 698:13
**duly** 759:6
**dust** 583:3
**dusted** 681:18
688:1 689:25
**dusting** 450:6
**dyes** 435:5
**D.C** 379:19
514:9 597:3

---

### E

**E** 379:15 381:1,1
385:1,9 386:1
387:1 388:1,8
389:1 390:1
391:1 392:1,1
761:2
**earlier** 423:13
487:8 589:24
606:7 701:5
710:2 716:2
717:14 718:3
721:18 743:21
754:16
**early** 459:8
518:11 545:3
553:7 556:3
607:21 646:12
646:23 647:1,7
700:20 701:16
740:8
**easy** 649:9 650:7
**econom** 540:5
**edit** 746:9,13
**edited** 745:12
**editing** 625:3
**editor** 632:11,22
633:8
**edits** 527:24
528:7,20

**Edward** 716:21
**effect** 534:22
535:11 562:19
563:18,24
565:11 568:14
740:11
**effective** 642:17
**effects** 692:10
**efficacy** 666:13
666:14,22
**effort** 520:24
522:16 714:19
**efforts** 514:20
**either** 393:6
396:2 416:14
416:15 424:13
449:22 498:8
508:20 556:12
560:12 575:5
577:1 598:2
600:1 601:22
624:2 629:2,6
639:21 640:4
705:3
**elect** 716:17,18
**elected** 716:20
716:22
**elemental** 576:2
**eliminate** 554:7
**eliminated**
545:4,9 546:9
547:1,21
553:21 554:4
555:1,25
571:16
**elimination**
545:12,22
556:23 588:8
**Ellis** 384:5 477:4
**eluciate** 639:10
**elucidate** 639:11
**emeritus** 405:24
**Emily** 384:14
397:4
**employee** 454:1
510:21 660:6

686:21 717:11
**employees** 396:2
396:2,8,8
458:10 677:20
711:19
**enclosing** 732:7
732:8
**engage** 509:11
522:24 523:4
**engaging** 537:5
**engineered**
686:18
**entering** 681:20
688:3 690:2
**entire** 456:2
459:9
**entitled** 385:19
386:18 387:4
388:10 389:4
389:14 390:7
390:12 453:11
475:11 522:17
579:16 603:14
612:19 617:8
619:3
**entity** 550:15
**entries** 385:12
**entry** 685:11
**environmental**
385:22 405:10
405:25
**epi** 723:12
**epidemiologic**
533:8,18
534:16 564:1
**epidemiological**
435:3 587:14
588:6,9 589:13
607:6 613:11
614:9
**epidemiologies**
559:17
**epidemiologist**
563:17 610:16
723:12
**epidemiologists**

419:5,15,21
420:13 425:13
425:19 508:12
527:6 530:9,9
531:6 536:18
609:22 630:8
632:5,6 633:19
655:6
epidemiology
385:22 508:6,8
508:24 530:21
536:24 542:15
542:15 548:16
553:5,11
558:21 559:16
563:13 568:20
575:14 588:9
589:5 609:23
615:17 621:21
624:13 634:7
641:22 672:3
692:25 723:13
729:2 750:10
Epithelial 389:6
Epstein 387:11
405:4,7,23
406:11,17
409:8 411:2
412:14 419:11
419:13 420:3
438:6,21 442:1
461:1 483:1
484:19 498:19
501:8,13 502:3
502:4 504:14
509:16 522:15
537:12 538:10
539:1 560:17
590:5,17
608:24 609:4
Epstein's 539:25
equation 577:3
equivalent 555:5
equivocal
739:20
Eric 579:7

Ernst 613:12
621:19
errata 760:4,6,9
760:11 762:8
error 491:22
492:3
errors 723:2
728:16 745:12
ESQUIRE
381:4,11,12,18
381:19,20
382:3,9,16
383:4,12,18
384:4
essence 576:9
essentially
551:13,14
665:11 738:11
752:22
establishing
563:24
Establishment
673:6
Estrin 712:7,9
et 489:19 542:13
557:25 571:3
580:19 598:6
639:14
ethical 722:5,15
747:21
Europe 578:7
evaluate 630:8
632:5
evaluation 439:2
442:6 447:18
532:18
evaluations
748:23 752:21
event 630:23
752:20 755:4
eventually
403:17 670:10
everybody
400:24 538:21
547:18 711:9
evidence 395:7

413:7 414:17
417:1,11 418:1
418:23 419:6,7
419:24 420:19
420:21,22
421:5,12,13
440:18 461:2
466:2,5 467:15
473:19,23
517:17 558:25
561:4,10
565:21 571:20
607:3,8,15
691:14 692:4
693:8,10,13,20
739:18,20
751:1,15
evidenced
463:19
evident 471:2
exact 458:22
exactly 428:24
449:16 458:22
479:5 496:10
597:9 615:17
710:11 734:21
749:12
examination
385:2 759:8
examining
388:11 389:20
621:22
example 396:7
398:18 430:4
446:21 460:25
467:8 485:24
508:9 519:11
531:24 540:24
573:1 574:24
595:19 600:13
664:5 665:20
665:22 670:17
678:7 723:11
746:22
examples 521:7
exceptions 471:4

excess 508:25
741:23
exchange 682:23
exclude 746:24
excluding 610:3
excuse 402:2
702:10
executive 454:9
660:8 711:5
736:23
exhaustive
597:16 670:19
exhibit 395:11
397:7 401:6,8
404:9,13
410:21,22
429:4 430:23
431:1 434:14
436:12,16
452:23 453:2
462:8,12,15
468:8,10 470:5
470:8 474:11
474:12 476:16
479:9,12,20,23
480:1,16
483:24 484:3
486:15,16
491:24,25
494:25 495:1
512:10,13
521:23 532:21
552:3,4 577:22
577:23 583:11
589:21 590:22
592:5,9 601:3
602:23 603:2
615:21,24
616:2,20 617:7
620:8,12
625:21,22,25
630:1 631:1,2
632:21 633:4,5
639:4,5 660:16
660:17 672:8
672:11,12

678:11,12
681:1,2 682:11
687:1,2 688:14
690:7 693:24
696:8 697:6,7
713:23 714:1
724:20,21
731:1 734:12
735:10 744:6
748:7,10 753:9
753:10
exhibits 385:11
386:3 387:3
388:3 389:3
390:3 391:3
395:12 616:19
690:22
exist 667:9
existing 412:11
542:1 607:3
expansive
574:13
expect 522:7
563:10 638:25
652:20
expects 733:3
expend 729:20
expenses 732:9
expensive 644:2
experience
510:4 515:21
516:19 539:16
623:19,22
692:25 722:5
730:11
experienced
448:4
experimental
562:15,18
564:2
experiments
563:21
expert 433:22
433:25 534:24
584:18 589:1
609:22 667:1

723:25 724:8
730:16
**expertise** 435:3
530:21 723:18
728:20 729:1,2
748:3
**experts** 434:21
435:14,23
437:15 522:25
707:2 728:17
**expires** 762:17
**explain** 540:6,22
548:3 549:14
558:20 575:14
582:7 636:12
660:4
**explained**
400:21
**explains** 466:22
581:13
**explanation**
537:15 538:2
576:18 589:16
**explanations**
536:13 537:22
**explore** 446:3
**exposed** 702:20
**exposure** 388:12
389:15 509:5
567:18 607:3
630:9 691:23
749:14,18
752:12,19
**expressed** 441:6
502:11
**extends** 663:14
**extent** 519:9
521:12 526:25
554:19 585:14
690:25
**external** 523:19
**extremely** 580:8
**e-mail** 386:4,14
387:15,20,22
388:4 390:10
424:14 453:5

474:16,17
475:4 476:16
492:9,10
512:22 522:1
579:24 626:19
635:21 637:9
682:23 683:6
683:11 684:20
**e-mails** 396:16
427:19,25

**F**

**F** 380:6 382:18
383:12 384:15
**face** 527:13
664:13,13,17
665:6
**facetious** 635:7
**fact** 408:8
420:23 423:13
426:2 436:9,11
442:19 448:5
450:10 454:14
455:13 459:5
466:16 467:18
497:5 507:4
510:3,7,19
542:16 544:7
563:23 573:8
577:13 583:6
589:18 615:5
623:6 648:5
656:17 659:11
662:10 691:16
733:18 737:11
739:1
**factitious** 524:19
**factor** 488:3
689:7 695:17
695:24 696:20
697:12,22
698:11
**factored** 577:3
**factors** 540:10
565:14,15,23
566:23 567:2

689:4 695:9
697:21,25
698:1
**facts** 439:3
442:7 532:19
**fail** 760:14
**fair** 408:5 411:5
416:6 420:2
435:7 460:13
464:22 485:22
558:12 720:7
757:17
**fairly** 494:9
503:4 518:1
520:8,11 537:1
**faith** 530:8
**fall** 398:11
447:10,11
**familiar** 400:17
402:21 404:21
406:15 412:5
420:7 422:24
430:10 450:14
477:3 480:3,7
480:7 536:4
564:17 602:12
602:19 626:7
627:17 628:4
628:12 630:18
650:9 652:13
652:14,18
654:14 672:16
672:21 679:5
679:14 682:19
701:12 734:23
739:11
**far** 480:18 485:3
487:20 510:16
536:16 622:4
636:15 644:3
645:19 654:4
674:4 703:3
744:21 746:10
**fashion** 595:7
710:22 712:11
730:1

**favor** 465:21
**favorable** 435:4
435:6
**favorably** 642:3
**Fax** 385:17
**FDA** 385:15
387:13,16
399:4,14,21
402:5 403:9,13
403:13 408:14
408:14 409:9
410:14,14
415:21 418:11
423:16 429:10
432:25 434:7
437:24 443:2
446:6 447:18
449:6,22
453:16,25
454:11,15,18
456:10,25
457:9,20,23
458:10 461:12
462:3 463:17
463:24 464:6
483:11,14,21
484:2,14,18
485:7,14,14,20
485:21 486:10
487:12 490:6
492:14,17,24
493:8,14
494:15,20,24
495:4,18,25
496:5 497:11
497:13 498:2
498:22 499:23
499:25 502:10
503:7 504:13
504:24 505:7,9
506:20,22,24
510:7,20
511:22 513:25
514:10,12,15
514:19 515:22
516:2,4,10,20

516:21 517:1
517:16 522:5
524:10 525:13
525:15 536:23
537:5 539:2,5
539:11,16
540:1,16 546:8
546:10 547:20
548:8,16 549:9
550:12,21
551:7,18
552:17 555:20
556:20 557:14
557:16 558:3
558:14 561:14
570:7 576:2
582:21 583:8
585:4,22 590:6
590:12,14
592:12,18,24
594:4,10,13
595:12,19,21
596:4,9,20,21
596:22 597:2
597:14,16
598:6,18,23
599:11,16
600:1,3,6,13
600:25 663:1
665:25 667:9
667:17,25
668:3,20,21
669:9,25 670:6
674:4,9 675:1
709:24 749:21
750:1,4,21
751:11,13,20
**FDA's** 552:24
572:8
**February**
579:19 720:22
**Federal** 386:12
390:4 403:12
418:17 469:23
470:9 672:15
673:4

Linda Loretz, Ph.D.

**Federation**
667:10
**feel** 397:14
542:7 589:7
650:13
**feet** 411:16
**felt** 416:7 418:13
419:6 420:9
732:24
**female** 409:1
438:14 739:17
739:19
**Ferret** 579:10
580:20
**fibers** 470:24,24
**fibrous** 543:1,7
**Fifteen** 708:22
**fifth** 689:7
**figure** 514:10
632:2 669:6
**file** 403:19
409:11 410:13
**filed** 400:15,20
401:1 402:5,18
403:23 404:1,5
404:6,17 405:4
406:4 408:13
409:25 410:6,7
410:17 411:16
413:12,24
419:3 432:25
436:22 437:24
457:18,24
458:20 481:24
483:8,13,20
497:8 512:5
517:18,20
521:19 522:3
522:15 524:11
526:18 536:21
573:10 582:1
590:5 688:6
738:13
**files** 483:2,5
757:14
**filing** 436:1

481:2,13,13
486:23,25
487:7 591:13
**fill** 401:3 459:3
482:24 484:9
**final** 494:8
597:23 734:18
**finalized** 738:20
**financial** 603:21
604:12 722:7
**find** 451:7
477:24 548:20
568:22 593:17
595:9 614:14
677:24
**finding** 693:9
700:22 701:22
701:24 702:5,6
702:18 703:10
704:10,17
705:4
**findings** 439:6
702:3 706:24
723:13
**fine** 418:9
420:16 558:15
672:10 679:25
**finish** 440:12
527:15 546:21
561:19
**firm** 474:5
475:18 476:24
478:10
**firmly** 583:7
**first** 396:25
399:20 402:13
402:17 405:12
405:23 407:4
410:4 416:13
425:14 431:17
432:24 433:11
441:25 442:1,2
442:9 444:8
459:5 466:23
477:6,7 495:17
495:22 503:3

508:7 512:20
513:17,19,22
517:22 523:21
543:3,11,14
555:9 562:22
569:17 578:4
580:24 591:13
591:23,25
594:3,9 605:8
605:17 617:6
618:24 620:3
621:1 630:4
640:2 653:23
654:14 662:6
662:16 663:11
667:21 686:16
688:5 701:8
709:15,18
712:3,18,21
713:4 725:2
726:11,14,16
727:5,10,13
729:16 731:16
732:1 735:16
737:8
**five** 469:13
484:21 485:7
505:6 591:20
597:4
**flash** 459:23
**fleshed-out**
641:18
**flip** 431:17
**Florida** 381:8
**FLW** 379:6
**focus** 429:23
528:22 571:8,9
571:12 658:17
658:20 751:8
**focused** 507:14
507:15 560:21
571:14 752:18
**folks** 478:16
549:22
**follow** 475:22
615:17 619:15

645:22
**followed** 556:20
**following** 455:9
689:4
**follows** 666:16
**follow-up** 504:8
505:1 549:19
600:2 614:19
618:8 628:10
629:8 636:18
709:8
**Food** 398:16
404:18 438:8
438:11 493:17
**footnote** 652:7
**force** 386:8
390:20 391:8
452:10 462:13
463:8 464:5
487:21 488:7
601:6,11,13
612:16 613:9
613:10,20
616:17 622:10
622:12,15
624:7,13
663:16 700:8
700:13,14,17
701:19 702:24
703:19 704:14
705:1,7,10,18
706:9,19 707:1
707:15,15,25
708:6,19,24
709:2,15 710:6
710:18 711:22
712:3,22 713:5
713:18,21
714:7 716:18
718:6,8,10,24
719:9,24 720:9
720:9,13,15,16
720:20 721:7
722:2,19,24
724:6 725:1
726:12,24

727:15,20
729:11,22,25
731:13 734:16
734:25 737:7
737:10,22
738:6 753:15
754:7 755:23
**forces** 707:18
**foregoing** 759:4
759:21 762:3
**forget** 593:22
**forgetting**
594:20 596:7
**forgotten** 408:2
**form** 385:18
417:13 456:4
488:4,9,24
489:25 497:1
501:21 515:24
516:24 517:9
517:24 528:1
550:1 607:12
607:25 608:14
623:1 629:9
690:19 694:12
695:18,23
696:24 697:16
699:20 710:17
710:22 712:11
722:10 723:3
726:19 727:16
730:1 732:4
746:11 749:23
762:7
**formal** 511:5
524:11
**formally** 504:6
599:15
**format** 602:9
688:21
**formed** 701:19
701:21 709:18
**former** 396:2
491:15 538:21
**forming** 705:7
**forms** 471:3

Case 3:16-md-02738-MAS-RLS   Document 9895-3   Filed 05/30/19   Page 179 of 565 PageID: 71423
Linda Loretz, Ph.D.

Page 779

forth 401:12
443:22 466:5,8
759:5
forward 394:4
408:4 482:22
492:4 556:12
556:13,15
636:11 637:18
733:4,6
forwarded
744:1
found 470:21
473:18 535:8
595:9 611:6
614:23 621:15
630:17 702:2,8
702:10,10,19
710:4 743:8
foundation
388:17 429:16
615:11,13,14
617:10 619:18
621:20 622:25
633:10,19
690:23 694:12
695:23 696:23
697:16 753:2
four 484:20
505:6 537:19
fourth 695:12
fragrance
393:12 394:22
515:10 557:22
559:1,9,10,18
560:3,4,5
586:4 603:23
604:14
fragrances
557:4,6,24
573:23
frame 453:4
524:9,14
525:15 614:3
619:13
framework
564:11,12

567:2,8
FRAZIER
383:4 476:3,8
487:23 488:4,9
488:24 489:3
515:24 516:24
517:9 528:1
550:1 616:24
623:1 629:9
690:19 695:18
696:25 697:18
698:14 699:20
726:19 727:16
748:18 753:3
free 542:8
584:12
Frequent 409:1
438:13
Friday 492:17
492:21 629:17
front 405:3
431:3 618:24
707:3 745:20
fulcrum 399:22
full 495:22
510:11 524:9
543:11 569:17
696:18 732:17
735:10 749:6
fully 398:1
509:14
fulsome 495:8
498:25 501:9
598:2
function 666:20
fund 625:11
628:2,11,23
629:1 636:1
funded 610:20
611:1 623:16
627:15,19,21
662:20,22
707:2 708:12
722:24
funder 488:7,11
funding 489:23

522:24 529:17
530:16 605:1
623:20 625:15
627:25 629:7
651:3 707:14
707:18,19,24
708:25
funds 675:14
further 396:12
471:2 504:16
517:16 597:17
613:11 635:3
639:10 704:10
705:8 706:4,6
706:15
future 612:19,23
707:21

G

G 390:5 392:1
Gamble 601:23
716:9 735:5
gate 580:9
gathers 730:1
general 510:19
559:9 625:14
641:24 704:16
705:20 746:21
746:25
generally 675:18
679:8 702:12
705:17 707:18
710:11,15
711:15 718:7,9
728:6,11
735:21 746:14
genital 409:2
438:14
gentlemen 660:3
GEREL 382:4
Gertig 652:6
734:4,11
getting 573:3
662:10 709:11
Gettings 391:4
463:2,4,5

621:1,17
724:25 725:3,7
725:10,16
731:14 735:12
753:15
ghostwriting
532:13
give 397:23
401:2 504:3
563:2 602:24
694:3 722:21
742:15 753:24
given 438:25
442:4 447:22
447:24 526:16
532:16 612:1
614:13 718:13
746:4 762:5
giving 400:8
Glenn 427:14
431:13 432:12
474:19 475:5
476:17,19
521:9 578:20
578:21,25
626:19 635:21
go 397:20
405:14 407:7
408:18,20
411:6 421:6
422:16 431:5,7
431:11 437:23
437:24 440:12
441:20 457:6
468:7 475:2
490:5 496:10
503:21 513:7
513:10 525:11
535:10 541:11
541:11,11
547:12 552:1,6
553:18 554:2
562:5,8,8
567:15 569:6,7
572:7 574:15
587:22 589:21

589:23 590:10
591:5 592:10
593:15 595:9
600:18 601:3
602:2 603:19
603:20 604:4,7
605:2 606:2,9
606:12,12
612:13,16,22
612:24 618:5
619:5,24
629:12,12
630:4 631:20
632:1 637:12
637:17 646:16
653:21 654:22
660:13 661:25
662:13 666:25
672:6 677:20
678:10 679:16
679:17 681:12
682:9,21
687:14 693:23
695:12 696:2
697:2 704:22
705:3,14,20,23
709:9 719:13
719:19 724:1,2
724:3 726:24
729:14 730:4
735:22 742:16
757:22
goal 554:7 718:9
goes 586:25
602:10 617:11
642:9 722:23
746:5,6
going 395:9
398:3,12 400:6
400:13,23
401:2,3,6,13
403:4 404:12
405:16 407:13
422:4 428:14
430:14,14
431:1,22

Linda Loretz, Ph.D.

436:15 441:18
441:18,20
443:1,3,15
444:1 445:5,6
453:1,25 457:5
458:4,8 462:11
462:14 463:12
464:3 465:17
465:17 466:18
468:6 469:2,11
470:8 471:23
471:24 474:21
474:21,24,25
475:2 476:10
478:15 479:6
479:12,17
482:25 489:14
490:11 491:20
491:22 492:4
493:7,8,9
494:24 497:13
497:18 499:14
502:20 503:23
504:2,2 506:21
509:11 512:17
512:17 513:16
516:16 525:8
526:21 528:18
531:7,12 537:6
539:20 546:11
556:14 570:20
572:7 577:21
578:3 581:25
592:8,10,11
593:14 594:3,6
595:22 601:2
602:16,23,24
614:21,21
615:24 618:14
618:20 620:7
623:24 625:20
626:5 630:25
631:20 632:20
632:21 633:2
633:13,23
634:4 643:9,18

643:19 644:2
648:13 653:21
656:7 657:17
669:3 672:6
673:19 683:13
686:16 687:18
690:20 694:25
700:10 705:21
705:23 709:11
711:9 713:9
714:17,18
721:6,16
722:16,22
733:4,4 744:8
744:14 747:9
757:25
**gold** 562:19
**Golomb** 381:11
381:13 385:4
590:20 591:7
604:1,5 621:3
643:14,16
651:5,18,23
652:25 653:4
653:19 654:16
656:4,12
657:24 658:1
659:4 660:19
661:12 663:19
664:15,25
665:8 667:12
669:16 670:11
670:21 671:10
672:1,10,14
674:3,11,18
675:8 676:13
678:14,17,21
679:24 680:14
680:24 681:8
681:11 682:5
682:13 683:22
684:3,12,18
685:17 686:3
687:4 688:11
688:16 689:12
689:20 690:9

691:3,15,21
692:1,16,23
693:11 694:1
694:14,19
695:4,6,20
696:2,4,10
697:1,3,5,9,19
698:7,16
699:25 703:5
703:15,25
704:3 710:20
712:1 713:25
715:10 717:4
721:2 722:17
723:23 724:15
724:20,23
726:3 727:2,21
728:13 731:3
732:5 733:1,22
734:14 739:6
740:21 742:17
743:2,4,14
744:9,12,18
745:7 746:17
748:5,9,21
749:24 750:11
750:23 751:9
751:22 753:7
753:12 754:23
755:2,3,20
756:4,14
757:10,17,22
**good** 392:10,11
451:23 472:13
472:16 476:2
510:8 516:7
526:2 570:15
570:17 586:21
602:9 624:19
643:15 665:21
**GORDON**
383:19
**gorilla** 489:4,5
**gorillas** 488:18
**gotten** 403:16
555:4

**government**
664:4
**governmental**
667:4 675:12
675:14
**grade** 549:3,6
550:7 580:7,7
**grammatical**
728:15 745:12
**grant** 388:17
616:3,8 617:7
**great** 496:15
556:2 677:7
709:23 721:15
751:12
**Greenbriar**
450:17
**groomed** 434:21
**Gross** 390:23
391:9 602:7,13
602:17 611:18
611:23 612:2
721:18 722:21
722:21 726:6
729:24,25
733:8 736:15
738:10,19
740:19 741:5
742:3,4,10,14
743:9,22 745:4
748:17,17
749:4 750:15
751:2,11,19,24
752:22
**Gross's** 721:25
729:4 732:8
740:4,11,25
754:20
**ground** 560:9
601:10
**group** 404:1
422:20,21,23
423:7 426:3
429:2,11,13,20
429:21,22
430:19 432:16

433:10 435:19
439:4 467:1
473:5,5 514:11
514:18 529:16
529:25 530:1,5
539:25 578:9
619:17,17
625:1 641:17
654:23,24
655:1,2,2,10
655:15 704:21
711:17 730:2
735:22
**groups** 466:24
658:18,21
**guarantee** 554:3
597:19
**guess** 394:21
397:18,22
418:7 432:18
447:9 451:6
460:13 461:21
461:24 482:1
499:3 520:22
523:16 550:11
553:22 560:2
564:24 583:16
587:17,22
595:5,6 613:22
614:20 615:12
624:15,16
625:7 631:12
633:21 634:15
640:8,17 642:2
648:2 662:9,25
680:22 707:10
714:25 718:8
723:5 726:22
728:19 739:24
**Guidelines**
564:24
**guy** 490:23
498:16 513:24
539:23
**guys** 549:10
550:16 614:5

Linda Loretz, Ph.D.

**H**

**H** 384:14 385:9
386:1 387:1
388:1 389:1
390:1 391:1
717:10
**hair** 435:5
**half** 508:19
622:2 695:7
708:10
**hand** 395:9
404:12 461:1
470:8 680:15
687:18
**hands** 520:19
**handwriting**
388:21 465:8
471:25 478:17
**handwritten**
385:12
**Hankinson**
733:23 734:1,2
734:8 736:9,17
737:9,20,20
738:2,25
**happen** 449:18
465:17 645:20
747:9,10
**happened**
395:21 402:16
453:21 459:4
471:17 492:21
493:8 494:10
496:18 500:17
505:16 516:13
516:19 517:19
518:16 520:8
526:5,13
527:18 604:25
610:23 709:13
710:12 727:12
747:22
**happening**
436:9,10
452:20 511:10
511:14 522:14

**happenings**
459:12
**happens** 557:16
709:3
**happy** 469:9
742:19
**hard** 466:19
640:14 689:1
**HARDY** 383:5
**hard-pressed**
628:16
**harm** 417:2,12
417:15 448:2,4
692:18
**hat** 410:1,2
587:11 632:16
**hate** 654:21
**hazard** 673:13
**heading** 612:19
**headquarters**
514:25
**health** 387:12
388:17 406:2
429:16 472:10
615:11,13
617:10 619:18
621:20 622:25
633:10,18
673:13
**hear** 399:2
489:1
**heard** 409:9
426:19,20
429:1 435:10
441:8 444:11
444:13,19
445:1 446:15
447:13 505:11
507:7 536:5
543:23 620:4
627:10 652:15
658:12 677:3
698:1,5,23
708:15 716:6
**hearing** 495:19
**heart** 457:10

626:4
**heavily** 485:23
**height** 698:6
**held** 380:1
407:10 712:11
712:14 715:15
748:20
**Helene** 601:24
**help** 400:1,19
404:8 514:16
519:3 622:7
624:5 641:23
642:3 649:11
650:3 657:4
659:13 721:14
**helpful** 632:1
723:5
**helping** 587:6
672:23
**helps** 707:21
**Henderson**
701:12,20
702:16,17,25
703:10,14,20
710:3
**hesitation** 503:5
**hexachloroph...**
580:16
**Hey** 511:14
550:16
**hide** 484:11
**high** 464:14
638:24
**higher** 449:20
**highlighted**
687:20
**Hill** 564:13
565:8 567:2
635:24
**hire** 624:25
723:7 729:24
**hired** 435:2
454:14 456:9
457:1 510:3,4
510:6,11
539:15 606:21

611:16,18,19
648:1 655:3,14
668:22 721:19
724:8 738:10
738:20 746:3
**hiring** 456:8
510:17 528:17
706:16,20
707:2,9,9
722:15 723:10
723:11 729:1
748:2
**historical**
400:25
**hoc** 390:20
712:22 713:17
**hold** 630:5
**holds** 665:17,18
665:25
**HOLMSTOCK**
384:17
**hone** 453:4
**honestly** 429:14
531:9 532:9,10
532:11 546:19
554:13 574:12
**HONIK** 381:13
**hopefully** 401:3
**hoping** 651:14
**Hospital** 702:4
**Houghton** 734:5
**hour** 744:8
**Houston** 383:8
**how's** 595:21
**Huh-uh** 747:3
**human** 387:12
562:17
**humans** 749:14
**Huncharek**
388:4 423:2
424:7,10,15
426:24 427:22
428:5,13,20
430:1,13
431:13 432:11
433:24 434:20

435:5,13
457:23 461:3
468:25 474:4
477:11 478:9
478:18 479:19
480:16 505:25
508:13,15
514:21,24
520:4 522:25
526:9 527:20
530:14 538:2
541:6 544:24
555:24 564:20
568:17 575:15
579:16 582:4
585:21 625:21
626:9,18 637:9
639:9 653:21
653:24 654:4,9
655:10 751:20
**Huncharek's**
497:6 500:13
541:12,13
571:13
**Huncharek/M...**
724:17
**hundred** 533:23
534:1,4 568:18
575:17
**Huskarek**
508:14
**hygenic** 621:22
**hypothesis**
563:1 611:8
**hypothesized**
621:22
**hysterectomy**
639:12
**H&M** 437:22

**I**

**IARC** 388:4
401:24 427:3
428:1 455:16
455:18 472:1,3
472:6 473:11

473:14 477:10
478:15 482:23
521:8 579:16
579:20 580:1
580:17 690:16
691:7,10,18
693:22
**idea** 622:14
676:10 705:18
**ideal** 554:10,11
**identical** 436:21
**identification**
401:9 404:10
410:23 430:24
436:13 452:24
462:9 468:11
470:6 474:13
479:10,24
483:25 486:17
492:1 495:2
512:11 521:24
577:24 592:6
603:3 615:22
620:13 626:1
630:2 631:3
633:6 639:6
660:18 672:8
672:13 678:13
678:19 682:12
687:1,3 688:15
690:6,8 693:25
696:7,9 697:8
713:24 724:22
731:2 734:13
748:8 753:11
**identified**
481:17 583:10
711:16,19
738:2
**identifies** 405:24
424:21,22
425:3 433:10
676:8 696:19
698:10 708:5
**identify** 423:6
468:6 479:6

522:24 583:9
697:12
**ignored** 622:2
**II** 392:4
**Illinois** 384:8
405:11 406:1
**illustrates**
420:17
**IMA** 477:4
578:7,7 579:24
627:19
**imagine** 517:1
**Imerys** 383:11
386:11 387:6
387:19,21
389:16,21
396:9 431:14
432:13 437:3
447:7,7 452:3
452:16 474:4
476:25 478:11
480:22 488:13
489:21 490:5
505:12 512:24
521:13 526:8
526:10 527:8
527:21 549:23
579:4,8,12
599:8 629:7
648:12 676:4
684:12 685:22
708:13,14,25
**Imerys's** 425:22
**imidazolidinyl**
580:18
**immediately**
408:24 455:9
**impact** 439:24
440:3,5 441:7
446:22
**imperative**
760:10
**implanted** 719:4
**implemented**
705:19
**implicated**

588:23 589:9
**implication**
444:8
**implications**
438:25 439:10
439:14,20
440:23,25
441:1,4 442:4
442:13 443:8
443:14,17
444:4,9,12
447:16,16
532:16
**implied** 547:7
**importance**
613:7,24
614:13
**important**
420:17 490:20
501:3,4,5
506:6 510:12
539:4,10 541:1
565:19 569:9
569:16,17
605:22 613:18
614:4 637:6
**improve** 622:11
**impurities** 574:9
574:17,23
**inadequate**
471:4
**inappropriate**
411:9 416:7
515:22
**inartful** 575:1
**incidence**
621:23 695:9
**include** 569:19
745:15 746:18
746:19,20,22
747:18,19
**included** 648:9
709:24 744:23
747:2,6 749:14
**includes** 393:12
393:12 695:25

**including**
396:24 398:18
419:11 458:15
493:21 642:7
642:18
**inconsistency**
419:16
**incorporation**
736:16
**increase** 568:8,8
610:12 681:17
687:25 689:4
689:24
**increased**
540:23 548:4
549:15 558:21
576:19 582:8
583:14 605:21
607:4 610:6
611:9,11 692:5
692:18
**increases** 438:15
**incredible**
636:14
**independent**
424:22 425:3,8
425:12,17
429:19 439:5
447:18 481:4
481:17,21
482:2
**indicate** 437:13
**indicated** 406:10
514:12 555:15
634:8
**indicates** 503:4
**indirect** 592:24
**indirectly**
592:18 595:4
596:4 600:1
675:17 677:15
**individual** 610:9
631:11 642:13
671:21,25
**individually**
582:7 634:6

**individuals**
655:22
**Industrial** 477:1
578:8
**industries** 545:3
**industry** 426:4
427:2,4 428:14
429:20 433:7
456:14 472:21
472:24 481:23
482:7,9 500:14
504:16 505:2
505:11,19
507:25 514:16
517:17 535:21
538:3 545:17
579:25 607:1
614:8,12,22,23
622:13 624:17
628:10 634:5,6
642:4,12 662:7
662:11 663:21
664:14,17
665:7 667:11
671:20 723:9
724:9 726:16
728:22 730:9
730:16,18,19
737:7 738:12
742:5 743:23
745:14,19
746:7,9 747:3
747:18 751:13
752:3,4
**industry-only**
505:21
**inference** 419:8
420:10 440:19
542:20
**influence** 663:21
**inform** 704:17
710:13,14
**informal** 515:9
**informally**
599:16
**information**

390:9,14
397:17 398:7
426:14 450:11
496:22 504:6
507:20,24
549:19 588:21
655:5 657:5
663:12 679:2
705:6
**informational**
449:24 450:5
**informed** 514:8
**ingredients**
574:8,18 577:2
582:9,14,15
583:18 588:12
666:6
**inhalation**
739:12,14
740:1,16 743:7
744:20 745:6
749:8,15 752:8
752:23 753:5
**inhaled** 739:16
**inherently**
563:25
**initial** 408:12
503:5 668:7,9
668:17 669:18
**initially** 423:10
502:10,15
541:19 542:13
543:12 567:20
668:13
**initiated** 423:23
425:15 526:7
**initiative** 622:13
**input** 425:22
452:15 504:16
526:8 527:8
736:2
**inspections**
666:9
**Institute** 675:10
675:11 693:12
693:19

**instruction**
532:3
**INSTRUCTI...**
760:1
**intended** 574:18
577:2
**interact** 456:13
**interacted** 457:4
**interest** 386:7
445:13,19
452:10,18
462:6 488:17
489:10,17
535:23 601:14
601:16 704:18
705:7,24
707:20 710:6
710:16 711:10
722:8
**interested** 391:7
403:19 425:24
463:7 477:6
498:25 502:1
523:19 601:12
616:17 622:10
623:7,10 629:7
700:8,13,14
701:18 702:24
703:19 705:10
706:2,3 707:1
708:6 709:14
710:21 711:16
711:18 712:12
720:8,12 721:7
725:1 729:17
729:19 731:22
734:16 753:14
755:23
**interesting**
720:12
**interests** 443:18
**interface** 726:23
**intermediary**
664:3 732:20
**internal** 522:3,7
523:4 603:10

**International**
472:7 692:6
**internet** 683:12
683:17
**interpretation**
517:17
**interpreting**
503:4
**interrogatories**
389:13 433:1
604:12 629:13
629:16
**interrogatory**
631:24
**interrupt** 440:12
676:22
**interruption**
436:18
**interval** 610:3
692:21
**intervening**
738:19
**intervention**
563:19
**interview**
518:13
**interviewed**
395:25
**introduction**
424:19 437:25
438:5 531:25
562:9 661:3
**Invasive** 389:6
**inverse** 509:3
534:17,20
535:13,13
536:1,14
537:21
**investigate**
490:19 518:7
530:14 641:14
**investigation**
397:16
**invite** 502:2
**invited** 498:17
**invoice** 732:8,13

732:18,24
733:2,5,7
**involved** 434:9
437:7 498:12
519:12,16
546:12 587:4
612:12 613:9
624:12 627:4
627:14,24
711:25
**involvement**
520:23,24
**involving** 514:5
**in-person** 754:5
**IQA** 685:9,11,12
**irrelevant**
752:14
**ISRTP** 613:13
647:10 740:18
**ISSER** 381:12
**issue** 398:19
406:22,22,25
407:25 408:1,2
419:1 440:20
455:11,20,23
461:13,19
462:2 463:18
464:8 465:25
469:18 472:2,4
473:17 499:18
501:3,4,5
507:8,16
510:12,18
511:22 520:12
520:17,20
524:21,25
525:21 526:20
529:8 536:23
541:2 545:16
549:13 555:10
558:3 576:14
577:10 582:2
583:6 585:4,12
590:7 592:25
594:11 597:2
600:25 605:22

608:16 614:4
614:13 615:18
624:6,24
639:11,25
640:6 678:7
703:4 704:6,19
707:10 709:8
715:3 718:12
718:24 745:6
**issues** 399:4
456:14,15
501:18 504:18
504:20 516:21
521:8,14
530:17 540:13
586:4 594:14
599:16 641:14
671:6 672:23
706:10 710:14
720:17 741:1
**items** 494:19
495:5
**iterations** 493:5
**it'd** 686:13
**i.e** 580:7,12
586:24

**J**

**J** 382:9 664:10
**Jackson** 716:21
**JAMES** 384:4
**January** 391:8
391:13 457:1
617:23 734:7
734:19 736:4
753:14 754:6
754:23
**Jersey** 379:2
383:15 514:25
527:20
**Jill** 388:7
**Jim** 682:24
683:4,7
**JNJ** 386:6,16,22
387:23 388:13
388:18,21

Linda Loretz, Ph.D.

390:24 391:11
**JNJTALC000...**
388:5
**JNJTALC000...**
386:9
**job** 668:25
732:14
**Jocelyn** 579:10
580:20
**Joe** 717:18,15
**John** 388:8
396:18,20,21
396:23 416:14
454:2,3,5
492:4 523:21
523:22 590:11
667:14,16,20
667:24 668:3
**Johnson** 379:5,5
383:3,3 392:22
392:22 396:8,8
411:8 423:11
423:11,14,15
423:20,20
425:22,22
437:16,16
451:14,14
463:8,9 469:5
469:5 487:19
487:19 488:20
489:14,14,22
489:22 490:4,5
524:7,7 601:19
601:19 616:8,8
671:17,17
716:20,20
726:10,10
727:4,4,10,10
727:14,14
732:21,21
748:15,15
752:21,22
**Johnson's** 393:7
411:8 488:20
574:16
**Join** 696:25

697:18 753:3
**JONATHAN**
383:12 384:18
**Joseph** 717:10
**Joshua** 423:4
578:23 579:25
617:9 621:19
**journal** 638:3,11
722:9 751:4
**Jr** 682:24 683:2
684:20 685:4
**July** 395:22,24
410:12,17
413:13 422:1
429:10 437:5
457:18 483:6
487:8 524:11
590:25 659:5
659:24
**June** 523:24
687:9 688:4
**jurors** 568:6
**jury** 392:12
395:6 400:21
401:16 402:25
482:25 484:11
605:9 660:4
673:10 687:22
689:21
**justify** 514:17
**J&J** 387:20
424:3 425:15
433:3 451:18
452:3,16 453:8
453:13 488:18
505:12 512:23
513:2,20 514:8
514:23 520:3
521:13 523:10
523:10 524:14
526:7 527:9,21
549:23 579:14
582:12 584:14
598:13,17
599:4,5 604:24
606:23,24

612:6 615:17
618:4,23
619:15 622:6
622:21 623:21
629:6 644:11
645:6 648:21
654:13,17,18
664:10,18
676:3 684:12
708:13,25
726:24 727:18
731:11,23
732:1,2,11,16
733:5,7,9,14
733:14 735:8
736:12,21
755:12 756:11
757:5,15
**J&S** 517:22

**K**
**kaolin** 580:15
**Kathleen** 383:4
453:5,6 522:6
**Kathy** 514:8
524:5
**KATIE** 384:13
**Katsiouleris**
513:24
**Katz** 456:17,19
458:15,16
491:16 495:23
495:24 497:17
509:9
**Kelly** 390:10
682:24 683:2,7
684:20 685:4
**Kemble** 383:14
**kept** 521:8
**key** 514:10
**kind** 399:22
400:23 401:13
401:14 408:16
411:15 420:16
430:11 453:4
455:15 465:25

467:8,13
469:16 484:9
505:3,17,20
512:18 522:15
524:6 525:7
563:8 565:2,18
565:20 575:4,8
581:25 595:6
598:7 600:14
600:22 617:2
623:5 634:4
641:17,20,24
644:9 649:17
649:20 656:18
661:2 664:3
665:11 666:15
678:7 706:7
711:20 714:21
719:1 720:11
722:21 728:24
737:3 745:10
752:17
**kinds** 628:19
639:9
**knew** 430:21
434:2 461:12
462:2 465:16
474:8 476:22
501:13,14
502:4 509:23
548:22 632:12
651:13 675:5
737:2
**know** 393:23
396:21 399:23
401:22 405:4,7
411:23 413:19
415:7,7 416:24
416:24 417:10
418:6,6,8
420:9 424:10
425:24 426:21
427:1,5,14,15
427:16 428:3
428:23 429:14
429:25 430:2,4

430:5,6,11,12
430:17 432:6
433:24 434:18
434:19 435:18
435:21,21,22
436:9,10 437:2
437:2,9 444:4
447:19 449:5,9
449:17 450:9
450:13 451:4,6
451:11 452:12
452:14,20
453:6,22
454:19 456:21
473:8,13 474:3
476:20,23,25
478:8 478:24
479:2 483:17
485:3,7,9,14
486:14 487:3
490:10,22
496:15 498:19
501:2,7 503:16
503:22,25
504:13,15,23
505:5,16 506:5
508:4 510:16
510:24 511:8
511:10,12,13
511:19,20,21
516:2,13,14,14
517:11,21
518:5 519:22
520:22 521:7,7
521:19 523:5
524:8,13,17
525:14,25
526:4,7,8,13
526:13 527:18
527:24 528:16
532:5,20
537:13,20
538:10,13
539:1,23,24,24
548:17,18,21
548:23 549:10

| | | | | |
|---|---|---|---|---|
| 549:11 550:3 | 655:11 657:10 | 516:17 587:19 | 696:23 697:16 | 416:8 433:19 |
| 550:10 551:11 | 657:11,16 | 611:6 624:7 | 753:1 | 608:16 609:17 |
| 551:14 555:15 | 658:19 660:1,5 | 723:9,14 | **lacked** 602:9 | 725:13 |
| 557:2 560:6 | 661:23 669:3 | 728:21 | **lacking** 540:5 | **legalese** 394:3 |
| 563:9 566:13 | 671:13 674:4 | **knowledgeable** | **lacks** 509:1,3 | **legislation** |
| 566:18,21 | 674:17 675:6 | 530:9 | **ladies** 660:3 | 665:20 |
| 572:11 573:4 | 677:6 679:9 | **known** 428:8 | **laid** 443:7 | **LEIGH** 381:19 |
| 574:12 575:16 | 680:1,2 683:16 | 449:19 483:22 | **Lake** 382:12 | **lend** 571:21 |
| 580:19 582:17 | 683:23 684:16 | 541:8 542:3 | **large** 711:2,3 | **length** 656:2 |
| 582:20 583:16 | 684:17 685:16 | 543:2,8 565:8 | **larger** 585:2 | 740:18 |
| 583:22 584:1,4 | 686:4,5,7 | 566:11 679:23 | **late** 518:1 | **lengthy** 494:9 |
| 584:9 585:3 | 690:11 693:18 | **knows** 546:10 | **Latest** 386:5 | **Leslie** 379:25 |
| 590:10 595:9 | 694:24 698:23 | 686:17 711:9 | 453:12 | 380:12 759:18 |
| 595:19,22 | 699:10,12,24 | 728:22 750:4 | **law** 474:4 | **letter** 385:15 |
| 596:11 598:3 | 700:4,17 | **Knoxville** | 475:18 476:24 | 386:10 387:11 |
| 598:13,18,22 | 701:14 702:1 | 716:21 | 478:10 | 388:7,20 391:4 |
| 599:15 600:5,9 | 702:23 703:7,9 | **KOHRS** 382:9 | **lawsuits** 444:17 | 391:9 408:19 |
| 600:16 601:21 | 703:13 704:25 | **Korean** 507:8,8 | 598:23 599:10 | 409:11 416:12 |
| 601:22 604:25 | 705:13 706:2,3 | | 683:14,24 | 416:12,13,18 |
| 606:16,25 | 709:7 710:17 | **L** | 684:17 688:5 | 418:9,10,18 |
| 607:20 608:2 | 712:17,25 | **L** 379:15 | **lawyers** 397:2,4 | 420:20 438:3 |
| 608:11 609:4,7 | 713:2,9,20 | **label** 411:8 | 416:6 432:13 | 449:15 457:13 |
| 609:15 613:4 | 714:17,22 | 412:14,20 | 437:15 449:14 | 457:14,15,16 |
| 613:23 614:19 | 715:21 716:4 | 413:1,8 417:16 | 480:22 487:11 | 468:8 486:10 |
| 615:7,9,10,13 | 718:14 719:10 | 417:22 418:1 | 579:1,3 | 508:13 533:7 |
| 615:16,19,20 | 719:11 720:1 | 418:11 438:10 | **lay** 411:22 | 533:13 590:17 |
| 618:20,23 | 720:18 721:1,3 | 439:25 442:5 | 443:15 563:16 | 617:11 618:4 |
| 620:5 621:9,14 | 721:15,24 | 450:5,6 514:1 | **leadership** 730:2 | 618:10,12 |
| 622:21 623:17 | 723:15,18 | 608:25 609:5 | **leading** 719:2 | 621:7 626:19 |
| 624:10,16,19 | 725:20 726:1 | 673:11,19 | **learn** 646:1 | 632:11,22 |
| 624:20 625:10 | 727:6,9,12,18 | 674:6,13 | 658:20 699:1,5 | 633:8 647:20 |
| 626:4,6 627:9 | 728:20,25 | **labeled** 417:20 | 699:7,11 | 647:20,24,25 |
| 627:11,14,18 | 729:3 731:19 | **labeling** 412:9 | **learned** 472:3 | 649:7 650:4 |
| 627:21,24 | 731:19,23 | 412:11 608:6,8 | 549:21 658:10 | 668:2,4,17 |
| 628:22 629:2,3 | 733:23,25 | 608:9,16,19 | 676:5,21,24 | 731:4,14 732:1 |
| 630:15,16 | 734:2,8 735:23 | 672:22,23,24 | 700:3 701:8 | 733:11 748:11 |
| 631:9,11 632:6 | 736:22,25 | 672:25 674:2 | **leave** 422:15 | 748:13,15 |
| 632:8,10 635:5 | 737:4 738:1,23 | **labels** 408:25 | 725:10 | 749:3 752:24 |
| 637:5,13 | 739:7 744:22 | 438:12 439:1 | **left** 454:17 | **letterhead** |
| 639:16 640:4 | 746:23 747:6 | 439:11,15 | 456:25 458:18 | 429:11 757:5 |
| 640:23 641:6,7 | 750:24 755:8 | 440:22 442:15 | 458:21 536:17 | **letters** 647:14,16 |
| 641:10 645:7 | 756:6 | 514:14 | 576:5 643:18 | 647:17,18 |
| 645:19 647:10 | **knowing** 470:2 | **lack** 418:22 | 643:21 725:12 | 648:5,9,18 |
| 647:19 650:24 | 510:11 539:19 | 534:13 542:3 | 744:11 746:22 | 727:23 |
| 651:7 652:5 | 609:19 | 690:23 694:12 | **legal** 412:6 | **letting** 447:19 |
| 654:4,23 | **knowledge** | 695:22,23 | 413:22 416:2,2 | 572:11 |

let's 395:25
  399:19 402:12
  404:8 410:10
  421:15 422:13
  431:16 437:21
  437:23 443:14
  443:14 451:9
  457:15,15
  459:2 464:4
  465:16,18,18
  474:20 482:20
  482:22 489:6
  513:11 517:18
  531:17 533:4
  541:11,11,15
  547:9 555:7
  558:7,12,12
  562:4,4 563:1
  567:15 570:14
  589:21 593:25
  597:1 600:18
  601:2 605:2
  606:12 612:13
  612:16 629:12
  641:12 661:25
  662:13 666:23
  668:23,24
  678:10 682:9
  686:24 693:23
  697:2 700:7
  731:25 744:5
  757:22
level 418:1
  446:19 523:19
  586:24 587:3
  707:20 710:6
levels 449:20
  594:15,25
  596:17
LEVIN 381:5
LHG 379:6
LIABILITY
  379:8
liaison 515:22
  516:2 521:16
  667:2,8 711:21

  717:14 746:15
liaisoned 667:3
life 641:4
ligation 639:12
light 553:17
  554:24 583:6
  588:9 589:5,13
  631:23 635:5
limit 546:17
  547:5,6
limitation 542:1
limitations
  472:25
limited 473:22
  509:5 537:2
  591:14 680:12
  691:14 693:10
limits 555:4
  573:19
Linda 379:18
  380:1 385:2
  392:5,14
  413:25 435:11
  524:4 579:5
  758:3 762:11
line 479:18
  683:10 695:12
  748:25 761:4
lines 561:3
  653:7 679:11
link 406:18
  508:22 621:22
linking 607:3
list 398:5 582:13
  582:13,14,15
  695:25 711:3
listed 467:11
  601:18 697:23
  699:6
listing 465:13,21
  467:4,9 470:19
  587:23 618:4
lists 469:24
  489:9
literal 556:24,25
literature 408:4

419:14 420:8
  421:8 432:4
  436:5 444:14
  445:10 447:21
  448:15 450:1
  461:9 471:3
  477:12,18
  520:6 537:14
  542:1,19
  555:21 611:7
  752:2
litigation 379:9
  430:5 433:20
  434:1,9,21
  435:12,23
  437:15 446:15
  549:22 684:2,6
  708:4
little 397:23
  400:22 402:25
  454:3 459:3
  503:4,5 606:22
  614:14 618:20
  636:12 645:14
  671:8 688:20
  705:22 710:24
  723:21 735:24
  742:6
live 464:22
  554:17,20
  641:4
LLP 380:5
  382:4,10,17
  383:5,13,19
  384:5 475:17
lobbying 677:24
Locke 382:16
  400:3,7,10
  403:3 405:13
  412:16,21
  413:3,15
  414:11,22
  415:2,12 416:4
  416:19 417:3
  417:13,23
  418:3,19 419:9

419:12 420:1
  420:11,25
  422:4 425:10
  426:7,16 427:6
  427:10 428:6
  428:16 429:3
  430:8,20 431:8
  431:16 432:19
  434:10,13,22
  434:24 435:15
  436:6 437:17
  439:16 443:10
  440:20 445:14
  446:24 447:23
  448:18 449:2,7
  451:5 456:4
  458:1 459:10
  460:1,12,19,22
  461:5,15,20
  462:5,16
  464:20,24
  466:13 473:2
  473:21 474:7
  474:20,23
  481:11,25
  482:14 483:7
  484:23 485:2
  486:2,7 487:14
  487:24 488:23
  496:23 497:1
  497:15 501:21
  502:13,18
  503:11,14
  506:10,13,20
  507:9,17,23
  509:18 510:15
  511:16 513:11
  515:16,23,25
  516:23,25
  517:8,10,24
  518:18 519:8
  519:25 521:21
  523:9 524:23
  525:1,23 526:2
  527:3,15 528:9
  528:14 529:2,9

529:13,18
  530:6,12,18
  531:4,12,16,20
  532:2,8,10,14
  532:24 533:12
  533:14,21
  534:23 535:3
  536:6 537:16
  537:24 538:5
  538:24 539:6
  539:13 542:21
  543:5 544:11
  545:14,23
  546:15,21
  547:3 548:5,10
  549:4,17
  550:19 551:5
  551:21 552:2
  552:21 553:14
  554:15,21
  555:18 557:9
  557:20 558:23
  560:22 561:19
  566:8,15 567:4
  569:1,3,4,11
  570:2,8,15
  572:21 575:10
  575:21 576:6
  576:10,21
  581:6 582:23
  583:15 584:24
  585:9,23
  588:19 589:14
  593:1 596:20
  597:8,21 599:3
  599:19 606:15
  607:11,17,24
  608:3,7,13
  609:1,11,20
  610:7,14,21
  612:14 614:15
  615:2 617:22
  617:25 619:5
  619:21 620:14
  620:17,20
  625:6,13,23

627:6 629:21
629:25 631:22
634:1,25
635:15 636:4
637:15 638:4
650:25 651:10
651:20 652:24
653:2,14
654:12 656:1
657:22,25
659:1 661:5
663:18 664:11
664:22 665:4
667:6 669:13
670:7,15 671:3
671:23 673:23
673:25 674:7
674:15 675:3
676:12 679:20
680:9,20 681:6
682:2 683:18
683:25 684:10
684:14 685:14
685:24 688:7
689:10,17
690:20 691:13
691:19,25
692:14,19
693:2,5 694:11
694:17 695:2
695:19,22
696:21,23
697:4,15 698:3
698:12 699:19
699:21 703:1
703:12,21
710:9 711:23
715:6 716:24
720:25 722:10
723:3 724:12
726:2,18
727:17 728:9
732:4,22
733:20 739:3
740:13 742:13
742:25 744:7

744:10 745:3
746:11 747:24
749:23 750:3
750:22,25
751:18 753:1
754:22 755:1
755:17 756:1
756:11 757:3,9
757:12,21
**Locke's** 475:22
**Logan** 383:20
**logo** 529:25
**long** 562:23
573:9 622:9
716:14
**longer** 715:4
**longstanding**
520:3
**long-time** 482:8
**look** 405:22
411:25 421:11
421:11 437:8
466:1,16,18,20
467:15 470:10
475:23 476:16
504:15 518:13
520:15 547:18
551:3 556:13
557:6,9,10
559:3,5,20,21
559:23 560:1
561:10 564:6
566:22 575:25
582:4 583:17
584:21 588:15
628:19 631:7
636:19 646:16
653:17 680:25
681:1 683:6
684:25 686:15
686:24 696:15
696:18 704:10
704:18 707:10
717:6 718:15
718:18 723:8
735:23 736:4

741:25 742:19
744:5
**looked** 446:11
465:19,19
473:19 485:24
487:8 521:7
542:18 555:22
575:19 576:20
589:13 614:10
645:5 651:13
670:23 677:1,3
712:13 719:21
721:9,11,13
741:10 742:10
**looking** 419:6
420:19,21,22
466:17 514:15
520:13 550:21
551:15 562:11
565:21 571:25
587:20 588:1,3
634:17 657:9
693:7,22
722:13 743:8
748:1 749:21
**looks** 404:20
478:24 509:9
604:19 612:10
661:2 686:23
731:20
**loose** 580:12
**Loretz** 379:18
380:1 385:2,11
386:3 387:3
388:3 389:3
390:3 391:3
392:5,10,14
394:12 407:18
410:2 414:1
419:21 435:11
476:15 524:4
570:25 579:5
758:3 762:11
**lot** 403:8 416:6
419:16 441:19
449:10 460:8

485:14,17
488:3 495:11
505:19 507:20
507:22 525:7
532:12 545:16
549:9 557:23
559:7 667:14
672:6 700:9
711:4 712:13
712:13,14
735:2
**lotion** 559:10,14
**loud** 669:4
**Louisiana**
382:12
**low** 555:2
**lower** 555:4
678:24 695:7
**lunch** 562:6,6,7
570:16,21
**LUNDY** 382:10
382:10
**lung** 739:17
740:17 743:8
745:6
**Luzenac** 463:9
477:8 478:11
579:7,10
601:19 637:4
648:11 676:3

## M

**M** 379:15
381:11 391:9
731:7 736:11
**magnesium**
584:4
**magnitude**
692:9
**mail** 737:13
**mailing** 711:3
**main** 560:2
739:24
**major** 409:2
433:11 488:7
489:13,17

529:17
**majority** 458:10
458:12 560:24
561:1
**male** 739:19,20
**manager** 748:22
752:21
**mandate** 408:14
**mandated**
442:16 483:3,9
**manipulation**
563:20
**Mann** 579:13
**Manoso** 384:14
397:5
**MANSUKHA...**
383:19
**manual** 412:9
672:25
**manufacture**
447:8 450:22
**manufactured**
580:12
**manufacturer**
488:19
**manufacturers**
451:1 452:6,7
578:13 580:13
598:25
**manufacturing**
665:21
**manuscript**
602:3,6,6,9,14
602:25 732:12
736:17
**march** 563:8
612:4 690:13
691:4
**marched** 536:22
**marching**
722:22 746:4
**mark** 400:23
401:6 477:4
512:23 592:8
602:23 660:5
672:11 678:11

Linda Loretz, Ph.D.

708:1
**marked** 395:10
395:11 401:8
401:17 404:9
404:13 410:21
410:22 430:23
436:12,16
452:23 453:2
462:8,12
468:10 470:5
474:11,12
479:9,23
483:24 486:16
491:25 495:1
512:10 521:23
577:22,23
592:6 603:3
615:21 620:12
620:14 625:25
630:1 631:2
633:5 639:5
660:16,17
672:8,12
678:12,18
682:11 686:25
687:2 688:13
688:14 690:6,7
693:24 696:6,8
697:7 713:23
724:21 731:1
734:12 748:7
753:8,10
**Market** 381:14
**marketed** 598:3
**MARKETING**
379:7
**Mary** 386:10
613:6
**material** 471:5
552:10 656:1
683:12,17
**materials** 560:5
**matter** 434:6
475:15 481:6
500:10 513:8
513:19 629:23

**MBS-CRE000...**
390:11
**MBS-CRE271**
682:10
**McEwen** 520:18
**MD** 438:6
**MDL** 379:5
**Meadows**
381:18 656:2
**mean** 393:3
394:16 397:18
399:23 400:4
402:18 403:8
414:7,12
415:16 416:5
416:21 420:5
421:7 422:5
424:2 425:12
425:13,25
429:4 430:9
434:10,13,24
435:4 439:23
439:24 440:6,7
440:11 442:23
443:14 446:25
447:1,3 452:18
452:21 459:19
459:20 460:10
461:22,24
468:2 469:25
471:12 472:4
472:14 473:6
473:12 481:12
483:21 485:13
485:22 487:9
488:3,6,25
489:8 498:25
501:13 503:1
507:17 510:6
510:19 512:23
516:1,12 517:2
517:25 518:1,8
519:15 521:10
524:6,19 525:5
527:5,10,22
528:4,13,19,20

528:24 529:5
531:24 535:1,7
536:16,19
537:2 538:16
539:3,14,20
541:10 544:13
545:13,22
546:4,10 547:5
547:10 550:12
550:18 551:6
556:2,24
557:21,23
558:1,24 559:9
561:3,5 562:23
566:5 573:17
574:11 575:25
576:12,15
577:25 581:10
581:17 582:25
583:16,21
584:25 586:12
586:14 587:8
591:25 596:23
598:7 600:5,7
600:13 610:15
614:20 615:19
623:6,17,25
624:1,10,15,24
625:5,14
627:20 631:19
634:24 635:2,7
637:22 638:25
640:8,15,17,22
641:22 642:2,9
642:24 647:18
647:19 648:1
648:16 649:21
651:1,3 653:7
653:15 659:2
662:25 665:15
666:19 668:11
671:6,11 674:9
675:5 676:22
676:24 678:6
684:1 685:25
686:12 699:9

704:16 706:20
707:17,17,18
708:11 709:4
709:20 710:11
712:13 715:18
716:3 717:19
718:19 719:10
719:20 720:1
721:8 723:7,20
723:22 729:6
740:14 741:7,9
741:16,17
745:19,24
746:12,21,21
746:24 747:5
747:13,23
748:17 751:2,3
754:1,1,16
**meaning** 433:5
437:4 550:5
663:15 664:2
692:17 701:8
704:23 732:7
**means** 501:10
505:14 536:9
545:25 550:4
683:23 753:24
759:23
**meant** 460:11
499:12 547:23
587:8 593:4
**measurement**
553:19
**mechanism**
509:4 540:5
541:7 542:3
544:9,24 548:3
553:13 557:8
557:19 571:21
575:13 577:10
**mechanisms**
558:19 582:3
587:20
**medical** 398:6
405:11 408:3
419:2,22

433:19 444:14
445:10,17
448:15 459:16
499:11 537:14
542:19 611:6
**medicine** 405:10
405:25
**meet** 405:6
409:13 490:5
501:23,25
514:24 585:7
720:10,10,16
722:25
**meeting** 387:15
387:18,20
457:20 458:6
463:7 467:24
468:5 469:21
470:1 490:16
490:21 491:2,4
491:9,13,16,21
492:13,14,17
492:24 493:7,8
494:2,6,11,20
494:21 495:4,8
495:14,23
496:4 497:23
498:17,22
499:2,25 501:8
501:11,12,17
501:18 502:8
502:11,23
505:7 510:25
511:1,2,5,8,23
513:1,20 514:9
516:3,4,8
517:16 522:4
524:10 526:9
526:11 527:19
537:3,5 540:16
548:14 551:23
551:25 552:1
556:8 572:9
592:15,17
595:20,22
598:17 599:14

Linda Loretz, Ph.D.

600:2,3 614:5
619:14 622:15
644:14 670:5
670:10,12
711:13 712:11
712:21 715:15
720:19 754:3,5
754:6
**meetings** 489:19
521:5 595:2
600:14 705:15
712:14 715:12
715:17
**meets** 586:19
722:19
**member** 427:4
601:16 663:8
676:2,4 707:1
724:9 725:15
726:15,16
730:9,16
731:13 737:6,7
737:24 745:14
746:7 747:3,18
**members** 401:16
402:24 412:9
425:14,23
441:8 443:19
444:15 446:14
449:23 450:4,4
450:21,23
456:2 481:9
488:17 498:20
499:20 506:6
596:24 598:1
608:6 613:19
622:14 624:6
634:6 635:10
645:3,17 646:1
648:22 650:23
651:2,2 654:10
667:2,8 704:18
704:24 705:11
705:12 706:1
706:24 708:19
708:24 709:16

710:5,13
711:21 719:9
719:12 722:1
724:2,10
727:15 729:15
729:23 730:18
736:1 737:10
737:21 738:6
742:5 743:23
744:1,1 746:9
751:14 752:3
755:22
**membership**
446:22 660:9
**memo** 490:14
753:24
**memorandum**
387:18 388:15
390:22 391:12
603:13 724:24
753:13 755:22
756:22 757:4
**memory** 478:13
512:8 592:20
646:17 719:16
720:6 721:14
742:15,21
**memos** 490:12
715:20
**mention** 447:14
557:25 585:25
**mentioned**
451:11 493:13
552:7,10
572:18 573:22
601:8 615:7
699:9 717:23
732:10
**menu** 565:2
**messages** 658:4
**met** 393:21
396:15 424:7,9
424:10 457:16
487:12 504:16
505:11,12
513:23 527:21

565:10 643:16
686:7 716:13
**meta** 386:20
388:15 390:22
**meta-analysis**
389:7 422:20
423:7 426:3
429:2,11,12,21
429:22,25
430:11,18
432:3,16
433:10,14
435:18 439:4
474:5 477:14
477:19,24
479:13 529:16
529:24 530:1,5
602:6 603:14
610:1,5,9,11
611:10,17
612:5,5 614:9
721:22 736:17
738:15
**Meta-Analytic...**
388:10
**method** 555:6
586:25
**methodologies**
551:9 555:3
709:21
**methodology**
552:9 553:23
563:16 714:20
715:9
**methods** 433:15
553:23 554:3
563:18 564:1
706:13
**METHVIN**
381:21
**mice** 739:19
**Michael** 423:2
508:12 731:11
736:12 748:12
748:22,24
**MICHELLE**

382:3
**mid** 646:12
647:3,5
**middle** 681:13
683:6
**mid-1990s**
646:24
**Mike** 613:13
732:10
**mild** 575:18
**MILES** 381:22
**million** 708:10
**mind** 633:25
**mine** 393:13
571:3 580:9
581:4
**mined** 393:13
**mineral** 470:22
578:13
**mineralogy**
466:7 723:16
**minerals** 477:1
578:8 580:14
**mines** 548:20
550:6
**mining** 488:21
723:16
**minute** 423:10
463:13 618:12
713:5
**minutes** 386:7
390:20 391:7
396:16 462:13
469:14 507:11
537:5 656:6
684:21 705:14
712:14,15,21
712:24 713:2,5
713:7,9,17
714:2 715:16
715:19,21
717:2,17 718:3
718:5,11,14
720:24 734:7,7
734:17,18,18
734:22,25

735:17,18,22
736:3 744:10
744:11
**miracle** 535:8
**Mischaracteri...**
529:9 530:18
653:2
**misrepresent**
616:1
**missed** 390:10
**missing** 661:6
**mission** 662:5,8
**mistake** 593:12
**mistaken** 466:6
**MITCHELL**
381:5
**MIZGALA**
384:4
**mm-hmm**
400:16 462:19
465:20 494:23
512:4,7 513:6
518:12 578:5
591:8 595:11
595:13 605:4
607:7
**MNordhauser**
613:4
**mobilization**
522:16
**modifications**
436:3
**molecule** 549:11
**moment** 396:1
402:12 410:11
422:14 428:3
445:6 455:1,3
458:18 484:16
533:5,17
572:17
**Monday** 379:20
492:5 728:1
**money** 487:22
709:10 722:23
729:10,20
730:14,20

monkey 634:15
634:15 640:8
719:5
monkeys 719:3
Montgomery
381:24
months 513:23
516:8 616:16
649:10 650:8
685:10
Moring 426:13
426:19,22
427:17 432:13
475:17 476:17
476:20 578:20
578:25
morning 392:10
392:11 459:21
580:21 652:16
708:15 724:14
726:21 751:12
757:20
Morristown
383:15
mortality
464:14 695:9
Mossman 627:9
627:25 628:3,6
628:7,9 629:8
640:16
Mount 383:14
702:4
move 413:9
415:24 430:15
482:22 531:17
675:9
moved 725:13
725:14 735:5
moving 531:18
575:8
multiple 438:25
439:10,14,20
440:25 442:4
442:13 443:8
443:13 444:12
447:16 521:4

532:16 730:18
Muscat 423:4
424:7,10
426:10,24
427:3,9,23
428:5,13,17
430:13 433:25
434:2,20
435:13 457:24
461:4 468:19
468:20,24
469:2,4 474:3
477:12 478:9
478:18 479:19
480:17,18
497:6 500:13
505:25 508:13
508:15 514:20
514:24 520:4
522:25 526:9
527:19 529:22
530:15 538:2
541:6,13
544:24 555:24
564:20 568:17
571:13 575:15
578:15,17,23
579:25 582:4
615:14,16
616:6 617:4,9
621:19 622:24
624:5 626:18
632:8,10,18
633:9,18
637:10 639:9
646:6 648:20
650:18 651:7
653:12 655:16
655:22 751:21
Muscat's 429:15
585:21
MUSCAT000...
386:13
Myers 384:15
397:4
mystery 750:6

**N**

N 381:1 385:1,1
392:1
name 392:13,20
394:19 454:2
466:18 526:25
604:21 627:10
628:5 658:12
664:9,20,21
686:1 711:6
716:6,12
759:14
named 523:1
685:18
National 401:19
675:10,11
693:12,18
nature 470:22
714:12
NCI 390:9,14
675:18 676:5,7
677:1,16,25
678:22 680:16
682:1 694:9,23
695:16 696:12
698:10,22
699:2,16 700:2
nearing 477:22
nearly 622:3
692:17
necessarily
629:3 720:10
necessary
411:19 413:8
422:12 464:19
673:12 760:3
need 403:17
407:11 418:22
441:13 499:9
552:12 553:18
554:16,19
574:3 581:3
626:5 635:2
682:16,20
694:4 705:1
709:21 714:3

719:25 731:16
755:9 756:6
needed 528:20
709:8
Needs 612:20,23
Nettesheim
598:14
never 388:20
444:19,21,24
445:1 447:12
447:13 525:17
525:20 620:9
621:8 624:6,13
637:20 638:2
638:10 646:15
650:12,15,18
683:21 693:15
698:5,18
733:18 750:12
750:15
new 379:2
383:15 389:19
406:22 508:20
514:25 527:20
551:16 553:9
621:21
newspaper
701:25 702:3
NICHOLAS
382:9
Nicholson
598:13,15
Nichols-Dezen...
658:13,14,24
nickel 560:7
584:8,12,16,19
584:20 585:13
nine 386:21
482:20 565:15
597:4
nomenclature
568:16
nominated
714:16
nomination
470:16

nominations
716:16
non-approval
625:4
non-asbestifor...
470:20
Nordhauser
613:6,9
Norm 712:6,9
normal 452:18
452:22 503:23
651:15
normally 731:21
731:21
North 477:2,5
579:24 627:19
Nos 603:2
Notary 380:13
762:19
note 397:18
492:21 570:13
661:6 695:2
noted 463:17
508:19 537:21
551:18,22
613:11 760:9
762:7
notes 387:15
492:13,17,21
494:10,20,24
495:4,7 499:3
518:14 519:2
552:1 601:3
759:11
notice 380:12
395:15 396:14
397:6,13 518:9
616:3,4 654:21
657:13
noting 508:25
November 515:1
516:7 526:10
527:19 713:6,7
715:25 716:16
718:10 720:20
731:15

Linda Loretz, Ph.D.

**NTP** 386:16
426:11,14
454:21 463:20
465:4 466:21
468:3,21
469:18 470:14
470:18 471:24
471:24 475:13
477:9 520:24
638:5,8 644:14
655:3,19,24
658:18 706:24
707:3 739:12
739:14 740:1
740:16 743:7
744:20 745:5
749:8 752:7,23
**null** 610:3
**number** 400:4
408:23 459:18
463:17 494:1
523:4 525:11
525:12 568:1
571:14,19
602:7 612:18
612:25 620:16
637:3 644:7
652:19 676:7
697:3 707:12
737:15 757:13
**numbers** 490:2
616:4 652:8
741:23
**Nutrition**
493:18
**NW** 382:18
**N.W** 380:6

**O**

**O** 379:15 385:1
392:1
**oath** 380:15
392:7 395:5
531:8
**object** 422:4
488:4,9 515:24

516:24 517:9
528:1 550:1
552:21 623:1
629:9 652:24
690:19 699:20
726:19 727:16
750:22
**objected** 728:4
**objecting** 489:4
**objection** 403:3
405:13 412:16
412:21 413:3
413:15 414:11
414:22 415:2
415:12 416:4
416:19 417:3
417:13,23
418:3,19 419:9
419:12 420:1
420:11,25
425:10 426:7
426:16 428:6
428:16 430:8
430:20 434:10
434:22,24
435:15 436:6
437:17 439:16
443:10 444:20
445:14 446:24
447:23 448:18
449:2,7 451:5
456:4 458:1
459:10 460:1
460:12,19,22
461:5,15,20
462:5 464:20
464:24 466:13
473:2,21 474:7
481:11,25
482:14 483:7
484:23 485:2
486:2,7 487:23
487:24 488:23
488:24 489:25
496:23 497:1
497:15 501:21

502:13,18
503:11,14,18
506:10,13
507:9,23
509:18 510:15
511:16 515:16
515:23 516:23
517:8,24
518:18 519:25
521:21 523:9
524:23 525:1
527:3 528:9,14
529:2,9,18
530:6,12,18
531:4,16
532:14,24
533:21 534:23
535:3 536:6
537:16,24
538:5,24
539:13 542:21
544:11 545:14
545:23 547:3
548:5,10 549:4
549:17,25
550:19 551:5
551:21 552:21
553:14 554:15
554:21 555:18
557:20 558:23
560:22 566:8
566:15 567:4
569:1 570:2,8
575:21 576:6
576:10,21
581:6 582:23
583:15 584:24
585:23 588:19
589:14 597:8
597:21 607:11
607:17,24
608:3,7,13
609:11,20
610:7,14,21
612:14 614:15

615:2 619:21
625:6,13 627:6
634:25 635:15
636:4 637:15
650:25 651:10
651:20 653:2
653:14 654:12
656:1 663:18
664:11,22
665:4 667:6
669:13 670:7
670:15 671:3
671:23 673:23
674:7,15 675:3
676:12 679:20
680:9,20 682:2
683:18,25
684:14 685:14
685:24 688:7
689:10,17
690:20 691:13
691:19,25
692:14,19
693:2 694:11
695:18,19
696:21 697:15
698:3,12,14
699:19 703:1
703:12,21
710:9 711:23
715:6 716:24
720:25 722:10
723:3 724:12
726:2,18
727:17 728:9
732:4,22
733:20 739:3
740:13 742:13
745:3 746:11
747:24 749:23
750:3,25
751:18 753:1
756:1
**objections**
389:12 694:17
759:7

**obligation**
403:13 592:3
**observational**
386:21 389:8
563:18
**observe** 563:17
**obtained** 598:25
**obvious** 439:23
622:8
**obviously**
397:19 439:16
440:3 510:7
526:20 551:7
570:14 661:4
663:7 684:1
707:19 745:20
**occasion** 403:22
424:12 429:12
472:15
**occasions**
402:14 676:7
**occupational**
405:9,25
**occur** 536:3
**occurred** 491:4
**October** 379:20
392:4 696:16
725:11 757:25
759:15
**odd** 614:14
**odds** 568:3,7
692:12,22
**offer** 588:13
**offering** 609:21
**offers** 589:15
**office** 454:20
456:10,23
457:7,17 458:5
458:7,11
485:19 491:8,9
493:22 494:2,3
509:25 513:24
515:9,11
523:23
**offices** 380:2
**official** 455:7

**officiated**
380:14
**oftentimes** 445:8
445:9,17
**oh** 422:15
426:25 431:6
431:19 455:17
457:19 471:18
492:8 496:10
505:24 516:9
516:11 543:13
587:7 590:22
596:22 598:16
603:11 610:22
620:15 630:12
630:19 640:12
676:23 705:3
735:15 736:22
**okay** 392:15,17
393:2,6,11,16
393:19,20,23
394:2,11,19
395:4,9,16,17
395:24 396:11
397:6,12 398:3
398:13,14,20
398:21 399:1,6
399:12,13,16
399:17 400:1,7
400:10 401:24
402:8,12,24
403:22 404:5,8
404:16,21
406:9,14,17,25
407:5,25 408:7
408:18 409:8
409:11,21
410:1 411:5
412:2 413:9,19
414:3 415:6,8
416:1,15
418:25 420:16
421:4 422:2,13
422:23 423:1
423:19 424:12
424:16,18

425:2,5,8
426:12,21
427:10,16
428:2,10,25
429:18 430:2
431:1 432:6,10
432:14,15,20
432:20,22
433:3,5 435:10
435:18 437:8
438:5,19,23
440:5,17 441:3
441:10,19,21
441:24 442:12
442:22 443:23
444:3,5 445:6
446:6,7,11,12
446:18,20
448:10 450:3
450:21 451:9
453:8,15,25
454:4,11,17,25
455:8 457:4
458:25 459:14
460:16,17,18
460:25 461:11
462:7,23 463:1
463:12,15,23
464:1,4 465:9
465:15,25
467:21 469:2,3
469:11,13
470:8,13 471:9
471:20 472:6
473:14,17,25
474:10,19
475:6,10,11,17
475:19 476:23
477:4,17,22
478:4,7,14
479:6,8 480:1
480:18 481:16
481:17,20
482:12,20
483:17 484:9
484:24 486:23

487:19 488:16
489:3,6,13
490:4,17 491:8
491:20 492:13
492:16,20
493:2,5,5,17
494:8,12,15
495:7,13,17
496:3,10,13,19
497:21 498:8
499:4,17
500:23 502:10
504:11 506:2,5
506:8 509:22
512:21 513:4
513:13,18,19
513:22 515:16
516:9 517:15
518:21 519:7
519:11,15
520:19 521:1
521:18 522:12
522:13,22
523:4,18 524:3
526:2 530:4,11
531:1 532:12
533:4,14 534:7
536:2,11
537:13 539:20
541:1,9,14,19
541:24 542:5,7
542:12,24
543:13,13,18
544:1,6 545:8
545:12 546:2
546:20 547:9
547:15,25
552:16 553:9
553:17 555:7
557:17 558:7
558:12,13
560:11,15
561:25 562:4
562:13,22
563:16 564:5
564:10,12,19

565:3,14,24
566:2 568:5,10
571:19 572:4
573:2,8,13
575:7 577:12
577:16 578:12
578:15,17
579:19,21
580:23 581:9
581:14,16
582:17 584:15
584:20 585:20
586:7 587:8,12
588:2,4 589:8
589:18,22
590:2 591:18
592:8 593:11
593:13,16,20
594:2,8,17
596:1,16 597:1
598:9 599:14
600:12,12,21
600:24 601:1,5
601:18 602:4
602:12,23
603:16 604:16
605:3,8,10,13
606:12,19,24
609:18 611:25
612:11 613:1,2
613:7,18 616:2
616:10,11
617:3,21,24
618:1,2,11
619:1,7,11
620:7 622:21
624:4,21
626:14,17
627:23 628:8
629:18,23,25
630:6,12
631:21 632:20
633:23 634:1,3
634:17,22
635:20 636:12
636:17,23

637:4 638:13
638:16 639:20
641:25 642:5
644:5,15,22
645:11,14
646:18 647:2
647:12,19
648:9,17 649:1
649:16 650:3
650:22 651:6
651:19 652:17
652:21 654:9
654:20 656:13
656:15,22
657:7,20 658:2
658:23 660:10
661:1 668:23
669:8,19
672:10 673:1
674:23 676:14
677:1,18
679:13,16,25
680:15,25
681:3 682:9,16
682:22 684:4
684:19 688:4
688:12 690:3
693:23 695:1
696:2 697:2,6
697:22,24
698:25 699:11
699:15 700:1,7
700:24 702:22
703:6 704:4,23
705:9 707:11
707:13 708:9
709:2,13
711:18 712:2
712:15,20
713:4,15 714:1
714:5,6,14
715:1,11,23
716:4,11
717:13,17,23
718:18,22
719:8,23

Case 3:16-md-02738-MAS-RLS    Document 9895-3    Filed 05/30/19    Page 193 of 565 PageID: 71437
Linda Loretz, Ph.D.

Page 793

720:18 721:17
722:4,18
723:20 724:7
724:18 725:22
726:14 727:3
727:22 728:14
729:22 730:3,8
730:13,23
731:17,25
733:11 734:6
734:15,24
735:3,7 736:3
737:17 738:1
738:16,23
739:7,11,21
740:7,22 741:3
741:12,15
742:9 744:5,12
745:8 746:1,18
747:10,16,16
748:5 749:3
750:12 751:10
751:23 752:13
754:15 755:2,7
755:11 756:8
756:10,21,25
757:8,17,21
**old** 551:1,20
601:10 668:25
670:13
**older** 661:4
**onboard** 644:19
**once** 424:10,17
428:23 686:7
694:23 709:2
711:12,15
723:25,25
727:13
**Oncology**
385:17
**ones** 489:13
505:1 552:9
564:2 585:7
595:8 639:22
640:15 655:18
661:9,10

688:22 711:20
730:7
**ongoing** 459:11
596:24 598:8
642:12 643:5
709:21
**open** 444:15
**opened** 495:23
**openness** 551:7
**opined** 674:9
743:11
**opinion** 609:22
**opinions** 421:2,4
461:7
**opportunities**
403:18
**opportunity**
476:15 526:16
530:23 537:11
537:18 547:18
631:14,16
756:16
**opposed** 609:9
666:4
**opposes** 412:19
**opposing** 410:14
443:7
**opposition**
413:12 421:16
421:25 422:6,9
446:5 447:19
458:19 483:5
487:1,2,4,7
497:7,7 560:16
**orchestrate**
514:22
**order** 514:22
515:1 565:10
583:12 679:16
**orders** 722:22
746:4
**organization**
394:17 414:2,4
430:3,4 472:9
472:11 483:5
504:17 676:3

722:25
**organizational**
677:7
**organizations**
483:18
**organize** 655:4
**original** 527:25
759:12 760:11
**originally**
423:21,22
453:17
**ought** 552:19
581:1 635:10
637:13
**outcome** 722:8
**outdated** 552:19
**outline** 613:12
**outlining** 648:6
**outset** 686:18
**outside** 396:9
484:18 555:22
624:1,25
723:25 728:17
**ovarian** 385:20
386:20 387:5
388:13 389:6
389:15 390:7
390:12,15,16
390:17,18,19
392:21,24
398:8,18
406:19,20
407:1,23
408:16 409:3
412:1 413:5
438:15 447:20
450:1 455:24
459:7 463:19
463:25 464:6,7
464:10,10,12
477:13,14,25
480:15 501:4
508:21,24
535:8,14
544:10 549:12
563:3 567:19

571:22 574:6
574:22 581:3
584:18 587:15
587:21 588:14
588:17,23
589:6,10
592:25 594:4
594:11,25
596:5 599:17
605:21,22
606:5 607:4
611:9,11
613:21 614:11
617:8,14 619:4
621:24 624:14
628:20 634:7
634:13,19
639:11,25
640:7 641:14
648:14 652:2,9
652:13,18,23
670:24 671:2
674:24 676:9
677:16 679:1
680:3,4,17,18
681:4,17 684:8
686:10 687:5
687:25 688:17
689:5,24
691:16 692:5
694:8 695:8,10
695:16,21,25
696:13 697:11
698:9 701:1,6
702:8 718:12
721:12 736:5
739:2,9 740:15
740:20 741:11
742:1 743:9
745:5 749:13
749:17 750:9
751:16 752:11
752:15,19
**ovaries** 559:15
635:13 681:19
688:2 690:1

702:19
**ovary** 718:21
719:7
**overall** 508:23
509:1,12
520:13 565:5
623:25
**overarching**
714:21
**overlap** 725:6
**Overview**
389:19 567:17
567:24
**over-the-coun...**
485:16,25
**O'DELL** 381:19

|  **P**  |
| P 381:1,1,19 |

P 381:1,1,19
392:1
**PA** 381:6
**page** 385:2,11
386:3 387:3
388:3 389:3
390:3 391:3
408:18 422:16
424:18 431:23
432:19 433:18
438:2,3 470:11
512:19,20
522:20 533:12
533:13 541:11
541:12,17,21
541:22 552:6
562:8,9 567:14
569:7 578:4
602:2 603:21
604:4 606:9,13
610:19,19
612:18,21,22
612:24 619:5
619:25 620:8
629:14 630:4,6
630:10,11
681:9,12 683:7
684:19 686:17

687:14,15,17
687:19 688:25
689:3,15
691:23 695:5,8
696:16,24
697:17 714:2
717:3,5 735:9
735:9,10,11,14
736:4 749:1
755:19,21
757:14 761:4
**pages** 431:4,18
494:10 661:6,7
681:7 695:3
716:25 762:3
**paid** 435:22
436:2 437:10
437:14 481:22
523:1 603:16
606:21 621:25
621:25 647:10
729:4
**Palmolive**
601:24
**pan** 459:23
**panel** 473:11
**panels** 472:25
667:1
**PAPANTONIO**
381:5
**paper** 407:4
410:13 437:4
474:5 517:18
603:20 604:23
605:2,3 628:4
632:11 633:20
636:6 647:20
652:6,7,8,21
653:1,3,16
719:14 721:25
722:1,6,8
724:1 736:8
741:6 742:3,4
742:4,10,14,16
742:23,24
743:9,11,22

744:23,24
745:4,11,15
746:6,22,24
747:3 749:12
750:20 751:3,6
751:8,11,20
752:11,18
754:12,20
**papers** 431:13
432:2 478:5,18
480:21 626:18
721:9,11,13
738:25 741:17
741:22,24
742:7,12
**paragraph**
405:12,23
411:13 424:21
424:25 433:11
438:19,21,23
441:25 442:2
477:7,7 494:22
495:5,22,22
513:17 541:25
542:6,7 543:11
545:2 569:17
591:5 630:12
684:25 696:19
726:4 736:11
749:6
**paragraphs**
436:22 508:7
541:16
**Paralegal**
384:13
**parameters**
650:6
**pardon** 536:19
**PARFITT** 382:3
**part** 390:6 399:7
436:3 441:16
466:22 528:25
536:25 557:23
585:20 603:17
603:22 604:13
607:1 640:2

662:2 665:22
666:17
**participate**
472:22 517:22
**participated**
737:4
**particular** 510:5
625:17 635:14
679:7 704:19
706:4 707:15
711:22 714:15
715:24 717:15
732:18
**particularly**
466:7 536:3
554:12 594:7
720:14
**parties** 403:19
711:19 712:12
729:18
**parts** 485:20
537:2 586:15
586:16
**party** 386:7
391:7 463:8
503:8,25
601:12 616:17
622:10 700:8
700:13,14
701:19 702:24
703:19 705:10
707:1 708:6
709:14 720:8
725:1 729:19
731:23 734:16
753:15 755:23
**passed** 662:11
**Pastides** 636:6
638:2 655:15
656:14,16
**Patient** 390:9,14
679:2
**patients** 506:12
506:18
**pause** 407:14
455:1 459:2

**pay** 433:3
601:14 729:14
730:7,16
731:22,24
732:2,2,11,17
733:7,15,17
**paying** 733:9
**pays** 730:9
**PC** 570:13
**PCPC** 382:15
384:14,15
385:15 397:4
399:11 402:14
403:22 405:6
410:25 414:8
416:2,6 418:13
421:25 422:19
429:21 433:3,5
433:6 436:1,2
436:23 437:5,9
439:13 441:8
442:9 443:6,19
446:23 447:11
449:9,15,21
450:3,23
451:13 452:15
454:1,10,15
455:8 456:9
457:2 458:18
459:1 461:12
462:2 467:25
468:16 469:5
481:8,9,23
484:5,20
487:10 489:24
490:4 497:24
498:23 500:19
505:13 512:14
519:17 521:14
523:1,16 527:1
528:16 531:3
532:22 534:10
536:12 540:4
541:6 543:18
552:17 557:11
557:13 564:21

570:5,6 571:9
578:10 587:9
587:10,11,19
588:5 592:16
592:23 596:3
596:14 599:25
601:25 604:21
608:5 611:1
623:7 626:14
626:17 627:4
628:22 631:17
632:16 633:24
638:17 639:18
639:24,24
640:5,5 641:13
644:15,19,23
645:2,11,12,12
645:16 646:15
650:20,23
653:23 654:5
654:10 656:24
660:20 661:4
661:18 662:8
662:14,21,22
663:3,8 664:2
670:2,5 671:17
674:1 675:18
675:24 676:1
677:11,24
699:22 701:8
704:24 706:25
724:4 729:6,7
729:13 746:15
757:13
**PCPC's** 419:23
441:5 487:7
519:4 520:23
526:18,24
531:2,11,15,23
532:22 757:14
**PCPC_MDL**
391:5
**PCPC_MDL0...**
388:16
**PCPC0005505**
387:16

**PCPC0052415**
389:24
**PDQ** 390:8,13
679:2,5,7,17
680:7 681:4,25
687:6 688:18
691:17 694:4
698:21
**PDQs** 698:19
**peer** 604:17
605:5 637:21
638:3
**peer-reviewed**
638:11 752:1
**pending** 502:16
516:21 537:19
583:7 598:24
**Pennsylvania**
381:15 383:22
**Pensacola** 381:8
**people** 395:25
396:7 399:8
428:13 434:8
440:16 445:2
445:11,23
446:20 448:3,3
448:8 449:9
450:22 452:9
452:10,18
458:9,10,11,13
461:3 466:1
467:10 472:21
472:24 473:6
489:9 493:20
493:21 494:1
509:24,24
511:9 516:20
519:16 523:6
523:14 528:18
528:25 529:7
539:19 542:18
555:12 561:8
563:2 601:13
606:20 611:16
618:22 624:2
629:1 655:14

657:4 658:5
695:16 704:20
709:12 710:21
711:4,6,16
714:12 722:7
722:15 729:19
735:23
**people's** 707:20
**percent** 489:23
533:23 534:1,4
568:8,8,18
575:17 610:2
652:22 692:18
708:12
**performed**
399:9,10
**perfume** 558:25
**perfumes**
580:16
**perineal** 385:19
387:4 389:4,14
450:6 567:18
605:20 611:12
624:14 630:9
691:23 692:4,7
**perineum**
681:18 688:1
689:25 718:21
**period** 671:12
671:19 754:19
**peritoneal**
611:12
**persistent**
576:19
**persistently**
408:3
**person** 456:16
473:10 509:23
517:2 521:15
613:5 711:14
712:3,6 715:13
715:16 716:13
717:13 731:11
746:15
**personal** 379:16
387:9 389:10

393:25 394:13
394:15,20
396:3 406:10
409:16 410:2,4
410:12 411:1,6
411:18,21
412:8,24
415:14 417:5
423:16,23
424:4 439:1
442:5 492:5
515:2 523:22
532:17 660:6
**personally** 487:9
**perspective**
441:4,5 572:8
**pertaining**
518:14
**Peruses** 431:24
475:25 513:14
522:12 682:22
714:5 731:18
756:10
**petition** 385:13
386:5 387:22
391:13 398:19
399:23,24
400:14,20,25
403:1,9,20
404:1,17 406:4
406:5,12
408:14,17
409:9,18,19,22
410:5,15 411:2
411:16,17,21
411:24 412:13
414:10 419:3
421:16 422:1
438:8,11
451:10 453:12
453:17 457:6
458:19 468:25
481:2,3 483:15
483:19,21
484:12,19,22
485:8 486:21

487:1,5,12
490:6,9 495:15
495:18 496:6
496:16,22
498:13,16
499:6,23 500:1
500:8,12
502:17 503:7
504:21 505:17
505:22 508:10
508:16 512:3
513:25 514:12
514:13 515:21
517:20 518:10
518:14,23
519:5,12 521:1
521:18 522:3,9
522:14 523:7
523:15 525:6
525:12 526:6
526:17 536:23
538:18 560:17
573:10 582:2
583:8 585:5
590:6,9,15
591:13,14,18
605:12 608:19
609:19 654:1
667:21 668:4
669:11 670:14
706:23 707:4
738:13 749:22
751:14 753:17
755:5,13
**petitioner's**
414:13
**petitions** 400:4
402:15,18
403:23 485:10
485:12 592:2
600:23 668:12
674:10
**pharmaceutical**
433:12 464:19
485:15,25
549:2,6 665:13

666:4,11
**Philadelphia**
381:15 383:22
**phone** 390:10
436:18 686:6
686:11 737:1,5
**phrase** 536:9
575:2
**physical** 550:8
**physician**
679:18 680:6
**physicians**
680:13
**Physician's**
679:12
**Ph.D** 379:18
380:1 385:2
717:10 725:1
758:3 762:11
**pick** 757:19
**picture** 428:12
**piece** 537:7
608:21 647:20
**place** 442:9
642:10 759:5
**placed** 397:7
514:1
**placement** 438:9
**Plaintiffs** 381:3
389:13
**Plaintiff's** 672:8
687:1
**plan** 595:20
**planned** 428:5
**plans** 523:24
525:3
**plausibility**
504:20 557:15
571:12 576:14
576:17 585:10
585:12 671:7
**plausible** 451:7
509:4 540:4
541:7 544:8,24
548:3 553:13
557:8 558:5,19

559:25 575:13
577:9 582:3
587:20 588:13
589:16 631:15
**played** 395:6
**please** 392:13,13
408:20 513:5
527:16 537:9
590:19 591:6
622:13 673:10
687:23 689:22
692:2 696:3
704:1 727:25
733:7 748:6
749:7 752:7
757:23 760:2,6
**Pltf_PCPC_0...**
391:14
**plus** 408:12
**pocket** 729:14
**point** 408:4,23
419:14,15
420:17 461:11
463:16 471:9
490:20 495:17
495:24 496:1,5
499:17,22
525:8 535:25
541:10 542:12
543:19 544:18
548:15 549:8
550:25 565:7
569:7,9,17
575:15 580:23
580:25 584:9
585:2 602:5
618:20 662:6
662:16 663:11
663:20 668:3
670:22 698:20
698:24 699:1,5
699:10 706:22
711:11 717:20
721:10 739:24
743:18
**pointed** 496:20

498:12 575:16
613:7 671:7
**points** 541:5
718:17
**policy** 503:23
663:21
**poll** 622:14
**Pollack** 659:25
660:4,5 708:1
708:3
**Pollack's** 660:10
**poorly** 747:12
750:7
**portion** 395:19
695:7
**portions** 681:9
**PORTIS** 381:21
**position** 411:6
413:6 416:8,9
417:14 419:19
440:18 447:24
502:7 514:17
532:22
**posits** 534:16
**possession**
518:22 555:14
**possibility**
567:17 611:11
**possible** 473:19
474:1 535:4
537:14,22
573:20 595:22
622:1 633:22
692:8
**possibly** 544:2
**post** 587:16
**posted** 511:9,19
538:7,19,20
561:24 681:25
**potential** 388:11
389:19 406:18
417:2,12
444:15,16
445:12,12
446:3,4 447:20
450:11 540:9

553:10 574:6
576:3 577:17
585:6 607:10
607:16 609:6
642:6,18 701:9
723:1
**potentially**
558:19 574:1
**powder** 379:6
389:14 392:22
392:22,23
393:2,7 398:7
406:19 407:1
407:22 408:15
408:24 409:13
411:9,25 413:6
438:14 448:8
448:13 450:6,9
450:12,22
451:2 452:7
455:23 459:6
464:18,23
465:2 466:12
488:19,20
489:10 544:8,9
544:22 547:1
548:1,17 550:7
557:3 558:18
560:9,18 563:2
571:1,15
573:10 574:2,3
574:5,16,17,21
575:3 580:12
580:12 581:2
582:6 596:17
596:18 597:20
599:17 606:4
617:8,14 619:4
621:23 630:9
635:12 640:6
677:17 680:5
681:18 688:1
689:25
**powders** 438:12
**power** 398:17
610:12

**PowerPoint**
389:23 660:21
663:3
**practical** 568:21
**practices** 379:7
665:21
**precaution**
449:24
**precise** 713:8
**preclinical**
748:23 752:21
**preclude** 563:19
**predecessor**
394:19 463:5,9
648:12 729:13
**predecessors**
684:13 708:14
**predicate** 442:8
442:12 443:6
544:25
**predominant**
494:1
**preliminary**
706:24
**premarket**
666:2
**premise** 560:16
**preparation**
477:9 494:17
498:6 518:22
518:24 602:14
645:25 647:13
658:10,22
659:21 660:24
674:20 677:13
682:15 721:4
725:24 726:10
726:22 727:4
732:12 741:13
**prepare** 395:19
396:12,12
494:20 520:5
657:4,20
659:14 718:4
735:1
**prepared** 398:1

400:2,22 423:1
423:14,16,19
423:22 500:11
500:22 508:12
532:8 596:13
602:6 621:19
661:23 727:1
754:2 755:12
757:15
**preparing**
661:21 741:4
745:24
**present** 384:11
446:5 502:7
**presentation**
389:23 656:9
656:19
**presented**
499:23
**presenting**
521:4
**presents** 600:14
**president** 454:7
454:9 477:1
**presumably**
414:7
**presume** 684:2
744:3
**presumes**
528:25
**pretty** 439:23
451:21,22,24
539:4,4,10
589:7 592:1
**prevent** 673:13
**prevention**
388:8 390:8,8
390:13,13,15
390:16 402:5
404:2,18
408:13 410:15
438:7 483:2
498:21 511:11
679:2,2 681:5
687:6 688:18
691:17 755:13

previewed 457:23
previous 476:24 688:22 754:24
previously 454:11 510:1 575:3 590:5 622:1,8 672:7 677:6 678:18 686:25 690:6 690:23 696:6
pre-study 634:16
primarily 452:4 452:15
primary 493:25 520:16 521:15 555:12 662:8
prime 521:15
Principal 514:19
printed 589:25
prior 395:11 424:6 428:25 428:25 429:9 429:19 449:21 467:23,24 477:1 486:25 487:7 492:21 510:24 520:11 520:15 524:15 531:13 543:20 576:3 577:16 659:5 665:25 741:4 749:7 752:5,6
priorities 591:15
prism 446:10
probably 402:17 403:11 420:2 425:23 441:20 476:22 503:23 519:19 521:17 521:17 575:1 627:20 644:21 662:9 698:20 708:21 717:1

727:6 737:14 749:16 757:1
problem 572:1 588:22 747:11 747:21
proceeding 759:4
proceedings 407:14 427:3 579:20
process 396:24 397:23 402:22 403:10,11 421:21 451:15 451:18 452:19 452:22 472:17 472:19 473:8 517:23 519:16 738:11
Procter 601:23 716:9 735:5
PROCTOR 381:6
produce 555:20 665:16,18
produced 519:9 520:14 629:13 757:4
producers 580:8
product 413:2 416:25 417:11 440:4,5 447:3 447:4 488:22 554:12 560:24 561:1,2 581:18 581:22,23 585:7 607:10 673:11,14,16 673:20
production 452:16
products 379:6 379:8,16 385:14 387:9 389:10 392:22 393:3,4,25

394:13,15,20 396:3 398:17 404:3 406:7,11 406:20 407:1 407:22 408:15 408:25 409:13 409:17 410:3,4 410:13 411:2,7 411:8,18,22 412:8,24 423:16,23 424:4 438:10 439:1 442:5 448:1,13 450:7 450:10,12,23 451:2 452:7 455:23 459:6 466:12 488:19 489:11 514:2 514:15 515:2 523:22 532:17 543:20 544:2,8 544:9,22 545:5 547:1 548:2,17 550:8 557:4,23 558:18 560:18 563:2 571:1,15 573:10 574:2,3 574:5,21 575:4 581:2 582:6,13 596:17,18 597:3,11,20 598:3 599:2,17 606:4 635:12 635:13 640:6 660:7 702:11
profession 410:15
professional 732:9
professor 405:9 405:24
program 401:20 662:20,24
Programs 662:16

projects 389:19 477:11 601:15
prominent 408:25
promoting 662:6
promulgated 551:16
pronounce 580:18,19
proof 556:14 558:11
properly 517:12
proposal 386:14 431:12 432:2 432:10 437:3 475:12 613:13 613:15 616:9 616:13 617:13 619:3,11 621:18 622:6 640:17 641:18 641:19 643:22 643:25 644:4,8 644:25 645:8 645:17 646:12 647:23 650:21 729:25
proposals 639:17 648:2 651:8 709:11
propose 498:15 615:5 636:10 636:18 638:16 638:17 639:14
proposed 542:2 615:16 619:18 623:21,23 624:5 628:4,10 639:9,24 640:5 640:11 641:13 726:5 727:24
proposing 621:21 636:21 648:7 650:11
propounded

393:24 762:6
pros 501:9
prospective 712:11
protection 706:14
protective 534:21,22 535:7,11
proven 413:20 415:10
provide 410:20 412:9 426:14 439:5 471:4 489:21,22 508:15,20,22 548:2 557:19 582:12 620:7
provided 457:24 459:1 484:5 496:21 498:2 515:2 533:6 549:19 557:7 557:13 559:25 603:22 604:13 629:15
provides 433:19 488:21 508:23 621:18 663:11
providing 413:1 415:9 444:13 507:20
proximity 699:12
prudent 583:9
PTI 384:3
public 380:13 406:1 523:6,13 657:5 658:5,14 677:8,21 678:6 762:19
publication 390:22 429:1,4 436:8 437:6,22 478:25 479:18 480:10,25

481:1 636:22
637:18,20
638:11 639:13
642:20,24
722:6 750:6
751:25
**publications**
428:4 459:18
460:3 479:1
508:16,19
642:16 728:17
**publicly** 648:13
**publish** 432:6
608:5 637:6,13
726:6
**published** 407:4
420:7,8,9
435:5 436:4,25
437:14 479:2
542:14 552:7
567:21 588:7
602:17 603:7
603:20 604:18
604:20,23
605:2,3 606:18
612:5 625:12
626:12,15
627:4 628:6
636:2 637:14
652:1,4,5
713:19,22
721:22 722:2,9
728:8,12,18
738:18 751:3
752:1
**publishes** 608:5
**pull** 521:10
574:16 637:8
640:24 655:4
663:15
**pulled** 484:3,3
**pure** 393:17
541:8 548:17
550:15 560:1
571:19,20
580:7

**purity** 540:25
571:1 642:6
723:16
**purpose** 495:14
591:10 610:11
610:17 704:8
751:23
**pursuant** 380:12
395:14
**pursuing** 704:18
**put** 396:1
401:14 410:10
421:15 422:13
437:21,22
446:3 448:1
458:17 459:2
461:11 464:4
467:21 468:14
468:16 469:2
469:16 471:23
471:24 479:7
493:8 505:23
530:8 541:15
581:19 590:3
622:14 632:21
632:24 633:2
642:10 650:6
656:10,11
664:9 674:5,13
708:24,25
**puts** 394:4 611:8
**putting** 410:2
440:20 478:22
533:16 587:11
658:4 706:10
730:19
**P&G** 716:7
**P-225** 687:1
**P-384** 688:13
**P-385** 690:6
**P-437** 693:23
**P-645** 696:7
**P-72** 678:19
**P.C** 381:13,22
**p.m** 570:20,23
618:13,16

643:8,11
684:22 744:13
744:17 757:25
758:4
**P1.004.1** 385:18
**P1.004.9** 385:18
**P1.0154** 387:13
**P1.0154-7**
387:14
**P1.0164** 385:16
**P1.0164.39**
385:16
**P2.0007** 385:23
**P2.0007.7**
385:23

## Q

**quarter** 687:15
**Query** 679:12
**quest** 547:16
**question** 405:22
412:2 413:11
413:23 414:8
414:19 415:4
416:1 417:8
419:20 426:9
429:7,18
430:17 432:1
434:5 455:4,5
460:10 465:9
471:9,10 473:7
481:16 489:6
497:21 499:4
502:2 505:5
506:25 507:2
508:5 516:17
518:19 529:23
531:19 532:7
532:12,25
539:6 543:5
545:21 546:6,7
546:20,24,24
547:16 548:13
548:23 549:15
550:22 551:17
551:17 553:3

554:5,24
560:15 561:19
563:12 566:14
566:22 568:2
569:6 572:5
573:3 574:4,14
574:25 575:12
575:18 576:1,3
576:17 577:5
587:17,24,25
588:5 589:19
593:23 594:3,6
594:9,10,22
595:21 600:8
600:15,19
607:14 614:10
614:20 618:7
624:16 627:23
635:9 637:24
640:3 641:9
644:6 645:14
645:23 648:4
657:23 658:6
691:2 702:1
703:7,7,16,23
704:1 707:23
713:13 714:22
722:14 723:12
728:23 742:14
742:14,18,22
743:3,6,21
**questioned**
721:18
**questioning**
668:14
**questions** 398:4
398:12 475:24
499:6 504:9
505:1,13,19,21
507:25 548:19
550:13 553:11
556:21 571:7
592:12,19
594:1,17
595:12 598:6
600:9 631:17

634:3 656:3
657:18,21
661:10 707:24
709:7 723:15
743:5 762:5
**quickly** 741:9,14
741:15 742:11
**quite** 416:21
590:1 659:9
661:6
**quote** 433:13
481:4 687:24
689:23 692:3
712:22 727:22

## R

**R** 381:1 392:1
578:20,25
761:2,2
**Radiation**
385:17
**radio** 719:3,4
**RAFFERTY**
381:6
**raise** 419:7
445:2 534:21
**raised** 407:22
408:2 465:16
504:17 545:16
548:18 553:10
572:9 597:1
641:21
**raises** 620:24
**ran** 457:8 458:5
494:2
**randomized**
562:20
**rank** 489:8,14
**rate** 464:14
610:2
**ratio** 568:3
692:12,22
**rational** 651:17
**rationale** 414:13
**ratios** 568:7
**rats** 739:17,20

Case 3:16-md-02738-MAS-RLS   Document 9895-3   Filed 05/30/19   Page 199 of 565 PageID: 71443
Linda Loretz, Ph.D.

Page 799

raw 552:10
reach 420:21,23
    467:16,18
    591:12 655:5
    681:19 688:2
    690:1
reached 504:14
    505:9 654:13
reaching 504:25
reacted 628:19
read 409:6
    431:17,25
    438:17 449:16
    474:23 484:4
    512:17 513:4,8
    515:6 522:13
    525:7 527:23
    531:24 535:24
    537:10 541:15
    542:8,9 605:23
    622:4,19
    659:15 660:10
    673:7,9 674:20
    681:23 686:19
    687:22 689:1
    689:21 692:2
    703:25 704:25
    714:4 717:7,8
    718:3,5 726:4
    727:3 731:16
    734:22,24
    735:2,6 741:8
    741:9,12,14,15
    741:19 742:24
    749:10 750:7
    751:7 756:2
    760:2 762:3
reading 411:11
    445:23 522:11
    716:25 727:1
    742:10 752:6
real 440:16
    448:21 449:1
    478:16 505:21
    649:23 704:11
reality 568:21

really 400:1
    409:20 447:2,5
    466:5 473:12
    501:2 502:1,24
    507:14,15
    509:11 511:20
    513:16 520:19
    535:19,22
    549:9 550:11
    553:10 564:22
    565:19 566:16
    572:5 578:3
    581:1 612:2
    623:17,18
    631:16 635:5
    636:13 637:5
    643:25 648:3
    650:13 656:21
    674:17 735:24
    747:7 749:15
    756:6
realtime 522:8
reask 405:22
reason 401:18
    441:11 443:24
    444:16 445:9
    445:21 448:23
    468:18 484:8
    491:18 548:22
    586:6 588:13
    623:13 629:4
    653:24 677:2
    731:12 744:22
    745:9,13
    749:11 760:4
    761:6,8,10,12
    761:14,16,18
    761:20,22,24
reasonable
    420:20 566:1
    636:10,16
    637:3 651:15
    730:3
reasonably
    518:2
reasons 444:2

535:1 638:14
    651:2 728:15
recall 410:19
    449:16 470:2
    483:23 491:6
    498:4 513:23
    526:15 592:21
    592:22 594:10
    594:12,16,20
    629:10 647:12
    647:22,24
    648:15,17
    649:2,3,7,11
    649:19,25
    650:3 652:9
    653:1,5,6
    656:17,20
    658:23 659:7
    673:2,3 676:19
    694:5 699:8
    700:2 713:6,8
    714:14,17,24
    714:25 734:21
    740:14 741:20
    745:2 757:1,11
recalling 596:8
    648:24 649:6
    741:11
receipt 760:13
received 427:19
    427:25 538:19
    727:10
recess 476:11
    570:21 618:15
    643:10 744:15
recognize
    404:14 493:21
    583:17
recognized
    584:17 585:17
recollection
    478:8 484:6
    512:15 515:15
    515:18 520:2
    525:24 649:12
    650:4 651:22

694:2 702:15
    702:17 703:18
    713:17 715:2
    716:23 721:4
recommendati...
    649:4
recommended
    469:4 648:21
    653:11
recommending
    649:19,25
    650:5
record 398:10
    405:15,17,20
    407:9,10,13,16
    476:7,10,13
    486:9 493:6
    513:7,10,12
    570:20,23
    578:6 617:7
    618:14,17
    631:22 643:9
    643:12 661:5,8
    696:5 699:22
    716:24 724:24
    725:3 744:14
    744:17 748:20
    755:17 757:22
    758:1
recorded 495:8
    759:8
records 396:16
    397:20 520:13
    555:21 621:11
    641:2 645:8
    700:12 740:24
recounting
    492:20
red 493:9
REES 383:19
refamiliarize
    397:8
refer 429:3
    511:25 617:4
    700:12,14
    717:5 733:24

743:16
reference 558:9
    558:11,15,16
    631:23 739:5
    749:8 752:7,23
referred 603:1
    694:5 754:24
referring 393:8
    427:8 434:14
    439:15 471:18
    513:1 516:3
    523:9 552:3
    557:10 569:12
    573:15 585:9
    683:16 684:2
    684:11 691:17
    701:24,25
    734:9 743:16
    754:12 757:15
refers 630:15
    654:23 681:13
    685:18 687:15
    689:16 691:17
    695:5 712:22
    718:15 729:19
    736:8
reflect 716:25
reflects 606:2,3
refresh 478:7,12
    484:6 512:8
    515:14,18
    525:24 592:20
    649:11 650:4
    694:2 716:23
    719:16 720:5
refreshes 512:15
regard 594:8
regarded 507:25
    559:1,19 584:6
regarding 466:7
    477:10 505:20
    592:24 594:11
    608:19 632:11
    640:6
region 605:20
Register/Vol

Linda Loretz, Ph.D.

386:12
regular 720:10
regularly 720:16
regulated
  485:24
regulations
  390:4 403:12
  418:17 469:24
  470:10 662:11
  672:16 673:5
regulations.gov
  387:8
regulatory
  412:12 711:1
rejected 590:15
  643:22 644:25
  645:8,18 646:2
  651:8 669:18
  670:14
rejecting 668:4
  671:18
related 396:17
  428:1 459:12
  477:12 485:12
  496:22 512:3
  520:24 521:14
  612:10 614:11
  620:10 704:19
  706:4 709:24
  710:15 749:17
RELATES
  379:11
relating 398:4
  432:7 508:24
  518:22 592:18
  594:14 621:12
  627:15 639:24
  639:25 640:5
  641:14 642:5
  712:25 713:3
  715:8
relation 427:21
  427:22
relations 523:6
  523:14 677:21
relationship

388:12 389:21
477:24 509:2,3
530:15 534:14
535:13 536:1
536:15 537:22
540:1,6 562:19
563:19,25
565:11 684:7
Relations/Co...
  677:8
relative 540:23
  610:2
relevant 424:23
  425:4,9 439:5
  447:5 545:3
  681:9 748:4
  749:17,20,25
relied 643:2
rely 563:13
remember 404:7
  409:18,21,23
  409:25 428:24
  429:17 484:7
  495:15 496:13
  496:17 537:2
  571:4,17 573:5
  628:16,21,24
  637:10 650:10
  654:19 658:25
  659:8 676:16
  676:25 686:12
  698:21 700:3
  719:20,22
  720:1 735:24
  737:1 740:25
  743:13
remembered
  628:25
remind 392:12
reminder 392:6
removed 700:2
removing
  642:18
renominated
  471:21,24
repeat 643:19

643:19 700:10
repeating
  455:21
rephrase 429:7
  489:6 548:13
  554:5 577:4
  637:23
replaced 725:16
report 398:25
  401:20 422:17
  422:19,20
  423:10 424:4
  424:22 425:16
  425:21 429:19
  432:24 436:1
  436:22 437:5
  437:10,23
  438:2 442:9
  451:18,22
  453:13,15
  463:6 465:5
  466:7 467:25
  468:20,24
  491:21 527:14
  528:5 532:21
  541:12,13
  546:25 555:8
  557:13 576:1
  578:18 584:10
  603:10 604:16
  638:1 655:3,18
  655:24 656:10
  658:18 664:19
  664:24 686:18
  690:16 691:7
  691:10,18
  729:4 738:11
  738:21 740:2
  754:11
reported 379:25
  589:5 622:8
  653:10
reporter 380:13
  489:1 669:5
  759:1,2,25
reporter's

759:13
reporting
  700:23,24,25
  701:2 702:18
reports 408:13
  568:2 655:20
  660:7 702:1,2
  738:25
represent
  392:20 431:12
  432:12 436:20
  477:8 506:15
  544:2 562:18
  579:3 611:22
  615:25 617:18
  639:2,8 712:20
  720:21,23
representative
  379:17 427:2
  527:1 580:1
  596:13
represented
  392:17 459:25
  487:11 506:18
  546:8
representing
  437:15 476:25
  478:10 480:22
  506:9 546:7
  667:11 668:3
represents
  535:21 578:12
reproduction
  759:23
reputable 472:9
  472:18 528:18
  528:25
request 403:10
  403:12 414:5
  415:20 439:3
  442:7,15
  532:19 664:18
requested
  408:23 496:4
  497:25 498:1
  600:3 732:14

requesting
  409:12 495:19
  514:1
requests 418:11
  438:11
require 408:15
  408:24 414:21
  414:24 415:6
  415:10,22
  438:12 443:3
  514:14,14
  753:23
required 412:5
  413:2 416:3,17
  416:22 418:1
  440:1 442:14
  534:5 601:15
  666:1
requirement
  443:7
requirements
  412:11,12
  414:9 565:9
  608:9 672:22
  672:25
requires 413:20
  753:20,24
  754:10
requiring
  415:17 418:11
  443:8
research 422:21
  423:7 426:3
  429:2,11,13,21
  429:22 430:3
  430:19 431:14
  432:16 433:10
  435:19 439:4
  472:7 529:16
  529:25 530:1,5
  563:13 612:19
  612:23 613:8
  613:13,20,25
  617:9 675:15
  692:6
researchers

396:9
**reservation**
502:11
**reserve** 528:6
**resources**
487:21 591:15
663:14,15
668:5 669:11
730:19
**respect** 519:4
526:5
**respond** 403:14
403:15,17
485:10 522:16
523:25 538:13
590:14 592:3
668:12 707:3
**responded**
461:16 572:10
585:4 591:20
592:12 609:9
609:18,21
669:23
**responding**
414:4,10
418:11 514:11
524:7 525:12
592:19 608:18
608:20,21
720:17
**response** 386:4
391:12 411:1
411:24 415:19
418:14 438:24
438:24 451:9
451:13 452:3
452:15 453:11
453:17 457:6
481:3 483:20
484:20 504:18
504:22 505:14
505:18,23
508:11 509:13
524:11 526:6
531:2 560:21
571:9,13 582:1

585:6 591:4,24
592:3 627:15
631:24 637:7
644:5 654:3
668:8,9,18
669:10,15,17
700:22 701:19
701:21 703:4
703:20,24
704:5,7 706:23
706:23 753:17
755:5,8,12
757:2
**responses**
389:12 711:13
**responsible**
409:2 514:11
583:14
**result** 684:7
**results** 477:23
589:5 600:6
611:10 649:9
650:8,24
736:16 747:6
750:1,5
**retain** 653:23
722:21
**retained** 389:18
425:13 426:13
439:4 474:4
647:6,9,9
654:10 742:5
**retread** 601:10
**return** 760:11
**returned** 550:9
**review** 386:5
387:6 401:24
424:22 425:4,9
425:25 426:15
428:1 432:4
439:5,6 453:12
466:23 467:1
470:21 473:14
474:5 478:15
478:18 480:2
480:14 481:4

481:18 496:7
515:1 518:21
520:5,5 526:16
528:7 530:23
533:7 604:17
605:6 627:5
637:21 638:3
645:7,24
656:11,17
659:12,21
661:13 682:16
682:20 724:17
728:7,11,17
740:2,4 741:1
741:5 745:21
753:24 754:2
**reviewed** 397:6
397:10,11
413:5 426:11
480:6 490:12
490:14 622:6
646:20 647:14
657:12 664:19
726:11 727:13
727:19 739:25
740:2,23 741:7
741:7 743:25
**reviewing**
396:16 403:16
477:12,18
723:17 726:25
**reviews** 508:20
602:3
**rhetorical** 743:2
**Richard** 381:11
643:15
**rid** 394:3
**right** 395:17
399:19 402:21
406:15,21
409:16 410:10
412:13 414:5
418:15 419:5
420:5 421:9,15
421:15 423:9
424:1,3 425:21

426:2 443:1,6
443:13 444:6
446:2,4,8
447:7 448:17
456:8,16,22
457:12 458:14
458:24 460:25
462:21 463:6
465:12 466:9
467:1,21
468:23 469:16
471:20,22,23
473:14,20
476:6 478:5
479:1 480:4,8
481:4,18 482:6
482:21,21,22
483:8 484:2
485:6,21
489:20 490:1
491:7 492:10
493:10,24
497:5,9 498:13
499:1,10,20
500:24 501:5
501:16,19
502:6 503:3
504:3,8 505:5
505:22 506:3,6
506:9 507:2,13
508:4 509:7,15
510:4 511:18
514:4,6 515:6
515:8 517:7,15
519:2,18 521:3
521:6 522:2
523:2 525:11
527:8,24 528:6
528:22,24
530:2 532:19
533:4 535:9
537:8 538:15
538:17 539:21
540:15,20
542:6,10,16,20
543:3,15,24

544:17,20,21
545:21 547:10
547:10,13
548:4,9 549:1
549:2,3,16
550:25 551:2,4
553:3,6,13,25
554:14,19,20
554:24 555:7
555:16,17
556:4,9 557:4
557:16 559:12
560:9,13,19
561:8 563:4,6
563:12,21,23
564:24,25
565:1,4,5,7,12
566:3,7,13
568:21 569:5
569:20,22
571:24,25
572:2 574:25
575:6,17,23
577:13 578:23
579:22 580:9
581:8,24
584:22 585:22
586:1,11,14,17
587:5,6 588:15
589:19,21
591:23 596:12
597:14,25
600:18 603:10
603:14,17
604:7,17 605:6
605:14,25
606:21 607:1,2
607:6 608:2,11
608:19,23,25
609:6,14
610:13 612:24
613:5 614:4,17
614:19,25
620:2,15 623:8
623:11 625:1,4
625:5,10,12

634:23 636:9
639:3 640:18
640:21,23
641:1,3,5
643:4,6 644:18
644:24 645:21
646:4,11 649:6
650:17 651:24
652:4,7,12
653:20 655:7,9
655:17,23
657:12 658:9
658:13 659:12
660:13 661:8
661:18 662:19
664:2,16 665:1
665:9 666:8
667:13 668:11
668:19 669:24
670:9,12
672:15 673:4
673:18 674:4
674:19 675:9
675:13,22
677:13 680:2
685:23 686:4,8
686:15 688:20
690:12 692:24
693:21 695:4
701:4,17,18,23
702:14 703:16
705:15 706:18
708:2,11,16,23
711:15 713:12
718:2,7,9
720:7 721:3,21
725:18 729:15
732:3,6,16
733:12 737:6
738:14 741:3
742:2,3 743:15
743:25 745:22
748:1 752:5
754:18,21
**right-hand**
678:24 687:8

**rigorous** 433:14
666:8
**Rio** 512:23,23
676:3
**risk** 385:20
386:20 389:5
389:15 438:15
443:21 448:21
449:1,4 450:11
508:25 544:3
548:4 549:15
553:10 558:21
568:11,19,22
569:20 575:16
576:19 581:2
582:8 583:14
594:5 605:21
607:4,10,16,23
608:12 609:6
610:2,6,13
611:9 676:8
677:16 681:17
687:25 689:4,4
689:7,24 692:5
692:18 695:9
695:17,24
696:20 697:12
697:25 698:1
698:11
**risks** 409:2
540:23 585:18
639:11
**Road** 382:5
**Robert** 427:14
474:19 475:4
578:20
**RoC** 470:20
**rodent** 750:20
**rodents** 749:9
749:15 752:8
**role** 413:7
447:25 519:4
625:1,2,3
675:1,24
677:19 705:5
728:6 737:19

**rolling** 451:16
**room** 488:18
506:3,17
509:15,17,22
511:15 561:13
561:18,22
**Rothman**
386:14 475:11
636:1 638:2
643:22 646:5
648:19 651:7
651:12 653:12
655:15 656:8
656:14,15,18
**Rothman's**
636:5 639:13
**roughly** 458:24
490:1 661:19
669:7
**RPR** 759:18
**rule** 514:13
569:23
**rules** 525:25
**ruminate** 669:4
**ruminating**
669:2
**run** 491:10
627:20
**RYAN** 381:20

─────────────

**S**

**S** 381:1,7 385:1
385:9 386:1
387:1 388:1
389:1 390:1
391:1 392:1
**safe** 586:24
**safety** 493:18
581:18,22
711:1
**sales** 379:7
443:22 444:10
446:14,20
**Samet** 638:2
655:16
**Samet's** 636:6

**samples** 549:23
550:5,16
555:13 598:4
**sampling** 595:20
597:2,19
**Samuel** 387:11
438:6 655:16
**sat** 732:25
**saving** 750:20
**saw** 526:8
537:13 602:14
626:7 631:19
645:1,2,6,9
646:14 648:5
668:2 669:19
669:22 682:15
698:20 712:19
712:25 713:2
737:7 751:1
**saying** 403:15
439:9 443:2
459:20,21
483:8 496:3,14
517:2 527:4
535:25 544:14
544:19 552:23
564:5 574:15
581:21 586:11
589:7 610:4
611:20 625:11
632:18 656:13
665:19 668:5
685:5 704:25
723:18 732:23
735:11 749:13
749:19 756:24
**says** 406:3,5
408:17,22,23
409:7,10,15
422:5 423:16
433:21 438:5
438:18 441:2
443:11 453:15
463:17 470:14
470:18 471:2
477:7,22

478:21 492:16
492:24 493:23
494:19 495:18
495:23 497:2
497:12,13,16
498:3,14 500:6
500:10,15,16
508:9 513:22
523:21 525:2
530:1 531:25
532:8 533:7
534:13 535:15
540:4 541:19
541:22,25
544:1,5 545:2
545:11 547:21
551:25 552:1,6
552:6 556:6
562:17 563:17
567:8,17
569:16,25
580:5 602:5
603:21 605:3
605:16,24
606:23 607:2
610:1 611:1,5
612:6,6 613:4
613:24 617:22
620:1,8 621:7
621:8,17 630:5
630:6 657:17
662:5,6,15,17
664:1 673:17
681:16,22
683:10,11,15
683:17 685:7
686:17,20
687:24 689:3,9
689:14,23
691:23 692:3
692:12,15
695:13,24
698:15 716:16
726:9 727:22
728:2 731:7
732:6,7,15

733:3,6,10
734:17,18
735:13,15
736:11,15
737:11 749:7
752:9 753:20
754:9,10 755:4
755:11,18
757:14
**scale** 485:23
**scare** 440:16
**scaring** 448:3,7
**scary** 448:11
**scheme** 485:13
**School** 406:1
**schooling** 531:9
**science** 411:25
413:5,17 440:1
440:14 441:13
445:4,6,7
446:9,10,11
454:7,7,9
458:25 472:13
472:16 499:1,7
499:12 501:10
514:9 566:3
608:21 609:12
623:7 678:3,7
712:6 717:20
**scientific** 385:21
398:7 408:4
419:2,22 421:8
439:3 442:6
445:10 457:11
459:16 499:11
502:1 507:2
509:23 514:16
532:19 536:17
602:8 609:22
711:4 722:9
**scientifically**
607:5
**scientist** 435:7
445:9 536:17
564:16 617:9
679:18 680:6

707:9 717:12
737:1,3 745:17
**scientists** 419:22
420:21 421:11
460:17 467:15
481:22 532:4,6
561:9 565:21
566:4,22 606:6
706:16,21
707:2 741:25
745:14 746:19
**scope** 415:13
417:4 418:4
464:25 486:3
515:25 516:25
517:10 528:10
533:22 534:24
536:7 544:12
548:6 566:9
567:5 569:3
570:3,9 607:11
607:24 608:13
673:25 674:8
674:16 679:21
680:10,21
682:3 683:19
684:15 685:15
688:8 689:11
689:18 690:24
693:3 694:12
695:22,23
696:23 697:16
698:4,13
699:21 722:11
747:25 753:2
**screen** 590:3
621:4 633:2,11
666:25 678:19
**screenshot**
387:8 390:15
390:16
**SCULLY**
383:19
**se** 544:15
**search** 680:17
**searching**

583:12
**second** 389:11
395:14 399:7
411:12 424:21
424:25,25,25
427:7 431:17
438:19,23
463:13 512:19
522:20 525:19
569:12 591:5,7
594:6 600:18
600:19 602:5
617:24 629:16
630:5,12
663:14 683:10
684:25 726:4
735:8,9,11
749:6
**secondary** 544:3
**section** 408:22
437:25 531:25
602:2 604:10
606:13 673:5
**Secure** 522:24
**see** 404:8 406:7
407:11 409:4
410:20 421:22
424:19,23
425:6 432:1,16
433:16,18,22
438:3 439:7,11
440:23 453:4
453:13 459:2
462:18 463:21
470:15,25
471:5,7 475:7
475:20 477:15
477:20 478:2
491:2,23 492:7
492:25 493:6
493:15 494:13
495:20 496:8
496:11 498:8
498:10 508:17
513:2 515:4
519:2 522:10

522:17 524:1
533:10 534:19
536:14 538:7
540:7 542:4
545:6 552:14
554:2 557:7
559:23 562:16
563:2,10,13
564:3 567:12
567:22,25
575:1 578:22
579:14,17
580:20 582:6
587:22 589:24
596:1 600:15
602:3,10,20
604:24 605:3
611:13 612:20
612:23 613:2
613:16,22,25
616:13 619:2,8
619:15 620:18
620:24 622:17
630:13 633:11
634:1 641:2
646:15 659:15
661:20 663:4
668:23,24
678:23,24
679:3 681:14
681:15,21
683:8,20
684:23 685:2
685:19 687:8
687:20 688:24
689:5 690:12
690:14 691:22
695:7,10,13
704:10 705:6
706:2 710:2
711:9 712:15
723:6 725:23
726:5,7 735:13
736:6,18
737:20 747:13
747:21 748:23

748:25 750:1
753:18,21
755:9 756:6,13
756:16,21
**seeing** 512:14
635:11 650:13
709:11 713:7
717:2
**seeking** 385:13
404:2 406:6
438:9
**seemingly**
433:13
**seen** 397:20
436:23 473:10
487:25 489:9
490:2 494:8,15
498:5 511:25
517:6 519:13
521:10 522:8
533:19 535:2
535:20 558:21
564:13 602:18
603:11 621:11
623:3,3 624:9
625:19 629:19
642:3 645:16
660:23,24
669:21 679:11
682:14 690:10
690:22 693:15
694:20,22
698:18 708:8
715:18 716:12
718:14 724:7
725:18 726:15
730:8 733:18
734:20,22
744:3 748:12
756:5,19,23,24
757:8
**Sekerke** 717:10
717:18
**selecting** 748:3
**self-regulation**
662:7,15

Linda Loretz, Ph.D.

**self-regulatory** 662:20,23 666:18
**sell** 583:3
**selling** 446:21 451:2
**Seminary** 382:5
**Semple** 716:5,19 717:24 719:19 730:2 735:4
**send** 449:14 733:8 756:12
**senior** 509:23
**sense** 425:17 447:2 473:4 482:2 524:20 526:19 576:18 631:13 635:4 641:24 717:19 717:22 746:16
**sensitivity** 586:21
**sent** 388:20 446:6 449:6 452:17 457:16 543:16 570:6 576:1 580:20 618:4 620:9 621:8 624:6 635:21 719:13 751:11
**sentence** 425:1 442:12 503:3 513:22 531:24 543:11,14 605:18 609:25 611:5 686:16 686:16 693:22 726:9
**separate** 398:12 593:25 594:18 655:20 741:1
**September** 678:23 682:1,4 720:21 724:25 725:23 728:1

**sequentially** 737:16
**serious** 464:16
**services** 387:13 663:9 732:9
**serving** 664:13 664:17
**session** 571:6 641:18 758:1
**set** 416:11 490:8 490:21,22 491:2,9 497:23 511:5 512:18 556:19 573:20 586:15,24 629:15,16 670:5,10,12 759:5
**setting** 490:15
**setup** 705:22
**seven** 465:13 467:4,9
**seven-page** 681:7
**SEYFARTH** 380:5 382:17
**shape** 451:23
**Shapiro** 655:16 655:22
**Sharfstein** 507:6
**Sharma** 685:23 686:5
**SHAW** 380:5 382:17
**shed** 631:23 635:5
**sheet** 760:5,6,9 760:11 762:8
**shelf** 574:17 597:12
**shelves** 448:17
**SHOOK** 383:5
**short** 477:23
**shortcomings** 622:8
**shorthand** 759:1

759:2,11
**shortly** 435:19 480:12 644:18 713:13,18
**shot** 696:11
**show** 431:1 436:15 453:1 462:1,11 474:10 494:24 512:13 522:1 525:23 556:5 556:14 573:18 577:21 602:16 615:24 625:20 630:25 632:20 649:13 681:9 688:12 690:4 713:5 719:15 720:5 721:14 724:18 730:23 734:15 743:11 753:8
**showed** 460:4 481:7 519:12 535:18,25 575:15 583:10 610:5 670:25 671:15 687:12 751:15,15
**Shower** 392:23 392:23 393:7,7 411:9,9 488:20 488:21
**showing** 568:3,7 683:11 714:1
**shown** 502:25 708:3 717:1
**shows** 440:14 509:2 609:23
**Shripal** 685:19 685:22,23 686:17
**Shukla** 628:4
**side** 505:10 509:17 514:10 515:20 516:20

**sign** 760:6
**signature** 735:12 748:25
**signed** 483:13 717:18
**significant** 509:1 568:24 671:1,16 693:1
**signing** 760:8
**silence** 669:2
**silica** 560:8 583:22 584:2 584:16 585:14
**similar** 539:25
**simple** 403:5,7,7 575:9
**simply** 565:9
**Sinai** 702:4
**single** 630:24
**single-spaced** 494:9
**sit** 472:25 473:1 596:12 649:1 700:1 702:22 703:8 719:18 727:8 741:19 755:7 757:11
**site** 730:20
**sitting** 651:6
**situation** 724:7 730:8
**six** 485:7 516:8 616:16 649:10 650:8 685:10 695:3 696:24 697:17
**Sixteen** 389:8
**Skillman** 527:20
**skip** 570:14
**skipping** 654:7
**SLAVIN** 383:18
**small** 508:25 692:5 717:20
**smoking** 566:6 639:11
**snapshot** 390:17

390:18,19 680:18 694:5,8 695:8,15 696:12 697:10 698:9
**SOILEAU** 382:10
**sold** 580:8 582:5
**sole** 731:13
**solely** 560:1 585:9
**solid** 692:3 693:8,13,20
**somebody** 499:22 526:24 527:5 535:21 538:7 539:11 562:1 564:16 600:7 638:22 647:21 655:23 685:18,22 711:24,24 714:7 723:11 727:14 728:21 737:17,18
**soon** 409:24 410:6 520:8 725:12
**sorry** 407:18 410:25 417:7 422:15 424:24 426:9 431:6,7 433:6 475:14 479:15 482:18 486:11 492:8 496:9 503:20 503:21,21 515:10 516:11 542:5 543:4,13 562:11 569:13 571:10 577:5 577:25 587:12 593:4,4,8 599:23 601:9 603:11 606:10 606:14 620:15

630:10 637:23
640:2 645:12
657:1 667:7
676:22 712:8
716:8 718:7
719:25 720:3
720:22 729:7
735:15 756:8
**sort** 460:4 521:5
537:4 633:12
660:22 711:13
736:24 738:5
**sorts** 714:8
**sought** 405:6
439:2 442:5
447:17 532:18
542:25 630:7
632:4
**sound** 477:3
630:18 652:14
652:18 679:14
**sounded** 751:6
**sounds** 412:6
413:22 458:24
490:1 491:6
602:19 627:17
628:12 650:9
652:12,15,19
701:17 708:11
708:16
**source** 505:2
**sourced** 728:23
**sourcing** 505:20
507:8 508:1
537:3 548:19
556:21
**South** 382:10
384:6
**space** 760:4
**speak** 499:3
506:3 518:15
518:17 519:15
519:20 524:22
669:1 707:16
707:17
**speaking** 394:11

394:12 399:13
413:25 414:1
525:13 527:10
**speaks** 505:18
**special** 621:25
**specific** 398:4
432:7,8 485:11
505:2 510:18
518:9 573:17
595:23 600:4
649:24 664:18
666:12 703:17
707:23 720:17
721:10 742:22
**specifically**
490:9 496:14
518:13 601:13
614:10 648:24
657:17 667:20
672:21 673:3
675:1 677:14
679:17 686:9
689:16 693:9
702:7 708:13
742:5
**specification**
545:17 546:4
546:12 551:8
551:13,16
556:6,19
573:19 574:24
577:14 586:10
586:12,14
589:3,4,8
595:24 642:10
704:12 706:11
706:12,13
**specifications**
551:1,4 552:8
552:18 553:4
583:24,25
584:1 585:8
586:20,20,23
587:13,18
588:7 594:7,14
595:1 713:1

714:18
**specificity**
586:21
**specifics** 675:6
**specter** 620:25
**speculating**
752:17
**spelled** 403:11
646:9
**spent** 530:17
**spoke** 428:22,23
505:22 513:24
596:4
**spoken** 395:25
396:6,18,20,23
397:2 424:15
428:20 525:15
525:20 686:8
686:14
**sponsor** 622:12
642:7
**sponsored**
477:11 612:6
614:9 752:4
**sponsoring**
613:10
**spread** 705:25
710:16 711:7
**spring** 517:20
**Square** 383:20
**staff** 384:14,15
717:20
**stake** 529:8
**stakeholders**
523:5
**stamp** 470:11
**stand** 435:8
504:3
**standard** 411:22
412:4,5,25
413:14,20
414:20 415:1,6
415:9,17 416:3
416:11,16
417:22 418:16
448:24,25,25

449:5 562:19
607:20,22
608:24 609:15
609:19 666:18
672:5
**standards**
385:21 551:19
553:19 572:17
587:5,6 588:16
588:17 666:12
**standing** 720:15
**standpoint**
416:8
**stands** 679:10
**starch** 446:21
447:3,8 448:17
451:4 554:20
580:14
**start** 400:13
479:17 601:2
643:18
**started** 399:19
401:17 425:16
437:25 451:15
496:14 573:3,5
644:20,23
668:23 725:11
**starting** 407:25
451:17 543:12
**state** 392:13
449:25 585:18
760:3
**stated** 486:14
**statement** 439:9
442:8 449:24
453:20 545:1
547:17,20
556:1,16,17
673:12,20
**Statements**
673:6
**STATES** 379:1
**stating** 442:1
**stationery**
748:16 753:13
**statistically**

509:1 671:1,16
693:1
**status** 497:19
**stay** 513:11
**stenographica...**
759:9
**Stephen** 391:4
463:2 724:25
753:15
**steps** 387:23
522:9,17
**Steve** 579:13
621:17 735:12
**stick** 531:12
**sticky** 625:24
**stood** 501:13,14
502:4
**stop** 446:20
455:1 539:6
624:21
**stopped** 451:2
**stored** 598:4
**straight** 727:19
**straightforward**
671:9
**Street** 380:6
381:7,14,23
382:11,18
383:6,21
**strike** 413:9
415:24 430:15
737:8
**string** 390:10
**stringent** 552:19
**structure** 666:20
**student** 611:22
**studies** 386:22
389:8 399:8,9
399:15 420:9
460:11 463:14
533:19 534:8
534:17 535:16
535:20,25
542:15 553:5
553:11 558:22
562:15,18

563:4 575:14
587:14 588:6
588:10 589:13
600:20 607:6
610:9,12
613:11 622:9
624:2,22
626:21,23
627:15,18,25
631:12 634:12
634:15 639:10
639:20 641:10
641:12,20
642:5,8,23,25
642:25 650:23
670:23,25
671:14,15,18
671:22,25
719:1 734:3
738:18 749:8
752:14
**study** 385:21
471:5 563:20
567:20 568:20
596:23 597:5,6
602:12 603:22
604:13 605:22
606:13,18
610:12 612:9
612:11 614:9
614:12,18,22
614:23 615:5
615:17 617:13
618:24,25
619:3,10,11,16
619:19,19,19
619:24,25
620:4 621:21
621:25 622:2,7
622:13,24
623:5,14,15,22
624:4,13,14,17
624:19 625:2,3
625:8,11,15,18
625:20 626:3,7
626:8,8,11,12

626:15 628:3,7
628:10,15,23
628:25 629:8
630:8,15,17,18
630:20,22,24
630:25 631:18
634:7,11,15,16
635:11,23
636:1,19 637:6
637:14 638:18
639:15,23
640:4,8 642:16
643:23 645:19
646:2,25 647:8
648:23 649:5
649:14,17,20
649:21 650:1,6
650:12,14,15
650:18 653:11
653:22 671:20
672:2,3 693:7
701:10,13,20
702:16,17,25
703:10,14,20
707:8 710:3
713:10,14,18
713:21 715:5
718:13,14,15
719:2,2 720:2
720:4 733:23
734:1,4,5,6,8
734:11 736:17
737:9,20,21
738:2,6 739:1
739:5,8,12,14
740:1,8,16
744:20,22
749:15,22
750:1,5,10,20
752:8 753:5,5
753:5
**studying** 634:7
**stuff** 509:7
521:5 540:19
548:20 576:16
**Subchapter**

390:5
**subject** 475:15
500:10 513:19
605:20 622:15
637:20 753:16
755:4 757:19
760:8
**subjects** 389:7
563:20 745:11
745:11
**submission**
386:15 454:1
457:11 468:17
475:12 508:10
508:23 527:23
636:21 638:14
749:7 752:6
**submissions**
521:4
**submit** 424:3
447:18 453:16
504:6,6 509:13
520:7 537:9
664:7 732:13
**submitted**
423:15 424:2
429:10 437:5
438:7 453:23
454:1 468:2,20
482:3 495:18
500:4 514:19
518:3 520:8
526:21 528:8
531:5 532:22
533:2 561:23
638:3,7,10
655:19
**submitter**
453:19
**submitting**
429:19 434:6
732:24
**subordinate**
491:15
**subordinates**
670:13

**subscribed**
759:14 762:14
**subsection** 673:9
717:5
**subsequently**
457:25 479:4
592:5 639:14
**subset** 578:14
**substance** 762:7
**substances**
605:19
**substantially**
438:15 551:9
572:25
**substitute** 633:3
**sued** 684:7
**sufficiency**
419:24
**sufficient** 419:7
**suggest** 515:8
534:17 535:17
536:3 611:10
**suggested**
498:22 514:17
613:10 664:20
**suggesting** 448:2
732:19
**suggestion**
534:21 571:22
619:15
**Suite** 381:7,14
382:5 383:7,21
384:7
**summarize**
406:18
**summarized**
420:20 497:11
508:11
**summarizes**
540:12
**summarizing**
744:25
**summary**
412:11 438:24
508:15,23
509:12 533:6

595:7
**supervision**
759:25
**supplemental**
389:11 629:16
**suppliers** 597:11
**supply** 485:17
**support** 384:18
414:18,18
417:15 441:13
499:9 514:16
523:20 558:15
603:21 604:12
611:7 635:25
638:13
**supported**
417:16 440:2
440:19 499:7
**suppose** 460:23
**sure** 409:24,24
410:6 411:15
412:7 415:3,16
416:21 424:9
426:17 428:7
434:2 441:22
442:11,21
445:20 446:19
448:11 451:12
452:5 453:9
455:17,21
458:12,21
467:12 472:3,5
481:21 485:20
486:12 490:8
490:15 502:25
503:6 506:14
509:8 519:1
522:19 525:25
526:19 530:25
536:8 541:3
550:4 553:20
558:8 572:10
573:15 576:22
578:22 584:6
589:15 591:24
594:19 610:23

Linda Loretz, Ph.D.

611:20 628:2
635:16 636:13
640:16 642:24
643:25 644:21
647:18 648:16
649:14 651:16
654:6 656:4
658:16 659:10
659:16 660:9
660:25 665:5
675:13 676:17
679:9 680:23
706:20 708:20
710:11 711:7,8
719:15 726:24
727:7 734:17
737:2 740:19
744:9 745:24
754:14 756:20
**surmising**
740:23 750:18
**surprise** 489:20
**surprised** 693:7
**surrounding**
486:22 518:10
623:8 715:3
**survey** 598:2
**Surveys** 642:25
**survival** 536:5
**Susan** 598:13
**suspect** 520:7
**switch** 421:18
**sworn** 759:6
762:14
**symposium**
613:13
**system** 564:11
737:12

─────────
**T**

**T** 382:16 385:1,1
385:9 386:1
387:1 388:1
389:1 390:1
391:1 761:2
**table** 445:25

446:4 487:11
512:18 614:25
**Tac** 389:5
**take** 397:23
475:23 527:13
557:2 581:19
618:11 622:2
636:11 641:12
643:7 651:1
656:7 680:25
681:1 686:24
714:3,3 717:6
744:5,7 747:4
750:19
**taken** 472:2
525:17 604:21
624:18 676:9
688:21 716:17
759:4
**takes** 485:9
576:2
**talc** 385:14,19
386:5,7,19
387:4,16,22
388:12 390:20
391:7 393:4,18
402:20 404:3
406:6 409:1
426:4 428:14
428:25 432:4
433:7,25
438:10 446:21
446:22 447:4
449:25 452:10
452:11 453:12
454:22 456:14
462:13 463:7
463:25 467:9
469:18 470:19
470:20,21,23
471:3,11
473:18 474:6
477:10,13,14
477:18,25
480:15 482:12
487:21 488:7

488:18,22
492:14 496:6
501:4 504:19
505:2 507:8
508:21,24
510:12 514:5
521:14 528:16
535:14,21
540:18 541:8,8
543:1 544:14
545:5 549:3,3
549:6,11,23
550:5,7,15
552:8,18 554:8
554:9,16
555:23 556:14
558:18,25
560:1,12,21
567:18 571:2
571:19,20
572:1,5 573:3
573:5 576:5,8
576:20 577:8
578:12,13
580:7,7,8,11
580:13 582:5
582:10,13,14
582:15,20
583:2,13
584:12 589:6
592:18,25
594:4,7,11,15
594:25 595:1
596:4 598:25
599:2 600:6
601:12,14
605:17,17,19
607:3 611:8,12
613:19,21
614:11 616:17
621:18 622:9
622:11 623:8
624:1,14
627:16 628:19
634:8,18,18
640:1 641:15

642:6 648:14
652:2,23
658:18 670:24
671:1 676:8
681:10,13,16
684:8 685:2,8
686:9 687:16
687:24 689:14
689:16,23
690:17 691:11
691:23 692:4,7
695:5,13,17
696:1,19
697:12,22
698:10 699:2
699:17 700:7
700:13,23,25
701:6,18 702:5
702:7,7,9,18
702:20,24
703:19 704:13
705:9 706:9,11
706:19,19
707:1,15,24
708:6 709:14
709:22 710:4
712:22 713:18
714:21 718:20
719:6 720:8
723:14,15,16
725:1 728:22
734:15 739:2,9
739:16,16
741:25 749:13
749:18 751:16
752:11,15,19
753:14 755:22
**talcs** 582:12
670:18,19
**talcum** 379:6
392:21 393:2
398:7,17
406:19 407:1
407:22 408:15
408:24 409:13
411:25 413:6

438:12,14
448:13 450:6,9
450:11,22
451:2 452:7
455:23 459:6
465:2 466:12
488:19 489:10
544:7,9,22
547:1 548:1,17
550:7 557:3,3
558:18 560:9
560:17 563:2
571:1,14
573:10,22
574:2,3,5,16
574:21 575:3
581:2 582:5
583:23 596:17
596:18 597:19
599:16 606:4
617:8,13 619:4
621:23 635:11
640:6 677:17
680:5 681:17
687:25 689:24
702:11
**talc-containing**
605:19
**talc-related**
489:23
**talc/ovarian**
389:20 542:2
**talk** 395:18
399:20 402:12
406:12 428:3
428:10,11
444:1 445:5
446:8,9,9,10
454:2 455:3
457:5 458:8
462:14 463:13
465:5 486:19
486:20 490:11
490:11 496:5
497:13,18
500:22 502:16

502:20,20
503:2,24 504:4
509:10 517:19
533:4,17
536:24 537:1
540:23 555:7
556:20 562:4
572:16 586:3,7
624:2 635:9
654:18 655:10
655:13 667:14
700:7 709:5
719:13,19
**talked** 444:21,24
445:4 446:14
448:13 456:5
459:5 463:14
482:23 497:9
497:10,14
499:5 540:25
542:14 549:11
572:4 573:23
573:23 576:15
596:16 606:6
607:21 623:6
637:9 638:20
640:15 641:11
641:17 683:21
700:9 724:13
735:25 741:22
750:12,15
**talking** 393:17
401:22 438:1
466:1 467:8,14
478:4 487:3
522:8 532:2
537:3 544:17
544:19 550:22
552:17,22
557:14,22
565:18 570:25
574:7,8 576:16
581:2 582:21
591:19 599:4
614:6 638:5
640:18 642:15

642:15 648:25
649:14,23
663:6 668:10
675:23 678:2
686:2 694:4
701:14 709:17
744:19 745:16
754:20
**talks** 471:16
477:4 540:9,12
562:14 652:8
667:2 692:9
**tall** 698:6
**task** 386:8
390:20 391:8
452:10 463:8
464:5 487:21
488:7 601:6,11
601:13 612:16
613:9,10,20
616:17 622:10
622:12,15
624:6,12
663:16 700:8
700:13,14,17
701:19 702:24
703:19 704:14
705:1,7,10,18
706:8,19 707:1
707:14,15,18
707:24 708:6
708:19,24
709:2,14 710:6
710:17 711:22
712:2,22 713:4
713:18,21
714:6 716:18
718:6,8,10,23
719:9,24 720:8
720:9,12,15,16
720:20 721:7
722:2,19,24
724:6 725:1
726:12,24
727:15,19
729:11,22,25

731:13 734:16
734:25 737:7
737:10,22
738:6 753:15
754:7 755:23
**technical** 384:18
405:18 407:19
737:4
**TED** 381:18
**teleconferences**
424:13
**telephone**
711:14 715:13
715:16
**tell** 402:24 410:3
439:13 446:16
449:17 504:3
509:10 519:17
520:1,13 526:4
552:2 601:11
630:21 649:17
652:12 654:21
661:1,14 674:5
674:12 717:7
730:4 735:20
745:14,25
**telling** 651:9
672:23 699:15
742:9 746:19
752:22
**tells** 661:17
695:16
**terms** 393:2
487:20,22
521:6 553:20
636:10
**terrible** 465:8
471:25
**test** 547:10,12
550:17 586:22
587:3 596:24
642:17 742:15
742:21
**tested** 555:13,23
598:9
**testified** 531:5

617:3 657:14
674:24 675:6
690:22 744:21
**testify** 394:5
396:13 398:1
524:21 596:13
676:1
**testifying** 397:14
500:19
**testimony** 394:8
395:1,5,5
422:8 529:10
529:12 530:19
534:24 674:21
693:5 698:18
700:5 701:10
710:2 723:2,5
744:25 759:7
**testing** 548:19
552:18 555:21
556:2,21
572:11,14
596:18 598:6
600:7 642:11
642:15
**tests** 643:3
**Texas** 383:8
**text** 625:4
**Thank** 431:8
476:8 494:5
570:12 617:15
620:22 629:25
690:3 717:9
**thanks** 637:1,2
**theory** 535:4
**thereof** 759:11
759:14
**thing** 403:5
427:24 448:11
505:3 510:8
520:3 537:4
540:3 557:25
560:2 575:4
617:5 651:11
651:13 728:24
**things** 400:24

402:8 433:9
443:16 446:13
449:18 461:12
463:8 466:6,9
466:10 468:13
477:17 485:13
485:15,18,23
492:11 500:1
503:24 505:20
522:23,23,24
525:11 539:22
540:15 541:4
549:9,14,21
550:12,14
551:2 552:16
557:18 559:24
560:11 565:1
567:15 571:14
573:11,24
577:1 580:25
610:24 611:3
616:1 640:17
640:25 643:21
648:12 658:19
659:16 665:22
665:24 670:17
707:12 709:10
710:14,24
715:18 721:16
729:21 731:21
**think** 406:9
407:3,20
413:22 414:23
416:5 419:14
420:17 422:8,8
422:11 424:6
425:11,17
428:23 429:24
430:9 432:23
433:2 434:3,12
434:19 436:7
439:23,25
440:9,18
441:11 447:5
447:13,17,22
448:1,3 451:19

Linda Loretz, Ph.D.

457:10 466:4,5
466:14,21
469:7,11 470:2
472:4,17 473:6
474:8 483:9
484:8 487:25
490:14 491:21
494:17 498:3,7
499:2,7 501:11
502:4,8 503:22
504:25 507:10
507:25 509:9
511:7 514:3
517:25 518:1
520:2,22 525:5
527:10 528:17
529:1 536:16
537:1 538:4,6
539:5,14
540:25 541:2
542:6 544:13
545:24 546:10
547:4,7,22
549:5 550:20
551:6,9,12,13
556:17,23,24
557:21,23
560:2 561:8,10
561:15 562:5,6
565:14,19
566:11 576:11
581:3,17,17,21
581:22 582:9
583:9 584:14
584:23 592:1
596:6,15 597:4
597:10 598:5,7
602:19,25
604:11 609:16
611:18,19
612:10 613:6
613:22 622:12
623:17,24
625:7 627:13
629:21 630:19
630:24 631:8

632:9,12
634:21 635:3,8
637:5 638:20
638:21 639:23
640:14 641:12
641:22 642:9
643:2,7 644:1
644:11 645:9
645:12 648:8
649:23 650:9
651:11,15
654:6,7 656:23
656:23,25
657:4,8 658:3
658:4 659:18
668:7,13
670:16 671:12
677:3 679:10
680:11 689:1
693:4 694:22
697:24 698:20
701:6,7 702:4
705:13,24
706:1 707:13
708:8,17,20
710:21 712:5
714:19,20,23
716:6 717:16
718:11,16,25
719:1,3,25
721:8,8,12
723:19,20
725:21 731:16
733:21 734:10
735:6,20
736:25 737:14
738:14 741:22
743:10 744:11
747:9 748:14
749:25 750:2,6
752:10,16,17
752:18 756:24
757:18
**thinking** 512:9
581:12 630:23
642:14

**third** 467:1
523:18 541:25
663:20 691:22
696:18 708:24
735:10
**third-party**
396:6
**thirty** 760:12
**THOMAS** 381:5
382:16 384:15
**thought** 407:3
447:1,12 461:1
461:4 467:10
469:25 509:16
520:6 542:19
593:19 618:1,2
635:24 642:2
669:14,18
701:2 702:9
713:1 715:21
718:15 734:25
735:4 743:6
**thoughts** 421:7
**three** 383:20
465:14,18
467:4,9,10
488:13 522:23
531:21 655:20
655:21 656:10
656:11 667:8
719:3
**throw** 578:1
**Thursday**
629:22
**tighten** 553:18
**tightening** 551:4
**time** 392:3
396:24 402:16
403:14 405:16
405:19 407:12
407:15 414:20
424:11 428:22
431:25 437:13
443:16 445:15
449:6,21
451:25 453:4

454:6,17,21
456:2,20 459:9
466:12 472:1
476:2,9,12,22
480:8,9 483:22
505:7,8 518:17
520:25 524:9
524:13 525:14
525:17 530:16
562:24 566:10
567:13 568:1
570:15,17,19
570:22 577:17
580:1 587:7
590:9 596:3,16
598:4 599:24
601:9 610:5
614:3 615:7
618:13,16,21
619:13 624:11
641:13 643:8
643:11 644:16
647:13 648:11
648:22 654:18
655:3,11 656:7
658:18 663:7
664:3 667:4,16
667:24 668:6
671:12,17,19
674:19 675:20
675:21 682:16
682:20 694:3
694:23 706:22
706:25 711:20
712:5 714:3
725:4,8 726:14
728:7 729:8
735:19 738:19
738:19,20
739:25 744:13
744:16 750:21
751:1 754:19
757:24 759:5,6
759:8
**timeline** 385:12
400:2,8,23

407:7 421:17
437:21 455:22
456:3 458:17
459:3 461:12
462:20 464:4
467:22 468:15
469:17 479:7
481:7 482:25
484:10 486:20
493:7 606:3
667:19 668:16
**times** 455:22
531:21 548:15
625:5
**timingwise**
631:12
**Tinto** 512:23,24
676:3
**Tisi** 381:4 385:3
392:9,20 400:6
400:8,11,12
401:10 403:6
404:11,25
405:2,21 407:9
407:11,17
408:20,21
410:24 412:18
412:23 413:9
413:10,18
414:15,25
415:5,18,24,25
416:10,23
417:9,17,24
418:5,24
419:10,17
420:4,15 421:3
421:18,22,24
422:7 425:20
426:8,18 427:9
427:11 428:9
428:19 429:5,6
430:14,16,25
431:6,9,10,19
431:21 432:21
434:11,16,17
435:1,9,17

Linda Loretz, Ph.D.

436:14,19
437:20 439:18
439:19 443:12
444:23 445:16
447:6 448:6,22
449:3,11 451:8
452:25 456:7
458:3 459:13
460:5,15,20,24
461:8,18,23
462:10,17
464:21 465:1
466:25 468:12
470:7 473:9,24
474:10,14,21
474:24 475:3
476:1,4,14
479:11,25
481:15 482:5
482:17 483:10
484:1,15,17,25
485:5 486:4,8
486:18 487:16
488:2,5,12
489:5,7 490:3
492:2 495:3
496:24 497:4
497:20 501:24
502:14,21
503:12,17
506:11,16,23
507:12,18,19
508:2 509:19
510:23 511:17
512:12 513:10
513:13,15
515:17 516:5
517:4,14 518:4
518:20 519:10
520:10 521:25
523:11,12
524:24 525:4,9
525:25 526:3
527:7,17 528:3
528:11,21
529:4,12,14,20

530:10,13,22
531:7,10,14,18
531:22 532:5,9
532:11,15
533:3,13,15,25
534:25 535:6
536:10 537:17
537:25 538:9
538:25 539:8,9
539:17 542:23
543:6 544:16
545:20 546:1
546:18,23
547:8 548:7,11
549:7,20,25
550:2,24
551:10,24
552:4,5,25
553:16 554:18
554:23 555:19
557:11,12
558:2 559:2
560:25 561:20
566:12,17
567:6 569:13
569:15 570:4
570:11,17,24
572:22 575:11
575:22 576:7
576:13,25
577:25 578:2
581:7 582:24
583:19 585:1
585:11,24
588:24 589:17
590:19,21,24
591:2,3,5,8,9
592:7 593:3,7
596:21,25
597:13,24
599:5,7,21
602:22 603:4,6
604:3,6,9
606:10,17
607:13,19
608:1,4,10,17

609:3,13,24
610:10,18
611:4 612:15
614:16 615:3
615:23 616:21
617:1,3,16,17
617:24 618:1,6
618:9,18 619:9
619:23 620:15
620:18,22,23
621:5,6 623:4
625:9,16,22,24
626:2,22,25
627:2,8 629:11
629:23 630:3
631:4,25 632:3
632:24 633:1,7
633:23 634:2
635:6,19 636:7
637:19 638:6,9
639:7 643:6,18
653:22 661:8
672:4 701:5
721:18 751:11
**Tisi's** 644:6
743:21
**tissue** 701:1
702:8
**title** 390:5 660:6
660:8 672:16
673:5 736:21
737:2
**titled** 603:13
**Ti02** 580:15
**today** 397:9,15
398:1,4 408:9
444:16 490:13
498:6 525:18
542:9 553:24
572:25 589:24
620:4 641:11
645:25 649:1
651:6 659:14
659:22,23,25
665:16 667:9
667:14 669:20

669:21,22
675:24 700:1
702:22 703:8
710:2 719:18
721:18 743:21
755:7
**today's** 658:11
758:1
**Todd** 379:25
380:12 759:18
**Toiletry** 394:21
603:23 604:14
**told** 448:12
459:1 478:17
584:11,13
587:25 604:11
607:9,15 608:2
647:14 649:8
676:15 699:4
716:15 718:2
728:14 745:10
747:18
**Tom** 397:4
431:6,20
620:22
**tomorrow**
757:20
**ton** 741:17,21
**top** 406:5 407:8
474:15 488:13
530:2 541:22
569:12 616:3
617:7 621:8
630:21 662:15
689:3 715:20
**topic** 397:12
419:4 449:10
459:12,15,22
459:22 479:3
600:4 601:17
654:22 675:9
706:5 747:7,7
748:2 749:16
752:16
**topics** 396:13
397:8,12,17

432:8 500:21
528:16 736:5
751:6
**totally** 632:17
706:8 750:8
**toxicologist**
392:15 476:20
534:19 535:20
**toxicology**
401:20 634:12
711:2 725:4,7
753:16
**Tozzi** 682:24
683:4,7 684:21
**tracers** 719:3,4
**trade** 453:18
504:17 578:9
663:7
**Trans** 718:20
**transcribed**
759:10
**transcript**
385:10 386:2
387:2 388:2
389:2 390:2
391:2 659:13
660:11 759:10
759:12,22
760:13,14
**transcription**
762:4
**translocate**
718:20 719:6
**translocation**
557:25 558:3
558:15 634:16
718:16,19
**Transmittal**
385:17
**travel** 647:10
**travels** 621:15
**Travis** 383:6
**treated** 745:11
**trend** 558:20
**trial** 562:20
563:1,7 564:6

699:17,23
**trials** 562:15
563:9,10
699:12
**trick** 648:3
**triclosan** 580:19
**tried** 640:24
**trivial** 464:8
**true** 408:16
420:10,13
421:14 428:5
438:20,21
467:16 473:3
484:8 486:1,5
500:5 503:9,13
504:9 510:2
521:17 541:10
543:3 547:2,2
547:14,21
553:8 555:1
565:12,25
567:7 568:23
569:2,5 573:14
574:22 586:2
587:15 597:19
605:25 619:20
619:22 650:22
656:5 665:17
665:18,25
733:21 759:10
**truly** 443:21
**truth** 481:6
**truthfulness**
555:24
**try** 478:16
490:19 643:19
646:16 700:10
705:25
**trying** 446:2
466:20 506:25
548:25 574:12
574:13 593:6
594:19 595:6
595:15 596:6
601:10 633:17
640:22 648:4

654:6 668:15
669:6 679:9
711:8 714:23
734:10 740:25
742:22
**tubal** 639:12
**TUCKER** 384:5
384:13
**tumors** 743:8
**turn** 437:4
618:21 636:21
666:23 687:19
**Turner** 579:7
**twice** 424:17
643:16 686:7
**two** 398:11,12
399:13 408:12
432:2,7,8
465:21 466:23
477:17 478:4
478:18,19
479:2 481:21
488:13,18
489:21 495:5
508:12,22
519:16 522:23
525:12 531:6
532:3,6 541:16
571:14,19
575:17 593:25
594:17 616:22
622:2 626:17
626:21,22
634:15 671:15
687:11 717:21
719:1 741:1
751:5
**two-dimensio...**
575:4
**type** 548:20
753:4
**typed** 680:17
**typical** 592:1
729:12
**typically** 485:9
528:12 559:16

724:3,3
**typographical**
723:2 745:12
**typos** 528:20
722:13

**U**

**U** 379:15
**Uh-huh** 580:22
**ultimate** 740:11
**ultimately** 505:8
523:1 704:11
**Um** 679:6
**unanimous**
467:2
**unanimously**
716:20,22
**unaware** 625:17
634:9 699:16
**unbiased** 683:12
**underlying**
439:3 442:7
532:19
**underneath**
522:22 754:9
**undersigned**
759:2
**understand**
392:25 393:3
393:10,15
394:6,8,16
395:1,4 400:1
400:19 414:16
414:19 415:3
417:18,21
419:18 428:2
440:17 441:15
441:23 445:11
445:24 451:12
452:2 519:4
525:4 546:16
548:25 561:7
568:6 582:25
583:4,25
598:12,17
624:5 628:14

628:18 632:15
633:17 640:22
648:4 653:9
667:19 668:15
672:24 692:25
694:9 698:17
707:22 709:6,8
**understanding**
402:13 403:1
414:24 455:10
460:3 466:11
517:13 539:16
555:3 560:4
584:10 622:11
636:18 646:13
679:19 680:8
680:19 719:18
755:25
**understands**
400:24 482:25
605:9
**understood**
419:18 444:1
446:18 462:3
628:13 671:11
**undertake** 707:6
709:6
**undertaken**
638:19
**undertook** 663:1
**undetected**
547:12
**unequivocal**
415:11
**unequivocally**
611:7
**unethical** 562:25
564:7
**unfeasible**
562:25
**Unilever** 487:17
487:18 490:5
505:12
**UNITED** 379:1
**University**
405:10 406:1

627:12
**unnecessary**
411:10
**unqualified**
473:10
**unreasonable**
638:15
**unusual** 421:9
566:2,22 686:1
**unveiled** 600:6
**unworkable**
564:7
**upcoming**
622:15
**update** 514:7
572:19
**updated** 587:16
662:10
**Updating**
386:15 475:12
**upset** 656:18
**upside** 666:24
**urea** 580:18
**usage** 477:24
**use** 385:19
386:18 387:5
399:21 407:5
446:21 451:3,3
459:14 469:8,9
488:22 547:10
547:11,11
553:19 565:5
582:19 583:3
605:17,18
611:8,12 617:8
617:14 619:4
621:23 622:12
658:19 680:5
681:16 687:24
689:23 695:13
695:17,15
696:19 697:12
697:22 698:10
699:2,16
737:12,13
**uses** 551:14

Case 3:16-md-02738-MAS-RLS   Document 9895-3   Filed 05/30/19   Page 212 of 565 PageID: 71456
Linda Loretz, Ph.D.

Page 812

**USP** 551:14
554:1 555:6
573:1
**usual** 733:17
**usually** 528:6
**utilizing** 564:1

---
**V**
---
V 379:15 381:4
**VADERS**
384:18
**vagina** 681:19
681:20 688:2,3
690:1,2
**vaginas** 719:5
**vaguely** 650:2,9
**validate** 642:16
**validity** 439:2
442:6 532:18
**valuable** 510:21
**value** 527:13
**various** 649:22
654:15 667:4
700:11 715:11
718:3 741:24
**vast** 458:9,12
560:23 561:1
**verbal** 644:9,12
**verdicts** 598:24
**verifications**
552:13
**Vermont** 627:11
627:12
**versa** 747:2
**version** 423:15
494:15 621:10
**versions** 423:14
**versus** 564:1
**vice** 454:7,9
747:2
**vice-chairman**
716:19,22
**video** 392:4
**Videographer**
384:17 392:3
405:14,19

407:12,15
421:20 476:6,9
476:12 570:19
570:22 618:13
618:16 643:8
643:11 744:13
744:16 757:24
**videotaped**
379:16 758:1
**view** 418:21
419:23 472:12
499:18,23
576:2 607:8
**viewed** 607:4
**Virginia** 382:6
**vitro** 752:13
**vivo** 752:13
**void** 759:13
**Volume** 392:4
**voluntarily**
417:11 442:19
442:23 443:1
450:5,10 545:4
**voluntary**
417:16 449:23
662:7
**volunteered**
732:2,17
733:14
**vote** 465:10
467:3
**voted** 465:10,13
465:21,23
**VP** 660:8

---
**W**
---
W 384:4
**Wacker** 384:6
**wait** 427:6,6
569:11,11
604:1 754:22
757:9
**walk** 501:1
**walked** 470:2
500:11
**Walmart** 574:15

**want** 397:24
399:20 421:6
434:18 441:12
441:20,23
443:22 444:4
446:10 448:1
448:21 451:12
454:2 455:1,2
455:21 458:17
465:7 468:7
482:24 484:10
484:11 486:19
486:20 496:15
501:2 502:16
503:2 513:7
519:8 531:19
538:12 539:7
554:8,25 555:1
555:2 564:20
567:12 583:1
584:21 585:3
589:23 593:17
593:22,25
594:18 610:25
618:19 621:9
625:10,15
629:1 636:24
643:6,20
650:24 661:6
667:19 675:9
685:9 695:2
709:12 710:12
711:16 716:7,9
725:20 742:15
743:10 745:20
**wanted** 409:13
466:16 496:4
500:7 506:2
521:20 548:16
548:18,21,23
549:10 560:17
562:1 576:23
628:18 636:14
644:3
**wants** 750:19
**warn** 448:21

**warning** 385:13
404:2 406:6
408:16,25
409:12 411:3,7
411:17,18,23
412:4 413:1,21
414:5,9,14,18
414:21,24
415:10,17,20
415:22 416:3
416:17,21
418:22 422:9
422:11 438:10
439:1,10,14
440:9,15 441:7
441:14 442:4
442:13,14,15
442:19,23
443:1,9,25
444:13 445:2
448:9,25 449:5
449:23 450:5
495:19 499:9
514:1,14
560:17 609:5
673:6,12,20
**warnings**
416:25 417:10
438:13 440:22
444:10 448:1
450:10 483:2,9
532:17 607:22
608:11
**Washington**
379:19 380:7
382:19 514:9
597:3
**wasn't** 397:19
408:1 459:22
466:14 486:12
504:1 510:18
520:19,25
521:3 527:22
537:5 591:19
597:5,5 624:18
632:1,13,13,18

635:17 636:20
636:20 638:25
640:10,12
642:2,2 656:19
699:22 703:6
723:4 743:19
**way** 412:25
464:7 486:20
525:2 535:11
535:24 538:18
557:15 564:8
569:8 596:2
598:8 604:19
626:14 627:5
663:17 666:15
666:22 668:15
678:5 679:25
684:4 702:15
702:23 703:7
703:18 705:4
710:18 711:12
719:11 720:18
721:24 727:9
728:3 730:13
731:21 733:17
733:19 738:16
738:23 739:7
**ways** 564:10
622:11 665:14
**weak** 533:8,17
568:14,19
569:10,18,19
**weaknesses**
460:8
**website** 484:2
511:9 538:14
561:24 656:24
658:3 676:8,10
677:2,10
678:22 679:17
680:16 688:21
694:9 695:16
696:12,12
699:3,17 700:2
700:5
**Wednesday**

Linda Loretz, Ph.D.

514:25
week 523:23
weekend 629:24
Wehner 391:5
  646:6,7,8,20
  646:25 647:15
  647:21,25
  648:5,10,18,20
  649:3,8,19,25
  650:6,15 651:8
  653:13 731:5
  731:14 732:7
  732:18
weigh 483:19
  553:2
weight 414:17
Weinberg
  654:23,24
  655:1,2,10,15
welcome 525:23
  551:8 552:24
  617:16
well-described
  543:2,8
well-designed
  622:23
went 407:2
  435:12,19
  457:22 484:2
  487:11 490:5
  490:15 524:17
  526:24 527:20
  530:24 547:19
  555:14,22
  556:3 576:4
  597:17 604:16
  605:5 644:11
  644:19 670:17
  680:16 705:11
  710:5,18 715:9
  719:19 724:8,9
  725:14 727:19
  750:7 751:12
  751:12,20
  755:22
weren't 521:3

561:13 585:17
  600:5
Westminster
  601:19
we'll 400:9,11
  401:14 407:5
  410:11 423:9
  428:2,10,10
  446:8,9 455:3
  468:14 487:2
  490:11 562:6,7
  572:16 590:3
  590:18,21
  633:3 678:11
  757:19
we're 397:9
  400:23 401:3,6
  403:16,25
  405:16,20
  407:13,16,19
  411:15 441:19
  443:3 444:1,16
  445:6 457:5
  458:8 462:14
  469:2 476:10
  487:3 490:11
  497:13,18
  502:20 504:1,2
  504:2 509:11
  524:3 531:12
  531:18 544:17
  544:19 550:22
  556:9,13 561:5
  561:6 570:20
  592:4,4 596:22
  596:23 618:14
  618:17 620:19
  620:20 625:15
  640:18 643:9
  643:12 654:21
  657:17 661:4
  691:17 711:8
  717:2 722:13
  722:15 723:10
  723:11,17
  729:1 730:19

730:19,20
  733:4 737:18
  740:7,7 744:14
  744:17 747:8
  757:18,25
we've 401:17
  403:16 467:14
  505:11 525:18
  529:19 560:3
  561:12 564:12
  575:3 591:19
  593:1 606:1
  613:20 618:20
  625:8 639:22
  641:11 658:16
  700:8 741:22
  744:8,11 746:1
  746:2
whatnot 745:13
white 410:13
  517:18 580:8
widely 705:25
Wikipedia
  685:11
Wille 453:5,6
  514:8 522:6
  524:5
William 682:24
  683:2 684:20
  685:4
willing 501:23
  501:25 551:3
  572:18 601:14
  623:20 729:20
wish 542:8
withdrawn
  471:13,14
witness 380:15
  382:15 392:6
  394:5 403:4
  412:17,22
  413:4,16
  414:12,23
  415:3,16 416:5
  416:20 417:7
  417:14 418:20

419:13 420:2
  420:12 421:1
  425:11 426:17
  428:7,17 430:9
  430:21 431:16
  432:20 434:23
  435:2,16 436:7
  437:18 443:11
  444:21 445:15
  446:25 447:24
  448:19 449:8
  451:6 456:5
  458:2 459:11
  460:2,13,23
  461:6,16,21
  462:6 466:14
  473:3,22 474:8
  474:23 481:12
  482:1,15 483:8
  484:24 485:3
  487:15,25
  488:10,25
  490:1 497:2,16
  501:22 502:19
  503:15 506:14
  506:21 507:10
  507:24 510:16
  513:14 516:1
  517:1,11,25
  520:1 521:22
  523:10 525:5
  527:4 528:2,15
  529:3,11 530:8
  530:20 531:5
  533:1,23 535:4
  536:8 538:6
  539:14 542:22
  544:13 545:15
  545:24 546:16
  547:4 549:5,18
  550:20 551:6
  551:22 552:22
  553:15 554:16
  554:22 557:21
  558:24 560:23
  566:10,16

569:2 570:10
  576:11,22
  583:16 584:25
  588:20 589:15
  593:5 596:22
  597:9,22 599:6
  599:20 606:16
  607:18 608:8
  608:15 609:12
  609:21 610:8
  610:15,22
  619:7,22 623:2
  625:7,14 627:7
  629:10 635:1
  635:16 636:5
  637:16 638:7
  651:1,11,21
  653:15 654:13
  656:8 659:3
  664:12,23
  665:5 667:7
  669:14 670:9
  670:16 671:4
  671:24 673:24
  674:1,9,17
  675:5 677:20
  679:22 680:11
  680:22 682:4
  683:20 684:1
  684:16 685:16
  685:25 688:9
  689:19 690:21
  691:1,14,20
  692:15,20
  693:4,6 694:13
  694:18 695:24
  696:22 698:5
  698:15 699:24
  703:3,13,23
  704:2 710:10
  711:24 715:7
  717:1 721:1
  722:12 723:4
  724:13 726:20
  727:18 728:10
  732:23 733:21

Case 3:16-md-02738-MAS-RLS   Document 9895-3   Filed 05/30/19   Page 214 of 565 PageID: 71458
Linda Loretz, Ph.D.

Page 814

739:4 740:14
743:3,6 745:4
746:12 748:1
750:4 751:2,19
753:4 756:2
759:6,7,14
760:1
**witnesses** 396:7
433:22,25
434:19,25
**woke** 459:20
**Wolfe** 386:10
**woman** 448:12
680:3
**women** 392:21
447:19 464:11
583:3 605:20
607:9,15 611:8
652:9,13,17,22
702:20
**wonderful**
510:20
**word** 459:14
465:5 514:2
516:18 545:12
545:22 547:23
547:24 675:13
677:5,23
705:25 710:16
711:8
**words** 397:15
483:19
**work** 396:11
402:14 453:18
483:14 485:13
490:23 491:1
491:17,23
500:13 535:11
538:22 545:17
556:18 595:24
641:23 642:12
654:5,15
656:24 657:5
658:3,4,5,15
678:5 716:2
**worked** 454:11

456:19,20
476:19 510:1
520:4 529:22
539:11 550:21
615:14 629:24
730:12
**working** 473:5,5
476:24 480:21
504:1 514:18
587:5 662:10
685:1,8 706:13
713:1
**works** 453:8
710:11
**workshop**
462:21,23
647:11
**World** 472:10
**wouldn't** 447:2
511:13 524:20
526:21 535:23
678:1 679:22
713:8 729:14
745:9,13
746:13 747:11
**write** 401:5
407:20 421:22
432:2,11 444:9
460:16 465:7
474:5 478:16
479:19 480:25
481:1 484:14
590:17 685:9
730:21
**writes** 717:18
**writing** 406:18
416:17 425:16
457:5 728:21
**written** 423:10
425:21 439:17
439:22 441:24
451:18,24
463:1 529:24
532:3,6 724:1
730:15 741:24
747:12

**wrong** 401:4
470:3 517:5,7
520:15 547:12
604:5 667:3
701:7 713:2
715:22 716:10
744:21 747:15
**wrote** 407:8
418:9,10 420:7
468:20,24
479:20 480:2
498:16 578:18
591:1 632:10
655:18 668:4
668:17 693:13
755:8
**Wynder** 613:12
613:15 615:5,8
615:10 621:19
633:9 646:5
648:19 650:18
651:7 653:12
**Wynder's**
619:17,17
**Wynder/Musc...**
644:24 646:2
646:11
**W-E-H-N-E-R**
646:9

─────────

**X**

**x** 379:4,13 385:9
386:1 387:1
388:1 389:1
390:1 391:1

─────────

**Y**

**Yea** 469:15
**yeah** 395:1
402:4 418:7
421:1 433:2
441:9 448:9,19
451:19 453:9
468:6 469:25
478:24 480:13
486:12 490:8

524:17 528:23
529:11 544:13
562:7 566:10
567:25 570:17
576:22 587:10
590:23 593:8
593:10 595:15
595:17 597:9
598:11 604:6,7
604:20 607:18
608:15 610:22
617:1,1 621:5
623:18 630:19
631:25 635:1
637:25 640:13
641:8 642:21
658:3 659:3
667:8 669:3
674:1 678:18
679:15,15,22
684:16 685:20
693:6,21
699:10 703:13
710:10 727:6
727:18 729:1
738:14 739:23
742:19 745:18
**year** 401:21
458:22 464:12
471:23 478:22
522:4 524:9,11
592:11 593:15
593:18 598:19
598:20 630:22
652:13,17
703:14 733:24
734:10
**years** 419:3
444:15 448:14
459:24 481:23
482:13,20
484:21,21
485:7,7,10
505:6 537:19
552:11 556:10
566:5 578:18

591:20 605:11
622:3 635:8
658:16,17
662:12 687:11
705:21 708:7
**Yep** 431:9 444:7
578:24 619:7
**younger** 566:20

─────────

**Z**

**Zamek** 512:23
**zero** 554:25
556:24 557:1

─────────

**$**

**$100,000** 636:25
644:7 651:19
**$1400** 731:19
732:9
**$400,000** 619:25
622:3,23
**$50,000** 433:1

─────────

**0**

**000004013**
386:13
**000011723**
390:24
**000018452**
388:14
**000018466**
388:14
**000018732**
389:9
**000018737**
389:9
**000023357**
391:11
**000023366**
388:18
**000023392**
388:19
**000024880**
388:21
**000089586**
390:21
**000109060**

388:6
**00026194**
388:16
**000272** 390:11
**00028675** 391:6
**000375876**
386:22
**000375883**
386:23
**000376528**
386:9
**000391715**
386:16
**000391716**
386:17
**000426011**
386:6
**000488256**
387:23
**000488257**
387:24
**0005507** 387:17
**0052507** 389:24
**07962** 383:15
**09** 493:12

_____
**1**
**1** 379:20 390:5
392:4 395:11
397:8 408:23
444:10 463:17
568:8 610:2
654:22 681:7
683:7 687:17
755:18
**1st** 392:4 757:25
**1(e)** 398:6
**1(f)** 398:8
657:16
**1(g)** 398:8
**1.0** 568:3
**1.24** 692:12
**1:12** 570:22
**10** 605:11 630:4
652:22
**10th** 401:20

465:4 470:20
**10.30(e)(2)**
591:11
**10:43** 476:9
**10:58** 476:12
**100** 568:8
**11** 391:8,13
716:16
**11th** 492:6 713:6
713:7 715:25
720:20 734:19
736:4 753:14
754:23
**11,933** 389:7
**11:12** 683:8
**12** 386:8 426:14
470:11 471:20
508:16 572:16
630:6,10,11
662:12 687:9
**12th** 426:14
462:24 601:4
**12:32** 570:20
**12:48** 684:22
**13** 605:11 684:8
**13th** 404:19
438:6 579:19
698:9 699:1
**137977** 386:11
**137978** 386:11
**139** 621:5
**14** 486:12
**14th** 696:16
**14,000** 652:17
**146545** 389:16
**146551** 389:17
**15** 481:23
482:12,13
620:8
**15th** 678:23
682:4 683:8
684:9,21
**154013** 387:6
**154020** 387:7
**15618** 735:8
**16** 708:23

**16th** 720:21
**16-2738** 379:6
**17** 612:4 654:22
**1717** 383:21
**18** 482:13
670:25 689:2
708:18
**18th** 754:6
**180** 591:13,25
**1835** 381:14
**188** 604:8
**19** 475:9 700:19
754:23
**19th** 515:1
690:13 691:4
**19103** 381:15
383:22
**192** 606:13,15
**193** 610:19
**1970** 547:1
576:3
**1970s** 407:2
543:20 546:14
551:20 553:5
556:7,11,15
571:16 585:15
**1971** 709:17
711:12 712:16
715:3
**1980s** 459:8
553:7 558:17
719:23,25
**1982** 407:4,21
407:25 553:6
567:21 652:3
671:13 701:9
712:23 713:6,7
715:4,25 716:3
716:16 717:15
717:24 718:10
718:23 720:20
721:6
**1990s** 461:14
558:17 590:6
601:2 613:19
**1992** 652:4,22

653:10 721:6
**1993** 667:22
668:9 669:8
720:21,22
721:19 724:25
725:23 728:1
731:15 738:13
**1994** 386:8
391:8,10
401:17 462:18
462:24 464:5
601:4 612:4,17
615:18 616:14
617:20 618:2
619:14 649:8
650:5 734:8,19
736:4 748:11
748:16 754:17
754:25 755:1
**1995** 391:14
590:25 605:9
610:20 612:5
615:18 617:23
753:14 754:6
754:22,23
**1997** 630:7
633:9 644:23
**1999** 655:7

_____
**2**
**2** 408:18 523:4
533:13 552:6
602:2 669:7
683:7 687:19
689:15 717:5
736:4,11
759:15
**2B** 690:17
691:11
**2nd** 523:24
720:22
**2.0** 568:3,10
**2:06** 618:13
**2:16** 618:16
**2:44** 643:8
**2:51** 643:11

**20** 408:12
464:11 489:9
532:21 541:22
552:11,11
708:18 762:16
**20,000** 464:11
464:11
**20-year-old**
572:17
**200** 386:12
**2000** 401:21
411:16 428:15
428:17 429:15
465:4 468:15
468:16 469:6
469:21,22
470:21 480:19
482:16,18,18
493:10 595:19
617:19 632:19
636:8 638:5
644:20,21
647:9 655:7,8
668:24,25
**2000s** 408:8
478:9 481:9
556:10,11
558:17 588:6
**20004** 380:7
382:19
**2001** 454:18,21
457:1 644:21
**2002** 457:1
669:8
**2003** 626:3,8
669:7,9
**2004** 431:14
471:21,24
**2005** 401:24
470:10 471:15
471:16 474:3
475:9 478:15
478:15,23
480:21 484:14
635:22 637:4
**2006** 402:1,2

479:14 579:19
661:19
**2007** 479:15,18
480:25
**2008** 400:15
402:6 404:3,6
404:19 408:11
410:7,8 438:6
451:14 480:14
480:15 481:1
482:18 483:1
492:25 516:7
517:21 522:2
556:8 599:18
654:3,5 669:22
670:22 671:13
**2009** 387:18
410:12,17
413:13 422:1
429:10 434:16
437:5 450:3
481:2 482:19
483:6 491:5
492:6 493:3,6
493:10 506:18
511:3,4 517:17
524:12 536:24
572:9 592:16
592:23 600:2
639:8 654:3
670:10
**2010** 435:23
458:23 593:4
593:21 594:9
**2011** 435:25
436:25 437:1
437:22,22
458:23,23
594:17 596:2
678:23 682:1,6
**2012** 594:21
**2013** 682:24
683:8 684:9,21
687:9 688:4
**2014** 486:10,11
669:23 689:2

**2015** 484:12
486:14 690:13
691:5
**2016** 659:19
694:15 695:15
696:16
**2017** 698:9
699:2
**2018** 379:20
392:4 598:18
659:6,13,25
757:25 759:15
**202** 382:20
**21** 390:5 562:9
562:10 591:11
672:16 673:5
**21st** 410:17
590:25
**215** 381:16
383:23
**218** 381:23
**22** 398:9
**22nd** 724:25
725:23
**22,000** 652:13
**22311** 382:6
**227-8008** 383:9
**23** 569:7,12
**233** 384:6
**24** 562:11,13
670:23 684:21
**25** 419:2 444:14
448:14 459:24
541:12,17,22
692:17
**250983** 387:21
**250984** 387:21
**26** 567:14
569:13
**266294** 387:19
**266295** 387:19
**267-0058** 383:16
**269-2343** 381:25
**27th** 728:1
**272247** 389:21
**272250** 389:22

**28** 541:17,23,24
**29** 567:14
**2900** 381:14

### 3

**3** 438:2 580:17
586:15,15
681:7,12
689:15 725:24
**3rd** 475:9 516:7
**30** 489:9 556:10
741:23 742:7
742:12 760:12
**30(b)(6)** 379:16
393:24 394:2
677:19
**30,000** 411:16
**30-page** 505:23
**30-some** 597:11
**31st** 617:23
**312** 384:9
**316** 381:7
**324** 672:9
**32502** 381:8
**33** 603:21
**334** 381:25
**337** 382:13
**3400** 383:7
**350** 383:14
**36104** 381:24
**39** 422:16
541:18,23
562:11,13
569:13
**392** 385:3

### 4

**4** 422:16 612:18
612:25 717:5
**4th** 748:16
**4(a)** 398:8
**4(c)** 398:8
**4:38** 744:13
**4:49** 744:16
**40** 470:9 635:8
**401** 385:12

**404** 385:14
**41** 385:12 401:7
401:8
**410** 385:16
**42** 385:13 404:9
404:13
**43** 385:15
410:21,22
429:4 434:14
532:21
**430** 385:18
**436** 385:23
**436-6250** 381:9
**439-0707** 382:13
**44** 385:17
430:23 431:2
744:11
**45** 385:19
436:12,16
**452** 386:6
**46** 386:4 452:23
453:2
**462** 386:9
**463-2400** 382:20
**468** 386:11
**47** 386:7 462:8
462:12,15
601:3
**470** 386:13
**474** 386:17
**479** 386:23
387:7
**48** 386:10 468:9
468:10
**483** 387:10
**486** 387:14
**49** 386:12 470:5
470:9
**4900** 382:5
**491** 387:17
**495** 387:19

### 5

**5** 391:10 431:23
432:19
**5th** 621:5 682:1

748:11 755:1
**5:03** 757:25
758:4
**50** 386:14
474:11,12
476:16 660:13
744:10
**50-page** 661:9
**501** 382:11
**51** 386:18 479:9
479:12,22
626:25
**512** 387:21
**5129** 759:19
**52** 387:4 479:23
480:1,16
626:25
**521** 387:24
**52415** 660:14
**52418** 662:1
**52424** 662:14
**52426** 663:3
**52457** 665:10
**52505** 666:23
**53** 387:8 483:24
484:3
**54** 387:11
486:15,16
**55** 387:15
491:24,25
552:4
**56** 387:18
494:25 495:1
**57** 387:20
512:10,13
**577** 388:6
**58** 387:22
521:23 522:2
**59** 388:4 577:22
577:23 583:11
**592** 388:9

### 6

**6** 424:18 438:3,3
**60** 388:7 592:5,9
**600** 381:7 383:6

| | | |
|---|---|---|
| **603** 388:14,16 | **7** | 695:15 755:18 |
| **60606-9997** | **7** 675:9 | **8th** 492:25 493:3 |
| 384:8 | **70** 386:12 | 511:2 548:12 |
| **61** 388:10 | 389:23 489:22 | 548:14 694:15 |
| 602:24 603:2,7 | 660:16,17 | **80** 390:20 |
| **610** 383:21 | **70s** 545:3,15 | 713:23 714:1 |
| **615** 388:19 | 550:23 556:3 | **80s** 397:19 407:3 |
| **62** 388:15 | 556:10,19 | 408:7 556:10 |
| 602:24 603:2,5 | 700:20 701:16 | 647:1,3,5 |
| 603:10,11 | 712:19 714:18 | 713:9 |
| 604:6 | 715:8,9,12 | **81** 390:22 |
| **620** 388:21 | **703** 382:7 | 724:20,21 |
| **624-6307** 384:9 | **70601** 382:12 | **82** 391:4 730:25 |
| **625** 389:9 | **71** 390:4 672:11 | 731:1 |
| **63** 388:17 | 672:12 700:20 | **83** 391:7 734:12 |
| 615:21,24 | 712:17 | **84** 391:9 748:7 |
| 620:14 | **713** 383:9 | 748:10 |
| **630** 389:13 | 390:21 | **85** 391:12 753:9 |
| **631** 389:17 | **717-4006** 383:23 | 753:10 |
| **633** 389:18 | **72** 390:7 678:11 | **850** 381:9 |
| **639** 389:22 | 678:12 681:1,2 | |
| **64** 388:20 | **724** 390:24 | **9** |
| 620:12,17,20 | **73** 390:10 | **9** 438:3 481:2 |
| **643** 385:4 | 682:11 | 599:19,20,22 |
| **65** 389:4 489:22 | **731** 391:6 | **9th** 511:2 592:13 |
| 625:23,25 | **734** 391:8 | **9:09** 379:21 |
| **650** 382:5 | **74** 390:12 687:2 | 392:3 |
| **66** 389:10 630:1 | **740** 390:6 | **9:23** 405:16 |
| **660** 389:24 | **740.1** 673:5 | **9:27** 405:19 |
| **67** 389:14 631:1 | **748** 391:11 | **9:30** 407:12 |
| 631:2 708:12 | **75** 390:15 | **9:31** 407:15 |
| **672** 390:6 | 688:14 | **90s** 408:8 556:10 |
| **678** 390:9 | **753** 391:14 | 646:12 647:7 |
| **68** 389:18 633:4 | **76** 390:16 690:7 | 740:8 |
| 633:5 | **77** 390:17 | **93** 721:16,20 |
| **682** 390:11 | 693:24 | **94** 647:11 |
| **687** 390:14 | **77002-2926** | 737:14 |
| **688** 390:15 | 383:8 | **94TA03** 737:11 |
| **69** 389:19 639:4 | **78** 390:18 619:5 | **95** 610:2 |
| 639:5 | 696:8 | **97** 630:16 |
| **690** 390:16 | **79** 390:19 697:4 | 668:23 725:11 |
| **693** 390:17 | 697:6,7 | **973** 383:16 |
| **6950** 384:7 | | **975** 380:6 |
| **696** 390:18 | **8** | 382:18 |
| **697** 390:19 | **8** 387:18 398:9 | **985-9177** 381:16 |
| | 481:2 506:17 | **997-1774** 382:7 |

# Exhibit 135

# Memorandum of Meeting

**Date:** May 8, 2009

**Place:** FDA, University Station Building, College Park, MD

## Participants:

Visitors:
John Bailey, Ph.D., Personal Care Products Council
Linda Loretz, Ph.D., Personal Care Products Council
Kathleen Wille, Ph.D., Johnson & Johnson
David Mallon, Unilever
Craig Bernard, Ph.D., Rio Tinto Minerals (via telephone)
Jack Linard, Ph.D., Unilever (via telephone)
Shripal Sharma, Rio Tinto Minerals (via telephone)

### FDA:

Linda Katz, M.D., M.P.H., Meeting Chair
Joshua Sharfstein, M.D.
Stephen Sundlof, D.V.M., Ph.D.
Robert Bronaugh, Ph.D.
Patricia Hansen, Ph.D.
Stanley Milstein, Ph.D.
Donald Havery
John Gasper, Minutes
Diego Rua, Ph.D.
Patrick McCarthy, Ph.D.

**Subject:** Talc

The meeting was held at the request of the Personal Care Products Council (PCPC). PCPC expressed their commitment to working with FDA on issues concerning cosmetic products containing talc. PCPC and the representatives of individual firms presented an analysis of the epidemiological association of cosmetic talc use with ovarian cancer, information regarding chemical and physical properties they believe differentiate cosmetic grade talc from other grades of talc, and different specifications used. FDA representatives indicated that they would like to see more detailed information on the chemical and physical properties of cosmetic grade talc, characterization and testing of cosmetic grade talc, commercial suppliers and users of cosmetic grade talc, and related information. Dr. Bailey of PCPC indicated that it might take some time to assemble all of the information, but that he would check with the members and get back to Dr. Katz on the timing. FDA representatives also indicated that if PCPC wished the Agency to consider the information in responding to citizen petitions, it should submit the information to the appropriate dockets. PCPC also indicated that they would consider



Protected Document - Subject to Protective Order

IMERYS 266294

different mechanisms for strengthening the guidelines and procedures meant to assure the safety of talc used in cosmetics.

**Action Items:**
- o Dr. Bailey to forward PCPC's expected responses to FDA questions (see attached) as soon as possible ~~in 2 weeks~~. Additionally, PCPC will provide a list of talc suppliers along with their contact information.
- o PCPC agreed to submit their prepared comments on: Citizen Petition to the Commissioner of the Food and Drug Administration Seeking a Cancer Warning on Talc Products to the docket.

Protected Document - Subject to Protective Order

IMERYS 266295

Exhibit 136

ARTICLE IN PRESS

YGYNO-976277; No. of pages: 3; 4C:

Gynecologic Oncology xxx (2016) xxx–xxx



Contents lists available at ScienceDirect

# Gynecologic Oncology

journal homepage: www.elsevier.com/locate/ygyno



# Talc and ovarian cancer

Steven A. Narod *

Women's College Research Institute, Toronto, Ontario, Canada
Dalla Lana School of Public Health, University of Toronto, Toronto, Ontario, Canada

## HIGHLIGHTS

- Talc use has been linked to the risk of ovarian cancer in many case-control studies.
- Genital talc use is much less common now than it was in earlier cohorts of women in North America.
- It is not possible to say that any specific case of ovarian cancer was the result of talc use.

## ARTICLE INFO

Article history:
Received 2 March 2016
Received in revised form 4 April 2016
Accepted 12 April 2016
Available online xxxx

Keywords:
Talc
Ovarian cancer

Interest in a possible link between talcum powder and ovarian cancer risk dates back to the 1960s when the public was concerned about asbestos contamination in talc. Talc has been in the news intermittently since then, but the story of talc and ovarian cancer made the front page in February 2016, when the family of an ovarian cancer patient successfully sued Johnson and Johnson for 72 million dollars. This surprising jury decision raises a few questions. Is there a real and robust statistical association between talc use and ovarian cancer, and if so, is the association causal or due to confounding? What is the risk of cancer associated with talc use and how do we tell if a particular case of ovarian cancer was caused by talc? What should we tell our patients?

Most of the evidence comes from case-control studies. In 2013, the Ovarian Cancer Association Consortium pooled eight of these and analysed 8525 cases and 9859 controls [1]. They reported that genital powder use was associated with a modest but significant increased risk of epithelial ovarian cancer (OR = 1.24; 95% CI 1.15–1.33). The association between talc and ovarian cancer was significant in five of the eight individual studies. More recently, Cramer et al. studied 2041 cases and 2100 controls (some of whom were included in the OCAC study) [2]. They

estimated the risk of ovarian cancer associated with genital talc use to be 1.33 (95% CI 1.16 to 1.52) The case-control studies to date are consistent; given the small effect size it is not surprising that some are positive (i.e., show a significant increase in risk) and some are negative (i.e., show a non-significant increase in risk or no risk difference). Some say, based on this data, that there is little or no evidence that talc is associated with ovarian cancer. This is a conservative opinion, based on an uncompromising interpretation of statistics and a demand for proof. For the sake of argument, let us suppose that the true risk ratio for ever use of talc and the development of ovarian cancer is 1.2. This estimate is the one generated from the large pooling study [1] and is the level of risk that is under discussion the media. It is possible that the true risk might be lower or higher than this single estimate. In this scenario, where talc increases the risk of ovarian cancer by 20% beyond the baseline of 1.3% lifetime, it would be challenging to convince the epidemiology community that there is a danger. Simply put, a risk ratio of this size falls outside the resolution of most epidemiologic studies; for example, if we set the $p$-value for significance at 0.05, then, in order to have a power of 0.80 to discriminate an increase in risk of 20%, and if 20% of the population is exposed to talc, we would require a case-control study of 2801 cases and 2801 controls. This is a very large sample for a case-control study, especially given that ovarian cancer is rare and only but the large study of Cramer et al the pooled analyses of OCAC were designed to detect and odds ratios this small [1,2]. If the

* Women's College Research Institute, 76 Grenville Street, Toronto, Ontario, M5S 1B1, Canada.
E-mail address: steven.narod@wchospital.ca.

http://dx.doi.org/10.1016/j.ygyno.2016.04.011
0090-8258/© 2016 Elsevier Inc. All rights reserved.

2                                    S.A. Narod / Gynecologic Oncology xxx (2016) xxx–xxx

magnitude of the association is to be estimated with precision it is important that consortia are develop and expanded in order to generate the appropriate sample size.

Prospective observational studies are less prone to bias than case-control studies, and for this reason they are given greater weight. In particular, they are not prone to recall bias (where the accuracy of the recollection of the exposure differs between cases and controls); selection bias (where the unexposed and exposed women are not equally likely to be ascertained for study) and survivorship bias (which would occur if the survival of women with ovarian cancer differs, depending on prior talc exposure. In the Nurses Health Study, 78,630 women were followed for a mean of 12.9 years [3]. There were 307 ovarian cancers diagnosed in the follow-up period. There was no overall association with ever-use of talc (HR = 1.09; 95% CI 0.86 to 1.37, but there was a modest and significant increased risk for serous ovarian cancer (HR = 1.40; 95% CI; 1.02–1.91). These figures could be dismissed as non-significant or as due to chance, but if the real risk were in fact 1.2, this is about what we would expect. In the Women's Health Initiative [4], 61,285 women were followed for an average of 12.4 years. 53% of the women reported perineal talc use (a very high proportion). The adjusted hazard ratio for serous ovarian cancer was 1.13, but this was not significant (95% CI 0.84 to 1.51). Neither prospective study confirmed the association of talc use and ovarian cancer raised by the case-control studies, but neither study was powered to detect a risk of 1.2 and therefore we cannot exclude the possibility. Only two women in a thousand will develop ovarian cancer in a ten-year follow up period. If we study 10,000 women over 10 years we can expect 20 cancers to occur. If the true odds ratio is 1.2, we will expect 20 cancers in an unexposed group of 10,000 women and 24 cancers in an exposed group of equal size and this difference will not be significant ($p = 0.65$). In order to achieve statistical significance in a prospective study, we need a much larger cohort, e.g., we will need to study upwards of 200,000 women for ten years.

Given this inherent limitation of cohort studies, it is not surprising that we have not been able to confirm the case-control studies with prospective studies, but this does not mean that the case-control studies were wrong. I don't think it is because the prospective studies are free from the biases that plague the case-control studies (e.g., recall bas) — I think the parsimonious explanation is that they lack statistical power. It is well that we also consider various possible biases as a source of imprecision in case-control studies. In the case of talc and ovarian cancer we should consider recall bias, survivorship bias and confounding bias. The idea behind recall bias is that a case is more likely to (correctly) recall the past use of talc than a control (who might forget) or that a case is more likely than a control to (incorrectly) report the use of talc that was never used. In studies where simple exposures that are coded as never/ever use recall bias unlikely to be an important source of bias. Survivorship bias would occur if we used prevalent cases and the use of talc was associated with better or worse survival, once ovarian cancer develops. There is no reason to assume that this is the case.

Confounding bias may be more subtle. When people say that 'association is not causality' they mean to say that that talc may not actually cause ovarian cancer but both talc and ovarian cancer may be linked to a third factor such as birth control pills — perhaps women who use talc are less likely to use birth control pills and therefore form a high risk group. Hardly likely — and the other risk factors for ovarian cancer are parity, breast feeding and tubal ligation. None of these are a priori likely to be confounders and in any case, most case-control studies will adjust for these. The most important potential confounder is year of birth (see below) and it is difficult to control for this. It is unlikely that the association between talc and ovarian cancer is due to confounding and so it is fair to say that if there is a statistically robust relationship between talc use and ovarian cancer it is likely to be causal (albeit with intermediate factors such as inflammation). In any case, given the number of hazard ratios reported in the literature between 1.1 of 1.4 in both case-control and cohort studies, it is disingenuous to state that there is *no evidence* that talc is associated with ovarian cancer.

It has been suggested that talc passes through the cervix and endometrium and becomes lodged in the fallopian tube where it induces an inflammatory reaction [5]. This is hypothetical, but is supported by the observation of talc particles within the pelvic organs [6] and fits with the paradigm that most serous ovarian cancers originate in the fallopian tube and that intra-epithelial lesions in the fallopian epithelium are the earliest manifestations of an impending ovarian cancer [7]. If the model is correct, it is possible that the passage of talc is aided by retrograde menses and that talc use during menses poses a special risk. This might explain in part why the association between talc applied to sanitary napkins and ovarian cancer is among the most consistent. Against the model is the observation that, in the prospective studies, the relative risk of cancer associated with talc was not lower in women who had a tubal ligation [3,4] (and presumably had blocked access to talc).

If we accept that the actual hazard ratio for ever-use versus never-use is 1.2 how are we to interpret this number? If we consider a particular woman who uses talc regularly, her lifetime risk of ovarian cancer would increase from about 1.3% to 1.6%, an increase of 0.3% or three cases in a thousand. On a yearly scale, the risk rises from 20 per 100,000 women per year to 24 per 100,000 per year or four cancer cases for every 100,000 talc users. The latter might strike as more favorable, but, in fact describes the same risk. If we consider the population as a whole, the total number of ovarian cancer cases caused by talc depends on the frequency of talc use in the population. It is right to be concerned over the carcinogenicity of talc even if the risk ratio is low, because up to 50% of women are exposed [1]. If 40% of women use talc and the relative risk is 1.2, then 7% of ovarian cancer cases would be attributable to talc use or 1577 cases a year in the USA. This is not a trivial number and should not be dismissed. If 20% of women were talc users the number of cases per year would be 819. If only 5% of women use talc then the number of cases per year would be 211. Few perhaps, but if ovarian cancer is avoidable, it is best avoided. Is there a downside? Talc affords comfort and was used commonly in the past to control moisture and odor but women have many more choices nowadays. One could of course make a recommendation here not to use talc on sanitary napkins, but this will have little impact because few women continue to use it. In our database of 6000 women from North America that we follow at Women's College Hospital, the use of talc on sanitary napkins has declined precipitously from one generation to the next; talc use was recorded by 11% for women born from 1920 to 1940, but for only 1% of women born after 1975. Similarly, the use of talc applied directly to the genital area fell from 19% to 3% over the same period.

In the interests of public health, I believe we should caution women against using genital talcum powder. However, this policy of talc avoidance is unlikely to have much impact nowadays given this downward trend in usage. I don't think we should try to ascribe any particular case of ovarian cancer to prior talc use. The estimate of a risk ratio of 1.2 provides information about the potential contribution of talc to the burden of ovarian cancer in the population, but is not helpful in determining if a specific case is, or is not, the result of talc exposure. Are we able to make helpful recommendations for women who have used it in the past but who no longer use it? Probably not, we do not offer preventive surgery for women with a risk of ovarian cancer that is less than 2% and screening with CA125 or ultrasound is not recommended to women at average or slightly increased risk.

## Conflict of interest

The author declares no conflict of interest.

## References

[1] K.L. Terry, S. Karageorgi, Y.B. Shvetsov, M.A. Merritt, G. Lurie, P.J. Thompson, M.E. Carney, R.P. Weber, L. Akushevich, W.H. Lo-Ciganic, K. Cushing-Haugen, W. Sieh, K. Moysich, J.A. Doherty, C.M. Nagle, A. Berchuck, C.L. Pearce, M. Pike, R.B. Ness, P.M. Webb, Australian Cancer Study (Ovarian Cancer), Australian Ovarian Cancer Study Group, M.A. Rossing, J. Schildkraut, H. Risch, M.T. Goodman, Ovarian Cancer

S.A. Narod / Gynecologic Oncology xxx (2016) xxx–xxx

3

Association Consortium, Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls, Cancer Prev. Res. 6 (2013) 811–821.

[2] D.W. Cramer, A.F. Vitonis, K.L. Terry, W.R. Welch, L.J. Titus, The association between talc use and ovarian cancer: a retrospective case-control study in two US states, Epidemiology (2015) (Epub ahead of print).

[3] M.A. Gates, S.S. Tworoger, K.L. Terry, L. Titus-Ernstoff, B. Rosner, I. De Vivo, D.W. Cramer, S.E. Hankinson, Talc use, variants of the GSTM1, GSTT1, and NAT2 genes, and risk of epithelial ovarian cancer, Cancer Epidemiol. Biomark. Prev. 17 (2008) 2436–2444.

[4] S.C. Houghton, K.W. Reeves, S.E. Hankinson, L. Crawford, D. Lane, J. Wactawski-Wende, C.A. Thomson, J.K. Ockene, S.R. Sturgeon, Perineal powder use and risk of ovarian cancer, J. Natl. Cancer Inst. 106 (9) (2014).

[5] R.B. Ness, J.A. Grisso, C. Cottreau, et al., Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer, Epidemiology 11 (2000) 111–117.

[6] D.S. Heller, C. Westhoff, R.E. Gordon, N. Katz, The relationship between perineal cosmetic talc usage and ovarian talc particle burden, Am. J. Obstet. Gynecol. 174 (1996) 1507–1510.

[7] S. Salvador, B. Gilks, M. Köbel, D. Huntsman, B. Rosen, D. Miller, The fallopian tube: primary site of most pelvic high-grade serous carcinomas, Int. J. Gynecol. Cancer 19 (2009) 58–64.

Please cite this article as: S.A. Narod, Talc and ovarian cancer, Gynecol Oncol (2016), http://dx.doi.org/10.1016/j.ygyno.2016.04.011

# Exhibit 137



**The American Statistician**

ISSN: 0003-1305 (Print) 1537-2731 (Online) Journal homepage: https://www.tandfonline.com/loi/utas20

# Moving to a World Beyond "*p* < 0.05"

Ronald L. Wasserstein, Allen L. Schirm & Nicole A. Lazar

**To cite this article:** Ronald L. Wasserstein, Allen L. Schirm & Nicole A. Lazar (2019) Moving to a World Beyond "*p*<0.05", The American Statistician, 73:sup1, 1-19, DOI: 10.1080/00031305.2019.1583913

**To link to this article:** https://doi.org/10.1080/00031305.2019.1583913

© 2019 The Author(s). Published by Informa UK Limited, trading as Taylor & Francis Group.

Published online: 20 Mar 2019.

Submit your article to this journal ↗

View Crossmark data ↗

THE AMERICAN STATISTICIAN
2019, VOL. 73, NO. S1, 1–19: Editorial
https://doi.org/10.1080/00031305.2019.1583913



ⓐ OPEN ACCESS 

EDITORIAL

# Moving to a World Beyond "$p < 0.05$"

Some of you exploring this special issue of *The American Statistician* might be wondering if it's a scolding from pedantic statisticians lecturing you about what *not* to do with *p*-values, without offering any real ideas of what *to do* about the very hard problem of separating signal from noise in data and making decisions under uncertainty. Fear not. In this issue, thanks to 43 innovative and thought-provoking papers from forward-looking statisticians, help is on the way.

## 1. "Don't" Is Not Enough

There's not much we can say here about the perils of *p*-values and significance testing that hasn't been said already for decades (Ziliak and McCloskey 2008; Hubbard 2016). If you're just arriving to the debate, here's a sampling of what not to do:

- Don't base your conclusions solely on whether an association or effect was found to be "statistically significant" (i.e., the *p*-value passed some arbitrary threshold such as $p < 0.05$).
- Don't believe that an association or effect exists just because it was statistically significant.
- Don't believe that an association or effect is absent just because it was not statistically significant.
- Don't believe that your *p*-value gives the probability that chance alone produced the observed association or effect or the probability that your test hypothesis is true.
- Don't conclude anything about scientific or practical importance based on statistical significance (or lack thereof).

Don't. Don't. Just…don't. Yes, we talk a lot about don'ts. The *ASA Statement on p-Values and Statistical Significance* (Wasserstein and Lazar 2016) was developed primarily because after decades, warnings about the don'ts had gone mostly unheeded. The statement was about what not to do, because there is widespread agreement about the don'ts.

Knowing what not to do with *p*-values is indeed necessary, but it does not suffice. It is as though statisticians were asking users of statistics to tear out the beams and struts holding up the edifice of modern scientific research without offering solid construction materials to replace them. Pointing out old, rotting timbers was a good start, but now we need more.

Recognizing this, in October 2017, the American Statistical Association (ASA) held the Symposium on Statistical Inference, a two-day gathering that laid the foundations for this

special issue of *The American Statistician*. Authors were explicitly instructed to develop papers for the variety of audiences interested in these topics. If you use statistics in research, business, or policymaking but are not a statistician, these articles were indeed written with YOU in mind. And if you are a statistician, there is still much here for you as well.

The papers in this issue propose many new ideas, ideas that in our determination as editors merited publication to enable broader consideration and debate. The ideas in this editorial are likewise open to debate. They are our own attempt to distill the wisdom of the many voices in this issue into an essence of good statistical practice as we currently see it: some do's for teaching, doing research, and informing decisions.

Yet the voices in the 43 papers in this issue do not sing as one. At times in this editorial and the papers you'll hear deep dissonance, the echoes of "statistics wars" still simmering today (Mayo 2018). At other times you'll hear melodies wrapping in a rich counterpoint that may herald an increasingly harmonious new era of statistics. To us, these are all the sounds of statistical inference in the 21st century, the sounds of a world learning to venture beyond "$p < 0.05$."

This is a world where researchers are free to treat "$p = 0.051$" and "$p = 0.049$" as not being categorically different, where authors no longer find themselves constrained to selectively publish their results based on a single magic number. In this world, where studies with "$p < 0.05$" and studies with "$p > 0.05$" are not automatically in conflict, researchers will see their results more easily replicated—and, even when not, they will better understand *why*. As we venture down this path, we will begin to see fewer false alarms, fewer overlooked discoveries, and the development of more customized statistical strategies. Researchers will be free to communicate all their findings in all their glorious uncertainty, knowing their work is to be judged by the quality and effective communication of their science, and not by their *p*-values. As "statistical significance" is used less, statistical thinking will be used more.

The *ASA Statement on P-Values and Statistical Significance* started moving us toward this world. As of the date of publication of this special issue, the statement has been viewed over 294,000 times and cited over 1700 times—an average of about 11 citations per week since its release. Now we must go further. That's what this special issue of *The American Statistician* sets out to do.

To get to the do's, though, we must begin with one more don't.

© 2019 The Author(s). Published with license by Taylor & Francis Group, LLC.
This is an Open Access article distributed under the terms of the Creative Commons Attribution-NonCommercial-NoDerivatives License (http://creativecommons.org/licenses/by-nc-nd/4.0/), which permits non-commercial re-use, distribution, and reproduction in any medium, provided the original work is properly cited, and is not altered, transformed, or built upon in any way.

## 2. Don't Say "Statistically Significant"

The *ASA Statement on P-Values and Statistical Significance* stopped just short of recommending that declarations of "statistical significance" be abandoned. We take that step here. We conclude, based on our review of the articles in this special issue and the broader literature, that it is time to stop using the term "statistically significant" entirely. Nor should variants such as "significantly different," "$p < 0.05$," and "nonsignificant" survive, whether expressed in words, by asterisks in a table, or in some other way.

Regardless of whether it was ever useful, a declaration of "statistical significance" has today become meaningless. Made broadly known by Fisher's use of the phrase (1925), Edgeworth's (1885) original intention for statistical significance was simply as a tool to indicate when a result warrants further scrutiny. But that idea has been irretrievably lost. Statistical significance was never meant to imply scientific importance, and the confusion of the two was decried soon after its widespread use (Boring 1919). Yet a full century later the confusion persists.

And so the tool has become the tyrant. The problem is not simply use of the word "significant," although the statistical and ordinary language meanings of the word are indeed now hopelessly confused (Ghose 2013); the term should be avoided for that reason alone. The problem is a larger one, however: using bright-line rules for justifying scientific claims or conclusions can lead to erroneous beliefs and poor decision making (ASA statement, Principle 3). A label of statistical significance adds nothing to what is already conveyed by the value of $p$; in fact, this dichotomization of $p$-values makes matters worse.

For example, no $p$-value can reveal the plausibility, presence, truth, or importance of an association or effect. Therefore, a label of statistical significance does not mean or imply that an association or effect is highly probable, real, true, or important. Nor does a label of statistical nonsignificance lead to the association or effect being improbable, absent, false, or unimportant. Yet the dichotomization into "significant" and "not significant" is taken as an imprimatur of authority on these characteristics. In a world without bright lines, on the other hand, it becomes untenable to assert dramatic differences in interpretation from inconsequential differences in estimates. As Gelman and Stern (2006) famously observed, the difference between "significant" and "not significant" is not itself statistically significant.

Furthermore, this false split into "worthy" and "unworthy" results leads to the selective reporting and publishing of results based on their statistical significance—the so-called "file drawer problem" (Rosenthal 1979). And the dichotomized reporting problem extends beyond just publication, notes Amrhein, Trafimow, and Greenland (2019): when authors use $p$-value thresholds to select which findings to discuss in their papers, "their conclusions and what is reported in subsequent news and reviews will be biased…Such selective attention based on study outcomes will therefore not only distort the literature but will slant published descriptions of study results—biasing the summary descriptions reported to practicing professionals and the general public." For the integrity of scientific publishing and research dissemination, therefore, whether a $p$-value passes any arbitrary threshold should not be considered at all when deciding which results to present or highlight.

To be clear, the problem is not that of having only two labels. Results should not be trichotomized, or indeed categorized into any number of groups, based on arbitrary $p$-value thresholds. Similarly, we need to stop using confidence intervals as another means of dichotomizing (based, on whether a null value falls within the interval). And, to preclude a reappearance of this problem elsewhere, we must not begin arbitrarily categorizing other statistical measures (such as Bayes factors).

Despite the limitations of $p$-values (as noted in Principles 5 and 6 of the ASA statement), however, we are not recommending that the calculation and use of continuous $p$-values be discontinued. Where $p$-values are used, they should be reported as continuous quantities (e.g., $p = 0.08$). They should also be described in language stating what the value means in the scientific context. We believe that a reasonable prerequisite for reporting any $p$-value is the ability to interpret it appropriately. We say more about this in Section 3.3.

To move forward to a world beyond "$p < 0.05$," we must recognize afresh that statistical inference is not—and never has been—equivalent to scientific inference (Hubbard, Haig, and Parsa 2019; Ziliak 2019). However, looking to statistical significance for a marker of scientific observations' credibility has created a guise of equivalency. Moving beyond "statistical significance" opens researchers to the real significance of statistics, which is "the science of learning from data, and of measuring, controlling, and communicating uncertainty" (Davidian and Louis 2012).

In sum, "statistically significant"—don't say it and don't use it.

## 3. There Are Many Do's

With the don'ts out of the way, we can finally discuss ideas for specific, positive, constructive actions. We have a massive list of them in the seventh section of this editorial! In that section, the authors of all the articles in this special issue each provide their own short set of do's. Those lists, and the rest of this editorial, will help you navigate the substantial collection of articles that follows.

Because of the size of this collection, we take the liberty here of distilling our readings of the articles into a summary of what can be done to move beyond "$p < 0.05$." You will find the rich details in the articles themselves.

*What you will NOT find in this issue is one solution that majestically replaces the outsized role that statistical significance has come to play.* The statistical community has not yet converged on a simple paradigm for the use of statistical inference in scientific research—and in fact it may never do so. A one-size-fits-all approach to statistical inference is an inappropriate expectation, even after the dust settles from our current remodeling of statistical practice (Tong 2019). Yet solid principles for the use of statistics do exist, and they are well explained in this special issue.

We summarize our recommendations in two sentences totaling seven words: "**A**ccept uncertainty. Be **t**houghtful, **o**pen, and **m**odest." Remember "ATOM."

### 3.1.  Accept Uncertainty

Uncertainty exists everywhere in research. And, just like with the frigid weather in a Wisconsin winter, there are those who will flee from it, trying to hide in warmer havens elsewhere. Others, however, accept and even delight in the omnipresent cold; these are the ones who buy the right gear and bravely take full advantage of all the wonders of a challenging climate. Significance tests and dichotomized $p$-values have turned many researchers into scientific snowbirds, trying to avoid dealing with uncertainty by escaping to a "happy place" where results are either statistically significant or not. In the real world, data provide a noisy signal. Variation, one of the causes of uncertainty, is everywhere. Exact replication is difficult to achieve. So it is time to get the right (statistical) gear and "move toward a greater acceptance of uncertainty and embracing of variation" (Gelman 2016).

Statistical methods do not rid data of their uncertainty. "Statistics," Gelman (2016) says, "is often sold as a sort of alchemy that transmutes randomness into certainty, an 'uncertainty laundering' that begins with data and concludes with success as measured by statistical significance." To accept uncertainty requires that we "treat statistical results as being much more incomplete and uncertain than is currently the norm" (Amrhein, Trafimow, and Greenland 2019). We must "countenance uncertainty in all statistical conclusions, seeking ways to quantify, visualize, and interpret the potential for error" (Calin-Jageman and Cumming 2019).

"Accept uncertainty and embrace variation in effects," advise McShane et al. in Section 7 of this editorial. "[W]e can learn much (indeed, more) about the world by forsaking the false promise of certainty offered by dichotomous declarations of truth or falsity—binary statements about there being 'an effect' or 'no effect'—based on some $p$-value or other statistical threshold being attained."

We can make acceptance of uncertainty more natural to our thinking by accompanying every point estimate in our research with a measure of its uncertainty such as a standard error or interval estimate. Reporting and interpreting point and interval estimates should be routine. However, simplistic use of confidence intervals as a measurement of uncertainty leads to the same bad outcomes as use of statistical significance (especially, a focus on whether such intervals include or exclude the "null hypothesis value"). Instead, Greenland (2019) and Amrhein, Trafimow, and Greenland (2019) encourage thinking of confidence intervals as "compatibility intervals," which use $p$-values to show the effect sizes that are most compatible with the data under the given model.

How will **accepting uncertainty** change anything? To begin, it will prompt us to seek better measures, more sensitive designs, and larger samples, all of which increase the rigor of research. It also helps us **be modest** (the fourth of our four principles, on which we will expand in Section 3.4) and encourages "meta-analytic thinking" (Cumming 2014). Accepting uncertainty as inevitable is a natural antidote to the seductive certainty falsely promised by statistical significance. With this new outlook, we will naturally seek out replications and the integration of evidence through meta-analyses, which usually requires point and interval estimates from contributing studies. This will in turn give us more precise overall estimates for our effects and associations. And this is what will lead to the best research-based guidance for practical decisions.

**Accepting uncertainty** leads us to **be thoughtful**, the second of our four principles.

### 3.2.  Be Thoughtful

What do we mean by this exhortation to "be thoughtful"? Researchers already clearly put much thought into their work. We are not accusing anyone of laziness. Rather, we are envisioning a sort of "statistical thoughtfulness." In this perspective, statistically **thoughtful researchers** begin above all else with clearly expressed objectives. They recognize when they are doing exploratory studies and when they are doing more rigidly pre-planned studies. They invest in producing solid data. They consider not one but a multitude of data analysis techniques. And they think about so much more.

#### 3.2.1.  Thoughtfulness in the Big Picture

"[M]ost scientific research is exploratory in nature," Tong (2019) contends. "[T]he design, conduct, and analysis of a study are necessarily flexible, and must be open to the discovery of unexpected patterns that prompt new questions and hypotheses. In this context, statistical modeling can be exceedingly useful for elucidating patterns in the data, and researcher degrees of freedom can be helpful and even essential, though they still carry the risk of overfitting. The price of allowing this flexibility is that the validity of any resulting statistical inferences is undermined."

Calin-Jageman and Cumming (2019) caution that "in practice the dividing line between planned and exploratory research can be difficult to maintain. Indeed, exploratory findings have a slippery way of 'transforming' into planned findings as the research process progresses." At the bottom of that slippery slope are often finds results that don't reproduce.

Anderson (2019) proposes three questions **thoughtful researchers** asked thoughtful researchers evaluating research results: What are the practical implications of the estimate? How precise is the estimate? And is the model correctly specified? The latter question leads naturally to three more: Are the modeling assumptions understood? Are these assumptions valid? And do the key results hold up when other modeling choices are made? Anderson further notes, "Modeling assumptions (including all the choices from model specification to sample selection and the handling of data issues) should be sufficiently documented so independent parties can critique, and replicate, the work."

Drawing on archival research done at the Guinness Archives in Dublin, Ziliak (2019) emerges with ten "$G$-values" he believes we all wish to maximize in research. That is, we want large $G$-values, not small $p$-values. The ten principles of Ziliak's "Guinnessometrics" are derived primarily from his examination of experiments conducted by statistician William Sealy Gosset while working as Head Brewer for Guinness. Gosset took an economic approach to the logic of uncertainty, preferring balanced designs over random ones and estimation of gambles over bright-line "testing." Take, for example, Ziliak's $G$-value 10: "Consider purpose of the inquiry, and compare with best

practice," in the spirit of what farmers and brewers must do. The purpose is generally NOT to falsify a null hypothesis, says Ziliak. Ask what is at stake, he advises, and determine what magnitudes of change are humanly or scientifically meaningful in context.

Pogrow (2019) offers an approach based on practical benefit rather than statistical or practical significance. This approach is especially useful, he says, for assessing whether interventions in complex organizations (such as hospitals and schools) are effective, and also for increasing the likelihood that the observed benefits will replicate in subsequent research and in clinical practice. In this approach, "practical benefit" recognizes that reliance on small effect sizes can be as problematic as relying on p-values.

**Thoughtful research** prioritizes sound data production by putting energy into the careful planning, design, and execution of the study (Tong 2019).

Locascio (2019) urges researchers to be prepared for a new publishing model that evaluates their research based on the importance of the questions being asked and the methods used to answer them, rather than the outcomes obtained.

### 3.2.2. Thoughtfulness Through Context and Prior Knowledge

**Thoughtful research** considers the scientific context and prior evidence. In this regard, a declaration of statistical significance is the antithesis of thoughtfulness: it says nothing about practical importance, and it ignores what previous studies have contributed to our knowledge.

**Thoughtful research** looks ahead to prospective outcomes in the context of theory and previous research. Researchers would do well to ask, *What do we already know, and how certain are we in what we know?* And building on that and on the field's theory, *what magnitudes of differences, odds ratios, or other effect sizes are practically important?* These questions would naturally lead a researcher, for example, to use existing evidence from a literature review to identify specifically the findings that would be practically important for the key outcomes under study.

**Thoughtful research** includes careful consideration of the definition of a meaningful effect size. As a researcher you should communicate this up front, before data are collected and analyzed. Afterwards is just too late; it is dangerously easy to justify observed results after the fact and to overinterpret trivial effect sizes as being meaningful. Many authors in this special issue argue that consideration of the effect size and its "scientific meaningfulness" is essential for reliable inference (e.g., Blume et al. 2019; Betensky 2019). This concern is also addressed in the literature on equivalence testing (Wellek 2017).

**Thoughtful research** considers "related prior evidence, plausibility of mechanism, study design and data quality, real world costs and benefits, novelty of finding, and other factors that vary by research domain…without giving priority to p-values or other purely statistical measures" (McShane et al. 2019).

**Thoughtful researchers** "use a toolbox of statistical techniques, employ good judgment, and keep an eye on developments in statistical and data science," conclude Heck and Krueger (2019), who demonstrate how the p-value can be useful to researchers as a heuristic.

### 3.2.3. Thoughtful Alternatives and Complements to P-Values

**Thoughtful research** considers multiple approaches for solving problems. This special issue includes some ideas for supplementing or replacing p-values. Here is a short summary of some of them, with a few technical details:

Amrhein, Trafimow, and Greenland (2019) and Greenland (2019) advise that null p-values should be supplemented with a p-value from a test of a pre-specified alternative (such as a minimal important effect size). To reduce confusion with posterior probabilities and better portray evidential value, they further advise that p-values be transformed into s-values (Shannon information, surprisal, or binary logworth) $s = -\log_2(p)$. This measure of evidence affirms other arguments that the evidence against a hypothesis contained in the p-value is not nearly as strong as is believed by many researchers. The change of scale also moves users away from probability misinterpretations of the p-value.

Blume et al. (2019) offer a "second generation p-value (SGPV)," the characteristics of which mimic or improve upon those of p-values but take practical significance into account. The null hypothesis from which an SGPV is computed is a composite hypothesis representing a range of differences that would be practically or scientifically inconsequential, as in equivalence testing (Wellek 2017). This range is determined in advance by the experimenters. When the SGPV is 1, the data only support null hypotheses; when the SGPV is 0, the data are incompatible with any of the null hypotheses. SGPVs between 0 and 1 are inconclusive at varying levels (maximally inconclusive at or near SGPV = 0.5.) Blume et al. illustrate how the SGPV provides a straightforward and useful descriptive summary of the data. They argue that it eliminates the problem of how classical statistical significance does not imply scientific relevance, it lowers false discovery rates, and its conclusions are more likely to reproduce in subsequent studies.

The "analysis of credibility"(AnCred) is promoted by Matthews (2019). This approach takes account of both the width of the confidence interval and the location of its bounds when assessing weight of evidence. AnCred assesses the credibility of inferences based on the confidence interval by determining the level of prior evidence needed for a new finding to provide credible evidence for a nonzero effect. If this required level of prior evidence is supported by current knowledge and insight, Matthews calls the new result "credible evidence for a non-zero effect," irrespective of its statistical significance/nonsignificance.

Colquhoun (2019) proposes continuing the use of continuous p-values, but only in conjunction with the "false positive risk (FPR)." The FPR answers the question, "If you observe a 'significant' p-value after doing a single unbiased experiment, what is the probability that your result is a false positive?" It tells you what most people mistakenly still think the p-value does, Colquhoun says. The problem, however, is that to calculate the FPR you need to specify the prior probability that an effect is real, and it's rare to know this. Colquhoun suggests that the FPR could be calculated with a prior probability of 0.5, the largest value reasonable to assume in the absence of hard prior data. The FPR found this way is in a sense the minimum false positive risk (mFPR); less plausible hypotheses (prior probabilities below 0.5) would give even bigger FPRs, Colquhoun says, but the

mFPR would be a big improvement on reporting a *p*-value alone. He points out that *p*-values near 0.05 are, under a variety of assumptions, associated with minimum false positive risks of 20–30%, which should stop a researcher from making too big a claim about the "statistical significance" of such a result.

Benjamin and Berger (2019) propose a different supplement to the null *p*-value. The Bayes factor bound (BFB)—which under typically plausible assumptions is the value $1/(-ep \ln p)$—represents the upper bound of the ratio of data-based odds of the alternative hypothesis to the null hypothesis. Benjamin and Berger advise that the BFB should be reported along with the continuous *p*-value. This is an incomplete step toward revising practice, they argue, but one that at least confronts the researcher with the maximum possible odds that the alternative hypothesis is true—which is what researchers often think they are getting with a *p*-value. The BFB, like the FPR, often clarifies that the evidence against the null hypothesis contained in the *p*-value is not nearly as strong as is believed by many researchers.

Goodman, Spruill, and Komaroff (2019) propose a two-stage approach to inference, requiring both a small *p*-value below a pre-specified level and a pre-specified sufficiently large effect size before declaring a result "significant." They argue that this method has improved performance relative to use of dichotomized *p*-values alone.

Gannon, Pereira, and Polpo (2019) have developed a testing procedure combining frequentist and Bayesian tools to provide a significance level that is a function of sample size.

Manski (2019) and Manski and Tetenov (2019) urge a return to the use of statistical decision theory, which they say has largely been forgotten. Statistical decision theory is not based on *p*-value thresholds and readily distinguishes between statistical and clinical significance.

Billheimer (2019) suggests abandoning inference about parameters, which are frequently hypothetical quantities used to idealize a problem. Instead, he proposes focusing on the prediction of future observables, and their associated uncertainty, as a means to improving science and decision-making.

### 3.2.4. Thoughtful Communication of Confidence

**Be thoughtful** and clear about the level of confidence or credibility that is present in statistical results.

Amrhein, Trafimow, and Greenland (2019) and Greenland (2019) argue that the use of words like "significance" in conjunction with *p*-values and "confidence" with interval estimates misleads users into overconfident claims. They propose that researchers think of *p*-values as measuring the compatibility between hypotheses and data, and interpret interval estimates as "compatibility intervals."

In what may be a controversial proposal, Goodman (2018) suggests requiring "that any researcher making a claim in a study accompany it with their estimate of the chance that the claim is true." Goodman calls this the confidence index. For example, along with stating "This drug is associated with elevated risk of a heart attack, relative risk (RR) = 2.4, $p = 0.03$," Goodman says investigators might add a statement such as "There is an 80% chance that this drug raises the risk, and a 60% chance that the risk is at least doubled." Goodman acknowledges, "Although

simple on paper, requiring a confidence index would entail a profound overhaul of scientific and statistical practice."

In a similar vein, Hubbard and Carriquiry (2019) urge that researchers prominently display the probability the hypothesis is true or a probability distribution of an effect size, or provide sufficient information for future researchers and policy makers to compute it. The authors further describe why such a probability is necessary for decision making, how it could be estimated by using historical rates of reproduction of findings, and how this same process can be part of continuous "quality control" for science.

**Being thoughtful** in our approach to research will lead us to **be open** in our design, conduct, and presentation of it as well.

### 3.3. Be Open

We envision **openness** as embracing certain positive practices in the development and presentation of research work.

### 3.3.1. Openness to Transparency and to the Role of Expert Judgment

First, we repeat oft-repeated advice: **Be open** to "open science" practices. Calin-Jageman and Cumming (2019), Locascio (2019), and others in this special issue urge adherence to practices such as public pre-registration of methods, transparency and completeness in reporting, shared data and code, and even pre-registered ("results-blind") review. Completeness in reporting, for example, requires not only describing all analyses performed but also presenting all findings obtained, without regard to statistical significance or any such criterion.

**Openness** also includes understanding and accepting the role of expert judgment, which enters the practice of statistical inference and decision-making in numerous ways (O'Hagan 2019). "Indeed, there is essentially no aspect of scientific investigation in which judgment is not required," O'Hagan observes. "Judgment is necessarily subjective, but should be made as carefully, as objectively, and as scientifically as possible."

Subjectivity is involved in any statistical analysis, Bayesian or frequentist. Gelman and Hennig (2017) observe, "Personal decision making cannot be avoided in statistical data analysis and, for want of approaches to justify such decisions, the pursuit of objectivity degenerates easily to a pursuit to merely *appear* objective." One might say that subjectivity is not a problem; it is part of the solution.

Acknowledging this, Brownstein et al. (2019) point out that expert judgment and knowledge are required in all stages of the scientific method. They examine the roles of expert judgment throughout the scientific process, especially regarding the integration of statistical and content expertise. "All researchers, irrespective of their philosophy or practice, use expert judgment in developing models and interpreting results," say Brownstein et al. "We must accept that there is subjectivity in every stage of scientific inquiry, but objectivity is nevertheless the fundamental goal. Therefore, we should base judgments on evidence and careful reasoning, and seek wherever possible to eliminate potential sources of bias."

How does one rigorously elicit expert knowledge and judgment in an effective, unbiased, and transparent way? O'Hagan (2019) addresses this, discussing protocols to elicit expert knowledge in an unbiased and as scientifically sound was as possible. It is also important for such elicited knowledge to be examined critically, comparing it to actual study results being an important diagnostic step.

### 3.3.2. Openness in Communication

**Be open** in your reporting. Report $p$-values as continuous, descriptive statistics, as we explain in Section 2. We realize that this leaves researchers without their familiar bright line anchors. Yet if we were to propose a universal template for presenting and interpreting continuous $p$-values we would violate our own principles! Rather, we believe that the thoughtful use and interpretation of $p$-values will never adhere to a rigid rulebook, and will instead inevitably vary from study to study. Despite these caveats, we can offer recommendations for sound practices, as described below.

In all instances, regardless of the value taken by $p$ or any other statistic, consider what McShane et al. (2019) call the "currently subordinate factors"—the factors that should no longer be subordinate to "$p < 0.05$." These include relevant prior evidence, plausibility of mechanism, study design and data quality, and the real-world costs and benefits that determine what effects are scientifically important. The scientific context of your study matters, they say, and this should guide your interpretation.

When using $p$-values, remember not only Principle 5 of the ASA statement: "A $p$-value…does not measure the size of an effect or the importance of a result" but also Principle 6: "By itself, a $p$-value does not provide a good measure of evidence regarding a model or hypothesis." Despite these limitations, if you present $p$-values, do so for more than one hypothesized value of your variable of interest (Fraser 2019; Greenland 2019), such as 0 and at least one plausible, relevant alternative, such as the minimum practically important effect size (which should be determined before analyzing the data).

Betensky (2019) also reminds us to interpret the $p$-value in the context of sample size and meaningful effect size.

Instead of $p$, you might consider presenting the $s$-value (Greenland 2019), which is described in Section 3.2. As noted in Section 3.1, you might present a confidence interval. Sound practices in the interpretation of confidence intervals include (1) discussing both the upper and lower limits and whether they have different practical implications, (2) paying no particular attention to whether the interval includes the null value, and (3) remembering that an interval is itself an estimate subject to error and generally provides only a rough indication of uncertainty given that all of the assumptions used to create it are correct and, thus, for example, does not "rule out" values outside the interval. Amrhein, Trafimow, and Greenland (2019) suggest that interval estimates be interpreted as "compatibility" intervals rather than as "confidence" intervals, showing the values that are most compatible with the data, under the model used to compute the interval. They argue that such an interpretation and the practices outlined here can help guard against overconfidence.

It is worth noting that Tong (2019) disagrees with using $p$-values as descriptive statistics. "Divorced from the probability

claims attached to such quantities (confidence levels, nominal Type I errors, and so on), there is no longer any reason to privilege such quantities over descriptive statistics that more directly characterize the data at hand." He further states, "Methods with alleged generality, such as the $p$-value or Bayes factor, should be avoided in favor of discipline- and problem-specific solutions that can be designed to be fit for purpose."

Failing to **be open** in reporting leads to publication bias. Ioannidis (2019) notes the high level of selection bias prevalent in biomedical journals. He defines "selection" as "the collection of choices that lead from the planning of a study to the reporting of $p$-values." As an illustration of one form of selection bias, Ioannidis compared "the set of $p$-values reported in the full text of an article with the set of $p$-values reported in the abstract." The main finding, he says, "was that $p$-values chosen for the abstract tended to show greater significance than those reported in the text, and that the gradient was more pronounced in some types of journals and types of designs." Ioannidis notes, however, that selection bias "can be present regardless of the approach to inference used." He argues that in the long run, "the only direct protection must come from standards for reproducible research."

To **be open**, remember that one study is rarely enough. The words "a groundbreaking new study" might be loved by news writers but must be resisted by researchers. Breaking ground is only the first step in building a house. It will be suitable for habitation only after much more hard work.

**Be open** by providing sufficient information so that other researchers can execute meaningful alternative analyses. van Dongen et al. (2019) provide an illustrative example of such alternative analyses by different groups attacking the same problem.

**Being open** goes hand in hand with **being modest.**

### 3.4. Be Modest

Researchers of any ilk may rarely advertise their personal modesty. Yet the most successful ones cultivate a practice of **being modest** throughout their research, by understanding and clearly expressing the limitations of their work.

**Being modest** requires a reality check (Amrhein, Trafimow, and Greenland 2019). "A core problem," they observe, "is that both scientists and the public confound statistics with reality. But statistical inference is a thought experiment, describing the predictive performance of models about reality. Of necessity, these models are extremely simplified relative to the complexities of actual study conduct and of the reality being studied. Statistical results must eventually mislead us when they are used and communicated as if they present this complex reality, rather than a model for it. This is not a problem of our statistical methods. It is a problem of interpretation and communication of results."

**Be modest** in recognizing there is not a "true statistical model" underlying every problem, which is why it is wise to **thoughtfully** consider many possible models (Lavine 2019). Rougier (2019) calls on researchers to "recognize that behind every choice of null distribution and test statistic, there lurks

a plausible family of alternative hypotheses, which can provide more insight into the null distribution."

*p*-values, confidence intervals, and other statistical measures are all uncertain. Treating them otherwise is immodest overconfidence.

Remember that statistical tools have their limitations. Rose and McGuire (2019) show how use of stepwise regression in health care settings can lead to policies that are unfair.

Remember also that the amount of evidence for or against a hypothesis provided by *p*-values near the ubiquitous $p < 0.05$ threshold (Johnson 2019) is usually much less than you think (Benjamin and Berger 2019; Colquhoun 2019; Greenland 2019).

**Be modest** about the role of statistical inference in scientific inference. "Scientific inference is a far broader concept than statistical inference," says Hubbard, Haig, and Parsa (2019). "A major focus of scientific inference can be viewed as the pursuit of *significant sameness*, meaning replicable and empirically generalizable results among phenomena. Regrettably, the obsession with users of statistical inference to report *significant differences* in data sets actively thwarts cumulative knowledge development."

The nexus of **openness** and **modesty** is to report everything while at the same time not concluding anything from a single study with unwarranted certainty. Because of the strong desire to inform and be informed, there is a relentless demand to state results with certainty. Again, **accept uncertainty** and embrace variation in associations and effects, because they are always there, like it or not. Understand that expressions of uncertainty are themselves uncertain. Accept that one study is rarely definitive, so encourage, sponsor, conduct, and publish replication studies. Then, use meta-analysis, evidence reviews, and Bayesian methods to synthesize evidence across studies.

Resist the urge to overreach in the generalizability of claims, Watch out for pressure to embellish the abstract or the press release. If the study's limitations are expressed in the paper but not in the abstract, they may never be read.

**Be modest** by encouraging others to reproduce your work. Of course, for it to be reproduced readily, you will necessarily have been **thoughtful** in conducting the research and **open** in presenting it.

Hubbard and Carriquiry (see their "do list" in Section 7) suggest encouraging reproduction of research by giving "a byline status for researchers who reproduce studies." They would like to see digital versions of papers dynamically updated to display "Reproduced by…." below original research authors' names or "not yet reproduced" until it is reproduced.

Indeed, when it comes to reproducibility, Amrhein, Trafimow, and Greenland (2019) demand that we **be modest** in our expectations. "An important role for statistics in research is the summary and accumulation of information," they say. "If replications do not find the same results, this is not necessarily a crisis, but is part of a natural process by which science evolves. The goal of scientific methodology should be to direct this evolution toward ever more accurate descriptions of the world and how it works, not toward ever more publication of inferences, conclusions, or decisions."

Referring to replication studies in psychology, McShane et al. (2019) recommend that future large-scale replication projects "should follow the 'one phenomenon, many studies' approach of the Many Labs project and Registered Replication Reports rather than the 'many phenomena, one study' approach of the Open Science Collaboration project. In doing so, they should systematically vary method factors across the laboratories involved in the project." This approach helps achieve the goals of Amrhein, Trafimow, and Greenland (2019) by increasing understanding of why and when results replicate or fail to do so, yielding more accurate descriptions of the world and how it works. It also speaks to significant sameness versus significant difference a la Hubbard, Haig, and Parsa (2019).

Kennedy-Shaffer's (2019) historical perspective on statistical significance reminds us to **be modest**, by prompting us to recall how the current state of affairs in *p*-values has come to be.

Finally, **be modest** by recognizing that different readers may have very different stakes on the results of your analysis, which means you should try to take the role of a neutral judge rather than an advocate for any hypothesis. This can be done, for example, by pairing every null *p*-value with a *p*-value testing an equally reasonable alternative, and by discussing the endpoints of every interval estimate (not only whether it contains the null).

Accept that both scientific inference and statistical inference are hard, and understand that no knowledge will be efficiently advanced using simplistic, mechanical rules and procedures. Accept also that pure objectivity is an unattainable goal—no matter how laudable—and that both subjectivity and expert judgment are intrinsic to the conduct of science and statistics. Accept that there will always be uncertainty, and be **t**houghtful, **o**pen, and **m**odest. ATOM.

And to push this acronym further, we argue in the next section that **i**nstitutional **c**hange is needed, so we put forward that change is needed at the ATOMIC level. Let's go.

## 4.  Editorial, Educational and Other Institutional Practices Will Have to Change

Institutional reform is necessary for moving beyond statistical significance in any context—whether journals, education, academic incentive systems, or others. Several papers in this special issue focus on reform.

Goodman (2019) notes considerable social change is needed in academic institutions, in journals, and among funding and regulatory agencies. He suggests (see Section 7) partnering "with science reform movements and reformers within disciplines, journals, funding agencies and regulators to promote and reward 'reproducible' science and diminish the impact of statistical significance on publication, funding and promotion." Similarly, Colquhoun (2019) says, "In the end, the only way to solve the problem of reproducibility is to do more replication and to reduce the incentives that are imposed on scientists to produce unreliable work. The publish-or-perish culture has damaged science, as has the judgment of their work by silly metrics."

Trafimow (2019), who added energy to the discussion of *p*-values a few years ago by banning them from the journal he edits (Fricker et al. 2019), suggests five "nonobvious changes" to editorial practice. These suggestions, which demand reevaluating traditional practices in editorial policy, will not be trivial to implement but would result in massive change in some journals.

Locascio (2017, 2019) suggests that evaluation of manuscripts for publication should be "results-blind." That is, manuscripts should be assessed for suitability for publication based on the substantive importance of the research without regard to their reported results. Kmetz (2019) supports this approach as well and says that it would be a huge benefit for reviewers, "freeing [them] from their often thankless present jobs and instead allowing them to review research designs for their potential to provide useful knowledge." (See also "registered reports" from the Center for Open Science (*https://cos.io/rr/?_ga=2.184185454.979594832.1547755516-1193527346.1457026171*) and "registered replication reports" from the Association for Psychological Science (*https://www.psychologicalscience.org/publications/replication*) in relation to this concept.)

Amrhein, Trafimow, and Greenland (2019) ask if results-blind publishing means that anything goes, and then answer affirmatively: "Everything should be published in some form if whatever we measured made sense *before we obtained the data* because it was connected in a potentially useful way to some research question." Journal editors, they say, "should be proud about [their] exhaustive methods sections" and base their decisions about the suitability of a study for publication "on the quality of its materials and methods rather than on results and conclusions; the quality of the presentation of the latter is only judged after it is determined that the study is valuable based on its materials and methods."

A "variation on this theme is *pre-registered replication*, where a *replication* study, rather than the original study, is subject to strict pre-registration (e.g., Gelman 2015)," says Tong (2019). "A broader vision of this idea (Mogil and Macleod 2017) is to carry out a whole series of exploratory experiments *without* any formal statistical inference, and summarize the results by descriptive statistics (including graphics) or even just disclosure of the raw data. When results from this series of experiments converge to a single working hypothesis, it can *then* be subjected to a pre-registered, randomized and blinded, appropriately powered confirmatory experiment, carried out by another laboratory, in which valid statistical inference may be made."

Hurlbert, Levine, and Utts (2019) urge abandoning the use of "statistically significant" in all its forms and encourage journals to provide instructions to authors along these lines: "There is now wide agreement among many statisticians who have studied the issue that for reporting of statistical tests yielding *p*-values it is illogical and inappropriate to dichotomize the *p*-scale and describe results as 'significant' and 'nonsignificant.' Authors are strongly discouraged from continuing this never justified practice that originated from confusions in the early history of modern statistics."

Hurlbert, Levine, and Utts (2019) also urge that the *ASA Statement on P-Values and Statistical Significance* "be sent to the editor-in-chief of every journal in the natural, behavioral and social sciences for forwarding to their respective editorial boards and stables of manuscript reviewers. That would be a good way to quickly improve statistical understanding and practice." Kmetz (2019) suggests referring to the ASA statement whenever submitting a paper or revision to any editor, peer reviewer, or prospective reader. Hurlbert et al. encourage a "community grassroots effort" to encourage change in journal procedures.

Campbell and Gustafson (2019) propose a statistical model for evaluating publication policies in terms of weighing novelty of studies (and the likelihood of those studies subsequently being found false) against pre-specified study power. They observe that "no publication policy will be perfect. Science is inherently challenging and we must always be willing to accept that a certain proportion of research is potentially false."

Statistics education will require major changes at all levels to move to a post "*p* < 0.05" world. Two papers in this special issue make a specific start in that direction (Maurer et al. 2019; Steel, Liermann, and Guttorp 2019), but we hope that volumes will be written on this topic in other venues. We are excited that, with support from the ASA, the US Conference on Teaching Statistics (USCOTS) will focus its 2019 meeting on teaching inference.

The change that needs to happen demands change to editorial practice, to the teaching of statistics at every level where inference is taught, and to much more. However…

## 5. It Is Going to Take Work, and It Is Going to Take Time

If it were easy, it would have already been done, because as we have noted, this is nowhere near the first time the alarm has been sounded.

Why is eliminating the use of *p*-values as a truth arbiter so hard? "The basic explanation is neither philosophical nor scientific, but sociologic; everyone uses them," says Goodman (2019). "It's the same reason we can use money. When everyone believes in something's value, we can use it for real things; money for food, and *p*-values for knowledge claims, publication, funding, and promotion. It doesn't matter if the *p*-value doesn't mean what people think it means; it becomes valuable because of what it buys."

Goodman observes that statisticians alone cannot address the problem, and that "any approach involving only statisticians will not succeed." He calls on statisticians to ally themselves "both with scientists in other fields and with broader based, multidisciplinary scientific reform movements. What statisticians can do within our own discipline is important, but to effectively disseminate or implement virtually any method or policy, we need partners."

"The loci of influence," Goodman says, "include journals, scientific lay and professional media (including social media), research funders, healthcare payors, technology assessors, regulators, academic institutions, the private sector, and professional societies. They also can include policy or informational entities like the National Academies…as well as various other science advisory bodies across the government. Increasingly, they are also including non-traditional science reform organizations comprised both of scientists and of the science literate lay public…and a broad base of health or science advocacy groups…"

It is no wonder, then, that the problem has persisted for so long. And persist it has! Hubbard (2019) looked at citation-count data on twenty-five articles and books severely critical of the effect of null hypothesis significance testing (NHST) on good science. Though issues were well known, Hubbard says, this did nothing to stem NHST usage over time.

Greenland (personal communication, January 25, 2019) notes that cognitive biases and perverse incentives to offer firm conclusions where none are warranted can warp the use of any method. "The core human and systemic problems are not addressed by shifting blame to *p*-values and pushing alternatives as magic cures—especially alternatives that have been subject to little or no comparative evaluation in either classrooms or practice," Greenland said. "What we need now is to move beyond debating only our methods and their interpretations, to concrete proposals for elimination of systemic problems such as pressure to produce noteworthy findings rather than to produce reliable studies and analyses. Review and provisional acceptance of reports before their results are given to the journal (Locascio 2019) is one way to address that pressure, but more ideas are needed since review of promotions and funding applications cannot be so blinded. The challenges of how to deal with human biases and incentives may be the most difficult we must face." Supporting this view is McShane and Gal's (2016, 2017) empirical demonstration of cognitive dichotomization errors among biomedical and social science researchers—and even among statisticians.

Challenges for editors and reviewers are many. Here's an example: Fricker et al. (2019) observed that when *p*-values were suspended from the journal *Basic and Applied Social Psychology* authors tended to overstate conclusions.

With all the challenges, how do we get from here to there, from a "*p* < 0.05" world to a post "*p* < 0.05" world?

Matthews (2019) notes that "Any proposal encouraging changes in inferential practice must accept the ubiquity of NHST.…Pragmatism suggests, therefore, that the best hope of achieving a change in practice lies in offering inferential tools that can be used alongside the concepts of NHST, adding value to them while mitigating their most egregious features."

Benjamin and Berger (2019) propose three practices to help researchers during the transition away from use of statistical significance. "…[O]ur goal is to suggest minimal changes that would require little effort for the scientific community to implement," they say. "Motivating this goal are our hope that easy (but impactful) changes might be adopted and our worry that more complicated changes could be resisted simply because they are perceived to be too difficult for routine implementation."

Yet there is also concern that progress will stop after a small step or two. Even some proponents of small steps are clear that those small steps still carry us far short of the destination.

For example, Matthews (2019) says that his proposed methodology "is not a panacea for the inferential ills of the research community." But that doesn't make it useless. It may "encourage researchers to move beyond NHST and explore the statistical armamentarium now available to answer the central question of research: what does our study tell us?" he says. It "provides a bridge between the dominant but flawed NHST paradigm and the less familiar but more informative methods of Bayesian estimation."

Likewise, Benjamin and Berger (2019) observe, "In research communities that are deeply attached to reliance on '*p* < 0.05,' our recommendations will serve as initial steps away from this attachment. We emphasize that our recommendations are intended merely as initial, temporary steps and that many

further steps will need to be taken to reach the ultimate destination: a holistic interpretation of statistical evidence that fully conforms to the principles laid out in the ASA Statement…"

Yet, like the authors of this editorial, not all authors in this special issue support gradual approaches with transitional methods.

Some (e.g., Amrhein, Trafimow, and Greenland 2019; Hurlbert, Levine, and Utts 2019; McShane et al. 2019) prefer to rip off the bandage and abandon use of statistical significance altogether. In short, no more dichotomizing *p*-values into categories of "significance." Notably, these authors do not suggest banning the use of *p*-values, but rather suggest using them descriptively, treating them as continuous, and assessing their weight or import with nuanced thinking, clear language, and full understanding of their properties.

So even when there is agreement on the destination, there is disagreement about what road to take. The questions around reform need consideration and debate. It might turn out that different fields take different roads.

The catalyst for change may well come from those people who fund, use, or depend on scientific research, say Calin-Jageman and Cumming (2019). They believe this change has not yet happened to the desired level because of "the cognitive opacity of the NHST approach: the counter-intuitive *p*-value (it's good when it is small), the mysterious null hypothesis (you want it to be false), and the eminently confusable Type I and Type II errors."

Reviewers of this editorial asked, as some readers of it will, is a *p*-value threshold ever okay to use? We asked some of the authors of articles in the special issue that question as well. Authors identified four general instances. Some allowed that, while *p*-value thresholds should not be used for inference, they might still be useful for applications such as industrial quality control, in which a highly automated decision rule is needed and the costs of erroneous decisions can be carefully weighed when specifying the threshold. Other authors suggested that such dichotomized use of *p*-values was acceptable in model-fitting and variable selection strategies, again as automated tools, this time for sorting through large numbers of potential models or variables. Still others pointed out that *p*-values with very low thresholds are used in fields such as physics, genomics, and imaging as a filter for massive numbers of tests. The fourth instance can be described as "confirmatory setting[s] where the study design and statistical analysis plan are specified prior to data collection, and then adhered to during and after it" (Tong 2019). Tong argues these are the only proper settings for formal statistical inference. And Wellek (2017) says at present it is essential in these settings. "[B]inary decision making is indispensable in medicine and related fields," he says. "[A] radical rejection of the classical principles of statistical inference…is of virtually no help as long as no conclusively substantiated alternative can be offered."

Eliminating the declaration of "statistical significance" based on $p < 0.05$ or other arbitrary thresholds will be easier in some venues than others. Most journals, if they are willing, could fairly rapidly implement editorial policies to effect these changes. Suggestions for how to do that are in this special issue of *The American Statistician*. However, regulatory agencies might require longer timelines for making changes. The U.S. Food and

Drug Administration (FDA), for example, has long established drug review procedures that involve comparing $p$-values to significance thresholds for Phase III drug trials. Many factors demand consideration, not the least of which is how to avoid turning every drug decision into a court battle. Goodman (2019) cautions that, even as we seek change, "we must respect the reason why the statistical procedures are there in the first place." Perhaps the ASA could convene a panel of experts, internal and external to FDA, to provide a workable new paradigm. (See Ruberg et al. 2019, who argue for a Bayesian approach that employs data from other trials as a "prior" for Phase 3 trials.)

Change is needed. Change has been needed for decades. Change has been called for by others for quite a while. So…

## 6. Why Will Change Finally Happen Now?

In 1991, a confluence of weather events created a monster storm that came to be known as "the perfect storm," entering popular culture through a book (Junger 1997) and a 2000 movie starring George Clooney. Concerns about reproducible science, falling public confidence in science, and the initial impact of the ASA statement in heightening awareness of long-known problems created a perfect storm, in this case, a good storm of motivation to make lasting change. Indeed, such change was the intent of the ASA statement, and we expect this special issue of TAS will inject enough additional energy to the storm to make its impact widely felt.

We are not alone in this view. "60+ years of incisive criticism has not yet dethroned NHST as the dominant approach to inference in many fields of science," note Calin-Jageman and Cumming (2019). "Momentum, though, seems to finally be on the side of reform."

Goodman (2019) agrees: "The initial slow speed of progress should not be discouraging; that is how all broad-based social movements move forward and we should be playing the long game. But the ball is rolling downhill, the current generation is inspired and impatient to carry this forward."

So, let's do it. Let's move beyond "statistically significant," even if upheaval and disruption are inevitable for the time being. It's worth it. In a world beyond "$p < 0.05$," by breaking free from the bonds of statistical significance, statistics in science and policy will become more significant than ever.

## 7. Authors' Suggestions

The editors of this special TAS issue on statistical inference asked all the contact authors to help us summarize the guidance they provided in their papers by providing us a short list of do's. We asked them to be specific but concise and to be active—start each with a verb. Here is the complete list of the authors' responses, ordered as the papers appear in this special issue.

### 7.1. Getting to a Post "$p < 0.05$" Era

**Ioannidis, J., What Have We (Not) Learnt From Millions of Scientific Papers With $p$-Values?**

1. Do not use $p$-values, unless you have clearly thought about the need to use them and they still seem the best choice.

2. Do not favor "statistically significant" results.
3. Do be highly skeptical about "statistically significant" results at the 0.05 level.

**Goodman, S., Why Is Getting Rid of $p$-Values So Hard? Musings on Science and Statistics**

1. Partner with science reform movements and reformers within disciplines, journals, funding agencies and regulators to promote and reward reproducible science and diminish the impact of statistical significance on publication, funding and promotion.
2. Speak to and write for the multifarious array of scientific disciplines, showing how statistical uncertainty and reasoning can be conveyed in non-"bright-line" ways both with conventional and alternative approaches. This should be done not just in didactic articles, but also in original or reanalyzed research, to demonstrate that it is publishable.
3. Promote, teach and conduct meta-research within many individual scientific disciplines to demonstrate the adverse effects in each of over-reliance on and misinterpretation of $p$-values and significance verdicts in individual studies and the benefits of emphasizing estimation and cumulative evidence.
4. Require reporting a quantitative measure of certainty—a "confidence index"—that an observed relationship, or claim, is true. Change analysis goal from achieving significance to appropriately estimating this confidence.
5. Develop and share teaching materials, software, and published case examples to help with all of the do's above, and to spread progress in one discipline to others.

**Hubbard, R., Will the ASA's Efforts to Improve Statistical Practice be Successful? Some Evidence to the Contrary**

This list applies to the ASA and to the professional statistics community more generally.

1. Specify, where/if possible, those situations in which the $p$-value plays a clearly valuable role in data analysis and interpretation.
2. Contemplate issuing a statement abandoning the use of $p$-values in null hypothesis significance testing.

**Kmetz, J., Correcting Corrupt Research: Recommendations for the Profession to Stop Misuse of $p$-Values**

1. Refer to the ASA statement on $p$-values whenever submitting a paper or revision to any editor, peer reviewer, or prospective reader. Many in the field do not know of this statement, and having the support of a prestigious organization when authoring any research document will help stop corrupt research from becoming even more dominant than it is.
2. Train graduate students and future researchers by having them reanalyze published studies and post their findings to appropriate websites or weblogs. This practice will benefit not only the students, but will benefit the professions, by increasing the amount of replicated (or nonreplicated) research available and readily accessible, and as well as reformer organizations that support replication.
3. Join one or more of the reformer organizations formed or forming in many research fields, and support and publicize their efforts to improve the quality of research practices.

4. Challenge editors and reviewers when they assert that incorrect practices and interpretations of research, consistent with existing null hypothesis significance testing and beliefs regarding $p$-values, should be followed in papers submitted to their journals. Point out that new submissions have been prepared to be consistent with the ASA statement on $p$-values.

5. Promote emphasis on research quality rather than research quantity in universities and other institutions where professional advancement depends heavily on research "productivity," by following the practices recommended in this special journal edition. This recommendation will fall most heavily on those who have already achieved success in their fields, perhaps by following an approach quite different from that which led to their success; whatever the merits of that approach may have been, one objectionable outcome of it has been the production of voluminous corrupt research and creation of an environment that promotes and protects it. We must do better.

### Hubbard, D., and Carriquiry, A., Quality Control for Scientific Research: Addressing Reproducibility, Responsiveness and Relevance

1. Compute and prominently display the probability the hypothesis is true (or a probability distribution of an effect size) or provide sufficient information for future researchers and policy makers to compute it.

2. Promote publicly displayed quality control metrics within your field—in particular, support tracking of reproduction studies and computing the "level 1" and even "level 2" priors as required for #1 above.

3. Promote a byline status for researchers who reproduce studies: Digital versions are dynamically updated to display "Reproduced by…." below original research authors' names or "Not yet reproduced" until it is reproduced.

### Brownstein, N., Louis, T., O'Hagan, A., and Pendergast, J., The Role of Expert Judgment in Statistical Inference and Evidence-Based Decision-Making

1. Staff the study team with members who have the necessary knowledge, skills and experience—statistically, scientifically, and otherwise.

2. Include key members of the research team, including statisticians, in all scientific and administrative meetings.

3. Understand that subjective judgments are needed in all stages of a study.

4. Make all judgments as carefully and rigorously as possible and document each decision and rationale for transparency and reproducibility.

5. Use protocol-guided elicitation of judgments.

6. Statisticians specifically should:

   - Refine oral and written communication skills.
   - Understand their multiple roles and obligations as collaborators.
   - Take an active leadership role as a member of the scientific team; contribute throughout all phases of the study.

   - Co-own the subject matter—understand a sufficient amount about the relevant science/policy to meld statistical and subject-area expertise.
   - Promote the expectation that your collaborators co-own statistical issues.
   - Write a statistical analysis plan for all analyses and track any changes to that plan over time.
   - Promote co-responsibility for data quality, security, and documentation.
   - Reduce unplanned and uncontrolled modeling/testing (HARK-ing, $p$-hacking); document all analyses.

### O'Hagan, A., Expert Knowledge Elicitation: Subjective but Scientific

1. Elicit expert knowledge when data relating to a parameter of interest is weak, ambiguous or indirect.

2. Use a well-designed protocol, such as SHELF, to ensure expert knowledge is elicited in as scientific and unbiased a way as possible.

### Kennedy-Shaffer, L., Before $p < 0.05$ to Beyond $p < 0.05$: Using History to Contextualize p-Values and Significance Testing

1. Ensure that inference methods match intuitive understandings of statistical reasoning.

2. Reduce the computational burden for nonstatisticians using statistical methods.

3. Consider changing conditions of statistical and scientific inference in developing statistical methods.

4. Address uncertainty quantitatively and in ways that reward increased precision.

### Hubbard, R., Haig, B. D., and Parsa, R. A., The Limited Role of Formal Statistical Inference in Scientific Inference

1. Teach readers that although deemed equivalent in the social, management, and biomedical sciences, formal methods of statistical inference and scientific inference are very different animals.

2. Show these readers that formal methods of statistical inference play only a restricted role in scientific inference.

3. Instruct researchers to pursue significant *sameness* (i.e., replicable and empirically generalizable results) rather than significant *differences* in results.

4. Demonstrate how the pursuit of significant differences actively impedes cumulative knowledge development.

### McShane, B., Tackett, J., Böckenholt, U., and Gelman, A., Large Scale Replication Projects in Contemporary Psychological Research

1. When planning a replication study of a given psychological phenomenon, bear in mind that replication is complicated in psychological research because studies can never be direct or exact replications of one another, and thus heterogeneity—effect sizes that vary from one study of the phenomenon to the next—cannot be avoided.

2. Future large scale replication projects should follow the "one phenomenon, many studies" approach of the Many Labs project and Registered Replication Reports rather than the

"many phenomena, one study" approach of the Open Science Collaboration project. In doing so, they should systematically vary method factors across the laboratories involved in the project.

3. Researchers analyzing the data resulting from large scale replication projects should do so via a hierarchical (or multilevel) model fit to the totality of the individual-level observations. In doing so, all theoretical moderators should be modeled via covariates while all other potential moderators—that is, method factors—should induce variation (i.e., heterogeneity).

4. Assessments of replicability should not depend solely on estimates of effects, or worse, significance tests based on them. Heterogeneity must also be an important consideration in assessing replicability.

### 7.2. Interpreting and Using p

*Greenland, S., Valid p-Values Behave Exactly as They Should: Some Misleading Criticisms of p-Values and Their Resolution With s-Values*

1. Replace any statements about statistical significance of a result with the *p*-value from the test, and present the *p*-value as an equality, not an inequality. For example, if $p = 0.03$ then "…was statistically significant" would be replaced by "…had $p = 0.03$," and "$p < 0.05$" would be replaced by "$p = 0.03$." (An exception: If $p$ is so small that the accuracy becomes very poor then an inequality reflecting that limit is appropriate; e.g., depending on the sample size, *p*-values from normal or $\chi^2$ approximations to discrete data often lack even 1-digit accuracy when $p < 0.0001$.) In parallel, if $p = 0.25$ then "…was not statistically significant" would be replaced by "…had $p = 0.25$," and "$p > 0.05$" would be replaced by "$p = 0.25$."

2. Present *p*-values for more than one possibility when testing a targeted parameter. For example, if you discuss the *p*-value from a test of a null hypothesis, also discuss alongside this null *p*-value another *p*-value for a plausible alternative parameter possibility (ideally the one used to calculate power in the study proposal). As another example: if you do an equivalence test, present the *p*-values for both the lower and upper bounds of the equivalence interval (which are used for equivalence tests based on two one-sided tests).

3. Show confidence intervals for targeted study parameters, but also supplement them with *p*-values for testing relevant hypotheses (e.g., the *p*-values for both the null and the alternative hypotheses used for the study design or proposal, as in #2). Confidence intervals only show clearly what is in or out of the interval (i.e., a 95% interval only shows clearly what has $p > 0.05$ or $p \leq 0.05$), but more detail is often desirable for key hypotheses under contention.

4. Compare groups and studies directly by showing *p*-values and interval estimates for their differences, not by comparing *p*-values or interval estimates from the two groups or studies. For example, seeing $p = 0.03$ in males and $p = 0.12$ in females does **not** mean that different associations were seen in males and females; instead, one needs a *p*-value and confidence interval for the difference in the sex-specific

associations to examine the between-sex difference. Similarly, if an early study reported a confidence interval which excluded the null and then a subsequent study reported a confidence interval which included the null, that does not mean the studies gave conflicting results or that the second study failed to replicate the first study; instead, one needs a *p*-value and confidence interval for the difference in the study-specific associations to examine the between-study difference. In all cases, differences-between-differences must be analyzed directly by statistics for that purpose.

5. Supplement a focal *p*-value *p* with its Shannon information transform (*s*-value or surprisal) $s = -\log_2(p)$. This measures the amount of information supplied by the test against the tested hypothesis (or model): Rounded off, the s-value s shows the number of heads in a row one would need to see when tossing a coin to get the same amount of information against the tosses being "fair" (independent with "heads" probability of 1/2) instead of being loaded for heads. For example, if $p = 0.03$, this represents $-\log_2(0.03) = 5$ bits of information against the hypothesis (like getting 5 heads in a trial of "fairness" with 5 coin tosses); and if $p = 0.25$, this represents only $-\log_2(0.25) = 2$ bits of information against the hypothesis (like getting 2 heads in a trial of "fairness" with only 2 coin tosses).

*Betensky, R., The p-Value Requires Context, Not a Threshold*

1. Interpret the *p*-value in light of its context of sample size and meaningful effect size.

2. Incorporate the sample size and meaningful effect size into a decision to reject the null hypothesis.

*Anderson, A., Assessing Statistical Results: Magnitude, Precision and Model Uncertainty*

1. Evaluate the importance of statistical results based on their practical implications.

2. Evaluate the strength of empirical evidence based on the precision of the estimates and the plausibility of the modeling choices.

3. Seek out subject matter expertise when evaluating the importance and the strength of empirical evidence.

*Heck, P., and Krueger, J., Putting the p-Value in Its Place*

1. Use the *p*-value as a heuristic, that is, as the base for a tentative inference regarding the presence or absence of evidence against the tested hypothesis.

2. Supplement the *p*-value with other, conceptually distinct methods and practices, such as effect size estimates, likelihood ratios, or graphical representations.

3. Strive to embed statistical hypothesis testing within strong *a priori* theory and a context of relevant prior empirical evidence.

*Johnson, V., Evidence From Marginally Significant t-Statistics*

1. Be transparent in the number of outcome variables that were analyzed.

2. Report the number (and values) of all test statistics that were calculated.

3. Provide access to protocols for studies involving human or animal subjects.

4. Clearly describe data values that were excluded from analysis and the justification for doing so.

5. Provide sufficient details on experimental design so that other researchers can replicate the experiment.

6. Describe only *p*-values less than 0.005 as being "statistically significant."

### Fraser, D., The p-Value Function and Statistical Inference

1. Determine a primary variable for assessing the hypothesis at issue.

2. Calculate its well defined distribution function, respecting continuity.

3. Substitute the observed data value to obtain the "*p*-value function."

4. Extract the available well defined confidence bounds, confidence intervals, and median estimate.

5. Know that you don't have an intellectual basis for decisions.

### Rougier, J., p-Values, Bayes Factors, and Sufficiency

1. Recognize that behind every choice of null distribution and test statistic, there lurks a plausible family of alternative hypotheses, which can provide more insight into the null distribution.

### Rose, S., and McGuire, T., Limitations of p-Values and R-Squared for Stepwise Regression Building: A Fairness Demonstration in Health Policy Risk Adjustment

1. Formulate a clear objective for variable inclusion in regression procedures.

2. Assess all relevant evaluation metrics.

3. Incorporate algorithmic fairness considerations.

### 7.3.  Supplementing or Replacing p

### Blume, J., Greevy, R., Welty, V., Smith, J., and DuPont, W., An Introduction to Second Generation p-Values

1. Construct a composite null hypothesis by specifying the range of effects that are not scientifically meaningful (do this before looking at the data). Why: Eliminating the conflict between scientific significance and statistical significance has numerous statistical and scientific benefits.

2. Replace classical *p*-values with second-generation *p*-values (SGPV). Why: SGPVs accommodate composite null hypotheses and encourage the proper communication of findings.

3. Interpret the SGPV as a high-level summary of what the data say. Why: Science needs a simple indicator of when the data support only meaningful effects (SGPV = 0), when the data support only trivially null effects (SGPV = 1), or when the data are inconclusive (0 < SGPV < 1).

4. Report an interval estimate of effect size (confidence interval, support interval, or credible interval) and note its proximity to the composite null hypothesis. Why: This is a more detailed description of study findings.

5. Consider reporting false discovery rates with SGPVs of 0 or 1. Why: FDRs gauge the chance that an inference is incorrect under assumptions about the data generating process and prior knowledge.

### Goodman, W., Spruill, S., and Komaroff, E., A Proposed Hybrid Effect Size Plus p-Value Criterion: Empirical Evidence Supporting Its Use

1. Determine how far the true parameter's value would have to be, in your research context, from exactly equaling the conventional, point null hypothesis to consider that the distance is meaningfully large or practically significant.

2. Combine the conventional *p*-value criterion with a minimum effect size criterion to generate a two-criteria inference-indicator signal, which provides heuristic, but nondefinitive evidence, for inferring the parameter's true location.

3. Document the intended criteria for your inference procedures, such as a *p*-value cut-point and a minimum practically significant effect size, prior to undertaking the procedure.

4. Ensure that you use the appropriate inference method for the data that are obtainable and for the inference that is intended.

5. Acknowledge that every study is fraught with limitations from unknowns regarding true data distributions and other conditions that one's method assumes.

### Benjamin, D., and Berger, J., Three Recommendations for Improving the Use of p-Values

1. Replace the 0.05 "statistical significance" threshold for claims of novel discoveries with a 0.005 threshold and refer to *p*-values between 0.05 and 0.005 as "suggestive."

2. Report the data-based odds of the alternative hypothesis to the null hypothesis. If the data-based odds cannot be calculated, then use the *p*-value to report an upper bound on the data-based odds: $1/(-ep \ln p)$.

3. Report your prior odds and posterior odds (prior odds * data-based odds) of the alternative hypothesis to the null hypothesis. If the data-based odds cannot be calculated, then use your prior odds and the *p*-value to report an upper bound on your posterior odds: (prior odds) * $(1/(-ep \ln p))$.

### Colquhoun, D., The False Positive Risk: A Proposal Concerning What to Do About p-Values

1. Continue to provide *p*-values and confidence intervals. Although widely misinterpreted, people know how to calculate them and they aren't entirely useless. Just don't ever use the terms "statistically significant" or "nonsignificant."

2. Provide in addition an indication of false positive risk (FPR). This is the probability that the claim of a real effect on the basis of the *p*-value is in fact false. The FPR (not the *p*-value) is the probability that your result occurred by chance. For example, the fact that, under plausible assumptions, observation of a *p*-value close to 0.05 corresponds to an FPR of at least 0.2–0.3 shows clearly the weakness of the conventional criterion for "statistical significance."

3. Alternatively, specify the prior probability of there being a real effect that one would need to be able to justify in order to achieve an FPR of, say, 0.05.

Notes:

There are many ways to calculate the FPR. One, based on a point null and simple alternative can be calculated with the web calculator at *http://fpr-calc.ucl.ac.uk/*. However other approaches to the calculation of FPR, based on different

assumptions, give results that are similar (Table 1 in Colquhoun 2019).

To calculate FPR it is necessary to specify a prior probability and this is rarely known. My recommendation 2 is based on giving the FPR for a prior probability of 0.5. Any higher prior probability of there being a real effect is not justifiable in the absence of hard data. In this sense, the calculated FPR is the minimum that can be expected. More implausible hypotheses would make the problem worse. For example, if the prior probability of there being a real effect were only 0.1, then observation of $p = 0.05$ would imply a disastrously high FPR = 0.76, and in order to achieve an FPR of 0.05, you'd need to observe $p = 0.00045$. Others (especially Goodman) have advocated giving likelihood ratios (LRs) in place of $p$-values. The FPR for a prior of 0.5 is simply $1/(1 + LR)$, so to give the FPR for a prior of 0.5 is simply a more-easily-comprehensible way of specifying the LR, and so should be acceptable to frequentists and Bayesians.

**Matthews, R., *Moving Toward the Post p < 0.05 Era via the Analysis of Credibility***

1. Report the outcome of studies as effect sizes summarized by confidence intervals (CIs) along with their point estimates.
2. Make full use of the point estimate and width and location of the CI relative to the null effect line when interpreting findings. The point estimate is generally the effect size best supported by the study, irrespective of its statistical significance/nonsignificance. Similarly, tight CIs located far from the null effect line generally represent more compelling evidence for a nonzero effect than wide CIs lying close to that line.
3. Use the analysis of credibility (AnCred) to assess quantitatively the credibility of inferences based on the CI. AnCred determines the level of prior evidence needed for a new finding to provide credible evidence for a nonzero effect.
4. Establish whether this required level of prior evidence is supported by current knowledge and insight. If it is, the new result provides credible evidence for a nonzero effect, irrespective of its statistical significance/nonsignificance.

**Gannon, M., Pereira, C., and Polpo, A., *Blending Bayesian and Classical Tools to Define Optimal Sample-Size-Dependent Significance Levels***

1. Retain the useful concept of statistical significance and the same operational procedures as currently used for hypothesis tests, whether frequentist (Neyman–Pearson $p$-value tests) or Bayesian (Bayes-factor tests).
2. Use tests with a sample-size-dependent significance level—ours is optimal in the sense of the generalized Neyman–Pearson lemma.
3. Use a testing scheme that allows tests of any kind of hypothesis, without restrictions on the dimensionalities of the parameter space or the hypothesis. Note that this should include "sharp" hypotheses, which correspond to subsets of lower dimensionality than the full parameter space.
4. Use hypothesis tests that are compatible with the likelihood principle (LP). They can be easier to interpret consistently than tests that are not LP-compliant.

5. Use numerical methods to handle hypothesis-testing problems with high-dimensional sample spaces or parameter spaces.

**Pogrow, S., *How Effect Size (Practical Significance) Misleads Clinical Practice: The Case for Switching to Practical Benefit to Assess Applied Research Findings***

1. Switch from reliance on statistical or practical significance to the more stringent statistical criterion of practical benefit for (a) assessing whether applied research findings indicate that an intervention is effective and should be adopted and scaled—particularly in complex organizations such as schools and hospitals and (b) determining whether relationships are sufficiently strong and explanatory to be used as a basis for setting policy or practice recommendations. Practical benefit increases the likelihood that observed benefits will replicate in subsequent research and in clinical practice by avoiding the problems associated with relying on small effect sizes.
2. Reform statistics courses in applied disciplines to include the principles of practical benefit, and have students review influential applied research articles in the discipline to determine which findings demonstrate practical benefit.
3. Recognize the need to develop different inferential statistical criteria for assessing the importance of applied research findings as compared to assessing basic research findings.
4. Consider consistent, noticeable improvements across contexts using the quick prototyping methods of improvement science as a preferable methodology for identifying effective practices rather than on relying on RCT methods.
5. Require that applied research reveal the actual unadjusted means/medians of results for all groups and subgroups, and that review panels take such data into account—as opposed to only reporting relative differences between adjusted means/medians. This will help preliminarily identify whether there appear to be clear benefits for an intervention.

### 7.4.  Adopting More Holistic Approaches

**McShane, B., Gal, D., Gelman, A., Robert, C., and Tackett, J., *Abandon Statistical Significance***

1. Treat $p$-values (and other purely statistical measures like confidence intervals and Bayes factors) continuously rather than in a dichotomous or thresholded manner. In doing so, bear in mind that it seldom makes sense to calibrate evidence as a function of $p$-values or other purely statistical measures because they are, among other things, typically defined relative to the generally uninteresting and implausible null hypothesis of zero effect and zero systematic error.
2. Give consideration to related prior evidence, plausibility of mechanism, study design and data quality, real world costs and benefits, novelty of finding, and other factors that vary by research domain. Do this always—not just once some $p$-value or other statistical threshold has been attained—and do this without giving priority to $p$-values or other purely statistical measures.

3. Analyze and report all of the data and relevant results rather than focusing on single comparisons that attain some *p*-value or other statistical threshold.
4. Conduct a decision analysis: *p*-value and other statistical threshold-based rules implicitly express a particular tradeoff between Type I and Type II error, but in reality this tradeoff should depend on the costs, benefits, and probabilities of all outcomes.
5. Accept uncertainty and embrace variation in effects: we can learn much (indeed, more) about the world by forsaking the false promise of certainty offered by dichotomous declarations of truth or falsity—binary statements about there being "an effect" or "no effect"—based on some *p*-value or other statistical threshold being attained.
6. Obtain more precise individual-level measurements, use within-person or longitudinal designs more often, and give increased consideration to models that use informative priors, that feature varying treatment effects, and that are multilevel or meta-analytic in nature.

### Tong, C., *Statistical Inference Enables Bad Science; Statistical Thinking Enables Good Science*

1. Prioritize effort for sound data production: the planning, design, and execution of the study.
2. Build scientific arguments with many sets of data and multiple lines of evidence.
3. Recognize the difference between exploratory and confirmatory objectives and use distinct statistical strategies for each.
4. Use flexible descriptive methodology, including disciplined data exploration, enlightened data display, and regularized, robust, and nonparametric models, for exploratory research.
5. Restrict statistical inferences to confirmatory analyses for which the study design and statistical analysis plan are pre-specified prior to, and strictly adhered to during, data acquisition.

### Amrhein, V., Trafimow, D., and Greenland, S., *Inferential Statistics as Descriptive Statistics: There Is No Replication Crisis If We Don't Expect Replication*

1. Do not dichotomize, but embrace variation.

(a) Report and interpret inferential statistics like the *p*-value in a continuous fashion; do not use the word "significant."
(b) Interpret interval estimates as "compatibility intervals," showing effect sizes most compatible with the data, under the model used to compute the interval; do not focus on whether such intervals include or exclude zero.
(c) Treat inferential statistics as highly unstable local descriptions of relations between models and the obtained data.

   (i) Free your "negative results" by allowing them to be potentially positive. Most studies with large *p*-values or interval estimates that include the null should be considered "positive," in the sense that they usually leave open the possibility of important effects (e.g., the effect sizes within the interval estimates).

   (ii) Free your "positive results" by allowing them to be different. Most studies with small *p*-values or interval estimates that are not near the null should be considered provisional, because in replication studies the *p*-values could be large and the interval estimates could show very different effect sizes.

   (iii) There is no replication crisis if we don't expect replication. Honestly reported results *must* vary from replication to replication because of varying assumption violations and random variation; excessive agreement itself would suggest deeper problems such as failure to publish results in conflict with group expectations.

### Calin-Jageman, R., and Cumming, G., *The New Statistics for Better Science: Ask How Much, How Uncertain, and What Else Is Known*

1. Ask quantitative questions and give quantitative answers.
2. Countenance uncertainty in all statistical conclusions, seeking ways to quantify, visualize, and interpret the potential for error.
3. Seek replication, and use quantitative methods to synthesize across data sets as a matter of course.
4. Use Open Science practices to enhance the trustworthiness of research results.
5. Avoid, wherever possible, any use of *p*-values or NHST.

### Ziliak, S., *How Large Are Your G-Values? Try Gosset's Guinnessometrics When a Little "p" Is Not Enough*

- *G-10 Consider the Purpose of the Inquiry, and Compare with Best Practice.* Falsification of a null hypothesis is not the main purpose of the experiment or observational study. Making money or beer or medicine—ideally more and better than the competition and best practice—is. Estimating the importance of your coefficient relative to results reported by others, is. To repeat, as the 2016 ASA Statement makes clear, merely falsifying a null hypothesis with a qualitative yes/no, exists/does not exist, significant/not significant answer, is not itself significant science, and should be eschewed.
- *G-9 Estimate the Stakes (Or Eat Them).* Estimation of magnitudes of effects, and demonstrations of their substantive meaning, should be the center of most inquiries. Failure to specify the stakes of a hypothesis is the first step toward eating them (gulp).
- *G-8 Study Correlated Data: ABBA, Take a Chance on Me.* Most regression models assume "iid" error terms—independently and identically distributed—yet most data in the social and life sciences are correlated by systematic, nonrandom effects—and are thus not independent. Gosset solved the problem of correlated soil plots with the "ABBA" layout, maximizing the correlation of paired differences between the As and Bs with a perfectly balanced chiasmic arrangement.
- *G-7 Minimize "Real Error" with the 3 R's: Represent, Replicate, Reproduce.* A test of significance on a single set of data is nearly valueless. Fisher's *p*, Student's *t*, and other tests should only be used when there is actual repetition of the experi-

ment. "One and done" is scientism, not scientific. Random error is not equal to real error, and is usually smaller and less important than the sum of nonrandom errors. Measurement error, confounding, specification error, and bias of the auspices are frequently larger in all the testing sciences, agronomy to medicine. Guinnessometrics minimizes real error by repeating trials on stratified and balanced yet independent experimental units, controlling as much as possible for local fixed effects.

- *G-6 Economize with "Less is More": Small Samples of Independent Experiments*. Small sample analysis and distribution theory has an economic origin and foundation: changing inputs to the beer on the large scale (for Guinness, enormous global scale) is risky, with more than money at stake. But smaller samples, as Gosset showed in decades of barley and hops experimentation, does not mean "less than," and Big Data is in any case not the solution for many problems.

- *G-5 Keep Your Eyes on the Size Matters/How Much? Question*. There will be distractions but the expected loss and profit functions rule, or should. Are regression coefficients or differences between means large or small? Compared to what? How do you know?

- *G-4 Visualize*. Parameter uncertainty is not the same thing as model uncertainty. Does the result hit you between the eyes? Does the study show magnitudes of effects across the entire distribution? Advances in visualization software continue to outstrip advances in statistical modeling, making more visualization a no brainer.

- *G-3 Consider Posteriors and Priors too ("It pays to go Bayes")*. The sample on hand is rarely the only thing that is "known." Subject matter expertise is an important prior input to statistical design and affects analysis of "posterior" results. For example, Gosset at Guinness was wise to keep quality assurance metrics and bottom line profit at the center of his inquiry. How does prior information fit into the story and evidence? Advances in Bayesian computing software make it easier and easier to do a Bayesian analysis, merging prior and posterior information, values, and knowledge.

- *G-2 Cooperate Up, Down, and Across (Networks and Value Chains)*. For example, where would brewers be today without the continued cooperation of farmers? Perhaps back on the farm and not at the brewery making beer. Statistical science is social, and cooperation helps. Guinness financed a large share of modern statistical theory, and not only by supporting Gosset and other brewers with academic sabbaticals (Ziliak and McCloskey 2008).

- *G-1 Answer the Brewer's Original Question ("How should you set the odds?")*. No bright-line rule of statistical significance can answer the brewer's question. As Gosset said way back in 1904, how you set the odds depends on "the importance of the issues at stake" (e.g., the expected benefit and cost) together with the cost of obtaining new material.

### Billheimer, D., Predictive Inference and Scientific Reproducibility

1. Predict observable events or quantities that you care about.
2. Quantify the uncertainty of your predictions.

### Manski, C., Treatment Choice With Trial Data: Statistical Decision Theory Should Supplant Hypothesis Testing

1. Statisticians should relearn statistical decision theory, which received considerable attention in the middle of the twentieth century but was largely forgotten by the century's end.
2. Statistical decision theory should supplant hypothesis testing when statisticians study treatment choice with trial data.
3. Statisticians should use statistical decision theory when analyzing decision making with sample data more generally.

### Manski, C., and Tetenov, A., Trial Size for Near Optimal Choice between Surveillance and Aggressive Treatment: Reconsidering MSLT-II

1. Statisticians should relearn statistical decision theory, which received considerable attention in the middle of the twentieth century but was largely forgotten by the century's end.
2. Statistical decision theory should supplant hypothesis testing when statisticians study treatment choice with trial data.
3. Statisticians should use statistical decision theory when analyzing decision making with sample data more generally.

### Lavine, M., Frequentist, Bayes, or Other?

1. Look for and present results from many models that fit the data well.
2. Evaluate models, not just procedures.

### Ruberg, S., Harrell, F., Gamalo-Siebers, M., LaVange, L., Lee J., Price K., and Peck C., Inference and Decision-Making for 21st Century Drug Development and Approval

1. Apply Bayesian paradigm as a framework for improving statistical inference and regulatory decision making by using probability assertions about the magnitude of a treatment effect.
2. Incorporate prior data and available information formally into the analysis of the confirmatory trials.
3. Justify and pre-specify how priors are derived and perform sensitivity analysis for a better understanding of the impact of the choice of prior distribution.
4. Employ quantitative utility functions to reflect key considerations from all stakeholders for optimal decisions via a probability-based evaluation of the treatment effects.
5. Intensify training in Bayesian approaches, particularly for decision makers and clinical trialists (e.g., physician scientists in FDA, industry and academia).

### van Dongen, N., Wagenmakers, E.J., van Doorn, J., Gronau, Q., van Ravenzwaaij, D., Hoekstra, R., Haucke, M., Lakens, D., Hennig, C., Morey, R., Homer, S., Gelman, A., and Sprenger, J., Multiple Perspectives on Inference for Two Simple Statistical Scenarios

1. Clarify your statistical goals explicitly and unambiguously.
2. Consider the question of interest and choose a statistical approach accordingly.
3. Acknowledge the uncertainty in your statistical conclusions.
4. Explore the robustness of your conclusions by executing several different analyses.
5. Provide enough background information such that other researchers can interpret your results and possibly execute meaningful alternative analyses.

### 7.5. Reforming Institutions: Changing Publication Policies and Statistical Education

**Trafimow, D., Five Nonobvious Changes in Editorial Practice for Editors and Reviewers to Consider When Evaluating Submissions in a Post P < 0.05 Universe**

1. Tolerate ambiguity.
2. Replace significance testing with a priori thinking.
3. Consider the nature of the contribution, on multiple levels.
4. Emphasize thinking and execution, not results.
5. Consider that the assumption of random and independent sampling might be wrong.

**Locascio, J., The Impact of Results Blind Science Publishing on Statistical Consultation and Collaboration**
For journal reviewers

1. Provide an initial provisional decision regarding acceptance for publication of a journal manuscript based exclusively on the judged importance of the research issues addressed by the study and the soundness of the reported methodology. (The latter would include appropriateness of data analysis methods.) Give no weight to the reported results of the study per se in the decision as to whether to publish or not.
2. To ensure #1 above is accomplished, commit to an initial decision regarding publication after having been provided with only the Introduction and Methods sections of a manuscript by the editor, not having seen the Abstract, Results, or Discussion. (The latter would be reviewed only if and after a generally irrevocable decision to publish has already been made.)

For investigators/manuscript authors

1. Obtain consultation and collaboration from statistical consultant(s) and research methodologist(s) early in the development and conduct of a research study.
2. Emphasize the clinical and scientific importance of a study in the Introduction section of a manuscript, and give a clear, explicit statement of the research questions being addressed and any hypotheses to be tested.
3. Include a detailed statistical analysis subsection in the Methods section, which would contain, among other things, a justification of the adequacy of the sample size and the reasons various statistical methods were employed. For example, if null hypothesis significance testing and $p$-values are used, presumably supplemental to other methods, justify why those methods apply and will provide useful additional information in this particular study.
4. Submit for publication reports of well-conducted studies on important research issues regardless of findings, for example, even if only null effects were obtained, hypotheses were not confirmed, mere replication of previous results were found, or results were inconsistent with established theories.

**Hurlbert, S., Levine, R., and Utts, J., Coup de Grâce for a Tough Old Bull: "Statistically Significant" Expires**

1. Encourage journal editorial boards to disallow use of the phrase "statistically significant," or even "significant," in manuscripts they will accept for review.

2. Give primary emphasis in abstracts to the magnitudes of those effects most conclusively demonstrated and of greatest import to the subject matter.
3. Report precise $p$-values or other indices of evidence against null hypotheses as continuous variables not requiring any labeling.
4. Understand the meaning of and rationale for neoFisherian significance assessment (NFSA).

**Campbell, H., and Gustafson, P., The World of Research Has Gone Berserk: Modeling the Consequences of Requiring "Greater Statistical Stringency" for Scientific Publication**

1. *Consider the meta-research implications of implementing new publication/funding policies.* Journal editors and research funders should attempt to model the impact of proposed policy changes before any implementation. In this way, we can anticipate the policy impacts (both positive and negative) on the types of studies researchers pursue and the types of scientific articles that ultimately end up published in the literature.

**Fricker, R., Burke, K., Han, X., and Woodall, W., Assessing the Statistical Analyses Used in Basic and Applied Social Psychology After Their p-Value Ban**

1. Use measures of statistical significance combined with measures of practical significance, such as confidence intervals on effect sizes, in assessing research results.
2. Classify research results as either exploratory or confirmatory and appropriately describe them as such in all published documentation.
3. Define precisely the population of interest in research studies and carefully assess whether the data being analyzed are representative of the population.
4. Understand the limitations of inferential methods applied to observational, convenience, or other nonprobabilistically sampled data.

**Maurer, K., Hudiburgh, L., Werwinski, L., and Bailer J., Content Audit for p-Value Principles in Introductory Statistics**

1. Evaluate the coverage of $p$-value principles in the introductory statistics course using rubrics or other systematic assessment guidelines.
2. Discuss and deploy improvements to curriculum coverage of $p$-value principles.
3. Meet with representatives from other departments, who have majors taking your statistics courses, to make sure that inference is being taught in a way that fits the needs of their disciplines.
4. Ensure that the correct interpretation of $p$-value principles is a point of emphasis for all faculty members and embedded within all courses of instruction.

**Steel, A., Liermann, M., and Guttorp, P., Beyond Calculations: A Course in Statistical Thinking**

1. Design curricula to teach students how statistical analyses are embedded within a larger science life-cycle, including steps such as project formulation, exploratory graphing, peer review, and communication beyond scientists.
2. Teach the $p$-value as only one aspect of a complete data analysis.

3. Prioritize helping students build a strong understanding of what testing and estimation can tell you over teaching statistical procedures.

4. Explicitly teach statistical communication. Effective communication requires that students clearly formulate the benefits and limitations of statistical results.

5. Force students to struggle with poorly defined questions and real, messy data in statistics classes.

5. Encourage students to match the mathematical metric (or data summary) to the scientific question. Teaching students to create customized statistical tests for custom metrics allows statistics to move beyond the mean and pinpoint specific scientific questions.

## Acknowledgments

Without the help of a huge team, this special issue would never have happened. The articles herein are about the equivalent of three regular issues of *The American Statistician*. Thank you to all the authors who submitted papers for this issue. Thank you, authors whose papers were accepted, for enduring our critiques. We hope they made you happier with your finished product. Thank you to a talented, hard-working group of associate editors for handling many papers: Frank Bretz, George Cobb, Doug Hubbard, Ray Hubbard, Michael Lavine, Fan Li, Xihong Lin, Tom Louis, Regina Nuzzo, Jane Pendergast, Annie Qu, Sherri Rose, and Steve Ziliak. Thank you to all who served as reviewers. We definitely couldn't have done this without you. Thank you, TAS Editor Dan Jeske, for your vision and your willingness to let us create this special issue. Special thanks to Janet Wallace, TAS editorial coordinator, for spectacular work and tons of patience. We also are grateful to ASA Journals Manager Eric Sampson for his leadership, and to our partners, the team at Taylor and Francis, for their commitment to ASA's publishing efforts. Thank you to all who read and commented on the draft of this editorial. You made it so much better! Regina Nuzzo provided extraordinarily helpful substantive and editorial comments. And thanks most especially to the ASA Board of Directors, for generously and enthusiastically supporting the "*p*-values project" since its inception in 2014. Thank you for your leadership of our profession and our association.

Gratefully,
Ronald L. Wasserstein
*American Statistical Association, Alexandria, VA*
*ron@amstat.org*

Allen L. Schirm
*Mathematica Policy Research (retired), Washington, DC*
*allenschirm@gmail.com*

Nicole A. Lazar
*Department of Statistics, University of Georgia, Athens GA*
*nlazar@stat.uga.edu*

## References

### References to articles in this special issue

Amrhein, V., Trafimow, D., and Greenland, S. (2019), "Inferential Statistics as Descriptive Statistics: There Is No Replication Crisis If We Don't Expect Replication," *The American Statistician*, 73. [2,3,4,5,6,7,8,9]

Anderson, A. (2019), "Assessing Statistical Results: Magnitude, Precision and Model Uncertainty," *The American Statistician*, 73. [3]

Benjamin, D., and Berger, J. (2019), "Three Recommendations for Improving the Use of *p*-Values," *The American Statistician*, 73. [5,7,9]

Betensky, R. (2019), "The *p*-Value Requires Context, Not a Threshold," *The American Statistician*, 73. [4,6]

Billheimer, D. (2019), "Predictive Inference and Scientific Reproducibility," *The American Statistician*, 73. [5]

Blume, J., Greevy, R., Welty, V., Smith, J., and DuPont, W. (2019), "An Introduction to Second Generation *p*-Value," *The American Statistician*, 73. [4]

Brownstein, N., Louis, T., O'Hagan, A., and Pendergast, J. (2019), "The Role of Expert Judgment in Statistical Inference and Evidence-Based Decision-Making," *The American Statistician*, 73. [5]

Calin-Jageman, R., and Cumming, G. (2019), "The New Statistics for Better Science: Ask How Much, How Uncertain, and What Else is Known," *The American Statistician*, 73. [3,5,9,10]

Campbell, H., and Gustafson, P. (2019), "The World of Research Has Gone Berserk: Modeling the Consequences of Requiring 'Greater Statistical Stringency' for Scientific Publication," *The American Statistician*, 73. [8]

Colquhoun, D. (2019), "The False Positive Risk: A Proposal Concerning What to Do About *p*-Value," *The American Statistician*, 73. [4,7,14]

Fraser, D. (2019), "The *p*-Value Function and Statistical Inference," *The American Statistician*, 73. [6]

Fricker, R., Burke, K., Han, X., and Woodall, W (2019), "Assessing the Statistical Analyses Used in Basic and Applied Social Psychology After Their *p*-Value Ban," *The American Statistician*, 73. [7,9]

Gannon, M., Pereira, C., and Polpo, A. (2019), "Blending Bayesian and Classical Tools to Define Optimal Sample-Size-Dependent Significance Levels," *The American Statistician*, 73. [5]

Goodman, S. (2019), "Why is Getting Rid of *p*-Values So Hard? Musings on Science and Statistics," *The American Statistician*, 73. [7,8,10]

Goodman, W., Spruill, S., and Komaroff, E. (2019), "A Proposed Hybrid Effect Size Plus *p*-Value Criterion: Empirical Evidence Supporting Its Use," *The American Statistician*, 73. [5]

Greenland, S. (2019), "Valid *p*-Values Behave Exactly as They Should: Some Misleading Criticisms of *p*-Values and Their Resolution With *s*-Values," *The American Statistician*, 73. [3,4,5,6,7]

Heck, P., and Krueger, J. (2019), "Putting the *p*-Value in Its Place," *The American Statistician*, 73. [4]

Hubbard, D., and Carriquiry, A. (2019), "Quality Control for Scientific Research: Addressing Reproducibility, Responsiveness and Relevance," *The American Statistician*, 73. [5]

Hubbard, R. (2019), "Will the ASA's Efforts to Improve Statistical Practice Be Successful? Some Evidence to the Contrary," *The American Statistician*, 73. [8]

Hubbard, R., Haig, B. D., and Parsa, R. A. (2019), "The Limited Role of Formal Statistical Inference in Scientific Inference," *The American Statistician*, 73. [2,7]

Hurlbert, S., Levine, R., and Utts, J. (2019), "Coup de Grâce for a Tough Old Bull: 'Statistically Significant' Expires," *The American Statistician*, 73. [8,9]

Ioannidis, J. (2019), "What Have We (Not) Learnt From Millions of Scientific Papers With *p*-Values?," *The American Statistician*, 73. [6]

Johnson, V. (2019), "Evidence From Marginally Significant *t* Statistics," *The American Statistician*, 73. [7]

Kennedy-Shaffer, L. (2019), "Before *p* < 0.05 to Beyond *p* < 0.05: Using History to Contextualize *p*-Values and Significance Testing," *The American Statistician*, 73. [7]

Kmetz, J. (2019), "Correcting Corrupt Research: Recommendations for the Profession to Stop Misuse of *p*-Values," *The American Statistician*, 73. [8]

Lavine, M. (2019), "Frequentist, Bayes, or Other?," *The American Statistician*, 73. [6]

Locascio, J. (2019), "The Impact of Results Blind Science Publishing on Statistical Consultation and Collaboration," *The American Statistician*, 73. [4,5,8,9]

Manski, C. (2019), "Treatment Choice With Trial Data: Statistical Decision Theory Should Supplant Hypothesis Testing," *The American Statistician*, 73. [5]

Manski, C., and Tetenov, A. (2019), "Trial Size for Near Optimal Choice between Surveillance and Aggressive Treatment: Reconsidering MSLT-II," *The American Statistician*, 73. [5]

Matthews, R. (2019), "Moving Toward the Post *p* < 0.05 Era Via the Analysis of Credibility," *The American Statistician*, 73. [4,9]

Maurer, K., Hudiburgh, L., Werwinski, L., and Bailer, J. (2019), "Content Audit for *P*-Value Principles in Introductory Statistics," *The American Statistician*, 73. [8]

McShane, B., Gal, D., Gelman, A., Robert, C., and Tackett, J. (2019), "Abandon Statistical Significance," *The American Statistician*, 73. [4,6,7]

McShane, B., Tackett, J., Böckenholt, U., and Gelman, A. (2019), "Large Scale Replication Projects in Contemporary Psychological Research," *The American Statistician*, 73. [9]

O'Hagan, A. (2019), "Expert Knowledge Elicitation: Subjective But Scientific," *The American Statistician*, 73. [5,6]

Pogrow, S. (2019), "How Effect Size (Practical Significance) Misleads Clinical Practice: The Case for Switching to Practical Benefit to Assess Applied Research Findings," *The American Statistician*, 73. [7]

Rose, S., and McGuire, T. (2019), "Limitations of *p*-Values and *R*-Squared for Stepwise Regression Building: A Fairness Demonstration in Health Policy Risk Adjustment," *The American Statistician*, 73. [7]

Rougier, J. (2019), "*p*-Values, Bayes Factors, and Sufficiency," *The American Statistician*, 73. [6]

Ruberg, S., Harrell, F., Gamalo-Siebers, M., LaVange, L., Lee J., Price K., and Peck C. (2019), "Inference and Decision-Making for 21st Century Drug Development and Approval," *The American Statistician*, 73. [10]

Steel, A., Liermann, M., and Guttorp, P. (2019), "Beyond Calculations: A Course in Statistical Thinking," *The American Statistician*, 73. [8]

Trafimow, D. (2019), "Five Nonobvious Changes in Editorial Practice for Editors and Reviewers to Consider When Evaluating Submissions in a Post *p* < .05 Universe," *The American Statistician*, 73. [7]

Tong, C. (2019), "Statistical Inference Enables Bad Science; Statistical Thinking Enables Good Science," *The American Statistician*, 73. [2,3,4,6,8,9]

van Dongen, N., Wagenmakers, E. J., van Doorn, J., Gronau, Q., van Ravenzwaaij, D., Hoekstra, R., Haucke, M., Lakens, D., Hennig, C., Morey, R., Homer, S., Gelman, A., and Sprenger, J. (2019), "Multiple Perspectives on Inference for Two Simple Statistical Scenarios," *The American Statistician*, 73. [6]

Ziliak, S. (2019), "How Large Are Your G-Values? Try Gosset's Guinnessometrics When a Little 'P' Is Not Enough," *The American Statistician*, 73. [2,3]

**Other articles or books referenced**

Boring, E. G. (1919), "Mathematical vs. Scientific Significance," *Psychological Bulletin*, 16, 335–338. [2]

Cumming, G. (2014), "The New Statistics: Why and How," *Psychological Science*, 25, 7–29. [3]

Davidian, M., and Louis, T. (2012), "Why Statistics?" *Science*, 336, 12. [2]

Edgeworth, F. Y. (1885), "Methods of Statistics," *Journal of the Statistical Society of London*, Jubilee Volume, 181–217. [2]

Fisher, R. A. (1925), *Statistical Methods for Research Workers*, Edinburgh: Oliver & Boyd. [2]

Gelman, A. (2015), "Statistics and Research Integrity," *European Science Editing*, 41, 13–14. [8]

——— (2016), "The Problems With *p*-Values Are Not Just With *p*-Values," *The American Statistician*, supplemental materials to *ASA Statement on p-Values and Statistical Significance*, 70, 1–2. [3]

Gelman, A., and Hennig, C. (2017), "Beyond Subjective and Objective in Statistics," *Journal of the Royal Statistical Society*, Series A, 180, 967–1035. [5]

Gelman, A., and Stern, H. (2006), "The Difference Between 'Significant' and 'Not Significant' Is Not Itself Statistically Significant," *The American Statistician*, 60, 328–331. [2]

Ghose, T. (2013), "'Just a Theory': 7 Misused Science Words," *Scientific American* (online), available at *https://www.scientificamerican.com/article/just-a-theory-7-misused-science-words/*. [2]

Goodman, S. (2018), "How Sure Are You of Your Result? Put a Number on It," *Nature*, 564. [5]

Hubbard, R. (2016), *Corrupt Research: The Case for Reconceptualizing Empirical Management and Social Science*, Thousand Oaks, CA: Sage. [1]

Junger, S. (1997), *The Perfect Storm: A True Story of Men Against the Sea*, New York: W.W. Norton. [10]

Locascio, J. (2017), "Results Blind Science Publishing," *Basic and Applied Social Psychology*, 39, 239–246. [8]

Mayo, D. (2018), "Statistical Inference as Severe Testing: How to Get Beyond the Statistics Wars," Cambridge, UK: University Printing House. [1]

McShane, B., and Gal, D. (2016), "Blinding Us to the Obvious? The Effect of Statistical Training on the Evaluation of Evidence," *Management Science*, 62, 1707–1718. [9]

——— (2017), "Statistical Significance and the Dichotomization of Evidence." *Journal of the American Statistical Association*, 112, 885–895. [9]

Mogil, J. S., and Macleod, M. R. (2017), "No Publication Without Confirmation," *Nature*, 542, 409–411, available at *https://www.nature.com/news/no-publication-without-confirmation-1.21509*. [8]

Rosenthal, R. (1979), "File Drawer Problem and Tolerance for Null Results," *Psychological Bulletin* 86, 638–641. [2]

Wasserstein, R., and Lazar, N. (2016), "The ASA's Statement on *p*-Values: Context, Process, and Purpose," *The American Statistician*, 70, 129–133. [1]

Wellek, S. (2017), "A Critical Evaluation of the Current *p*-Value Controversy" (with discussion), *Biometrical Journal*, 59, 854–900. [4,9]

Ziliak, S., and McCloskey, D. (2008), *The Cult of Statistical Significance: How the Standard Error Costs Us Jobs, Justice, and Lives*, Ann Arbor, MI: University of Michigan Press. [1,16]

Exhibit 138

# COMMENT



**EVOLUTION** Cooperation and conflict from ants and chimps to us **p.308**

**HISTORY** To fight denial, study Galileo and Arendt **p.309**

**CHEMISTRY** Three more unsung women — of astatine discovery **p.311**

**PUBLISHING** As well as ORCID ID and English, list authors in their own script **p.311**



ILLUSTRATION BY DAVID PARKINS

# Retire statistical significance

**Valentin Amrhein**, **Sander Greenland**, **Blake McShane** and more than 800 signatories call for an end to hyped claims and the dismissal of possibly crucial effects.

When was the last time you heard a seminar speaker claim there was 'no difference' between two groups because the difference was 'statistically non-significant'?

If your experience matches ours, there's a good chance that this happened at the last talk you attended. We hope that at least someone in the audience was perplexed if, as frequently happens, a plot or table showed that there actually was a difference.

How do statistics so often lead scientists to deny differences that those not educated in statistics can plainly see? For several generations, researchers have been warned that a statistically non-significant result does not 'prove' the null hypothesis (the hypothesis that there is no difference between groups or no effect of a treatment on some measured outcome)[1]. Nor do statistically significant results 'prove' some other hypothesis. Such misconceptions have famously warped the

literature with overstated claims and, less famously, led to claims of conflicts between studies where none exists.

We have some proposals to keep scientists from falling prey to these misconceptions.

## PERVASIVE PROBLEM

Let's be clear about what must stop: we should never conclude there is 'no difference' or 'no association' just because a $P$ value is larger than a threshold such as 0.05 ▶

© 2019 Springer Nature Limited. All rights reserved.

**COMMENT**

▶ or, equivalently, because a confidence interval includes zero. Neither should we conclude that two studies conflict because one had a statistically significant result and the other did not. These errors waste research efforts and misinform policy decisions.

For example, consider a series of analyses of unintended effects of anti-inflammatory drugs[2]. Because their results were statistically non-significant, one set of researchers concluded that exposure to the drugs was "not associated" with new-onset atrial fibrillation (the most common disturbance to heart rhythm) and that the results stood in contrast to those from an earlier study with a statistically significant outcome.

Now, let's look at the actual data. The researchers describing their statistically non-significant results found a risk ratio of 1.2 (that is, a 20% greater risk in exposed patients relative to unexposed ones). They also found a 95% confidence interval that spanned everything from a trifling risk decrease of 3% to a considerable risk increase of 48% ($P = 0.091$; our calculation). The researchers from the earlier, statistically significant, study found the exact same risk ratio of 1.2. That study was simply more precise, with an interval spanning from 9% to 33% greater risk ($P = 0.0003$; our calculation).

It is ludicrous to conclude that the statistically non-significant results showed "no association", when the interval estimate included serious risk increases; it is equally absurd to claim these results were in contrast with the earlier results showing an identical observed effect. Yet these common practices show how reliance on thresholds of statistical significance can mislead us (see 'Beware false conclusions').

These and similar errors are widespread. Surveys of hundreds of articles have found that statistically non-significant results are interpreted as indicating 'no difference' or 'no effect' in around half (see 'Wrong interpretations' and Supplementary Information).

In 2016, the American Statistical Association released a statement in *The American Statistician* warning against the misuse of statistical significance and *P* values. The issue also included many commentaries on the subject. This month, a special issue in the same journal attempts to push these reforms further. It presents more than 40 papers on 'Statistical inference in the 21st century: a world beyond $P < 0.05$'. The editors introduce the collection with the caution "don't say 'statistically significant'"[3]. Another article[4] with dozens of signatories also calls on authors and journal editors to disavow these terms.

We agree, and call for the entire concept of statistical significance to be abandoned.

> *"Eradicating categorization will help to halt overconfident claims, unwarranted declarations of 'no difference' and absurd statements about 'replication failure'."*

We are far from alone. When we invited others to read a draft of this comment and sign their names if they concurred with our message, 250 did so within the first 24 hours. A week later, we had more than 800 signatories — all checked for an academic affiliation or other indication of present or past work in a field that depends on statistical modelling (see the list and final count of signatories in the Supplementary Information). These include statisticians, clinical and medical researchers, biologists and psychologists from more than 50 countries and across all continents except Antarctica. One advocate called it a "surgical strike against thoughtless testing of statistical significance" and "an opportunity to register your voice in favour of better scientific practices".

We are not calling for a ban on *P* values. Nor are we saying they cannot be used as a decision criterion in certain specialized applications (such as determining whether a manufacturing process meets some quality-control standard). And we are also not advocating for an anything-goes situation, in which weak evidence suddenly becomes credible. Rather, and in line with many others over the decades, we are calling for a stop to the use of *P* values in the conventional, dichotomous way — to decide whether a result refutes or supports a scientific hypothesis[5].

### QUIT CATEGORIZING

The trouble is human and cognitive more than it is statistical: bucketing results into 'statistically significant' and 'statistically non-significant' makes people think that the items assigned in that way are categorically different[6–8]. The same problems are likely to arise under any proposed statistical alternative that involves dichotomization, whether frequentist, Bayesian or otherwise.

Unfortunately, the false belief that crossing the threshold of statistical significance is enough to show that a result is 'real' has led scientists and journal editors to privilege such results, thereby distorting the literature. Statistically significant estimates are biased upwards in magnitude and potentially to a large degree, whereas statistically non-significant estimates are biased downwards in magnitude. Consequently, any discussion that focuses on estimates chosen for their significance will be biased. On top of this, the rigid focus on statistical significance encourages researchers to choose data and methods that yield statistical significance for some desired (or simply publishable) result, or that yield statistical non-significance for an undesired result, such as potential side effects of drugs — thereby invalidating conclusions.

The pre-registration of studies and a commitment to publish all results of all analyses can do much to mitigate these issues. However, even results from pre-registered studies can be biased by decisions invariably left open in the analysis plan[9]. This occurs even with the best of intentions.

Again, we are not advocating a ban on *P* values, confidence intervals or other statistical measures — only that we should not treat them categorically. This includes dichotomization as statistically significant or not, as well as categorization based on other statistical measures such as Bayes factors.

One reason to avoid such 'dichotomania' is that all statistics, including *P* values and confidence intervals, naturally vary from study to study, and often do so to a surprising degree. In fact, random variation alone can easily lead to large disparities in *P* values, far beyond falling just to either side of the 0.05 threshold. For example, even if researchers could conduct two perfect replication studies of some genuine effect, each with 80% power (chance) of achieving $P < 0.05$, it would not be very surprising for one to obtain $P < 0.01$ and the other $P > 0.30$.

---

### BEWARE FALSE CONCLUSIONS
Studies currently dubbed 'statistically significant' and 'statistically non-significant' need not be contradictory, and such designations might cause genuine effects to be dismissed.



'Significant' study (low *P* value)

'Non-significant' study (high *P* value)

The observed effect (or point estimate) is the same in both studies, so they are not in conflict, even if one is 'significant' and the other is not.

Decreased effect ◀ No effect ▶ Increased effect

SOURCE: V. AMRHEIN ET AL.

© 2019 Springer Nature Limited. All rights reserved.

SOURCE: V. AMRHEIN ET AL.

Whether a *P* value is small or large, caution is warranted.

We must learn to embrace uncertainty. One practical way to do so is to rename confidence intervals as 'compatibility intervals' and interpret them in a way that avoids overconfidence. Specifically, we recommend that authors describe the practical implications of all values inside the interval, especially the observed effect (or point estimate) and the limits. In doing so, they should remember that all the values between the interval's limits are reasonably compatible with the data, given the statistical assumptions used to compute the interval[7,10]. Therefore, singling out one particular value (such as the null value) in the interval as 'shown' makes no sense.

We're frankly sick of seeing such nonsensical 'proofs of the null' and claims of non-association in presentations, research articles, reviews and instructional materials. An interval that contains the null value will often also contain non-null values of high practical importance. That said, if you deem all of the values inside the interval to be practically unimportant, you might then be able to say something like 'our results are most compatible with no important effect'.

When talking about compatibility intervals, bear in mind four things. First, just because the interval gives the values most compatible with the data, given the assumptions, it doesn't mean values outside it are incompatible; they are just less compatible. In fact, values just outside the interval do not differ substantively from those just inside the interval. It is thus wrong to claim that an interval shows all possible values.

Second, not all values inside are equally compatible with the data, given the assumptions. The point estimate is the most compatible, and values near it are more compatible than those near the limits. This is why we urge authors to discuss the point estimate, even when they have a large *P* value or a wide interval, as well as discussing the limits of that interval. For example, the authors above could have written: 'Like a previous study, our results suggest a 20% increase in risk of new-onset atrial fibrillation in patients given the anti-inflammatory drugs. Nonetheless, a risk difference ranging from a 3% decrease, a small negative association, to a 48% increase, a substantial positive association, is also reasonably compatible with our data, given our assumptions.' Interpreting the point estimate, while acknowledging its uncertainty, will keep you from making false declarations of 'no difference', and from making overconfident claims.

Third, like the 0.05 threshold from which it came, the default 95% used to compute intervals is itself an arbitrary convention. It is based on the false idea that there is a 95% chance that the computed interval itself contains the true value, coupled with the vague



**WRONG INTERPRETATIONS**
An analysis of 791 articles across 5 journals* found that around half mistakenly assume non-significance means no effect.

Appropriately interpreted **49%**

Wrongly interpreted **51%**

**ARTICLES 791**

*Data taken from: P. Schatz et al. *Arch. Clin. Neuropsychol.* **20**, 1053–1059 (2005); F. Fidler et al. *Conserv. Biol.* **20**, 1539–1544 (2006); R. Hoekstra et al. *Psychon. Bull. Rev.* **13**, 1033–1037 (2006); F. Bernardi et al. *Eur. Sociol. Rev.* **33**, 1–15 (2017).

feeling that this is a basis for a confident decision. A different level can be justified, depending on the application. And, as in the anti-inflammatory-drugs example, interval estimates can perpetuate the problems of statistical significance when the dichotomization they impose is treated as a scientific standard.

Last, and most important of all, be humble: compatibility assessments hinge on the correctness of the statistical assumptions used to compute the interval. In practice, these assumptions are at best subject to considerable uncertainty[7,8,10]. Make these assumptions as clear as possible and test the ones you can, for example by plotting your data and by fitting alternative models, and then reporting all results.

Whatever the statistics show, it is fine to suggest reasons for your results, but discuss a range of potential explanations, not just favoured ones. Inferences should be scientific, and that goes far beyond the merely statistical. Factors such as background evidence, study design, data quality and understanding of underlying mechanisms are often more important than statistical measures such as *P* values or intervals.

The objection we hear most against retiring statistical significance is that it is needed to make yes-or-no decisions. But for the choices often required in regulatory, policy and business environments, decisions based on the costs, benefits and likelihoods of all potential consequences always beat those made based solely on statistical significance. Moreover, for decisions about whether to pursue a research idea further, there is no simple connection between a *P* value and the probable results of subsequent studies.

What will retiring statistical significance look like? We hope that methods sections

and data tabulation will be more detailed and nuanced. Authors will emphasize their estimates and the uncertainty in them — for example, by explicitly discussing the lower and upper limits of their intervals. They will not rely on significance tests. When *P* values are reported, they will be given with sensible precision (for example, $P = 0.021$ or $P = 0.13$) — without adornments such as stars or letters to denote statistical significance and not as binary inequalities ($P < 0.05$ or $P > 0.05$). Decisions to interpret or to publish results will not be based on statistical thresholds. People will spend less time with statistical software, and more time thinking.

Our call to retire statistical significance and to use confidence intervals as compatibility intervals is not a panacea. Although it will eliminate many bad practices, it could well introduce new ones. Thus, monitoring the literature for statistical abuses should be an ongoing priority for the scientific community. But eradicating categorization will help to halt overconfident claims, unwarranted declarations of 'no difference' and absurd statements about 'replication failure' when the results from the original and replication studies are highly compatible. The misuse of statistical significance has done much harm to the scientific community and those who rely on scientific advice. *P* values, intervals and other statistical measures all have their place, but it's time for statistical significance to go. ∎

**Valentin Amrhein** *is a professor of zoology at the University of Basel, Switzerland.* **Sander Greenland** *is a professor of epidemiology and statistics at the University of California, Los Angeles.* **Blake McShane** *is a statistical methodologist and professor of marketing at Northwestern University in Evanston, Illinois. For a full list of co-signatories, see Supplementary Information.*
*e-mail: v.amrhein@unibas.ch*

1. Fisher, R. A. *Nature* **136**, 474 (1935).
2. Schmidt, M. & Rothman, K. J. *Int. J. Cardiol.* **177**, 1089–1090 (2014).
3. Wasserstein, R. L., Schirm, A. & Lazar, N. A. *Am. Stat.* https://doi.org/10.1080/00031305.2019.1583913 (2019).
4. Hurlbert, S. H., Levine, R. A. & Utts, J. *Am. Stat.* https://doi.org/10.1080/00031305.2018.1543616 (2019).
5. Lehmann, E. L. *Testing Statistical Hypotheses* 2nd edn 70–71 (Springer, 1986).
6. Gigerenzer, G. *Adv. Meth. Pract. Psychol. Sci.* **1**, 198–218 (2018).
7. Greenland, S. *Am. J. Epidemiol.* **186**, 639–645 (2017).
8. McShane, B. B., Gal, D., Gelman, A., Robert, C. & Tackett, J. L. *Am. Stat.* https://doi.org/10.1080/00031305.2018.1527253 (2019).
9. Gelman, A. & Loken, E. *Am. Sci.* **102**, 460–465 (2014).
10. Amrhein, V., Trafimow, D. & Greenland, S. *Am. Stat.* https://doi.org/10.1080/00031305.2018.1543137 (2019).

Supplementary information accompanies this article; see go.nature.com/2tc5nkm

© 2019 Springer Nature Limited. All rights reserved.

# Exhibit 139

Sarah E. Kane, M.D.

```
 1         IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF NEW JERSEY

 3   -----------------------------------x

 4   IN RE:  JOHNSON & JOHNSON TALCUM

 5   POWDER PRODUCTS MARKETING, SALES

 6   PRACTICES, AND PRODUCTS          MDL NO:

 7   LIABILITY LITIGATION          16-2738 (FLW)(LHG)

 8   -----------------------------------x

 9   THIS DOCUMENT RELATES TO

10   ALL CASES

11   -----------------------------------x

12

13

14        DEPOSITION UNDER ORAL EXAMINATION OF

15              SARAH E. KANE, M.D.

16           January 25, 2019, 9:19 a.m.

17

18                   -  -  -

19    REPORTED BY: JANET M. SAMBATARO, RMR, CRR, CLR

20                   -  -  -

21          GOLKOW TECHNOLOGIES, INC.

22       877.370.3377 ph | 917.591.5672 fax

23              deps@golkow.com

24

25
```

Page 2

7      Deposition of SARAH E. KANE, M.D.,
8  held at the offices of Sugarman, Rogers,
9  Barshak & Cohen, PC 363 Plantation Street, Boston,
10 Massachusetts, pursuant to Agreement before
11 Janet Sambataro, a Registered Merit Reporter,
12 Certified Realtime Reporter, Certified LiveNote
13 Reporter, and a Notary Public within and for the
14 Commonwealth of Massachusetts, on January 25, 2019,
15 commencing at 9:19 a.m.

Page 3

1  APPEARANCES:
2  HAUSFELD LLP
3  BY:  STEVE ROTMAN, ESQ.
4  One Marina Park Drive
5  Suite 1410
6  Boston, MA 02210
7  (617) 207-0600
8  srotman@hausfeld.com
9  Representing the Plaintiffs

11 LEVIN PAPANTONIO
12 BY:  CHRISTOPHER V. TISI, ESQ.
13 316 South Baylen St.
14 Pensacola, Florida 32502
15 (850) 435-7000
16 ctisi@levinlaw.com
17 Representing the Plaintiffs

19 RESTAINO LAW, LLC
20 BY:  JOHN RESTAINO, ESQ.
21 130 Forest Street
22 Denver, Colorado 80220
23 (303) 839-8000
24 JRestaino@RestainoLLC.com
25 Representing the Plaintiffs

Page 4

1  APPEARANCES:  (Continued)

3  SHOOK, HARDY & BACON L.L.P.
4  BY:  HUNTER K. AHERN, ESQ.
5  701 Fifth Avenue, Suite 6800
6  Seattle, Washington 98104
7  (206) 344-7600
8  hahern@shb.com
9  Representing the Defendant, Johnson & Johnson,
10 Johnson & Johnson Consumer Companies, Inc.

12 DRINKER BIDDLE AND REATH LLP
13 BY:  KATHERINE MCBETH, ESQ.
14 One Logan Square, Suite 2000
15 Philadelphia, Pennsylvania 19103-6996
16 (215) 988-2700
17 katherine.mcbeth@dbr.com
18 Representing the Defendant, Johnson & Johnson,
19 Johnson & Johnson Consumer Companies, Inc.

21 GORDON & REES SCULLY MANSUKHANI, LLP
22 BY:  MICHAEL R. KLATT, ESQUIRE
23 816 Congress Avenue, Suite 1510
24 Austin, Texas 78701
25 (512) 391-0197

Page 5

1  APPEARANCES:  (Continued)

3  GORDON & REES SCULLY MANSUKHANI, LLP (Continued)
4  Representing the Defendants,
5  Imerys Talc America, Inc.

8  COUGHLIN DUFFY LLP
9  BY:  AMARYAM M. MESEHA, ESQ.
10 350 Mount Kemble Avenue
11 Morristown, New Jersey 07962
12 (973) 267-0058
13 mmeseha@coughlinduffy.com
14 Representing Imerys Talc America, Inc.

17 TUCKER ELLIS LLP
18 BY:  MICHAEL ANDERTON, ESQ.
19 950 Main Avenue
20 Cleveland, Ohio 44113
21 (216) 592-5000
22 michael.anderton@tuckerellis.com
23 Representing PTI

25 - Continued -

Sarah E. Kane, M.D.

Page 6

1  APPEARANCES:  (Continued)
2
3  SEYFARTH SHAW LLP
4  BY:  THOMAS T. LOCKE, ESQ.  (Via telephone)
5  975 F Street, N.W.
6  Washington, D.C. 20004
7  (202) 463-2400
8  Representing PCPC
9
10 ALSO PRESENT:
11 Jody Urbati, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1          I N D E X
2  WITNESS      DIRECT  CROSS  REDIRECT  RECROSS
3  SARAH E. KANE, M.D.
4  By Ms. Ahern   15
5  By Mr. Klatt        318         348
6  By Mr. Rotman       341
7
8         E X H I B I T S
9  Number       Description            Page
10 Exhibit 1  Notice of Oral and Videotaped
11       Deposition of Sarah E. Kane and
12       Duces Tecum              27
13 Exhibit 2  Curriculum vitae of Sarah E.
14       Kane, M.D.               29
15 Exhibit 3  Invoice from Sarah Kane, M.D., for
16       services 5/19 through 7/14      31
17 Exhibit 4  Invoice from Sarah Kane, M.D., for
18       services 7/28 through 9/12      41
19 Exhibit 5  Invoice from Sarah Kane, M.D., for
20       services 9/18/17 through 2/5/18    43
21 Exhibit 6  Invoice from Sarah Kane, M.D., for
22       services 2/23/18 through 8/3/18    44
23 Exhibit 7  Invoice from Sarah Kane, M.D., for
24       services 9/20/18 through 11/16/18   45
25 Exhibit 8  Excerpt from Blaustein's Second Edition 54

Page 8

1         E X H I B I T S
2  Number       Description            Page
3  Exhibit 9  Article entitled "Serous tubal
4       intraepithelial carcinoma, chronic
5       fallopian tube injury, and serous
6       carcinoma development"       91
7  Exhibit 10 "Blaustein's Pathology of the Female
8       Genital Tract," Fourth Edition   95
9  Exhibit 11 Excerpt from "Blaustein's Pathology of
10       the Female Genital Tract,"
11       Fourth Edition          98
12 Exhibit 12 Blaustein's Pathology of the Female
13       Genital Tract"          160
14 Exhibit 13 Excerpt of "Blaustein's Pathology
15       of the Female Genital Tract, Fifth
16       Edition            160
17 Exhibit 14 Rule 26 Expert Report of Sarah E.
18       Kane, M.D.            164
19 Exhibit 15 Document entitled "References Cited
20       and Other Material and Data
21       Considered"           165
22 Exhibit 16 Document entitled "Additional
23       Material Considered"       181
24 Exhibit 17 Document entitled "Additional Materials
25       to Dr. Sarah Kane"        186

Page 9

1         E X H I B I T S
2  Number       Description            Page
3  Exhibit 18 "The Plaintiffs' Steering Committee's
4       Initial Designation and Disclosure of
5       Non-case Specific Expert Witnesses"  194
6  Exhibit 19 Article entitled "Presence of Talc
7       in Pelvic Lymph Nodes of a Woman with
8       Ovarian Cancer and Long-Term Genital
9       Exposure to Cosmetic Talc"    252
10 Exhibit 20 Article entitled "Perineal Exposure
11       to Talc and Ovarian Cancer Risk"   260
12 Exhibit 21 Article entitled "Genital Talc
13       Exposure and Risk of Ovarian Cancer"  266
14 Exhibit 22 Article entitled "Perineal Talc
15       Exposure and Epithelial Ovarian Cancer
16       Risk in the Central Valley of
17       California"           272
18 Exhibit 23 Highlighted copy of Dr. Kane's
19       expert report           284
20 Exhibit 24 Article entitled "Talcum powder,
21       chronic pelvic inflammation and
22       NSAIDs in relation to risk of
23       epithelial ovarian cancer"    289
24 Exhibit 25 Article entitled "The relationship
25       between perineal cosmetic talc usage

Sarah F. Kane, M.D.

Page 10

E X H I B I T S
1 Number      Description           Page
2 Exhibit 25 (Continued)
3    and ovarian talc particle burden"   308
4 Exhibit 26 Article entitled "Pycnogenol reduces
5    Talc-induced Neoplastic Transformation
6    in Human Ovarian Cell Cultures"     328

Page 11

P R O C E E D I N G S

1          THE VIDEOGRAPHER:  We are now on the
2 record.  My name is Jody Urbati.  I am a
3 videographer for Golkow Litigation Services.
4 Today's date is January 25, 2019; the time,
5 9:19 a.m.
6          This video deposition is being held in
7 Boston, Massachusetts, In Re: Johnson & Johnson
8 Talcum Powder Products Liability Litigation in
9 the United States District Court for the District
10 of New Jersey.
11          The deponent today is Sarah Kane.
12 Counsel will be noted on the stenographic record.
13 The court reporter is Janet Sambataro and will
14 now swear in the witness.
15          (Witness sworn.)
16          MS. AHERN:  Just a quick housekeeping
17 matter.  The defendants would like to lodge an
18 objection to the additional materials to Sarah
19 Kane that were served yesterday at 3:36 p.m. by
20 Ashcraft law firm.  Serving supplementary
21 materials 24 hours before an expert deposition is
22 prejudicial to the defendants' ability to
23 prepare.  The number of the documents that were

Page 12

1 identified yesterday in that list are voluminous
2 and dense and require additional time to cover,
3 to the extent that they substantively informed
4 Dr. Kane's opinions in this case.
5          We'd also like to object to the
6 inclusion of those materials on the science day
7 presentations, which were not intended for any
8 other purpose than for science day in the MDL.
9          And that's all I have to say on the
10 objections.
11          MR. ROTMAN:  Go ahead.
12          MR. TISI:  First of all, as you know,
13 many of those documents were documents that were
14 provided to counsel in connection with virtually
15 every depositions that have been taken to date.
16 In fact, it was provided with Dr. Mohrman that
17 was being taken at the same time today; it was
18 provided with Dr. Zelikoff earlier in the week;
19 it was provided almost routinely.
20          Many of them -- some of them,
21 particularly the Health Canada document, were
22 documents that only became available in mid
23 December, number one.
24          Number two, I believe that the science
25 day document that you're referring to, which I

Page 13

1 think you'll find was not relied on in any way,
2 was a -- that was the California and not the MDL.
3 So I just want to be clear about that.
4          So there is no prejudice, and we would
5 clearly object to -- these are not documents she
6 relied on for her report; they just were
7 supplemental materials.  But -- you can ask
8 questions, but we will certainly object to
9 reconvening the deposition at any later time.  We
10 made that clear yesterday.
11          MS. AHERN:  Thank you.
12          MR. ROTMAN:  Yeah, there was -- one of
13 the documents was a textbook that Dr. Kane first
14 looked at two days ago or -- yeah, I think it was
15 two days ago, and so I added it to the list.  And
16 she brought the textbook with her today.
17          MR. KLATT:  Can I just add we had an
18 agreement for all the other depositions, and I
19 assume we continue today, one objection by a
20 party is good for all.
21          MR. TISI:  That's fine, yes.
22          MR. ROTMAN:  And, you know, just so
23 it's clear to anybody reading the transcript that
24 what you received yesterday was the third
25 reference list that we've provided for Dr. Kane,

1 the first being with her report in November; the
2 second being on January 4th, which was about ten
3 days before the deposition had been scheduled for
4 January 14th; and then these additional items
5 were materials that either were inadvertently
6 left off or not reviewed until just very
7 recently.
8        MS. AHERN:  Okay.  To the extent that
9 these new materials inform her substantive
10 opinions and were not included in her report or
11 prior versions of the reference list, then we can
12 talk about that later --
13        MR. TISI:  Yeah.
14        MS. AHERN:  -- in terms of additional
15 time.
16        And just to clarify, Steve, you said
17 that she reviewed one textbook.  It looks like on
18 the list that I received, she reviewed the
19 second, fourth, and fifth editions of the
20 textbook --
21        MR. ROTMAN:  I was referring --
22        MS. AHERN:  -- or textbooks.
23        MR. ROTMAN:  I was referring to that as
24 one textbook, yeah, but you're right, the
25 different editions.  And she did bring with her

1 today those materials.
2        MS. AHERN:  So she has a copy with her
3 today of all of the items listed in the
4 additional materials to Sarah Kane that was
5 served yesterday.
6        MR. ROTMAN:  No.
7        MS. AHERN:  Okay.  Do you know what
8 she -- well, we can -- we'll find out.
9        MR. ROTMAN:  Yeah.
10        MS. AHERN:  Okay.  All right.
11        SARAH E. KANE, M.D.,
12 having been duly sworn, after presenting
13 identification in the form of a driver's license,
14 deposes and says as follows:
15        DIRECT EXAMINATION
16 BY MS. AHERN:
17    Q.  Good morning, Dr. Kane.
18    A.  Good morning.
19    Q.  Can you please state your name for the
20 record?
21    A.  Sure.  Sarah Kane.
22    Q.  And, Dr. Kane, who is your current
23 employer?
24    A.  Commonwealth Pathology Partners.
25    Q.  And do you have a business address at

1 Commonwealth Pathology Partners?
2    A.  The address we commonly use is 81
3 Highland Avenue, Salem, Massachusetts.  It's
4 01970.
5    Q.  Okay.  And do you have any separate
6 consulting business?
7    A.  No.  Other -- outside of this type of
8 medical expert witness work, no.
9    Q.  Okay.  And how often do you do this
10 sort of medical witness work?
11    A.  I am very new at it.  I have done one
12 deposition before in a tobacco case.
13    Q.  Okay.  And the fees that you get from
14 these cases, do they go directly to you or do
15 they go to your -- Commonwealth Pathology
16 Partners?
17    A.  They go directly to me.
18    Q.  And, Dr. Kane, you're a medical doctor;
19 correct?
20    A.  Yes.
21    Q.  And what is your medical specialty?
22    A.  I am board certified in anatomic and
23 clinical pathology and cytopathology, with
24 fellowship training in gynecologic pathology.
25    Q.  Does that mean that you review

1 diagnostic materials, slides, and blocks that
2 have been taken from patient procedures and make
3 determinations regarding diagnosis?
4    A.  Yes.
5    Q.  Do you see patients as part of your
6 medical practice?
7    A.  Yes.  Occasionally, cytopathologists
8 sometimes perform a procedure that's called a
9 fine-needle aspiration.  And so if a patient is
10 seen in clinic and the clinician discovers a
11 palpable nodule, I might be asked to go into the
12 room and perform a fine-needle aspiration.
13    Q.  But you don't see patients in the sense
14 that you don't counsel patients and provide
15 ongoing care for an individual patient?
16    A.  Well, I mean, I guess my pathology
17 report is part of the -- basically speaks to
18 medical treatment and informs clinical treatment
19 of the patient.  So my pathology reports are seen
20 by the patient.
21    Q.  I guess what I'm getting at is:  Do you
22 see patients as part of your practice, give them
23 a history and physical, provide ongoing care for
24 them outside of the setting of a fine-needle
25 aspiration or a specific procedure related to a

Sarah F. Kane, M.D.

Page 18

1 diagnosis?
2     MR. ROTMAN: Is this working for you?
3     THE WITNESS: Oh, I'm sorry?
4     MR. ROTMAN: Is it working?
5     THE WITNESS: Yes.
6     MR. ROTMAN: Okay.
7     A. Outside of the fine-needle aspiration
8 setting, the only time I might see a patient
9 would be with a blood transfusion reaction. I
10 might have to go to the floor to examine the
11 patient or patient chart.
12     Ongoing care for them outside of the setting
13 of a fine-needle aspiration, the nature of
14 gynecologic pathology, sometimes I will see a Pap
15 smear from a patient and then a cervical biopsy
16 from a patient and then a LEEP from the patient,
17 and I might speak to the clinician about
18 treatment algorithms, that kind of thing.
19     Q. Do you actually then go see the patient
20 themselves and discuss with them the results of
21 their Pap smear or other testing?
22     A. Typically, no.
23     Q. Have you ever performed a history and
24 physical in your practice as a pathologist?
25     A. Yes.

Page 19

1     Q. Under what circumstances?
2     A. Under blood transfusion reactions.
3     Q. And what sort of history and physical
4 do you take in relation to a blood transfusion
5 reaction?
6     A. Well, you might be looking at blood
7 pressure and review of the medical chart,
8 temperature, that kind of thing.
9     Q. So you review the medical chart.
10     Is that medical chart prepared by another
11 physician?
12     A. Usually, you're looking at
13 retrospective data at the time of the blood
14 transfusion reaction.
15     Q. How often will you see the same patient
16 who has had a blood transfusion reaction?
17     A. Not very often.
18     Q. Okay. Do you ever counsel patients on
19 risk factors for ovarian cancer?
20     A. Have I ever? Probably, but in my
21 day-to-day practice, I'm not seeing patients on a
22 regular basis to do that.
23     Q. And the only time you see patients is
24 with regard to specific issues that are within
25 your realm of pathology expertise, a fine-needle

Page 20

1 aspiration, a blood transfusion reaction.
2     Are there any others?
3     A. I'm trying to think what another
4 possibility might be.
5     I mean, I go into the operative room when
6 patients are in surgery sometimes with the
7 surgeon to do intraoperative frozen sections,
8 which are realtime diagnosis while the patient is
9 having a procedure.
10     Q. But you're interacting with the
11 physicians in that respect, aren't you, not with
12 the patient?
13     A. It can be both.
14     MR. ROTMAN: Objection. Objection.
15     You can answer.
16     MS. AHERN: You can answer.
17     A. The vast majority of the time I'm with
18 frozen sections, I'm interacting with the
19 surgeon.
20     Q. Are there times where you are
21 interacting with the patient during a surgical
22 procedure?
23     MR. ROTMAN: When you say
24 "interacting," you mean having a conversation or
25 do you mean having any kind of contact?

Page 21

1     MR. KLATT: Steve, just limit the
2 objection to "form."
3     MR. ROTMAN: I'm trying to clarify.
4     MR. KLATT: It doesn't matter.
5 BY MS. AHERN:
6     Q. Did you understand --
7     MR. KLATT: Object to form.
8     Q. -- the question, Doctor?
9     A. Let me -- can -- I'm sorry. Can you
10 read it back or --
11     Q. You said, "The vast majority of" --
12     MR. ROTMAN: She's reading, I think.
13     MS. AHERN: I'll withdraw the question
14 and just remind you.
15 BY MS. AHERN:
16     Q. You said that the vast majority of the
17 time you're interacting with the physicians;
18 correct?
19     A. Yes.
20     Q. What do you mean by "interacting"?
21     A. During the surgery, the surgeon might
22 have me come up to the operative room or the
23 surgeon might come down to look at the tissue,
24 both grossly and under the microscope with me.
25     Q. Okay. Under those circumstances, would

Sarah F. Kane, M.D.

Page 22

1  you ever speak to the patient?
2      A.  Usually not.
3      Q.  And if you -- have you ever spoken to a
4  patient when you were reviewing frozen sections?
5      A.  I might have during rapid reads of
6  fine-needle aspirations.  So sometimes
7  interventional radiologists will do fine-needle
8  aspirations if they have to be ultrasound guided.
9  So, yes, I'm speaking to patients sometimes in
10  that situation and, obviously, when I do
11  fine-needle aspirations.
12      Q.  Okay.  But you don't have a group of
13  patients that come to you for ongoing care and
14  see you in an office setting, do you?
15      A.  They are basically -- I would say it's
16  the equivalent of physician referral.  So if a --
17  if a clinician is doing a biopsy -- I mentioned
18  women with Pap smears and then cervical biopsies
19  and then cone LEEPs, you know, it's a trajectory
20  of care, but it's physician referred for tissue.
21      Q.  When you say "physician referred," what
22  do you -- what do you mean by that?  Are you
23  interacting with the physician in providing
24  advice or recommendations or are you interacting
25  with the patients themselves and providing advice

Page 23

1  or recommendations?
2      A.  The physicians usually.
3      Q.  Okay.  So I'm asking about patients.
4      A.  Yeah.
5      Q.  On a given day -- like what are -- what
6  are the days that you're in the office?
7      A.  Monday through Friday.
8      Q.  So are there days that you do
9  particular tasks, administrative, and then days
10  that you do frozen sections or days that you do
11  just general pathology reads?
12      A.  Rarely, I have an administrative day.
13  It would be nice to have more, but, typically, I
14  am looking at slides the majority of the day.
15      I will be doing frozen sections on some
16  days, but we have a very collegial atmosphere, so
17  I might do frozens with another pathologist.
18  Some days I'm on cytology, so I'm doing the
19  fine-needle aspirations, which is either me
20  performing the fine-needle aspirations or me
21  reading a rapid interpretation that an
22  interventional radiologist has performed.
23      Q.  So on -- in a given week, it's not like
24  you have a patient clinic where patients come to
25  see you and they're scheduled to see you.

Page 24

1      A.  That's correct.  They're not scheduled
2  to see me.
3      Q.  Okay.  And so outside of, like you
4  mentioned, procedures like a fine-needle
5  aspiration, you wouldn't generally see patients
6  directly.
7      A.  The fine-needle aspiration would be the
8  only setting where they would have a scheduled,
9  allotted slot time with me.
10      Q.  Okay.  Generally speaking, when you're
11  reviewing slides, what sort of medical records do
12  you have available to you that are relevant to
13  your clinical diagnosis?
14      A.  I have the entire medical record
15  available to me, whatever is in the hospital
16  system for that patient.
17      Q.  What do you routinely rely on or review
18  as part of your review of slides in terms of
19  medical records?
20      A.  Well, it's very patient dependent and
21  very diagnosis dependent, but, for example --
22  I'll stick to the example of cervical biopsy.  So
23  I'll be looking -- if I have a cervical biopsy,
24  I'll look to see the patient's history of Pap
25  smears, HPV tests, that kind of thing.

Page 25

1      Q.  Documents that are directly relevant to
2  your review of the current pathology; is that
3  correct?
4      A.  For the most part, I would say so.
5      Q.  In other words, you don't go back
6  through all of their physician records or
7  gynecologic visits, their primary care physician
8  records?
9      A.  Again, it would depend on the
10  situation.  I mean, if I have a lung tumor case,
11  I'll probably be looking at the radiology, the
12  radiology reports, the -- I'll pull up a report
13  with a primary care physician to look for smoking
14  history, that kind of thing, to put the whole
15  piece together for the diagnosis.
16      Q.  Okay.  And, Doctor, you're here today
17  to provide a deposition as an expert witness on
18  behalf of the plaintiffs; is that correct?
19      A.  Yes.
20      Q.  And you said you've given one
21  deposition in the past?
22      A.  Yes, that's correct.
23      Q.  And what sort of case was that?
24      A.  That was a tobacco case.
25      Q.  Were you an expert in that case?

Sarah E. Kane, M.D.

Page 26

1    A.  Yes.  It was an individual causation
2 case.
3    Q.  Okay.  Were you an expert for the
4 plaintiffs or the defendants?
5    A.  For the plaintiffs.
6    Q.  And what sort of -- what sort of case
7 was that in terms of the injury that was being
8 alleged?
9    A.  It was a patient with lung cancer who
10 was suing a tobacco company.
11    Q.  And what was your specific -- what was
12 your opinion in that case?
13    A.  That it was highly likely that her long
14 history of smoking caused her lung cancer.
15    Q.  So -- and I should have gone over this
16 with you in the beginning, but you're familiar
17 with the deposition rules?
18    A.  In general, I think.
19    Q.  Okay.  You're doing a very good job.
20 And the main things to remember is the two of us
21 will try not to speak over each other so that the
22 court reporter can take a clean transcript down.
23    If you need a break at some time, that's
24 fine, just let me know.  All I ask is if there's
25 a question pending, you go ahead and finish the

Page 27

1 answer to the question and then we'll take a
2 break.
3    If you don't understand a question that I
4 ask you, please don't answer it.  Let me know
5 that you don't understand the question or you'd
6 like me to rephrase it and I'll be happy to do
7 that.  All right?
8    A.  Okay.
9    Q.  Okay.  And if you answer the question,
10 is it fair for me to assume that you understood
11 it?
12    A.  Yes.
13    Q.  All right.
14      (Notice of Oral and Videotaped
15    Deposition of Sarah E. Kane and Duces Tecum
16    marked Exhibit 1.)
17 BY MS. AHERN:
18    Q.  Doctor, I'm handing you what's been
19 marked as Exhibit No. 1 to your deposition.
20    MS. AHERN:  I don't know how many
21 people need copies of these.  I don't have that
22 many, but --
23    MR. TISI:  I'll take a copy.  Thank
24 you.
25    MR. ROTMAN:  Thank you.

Page 28

1    MS. AHERN:  You're welcome.
2 BY MS. AHERN:
3    Q.  Dr. Kane, I've handed you a copy of
4 your Notice of Deposition for today.
5    Have you seen this document before?
6    A.  Yes.
7    Q.  When did you see it?
8    A.  I believe it was sometime in December,
9 because the original deposition date was
10 January 14th.
11    Q.  And, Doctor, do you know whether you
12 produced all of the documents that are responsive
13 to the request in Exhibit 1, your deposition
14 notice?
15    MR. ROTMAN:  We've objected to a number
16 of them.  And so she's producing -- you should go
17 item by item, I think, if you want to -- I'm
18 going to object otherwise.
19    Q.  Doctor, do you know what you brought
20 with you today?
21    A.  Yes.  We have my -- a copy of my
22 updated CV.  We have copies of my invoice.  I
23 believe I have a copy of -- oh, right.  Sorry.
24    I have pages that I found for the Blaustein
25 second edition, which I don't have the actual

Page 29

1 textbook.  I believe I got -- I found this image
2 off of the internet.  But I do have the fourth
3 and fifth editions of the Kurman Blaustein's
4 textbook, and I've marked any relevant pages that
5 I reviewed a couple of days ago.
6    MS. AHERN:  If you --
7    MR. ROTMAN:  One second.
8    MS. AHERN:  It might be easier if you
9 just hand me those and let me take a look.
10    MR. ROTMAN:  In addition, there's the
11 boxes in the room that are the documents that
12 were sent up by counsel from Ashcraft & Gerel.
13    MS. AHERN:  Thank you.
14 BY MS. AHERN:
15    Q.  All right, Doctor.  So let's take these
16 in order, I guess.  Let's look at your --
17    MR. ROTMAN:  She also has a copy of her
18 report.
19    MS. AHERN:  Okay.  We'll mark your
20 updated CV as Exhibit No. 2.
21      (Curriculum vitae of Sarah E.
22    Kane, M.D. marked Exhibit 2.)
23 BY MS. AHERN:
24    Q.  Do you need a copy in front of you?
25    A.  Sure.

Sarah F. Kane, M.D.

Page 30

1    Q.   Okay.
2        MS. AHERN:  I don't know if anyone else
3    needs a copy.
4    BY MS. AHERN:
5        Q.   Doctor, Exhibit 2, this is a copy of
6    your current curriculum vitae?
7        A.   Yes.  January 2019, yes, this is the
8    current.
9        Q.   And can you tell me what has been
10   updated since you submitted your report
11   November 15th of 2018?
12       A.   I believe the only change is that I am
13   now director of cytopathology at North Shore
14   Medical Center, which includes Salem Hospital and
15   Union Hospital, which is in Lynn, Massachusetts.
16       Q.   Are there any additional publications
17   that you have included on your updated resume --
18   or, sorry, updated CV?
19       A.   I don't believe so.
20       Q.   The only change is that your position
21   has changed to director?
22       A.   Yes, of cytopathology.
23       Q.   Okay.  And you've also brought with you
24   invoices --
25       A.   Yes.

Page 31

1        Q.   -- for your time spent on talc?
2        A.   I handed them to her.  Yes.
3        MR. ROTMAN:  What we handed, I think,
4    is multiple copies, so you can hand one back, I
5    suppose.
6        MS. AHERN:  We'll mark as Exhibit 3 to
7    your deposition an invoice for rendered services.
8        (Invoice from Sarah Kane, M.D.,
9        for services 5/19 through 7/14 marked
10       Exhibit 3.)
11       MS. AHERN:  I can't see a date, but it
12   looks like it covers -- well, let's just have you
13   look at it.
14   BY MS. AHERN:
15       Q.   Can you tell me the date range covered
16   by that invoice?
17       MR. ROTMAN:  Copy for me?
18       A.   Yes.  It looks like it is from May 19th
19   to June 16th.  That would be -- if this is the
20   first invoice, I believe, that would be of 2017,
21   year 2017.
22       Q.   Okay.  And, Doctor, was this May 19,
23   2017 -- how long after you were retained did you
24   submit this invoice?
25       A.   I wouldn't have sent it until after

Page 32

1    June 16th, which is the last date.  So it would
2    have been after June 16th, 2017.
3        Q.   I'm sorry.  Do you remember when you
4    were retained by the plaintiffs to be an expert
5    in this litigation?
6        A.   I believe I was contacted by Mr. Rotman
7    in early May of 2017.
8        Q.   Okay.  Do you know how Mr. Rotman found
9    your name?
10       A.   I believe he was referred by a
11   colleague.
12       Q.   Do you remember what colleague that is?
13       A.   Dr. Paul Michaels.
14       Q.   And is Dr. Michaels a pathologist?
15       A.   Yes.
16       Q.   Where does Dr. Michaels work?
17       A.   I actually don't know the name of his
18   group, but he is in Austin, Texas now.
19       Q.   Where was he in 2017?
20       A.   Austin, Texas, I believe.
21       Q.   Okay.  Is he a gynecologic pathologist?
22       A.   No.
23       Q.   What type of pathologist is he?
24       A.   He has a cytopathology fellowship, in
25   addition to anatomic and clinical board

Page 33

1    certification.
2        Q.   And how do you know Dr. Michaels?
3        A.   We were residents and fellows together.
4        Q.   Were you -- fellows where?  Mass
5    General?
6        A.   At Massachusetts General, yes.
7        Q.   Was he in the gynecologic pathology
8    fellowship with you or a different fellowship?
9        A.   So my fellowship was kind of
10   interesting.  I was, unfortunately, one of the
11   last groups where a combined anatomic and
12   clinical pathology residency was five years.  I
13   think the next year after I began residency they
14   dropped it to four years.
15       So my surgical pathology and cytopathology,
16   it was a two-year fellowship.  The gyn path and
17   the cytopathology, it was over a two-year period.
18   And the weeks of gynecologic pathology were mixed
19   with weeks of cytopathology, so they spread out
20   the cytopathology fellowship over two years.
21       Paul was a cytopathology fellow the first
22   year of my fellowship, so we did all four years
23   of anatomic and clinical pathology and then the
24   first year of fellowship at the same time.
25       Q.   Okay.  And looking back at Exhibit 3,

Page 34

1  this invoice from May 19, 2017, to July 14 of
2  2017, the first entry looks like it's -- it
3  covers a period of May 19th through July 14th,
4  "Communication with firm regarding talc
5  litigation case, one hour"; is that correct?
6    A.  Yes.  Sorry.  Thank you for correcting
7  me.  I saw the last line, 6/16, and figured that
8  was the last day that this covered.  But you're
9  correct, it's -- July 14th would have been the
10  last date that this invoice covered.
11    Yes, June 16th I met with Mr. Rotman,
12  Dr. Thompson, and Mr. Soileau -- I don't know how
13  to pronounce his last name.
14    Q.  Are they all -- they're all attorneys;
15  correct?
16    A.  Correct.
17    Q.  Okay.  What firm?
18    A.  I know Mr. Rotman is with Hausfeld.
19  Dr. Thompson is with Allen Beasley.  I don't know
20  for sure where Mr. Soileau is from.
21    Q.  You said Mr. Thompson is with Beasley
22  Allen.
23    A.  I believe so.  I don't remember for
24  certain.
25    Q.  And at least during --

Page 35

1    MR. ROTMAN:  It's Ms. Thompson.
2    MS. AHERN:  Ms. Thompson.
3    MR. ROTMAN:  Or Dr. Thompson.
4    THE WITNESS:  Doctor.  She's a -- she's
5  a doctor, as well as an attorney.
6    Q.  And for this first invoice, you billed
7  $26,666.67; correct?
8    A.  Yes.
9    Q.  And you spent a total of 53 hours and
10  20 minutes working on talc-related issues?
11    A.  Yes.
12    Q.  Seventeen hours and five minutes of
13  that was reviewing the medical literature, expert
14  reports, and testimony; is that correct?
15    A.  So this was my first time ever
16  recording any sort of invoice for medical expert
17  witness work, so the review of medical
18  literature, expert reports, and testimony,
19  probably some of that will also be included in
20  the generating of medical expert report, because
21  while I was -- I basically began -- you can see
22  from the dates I pretty much started drafting,
23  taking notes in a draft, around May 28th, which
24  was soon after I did my initial medical
25  literature searches.

Page 36

1    So those hours overlap a little bit.  I
2  mean, I kept track of particular hours so that I
3  could bill accurately, but those two things --
4  certainly, generating the medical expert report
5  would also include review of medical literature.
6    Q.  Okay.  So you started on your -- on the
7  draft of your expert report in this case back in
8  May of 2017; is that correct?
9    A.  Late May, yes.
10    Q.  And did you -- do you remember when you
11  started your review of the medical literature?
12  Would it have been May 20th, as reflected in this
13  invoice, Exhibit 3?
14    A.  Yes, I believe so.
15    Q.  You also have on here that you spent
16  some time researching electron microscopy
17  experts.
18    A.  Yes.
19    Q.  Was that at the request of the
20  plaintiffs' counsel?
21    A.  Plaintiffs' counsel was looking for
22  additional people because there are very few
23  electron microscopy units in the country and very
24  few expert electron microscopists.
25    I can't remember if they asked me to or I

Page 37

1  offered to.  It could have been the latter.  But
2  I was aware that they were looking for additional
3  people to potentially use electron microscopy.
4    Q.  Do you know how plaintiffs intended to
5  use the electron microscopy experts?
6    MR. ROTMAN:  Objection.  That's going
7  into areas that you're not entitled to, so she's
8  not going to answer that.
9  BY MS. AHERN:
10    Q.  Doctor, what sort of electron
11  microscopists were you looking for at the
12  plaintiffs' request?
13    MR. ROTMAN:  Same objection.
14    MS. AHERN:  I'm not asking her about
15  communications that she had with counsel; I'm
16  asking her what sort of work --
17    MR. ROTMAN:  Your question --
18    MS. AHERN:  -- she did --
19    MR. ROTMAN:  Your question --
20    MS. AHERN:  -- that she was paid for by
21  the plaintiffs' counsel and that's reflected on
22  the invoice that you've submitted here today.
23    MR. ROTMAN:  You are asking her what
24  she was doing at plaintiffs' counsel's request.
25  That's unrelated to her --

Sarah E. Kane, M.D.

Page 38

1    MS. AHERN:  You're --
2    MR. ROTMAN:  -- opinions.
3    MS. AHERN:  -- instructing her not to
4  answer the question of, "Doctor, what sort of
5  electron microscopists were you looking for at
6  plaintiffs' request?"
7    MR. ROTMAN:  Yes.  I'm objecting to
8  that.
9    MR. KLATT:  That's not a communication.
10    MS. AHERN:  That's not a communication.
11  That is what did she do and what was she looking
12  for.
13    MR. TISI:  It's consulting.
14    MS. AHERN:  She's sitting here today as
15  a testifying expert.
16    MR. ROTMAN:  Understood.  She's not
17  going to answer that.
18  BY MS. AHERN:
19    Q.  Doctor, did you make any
20  recommendations regarding electron microscopists?
21    A.  No, ultimately, I did not give them any
22  names.
23    Q.  What electron microscopists were you
24  looking at when you were conducting your
25  research?

Page 39

1    MR. ROTMAN:  Again, this is her work
2  on -- as a consultant not relating to her
3  opinions in this case --
4    Q.  Doctor, do you --
5    MR. ROTMAN:  -- so you're not entitled
6  to this information.
7    MS. AHERN:  You're instructing her not
8  to answer.
9    MR. ROTMAN:  Yes.
10    MS. AHERN:  Then instruct her not to
11  answer.
12    MR. ROTMAN:  I'm instructing you not to
13  answer.
14    THE WITNESS:  Okay.
15  BY MS. AHERN:
16    Q.  Doctor, do you know any electron
17  microscopists?
18    A.  Yes.
19    Q.  Who?
20    A.  I know Dr. Gunnlaugur Nielsen at
21  Massachusetts General Hospital.
22    Q.  How do you spell Gunnlaugur's name?
23    A.  G-U-N-N -- I believe there are two
24  Ns -- L-A-U-G-H-E-R [sic], Nielsen.  That's with
25  an S-E-N.  But he goes by Petur, which is

Page 40

1  P-E-T-U-R.
2    Q.  N-I-E-, Nielsen?
3    A.  I believe so.
4    Q.  -S-S-O-N?
5    A.  No, -L-S-E-N.
6    Q.  Did you speak to Dr. Nielsen about
7  potentially working on the talc litigation?
8    A.  I believe I e-mailed him.
9    Q.  Do you remember when that occurred?
10    A.  It was probably -- I don't remember
11  exactly, but I would imagine it was between 5/22
12  and 6/1 of 2017.
13    Q.  And was he interested in doing any talc
14  work?
15    A.  He was not interested in doing medical
16  expert witness or consulting work.
17    Q.  Did you e-mail anybody else, any other
18  electron microscopists?
19    MR. ROTMAN:  So you keep on asking her
20  about the consulting work that she was doing that
21  had nothing to do with her opinions in this case,
22  which is why we're here today.  We're not here
23  today for you to take the deposition of her
24  consulting work at that stage on this issue, so
25  that whole area is off limits and I'm instructing

Page 41

1  her not to answer.  If you want to continue
2  asking those questions, I'm going to continue to
3  object on the same basis.
4    Q.  Doctor, did you contact any electron
5  microscopists who agreed to work on the talc
6  litigation?
7    MR. ROTMAN:  Objection.
8    Instruct you not to answer for the
9  reasons previously provided.
10    Q.  Doctor, do you know a Dr. Campion?
11    A.  I do not.
12    Q.  Do you know a Dr. John Godleski?
13    A.  I know the name.  I do not know him
14  personally.
15    Q.  Do you know Bill Welch?
16    A.  I know the name.  I do not know him
17  personally.
18    Q.  Okay.
19    (Invoice from Sarah Kane, M.D.,
20    for services 7/28 through 9/12 marked
21    Exhibit 4.)
22  BY MS. AHERN:
23    Q.  Doctor, I'm handing you what's been
24  marked as Exhibit 4 to your deposition.
25    Can you tell me what that is?

Sarah F. Kane, M.D.

Page 42

1    A.  This is probably the second invoice.
2  Again, I don't believe I had it numbered on the
3  actual invoice, but this looks like it would be
4  the second invoice.
5    Q.  And what period of time does Exhibit 4
6  cover?
7    A.  This covers July 28th to September 12.
8    Q.  Is this 2017?
9    A.  Yes.
10    Q.  And you spent an additional 37 hours
11  and 40 minutes reviewing literature and
12  generating your expert report; is that correct?
13    A.  Right.  And you'll see I actually
14  combined everything, because it got too
15  complicated to separate them out.  And generating
16  the medical expert report was sort of this
17  organic part of reviewing the literature.
18    Q.  And the total bill was for $19,666.67;
19  correct?
20    A.  Yes.
21    Q.  Okay.  Was all your time on Exhibit 4
22  spent working on your MDL report?
23    A.  I'm sorry.  This invoice?
24    Q.  Yes, ma'am.  Was the time spent on
25  Exhibits 3 and 4, these first two invoices, was

Page 43

1  this all in relation to your work on the talc
2  MDL?
3    A.  Yes.  I'm not involved in any other
4  talc litigation.
5    Q.  Okay.
6    MS. AHERN:  Okay.  I'm marking
7  Exhibit 5 as -- oh, I'm marking, sorry, your
8  third invoice as Exhibit 5 to your deposition.
9    (Invoice from Sarah Kane, M.D.,
10    for services 9/18/17 through 2/5/18 marked
11    Exhibit 5.)
12  BY MS. AHERN:
13    Q.  This is a copy of an invoice submitted
14  by you; correct?
15    A.  Yes.
16    Q.  And what dates does it cover?
17    A.  This covers September 18th, 2017, to
18  February 5th, 2018.
19    Q.  You spent an additional 27 hours and 40
20  minutes working on your report; is that correct?
21    A.  Yes.  Well, 21 hours, 55 minutes
22  reviewing the literature and the medical expert
23  witness report, and then there were a few hours
24  communicating and meeting with the firm, which
25  would likely be Mr. Rotman.

Page 44

1    Q.  Who's been your primary contact?
2    A.  Mr. Rotman.
3    Q.  Okay.  And a total for that bill was
4  $13,835; is that correct?
5    A.  Yes.
6    (Invoice from Sarah Kane, M.D.,
7    for services 2/23/18 through 8/3/18 marked
8    Exhibit 6.)
9  BY MS. AHERN:
10    Q.  I'm handing you what's been marked as
11  Exhibit 6 to your deposition.
12    Can you tell me what that document is,
13  please?
14    A.  So this -- I'm counting now -- looks
15  like this is the fourth invoice -- yes, the
16  fourth invoice that I sent them.
17    Q.  And what period of time does this
18  Exhibit 6 cover?
19    A.  It looks like February 23rd, 2018,
20  through August 7th, 2018.
21    Q.  Okay.  And Exhibit 6 reflects that you
22  spent an additional 16 hours and 55 minutes
23  reviewing literature and generating your medical
24  expert report; is that correct?
25    A.  Yes.

Page 45

1    Q.  And 3 hours and 30 minutes
2  communicating or meeting with the law firms
3  involved.
4    A.  Correct.
5    Q.  Okay.  And the total for that invoice
6  was $10,208; correct?
7    A.  Correct.
8    Q.  Okay.  I'm handing you what's been
9  marked as Exhibit 7 to your deposition.
10    (Invoice from Sarah Kane, M.D.,
11    for services 9/20/18 through 11/16/18
12    marked Exhibit 7.)
13  BY MS. AHERN:
14    Q.  And this is another invoice prepared by
15  you?
16    A.  Yes.
17    Q.  And the period of time that is covered
18  appears to be September 20th, 2018, through
19  November 16th of 2018; is that right?
20    A.  Yes.
21    Q.  And you spent an additional 71 hours
22  and 5 minutes reviewing materials and generating
23  your expert report?
24    A.  Yes.
25    Q.  And about four-and-a-half hours

Page 46

1  communicating with the law firms involved?
2      A.  That's correct.
3      Q.  For a total of $37,791.67?
4      A.  Yes.
5      Q.  Doctor, do you have any -- this takes
6  us through -- this last invoice, Exhibit 7, takes
7  us through November of 2018.
8      You've done additional work since November
9  of 2018; correct?
10     A.  I have.
11     Q.  Do you know how much time you have yet
12 to invoice or -- sorry, let me back up.  Withdraw
13 that.
14     Have you sent another invoice to plaintiffs'
15 counsel?
16     A.  I have not.
17     Q.  Okay.  Do you have any idea how many
18 hours you have yet to invoice?
19     A.  I have not added it up.  I don't really
20 have a ballpark.  Maybe -- I would just be
21 guessing.  I haven't added it up, to be honest.
22     Q.  Do you know how much money you've made
23 to date, totaling all of these together?
24     MR. ROTMAN:  Objection.
25     Q.  How much money -- how much money have

Page 47

1  you made in fees associated with your talc work
2  to date?
3      A.  I would need a calculator to add it all
4  up, but this would be the full amount, all added
5  together.
6      Q.  And, Doctor, you're charging $500 an
7  hour; correct?
8      A.  Yes.
9      Q.  Did you ask for a retainer when you
10 were initially asked to get involved in the case?
11     A.  I did not.
12     Q.  Were you offered a retainer?
13     A.  It wasn't discussed.
14     Q.  Does the amount that you charge or your
15 fee, does that change with the activity that
16 you're performing?
17     A.  No.  I think I had a fee schedule where
18 trial might be on a per-day basis, but I don't
19 remember what that is.
20     Q.  Did you actually submit a written fee
21 schedule to the plaintiffs' counsel?
22     A.  I believe I did at some point.
23     MR. ROTMAN:  I don't know.  I don't
24 recall that.
25     Q.  Could you find a copy of that, please,

Page 48

1  and produce it to one of the attorneys involved?
2      A.  Sure.
3      Q.  Thank you.
4      MR. ROTMAN:  She'll find it if it
5  exists.  She'll look for it.
6      MS. AHERN:  Clearly.
7      MR. ROTMAN:  She didn't testify that
8  she produced a fee schedule; she said she
9  believed she did.
10     MS. AHERN:  Understood.  If she finds
11 it --
12     MR. ROTMAN:  Yeah.
13     MS. AHERN:  -- she'll produce it to you
14 and you'll produce it to us.
15     MR. ROTMAN:  Exactly.
16 BY MS. AHERN:
17     Q.  Doctor, how much -- I mean, how do you
18 keep track of your time?  Do you have a
19 spreadsheet?  Do you have some process where you
20 log your hours?
21     A.  I keep a list, an electronic list.
22 It's not an Excel, but it's just a list.
23     Q.  So is it just a Word document and you
24 put your time entries in and multiply that by
25 your hourly rate?

Page 49

1      A.  Basically.
2      Q.  And do you generate the invoices
3  yourself?
4      A.  I do.
5      Q.  Is that through some sort of program or
6  is this just a Word document that you created and
7  you plug the information in?
8      A.  It's just a Word document.
9      (Discussion off the record.)
10 BY MS. AHERN:
11     Q.  So, Doctor, other than the folders that
12 we've just gone through, is there anything
13 related to your opinions in this case that you
14 did not bring with you to the deposition today?
15     MR. ROTMAN:  Objection.
16     Q.  Start with that.
17     MR. ROTMAN:  Objection.
18     A.  I believe I brought all of the
19 literature cited in the initial reports.  I've
20 tried to be complete, as you know, with listing
21 everything that I've reviewed.  It's possible
22 there might have been some things that I reviewed
23 that I forgot to put on a list, but I've tried to
24 be as complete as possible.
25     Q.  How did you track your literature

Page 50

1 reviews?
2    A.  So when I was writing the report,
3 you'll notice the first reference list is a list
4 of papers that I actually cited in the text of
5 the report, and then I had -- any papers that I
6 reviewed or other data that I reviewed, I kept in
7 folders on my computer.
8    Unfortunately, I had two hard drives
9 malfunction while I was in the process of writing
10 this report.  Luckily, I backed up most of it, so
11 it's possible a few things didn't get documented,
12 ultimately, but I really tried my best to make it
13 complete and accurate, and that's why you got
14 another list yesterday.
15    Q.  Okay.  And, I'm sorry, we forgot to
16 mark some of these.
17    And so can you tell me -- this is something
18 you brought with you today?
19    A.  Yes.
20    MR. TISI:  Can I -- and he's defending
21 the deposition; I just have a little more
22 knowledge of the documents and how they -- at
23 least I think I do.
24    I think that in the boxes here are the
25 references cited.  The materials considered, I

Page 51

1 don't think we printed out.  I don't think those
2 are in the boxes.  And so I don't want there to
3 be any -- there are documents she reviewed that
4 are not here that are not referenced, but were
5 identified in that list.
6    Does that make sense?
7    MS. AHERN:  Maybe.  I'm going to go
8 through the various reference lists with her --
9    MR. TISI:  Okay.
10    MS. AHERN:  -- and we can kind of
11 clarify as we go.
12    MR. TISI:  Like, for example, I mean, I
13 just -- I'm just using an example -- we
14 supplemented with some Health Canada materials.
15 I don't know if she brought those with her,
16 because they were not in the original report.
17 They weren't available at the time, so they would
18 not be in the reference materials that are in the
19 binders.
20    I know you haven't cracked open the
21 boxes, but I don't want there to be any
22 misimpression.  So in terms of what they are, you
23 can certainly ask her, but she may not know what
24 is in the boxes, because we printed them out for
25 her.  Do you know what I'm saying?

Page 52

1    MR. KLATT:  Chris, let me just clarify.
2 There's four blue cardboard TLS boxes --
3    MR. TISI:  Correct.
4    MR. KLATT:  -- that you're referring
5 to?
6    MR. TISI:  Correct.
7    MR. KLATT:  And they have binders in
8 them?
9    MR. TISI:  They have binders in them.
10 And I haven't even looked at them because they
11 were sent out from the Ashcraft office, but my
12 understanding -- and you can crack them open at
13 break -- but my understanding is there are copies
14 of those.  I don't know how many.  So it's four
15 boxes, but there are duplicates in there.
16    But they are -- if I understand -- and
17 I can correct them on a break -- if I understand
18 them, they are copies of the references.  We did
19 not make copies -- or they did not make copies of
20 the materials that were considered but not
21 referenced in the reports.
22    Do you follow what I'm saying?
23    MR. KLATT:  Yeah.  What I want to
24 clarify is the four boxes here have not been in
25 Dr. Kane's possession, so there's no notations,

Page 53

1 highlighting, stickies --
2    MR. TISI:  Oh, no.
3    MR. KLATT:  -- that she -- that
4 Dr. Kane herself would have put on what's in the
5 boxes --
6    MR. TISI:  No.  Those were print- --
7    MR. KLATT:  -- is that correct?
8    MR. TISI:  Correct.  Those were printed
9 out by the plaintiffs' steering committee.
10 Basically, we took her reference list and printed
11 them out for you all.  There's no -- there are no
12 notes from her or anything like that.
13    What I don't think we printed out for
14 you would be the extensive documents that she
15 reviewed, including the supplemental materials
16 that were identified, and then put them -- we can
17 provide those in a -- you know, on a thumb drive
18 if you want to.  It's just in these depositions
19 we've had so far, half the time the boxes aren't
20 even opened, and we didn't want to just create
21 paper for the purpose of creating paper.  But if
22 you want, we can pull those for you and put them
23 in a Dropbox or whatever.
24    I don't want to waste your time,
25 because I do want there to be -- because she

Sarah F. Kane, M.D.

Page 54

1  doesn't necessarily know what was printed out for
2  her.
3        MS. AHERN:  Understood.  So let's --
4        MR. TISI:  I'm sorry if I --
5        MS. AHERN:  That's okay.
6        MR. TISI:  -- took up time.
7        (Excerpt from Blaustein's Second
8  marked Exhibit 8.)
9  BY MS. AHERN:
10       Q.  Doctor, I'm handing you what's been
11  marked as Exhibit 8 to your deposition.
12       A.  Yes.
13       Q.  Is this something that you brought with
14  you today in response to the Notice of
15  Deposition?
16       A.  It's something I brought because I
17  reviewed it a couple days ago.  It probably falls
18  within the deposition.  I know you wanted to see
19  everything that I reviewed.
20       Q.  So, first of all, tell me what this is.
21  What is Exhibit 8?
22       A.  This is a page from Blaustein's second
23  edition of the Pathology of the Female Genital
24  Tract.
25       Q.  Do you know what page it is?

Page 55

1        A.  Unfortunately, it is cut off.  This --
2  I don't have this textbook.  I found this, I
3  think, on Google Books, actually.
4        Q.  And so why are you bringing it today
5  again?
6        A.  Because I reviewed it.
7        Q.  Okay.  And why did you review this?
8        A.  Well, I recently became aware that
9  Dr. Kurman is a medical expert witness for the
10  defense, so I was more curious.  I actually asked
11  the plaintiffs' attorneys for a report -- any
12  report that Dr. Kurman had done, because I was
13  trying to understand his -- what his viewpoint
14  might be.  I don't have his defense report
15  because they're not available to us yet, but I
16  was trying to get a sense for what defense
17  medical experts -- their viewpoints.
18        And so I did a search for, basically, "talc"
19  and "Kurman" and I found this (indicating).  And
20  then I have two other editions, so I looked
21  through my other editions for any references to
22  talc.  Because Kurman edited the fourth and fifth
23  edition.  I do not believe he edited the second
24  edition, which is -- this one page is from
25  (indicating).

Page 56

1        Q.  And, Doctor, the additional materials
2  to -- of Dr. Sarah Kane that were provided to us
3  yesterday, you list "Kurman defense report" from
4  a case by the name of Ristesund.
5        Did you not receive that?
6        A.  I asked for -- yeah, I did receive
7  that.
8        Q.  You received it?
9        MR. ROTMAN:  What she -- what she was
10  saying is she --
11        MS. AHERN:  Wait.  I'm asking her the
12  question.
13        Q.  Did you receive the report, the Kurman
14  defense report, from a case by the name of
15  Ristesund?
16        A.  Yes.  I had requested a defense report
17  written by Kurman, if they had anything, and that
18  is what I received.
19        Q.  Okay.  I thought just a minute ago you
20  said you had not received one because it wasn't
21  available to you.
22        A.  I'm talking about the MDL, the curr- --
23        Q.  Ah.
24        A.  -- the current defense expert witness
25  reports.

Page 57

1        Q.  Okay.
2        A.  Yeah.
3        Q.  Thank you for the clarification.
4        So you have seen at least one defense report
5  that was written by Dr. Bob Kurman; right?
6        A.  Yes.
7        Q.  And did you -- do you know Dr. Robert
8  Kurman, either personally or by reputation?
9        A.  By reputation and I've gone to dinner
10  with him before, but I don't know him well.
11        Q.  And what do you know about Dr. Kurman?
12        A.  So he is a well-known gynecologic
13  pathologist out of -- he was out of Johns
14  Hopkins.  I believe he recently retired.
15        But he certainly edited one of the main
16  gynecologic pathology textbooks and was -- you
17  know, published quite a bit in gynecologic
18  pathology, so his name is well known in our
19  community.
20        Q.  And you've actually cited to a number
21  of his papers in your report; correct?
22        A.  Yes, I'm sure I have.  I know at least
23  one or two.
24        Q.  And Dr. Kurman was a Robert Scully
25  fellow, as well, wasn't he?

Sarah F. Kane, M.D.

Page 58

1    A.  I actually don't remember if he trained
2  under Scully.  It's possible.  I don't remember
3  whether or not he did.
4    Q.  Okay.  This Exhibit 8 that you brought
5  with you today, are you bringing it here because
6  it mentions granulomatous endometritis caused by
7  foreign bodies?
8    A.  It says, "Talc may be introduced into
9  the endometrial cavity by instruments
10  contaminated with talcum powder or by gloves
11  during a pelvic examination.  Patients may be
12  asymptomatic or may present with menorrhagia.
13  Microscopically, the extent of the granulomatous
14  inflammatory reaction depends on the quantity of
15  the talc inoculated.  The infiltrate is
16  characterized by histiocytes and foreign-body
17  multinucleated giant cells surrounded --
18  surrounding the talc crystals, along with
19  lymphocytes and plasma cells.  The crystals
20  appear as refractile, birefringent, needle-like,
21  or fan-shaped splinters in polarizing light."
22    Q.  Are you familiar with the type of
23  reactions -- tissue reactions that are elicited
24  by talc in tissue?
25    A.  I know -- I'm aware that you can get

Page 59

1  granulomous -- granulomatous inflammation, like
2  here, and you can have acute inflammation, for
3  example, in pleurodesis and chronic inflammation,
4  like lymphocytes and plasma cells.
5    Q.  Are you an expert in granulomatous
6  inflammation?
7    A.  Well, I certainly am familiar with
8  the -- with diagnosis of granulomatous
9  inflammation.  I see it quite commonly.
10    Q.  Under what circumstances do you
11  commonly see granulomatous inflammation?
12    A.  You see it often in -- the most common
13  situation would be foreign-body giant cell.  That
14  could be due to foreign bodies or it could be due
15  to -- a common situation we might see them is
16  what's called an epidermal inclusion cyst in the
17  skin, and you actually can get a granulomatous
18  response to keratin that has -- if it's ruptured
19  and gone into the dermis, you can see that.
20    Infections is another one.  In tuberculosis,
21  you can see granulomatous inflammation.  Fungal
22  infections, you can see granulomatous
23  inflammation.
24    Q.  How many different types of
25  granulomatous reactions are there?

Page 60

1    A.  I'm not really sure what you mean by
2  "types."  You mean foreign body versus infectious
3  versus --
4    Q.  Yes.
5    A.  Those would be the top of the list.
6    Q.  And are there subtypes of granulomatous
7  inflammation within those categories?
8    A.  Well, you can have multinucleated giant
9  cells that aren't part of a granuloma.
10    You can see -- another common situation
11  where you'll see granulomas is in Crohn's
12  disease.  That's granulomatous inflammation in
13  the colon due to inflammatory bowel disease.
14    And I think -- yeah.  So foreign body and
15  infection are -- and certain diseases that may
16  cause granulomatous -- that's sort of the
17  hallmark of that type of disease, sarcoidosis.
18    Q.  Have you ever -- the Figure 12.6 in
19  Exhibit 8 actually doesn't have anything to do
20  with granulomatous endometritis, does it?
21    A.  No.  That figure is of a type of
22  finding you can see in the endometrium that's not
23  a granulomatous reaction.
24    Q.  And how did Exhibit 8, if it does,
25  inform your opinions in this case?

Page 61

1    A.  Well, it was just a piece of
2  information I found, again because I was curious
3  mostly about what Kurman's opinion might be on
4  this litigation.  So...
5    Q.  Does -- do you know what -- did this
6  come from a particular chapter in Blaustein's
7  second edition?
8    A.  This, I don't -- I have no more
9  information on this particular one.  Um --
10    Q.  Do you know who authored the chapter?
11    MR. ROTMAN:  Excuse me.  I think she
12  was in the middle of an answer.
13    Q.  I didn't mean to cut you off.  Please
14  go ahead.
15    A.  Again, I don't have any more
16  information.  I brought it because I saw it.
17    Q.  Okay.  So you don't know who authored
18  the chapter that contains this information in
19  Exhibit 8?
20    A.  Not for this edition, I do not.
21    Q.  And are you -- do you -- did you say
22  earlier you weren't sure if Dr. Kurman edited
23  this particular version of Blaustein's Pathology?
24    A.  I don't believe he did.  I know he
25  edited the fourth and fifth, but I don't believe

Sarah F. Kane, M.D.

Page 62

1  he did the second.
2      Q.  Does the information in Exhibit 8
3  inform your decisions regarding talc and
4  causation with regard to ovarian cancer?
5      MR. ROTMAN:  Objection.
6      A.  It's another piece of evidence.  It
7  mentions granulomatous inflammation due to talc
8  in the endometrium.
9      Q.  And what does that have to do with
10 ovarian cancer?
11     A.  Well, one of the plausible biologic
12 mechanisms for talc causing ovarian cancer is
13 that it elicits a chronic inflammatory reaction.
14     Q.  And there are different types of
15 chronic inflammatory reactions, aren't there?
16     A.  Yes, there are.
17     Q.  Is a foreign-body reaction the same as
18 the type of inflammation seen, for instance, in
19 ulcerative colitis?  If you know.
20     A.  No, I'm just rereading the question.
21 Ulcerative colitis, you don't typically see
22 foreign-body reaction.
23     Q.  Ulcerative colitis is one of the
24 conditions that has been associated with the
25 development of cancer; correct?

Page 63

1      A.  Those with ulcerative colitis have an
2  increased risk of colon cancer, yes.
3      Q.  Do you know of any particular cancers
4  that have been linked to foreign-body responses?
5      A.  Well, foreign-body responses -- for
6  example, asbestos is known to cause an
7  inflammatory response and asbestos is known to
8  cause mesothelioma and lung cancer, and the IARC
9  states that it causes ovarian cancer.
10     Q.  And how is the response to asbestos
11 different from the response that's been
12 documented with talc in terms of tissue reaction?
13     A.  So you can see a granulomatous reaction
14 to talc.  You can see an acute reaction to talc
15 in pleurodesis patients.
16     This page here mentions plasma cells and
17 lymphocytes, which you do see in Crohn's disease.
18     Q.  You see plasma cells and lymphocytes in
19 a number of different inflammatory conditions;
20 correct?
21     MR. ROTMAN:  You can answer.
22     A.  Yes, you can see lymphocytes and plasma
23 cells in inflammatory conditions.
24     Q.  And you can see inflammatory con- ---
25     MR. ROTMAN:  Object -- object -- I was

Page 64

1  going to --
2      MS. AHERN:  One second, please.
3      Q.  You can see inflammatory conditions
4  that are not in any way linked to the development
5  of cancer; correct?
6      A.  So not all chronic inflammation is
7  going to lead to cancer, but chronic inflammation
8  is a well-established cause of different types of
9  cancer.
10     MR. ROTMAN:  I'd like to take a break.
11 We've been going a little over an hour.
12     MS. AHERN:  Okay.
13     THE VIDEOGRAPHER:  Here ends Media 1.
14 Off the record, 10:21 a.m.
15         (A recess was taken.)
16     THE VIDEOGRAPHER:  Here begins Media
17 No. 2 in today's deposition of Sarah Kane, M.D.
18 Back on the record, 10:37 a.m.
19 BY MS. AHERN:
20     Q.  All right.  Dr. Kane, we were -- we
21 left off, we were talking about chronic
22 inflammation and cancer.
23     Do you remember that?
24     A.  Yes.
25     Q.  Okay.  Can you identify for me the

Page 65

1  types of ovarian cancer that have been associated
2  with chronic inflammation?
3      A.  So we know that endometriosis, as an
4  example, causes an inflammatory response.  The
5  types of ovarian cancer that are associated with
6  endometriosis are clear cell carcinoma and
7  endometrioid carcinoma.
8      Q.  Are there other forms of ovarian cancer
9  that are associated in the literature with
10 chronic inflammation?
11     A.  So we do see chronic inflammation
12 within other types of ovarian cancer, so
13 high-grade invasive serous, low-grade serous
14 carcinoma, you do see chronic inflammation within
15 those tumors.
16     Q.  Let me be more precise, because it's
17 sort of a chicken and the egg kind of thing.
18     I'm asking what sort of inflammatory
19 conditions have been associated with the
20 development or the cause of ovarian cancers?
21     A.  Yeah.  So the mechanisms of a lot of
22 ovarian cancer have been somewhat elusive.
23 Unfortunately, it's a rare disease.  It's hard to
24 study.  It's difficult to have sort of a large
25 enough cohort to really get good data on ovarian

Sarah E. Kane, M.D.

Page 66

1 cancer, and so we don't really know all of the
2 mechanisms of the initiation of ovarian cancer.
3 But we know that chronic inflammation, we
4 see it in ovarian tumors. We know that -- and
5 putting it in a talc perspective, we know that
6 talc can cause chronic inflammation and so -- and
7 we know that chronic inflammation causes other
8 types of cancer.
9 Q. So is that -- can you name any other
10 types of ovarian cancers that have been
11 associated in the literature with chronic
12 inflammation in terms of a specific etiology for
13 that cancer?
14 A. So, again, I would say I don't know if
15 we can say for certain what the specific etiology
16 is for all types of surface epithelial cancer,
17 but we do know that, again, clear cell has been
18 associated with endometriosis, which causes
19 chronic inflammation, and we see chronic
20 inflammation in tumors. But the mechanisms for
21 these types of tumors have not been completely
22 mechan- -- elucidated.
23 Q. So do you not know of any other
24 specific ovarian tumors that have been associated
25 in the literature causally with chronic

Page 67

1 inflammation?
2 A. Again, I don't believe that the
3 mechanisms of all of these tumors have been
4 elucidated completely.
5 Q. And I do understand your answer, but I
6 just want to know if there are -- if you're aware
7 of literature connecting causally chronic
8 inflammation with other types of ovarian cancer
9 other than the two that you've mentioned,
10 endometrioid and clear cell carcinoma.
11 A. Well, again, I mentioned that in serous
12 tumors, we do see chronic inflammation in those
13 tumors.
14 And with smoking and mucinous ovarian
15 cancers, you know, it's been -- there's some
16 literature that suggests, you know, smoking is
17 associated with mucinous and those -- that can
18 cause inflammatory reactions.
19 But, again, this is all -- it's not entirely
20 clear what the etiology of some of these tumors
21 are.
22 Q. You mentioned that in high-grade serous
23 carcinoma, you see associated inflammation;
24 correct?
25 A. You can see associated chronic

Page 68

1 inflammation, yes.
2 Q. And you would agree that many, if not
3 most, cancers are somewhat proinflammatory.
4 A. I think tumors can be -- can be
5 proinflammatory, yes.
6 Q. So the tumor itself can invoke an
7 inflammatory response during its development;
8 correct?
9 A. Some tumors will.
10 Q. And often the tumors will hijack
11 portions of the immune system to help them to
12 grow and metastasize; correct?
13 A. I'm not sure exactly what you mean by
14 "hijack," but there are mechanisms to -- or
15 literature to suggest that.
16 Q. So just looking at a high-grade serous
17 carcinoma and seeing inflammation doesn't tell
18 you anything about whether that inflammation
19 caused the tumor or whether it was caused by the
20 tumor; is that correct?
21 A. So, again, the mechanisms are not that
22 clear, so we don't know for sure. But is all
23 chronic inflammation seen in a tumor the cause of
24 the tumor? I don't know if we know the answer,
25 but, you know, it's definitely an associated

Page 69

1 pattern that we see with ovarian tumors.
2 Q. So my question is a little different,
3 if I can go back and find it. And it's missing.
4 My question is: As a pathologist looking at
5 slides from a particular patient who has ovarian
6 cancer --
7 A. Mm-hmm.
8 Q. -- just the observation that there is
9 inflammatory cells associated with that tumor
10 doesn't tell you anything, as a pathologist, in
11 terms of whether that inflammation caused the
12 tumor or if the tumor caused the inflammation.
13 A. Well, I think it depends on the
14 situation. You know, again, for ovarian tumors,
15 if we have a clear cell carcinoma, we could, you
16 know, deduce, especially if you see associated
17 endometriosis, that that is the likely cause,
18 and, again, depending on the patient and the
19 patient's risk factors.
20 But, yeah, if you're looking just at one
21 slide without any other information, it would be
22 difficult to say.
23 Q. Well, you would never just be looking
24 at one slide, would you? You'd be looking at all
25 of the slides that were available for a

Page 70

1  particular patient, which would include
2  diagnostic tissue or tumor tissue, as well as
3  normal, nontumor tissue; correct?
4      A.  Right.
5      Q.  Okay.  So you would never be in a
6  situation where you're just looking at a single
7  slide and making a determination, unless it's
8  maybe cytology or a biopsy; correct?
9      A.  I'm sorry.  I'm just looking at the --
10     Q.  Sure.
11     A.  I'm not sure what the -- the first
12 question came out kind of funny.
13     Q.  What I was saying is there would never
14 be a situation where you're only looking at a
15 single slide to make a diagnostic determination
16 unless it was from a biopsy sample or a cytology.
17     A.  That's what I was going to kind of
18 rewind and clarify, that sometimes there is only
19 one slide.  So --
20     Q.  Is that an accurate statement?
21         MR. ROTMAN:  Let her finish the answer.
22 I think she was saying "so" and then you asked
23 another question.
24     A.  So in a larger specimen type, it's
25 correct you would be looking, usually, at more

Page 71

1  slide if there's more tissue that would fit in
2  one cassette to make one slide.
3      Q.  Let's talk about high-grade serous
4  carcinoma.
5          High-grade serous carcinoma is the most
6  common form of ovarian cancer; correct?
7      A.  It's most -- yes.
8      Q.  By far the most common form of ovarian
9  cancer; is that also correct?
10     A.  It's the most common form, yes.
11     Q.  So let's talk about high-grade serous
12 carcinoma in the context of chronic inflammation.
13 Do you know of any published literature that
14 connects chronic inflammation causally with the
15 development of high-grade serous carcinoma?
16     A.  I can -- in my report, I actually do
17 have a section.  Let me find it.
18         MR. ROTMAN:  It might be easier to take
19 off the clip, if that helps you flip the pages,
20 because it's two-sided.
21     Q.  Doctor, while you look for that, just
22 to the best of your recollection, do you remember
23 reading any studies that concluded that --
24         MR. ROTMAN:  I object.  She's in the
25 middle of answering --

Page 72

1          MS. AHERN:  I'm not finished with my
2  question.  You can object when I'm done with my
3  question.
4          MR. ROTMAN:  I object to you asking a
5  question --
6          MR. KLATT:  She didn't have --
7          MR. ROTMAN:  -- when she's asking --
8          MS. AHERN:  I can ask a question
9  whenever I want.  She doesn't have to answer the
10 question if you instruct her not to, but while
11 she's spending time looking through her report,
12 I'm going to ask her a different question based
13 on her recollection.
14         MR. ROTMAN:  Well, you've asked her a
15 question, she's in the process of answering it,
16 and you're asking -- you're asking her a second
17 question.  That's what I'm objecting to.
18 BY MS. AHERN:
19     Q.  Doctor --
20         MR. ROTMAN:  Let her finish --
21     Q.  -- can you answer the question without
22 looking at your report?
23     A.  Well, I'd like to refer to my report if
24 you're asking questions.
25     Q.  And that's fine.  My only question,

Page 73

1  really, was, just based on your recollection as
2  we sit here discussing chronic inflammation and
3  ovarian cancer, if you are aware of studies that
4  causally associate chronic inflammation with
5  high-grade serous carcinoma?
6      A.  So there's definitely literature that
7  has looked at associations between chronic
8  inflammation and the resulting sort of
9  expressions.
10         And that's what -- I was trying to point you
11 to my report on Page 12, the end of it, where it
12 says, "There also is evidence that talc induces
13 macrophage TNF alpha expression and macrophages
14 that express TNF alpha promote ovarian tumor
15 genesis.  TNF alpha is involved in chronic
16 inflammation and induces mutations in vitro and
17 TNF alpha-induced chromosomal mutations occur
18 mostly in cells with P53 aberrations and, of
19 note, high-grade serous carcinomas typically have
20 inactivating mutations in P53."
21         So, again, we don't know all the mechanisms
22 of all of these tumors, but there's certainly
23 literature that is investigating those types of
24 associations.
25         MR. KLATT:  Object.  Nonresponsive.

Sarah F. Kane, M.D.

Page 74

1    MS. AHERN:  Same.
2    Q.  But since you brought it up, on Page 12
3 of your report, can you translate for me that
4 paragraph that you just read and put it in lay
5 terms and explain how that has anything to do
6 with causal associations with ovarian cancer and
7 chronic inflammation caused by talc?
8    MR. ROTMAN:  Objection.
9    A.  Well, I think it's there in the report.
10 If talc is inducing macrophage TNF alpha
11 expression and macrophages that express TNF alpha
12 can promote ovarian tumor genesis that occur
13 mostly in the -- TNF alpha-induced chromosomal
14 mutations occur mostly in cells with P53
15 aberrations, I think that's relevant in looking
16 at evidence that -- for a plausible mechanism
17 that inflammation caused by talc can cause
18 aberrations in -- can cause P53 aberrations.  And
19 we know that high-grade serous carcinomas, many
20 of them have P53 mutations.
21    Q.  And high-grade serous carcinomas with
22 P53 mutations, what causes the P53 mutations?
23    A.  Well, again, the literature is still
24 evolving into all of the mechanisms regarding
25 this.  Some of them we know are sort of aberrant

Page 75

1 mutations, and we don't always know why they
2 occur.
3    We know that women with BRCA1 and BRCA2
4 mutations have -- can get high-grade -- have a
5 higher risk of high-grade serous carcinoma.
6    But, again, I don't think we know all of the
7 mechanisms that cause, you know, all of these
8 tumors.
9    MS. AHERN:  Objection.  Nonresponsive.
10    Q.  Doctor, do you know, as we sit here
11 today, what causes P53 mutations in high-grade
12 serous carcinoma?
13    A.  I think I answered that.  We know, I
14 mean, what's in my report and women with BRCA1
15 and BRCA2 mutations.  But, again, the literature
16 is evolving with this.
17    Q.  Doctor, are you suggesting that BRCA1
18 and -2 mutations cause P53 mutations in
19 high-grade serous carcinomas?
20    A.  What I'm saying is that we know that
21 BRCA1 and BRCA2 mutation patients have a high
22 risk of ovarian cancer.
23    And so you're asking me what causes, so, you
24 know, I'm telling you the data that we have.
25    Q.  What is the earliest identifiable

Page 76

1 genomic event in the development of high-grade
2 serous carcinoma?
3    A.  So, again, I don't know if I -- I don't
4 know if we always know what the earliest
5 identifiable genomic event in the development of
6 high-grade serous carcinoma is.
7    Q.  Have you reviewed the literature on
8 high-grade serous carcinoma from a molecular
9 genetics perspective?
10    A.  Yes, I reviewed papers on molecular
11 genetics, yes.
12    Q.  Do those papers indicate that one of
13 the earliest, if not the earliest, genomic event
14 in the development of high-grade serous carcinoma
15 that has been identified are mutations in P53?
16    A.  So, again, you can see P53 mutations,
17 for example, in the fallopian tubes and you can
18 have sort of serous tubal intraepithelial
19 carcinomas in the fallopian tube, which are
20 thought to be early precursors for high-grade
21 carcinoma.
22    Q.  High-grade serous carcinoma?
23    A.  Mm-hmm.  Sorry, high-grade serous
24 carcinoma.
25    Q.  And do you agree that the STIC lesions

Page 77

1 or serous tubal epithelial carcinomas in the
2 fallopian tubes are currently known to be the
3 earliest manifestation of high-grade serous
4 carcinoma?
5    A.  Well, it depends on what you mean by
6 "manifestation."  I mean, it takes a period of
7 time from initial insult until we can recognize
8 something histologically as a precursor to
9 cancer.
10    Q.  That was -- you're right, that was a
11 bad question.
12    Do you recognize serous tubal
13 intraepithelial carcinomas as an in situ serous
14 carcinoma?
15    A.  I think evidence is supportive of
16 serous tubal intraepithelial carcinoma being a
17 precursor to some high-grade serous carcinomas.
18    Q.  And when you say "precursor," do you
19 mean a frank cancer or a premalignant lesion?
20 What do you mean by "precursor"?
21    A.  Well, again, not -- we don't know if
22 all STICs are going to become high-grade serous
23 carcinomas.  STICs were originally discovered in
24 looking at fallopian tubes of BRCA1 and BRCA2
25 patients that had -- what's the word I'm looking

Sarah E. Kane, M.D.

Page 78

1 for? -- prophylactic salpingectomies to decrease
2 their risk of ovarian cancer.
3     And that was -- you know, they had evaluated
4 these precursor lesions, and so the thought is
5 that when you have these atypical cells in the
6 fallopian tube fimbria that are -- that have P53
7 aberrations, that that -- the belief is that
8 that's a precursor to some of the serous invasive
9 carcinomas that we see.
10     Q.  Do you consider STIC lesions to be
11 carcinomas?
12     A.  They're -- the name is intraepithelial
13 carcinoma, so its analogous term would be sort of
14 an in situ cancer.
15     Q.  It is a cancer; correct?
16     A.  Well, they're calling them
17 intraepithelial carcinomas because they have -- I
18 mean, it's sort of semantics.  They have a P53
19 mutation and they're recognizable histologically.
20     Q.  Do you agree that they're carcinomas or
21 cancer?
22     A.  I certainly agree that they can be
23 precursors to invasive serous carcinomas.  It's
24 sort of semantics, precursor -- it -- it's --
25 it's sort of the same question as ductal

Page 79

1 carcinoma in situ in the breast.  There's
2 literature that debate about is ductal carcinoma
3 in situ a true cancer or is it a risk factor for
4 cancer, and what is the meaning of treatment for
5 DCIS in the breast?  And I would say that that's
6 sort of analogous to STIC lesions in the
7 fallopian tube.
8     Q.  Okay.  Do you agree that most
9 high-grade serous carcinomas arise from the
10 endometrial cells in the fallopian tube?
11     A.  High-grade --
12     Q.  Epithelial cells in the fallopian tube.
13 Excuse me.
14     A.  So, again, we -- this was something
15 that the medical community really struggled with,
16 trying to find the precursor lesions to a lot of
17 these tumors.
18     And for a lot of years it was thought that
19 maybe serous carcinomas derived from what are
20 called epithelial inclusion cysts, so, basically,
21 the thought was that during ovulation, you're
22 disrupting the surface epithelium of the ovary
23 and when the ovary sort of heals itself, you get
24 this invaginated epithelium within the ovary and
25 that maybe because of inflammatory response to

Page 80

1 that ovulation event, you might end up with
2 precursors.
3     We don't really have a model in a lot of
4 ovarian cancers where you can follow a precursor
5 all the way through to -- what we think is a
6 precursor all the way through to the final tumor.
7 We just -- we don't really have a lot of data on
8 those in-between steps.
9     So it was very, very interesting when they
10 discovered these STIC lesions in the fallopian
11 tube fimbria that had P53 mutations.  It was
12 pretty compelling that these might be the
13 precursor lesions to serous -- high-grade serous
14 carcinomas.
15     Now, are all high-grade serous carcinoma
16 caused by STIC lesions or are they all -- is a
17 STIC lesion a precursor to all serous --
18 high-grade serous carcinomas?  I don't think we
19 know that.
20     Q.  Do you know of any data associating
21 high -- excuse me, associating chronic
22 inflammation or injury with the development of
23 STIC lesions?
24     A.  So, again, I think the literature is
25 still evolving with this -- these STIC lesions.

Page 81

1     Q.  Sorry.  Were you finished?  I don't
2 want to interrupt you if you're thinking.
3     A.  No, I'm thinking.
4     Again, I don't think we really have the data
5 on where these STIC lesions are coming from.
6     Q.  As part of your literature review for
7 your MDL report, did you search specifically for
8 papers that might be linking or associating
9 chronic inflammation with early precursor lesions
10 to serous invasive carcinomas or high-grade
11 serous carcinomas?
12     A.  I was certainly looking for literature
13 with the association of inflammation with ovarian
14 cancer.
15     Q.  With -- did you look specifically at
16 the various subtypes of ovarian cancer?
17     A.  Yes.
18     Q.  Is there a particular subtype of
19 ovarian cancer that you think is associated with
20 talc use?
21     A.  So most of the epidemiology literature
22 show the highest association with high-grade
23 serous invasive carcinoma.
24     Q.  When you say "highest association," are
25 you talking about strength of association?

Sarah F. Kane, M.D.

Page 82

1    A.  I'm talking about the -- for example,
2  on the cohort studies, they found an association
3  with high-grade serous carcinoma.
4    And in a lot of the case-control studies,
5  when they looked at tumor subtype, a lot of those
6  tumors were serous carcinomas.  Now, some of them
7  broke them out by relative risk by subtype; some
8  of them didn't.  I'd have to look at the papers.
9    Q.  Do you remember which cohort study
10  found an association with high-grade serous
11  carcinoma?
12    A.  I believe the Nurses' Health Study.
13  I'd have to look at it to see the numbers.
14    Q.  Was there more than one cohort study
15  that you recall associated talc use with
16  high-grade serous carcinoma?
17    A.  I'd have to look at them just to be
18  sure, but the one that I remember is the Nurses'
19  Health Study.
20    Q.  Are there any other subtypes,
21  histologic types, of ovarian cancer that you
22  believe are associated with talc use?
23    A.  Well, I think talc use -- I think talc
24  use could be associated with the -- any type of
25  surface epithelial cancer.  That seems to bear

Page 83

1  out in the epi data.  They've certainly seen an
2  association with different types of surface
3  epithelial cancers in the epi data, the strongest
4  association being with the serous invasive.
5    Q.  Have you seen any data supporting an
6  association with talc use and a low-grade serous
7  carcinoma?
8    A.  I'd have -- again, I'd have to look at
9  the different studies to break it out, but I know
10  there was a study that found an increased risk
11  with serous borderline carcinomas.  I'd have to
12  look through the individual data sets.
13    Q.  And serous borderline -- are -- serous
14  borderline tumors are not carcinomas; correct?
15    A.  Sorry.  I -- serous borderline tumors,
16  yes.  I misspoke.
17    Q.  And you don't remember what study that
18  was that associated talc use with serous
19  borderline tumors?
20    A.  I would have to look at the data -- or
21  the study.
22    Q.  So do your opinions in this case apply
23  equally to all histologic subtypes of ovarian
24  cancer or are there specific subtype or subtypes
25  that you are opining are caused by talc?

Page 84

1    A.  So I think the most consistent finding
2  is with high-grade serous carcinoma, but there's
3  data for the other types of surface epithelial
4  carcinomas.
5    Q.  And what are the surface types of
6  carcinomas?
7    A.  So they're endometrioid and clear cell,
8  and mucinous less so than, I believe, the
9  endometrioid and clear cell, although I believe,
10  again, in the 2010 Nurses' Health -- is that --
11  I'd have to go back -- I -- there was a mention
12  of mucinous -- I'm not absolutely sure it was the
13  Gates 2010, but there was a mention of an
14  increased risk of mucinous in one of those
15  studies.
16    Q.  Do you agree that the different
17  histologic subtypes of epithelial ovarian cancer
18  are likely to have different genetic causes?
19    A.  I know they're associated with
20  different genetic mutations.
21    Q.  Do they develop along distinct
22  molecular genetic pathways?
23    A.  That's what the literature suggests at
24  this point.
25    Q.  Do they behave differently?

Page 85

1    A.  So the high-grade surface epithelial
2  carcinomas have a more aggressive pathway or
3  presentation.  The low-grade surface endothelial
4  carcinomas tend to have a more indolent
5  progression.
6    Q.  You've used the term "surface
7  epithelial carcinomas" and I haven't seen that
8  term generally used in the literature.
9    When you talk about surface epithelial
10  carcinomas, are you talking about serous or are
11  you talking about endometrioid or are you talking
12  about clear cell?  Mucinous?
13    A.  Epithelial carcinomas.
14    Q.  That would encompass all of those,
15  wouldn't it?  Wouldn't surface epithelial
16  carcinomas encompass mucinous, clear cell,
17  endometrioid, and serous subtypes?  They're all
18  epithelial ovarian cancers; correct?
19    A.  Yes.  That's what I'm referring to when
20  I -- because we also have germ cell tumors and
21  stromal tumors of the ovary.  Those are much more
22  rare, and I'm not -- you know, I don't think
23  there's associations with those.  So, yes, we're
24  talking about epithelial carcinomas, to be clear.
25    Q.  Well, and just -- because I want to

Sarah E. Kane, M.D.

Page 86

1  make sure your testimony is also clear.
2      So if we could, if you could use the
3  specific subtype names, like serous or
4  endometriod --
5      A.  Okay.
6      Q.  -- or clear cell.  That way there's no
7  confusion later on about what you intended.
8      So when you say -- let's see.  Let me go
9  down.  Sorry.
10     When you say "high-grade surface epithelial
11 carcinoma," are you talking about high-grade
12 serous carcinomas?
13         MR. ROTMAN:  Objection.  You're asking
14 her to reflect back on all of her prior answers
15 to all of your prior questions, whether she was
16 referring to the same thing in each one?
17     Q.  Do you understand my question?
18     A.  I'd have to figure out what answer
19 you're talking about, but --
20     Q.  So you just -- just a few questions
21 ago, you answered -- I said, "Do the different
22 types -- histologic types develop along the same
23 molecular genetic pathways?"
24     You said, "That's what the literature
25 suggests at this point."

Page 87

1      I asked, "Do they behave differently?"
2      And then you responded, "So the high-grade
3  surface epithelial carcinomas have a more
4  aggressive pathway or presentation.  The
5  low-grade surface epithelial carcinomas tend to
6  have a more indolent..."
7      Were you talking about high-grade serous and
8  low-grade serous carcinomas?
9      A.  I was talking -- sorry.  I was talking
10 about high-grade serous carcinomas, yeah.  And we
11 also have sort of undifferentiated carcinomas
12 that are also considered high grade.
13     Q.  Okay.  And were you talking about
14 low-grade serous carcinomas when you said
15 "low-grade surface"?
16     A.  No.  So "surface" doesn't really refer
17 to cell type; it's just sort of a --
18     Q.  Right.
19     A.  -- an umbrella term for the epithelial
20 carcinoma.
21     Q.  Right, which is my point.  I just
22 wanted to be clear.  When you say "surface" --
23     A.  Yes.
24     Q.  -- could you instead use the actual
25 cell type.

Page 88

1  Does that make sense?
2      A.  Okay.  Yes.  Okay.
3      Q.  Okay.  All right.  So let me ask my
4  question that I asked a little while again, and
5  you tell me -- you can answer it again with the
6  terminology.
7      Do the different histologic subtypes of
8  ovarian cancer behave differently?
9      A.  Yes.  Again, the high-grade ones
10 generally behave differently than the low-grade
11 ones.
12     Q.  Okay.  Do endometrioid and clear cell
13 carcinomas behave differently from high-grade
14 serous carcinomas?
15     A.  The high-grade serous carcinomas tend
16 to behave more aggressively.
17     Q.  Do low-grade serous carcinomas behave
18 differently from endometrioid, clear cell, and
19 high-grade serous carcinomas?
20     A.  They tend to be less aggressive.  They
21 all tend to be less aggressive than the
22 high-grade serous carcinomas or other high-grade
23 carcinomas of the ovary.
24     Q.  And are they thought to each have
25 different cells of origin?

Page 89

1      A.  Again, we're not entirely sure where
2  these tumors are arising from, particularly with
3  mucinous carcinomas.  I think mucinous carcinomas
4  and there's also a type transitional cell, which
5  is very, very rare, and most of the literature,
6  when it comes to the epi data, don't really
7  discuss transitional cell.
8      But putting that aside, mucinous carcinomas
9  we have, I think, the least amount of data on
10 where they are actually arising from.  Clear cell
11 and endometrial carcinomas have an association
12 with endometriosis, but, again, you know, are all
13 cases of endometrioid and clear cell carcinomas,
14 are they all arising from endometriosis?  I don't
15 think I can say that.  I don't think we know for
16 sure.
17     And serous carcinomas, we talked about the
18 precursor lesions and the fallopian tubes.
19     So there are differences where we think the
20 tumors are arising from, but, again, I don't
21 think we have absolutes where we can definitively
22 say, you know, this particular tumor in this
23 particular woman arised [sic] from this precursor
24 or...
25     Q.  Okay.  And do you know if the different

Page 90

1 histologic subtypes have been associated in the
2 epidemiologic literature with different risk
3 factors?
4     A.  Yes.  Again, I think we touched on some
5 of that before.  There is an association with
6 endometrioid and clear cell with endometriosis
7 and obesity.
8     Mucinous carcinomas have shown to be
9 associated in some studies with a smoking
10 history.
11     High-grade serous carcinomas, it's a little
12 bit harder.  We know that BRCA1 and BRCA2
13 patients have an increased risk.
14     Q.  Now that we're on that topic of
15 genetics, do you know what proportion --
16 currently, what is believed to be the proportion
17 of ovarian cancers that are caused by germline
18 mutations?
19     A.  Off the top of my head, I think -- do I
20 have that in my report?  But I -- I'm thinking
21 it's 10 to 20 percent, but that's off the top of
22 my head.
23     Q.  Have you seen any research coming out
24 of Seattle Cancer Care Alliance over the last 10
25 or 15 years that indicates the number could be as

Page 91

1 high as a quarter of all ovarian cancers being
2 linked to germline mutations?
3     A.  That would roughly fit with what I just
4 said, 10 to 20 percent.  I can't say for sure
5 that I have seen that.  I might have.  But it
6 fits with what I remember.
7     Q.  I had asked you earlier if you had
8 reviewed any literature relating to inflammatory
9 conditions and associations with early STIC
10 lesions.
11     And you -- and, I'm sorry, I don't want to
12 misstate your response.  What was your response
13 to that?
14     A.  Had I reviewed literature?  Yes, I've
15 seen literature.
16     Q.  Okay.
17     (Article entitled "Serous tubal
18     intraepithelial carcinoma, chronic
19     fallopian tube injury, and serous carcinoma
20     development" marked Exhibit 9.)
21 BY MS. AHERN:
22     Q.  I'm handing you what's been marked as
23 Exhibit 9 to your deposition.  And this is --
24     MS. AHERN:  I don't know if anyone else
25 wants one.

Page 92

1     Q.  -- this is an article by Karen
2 Malmberg, et al., entitled "Serous tubal
3 intraepithelial carcinoma, chronic fallopian tube
4 injury, and serous carcinoma development," and it
5 was in Virchows Archives, March of 2016.
6     MR. TISI:  What did you mark this?  I'm
7 sorry.
8     MS. AHERN:  I marked this one 9.  Thank
9 you.  No -- yes, 9.
10     MR. TISI:  Oh, I'm sorry.
11     MS. AHERN:  That's okay.
12     Q.  Do you recall if you've ever reviewed
13 this article?
14     A.  It's possible.  It's certainly possible
15 that I have seen this before in just my daily
16 practice.  I don't believe I cited it in any of
17 the references that I can remember, but it's
18 highly possible that I've seen it.
19     Q.  Do you see the first page that -- you
20 can just skip if you want, take your time reading
21 it if you'd like, but the authors conclude in
22 their study that there is no correlation with
23 chronic tubal injury or inflammation with the
24 development of STIC lesions or the existence of
25 STIC lesions.

Page 93

1     Do you see that?
2     A.  No.  Can you -- I'm sorry, can you
3 point to me --
4     Q.  Oh, sure.
5     A.  -- where?
6     Q.  Do you see the abstract, if you carry
7 it over to the second column?
8     A.  Mm-hmm.  Yes.
9     Q.  It says, "STIC and invasive cancer were
10 seen more often in the older patients than in the
11 younger patients"?
12     A.  Mm-hmm.
13     Q.  This study is -- small study, no
14 correlation with chronic tubal injury or
15 inflammation was identified.
16     A.  Yes, with the caveat -- that was a
17 conclusion with the caveat that it was a small
18 study.
19     Q.  Have you -- as a gynecologic
20 pathologist or a pathologist who has subspecialty
21 training in gynecologic malignancies, how often
22 do you see chronic -- or evidence of chronic
23 inflammation surrounding STIC lesions?
24     Or strike that.  How often do you see STIC
25 lesions?

Sarah E. Kane, M.D.

1    A.  On -- certainly, I can't give you a
2  number.  I've certainly made the diagnosis and
3  see it -- I can't give you a number of how many
4  times.
5    Q.  Have you ever been involved in a study
6  looking specifically at STIC lesions and
7  high-grade serous carcinomas?
8    A.  I have not been involved in a study,
9  no.
10   Q.  Have you ever seen evidence of chronic
11  inflammation with a STIC lesion?
12   A.  Off the top of my head, I am not sure.
13  It's possible, but I can't really answer that off
14  the top of my head.
15   Q.  How often do you see chronic
16  inflammation in the fallopian tubes associated
17  with high-grade serous carcinoma?
18   A.  You can certainly see it, but it sort
19  of goes along with the discussion that we had
20  before.  You can see chronic inflammation within
21  the tumor, as well.
22   And so I think, you know, the literature
23  is -- the research is ongoing as to, you know...
24   Q.  So once the tumor -- once there's a lot
25  of tumor burden in the abdominal cavity, it's

1  difficult to tell where the inflammation is
2  coming from or what started it; is that correct?
3    A.  Well, if there's chronic inflammation
4  in the tumor, it's likely the tumor has something
5  to do with the chronic inflammation.
6    But, again, you know, as we talked about
7  before, I think sometimes it is difficult to
8  tell.
9    MS. AHERN:  Okay.  Housekeeping matters
10  before I forget.
11   Let me go ahead somehow and mark --
12  let's mark -- we can remove this later --
13  "Blaustein's Pathology of the Female Genital
14  Tract," Fourth Edition, as Exhibit 10 to your
15  deposition.
16       ("Blaustein's Pathology of the
17   Female Genital Tract," Fourth Edition,
18   marked Exhibit 10.)
19  BY MS. AHERN:
20   Q.  And, Doctor, you brought this textbook
21  with you today.
22   Is this your textbook?
23   A.  That particular copy is not.  That's my
24  coworker's copy.  This copy is mine (indicating).
25   Q.  Okay.  And inside this, you have what

1  looks --
2    MR. ROTMAN:  Just so the record is
3  clear, when you said "this," do you want to
4  identify it?
5    A.  Sorry.  The fourth edition belongs to a
6  colleague.  The fifth edition is my own.
7    MS. AHERN:  Okay.  We'll get to that
8  one.  I'll mark that next.
9    Q.  There is a photocopy here, "Blaustein's
10  Pathology of the Female Genital Tract, Fourth
11  Edition," Pages 300 and -- well, Page 376,
12  Page 539, Page 540, 648, 1216, 1217, 1218.
13   Is this a copy -- are these copies that you
14  made?
15   A.  Yes.
16   Q.  Okay.
17   MR. TISI:  Do you have a stapler?
18  Otherwise I'll get one.
19   MS. AHERN:  No, I don't have one.
20   MR. TISI:  No, I'll go get one.
21  BY MS. AHERN:
22   Q.  Can you tell me why you made those
23  copies?
24   A.  I made them because it was easier than
25  lugging around a whole textbook.  That's why I

1  Xeroxed them.  But --
2    Q.  You had to bring it anyway.
3    Sorry.  Go ahead.
4    A.  But the particular pages that I copied
5  are ones that talk about granulomatous reactions
6  to talc in the female reproductive system.
7    Oh, sorry.  Okay.
8    MS. AHERN:  Okay.  We'll go ahead and
9  mark those copies as Exhibit 10 to your
10  deposition.
11   Q.  And just to confirm --
12   MS. AHERN:  Sorry.  Are we on 10 or 11?
13  We're on 11.  Thank you.
14   Q.  As a --
15   MR. TISI:  Is this the next one?
16   MS. AHERN:  Yeah.  Hold on.  I'm going
17  to clarify it.
18   Q.  So this photocopy that you made from
19  Blaustein's came from the fourth edition?
20   A.  Correct.
21   Q.  The textbook that we have here marked
22  as Exhibit 10.
23   A.  (Witness nodded.)
24   Q.  Okay.  So Exhibit 11 are photocopies of
25  specific pages from Exhibit 10, which is

Sarah E. Kane, M.D.

1 Blaustein's Pathology of the Female Genital
2 Tract, Fourth Edition.
3          (Excerpt from "Blaustein's
4     Pathology of the Female Genital Tract,"
5     Fourth Edition, marked Exhibit 11.)
6 BY MS. AHERN:
7     Q.  Okay.  And can you tell me, with
8 Exhibit 11, the specific information that you
9 found relevant to your opinions in this case?
10    A.  Okay.  So on Page --
11       MR. ROTMAN:  You marked the copy as
12 Exhibit 11 and the book as Exhibit 10?
13       MS. AHERN:  Mm-hmm.
14       MR. ROTMAN:  Okay.
15    A.  Okay.  You have to bear with me,
16 because I don't have any highlights or anything,
17 so I have to find it.
18    So Page 376, right down -- okay.  The last
19 paragraph under "Zanko Granulomatous
20 Inflammation," it says, "Rarely, talc or another
21 foreign substance may elicit a foreign-body
22 reaction in the endometrium.  Talc may be
23 introduced into the endometrial cavity by
24 instruments contaminated with talcum powder or by
25 gloves during a pelvic examination.  Patients may

1 be asymptomatic or may have menorrhagia.
2 Microscopically, the extent of the granulomatous
3 inflammatory reaction depends on the quantity of
4 talc inoculated.  The infiltrate is characterized
5 by histiocytes and foreign-body multinucleated
6 giant cells surrounding the talc crystals, along
7 with lymphocytes and plasma cells.  The crystals
8 appear as refractile, birefringent, needle-like,
9 or fan-shaped splinters in polarizing light."
10    Then on Page 530 --
11    Q.  Sorry.  Let me just -- let's take this
12 in order.
13    So what about that particular passage
14 informs your causation opinions regarding talc
15 and ovarian cancer, if at all?
16    A.  So it is evidence that talc causes
17 foreign-body giant cell reaction and chronic
18 inflammation in the endometrium.
19    Q.  And that is the uterine tissue;
20 correct?
21    A.  That's the lining of the uterus,
22 correct.
23    Q.  And how does that inform your opinions
24 regarding the development of ovarian cancer?
25    A.  Well, I thought, again, it's a piece of

1 evidence, and it shows that talc can cause
2 granulomatous or chronic inflammation in the
3 female reproductive tract.
4    Q.  And how is uterine cancer related to,
5 for instance, high-grade serous carcinoma of the
6 ovary?
7    A.  Again, this is just evidence that talc
8 can cause chronic inflammation and granulomas in
9 the endometrium, which I think is another piece
10 of evidence that talc can cause chronic
11 inflammation and granulomatous inflammation in
12 the female reproductive tract.
13    Q.  Doctor, shouldn't talc -- based on the
14 literature that we have available to us over the
15 last 50 years, shouldn't talc induce that
16 response in any tissue that it's found in?
17    A.  Well, again, different tissues will
18 respond in different ways, but I think it also
19 depends -- well, I'll just...
20    Q.  Well, as a pathologist --
21       MR. ROTMAN:  Wait.  Wait.  Are you
22 done?
23       MS. AHERN:  Are you done?
24       THE WITNESS:  I think so.
25    Q.  Okay.  So as an anatomic pathologist

1 who knows something about granulomatous
2 reactions, shouldn't a foreign body produce a
3 foreign-body reaction in any tissue that it's
4 found in?
5    A.  Not -- no, not always.  Sometimes you
6 will have a foreign body that won't cause a
7 foreign-body giant cell reaction.  It depends
8 on -- it depends on the particle, the foreign
9 body, the tissue it's in.  You don't always see
10 that.  And also the timing, when you're looking
11 at it, versus how long it's been there.
12    Q.  Well, the timing is just more or less
13 when you observed it, not whether it occurred;
14 correct?
15       MR. ROTMAN:  Objection.
16    A.  So it's hard to know whether or not it
17 occurred -- if it had been there for a long time
18 and you're looking years, you know, in -- years
19 after it's been there, if you don't see a
20 granulomatous or chronic inflammation, that's not
21 evidence that it never occurred; it's just you're
22 not seeing it at that moment.
23    Q.  Do you know of any -- any foreign
24 bodies that generate tissue-specific reactions?
25    A.  Well, we -- I mean, we certainly have

Sarah F. Kane, M.D.

Page 102

1 evidence with, say, viruses and bacteria that
2 respond differently -- certain tissues will
3 respond differently to different infections.
4     For esophageal cancer, there's some
5 literature to suggest that very hot liquids
6 increase your risk of esophageal cancer.  So,
7 yes, certain tissues will respond differently to
8 different material.
9     Q.  So my question was -- it might be just
10 a little simpler to think of just this
11 question -- do you know of any foreign bodies --
12 I'm not talking about viruses and bacteria which
13 cause immune responses -- but foreign bodies that
14 generate a tissue-specific foreign-body reaction?
15     A.  Well, it's sort of semantics.  I mean,
16 viruses and bacteria -- that's why I answered the
17 way I did -- are foreign to -- and, certainly,
18 foreign bodies can elicit immune response.
19 That's why you see granulomatous reactions and
20 chronic inflammation.
21     So I guess I'm not -- I think I answered the
22 question.
23     Q.  Pathologists distinguish the different
24 types of granulomatous inflammation based on the
25 cause of the inflammation; correct?

Page 103

1     A.  We look for -- if we see granulomatous
2 inflammation in tissue, we certainly look for a
3 potential cause.  We want to rule out infection,
4 so if we see granulomas, we'll routinely do
5 special stains to rule out infection.  Like we'll
6 do an acid-fast Bacillus stain for microbacteria.
7 We'll do fungal stains to rule out a fungal
8 infection that causes inflammation.
9     And then, of course, if we have -- if those
10 are negative and we're trying to figure out if
11 there's a foreign body within a granuloma, we can
12 use polarized light to try to find the foreign
13 body to identify it as a foreign-body giant cell
14 reaction.
15     But often you do have granulomatous
16 inflammation and you won't find fungi -- fungal
17 lesions -- fungal bodies or bacteria or
18 birefringent particles on them, so you don't
19 necessarily know why you have a granulomatous
20 inflammation.
21     Q.  Pathologists categorize granulomatous
22 inflammation, don't they?  They categorize it in
23 terms of the different types of immune granulomas
24 and the etiologic agents for those granulomas,
25 and over here somewhere are the foreign-body

Page 104

1 granulomas, which are caused by talc and
2 cornstarch and certain other inert-type
3 materials; correct?
4     MR. ROTMAN:  Objection.
5     A.  Again, you can have inflammation --
6 granulomatous inflammation due to infection, you
7 can have granulomatous infection -- response due
8 to foreign bodies, and you can have granulomas in
9 certain diseases, like sarcoidosis or Crohn's
10 disease.
11     So in that respect, yes, we're categorizing
12 granulomas, but on a daily basis, other than that
13 type of breakdown, we're not subcategorizing
14 granulomas.
15     Q.  But you are aware of the literature
16 that actually characterizes the different types
17 of granulomas and the types of cells that are
18 involved in the formation of those granulomas;
19 correct?
20     A.  As far as foreign-body giant cells and
21 multinucleated giant cells and inflammatory
22 versus foreign body, yes.
23     Q.  So, you know, a granuloma caused by
24 tuberculosis is going to be very different from a
25 granuloma caused by talc; correct?

Page 105

1     MR. ROTMAN:  Objection.
2     A.  I would say not necessarily.  In
3 microbacterial infections, you can have necrosis
4 within granulomas, but that doesn't mean that
5 you're not necessarily going to see necrosis in a
6 foreign-body granuloma.
7     Q.  How often have you seen necrosis
8 associated with a foreign-body granuloma?
9     A.  I'd say more commonly you see
10 necrotizing or necrotic granulomas in infectious
11 granulomas.
12     Q.  There are different types of
13 macrophages that are involved, too, in
14 foreign-body granulomas and in immune granulomas;
15 correct?
16     A.  As far as macrophages themselves and
17 multinucleated giant cells that can form
18 granulomas.
19     Q.  There are different types, different
20 subtypes of macrophages that are involved in --
21     A.  Yes.
22     Q.  -- those activities; correct?
23     A.  Yes.
24     Q.  Okay.  So there are differences between
25 a foreign-body granuloma and an immune granuloma?

Sarah F. Kane, M.D.

1    A.   There can be.

2    Q.   Well, there are, aren't there?  I mean,
3  there are papers that characterize these.

4    A.   Yes, but I'm -- yes.  In the
5  literature, yes.  And -- but are we necessarily
6  categorizing them when we're looking at a
7  particular patient?  We're looking for the cause
8  of the granuloma, but we're not necessarily
9  subcategorizing, is my point.

10    Q.   Understood.

11    Oh, I'm sorry.  We were talking about the
12  pages that you copied from Blaustein's.

13    What was the second page in that photocopy,
14  Exhibit 11?

15    A.   Okay.  So Page 539.

16    Q.   What was it on 539 that's relevant to
17  your opinions in this case?

18    A.   Okay.  I think it starts at the very
19  bottom.  I think it carries into Page 540, where
20  it starts talking about foreign-body reactions in
21  the -- this is diseases of the fallopian tube.

22    So it starts, "Foreign material may be
23  introduced into the tube in the course of
24  gynecological investigation, especially
25  hysterosalpingography, lubricant jelly, mineral

1  oil, and starch and talc powder may cause lipoid
2  or granulomatous salpingitis.  Talc may cause
3  mucosal or serosal granulomas.  Examination of
4  all granulomas or foreign-body reactions under
5  polarized light is useful in the recognition of
6  these processes."

7    So, again, I'm just referencing the fact
8  that talc can cause granulomatous reaction in the
9  fallopian tube.

10    Q.   So another tissue that's exposed to
11  talc forms the typical type of foreign-body
12  response?

13    A.   That can form a granulomatous reaction.

14    Q.   Okay.  And does that in any way inform
15  your opinions on causation, other than
16  granulomatous reactions occur?

17    A.   Well, so, again, it's another piece of
18  evidence that talc can cause a granulomatous
19  reaction within the female reproductive tract.

20    Now, the fallopian tube, we know some -- has
21  been indicated as a precursor site for certain
22  high-grade serous carcinomas, so I think it's
23  relevant.

24    But, again, you know, we're talking about
25  mechanisms that talc may eventually cause ovarian

1  cancer, which is sort of the plausibility arm of
2  the Bradford Hill.  I think it's compelling
3  evidence that we see that you can get
4  granulomatous inflammation and some of these
5  sections have mentioned lymphocytes and plasma
6  cells in the tissue.  I mean, I think it's a
7  further piece of evidence that talc can cause
8  these -- this type of inflammation in female
9  reproductive market.

10    Q.   How often have you, in your career,
11  seen a talc granuloma in gynecologic specimens?

12    A.   We don't routinely do -- perform
13  polarized light microscopy on ovarian tumors,
14  partly because you really need electron
15  microscopy.  You can -- with polarized light
16  microscopy, you can tell that there's a foreign
17  substance there, but that's pretty much as far as
18  you can -- you can get.  You need more testing to
19  be able to determine what type of particle it is,
20  usually.  So we don't, in daily practice,
21  routinely use polarized light microscopy.

22    Now, it's entirely possible that, you know,
23  in the course of my career, I've come across
24  chronic inflammation or granulomas in an ovarian
25  tumor that could have been due to talc that I

1  didn't polarize so I didn't see particles, I
2  guess.

3    Q.   So let me back up and just ask you:
4  How often in your career have you seen
5  foreign-body granulomas?  Regardless of whether
6  you've identified the particle in the granuloma,
7  how often have you seen foreign-body granulomas
8  in gynecologic specimens?  Not just tumors, but
9  any gynecologic specimens you've reviewed.

10    A.   No, I understand.

11    Q.   Okay.

12    A.   You can certainly see granulomas -- how
13  often, I can't give you a number; that would just
14  be wildly guessing -- but you can see granulomas
15  in the endometrium.  You can see them in
16  different types of tumor.

17    Sometimes it's -- you'll see granulomas, but
18  you won't see a particle, so you don't know for
19  sure if it's a foreign-body granuloma; you just
20  see the granuloma because you're not using
21  polarized light microscopy on it.

22    MR. KLATT:  Object.  Nonresponsive.

23    MS. AHERN:  Same.

24    Q.   So how often, though, in your career --
25  you can give me an estimate -- have you seen

Sarah E. Kane, M.D.

Page 110

1 foreign-body granulomas in gynecologic specimens?
2       MR. ROTMAN: Objection.
3    Q. I'm not talking about immune
4 granulomas, but just foreign-body granulomas.
5 We'll start there.
6       MR. ROTMAN: Objection. You've asked
7 that question. She's answered it.
8    A. So, again, I've seen granulomas in my
9 career in the female reproductive tract, but I
10 don't -- pathologists don't routinely use
11 polarized light microscopy in that instance to
12 look for foreign bodies.
13    Q. Okay. So are you done?
14       MR. ROTMAN: Can we take a break?
15       MS. AHERN: Not just yet. Let me
16 finish this line of questioning and then we can
17 take a break. Because we may want to -- what
18 time is it?
19       MR. ROTMAN: It's been an hour.
20       MS. AHERN: 11:30. If we go a little
21 bit longer, we can break for lunch if you want.
22       MR. ROTMAN: I just want to take a
23 break in the next few minutes.
24       MS. AHERN: Sure.
25

Page 111

1 BY MS. AHERN:
2    Q. Doctor, are you able, as a -- as a
3 pathologist, under regular light microscopy to
4 identify a foreign-body granuloma? Not the
5 content, just the foreign-body granuloma.
6    A. I would say it depends on the specific
7 granuloma. Sometimes, for example, in epidermal
8 inclusion cysts, you can see the keratin under
9 light microscopy that's causing the reaction, but
10 you don't always -- you won't always necessarily
11 see a particle. They're very small. And unless
12 you're looking specifically for polarizable
13 birefringent particles, you're not going to see
14 it just with regular light microscopy.
15    Q. So my question wasn't -- and I thought
16 I was specific -- my question wasn't whether or
17 not you could see the particle; my question was:
18 You should be able to see the foreign-body
19 response in terms of multinucleated giant cells.
20    Do you -- can you see that under regular
21 light microscopy?
22    A. Well, so you're categorizing it as a
23 foreign-body granuloma. What I'm saying is you
24 can see granulomas, of course, under light
25 microscopy. But if you're not looking for a

Page 112

1 foreign body, you're not necessarily going to be
2 able to say whether or not it's a foreign-body
3 granuloma with absolute certainty unless you're
4 looking under polarized light microscopy. And
5 even then, you might not see it under polarized
6 light microscopy, because it depends on the
7 section of the tissue you're looking at and --
8    Q. Okay. Thank you.
9    And if you see a foreign-body response in
10 tissue, do you then go one step further and
11 polarize to see if you can identify whether
12 that's got a foreign body in it?
13    A. It certainly depends on the situation.
14    So, for example, in cases where there's been
15 a surgery and they've taken out more tissue after
16 surgery, you might be looking for polarizable
17 foreign body. Often, you can see a suture on
18 light microscopy. But, yeah, we do -- depending
19 on the situation, we will use polarized light
20 microscopy to find foreign bodies.
21       MR. ROTMAN: Okay.
22    Q. How often do you polarize specimens
23 where you've found a foreign-body response? How
24 often do you do that?
25    A. I think -- I think I tried to come up

Page 113

1 with an estimate. I think I have it in my
2 report, actually, in the beginning.
3    Yes. So I estimated that I use polarized
4 light microscopy for this purpose, which is
5 identifying foreign material to explain an
6 inflammatory reaction, I estimated about twice a
7 month. It's an estimate.
8    And I -- well, that was -- actually, I was
9 referring to calcium oxalate crystals in breast
10 biopsies. That's different. So it's not
11 uncommon, let's put it that way, but I can't
12 really give you a -- an estimate.
13    Q. What was the estimate for breast
14 tissue?
15    A. I think it was twice a month, is what I
16 said.
17    Q. So compared to looking for calcium
18 crystals in breast tissue twice a month, how
19 often in gynecologic specimens do you look for
20 foreign bodies?
21    A. I would say slightly less than that.
22    Q. Maybe once a month, maybe less than
23 that?
24    A. Once a month is probably a good
25 estimate, I guess.

Sarah E. Kane, M.D.

1  Q.  Do you know, based on your review of
2  the epidemiologic literature, what proportion of
3  women are said to use talc?
4  A.  I believe I've seen in some of the
5  literature -- it depends on the population, I
6  think.  I think I saw -- well, again, I'd have to
7  pull out the papers to be absolutely certain, but
8  I remember there was a reference to
9  African-American women, about 50 percent of them
10  using talc.
11  Q.  Would you say that in 50 percent of the
12  gynecologic specimens you review, you find
13  foreign-body granulomas or granulomas?
14  A.  Well, I wouldn't necessarily expect --
15  I wouldn't expect to, just because, you know,
16  again, we're looking at an ovarian tumor at a
17  very particular point in time.
18  How many granulomas -- how much talc is
19  getting to the ovary, we don't -- we don't know
20  how much talc is getting to the ovary.  We know
21  it's been found there, we know it can get there,
22  but we don't know with how much use, how much is
23  actually getting there.
24  So we wouldn't necessarily find a lot of
25  granulomas in ovarian tissue of women that use

1  it, because we don't know exactly how much is
2  getting there or we don't know how long those
3  granulomas are there once the tissue is in the
4  ovary.
5  I mean, 20 years later, when you're looking
6  at the -- at the ovary for a talc particle that's
7  been there, we don't know if the granuloma would
8  still be there or the chronic inflammation would
9  still be there.
10  Q.  And my question wasn't specific to
11  ovarian tissue; it was just gynecologic
12  specimens.
13  Because you review more than ovarian tissues
14  when you're looking at gynecologic samples;
15  correct?
16  A.  Yes.
17  Q.  So looking at all of your gynecologic
18  specimens, your vaginal, vulvar, endometrial,
19  tubal, ovarian, I guess omentum might fall in
20  there, how often do you identify foreign bodies
21  or foreign-body granulomas?
22  A.  I would have to be -- a completely
23  ballpark guess, but, I don't know, maybe every --
24  I'm really trying to figure out a somewhat
25  ballpark figure.  It's tough.

1  I mean, it's not -- it's not frequent that
2  you're going to find foreign-body giant cell
3  reactions in tissue, but, again, it doesn't mean
4  that they weren't there.  Maybe --
5  Q.  And this is based just on your
6  experience.  I know that -- I don't want you to
7  guess about what might have been there --
8  A.  Yeah, I'm --
9  Q.  -- but based on your experience as a
10  practicing pathologist.
11  A.  It would just be a pure guess at this
12  point.  I couldn't give you an accurate number.
13  Q.  Do you see foreign-body reactions in
14  50 percent of the gynecologic specimens or cases
15  that you review?
16  MR. ROTMAN:  Objection.
17  A.  I would say it's less than 50 percent.
18  Q.  Is it less than 25?
19  A.  I would say less than 25.
20  Q.  Less than ten?
21  A.  Probably less than ten.
22  Q.  Less than five?
23  A.  That's where I'm not exactly sure.
24  Q.  Okay.
25  MS. AHERN:  All right.  We can go ahead

1  and take a break.  Thank you.
2  THE VIDEOGRAPHER:  Here ends Media 2.
3  Off the record, 11:44 a.m.
4  (A recess was taken.)
5  THE VIDEOGRAPHER:  Here begins Media
6  No. 3 in today's deposition of Sarah Kane, M.D.
7  Back on the record, 12:02 p.m.
8  BY MS. AHERN:
9  Q.  All right.  Doctor, can we go ahead and
10  keep moving through that photocopy, Exhibit 11.
11  Can you tell me what the next page was?
12  A.  Okay.  We just read from Page 540, I
13  believe, so the next one is Page 648.
14  Q.  Okay.  And tell me what on 648 caught
15  your eye.
16  A.  Okay.  It's the first paragraph under
17  "Noninfectious Granulomatous Peritonitis."  So it
18  says, "Foreign material typically recognizable on
19  histologic examination can elicit a granulomatous
20  reaction on the peritoneum.  Starch granulomas
21  from surgical gloves, douche fluid, and
22  lubricants typically incite a granulomatous and
23  fibrosing peritonitis.  In occasional cases, the
24  inflammatory reaction may be a tuberculoid type
25  with KCS necrosis.  The periodic acid shift (PAS)

Page 118

1 positive starch granules exhibit the
2 characteristic Maltese cross configuration" --
3      THE COURT REPORTER:  I'm sorry, you're
4 reading too fast.
5      THE WITNESS:  I'm sorry.
6   A.  "The periodic acid shift (PAS) positive
7 starch granules exhibits a characteristic Maltese
8 cross configuration under polarized light.  Talc
9 was once an important cause of granulomatous and
10 fibrosing peritonitis because of its use as a
11 lubricant on surgical gloves and talc-induced
12 peritonitis has been described more recently in
13 drug abusers."  I think that's kind of where it
14 stops.
15   Q.  Okay.  And how does that passage that
16 you just read inform your opinions in this case?
17   A.  Well, again, it's just another --
18 similar to the last pieces, this is the
19 peritoneum, so this is outside of the fallopian
20 tube.  Once particles are outside of the
21 fallopian tube, they are in the peritoneum.
22 That's where the ovary is.  And so it's
23 discussing foreign-body granulomatous reactions
24 in the peritoneum.
25   Q.  And this question -- this passage that

Page 119

1 you just read also mentions that starch granules
2 from surgical gloves --
3   A.  Yes.
4   Q.  -- cause granulomatous and fibrosing
5 peritonitis, which is the same that they mention
6 talc use to.
7      Would you say that starch granules, then,
8 have the capacity to cause chronic inflammation
9 that can lead to cancer?
10   A.  Starch can cause inflammatory
11 reactions, but it's a -- very different, in that
12 it's bioabsorbable, and so the particles are
13 absorbed in the body.  And the literature hasn't
14 supported a link between starch and ovarian
15 cancer.
16   Q.  How many studies have evaluated the
17 association between starch and ovarian cancer?
18   A.  I couldn't say, off the top of my head,
19 how many.  But I know, you know, they looked at
20 starch when they were evaluating whether or not
21 to remove it from surgical gloves, and they ended
22 up deciding to remove it from surgical gloves.
23      And I -- I think at that point they had done
24 a literature search.  I don't think there was --
25 I don't know how many studies off the top of my

Page 120

1 head.
2   Q.  And when you say "they" were looking
3 at, are you talking -- who are you talking about?
4   A.  When the -- when the regulatory -- if I
5 recall -- did I put that in my report? -- they
6 removed -- I know that they removed starch from
7 surgical gloves because it was causing an
8 inflammatory reaction.
9      And they had started using starch more
10 commonly because talc had been removed from
11 surgical gloves for also causing inflammatory
12 reactions.
13   Q.  And talc particles and cornstarch
14 particles cause the same foreign-body reaction in
15 the peritoneum and fibrosis; correct?
16   A.  Well, again, they can cause a
17 granulomatous reaction, but they're
18 bioabsorbable, so it's not going to be -- you
19 know, when we're talking about talc, we're
20 talking about the talc in surgical gloves.  And,
21 you know, talc is not bioabsorbable and it will
22 stay in the peritoneum longer than starch, which
23 is bioabsorbable.  So it will -- the inflammation
24 will likely resolve more quickly.  It's a
25 different -- it's a different type of reaction

Page 121

1 because it's bioabsorbable.
2   Q.  Well, they both cause granulomas;
3 right?
4   A.  Mm-hmm.
5   Q.  And they both cause fibrosis; correct?
6   A.  They can cause fibrosis.
7   Q.  Does the biodurability of the causative
8 agent determine how long fibrosis exists?
9   A.  Well, the fibrosis is thought to arise
10 from the inflammatory process.  And since -- I
11 don't know how much data is really there except
12 to say that starch is bioabsorbable and talc is
13 not.  So talc is going to be available for an
14 inflammatory response more than a starch particle
15 will.
16   Q.  Is the purpose of a foreign-body
17 granuloma to essentially wall off an irritant, a
18 foreign body, from the rest of the tissue to
19 prevent damage?
20   A.  That can be one reason.
21      Another reason is if the particle is large
22 enough and one macrophage can't handle it because
23 of its size, it will sort of recruit more
24 macrophages to the area to try to digest the
25 foreign material, which is not going to -- they

Sarah E. Kane, M.D.

Page 122

1 won't be able to digest the talc particle.
2    Q.  If they can't digest the particle,
3 these macrophages will fuse to form a
4 multinucleated giant cell and surround the
5 particle to basically encapsulate it and prevent
6 it from harming the surrounding tissue; correct?
7    A.  It's possible that they would, yes,
8 they would recruit more macrophages and
9 potentially do that.
10    Q.  Isn't that the purpose of a
11 foreign-body granuloma?
12    A.  So, again, you can get well-formed --
13 you can get well-formed encapsulated granulomas.
14 You can also get sort of poorly formed granulomas
15 that are -- when more macrophages have been
16 recruited to that site.
17    You can get a -- you can get a histiocytic
18 reaction that isn't a well-formed granuloma in
19 the sense that you're talking about, where it's
20 kind of walling off the foreign body.  You can
21 get histiocytic reactions that aren't as well
22 formed like that.
23    Q.  But we're just talking about the actual
24 granuloma itself, those particles that do result
25 in a well-formed granuloma.

Page 123

1    Once that granuloma has formed, it can
2 persist for many years, can't it, without
3 damaging the surrounding tissue?
4    MR. ROTMAN:  Objection.
5    A.  I think it would depend.  Macrophages
6 have a certain lifespan, so it's going to be
7 constantly recruiting different macrophages to
8 that site.
9    So I don't think we can say for certain that
10 the -- in fact, I think the body is still
11 reacting to that foreign body if it's still
12 recruiting new macrophages in.
13    Q.  Do you know that for a fact based on
14 your reading of the literature of granulomas,
15 that that's the mechanism behind a foreign-body
16 granuloma, as opposed to an immune granuloma?
17    A.  What I'm saying is -- is that
18 macrophages have a certain shelf life, and so
19 they will constantly recruit new macrophages to
20 that area.
21    Now, whether or not there's an exposure in
22 that particle while it's in that process, I don't
23 think we can definitively say.
24    Q.  Can you cite to any papers that support
25 your understanding of that process whereby

Page 124

1 macrophages are continuously recruited to
2 foreign-body granulomas?
3    A.  I know that I've read it in the course
4 of my daily practice.  I can search at some point
5 for it, but I know that that's the case, because
6 I know that macrophages, again, have a certain
7 lifespan.
8    But, you know, again, the inflammatory
9 response, we also don't know how long that
10 inflammatory response is going to be there for
11 sure.  Is it possible that at some point the
12 granuloma resolves and you get some fibrosis and
13 the talc particle or whatever particle is there
14 remains?  I think that's possible and likely, in
15 fact, because you do see resolution of granulomas
16 with fibrosis.
17    Q.  Is fibrosis associated with the
18 development of ovarian cancer?
19    A.  There hasn't -- there hasn't been a
20 lot -- again, the causes of ovarian cancer are
21 sort of -- the literature and the research is
22 still bearing all of it out, but from what I know
23 of the literature, I don't think that they found
24 fibrosis itself being an increased risk factor
25 for ovarian cancer.

Page 125

1    Q.  Is fibrosis associated with chronic
2 inflammation?
3    A.  It can be, yeah.  Chronic inflammation
4 can lead to fibrosis.
5    Q.  Do you know of any literature that has
6 linked talc granulomas introduced into the body
7 through the use of talc-dusted surgical gloves
8 with any sort of cancer?
9    A.  So we know that talc can -- there are
10 studies that have shown talc in the ovaries, and
11 we know that chronic inflammation has been
12 implicated in cancer.
13    So if talc can reach the ovaries -- and we
14 also have evidence that talc causes chronic
15 inflammation.  So if talc reaches the ovary, I
16 think it's a plausible mechanism for talc from
17 surgical gloves to cause an inflammatory reaction
18 and lead to cancer.  I think that's plausible.
19    And, again, that's the plausibility arm of
20 it.  You know, that's a piece of the general
21 causation opinion, but, you know, they're still
22 piecing together a lot of the etiology of ovarian
23 cancer.
24    Q.  Then why --
25    MR. KLATT:  Objection, nonresponsive.

Page 126

1     MS. AHERN:  Nonresponsive, yeah.
2     Q.  Doctor, why are you so sure, then, that
3  talc causes ovarian cancer?
4     A.  It's --
5     MR. ROTMAN:  Objection.
6     A.  So I can lay out to you my methodology.
7  It's in the report.  I did very in-depth,
8  extensive review of the literature, which
9  included the epi studies, animal studies, and
10  biologic studies.
11     And I think -- well, I know that the epi
12  studies have been very consistent with the
13  increased risk associated with talcum powder
14  product usage -- I'm talking about talcum powder
15  product, what's in the bottle -- and perineal
16  talc application with ovarian cancer.
17     And I think if you're looking at -- if you
18  go through the methodology that I used and you're
19  looking at the Bradford Hill analysis, which I've
20  laid out in the report, I've come to the
21  professional -- you know, my professional
22  judgment is that the talcum powder products --
23  weighing everything, that talcum powder products
24  cause ovarian cancer.
25     And I know -- and, interestingly, about

Page 127

1  three weeks after I wrote my report, there was
2  the Health Canada report that, in reading their
3  methodology and the literature that they
4  reviewed, was very similar to what I reviewed and
5  my methodology.  And they came to the same
6  conclusion.
7     MR. KLATT:  Objection.
8     MS. AHERN:  Objection.  Nonresponsive.
9     Q.  Doctor, my question was:  Do you know
10  of any literature that has linked -- sorry.
11     My first question we're going to go back to
12  now is:  Do you know of any literature that has
13  linked talc granulomas introduced into the body
14  through the use of talc-dusted surgical gloves to
15  any sort of cancer?
16     MR. ROTMAN:  Objection.
17     MS. AHERN:  What's the objection?
18     MR. ROTMAN:  Your question was --
19     MS. AHERN:  I'm reading it.
20     MR. ROTMAN:  -- why are you so certain.
21     MS. AHERN:  Well, I just told you we're
22  going back to this question.
23     MR. ROTMAN:  Okay.  So you're asking --
24  you're not saying that she didn't -- you're not
25  repeating your former question?

Page 128

1     MS. AHERN:  No.  We're going back to
2  this question.
3     MR. ROTMAN:  Okay.  That's fine.
4     So you're asking her again a question
5  that she previously answered.
6     MR. KLATT:  No --
7     MS. AHERN:  I'm interested in --
8     MR. KLATT:  -- a question she didn't
9  answer.
10     MS. AHERN:  -- the question she didn't
11  answer first.
12  BY MS. AHERN:
13     Q.  Which is:  "Do you know of any
14  literature that has linked talc granulomas
15  introduced into the body through the use of
16  talc-dusted surgical gloves with any sort of
17  cancer?"
18     Do you know or not know of any literature
19  that supports that?
20     A.  Well, first of all, I think we're
21  talking about -- you're talking about surgical
22  glove talc, right, which is pharmaceutical-grade
23  talc, which is different from the talcum powder
24  product that I'm opining about.
25     And we know that these talc particles can

Page 129

1  get to the ovary and we know that talc can cause
2  chronic inflammation.
3     Q.  Doctor, first question about your
4  answer is:  What makes you think that cosmetic
5  talc used in Johnson & Johnson baby powder is not
6  pharmaceutical-grade talc?
7     A.  I'm talking about the product, the
8  ultimate product.
9     Q.  Johnson's baby powder; correct?
10     A.  Whatever is in the bottle.
11     Q.  You're saying that's not
12  pharmaceutical-grade talc?
13     A.  Whatever is in the bottle.
14     Q.  Okay.
15     A.  So --
16     Q.  What is your -- what is your
17  understanding of what pharmaceutical-grade talc
18  is and how is that different from what's in
19  Johnson's baby powder?
20     A.  So I didn't opine on the constituents
21  of the talcum powder that -- the baby product --
22  talcum powder products, the Johnson & Johnson.  I
23  saw evidence as to what's in the talcum powder
24  products, but I didn't do my own analysis as to
25  what is in the talcum powder products.

Sarah E. Kane, M.D.

1   But pharmaceutical-grade talc, if we're
2  talking about talc that's used in pleurodesis,
3  for example, is going to be different than talcum
4  powder products in the bottle --
5   Q.  Okay.
6   A.  -- cosmetic talcum powder products.
7   Q.  So how is it different?
8   A.  So, again, I didn't do my own analysis
9  as to what is in the talcum powder product, but
10  that's what I am -- that's what my general
11  causation opinion is on, is the talcum powder
12  product in the bottle, that regular perineal use
13  of that causes ovarian cancer.
14   Q.  My question to you is:  What do you
15  understand the difference between the talcum
16  powder products and pharmaceutical-grade talc --
17   MR. ROTMAN:  Objection.
18   Q.  -- to be?
19   A.  So I've seen evidence that in talcum
20  powder products, there are heavy metals.  There
21  are fragrances that are added to the talcum
22  powder product that, in talc used for
23  pleurodesis, they wouldn't be adding fragrances
24  to that type of talc.
25   Q.  Would -- you're not saying that talcum

1  powder products that are sold to consumers have
2  been altered to add heavy metals, are you?
3   A.  Well, I've seen the report of
4  Dr. Crowley that looks at heavy metals and
5  fragrances in the talc, the baby product talc
6  powder that he examined.  I did not do my own
7  analysis of that.
8   Q.  Does pharmaceutical-grade talcum powder
9  also have associated metals and sometimes heavy
10  metals?
11   A.  I'm not sure if I've seen data as to
12  what is specifically in pharmaceutical-grade
13  talcum powder, but, again, to me, what is
14  important is the ultimate product and what is in
15  that bottle.  It can -- whether it's platy talc,
16  fibrous talc, asbestos, heavy metals, fragrance
17  metals.
18   I mean, to me -- you know, I've seen
19  evidence of those things in that product, but to
20  me, what I'm looking at is the final product when
21  it comes to causing ovarian cancer.
22   Q.  So what is different about that final
23  product and pharmaceutical-grade talc?  What
24  specific components have been added to that that
25  affect your opinions in this case?

1   A.  Well, I think I've answered, like, to
2  me, it doesn't -- it doesn't really matter
3  what -- the difference between pharmaceutical
4  talc and talcum powder products; it's whatever is
5  in that talcum powder products -- product,
6  whatever is in the bottle that women are buying
7  off the shelf and applying to their perineum.
8   MR. KLATT:  Objection.  Nonresponsive.
9   MS. AHERN:  Objection.  Nonresponsive.
10   Q.  My question was -- originally was:  Do
11  you know of any literature that connects talc
12  dust of surgical gloves and any sort of cancer.
13   And then you said, "First of all, I think
14  we're talking about surgical glove talc, which is
15  a pharmaceutical-grade talc, which is different
16  from the talcum powder product that I'm opining
17  about."
18   So what I'm asking you is:  What is
19  different about the talcum powder product that
20  you're --
21   A.  It's what I'm opining about.  You know,
22  I haven't --
23   Q.  Right.
24   A.  -- looked at the talc that's used for
25  pleurodesis, for example.  It's what I'm

1  separating out.
2   I've looked at the talcum powder product
3  that women use on their perineum, what they
4  bought off the shelf.  I haven't looked at
5  pharmaceutical-grade -- let me correct that --
6  pleurodesis talc, for example.  I have not looked
7  at pleurodesis talc and ovarian cancer.  I have
8  not looked at any literature specifically on
9  that.  It's been the talcum powder products that
10  women are buying off the shelf and using on their
11  perineum.
12   Q.  So if I told you that Johnson's baby
13  powder starts out as pharmaceutical-grade talc
14  and that, beyond that, fragrance is added, would
15  it be the fragrance that you're taking issue with
16  that you believe is causally associated with the
17  development of ovarian cancer?
18   A.  Again, I -- it's whatever is in that
19  bottle.  It could be platy talc, fibrous talc,
20  asbestos, heavy metals, fragrance.  It -- to me,
21  it's the product, whatever the product is that
22  they are using.
23   Q.  And you have done a biologic
24  plausibility analysis for fragrances, for metals,
25  for asbestos, for fibrous talc, and for platy

Sarah E. Kane, M.D.

Page 134

1  talc --
2     A.  So --
3     Q.  -- each one of those constituents?
4     A.  So I have looked at evidence -- so
5  Dr. Crowley's report, I mentioned.  I've looked
6  at Dr. Longo's report.  I've looked at Hopkins
7  and the Pier charts from their depositions.  I'm
8  aware of evidence that these heavy metals and
9  fragrances and asbestos are in there.
10    However, I haven't done -- what I know, I
11 looked at the -- I've looked at some literature
12 and I've looked at the IARC categorization of the
13 heavy metals.  I've looked at Dr. Crowley's
14 report and I've done an extensive look at
15 asbestos and ovarian cancer.
16    But, ultimately, those are just pieces of
17 biological plausibility.  What I'm mainly -- what
18 I am opining about is the ultimate product.  And,
19 again, it can be platy talc, it can be fibrous
20 talc, it can be asbestos, it can be heavy metals.
21    It's pieces of information that strengthen
22 the plausibility.  We know that asbestos causes
23 ovarian cancer, that certain heavy metals are
24 carcinogens, which the IARC categorized them as.
25 So it's just -- it's just additional pieces of

Page 135

1  information that strengthen the biological
2  plausibility arm of it.
3     Q.  Doctor, how do you arrive at a
4  causation conclusion without a well-defined agent
5  of exposure?
6     MR. ROTMAN:  Objection.
7     Q.  Do you understand what I'm asking you?
8  How do you arrive at your causation and
9  conclusion when you're not sure what it is about
10 the talcum powder products that's actually
11 biologically relevant?
12    A.  Well, I think -- well, strike that.
13    The epi studies are looking at the product
14 that the women are using.  So that is the agent.
15 It's the -- it's the total product.  That is the
16 agent.
17    So when you're looking through -- let me
18 just -- so let's keep in mind that we're looking
19 at that product.
20    And then if you go through my Bradford Hill
21 analysis, you look at strength of association.
22 And, overall, there's a consistent relative risk
23 that's between 1 and 2.  I would say it's, across
24 studies, averaging 1.3 to 1.4 relative risk, and
25 that's consistent across studies.  That's the

Page 136

1  consistency piece of it.
2     Q.  Can I ask you -- you can go through all
3  of it if you want, but would you rather break it
4  down piece by piece?
5     MR. ROTMAN:  She should answer your
6  question.
7     MS. AHERN:  I'm not sure she's
8  answering my question.  My question was:  How do
9  you come up with causation when you don't know
10 what the exposure is?
11    MR. ROTMAN:  I think she's answering
12 the question.
13    MR. TISI:  That wasn't the question.
14 The question was:  Do you need to know the agent?
15 And she said the agent is the product.
16 BY MS. AHERN:
17    Q.  The agent is everything in it?
18    A.  Yes, the agent is whatever is in that
19 talcum powder product.
20    Q.  So are you basing, then, your causation
21 conclusions on the epidemiologic literature
22 alone?
23    A.  The epidemiologic literature is very
24 comp---
25    MR. ROTMAN:  She was not done with her

Page 137

1  earlier answer.  Now you've gone two more beyond
2  it.
3     MS. AHERN:  She's answering.  Why don't
4  you let her answer.  If she wants to go back, she
5  can.
6     MR. ROTMAN:  No, I want her to go back.
7  She was -- she was in the middle of going through
8  her Bradford Hill to answer your earlier question
9  and you cut her off.  So she had covered strength
10 of association.
11 BY MS. AHERN:
12    Q.  Doctor, you can answer the question the
13 way you want to answer the question.
14    MR. ROTMAN:  Now there's no question in
15 front of her.
16    MS. AHERN:  Well, because you
17 interrupted it.
18    MR. ROTMAN:  Let's go back to what the
19 question was before you cut her off.  "Do you
20 understand what I'm asking you?  How do you
21 arrive at your causation and conclusion when
22 you're not sure what it is about the talcum
23 powder products that actually biologically --
24 that are biologically relevant?"
25    And then you gave -- then you started

Page 138

1 an answer about the epi studies are looking at
2 the product that the women are using, and you
3 were talking about strength of association and
4 then you said, "And that's consistent across
5 studies.  That's the consistency piece of it,"
6 and then you were interrupted.
7       So were you done with your answer to
8 that earlier question?
9       THE WITNESS:  I can continue, because I
10 think it's important.
11       I mean, I was -- my general causation
12 opinion, the methodology I used was to answer the
13 question:  Does perineal application of talcum
14 powder products, the, you know, baby powder
15 product that you buy off the shelf, does that
16 cause ovarian cancer?  So it's whatever is in
17 that bottle.
18       So with the methodology that I used,
19 looking at the epi data, but also considering the
20 Bradford Hill criteria -- which, you know,
21 looking for specificity is another one.  So most
22 of the studies showed a stronger -- a strong
23 association with serous ovarian cancer, but it
24 was basically associated with epithelial ovarian
25 cancer, so all groups of epithelial ovarian

Page 139

1 cancer.  It was pretty specific, the epi data,
2 for that type of ovarian cancer.
3       Temporality.  If you look at that, I
4 mean, the case-control studies are retrospective
5 reviews, so we know that they were using talc
6 before their diagnosis of ovarian cancer.
7       Biological gradient.  For those studies
8 that looked at a biological gradient, there was
9 an evident -- there was evidence of a
10 dose-response, not all of the times statistically
11 significant, but the trend -- you can see a trend
12 of a dose-response across studies.
13       And then we get into the plausibility
14 piece, which you've been discussing mostly so far
15 in this deposition, which has to do with the
16 plausible mechanism of talcum powder -- what I'm
17 thinking of, talcum powder products -- whatever
18 is in that bottle was what I'm looking at --
19 talcum powder products causing -- the
20 plausibility of it causing a chronic inflammatory
21 response, leading to ovarian cancer.  We've been
22 discussing that quite a bit today.
23       And then coherence.  So I can refer
24 again to my report.  Coherence, in this context,
25 means coherence between epidemiologic and

Page 140

1 generally accepted knowledge of the disease in
2 question.
3       So we know that particles can reach the
4 ovary.  We know that talc can cause chronic
5 inflammation.  We know that chronic inflammation
6 is associated with certain types of cancer.  We
7 know that certain types of ovarian cancer have
8 shown association with chronic inflammatory
9 conditions.
10       So, again, going through all this is
11 experiment and analogy, experiment with the
12 animal studies and the in vitro studies.  And
13 analogy, I used the example of asbestos, because
14 even though asbestos is -- you know, asbestos is
15 chemically similar, you can have asbestos fibers
16 and talc fibers, but it's a similar mineral
17 chemically, and we know that that is a
18 carcinogen.  So that's part of the analogy.
19       But, again, it's the whole picture.  I
20 mean, you look at the -- all of this data
21 following my methodology and you apply the
22 Bradford Hill criteria guidelines -- the Bradford
23 Hill guidelines.  And, looking at all that, my
24 professional judgment is that the talcum powder
25 products can cause ovarian cancer.

Page 141

1    Q.  Okay.  Are you done?  I don't want to
2 interrupt you.
3    A.  I think I answered the question.
4    Q.  Okay.  One of the things, and I guess a
5 major component of the talcum powder products,
6 would be talc; correct?
7    A.  Presumably -- it's called talcum
8 powder, so presumably, talc would be a
9 constituent.
10    Q.  Do you know what percentage of talcum
11 powder products is talc?
12    A.  Again, I did not do my own analysis as
13 to how much talc was in that product.
14    Q.  Do you know whether any of the heavy
15 metals that you looked at or were examined by
16 other experts in this litigation, whether any of
17 those are known carcinogens for the ovary?
18    A.  So it's another piece of information.
19 There is not, to my knowledge -- looking at what
20 the IARC looked at, there's not data right now on
21 those heavy metals and ovarian cancer, but
22 it's -- it's a -- it's a piece of the puzzle.
23 It's a piece of information.
24       The IARC has called some of them
25 carcinogenic, some of them probably carcinogenic,

Sarah F. Kane, M.D.

Page 142

1  so we know that they can cause cancer.  And if
2  they're in the talcum powder products, then it's
3  just another piece to the puzzle of plausibility.
4      Q.  Are you saying that the probably
5  carcinogenic category for IARC means that they
6  can cause cancer?
7      A.  Well, we can look at what the IARC 2A
8  categorization -- category actually says, what
9  they break it down.  But my understanding is
10  it's -- probably carcinogenic means it probably
11  causes cancer, more likely than not, probably
12  causes cancer.
13     Q.  How many categories does IARC have?
14     A.  They have four.
15     Q.  What is the -- what is Category 1?
16     A.  Carcinogenic.
17     Q.  Known to be carcinogenic?
18     A.  Mm-hmm.
19     Q.  And then the next?
20     A.  Probably carcinogenic.
21     Q.  And then?
22     A.  Possibly carcinogenic.
23     Q.  And then?
24     A.  I think it's unclassifiable.  I have to
25  look.  But I think it's uncertain, basically.

Page 143

1      Q.  And then what is the last?
2      A.  And then known not to be carcinogenic.
3      Q.  How many agents are in the known not to
4  be carcinogenic category?
5      A.  Very, very few.
6      Q.  One; right?
7      A.  That's plausible.  I haven't looked at
8  the list recently.
9      Q.  So going back to the major component,
10  you don't know what percentage of talcum powder
11  products are actually talc?
12         MR. ROTMAN:  Objection.
13     A.  I have not done my own analysis as to
14  what the components are of that talcum powder --
15  of the talcum powder products.
16     Q.  Do you agree that carcinogens can be
17  organ specific?
18     A.  I will agree that certain tissues
19  respond to certain things differently.
20     Q.  Do you agree that carcinogens can be
21  organ specific?
22     A.  Certain tissues respond to certain
23  things differently.  If you're casting that wide
24  a net to say that one specific carcinogen only
25  causes one type of cancer, I think that's a

Page 144

1  little too wide a net.  I think science is always
2  evolving and there's always the possibility of an
3  unknown cause of a certain type of cancer.
4         MS. AHERN:  Objection.  Nonresponsive.
5      Q.  My question was just:  Can carcinogens
6  be organ specific?
7      A.  And I feel like I answered that fairly.
8      Q.  Do you know of carcinogens that are
9  organ specific?
10     A.  I know -- for example, we know that H.
11  Pylori causes increased risk of gastric cancer,
12  but not oral or esophageal cancer.
13     We know that HPV infection can cause
14  cervical cancer, anal cancer, certain types of
15  squamous cell carcinomas of the oropharyngeal
16  system, but not, you know, of the endometrium,
17  for example.
18     So we know that certain things cause certain
19  cancers and aren't -- haven't been associated
20  with other types of cancers.  But to cast that
21  wide a net, to say that a carcinogen is only
22  going to cause one type of cancer or this cancer
23  is caused only by this carcinogen, I think that's
24  too wide a net, because I feel like research is
25  constantly evolving.  We're constantly learning

Page 145

1  of new causal factors in cancer.
2      Q.  Do you think that dose is an important
3  consideration when you're looking at the
4  toxicologic effects of an agent on a tissue?
5      A.  I think it is a piece of information.
6  I'm looking at my biological gradient portion of
7  my report, and I said in my report that it was an
8  important factor in my analysis because it does
9  add information to the overall causality.
10     Q.  Are there agents that can be toxic at
11  certain levels and not toxic at other levels?
12     A.  There are certainly agents that are
13  more toxic with increased exposure and increased
14  duration.  We don't know all of the thresholds
15  for carcinogenicity of all carcinogens.
16     Q.  As part of the biologic plausibility
17  analysis that you would do on a particular agent,
18  would that take into consideration the relative
19  levels of exposure that a person would have to
20  that agent?
21     A.  Well, dose-response -- I -- I'm taking
22  it -- your question -- can you rephrase the
23  question?  I'm sorry.  I just want to make sure
24  I'm answering it accurately.
25     Q.  To determine whether it's biologically

Sarah F. Kane, M.D.

1 plausible for a particular agent to cause a
2 particular harm, would you need to be able to
3 characterize the dose of that agent that is
4 required to elicit the effect that you're looking
5 for?
6     A.   I think it's a piece of the
7 information -- a piece of information, but you're
8 not always going to be able to determine a
9 dose-response.  It's going to depend on the
10 carcinogen, the agent, the routes of exposure.
11 You're just not always going to have that data,
12 unfortunately.  It would be nice to have, but
13 you're not always going to have it, and you don't
14 necessarily have to have it to come to
15 plausibility.
16     Q.   And do you have well-characterized
17 levels of exposure to the ovaries for women who
18 are using talc perineally?
19        MR. ROTMAN:  Objection.
20     A.   So some of the -- we're never really
21 going to be able to figure out what an actual --
22 to characterize what an actual dose -- dose of
23 talcum powder product of what -- of a talcum
24 powder product in a particular use.  We don't
25 know how much a woman is putting on her hand to

1 place into the perineum.  We don't know how much
2 of that product is getting to the ovary.  We know
3 that it can get to the ovary because we've seen
4 talc in the ovary.  But where -- it's extremely
5 difficult in this type of situation, when women
6 use the product differently, to know what the
7 dose -- what a single dose is.
8        Now, if you're talking long-term, frequent
9 use of talcum powder products, of course, the
10 exposure is going to be greater than a single use
11 of that product.
12        But are we ever going to know what one dose
13 of talcum powder product is?  I don't think we're
14 going to be able to say that and how much of one
15 dose reaches the ovary.
16        But, certainly, again, with -- over time,
17 increased frequency and duration, it's -- you
18 know, more of that product is going to reach the
19 ovary.
20     Q.   So going back to the discussion we had
21 earlier about surgical glove talc, do you know of
22 any literature that links exposure to talcum
23 powder -- pharmaceutical-grade talcum powder from
24 surgical gloves to any kind of cancer?
25     A.   I did not opine on surgical glove talc

1 and ovarian cancer.  I certainly saw some of the
2 data about talc migration and cornstarch on
3 surgical gloves migration, but I didn't
4 specifically -- I don't know if -- I don't even
5 know if that study has really been done.
6     Q.   Did you consider the publications on
7 talc responses -- or, excuse me, did you consider
8 the publications on granulomatous reactions to
9 talc from surgical gloves to be relevant to your
10 biologic plausibility analysis?
11     A.   It's a piece of information that
12 talc -- now, again, surgical glove talc, for me,
13 is different than the talcum powder products.
14        You know, my general causation opinion -- I
15 just want to be clear -- is about, you know,
16 talcum powder products, not the talc used in
17 pleurodesis, not talc on surgical gloves.
18        Having said that, I think it's an important
19 piece of information to know that talc on
20 surgical gloves can cause a granulomatous
21 reaction, because that is further evidence for
22 plausibility that talcum powder products --
23 they're called talcum powder products, so, again,
24 it's sort of an assumption.  It doesn't really
25 matter to me what's in there, but my assumption

1 is that whatever -- the talc or whatever is in
2 that product is causing the -- a chronic
3 inflammation.  And so it's part -- it's a piece
4 of evidence for the plausibility.
5     Q.   So are you not aware of any studies,
6 based on the review that you did conduct, that
7 link surgical glove talcum powder with the
8 development of any cancer?
9        MR. ROTMAN:  Objection.
10     A.   So I'm not sure how you could do that.
11 If you're looking at patients who -- I think that
12 would be a very difficult study to design.
13        If you're looking at women -- if you're
14 doing a case-control study -- I'm just
15 thinking -- and you're looking at patients who
16 have been diagnosed with ovarian cancer who have,
17 at any time, had surgery during the time period
18 that talc was used on surgical gloves, I think
19 that would be a difficult study.
20     Q.   My question to you was --
21        MR. KLATT:  Objection.  Nonresponsive.
22     Q.   My question to you was:  Are you aware
23 of any studies or literature that link
24 talc-dusted surgical gloves to the development of
25 any kind of cancer?

Sarah F. Kane, M.D.

Page 150

1    MR. ROTMAN: Objection.
2    THE WITNESS: My thing is not --
3    MR. ROTMAN: There's a button you can
4  push.
5    THE WITNESS: Oh, "follow."
6    MR. ROTMAN: Do you see the button
7  that's flashing on the right-hand --
8    THE WITNESS: Yeah.
9    MR. ROTMAN: -- side? If you hit that,
10  it should go to the bottom.
11   THE WITNESS: Okay. I see. Yup.
12   MS. AHERN: And I'll withdraw that,
13  because there's -- the question asked first was,
14  I think, better. I slightly modified it on
15  accident.
16  BY MS. AHERN:
17   Q.  Are you aware of any studies, based on
18  your review, that link surgical glove talcum
19  powder with the development of any kind of
20  cancer?
21   And, Doctor, to be clear, I'm only
22  interested in whether you know of a study, not
23  whether one could be conducted.
24   A.  Off the top of my head, it's possible
25  that one exists, but I can't come up with one off

Page 151

1  the top of my head.
2    Q.  Do you know of any data linking
3  surgical glove talcum powder with the development
4  of any cancer?
5    MR. ROTMAN: Objection.
6    A.  It would be my same answer.
7    Q.  That you don't know, but there might
8  be?
9    A.  Sitting here right now, I can't come up
10  with a specific study that evaluated ovarian
11  cancer patients who have had surgery with talcum
12  powder gloves.
13   Q.  Any cancer. Not ovarian cancer, any
14  cancer.
15   A.  Similar. Sitting here right now, I
16  cannot think of one off the top of my head.
17   Q.  And wouldn't that have been something
18  you think you would have picked up in your
19  review?
20   A.  It's possible that I did. I just said
21  I can't think of it off the top of my head. It's
22  possible that I did at some point.
23   But my -- and, again, I tried to make every
24  effort to be able to identify studies and
25  literature and evidence that were relevant or

Page 152

1  could be helpful information to my general
2  causation opinion. So it's possible that I did.
3    Q.  Is it in your report or cited in any of
4  your reference lists?
5    A.  Again, I can look through my whole
6  reference list. It's the same answer. Off the
7  top of my head, I don't know the answer to that.
8    Q.  Do you know of any studies or any data
9  that link foreign-body granulomas to the
10  development of any kind of cancer?
11   A.  Well, we know that asbestos can cause a
12  granulomatous reaction and asbestos is certainly
13  associated with mesothelioma and lung cancer.
14   Q.  Are there other biologic properties of
15  asbestos that contribute to its carcinogenicity?
16   A.  It can provoke a reactive oxygen
17  species inflammatory response.
18   Q.  Can it disrupt DNA?
19   A.  It can based on that mechanism, yes.
20   Q.  Have you seen any studies or data
21  suggesting that talcum powder can do those
22  things?
23   A.  I've seen studies that show that talcum
24  powder can increase production of reactive oxygen
25  species and can change gene expression in

Page 153

1  mesothelial cells. So, yes, I mean -- let me go
2  back to your question.
3    So I would say, yes, there are studies that
4  show talc can cause the production of reactive
5  oxygen species and reactive nitrogen species,
6  which can disrupt DNA, similar to asbestos.
7    Q.  How do reactive oxygen and nitrogen
8  species disrupt DNA similar to asbestos?
9    A.  Well, it's the reactive oxygen species
10  -- it's part of this feedback loop with -- what's
11  the word I'm looking for? -- tumor factors like
12  COX and TNF alpha. It's related to those types
13  of expressions and an inflammatory response.
14   Q.  Are you relying on cell studies?
15   MR. ROTMAN: Objection.
16   A.  I have looked at cell studies. The
17  Buz'Zard study is one, and I know Saed has done a
18  lot with myeloperoxidase and ovarian cells. He
19  recently came out with a paper.
20   So it's, again, a piece of information
21  towards the plausibility arm of my general
22  causation opinion.
23   Q.  Have you seen any studies in animals or
24  in humans that have linked the specific enzymes
25  that Dr. Saed has evaluated in cell studies to

1 the development of ovarian cancer?

2    A.   So there have been some studies that

3 have looked at anti-inflammatory drugs, aspirin

4 and NSAIDs in particular.

5    The data on NSAIDs has been less consistent,

6 but the data on aspirin has been consistent, in

7 that it lowers the risk of ovarian cancer with

8 regular aspirin use.

9    And aspirin, one of the mechanisms of action

10 is on the cyclooxygenase expression, which is

11 similar to the cyclooxygenase expression seen in

12 some of the in vitro studies.

13    Q.   So my question was:  Have you seen any

14 studies in animals or in humans that have linked

15 specific enzymes that Dr. Saed has evaluated in

16 his cell studies to the development of ovarian

17 cancer?

18       MR. ROTMAN:  Objection.

19    Q.   Are you relying, then, on epidemiologic

20 studies looking at NSAID and aspirin use?

21       MR. ROTMAN:  Objection.

22    A.   I'm saying that the NSAID and aspirin

23 use is another piece of information that -- as to

24 plausibility, mechanism -- and mechanism of

25 regulation of pathways that can result in

1 reactive oxygen species and cause an inflammatory

2 response.

3       MR. KLATT:  Objection.  Nonresponsive.

4       MS. AHERN:  Same.

5    Q.   Let's go back to that.  We'll finish up

6 this Exhibit 11.

7    What was the next page, if any, the last

8 page in your photocopy?

9    A.   Okay.  So this is Page 1216 of the

10 fourth edition, if I am correct.  Give me one

11 second while I find it.

12    Okay.  So the reason why Page 1216 is there

13 is because it starts the section on ovarian

14 cancer, which then continues on to Page 1217.

15 And it says -- the last paragraph on Page 1217

16 says, "Other suggested factors affecting ovarian

17 cancer risk include talc exposure, a history of

18 mumps infection, and alcohol consumption.  Talc

19 exposure, which has been related to an excess

20 risk of ovarian cancer in a number of

21 case-control studies, is of interest biologically

22 in that ovarian cancer is thought to arise from

23 the mesothelium that lines the peritoneal

24 cavity."

25       MR. ROTMAN:  Slow it down so she can

1 get it.

2       THE WITNESS:  Oh, I'm sorry.

3    A.   "Ovarian cancer may be analogous,

4 therefore, to plural mesothelioma, which has been

5 shown to be caused by asbestos, a chemical

6 similar to talc."

7    Q.   Is that the complete passage that

8 you're looking at?

9    A.   I believe that is why I had highlighted

10 that one, yes.

11    Q.   You'd agree that this version of

12 Blaustein's textbook was published in 1994?

13    A.   Yes, I am aware.

14    Q.   Would you agree that a number of the

15 risk factors that have been identified here,

16 there have been additional studies published on?

17    A.   Yes.

18    Q.   Would you agree that alcohol is a known

19 risk factor these days for ovarian cancer?

20    A.   I don't think that's been borne out to

21 be the case.  But with talc, there's continued to

22 be several case controls and meta-analyses which

23 have continued to be consistent with the

24 increased risk of ovarian cancer cited in the

25 studies that were cited here, which I didn't

1 actually Xerox.  You have the book, so --

2    Yes, I agree this was 1994, but taken into

3 context of the subsequent studies and literature

4 looking at talc and ovarian cancer, I think it's

5 still relevant.

6    Q.   Have there been a number of updates and

7 changes to the classification of tumors since

8 1994?

9    A.   Since 1994, sort of semantically.  We

10 still have the same subtypes of ovarian cancer.

11 There's been a new categorization.  We talked

12 about the Type 1 and Type 2 ovarian cancers.

13    So not a complete overhaul in

14 categorization; I think just different ways to

15 category the same entities, let's --

16    Q.   Has the --

17    A.   -- put it that way.

18    Q.   Sorry.

19    Has the understanding of the origin of

20 ovarian tumors evolved significantly since 1994?

21    A.   So this mentions -- we talked about

22 this a little bit earlier -- this does mention

23 that at this time, in 1994, there was thought

24 that ovarian cancer might arise from the

25 mesothelium.  So the ovary is covered by a layer

1 of mesothelium. That's the outer layer. And so
2 in 1994, that was still, I would say -- this is
3 before my residency, a little before my time --
4 that that was the most common thought, that
5 that's where the ovarian cancer -- cancers are
6 arising from. Now, since then we've discussed
7 some of the other more recent findings of the
8 etiology.
9     But, anyway, I just -- I had read this a
10 couple of days ago and, you know, it was -- it
11 was a reference that I think is still relevant
12 because of the -- the subsequent case controls
13 and meta-analyses that were done since then that
14 I think still make it relevant, although, again,
15 I -- we're not -- we're still not absolutely sure
16 where all of these ovarian epithelial tumors are
17 arising from. But we have a little more evidence
18 than we did in 1994.
19     Q.  And in 1994, the first prospective
20 cohort study had not yet been published; correct?
21     A.  I believe that is correct.
22     Q.  So we would be -- these numbers here
23 in -- that are discussed for talc exposure would
24 be, essentially, just the retrospective case
25 controls that had been published up to that point

1 or the specific ones --
2     A.  Yeah.  You have the reference list of
3 the reference numbers 47, 69, 70, and 182.
4     Q.  Cramer?  You said 59?
5     A.  69.
6     Q.  Harlow, 92.
7     A.  70.
8     Q.  70.  Hartge.
9 And 83.
10     A.  And 182.
11     Q.  And Whittemore, 1988.
12     A.  So, yes, that was before.  They only
13 looked up until 1988.
14     Q.  Okay.
15         MR. ROTMAN:  Hunter, a good time to
16 take our lunch break?  It's been an hour since
17 our last -- since we started.
18         MS. AHERN:  Sure.  I'm sure people
19 could use a bio break too.
20     Q.  Are these the only pages that you
21 photocopied from this book -- or in -- sorry.
22 Let me rephrase that.
23     Have we finished with the photocopy of
24 Exhibit 11 or are there more pages?
25     A.  I think -- I think I Xeroxed this last

1 page just because it was a continuation of that.
2 So, yes, I think we're done with the fourth
3 edition.
4     Sorry.  I'm starting to talk fast because
5 I'm excited for lunch.
6         MS. AHERN:  We can take a break for
7 lunch, then.
8         THE VIDEOGRAPHER:  Here ends Media 3.
9 Off the record, 1:05 p.m.
10         (Lunch recess was taken.)
11         ("Blaustein's Pathology of the
12 Female Genital Tract," Fifth Edition,
13 marked Exhibit 12.)
14         (Excerpt of Blaustein's
15 Pathology of the Female Genital Tract,"
16 Fifth Edition marked Exhibit 13.)
17         THE VIDEOGRAPHER:  Here begins Media
18 No. 4 in today's deposition of Sarah Kane, M.D.
19 Back on the record, 1:45 p.m.
20 BY MS. AHERN:
21     Q.  Okay.  Hi, Dr. Kane.
22     A.  Hello.
23     Q.  I'm looking here at Blaustein's
24 Pathology of the Female Genital Tract, Fifth
25 Edition, which you brought with you here today.

1 I marked it as Exhibit 12 to your deposition.
2 You can have it back.
3     A.  Okay.
4     Q.  Thank you.  And inside, you brought
5 with you a photocopy of the cover page and also
6 Page 629.  I'll hand that back to you.  I think
7 there's only one copy.  I've marked that as
8 Exhibit 13.
9     A.  Oh, okay.
10     Q.  Here you go.
11     A.  Okay.
12         MR. TISI:  What was the page?  I'm
13 sorry.
14         THE WITNESS:  629.  Do you want the
15 textbook back?
16     Q.  Whichever one you'd rather actually
17 pass back to me.  Thank you.
18     Can you tell us, on Page 629, what
19 information you thought was relevant to your
20 review of the talc issue?
21     A.  Yes.  I believe this is under "Foreign
22 Body."  So this is diseases of the fallopian
23 tube.  So under "Foreign Body" -- hold on one
24 second.  Okay.  It says, "Foreign material may be
25 introduced into the tube in the course of

Sarah E. Kane, M.D.

Page 162

1  gynecologic investigation, especially
2  hysteroscopic -- I can't say the word,
3  hysterosalpingo -- anyway, HPG, lubricant jelly,
4  mineral oil and starch and talc powder may cause
5  a lipoid or granulomatous salpingitis.  An
6  intense phagocytic reaction to introduce lipid
7  material causes" --
8         THE COURT REPORTER:  Excuse me.
9         A.  Sorry.  I think that's basically the --
10  that is the end.
11         No.  At the very end of the page, it says,
12  "Talc may cause mucosal or serosal granulomas.
13  Examination of all granulomas or foreign body
14  reactions under polarized light is useful in the
15  recognition of these processes.  Other disease
16  processes in the tube such as leprosy or
17  amyloidosis are so infrequent that they are of
18  little clinical or pathologic significance."
19         Q.  How does that information inform your
20  opinions today?
21         A.  So it's just another -- again, similar
22  to the other things that we reviewed in the other
23  edition, just another piece of evidence that talc
24  causes mucosal and serosal granulomas, and
25  they're talking about the fallopian tube in this

Page 163

1  chapter.
2         MR. KLATT:  Can I interrupt?
3         (Discussion off the record.)
4         MR. LOCKE:  I'm on right now.  Thanks,
5  Mike.
6  BY MS. AHERN:
7         Q.  And, Doctor, did you review any other
8  sections of Exhibit 12, Blaustein, Fifth Edition?
9         A.  I believe I did.  I think in this
10  edition, from what I recall, that was the -- the
11  reference was in the fallopian tube.
12         Q.  Is that what we just discussed on
13  Page 629?
14         A.  Yes.  629 was where talc was discussed
15  in the fallopian tube.
16         Q.  Did you see any other information in
17  any of the Blaustein texts that we reviewed today
18  that suggests that foreign body granulomas caused
19  by talc have been associated with the development
20  of ovarian cancer?
21         A.  Well, we saw mention of the
22  epidemiologic studies in the fourth edition that
23  we reviewed.
24         Q.  So other than the epidemiology, is
25  there any reference to pathology studies or

Page 164

1  experimental studies or animal studies
2  linking talc foreign-body responses to
3  development of cancer?
4         A.  From what I can recall in those
5  textbooks, I don't think they went into any more
6  detail than what I've read for you.
7         Q.  Okay.  What else did you bring with you
8  today?  Anything that we haven't covered other
9  than the boxes behind me?
10         A.  Correct.  I don't think so.  Mr. Rotman
11  brought a copy of my report, but that is all.
12  This -- let me look.
13         All of these have been marked already.
14  Yeah.
15         Q.  All right.  Doctor, you've got a copy,
16  but I'm going to hand you another one.  I've
17  marked as Exhibit 14 a copy of your expert report
18  dated November 15, 2018.
19             (Rule 26 Expert Report of Sarah
20         E. Kane, M.D. marked Exhibit 14.)
21         Q.  Can you review Exhibit 14 and tell us
22  if this is indeed your expert report dated
23  November 15, 2018?
24         A.  Yes.  This appears to be my report.
25         Q.  And you brought with you earlier an

Page 165

1  updated copy of your CV; correct?
2         A.  Yes, I did.
3         Q.  Which we marked Exhibit 2.
4             (Document entitled "References
5         Cited and Other Material and Data
6         Considered" marked Exhibit 15.)
7  BY MS. AHERN:
8         Q.  And Exhibit B to your report was
9  entitled "References Cited and Other Material and
10  Data Considered."  I've marked that as Exhibit 15
11  to your deposition.
12         A.  Okay.
13         Q.  Okay.  And Exhibit 15 isn't paginated
14  but consists of 11 pages.  The first ten pages of
15  materials consist of 186 items identified by the
16  caption on the top of Page 1 as "Literature"; is
17  that correct?
18         A.  I'm sorry.  Are you talking about the
19  "References Cited and Other Material and Data
20  Considered," Exhibit 15?
21         Q.  Yes.
22         A.  Yes.  There is a list of 186 literature
23  references.
24         Q.  And the materials listed on Page 11 are
25  identified by a caption as "Other Sources" and

Sarah E. Kane, M.D.

Page 166

1 include an additional 17 items; is that correct?
2    A.   Yes.
3    Q.   Okay.  So did you prepare Exhibit 15?
4    A.   Yes.  I did.
5    Q.   Did you type this out yourself?
6    A.   I did.  Yes.
7    Q.   Okay.  And how did you go about pulling
8 this together?
9    A.   I'm -- in what way?
10    Q.   Did you keep a running list of the
11 citations as you went and then pull this all
12 together at the end of your report?
13    A.   Yes.  So what happened is this was my
14 first medical expert witness report I have
15 written.  And you'll notice that -- let's see,
16 all of the -- oh, I'm sorry.  This doesn't
17 include the January 4th list; right?
18    Q.   We'll get there.
19    A.   Okay.  So that's what I kind of want to
20 explain.  What happened is, the reason why you
21 had a January 4th list, is because I wrote
22 this -- the accepted form for published
23 literature is listing literature that you've
24 actually cited within the body of your report,
25 and so it was my misunderstanding.  I was not

Page 167

1 aware at first that you guys were going to want a
2 list of everything that I had reviewed.
3    So what I tried to do is this, I think, was
4 turned in at the same time, so Exhibit 15 was
5 turned in at the same time as Exhibit 14, and it
6 has the literature that was cited within the body
7 of the report.
8    And then when I realized I needed to get a
9 list together of everything, as complete a list
10 of everything that I thought I reviewed, I put
11 together the January 4th list, which was -- I had
12 to sort of recreate -- and I kept almost all of
13 those -- all of this literature in different
14 files.
15    I had to do a little bit of recreation
16 because, as I mentioned before, I lost a couple
17 of hard drives during this whole process, which
18 was not fun.  But thankfully, I was -- I had
19 backed up a lot of it.
20    So I tried to be as complete as possible.
21 It is possible that there are a few things I
22 reviewed that did not make the list, which I
23 think I realized on the list that you got
24 yesterday there might have been a couple that I
25 had reviewed before, but most of that literature

Page 168

1 that you -- the list that you got yesterday is
2 stuff that I had reviewed, I believe.  I have to
3 look at it.
4    But my point is that list that you got
5 yesterday was varied, and -- when I looked at it,
6 and it was just an effort to be as complete as
7 possible.
8    Q.   Okay.  And just looking -- we'll get
9 there, but just looking at Exhibit 15, which --
10 the first ten pages, which are the references?
11    A.   Mm-hmm.
12    Q.   So do you define the references as the
13 specific sources that you cited within the body
14 of your report?
15    A.   These are sources that I cited within
16 the body of my report.
17    Q.   And are these the sources that you rely
18 on to support the opinions expressed in your
19 report?
20    A.   So these are some of the references
21 that I used.  Again, I also had reviewed the
22 subsequent -- the literature and the other data
23 in the subsequent lists.  So I would not say this
24 is all-encompassing, but ultimately, with all the
25 lists you have now, I'm hoping that that is

Page 169

1 encompassing of at least all of the stuff that I
2 considered.  I wouldn't necessarily say "rely
3 on," but at least everything that I considered.
4    Q.   Okay.  And that was -- my next question
5 was:  Do you differentiate between the sources
6 cited here as references and those that you just
7 considered but weren't included as references?
8    A.   Not necessarily.  These are the ones
9 that ended up getting cited in the report.  Now,
10 there were different drafts, which at one point
11 some of the other ones were cited, and there was
12 a little bit of changing it around, which there's
13 a couple -- I think there are a couple of
14 typographical-type errors in a couple of the
15 references because of that.
16    But essentially, there isn't that much of a
17 difference, I would say, except to say that this
18 is the literature that I ended up specifically
19 citing.
20    But all of the literature that I looked at,
21 I considered.
22    Q.   Would you say that all of the
23 literature that you looked at, which would
24 include your other sources here on Exhibit 15,
25 your January 4, 2018, reference list, and the

Page 170

1 ones served yesterday, January 24th, would you
2 say that you relied on all of those materials?
3    A.  No.  Well, I at least reviewed those.
4 I would say that I considered them.  I wouldn't
5 necessarily say that I relied upon them.
6    Q.  And when you consider material, what
7 does that mean to you?
8    A.  Well, you know, when I'm -- you can
9 look at my methodology, how I tried to cast as
10 wide a net as possible with the information that
11 I gathered in the information stage.  So I wanted
12 to have as much data, as many literature
13 references, expert reports, whatever I could kind
14 of get my hands on that might be relevant to my
15 general causation report.
16    And then I'm reading through those, and
17 that's actually when I started my draft of the
18 report.  It really started as sort of notes that
19 I took as I read the different literature
20 references, and I sort of built out from there.
21    Does that answer your question?
22    Q.  I think probably so.
23    Did you collect -- did you identify all of
24 the materials in Exhibit 15 yourself, or were
25 some of these provided to you by the plaintiffs'

Page 171

1 counsel?
2    A.  The vast majority of them, I found
3 through my own literature search.  Some of them
4 may have been supplied by the plaintiffs'
5 attorneys.  A lot of those overlapped with what I
6 had already found; the exception, of course,
7 being documents on the other sources that I would
8 not have had access to on my own.
9    So I had asked for, and in forming my
10 opinion, my general causation opinion, I had
11 asked for defense expert reports so I could get a
12 sense of what the defense experts' opinions were,
13 just to get, you know, the other -- just to get
14 more information.
15    So that's -- so those were definitely given
16 to me by plaintiffs' attorneys.
17    Q.  Do you remember, timewise, did you
18 review the defense expert reports and the
19 materials in the other sources earlier on to get
20 a sense of the issues in the litigation and then
21 do your literature search, or the other way
22 around?  What was the timing?
23    A.  I don't remember exactly.  I don't
24 believe I read the -- I'm trying to think timing.
25    I think what I did is -- from what I

Page 172

1 remember, I did my own literature search, read as
2 much as possible, started taking my own notes.
3 And then thought, as I was sort of forming my
4 opinion, thought, you know, it would be nice to
5 know what the defense is saying.  And, of course,
6 I think at that point is when I asked, but I
7 don't remember specific timing.
8    Q.  And did you specifically -- did you ask
9 for specific defense reports or specific defense
10 reports related to particular expertise?
11    A.  If I recall -- I'm looking at this
12 list -- I believe the first request was a more
13 general request.
14    Q.  When you say "more general," do you
15 mean for --
16    A.  Meaning --
17    Q.  -- for defense?
18    A.  -- I didn't ask for specific names of
19 people.
20    Q.  Ah.
21    A.  I think at this point, I wasn't
22 necessarily aware of who would have been defense
23 experts.  And so I don't remember exactly, but my
24 inclination is that I had asked for a more
25 general sort of representation.

Page 173

1    Q.  And can you identify on here which of
2 the other sources are from defense experts?
3    A.  Yes.  I'll try my best.
4    The Michael Ober expert report was provided
5 by plaintiffs' counsel.  The deposition of Alice
6 Blount was also provided by plaintiffs' counsel.
7 Both of the Chodosh, his report and his trial
8 testimony, was provided by plaintiffs' counsel.
9 Samuel Cohen was provided by plaintiffs' counsel.
10    And also -- also, let's see, the Cramer, I
11 wouldn't have access to the Cramer reports on the
12 Byrd and Jacqueline Fox.  The expert report of
13 Michael Crowley was given to me.  That,
14 obviously, is a plaintiffs' report that was
15 within a day or two of turning in my report.
16 That was very late in the process.
17    John Godleski, I might have asked for by
18 name.  Of course, he's a plaintiffs' expert.
19 His, I may have asked for by name because of the
20 Cramer papers.
21    Q.  Did you say Cramer was a plaintiff or
22 defense expert?
23    A.  Cramer, I believe, was a plaintiff.
24    Q.  I wasn't sure.  You named him after the
25 defense experts.  I'm sorry.  I'm just going

Sarah F. Kane, M.D.

1  through the list.
2      MR. ROTMAN:  The list is alphabetical,
3  so she's going down the list.
4  BY MS. AHERN:
5      Q.  Yeah.  My question was:  Which ones are
6  the defense experts?
7      A.  I'm sorry.
8      Q.  If you're done, you're done.  Are there
9  any other defense experts.
10     A.  Well, the John Hopkins and Julie Pier,
11  those exhibits and depositions I got from
12  plaintiffs' counsel.
13     I believe that is it, looking at the list of
14  defense reports.
15     Q.  Did you want to know what the defense
16  experts had to say about epidemiology?
17     A.  I wanted -- yeah.  I wanted as much
18  evidence as I could get, so --
19     Q.  Were you aware that the defendants had
20  designated epidemiologists in the litigation who
21  had given reports and testimony?
22     A.  I don't know if I was aware
23  specifically of that.
24     Q.  Were you aware that the defense had
25  designated a number of gynecologic pathologists

1  who had given reports and testimony as well?
2      A.  Again, I don't know if I was
3  specifically aware of that.  No.
4      Q.  Would you have, as a pathologist doing
5  an expert report on this litigation, would you
6  have been interested to know what the defense
7  pathologists had said?
8      A.  Well, I will take any data that I can
9  get to try to see if it's relevant.  I mean, so I
10  had asked for defense reports, and that's what I
11  got.
12     Q.  These reports, these other sources, the
13  17 items here were in response to your request,
14  but they were chosen by the plaintiffs' counsel?
15     MR. ROTMAN:  Objection.
16     A.  I'm not sure how they were chosen or
17  how -- why -- all I know is that I asked for
18  reports, and this is what I received.
19     Q.  And you specifically asked for defense
20  reports; right?
21     A.  I did.
22     Q.  And you got Michael Beer, who is an
23  oncologist; Lewis Chodosh, a cancer biologist;
24  and Sam Cohen, a toxicologist; correct?
25     A.  That would appear, from the list, the

1  ones that I received.  Yes.
2      Q.  Is there anyone on this list that's --
3  that specifically addresses gynecologic
4  pathology?
5      A.  I think it's been a long time since I
6  read those reports, but I do remember some of
7  those reports speaking to -- your question was on
8  top.  I'm just making sure.
9      Q.  Sure.
10     A.  Some -- so the gyn onc report
11  definitely went into some gynecologic pathology.
12  Gyn oncs are generally knowledgeable about gyn
13  pathology because we work pretty closely with
14  them.  We often show our gyn pathology, for
15  example, at multiconferences, multidisciplinary
16  conferences.
17     So I vaguely remember a gyn onc one going
18  over some gyn path stuff, but my memory is vague
19  because I have not read these in probably over a
20  year.  I don't know exactly.
21     Q.  Would you be interested in what the
22  epidemiologists that had served reports and given
23  testimony in the litigation the last five years,
24  what they've said?
25     MR. ROTMAN:  Objection.

1      A.  Again, I'll take whatever information
2  or data, you know, I can get that might be
3  relevant.
4      Q.  And do you consider expert litigation
5  reports to be data?
6      A.  Yes.  I think it's data.
7      Q.  Okay.  Is it the kind of data you rely
8  on in your everyday practice as a pathologist?
9      A.  I sort of view they're opinion reports.
10  They're opinion, general causation opinions, and
11  a couple of these are -- I can't remember.  All
12  of these were general, I believe, from the
13  defense.
14     So they're professional opinion data, and I
15  would say that's similar to having a consultation
16  with a colleague or a peer.  I mean, you know, in
17  my day-to-day practice, I'm certainly asking
18  opinions of colleagues and different specialties
19  or my own specialty, even.  Those are
20  professional judgments, professional opinions,
21  looking at their knowledge of the literature or
22  data.
23     So I think it's a good analogy; looking at
24  general causation, professional opinions, is
25  similar to kind of getting a colleague's opinion.

Sarah E. Kane, M.D.

1    Q.   But this is the first time you've
2  relied on litigation reports to inform your own
3  opinions; correct?
4    A.   Well, again, I don't know if I would
5  use the word "rely." I certainly considered
6  them, you know. But, again, I think it's very
7  similar to asking a colleague in my daily
8  practice for an opinion on something.
9    Q.   And, Doctor, looking at 186 references
10  that are cited in Exhibit 15.
11    Did you review each one of these carefully
12  and thoroughly?
13    A.   I reviewed each one of them, some of
14  them probably more thoroughly than others,
15  depending on what I was looking for; but yes, I
16  reviewed all of them.
17    Q.   And do you know whether or not the
18  boxes, the four boxes that are sitting behind me,
19  do those include these 186 references on
20  Exhibit 15?
21    MR. TISI: Let me see if I can help you
22  out.
23    MS. AHERN: Sure. Go ahead.
24    MR. TISI: My understanding is they do.
25    MS. AHERN: That's the 186?

1    MR. TISI: That would be the references
2  in the report. It would not be, to my -- I
3  haven't cracked the boxes, so I can only assume
4  from past prologue that the information
5  considered is not in those boxes. They may be,
6  but the information relied on that is cited in
7  the report are.
8    MS. AHERN: Okay. So other sources
9  here that are not cited specifically, well, they
10  may be --
11    MR. TISI: I don't know, for example --
12  well, maybe we can open them up. But I don't
13  know, for example, if the expert reports and
14  depositions are in the -- in there. If they're
15  cited, then they're probably in there. If
16  they're not cited --
17    THE WITNESS: I'm not sure because --
18  I'm not sure I cited these in my report because
19  they weren't necessarily reliance. It was more
20  data.
21    But I thought at the time that I should
22  list what -- because these aren't publicly -- I
23  don't believe any of these are publicly
24  available, what is on this list, so I felt like I
25  should list them.

1    But I don't believe I -- well, I might
2  have referenced the Longo.
3  BY MS. AHERN:
4    Q.   Page 5. I think if you look at Page 5
5  of your report, you reference Dr. Blount --
6    A.   Yes.
7    Q.   -- Dr. Crowley, Longo, Rigler,
8  Hopkins --
9    A.   Yes.
10    Q.   -- Pier?
11    A.   Yes. Looking back at the list, you're
12  absolutely correct. I did.
13    Q.   Do you think, as you sit here, that
14  those are --
15    MR. TISI: I can look at them if it
16  makes your life easier. I'm happy to do it.
17    But I do think -- Mike is back there
18  looking. I'm thinking that those are the actual,
19  relied-on referenced materials, not the materials
20  considered, which was a separate list.
21    MS. AHERN: That's the January 4th, and
22  we're going to get to that one.
23    MR. TISI: No. it's in the back of the
24  report. Maybe I'm wrong.
25    MS. AHERN: There are other sources,

1  but she has apparently relied on them --
2    MR. TISI: That's fine.
3    MS. AHERN: -- to some extent in
4  performing reviews about fragrances and asbestos.
5  BY MS. AHERN:
6    Q.   Is that right, Doctor?
7    A.   Dr. Crowley's report and Dr. Longo's
8  report, yes. I --
9    Q.   And what about Dr. Hopkins and Pier?
10    A.   Yes. I don't believe I read their
11  entire depositions. I know I had seen the
12  exhibits from the depositions, and I think
13  part -- I listed it here, so I must have at some
14  point.
15    MS. AHERN: Okay. So let's put 15 over
16  here, and let's move on to the next one.
17    (Document entitled "Additional
18  Material Considered" marked Exhibit 16.)
19  BY MS. AHERN:
20    Q.   Okay. Doctor, I'm handing you what's
21  been marked as Exhibit 16 to your deposition.
22    Can you take a look at Exhibit 16 and tell
23  us what that is?
24    A.   Yes. So this is a combination. So
25  once I realized that I needed to give you all a

Page 182

1 list of -- as complete a list as I could -- I'm
2 not going to say this is a complete list -- and,
3 of course, you have another list that you just
4 got, but I tried to be as complete as I could in
5 recreating the literature and other reports that
6 I had considered.
7 So these are ones that, to my recollection,
8 I didn't specifically cite or were not
9 available -- I mean, obviously, I have some of
10 the plaintiffs' expert reports that weren't
11 available to me until after I had written and
12 submitted my report. So some of these were
13 available to me only after -- and the Health
14 Canada came out after my report.
15 So these are a combination of things I
16 reviewed subsequent to November 15th and stuff
17 that I had reviewed prior to that but had not
18 specifically cited and recreated the list.
19 Q. Okay. And just for the record, this
20 is -- Exhibit 16 is a four-page document. It's
21 not paginated, but it has 96 items identified as
22 "Additional Materials Considered," so -- served
23 on January 4, 2018.
24 Can you identify, as you look through these
25 items on Exhibit 16, which of those you reviewed

Page 183

1 prior to the submission of your report and which
2 ones you reviewed after?
3 A. I can do the best that I can. My
4 memory might be a little -- and I have to jog my
5 memory a little bit on some of them.
6 Clearly, the expert reports that were
7 dated -- the plaintiff expert reports that were
8 dated after my report, I had not seen --
9 Q. Mm-hmm.
10 A. -- prior.
11 And, again, the Health Canada came out
12 afterwards, so that was not available when I
13 submitted my report. The majority of the rest of
14 the literature, I had read prior to submitting my
15 report.
16 Q. Okay. Had you seen any draft reports
17 from any of the other experts designated by the
18 plaintiffs in this litigation?
19 A. Not before my report. I didn't see any
20 drafts. I only saw the final reports after my
21 report was submitted.
22 Q. Okay. Did you have an opportunity to
23 talk with any of the other experts that were
24 designated by plaintiffs prior to your report
25 being submitted?

Page 184

1 A. No.
2 Q. And are there some materials on
3 Exhibit 16 that were provided to you or
4 identified for you by the plaintiffs other
5 than -- and I'm not talking about the litigation
6 materials, but the articles?
7 A. Again, there might have been some that
8 overlapped with what I had already found. I'm
9 looking.
10 I believe the April 2014 FDA letter may --
11 although that might have been available on the
12 internet. I might have come across that on my
13 own first.
14 No. I believe the vast majority of this
15 stuff was stuff that I -- other than those
16 reports was stuff that I had independently
17 already found. That's the only one that is
18 ringing a bell as a possibility, but I also seem
19 to remember finding it on the internet.
20 Q. Okay. And are any of these materials,
21 materials that you explicitly rely on or, excuse
22 me, are any of the materials on Exhibit 16
23 materials that you rely on to support your
24 opinions?
25 A. Again, it's all data that I considered.

Page 185

1 I didn't specifically cite them, but there's
2 certainly pieces of information that helped me
3 come to my conclusion.
4 Q. And you prepared Exhibit 16, didn't
5 you?
6 A. Yes.
7 Q. And do you remember when you prepared
8 it?
9 A. Very shortly before you received it.
10 So it would have been -- you received it
11 January 4th?
12 Q. Mm-hmm.
13 A. I think I -- it was only -- I don't
14 remember exactly, but it wasn't very long before
15 that I put it all together, after
16 recreating -- trying to recreate as best I could
17 the list of literature that I had reviewed.
18 Q. And did you carefully and completely
19 review all of the information in Exhibit 16?
20 A. Again, I reviewed all of it. Some of
21 it was more relevant than others, likely, so --
22 but I reviewed all of them.
23 Q. Okay. Obviously, anything that you
24 received after your report is information you
25 would not have relied on to form your opinions in

Sarah E. Kane, M.D.

Page 186

1 this case; correct?
2     A.  No.  It's more information for my -- my
3 opinion hasn't changed since I wrote my report.
4 In fact, I know we've talked about Health Canada
5 a little bit, but that was pretty interesting to
6 see that report because their methodology was
7 very similar to mine, and they did a Bradford
8 Hill analysis, and they looked at a lot of the
9 same literature and came to the same conclusion.
10     So that definitely was supportive evidence,
11 I think -- not I think; it is -- of my opinion.
12     Q.  And, Doctor, I only have one copy of
13 this.  It's "Additional Materials to Sarah Kane"
14 that were served last night or yesterday
15 afternoon, January 24th.
16         (Document entitled "Additional
17     Materials to Dr. Sarah Kane" marked Exhibit
18     17.)
19 BY MS. AHERN:
20     Q.  First of all, can you take a look at
21 that?
22     Have you seen it before?
23     A.  Yes.  Yes.  I have.
24     Q.  Did you prepare that?
25     A.  I did.  I had listed -- there are a

Page 187

1 couple of papers that I realize I had read
2 previously and didn't -- I can tell you Purdie,
3 1995, Keskin, 2009, I definitely reviewed while
4 preparing my report, and somehow those got off
5 the list.
6     The other ones, Taher wasn't available.  I'm
7 trying to remember Gordon, if I had seen that.
8 If I had seen that before I submitted a report,
9 it was very late.  It might have been after.
10     The IARC heavy metals, I believe I actually
11 cited that in my reference list, but I was trying
12 to be -- it was one of these last-minute, trying
13 to be as complete as possible, so that actually
14 might be a repeat.
15     The website, I had reviewed prior to turning
16 in my report.  And the Longo supplemental report,
17 obviously, wasn't available until January.  Same
18 with the depositions.  Those weren't available
19 until after they were done.
20     The Kurman defense report, I asked for
21 recently when I realized that Kurman was a
22 listed -- a named expert witness, which is also
23 why I went through my copies of my old textbooks
24 and my partner's old textbooks.  So that, I asked
25 for specifically.

Page 188

1     I think that covers most of them.
2     Q.  What about the EFSA guidance on the use
3 of weight of evidence?
4     A.  Oh, yeah.  That, I think, I reviewed
5 after I had submitted my report.
6     Q.  Did that form part of the basis of your
7 opinions or your methodology?
8     A.  It was more of a -- it basically shows
9 that the methodology that I used is very similar
10 to evidence-based medicine that we would use on a
11 daily basis.  It kind of went through weight of
12 evidence, and it was sort of helpful to see the
13 similarity of the methodology that I used coming
14 to my conclusion.
15     Q.  Was the methodology you used for
16 preparing your opinions in this case and your
17 report in this case taken directly from the EFSA
18 guidance?
19     A.  No.  I think I just -- I saw this EFSA
20 guidance after writing my report.
21     Q.  Did you use any other sort of published
22 methodology on weight of the evidence when you
23 prepared your opinions?
24     A.  I used what we have been trained to
25 use.  I mean, it's evidence.  It's an

Page 189

1 evidence-based medicine model of methodology and
2 coming to conclusions.  So it's -- I tried to do
3 as thorough as possible description of my
4 methodology, which we can refer to in my report
5 if you'd like.
6     Q.  What about the J&J Science Day
7 presentation?
8     A.  That --
9         MR. ROTMAN:  Objection.  Is there a
10 question?
11         MS. AHERN:  I'm about to get there if
12 you'd let me finish my question.
13         MR. ROTMAN:  I thought you were.
14 Sorry.
15         MS. AHERN:  You might just hold off.
16 BY MS. AHERN:
17     Q.  What about the J&J Science Day
18 presentation?  Is that something that you
19 reviewed?
20     A.  I reviewed that very quickly, and I
21 only received that maybe a week ago.  It was very
22 recently.
23     Q.  Did you request that information?
24     A.  I think, from what I remember, it was
25 part of asking for more sort of defense side of

Page 190

1  the story; what, you know, your experts might
2  have been saying; what kind of -- you know, I was
3  trying to figure out how somebody who had looked
4  at the same body of evidence that I did can come
5  to a different conclusion, so it was part of sort
6  of that request.
7      I think I probably got it after I requested
8  Kurman's defense report from a prior litigation,
9  if memory serves me correctly.
10     Q.  You would agree that a very large part,
11 not just volume, but a very large part of your
12 report and your opinions in this case are related
13 to the observational epidemiology on talc and
14 ovarian cancer; is that correct?
15     A.  Well, I think that epidemiology
16 literature is extremely compelling.  You have
17 30 case-control studies over different periods of
18 time in different populations that have come to
19 the same -- same ballpark relative risk, I would
20 say, 1.3 to 1.4.
21     Now, not all of those have been
22 statistically significant, but some of those
23 studies were smaller studies, and so that tends
24 to decrease the power of the study and your
25 confidence intervals will be wider.

Page 191

1      But I thought the epi data was really
2  compelling.  And often in causation, the epi data
3  sort of leads the way in paving a path to
4  figuring out causation.
5      A perfect example is tobacco.  You know, the
6  Surgeon General issued his report in the 1960s
7  about tobacco before they had any mechanism for
8  tobacco causing -- so that was a perfect example
9  of the epi data leading to causation.
10     So it's true, a lot of the studies looking
11 at talcum powder products and ovarian cancer are
12 epidemiology studies, but they're extremely
13 informative in that they are very consistent in
14 their findings.  And, again, different authors,
15 different populations, different countries.
16     And there's also the cohort.  So I went
17 through the cohort studies.  The cohort studies,
18 some of them showed an association with serous
19 invasive carcinoma, but the cohort studies didn't
20 tend to find, other than that, a statistically
21 significant increased risk, although some of them
22 did find increased risk.
23     But we can talk about cohort studies versus
24 case-control studies if you want, but I think the
25 difficulty with cohort studies is ovarian cancer

Page 192

1  is such a rare disease, and you're sort of, you
2  know, rolling the dice when you enroll patients
3  as to whether or not they're going to end up with
4  a disease at the end that you want to study.
5      So you're sort of -- and these cohorts are
6  also designed for multiple endpoints and multiple
7  diseases.  They weren't just looking, most of
8  them -- I believe the sister -- well, the sister
9  study -- anyway, we can pull it out if I have to,
10 but my point is the cohort studies are designed
11 for multiple different things, especially the
12 Nurses' Health Study.
13     And so it's a difficult type of study to
14 design with a very rare disease.  And I think
15 that's where the case-control studies are
16 important because you can start with the disease
17 and work backwards, and so you can have an easier
18 time getting cases.
19     Q.  Did you find it interesting or odd that
20 you were provided with a number of defense expert
21 reports, but not a single one of them related to
22 the epidemiology specifically from an
23 epidemiologist?
24     A.  Well, you know, again, I don't pretend
25 to know why I was sent what I was sent.  I just

Page 193

1  know that I asked for reports, and I got what I
2  got.  So I have no idea what the process was in
3  deciding what I received; if there was even a
4  decision.  For all I know, it's just what they
5  had readily available.
6      Sorry.  What is the question?
7      Q.  Well, let me ask another question.
8          MR. ROTMAN:  Let her finish the answer
9  because you can read -- she can go back and read
10 from the realtime what the question was and see
11 if she's done.
12     A.  So I guess I don't know if there was
13 thinking -- what the thinking was or if there was
14 any.  But also I can say that the epi data -- I
15 knew that by that point that the epi data was
16 consistent by the time I -- I think that was the
17 first literature that I was looking at, and so I
18 knew that it was consistent.
19     So it's -- anyway, I don't really -- I don't
20 know is the answer, the short answer.
21     The long answer, the short answer is I don't
22 know why I got what I did.  I just did.
23     Q.  Okay.  And you've seen the designations
24 in this case from November of 2017 in which you
25 were listed formally and publicly as an expert

Sarah L. Kane, M.D.

Page 194

1 for the MDL?  Have you seen that document?
2    A.  I'm not sure that I have, actually.
3    Q.  Were you aware that in November of
4 2017, you were listed on a court document as an
5 expert for the plaintiffs in the MDL litigation?
6        MR. ROTMAN:  Objection.
7    A.  I don't know the timing or I don't
8 think I saw the document, so I...
9        ("The Plaintiffs' Steering
10       Committee's Initial Designation and
11       Disclosure of Non-case Specific Expert
12       Witnesses" marked Exhibit 18.)
13 BY MS. AHERN:
14    Q.  Okay.  I'm marking Exhibit 18 to your
15 deposition.  Do you see this document,
16 Exhibit 18, is entitled "Plaintiff Steering
17 Committee's Initial Designation and Disclosure of
18 Non-case Specific Expert Witnesses"?
19    A.  Okay.
20    Q.  And if you turn to -- first of all,
21 let's see.  Unfortunately, I can't find the date
22 on that, and I apologize.
23        MR. TISI:  It's January, if I'm not
24 mistaken.  I think it was mid-January of 2017.
25        MS. AHERN:  Is that what it is?

Page 195

1        MR. TISI:  Yeah.  And, Counsel, since I
2 was involved in this process, if you don't mind
3 if I place an objection here.
4        MS. AHERN:  Sure.
5        MR. TISI:  As you may not know, during
6 the status conference where this was ordered -- I
7 don't have the transcript in front of me -- it
8 was intended to be an interim -- I don't know
9 what the questions are going to be, but it was
10 intended to be an interim disclosure to help
11 guide the legal process for identifying issues
12 that would be involved in Judge Wolfson looking
13 at the science.
14        It was never -- I don't know -- again,
15 not knowing what your questions are, I don't even
16 think it would be intended to be used as an
17 expert -- as an exhibit in a deposition.
18        But, you know, whatever your questions
19 are, we would like to reserve that because --
20        MS. AHERN:  Sure.
21        MR. TISI:  -- this was intended to be
22 a -- more of an informative document than
23 anything else.
24        MS. AHERN:  Okay.  Your objection is
25 noted.

Page 196

1        MR. TISI:  That's fine.
2        MS. AHERN:  Absolutely.
3        I have the date as November 6, 2017.
4        MR. TISI:  You are exactly -- well, it
5 is what it is.
6        MS. AHERN:  Okay.  Either way.
7 BY MS. AHERN:
8    Q.  Okay.  Doctor, if you turn to -- if you
9 turn to Page 8, the bottom of Page 8, do you see
10 your name?
11    A.  Yes.
12    Q.  Okay.  And did you -- go ahead and
13 review the text here associated with your name
14 and designation.
15        (Witness complies.)
16    Q.  Just let me know when you're finished.
17    A.  I'm finished reading my blurb.  I'm
18 just looking...
19    Q.  Sure.
20    A.  Okay.
21    Q.  Were you aware in November of 2017 that
22 you had been publicly disclosed as an expert on
23 behalf of plaintiffs in the MDL?
24        MR. TISI:  Okay.  That's -- and you do
25 kind of need to know the context in which this

Page 197

1 was done.
2        MS. AHERN:  I'm just asking if she was
3 aware she was publicly -- she was already
4 retained at that point.
5        MR. TISI:  She was retained, but there
6 was no -- the judge was very clear when she
7 ordered that this be done.  She understood that
8 this was not a disclosure of experts.
9        So when you ask the question "You
10 understand you were being identified as an expert
11 at that time," she would have no way of knowing
12 that because we didn't know it.
13        MR. KLATT:  Chris, you've got to limit
14 your objection.
15        MR. TISI:  No.  But it's unfair
16 because --
17        MR. KLATT:  You're coaching the
18 witness.  You're telling her the whole story.
19        MR. TISI:  It's a true story.  Why
20 don't we ask her to leave, and we'll put it on
21 the record.  I have no problem with that.
22        MR. KLATT:  All right.
23        MR. TISI:  We can ask her to leave, and
24 we can put it on the record.
25        MR. KLATT:  Let's do that.

Sarah L. Kane, M.D.

Page 198

1    MR. ROTMAN:  Go get a cookie.
2    MS. AHERN:  Sorry, doctor.
3       (Witness exited)
4    MS. AHERN:  My questions on this are
5 fairly limited to the time period that she was
6 retained, time period she was intending to be an
7 expert, that sort of thing --
8    MR. TISI:  Yeah.
9    MS. AHERN:  -- and the subject matter
10 that she is being designated for.
11    MR. TISI:  Yeah.  But, you see, the
12 issue in the case -- and the reason why this was
13 a tricky issue for the judge and -- well, I won't
14 speak for the judge, but for us when we disclosed
15 this was because we didn't know -- we didn't have
16 expert reports.  We didn't even have opinions
17 yet.
18    So this was being done in a way that
19 said, "Okay, Judge, she wants to know, A, are
20 there new and different witnesses that were going
21 to be designated that were different than what
22 was designated in the state court?"
23    MS. AHERN:  I do recall this, yes.
24    MR. TISI:  The second issue, she was
25 very clear that she understood that there was a

Page 199

1 lot of discovery that needed to be done,
2 documents to be reviewed, science that was going
3 to come out.  So she was pretty clear that this
4 was more informative than anything else.
5    And so when you ask her a question
6 about -- when you ask her questions, "You know
7 when this document was disclosed when you were
8 identified as an expert," you know, it implies
9 that she had agreed to be -- you know, what her
10 opinions actually were at that time.
11    She -- I can tell you that these
12 reports were done over a period of time.  So it's
13 misleading, and it really is an unfair thing to
14 do to a witness because this was a court request
15 having nothing to do with her opinions or her
16 expert report.
17    MS. AHERN:  Okay.
18    MR. TISI:  Do you understand where I'm
19 coming from?
20    MS. AHERN:  I understand where you're
21 coming from.
22    Here is my question to you:  Did Dr. --
23 was Dr. Kane not aware that you were going to
24 designate her or that you had at least publicly
25 disclosed her to the Court?

Page 200

1    MR. TISI:  She was probably not, I
2 mean, what she was aware of when she had been
3 retained.
4    MS. AHERN:  Did she agree to be
5 disclosed as an expert?
6    MR. TISI:  She agreed to be retained.
7 She was disclosed as an expert when she reached
8 her conclusions in the case.
9    And so what the Court was requiring us
10 to do was to give us a broad brush, and she was
11 very clear.  I remember standing in court, and
12 she said, "Look, some of these may fall off your
13 list.  Some of these may -- we may have maybe
14 that might be added, but I want a snapshot in
15 time as to what I'm dealing with in terms of" --
16    MR. KLATT:  We don't need to waste time
17 on the record on this.
18    MR. TISI:  We can go off the record if
19 you want.  I just don't want to be -- use this as
20 an unfair -- you know, none of your questions
21 have been unfair up until now.
22    But to take this document and to
23 suggest in some fashion -- and I don't know what
24 you're going to do with it.  Maybe we just need
25 to wait and see.

Page 201

1    But I think this is -- I don't think
2 anyone ever intended that this document would be
3 used as an exhibit in a deposition of one of
4 these witnesses.  I don't think the court
5 intended that to be the case, just like she --
6 when she ordered the Tardek report --
7 informational only.
8    MR. KLATT:  Are we off the record?
9 We're just going on here.  Let's go off the
10 record.
11    MR. TISI:  Yeah.
12    THE VIDEOGRAPHER:  Off the record,
13 2:38 p.m.
14       (A recess was taken.)
15    THE VIDEOGRAPHER:  Back on the record,
16 2:42 p.m.
17       (Witness returns)
18 BY MS. AHERN:
19    Q.  Okay.  Doctor, I've just shown you a
20 copy of some early designations that were
21 submitted in the talc MDL, and you saw your name
22 listed as one of the people who was being
23 considered as an expert; correct?
24    A.  My name is in this document.  Yes.
25    Q.  Okay.  Is there any -- do you have any

Page 202

1  issues with the description of the testimony that
2  you were going to offer to give?
3      A.  I believe that to be accurate.
4      Q.  Okay.  And you had been working on your
5  report at this point since May of 2017; correct?
6      A.  I started in May.  "Writing the report"
7  is a very loose description.  What I was -- what
8  I started, as I mentioned before, was I started
9  to review literature.  I sort of took notes.  So
10 I sort of counted that as writing.  So I started
11 that process in May.
12      Q.  Okay.  And the only thing I was going
13 to ask you about in this report is, as you look
14 through it, do you note that there are a number
15 of professional epidemiologists that have been
16 listed in this report on behalf of plaintiffs?
17      A.  I'd have to go through the list.  I
18 actually, even though I did have access to
19 several final reports, after I had submitted my
20 report, I don't remember who was what specialty,
21 what field, for the majority of them.
22      Q.  Well, how about this question:  Of the
23 experts -- are you aware of which experts have
24 submitted reports on behalf of the plaintiffs?
25      A.  I would need to look at the list that I

Page 203

1  reviewed, which I think is all of the ones that
2  were submitted, and compare it to this list.
3      I mean, I know Jack Siemiatycki is an
4  epidemiologist, off the top of my head.
5  Dr. Singh, I believe, is an epidemiologist.
6      But without going through the list and sort
7  of jogging my memory as to the reports, I skimmed
8  a lot of these reports.
9      Q.  Okay.  And I guess the point is:  Are
10 you aware, as we sit here today, that the
11 plaintiffs have designated a number of
12 epidemiologists in this MDL litigation who have
13 given reports and/or testimony at this point on
14 the topic of epidemiology, talc and ovarian
15 cancer?
16      A.  I am aware that they have
17 epidemiologists that have submitted reports for
18 this MDL.
19      Q.  Okay.  And specifically, if you can
20 think back to your initial contact with
21 plaintiffs' counsel when you were asked to get
22 involved in the litigation, what specifically
23 were you asked to do, or what was your
24 understanding of what your role would be?
25      A.  Yeah.  My understanding was they had

Page 204

1  asked me if I would be willing to do an extensive
2  review of the literature and decide what my
3  opinion would be on talcum powder products
4  causing ovarian cancer.
5      Q.  Did you ask them or discuss with them
6  what your role would be in terms of your specific
7  area of expertise in anatomic pathology?
8      A.  I did not specifically talk to them
9  about that because I know that I'm a gynecologic
10 pathologist, so I thought that would be my area
11 where I weigh in on my opinion.
12      Q.  And where in your report specifically
13 do you address your expertise in gynecologic
14 pathology, anatomic pathology?
15      A.  I list it in the beginning of my
16 report, I think.  I talk about -- I talk about my
17 background.
18      Is that what you mean?
19      Q.  I mean more in terms of the opinions
20 that you're giving being informed by your
21 expertise in anatomic pathology.
22      A.  Well, again, I'm an expert in
23 gynecologic pathology, and the question is about
24 a causation of ovarian cancer, so certainly that
25 falls into my area of expertise.

Page 205

1      Q.  And do you specifically address in
2  terms of anatomic pathology or ovarian cancer
3  pathogenesis the question of talc and ovarian
4  cancer?
5      A.  I think that goes to the plausibility,
6  the mechanisms, as part of it.
7      Q.  And which particular mechanisms are
8  informed by the discipline of anatomic pathology
9  and gynecologic pathology?
10      A.  Well, I think pathologists, anatomical
11 and clinical pathologists, have training in
12 inflammation and immunology and certainly
13 epidemiology, looking at epidemiologic studies.
14 I think all of it is within the realm of
15 gynecologic pathology.
16      Q.  Did you discuss anywhere specifically
17 in your report the biology of foreign body
18 reactions and granulomas as a part of the
19 biologic plausibility for exposure?
20      A.  Let me refer to my report.  I
21 definitely talk about inflammation.  I can do a
22 word search for granulomas, if you would like.
23      Q.  Do you talk about inflammation --
24      MR. ROTMAN:  Would you like --
25      Q.  -- in the context of anatomic

Sarah F. Kane, M.D.

1 pathology?

2      MR. ROTMAN:  Would you like to do that?

3 Because I can get your report up electronically.

4      MS. AHERN:  I know where she's

5 mentioned granulomas.  I already know.  I'm just

6 asking her if she knows.

7      MR. ROTMAN:  So she wants to find it

8 quickly.

9      MS. AHERN:  You can give her your

10 computer and let her search.

11      MR. ROTMAN:  Okay.  That's what I was

12 asking.

13 BY MS. AHERN:

14   Q.  Do you cite any publications describing

15 the biology of granulomas?

16   A.  I know some of the literature talks

17 about granulomatous inflammation, discusses

18 granulomatous inflammation.

19      MR. ROTMAN:  If you want to search, do

20 you know how to do it on this computer?  Edit,

21 Find, then you can type in a word that you want

22 to search.

23      MR. KLATT:  Is there a question?

24   A.  So I mention it in the animal studies,

25 injecting talc into the pleural spaces causes

1 granulomatous response.  It looks like those are

2 the two.

3      And then I cite the Mostafa 1985 paper,

4 "Foreign body granulomas in normal ovaries."

5 I'm double-checking.  It looks like in doing

6 a word search for granuloma, that's what is

7 popping up.

8 BY MS. AHERN:

9   Q.  Okay.  Are there any other portions of

10 your report that directly address ovarian cancer

11 pathogenesis from a pathology standpoint?

12      MR. ROTMAN:  Objection.

13   A.  This might be attorney work product

14 draft stuff.

15      MR. ROTMAN:  Do you want to talk to me

16 outside where I can understand what you're

17 getting at?

18      THE WITNESS:  Sure.  Sure.

19      THE VIDEOGRAPHER:  Off the record,

20 2:50 p.m.

21      (A recess was taken.)

22      THE VIDEOGRAPHER:  Back on the record,

23 2:54 p.m.

24 BY MS. AHERN:

25   Q.  Okay.  Doctor, I had asked: "Are there

1 any other portions of your report that directly

2 address ovarian cancer pathogenesis from a

3 pathology standpoint," and --

4   A.  So my answer is I did the work, but I

5 can't discuss it because of attorney work product

6 issues.

7   Q.  Okay.

8      MR. ROTMAN:  You can -- she can -- you

9 can ask her questions about it.

10      MS. AHERN:  Sure.

11      MR. ROTMAN:  But she's -- as to what is

12 in the report or not in the report, that's the

13 work product piece.

14      MS. AHERN:  That's kind of all the

15 questions.

16      MR. ROTMAN:  Ask her about the science.

17      MS. AHERN:  I'll ask, and you can

18 object.

19      MR. KLATT:  Find out what is in or is

20 not in the report.

21      MS. AHERN:  Let's pick up the

22 foundation here.

23 BY MS. AHERN:

24   Q.  Doctor, first of all, you said you did

25 the work relating to ovarian cancer pathogenesis

1 from a pathology standpoint; correct?

2   A.  Yes.

3   Q.  Was it ever in your report?

4      MR. ROTMAN:  That's part of the work

5 product objection.

6      MR. KLATT:  We've got to establish the

7 facts to know whether there's a basis to assert

8 the objection.

9      MR. ROTMAN:  You can ask the question.

10 But in order to answer the question, you're

11 invading the domain of what is protected under

12 the Federal Rules in terms of the drafting of

13 expert reports.

14      I will object and instruct her not to

15 answer.

16      What's in the report, you have.  What

17 was in drafts of the report, you're not entitled

18 to.

19      So that's the problem we have.

20      MR. KLATT:  She's not asking what was

21 in the report.  She's asking whether it was or

22 isn't.  So we can establish if there's anything

23 to even have a dispute about.

24      MR. ROTMAN:  You can ask her about what

25 is in the report all you want.

1    MS. AHERN:  Well, she's already said
2 there was a section on ovarian cancer
3 pathogenesis from a pathology standpoint in the
4 report, and it was removed; correct?
5    MR. TISI:  That's not what she
6 testified.
7    MS. AHERN:  Read back.
8    MR. TISI:  Why don't we read what she
9 said because she said the answer is:
10    "ANSWER:  I did the work, but I can't
11 discuss it because of attorney work product."
12    MS. AHERN:  Okay.  Okay.
13    MR. TISI:  She never said it was in the
14 report.
15    MS. AHERN:  Thank you.
16    MR. TISI:  Line 48.
17 BY MS. AHERN:
18    Q.  When you say you "did the work," did
19 you take any notes on any reading that you did on
20 ovarian cancer pathogenesis?
21    A.  So in writing this report, I generally
22 did not take any notes, handwritten notes.  It
23 was sort of a living document that I used.
24    Q.  Now, earlier, you referred several
25 times to taking notes as you were going through

1 literature.
2    Are all those notes something that became --
3 on a single document that ultimately became a
4 report?
5    A.  It was one document that went through
6 numerous, numerous editing on my part and, of
7 course, suggestions from attorneys at different
8 points.
9    Q.  Now, as an anatomic pathologist and as
10 the only pathologist that has been designated by
11 the plaintiffs in this MDL, did you think that it
12 was important to opine on the pathogenesis of
13 ovarian cancer from an anatomic pathology
14 standpoint?
15    MR. ROTMAN:  Objection.  For what
16 purpose?
17    MS. AHERN:  I'm asking her.
18    Q.  Can you answer the question?
19    A.  First of all, I wasn't aware I was the
20 only pathologist because I didn't have a list of
21 their named experts.
22    I did work on -- I'm not sure how much I can
23 really talk about the whole draft process.
24    MR. ROTMAN:  You can't --
25    Q.  So my question was:  As an anatomic --

1 let me rephrase it.
2    As a gynecologic pathologist who was asked
3 to opine on ovarian cancer and talc, did you
4 assume that part of your opinions would be to
5 incorporate your expertise in anatomic pathology
6 and gynecologic pathology?
7    MR. ROTMAN:  Wait.  Wait.  Wait.  Wait.
8 Wait.
9    MS. AHERN:  I'm only concerned if she
10 understands the question.
11 BY MS. AHERN:
12    Q.  Do you understand the question?
13    MR. ROTMAN:  No.  You have to let me
14 see if I understand the question to see if I'm
15 going to object to it before she's allowed to
16 answer.
17    MS. AHERN:  Why don't you make an
18 objection, and we'll move on.
19    MR. TISI:  Because he may instruct her
20 not to answer the question.
21    MS. AHERN:  This is not -- this is not
22 a question that should invade your privilege.
23    MR. TISI:  It involves the discussion
24 between counsel and in the drafting of the
25 reports, what would be in, what would be out,

1 what she thought, what she didn't think.  You're
2 not entitled to any of that.
3    MR. ROTMAN:  So if you can find the
4 question, read the question, and I will object to
5 the question, but you can answer it.
6    A.  Okay.  So you want me to reread the
7 question?
8    MR. ROTMAN:  To yourself.
9    So my question was -- do you see that?
10    THE WITNESS:  Yeah.
11    A.  Well, I feel as if I did that in my
12 final report.  I certainly -- the -- my opinions
13 that are in my final report are certainly within
14 the realm of gynecologic pathology.
15    Q.  And can you specifically point to the
16 opinions and the discussions in your report that
17 are within your personal expertise in gynecologic
18 pathology?
19    A.  So, again, review of epidemiology is
20 something that physicians do on a regular basis.
21 We're trained to look at epi data.  We're trained
22 to practice evidence-based medicine, which has a
23 very similar, if not identical, methodology.
24    So -- and we certainly are trained in
25 inflammation, the immune system, talc and

Sarah E. Kane, M.D.

| Page 214 |
|---|

1  tissue -- I have a section on talc and tissue --
2  the epi data.
3      Not -- I don't think any of this report is
4  outside of my -- I know that none of this is
5  outside of my expertise as a gynecologic
6  pathologist.
7      Q.  Okay.  Doctor, were you retained as an
8  expert epidemiologist in this case?
9      A.  I was retained as a gynecologic
10  pathologist.
11      Q.  And you are not an epidemiologist;
12  correct?
13      A.  I'm not a epidemiologist, but we
14  certainly review epidemiology and critique
15  epidemiology studies on a regular basis in our
16  daily practice.
17      Q.  When people ask you what you do for a
18  living, you don't tell them you're an
19  epidemiologist, do you?
20      A.  I often have to explain what a
21  pathologist is, so I spend half the time just
22  trying to describe what a pathologist is, so...
23          MR. KLATT:  Objection.  Nonresponsive.
24          MS. AHERN:  Yeah.
25          MR. ROTMAN:  She's not done answering

| Page 215 |
|---|

1  your question.  She's in the middle of an answer.
2      A.  So my point is I'm unlikely to describe
3  myself as an epidemiologist when I'm trying to
4  describe what a pathologist does, but that's the
5  big picture.
6      But the real picture is, on a daily basis,
7  we are evaluating epidemiologic data in the
8  literature.
9  BY MS. AHERN:
10      Q.  When was the last time you did a
11  systematic review of the literature for the
12  purpose of opining on causation?
13      A.  So we review literature --
14      Q.  You.  I'm just talking about you.
15      A.  Hold on one second.  Let me just review
16  the question.  I'm way behind here on my --
17      Well, I do literature searches all the time
18  and looking -- when I'm looking at cases to
19  figure out causation.
20      I've been involved in one other legal case,
21  but it is -- this was the first medical-legal
22  general causation report.
23      But, again, this is all the same methodology
24  that we use in evidence-based medicine and our
25  practice.

| Page 216 |
|---|

1      Q.  You do a full systematic review of the
2  literature, as that term is defined
3  epidemiologically?
4      A.  We certainly do when we're doing
5  research, when we're writing papers, but we still
6  do literature searches when we're assigning out
7  cases that are relevant to individual patients.
8      Q.  When was the last time you conducted a
9  full systematic review of the literature and a
10  Bradford Hill analysis to opine on causation?
11      A.  So, again, this is not something that's
12  completely foreign to me.  The legal aspect of it
13  is new to me, but this methodology is not new to
14  me.
15      The last time -- I mean, there was a tobacco
16  case that I worked on, but in my daily practice,
17  again, I'm still looking at epidemiology
18  literature all the time.
19      Q.  Well, there is a difference, Doctor,
20  wouldn't you agree, between looking at the
21  epidemiology to inform yourself about a
22  particular issue and doing a systematic review of
23  the literature and a full Bradford Hill analysis
24  to opine on causation?  Is there a difference?
25      A.  Well, this was a deep dive, so I'll say

| Page 217 |
|---|

1  I was aware of the literature on talcum powder
2  and ovarian cancer before I became involved in
3  this litigation.
4      I will say, you know, it wasn't until they
5  asked me to form my opinion on this that I did a
6  deep dive on the literature again on this
7  particular issue.
8      Again, I've certainly done extensive
9  literature reviews before to, you know -- in
10  research and in practice.
11      Q.  But nothing like this?
12      A.  It's very similar.
13          MR. ROTMAN:  Objection.
14      A.  The methodology is very similar to
15  this.  It's identical.
16      Q.  Doctor, can you point me to -- take a
17  look at Exhibit 2, your CV.
18      Can you point me to something in your CV
19  that demonstrates some specialized knowledge or
20  expertise in epidemiology?  A course, a class
21  you've taught?  A paper that you've published?  A
22  case-control study you've been involved in?
23  Anything that would indicate that you have
24  specialized expertise in epidemiology?
25      A.  It's part of our medical training as

Page 218

1 part of evidence-based medicine.
2     I'm trying to find my CV. I'm not sure I
3 have it in front of me. Maybe it's under here.
4 Well, you're sitting in -- I mean, all of these
5 involved epidemiology research.
6         MR. ROTMAN: All of what?
7     A. I'm sorry. All of these research
8 projects start with -- the pathology publications
9 start with looking at the literature of
10 epidemiology.
11    Q. Which ones are you pointing to --
12 sorry. Let's look at the peer-reviewed
13 publications.
14    Is that what you're talking about?
15    A. Yes. Sorry.
16    Q. So the first publication is Narasimhan,
17 "Temperature Induced Interstrand Crosslinks in
18 Cisplatin-DNA Adducts Detected by Electrophoresis
19 and UV Spectrophotometer."
20    That's not an epi study, is it?
21    A. Some of these were biology. The one
22 that comes to mind when I'm looking at this list
23 is the "Yersinia pestis and the plague." That
24 was a review article. That was around -- that
25 was after the 2001 mailings of the pattern

Page 219

1 substance. And so the literature was very
2 interested in Yersinia pestis at the time, and so
3 I did a review article on that.
4    Q. Was that a systematic review and a
5 Bradford Hill analysis?
6    A. The Bradford Hill analysis is part of
7 evidence-based medicine when you're coming to a
8 conclusion. So --
9    Q. This isn't a case-control study or a
10 prospective cohort study --
11         MR. ROTMAN: You're not allowing her to
12 finish her answer.
13    Q. -- or epidemiology study, is it?
14    A. But my general causation opinion is
15 very similar to a review article on causation.
16 It's a review of the epi data and mechanisms.
17    Q. Did you do a full review of the epi
18 data and mechanisms on Yersinian plague?
19    It's kind of a done deal; right? We already
20 know that; isn't that right?
21    A. Well, you're still looking at -- you're
22 still looking at data. The question is -- the
23 question was at the time: Can Yersinia pestis be
24 a dangerous weapon of destruction or
25 terrorist-type agent?

Page 220

1    So that was sort of more the review on that.
2    Q. Who is S.M. Rollins?
3    A. That's my ex-husband.
4    Q. What is his specialty?
5    A. He's a microbiologist.
6    Q. What about Ryan?
7    A. He is an infectious disease physician.
8    Q. Okay. What portion of "Yersinia pestis
9 and the plague" did you draft or did you
10 contribute?
11    A. I drafted the entire -- I was the lead
12 author, and I -- the primary author, and I
13 drafted that report.
14    Q. Okay. So if we go in there, we're
15 going to find you used statistical methods or
16 analysis in any way to weigh the evidence and
17 conduct a systematic review?
18    A. It's definitely a review article. Off
19 the top of my head, I don't know if I did a
20 statistical analysis, but...
21    Q. Would you describe it as more of a
22 narrative review of the literature?
23    A. A review of the literature. I don't
24 know about the word "narrative," but review.
25    Q. What about the Grundy paper,

Page 221

1 "Specificity of tRNA-mRNA Interactions in
2 Bacillus substilis tyrS Antitermination"?
3    Is that an epi study?
4    A. No.
5    Q. What about the Rollins paper,
6 "Diagnostic yield of muscle biopsy in patients
7 with clinical evidence of mitochondrial
8 cytopathy"?
9    Is that an epidemiologic article?
10    A. No. That's not an epidemiology
11 article, but we --
12    Q. Sorry?
13    A. It's getting late in the day.
14         MR. TISI: Do you need some water?
15         THE WITNESS: Sure.
16    A. But it's interesting that it actually
17 did involve electron microscopy. And when we do
18 muscle biopsies for mitochondrial cytopathy, we
19 use electron microscopy anyway, regularly.
20         MR. KLATT: Objection. Nonresponsive.
21    Q. And what about the Rollins
22 "Autoimplants and serous borderline tumors of the
23 ovary: A clinicopathologic study of 30 cases and
24 a process to be distinguished from serous
25 adenocarcinoma"?

Sarah E. Kane, M.D.

Page 222

1  Was that a systematic review of the
2  literature, or an epidemiologic study?
3      A.  There's definitely review of literature
4  as part of that study because the question arises
5  with autoimplants, sometimes they're misdiagnosed
6  as invasive serous.
7      So there is definitely literature review for
8  that study.
9      Q.  This would be described as you have it
10 in the title, this is a clinicopathologic study?
11     A.  Correct.
12     Q.  So you were looking at this as a
13 pathologist; correct?
14     A.  Well, I'm looking at -- I mean, some of
15 these were before I was -- the first couple are
16 before I was an M.D., but all of the subsequent
17 ones I'm looking at as a pathologist.
18     Q.  What about the Chan study,
19 "Clinicopathologic Correlation of Fetal Vessel
20 Thrombosis in Mono- and Dichorionic Twin
21 Placentas"?
22     Is that an epidemiologic study?
23     A.  That's a clinicopathologic correlation.
24     Q.  And then the publication with Jonathan
25 Hecht, "Endometrial Interepithelial Neoplasia,"

Page 223

1  is that an epidemiology study?
2      A.  That was a review of a new terminology
3  in endometrial precursor lesions.  So that was a
4  pathologic -- an anatomic pathology article.
5      Q.  And then you have the one with Haspel,
6  which is "Successful Implementation of a
7  Longitudinal, Integrated Pathology Curriculum
8  During the Third Year of Medical School"?
9      A.  That was a medical-education-type
10 article.
11     Q.  Okay.  And do you have any proceedings
12 of meetings, poster presentations, that were from
13 a case-control or a cohort study that you
14 conducted?
15     A.  Let me look.  I don't believe these
16 poster presentations were case -- well, I mean,
17 case-control or cohort epi-type studies.
18     Q.  Okay.  And, Doctor, to be fair, you
19 don't have a degree in epidemiology; correct?
20     A.  I do not have a degree.  But, again,
21 it's -- epidemiology is a very big part of
22 evidence-based medicine and what we practice as
23 M.D.s.
24     MR. KLATT:  Objection.  Nonresponsive.
25     Q.  And, Doctor, you understand that there

Page 224

1  are degreed epidemiologists who have been
2  designated on behalf of plaintiffs to look at
3  these issues; correct?
4      A.  I'm aware of that now.  I didn't know
5  who their list was before I submitted my report.
6      Q.  You've never published -- as we just
7  looked through here -- an epidemiologic study, a
8  case-control study, or a cohort study?
9      A.  I have not published; but, again, that
10 doesn't -- I mean, it doesn't mean I haven't done
11 them.  It's just that --
12     Q.  Have you done them?
13     A.  They haven't been published.  Well,
14 again, literature reviews of epidemiology is part
15 of our regular practice.
16     Q.  I'm asking about, like, actual study
17 designs.
18     Have you conducted a case-control or a
19 cohort study?
20     A.  Not of an epi- --
21     Q.  Okay.
22     A.  -- specific design.
23     Q.  Have you ever taught an epidemiology
24 course?
25     A.  No.

Page 225

1      Q.  Do you have any grant funding to
2  conduct epidemiologic observational studies?
3      A.  No.
4      Q.  Have you ever given any lectures or
5  presentations specifically on epidemiology
6  methodologies?
7      A.  That's possible.  I'm trying to think.
8  It's been a long time.  Medical school through
9  residency, fellowship, not that I can think of
10 off the top of my head.
11     Q.  Okay.  And have you ever designed a
12 clinical trial?
13     A.  I have not designed a clinical trial.
14     Q.  Have you designed a case-control study?
15     A.  I have not designed a case-control
16 study.
17     Q.  Have you designed a cohort study?
18     A.  I have not designed a cohort study;
19 but, again, these are -- we can critically
20 evaluate.  Just because I haven't designed one
21 doesn't mean I can't critically evaluate
22 case-control studies or cohort studies.
23     Q.  Doctor, you haven't conducted a
24 meta-analysis or a pooled analysis to evaluate
25 potential risk factors for any disease, have you?

Sarah E. Kane, M.D.

Page 226

1    A.   No, I haven't.
2    Q.   Are you qualified to conduct a
3 meta-analysis or a pooled analysis?
4    A.   I'm -- I'm sure I could develop one.
5    Q.   As we sit here today, are you qualified
6 to conduct a meta-analysis or a pooled analysis?
7    A.   If it was sort of a joint venture, I'm
8 sure; but, again, that doesn't mean that I can't
9 critically evaluate them, because that's what I
10 do on a daily basis.
11    Q.   Have you authored any paper or
12 conducted a study -- well, have you authored any
13 paper on the methods of causal interpretation?
14    A.   Have I authored a paper on the methods
15 of causal interpretation?
16    I don't believe I've authored.  It would be
17 on my list.
18    Q.   Okay.  Doctor, I should have asked you
19 this when it was in front of you:  Do you have a
20 copy of that one-page additional materials?
21    A.   Probably.  Let's see.
22    Q.   Thank you.  Maybe I have.  Maybe I have
23 it too.
24    A.   Exhibit 17?
25    Q.   Yes.  Yes.

Page 227

1    You received a copy of the Longo
2 supplemental report; correct?
3    A.   I did.  Yes.
4    Q.   And it's, what, 404 pages?
5    A.   That's possible.  I don't think I
6 looked.
7    Q.   That was my next question:  Did you
8 review it?
9    A.   I did review it.  I did skim a lot of
10 it because, again, it was additional information
11 that was nice to have, but it was after my
12 report.
13    And, again, my general causation opinion is
14 not dependent on asbestos being in the product.
15 My general causation opinion is based on whatever
16 is in the bottle.  So it was interesting
17 information to have.
18    Q.   So your opinions here, it doesn't
19 matter for your opinions whether or not there's
20 asbestos in talcum powder products; is that your
21 testimony?
22    A.   What I'm saying is my opinion is based
23 on whatever is in the talcum powder product's
24 bottle.  Now, it's up to the jury to decide if
25 there's asbestos in it.  However, if there is

Page 228

1 asbestos in it, that would certainly add to the
2 plausibility of causation.
3    Q.   If there was not asbestos in talcum
4 powder products and there was not fragrance in
5 talcum powder products and you were just left
6 with the pharmaceutical-grade talc, what would
7 your biologic plausibility argument be?
8    MR. ROTMAN:  Objection.
9    Q.   In other words, what is your mechanism
10 by which pharmaceutical-grade talc would cause
11 ovarian cancer?
12    MR. ROTMAN:  Objection.  Are you asking
13 about causation or about biological plausibility?
14    MS. AHERN:  I'm asking --
15    MR. ROTMAN:  You mixed them.
16    MS. AHERN:  -- about her mechanism.
17 BY MS. AHERN:
18    Q.   What is your mechanism by which
19 pharmaceutical-grade talc would cause ovarian
20 cancer?
21    A.   So there are -- again, most of the
22 studies are dealing with talc powder products.
23 If we were to say that all that was in there is
24 pharmaceutical -- it's completely hypothetical
25 because I don't know what's in there -- I still

Page 229

1 think the mechanisms would be similar where, you
2 know, there's evidence that talc can cause
3 inflammation, and we know that inflammation is a
4 cause of cancer.
5    And so I -- and there's also, you know,
6 Dr. Cramer talked about anti-MUC-1 antibodies, so
7 there's an immune -- plausible immune mechanism,
8 so I think all of those are still on the table
9 and the hypothetical situation that it's only
10 pharmaceutical-grade talc in that bottle.
11    But, again, I -- I'm not opining about what
12 is in the bottle; I'm just opining about that --
13 whatever that product is in that bottle causing
14 ovarian cancer.
15    Q.   Okay.  Let's take a look at your expert
16 report again, Exhibit 14, if you will.
17    Just let me know when you've got it.
18    A.   Yeah.
19    Q.   Okay.  Doctor, does Exhibit 14, your
20 November 15, 2018, expert report, contain all of
21 the opinions that you intend to offer as a
22 witness in this matter?
23    A.   I wouldn't box myself in that way.
24 There might be questions that I'm asked here
25 today or in trial that aren't necessarily in my

Sarah R. Kane, M.D.

Page 230

1 report.
2    Q.  Okay.  But the opinions that you intend
3 to offer, absent somebody asking you to offer
4 other opinions, are all outlined and other
5 opinions within Exhibit 14, your report; is that correct?
6    A.  Again, I wouldn't want to say "all."  I
7 wouldn't want to limit myself.  There's always
8 the possibility that something else will come up,
9 and I even have a thing that additional
10 information may come up.
11    Q.  Okay.  As we sit here today, do you
12 understand that this is our opportunity to ask
13 you about the opinions in your report, and we
14 have the day to do it?
15    Do you understand that?
16    A.  I understand.
17    Q.  Okay.  So to the extent that you think
18 you're going to offer additional opinions or
19 different opinions, we need to know that today.
20    I understand that if something comes up two
21 weeks from now and it's additional information,
22 you might supplement your report.
23    But as of today, as we sit here today, is
24 this report an accurate reflection of the
25 opinions that you have formed and that you intend

Page 231

1 to offer in this case?
2    A.  I would say it's an accurate reflection
3 of the opinions I have formed with the exception
4 of anything that might be asked that is not in
5 the report; but yes.
6    Q.  All right.  All right.
7    And as we sit here today, is your report
8 complete?
9    A.  Well, it's signed and turned in, so --
10    Q.  Do you, as the expert designated in
11 this case, Sarah Kane, do you consider your
12 report to be complete as we sit here today?
13    A.  Yes.
14    MR. ROTMAN:  Off the record.
15    (Discussion off the record.)
16    THE VIDEOGRAPHER:  Off the record,
17 3:24 p.m.
18    (A recess was taken.)
19    THE VIDEOGRAPHER:  Here begins Media
20 No. 5 in today's deposition of Sarah Kane, M.D.
21 Back on the record, 3:39 p.m.
22 BY MS. AHERN:
23    Q.  Okay.  Dr. Kane, we were talking about
24 your report.  Just some basic housekeeping first.
25    We have the four boxes back here which

Page 232

1 probably have within them all the references to
2 your report.  Other than those and what you
3 brought with you today, is there anything else
4 related to your work on your report that you have
5 in your possession that you haven't been able to
6 bring with you today?
7    A.  Not that I'm aware of.  I've tried to
8 be very complete in my list of what I reviewed.
9 It's possible -- again, it's possible there are a
10 couple of things that might have been left off,
11 but I tried to be as complete as possible.
12    Q.  Okay.  And you mentioned earlier you
13 had done some work on the pathogenesis of ovarian
14 cancer.
15    Did you have any articles or publications
16 that are related to that work that are not
17 referenced in your report?
18    A.  I believe they should be in the list.
19 They should be included in the list that you
20 have.
21    Q.  The one from -- your initial report?
22    A.  Taken all together.  Taken all
23 together.  So that, probably, is more -- the
24 January 4th one would probably be some of those.
25    And then I can't remember what's on that one

Page 233

1 that you just got, but if there's a couple on
2 there.
3    But I would think if they weren't cited in
4 the report, the majority of those should be in
5 the January 4th list.
6    Q.  Okay.  And those would pertain to the
7 various histologic categorizations of ovarian
8 cancer; what is known about etiology.
9    Is that kind of the gist of the information
10 that you researched?
11    A.  Yes.  Yes.  That was certainly part of
12 it.
13    Q.  And were there other parts to that?
14    THE WITNESS:  Is that -- I don't know
15 if --
16    MR. ROTMAN:  Yeah.  You can say what
17 work you did.
18    A.  There was -- so a good bit of it was
19 sort of background information on the pathologic
20 diagnosis of ovarian cancer and different, as you
21 said, different subtypes.
22    There was -- I'm trying to remember -- it
23 was so long ago -- what some of the -- I believe
24 there was a little bit more on inflammation, but
25 I can't say for sure.

1 BY MS. AHERN:
2     Q.   And would that have been just related
3 to ovarian cancer pathogenesis?
4     A.   Yes.  Yes.
5     Q.   And you think that all of the
6 publications that you found, identified, reviewed
7 in relation to that work are identified in one of
8 the lists or across several lists?
9     A.   I'm hoping that across all of the
10 lists, that encompasses the vast majority, if not
11 all.  But let's just keep it at vast majority.
12     And, of course, you know, I'm a gynecologic
13 pathologist, so I read tons of other stuff that,
14 you know, is just my background knowledge that
15 I'm not going to put on these lists.  So I can't
16 say it's all-inclusive; but, again, I tried.
17     Q.   Understood.  Understood.
18     And you've now seen at least one report from
19 Dr. Robert Kurman; correct?
20     A.   That's correct.  That was an individual
21 causation report, though.  So...
22     Q.   And he had a very large background
23 section on ovarian cancer pathogenesis; correct?
24     A.   To be honest with you, I sort of
25 skimmed it, but I do remember seeing a section on

1 that.  Yes.
2     Q.   Okay.  Did you skim the section that
3 was case-specific?
4     A.   No.  Mostly the background since I
5 already know that stuff.
6     Q.   Okay.  And is the stuff that was in his
7 background section similar to the research that
8 you did?
9     A.   I would say yes.  If I am remembering
10 accurately, it was similar.  I wouldn't say
11 identical, but similar.
12     Q.   Okay.  And did anyone other than your
13 attorneys assist you in preparing the report?
14     A.   No.
15     Q.   And you said earlier, I think, that you
16 didn't consult with any of the other experts in
17 the MDL litigation in forming your opinions or
18 preparing your report?
19     A.   That's correct.
20     Q.   And you didn't review any draft reports
21 from any other experts in this litigation?
22     A.   No.  The only time I saw their reports
23 was after we had all turned them in to the court.
24     Q.   Okay.  And are all of the words, the
25 ideas, the analysis that's contained in

1 Exhibit 14, your expert report, are they solely
2 the product of your own work?
3     A.   Yes.  I wrote the report.  Certainly,
4 again, there were drafts that went back and
5 forth.  There may have been suggestions from
6 attorneys where language was -- that I accepted
7 into my report; but yes.
8     Q.   Okay.  You didn't borrow language from
9 other experts or from other publications and then
10 not quote that in your report?
11     A.   I certainly tried not to.  No.  I
12 certainly cited anything that I -- I tried to
13 cite everything that I referenced --
14     Q.   Okay.
15     A.   -- to the best of my ability.
16     You know, again, I was taking the notes as I
17 wrote, so it's plausible there might be
18 something, but I was very cognizant of trying not
19 to -- trying to cite everything that I was
20 referencing.
21     Q.   And in reaching your opinions, was it
22 important to you that you review the data in a
23 fair and objective way?
24     A.   Yes.  I think it's always important to
25 review data in a fair and objective way.

1     Q.   I know.  It's kind of a basic question.
2     When you were doing your literature reviews
3 and searches, were you looking both for papers or
4 data that supported talc and ovarian cancer
5 connection as well as for data and literature
6 that did not or that -- well, that did not
7 support?
8     A.   When I was doing my literature search,
9 I was looking for any data that spoke to talcum
10 powder products and ovarian cancer.  I was really
11 trying to cast as wide a net as possible to get
12 as much data as I could.
13     Now, certainly, there are limitations when
14 you're doing searches.  It's possible there are
15 studies that I missed; but when I was retrieving
16 studies, reading them, I would also reference
17 their references as a sort of cross-check.  So I
18 tried to be as complete as I could.
19     Q.   So when you were reading someone else's
20 work and they referenced an article as the basis
21 for synthesis or the statement in their paper,
22 did you then go and review the underlying
23 reference as well?
24     A.   Yes.  I pulled up those references.
25     Q.   Okay.  And you reviewed those as well?

Sarah H. Kane, M.D.

1   A.  Yes.
2   Q.  Okay.  And you mentioned on Page 4 of
3  your report that your interest in talc and
4  ovarian cancer began during your training, your
5  fellowship training, at Mass General; is that
6  right?
7   A.  I became aware of it.  I mean, both
8  Dr. Scully and Dr. Bell were still there at my
9  time of training, and Dr. Scully was a coauthor
10  on Cramer's first 1982 paper.
11   And then Dr. Bell was a coauthor in one of
12  the subsequent -- I think his 1992 paper with
13  Harlow.
14   So I was certainly aware of literature on
15  talcum powder and ovarian cancer.
16   Q.  And neither one of them published
17  anything else on talc; is that correct?
18   A.  I believe those were the only two that
19  they were on.  That's correct.
20   Q.  And did you understand that the role
21  that Dr. Scully played on Cramer's first
22  publication was simply that of pathologist and
23  determining or confirming the diagnosis of the
24  samples that were being studied?
25   A.  I was aware that he did a pathologic

1  review of the case.
2   Q.  Okay.  Did you ever have an opportunity
3  to talk to Dr. Scully about talc and ovarian
4  cancer?
5   A.  I believe my conversations were -- my
6  memory is -- this is 20 years ago now -- it's
7  possible, but probably with Dr. Bell, more.  I
8  interacted more with Dr. Bell than Dr. Scully.
9   Dr. Scully was semiretired at the time.  He
10  would come in for half the day, but that was
11  usually when I was with other attendings.  But I
12  did spend a significant time with Dr. Bell, and I
13  do remember being aware of that literature.
14   Now, if you're going to ask me the specific
15  conversation, I probably can't prompt that at the
16  moment.
17   I was also, when I was at Beth Israel
18  Deaconess, my colleague Jonathan Hecht is there.
19  And I was aware he was doing work on the Nurses'
20  Health Study.
21   We didn't -- I can't remember if we really
22  talked about talc at that point because the Gates
23  2010 paper that he was doing, talc was a very
24  small -- it was almost, like, a side comment in
25  that report.  But I think we had talked about --

1  I know we talked about the Nurses' Health Study.
2   That's funny, though, I actually did talk --
3  I saw Jonathan last night, so it's kind of funny
4  timing.  But anyway...
5   Q.  Have you talked to Dr. Hecht since
6  then, since you first discussed with him the
7  Nurses' Health Study?
8   Have you spoken with him on talc and ovarian
9  cancer?
10   A.  Yes.  I saw him last night.  We went
11  out for a drink.
12   Q.  Did he give you any opinions on what he
13  thought about talc and ovarian cancer?
14   A.  He told me that he had met with defense
15  counsel at one point; did not want to do medical
16  expert witness work but did a brief sort of
17  intro, I guess, overview for the defense.
18   Q.  Did he tell you what his personal or
19  his professional opinion was on whether or not
20  talc causes ovarian cancer?
21   A.  Yes.  He thought that -- so I'll say in
22  my report, I did not spend a lot of time on
23  migration because in the gynecologic world, it's
24  widely accepted that migration happens.  He told
25  me that he specifically told the defense counsel

1  he met with not to use migration because it's
2  widely accepted that it occurs.
3   We did talk about the Nurses' Health paper.
4  He said that the data set was very small, it was
5  very difficult with classification, and that
6  that -- there just really wasn't a lot of data in
7  that 2010 study.
8   And he thinks that it is plausible for
9  talcum powder to cause ovarian cancer.
10   Q.  Have you spoken to any other
11  pathologist or colleagues about talc and ovarian
12  cancer?
13   A.  I have talked to my coworkers about it
14  because -- as a conflict-of-interest notification
15  for our group and for our hospital, Partners
16  Healthcare, and I discussed my findings with my
17  partners.
18   And I've also talked about it at
19  multidisciplinary conferences; recently at, for
20  example, at a thoracic conference.  There were
21  gyn oncs there and radiologists and rad onc
22  people there.
23   Q.  And you talked to them specifically
24  about talc and ovarian cancer?
25   A.  So I told them about my work on it and

1 the research that I had done, and I was asking
2 them -- it was a thoracic conference, so I was
3 curious if any of them had asked any of their
4 mesothelioma patients that didn't have
5 nonasbestos exposure if they've ever asked them
6 if they'd had talc exposure.
7     And they said no, they hadn't really done
8 it, they hadn't thought about it, but maybe it
9 was something that they should be asking.
10     Q.   And, by the way, what were the
11 circumstances under which you and Dr. Hecht had
12 dinner the other night?
13     A.   His birthday is coming up.  We're still
14 friends, so it was one of these -- I actually
15 stayed in a hotel last night because it took me
16 an hour and a half to drive from Topsfield
17 yesterday morning, and I didn't want to be
18 worried about traffic.  So I decided to stay in a
19 hotel last night.  His birthday is coming up, so
20 I said, "Let's just grab a drink."
21     Q.   You mentioned while you were at Mass
22 General, the fellowship director for your program
23 was Robert Young; correct?
24     A.   Yes.
25     Q.   Is he someone that you look up to as a

1 pathologist?
2     A.   Yes.  He's very well-respected.
3     Q.   By the way, who do you send second
4 opinion consults to when you have a difficult
5 case?
6     A.   We have a relationship with Mass
7 General, so I'll occasionally send -- if I need
8 another set of eyes on, I'll send it to either --
9 it's sort of their gyn pathology group in
10 general, so it might be Dr. Young.  It might be
11 Esther Oliva.  Those are the two that I would say
12 most frequently would receive any consults from
13 our group for gyn path.
14     Q.   Have you ever spoken with Dr. Young
15 about talc and ovarian cancer?
16     A.   It's possible.  I haven't recently.  He
17 and I aren't in regular communication, so I
18 certainly wouldn't have talked to him -- I don't
19 know if I've talked to him since starting this.
20     It's more of a professional-type
21 relationship, so I don't know if it would have
22 come up recently.  But it's possible in training,
23 but I don't remember specifically.
24     Q.   And Robin Young inherited all of
25 Dr. Scully's case files in his office when

1 Dr. Scully retired; is that right?
2     A.   Yes.  He inherited his consult service.
3 So it's a separate service from our regular
4 clinical work.  So it's pathologists from all
5 over the country or even world that have
6 difficult cases, they will send as a specific
7 private consult to -- it was Dr. Scully, and now
8 it's Dr. Young.
9     Q.   Okay.  When you were first contacted by
10 the plaintiffs' counsel back in 2017, what were
11 your opinions regarding talc and ovarian cancer
12 at that point?
13     A.   First contacted?  When I was first
14 contacted, I was aware of the literature,
15 certainly.  I hadn't come to a strong opinion one
16 way or the other.  In fact, I'd probably say I
17 was aware that the epi data had been relatively
18 consistent.  That was kind of all I knew about it
19 until I did my sort of deep dive into the
20 literature for my general causation opinion.
21     Q.   So as a pathologist, you never had a
22 particular interest in pursuing additional
23 research in the area --
24         MR. ROTMAN:  Objection.
25     Q.   -- of talc and ovarian cancer?

1     A.   Well, there's certainly a lot of things
2 to study in gynecologic pathology.  And so I
3 hadn't decided to take that -- to do that study
4 at the time that I was contacted by counsel.
5 That's not to say I never would have or I never
6 would have thought about it, but I hadn't at the
7 time.
8     Q.   Okay.  In your report on Page 4, you
9 say that you've maintained a professional
10 interest -- "since your fellowship, you've
11 maintained a professional interest and have
12 continued to monitor developments in the science
13 regarding talcum powder exposure and ovarian
14 cancer, and it has been the subject of
15 professional discussions predating the
16 litigation."
17     So what sort of professional discussions
18 about talc and ovarian cancer did you have before
19 the plaintiffs retained you?
20     A.   So, again, I was aware of the
21 literature.  And I knew -- I saw some of the
22 newer epi data come out.  I had had conversations
23 with Dr. Bell that I remember specifically;
24 again, with Jonathan.  I knew he was working on
25 that Nurses' Health.  We certainly talked about

Page 246

1 that study at some point.
2 But, you know, I was certainly aware of the
3 literature as it came out.
4 Q. And you call it a "professional
5 interest."
6 Did you take -- other than just reviewing
7 the literature, did you do anything
8 professionally to either advance your knowledge
9 or other people's knowledge about this potential
10 association?
11 A. Not -- I mean, not at the time. I
12 think "professional interest" in my mind, you
13 know, means being aware of what's going on in the
14 literature. Again, that doesn't necessarily mean
15 an in-depth review of everything but being
16 generally aware of it.
17 Q. Would you say that since you first
18 learned about this in your fellowship and were
19 interested in the topic, did it influence the way
20 you looked at gynecologic cases as a professional
21 pathologist?
22 A. Yeah. It's not really routine practice
23 to use polarized light microscopy in gynecologic
24 pathology. It's just -- we use it more commonly
25 for breast cases, so...

Page 247

1 And also, you know, even if we found
2 birefringent particles and granulomas or -- in
3 the tissue, it wouldn't necessarily mean that
4 they're talc unless you do subsequent studies.
5 So I wouldn't say it changed my daily
6 practice in diagnosing tumors.
7 Q. Okay. Doctor, if you can turn to
8 Page 4 and 5 of your report.
9 Is this where you set out a summary of your
10 opinions?
11 A. Yes. This is.
12 Q. Under Heading 2, Page 4, "General
13 causation opinions."
14 A. Okay.
15 Q. And you list, it looks like, five
16 specific opinions; is that correct?
17 A. I see where you are. Yes.
18 Q. And are those -- again, are those all
19 the opinions that you have that you intend to
20 offer in this case?
21 MR. ROTMAN: Objection.
22 A. Same answer as before. Again, there
23 might be something that comes up today or at
24 trial that I'm asked that I, you know, didn't put
25 in this report. But I tried to be as -- complete

Page 248

1 in the report.
2 Q. Okay. And the first opinion is that
3 talc can migrate to the ovaries through the
4 genital tract through the lymphatic system and
5 through inhalation.
6 Is that an accurate summary of your first
7 opinion or set of opinions?
8 (reading from document)
9 A. Yes. The talcum powder products can
10 reach the ovaries; that they can be transported
11 through the lymphatic system; and there is
12 evidence that it can be inhaled as well with
13 transport to the ovaries.
14 Q. And the second opinion in the case or
15 second set of opinions is that talc causes
16 chronic inflammation in the ovaries, causes
17 increased oxidative stress in the ovaries, and
18 causes immunosuppression.
19 Is that an accurate summary of your
20 mechanism?
21 A. Well, if you're going to read it word
22 for word, it's "Once reaching the ovaries, talcum
23 powder products can cause chronic inflammation,
24 can increase oxidative stress, and can reduce
25 immune response. These are biologically

Page 249

1 plausible and likely mechanisms for ovarian
2 cancer development and progression."
3 Q. Okay. When you say "reduce the immune
4 response," is that essentially discussing, like,
5 an immunosuppressive effect?
6 A. That's referencing the MUC-1 antibody
7 paper that Cramer published in 2005.
8 Q. Are you aware that Dr. Cramer himself
9 has disclaimed that theory as a "hypothesis
10 that's not ready for prime time"? I believe
11 those were his words, "prime time."
12 A. I don't know where you saw those words.
13 Q. His testimony in the litigation.
14 A. Okay. I don't believe I saw his
15 testimony in the litigation. But, again, it's
16 not -- I'm not seeing it as something that needs
17 to be proven. I'm looking at it as a
18 plausibility that, you know, it's a plausible
19 mechanism. If it's not proven, it doesn't really
20 change the fact that it's plausible.
21 Q. So are you building -- so is your
22 plausibility opinion independent of whether or
23 not the basis for that opinion is proven?
24 MR. ROTMAN: Objection.
25 Q. In other words, are you -- do you have

1 a plausibility opinion that's based on a bunch of
2 other potential or plausible mechanisms?
3     MR. ROTMAN: Objection.
4     A. Right.
5     MR. ROTMAN: I just objected, but you
6 can answer. If you can understand the question,
7 you can answer it.
8     A. Well, I think -- I think they're all
9 somewhat interrelated.
10     I think there's the chronic inflammation.
11 There's the immune response. Those are plausible
12 mechanisms for ovarian cancer.
13     And the Bradford Hill guidelines, you don't
14 have to prove -- prove mechanism in order to have
15 causation. We have plenty of -- again, plenty of
16 examples of that in prior diseases, like smoking
17 and lung cancer. And even certain drugs, they
18 don't know the mechanism of action, very common
19 drugs like lithium, for example, or metformin.
20     So you don't need to prove mechanism in
21 order for it to be an important part of a
22 causation because it's part of the plausibility
23 component.
24     Q. Do any of the bases on which you -- any
25 of the bases that you use to support plausibility

1 for talc and ovarian cancer, do any of them have
2 to be proven or established?
3     MR. ROTMAN: Objection.
4     A. I think it's important to have evidence
5 to support it. There may be evidence that
6 refutes it as well, but you're sort of looking
7 at -- you're balancing the weight of it.
8     And the plausibility, a plausible mechanism,
9 now, is that always going to be probable or
10 definite? No. It's plausible.
11     In this case, I think it's a compelling
12 mechanism, chronic inflammation, because, again,
13 we know that talcum powder can reach the ovaries,
14 and we know that it can cause chronic
15 inflammation, and we know chronic inflammation is
16 implicated in cancer.
17     So I think it's a high degree of
18 plausibility in that case.
19     Q. So when you mention that you know that
20 talc can reach the ovaries, are you referring to,
21 for example, the Heller study?
22     A. So Heller found talc in women's
23 ovaries. Yes. Cramer found talc in pelvic lymph
24 nodes. We have other animal and human studies of
25 talc or particulates similar in size to talc

1 reaching the ovaries.
2     So -- and, again, it's widely accepted in
3 the gynecologic community that migration occurs.
4 In fact, endometriosis, we really -- the evidence
5 is that endometriosis is caused by retrograde
6 menstruation of endometrium.
7     So there's a substantial amount of evidence
8 and widely accepted that migration occurs.
9     And I'm aware of studies that didn't find
10 migration, but I think, you know, those few
11 negative studies don't cancel out the positive
12 studies.
13     And, you know, certainly, looking for
14 migrated particles is very difficult. You know,
15 again, we're talking about dose. How much do you
16 inject to get there?
17     And so I think the positive studies are
18 compelling, and it's widely accepted that
19 migration occurs.
20     (Article entitled "Presence of
21 Talc in Pelvic Lymph Nodes of a Woman with
22 Ovarian Cancer and Long-Term Genital
23 Exposure to Cosmetic Talc" marked Exhibit
24 19.)
25

1 BY MS. AHERN:
2     Q. Doctor, I'm handing you what's been
3 marked as Exhibit 19 to your deposition.
4     A. Okay.
5     MR. TISI: Thank you.
6     MS. AHERN: You're welcome.
7     Q. Exhibit 19 is an article drafted by
8 Dr. Dan Cramer, the "Presence of talc in pelvic
9 lymph nodes of a woman with ovarian cancer and
10 long-term genital exposure to cosmetic talc."
11     Is this a paper that you were referring to a
12 few minutes ago?
13     A. The 2005, yes.
14     Q. This is 2007.
15     A. I'm sorry. Did I say 2005? Yes. This
16 is the paper, anyway.
17     Q. And the authors are Dan Cramer and Bill
18 Welch, Ross Berkowitz, and John Godleski.
19     Do you see that?
20     A. Yes.
21     Q. And three of those individuals have
22 been disclosed as plaintiffs' experts in the talc
23 litigation.
24     Were you aware of that?
25     A. I was not aware of Bill Welch. I knew

Sarah P. Kane, M.D.

Page 254

1 after -- at some point, I was aware that
2 Dr. Cramer and Dr. Godleski was.  I don't believe
3 I was aware of that at the beginning of my
4 research, but I became aware of that.  Yes.
5    Q.  Okay.  Are you aware that Dr. Welch has
6 been designated in maybe three cases and given
7 testimony in those cases?
8    A.  Again, I was not aware that Bill Welch
9 had been retained.
10    Q.  Are you aware that Dr. Welch has run
11 the pathology portion of Dr. Cramer's study
12 program for 40 years?
13    A.  I'm aware who Dr. Welch is, and I've
14 certainly seen his name on papers.  But now
15 his -- his role in these studies specifically, I
16 don't know if I can speak to other than he's
17 involved.
18    Q.  He's testified that his only role was
19 in identifying the types of tumors involved in
20 the study to keep people honest.
21    Are you aware that Dr. Welch has repeatedly
22 refused to give -- refused to give a causation
23 opinion like you're giving today?
24    A.  I'm not aware of Dr. Welch's opinions.
25 I didn't know that he was an expert, so I

Page 255

1 wouldn't have reviewed any of that testimony.
2    Q.  Okay.  You weren't provided with any of
3 his testimony or his reports in the litigation?
4    A.  No.  I was not aware that he was a
5 medical expert witness.
6    Q.  Okay.  Do you see under the
7 "Background" section here, it says, "Although
8 epidemiologic studies suggest talc may increase
9 ovarian cancer risk, there is no proof that talc
10 used externally reaches the pelvis"?
11    A.  That's what it says.
12    Q.  Are then if you look down in the -- I'm
13 sorry.  I'm sorry.
14    If you look down in the first paragraph, he
15 mentions, "An epidemiologic association between
16 the use of cosmetic talc and genital hygiene and
17 ovarian cancer was first described in 1982."
18    That's Cramer citing Cramer; isn't it?
19    A.  Let's see.  Let me double-check.  I'm
20 assuming because it's 1982.  But let me
21 double-check.  Or -- yeah.  It's 1999.  He's
22 referencing his 1999 paper.
23    Q.  And he says, "And the many subsequent
24 studies found talc use to increase the risk for
25 ovarian cancer."

Page 256

1    A.  I'm sorry.  Where are you now?
2    Q.  Same sentence.  He just finishes it
3 with "Many subsequent studies found --
4    A.  Okay.
5    Q.  -- "talc use to increase the risk for
6 ovarian cancer."
7    But he just cites himself again from 1982;
8 correct?
9    A.  Sorry?
10    Q.  The only cite he provides for that
11 statement is his own study from 1982?
12    A.  Oh, the one -- the No. 1?
13    Q.  Mm-hmm.
14    A.  Yes.  That's his 1999, it says.  1999.
15    Q.  Okay.  Sorry about that.  You're right.
16    And then he says, "However, the causality of
17 the relationship has been challenged for several
18 reasons."
19    Do you see that?
20    A.  I do.
21    Q.  And he says, "First, the association is
22 a relatively weak one; i.e., summary relative
23 risk of approximately 1.3."
24    Do you agree that a summary relative risk of
25 1.3 is a weak association?

Page 257

1    A.  I've seen "weak" or "moderate" used to
2 describe a 1.3, but that doesn't mean it's not a
3 significant one, especially in a rare disease
4 like ovarian cancer.
5       MS. AHERN:  Objection to the
6 nonresponsive portion.
7    Q.  But I agree it's been described as
8 "weak," at least here by Dr. Cramer?
9    A.  That's -- the sentence says, "First,
10 the association is a relatively weak one; i.e.,
11 summary relative risk of approximately 1.3."
12    Q.  And he says, "Second, there's no clear
13 increase in risk with duration of use."
14    Do you agree with that, as of 2007, there
15 was no clear dose-response in the studies that
16 looked at talc and ovarian cancer?
17    A.  I think there was evidence of a
18 dose-response by 2007.
19    Q.  So do you disagree with Dr. Cramer's
20 statement in the 2007 publication that as of that
21 time, there was no clear increase in risk with
22 duration of use in most studies?
23    A.  I wouldn't necessarily phrase it that
24 way:  There's no clear increased risk.  I think,
25 again, there isn't a lot of data, but what data

Sarah F. Kane, M.D.

| Page 258 | Page 260 |
|---|---|

**Page 258**

1 there was -- I believe at that time, I'm trying
2 to think if I was in 2007 -- would be evidence
3 that there was a dose-response.
4    Q.  And which papers, prior to 2007, did
5 they find dose-response that was clear?
6    A.  I would have to look back.
7    Okay.  So I tried to do this in chronologic
8 order.
9    Q.  What page are you on?
10    A.  I'm looking at 16.
11    Q.  Page 16 of Exhibit 14?
12    A.  Yes.
13    Q.  Okay.  Were --
14    A.  I'm just trying to refresh my memory.
15    So Harlow's -- let's see -- 1992 study was,
16 it looks like, the first one that I have listed
17 that had a dose-response -- evaluated for
18 dose-response.
19    They both -- let's see.  The confidence
20 intervals all included the null.  Life- -- so
21 what I wrote here -- this is Page 18 -- "lifetime
22 application ORs when compared to control women
23 with no perineal talc exposure were 1.3, 4 less
24 than 1,000, with a confidence interval of 0.7 to
25 2.7; 1.5 for 1,000 to 10,000 with a confidence

**Page 259**

1 interval of 0.9 to 2.4; and 1.8 for greater than
2 10,000 with the confidence interval of 1.0 to
3 3.0.
4    And then I also -- yeah.  So that's after
5 2007, the Terry and the Lou studies.
6    Q.  You're looking at Harlow 1992?
7    A.  Yes.  That's the paragraph I'm looking
8 at.
9    Q.  And Harlow 1992 found a
10 nonstatistically significant increased risk; is
11 that correct?
12    A.  So the confidence intervals included
13 the null.  So, yeah, it was not statistically
14 significant.  I'm not sure -- I don't have the
15 numbers here, though, of how many they had
16 dose-response data on, which would -- which might
17 increase the interval.
18    In fact, if you look at the confidence
19 intervals, they're pretty wide, trending toward
20 higher.
21    Q.  What are the confidence intervals
22 you're looking at?
23    A.  For less than 1,000 lifetime
24 applications, we're looking at 0.7 to 2.7.
25    For 1,000 to 10,000, we're looking at 0.9 to

**Page 260**

1 2.4.
2    And for greater than 10,000, we're looking
3 at 1.0 to 3.0.
4    Q.  And when they just adjusted -- when
5 they excluded -- when they looked at lifetime
6 talc applications and ovarian cancer after
7 excluding use following hysterectomy or tubal
8 ligation, they found no evidence of an
9 exposure-response relationship, didn't they?
10    A.  Are you looking at the actual paper?
11    Q.  Do you need it?
12    A.  If you're asking me questions about it.
13    Q.  Yeah.  That wasn't in your report -- or
14 is it?
15    MR. ROTMAN:  What is the "it" referring
16 to?
17    Q.  That particular finding is not in her
18 report on dose-response from Harlow in 1992?
19    A.  Well, yeah.  Let me look at the --
20    MS. AHERN:  Sure.
21    (Article entitled "Perineal
22    Exposure to Talc and Ovarian Cancer Risk"
23    marked Exhibit 20.)
24    MS. AHERN:  I'll mark as Exhibit 20 to
25 your deposition "Perineal Exposure to Talc and

**Page 261**

1 Ovarian Cancer Risk" by Harlow, 1992.  That's my
2 only copy.  Sorry.
3    MR. ROTMAN:  Exhibit 20.
4    A.  Okay.  So, I'm sorry, where are you
5 looking?
6    Q.  Let me find it.  Take your time, if you
7 need to.  I'm trying to find my copy.
8    Okay.  If you look at Table 3, "Estimated
9 total lifetime perineal applications of talc
10 containing powders and cases and controls."
11    A.  Okay.  I see Table 3.
12    MR. ROTMAN:  Is there a question?
13    MS. AHERN:  She asked to see the study.
14 I asked her to confirm that once they excluded
15 cases after hysterectomy or tubal ligation, there
16 was no exposure-response relationship.
17    A.  These look to be similar -- oh, I see.
18 Okay.  Total applications.
19    Well, if you actually look at the numbers,
20 the ones above, which are, I believe, what I
21 quoted in my report, so under "Total
22 applications."
23    And then you're asking me about applications
24 excluding use after hysterectomy or tubal
25 ligation?

Sarah E. Kane, M.D.

BY MS. AHERN:

Q.   Mm-hmm.

A.   What was your question about it?  I'm sorry.

Q.   There's no statistically significant dose-response relationship with lifetime application?

A.   So the confidence intervals are somewhat similar, but -- are somewhat similar, it looks like, to the top.

Q.   There's no statistically significant dose-response relationship, is there?

A.   They all include the null.  That's correct.  But, again, they're trending high.

Q.   But if they include the null, then it's consistent with the null hypothesis that there's no association; isn't that true?

MR. ROTMAN:  Objection.

A.   It's possible.  The null hypothesis is included in "Possibilities."

Q.   It also basically means you can't exclude chance as a reason for the findings; correct?

A.   Again, it's possible.  I would say it's trending higher, but it does include the null

hypothesis.

Q.   Do you see on Page 25, in the first column on the left-hand side, the first full paragraph, "In our analysis"?

Okay.  The authors say, "In our analysis, we first calculated all genital applications of talc based on frequency and years of use.  As a continuous variable in a multivariate model, no significant dose-response was observed between total genital applications of talc and ovarian cancer risk"; correct?

A.   That's what it says.

Q.   And the reason they excluded hysterectomy and tubal ligation is the next sentence, "because the translocation theory assumes an open genital tract, we then excluded application after tubal ligation or hysterectomy but observed no appreciable change in the dose-response."

In other words, still no significant dose-response; correct?

A.   That's what it says.

Q.   So the authors interpreted both the data you cite in your report as well as the data you didn't cite in your report as showing no

dose-response?

A.   Well, I state in my report what the confidence intervals are.  So certainly, I'm showing that it did include the null hypothesis.  But I think it's still -- just because it's not statistically significant, I think it's still data, and I wouldn't completely discount it.

But it does -- does contain the null.  The numbers weren't super high, if I remember.  But on their -- I'll have to find it.

On -- in their abstract conclusion, they still say that "The greatest ovarian cancer risk associated with perineal talc use was observed in the subgroup of women estimated to have made more than 10,000 applications during years when they were ovulating and had an intact genital tract with the OR of 2.8 and a statistically significant confidence interval of 1.4 to 5.4.  However, this exposure was found in only 14 percent of the women with ovarian cancer."

Q.   Okay.  But we were just asking -- you mentioned the study as support for a dose-response relationship in your report?

A.   As evidence of a dose -- a dose-response; again, with the caveat, which is

here, that it includes the null hypothesis.

Q.   Okay.  And what about Cramer in 1999?

MR. ROTMAN:  Objection.  I don't think that's a question.

MS. AHERN:  Fair point.

BY MS. AHERN:

Q.   In Cramer 1999, you've also cited as evidence after dose-response, correct, on Page 35 of your report?

A.   I see that.  Yes.  It's listed in a reference list.

Q.   And the authors, including Cramer, basically say they "failed to demonstrate consistent dose-response relationships with measures of intensity of exposure."

MR. ROTMAN:  Do you have -- do you have the paper?

MS. AHERN:  Do you want the paper?

MR. TISI:  Is that the one you identified before?

MS. AHERN:  No.  This is a new one.

MR. ROTMAN:  She's getting the paper out.

MS. AHERN:  I thought I had it too.  Maybe it's in one of the boxes.  Let me see if I

Page 266

1  can find my own copy.
2       Okay.  Sorry.  This is the only copy I
3  have right now.
4       THE WITNESS:  Okay.
5       MS. AHERN:  We can mark it, if you
6  want.
7  BY MS. AHERN:
8       Q.  It's a copy of the Cramer 1999
9  publication that you cited in your report in
10  support of dose-response.
11       MR. TISI:  Are you marking it?
12       THE COURT:  I can if you want me to.  I
13  just didn't want to mark my copy.
14       MR. KLATT:  I don't think I do.
15       MS. AHERN:  That's all right.  I don't.
16  We'll mark Cramer -- oops, no, we won't because
17  this is the wrong study.  Sorry.  The old "wrong
18  study" trick.
19       THE WITNESS:  I can't find that
20  information.  Oh, I've got the wrong reference.
21  Sorry.  All righty.
22       (Article entitled "Genital Talc
23  Exposure and Risk of Ovarian Cancer" marked
24  Exhibit 21.)
25

Page 267

1  BY MS. AHERN:
2       Q.  Okay.  So, Doctor, this is Exhibit 21,
3  which is "Genital Talc Exposure and Risk of
4  Ovarian Cancer," Dan Cramer, 1999.
5       A.  Okay.
6       Q.  This is something else.
7       Can you find -- I don't have it in front of
8  me, so I'm going to rely on you to find the
9  tables that show their dose-response analysis.
10       MR. ROTMAN:  You made that Exhibit 21?
11       MS. AHERN:  Yes.
12       MR. TISI:  It's 21.  Yes.
13       THE WITNESS:  Would that be Table 2,
14  what you're referring to (indicating)?
15  BY MS. AHERN:
16       Q.  I believe the numbers were -- they were
17  looked at in terms of zero years' duration, less
18  than 20, 20 to 30, and greater than 30.
19       Do you see that on there?
20       A.  I'm looking.  This one says "less
21  than -- frequency of use."
22       Q.  There's a frequency and a duration.
23       A.  Okay.
24       Q.  Yeah.
25       A.  Sorry.  Why am I not seeing it?  It's

Page 268

1  in the table.  Let me see.
2       Q.  I think so.  If you want to go to --
3       A.  Oh.
4       Q.  You got it.
5       A.  Yes.  I see it now.  Sorry.  It was
6  buried in Table 3, very small print.  Okay.  Yes.
7  So Table 3, years of use.  Yup.
8       Q.  Do you see they're not showing a
9  statistically significant dose-response
10  relationship?
11       A.  So for less than 20 years, the
12  confidence intervals were 1.16 to 3; at 20 and 30
13  and greater than 30, they did -- the confidence
14  intervals did include the null.
15       But, again, I don't know how many -- I can't
16  remember.  Oh, here are the cases.
17       Yeah.  So there are 55, less than 20 cases;
18  thirty-two 20 to 30; and 59 greater than 30.
19       Q.  And you see also the frequency
20  analysis?  It also did not find a significant
21  dose-response relationship as a statistically
22  significant dose-response relationship?
23       A.  Yes.  For less than 30 years, the
24  adjusted OR was 2.21 with a confidence interval
25  of 1.37 to 3.56.

Page 269

1       The 30 to 39 was adjusted OR of 1.17 with
2  confidence intervals .78 to 1.76.
3       And the 40-plus adjusted OR was 1.57 with
4  confidence intervals of 0.8 to 3.10.
5       Q.  So not only did the point estimate go
6  down with more use, but the higher the
7  concentration, there was also no statistical
8  significance; correct?
9       A.  Yeah.  I mean, the numbers -- so the
10  only one that doesn't include the null -- let me
11  just double-check.
12       Actually, there are two.  So the less than
13  20 years or less than 30 per month are
14  statistically significant.
15       Q.  It's only the first dose category in
16  each group --
17       A.  Yeah.
18       Q.  -- shows statistical significance.
19       And as the doses got higher, the exposure
20  frequency got higher, the point estimates went
21  down and statistical significance went away;
22  correct?
23       A.  The confidence intervals did include
24  the null.  And I think this illustrates how
25  difficult sort of dose and frequency can be to

Sarah E. Kane, M.D.

Page 270

1 study because we don't really know what the doses
2 are, and we don't really have granularity as far
3 as frequency of use. Well, I have to look at --
4     Q. These are studies that you cited in
5 your report as evidence of a dose-response,
6 correct, the Harlow and the Cramer papers? You
7 both cited yourself.
8     Did you evaluate the internal validity of
9 those studies and critically evaluate the methods
10 and study populations when you included them in
11 your report?
12     A. Let me -- well, I said -- this is the
13 sentence -- "Most have found an increased risk of
14 ovarian cancer with increased exposure." So,
15 yet, when studies have evaluated duration of
16 frequency of perineal talc use.
17     So this list is the studies that evaluated
18 duration and frequency of perineal talc use. And
19 I said, "Most have found an increased risk." So
20 what I'm citing here are the studies that looked
21 at duration and frequency.
22     Q. Okay. And we were referring to
23 Cramer's 2007 publication where he himself says
24 that the association has been challenged because
25 it's weak and because there's no clear increase

Page 271

1 in risk with duration of use.
2     And you didn't agree with that statement,
3 and you referred me to Harlow 1992; correct?
4     A. I was going to where I mentioned the
5 dose-response studies.
6     Q. Okay. Just to button up and finish up
7 with Cramer 1999, if you look at Page 355, the
8 authors included, "They failed to demonstrate
9 consistent dose-response relationships with
10 measures of intensity of exposure."
11     Do you see that?
12     A. I'm sorry. Where are you?
13     Q. On Page 355.
14     A. Okay. I'm seeing "in attempting" --
15 sorry. I see, "Most talc and ovarian cancer
16 studies that have addressed dose-response,
17 including this one, have failed to demonstrate
18 consistent dose-response relationships with
19 measures of the intensity of the exposure,
20 especially when the trend is examined among users
21 only. In attempting to address this weakness, we
22 point out that it is difficult to quantify the
23 amount of powder actually used and degree of
24 perineal dusting that might constitute an
25 application of talc," quote/unquote around

Page 272

1 "application of talc."
2     "Another factor that may affect the
3 dose-response relationship is whether use
4 occurred at a time when the female tract was
5 open. There is evidence from several studies
6 that the talc/ovarian cancer association is
7 modified by closure of the female tract as a
8 result of tubal ligation or hysterectomy.
9     Q. Doctor, did they say they didn't find a
10 dose-response relationship?
11     A. I'm trying to find what they said other
12 than that on Page 355.
13     Yeah. They said, "Studies that have
14 dose-response, including this one, have failed to
15 demonstrate consistent dose-response
16 relationships."
17     But it goes on to qualify with the
18 difficulty of measuring dose and frequency, which
19 is what I described earlier.
20     Q. Mm-hmm.
21     (Article entitled "Perineal Talc
22 Exposure and Epithelial Ovarian Cancer Risk
23 in the Central Valley of California" marked
24 Exhibit 22.)
25

Page 273

1 BY MS. AHERN:
2     Q. Okay. The next one -- are you done,
3 sorry, with that one?
4     A. If we're moving on, sure.
5     Q. If you're done.
6     The next one you mention, you cite in your
7 report for dose-response is Mills 2004, which I'm
8 handing you now marked as Exhibit 22.
9     Oh, yeah. We'll leave that here for right
10 now.
11     A. Okay.
12     MR. ROTMAN: Can I see the one you just
13 finished with?
14     MR. TISI: This is 22; right?
15     MS. AHERN: Yes, sir.
16 BY MS. AHERN:
17     Q. And this one, you're welcome to read
18 through it if you want. All I wanted to point
19 out is if you look right up front in the
20 abstract, a little more than midway down, they
21 say, "The odds ratio for ever use of talc was
22 1.37 with the confidence interval of 1.02 to 1.85
23 compared to never users. However, no
24 dose-response association was found."
25     Do you see that?

Sarah F. Kane, M.D.

Page 274

1    A.  I see where it says that.
2    Q.  And if you want to look through there
3  and convince yourself of that, go for it.  I
4  think the table that we're looking at is Table 2
5  on Page 460.
6    A.  Yeah.  The 4 to 12 years had an OR of
7  1.86 that was statistically significant at 1.16
8  to 2.98.  But the others, which were never --
9  which, of course, is the null, 4 to 12 years,
10  which -- oh, the 13 to 30 was adjusted OR of
11  1.45, confidence interval .9 to 2.32.
12    And then the greater than 30 years was OR of
13  1.22 with confidence interval of .72 and 2.08.
14  So the 13 to 30 and the greater than 30 includes
15  the null.
16    And then if we look at frequency, cumulative
17  use, frequency types duration, there was a
18  statistically significant increase with second
19  quartile and third quartile divisions.  But then
20  it dropped in the fourth quartile, the highest
21  exposure.
22    And, you know, again, sort of difficulty in
23  measuring this.  But you do see an increase in
24  the second and third quartile, between the second
25  and third, that was statistically significant.

Page 275

1  And then --
2    Q.  But the authors themselves interpret
3  their data as no dose-response association;
4  correct?
5    A.  In the abstract, that's what they
6  state.  I'm trying to figure out what their --
7  what they said.  They must have said a little bit
8  more.
9    Q.  Doctor, you reviewed this study before;
10  right?
11    A.  I did.  Yes.
12    Q.  Okay.
13    A.  I'm just refreshing my memory.
14    Q.  Okay.  If you look at Page 463.
15    MR. ROTMAN:  Are you changing the
16  topic?
17    MS. AHERN:  No.  Same topic.
18    MR. ROTMAN:  She was looking for
19  something as part of a prior answer.
20  BY MS. AHERN:
21    Q.  As part of your prior answer that there
22  was no dose-response?
23    A.  As part of the answer that they stated
24  that in the abstract.  I was trying to find out
25  where they had a discussion.

Page 276

1    Q.  I was trying to point you a little bit
2  toward this.  It's Page 463.  There's some
3  discussion of it.
4    If you look at the third paragraph down, "As
5  in other studies, the present study did not find
6  a clear dose-response based on duration of use or
7  cumulative use."
8    And then it says, "Limiting the analysis of
9  dose-response to women who reported ever use of
10  talc did not affect the results, data not shown.
11  The lack of dose-response between talc use and
12  epithelial ovarian cancer may be explained by the
13  inability to quantify the actual amount of talc
14  used per application and the timing of the
15  application."
16    A.  Yeah.  So with that caveat.
17    Q.  Well, the findings are what they are;
18  right?
19    The findings are no dose-response
20  relationship?
21    A.  The findings are what they are.  But,
22  again, it's not an easy -- there's not huge
23  numbers in these cases.
24    And, again, you still don't know from woman
25  to woman what one dose is, so there's a ton of

Page 277

1  variability.  It's not like a cigarette, where,
2  you know, from one cigarette to the next or, you
3  know, a drug dose is probably a more accurate
4  analogy, you know.
5    Q.  True.  But just because it's difficult
6  to study, it doesn't mean if we could study it
7  better, we would get a positive result, does it?
8    A.  I -- oh, my thing is not working.  I
9  think I have to plug my thing in.
10    MR. ROTMAN:  Can you?
11    COURT REPORTER:  I'd have to break to
12  do it.
13    MR. ROTMAN:  Let's go off the record.
14    THE VIDEOGRAPHER:  Off the record.
15  4:37 p.m.
16    (A recess was taken.)
17    THE VIDEOGRAPHER:  Back on the record,
18  4:44 p.m.
19  BY MS. AHERN:
20    Q.  Okay.  Doctor, you saw the Mills paper
21  in front of you?
22    A.  Yes.
23    Q.  Okay.  Could you look at your report on
24  Page 21?
25    (Witness complies.)

Page 278

1    A.   Okay.
2    Q.   Let's see, where is my copy?
3    And turn to Page 3 of the Mills publication.
4    A.   Page 3, which would be Page 460?
5    Q.   That's a good question.
6    Where is my Mills publication?
7        MS. AHERN:  Do you have it?
8        MR. TISI:  Sure.
9        MS. AHERN:  Thank you.
10       Oh, I know where it is.
11   BY MS. AHERN:
12   Q.   I'm sorry.  I thought I had the
13   specific passage marked.  And I do, somewhere in
14   here.  Okay.  Sorry.  It's on Page 460.  I
15   apologize.
16   A.   Okay.
17   Q.   All right.  Do you see on the Mills
18   publication on Page 460 that bottom paragraph on
19   the left, "ever use of talcum powder"?
20   A.   Yes.
21   Q.   And if you read down toward the bottom
22   part of that paragraph, on the fourth line from
23   the bottom, the sentence starts "Duration of
24   use."
25   A.   Okay.

Page 279

1    Q.   "Duration of use of talcum powder was
2    associated with increased risk, although the
3    pattern was also not clear-cut in that the point
4    estimate peaked among those reporting 4 to 12
5    years of use and declined somewhat among those
6    reporting longer duration of use."
7        Do you see that statement?
8    A.   I see that.  Yup.
9    Q.   And if you look at your report on
10   Page 21, the top paragraph, about midway, a
11   little -- well, a third of the way down, you pick
12   up with "Duration of use of talc was also
13   associated with increased risk, although the risk
14   peaked."
15       Do you see that statement?
16   A.   Yes.
17   Q.   If you compare those statements, are
18   they almost identical with the exception of the
19   statement by Mills that the pattern was not
20   clear-cut?
21   A.   They are similar.  This might have
22   been, like I described earlier, where, if I was
23   taking notes, some of the language might have
24   gotten incorporated, although I do have the
25   citation.

Page 280

1    Q.   Is there a reason that that entire
2    portion of your report is copied identically from
3    Mills except for the qualifier that the pattern
4    was not clear-cut for dose-response?
5    A.   Well, I think it still has the same
6    meaning.
7    Q.   Without the qualifier?
8    A.   I think the qualifier is in the -- in
9    the data.
10   Q.   Okay.
11   A.   I don't think I was -- I wasn't trying
12   to make it sound anything different than what it
13   was.  I think I was trying to report the data.
14   Q.   Okay.  All right.  And, Doctor, if you
15   turn to Page 10 of your report, the section on
16   inflammation.
17       Are you there?
18   A.   Yes.
19   Q.   You start on the second paragraph under
20   "Inflammation" discussing oxidative stress.
21   A.   Okay.
22   Q.   Okay.  Were you aware that a
23   significant amount of the section of your report
24   on oxidative stress is copied verbatim?  More
25   than 60 percent of it, I think, is copied

Page 281

1    verbatim from Dr. Saed's 2018 publication?
2    A.   Again, if the language is similar, it
3    was not an intentional.  I am citing him here, so
4    it's -- you know, it's clear that those are the
5    references.  Again, it might have been due to
6    note-taking, but the citation is clear.
7    Q.   Do you ever take verbatim language out
8    of another scientist's work and not set it off in
9    quotation marks in your professional work?
10   A.   I think I've cited the source here.
11   It's -- so it's not -- again, it's not like I was
12   intentionally copying his words.  It was, again,
13   probably an editing while I was taking notes, but
14   the citations are clear.
15   Q.   Is your -- is the underlying
16   understanding that you have related to oxidative
17   stress and inflammation drawn primarily from
18   Dr. Saed's work?
19   A.   No.  I mean, oxidative stress and
20   inflammation is something that we study -- that
21   I've studied.
22   Q.   Have you ever published a study on
23   oxidative stress or redox biology?
24   A.   I have not published on oxidative
25   stress.

Page 282

1    Q.  What sort of work as a pathologist have
2    you done that incorporates redox biology?
3    A.  Well, again, this is part of our
4    medical training.  Certainly in training to be a
5    physician, that is something that we learn.  And,
6    you know, pathologists do quite frequently come
7    across inflammatory -- inflammation literature.
8    Q.  Are you -- is it your position that the
9    information in your report under "Inflammation"
10   that discusses oxidative stress and redox biology
11   is common knowledge among pathologists?
12   A.  That oxidative stress and inflammation,
13   yes.  I think -- yes.  I think that's widely
14   accepted.
15   Q.  The specific information contained on
16   Pages 10 and 11 of your report that was drawn
17   from Dr. Saed's work, is that information that is
18   common knowledge?
19   The specific enzymes that are discussed, the
20   research on these issues, is that specific
21   information there common knowledge?
22   A.  It's common knowledge that these types
23   of cancer are associated with inflammation, and
24   certainly oxidative stress is part of
25   inflammation.

Page 283

1    Q.  Was this common knowledge to you before
2    you reviewed Dr. Saed's 2018 publication?
3    A.  Yes.  I was just citing his report at
4    this point.
5    Q.  Are you aware you also cited his
6    underlying citations in the same spots that he
7    cited them?
8    A.  That's possible because I reviewed his
9    citations as I was reading his citations.
10   Q.  Did Dr. Saed give you permission to
11   copy his -- the language from his publication?
12   A.  I wouldn't characterize it as
13   "copying."  I think it may be similar language,
14   again, because I was writing as I was reading.
15   But I am certainly clearly citing his work and
16   the other citations.
17   Q.  Do you agree that Dr. Saed's 2018
18   paper is a compilation of his own synthesis and
19   review of the underlying articles that he
20   incorporated into his paper, and do you think
21   it's appropriate for you to just lift the
22   language from his paper and the citations that he
23   found and synthesized and put it in your report
24   and not attribute it to him with quotation marks?
25   MR. ROTMAN:  Objection.

Page 284

1    A.  I did attribute -- I certainly cited
2    him in several places in this area.  And, again,
3    it was not an intentional copying.  Again, it
4    might have just happened with my editing, but I
5    certainly tried to cite everything that I was
6    looking at in the proper place.
7    But I do believe that it's common knowledge
8    that chronic inflammation can cause different
9    types of cancer.  This is not really new data.
10   Q.  Dr. Saed says that it's new data.
11   A.  In what respect, though?  If we're
12   talking about myeloperoxidase, yes.  But I'm
13   talking about oxidative stress and chronic
14   inflammation with known association with certain
15   types of cancer.
16   Q.  So it's your testimony that the
17   verbatim text that you used in the section from
18   Dr. Saed's 2018 paper was appropriately cited and
19   attributed to him?
20   MR. ROTMAN:  Objection.
21   A.  Again, I'm not sure it's absolutely
22   verbatim, but I certainly cited him in every
23   place that I was referencing.
24   Q.  Okay.  We'll just move on.
25   (Highlighted copy of Dr. Kane's

Page 285

1    expert report marked Exhibit 23.)
2    BY MS. AHERN:
3    Q.  Doctor, I've marked as Exhibit 23 to
4    your deposition a highlighted copy of your report
5    that shows the verbatim text that has been
6    carried over from various publications into your
7    report.
8    If you turn to Page 10 and 11, you'll see
9    that the highlighted portions are copied directly
10   from Dr. Saed's work.
11   MR. ROTMAN:  Do you have a copy for me
12   of this exhibit?
13   MS. AHERN:  Oh.  I do.  Sorry about
14   that.
15   MR. ROTMAN:  So we're at Page 10 and
16   11?
17   MS. AHERN:  That's just for the Saed
18   publication.  And there's one in there that Saed
19   was also on.
20   MR. ROTMAN:  Does she have the Saed
21   publication in front of her?
22   MS. AHERN:  I can find it for you.
23   BY MS. AHERN:
24   Q.  But my point is, are you aware that
25   that -- that there's a significant portion of

Page 286

1  that section of your report that is just
2  cut-and-pasted from Dr. Saed's work?
3      A.  I don't believe -- again, it's -- it
4  wasn't intentional with the citations, and it
5  could have happened with my note-taking or other
6  suggested input.  But, again, I cited -- I
7  certainly cited him in that section.
8      Q.  Okay.
9          MR. TISI:  Did you mark that?
10         MS. AHERN:  Hmm?
11         MR. TISI:  Did you mark that as an
12 exhibit?
13         MS. AHERN:  Yes.  I think it's 23.
14 Sorry.
15         MR. TISI:  That's okay.
16         MR. ROTMAN:  Do you have the Saed in
17 front of you?
18 BY MS. AHERN:
19     Q.  I think it's -- it wasn't intentional
20 is your testimony, and it's probably just a
21 result of your note-taking process; is that
22 correct?
23     A.  Well, because I cited him specifically,
24 certainly it wasn't intentional to be verbatim.
25 And I'm not sure exactly the process, but

Page 287

1  certainly I'm citing him several times there.
2      Q.  Okay.  That's fine.  We'll just move
3  on.
4      And, Doctor, just to be clear, I understand
5  your testimony is that it is common knowledge to
6  pathologists that oxidative stress and
7  inflammation are related; correct?
8      A.  Yes.
9      Q.  Okay.  But you are -- we're talking
10 about oxidative stress and redox biology
11 specifically as a field of study or research.
12     You're not an expert in that field of study
13 or research, are you?
14     A.  I certainly have read literature in
15 that area.
16     Q.  Does that make you an expert?
17     A.  I'm -- I mean, I'm familiar with
18 literature in the area.  That's -- that's my
19 answer.
20     Q.  Okay.  But you don't conduct studies in
21 oxidative stress and redox biology, do you?
22     A.  I do not conduct studies in oxidative
23 stress and redox biology.
24     Q.  You're not currently participating in a
25 study looking at oxidative stress or redox

Page 288

1  biology and inflammation, are you?
2      A.  I am not currently participating in a
3  study of oxidative stress or redox biology.
4      Q.  You don't have any funding related to
5  oxidative stress and inflammation, do you?
6      A.  No, I do not.
7      Q.  Have you ever applied for any funding
8  in that area?
9      A.  No.  I have not.
10     Q.  Have you ever authored a systematic
11 review of the literature on oxidative stress and
12 inflammation?
13     A.  Oxidative stress and inflammation, no.
14 I don't believe I have.
15     Q.  Have you ever authored a systematic
16 review of the literature on oxidative stress and
17 cancer?
18     A.  No.  I have not authored a systematic
19 review on that.
20     Q.  Okay.  Doctor, moving on to
21 inflammation and ovarian cancer.
22     Generally, on inflammation, can you cite to
23 a published experiment that was conducted in
24 animals in vivo that establishes a role of any
25 particular inflammatory cell or cytokine or

Page 289

1  enzyme in tumor regenesis?
2      A.  Oh.  Let me -- let me bring up my
3  inflammation section.  Sorry.  I'm just
4  refreshing myself as to what I stated in my
5  report.
6      Oh, this is low battery again.  I don't
7  think this is plugged in.
8          MR. ROTMAN:  Can we take five minutes
9  off the record?
10         MS. AHERN:  Yes.
11         THE VIDEOGRAPHER:  Off the record,
12 5:02 p.m.
13         (A recess was taken.)
14         THE VIDEOGRAPHER:  Here begins Media
15 No. 6 in today's deposition of Sarah Kane, M.D.
16 Back on the record, 5:28 p.m.
17         (Article entitled "Talcum
18     powder, chronic pelvic inflammation and
19     NSAIDs in relation to risk of epithelial
20     ovarian cancer" marked Exhibit 24.)
21 BY MS. AHERN:
22     Q.  Dr. Kane, I'm marking what's been --
23 well, I'm marking Exhibit 24 to your deposition,
24 which is a copy of the Merritt 2008 publication.
25 And I'm sorry, I don't have an extra.  I'm going

Sarah F. Kane, M.D.

1  to share.
2      It's "Talcum powder, chronic pelvic
3  inflammatory -- sorry, chronic pelvic
4  inflammation and NSAIDs in relation to risk of
5  epithelial ovarian cancer."
6      And you cite Dr. Merritt's paper a couple of
7  times in your report; is that correct?
8      A.  I believe I cited it, yes.
9      Q.  I think you cite it as a statistically
10 significant positive talc study on Page 17 of
11 your report?
12     A.  Oh, let me get to that, if that's the
13 section I'm thinking of.
14     Q.  There are a couple of places?
15     A.  There was -- yes.  This happened in
16 editing.  I believe if this is -- so the sentence
17 ended up, it originally didn't have the
18 "statistically significant."  It was just, you
19 know, an odds ratio greater than one and listed.
20     And then I mistakenly didn't delete.  When I
21 changed it to "statistically significant," for
22 some reason -- I don't know if it happened in the
23 editing between additions or something -- somehow
24 I seem to remember deleting them.  But in the
25 final, they ended up all there.  So that was a --

1      MR. ROTMAN:  What page was this?
2      A.  -- typographical error.
3      It's in there twice.  I noticed it after I
4  submitted it, and it was one of those --
5      Q.  Are you saying Merritt is not
6  statistically significant?
7      A.  So I know which -- again, I'd have -- I
8  have to go through.  It's been a long day, and
9  the names are starting to get all confused.
10     Q.  Yeah.
11     A.  But I know that that sentence, with
12 "all of those" at the end of that sentence, is
13 incorrect because I had changed -- I had meant to
14 list cumulatively the statistically significant
15 ones and ended up --
16     Q.  Okay.  So just to clarify for the
17 record, on Page 17, we're talking about the first
18 full paragraph that says, "In addition to the
19 Cramer 1982 study, numerous other case-control
20 studies addressing talc use and ovarian cancer
21 have shown statistically significant odds ratios
22 greater than one indicating talc use is
23 associated with an increased ovarian cancer
24 risk."
25     And then there's a string cite with a number

1  of multiple publications.
2      A.  Right.
3      Q.  You're saying that some of those
4  publications shouldn't be in there because you
5  added "statistically significant" as a criteria
6  later?
7      A.  Exactly.
8      Q.  Okay.  That's actually not my question
9  about Merritt, but thank you.
10     A.  I knew that was going to come up --
11     Q.  That's okay.
12     A.  -- at some point.
13     Q.  While we're there, since we're sitting
14 here looking at this, so these are -- you listed
15 out case-control studies addressing talc, and
16 they're supposed to be those that have
17 statistically significant odds ratios; correct?
18     A.  That's correct.  That was the
19 intention.
20     Q.  And Gertig 2000 is there, and Houghton
21 2014 are there, and they're obviously cohort
22 studies?
23     A.  So, again, I think that somehow that
24 paragraph got all -- and I didn't catch it in the
25 final edits.

1      Q.  Okay.
2      A.  I know that that was at least a
3  different paragraph at first, possibly two
4  paragraphs that got condensed.  And then somehow,
5  the references didn't get changed in the final.
6      Q.  Okay.  Do you happen to know -- and if
7  you don't it's okay -- but do you happen to know
8  which of these studies should be there and which
9  should be removed?
10     A.  Off -- I would want to look just to
11 make sure.
12     Q.  Okay.
13     A.  But I'm -- if I am -- I'd want to look
14 just to make sure, but I know there are some that
15 should not be there.
16     Q.  All right.  But looking at Merritt,
17 there are a couple of places where Merritt is
18 cited in your report.  One is Page 17 in that
19 paragraph we just looked at.  Another is Page 28
20 in Section -- the "Pooled study regarding talc
21 use and ovarian cancer" section.
22     It says some -- let's see, you're talking
23 about the advantages of pooled studies, and you
24 cited Merritt 2008.
25     A.  Okay.

Page 294

1  Q. And then on Page 35, Merritt is cited.
2  "Studies evaluating duration and frequency of
3  perineal use, most have found an increased risk
4  of ovarian cancer with increased exposure."
5  We already went through this paragraph
6  earlier --
7  A. Yeah. Yeah.
8  Q. -- and discussed Merritt a little bit
9  in that context.
10  MR. ROTMAN: Page 30 -- the last one
11  was Page 35?
12  MS. AHERN: Thirty-five. Yeah. I
13  apologize. We may not have discussed Merritt.
14  BY MS. AHERN:
15  Q. But looking at Merritt now, you're
16  aware that Merritt looked specifically at
17  inflammatory conditions as part of their
18  exploration of the hypothesis that chronic
19  inflammation could lead to ovarian cancer; is
20  that right?
21  A. Yes. There was a component from what I
22  remember.
23  Q. They say in the abstract that "Chronic
24  inflammation has been proposed as the possible
25  causal mechanism that explains the observed

Page 295

1  association between certain risk factors such as
2  the use of talcum powder or talc in the pelvic
3  region and epithelial ovarian cancer."
4  Do you see that? It's in the abstract, the
5  first sentence?
6  A. Yeah. Okay. The first sentence.
7  Q. Okay. They go on to say, "To address
8  the issue, we evaluated the potential role of
9  chronic local ovarian inflammation in the
10  development of the major subtypes of epithelial
11  ovarian cancer."
12  Do you see that?
13  A. Yes.
14  Q. Okay. And just want to ask you: They
15  conducted the study as a case-control study
16  looking at 2319 women with epithelial ovarian
17  cancer; correct?
18  A. I don't remember the exact number, but
19  I will -- I will --
20  Q. I think that's -- that's okay.
21  A. I don't remember the exact number.
22  Q. Okay. So they looked at a number of
23  factors that are theoretically associated with
24  chronic inflammation, didn't they, including
25  pelvic inflammatory disease and talc use,

Page 296

1  endometriosis.
2  And do you see if you turn to -- I'm trying
3  to get through this quickly. You're welcome to
4  point out anything you want, but I kind of want
5  to move us along.
6  A. Okay.
7  Q. If you look at the "Discussion"
8  section, I, unless I missed it, on Page 174, the
9  right-hand column, second full paragraph, they
10  note that "It has been hypothesized that talc is
11  linked to ovarian cancer development through
12  inflammation. However, evidence linking an
13  inflammatory response with talc contamination of
14  the ovaries is lacking."
15  Do you agree or disagree with that statement
16  that evidence linking an inflammatory response
17  with talc contamination of the ovaries is
18  lacking?
19  A. I don't know if I would phrase it that
20  way. Have there been studies that have followed
21  talc from application up to the ovaries and
22  documenting an inflammatory response after talc?
23  No. There's not going to be that study.
24  That would be -- I don't think you could do
25  that study today with talc being called by the

Page 297

1  IARC a possible carcinogen. I don't think you
2  could design that study right now and do that in
3  women.
4  But, again, I think -- I think it's still a
5  highly compelling, plausible mechanism because we
6  know talc can cause inflammation, and
7  inflammation is associated with certain cancers,
8  including certain types of ovarian cancers.
9  So I don't know if I would state it that
10  way.
11  Q. When you say inflammation is associated
12  with ovarian cancer, what studies are you
13  referring to?
14  A. I'm referring to, for example, clear
15  cell carcinomas that have arisen from
16  endometriotic lesions that we've talked about
17  before.
18  Q. And those cells are -- the originating
19  cells are thought to come from the endometrium
20  itself, the uterus; correct?
21  A. I don't know if we know for sure. I
22  mean, is it endometriosis that's in the ovary
23  causing chronic inflammation in the ovarian cells
24  that are causing the clear cell? I don't know if
25  that's been completely delineated.

Sarah E. Kane, M.D.

Page 298

1    Q.   But there are markers that will
2  distinguish ovarian surface epithelial cells from
3  endometrioid cells which resemble endometrial
4  cells; correct?
5    A.   There are some stains that you can do.
6  But, again, I don't know if it's going to be --
7  been completely elucidated.
8    Q.   Are you aware of recent studies that
9  have demonstrated that there is some abnormality
10 in the endometrium of women who develop
11 endometriosis when compared to women who don't
12 develop endometriosis?
13   A.   I'm aware that retrograde migration of
14 the endometrium is thought to -- has been
15 associated with endometriosis.  I don't know what
16 you mean by "abnormalities" of the -- you have to
17 be more specific.  I can't --
18   Q.   I don't have the publication with me.
19 I was just asking if you were aware of those
20 studies.
21   A.   I probably read them at some point, but
22 off the top of my head, I'm not really sure
23 without knowing more specifically.
24   Q.   And would you agree that the studies,
25 though, that show a decreased risk of ovarian

Page 299

1  cancer for women who have tubal ligation are
2  studies -- well, are more highly associated with
3  endometrioid clear cell carcinomas than with
4  high-grade serous?
5    A.   With tubal ligation, off the top of my
6  head, I believe that's -- that that's the case.
7    But with salpingectomy, which removes the
8  fallopian tube fimbriae, there's -- that
9  decreases the risk of serous carcinomas.
10   Q.   To a lesser extent, then, the decrease
11 for clear cell and endometrioid, which some
12 people have suggested supports the retrograde
13 migration of endometrial cells into the abdominal
14 cavity?
15   A.   Some people have said that that
16 supports the retrograde migration of the
17 endometrial cells.  That is correct.
18   Q.   And I got off topic.  We're looking at
19 Merritt.  Page 174, if you look, let's see --
20 here it is.  Sorry.  I apologize, on Page 175.
21   The very bottom of the summary paragraph, it
22 says, "The elevation in ovarian cancer risk
23 associated with use of talc in the perineal
24 region that we and others have observed has been
25 regarded as the main evidence supporting an

Page 300

1  inflammatory mechanism in the development of
2  epithelial ovarian cancer.  However, experimental
3  evidence that perineal talc use elicits an
4  inflammatory response in the ovaries is lacking,
5  and overall, we conclude that chronic
6  inflammation does not play a major role in
7  development of ovarian cancer."
8    Is there a reason you didn't cite the
9  Merritt study in your report specifically when
10 discussing evidence of chronic inflammation and
11 ovarian cancer, a link between those two?
12   A.   In the places that I -- let me just
13 double-check.  Places that I mention, was I
14 not -- I wasn't talking about inflammation.  Is
15 that what you're --
16   Q.   Yes.  You agree you cited Merritt in
17 several places in your report?
18   A.   Yes.
19   Q.   But you didn't cite anything about the
20 inflammation findings from Merritt.
21   A.   I'm not sure I can completely agree
22 with their conclusion.  It's true we don't
23 have -- like I mentioned before, we don't have a
24 study that has looked at women who use talc,
25 follow it up, and then see chronic inflammation

Page 301

1  in the ovary.
2    But I think that's going to be -- again, we
3  don't know how long that chronic inflammation is
4  going to be there.  We don't know what dose is
5  getting into the ovary.
6    I still think -- and, again, this is the
7  plausibility part of it -- I think there's still
8  compelling evidence that talc can cause an
9  inflammatory response that would explain the risk
10 of increased risk of ovarian cancer with talcum
11 powder products.
12   So, I mean, I certainly read this.  It had
13 some good information in it.  I don't think I was
14 purposely trying to leave out something that had
15 evidence.  This was their opinion.
16   And I'm -- I don't know if I would phrase it
17 that way, the exact words that they use.
18   Q.   Well, if those are exactly their
19 findings here -- if you look at the top of the
20 summary paragraph, "In summary, most factors that
21 could potentially cause ovarian inflammation such
22 as pelvic inflammatory disease, HPV infection,
23 and postpubertal mumps were not associated with a
24 significant elevation in ovarian cancer risk in
25 our study.  In addition, the expected corollary,

Page 302

1 an inverse association with regular use of
2 anti-inflammatory medications, was also not
3 observed -- or was not observed."
4     A.  Yes.  Yeah.  Yeah.
5     Q.  They looked at multiple sources or
6 multiple causes of inflammation in the pelvic
7 region and did not find an association with the
8 risk of ovarian cancer, and they didn't find a
9 decreased risk in people that used
10 inflammatory -- anti-inflammatory medications.
11     A.  I think I mentioned --
12     Q.  So this is an inflammation study, isn't
13 it?
14     A.  Yeah.  I think I mentioned in -- about
15 NSAIDs that I might have cited them in that
16 section, that the evidence was not consistent
17 with NSAIDs, if I remember correctly.
18     I definitely looked at this paper when I was
19 looking at NSAID and aspirin use and certainly
20 inflammation as well.  So...
21     Q.  It's actually not cited anywhere with
22 NSAID use or regarding inflammation at all.
23     So maybe it was an earlier draft and was
24 removed at some point?
25     A.  It's possible.

Page 303

1     Q.  And you also -- you cite -- you do cite
2 some of the NSAID studies and aspirin studies,
3 but you leave out others.  You leave out Baandrup
4 2013, which was a negative study; Bonovas, 2005,
5 which was a negative study; Ni, 2012, which was a
6 negative study.
7     When you did your review of inflammation
8 including anti-inflammatory medications and the
9 risk of ovarian cancer, did you pull out more
10 studies in review than you actually included in
11 your report?
12     A.  Yes.  There are definitely more studies
13 than were cited in my report.
14     Q.  Is there a reason you didn't cite the
15 negative studies?
16     A.  I didn't intentionally leave out the
17 negative studies, but I do mention that the
18 evidence had been inconsistent with NSAID.
19     Q.  Okay.  And you mentioned the Heller
20 study in a couple of places.  You mentioned
21 several times that part of your plausibility
22 opinions involve the fact that talc has been
23 observed in the ovaries; correct?
24     A.  Can you show me?  I'm sorry.  I just
25 want to make sure.

Page 304

1     Q.  I'm sorry.  I'm just referring
2 generally.
3     Do your opinions, in part, depend on the
4 finding of talc in ovaries?
5     A.  No.  Because I think, again, it's
6 difficult to find talc in the ovaries.  So I
7 would not expect to see -- to find, to
8 histologically find talc in every ovary of a
9 woman who has used talcum powder products.  I
10 think that would be extremely difficult to do in
11 every patient.
12     And I know we talked about the MUC-1 theory
13 earlier, but if that is the mechanism, that would
14 not require talc to get to the ovary.
15     So, no, I don't think it's necessary to find
16 talc in the ovary in every woman to come --
17 that's a user.
18     Q.  Let's talk about evidence for
19 talc-induced inflammation in the ovary.
20     For instance, you've cited the Heller study
21 from 1996 in your "Migration translocation,
22 inhalation, and lymphatic transport" section on
23 Page 14.
24     A.  Mm-hmm.
25     Q.  Heller actually states in their study

Page 305

1 that they did not find on their H&E slides any
2 response -- any expected response to talc
3 particles.
4     Do you remember that?
5     A.  I do remember that vaguely.  Yes.
6     Q.  Did any of the studies that you cite in
7 that section for the proposition that talc has
8 been found in ovarian tissue, did any of those
9 find a reaction to talc in the ovaries?
10     A.  I don't believe the studies that have
11 found talc in the ovaries have all looked for
12 chronic inflammation.  Some of them, if I'm
13 remembering correctly, I don't know if they all
14 looked histologically; but the ones that did, I
15 don't believe they had mentioned finding chronic
16 inflammation near the talc particles.
17     But again, you know, depending on how long
18 that inflammatory response is going to be there,
19 depending how long that particular talc particle
20 has been there, you wouldn't necessarily expect
21 to still see it 20 years later.
22     Q.  Okay.  In the Heller study, they looked
23 at ovarian tissue -- ovaries from one of their
24 subjects who had 1.7 or approximately
25 1.669 million particles per gram of wet weight by

Page 306

1 electron microscopy and found on hematoxylin and
2 eosin stain slides from the analyzed sections of
3 the tissue that no evidence of response to talc
4 such as foreign body giant cell reactions or
5 fibrosis in the tissue.
6     Is that consistent with the other studies
7 that have reported findings from H&E have also
8 reported no response to talc or supposed talc
9 they found?
10     What is an alternative explanation for how
11 microscopists doing these sorts of studies might
12 find talc by TEM or SEM without any histologic
13 response --
14         MR. ROTMAN:  Objection.
15     Q.  -- to talc in the tissue?
16     A.  Well, I think I addressed that a little
17 earlier.  Again, I don't know -- we don't know
18 how long a chronic inflammatory response would be
19 there after a particular talc particle lands on
20 the ovary.
21     But the important thing would be that that
22 chronic inflammation, the initial chronic
23 inflammation, whenever that may be, however long
24 it is there, causes oxidative stress that induces
25 an oncogenic change in an ovarian cell or

Page 307

1 fallopian tube cell, for that matter.
2     So -- and these are very small studies that
3 looked at histologic -- that looked
4 histologically for talc in these ovaries.
5     So, you know, I don't necessarily think -- I
6 don't think that you would have to find chronic
7 inflammation if you're looking at an ovary at a
8 particular point in time when we're talking about
9 long-term talc use from, you know, up to 20 years
10 ago or something.
11     Q.  Well, if they're finding 1.7 million
12 particles per gram of wet tissue right then and
13 there, and their slides from that time period
14 don't show any response whatsoever to talc that
15 they would expect to see, what's an alternative
16 explanation?
17     A.  An alternative explanation is that
18 there was chronic inflammation, and it has since
19 resolved.
20     Q.  How about there might be contamination
21 of their samples with talc, which is ubiquitous
22 in many laboratories?
23     A.  I believe they -- I have to look at the
24 study to -- do you have the study?
25         MR. ROTMAN:  Thank you.  What number?

Page 308

1         MS. AHERN:  What number are we on?
2         COURT REPORTER:  Twenty-five.
3         MS. AHERN:  Twenty-five.
4         MR. TISI:  So 24 was --
5         MS. AHERN:  We'll wait.
6         (Article entitled "The
7 relationship between perineal cosmetic talc
8 usage and ovarian talc particle burden"
9 marked Exhibit 25.)
10     A.  I believe they went through standard
11 electron microscopy methods, which controls for
12 contamination.
13 BY MS. AHERN:
14     Q.  How?
15     A.  I don't know if it goes through the
16 whole -- but they're very careful in how they
17 handle tissue before they prep for electron
18 microscopy.
19     Q.  Doctor, do you know where they got the
20 tissue from?
21     A.  Yeah.  It's listed.
22     Q.  Did they collect the tissue themselves
23 from the patient in a particulate-free
24 environment and handle it with particulate-free
25 gloves in containers, or did they get it from

Page 309

1 hospital paraffin-embedded tissue?
2     If you look on Page 1508, "Ovarian tissue in
3 blocks was reparafinized, rehydrated, blotted dry
4 and weighed, and then digested with reagents."
5     A.  So I think these women were talc users.
6 I'm trying to find controls that they had ovaries
7 from -- if I remember correctly, they had ovaries
8 from fetal cases that did not show talc, if I
9 remember correctly.  I'm trying to find that.
10     Yeah.  "In addition, the ovaries of two
11 stillborn fetuses were analyzed as negative
12 controls."
13     Q.  Does it say anything about where those
14 stillborn fetus ovaries came from and if they
15 were handled in the same hospital in the same way
16 that the parafinized blocks were handled?
17     A.  If they didn't have a separate section
18 of their methods how they handled it, it would be
19 the same methodology.
20     Q.  Well, assuming it's not contamination
21 and there's still no reaction to talc, another
22 alternative explanation might be that talc
23 doesn't cause chronic inflammation in the
24 ovaries.
25     A.  But they didn't find talc in their

Page 310

1  negative controls, which were fetal females that
2  would never have been exposed to talc.
3      Q.  Except for after the tissues were taken
4  from the fetuses and processed?
5      A.  I'm just trying to find where they --
6  what they did.
7      Q.  What I wonder and what I don't think is
8  in the paper, unless you can find it, is an
9  explanation for how the fetal ovaries were
10  obtained and processed.
11      Did they come from the same hospital
12  system --
13      A.  It would be the same.
14      Q.  -- from the laboratory so that any
15  contamination that occurred to those tissues
16  prior to the Heller group getting them was
17  accounted for?
18      Or did they purchase them separately through
19  a company or something else that handled them
20  differently from the hospital samples?
21      MR. ROTMAN:  Objection.
22      A.  If those were obtained differently, it
23  should have been in the methodology.  So the fact
24  that it's not there, the next sentence after they
25  say, "In addition, the ovaries of two stillborn

Page 311

1  fetuses were analyzed as negative controls," that
2  is where, if it had been a different methodology
3  or different purchased ovarian cell blocks from
4  fetuses, which I have never -- anyway, it would
5  be -- it would be there.  And it's not.
6      Q.  Hmm.  So my next question is:  I had
7  asked you earlier if there was an alternative
8  explanation for why there's no tissue response
9  seen in this study to talc particles, and you
10  said it could be because the chronic inflammation
11  was there and not there at the time that they
12  looked at the H&Es?
13      A.  Yeah.  I mean, you're looking at an
14  ovary at a very -- at one time point.  So we
15  don't know how long those talc particles were
16  there.  We don't know if -- how long -- we don't
17  know how long the chronic inflammation is there.
18      But the important thing is that the chronic
19  inflammation would cause an event to change to an
20  oncogenic phenotype, gene type.
21      Q.  So chronic inflammation is, by
22  definition, chronic; correct?  Doesn't just -- it
23  doesn't just resolve in a couple of days.
24      It's ongoing; is that correct?
25      A.  It is -- acute inflammation would be

Page 312

1  something that would happen over days.  Chronic
2  inflammation is generally longer, but it still
3  resolves.
4      Q.  And are -- for instance, pelvic
5  inflammatory disease is -- the effects of pelvic
6  inflammatory disease can be seen by pathologists
7  for a very long time; correct?
8      A.  You can see fibrosis.  So...
9      Q.  And one of the things that you
10  mentioned earlier is that talc can cause
11  fibrosis?
12      A.  Talc can cause fibrosis.  You get -- in
13  the ovary, however, you will get surface
14  fibrosis, generally, from the mesothelial cells
15  in the surface.
16      But, again, you're not always going to have
17  fibrosis with chronic inflammation, either.
18      Q.  If it's chronic inflammation that is
19  significant enough to lead to a transformative
20  event, shouldn't you expect to see some evidence
21  of that chronic inflammation?
22      A.  Well, we don't know how much chronic
23  inflammation is necessary to cause a carcinogenic
24  effect.
25      Q.  By analogy, wouldn't you look at

Page 313

1  something like ulcerative colitis and colon
2  cancer since that seems to be a fairly
3  well-established association?
4      A.  Yes.  And as soon as patients are
5  diagnosed with ulcerative colitis and Crohn's
6  disease, they are carefully followed at the
7  beginning.  We don't wait 20 years to start
8  following them.  We know that, you know, the risk
9  is there.  As soon as they're diagnosed, we know
10  there is a risk for increased cancer, so we start
11  surveying them.
12      Q.  But there's massive evidence of
13  inflammation -- tissue-damaging inflammation in
14  ulcerative colitis; correct?
15      A.  Not always massive, but there's chronic
16  inflammation.
17      Q.  Throughout the entire GI tract or
18  bowel?
19      A.  In -- it's not always the whole, but
20  yeah, there's chronic inflammation in the
21  intestines.
22      Q.  There's nothing in the literature that
23  suggests that talc causes that kind of an
24  inflammatory reaction, is there?
25      A.  That talc causes a chronic

Sarah E. Kane, M.D.

1 inflammation?

2    Q.  That talc causes that sort of chronic

3 inflammatory reaction.

4    A.  Well, I showed you some excerpts where

5 they mention lymphocytic and plasmacytic

6 inflammation due to talc.  We know that talc

7 causes an acute inflammation.  I know we weren't

8 talking about acute inflammation, but we know it

9 causes acute inflammation in the -- after a

10 pleurodesis.  And I'm sure you could have

11 lymphocytes in plasma cells there too.

12    Again, I don't think it's the -- sure.  The

13 amount and duration of chronic inflammation, I

14 mean, would that increase the risk?  But even a

15 small amount of chronic inflammation for a

16 relatively short period of time, I think it's

17 plausible.

18    And, again, this is all under the plausible

19 thing that this would cause a mutagenic effect.

20    Q.  Can you name other chronic inflammatory

21 conditions that are not associated with cancer?

22    A.  Chronic inflammatory conditions that

23 are not associated with cancer?  Well, I'm not

24 sure we absolutely know every -- that a chronic

25 inflammatory condition won't cause a cancer,

1 but -- so I'm not really sure.  I'm not really

2 sure what you're getting at.

3    Q.  Can you list five chronic inflammatory

4 conditions?

5    A.  That don't cause --

6    Q.  Just list five chronic inflammatory

7 conditions.

8    A.  Well, we have rheumatoid arthritis that

9 increases risk of lymphomas.  We have

10 Helicobacter pylori infections that increase

11 gastric cancer.  We have the ulcerative colitis,

12 Crohn's disease, that increase the risk of

13 cancer.  Agent exposures like asbestos that

14 causes chronic inflammation and causes cancer.

15 HPV infection causes cancer.  I mean...

16    Q.  Can you name one that doesn't involve a

17 virus or an underlying immune dysfunction?

18    A.  I named asbestos.

19    Q.  Asbestos.

20    And was there another?

21    A.  Again, I don't know if we have all the

22 data on potential carcinogens and whether or not

23 they cause chronic inflammation for sure.  I

24 think that, you know, we're still getting that

25 data.

1    Q.  Have you ever diagnosed a patient with

2 a talc-related ovarian cancer?

3    A.  It's entirely possible that I have, but

4 I have not used polarized light microscopy on

5 ovarian tumors, so it's possible I have and

6 didn't look for talc -- didn't look for talc.

7    MR. KLATT:  Objection.  Nonresponsive.

8    Q.  My question was:  Have you ever

9 diagnosed a patient with a talc-related ovarian

10 cancer, meaning you have said, "Your cancer is

11 related to talc use"?

12    A.  Well, first of all, I wouldn't have

13 said that if I'm not looking for talc.

14    But secondly, in our pathology reports, even

15 though we're thinking and looking at causation,

16 we're not necessarily putting in our individual

17 patient reports what caused their cancer.

18    We're certainly putting the diagnosis

19 together with their medical history and their --

20 to kind of make all the pieces fit together, but

21 we're not necessarily in every patient putting

22 out a report on what causes their cancer.

23    MR. KLATT:  Objection.  Nonresponsive.

24    MS. AHERN:  Objection.  Nonresponsive.

25    Q.  I just want to know if you've ever

1 actually diagnosed a patient with a talc-related

2 ovarian cancer.  It sounds like the answer is no.

3    If it is, it's okay.  I need an answer.

4    A.  I'm trying to answer your question.

5 Honestly, it's entirely possible that I have.

6    But have I specifically put in a patient's

7 report, "This ovarian cancer was caused by talc,"

8 no.

9    Q.  Thank you.  That's all I was asking.

10    What about at tumor boards?  Do you attend

11 tumor boards?

12    A.  I do.

13    Q.  Have you ever suggested in a tumor

14 board meeting with other colleagues that a

15 particular patient's ovarian cancer was caused by

16 talc use?

17    A.  I've certainly discussed with

18 oncologists and radiation oncologists about my

19 recent work.  Again, it's been only in the last

20 year and a half that I have really done this deep

21 dive in this literature.

22    And I've certainly talked to radiation

23 oncologists, oncologists about it at tumor boards

24 in a way of sort of educating them about my

25 findings, but we haven't discussed in the context

Sarah E. Kane, M.D.

Page 318

1   of a particular patient.
2       Q.   And were these discussions with
3   radiation oncologists, were these people that
4   focused on -- if they focus on -- gynecologic
5   malignancies?  Were they more pulmonary?  Is
6   there a difference with radiologists in terms of
7   specialty?
8       A.   There are some subspecialties.  In this
9   one, they were more general radiation
10  oncologists.
11      Q.   Okay.
12          MS. AHERN:  How much time do we have?
13          THE VIDEOGRAPHER:  Fifteen minutes.
14          MS. AHERN:  I'm going to turn it over
15  to my colleagues so they have an opportunity to
16  ask questions.  Thank you very much.  I
17  appreciate it.
18          THE WITNESS:  Thank you.
19          MR. KLATT:  How much time do we have?
20  We're at 6:37 right now.
21      Are you ready for me to continue?
22          CROSS-EXAMINATION
23  BY MR. KLATT:
24      Q.   Dr. Kane, are you ready to continue?
25      A.   Yes.

Page 319

1       Q.   Can you hear me okay?
2       A.   Yes.
3       Q.   Yes.  Dr. Kane, my name is Mike Klatt,
4   and I represent a company called Imerys Talc
5   America in this case.
6       Before this lawsuit, have you ever heard of
7   Imerys Talc America?
8       A.   I don't believe I had, no.
9       Q.   Do you know what Imerys Talc America
10  does?
11      A.   From my understanding, they mine talc,
12  and they supply -- they're the talc -- one of the
13  talc suppliers for Johnson & Johnson.
14      Q.   You said earlier you reviewed an
15  exhibit of Julie Pier's deposition.
16      Do you know who Julie Pier is?
17      A.   I know she was a designated
18  representative.  I don't know if it was for J&J
19  or for Imerys off the top of my head.
20      Q.   Ms. Pier works at Imerys, and she's an
21  expert microscopist and at analyzing talc for any
22  extraneous substances like asbestos.
23      She testified that the evidence you looked
24  at did not indicate in any way that talc that
25  ended up in Johnson & Johnson's baby powder had

Page 320

1   asbestos in it.
2       Are you choosing to believe the plaintiffs'
3   asbestos experts over Ms. Pier's testimony?
4           MR. TISI:  Objection.
5       A.   Again, I think these were pieces of
6   information for me.  I wasn't relying on her --
7   the exhibit from her testimony for my general
8   causation.  I wasn't -- and I didn't see
9   Dr. Longo's reports until very late in my process
10  from what I recall.
11      It's interesting information for me.  It's
12  informative in that if the talcum powder products
13  cause [sic] asbestos, that certainly lends
14  significance to plausibility.  But I'm --
15          MR. ROTMAN:  Do you want to reread your
16  answer there?  I think you misspoke.
17          THE WITNESS:  Okay.  Sorry.
18      A.   Yes.  I did.  If the talcum powder
19  contains asbestos, that certainly adds to the
20  plausibility.  But I'm not opining on whether or
21  not talcum powder products contain asbestos.
22      Q.   And you wouldn't have the expertise to
23  decide that Dr. Longo's testimony about asbestos
24  in talc is more credible than Ms. Pier's
25  testimony about asbestos in talc, do you?

Page 321

1       A.   I have a, I would say, cursory
2   knowledge of how they would test for asbestos.  I
3   couldn't say that I am an expert in the methods
4   that they use to detect asbestos.
5       Q.   But my specific question is:  You don't
6   have the expertise to determine that Dr. Longo's
7   testimony about asbestos and talc is more
8   credible with or more believable or more
9   scientifically valid or less scientifically valid
10  than Ms. Pier's testimony about asbestos and
11  talc; correct?
12      That's my question.
13      A.   Again, it's pieces of information for
14  me.  I don't know anything, really, about
15  Dr. Longo versus Ms. Pier.  I just have seen the
16  exhibit from Ms. Pier's testimony and Dr. Longo's
17  report, but I don't have more information nor
18  have I really sought it out about their
19  credentials.  I was just using it as pieces of
20  information.
21      Q.   But again my question is:  You have no
22  ability or expertise on your own to judge whether
23  Ms. Pier's testimony that there's not asbestos in
24  talc is correct or Dr. Longo's testimony is
25  correct.  That's not an area of your expertise;

Sarah E. Kane, M.D.

Page 322

1  correct?
2     A.  It -- I wouldn't say I'm an expert in
3  that area.
4     Q.  You mentioned earlier in response to
5  Ms. Ahern's questions, you talked about heavy
6  metals.
7     Are you aware that IARC has not singled out
8  a single heavy metal as a cause of ovarian
9  cancer?
10    A.  Yes.  I have seen that.  I have
11 reviewed the IARC monograph on heavy metals, and
12 I'm aware.
13    But, again, it's another sort of piece of
14 the plausibility puzzle.  If we -- we know that
15 some of them are either listed as carcinogens or
16 probable carcinogens.  If they're in the talcum
17 powder product, that's just another piece of the
18 biological plausibility puzzle.  And I --
19    Q.  Well, is it your -- I'm sorry.  I
20 didn't mean to cut you off.
21    A.  No.  Sorry.
22    Q.  Is it your testimony that if something
23 is considered a carcinogen for one organ system
24 by IARC, that it's capable of causing cancer in
25 all organ systems?

Page 323

1     A.  As I've testified several times here
2  today, I think different tissues respond in
3  different ways to different carcinogens.  So I
4  would not make a blanket statement that a
5  carcinogen in one site will definitely cause
6  cancer in another site.
7     However, having carcinogens, known
8  carcinogens in a product, it can add to the
9  biological plausibility.  And we're not talking
10 about these heavy metals sort of in the
11 environment.  I mean, these are -- there's
12 evidence that they are in a product that's used
13 regularly and frequently.
14    Q.  Are you -- are you aware that the same,
15 exact heavy metals are in bottled drinking water?
16    A.  So, again, I don't know what the levels
17 of these heavy metals are in drinking water.  I
18 know that they are found in the environment
19 commonly.
20    Q.  Are you aware they're in foods?
21    A.  I'm aware that they are in the
22 environment and foods regularly.  Yes.  But --
23    Q.  Are you aware they're in multivitamins?
24    MR. ROTMAN:  Wait.  Wait.
25    I was hearing a "but" and not a period

Page 324

1  at the end of the answer before you started your
2  next question.
3     A.  So I'm aware that they're in these
4  things.  What I'm looking at is a product that's
5  used frequently and for -- in a lot of women for
6  a long duration of time.  So their exposure -- if
7  they are in the talcum powder, their exposure to
8  those heavy metals would be greater than the
9  exposure they're getting in the environment.
10    Q.  Those same, exact heavy metals are in
11 drinking water, bottled water, food, and
12 multivitamins that people take every single day,
13 and there's no evidence that they cause ovarian
14 cancer; correct?
15    A.  There has not been a link with heavy
16 metals to ovarian cancer specifically as of yet.
17    Q.  And there's no evidence you're aware of
18 that the tissue levels of any heavy metals are
19 higher in talc users than in women who never used
20 talc; correct?
21    A.  I don't -- I'm not aware of that study
22 being done.
23    Are you talking tissue levels?
24    Q.  Blood levels --
25    A.  Blood levels.

Page 325

1     Q.  -- tissue levels.  Anything you want.
2     You're -- there's no medical or scientific
3  evidence that you would tell this court that the
4  levels of heavy metals in women who use talcum
5  powder in the genital area are higher than women
6  who have never used talcum powder?
7     A.  I'm not aware of studies that have been
8  done that have looked at the levels of those
9  heavy metals in ovarian tissue or blood levels.
10    Q.  Earlier you mentioned there was a study
11 about changing gene expression in the presence of
12 talc in mesothelial cells?
13    A.  Yes.
14    Q.  The mere fact that you have changing
15 gene expression in no way implies something is
16 carcinogenic; correct?
17    A.  It -- it's evidence that it's changing
18 gene expression within those cells, and --
19    Q.  If -- I'm sorry.  Go ahead.
20    A.  And the genes in that study that had
21 increased expression are involved in the
22 inflammatory -- are pieces in the inflammatory
23 response.
24    Q.  You're aware that many of those genes
25 in that study were antioxidant genes and

Sarah S. Kane, M.D.

Page 326

1  anti-inflammatory genes that were elevated;
2  correct?
3      A.  They can regulate or deregulate, and I
4  think it's interesting -- let's say that they
5  were antioxidant -- they were producing
6  antioxidant enzymes.  I think that is evidence
7  that it's trying -- that the cell is trying to
8  respond and is trying to prepare itself for an
9  insult, an inflammatory insult.  Otherwise, why
10  would that gene be expressed?
11      So, I mean, there's increased and decreased
12  regulation.
13      Q.  But, Dr. Kane, you're aware that
14  strenuous exercise can increase gene expression
15  of prooxidants, antioxidants, proinflammatory,
16  anti-inflammatory proteins; correct?
17      A.  Strenuous exercise can increase
18  antioxidants in proinflammatory,
19  anti-inflammatory proteins.
20      But, again, I'm opining about a product that
21  someone is going to be using regularly with
22  frequency over a long period of time.
23      Q.  You're aware that --
24      A.  It just adds to the -- I'm not -- you
25  know, I don't have an opinion about whether or

Page 327

1  not those heavy metals are in talc.  I've looked
2  at some evidence that they are there, but I don't
3  have an opinion that they're actually in talc.
4  It's just another piece of evidence, again, for
5  the biological plausibility.
6      Q.  Well, you're not saying that people who
7  regularly engage in chronic exercise, chronic
8  strenuous exercise, for a long period of time are
9  at increased risk of cancer because they have
10  increased gene expression, are you?
11      A.  Well, there hasn't been epidemiologic
12  evidence that is consistent that people who do
13  routine strenuous exercise get cancer.
14      Q.  The Buz'Zard study you cited, that
15  actually showed that talc -- increasing doses of
16  talc decreased release of reactive oxygen species
17  from ovarian cells, not increased it; correct?
18      A.  I believe it was different -- I would
19  have to look at the study, but it was over
20  different time periods.  It fluctuated.
21      Q.  The highest level of reactive oxygen
22  species in the Buz'Zard study was the group of
23  cells that had no talc applied at all; correct?
24      A.  I'd have to re-review the study.
25      Q.  Let's --

Page 328

1      MR. KLATT:  Can we mark that?
2      MR. ROTMAN:  Can we get a time check?
3      THE VIDEOGRAPHER:  6:30.
4      MR. ROTMAN:  Thank you.
5      (Article entitled "Pycnogenol
6  reduces Talc-induced Neoplastic
7  Transformation in Human Ovarian Cell
8  Cultures" marked Exhibit 26.)
9      MS. AHERN:  That's 26.
10      Q.  Referring to Exhibit 26, Dr. Kane, is
11  this the Buz'Zard study you were mentioning
12  earlier?
13      A.  Yes, this is it.
14      Q.  And if you'll flip over to Page 3 --
15  excuse me, 582, Figure 3, do you see Figure 3
16  is --
17      MR. ROTMAN:  Can I have a copy of that,
18  please?
19      MR. KLATT:  I'm sorry?
20      MR. ROTMAN:  I'm waiting for a copy of
21  that.
22      MR. KLATT:  Oh.  Yes.  We do provide
23  copies.
24      MR. ROTMAN:  This is Exhibit No. 1?
25      THE WITNESS:  I'm sorry.  Which table?

Page 329

1      MS. AHERN:  Twenty-six.
2  BY MR. KLATT:
3      Q.  Figure 3.  Page 582.
4      MR. ROTMAN:  What exhibit are we on?
5      COURT REPORTER:  Twenty-six.
6      MR. ROTMAN:  Thank you.
7  BY MR. KLATT:
8      Q.  And you see Figure 3 is "ROS."
9  That stands for reactive oxygen species?
10      A.  That's --
11      Q.  And, by the way, ROS are generated by
12  every cell of the body every day, 24 hours a day;
13  correct?
14      A.  Reactive -- you do see it in daily cell
15  life.  But, again, I'm talking about an
16  additional exposure, an agent that is being
17  applied in addition to what you're seeing on --
18  basically the cell has, as we just discussed,
19  they have ways of mitigating reactive oxygen
20  species.
21      The cell can increase their antioxidant
22  enzymes, but at some point, they can get
23  overloaded.  So if you're giving it a higher dose
24  at a higher frequency than those systems can
25  handle, you're going to have an increased risk of

Page 330

1  mutagenesis.
2    Q.  Well, let's look at what Buz'Zard found
3  when talc was applied to surface ovarian cells.
4    Do you see that?  That's Figure 3A up at the
5  top?
6    A.  A, up at the top.  Yes.
7    Q.  And you'll agree with me, you see on
8  the Y axis it says "Percentage of reactive oxygen
9  species generation in OSE2a cells"; correct?
10    A.  Yes.
11    Q.  That's ovarian surface epithelial
12  cells; correct?
13    A.  Yes.
14    Q.  And you'll see at the zero talc level
15  on the X axis --
16    A.  Mm-hmm.
17    Q.  -- that had 100 percent talc -- excuse
18  me -- a 100 percent reactive oxygen species
19  generation at all three time periods; correct?
20    A.  That is correct.  And --
21    Q.  And when talc was applied?
22    MR. ROTMAN:  Wait.  Wait.
23    Did you finish your answer?
24    A.  Well, we were just talking about how
25  cells can have innate ROS generation.

Page 331

1    Q.  And this graph shows that as you
2  applied increasing doses of talc, the level of
3  generation of reactive oxygen species in the
4  ovarian cells went down.
5    It didn't go up; correct?
6    A.  Well, it goes up at -- what's the 50 --
7  the 50 micrograms per milliliter.  It goes up at
8  that dose at the 120 hour, and then it goes up at
9  the 200 microgram level.
10    Q.  That's not talc, is it?
11    A.  I'm sorry.  I'm looking at -- I'm
12  looking at -- it says "Talc micrograms per
13  milliliter," and then it lists the different
14  hours on the right; that they're color-coded to
15  the different hours.
16    Q.  And 17 out of the 18 measurements they
17  took when talc is applied to ovarian cells showed
18  the ovarian cells generated less reactive oxygen
19  species than no talc at all; correct?
20    A.  And I --
21    Q.  Is that correct?
22    A.  It looks like at different periods of
23  time at the 100 micrograms and 500, there was
24  less than the lower.  But I'm not sure what the
25  threshold dose would be for optimal ROS

Page 332

1  generation for each talc microgram.
2    Q.  Do you see in the far right column,
3  they applied 200 micrograms of hydrogen peroxide?
4    A.  Yes.
5    Q.  And that resulted in a 200 percent
6  increase in reactive oxygen species during those
7  time periods; correct?
8    A.  That is what it says.  Yes.
9    Q.  And that's their positive control;
10  correct?
11    A.  Let me just double-check.
12    If I'm remembering the study correctly, yes,
13  you are -- you are right.
14    Q.  People gargle with hydrogen peroxide;
15  correct?
16    A.  They shouldn't.
17    Q.  Well, you know, it's allowed on the
18  bottle.
19    You know that; correct?
20    A.  If you're telling me they gargle with
21  it, that's fine.
22    Q.  Well, they put it on cuts; right?
23    A.  They shouldn't put it on cuts.  It's
24  actually --
25    Q.  It's sold for that, isn't it?

Page 333

1    A.  I think most MDs would tell you that
2  it's probably better not to use hydrogen peroxide
3  on open cuts because it can cause a pretty severe
4  reaction.
5    Q.  You're aware that it's sold over the
6  counter in stores every day for -- as an
7  antiseptic?
8    A.  Talcum powder is sold for everyday use
9  on babies.
10    Q.  So are you telling us that hydrogen
11  peroxide now causes cancer?
12    A.  I'm saying that it will release ROS
13  species generation.
14    Q.  Far more than talc; correct?
15    A.  Based on this study, it appears that
16  way.
17    Q.  And you --
18    A.  This one study.
19    Q.  You agree with me this shows, as you
20  apply talc, reactive oxygen species in ovarian
21  cells decreases.
22    It doesn't increase at 17 out of 18 time
23  points; correct?
24    A.  They're -- I will agree with you,
25  except there is a time point where it is

Sarah E. Kane, M.D.

Page 334

1 increased. And I don't know -- my caveat is I
2 don't know where the threshold would be where the
3 ROS would stop being generated.
4    Q.   Is aspirin approved by any
5 pharmaceutical company or recommended by any
6 medical organization for prevention of ovarian
7 cancer?
8    A.   That is not on the label description.
9    Q.   If aspirin prevented ovarian cancer,
10 don't you think it would be marketed for that
11 purpose?
12       MR. TISI:  Objection.
13       MR. ROTMAN:  Objection.
14    A.   I'm sure it may be after years of FDA
15 red tape and approval, but the literature --
16 again, I've said the literature is not as beefy
17 as the epi data when we're looking at aspirin and
18 NSAIDs.
19       NSAID, in particular, is not as consistent.
20 The aspirin data does appear to be consistent in
21 lowering the risk, but there are not a lot of
22 studies looking at this yet.
23       Again, though, just a piece of the puzzle
24 for a biologic plausibility.
25    Q.   Well, certainly, we're not at the point

Page 335

1 for aspirin and ovarian cancer that we are, for
2 example, with aspirin in terms of cardiovascular
3 risk; correct?
4    A.   I would agree with that sentiment.
5    Q.   And doctors and medical organizations
6 have recommended aspirin for reduction of
7 cardiovascular risk; correct?
8    A.   That's correct. Although the dosage
9 has -- as of late, they're kind of parsing out
10 the -- they're reevaluating what dosages, but
11 you're correct.
12    Q.   And you can't cite a single medical
13 organization that at this point in time says the
14 evidence that aspirin reduces ovarian cancer is
15 sufficient that women should take it on a regular
16 basis to reduce ovarian cancer; correct?
17    A.   Well, I think I've said there aren't
18 that many studies yet. It's only -- that I'm
19 aware of, there are only a handful. They've been
20 consistent with aspirin. Not so much with NSAID.
21 That's, I think, as far as the evidence takes us
22 as this point.
23    Q.   There's actually studies showing that
24 chronic aspirin ingestion doesn't decrease
25 ovarian cancer risk; correct?

Page 336

1    A.   I have to look at the studies. There
2 might be one where it wasn't statistically
3 significant, but I think the majority of the ones
4 that looked at aspirin use showed a decreased
5 risk of ovarian cancer.
6    Q.   Are you -- are you a member of the
7 International Society of Gynecologic
8 Pathologists?
9    A.   I don't think I'm a member currently.
10 No.
11    Q.   Have you ever been?
12    A.   I believe so.
13    Q.   It's not on your CV.
14    A.   Okay. I'm not currently. I know that.
15    Q.   Are you a member of the American
16 Society of Clinical Pathology?
17    A.   I actually am.
18    Q.   It's not on your CV.
19    A.   Okay. That should be updated, then.
20    Q.   Have you ever been a member of any
21 working group or organization on the
22 classification of female reproductive organ
23 tumors?
24    A.   No. I can't -- no.
25    Q.   You mentioned the Surgeon General's

Page 337

1 report in 1964. You're aware that when that came
2 out about smoking, there were numerous studies in
3 the literature at that point in time showing that
4 the chemicals in cigarette smoke actually damaged
5 DNA and resulted in cancer; it wasn't based just
6 on epidemiology?
7    A.   I think epidemiology -- my point was
8 that the epidemiology was the sort of first --
9 there were pathologists that had noticed on
10 autopsies in patients that smoked -- it was
11 actually pathologists and a surgeon in the early
12 years -- that had noticed some changes, some
13 squamous metaplastic changes.
14       But it was really the epi data that sort of
15 drove the research on smoking and tobacco
16 initially. But, again, there were some studies
17 that had shown some pathologic changes in
18 smokers. That's true.
19    Q.   You're aware that the cohort studies,
20 the hospital-based case-control studies, and the
21 population-based case-control studies all
22 uniformly showed that smoking increased the risk
23 of lung cancer; correct?
24    A.   That's correct.
25    Q.   And that's not true for talc and

Sarah F. Kane, M.D.

Page 338

1  ovarian cancer; correct?
2      A.  Well, I have some issues with the
3  cohort studies.
4      Q.  I know that.
5      But my statement is true; correct?
6      A.  But I think it's relevant because the
7  cohort studies, I don't believe, followed
8  patients for a long enough time.
9      The Nurses' Health Study only asked about
10  talcum powder use once in 1982, so there's
11  certainly room for misclassifications of users as
12  never users.
13      And some of -- some of -- again, there's
14  smaller numbers because it's a -- it's a cohort
15  study.
16      Q.  You're aware that the National Cancer
17  Institute doesn't agree with you on that, aren't
18  you?
19      A.  I have seen the NCI website.  I
20  certainly considered what they say about it.  I
21  don't know if they have done the same type of
22  analysis as I've done.  I don't believe it's on
23  their website what methodology they used and what
24  literature they reviewed.
25      So I'm aware of what they've stated.  But,

Page 339

1  you know, I've still done this extensive review
2  that I'm not sure they did to come to my
3  conclusion.
4      Q.  You honestly don't know what the NCI
5  did in terms of review to come to their
6  conclusion, do you?
7      A.  They didn't state what they did, so I
8  do not know.  So that would -- but that's
9  something that I'm thinking about when I'm taking
10  into consideration.
11      Q.  And you are aware that they just
12  updated their statement that the evidence does
13  not support a link between talc and ovarian
14  cancer in January 2019, the same month we're
15  sitting here today?
16      A.  I don't know if I've gone to the NCI
17  website this month.
18      But I'm also aware of Health Canada that
19  came out and did -- and we know what the
20  methodology and literature they -- they spelled
21  it out very clearly what their methodology was,
22  what literature review they did, and they came to
23  the same conclusion that I did.
24      MR. ROTMAN:  Off the record, Mike?
25      MR. KLATT:  Let me just follow up on

Page 340

1  that one statement.
2      Go ahead.
3      MR. ROTMAN:  If you want to do that,
4  that's fine.
5  BY MR. KLATT:
6      Q.  That draft -- Health Canada issued a
7  draft assessment that's undergoing a 60-day
8  public comment period; correct?
9      A.  That's true.
10      Q.  And then they have up to two years to
11  decide whether to take any action or no action at
12  all; correct?
13      A.  Well, there's two pieces of that.  From
14  my understanding is that they've already done the
15  scientific.  They've already done the literature
16  review.  They've already done their Bradford Hill
17  analysis, and they've come to the conclusion that
18  they've come to.
19      And then there's the public commentary.  And
20  then there's the regulatory aspect of it.
21      Now, I am -- I would not claim to be an
22  expert in regulatory.  I know we have regulatory
23  experts that are coming on.  But in -- from my
24  understanding, the regulatory aspect is different
25  than the scientific aspect.

Page 341

1      MR. ROTMAN:  Mike, you're done?  I just
2  want to --
3      MR. KLATT:  I'm through.
4      MR. ROTMAN:  I just want to go off the
5  record.
6      We're done with seven hours.
7      MR. KLATT:  Yes.  I'm done.
8      MR. TISI:  Let's take a minute.
9      THE VIDEOGRAPHER:  Off the record,
10  6:31 p.m.
11      (A recess was taken.)
12      THE VIDEOGRAPHER:  Back on the record,
13  6:40 p.m.
14          CROSS-EXAMINATION
15  BY MR. ROTMAN:
16      Q.  Dr. Kane, I know it's been a long day
17  for you, but I'm going to ask you a few
18  questions.  I will be brief.
19      A.  Okay.
20      Q.  At one point today, you were asked some
21  questions by Attorney Ahern about certain
22  negative studies on inflammation, and she
23  mentioned Bonovast 2005 and Ni 2012, which she
24  asked you about.
25      Do you recall that?

Sarah E. Kane, M.D.

Page 342

1    A.  Yes.
2    Q.  She did not show you those studies, did
3 she?
4    A.  I don't believe I saw them.
5    Q.  Are you able to agree with her
6 characterization that these were negative studies
7 without having -- without looking at them?
8    A.  I should have asked for them and had
9 them in front of me while asking questions.
10    Q.  Now, you were asked questions --
11    A.  I mean answering questions.
12    Q.  -- throughout the day about
13 inflammation as a biologically plausible
14 mechanism for explaining talc causing ovarian
15 cancer in light of the epi study findings.
16    A.  Yes.
17    Q.  You were also asked questions about
18 cigarette smoking at various times throughout the
19 day?
20    A.  Yes.
21    Q.  Does cigarette smoking have an
22 inflammatory effect?
23    A.  Yes.
24    Q.  What is the --
25    A.  It does cause chronic inflammation.

Page 343

1    Q.  You were also asked questions about
2 heavy metals being present in food and water and
3 vitamins; correct?
4    A.  I remember.  Yeah.
5    Q.  Do -- what is different between those
6 circumstances and the situation that we have been
7 discussing all day today involving talcum powder?
8    A.  With talcum powder, we do have the epi
9 data that are consistent and show an increased
10 risk of ovarian cancer with talcum powder use.
11    Q.  And with respect -- you were asked some
12 questions in relation to the Buz'Zard study about
13 hydrogen peroxide and the reactive oxygen species
14 reaction?
15    A.  Yes.
16    Q.  Are you aware of any evidence that
17 hydrogen peroxide -- the effect of hydrogen
18 peroxide in the female genital tract?
19    A.  I'm not aware that women routinely use
20 hydrogen peroxide in the female genital tract.
21    Q.  And is there anything in particular
22 about the -- that part of the anatomy that where
23 certain agents, exposure to certain agents, would
24 raise any particular concerns -- strike that.
25    I think that was a bad question, so I'll

Page 344

1 just strike that.
2    You were asked questions about surgical
3 gloves and surgical-grade talc on surgical
4 gloves.
5    A.  Yes.
6    Q.  Do you recall that?
7    A.  Yes.
8    Q.  And I think you were asked if you were
9 aware of any studies linking the use of talcum
10 powder on surgical gloves with the occurrence of
11 ovarian cancer.
12    Do you recall that?
13    A.  Yes.
14    Q.  Is there a difference, a notable
15 difference, between talcum powder on surgical
16 gloves and the talcum powder products in perineal
17 use that, regardless of the constituent of the
18 powder, that you would want to point out?
19        MR. KLATT:  Objection.  Form.
20        MS. AHERN:  Same.
21    A.  So a patient's exposure to surgical
22 gloves are going to be infrequent and not of long
23 duration.  It's not the same type of exposure as
24 regular and frequent application of perineal
25 talcum powder that we're seeing in the epi data.

Page 345

1        MR. ROTMAN:  No further questions.
2 It's 6: --
3        (Discussion off the record.)
4        MR. ROTMAN:  You're right.
5 BY MR. ROTMAN:
6    Q.  I have some questions for you about
7 your testimony on the Harlow paper.
8    A.  Okay.
9    Q.  Can you pull that out in front of you,
10 which was Exhibit 20?
11    A.  Okay.
12    Q.  Can you turn to Table 3.
13    A.  Okay.
14    Q.  And do you recall that you were asked
15 questions about dose-response in this study?
16    A.  Yes.
17    Q.  And do you recall that you were
18 specifically asked questions about this Table 3?
19    A.  Yes.
20    Q.  Could you look at the middle part of
21 Table 3, at the column with "adjusted odds
22 ratios"?
23    A.  Yes.
24    Q.  What can -- what do you observe with
25 respect to the adjusted odds ratio as the -- as

Sarah E. Kane, M.D.

Page 346

1  the -- as the number of applications goes from
2  less than 1,000 to greater than 10,000?
3      A.   The adjusted ORs go from -- the null,
4  1.0 at none, 1.4 at less than 1,000, to 1.7 at
5  greater than 10,000.
6      Q.   And so what, just looking at the
7  adjusted odds ratio, what --
8      A.   It's an increase with increased --
9      Q.   -- what is your takeaway?
10      A.   So it does show an increased odds ratio
11  with increased applications.
12      The confidence intervals do include the
13  null, but they're -- the higher end, it's higher
14  confidence interval at the upper end.
15      And it's not very far from the null on the
16  lower end.
17      And it, in fact, includes -- it's 1.0 at
18  greater than 10,000.
19      Q.   And so for the 1,000 to 10,000
20  applications, the lower bound of the confidence
21  interval is .9?
22      A.   Correct.
23      Q.   And how close is that to being a
24  statistically significant finding?
25      A.   Very close.

Page 347

1      Q.   And can you also take a look at the
2  discussion on that page in the left-hand column
3  in the paragraph that begins with "We also
4  examined"?
5      A.   Okay.
6      Q.   Is there a discussion in that paragraph
7  concerning the author's discussion of
8  dose-response?
9      A.   Yeah.  There's a sentence that states,
10  "The categorical analysis showed that relative to
11  nonusers, the risk was greatest in women who
12  applied talc at least once per day.  When years
13  of use was included as a continuous variable, the
14  test for linear trend was 3.32, p-value of .07.
15      "The categorial analysis show that relative
16  to nonusers, women who applied talc for more than
17  ten years were at a 60 percent greater risk for
18  ovarian cancer.  Likewise, perineal applications
19  of talc early in life, before age 20, or
20  applications within six months of diagnosis
21  reference age for controls produced the stronger
22  ORs."
23      Q.   And I'd like to also call your
24  attention to the page 24 in the right-hand
25  column.

Page 348

1      A.   Yes.
2      Q.   And this is -- this is in the
3  "Discussion" section of the paper; is that right?
4      A.   Yes.
5      Q.   And do you see in the paragraph that
6  I'm pointing to that begins with "Our study"?
7      A.   Yes.
8      Q.   Could you read into the record and
9  comment on the last sentence in that paragraph.
10      A.   "Daily versus less-than-daily talc use
11  and talc use for more than ten years versus less
12  than ten years were associated with greater risk
13  for ovarian cancer."
14      Q.   And can you comment on that?
15      A.   So that does show a trend for a
16  dose-response.
17          MR. ROTMAN:  Okay.  So I have 6:48.
18  You've got eight minutes.
19              RECROSS-EXAMINATION
20  BY MR. KLATT:
21      Q.   That Harlow study you were just looking
22  at --
23      A.   Yeah.
24      Q.   -- is that the 1992 Harlow study?
25      A.   It's the 1992 from Exhibit 20.

Page 349

1      Q.   And can you look on the last page of
2  this study, the page where the article ends and
3  the reference begins.
4      Did Harlow find the strength of association
5  between genital use of talc and ovarian cancer
6  was strong or weak?
7      A.   So they use -- they say, "Because the
8  overall association between genital use of talc
9  and ovarian cancer remains weak."
10      And, again, "weak" is sort of a relative.
11  I've seen weak to moderate with this odds ratio.
12  And this is also 1992.
13          MR. KLATT:  Object.  Nonresponsive.
14      Q.   I'm simply asking you, Dr. Kane, does
15  Harlow say strength of association between
16  ovarian cancer and talc use is strong or weak?
17      A.   Well, I'm putting it in context.  He
18  states -- I agree with you that's what the words
19  say, but I'm putting it in context in that "weak
20  to moderate" is used amongst epidemiologists for
21  this level of overall risk.
22      And this is 1992, so there wasn't the
23  subsequent studies that have gone on that show
24  consistent, similar overall risk odds ratio.
25      Q.   And would it be correct that the

Sarah R. Kane, M.D.

Page 350

1 statement that I asked you to read says in full,
2 "Because the overall association between genital
3 use of talc and ovarian cancer remains weak, it
4 is unlikely that this exposure disease pathway is
5 the principal one involved in ovarian cancer
6 etiology"?
7 Is that what Harlow said?
8 A. That's what it states. But, again,
9 that is 1992. This is the very beginning of the
10 epi data looking at this exposure and ovarian
11 cancer.
12 MR. KLATT: Object and move to strike
13 everything after "That's what it says."
14 Q. And, by the way, the odds ratio that
15 Harlow found overall was 1.5.
16 And that's even a little higher than the
17 odds ratios the more recent meta-analyses have
18 shown; correct?
19 A. So --
20 Q. So they're even weaker than Harlow.
21 A. I'm sure some epidemiologists might
22 take -- I'm not -- but, again, I've seen, even
23 with 1.3 and 1.4, epidemiologists refer to that
24 as "moderate."
25 So I don't know if it's semantics, but it's

Page 351

1 1.3. It's a 30 percent increased risk. In this
2 case, 1.5, a 50 percent increase in risk. And in
3 a rare disease like ovarian cancer, that's
4 significant.
5 Q. And Harlow calls a 1.5 odds ratio weak;
6 correct?
7 A. That's what he says in this 1992 paper.
8 Q. And you'd agree with me the more recent
9 meta-analyses of talc and ovarian cancer have a
10 lower odds ratio than 1.5?
11 A. They seem to be between 1.3 and 1.4,
12 but the important thing to me is the consistency.
13 Q. And you're aware that epidemiologists
14 say with case-control studies that odds ratios in
15 the range of 1.0 to 1.5 are well within the range
16 that can be explained by bias and confounding?
17 MR. ROTMAN: Objection.
18 A. I think all of the studies were
19 aware -- all of the authors were aware of
20 potential recall bias and confounding and sought
21 to control as much as possible those factors in
22 their control studies. Most of them, I feel,
23 were relatively well-designed to assess for and
24 adjust for multiple confounding factors.
25 And as far as recall bias, there's an

Page 352

1 element of recall bias in case-control studies,
2 but the authors are aware. Many of them talk
3 about that and discuss why they feel recall bias
4 wasn't an explanation.
5 And, again, we're talking about multiple
6 studies over numerous populations over different
7 periods of time, most of them well before the
8 general public knew about an association between
9 talcum powder and ovarian cancer.
10 And even further, the fact that there's a
11 strong association in the literature with serous
12 invasive cancer would argue against a recall bias
13 because the lay public is not knowledgeable about
14 the histologic subtypes of epithelial ovarian
15 carcinoma.
16 Q. Let me ask you this, Dr. Kane: We
17 lawyers, before we have to go to trial, like to
18 know if the prospective jurors have already made
19 up their mind about the case.
20 Do you know if in any of these case-control
21 studies where the women who had ovarian cancer,
22 were they asked before they entered the study,
23 "Do you have a preconceived notion about what
24 caused your ovarian cancer?"
25 A. I'm not aware of a case-control design

Page 353

1 that would ask that question because even asking
2 that question would potentially add an element of
3 recall bias --
4 Q. But if a woman already --
5 MR. TISI: She wasn't finished.
6 Q. Were you finished?
7 A. I was going to say in a lot of these
8 studies, they also asked about smoking history
9 and other potential lifestyle issues in addition
10 to talcum powder use that would -- and yet, those
11 types of questions didn't show an elevated risk
12 like talcum powder products.
13 Q. Well, wouldn't you want to know --
14 before you interviewed the women who have ovarian
15 cancer, wouldn't you want to know if they have a
16 preconceived notion about what caused their
17 ovarian cancer so if you didn't exclude them from
18 the study, at least you could take that
19 preconceived bias into account when you did the
20 statistics?
21 A. I would think if you're designing a
22 case-control study and trying to avoid recall
23 bias, there are better ways to do that because
24 just by asking, "Do you have a preconceived
25 notion about it?", you're introducing potential

Sarah F. Kane, M.D.

|  | Page 354 |
|---|---|
| 1 | bias because they might think, Oh, maybe there is |
| 2 | an association.  And you're adding bias, |
| 3 | potentially, that way. |
| 4 | Q.  You mentioned cigarette smoking just a |
| 5 | minute ago in response to Mr. Rotman's questions. |
| 6 | And you said cigarette smoking involves a |
| 7 | chronic inflammatory condition in the body; |
| 8 | correct? |
| 9 | A.  There is an inflammatory response in |
| 10 | the body. |
| 11 | Q.  But cigarette smoking has not been |
| 12 | shown to increase the risk of the two most common |
| 13 | forms of ovarian cancer, which is serous invasive |
| 14 | and endometrioid invasive; correct? |
| 15 | A.  So, again, different tissues will |
| 16 | respond to different agents in different ways. |
| 17 | Mucinous carcinoma has been associated in some |
| 18 | studies with smoking, so there is evidence that |
| 19 | epithelial ovarian cancer can be caused by |
| 20 | smoking. |
| 21 | MR. KLATT:  Object.  Nonresponsive. |
| 22 | Q.  The two most common forms of invasive |
| 23 | ovarian cancer -- serous, which is the most |
| 24 | common, and endometrioid, which is the second |
| 25 | most common -- have not been shown to be elevated |

|  | Page 356 |
|---|---|
| 1 | Yes.  It involves an inflammatory state. |
| 2 | MR. KLATT:  Thank you, Doctor. |
| 3 | MR. TISI:  Just one question. |
| 4 | (Discussion off the record.) |
| 5 | MR. ROTMAN:  We're done. |
| 6 | MR. TISI:  Thank you. |
| 7 | THE VIDEOGRAPHER:  Here ends today's |
| 8 | deposition.  Off the record, 6:58 p.m. |
| 9 | (Deposition concluded at 6:58 p.m.) |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 355 |
|---|---|
| 1 | as a result of smoking; correct? |
| 2 | A.  The data has not shown an association |
| 3 | between those two types with smoking. |
| 4 | Q.  Even though smoking involves a chronic |
| 5 | inflammatory state; correct? |
| 6 | A.  But, again -- |
| 7 | Q.  That is -- did you hear my question? |
| 8 | Even though smoking involves a chronic |
| 9 | inflammatory state; correct? |
| 10 | A.  We're talking about different types of |
| 11 | exposures. |
| 12 | Q.  Does smoking -- |
| 13 | A.  Different agent -- |
| 14 | MR. ROTMAN:  One second, Mike. |
| 15 | Do you want an answer to the question? |
| 16 | Because you're cutting -- |
| 17 | BY MR. KLATT: |
| 18 | Q.  My question is:  Does smoking |
| 19 | involve -- |
| 20 | MR. ROTMAN:  Wait.  Wait, Mike.  Let |
| 21 | her answer the question, and then you're done |
| 22 | because we're over. |
| 23 | Do you know what the question was? |
| 24 | A.  Does smoking involve an inflammatory |
| 25 | state? |

|  | Page 357 |
|---|---|
| 1 | - - - - - - |
|  | E R R A T A |
| 2 | - - - - - - |
| 3 | PAGE  LINE  CHANGE |
| 4 | ____  ____  _____ |
| 5 | REASON: _____ |
| 6 | ____  ____  _____ |
| 7 | REASON: _____ |
| 8 | ____  ____  _____ |
| 9 | REASON: _____ |
| 10 | ____  ____  _____ |
| 11 | REASON: _____ |
| 12 | ____  ____  _____ |
| 13 | REASON: _____ |
| 14 | ____  ____  _____ |
| 15 | REASON: _____ |
| 16 | ____  ____  _____ |
| 17 | REASON: _____ |
| 18 | ____  ____  _____ |
| 19 | REASON: _____ |
| 20 | ____  ____  _____ |
| 21 | REASON: _____ |
| 22 | ____  ____  _____ |
| 23 | REASON: _____ |
| 24 | ____  ____  _____ |
| 25 | REASON: _____ |

Page 358

1      ACKNOWLEDGMENT OF DEPONENT
2
3          I,_____, do
       hereby certify that I have read the
       foregoing pages, and that the same
4      is a correct transcription of the answers
       given by me to the questions therein
5      propounded, except for the corrections or
       changes in form or substance, if any,
6      noted in the attached Errata Sheet.
7

       _____
8      SARAH E. KANE, M.D.          DATE
9
10
11
12
13
14

       Subscribed and sworn
15     to before me this
       _____ day of _____, 20_____.
16
       My commission expires:_____
17
18     _____
       Notary Public
19
20
21
22
23
24
25

Page 359

1          C E R T I F I C A T E
2      COMMONWEALTH OF MASSACHUSETTS
3      SUFFOLK, SS.
4          I, Janet M. Sambataro, a Registered Merit
5      Reporter and a Notary Public within and for the
6      Commonwealth of Massachusetts do hereby certify:
7          THAT SARAH E. KANE, M.D., the witness whose
8      testimony is hereinbefore set forth, was duly sworn
9      by me and that such testimony is a true and accurate
10     record of my stenotype notes taken in the foregoing
11     matter, to the best of my knowledge, skill and
12     ability; that before completion of the deposition
13     review of the transcript was requested.
14         I further certify that I am not related to any
15     parties to this action by blood or marriage; and that
16     I am in no way interested in the outcome of this
17     matter.
18         IN WITNESS WHEREOF, I have hereunto set my hand
19     this 28th day of January, 2019.
20
21              _____
                JANET M. SAMBATARO
22              Notary Public
       My Commission Expires:
23     July 16, 2021
24
25

# Exhibit 140

## WEILL CORNELL MEDICAL COLLEGE *CURRICULUM VITAE* FORM

### (REQUIRED FORMAT)

| Signature (required): | *Karla V. Ballman* |
|---|---|
| Version date: | 5 June 2018 |

## A.   GENERAL INFORMATION

**Required Information:**

| | |
|---|---|
| Name: First, Middle, Last | Karla V. Ballman |
| Office address: | Healthcare Policy and Research<br>LA-225<br>Weill Cornell Medical College<br>402 East 67th Street<br>New York, NY 10065 |
| Office telephone: | 646-962-8023 |
| Office fax: | 646-962-0281 |
| Home address: | 430 East 63rd Street<br>Apt. 12G<br>New York, NY 10065 |
| Home telephone: | 507-301-3013 |
| Cell phone: | 507-301-3013 |
| Beeper: | N/A |
| Work Email:<br>Personal Email: | kab2053@med.cornell.edu<br>kvballman@gmail.com |
| Citizenship: | USA |
| If not a U.S. Citizen, do you have: | Immigrant visa (green card)?<br><br>Non-immigrant Visa?<br>Type: |

Optional Information (not required but helpful):

| | |
|---|---|
| Birth date: | 11/14/1960 |
| Birth place: | St. Cloud, MN |

1

**P1.0199**

| Marital status: | Divorced |
|---|---|
| Race/Ethnicity: | Caucasian |

**B.   EDUCATIONAL BACKGROUND**

1.   Academic Degree(s): B.A. and higher; institution name and location; dates attended; date of award. Expand the table as needed.

| Degree (abbreviation) | Institution Name and Location | Dates attended | Year Awarded |
|---|---|---|---|
| B.A. | Macalester College St. Paul, MN | 9/1979 to 5/1983 | 1983 |
| Scientiæ Magister (S.M.) | Massachusetts Institute of Technology Cambridge, MA | 9/1985 to 6/1991 | 1989 |
| Ph.D. | Massachusetts Institute of Technology Cambridge, MA | 9/1985 to 6/1991 | 1991 |

2.   Post-doctoral training (include residency/fellowships): In chronological order beginning with post-doctoral training positions; include full titles, ranks and inclusive dates held. Expand the tables as needed.
**N/A**

3.   Continuing Medical Education Courses/Certificates
**N/A**

4.   Other Educational Experiences
**N/A**

**C.   LICENSURE, BOARD CERTIFICATION, MALPRACTICE**

1.   Licensure: Every physician appointed to the Hospital staff, except interns, and aliens in the US via non-immigrant visas, must have a New York State license or a temporary certificate in lieu of the license.
**N/A**

2.   Board Certification
**N/A**

3.   Malpractice Insurance
**N/A**

2

**P1.0199.2**

**D.   PROFESSIONAL POSITIONS AND EMPLOYMENT**

1.   Academic positions (teaching and research)

| Title | Institution name and location | Dates held |
|---|---|---|
| Assistant Professor of Mathematics and Computer Science | Macalester College St. Paul, MN | 8/1991 to 6/1999 |
| Lecturer of Statistics | University of Auckland Auckland, New Zealand | 1/1994 to 7/1996 |
| Assistant Professor of Biostatistics | Mayo Clinic College of Medicine Rochester, MN | 12/1999 to 7/2001 |
| Associate Professor of Biostatistics | Mayo Clinic College of Medicine Rochester, MN | 7/2001 to 10/2007 |
| Adjunct Associate Professor of Biostatistics | University of Minnesota Minneapolis, MN | 9/2007 to 7/2015 |
| Adjunct Associate Professor | Biomedical Informatics and Computation Biology, University of Minnesota Rochester Rochester, MN | 9/2010 to 7/2015 |
| Professor of Biostatistics | Mayo Clinic College of Medicine | 11/2014 to 7/2015 |
| Professor of Healthcare Policy and Research Tenure awarded (11/2016) | Weill Cornell Medical College New York, NY | 7/2015 to present |

2.   Hospital positions (e.g., attending physician)
     **N/A**

3.   Other Employment

| Title | Institution name and location | Dates held |
|---|---|---|
| Actuarial Trainee | Minnesota Mutual Life Insurance Company St. Paul, MN | 1983 to 1985 |
| Consultant | AT&T Bell Labs Software Production Research Naperville, IL | 1991 to 1994 |
| Research Associate | Division of Biostatistics, Department of Health Sciences Research, Mayo Clinic Rochester, MN | 1999 to 2002 |
| Senior Research Associate | Division of Biostatistics, Department of Health Sciences Research, Mayo Clinic Rochester, MN | 2002 to 2004 |
| Senior Associate Consultant | Division of Biostatistics, Department of Health Sciences Research, Mayo Clinic Rochester, MN | 2004 to 2007 |

3

| Senior Associate Consultant | Division of Biomedical Informatics Department of Health Sciences Research, Mayo Clinic Rochester, MN | 2005 to 2007 |
|---|---|---|
| Group Statistician | American College of Surgeons Oncology Group (ACOSOG) Statistics and Data Center Rochester, MN | 2006 to 2014 |
| Chair | Division of Biostatistics, Department of Health Sciences Research, Mayo Clinic Rochester, MN | 2006 to 2008 |
| Consultant | Division of Biostatistics, Department of Health Sciences Research, Mayo Clinic Rochester, MN | 2007 to 2008 |
| Consultant | Division of Biomedical Statistics and Informatics, Department of Health Sciences Research, Mayo Clinic Rochester, MN | 2008 to 2015 |
| Associate Editor | Journal of Clinical Oncology | 2010 to 2017 |
| Deputy Editor | Journal of Clinical Oncology | 2017 to present |
| Consultant | Department of Surgery, Mayo Clinic Rochester, MN | 2012 to 2015 |
| Director of Biostatistics | Alliance Statistics and Data Center Rochester, MN | 2013 to 2015 |
| Division Chief of Biostatistics and Epidemiology | Healthcare Research and Policy Weill Cornell Medical College New York, NY | 07/2015 to present |

**E.   EMPLOYMENT STATUS (current or anticipated)**

Name of Employer(s): Weill Cornell Medical College

Employment Status (choose one, delete the others):
Full-time salaried by Weill Cornell

**F.   INSTITUTIONAL/HOSPITAL AFFILIATION**
      **N/A**

4

**P1.0199.4**

## G.   PERCENT EFFORT AND INSTITUTIONAL RESPONSIBILITIES

| WCMC ANTICIPATED % EFFORT | (%) | Does the activity involve WCMC students/researchers? (Yes/No) |
|---|---|---|
| TEACHING | 20% | yes |
| CLINICAL | 0% | |
| ADMINISTRATIVE | 40% | no |
| RESEARCH | 40% | yes |
| TOTAL | 100% | |

### INSTITUTIONAL RESPONSIBILITIES

1.   Teaching (e.g., specific teaching functions, courses taught, dates: For guidance refer to Teaching Metrics table. Report your teaching activities in the 4 areas of teaching shown below. To provide a more detailed teaching report, use the Teaching Activities Report template or Educator Portfolio template (strongly encouraged). Refer to it here as an attachment (e.g., see attached), and attach it to the CV.

| Didactic teaching: (e.g., lectures, continuing medical education courses, grand rounds, professional development programs, seminars, tutorials) | |
|---|---|
| Protocol Development (tutorial leader, Mayo Clinic College of Medicine) Health Sciences Grand Rounds | Dates 2008-2012 |

| Mentorship: (e.g., mentor for medical student, graduate student, resident, clinical or postdoctoral research fellow or junior faculty projects; service as graduate student thesis advisor or committee member) | |
|---|---|
| | Dates |
| 8 M.S. candidates in the Clinical Research Master's degree program (Mayo Clinic College of Medicine) | 2004-2015 |
| Served on five M.S. thesis committees for M.S. candidates in the Clinical Research Master's degree program (Mayo Clinic College of Medicine) | 2004-2015 |
| Thesis advisor to 4 students in the Biomedical Informatics and Computational Biology M.S. degree program | 2012-2015 |

| Clinical teaching: (e.g., teaching in the clinic or hospital including bedside teaching, teaching in the operating room, preceptor in clinic) | |
|---|---|
| | Dates |
| | |

| Administrative teaching leadership role: (e.g., residency or fellowship director, course or seminar director or co-director) | |
|---|---|
| | Dates |
| Probability and Mathematical Statistics (course director, Macalester College) | 1991 |
| Introductory Statistics (course director, Macalester College) | 1991, 1992 |
| Mathematical Modeling (course director, Macalester College) | 1991, 1992 |
| Calculus II (course director, Macalester College) | 1992 |
| Calculus III (course director, Macalester College) | 1992 |
| Applied Probability (course director, Macalester College) | 1992, 1993, 1996, 1998 |
| Data Analysis and Statistics | |

5

P1.0199.5

| | |
|---|---|
| Mathematical Statistics | 1993, 1994, 1996, 1997, 1998 |
| Stochastic Methods in Management Science (course director, University of Auckland) | 1993, 1997, 1999 |
| Decision Analysis (course director, University of Auckland) | 1994, 1995 |
| Data Analysis with R (course director, University of Auckland) | 1994 |
| Statistics Minor Curriculum Development (Macalester College) | 1994, 1995 |
| Elementary Statistics (course director, Macalester College) | 1995-1996 |
| Linear Algebra (course director, Macalester College) | 1996, 1997, 1998 |
| Senior Capstone (course director, Macalester College) | 1996 |
| Applied Multivariate Statistics (course director, Macalester College) | 1997, 1998 |
| Differential Equations (course director, Macalester College) | 1998 |
| Experimental Design and Data analysis (course director, Macalester College) | 1998 |
| Introductory Statistical Method I (course director, Mayo Clinic College of Medicine) | 1999 |
| Special Topics in Health Sciences Research (course director, Mayo Clinic College of Medicine) | 2000-2003 |
| Introductory Statistics Methods II (course director, Mayo Clinic College of Medicine) | 2002, 2005 |
| Clinical Trials (course director, Mayo Clinic College of Medicine) | 2003-2004 |
| Introduction to Biostatistics (course director, Executive MBA/MS program, Weill Cornell Medicine) | 2010, 2011 2017-Present |

2. <u>Clinical care (duties, dates:</u> To document clinical activities use the table below or, to document extensive clinical activities use the <u>Clinical Portfolio template</u> (strongly encouraged). Refer to it here as an attachment and attach it to the CV.
   **N/A**

3. <u>Research (duties, dates):</u> Summarize research activities in the table below. Provide key contributions, and annotate key grants and publications or use a <u>Statement of Key Contributions.</u> Refer to it here and attach it to the CV.

| Research Activity / Key Contributions | Dates |
|---|---|
| **See Statement of Key Contributions** | |

4. <u>Administrative Activities (duties, dates):</u> Describe administrative activities in the table below. To document administrative activities more extensively use a supplemental statement, refer to it here and attach it to the CV.

| Administrative Activity | Date |
|---|---|
| Education Committee Member (Health Sciences Research, Mayo Clinic) | 2000 to 2002 |
| Education Committee Chair (Health Sciences Research, Mayo Clinic) | 2002 to 2007 |
| Education Committee Member (Clinical Research Training Program, Mayo Clinic) | 2001 to 2006 |
| Executive Committee Member (Clinical Research Training Program, Mayo Clinic) | 2001 to 2005 |
| Master's Examination Committee Member (Clinical Research Training Program, Mayo Clinic) | 2002 to 2015 |
| Curriculum Committee Chair (Clinical Research Training Program, Mayo Clinic) | 2002 to 2006 |
| Data Safety and Monitoring Board Member (Mayo Clinic Cancer Center) | 2003 to 2006 |
| Clinical Studies Oversight Committee Member (Mayo Clinic Cancer Center) | 2003 to 2006 |
| Neuro-Oncology Executive Committee Member (Mayo Clinic Cancer Center) | 2003 to 2010 |
| Neuro-Oncology Protocol Planning Committee Member (Mayo Clinic Cancer Center) | 2003 to 2007 |
| Education Committee Member (Mayo Graduate School) | 2004 to 2006 |
| Executive Committee Member (Department of Health Sciences Research, Mayo Clinic) | 2004 to 2008 |
| Education Programs Curriculum Committee Member (Center for Translational Activities, Mayo Clinic) | 2006 to 2008 |
| Division Chair (Division of Biostatistics, Health Sciences Research, Mayo Clinic) | 2006 to 2008 |
| Peer Review Research Committee Member (Department of Surgery, Mayo Clinic) | 2011 to 2015 |
| Research Executive Committee Member (Department of Surgery, Mayo Clinic) | 2011 to 2015 |

6

| Research Committee Member (Department of Surgery, Mayo Clinic) | 2011 to 2015 |
| Data Safety and Monitoring Board Member (Department of Surgery, Mayo Clinic) | 2012 to 2015 |
| Division Chief for Healthcare Policy & Research | 2015 to present |
| Healthcare Policy & Research Promotions Committee Member | 2015 to present |
| Weill Cornell Medicine Data Safety and Monitoring Board (alternative) Co-Chair | 2017 to present |

## H. RESEARCH SUPPORT

Summarize Past Research Support:

| | |
|---|---|
| 1. | The Mayo Clinic Research Training Program funded by National Center for Research Resources (K30 RR 22296) from 06/1999 to 09/206 ; role: Associate Director |
| 2. | Risk Factors for Venous Thromboembolism in the Community funded by NHLBI (R01 HL 66216) from 04/2001 to 04/2005; role: Co-investigator |
| 3. | Angiotensin-II Blockade in Mitral Regurgitation funded by NHLBI (R01 HL 64928) fron 04/2001 to 03/2005; role: Co-investigator |
| 4. | Core 1: Statistical and Administrative Core in: Gene Therapy for Vaso-occlusive disease funded by NHLBI (P01 HL 66958) from 09/2001 to 08/2008; role: Co-investigator |
| 5. | Core B: Study Design and Analysis Core in: Molecular Markers of Glioma Initiation & Progression funded by NCI (P01 CA 85799) from 06/2001 to 05/2006; role: Principal Investigator |
| 6. | GSK-3 and Associated Pathways in PNET funded by NINDS (R01 NS 40794) from 07/2002 to 11/2005; role: Collaborator |
| 7. | Mitochondria and surgical myopreservation in aging funded by NIA (R01 AG 21201) from 09/2002 to 08/2008; role: Consultant |
| 8. | Heart Failure in the Community funded by NHLBI ((R01 HL 72435) from 01/2003 to 06/2007; role: Co-investigator |
| 9. | Flavopiridol as a Potential Therapy in Multiple Myeloma funded by NCI (R01 CA 98118) funded from 07/2003 to 06/2008; role: Co-investigator |
| 10. | MAGE-A3/HPV 16 Peptide Vaccines for Head and Neck Cancer funded by the NIDCR (R01 DE 15324) from 04/2004 to 12/2004; role: Co-investigator |
| 11. | Xenograft Model for Studying Amplified EGFR in GBM funded by NCI (R01 NS 49720) from 08/2004 to 05/2006; role: Co-investigator |
| 12. | Brain Tumor SPORE - Core B – Biostatistics funded by NCI (P50CA 108961) from 09/2004 to 08/2014; role: Core Director |
| 13. | Global Differential Expression Profiling During Sudden Tumor Progression Using the Tumor Dedifferentiation Phenomenon as a Model funded by Mayo Clinic Foundation (CR20) from 04/2006 to 06/2010; role: Co-investigator |
| 14. | Measles Virotherapy for Glioblastoma Multiforme funded by NCI (R21 CA 123839) from 08/2006 to 07/2010; role: Co-investigator |
| 15. | Utility of Serum and Tissue Biomarkers for Predicting Response to Androgen Deprivation Therapy in the Population of Men with Rising PSA Following Definitive Treatment in: SPORE in Prostate Cancer funded by NCI (P50 CA 91956) from 09/2006 to 08/2013 ; role: Co-investigator |
| 16. | SPORE in Prostate Cancer—Biostatistics Core funded by NCI (P50 CA 91956) from 09/2006 to 08/2013; role: Core Director |
| 17. | Statistical Responsibilities for American College Of Surgical Oncology Group (ACOSOG) funded by NCI (U10 CA 76001) with subcontract to Mayo from 03/2006 to 11/2014; role: Principal Investigator |
| 18. | Epigenetic regulation of temozolomide responsiveness in glioblastoma funded by NCI (R01 CA 127716) from 01/2008 to 12/2012; role: Co-Investigator |
| 19. | Correlative Science and Imaging Analysis for Z1031 funded by Breast Cancer Research Foundation (WU-09-200) with subcontract to Mayo fro m10/2008 to 09/2009; role: Principal Investigator |
| 20. | A phase III randomized Double Blind study of Adjuvant ST1571 (Gleevee) versus Placebo in patients following the Resection of primary gastrointestinal Stromal Tumor (GIST) funded by Novartis from 12/2008 to 06/2009; role: Principal Investigator |
| 21. | Mayo Comprehensive Cancer Center Grant funded by NCI (P30CA 15083) from 03/2009 to 07/2015; role: Statistician |
| 22. | Novel Biomarkers for Aromatase Inhibitor Therapy funded by NCI (R01 CA 95614) from 04/2009 to 12/2011; role: Principal Investigator |

7

| | |
|---|---|
| 23. | Optimizing Measles Virotherapy in the Treatment of Gliomas funded by NCI (R01CA 140620) from 07/2009 to 03/2011; role: Co-investigator |
| 24. | ACOSOG Community Clinical Oncology Program (CCOP) Research Base funded by NCI (U10CA 149950) from 06/2010 to 07/2014; role: Co-investigator |
| 25. | Treatment patterns of patients with newly diagnosed malignant primary brain tumors funded by Monteris Medical from 09/2010 to 08/2011; role: Principal Investigator |
| 26. | Statistical Responsibilities for American College Of Surgical Oncology Group (ACOSOG) in: Industry Supplement of Statistical Responsibilities for American College Of Surgical Oncology Group (ACOSOG) funded by Duke Clinical Research Institute from 12/2010 to 11/2011; role: Principal Investigator |
| 27. | N1037 P95HER2 expression in metastatic breast cancer patients treated with trastuzumab on N0337 and NCCTG 98-32-52 funded by BioTheranostics/BioMerieux from 10/2011 to 3/2012; role: Co-investigator |
| 28. | Part 1 N9831F-NCCTG-ICSC Validation study of Quantitative Single Gene Assessment of HER2 mRNA by qRT-PCR and Development and Testing of New HER2 Multi-Gene Signature funded by Genomic Health, Inc. from 04/2012 to 05/2015; role: co-Principal Investigator |
| 29. | Therapeutic Strategy to Slow Progression of Calcific Aortic Valve Stenosis funded by National Center for Advancing Translational Sciences (UH2TR 000954) fro 06/2013 to 07/2015; role: Co-investigator |
| 30. | Patient Centered:  Risk Stratified Surveillance After Curative Research of Colorectal Cancer funded by a subcontract from a PCORI grant (CE-1304-6855) from 03/2014 to 07/2015; role: Principal Investigator |
| 31. | Post-Treatment Surveillance in Breast Cancer:  Bringing CER to the Alliance funded by a subcontract from a PCORI grant (CE-1304-6543) from 03/2014 to 07/2015; role: Principal Investigator |
| 32. | Statistics and Data Center for the Alliance for Clinical Trials in Oncology funded by NCI (U10CA 180882) from 04/2014 to 07/2015; role: Co-investigator |
| 33. | Alliance NCORP Research Base funded by NCI (UG1CA 189823) from 08/2014 to 07/2015; role: Co-investigator |
| 34. | Improving How We Predict Toxicity for Older Women with Breast Cancer funded by Susan G. Komen Breast Cancer Foundation from 10/2014 to 09/2017; role: Principal Investigator (subsite) |
| 35. | Sarcoma Foundation from 11/2015 to 05/2017; role: Principal Investigator |
| 36. | Clinical and Translational Science Center (2UL1 TR000457) funded by NIH from 06/01/12 to 05/31/17; role: Co-Investigator |

For **Current extramural and intramural research funding,** provide the following for each award:

1. Source, amount, and duration of support (dates)
2. Name of Principal Investigator
3. Individual's role in project, including percentage (%) effort

**Current Research Support** (duplicate table as needed):

| Source | NCI (U01CA 157715) subcontract SPECs Grant |
|---|---|
| Amount | $85,700 (subcontract amount of the larger grant) |
| Duration | 07/2012 to 06/2018 |
| Principal Investigator | Fred Hirsch |
| Your Role in Project | Co-investigator (PI of the subcontract to WCMC) |
| % Effort | 5% |

| Source | NCI (U10CA 180882) subcontract Alliance |
|---|---|
| Amount | $93,009 |
| Duration | 04/2014 to 02/2019 |
| Principal Investigator | Dan Sargent |
| Your Role in Project | Co-investigator (PI of the subcontract to WCMC) |
| % Effort | 20% |

8

P1.0199.8

| Source | SU2C |
|---|---|
| Amount | $13,515 |
| Duration | 08/2017 – 06/2020 |
| Principal Investigator | Lewis Cantley |
| Your Role in Project | Co- Investigator |
| % Effort | 5% |

| Source | National Institutes of Health 1UL1TR002384-01 |
|---|---|
| Amount | $5,319,707 |
| Duration | 09/2017 to 06/2022 |
| Principal Investigator | Julianne Imperato-Mcginley |
| Your Role in Project | Co-Investigator |
| % Effort | 6% |

| Source | NCI (5U54CA 168512) SARC Sarcoma SPORE |
|---|---|
| Amount | $97,045 |
| Duration | 09/2016 to 08/2018 |
| Principal Investigator | Laurence Baker, Raphael Pollock, Denise Reinke |
| Your Role in Project | Principal Investigator (Subcontract) |
| % Effort | 5% |

| Source | Prostate Cancer Foundation |
|---|---|
| Amount | $1,000,000 |
| Duration | 7/2017 to 8/2018 |
| Principal Investigator | Scott Tagawa |
| Your Role in Project | Co-Investigator |
| % Effort | 5% |

| Source | Department of Defence (Subcontract with Duke University) |
|---|---|
| Amount | $170,266 |
| Duration | 11/2017 to 10/2020 |
| Principal Investigator | David Harpole |
| Your Role in Project | Principal Investigator (Subsite) |
| % Effort | 10% |

I.  **EXTRAMURAL PROFESSIONAL RESPONSIBILITIES**
    i.e. – Journal Reviewer, Editorial Boards, Study Sections, Invited Presentations·

| Activity / Responsibility | Dates |
|---|---|
| Reviewer<br>The American Math Monthly | 1991 to 1999 |
| Gender and Ethnic Division Committee Member<br>North Central Cancer Treatment Group | 2002 to 2005 |
| Neuro-Oncology Committee Member<br>North Central Cancer Treatment Group | 2002-2006 |
| Reviewer<br>The American Statistician | 1994 to 1999 |
| Editorial board member | 1998 to 2003 |

9

| | |
|---|---|
| Journal of Statistics Education | |
| Reviewer<br>Mayo Clinic Proceedings | 2001 to 2004 |
| Reviewer<br>Circulation | 2003 to 2006 |
| NCI Review Panel Member<br>Consortium Therapeutic Studies of Primary Central Nervous System Malignancies in Adults | 2003, 2008 |
| Reviewer<br>Bioinformatics | 2004 to present |
| NCI Study Section ad hoc Member<br>Scientific Review Group Subcommittee H-Clinical | 2004, 2007, 2008 |
| Reviewer<br>Cancer Research | 2004 to present |
| Editorial Board<br>Neuro-Oncology | 20045-2014 |
| Reviewer<br>American Journal of Gastroenterology | 2005 to 2006 |
| Review Panel Member<br>Academic Public-Private Partnership Program (AP4) | 2005 |
| NCI-Avon Foundation Review Panel Member<br>PFP Awards Program | 2005 to 2006 |
| NCI Review Panel Member<br>Advanced Proteomic Platforms and Computation Sciences for the NCI Clinical Proteomic Technologies Initiative Review Panel | 2006 |
| Executive Committee Member<br>American College of Surgeons Oncology Group | 2006 to 2012 |
| NCI Committee Member<br>Breast Cancer Intergroup Committee | 2007 to 2009 |
| NCI Committee Member<br>Breast Cancer Intergroup Correlative Sciences Committee | 2008 to 2009 |
| NCI Study Section Member<br>Scientific Review Group Subcommittee H-Clinical | 2009 to 2012 |
| NCI Steering Committee Member<br>Gastrointestinal Stromal Tumor Working Group | 2009-2013 |
| NCI Steering Committee Member<br>Brain Malignancies | 2009 to present |
| NCI Review Panel Member<br>Novel Methodologies | 2006 |
| Data Monitoring Committee Member<br>American College of Surgeons Oncology Group | 2006 to 2011 |
| Breast Cancer Committee Lead Statistician<br>American College of Surgeons Oncology Group | 2006 to 2011 |
| Reviewer<br>Biometrics | 2006 |
| NIAID Review Panel Member<br>Cooperative Study Group for Autoimmune Disease Prevention | 2006 |
| Clinical Scientific Review Committee Member<br>American College of Surgeons Oncology Group | 2006 to 2011 |
| Reviewer<br>International Journal of Cancer | 2006 to present |
| NICHHD Review Panel Member<br>Obstetrical Pharmacology Research Network-Data Coordination and Analyses Center (OPRU-DCAC) | 2007 |
| Canada Cancer Society Review Panel<br>Grant Application Review | 2007 |
| Editorial Board<br>Journal of Clinical Oncology | 2007 to 2010 |
| NIAID Review Panel Member | 2008 |

10

**P1.0199.10**

| | |
|---|---|
| Proteomics Centers for Infectious Diseases and Biodefense | |
| NIDDK Review Panel Member<br>Hepatitis B Clinical Research Network (U01) | 2008 |
| NIH Review Panel Member<br>Data Management and Coordinating Center DMCC for the Rare Diseases Clinical Research Network (RDCRN) | 2008 |
| NIDDK Review Panel Member<br>Multi-disciplinary Approach to the Study of Chronic Pelvic Pain (MAPP) Research Network (U01) | 2008 |
| Data Monitoring Committee Member<br>Astra-Zeneca Phase III Trial | 2008-2012 |
| Reviewer<br>EURASIP Journal on Bioinformatics and Systems Biology | 2008 to present |
| NCI Committee Member<br>Clinical Trials Advisory Committee, Operational Efficiencies Working Group | 2008 to 2009 |
| NICHHD Review Panel Member<br>Best Pharmaceuticals for Children Act Data Coordinating Center | 2009 |
| MN Partnership for Biotechnology and Medical Genomics Review Panel Member<br>Scientific review of grant proposals | 2009 |
| NIDA Review Panel Member<br>Data and Statistics Center for NIDA Clinical Trials Network | 2009 |
| Thoracic Cancer Committee Lead Statistician<br>American College of Surgeons Oncology Group | 2009 to 2011 |
| Reviewer<br>British Journal of Cancer | 2009 to present |
| Reviewer<br>Clinical Trials | 2009 to present |
| Reviewer<br>Plos1 | 2009 to present |
| NCI Review Panel Member<br>Clinical Proteomic Technologies for Cancer Initiative: Proteome Characterization Centers | 2010 |
| NICHHD Review Panel Member<br>Pediatric Trials Network | 2010 |
| Review Panel Member<br>National Cancer Institute of Canada | 2010 |
| DOD CDMRP Review Panel Member<br>Prostate Cancer Research Program | 2010, 2011, 2012 |
| Data Monitoring Committee Chair<br>University of Minnesota Iron Study | 2010 to 2014 |
| Data Monitoring Committee Member<br>Eli Lilly 14T-MC-JVBB Trial | 2010 to 2014 |
| Data Monitoring Committee<br>Incyte RESPONSE Trial | 2010 to 2014 |
| Associate Editor<br>Journal of Clinical Oncology | 2010 to 2017 |
| Deputy Editor<br>Journal of Clinical Oncology | 2017-present |
| Reviewer<br>Nature | 2010, 2013, 2017 |
| NICHHD Review Panel Member<br>Systematic Review of Neonatal Medicine | 2011 |
| NICHHD Review Panel Member<br>Maintenance of Child Health and Development Studies Name and Address Files | 2011 |
| Dutch Cancer Society Review Panel Member<br>Scientific Grant Review | 2011, 2014, 2015 |
| Reviewer<br>Annals of Surgery | 2011 to present |
| Operations Committee Member | 2011 to 2015 |

11

**P1.0199.11**

| | |
|---|---|
| Alliance Adult Cancer Cooperative Group | |
| Scientific Concept Peer Review Committee Member | 2011 to 2014 |
| Alliance Adult Cancer Cooperative Group | |
| Data Safety Monitoring Board Chair | 2011 to present |
| Kanas University PAD in AA Trial | |
| NICHHD Review Panel Member | 2012 |
| Folic Acid Supplementation and Semen Quality Trial (FAAST) | |
| NIAID Review Panel Member | 2012 |
| Pre-Clinical Pharmacology and Toxicology Studies | |
| NCI Review Panel | 2012 |
| Pre-clinical Efficacy and Intermediate Endpoint | |
| NIDA Review Panel | 2012, 2014 |
| Data, Statistics, and Clinical Trial Support for NIDA | |
| Cancer in the Elderly Committee Lead Statistician | 2012 to 2015 |
| Alliance Adult Cancer Cooperative Group | |
| NICHHD Review Panel Member | 2013 |
| Multiple Study Data Coordinating Center for DESPR | |
| Mayo Clinic Review Panel Member | 2013 |
| Microbiome Program Clinic Trial Funding | |
| DOD CDMRP Review Panel Member | 2013, 2015 |
| Psychological Health/Traumatic Brain Injury Research Program | |
| NICHHD Review Panel Member | 2013 |
| Further Investigation into the Causes of Stillbirth Concept Clearance | |
| Publications Committee Member | 2013 to 2016 |
| Alliance Adult Cancer Cooperative Group | |
| Neuro-Oncology Committee Lead Statistician | 2013 to present |
| Alliance Adult Cancer Cooperative Group | |
| FDA Medical Devices Advisory Committee Member | 2013 to present |
| General and Plastic Surgery Devices | |
| Damon Runyon Foundation Review Panel Member | 2013 to present |
| Clinical Investigator Award | |
| NCI Review Panel Member | 2014, 2015 |
| PLCO Secondary Studies Proposals | |
| NIAID Review Panel Member | 2014 |
| Inner City Asthma Consortium (ICAC3) | |
| DOD CDMRP Review Panel Member | 2014 |
| Vision Research Program | |
| Associate Editor | 2014 to present |
| Neuro-Oncology | |
| Data Safety and Monitoring Board Committee Member | 2014 to present |
| NIDDK | |
| NICHHD Review Panel Member | 2015 |
| P01 Pre-Natal Microbiome Grant Review | |
| NIAID Review Panel Member | 2015 |
| Centers for Medical Countermeasures against Radiation Consortium (U19 | |
| U.S. Army and the Army Medical Research and Material Command Review Panel | 2015 |
| Army Broad Agency Announcement (BAA) | |
| Cancer Research UK Review Panel Member | 2015 |
| Biomarker Project Award | |
| DOD CDMRP Review Panel Member | 2015-2018 |
| Statistical Associate Editor | 2015 to present |
| American Journal of Respiratory and Critical Care Medicine | |
| NIAMS Technical Evaluation Panel Member | 2016 |
| Clinical Studies Management and Support | |
| NIAID Scientific Review Panel Member | 2016 |
| Asthma and Allergic Diseases Cooperative Research Centers | |
| NICHD Technical Evaluation Panel Member | 2016 |
| Best Pharmaceutical for Children Act Data Coordinating Center | |
| NINDS Scientific Review Panel Member | 2016 |

12

**P1.0199.12**

| Parkinson's Disease Biomarkers Program | |
| --- | --- |
| Cancer Research United Kingdom Review Panel Member Program Project Submission | 2016 |
| United States Army Medical Research and Material Command (MRMC) Peer Review Panel Member | 2016-2018 |
| KNOD study section ad hoc reviewer | 2018 |
| Cancer Moonshot Initiative: Human Tumor Atlas Research Centers (U2C) review panel member | 2018 |
| Clinical Research Training Institute Summer Workshop Faculty Member American Society of Hematology | 2016 - |
| Cancer LinQ Publications Committee Member | 2016 - |
| STATS.org Statistical Advisory Board Member | 2016 - |

## J.  PROFESSIONAL MEMBERSHIPS

Include medical and scientific societies.

| Member/Officer/Fellow/Role | Organization | Dates |
| --- | --- | --- |
| Member | Operations Research Society of America | 1990 to 1993 |
| Officer | Operations Research Society of America | 1992 |
| Member | Mathematical Association of America | 1991 to 1997 |
| Officer | American Statistical Association | 2000 to 2003; 2011 to 2013 |
| Member | American Society of Clinical Oncology | 2005 to present |
| Member | International Biometric Society, East North American Region | 2006 to present |
| Officer | International Biometric Society, East North American Region | 2008 to 2011 |
| Member | Society of Clinical Trials | 2008 to present |

## K.  HONORS AND AWARDS

| Name of award | Date awarded |
| --- | --- |
| Pi Mu Epsilon (Math honorary) - Macalester College | 1980 |
| Phi Beta Kappa - Macalester College | 1982 |
| Magna Cum Laude - Macalester College | 1983 |
| Academic All-American, Division III Volleyball - Macalester College | 1983 |
| Fredrick Hennie II Teaching Award - Massachusetts Institute of Technology | 1987 |
| Health Sciences Research Distinguished Teaching Award - Mayo Clinic | 2004 |
| Macalester College Distinguished Alumni in Science | 2015 |

## L.  BIBLIOGRAPHY

### 1.  Articles in professional peer-reviewed journals

1.  **Ballman KV**. Greater emphasis on variation in an introductory statistics course. J Statistics Education. 1997; 5(2).

2.  Singh M, Nuttall GA, **Ballman KV**, Mullany CJ, Berger PB, Holmes DR Jr, Bell MR. Effect of abciximab on the outcome of emergency coronary artery bypass grafting after failed percutaneous coronary intervention. Mayo Clin Proc. 2001 Aug; 76(8):784-8. PMID:11499816. DOI:10.1016/S0025-6196(11)63221-7.

3.  McConnell JP, Branum EL, **Ballman KV**, Lagerstedt SA, Katzmann JA, Jaffe AS. Gender differences in C-reactive protein concentrations - Confirmation with two sensitive methods. Clinical Chemistry & Laboratory Medicine. 2002; 40(1):56-9. PMID:11916271.

4.  Aviles RJ, Wright RS, Aviles JM, McDonald F, **Ballman K**, Harker-Murray A, Scott C, Lauer MS, Kopecky SL, Jaffe AS. Long-term prognosis of patients with clinical unstable angina pectoris without

13

elevation of creatine kinase but with elevation of cardiac troponin I levels. Am J Cardiol. 2002 Oct 15; 90(8):875-8. PMID:12372578.

5.  Brilakis ES, McConnell JP, **Ballman KV**, Klee GG, Berger PB. Lack of association between plasma homocysteine and angiographic coronary artery disease in the era of fortification of cereal grain flour with folic acid. Atherosclerosis. 2002 Dec; 165(2):375-81. PMID:12417290.

6.  Squires RW, Leung TC, Cyr NS, Allison TG, Johnson BD, **Ballman KV**, Wagner JA, Olson LJ, Frantz RP, Edwards BS, Kushwaha SS, Dearani JA, Daly RC, McGregor CG, Rodeheffer RJ. Partial normalization of the heart rate response to exercise after cardiac transplantation: frequency and relationship to exercise capacity. Mayo Clin Proc. 2002 Dec; 77(12):1295-300. PMID:12479515. DOI:10.4065/77.12.1295.

7.  Leung TC, **Ballman KV**, Allison TG, Wagner JA, Olson LJ, Frantz RP, Edwards BS, Dearani JA, Daly RC, McGregor CG, Rodeheffer RJ. Clinical predictors of exercise capacity 1 year after cardiac transplantation. J Heart Lung Transplant. 2003 Jan; 22(1):16-27. PMID:12531409.

8.  Weisberg IS, Park E, **Ballman KV**, Berger P, Nunn M, Suh DS, Breksa AP, Garrow TA, Rozen R. Investigations of a common genetic methyltransferase (BHMT) variant in betaine-homocysteine in coronary artery disease. Atherosclerosis. 2003 Apr; 167(2):205-14. PMID:12818402.

9.  O'Neill BP, Iturria NJ, Link MJ, Pollock BE, **Ballman KV**, O'Fallon JR. A comparison of surgical resection and stereotactic radiosurgery in the treatment of solitary brain metastases. Int J Radiat Oncol Biol Phys. 2003 Apr 1; 55(5):1169-76. PMID:12654423.

10.  Takemoto Y, Tanabe K, Chandrasekaran KW, **Ballman KV**, Seward JB, Belohlavek M. Single-plane and biplane echocardiography: Use of targeted scan planes improves the estimates of left ventricular volume and shape for analysis of postinfarction remodeling. J Am Soc Echocardiogr. 2003 May; 16(5):448-56. PMID:12724654.

11.  Barretto S, **Ballman KV**, Rooke TW, Kullo IJ. Early-onset peripheral arterial occlusive disease: clinical features and determinants of disease severity and location. Vasc Med. 2003 May; 8(2):95-100. PMID:14518611.

12.  Gami AS, Wright RS, **Ballman KV**, Kopecky SL, Hayes SN. Hormone replacement therapy and risk of acute myocardial infarction in postmenopausal women with diabetes mellitus. Am J Cardiol. 2003 May 15; 91(10):1275-7. PMID:12745121.

13.  Kanagala R, Murali NS, Friedman PA, Ammash NM, Gersh BJ, **Ballman KV**, Shamsuzzaman ASM, Somers VK. Obstructive sleep apnea and the recurrence of atrial fibrillation. Circulation. 2003 May 27; 107(20):2589-94. PMID:12743002.

14.  Brilakis ES, Berger PB, **Ballman KV**, Rozen R. Methylenetetrahydrofolate reductase (MTHFR) 677C>T and methionine synthase reductase (MTRR) 66A>G polymorphisms: association with serum homocysteine and angiographic coronary artery disease in the era of flour products fortified with folic acid. Atherosclerosis. 2003 Jun; 168(2):315-22. PMID:12801615.

15.  Michels VV, Olson TM, Miller FA, **Ballman KV**, Rosales AG, Driscoll DJ. Frequency of development of idiopathic dilated cardiomyopathy among relatives of patients with idiopathic dilated cardiomyopathy. Am J Cardiol. 2003 Jun 1; 91(11):1389-92. PMID:12767445.

16.  Bunch TJ, White RD, Gersh BJ, Meverden RA, Hodge DO, **Ballman KV**, Hammill SC, Shen WK, Packer DL. Long-term outcomes of out-of-hospital cardiac arrest after successful early defibrillation. N Engl J Med. 2003 Jun 26; 348(26):2626-33. PMID:12826637. DOI:10.1056/NEJMoa023053.

17.  Gurevitz OT, Friedman PA, Glikson M, Trusty JM, **Ballman KV**, Rosales AG, Hayes DL, Hammill SC, Swerdlow CD. Discrepancies between the upper limit of vulnerability and defibrillation threshold: Prevalence and clinical predictors. J Cardiovasc Electrophysiol. 2003 Jul; 14(7):728-32. PMID:12930253.

18.  Strome SE, Dong H, Tamura H, Voss SG, Flies DB, Tamada K, Salomao D, Cheville J, Hirano F, Lin W, Kasperbauer JL, **Ballman KV**, Chen L. B7-H1 blockade augments adoptive T-cell immunotherapy for squamous cell carcinoma. Cancer Res. 2003 Oct 1; 63(19):6501-5. PMID:14559843.

19.  Spotila LD, Jacques PF, Berger PB, **Ballman KV**, Ellison RC, Rozen R. Age dependence of the influence of methylenetetrahydrofolate reductase genotype on plasma homocysteine level. Am J Epidemiol. 2003 Nov 1; 158(9):871-7. PMID:14585765.

14

20. Aldape KD, **Ballman KV**, Furth A, Buckner JC, Giannin C, Burger PC, Scheithauer BW, Jenkins RB, James CD. Immunohistochemical detection of EGFRvIII in malignant astrocytomas and evaluation of prognostic significance. Journal of Neuropathology and Experimental Neurology. 2004; 63(7):700-707.

21. Gurevitz O, Viskin S, Glikson M, **Ballman KV**, Rosales AG, Shen WK, Hammill SC, Friedman PA. Long-term prognosis of inducible ventricular flutter: not an innocent finding. Am Heart J. 2004 Apr; 147(4):649-54. PMID:15077080.

22. Glikson M, Lipchenca I, Viskin S, **Ballman KV**, Trusty JM, Gurevitz OT, Luria DM, Eldar M, Hammill SC, Friedman PA. Long-term outcome of patients who received implantable cardioverter defibrillators for stable ventricular tachycardia. J Cardiovasc Electrophysiol. 2004 Jun; 15(6):658-64. PMID:15175060.

23. Aldape KD, **Ballman K**, Furth A, Buckner JC, Giannini C, Burger PC, Scheithauer BW, Jenkins RB, James CD. Immunohistochemical detection of EGFRvIII in high malignancy grade astrocytomas and evaluation of prognostic significance. J Neuropathol Exp Neurol. 2004 Jul; 63(7):700-7. PMID:15290895.

24. Kernis SJ, Nkomo VT, Messika-Zeitoun D, Gersh BJ, Sundt TM, **Ballman KV**, Scott CG, Schaff HV, Enriquez-Sarano M. Atrial fibrillation after surgical correction of mitral regurgitation in sinus rhythm - Incidence, outcome, and determinants. Circulation. 2004 Oct 19; 110(16):2320-5. PMID:15477410.

25. Kremers HM, Nicola PJ, Crowson CS, **Ballman KV**, Gabriel SE. Prognostic importance of low body mass index in relation to cardiovascular mortality in rheumatoid arthritis. Arthritis Rheum. 2004 Nov; 50(11):3450-7. PMID:15529378.

26. **Ballman KV**, Grill DE, Oberg AL, Therneau TM. Faster cyclic loess: normalizing RNA arrays via linear models. Bioinformatics. 2004 Nov 1; 20(16):2778-86. PMID:15166021.

27. Brown PD, Petersen IA, Schomberg PJ, Ivnik RJ, Furth AF, **Ballman KV**, Hammack JE, Buckner JC, Shaw EG, Arusell R. Cognitive function after radiotherapy for supratentorial low-grade glioma: a North Central Cancer Treatment Group prospective study. Int J Radiat Oncol Biol Phys. 2005; 58(4):1153-60.

28. Brown P, **Ballman K**, Rummans T, Maurer M, Sloan J, Boeve B, Gupta L, Tang-Wai D, Arusell R, Clark M, Buckner J. Prospective study of quality of life in adults with newly diagnosed high-grade glioma: A North Central Cancer Treatment Group trial. J Neuro-Oncol. 2005; 57(3);495-504.

29. Kitange G, Misra A, Law M, Passe S, Kollmeyer TM, Maurer M, **Ballman K**, Feuerstein BG, Jenkins RB. Chromosomal imbalances detected by array comparative genomic hybridization in human oligodendrogliomas and mixed oligoastrocytomas. Genes Chromosomes Cancer. 2005 Jan; 42(1):68-77.

30. Abraham RS, **Ballman KV**, Dispenzieri A, Grill DE, Manske MK, Price-Troska TL, Paz NG, Gertz MA, Fonseca R. Functional gene expression analysis of clonal plasma cells identifies a unique molecular profile for light chain amyloidosis. Blood. 2005 Jan 15; 105(2):794-803. PMID:15388584.

31. Gurevitz OT, Ammash NM, Malouf JF, Chandrasekaran K, Rosales AG, **Ballman KV**, Hammill SC, White RD, Gersh BJ, Friedman PA. Comparative efficacy of monophasic and biphasic waveforms for transthoracic cardioversion of atrial fibrillation and atrial flutter. Am Heart J. 2005 Feb; 149(2):316-21. PMID:15846271. DOI:10.1016/j.ahj.2004.07.007.

32. Maradit-Kremers H, Crowson CS, Nicola PJ, **Ballman KV**, Roger VL, Jacobsen SJ, Gabriel SE. Increased unrecognized coronary heart disease and sudden deaths in rheumatoid arthritis-a population-based cohort study. Arthritis Rheum. 2005 Feb; 52(2):402-11. PMID:15693010.

33. Nicola PJ, Maradit-Kremers H, Roger VL, Jacobsen SJ, Crowson CS, **Ballman KV**, Gabriel SE. The risk of congestive heart failure in rheumatoid arthritis-a population-based study over 46 years. Arthritis Rheum. 2005 Feb; 52(2):412-20. PMID:15692992.

34. Maradit-Kremers H, Nicola PJ, Crowson CS, **Ballman KV**, Gabriel SE. Cardiovascular death in rheumatoid arthritis: a population-based study. Arthritis Rheum. 2005 Mar; 52(3):722-32. PMID:15751097.

35. Yang P, Kollmeyer TM, Buckner K, Bamlet W, **Ballman KV**, Jenkins RB. Polymorphisms in GLTSCR1 and ERCC2 are associated with the development of oligodendrogliomas. Cancer. 2005 Jun 1; 103(11):2363-72. PMID:15834925. DOI:10.1002/cncr.21028.

15

36. Galanis E, Buckner JC, Maurer MJ, Kreisberg JI, **Ballman K**, Boni J, Peralba JM, Jenkins RB, Dakhil SR, Morton RF, Jaeckle KA, Scheithauer BW, Dancey J, Hidalgo M, Walsh DJ, North Central Cancer Treatment Group. Phase II trial of temsirolimus (CCI-779) in recurrent glioblastoma multiforme: a North Central Cancer Treatment Group Study. J Clin Oncol. 2005 Aug 10; 23(23):5294-304. Epub 2005 Jul 05. PMID:15998902. DOI:10.1200/JCO.2005.23.622.

37. Brown PD, Maurer MJ, Rummans TA, Pollock BE, **Ballman KV**, Sloan JA, Boeve BF, Arusell RM, Clark MM, Buckner JC. A prospective study of quality of life in adults with newly diagnosed high-grade gliomas: the impact of the extent of resection on quality of life and survival. Neurosurgery. 2005 Sep; 57(3):495-504; discussion 495-504. PMID:16145528.

38. Crowson CS, Nicola PJ, Maradit Kremers H, O'Fallon WM, Therneau TM, Jacobsen SJ, Roger VL, **Ballman KV**, Gabriel SE. How much of the increased incidence of heart failure in rheumatoid arthritis is attributable to traditional cardiovascular risk factors and ischemic heart disease? Arthritis Rheum. 2005 Oct; 52(10):3039-44. PMID:16200583.

39. Laack NN, Brown PD, Ivnik RJ, Furth AF, **Ballman KV**, Hammack JE, Arusell RM, Shaw EG, Buckner JC. Cognitive function after radiotherapy for supratentorial low-grade glioma: A North Central Cancer Treatment Group prospective study. Int J Radiat Oncol Biol Phys. 2005 Nov 15; 63(4):1175-83.

40. Miller WL, **Ballman KV**, Hodge DO, Rodeheffer RJ, Hammill SC. Risk factor implications of incidentally discovered uncomplicated bundle branch block. Mayo Clin Proc. 2005 Dec; 80(12):1585-90. PMID:16342651. DOI:10.4065/80.12.1585.

41. Brown PD, Foote RL, McLaughlin MP, Halyard MY, **Ballman KV**, Collie AC, Miller RC, Flemming KD, Hallett JW. A historical prospective cohort study of carotid artery stenosis after radiotherapy for head and neck malignancies. Int J Radiat Oncol Biol Phys. 2005 Dec 1; 63(5):1361-7. Epub 2005 Sep 19. PMID:16169673. DOI:10.1016/j.ijrobp.2005.05.046.

42. Cooper LT, Henderson SS, **Ballman KV**, Offord KP, Tse TS, Holmes DR, Hurt RD. A prospective, case-control study of tobacco dependence in thromboangiitis obliterans (Buerger's Disease). Angiology. 2006 Jan-Feb; 57(1):73-8. PMID:16444459.

43. Nicola PJ, Crowson CS, Maradit-Kremers H, **Ballman KV**, Roger VL, Jacobsen SJ, Gabriel SE. Contribution of congestive heart failure and ischemic heart disease to excess mortality in rheumatoid arthritis. Arthritis Rheum. 2006 Jan; 54(1):60-7. PMID:16385496. DOI:10.1002/art.21560.

44. Brown PD, **Ballman KV**, Rummans TA, Maurer MJ, Sloan JA, Boeve BF, Gupta L, Tang-Wai DF, Arusell RM, Clark MM, Buckner JC. Prospective study of quality of life in adults with newly diagnosed high-grade gliomas. J Neurooncol. 2006 Feb; 76(3):283-91. PMID:16163448. DOI:10.1007/s11060-005-7020-9.

45. Vanaja DK, **Ballman KV**, Morlan BW, Cheville JC, Neumann RM, Lieber MM, Tindall DJ, Young CY. PDLIM4 repression by hypermethylation as a potential biomarker for prostate cancer. Clin Cancer Res. 2006 Feb 15; 12(4):1128-36. PMID:16489065. DOI:10.1158/1078-0432.CCR-05-2072.

46. Jaeckle KA, **Ballman KV**, Rao RD, Jenkins RB, Buckner JC. Current strategies in treatment of oligodendroglioma: evolution of molecular signatures of response. J Clin Oncol. 2006 Mar 10; 24(8):1246-52. PMID:16525179. DOI:10.1200/JCO.2005.04.9874.

47. Witt BJ, **Ballman KV**, Brown RD, Meverden RA, Jacobsen SJ, Roger VL. The incidence of stroke after myocardial infarction: a meta-analysis. Am J Med. 2006 Apr; 119(4):354.e1-9. PMID:16564779. DOI:10.1016/j.amjmed.2005.10.058.

48. Galanis E, Buckner JC, Maurer MJ, Sykora R, Castillo R, **Ballman KV**, Erickson BJ. Validation of neuroradiologic response assessment in gliomas: measurement by RECIST, two-dimensional, computer-assisted tumor area, and computer-assisted tumor volume methods. Neuro Oncol. 2006 Apr; 8(2):156-65. Epub 2006 Mar 02. PMID:16533757. PMCID:1871930. DOI:10.1215/15228517-2005-005.

49. Sarkaria JN, Carlson BL, Schroeder MA, Grogan P, Brown PD, Giannini C, **Ballman KV**, Kitange GJ, Guha A, Pandita A, James CD. Use of an orthotopic xenograft model for assessing the effect of epidermal growth factor receptor amplification on glioblastoma radiation response. Clin Cancer Res. 2006 Apr 1; 12(7 Pt 1):2264-71. PMID:16609043. DOI:10.1158/1078-0432.CCR-05-2510.

50. Marshall NE, **Ballman KV**, Michalak JC, Schomberg PJ, Burton GV, Sandler HM, Cascino TL, Jaeckle KA, Buckner JC. Ototoxicity of cisplatin plus standard radiation therapy vs. accelerated radiation

16

therapy in glioblastoma patients. J Neurooncol. 2006 May; 77(3):315-20. PMID:16273313. DOI:10.1007/s11060-005-9049-1.

51.  Witt BJ, Brown RD, Jacobsen SJ, Weston SA, **Ballman KV**, Meverden RA, Roger VL. Ischemic stroke after heart failure: a community-based study. Am Heart J. 2006 Jul; 152(1):102-9. PMID:16824838. DOI:10.1016/j.ahj.2005.10.018.

52.  Murillo H, Schmidt LJ, Karter M, Hafner KA, Kondo Y, **Ballman KV**, Vasmatzis G, Jenkins RB, Tindall DJ. Prostate cancer cells use genetic and epigenetic mechanisms for progression to androgen independence. Genes Chromosomes Cancer. 2006 Jul; 45(7):702-16. PMID:16615098. DOI:10.1002/gcc.20333.

53.  Krishnan S, Brown PD, **Ballman KV**, Fiveash JB, Uhm JH, Giannini C, Jaeckle KA, Geoffroy FJ, Nabors LB, Buckner JC, North Central Cancer Treatment Group. Phase I trial of erlotinib with radiation therapy in patients with glioblastoma multiforme: results of North Central Cancer Treatment Group protocol N0177. Int J Radiat Oncol Biol Phys. 2006 Jul 15; 65(4):1192-9. Epub 2006 Apr 19. PMID:16626884. DOI:10.1016/j.ijrobp.2006.01.018.

54.  Laack NN, **Ballman KV**, Brown PB, O'Neill BP, North Central Cancer Treatment Group. Whole-brain radiotherapy and high-dose methylprednisolone for elderly patients with primary central nervous system lymphoma: Results of North Central Cancer Treatment Group (NCCTG) 96-73-51. Int J Radiat Oncol Biol Phys. 2006 Aug 1; 65(5):1429-39. PMID:16863926. DOI:10.1016/j.ijrobp.2006.03.061.

55.  Buckner JC, **Ballman KV**, Michalak JC, Burton GV, Cascino TL, Schomberg PJ, Hawkins RB, Scheithauer BW, Sandler HM, Marks RS, O'Fallon JR, North Central Cancer Treatment Group 93-72-52, Southwest Oncology Group 9503 Trials. Phase III trial of carmustine and cisplatin compared with carmustine alone and standard radiation therapy or accelerated radiation therapy in patients with glioblastoma multiforme: North Central Cancer Treatment Group 93-72-52 and Southwest Oncology Group 9503 Trials. J Clin Oncol. 2006 Aug 20; 24(24):3871-9. PMID:16921039. DOI:10.1200/JCO.2005.04.6979.

56.  Oberg AL, Mahoney DW, **Ballman KV**, Therneau TM. Joint estimation of calibration and expression for high-density oligonucleotide arrays. Bioinformatics. 2006 Oct 1; 22(19):2381-7. Epub 2006 Jul 28. PMID:16877757. DOI:10.1093/bioinformatics/btl399.

57.  Jenkins RB, Blair H, **Ballman KV**, Giannini C, Arusell RM, Law M, Flynn H, Passe S, Felten S, Brown PD, Shaw EG, Buckner JC. A t(1;19)(q10;p10) mediates the combined deletions of 1p and 19q and predicts a better prognosis of patients with oligodendroglioma. Cancer Res. 2006 Oct 15; 66(20):9852-61. PMID:17047046. DOI:10.1158/0008-5472.CAN-06-1796.

58.  Babovic-Vuksanovic D, **Ballman K**, Michels V, McGrann P, Lindor N, King B, Camp J, Micic V, Babovic N, Carrero X, Spinner R, O'Neill B. Phase II trial of pirfenidone in adults with neurofibromatosis type I. Neurology. 2006 Nov 28; 67(10):1860-2. Epub 2006 Oct 11. PMID:17035676. DOI:10.1212/01.wnl.0000243231.12248.67.

59.  Brown PD, Jensen AW, Felten SJ, **Ballman KV**, Schaefer PL, Jaeckle KA, Cerhan JH, Buckner JC. Detrimental effects of tumor progression on cognitive function of patients with high-grade glioma. J Clin Oncol. 2006 Dec 1; 24(34):5427-33. PMID:17135644. DOI:10.1200/JCO.2006.08.5605.

60.  Maradit-Kremers H, Nicola PJ, Crowson CS, **Ballman KV**, Jacobsen SJ, Roger VL, Gabriel SE. Raised erythrocyte sedimentation rate signals heart failure in patients with rheumatoid arthritis. Ann Rheum Dis. 2007 Jan; 66(1):76-80. Epub 2006 Jul 03. PMID:16818462. PMCID:1798392. DOI:10.1136/ard.2006.053710.

61.  Mercader M, Sengupta S, Bodner BK, Manecke RG, Cosar EF, Moser MT, **Ballman KV**, Wojcik EM, Kwon ED. Early effects of pharmacological androgen deprivation in human prostate cancer. BJU Int. 2007 Jan; 99(1):60-7. PMID:17227493. DOI:10.1111/j.1464-410X.2007.06538.x.

62.  **Ballman KV**, Buckner JC, Brown PD, Giannini C, Flynn PJ, LaPlant BR, Jaeckle KA. The relationship between six-month progression-free survival and 12-month overall survival end points for phase II trials in patients with glioblastoma multiforme. Neuro Oncol. 2007 Jan; 9(1):29-38. Epub 2006 Nov 15 PMID:17108063. PMCID:1828103. DOI:10.1215/15228517-2006-025.

63.  Davis JM 3rd, Maradit Kremers H, Crowson CS, Nicola PJ, **Ballman KV**, Therneau TM, Roger VL, Gabriel SE. Glucocorticoids and cardiovascular events in rheumatoid arthritis: a population-based cohort study. Arthritis Rheum. 2007 Mar; 56(3):820-30. PMID:17330254.

17

64. Meyers BF, Downey RJ, Decker PA, Keenan RJ, Siegel BA, Cerfolio RJ, Landreneau RJ, Reed CE, Balfe DM, Dehdashti F, **Ballman KV**, Rusch VW, Putnam JB Jr, American College of Surgeons Oncology Group Z0060. The utility of positron emission tomography in staging of potentially operable carcinoma of the thoracic esophagus: results of the American College of Surgeons Oncology Group Z0060 trial. J Thorac Cardiovasc Surg. 2007 Mar; 133(3):738–45. PMID:17320575.

65. Majumdar R, Miller DV, **Ballman KV**, Unnikrishnan G, McKellar SH, Sarkar G, Sreekumar R, Bolander ME, Sundt TM 3rd. Elevated expressions of osteopontin and tenascin C in ascending aortic aneurysms are associated with trileaflet aortic valves as compared with bicuspid aortic valves. Cardiovasc Pathol. 2007 May-Jun; 16(3):144-50. Epub 2007 Feb 21. PMID:17502243. DOI:10.1016/j.carpath.2006.12.001.

66. Pelloski CE, **Ballman KV**, Furth AF, Zhang L, Lin E, Sulman EP, Bhat K, McDonald JM, Yung WK, Colman H, Woo SY, Heimberger AB, Suki D, Prados MD, Chang SM, Barker FG, Buckner JC, James CD, Aldape K. Epidermal growth factor receptor variant III status defines clinically distinct subtypes of glioblastoma. J Clin Oncol. 2007 Jun 1; 25(16):2288-94. PMID:17538175. DOI:10.1200/JCO.2006.08.0705.

67. Schmidt LJ, **Ballman KV**, Tindall DJ. Inhibition of fatty acid synthase activity in prostate cancer cells by dutasteride. Prostate. 2007 Jul 1; 67(10):1111-20. PMID:17477363. DOI:10.1002/pros.20602.

68. Witt BJ, Gami AS, **Ballman KV**, Brown RD Jr, Meverden RA, Jacobsen SJ, Roger VL. The incidence of ischemic stroke in chronic heart failure: a meta-analysis. J Card Fail. 2007 Aug; 13(6):489-96. PMID:17675064. DOI:10.1016/j.cardfail.2007.01.009.

69. Buckner JC, O'Fallon JR, Dinapoli RP, Schomberg PJ, Farr G, Schaefer P, Giannini C, Scheithauer BW, **Ballman KV**. Prognosis in patients with anaplastic oligoastrocytoma is associated with histologic grade. J Neurooncol. 2007 Sep; 84(3):279-86. Epub 2007 Apr 13. PMID:17431544. DOI:10.1007/s11060-007-9370-y.

70. Locke DE, Decker PA, Sloan JA, Brown PD, Malec JF, Clark MM, Rummans TA, **Ballman KV**, Schaefer PL, Buckner JC. Validation of single-item linear analog scale assessment of quality of life in neuro-oncology patients. J Pain Symptom Manage. 2007 Dec; 34(6):628-38. Epub 2007 Aug 20. PMID:17703910. PMCID:2732111. DOI:10.1016/j.jpainsymman.2007.01.016.

71. Therneau TM, **Ballman KV**. What does PLIER really do? Cancer Inform. 2008; 6:423-31. Epub 2008 Aug 27. PMID:19259420. PMCID:2623311.

72. Nakagawa T, Kollmeyer TM, Morlan BW, Anderson SK, Bergstralh EJ, Davis BJ, Asmann YW, Klee GG, **Ballman KV**, Jenkins RB. A tissue biomarker panel predicting systemic progression after PSA recurrence post-definitive prostate cancer therapy. PLoS One. 2008; 3(5):e2318. Epub 2008 May 28. PMID:18846227. PMCID:2565588. DOI:10.1371/journal.pone.0002318.

73. Gonzalez A, Maradit Kremers H, Crowson CS, **Ballman KV**, Roger VL, Jacobsen SJ, O'Fallon WM, Gabriel SE. Do cardiovascular risk factors confer the same risk for cardiovascular outcomes in rheumatoid arthritis patients as in non-rheumatoid arthritis patients? Ann Rheum Dis. 2008 Jan; 67(1):64-9. Epub 2007 May 21. PMID:17517756. DOI:10.1136/ard.2006.059980.

74. Brown PD, Decker PA, Rummans TA, Clark MM, Frost MH, **Ballman KV**, Arusell RM, Buckner JC. A prospective study of quality of life in adults with newly diagnosed high-grade gliomas: comparison of patient and caregiver ratings of quality of life. Am J Clin Oncol. 2008 Apr; 31(2):163-8. PMID:18391601. DOI:10.1097/COC.0b013e318149f1d3.

75. McCollum AK, TenEyck CJ, Stensgard B, Morlan BW, **Ballman KV**, Jenkins RB, Toft DO, Erlichman C. P-Glycoprotein-mediated resistance to Hsp90-directed therapy is eclipsed by the heat shock response. Cancer Res. 2008 Sep 15; 68(18):7419-27. PMID:18794130. PMCID:2695926. DOI:10.1158/0008-5472.CAN-07-5175.

76. **Ballman KV**. Genetics and genomics: gene expression microarrays. Circulation. 2008 Oct 7; 118(15):1593-7. PMID:18838575. DOI:10.1161/CIRCULATIONAHA.107.714600.

77. Cooper LT Jr, Hare JM, Tazelaar HD, Edwards WD, Starling RC, Deng MC, Menon S, Mullen GM, Jaski B, Bailey KR, Cunningham MW, Dec GW, **Giant Cell Myocarditis Treatment Trial Investigators**. Usefulness of immunosuppression for giant cell myocarditis. Am J Cardiol. 2008 Dec 1; 102(11):1535-9. Epub 2008 Sep 18. PMID:19026310. PMCID:2613862. DOI:10.1016/j.amjcard.2008.07.041.

18

78. Kitange GJ, Carlson BL, Mladek AC, Decker PA, Schroeder MA, Wu W, Grogan PT, Giannini C, **Ballman KV**, Buckner JC, James CD, Sarkaria JN. Evaluation of MGMT promoter methylation status and correlation with temozolomide response in orthotopic glioblastoma xenograft model. J Neurooncol. 2009 Mar; 92(1):23-31. Epub 2008 Nov 15. PMID:19011762. PMCID:2790867. DOI:10.1007/s11060-008-9737-8.

79. Dematteo RP, **Ballman KV**, Antonescu CR, Maki RG, Pisters PW, Demetri GD, Blackstein ME, Blanke CD, von Mehren M, Brennan MF, Patel S, McCarter MD, Polikoff JA, Tan BR, Owzar K, American College of Surgeons Oncology Group (ACOSOG) Intergroup Adjuvant GIST Study Team. Adjuvant imatinib mesylate after resection of localised, primary gastrointestinal stromal tumour: a randomised, double-blind, placebo-controlled trial. Lancet. 2009 Mar 28; 373(9669):1097-104. Epub 2009 Mar 18. PMID:19303137. PMCID:2915459. DOI:10.1016/S0140-6736(09)60500-6.

80. Heemers HV, Regan KM, Schmidt LJ, Anderson SK, **Ballman KV**, Tindall DJ. Androgen modulation of coregulator expression in prostate cancer cells. Mol Endocrinol. 2009 Apr; 23(4):572-83. Epub 2009 Jan 22. PMID:19164447. PMCID:2667711. DOI:10.1210/me.2008-0363.

81. Wrensch M, Jenkins RB, Chang JS, Yeh RF, Xiao Y, Decker PA, **Ballman KV**, Berger M, Buckner JC, Chang S, Giannini C, Halder C, Kollmeyer TM, Kosel ML, LaChance DH, McCoy L, O'Neill BP, Patoka J, Pico AR, Prados M, Quesenberry C, Rice T, Rynearson AL, Smirnov I, Tihan T, Wiemels J, Yang P, Wiencke JK. Variants in the CDKN2B and RTEL1 regions are associated with high-grade glioma susceptibility. Nat Genet. 2009 Aug; 41(8):905-8. Epub 2009 Jul 05. PMID:19578366. PMCID:2923561. DOI:10.1038/ng.408.

82. Carlson BL, Grogan PT, Mladek AC, Schroeder MA, Kitange GJ, Decker PA, Giannini C, Wu W, **Ballman KA**, James CD, Sarkaria JN. Radiosensitizing effects of temozolomide observed in vivo only in a subset of O6-methylguanine-DNA methyltransferase methylated glioblastoma multiforme xenografts. Int J Radiat Oncol Biol Phys. 2009 Sep 1; 75(1):212-9. PMID:19695438. PMCID:2773462. DOI:10.1016/j.ijrobp.2009.04.026.

83. Drucker KL, Kitange GJ, Kollmeyer TM, Law ME, Passe S, Rynearson AL, Blair H, Soderberg CL, Morlan BW, **Ballman KV**, Giannini C, Jenkins RB. Characterization and gene expression profiling in glioma cell lines with deletion of chromosome 19 before and after microcell-mediated restoration of normal human chromosome 19. Genes Chromosomes Cancer. 2009 Oct; 48(10):854-64. PMID:19544381. PMCID:3190979. DOI:10.1002/gcc.20688.

84. Jaeckle KA, **Ballman K**, Furth A, Buckner JC. Correlation of enzyme-inducing anticonvulsant use with outcome of patients with glioblastoma. Neurology. 2009 Oct 13; 73(15):1207-13. PMID:19822870. PMCID:2764724. DOI:10.1212/WNL.0b013e3181bbfeca.

85. Schmidt LJ, Regan KM, Anderson SK, Sun Z, **Ballman KV**, Tindall DJ. Effects of the 5 alpha-reductase inhibitor dutasteride on gene expression in prostate cancer xenografts. Prostate. 2009 Dec 1; 69(16):1730-43. PMID:19676081. PMCID:2783419. DOI:10.1002/pros.21022.

86. Hillman SL, Mandrekar SJ, Bot B, DeMatteo RP, Perez EA, **Ballman KV**, Nelson H, Buckner JC, Sargent DJ. Evaluation of the value of attribution in the interpretation of adverse event data: a North Central Cancer Treatment Group and American College of Surgeons Oncology Group investigation. J Clin Oncol. 2010 Jun 20; 28(18):3002-7. Epub 2010 May 17. PMID:20479400. PMCID:2903334. DOI:10.1200/JCO.2009.27.4282.

87. Wilke LG, **Ballman KV**, McCall LM, Giuliano AE, Whitworth PW, Blumencranz PW, Reintgen DS, Burak WE, Leitch AM, Hunt KK. Adherence to the National Quality Forum (NQF) breast cancer measures within cancer clinical trials: a review from ACOSOG Z0010. Ann Surg Oncol. 2010 Aug; 17(8):1989-94. Epub 2010 Mar 23. PMID:20309640. PMCID:2950006. DOI:10.1245/s10434-010-0980-9.

88. Jaeckle KA, **Ballman KV**, Giannini C, Schomberg PJ, Ames MM, Reid JM, McGovern RM, Safgren SL, Galanis E, Uhm JH, Brown PD, Hammack JE, Arusell R, Nikcevich DA, Morton RF, Wender DB, Buckner JC. Phase II NCCTG trial of RT + irinotecan and adjuvant BCNU plus irinotecan for newly diagnosed GBM. J Neurooncol. 2010 Aug; 99(1):73-80. Epub 2010 Jan 09. PMID:20063115. PMCID:2897141. DOI:10.1007/s11060-009-0103-2.

89. Giuliano AE, McCall L, Beitsch P, Whitworth PW, Blumencranz P, Leitch AM, Saha S, Hunt KK, Morrow M, **Ballman K**. Locoregional recurrence after sentinel lymph node dissection with or without axillary dissection in patients with sentinel lymph node metastases: the American College of Surgeons

Oncology Group Z0011 randomized trial. Ann Surg. 2010 Sep; 252(3):426-32; discussion 432-3. PMID:20739842. DOI:10.1097/SLA.0b013e3181f08f32.

90.  Kitange GJ, Carlson BL, Schroeder MA, Decker PA, Morlan BW, Wu W, **Ballman KV**, Giannini C, Sarkaria JN. Expression of CD74 in high grade gliomas: a potential role in temozolomide resistance. J Neurooncol. 2010 Nov; 100(2):177-86. Epub 2010 May 05. PMID:20443131. PMCID:3233976. DOI:10.1007/s11060-010-0186-9.

91.  Shi Q, You YN, Nelson H, Allen MS, Winchester D, Stewart A, Young-Fadok T, Decker PA, Green EM, Holton SJ, **Ballman KV**. Cancer registries: a novel alternative to long-term clinical trial follow-up based on results of a comparative study. Clin Trials. 2010 Dec; 7(6):686-95. Epub 2010 Aug 20. PMID:20729254. DOI:10.1177/1740774510380953.

92.  Giuliano AE, Hunt KK, **Ballman KV**, Beitsch PD, Whitworth PW, Blumencranz PW, Leitch AM, Saha S, McCall LM, Morrow M. Axillary dissection vs no axillary dissection in women with invasive breast cancer and sentinel node metastasis: a randomized clinical trial. JAMA. 2011 Feb 9; 305(6):569-75. PMID:21304082. DOI:10.1001/jama.2011.90.

93.  Darling GE, Allen MS, Decker PA, **Ballman K**, Malthaner RA, Inculet RI, Jones DR, McKenna RJ, Landreneau RJ, Rusch VW, Putnam JB. Randomized trial of mediastinal lymph node sampling versus complete lymphadenectomy during pulmonary resection in the patient with N0 or N1 (less than hilar) non-small cell carcinoma: results of the American College of Surgery Oncology Group Z0030 Trial. J Thorac Cardiovasc Surg. 2011 Mar; 141(3):662-70. PMID:21335122. DOI:10.1016/j.jtcvs.2010.11.008.

94.  Heemers HV, Schmidt LJ, Sun Z, Regan KM, Anderson SK, Duncan K, Wang D, Liu S, **Ballman KV**, Tindall DJ. Identification of a clinically relevant androgen-dependent gene signature in prostate cancer. Cancer Res. 2011 Mar 1; 71(5):1978-88. Epub 2011 Feb 15. PMID:21324924. PMCID:3077061. DOI:10.1158/0008-5472.CAN-10-2512.

95.  Darling GE, Allen MS, Decker PA, **Ballman K**, Malthaner RA, Inculet RI, Jones DR, McKenna RJ, Landreneau RJ, Putnam JB. Number of lymph nodes harvested from a mediastinal lymphadenectomy: results of the randomized, prospective American College of Surgeons Oncology Group Z0030 trial. Chest. 2011 May; 139(5):1124-9. Epub 2010 Sep 09. PMID:20829340. PMCID:3087457. DOI:10.1378/chest.10-0859.

96.  Uhm JH, **Ballman KV**, Wu W, Giannini C, Krauss JC, Buckner JC, James CD, Scheithauer BW, Behrens RJ, Flynn PJ, Schaefer PL, Dakhill SR, Jaeckle KA. Phase II evaluation of gefitinib in patients with newly diagnosed Grade 4 astrocytoma: Mayo/North Central Cancer Treatment Group Study N0074. Int J Radiat Oncol Biol Phys. 2011 Jun 1; 80(2):347-53. Epub 2010 May 25. PMID:20510539. DOI:10.1016/j.ijrobp.2010.01.070.

97.  Giuliano AE, Hawes D, **Ballman KV**, Whitworth PW, Blumencranz PW, Reintgen DS, Morrow M, Leitch AM, Hunt KK, McCall LM, Abati A, Cote R. Association of occult metastases in sentinel lymph nodes and bone marrow with survival among women with early-stage invasive breast cancer. JAMA. 2011 Jul 27; 306(4):385-93. PMID:21791687. DOI:10.1001/jama.2011.1034.

98.  Jaeckle KA, Decker PA, **Ballman KV**, Flynn PJ, Giannini C, Scheithauer BW, Jenkins RB, Buckner JC. Transformation of low grade glioma and correlation with outcome: an NCCTG database analysis. J Neurooncol. 2011 Aug; 104(1):253-9. Epub 2010 Dec 12. PMID:21153680. DOI:10.1007/s11060-010-0476-2.

99.  Laack NN, O'Neill BP, **Ballman KV**, O'Fallon JR, Carrero XW, Kurtin PJ, Scheithauer BW, Brown PD, Habermann TM, Colgan JP, Gilbert MR, Hawkins RB, Morton RF, Windschitl HE, Fitch TR, Pajon ER Jr, North Central Cancer Treatment Group and Mayo Clinic. CHOD/BVAM chemotherapy and whole-brain radiotherapy for newly diagnosed primary central nervous system lymphoma. Int J Radiat Oncol Biol Phys. 2011 Oct 1; 81(2):476-82. Epub 2010 Aug 26 PMID:20800387. PMCID:4335722. DOI:10.1016/j.ijrobp.2010.06.002.

100. Rusch VW, Hawes D, Decker PA, Martin SE, Abati A, Landreneau RJ, Patterson GA, Inculet RI, Jones DR, Malthaner RA, Cohen RG, **Ballman K**, Putnam JB Jr, Cote RJ. Occult metastases in lymph nodes predict survival in resectable non-small cell lung cancer: report of the ACOSOG Z0040 trial. J Clin Oncol. 2011 Nov 10; 29(32):4313-9. Epub 2011 Oct 11. PMID:21990404. PMCID:3221530. DOI:10.1200/JCO.2011.35.2500.

101. Toussaint LG III, Nilson AE, Goble JM, **Ballman KV**, James CD, Lefranc F, Kiss R, Uhm JH. Galectin-1, a gene preferentially expressed at the tumor margin, promotes glioblastoma cell invasion. Mol

20

Cancer. 2012; 11:32. Epub 2012 May 14. PMID:22583806. PMCID:3407025. DOI:10.1186/1476-4598-11-32.

102. Deley MC, **Ballman KV**, Marandet J, Sargent D. Taking the long view: how to design a series of Phase III trials to maximize cumulative therapeutic benefit. Clin Trials. 2012 Jun; 9(3):283-92. Epub 2012 May 08. PMID:22569743. PMCID:3904223. DOI:10.1177/1740774512443430.

103. Ellis MJ, Ding L, Shen D, Luo J, Suman VJ, Wallis JW, Van Tine BA, Hoog J, Goiffon RJ, Goldstein TC, Ng S, Lin L, Crowder R, Snider J, **Ballman K**, Weber J, Chen K, Koboldt DC, Kandoth C, Schierding WS, McMichael JF, Miller CA, Lu C, Harris CC, McLellan MD, Wendl MC, DeSchryver K, Allred DC, Esserman L, Unzeitig G, Margenthaler J, Babiera GV, Marcom PK, Guenther JM, Leitch M, Hunt K, Olson J, Tao Y, Maher CA, Fulton LL, Fulton RS, Harrison M, Oberkfell B, Du F, Demeter R, Vickery TL, Elhammali A, Piwnica-Worms H, McDonald S, Watson M, Dooling DJ, Ota D, Chang LW, Bose R, Ley TJ, Piwnica-Worms D, Stuart JM, Wilson RK, Mardis ER. Whole-genome analysis informs breast cancer response to aromatase inhibition. Nature. 2012 Jun 21; 486(7403):353-60. Epub 2012 Jun 10. PMID:22722193. PMCID:3383766. DOI:10.1038/nature11143.

104. McCarter MD, Antonescu CR, **Ballman KV**, Maki RG, Pisters PW, Demetri GD, Blanke CD, von Mehren M, Brennan MF, McCall L, Ota DM, DeMatteo RP, American College of Surgeons Oncology Group (ACOSOG) Intergroup Adjuvant Gist Study Team. Microscopically positive margins for primary gastrointestinal stromal tumors: analysis of risk factors and tumor recurrence. J Am Coll Surg. 2012 Jul; 215(1):53-9; discussion 59-60. PMID:22726733. PMCID:3383609. DOI:10.1016/j.jamcollsurg.2012.05.008.

105. Hunt KK, **Ballman KV**, McCall LM, Boughey JC, Mittendorf EA, Cox CE, Whitworth PW, Beitsch PD, Leitch AM, Buchholz TA, Morrow MA, Giuliano AE. Factors associated with local-regional recurrence after a negative sentinel node dissection: results of the ACOSOG Z0010 trial. Ann Surg. 2012 Sep; 256(3):428-36. PMID:22868365. DOI:10.1097/SLA.0b013e3182654494.

106. O'Brien KM, Orlow I, Antonescu CR, **Ballman K**, McCall L, DeMatteo R, Engel LS. Gastrointestinal stromal tumors, somatic mutations and candidate genetic risk variants. PLoS One. 2013; 8(4):e62119. Epub 2013 Apr 18. PMID:23637977. PMCID:3630216. DOI:10.1371/journal.pone.0062119.

107. Erho N, Crisan A, Vergara IA, Mitra AP, Ghadessi M, Buerki C, Bergstralh EJ, Kollmeyer T, Fink S, Haddad Z, Zimmermann B, Sierocinski T, **Ballman KV**, Triche TJ, Black PC, Karnes RJ, Klee G, Davicioni E, Jenkins RB. Discovery and validation of a prostate cancer genomic classifier that predicts early metastasis following radical prostatectomy. PLoS One. 2013; 8(6):e66855. Epub 2013 Jun 24. PMID:23826159. PMCID:3691249. DOI:10.1371/journal.pone.0066855.

108. Garraway LA, Verweij J, **Ballman KV**. Precision oncology: an overview. J Clin Oncol. 2013 May 20; 31(15):1803-5. Epub 2013 Apr 15. PMID:23589545. DOI:10.1200/JCO.2013.49.4799.

109. Freedman RA, Pitcher B, Keating NL, **Ballman KV**, Mandelblatt J, Kornblith AB, Kimmick GG, Hurria A, Winer EP, Hudis CA, Cohen HJ, Muss HB, Alliance for Clinical Trials in Oncology. Cognitive function in older women with breast cancer treated with standard chemotherapy and capecitabine on Cancer and Leukemia Group B 49907. Breast Cancer Res Treat. 2013 Jun; 139(2):607-16. Epub 2013 May 17. PMID:23681403. PMCID:3920483. DOI:10.1007/s10549-013-2562-6.

110. Cen L, Carlson BL, Pokorny JL, Mladek AC, Grogan PT, Schroeder MA, Decker PA, Anderson SK, Giannini C, Wu W, **Ballman KV**, Kitange GJ, Sarkaria JN. Efficacy of protracted temozolomide dosing is limited in MGMT unmethylated GBM xenograft models. Neuro Oncol. 2013 Jun; 15(6):735-46. Epub 2013 Mar 10. PMID:23479134. PMCID:3661094. DOI:10.1093/neuonc/not010.

111. Crozier JA, Moreno-Aspitia A, **Ballman KV**, Dueck AC, Pockaj BA, Perez EA. Effect of body mass index on tumor characteristics and disease-free survival in patients from the HER2-positive adjuvant trastuzumab trial N9831. Cancer. 2013 Jul 1; 119(13):2447-54. Epub 2013 Apr 12. PMID:23585192. PMCID:3686994. DOI:10.1002/cncr.28051.

112. Gami AS, Olson EJ, Shen WK, Wright RS, **Ballman KV**, Hodge DO, Herges RM, Howard DE, Somers VK. Obstructive sleep apnea and the risk of sudden cardiac death: a longitudinal study of 10,701 adults. J Am Coll Cardiol. 2013 Aug 13; 62(7):610-6. Epub 2013 Jun 13. PMID:23770166. PMCID:3851022. DOI:10.1016/j.jacc.2013.04.080.

113. DeMatteo RP, **Ballman KV**, Antonescu CR, Corless C, Kolesnikova V, von Mehren M, McCarter MD, Norton J, Maki RG, Pisters PW, Demetri GD, Brennan MF, Owzar K, American College of Surgeons Oncology Group (ACOSOG) Intergroup Adjuvant GIST Study Team for the Alliance for Clinical Trials in

21

Oncology. Long-term results of adjuvant imatinib mesylate in localized, high-risk, primary gastrointestinal stromal tumor: ACOSOG Z9000 (Alliance) intergroup phase 2 trial. Ann Surg. 2013 Sep; 258(3):422-9. PMID:23860199. PMCID:4041735. DOI:10.1097/SLA.0b013e3182a15eb7.

114. Wildiers H, Mauer M, Pallis A, Hurria A, Mohile SG, Luciani A, Curigliano G, Extermann M, Lichtman SM, **Ballman K**, Cohen HJ, Muss H, Wedding U. End points and trial design in geriatric oncology research: a joint European organisation for research and treatment of cancer--Alliance for Clinical Trials in Oncology--International Society Of Geriatric Oncology position article. J Clin Oncol. 2013 Oct 10; 31(29):3711-8. Epub 2013 Sep 09. PMID:24019549. DOI:10.1200/JCO.2013.49.6125.

115. Dueck AC, Reinholz MM, Geiger XJ, Tenner K, **Ballman K**, Jenkins RB, Riehle D, Chen B, McCullough AE, Davidson NE, Martino S, Sledge GW, Kaufman PA, Kutteh LA, Gralow J, Harris LN, Ingle JN, Lingle WL, Perez EA. Impact of c-MYC protein expression on outcome of patients with early-stage HER2+ breast cancer treated with adjuvant trastuzumab NCCTG (alliance) N9831. Clin Cancer Res. 2013 Oct 15; 19(20):5798-807. Epub 2013 Aug 21. PMID:23965903. PMCID:3805021. DOI:10.1158/1078-0432.CCR-13-0558.

116. Karnes RJ, Bergstralh EJ, Davicioni E, Ghadessi M, Buerki C, Mitra AP, Crisan A, Erho N, Vergara IA, Lam LL, Carlson R, Thompson DJ, Haddad Z, Zimmermann B, Sierocinski T, Triche TJ, Kollmeyer T, **Ballman KV**, Black PC, Klee GG, Jenkins RB. Validation of a genomic classifier that predicts metastasis following radical prostatectomy in an at risk patient population. J Urol. 2013 Dec; 190(6):2047-53. Epub 2013 Jun 11. PMID:23770138. PMCID:4097302. DOI:10.1016/j.juro.2013.06.017.

117. Barginear MF, Muss H, Kimmick G, Owusu C, Mrozek E, Shahrokni A, **Ballman K**, Hurria A. Breast cancer and aging: Results of the U13 conference breast cancer panel. Breast Cancer Res Treat. 2014; 146(1):1-6.

118. Joensuu H, Eriksson M, Hall KS, Hartmann JT, Pink D, Schutte J, Ramadori G, Hohenberger P, Duyster J, Al-Batran SE, Schlemmer M, Bauer S, Wardelmann E, Sarlomo-Rikala M, Nilsson B, Sihto H, **Ballman KV**, Leinonen M, Dematteo RP, Reichardt P. Risk factors for gastrointestinal stromal tumor recurrence in patients treated with adjuvant imatinib. Cancer. 2014; 120(15):2325-33.

119. Batdorf NJ, Mubang R, Whitney G, **Ballman K**, Lovely J, Grubbs P, Lisa B, Hinckley A, Lemaine V, Saint-Cyr M. Abstract 113: Comparison of Outcomes for Patients Undergoing Free Flap Autologous Breast Reconstruction Utilizing a Multimodal Enhanced Recovery Pathway versus Traditional Care. Plast Reconstr Surg. 2014 Mar; 133(3 Suppl):130. PMID:25942224. DOI:10.1097/01.prs.0000444938.78110.c2.

120. Grogan EL, Deppen SA, **Ballman KV**, Andrade GM, Verdial FC, Aldrich MC, Chen CL, Decker PA, Harpole DH, Cerfolio RJ, Keenan RJ, Jones DR, D'Amico TA, Shrager JB, Meyers BF, Putnam JB Jr. Accuracy of fluorodeoxyglucose-positron emission tomography within the clinical practice of the American College of Surgeons Oncology Group Z4031 trial to diagnose clinical stage I non-small cell lung cancer. Ann Thorac Surg. 2014 Apr; 97(4):1142-8. Epub 2014 Feb 25. PMID:24576597. PMCID:4008142. DOI:10.1016/j.athoracsur.2013.12.043.

121. Corless CL, **Ballman KV**, Antonescu CR, Kolesnikova V, Maki RG, Pisters PW, Blackstein ME, Blanke CD, Demetri GD, Heinrich MC, von Mehren M, Patel S, McCarter MD, Owzar K, DeMatteo RP. Pathologic and molecular features correlate with long-term outcome after adjuvant therapy of resected primary GI stromal tumor: the ACOSOG Z9001 trial. J Clin Oncol. 2014 May 20; 32(15):1563-70. Epub 2014 Mar 17. PMID:24638003. PMCID:4026579. DOI:10.1200/JCO.2013.51.2046.

122. Hurria A, Dale W, Mooney M, Rowland JH, **Ballman KV**, Cohen HJ, Muss HB, Schilsky RL, Ferrell B, Extermann M, Schmader KE, Mohile SG. Designing Therapeutic Clinical Trials for Older and Frail Adults With Cancer: U13 Conference Recommendations. J Clin Oncol. 2014 Aug 20;32(24):2587-94. Epub 2014 Jul 14. PMID:25071116. PMCID:4129504. DOI:10.1200/JCO.2013.55.0418.

123. Klepin HD, Pitcher BN, **Ballman KV**, Kornblith AB, Hurria A, Winer EP, Hudis C, Cohen HJ, Muss HB, Kimmick GG. Comorbidity, chemotherapy toxicity, and outcomes among older women receiving adjuvant chemotherapy for breast cancer on a clinical trial: CALGB 49907 and CALGB 361004 (alliance). J Oncol Pract. 2014 Sep; 10(5):e285-92. Epub 2014 Jul 29. PMID:25074878. PMCID:4161730. DOI:10.1200/JOP.2014.001388.

124. Cheng H, **Ballman K**, Vassilakopoulou M, Dueck AC, Reinholz MM, Tenner K, Gralow J, Hudis C, Davidson NE, Fountzilas G, McCullough AE, Chen B, Psyrri A, Rimm DL, Perez EA. EGFR expression

22

is associated with decreased benefit from trastuzumab in the NCCTG N9831 (Alliance) trial. Br J Cancer. 2014 Sep 9; 111(6):1065-71. Epub 2014 Aug 12. PMID:25117817. DOI:10.1038/bjc.2014.442.

125. Boughey JC, McCall LM, **Ballman KV**, Mittendorf EA, Ahrendt GM, Wilke LG, Taback B, Leitch AM, Flippo-Morton T, Hunt KK. Tumor biology correlates with rates of breast-conserving surgery and pathologic complete response after neoadjuvant chemotherapy for breast cancer: findings from the ACOSOG Z1071 (Alliance) Prospective Multicenter Clinical Trial. Ann Surg. 2014 Oct; 260(4):608-14; discussion 614-6. PMID:25203877. PMCID:4159769. DOI:10.1097/SLA.0000000000000924.

126. Degnim AC, Hoskin TL, Brahmbhatt RD, Warren-Peled A, Loprinzi M, Pavey ES, Boughey JC, Hieken TJ, Jacobson S, Lemaine V, Jakub JW, Irwin C, Foster RD, Sbitany H, Saint-Cyr M, Duralde E, Ramaker S, Chin R, Sieg M, Wildeman M, Scow JS, Patel R, **Ballman K**, Baddour LM, Esserman LJ. Randomized trial of drain antisepsis after mastectomy and immediate prosthetic breast reconstruction. Ann Surg Oncol. 2014 Oct; 21(10):3240-8. Epub 2014 Aug 06. PMID:25096386. PMCID:4373621. DOI:10.1245/s10434-014-3918-9.

127. Onkendi EO, Jimenez RE, Spears GM, Harmsen WS, **Ballman KV**, Hieken TJ. Surgical treatment of borderline and malignant phyllodes tumors: the effect of the extent of resection and tumor characteristics on patient outcome. Ann Surg Oncol. 2014 Oct; 21(10):3304-9. Epub 2014 Jul 18. PMID:25034817. DOI:10.1245/s10434-014-3909-x.

128. Norton N, Olson RM, Pegram M, Tenner K, **Ballman KV**, Clynes R, Knutson KL, Perez EA. Association studies of Fcgamma receptor polymorphisms with outcome in HER2+ breast cancer patients treated with trastuzumab in NCCTG (Alliance) Trial N9831. Cancer Immunol Res. 2014 Oct; 2(10):962-9. Epub 2014 Jul 02. PMID:24989892. PMCID:4215796. DOI:10.1158/2326-6066.CIR-14-0059.

129. Reardon DA, **Ballman KV**, Buckner JC, Chang SM, Ellingson BM. Impact of imaging measurements on response assessment in glioblastoma clinical trials. Neuro Oncol. 2014 Oct; 16 Suppl 7:vii24-35. PMID:25313236. PMCID:4195531. DOI:10.1093/neuonc/nou286.

130. Wen PY, Cloughesy TF, Ellingson BM, Reardon DA, Fine HA, Abrey L, **Ballman K**, Bendszuz M, Buckner J, Chang SM, Prados MD, Pope WB, Gregory Sorensen A, van den Bent M, Yung WK. Report of the Jumpstarting Brain Tumor Drug Development Coalition and FDA clinical trials neuroimaging endpoint workshop (January 30, 2014, Bethesda MD). Neuro Oncol. 2014 Oct; 16 Suppl 7:vii36-47. PMID:25313237. PMCID:4195530. DOI:10.1093/neuonc/nou226.

131. Jagsi R, Chadha M, Moni J, **Ballman K**, Laurie F, Buchholz TA, Giuliano A, Haffty BG. Radiation field design in the ACOSOG Z0011 (Alliance) Trial. J Clin Oncol. 2014 Nov 10; 32(32):3600-6. Epub 2014 Aug 18. PMID:25135994. PMCID:4220042. DOI:10.1200/JCO.2014.56.5838.

132. Necela BM, Crozier JA, Andorfer CA, Lewis-Tuffin L, Kachergus JM, Geiger XJ, Kalari KR, Serie DJ, Sun Z, Aspita AM, O'Shannessy DJ, Maltzman JD, McCullough AE, Pockaj BA, Cunliffe HE, **Ballman KV**, Thompson EA, Perez EA. Folate Receptor-alpha (FOLR1) Expression and Function in Triple Negative Tumors. PLoS One. 2015; 10(3):e0122209. Epub 2015 Mar 27. PMID:25816016. PMCID:4376802. DOI:10.1371/journal.pone.0122209.

133. Grotz TE, Puig CA, Perkins S, **Ballman K**, Hieken TJ. Management of regional lymph nodes in the elderly melanoma patient: patient selection, accuracy and prognostic implications. Eur J Surg Oncol. 2015 Jan; 41(1):157-64. Epub 2014 Oct 30. PMID:25468751. DOI:10.1016/j.ejso.2014.10.051.

134. Alexander BM, Galanis E, Yung WK, **Ballman KV**, Boyett JM, Cloughesy TF, Degroot JF, Huse JT, Mann B, Mason W, Mellinghoff IK, Mikkelsen T, Mischel PS, O'Neill BP, Prados MD, Sarkaria JN, Tawab-Amiri A, Trippa L, Ye X, Ligon KL, Berry DA, Wen PY. Brain Malignancy Steering Committee clinical trials planning workshop: report from the Targeted Therapies Working Group. Neuro Oncol. 2015 Feb; 17(2):180-8. Epub 2014 Aug 26. PMID:25165194. PMCID:4288520. DOI:10.1093/neuonc/nou154.

135. Boughey JC, **Ballman KV**, Hunt KK, McCall LM, Mittendorf EA, Ahrendt GM, Wilke LG, Le-Petross HT. Axillary Ultrasound After Neoadjuvant Chemotherapy and Its Impact on Sentinel Lymph Node Surgery: Results From the American College of Surgeons Oncology Group Z1071 Trial (Alliance). J Clin Oncol. 2015 Feb 02. PMID:25646192. DOI:10.1200/JCO.2014.57.8401.

136. Batdorf NJ, Lemaine V, Lovely JK, **Ballman KV**, Goede WJ, Martinez-Jorge J, Booth-Kowalczyk AL, Grubbs PL, Bungum LD, Saint-Cyr M. Enhanced recovery after surgery in microvascular breast

23

reconstruction. J Plast Reconstr Aesthet Surg. 2015 Mar; 68(3):395-402. Epub 2014 Nov 21. PMID:25488326. DOI:10.1016/j.bjps.2014.11.014.

137. Perez EA, Thompson EA, **Ballman KV**, Anderson SK, Asmann YW, Kalari KR, Eckel-Passow JE, Dueck AC, Tenner KS, Jen J, Fan JB, Geiger XJ, McCullough AE, Chen B, Jenkins RB, Sledge GW, Winer EP, Gralow JR, Reinholz MM. Genomic analysis reveals that immune function genes are strongly linked to clinical outcome in the North Central Cancer Treatment Group n9831 Adjuvant Trastuzumab Trial. J Clin Oncol. 2015 Mar 1; 33(7):701-8. Epub 2015 Jan 20. PMID:25605861. PMCID:4334774. DOI:10.1200/JCO.2014.57.6298.

138. Mohan AT, Rammos CK, Gaba P, Schupbach J, Goede WJ, **Ballman K**, Batdorf N, Cheng A, Saint-Cyr M. Modified aesthetic abdominoplasty approach in perforator free-flap breast reconstruction: Impact of drain free donor site on patient outcomes. J Plast Reconstr Aesthet Surg. 2015. 68(6):800-809. PMID:25843908. DOI:10.1016/j.bjps.2015.03.008.

139. Laungani AT, Van Alphen N, Christner JA, Lachman N, Pawlina W, **Ballman KV**, Saint-Cyr M. Three-dimensional CT angiography assessment of the impact of the dermis and the subdermal plexus in DIEP flap perfusion. J Plast Reconstr Aesthet Surg. 2015 Apr; 68(4):525-30. Epub 2015 Jan 07. PMID:25665491. DOI:10.1016/j.bjps.2014.12.004.

140. Mittendorf EA, **Ballman KV**, McCall LM, Yi M, Sahin AA, Bedrosian I, Hansen N, Gabram S, Hurd T, Giuliano AE, Hunt KK. Evaluation of the Stage IB Designation of the American Joint Committee on Cancer Staging System in Breast Cancer. J Clin Oncol. 2015 Apr 1; 33(10):1119-27. Epub 2014 Dec 08. PMID:25488970. PMCID:4372850. DOI:10.1200/JCO.2014.57.2958.

141. Jatoi A, Muss H, Allred JB, Cohen HJ, **Ballman K**, Hopkins JO, Gajra A, Lafky J, Wolff A, Kottschade L, Gralow J, Hurria A. Psychooncology. 2015 May 20. doi: 10.1002/pon.3850. [Epub ahead of print] PMID: 25994447

142. O'Sullivan CC, Bradbury I, Campbell C, Spielmann M, Perez EA, Joensuu H, Costantino JP, Delaloge S, Rastogi P, Zardavas D, **Ballman KV**, Holmes E, de Azambuja E, Piccart-Gebhart M, Zujewski JA, Gelber RD. Efficacy of Adjuvant Trastuzumab for Patients With Human Epidermal Growth Factor Receptor 2-Positive Early Breast Cancer and Tumors ≤ 2 cm: A Meta-Analysis of the Randomized Trastuzumab Trials. J Clin Oncol. 2015 Aug 20;33(24):2600-8. doi: 10.1200/JCO.2015.60.8620. PMID: 26101239

143. **Ballman KV**. Biomarker: Predictive or Prognostic? J Clin Oncol. 2015 Nov 20;33(33):3968-71. doi: 10.1200/JCO.2015.63.3651. Epub 2015 Sep 21. PubMed PMID: 26392104.

144. Zielinski MD, Kuntz MM, Polites SF, Boggust A, Nelson H, Khasawneh MA, Jenkins DH, Harmsen S, **Ballman KV**, Pieper R. A prospective analysis of urinary tract infections among elderly trauma patients. J Trauma Acute Care Surg. 2015 Oct;79(4):638-42. doi: 10.1097/TA.0000000000000796. PubMed PMID: 26402539; PubMed Central PMCID: PMC4582427.

145. **Ballman KV**. Biomarker-based trials in neuro-oncology. Chin Clin Oncol. 2015 Sep;4(3):38. doi: 10.3978/j.issn.2304-3865.2015.09.04. PubMed PMID: 26408305.

146. Perez EA, Baehner FL, Butler SM, Thompson EA, Dueck AC, Jamshidian F, Cherbavaz D, Yoshizawa C, Shak S, Kaufman PA, Davidson NE, Gralow J, Asmann YW, **Ballman KV**. The relationship between quantitative human epidermal growth factor receptor 2 gene expression by the 21-gene reverse transcriptase polymerase chain reaction assay and adjuvant trastuzumab benefit in Alliance N9831. Breast Cancer Res. 2015 Oct 1;17(1):133. doi: 10.1186/s13058-015-0643-7. PubMed PMID: 26429296; PubMed Central PMCID: PMC4589954.

147. Perez EA, **Ballman KV**, Tenner KS, Thompson EA, Badve SS, Bailey H, Baehner FL. Association of Stromal Tumor-Infiltrating Lymphocytes With Recurrence-Free Survival in the N9831 Adjuvant Trial in Patients With Early-Stage HER2-Positive Breast Cancer. JAMA Oncol. 2016 Jan 1;2(1):56-64. doi: 10.1001/jamaoncol.2015.3239. PubMed PMID: 26469139; PubMed Central PMCID: PMC4713247.

148. Huang RY, Rahman R, **Ballman KV**, Felten SJ, Anderson SK, Ellingson BM, Nayak L, Lee EQ, Abrey LE, Galanis E, Reardon DA, Pope WB, Cloughesy TF, Wen PY. The Impact of T2/FLAIR Evaluation per RANO Criteria on Response Assessment of Recurrent Glioblastoma Patients Treated with Bevacizumab. Clin Cancer Res. 2015 Oct 21. [Epub ahead of print] PubMed PMID: 26490307.

149. Park MS, Xue A, Spears GM, Halling TM, Ferrara MJ, Kuntz MM, Dhillon SK, Jenkins DH, Harmsen WS, **Ballman KV**, Harrison P, Heit JA. Thrombin generation and procoagulant microparticle profiles

24

after acute trauma: A prospective cohort study. J Trauma Acute Care Surg. 2015 Nov;79(5):726-31. doi: 10.1097/TA.0000000000000839. PubMed PMID: 26496097; PubMed Central PMCID: PMC4621757.

150. Gupta SK, Kizilbash SH, Carlson BL, Mladek AC, Boakye-Agyeman F, Bakken KK, Pokorny JL, Schroeder MA, Decker PA, Cen L, Eckel-Passow JE, Sarkar G, Ballman KV, Reid JM, Jenkins RB, Verhaak RG, Sulman EP, Kitange GJ, Sarkaria JN. Delineation of MGMT Hypermethylation as a Biomarker for Veliparib-Mediated Temozolomide-Sensitizing Therapy of Glioblastoma. J Natl Cancer Inst. 2015 Nov 27;108(5). pii: djv369. doi: 10.1093/jnci/djv369. Print 2015 May. PubMed PMID: 26615020.

151. Boughey JC, Ballman KV, Le-Petross HT, McCall LM, Mittendorf EA, Ahrendt GM, Wilke LG, Taback B, Feliberti EC, Hunt KK. Identification and Resection of Clipped Node Decreases the False-negative Rate of Sentinel Lymph Node Surgery in Patients Presenting With Node-positive Breast Cancer (T0-T4, N1-N2) Who Receive Neoadjuvant Chemotherapy: Results From ACOSOG Z1071 (Alliance). Ann Surg. 2015 Nov 26. [Epub ahead of print] PubMed PMID: 26649589.

152. Chen J, Ryu E, Hatchcock M, Ballman K, Chia N, Olson JE, Nelson H. Impact of demographics on human gut microbial diversity in a US Midwest population. PeerJ 2016 4:e1514; DOI 10.7717/peerj.1514

153. Zielinski MD, Kuntz M, Zhang X, Zagar AE, Khasawneh MA, Zendejas B, Polites SF, Ferrara M, Harmsen WS, Ballman KV, Park MS, Schiller HJ, Dries D, Jenkins DH. Botulinum toxin A-induced paralysis of the lateral abdominal wall after damage-control laparotomy: A multi-institutional, prospective, randomized, placebo-controlled pilot study. J Trauma Acute Care Surg. 2016 Feb;80(2):237-42. doi: 10.1097/TA.0000000000000917. PMID: 26813298.

154. Haffty BG, McCall LM, Ballman KV, McLaughlin S, Jagsi R, Ollila DW, Hunt KK, Buchholz TA, Boughey JC. Patterns of Local-Regional Management Following Neoadjuvant Chemotherapy in Breast Cancer: Results From ACOSOG Z1071 (Alliance). Int J Radiat Oncol Biol Phys. 2016 Mar 1;94(3):493-502. doi: 10.1016/j.ijrobp.2015.11.005. PMID: 26867878; PMCID: PMC4752720.

155. Shoag J, Halpern JA, Lee DJ, Mittal S, Ballman KV, Barbieri CE, Hu JC. Decline in prostate cancer screening by primary care physicians: an analysis of trends in the use of digital rectal examination and prostate specific antigen testing. J Urol. 2016 Oct;196(4):1047-52. doi: 10.1016/j.juro.2016.03.171. PMID: 27060052

156. Knutson KL, Clynes R, Shreeder B, Yeramian P, Kemp K, Ballman K, Tenner KS, Erskine CL, Norton N, Northfelt DW, Tan W, Calfa C, Pegram MD, Mittendorf EA, Perez EA. Improved survival of HER2+ breast cancer patients treated with trastuzumab and chemotherapy is associated with host antibody immunity against the HER2 intracellular domain. Cancer Res. 2016 Jul 1;76(13):3702-10. PMID: 27197192

157. Nipp RD, Yao NA, Lowenstein LM, Buckner JC, Parker IR, Gajra A, Morrison VA, Dale W, Ballman KV. Pragmatic study designs for older adults with cancer: Report from the U13 conference. J Geriatr Oncol. 2016 Jul;7(4):234-41. Review. PubMed PMID: 27197914

158. Simmons RM, Ballman KV, Cox C, Carp N, Sabol J, Hwang RF, Attai D, Sabel M, Nathanson D, Kenler A, Gold L, Kaufman C, Han L, Bleznak A, Stanley Smith J, Holmes D, Fornage B, Le-Petross C, Hoda S, McCall L, Hunt KK; ACOSOG investigators. A Phase II Trial Exploring the Success of Cryoablation Therapy in the Treatment of Invasive Breast Carcinoma: Results from ACOSOG (Alliance) Z1072. Ann Surg Oncol. 2016 Aug;23(8):2438-45. PMID: 27221361

159. Osarogiagbon RU, Decker PA, Ballman K, Wigle D, Allen MS, Darling GE. Survival Implications of Variation in the Thoroughness of Pathologic Lymph Node Examination in American College of Surgeons Oncology Group Z0030 (Alliance). Ann Thorac Surg. 2016 Aug;102(2):363-9. PMID: 27262908

160. Park MS, Perkins SE, Spears GM, Ashrani AA, Leibson CL, Boos CM, Harmsen WS, Jenkins DH, Bailey KR, Ballman KV, Heit JA. Risk factors for venous thromboembolism after acute trauma: A population-based case-cohort study. Thromb Res. 2016 Aug;144:40-5. doi: 10.1016/j.thromres.2016.03.026. PMID: 27284980

161. Aho JM, Nourallah A, Samaha MJ, Antiel RM, Dupont SC, Ballman KV, Sloan A, Bingener J. Patient-Reported Outcomes after Laparoscopic Ventral Hernia Repair. Am Surg. 2016 Jun;82(6):550-6. PMID: 27305889

25

162. Brown PD, Jaeckle K, **Ballman KV**, Farace E, Cerhan JH, Anderson SK, Carrero XW, Barker FG 2nd, Deming R, Burri SH, Ménard J, Chung C, Stieber VW, Pollock BE, Galanis E, Buckner JC, Asher AL. Effect of Radiosurgery Alone vs Radiosurgery With Whole Brain Radiation Therapy on Cognitive Function in Patients With 1 to 3 Brain Metastases: A Randomized Clinical Trial. JAMA. 2016 Jul 26;316(4):401-9. doi: 10.1001/jama.2016.9839. PubMed PMID: 27458945.

163. Shah MV, Wiktor AE, Meyer RG, Tenner KS, **Ballman KV**, Green SJ, Sukov WR, Ketterling RP, Perez EA, Jenkins RB. Change in Pattern of HER2 Fluorescent in Situ Hybridization (FISH) Results in Breast Cancers Submitted for FISH Testing: Experience of a Reference Laboratory Using US Food and Drug Administration Criteria and American Society of Clinical Oncology and College of American Pathologists Guidelines. J Clin Oncol. 2016 Oct 10;34(29):3502-3510. PubMed PMID: 27458302.

164. Giuliano AE, **Ballman K**, McCall L, Beitsch P, Whitworth PW, Blumencranz P, Leitch AM, Saha S, Morrow M, Hunt KK. Locoregional Recurrence After Sentinel Lymph Node Dissection With or Without Axillary Dissection in Patients With Sentinel Lymph Node Metastases: Long-term Follow-up From the American College of Surgeons Oncology Group (Alliance) ACOSOG Z0011 Randomized Trial. Ann Surg. 2016 Sep;264(3):413-20. doi: 10.1097/SLA.0000000000001863.

165. Warner ET, **Ballman KV**, Strand C, Boughey JC, Buzdar AU, Carey LA, Sikov WM, Partridge AH. Impact of race, ethnicity, and BMI on achievement of pathologic complete response following neoadjuvant chemotherapy for breast cancer: a pooled analysis of four prospective Alliance clinical trials (A151426). Breast Cancer Res Treat. 2016 Aug;159(1):109-18. PubMed PMID: 27449492

166. Halpern JA, Shoag JE, Mittal S, Oromendia C, **Ballman KV**, Hershman DL, Wright JD, Tina Shih YC, Nguyen PL, Hu JC. Prognostic Significance of Digital Rectal Examination and Prostate Specific Antigen in the Prostate, Lung, Colorectal, and Ovarian Cancer Screening Arm. J Urol. 2017 Feb;197(2):363-368. doi: 10.1016/j.juro.2016.08.092. PubMed PMID: 27569432.

167. Laungani AT, Christner J, Primus JA, Lachman N, **Ballman KV**, Mohan A, Saint-Cyr M. Study of the Impact of the Location of a Perforator in the Perfusion of a Perforator Flap: The Concept of "Angle of Perfusion". J Reconstr Microsurg. 2017 Jan;33(1):49-58. PMID: 27636539

168. Perez EA, **Ballman KV**, Mashadi-Hossein A, Tenner KS, Kachergus JM, Norton N, Necela BM, Carr JM, Ferree S, Perou CM, Baehner F, Cheang MC, Thompson EA. Intrinsic Subtype and Therapeutic Response Among HER2-Positive Breaty st Tumors from the NCCTG (Alliance) N9831 Trial. J Natl Cancer Inst. 2016 Oct 28;109(2). pii: djw207.

169. Halpern JA, Shoag JE, Artis AS, **Ballman KV**, Sedrakyan A, Hershman DL, Wright JD, Shih YC, Hu JC. National Trends in Prostate Biopsy and Radical Prostatectomy Volumes Following the United States Preventative Services Task Force Guidelines Against Prostate-Specific Antigen Screening. JAMA Surg. 2017 Feb 1;152(2):192-198. doi: 10.1001/jamasurg.2016.3987. PubMed PMID: 27806151.

170. Lewicki P, Shoag J, Golombos DM, Oromendia C, **Ballman KV**, Halpern JA, Stone BV, O'Malley P, Barbieri CE, Scherr DS. Prognostic significance of a negative prostate biopsy: An analysis of subjects enrolled in a prostate cancer screening trial. J Urol. 2017 Apr;197(4):1014-1019. doi: 10.1016/j.juro.2016.11.002. PubMed PMID: 27836710

171. Argenta PA, **Ballman KV**, Geller MA, Carson LF, Ghebre R, Mullany SA, Teoh DG, Winterhoff BJ, Rivard CL, Erickson BK. The effect of photobiomodulation on chemotherapy-induced peripheral neuropathy: A randomized, sham-controlled clinical trial. Gynecol Oncol. 2017 Jan;144(1):159-166. doi:10.1016/j.ygyno.2016.11.013. PubMed PMID: 27887804.

172. Ashamalla H, Guirguis A, McCool M, McVorran S, Mattes M, Metzger D, Oromendia C, **Ballman KV,** Mokhtar B, Tchelebi M, Katsoulakis E, Rafla S. Brachytherapy improves outcomes in young men (≤60 years) with prostate cancer: A SEER analysis. Brachytherapy. 2017 Jul - Aug;16(4):916-918. doi: 10.1016/j.brachy.2016.12.010. PubMed PMID: 28139417.

173. Kimmick GG, Major B, Clapp J, Sloan J, Pitcher B, **Ballman K**, Barginear M, Freedman RA, Artz A, Klepin HD, Lafky JM, Hopkins J, Winer E, Hudis C, Muss H, Cohen H, Jatoi A, Hurria A, Mandelblatt J. Using ePrognosis to estimate 2-year all-cause mortality in older women with breast cancer: Cancer and Leukemia Group B (CALGB) 49907 and 369901 (Alliance A151503). Breast Cancer Res Treat. 2017 Jun;163(2):391-398.. doi: 10.1007/s10549-017-4188-6. PubMed PMID: 28283904.

174. Perez EA, **Ballman KV**, Mashadi-Hossein A, Tenner KS, Kachergus JM, Norton N, Necela BM, Carr JM, Ferree S, Perou CM, Baehner F, Cheang MC, Thompson EA. Intrinsic Subtype and Therapeutic

26

Response Among HER2-Positive Breast Tumors from the NCCTG (Alliance) N9831 Trial. J Natl Cancer Inst. 2017 Feb 1;109(2):1-8. doi: 10.1093/jnci/djw207. PubMed PMID: 28376219.

175. Grossman SA, Schreck KC, **Ballman K**, Alexander B. Point/counterpoint: randomized versus single-arm phase II clinical trials for patients with newly diagnosed glioblastoma. Neuro Oncol. 2017 Apr 1;19(4):469-474. doi: 10.1093/neuonc/nox030. PubMed PMID: 28388713.

176. Reinholz MM, Chen B, Dueck AC, Tenner K, **Ballman K**, Riehle D, Jenkins RB, Geiger XJ, McCullough AE, Perez EA. IGF1R Protein Expression Is Not Associated with Differential Benefit to Concurrent Trastuzumab in Early-Stage HER2(+) Breast Cancer from the North Central Cancer Treatment Group (Alliance) Adjuvant Trastuzumab Trial N9831. Clin Cancer Res. 2017 Aug 1;23(15):4203-4211. doi: 10.1158/1078-0432.CCR-15-0574. PubMed PMID: 28533226.

177. Antonarakis ES, Tagawa ST, Galletti G, Worroll D, **Ballman K**, Vanhuyse M, Sonpavde G, North S, Albany C, Tsao CK, Stewart J, Zaher A, Szatrowski T, Zhou W, Gjyrezi A, Tasaki S, Portella L, Bai Y, Lannin TB, Suri S, Gruber CN, Pratt ED, Kirby BJ, Eisenberger MA, Nanus DM, Saad F, Giannakakou P; TAXYNERGY Investigators. Randomized, Noncomparative, Phase II Trial of Early Switch From Docetaxel to Cabazitaxel or Vice Versa, With Integrated Biomarker Analysis, in Men With Chemotherapy-Naïve, Metastatic, Castration-Resistant Prostate Cancer. J Clin Oncol. 2017 Oct 1;35(28):3181-3188. doi: 10.1200/JCO.2017.72.4138. PubMed PMID: 28632486.

178. Boughey JC, **Ballman KV**, McCall LM, Mittendorf EA, Symmans WF, Julian TB, Byrd D, Hunt KK. Tumor Biology and Response to Chemotherapy Impact Breast Cancer-specific Survival in Node-positive Breast Cancer Patients Treated With Neoadjuvant Chemotherapy: Long-term Follow-up From ACOSOG Z1071 (Alliance). Ann Surg. 2017 Oct;266(4):667-676. doi: 10.1097/SLA.0000000000002373. PubMed PMID: 28657941.

179. Brown PD, **Ballman KV**, Cerhan JH, Anderson SK, Carrero XW, Whitton AC, Greenspoon J, Parney IF, Laack NNI, Ashman JB, Bahary JP, Hadjipanayis CG, Urbanic JJ, Barker FG 2nd, Farace E, Khuntia D, Giannini C, Buckner JC, Galanis E, Roberge D. Postoperative stereotactic radiosurgery compared with whole brain radiotherapy for resected metastatic brain disease (NCCTG N107C/CEC·3): a multicentre, randomised, controlled, phase 3 trial. Lancet Oncol. 2017 Aug;18(8):1049-1060. doi: 10.1016/S1470-2045(17)30441-2. PubMed PMID: 28687377.

180. Giuliano AE, **Ballman KV**, McCall L, Beitsch PD, Brennan MB, Kelemen PR, Ollila DW, Hansen NM, Whitworth PW, Blumencranz PW, Leitch AM, Saha S, Hunt KK, Morrow M. Effect of Axillary Dissection vs No Axillary Dissection on 10-Year Overall Survival Among Women With Invasive Breast Cancer and Sentinel Node Metastasis: The ACOSOG Z0011 (Alliance) Randomized Clinical Trial. JAMA. 2017 Sep 12;318(10):918-926. doi: 10.1001/jama.2017.11470. PubMed PMID: 28898379.

181. Churilla TM, **Ballman KV**, Brown PD, Twohy EL, Jaeckle K, Farace E, Cerhan JH, Anderson SK, Carrero XW, Garces YI, Barker FG 2nd, Deming R, Dixon JG, Burri SH, Chung C, Ménard C, Stieber VW, Pollock BE, Galanis E, Buckner JC, Asher AL. Stereotactic Radiosurgery With or Without Whole-Brain Radiation Therapy for Limited Brain Metastases: A Secondary Analysis of the North Central Cancer Treatment Group N0574 (Alliance) Randomized Controlled Trial. Int J Radiat Oncol Biol Phys. 2017 Aug 5. pii: S0360-3016(17)33691-X. doi: 10.1016/j.ijrobp.2017.07.045. [Epub ahead of print] PubMed PMID: 28939223.

182. Galanis E, Anderson SK, Miller CR, Sarkaria JN, Jaeckle K, Buckner JC, Ligon KL, **Ballman KV**, Moore DF Jr, Nebozhyn M, Loboda A, Schiff D, Ahluwalia MS, Lee EQ, Gerstner ER, Lesser GJ, Prados M, Grossman SA, Cerhan J, Giannini C, Wen PY; Alliance for Clinical Trials in Oncology and ABTC. Phase I/II Trial of Vorinostat Combined with Temozolomide and Radiation Therapy for Newly Diagnosed Glioblastoma: Final Results of Alliance N0874/ABTC 02. Neuro Oncol. 2017 Aug 22. doi: 10.1093/neuonc/nox161. [Epub ahead of print] PubMed PMID: 29016887.

183. Chen J, King E, Deek R, Wei Z, Yu Y, Grill D, **Ballman K**, Stengle O. An omnibus test for differential distribution analysis of microbiome sequencing data. Bioinformatics 2018. 34: 643-651. doi: 10.1093/bioinformatics/btx650. PMID: 29040451

184. Gaudino M, Alexander JH, Bakaeen FG, **Ballman K**, Barili F, Calafiore AM, Davierwala P, Goldman S, Kappetein P, Lorusso R, Mylotte D, Pagano D, Ruel M, Schwann T, Suma H, Taggart DP, Tranbaugh RF, Fremes S. Randomized comparison of the clinical outcome of single versus multiple arterial grafts: the ROMA trial-rationale and study protocol. Eur J Cardiothorac Surg. 2017 Oct 20. doi: 10.1093/ejcts/ezx358. [Epub ahead of print] PubMed PMID: 29059371.

27

185. Halpern JA, Oromendia C, Shoag JE, Mittal S, Cosiano MF, **Ballman KV**, Vickers AJ, Hu JC. Utility of Digital Rectal Examination (DRE) as an Adjunct to Prostate Specific Antigen (PSA) in the Detection of Clinically Significant Prostate Cancer. J Urol. 2017 Oct 20. pii: S0022-5347(17)77762-2. doi: 10.1016/j.juro.2017.10.021. [Epub ahead of print] PubMed PMID: 29061540.

186. Le-Petross HT, McCall LM, Hunt KK, Mittendorf EA, Ahrendt GM, Wilke LG, **Ballman KV**, Boughey JC. Axillary Ultrasound Identifies Residual Nodal Disease After Chemotherapy: Results From the American College of Surgeons Oncology Group Z1071 Trial (Alliance). *AJR Am J Roentgenol*. 2018 Jan 30:1-8. doi: 10.2214/AJR.17.18295. [Epub ahead of print] PubMed PMID: 29381381.

187. Chen J, Oromendia C, Halpern JA, **Ballman KV**. National trends in management of localized prostate cancer: A population based analysis 2004-2013. Prostate. 2018 Mar 14. doi: 10.1002/pros.23496. [Epub ahead of print] PubMed PMID: 29542178.

188. Gajra A, McCall L, Muss HB, Cohen HJ, Jatoi A, **Ballman KV**, Partridge AH, Sutton L, Parker BA, Magrinat G, Klepin HD, Lafky JM, Hurria A. The preference to receive chemotherapy and cancer-related outcomes in older adults with breast cancer CALGB 49907 (alliance). J Geriatr Oncol. 2018 Mar 28. pii: S1879-4068(18)30070-5. doi: 10.1016/j.jgo.2018.02.003. [Epub ahead of print] PubMed PMID: 29602735.

189. Schumacher JR, Neuman HB, Chang GJ, Kozower BD, Edge SB, Yu M, Vanness DJ, Si Y, Jacobs EA, Francescatti AB, Spears PA, Havlena J, Adesoye T, McKellar D, Winchester D, Burnside ES, Greenberg CC; Alliance ACS-CRP CCDR Breast Cancer Surveillance Working Group. A National Study of the Use of Asymptomatic Systemic Imaging for Surveillance Following Breast Cancer Treatment (AFT-01). Ann Surg Oncol. 2018 May 17. doi: 10.1245/s10434-018-6496-4. [Epub ahead of print] PubMed PMID: 29777402.

190. Díaz I, Savenkov O, **Ballman K**; Targeted learning ensembles for optimal individualized treatment rules with time-to-event outcomes, Biometrika, asy017, https://doi.org/10.1093/biomet/asy017

191. Li D, McCall LM, Hahn OM, Hudis CA, Cohen HJ, Muss HB, Jatoi A, Lafky JM, **Ballman KV**, Winer EP, Tripathy D, Schneider B, Barry W, Dickler MN, Hurria A. Identification of risk factors for toxicity in patients with hormone receptor-positive advanced breast cancer treated with bevacizumab plus letrozole: a CALGB 40503 (alliance) correlative study. Breast Cancer Res Treat. 2018 May 22. doi: 10.1007/s10549-018-4828-5. [Epub ahead of print] PubMed PMID: 29789969.

## 2. Editorials and Letters

1. Ellis M, **Ballman K**. Trawling for genes that predict response to breast cancer adjuvant therapy. J Clin Oncol. 2004 Jun 15; 22(12):2267-9. (Editorial) PMID:15136594.

2. Goodwin PJ, **Ballman KV**, Small EJ, Cannistra SA. Evaluation of treatment benefit in Journal of Clinical Oncology. J Clin Oncol. 2013 Mar 20; 31(9):1123-4. Epub 2013 Jan 28. PMID:23358984. DOI:10.1200/JCO.2012.47.6952. (Editorial)

3. Sleijfer S, **Ballman K**, Verweij J. The future of drug development? Seeking evidence of activity of novel drugs in small groups of patients. J Clin Oncol. 2013 Jun 20; 31(18):2246-8. Epub 2013 Apr 29. PMID:23630203. DOI:10.1200/JCO.2013.48.7645. (Editorial)

4. Nelson H, **Ballman K**. Achieving the right volume of randomized controlled trials. Ann Surg. 2013 Aug; 258(2):208-9. PMID:23751450. DOI:10.1097/SLA.0b013e31829c4a05. (Editorial)

5. **Ballman KV**. Phase I trial improvement: a question of patient selection, trial design, or both? J Clin Oncol. 2014 Feb 20; 32(6):489-90. Epub 2014 Jan 13. PMID:24419111. DOI:10.1200/JCO.2013.53.6896. (Editorial)

6. Goodwin PJ, **Ballman KV**, Levine M. Twenty-twenty hindsight: an adjuvant breast cancer trial through the retrospectoscope. J Clin Oncol. 2014 Aug 1; 32(22):2284-6. Epub 2014 Jun 16. PMID:24934788. DOI:10.1200/JCO.2014.55.9344. (Editorial)

7. Connolly HM, **Ballman KV**, Roger VL, Tajik AJ. Aortic stenosis: no more hemodynamic cardiac catheterization! Mayo Clin Proc. 2001 Sep; 76(9):961. PMID:11560311. DOI:10.4065/76.9.961. (Letter)

8. Cooper LT, Tse TS, Mikhail MA, McBane RD, Stanson AW, **Ballman KV**. Long-term survival and amputation risk in Thromboangiitis obliterans (Buerger's disease). J Am Coll Cardiol. 2004 Dec 21; 44(12):2410-1. PMID:15607407. (Letter)

9. Giuliano AE, Morrow M, **Ballman KV**. Axillary vs sentinel lymph node dissection for invasive breast cancer. JAMA. 2011 Jun 8; 305(22):2290-1. (Letter)

28

10. Goodwin PJ, **Ballman KV**, Small EJ, Levine M, Cannistra SA. Evaluation of treatment benefit: randomized controlled trials and population-based observational research reply. J Clin Oncol. 2013 Sep 10; 31(26):3300. (Letter)
11. **Ballman KV**, Mauer M, Wedding U, Mohile SG, Muss H, Extermann M, Luciani A, Cohen HJ, Hurria A, Lichtman SM, Curigliano G, Wildiers H. Reply to L.K. Mell et al. J Clin Oncol. 2014 Apr 1; 32(10):1090-1. Epub 2014 Feb 18. PMID:24550420. DOI:10.1200/JCO.2013.54.5236. (Letter)
12. **Ballman KV**. Reply to D.M. Hyman et al and M. Voskoboynik et al. J Clin Oncol. 2014 Oct 1; 32(28):3200. Epub 2014 Jul 28. PMID:25071106. DOI:10.1200/JCO.2014.56.5770. (Letter)
13. **Ballman KV**. Surprising results from an angiotensin-converting enzyme inhibitor trial in patients with chronic obstructive pulmonary disease. Am J Respir Crit Care Med. 2016; 194(11):1307-1308.
14. **Ballman KV**, McCall LM, Giuliano AE. Axillary vs Sentinel Lymph Node Dissection in Women With Invasive Breast Cancer-Reply. JAMA. 2018 Jan 16;319(3):306-307. doi: 10.1001/jama.2017.18318. PubMed PMID: 29340672.

### 3. Chapters

1. **Ballman KV**, Votta L. Organizational congestion in large-scale software development. Proceedings of the Third International Conference on Software Process, 1994.
2. **Ballman KV**. Real Data in Classroom Examples. In: Teaching Resources for Undergraduate Statistics. 2000. (Book chapter)

29

P1.0199.29

Exhibit 141

Gregory B. Diette, M.D.

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

-----------------------------x

IN RE JOHNSON & JOHNSON         ) MDL No.

TALCUM POWDER PRODUCTS          ) 16-2738 (FLW)(LHG)

MARKETING SALES PRACTICES,      )

AND PRODUCTS LIABILITY          )

LITIGATION                      )

                                )

THIS DOCUMENT RELATES TO        )

ALL CASES                       )

-----------------------------x

VIDEOTAPED DEPOSITION OF

GREGORY B. DIETTE, M.D.

TOWSON, MARYLAND

TUESDAY, APRIL 9, 2019

8:58 A.M.

Reported by: Leslie A. Todd

Gregory B. Diette, M.D.

Page 2

1    Deposition of GREGORY B. DIETTE, M.D., held at
2  the:
3
4
5         SHERATON BALTIMORE NORTH HOTEL
6         903 Dulaney Valley Road
7         Towson, Maryland 21204
8
9
10
11
12
13
14
15
16    Pursuant to notice, before Leslie Anne Todd,
17  Court Reporter and Notary Public of the State of
18  Maryland, who officiated in administering the oath
19  to the witness.
20
21
22
23
24
25

Page 3

1         A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFFS:
4     MICHELLE PARFITT, ESQUIRE
5     ADAM K. ROSEN, ESQUIRE
6     ASHCRAFT & GEREL, LLP
7     1825 K Street, N.W.
8     Suite 700
9     Washington, D.C. 20006
10     (202) 783-6400
11
12     CHRISTOPHER V. TISI, ESQUIRE
13     LEVIN PAPANTONIO THOMAS MITCHELL
14       RAFFERTY PROCTOR, P.A.
15     316 South Baylen Street
16     Pensacola, Florida 32502
17     (850) 435-7000
18
19     DENNIS M. GEIER, ESQUIRE
20     COHEN PLACITELLA ROTH, PC
21     127 Maple Avenue
22     Red Bank, New Jersey 07701
23     (732) 747-9003
24
25

Page 4

1    APPEARANCES (Continued):
2
3       CYNTHIA L. GARBER, ESQUIRE
4       ROBINSON CALCAGNIE, INC.
5       19 Corporate Plaza Drive
6       Newport Beach, California 92660
7       (949) 720-1288
8
9       NATHAN D. FINCH, ESQUIRE
10       MOTLEY RICE LLC
11       401 9th Street, NW
12       Suite 1001
13       Washington, D.C. 20004
14       (202) 232-5507
15
16    ON BEHALF OF THE JOHNSON & JOHNSON DEFENDANTS:
17       ALLISON M. BROWN, ESQUIRE
18       RICHARD M. HEASLIP, ESQUIRE
19       WEIL, GOTSHAL & MANGES LLP
20       17 Hutfish Street, Suite 201
21       Princeton, New Jersey 08542-3792
22       (609) 986-1104
23
24
25

Page 5

1    APPEARANCES (Continued):
2
3       KATHERINE MCBETH, ESQUIRE
4       DRINKER BIDDLE & REATH, LLP
5       One Logan Square, Suite 2000
6       Philadelphia, Pennsylvania 19103-69896
7       (215) 988-2706
8
9       JESSICA D. MILLER, ESQUIRE
10       SKADDEN, ARPS, MEAGHER & FLOM, LLP
11       1440 New York Avenue, N.W.
12       Washington, D.C. 20005
13       (202) 371-7000
14
15    ON BEHALF OF THE PCPC:
16       THOMAS T. LOCKE, ESQUIRE
17       SEYFARTH SHAW LLP
18       975 F Street, N.W.
19       Washington, D.C. 20004-1454
20       (202) 463-2400
21
22    ALSO PRESENT:
23       DANIEL HOLMSTOCK, Videographer
24
25

2 (Pages 2 to 5)

Gregory B. Diette, M.D.

Page 6

```
 1           C O N T E N T S
 2   EXAMINATION OF GREGORY B. DIETTE, M.D.     PAGE
 3      By Ms. Parfitt            14
 4      By Mr. Finch              465
 5      By Ms. Brown             467
 6
 7
 8           E X H I B I T S
 9        (Attached to transcript)
10   DIETTE DEPOSITION EXHIBITS          PAGE
11   No. 1   Notice of Oral and Videotaped
12           Deposition of Gregory Diette, MD,
13           MHS, and Duces Tecum        16
14   No. 2   Defendants' Response to Plaintiffs'
15           Document Requests Contained in Notice
16           of Oral and Videotaped Deposition of
17           Gregory Diette, M.D., MHS and Duces
18           Tecum                      17
19   No. 3   Expert Report of Gregory Diette, MD,
20           MHS for General Causation Daubert
21           Hearing, Supplemental Materials
22           Reviewed and Considered     18
23   No. 4   Article entitled "Ovulation and Risk
24           of Epithelial Ovarian Cancer"    44
25
```

Page 8

```
 1          E X H I B I T S (Continued)
 2        (Attached to transcript)
 3   DIETTE DEPOSITION EXHIBITS          PAGE
 4   No. 13   Document headed "Statement of Dr.
 5            Anne Mc Tiernan prepared for the
 6            Subcommittee on Economic and
 7            Consumer Policy Hearing on Examining
 8            the Public Health Risk on
 9            Carcinogens and Consumer Products,
10            March 12, 2019"            235
11   No. 14   Draft Screening Assessment, Talc,
12            Chemical Abstracts Service Registry
13            Number 14807-96-6, Environment and
14            Climate Change Canada, Health Canada,
15            December 2018              267
16   No. 15   Article entitled "Asbestos Exposure
17            and Ovarian Fiber Burden," Bates
18            JNJ 000004999 to 000005003    281
19   No. 16   Excerpt from "Modern Epidemiology,"
20            Third Edition, by Rothman, Greenland
21            and Lash                   289
22   No. 17   Taylor and Francis Group article,
23            "Moving to a World Beyond "p < 0.05" 297
24
25
```

Page 7

```
 1          E X H I B I T S (Continued)
 2        (Attached to transcript)
 3   DIETTE DEPOSITION EXHIBITS          PAGE
 4   No. 5   Bottle of Johnson's Baby Powder
 5           (Retained by Plaintiffs' Counsel)    52
 6   No. 6   Excerpt of Deposition of Susan
 7           Nicholson, M.D.            82
 8   No. 7   Document entitled "Appendix C"
 9           Curriculum Vitae of Gregory B.
10           Diette, MD, MHS            91
11   No. 8   Document from Johns Hopkins Medicine
12           website, entitled "Find an Expert,"
13           Gregory Bruce Diette, M.D.      95
14   No. 9   Gregory B. Diette, MD, Associate
15           Professor, Departmental Affiliations 98
16   No. 10   Expert Report of Gregory Diette, MD,
17            MHS for General Causation Daubert
18            Hearing                   133
19   No. 11   Document entitled "Appendix E,"
20            Expert Testimony of Gregory B.
21            Diette, MD, MHS           138
22   No. 12   Document from the Sidney Kimmel
23            Comprehensive Cancer Center, Risk
24            Factors & Symptoms          213
25
```

Page 9

```
 1          E X H I B I T S (Continued)
 2        (Attached to transcript)
 3   DIETTE DEPOSITION EXHIBITS          PAGE
 4   No. 18   Article entitled "Retire statistical
 5            Significance," by Amrhein, Greenland,
 6            McShane                   299
 7   No. 19   Article from Johns Hopkins Institute
 8            for Clinical & Translational Research,
 9            "The American Statistician Special
10            Issue: Moving to a World Beyond 'P
11            < 0.05'"                  308
12   No. 20   Supplementary information to: Retire
13            Statistical significance, Valentin
14            Amrhein et al.            312
15   No. 21   Document entitled "Gregory Diette,
16            MD, MHS: Talc/Ovarian Cancer Disease
17            Control Studies (Hospital Studies
18            Below Line)               324
19   No. 22   Chart showing Estimated Relative
20            Risk of Ovarian Cancer, According
21            to Reported Use of Talc, Bates
22            JNJ 000013131            327
23
24
25
```

3 (Pages 6 to 9)

Gregory B. Diette, M.D.

Page 10

E X H I B I T S (Continued)
(Attached to transcript)

DIETTE DEPOSITION EXHIBITS          PAGE

No. 23   Article entitled "Exposure to
Secondhand Smoke and Risk of Cancer
in Never Smokers: A Meta-Analysis of
Epidemiologic Studies"          366

No. 24   International Journal of Cardiology
article, "Risk of all-cause mortality
and cardiovascular disease associated
with secondhand smoke exposure: A
systematic review and meta-analysis" 369

No. 25   NIH Public Access Author Manuscript,
"Common Household Activities are
Associated with Elevated Particulate
Matter Concentrations in Bedrooms of
Inner-City Baltimore Pre-School
Children"          377

No. 26   "The Health Consequences of
Involuntary Exposure to Tobacco
Smoke," A Report of the Surgeon
General          377

No. 27   IARC Monograph entitled "Arsenic,
Metals, Fibres and Dusts," Volume
100 C, A review of Human Carcinogens 392

Page 11

E X H I B I T S (Continued)
(Attached to transcript)

DIETTE DEPOSITION EXHIBITS          PAGE

No. 28   Table 2.8 Epidemiologic studies of
asbestos exposure and ovarian cancer
(and, for comparison, lung cancer
and mesothelioma)          396

No. 29   Article entitled "Association between
Body Powder Use and Ovarian Cancer:
The African American Cancer
Epidemiology Study (AACES)"          413

No. 30   Article entitled "Perineal Talc Use
and Ovarian Cancer, A Systematic
Review and Meta-Analysis"          416

No. 31   Ultrastructural Pathology article,
"Correlative polarizing light and
scanning electron microscopy for
the assessment of talc in pelvic
region lymph nodes"          427

No. 32   Letter to Samuel Epstein from the
Department of Health and Human
Services, dated April 1, 2014          431

No. 33   Facsimile dated September 30,
2004 to Luzenac America from
Richard Zazenski to Bill Ashton          437

Page 12

E X H I B I T S (Continued)
(Attached to transcript)

DIETTE DEPOSITION EXHIBITS          PAGE

No. 34   Article entitled "Possible Role of
Epithelial Inflammation in Ovarian
Cancer"          442

Page 13

P R O C E E D I N G S
------------------

THE VIDEOGRAPHER:  We are now on the
record, and my name is Daniel Holmstock.  I am the
videographer for Golkow Litigation Services.
Today's date is April 9th, 2019, and the time on
the video screen is 8:58 a.m.

This video deposition is being held at
the Sheraton Baltimore North Hotel, at 903 Dulaney
Valley Road in Towson, Maryland, in the matter of
Johnson & Johnson Talcum Powder Products
Marketing, Sales Practices and Products Liability
Litigation, MDL No. 2738, and is pending before
the United States District Court for the Eastern
District of New Jersey.

Our deponent today is Dr. Gregory
Diette.

Counsel for appearances will be noted on
the stenographic record.  And our court reporter
today is Leslie A. Todd, who will now administer
the oath.

GREGORY B. DIETTE, M.D.,
and having been first duly sworn,
was examined and testified as follows:
DIRECT EXAMINATION

4 (Pages 10 to 13)

Gregory B. Diette, M.D.

Page 14

```
 1    BY MS. PARFITT:
 2        Q   Good morning, Dr. Diette.  How are you?
 3        A   Good morning.  Fine, thanks.
 4        Q   Good.  We will dispense with the usual
 5    comments with regard to a deposition.  I
 6    understand you've had --
 7            THE VIDEOGRAPHER:  Microphone.
 8    BY MS. PARFITT:
 9        Q   All right.  Now we're back on the mic.
10        Dr. Diette, we'll dispense with the
11    usual comments with regard to what a deposition is
12    about.  I understand you've probably had your
13    deposition taken more than a hundred times.  Is
14    that fair?
15        A   I don't know if it's a hundred, but --
16    but plenty enough that I think that I -- I
17    understand the process.
18        Q   All right.  The only one that I will ask
19    you to pay some attention to is the fact that if
20    you don't understand my question, please let me
21    know.  Otherwise, I'm going to assume you
22    understand every question that I ask, and the
23    answers that you're giving are truthful and
24    accurate.  Fair enough?
25        A   It is.
```

Page 15

```
 1        Q   All right.  Now, you're sitting here
 2    today in Towson, Maryland, in a Sheraton Hotel; is
 3    that correct?
 4        A   That is.
 5        Q   All right.  You are normally, I believe,
 6    over at Johns Hopkins University Medical Center,
 7    correct?
 8        A   That's right.
 9        Q   All right.  Is your department aware of
10    the fact that you're sitting over here having a
11    deposition taken?
12        A   I don't know if anybody knows about this
13    today, but they wouldn't be surprised, I mean, to
14    hear it if I told them.
15        Q   All right.  They know that you
16    frequently give depositions so they would not be
17    surprised; is that correct?
18            MS. BROWN:  Objection to form.
19            THE WITNESS:  They -- I don't know about
20    frequently, but they know that -- that I do give
21    depositions.
22    BY MS. PARFITT:
23        Q   All right.  Very good.
24            Would you please introduce your formal
25    God-given name for the ladies and gentlemen of the
```

Page 16

```
 1    jury.
 2        A   Sure.  It's Gregory --
 3            MS. BROWN:  Objection.  There's no jury
 4    here.
 5            MS. PARFITT:  There may be.
 6            MS. BROWN:  Go ahead, Dr. Diette.
 7            THE WITNESS:  My parents gave it to me,
 8    for what it's worth, but it's Gregory Bruce
 9    Diette.
10    BY MS. PARFITT:
11        Q   Okay.  Very good.
12            Dr. Diette, what I'd like to do is mark
13    as Exhibit 1 a notice of the deposition.
14            (Diette Exhibit No. 1 was marked
15             for identification.)
16    BY MS. PARFITT:
17        Q   Dr. Diette, if I may, Exhibit 1 is the
18    notice of deposition.  Have you seen that document
19    before?
20        A   Yeah, I've certainly seen -- seen
21    something just like this.
22        Q   All right.  Do you see at the back of
23    the deposition, there is a notice that -- there is
24    a request for you to bring certain information to
25    your deposition?  Do you see that?
```

Page 17

```
 1        A   Yes.
 2        Q   All right.  Have you had a chance to
 3    review that?
 4        A   I have.
 5        Q   All right.  How recently?
 6        A   Last week sometime.
 7        Q   All right.  Was it provided to you by
 8    counsel?
 9        A   I think that's the only way I could get
10    it.
11        Q   Okay.  Very good.
12            Now, yesterday, perhaps early in the
13    morning, I was also provided a copy of the
14    Defendants' Response to the Plaintiffs' Document
15    Requests Contained in the Notice of Oral and
16    Videotaped Deposition.
17            Let me show you what we will have marked
18    as Exhibit No. 2.
19            (Diette Exhibit No. 2 was marked
20             for identification.)
21    BY MS. PARFITT:
22        Q   Dr. Diette, let me present you with a
23    copy of Exhibit No. 2.
24            All right.  Dr. Diette, my understanding
25    is that this document, Exhibit No. 2, represents
```

5 (Pages 14 to 17)

Page 18

1    your responses to the requests that were
2    propounded upon you to -- for documents and other
3    materials prior to your deposition, correct?
4              MS. BROWN:  Objection to the form.  It
5    represents the lawyer's objections to the document
6    requests you served.
7              MS. PARFITT:  Fair.
8              THE WITNESS:  I -- I think Ms. Brown's
9    got it right.
10   BY MS. PARFITT:
11        Q    All right.  Did you -- well, let's have
12   marked the attachment to the response to
13   plaintiffs' document, which was prepared by your
14   lawyers.  And let's separately mark as Exhibit
15   No. 3 the attachments, if you will.
16        A    Should I pull this apart or -- or you
17   want to do that?
18        Q    And for purposes of the record,
19   Exhibit 2 will represent the entire document, the
20   response to plaintiffs' request, and No. 3 will
21   represent just the attachments to the request,
22   which would be material that you, Dr. Diette, were
23   to provide.
24             (Diette Exhibit No. 3 was marked
25             for identification.)

Page 19

1    BY MS. PARFITT:
2         Q    And we'll briefly just review what's
3    here, so we can move on to other areas.
4              The first page of that document
5    indicates supplemental materials reviewed and
6    considered.
7              MS. BROWN:  Counsel, can we go off the
8    record for a second?
9              MS. PARFITT:  Yes.
10             THE VIDEOGRAPHER:  The time is 9:03.
11   We're going off the record.
12             (Pause in the proceedings.)
13             THE VIDEOGRAPHER:  The time is 9:04 a.m.
14   We're back on the record.
15             MS. BROWN:  Good morning.  This is Ali
16   Brown for J&J.  We're back on the record, having
17   taken a short break to put the cameras on both the
18   questioner and myself, and we'll proceed, of
19   course, with the camera on Dr. Diette.  Thank you.
20             MS. PARFITT:  Thank you.  And I should
21   have asked, there's no one on the phone, is there,
22   today?
23             THE VIDEOGRAPHER:  There is no phone
24   present here today.
25             MS. PARFITT:  Perfect.  Thank you very

Page 20

1    much.
2    BY MS. PARFITT:
3         Q    All right.  Dr. Diette, number -- or
4    Exhibit No. 3, the first document, Supplemental
5    Materials Reviewed and Considered, did you prepare
6    this Supplemental Materials Reviewed and
7    Considered?
8         A    I contributed to it, but I didn't do the
9    typing.
10        Q    Okay.  What does that mean when you say
11   you contributed to it?
12        A    I helped to clarify what other --
13   because this -- this looks like it's all
14   reports -- I just want to make sure what's here --
15   reports, a couple of papers probably, and I -- I
16   helped to verify that these were also things that
17   I had -- had received and had a chance to look at.
18        Q    All right.  So would it be fair to say
19   that the 23 items listed on this were materials
20   that somebody typed on a list and asked that you
21   review it; is that correct?
22             MS. BROWN:  Objection to the form.
23   Misstates his testimony.
24             THE WITNESS:  So I think, just in terms
25   of the sequence, I mean I've gotten materials in

Page 21

1    this matter over a period of time, right.  So they
2    come in dribs and drabs.  And a lot of this looks
3    like some of the more recent things that came, you
4    know, because you guys have been doing
5    depositions, and some of the reports came in later
6    and so forth.  So it's really -- that's how I got
7    the materials, and then this is just to make sure
8    that I had a complete list of everything that I've
9    gotten.
10   BY MS. PARFITT:
11        Q    All right.  And the reason I asked is
12   because you submitted your report on
13   February 25th, 2019.  So may I assume that
14   everything on the list, Exhibit No. 3, the first
15   page, supplemental, represents documents you
16   received after February 25th, 2019, correct?
17             MS. BROWN:  Objection to the form.
18             THE WITNESS:  I wouldn't assume that.  I
19   mean, so certainly some things here, right.  So
20   the expert reports that are dated 2/25, I didn't
21   have, you know, even on the day that I submitted
22   mine, so those came after.  Something like the
23   Barnard study, I may well have had that.  I mean,
24   my -- my goal here was to -- just to make sure
25   that we hadn't left anything off.

                                    6 (Pages 18 to 21)

Gregory B. Diette, M.D.

Page 22

1  BY MS. PARFITT:
2      Q   All right.  Is it fair to say that the
3  items that are listed on Exhibit No. 2 -- 3 were
4  not items that you considered for purposes of the
5  opinions you've expressed in your report of
6  February 25th, 2019?
7          MS. BROWN:  Objection to the form.
8          THE WITNESS:  So I -- it's very possible
9  that the Barnard study I did consider.  Trabert, I
10 can't remember.  But definitely, right, the expert
11 reports that are dated on 2/25, I couldn't have
12 considered.  And anything that's a deposition
13 transcript that happened after 2/25, obviously I
14 couldn't have considered that either.
15 BY MS. PARFITT:
16     Q   All right.  Very good.
17         The information thereafter, I believe we
18 have -- one, two, three -- four invoices.  They
19 begin with the date of 12/14/2018, and end with a
20 date of 3/15/19.
21         Are there any other invoices that you
22 would like to share with me today?
23     A   I don't have any others that I'm aware
24 of.
25     Q   Are you preparing any invoices for your

Page 23

1  time post the very last invoice which is dated
2  3/15/2019?
3      A   I will be.
4      Q   All right.  How many hours have you
5  spent since your submitting the invoice of
6  3/15/2019?
7      A   Let's see, three -- I would estimate
8  about -- about 20 hours or maybe 25 hours, give or
9  take.
10     Q   All right.  And what is your hourly
11 rate?
12     A   So to clarify, so when on here it says
13 it's 485, my -- my rate itself is actually $400 an
14 hour, and that's the amount that was charged.
15     Q   Okay.  Now, is the amount that was
16 charged, 400, because you worked with someone else
17 who assists you with preparing the materials?
18     A   It's not --
19         MS. BROWN:  Objection to the form of the
20 question.
21         THE WITNESS:  Sorry.
22         MS. BROWN:  Go ahead.  You can answer.
23         THE WITNESS:  No, it's because that's
24 how much I've asked to be paid is $400 per hour.
25 BY MS. PARFITT:

Page 24

1      Q   All right.  Let me get this straight.
2  Your hourly rate is 485.
3      A   Well, sort of.  I'll describe it if
4  you'd like here.
5      Q   Well, I -- you can understand my
6  confusion.  If your hourly rate is 485, I want to
7  know you're -- why I'm getting --
8      A   You don't need to be confused for very
9  long, though.
10         MS. BROWN:  Hold on.  Hold on.
11         Counsel, you've got to let him answer
12 the question.
13         MS. PARFITT:  Sure.
14         MS. BROWN:  He is endeavoring to set
15 that straight.
16         MS. PARFITT:  Please.
17         MS. BROWN:  So go ahead.
18         THE WITNESS:  I think it's pretty easy.
19 I charge $400 an hour, and Medical Science
20 Affiliates prepares this invoice, and part of
21 their business model is to add an hourly rate
22 to -- to my rate.
23 BY MS. PARFITT:
24     Q   Okay.  And I want to talk a little bit
25 about that in a moment, but that's exactly one of

Page 25

1  the issues I need some clarification on.  But
2  let's finish up the bills.
3      A   Mm-hmm.
4      Q   We have a bill for 12/14/2018 for
5  $17,103.75.  Correct?
6      A   Correct.
7      Q   And we have a bill for 1/15/2018 for
8  $5,068.02, correct?
9      A   That's correct.
10     Q   We have a bill for 2/12/2019 for
11 $35,375.  Is that correct?
12     A   It is.
13     Q   And we have a bill for $20,973.75; is
14 that correct?
15     A   It is.
16     Q   And then we have an additional 20, maybe
17 25 hours that you will charge at the rate of $400,
18 although Medical Science Affiliates gets $85 of
19 that, correct?
20     A   That's correct, although I think -- I
21 don't know if you're following -- well, that's
22 correct.  Go ahead.
23     Q   Okay.  And we'll explore that in a
24 minute.
25     A   Okay.

7 (Pages 22 to 25)

Gregory B. Diette, M.D.

Page 26

1    Q   Now, attached to that is -- it has an
2  exhibit on it, Plaintiffs' Exhibit No. 7, and it
3  appears to be several pages of notes.
4        Do you see that?
5    A   I do.
6    Q   All right.  What are these notes?
7    A   Well, these -- I haven't looked to see
8  for sure what's --
9        MS. BROWN:  And, Counsel, just to make
10  sure the record is clear, this was produced in
11  response per your request for his notes that were
12  marked at the Ingham deposition.  So this exhibit
13  number is the marking from the Ingham deposition,
14  and these were the notes that he produced there
15  that I'm frankly sure you have access to, but in
16  the effort of cooperation, we reproduced them here
17  per your request.
18  BY MS. PARFITT:
19    Q   So, Doctor --
20    A   It's -- oh, go ahead.  I'm sorry.
21    Q   Go ahead.  You were going to tell me
22  what they are.
23    A   Yeah, and I didn't know if that was
24  the -- the sufficient answer, because that's
25  literally, I guess, what they are right there.

Page 27

1  These are -- they're an exhibit.  But did you mean
2  something else, like --
3    Q   Well, now that I've had clarification by
4  your attorney, that does help a bit, but I do have
5  a couple of questions.
6        MS. MILLER:  For the record, she's not
7  his attorney.  She's J&J's attorney.
8        MS. PARFITT:  We're going to have one
9  examiner today.  So you and Ali decide who that's
10  going to be.
11        MS. BROWN:  Okay.  Counsel, let's keep
12  going with the questions for Dr. Diette so we
13  don't waste the doctor's time.
14        MS. PARFITT:  Believe me, I don't want
15  to waste my time.  So let's -- okay.  I realize
16  every now and again it happens.
17  BY MS. PARFITT:
18    Q   So, Dr. Diette, these are notes that you
19  prepared back at the time of the Ingham
20  deposition, correct?
21    A   So not literally.  Right, there are -- I
22  was asked, and I don't remember exactly what --
23  what was on the notice, but I was asked to bring
24  any notes that I had made.  So they're not
25  necessarily for the Ingham matter.  They're notes

Page 28

1  that I just made as I was reading through
2  different articles.
3    Q   Okay.  Would --
4    A   No, I'm sorry.
5    Q   Are you finished?
6    A   No, that's just what I was going to say,
7  so these are -- it just represents just notes that
8  I was making at certain times when I was looking
9  at some of the articles.
10    Q   Okay.  When did you first start looking
11  at any of the articles?
12    A   Sometime in -- by -- if we're talking
13  about the articles, meaning articles pertaining to
14  ovarian cancer and talcum powder, is it?
15    Q   Well, it's a good question, because you
16  just said when you started looking at any of the
17  articles, are you talk- -- do these represent any
18  articles or do these represent articles of ovarian
19  cancer and talcum powder?
20    A   Yeah, yeah.
21        MS. BROWN:  And hold on, I think the
22  record is going to be unclear.  When you say
23  "these," are you referring to what has been marked
24  as Plaintiffs' Exhibit 7 in response to your --
25        MS. PARFITT:  Correct.

Page 29

1        MS. BROWN:  -- notice of deposition?
2  Okay.
3        THE WITNESS:  So this would have been
4  sometime in 2017 that -- that I started.  I don't
5  know if these notes were made in 2017, but I
6  just mean that that's the answer to when I started
7  to look at those article -- articles.
8  BY MS. PARFITT:
9    Q   And we'll get to that timeline in a
10  moment.
11        Are there any additional notes that you
12  have prepared post Plaintiffs' Exhibit No. 7,
13  which I understand you presented at the Ingham
14  deposition?
15    A   I don't think so.  I'll give you an
16  example of something that I don't know whether you
17  consider it a note or not.
18    Q   Okay.
19    A   Like as I was preparing my report, I
20  would put like a -- like a little sticker on a
21  paper where I wanted to pull a quote into the --
22  into the paper, and then I would tear that off and
23  throw it away because it wasn't, you know, useful
24  anymore.  But nothing else that kind of -- that
25  looks like this.

8 (Pages 26 to 29)

Page 30

1      Q   All right.  So you would put a sticker
2  on a paper like when I wanted to put a quote in,
3  and then I tore it off.
4          Are these medical records that -- or
5  excuse me, medical articles that you were
6  reviewing?
7      A   These are scientific articles, yeah, the
8  ones that informed my report.
9      Q   All right.  So do you have a stack of
10 scientific and medical articles that informed your
11 report at your office, at your home?
12     A   I've got -- I've got little piles of
13 stuff everywhere you can look.
14     Q   Okay.  Do any of them have markings on
15 them or any stickies?
16     A   I don't think there's any stickies
17 anymore.  If they have markings, there could be
18 some that have yellow highlights.
19     Q   All right.
20     A   But I don't think any that have like
21 writing on them per se.
22     Q   Okay.  But there might be yellow
23 highlights on them, correct?
24     A   There sure could be, yeah.  Not on all
25 of them, but could be on some.

Page 31

1      Q   All right.
2          MS. PARFITT:  I'll address this with
3  counsel later, but I would request copies of all
4  those highlighted articles that you may have
5  somewhere.  But we can talk about that --
6          MS. BROWN:  We can talk about that off
7  the record.
8          THE WITNESS:  Okay.
9  BY MS. PARFITT:
10     Q   All right.  So other than notations on
11 some medical and scientific articles, there would
12 be no additional notes like that which forms part
13 of the part of Plaintiffs' Exhibit 7, correct?
14     A   Correct.
15     Q   All right.  In the request to appear
16 here at your deposition, there was an inquiry with
17 regard to, I believe you called it, Medical
18 Science Affiliates.
19     A   Correct.
20     Q   All right.  Do you have a retainer
21 agreement with Medical Science Affiliates?
22         MS. BROWN:  And I'm just going to
23 interject here, Counsel.  To the extent you've
24 made a request for any documentation regarding
25 Medical Science Affiliates, you have our

Page 32

1  objections to those document requests, and
2  Dr. Diette's testimony will be consistent with
3  that.
4          MS. PARFITT:  My question -- are you
5  objecting to providing me with a copy of
6  Dr. Diette's agreement with Medical Science
7  Affiliates?
8          MS. BROWN:  Well, we haven't even
9  established that there is such a thing.  I
10 understand you to be getting into questions
11 regarding Medical Sciences.
12         MS. PARFITT:  I will, yeah.
13         MS. BROWN:  I understand you've asked a
14 number of document requests regarding Medical
15 Sciences, and I just want to make sure that the
16 record is clear that we have endeavored to respond
17 to those and object accordingly.
18         MS. PARFITT:  Okay.  And we're going to
19 try and reduce the number of narrative objections
20 if we can so we can get through this --
21         THE WITNESS:  I remember your question
22 if you want me to answer it.
23 BY MS. PARFITT:
24     Q   I do.
25         I wanted to know in response to request

Page 33

1  number 14, whether or not you have any contracts,
2  agreements, writings conveying mutual
3  understandings between you and Medical Science
4  Affiliates or any entity of or related to Medical
5  Science Affiliates for the past ten years?
6          MS. BROWN:  And, Counsel, I'm going to
7  object to the extent that any of those requests or
8  documentation involve work product that we have
9  asserted privilege over, he will not be answering
10 that question under the work-product privilege.
11         MS. PARFITT:  Okay, Counsel, you can
12 assert work product.  Got it.  Is that what you're
13 asserting right now?
14         MS. BROWN:  Yes.  He's not going to
15 answer that question.  We're asserting work
16 product.
17         MS. PARFITT:  So he is not going to
18 answer my question with regard to any agreement or
19 writing or contracts that he has with Medical
20 Science Affiliates under the guidance of counsel
21 that is objecting and refusing to have you answer
22 that question.  Is that correct -- record correct?
23         MS. BROWN:  That's correct, Counsel.
24         MS. PARFITT:  Okay.
25 BY MS. PARFITT:

9 (Pages 30 to 33)

Gregory B. Diette, M.D.

Page 34

1      Q   And we're going to talk about Medical
2   Science in just -- just a moment.
3           Anything else other than the documents
4   that I have in front of you, Exhibit 7, the
5   invoice and your supplemental reliance, that you
6   have brought to your deposition today?
7      A   So I didn't bring this today.
8      Q   Okay.  Fair enough.
9      A   I mean I -- I didn't bring anything -- I
10   mean I didn't bring any materials to the
11   deposition.
12      Q   Okay.
13           All right.  Dr. Diette, what is your
14   profession?
15      A   Well, I'm a physician, epidemiologist,
16   researcher.
17      Q   Okay.  You're actually a professor of
18   medicine at the Department of Pulmonary and
19   Critical Care, is that correct, at Johns Hopkins?
20      A   Literally it's the Department of
21   Internal Medicine, and it's the Division of
22   Pulmonary, Critical Care, and Sleep Medicine.
23      Q   Okay.  Dr. Diette, do you agree that
24   ovarian cancer ranks as the fifth cause of
25   neoplastic death among women?

Page 35

1      A   I've seen -- I've seen it listed on --
2   you know, on lists of causes of death.  I don't
3   know what you mean by "agree with," but I mean --
4      Q   Do you have a difference of opinion as
5   to whether or not ovarian cancer ranks fifth with
6   regard to causes of neoplastic death among women?
7           MS. BROWN:  Objection.  Asked and
8   answered.
9           THE WITNESS:  It doesn't seem to be
10   something that there's an opinion on.  That's what
11   I mean.  I mean it's like an objective fact.  I
12   mean if there's a list that's put out by, you
13   know, government stats, and it's number 5 on that
14   list, that's -- that's an objective fact.
15   BY MS. PARFITT:
16      Q   Do you object to that?
17           MS. BROWN:  Let him answer, Counsel.
18           MS. PARFITT:  I have.  Thank you.
19           Are you objecting as --
20   BY MS. PARFITT:
21      Q   Let me ask you this, Doctor.
22      A   Okay.
23      Q   Have you seen that in any published
24   scientific literature?
25           MS. BROWN:  Objection to the form.

Page 36

1           THE WITNESS:  I've seen -- I've seen it
2   ranked highly.  I don't remember if it was fifth,
3   but I've seen it ranked highly.
4   BY MS. PARFITT:
5      Q   All right.  Are you aware of the fact
6   that ovarian cancer accounts for more deaths than
7   any other cancer in the female reproductive
8   system?
9      A   Ovarian cancer.  Is that -- is that a
10   statement from a -- like a document or something?
11      Q   It's a question.
12      A   It's a question that --
13      Q   Do you know whether or not ovarian
14   cancer accounts for more deaths than any other
15   cancer of the female reproductive system?
16      A   I know it's a highly ranked one.  I
17   wouldn't be able to say whether it's more than all
18   others.
19      Q   All right.  Do you know whether
20   approximately 22,000 new cases of ovarian cancer
21   identified each year and 14,000 women
22   approximately will die in the United States alone
23   from ovarian cancer?
24           MS. BROWN:  Objection to the form.
25           THE WITNESS:  I haven't memorized

Page 37

1   anything with exact numbers like that.  I mean I'm
2   not saying it's far off from the truth, and if you
3   have, you know, some document that supports that,
4   I'd be glad to look at it and see if it looks
5   right, but -- but I haven't memorized the exact
6   number.
7   BY MS. PARFITT:
8      Q   All right.  And you know, Dr. Diette,
9   this won't be a memory test, but I do understand
10   that you have spent almost $100,000 in this case
11   alone reviewing medical and scientific articles,
12   so all I'm simply asking is that you provide me
13   with your best answers.  Fair?
14           MS. BROWN:  I object to the --
15           MS. PARFITT:  That's all, Counsel.
16   That's all --
17           MS. BROWN:  -- speech by counsel.  He's
18   here to answer your questions.
19           MS. PARFITT:  Counsel --
20           MS. BROWN:  That is a highly
21   objectionable statement, Counsel, and you know it.
22   If you have a question to ask him, he is here to
23   answer it.  We're not going to be here to have you
24   give speeches on the record about the fees that he
25   has charged for the work that he has done.

Gregory B. Diette, M.D.

Page 38

1          MS. PARFITT: Ms. Brown, your objection,
2  according to the CMO in the MDL case, perhaps
3  you're doing other state depositions, is that you
4  say, "Objection. Form."
5          And I'll try and do my best, if you'd do
6  the same. And I'm not admonishing you, and I hope
7  you're not admonishing me. That's not how I roll.
8          MS. BROWN: Well, the record is going to
9  be very clear --
10          MS. PARFITT: It will be.
11          MS. BROWN: -- about the statement that
12  you just made about the other work that I'm doing.
13          MS. PARFITT: I said --
14          MS. BROWN: I am well aware of the
15  CMO --
16          MS. PARFITT: Perfect. Okay.
17  Counsel --
18          MS. BROWN: -- and the deposition
19  protocol in this case.
20          MS. PARFITT: -- that's fine.
21          MS. BROWN: And I --
22          MS. PARFITT: Counsel --
23          MS. BROWN: -- expect that you will
24  abide by it --
25          MS. PARFITT: -- let me ask questions.

Page 39

1          MS. BROWN: -- and not interrupt me.
2  Thank you.
3          MS. PARFITT: I am not going to, but I
4  would ask the same courtesy. And, listen, we have
5  a long day to go, and it will be longer --
6          MS. BROWN: Just ask the doctor a
7  question and move on.
8          MS. PARFITT: -- if we go back and
9  forth. "Objection, form" is the appropriate way,
10  or we will have to call the judge.
11          MS. BROWN: Happy to do it.
12          MS. PARFITT: Very good. So will I.
13  BY MS. PARFITT:
14      Q   All right. Dr. Diette, do you have an
15  understanding from your review of the scientific
16  and medical literature that ovarian cancer cases
17  are detected and diagnosed at a late stage and
18  there are limited prospects for cure?
19          MS. BROWN: Objection to the form of the
20  question.
21          THE WITNESS: I didn't listen to what
22  you said because --
23  BY MS. PARFITT:
24      Q   Sure.
25      A   But just for the reason that I'm still

Page 40

1  thinking about your question before, I just wanted
2  to clarify that I -- because when you said that I
3  billed $100,000, I think what you might be doing
4  is adding up all of those MSA invoices, which that
5  doesn't all go to me. I mean there's a way to
6  figure out how much that I've billed, but -- but
7  you wouldn't be correct if you're saying that
8  those four invoices represent the amount that I've
9  charged.
10      Q   Okay. And we'll talk about that, but I
11  appreciate the clarification.
12          So, the other question is, do you have
13  an understanding that most ovarian cancer cases
14  are detected and diagnosed at a late stage and
15  there are limited prospects for cure?
16          MS. BROWN: Same objection.
17          THE WITNESS: I have that general
18  understanding.
19  BY MS. PARFITT:
20      Q   Okay. Do you have any knowledge as to
21  what the mortality and morbidity of ovarian cancer
22  is?
23      A   Well, the morbidity is not a number,
24  right. I mean you're talking about what are the
25  consequences?

Page 41

1      Q   You're right.
2      A   And then the mortality would be
3  something that's an objective fact that there's a
4  percentage of people with the disease that die.
5      Q   Right.
6      A   I don't know the number. I didn't
7  memorize that. If it's important, we can look it
8  up, but it's a high -- it's a high proportion that
9  die from it.
10      Q   Fair. Do you know what the latency is
11  for ovarian cancer?
12      A   Between what and what?
13      Q   The latency period between -- let's take
14  some examples -- asbestos and ovarian cancer.
15          MS. BROWN: Objection to the form of the
16  question.
17          You can answer if you understand.
18          THE WITNESS: So the -- that's a tricky
19  issue, I think in a way, because I'm not sure that
20  it's been fully established that asbestos causes
21  ovarian cancer. I mean I'm aware of what the IARC
22  has put out on it, but I'm not sure that that's a
23  fact. But I don't recall seeing in there where
24  the latency, if it was even true, whether that
25  was -- whether that was established.

Gregory B. Diette, M.D.

Page 42

1  BY MS. PARFITT:
2      Q  All right.  Have you in the course of --
3  strike that.
4          All right.  From a review of the
5  materials you reviewed attached to your expert
6  report, Doctor, I see that you reviewed the Purdie
7  case --
8          MS. BROWN:  Counsel -- Counsel, is there
9  a page you want to point him to so we can follow
10  along?
11          MS. PARFITT:  I'm still asking the
12  question, Counsel.
13  BY MS. PARFITT:
14      Q  Dr. Diette, attached to your report is a
15  materials reviewed.  And on page 7, it lists that
16  you have read the Purdie case, which is a 1995
17  case study -- excuse me, not case study, but a
18  scientific article.
19          MS. BROWN:  Objection to the form.
20          Take your time to get to that page,
21  Doctor.
22          THE WITNESS:  It's 7 in my report?
23  BY MS. PARFITT:
24      Q  It is on page 7 of your report.
25          MS. BROWN:  And, Counsel, I think we

Page 43

1  have a disconnect here.  Are you referring to the
2  7 of the reliance list?
3          MS. PARFITT:  I am.  I'm sorry about
4  that.
5          THE WITNESS:  Oh.  Is it 7 of the -- the
6  exhibit you gave me or is it part of what's my
7  reliance list that's attached to my report?
8  BY MS. PARFITT:
9      Q  What I have is your reliance list, and
10  it's page 7 of your reliance list.
11      A  I got you.
12          MS. BROWN:  Got that.  Okay.
13  BY MS. PARFITT:
14      Q  And I believe you have three Purdie --
15  excuse me, two Purdie cites, one 2003 and one
16  1995.  Correct?
17      A  That's correct.
18      Q  Okay.  Did you indeed review the Purdie
19  article for purposes of your testimony here today?
20          MS. BROWN:  Objection to the form.
21          THE WITNESS:  I don't think I reviewed
22  it for the purpose of my testimony, but I -- I
23  included it because it's something I reviewed at
24  some point prior to preparing the report.
25  BY MS. PARFITT:

Page 44

1      Q  Okay.  All right.  And we're going to
2  talk about that in conjunction with -- just hold
3  tight.  I'm going to set that aside, and let me
4  ask you this --
5      A  Can I ask just real quick?
6      Q  Sure.
7      A  There's like a cold breeze blowing down
8  here, and I know we will regret making it warmer
9  in here at some point.
10      Q  Sure.
11          MS. PARFITT:  Well, let's take a moment
12  and let's see if we can --
13          MS. BROWN:  Why don't we go off the
14  record for one second.
15          THE VIDEOGRAPHER:  The time is 9:25 a.m.
16  We're going off the record.
17          (Pause in the proceedings.)
18          THE VIDEOGRAPHER:  The time is 9:27 a.m.
19  and we are back on the record.
20          (Diette Exhibit No. 4 was marked
21          for identification.)
22          MS. PARFITT:  Ready?
23          THE VIDEOGRAPHER:  Oh, yeah, we're on.
24          MS. PARFITT:  Okay.  Thank you.
25  BY MS. PARFITT:

Page 45

1      Q  Dr. Diette, let me show you what's been
2  marked as Plaintiffs' Exhibit No. 4 to the Diette
3  deposition, and I'll represent to you -- sorry --
4  I'll represent to you that this is the --
5          MS. BROWN:  Thank you.
6  BY MS. PARFITT:
7      Q  -- an article by Dr. Purdie entitled
8  "Ovulation and Risk of Epithelial Ovarian Cancer"
9  published in the International Journal of Cancer
10  in 2003.  Do you see that?
11      A  I do.
12      Q  All right.  If I can direct your
13  attention to page 231 of that article.
14          MS. PARFITT:  Let's put it on the ELMO.
15  BY MS. PARFITT:
16      Q  Okay.  And, Dr. Diette, I'll put it up
17  on the overhead as well.  About halfway down --
18  there you go -- left-hand column, Dr. Purdie and
19  authors state:  "Thus, the latency period of more
20  advanced malignant epithelial ovarian cancer could
21  be estimated to be approximately 30 to 40 years."
22          Did I read that correctly?
23      A  You read it fine.
24      Q  All right.  Do you agree or disagree
25  that the latency period of more advanced malignant

12 (Pages 42 to 45)

Gregory B. Diette, M.D.

Page 46

1    epithelial ovarian cancer can be estimated to be
2    approximately 30 to 40 years?
3        A   Well, I think, you know -- so there's no
4    way for me to know for sure, right, but could
5    be -- it seems like a pretty safe statement
6    because it could be more, it could be less.
7            It's also an incomplete sentence, right,
8    in the sense that when you talk about the latency,
9    you talk about the latency between a particular
10   kind of exposure.  I mean, in this context, right,
11   there may have other -- there may be other ways
12   people use that word, but in this context it's the
13   time from the exposure to the development of the
14   disease.  So there's no exposure mentioned in that
15   sentence, so it's a little -- a little loose, you
16   know.
17           MS. PARFITT:  All right.  Move to strike
18   that last part of your statement.
19   BY MS. PARFITT:
20       Q   Okay.  Dr. Diette, do you agree that
21   it's imperative to develop public health programs
22   that either reduce the incidence or detect ovarian
23   cancer at an earlier stage?
24       A   It's an agreeable statement.
25       Q   Okay.  In developing public health

Page 47

1    programs, does -- in order to set up preventive
2    programs, detection programs, does that include
3    getting information about whatever the putative
4    exposure may be to individuals who may be
5    susceptible to them?
6            MS. BROWN:  Objection to the form of the
7    question.
8            MS. PARFITT:  Let me strike that
9    question completely.  It was a lousy question.
10   All right.
11           THE WITNESS:  It was --
12           MS. PARFITT:  And I'm going to agree
13   with counsel on that.  How about that?
14           THE WITNESS:  It was below average.  It
15   wasn't lousy.
16   BY MS. PARFITT:
17       Q   Sure.  Okay.
18           When one develops a public health
19   program in order to alert individuals about a
20   public health issue, what is the manner, let's
21   say, in your department to do that?
22           MS. BROWN:  Objection to the form of the
23   question.
24           THE WITNESS:  I'm not sure what we're
25   talking about.  I mean --

Page 48

1    BY MS. PARFITT:
2        Q   Sure.  And, you know, that might be --
3    that might be fair.  So let me go for a third try.
4    Okay?
5        A   Okay.
6        Q   Do you develop public health programs
7    for Johns Hopkins?
8        A   I'm trying to think -- I would say
9    generally, no.  I mean --
10       Q   It's not part of your role.
11           MS. BROWN:  Well, let him finish.  I'm
12   sorry.
13           THE WITNESS:  But I don't know -- I
14   mean, I don't know what -- I mean that's a pretty
15   broad topic, which is what's a public health
16   program.  So I'm just thinking like, for example,
17   you know, I've done work with asthma in -- in the
18   inner city nearby.
19   BY MS. PARFITT:
20       Q   Correct.
21       A   And we certainly have a program, you
22   know, that deals with -- with that.  I wouldn't
23   say I've developed it as a public health program
24   per se but as a a -- as a research program.  But,
25   you know, where public health starts and stops,

Page 49

1    I'm not exactly sure.
2        Q   Fair enough.
3            All right.  Talcum powder products are
4    widely available, correct?
5            MS. BROWN:  Objection to the form of the
6    question.
7            THE WITNESS:  You know, they -- I
8    guess -- so anyway, I'm an epidemiologist, so when
9    somebody says something like that, like when you
10   say it, like I'm thinking like to whom or for whom
11   or where or when or something.  I mean there's
12   sort of like a time and place and something else
13   more to that.  I think it's a common product, but
14   I don't -- I don't know what it means to be widely
15   available.
16   BY MS. PARFITT:
17       Q   All right.  Did you ever ask Johnson &
18   Johnson or their attorneys a question with regard
19   to how many bottles of Johnson & Johnson's Baby
20   Powder they distribute each year in America?
21           MS. BROWN:  Objection to the form of the
22   question.
23           THE WITNESS:  I have not asked that.
24   BY MS. PARFITT:
25       Q   Okay.  Similarly, have you ever asked

13 (Pages 46 to 49)

Gregory B. Diette, M.D.

Page 50

1    Johnson & Johnson how many bottles of their Shower
2    to Shower they distributed?
3         A   No.
4         MS. BROWN:  Same objection.
5    BY MS. PARFITT:
6         Q   All right.  Have you ever purchased
7    talcum powder products?
8         A   I -- I don't do the shopping.  You know,
9    and so it -- like, I don't -- I don't buy anything
10   at the store.
11        Q   Okay.  Fair enough.
12            Are you aware of the fact that Johnson &
13   Johnson continues to sell their talcum powder
14   products?
15        A   I wasn't aware that they weren't.  I
16   mean, I don't know where I would get that from,
17   but as best as I can tell.
18        Q   All right.  Have you ever looked at the
19   back of a Johnson & Johnson's Baby Powder product
20   to see what it says about its usage --
21        MS. BROWN:  Objection.
22   BY MS. PARFITT:
23        Q   -- and direction?
24        MS. BROWN:  Excuse me.  Objection to the
25   form of the question.

Page 51

1         THE WITNESS:  It's possible that I have
2    years ago, but not -- not recently.
3    BY MS. PARFITT:
4         Q   Nothing recent.
5             How about since you were retained by
6    Johnson & Johnson as an expert, have you ever
7    looked at a bottle of Johnson & Johnson's Baby
8    Powder or Shower to Shower?
9         MS. BROWN:  Same objection.
10        THE WITNESS:  No.  I've seen pictures,
11   you know, in different settings, but I haven't --
12   I haven't seen a bottle of it or looked at it.
13   BY MS. PARFITT:
14        Q   Okay.  Do you have an understanding as
15   to whether or not Johnson & Johnson's Baby Powder
16   or the Shower to Shower contains a warning on its
17   product against use in the genital area to avoid
18   ovarian cancer?
19        MS. BROWN:  Objection to the form.
20        THE WITNESS:  I don't know whether they
21   do or don't.  But I'm also not, you know, skilled
22   in warnings.  So I wouldn't -- I mean, I -- even
23   if it said something, I wouldn't necessarily be
24   the person to tell you whether that's a warning or
25   not.

Page 52

1    BY MS. PARFITT:
2         Q   Okay.  Let me show you what I'll have
3    marked as Exhibit --
4         MS. PARFITT:  Where are we?
5         MR. ROSEN:  Five.
6    BY MS. PARFITT:
7         Q   -- 5.  And I'll represent to you,
8    Dr. Diette, that this is a bottle of Johnson's
9    Baby Powder, and we'll have it marked as Exhibit
10   No. 5.
11        (Diette Exhibit No. 5 was marked
12        for identification.)
13   BY MS. PARFITT:
14        Q   Now, my understanding is that you are
15   trained, skilled, and have expertise in pulmonary
16   medicine, correct?
17        A   Among other things.
18        Q   And I didn't mean to limit your
19   expertise.  Okay.
20            If you will, let me show -- pass to you
21   the Exhibit No. 5, and ask that you turn it to the
22   back.  Look at the bottle.
23        MS. BROWN:  Counsel, before he does
24   that, will you put -- represent on the record
25   where this bottle that you've marked as Exhibit 5

Page 53

1    came from and when it was purchased and by whom?
2         MS. PARFITT:  Counsel, I'm asking the
3    questions.  I just represent that it is a bottle
4    of Johnson & Johnson's Baby Powder purchased from
5    a store.
6         MS. MILLER:  Michelle, I'm trying
7    really, really hard not to say a word today.
8         MS. PARFITT:  Sure.
9         MS. MILLER:  I know that I'll annoy
10   you --
11        MS. PARFITT:  Oh, no, you're not.
12        MS. MILLER:  -- but it's not Johnson &
13   Johnson's Baby Powder.  It's Johnson's Baby
14   Powder, and you keep saying it wrong.
15        MS. PARFITT:  That's fine.  That's fine.
16        MS. MILLER:  And I think for the record,
17   it's important.  It's a product by JJCI, as you
18   know.
19        MS. PARFITT:  That's fine.
20        MS. MILLER:  So we just need
21   Johnson's --
22        MS. PARFITT:  Okay.  And why don't we --
23   whenever I -- since I'm sure I won't remember all
24   that, why don't we just reflect for the record
25   that when I say Johnson & Johnson's Baby Powder,

14 (Pages 50 to 53)

Gregory B. Diette, M.D.

Page 54

1    that it's Johnson's Baby Powder.  Okay?
2         MS. BROWN:  And just to get my --  my
3    objection on the record to what you marked as
4    Exhibit 5, we have no representation of when this
5    was bought, by whom it was bought.
6         With that, Dr. Diette, here is
7    Exhibit 5.
8         MS. PARFITT:  Thank you.
9    BY MS. PARFITT:
10        Q    All right, Dr. Diette, look at the back
11   of that.  Do you see that there's a little picture
12   that looks like a little baby with an X on it?
13        A    I do.
14        MS. BROWN:  Objection to the form.
15   BY MS. PARFITT:
16        Q    Okay.  Okay.  What does that say on the
17   back of the product?
18        A    It says: "Warning:  Keep powder away
19   from child's face to avoid inhalation, which can
20   cause breathing problems.  Avoid contact with the
21   eyes.  For external use only."
22        Q    Okay.  And at the bottom of that
23   product, does it happen to say what's contained in
24   it?
25        MS. BROWN:  Objection to the form of the

Page 55

1    question.
2         THE WITNESS:  It has a line called
3    "Ingredients," which says "Talc, fragrance."
4    BY MS. PARFITT:
5         Q    Okay.  Dr. Diette, you've been retained
6    by Johnson & Johnson since when, for purposes of
7    the ovarian cancer cases?
8         MS. BROWN:  Objection.  Form.  Do you
9    mean the Ingham case or do you mean the MDL?
10   BY MS. PARFITT:
11        Q    Well, let me clarify.
12        When were you first -- it's a fair
13   question -- when were you first retained by
14   Johnson & Johnson to represent them in either
15   mesothelioma cases or ovarian cancer cases?
16        MS. BROWN:  Objection to the form.  He
17   is an expert witness on behalf of Johnson &
18   Johnson.  He is not here representing anyone.
19        THE WITNESS:  That honestly sounds like
20   Ms. Brown's job, I mean, but -- but I guess to try
21   to answer your question, the -- I was first asked
22   to review the epidemiology in 2017.
23   BY MS. PARFITT:
24        Q    Okay.  And was that the first time that
25   Johnson & Johnson had asked you to provide any

Page 56

1    expert work for them?
2         MS. BROWN:  Objection to the form.
3         THE WITNESS:  I believe so, yeah.
4    BY MS. PARFITT:
5         Q    Okay.  Had you ever worked for Johnson &
6    Johnson or any of their entities prior to 2017 in
7    any type of litigation?
8         MS. BROWN:  Same objection.
9         THE WITNESS:  I -- I don't think so.  I
10   would say almost certainly no.
11   BY MS. PARFITT:
12        Q    Okay.  Since your retention in 2017, did
13   Johnson & Johnson, their medical department, their
14   regulatory department, science department, ever
15   ask that you take a look at the back of the
16   product, Johnson's Baby Powder, for purposes of
17   giving an opinion as to what scientific and
18   medical information should be on that product?
19        MS. BROWN:  Objection to the form of the
20   question.
21        THE WITNESS:  I would be the wrong kind
22   of expert for that.  I mean I'm not a warnings
23   expert, so it wouldn't -- wouldn't make any sense
24   for anybody to ask me that question.
25   BY MS. PARFITT:

Page 57

1         Q    I'm not asking you about the adequacy of
2    the warning.  I'm asking you about your expertise
3    as a pulmonary medicine expert with regard to
4    inhalation issues as contained on the back of that
5    product.
6         A    It still wouldn't make any sense.  I
7    wouldn't be the person to ask that to.
8         Q    Dr. Diette, whether or not it makes
9    sense to you or not, my question is simply this:
10   Yes or no, has Johnson & Johnson asked your
11   opinion at any point in time with regard to what
12   kind of scientific and medical information should
13   be on the back of their powder?
14        MS. BROWN:  Objection.  Answered three
15   times.
16        THE WITNESS:  They and everybody else in
17   the world has not asked me to do anything like
18   that ever.
19   BY MS. PARFITT:
20        Q    Okay.  And they, Johnson & Johnson, has
21   never asked you to -- your opinion with regard to
22   the inhalation warning; is that correct?
23        MS. BROWN:  Objection.  Counsel, we've
24   been through this like six times.
25        THE WITNESS:  I think it's the same

15  (Pages 54 to 57)

Gregory B. Diette, M.D.

Page 58

1  warning we're talking about, right?
2  BY MS. PARFITT:
3     Q   The one that's on the back, yeah.
4     A   So it's still -- still the same.
5     Q   Okay.  And just for the record, we're
6  going to put on the ELMO -- thank you.  Just go
7  ahead and see if we can get that on there.  Okay.
8         (Counsel conferring.)
9  BY MS. PARFITT:
10    Q   And again, for clarity of the record,
11 what we've been talking about is on -- the child
12 with the X over the nose and mouth and the warning
13 that is to the far right, correct?
14        MS. BROWN:  Objection to the form.
15        THE WITNESS:  I was with you until you
16 said "to the far right."  I don't know --
17 BY MS. PARFITT:
18    Q   To the right of the baby.
19    A   Oh, I see.  I'm sorry.
20    Q   Yeah, no problem.
21    A   Yeah.  No, that's --
22    Q   That's what we're talking about.
23    A   It's to the right of the baby, yeah.
24    Q   Okay.  Very good.  All right.
25        Dr. Diette, as a scientist and a

Page 59

1  clinician, do you have a belief or opinion that
2  women should be informed of even a potential risk
3  of using talcum powder products on their genital
4  area?
5         MS. BROWN:  Objection.
6         THE WITNESS:  Not based on what I've
7  reviewed.
8  BY MS. PARFITT:
9     Q   Okay.  Is it your opinion that there is
10 no risk of ovarian cancer from the long-term use
11 of talcum powder products?
12        MS. BROWN:  Objection.  Form.
13        THE WITNESS:  I -- I don't see evidence
14 that there's a -- so I'm an epidemiologist, so the
15 way I talk about things might be a little
16 different than the way you're asking it.  But
17 there's not sufficient evidence to say that it's a
18 cause of ovarian cancer.
19 BY MS. PARFITT:
20    Q   Okay.  And we'll talk about that in a
21 little bit.
22        Do you have an understanding as to
23 whether there are other scientists and
24 epidemiologists who have reviewed the same
25 scientific and epidemiological information that

Page 60

1  you have who have a different opinion with regard
2  to the causality of talcum powder products and
3  ovarian cancer?
4         MS. BROWN:  Objection to the form.
5         THE WITNESS:  Well, I've seen like, for
6  example, the expert reports that are -- that are
7  part of this matter and some of the deposition
8  transcripts.  So -- so, yes, I mean I've seen what
9  they've said.
10 BY MS. PARFITT:
11    Q   Okay.  And from your review of those
12 expert reports, do you understand that many of
13 those scientists and epidemiologists are
14 individuals who treat women who have been
15 diagnosed for ovarian cancer?  Do you understand
16 that?
17        MS. BROWN:  Objection.  Lacks
18 foundation, calls for speculation.
19        THE WITNESS:  So I saw that there were
20 some GYN oncologists involved.  I don't remember
21 the count of them, but I saw there were GYN
22 oncologists, both on the defense and the
23 plaintiffs' side.
24 BY MS. PARFITT:
25    Q   Okay.  And the GYN oncologists would be

Page 61

1  the practice of medicine that treats women for
2  reproductive diseases and cancers like ovarian
3  cancer, correct?
4         MS. BROWN:  Objection.
5         THE WITNESS:  They -- they would be the
6  ones that provide treatment for the GYN cancers.
7  BY MS. PARFITT:
8     Q   Okay.  You're a pulmonologist, correct?
9     A   I am.
10    Q   All right.
11    A   And again, among other things.
12    Q   Understood.
13        MS. BROWN:  Let him finish, Counsel, he
14 wasn't done.
15 BY MS. PARFITT:
16    Q   My -- it's a simple question, are you a
17 pulmonologist?
18        MS. BROWN:  Wait, but he was still
19 answering.  You cut him off.  Let him finish.
20        MS. PARFITT:  Doc -- I withdraw that
21 question.
22 BY MS. PARFITT:
23    Q   Are you a pulmonologist?
24    A   I am a pulmonologist.
25    Q   All right.  As a pulmonologist, do you

16 (Pages 58 to 61)

Gregory B. Diette, M.D.

Page 62

1    treat and care for women -- treat and care and
2    provide gynecological and oncological care to
3    women who have been diagnosed with ovarian cancer?
4          MS. BROWN: Objection to the form.
5          THE WITNESS: Mostly, no, although
6    I'll just -- there was a lot in your question,
7    right, so that --
8    BY MS. PARFITT:
9      Q    You want me to break it down?
10         MS. BROWN: Let him finish first, and
11   then you can follow up. He has to be allowed to
12   answer your question.
13         MS. PARFITT: Oh, absolutely, but if
14   it's unclear -- that was one of the --
15         THE WITNESS: I didn't say it was
16   unclear. I just said it -- it's complicated, so
17   there's more than -- it's not just a simple
18   answer.
19         MS. PARFITT: Let me withdraw the
20   question.
21         MS. BROWN: Wait, Counsel, he's not
22   done.
23         Dr. Diette, you finish your answer, and
24   then counsel, of course, will follow up.
25   BY MS. PARFITT:

Page 63

1      Q    Okay. Go ahead.
2      A    Thank you.
3      Q    Sure.
4      A    So, you know, I wouldn't be the person
5    who prescribes chemotherapy or provides the
6    surgery. Part of my work is as an intensive care
7    doc in the oncology center, and so I'll see people
8    with every kind of cancer possible and provide
9    some of the care to them.
10         I see people in my clinic that have, you
11   know, pulmonary consequences of some of their
12   treatment for ovarian cancer. And so it's -- it's
13   not a straightforward yes or no that I do or don't
14   participate, but I don't do the -- the GYN onc
15   part of that care.
16     Q    All right. Have you in your practice of
17   pulmonary medicine ever diagnosed a woman with
18   ovarian cancer?
19     A    I can't remember ever doing that.
20     Q    All right. Now, Dr. Diette, are you
21   aware of whether or not -- strike that.
22         Are you aware that Johnson & Johnson has
23   tested their talcum powder products?
24         MS. BROWN: Objection to the form.
25         THE WITNESS: I have some awareness of

Page 64

1    that.
2    BY MS. PARFITT:
3      Q    Okay. What is your understanding of the
4    testing that's been performed by Johnson & Johnson
5    on their talcum powder products?
6          MS. BROWN: Objection. That's overly
7    broad.
8          THE WITNESS: Well, like the type --
9          MS. BROWN: You mean internal, external,
10   third party, FDA?
11   BY MS. PARFITT:
12     Q    Do you understand the question?
13     A    I was actually going to say something
14   similar to what Ms. Brown said but less
15   sophisticated.
16         I mean what I meant was, were you asking
17   about like the kinds of tests that were done or --
18   or things of that sort? I just -- I just know,
19   generally speaking, that there has been testing
20   done.
21     Q    Sure. Let me make it very simple.
22         Are you aware of studies -- strike that.
23         Have you seen studies done by Johnson &
24   Johnson that tested and evaluated their talcum
25   powder products for the presence of asbestos?

Page 65

1          MS. BROWN: Same objection.
2          THE WITNESS: I don't think I've seen
3    anything from Johnson & Johnson, per se.
4          Is that what -- is that what you're
5    referring to?
6    BY MS. PARFITT:
7      Q    That is, yes.
8      A    Okay. Then not -- not that I'm aware
9    of.
10     Q    All right. I saw where you looked at
11   the depositions of Drs. Longo and Rigler.
12         MS. BROWN: Objection to the form.
13         THE WITNESS: Is that in a different
14   case?
15   BY MS. PARFITT:
16     Q    Good question. You have their
17   depositions listed as part of the materials
18   reviewed and relied upon. Have you read those?
19         MS. BROWN: Objection.
20         If you want to refresh yourself on your
21   reliance list, I'm sure counsel will point you to
22   the page.
23         MS. PARFITT: Absolutely.
24   BY MS. PARFITT:
25     Q    Let me direct you to -- just bear with

17 (Pages 62 to 65)

Gregory B. Diette, M.D.

Page 66

1    me one second.  I apologize here.
2           Okay.  It's -- your reference materials
3    reviewed and considered start on -- or in
4    Appendix B of your report.
5           Do you see that?
6        A   I don't see Longo and Rigler.
7        Q   Okay.  At the very top, it has
8    "Materials Reviewed and Considered by Gregory
9    Diette," and the second item under "Expert
10   References" says "Expert report of William Longo
11   and Mark Rigler."
12          Do you see that?
13       A   Oh, I do, yeah.  So I see Longo, and I'm
14   just --
15       Q   Do you see Rigler?  He's right after
16   that.  It says William --
17       A   Oh, got you.
18          MS. BROWN:  Counsel, these are reports.
19   I thought your question was about a deposition.
20          MS. PARFITT:  That's a -- that's a fair
21   objection.
22   BY MS. PARFITT:
23       Q   Have you read the expert report of
24   William Longo and Mark Rigler?
25       A   So, because I see there's a date on it

Page 67

1    of November 14th, 2018 --
2        Q   Correct.
3        A   -- I know I've seen at least a few of
4    Dr. Longo's reports, and I -- I think they're the
5    same over and over again.  So I -- if I -- if I'm
6    not mistaken, I don't think I would have reread it
7    like, you know, specifically for this matter if it
8    looked the same as others.  I think I probably
9    just like flipped through it to see what it was --
10   was there generally.
11       Q   All right.  So I understand your answer,
12   is your testimony that you don't recall
13   specifically reviewing the November 14th, 2018
14   expert report of Dr. Longo's and Rigler?
15          MS. BROWN:  Objection to the form,
16   misstates his testimony.
17          MS. MILLER:  So can I say something?
18   Because I was involved in that, I think that every
19   item with respect to litigation that we sent to
20   Dr. Diette, which would have been depositions or
21   expert reports, was put on the list because it was
22   sent to him.  I --
23          MS. PARFITT:  Oh, and I understand.  I
24   appreciate that.
25   BY MS. PARFITT:

Page 68

1        Q   But my question --
2           MS. PARFITT:  And noted.
3    BY MS. PARFITT:
4        Q   My question to you is, sitting here
5    today, what I need to know -- and if it's no,
6    that's a fine answer.  If it's yes, that's a fine
7    answer.
8           Have you read the expert report of
9    Drs. Longo and Rigler dated November 14, 2018?
10          If you did, I'm not -- I'm not --
11          MS. BROWN:  Objection to the form.  I
12   think he answered that.
13          Counsel, I think what you're really
14   after is, is he relying on that to form his
15   opinion.
16          MS. PARFITT:  Actually, I'm not.  That's
17   a good question, but I'm not asking that.
18   BY MS. PARFITT:
19       Q   Did you read the report?
20       A   So I -- I'm not sure if I read this one
21   with this particular date.
22       Q   That's fine.
23       A   But wait, wait, wait.  But, you know, if
24   it's on here, because that's what it reminds me
25   of, I don't have a specific memory for this matter

Page 69

1    because I've been reading some of these things for
2    other matters as well.  So I -- you know, I don't
3    remember whether -- whether I read that particular
4    one, but if it looked like other ones that I had,
5    I would have, you know, touched it, opened it,
6    looked to see what was in there, and then not read
7    every word of it.  But I don't remember which way
8    it worked.
9        Q   Sitting here today, are you able to tell
10   me the results of Dr. Longo and Rigler's testing
11   of Johnson & Johnson's talcum powder products as
12   reflected in their expert reports of November 14,
13   2018?
14          MS. BROWN:  Objection to the form.
15          THE WITNESS:  I don't remember the
16   details, but I could -- I could look that up and
17   pull -- pull out what I saw.
18   BY MS. PARFITT:
19       Q   Did you mark it?
20          MS. BROWN:  Objection to the form.
21          THE WITNESS:  Oh, you mean like with
22   highlights?
23   BY MS. PARFITT:
24       Q   Mm-hmm.  Yes, with highlights.
25       A   Sorry.  I thought you were talking about

18 (Pages 66 to 69)

Gregory B. Diette, M.D.

Page 70

1  marking exhibits, I'm thinking like that's not
2  what I do. So, no -- so I don't know.
3      Q   All right.
4      A   This particular one, I might have
5  highlighted an earlier one or -- or even not. And
6  the only reason I say that is because his reports
7  tend to have an awful lot of like sort of like
8  testing data in the -- in the back of it, and
9  there's not a lot of like words, you know, to
10 read. So there's not a lot to really highlight
11 for me. I mean, you know what I mean? It's kind
12 of succinct in terms of like the opinion part, and
13 then there's a whole bunch of scientific stuff
14 that's somebody else's field.
15     Q   Understood. And I think what I'm
16 getting at is for purposes of the opinions you are
17 presenting to the jury in this case, are you
18 relying on the test results of Dr. Longo's and
19 Rigler's that are contained in not only their
20 November 14th -- contained in their November 14th,
21 2018 report?
22     MS. BROWN: And objection.
23     Counsel, you said "jury." I assume you
24 mean for purposes of this Daubert hearing, is he
25 relying on the Rigler and Longo report of

Page 71

1  November 14th, 2018.
2  BY MS. PARFITT:
3      Q   For purposes of the opinions that you
4  have provided in your expert report and I assume
5  will present to Judge Wolfson sometime in July,
6  are you relying on the information that's
7  contained in the expert report of Dr. Longo and
8  Rigler, November 14, 2018?
9      A   I wouldn't use the word "rely." I would
10 say aware of, but not -- I'm not relying on it.
11     Q   And let me explore that, because this is
12 the only time I will have a chance to talk to you
13 before that Daubert hearing.
14     A   Sure.
15     Q   Are you, for purposes of your opinion
16 that you're sharing -- will share with me today
17 and will share with the court in July, relying on
18 any of the test results of Drs. Longo and Rigler
19 contained in their reports of November 14, 2018?
20     A   Yeah, I think the way I said it is
21 exactly right, because to me I rely on" has some --
22 there's some legal connotation for that, right.
23     And so it doesn't -- it doesn't inform
24 my opinion, but I'm aware of what his general
25 position has been. And so -- but I don't -- I

Page 72

1  wouldn't say I rely on it in the sense that it's
2  an underpinning of an opinion or something like
3  that.
4      Q   All right. Do you have an understanding
5  then that Drs. Longo and Rigler found the presence
6  of asbestos in the talcum powder products they
7  tested?
8      MS. BROWN: Objection to the form of the
9  question.
10     THE WITNESS: My -- my understanding is
11 they say they found it, but I don't -- I don't
12 know the fact of whether they found it or not.
13 BY MS. PARFITT:
14     Q   Okay. Did -- from your read or not read
15 of Drs. Longo and Rigler -- strike that.
16     Did Drs. Longo and Rigler find
17 asbestiform fibers in the tests done of Johnson &
18 Johnson's product, talcum powder products?
19     MS. BROWN: Objection to the form.
20     THE WITNESS: I guess I need to know
21 what we're talking about if you say "asbestiform
22 fibers," because I thought your question before
23 was asbestos.
24 BY MS. PARFITT:
25     Q   It was.

Page 73

1      A   And are you expecting me to -- to say
2  that that's two different things, or is it just
3  another way of you trying to ask the same
4  question?
5      Q   How do you define "asbestiform fibers"?
6      MR. LOCKE: Objection.
7      MS. BROWN: Objection to the form of the
8  question.
9      THE WITNESS: Well, I -- I understand
10 some of the terminology, but I'm not a mineralogist.
11 Right. So I -- I can tell you -- I think I have
12 to diverge a little bit to answer your question,
13 if I can, just to say that -- unless you don't
14 want me to. Feel free to --
15     MS. BROWN: No, you should answer the
16 question --
17     THE WITNESS: Okay.
18     MS. BROWN: -- as honestly and
19 truthfully and accurately as you can.
20     THE WITNESS: Because asbestos -- I
21 mean, asbestos in terms of at least its
22 commercial, you know, forms is something that's
23 in -- that's in asbestiform fiber, right. It's in
24 asbestiform habit. And so I think, you know, for
25 me to understand the minerals, when we're talking

19 (Pages 70 to 73)

Gregory B. Diette, M.D.

Page 74

1    about asbestos, we're talking about a particular
2    kind of mineral that's in a particular form or
3    habit.
4         And so I -- I think when you're talking
5    about an asbestiform fiber, there's some
6    redundancy there in a way, right, which is that
7    that's a description that you could apply to
8    something that other people would call asbestos.
9    BY MS. PARFITT:
10        Q    All right.  Fine.  Thank you.
11        Has Johnson & Johnson provided you with
12   any testing that they performed on their product?
13        MS. BROWN:  Objection.
14   BY MS. PARFITT:
15        Q    Shower to Shower or Johnson's Baby
16   Powder.
17        MS. BROWN:  Objection.
18        THE WITNESS:  I don't think I have seen
19   anything.
20   BY MS. PARFITT:
21        Q    Did you ever ask Johnson & Johnson to
22   see any of the testing that they performed on
23   their own talcum powder products?
24        MS. BROWN:  Objection.  Asked and
25   answered.

Page 75

1         THE WITNESS:  I have not.
2    BY MS. PARFITT:
3         Q    Okay.  Dr. Diette, are you aware that
4    there are generic talcum powder products being
5    sold in the marketplace today that contain an
6    ovarian cancer warning for individuals who use it
7    in their genital area?
8         MS. BROWN:  Objection to the form --
9         THE WITNESS:  I don't --
10        MS. BROWN:  -- lacks foundation, calls
11   for speculation.
12        THE WITNESS:  I don't know one way or
13   the other.
14   BY MS. PARFITT:
15        Q    Okay.  Has Johnson & Johnson shared that
16   information with you?
17        MS. BROWN:  Same objections.
18        THE WITNESS:  Well, if they had, I'd be
19   aware of it, right?  I mean --
20   BY MS. PARFITT:
21        Q    I would think.
22        A    Yeah.  So it has to be no.  Yeah.
23        Q    Okay.  You state in your -- you state in
24   your expert report that the presence of asbestos
25   as an accessory mineral present in cosmetic talc

Page 76

1    would not alter your analysis, and I assume
2    opinions, with regard to talcum powder products
3    causing ovarian cancer.
4         A    That's in my report?
5         Q    Yes.
6         A    Can we flip to that?
7         Q    Sure.  Why don't you go to page 3.
8         And if I may, it's at the bottom,
9    paragraph 6.
10        A    I'm with you, yeah.
11        Q    Okay.  And it says:  "To the extent
12   plaintiffs' expert opined that asbestos is an
13   accessory mineral present in cosmetic talc that
14   causes ovarian cancer, this theory would not alter
15   the analysis because the existing epidemiological
16   literature regarding talc use would
17   necessarily" --
18        MS. BROWN:  You're reading it --
19        MS. PARFITT:  Beg your pardon?
20        MS. BROWN:  You read it wrong.  Perineal
21   talc use.
22        MS. PARFITT:  Oh, I'm sorry.  Perineal.
23   Thank you.
24   BY MS. PARFITT:
25        Q    -- "perineal talc use would necessarily

Page 77

1    account for the presence of any asbestos in the
2    products used in both studies."
3         Did I now read that correctly, with
4    counsel's correction?
5         A    Yeah, you're -- you've got it right now.
6         Q    Okay.  What do you mean by that
7    statement?
8         A    So what I -- what I mean generally is
9    that I've reviewed the -- what I think is the
10   whole epidemiology on the -- on the topic, and the
11   studies themselves don't break down or don't do
12   analyses of what the talcum powder is or what it
13   consists of.  So to the extent that they've
14   studied talcum powder, to me whatever is in talcum
15   powder is baked into the epidemiology.  And so
16   whether asbestos is a fact that it's in there or
17   it's a fact that it's not doesn't really change
18   how to interpret those studies.
19        Is that what you're asking?
20        Q    Mm-hmm.
21        A    Okay.
22        Q    Mm-hmm.  Is asbestos a carcinogen?
23        A    It is.
24        Q    We're going to come back to that.
25        Let me just get on a little bit further

20  (Pages 74 to 77)

Gregory B. Diette, M.D.

Page 78

1    on here.
2            Are you going to be giving an opinion in
3    this case that Johnson & Johnson's talcum powder
4    products contain asbestos?
5        A   No.
6        Q   You will not?
7        A   I will not.
8        Q   Have you made an assumption then for
9    purposes of your opinion that Johnson's -- that
10   Johnson & Johnson's talcum powder products do not
11   contain asbestos?
12       A   I -- no, I haven't made that assumption.
13   I -- I recognize that there's a debate about that,
14   and I don't have the expertise to sort through
15   what's right about that debate.
16       Q   All right.  Assume that Johnson &
17   Johnson's talcum powder products contain asbestos,
18   would that place consumers that use the product in
19   needless danger?
20           MS. BROWN:  Objection.  Counsel, that's
21   an incomplete hypothetical.  Is that the same talc
22   that's in the epi?
23   BY MS. PARFITT:
24       Q   Can you answer the question?
25           MS. PARFITT:  And please don't coach the

Page 79

1    witness.
2            MS. BROWN:  Objection to the incomplete
3    hypothetical.
4            THE WITNESS:  So, anyway, so the
5    needless part, I think -- I'm not sure if you need
6    that in your question or whether it changes how I
7    would answer it.  I think the general issue is
8    whether or not there's a risk or whether there's a
9    danger.  And from what I can tell from reading the
10   literature, that there's not a risk of -- did you
11   say "ovarian cancer" in your question?
12   BY MS. PARFITT:
13       Q   Correct.
14       A   Yeah, I don't see that there's a -- a
15   risk of ovarian cancer from the literature.
16       Q   Assume for purposes of my question that
17   Johnson & Johnson's talcum powder products has
18   asbestos in it, would it be imprudent and not
19   reasonable for Johnson & Johnson to sell that
20   product to its customers, yes or no?
21           MS. BROWN:  Objection to the incomplete
22   hypothetical.
23           THE WITNESS:  So I think, you know, it
24   isn't a yes or no, right?  I mean, because it's --
25   if you're talking about asbestos, there's asbestos

Page 80

1    all over the world, right.  And so everything
2    comes down to dose in any case, right.  So for me
3    to be concerned about it, you'd have to show me
4    that there's a sufficient dose that a person gets
5    in order to raise the risk of whatever it is that
6    you're talking about.
7    BY MS. PARFITT:
8        Q   Let me ask you this:  Assume Johnson &
9    Johnson's talcum powder products has asbestos in
10   it.  Are you with me?
11       A   I am, yeah.
12       Q   All right.  Would it be imprudent for
13   Johnson & Johnson to sell its talcum powder
14   products to consumers to use it in their
15   genital -- on their genital areas?
16           MS. BROWN:  I object to this line of
17   question, Counsel.  Are you divorcing your
18   hypothetical from the epidemiology he has reviewed
19   and is here to talk about?
20           MS. PARFITT:  He didn't answer the
21   question, Counsel.  Counsel, if he understands --
22   he understood the last question, it's the same.
23   Thank you.
24           MS. BROWN:  I object to the entire line
25   of questioning.

Page 81

1    BY MS. PARFITT:
2        Q   Please.
3        A   If we're talking about what exists in
4    the world right now, I -- I don't see any issue
5    with it.
6        Q   All right.  Do you know who
7    Dr. Nicholson is?
8        A   Which -- which Nicholson?
9        Q   Susan Nicholson.
10       A   I'm not sure.  Is she an expert in --
11       Q   She's not.  She's actually the -- and
12   I'll represent to you, the chief medical officer
13   for Johnson & Johnson.
14       A   Oh, I don't know her.
15       Q   Okay.  Let me represent to you that
16   Dr. Nicholson, who is a medical officer for
17   Johnson & Johnson, was deposed in this case, this
18   same case that we're in together, you and I.  Are
19   you aware of that?
20       A   Only because you said so.
21       Q   Okay.  And the deposition that was taken
22   of Dr. Nicholson was a deposition that was taken
23   wherein she -- we call it a 30(b)(6).  That means
24   she represents the voice of the company that she
25   works for.  Understand?

21 (Pages 78 to 81)

Gregory B. Diette, M.D.

Page 82

1      MS. BROWN:  Objection to the form of the
2   question.
3      THE WITNESS:  I understand what you
4   said.  I don't know what I -- if I understand what
5   that means.
6      MS. PARFITT:  Okay.  All right.  Let me
7   have marked as Exhibit -- I believe it's
8   Exhibit No. 6 that we're on.
9      (Diette Exhibit No. 6 was marked
10        for identification.)
11     MS. BROWN:  And, Counsel, if you're
12   going to ask him questions about Dr. Nicholson's
13   deposition that he has not reviewed, we need to at
14   least have a full copy of the deposition here.
15   Thanks.
16     MS. PARFITT:  I believe you have --
17     MS. BROWN:  And you should take as long
18   as you need to review it to answer any questions
19   counsel might have.
20     MS. PARFITT:  Okay.  And, Counsel, I'll
21   get you that -- I don't have a copy --
22     MS. BROWN:  We have -- I mean your
23   colleague just --
24     MS. PARFITT:  We have just one.  I'm
25   just saying we just have one.  I don't have one

Page 83

1   for you.
2      MS. BROWN:  As long as the doctor has
3   time to review it -- you know he hasn't seen this
4   before.  If you're going to ask him questions
5   about it, he needs to read it.
6      MS. PARFITT:  Just one.
7   BY MS. PARFITT:
8      Q   Dr. Nich- -- or Dr. Diette, let me
9   direct your attention to page 37.
10     A   Okay.
11     Q   And specifically line 2, and let me read
12   it.  We'll put it up on the ELMO.
13     MS. BROWN:  Counsel, while you're doing
14   that, I'm going to object to taking one page out
15   of Dr. Nicholson's deposition that the doctor has
16   not reviewed and asking questions out of context.
17   And if he needs to read the whole deposition to
18   answer your question, he will need to do that.
19     MS. PARFITT:  Counsel, please not --
20   let's not coach.
21     MS. BROWN:  And I'm objecting on the
22   record to the improper questioning with snippets
23   of somebody else's deposition.
24     MS. PARFITT:  Okay.
25   BY MS. PARFITT:

Page 84

1      Q   Okay.  At the top, if I may, it says --
2   line 2:  "Well" -- and I'll represent to you that
3   I was one of the attorneys that took
4   Dr. Nicholson's deposition.
5      The question is:  "Well, if your
6   products contain asbestos, would you agree with me
7   that that impacts the safety of the product?"
8      Answer:  "Absolutely, yes."
9      Next question:  "Would you agree that
10   Johnson & Johnson has a zero tolerance policy with
11   regard to having asbestos in their talcum powder
12   products?"
13     The answer:  "Yeah, that is correct."
14     Next question:  "In fact, as a
15   representative of the company, it's your position
16   that your Johnson & Johnson's talcum powder
17   products should not contain asbestos; is that
18   correct?"
19     "That's correct -- that is correct."
20     Next question:  "And you would agree
21   with me that if your talcum powder products had
22   asbestos in them, it would place the consumers
23   that use your product in needless danger,
24   correct?"
25     "It could, yes."

Page 85

1      Next question on page 48 of that same
2   deposition --
3      MS. BROWN:  Counsel, I'm sorry, but your
4   pages are not matching up to what we've been
5   handed.  Can you just direct us -- and we're -- in
6   the snippet you gave us, I can't find this.
7      THE WITNESS:  I don't have 48.  Mine
8   goes to 41.
9      MS. BROWN:  Yeah, mine says 37, 37, 37.
10     THE WITNESS:  Maybe here in the whole
11   thing?
12     MR. HEASLIP:  And mine is 46 through 53.
13     MS. PARFITT:  Okay.
14     MS. BROWN:  This is not what you're
15   reading, so it's impossible to follow.
16     Were you able to follow that, Doctor?
17     MS. PARFITT:  We have it on the
18   overhead.  I think --
19     MR. ROSEN:  I go to -- I go to 41.
20     MS. BROWN:  Yeah, well, he needs to have
21   it in front of him.  We don't have a copy.
22     MS. PARFITT:  Well, let's do this.  I
23   have an overhead and an ELMO.  So let's keep
24   going.  Why don't you read the screen.
25     Do you need me to go back over those

22 (Pages 82 to 85)

Gregory B. Diette, M.D.

Page 86

1    questions?
2        MS. BROWN:  But, Counsel, that's not
3    even a transcript.  What is that?
4        MS. PARFITT:  It's --
5        MS. MILLER:  How are you going to mark
6    that as an exhibit?
7        MS. PARFITT:  I'm going to put an
8    exhibit sticker on it, and I'm going to put it in
9    as representative pages from the Nicholson
10   deposition.
11       MS. BROWN:  Can he find it in the large
12   copy?
13       MR. ROSEN:  Would you mind passing
14   back Exhibit 6 that we handed --
15       THE WITNESS:  Oh.  This is all of your
16   36's.  That's a whole bundle of the same thing.
17       But I would like to get the 36-page
18   back --
19       MS. PARFITT:  Sure.
20       THE WITNESS:  -- if we're going to talk
21   about it.
22       MS. PARFITT:  Absolutely.  I want you to
23   have actually 37, and you need -- here we go.
24       MS. BROWN:  This is the complete set?
25       MS. PARFITT:  Yes, I'm assuming.

Page 87

1        MS. BROWN:  You have that in front of
2    you?
3        THE WITNESS:  I do.
4    BY MS. PARFITT:
5        Q   And, Dr. Diette, if you have any trouble
6    reading any of that -- or you can also look up on
7    the ELMO that's being displayed.
8        MS. BROWN:  Thank you.
9        MS. PARFITT:  Okay.  Yeah, sorry.
10   BY MS. PARFITT:
11       Q   Again, page 48, line 14.
12       Do you have that there, Doctor, in front
13   of you?
14       A   I do.
15       Q   Okay.
16       "Q.  You would agree, Dr. Nicholson, if
17   Johnson & Johnson's Baby Powder indeed had
18   asbestos in it, it would be imprudent and not
19   reasonable for Johnson & Johnson to sell it to its
20   consumers?"
21       "A.  I would agree with that.
22       "Q.  Thank you.
23       "A.  I would not support Johnson &
24   Johnson selling a product that contained
25   asbestos."

Page 88

1        Did I read all that correctly?
2        A   You did.
3        Q   All right.  Do you -- so you disagree
4    with Dr. Nicholson; is that correct?
5        MS. BROWN:  Objection to the form.
6        MR. LOCKE:  Objection.
7        MS. BROWN:  Misstates his testimony.
8        THE WITNESS:  I don't -- I don't agree
9    or disagree.  I mean, I -- I honestly don't know
10   who she is other than what you just said.  But --
11   but it sounds like she's articulating a policy for
12   the company, which I think is her right -- her
13   right to do that and to express those opinions.
14   BY MS. PARFITT:
15       Q   Okay.  All right.
16       Okay.  Now, counsel provided for us in
17   advance of this deposition a copy of your CV.  So
18   let me --
19       THE WITNESS:  Would it -- would it be a
20   good time just to refill coffee?  Is that okay?
21       MS. PARFITT:  Sure.  And I should have
22   said that.  Any time you need a break --
23       THE WITNESS:  No, I know.
24       MS. PARFITT:  -- you holler.
25       THE WITNESS:  Thank you.  I appreciate

Page 89

1    that.
2        MS. PARFITT:  You're very welcome.
3        THE VIDEOGRAPHER:  The time is 10:07
4    p.m.  We're going off the record.
5        (Recess.)
6        THE VIDEOGRAPHER:  The time is
7    10:20 a.m., and we're back on the record.
8    BY MS. PARFITT:
9        Q   Dr. Diette, are you still --
10       THE VIDEOGRAPHER:  Microphone, Counsel.
11   BY MS. PARFITT:
12       Q   Are you good?
13       A   All set.  Thank you.
14       Q   All right.  Dr. Diette, if asbestos was
15   found to be in talcum powder products -- strike
16   that.
17       Would the presence of asbestos in talcum
18   powder products provide evidence to support the
19   hypothesis that talcum powder products -- strike
20   that.
21       Would the presence of asbestos in talcum
22   powder products provide biologically plausible
23   evidence to support the hypothesis that talcum
24   powder products can cause ovarian cancer?
25       MR. LOCKE:  Objection.

23 (Pages 86 to 89)

Page 90

1    MS. BROWN:  Objection to the form of the
2  question.
3    THE WITNESS:  You would have to qualify
4  it, right, because I -- if you're talking about
5  like -- even like, you know, one fiber or
6  something would be quite different than if there's
7  a sufficient amount in order to -- to cause a
8  disease, right.  So it -- it always comes down to
9  dose in terms of what you're talking about.
10    So it's -- all by itself, I don't think
11  that that question is answerable.
12  BY MS. PARFITT:
13    Q   Can one fiber of asbestos alone cause
14  cancer?
15    MS. BROWN:  Objection to the form.
16    THE WITNESS:  It's -- it's so impossible
17  to think that it would, because we all have
18  asbestos in our lungs, and there's a background
19  amount of asbestos in the world that if one fiber
20  could do it, I think we would all have cancer.  So
21  I -- I think somebody could say that, but I don't
22  think it would be true.
23  BY MS. PARFITT:
24    Q   You certainly don't think it's true; is
25  that correct?

Page 91

1    A   Oh, for sure, yeah.
2    Q   Okay.  Let me mark at this time a
3  copy -- a copy of your curriculum vitae, and we'll
4  have it marked as exhibit -- Exhibit 7.
5    (Diette Exhibit No. 7 was marked
6    for identification.)
7  BY MS. PARFITT:
8    Q   Do you have that in front of you?
9    A   I do.
10    Q   Okay.  Who prepared that curriculum
11  vitae?
12    A   Well, not one person.  This is an
13  iterative exercise over time.  So it's -- I mean,
14  me in the sense, although not as the person, you
15  know, typing the words, but it's -- you know, it's
16  my -- my information on here.  And I've had
17  different administrative assistants who have --
18  who have helped to sort of shape it.
19    Q   Is it current?
20    A   No.
21    Q   It's not?
22    A   It's not.
23    Q   All right.  What additions or deletions
24  would you make to your curriculum vitae?
25    A   For the most part, I'd add a bunch of

Page 92

1  papers that have been either accepted or published
2  since then.  There's probably some talks and
3  things.  The -- the grant award section I'm sure
4  needs updating.
5    Q   Okay.  It looks, on the far right of
6  that CV, that it's got a June 2017 date; is that
7  correct?
8    A   It is.
9    Q   All right.  Has there been a curriculum
10  vitae prepared by you since June of 2017?
11    A   No.
12    Q   All right.  Where would I get these
13  additional articles and speeches?  Do you have
14  them in a -- contained in one particular place?
15    A   No.  Where -- where you could get the
16  articles would be on PubMed, and if you just did a
17  PubMed search with my name, you would find them
18  all.
19    For speeches, I don't actually have a
20  repository, so it's going to take me some work to
21  actually sort of populate that part of the CV.
22    Q   Are you -- do you have any intention of
23  updating your CV?
24    A   Yes.  Can I give you an extra sentence
25  or two?

Page 93

1    Q   Sure.
2    A   Okay.  So I sure want to.  The stakes
3  are low for me at this point.  This is our
4  Department of Medicine format CV, which we use for
5  promotion purposes, for the most part.  I've been
6  promoted to professor, which there's no other rank
7  to get promoted to.  And so it's not really that
8  urgent for me to -- to change that.
9    Then on top of that, my administrative
10  assistant went out on maternity leave, and then I
11  didn't want to swamp her with this when she came
12  back.
13    Q   That was nice.
14    A   And literally just last week, she took a
15  new job, a better job but in a different place.
16    So long answer, yeah, I want to, but
17  it's not going to happen really soon.
18    Q   Okay.  So your current academic
19  appointment at Johns Hopkins University, is that a
20  professor of medicine, is that correct, Division
21  of Pulmonary and Critical Care?
22    A   Yeah, and I think it's called Pulmonary,
23  Criteria Care and Sleep Medicine now.  We just --
24  we just changed the name recently.
25    Q   And sleep medicine?

24 (Pages 90 to 93)

Gregory B. Diette, M.D.

Page 94

1      A   And sleep, yeah.
2      Q   All right.  Are you still within the
3   Department of Epidemiology?
4      A   Yes.
5      Q   All right.  Are you still an associate
6   professor of medicine in epi and environmental
7   health?
8      A   No, that's a typo somewhere.  I don't
9   know where you saw that, but -- oh, probably in my
10   report.  But, no, I'm -- the professor label
11   carries across all the -- different entities.
12      Q   So you're no longer an associate
13   professor.
14      A   Right.  Professor of whatever it is that
15   I'm a professor of.
16      Q   All right.  Your board certification is
17   in pulmonary and critical care?
18      A   It's in internal medicine and pulmonary
19   medicine.
20      Q   You're not a member of the American
21   College of Epidemiology, correct?
22      A   No.
23      Q   Your undergraduate degree was in
24   English?
25      A   English and economics.

Page 95

1      Q   Okay.  And then post-medical school, you
2   received a MHS in public health; is that correct?
3      A   Well, it was in epidemiology.
4      Q   Okay.
5      A   I only just say that because there is a
6   degree in public health, and that's not what mine
7   was called.
8      Q   Okay.  Let me show you what we'll have
9   marked as the Johns Hopkins Medicine website as --
10      MS. PARFITT:  What exhibit?
11      MS. BROWN:  8.
12   BY MS. PARFITT:
13      Q   -- Exhibit 8?
14      (Diette Exhibit No. 8 was marked
15      for identification.)
16   BY MS. PARFITT:
17      Q   All right.  Do you have that in front of
18   you?
19      A   I do.
20      Q   All right.  Now, this is for the Johns
21   Hopkins Medical School; is that correct, or
22   medical center?
23      A   So I don't know.  You know, the top says
24   "Johns Hopkins Medicine," which is a broader label
25   that includes the medical school and probably the

Page 96

1   hospital as well.
2      Q   All right.  So if someone were going on
3   the website to look at the hospital, the medical
4   school, medical center, this is what they would
5   see.  And look over to the far right, and it has
6   "Expertise."  Do you see that?
7      A   I do.
8      Q   All right.  Is -- it reads:  "Expertise:
9   Asthma, chronic obstructive pulmonary disease
10   (COPD), pulmonary" -- excuse me -- "pulmonary
11   disease, and critical care medicine, pulmonary
12   medicine."
13      Is that correct?
14      A   It is correct.
15      Q   All right.  Is there anything you want
16   to add with regard to your expertise?
17      MS. BROWN:  Objection to the form of the
18   question.
19      THE WITNESS:  So I honestly don't know
20   what this is.  I mean, I don't doubt that it comes
21   from Hopkins, but it's not something I look at.
22   BY MS. PARFITT:
23      Q   Okay.
24      A   If you -- well, no, just one second.
25   Because if you look at the bottom, it says

Page 97

1   "Request an appointment."  So this looks like some
2   kind of place that somebody could go and find a
3   call-in number to get an appointment for -- for a
4   doctor.
5      Q   Okay.
6      A   So I think it's -- I don't know.  I
7   could add all kinds of things, but I don't -- I
8   don't know what the format is for this.  Like I
9   don't know if there is a word limit.
10      Q   Sorry.
11      A   I don't know -- I don't know what the
12   purpose of this is.
13      Q   All right.  The second line says:
14   "Research interests," and it states:
15   "Environmental impacts on lung disease,
16   epidemiology of airway disease and chronic
17   obstructive pulmonary disease, asthma."
18      Did I read that correctly?
19      A   You did.
20      Q   Does that accurately reflect your
21   current research interests?
22      MS. BROWN:  Objection.  Form.
23      THE WITNESS:  Well, it's some, but it's
24   so incomplete.  You know, it's obviously just a
25   couple of snippets that somebody chose to put on

25  (Pages 94 to 97)

Gregory B. Diette, M.D.

Page 98

1    this -- on this page.
2    BY MS. PARFITT:
3        Q   Okay.  Well, I will represent to you
4    that if one chose to go on the Johns Hopkins
5    Medicine website, this is how they hold you out to
6    the -- to the world, so to speak.
7            MS. BROWN:  Objection to the speech.  Is
8    there a question?
9            THE WITNESS:  So --
10           MS. PARFITT:  Counsel --
11           MS. BROWN:  There's no question.
12           MS. PARFITT:  -- please.
13           MS. BROWN:  Is there a question?
14           MS. PARFITT:  Yes.
15           MS. BROWN:  What is it?
16   BY MS. PARFITT:
17       Q   Is this how -- is this information
18   correct, Dr. Diette?
19       A   Oh, the information is correct.
20       Q   Okay.
21       A   It's very incomplete.
22       Q   Okay.  Let me show you now what we'll
23   have marked as Exhibit 9.
24           (Diette Exhibit No. 9 was marked
25           for identification.)

Page 99

1            THE WITNESS:  Can I just -- just
2    clarify?
3    BY MS. PARFITT:
4        Q   There's no question pending right now.
5        A   I want to clarify my last --
6            MS. BROWN:  But if you want --
7    BY MS. PARFITT:
8        Q   Your counsel will have a chance to -- to
9    talk with you.
10           MS. BROWN:  Whoa, Counsel.  Are you
11   going to take the position on the record that the
12   witness can't clarify any --
13           MS. PARFITT:  No, I'm not doing that
14   all.
15           MS. BROWN:  Well, that was his request,
16   and he wanted to --
17   BY MS. PARFITT:
18       Q   What do you need to do, Doctor?  I'm
19   sorry.
20       A   Oh, well, I just -- because we were
21   talking about this front page, and I didn't
22   realize there were other pages here.  This still
23   isn't complete, but there's a whole lot here more
24   about me than just what was on that front page.  I
25   just wanted to point to all that.  I haven't read

Page 100

1    it to see if it's accurate or not, but there's --
2    there's certainly more about me than just those
3    couple of --
4        Q   Okay.  Well, you know, that's a good
5    point, and I missed that.  So thank you for
6    bringing that to our attention.
7            Let's look at that sec- -- second page
8    of the website for Johns Hopkins Medical Center.
9            MR. TISI:  Counsel, that is Exhibit 8.
10           MS. PARFITT:  And it is Exhibit 8.
11   Thank you.
12           Okay.  Let's put that up there.
13   BY MS. PARFITT:
14       Q   And there's a category that says
15   "Background"; is that correct?
16       A   It is.
17       Q   All right.  Now, it states:
18   "Dr. Gregory Diette is a professor of medicine at
19   the Johns Hopkins University School of Medicine.
20   He holds a joint appointment in the Department of
21   Epidemiology in the Johns Hopkins Bloomberg School
22   of Public Health."  Hashtag, "His areas of
23   clinical expertise include asthma and obstructive
24   lung disease."
25           Did I read that correctly?

Page 101

1        A   You did.
2        Q   Okay.  Is that correct?
3        A   That -- that it includes those two
4    diseases?
5        Q   Yes.
6        A   It does include that.
7        Q   Okay.  And the third paragraph reads:
8    "His research interests include environmental
9    impacts on lung disease, epidemiology of airway
10   disease, and chronic obstructive pulmonary
11   disease."
12           Did I read that correctly?
13       A   You did.
14       Q   All right.  And does that reflect some
15   of your research interests?
16       A   It does.
17       Q   All right.  Now, let's move over -- and
18   thank you for correcting me on that.
19           Now, I will represent to you that
20   Exhibit 9 is from the website from the Bloomberg
21   School of Public Health.
22           Do you have that in front of you?
23       A   I do.
24       Q   All right.  Now, if one was to go onto
25   the website for the Bloomberg School of Public

26  (Pages 98 to 101)

Gregory B. Diette, M.D.

Page 102

1    Health, this is the type of information they would
2    receive, Dr. Diette.
3              Look down at the "Overview." Do you see
4    that?
5        A   I do.
6        Q   Okay. It says --
7              MS. PARFITT: Let's get that up on the
8    ELMO.
9    BY MS. PARFITT:
10       Q   All right. Do you see under "Overview,"
11   it says: "My research focuses on identifying
12   factors that cause or provoke asthma. We have
13   been interested especially in air pollutants,"
14   parens, "particulate matter, NO2, secondhand
15   smoke," close parens, "and allergens," parens,
16   "including mouse," close parens, "that are
17   especially problematic in inner city homes. We
18   are studying the effects of these pollutants and
19   allergens on inflammation and oxidative stress.
20   More recently, we have begun examining how dietary
21   patterns, especially a Western diet style -- a
22   Western-style diet, may increase susceptibility to
23   inhalable pollutants and allergens."
24             Did I read that correctly?
25       A   You did.

Page 103

1        Q   Okay. And then again, under your
2    "Research Interests, it states: "Epidemiology of
3    lung diseases, asthma, COPD" --
4              And what's COPD?
5        A   Chronic obstructive pulmonary disease.
6        Q   "-- outcomes, environmental," and then
7    it says, "Particulate matter, allergens and health
8    disparities."
9              Did I read that correctly?
10       A   You did.
11       Q   All right. Does that represent some of
12   your research interests?
13       A   It does represent some.
14       Q   Okay. You are a clinician?
15       A   True.
16       Q   All right. What is the profile of the
17   types of patients that you see in your practice?
18             MS. BROWN: Form.
19             THE WITNESS: You want me to just take a
20   stab at it? Because I'm not sure -- is profile --
21             MS. BROWN: If you don't understand the
22   question, I'm sure counsel will clarify it.
23             MS. PARFITT: I will, sure.
24   BY MS. PARFITT:
25       Q   What is the nature of the diseases that

Page 104

1    patients who come to you are experiencing?
2              MS. BROWN: Objection to the form.
3              THE WITNESS: And I'll do my best, and
4    then if it's not what you're looking for, please
5    just ask me to clarify.
6              I -- I see probably, you know, almost
7    every single kind of medical problem there is
8    because I -- I attend in so many different
9    locations within the Hopkins system. So meaning
10   that I do work in the intensive care unit where
11   it's every kind of medical problem you could
12   imagine, it just happens to be the sickest of the
13   sick. So it could be any -- any organ system, or
14   not even an organ system, but all sorts of
15   illnesses.
16             In the pulmonary clinic, I see -- I
17   certainly see people with asthma and COPD, but I
18   see pretty much any kind of pulmonary disease and
19   get referrals for things that aren't pulmonary
20   diseases. They -- they may be somebody who's got
21   a -- a symptom that turns out to be a
22   pulmonary disease.
23             In the oncology center, when I attend
24   there, I see every kind of cancer patient that at
25   least that Hopkins sees.

Page 105

1              And then I'm also lucky enough to attend
2    on the general internal medicine service, and so
3    there it's really everything, it's all comers.
4    And so it ranges from basically head-to-toe kind
5    of medicine.
6    BY MS. PARFITT:
7        Q   Okay. Now, if I arrived at -- for in --
8    I guess you said the intensive care clinic, and I
9    had a gynecological problem, would I see you?
10             MS. BROWN: Objection to the form.
11             THE WITNESS: So there's no intensive
12   care clinic, just to be clear. Like a clinic is
13   an outpatient setting. So our intensive care unit
14   is an inpatient setting for critically ill people.
15   BY MS. PARFITT:
16       Q   Okay.
17       A   So you might or might not end up seeing
18   me, because if we're -- the way that the program
19   works is that -- so, for example, if somebody is
20   pregnant, just giving an example, if it's an early
21   pregnancy, then those patients would end up in our
22   medical ICU. If it's a later pregnancy, then they
23   would go to the -- the obstetrics unit to their --
24   their own particular unit. And then you might see
25   me if I was consulted into that unit, whether or

27 (Pages 102 to 105)

Gregory B. Diette, M.D.

Page 106

1    not you were in our -- our unit or not.
2        Q   So if I came in with a gynecological
3    problem, they might call you -- you, who are a
4    pulmonologist, they might call you in to consult
5    with me?
6            MS. BROWN:  Objection to the form of the
7    question and the tone.
8            THE WITNESS:  Well, I am picking up the
9    tone, which I -- which I think -- I mean, I know
10   you're trying to make a point here.  And the
11   question as you asked it is -- the answer is, of
12   course.  But I think what you're trying to get at
13   is would they have asked me to come deal with
14   their pregnancy, for example, and I wouldn't be
15   the person dealing with their pregnancy.  I would
16   be dealing with something else.
17   BY MS. PARFITT:
18       Q   Okay.  All right.  Is it fair to say
19   that your practice primarily deals with
20   individuals who have pulmonary and lung disease
21   conditions?
22           MS. BROWN:  Objection.
23           THE WITNESS:  I think if you dial back
24   and listen to what I said for those other answers,
25   you would be pretty clear that it isn't just that.

Page 107

1    BY MS. PARFITT:
2        Q   Okay.  Well, I would include asthma in
3    that as well.
4            MS. BROWN:  Same objection.
5            THE WITNESS:  Well, include it, but I
6    mean -- but, you know, when I'm on the general
7    internal medicine service, I'm not seeing mostly
8    asthma.  I might be seeing somebody with diabetes
9    or a heart attack or pelvic inflammatory disease,
10   you know, to name a GYN problem.  I mean it's the
11   whole gamut from head to toe.
12   BY MS. PARFITT:
13       Q   Is it fair to say your research in
14   public health focuses on factors that cause and
15   provoke asthma?
16           MS. BROWN:  Objection to the form of the
17   question.
18           THE WITNESS:  It's a focus.
19   BY MS. PARFITT:
20       Q   Is it fair to say that you have a
21   particular interest in air pollutants, and that
22   includes secondhand smoke and mouse allergens?
23       A   I agree with most of what you said, but
24   not literally the way you said it, because I don't
25   think mouse allergen's a pollutant.  So I'm

Page 108

1    certainly interested in pollutants.
2        Q   Okay.  And more recently, you've
3    expressed a research interest in dietary patterns
4    particularly, and especially a Western diet and
5    how that might increase susceptibility to
6    inhalable pollutants; is that correct?
7        A   True.
8            MS. BROWN:  Form.
9    BY MS. PARFITT:
10       Q   Are you -- have you published recently
11   on that?
12       A   I'm sure there's stuff that's come out.
13       Q   Well, I only have your CV from 2017, so
14   I'll represent that I'm not seeing something on
15   that CV.
16           Is there something you've done recently?
17       A   Yeah, it's a couple of years ago.
18       Q   Okay.
19       A   I mean the best way to find stuff would
20   be on PubMed.
21       Q   All right.  You've been retained to
22   serve as an expert for Johnson & Johnson, correct?
23           MS. BROWN:  Form.
24           THE WITNESS:  That's correct.
25   BY MS. PARFITT:

Page 109

1        Q   Okay.  Do you know what the -- do you
2    have an understanding of what the allegations are
3    against Johnson & Johnson?
4            MS. BROWN:  Objection to the form.
5            THE WITNESS:  Which -- which ones?
6    BY MS. PARFITT:
7        Q   Do you know why you're -- Johnson &
8    Johnson is being sued?
9            MS. BROWN:  Objection.
10           Counsel, are you asking a legal
11   question?
12           MS. PARFITT:  No.
13   BY MS. PARFITT:
14       Q   Do you have any understanding of the
15   allegations or the nature of the lawsuit against
16   Johnson & Johnson, the company that's retained you
17   to provide expert legal testimony?
18           MS. BROWN:  Same objection.
19           THE WITNESS:  I think, generally
20   speaking, what I understand is that there's an
21   allegation that talcum powder causes ovarian
22   cancer.
23   BY MS. PARFITT:
24       Q   Okay.  Do you have an understanding of
25   the allegations against Imerys?

28 (Pages 106 to 109)

Gregory B. Diette, M.D.

Page 110

```
1          MS. BROWN:  Objection.
2          THE WITNESS:  I don't have any separate
3   understanding.
4   BY MS. PARFITT:
5      Q   Okay.  Do you know who Imerys are -- is
6   or are?
7      A   I'm aware that it's a supply company of
8   some sort, but I don't know much more about them.
9      Q   All right.  And do you have an
10  understanding of the allegations against the
11  Personal Care Products Corporation --
12         MS. BROWN:  Objection.
13  BY MS. PARFITT:
14     Q   -- otherwise known as the PCPC?
15         MS. BROWN:  Objection.  Calls for
16  speculation.
17         THE WITNESS:  I don't --
18         MR. LOCKE:  Objection.
19  BY MS. PARFITT:
20     Q   You don't.
21     A   I don't know who that is.
22     Q   All right.  Have you ever seen a
23  complaint in this case?
24         MS. BROWN:  Objection.
25  BY MS. PARFITT:
```

Page 111

```
1      Q   And when I say "this case," I'm talking
2   about this case of talcum powder products and
3   ovarian cancer, be it in an MDL context or a state
4   context.
5          MS. BROWN:  Same objection.
6          MS. MILLER:  With any complaint, any
7   talcum --
8          MS. PARFITT:  Any -- yeah, has he ever
9   seen a complaint in any talcum powder product and
10  ovarian cancer case.
11         MS. BROWN:  Objection to the form.
12         THE WITNESS:  I'm sure I must have.
13  BY MS. PARFITT:
14     Q   You're sure you must have.
15         Is it in the materials that you have
16  reviewed for purposes of your -- your deposition
17  today or for purposes of the report you prepared?
18     A   No.
19         MS. BROWN:  Objection.
20  BY MS. PARFITT:
21     Q   Okay.  If you have seen it, what have
22  you done with it?
23         MS. BROWN:  Objection.  Vague.
24         THE WITNESS:  Well, the same thing I do
25  with any complaint, which is just to try to read
```

Page 112

```
1   through it quickly and just get a sense of what
2   the case is about.
3   BY MS. PARFITT:
4      Q   And then what do you do with it?
5          MS. BROWN:  Form.
6   BY MS. PARFITT:
7      Q   Do you keep it?
8      A   Oh, not forever.  I mean if the case is
9   over, then I destroy it with all the other
10  materials.
11     Q   Well, this case is far from over.
12         Have -- do you still have --
13         MS. BROWN:  Counsel, just ask the
14  question.
15  BY MS. PARFITT:
16     Q   -- a copy of the complaint?
17         MS. MILLER:  You asked about a state
18  court case.
19         MS. PARFITT:  No.  I said was there --
20  hey -- again, hey, ladies, I'm sorry, I think the
21  two of you are going to have to agree who is going
22  to com- -- who's going to complain -- who's going
23  to object.  One of you can object.
24         MS. BROWN:  Well, if you're going to
25  complain, I'm going to object.
```

Page 113

```
1          MS. PARFITT:  Okay.
2          MS. BROWN:  Please just ask the
3   question.  No speeches.
4          MS. PARFITT:  Then, please, and I --
5   listen, I think that we're getting at a crossroads
6   here.  One person gets to object.  And let me
7   remind you what the CMO says, because I know you
8   know that --
9          MS. BROWN:  Counsel --
10         MS. PARFITT:  And I'm not admonishing.
11  Let me finish, Counsel --
12         MS. BROWN:  Don't yell at me.
13         MS. PARFITT:  -- and then you can speak.
14         MS. BROWN:  You're raising your tone at
15  me.
16         MS. PARFITT:  Well, the camera will --
17  oh, please, don't be so condescending.
18         MS. BROWN:  Sure, it's going to reflect
19  that you're raising your tone.
20         MS. PARFITT:  I hope -- I hope that the
21  Judge sees this because we're probably --
22         MS. BROWN:  We are well aware of the
23  CMO.
24         MS. PARFITT:  -- going to have to call
25  him soon.
```

Gregory B. Diette, M.D.

Page 114

```
 1          MS. BROWN:  We are complying with it.
 2  We're happy to call the Judge.
 3          MS. PARFITT:  So the CMO says that you
 4  get to say, "Objection.  Form."  That's what you
 5  get to say.
 6          You have a wonderful opportunity at the
 7  end of this deposition to ask him as many
 8  questions as you like, but for right now, my time,
 9  my deposition.  It's, "Objection.  Form."  And I
10  really would appreciate that courtesy.  I will
11  give it to you, but I would appreciate getting it
12  back.  So --
13          MS. BROWN:  And to be clear --
14          MS. PARFITT:  No, Counsel, no more
15  speeches.  No more speeches.
16          MS. BROWN:  You just made a speech, and
17  I'm going to respond --
18          MS. PARFITT:  No more speeches, Counsel.
19  My deposition.
20          MS. BROWN:  No, Counsel.
21          MS. PARFITT:  Not your deposition.
22  BY MS. PARFITT:
23      Q   Next question I have --
24          MS. PARFITT:  No more questions,
25  Counsel.  You want me to depose you?
```

Page 115

```
 1          MS. BROWN:  Counsel, no.  You are
 2  raising your tone.
 3          MS. PARFITT:  Counsel --
 4          MS. BROWN:  You are yelling at me.
 5          MS. PARFITT:  -- you know what, I was
 6  told a little bit earlier nobody could hear me.
 7  So I have lifted my voice, and now I'm using my
 8  stage voice.  So now everyone can hear me, and now
 9  I'm speaking too loud to you.
10          So I'm going to try -- you know, you
11  can't have it both ways.  One speaker, one
12  objectioner.  Next question.
13          MS. BROWN:  The record will reflect that
14  you are making incessant speeches.  Please --
15  BY MS. PARFITT:
16      Q   Are you an oncologist, Dr. Diette?
17      A   I am not an oncologist.
18      Q   Are you a radiation oncologist?
19      A   No.
20      Q   Are you a gynecologist?
21      A   No.
22      Q   Okay.  Have you ever provided
23  gynecological care or treatment for a woman who
24  has been diagnosed with ovarian cancer?
25          MS. BROWN:  Objection.  Form.
```

Page 116

```
 1          THE WITNESS:  Can you say it again?
 2  BY MS. PARFITT:
 3      Q   Sure.
 4      A   Yeah.
 5      Q   Have you ever been provided
 6  gynecological care or treatment for a woman who
 7  has been diagnosed with ovarian cancer?
 8      A   So there's just a couple of things
 9  there, and I think maybe I heard it wrong.
10          Did you say been provided care?
11      Q   Have you ever provided --
12      A   Provided.  Okay.  I'm sorry.  I thought
13  you said "been provided."
14      Q   No, no, no, no.
15          MS. MILLER:  You did say that.
16          THE WITNESS:  I thought it sounded like
17  did I get care.  I was like --
18          MS. MILLER:  You did --
19  BY MS. PARFITT:
20      Q   No, I -- I don't think you did.
21      A   Yeah, right.
22      Q   I know, that would have been a very
23  awkward question, wouldn't it?
24          Have you ever provided gynecological
25  care or treatment for a woman who has been
```

Page 117

```
 1  diagnosed with ovarian cancer?
 2      A   Sure.  And I think it goes back to some
 3  of the things I said before where I see people in
 4  the hospital who have ovarian cancer, and through
 5  my training, you know, for medical school and
 6  residency, that was part of our training also,
 7  which was to rotate on services where people
 8  had every -- every imaginable illness.
 9      Q   Okay.  Well, your residency was how long
10  ago?
11          MS. BROWN:  Objection.
12          THE WITNESS:  My residency was 1990 to
13  1993.
14  BY MS. PARFITT:
15      Q   Okay.  So I'm not talking about what you
16  did in 1993, back in that period of time.
17          What I'm talking about is whether or not
18  you have actually provided gynecological care to a
19  woman who presented to you with ovarian cancer?
20          MS. BROWN:  Objection to the form.
21  Asked and answered five times.
22          You can answer, Dr. Diette.
23  BY MS. PARFITT:
24      Q   And by that, primary care.  Not in a
25  consulting role but primary care.
```

Gregory B. Diette, M.D.

Page 118

1    MS. BROWN: Same objection.
2         THE WITNESS: I think I know your
3    question, but could you be specific like --
4    BY MS. PARFITT:
5         Q   Sure.
6         A   -- like just an example, and then I'll
7    know that we're talking about the same thing.
8         Q   Okay. Have you ever provided primary
9    care, gynecological care or treatment for a woman
10   who has been diagnosed with ovarian cancer?
11        A   So --
12        MR. LOCKE: Objection.
13        THE WITNESS: -- I'm not trying to
14   criticize the question, but primary care sounds
15   like something that a -- like a family
16   practitioner or an internist would do. I think
17   you mean something else, so --
18   BY MS. PARFITT:
19        Q   I do. Okay. What I'm talking about is
20   if I called up Johns Hopkins and said, I have been
21   diagnosed with ovarian cancer, I need to see a
22   physician, would I be referred to the pulmonology
23   department, your department, or would I be
24   referred to a different department?
25        MS. BROWN: Objection to the form.

Page 119

1         THE WITNESS: Different department,
2    assuming it's literally for the care of the
3    ovarian cancer.
4    BY MS. PARFITT:
5         Q   Okay. Fair. Thank you.
6         Have you ever researched the life
7    expectancy of a woman who has ovarian cancer?
8         A   No.
9         MS. BROWN: Objection to the form.
10   BY MS. PARFITT:
11        Q   Are you a pathologist?
12        A   I am not.
13        Q   All right. And are you a radiologist?
14        A   I am not.
15        Q   Okay. Are you a mineralogist?
16        A   No.
17        Q   Are you a toxicologist?
18        A   No.
19        Q   Are you a pharmacologist?
20        A   No.
21        Q   Okay. Are you a regulatory expert?
22        A   I don't know what that means, but I
23   don't -- I don't use those words to describe
24   myself.
25        Q   Okay. Are you a certified industrial

Page 120

1    hygienist?
2         A   No.
3         Q   Okay. Are you what's referred to as a
4    mineralogist or a mineral scientist specialist?
5         A   Neither one.
6         Q   Are you a geologist?
7         A   No.
8         Q   Okay. Is it fair to say that you do not
9    hold yourself out in the scientific and medical
10   community as an expert with regard to testing
11   standards of particulate matter, toxins or
12   carcinogens?
13        A   I think that sounds right.
14        Q   And that would include testing of
15   minerals -- or, excuse me, that would include
16   testing of asbestos?
17        MS. BROWN: Objection to the form.
18        THE WITNESS: Correct.
19   BY MS. PARFITT:
20        Q   And that would include testing of talcum
21   powder products?
22        A   That I -- I don't do that, is that
23   right?
24        Q   Right.
25        A   Yeah, that's correct.

Page 121

1         Q   All right. Let's talk a little bit
2    about your publications and your research.
3         Let me direct your attention to -- I
4    believe this is Appendix C of your CV, which I
5    believe is Exhibit 7.
6         Do you have that in front of you?
7         A   I do.
8         Q   Okay. I understand, now that I have a
9    CV that's dated June of 2017, and the CV I have,
10   it says that you've published approximately 167
11   publications in peer-reviewed literature.
12        Is that correct or incorrect?
13        A   It was probably true as of June 2017.
14        Q   All right. So sitting here today in
15   April of 2019, approximately how many publications
16   in peer-reviewed journals have you published?
17        A   I think if you look on PubMed, you will
18   see more than 200.
19        Q   Okay. Is it fair to say that you've
20   published no papers or studies in the peer-
21   reviewed literature about asbestos or asbestos-
22   related diseases?
23        A   Correct.
24        Well, can you ask that as two different
25   questions?

Gregory B. Diette, M.D.

Page 122

1    Q   Sure.
2    A   I can help you just clarify what I --
3  what I'm trying to answer.
4    Q   Please.
5    A   So nothing about asbestos, but if you --
6  if you consider asbestos-related diseases to
7  include lung cancer, for example, that there are
8  publications that bear on lung cancer, and there's
9  at least one article, maybe more, on interstitial
10  lung diseases, and asbestosis would be an
11  interstitial lung disease.
12    Q   Okay.  Can you tell me what those
13  articles are?
14    A   Let's see.  Would the -- how do you want
15  me to do it, like the number?
16    Q   If you give me the number, that would be
17  fine.
18    A   Yeah.  So number 5 has to do with lung
19  cancer.
20    Q   Now, does that have to do with lung
21  cancer and asbestos exposure?
22    A   No, not specifically.
23    Q   All right.  So that has -- that is not
24  lung cancer and asbestos.
25      All right.  Is there another one?

Page 123

1    A   Yeah, so if you look at number 6, this
2  is, you know, a study about evaluating lung masses
3  and large lymph nodes.
4    Q   Yes.
5    A   So that would include, you know, lung
6  cancer in that as well.
7    Q   Does that include asbestos and lung
8  cancer?
9    A   Not specifically.
10    Q   All right.  Any others?
11    A   I would say any of the ones where you
12  see the word "bronchoscopy," is something to
13  do with lung cancer for the most part, though not
14  literally lung cancer and asbestos.
15      So, for example, like 21, number 2,
16  number 3, you know, all sort of have some bearing
17  on at least the -- you know, the care or
18  management of people with suspected lung cancer or
19  who actually have lung cancer.
20    Q   Dr. Diette, my question is very specific
21  to publications in the peer-reviewed journal that
22  deal with the topic of asbestos or asbestos-
23  related diseases like lung cancer where the word
24  "asbestos" appears in your publication.
25      MS. BROWN: Objection to the form.

Page 124

1      THE WITNESS:  So that's a different
2  question.  So the answer to that is no.
3  BY MS. PARFITT:
4    Q   All right.  Have you published any
5  papers in the peer-reviewed literature on
6  mesothelioma?
7    A   No.
8    Q   All right.  So nowhere in the 200
9  publications that you have prepared would I see
10  the word "mesothelioma"?
11    A   I can't promise that you won't see that
12  word in some paper, but there's not a paper whose
13  primary topic is about mesothelioma.
14    Q   All right.  Very good.
15      Having reviewed your 200 or so
16  publications, is it fair to say that there are no
17  peer-reviewed publications regarding the subject
18  matter of ovarian cancer?
19    A   That's correct.
20    Q   Is it fair to say that none of your
21  peer-reviewed papers address a diagnosis of
22  ovarian cancer?
23      MS. BROWN: Objection. Form. I don't
24  understand that.
25      THE WITNESS:  Well, I think -- I think

Page 125

1  the answer to the one before encompasses, you
2  know, something else with the word "ovarian
3  cancer" in the question.
4  BY MS. PARFITT:
5    Q   Okay.  All right.  Have you published
6  any peer-reviewed publications that talk about the
7  causes of ovarian cancer?
8      MS. BROWN:  Objection.
9      THE WITNESS:  No.
10  BY MS. PARFITT:
11    Q   Have you published any peer-reviewed
12  papers that talk about risk factors for ovarian
13  cancer?
14      MS. BROWN:  Same objection.
15      THE WITNESS:  No.
16  BY MS. PARFITT:
17    Q   Have you published any publications in
18  the peer-reviewed journal on risk factors for
19  mesothelioma?
20    A   No.
21    Q   What causes mesothelioma?
22    A   A few things.  You know, asbestos in
23  sufficient dose can do it.  Radiation can do it.
24  There's some other minerals that aren't asbestos
25  that are suspected to do it.  It can arise on its

32 (Pages 122 to 125)

Gregory B. Diette, M.D.

Page 126

1    own spontaneously.  And, you know, there's
2    thoughts of, at least in the peritoneum, about
3    certain kinds of chronic inflammation that may
4    lead to that as well.
5        Q   Okay.  Can asbestos cause lung cancer?
6        A   Yes.  In a sufficient dose.
7        Q   Okay.  Is it fair to say that you have
8    not published in the peer-reviewed literature any
9    studies on talcum powder products as a causative
10   factor for ovarian cancer?
11       A   That is correct.
12       Q   Is it fair to say that you have not
13   published in the peer-reviewed journal any studies
14   with regard to talcum powder products as a risk
15   factor for ovarian cancer?
16       A   That's correct.
17       Q   Is it fair to say to say that there are
18   no publications in your peer-reviewed literature
19   on the subject of talcum -- of talc as a source of
20   asbestos fibers?
21           MS. BROWN:  Objection.  Counsel, I think
22   you just misspoke.  Do you mean on his CV?
23           MS. PARFITT:  I'm sorry?  I did.
24   BY MS. PARFITT:
25       Q   Is it fair to say --

Page 127

1            MS. PARFITT:  Thank you.
2    BY MS. PARFITT:
3        Q   Is it fair to say that there are no
4    peer-reviewed publications in your CV that discuss
5    the subject as -- of talc as a source of asbestos
6    fibers?
7        A   Correct.
8        Q   Is it fair to say there are no
9    publications in a peer-reviewed journal contained
10   in your curriculum vitae regarding the association
11   or relationship between talcum powder products and
12   ovarian cancer?
13           MS. BROWN:  Objection to the form of the
14   question.
15           THE WITNESS:  Correct.
16   BY MS. PARFITT:
17       Q   Are there any publications in --
18   peer-reviewed publications on your curriculum
19   vitae regarding the association or relationship
20   between asbestos and ovarian cancer?
21           MS. BROWN:  Objection.  Asked and
22   answered.
23           THE WITNESS:  You said are there any --
24   BY MS. PARFITT:
25       Q   Asbestos.

Page 128

1        A   Right, are there -- no.
2        Q   Okay.  I noted in your CV or in some of
3    the readings that you are currently involved in
4    some clinical trials.
5            Did I -- did I get that correct?
6        A   I have been involved in trials.
7        Q   Something recent?
8        A   Oh, all the time.
9        Q   Okay.  Are you currently involved in any
10   clinical trial --
11       A   Yeah.
12       Q   -- trials?
13           Okay.  Do any of them deal with the
14   subject of asbestos?
15       A   No.
16       Q   Do any of your trials or research deal
17   with the subject of talcum powder products?
18       A   No.
19       Q   All right.  Do you currently have
20   ongoing any research work in the area of asbestos?
21           MS. BROWN:  Objection to the form.
22           THE WITNESS:  No.
23   BY MS. PARFITT:
24       Q   Do you currently have ongoing in any of
25   your research work on the topic of mesothelioma?

Page 129

1        A   No.
2        Q   Do you currently have any research work
3    ongoing on the topic of talcum powder products?
4        A   No.
5        Q   Do you currently have any research in
6    the works with regard to work on -- work on
7    ovarian cancer?
8        A   No.
9            MS. BROWN:  Objection to the form.
10   BY MS. PARFITT:
11       Q   Okay.  Would it be fair to say that the
12   only report that you have prepared on the topic of
13   talcum powder products and ovarian cancer would be
14   your litigation report --
15           MS. BROWN:  Object --
16   BY MS. PARFITT:
17       Q   -- in the multidistrict litigation?
18           MS. BROWN:  Objection to the form,
19   misstates his testimony.
20           THE WITNESS:  I doubt it's the only
21   report.  But I certainly did prepare a report for
22   this.
23   BY MS. PARFITT:
24       Q   Okay.  How many reports have you
25   prepared on the issue of talcum powder products

33 (Pages 126 to 129)

Gregory B. Diette, M.D.

Page 130

1    and ovarian cancer?
2          MS. BROWN:  Objection to the form.
3    Litigation?
4          MS. PARFITT:  Litigation reports.
5          THE WITNESS:  Like less than ten, and --
6    and I may be getting the terminology wrong.  I
7    think there's like a couple of affidavits that I
8    think to me are like a report.  So I don't know --
9    BY MS. PARFITT:
10         Q    That's a good clarification.
11         MS. BROWN:  Well, let him finish.  Let
12   him finish.
13   BY MS. PARFITT:
14         Q    I was trying to clarify for you, Doctor.
15         MS. BROWN:  Right, but just let him
16   finish and then you can clarify.
17         MS. PARFITT:  Counsel, I will.  Please.
18         THE WITNESS:  But -- but that's what I
19   meant, so there's -- there's other things that
20   I've sort of written in the litigation work that
21   are other than just this report that we're looking
22   at here today.
23   BY MS. PARFITT:
24         Q    Okay.  So your understanding of what you
25   have prepared in written form on talcum powder

Page 131

1    products and ovarian cancer would be, one,
2    affidavits.  Correct?
3          A    Correct.
4          Q    And two, a legal expert report or more?
5          MS. BROWN:  Form.
6          THE WITNESS:  Correct.
7    BY MS. PARFITT:
8          Q    Okay.  Do you know whether or not you
9    have prepared any legal expert reports like the
10   one you prepared here in the MDL?
11         MS. BROWN:  Objection to the form.
12         THE WITNESS:  Well, on any topic?
13   BY MS. PARFITT:
14         Q    Affidavits -- no, on ovarian cancer and
15   talcum powder products.
16         A    I don't think I --
17         MS. BROWN:  I object.
18         THE WITNESS:  I'm sorry.
19         Yeah, I don't know if I've completed
20   another -- another report, although I'm just
21   trying to think if there was like -- like a case-
22   specific report that might have had something in
23   it.  I mean not a report like this one, meaning
24   where -- where the whole topic is just about
25   the -- the epidemiology and so forth.

Page 132

1    BY MS. PARFITT:
2          Q    Okay.  So the record is clear and I'm
3    clear --
4          A    Yeah.
5          Q    -- the only report that you have
6    prepared dealing with the -- your evaluation of
7    the epidemiology on talcum powder products and
8    ovarian cancer is the report that we have marked
9    as exhibit -- I guess we haven't had it marked
10   yet, but is the report that you filed in this
11   case; is that right?
12         MS. BROWN:  Objection.  Misstates his
13   testimony.
14         MS. MILLER:  When you say "report," do
15   you mean depositions?
16         MS. PARFITT:  Counsel, I -- I know --
17   we'll get to it.  You'll get a -- you'll get a
18   question.
19         MS. MILLER:  It's not about us having a
20   question.  It's about you asking fair questions.
21         MR. TISI:  Well, it's not -- her job --
22   I'm going to jump in here because --
23         MS. PARFITT:  Okay.  Right.
24         MR. TISI:  -- now you're double teaming.
25   I assume you have competent counsel defending this

Page 133

1    deposition.  Honestly, you did this last week, and
2    you've done it in every deposition, and you in
3    particular, and you have a real problem with
4    obstructing depositions.  You need to stop.
5    BY MS. PARFITT:
6          Q    Okay.  Dr. Diette, I'll try and break it
7    down, and I'm just trying to -- this isn't a trick
8    question.  So you let me know if you don't
9    understand my question.
10         MS. BROWN:  And, Counsel, in all
11   seriousness, in an effort to help, are you meaning
12   to include or exclude the Ingham affidavit, which
13   I think is the --
14         MS. PARFITT:  I haven't gotten to it.  I
15   really haven't gotten to it.  That's -- that's --
16   I'm hoping that the doctor knows what he -- what
17   he's filed.
18         Let's have marked as Plaintiffs' Exhibit
19   No. 10.
20         (Diette Exhibit No. 10 was marked
21         for identification.)
22   BY MS. PARFITT:
23         Q    Okay.  Dr. Diette, let me present you
24   with an "Expert Report of Gregory Diette for
25   General Causation Daubert Hearing."  Okay.

34 (Pages 130 to 133)

Gregory B. Diette, M.D.

Page 134

1    A    That's this --
2    Q    Do you see that?
3    A    That's this one for here?
4    Q    Correct.
5    A    Yes.
6    Q    All right.  Now, you've identified on
7  the record that the report I have handed you,
8  which is Exhibit No. 10, is a copy of your federal
9  court expert report in the matter of -- dealing
10 with the issues of talc and ovarian cancer,
11 correct?
12   A    Exactly right.
13   Q    And in addition to that report, you have
14 prepared some affidavits in the past also
15 addressing the topic of talcum powder products and
16 ovarian cancer, correct?
17   A    That's correct.
18   Q    Okay.  Have you prepared any reports on
19 talcum powder products and ovarian cancer outside
20 of the legal context?
21       MS. BROWN:  Objection to the form.
22       THE WITNESS:  No.
23 BY MS. PARFITT:
24   Q    Okay.  And have you provided any other
25 type of written report in a legal context, aside

Page 135

1  from affidavits and the MDL report that you have
2  in front of you?
3        MS. BROWN:  Form.
4  BY MS. PARFITT:
5    Q    On talcum powder products and ovarian
6  cancer.  I'm just trying to find out your world.
7    A    No, I understand.  And I'm not sure if
8  there could be like a work in progress.  But
9  you're talking about completed, completed like
10 products like this, right?
11   Q    Correct.
12   A    I -- I can't think of another one.
13   Q    Okay.  Do you have another report and/or
14 affidavit in progress in the talcum powder
15 products cases and ovarian cancer?
16       MS. BROWN:  Dr. Diette, I'm going to
17 instruct you to the extent you're doing any work
18 on this issue that is in a consulting nature and
19 has not been disclosed, you should not disclose
20 that here.
21       I assume counsel is only asking for
22 situations in which you have been disclosed as an
23 expert, and with that, you can answer the
24 question.
25       THE WITNESS:  Is that right?

Page 136

1  BY MS. PARFITT:
2    Q    That's correct.
3    A    Oh, yeah, so then, no, nothing --
4  nothing for which I've been disclosed.
5    Q    Okay.  But I take it that you have been
6  retained -- you're currently retained to work on
7  some other cases other than talcum powder products
8  and ovarian cancer, is that correct, by Johnson &
9  Johnson?
10       MS. BROWN:  Counsel, I'm going to -- to
11 the extent you're asking about consulting
12 engagements, I'm going to instruct him not to
13 answer.
14 BY MS. PARFITT:
15   Q    No, I'm asking this:  Are you an expert
16 on behalf of Johnson & Johnson and asbestos and --
17 and ovarian cancer cases?
18   A    So there's a subtlety there, right,
19 because -- I mean you may call this an asbestos
20 and ovarian cancer case.  I think it's a talcum
21 powder and ovarian cancer case.
22   Q    Okay.
23   A    There's nothing that's about asbestos
24 separately from what we're talking about here.
25   Q    Fair enough.  Have you been retained by

Page 137

1  Johnson & Johnson to testify as a legal expert in
2  any talcum powder product cases and meso- --
3  mesothelioma?
4    A    Yes.
5    Q    Okay.  Are you currently an expert in
6  any of those cases?
7    A    Yes.
8    Q    How many?
9        MS. BROWN:  And again, Doctor, to the
10 extent you've been disclosed, you can answer the
11 question.
12       THE WITNESS:  So I don't -- I don't know
13 the count then.  I would estimate ten, but I could
14 be off by a couple.
15 BY MS. PARFITT:
16   Q    Have you given depositions in those
17 cases yet?
18   A    In some cases I have.
19   Q    Okay.  Is this the first deposition that
20 you have given in talcum powder products and
21 ovarian cancer?
22       MS. BROWN:  Objection.
23       THE WITNESS:  I don't think so.
24 BY MS. PARFITT:
25   Q    Okay.  Did you give testimony in the

35 (Pages 134 to 137)

Gregory B. Diette, M.D.

Page 138

```
 1    Ingham case?
 2        A   I did.
 3        Q   Okay.  Did you testify at trial at the
 4    Ingham case?
 5        A   I did not.
 6        Q   Okay.  Is there any other case other
 7    than the Ingham case where you have given
 8    deposition in an ovarian cancer and a talcum
 9    powder case?
10        A   I think there's at least one other one.
11        Q   Okay.  Do you remember the name of it?
12        A   I don't.  I could look at my testimony
13    list and see if I can figure it out.
14        Q   Okay.  And we'll have that marked as
15    well.  Why don't we have that marked as Diette
16    Exhibit -- it's part of your exhibit number --
17    it's part of your report, but we'll have it marked
18    as a separate exhibit.
19        (Counsel conferring.)
20    BY MS. PARFITT:
21        Q   Let me show you what's -- we'll have
22    marked as Exhibit No. 11.
23        (Diette Exhibit No. 11 was marked
24            for identification.)
25    BY MS. PARFITT:
```

Page 139

```
 1        Q   All right.  Let me show you what's
 2    Exhibit 11.
 3        MS. PARFITT:  We have a copy for
 4    counsel.
 5        MS. BROWN:  Thank you.
 6        MR. ROSEN:  I think there's --
 7        THE WITNESS:  Oh, there's two.
 8        MS. PARFITT:  Oh, okay, we'll take one
 9    back.  Thank you.  Okay.  Very good.
10    BY MS. PARFITT:
11        Q   Dr. Diette, does this represent an
12    accurate list of cases in which you have been
13    retained as an expert since I believe 2014?
14        A   It is.
15        Q   All right.  Are there any additions to
16    this list of cases --
17        A   I'm sorry.
18        Q   -- where you've given testimony?
19        A   I'm sorry.  I think I -- I wasn't paying
20    attention to your last question.
21        Q   That's all right.
22        A   Did you say is this a list of cases that
23    I provided depositions?
24        Q   Expert testimony.
25        A   Expert testimony.  Then the answer is
```

Page 140

```
 1    yes.
 2        Q   Okay.  The last date I have here is
 3    September 28, '18.
 4        A   No.  It should go further.
 5        MS. BROWN:  We have another page,
 6    Counsel.
 7        MS. PARFITT:  Okay.
 8        THE WITNESS:  I think it's two-sided, so
 9    it's the back of that page.
10        MS. PARFITT:  Okay.  Well --
11        MS. BROWN:  Do you want my copy?
12        MS. PARFITT:  That would be great.  I
13    appreciate that.  I will give it right back to
14    you.
15    BY MS. PARFITT:
16        Q   Okay.  All right.  So the last date is
17    February 22nd, 2019; is that correct?
18        A   That is.
19        Q   All right.  Are you able to circle for
20    me which cases are cases in which you have been
21    retained as an expert in the -- on the topic of
22    talcum powder products and ovarian cancer?
23        MS. BROWN:  Objection to the form.
24        You can answer to the extent you know,
25    Doctor.
```

Page 141

```
 1        THE WITNESS:  I actually don't.  I'd
 2    have to look it up to figure out if I'm right that
 3    there is one on here, but I don't know -- and
 4    other than Ingham, right?
 5    BY MS. PARFITT:
 6        Q   Yes, sir.
 7        A   Other than Ingham, yeah, so I -- I'm not
 8    sure.  I can't tell.
 9        Q   All right.  Have you -- we talked about
10    your peer-reviewed publications.  Are any of your
11    public -- peer-reviewed publications discussing
12    cohort studies?
13        MS. BROWN:  Objection to the form.
14        THE WITNESS:  So some of them are cohort
15    studies.
16    BY MS. PARFITT:
17        Q   But you have performed --
18        MS. BROWN:  Let him answer, please.
19        MS. PARFITT:  Sure.
20        THE WITNESS:  That I performed, yes.
21    BY MS. PARFITT:
22        Q   All right.  So in your carrier as a
23    medical doctor, you have published cohort studies?
24        A   I have.
25        Q   What have been the general topics of
```

36 (Pages 138 to 141)

Gregory B. Diette, M.D.

1   those cohort studies?
2       A   Generally speaking, things related to
3   respiratory diseases and -- and things people
4   inhale.
5       Q   All right.  Have you published case-
6   control studies?
7       A   I don't know.  I can't think of one.  It
8   doesn't mean that there isn't one, but I'm -- I
9   can't think of a case-control study.
10      Q   All right.  Is it fair to say that none
11  of the published cohort studies address the issue
12  of talcum powder products and ovarian cancer?
13      A   Correct.
14      Q   And is it fair to say that none of the
15  cohort studies that you published address the
16  issue of talcum powder products and mesothelioma?
17      A   Correct.
18      Q   Is it fair to say that none of the
19  cohort studies that you have published address the
20  issue of asbestos and mesothelioma?
21      A   Correct.
22      Q   Is it fair to say that -- that the
23  majority of your publications in your -- listed in
24  your curriculum CV and those that you said you
25  have published since 2017 deal primarily in the

1   research interests of lung disease, COPD,
2   asthma --
3           MS. BROWN:  Objection --
4   BY MS. PARFITT:
5       Q   -- pulmonary medicine, lung diseases?
6           MS. BROWN:  Objection to the form.
7           THE WITNESS:  There's certainly plenty
8   there.  You know, I get different feedback from
9   different people who look at my CV to tell whether
10  or not it's, you know, all that or whether there's
11  other things.  I think people read into it what
12  they -- what they see.  Because there's -- you
13  know, there's ICU research topics, there's
14  procedure-related topics, there's radiology
15  topics.  I mean there's all -- all sorts of
16  different things besides those.
17  BY MS. PARFITT:
18      Q   Okay.  Do you publish on methods and
19  methodology?
20          MS. BROWN:  Form.
21          THE WITNESS:  So I think there's a
22  couple of methods -- methods related papers.
23  BY MS. PARFITT:
24      Q   Papers that deal primarily with
25  epidemiological methodology?

1           MS. BROWN:  Wait.  Hold on.  Is that a
2   question?
3           MS. PARFITT:  Mm-hmm.
4           MS. BROWN:  I didn't understand that.
5           If you understood it, you can answer.
6           THE WITNESS:  Well, the papers I was
7   thinking about had to do with methods and
8   quality -- quality assessment in terms of
9   healthcare.
10  BY MS. PARFITT:
11      Q   Okay.
12      A   I don't know if I've published anything
13  on epi methods, meaning like, you know, the topic
14  of a case-control study or --
15      Q   Right.
16      A   -- cohort studies, things of that sort.
17      Q   So it would be fair to say that you have
18  not published in a peer-reviewed journal a paper
19  on study designs, correct?
20          MS. BROWN:  Objection to the form.
21          THE WITNESS:  I would have to look back
22  and see.  I mean it's -- it's possible I've been
23  involved in something that -- that -- I mean it's
24  just hard to remember.  It's 200 plus papers,
25  so --

1   BY MS. PARFITT:
2       Q   Right.  So nothing you can remember
3   today.
4       A   Correct.
5       Q   Okay.  And have you published on the
6   Bradford Hill factors?
7           MS. BROWN:  Form.
8           MR. LOCKE:  Objection.
9           THE WITNESS:  So I've not written a
10  paper about Bradford Hill.
11  BY MS. PARFITT:
12      Q   All right.  In any of the 200 papers
13  that you have published in a peer-reviewed
14  journal, do you set forth in those papers the
15  Bradford Hill framework?
16          MS. BROWN:  Objection to the form of the
17  question.
18          THE WITNESS:  You couldn't do it.
19  Right.  I mean, it's -- the papers that I write
20  are primary research papers, and that framework
21  doesn't belong in those papers, but we articulate
22  the -- the issues that are -- that are relevant
23  for a Bradford Hill analysis.
24  BY MS. PARFITT:
25      Q   Okay.  Well, in this expert report that

37 (Pages 142 to 145)

Gregory B. Diette, M.D.

Page 146

1    you did file in the federal court, you stated
2    specifically that you followed the Bradford Hill
3    framework.  Do you recall saying that?
4         A   I -- I do.  There was more to it, but it
5    included that.
6         Q   Okay.  So what I'm asking you, in any of
7    the papers, whether they be cohort study, case
8    control, other research and scientific
9    publications that you've listed on your curriculum
10   vitae, have you stated in those papers that you
11   are following or are guided by the Bradford Hill
12   framework?
13            MS. BROWN:  Objection.  He just answered
14   that.
15            THE WITNESS:  Yeah, it's sort of baked
16   into what we do.  So it's like in -- I mean the
17   answer is no, generally, but -- but we include
18   things in a way that they fit with what Bradford
19   Hill considerations are.  But there's not one that
20   was called like the Bradford Hill approach or
21   something.
22   BY MS. PARFITT:
23        Q   Okay.  And by --
24            MS. BROWN:  Let him finish.
25            Were you finished, Doctor?

Page 147

1            THE WITNESS:  I'm okay.  Thank you.
2            MS. PARFITT:  Thank you.
3    BY MS. PARFITT:
4         Q   Assume I did a search of the word
5    "Bradford Hill" in the 167 papers that you have
6    published in the peer-reviewed journal, would it
7    surprise you if those words did not appear?
8            MS. BROWN:  Objection to the form.
9            THE WITNESS:  It wouldn't surprise me,
10   but I -- I don't know that it's not there
11   somewhere.  And I would search more broadly than
12   just those 167.  I would look at the more recent
13   ones too.  I mean I can't say that it's not there,
14   but there's not a paper about Bradford Hill.
15   BY MS. PARFITT:
16        Q   Okay.  Have you been involved in any
17   original research on asbestos in general?
18            MS. BROWN:  Objection to the form.
19            THE WITNESS:  I have not.
20   BY MS. PARFITT:
21        Q   Have you -- have you conducted any
22   original research on ovarian cancer?
23            MS. BROWN:  Objection to the form, asked
24   and answered.
25            THE WITNESS:  I guess, I mean -- is it

Page 148

1    different than what you asked?  Because I'm
2    just --
3    BY MS. PARFITT:
4         Q   It is.
5            This would be some original research
6    that you might be -- got a funding or a grant or
7    something.
8         A   I see.  Nothing like that.
9         Q   Okay.  Have you received any funds --
10   any funding or any grants to study mesothelioma?
11        A   No.
12        Q   Have you received any funding or grants
13   to study asbestos?
14        A   No.
15        Q   Have you received any funding or grants
16   to study talcum powder products and their
17   association with ovarian cancer?
18            MS. BROWN:  Objection to the form.
19            THE WITNESS:  No.
20   BY MS. PARFITT:
21        Q   Have you ever published in peer-reviewed
22   literature a causation analysis or a review
23   article asking whether an exposure causes a
24   disease?
25            MS. BROWN:  Objection to the form of the

Page 149

1    question.
2            THE WITNESS:  I don't know.  I would
3    have to look back over.  I don't -- like I don't
4    know if I would use those words "causation
5    analysis," but we certainly write -- did you say
6    review article?
7    BY MS. PARFITT:
8         Q   Yes.
9         A   So I don't write many review articles.
10   They're really -- they're really low quality
11   academic products for the most part, and so I try
12   to focus more on original research.
13        Q   All right.  Well, same question applied
14   to original research.
15            MS. BROWN:  Objection to the form.
16            THE WITNESS:  Well, it wouldn't be -- I
17   mean that wouldn't be an original research
18   article.
19   BY MS. PARFITT:
20        Q   Okay.  Have you ever performed any
21   research on the environmental impacts of talcum
22   powder products and ovarian cancer?
23            MS. BROWN:  Objection to the form,
24   vague.
25            THE WITNESS:  No.

38 (Pages 146 to 149)

Gregory B. Diette, M.D.

Page 150

1    BY MS. PARFITT:
2        Q   Environmental impacts of diseases is
3    something -- is a topic that you are interesting
4    in, correct?
5        A   I am.
6        Q   You've studied the impact of
7    environmental effects on lung diseases, correct?
8        A   I have.
9        Q   In fact, that's something you continue
10   to be interested in, correct?
11       A   I am.
12       Q   But you've not studied any environmental
13   impacts on ovarian cancer, correct?
14       A   Correct.
15           MS. BROWN:  Asked and answered.
16   BY MS. PARFITT:
17       Q   Would it be fair to say that prior to
18   being retained by Johnson & Johnson sometime in
19   2017, you had done no research on the issue of
20   talcum powder products and ovarian cancer?
21           MS. BROWN:  Objection to the form,
22   misstates his testimony.
23           THE WITNESS:  I think it's the same as
24   before.  Right.  I mean you went through each --
25   each item, and my answer was no.

Page 151

1    BY MS. PARFITT:
2        Q   So it was not until you were retained by
3    Johnson & Johnson that you conducted any research
4    on the topic of ovarian cancer and talcum powder
5    products, correct?
6            MS. BROWN:  Objection to the form,
7    misstates his testimony.
8            THE WITNESS:  That is right.
9            MS. PARFITT:  Okay.  And is now a good
10   time for a bio break or is it --
11           MS. PARFITT:  Sure.
12           THE WITNESS:  If you're in the middle of
13   something, I --
14           MS. PARFITT:  No, no, this is fine.
15   We'll just move into another area quickly, yeah.
16           THE VIDEOGRAPHER:  The time is
17   11:14 a.m., and we're going off the record.
18           (Recess.)
19           THE VIDEOGRAPHER:  The time is
20   11:24 a.m., and we are back on the record.
21   BY MS. PARFITT:
22       Q   All right.  Dr. Diette, I want to talk
23   for a moment about Medical Science Affiliates.
24   All right?
25       A   Okay.

Page 152

1        Q   And to give you some -- a reference,
2    we'll spend a little time on that before we get
3    into your report.  All right?  Fair?
4        A   Sounds good.
5        Q   Okay.  What is Medical Science
6    Affiliates?
7        A   I think they -- they call themselves an
8    environmental consulting company.
9        Q   How long have you been involved with
10   Medical Science Affiliates?
11           MS. BROWN:  Form.
12           THE WITNESS:  So involved, I guess we'll
13   have to sort, but I -- I've known about them and
14   done some work with them for about ten years.
15   BY MS. PARFITT:
16       Q   Okay.  And I too want to sort, so let me
17   ask you this:  When were you first introduced to
18   Medical Science Affiliates?
19       A   Well, I guess if it's ten years, it
20   would have been about ten years ago.
21       Q   And what were -- how did it come about
22   that you learned of a group called Medical Science
23   Affiliates?
24       A   There was a woman who worked there
25   then -- I don't remember what her name is, she's

Page 153

1    not there anymore -- and she knew a colleague of
2    mine, and they were I think at the time looking
3    for somebody to take on an epidemiology project, a
4    review.  And so he -- he sent around like a note
5    or talked to us, I don't remember how he did it,
6    but to see if anybody was interested in -- in
7    doing an epidemiology project.
8        Q   Who was that colleague?
9        A   I think it was Hank Fessler, but I could
10   be wrong.  That's a while ago.
11       Q   And what is his position within the
12   university?
13       A   He works in pulmonary.
14       Q   Okay.  So you were -- you were then
15   engaged by Medical Science Affiliates to do an
16   epidemiological report for them?
17           MS. BROWN:  Objection.  Misstates
18   testimony.
19           THE WITNESS:  I don't know about
20   engaged.  I mean my -- my relationship is as an
21   independent contractor.  So it's like -- it's not
22   like I have an agreement to do anything with them
23   or for them.  But that's -- that's the place
24   where, you know, they organize the materials for
25   me to look over and to -- and to do the

39 (Pages 150 to 153)

Gregory B. Diette, M.D.

Page 154

1  epidemiological review.
2  BY MS. PARFITT:
3      Q   Okay.  Your counsel has objected, as you
4  heard, to me obtaining a copy of your agreement,
5  so I'm going to have to ask you a few more
6  questions about this.
7          What is your arrangement with Medical
8  Science Affiliates?  Independent contractor?
9      A   That's exactly right.
10         MS. BROWN:  He just said it.
11         MS. PARFITT:  Okay.  I understand.  You
12  can take your own deposition, Counsel.  It's going
13  to show up on the record too, you're rubbing your
14  head.
15  BY MS. PARFITT:
16     Q   Medical Science, you have an independent
17  contract relationship, to do what?
18     A   I think what it establishes is that I
19  can use their administrative services as kind of
20  like an outside office for me to do work.
21     Q   Okay.  So that's one role, they're an
22  outside office.  You mentioned, though, that they
23  contracted you to also write an epidemiology
24  report.  Correct?
25     A   It's --

Page 155

1          MS. BROWN:  Objection to the form.
2          THE WITNESS:  It's incorrect.
3  BY MS. PARFITT:
4      Q   Okay.  Straighten it out for me.
5      A   Well, they didn't contract me to do
6  anything.  They asked if I was interested in doing
7  this epidemiologic project for a client that they
8  knew of.
9      Q   Okay.  That helps me.
10         So Medical Science Affiliates reached
11  out -- requested that you do an epidemiological
12  report for one of their clients.
13     A   Exactly right.
14     Q   Okay.  Over the course of ten years that
15  you've been affiliated as an independent
16  contractor with Medical Science Affiliates, how
17  many times have you prepared a report for one of
18  Medical Science Affiliates' clients?
19     A   I don't know.
20     Q   More than ten?
21     A   Sure.
22     Q   More than a hundred?
23     A   A hundred would be pushing it.  So
24  something in the tens, I would say.  But not ten.
25  I mean something higher up in --

Page 156

1      Q   More 50?
2      A   At least 50.
3      Q   Okay.  And what has been the topic of
4  those reports that you have prepared for Medical
5  Science Affiliates' clients?
6          MS. BROWN:  And I'm going to jump in
7  here.  To the extent that those projects are
8  governed by confidentiality agreements, I would
9  ask Dr. Diette that you only disclose that which
10  has been disclosed publicly, for example, in court
11  or at a deposition.
12         MS. PARFITT:  Please stop coaching the
13  witness.
14  BY MS. PARFITT:
15     Q   Can you answer?
16         MS. BROWN:  We're trying to protect
17  confidentiality.
18         MS. PARFITT:  I get --
19         MS. BROWN:  I'm instructing him on
20  privilege.
21         MS. PARFITT:  That's fine.  I
22  understood.  He can talk now.
23         THE WITNESS:  So I would say that most
24  of the work is in the context of what Ms. Brown
25  said, which is that it wasn't for me to share with

Page 157

1  other people.
2  BY MS. PARFITT:
3      Q   All right.  Is J&J a client of Medical
4  Science Affiliates?
5      A   I don't know what their relationship is,
6  like I don't know if you would call them a client
7  or not.
8      Q   Okay.  Does Medical Science Affiliates
9  do some work for Johnson & Johnson?
10         MS. BROWN:  Objection.  Speculation.
11         THE WITNESS:  So I can tell you about
12  what they do for me with regard to Johnson &
13  Johnson.  I don't know about anything else.
14  BY MS. PARFITT:
15     Q   All right.  Tell me what you know.
16     A   Well, like, for example, like in the
17  cases that we've discussed that involve Johnson &
18  Johnson, they've provided a service by collecting
19  the materials, right.  So, for example, like when
20  you see that list of materials that -- that I
21  provided that I reviewed, they will collect those
22  and -- and organize them for me.
23         If there's a need to have a meeting or a
24  phone call, they'll help to set that up, right, so
25  that -- so, for example, for the deposition today,

40 (Pages 154 to 157)

Gregory B. Diette, M.D.

Page 158

1  they were able to help sort my -- through my
2  schedule, you know, with me, and figure out a day
3  or days, I don't remember what we offered, things
4  of that sort. They'll prepare invoices on my
5  behalf. They'll help edit a report. You know,
6  administrative type things.
7      Q   Okay. Let's break that down a little
8  bit.
9          Is it your understanding that Medical
10 Science Affiliates bills Johnson & Johnson --
11         MS. BROWN: Object --
12 BY MS. PARFITT:
13     Q   -- and invoices them for work?
14         MS. BROWN: Objection to the form, calls
15 for speculation.
16 BY MS. PARFITT:
17     Q   If you know.
18     A   I don't know where the bill goes because
19 I don't know if it goes to the law firm. Like if
20 it matters to you whether it's directly to Johnson
21 & Johnson or -- I mean I can only guess that, you
22 know, the law firm is not going to pay the bill
23 out of their own pocket. They're probably going
24 to then invoice Johnson & Johnson, but I don't
25 know whether the bill goes directly to Johnson &

Page 159

1  Johnson or whether it goes to the law firm.
2      Q   All right.
3          MS. BROWN: And, Doctor, counsel doesn't
4  want you to guess, so just answer the question the
5  best --
6  BY MS. PARFITT:
7      Q   Dr. Diette, if they -- Medical Science
8  Affiliates collects material for you -- as you say
9  they did, correct?
10     A   That's correct.
11     Q   -- do they bill you or do they bill
12 someone else?
13         MS. BROWN: Objection to the form.
14         THE WITNESS: They bill someone else.
15 BY MS. PARFITT:
16     Q   Okay. So when you testified that J&J --
17 excuse me, when you testified that you had
18 assistance with regard to the preparation of some
19 of the materials that accompany your report, that
20 was work that you contracted with Medical Service
21 Affiliates to do, and they didn't bill you, they
22 billed somebody else, correct?
23         MS. BROWN: Objection to the form.
24         THE WITNESS: I don't know if
25 "contracted" is right, but -- but they did what

Page 160

1  you said, which is that they billed somebody else
2  for the work that they did.
3  BY MS. PARFITT:
4      Q   Do you know who that somebody else is?
5  And I want to remind you you're under oath,
6  Dr. Diette.
7          MS. BROWN: What --
8          THE WITNESS: What's --
9          MS. BROWN: Whoa, whoa, whoa. I'm
10 objecting to the implication there. Dr. Diette
11 has done nothing but testify truthfully today.
12         MS. PARFITT: Counsel, objection, form.
13 I'm telling you.
14 BY MS. PARFITT:
15     Q   Please go on, Dr. Diette.
16         MS. BROWN: No, but what you just said
17 is inappropriate --
18         MS. PARFITT: It was not --
19         MS. BROWN: -- and it violates both the
20 federal rules --
21         MS. PARFITT: -- violative of anything,
22 Counsel.
23         MS. BROWN: -- as well as deposition
24 protocol. He of course is testifying under oath,
25 and if you're suggesting something otherwise,

Page 161

1  that's wildly inappropriate.
2          MS. PARFITT: Counsel, let the Court
3  decide if it's -- I think the Court might decide
4  that your objections and your manner today are
5  wildly inappropriate.
6  BY MS. PARFITT:
7      Q   So, Dr. Diette, so we can move forward,
8  do you remember the question?
9      A   I remember it, but I think I already
10 answered it. It's -- I don't have a better answer
11 than what I gave you before.
12     Q   You don't know who Medical Science
13 billed for the services they rendered to you?
14     A   Well, let's look at the invoice if we
15 want to. If it's on the top of that, then I
16 might --
17     Q   It's been blacked out, Dr. Diette.
18     A   So it's either a law firm or it's
19 Johnson & Johnson. I don't know whether it's one
20 or the other.
21         MS. BROWN: Counsel, you're
22 misrepresenting the documents. It's very clear
23 who they sent the bill to on the face of the
24 invoice, and it has not been redacted for
25 work-product privilege.

41 (Pages 158 to 161)

Gregory B. Diette, M.D.

Page 162

BY MS. PARFITT:

Q   What I want to understand, for purpose of the expert report you prepared in this litigation, I want you to tell me, if you will, every service that Medical Science Affiliates performed for you.

A   I don't think I can give you a full list. I think that the -- go ahead.

Q   No, no, please, go ahead.

A   All right. So I think the category of things that I told you about here are the kinds of things that they -- that they did in this case. I don't know if I mentioned like arranging like a phone call. Like if I was going to have a phone call, they would arrange that. Help with -- I already talked about editing -- editing reports and -- I can't think of another service they did, but that's what I can think of right now.

Q   Okay. Did Medical Science Affiliates research the scientific literature for you in preparation for some of the information contained in your expert report?

A   I don't -- I don't think they did any of that. I mean, they've -- they've done searches in the past on other -- other topics, but I don't

Page 163

think they did any for this.

Q   All right. So it's your testimony that in the talcum powder/ovarian cancer case, they did not do any research of the peer-reviewed literature; is that correct?

A   Well, let me be clear, when you talk about talcum powder and ovarian cancer -- because I have to think back with each -- you know, each case or whatever, but we're talking about this particular matter as you're asking these questions or --

Q   Well, that's a -- that's a great point. You got involved in talcum powder and ovarian cancer cases sometime in 2017. That's your testimony.

A   It is.

Q   All right. So at that point in time when you became engaged to work on talcum powder products and ovarian cancer, what I'm interested in knowing is whether or not, whether it was for this report, another report, has Medical Science Affiliates done any research work of the literature on this topic?

A   And by "research work," does that -- do you mean like finding papers or does it mean doing

Page 164

something else with the papers?

Q   I'll break it down. Did they do a literature search for you?

A   Yeah, and that's what I don't remember. So I'm just saying that they've done that at my request in the past. But not -- not too much. I mean it's actually not that helpful, because I -- I find it easier to do it myself.

Q   Whether it was helpful or not, my question is, did Medical Science Affiliates do any literature research for you in -- on the topic of talcum powder products and ovarian cancer?

A   I can't give you a better answer. I mean I -- I think it sounds to me like you keep asking the same thing, and it -- my answer is I'm not -- I'm not sure. Like they may have gathered a couple of papers, I don't remember if they did or not. They certainly didn't do the search, like I didn't commission anybody to do like -- like the search.

Q   Okay. And how would they deliver that information to you? Do they e-mail it to you? Do they send it to you? What happens?

A   It depends upon how I ask. So it can come as a binder, like the binder you have in

Page 165

front of you, it could like that, and be hard copies. It could be through, you know, an electronic mechanism, if there were something to share that way.

Q   All right. Did Medical Science Affiliates summarize any of those depositions that you have listed in your report?

A   I don't -- do I have -- I don't think -- do I have deposition summaries?

Q   No.

A   Oh, then no.

Q   You have depositions.

A   Then the answer is no.

Q   Okay. Now, what you've provided me are reports and depositions of various experts either for Johnson & Johnson or for the plaintiff that you've indicated you've -- you've put them on your reliance list.

And what I'm questioning is whether or not you've had any summaries done of those reports by Medical Science Affiliates.

A   No.

Q   Okay. Have they done any summaries of any type of information for you in the talcum powder products and ovarian cancer?

Gregory B. Diette, M.D.

Page 166

1     MS. BROWN:  And, Counsel, here I'm going
2  to interject, and to the extent your question --
3     MS. PARFITT:  Objection.  Form.
4     MS. BROWN:  -- seeks to -- I'm
5  instructing on privilege, which I'm allowed to do
6  under the federal rules and under the --
7     MS. PARFITT:  If it's a privilege
8  issue --
9     MS. BROWN:  -- let me do that.
10     MS. PARFITT:  -- it's certainly fine.
11     MS. BROWN:  Thanks.  So my instruction
12  here will be that, Doctor, you are not under the
13  work-product privilege to disclose any
14  correspondence you've had with MSA, unless it is
15  something on which you rely for your opinions
16  here, and then of course, counsel is entitled to
17  have that information.
18  BY MS. PARFITT:
19     Q   With that understanding, how do you
20  answer the question?
21     A   Can you say it again because I think I
22  lost it?
23     Q   Sure.  Let me just have it read back to
24  you here.
25          Has Medical Science Affiliates done any

Page 167

1  summaries of any type of information for you -- or
2  provided any information for you on the talcum
3  powder products and ovarian cancer cases?
4     MS. BROWN:  Same instruction.  If you're
5  relying on anything they've done, of course,
6  please answer the question.
7     THE WITNESS:  So if we're talking about
8  cases -- because that's why I clarified before,
9  we're not talking about this matter.  We're
10  talking about ever in any -- in any case?
11  BY MS. PARFITT:
12     Q   Ovarian cancer and talcum powder
13  products.
14     A   Oh, yeah.  No, I understand the words.
15  I'm just trying to make sure whether we're talking
16  about like this -- this matter that we're talking
17  about only or -- or beyond that.
18     Q   Has -- has -- beyond that.
19     A   So I'm going to say probably they have.
20  That if there are cases where there were like
21  medical records, for example, although I don't
22  think I've gotten any medical records, but they
23  would have provided a summary.  If there were
24  deposition transcripts in those other cases, they
25  might well have -- have done that.

Page 168

1     Q   Did you use for purposes of your expert
2  report any of the summaries that were -- that were
3  conducted by Medical Science Affiliates that you
4  just spoke about?
5     A   See, this is where I -- I don't know if
6  you're trying to confuse me or what, but --
7     Q   No, I'm not.
8     A   Okay.  So I just want to be clear,
9  because there aren't any summaries for this,
10  right.
11     Q   Okay.
12     A   So -- and that's why I keep trying to --
13  I just -- because there's a different answer for
14  what -- what people have done in other matters and
15  what they've done in this matter.  There aren't
16  any summaries that I'm aware of to -- to look at.
17     Q   All right.  Did Medical Science
18  Affiliates help you write your expert report?
19     MS. BROWN:  Objection to the form of the
20  question.
21     THE WITNESS:  You know, "write" is a --
22  is a word that can mean a lot of things.  They
23  helped me to -- to shape it, like to create the --
24  the format for it and like edit out typos and
25  things of that sort.

Page 169

1  BY MS. PARFITT:
2     Q   Okay.  Well, that has -- it means a lot
3  of things as well.  So let me ask you --
4     MS. BROWN:  Counsel, just ask the
5  question.
6     MS. PARFITT:  Counsel, I'm -- please.
7     MS. BROWN:  You can't editorialize like
8  that.  It's a question and an answer.
9  BY MS. PARFITT:
10     Q   Dr. Diette, what I would like to ask you
11  is, when you say they helped shape your report,
12  what do you mean they helped shape your report?
13     MS. BROWN:  Objection.
14     THE WITNESS:  What I just said -- I mean
15  what I said after -- after that before.
16  BY MS. PARFITT:
17     Q   Is every word in your expert report that
18  you have there in front of you a word that you put
19  in it?
20     MS. BROWN:  Objection to the form.
21     THE WITNESS:  Well, I don't know.  I
22  mean, there's -- there's quotes from people,
23  right, so that those aren't my words, for example.
24  BY MS. PARFITT:
25     Q   Well, you know, I'm glad you brought

43 (Pages 166 to 169)

Gregory B. Diette, M.D.

Page 170

1   that up.  That's a good question.
2       A   Yeah.
3       Q   Are the opinions and the writings
4   contained in that report words that you selected?
5       A   Oh, for sure.  I mean like the opinions
6   and my -- my summaries of things and -- is that
7   what we're talking about?
8       Q   No.  No.
9       A   We're not?  All right.
10      Q   The report is about -- let's see how
11  many pages -- it's about 51 pages long, and the
12  question I have, with the exception of quotes from
13  other people, Dr. Diette, is every word in this
14  report a word you chose to put in there?
15          MS. BROWN:  Objection to the form.
16          THE WITNESS:  For sure, yes.  Although
17  like some of the words, for example, I think might
18  come from one of those affidavits that we were
19  talking about, right.  So it may be like, you
20  know, words that I created in a different context
21  and then pulled into this.
22  BY MS. PARFITT:
23      Q   Okay.  Well, then when you say "Medical
24  Science Affiliates helped shape," I'm trying to
25  get an understanding, what do you mean "shape"?

Page 171

1       A   It would look like a disaster if I did
2   this myself.  So the fact that there are headings,
3   that, you know, things don't spill over from one
4   page to another.  I don't remember if there's a
5   table in here, but to not have the table split
6   across, to have, you know, references look okay.
7   That I'm not good at.  So the fact that this, in
8   my view, looks like a professional product, that's
9   what they -- that's what they've done for me is to
10  make it look like that.
11      Q   Okay.  There are multiple footnotes in
12  your report to testimony of various experts that
13  were retained by the plaintiff.
14      A   Yeah.
15      Q   Who prepared those footnotes?
16          MS. BROWN:  Objection to the form.
17          THE WITNESS:  Staff somewhere, but --
18  BY MS. PARFITT:
19      Q   I'm sorry.
20      A   Staff.
21      Q   Staff?
22      A   Yes.
23      Q   What staff?
24      A   I don't know which staff did it, but I
25  mean like the -- if you say who prepared the

Page 172

1   footnotes, like the information that comes from it
2   was information that I pulled from the --
3       Q   Not my question.  Who prepared the
4   actual footnotes that appear at the bottom of your
5   expert report of 58 -- or, excuse me, 51 pages?
6       A   So like actually put like -- like 110
7   and then put like "Siemiatycki dep, 149"?
8       Q   Or how about put "226, Singh depo, don't
9   consistently reduce," and there's a summary, I
10  mean who provided that information, what staff?
11          MS. BROWN:  Objection to the form.
12  Misstates his testimony about how the report was
13  prepared.
14          THE WITNESS:  I'm sorry.  We're looking
15  at number 226.
16  BY MS. PARFITT:
17      Q   By way of example, Dr. Diette.
18      A   No, no, I'm just -- I'm just trying to
19  help because an example helps.
20          So I don't know.  I mean some -- some
21  staff person put that particular -- literally that
22  segment in, but like it came from me identifying
23  that NSAIDS don't consistently reduce the risk of
24  ovarian cancer and wanting to link it there to my
25  statement.

Page 173

1       Q   Who's the staff?  Staff for MSA?
2       A   It could be MSA; it could be the law
3   firm.  I'm not sure which.
4       Q   Did you dictate to MSA or anyone else
5   portions of your expert report, and someone else
6   then did the recordation?
7       A   Somebody else did the --
8       Q   Did the -- did --
9       A   The --
10      Q   Did you dictate any portions of your
11  report to anyone?
12      A   I don't -- I don't do that.
13      Q   You don't dictate.  Okay.
14      A   No.
15      Q   Did you spend time on the phone with
16  anyone at MSA and discuss what your -- your report
17  should look like?
18          MS. BROWN:  And again, I'm going to
19  instruct on work product, that you not reveal the
20  substance of any discussions you had regarding
21  drafts of this report.  Whether or not there was a
22  conversation is an appropriate question to answer.
23          THE WITNESS:  Sure.
24  BY MS. PARFITT:
25      Q   You did?

44 (Pages 170 to 173)

Gregory B. Diette, M.D.

Page 174

1    A   Yes.
2    Q   So you had a conversation --
3    A   Yes.
4    Q   -- about the substance of your report,
5    correct?
6        MS. BROWN:  Objection to the form.
7        THE WITNESS:  Oh, no, you just -- you
8    said something else before that.  What was the
9    question before?
10       MS. BROWN:  Discuss what your report
11   should look like.
12       THE WITNESS:  Yeah, that's different.
13   BY MS. PARFITT:
14   Q   Okay.
15   A   You changed it to "substance."  But I
16   mean what it should look like is what I'm talking
17   about.  It was -- it should look good, right?  And
18   so there should be like, you know, bold headings
19   and there should be spaces where they belong.
20   Q   What's the name of the contact person
21   you interfaced with at MSA?
22   A   My main one is Maddie Petta --
23   Pettenati.
24   Q   Okay.  And how long have you worked with
25   Maddie Pettenati?

Page 175

1    A   A couple of years.
2    Q   Okay.  Do you work with anyone else over
3    at MSA to help you with your reports?
4    A   Oh, sure.
5        MS. BROWN:  Objection to the form.
6        THE WITNESS:  Yeah.
7    BY MS. PARFITT:
8    Q   Who?
9    A   There's a woman named April, Shannon.
10   I'm sure there's others too.
11   Q   What are their backgrounds?
12       MS. BROWN:  Objection to the form.
13       THE WITNESS:  Everybody has a -- a
14   science background of some sort, like biology
15   degrees, things of that sort.
16   BY MS. PARFITT:
17   Q   Okay.  How much time did you spend with
18   the folks at -- the team at MSA for purposes of
19   getting your report put together?
20   A   I don't know.  I mean, what do you mean
21   by "with"?
22   Q   Well, we know you've had conversations.
23   We know that you have received information with
24   regard to shaping your report, and what I want to
25   know is, how much time did you spend with the team

Page 176

1    at MSA to help you get your report in order?
2        MS. BROWN:  Objection to the form,
3    misstates the testimony.
4        THE WITNESS:  I don't recall the amount
5    of time.  I mean whatever it took.  Like some of
6    it might be like a two-minute conversation to say
7    like, you know, I want to move a section down or
8    something.  Or, you know, Can you proofread that
9    particular paragraph and look for typos?  And
10   things of that sort.
11   BY MS. PARFITT:
12   Q   Did any of the folks at MSA make any
13   suggestions with regard to the scientific or
14   medical content of your report?
15       MS. BROWN:  Objection.  Instruct not to
16   answer on work product.  You can discuss -- you
17   can answer the question of whether you had any
18   conversations, the substance of which is
19   privileged, and I'll instruct you not to answer.
20       MS. PARFITT:  MSA is a third-party
21   contractor from what I'm understanding.
22       MS. BROWN:  No different than if he was
23   working with a secretary to format this.
24   Conversations about drafts of the report are
25   privileged and will not be discussed.

Page 177

1    BY MS. PARFITT:
2    Q   Doctor, if you can answer the question.
3    Can you say it again?  I'm sorry.
4    Q   Sure.  No worries.  I'm just getting it
5    here.
6        Did any of the folks at MSA make any
7    suggestions with regard to the scientific or
8    medical content of your report?
9        MS. BROWN:  I'm instructing you not to
10   answer that question under the work-product
11   privilege.
12   BY MS. PARFITT:
13   Q   Do you keep time records of the time you
14   spend with MSA?
15   A   No.
16   Q   Okay.  Well, I believe you testified at
17   the beginning of your deposition that your charge
18   per hour is $485, correct?
19   A   Well, I was trying -- I was trying to
20   make you understand that differently, and you said
21   we would talk about it, so maybe we can.  My
22   charge is $400 an hour.
23   Q   All right.  Where does the 485 come
24   from?
25   A   It's what I said before, right.  They

45 (Pages 174 to 177)

Gregory B. Diette, M.D.

Page 178

1  add $85 when they bill somebody for my time.
2      Q  Who "they"?
3      A  MSA.
4      Q  "They," MSA?
5      A  Yeah.
6      Q  All right.  So that I get it straight,
7  you charge 400 -- $400 for your time, correct?
8      A  Correct.
9      Q  And then your understanding is MSA
10  charges an additional $85 to someone for their
11  assistance for you, correct?
12      MS. BROWN:  Objection to the form, calls
13  for speculation.
14      THE WITNESS:  So it's -- I don't know --
15  I don't know how they break it down, because they
16  bill for different things, like they bill for
17  photocopying, they bill for some administrative
18  tasks separately.  Whatever it is, it's their
19  business model, and they -- they add that amount
20  to the hourly rate.
21  BY MS. PARFITT:
22      Q  How much did Medical Science bill for
23  their work, do you know?
24      MS. BROWN:  Objection.  Calls for
25  speculation.

Page 179

1      THE WITNESS:  You can tell if we look at
2  the -- the invoices.
3  BY MS. PARFITT:
4      Q  Okay.  They would bill the same number
5  of -- well, let me ask for a clarification.  Not
6  all your work was done in conjunction with the
7  assistance of Medical Science Affiliates, correct?
8      MS. BROWN:  Objection to the form.
9      THE WITNESS:  I mostly sat by myself.
10  Yeah.
11  BY MS. PARFITT:
12      Q  Okay.  So the invoices that I have for
13  you would not necessarily reflect all of the work
14  that Medical Science Affiliates afforded you,
15  correct?
16      A  That's incorrect.
17      MS. BROWN:  Objection to the form.
18  BY MS. PARFITT:
19      Q  Okay.
20      A  I mean that's what I was trying to offer
21  you earlier is to try to understand the -- the
22  bills.  Because also when you add that comment
23  about the amount of money in total, it wasn't all
24  money that goes to me.
25      Q  Yeah.  The bills that I have have a date

Page 180

1  and basically an amount.  I don't have --
2      A  Like it --
3      Q  -- it's been blacked out.
4      A  It doesn't matter.  I can still --
5      MS. BROWN:  It's been redacted for work
6  product.
7      THE WITNESS:  I mean I can help you
8  understand it if you want.
9  BY MS. PARFITT:
10      Q  All I really want to understand and get
11  a better understanding, Dr. Diette, is the types
12  of services that MSA provided you in order to
13  file this -- prepare this report.
14      A  Yeah, I -- I listed those.
15      Q  Okay.  Do they help you with all of your
16  expert reports?
17      A  In what?
18      Q  Does MSA provide any type of service in
19  any and all expert reports that you prepare in the
20  context of litigation?
21      A  No.
22      Q  Okay.  Do you have another go-to service
23  to help you with the preparation of your expert
24  services?
25      MS. BROWN:  Objection to form.

Page 181

1      THE WITNESS:  No.  I do stuff on my own
2  as well.
3  BY MS. PARFITT:
4      Q  All right.  So there are cases where
5  you've done the work by yourself, and there are
6  cases like this particular case where you engage
7  the services of MSA, correct?
8      A  That is --
9      MS. BROWN:  Objection to the form.
10      THE WITNESS:  -- correct.
11  BY MS. PARFITT:
12      Q  Okay.  And did MSA edit any of your --
13  any of your -- did MSA edit your expert report?
14      A  Yeah.
15      Q  Okay.  What kind of edits did they make?
16      A  Well, all sorts.  Like I asked them to
17  look for typos, for example.
18      Q  Right.
19      A  I just happen to be open to page 30 and
20  31, and where you see that the -- there's like
21  bulleted sections, when I wrote that, it was just
22  one long impenetrable paragraph, and so they were
23  nice enough to sort of break it into some chunks
24  so it would be easier to read.
25      Q  Okay.  Bear with me if I asked this

46 (Pages 178 to 181)

Gregory B. Diette, M.D.

Page 182

1  before, but did MSA ever suggest any new sentences
2  or study that you didn't previously insert in your
3  paper?
4      A   I doubt a new study.  It could be -- I
5  mean we worked -- we worked pretty hard to make
6  sure that I have the full list of studies, you
7  know, acknowledged, and so if there was something
8  I left off -- I mean I don't remember this
9  specifically for this, but that would be a normal
10 practice, right, like which is to say, you know,
11 Oh, I saw in your list of papers that there's a
12 Smith paper, should that be on here?  Not them
13 going out and saying, Oh, I found a Smith paper,
14 would you like that on there?
15     Q   But they might looked at yours and say,
16 You -- you missed a study.  Fair?
17     A   Oh, sure.
18         MS. BROWN:  Objection to the form.
19         THE WITNESS:  Yeah.
20 BY MS. PARFITT:
21     Q   Okay.  And they might look at your
22 report and say, You missed --
23         I think what I'm getting at, Dr. Diette,
24 you described their efforts as generally
25 editorial.  Is that fair?

Page 183

1          MS. BROWN:  Objection to the form.
2          THE WITNESS:  I would say administrative
3  and editorial.
4  BY MS. PARFITT:
5      Q   Okay.  So we can agree that it's both
6  administrative and editorial?
7          MS. BROWN:  Objection to the form.
8          THE WITNESS:  Correct.
9  BY MS. PARFITT:
10     Q   And as I appreciate, in addition to
11 perhaps providing you with a study or two that --
12 or three, however number, that you might have
13 omitted, is there anything substantive like that
14 that they did for you for purposes of your expert
15 report?
16     A   I insist that they don't.  I tell them
17 that I don't want any intellectual input into
18 the -- to the stuff that we're working on.  Like I
19 don't want their -- I don't even know if they have
20 opinions, but I don't want their opinions.  I
21 literally want this to look like a professional
22 product, and I want to get it done in a way that I
23 can still spend my time -- my other professional
24 time on other things.  So if I were to try to make
25 this look like this, it would take me forever.

Page 184

1      Q   And I'm not concerned about the format.
2  What I'm concerned about is the substance,
3  Dr. Diette, as you can appreciate.
4          MS. BROWN:  Objection.
5  BY MS. PARFITT:
6      Q   And so what I'm trying to -- to get some
7  clarity here is that, other than perhaps providing
8  you a study that you may have omitted from your
9  report, is there anything else that falls more in
10 the substantive area that they provided and
11 offered for you?
12     A   I -- I think I've answered as best I
13 can.
14     Q   Well, why don't we -- let's talk about
15 your contact with J&J.  When did they first reach
16 out to you to talk with you about being an expert
17 to defend them in these lawsuits?
18         MS. BROWN:  Objection to the form of the
19 question.
20         THE WITNESS:  So they never asked me to
21 defend them.  They -- they asked me to evaluate
22 the epidemiologic literature.
23         And just to be clear, because it seemed
24 like it was tripping us up before trying to talk
25 about this, when I talk about J&J, it's lawyers

Page 185

1  that are working with J&J as opposed to somebody
2  from J&J per se.  And so I'll leave it to you guys
3  to sort out what that -- what that means.
4  BY MS. PARFITT:
5      Q   Fair enough.
6      A   But -- but the first time would have
7  been a lawyer back in 2017 who asked if I would be
8  interested in reviewing the epidemiologic
9  literature.
10     Q   Who was that lawyer?
11     A   Jonathan Cooper.
12     Q   Okay.  Now, at the time that Jonathan --
13 or Jonathan Cooper contacted you, did you -- were
14 you working with MSA?
15     A   Obviously, because I said ten years,
16 and, you know, this was 2017.
17     Q   Okay.  Did you share with Jonathan
18 Cooper that you worked with this MSA company to
19 help you prepare your expert reports?
20     A   He knew about it already, because I
21 think the reason he reached out to me is because
22 he was impressed with the work I had done in
23 other -- other cases.
24     Q   Okay.  Well, when he -- when you say he
25 was impressed with you, with the work that you've

47 (Pages 182 to 185)

Gregory B. Diette, M.D.

Page 186

1    done, when he -- let me explore that a little bit.
2          When he called you, did you tell him
3    that you had previously worked with MSA to help
4    you with your expert reports?
5        A    I didn't have to.
6        Q    He knew that.
7        A    Yes.
8        Q    Okay.  How would Mr. Cooper have known
9    that you worked with MSA before?
10          MS. BROWN:  Objection to the form, calls
11    for speculation.
12          MR. LOCKE:  Objection.
13    BY MS. PARFITT:
14        Q    If you know.  Seems like you know.
15        A    Oh, I do.  We had -- he and I had worked
16    together on other cases.
17        Q    Okay.  What other cases did you work
18    with Mr. Cooper on?
19        A    They were asbestos-related cases with
20    plastic or phenolics, like electrical equipment.
21        Q    Okay.  And in those cases that you
22    worked with Jonathan on -- or Mr. Cooper on, did
23    you utilize the services of MSA as well to help
24    you prepare your expert report in those cases?
25        A    I did.

Page 187

1        Q    Okay.  Has MSA reached out to you and
2    engaged or asked if you would engage in assisting
3    them on any other projects currently?
4        A    What do you mean by "currently"?
5        Q    Well, are you working with MSA on any
6    other projects other than the talcum powder
7    products and ovarian cancer?
8        A    Yes.
9        Q    What projects?
10          MS. BROWN:  And again, Doctor, to the
11    extent that a confidentiality agreement doesn't
12    prevent you from disclosing other work that you're
13    doing, you can answer the question.
14          THE WITNESS:  Some cases that relate to
15    asbestos and other chemical-related cases.
16    BY MS. PARFITT:
17        Q    Okay.  Was there a time when you,
18    instead of receiving services from MSA, you
19    provided services to MSA as an affiliate expert?
20          MS. BROWN:  Objection to the form of the
21    question.
22          THE WITNESS:  I know they have that word
23    "affiliate" in their name.  I don't know what that
24    means.  But I don't provide services to them.
25    BY MS. PARFITT:

Page 188

1        Q    Okay.  Have they ever listed you on some
2    type of website as a consultant for legal
3    purposes?
4        A    Well, I see --
5          MS. BROWN:  Objection to the form,
6    calls for speculation.
7          THE WITNESS:  -- Mr. Finch is here and
8    he --
9          THE REPORTER:  Excuse me.
10          THE WITNESS:  Oh, sorry.
11          MS. BROWN:  Objection to the form, call
12    for speculation.  Thank you.
13          THE WITNESS:  Mr. Finch flashed
14    something up at a trial to suggest that they had,
15    but that wasn't an advertisement for me.  It was a
16    list of somebody who had credentials that were
17    similar to mine.
18    BY MS. PARFITT:
19        Q    Okay.  Well, my question is, have -- are
20    you aware of whether or not Medical Science
21    Affiliates has ever advertised your name out in
22    the -- the community as someone --
23          MS. BROWN:  Same objection --
24    BY MS. PARFITT:
25        Q    -- who was a specialist in pulmonology

Page 189

1    medicine?
2          MS. BROWN:  Same objection.
3          THE WITNESS:  I'm not aware that they
4    advertise.
5    BY MS. PARFITT:
6        Q    Okay.  So are there times that Medical
7    Science Affiliates reaches out to you and says,
8    Dr. Diette, we want you to do a medical -- a
9    scientific review for us on a topic?
10        A    Never.
11        Q    Okay.  They've never done that.  You've
12    never provided that service for them.
13        A    They -- they don't ask me to do work for
14    them.
15        Q    Okay.  Do their clients ask you to do
16    work for them?
17        A    Of course, that's where we started,
18    right, from ten years ago.
19        Q    Right.  And that's what I'm trying to
20    figure out.
21          MS. BROWN:  Let him finish.  I don't
22    think he was done.
23          THE WITNESS:  No, that was -- that was
24    the description of what I was saying, like how
25    the -- the first time that I met them was that

48 (Pages 186 to 189)

Gregory B. Diette, M.D.

Page 190

1    they -- there was some, you know, group that
2    wanted an epidemiologic review, and they were
3    trying to figure out if there were local
4    epidemiologists that could take on a task like
5    that, and so that's the way it worked.
6    BY MS. PARFITT:
7        Q   Okay.  So I now get --
8        MS. BROWN:  He is not done.
9    BY MS. PARFITT:
10       Q   Are you done, Doctor?  I thought you
11   were.
12       A   I'll be done.
13       Q   Okay.  So if I appreciate this
14   structure, so we can move on, a client, some
15   company can reach out to Medical Science
16   Affiliates and say, We need some work done and
17   research done on a particular area.  Will you do
18   that for me?
19           Medical Science Affiliates will say,
20   Yes, we can.  And then Medical Science Affiliates
21   reaches out to people like you?
22       MS. BROWN:  Objection to the form.
23       THE WITNESS:  So I don't know -- I don't
24   know when they say, Yes, we can.  Like I don't
25   know, for example -- like their -- I don't know

Page 191

1    what their size is, but they may say, Yes, we can,
2    and just do it themselves.  Right.  They have
3    other people that I don't work with that work
4    there.
5            I'm just saying, like you're asking the
6    question, so it's like -- so if somebody calls
7    them and says, Can you do this work?  They may
8    well say, Yes, we can do it.  They may or may not
9    need a content expert or methodologic expert to do
10   it.  So it -- I assume it depends, but I'm -- I'm
11   not familiar with their entire business operation.
12   BY MS. PARFITT:
13       Q   Okay.  All I'm trying to find out is --
14   is who comes to who, and from what I understand
15   your testimony is, a client will reach out to MSA
16   and say, We have a project.  MSA will determine
17   whether or not someone -- someone's expertise is
18   needed in order to complete that job, and then MSA
19   reaches out to you.  Is that fair?
20       MR. LOCKE:  Objection.
21       MS. BROWN:  Objection.  Speculation.
22       THE WITNESS:  I like the answer I just
23   gave.  I mean I think that really was my answer to
24   that exact question.
25   BY MS. PARFITT:

Page 192

1        Q   So you never work for MSA; you always
2    work for a corporate client?
3        MR. LOCKE:  Objection.
4        MS. BROWN:  Objection to the form of the
5    question.
6        THE WITNESS:  So I've never worked for
7    MSA.
8    BY MS. PARFITT:
9        Q   Who pays your bills?  Law firms?
10       MS. BROWN:  Objection to the form.
11       THE WITNESS:  So --
12       MS. BROWN:  What bills?  What are you
13   talking about?
14   BY MS. PARFITT:
15       Q   Who pays your bills for doing services
16   at the request of MSA?
17       MS. BROWN:  Objection to the form.
18   BY MS. PARFITT:
19       Q   Anybody?
20       MS. BROWN:  Objection.  Can we -- let's
21   have one question and let him answer.
22       Go ahead.
23   BY MS. PARFITT:
24       Q   And I'll tell you the reason I'm asking,
25   Dr. Diette.

Page 193

1        MS. BROWN:  No, no, no, no.  You ask the
2    question, he answers.  We don't need to know why
3    you're asking the question.
4        MS. PARFITT:  Excuse me.
5        MS. BROWN:  It's improper.  You're not
6    going to give a speech, Counsel.
7    BY MS. PARFITT:
8        Q   Dr. Diette, we -- has there ever been a
9    chance or an opportunity where you have reached
10   out to MSA on your own, and say, A client that
11   doesn't work or do business with you, MSA, has
12   asked me to do a report.  Can you help me?
13       A   Yes.
14       Q   Okay.  So that's one scenario, correct?
15       A   Correct.
16       Q   It's some other client has -- some other
17   individual or entity has reached out to you and
18   said, Dr. Diette, I would like to engage your
19   expertise in the legal context.  Fair?
20       MS. BROWN:  Objection to the form.
21       THE WITNESS:  Or the epidemiologic
22   context, but in some context.
23   BY MS. PARFITT:
24       Q   Okay.  And then you have in turn reached
25   out to MSA and said, I need some help.

Gregory B. Diette, M.D.

Page 194

1      MS. BROWN: Objection to the form.
2      THE WITNESS: Something like that, yeah.
3  BY MS. PARFITT:
4      Q   Okay. That's one scenario.
5      Another scenario is when a corporate
6  client, for instance, engages the services of MSA
7  to do a project and a particular expertise is
8  needed, and MSA then reaches out to folks like
9  yourself or folks in other medical specialties.
10 Fair?
11     MS. BROWN: Objection. Speculation.
12     THE WITNESS: So I'm not a lawyer,
13 right. So I'm trying to listen carefully to the
14 words that you're using, and when you say they
15 reach out and they retain MSA, I -- I actually
16 don't know if that's actually what happens, right.
17     So I gave you an example that --
18 BY MS. PARFITT:
19     Q   Okay.
20     A   -- they might retain MSA for their own
21 purposes, and nobody else gets involved. If like,
22 for example, in this case when Jonathan Cooper
23 reached out, he wanted to work with me, and MSA
24 provided the support services for me to get that
25 work done. So I -- I have no idea whether he

Page 195

1  retained MSA per se. I mean that's -- that's
2  something for lawyers to kind of sort through.
3      Q   Well, did Jonathan Cooper go to you
4  directly or did Jonathan Cooper go to MSA?
5      MS. BROWN: Objection to the form.
6      You can answer if you know.
7      THE WITNESS: It was kind of both. I
8  mean I think we -- we were talking about something
9  else one day, and he asked if I would be
10 interested in this.
11 BY MS. PARFITT:
12     Q   Okay. And did Jonathan Cooper then
13 reach out to MSA as well?
14     MS. BROWN: Objection. Speculation.
15 BY MS. PARFITT:
16     Q   You said both. That's why I'm asking.
17     A   Yeah, yeah, I mean --
18     MS. BROWN: Same objection.
19     THE WITNESS: I don't know how that part
20 worked, I mean, but -- but it was pretty clear
21 that it was such a big volume of work, that if I
22 was going to do it with him that I was going to
23 use MSA's services.
24 BY MS. PARFITT:
25     Q   When you're engaged, who does the

Page 196

1  conflicts checks?
2      MS. BROWN: Objection. Speculation.
3  Engaged by who?
4  BY MS. PARFITT:
5      Q   When you're engaged by a client, who
6  does the conflict --
7      MS. BROWN: Same --
8  BY MS. PARFITT:
9      Q   -- conflicts checks for you?
10     MS. BROWN: Same objection.
11     THE WITNESS: I don't know that anybody
12 does conflicts checks. I mean if there is
13 somebody, I'm not aware of who that is. If it
14 comes up, people will ask me sometimes if I have a
15 conflict of interest. Sometimes I'll see a
16 complaint, you know, and be asked to look at, you
17 know, the names on the complaint.
18     It all depends, but I -- I don't even
19 know if I know what a conflict checks is, I mean
20 if that's a technical term. It's only been --
21 it's only been done the way I'm describing, which
22 somebody will say to me like, you know, Do you
23 have any conflict of interest?
24 BY MS. PARFITT:
25     Q   Okay. You prepared two affidavits that

Page 197

1  I'm aware of, one in the Ingham case and one in
2  the Forrest. Do you recall doing that back in
3  2018?
4      A   I do.
5      Q   Okay. Are you aware of any other
6  affidavits you prepared in 2018 other than the
7  Ingham and the Forrest?
8      A   I don't think so. But I mean if you
9  have one, I would be glad to help confirm it, but
10 I can't recall one off the top of my head.
11     Q   Fair enough. How much did you charge
12 for preparation of the Ingham affidavit?
13     MS. BROWN: Objection to the form.
14     THE WITNESS: I don't remember.
15 BY MS. PARFITT:
16     Q   More than 50,000?
17     MS. BROWN: Same objection.
18     THE WITNESS: So I guess it depends upon
19 when we're talking about like me, you know,
20 because earlier you were lumping together, you
21 know, services that MSA charges for and gets paid
22 for. So I don't remember what -- what part I got.
23 It wouldn't -- it wouldn't have taken $50,000
24 worth of my time to prepare, you know, the
25 affidavit, I don't think. And in part, because,

Gregory B. Diette, M.D.

Page 198

1    you know, the input for that was stuff I was
2    already, you know, reading and interpreting
3    otherwise.
4    BY MS. PARFITT:
5        Q   All right.  How much did you charge for
6    the Forrest report?
7            MS. BROWN:  Objection to the form.
8            THE WITNESS:  The same -- same answer.
9    I don't know.  And in fact, the Forrest report, if
10   it came second, probably not very much because I
11   think it's mostly derivative from the first.  I
12   mean I try -- I'm not trying to just, you know,
13   create work to create it.  Like if there's
14   something I -- that I like the way it reads, I try
15   to use it again.
16   BY MS. PARFITT:
17       Q   Okay.  Are you aware, having actually
18   prepared both of those affidavits, they are
19   virtually the same affidavit?  Would that surprise
20   you?
21           MS. BROWN:  Objection to the form.
22           THE WITNESS:  I hope they are.  I mean
23   that -- that was the intent.
24   BY MS. PARFITT:
25       Q   Okay.  Other than the ovarian cancer/

Page 199

1    talcum powder cases, have you been engaged by
2    anyone else for opinions on a non-pulmonary issue?
3            MS. BROWN:  Objection to the form.
4            THE WITNESS:  Related to?
5    BY MS. PARFITT:
6        Q   Your work with MSA.
7        A   No, but you said -- it sounded like
8    there's something missing from the question.
9        Q   Sure.  Let me -- let me ask it again.
10   Okay.
11           Other than this case involving ovarian
12   cancer and talcum powder products, have you been
13   asked and -- or requested by anyone for your
14   opinions on a topic that was something other than
15   non-pulmonary?
16           MS. BROWN:  Objection.  Do you mean --
17           MS. PARFITT:  That was non-pulmonary.
18           MS. BROWN:  -- to exclude Ingham and the
19   other?  When you say "this case," do you mean just
20   the MDL?
21           MS. PARFITT:  Yeah.
22   BY MS. PARFITT:
23       Q   And I think that's where we're getting
24   hung up.  When I say "this case," I'm going to be
25   talking about "this case" being talcum powder

Page 200

1    products and ovarian cancer.
2            And the question I have is, in any
3    context, when the topic of interest is talcum
4    powder products and ovarian cancer, have you ever
5    been asked by MSA to do any work that's
6    non-pulmonary, other than the ovarian cancer
7    cases?
8        A   Related --
9            MR. LOCKE:  Objection.
10           THE WITNESS:  Related to talcum powder?
11   BY MS. PARFITT:
12       Q   Related to anything.
13       A   Well, wait a minute.  No, because -- so,
14   first of all, you said has MSA asked me to do it.
15   Like they don't ask me to do stuff.  Like they --
16   it's -- the relationship we described before is
17   what it is.  So if it's more general about are
18   there other cases --
19       Q   Yeah.
20       A   -- and when you say non-pulmonary, you
21   know, there are cases I've been involved in that
22   have nothing do with talcum powder that are
23   non-pulmonary.
24           So I'm just trying to figure out,
25   there's a lot of different angles to what -- to

Page 201

1    what you're asking.
2        Q   Sure.
3        A   Are you talking about talcum powder
4    cases that are related to something other than
5    ovarian cancer, and something other than a
6    pulmonary --
7        Q   I'll simplify it.  Have you ever
8    prepared a report in a -- let me do it this way.
9            Talcum powder products and ovarian
10   cancer have nothing to do with pulmonary medicine,
11   correct?
12           MS. BROWN:  Objection to the form.  Are
13   we abandoning inhalation as a theory of --
14           MS. PARFITT:  No, we're not, no.
15           MS. BROWN:  Okay.
16           THE WITNESS:  Then no.  I mean, no,
17   meaning that if that's a theory, then that
18   certainly has something to do with pulmonary
19   medicine.
20   BY MS. PARFITT:
21       Q   Okay.  And I think what I'm really
22   driving at is, it looks as though your focus for
23   the last couple of years has been talcum powder
24   products and ovarian cancer or asbestos and
25   mesothelioma.  Is that fair?

51 (Pages 198 to 201)

Gregory B. Diette, M.D.

| Page 202 |
| --- |

1          MR. LOCKE:  Objection.
2          THE WITNESS:  My focus --
3     BY MS. PARFITT:
4          Q   Focus and research --
5          MS. BROWN:  Objection.
6     BY MS. PARFITT:
7          Q   -- for preparation of expert legal
8     reports.
9          MS. BROWN:  Objection to the form.
10          THE WITNESS:  I -- I'm either not
11     hearing you well or I think things are getting
12     jumbled.
13     BY MS. PARFITT:
14          Q   Okay.
15          A   And I --
16          Q   Probably the -- the latter.
17          A   No, and I apologize.
18          Q   It's probably me.
19          A   I'm not trying to give you a hard time.
20     I just mean that -- what I -- what I heard earlier
21     is am I working on something with talcum powder
22     other than ovarian cancer or other than ovarian
23     cancer and something that isn't part of the lung?
24     Is that it?
25          Q   Are you preparing expert reports on a

| Page 203 |
| --- |

1     topic area other than talcum powder products and
2     ovarian cancer currently?
3          MS. BROWN:  Objection.  He's not
4     answering questions about reports that have not
5     been served in cases --
6          MS. PARFITT:  Understood.
7          MS. BROWN:  -- where he's not a
8     disclosed expert.
9          THE WITNESS:  You mean in my
10     professional life in general?
11     BY MS. PARFITT:
12          Q   Correct.
13          A   Yes.
14          Q   Okay.  What other areas?
15          A   Well, that's what we talked about
16     before, right.  So there was asbestos, there's
17     some chemicals, probably like mold and dampness.
18     There's malpractice cases.  I mean a whole variety
19     of different things.
20          Q   Okay.  All right.  I want to come to --
21     where I want to go is your -- your actual report.
22     I want you to take me through -- I'll ask you some
23     questions about the process that you went through
24     in actually putting this report together.  or
25          A   And I don't want to overbreak or

| Page 204 |
| --- |

1     anything --
2          Q   Do you want to take --
3          A   No, I'm just wondering.  Not
4     necessarily, but if it's --
5          MS. MILLER:  This would be a good time
6     for lunch.
7          THE WITNESS:  Yeah, that's what I'm
8     wondering, just if it's going to be --
9          MS. BROWN:  Yeah, it's up to you.  If
10     you want to break, counsel will give you a break.
11          MS. PARFITT:  Whatever you want to do.
12     Do you want to take a break now?
13          THE WITNESS:  It would be nice to -- to
14     get a snack, and --
15          MS. PARFITT:  You want to take a half
16     hour and grab --
17          THE WITNESS:  Would that be okay?
18          MS. PARFITT:  That's totally fine, yep.
19          THE VIDEOGRAPHER:  The time is 12:08
20     p.m., and we are going off the record.
21          (Lunch recess.)
22          THE VIDEOGRAPHER:  The time is 12:43
23     p.m., and we're back on the record.
24     BY MS. PARFITT:
25          Q   Good afternoon, Dr. Diette.

| Page 205 |
| --- |

1          A   Good afternoon.
2          Q   All right, Dr. Diette, I'd like to focus
3     for a little bit about your -- actually your
4     expert report and hopefully get to your opinions
5     here soon.
6          It's fair to say that this report is --
7     this expert report is not a report that you
8     prepared in the ordinary course of your activities
9     as a pulmonary medicine at Johns Hopkins?
10          MS. BROWN:  Objection to the form.
11          THE WITNESS:  That's correct.
12     BY MS. PARFITT:
13          Q   Okay.  And are all the opinions which
14     you will be sharing with us today, and eventually
15     the court and a jury, set forth in your -- your
16     expert report?
17          MS. BROWN:  Form.
18          THE WITNESS:  I hope so.  I mean,
19     it's -- there may be like -- like smaller opinions
20     that are underpinnings that I didn't capture, but
21     I mean the fundamental opinions should be there.
22     And assuming nothing different comes out when
23     you're asking me about it today, I guess the only
24     other thing I'd say is that I don't think that
25     I've seen all of the -- the testimony yet in this

Gregory B. Diette, M.D.

Page 206

1   case. So I don't know whether that's going to,
2   you know, spur some other thought, you know, from
3   the other -- other experts who are testifying, but
4   aside from that, then this should otherwise be
5   complete.
6   BY MS. PARFITT:
7       Q   And obviously if you see something,
8   testimony that causes you to change your opinions,
9   you will let me know, correct?
10          MS. BROWN: Form.
11          THE WITNESS: I will.
12  BY MS. PARFITT:
13      Q   All right. Dr. Diette, on the front of
14  your report it says "Expert Report of Gregory
15  Diette, MD, MHS, For General Causation Daubert
16  Hearing." Did you write that?
17      A   Not this page, no.
18      Q   All right. Who wrote that?
19          MS. BROWN: Objection to the form.
20          THE WITNESS: I -- I don't know
21  literally. I think this came from the law firm as
22  a cover page for me to -- to sign.
23  BY MS. PARFITT:
24      Q   You've testified both in general
25  causation case -- as a general causation witness

Page 207

1   and as well as a specific causation witness,
2   correct?
3       A   Generally speaking, like in legal cases?
4       Q   Correct.
5       A   Yes, I have.
6       Q   All right. So you understand the
7   difference.
8       A   I hope so, yeah.
9       Q   Okay. Have you actually testified in an
10  asbestos/meso- -- mesothelioma case on giving
11  specific causation opinions?
12      A   Yes.
13      Q   Okay. Have you also provided general
14  causation opinions in a meso/asbestos case?
15      A   Yes.
16      Q   Okay. Now, it says Daubert. Do you
17  understand what a Daubert hearing is?
18          MS. BROWN: Objection to the form.
19          THE WITNESS: Probably not the way that
20  you do. I have a general -- general sense of
21  this, but -- you know, I -- I wouldn't be able to
22  answer, you know, a lot of test questions about
23  it.
24  BY MS. PARFITT:
25      Q   Okay. All right. And would it be fair

Page 208

1   to say that that is your signature on the -- on
2   the front page, Gregory Diette?
3       A   Yes, it is.
4       Q   And you completed that on February 25th,
5   2019, correct?
6       A   Exactly right.
7       Q   Okay. And it would also -- is it also
8   fair to say that the opinions contained in this
9   report are not the opinions of Johns Hopkins
10  University?
11      A   Not as far as I know. I mean they're
12  literally just mine.
13      Q   Have you shared these opinions with any
14  of the other members of the Johns Hopkins
15  community?
16      A   No.
17      Q   All right. Did you run the opinions
18  that you have by any of the staff or your
19  superiors at Johns Hopkins?
20          MS. BROWN: Objection to the form.
21          THE WITNESS: No.
22  BY MS. PARFITT:
23      Q   Okay. Aside from this expert report and
24  the opinions retained herein, have you shared your
25  opinions with anyone else outside of the Johns

Page 209

1   Hopkins community, regulatory or scientific
2   bodies?
3           MS. BROWN: Objection to the form.
4           THE WITNESS: No. You mean other than
5   the lawyers and --
6   BY MS. PARFITT:
7       Q   Correct, other than your lawyers.
8       A   Oh, yeah, yeah, yeah.
9           MS. BROWN: Objection to the form.
10  We're not his lawyers.
11          THE WITNESS: Right, but I mean but
12  lawyers that are involved in this case, I have
13  expressed it to, but not those other kinds of
14  entities that you described.
15  BY MS. PARFITT:
16      Q   Okay. And to be clear, you have not
17  shared with the Johns Hopkins community your
18  opinions on talcum powder products and ovarian
19  cancer.
20          MS. BROWN: Objection to the form.
21          THE WITNESS: That is correct.
22  BY MS. PARFITT:
23      Q   Okay. Let's go to I believe page 2 of
24  your report, if you will.
25          And take a moment. Do you have that in

Gregory B. Diette, M.D.

Page 210

1    front of you?
2        A   I do.  Thank you.
3        Q   Okay.  Is it fair to say that your
4    report contains the bases for your opinions as
5    well?
6        A   Yes.
7        Q   All right.  And is it fair the -- do you
8    know whether or not this report has answered all
9    the questions that J&J asked you to answer for
10   them?
11       MS. BROWN:  Objection.  Lacks
12   foundation.
13       THE WITNESS:  Well, I think there's only
14   one question, right?
15   BY MS. PARFITT:
16       Q   And what was that question?
17       MS. BROWN:  Wait.  Let him finish.
18   BY MS. PARFITT:
19       Q   What was that question?
20       A   I'm sorry.  So the question was -- was
21   really about whether or not the -- what does the
22   epidemiologic evidence say about the relationship
23   between talcum powder and ovarian cancer.
24       Q   All right.  So let's turn to your
25   report, page 2, and I believe --

Page 211

1        MS. PARFITT:  And we'll put it up on the
2    ELMO here.
3        (Counsel conferring.)
4        MS. PARFITT:  I guess we won't put it up
5    on the ELMO here.
6    BY MS. PARFITT:
7        Q   Looking at the Summary of Opinions,
8    would you please read, if you will, that first
9    sentence.
10       A   Down at the bottom?
11       Q   Please.
12       A   "The body of"?
13       Q   Under "Summary of Opinions."
14       A   Yep, sure.
15       "The body of relevant epidemiological
16   evidence does not support a causal connection
17   between perineal use of talcum powder products,"
18   parentheses, "whatever constituents those products
19   may contain in addition to talc," end parentheses,
20   "and ovarian cancer."
21       Q   All right.  And then in the next page is
22   you talk about the bases for that, correct?
23       A   I think that's the right way to say the
24   bases.  I mean it's sort of an elaboration of that
25   general -- general opinion.

Page 212

1        Q   Okay.  And if you would turn -- be so
2    kind to turn to the last page of the report,
3    page 51.
4        A   Okay.
5        Q   And again, if you would read the first
6    paragraph.
7        A   At the --
8        Q   And we'll go ahead and put that up on
9    the ELMO.
10       A   Under "Conclusion" or the --
11       Q   Under the Conclusion, if you will.
12       A   Yep.  The whole thing?
13       Q   Just that -- just that first
14   paragraph -- or first sentence.
15       A   First sentence.  Oh, okay.  Yep.
16       "It is my opinion, based on my
17   qualifications and my extensive review of the
18   available epidemiology studies and scientific
19   literature, that there is not sufficient evidence
20   to conclude that there is a causal relationship
21   between perineal talcum powder exposure and
22   ovarian cancer."
23       Q   Okay.  And I know you have much to say
24   about that, but that is basically the -- the
25   general opinion that you're going to be sharing,

Page 213

1    correct?
2        A   I agree with you, yes.
3        Q   Okay.  Let me show you what we'll have
4    marked as 12, Exhibit 12.
5        (Counsel conferring.)
6        MS. PARFITT:  Let me show you, Counsel,
7    what we -- what we'll have marked as Exhibit 12.
8    There you go.
9        (Diette Exhibit No. 12 was marked
10       for identification.)
11   BY MS. PARFITT:
12       Q   Doctor, have you seen this before?
13       A   Let me take a look and see.  (Peruses
14   document.)
15       So generally speaking, yes.  The -- the
16   only reason I can't say for sure I've literally
17   seen this exact version is because that -- not
18   that I would know when it was updated otherwise,
19   but I don't know who's in charge of all these
20   different -- excuse me -- websites that you found
21   at Johns Hopkins, and so I don't know, you know,
22   whether what I looked at is literally identical to
23   what we're looking at here.
24       Q   All right.
25       A   But it's approximately something that

Gregory B. Diette, M.D.

Page 214

1  I've seen.
2      Q   Okay.  Fair.
3          Now, this is from the Sidney Kimmel
4  Comprehensive Cancer Center, correct?
5      A   That's right.
6      Q   And it's entitled "Risk Factors -- Risk
7  Factors" -- excuse me -- and Symptoms."  Do you
8  see that?
9      A   I do.
10     Q   All right.  And if you and this is for
11 ovarian cancer, you see that?
12         On the second line, "ovarian cancer," it
13 talks --
14     A   Yes.
15     Q   Okay.  Now, what I'd like you to do is
16 turn to the second page, and there is a risk
17 factor listed, amongst others.  Do you see that?
18     A   I do.
19     Q   And it says "Talcum Powder and
20 Asbestos."  Do you see that?
21     A   Yes.
22     Q   All right.  Would you read that, please.
23     A   "Habitual use of talcum powder on the
24 genital area may increase the risk for ovarian
25 cancer, but the evidence is not strong.  A study"

Page 215

1  -- the first sentence or the whole thing?
2      Q   The whole thing.
3      A   Yep.  "A study at Harvard Medical School
4  found that using talc this way doubled the risk,
5  but other studies found no increased risk.  Some
6  researchers believe that talc may be carcinogenic
7  because it contains particles of asbestos, a known
8  carcinogen.  It's been shown that rates of ovarian
9  cancer are higher than normal in women whose jobs
10 expose them to asbestos."
11     Q   All right.  Thank you.
12         Fair to say, Dr. Diette, that your
13 opinions are contrary to the opinions of what --
14 of those individuals at the Sidney Kimmel
15 Comprehensive Cancer Center?
16         MS. BROWN:  Objection to the form of the
17 question, lacks foundation.
18         THE WITNESS:  I wouldn't say globally.
19 I mean there's -- there's things here that
20 resonate with me just fine.
21 BY MS. PARFITT:
22     Q   What resonates with you fine and what
23 does not resonate with you?
24     A   Well, so, for example, when --
25     Q   And if you will, I'm going to put mine

Page 216

1  up here, and I'm going to doc- -- and I'm going to
2  go ahead and make a notation as you talk, and
3  we're going to put your initials by that which you
4  agree or don't agree, or that which resonates with
5  you or that which does not.
6          So give me a moment.  Hang with me,
7  okay?
8      A   Yeah.
9      Q   All right.
10         MS. BROWN:  Objection to the exercise.
11         THE WITNESS:  And I will say -- I mean I
12 wasn't -- you know, that I don't necessarily --
13 I'm not going to be able to necessarily agree or
14 literally disagree with each one of these, but
15 I'll just try to comment on what they -- what they
16 have here and what it says to me.
17 BY MS. PARFITT:
18     Q   All right.  Well, why don't we take the
19 first one.
20         "Habitual use of talcum powder on the
21 genital area may increase the risk for ovarian
22 cancer, but the evidence is not strong."
23     A   Yeah.
24     Q   Do you agree with that?
25     A   I agree that the evidence is not strong.

Page 217

1  And -- and I think it's a -- it's a pretty nuanced
2  statement.  It may increase, which leaves open
3  that it may not increase.  So I think it's a --
4  it's a balanced statement.  And their inclusion of
5  the evidence not being strong is what resonates
6  with me.
7      Q   Okay.  Do you disagree, though, that
8  it -- do you agree or disagree with this
9  statement: "Habitual use of talcum powder on the
10 genital area may increase the risk for ovarian
11 cancer, but the evidence is not strong"?
12         MR. LOCKE:  Objection.
13 BY MS. PARFITT:
14     Q   Do you agree with that statement?
15     A   I don't literally agree or disagree with
16 it.  I mean, I think I break it down the way that
17 I did into those two parts.
18     Q   Okay.  Well, I have a different
19 question.  I know how you want to do it, but I --
20 I do get the ask the questions.
21         MS. BROWN:  He answered your question,
22 Counsel.
23 BY MS. PARFITT:
24     Q   Habitual question -- yes or no --
25         MS. BROWN:  No.

Gregory B. Diette, M.D.

Page 218

1    BY MS. PARFITT:
2       Q   "Habitual use of talcum powder on the
3    genital area may increase the risk for ovarian
4    cancer." True or false?
5       MR. LOCKE:  Objection.
6       MS. BROWN:  Objection to the form of the
7    question, asked and answered.
8       You can give the same answer again.
9       THE WITNESS:  It's --
10      MS. PARFITT:  Counsel, please quit
11   instructing the witness.
12      MS. BROWN:  Counsel, don't yell at me.
13   BY MS. PARFITT:
14      Q   Go ahead.
15      MS. BROWN:  We can call the Judge.
16      MS. PARFITT:  I'm not yelling -- we can
17   call the Judge because I'll tell you, I don't
18   think he'll be -- she will be impressed.
19      MS. BROWN:  That's fine.  Let's go.
20   Let's walk right there and call her right now.
21      MS. PARFITT:  I'm not going to waste the
22   time right now.
23      MS. BROWN:  Okay.
24      THE WITNESS:  So I don't see it as a
25   true or false questions.  I think that there's two

Page 220

1    than "may increase the risk," and it's very
2    different than saying it causes it.
3    BY MS. PARFITT:
4       Q   Okay.
5       A   So it's -- it's a pretty vague
6    statement.
7       Q   Okay.  And I think -- I hear what you're
8    saying, but my question, and I think you just
9    answered it, is if -- if Judge Wolfson says to
10   you, Dr. Diette, I would like an answer to my
11   question:  Does the habitual use of talcum powder
12   on the genital area increase the risk for ovarian
13   cancer?
14      My -- my question to you from Judge
15   Wolfson.
16      MR. LOCKE:  Objection.
17      MS. BROWN:  Objection to the form of the
18   question, asked and answered.
19      THE WITNESS:  And whether it does?
20   BY MS. PARFITT:
21      Q   Yeah, the question is --
22      A   Well, it doesn't say that, though.
23      Q   -- do you have -- no, no, no, I know it
24   doesn't.
25      A   Oh.

Page 219

1    parts, and I -- I like the way that I answered it.
2    BY MS. PARFITT:
3       Q   Well, let me ask you this:  My -- if
4    Judge Wolfson, who is the judge presiding over
5    this case, says to you, Dr. Diette, I've got a
6    question for you -- this is in July -- do you have
7    an opinion whether or not habitual use of talcum
8    powder on the genital area may increase the risk
9    for ovarian cancer, what are you going to tell
10   her?
11      MS. BROWN:  Objection to the form of the
12   question and to the yelling at the witness.
13   BY MS. PARFITT:
14      Q   I'm not yelling at you, Dr. Diette.
15      MS. PARFITT:  Everyone is saying I
16   talk -- believe me, I'm not yelling at him.  I'm
17   not that disrespectful.  Trust me, please.
18      THE WITNESS:  Okay.  I don't think it
19   does, but, you know, there's so many ways you
20   could write this, which is why that it doesn't
21   strike me as something to agree or disagree with.
22   They could -- could have said "habitual use
23   causes."  They could have said that it does
24   increase the risk.
25      So, you know, those are very different

Page 221

1       Q   I'm representing -- you've already told
2    me what you said about what's here.
3       A   I see.
4       Q   What I'm asking you is, do you have an
5    opinion whether or not the habitual use of talcum
6    powder -- powder on the genital area may increase
7    the risk for ovarian cancer?
8       A   Not to quibble, but you just said does
9    increase before that, and now it's may increase?
10   Is it -- is it does increase --
11      Q   I'm going to do both, yeah.
12      A   Okay.  Well, I think this is so watered
13   down that it doesn't really say anything
14   definitive when you say "may increase."  If the
15   question is about "does increase," I would say it
16   does not increase the risk.
17      Q   Okay.  And as worded, you feel that it's
18   somewhat equivocal.  Is that fair?
19      MS. BROWN:  Objection to the form of the
20   question.
21      THE WITNESS:  Well, not the entire
22   statement.  I mean the evidence is not strong.
23   Seems like a pretty -- a pretty potent part of the
24   statement.
25   BY MS. PARFITT:

56 (Pages 218 to 221)

Gregory B. Diette, M.D.

Page 222

1      Q   Okay.  So you agree with "the evidence
2   is not strong."
3          And then what about the next part, "A
4   study at Harvard Medical School found that using
5   talc this way doubled the risk, but other studies
6   found no increased risk."  Do you agree with that
7   statement?
8          MS. BROWN:  Objection to the form of the
9   question.
10         THE WITNESS:  It's -- I would say maybe.
11   And the reason is because they -- they haven't
12   cited what the Harvard study is.  It -- I could
13   assume, but I might be wrong that maybe it's the
14   Cramer study from '82.  Maybe it's not.  So if
15   they're citing that, then --
16   then that might well be a correct statement.  And
17   it's certainly correct that other studies have
18   found no increased risk.
19   BY MS. PARFITT:
20         Q   All right.  So from your review of the
21   medical and scientific literature, you have seen
22   where scientists who look at the same scientific
23   and medical literature can arrive at different
24   opinions, correct?
25         MS. BROWN:  Objection to the form of the

Page 223

1   question.
2          THE WITNESS:  Are we talking about a
3   specific topic or just you -- in general, that
4   scientists can disagree with each other?
5   BY MS. PARFITT:
6          Q   Scientists can disagree with each other.
7          MS. BROWN:  Objection to the form.
8          THE WITNESS:  I think in general, they
9   can disagree about all sorts of things.  I don't
10   think there's a good reason to disagree about this
11   topic that we're talking about.
12   BY MS. PARFITT:
13         Q   Well, in this particular sentence, Johns
14   Hopkins University is representing to consumers,
15   or anyone who wants to get onto the website, that
16   medical schools found -- that a study of the
17   Harvard Medical School found that using talc this
18   way doubled the risk, but other studies found no
19   increased risk.
20         A   Yes.
21         Q   Is it fair to say they're communicating
22   that there are science -- there's science out
23   there that goes both ways?
24         MS. BROWN:  Objection to the form --
25         MR. LOCKE:  Objection.

Page 224

1          MS. BROWN:  -- of the question,
2   misstates the document, and it's been asked and
3   answered.
4          THE WITNESS:  I'd be careful a lot of
5   ways, right?  I think it's -- it's easy to say
6   what, you know, Johns Hopkins is saying.  I don't
7   know how well this represents Johns Hopkins as an
8   entity.  I -- like I don't know who controls this
9   website.  I don't know who the author was.  I
10   don't know if it was -- you know, somebody who was
11   hired for the summer to create a website or
12   whether it's somebody who is a credible
13   researcher.
14         But I also know that these kinds of
15   things populate all kinds of different websites,
16   and they're not necessarily like a policy
17   statement, you know, of a university or a hospital
18   or an entity.
19   BY MS. PARFITT:
20         Q   And I'll --
21         A   I would just be careful, I mean just in
22   terms of saying Johns Hopkins is saying this.
23         Q   Well, I will represent to you, and you
24   can see for yourself, that the Sidney Kimmel
25   Comprehensive Center puts out this information.

Page 225

1   Your institution.
2          MS. BROWN:  Objection to the form of the
3   question, and misstates the document.
4          THE WITNESS:  It's the same issue.
5   Right.  I mean I know the Sidney Kimmel Cancer
6   Center, and I work there.  It's -- but I don't
7   know what the source is of this information, I
8   don't know who's the author, and I don't know what
9   they expect it to represent in terms of a Johns
10   Hopkins, you know, point of view.
11   BY MS. PARFITT:
12         Q   Did anyone over at the Sidney Kimmel
13   Comprehensive Cancer Center ever consult you with
14   regard to what language should be included on the
15   website with regard to risk factor information?
16         A   No.
17         MS. BROWN:  Objection to the form.
18   BY MS. PARFITT:
19         Q   Okay.  The second part, let's go on.  If
20   you will, it starts with -- if you can read on
21   "Some," if you would read that, please.
22         A   "Some researchers believe that talc may
23   be carcinogenic because it contains particles of
24   asbestos, a known carcinogen."
25         Q   All right.  And do you agree with that

57 (Pages 222 to 225)

Gregory B. Diette, M.D.

Page 226

1  statement?
2        MS. BROWN: Objection to the form.
3        THE WITNESS: Well, I certainly agree
4  that some researchers believe that, because we've
5  seen it in plaintiffs' experts. So it's -- on its
6  face, I think it's a -- a true -- true statement
7  that there are people who believe that.
8        And I think the part that asbestos is a
9  known carcinogen is also something I agree with.
10 BY MS. PARFITT:
11       Q   Okay. And then it goes on to say:
12 "It's been shown that rates of ovarian cancer are
13 higher than normal in women whose jobs expose them
14 to asbestos."
15       Do you agree with that statement?
16       A   So, you know, this language is -- is not
17 great, right? It has been shown that, right. So
18 we could look at, you know, any one of those
19 studies that was done around World War II, for
20 example, and if you looked at one that was
21 positive, you could say it was shown that they
22 were higher. I'm not sure whether the general
23 proposition has been established, though.
24       Q   Okay.
25       A   If you guys are going to whisper, you're

Page 227

1  going to miss what I'm saying.
2        Q   No, I was -- I was just turned.
3        A   Okay.
4        Q   I heard what you said. Thank you.
5        A   All right.
6        Q   And fortunately, I have it right here in
7  front of you too.
8        A   Okay, good. Good, good, good.
9        Q   Yeah, thank you. And I thought you had
10 finished what you were saying because you finished
11 "okay," so I thought --
12       MS. BROWN: That's your "okay," Counsel.
13 BY MS. PARFITT:
14       Q   I'm sorry. I believe you finished. I'm
15 not sure whether the general proposition has been
16 established. So I thought that was the end --
17       A   That was the end --
18       Q   -- of your sentence.
19       A   Yeah.
20       Q   Right. Okay. All right.
21       A   Are we done with this one?
22       Q   For the time being, yeah. We may come
23 back to that.
24       Other than providing counsel with an
25 expert report of your opinions, have you reached

Page 228

1  out to the Food and Drug Administration to share
2  your opinions with them?
3        A   No.
4        Q   All right. Other than counsel who has
5  retained you to provide an expert -- a legal
6  expert report, have you reached out to any
7  scientific body to share your opinions?
8        MS. BROWN: Objection to the form.
9        THE WITNESS: No.
10 BY MS. PARFITT:
11       Q   Okay. Have you reached out to any
12 medical body to share your opinions?
13       MS. BROWN: Objection to the form.
14       THE WITNESS: No.
15 BY MS. PARFITT:
16       Q   Okay. Did you reach out to the Sidney
17 Kimmel Comprehensive Cancer Center and the folks
18 over there and share with them what your opinions
19 are?
20       A   No.
21       MS. BROWN: Asked and answered.
22 BY MS. PARFITT:
23       Q   Do you know Dr. Merlo?
24       A   I do.
25       Q   He's a friend of yours, right?

Page 229

1        A   He is.
2        Q   Okay. And you're Facebook friends.
3        A   I'm friends with his wife. He and I
4  might be also, but we're friends in -- in reality,
5  not just on --
6        Q   Not just on Facebook.
7        A   Yeah.
8        Q   Is his wife a doctor?
9        A   She is not.
10       Q   Okay. Do you know Dr. April
11 Zambelli-Weiner?
12       A   I do.
13       Q   Okay. You have worked with her in the
14 past, correct?
15       A   Really briefly, way back when.
16       Q   Okay. Do you consider her -- do you
17 know she's an epidemiologist, correct?
18       A   I think I know that.
19       Q   Okay. Do you consider her an
20 epidemiologist with expertise and well received in
21 the medical comm-- and scientific community?
22       MS. BROWN: Objection. Lacks
23 foundation, calls for speculation.
24       THE WITNESS: So I don't know much
25 about -- about her lately. I think the last time

58 (Pages 226 to 229)

Gregory B. Diette, M.D.

Page 230

1    that I saw her was when she was still training at
2    Hopkins.  And so there's a couple of decades that
3    have gone by.  So I -- so I honestly have no idea
4    what her reputation is at this point.
5    BY MS. PARFITT:
6        Q   Okay.  Did you work with her?
7        A   Sort of.  Like not -- we were -- we were
8    both involved in a research project, but we
9    weren't both involved in the same part of the
10   project.  So I -- it's -- to say that we worked
11   together, it's -- it's a little bit vague in a way
12   about whether we did.  We traveled together for
13   one particular research program we were a part of.
14   But --
15       Q   Okay.
16       A   Like I don't think we published
17   together.  I don't think.
18       Q   Do you think of her as a good scientist?
19           MS. BROWN:  Objection to the form of the
20   question, calls for speculation.
21           THE WITNESS:  I -- I honestly don't know
22   what she's -- what she's up to.  I mean it's
23   literally been a couple of decades.
24   BY MS. PARFITT:
25       Q   Sure.  Well, when you did know her back

Page 231

1    a couple of decades ago, did you consider her a
2    good scientist?
3           MS. BROWN:  Objection to the form,
4    vague, calls for speculation.
5           THE WITNESS:  I wouldn't say that I know
6    that she wasn't, but I really wasn't very familiar
7    with what her work was.
8    BY MS. PARFITT:
9        Q   Her work.  Okay.  That's fair enough.
10          Okay.  Alrighty.  Let's set this aside.
11          Dr. Diette, are you aware that just last
12   month, and I believe it was March 12th, the House
13   Committee on Oversight and Reform, Committee on
14   Economic and Consumer Policy conducted a hearing
15   about the public health risk of carcinogens in
16   talcum powder products and other consumer
17   products?  Were you aware of that?
18          MR. LOCKE:  Objection.
19          MS. BROWN:  Objection to the form.
20          THE WITNESS:  I saw that -- a question
21   about that in one of the deposition transcripts
22   that I -- that I read.  I don't remember which
23   one.  But that's my only awareness of that.
24   BY MS. PARFITT:
25       Q   Okay.  So no one requested that you

Page 232

1    appear and give testimony, correct?
2        A   Correct.
3           MS. BROWN:  Form.
4    BY MS. PARFITT:
5        Q   Right.  So no one inquired as to what
6    your opinions were on this topic; is that correct?
7           MS. BROWN:  Asked and answered.
8           THE WITNESS:  That is correct.
9    BY MS. PARFITT:
10       Q   Okay.  I'll represent to you that at the
11   hearing, both consumer and industry were invited
12   to attend.
13          Are you aware that Dr. McTiernan, who is
14   an expert in this case, was one of those
15   individuals that was invited to attend?
16          MR. LOCKE:  Objection.
17          MS. BROWN:  Objection.  Lacks
18   foundation.
19          THE WITNESS:  I don't know.
20   BY MS. PARFITT:
21       Q   Okay.  You've read her expert report,
22   correct?
23       A   I did.
24       Q   And you understand that she was one of
25   the coinvestigators with the WHI study?

Page 233

1           MS. BROWN:  Objection to the form.
2    BY MS. PARFITT:
3        Q   One of the cohorts that you rely on.
4           MS. BROWN:  Foundation, speculation.
5           THE WITNESS:  That's what I understand.
6    BY MS. PARFITT:
7        Q   Okay.  When you were writing your expert
8    report and researching the cohort studies, did you
9    ever reach out to Dr. McTiernan to consult with
10   her with regard to her thoughts and opinions about
11   that particular cohort study?
12          MS. BROWN:  Objection to the form.
13   Which study?
14          MS. PARFITT:  I said the WHI study.
15          MS. BROWN:  It's not in your question.
16          THE WITNESS:  Assuming the WHI study, I
17   did not.
18   BY MS. PARFITT:
19       Q   Okay.  Dr. McTiernan testified at that
20   hearing, and her testimony went uncontroverted,
21   that there was a statistically significant
22   increased risk of 22 to 31 percent of developing
23   ovarian cancer from genital use of talcum powder
24   products.
25          Do you agree or disagree with that?

59 (Pages 230 to 233)

Gregory B. Diette, M.D.

Page 234

1          MR. LOCKE: Objection.
2          MS. BROWN: Objection. This lacks
3    foundation. Counsel, are you giving him a
4    hypothetical? Or if not, are you going to give
5    him something that would support the statements
6    that you're making on the record?
7    BY MS. PARFITT:
8          Q    Assume that Dr. McTiernan testified
9    before the subcommittee who was investigating the
10   safety of talcum powder products, that
11   Dr. McTiernan testified that there was scientific
12   evidence that women who used talcum powder
13   products have a statistically significant
14   increased risk of 22 to 31 percent of developing
15   ovarian cancer.
16         A    So, first of all --
17         MS. BROWN: Wait, wait. What's the
18   question?
19   BY MS. PARFITT:
20         Q    And I should add developing epithelial
21   ovarian cancer having used talcum powder products.
22         MS. BROWN: What's the question? You
23   just gave an assumption.
24   BY MS. PARFITT:
25         Q    Do you --

Page 235

1          MS. PARFITT: I just was finishing.
2    BY MS. PARFITT:
3          Q    But do you agree with her statement
4    before Congress?
5          MS. BROWN: Objection to the form.
6          MR. LOCKE: Objection.
7          MS. BROWN: Incomplete hypothetical,
8    lacks foundation, calls for speculation.
9          THE WITNESS: So I don't know what she
10   said -- and I know you're asking me to assume what
11   she said -- I don't know what else she said about
12   it, so how the -- how that's framed -- it sounds
13   compatible generally with what her report had at
14   least one sentence about.
15   BY MS. PARFITT:
16         Q    Okay. Let me show you what we'll have
17   marked as Exhibit 13.
18         (Diette Exhibit No. 13 was marked
19         for identification.)
20   BY MS. PARFITT:
21         Q    And I'll represent to you that this
22   is the statement of Ann McTiernan that was
23   prepared for the Subcommittee on Economic and
24   Consumer Policy on "Examining the Public Health
25   Risks of Carcinogens in Consumer Products" dated

Page 236

1    March 12th, 2019.
2          Do you see that?
3          A    I see it.
4          Q    Okay. If I can direct your attention
5    to -- and I'll represent that this was a statement
6    that she submitted prior to the hearing, and
7    specifically -- I can put it on the ELMO here.
8    Let's go down to the third full paragraph.
9          Do you see that, it starts
10   "Summarizing"?
11         A    Yes.
12         Q    Okay. And it states: "Summarizing data
13   from all of the published studies consistently
14   shows that women who had ever used talcum powder
15   products in the genital area had a statistically
16   significant 22 to 31 percent increased risk of
17   developing epithelial ovarian cancer compared with
18   women who had never used them. Evidence suggests
19   that these associations hold across diverse race
20   and ethnic groups."
21         Did I read that correctly?
22         A    You did.
23         Q    All right. Do you agree with that
24   statement?
25         MS. BROWN: Objection to the form.

Page 237

1          THE WITNESS: Well, I think this is
2    compatible with what, you know, her report and her
3    testimony has been generally. I think it's --
4    it's -- unfortunately, it's not very balanced,
5    right. I mean she -- she's leaving out an awful
6    lot of information here and -- and really
7    referring just to one narrow slice of the evidence
8    that she's -- that she's citing here.
9    BY MS. PARFITT:
10         Q    Okay. What did she leave out, Doctor?
11         A    I'm sorry?
12         Q    What is she leaving out?
13         A    Well, saying that -- that "data from all
14   the published studies consistently shows that
15   women who had ever used talcum powder products in
16   the genital area had a statistically significant
17   22 to 31 percent increased risk," and I won't
18   finish the rest, but, you know, of developing
19   ovarian cancer.
20         So, you know, they don't all have a
21   statistically significant increase, and she's
22   leaving out information that would run counter to
23   that also, including I think -- let me just see
24   what she cites.
25         She cites Berge and Penninkilampi and

Gregory B. Diette, M.D.

Page 238

1    Terry, but there's other information in there,
2    like from Berge, for example, you know, who points
3    out that there's no risk seen in the cohort
4    studies. So I think if this were balanced, that
5    she would -- she would have more information than
6    just that particular statement.
7        Q    Okay. And we'll talk a little bit more
8    about the -- the cohorts in just -- just a moment.
9            Okay. What was the methodology you
10   employed in order to present the opinions and
11   bases for opinions in your report?
12       A    So generally, I tried to identify all of
13   the relevant epidemiologic studies -- is that what
14   you're -- you're asking?
15       Q    That is?
16       A    Okay.
17       Q    That is.
18       A    And so I tried to find them in an
19   iterative way, you know, meaning that there were
20   meta-analyses that had many of them listed. I did
21   some searches of their own reference lists to look
22   for others. I did searches, you know, using
23   web-based, you know, tools to find other -- other
24   studies, and tried to get what I thought was a
25   pretty comprehensive group of all the

Page 239

1    epidemiologic studies.
2            And then I also tried to read other
3    things, you know, IARC monographs, other -- like
4    reports from like American College of Obstetrics
5    and Gynecology, and -- and get a sense of how some
6    of the information was being interpreted by
7    other -- other bodies.
8            And -- and then ultimately looked at
9    criteria that people recognize as useful for
10   assessing causation, which are labeled sometimes
11   Bradford Hill considerations, and then other
12   things too.
13           So besides that, then, you know, looking
14   at the quality of the studies in some cases. So,
15   for example, were there valid measures of -- of
16   exposure that were used, was there evidence for
17   confounding and bias, and so forth.
18       Q    All right.
19       A    Meaning especially those latters
20   aren't -- those latter factors aren't part of
21   Bradford Hill. Like he doesn't talk about, you
22   know, bias and confounding and validity of the
23   measures and so forth. So there's more to looking
24   at it than just Bradford Hill.
25       Q    Okay. So what was -- what were the

Page 240

1    search terms that you used in order to do your
2    literature review?
3        A    I didn't -- I didn't write them down,
4    but it -- you know, this didn't start as like a --
5    like a -- like there's been some searches that
6    I've been involved in where, you know, somebody
7    might commission a review of a particular topic,
8    and you have to figure out what those search terms
9    are.
10           In this case, there's a really good head
11   start because there's meta-analyses done and
12   there's some other -- some other papers. And so
13   what I tried to use was the words that the authors
14   used, you know, assuming that they would then link
15   up and find the other -- other articles.
16           So -- so like "ovarian cancer," "talc,"
17   "talcum powder," probably some -- you know, some
18   words like "risk" and "cause" and -- I think for
19   that part of it that was -- that was kind of the
20   bulk of it. There may have been other terms that
21   came up in some of the -- some of the articles
22   that I would search for also, but that -- that was
23   the main ones.
24       Q    Did you search for the word "cancer"?
25       A    Oh, well, "ovarian cancer."

Page 241

1        Q    Okay. Did you search for the word
2    "asbestos"?
3        A    I did, but differently -- so I did sort
4    of a separate search for that, which was "asbestos
5    and ovarian cancer." Same approach, but -- but
6    different -- I thought we were just talking about
7    the talcum powder at the moment.
8            But separately, I did a search for
9    "asbestos and -- and ovarian cancer." And -- and
10   just like for this issue of talcum powder, there
11   was a good head start from -- from IARC, at least
12   having identified several -- several key studies,
13   and then looked for more because there were
14   obviously some that they didn't cite or that
15   weren't available to them at the time that they
16   did their -- their review.
17       Q    Did you search for the word
18   "inflammation"?
19       A    I did, for -- part of the searches was
20   for inflammation.
21       Q    Okay.
22       A    I should say also -- I mean there's more
23   to it if you want, just a little bit more.
24       Q    No. Let me ask you a question first.
25       A    Okay.

61 (Pages 238 to 241)

Gregory B. Diette, M.D.

Page 242

```
 1        Q   There's no question pending.
 2        I assume you did a literature search
 3   back in the early part of 2017 when you were first
 4   retained, correct?
 5        A   Correct.
 6        Q   All right.  So did you update that
 7   literature search?
 8        A   Oh, yeah.
 9        Q   Okay.  Did you keep -- do you keep some
10   kind of recordation of material you had before and
11   then what material you're looking at now for
12   purposes of this most recent report?
13        A   No, I mean it's not sorted by -- by when
14   I found it.
15        Q   All right.  You represented, at least in
16   your report, that you looked at the databases
17   Medline and Google.
18        Did you use any other databases for your
19   research?
20        A   Well, scholar -- Google Scholar as
21   opposed to just plain Google and then main Google
22   itself.  I don't remember if I used any others.
23        Q   Okay.  Where in your report do you share
24   your systematic review and collection of the
25   various literature that formed the bases of your
```

Page 243

```
 1   opinion?
 2        A   I didn't write that part, I don't think,
 3   but it -- I do talk about the -- the methodology
 4   in general.
 5        Q   Okay.  Well, you talk about the
 6   methodology on page -- I believe it's page 4, and
 7   there's about two paragraphs there, and then on
 8   the top of page 5, where there's just two full
 9   paragraphs.
10        So my question is, where do you -- is
11   there anywhere else in your report that you set
12   forth your methodology --
13        A   Yeah.
14        Q   -- employed in order to --
15        A   Sure, other places --
16        Q   -- form the basis for your opinions?
17        A   Sorry, I didn't mean to interrupt.
18        Q   No, and what I'm saying --
19        A   Were you done?
20        Q   -- you have a methodology section --
21   let's start over.
22        You have a methodology section of your
23   report.  Is it fair that that is where you set
24   forth the methodology that you employ in this
25   case?
```

Page 244

```
 1        A   Some --
 2        MS. BROWN:  Objection to the form.
 3        THE WITNESS:  Some of it.
 4   BY MS. PARFITT:
 5        Q   Okay.  And how did you select the
 6   case -- the cases that became part of your list of
 7   cases on page 13 and 14 of your report?
 8        A   What does "cases" mean?
 9        Q   Studies.  You have them listed on
10   page 13, and it carries over to page 14.
11        A   It's -- the way I describe it, I don't
12   think I got to finish answering the question about
13   the -- the rest of the methodology.  You'd have to
14   turn over to page 6, and in the section called
15   "Review of Epidemiology Data," there's a
16   description of what I just told you verbally just
17   a moment ago, which is talking about MedLine and
18   Google Scholar, and reviewed the reference list of
19   the individual studies and the meta-analyses to
20   assemble a complete list of studies, and then I --
21   it goes on.  That's not the whole paragraph
22   obviously, but that's the -- that's the general
23   method of how I found them.
24        Q   Okay.  And what process did you go
25   through to select or deselect certain pieces of
```

Page 245

```
 1   literature that you reviewed?
 2        A   Well, I -- I included all of the ones
 3   that I could find.  I mean we're talking about the
 4   epidemiologic studies.
 5        Q   We are.  We are indeed, yeah.
 6        A   So like in terms of the cohort studies,
 7   there's only three I could find.  There's more
 8   than three publications that pertain to the three,
 9   but I included all three, and I included all the
10   publications I could find on the topic.
11        But the case-control study, a similar
12   approach, although there's a little bit of
13   confusion with the case controls because there's
14   overlap.  There is a redundant publication where
15   some authors are presenting the same data twice,
16   and it's not entirely clear how to unravel them.
17   So I just tried to include as many of those as I
18   could that looked like distinct studies, and I
19   tried to make sure I had the -- you know, the vast
20   majority of what was being considered in the
21   meta-analysis as well.
22        Q   I think where I'm going is, where do
23   you -- where do you tell the -- the reader what
24   your inclusion criteria was for selecting studies?
25        MS. BROWN:  Objection to the form.
```

62 (Pages 242 to 245)

Gregory B. Diette, M.D.

Page 246

1    THE WITNESS: I tried to get them all.
2  I wasn't trying to exclude any studies.
3  BY MS. PARFITT:
4    Q  So every -- so may I assume from that
5  statement that all of the literature that you've
6  listed on page 13 and 14 in the cohort studies and
7  the meta-analysis is the entire body of literature
8  that you reviewed?
9    A  Of course not.
10    MS. BROWN: Objection to the form.
11    THE WITNESS: No, no, what -- well, I
12  guess, if you could, please be very precise what
13  you're asking.
14    To me what I think we're talking about
15  is the case-control studies and the cohort
16  studies, and so I tried to identify every single
17  one of them. So I didn't have an exclusion
18  criteria to say I was going to ignore this one
19  because it wasn't supportive of my view or
20  something like that. I included them all.
21    I searched for clinical trials, but
22  there weren't any. So that was -- that was an
23  issue as well.
24  BY MS. PARFITT:
25    Q  Were there any studies that you chose

Page 247

1  not to include on your list of 13 and 14 that you
2  had actually reviewed during the course of your
3  study?
4    A  And we're talking about case-control
5  studies and cohorts.
6    Q  Correct.
7    A  I didn't -- wait a minute. I didn't
8  deliberately not include any of them. I tried to
9  include every single one, with that exception
10  being -- and I don't remember which ones were
11  which, but there were a couple that were
12  redundant. You know, the -- the authors of these
13  haven't in every case been careful about reporting
14  findings that are unique.
15    Q  Okay. Focusing now, if I may, on your
16  chart, page 13 and 14 of the case-control studies.
17    Do you have that in front of you?
18    A  Almost.
19    Q  Okay.
20    A  I do.
21    Q  All right. Where in this document,
22  page 13 and 14, do you identify the number of
23  ovarian cases that formed the bases of the study?
24    MS. BROWN: Objection to the form.
25    THE WITNESS: This is the list of the --

Page 248

1  of the risk -- risk estimates, not of the number
2  of cases.
3  BY MS. PARFITT:
4    Q  Correct. So where on this page 13 or 14
5  do you tell the reader how many ovarian cancer
6  cases were part of that study?
7    MS. BROWN: Objection to the form.
8    THE WITNESS: It's not on there.
9  BY MS. PARFITT:
10    Q  Okay. Where on your list of cases, 13
11  and 14, do you tell the reader the number of
12  controls that were involved in that study?
13    A  I didn't -- I didn't list every single
14  thing like that on here.
15    Q  You didn't list it in your report
16  either, correct?
17    MS. BROWN: Objection to the form.
18    THE WITNESS: Well, this is the report.
19  BY MS. PARFITT:
20    Q  Well, you didn't list it anywhere else
21  other -- that information is not contained in your
22  report. Is that fair?
23    MS. BROWN: Objection to the form.
24    MR. LOCKE: Objection.
25    THE WITNESS: The sample size?

Page 249

1  BY MS. PARFITT:
2    Q  The sample size is not information that
3  you contained -- that you included in your report,
4  correct?
5    A  I did not.
6    MS. BROWN: Same objection.
7  BY MS. PARFITT:
8    Q  Okay. Where in your report do you tell
9  the reader the country from where these studies
10  came from?
11    MS. BROWN: Objection to the form.
12    THE WITNESS: I don't list that.
13  BY MS. PARFITT:
14    Q  Okay. Where do you tell the reader what
15  the mean age of the participants in this study
16  were?
17    MS. BROWN: Same objection.
18    THE WITNESS: And same answer, I
19  don't -- I don't list that either.
20  BY MS. PARFITT:
21    Q  Where in your report do you tell the
22  reader the number of adjusted variables per study
23  that were considered?
24    MS. BROWN: Objection to the form.
25    THE WITNESS: I didn't -- I didn't

63 (Pages 246 to 249)

Gregory B. Diette, M.D.

Page 250

1    capture that here.
2    BY MS. PARFITT:
3        Q    Okay.  And where in your report do you
4    tell the reader the type of ovarian cancer that
5    the women suffered?
6        MS. BROWN:  Objection to the form.
7        THE WITNESS:  That's not listed on -- on
8    this table either.
9    BY MS. PARFITT:
10        Q    Did you create this table yourself or
11    did you have assistance?
12        A    So, actually, I made this initially, and
13    there might have been a couple that filtered in
14    after I started to create it where -- you know,
15    where I had an assistant, you know, plug in a
16    different study.
17        Q    Where in your report do you tell the
18    reader if you applied a scoring system to the data
19    and the studies that you reviewed?
20        A    That wasn't --
21        MS. BROWN:  Objection.  Lacks
22    foundation.
23        THE WITNESS:  That wasn't my approach.
24    BY MS. PARFITT:
25        Q    Okay.  We'll talk about that in a

Page 251

1    minute.  Appreciate that.
2        Did you exercise any independent
3    judgment in determining what cases to include on
4    this chart of case-control studies on 13 and 14?
5        MS. BROWN:  Objection.  Asked and
6    answered.
7        THE WITNESS:  I tried to be inclusive.
8    BY MS. PARFITT:
9        Q    Being inclusive -- did being inclusive
10    require you to exercise professional judgment with
11    regard to selection of the cases that you reviewed
12    and included for purposes of your analysis?
13        A    So, mostly, yes.  What I would say is I
14    was trying to understand what the universe was of
15    case controls that were being listed in the
16    meta-analyses, what the case controls were that
17    were informing the opinions of the plaintiffs'
18    experts.  And so I didn't want to have some
19    arbitrary rule for saying one shouldn't be in
20    here.  I wanted to look at them all.  And so my
21    goal was actually to include them all, and not
22    deselect some because I thought that there was a
23    quality issue with them.
24        (Brief interruption.)
25    BY MS. PARFITT:

Page 252

1        Q    What specific, if any, in vitro studies
2    did you consider for purposes of your opinion?
3        A    So I -- are you good?
4        Q    Yeah, thank you.
5        A    Okay.  So I -- I don't know if you're
6    including some animal studies as in vitro studies
7    or whether you just mean sort of like ones that
8    are -- that are cell-based or in a dish.
9        Q    Well, there's a difference, isn't there?
10        A    There should be, yeah, but I just --
11    since you're asking the question, I don't know
12    you, and so I -- I just want to be clear.
13        Q    No, I'm -- I'm cognizant of the
14    difference between in vivo and in vitro, so what
15    I -- what I would ask you is what in vitro studies
16    did you consider for purposes of your analysis?
17        A    Yeah, I looked at some.  I think the
18    ones that were cited by IARC I looked at.  I don't
19    remember the full list of ones -- which ones I may
20    have listed, if any, that -- that I looked at.
21    But that wasn't really my main -- my main purpose
22    in looking at the epidemiology, which was to --
23    was to look at in vitro studies.
24        Q    Okay.  Was part of your analysis -- or
25    did part of your analysis include looking at

Page 253

1    in vivo studies?
2        A    So I looked at -- at a bunch of the
3    different animal studies that were cited, cited in
4    some of the other documents.
5        Q    Which ones?
6        A    So I don't remember the author names.  I
7    mean, there were -- there were studies of, you
8    know, rats, rabbits, primates.  I can't remember
9    if there were mouse -- there were mouse studies as
10    well.
11        So whatever that list is that was in
12    IARC that they had considered at that point, and
13    then I think I found a couple more.
14        Q    What, if any, information did you glean
15    from your review of the in vitro and in vivo
16    studies that formed the basis of your study
17    report?
18        A    Well, mostly -- so to -- to think about
19    how -- for me as an epidemiologist, and not as a
20    cancer biologist or molecular biologist, I wanted
21    to just understand generally how some of the other
22    entities were wielding that information, right.
23    So that -- like I wasn't about to become a cancer
24    biologist in reading these things or understand
25    whether their methods were appropriate or not, but

64 (Pages 250 to 253)

Gregory B. Diette, M.D.

Page 254

1    I did want to understand some of their
2    underpinnings.
3        Q   Okay.
4        A   And just so, for example, right, so
5    there's the -- the studies on migration, for
6    example.  I thought it was important to look at
7    those and see what kind of animals, for example,
8    had what kind of particles either put into their
9    vaginas or put into their uterus, or whatever it
10   was, so I could understand what the -- what the
11   story was there.
12       Q   Okay.  Do animals have vaginas?
13       A   Some do, yeah.
14       Q   You -- you indicated you're not a cancer
15   specialist.  Would you defer to -- on topics
16   involving those issues to a cancer biologist?
17           MS. BROWN:  Objection to the form of the
18   question.
19   BY MS. PARFITT:
20       Q   And let me clean it up because I think I
21   left that off.  You are not a cancer biologist,
22   correct?
23       A   Correct.
24       Q   All right.  So would you defer questions
25   in that wheelhouse to someone who is a cancer

Page 255

1    biologist?
2           MS. BROWN:  Same objection.
3           THE WITNESS:  So I mostly don't think
4    about deferring my opinions to other -- other
5    people's categorically.  You know, so that I think
6    if there were somebody that was a cancer biologist
7    and they had an opinion that seemed credible, I
8    would take it into account.  But to the extent
9    that I needed to understand something, I would
10   still rely on my own -- my own background and
11   knowledge.
12   BY MS. PARFITT:
13       Q   All right.  You're not a -- a molecular
14   specialist, correct?
15           MS. BROWN:  Objection.
16           THE WITNESS:  Not a molecular biologist.
17   BY MS. PARFITT:
18       Q   Okay.  I believe you stated in your
19   report that you were deferring to other experts in
20   this case as it pertains to the opinions that
21   Dr. Saed has given; is that correct?
22           MS. BROWN:  Objection to the form.
23   Counsel, is there a part of the report you're
24   referring to?
25           MS. PARFITT:  Mm-hmm, there is.

Page 256

1           MS. BROWN:  What report is --
2           MS. PARFITT:  Saed.
3    BY MS. PARFITT:
4        Q   Just give me a moment, Doctor.
5            If you turn your attention to page 42.
6        A   Mm-hmm.
7        Q   At the bottom.
8        A   Okay.
9        Q   "I leave a detailed assessment of
10   Dr. Saed's efforts to other experts.  I did review
11   Dr. Saed's report and his two depositions and was
12   struck by the irregularities in his study, which
13   render his results highly questionable."
14           So are you or are you not deferring with
15   regard to opinions concerning what Dr. Saed had to
16   say?
17           MS. BROWN:  Objection.  Misstates the
18   expert report and the opinion.
19           THE WITNESS:  I -- I meant to be
20   somewhat nuanced here, right, which is that -- you
21   know, it's possible for me to read things and
22   understand that there might be some issues with
23   what he's done.  I -- I'm not going to be the
24   person to critique the biologic aspects of his
25   work, though.

Page 257

1    BY MS. PARFITT:
2        Q   Okay.  Fair enough.  In fact, let me ask
3    you, have you read the published scientific
4    article by Dr. Saed?
5        A   Not yet.
6        Q   Okay.  Do you have any plans to do that?
7        A   I might.  I might, because I was just --
8    I was curious because I saw some of the -- like
9    the expert reports that came in after I wrote my
10   report, and there were things that just kind of
11   struck me that would be worth trying to sort
12   through, like whether he had changed like 48 to 36
13   or -- yeah, 48 hours to 72 hours, whatever it was,
14   that there were like some tables apparently that
15   were the same as an original paper, that the only
16   change was like the numbers on them.  And so just
17   to sort of understand the quality issues related
18   to the study, I thought I might take a look at it.
19       Q   All right.  But prior to preparing your
20   expert report, and, frankly, this deposition
21   today, you have not read either Dr. Saed's -- you
22   have not read Dr. Saed's most current peer-
23   reviewed paper, correct?
24       A   True for both time periods.  I don't
25   think it was published or available to me before I

Gregory B. Diette, M.D.

Page 258

1    did the report, but I could be wrong.
2        Q   Well, it's available now, isn't it?
3        A   That's what I've heard.
4            MS. BROWN:  Objection to the form.
5    BY MS. PARFITT:
6        Q   But you've not seen it.
7        A   No.  I just -- I mean like -- I mean
8    it -- sorry, it's the way I think.  It sounds like
9    two different time periods.  One was --
10       Q   No.
11       A   -- before the report and one was between
12   then and now.
13       Q   No, my question goes --
14           MS. BROWN:  Wait, he's finishing.  Let
15   him finish.
16   BY MS. PARFITT:
17       Q   My question -- are you done?
18       A   I'm good.
19       Q   My question really goes to, is it fair
20   to say that you have not read Dr. Saed's published
21   peer-reviewed article at the time of your
22   deposition?
23       A   That is correct.
24           THE WITNESS:  Sorry.
25           MS. BROWN:  That's all right.

Page 259

1    BY MS. PARFITT:
2        Q   Okay.  Now, you've mentioned IARC a
3    couple of times during the course of your
4    testimony.
5            Have you rereviewed the IARC
6    monograms -- or the IARC monogram that was
7    published in 2010 on silica?
8            MS. BROWN:  The monograph?
9            MS. PARFITT:  The monograph.  Monograph.
10           MS. BROWN:  Monograph on talc?
11           MS. PARFITT:  On talc, mm-hmm.
12           THE WITNESS:  Did you just say silica or
13   no?
14   BY MS. PARFITT:
15       Q   I did say silica.  I meant talc.
16       A   You meant talc.  Yeah, I've read the
17   talc one.
18       Q   You've read the talc one.  Have you read
19   the 2012 monograph, the one 100C, have you seen
20   that?
21       A   I have.
22       Q   Okay.  Have you read any other
23   monographs on talc or asbestos?
24       A   I've read earlier ones on asbestos.  I
25   don't know of any other ones on talc, I don't

Page 260

1    think, but I've certainly read other -- I mean
2    others that aren't on either of those topics.
3        Q   Would you agree -- would you agree that
4    IARC is a well-respected scientific organization?
5            MS. BROWN:  Object -- I'm sorry.  I
6    didn't hear the question.
7    BY MS. PARFITT:
8        Q   Would you agree that IARC is a well-
9    respected scientific organization?
10           MS. BROWN:  Objection to the form.
11           THE WITNESS:  It's -- it's hard for me
12   to characterize whole organizations, you know, in
13   terms of whether they're well respected or by whom
14   or when, but generally speaking, you know, they --
15   they do produce some -- some credible documents.
16   BY MS. PARFITT:
17       Q   They do produce some credible documents.
18           It's -- IARC is part of the World Health
19   Organization, correct?
20       A   It is.
21       Q   Okay.  And when IARC has its meetings to
22   discuss classification of carcinogens, it invites
23   world-renowned experts for whatever area and
24   specialty is being discussed.  Is that fair?
25           MS. BROWN:  Objection to the form.

Page 261

1            MR. LOCKE:  Objection.
2            MS. BROWN:  Calls for speculation.
3            THE WITNESS:  I don't know their
4    selection process, but they -- but they certainly
5    invite -- invite people to attend.
6    BY MS. PARFITT:
7        Q   Okay.  Have you ever been invited to
8    attend an IARC --
9        A   I have not.
10       Q   -- working group?
11       A   No.
12       Q   Okay.  Did IARC invite you to attend
13   their working group back in 2006 when they were
14   deliberating on the issue of talcum -- talc
15   products?
16           MS. BROWN:  Objection.  Same question,
17   asked and answered.
18           THE WITNESS:  She's right, but -- but
19   no.
20   BY MS. PARFITT:
21       Q   Okay.  Did IARC ever invite you to
22   attend and share your opinions when they had their
23   asbestos meetings?
24           MS. BROWN:  Same objection.
25           THE WITNESS:  No.

66 (Pages 258 to 261)

Gregory B. Diette, M.D.

Page 262

1    BY MS. PARFITT:
2       Q   Do you know what the NTP is?
3       A   It's like the National Toxicological
4    Program.
5       Q   Okay.  Has the National Toxicological
6    Program ever asked you to do research for them on
7    talcum powder products?
8       A   No.
9       Q   Has the National Toxicology Program ever
10   asked that you do research with them on asbestos?
11      A   No.
12      Q   Have you ever submitted any research to
13   the NTP on anything?
14      A   No.
15      Q   Have you ever submitted any research to
16   IARC on anything?
17      A   No.
18      Q   What is a risk factor?
19          MS. BROWN:  Objection to the form.
20          THE WITNESS:  Are we talking about like
21   an epidemiologic definition?
22   BY MS. PARFITT:
23      Q   Just generally, what's a risk factor?
24          MS. BROWN:  Objection.
25          THE WITNESS:  Well, I don't -- you said

Page 263

1    generally.  It could mean a million things to
2    different people.
3    BY MS. PARFITT:
4       Q   What's it mean to you?
5       A   It depends upon the context.  That's why
6    I'm asking from like an epidemiologic standpoint
7    as opposed to some other context.
8       Q   Well, let's take mesothelioma.  What are
9    the risk factors for mesothelioma?
10      A   Well, if we're talking about, you know,
11   asbestos, for example, as one risk factor, then
12   you could use it that way, that -- that an
13   exposure elevates the risk of developing a
14   disease.
15      Q   Okay.  Let's take talcum powder.  Is
16   talcum powder a risk factor for ovarian cancer?
17      A   I don't believe so.
18      Q   Are there risk factors that are
19   modifiable?
20          MS. BROWN:  Objection to the form.
21          THE WITNESS:  For what?
22   BY MS. PARFITT:
23      Q   For a disease.
24          MS. BROWN:  Same objection.
25   BY MS. PARFITT:

Page 264

1       Q   For instance, if -- is talcum powder a
2    modifiable behavior -- the use of talcum powder a
3    modifiable behavior?
4           MS. BROWN:  Objection.  Misstates his
5    prior testimony.
6           THE WITNESS:  So it -- it should be,
7    yeah.
8    BY MS. PARFITT:
9       Q   Okay.  Now, Dr. Diette, your paper or
10   your expert report was signed and executed by you
11   on February 25th, 2019.
12      A   Correct.
13      Q   Okay.  When did you actually finish the
14   paper, the report?
15      A   Oh, I think about then.  I mean --
16      Q   About then?
17      A   I think around then.  I mean it's -- I
18   don't know whether it was the day before or the --
19   or that actual day, but -- but right around then.
20      Q   Okay.  Are you aware that -- I guess it
21   was just a couple of months earlier that Health
22   Canada issued and published a critical review and
23   assessment of the science, which actually included
24   a comprehensive review of the epidemiological
25   literature?  Did you know that?

Page 265

1           MR. LOCKE:  Objection.
2           MS. BROWN:  Objection.  That misstates
3    the draft assessment.
4           THE WITNESS:  I'm familiar with it.
5    BY MS. PARFITT:
6       Q   Okay.  Have you read it?
7       A   I have.
8       Q   Have you read it in its entirety?
9       A   I don't remember if there's like
10   appendices or something, but I read all the -- you
11   know, the mean part of the text.
12      Q   Okay.  There is also meta-analysis that
13   was performed about that same time.
14      A   Yes.  Yeah.
15      Q   Have you read that?
16      A   I have.
17      Q   Okay.  Did Health Canada do what we
18   would refer to in your world of epidemiology a
19   causality assessment?
20          MS. BROWN:  Objection to the form of the
21   question.
22          THE WITNESS:  I don't know if that's
23   what they did.
24   BY MS. PARFITT:
25      Q   What did they do?

67 (Pages 262 to 265)

Gregory B. Diette, M.D.

Page 266

1          MS. BROWN: Objection.
2          THE WITNESS: It looks to me as if they
3    create -- well, so I don't know. So they -- they
4    have their own process. I don't know anything
5    about Health Canada, so I don't know what they
6    typically do. You know, I've never -- it's unlike
7    some other entities where I would kind of
8    understand their process because I've read their
9    things before.
10          I don't -- I don't know anybody
11    personally that looks to Health Canada for
12    information, so I've never had a conversation with
13    anybody about, you know, what their methods are,
14    how they go about their business.
15          But it looks as if what they were trying
16    to do was to try to line up whether there was
17    information about where talcum powder is found in
18    Canada, so meaning like, you know, how many
19    different kinds of products. It looked like they
20    were trying to assess some things about dermal
21    absorption or not, whether it's ingested or not,
22    whether it's inhaled, whether perineal application
23    matters or not.
24          It seems that they commissioned yet
25    another meta-analysis of some sort by Dr. Taher,

Page 267

1    and -- and then created the document that I guess
2    that they put out there for -- for public comment
3    of some sort.
4    BY MS. PARFITT:
5          Q   Okay. All right. Let's have marked the
6    Health Canada report, the draft assessment. And
7    we'll have that marked as Exhibit No. 14.
8          (Diette Exhibit No. 14 was marked
9          for identification.)
10          (Counsel conferring.)
11    BY MS. PARFITT:
12          Q   Do you have that in front of you?
13          A   I do.
14          Q   Okay. All right. Did the -- did Health
15    Canada look at all three types of study designs?
16    And by that, I mean case control, cohort, and
17    meta-analyses.
18          MS. BROWN: Objection to what you mean
19    by "look at." Objection to the form.
20          THE WITNESS: They've listed -- they've
21    listed some of each.
22    BY MS. PARFITT:
23          Q   All right. So they consider for
24    purposes of their analysis cohort studies,
25    case-control studies and meta-analyses. Is that

Page 268

1    fair?
2          MS. BROWN: Objection to the form.
3          THE WITNESS: That looks to be part of
4    what they've included in here.
5    BY MS. PARFITT:
6          Q   And you yourself, for purposes of your
7    report, looked at case-control studies, cohort
8    studies, and meta-analyses, correct?
9          A   I did.
10          Q   Okay. Did Health Canada perform a
11    Bradford Hill assessment of the evidence?
12          MS. BROWN: Objection to the form.
13          THE WITNESS: They have a section here.
14    I mean, there's something here that -- that
15    resembles a Bradford Hill analysis.
16    BY MS. PARFITT:
17          Q   Okay. Let me direct your --
18          MS. BROWN: Take as long as you need,
19    Doctor, to finish your answer.
20          THE WITNESS: Well, I just -- like I
21    don't know -- I don't know how much leeway there
22    is in the world for people to say that they did a
23    Bradford Hill analysis just by listing out certain
24    keywords, right? I mean it's sort of like a word
25    salad exercise to me for some of these cases, and

Page 269

1    so --
2    BY MS. PARFITT:
3          Q   I'm sorry. A word what?
4          A   Word salad.
5          Q   Word salad.
6          A   Yeah. Not a technical term, but it's
7    kind of a mess, right. So they've got -- like on
8    page 19, they've got strength, and strength is a
9    Bradford Hill criterion. They don't say whether
10    the risk is, you know, weak or strong. They just
11    have a list of 30 epidemiologic studies, and they
12    say a couple things about some of them being
13    statistically significant and -- so forth.
14          Q   Okay.
15          A   And so that -- that isn't really a
16    Bradford Hill type analysis about what the --
17    whether the strength is high or low.
18          And similarly, I would just say like,
19    you know, for temporality, you know, what they've
20    said here is crazy, right. So it's like --
21          Q   I'm sorry. What they've said here is
22    what?
23          A   Crazy.
24          Q   Crazy.
25          A   Crazy.

68 (Pages 266 to 269)

Gregory B. Diette, M.D.

Page 270

1    Q   So let me just ask --
2        MS. BROWN:  Wait now, he is not done.
3    You can follow up when he is done with --
4        MS. PARFITT:  Fair enough.
5        MS. BROWN:  Go ahead, Doctor.
6    BY MS. PARFITT:
7    Q   Okay.  Crazy.
8    A   Okay.  Oh, well, they said like in all
9    case-control studies reporting positive outcomes,
10   the participants recalled the exposure to talc
11   preceded the reported outcome.  I mean that is so
12   far afield from any realistic epidemiologic
13   principle that to say that somehow informs a
14   Bradford Hill analysis -- I don't know, maybe
15   "crazy" is the wrong word.  Maybe absurd, maybe
16   ridiculous.  But every person in the world that
17   has a particular event or outcome, everything
18   about them preceded them.  That isn't the same as
19   temporality.  Temporality in the epidemiologic
20   world is demonstrating that time flowed from the
21   time of the exposure.
22       So, that's why I say like -- you know, I
23   read the words here, I see consistency,
24   specificity, and so forth, but I don't think their
25   application to this is actually a legitimate

Page 271

1    Bradford Hill analysis.
2    Q   All right.  So it's absurd, it's crazy,
3    and your opinion is that they did not do a proper
4    Bradford Hill analysis.  Is that your opinion?
5    A   It is.
6        MR. LOCKE:  Objection.
7        MS. BROWN:  Objection to the form.
8    BY MS. PARFITT:
9    Q   Okay.  All right.  Let me direct -- did
10   they -- let me direct your attention to page 21.
11   And we'll put that up on the ELMO.
12       All right.  Do you see that?  Okay?
13   A   I'm on page 21.
14   Q   Page 21, and it's the last paragraph,
15   and I'll read it.
16       "The most recent meta-analysis detailed
17   above, Taher, et al., 2018, and consistent with
18   the Hill criteria, suggests a small but
19   consistently statistically significant positive
20   association between ovarian cancer and perineal
21   exposure to talc.  Further available data are
22   indicative of a causal effect.  A clear point of
23   departure could not be derived from the available
24   literature.  Consequently, hazard characterization
25   is qualitative in nature."

Page 272

1        Did I read that correctly?
2        MS. BROWN:  You didn't, and actually you
3    said "consistently" and the word is "consistent."
4        MS. PARFITT:  Thank you.
5    BY MS. PARFITT:
6    Q   Did I read that correctly with that
7    correction?
8    A   Yes.
9    Q   Okay.  Do you see where the authors
10   state that, "Further available data are indicative
11   of a causal effect"?  Do you see that?
12   A   I do.
13   Q   Do you agree with Health Canada that
14   there was a causal effect drawn from the genital
15   use of talcum powder products and ovarian cancer?
16       MS. BROWN:  Objection to the form,
17   misstates the draft assessment, lacks foundation.
18       THE WITNESS:  I don't think so, but for
19   the reason that -- being that this is -- this is
20   at some level -- maybe it's a summary, I don't
21   know -- of what they have from above.  But their
22   input information into what they're concluding
23   here is not good.  Right.
24       I mean look -- look up a couple of
25   sentences under "Biologic plausibility," and they

Page 273

1    say:  "The presence of talc in the ovaries has
2    been documented," and cite Heller.  And they say,
3    "The evidence of retrograde transport supports the
4    biologic plausibility."
5        That Heller study doesn't -- doesn't
6    support that, right.  So they're -- they're
7    stringing things together here that don't
8    literally support I think a conclusive statement
9    here.
10       And also I would just say too, that when
11   they say that -- that with the last part of that
12   part you read where it says that "The hazard
13   characterization is qualitative in nature," well,
14   "qualitative" doesn't tell you something about
15   whether it's a strong association.  I mean they --
16   they've resisted using that -- that word here.
17   BY MS. PARFITT:
18   Q   Okay.  So my question for you,
19   Dr. Diette, is do you disagree with the draft
20   Health Canada assessment which found that there
21   was a causal relationship between the use of
22   genital talcum powder products and ovarian cancer?
23       MS. BROWN:  Objection.  That's not what
24   the draft assessment --
25       MS. PARFITT:  Counsel, objection, form.

69 (Pages 270 to 273)

Gregory B. Diette, M.D.

Page 274

1          MS. BROWN:  You're -- it misstates the
2    document intentionally attempting to mislead the
3    witness.
4          MS. PARFITT:  Objection.
5          THE WITNESS:  So I -- first of all,
6    so --
7    BY MS. PARFITT:
8          Q   And, Doctor, let me just say something.
9    You can explain, but -- I have a question, and
10   then you can explain it if you wish.
11         And my question is, do you disagree with
12   the draft Health Canada assessment which found or
13   concluded that there was a causal relationship
14   between the use of genital talcum powder product
15   and ovarian cancer?
16         MR. LOCKE:  Objection.
17         MS. BROWN:  Objection to the form.
18         You can answer it truthfully and
19   accurately.
20         THE WITNESS:  I can't answer it.
21   BY MS. PARFITT:
22         Q   You can't -- wait one second.
23         A   I cannot answer it.
24         Q   You can't answer the question as to
25   whether or not you agree that they concluded that

Page 275

1    there was a causal relationship between talcum
2    powder products and ovarian cancer?
3          A   So that --
4          MS. BROWN:  Objection to the form,
5    misstates the document.
6          Go ahead, Doctor.
7          THE WITNESS:  Yeah, your question has
8    morphed, right.  And so I'm still stuck on the way
9    it came out when you first said it.
10   BY MS. PARFITT:
11         Q   Then let's go -- we'll go with the one
12   the --
13         MS. BROWN:  Wait, let him finish.
14         MS. PARFITT:  No.  Excuse me.
15         MS. BROWN:  Counsel, you've been doing
16   that all day.  You cannot cut this witness off.
17   He needs to finish.
18         MS. PARFITT:  I'm not -- he asked for
19   what question I wanted to ask, so let me ask it
20   again.
21   BY MS. PARFITT:
22         Q   Do you have -- is it -- do you -- strike
23   that.
24         Do you agree or disagree with Health
25   Canada and their assessment of causality between

Page 276

1    talcum powder products used in the genital area
2    and ovarian cancer?  That's the question.
3          MS. BROWN:  Objection to the form of the
4    question, misstates the document --
5    BY MS. PARFITT:
6          Q   You may answer.
7          A   Is there a specific sentence in there
8    that says that?
9          Q   It's the question that I've asked you.
10         A   Oh, so I can't answer it.  I can answer
11   the --
12         Q   Is there a specific question --
13         MS. BROWN:  Wait, wait, let him finish.
14   BY MS. PARFITT:
15         Q   -- 20, 21, 28, and Roman numeral iii?
16         MS. BROWN:  What?
17         THE WITNESS:  If there's a specific
18   sentence that says that, and you want me to agree
19   or disagree, I can agree or disagree with that
20   sentence.
21         What I can't agree with is an entire
22   document because I think it's not fair.  I'm not
23   talking about just this one.  I think, you know,
24   lawyers like to do this, right.  They like to say,
25   Do you agree with a such-and-such paper.  Well,

Page 277

1    it's nonsense.  You don't agree with the paper.
2    You agree with the finding or you agree with the
3    conclusion, but not with the entire thing.
4          So here what I'm saying is, there's an
5    entire document here.  There's some good stuff and
6    some bad stuff, and I can point out some of --
7    some of each.
8          But the point here is if there's a
9    specific statement that they made that says --
10   about causation, I would just like to see that
11   particular statement and tell you whether I can
12   agree with it or not.
13   BY MS. PARFITT:
14         Q   Well, look at page 28 -- or excuse me,
15   21, the page we were on.
16         Do you have that in front of you?
17         A   I do.
18         Q   Okay.  "Available data are
19   indicative" --
20         MS. BROWN:  Counsel, where are you?
21         MS. PARFITT:  It's the paragraph just
22   above "Exposure Assessment."  It says the recent
23   -- we just read it.
24   BY MS. PARFITT:
25         Q   "The most recent meta-analysis detailed

70 (Pages 274 to 277)

Gregory B. Diette, M.D.

Page 278

1    above, Taher, and consistent with the Hill
2    criteria, suggests a small but consistent
3    statistically significant positive association
4    between ovarian cancer and perineal exposure to
5    talc. Further available data are indicative of a
6    causal effect."
7                MS. BROWN:  What's the question?
8    BY MS. PARFITT:
9        Q   Do you agree with the conclusions of
10   Health Canada?
11               MS. BROWN:  Objection to the form.  This
12   is not the conclusion section.
13               THE WITNESS:  So, first of all, the --
14   the first sentence that you read there talks about
15   a significant positive association, which isn't
16   the same as cause.  Right.  And then they say,
17   "Further available data are indicative of..."
18               I -- I think if you're trying to say
19   that something causes something, you come out and
20   you say it.  You don't say, "Further data are
21   indicative of it."  So I -- I don't think this
22   statement says talcum powder causes ovarian
23   cancer.
24   BY MS. PARFITT:
25       Q   Okay.  So your quarrel with Health

Page 279

1    Canada is the fact that they didn't say it, Talcum
2    powder products used in the genital area cause
3    ovarian cancer.
4        A   Well --
5        Q   You quarrel with their language.  Is
6    that what you're saying?
7        A   Well, I quarrel --
8                MS. BROWN:  Objection.  Misstates his
9    testimony.
10               THE WITNESS:  I quarrel a little with
11   you, I think -- I'm sorry.
12               THE REPORTER:  I'm sorry, your --
13               MS. BROWN:  I just want to object to the
14   question as misstating your testimony.
15               THE WITNESS:  Because I think your
16   initial question before you read it literally was
17   about whether or not they said that it causes it,
18   and I don't think that it said that.
19               And -- and I think otherwise that there
20   are some flaws in the -- in the information that
21   they've used up above to reach this -- I guess
22   it's a conclusion.  I don't know if it is or not.
23   BY MS. PARFITT:
24       Q   Okay.  Does it say, "Further available
25   data are indicative of a causal effect"?

Page 280

1        A   That sentence is there.
2        Q   All right.  Okay.
3                MS. BROWN:  Counsel, if you're moving to
4    another area, would --
5                MS. PARFITT:  I am.
6                MS. BROWN:  Would this be a good time
7    for a break?
8                MS. PARFITT:  Yeah.  I'm going to move
9    on and change gears.
10               THE VIDEOGRAPHER:  The time is 1:52
11   p.m., and we are off the record.
12               (Recess.)
13               THE VIDEOGRAPHER:  The time is
14   2:04 p.m., and we're back on the record.
15   BY MS. PARFITT:
16       Q   Dr. Diette, you mentioned before the
17   break the Heller article, and so I don't misquote
18   you, what was your position with regard to Heller
19   and what it stood for?
20       A   I think if we're talking about the --
21   the right one, it's the one where the ovaries were
22   removed from, I think, 24 women, and that 12 -- 12
23   had said that they were talcum powder users and 12
24   not, but they found a -- they found a similar
25   amount of talc in ovaries regardless of whether

Page 281

1    they were users or not.
2        Q   Okay.  Is -- is it your opinion that
3    talc cannot migrate to the ovaries?
4        A   I don't know that it can.  I -- if it's
5    found there, I'm not sure how it got there.
6        Q   Is it your opinion that asbestos can
7    migrate to the ovaries?
8                MS. BROWN:  Objection to the form.
9                THE WITNESS:  I've seen -- I don't think
10   I've seen anything that shows for sure that it
11   can.
12   BY MS. PARFITT:
13       Q   Okay.  If asbestos was found in the
14   ovaries, how would it get there?
15               MS. BROWN:  Objection to the form.
16               THE WITNESS:  So I don't know.  I mean,
17   it's -- I don't know of a worked-out mechanism
18   that shows how it got there.
19               (Diette Exhibit No. 15 was marked
20               for identification.)
21   BY MS. PARFITT:
22       Q   Let me show you what's been marked as
23   Heller Exhibit No. 15.  And it is a 1996 article
24   entitled "Asbestos Exposure and Ovarian Fiber
25   Burden."

71 (Pages 278 to 281)

Gregory B. Diette, M.D.

Page 282

1      (Counsel conferring.)
2    BY MS. PARFITT:
3      Q   Do you have that in front of you?
4      A   I do.
5      Q   All right.  Now, this was a different
6    Heller article than the one you were referring to?
7      A   Thank you, yes.
8      Q   Okay.  All right.  Now, let me direct
9    your attention to the Abstract section, the last
10   paragraph.
11     Okay.  And it states:  "This study
12   demonstrates that asbestos can reach the ovary.
13   Although the number of subjects is small, asbestos
14   appears to be present in ovarian tissue more
15   frequently and in higher amounts in women with a
16   documentable exposure history."
17     Did I read that correctly?
18     A   Yes.
19     Q   All right.  Do you agree with that
20   statement?
21     MS. BROWN:  Objection to the form.
22     THE WITNESS:  Give me one sec, because
23   I -- it's been a while since I looked at this.
24     MS. BROWN:  Take your time, Doctor.
25     THE WITNESS:  (Peruses document.)  Yeah,

Page 283

1    again, like -- so not entirely.
2    BY MS. PARFITT:
3      Q   What part -- what part --
4      MS. BROWN:  Let him finish.
5    BY MS. PARFITT:
6      Q   What part do you agree with?
7      A   Well, the -- I think that it's -- it's
8    not -- well, so the study demonstrates that
9    asbestos can reach the ovary.  I guess if it's
10   definitely there, then -- and it got there somehow
11   and it wasn't through contamination, you know, of
12   the procedure that -- that led to it, you could --
13   you know, you could infer that there's some way
14   that it got there.
15     I think it doesn't tell us anything
16   about how to make sense of that.  And what I was
17   looking for that I remember is that they said that
18   it's unclear why so many women giving no exposure
19   history did have detectible asbestos in their
20   ovaries.
21     Q   Where do you see that?
22     A   I'm sorry.  I'm on 439.
23     Q   Thank you.
24     A   And in the Conclusion paragraph.
25     Q   Mm-hmm.  Yes.

Page 284

1      A   And it's about the middle of the
2    paragraph, and it says it is -- it says --
3    above it, it says:  "None of the exposed subjects
4    in the study was directly occupationally exposed
5    but all were passively exposed to household
6    contact.  It is unclear why so many of the women
7    giving no exposure history did have detectible
8    asbestos in their ovaries, although it is known
9    that there is a background level of asbestos in
10   the lung tissue of non-exposed individuals."
11     So I -- I don't know.  I just don't --
12   that this -- this cements the idea that -- that we
13   know something about how asbestos, you know, can
14   get to the ovaries.
15     Q   All right.  Let me direct your attention
16   to the bottom of 438, top of 439.
17     At the bottom of 438, it says "There
18   is," and then it goes on to the top of 439:
19   "There is evidence of transport of particulate
20   matter into the female perineum by the
21   transvaginal route."
22     A   I apologize, I -- I'm not with you, and
23   I just --
24     Q   Oh, sure.
25     A   I'm just trying to --

Page 285

1      Q   It's right here, upper corner, 439.
2      A   Got you.
3      Q   Okay?
4      A   Yep.
5      Q   All right, again.  "There is evidence of
6    transport of particulate matter into the female
7    perineum by the transvaginal route in both human
8    and animal studies."  It cites Egli and Newton,
9    1961.  It cites Henderson, 1986; Venter -- and I'm
10   sure I'll destroy this name -- Iturralde, 1979;
11   Whittemore, 1988.  "Suggested that vaginal
12   exposure to particulate matter such as asbestos
13   and talc was a potential risk factor for
14   intraperitoneal ovarian exposure.  Her conclusion
15   was based on finding that in talc exposed women, a
16   previous history of hysterectomy or tubal
17   ligation, which blocks perineum access, was
18   protective against ovarian cancer."
19     It goes on to say:  "Talc has been
20   implicated as a possible etiological agent in
21   ovarian cancer," citing Harlow '89 and '92, "and
22   is related to the asbestos problem in several
23   ways.  Aside from the chemical similarities
24   between the two, many cosmetic talcs contained
25   significant amounts of asbestos, particularly

72 (Pages 282 to 285)

Gregory B. Diette, M.D.

1   prior to '70 -- 1976, Cramer, 1982. The
2   significance of this detection of talc in the
3   majority of exposed women and in all women giving
4   no exposure history is unclear and further studies
5   are underway to further elucidate this question."
6        Did I read that correctly?
7        A   Yes.
8        Q   Question:  Are there chemical
9   similarities between cosmetic talcs and asbestos?
10       MS. BROWN:  Objection to the form.
11       THE WITNESS:  So some of the same --
12   some of the same features chemically are present
13   in both.
14   BY MS. PARFITT:
15       Q   All right.  Set that aside for a minute.
16   We may come back to that.
17       Dr. Diette, for purposes of your
18   opinions in this case, you have stated that the
19   cohort studies lack statistical significance, and
20   only a subset of the case-control studies are
21   statistically significant.  Therefore, there is a
22   disparity and inconsistency between cohorts and
23   case control.
24       Have I summed it up pretty well?
25       A   That -- that's one of the -- one of the

1   bits of evidence of inconsistency.
2        Q   Okay.  Would you agree that to disregard
3   study results based upon whether they are
4   statistically significant or not statistically
5   significant would be a mistake?
6        MS. BROWN:  Objection to the form.
7   Counsel, is there something you're reading from
8   that --
9        MS. PARFITT:  No.  Actually, my notes,
10   and he doesn't get those.  Thank you.
11       THE WITNESS:  Okay.  So "disregard" is
12   pretty severe.  Right.  So I don't think that
13   somebody should disregard any study, unless it's,
14   you know, fraudulent or, you know, created out of
15   nowhere.  So I think that people should regard the
16   findings and interpret them appropriately.
17       So I think that would be an overly
18   strong thing to do, which would be to disregard it
19   simply because it's statistically insignificant.
20   BY MS. PARFITT:
21       Q   Okay.  Do you know who Ken Rothman is?
22       A   I -- I know of him.  I don't know him
23   personally.
24       Q   Okay.  What does he do for a living?
25       MS. BROWN:  Objection to the form.

1        If you know.
2        THE WITNESS:  Can I assume or --
3        MS. BROWN:  No, if you don't know, don't
4   answer.  Then you have no basis to answer the
5   question.
6   BY MS. PARFITT:
7        Q   My question is, do you know what Ken
8   Rothman's area of expertise is?
9        MS. BROWN:  Objection.
10       THE WITNESS:  Well, he's -- he's made a
11   career out of -- out of case-control studies and
12   articulating, you know, features of the design and
13   so forth.
14   BY MS. PARFITT:
15       Q   All right.  Is he an epidemiologist?
16       A   Well, that's what I was trying to
17   remember.  Like, I would be guessing.  Like,
18   I assume for him to be in that role, he would be,
19   but there are people that come to epidemiology
20   from other -- you know, other backgrounds, and so
21   I just don't know his credentials.
22       Q   Okay.  What about Sander Greenland, do
23   you know who he is?
24       A   I know the name, but I don't know him.
25       Q   Okay.  Have you ever -- do you know what

1   kind of scientist Sander Greenland is?
2        MS. BROWN:  Objection.  Form.
3        THE WITNESS:  I do not.
4        MS. BROWN:  Foundation.
5   BY MS. PARFITT:
6        Q   Okay.  All right.  Do you know Timothy
7   Lash?
8        MS. BROWN:  Objection.  Foundation.
9        THE WITNESS:  I don't know the name.
10   BY MS. PARFITT:
11       Q   Okay.  Do you know what kind of
12   scientist Tim -- Timothy Lash is?
13       MS. BROWN:  Same objection.
14       THE WITNESS:  It would be hard to know
15   that --
16   BY MS. PARFITT:
17       Q   Okay.
18       A   -- without knowing him.
19       Q   Okay.  Let me show you what we will have
20   marked as Exhibit No. -- 61?  16.
21       MR. TISI:  We're not that high.
22       (Diette Exhibit No. 16 was marked
23       for identification.)
24   BY MS. PARFITT:
25       Q   And I will -- and I will represent,

Gregory B. Diette, M.D.

Page 290

```
1     Dr. Diette, that this is Chapter 2 out of the
2     Third Edition, Modern Epidemiology.
3             Do you see that?
4        A  I do.
5        Q  Okay.  And if you look at the front of
6     it, it has three authors.
7             Do you see that?
8        A  I do.
9        Q  Okay.  The first one is Ken Rothman.  Do
10    you see that?
11       A  Correct.
12       Q  The second one is Sander Greenland.
13       A  Correct.
14       Q  And the third author is Tim Lash.  Do
15    you see that?
16       A  I do.
17       Q  And they are -- the book that they have
18    authored is called Modern Epidemiology, Third
19    Edition.  Do you see that?
20       A  I do.
21       Q  Okay.  Let me -- let me direct your
22    attention to page 27.
23          MS. BROWN:  Counsel, are you going to
24    lay a foundation for the use of this document?
25          MS. PARFITT:  I can just ask a question.
```

Page 291

```
1     I can do that.
2     BY MS. PARFITT:
3        Q  Let me ask a question.
4          "To claim that literature, scientific
5     literature, or a set of results reported in
6     scientific literature is inconsistent simply
7     because some results are statistically
8     significant, and some are not, would be completely
9     fallacious, even if one accepts the use of
10    significant testing methods."
11          Do you agree with that statement?
12          MR. LOCKE:  Objection.
13          MS. BROWN:  Objection.  Form,
14    foundation.
15          THE WITNESS:  Is that a hybrid of a
16    couple of things?  Because I thought I was reading
17    with you, and then I might have left off.
18    BY MS. PARFITT:
19       Q  Well, why don't we do this.  We'll put
20    it back on the ELMO, and I'll represent that it is
21    a --
22       A  Yeah, I don't doubt you.  I just --
23       Q  Sure, no worries.  That's fine.
24       A  It goes on to a different sentence.
25       Q  That's fine.
```

Page 292

```
1          MS. BROWN:  I have a continuing
2     foundation.
3          MS. PARFITT:  That's fine, Counsel.
4          MS. BROWN:  -- objection to this
5     exhibit, for which no foundation has been laid.
6     BY MS. PARFITT:
7        Q  All right.  Again, I'm referring to the
8     category consistency which I represent that is in
9     Chapter 2 of the Rothman book, and we can just go
10    ahead and circle the paragraph that starts:  "One
11    mistake in implementing the consistency criterion
12    is so common that it deserves special mention.  It
13    is sometimes claimed that a literature or set of
14    results is inconsistent simply because some
15    results are statistically significant, and some
16    are not."
17          Did I read that correctly?
18       A  You did.
19       Q  "This sort of evaluation is completely
20    fallacious, even if one accepts the use of
21    significant testing methods."
22          Did I read that correctly?
23       A  You did.
24       Q  All right.  Do you agree with that
25    statement?
```

Page 293

```
1          MR. LOCKE:  Objection.
2          THE WITNESS:  So wait a minute, I just
3     want to -- so there's a couple of statements
4     there.  I think the part that makes it agreeable
5     is to say that -- that if it's claimed that
6     results are -- and I'm paraphrasing --
7     BY MS. PARFITT:
8        Q  Sure.
9        A  -- but that the results are inconsistent
10    simply, and the word "simply" to me is really
11    important here because it suggests that somebody
12    would be not looking at the entire universe of
13    evidence that they have available.
14          So I think if you just took a quick look
15    at studies and said some were significant and some
16    weren't and left it at that, you know, it's a
17    pretty strong statement, but I think -- I think
18    that would be a mistake to only do that.
19       Q  All right.  Now, you're not a
20    statistician, correct?
21       A  I'm not a statistician.
22       Q  Okay.  And you're not a biostatistician.
23       A  I'm not a biostatistician.
24       Q  Okay.  Do you know who Daniel Ford is?
25       A  I do.
```

74 (Pages 290 to 293)

Gregory B. Diette, M.D.

Page 294

1    Q   Okay.  Who is Daniel Ford?
2    A   If it's the one that --
3    Q   Daniel E. Ford.
4    A   I don't know his middle name, but
5  there's a Dan Ford at our -- at our place.
6    Q   Okay.  Is the Dan Ford you know vice
7  dean for clinical investigation, Johns Hopkins
8  School of Medicine?
9    A   Yes.
10   Q   Okay.  Is he a friend of yours?
11   A   We're friendly.  I mean, we don't hang
12  out, though.
13   Q   Now, he is with the Institute for
14  Clinical and Translational Research; is that
15  correct?
16   A   He has been.  I'm just trying to think
17  if that still exists.  Because I know there was a
18  funding issue, so -- but he -- he certainly was in
19  that role, and he may still be.
20   Q   He may what?
21   A   He may still be.  I just -- I just -- I
22  thought I had heard that the ICTRs were going to
23  be not funded anymore.
24   Q   Okay.
25   A   Maybe it's true, maybe not; but I'm just

Page 295

1  saying for sure he was part of that.
2    Q   Mm-hmm.  Okay.  Sure.  Okay.
3    All right.  Are you a member -- and I'm
4  assuming you're not because you're not a
5  statistician, but I should assume nothing.
6    Are you a member of the American
7  Statistical Association?
8    A   I am not.
9    Q   Okay.  Do you know who they are?
10   A   Not -- not really.  I mean, it -- it
11  sounds like the name gives them away, but I
12  don't -- I don't know, you know, who they are as
13  an entity otherwise.
14   Q   That's fair.  Okay.
15   Are you aware that due to a widespread
16  misuse by scientists and researchers regarding
17  statistical significance and p-values, that the
18  American Statistical Association issued a
19  statement back in 2016 warning the scientific
20  community of this misuse and urging them to cease
21  and desist with the p-value?
22   MR. LOCKE:  Objection.
23   MS. BROWN:  Objection to the form, lacks
24  foundation, misrepresents the facts.
25  BY MS. PARFITT:

Page 296

1    Q   Do you know about that?
2    A   I'm aware of that.
3    Q   Okay.  Now, are you -- did you read
4  Dr. Bowman's deposition?
5    A   I did.
6    Q   Okay.  Did you see that in Dr. Bowman's
7  deposition?
8    A   I saw -- I'm just trying to remember.  I
9  saw the Nature article, I think that is more
10  recently published than -- you said 2016?
11   Q   Originally, yes.
12   A   Yeah, but I can't remember if 2016 was
13  in her deposition, but for sure the more recent
14  one.
15   Q   The one in 2019?
16   A   Exactly right, yeah.
17   Q   All right.  All right.  Let me show you
18  then what's been marked as -- or will be marked as
19  17.  And it is the March 2019 --
20   (Counsel conferring.)
21  BY MS. PARFITT:
22   Q   Okay.  Let me show you what we will have
23  marked as 17, a study that appeared in The
24  American Statistician in 2019.  It's Volume 73,
25  and it's called "Moving to a World Beyond P <

Page 297

1  0.05."
2    Do you see that?
3    A   Actually, I was just sort of flipping
4  through to see what I'm looking at.  Oh, so the
5  title, yes.
6    Q   Okay.  Is this a document you were
7  referring to?
8    A   No.
9    Q   No?
10   A   I was referring to the one in Nature
11  that I think reports about this.
12   Q   Yes.  Okay.  Let's go ahead and get that
13  marked, and we'll talk about all three.
14   (Diette Exhibit No. 17 was marked
15   for identification.)
16   MS. PARFITT:  Let's have marked as
17  Exhibit No. 18.
18   (Diette Exhibit No. 18 was marked
19   for identification.)
20  BY MS. PARFITT:
21   Q   And I will represent that 18 is a Sander
22  Greenland article that appeared in Nature on
23  March 2019.
24   Okay.  Is that the article you were
25  referring to?

75 (Pages 294 to 297)

Gregory B. Diette, M.D.

Page 298

1      A   Yes.
2      Q   Okay.  Have you had an opportunity to
3  read Exhibit No. 18?
4      A   I have.
5      Q   Okay.  Exhibit 17, which is the
6  Wasserstein article, have you had an opportunity
7  to read it prior to today?
8      A   This -- this one, no.
9      Q   Okay.  All right.  Let's first take a
10  moment and discuss what's been marked as 18.
11      Excuse me.  No, 18.  18.
12      Are you aware that due to the American
13  Statistical Society's concern of the misuse of
14  statistical significance and p-value, that they
15  literally used their March 2019 research paper and
16  devoted attention to this issue and attached
17  almost 40 papers on statistical inference?  Are
18  you aware of that?
19      MR. LOCKE:  Objection.
20      MS. BROWN:  Objection to the form,
21  misstates the facts.  Are you referring to
22  Exhibit 17?
23      MS. PARFITT:  No.  17.  17.
24      MS. BROWN:  Yes, 17.
25      MS. PARFITT:  No, I'm not referring to

Page 299

1  that at all.  I'm just -- I'm asking a question.
2      MS. BROWN:  Objection.  Lacks
3  foundation, misstates the facts.
4      THE WITNESS:  I saw that there was a --
5  a journal issue that had many articles.  I
6  didn't -- I don't know what the count was, but
7  there -- it's probably the same thing we're
8  talking about, but I'm not sure.
9  BY MS. PARFITT:
10      Q   Okay.  Did you have a chance to read
11  those 40 or so articles?
12      MS. BROWN:  Objection to the form.
13      THE WITNESS:  I -- I wish I had that
14  kind of time, but --
15  BY MS. PARFITT:
16      Q   You and me both.
17      A   Yeah.
18      Q   Okay.  All right.  Let's stay a few
19  minutes on 17, and we'll put it up on the ELMO.
20      And it starts --
21      MS. BROWN:  Counsel, he's never seen 17
22  before, so he's going to need a minute to
23  familiarize himself with it --
24  BY MS. PARFITT:
25      Q   Take a minute to familiarize yourself.

Page 300

1      MS. BROWN:  -- before you ask him any
2  questions about it.
3  BY MS. PARFITT:
4      Q   I just have a couple of questions about
5  it.
6      MS. BROWN:  Take as long as you need.
7      THE WITNESS:  (Peruses document.)
8  BY MS. PARFITT:
9      Q   And I just have a couple of questions
10  about it.
11      A   Sure.
12      MS. BROWN:  He's never seen it, so he
13  needs --
14      MS. PARFITT:  That's fine.
15      MS. BROWN:  -- as long as he needs.
16      MS. PARFITT:  He can take -- yeah.
17      THE WITNESS:  Well, I won't be able to
18  read it in --
19  BY MS. PARFITT:
20      Q   Okay.  Let me just --
21      A   -- in realtime today.
22      Q   -- ask you a couple of questions.  I'm
23  not expecting you to digest it.
24      All right.  The first paragraph, it
25  says -- do you have it up there?

Page 301

1      "Some of you exploring this special
2  issue of The American Statistician might be
3  wondering if it's a scolding from the pedantic
4  statisticians lecturing you about what not to do
5  with p-values, without offering any real ideas of
6  what to do about the very hard problem separating
7  signal from noise in data and making decisions
8  under uncertainty.  Fear not, in this issue,
9  thanks to 43 innovative and thought-provoking
10  papers from forward-looking statisticians, help is
11  on the way."
12      Do you see that?
13      A   I do.
14      Q   Okay.  Did I read that correctly?
15      A   You did.
16      Q   And is that the 43 papers that you were
17  speaking of that you didn't have time to read?
18      MS. BROWN:  Objection to the form, lacks
19  foundation.
20      THE WITNESS:  I -- I think so.  I mean,
21  this sounds familiar.  I think it's what I was
22  looking at, but I'm not -- not a hundred percent
23  sure.
24  BY MS. PARFITT:
25      Q   Okay.  If you'd look at right under

76 (Pages 298 to 301)

Gregory B. Diette, M.D.

1  "'Don't' is Not Enough." Do you see that?
2      A   Yes.
3      Q   All right. The first sentence says:
4  "There's not much we can say here about the perils
5  of p-values and significance testing that hasn't
6  already -- that hasn't been said already for
7  decades."
8          Did I read that correctly?
9      A   Yes.
10     Q   And then it goes down to the first one:
11 "Don't base your conclusions solely on whether an
12 association or effect was found to be
13 statistically significant. The p-value passed
14 some arbitrary threshold such as p < 0.05."
15         Did I read that correctly?
16     A   Yes.
17     Q   Do you agree with that statement?
18         MR. LOCKE: Objection.
19         THE WITNESS: So there's a lot to this,
20 right. I mean because, I mean, the lead in to it,
21 it says -- it says that there's not much to say
22 here, you know --
23 BY MS. PARFITT:
24     Q   That hasn't been said.
25     A   -- hasn't been said for decades.

1          MS. BROWN: Wait, wait, let him finish.
2          THE WITNESS: And -- and that's --
3  that's pretty -- well, I can't say it's true
4  because I haven't read this, so I don't know
5  what's in here, but the debate about p-values and
6  statistical significance isn't brand new. I mean,
7  I've been talking about it with colleagues for
8  decades, and I'm sure there were people decades
9  before me. So that -- that part rings me.
10         And I think -- you know, I don't know
11 when they're talking about conclusions. That's
12 a -- that's a pretty broad topic, but I think the
13 word "solely" is very helpful there, that we
14 shouldn't be making decisions solely on whether
15 something is statistically significant. And
16 there's more to it than that.
17 BY MS. PARFITT:
18     Q   Okay.
19     A   But that's a -- that's a super broad
20 statement, and I don't know, you know, in every
21 circumstance whether that would be agreeable or
22 not.
23     Q   Okay. Look at the last bullet there.
24 It states: "Don't conclude anything about
25 scientific or practical importance based on

1  statistical significance or lack thereof."
2          Do you agree with that statement?
3          MS. BROWN: Objection to the form.
4          And, Doctor, if you need to read the
5  whole article to answer these questions --
6          MS. PARFITT: Counsel, don't coach the
7  witness.
8          MS. BROWN: -- you should do that.
9          Yeah, but you are knowingly --
10 BY MS. PARFITT:
11     Q   Go ahead, Doctor.
12         MS. BROWN: -- putting a document in
13 front of him that he's never seen, so we're not
14 going to sit here --
15 BY MS. PARFITT:
16     Q   I'm asking you a question, Dr. Diette --
17         MS. BROWN: -- and play cherry-
18 picking statements to get --
19 BY MS. PARFITT:
20     Q   -- do you agree that one should not
21 conclude anything about scientific or practical
22 importance based on statistical significance or
23 lack thereof? Do you agree with that?
24         MR. LOCKE: Objection.
25         MS. BROWN: Same objection.

1          THE WITNESS: So, anyway, I think by
2  saying "don't conclude anything," I think makes
3  this not a very agreeable statement for me.
4  BY MS. PARFITT:
5      Q   Okay. All right. Let's turn to what
6  you did read, what's that's Exhibit 18.
7          Do you have that, Doctor?
8      A   I do.
9      Q   Okay. And this is an article that
10 appeared in Nature back in March of 2019, correct?
11     A   That's right.
12     Q   Okay. And you did have a chance to read
13 this; is that correct?
14     A   I did.
15     Q   Okay. And under the section "Pervasive
16 Problem," do you see that?
17     A   Yes.
18     Q   Okay. It states: "Let's be clear about
19 what must stop. We should never conclude there is
20 no difference or no association just because the
21 p-value is larger than the threshold, such as
22 0.05, or equivalently because a confidence
23 interval includes zero. Neither should we
24 conclude that two studies conflict because one had
25 a statistically significant result and the other

Gregory B. Diette, M.D.

Page 306

1    did not.  These errors waste research efforts and
2    misinform policy decisions."
3         Did I read that correctly?
4    A    You did.
5    Q    Do you agree with that?
6         MS. BROWN:  Objection to the form.
7         MR. LOCKE:  Objection.
8         THE WITNESS:  To me it's overly broad,
9    and I think that -- I think that if we go through
10   and we find a sentence or two in here that are
11   agreeable or not, there's a -- there's a much,
12   much bigger proposition here about what's going
13   on, and I don't think it boils down to any one of
14   these sentences.
15        And I think this looks like a passionate
16   opinion piece, right.  That's calling it an
17   article, but it's a commentary.  And, you know,
18   these guys might believe that, but I don't -- I
19   don't think it's a mainstream view, and it's not
20   my view, you know, without any qualifications
21   that -- that that statement is correct either.
22   Q    Okay.  Are you aware that over 800
23   statisticians and scientists signed on to this
24   document to push the concept of abandoning
25   statistical significance?

Page 307

1         MS. BROWN:  Objection to the form.
2         MR. LOCKE:  Objection.
3         THE WITNESS:  I saw that.
4    BY MS. PARFITT:
5    Q    Okay.  You weren't one of those, were
6    you?
7         MS. BROWN:  Objection to the form.
8         THE WITNESS:  I'm not a statistician.
9    BY MS. PARFITT:
10   Q    Okay.  Well, but you use statistics in
11   your practice?
12   A    I do.
13   Q    Okay.  Did anyone say you had to be a
14   statistician to sign on to that proposition?
15   A    Well, I -- I thought I heard you say
16   statisticians.  Maybe I -- I might have misheard.
17   I thought you said 800 statisticians.
18   Q    I said there are about 800 statisticians
19   and other scientists that --
20   A    Oh, and other scientists.
21   Q    -- yeah, that signed on to this.
22   A    No, I didn't hear right.  So I just --
23   so I don't know what the criteria were for who
24   could sign or not sign.
25   Q    Okay.  You didn't sign on to it, though;

Page 308

1    is that correct?
2    A    I didn't.
3         MS. BROWN:  Asked and answered.
4    BY MS. PARFITT:
5    Q    All right.  Now, let me have marked now
6    as Exhibit No. 19.
7         (Diette Exhibit No. 19 was marked
8         for identification.)
9    BY MS. PARFITT:
10   Q    Do you have that, Doctor?
11        Take a look at that, if you will.
12   A    (Peruses document.)  So is this meant to
13   be a couple of things?
14   Q    It's two things.  I will represent to
15   you that the face sheet states "Johns Hopkins
16   Institute for Clinical and Translational
17   Research."  The American Statistician special
18   issue, "Moving to a World Beyond P < 0.05."  It's
19   dated March 25, 2019.  It has The American
20   Statistician on the side.
21   A    What are we -- I'm confused, though.
22   This is -- this is Exhibit 17 with something
23   attached to it or --
24   Q    You know, that's exactly it.  And if you
25   look at Exhibit 19 --

Page 309

1    A    Mm-hmm.
2    Q    -- it is moving -- it states "Moving to
3    the World Beyond P" -- it's a special issue of The
4    American Statistician.  The lead article calls for
5    abandoning the use of status -- statistically
6    significant, and offers much, not just one thing,
7    to replace it, written by Ron Wasserstein, Allen
8    Shirm, and Nicole Lazar.  The coeditors of this
9    special issue summarize the content of the issue's
10   43 articles.
11        These articles -- and put this up
12   there -- discuss the use of p-values and
13   statistical significance that Johns Hopkins'
14   researchers may find beneficial, and it attaches
15   the full article, which is what's been marked as
16   Exhibit No. 17.
17        Do you see that?
18   A    I do.
19   Q    Okay.  Did anyone share with you at
20   Johns Hopkins that their Clinical and
21   Translational Research group was disseminating the
22   article by Wasserstein, "Moving to a World Beyond
23   P < 0.05," and urging individuals not only to
24   abandon the use of statistical significance, but
25   to discuss the use of p-values and statistical

78 (Pages 306 to 309)

Gregory B. Diette, M.D.

Page 310

1   significance with the researchers at Johns
2   Hopkins?
3           And that's a mouthful.  So let me make
4   it really clear.
5           MS. BROWN:  Let me object --
6           MS. PARFITT:  I move to strike the
7   question.
8           MS. BROWN:  You're going to strike it?
9           MS. PARFITT:  Yeah, let me strike it.
10  BY MS. PARFITT:
11      Q   Were you aware, Dr. Diette, that the
12  division of Clinical and Translational Research
13  over at Hopkins had distributed to its scientists
14  this group of 43 articles, including the
15  Wassertine -- Wasserstein, for purposes of
16  educating them with regard to this concern over
17  the misuse of statistical significance?
18          MS. BROWN:  I object to a complete
19  misrepresentation of the exhibit and to
20  foundation.
21          THE WITNESS:  So I mean, there's a lot
22  of things, right.  I'll try to answer as many as I
23  can.
24          So one is that I probably got something
25  because I'm -- I've been part of the ICTR, and I

Page 311

1   use the resources, I'm one of the people who
2   helped to write the grant to get it funded, and
3   so -- like I get a zillion things that fly by.
4           I don't know if I saw this or not, but I
5   probably wouldn't have clicked on if it came
6   through like an e-mail because I had already seen
7   it, like, as part of this -- as part of the Bowman
8   deposition.
9   BY MS. PARFITT:
10      Q   Mm-hmm.
11      A   But other than that, I mean, I think
12  it's -- I think they're smart to do it.  They
13  should always put stuff out there for people to
14  read.  It doesn't mean that we're going to get rid
15  of p of 0.05.  It doesn't mean we're going to get
16  rid of statistical significance.  They're just
17  saying it's an interesting read.
18      Q   Do you know any of the signatories to
19  this particular document?
20      A   I found one.  One that I know
21  personally, and I'm just trying to remember if
22  there was anybody else that I saw.
23      Q   Well, let me show you what we'll have
24  marked as Exhibit No. 20.
25      A   Yeah, so let me just say, so I didn't

Page 312

1   read all 800, but I looked to see if there were
2   people from Hopkins in particular that signed it,
3   and I knew one of the two.
4       Q   Okay.  Let me show you what we'll have
5   marked as Exhibit No. 20.  And I will represent to
6   you that it is a list of the 800 signatories that
7   joined together to support this movement to
8   abandon p-value in statistical significance.
9           (Diette Exhibit No. 20 was marked
10          for identification.)
11          MS. PARFITT:  Again, Counsel, I
12  apologize.  Apparently, we only have one copy of
13  this document.
14          MS. BROWN:  So is it the blog soliciting
15  the signatures, or is it just the list?
16          MS. PARFITT:  It is the list of
17  signatories.
18          MS. BROWN:  Okay, that's fine.
19  BY MS. PARFITT:
20      Q   Do you see that?
21      A   I do.
22      Q   Okay.  Do you know an Elizabeth Ogburn?
23      A   I don't.  I saw her name on here, but
24  I -- I don't know her.
25      Q   All right.  Do you know Daniel

Page 313

1   Sharfenstein (phonetic)?
2       A   Sharfstein, and I know him.  Yeah.
3       Q   Okay.  Is that -- do you know anyone
4   else that might appear on that list?
5       A   I don't know.  I didn't read it.  I
6   just -- I literally just did a word search for
7   "Hopkins," and I came up with like one person
8   whose name is Hopkins who works in England, and
9   another one, something Hopkins Institute, which is
10  not, and then two from Johns Hopkins.
11      Q   Okay.  When did you do this research?
12      A   In the last week.  I mean, after --
13  after reading the Bowman deposition.
14      Q   All right.  So you read the Bowman
15  deposition, and then you -- what caused you then
16  to -- to go back and look at that or for that?
17      A   Well, because it sounds like an
18  interesting topic, and, you know, who knows, maybe
19  one day it either will or won't change, but it's
20  an interesting thing to read about.  And so I
21  wanted to just sort of see what -- what you guys
22  were driving at.  And then since I saw that there
23  were 800 signatories, I just figured I would see
24  if there was anybody at Hopkins that was part of
25  it or not.

Gregory B. Diette, M.D.

Page 314

1    Q   Mm-hmm.  And you found a couple of
2  people from Hopkins?
3    A   Yeah, I found two.  One I know, one I
4  don't.
5    Q   All right.  Again, you were not one of
6  the signatories?
7    A   Still true, yeah.
8    Q   Okay.  Okay.  What position does
9  Dr. Sharfstein hold within the University?
10    MS. BROWN:  Objection.  Speculation.
11    THE WITNESS:  He's been in the
12  Department of Biostatistics, and I don't know
13  what -- what other ways to label what he -- what
14  his positions are.
15  BY MS. PARFITT:
16    Q   Okay.  From the time you saw the
17  discussion about statistical significance and a
18  movement away from that and did your bit of
19  research, did you ever call Dr. Sharfstein to talk
20  to him about it?
21    A   Not yet.  I'm hoping I'll just run into
22  him at some point and -- and ask him about that.
23    Q   Is the -- is your interest strong enough
24  that you might reach out to him?
25    MS. BROWN:  Objection to the form.

Page 315

1  What -- what interest are we talking about?
2  BY MS. PARFITT:
3    Q   Interest in this science that you have
4  indicated yourself seems to be pretty important.
5    MS. BROWN:  Objection.  That misstates
6  his testimony by a lot.
7    THE WITNESS:  So it -- it might be.  I
8  mean, the -- the reason there's no urgency for me
9  to do it is that I still live in the world in
10  2019, and I'm still living in a world where
11  hypothesis testing is the rule and p-values are
12  part of what you're required to report if you're
13  going to publish a paper in a credible journal.
14    And so, you know, whether -- whether
15  this gets traction or not, you know, we'll see.  I
16  don't know what the replacement is going to be.  I
17  don't know if chaos will ensue.  It's an
18  interesting topic to talk about, but it's sure not
19  ready for prime time.
20    So I think if I see Dan in the hall, I
21  might ask him about it, but there's no -- there's
22  no urgency to it.
23  BY MS. PARFITT:
24    Q   So what's the world you're living in
25  with regard to the relevance of statistical

Page 316

1  significance and p-values?
2    A   Yeah, well, I'd say the real world,
3  right.  And the real world --
4    Q   I'm sorry.  You're in the real world?
5    A   Real world, yeah.
6    Q   Okay.  And what's the real world doing?
7    A   Well, the real world, if I want to write
8  a grant, I have to provide people with a sample
9  size estimate of what it is that I'm looking for,
10  and the sample size estimate is almost always
11  based on hypothesis testing.  And you have to
12  declare a certain p-value that you find to be a
13  credible one.
14    So I can't just say, I've decided
15  because I read some editorial that I'm not going
16  to use a p-value of 0.05.  That I'm still stuck
17  with 0.05 as a -- as an estimate.  And so if I
18  want to have any success getting a grant, I'm
19  going to have to still use the rules that we've
20  used for years.
21    And if I publish a paper, I happened to
22  look because I thought it was curious, I went on
23  New England Journal's website --
24    Q   Yes.
25    A   -- and they have an extensive list of

Page 317

1  ways in order to represent your p-values and your
2  confidence intervals that you have to adhere to if
3  you want to publish your papers.  You know, Nature
4  said that they're not going to change their rules
5  based on this.
6    So, anyway, so it's like it's -- that's
7  the world that we live in right now.  If you want
8  to communicate about -- about clinical science,
9  then you're going to have to use the rules that
10  we've learned to -- that we've learned to use.
11    Q   Do you know if the rules you've just set
12  forth are the rules that Dr. -- or, excuse me,
13  that Dr. Rothman and Sander Greenland, esteemed
14  epidemiologists, promote in their practice?
15    A   I have no idea what they promote.
16    Q   Well, you read the article in Nature,
17  didn't you?
18    A   Yeah, but you said "their practice."  I
19  don't even know what that is even.
20    Q   Well, who is the author of the Nature
21  article?
22    A   We're talking about the -- the
23  commentary?
24    Q   That's right.
25    A   Yeah.  So it looks like Armhein,

Gregory B. Diette, M.D.

Page 318

1    Greenland and McShane.  Or maybe not.  Maybe
2    that's -- wait a minute, I could be wrong.  No,
3    it's -- it's those three.
4        Q    And again, you don't know -- do you know
5    any of them?  I know you don't know Dr. Greenland.
6    Do you know any of the others?
7        A    I do not.
8        Q    Okay.  So if I understand your opinion
9    today, you still believe in the strength of a
10   statistical significance versus not statistically
11   significant?
12       A    It's --
13           MS. BROWN:  Objection to the form.
14           THE WITNESS:  It's still a factor to
15   consider when either planning, conducting, or
16   interpreting a study.
17   BY MS. PARFITT:
18       Q    Okay.  And do you still live in the
19   world that there is a threshold of a p-value of
20   0.05?
21       A    It depends.
22       Q    Well, what do you mean "it depends"?
23       A    I'm going to explain.
24       Q    Please.
25       A    So that's why I used the example of p at

Page 319

1    0.05, right?  I could just say, I have decided
2    that now I only want to do studies with six people
3    in them, and I'll be happy to have a p-value of
4    0.5.  You'd have to wish me luck getting it
5    published anywhere because it's not going to
6    happen, right?
7           So if I still want to do research and I
8    still want to get it published, I'm going to have
9    to pick a threshold for a p-value that's agreeable
10   to the peer reviewers and to the editor.  And it
11   doesn't have to be 0.05.  In some circumstances it
12   might be 0.01.  It might be even lower than that.
13   But a -- but a p threshold is necessary, at least
14   in our current era, if you want to be able to
15   conduct and talk about your research.
16       Q    Do you -- do you think Dr. Sharfstein is
17   going to now have difficulty having his scientific
18   works published?
19           MS. BROWN:  Objection.  Based on what?
20   There's no foundation for that question.
21   BY MS. PARFITT:
22       Q    You can answer the question, Doctor.
23       A    Well, exactly that.  So -- so Sharfstein
24   has been involved in some of our research and some
25   critical illness stuff, and the approach that we

Page 320

1    took wasn't anything novel or different.  I mean,
2    I don't know at all what his plans are going
3    forward, but he still works at the University
4    where we still compete for NIH grants --
5        Q    Mm-hmm.
6        A    -- and I haven't seen any change in the
7    NIH's posture on this, and I haven't seen any, you
8    know, ground swell of support for just doing
9    whatever you feel like in order to publish your
10   paper.
11       Q    Well, are you suggesting that what
12   Dr. Greenland and others and Dr. Wasserstein have
13   suggested to do whatever you -- let me get your
14   words -- shall -- yeah.  Okay.
15           MS. PARFITT:  Tell you what, let's take
16   a quick break.  I want to find that part, and
17   we'll get back.  Let's take a quick break.
18           THE VIDEOGRAPHER:  The time is 2:44 p.m.
19   We're going off the record.
20           (Recess.)
21           THE VIDEOGRAPHER:  The time is 2:53
22   p.m., and we're back on the record.
23   BY MS. PARFITT:
24       Q    Dr. Diette, when we left just before the
25   break, you said:  "I haven't seen any ground swell

Page 321

1    of support for doing whatever you feel like in
2    order to publish your paper."
3           I'm not talking about the publication of
4    papers.  What I would like to know from you is, do
5    you agree, though, when you were evaluating the
6    consistency of evidence, that one should not
7    disregard studies that are nonstatistically
8    significant and give greater weight to those that
9    are statistically significant?
10           MS. BROWN:  Objection to the form of the
11   question.
12           THE WITNESS:  I hear two questions
13   there, and the first part I agree with, and the
14   second part, it depends.
15   BY MS. PARFITT:
16       Q    Okay.  Do you agree that when you are
17   evaluating and weighing evidence, studies, that
18   you should evaluate studies the same whether they
19   are statistically significant or not statistically
20   significant?
21           MS. BROWN:  Objection to the form.  In
22   what context?
23           THE WITNESS:  I don't know what
24   "evaluate the same" means.  I mean, I think any --
25   any study that you think should be evaluated

81 (Pages 318 to 321)

Gregory B. Diette, M.D.

Page 322

1  should be evaluated, you know, as thoroughly as
2  you can.
3      BY MS. PARFITT:
4      Q  When you're evaluating the consistency
5  of studies, is it proper epidemiology to consider
6  those studies whether or not they are
7  statistically significant or nonstatistically
8  significant?
9          MS. BROWN: Objection to the form.
10         THE WITNESS: It is. And I think, you
11 know, regardless of what Dr. Rothman has written,
12 you know, it's part of the information that's
13 available to you, and I think to ignore it would
14 be, you know, not in your best interest.
15     BY MS. PARFITT:
16     Q  Okay. And would you agree that one
17 should not conclude there is no association or no
18 difference just because a -- one study is
19 statistically significant and another study is
20 significant?
21         MS. BROWN: Objection to the form.
22         THE WITNESS: And I agree with you,
23 especially because you used "just because."
24     BY MS. PARFITT:
25     Q  All right. So maybe -- what do you

Page 323

1  mean?
2      A  No, it's a good sentence. I mean, I --
3  it -- I think that over and over what we're
4  talking about is that -- that you shouldn't be
5  wedded to the idea that statistical significance
6  is the only feature that you look at, but it
7  doesn't mean that you don't look at it.
8          And so when you say that, you know, if
9  you were just to hold up two studies, and one was
10 significant and the other one wasn't and -- that
11 wouldn't -- you know, you wouldn't be curious
12 enough. You would need to know more about those
13 studies to reach the conclusion you do.
14         So I think, you know, looking at the
15 whole study, looking how it's built, looking how
16 it's interpreted, all that's important.
17     Q  All right. So it would not be proper to
18 conclude the two studies conflict just because one
19 was significant and one was statistically
20 significant.
21         MS. BROWN: Objection. Misstates
22 testimony.
23         THE WITNESS: It -- not -- not by
24 itself, but that is at least one indicator of
25 something that's different about those studies.

Page 324

1      BY MS. PARFITT:
2      Q  Okay. Now, let's turn to -- your chart,
3  and specifically the studies that you set forth in
4  your report on pages 13 and 14.
5          And if you'd go to your report, 13 and
6  14.
7      A  I'm sorry, I've got somebody else's
8  thing here.
9      Q  That's okay.
10     A  Okay.
11     Q  Okay. You got there? All right.
12         What I would like -- all right. So you
13 have that in front of you, correct, sir?
14     A  I do.
15     Q  Okay. Now, what I'll have marked as --
16 for demonstrative purposes is a chart that we have
17 marked as Diette Exhibit 21.
18         (Diette Exhibit No. 21 was marked
19         for identification.)
20     BY MS. PARFITT:
21     Q  And let me hand that to you.
22         MS. BROWN: Counsel, can you give a
23 representation for the record about what
24 Exhibit 21 is?
25         MS. PARFITT: Yes, I was about to do

Page 325

1  that.
2          MS. BROWN: Thank you.
3      BY MS. PARFITT:
4      Q  Dr. Diette, on pages 13 and 14, you
5  have -- of your report, you have listed I believe
6  25 case-control studies, 3 cohort studies and --
7  is that correct?
8          MR. LOCKE: Objection.
9      BY MS. PARFITT:
10     Q  You've got 7 population studies on the
11 back. That's on page 14. You have 25
12 case-control -- hospital studies, rather, on
13 page 14, and 25 studies on page 13. Is that
14 correct?
15         MR. LOCKE: Do you have a copy for --
16         MS. PARFITT: Beg your pardon?
17         MR. LOCKE: Do you have a copy for me,
18 please?
19         MS. PARFITT: Oh, Tom, I think we do,
20 yeah.
21         MR. LOCKE: Thank you. Is this a --
22 does this come from a published --
23         MS. PARFITT: No. Let me represent --
24 no, let me represent that Exhibit No -- Exhibit 21
25 is a demonstrative which lists all of the studies

82 (Pages 322 to 325)

Gregory B. Diette, M.D.

Page 326

1   that Dr. Diette listed in his report on page 13
2   and 14 and has put them on a graph.
3           MS. BROWN:  Who -- who put them on a
4   graph and what is the graph?
5           MS. PARFITT:  Counsel --
6           MS. BROWN:  Well, I'm going to have an
7   objection to this document, and I just want to --
8           MS. PARFITT:  You can.  You can object
9   to this --
10          MS. BROWN:  -- make sure I'm properly
11  objecting, because I don't know what it is, who
12  made it, based on what, and to the extent the
13  doctor needs the underlying studies to answer your
14  questions.  We'll --
15          MS. PARFITT:  Counsel, no speaking
16  objections.
17          MS. BROWN:  I just want to object to
18  this.
19  BY MS. PARFITT:
20      Q   Dr. Diette --
21          MS. PARFITT:  I understand, Counsel.  I
22  know what you're doing.
23          MS. BROWN:  The name is Diette.
24          MS. PARFITT:  Diette?
25          MS. BROWN:  Diette.

Page 327

1           MS. PARFITT:  Diette.
2   BY MS. PARFITT:
3       Q   I'm sorry, Dr. Diette.  I'm not doing it
4   to annoy you.
5       A   You've had it -- you've had it right all
6   day.  You're --
7       Q   Thank you.  Thank you.  I appreciate
8   that.
9           What I will represent to you, and you
10  can track it, Dr. Diette, that Exhibit No. 21
11  represents the sales studies you selected for
12  purposes of your expert report.  It lists them
13  study by study.  It plots them on a forest plot on
14  the right-hand side.
15          Do you see that?
16      A   I do.
17      Q   Okay.  And I'll represent that we took
18  your relative risks and confidence intervals, and
19  simply extracted those and put them on Exhibit 21
20  with one exception.
21          What I'd like you to do is look at
22  Hartge.  And we will have that marked as
23  Exhibit 22.
24          (Diette Exhibit No. 22 was marked
25          for identification.)

Page 328

1           MS. PARFITT:  Yeah, there you go.
2           There you go, Doctor.
3   BY MS. PARFITT:
4       Q   Doctor, I've handed you what's marked as
5   Exhibit 22.  It is the -- an article by Patricia
6   Hartge dated 1983 in JAMA.  Do you see that?
7       A   I do.
8       Q   Okay.  And at the top of the study, she
9   has a table entitled "Estimated Relative Risk."
10          Do you see that?
11      A   I do.
12      Q   And I'll put this up on the ELMO.
13          MS. PARFITT:  Okay.  And it's hard to
14  see.  We'll have to zero in there.  There you go.
15  Okay.
16  BY MS. PARFITT:
17      Q   You'll see on your chart you had listed
18  for Hartge, 1983, a relative risk of 0.7 with a
19  confidence interval of 0.40 to 1.10.
20          Do you see that?
21      A   Uh --
22      Q   Look at your --
23      A   I do, yep.
24      Q   -- on page 14.
25          Okay.  Now, look at the table of the

Page 329

1   Hartge study under "Genital Talc Use."
2           Do you see that?
3       A   I do.
4       Q   Okay.  And do you see where Dr. Hartge
5   reports that the relative risk for genital use
6   talcum powder is not what you have as 0.7, but 2.5
7   with a confidence interval of 0.7 to 10.
8           Do you see that?
9       A   I do.
10      Q   All right.  So that would be an error in
11  your chart; is that correct?
12          MS. BROWN:  Objection.
13          Doctor, take as long as you need to look
14  at what counsel is asking you about.
15          And --
16          MS. PARFITT:  Counsel --
17          MS. BROWN:  -- Counsel, do you mean
18  to --
19          MS. PARFITT:  Counsel --
20          MS. BROWN:  -- misrepresent the
21  paragraph?
22          MS. PARFITT:  No, Counsel.  And, listen,
23  if the Doctor doesn't have any questions -- he's a
24  very intelligent man as we've seen today --
25          MS. BROWN:  I know, but what you're

Gregory B. Diette, M.D.

| | |
|---|---|
| Page 330 | Page 332 |

Page 330

1   saying is not right.
2       MS. PARFITT:  Counsel, that's it.  No.
3   I'm sorry.
4       MS. BROWN:  Are you intentionally
5   misrepresenting what's in the paper?
6       MS. PARFITT:  Counsel, if you heard my
7   question -- I think Dr. Diette understands the
8   question.
9   BY MS. PARFITT:
10     Q   Dr. Diette, we have on the table a
11   genital use, which is 2.5 with a confidence
12   interval of 0.7 to 10.
13      Do you see that?
14     A   Yeah, I'm sorry.  Can you give me just
15   one second?
16     Q   Okay.  Of course I can.
17     A   Thank you.  (Peruses document.)
18      Yeah, I'm with you.
19     Q   Okay.  And the only correction I -- I
20   wish to make is that, instead of the 0.70 that you
21   have for Hartge, it should be 2.5 --
22       MS. BROWN:  Objection.
23   BY MS. PARFITT:
24     Q   -- for the genital --
25       MS. PARFITT:  Let me finish, Counsel.

Page 331

1   BY MS. PARFITT:
2     Q   -- for the genital use of talc.  Do you
3   agree with that?
4       MS. BROWN:  Objection to the form.
5       THE WITNESS:  So, maybe.  I'm just
6   trying to think about how I got --
7   BY MS. PARFITT:
8     Q   Sure.
9     A   -- got here.  Because the -- you know,
10   the text says that it's -- there were ten users,
11   so I guess like seven cases and three controls.
12     Q   Mm-hmm.
13     A   It said -- specifically mentioned use on
14   sanitary napkins, underwear, or the genital area.
15   But then it says -- but estimated is
16   2.5, but the small number of exposed women yielded
17   an unreliable estimate.  So I --
18       MS. BROWN:  It's --
19       THE WITNESS:  Yeah --
20       MS. PARFITT:  You don't have to show the
21   doctor.
22       MS. BROWN:  Do you want the truth on the
23   record, or do you want --
24       MS. PARFITT:  You know, I really do want
25   the truth.

Page 332

1       MS. BROWN:  Okay.  Then let him --
2       MS. PARFITT:  I just don't want you
3   coaching --
4       MS. BROWN:  -- answer the question.
5       MS. PARFITT:  -- and touching the paper
6   and pointing at things.
7       MS. BROWN:  You are intentionally
8   misreading this document.
9   BY MS. PARFITT:
10     Q   Doctor -- all right, Dr. Diette, you're
11   the one I'm interested in hearing from, to be
12   perfectly candid.
13      My question is, are the -- is the
14   relative risk that you have listed for Hartge
15   0.70, or should it be 2.5?
16     A   You know, the -- the study report is
17   really tough I think to decide that either one of
18   them is ideal.  And for a couple of reasons, and
19   one is just because this -- this genital with an
20   asterisk, it isn't literally just genital
21   application.  It includes sanitary napkins.
22      And you can see in a lot of the studies
23   that people have sort of broken out sanitary
24   napkin use separate from like perineal
25   application.

Page 333

1      And so, you know, that's not an ideal
2   measure for this -- this chart either.  I mean, I
3   get your point, the all over is something else.
4   But there's at least -- you know, there's more
5   than ten people at least in that particular --
6   that particular row.  So I -- I'm not sure if
7   either of these is great, but they --
8     Q   Well, the analysis you went through, did
9   you go through that analysis for each and every
10   one of the studies that you listed when you made a
11   decision as to which odds ratio to select?
12     A   I did.
13     Q   You did.
14     A   I mean, I tried to pick the one that --
15   that fit the best.
16     Q   Okay.  And is the one that fits the best
17   for Hartge the 0.70, or is the one that fits the
18   best for Hartge the 2.5?
19       MS. BROWN:  Objection to the form.
20       THE WITNESS:  So I don't know.  I mean
21   other than the fact that you've got the word
22   "genital" there, I mean "all over" is kind of
23   confusing, right, because it doesn't say like "all
24   over except the genitals," right.
25      And so that's where it gets kind of

84 (Pages 330 to 333)

Page 334

1    confusing is how you -- it's not a great study,
2    right. I mean, I'm not saying the study is not
3    great. I'm saying the report of the study doesn't
4    really tell us everything that you could really
5    wish to know.
6    BY MS. PARFITT:
7        Q   So would you like to keep your chart
8    with the 0.70, or do you think the chart should be
9    modified to say 2.5?
10       MS. BROWN: Objection to the form.
11       THE WITNESS: I mean, I'd be happy to
12   put both rows there and just with an asterisk, and
13   explain, you know, what each one of those is.
14   BY MS. PARFITT:
15       Q   Okay. Would you -- have you done that
16   for all the other studies that you've listed here,
17   wherein there may be data for sanitary napkins and
18   data for genital use and data for cornstarch? Did
19   you go through that analysis?
20       MS. BROWN: Objection to the form.
21       THE WITNESS: So, for this table I
22   haven't, but I have gone through all the sanitary
23   napkin findings that I can. And that's one of the
24   things you'll find in my handwritten notes from
25   the -- from the prior case.

Page 335

1        In terms of cornstarch, that's a
2    different question.
3    BY MS. PARFITT:
4        Q   And, Doctor, I --
5        MS. BROWN: Wait, he needs to finish.
6    He's got to --
7    BY MS. PARFITT:
8        Q   Doctor, that's really not my question.
9        MS. BROWN: No, no, no, no, no, he --
10   BY MS. PARFITT:
11       Q   My question is this --
12       MS. BROWN: Counsel.
13       MS. PARFITT: Counsel.
14   BY MS. PARFITT:
15       Q   My question is --
16       MS. BROWN: He has to finish the
17   question.
18   BY MS. PARFITT:
19       Q   You're not answering my question. Mine
20   is a very simple one.
21       My question was -- if you'll be patient
22   with me, my question was: The analysis that
23   you've just talked about that you're going through
24   with Hartge, did you go through a similar analysis
25   for each and every one of these studies; and if

Page 336

1    you did, where is that contained in your report?
2        MS. BROWN: And you should feel free to
3    answer both questions since counsel cut you off.
4        THE WITNESS: I have no idea about what
5    you mean by where it is in the report.
6    BY MS. PARFITT:
7        Q   Well, I only have RRs here. I have a
8    table. No analyses of the different case
9    controls. Just a table of their relative risks.
10       So, you've now gone through an analysis
11   of the Hartge case and said, You know, maybe this
12   is what we should have extracted, maybe we should
13   have looked at this, but I used my judgment and
14   put the 0.7.
15       And what I'm asking is, is that analyses
16   that you just did for us on the record the kind of
17   analysis that you did for all the other studies?
18   And if it was, where in the 51 pages of your
19   report or this chart have you included that
20   information?
21       MS. BROWN: Objection. Completely
22   misstates his testimony, as well as the article,
23   as well as the report, as well as the chart.
24       THE WITNESS: Let me just see. So
25   obviously it's not -- it's not documented, but I

Page 337

1    think part of what I'm trying to do is communicate
2    what the -- what the risks are that were reported
3    and what their confidence bounds were.
4        And so, you know, the papers stand for
5    themselves. They all exist. They're all cited.
6    We can look at anything we want.
7        I think in terms of the cornstarch
8    issue --
9    BY MS. PARFITT:
10       Q   Doctor, I'm not asking about --
11       MS. BROWN: Stop cutting him off.
12   BY MS. PARFITT:
13       Q   -- the cornstarch. We can talk about
14   that later. I'm not talking about cornstarch.
15       MS. BROWN: You cannot continue to cut
16   him off, or we'll have to call the Judge.
17       MS. PARFITT: I don't have a question
18   about cornstarch.
19       MS. BROWN: He's answering your
20   question.
21       MS. PARFITT: He is not.
22       MS. BROWN: You have to let him answer
23   or we have to call the Judge. You are
24   violating --
25       MS. PARFITT: You can do it in your

85 (Pages 334 to 337)

Gregory B. Diette, M.D.

Page 338

```
 1    direct.
 2         MS. BROWN: No, you have to let him
 3    answer the question or --
 4         MS. PARFITT: Counsel.
 5         MS. BROWN: We're going off the record.
 6         MS. PARFITT: Do you want to go -- we'll
 7    go off the record right now.
 8         MS. BROWN: Yeah, let's go. Fine. Do
 9    we need to call the Judge? You have to let him
10    answer.
11         MS. PARFITT: We'll call her. We'll
12    call her.
13         THE VIDEOGRAPHER: The time is 3:09 p.m.
14    We're going off the record.
15         (A discussion was held off the record.)
16         THE VIDEOGRAPHER: The time is
17    3:10 p.m., and we're back on the record.
18         MS. PARFITT: Thank you.
19    BY MS. PARFITT:
20         Q   Okay. And, Dr. Diette, all I'm trying to -- to
21    ask, and obviously very poorly, is the analysis
22    that you just discussed that you went through with
23    Hartge, as we sat here today and you did it on the
24    record, did you do that for all the other studies?
25         A   I tried to.
```

Page 339

```
 1         Q   Okay. And so you had to make
 2    determinations as to what relative risks to
 3    extract from those studies, correct?
 4         MS. BROWN: Objection to the form.
 5         THE WITNESS: I -- I had to work with
 6    what they reported.
 7    BY MS. PARFITT:
 8         Q   Okay. And just like Hartge, they
 9    reported different pieces of information:
10    Diaphragms used, no diaphragm, all over, genital,
11    legs, feet, correct?
12         A   Correct.
13         Q   And you had to decide what was the most
14    appropriate data to pull from those studies to
15    include on your chart for relative risks, correct?
16         A   For the most --
17         MS. BROWN: Objection to the form.
18         THE WITNESS: Yes, of course.
19    BY MS. PARFITT:
20         Q   Okay. So my question to you is, you
21    chose for the Hartge, based upon that analysis, to
22    use the -- any talc mentioned, which gave us a
23    relative risk of 0.7, as opposed to genital, which
24    would have represented a 2.5 risk.
25         MS. BROWN: Objection to the form.
```

Page 340

```
 1    BY MS. PARFITT:
 2         Q   Correct?
 3         A   I did.
 4         Q   Okay. And my last question is, is that
 5    the position you wish to take today?
 6         MS. BROWN: Objection to the form.
 7    BY MS. PARFITT:
 8         Q   Or would you modify that and use a
 9    different relative risk? That's all.
10         A   I don't --
11         MS. BROWN: Objection.
12         THE WITNESS: I don't think anybody is
13    well served by looking at this other number, other
14    than if you're just trying to make a point and
15    be -- you know, for a plaintiff or something to
16    look at this 2.5.
17         I think if you take this one that says
18    there's a small number of exposed women, ten
19    people, you know, that yields an unreliable
20    estimate. I mean, somebody should fuss about that
21    too. So that's not -- that's not an ideal
22    measure.
23         If it helps, we can put them on the
24    table, and it wouldn't really change things,
25    right. You've got confidence bounds from 0.7 to
```

Page 341

```
 1    10. I mean, that's an enormous confidence value.
 2    So there's not a lot of information from those ten
 3    people.
 4    BY MS. PARFITT:
 5         Q   And the reason I ask as well, as you
 6    said earlier on in your deposition, you did not
 7    know for all these studies their sample size.
 8         A   Oh, no, no, no. I didn't memorize it,
 9    but I've got all the studies, and it's a piece of
10    cake, we can just go look at them and look at the
11    sample size. I didn't want to, like -- I didn't
12    want to, like, make -- this is already a long
13    enough report. I don't need to put every bit of
14    data from every study in it to have it make sense
15    to me.
16         Q   So somewhere you have all the sample
17    sizes pulled together for the various cases and
18    controls for each one of these studies?
19         A   It's in every one of the studies.
20         Q   I know it's in each and every one of the
21    studies, but did you document it on any kind of
22    chart or anything like that?
23         A   For what?
24         Q   So that you could tell someone like me
25    and the Court why you chose the data that you did.
```

86 (Pages 338 to 341)

Gregory B. Diette, M.D.

Page 342

1      A   We can just look at the studies.  If I
2  documented the sample size next to each one of
3  these, it wouldn't tell you why I picked this
4  particular relative risk.
5      Q   It would -- it would not offer valid
6  information as to the relevance of those relative
7  risks?
8      A   Oh, my gosh.  I mean if you were
9  interested in it, I could find it for you.  It
10 wasn't -- it wasn't important for me to
11 communicate what I was trying to communicate.
12     Q   No, I -- it's a different question.
13         Is sample size important when one is
14 doing an analysis of a scientific study?
15     A   Yeah, that's why it's in the paper.
16     Q   Okay.  Because if the sample size is too
17 small, it may be underpowered; is that correct?
18     MS. BROWN:  Objection.
19     THE WITNESS:  Well, I don't know.  I
20 mean, if we're going to do power now, I think
21 that's going to be a different -- a different
22 conversation.
23         The sample size being small can have all
24 kinds of -- all kinds of impact.  This to me is
25 actually the most generous way to look at these

Page 343

1  data, rather than picking at the same size.  I
2  mean, I can do that too, right?  I can say, This
3  is a crummy study because it's got 23 people, or
4  this is crummy one -- that wasn't my goal.  It
5  wasn't to sort of tear down the -- the
6  case-control studies.
7          I was trying to have a balanced approach
8  here, I think unlike the plaintiffs' experts, and
9  I wasn't trying to say that this one particular
10 design is awful and the other one is good.  I was
11 just trying to represent something about it in
12 order to summarize it and communicate a point.
13 BY MS. PARFITT:
14     Q   Okay.  And your balanced approach was to
15 take the lower, the 0.7 relative risk, rather than
16 the 2.5 relative risk.
17     A   Oh, my goodness.
18     MS. BROWN:  Objection to the form.
19     THE WITNESS:  I -- I think -- I mean, I
20 think this little article, that doesn't even fit
21 on an entire page, gives us so little information
22 about what to do, and I think my point about there
23 being ten people that provide a relatively
24 uninformative risk, it's not great.  If you want
25 to use it, you're welcome to, but it doesn't -- it

Page 344

1  doesn't change anything about this exercise.
2  BY MS. PARFITT:
3      Q   Okay.  Well, I didn't select Hartge.
4  You selected Hartge.
5      A   Well, I selected it because it exists.
6  I mean, I -- my -- my goal was to find all the
7  studies that exist.
8      Q   Okay.
9      A   I mean, I didn't invent it, right?  I
10 just -- I just looked at --
11     Q   Well, I just didn't want the record to
12 reflect that I was selecting your data.
13     A   No, but you -- it sounds like you would
14 prefer me to use that 2.5 from the ten people,
15 instead of the 0.7 from the nearly hundred people.
16     Q   I have --
17     A   And I'm happy to look at them both.  I
18 mean they both tell us some information.  It's not
19 like, you know, one is ideal and the other isn't.
20 But it really doesn't change the basic premise
21 here.
22     Q   All right.  So on my chart I have them
23 both.  I have 0.7 and 2.5.  Do you see that?
24     A   Um --
25     Q   Right at the bottom there, "Genital use"

Page 345

1  and "Any talc use."  Do you see that?
2      A   I do.
3      Q   Okay.  All right.  So as I appreciate
4  your testimony, you had selected 25 population
5  case controls, 7 hospital -- and 7 hospital case
6  controls, correct?
7      MS. BROWN:  Objection.
8  BY MS. PARFITT:
9      Q   Do I have the numbers right?
10     A   I wasn't listening.  I'm sorry.
11     MS. BROWN:  Look at the realtime.  I
12 just think you misspoke.  You said seven hospitals
13 twice.  Is that what you meant?
14 BY MS. PARFITT:
15     Q   As I appreciate your testimony, you
16 selected -- no, this is populate -- 25 population
17 case controls and 7 hospital case controls.  I
18 said it twice.  Correct?
19     A   That's correct.
20     Q   Okay.  And that formed the basis for
21 your selection of case studies, correct?
22     MS. BROWN:  Objection to the form.
23     THE WITNESS:  Case-control studies.
24 BY MS. PARFITT:
25     Q   Case-control studies.

87 (Pages 342 to 345)

Gregory B. Diette, M.D.

Page 346

1    A    Correct.
2    Q    Yes. Okay.
3         Now, looking at the chart, which is 21,
4  what is the point estimate -- wait.
5         What I would like you to do, rather, I
6  would like you to circle the point estimate for
7  every study that exceeds -- that has a 1.0.
8         MS. BROWN: Objection. Based on the
9  document you created as 21?
10        MS. PARFITT: Which is identical to the
11 doctor's document, with the exception of I put two
12 numbers for Hartge.
13        MS. BROWN: You put two numbers for
14 Moorman too.
15        MS. PARFITT: Before and after 2014,
16 correct?
17        MS. BROWN: Nope, Moorman is 2009. You
18 have -- you've broken out Moorman by race.
19        MS. PARFITT: I did.
20        MS. BROWN: So I mean, my point here is
21 just if you wanted to use his report, he's happy
22 to answer your questions, but --
23        MS. PARFITT: He did it -- but he did it
24 too.
25        MS. BROWN: Okay. That's fine.

Page 347

1         MS. PARFITT: It's on his chart.
2  BY MS. PARFITT:
3    Q    I didn't do anything -- the only
4  modification I made to your chart, Doctor, is
5  Hartge, and there I kept your 0.70 and added the
6  genital 2.5.
7         And what I'd like you to do is circle in
8  that document every point estimate or odds ratio
9  that is 1.0 or above.
10   A    1.0 or higher?
11   Q    That's right.
12        MS. BROWN: Objection to the exercise.
13        And, Doctor, if you need the articles,
14 we'll give them to you.
15        THE WITNESS: So just as an example, if
16 we look at Jordan 2007, which has an odds ratio of
17 1.00 --
18 BY MS. PARFITT:
19   Q    Mm-hmm.
20   A    -- you find that one that would be
21 interesting for me to circle.
22   Q    If it has a 1.0, I'd like you to circle
23 it.
24   A    Sure.
25        So in terms of your -- like, it's going

Page 348

1  to be hard for me to read it off of your figure
2  because I don't know, like -- like, the Harlow and
3  Weiss one -- what is wrong with that one? Or is
4  it --
5         MS. BROWN: That looks wrong, doesn't
6  it?
7         THE WITNESS: No, it's Harlow and Weiss
8  versus Harlow.
9         So what am I circling? I'm circling
10 the -- the -- on the forest plot?
11 BY MS. PARFITT:
12   Q    On the forest plot, if you would be kind
13 enough to circle every relative risk where the
14 point estimate was 1.0 or above.
15   A    Oh, I did it wrong.
16   Q    That's all right.
17   A    Sorry. I'm circling the ones that
18 are -- do you have another -- another copy of
19 this?
20        MS. MILLER: You can have mine.
21        MR. LOCKE: I didn't --
22        MS. PARFITT: I'm sorry. I'm sorry,
23 Tom?
24        MR. LOCKE: I just couldn't hear -- you
25 trailed off at the end.

Page 349

1         MS. PARFITT: Sure.
2  BY MS. PARFITT:
3    Q    You have -- and maybe I can shorten this
4  for you, how about that, in the interest of time.
5    A    Your call.
6    Q    We have -- thank you. I appreciate
7  that.
8         We've got about 32 studies here. How
9  many of those studies reflect an odds ratio
10 greater than 1.0?
11        MS. BROWN: For a relative risk?
12        MS. PARFITT: Correct.
13        THE WITNESS: I don't know what to do
14 with Moorman, because it's one study, right. Two
15 different odds ratios.
16 BY MS. PARFITT:
17   Q    Mm-hmm.
18   A    But it looks like above the dotted line,
19 it's -- there's 24 studies, I guess, and then down
20 below it, there's -- one, two, three, four,
21 five -- there's 5 that are above 1.0, and you said
22 above 1.0 this time, before you said --
23   Q    Above -- I did, above 1.0.
24   A    Because the including an odds ratio of
25 1.00 is evidence of something above 1.0 would

88 (Pages 346 to 349)

Gregory B. Diette, M.D.

Page 350

```
 1   be --
 2       Q   Right.  So we're doing above 1.0.
 3       A   Okay.
 4       Q   You pointed that out, and you're right.
 5       A   Yeah.  So have I done it?  There's one,
 6   two, three, four -- well, I guess Hartge is --
 7   one, two, three, four, five --
 8       Q   Sure.
 9       A   -- there's five down below the dotted
10   line, and there were --
11       Q   Okay.  And if you can just identify
12   those where the point estimate does not exceed --
13   it's not above 1.0.
14           MS. BROWN:  Counsel, can you represent,
15   on the record, what this second up from the bottom
16   is?
17           MS. PARFITT:  Sure.  Hartge and Stewart,
18   '94.
19           MS. BROWN:  Underneath that.
20           MS. PARFITT:  Wong.
21           MS. BROWN:  No, above -- what is the
22   entry above Wong?
23           MS. PARFITT:  Oh, in his table --
24           THE WITNESS:  Oh, that too.
25           MS. PARFITT:  In his table he had RR
```

Page 352

```
 1   that those studies have a relative risk in excess
 2   of 1.0 demonstrate a positive result?
 3           MS. BROWN:  Objection to the form.
 4           THE WITNESS:  So some -- some of those,
 5   yes, and some of those, no.
 6   BY MS. PARFITT:
 7       Q   All right.  Would it be fair to say that
 8   they're certainly trending above the null; is that
 9   correct?
10           MS. BROWN:  Objection to the form.
11           THE WITNESS:  Not necessarily.  I'm just
12   trying to imagine like -- I think I understand why
13   you're doing this -- but I'm just trying to
14   imagine like standing in front of colleagues like
15   with the Tzonou one and say, I've decided that a
16   relative risk of 1.05 is a positive risk.
17           I mean, you can only guess so close to
18   1.0.  I mean, 1.0 is basically null, right?
19   There's no -- there's no effect.  So you can hope
20   for, but you're rarely going to get a 1.00.  So if
21   you get like a 1.01, 1.02, 1.03, those are
22   basically 1.0.
23           I mean, you can -- you can say -- try to
24   make some point to somebody, Oh, it's a little bit
25   above 1.0; therefore, it's a positive association.
```

Page 351

```
 1   0.03, RR 0.05.  It was just extracted from his
 2   table.
 3           MS. BROWN:  Oh, it's the second Hartge
 4   and Stewart.
 5           MS. PARFITT:  Yeah.
 6           THE WITNESS:  And so you want where just
 7   the midpoint is above the number 1.0?
 8   BY MS. PARFITT:
 9       Q   Correct.
10       A   So Cramer, Harlow, Harlow, Chen, Cramer,
11   Purdie, Chang, Cook, Green, Godard, Cramer, Ness,
12   Mills, Cramer, Gates, Merritt; the two odds ratios
13   for Moorman, Wu, Rosenblatt, Kurta, Kotsopoulos,
14   Wu, Cramer, Schildkraut; and then one of the two
15   Hartge's, Whittemore --
16       Q   And are you circling those, Doctor?
17       A   I'm not, no.
18       Q   Okay.  If you could do that because
19   we'll attach it as an exhibit.  Sorry.
20       A   Should I just finish saying them --
21       Q   Sure.
22       A   -- and then go back and do it?
23           So Rosenblatt, Tzonou, and that's it.
24   So -- (circling studies.)  Okay.
25       Q   Okay.  What does the -- does the fact
```

Page 353

```
 1   But other than this setting, you're going to get
 2   laughed out of the room.  I mean, this is -- this
 3   is a 1.05.  So, you know, that's -- you call it
 4   what you want.  I don't call that a positive
 5   finding.
 6   BY MS. PARFITT:
 7       Q   Okay.  Now, what I'd like you to do is
 8   look at the confidence intervals for each one of
 9   those studies, and circle where the confidence
10   interval shows a relative risk of 1.2.
11           MS. BROWN:  Objection to the form of the
12   question.
13   BY MS. PARFITT:
14       Q   And again, if you will just circle
15   those.
16       A   I -- I think you'd be better off drawing
17   a line, right.  Because it -- I mean, this scale
18   here isn't really -- like there's no vertical
19   scale that's labeled here.  Right.  So you've got
20   1.0, 1.1 and 1.2.  I mean if you want, I think you
21   ought to just take a ruler and run it up from 1.2.
22       Q   Why don't you just go ahead and identify
23   them, if you will, and we can go ahead and do
24   that.  Let's see.
25       A   Well, like I can --
```

89 (Pages 350 to 353)

Gregory B. Diette, M.D.

Page 354

1    Q   My question is just simply this:  Would
2  you identify all studies where the confidence
3  interval is 1.2 or higher?
4         MS. BROWN:  Objection to the form.
5  BY MS. PARFITT:
6    Q   And you can just circle them.
7    A   And it doesn't have to mean anything to
8  me, right?
9    Q   Nope.  Just circle anything where the
10  confidence interval is above a 1.2.
11    A   So where the confidence interval
12  includes 1.2?
13    Q   1.2, correct.
14    A   Or where it's above 1.2?
15    Q   It's above 1.2.
16         MS. BROWN:  The entire interval?
17         THE WITNESS:  Well, so there's not many,
18  right?  So there's one --
19  BY MS. PARFITT:
20    Q   You understand that it includes 1.2?
21    A   I heard -- oh, that's different,
22  because there's only one where it's above 1.2.
23    Q   It includes the 1.2.
24    A   Or two that are above it.
25         So the two that are above it, don't

Page 355

1  include it, right, so we got to start over.
2    Q   Everywhere -- sure.  You go ahead and do
3  it.  Everywhere where the confidence interval is
4  above -- includes 1.2.
5    A   That's all right.  I'm just going to put
6  a little asterisk next to them, because I already
7  made a mark --
8    Q   Sure, that's fine.
9    A   -- next to the ones that are above 1.2.
10         Okay.
11    Q   Okay.  Let's go ahead and just put this
12  here.  I appreciate that.
13         Okay.  Here we go.  Let's see here.
14         Okay.  So let's just stay with that one
15  here for a moment.  Let me give you -- give you a
16  blank one here for a moment.  Is that all right?
17  So you have something in front of you.
18    A   Sure.
19    Q   Okay.  All right.
20         Dr. Diette, looking at the chart that we
21  just talked about, you have described in your
22  report that the case-control studies are
23  inconsistent.  Is that your testimony?
24    A   I think we should look literally at what
25  I wrote, because I talked about one aspect that

Page 356

1  was inconsistent.
2    Q   And that aspect --
3         MS. BROWN:  Are you looking at the
4  report?
5         THE WITNESS:  Yeah.
6  BY MS. PARFITT:
7    Q   -- was with regard to population study
8  versus hospital-based studies?
9    A   Well, I think I made a comment about
10  both, right?
11    Q   And if I can summarize your testimony,
12  but feel free to look, but your testimony from the
13  report -- or your writings and your report suggest
14  that the case-control studies are inconsistent,
15  and you focus on the fact that the hospital-based
16  controls were inconsistent with the population-
17  based controls.
18    A   That's one -- one of the areas of
19  inconsistency.
20    Q   Okay.  And you base that opinion on the
21  fact that there -- the hospital-based studies were
22  not statistically significant, but the
23  population-based studies were statistically
24  significant; is that correct?
25         MS. BROWN:  Objection to the form.

Page 357

1         THE WITNESS:  That's one piece of
2  evidence, right.  So one piece of evidence is that
3  the hospital-based ones, none of them were
4  statistically significant, and some of the
5  population-based ones were.
6  BY MS. PARFITT:
7    Q   All right.  And because you had some of
8  the population-based studies, you found
9  inconsistent because the confidence intervals were
10  not -- were such that they were not statistically
11  significant; is that correct?
12    A   That's a --
13         MS. BROWN:  Objection to the form.
14         THE WITNESS:  And as before, that's a
15  piece of -- a piece of the information here.
16  BY MS. PARFITT:
17    Q   Okay.  I've reviewed your report.  Other
18  than the distinction between the statistical
19  significance of studies versus the nonstatistical
20  significance of studies, how else did you discern
21  that they were different and not consistent?
22    A   Well, I have a section on consistency.
23  So it -- there's other things about these studies
24  that are inconsistent.
25         So, for example, the -- the

Gregory B. Diette, M.D.

Page 358

1    dose-response relationships are all over the
2    place. So that I found to be an inconsistency.
3    The findings about certain kinds of ovarian
4    cancers, some showed a particular cell type and
5    some -- some didn't.
6             Let me just --
7        Q   Let me ask you --
8             MS. BROWN: Wait, I don't think he's
9    finished.
10            MS. PARFITT: No. Let's just make sure.
11            THE WITNESS: I think we've said it, but
12   I want to make it clear, right, because we were --
13   we were really just sort of focused very -- very
14   much on population-based and hospital-based case
15   controls.
16   BY MS. PARFITT:
17       Q   That's right.
18       A   But I think the fact that there is
19   basically, you know, not a signal from the cohort
20   studies is an inconsistency with studies of
21   another design, so another form of inconsistency.
22            I think that -- and what I've tried to
23   say here, right, because I think -- I think some
24   of these Hill criteria, it's hard to -- hard to
25   keep every -- every comment you want under one

Page 359

1    particular heading, and so I've tried to get at
2    this issue here too that if it were consistent
3    that talc caused or was associated with ovarian
4    cancer, I would expect to see it under a variety
5    of circumstances, not just perineal dusting. And
6    so one of the inconsistencies is that, you know,
7    diaphragms and condoms, that we don't see that
8    signal. So I'm just saying that that's an
9    inconsistency. It's the opposite of consistency.
10            And I guess too -- I mean just while
11   we're even still on the -- on the types of
12   studies, I mean the Taher study that, I guess, you
13   know, even though it's not published yet, I mean
14   they've got a summary risk for the hospital-based
15   studies which is less than 1.0. Right. So now
16   it's not even just like -- if -- I don't know
17   whether we should like the Taher study or not, but
18   it's out there, right. And so now we've got --
19       Q   It's out there. It's a piece of the
20   evidence.
21       A   Yeah, it's something that's out there,
22   so now we've got something that's unpublished from
23   2018 that's got not even a positive risk. I mean,
24   this -- this exercise of going to look and see
25   what's over 1.0, there's a 0.94 or 6 or something

Page 360

1    like that. So I'm -- that's more inconsistency.
2        Q   Okay. Dr. Diette, what I'm trying to
3    get at here is, the underbelly, I guess, of your
4    opinions seem to be from your report that cohort
5    studies are inconsistent with the case-control
6    studies, which they themselves are inconsistent
7    because population-based studies and
8    hospital-based studies, some were statistically
9    significant and some were not. Correct?
10       A   Exactly, yes.
11       Q   Okay. And that really the -- the guts
12   of your report, correct?
13            MS. BROWN: Objection to the form.
14            THE WITNESS: I -- no. I mean, those
15   are two very important points, but I'd say there's
16   a heck of a lot more than that in the report.
17   BY MS. PARFITT:
18       Q   Okay. Did you go through -- let's --
19   let's talk a little bit about that.
20            You described these relative risks of
21   the case-control studies as small, weak -- small
22   and weak, correct?
23       A   Correct.
24       Q   Okay. What type of -- those words
25   "small and weak," are those scientific words?

Page 361

1        A   So they're words that my colleagues and
2    I use. I mean, it's a word that Dr. Rothman used
3    when he did his analysis in 2000 and called the
4    summary odds ratio or the risk -- risk of 1.3, he
5    called it weak. I'm not sure whether he's citing
6    a particular definition, but, you know, it --
7    it's -- there's probably reasons, just like where
8    you talk about a p-value of 0.05 not being the
9    absolute line. I think it's why people have
10   resisted trying to say that it has to be above an
11   exact specific number.
12            But I think we can all recognize risks
13   that are large. You know, we know that a risk of
14   10 is a large risk. We know that 20 is a large
15   risk. We know that a relative risk of 1.01, it's
16   got to be tiny, right, because it can't be any
17   smaller than that on that particular scale.
18            So somewhere in there we have to use
19   some judgment, and I think if you got a 1.2 or
20   1.3, I don't know who -- I don't know who thinks
21   that's strong. It doesn't make any sense.
22       Q   Do you agree that having a weak
23   association does not rule out a causal connection?
24            MS. BROWN: Objection to the form.
25            THE WITNESS: Wait a minute, say it

Gregory B. Diette, M.D.

Page 362

1  again because I think --
2  BY MS. PARFITT:
3      Q   Having a weak association would not rule
4  out a causal association.
5      A   That's correct.
6      Q   All right.  Would you also agree that
7  while the strength of an association is a
8  guideline for drawing an inference of causation,
9  there is no specified threshold required?
10     MS. BROWN:  Objection to the form.
11     THE WITNESS:  I don't think there's a
12 specified threshold.  I think it's a gradient,
13 right, that you have to use as you're applying
14 your judgment about all of the evidence.  And that
15 when you have a very small risk, you should be
16 more concerned about the distorting effects of
17 other factors, and if you have a larger risk, you
18 can be less worried about those distorting
19 factors.
20 BY MS. PARFITT:
21     Q   But you will agree with me under the
22 Bradford Hill factors, strong association or weak
23 association, neither are necessary for finding
24 causality, correct?
25     MS. BROWN:  Objection to the form.

Page 363

1      THE WITNESS:  So there isn't a single
2  one of his considerations that all by itself is
3  completely necessary, right.  It's a -- it's a
4  method to pull together a variety of, you know,
5  information about the studies.  But he -- he
6  certainly does give us some guidance about what
7  "strong" and "not strong" might mean and the
8  implications of that.
9  BY MS. PARFITT:
10     Q   But we can agree sitting here today that
11 those general terms, "weak," "small," do not
12 dictate whether or not there is causality.
13     MS. BROWN:  Objection to the form.
14     THE WITNESS:  They don't dictate it.
15 They inform it.
16 BY MS. PARFITT:
17     Q   You mentioned that the -- I want to come
18 back to that one in a second.
19     Now, you, yourself, have actually done
20 secondhand smoke studies, correct?
21     A   I've done studies that include
22 secondhand smoke as a measure.
23     Q   Okay.  What is your understanding of the
24 relative risks for secondhand smoke?
25     A   For what?

Page 364

1      Q   Secondhand smoke and lung cancer.
2      MR. LOCKE:  Objection.
3      THE WITNESS:  I think really the Surgeon
4  General has put it at -- it's either about 1.7 or
5  1.9, somewhere in there.
6  BY MS. PARFITT:
7      Q   Okay.  Let me show you -- I'm sorry.
8  1.7 or 1.9.
9      Let me show you a study by Kim.  And
10 it's entitled "Exposure to Secondhand Smoke and
11 the Risk of Cancer in Never Smokers."  And I'll
12 represent that it's in the International Journal
13 of Environment, 2018.  And this would be a
14 meta-analysis by Dr. Kim.
15     A   Do you know, is it something I cited or
16 is this new -- new to me or --
17     Q   I did not see it in your --
18     A   Okay.  Thank you.
19     Q   -- list of references.
20     In fact, good question.  None of the 167
21 articles that were in your curriculum vitae did I
22 see that you cited in support for your expert
23 report; is that correct?
24     A   That would -- I'm sure that's correct.
25     Q   Okay.  Okay.  Do you see that?

Page 365

1      A   I do, yes.
2      Q   Okay.  And if you look in the abstract,
3  do you see where the authors determined that the
4  relative risks for passive smoke exposure and lung
5  cancer in never users was a relative risk rather
6  than of 1.2.
7      Do you see that?  Take a moment.
8      A   Yeah.
9      Q   We'll put it on the ELMO.
10     A   So we're looking at the abstract?
11     Q   We are, mm-hmm.
12     A   And saying -- so odds ratio involving
13 never smokers with significant exposure to
14 secondhand compared to never smokers was 1.163.
15     Q   Okay.  Do you see where it says:
16 "Passive smoke exposure and lung cancer in never
17 users was a relative risk of 1.245"?
18     And we can go ahead and circle that.
19     A   That's for females?
20     Q   Yes.
21     A   For females, yeah, 1.245.
22     Q   Okay.  So we had a 1.245 for females,
23 and, I'm sorry, you said a 1.16 for secondhand all
24 comers, right?
25     A   Exactly right.

92 (Pages 362 to 365)

Gregory B. Diette, M.D.

Page 366

1      Q   Okay.  Let me show you as well the Lv
2    study, and it was a 2015 study.  "Risk of
3    All-Cause Mortality Associated With Secondhand
4    Smoke."
5      A   Do I have that?
6      Q   I'm getting that for you.  Hold on one
7    second.
8      A   Oh, I'm sorry.  I thought I --
9      Q   No, no worries.
10      A   I thought I missed it.
11      (Diette Exhibit No. 23 was marked
12      for identification.)
13   BY MS. PARFITT:
14      Q   Do you have that in front of you?
15      A   Yes.  So this is by Lv?
16      Q   That's right.
17      A   The last name, yeah.
18      Q   And now again, looking at the abstract
19    section, does it report the relative risk for
20    never smokers exposed to secondhand smoke versus
21    unexposed?
22      A   So the pooled relative risk for never
23    smokers compared to those -- is that -- so that
24    first sentence of the results --
25      Q   That's right --

Page 367

1      A   -- 1.18?
2      Q   Correct.  And they then report in the
3    all-cause mortality and RR was 1.23 for
4    cardiovascular diseases.  Do you see that?
5      A   Yeah, although -- exactly right, yep.
6      Q   Now, there have been -- and this
7    is work that you do as well, correct?
8      MS. BROWN:  Objection to the form.
9    BY MS. PARFITT:
10      Q   You do research work on secondhand
11    smoke?
12      A   I have done, yeah, and still do.
13      Q   Okay.  And are you aware that in the
14    United States and in other countries, there have
15    been health programs implemented to reduce
16    secondhand smoke based upon relative risks, like
17    you've just seen, 1.1, 0.8, 1.2?
18      MR. LOCKE:  Objection.
19      THE WITNESS:  I mean, I don't know if
20    the programs were based on these studies, and
21    there certainly have been higher relative risks
22    before.  But I -- but I agree that there are
23    programs to reduce secondhand smoke exposure.
24   BY MS. PARFITT:
25      Q   Okay.  And would you agree today that

Page 368

1    associations that are implementing those types of
2    programs to reduce secondhand smoke for fear of
3    lung cancer have accepted this type of data, 1.1,
4    1.2, for purposes of making those policy
5    decisions?
6      A   So I don't know --
7      MR. LOCKE:  Objection.
8      THE WITNESS:  Oops, sorry.
9      Like, I don't -- I don't know what
10    inputs they -- they used, and I don't -- I'm not
11    saying they wouldn't, but I don't know whether
12    they would use these risks to drive that or not.
13   BY MS. PARFITT:
14      Q   Okay.  You would agree with me, though,
15    that the risk of 1.1 and 1.2 are very -- are
16    actually less than the relative risks that we've
17    seen with talcum powder products and ovarian
18    cancer, correct?
19      MS. BROWN:  Objection to the form.
20      THE WITNESS:  So it's less than the
21    pooled odds ratio from the case-control studies in
22    the meta-analyses.
23   BY MS. PARFITT:
24      Q   Okay.  Now, you yourself have done
25    studies on indoor particulate matter, correct?

Page 369

1      A   Correct.
2      Q   Okay.  In particular, you published a
3    study with McCormack and Diette on common
4    household exposures?
5      A   I've published a bunch with her, so I
6    don't know which -- which particular one that is.
7      Q   All right.  It's Common -- it's Common
8    Household Products, 2008."  McCormack is the lead
9    article -- author.
10      A   What journal?
11      Q   It is in the Environmental Res,
12    Environmental --
13      A   Environmental research.
14      Q   -- Research.  And it's dated February
15    2008.  And take a minute to --
16      (Diette Exhibit No. 24 was marked
17      for identification.)
18   BY MS. PARFITT:
19      Q   Do you have that in front of you?
20      A   I do.
21      Q   Okay.  Now, if you look at the first
22    page under the abstract, about the third line
23    down -- excuse me, fourth line down, it says:
24    "There is a public health imperative to
25    characterize indoor source as being less

Gregory B. Diette, M.D.

Page 370

```
1   extensively characterized" -- excuse me. I'm
2   sorry.
3           "There is a public health imperative to
4   characterize indoor sources of PM" -- I assume
5   that's particulate matter?
6       A   Correct.
7       Q   -- "with this vulnerable population to
8   enable effective intervention strategies."
9           Did I read that correctly?
10      A   You did.
11      Q   Okay.  You were the lead -- one of the
12  lead authors in that study?
13      A   Yeah, I was, by position, the senior
14  author, but I was the head of the -- the study
15  that produced this paper.
16      Q   All right.  And what is -- and do you
17  have an opinion with regard to what the relative
18  risks are for indoor ambient particulate matter?
19      A   For what?
20      Q   For --
21      A   You mean qualitative, like what
22  illnesses they cause or --
23      Q   Yes, with regard -- I believe you
24  studied a bit of asthma, so I believe it would be
25  the relative risk of indoor particulates and
```

Page 371

```
1   asthma?
2       A   Well, there's not one single way to
3   answer that, right.  So this -- this paper doesn't
4   look like the one that's actually quantified it,
5   right.  We have other ones that look at the
6   increase in, say, symptoms, for example, or
7   exacerbations per very small increment in
8   particulate matter.
9           So like, I think if you -- if you're
10  looking at our studies, you're not going to find a
11  relative risk that's, like -- that's analogous to
12  these where this is the relative risk of an
13  outcome for secondhand smoke, yes/no.  Ours are
14  reported not by that but by little tiny increments
15  or decrements of -- of particle concentrations.
16      Q   Do you know what the relative risk is
17  for indoor ambient air?
18      A   That's --
19          MS. BROWN:  Objection to the form.
20          THE WITNESS:  That's not a full
21  question.
22  BY MS. PARFITT:
23      Q   Do you -- is there a relative risk for
24  exposure to the lungs in indoor particulate
25  matter?
```

Page 372

```
1           MS. BROWN:  Objection to the form.  You
2   need the disease to link the --
3           MS. PARFITT:  Lung.  Lung.
4           MS. BROWN:  You mean cancer?  Objection
5   to the form.
6           THE WITNESS:  Anyway, I can't answer it.
7   You need more in the sentence or the question in
8   order for me to be able to answer it.
9   BY MS. PARFITT:
10      Q   Okay.  Are there any -- fair enough.
11          Are there any reported relative risks
12  between indoor particulate matter and lung
13  disease?
14          MS. BROWN:  Objection to the form.
15          THE WITNESS:  I'd want to be super
16  careful about what we're saying is lung disease,
17  because some people might think that that means
18  the risk of developing a particular lung disease,
19  and others might mean the worsening of an existing
20  disease or a lung function abnormality.
21  BY MS. PARFITT:
22      Q   Okay.  Do you know what the relative
23  risk is between indoor particulate matter and
24  asthma?
25      A   The risk of developing asthma?
```

Page 373

```
1       Q   Correct.
2       A   It's not --
3           MS. BROWN:  Objection to the form.
4           THE WITNESS:  Sorry.  It's not known.
5   BY MS. PARFITT:
6       Q   It's not known.
7       A   Not known.
8       Q   It's not been published.
9       A   Well, I can't say there's not a single
10  paper out there, but at this point the -- a
11  summary of the evidence is that we can't say for
12  sure that it's -- that it causes asthma.
13      Q   Have you reviewed in any of the
14  literature published data with regard to airborne
15  particles -- indoor airborne particles and asthma
16  as to what the relative risk may be?
17          MS. BROWN:  Objection to form.
18          THE WITNESS:  Relative risk of?
19  BY MS. PARFITT:
20      Q   Relative risk of asthma from exposure to
21  indoor air particulate.
22          MS. BROWN:  Objection to the form.
23          THE WITNESS:  So I -- I've read a ton of
24  stuff about it.  I mean if you've got a particular
25  article, I'm happy to read it and interpret it.
```

94 (Pages 370 to 373)

Gregory B. Diette, M.D.

Page 374

1  But as of this point, I think we -- should I
2  explain or just --
3  BY MS. PARFITT:
4      Q   No, I -- all I really want to know in
5  the interest of time is whether or not you have
6  reviewed any of the scientific literature data
7  that reports what the relative risk is for indoor
8  particulate matter and the risk of getting asthma?
9          MS. BROWN:  Objection to the form.
10  BY MS. PARFITT:
11     Q   And if you haven't, that's fine.
12     A   Oh, my gosh, no, it's not that.  I have.
13  I just don't think that you can answer that
14  question.  I'm not saying there's not some study
15  out there that may estimate a risk for that, but
16  it isn't established.  Like, at this point, we
17  cannot say in 2019 that indoor particulate matter
18  causes asthma.
19          And -- and you have to say more to the
20  sentence.  So let's just talk about like adults
21  living in the city.  We can't say that.  You
22  know -- you know, there's -- there's studies that
23  have looked at the relative risk of indoor
24  cooking, which is predominantly particulate
25  matter, in developing countries, but even the

Page 375

1  asthma evidence is not fully developed.
2          So it's just -- it's one of those things
3  where you may find a paper that has an estimate,
4  but it hasn't been fully established yet.
5      Q   All right.  Do you -- I understand it's
6  not fully established, but are there reported
7  relative risks from the scientific literature?
8          MS. BROWN:  Objection.
9          THE WITNESS:  I'm sure there are.
10         MS. BROWN:  Objection --
11         THE WITNESS:  I'm sure there are, but --
12  BY MS. PARFITT:
13     Q   There are.  Do you know what they are?
14         MS. BROWN:  Objection to the form.
15         THE WITNESS:  Oh, my gosh.
16  BY MS. PARFITT:
17     Q   If you know.  If -- like, do you know
18  there is a range of relative risks between
19  exposure to indoor particulate matter and asthma?
20         MS. BROWN:  Objection to the form of the
21  question.
22         THE WITNESS:  I've got to see what
23  you're talking about, because I think that when
24  you ask it that way, there may be some estimate
25  based on a particular number of micrograms per

Page 376

1  meter cubed.  It may be from a particular source,
2  like traffic-related pollution or not.
3          I mean there's more to it.  There's not
4  just like some summary that -- that I can -- I can
5  make.  Maybe you can find somebody that can just
6  say particulate matter has this risk of causing
7  asthma.  I haven't seen it.
8          But it's not there aren't like a whole
9  bunch of studies looking at the relationship
10  between indoor and outdoor particulate matter and
11  lung disease as both, you know, developing newly
12  and worsening the existing ones.
13  BY MS. PARFITT:
14     Q   Right.  Does secondhand smoke cause lung
15  cancer?
16         MS. BROWN:  Objection to the form.
17         THE WITNESS:  It seems -- it seems that
18  that -- that has been established.
19         (Counsel conferring.)
20  BY MS. PARFITT:
21     Q   Okay.  Let's talk a little bit --
22         THE WITNESS:  We're just doing a time
23  check.  I'm just trying -- do you know roughly how
24  much we --
25         THE VIDEOGRAPHER:  Five hours, 34

Page 377

1  minutes.
2          THE WITNESS:  So a little under an hour
3  and a half?  Did you guys want to do a --
4          MS. PARFITT:  A quick break here?  Sure.
5          THE WITNESS:  -- or a break here or
6  wait?
7          MS. PARFITT:  No, that's fine.  We can
8  take a quick one now.  That's fine.
9          THE VIDEOGRAPHER:  The time is 3:50 p.m.
10  We're going off the record.
11         (Recess.)
12         THE VIDEOGRAPHER:  The time is 4:10 p.m.
13  We're back on the record.
14         We're on the record, by the way.
15         (A discussion was held off the record.)
16         (Diette Exhibit Nos. 25 and 26
17         were marked for identification.)
18  BY MS. PARFITT:
19     Q   Are you ready, Dr. Diette?
20     A   I am.  Thank you.
21     Q   Very good.
22         THE VIDEOGRAPHER:  Microphone, Counsel.
23  BY MS. PARFITT:
24     Q   Dr. Diette, I -- I asked you a little
25  bit earlier about the relative risk for secondhand

95 (Pages 374 to 377)

Gregory B. Diette, M.D.

Page 378

1    smoke and -- and lung cancer.
2         And what I would like you to do is --
3    and I apologize, I don't have copies of this -- so
4    I'm showing you what is the report of the Surgeon
5    General, I believe it was back in 2006, "The
6    Health Consequences of Involuntary Exposure to
7    Tobacco Smoke, A Report of the Surgeon General."
8         Have you read that in the past?
9    A   So definitely not every word, but I've
10   read big chunks of it.
11   Q   Okay. I figured with your work you may
12   have.
13   A   Yeah.
14   Q   All right. Let me direct your attention
15   to --
16        MS. PARFITT: And I apologize to all, so
17   you have to look on the camera -- on the screen.
18        MS. BROWN: Okay. So just for the
19   record, we don't have copies of this, and so I
20   will object to the fact that we have no context or
21   ability to look at the document ourselves.
22        MS. PARFITT: All right.
23   BY MS. PARFITT:
24   Q   And again, Doctor, you've reviewed this
25   report, correct, in the past?

Page 379

1    A   In the past, and I've read parts of it,
2    but as you know, I mean it's a humongous --
3    Q   It is big.
4    A   -- document, and so some parts
5    weren't -- weren't for me.
6    Q   All right. I want to focus your
7    attention on the conclusions of the Surgeon
8    General's report.
9         And 1: "The evidence is sufficient to
10   infer a causal relationship between secondhand
11   smoke exposure and lung cancer among lifetime
12   nonsmokers. This conclusion extends to all
13   secondhand smoke exposure, regardless of location.
14        "2. The pooled evidence that indicates"
15   -- sorry -- "the pooled evidence indicates a 20 to
16   30 percent" -- that would be a 1.2 or 1.3 relative
17   risk -- "increase in the risk of lung cancer from
18   secondhand smoke exposure associated with a
19   smoker."
20        Did I read that correctly?
21   A   You did.
22   Q   And is that what the -- are those the
23   numbers, 1.2 and 1.3, the relative risks that the
24   Surgeon General has concluded is --
25   A   Um -- I'm sorry.

Page 380

1    Q   That's all right.
2         -- is related to secondhand smoke and
3    lung cancer?
4         MS. BROWN: Objection to the form.
5         THE WITNESS: It looks like it there. I
6    remember there's other numbers in there as well,
7    but I mean, I remember it being 1-point something
8    and --
9    BY MS. PARFITT:
10   Q   Does that refresh my memory?
11        MS. BROWN: Well, let him finish,
12   please.
13        THE WITNESS: I think there's somewhere
14   else in there where there's other estimates, but
15   still not like -- not sky high. Still less than
16   2.0.
17   BY MS. PARFITT:
18   Q   But you don't disagree with the Surgeon
19   General's conclusion that the pooled evidence
20   indicates a 20 to 30 percent increase in the risk
21   of lung cancer from secondhand smoke exposure
22   associated with living with a smoker, correct?
23        MR. LOCKE: Objection.
24        MS. BROWN: Objection. He doesn't have
25   the document, he can't review it.

Page 381

1    BY MS. PARFITT:
2    Q   Are you disputing that conclusion?
3         MS. BROWN: Objection. He has no basis
4    to do it, he doesn't have the document.
5    BY MS. PARFITT:
6    Q   Are you disputing that, Doctor?
7    A   I would --
8         MR. LOCKE: Objection.
9         THE WITNESS: I would say it fits with
10   what I understood to be true at the time that that
11   was published.
12   BY MS. PARFITT:
13   Q   Fair enough. Thank you. I appreciate
14   that.
15        Dr. Diette, is it fair that -- to say
16   that we don't have, and you've not reviewed, any
17   Johnson -- Johnson & Johnson specific epidemiology
18   with regard to a study of just Johnson & Johnson
19   Baby Powder?
20        MS. BROWN: Objection to the form.
21        THE WITNESS: That is correct.
22   BY MS. PARFITT:
23   Q   Okay. And so what we rely on, and what
24   you've relied on, rather, is data and
25   epidemiological science on all comers, all brands,

Gregory B. Diette, M.D.

Page 382

1    correct?
2         MS. BROWN: Objection to the form.
3         MR. LOCKE: Objection.
4         THE WITNESS: I -- I wouldn't
5    characterize it exactly that way. I mean I would
6    say that I can't really sort between different
7    brands based on the epidemiologic literature, but
8    whatever all brands is, I don't -- you know, I
9    don't know what that represents.
10   BY MS. PARFITT:
11        Q   And would it be fair then if one product
12   that contained -- one product, talcum powder
13   product contained asbestos, and another did not,
14   that would result in a conclusion that would draw
15   it towards the null? Is that fair?
16        MS. BROWN: Objection to the question.
17        THE WITNESS: I don't understand that.
18   BY MS. PARFITT:
19        Q   Okay.
20        A   I mean I understand the idea of drawing
21   something to the null. I just don't understand --
22        Q   Sure.
23        A   -- what preceded that.
24        Q   If you have a product like Johnson &
25   Johnson, and you -- and it has a carcinogen in it,

Page 383

1    and you lump it together with other products that
2    are not infected or contaminated with asbestos,
3    what does that do to the overall relative risk --
4         A   Oh.
5         Q   -- when studying that product?
6         MS. BROWN: Objection to the incomplete
7    hypothetical.
8         THE WITNESS: So concept and reality,
9    right. So the concept would be, if you knew that
10   there were enough asbestos that led to an exposure
11   that was enough in order to cause a disease from
12   one product, and it was pooled with another
13   product that didn't have that same amount or
14   didn't have any asbestos but you knew that there
15   was enough to cause disease, then it would -- it
16   would do exactly what you're saying, is it would
17   move it towards -- towards one.
18        The reality is there wouldn't be any
19   impact whatsoever because the epidemiology already
20   takes into account whatever those brands are, and
21   so it doesn't change the totality of the evidence
22   that we have available for us.
23        So concept, I mean you could sort of
24   imagine what you're saying to be true, but
25   reality, no.

Page 384

1    BY MS. PARFITT:
2         Q   Okay. When you say it doesn't change
3    the totality of the evidence that we have
4    available for us, isn't it true that the presence
5    of a carcinogen, like asbestos in talcum powder
6    products, supports the biological -- biologically
7    plausible mechanism for association between talcum
8    powder products and ovarian cancer?
9         MS. BROWN: Objection to the form of the
10   question.
11        THE WITNESS: I -- I'd say no. And for
12   reasons, if you want them, or just leave it at no.
13   BY MS. PARFITT:
14        Q   Well, you've testified that asbestos is
15   a carcinogen. Correct?
16        A   Correct.
17        Q   All right. And the fact that asbestos
18   might be in the talcum powder product does not
19   impact your opinions with regard to the increased
20   biologically plausible mechanism for talc to cause
21   ovarian cancer.
22        MS. BROWN: Objection to the form. Are
23   you talking about a Johnson & Johnson product?
24        MS. PARFITT: Just generally.
25        MS. BROWN: Objection to the form.

Page 385

1         THE WITNESS: It -- it does not.
2         As you ask these things, I'm trying to
3    figure out if I'm supposed to explain what I'm
4    saying or is --
5         MS. BROWN: No, you answered the
6    question.
7         THE WITNESS: Okay.
8         MS. BROWN: She'll ask you another one
9    if she has one.
10        THE WITNESS: Okay. All right.
11   BY MS. PARFITT:
12        Q   Does Johnson & Johnson sell baby powder
13   that's 99 percent asbestos and 1 percent
14   fragrance?
15        MS. BROWN: Objection to the form of the
16   question.
17        THE WITNESS: If they do, I'm not aware
18   of that.
19   BY MS. PARFITT:
20        Q   Okay. And if I understand, the presence
21   of asbestos in a talcum powder product does not in
22   your mind impact the biologically plausible
23   mechanism for talcum powder products to cause
24   ovarian cancer.
25        MR. LOCKE: Objection.

97 (Pages 382 to 385)

Gregory B. Diette, M.D.

Page 386

1    THE WITNESS: No, there's not enough
2  information in what you said there.
3  BY MS. PARFITT:
4    Q   What would you need?
5    A   So I would need a couple of things. One
6  is I would need to have some estimate of what the
7  dose would be, and some assurance from somewhere,
8  which I don't have, that that represented a dose
9  that was sufficient to cause -- and by dose, I'm
10  talking about dose of asbestos, right -- that that
11  was a sufficient dose to cause ovarian cancer.
12    And based on what I've seen, I can't
13  make that link.  I can't -- I haven't seen
14  anything that says that there's a plausible
15  concentration or dose that people would be exposed
16  to that links to anything I can find in the
17  epidemiologic literature about how much, if any,
18  it would take in order to -- to cause ovarian
19  cancer.  And what I -- should I finish?
20    Q   Mm-hmm, yeah, finish.
21    A   Okay.  I'm sorry.
22    Q   I'm trying not to interpret you.
23    A   No, no, you're not.  I didn't mean -- I
24  didn't think you were.
25    Q   So doing better.

Page 387

1    A   I didn't think you were.
2    So I mean there's more, right.  I mean
3  so the -- if you look at IARC and what those
4  studies represented, they represent for the most
5  part -- and by IARC, I'm talking about IARC and
6  ovarian cancer and asbestos -- you know, mostly
7  circumstances that aren't typical of American
8  women.  For example, so women in Europe who were
9  working at a time and place when there was
10  different forms and lots of asbestos that may have
11  been sufficient to cause other asbestos-related
12  diseases.
13    So if you -- if those -- if those
14  findings are absolutely accurate -- you know, you
15  take away the issue of misclassification or
16  anything else -- if they're absolutely accurate,
17  you've got a relative risk in the neighborhood of
18  like 1.75 or something like that.
19    So I'm not saying that's not an
20  important risk, but it's not a huge risk, right?
21  So we're taking heavy industrial exposure to get
22  to a 1.75.  I haven't seen anything that could
23  tell me that anything we're talking about here
24  could possibly rise to the level of heavy
25  industrial exposure.

Page 388

1    And then I think if you -- if you pair
2  that with more modern studies, if you take like
3  the Reid study from Australia, you take women who
4  worked, you know, in and around a crocidolite
5  mine, they certainly had enough exposure to get
6  asbestos-related diseases, but they don't get
7  ovarian cancer.
8    And so I think that the -- you know, the
9  sum total of all that just -- it doesn't make
10  sense that just knowing the fact that there's some
11  particle -- even if it's true, that some particle
12  of asbestos is going to be enough to cause
13  disease.
14    Q   Okay.  Have you -- have you read -- I
15  didn't see it in your reliance list -- Reid, 2012?
16    A   I have two Reids, I think, and if I only
17  listed one, I meant to include two.
18    Q   Yeah, you only listed 2011 Reid.  You
19  didn't list 2012 Reid.
20    A   I meant -- so I don't know which one is
21  there.  There's one from Whitnum, which is the
22  study of the women that -- you know, that I was
23  just describing, and a separate one is -- it's
24  basic -- basically like a meta-analysis or a
25  reanalysis of the ovarian cancer and asbestos

Page 389

1  literature.
2    Q   Okay.  Do you recall from your reading
3  that the scientists in Reid 2012 determined that
4  childhood exposure to asbestos was associated with
5  an increased risk of cancer mortality which was
6  3.5 times greater than the general population?  Do
7  you recall those numbers?
8    A   I don't, but cancer mortality to --
9    MS. BROWN:  Objection.
10    THE WITNESS:  Can you tell me which --
11  because I don't remember which year links to which
12  Reid study.
13  BY MS. PARFITT:
14    Q   That was the 2012 that I was speaking
15  of.
16    A   No, I understand that.  I heard the
17  year, but I don't know what the title is.
18    Q   Oh, the title is "All-cause mortality in
19  cancer incidence among adults exposed to blue
20  asbestos during childhood."
21    A   I think that's a third study then,
22  because I think the two I'm referring to are --
23  are two different ones.
24    Q   All right.  So did you read the 2012 or
25  that just wasn't one you read?

98 (Pages 386 to 389)

Gregory B. Diette, M.D.

Page 390

1    MS. BROWN: Well, Counsel, can you show
2 it to him and he'll tell you?
3    MS. PARFITT: Sure.
4    THE WITNESS: I don't know if either of
5 the ones that I cite, you know, that I'm familiar
6 with are from 2012, but I don't think I read the
7 one that you're talking about.
8 BY MS. PARFITT:
9    Q   Okay. From looking at your curriculum
10 vitae and the studies you cited, you cited Reid --
11 actually you cited three Reids. You cited Reid
12 2011, you cited Reid 2008, and you cited Reid
13 2009. The study that you did not cite was Reid
14 2012.
15    A   That -- that sounds believable. That
16 makes sense.
17    Q   All right. So for purposes of the
18 opinions in your report, you did not rely on Reid
19 2012, is that fair?
20    MS. BROWN: Objection to the form of the
21 question.
22    THE WITNESS: I -- I don't think I'm
23 familiar with that study.
24 BY MS. PARFITT:
25    Q   Okay. Fair enough.

Page 391

1    Are you able to share with us,
2 Dr. Diette, what the minimum dose of asbestos is
3 necessary in order to cause an ovarian cancer?
4    MS. BROWN: Objection to the form of the
5 question.
6    THE WITNESS: I haven't seen that
7 published. I can tell you that at least in one of
8 those Whitnum studies that women were exposed to
9 as much as 40 fiber/cc years cumulatively of
10 crocidolite, and -- and that apparently wasn't
11 enough to cause ovarian cancer. But I didn't see,
12 you know, good measurements or estimates from
13 the -- the more historic to say what the exposures
14 were.
15 BY MS. PARFITT:
16    Q   Okay. IARC looked at the issue of
17 asbestos and ovarian cancer, correct?
18    A   They did.
19    MS. BROWN: Form.
20    THE WITNESS: Sorry.
21 BY MS. PARFITT:
22    Q   All right. IARC concluded that asbestos
23 causes ovarian cancer.
24    MS. BROWN: Form.
25    MR. LOCKE: Objection.

Page 392

1    THE WITNESS: I'm not disagreeing with
2 you, I think that's the language they use, but
3 they -- they used their -- their strongest --
4 their strongest grading.
5 BY MS. PARFITT:
6    Q   How many of the IARC studies that formed
7 the basis for IARC's conclusion that asbestos
8 causes ovarian cancer was there information
9 concerning the exposure and the dose?
10    A   So I think you said something that you
11 didn't mean to, because I think you said how many
12 of the IARC studies that IARC considered. I
13 think -- did you mean how many of the underlying
14 studies that IARC considered?
15    Q   Correct.
16    A   Okay. And so there's at least five that
17 I remember that were like sort of factory worker
18 type studies, and then I think there were a couple
19 of more. I'd have to go back, though, to look and
20 see what -- what they had about dose, if anything.
21 My -- I'm thinking like at least for the World
22 War II era ones, they probably didn't have good
23 measures at all, you know, if any.
24    Q   Okay. Let me show you what I will have
25 marked as Exhibit 27.

Page 393

1    (Diette Exhibit No. 27 was marked
2    for identification.)
3    MR. ROSEN: 26, for the record, is the
4 Surgeon General's report, which we'll supplement
5 with a paper copy.
6    THE WITNESS: The same one -- the same
7 one that we were talking about before the
8 secondhand smoke or involuntary smoke?
9    MR. ROSEN: Right, so there won't be a
10 26 in the file.
11    THE WITNESS: Got you.
12 BY MS. PARFITT:
13    Q   Let me show you what we have marked as
14 Exhibit 27.
15    Do you have that in front of you?
16    A   I have the "Arsenic, Metals, Fibres and
17 Dusts," 100C IARC.
18    Q   That's correct, that's the right one.
19    Okay. Let me direct your attention to
20 the bottom of page 253.
21    Do you have that?
22    A   253?
23    Q   253, correct.
24    A   I do.
25    Q   All right. And it says: "An

Gregory B. Diette, M.D.

Page 394

1    examination of the association between asbestos
2    and ovarian cancer was not undertaken by the IOM,"
3    and then it has a 2000 -- a 2006 date. Correct?
4        A    Yes.
5        Q    Okay. Now, before we get to Table 2.8,
6    what I want you to do is turn over to page 256.
7        All right. And again, directing your
8    attention to the far right column. Are you there?
9    And it starts with, "Working group"?
10       A    I am. I'm sorry, I'm distracted because
11   I think there's --
12       MS. BROWN: It has a weird --
13       THE WITNESS: -- there's like a font
14   issue or something, like somebody's printer didn't
15   have the right --
16   BY MS. PARFITT:
17       Q    That might have been ours. I apologize.
18   Not ideal circumstances.
19       All right. Do you see where it says,
20   "The working group"?
21       A    I do.
22       Q    All right. "The working group noted
23   that a causal association between exposure to
24   asbestos and cancer of the ovary was clearly
25   established based on five strongly positive cohort

Page 395

1    mortality studies of women with heavy occupational
2    exposure to asbestos."
3        Do you see that?
4        A    I do.
5        Q    Okay. And then if you go -- and then it
6    cites those studies.
7        Do you see that?
8        A    I do.
9        Q    And go down to where it starts: "The
10   working group carefully considered the
11   possibilities that cases of peritoneal
12   mesothelioma may have been misdiagnosed as ovarian
13   cancer, and that these contributed to the observed
14   excesses."
15       Do you see that?
16       A    I do.
17       Q    Okay. Did I read that correctly?
18       A    Yes.
19       Q    Okay. In your report you stated that it
20   was your belief that perhaps the results were
21   limited by virtue of the fact that there may have
22   been misdiagnosis between peritoneal mesothelioma
23   and ovarian cancer cases.
24       Do you remember writing that?
25       A    I do.

Page 396

1        Q    Okay. Do you see where the working
2    group of IARC considered all of the data, and they
3    made a determination that there were not, at the
4    bottom, sufficient -- they ruled out the
5    possibility that there may have been a
6    misdiagnosis?
7        Do you see that?
8        MS. BROWN: Objection to the form.
9        THE WITNESS: I see that they've -- that
10   they reached that -- that conclusion.
11   BY MS. PARFITT:
12       Q    Okay. And that's different than the
13   conclusion you raised in your report, correct?
14       A    Well, it's different --
15       MS. BROWN: Objection.
16       THE WITNESS: It is different, yes.
17   BY MS. PARFITT:
18       Q    All okay. Right. Let's go back to
19   again page 253.
20       And you will see it references a table,
21   Table 2.8. Do you see that on the top of 254?
22       A    Okay.
23       Q    Okay. Got that.
24       Okay. Let me show you what we'll have
25   marked as Exhibit 28.

Page 397

1        (Diette Exhibit No. 28 was marked
2        for identification.)
3    BY MS. PARFITT:
4        Q    Okay. Diette Exhibit 28, if you will.
5    There you go.
6        MS. PARFITT: And, Counsel, I have a
7    copy for you.
8        MS. BROWN: Thank you.
9        MS. PARFITT: Of course.
10       Sorry, guys. I'm going to need one.
11   I'm sorry. I'll give you this one later.
12   BY MS. PARFITT:
13       Q    Okay. I will represent to you that that
14   is -- that is Table 2.8, which is referenced in
15   the IARC report on page 253 and 254.
16       And it says: "Epidemiological studies
17   of asbestos exposure and ovarian cancer," and then
18   in parens, "and for comparison, lung cancer and
19   mesothelioma."
20       Do you see that?
21       A    I do.
22       Q    All right. Look over at the first study
23   mentioned there, the Atkinson study from 1982.
24       A    Mm-hmm.
25       Q    All right. Do you see that the relative

Gregory B. Diette, M.D.

Page 398

1  risk for ovarian cancer and lung cancer, for
2  ovarian cancer it was 2.75, and for lung cancer it
3  was 2.41. Do you see that?
4      A  I do.
5      Q  Okay. Then move down to the Wignall and
6  Fox study. It's a 1982 study. Do you see that?
7      A  I don't -- oh, yeah, the next one down,
8  yeah.
9      Q  Okay, yeah. Do you see that the
10  relative risk for ovarian cancer were 2.13, and
11  for lung cancer 2.73?
12      A  Correct.
13      Q  And let's move down to Pira in 2005. Do
14  you see where the relative risk for ovarian cancer
15  were 2.61 and for lung cancer 2.82?
16      A  I do.
17      Q  All right. And then let's move to
18  Magnani, a 2008 study.
19          All right. Do you see -- and this is
20  one of the studies that the working group of IARC
21  looked at. They determined that the relative risk
22  for -- not determined -- they indicated that the
23  relative risk for ovarian cancer on the Magnani
24  study was 2.27, and for lung cancer 2.20.
25          Do you see that?

Page 399

1      A  I do.
2      Q  All right. And let's go on to the
3  Ferrante study. Do you see that?
4      MS. BROWN: Where -- where are you?
5      MS. PARFITT: On the last page.
6  BY MS. PARFITT:
7      Q  Do you see that? It's on the last page,
8  Ferrante, 2007. Do you see that?
9      A  I do.
10      Q  Okay. And the relative risk for ovarian
11  cancer was 1.43, and for lung cancer it was 1.17.
12          Now, I'll represent to you, Doctor --
13  or, Dr. Diette, is it fair to say that this
14  Table 2.8 of epidemiological exposures, asbestos
15  exposure and ovarian cancer formed part of the
16  bases for IARC's decision in their IARC report
17  that asbestos -- or ovarian -- asbestos causes
18  ovarian cancer?
19      A  I assume so, yeah.
20      Q  Okay. All right. Let's talk a little
21  bit -- do you intend to give an opinion in this
22  case that fibrous talc is a carcinogen?
23      MS. BROWN: Objection to the form.
24      THE WITNESS: I just want to correct
25  something real quick.

Page 400

1  BY MS. PARFITT:
2      Q  Sure.
3      A  In one of your questions a little while
4  back, you were asking me to agree that you were
5  reading fine, and you were for the relative risks.
6      Q  Yeah.
7      A  None of these are relative risks,
8  though. They're SMRs and SIRs. So just a
9  slightly different --
10      Q  I appreciate that. Thank you. Thank
11  you for the correction. Thank you.
12          Next question. Do you intend to give an
13  opinion that fibrous talc is a carcinogen?
14      MS. BROWN: Form.
15      THE WITNESS: I'm not sure I understand
16  what fibrous talc is.
17  BY MS. PARFITT:
18      Q  Okay. Let me direct your attention
19  to -- we'll go back to the IARC on ovarian
20  cancer -- or, excuse me, IARC on asbestos.
21  Paragraph 1.1 on page 219.
22          Are you there?
23      A  Paragraph 1, yes.
24      Q  Yes. Okay. Do you see where after it
25  has IARC, '73, and USGS, 2001, it states: "The

Page 401

1  conclusions reached in this monograph about
2  asbestos and its carcinogenic risks apply to these
3  six types of fibres wherever they are found, and
4  that includes talc containing asbestiform fibres."
5          Do you see that?
6      A  Yes.
7      Q  All right. Do you intend to give an
8  opinion in this case that talc containing
9  asbestiform fibers can cause ovarian cancer?
10      MS. BROWN: Objection to the form.
11  That's different than the original question.
12      MS. PARFITT: It is.
13      MS. BROWN: Did you mean it to be?
14      MS. PARFITT: No. I mean the new
15  question.
16      MS. BROWN: Okay.
17      THE WITNESS: So, because to me, the way
18  I have read this before and then also again now, I
19  think, although I can't know what they were
20  intending, but this to me says basically talc with
21  asbestos in it -- what we would agree is talc with
22  asbestos in it, as opposed to something else.
23          And I don't think you need the "talc
24  containing." I think you could say anything
25  containing asbestos, you know, could potentially

Gregory B. Diette, M.D.

Page 402

1    increase carcinogenic risk if there's enough of a
2    dose.
3    BY MS. PARFITT:
4        Q    Okay.  Did you see anywhere in the IARC
5    working group document that we've been talking
6    about that the working group determined that there
7    was a causal association between asbestos and
8    ovarian cancer, but it depended on the dose?
9        MR. LOCKE:  Objection.
10       MS. BROWN:  Objection to the form of the
11   question.
12       THE WITNESS:  I don't recall.
13   BY MS. PARFITT:
14       Q    Okay.  You've worked an secondhand smoke
15   studies, correct?
16       A    Yes.
17       Q    How do you determine the dose for those?
18       MS. BROWN:  Objection to the form.
19       THE WITNESS:  So the dose of secondhand
20   smoke?
21   BY MS. PARFITT:
22       Q    Mm-hmm.
23       A    So it depends, right.  So at the moment,
24   it -- so it depends upon which kind of study.  And
25   when you say "you," do you mean you in the broad

Page 403

1    sense or me, Greg Diette?
2        Q    Well, Greg Diette has been doing
3    research on secondhand smoke, and you, Greg
4    Diette, has indicated that dose is important to
5    you.  So what I'd like to know is how you measure
6    the dose in your secondhand smoke.
7        A    Yeah, so a lot of different --
8        MS. BROWN:  Objection.  Dose is
9    important to him as it relates to secondhand
10   smoke, is that what the question is asking?
11       MS. PARFITT:  No.
12   BY MS. PARFITT:
13       Q    I was just reiterating that you,
14   Dr. Diette, have done several secondhand smoke
15   studies, correct?
16       A    Yes.
17       Q    Okay.  And how do you measure the dose
18   in the studies that you have performed?
19       A    So different ways, depending upon the
20   studies.  So for some studies, it's simple enough
21   to ask, especially if you're talking about an
22   adult, whether or not they've had secondhand smoke
23   exposure from their parents, often broken down by
24   whether it's mother or father.  And for some --
25   some studies, that's a sufficient indicator of a

Page 404

1    sufficient dose.  It's not a measurement of dose.
2    It's an indicator of sufficient -- sufficient
3    exposure to be linkable to things like lung
4    cancer.
5        The same kind of question for being
6    around coworkers, and so a yes/no to that has been
7    sufficient.
8        In our other studies, we -- we get more
9    precise so that we'll -- and use a variety of
10   overlapping methods.  So one is to -- to query --
11   if it's a child study, to query the parent about
12   the number of cigarettes that are smoked per day
13   in the home, and with a very elaborate procedure
14   of asking not only the person who is answering the
15   questionnaire but about all the other people that
16   are in and out of the house that day, so we get a
17   count of cigarettes.
18       We also use different types of
19   particulate matter monitors, and we've established
20   that you can estimate about 1 microgram per meter
21   cubed of particulate matter per cigarette smoked
22   in the home.  So we've got an estimate that way.
23       We -- we collect nicotine and cotinine
24   from a variety of sources, so we've collected
25   hair, saliva, urine, and blood.  And so depending

Page 405

1    upon which study and which population, we can
2    estimate something about dose based on what
3    their -- what their sort of biomarker is.
4        Q    All right.  How much have you --
5    understanding those metrics, for lack of a better
6    word, how much smoke does a patient need to
7    actually inhale?
8        MS. BROWN:  For what?
9    BY MS. PARFITT:
10       Q    In order to determine whether or not
11   they have been impacted by secondhand smoke.
12       MS. BROWN:  Objection to the form.
13       THE WITNESS:  That's a complicated
14   question, I guess, because we don't -- at least in
15   our studies, we don't measure -- like I don't know
16   what that means, like how much they inhale.  I can
17   tell you, you know, what their absorbed dose is of
18   nicotine, right, which has some implication about
19   how much they might have inhaled, but I don't
20   relate that to like sort of a volume of smokey air
21   or something like that, the way that you might if
22   you were doing like a smoke machine, you know,
23   study.
24       So it's really -- it's implied, right.
25   If you find it in the urine and the blood, they

102 (Pages 402 to 405)

Gregory B. Diette, M.D.

Page 406

1    inhaled it enough in order to get that particular
2    fluid level high enough to -- for you to measure
3    it. And same with saliva and same with hair.
4    BY MS. PARFITT:
5        Q   Okay.
6        A   I left one out too. We also measure
7    airborne nicotine, and so that's another
8    indicator. So I was talking about cotinine that's
9    measured in -- in the people, but we also have
10   nicotine matches, and we'll measure nicotine
11   directly in the environment.
12       Q   Based upon -- I meant to ask this
13   earlier. Based upon your study of ovarian cancer
14   and talcum powder products that you've done for
15   Johnson & Johnson, have you made any of these
16   recommendations to Johnson & Johnson as to how --
17   what kind of study they could perform in order to
18   ascertain dose?
19           MS. BROWN:  What?
20           MR. LOCKE:  Objection.
21           MS. BROWN:  Objection to the form of the
22   question.
23   BY MS. PARFITT:
24       Q   Let me ask it again.
25       A   Oh, no, I heard it. I was just -- I

Page 407

1    guess the broad answer is no. I mean I haven't
2    made any recommendations about studies to Johnson
3    & Johnson for -- for anything.
4        Q   Okay. And the reason I ask is, your
5    work appears to be reviewing and surveying the
6    literature for Johnson & Johnson in order to give
7    litigation opinions on whether or not talcum
8    powder products can cause ovarian cancer.
9            MR. LOCKE:  Objection.
10           MS. BROWN:  Objection to the form of the
11   question.
12   BY MS. PARFITT:
13       Q   Correct?
14       A   Can you say it again?
15       Q   Sure.
16       A   I spaced out a little bit.
17       Q   No, that's all right. It's getting late
18   in the day.
19           Your work for Johnson & Johnson appears
20   to be surveying the literature, preparing
21   litigation reports, and then giving testimony in a
22   court that the Johnson & Johnson product is safe.
23           And my question for you is, what have
24   you done in order to inform the scientific
25   community of the results of your -- your now

Page 408

1    couple-year study and, you know, tens of thousands
2    of dollars spent doing it?
3            MR. LOCKE:  Objection.
4            MS. BROWN:  Objection to the form.
5    There are multiple questions in there, Counsel.
6    Can you rephrase?
7    BY MS. PARFITT:
8        Q   Do you understand the question?
9        A   The -- the last part you said -- I'll
10   try to paraphrase it so we know we're talking
11   about the same thing. I have not -- I have not
12   done anything to inform the medical community
13   about the findings so far from my -- you know,
14   from my work on these cases.
15       Q   Do you intend to do so?
16       A   I don't have any active intention to do
17   it right now.
18       Q   Okay. Do you intend to have your report
19   peer -- published?
20       A   It's not in the right format for that.
21       Q   Okay. Do you intend to do any
22   meta-analysis of your work?
23           MS. BROWN:  Objection to the form.
24           THE WITNESS:  Not on that -- not on that
25   topic.

Page 409

1    BY MS. PARFITT:
2        Q   Okay. And if you saw with regard to
3    Health Canada, they have given -- they gave
4    individuals an opportunity to comment on the work
5    that they did and present that to them.
6            You saw that, correct?
7        A   Yes.
8        Q   Okay. So you had an opportunity as
9    someone who's reviewed the literature to write to
10   Health Canada and inform them of your concern
11   about the manner in which they conducted their
12   study. Fair?
13           MS. BROWN:  Objection to the form, lacks
14   foundation.
15           THE WITNESS:  I guess. I actually don't
16   know who they're asking. Like I haven't looked to
17   see whether they're looking for people outside of
18   Canada.
19           I don't even know who they are. I mean
20   the only reason I've heard of Health Canada is
21   because of this litigation and because something,
22   you know, opportunistic came up. But otherwise, I
23   mean I wouldn't be talking to Health Canada about
24   anything or reading whatever they've written.
25   BY MS. PARFITT:

Gregory B. Diette, M.D.

Page 410

```
 1      Q   Something opportunist came up.  Is that
 2  the fact that you are being engaged in this
 3  litigation --
 4      A   No.
 5          MS. BROWN:  Objection --
 6  BY MS. PARFITT:
 7      Q   -- as an expert witness?
 8          MS. BROWN:  Objection to the form.
 9          THE WITNESS:  Oh, no, I just see -- I
10  think the reason that I have it in front of me is
11  because it -- it seemed to help -- help
12  plaintiffs' experts to be able to say something
13  else about this -- this story.  And if -- if it
14  had said something else, then I probably wouldn't
15  even have heard about it.
16  BY MS. PARFITT:
17      Q   Okay.  This story, Dr. Diette, is about
18  women who are dying of ovarian cancer --
19          MS. BROWN:  Careful -- what's the
20  question?
21  BY MS. PARFITT:
22      Q   -- having been exposed to talcum powder
23  products.
24          Do you understand that?
25          MR. LOCKE:  Objection.
```

Page 411

```
 1          MS. BROWN:  Objection to the form of the
 2  question.
 3          THE WITNESS:  I understand the general
 4  notion is about ovarian cancer and whether there
 5  is or is not a risk from talcum powder.
 6  BY MS. PARFITT:
 7      Q   I appreciate that.
 8          All right, Dr. Diette, do you agree that
 9  there is scientific evidence published in the
10  peer-reviewed journal that talcum powder products
11  can migrate from the vagina to the peritoneal
12  capacity up through the ovaries?
13          MS. BROWN:  Objection to the form.
14          MR. LOCKE:  Objection.
15          THE WITNESS:  From the perineum?
16  BY MS. PARFITT:
17      Q   From the perineum.
18          MS. BROWN:  Objection.
19          THE WITNESS:  I have not seen that.
20  BY MS. PARFITT:
21      Q   Okay.  Do you have -- have you seen in
22  your review of the literature that talcum powder
23  products can migrate from the vagina to the
24  ovaries?
25          MR. LOCKE:  Objection.
```

Page 412

```
 1          MS. BROWN:  Objection.
 2          THE WITNESS:  The only studies I've seen
 3  are the ones that -- I think that were cited by --
 4  by IARC with -- if that's what we're talking
 5  about, is like women who were about to have
 6  surgery for some other reason and -- and different
 7  things placed either in their uterus or vagina,
 8  although not necessarily talc.  I mean all kinds
 9  of things, you know, carbon particles,
10  radiolabeled particles, different things that
11  aren't talc.
12          (Counsel conferring.)
13  BY MS. PARFITT:
14      Q   So sitting here today, is it your
15  testimony that you have not reviewed or seen in
16  the medical literature that particles of talc can
17  migrate to the ovaries, lymph nodes, of a woman's
18  body?
19          MS. BROWN:  Objection to the form of the
20  question.
21          MR. LOCKE:  Objection.
22          THE WITNESS:  So -- so the study would
23  be one where somebody applied talc to the perineum
24  and then demonstrated that it migrated from there
25  to the ovaries or into some lymph node somewhere?
```

Page 413

```
 1  BY MS. PARFITT:
 2      Q   That's right.
 3      A   I have not seen that study.
 4      Q   Okay.  You've read the Schildkraut
 5  study, correct?
 6      A   Yes.
 7      Q   Okay.  Do you agree with the authors of
 8  the Schildkraut study that chronic inflammation
 9  resulting from the use of exposure to baby powder,
10  whether through inhalation or through a
11  transvaginal route, may lead to an increased risk
12  of ovarian cancer?
13          MR. LOCKE:  Objection.
14          MS. BROWN:  Objection to the form of the
15  question.
16          THE WITNESS:  I've read the study.  I'd
17  like to see whether that's in the introduction or
18  the conclusion.
19  BY MS. PARFITT:
20      Q   Okay.  Let me show you Schildkraut.
21      A   Because it's certainly not a conclusion
22  of their study.
23          (Diette Exhibit No. 29 was marked
24          for identification.)
25          MS. BROWN:  Do you guys want a number on
```

Gregory B. Diette, M.D.

Page 414

1    this?
2            MS. PARFITT:  Sure.  What number are we
3    up to?
4            MS. BROWN:  Oh, 29.  I'm sorry.  It's
5    there.  My bad.
6    BY MS. PARFITT:
7        Q   Do you have that in front of you,
8    Doctor?
9        A   I do.
10       Q   Okay.  And if I can direct your
11   attention to pages 14, 16.
12       A   Got you.
13       Q   Do you have that?
14           Do you see where the authors state:
15   "Lung inhalation of powder could be a biologically
16   plausible mechanism for the association between
17   nongenital powder use and increased EOC risk,
18   particularly non-serous EOC."
19           Do you see that?
20       A   I do.  It's the top of the first column
21   in the -- the rest of the incomplete paragraph.
22       Q   Okay.  Do you see that?
23       A   I do.
24       Q   Okay.  Do you agree with that?
25           MR. LOCKE:  Objection.

Page 415

1            THE WITNESS:  Only -- well, no.  Only in
2    the broadest sense that lots of things could be,
3    but not because there's any evidence to show that
4    inhalation of powder is a way to get to the
5    ovaries.
6    BY MS. PARFITT:
7        Q   All right.  So you dispute that
8    inhalation of talcum powder products can cause
9    ovarian cancer.  Is that your testimony?
10       A   Inhalation?
11       Q   Inhalation.
12       A   I haven't seen any evidence that it can.
13   I mean there's not affirmative evidence to say
14   that it absolutely can't, but there's no evidence
15   that there's been talcum powder inhaled, leading
16   to other -- other diseases along the way, and I
17   haven't seen any study that has shown that it can
18   migrate from the lungs to the ovaries.  And so --
19   I mean people could say that, but it's not based
20   on -- on studies.
21       Q   Does the fact that talcum powder
22   products can be inhaled support a biologically
23   plausible mechanism for talcum powder products to
24   cause ovarian cancer?
25       A   No.

Page 416

1            MR. LOCKE:  Objection.
2    BY MS. PARFITT:
3        Q   Okay.  Do you agree that there is
4    reliable scientific literature in the
5    peer-reviewed studies to support that it is
6    biologically plausible for talc products to
7    migrate from the vagina to the ovaries following
8    perineal application?
9        A   I'm not aware of that study that has
10   shown that.
11       Q   Have you seen the Penninkilampi study?
12       A   Oh.
13           MS. BROWN:  Objection.
14           THE WITNESS:  Yes, I have.
15   BY MS. PARFITT:
16       Q   Okay.  Why don't we take a look at that.
17           Let's pull it up, and we'll make it
18   Exhibit No. 30.
19           (Diette Exhibit No. 30 was marked
20           for identification.)
21   BY MS. PARFITT:
22       Q   Right here.  And if I may, Doctor, let
23   me direct your attention to the discussion section
24   of Penninkilampi on page 45.
25       A   Page 45?

Page 417

1        Q   45.
2        A   Yep.
3        Q   Do you have that?
4        A   I'm there, yep.
5        Q   Okay.  It says:  "The present
6    meta-analysis" -- and it is meta-analysis,
7    correct?
8        A   Yeah, part of this study is a
9    meta-analysis.
10       Q   "The present meta-analysis reports a
11   positive association between perineal talc use and
12   ovarian cancer, specifically of the serous and
13   endometriode -- and endometrioid histology site --
14   subtypes.  The mechanism by which perineal talc
15   use may increase the risk of ovarian cancer is
16   uncertain.  It has been previously proposed that
17   talc as a foreign body may ascend from the vagina
18   through to the uterine tubes and instigate a
19   chronic inflammatory response, which may
20   predispose to the development of ovarian cancer."
21           Did I read that correctly?
22       A   You did.
23       Q   Okay.  Do you agree with that?
24           MR. LOCKE:  Objection.
25           MS. BROWN:  Objection to the form.

105 (Pages 414 to 417)

Gregory B. Diette, M.D.

Page 418

```
 1          THE WITNESS:  So -- so I agree with a
 2  lot of this, right.  So I agree that the mechanism
 3  is uncertain.  Right.  I agree that it has been
 4  previously proposed 20 years ago by the citation
 5  that they have that that may ascend from the
 6  vagina, and instigate a chronic inflammation
 7  response.
 8          They don't cite anything more modern
 9  than that one from 20 years ago, though.  And
10  where it talks about it may be mutagenic and
11  promote carcinogenesis --
12  BY MS. PARFITT:
13      Q   Correct.
14      A   -- I don't -- I don't think that's well
15  supported either.
16      Q   Is migration of talc a biologically
17  plausible mechanism by which talc can reach the
18  ovaries?
19          MS. BROWN:  Objection to the form.
20          MR. LOCKE:  Objection.
21          THE WITNESS:  If it were true, it could
22  be supportive of that.  But I don't see any -- any
23  evidence that it's true.
24  BY MS. PARFITT:
25      Q   Is biological plausibility essential for
```

Page 419

```
 1  causality?
 2      A   No, it's -- it's one important criterion
 3  to consider.
 4      Q   Does biological plausibility mean it
 5  must be proved?
 6          MS. BROWN:  Objection.
 7          THE WITNESS:  And I assume we're talking
 8  about in the context of a Bradford Hill?
 9  BY MS. PARFITT:
10      Q   Correct.
11      A   Yeah, so -- so the answer is, no, it
12  doesn't have to be proved.
13      Q   Look at the lower right-hand corner of
14  that article.
15          MS. BROWN:  Are we done with that
16  paragraph, Counsel?
17          MS. PARFITT:  We are.  Thank you very
18  much, yeah.
19  BY MS. PARFITT:
20      Q   And if you will go down to the lower
21  right, it starts with "We also found."
22      A   Okay.
23      Q   Do you see that?
24      Okay.  It says:  "This finding also
25  supports the chronic" -- I'm sorry -- "chronic
```

Page 420

```
 1  inflammatory hypothesis, as repeated exposure
 2  would induce a longer period of chronic
 3  inflammation, and therefore should increase the
 4  predisposition to the development of ovarian
 5  cancer."
 6          Did I read that correctly?
 7      A   You did.
 8      Q   All right.  Do you agree with that
 9  statement, that chronic inflammation as a
10  biologically plausible hypothesis could induce
11  carcinogenicity?
12          MR. LOCKE:  Objection.
13          MS. BROWN:  Counsel, are you
14  intentionally not reading the rest of that
15  paragraph?
16          MS. PARFITT:  No, I -- I'm getting
17  there.
18          MS. BROWN:  Okay.
19          MS. PARFITT:  Yeah.
20          THE WITNESS:  Well, I disagree with the
21  fact that the small difference between 3600, plus
22  or minus, lifetime applications supports a -- an
23  inflammatory theory, because that's got nothing
24  too do with inflammation.  It's really just a -- a
25  total number of applications.
```

Page 421

```
 1  BY MS. PARFITT:
 2      Q   Perhaps I can simplify my answer.  Do
 3  you have an opinion as to whether or not chronic
 4  inflammation can be a biologically plausible
 5  method for promoting carcinogenesis?
 6          MS. BROWN:  Objection to the form.
 7          THE WITNESS:  In -- in all kinds of
 8  cancer or ovarian cancer?
 9  BY MS. PARFITT:
10      Q   In ovarian cancer.
11      A   So I -- I don't think there's strong
12  evidence to support that.
13      Q   Is there evidence at all?
14          MS. BROWN:  Let him finish.
15          THE WITNESS:  So not much.  I mean
16  there's -- I know that folks have looked at, you
17  know, whether NSAIDS and aspirin, whether that use
18  would lead to a limitation in risk, and it seems
19  like the -- the findings are kind of mixed.  And
20  sometimes aspirin in a particular dose is
21  protective and aspirin of another dose is not.
22  That NSAIDS are sometimes protective, but mostly
23  not.
24          Since preparing my report, I saw
25  Dr. Shih -- Shih's report talking about the stick
```

106 (Pages 418 to 421)

Gregory B. Diette, M.D.

Page 422

1   cells, like these precursor cells, and -- and at
2   least, you know, from histologic specimens, not
3   seeing evidence of inflammation. And I haven't
4   really seen much that -- that would confirm that
5   there's a link between chronic inflammation.
6   BY MS. PARFITT:
7       Q   What I'm asking you is, based upon your
8   review, Dr. Diette, have you seen anything in the
9   peer-reviewed literature that there are
10   biologically plausible mechanisms of talc's
11   carcinogenicity demonstrated by chronic
12   inflammation from migration of the talc to the
13   ovaries?
14          MS. BROWN: Objection. I don't
15   understand that question.
16          MR. LOCKE: Objection.
17          THE WITNESS: Would you --
18   BY MS. PARFITT:
19       Q   The question -- let me rephrase it.
20       A   Okay.
21       Q   Is there -- are there studies in the
22   peer-reviewed literature that support an
23   association of inflammation and increased risk of
24   ovarian cancer?
25          MS. BROWN: Objection to the form, asked

Page 423

1   and answered.
2   BY MS. PARFITT:
3       Q   Is there something in the literature?
4          MS. BROWN: Objection.
5   BY MS. PARFITT:
6       Q   Not whether there is a lot or a little.
7   Is there anything in the peer-reviewed literature
8   that you've seen that supports an association
9   between inflammation and an increased risk of
10   ovarian cancer?
11          MS. BROWN: Objection to the form.
12          THE WITNESS: I've seen the paper where
13   C-reactive protein in the serum popped out of
14   dozens of different markers of inflammation and
15   predated the diagnosis of ovarian cancer.
16          I guess I haven't really seen something
17   that shows that chronic inflammation in the
18   ovaries is -- is a precursor to ovarian cancer or
19   that talc induces that particular chronic
20   inflammation that would in turn lead to cancer.
21   BY MS. PARFITT:
22       Q   Have you read Taher? You've read the
23   Taher study, correct?
24          MR. LOCKE: Objection.
25          THE WITNESS: How do you spell it?

Page 424

1   BY MS. PARFITT:
2       Q   T-A-H-E-R.
3       A   Oh.
4       Q   2018.
5       A   Sorry, I was saying Taher.
6       Q   No, no problem.
7       A   But I don't now how you --
8       Q   You could be right on that. Probably
9   are.
10       A   I don't know.
11          I did.
12       Q   Do you see where Taher authors found
13   that there was biologically plausible evidence of
14   inflammation from talc exposure?
15          MS. BROWN: Objection. Counsel, can we
16   see the article if you want to ask him about it?
17          MR. LOCKE: Objection.
18   BY MS. PARFITT:
19       Q   You've read the article. Do you know
20   the answer to that?
21          MS. BROWN: But it's not a memory test.
22          MS. PARFITT: No, it's not, but perhaps
23   he can answer. I didn't ask you the question.
24   BY MS. PARFITT:
25       Q   Do you know the answer to that?

Page 425

1       A   Well, the paper wasn't about that, so I
2   don't -- I don't remember whether there was sort
3   of a preamble thing, but they -- they weren't
4   really analyzing that. They were doing a
5   meta-analysis, you know, sort of combining the epi
6   studies. So, I mean, I don't remember what their
7   statement was, but when you --
8       Q   All right. Did you --
9       A   I'm sorry, I just want to say, but if
10   you say that they found it, by finding it, I don't
11   think they demonstrated it or it was a finding
12   from their study per se.
13       Q   Okay. Have you read Langseth, 2008?
14       A   Langseth, 2008?
15       Q   Correct.
16       A   Is that a meta-analysis?
17       Q   Correct.
18       A   Yes.
19       Q   All right. And do you see where the
20   Langseth authors also found migration and -- and
21   concluded that there was chronic inflammation that
22   was biologically plausible?
23          MS. BROWN: No, I -- I object. If
24   you're going to quote articles --
25   BY MS. PARFITT:

107 (Pages 422 to 425)

Gregory B. Diette, M.D.

Page 426

1    Q  Do you remember?
2         MS. BROWN: -- I would request the
3    article.
4         MS. PARFITT: I can do that.
5    BY MS. PARFITT:
6    Q  Do you know, Doctor?
7    A  I don't remember what they said.
8         (Counsel conferring.)
9         MS. PARFITT: Doctor, if we can take a
10   quick break here --
11        THE WITNESS: Sure.
12        MS. PARFITT: -- right now, so maybe I
13   can --
14        THE WITNESS: Yeah, it's a good time.
15        MS. PARFITT: -- shorten things.
16        THE VIDEOGRAPHER: The time is 4:59 p.m.
17   We're going off the record.
18        (Recess.)
19        THE VIDEOGRAPHER: The time is 5:12 p.m.
20   and we're back on the record.
21        MS. PARFITT: I apologize.
22   BY MS. PARFITT:
23   Q  Dr. Diette, and I apologize, I have only
24   one copy that isn't marked up, so we're going to
25   have to put this and substitute it on the -- on

Page 427

1    the ELMO, if I may. We've done pretty good with
2    copies all day today.
3         So here we go.
4         MR. ROSEN: This will be Exhibit 31.
5         (Diette Exhibit No. 31 was marked
6         for identification.)
7    BY MS. PARFITT:
8    Q  All right. Dr. Diette, this is an
9    article from Ultrastructural Pathology, and it's
10   entitled "Correlative polarizing light and
11   scanning electron microscopy for the assessment of
12   talc in pelvic region lymph nodes."
13        Do you see that?
14   A  I do.
15   Q  And the lead author is Dr. McDonald,
16   along with Cramer and Godleski, and others.
17        Do you see that?
18   A  I do.
19   Q  All right. This is published in 2019.
20        Have you had an opportunity to review
21   this article?
22   A  I have not seen this one.
23   Q  Okay. I just have one question about
24   it. And if --
25        MS. BROWN: Well, I'm going to object.

Page 428

1    He doesn't have the article.
2         MS. PARFITT: That's fine.
3         MS. BROWN: And he's never read it.
4    BY MS. PARFITT:
5    Q  Look at the abstract, first sentence.
6    It says: "Perineal talc use is associated with
7    ovarian carcinoma in many case-control studies.
8    Such talc may migrate to pelvic organs and
9    regional lymph nodes, with both clinical and legal
10   significance."
11        Did I read that correctly?
12   A  Yes.
13   Q  All right. Would it be -- I believe you
14   had some concerns about the Heller study that we
15   talked about earlier because it involved some
16   unexposed -- what you testified were unexposed
17   women.
18        MS. BROWN: Objection to the form.
19        THE WITNESS: Correct, women who
20   reported not being perineal talc users.
21   BY MS. PARFITT:
22   Q  Right. Okay. You understand in this
23   study that what Drs. McDonald and Godleski were
24   doing were looking at particles in exposed women.
25        MS. BROWN: No, he doesn't understand

Page 429

1    that because he doesn't have the study and he
2    hasn't read it. I object. It's not fair.
3         THE WITNESS: I honestly have no idea
4    what they've done.
5    BY MS. PARFITT:
6    Q  Well, do you dispute that talc
7    particles can migrate to the pelvic organs and
8    regional lymph nodes?
9    A  I don't -- I don't know.
10        MR. LOCKE: Asked and answered.
11   BY MS. PARFITT:
12   Q  You don't know. You don't know. You
13   don't know one way or another?
14        MS. BROWN: Objection, misstates his
15   private -- his prior testimony.
16        THE WITNESS: Migrate from where to
17   where? From --
18   BY MS. PARFITT:
19   Q  It says right here: "Talc may migrate
20   to pelvic organs and regional lymph nodes."
21        MS. BROWN: Right, but he can't --
22        THE WITNESS: Oh, I saw the "to," but I
23   don't see the "from."
24   BY MS. PARFITT:
25   Q  Does it make a difference to you?

108 (Pages 426 to 429)

Gregory B. Diette, M.D.

Page 430

1      MS. BROWN: Of course.
2  BY MS. PARFITT:
3      Q   If it's from the vaginal area to the
4  ovaries and the lymph nodes, does that make a
5  difference whether --
6      MR. LOCKE: Objection.
7      MS. BROWN: Objection to the form, lacks
8  foundation, calls for speculation about a document
9  he told you he's never read.
10     MR. LOCKE: Does the witness have a
11  copy?
12     MS. BROWN: No. That's the objection.
13     MS. PARFITT: Tom, we didn't -- we only
14  have one copy of it.
15     MR. LOCKE: I think you need to disclose
16  to the witness that three of these authors are
17  paid experts, et cetera --
18     MS. PARFITT: Tom, Tom, Tom, Tom.
19     MR. LOCKE: Come on.
20     MS. BROWN: No, but to be fair, you
21  guys, if you want to ask him questions, he's got
22  to look at it. I'm going to take it off the ELMO
23  and give it to him if you're going to continue
24  asking him questions.
25  BY MS. PARFITT:

Page 431

1      Q   I'm not going to ask him any more
2  questions on it, Doctor.
3      A   Okay. Thank you.
4      Q   All right. Let me show you --
5      MR. LOCKE: Come on. Give him -- if
6  you're going to give him -- if you're going to ask
7  him about it --
8      MR. TISI: You're not even on record.
9      MS. PARFITT: Tom, it was just --
10     MS. BROWN: Hey, hey, hey, guys. It's
11  the end of the day.
12     MS. PARFITT: Okay. Let's don't --
13     MS. BROWN: Let's get through this.
14     (Diette Exhibit No. 32 was marked
15     for identification.)
16  BY MS. PARFITT:
17     Q   32. Let me show you what's been marked
18  as Plaintiffs' Exhibit 32.
19     I need a copy. There you go. Sorry.
20     A   Thank you.
21     Q   Okay. You previously testified that you
22  -- take a look at it. You read this before, the
23  FDA letter 2014?
24     A   I've seen this.
25     Q   Okay. Very good.

Page 432

1      You had testified earlier that you
2  disagree with Health Canada when they state that
3  talc can migrate to the ovaries; is that correct?
4      MR. LOCKE: Objection.
5      MS. BROWN: Objection. Misstates prior
6  testimony. I don't even think he said that.
7  BY MS. PARFITT:
8      Q   Well, let me ask you. In the Health
9  Canada report, they discuss the fact that it is
10  biologically plausible for talc to migrate to the
11  ovaries and cause an inflammatory process.
12     Do you agree or disagree with that?
13     MR. LOCKE: Objection.
14     MS. BROWN: Objection. Lacks
15  foundation. Do you want to show him where they
16  said that?
17     THE WITNESS: I don't remember their
18  statement about that.
19  BY MS. PARFITT:
20     Q   You don't. Okay.
21     How about this statement. Go down to --
22  I believe it's -- one, two, three -- the third
23  paragraph. Do you see that? It starts with
24  "While."
25     A   No.

Page 433

1      Q   No?
2      A   Oh, I'm on a different page.
3      Q   I'm sorry. Page 5. Page 5.
4      A   Okay.
5      Q   Okay. "While there exists no direct
6  proof of talc and ovarian carcinogenesis, the
7  potential for particles to migrate from the
8  perineum into the vagina to the peritoneal cavity
9  is indisputable."
10     Do you see that?
11     A   I do.
12     Q   Okay. Do you agree with the FDA?
13     MS. BROWN: Objection to the form.
14     THE WITNESS: So there's no citation for
15  that. I don't know how they get -- I mean I don't
16  know why they make that statement, and I -- it
17  certainly doesn't seem to be indisputable, because
18  there -- several of the articles that we've looked
19  at today and others say it's not clear what the
20  mechanism is or the biologic plausibility. So
21  it's -- it's obviously disputable, at the very
22  least, but there's no citation, so it's hard to
23  know how to -- how to process this.
24  BY MS. PARFITT:
25     Q   If this is the FDA's position with

109 (Pages 430 to 433)

Gregory B. Diette, M.D.

Page 434

1    regard to whether or not talc can migrate, do you
2    dispute that?
3          MS. BROWN:  Objection.  Misstates the
4    document.
5          THE WITNESS:  I don't -- I don't dispute
6    that they said it obviously, because it's right
7    here, but there's just no citation for it, and
8    there's no information that tells who in
9    particular thinks that.
10   BY MS. PARFITT:
11         Q   Well, the Food and Drug Administration
12   is our regulatory body here in the United States,
13   correct?
14         A   It is one.
15         MR. LOCKE:  Objection.
16   BY MS. PARFITT:
17         Q   All right.  Would you agree that
18   dissemination of information that is accurate and
19   truthful is -- is something that they would
20   probably take quite seriously?  Would you agree?
21         MS. BROWN:  Objection.
22         THE WITNESS:  I -- I hope so.
23   BY MS. PARFITT:
24         Q   Right.  And would you agree that the FDA
25   would not be disseminating information about the

Page 435

1    potential for particulates to migrate from the
2    perineum, the vagina to the peritoneal cavity, and
3    say it's indisputable if they didn't have some
4    evidence?
5          MS. BROWN:  Objection.  Calls for
6    speculation.
7          MR. LOCKE:  Objection.
8          THE WITNESS:  I don't know why they
9    wrote it.  I just think it would be odd to find
10   that the FDA knew this, and it's not out there
11   generally otherwise.  I mean I don't -- I don't
12   know what they considered.
13   BY MS. PARFITT:
14         Q   When you say it's not out there
15   generally, we talked today about several
16   peer-reviewed articles that have in fact talked
17   about talcum powder part- -- particles migrating
18   to the ovaries, have we not?
19         MS. BROWN:  Objection.  We have not.
20         THE WITNESS:  No, I was going to say, I
21   mean, you've said that a lot, but I mean -- but we
22   haven't looked at a study that shows that.  I mean
23   we've talked about whether -- whether or not talc
24   applied to the perineum has been shown to migrate
25   to the ovaries, and a bunch of questions back, I

Page 436

1    think my answer was along the lines of I haven't
2    seen a study that shows that that's true.
3    BY MS. PARFITT:
4          Q   We talked about Schildkraut.  We talked
5    about Schildkraut, didn't we?
6          A   Yeah, they didn't show that either,
7    though.
8          Q   When you say they didn't show it, have
9    they opined in medical -- or let me ask you this
10   question.  I see the disconnect.
11         Is there evidence contained in
12   peer-reviewed scientific articles wherein it is
13   stated that talcum powder products can migrate to
14   the ovaries?
15         MS. BROWN:  Objection.
16         MR. LOCKE:  Objection.
17         MS. BROWN:  Misstates everything we've
18   looked at and his testimony.
19         THE WITNESS:  I think there's been
20   opinions of different people in different articles
21   that are both supportive and not supportive of
22   that statement.
23   BY MS. PARFITT:
24         Q   All right.  So you've seen scientific
25   writers who have said talc can migrate to the

Page 437

1    ovaries, and you've seen scientific articles that
2    say that's more questionable.  Is that fair?
3          MS. BROWN:  Objection.  Not fair.
4    Misstates prior --
5          THE WITNESS:  It's sort of fair, but I
6    can't find anybody who's actually shown that it's
7    true.  I mean, you know, people may write that,
8    but I mean I haven't seen a study that's shown
9    that you can actually apply talc to the perineum
10   and then find it in the ovaries.
11   BY MS. PARFITT:
12         Q   Okay.  Let me show you what we'll have
13   marked as exhibit -- oh, thank you.
14         (Counsel conferring.)
15   BY MS. PARFITT:
16         Q   It's the end of the day, and we are
17   running out of copies, Doctor.
18         Let me show you --
19         (Diette Exhibit No. 33 was marked
20         for identification.)
21         MR. ROSEN:  Exhibit 33.
22         MS. PARFITT:  Beg your pardon?  33?
23         THE WITNESS:  This one says 32 on it.
24         MR. ROSEN:  Ah, you're correct.
25   BY MS. PARFITT:

Gregory B. Diette, M.D.

Page 438

1      Q   So I'm going to share this with you,
2  and -- actually, if we could put it on the ELMO,
3  and then I will give it to you so I can at least
4  identify it for counsel.
5      Is that fair?
6      A   Yeah.  We will see how it goes.
7      Q   All right.  Let me show you -- it is
8  marked September 30th, 2004, and I will represent
9  that it is to Bill Ashton from Richard Zazenski,
10 and it's a Luzenac document.
11     MS. BROWN:  What?  I'm going to object
12 on form and foundation.
13 BY MS. PARFITT:
14     Q   Okay.  Can you see that, Doctor?  I
15 don't want to strain your eyes too much.
16     MS. BROWN:  No, we need to give him --
17 he's never seen it.  He hasn't reviewed it.  His
18 opinions are not based on it.  If you want to ask
19 him questions about it, he needs to hold it and
20 look at it.
21 BY MS. PARFITT:
22     Q   I'm going to give it to you.  I'm going
23 to let you hold it in one moment.
24     Dr. Diette, this is a document I will
25 represent that's dated September 30, 2004, and

Page 439

1  that would have preceded any litigation.
2      And it states:  "Bill, I came across
3  this paper this morning published in the April
4  2004 journal Human Reproduction, an official
5  journal of the European Society for Human
6  Reproduction and Embryology.  It offers some
7  compelling evidence in support of the migration
8  hypothesis.  Combine this evidence with the theory
9  that the talc deposition on the ovarian epithelium
10 initiates epithelium inflammation, which leads to
11 epithelium carcinogenesis, and you have a
12 potential formula for NTP classifying talc as a
13 causative agent in ovarian cancer."
14     Now, did I read that correctly?
15     A   Yes.
16     Q   So let me -- because counsel wants you
17 to hold it, let me have you take --
18     MS. BROWN:  Well, only if you're going
19 to ask him questions about it.
20     MS. PARFITT:  I am.  I am.  But I can't
21 do both.
22 BY MS. PARFITT:
23     Q   I've got to hand it to you because she
24 says she wants you to hold it.
25     And attached to that is the article.

Page 440

1  Take a moment and take a look at that, to eyeball
2  that.
3      MS. BROWN:  Take as long as you need to
4  inform your response --
5      MS. PARFITT:  It's a one-page document.
6      MR. LOCKE:  No.  This -- this is a
7  document that he hasn't seen before.
8      MS. PARFITT:  That's correct.
9      MR. LOCKE:  Why don't we go off the
10 record.
11     MS. PARFITT:  It's one page, Doctor.
12     MS. BROWN:  Right, and that's just fair.
13     MS. MILLER:  If you're going to ask him
14 questions about what you just threw out there --
15     MS. BROWN:  That's fine.  That's fine,
16 but you understand there's no foundation.  He's
17 never relied it.
18     MS. PARFITT:  Okay, guys --
19     MS. BROWN:  So if we want to ask
20 questions --
21     THE REPORTER:  Excuse me.
22     MS. PARFITT:  I'm not having him --
23 whoa, whoa.
24     (A discussion was held off the record.)
25 BY MS. PARFITT:

Page 441

1      Q   Dr. Diette, I'm simply referring to the
2  cover letter.
3      A   Oh.
4      Q   And that's all, just one page.  Do you
5  see that?
6      A   I do.
7      Q   Okay.  And that's what I just read into
8  the record.  Do you see that?
9      A   I do.
10     Q   Okay.  And do you see back in 2004,
11 there was information with regard -- and I have to
12 see it, I can't be -- sorry.  I can't memorize it
13 either.
14     So you see back in 2004, the company's
15 being advised that there is indeed literature
16 compelling evidence in support of a migration
17 hypothesis --
18     MS. BROWN:  Object.
19 BY MS. PARFITT:
20     Q   -- that was shared between the two
21 companies.
22     Did J&J ever share with you this
23 document that they had in their company files that
24 they had support -- actually compelling evidence
25 of support of the migration hypothesis?

111 (Pages 438 to 441)

Gregory B. Diette, M.D.

Page 442

1        MS. BROWN:  Objection to the speech,
2  lacks foundation.  I also believe that's an Imerys
3  document.
4        THE WITNESS:  So a few things, right.
5  So one is I -- I've never seen that, so I don't
6  even know what it is.  I don't know who those
7  people are.  That -- I don't know what their
8  qualifications are to consider something to be
9  compelling evidence or if that's the word that was
10  used.
11 BY MS. PARFITT:
12    Q    Mm-hmm.
13    A    I have not seen the article that's
14  attached to the back of it.
15    Q    Okay.
16    A    But it's hard to say much about that.
17    Q    Yes.
18        Let me show you what we will have marked
19  as Exhibit 34, and I'll represent to you it's an
20  article by Roberta Ness, "Possible Role of Ovarian
21  Epithelial Inflammation."
22        (Diette Exhibit No. 34 was marked
23        for identification.)
24 BY MS. PARFITT:
25    Q    Have you seen this article before?

Page 443

1    A    I have.
2    Q    Okay.  Do you see on page 2 --
3        MS. PARFITT:  Where is the other one?
4        (Counsel conferring.)
5  BY MS. PARFITT:
6    Q    If I could -- you have in front of you
7  the Zazenski -- thank you.
8        Okay.  Now, do you see the graph, I'll
9  call it, it's the chart there on Zazenski?  And
10  then look at Figure No. 1.  Do you see that,
11  "Inflammation is a common mechanism underlying
12  ovarian cancer"?
13    A    I do.
14    Q    Okay.  And do you see that -- you can
15  look at it.  Do you see that that's the same
16  figure in the Zazenski letter as it is in
17  Dr. Ness's letter?  Do you see that?
18        MS. BROWN:  Objection to the form, lacks
19  foundation.
20 BY MS. PARFITT:
21    Q    Or Dr. Ness's report.
22        MS. BROWN:  Same objection.
23        THE WITNESS:  I mean it -- it looks the
24  same.
25        But what does that mean?  Does that mean

Page 444

1  it -- that this -- is this an e-mail or a fax?  It
2  has something from Ness's paper or Ness's paper
3  has something from this --
4  BY MS. PARFITT:
5    Q    They have something from Ness's paper,
6  correct.
7        MS. BROWN:  Well, objection.
8        THE WITNESS:  But this is --
9        MS. BROWN:  Don't -- don't speculate.
10 No one wants you to guess.
11        MS. PARFITT:  So we won't talk about --
12        MS. BROWN:  Just wait for a question,
13 and we'll do the best we can.
14 BY MS. PARFITT:
15    Q    Okay.  Do you see on the first page of
16 Dr. Ness's article, in the left-hand column
17 towards the bottom, where Dr. Ness states:
18 "Inflammation entails cell damage, oxidative
19 stress, and elevations of cytokines and
20 prostaglandins, all of which may be mutagenic.
21 The possibility that inflammation is a
22 pathophysiological contributor to the development
23 of ovarian cancer suggests a directed approach to
24 future research."
25        Do you see that?

Page 445

1    A    I do.
2    Q    Okay.  Do you agree with that statement?
3        MR. LOCKE:  Objection.
4        MS. BROWN:  Objection to the form.
5        THE WITNESS:  So, I haven't read this
6  article in a while.  It is from about 20 years
7  ago.  And so I don't know if 20 years ago that was
8  a reasonable thing to consider, but it sounds as
9  if 20 years have gone by and this still hasn't
10 been proven.  And so whether I agree with it still
11 now, I'm not sure.  I'm not sure if it would be a
12 fruitful endeavor or not.
13 BY MS. PARFITT:
14    Q    Does biological plausibility mean that
15 something must be proven?
16        MR. LOCKE:  Objection.  Asked --
17        MS. BROWN:  Objection.  Asked and
18 answered.
19        THE WITNESS:  It doesn't mean that
20 it's -- that it's been proven, but it's one of the
21 ways to provide supportive information about
22 whether or not an observed association is causal
23 or not.
24 BY MS. PARFITT:
25    Q    Okay.  So you agree that you do not --

112 (Pages 442 to 445)

Gregory B. Diette, M.D.

Page 446

1    one does not need to prove mechanism in order to
2    find causality, correct?
3        A   I need to prove --
4            MR. LOCKE:  Objection.
5            MS. BROWN:  Objection to form.
6            THE WITNESS:  Sorry.  Wow, sorry.
7    BY MS. PARFITT:
8        Q   We had a chorus.
9        A   Yeah.
10           No, you don't need to prove it, but
11   it's --
12       Q   You don't need to prove mechanism.
13       A   You don't need to prove mechanism in
14   order to establish causation, but it's hard to get
15   there for a low observed risk if you don't have
16   biological plausibility.
17       Q   I'll take that back -- yes, I'm sorry.
18           I hope I didn't ask you this before, but
19   is biological plausibility the same as proof of
20   mechanism?
21           MR. LOCKE:  Objection.
22           MS. BROWN:  Objection to the form of the
23   question.
24           THE WITNESS:  Proof of -- I don't know
25   if I would use the -- so "proof of mechanism"

Page 447

1    sounds like a term in a way, but maybe not one
2    that's in my vocabulary.  Like people talk about
3    proof of concept just as a study design, which --
4    I don't know if that's the same thing, but I
5    don't -- I don't -- I don't know "proof of
6    mechanism" as a -- as a term.
7            (Counsel conferring.)
8            MS. PARFITT:  Let's go off the record
9    for a moment.
10           THE VIDEOGRAPHER:  The time is 5:30 p.m.
11   We're going off the record.
12           (Recess.)
13           THE VIDEOGRAPHER:  The time is 5:37 p.m.
14   and we're back on the record.
15   BY MS. PARFITT:
16       Q   Doctor, what is your definition of
17   "biological plausibility"?
18           MS. BROWN:  Objection.  Asked and
19   answered.
20           THE WITNESS:  I don't have a single one.
21   I think it's in my report somewhere, or at least
22   what I tried to capture from Bradford Hill's
23   statement, but in a general sense, you know, being
24   evidence that whatever -- if we're talking about
25   an exposure, that there is a pathway by which that

Page 448

1    exposure can lead to the outcome that you're
2    interested in.
3    BY MS. PARFITT:
4        Q   Okay.  Doctor, from your review of the
5    peer-reviewed scientific literature, have you read
6    where study authors who have actually looked at
7    the issue of migration and other biological
8    plausible methods by which talc can get to the
9    ovary?
10       A   I guess --
11           MS. BROWN:  I object.  I don't
12   understand.
13           THE WITNESS:  I mean I've looked at both
14   the human and the animal studies that I could find
15   cited on the topic.  And -- and you said that
16   talc -- talc can get to the ovary?
17   BY MS. PARFITT:
18       Q   Mm-hmm.
19       A   Because, you know, some are not talc,
20   right.  There -- there are other kinds of
21   particles or substances.  And so I've looked at
22   both the animal and the human studies that I could
23   find.
24       Q   And in those studies that you have
25   reviewed, have you seen where those authors who

Page 449

1    have studied the issue of biological plausibility
2    and mechanisms by which talc can get to the ovary
3    have concluded in their articles that that is
4    indeed a pathway?
5            MS. BROWN:  Objection.
6            MR. LOCKE:  Objection.
7            MS. BROWN:  Misstates his testimony and
8    the documents.
9            THE WITNESS:  That there is -- well, I
10   guess we've got to -- we'd have to look at each
11   one, right.  Because, I mean, there's ones like,
12   for example, you know, if we're talking about
13   humans, like where women are basically placed
14   upside down in a -- in an usual position and
15   having something deposited directly into their
16   vagina, and then that may or may not then migrate
17   to their ovaries, but that wouldn't be the same as
18   saying that's a plausible mechanism for applying
19   something to the perineum and then finding it in
20   the ovaries.
21           And then I just want to -- I don't have
22   a lot to say about it, but I would just say with
23   the animals, it looks like certain animals that
24   application of -- of particles does, and then in
25   others it doesn't migrate.  And then so I -- I

113 (Pages 446 to 449)

Gregory B. Diette, M.D.

1    took that as kind of mixed evidence that even in
2    animals, assuming that there is an appropriate
3    animal model, that they're not getting the same
4    answer based on which animal it is.
5    BY MS. PARFITT:
6        Q   Does exposure of a disease have to be
7    proven in order to have a biologically plausible
8    mechanism?
9            MS. BROWN:  Objection to the form.
10           MR. LOCKE:  Objection.
11           THE WITNESS:  So I don't know if I
12   understand that.  So are you saying that -- so say
13   it again.  I'm sorry.
14   BY MS. PARFITT:
15       Q   Sure.  It was probably a bad question.
16           MS. BROWN:  The realtime --
17   BY MS. PARFITT:
18       Q   Does one need -- does a scientist need
19   to know the precise mechanism in order to
20   determine whether or not it's biologically
21   plausible for some toxin to cause some disease?
22           MS. BROWN:  Objection to the form.
23           MR. LOCKE:  Objection.
24           THE WITNESS:  So "precise" might be a --
25   a term that matters, but -- but it can be a work

1    in progress in the sense that you can have some
2    information or no information or lots of
3    information.  So there can be, you know, quite a
4    spectrum of information you would have about the
5    plausibility.
6    BY MS. PARFITT:
7        Q   I think what I'm asking is, does the
8    mechanism of disease need to be proven in order to
9    find causality?
10           MS. BROWN:  Objection to the form.
11           THE WITNESS:  I -- I think we keep doing
12   this over and over, because this -- I think -- I
13   think this is the same -- unless it's meant to be
14   different, like I don't know how to answer that
15   differently.  It's -- you know, obviously it
16   doesn't have to be proven, but it certainly is
17   important.  And when you have a very small
18   estimated risk, then it becomes even more
19   important.
20   BY MS. PARFITT:
21       Q   Okay.  Have you seen in the literature
22   that you've reviewed numerous authors who have
23   proposed a biologically plausible mechanism by
24   which talcum powder products can cause ovarian
25   cancer?

1            MS. BROWN:  Objection to the form.
2            MR. LOCKE:  Objection.
3            THE WITNESS:  So I -- I looked -- for
4    all the things that we talked about -- I don't
5    know which ones we're talking about now in terms
6    of the epidemiology studies.
7    BY MS. PARFITT:
8        Q   Correct.
9        A   So I've seen some that do and some that
10   don't propose that.  Some I think are -- and I'm
11   paraphrasing -- but are sort of more along the
12   lines of we just don't know or there's a lot more
13   work needed, and -- and things of that sort.
14       Q   Are there a lot on the lines of
15   migration of talc -- excuse me.
16           Are there a lot of articles that you've
17   reviewed where they have -- authors have stated
18   that talc can migrate to the ovaries?
19       A   I wouldn't say --
20           MS. BROWN:  Objection.
21           THE WITNESS:  I wouldn't say a lot.  And
22   I haven't seen anything as strong as that FDA
23   statement, you know, I mean, where -- where
24   there's some, you know, certainty that is coupled
25   with that kind of a statement.

1    BY MS. PARFITT:
2        Q   But you've certainly seen where the
3    authors have opined and discussed biologically
4    plausible mechanism by -- mechanisms by which
5    talcum powder products can cause ovarian cancer.
6            MR. LOCKE:  Objection.
7            MS. BROWN:  Objection.  Continues to
8    misstate his testimony.
9            THE WITNESS:  What's -- what's different
10   about that than what I already answered?
11   BY MS. PARFITT:
12       Q   Well, what I'm trying to get at is,
13   whether or not you believe it or don't believe it,
14   I'm simply trying to understand from you whether
15   or not in your read of the scientific literature
16   have you seen where authors who have actually
17   studied this topic where they have determined and
18   written in their reports that there are
19   biologically plausible mechanisms by which talc
20   can migrate to the ovaries?
21           MR. LOCKE:  Objection.
22           MS. BROWN:  No, objection.  He's
23   answered this a hundred times, and it's --
24   BY MS. PARFITT:
25       Q   And if it's no, then it's no.  If you've

114 (Pages 450 to 453)

Gregory B. Diette, M.D.

Page 454

1    seen it, you've seen it.  If you dispute it, you
2    dispute it.
3        A   Well, it's -- it's none of those.
4            But you just said reports.  Does that --
5    are we now talking about expert reports or are --
6        Q   No.
7        A   -- we still talking about --
8        Q   No, we're still talking --
9        A   Okay.  We're talking about like
10   peer-reviewed publications?
11       Q   That's right.
12       A   So I've seen a mixture, yeah.  It's like
13   when you look at the epi literature, I mean the --
14   the way I read it is like -- is, you know, an
15   epidemiologist is supposed to be able to get up to
16   speed without becoming an expert in absolutely
17   everything, right?
18           So I already told you I'm not a cancer
19   biologist, but I do count on the authors to set
20   the stage with the introduction and then interpret
21   their findings and the discussion and sort of take
22   us at least partway towards there.
23           So even the recent meta-analysis, if you
24   look at Berge or Burge (phonetic), however you say
25   that, and Penninkilampi, you know, they talk about

Page 456

1    probably means one thing in the world in general.
2    I think if you're talking about Rothman, yeah,
3    Rothman has written about that --
4    BY MS. PARFITT:
5        Q   Right.
6        A   -- and about it being simply a
7    competition of sort of counting those that are
8    significant and those that are not.
9            I didn't see that.  I think the way I
10   described it I think was -- was the way I
11   approached it, which said some of the information
12   that's available is that some of the studies were
13   statistically significant and some weren't.  It's
14   informative, but it's not literally the same as
15   saying, I'm just going to count them up and stop
16   there.
17       Q   Because that would be improper, correct?
18           MS. BROWN:  Objection.
19           THE WITNESS:  To only do that, yes.
20   BY MS. PARFITT:
21       Q   Okay.  All right.  Let me ask a couple
22   of question -- questions.
23           What is the minimal level of exposure to
24   cigarette smoke in terms of cigarette smoke at
25   home that's necessary to cause lung cancer?

Page 455

1    there -- there being uncertainty about the
2    mechanism.  So I'm just saying even as recently as
3    the -- the very latest meta-analysis, there's
4    uncertainty expressed.
5        Q   Do you see uncertainty being expressed
6    by biologically plausible mechanisms?
7            MS. BROWN:  Objection.
8            THE WITNESS:  Well, I don't know if
9    they're plausible or not.  I mean that's the whole
10   point, right?  You know, I mean you can say
11   something, but it doesn't make it true.
12   BY MS. PARFITT:
13       Q   You reminded me of something.  In your
14   review of the various case-control studies, did
15   you exercise a process known as vote counting?
16           MS. BROWN:  Objection.
17           THE WITNESS:  No.
18   BY MS. PARFITT:
19       Q   You did not?
20       A   I did not.
21       Q   That would be improper to do so,
22   correct?
23           MS. BROWN:  Objection.
24           THE WITNESS:  Well, if we're talking --
25   so I guess, just to be clear, so vote counting

Page 457

1            MS. BROWN:  Form.
2            THE WITNESS:  I do not know.
3    BY MS. PARFITT:
4        Q   Okay.  What is the minimal level of
5    exposure to asbestos fibers inhaled that is
6    sufficient to cause ovarian cancer?
7            MS. BROWN:  Form.
8            MR. LOCKE:  Objection.
9            THE WITNESS:  We -- we did that before.
10   I don't -- I don't have any more information than
11   what I did, like meaning, you know, I have some --
12   some guideposts like the -- the Whitnum 40
13   fiber/cc years of -- of crocidolite, which did not
14   seem to be adequate to cause it.
15           And then, you know, when we looked at
16   the IARC, I didn't -- even when you and I looked
17   at it together, I didn't see information that
18   talked about what dose would be required.
19   BY MS. PARFITT:
20       Q   Okay.  Same question.  What's the
21   minimal level of exposure to asbestos fibers
22   inhaled that is sufficient to cause mesothelioma?
23           MS. BROWN:  Objection.
24           MR. LOCKE:  Objection.
25           THE WITNESS:  Pleural or peritoneal

115 (Pages 454 to 457)

Gregory B. Diette, M.D.

Page 458

1    or --
2    BY MS. PARFITT:
3        Q   Pleural.
4        A   So the -- so the amount for pleural
5    mesothelioma is -- and did you say fiber type or
6    you didn't mention fiber type?
7        Q   I didn't.  I just said fibers.
8        A   Okay.  So it would matter fiber type.
9    If it's chrysotile predominant, then above 200 to
10   400 fiber/cc years would be, you know, one
11   estimate of the dose.  If it's crocidolite, you
12   know, you could divide that by 500.  And if it's
13   amosite, by a hundred, and other amphiboles, you
14   know, somewhere in between those sort of ranges.
15           And so, you know, I think for
16   amphiboles, above like the single digit fiber/cc
17   years, and for chrysotile, above the couple of
18   like 200 to 400 fiber/cc years.
19       Q   Is it true that the dose-response curve
20   for any genotoxic carcinogen intersects with zero?
21           MS. BROWN:  Objection to the form.
22           THE WITNESS:  Well, there's got to be a
23   zero point if there's zero exposure, right?  If
24   there's literally zero exposure, then there can't
25   be -- there can't be a signal from that zero.

Page 459

1    BY MS. PARFITT:
2        Q   What does the -- what does it mean if a
3    dose-response curve intersects zero?
4            MS. BROWN:  Form.
5    BY MS. PARFITT:
6        Q   What does that mean?
7        A   It's not a term that's familiar.  I
8    mean, it's just -- I'm not sure -- if you've got
9    zero exposure, you can't have any outcome from
10   that.  So I -- I assume that's what we're talking
11   about is just like a -- like a no exposure
12   estimate.
13           If you're talking about like -- the
14   place I've seen people talk about it is like with
15   low doses of things and what happens, you know,
16   below the concentration or the level at which
17   there's known effects, then what happens between
18   there and zero.  But if it's literally zero -- if
19   there's literally zero exposure, it's got to be
20   zero outcome.
21           (Counsel conferring.)
22   BY MS. PARFITT:
23       Q   Okay.  You reviewed the cohort studies
24   in this case, correct?
25       A   The three -- three cohort studies.

Page 460

1        Q   Okay.  You criticize the plaintiffs'
2    experts for what you called a muted examination of
3    the case-control studies that they reviewed.
4            Do you remember saying that in your
5    report?
6        A   I don't remember that word, but it's --
7    it makes a lot of sense to me.
8        Q   Okay.  Where in your port -- report did
9    you set forth all of the limitations and
10   weaknesses of the cohort studies of talcum --
11   talcum powder products and asbestos -- and ovarian
12   cancer?
13       A   Well, there's a bunch, right.  So --
14       Q   Well, where did you --
15       A   I'm telling you.
16       Q   -- provide us in your report that
17   information --
18       A   I'm telling you.
19           MS. BROWN:  Let him finish --
20           THE WITNESS:  I understand your
21   question.
22           MS. BROWN:  -- and answer your question.
23           THE WITNESS:  So one of the criticisms,
24   which I think is pretty profound, which is the
25   lack of a validated measure of talcum powder

Page 461

1    exposure that could have someone estimate whether
2    or not somebody is exposed at all or whether or
3    not there's a dose-response, and that applies to
4    all the studies, right.  So that's uniformly
5    applied to whether they're case-control studies
6    or -- or cohort studies.
7    BY MS. PARFITT:
8        Q   That would be the exposure
9    misclassification.
10           MS. BROWN:  Objection.
11           THE WITNESS:  No, no, no.  So it would
12   be -- you could misclassify it, but it -- but what
13   I'm talking about is, that in order to measure an
14   exposure, you need a valid measure of that
15   exposure.  That doesn't exist, or at least if it
16   exists, it hasn't been employed in the -- in the
17   published literature.  And that applies to the
18   cohort studies and the case controls.
19           What I -- what I did was I tried to
20   actually not denigrate any of the study designs.
21   I thought that was appalling.  You know, when you
22   talk about where this came from, you know, to sort
23   of single out the cohort studies repeatedly by
24   the -- by the plaintiffs' expert and say, you
25   know, This is a terrible design, or this is

116 (Pages 458 to 461)

Gregory B. Diette, M.D.

Page 462

1    terrible for whatever reason, it's extraordinary,
2    and it's -- to me it's unprecedented for -- for
3    epidemiologists or other healthcare professionals
4    to sort of look at cohort studies and find that
5    those are so awful, and that case-control studies
6    are suddenly so sturdy.  It doesn't make any
7    sense.
8         So -- so for me, like the task wasn't
9    really so much -- I wasn't trying to criticize
10   either form of the study, but just to point out
11   realistically that there are biases, that there
12   are confounding issues, and -- and things of
13   that -- that sort.
14   BY MS. PARFITT:
15        Q   In your review of the literature for
16   purposes of your opinions today, did you see
17   evidence from any of the studies that you read
18   that there was a dose-response associated between
19   talcum powder products and ovarian cancer?
20        A   So in total, no.  In a couple of
21   studies, there are purported dose-response
22   findings, right.  So the latest Cramer study is an
23   example.  There may have been another, but there
24   are so many studies that show absolutely the
25   opposite, meaning either flat dose-response,

Page 463

1    upside down dose-response, zig-zaggy, haphazard
2    dose-response.  So I would say looking at the
3    evidence in total, it's a mess.  I mean it's
4    certainly not supportive.
5         And I'll you the truth, if you go back
6    to -- like to 2000 -- and I know we're in a hurry,
7    so I will try to talk a little faster -- but the
8    Rothman -- the Rothman review, at least up until
9    2000, they -- they plotted out all the
10   dose-response they found, and they found an
11   inverse relationship overall, which is one of the
12   things they found to be inconsistent with there
13   being causation.
14        So I think, you know, from 1982, when
15   the first case-control study was published, to
16   2000, at least when it's assessed by Rothman and
17   his colleagues, is actually upside down.
18        Q   What about Terry?  Terry in 2013
19   reported a dose-response, did they not?
20        MS. BROWN:  Objection to the form.
21        THE WITNESS:  I don't remember what they
22   showed.  I don't -- I don't doubt you, but I --
23   but there's just -- there's a couple of studies
24   that have demonstrated that.
25   BY MS. PARFITT:

Page 464

1         Q   Okay.  So you would agree with me there
2    are studies in the peer-reviewed literature that
3    have demonstrated a dose-response between talcum
4    powder products and ovarian cancer?
5         MS. BROWN:  Objection --
6         MR. LOCKE:  Objection.
7         MS. BROWN:  -- to the form.
8         MS. PARFITT:  Let him answer, please.
9         MS. BROWN:  I get to object.
10        THE WITNESS:  I think just a couple.
11        MS. PARFITT:  Let's go off the record.
12        THE VIDEOGRAPHER:  The time is 5:53 p.m.
13   We're going off the record.
14        (Recess.)
15        THE VIDEOGRAPHER:  The time is 5:58 p.m.
16   We're back on the record.
17        MR. HEASLIP:  Can we go off for one
18   moment?  I apologize.
19        THE VIDEOGRAPHER:  The time is 5:58 p.m.
20   We're going back off the record.
21        (A discussion was held off the record.)
22        THE VIDEOGRAPHER:  The time is 5:59 p.m.
23   We're back on the record.
24        CROSS-EXAMINATION
25   BY MR. FINCH:

Page 465

1         Q   Good afternoon, Dr. Diette.  My name is
2    Nate Finch.  You and I have met before, correct?
3         A   Yes.
4         Q   You were asked a question about the
5    dose-response curve to genotoxic carcinogens.  Do
6    you recall that question?
7         A   I do.
8         Q   And your answer was something to the
9    effect of if the dose was zero, then it would be
10   an intersection of zero.
11        Do you recall that answer?
12        A   Something like that.
13        Q   All right.  I want you to assume that
14   we're talking about a dose-response curve where
15   there is a positive dose, not a dose of zero.
16   Your typical dose-response curve looks something
17   like this (indicating), right, with dose on the
18   X-axis and response on the Y-axis?
19        A   You can draw it that way.
20        MS. MILLER:  Is that a exhibit?
21        MR. FINCH:  You can mark it as an
22   exhibit.  It's got somebody's notes on the back of
23   it, but...
24   BY MR. FINCH:
25        Q   Isn't it true, Dr. Diette, that for a

117 (Pages 462 to 465)

Gregory B. Diette, M.D.

Page 466

1  genotoxic carcinogen where there is a positive
2  dose, the dose-response curve always intersects
3  with zero?
4       MS. BROWN: Objection to form.
5       THE WITNESS: That's not something that
6  I say. I mean I don't -- people may say that, but
7  I -- I think when we're talking about -- like zero
8  is zero, right. So zero exposure means zero risk.
9  BY MR. FINCH:
10      Q  I'm not -- I'm not talking about zero.
11      MS. BROWN: Wait, let him finish,
12 please.
13      THE WITNESS: Well, I know. That's what
14 I'm talking about when I -- when I hear that
15 question.
16 BY MR. FINCH:
17      Q  All right. So if someone were to
18 testify when you're talking about a genotoxic
19 carcinogen where there is a positive exposure,
20 there -- the dose-response curve intersects with
21 zero, meaning that there -- isn't it true that
22 that means that there -- at any level of exposure,
23 there's an excess risk of cancer for a genotoxic
24 carcinogen?
25      MS. BROWN: Objection to the form.

Page 467

1       THE WITNESS: So I don't know. That may
2  be part of some field that's not my field. But I
3  -- but in the fields that I work in, I recognize
4  that you need a certain amount of exposure in
5  order to cause a disease, including cancer.
6  BY MR. FINCH:
7       Q  Okay. But you cannot dispute that
8  genotoxic carcinogens, the dose-response curve
9  intersects with zero. You haven't studied that
10 issue; is that correct?
11      MR. LOCKE: Objection.
12      MS. BROWN: Objection to the form.
13      THE VIDEOGRAPHER: Seven hours.
14      MS. BROWN: You're done. Wait.
15      THE WITNESS: So I mean, my answer is
16 the same as it was before.
17      MS. BROWN: I can ask from here.
18      (A discussion was held off the record.)
19      CROSS-EXAMINATION
20 BY MS. BROWN:
21      Q  Good evening, Dr. Diette.
22      A  Hi.
23      Q  Just a couple of quick questions, and we
24 will get you on your way.
25      We had some discussion earlier today

Page 468

1  about the sort of mechanical process of writing
2  your report. Do you remember that?
3       A  I do.
4       Q  And to be clear, Doctor, did you write
5  every substantive word of the expert report that
6  we've marked as an exhibit in this case?
7       A  To the -- yes, everything substantive.
8       Q  Did MSA or Medical Science Affiliates
9  make any substantive contributions to your expert
10 report in this proceeding?
11      A  No.
12      Q  You spoke a little bit earlier today
13 about some administrative support that you
14 received from MSA. Do you remember that?
15      A  I do.
16      Q  And tell us what you meant by
17 "administrative support."
18      A  So by "administrative support," I meant,
19 you know, gathering -- like collating materials
20 for me, helping to -- to format the report, you
21 know, putting -- you know, putting the reference
22 citations in correctly. You know, creating the --
23 the list of reliance documents at the end. You
24 know, things of that sort. And then -- and then
25 generating invoices.

Page 469

1       I'm trying to think what else.
2  Whatever -- whatever I said earlier was the -- was
3  the full list, I think.
4       Q  You also mentioned earlier today
5  receiving some editorial support from the folks at
6  MSA. Tell us what you meant by that.
7       A  So to look for typos or -- I gave the
8  example of like where I had a really long
9  paragraph, and they broke it up with bullets to
10 make it look more readable, that sort of thing,
11 and -- and just making this actually have the
12 physical appearance that it does.
13      Q  Did MSA provide anything other than
14 administrative formatting type support in
15 connection with your report in this case?
16      A  No.
17      Q  If someone were to suggest that the
18 opinions in your expert report are not entirely
19 your own, would that be the truth?
20      A  I'm sorry. I was reading that going by,
21 and I didn't listen.
22      Q  Sure. If someone were to suggest that
23 some of the opinions in your expert report are not
24 entirely your own, would that be the truth?
25      A  No.

Gregory B. Diette, M.D.

Page 470

1          MS. PARFITT:  Objection.
2          THE WITNESS:  They're -- they're all my
3     opinions.
4     BY MS. BROWN:
5          Q   If someone were to suggest that MSA
6     wrote some of the substantive pieces of your
7     report, would that be the truth?
8          MS. PARFITT:  Objection.
9          THE WITNESS:  No.
10          MS. BROWN:  Thanks very much for your
11     time, Dr. Diette.  I have no further questions.
12          MS. PARFITT:  Anybody?  No.  Thank you.
13     Dr. Diette, thank you very much.
14          THE WITNESS:  Thank you.
15          MS. PARFITT:  I appreciate it.
16          THE VIDEOGRAPHER:  The time is 6:04
17     p.m., April 9th, 2019.  Going off the record,
18     completing the videotaped deposition.
19          (Whereupon, the deposition of
20          GREGORY B. DIETTE, M.D. was
21          concluded at 6:04 p.m.)
22
23
24
25

Page 472

1          INSTRUCTIONS TO WITNESS
2          Please read your deposition over carefully and
3     make any necessary corrections. You should state
4     the reason in the appropriate space on the errata
5     sheet for any corrections that are made.
6     After doing so, please sign the errata sheet
7     and date it.
8          You are signing same subject to the changes
9     you have noted on the errata sheet, which will be
10     attached to your deposition.  It is imperative
11     that you return the original errata sheet to the
12     deposing attorney within thirty (30) days of
13     receipt of the deposition transcript by you. If
14     you fail to do so, the deposition transcript may
15     be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24
25

Page 471

1          CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2          The undersigned Certified Shorthand Reporter
3     does hereby certify:
4          That the foregoing proceeding was taken before
5     me at the time and place therein set forth, at
6     which time the witness was duly sworn; That the
7     testimony of the witness and all objections made
8     at the time of the examination were recorded
9     stenographically by me and were thereafter
10     transcribed, said transcript being a true and
11     correct copy of my shorthand notes thereof; That
12     the dismantling of the original transcript will
13     void the reporter's certificate.
14          In witness thereof, I have subscribed my name
15     this date:  April 10, 2019.
16
17          _____
18          LESLIE A. TODD, CSR, RPR
19          Certificate No. 5129
20     (The foregoing certification of
21     this transcript does not apply to any
22     reproduction of the same by any means,
23     unless under the direct control and/or
24     supervision of the certifying reporter.)
25

Page 473

1          - - - - - -
2          E R R A T A
3          - - - - - -
4     PAGE LINE CHANGE
5          _____
6     REASON: _____
7          _____
8     REASON: _____
9          _____
10     REASON: _____
11          _____
12     REASON: _____
13          _____
14     REASON: _____
15          _____
16     REASON: _____
17          _____
18     REASON: _____
19          _____
20     REASON: _____
21          _____
22     REASON: _____
23          _____
24     REASON: _____
25

119 (Pages 470 to 473)

Gregory B. Diette, M.D.

Page 474

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2        I,_____, do hereby
 3      certify that I have read the foregoing pages, and
 4      that the same is a correct transcription of the
 5      answers given by me to the questions therein
 6      propounded, except for the corrections or changes
 7      in form or substance, if any, noted in the
 8      attached Errata Sheet.
 9
10      _____
11      GREGORY B. DIETTE, M.D.            DATE
12
13
14      Subscribed and sworn to
15      before me this
16      _____ day of_____,20____.
17      My commission expires:_____
18      _____
19      Notary Public
20
21
22
23
24
25
```

**A**

**a.m** 1:18 13:7
19:13 44:15,18
89:7 151:17,20
**AACES** 11:11
**abandon** 309:24
312:8
**abandoning**
201:13 306:24
309:5
**abide** 38:24
**ability** 378:21
**able** 36:17 69:9
85:16 140:19
158:1 207:21
216:13 300:17
319:14 372:8
391:1 410:12
454:15
**abnormality**
372:20
**absolute** 361:9
**absolutely** 62:13
65:23 84:8
86:22 387:14
387:16 415:14
454:16 462:24
**absorbed**
405:17
**absorption**
266:21
**abstract** 282:9
365:2,10
366:18 369:22
428:5
**Abstracts** 8:12
**absurd** 270:15
271:2
**academic** 93:18
149:11
**accepted** 92:1
368:3
**accepts** 291:9
292:20
**access** 10:13
26:15 285:17

**accessory** 75:25
76:13
**accompany**
159:19
**account** 77:1
255:8 383:20
**accounts** 36:6
36:14
**accurate** 14:24
100:1 139:12
387:14,16
434:18 472:15
**accurately**
73:19 97:20
274:19
**acknowledged**
182:7
**ACKNOWLE...**
474:1
**active** 408:16
**activities** 10:14
205:8
**actual** 172:4
203:21 264:19
**ADAM** 3:5
**add** 24:21 91:25
96:16 97:7
178:1,19
179:22 234:20
**added** 347:5
**adding** 40:4
**addition** 134:13
183:10 211:19
**additional** 25:16
29:11 31:12
92:13 178:10
**additions** 91:23
139:15
**address** 31:2
124:21 142:11
142:15,19
**addressing**
134:15
**adequacy** 57:1
**adequate** 457:14
**adhere** 317:2
**adjusted** 249:22

**administer**
13:20
**administering**
2:18
**Administration**
228:1 434:11
**administrative**
91:17 93:9
154:19 158:6
178:17 183:2,6
468:13,17,18
469:14
**admonishing**
38:6,7 113:10
**adult** 403:22
**adults** 374:20
389:19
**advance** 88:17
**advanced** 45:20
45:25
**advertise** 189:4
**advertised**
188:21
**advertisement**
188:15
**advised** 441:15
**affidavit** 133:12
135:14 197:12
197:25 198:19
**affidavits** 130:7
131:2,14
134:14 135:1
170:18 196:25
197:6 198:18
**affiliate** 187:19
187:23
**affiliated** 155:15
**Affiliates** 24:20
25:18 31:18,21
31:25 32:7
33:4,5,20
151:23 152:6
152:10,18,23
152:8 154:8
155:10,16
157:4,8 158:10
159:8,21 162:5

162:19 163:22
164:10 165:6
165:21 166:25
168:3,18
170:24 179:7
179:14 188:21
189:7 190:16
190:19,20
468:8
**Affiliates'**
155:18 156:5
**Affiliations** 7:15
**affirmative**
415:13
**afforded** 179:14
**afield** 270:12
**African** 11:10
**afternoon**
204:25 205:1
465:1
**age** 249:15
**agent** 285:20
439:13
**ago** 51:2 108:17
117:10 152:20
153:10 189:18
231:1 244:17
418:4,9 445:7
445:7
**agree** 34:23 35:3
45:24 46:20
47:12 84:6,9
84:20 87:16,21
88:8 107:23
112:21 183:5
213:2 216:4,4
216:13,24,25
217:8,14,15
219:21 222:1,6
225:25 226:3,9
226:15 233:25
235:3 236:23
260:3,3,8
272:13 274:25
275:24 276:18
276:19,21,25
277:1,2,2,12

278:9 282:19
283:6 287:2
291:11 292:24
302:17 304:2
304:20,23
306:5 321:5,13
321:16 322:16
322:22 331:3
361:22 362:6
362:21 363:10
367:22,25
368:14 400:4
401:21 411:8
413:7 414:24
416:3 417:23
418:1,2,3
420:8 432:12
433:12 434:17
434:20,24
445:2,10,25
464:1
**agreeable** 46:24
293:4 303:21
305:3 306:11
319:9
**agreement**
31:21 32:6
33:18 153:22
154:4 187:11
**agreements** 33:2
156:8
**Ah** 437:24
**ahead** 16:6
23:22 24:17
25:22 26:20,21
58:7 63:1
162:8,9 192:22
212:8 216:2
218:14 270:5
275:6 292:10
297:12 304:11
353:22,23
355:2,11
365:18
**air** 102:13
107:21 371:17
373:21 405:20

airborne 373:14
373:15 406:7
airway 97:16
101:9
al 9:14 271:17
alert 47:19
Ali 19:15 27:9
all-cause 10:9
366:3 367:3
389:18
allegation
109:21
allegations
109:2,15,25
110:10
Allen 309:7
allergen's
107:25
allergens 102:15
102:19,23
103:7 107:22
ALLISON 4:17
allowed 62:11
166:5
Alrighty 231:10
alter 76:1,14
ambient 370:18
371:17
America 11:24
49:20
American 9:9
11:10 94:20
239:4 295:6,18
296:24 298:12
301:2 308:17
308:19 309:4
387:7
amosite 458:13
amount 23:14
23:15 40:8
90:7,19 176:4
178:19 179:23
180:1 280:25
383:13 458:4
467:4
amounts 282:15
285:25

amphiboles
458:13,16
Amrhein 9:5,14
analogous
371:11
analyses 77:12
336:8,15
analysis 76:1,15
145:23 148:22
149:5 251:12
252:16,24,25
267:24 268:15
268:23 269:16
270:14 271:1,4
333:8,9 334:19
335:22,24
336:10,17
338:21 339:21
342:14 361:3
analyzing 425:4
and/or 135:13
471:23
angles 200:25
animal 252:6
253:3 285:8
448:14,22
450:3,4
animals 254:7
254:12 449:23
449:23 450:2
Ann 235:22
Anne 2:16 8:5
annoy 53:9
327:4
answer 23:22
24:11 26:24
29:6 32:22
33:15,18,21
35:17 37:18,23
41:17 55:21
62:12,18,23
67:11 68:6,7
73:12,15 78:24
79:7 80:20
82:18 83:18
84:8,13 93:16
106:11 117:22

122:3 124:2
125:1 135:23
136:13 137:10
139:25 140:24
141:18 144:5
146:17 150:25
156:15 159:4
161:10 164:13
164:15 165:13
166:20 167:6
168:13 169:8
173:22 176:16
176:17,19
177:2,10
187:13 191:22
191:23 192:21
195:6 198:8
207:22 210:9
218:8 220:10
249:18 268:19
274:18,20,23
274:24 276:6
276:10,10
288:4,4 304:5
310:22 319:22
326:13 332:4
336:3 337:22
338:3,10
346:22 371:3
372:6,8 374:13
407:1 419:11
421:2 424:20
424:23,25
436:1 450:4
451:14 460:22
464:8 465:8,11
467:15
answerable
90:11
answered 35:8
57:14 68:12
74:25 117:21
127:22 146:13
147:24 150:15
161:10 184:12
210:8 217:21
218:7 219:1

220:9,18 224:3
228:21 232:7
251:6 261:17
308:3 385:5
423:1 429:10
445:18 447:19
453:10,23
answering 33:9
61:19 203:4
244:12 335:19
337:19 404:14
answers 14:23
37:13 106:24
193:2 474:5
anybody 15:12
56:24 153:6
164:19 192:19
196:11 266:10
266:13 311:22
313:24 340:12
437:6 470:12
anymore 29:24
30:17 153:1
294:23
anyway 49:8
79:4 305:1
317:6 372:6
apart 18:16
apologize 66:1
202:17 284:22
312:12 378:3
378:16 394:17
426:21,23
464:18
appalling
461:21
apparently
257:14 312:12
391:10
appear 31:15
147:7 172:4
232:1 313:4
appearance
469:12
appearances 4:1
5:1 13:18
appeared

296:23 297:22
305:10
appears 26:3
123:24 282:14
407:5,19
appendices
265:10
Appendix 7:8,19
66:4 121:4
application
266:22 270:25
332:21,25
416:8 449:24
applications
420:22,25
applied 149:13
250:18 412:23
435:24 461:5
applies 461:3,17
apply 74:7 401:2
437:9 471:21
applying 362:13
449:18
appointment
93:19 97:1,3
100:20
appreciate
40:11 67:24
88:25 114:10
114:11 140:13
183:10 184:3
190:13 251:1
327:7 345:3,15
349:6 355:12
381:13 400:10
411:7 470:15
approach
146:20 241:5
245:12 250:23
319:25 343:7
343:14 444:23
approached
456:11
appropriate
39:9 173:22
253:25 339:14
450:2 472:4

| | | | | |
|---|---|---|---|---|
| **appropriately** 287:16 | 258:21 280:17 281:23 282:6 | 78:17 79:18,25 79:25 80:9 | 122:6 186:19 387:11 388:6 | 57:1,2 59:16 64:16 68:17 |
| **approximately** 36:20,22 45:21 46:2 121:10,15 213:25 | 296:9 297:22 297:24 298:6 304:5 305:9 306:17 309:4 | 84:6,11,17,22 87:18,25 89:14 89:17,21 90:13 90:18,19 | **asbestos/meso-** 207:10 **asbestosis** 122:10 | 77:19 83:16 109:10 132:20 135:21 136:11 136:15 146:6 |
| **April** 1:17 11:22 13:6 121:15 175:9 229:10 439:3 470:17 471:15 | 309:15,22 317:16,21 328:5 336:22 343:20 369:9 373:25 419:14 | 120:16 121:21 122:5,21,24 123:7,14,22,24 125:22,24 126:5,20 127:5 | **ascend** 417:17 418:5 **ascertain** 406:18 **ASHCRAFT** 3:6 | 148:23 163:10 164:15 191:5 192:24 193:3 195:16 201:1 205:23 221:4 |
| **arbitrary** 251:19 302:14 | 424:16,19 426:3 427:9,21 | 127:20,25 128:14,20 | **Ashton** 11:25 438:9 | 235:10 238:14 246:13 252:11 |
| **area** 51:17 59:4 75:7 128:20 151:15 184:10 190:17 203:1 214:24 216:21 217:10 218:3 219:8 220:12 221:6 236:15 237:16 260:23 276:1 279:2 280:4 288:8 331:14 430:3 | 428:1 439:25 442:13,20,25 444:16 445:6 **articles** 28:2,9 28:11,13,13,17 28:18,18 29:7 30:5,7,10 31:4 31:11 37:11 92:13,16 122:13 149:9 240:15,21 299:5,11 309:10,11 | 136:16,19,23 142:20 147:17 148:13 187:15 201:24 203:16 214:20 215:7 215:10 225:24 226:8,14 241:2 241:4,9 259:23 259:24 261:23 262:10 263:11 281:6,13,24 282:12,13 283:9,19 284:8 | **aside** 44:3 134:25 206:4 208:23 231:10 285:23 286:15 **asked** 19:21 20:20 21:11 23:24 27:22,23 32:13 35:7 49:23,25 55:21 55:25 57:10,17 57:21 74:24 106:11,13 112:17 117:21 | 263:6 299:1 304:16 329:14 336:15 337:10 400:4 403:10 404:14 409:16 422:7 430:24 451:7 **aspect** 355:25 356:2 **aspects** 256:24 **aspirin** 421:17 421:20,21 **assemble** 244:20 |
| **areas** 19:3 80:15 100:22 203:14 356:18 | 310:14 347:13 364:21 425:24 433:18 435:16 | 284:9,13 285:12,22,25 286:9 382:13 | 127:21 147:23 148:1 150:15 155:6 181:16 | **assert** 33:12 **asserted** 33:9 **asserting** 33:13 |
| **Armhein** 317:25 **ARPS** 5:10 **arrange** 162:15 **arrangement** 154:7 **arranging** 162:13 | 436:12,20 437:1 449:3 452:16 **articulate** 145:21 **articulating** | 383:2,10,14 384:5,14,17 385:13,21 386:10 387:6 387:10 388:12 388:25 389:4 | 181:25 184:20 184:21 185:7 187:2 193:12 195:9 196:16 199:13 200:5 200:14 210:9 | 33:15 **assess** 266:20 **assessed** 463:16 **assessing** 239:10 **assessment** 8:11 11:18 144:8 |
| **arrive** 222:23 **arrived** 105:7 **Arsenic** 10:23 393:16 **article** 6:23 8:16 8:22 9:4,7 10:4 10:9 11:8,12 11:15 12:4 29:7 42:18 43:19 45:7,13 122:9 148:23 149:6,18 257:4 | 88:11 288:12 **asbestiform** 72:17,21 73:5 73:23,24 74:5 401:4,9 **asbestos** 8:16 11:5 41:14,20 64:25 72:6,23 73:20,21 74:1 74:8 75:24 76:12 77:1,16 77:22 78:4,11 | 389:20 391:2 391:17,22 392:7 394:1,24 395:2 397:17 399:14,17,17 400:20 401:2 401:21,22,25 402:7 457:5,21 460:11 **asbestos-** 121:21 123:22 **asbestos-related** | 218:7 220:18 224:2 228:21 232:7 251:5 261:17 262:6 262:10 275:18 276:9 308:3 377:24 422:25 429:10 445:16 445:17 447:18 465:4 **asking** 37:12 42:11 53:2 | 256:9 264:23 265:3,19 267:6 268:11 272:17 273:20,24 274:12 275:25 277:22 427:11 **assistance** 159:18 178:11 179:7 250:11 **assistant** 93:10 250:15 **assistants** 91:17 |

Gregory B. Diette, M.D.

assisting 187:2
assists 23:17
associate 7:14
  94:5,12
associated 10:10
  10:15 359:3
  366:3 379:18
  380:22 389:4
  428:6 462:18
association 11:8
  127:10,19
  148:17 271:20
  273:15 278:3
  278:15 295:7
  295:18 302:12
  305:20 322:17
  352:25 361:23
  362:3,4,7,22
  362:23 384:7
  394:1,23 402:7
  414:16 417:11
  422:23 423:8
  445:22
associations
  236:19 368:1
assume 14:21
  21:13,18 70:23
  71:4 76:1
  78:16 79:16
  80:8 132:25
  135:21 147:4
  191:10 222:13
  234:8 235:10
  242:2 246:4
  288:2,18 295:5
  370:4 399:19
  419:7 459:10
  465:13
assuming 86:25
  119:2 205:22
  233:16 240:14
  295:4 450:2
assumption 78:8
  78:12 234:23
assurance 386:7
asterisk 332:20
  334:12 355:6

asthma 48:17
  96:9 97:17
  100:23 102:12
  103:3 104:17
  107:2,8,15
  143:2 370:24
  371:1 372:24
  372:25 373:12
  373:15,20
  374:8,18 375:1
  375:19 376:7
Atkinson 397:23
attach 351:19
attached 6:9 7:2
  8:2 9:2 10:2
  11:2 12:2 26:1
  42:5,14 43:7
  298:16 308:23
  439:25 442:14
  472:10 474:8
attaches 309:14
attachment
  18:12
attachments
  18:15,21
attack 107:9
attempting
  274:2
attend 104:8,23
  105:1 232:12
  232:15 261:5,8
  261:12,22
attention 14:19
  45:13 83:9
  100:6 121:3
  139:20 236:4
  256:5 271:10
  282:9 284:15
  290:22 298:16
  378:14 379:7
  393:19 394:8
  400:18 414:11
  416:23
attorney 27:4,7
  27:7 472:12
attorneys 49:18
  84:3

Australia 388:3
author 10:13
  224:9 225:8
  253:6 290:14
  317:20 369:9
  370:14 427:15
authored 290:18
authors 45:19
  240:13 245:15
  247:12 272:9
  290:6 365:3
  370:12 413:7
  414:14 424:12
  425:20 430:16
  448:6,25
  451:22 452:17
  453:3,16
  454:19
available 49:4
  49:15 212:18
  241:15 257:25
  258:2 271:21
  271:23 272:10
  277:18 278:5
  278:17 279:24
  293:13 322:13
  383:22 384:4
  456:12
Avenue 3:21
  5:11
average 47:14
avoid 51:17
  54:19,20
award 92:3
aware 15:9
  22:23 36:5
  38:14 41:21
  50:12,15 63:21
  63:22 64:22
  65:8 71:10,24
  75:3,19 81:19
  110:7 113:22
  168:16 188:20
  189:3 196:13
  197:1,5 198:17
  231:11,17
  232:13 264:20

295:15 296:2
298:12,18
306:22 310:11
367:13 385:17
416:9
awareness 63:25
  231:23
awful 70:7 237:5
  343:10 462:5
awkward
  116:23

───────────
       **B**
───────────

B 1:15 2:1 6:2,8
  7:1,9,14,20 8:1
  9:1 10:1 11:1
  12:1 13:22
  66:4 470:20
  474:11
baby 7:4 49:19
  50:19 51:7,15
  52:9 53:4,13
  53:13,25 54:1
  54:12 56:16
  58:18,23 74:15
  87:17 381:19
  385:12 413:9
back 14:9 16:22
  19:14,16 27:19
  39:8 44:19
  50:19 52:22
  54:10,17 56:15
  57:4,13 58:3
  70:8 77:24
  85:25 86:14,18
  89:7 93:12
  106:23 114:12
  117:2,16 139:9
  140:9,13
  144:21 149:3
  151:20 163:8
  166:23 185:7
  197:2 204:23
  227:23 229:15
  230:25 242:3
  261:13 280:14
  286:16 291:20

295:19 305:10
313:16 320:17
320:22 325:11
338:17 351:22
363:18 377:13
378:5 392:19
396:18 400:4
400:19 426:20
435:25 441:10
441:14 442:14
446:17 447:14
463:5 464:16
464:20,23
465:22
background
  90:18 100:15
  175:14 255:10
  284:9
backgrounds
  175:11 288:20
bad 277:6 414:5
  450:15
baked 77:15
  146:15
balanced 217:4
  237:4 238:4
  343:7,14
Baltimore 2:5
  10:17 13:9
Bank 3:22
Barnard 21:23
  22:9
base 302:11
  356:20
based 59:6
  212:16 285:15
  287:3 303:25
  304:22 316:11
  317:5 319:19
  326:12 339:21
  346:8 356:17
  367:16,20
  375:25 382:7
  386:12 394:25
  405:2 406:12
  406:13 415:19
  422:7 438:18

450:4
**bases** 210:4
211:22,24
238:11 242:25
247:23 399:16
**basic** 344:20
388:24
**basically** 105:4
180:1 212:24
352:18,22
358:19 388:24
401:20 449:13
**basis** 243:16
253:16 288:4
345:20 381:3
392:7
**Bates** 8:17 9:21
**Baylen** 3:15
**Beach** 4:6
**bear** 65:25
122:8 181:25
**bearing** 123:16
**becoming**
454:16
**Bedrooms** 10:16
**Beg** 76:19
325:16 437:22
**beginning**
177:17
**begun** 102:20
**behalf** 3:3 4:16
5:15 55:17
136:16 158:5
**behavior** 264:2
264:3
**belief** 59:1
395:20
**believable**
390:15
**believe** 15:5
22:17 27:14
31:17 43:14
56:3 82:7,16
121:4,5 139:13
177:16 209:23
210:25 215:6
219:16 225:22

226:4,7 227:14
231:12 243:6
255:18 263:17
306:18 318:9
325:5 370:23
370:24 378:5
428:13 432:22
442:2 453:13
453:13
**belong** 145:21
174:19
**beneficial**
309:14
**Berge** 237:25
238:2 454:24
**best** 37:13 38:5
50:17 104:3
108:19 159:5
184:12 322:14
333:15,16,18
444:13
**better** 93:15
161:10 164:13
180:11 353:16
386:25 405:5
**beyond** 8:23
9:10 167:17,18
296:25 308:18
309:3,22
**bias** 239:17,22
**biases** 462:11
**BIDDLE** 5:4
**big** 195:21
378:10 379:3
**bigger** 306:12
**bill** 11:25 25:4,7
25:10,13
158:18,22,25
159:11,11,14
159:21 161:23
178:1,16,16,17
178:22 179:4
438:9 439:2
**billed** 40:3,6
159:22 160:1
161:13
**bills** 25:2 158:10

179:22,25
192:9,12,15
**binder** 164:25
164:25
**bio** 151:10
**biologic** 256:24
272:25 273:4
433:20
**biological** 384:6
418:25 419:4
445:14 446:16
446:19 447:17
448:7 449:1
**biologically**
89:22 384:6,20
385:22 414:15
415:22 416:6
418:16 420:10
421:4 422:10
424:13 425:22
432:10 450:7
450:20 451:23
453:3,19 455:6
**biologist** 253:20
253:20,24
254:16,21
255:1,6,16
454:19
**biology** 175:14
**biomarker**
405:3
**biostatistician**
293:22,23
**Biostatistics**
314:12
**bit** 24:24 27:4
59:21 73:12
77:25 115:6
121:1 158:8
186:1 205:3
230:11 238:7
241:23 245:12
314:18 341:13
352:24 360:19
370:24 376:21
377:25 399:21
407:16 468:12

**bits** 287:1
**blacked** 161:17
180:3
**blank** 355:16
**blocks** 285:17
**blog** 312:14
**blood** 404:25
405:25
**Bloomberg**
100:21 101:20
101:25
**blowing** 44:7
**blue** 389:19
**board** 94:16
**bodies** 209:2
239:7
**body** 11:9
211:12,15
228:7,12 246:7
412:18 417:17
434:12
**boils** 306:13
**bold** 174:18
**book** 290:17
292:9
**bottle** 7:4 51:7
51:12 52:8,22
52:25 53:3
**bottles** 49:19
50:1
**bottom** 54:22
76:8 96:25
172:4 211:10
256:7 284:16
284:17 344:25
350:15 393:20
396:4 444:17
**bought** 54:5,5
**bounds** 337:3
340:25
**Bowman** 311:7
313:13,14
**Bowman's**
296:4,6
**Bradford** 145:6
145:10,15,23
146:2,11,18,20

147:5,14
239:11,21,24
268:11,15,23
269:9,16
270:14 271:1,4
362:22 419:8
447:22
**brand** 303:6
**brands** 381:25
382:7,8 383:20
**break** 19:17
62:9 77:11
88:22 133:6
151:10 158:7
164:2 178:15
181:23 204:10
204:10,12
217:16 280:7
280:17 320:16
320:17,25
377:4,5 426:10
**breathing** 54:20
**breeze** 44:7
**Brief** 251:24
**briefly** 19:2
229:15
**bring** 16:24
27:23 34:7,9
34:10
**bringing** 100:6
**broad** 48:15
64:7 303:12,19
306:8 402:25
407:1
**broader** 95:24
**broadest** 415:2
**broadly** 147:11
**broke** 469:9
**broken** 332:23
346:18 403:23
**bronchoscopy**
123:12
**brought** 34:6
169:25
**Brown** 4:17 6:5
15:18 16:3,6
18:4 19:7,15

Gregory B. Diette, M.D.

| | | | | |
|---|---|---|---|---|
| 19:16 20:22 | 103:18,21 | 167:4 168:19 | 232:7,17 233:1 | 314:10,25 |
| 21:17 22:7 | 104:2 105:10 | 169:4,7,13,20 | 233:4,12,15 | 315:5 318:13 |
| 23:19,22 24:10 | 106:6,22 107:4 | 170:15 171:16 | 234:2,17,22 | 319:19 321:10 |
| 24:14,17 26:9 | 107:16 108:8 | 172:11 173:18 | 235:5,7 236:25 | 321:21 322:9 |
| 27:11 28:21 | 108:23 109:4,9 | 174:6,10 175:5 | 244:2 245:25 | 322:21 323:21 |
| 29:1 31:6,22 | 109:18 110:1 | 175:12 176:2 | 246:10 247:24 | 324:22 325:2 |
| 32:8,13 33:6 | 110:12,15,24 | 176:15,22 | 248:7,17,23 | 326:3,6,10,17 |
| 33:14,23 35:7 | 111:5,11,19,23 | 177:9 178:12 | 249:6,11,17,24 | 326:23,25 |
| 35:17,25 36:24 | 112:5,13,24 | 178:24 179:8 | 250:6,21 251:5 | 329:12,17,20 |
| 37:14,17,20 | 113:2,9,12,14 | 179:17 180:5 | 254:17 255:2 | 329:25 330:4 |
| 38:1,8,11,14 | 113:18,22 | 180:25 181:9 | 255:15,22 | 330:22 331:4 |
| 38:18,21,23 | 114:1,13,16,20 | 182:18 183:1,7 | 256:1,17 258:4 | 331:18,22 |
| 39:1,6,11,19 | 115:1,4,13,25 | 184:4,18 | 258:14,25 | 332:1,4,7 |
| 40:16 41:15 | 117:11,20 | 186:10 187:10 | 259:8,10 260:5 | 333:19 334:10 |
| 42:8,19,25 | 118:1,25 119:9 | 187:20 188:5 | 260:10,25 | 334:20 335:5,9 |
| 43:12,20 44:13 | 120:17 123:25 | 188:11,23 | 261:2,16,24 | 335:12,16 |
| 45:5 47:6,22 | 124:23 125:8 | 189:2,21 190:8 | 262:19,24 | 336:2,21 |
| 48:11 49:5,21 | 125:14 126:21 | 190:22 191:9 | 263:20,24 | 337:11,15,19 |
| 50:4,21,24 | 127:13,21 | 192:4,10,12,17 | 264:4 265:2,20 | 337:22 338:2,5 |
| 51:9,19 52:23 | 128:21 129:9 | 192:20 193:1,5 | 266:1 267:18 | 338:8 339:4,17 |
| 54:2,14,25 | 129:15,18 | 193:20 194:1 | 268:2,12,18 | 339:25 340:6 |
| 55:8,16 56:2,8 | 130:2,11,15 | 194:11 195:5 | 270:2,5 271:7 | 340:11 342:18 |
| 56:19 57:14,23 | 131:5,11,17 | 195:14,18 | 272:2,16 | 343:18 345:7 |
| 58:14 59:5,12 | 132:12 133:10 | 196:2,7,10 | 273:23 274:1 | 345:11,22 |
| 60:4,17 61:4 | 134:21 135:3 | 197:13,17 | 274:17 275:4 | 346:8,13,17,20 |
| 61:13,18 62:4 | 135:16 136:10 | 198:7,21 199:3 | 275:13,15 | 346:25 347:12 |
| 62:10,21 63:24 | 137:9,22 139:5 | 199:16,18 | 276:3,13,16 | 348:5 349:11 |
| 64:6,9,14 65:1 | 140:5,11,23 | 201:12,15 | 277:20 278:7 | 350:14,19,21 |
| 65:12,19 66:18 | 141:13,18 | 202:5,9 203:3 | 278:11 279:8 | 351:3 352:3,10 |
| 67:15 68:11 | 143:3,6,20 | 203:7 204:9 | 279:13 280:3,6 | 353:11 354:4 |
| 69:14,20 70:22 | 144:1,4,20 | 205:10,17 | 281:8,15 | 354:16 356:3 |
| 72:8,19 73:7 | 145:7,16 | 206:10,19 | 282:21,24 | 356:25 357:13 |
| 73:15,18 74:13 | 146:13,24 | 207:18 208:20 | 283:4 286:10 | 358:8 360:13 |
| 74:17,24 75:8 | 147:8,18,23 | 209:3,9,20 | 287:6,25 288:3 | 361:24 362:10 |
| 75:10,17 76:18 | 148:18,25 | 210:11,17 | 288:9 289:2,4 | 362:25 363:13 |
| 76:20 78:20 | 149:15,23 | 215:16 216:10 | 289:8,13 | 367:8 368:19 |
| 79:2,21 80:16 | 150:15,21 | 217:21,25 | 290:23 291:13 | 371:19 372:1,4 |
| 80:24 82:1,11 | 151:6 152:11 | 218:6,12,15,19 | 292:1,4 295:23 | 372:14 373:3 |
| 82:17,22 83:2 | 153:17 154:10 | 218:23 219:11 | 298:20,24 | 373:17,22 |
| 83:13,21 85:3 | 155:1 156:6,16 | 220:17 221:19 | 299:2,12,21 | 374:9 375:8,10 |
| 85:9,14,20 | 156:19,24 | 222:8,25 223:7 | 300:1,6,12,15 | 375:14,20 |
| 86:2,11,24 | 157:10 158:11 | 223:24 224:1 | 301:18 303:1 | 376:16 378:18 |
| 87:1,8 88:5,7 | 158:14 159:3 | 225:2,17 226:2 | 304:3,8,12,17 | 380:4,11,24 |
| 90:1,15 95:11 | 159:13,23 | 227:12 228:8 | 304:25 306:6 | 381:3,20 382:2 |
| 96:17 97:22 | 160:7,9,16,19 | 228:13,21 | 307:1,7 308:3 | 382:16 383:6 |
| 98:7,11,13,15 | 160:23 161:21 | 229:22 230:19 | 310:5,8,18 | 384:9,22,25 |
| 99:6,10,15 | 166:1,4,9,11 | 231:3,19 232:3 | 312:14,18 | 385:5,8,15 |

389:9 390:1,20
391:4,19,24
394:12 396:8
396:15 397:8
399:4,23
400:14 401:10
401:13,16
402:10,18
403:8 405:8,12
406:19,21
407:10 408:4
408:23 409:13
410:5,8,19
411:1,13,18
412:1,19
413:14,25
414:4 416:13
417:25 418:19
419:6,15
420:13,18
421:6,14
422:14,25
423:4,11
424:15,21
425:23 426:2
427:25 428:3
428:18,25
429:14,21
430:1,7,12,20
431:10,13
432:5,14
433:13 434:3
434:21 435:5
435:19 436:15
436:17 437:3
438:11,16
439:18 440:3
440:12,15,19
441:18 442:1
443:18,22
444:7,9,12
445:4,17 446:5
446:22 447:18
448:11 449:5,7
450:9,16,22
451:10 452:1
452:20 453:7

453:22 455:7
455:16,23
456:18 457:1,7
457:23 458:21
459:4 460:19
460:22 461:10
463:20 464:5,7
464:9 466:4,11
466:25 467:12
467:14,17,20
470:4,10
**Brown's** 18:8
55:20
**Bruce** 7:13 16:8
**built** 323:15
**bulk** 240:20
**bullet** 303:23
**bulleted** 181:21
**bullets** 469:9
**bunch** 70:13
91:25 253:2
369:5 376:9
435:25 460:13
**bundle** 86:16
**Burden** 8:17
281:25
**Burge** 454:24
**business** 24:21
178:19 191:11
193:11 266:14
**buy** 50:9

_____
**C**
**C** 3:1 6:1 7:8
10:25 13:1
121:4
**C-reactive**
423:13
**cake** 341:10
**CALCAGNIE**
4:4
**California** 4:6
**call** 39:10 74:8
81:23 106:3,4
113:24 114:2
136:19 152:7
157:6,24

162:14,15
188:11 218:15
218:17,20
314:19 337:16
337:23 338:9
338:11,12
349:5 353:3,4
443:9
**call-in** 97:3
**called** 31:17
55:2 93:22
95:7 118:20
146:20 152:22
186:2 244:14
290:18 296:25
361:3,5 460:2
**calling** 306:16
**calls** 60:18 75:10
110:15 158:14
178:12,24
186:10 188:6
191:6 229:23
230:20 231:4
235:8 261:2
309:4 430:8
435:5
**camera** 19:19
113:16 378:17
**cameras** 19:17
**Canada** 8:14,14
264:22 265:17
266:5,11,18
267:6,15
268:10 272:13
273:20 274:12
275:25 278:10
279:1 409:3,10
409:18,20,23
432:2,9
**cancer** 6:24 7:23
9:16,20 10:5
11:5,6,9,10,13
12:6 28:14,19
34:24 35:5
36:6,7,9,14,15
36:20,23 39:16
40:13,21 41:11

41:14,21 45:8
45:9,20 46:1
46:23 51:18
55:7,15 59:10
59:18 60:3,15
61:3 62:3 63:8
63:12,18 75:6
76:3,14 79:11
79:15 89:24
90:14,20
104:24 109:22
111:3,10
115:24 116:7
117:1,4,19
118:10,21
119:3,7 122:7
122:8,19,21,24
123:6,8,13,14
123:18,19,23
124:18,22
125:3,7,13
126:5,10,15
127:12,20
129:7,13 130:1
131:1,14 132:8
134:10,16,19
135:6,15 136:8
136:17,20,21
137:21 138:8
140:22 142:12
147:22 148:17
149:22 150:13
150:20 151:4
163:3,7,14,19
164:12 165:25
167:3,12
172:24 187:7
199:12 200:1,4
200:6 201:5,10
201:24 202:22
202:23 203:2
209:19 210:23
211:20 212:22
214:4,11,12,25
215:9,15
216:22 217:11
218:4 219:9

220:13 221:7
225:5,13
226:12 228:17
233:23 234:15
234:21 236:17
237:19 240:16
240:24,25
241:5,9 248:5
250:4 253:20
253:23 254:14
254:16,21,25
255:6 263:16
271:20 272:15
273:22 274:15
275:2 276:2
278:4,23 279:3
285:18,21
359:4 364:1,11
365:5,16 368:3
368:18 372:4
376:15 378:1
379:11,17
380:3,21 384:8
384:21 385:24
386:11,19
387:6 388:7,25
389:5,8,19
391:3,11,17,23
392:8 394:2,24
395:13,23
397:17,18
398:1,1,2,2,10
398:11,14,15
398:23,24
399:11,11,15
399:18 400:20
401:9 402:8
404:4 406:13
407:8 410:18
411:4 413:12
415:9,24
417:12,15,20
420:5 421:8,8
421:10 422:24
423:10,15,18
423:20 439:13
443:12 444:23

451:25 453:5
454:18 456:25
457:6 460:12
462:19 464:4
466:23 467:5
**cancer/** 198:25
**cancers** 61:2,6
358:4
**candid** 332:12
**capacity** 411:12
**capture** 205:20
250:1 447:22
**carbon** 412:9
**carcinogen**
77:22 215:8
225:24 226:9
382:25 384:5
384:15 399:22
400:13 458:20
466:1,19,24
**carcinogenesis**
418:11 421:5
433:6 439:11
**carcinogenic**
215:6 225:23
401:2 402:1
**carcinogenicity**
420:11 422:11
**carcinogens** 8:9
10:25 120:12
231:15 235:25
260:22 465:5
467:8
**carcinoma**
428:7
**Cardiology** 10:8
**cardiovascular**
10:10 367:4
**care** 34:19,22
62:1,1,2 63:6,9
63:15 93:21,23
94:17 96:11
104:10 105:8
105:12,13
110:11 115:23
116:6,10,17,25
117:18,24,25

118:9,9,14
119:2 123:17
**career** 288:11
**careful** 224:4,21
247:13 372:16
410:19
**carefully** 194:13
395:10 472:2
**carrier** 141:22
**carries** 94:11
244:10
**case** 37:10 38:2
38:19 42:7,16
42:17,17 55:9
65:14 70:17
78:3 80:2
81:17,18
110:23 111:1,2
111:10 112:2,8
112:11,18
132:11 136:20
136:21 138:1,4
138:6,7,9
146:7 162:12
163:3,9 167:10
181:6 194:22
197:1 199:11
199:19,24,25
206:1,25
207:10,14
209:12 219:5
232:14 240:10
243:25 244:6
245:13 247:13
251:15,16
255:20 267:16
286:18,23
334:25 336:8
336:11 345:5,5
345:17,17,21
358:14 399:22
401:8 459:24
461:18 468:6
469:15
**case-** 131:21
142:5
**case-control**

142:9 144:14
245:11 246:15
247:4,16 251:4
267:25 268:7
270:9 286:20
288:11 325:6
325:12 343:6
345:23,25
355:22 356:14
360:5,21
368:21 428:7
455:14 460:3
461:5 462:5
463:15
**cases** 1:11 36:20
39:16 40:13
55:7,15,15
135:15 136:7
136:17 137:2,6
137:17,18
139:12,16,22
140:20,20
157:17 163:14
167:3,8,20,24
181:4,6 185:23
186:16,17,19
186:21,24
187:14,15
199:1 200:7,18
200:21 201:4
203:5,18 207:3
239:14 244:6,7
244:8 247:23
248:2,6,10
251:3,11
268:25 331:11
341:17 395:11
395:23 408:14
**categorically**
255:5
**categories** 35:2,6
41:20 76:14
109:21 125:7
125:21 148:23
206:8 219:23
220:2 278:19
278:22 279:17
373:12 374:18

279:25 361:23
362:4 379:10
394:23 402:7
445:22
**causality** 60:2
265:19 275:25
362:24 363:12
419:1 446:2
451:9
**causation** 6:20
7:17 133:25
148:22 149:4
206:15,25,25
207:1,11,14
239:10 277:10
362:8 446:14
463:13
**causative** 126:9
439:13
**cause** 34:24
54:20 59:18
89:24 90:7,13
102:12 107:14
126:5 240:18
278:16 279:2
370:22 376:14
383:11,15
384:20 385:23
386:9,11,18
387:11 388:12
391:3,11 401:9
407:8 415:8,24
432:11 450:21
451:24 453:5
456:25 457:6
457:14,22
467:5
**caused** 313:15
359:3
**causes** 35:2,6
41:20 76:14
109:21 125:7
125:21 148:23
206:8 219:23
220:2 278:19
278:22 279:17
373:12 374:18

391:23 392:8
399:17
**causing** 76:3
376:6
**cavity** 433:8
435:2
**cease** 295:20
**cell** 358:4
444:18
**cell-based** 252:8
**cells** 422:1,1
**cements** 284:12
**center** 7:23 15:6
63:7 95:22
96:4 100:8
104:23 214:4
215:15 224:25
225:6,13
228:17
**certain** 16:24
28:8 126:3
244:25 268:23
316:12 358:3
449:23 467:4
**certainly** 16:20
21:19 48:21
56:10 90:24
100:2 104:17
108:1 129:21
143:7 149:5
164:18 166:10
201:18 222:17
226:3 260:1
261:4 294:16
352:8 363:6
367:21 388:5
413:21 433:17
451:16 453:2
463:4
**certainty** 452:24
**certificate** 471:1
471:13,19
**certification**
94:16 471:20
**certified** 119:25
471:1,2
**certify** 471:3

474:3
certifying 471:24
cetera 430:17
chance 17:2 20:17 71:12 99:8 193:9 299:10 305:12
Chang 351:11
change 8:14 77:17 93:8 206:8 257:16 280:9 313:19 317:4 320:6 340:24 344:1 344:20 383:21 384:2 473:4
changed 93:24 174:15 257:12
changes 79:6 472:8 474:6
chaos 315:17
Chapter 290:1 292:9
characterizati... 271:24 273:13
characterize 260:12 369:25 370:4 382:5
characterized 370:1
charge 24:19 25:17 177:17 177:22 178:7 197:11 198:5 213:19
charged 23:14 23:16 37:25 40:9
charges 178:10 197:21
chart 9:19 247:16 251:4 324:2,16 328:17 329:11 333:2 334:7,8 336:19,23

339:15 341:22 344:22 346:3 347:1,4 355:20 443:9
check 376:23
checks 196:1,9 196:12,19
chemical 8:12 285:23 286:8
chemical-relat... 187:15
chemically 286:12
chemicals 203:17
chemotherapy 63:5
Chen 351:10
cherry- 304:17
chief 81:12
child 58:11 404:11
child's 54:19
childhood 389:4 389:20
Children 10:18
chorus 446:8
chose 97:25 98:4 170:14 246:25 339:21 341:25
CHRISTOPH... 3:12
chronic 96:9 97:16 101:10 103:5 126:3 413:8 417:19 418:6 419:25 419:25 420:2,9 421:3 422:5,11 423:17,19 425:21
chrysotile 458:9 458:17
chunks 181:23 378:10
cigarette 404:21 456:24,24

cigarettes 404:12,17
circle 140:19 292:10 346:6 347:7,21,22 348:13 353:9 353:14 354:6,9 365:18
circling 348:9,9 348:17 351:16 351:24
circumstance 303:21
circumstances 319:11 359:5 387:7 394:18
citation 418:4 433:14,22 434:7
citations 468:22
cite 241:14 273:2 390:5,13 418:8
cited 222:12 252:18 253:3,3 337:5 364:15 364:22 390:10 390:10,11,11 390:12,12 412:3 448:15
cites 43:15 237:24,25 285:8,9 395:6
citing 222:15 237:8 285:21 361:5
city 48:18 102:17 374:21
claim 291:4
claimed 292:13 293:5
clarification 25:1 27:3 40:11 130:10 179:5
clarified 167:8
clarify 20:12

23:12 40:2 55:11 99:2,5 99:12 103:22 104:5 122:2 130:14,16
clarity 58:10 184:7
classification 260:22
classifying 439:12
clean 254:20
clear 26:10 32:16 38:9 105:12 106:25 114:13 132:2,3 161:22 163:6 168:8 184:23 195:20 209:16 245:16 252:12 271:22 305:18 310:4 358:12 433:19 455:25 468:4
clearly 394:24
clicked 311:5
client 155:7 157:3,6 190:14 191:15 192:2 193:10,16 194:6 196:5
clients 155:12 155:18 156:5 189:15
Climate 8:14
clinic 63:10 104:16 105:8 105:12,12
clinical 9:8 100:23 128:4 128:10 246:21 294:7,14 308:16 309:20 310:12 317:8 428:9
clinician 59:1 103:14

close 102:15,16 352:17
CMO 38:2,15 113:7,23 114:3
coach 78:25 83:20 304:6
coaching 156:12 332:3
coeditors 309:8
coffee 88:20
cognizant 252:13
COHEN 3:20
cohort 141:12 141:14,23 142:1,11,15,19 144:16 146:7 233:8,11 238:3 245:6 246:6,15 267:16,24 268:7 286:19 325:6 358:19 360:4 394:25 459:23,25 460:10 461:6 461:18,23 462:4
cohorts 233:3 238:8 247:5 286:22
coinvestigators 232:25
cold 44:7
collating 468:19
colleague 82:23 153:1,8
colleagues 303:7 352:14 361:1 463:17
collect 157:21 404:23
collected 404:24
collecting 157:18
collection 242:24
collects 159:8

Gregory B. Diette, M.D.

**College** 94:21
239:4
**column** 45:18
394:8 414:20
444:16
**com-** 112:22
**Combine** 439:8
**combining**
425:5
**come** 21:2 77:24
104:1 106:13
108:12 152:21
164:25 170:18
177:23 203:20
227:22 278:19
286:16 288:19
325:22 363:17
430:19 431:5
**comers** 105:3
365:24 381:25
**comes** 80:2 90:8
96:20 172:1
191:14 196:14
205:22
**comm-** 229:21
**comment**
179:22 216:15
267:2 356:9
358:25 409:4
**commentary**
306:17 317:23
**comments** 14:5
14:11
**commercial**
73:22
**commission**
164:19 240:7
474:17
**commissioned**
266:24
**Committee**
231:13,13
**common** 10:14
49:13 292:12
369:3,7,7
443:11
**communicate**

317:8 337:1
342:11,11
343:12
**communicating**
223:21
**community**
120:10 188:22
208:15 209:1
209:17 229:21
295:20 407:25
408:12
**companies**
441:21
**company** 81:24
84:15 88:12
109:16 110:7
152:8 185:18
190:15 441:23
**company's**
441:14
**compared**
236:17 365:14
366:23
**comparison**
11:6 397:18
**compatible**
235:13 237:2
**compelling**
439:7 441:16
441:24 442:9
**compete** 320:4
**competent**
132:25
**competition**
456:7
**complain**
112:22,25
**complaint**
110:23 111:6,9
111:25 112:16
196:16,17
**complete** 21:8
86:24 99:23
191:18 206:5
244:20 310:18
**completed**
131:19 135:9,9

208:4
**completely** 47:9
291:8 292:19
336:21 363:3
**completing**
470:18
**complicated**
62:16 405:13
**complying**
114:1
**comprehensive**
7:23 214:4
215:15 224:25
225:13 228:17
238:25 264:24
**concentration**
386:15 459:16
**concentrations**
10:16 371:15
**concept** 306:24
383:8,9,23
447:3
**concern** 298:13
310:16 409:10
**concerned** 80:3
184:1,2 362:16
**concerning**
256:15 392:9
**concerns** 428:14
**conclude** 212:20
303:24 304:21
305:2,19,24
322:17 323:18
**concluded**
274:13,25
379:24 391:22
425:21 449:3
470:21
**concluding**
272:22
**conclusion**
212:10,11
277:3 278:12
279:22 283:24
285:14 323:13
379:12 380:19
381:2 382:14

392:7 396:10
396:13 413:18
413:21
**conclusions**
278:9 302:11
303:11 379:7
401:1
**conclusive** 273:8
**condescending**
113:17
**conditions**
106:21
**condoms** 359:7
**conduct** 319:15
**conducted**
147:21 151:3
168:3 231:14
409:11
**conducting**
318:15
**conferring** 58:8
138:19 211:3
213:5 267:10
282:1 296:20
376:19 412:12
426:8 437:14
443:4 447:7
459:21
**confidence**
305:22 317:2
327:18 328:19
329:7 330:11
337:3 340:25
341:1 353:8,9
354:2,10,11
355:3 357:9
**confidentiality**
156:8,17
187:11
**confirm** 197:9
422:4
**conflict** 196:6,15
196:19,23
305:24 323:18
**conflicts** 196:1,9
196:12
**confounding**

239:17,22
462:12
**confuse** 168:6
**confused** 24:8
308:21
**confusing**
333:23 334:1
**confusion** 24:6
245:13
**Congress** 235:4
**conjunction**
44:2 179:6
**connection**
211:16 361:23
469:15
**connotation**
71:22
**consequences**
10:19 40:25
63:11 378:6
**Consequently**
271:24
**consider** 22:9
29:17 122:6
229:16,19
231:1 252:2,16
267:23 318:15
322:5 419:3
442:8 445:8
**considerations**
146:19 239:11
363:2
**considered** 6:22
19:6 20:5,7
22:4,12,14
66:3,8 245:20
249:23 253:12
392:12,14
395:10 396:2
435:12
**consistency**
270:23 292:8
292:11 321:6
322:4 357:22
359:9
**consistent** 32:2
271:17 272:3

Gregory B. Diette, M.D.

278:1,2 357:21 359:2
**consistently** 172:9,23 236:13 237:14 271:19 272:3
**consists** 77:13
**constituents** 211:18
**consult** 106:4 225:13 233:9
**consultant** 188:2
**consulted** 105:25
**consulting** 117:25 135:18 136:11 152:8
**consumer** 8:7,9 231:14,16 232:11 235:24 235:25
**consumers** 78:18 80:14 84:22 87:20 223:14
**contact** 54:20 174:20 184:15 284:6
**contacted** 185:13
**contain** 75:5 78:4,11,17 84:6,17 211:19
**contained** 6:15 17:15 54:23 57:4 70:19,20 71:7,19 87:24 92:14 127:9 162:21 170:4 208:8 248:21 249:3 285:24 336:1 382:12 382:12 436:11
**containing** 401:4,8,24,25
**contains** 51:16

210:4 215:7 225:23
**contaminated** 383:2
**contamination** 283:11
**content** 176:14 177:8 191:9 309:9
**context** 46:10,12 83:16 111:3,4 134:20,25 156:24 170:20 180:20 193:19 193:22,22 200:3 263:5,7 321:22 378:20 419:8
**continue** 150:9 337:15 430:23
**Continued** 4:1 5:1 7:1 8:1 9:1 10:1 11:1 12:1
**continues** 50:13 453:7
**continuing** 292:1
**contract** 154:17 155:5
**contracted** 154:23 159:20 159:25
**contractor** 153:21 154:8 155:16 176:21
**contracts** 33:1 33:19
**contrary** 215:13
**contributed** 20:8,11 395:13
**contributions** 468:9
**contributor** 444:22
**control** 9:17 142:6 146:8 267:16 286:23

471:23
**controls** 224:8 245:13 248:12 251:15,16 331:11 336:9 341:18 345:5,6 345:17,17 356:16,17 358:15 461:18
**conversation** 173:22 174:2 176:6 266:12 342:22
**conversations** 175:22 176:18 176:24
**conveying** 33:2
**Cook** 351:11
**cooking** 374:24
**Cooper** 185:11 185:13,18 186:8,18,22 194:22 195:3,4 195:12
**cooperation** 26:16
**COPD** 96:10 103:3,4 104:17 143:1
**copies** 31:3 165:2 378:3,19 427:2 437:17
**copy** 17:13,23 32:5 82:14,21 85:21 86:12 88:17 91:3,3 112:16 134:8 139:3 140:11 154:4 312:12 325:15,17 348:18 393:5 397:7 426:24 430:11,14 431:19 471:11
**corner** 285:1 419:13
**cornstarch**

334:18 335:1 337:7,13,14,18
**corporate** 4:5 192:2 194:5
**Corporation** 110:11
**correct** 15:3,7 15:17 18:3 20:21 21:16 25:5,6,8,9,11 25:14,19,20,22 27:20 28:25 30:23 31:13,14 31:19 33:22,22 33:23 34:19 40:7 43:16,17 48:20 49:4 52:16 57:22 58:13 61:3,8 67:2 79:13 84:13,18,19,19 84:24 88:4 90:25 92:7 93:20 94:21 95:2,21 96:13 96:14 98:18,19 100:15 101:2 108:6,22,24 120:18,25 121:12,23 124:19 126:11 126:16 127:7 127:15 128:5 131:2,3,6 134:4,11,16,17 135:11 136:2,8 140:17 142:13 142:17,21 144:19 145:4 150:4,7,10,13 150:14 151:5 154:24 159:9 159:10,22 163:5 174:5 177:18 178:7,8 178:11 179:7 179:15 181:7

181:10 183:8 193:14,15 201:11 203:12 205:11 206:9 207:2,4 208:5 209:7,21 211:22 213:1 214:4 222:16 222:17,24 229:14,17 232:1,2,6,8,22 242:4,5 247:6 248:4,16 249:4 254:22,23 255:14,21 257:23 258:23 260:19 264:12 268:8 290:11 290:13 293:20 294:15 305:10 305:13 306:21 308:1 324:13 325:7,14 329:11 339:3 339:11,12,15 340:2 342:17 345:6,18,19,21 346:1,16 349:12 351:9 352:9 354:13 356:24 357:11 360:9,12,22,23 362:5,24 363:20 364:23 364:24 367:2,7 368:18,25 369:1 370:6 373:1 378:25 380:22 381:21 382:1 384:15 384:16 391:17 392:15 393:18 393:23 394:3 396:13 398:12 399:24 402:15 403:15 407:13 409:6 413:5

Gregory B. Diette, M.D.

417:7 418:13
419:10 423:23
425:15,17
428:19 432:3
434:13 437:24
440:8 444:6
446:2 452:8
455:22 456:17
459:24 465:2
467:10 471:11
474:4
**correcting**
101:18
**correction** 77:4
272:7 330:19
400:11
**corrections**
472:3,5 474:6
**correctly** 45:22
77:3 88:1
97:18 100:25
101:12 102:24
103:9 236:21
272:1,6 282:17
286:6 292:17
292:22 301:14
302:8,15 306:3
370:9 379:20
395:17 417:21
420:6 428:11
439:14 468:22
**Correlative**
11:16 427:10
**correspondence**
166:14
**cosmetic** 75:25
76:13 285:24
286:9
**cotinine** 404:23
406:8
**counsel** 7:5
13:18 17:8
19:7 24:11
26:9 27:11
31:3,23 33:6
33:11,20,23
35:17 37:15,17

37:19,21 38:17
38:22 42:8,8
42:12,25 47:13
52:23 53:2
57:23 58:8
61:13 62:21,24
65:21 66:18
68:13 70:23
78:20 80:17,21
80:21 82:11,19
82:20 83:13,19
85:3 86:2
88:16 89:10
98:10 99:8,10
100:9 103:22
109:10 112:13
113:9,11
114:14,18,20
114:25 115:1,3
126:21 130:17
132:16,25
133:10 135:21
136:10 138:19
139:4 140:6
154:3,12 159:3
160:12,22
161:2,21 166:1
166:16 169:4,6
193:6 204:10
211:3 213:5,6
217:22 218:10
218:12 227:12
227:24 228:4
234:3 255:23
267:10 273:25
275:15 277:20
280:3 282:1
287:7 290:23
292:3 296:20
299:21 304:6
312:11 324:22
326:5,15,21
329:14,16,17
329:19,22
330:2,6,25
335:12,13
336:3 338:4

350:14 376:19
377:22 390:1
397:6 408:5
412:12 419:16
420:13 424:15
426:8 437:14
438:4 439:16
443:4 447:7
459:21
**counsel's** 77:4
**count** 60:21
137:14 299:6
404:17 454:19
456:15
**counter** 237:22
**counting** 455:15
455:25 456:7
**countries**
367:14 374:25
**country** 249:9
**couple** 20:15
27:5 97:25
100:3 108:17
116:8 130:7
137:14 143:22
164:17 175:1
201:23 230:2
230:23 231:1
247:11 250:13
253:13 259:3
264:21 269:12
272:24 291:16
293:3 300:4,9
300:22 308:13
314:1 332:18
386:5 392:18
456:21 458:17
462:20 463:23
464:10 467:23
**couple-year**
408:1
**coupled** 452:24
**course** 19:19
42:2 62:24
106:12 155:14
160:24 166:16
167:5 189:17

205:8 246:9
247:2 259:3
330:16 339:18
397:9 430:1
**court** 1:1 2:17
13:14,19 71:17
112:18 134:9
146:1 156:10
161:2,3 205:15
341:25 407:22
472:15
**courtesy** 39:4
114:10
**cover** 206:22
441:2
**coworkers**
404:6
**Cramer** 222:14
286:1 351:10
351:10,11,12
351:14 427:16
462:22
**crazy** 269:20,23
269:24,25
270:7,15 271:2
**create** 168:23
198:13,13
224:11 250:10
250:14 266:3
**created** 170:20
267:1 287:14
346:9
**creating** 468:22
**credentials**
188:16 288:21
**credible** 224:12
255:7 260:15
260:17 315:13
316:13
**criteria** 93:23
239:9 245:24
246:18 271:18
278:2 307:23
358:24
**criterion** 269:9
292:11 419:2
**critical** 34:19,22

93:21 94:17
96:11 264:22
319:25
**critically** 105:14
**criticisms**
460:23
**criticize** 118:14
460:1 462:9
**critique** 256:24
**crocidolite**
388:4 391:10
457:13 458:11
**CROSS-EXA...**
464:24 467:19
**crossroads**
113:5
**crummy** 343:3,4
**CSR** 471:18
**cubed** 376:1
404:21
**cumulatively**
391:9
**cure** 39:18 40:15
**curious** 257:8
316:22 323:11
**current** 91:19
93:18 97:21
257:22 319:14
**currently** 128:3
128:9,19,24
129:2,5 136:6
137:5 187:3,4
203:2
**curriculum** 7:9
91:3,10,24
92:9 127:10,18
142:24 146:9
364:21 390:9
**curve** 458:19
459:3 465:5,14
465:16 466:2
466:20 467:8
**customers** 79:20
**cut** 61:19 275:16
336:3 337:15
**cutting** 337:11
**CV** 88:17 92:6

Gregory B. Diette, M.D.

92:21,23 93:4
108:13,15
121:4,9,9
126:22 127:4
128:2 142:24
143:9
**CYNTHIA** 4:3
**cytokines**
444:19

**D**

**D** 4:9 5:9 13:1
**D.C** 3:9 4:13
5:12,19
**damage** 444:18
**dampness**
203:17
**Dan** 294:5,6
315:20
**danger** 78:19
79:9 84:23
**Daniel** 5:23 13:4
293:24 294:1,3
312:25
**data** 70:8 236:12
237:13 244:15
245:15 250:18
271:21 272:10
277:18 278:5
278:17,20
279:25 301:7
334:17,18,18
339:14 341:14
341:25 343:1
344:12 368:3
373:14 374:6
381:24 396:2
**databases**
242:16,18
**date** 13:6 22:19
22:20 66:25
68:21 92:6
140:2,16
179:25 394:3
471:15 472:7
474:11
**dated** 11:22,23

21:20 22:11
23:1 68:9
121:9 235:25
308:19 328:6
369:14 438:25
**Daubert** 6:20
7:17 70:24
71:13 133:25
206:15 207:16
207:17
**day** 21:21 39:5
158:2 195:9
264:18,19
275:16 313:19
327:6 404:12
404:16 407:18
427:2 431:11
437:16 474:16
**days** 158:3
472:12
**deal** 106:13
123:22 128:13
128:16 142:25
143:24
**dealing** 106:15
106:16 132:6
134:9
**deals** 48:22
106:19
**dean** 294:7
**death** 34:25 35:2
35:6
**deaths** 36:6,14
**debate** 78:13,15
303:5
**decades** 230:2
230:23 231:1
302:7,25 303:8
303:8
**December** 8:15
**decide** 27:9
161:3,3 332:17
339:13
**decided** 316:14
319:1 352:15
**decision** 333:11
399:16

**decisions** 301:7
303:14 306:2
368:5
**declare** 316:12
**decrements**
371:15
**deemed** 472:15
**defend** 184:17
184:21
**DEFENDANTS**
4:16
**Defendants'**
6:14 17:14
**defending**
132:25
**defense** 60:22
**defer** 254:15,24
255:19 256:14
**define** 73:5
**definitely** 22:10
283:10 378:9
**definition**
262:21 361:6
447:16
**definitive**
221:14
**degree** 94:23
95:6
**degrees** 175:15
**deletions** 91:23
**deliberately**
247:8
**deliberating**
261:14
**deliver** 164:21
**demonstrate**
352:2
**demonstrated**
412:24 422:11
425:11 463:24
464:3
**demonstrates**
282:12 283:8
**demonstrating**
270:20
**demonstrative**

324:16 325:25
**denigrate**
461:20
**DENNIS** 3:19
**dep** 172:7
**department**
11:21 15:9
34:18,20 47:21
56:13,14,14
93:4 94:3
100:20 118:23
118:23,24
119:1 314:12
**Departmental**
7:15
**departure**
271:23
**depended** 402:8
**depending**
403:19 404:25
**depends** 164:24
191:10 196:18
197:18 263:5
318:21,22
321:14 402:23
402:24
**depo** 172:8
**deponent** 13:16
474:1
**depose** 114:25
**deposed** 81:17
**deposing** 472:12
**deposited**
449:15
**deposition** 1:14
2:1 6:10,12,16
7:3,6 8:3 9:3
10:3 11:3 12:3
13:8 14:5,11
14:13 15:11
16:13,18,23,25
17:16 18:3
22:12 26:12,13
27:20 29:1,14
31:16 34:6,11
38:18 45:3
60:7 66:19

81:21,22 82:13
82:14 83:15,17
83:23 84:4
85:2 86:10
88:17 111:16
114:7,9,19,21
133:1,2 137:19
138:8 154:12
156:11 157:25
160:23 165:9
167:24 177:17
231:21 257:20
258:22 296:4,7
296:13 311:8
313:13,15
341:6 439:9
470:18,19
472:2,10,13,14
**depositions**
15:16,21 21:5
38:3 65:11,17
67:20 132:15
133:4 137:16
139:23 165:6
165:12,15
256:11
**derivative**
198:11
**derived** 271:23
**dermal** 266:20
**describe** 24:3
119:23 244:11
**described**
182:24 200:16
209:14 355:21
360:20 456:10
**describing**
196:21 388:23
**description** 74:7
189:24 244:16
**deselect** 244:25
251:22
**deserves** 292:12
**design** 288:12
343:10 358:21
447:3 461:25
**designs** 144:19

267:15 461:20
**desist** 295:21
**destroy** 112:9
 285:10
**detailed** 256:9
 271:16 277:25
**details** 69:16
**detect** 46:22
**detectable**
 283:19
**detected** 39:17
 40:14
**detectible** 284:7
**detection** 47:2
 286:2
**determination**
 396:3
**determinations**
 339:2
**determine**
 191:16 402:17
 405:10 450:20
**determined**
 365:3 389:3
 398:21,22
 402:6 453:17
**determining**
 251:3
**develop** 46:21
 48:6
**developed** 48:23
 375:1
**developing**
 46:25 233:22
 234:14,20
 236:17 237:18
 263:13 372:18
 372:25 374:25
 376:11
**development**
 46:13 417:20
 420:4 444:22
**develops** 47:18
**devoted** 298:16
**diabetes** 107:8
**diagnosed** 39:17
 40:14 60:15

62:3 63:17
115:24 116:7
117:1 118:10
118:21
**diagnosis**
 124:21 423:15
**dial** 106:23
**diaphragm**
 339:10
**diaphragms**
 339:10 359:7
**dictate** 173:4,10
 173:13 363:12
 363:14
**die** 36:22 41:4,9
**diet** 102:21,22
 108:4
**dietary** 102:20
 108:3
**Diette** 1:15 2:1
 6:2,10,12,17
 6:19 7:3,10,13
 7:14,16,21 8:3
 9:3,15 10:3
 11:3 12:3
 13:17,22 14:2
 14:10 16:6,9
 16:12,14,17
 17:19,22,24
 18:22,24 19:19
 20:3 27:12,18
 34:13,23 37:8
 39:14 42:14
 44:20 45:1,2
 45:16 46:20
 52:8,11 54:6
 54:10 55:5
 57:8 58:25
 62:23 63:20
 66:9 67:20
 75:3 82:9 83:8
 87:5 89:9,14
 91:5 95:14
 98:18,24
 100:18 102:2
 115:16 117:22
 123:20 133:6

133:20,23,24
135:16 138:15
138:23 139:11
151:22 156:9
159:7 160:6,10
160:15 161:7
161:17 169:10
170:13 172:17
180:11 182:23
184:3 189:8
192:25 193:8
193:18 204:25
205:2 206:13
206:15 208:2
213:9 215:12
219:5,14
220:10 231:11
235:18 264:9
267:8 273:19
280:16 281:19
286:17 289:22
290:1 297:14
297:18 304:16
308:7 310:11
312:9 320:24
324:17,18
325:4 326:1,20
326:23,24,25
327:1,3,10,24
330:7,10
332:10 338:20
355:20 360:2
366:11 369:3
369:16 377:16
377:19,24
381:15 391:2
393:1 397:1,4
399:13 403:1,2
403:4,14
410:17 411:8
413:23 416:19
422:8 426:23
427:5,8 431:14
437:19 438:24
441:1 442:22
465:1,25
467:21 470:11

470:13,20
474:11
**Diette's** 32:2,6
**difference** 35:4
 207:7 252:9,14
 305:20 322:18
 420:21 429:25
 430:5
**different** 28:2
 51:11 59:16
 60:1 65:13
 73:2 90:6
 91:17 93:15
 94:11 104:8
 118:24 119:1
 121:24 124:1
 143:8,9,16
 148:1 168:13
 170:20 174:12
 176:22 178:16
 200:25 203:19
 205:22 213:20
 217:18 219:25
 220:2 222:23
 224:15 241:6
 250:16 253:3
 258:9 263:2
 266:19 282:5
 291:24 320:1
 323:25 335:2
 336:8 339:9
 340:9 342:12
 342:21,21
 349:15 354:21
 357:21 382:6
 387:10 389:23
 396:12,14,16
 400:9 401:11
 403:7,19
 404:18 412:6
 412:10 423:14
 433:2 436:20
 436:20 451:14
 453:9
**differently**
 177:20 241:3
 451:15

**difficulty** 319:17
**digest** 300:23
**digit** 458:16
**direct** 13:25
 45:12 65:25
 83:9 85:5
 121:3 236:4
 268:17 271:9
 271:10 282:8
 284:15 290:21
 338:1 378:14
 393:19 400:18
 414:10 416:23
 433:5 471:23
**directed** 444:23
**directing** 394:7
**direction** 50:23
**directly** 158:20
 158:25 195:4
 284:4 406:11
 449:15
**disagree** 45:24
 88:3,9 216:14
 217:7,8,15
 219:21 223:4,6
 223:9,10
 233:25 273:19
 274:11 275:24
 276:19,19
 380:18 420:20
 432:2,12
**disagreeing**
 392:1
**disaster** 171:1
**discern** 357:20
**disclose** 135:19
 156:9 166:13
 430:15
**disclosed** 135:19
 135:22 136:4
 137:10 156:10
 203:8
**disclosing**
 187:12
**disconnect** 43:1
 436:10
**discuss** 127:4

173:16 174:10
176:16 260:22
298:10 309:12
309:25 432:9
**discussed**
157:17 176:25
260:24 338:22
453:3
**discussing**
141:11
**discussion**
314:17 338:15
377:15 416:23
440:24 454:21
464:21 467:18
467:25
**discussions**
173:20
**disease** 9:16
10:10 41:4
46:14 90:8
96:9,11 97:15
97:16,17
100:24 101:9
101:10,11
103:5 104:18
104:22 106:20
107:9 122:11
143:1 148:24
263:14,23
372:2,13,16,18
372:20 376:11
383:11,15
388:13 450:6
450:21 451:8
467:5
**diseases** 61:2
101:4 103:3,25
104:20 121:22
122:6,10
123:23 142:3
143:5 150:2,7
367:4 387:12
388:6 415:16
**dish** 252:8
**dismantling**
471:12

**disparities**
103:8
**disparity** 286:22
**dispense** 14:4,10
**displayed** 87:7
**disputable**
433:21
**dispute** 415:7
429:6 434:2,5
454:1,2 467:7
**disputing** 381:2
381:6
**disregard** 287:2
287:11,13,18
321:7
**disrespectful**
219:17
**disseminating**
309:21 434:25
**dissemination**
434:18
**distinct** 245:18
**distinction**
357:18
**distorting**
362:16,18
**distracted**
394:10
**distribute** 49:20
**distributed** 50:2
310:13
**District** 1:1,2
13:14,15
**diverge** 73:12
**diverse** 236:19
**divide** 458:12
**division** 34:21
93:20 310:12
**divorcing** 80:17
**doc** 61:20 63:7
**doc-** 216:1
**doctor** 26:19
35:21 39:6
42:6,21 83:2
83:15 85:16
87:12 97:4
99:18 130:14

133:16 137:9
140:25 141:23
146:25 159:3
166:12 177:2
187:10 190:10
213:12 229:8
237:10 256:4
268:19 270:5
274:8 275:6
282:24 304:4
304:11 305:7
308:10 319:22
326:13 328:2,4
329:13,23
331:21 332:10
335:4,8 337:10
347:4,13
351:16 378:24
381:6 399:12
414:8 416:22
426:6,9 431:2
437:17 438:14
440:11 447:16
448:4 468:4
**doctor's** 27:13
346:11
**document** 1:10
6:15 7:8,11,19
7:22 8:4 9:15
16:18 17:14,25
18:5,13,19
19:4 20:4 32:1
32:14 36:10
37:3 213:14
224:2 225:3
247:21 267:1
274:2 275:5
276:4,22 277:5
282:25 290:24
297:6 300:7
304:12 306:24
308:12 311:19
312:13 326:7
330:17 332:8
341:21 346:9
346:11 347:8
378:21 379:4

380:25 381:4
402:5 430:8
434:4 438:10
438:24 440:5,7
441:23 442:3
**documentable**
282:16
**documentation**
31:24 33:8
**documented**
273:2 336:25
342:2
**documents** 18:2
21:15 34:3
161:22 253:4
260:15,17
449:8 468:23
**doing** 21:4 38:3
38:12 40:3
63:19 83:13
99:13 135:17
153:7 155:6
163:25 187:13
192:15 197:2
275:15 316:6
320:8 321:1
326:22 327:3
342:14 350:2
352:13 376:22
386:25 403:2
405:22 408:2
425:4 428:24
451:11 472:6
**dollars** 408:2
**Don't'** 302:1
**dose** 80:2,4 90:9
125:23 126:6
386:7,8,9,10
386:11,15
391:2 392:9,20
402:2,8,17,19
403:4,6,8,17
404:1,1 405:2
405:17 406:18
421:20,21
457:18 458:11
465:9,15,15,17

466:2
**dose-response**
358:1 458:19
459:3 461:3
462:18,21,25
463:1,2,10,19
464:3 465:5,14
465:16 466:2
466:20 467:8
**doses** 459:15
**dotted** 349:18
350:9
**double** 132:24
**doubled** 215:4
222:5 223:18
**doubt** 96:20
129:20 182:4
291:22 463:22
**dozens** 423:14
**Dr** 8:4 13:16
14:2,10 16:6
16:12,17 17:22
17:24 18:22
19:19 20:3
27:12,18 32:2
32:6 34:13,23
37:8 39:14
42:14 45:1,7
45:16,18 46:20
52:8 54:6,10
55:5 57:8
58:25 62:23
63:20 67:4,14
67:20 69:10
70:18 71:7
75:3 81:7,16
81:22 82:12
83:8,8,15 84:4
87:5,16 88:4
89:9,14 98:18
100:18 102:2
115:16 117:22
123:20 133:6
133:23 135:16
139:11 151:22
156:9 159:7
160:6,10,15

161:7,17
169:10 170:13
172:17 180:11
182:23 184:3
189:8 192:25
193:8,18
204:25 205:2
206:13 215:12
219:5,14
220:10 228:23
229:10 231:11
232:13 233:9
233:19 234:8
234:11 255:21
256:10,11,15
257:4,21,22
258:20 264:9
266:25 273:19
280:16 286:17
290:1 296:4,6
304:16 310:11
314:9,19
317:12,13
318:5 319:16
320:12,12,24
322:11 325:4
326:1,20 327:3
327:10 329:4
330:7,10
332:10 338:20
355:20 360:2
361:2 364:14
377:19,24
381:15 391:2
399:13 403:14
410:17 411:8
421:25 422:8
426:23 427:8
427:15 438:24
441:1 443:17
443:21 444:16
444:17 465:1
465:25 467:21
470:11,13
**drabs** 21:2
**draft** 8:11 265:3
267:6 272:17

273:19,24
274:12
**drafts** 173:21
176:24
**draw** 382:14
465:19
**drawing** 353:16
362:8 382:20
**drawn** 272:14
**dribs** 21:2
**DRINKER** 5:4
**drive** 4:5 368:12
**driving** 201:22
313:22
**Drs** 65:11 68:9
71:18 72:5,15
72:16 428:23
**Drug** 228:1
434:11
**Duces** 6:13,17
**due** 295:15
298:12
**Dulaney** 2:6
13:9
**duly** 13:23 471:6
**dusting** 359:5
**Dusts** 10:24
393:17
**dying** 410:18

———————
**E**
**E** 3:1,1 6:1,8 7:1
7:19 8:1 9:1
10:1 11:1 12:1
13:1,1 294:3
473:2
**e-mail** 164:22
311:6 444:1
**earlier** 46:23
70:5 115:6
179:21 197:20
202:20 259:24
264:21 341:6
377:25 406:13
428:15 432:1
467:25 468:12
469:2,4

**early** 17:12
105:20 242:3
**easier** 164:8
181:24
**Eastern** 13:14
**easy** 24:18 224:5
**Economic** 8:6
231:14 235:23
**economics** 94:25
**edit** 158:5
168:24 181:12
181:13
**editing** 162:16
162:16
**Edition** 8:20
290:2,19
**editor** 319:10
**editorial** 182:25
183:3,6 316:15
469:5
**editorialize**
169:7
**edits** 181:15
**educating**
310:16
**effect** 271:22
272:11,14
278:6 279:25
302:12 352:19
465:9
**effective** 370:8
**effects** 102:18
150:7 362:16
459:17
**effort** 26:16
133:11
**efforts** 182:24
256:10 306:1
**Egli** 285:8
**either** 22:14
46:22 55:14
92:1 161:18
165:15 202:10
248:16 249:19
250:8 254:8
257:21 260:2
306:21 313:19

318:15 332:17
333:2,7 364:4
390:4 412:7
418:15 436:6
441:13 462:10
462:25
**elaborate**
404:13
**elaboration**
211:24
**electrical** 186:20
**electron** 11:17
427:11
**electronic** 165:3
**Elevated** 10:15
**elevates** 263:13
**elevations**
444:19
**Elizabeth**
312:22
**ELMO** 45:14
58:6 83:12
85:23 87:7
102:8 211:2,5
212:9 236:7
271:11 291:20
299:19 328:12
365:9 427:1
430:22 438:2
**else's** 70:14
83:23 324:7
**elucidate** 286:5
**Embryology**
439:6
**employ** 243:24
**employed**
238:10 243:14
461:16
**enable** 370:8
**encompasses**
125:1
**endeavor**
445:12
**endeavored**
32:16
**endeavoring**
24:14

**endometriode**
417:13
**endometrioid**
417:13
**engage** 181:6
187:2 193:18
**engaged** 153:15
153:20 163:18
187:2 195:25
196:3,5 199:1
410:2
**engagements**
136:12
**engages** 194:6
**England** 313:8
316:23
**English** 94:24
94:25
**enormous** 341:1
**ensue** 315:17
**entails** 444:18
**entire** 18:19
80:24 191:11
221:21 246:7
276:21 277:3,5
293:12 343:21
354:16
**entirely** 245:16
283:1 469:18
469:24
**entirety** 265:8
**entities** 56:6
94:11 209:14
253:22 266:7
**entitled** 6:23 7:8
7:12,19 8:16
9:4,15 10:4,23
11:8,12 12:4
45:7 166:16
214:6 281:24
328:9 364:10
427:10
**entity** 33:4
193:17 224:8
224:18 295:13
**entry** 350:22
**environment**

Gregory B. Diette, M.D.

Page 491

8:13 364:13
406:11
**environmental**
94:6 97:15
101:8 103:6
149:21 150:2,7
150:12 152:8
369:11,12,13
**EOC** 414:17,18
**epi** 78:22 94:6
144:13 425:5
454:13
**epidemiologic**
10:7 11:4
155:7 184:22
185:8 190:2
193:21 210:22
238:13 239:1
245:4 262:21
263:6 269:11
270:12,19
382:7 386:17
**epidemiological**
59:25 76:15
143:25 153:16
154:1 155:11
211:15 264:24
381:25 397:16
399:14
**epidemiologist**
34:15 49:8
59:14 229:17
229:20 253:19
288:15 454:15
**epidemiologists**
59:24 60:13
190:4 317:14
462:3
**epidemiology**
8:19 11:11
55:22 77:10,15
80:18 94:3,21
95:3 97:16
100:21 101:9
103:2 131:25
132:7 153:3,7
154:23 212:18

244:15 252:22
265:18 288:19
290:2,18 322:5
381:17 383:19
452:6
**epithelial** 6:24
12:5 45:8,20
46:1 234:20
236:17 442:21
**epithelium**
439:9,10,11
**Epstein** 11:20
**equipment**
186:20
**equivalently**
305:22
**equivocal**
221:18
**era** 319:14
392:22
**errata** 472:4,6,9
472:11 474:8
**error** 329:10
**errors** 306:1
**especially**
102:13,17,21
108:4 239:19
322:23 403:21
**ESQUIRE** 3:4,5
3:12,19 4:3,9
4:17,18 5:3,9
5:16
**essential** 418:25
**establish** 446:14
**established** 32:9
41:20,25
226:23 227:16
374:16 375:4,6
376:18 394:25
404:19
**establishes**
154:18
**esteemed** 317:13
**estimate** 23:7
137:13 316:9
316:10,17
331:17 340:20

346:4,6 347:8
348:14 350:12
374:15 375:3
375:24 386:6
404:20,22
405:2 458:11
459:12 461:1
**estimated** 9:19
45:21 46:1
328:9 331:15
451:18
**estimates** 248:1
380:14 391:12
**et** 9:14 271:17
430:17
**ethnic** 236:20
**etiological**
285:20
**Europe** 387:8
**European** 439:5
**evaluate** 184:21
321:18,24
**evaluated** 64:24
321:25 322:1
**evaluating**
123:2 321:5,17
322:4
**evaluation**
132:6 292:19
**evening** 467:21
**event** 270:17
**eventually**
205:14
**everybody**
57:16 175:13
**evidence** 59:13
59:17 89:18,23
210:22 211:16
212:19 214:25
216:22,25
217:5,11
221:22 222:1
234:12 236:18
237:7 239:16
268:11 273:3
284:19 285:5
287:1 293:13

321:6,17
349:25 357:2,2
359:20 362:14
373:11 375:1
379:9,14,15
380:19 383:21
384:3 411:9
415:3,12,13,14
418:23 421:12
421:13 422:3
424:13 435:4
436:11 439:7,8
441:16,24
442:9 447:24
450:1 462:17
463:3
**exacerbations**
371:7
**exact** 37:1,5
191:24 213:17
361:11
**exactly** 24:25
27:22 49:1
71:21 134:12
154:9 155:13
208:6 296:16
308:24 319:23
360:10 365:25
367:5 382:5
383:16
**examination** 6:2
13:25 394:1
460:2 471:8
**examined** 13:24
**examiner** 27:9
**examining** 8:7
102:20 235:24
**example** 29:16
48:16 60:6
105:19,20
106:14 118:6
122:7 123:15
156:10 157:16
157:19,25
167:21 169:23
170:17 172:17
172:19 181:17

190:25 194:17
194:22 215:24
226:20 238:2
239:15 254:4,6
254:7 263:11
318:25 347:15
357:25 371:6
387:8 449:12
462:23 469:8
**examples** 41:14
**exceed** 350:12
**exceeds** 346:7
**exception**
170:12 247:9
327:20 346:11
**Excerpt** 7:6 8:19
**excess** 352:1
466:23
**excesses** 395:14
**exclude** 313:12
199:18 246:2
**exclusion**
246:17
**excuse** 30:5
42:17 43:15
50:24 96:10
120:15 159:17
172:5 188:9
193:4 213:20
214:7 275:14
277:14 298:11
317:12 369:23
370:1 400:20
440:21 452:15
**executed** 264:10
**exercise** 91:13
216:10 251:2
251:10 268:25
344:1 347:12
359:24 455:15
**exhibit** 16:13,14
16:17 17:18,19
17:23,25 18:14
18:19,24 20:4
21:14 22:3
26:2,2,12 27:1
28:24 29:12

43:6 44:20
45:2 52:3,9,11
52:21,25 54:4
54:7 82:7,8,9
86:6,8,14 91:4
91:4,5 95:10
95:13,14 98:23
98:24 100:9,10
101:20 121:5
132:9 133:18
133:20 134:8
138:16,16,18
138:22,23
139:2 213:4,7
213:9 235:17
235:18 267:7,8
281:19,23
289:20,22
292:5 297:14
297:17,18
298:3,5,22
305:6 308:6,7
308:22,25
309:16 310:19
311:24 312:5,9
324:17,18,24
325:24,24
327:10,19,23
327:24 328:5
351:19 366:11
369:16 377:16
392:25 393:1
393:14 396:25
397:1,4 413:23
416:18,19
427:4,5 431:14
431:18 437:13
437:19,21
442:19,22
465:20,22
468:6
**exhibits** 6:10 7:3
8:3 9:3 10:3
11:3 12:3 70:1
**exist** 337:5
344:7 461:15
**existing** 76:15

372:19 376:12
**exists** 81:3
294:17 344:5
433:5 461:16
**expect** 38:23
225:9 359:4
**expectancy**
119:7
**expecting** 73:1
300:23
**experiencing**
104:1
**expert** 6:19 7:12
7:16,20 21:20
22:10 42:5
51:6 55:17
56:1,22,23
57:3 60:6,12
66:9,10,23
67:14,21 68:8
69:12 71:4,7
75:24 76:12
81:10 108:22
109:17 119:21
120:10 131:4,9
133:24 134:9
135:23 136:15
137:1,5 139:13
139:24,25
140:21 145:25
162:3,22 168:1
168:18 169:17
172:5 173:5
180:16,19,23
181:13 183:14
184:16 185:19
186:4,24
187:19 191:9,9
202:7,25 203:8
205:4,7,16
206:14 208:23
227:25 228:5,6
232:14,21
233:7 256:18
257:9,20
264:10 327:12
364:22 410:7

454:5,16
461:24 468:5,9
469:18,23
**expertise** 52:15
52:19 57:2
78:14 96:6,8
96:16 100:23
191:17 193:19
194:7 229:20
288:8
**experts** 165:15
171:12 206:3
226:5 251:18
255:19 256:10
260:23 343:8
410:12 430:17
460:2
**expires** 474:17
**explain** 274:9,10
318:23 334:13
374:2 385:3
**explore** 25:23
71:11 186:1
**exploring** 301:1
**expose** 215:10
226:13
**exposed** 284:3,4
284:5 285:15
286:3 331:16
340:18 366:20
386:15 389:19
391:8 410:22
428:24 461:2
**exposure** 8:16
10:4,11,20
11:5 46:10,13
46:14 47:4
122:21 148:23
212:21 239:16
263:13 270:10
270:21 271:21
277:22 278:4
281:24 282:16
283:18 284:7
285:12,14
286:4 364:10
365:4,13,16

367:23 371:24
373:20 375:19
378:6 379:11
379:13,18
380:21 383:10
387:21,25
388:5 389:4
392:9 394:23
395:2 397:17
399:15 403:23
404:3 413:9
420:1 424:14
447:25 448:1
450:6 456:23
457:5,21
458:23,24
459:9,11,19
461:1,8,14,15
466:8,19,22
467:4
**exposures** 369:4
391:13 399:14
**express** 88:13
**expressed** 22:5
108:3 209:13
455:4,5
**extends** 379:12
**extensive** 212:17
316:25
**extensively**
370:1
**extent** 31:23
33:7 76:11
77:13 135:17
136:11 137:10
140:24 156:7
166:2 187:11
255:8 326:12
**external** 54:21
64:9
**extra** 92:24
**extract** 339:3
**extracted**
327:19 336:12
351:1
**extraordinary**
462:1

**eyeball** 440:1
**eyes** 54:21
438:15

---

**F**

**F** 5:18
**face** 54:19
161:23 226:6
308:15
**Facebook** 229:2
229:6
**Facsimile** 11:23
**fact** 14:19 15:10
35:11,14 36:5
41:3,23 50:12
72:12 77:16,17
84:14 150:9
171:2,7 198:9
257:2 279:1
333:21 351:25
356:15,21
358:18 364:20
378:20 384:17
388:10 395:21
410:2 415:21
420:21 432:9
435:16
**factor** 126:10,15
214:17 225:15
262:18,23
263:11,16
285:13 318:14
**factors** 7:24
102:12 107:14
125:12,18
145:6 214:6,7
239:20 263:9
263:18 362:17
362:19,22
**factory** 392:17
**facts** 295:24
298:21 299:3
**fail** 472:14
**fair** 14:14,24
18:7 20:18
22:2 34:8
37:13 41:10

48:3 49:2
50:11 55:12
66:20 106:18
107:13,20
119:5 120:8
121:19 124:16
124:20 126:7
126:12,17,25
127:3,8 129:11
132:20 136:25
142:10,14,18
142:22 144:17
150:17 152:3
182:16,25
185:5 191:19
193:19 194:10
197:11 201:25
205:6 207:25
208:8 210:3,7
214:2 215:12
221:18 223:21
231:9 243:23
248:22 257:2
258:19 260:24
268:1 270:4
276:22 295:14
352:7 372:10
381:13,15
382:11,15
390:19,25
399:13 409:12
429:2 430:20
437:2,3,5
438:5 440:12
**fallacious** 291:9
292:20
**falls** 184:9
**false** 218:4,25
**familiar** 191:11
231:6 265:4
301:21 390:5
390:23 459:7
**familiarize**
299:23,25
**family** 118:15
**far** 37:2 58:13
58:16 92:5

96:5 112:11
208:11 270:12
394:8 408:13
**faster** 463:7
**father** 403:24
**fax** 444:1
**FDA** 64:10
431:23 433:12
434:24 435:10
452:22
**FDA's** 433:25
**fear** 301:8 368:2
**feature** 323:6
**features** 286:12
288:12
**February** 21:13
21:16 22:6
140:17 208:4
264:11 369:14
**federal** 134:8
146:1 160:20
166:6
**feedback** 143:8
**feel** 73:14
221:17 320:9
321:1 336:2
356:12
**fees** 37:24
**feet** 339:11
**female** 36:7,15
284:20 285:6
**females** 365:19
365:21,22
**Ferrante** 399:3
399:8
**Fessler** 153:9
**fiber** 8:17 73:23
74:5 90:5,13
90:19 281:24
458:5,6,8
**fiber/cc** 391:9
457:13 458:10
458:16,18
**fibers** 72:17,22
73:5 126:20
127:6 401:9
457:5,21 458:7

**fibres** 10:24
393:16 401:3,4
**fibrous** 399:22
400:13,16
**field** 70:14 467:2
467:2
**fields** 467:3
**fifth** 34:24 35:5
36:2
**figure** 40:6
138:13 141:2
158:2 189:20
190:3 200:24
240:8 348:1
385:3 443:10
443:16
**figured** 313:23
378:11
**file** 146:1 180:13
393:10
**filed** 132:10
133:17
**files** 441:23
**filtered** 250:13
**Finch** 4:9 6:4
188:7,13
464:25 465:2
465:21,24
466:9,16 467:6
**find** 7:12 72:16
85:6 86:11
92:17 97:2
108:19 135:6
164:8 191:13
238:18,23
240:15 245:3,7
245:10 306:10
309:14 316:12
320:16 334:24
342:9 344:6
347:20 371:10
375:3 376:5
386:16 405:25
435:9 437:6,10
446:2 448:14
448:23 451:9
462:4

**finding** 163:25
277:2 285:15
353:5 362:23
419:24 425:10
425:11 449:19
**findings** 247:14
287:16 334:23
358:3 387:14
408:13 421:19
454:21 462:22
**fine** 14:3 38:20
45:23 53:15,15
53:19 68:6,6
68:22 74:10
122:17 151:14
156:21 166:10
204:18 215:20
215:22 218:19
291:23,25
292:3 300:14
312:18 338:8
346:25 355:8
374:11 377:7,8
400:5 428:2
440:15,15
**finish** 25:2 48:11
61:13,19 62:10
62:23 113:11
130:11,12,16
146:24 189:21
210:17 237:18
244:12 258:15
264:13 268:19
275:13,17
276:13 283:4
303:1 330:25
335:5,16
351:20 380:11
386:19,20
421:14 460:19
466:11
**finished** 28:5
146:25 227:10
227:10,14
358:9
**finishing** 235:1
258:14

**firm** 158:19,22
159:1 161:18
173:3 206:21
**firms** 192:9
**first** 13:23 19:4
20:4 21:14
28:10 55:12,13
55:21,24 62:10
137:19 152:17
184:15 185:6
189:25 198:11
200:14 211:8
212:5,13,14,15
215:1 216:19
234:16 241:24
242:3 274:5
275:9 278:13
278:14 290:9
298:9 300:24
302:3,10
321:13 366:24
369:21 397:22
414:20 428:5
444:15 463:15
**fit** 146:18
333:15 343:20
**fits** 333:16,17
381:9
**five** 52:5 117:21
349:21 350:7,9
376:25 392:16
394:25
**flashed** 188:13
**flat** 462:25
**flaws** 279:20
**flip** 76:6
**flipped** 67:9
**flipping** 297:3
**FLOM** 5:10
**Florida** 3:16
**flowed** 270:20
**fluid** 406:2
**FLW** 1:5
**fly** 311:3
**focus** 107:18
149:12 201:22
202:2,4 205:2

356:15 379:6
**focused** 358:13
**focuses** 102:11
117:14
**Focusing** 247:15
**folks** 175:18
176:12 177:6
194:8,9 228:17
421:16 469:5
**follow** 42:9
62:11,24 85:15
85:16 270:3
**followed** 146:2
**following** 25:21
146:11 416:7
**follows** 13:24
**font** 394:13
**Food** 228:1
434:11
**footnotes** 171:11
171:15 172:1,4
**Ford** 293:24
294:1,3,5,6
**foregoing** 471:4
471:20 474:3
**foreign** 417:17
**forest** 327:13
348:10,12
**forever** 112:8
183:25
**form** 15:18 18:4
20:22 21:17
22:7 23:19
35:25 36:24
38:4 39:9,19
41:15 42:19
43:20 47:6,22
49:5,21 50:25
51:19 54:14,25
55:8,16 56:2
56:19 58:14
59:12 60:4
62:4 63:24
65:12 67:15
68:11,14 69:14
69:20 72:8,19
73:7 74:2 75:8

82:1 88:5 90:1
90:15 96:17
97:22 103:18
104:2 105:10
106:6 107:16
108:8,23 109:4
111:11 112:5
114:4,9 115:25
117:20 118:25
119:9 120:17
123:25 124:23
127:13 128:21
129:9,18 130:2
130:25 131:5
131:11 134:21
135:3 140:23
141:13 143:6
143:20 144:20
145:7,16 147:8
147:18,23
148:18,25
149:15,23
150:21 151:6
152:11 155:1
158:14 159:13
159:23 160:12
166:3 168:19
169:20 170:15
171:16 172:11
174:6 175:5,12
176:2 178:12
179:8,17
180:25 181:9
182:18 183:1,7
184:18 186:10
187:20 188:5
188:11 190:22
192:4,10,17
193:20 194:1
195:5 197:13
198:7,21 199:3
201:12 202:9
205:10,17
206:10,19
207:18 208:20
209:3,9,20
215:16 218:6

219:11 220:17
221:19 222:8
222:25 223:7
223:24 225:2
225:17 226:2
228:8,13
230:19 231:3
231:19 232:3
233:1,12 235:5
236:25 243:16
244:2 245:25
246:10 247:24
248:7,17,23
249:11,24
250:6 254:17
255:22 258:4
260:10,25
262:19 263:20
265:20 267:19
268:2,12 271:7
272:16 273:25
274:17 275:4
276:3 278:11
281:8,15
282:21 286:10
287:6,25 289:2
291:13 295:23
298:20 299:12
301:18 304:3
306:6 307:1,7
314:25 318:13
321:10,21
322:9,21 331:4
333:19 334:10
334:20 339:4
339:17,25
340:6 343:18
345:22 352:3
352:10 353:11
354:4 356:25
357:13 358:21
360:13 361:24
362:10,25
363:13 367:8
368:19 371:19
372:1,5,14
373:3,17,22

374:9 375:14
375:20 376:16
380:4 381:20
382:2 384:9,22
384:25 385:15
390:20 391:4
391:19,24
396:8 399:23
400:14 401:10
402:10,18
405:12 406:21
407:10 408:4
408:23 409:13
410:8 411:1,13
412:19 413:14
417:25 418:19
421:6 422:25
423:11 428:18
430:7 433:13
438:12 443:18
445:4 446:5,22
450:9,22
451:10 452:1
457:1,7 458:21
459:4 462:10
463:20 464:7
466:4,25
467:12 474:7
**formal** 15:24
**format** 93:4
97:8 168:24
176:23 184:1
408:20 468:20
**formatting**
469:14
**formed** 242:25
247:23 253:16
345:20 392:6
399:15
**forms** 31:12
73:22 387:10
**formula** 439:12
**Forrest** 197:2,7
198:6,9
**forth** 21:6 39:9
131:25 145:14
205:15 239:17

239:23 243:12
243:24 269:13
270:24 288:13
317:12 324:3
460:9 471:5
**fortunately**
227:6
**forward** 161:7
320:3
**forward-looki...**
301:10
**found** 72:5,11
72:12 89:15
182:13 213:20
215:4,5 222:4
222:6,18
223:16,17,18
242:14 244:23
253:13 266:17
273:20 274:12
280:24,24
281:5,13
302:12 311:20
314:1,3 357:8
358:2 401:3
419:21 424:12
425:10,20
463:10,10,12
**foundation**
60:18 75:10
210:12 215:17
229:23 232:18
233:4 234:3
235:8 250:22
272:17 289:4,8
290:24 291:14
292:2,5 295:24
299:3 301:19
310:20 319:20
409:14 430:8
432:15 438:12
440:16 442:2
443:19
**four** 22:18 40:8
349:20 350:6,7
**fourth** 369:23
**Fox** 398:6

**fragrance** 55:3 385:14
**framed** 235:12
**framework** 145:15,20 146:3,12
**Francis** 8:22
**frankly** 26:15 257:20
**fraudulent** 287:14
**free** 73:14 336:2 356:12
**frequently** 15:16,20 282:15
**friend** 228:25 294:10
**friendly** 294:11
**friends** 229:2,3 229:4
**front** 34:4 85:21 87:1,12 91:8 95:17 99:21,24 101:22 121:6 135:2 165:1 169:18 206:13 208:2 210:1 227:7 247:17 267:12 277:16 282:3 290:5 304:13 324:13 352:14 355:17 366:14 369:19 393:15 410:10 414:7 443:6
**fruitful** 445:12
**full** 82:14 162:7 182:6 236:8 243:8 252:19 309:15 371:20 469:3
**fully** 41:20 375:1,4,6
**function** 372:20
**fundamental** 205:21

**funded** 294:23 311:2
**funding** 148:6 148:10,12,15 294:18
**funds** 148:9
**further** 77:25 140:4 271:21 272:10 278:5 278:17,20 279:24 286:4,5 470:11
**fuss** 340:20
**future** 444:24

---

## G

**G** 13:1
**gamut** 107:11
**GARBER** 4:3
**Gates** 351:12
**gathered** 164:16
**gathering** 468:19
**gears** 280:9
**GEIER** 3:19
**general** 6:20 7:17 10:22 40:17 71:24 79:7 105:2 107:6 133:25 141:25 147:17 200:17 203:10 206:15,24,25 207:13,20,20 211:25,25 212:25 223:3,8 226:22 227:15 243:4 244:22 363:11 364:4 378:5,7 379:24 389:6 411:3 447:23 456:1
**General's** 379:8 380:19 393:4
**generally** 48:9 64:19 67:10 77:8 109:19

142:2 146:17 182:24 207:3 213:15 235:13 237:3 238:12 253:21 260:14 262:23 263:1 384:24 435:11 435:15
**generating** 468:25
**generic** 75:4
**generous** 342:25
**genital** 51:17 59:3 75:7 80:15,15 214:24 216:21 217:10 218:3 219:8 220:12 221:6 233:23 236:15 237:16 272:14 273:22 274:14 276:1 279:2 329:1,5 330:11,24 331:2,14 332:19,20 333:22 334:18 339:10,23 344:25 347:6
**genitals** 333:24
**genotoxic** 458:20 465:5 466:1,18,23 467:8
**gentlemen** 15:25
**geologist** 120:6
**GEREL** 3:6
**getting** 24:7 32:10 47:3 70:16 113:5 114:11 130:6 175:19 177:4 182:23 199:23 202:11 316:18 319:4 366:6 374:8 407:17 420:16 450:3

**give** 15:16,20 23:8 29:15 37:24 92:24 114:11 122:16 137:25 140:13 152:1 162:7 164:13 193:6 202:19 204:10 216:6 218:8 232:1 234:4 256:4 282:22 321:8 324:22 330:14 347:14 355:15,15 363:6 397:11 399:21 400:12 401:7 407:6 430:23 431:5,6 438:3,16,22
**given** 137:16,20 138:7 139:18 255:21 409:3 474:5
**gives** 295:11 343:21
**giving** 14:23 56:17 78:2 105:20 207:10 234:3 283:18 284:7 286:3 407:21
**glad** 37:4 169:25 197:9
**glean** 253:14
**globally** 215:18
**go** 16:6 19:7 23:22 24:17 25:22 26:20,21 39:5,8 40:5 44:13 45:18 48:3 58:6 63:1 76:7 85:19,19 85:25 86:23 97:2 98:4 101:24 105:23 140:4 160:15 162:8,9 192:22

195:3,4 203:21 209:23 212:8 213:8 216:2 218:14,19 225:19 236:8 244:24 266:14 270:5 275:6,11 275:11 292:9 297:12 304:11 306:9 313:16 324:5 328:1,2 328:14 333:9 334:19 335:24 338:6,7,8 341:10 351:22 353:22,23 355:2,11,13 360:18 365:18 392:19 395:5,9 396:18 397:5 399:2 400:19 419:20 427:3 431:19 432:21 440:9 447:8 463:5 464:11 464:17
**go-to** 180:22
**goal** 21:24 251:21 343:4 344:6
**God-given** 15:25
**Godard** 351:11
**Godleski** 427:16 428:23
**goes** 85:8 117:2 158:18,19,25 159:1 179:24 223:23 226:11 244:21 258:13 258:19 284:18 285:19 291:24 302:10 438:6
**going** 14:21 19:11 26:21 27:8,10,12 28:6,22 31:22

Gregory B. Diette, M.D.

| | | | | |
|---|---|---|---|---|
| 32:18 33:6,14 | 355:5 359:24 | **gotten** 20:25 | **groups** 236:20 | 10:1 11:1 12:1 |
| 33:17 34:1 | 371:10 377:10 | 21:9 133:14,15 | **guess** 26:25 49:8 | **habit** 73:24 74:3 |
| 37:23 38:8 | 388:12 397:10 | 167:22 | 55:20 72:20 | **habitual** 214:23 |
| 39:3 44:1,3,16 | 425:24 426:17 | **governed** 156:8 | 105:8 132:9 | 216:20 217:9 |
| 47:12 58:6 | 426:24 427:25 | **government** | 147:25 152:12 | 217:24 218:2 |
| 64:13 77:24 | 430:22,23 | 35:13 | 152:19 158:21 | 219:7,22 |
| 78:2 82:12 | 431:1,6,6 | **grab** 204:16 | 159:4 197:18 | 220:11 221:5 |
| 83:4,14 85:24 | 435:20 438:1 | **gradient** 362:12 | 205:23 211:4 | **hair** 404:25 |
| 86:5,7,8,20 | 438:11,22,22 | **grading** 392:4 | 246:12 264:20 | 406:3 |
| 89:4 92:20 | 439:18 440:13 | **grant** 92:3 148:6 | 267:1 279:21 | **half** 204:15 |
| 93:17 96:2 | 447:11 456:15 | 311:2 316:8,18 | 283:9 331:11 | 377:3 |
| 99:11 112:21 | 464:13,20 | **grants** 148:10 | 349:19 350:6 | **halfway** 45:17 |
| 112:21,22,22 | 469:20 470:17 | 148:12,15 | 352:17 359:10 | **hall** 315:20 |
| 112:24,25 | **Golkow** 13:5 | 320:4 | 359:12 360:3 | **hand** 324:21 |
| 113:18,24 | **good** 14:2,3,4 | **graph** 326:2,4,4 | 405:14 407:1 | 439:23 |
| 114:17 115:10 | 15:23 16:11 | 443:8 | 409:15 423:16 | **handed** 85:5 |
| 132:22 135:16 | 17:11 19:15 | **great** 140:12 | 444:10 448:10 | 86:14 134:7 |
| 136:10,12 | 22:16 28:15 | 163:12 226:17 | 449:10 455:25 | 328:4 |
| 151:17 154:5 | 39:12 58:24 | 333:7 334:1,3 | **guessing** 288:17 | **handwritten** |
| 154:12 156:6 | 65:16 68:17 | 343:24 | **guidance** 33:20 | 334:24 |
| 158:22,23 | 88:20 89:12 | **greater** 321:8 | 363:6 | **hang** 216:6 |
| 162:14 166:1 | 100:4 124:14 | 349:10 389:6 | **guided** 146:11 | 294:11 |
| 167:19 173:18 | 130:10 139:9 | **Green** 351:11 | **guideline** 362:8 | **Hank** 153:9 |
| 182:13 193:6 | 151:9 152:4 | **Greenland** 8:20 | **guideposts** | **haphazard** |
| 195:22,22 | 170:1 171:7 | 9:5 288:22 | 457:12 | 463:1 |
| 199:24 204:8 | 174:17 204:5 | 289:1 290:12 | **guts** 360:11 | **happen** 54:23 |
| 204:20 206:1 | 204:25 205:1 | 297:22 317:13 | **guys** 21:4 185:2 | 93:17 181:19 |
| 212:25 215:25 | 223:10 227:8,8 | 318:1,5 320:12 | 226:25 306:18 | 319:6 |
| 216:1,1,3,13 | 227:8,8 230:18 | **Greg** 403:1,2,3 | 313:21 377:3 | **happened** 22:13 |
| 218:21 219:9 | 231:2 240:10 | **Gregory** 1:15 | 397:10 413:25 | 316:21 |
| 221:11 226:25 | 241:11 252:3 | 2:1 6:2,12,17 | 430:21 431:10 | **happens** 27:16 |
| 227:1 234:4 | 258:18 272:23 | 6:19 7:9,13,14 | 440:18 | 104:12 164:23 |
| 245:22 246:18 | 277:5 280:6 | 7:16,20 9:15 | **GYN** 60:20,21 | 194:16 459:15 |
| 256:23 280:8 | 323:2 327:6 | 13:16,22 16:2 | 60:25 61:6 | 459:17 |
| 290:23 294:22 | 343:10 364:20 | 16:8 66:8 | 63:14 107:10 | **happy** 39:11 |
| 299:22 304:14 | 377:21 391:12 | 100:18 133:24 | **gynecological** | 114:2 319:3 |
| 306:12 310:8 | 392:22 426:14 | 206:14 208:2 | 62:2 105:9 | 334:11 344:17 |
| 311:14,15 | 427:1 431:25 | 470:20 474:11 | 106:2 115:23 | 346:21 373:25 |
| 315:13,16 | 465:1 467:21 | **ground** 320:8,25 | 116:6,24 | **hard** 53:7 |
| 316:15,19 | **goodness** 343:17 | **group** 8:22 | 117:18 118:9 | 144:24 165:1 |
| 317:4,9 318:23 | **Google** 242:17 | 152:22 190:1 | **gynecologist** | 182:5 202:19 |
| 319:5,8,17 | 242:20,21,21 | 238:25 261:10 | 115:20 | 260:11 289:14 |
| 320:2,19 326:6 | 244:18 | 261:13 309:21 | **Gynecology** | 301:6 328:13 |
| 335:23 338:5 | **gosh** 342:8 | 310:14 394:9 | 239:5 | 348:1 358:24 |
| 338:14 342:20 | 374:12 375:15 | 394:20,22 | | 358:24 433:22 |
| 342:21 347:25 | **GOTSHAL** | 395:10 396:2 | **H** | 442:16 446:14 |
| 352:20 353:1 | 4:19 | 398:20 402:5,6 | **H** 6:8 7:1 8:1 9:1 | **Harlow** 285:21 |

348:2,7,8
351:10,10
**Hartge** 327:22
328:6,18 329:1
329:4 330:21
332:14 333:17
333:18 335:24
336:11 338:23
339:8,21 344:3
344:4 346:12
347:5 350:6,17
351:3
**Hartge's** 351:15
**Harvard** 215:3
222:4,12
223:17
**Hashtag** 100:22
**hazard** 271:24
273:12
**he'll** 218:18
390:2
**head** 107:11
154:14 197:10
240:10 241:11
370:14
**head-to-toe**
105:4
**headed** 8:4
**heading** 359:1
**headings** 171:2
174:18
**health** 8:8,14
10:19 11:21
46:21,25 47:18
47:20 48:6,15
48:23,25 94:7
95:2,6 100:22
101:21 102:1
103:7 107:14
231:15 235:24
260:18 264:21
265:17 266:5
266:11 267:6
267:14 268:10
272:13 273:20
274:12 275:24
278:10,25

367:15 369:24
370:3 378:6
409:3,10,20,23
432:2,8
**healthcare**
144:9 462:3
**hear** 15:14
115:6,8 220:7
260:6 307:22
321:12 348:24
466:14
**heard** 116:9
154:4 202:20
227:4 258:3
294:22 307:15
330:6 354:21
389:16 406:25
409:20 410:15
**hearing** 6:21
7:18 8:7 70:24
71:13 133:25
202:11 206:16
207:17 231:14
232:11 233:20
236:6 332:11
**heart** 107:9
**HEASLIP** 4:18
85:12 464:17
**heavy** 387:21,24
395:1
**heck** 360:16
**held** 2:1 13:8
338:15 377:15
440:24 464:21
467:18
**Heller** 273:2,5
280:17,18
281:23 282:6
428:14
**help** 27:4 122:2
133:11 157:24
158:1,5 162:15
168:18 172:19
175:3 176:1
180:7,15,23
185:19 186:3
186:23 193:12

193:25 197:9
301:10 410:11
410:11
**helped** 20:12,16
91:18 168:23
169:11,12
170:24 311:2
**helpful** 164:7,9
303:13
**helping** 468:20
**helps** 155:9
172:19 340:23
**Henderson**
285:9
**hey** 112:20,20
431:10,10,10
**Hi** 467:22
**high** 41:8,8
269:17 289:21
380:15 406:2
**higher** 155:25
215:9 226:13
226:22 282:15
347:10 354:3
367:21
**highlight** 70:10
**highlighted** 31:4
70:5
**highlights** 30:18
30:23 69:22,24
**highly** 36:2,3,16
37:20 256:13
**Hill** 145:6,10,15
145:23 146:2
146:11,19,20
147:5,14
239:11,21,24
268:11,15,23
269:9,16
270:14 271:1,4
271:18 278:1
358:24 362:22
419:8
**Hill's** 447:22
**hired** 224:11
**histologic** 422:2
**histology** 417:13

**historic** 391:13
**history** 282:16
283:19 284:7
285:16 286:4
**hold** 24:10,10
28:21 44:2
98:5 120:9
144:1 236:19
314:9 323:9
366:6 438:19
438:23 439:17
439:24
**holds** 100:20
**holler** 88:24
**Holmstock** 5:23
13:4
**home** 30:11
404:13,22
456:25
**homes** 102:17
**honestly** 55:19
73:18 88:9
96:19 133:1
230:3,21 429:3
**hope** 38:6
113:20,20
198:22 205:18
207:8 352:19
434:22 446:18
**hopefully** 205:4
**hoping** 133:16
314:21
**Hopkins** 7:11
9:7 15:6 34:19
48:7 93:19
95:9,21,24
96:21 98:4
100:8,19,21
104:9,25
118:20 205:9
208:9,14,19
209:1,17
213:21 223:14
224:6,7,22
225:10 230:2
294:7 308:15
309:20 310:2

310:13 312:2
313:7,8,9,10
313:24 314:2
**Hopkins'** 309:13
**hospital** 9:17
96:1,3 117:4
224:17 325:12
345:5,5,17
**hospital-based**
356:8,15,21
357:3 358:14
359:14 360:8
**hospitals** 345:12
**Hotel** 2:5 13:9
15:2
**hour** 23:14,24
24:19 177:18
177:22 204:16
377:2
**hourly** 23:10
24:2,6,21
178:20
**hours** 23:4,8,8
25:17 257:13
257:13 376:25
467:13
**house** 231:12
404:16
**household** 10:14
284:5 369:4,8
**huge** 387:20
**human** 10:25
11:21 285:7
439:4,5 448:14
448:22
**humans** 449:13
**humongous**
379:2
**hundred** 14:13
14:15 155:22
155:23 301:22
344:15 453:23
458:13
**hung** 199:24
**hurry** 463:6
**Hutfish** 4:20
**hybrid** 291:15

hygienist 120:1
hypothesis
    89:19,23
    315:11 316:11
    420:1,10 439:8
    441:17,25
hypothetical
    78:21 79:3,22
    80:18 234:4
    235:7 383:7
hysterectomy
    285:16

**I**
IARC 10:23
    41:21 239:3
    241:11 252:18
    253:12 259:2,5
    259:6 260:4,8
    260:18,21
    261:8,12,21
    262:16 387:3,5
    387:5 391:16
    391:22 392:6
    392:12,12,14
    393:17 396:2
    397:15 398:20
    399:16 400:19
    400:20,25
    402:4 412:4
    457:16
IARC's 392:7
    399:16
ICTR 310:25
ICTRs 294:22
ICU 105:22
    143:13
idea 194:25
    230:3 284:12
    317:15 323:5
    336:4 382:20
    429:3
ideal 332:18
    333:1 340:21
    344:19 394:18
ideas 301:5
identical 213:22

346:10
identification
    16:15 17:20
    18:25 44:21
    52:12 82:10
    91:6 95:15
    98:25 133:21
    138:24 213:10
    235:19 267:9
    281:20 289:23
    297:15,19
    308:8 312:10
    324:19 327:25
    366:12 369:17
    377:17 393:2
    397:2 413:24
    416:20 427:6
    431:15 437:20
    442:23
identified 36:21
    134:6 241:12
identify 238:12
    246:16 247:22
    350:11 353:22
    354:2 438:4
identifying
    102:11 172:22
ignore 246:18
    322:13
II 226:19 392:22
iii 276:15
ill 105:14
illness 117:8
    319:25
illnesses 104:15
    370:22
imaginable
    117:8
imagine 104:12
    352:12,14
    383:24
Imerys 109:25
    110:5 442:2
impact 150:6
    342:24 383:19
    384:19 385:22
impacted

405:11
impacts 84:7
    97:15 101:9
    149:21 150:2
    150:13
impenetrable
    181:22
imperative
    46:21 369:24
    370:3 472:10
implemented
    367:15
implementing
    292:11 368:1
implicated
    285:20
implication
    160:10 405:18
implications
    363:8
implied 405:24
importance
    303:25 304:22
important 41:7
    53:17 254:6
    293:11 315:4
    323:16 342:10
    342:13 360:15
    387:20 403:4,9
    419:2 451:17
    451:19
impossible
    85:15 90:16
impressed
    185:22,25
    218:18
improper 83:22
    193:5 455:21
    456:17
imprudent
    79:18 80:12
    87:18
inappropriate
    160:17 161:1,5
incessant 115:14
incidence 46:22
    389:19

include 47:2
    100:23 101:6,8
    107:2,5 120:14
    120:15,20
    122:7 123:5,7
    133:12 146:17
    245:17 247:1,8
    247:9 251:3,21
    252:25 339:15
    355:1 363:21
    388:17
included 43:23
    146:5 225:14
    245:2,9,9
    246:20 249:3
    251:12 264:23
    268:4 336:19
includes 95:25
    101:3 107:22
    305:23 332:21
    354:12,20,23
    355:4 401:4
including
    102:16 237:23
    252:6 310:14
    349:24 467:5
inclusion 217:4
    245:24
inclusive 251:7
    251:9,9
incomplete 46:7
    78:21 79:2,21
    97:24 98:21
    235:7 383:6
    414:21
inconsistencies
    359:6
inconsistency
    286:22 287:1
    356:19 358:2
    358:20,21
    359:9 360:1
inconsistent
    291:6 292:14
    293:9 355:23
    356:1,14,16
    357:9,24 360:5

360:6 463:12
incorrect 121:12
    155:2 179:16
increase 102:22
    108:5 214:24
    216:21 217:2,3
    217:10 218:3
    219:8,24 220:1
    220:12 221:6,9
    221:9,10,14,15
    221:16 237:21
    371:6 379:17
    380:20 402:1
    417:15 420:3
increased 215:5
    222:6,18
    223:19 233:22
    234:14 236:16
    237:17 384:19
    389:5 413:11
    414:17 422:23
    423:9
increment 371:7
increments
    371:14
independent
    153:21 154:8
    154:16 155:15
    251:2
indicated
    165:17 254:14
    315:4 398:22
    403:4
indicates 19:5
    379:14,15
    380:20
indicating
    465:17
indicative
    271:22 272:10
    277:19 278:5
    278:17,21
    279:25
indicator 323:24
    403:25 404:2
    406:8
indisputable

433:9,17 435:3
**individual**
193:17 244:19
**individuals** 47:4
47:19 60:14
75:6 106:20
215:14 232:15
284:10 309:23
409:4
**indoor** 368:25
369:25 370:4
370:18,25
371:17,24
372:12,23
373:15,21
374:7,17,23
375:19 376:10
**induce** 420:2,10
**induces** 423:19
**industrial**
119:25 387:21
387:25
**industry** 232:11
**infected** 383:2
**infer** 283:13
379:10
**inference**
298:17 362:8
**inflammation**
12:5 102:19
126:3 241:18
241:20 413:8
418:6 420:3,9
420:24 421:4
422:3,5,12,23
423:9,14,17,20
424:14 425:21
439:10 442:21
443:11 444:18
444:21
**inflammatory**
107:9 417:19
420:1,23
432:11
**inform** 71:23
363:15 407:24
408:12 409:10

440:4
**information**
9:12 16:24
22:17 47:3
56:18 57:12
59:25 71:6
75:16 91:16
98:17,19 102:1
162:21 164:22
165:24 166:17
167:1,2 172:1
172:2,10
175:23 224:25
225:7,15 237:6
237:22 238:1,5
239:6 248:21
249:2 253:14
253:22 266:12
266:17 272:22
279:20 322:12
336:20 339:9
341:2 342:6
343:21 344:18
357:15 363:5
386:2 392:8
434:8,18,25
441:11 445:21
451:2,2,3,4
456:11 457:10
457:17 460:17
**informative**
456:14
**informed** 30:8
30:10 59:2
**informing**
251:17
**informs** 270:13
**ingested** 266:21
**Ingham** 26:12
26:13 27:19,25
29:13 55:9
133:12 138:1,4
138:7 141:4,7
197:1,7,12
199:18
**Ingredients** 55:3
**inhalable**

102:23 108:6
**inhalation** 54:19
57:4,22 201:13
413:10 414:15
415:4,8,10,11
**inhale** 142:4
405:7,16
**inhaled** 266:22
405:19 406:1
415:15,22
457:5,22
**initial** 279:16
**initially** 250:12
**initials** 216:3
**initiates** 439:10
**inner** 48:18
102:17
**Inner-City**
10:17
**innovative**
301:9
**inpatient** 105:14
**input** 183:17
198:1 272:22
**inputs** 368:10
**inquired** 232:5
**inquiry** 31:16
**insert** 182:2
**insignificant**
287:19
**insist** 183:16
**instance** 194:6
264:1
**instigate** 417:18
418:6
**Institute** 9:7
294:13 308:16
313:9
**institution** 225:1
**instruct** 135:17
136:12 173:19
176:15,19
**instructing**
156:19 166:5
177:9 218:11
**instruction**
166:11 167:4

**INSTRUCTI...**
472:1
**intellectual**
183:17
**intelligent**
329:24
**intend** 399:21
400:12 401:7
408:15,18,21
**intending**
401:20
**intensive** 63:6
104:10 105:8
105:11,13
**intent** 198:23
**intention** 92:22
408:16
**intentionally**
274:2 330:4
332:7 420:14
**interest** 107:21
108:3 196:15
196:23 200:3
314:23 315:1,3
322:14 349:4
374:5
**interested**
102:13 108:1
150:10 153:6
155:6 163:19
185:8 195:10
332:11 342:9
448:2
**interesting**
150:3 311:17
313:18,20
315:18 347:21
**interests** 97:14
97:21 101:8,15
103:2,12 143:1
**interfaced**
174:21
**interject** 31:23
166:2
**internal** 34:21
64:9 94:18
105:2 107:7

**International**
10:8 45:9
364:12
**internist** 118:16
**interpret** 77:18
287:16 373:25
386:22 454:20
**interpreted**
239:6 323:16
**interpreting**
198:2 318:16
**interrupt** 39:1
243:17
**interruption**
251:24
**intersection**
465:10
**intersects**
458:20 459:3
466:2,20 467:9
**interstitial**
122:9,11
**interval** 305:23
328:19 329:7
330:12 353:10
354:3,10,11,16
355:3
**intervals** 317:2
327:18 353:8
357:9
**intervention**
370:8
**intraperitoneal**
285:14
**introduce** 15:24
**introduced**
152:17
**introduction**
413:17 454:20
**invent** 344:9
**inverse** 463:11
**investigating**
234:9
**investigation**
294:7
**invite** 261:5,5,12
261:21

232:15 261:7
**invites** 260:22
**invoice** 23:1,5
24:20 34:5
158:24 161:14
161:24
**invoices** 22:18
22:21,25 40:4
40:8 158:4,13
179:2,12
468:25
**involuntary**
10:20 378:6
393:8
**involve** 33:8
157:17
**involved** 60:20
67:18 128:3,6
128:9 144:23
147:16 152:9
152:12 163:13
194:21 200:21
209:12 230:8,9
240:6 248:12
319:24 428:15
**involving**
199:11 254:16
365:12
**IOM** 394:2
**irregularities**
256:12
**issue** 9:10 41:19
47:20 79:7
81:4 129:25
135:18 142:11
142:16,20
150:19 166:8
199:2 225:4
241:10 246:23
251:23 261:14
294:18 298:16
299:5 301:2,8
308:18 309:3,9
337:8 359:2
387:15 391:16
394:14 448:7
449:1 467:10

**issue's** 309:9
**issued** 264:22
295:18
**issues** 25:1 57:4
134:10 145:22
254:16 256:22
257:17 462:12
**item** 66:9 67:19
150:25
**items** 20:19 22:3
22:4
**iterative** 91:13
238:19
**Iturralde**
285:10

---

**J**

**J&J** 19:16 157:3
159:16 184:15
184:25 185:1,2
210:9 441:22
**J&J's** 27:7
**JAMA** 328:6
**Jersey** 1:2 3:22
4:21 13:15
**JESSICA** 5:9
**JJCI** 53:17
**JNJ** 8:18 9:22
**job** 55:20 93:15
93:15 132:21
191:18
**jobs** 215:9
226:13
**Johns** 7:11 9:7
15:6 34:19
48:7 93:19
95:9,20,24
98:4 100:8,19
100:21 118:20
205:9 208:9,14
208:19,25
209:17 213:21
223:13 224:6,7
224:22 225:9
294:7 308:15
309:13,20
310:1 313:10

**Johnson** 1:4,4
4:16,16 13:11
13:11 49:17,18
49:19 50:1,1
50:12,13,19
51:6,6,7,15
53:4,12,25
55:6,6,14,14
55:17,18,25,25
56:5,6,13,13
57:10,10,20,20
63:22,22 64:4
64:4,23,24
65:3,3 69:11
72:17 74:11,11
74:21,21 75:15
75:15 78:3,10
78:16 79:17,19
79:19 80:8,13
80:13 81:13,13
81:17,17 84:10
84:10,16 87:17
87:19,19,23,24
108:22,22
109:3,3,7,8,16
109:16 136:8,9
136:16,16
137:1,1 150:18
150:18 151:3,3
157:9,9,12,13
157:17,18
158:10,10,20
158:21,24,24
158:25 159:1
161:19,19
165:16,16
381:17,17,17
381:18,18
382:24,25
384:23,23
385:12,12
406:15,15,16
406:16 407:2,3
407:6,6,19,19
407:22,22
**Johnson's** 7:4
49:19 50:19

51:7,15 52:8
53:4,13,13,21
53:25 54:1
56:16 69:11
72:18 74:15
78:3,9,10,17
79:17 80:9
84:16 87:17
**joined** 312:7
**joint** 100:20
**Jonathan**
185:11,12,13
185:17 186:22
194:22 195:3,4
195:12
**Jordan** 347:16
**journal** 10:8
45:9 123:21
125:18 126:13
127:9 144:18
145:14 147:6
299:5 315:13
364:12 369:10
411:10 439:4,5
**Journal's**
316:23
**journals** 121:16
**judge** 39:10 71:5
113:21 114:2
218:15,17
219:4,4 220:9
220:14 337:16
337:23 338:9
**judgment** 251:3
251:10 336:13
361:19 362:14
**July** 71:5,17
219:6
**jumbled** 202:12
**jump** 132:22
156:6
**June** 92:6,10
121:9,13
**jury** 16:1,3
70:17,23
205:15

**K**

---

**K** 3:5,7
**KATHERINE**
5:3
**keep** 27:11
53:14 54:18
85:23 112:7
164:14 168:12
177:13 242:9,9
334:7 358:25
451:11
**Ken** 287:21
288:7 290:9
**kept** 347:5
**key** 241:12
**keywords**
268:24
**Kim** 364:9,14
**Kimmel** 7:22
214:3 215:14
224:24 225:5
225:12 228:17
**kind** 29:24
46:10 56:21
57:12 63:8
70:11 74:2
97:2 104:7,11
104:18,24
105:4 154:19
181:15 195:2,7
212:2 240:19
242:10 254:7,8
257:10 266:7
269:7 289:1,11
299:14 333:22
333:25 336:16
341:21 348:12
402:24 404:5
406:17 421:19
450:1 452:25
**kinds** 64:17 97:7
126:3 162:11
209:13 224:14
224:15 266:19
342:24,24
358:3 412:8

Gregory B. Diette, M.D.

| | | | | |
|---|---|---|---|---|
| 421:7 448:20 | 144:12,13 | 235:9,10,11 | 320:2,8 321:4 | 451:3,14,15 |
| **knew** 153:1 | 147:10 149:2,4 | 237:2,18,20 | 321:23 322:1 | 452:5,12,23,24 |
| 155:8 185:20 | 153:19,24 | 238:2,19,22,23 | 322:11,12,14 | 454:14,25 |
| 186:6 312:3 | 155:19 157:5,6 | 239:3,13,22 | 323:8,11,12,14 | 455:8,10 457:2 |
| 383:9,14 | 157:13,15 | 240:4,6,14,17 | 326:11,22 | 457:11,15 |
| 435:10 | 158:2,5,17,18 | 245:19 247:12 | 329:25 331:9 | 458:10,12,14 |
| **know** 14:15,21 | 158:19,22,25 | 250:14,15 | 331:24 332:16 | 458:15 459:15 |
| 15:12,15,19,20 | 159:24 160:4 | 252:5,11 253:8 | 333:1,4,20 | 461:21,22,25 |
| 21:4,21 24:7 | 161:12,19 | 255:5 256:21 | 334:5,13 | 463:6,14 |
| 25:21 26:23 | 162:13 163:8 | 259:25 260:12 | 336:11 337:4 | 466:13 467:1 |
| 29:5,16,23 | 165:2 168:5,21 | 260:14 261:3 | 340:15,19 | 468:19,21,21 |
| 32:25 35:2,3 | 169:21,25 | 262:2 263:10 | 341:7,20 | 468:22,24 |
| 35:13 36:13,16 | 170:20 171:3,6 | 264:18,25 | 342:19 344:19 | **knowing** 163:20 |
| 36:19 37:3,8 | 171:24 172:20 | 265:11,22 | 348:2 349:13 | 289:18 388:10 |
| 37:21 41:6,10 | 174:18 175:20 | 266:3,4,5,6,10 | 353:3 358:19 | **knowingly** |
| 44:8 46:3,4,16 | 175:22,23,25 | 266:13,18 | 359:6,13,16 | 304:9 |
| 48:2,13,14,17 | 176:7,8 178:14 | 268:21,21 | 361:6,13,13,14 | **knowledge** |
| 48:22,25 49:7 | 178:15,23 | 269:10,19,19 | 361:15,20,20 | 40:20 255:11 |
| 49:14 50:8,16 | 182:7,10 | 270:14,22 | 363:4 364:15 | **known** 110:14 |
| 51:11,20,21 | 183:19 185:16 | 272:21 276:23 | 367:19 368:6,9 | 152:13 186:8 |
| 53:9,18 58:16 | 186:14,14 | 279:22 281:4 | 368:11 369:6 | 215:7 225:24 |
| 63:4,11 64:18 | 187:22,23 | 281:16,17 | 371:16 372:22 | 226:9 284:8 |
| 67:3,7 68:5,23 | 190:1,23,24,25 | 283:11,13 | 374:4,22,22 | 373:4,6,7 |
| 69:2,5 70:2,9 | 190:25 193:2 | 284:11,13,13 | 375:13,17,17 | 455:15 459:17 |
| 70:11 72:12,20 | 194:16 195:6 | 287:14,14,21 | 376:11,23 | **knows** 15:12 |
| 73:22,24 75:12 | 195:19 196:11 | 287:22,22 | 379:2 382:8,9 | 133:16 313:18 |
| 79:23 81:6,14 | 196:16,17,19 | 288:1,3,7,12 | 387:6,14 388:4 | **Kotsopoulos** |
| 82:4 83:3 88:9 | 196:19,22 | 288:20,21,23 | 388:8,20,22 | 351:13 |
| 88:23 90:5 | 197:19,21,24 | 288:24,24,25 | 389:17 390:4,5 | **Kurta** 351:13 |
| 91:15,15 94:9 | 198:1,2,9,12 | 289:6,9,11,14 | 391:12 392:23 | |
| 95:23,23 96:19 | 200:21 206:1,2 | 293:16,24 | 401:19,25 | **L** |
| 97:6,8,9,11,11 | 206:2,9,20 | 294:4,6,17 | 403:5 405:15 | **L** 4:3 |
| 97:24 100:4 | 207:21,22 | 295:9,12,12 | 405:17,22 | **label** 94:10 |
| 104:6 106:9 | 208:11 210:8 | 296:1 299:6 | 408:1,10,13 | 95:24 314:13 |
| 107:6,10 109:1 | 212:23 213:18 | 302:22 303:4 | 409:16,19,22 | **labeled** 239:10 |
| 109:7 110:5,8 | 213:19,21,21 | 303:10,10,20 | 412:9 421:16 | 353:19 |
| 110:21 113:7,8 | 216:12 217:19 | 303:20 306:17 | 421:17 422:2 | **lack** 286:19 |
| 115:5,10 | 219:19,25 | 306:20 307:23 | 424:10,19,25 | 304:1,23 405:5 |
| 116:22 117:5 | 220:23 222:15 | 308:24 311:4 | 425:5 426:6 | 460:25 |
| 118:2,7 119:22 | 224:6,7,8,9,10 | 311:18,20 | 429:9,12,12,13 | **lacks** 60:17 |
| 123:2,5,16,17 | 224:10,14,17 | 312:22,24,25 | 433:15,16,23 | 75:10 210:11 |
| 125:2,22 126:1 | 225:5,7,8,8,10 | 313:2,3,5,18 | 435:8,12 437:7 | 215:17 229:22 |
| 130:8 131:8,19 | 226:16,18 | 314:3,12 | 442:6,6,7 | 232:17 234:2 |
| 132:16 133:8 | 228:23 229:10 | 315:14,15,16 | 445:7 446:24 | 235:8 250:21 |
| 137:12 140:24 | 229:17,18,24 | 315:17 317:3 | 447:4,5,23 | 272:17 295:23 |
| 141:3 142:7 | 230:21,25 | 317:11,19 | 448:19 449:12 | 299:2 301:18 |
| 143:8,10,13 | 231:5 232:19 | 318:4,4,5,5,6 | 450:11,19 | 409:13 430:7 |

Gregory B. Diette, M.D.

432:14 442:2
443:18
**ladies** 15:25
112:20
**laid** 292:5
**Langseth**
425:13,14,20
**language** 225:14
226:16 279:5
392:2
**large** 86:11
123:3 361:13
361:14,14
**larger** 305:21
362:17
**Lash** 8:21 289:7
289:12 290:14
**late** 39:17 40:14
407:17
**lately** 229:25
**latency** 41:10,13
41:24 45:19,25
46:8,9
**latest** 455:3
462:22
**latters** 239:19
**laughed** 353:2
**law** 158:19,22
159:1 161:18
173:2 192:9
206:21
**lawsuit** 109:15
**lawsuits** 184:17
**lawyer** 185:7,10
194:12
**lawyer's** 18:5
**lawyers** 18:14
184:25 195:2
209:5,7,10,12
276:24
**lay** 290:24
**Lazar** 309:8
**lead** 126:4
302:20 309:4
369:8 370:11
370:12 413:11
421:18 423:20

427:15 448:1
**leading** 415:15
**leads** 439:10
**learned** 152:22
317:10,10
**leave** 93:10
185:2 237:10
256:9 384:12
**leaves** 217:2
**leaving** 237:5,12
237:22
**lecturing** 301:4
**led** 283:12
383:10
**leeway** 268:21
**left** 21:25 182:8
254:21 291:17
293:16 320:24
406:6
**left-hand** 45:18
444:16
**legal** 71:22
109:10,17
131:4,9 134:20
134:25 137:1
188:2 193:19
202:7 207:3
228:5 428:9
**legitimate**
270:25
**legs** 339:11
**Leslie** 1:25 2:16
13:20 471:18
**let's** 18:11,14
23:7 25:2
27:11,15 41:13
44:11,12 45:14
47:20 83:20
85:22,23 100:7
100:12 101:17
102:7 121:1
122:14 133:18
158:7 161:14
170:10 184:14
192:20 209:23
210:24 218:19
218:20 225:19

231:10 236:8
243:21 263:8
263:15 267:5
275:11 297:12
297:16 298:9
299:18 305:5
305:18 320:15
320:17 324:2
338:8 353:24
355:11,13,14
358:10 360:18
360:19 374:20
376:21 396:18
398:13,17
399:2,20
416:17 431:12
431:13 447:8
464:11
**letter** 11:20
431:23 441:2
443:16,17
**level** 272:20
284:9 387:24
406:2 456:23
457:4,21
459:16 466:22
**LEVIN** 3:13
**LHG** 1:5
**Liability** 1:7
13:12
**life** 119:6 203:10
**lifetime** 379:11
420:22
**lifted** 115:7
**ligation** 285:17
**light** 11:16
427:10
**limit** 52:18 97:9
**limitation**
421:18
**limitations**
460:9
**limited** 39:18
40:15 395:21
**line** 9:18 55:2
80:16,24 83:11
84:2 87:11

97:13 214:12
266:16 349:18
350:10 353:17
361:9 369:22
369:23 473:4
**lines** 436:1
452:12,14
**link** 172:24
240:14 372:2
386:13 422:5
**linkable** 404:3
**links** 386:16
389:11
**list** 20:20 21:8
21:14 35:12,14
43:2,7,9,10
65:21 67:21
138:13 139:12
139:16,22
157:20 162:8
165:18 182:6
182:11 188:16
244:6,18,20
247:1,25
248:10,13,15
248:20 249:12
249:19 252:19
253:11 269:11
312:6,15,16
313:4 316:25
364:19 388:15
388:19 468:23
469:3
**listed** 20:19 22:3
35:1 65:17
142:23 146:9
165:7 180:14
188:1 214:17
238:20 244:9
246:6 250:7
251:15 252:20
267:20,21
325:5 326:1
328:17 332:14
333:10 334:16
388:17,18
**listen** 39:4,21

106:24 113:5
194:13 329:22
469:21
**listening** 345:10
**listing** 268:23
**lists** 35:2 42:15
238:21 325:25
327:12
**literally** 26:25
27:21 34:20
93:14 107:24
119:2 123:14
172:21 183:21
206:21 208:12
213:16,22
216:14 217:15
230:23 273:8
279:16 298:15
313:6 332:20
355:24 456:14
458:24 459:18
459:19
**literature** 35:24
39:16 76:16
79:10,15
121:11,21
124:5 126:8,18
148:22 162:20
163:5,23 164:3
164:11 184:22
185:9 212:19
222:21,23
240:2 242:2,7
242:25 245:1
246:5,7 264:25
271:24 291:4,5
291:6 292:13
373:14 374:6
375:7 382:7
386:17 389:1
407:6,20 409:9
411:22 412:16
416:4 422:9,22
423:3,7 441:15
448:5 451:21
453:15 454:13
461:17 462:15

464:2
**litigation** 1:8
13:5,13 56:7
67:19 129:14
129:17 130:3,4
130:20 162:4
180:20 407:7
407:21 409:21
410:3 439:1
**little** 24:24
29:20 30:12
46:15,15 54:11
54:12 59:15,21
73:12 77:25
115:6 121:1
152:2 158:7
186:1 205:3
230:11 238:7
241:23 245:12
279:10 343:20
343:21 352:24
355:6 360:19
371:14 376:21
377:2,24
399:20 400:3
407:16 423:6
463:7 468:12
**live** 315:9 317:7
318:18
**living** 287:24
315:10,24
374:21 380:22
**LLC** 4:10
**LLP** 3:6 4:19
5:4,10,17
**local** 190:3
**location** 379:13
**locations** 104:9
**LOCKE** 5:16
73:6 88:6
89:25 110:18
118:12 145:8
186:12 191:20
192:3 200:9
202:1 217:12
218:5 220:16
223:25 231:18

232:16 234:1
235:6 248:24
261:1 265:1
271:6 274:16
291:12 293:1
295:22 298:19
302:18 304:24
306:7 307:2
325:8,15,17,21
348:21,24
364:2 367:18
368:7 380:23
381:8 382:3
385:25 391:25
402:9 406:20
407:9 408:3
410:25 411:14
411:25 412:21
413:13 414:25
416:1 417:24
418:20 420:12
422:16 423:24
424:17 429:10
430:6,10,15,19
431:5 432:4,13
434:15 435:7
436:16 440:6,9
445:3,16 446:4
446:21 449:6
450:10,23
452:2 453:6,21
457:8,24 464:6
467:11
**Logan** 5:5
**long** 24:9 39:5
82:17 83:2
93:16 117:9
152:9 170:11
174:24 181:22
268:18 300:6
300:15 329:13
341:12 440:3
469:8
**long-term** 59:10
**longer** 39:5
94:12 420:2
**Longo** 65:11

66:6,10,13,24
68:9 69:10
70:25 71:7,18
72:5,15,16
**Longo's** 67:4,14
70:18
**look** 20:17 29:7
30:13 37:4
41:7 52:22
54:10 56:15
69:16 87:6
96:3,5,21,25
100:7 102:3
121:17 123:1
138:12 141:2
143:9 144:21
147:12 149:3
153:25 161:14
168:16 171:1,6
171:10 173:17
174:11,16,17
176:9 179:1
181:17 182:21
183:21,25
196:16 213:13
222:22 226:18
238:21 251:20
252:23 254:6
257:18 267:15
267:19 272:24
272:24 277:14
290:5 293:14
301:25 303:23
308:11,25
313:16 316:22
323:6,7 327:21
328:22,25
329:13 337:6
340:16 341:10
341:10 342:1
342:25 344:17
345:11 347:16
353:8 355:24
356:12 359:24
365:2 369:21
371:4,5 378:17
378:21 387:3

392:19 397:22
416:16 419:13
428:5 430:22
431:22 438:20
440:1 443:10
443:15 449:10
454:13,24
462:4 469:7,10
**looked** 26:7
50:18 51:7,12
65:10 67:8
69:4,6 182:15
213:22 226:20
239:8 241:13
242:16 245:18
252:17,18,20
253:2 266:19
268:7 282:23
312:1 336:13
344:10 374:23
391:16 398:21
409:16 421:16
433:18 435:22
436:18 448:6
448:13,21
452:3 457:15
457:16
**looking** 28:8,10
28:16 104:4
130:21 153:2
172:14 211:7
213:23 239:13
239:23 242:11
252:22,25
283:17 293:12
297:4 301:22
316:9 323:14
323:15,15
340:13 346:3
355:20 356:3
365:10 366:18
371:10 376:9
390:9 409:17
428:24 463:2
**looks** 20:13 21:2
29:25 37:4
54:12 92:5

97:1 171:8
201:22 266:2
266:11,15
268:3 306:15
317:25 348:5
349:18 380:5
443:23 449:23
465:16
**loose** 46:15
**lost** 166:22
**lot** 21:2 62:6
70:7,9,10
99:23 168:22
169:2 200:25
207:22 224:4
237:6 302:19
310:21 315:6
332:22 341:2
360:16 403:7
418:2 423:6
435:21 449:22
452:12,14,16
452:21 460:7
**lots** 387:10
415:2 451:2
**loud** 115:9
**lousy** 47:9,15
**low** 93:3 149:10
269:17 446:15
459:15
**lower** 319:12
343:15 419:13
419:20
**luck** 319:4
**lucky** 105:1
**lump** 383:1
**lumping** 197:20
**lunch** 204:6,21
**lung** 11:6 97:15
100:24 101:9
103:3 106:20
122:7,8,10,11
122:18,20,24
123:2,5,7,13
123:14,18,19
123:23 126:5
143:1,5 150:7

202:23 284:10
364:1 365:4,16
368:3 372:3,3
372:12,16,18
372:20 376:11
376:14 378:1
379:11,17
380:3,21
397:18 398:1,2
398:11,15,24
399:11 404:3
414:15 456:25
**lungs** 90:18
371:24 415:18
**Luzenac** 11:24
438:10
**Lv** 366:1,15
**lymph** 11:19
123:3 412:17
412:25 427:12
428:9 429:8,20
430:4

---

**M**

**M** 3:19 4:17,18
**M.D** 1:15 2:1
6:2,17 7:7,13
13:22 470:20
474:11
**machine** 405:22
**Maddie** 174:22
174:25
**Magnani** 398:18
398:23
**main** 174:22
240:23 242:21
252:21,21
**mainstream**
306:19
**majority** 142:23
245:20 286:3
**making** 28:8
44:8 115:14
234:6 301:7
303:14 368:4
469:11
**malignant** 45:20

45:25
**malpractice**
203:18
**man** 329:24
**management**
123:18
**MANGES** 4:19
**manner** 47:20
161:4 409:11
**Manuscript**
10:13
**Maple** 3:21
**March** 8:10
231:12 236:1
296:19 297:23
298:15 305:10
308:19
**mark** 16:12
18:14 66:11,24
69:19 86:5
91:2 355:7
465:21
**marked** 16:14
17:17,19 18:12
18:24 26:12
28:23 44:20
45:2 52:3,9,11
52:25 54:3
82:7,9 91:4,5
95:9,14 98:23
98:24 132:8,9
133:18,20
138:14,15,17
138:22,23
213:4,7,9
235:17,18
267:5,7,8
281:19,22
289:20,22
296:18,18,23
297:13,14,16
297:18 298:10
308:5,7 309:15
311:24 312:5,9
324:15,17,18
327:22,24
328:4 366:11

369:16 377:17
392:25 393:1
393:13 396:25
397:1 413:23
416:19 426:24
427:5 431:14
431:17 437:13
437:19 438:8
442:18,22
468:6
**markers** 423:14
**Marketing** 1:6
13:12
**marketplace**
75:5
**marking** 26:13
70:1
**markings** 30:14
30:17
**Maryland** 1:16
2:7,18 13:10
15:2
**masses** 123:2
**matches** 406:10
**matching** 85:4
**material** 18:22
159:8 242:10
242:11
**materials** 6:21
18:3 19:5 20:5
20:6,19,25
21:7 23:17
34:10 42:5,15
65:17 66:2,8
111:15 112:10
153:24 157:19
157:20 159:19
468:19
**maternity** 93:10
**matter** 10:16
13:10 21:1
27:25 60:7
67:7 68:25
102:14 103:7
120:11 124:18
134:9 163:10
167:9,16

168:15 180:4
284:20 285:6
285:12 368:25
370:5,18 371:8
371:25 372:12
372:23 374:8
374:17,25
375:19 376:6
376:10 404:19
404:21 458:8
**matters** 69:2
158:20 168:14
266:23 450:25
**Mc** 8:5
**MCBETH** 5:3
**McCormack**
369:3,8
**McDonald**
427:15 428:23
**McShane** 9:6
318:1
**McTiernan**
232:13 233:9
233:19 234:8
234:11 235:22
**MD** 6:12,19
7:10,14,16,21
9:16 206:15
**MDL** 1:4 13:13
38:2 55:9
111:3 131:10
135:1 199:20
**MEAGHER**
5:10
**mean** 15:13
20:10,25 21:19
21:23 27:1
29:6 34:9,10
35:3,3,11,11
35:12 37:1
40:5,24 41:21
46:10 47:25
48:9,14,14
49:11 50:16
51:22 52:18
55:9,9,20
56:22 60:8

64:9,16 69:21
70:11,11,24
73:21 75:19
77:6,8 79:24
82:22 88:9
91:13 96:20
106:9 107:6,10
108:19 112:8
118:17 126:22
131:23 132:15
136:19 142:8
143:15 144:22
144:23 145:19
146:16 147:13
147:25 149:17
150:24 153:20
155:25 158:21
162:24 163:25
163:25 164:7
164:14 168:22
169:12,14,22
170:5,25
171:25 172:10
172:20 174:16
175:20,20
176:5 179:20
180:7 182:5,8
187:4 191:23
195:1,8,17,20
196:12,19
197:8 198:12
198:22 199:16
199:19 201:16
202:20 203:9
203:18 205:18
205:21 208:11
209:4,11
211:24 215:19
216:11 217:16
221:22 224:21
225:5 230:22
237:5 241:22
242:13 243:17
244:8 245:3
249:15 252:7
253:7 258:7,7
260:1 263:1,4

Gregory B. Diette, M.D.

| | | | | |
|---|---|---|---|---|
| 264:15,17 | 466:6 467:15 | 446:1,12,13,20 | **medicine** 7:11 | 142:16,20 |
| 265:11 267:16 | **meaning** 28:13 | 446:25 447:6 | 34:18,21,22 | 148:10 201:25 |
| 267:18 268:14 | 104:9 131:23 | 449:18 450:8 | 52:16 57:3 | 207:10 263:8,9 |
| 268:24 270:11 | 133:11 144:13 | 450:19 451:8 | 61:1 63:17 | 395:12,22 |
| 272:24 273:15 | 201:17 238:19 | 451:23 453:4 | 93:4,20,23,25 | 397:19 457:22 |
| 281:16 294:11 | 239:19 266:18 | 455:2 | 94:6,18,19 | 458:5 |
| 295:10 301:20 | 457:11 462:25 | **mechanisms** | 95:9,24 96:11 | **mess** 269:7 |
| 302:20,20 | 466:21 | 422:10 449:2 | 96:12 98:5 | 463:3 |
| 303:6 310:21 | **means** 49:14 | 453:4,19 455:6 | 100:18,19 | **met** 189:25 |
| 311:11,14,15 | 81:23 82:5 | **medical** 15:6 | 105:2,5 107:7 | 465:2 |
| 313:12 315:8 | 119:22 169:2 | 24:19 25:18 | 143:5 189:1 | **meta-analyses** |
| 318:22 320:1 | 185:3 187:24 | 30:4,5,10 | 201:10,19 | 238:20 240:11 |
| 321:24 323:1,2 | 321:24 372:17 | 31:11,17,21,25 | 205:9 294:8 | 244:19 251:16 |
| 323:7 329:17 | 405:16 456:1 | 32:6,11,14 | **Medline** 242:17 | 267:17,25 |
| 333:2,14,20,22 | 466:8,22 | 33:3,4,19 34:1 | 244:17 | 268:8 368:22 |
| 334:2,11 336:5 | 471:22 | 37:11 39:16 | **meeting** 157:23 | **meta-analysis** |
| 340:20 341:1 | **meant** 64:16 | 56:13,18 57:12 | **meetings** 260:21 | 10:6,12 11:14 |
| 342:8,20 343:2 | 130:19 256:19 | 81:12,16 95:21 | 261:23 | 245:21 246:7 |
| 343:19 344:6,9 | 259:15,16 | 95:22,25 96:3 | **member** 94:20 | 265:12 266:25 |
| 344:18 346:20 | 308:12 345:13 | 96:4 100:8 | 295:3,6 | 271:16 277:25 |
| 352:17,18,23 | 388:17,20 | 104:7,11 | **members** | 364:14 388:24 |
| 353:2,17,20 | 406:12 451:13 | 105:22 117:5 | 208:14 | 408:22 417:6,6 |
| 354:7 359:10 | 468:16,18 | 120:9 141:23 | **memorize** 41:7 | 417:9,10 425:5 |
| 359:12,13,23 | 469:6 | 151:23 152:5 | 341:8 441:12 | 425:16 454:23 |
| 360:14 361:2 | **measure** 333:2 | 152:10,18,22 | **memorized** | 455:3 |
| 363:7 367:19 | 340:22 363:22 | 153:15 154:7 | 36:25 37:5 | **Metals** 10:24 |
| 370:21 372:4 | 403:5,17 | 154:16 155:10 | **memory** 37:9 | 393:16 |
| 372:19 373:24 | 405:15 406:2,6 | 155:16,18 | 68:25 380:10 | **meter** 376:1 |
| 376:3 379:2 | 406:10 460:25 | 156:4 157:3,8 | 424:21 | 404:20 |
| 380:7 382:5,20 | 461:13,14 | 158:9 159:7,20 | **mention** 292:12 | **method** 244:23 |
| 383:23 386:23 | **measured** 406:9 | 161:12 162:5 | 458:6 | 363:4 421:5 |
| 387:2,2 392:11 | **measurement** | 162:19 163:21 | **mentioned** | **methodologic** |
| 392:13 401:13 | 404:1 | 164:10 165:5 | 46:14 154:22 | 191:9 |
| 401:14 402:25 | **measurements** | 165:21 166:25 | 162:13 259:2 | **methodology** |
| 407:1 409:19 | 391:12 | 167:21,22 | 280:16 331:13 | 143:19,25 |
| 409:23 412:8 | **measures** | 168:3,17 | 339:22 363:17 | 238:9 243:3,6 |
| 415:13,19 | 239:15,23 | 170:23 176:14 | 397:23 469:4 | 243:12,20,22 |
| 419:4 421:15 | 392:23 | 177:8 178:22 | **Merlo** 228:23 | 243:24 244:13 |
| 425:6 433:15 | **mechanical** | 179:7,14 | **Merritt** 351:12 | **methods** 143:18 |
| 435:11,21,21 | 468:1 | 188:20 189:6,8 | **meso-** 137:2 | 143:22,22 |
| 435:22 437:7,8 | **mechanism** | 190:15,19,20 | **meso/asbestos** | 144:7,13 |
| 443:23,25,25 | 165:3 281:17 | 194:9 215:3 | 207:14 | 253:25 266:13 |
| 445:14,19 | 384:7,20 | 222:4,21,23 | **mesothelioma** | 291:10 292:21 |
| 448:13 449:11 | 385:23 414:16 | 223:16,17 | 11:7 55:15 | 404:10 448:8 |
| 452:23 454:13 | 415:23 417:14 | 228:12 229:21 | 124:6,10,13 | **metrics** 405:5 |
| 455:9,10 459:2 | 418:2,17 | 408:12 412:16 | 125:19,21 | **MHS** 6:13,17,20 |
| 459:6,8 463:3 | 433:20 443:11 | 436:9 468:8 | 128:25 137:3 | 7:10,17,21 |

9:16 95:2
206:15
mic 14:9
Michelle 3:4
53:6
microgram
404:20
micrograms
375:25
Microphone
14:7 89:10
377:22
microscopy
11:17 427:11
middle 151:12
284:1 294:4
midpoint 351:7
migrate 281:3,7
411:11,23
412:17 415:18
416:7 428:8
429:7,16,19
432:3,10 433:7
434:1 435:1,24
436:13,25
449:16,25
452:18 453:20
migrated 412:24
migrating
435:17
migration 254:5
418:16 422:12
425:20 439:7
441:16,25
448:7 452:15
MILLER 5:9
27:6 53:6,9,12
53:16,20 67:17
86:5 111:6
112:17 116:15
116:18 132:14
132:19 204:5
348:20 440:13
465:20
million 263:1
Mills 351:12
mind 86:13

385:22
mine 21:22 85:7
85:9,12 95:6
153:2 188:17
208:12 215:25
335:19 348:20
388:5
mineral 74:2
75:25 76:13
120:4
mineralogist
73:10 119:15
120:4
minerals 73:25
120:15 125:24
minimal 456:23
457:4,21
minimum 391:2
minus 420:22
minute 25:24
200:13 247:7
251:1 286:15
293:2 299:22
299:25 318:2
361:25 369:15
minutes 299:19
377:1
misclassificati...
387:15 461:9
misclassify
461:12
misdiagnosed
395:12
misdiagnosis
395:22 396:6
misheard
307:16
misinform
306:2
mislead 274:2
misquote 280:17
misreading
332:8
misrepresent
329:20
misrepresenta...
310:19

misrepresenting
161:22 330:5
misrepresents
295:24
missed 100:5
182:16,22
366:10
missing 199:8
misspoke
126:22 345:12
misstate 453:8
misstates 20:23
67:16 88:7
129:19 132:12
150:22 151:7
153:17 172:12
176:3 224:2
225:3 256:17
264:4 265:2
272:17 274:1
275:5 276:4
279:8 298:21
299:3 315:5
323:21 336:22
429:14 432:5
434:3 436:17
437:4 449:7
misstating
279:14
mistake 287:5
292:11 293:18
mistaken 67:6
misuse 295:16
295:20 298:13
310:17
MITCHELL
3:13
mixed 421:19
450:1
mixture 454:12
mm-hmm 25:3
69:24 77:20,22
144:3 255:25
256:6 259:11
283:25 295:2
309:1 311:10
314:1 320:5

331:12 347:19
349:17 365:11
386:20 397:24
402:22 442:12
448:18
model 24:21
178:19 450:3
modern 8:19
290:2,18 388:2
418:8
modifiable
263:19 264:2,3
modification
347:4
modified 334:9
modify 340:8
mold 203:17
molecular
253:20 255:13
255:16
moment 24:25
29:10 34:2
44:11 151:23
209:25 216:6
238:8 241:7
244:17 256:4
298:10 355:15
355:16 365:7
402:23 438:23
440:1 447:9
464:18
money 179:23
179:24
monitors 404:19
monogram
259:6
monograms
259:6
monograph
10:23 259:8,9
259:9,10,19
401:1
monographs
239:3 259:23
month 231:12
months 264:21
Moorman

346:14,17,18
349:14 351:13
morbidity 40:21
40:23
morning 14:2,3
17:13 19:15
439:3
morphed 275:8
mortality 10:9
40:21 41:2
366:3 367:3
389:5,8,18
395:1
mother 403:24
MOTLEY 4:10
mouse 102:16
107:22,25
253:9,9
mouth 58:12
mouthful 310:3
move 19:3 39:7
46:17 101:17
151:15 161:7
176:7 190:14
280:8 310:6
383:17 398:5
398:13,17
movement
312:7 314:18
moving 8:23
9:10 280:3
296:25 308:18
309:2,2,22
MSA 40:4
166:14 173:1,2
173:4,16
174:21 175:3
175:18 176:1
176:12,20
177:6,14 178:3
178:4,9 180:12
180:18 181:7
181:12,13
182:1 185:14
185:18 186:3,9
186:23 187:1,5
187:18,19

Gregory B. Diette, M.D.

191:15,16,18
192:1,7,16
193:10,11,25
194:6,8,15,20
194:23 195:1,4
195:13 197:21
199:6 200:5,14
468:8,14 469:6
469:13 470:5
**MSA's** 195:23
**multidistrict**
129:17
**multiple** 171:11
408:5
**mutagenic**
418:10 444:20
**muted** 460:2
**mutual** 33:2

**N**

**N** 3:1 6:1,1 13:1
**N.W** 3:7 5:11,18
**name** 13:4 15:25
92:17 93:24
107:10 138:11
152:25 174:20
187:23 188:21
285:10 288:24
289:9 294:4
295:11 312:23
313:8 326:23
366:17 465:1
471:14
**named** 175:9
**names** 196:17
253:6
**napkin** 332:24
334:23
**napkins** 331:14
332:21 334:17
**narrative** 32:19
**narrow** 237:7
**Nate** 465:2
**NATHAN** 4:9
**National** 262:3,5
262:9
**nature** 103:25

109:15 135:18
271:25 273:13
296:9 297:10
297:22 305:10
317:3,16,20
**nearby** 48:18
**nearly** 344:15
**necessarily**
27:25 51:23
76:17,25
179:13 204:4
216:12,13
224:16 352:11
412:8
**necessary**
319:13 362:23
363:3 391:3
456:25 472:3
**need** 24:8 25:1
53:20 68:5
72:20 79:5
82:13,18 83:18
85:25 86:23
88:22 99:18
118:21 133:4
157:23 190:16
191:9 193:2,25
268:18 299:22
300:6 304:4
323:12 329:13
338:9 341:13
347:13 372:2,7
386:4,5,6
397:10 401:23
405:6 430:15
431:19 438:16
440:3 446:1,3
446:10,12,13
450:18,18
451:8 461:14
467:4
**needed** 191:18
194:8 255:9
452:13
**needless** 78:19
79:5 84:23
**needs** 83:5,17

85:20 92:4
275:17 300:13
300:15 326:13
335:5 438:19
**neighborhood**
387:17
**neither** 120:5
305:23 362:23
**neoplastic** 34:25
35:6
**Ness** 351:11
442:20 444:17
**Ness's** 443:17,21
444:2,2,5,16
**never** 10:6 57:21
184:20 189:10
189:11,12
192:1,6 236:18
266:6,12
299:21 300:12
304:13 305:19
364:11 365:5
365:13,14,16
366:20,22
428:3 430:9
438:17 440:17
442:5
**new** 1:2 3:22
4:21 5:11
13:15 36:20
93:15 182:1,4
303:6 316:23
364:16,16
401:14
**newly** 376:11
**Newport** 4:6
**Newton** 285:8
**nice** 93:13
181:23 204:13
**Nich-** 83:8
**Nicholson** 7:7
81:7,8,9,16,22
86:9 87:16
88:4
**Nicholson's**
82:12 83:15
84:4

**Nicole** 309:8
**nicotine** 404:23
405:18 406:7
406:10,10
**NIH** 10:13 320:4
**NIH's** 320:7
**NO2** 102:14
**node** 412:25
**nodes** 11:19
123:3 412:17
427:12 428:9
429:8,20 430:4
**noise** 301:7
**non-exposed**
284:10
**non-pulmonary**
199:2,15,17
200:6,20,23
**non-serous**
414:18
**nongenital**
414:17
**nonsense** 277:1
**nonsmokers**
379:12
**nonstatistical**
357:19
**nonstatistically**
321:7 322:7
**Nope** 346:17
354:9
**normal** 182:9
215:9 226:13
**normally** 15:5
**North** 2:5 13:9
**Nos** 377:16
**nose** 58:12
**Notary** 2:17
474:19
**notation** 216:2
**notations** 31:10
**note** 29:17 153:4
**noted** 13:18 68:2
128:2 394:22
472:9 474:7
**notes** 26:3,6,11
26:14 27:18,24

27:25 28:7
29:5,11 31:12
287:9 334:24
465:22 471:11
**notice** 2:16 6:11
6:15 16:13,18
16:23 17:15
27:23 29:1
**notion** 411:4
**novel** 320:1
**November** 67:1
67:13 68:9
69:12 70:20,20
71:1,8,19
**NSAIDS** 172:23
421:17,22
**NTP** 262:2,13
439:12
**nuanced** 217:1
256:20
**null** 352:8,18
382:15,21
**number** 8:13
20:3 26:13
32:14,19 33:1
35:13 37:6
40:23 41:6
97:3 122:15,16
122:18 123:1
123:15,16
138:16 172:15
179:4 183:12
247:22 248:1
248:11 249:22
282:13 331:16
340:13,18
351:7 361:11
375:25 404:12
413:25 414:2
420:25
**numbers** 37:1
257:16 345:9
346:12,13
379:23 380:6
389:7
**numeral** 276:15
**numerous**

451:22
NW 4:11

**O**

O 6:1 13:1
oath 2:18 13:21
  160:5,24
object 32:17
  33:7 35:16
  37:14 80:16,24
  83:14 112:23
  112:23,25
  113:6 129:15
  131:17 158:11
  260:5 279:13
  310:5,18 326:8
  326:17 378:20
  425:23 427:25
  429:2 438:11
  441:18 448:11
  464:9
objected 154:3
objecting 32:5
  33:21 35:19
  83:21 160:10
  326:11
objection 15:18
  16:3 18:4
  20:22 21:17
  22:7 23:19
  35:7,25 36:24
  38:1,4 39:9,19
  40:16 41:15
  42:19 43:20
  47:6,22 49:5
  49:21 50:4,21
  50:24 51:9,19
  54:3,14,25
  55:8,16 56:2,8
  56:19 57:14,23
  58:14 59:5,12
  60:4,17 61:4
  62:4 63:24
  64:6 65:1,12
  65:19 66:21
  67:15 68:11
  69:14,20 70:22

72:8,19 73:6,7
74:13,17,24
75:8 78:20
79:2,21 82:1
88:5,6 89:25
90:1,15 96:17
97:22 98:7
104:2 105:10
106:6,22 107:4
107:16 109:4,9
109:18 110:1
110:12,15,18
110:24 111:5
111:11,19,23
114:4,9 115:25
117:11,20
118:1,12,25
119:9 120:17
123:25 124:23
125:8,14
126:21 127:13
127:21 128:21
129:9,18 130:2
131:11 132:12
134:21 137:22
140:23 141:13
143:3,6 144:20
145:8,16
146:13 147:8
147:18,23
148:18,25
149:15,23
150:21 151:6
153:17 155:1
157:10 158:14
159:13,23
160:12 166:3
168:19 169:13
169:20 170:15
171:16 172:11
174:6 175:5,12
176:2,15
178:12,24
179:8,17
180:25 181:9
182:18 183:1,7
184:4,18

186:10,12
187:20 188:5
188:11,23
189:2 190:22
191:20,21
192:3,4,10,17
192:20 193:20
194:1,11 195:5
195:14,18
196:2,10
197:13,17
198:7,21 199:3
199:16 200:9
201:12 202:1,5
202:9 203:3
205:10 206:19
207:18 208:20
209:3,9,20
210:11 215:16
216:10 217:12
218:5,6 219:11
220:16,17
221:19 222:8
222:25 223:7
223:24,25
225:2,17 226:2
228:8,13
229:22 230:19
231:3,18,19
232:16,17
233:1,12 234:1
234:2 235:5,6
236:25 244:2
245:25 246:10
247:24 248:7
248:17,23,24
249:6,11,17,24
250:6,21 251:5
254:17 255:2
255:15,22
256:17 258:4
260:10,25
261:1,16,24
262:19,24
263:20,24
264:4 265:1,2
265:20 266:1

267:18,19
268:2,12 271:6
271:7 272:16
273:23,25
274:4,16,17
275:4 276:3
278:11 279:8
281:8,15
282:21 286:10
287:6,25 288:9
289:2,8,13
291:12,13
292:4 293:1
295:22,23
298:19,20
299:2,12
301:18 302:18
304:3,24,25
306:6,7 307:1
307:2,7 314:10
314:25 315:5
318:13 319:19
321:10,21
322:9,21
323:21 325:8
326:7 329:12
330:22 331:4
333:19 334:10
334:20 336:21
339:4,17,25
340:6,11
342:18 343:18
345:7,22 346:8
347:12 352:3
352:10 353:11
354:4 356:25
357:13 360:13
361:24 362:10
362:25 363:13
364:2 367:8,18
368:7,19
371:19 372:1,4
372:14 373:3
373:17,22
374:9 375:8,10
375:14,20
376:16 380:4

380:23,24
381:3,8,20
382:2,3,16
383:6 384:9,22
384:25 385:15
385:25 389:9
390:20 391:4
391:25 396:8
396:15 399:23
401:10 402:9
402:10,18
403:8 405:12
406:20,21
407:9,10 408:3
408:4,23
409:13 410:5,8
410:25 411:1
411:13,14,18
411:25 412:1
412:19,21
413:13,14
414:25 416:1
416:13 417:24
417:25 418:19
418:20 419:6
420:12 421:6
422:14,16,25
423:4,11,24
424:15,17
428:18 429:14
430:6,7,12
432:4,5,13,14
433:13 434:3
434:15,21
435:5,7,19
435:15,16
437:3 442:1
443:18,22
444:7 445:3,4
445:16,17
446:4,5,21,22
447:18 449:5,6
450:9,10,22,23
451:10 452:1,2
452:20 453:6,7
453:21,22
455:7,16,23

Gregory B. Diette, M.D.

456:18 457:8
457:23,24
458:21 461:10
463:20 464:5,6
466:4,25
467:11,12
470:1,8
**objectionable**
37:21
**objectioner**
115:12
**objections** 18:5
32:1,19 75:17
161:4 326:16
471:7
**objective** 35:11
35:14 41:3
**observed** 395:13
445:22 446:15
**obstetrics**
105:23 239:4
**obstructing**
133:4
**obstructive** 96:9
97:17 100:23
101:10 103:5
**obtaining** 154:4
**obviously** 22:13
97:24 185:15
206:7 241:14
244:22 336:25
338:21 433:21
434:6 451:15
**occupational**
395:1
**occupationally**
284:4
**odd** 435:9
**odds** 333:11
347:8,16 349:9
349:15,24
351:12 361:4
365:12 368:21
**offer** 179:20
342:5
**offered** 158:3
184:11

**offering** 301:5
**offers** 309:6
439:6
**office** 30:11
154:20,22
**officer** 81:12,16
**official** 439:4
**officiated** 2:18
**Ogburn** 312:22
**oh** 26:20 43:5
44:23 53:11
58:19 62:13
66:13,17 67:23
69:21 76:22
81:14 86:15
91:1 94:9
98:19 99:20
112:8 113:17
128:8 136:3
139:7,8 165:11
167:14 170:5
174:7 175:4
182:11,13,17
186:15 188:10
209:8 212:15
220:25 240:25
242:8 264:15
270:8 276:10
284:24 297:4
307:20 325:19
341:8 342:8
343:17 348:15
350:23,24
351:3 352:24
354:21 366:8
374:12 375:15
383:4 389:18
398:7 406:25
410:9 414:4
416:12 424:3
429:22 433:2
437:13 441:3
**okay** 16:11
17:11 20:10
23:15 24:24
25:23,25 27:11
27:15 28:3,10

29:2,18 30:14
30:22 31:8
32:18 33:11,24
34:8,12,17,23
35:22 38:16
40:10,20 43:12
43:18 44:1,24
45:16 46:20,25
47:17 48:4,5
49:25 50:11
51:14 52:2,19
53:22 54:1,16
54:16,22 55:5
55:24 56:5,12
57:20 58:5,7
58:24 59:9,20
60:11,25 61:8
63:1 64:3 65:8
66:2,7 72:14
73:17 75:3,15
75:23 76:11
77:6,21 81:15
81:21 82:6,20
83:10,24 84:1
85:13 87:9,15
88:15,16,20
91:2,10 92:5
93:2,18 95:1,4
95:8 96:23
97:5 98:3,20
98:22 100:4,12
101:2,7 102:6
103:1,14 105:7
105:16 106:18
107:2 108:2,18
109:1,24 110:5
111:21 113:1
115:22 116:12
117:9,15 118:8
118:19 119:5
119:15,21,25
120:3,8 121:8
121:19 122:12
125:5 126:5,7
128:2,9,13
129:11,24
130:24 131:8

132:2,23 133:6
133:23,25
134:18,24
135:13 136:5
136:22 137:5
137:19,25
138:3,6,11,14
139:8,9 140:2
140:7,10,16
143:18 144:11
145:5,25 146:6
146:23 147:1
147:16 148:9
149:20 151:9
151:25 152:5
152:16 153:14
154:3,11,21
155:4,9,14
156:3 157:8
158:7 159:16
162:19 164:21
165:14,23
168:8,11 169:2
170:23 171:6
171:11 173:13
174:14,24
175:2,17
177:16 179:4
179:12,19
180:15,22
181:12,15,25
182:21 183:5
185:12,17,24
186:8,17,21
187:1,17 188:1
188:19 189:6
189:11,15
190:7,13
191:13 193:14
193:24 194:4
194:19 195:12
196:25 197:5
198:17,25
199:10 201:15
201:21 202:14
203:14,20
204:17 205:13

207:9,13,16,25
208:7,23
209:16,23
210:3 212:1,4
212:15,23
213:3 214:2,15
216:7 217:7,18
218:23 219:18
220:4,7 221:12
221:17 222:1
225:19 226:11
226:24 227:3,8
227:11,12,20
228:11,16
229:2,10,13,16
229:19 230:6
230:15 231:9
231:10,25
232:10,21
233:7,19
235:16 236:4
236:12 237:10
238:7,9,16
239:25 241:1
241:21,25
242:9,23 243:5
244:5,24
247:15,19
248:10 249:8
249:14 250:3
250:25 252:5
252:24 254:3
254:12 255:18
256:8 257:2,6
259:2,22
260:21 261:7
261:12,21
262:5 263:15
264:9,13,20
265:6,12,17
267:5,14
268:10,17
269:14 270:7,8
271:9,12 272:9
273:18 277:18
278:25 279:24
280:2 281:2,13

282:8,11 285:3
287:2,11,21,24
288:22,25
289:6,11,17,19
290:5,9,21
293:22,24
294:1,6,10,24
295:2,2,9,14
296:3,6,22
297:6,12,24
298:2,5,9
299:10,18
300:20 301:14
301:25 303:18
303:23 305:5,9
305:12,15,18
306:22 307:5
307:10,13,25
309:19 312:4
312:18,22
313:3,11 314:8
314:8,16 316:6
318:8,18
320:14 321:16
322:16 324:2,9
324:10,11,15
327:17 328:8
328:13,15,25
329:4 330:16
330:19 332:1
333:16 334:15
339:1,8,20
340:4 342:16
343:14 344:3,8
345:3,20 346:2
346:25 350:3
350:11 351:18
351:24,25
353:7 355:10
355:11,13,14
355:19 356:20
357:17 360:2
360:11,18,24
363:23 364:7
364:18,25,25
365:2,15,22
366:1 367:6,13

367:25 368:14
368:24 369:2
369:21 370:11
372:10,22
376:21 378:11
378:18 381:23
382:19 384:2
385:7,10,20
386:21 388:14
389:2 390:9,25
391:16 392:16
392:24 393:19
394:5 395:5,17
395:19 396:1
396:12,18,22
396:23,24
397:4,13 398:5
398:9 399:10
399:20 400:18
400:24 401:16
402:4,14
403:17 406:5
407:4 408:18
408:21 409:2,8
410:17 411:21
413:4,7,20
414:10,22,24
416:3,16 417:5
417:23 419:22
419:24 420:18
422:20 425:13
427:23 428:22
429:6 431:3,12
431:21,25
432:20 433:4,5
433:12 437:12
438:14 440:18
441:7,10
442:15 443:2,8
443:14 444:15
445:2,25 448:4
451:21 454:9
456:21 457:4
457:20 458:8
459:23 460:1,8
464:1 467:7
**omitted** 183:13

184:8
**onc** 63:14
**oncological** 62:2
**oncologist**
  115:16,17,18
**oncologists**
  60:20,22,25
**oncology** 63:7
  104:23
**one-page** 440:5
**ones** 30:8 61:6
  69:4 109:5
  123:11 147:13
  240:23 245:2
  247:10 252:7
  252:18,19,19
  253:5 259:24
  259:25 348:17
  355:9 357:3,5
  371:5 376:12
  389:23 390:5
  392:22 412:3
  449:11 452:5
**ongoing** 128:20
  128:24 129:3
**Oops** 368:8
**open** 181:19
  217:2
**opened** 69:5
**operation**
  191:11
**opined** 76:12
  436:9 453:3
**opinion** 35:4,10
  56:17 57:11,21
  59:1,9 60:1
  68:15 70:12
  71:15,24 72:2
  78:2,9 211:25
  212:16,25
  219:7 221:5
  243:1 252:2
  255:7 256:18
  271:3,4 281:2
  281:6 306:16
  318:8 356:20
  370:17 399:21

400:13 401:8
  421:3
**opinions** 22:5
  70:16 71:3
  76:2 88:13
  166:15 170:3,5
  183:20,20
  199:2,14 205:4
  205:13,19,21
  206:8 207:11
  207:14 208:8,9
  208:13,17,24
  208:25 209:18
  210:4 211:7,13
  215:13,13
  222:24 227:25
  228:2,7,12,18
  232:6 233:10
  238:10,11
  243:16 251:17
  255:4,20
  256:15 261:22
  286:18 360:4
  384:19 390:18
  407:7 436:20
  438:18 462:16
  469:18,23
  470:3
**opportunist**
  410:1
**opportunistic**
  409:22
**opportunity**
  114:6 193:9
  298:2,6 409:4
  409:8 427:20
**opposed** 185:1
  242:21 263:7
  339:23 401:22
**opposite** 359:9
  462:25
**Oral** 6:11,16
  17:15
**order** 47:1,19
  80:5 90:7
  176:1 180:12
  191:18 238:10

240:1 243:14
  317:1 320:9
  321:2 343:12
  372:8 383:11
  386:18 391:3
  405:10 406:1
  406:17 407:6
  407:24 446:1
  446:14 450:7
  450:19 451:8
  461:13 467:5
**ordinary** 205:8
**organ** 104:13,14
**organization**
  260:4,9,19
**organizations**
  260:12
**organize** 153:24
  157:22
**organs** 428:8
  429:7,20
**original** 147:17
  147:22 148:5
  149:12,14,17
  257:15 401:11
  471:12 472:11
**Originally**
  296:11
**ought** 353:21
**outcome** 270:11
  270:17 371:13
  448:1 459:9,20
**outcomes** 103:6
  270:9
**outdoor** 376:10
**outpatient**
  105:13
**outside** 134:19
  154:20,22
  208:25 409:17
**ovarian** 6:24
  8:17 9:20 11:5
  11:9,13 12:5
  28:14,18 34:24
  35:5 36:6,9,13
  36:20,23 39:16
  40:13,21 41:11

Gregory B. Diette, M.D.

| | | | | |
|---|---|---|---|---|
| 41:14,21 45:8 | 247:23 248:5 | 435:18,25 | **p.m** 89:4 204:20 | 172:5 324:4 |
| 45:20 46:1,22 | 250:4 263:16 | 436:14 437:1 | 204:23 280:11 | 325:4 336:18 |
| 51:18 55:7,15 | 271:20 272:15 | 437:10 449:17 | 280:14 320:18 | 414:11 474:3 |
| 59:10,18 60:3 | 273:22 274:15 | 449:20 452:18 | 320:22 338:13 | **paid** 23:24 |
| 60:15 61:2 | 275:2 276:2 | 453:20 | 338:17 377:9 | 197:21 430:17 |
| 62:3 63:12,18 | 278:4,22 279:3 | **ovary** 282:12 | 377:12 426:16 | **pair** 388:1 |
| 75:6 76:3,14 | 281:24 282:14 | 283:9 394:24 | 426:19 447:10 | **PAPANTONIO** |
| 79:11,15 89:24 | 285:14,18,21 | 448:9,16 449:2 | 447:13 464:12 | 3:13 |
| 109:21 111:3 | 358:3 359:3 | **overall** 383:3 | 464:15,19,22 | **paper** 29:21,22 |
| 111:10 115:24 | 368:17 384:8 | 463:11 | 470:17,21 | 30:2 124:12,12 |
| 116:7 117:1,4 | 384:21 385:24 | **overbreak** | **page** 6:2,10 7:3 | 144:18 145:10 |
| 117:19 118:10 | 386:11,18 | 203:25 | 8:3 9:3 10:3 | 147:14 182:3 |
| 118:21 119:3,7 | 387:6 388:7,25 | **overhead** 45:17 | 11:3 12:3 19:4 | 182:12,13 |
| 124:18,22 | 391:3,11,17,23 | 85:18,23 | 21:15 42:9,15 | 257:15,23 |
| 125:2,7,12 | 392:8 394:2 | **overlap** 245:14 | 42:20,24 43:10 | 264:9,14 |
| 126:10,15 | 395:12,23 | **overlapping** | 45:13 65:22 | 276:25 277:1 |
| 127:12,20 | 397:17 398:1,2 | 404:10 | 76:7 83:9,14 | 298:15 315:13 |
| 129:7,13 130:1 | 398:10,14,23 | **overly** 64:6 | 85:1 87:11 | 316:21 320:10 |
| 131:1,14 132:8 | 399:10,15,17 | 287:17 306:8 | 98:1 99:21,24 | 321:2 330:5 |
| 134:10,16,19 | 399:18 400:19 | **Oversight** | 100:7 140:5,9 | 332:5 342:15 |
| 135:5,15 136:8 | 401:9 402:8 | 231:13 | 171:4 181:19 | 370:15 371:3 |
| 136:17,20,21 | 406:13 407:8 | **Overview** 102:3 | 206:17,22 | 373:10 375:3 |
| 137:21 138:8 | 410:18 411:4 | 102:10 | 208:2 209:23 | 393:5 423:12 |
| 140:22 142:12 | 413:12 415:9 | **Ovulation** 6:23 | 210:25 211:21 | 425:1 439:3 |
| 147:22 148:17 | 415:24 417:12 | 45:8 | 212:2,3 214:16 | 444:2,2,5 |
| 149:22 150:13 | 417:15,20 | **oxidative** 102:19 | 243:6,6,8 | **papers** 20:15 |
| 150:20 151:4 | 420:4 421:8,10 | 444:18 | 244:7,10,10,14 | 92:1 121:20 |
| 163:7,13,19 | 422:24 423:10 | | 246:6 247:16 | 124:5,21 |
| 164:12 165:25 | 423:15,18 | **P** | 247:22 248:4 | 125:12 143:22 |
| 167:3,12 | 428:7 433:6 | **p** 3:1,1 8:23 9:10 | 256:5 269:8 | 143:24 144:6 |
| 172:24 187:7 | 439:9,13 | 13:1 296:25 | 271:10,13,14 | 144:24 145:12 |
| 198:25 199:11 | 442:20 443:12 | 302:14 308:18 | 277:14,15 | 145:14,19,20 |
| 200:1,4,6 | 444:23 451:24 | 309:3,23 | 290:22 325:11 | 145:21 146:7 |
| 201:5,9,24 | 453:5 457:6 | 311:15 318:25 | 325:13,13 | 146:10 147:5 |
| 202:22,22 | 460:11 462:19 | 319:13 | 326:1 328:24 | 163:25 164:1 |
| 203:2 209:18 | 464:4 | **p-value** 295:21 | 343:21 369:22 | 164:17 182:11 |
| 210:23 211:20 | **ovaries** 273:1 | 298:14 302:13 | 393:20 394:6 | 240:12 298:17 |
| 212:22 214:11 | 280:21,25 | 305:21 312:8 | 396:19 397:15 | 301:10,16 |
| 214:12,24 | 281:3,7,14 | 316:12,16 | 399:5,7 400:21 | 317:3 321:4 |
| 215:8 216:21 | 283:20 284:8 | 318:19 319:3,9 | 416:24,25 | 337:4 |
| 217:10 218:3 | 284:14 411:12 | 361:8 | 433:2,3,3 | **paragraph** 76:9 |
| 219:9 220:12 | 411:24 412:17 | **p-values** 295:17 | 440:11 441:4 | 101:7 176:9 |
| 221:7 226:12 | 412:25 415:5 | 301:5 302:5 | 443:2 444:15 | 181:22 212:6 |
| 233:23 234:15 | 415:18 416:7 | 303:5 309:12 | 473:4 | 212:14 236:8 |
| 234:21 236:17 | 418:18 422:13 | 309:25 315:11 | **pages** 26:3 85:4 | 244:21 271:14 |
| 237:19 240:16 | 423:18 430:4 | 316:1 317:1 | 86:9 99:22 | 277:21 282:10 |
| 240:25 241:5,9 | 432:3,11 | **P.A** 3:14 | 170:11,11 | 283:24 284:2 |

Gregory B. Diette, M.D.

| | | | | |
|---|---|---|---|---|
| 292:10 300:24 | 48:19 49:16,24 | 113:1,4,10,13 | 167:11 169:1,6 | 227:13 228:10 |
| 329:21 400:21 | 50:5,22 51:3 | 113:16,20,24 | 169:9,16,24 | 228:15,22 |
| 400:23 414:21 | 51:13 52:1,4,6 | 114:3,14,18,21 | 170:22 171:18 | 230:5,24 231:8 |
| 419:16 420:15 | 52:13 53:2,8 | 114:22,24 | 172:16 173:24 | 231:24 232:4,9 |
| 432:23 469:9 | 53:11,15,19,22 | 115:3,5,15 | 174:13 175:7 | 232:20 233:2,6 |
| **paragraphs** | 54:8,9,15 55:4 | 116:2,19 | 175:16 176:11 | 233:14,18 |
| 243:7,9 | 55:10,23 56:4 | 117:14,23 | 176:20 177:1 | 234:7,19,24 |
| **paraphrase** | 56:11,25 57:19 | 118:4,18 119:4 | 177:12 178:21 | 235:1,2,15,20 |
| 408:10 | 58:2,9,17 59:8 | 119:10 120:19 | 179:3,11,18 | 237:9 244:4 |
| **paraphrasing** | 59:19 60:10,24 | 124:3 125:4,10 | 180:9 181:3,11 | 246:3,24 248:3 |
| 293:6 452:11 | 61:7,15,20,22 | 125:16 126:23 | 182:20 183:4,9 | 248:9,19 249:1 |
| **pardon** 76:19 | 62:8,13,19,25 | 126:24 127:1,2 | 184:5 185:4 | 249:7,13,20 |
| 325:16 437:22 | 64:2,11 65:6 | 127:16,24 | 186:13 187:16 | 250:2,9,24 |
| **parens** 102:14 | 65:15,23,24 | 128:23 129:10 | 187:25 188:18 | 251:8,25 |
| 102:15,15,16 | 66:20,22 67:23 | 129:16,23 | 188:24 189:5 | 254:19 255:12 |
| 397:18 | 67:25 68:2,3 | 130:4,9,13,17 | 190:6,9 191:12 | 255:17,25 |
| **parent** 404:11 | 68:16,18 69:18 | 130:23 131:7 | 191:25 192:8 | 256:2,3 257:1 |
| **parentheses** | 69:23 71:2 | 131:13 132:1 | 192:14,18,23 | 258:5,16 259:1 |
| 211:18,19 | 72:13,24 74:9 | 132:16,23 | 193:4,7,23 | 259:9,11,14 |
| **parents** 16:7 | 74:14,20 75:2 | 133:5,14,22 | 194:3,18 | 260:7,16 261:6 |
| 403:23 | 75:14,20 76:19 | 134:23 135:4 | 195:11,15,24 | 261:20 262:1 |
| **Parfitt** 3:4 6:3 | 76:22,24 78:23 | 136:1,14 | 196:4,8,24 | 262:22 263:3 |
| 14:1,8 15:22 | 78:25 79:12 | 137:15,24 | 197:15 198:4 | 263:22,25 |
| 16:5,10,16 | 80:7,20 81:1 | 138:20,25 | 198:16,24 | 264:8 265:5,24 |
| 17:21 18:7,10 | 82:6,16,20,24 | 139:3,8,10 | 199:5,17,21,22 | 267:4,11,22 |
| 19:1,9,20,25 | 83:6,7,19,24 | 140:7,10,12,15 | 200:11 201:14 | 268:5,16 269:2 |
| 20:2 21:10 | 83:25 85:13,17 | 141:5,16,19,21 | 201:20 202:3,6 | 270:4,6 271:8 |
| 22:1,15 23:25 | 85:22 86:4,7 | 143:4,17,23 | 202:13 203:6 | 272:4,5 273:17 |
| 24:13,16,23 | 86:19,22,25 | 144:3,10 145:1 | 203:11 204:11 | 273:25 274:4,7 |
| 26:18 27:8,14 | 87:4,9,10 | 145:11,24 | 204:15,18,24 | 274:21 275:10 |
| 27:17 28:25 | 88:14,21,24 | 146:22 147:2,3 | 205:12 206:6 | 275:14,18,21 |
| 29:8 31:2,9 | 89:2,8,11 | 147:15,20 | 206:12,23 | 276:5,14 |
| 32:4,12,18,23 | 90:12,23 91:7 | 148:3,20 149:7 | 207:24 208:22 | 277:13,21,24 |
| 33:11,17,24,25 | 95:10,12,16 | 149:19 150:1 | 209:6,15,22 | 278:8,24 |
| 35:15,18,20 | 96:22 98:2,10 | 150:16 151:1,9 | 210:15,18 | 279:23 280:5,8 |
| 36:4 37:7,15 | 98:12,14,16 | 151:11,14,21 | 211:1,4,6 | 280:15 281:12 |
| 37:19 38:1,10 | 99:3,7,13,17 | 152:15 154:2 | 213:6,11 | 281:21 282:2 |
| 38:13,16,20,22 | 100:10,13 | 154:11,15 | 215:21 216:17 | 283:2,5 286:14 |
| 38:25 39:3,8 | 102:7,9 103:23 | 155:3 156:12 | 217:13,23 | 287:9,20 288:6 |
| 39:12,13,23 | 103:24 105:6 | 156:14,18,21 | 218:1,10,13,16 | 288:14 289:5 |
| 40:19 42:1,11 | 105:15 106:17 | 157:2,14 | 218:21 219:2 | 289:10,16,24 |
| 42:13,23 43:3 | 107:1,12,19 | 158:12,16 | 219:13,15 | 290:25 291:2 |
| 43:8,13,25 | 108:9,25 109:6 | 159:6,15 160:3 | 220:3,20 | 291:18 292:3,6 |
| 44:11,22,24,25 | 109:12,13,23 | 160:12,14,18 | 221:25 222:19 | 293:7 295:25 |
| 45:6,14,15 | 110:4,13,19,25 | 160:21 161:2,6 | 223:5,12 | 296:21 297:16 |
| 46:17,19 47:8 | 111:8,13,20 | 162:1 166:3,7 | 224:19 225:11 | 297:20 298:23 |
| 47:12,16 48:1 | 112:3,6,15,19 | 166:10,18 | 225:18 226:10 | 298:25 299:9 |

Gregory B. Diette, M.D.

| | | | |
|---|---|---|---|
| 299:15,24 | 362:20 363:9 | 426:22 427:7 | 239:20 240:19 | 369:6 372:18 |
| 300:3,8,14,16 | 363:16 364:6 | 428:2,4,21 | 241:19 242:3 | 373:24 375:25 |
| 300:19 301:24 | 366:13 367:9 | 429:5,11,18,24 | 243:2 244:6 | 376:1 406:1 |
| 302:23 303:17 | 367:24 368:13 | 430:2,13,18,25 | 248:6 252:24 | 421:20 423:19 |
| 304:6,10,15,19 | 368:23 369:18 | 431:9,12,16 | 252:25 255:23 | 434:9 |
| 305:4 307:4,9 | 371:22 372:3,9 | 432:7,19 | 260:18 265:11 | **particularly** |
| 308:4,9 310:6 | 372:21 373:5 | 433:24 434:10 | 268:3 273:11 | 108:4 285:25 |
| 310:9,10 311:9 | 373:19 374:3 | 434:16,23 | 273:12 283:3,3 | 414:18 |
| 312:11,16,19 | 374:10 375:12 | 435:13 436:3 | 283:6 293:4 | **particulate** |
| 314:15 315:2 | 375:16 376:13 | 436:23 437:11 | 295:1 303:9 | 10:15 102:14 |
| 315:23 318:17 | 376:20 377:4,7 | 437:15,22,25 | 310:25 311:7,7 | 103:7 120:11 |
| 319:21 320:15 | 377:18,23 | 438:13,21 | 313:24 315:12 | 284:19 285:6 |
| 320:23 321:15 | 378:16,22,23 | 439:20,22 | 320:16 321:13 | 285:12 368:25 |
| 322:3,15,24 | 380:9,17 381:1 | 440:5,8,11,18 | 321:14 322:12 | 370:5,18 371:8 |
| 324:1,20,25 | 381:5,12,22 | 440:22,25 | 337:1 387:5 | 371:24 372:12 |
| 325:3,9,16,19 | 382:10,18 | 441:19 442:11 | 399:15 408:9 | 372:23 373:21 |
| 325:23 326:5,8 | 384:1,13,24 | 442:24 443:3,5 | 417:8 467:2 | 374:8,17,24 |
| 326:15,19,21 | 385:11,19 | 443:20 444:4 | **part-** 435:17 | 375:19 376:6 |
| 326:24 327:1,2 | 386:3 389:13 | 444:11,14 | **participants** | 376:10 404:19 |
| 328:1,3,13,16 | 390:3,8,24 | 445:13,24 | 249:15 270:10 | 404:21 |
| 329:16,19,22 | 391:15,21 | 446:7 447:8,15 | **participate** | **particulates** |
| 330:2,6,9,23 | 392:5 393:12 | 448:3,17 450:5 | 63:14 | 370:25 435:1 |
| 330:25 331:1,7 | 394:16 396:11 | 450:14,17 | **particle** 371:15 | **parts** 217:17 |
| 331:20,24 | 396:17 397:3,6 | 451:6,20 452:7 | 388:11,11 | 219:1 379:1,4 |
| 332:2,5,9 | 397:9,12 399:5 | 453:1,11,24 | **particles** 215:7 | **partway** 454:22 |
| 334:6,14 335:3 | 399:6 400:1,17 | 455:12,18 | 225:23 254:8 | **party** 64:10 |
| 335:7,10,13,14 | 401:12,14 | 456:4,20 457:3 | 373:15,15 | **pass** 52:20 |
| 335:18 336:6 | 402:3,13,21 | 457:19 458:2 | 412:9,10,16 | **passed** 302:13 |
| 337:9,12,17,21 | 403:11,12 | 459:1,5,22 | 428:24 429:7 | **passing** 86:13 |
| 337:25 338:4,6 | 405:9 406:4,23 | 461:7 462:14 | 433:7 435:17 | **passionate** |
| 338:11,18,19 | 407:12 408:7 | 463:25 464:8 | 448:21 449:24 | 306:15 |
| 339:7,19 340:1 | 409:1,25 410:6 | 464:11 470:1,8 | **particular** 46:9 | **passive** 365:4,16 |
| 340:7 341:4 | 410:16,21 | 470:12,15 | 68:21 69:3 | **passively** 284:5 |
| 343:13 344:2 | 411:6,16,20 | **part** 24:20 31:12 | 70:4 74:1,2 | **pathologist** |
| 345:8,14,24 | 412:13 413:1 | 31:13 43:6 | 92:14 105:24 | 119:11 |
| 346:10,15,19 | 413:19 414:2,6 | 46:18 48:10 | 107:21 133:3 | **Pathology** 11:15 |
| 346:23 347:1,2 | 415:6 416:2,15 | 60:7 63:6,15 | 163:10 172:21 | 427:9 |
| 347:18 348:11 | 416:21 418:12 | 65:17 70:12 | 176:9 181:6 | **pathophysiolo...** |
| 348:22 349:1,2 | 418:24 419:9 | 79:5 91:25 | 190:17 194:7 | 444:22 |
| 349:12,16 | 419:17,19 | 92:21 93:5 | 223:13 230:13 | **pathway** 447:25 |
| 350:17,20,23 | 420:16,19 | 117:6 123:13 | 233:11 238:6 | 449:4 |
| 350:25 351:5,8 | 421:1,9 422:6 | 138:16,17 | 240:7 270:17 | **patient** 104:24 |
| 352:6 353:6,13 | 422:18 423:2,5 | 149:11 195:19 | 277:11 311:19 | 335:21 405:6 |
| 354:5,19 356:6 | 423:21 424:1 | 197:22,25 | 312:2 333:5,6 | **patients** 103:17 |
| 357:6,16 | 424:18,22,24 | 202:23 221:23 | 342:4 343:9 | 104:1 105:21 |
| 358:10,16 | 425:25 426:4,5 | 222:3 225:19 | 358:4 359:1 | **Patricia** 328:5 |
| 360:17 362:2 | 426:9,12,15,21 | 226:8 230:9,13 | 361:6,17 369:2 | **patterns** 102:21 |

108:3
**Pause** 19:12
  44:17
pay 14:19
  158:22
paying 139:19
pays 192:9,15
PC 3:20
**PCPC** 5:15
  110:14
pedantic 301:3
peer 319:10
  408:19
peer- 121:20
  257:22
peer-reviewed
  121:11,16
  123:21 124:5
  124:17,21
  125:6,11,18
  126:8,13,18
  127:4,9,18
  141:10,11
  144:18 145:13
  147:6 148:21
  163:4 258:21
  411:10 416:5
  422:9,22 423:7
  435:16 436:12
  448:5 454:10
  464:2
pelvic 11:18
  107:9 427:12
  428:8 429:7,20
pending 13:13
  99:4 242:1
Penninkilampi
  237:25 416:11
  416:24 454:25
Pennsylvania
  5:6
Pensacola 3:16
people 41:4
  46:12 63:7,10
  74:8 104:17
  105:14 117:3,7
  123:18 142:3

143:9,11 157:1
168:14 169:22
170:13 190:21
191:3 196:14
226:7 239:9
261:5 263:2
268:22 287:15
288:19 303:8
311:1,13 312:2
314:2 316:8
319:2 332:23
333:5 340:19
341:3 343:3,23
344:14,15
361:9 372:17
386:15 404:15
406:9 409:17
415:19 436:20
437:7 442:7
447:2 459:14
466:6
people's 255:5
percent 233:22
  234:14 236:16
  237:17 301:22
  379:16 380:20
  385:13,13
percentage 41:4
Perfect 19:25
  38:16
perfectly 332:12
perform 268:10
  406:17
performed 64:4
  74:12,22
  141:17,20
  149:20 162:6
  265:13 403:18
perils 302:4
perineal 11:12
  76:20,22,25
  211:17 212:21
  266:22 271:20
  278:4 332:24
  359:5 416:8
  417:11,14
  428:6,20

perineum
  284:20 285:7
  285:17 411:15
  411:17 412:23
  433:8 435:2,24
  437:9 449:19
period 21:1
  41:13 45:19,25
  117:16 420:2
periods 257:24
  258:9
peritoneal
  395:11,22
  411:11 433:8
  435:2 457:25
peritoneum
  126:2
person 51:24
  57:7 63:4 80:4
  91:12,14
  106:15 113:6
  172:21 174:20
  256:24 270:16
  313:7 404:14
Personal 110:11
personally
  266:11 287:23
  311:21
pertain 245:8
pertaining
  28:13
pertains 255:20
Peruses 213:13
  282:25 300:7
  308:12 330:17
Pervasive
  305:15
Petta 174:22
Pettenati 174:23
  174:25
pharmacologist
  119:19
phenolics
  186:20
Philadelphia 5:6
phone 19:21,23
  157:24 162:14

162:14 173:15
phonetic 313:1
  454:24
photocopying
  178:17
physical 469:12
physician 34:15
  118:22
pick 319:9
  333:14
picked 342:3
picking 106:8
  304:18 343:1
picture 54:11
pictures 51:10
piece 306:16
  341:9 357:1,2
  357:15,15
  359:19
pieces 244:25
  339:9 470:6
piles 30:12
Pira 398:13
place 49:12
  78:18 84:22
  92:14 93:15
  97:2 153:23
  294:5 358:2
  387:9 459:14
  471:5
placed 412:7
  449:13
places 243:15
PLACITELLA
  3:20
plain 242:21
plaintiff 165:16
  171:13 340:15
PLAINTIFFS
  3:3
plaintiffs' 6:14
  7:5 17:14
  18:13,20 26:2
  28:24 29:12
  31:13 45:2
  60:23 76:12
  133:18 226:5

251:17 343:8
410:12 431:18
460:1 461:24
planning 318:15
plans 257:6
  320:2
plastic 186:20
plausibility
  272:25 273:4
  418:25 419:4
  433:20 445:14
  446:16,19
  447:17 449:1
  451:5
plausible 89:22
  384:7,20
  385:22 386:14
  414:16 415:23
  416:6 418:17
  420:10 421:4
  422:10 424:13
  425:22 432:10
  448:8 449:18
  450:7,21
  451:23 453:4
  453:19 455:6,9
play 304:17
Plaza 4:5
please 14:20
  15:24 24:16
  78:25 81:2
  83:19 98:12
  104:4 113:2,4
  113:17 115:14
  122:4 130:17
  141:18 156:12
  160:15 162:9
  167:6 169:6
  211:8,11
  214:22 218:10
  219:17 225:21
  246:12 318:24
  325:18 380:12
  464:8 466:12
  472:2,6
plenty 14:16
  143:7

pleural 457:25
    458:3,4
plot 327:13
    348:10,12
plots 327:13
plotted 463:9
plug 250:15
plus 144:24
    420:21
PM 370:4
pocket 158:23
point 42:9 43:24
    44:9 57:11
    65:21 93:3
    99:25 100:5
    106:10 163:12
    163:17 225:10
    230:4 253:12
    271:22 277:6,8
    314:22 333:3
    340:14 343:12
    343:22 346:4,6
    346:20 347:8
    348:14 350:12
    352:24 373:10
    374:1,16
    455:10 458:23
    462:10
pointed 350:4
pointing 332:6
points 238:2
    360:15
polarizing 11:16
    427:10
policy 8:7 84:10
    88:11 224:16
    231:14 235:24
    306:2 368:4
pollutant 107:25
pollutants
    102:13,18,23
    107:21 108:1,6
pollution 376:2
pooled 366:22
    368:21 379:14
    379:15 380:19
    383:12

poorly 338:21
popped 423:13
populate 92:21
    224:15 345:16
population
    325:10 345:4
    345:16 356:7
    370:7 389:6
    405:1
population-
    356:16
population-ba...
    356:23 357:5,8
    358:14 360:7
port 460:8
portions 173:5
    173:10
position 71:25
    84:15 99:11
    153:11 280:18
    314:8 340:5
    370:13 433:25
    449:14
positions 314:14
positive 226:21
    270:9 271:19
    278:3,15 352:2
    352:16,25
    353:4 359:23
    394:25 417:11
    465:15 466:1
    466:19
possibilities
    395:11
possibility 396:5
    444:21
possible 12:4
    22:8 51:1 63:8
    144:22 256:21
    285:20 442:20
possibly 387:24
post 23:1 29:12
post-medical
    95:1
posture 320:7
potent 221:23
potential 59:2

285:13 433:7
    435:1 439:12
potentially
    401:25
powder 1:5 7:4
    11:9 13:11
    28:14,19 49:3
    49:20 50:7,13
    50:19 51:8,15
    52:9 53:4,13
    53:14,25 54:1
    54:18 56:16
    57:13 59:3,11
    60:2 63:23
    64:5,25 69:11
    72:6,18 74:16
    74:23 75:4
    76:2 77:12,14
    77:15 78:3,10
    78:17 79:17
    80:9,13 84:11
    84:16,21 87:17
    89:15,18,19,22
    89:24 109:21
    111:2,9 120:21
    126:9,14
    127:11 128:17
    129:3,13,25
    130:25 131:15
    132:7 134:15
    134:19 135:5
    135:14 136:7
    136:21 137:2
    137:20 138:9
    140:22 142:12
    142:16 148:16
    149:22 150:20
    151:4 163:7,13
    163:18 164:12
    165:25 167:3
    167:12 187:6
    199:1,12,25
    200:4,10,22
    201:3,9,23
    202:21 203:1
    209:18 210:23
    211:17 212:21

214:19,23
    216:20 217:9
    218:2 219:8
    220:11 221:6,6
    231:16 233:23
    234:10,12,21
    236:14 237:15
    240:17 241:7
    241:10 262:7
    263:15,16
    264:1,2 266:17
    272:15 273:22
    274:14 275:2
    276:1 278:22
    279:2 280:23
    329:6 368:17
    381:19 382:12
    384:5,8,18
    385:12,21,23
    406:14 407:8
    410:22 411:5
    411:10,22
    413:9 414:15
    414:17 415:4,8
    415:15,21,23
    435:17 436:13
    451:24 453:5
    460:11,25
    462:19 464:4
powder/ovarian
    163:3
power 342:20
practical 303:25
    304:21
practice 61:1
    63:16 103:17
    106:19 182:10
    307:11 317:14
    317:18
Practices 1:6
    13:12
practitioner
    118:16
Pre-School
    10:17
preamble 425:3
preceded 270:11

270:18 382:23
    439:1
precise 246:12
    404:9 450:19
    450:24
precursor 422:1
    423:18
predated 423:15
predispose
    417:20
predisposition
    420:4
predominant
    458:9
predominantly
    374:24
prefer 344:14
pregnancy
    105:21,22
    106:14,15
pregnant 105:20
premise 344:20
preparation
    159:18 162:21
    180:23 197:12
    202:7
prepare 20:5
    129:21 158:4
    180:13,19
    185:19 186:24
    197:24
prepared 8:5
    18:13 27:19
    29:12 91:10
    92:10 111:17
    124:9 129:12
    129:25 130:25
    131:9,10 132:6
    134:14,18
    155:17 156:4
    162:3 171:15
    171:25 172:3
    172:13 196:25
    197:6 198:18
    201:8 205:8
    235:23
prepares 24:20

preparing 22:25
23:17 29:19
43:24 202:25
257:19 407:20
421:24
prescribes 63:5
presence 64:25
72:5 75:24
77:1 89:17,21
273:1 384:4
385:20
present 5:22
17:22 19:24
71:5 75:25
76:13 133:23
238:10 282:14
286:12 409:5
417:5,10
presented 29:13
117:19
presenting
70:17 245:15
presiding 219:4
pretty 24:18
46:5 48:14
104:18 106:25
182:5 195:20
217:1 220:5
221:23,23
238:25 286:24
287:12 293:17
303:3,12 315:4
427:1 460:24
prevent 187:12
preventive 47:1
previous 285:16
previously
182:2 186:3
417:16 418:4
431:21
primarily
106:19 142:25
143:24
primary 117:24
117:25 118:8
118:14 124:13
145:20

primates 253:8
prime 315:19
Princeton 4:21
principle 270:13
printer 394:14
prior 18:3 43:24
56:6 150:17
236:6 257:19
264:5 286:1
298:7 334:25
429:15 432:5
437:4
private 429:15
privilege 33:9
33:10 156:20
161:25 166:5,7
166:13 177:11
privileged
176:19,25
probably 14:12
20:15 67:8
92:2 94:9
95:25 104:6
113:21 121:13
158:23 167:19
198:10 202:16
202:18 203:17
207:19 240:17
299:7 310:24
311:5 361:7
392:22 410:14
424:8 434:20
450:15 456:1
problem 58:20
104:7,11 105:9
106:3 107:10
133:3 285:22
301:6 305:16
424:6
problematic
102:17
problems 54:20
procedure
283:12 404:13
procedure-rel...
143:14
proceed 19:18

proceeding
468:10 471:4
proceedings
19:12 44:17
process 14:17
203:23 244:24
261:4 266:4,8
432:11 433:23
455:15 468:1
PROCTOR
3:14
produce 260:15
260:17
produced 26:10
26:14 370:15
product 33:8,12
33:16 49:13
50:19 51:17
53:17 54:17,23
56:16,18 57:5
72:18 74:12
78:18 79:20
84:7,23 87:24
111:9 137:2
171:8 173:19
176:16 180:6
183:22 274:14
382:11,12,13
382:24 383:5
383:12,13
384:18,23
385:21 407:22
products 1:5,7
8:9 13:11,12
49:3 50:7,14
59:3,11 60:2
63:23 64:5,25
69:11 72:6,18
74:23 75:4
76:2 77:2 78:4
78:10,17 79:17
80:9,14 84:6
84:12,17,21
89:15,18,19,22
89:24 110:11
111:2 120:21
126:9,14

127:11 128:17
129:3,13,25
131:1,15 132:7
134:15,19
135:5,10,15
136:7 137:20
140:22 142:12
142:16 148:16
149:11,22
150:20 151:5
163:19 164:12
165:25 167:3
167:13 187:7
199:12 200:1,4
201:9,24 203:1
209:18 211:17
211:18 231:16
231:17 233:24
234:10,13,21
235:25 236:15
237:15 261:15
262:7 266:19
272:15 273:22
275:2 276:1
279:2 368:17
369:8 383:1
384:6,8 385:23
406:14 407:8
410:23 411:10
411:23 415:8
415:22,23
416:6 436:13
451:24 453:5
460:11 462:19
464:4
profession 34:14
professional
171:8 183:21
183:23 203:10
251:10
professionals
462:3
professor 7:15
34:17 93:6,20
94:6,10,13,14
94:15 100:18
profile 103:16

103:20
profound
460:24
program 47:19
48:16,21,23,24
105:18 230:13
262:4,6,9
programs 46:21
47:1,2,2 48:6
367:15,20,23
368:2
progress 135:8
135:14 451:1
project 153:3,7
155:7 191:16
194:7 230:8,10
projects 156:7
187:3,6,9
promise 124:11
promote 317:14
317:15 418:11
promoted 93:6,7
promoting
421:5
promotion 93:5
proof 433:6
446:19,24,25
447:3,5
proofread 176:8
proper 271:3
322:5 323:17
properly 326:10
proportion 41:8
propose 452:10
proposed
417:16 418:4
451:23
proposition
226:23 227:15
306:12 307:14
propounded
18:2 474:6
prospects 39:18
40:15
prostaglandins
444:20
protect 156:16

Case 3:16-md-02738-MAS-RLS   Document 9895-3   Filed 05/30/19   Page 536 of 565 PageID: 71780
Gregory B. Diette, M.D.

Page 517

protective
285:18 421:21
421:22
protein 423:13
protocol 38:19
160:24
prove 446:1,3
446:10,12,13
proved 419:5,12
proven 445:10
445:15,20
450:7 451:8,16
provide 18:23
37:12 55:25
61:6 62:2 63:8
89:18,22
109:17 180:18
187:24 228:5
316:8 343:23
445:21 460:16
469:13
provided 17:7
17:13 71:4
74:11 88:16
115:22 116:5
116:10,11,12
116:13,24
117:18 118:8
134:24 139:23
157:18,21
165:14 167:2
167:23 172:10
180:12 184:10
187:19 189:12
194:24 207:13
provides 63:5
providing 32:5
183:11 184:7
227:24
provoke 102:12
107:15
public 2:17 8:8
10:13 46:21,25
47:18,20 48:6
48:15,23,25
95:2,6 100:22
101:21,25

107:14 141:11
231:15 235:24
267:2 369:24
370:3 474:19
publication
123:24 245:14
321:3
publications
121:2,11,15
122:8 123:21
124:9,16,17
125:6,17
126:18 127:4,9
127:17,18
141:10,11
142:23 146:9
245:8,10
454:10
publicly 156:10
publish 143:18
315:13 316:21
317:3 320:9
321:2
published 35:23
45:9 92:1
108:10 121:10
121:16,20
124:4 125:5,11
125:17 126:8
126:13 141:23
142:5,11,15,19
142:25 144:12
144:18 145:5
145:13 147:6
148:21 230:16
236:13 237:14
257:3,25
258:20 259:7
264:22 296:10
319:5,8,18
325:22 359:13
369:2,5 373:8
373:14 381:11
391:7 408:19
411:9 427:19
439:3 461:17
463:15

PubMed 92:16
92:17 108:20
121:17
pull 18:16 29:21
69:17,17
339:14 363:4
416:17
pulled 170:21
172:2 341:17
pulmonary
34:18,22 52:15
57:3 63:11,17
93:21,22 94:17
94:18 96:9,10
96:10,11 97:17
101:10 103:5
104:16,18,19
104:22 106:20
143:5 153:13
201:6,10,18
205:9
pulmonologist
61:8,17,23,24
61:25 106:4
pulmonology
118:22 188:25
purchased 50:6
53:1,4
Purdie 42:6,16
43:14,15,18
45:7,18 351:11
purported
462:21
purpose 43:22
97:12 162:2
252:21
purposes 18:18
22:4 43:19
55:6 56:16
70:16,24 71:3
71:15 78:9
79:16 93:5
111:16,17
168:1 175:18
183:14 188:3
194:21 242:12
251:12 252:2

252:16 267:24
268:6 286:17
310:15 324:16
327:12 368:4
390:17 462:16
Pursuant 2:16
push 306:24
pushing 155:23
put 19:17 29:20
30:1,2 35:12
41:22 45:14,16
52:24 58:6
67:21 83:12
86:7,8 97:25
100:12 165:17
169:18 170:14
172:6,7,8,21
175:19 211:1,4
212:8 215:25
216:3 236:7
254:8,9 267:2
271:11 291:19
299:19 309:11
311:13 326:2,3
327:19 328:12
334:12 336:14
340:23 341:13
346:11,13
355:5,11 364:4
365:9 426:25
438:2
putative 47:3
puts 224:25
putting 203:24
304:12 468:21
468:21

**Q**

qualifications
212:17 306:20
442:8
qualify 90:3
qualitative
271:25 273:13
273:14 370:21
quality 144:8,8
149:10 239:14

251:23 257:17
quantified 371:4
quarrel 278:25
279:5,7,10
query 404:10,11
question 14:20
14:22 23:20
24:12 28:15
32:4,21 33:10
33:15,18,22
36:11,12 37:22
39:7,20 40:1
40:12 41:16
42:12 47:7,9,9
47:23 49:6,18
49:22 50:25
55:1,13,21
56:20,24 57:9
61:16,21 62:6
62:12,20 64:12
65:16 66:19
68:1,4,17 72:9
72:22 73:4,8
73:12,16 78:24
79:6,11,16
80:17,21,22
82:2 83:18
84:5,9,14,20
85:1 90:2,11
96:18 98:8,11
98:13 99:4
103:22 106:7
106:11 107:17
109:11 112:14
113:3 114:23
115:12 116:23
118:3,14
123:20 124:2
125:3 127:14
132:18,20
133:8,9 135:24
137:11 139:20
144:2 145:17
149:1,13 159:4
161:8 164:10
166:2,20 167:6
168:20 169:5,8

Gregory B. Diette, M.D.

| | | | | |
|---|---|---|---|---|
| 170:1,12 172:3 | 385:16 390:21 | 474:5 | 24:2,6,21,22 | 259:18,18,22 |
| 173:22 174:9 | 391:5 400:12 | **quibble** 221:8 | 25:17 178:20 | 259:24 260:1 |
| 176:17 177:2 | 401:11,15 | **quick** 44:5 | **rates** 215:8 | 265:6,8,10,15 |
| 177:10 184:19 | 402:11 403:10 | 293:14 320:16 | 226:12 | 266:8 270:23 |
| 187:13,21 | 404:5 405:14 | 320:17 377:4,8 | **ratio** 333:11 | 271:15 272:1,6 |
| 188:19 191:6 | 406:22 407:11 | 399:25 426:10 | 347:8,16 349:9 | 273:12 277:23 |
| 191:24 192:5 | 407:23 408:8 | 467:23 | 349:24 361:4 | 278:14 279:16 |
| 192:21 193:2,3 | 410:20 411:2 | **quickly** 112:1 | 365:12 368:21 | 282:17 286:6 |
| 199:8 200:2 | 412:20 413:15 | 151:15 | **ratios** 349:15 | 292:17,22 |
| 210:14,16,19 | 422:15,19 | **quit** 218:10 | 351:12 | 296:3 298:3,7 |
| 210:20 215:17 | 424:23 427:23 | **quite** 90:6 | **rats** 253:8 | 299:10 300:18 |
| 217:19,21,24 | 436:10 444:12 | 434:20 451:3 | **reach** 184:15 | 301:14,17 |
| 218:7 219:6,12 | 446:23 450:15 | **quote** 29:21 30:2 | 190:15 191:15 | 302:8,15 303:4 |
| 220:8,11,14,18 | 456:22 457:20 | 425:24 | 194:15 195:13 | 304:4 305:6,12 |
| 220:21 221:15 | 460:21,22 | **quotes** 169:22 | 228:16 233:9 | 306:3 311:14 |
| 221:20 222:9 | 465:4,6 466:15 | 170:12 | 279:21 282:12 | 311:17 312:1 |
| 223:1 224:1 | **questionable** | | 283:9 314:24 | 313:5,14,20 |
| 225:3 230:20 | 256:13 437:2 | **R** | 323:13 418:17 | 316:15 317:16 |
| 231:20 233:15 | **questioner** | **R** 3:1 13:1 473:2 | **reached** 155:10 | 348:1 370:9 |
| 234:18,22 | 19:18 | 473:2 | 185:21 187:1 | 373:23,25 |
| 241:24 242:1 | **questioning** | **rabbits** 253:8 | 193:9,17,24 | 378:8,10 379:1 |
| 243:10 244:12 | 80:25 83:22 | **race** 236:19 | 194:23 227:25 | 379:20 388:14 |
| 252:11 254:18 | 165:19 | 346:18 | 228:6,11 | 389:24,25 |
| 258:13,17,19 | **questionnaire** | **radiation** | 396:10 401:1 | 390:6 395:17 |
| 260:6 261:16 | 404:15 | 115:18 125:23 | **reaches** 189:7 | 401:18 413:4 |
| 265:21 273:18 | **questions** 27:5 | **radiolabeled** | 190:21 191:19 | 413:16 417:21 |
| 274:9,11,24 | 27:12 32:10 | 412:10 | 194:8 | 420:6 423:22 |
| 275:7,19 276:2 | 37:18 38:25 | **radiologist** | **read** 42:16 | 423:22 424:19 |
| 276:4,9,12 | 53:3 82:12,18 | 119:13 | 45:22,23 65:18 | 425:13 428:3 |
| 278:7 279:14 | 83:4,16 86:1 | **radiology** | 66:23 68:8,19 | 428:11 429:2 |
| 279:16 286:5,8 | 114:8,24 | 143:14 | 68:20 69:3,6 | 430:9 431:22 |
| 288:5,7 290:25 | 121:25 132:20 | **RAFFERTY** | 70:10 72:14,14 | 431:24 441:7 |
| 291:3 299:1 | 154:6 163:10 | 3:14 | 76:20 77:3 | 445:5 448:5 |
| 304:16 310:7 | 203:4,23 | **raise** 80:5 | 83:5,11,17 | 453:15 454:14 |
| 319:20,22 | 207:22 210:9 | **raised** 396:13 | 85:24 88:1 | 462:17 472:2 |
| 321:11 330:7,8 | 217:20 218:25 | **raising** 113:14 | 97:18 99:25 | 474:3 |
| 332:4,13 335:2 | 254:24 300:2,4 | 113:19 115:2 | 100:25 101:12 | **readable** 469:10 |
| 335:8,11,15,17 | 300:9,22 304:5 | **range** 375:18 | 102:24 103:9 | **reader** 245:23 |
| 335:19,21,22 | 321:12 326:14 | **ranges** 105:4 | 111:25 143:11 | 248:5,11 249:9 |
| 337:17,20 | 329:23 336:3 | 458:14 | 166:23 181:24 | 249:14,22 |
| 338:3 339:20 | 346:22 400:3 | **rank** 93:6 | 211:8 212:5 | 250:4,18 |
| 340:4 342:12 | 408:5 430:21 | **ranked** 36:2,3 | 214:22 225:20 | **reading** 28:1 |
| 353:12 354:1 | 430:24 431:2 | 36:16 | 225:21 231:22 | 69:1 76:18 |
| 364:20 371:21 | 435:25 438:19 | **ranks** 34:24 | 232:21 236:21 | 79:9 85:15 |
| 372:7 374:14 | 439:19 440:14 | 35:5 | 239:2 256:21 | 87:6 198:2 |
| 375:21 382:16 | 440:20 456:22 | **rarely** 352:20 | 257:3,21,22 | 253:24 287:7 |
| 384:10 385:6 | 467:23 470:11 | **rate** 23:11,13 | 258:20 259:16 | 291:16 313:13 |

Gregory B. Diette, M.D.

389:2 400:5
409:24 420:14
469:20
**readings** 128:3
**reads** 96:8 101:7
198:14
**ready** 44:22
315:19 377:19
**real** 44:5 133:3
301:5 316:2,3
316:4,5,6,7
399:25
**realistic** 270:12
**realistically**
462:11
**reality** 229:4
383:8,18,25
**realize** 27:15
99:22
**really** 21:6 53:7
53:7 68:13
70:10 77:17
93:7,17 105:3
114:10 133:15
149:10,10
180:10 191:23
201:21 210:21
221:13 229:15
231:6 237:6
240:10 252:21
258:19 269:15
293:10 295:10
310:4 331:24
332:17 334:4,4
335:8 340:24
344:20 353:18
358:13 360:11
364:3 374:4
382:6 405:24
420:24 422:4
423:16 425:4
462:9 469:8
**realtime** 300:21
345:11 450:16
**reanalysis**
388:25
**reason** 21:11

39:25 70:6
185:21 192:24
213:16 222:11
223:10 272:19
315:8 341:5
407:4 409:20
410:10 412:6
462:1 472:4
473:6,8,10,12
473:14,16,18
473:20,22,24
**reasonable**
79:19 87:19
445:8
**reasons** 332:18
361:7 384:12
**REATH** 5:4
**recall** 41:23
67:12 146:3
176:4 197:2,10
389:2,7 402:12
465:6,11
**recalled** 270:10
**receipt** 472:13
**receive** 102:2
**received** 20:17
21:16 95:2
148:9,12,15
175:23 229:20
468:14
**receiving** 187:18
469:5
**recess** 89:5
151:18 204:21
280:12 320:20
377:11 426:18
447:12 464:14
**recognize** 78:13
239:9 361:12
467:3
**recommendat...**
406:16 407:2
**record** 13:4,19
18:18 19:8,11
19:14,16 26:10
27:6 28:22
31:7 32:16

33:22 37:24
38:8 44:14,16
44:19 52:24
53:16,24 54:3
58:5,10 83:22
89:4,7 99:11
115:13 132:2
134:7 151:17
151:20 154:13
204:20,23
234:6 280:11
280:14 320:19
320:22 324:23
331:23 336:16
338:5,7,14,15
338:17,24
344:11 350:15
377:10,13,14
377:15 378:19
393:3 426:17
426:20 431:8
440:10,24
441:8 447:8,11
447:14 464:11
464:13,16,20
464:21,23
467:18 470:17
**recordation**
173:6 242:10
**recorded** 471:8
**records** 30:4
167:21,22
177:13
**Red** 3:22
**redacted** 161:24
180:5
**reduce** 32:19
46:22 172:9,23
367:15,23
368:2
**redundancy**
74:6
**redundant**
245:14 247:12
**Reeds** 388:16
**refer** 265:18
**reference** 66:2

152:1 238:21
244:18 468:21
**referenced**
397:14
**references** 66:10
171:6 364:19
396:20
**referrals** 104:19
**referred** 118:22
118:24 120:3
**referring** 28:23
43:1 65:5
237:7 255:24
282:6 292:7
297:7,10,25
298:21,25
389:22 441:1
**refill** 88:20
**reflect** 53:24
97:20 101:14
113:18 115:13
179:13 344:12
349:9
**reflected** 69:12
**Reform** 231:13
**refresh** 65:20
380:10
**refusing** 33:21
**regard** 14:5,11
31:17 33:18
35:6 49:18
57:3,11,21
60:1 76:2
84:11 96:16
120:10 126:14
129:6 157:12
159:18 175:24
176:13 177:7
225:14,15
233:10 251:11
256:15 280:18
287:15 310:16
315:25 356:7
370:17,23
373:14 381:18
384:19 409:2
434:1 441:11

**regarding** 31:24
32:11,14 76:16
124:17 127:10
127:19 173:20
295:16
**regardless**
280:25 322:11
379:13
**region** 11:19
427:12
**regional** 428:9
429:8,20
**Registry** 8:12
**regret** 44:8
**regulatory**
56:14 119:21
209:1 434:12
**Reid** 388:3,15
388:18,19
389:3,12
390:10,11,12
390:12,13,18
**Reids** 390:11
**reiterating**
403:13
**relate** 187:14
405:20
**related** 33:4
121:22 123:23
142:2 143:22
199:4 200:8,10
200:12 201:4
257:17 285:22
380:2
**relates** 1:10
403:9
**relationship**
127:11,19
153:20 154:17
157:5 200:16
210:22 212:20
273:21 274:13
275:1 376:9
379:10 463:11
**relationships**
358:1
**relative** 9:19

Gregory B. Diette, M.D.

| | | | | |
|---|---|---|---|---|
| 327:18 328:9 | 32:21 36:2 | 94:10 111:17 | 255:23 256:1 | 70:6 71:19 |
| 328:18 329:5 | 53:23 60:20 | 129:12,14,21 | 256:11,18 | 129:24 130:4 |
| 332:14 336:9 | 63:19 69:3,7 | 129:21 130:8 | 257:10,20 | 131:9 134:18 |
| 339:2,15,23 | 69:15 138:11 | 130:21 131:4 | 258:1,11 | 156:4 162:16 |
| 340:9 342:4,6 | 144:24 145:2 | 131:20,22,23 | 264:10,14 | 165:15,20 |
| 343:15,16 | 152:25 153:5 | 132:5,8,10,14 | 267:6 268:7 | 175:3 180:16 |
| 348:13 349:11 | 158:3 161:8,9 | 133:24 134:7,9 | 315:12 324:4,5 | 180:19 185:19 |
| 352:1,16 | 164:4,17 171:4 | 134:13,25 | 325:5 326:1 | 186:4 202:8,25 |
| 353:10 360:20 | 182:8 197:14 | 135:1,13 | 327:12 332:16 | 203:4 239:4 |
| 361:15 363:24 | 197:22 231:22 | 138:17 145:25 | 334:3 336:1,5 | 257:9 297:11 |
| 365:4,5,17 | 242:22 247:10 | 152:3 153:16 | 336:19,23 | 329:5 374:7 |
| 366:19,22 | 252:19 253:6,8 | 154:24 155:12 | 341:13 346:21 | 407:21 417:10 |
| 367:16,21 | 265:9 283:17 | 155:17 158:5 | 355:22 356:4 | 453:18 454:4,5 |
| 368:16 370:17 | 288:17 296:8 | 159:19 162:3 | 356:13,13 | **repository** 92:20 |
| 370:25 371:11 | 296:12 311:21 | 162:22 163:21 | 357:17 360:4 | **represent** 18:19 |
| 371:12,16,23 | 380:6,7 389:11 | 163:21 165:7 | 360:12,16 | 18:21 28:17,18 |
| 372:11,22 | 392:17 395:24 | 168:2,18 | 364:23 366:19 | 40:8 45:3,4 |
| 373:16,18,20 | 425:2,6 426:1 | 169:11,12,17 | 367:2 378:4,7 | 52:7,24 53:3 |
| 374:7,23 375:7 | 426:7 432:17 | 170:4,10,14,14 | 378:25 379:8 | 55:14 81:12,15 |
| 375:18 377:25 | 460:4,6 463:21 | 171:12 172:5 | 390:18 393:4 | 84:2 98:3 |
| 379:16,23 | 468:2,14 | 172:12 173:5 | 395:19 396:13 | 101:19 103:11 |
| 383:3 387:17 | **remind** 113:7 | 173:11,16,21 | 397:15 399:16 | 103:13 108:14 |
| 397:25 398:10 | 160:5 | 174:4,10 | 408:18 421:24 | 139:11 224:23 |
| 398:14,21,23 | **reminded** | 175:19,24 | 421:25 432:9 | 225:9 232:10 |
| 399:10 400:5,7 | 455:13 | 176:1,14,24 | 443:21 447:21 | 235:21 236:5 |
| **relatively** | **reminds** 68:24 | 177:8 180:13 | 460:5,8,16 | 289:25 291:20 |
| 343:23 | **removed** 280:22 | 181:13 182:22 | 468:2,5,10,20 | 292:8 297:21 |
| **relevance** | **render** 256:13 | 183:15 184:9 | 469:15,18,23 | 308:14 312:5 |
| 315:25 342:6 | **rendered** 161:13 | 186:24 193:12 | 470:7 | 317:1 325:23 |
| **relevant** 145:22 | **repeated** 420:1 | 198:6,9 201:8 | **reported** 1:25 | 325:24 327:9 |
| 211:15 238:13 | **repeatedly** | 203:21,24 | 9:21 270:11 | 327:17 343:11 |
| **reliable** 416:4 | 461:23 | 205:4,6,7,7,16 | 291:5 337:2 | 350:14 364:12 |
| **reliance** 34:5 | **rephrase** 408:6 | 206:14,14 | 339:6,9 371:14 | 387:4 397:13 |
| 43:2,7,9,10 | 422:19 | 208:9,23 | 372:11 375:6 | 399:12 438:8 |
| 65:21 165:18 | **replace** 309:7 | 209:24 210:4,8 | 428:20 463:19 | 438:25 442:19 |
| 388:15 468:23 | **replacement** | 210:25 212:2 | **reporter** 2:17 | **representation** |
| **relied** 65:18 | 315:16 | 227:25 228:6 | 13:19 188:9 | 54:4 324:23 |
| 381:24 440:17 | **report** 6:19 7:16 | 232:21 233:8 | 279:12 440:21 | **representative** |
| **rely** 71:9,21 | 10:21 21:12 | 235:13 237:2 | 471:1,2,24 | 84:15 86:9 |
| 72:1 166:15 | 22:5 29:19 | 238:11 242:12 | **reporter's** | **represented** |
| 233:3 255:10 | 30:8,11 42:6 | 242:16,23 | 471:13 | 242:15 339:24 |
| 381:23 390:18 | 42:14,22,24 | 243:11,23 | **reporting** | 386:8 387:4 |
| **relying** 68:14 | 43:7,24 66:4 | 244:7 248:15 | 247:13 270:9 | **representing** |
| 70:18,25 71:6 | 66:10,23 67:14 | 248:18,22 | **reports** 20:14,15 | 55:18 221:1 |
| 71:10,17 167:5 | 68:8,19 70:21 | 249:3,8,21 | 21:5,20 22:11 | 223:14 |
| **remember** | 70:25 71:4,7 | 250:3,17 | 60:6,12 66:18 | **represents** |
| 22:10 27:22 | 75:24 76:4 | 253:17 255:19 | 67:4,21 69:12 | 17:25 18:5 |

Gregory B. Diette, M.D.

21:15 28:7
81:24 224:7
327:11 382:9
**reproduced**
26:16
**reproduction**
439:4,6 471:22
**reproductive**
36:7,15 61:2
**reputation**
230:4
**request** 16:24
18:20,21 26:11
26:17 31:3,15
31:24 32:25
97:1 99:15
164:6 192:16
426:2
**requested**
155:11 199:13
231:25
**requests** 6:15
17:15 18:1,6
32:1,14 33:7
**require** 251:10
**required** 315:12
362:9 457:18
**reread** 67:6
**rereviewed**
259:5
**Res** 369:11
**research** 9:8
48:24 97:14,21
101:8,15
102:11 103:2
103:12 107:13
108:3 121:2
128:16,20,25
129:2,5 143:1
143:13 145:20
146:8 147:17
147:22 148:5
149:12,14,17
149:21 150:19
151:3 162:20
163:4,22,24
164:11 190:17

202:4 230:8,13
242:19 262:6
262:10,12,15
294:14 298:15
306:1 308:17
309:21 310:12
313:11 314:19
319:7,15,24
367:10 369:13
369:14 403:3
444:24
**researched**
119:6
**researcher**
34:16 224:13
**researchers**
215:6 225:22
226:4 295:16
309:14 310:1
**researching**
233:8
**resembles**
268:15
**residency** 117:6
117:9,12
**resisted** 273:16
361:10
**resonate** 215:20
215:23
**resonates**
215:22 216:4
217:5
**resources** 311:1
**respect** 67:19
**respected** 260:9
260:13
**respiratory**
142:3
**respond** 32:16
114:17
**response** 6:14
17:14 18:12,20
26:11 28:24
32:25 417:19
418:7 440:4
465:18
**responses** 18:1

**rest** 237:18
244:13 414:21
420:14
**result** 305:25
352:2 382:14
**resulting** 413:9
**results** 69:10
70:18 71:18
256:13 287:3
291:5,7 292:14
292:15 293:6,9
366:24 395:20
407:25
**retain** 194:15,20
**retained** 7:5
51:5 55:5,13
108:21 109:16
136:6,6,25
139:13 140:21
150:18 151:2
171:13 195:1
208:24 228:5
242:4
**retainer** 31:20
**retention** 56:12
**Retire** 9:4,12
**retrograde**
273:3
**return** 472:11
**reveal** 173:19
**review** 10:12,25
11:14 17:3
19:2 20:21
39:15 42:4
43:18 55:22
60:11 82:18
83:3 148:22
149:6,9 153:4
154:1 189:9
190:2 212:17
222:20 240:2,7
241:16 242:24
244:15 253:15
256:10 264:22
264:24 380:25
411:22 422:8
427:20 448:4

455:14 462:15
463:8
**reviewed** 6:22
19:5 20:5,6
42:5,6,15
43:21,23 59:7
59:24 65:18
66:3,8 77:9
80:18 82:13
83:16 111:16
121:21 124:15
157:21 244:18
245:1 246:8
247:2 250:19
251:11 257:23
357:17 373:13
374:6 378:24
381:16 409:9
412:15 438:17
448:25 451:22
452:17 459:23
460:3
**reviewers**
319:10
**reviewing** 30:6
37:11 67:13
185:8 407:5
**RICE** 4:10
**Richard** 4:18
11:25 438:9
**rid** 311:14,16
**ridiculous**
270:16
**right** 14:9,18
15:1,5,8,9,15
15:23 16:22
17:2,5,7,24
18:9,11 20:3
20:18 21:1,11
21:19 22:2,10
22:16 23:4,10
24:1 26:6,25
27:21 30:1,9
30:19 31:1,10
31:15,20 33:13
34:13 36:5,19
37:5,8 39:14

40:24 41:1,5
42:2,4 44:1
45:12,24 46:4
46:7,10,17
47:10 49:3,17
50:6,18 54:10
58:1,13,16,18
58:23,24 61:10
61:25 62:7
63:16,20 65:10
66:15 67:11
70:3 71:21,22
72:4 73:11,23
74:6,10 75:19
77:5 78:15,16
79:24 80:1,2
80:12 81:4,6
82:6 88:3,12
88:13,15 89:14
90:4,8 91:23
92:5,9,12 94:2
94:5,14,16
95:17,20 96:2
96:5,8,15
97:13 99:4
100:17 101:14
101:17,24
102:10 103:11
103:16 106:18
108:21 110:9
110:22 114:8
116:21 119:13
120:13,23,24
121:1,14
122:23,25
123:10 124:4,8
124:14 125:5
128:1,19
130:15 132:11
132:23 134:6
134:12 135:10
135:25 136:18
139:1,15,21
140:13,16,19
141:2,4,9,22
142:5,10
144:15 145:2

Gregory B. Diette, M.D.

| | | | | |
|---|---|---|---|---|
| 145:12,19 | 276:24 278:16 | 389:24 390:17 | 126:14 172:23 | 423:9 446:15 |
| 149:13 150:24 | 280:2,21 282:5 | 391:22 393:9 | 214:6,6,16,24 | 451:18 466:8 |
| 151:8,22,24 | 282:8,19 284:2 | 393:18,25 | 215:4,5 216:21 | 466:23 |
| 152:3 154:9 | 284:15 285:1,5 | 394:7,8,15,19 | 217:10 218:3 | **risks** 235:25 |
| 155:13 157:3 | 286:15 287:12 | 394:22 396:18 | 219:8,24 220:1 | 327:18 336:9 |
| 157:15,19,24 | 288:15 289:6 | 397:22,25 | 220:12 221:7 | 337:2 339:2,15 |
| 159:2,25 | 292:7,24 | 398:17,19 | 221:16 222:5,6 | 342:7 360:20 |
| 162:10,18 | 293:19 295:3 | 399:2,20 401:7 | 222:18 223:18 | 361:12 363:24 |
| 163:2,17 165:5 | 296:16,17,17 | 402:23 405:4 | 223:19 225:15 | 365:4 367:16 |
| 168:10,17 | 298:9 299:18 | 405:18,24 | 231:15 233:22 | 367:21 368:12 |
| 169:23 170:9 | 300:24 301:25 | 407:17 408:17 | 234:14 236:16 | 368:16 370:18 |
| 170:19 174:17 | 302:3,20 305:15 | 408:20 411:8 | 237:17 238:3 | 372:11 375:7 |
| 177:23,25 | 305:11 306:16 | 413:2 415:7 | 240:18 248:1,1 | 375:18 379:23 |
| 178:6 181:4,18 | 307:22 308:5 | 416:22 418:2,3 | 262:18,23 | 400:5,7 401:2 |
| 182:10 189:18 | 310:22 312:25 | 419:21 420:8 | 263:9,11,13,16 | **Road** 2:6 13:10 |
| 189:19 191:2 | 313:14 314:5 | 424:8 425:8,19 | 263:18 269:10 | **Roberta** 442:20 |
| 194:13,16 | 316:3 317:7,24 | 426:12 427:8 | 285:13 328:9 | **ROBINSON** 4:4 |
| 198:5 203:16 | 319:1,6 322:25 | 427:19 428:13 | 328:18 329:5 | **role** 12:4 48:10 |
| 203:20 205:2 | 323:17 324:11 | 428:22 429:19 | 332:14 339:23 | 117:25 154:21 |
| 206:13,18 | 324:12 327:5 | 429:21 431:4 | 339:24 340:9 | 288:18 294:19 |
| 207:6,25 208:6 | 329:10 330:1 | 434:6,17,24 | 342:4 343:15 | 442:20 |
| 208:17 209:11 | 332:10 333:23 | 436:24 438:7 | 343:16,24 | **roll** 38:7 |
| 210:7,14,24 | 333:24 334:2 | 440:12 442:4 | 348:13 349:11 | **Roman** 276:15 |
| 211:21,23 | 338:7 340:25 | 448:20 449:11 | 352:1,16,16 | **Ron** 309:7 |
| 213:24 214:5 | 343:2 344:9,22 | 454:11,17 | 353:10 359:14 | **room** 353:2 |
| 214:10,22 | 344:25 345:3,9 | 455:10 456:5 | 359:23 361:4,4 | **ROSEN** 3:5 |
| 215:11 216:9 | 347:11 348:16 | 456:21 458:23 | 361:13,14,15 | 52:5 85:19 |
| 216:18 218:20 | 349:14 350:2,4 | 460:13 461:4 | 361:15 362:15 | 86:13 139:6 |
| 218:20,22 | 352:7,18 | 462:22 465:13 | 362:17 364:11 | 393:3,9 427:4 |
| 222:20 224:5 | 353:17,19 | 465:17 466:8 | 365:5,17 366:2 | 437:21,24 |
| 225:5,25 | 354:8,18 355:1 | 466:17 | 366:19,22 | **Rosenblatt** |
| 226:17,17 | 355:5,16,19 | **right-hand** | 368:15 370:25 | 351:13,23 |
| 227:5,6,20,20 | 356:10 357:2,7 | 327:14 419:13 | 371:11,12,16 | **rotate** 117:7 |
| 228:4,25 232:5 | 358:12,17,23 | **Rigler** 65:11 | 371:23 372:18 | **ROTH** 3:20 |
| 236:23 237:5 | 359:15,18 | 66:6,11,15,24 | 372:23,25 | **Rothman** 8:20 |
| 239:18 242:6 | 361:16 362:6 | 67:14 68:9 | 373:16,18,20 | 287:21 290:9 |
| 242:15 247:21 | 362:13 363:3 | 70:25 71:8,18 | 374:7,8,15,23 | 292:9 317:13 |
| 253:22 254:4 | 365:24,25 | 72:5,15,16 | 376:6 377:25 | 322:11 361:2 |
| 254:24 255:13 | 366:16,25 | **Rigler's** 69:10 | 379:17,17 | 456:2,3 463:8 |
| 256:20 257:19 | 367:5 369:7 | 70:19 | 380:20 383:3 | 463:8,16 |
| 258:25 261:18 | 370:16 371:3,5 | **rings** 303:9 | 387:17,20,20 | **Rothman's** |
| 264:19 267:5 | 375:5 376:14 | **rise** 387:24 | 389:5 398:1,10 | 288:8 |
| 267:14,23 | 378:14,22 | **risk** 6:23 7:23 | 398:14,21,23 | **roughly** 376:23 |
| 268:24 269:7 | 379:6 380:1 | 8:8 9:20 10:5,9 | 399:10 402:1 | **route** 284:21 |
| 269:20 271:2,9 | 383:9 384:17 | 45:8 59:2,10 | 411:5 413:11 | 285:7 413:11 |
| 271:12 272:23 | 385:10 386:10 | 79:8,10,15 | 414:17 417:15 | **row** 333:6 |
| 273:6 275:8 | 387:2,20 | 80:5 125:12,18 | 421:18 422:23 | **rows** 334:12 |

Gregory B. Diette, M.D.

**RPR** 471:18
**RR** 350:25
 351:1 367:3
**RRs** 336:7
**rubbing** 154:13
**rule** 251:19
 315:11 361:23
 362:3
**ruled** 396:4
**ruler** 353:21
**rules** 160:20
 166:6 316:19
 317:4,9,11,12
**run** 208:17
 237:22 314:21
 353:21
**running** 437:17

---

**S**

**S** 3:1 6:1,8 7:1
 8:1 9:1 10:1
 11:1 12:1 13:1
**Saed** 255:21
 256:2,15 257:4
**Saed's** 256:10
 256:11 257:21
 257:22 258:20
**safe** 46:5 407:22
**safety** 84:7
 234:10
**salad** 268:25
 269:4,5
**sales** 1:6 13:12
 327:11
**saliva** 404:25
 406:3
**sample** 248:25
 249:2 316:8,10
 341:7,11,16
 342:2,13,16,23
**Samuel** 11:20
**Sander** 288:22
 289:1 290:12
 297:21 317:13
**sanitary** 331:14
 332:21,23
 334:17,22

**sat** 179:9 338:23
**saw** 60:19,21
 65:10 69:17
 94:9 182:11
 230:1 231:20
 257:8 296:8,9
 299:4 307:3
 311:4,22
 312:23 313:22
 314:16 409:2,6
 421:24 429:22
**saying** 37:2 40:7
 53:14 82:25
 146:3 164:5
 182:13 189:24
 191:5 219:15
 220:2,8 224:6
 224:22,22
 227:1,10
 237:13 243:18
 251:19 277:4
 279:6 295:1
 305:2 311:17
 330:1 334:2,3
 351:20 359:8
 365:12 368:11
 372:16 374:14
 383:16,24
 385:4 387:19
 424:5 449:18
 450:12 455:2
 456:15 460:4
**says** 23:12 49:9
 50:20 54:18
 55:3 66:10,16
 76:11 84:1
 85:9 95:23
 96:25 97:13
 100:14 102:6
 102:11 103:7
 113:7 114:3
 121:10 189:7
 191:7 206:14
 207:16 214:19
 216:16 219:5
 220:9 273:12
 276:8,18 277:9

 277:22 278:22
 284:2,2,3,17
 300:25 302:3
 302:21,21
 331:10,15
 340:17 365:15
 369:23 386:14
 393:25 394:19
 397:16 401:20
 417:5 419:24
 428:6 429:19
 437:23 439:24
**scale** 353:17,19
 361:17
**scanning** 11:17
 427:11
**scenario** 193:14
 194:4,5
**schedule** 158:2
**Schildkraut**
 351:14 413:4,8
 413:20 436:4,5
**scholar** 242:20
 242:20 244:18
**school** 95:1,21
 95:25 96:4
 100:19,21
 101:21,25
 117:5 215:3
 222:4 223:17
 294:8
**schools** 223:16
**science** 24:19
 25:18 31:18,21
 31:25 32:6
 33:3,5,20 34:2
 56:14 151:23
 152:5,10,18,22
 153:15 154:8
 154:16 155:10
 155:16,18
 156:5 157:4,8
 158:10 159:7
 161:12 162:5
 162:19 163:21
 164:10 165:5
 165:21 166:25

 168:3,17
 170:24 175:14
 178:22 179:7
 179:14 188:20
 189:7 190:15
 190:19,20
 223:22,22
 264:23 315:3
 317:8 381:25
 468:8
**Sciences** 32:11
 32:15
**scientific** 30:7
 30:10 31:11
 35:24 37:11
 39:15 42:18
 56:17 57:12
 59:25 70:13
 120:9 146:8
 162:20 176:13
 177:7 189:9
 209:1 212:18
 222:21,22
 228:7 229:21
 234:11 257:3
 260:4,9 291:4
 291:6 295:19
 303:25 304:21
 319:17 342:14
 360:25 374:6
 375:7 407:24
 411:9 416:4
 436:12,24
 437:1 448:5
 453:15
**scientist** 58:25
 120:4 230:18
 231:2 289:1,12
 450:18
**scientists** 59:23
 60:13 222:22
 223:4,6 295:16
 306:23 307:19
 307:20 310:13
 389:3
**scolding** 301:3
**scoring** 250:18

**screen** 13:7
 85:24 378:17
**Screening** 8:11
**se** 30:21 48:24
 65:3 185:2
 195:1 425:12
**search** 92:17
 147:4,11 164:3
 164:18,20
 240:1,8,22,24
 241:1,4,8,17
 242:2,7 313:6
**searched** 246:21
**searches** 162:24
 238:21,22
 240:5 241:19
**sec** 282:22
**sec-** 100:7
**second** 19:8
 44:16 66:1,9
 96:24 97:13
 100:7 198:10
 214:12,16
 225:19 274:22
 290:12 321:14
 330:15 350:15
 351:3 363:18
 366:7
**secondhand**
 10:5,11 102:14
 107:22 363:20
 363:22,24
 364:1,10
 365:14,23
 366:3,20
 367:10,16,23
 368:2 371:13
 376:14 377:25
 379:10,13,18
 380:2,21 393:8
 402:14,19
 403:3,6,9,14
 403:22 405:11
**secretary**
 176:23
**section** 92:3
 176:7 243:20

243:22 244:14
268:13 278:12
282:9 305:15
357:22 366:19
416:23
**sections** 181:21
**see** 16:22,25
23:7 26:4,7
37:4 42:6
44:12 45:10
50:20 54:11
58:7,19 59:13
63:7,10 66:5,6
66:12,13,15,25
67:9 69:6
74:22 79:14
81:4 96:5,6
100:1 102:3,10
103:17 104:6
104:16,17,18
104:24 105:9
105:24 117:3
118:21 121:18
122:14 123:12
124:9,11 134:2
138:13 143:12
144:22 148:8
153:6 157:20
168:5 170:10
181:20 188:4
196:15 206:7
213:13 214:8
214:11,17,20
218:24 221:3
224:24 236:2,3
236:9 237:23
254:7 270:23
271:12 272:9
272:11 277:10
283:21 290:3,7
290:10,15,19
296:6 297:2,4
301:12 302:1
305:16 309:17
312:1,20
313:21,23
315:15,20

327:15 328:6
328:10,14,17
328:20 329:2,4
329:8 330:13
332:22 336:24
344:23 345:1
353:24 355:13
359:4,7,24
364:17,22,25
365:3,7,15
367:4 375:22
388:15 391:11
392:20 394:19
395:3,7,15
396:1,7,9,20
396:21 397:20
397:25 398:3,6
398:9,14,19,25
399:3,7,8
400:24 401:5
402:4 409:17
410:9 413:17
414:14,19,22
418:22 419:23
424:12,16
425:19 427:13
427:17 429:23
432:23 433:10
436:10 438:6
438:14 441:5,8
441:10,12,14
443:2,8,10,14
443:15,17
444:15,25
455:5 456:9
457:17 462:16
**seeing** 41:23
105:17 107:7,8
108:14 422:3
**seeks** 166:4
**seen** 16:18,20,20
35:1,1,23 36:1
36:1,3 51:10
51:12 60:5,8
64:23 65:2
67:3 74:18
83:3 110:22

111:9,21
205:25 213:12
213:17 214:1
222:21 226:5
238:3 258:6
259:19 281:9
281:10 299:21
300:12 304:13
311:6 320:6,7
320:25 329:24
367:17 368:17
376:7 386:12
386:13 387:22
391:6 411:19
411:21 412:2
412:15 413:3
415:12,17
416:11 422:4,8
423:8,12,16
427:22 431:24
436:2,24 437:1
437:8 438:17
440:7 442:5,13
442:25 448:25
451:21 452:9
452:22 453:2
453:16 454:1,1
454:12 459:14
**sees** 104:25
113:21
**segment** 172:22
**select** 244:5,25
333:11 344:3
**selected** 170:4
327:11 344:4,5
345:4,16
**selecting** 245:24
344:12
**selection** 251:11
261:4 345:21
**sell** 50:13 79:19
80:13 87:19
385:12
**selling** 87:24
**send** 164:23
**senior** 370:13
**sense** 46:8 56:23

57:6,9 72:1
91:14 112:1
207:20 239:5
283:16 341:14
361:21 388:10
390:16 403:1
415:2 447:23
451:1 460:7
462:7
**sent** 67:19,22
153:4 161:23
**sentence** 46:7,15
92:24 211:9
212:14,15
215:1 223:13
227:18 235:14
276:7,18,20
278:14 280:1
291:24 302:3
306:10 323:2
366:24 372:7
374:20 428:5
**sentences** 182:1
272:25 306:14
**separate** 110:2
138:18 241:4
332:24 388:23
**separately** 18:14
136:24 178:18
241:8
**separating**
301:6
**September**
11:23 140:3
438:8,25
**sequence** 20:25
**seriously** 434:20
**seriousness**
133:11
**serous** 417:12
**serum** 423:13
**serve** 108:22
**served** 18:6
203:5 340:13
**service** 8:12
105:2 107:7
157:18 159:20

162:5,17
180:18,22
189:12
**services** 11:22
13:5 117:7
154:19 161:13
180:12,24
181:7 186:23
187:18,19,24
192:15 194:6
194:24 195:23
197:21
**set** 24:14 44:3
47:1 86:24
89:13 145:14
157:24 205:15
231:10 243:11
243:23 286:15
291:5 292:13
317:11 324:3
454:19 460:9
471:5
**setting** 105:13
105:14 353:1
**settings** 51:11
**seven** 331:11
345:12 467:13
**severe** 287:12
**SEYFARTH**
5:17
**Shannon** 175:9
**shape** 91:18
168:23 169:11
169:12 170:24
170:25
**shaping** 175:24
**share** 22:22
71:16,17
156:25 165:4
185:17 228:1,7
228:12,18
242:23 261:22
309:19 391:1
438:1 441:22
**shared** 75:15
208:13,24
209:17 441:20

Sharfenstein 313:1
Sharfstein 313:2 314:9,19 319:16,23
sharing 71:16 205:14 212:25
SHAW 5:17
She'll 385:8
sheet 308:15 472:5,6,9,11 474:8
Sheraton 2:5 13:9 15:2
Shih 421:25
Shih's 421:25
Shirm 309:8
shopping 50:8
short 19:17
shorten 349:3 426:15
shorthand 471:1 471:2,11
show 17:17 45:1 52:2,20 80:3 95:8 98:22 138:21 139:1 154:13 213:3,6 235:16 281:22 289:19 296:17 296:22 311:23 312:4 331:20 364:7,9 366:1 390:1 392:24 393:13 396:24 413:20 415:3 431:4,17 432:15 436:6,8 437:12,18 438:7 442:18 462:24
showed 358:4 463:22
Shower 50:1,2 51:8,8,16,16 74:15,15
showing 9:19

378:4
shown 215:8 226:12,17,21 415:17 416:10 435:24 437:6,8
shows 236:14 237:14 281:10 281:18 353:10 423:17 435:22 436:2
sick 104:13
sickest 104:12
side 60:23 308:20 327:14
Sidney 7:22 214:3 215:14 224:24 225:5 225:12 228:16
Siemiatycki 172:7
sign 206:22 307:14,24,24 307:25 472:6
signal 301:7 358:19 359:8 458:25
signatories 311:18 312:6 312:17 313:23 314:6
signature 208:1
signatures 312:15
signed 264:10 306:23 307:21 312:2
significance 9:5 9:13 286:2,19 295:17 298:14 302:5 303:6 304:1,22 306:25 309:13 309:24 310:1 310:17 311:16 312:8 314:17 316:1 318:10 323:5 357:19

357:20 428:10
significant 233:21 234:13 236:16 237:16 237:21 269:13 271:19 278:3 278:15 285:25 286:21 287:4,5 291:8,10 292:15,21 293:15 302:13 303:15 305:25 309:6 318:11 321:8,9,19,20 322:7,8,19,20 323:10,19,20 356:22,24 357:4,11 360:9 365:13 456:8 456:13
signing 472:8
silica 259:7,12 259:15
similar 64:14 188:17 245:11 280:24 335:24
similarities 285:23 286:9
similarly 49:25 269:18
simple 61:16 62:17 64:21 335:20 403:20
simplify 201:7 421:2
simply 37:12 57:9 287:19 291:6 292:14 293:10,10 327:19 354:1 441:1 453:14 456:6
Singh 172:8
single 104:7 246:16 247:9 248:13 363:1 371:2 373:9

447:20 458:16 461:23
sir 141:6 324:13
SIRs 400:8
sit 304:14
site 417:13
sitting 15:1,10 68:4 69:9 121:14 363:10 412:14
situations 135:22
six 57:24 319:2 401:3
size 191:1 248:25 249:2 316:9,10 341:7 341:11 342:2 342:13,16,23 343:1
sizes 341:17
SKADDEN 5:10
skilled 51:21 52:15
sky 380:15
sleep 34:22 93:23,25 94:1
slice 237:7
slightly 400:9
small 271:18 278:2 282:13 331:16 340:18 342:17,23 360:21,21,25 362:15 363:11 371:7 420:21 451:17
smaller 205:19 361:17
smart 311:12
Smith 182:12,13
smoke 10:5,11 10:21 102:15 107:22 363:20 363:22,24 364:1,10 365:4 365:16 366:4

366:20 367:11 367:16,23 368:2 371:13 376:14 378:1,7 379:11,13,18 380:2,21 393:8 393:8 402:14 402:20 403:3,6 403:10,14,22 405:6,11,22 456:24,24
smoked 404:12 404:21
smoker 379:19 380:22
smokers 10:6 364:11 365:13 365:14 366:20 366:23
smokey 405:20
SMRs 400:8
snack 204:14
snippet 85:6
snippets 83:22 97:25
Society 439:5
Society's 298:13
sold 75:5
solely 302:11 303:13,14
soliciting 312:14
somebody 20:20 49:9 70:14 83:23 90:21 97:2,25 104:20 105:19 107:8 153:3 159:22 160:1,4 173:7 178:1 185:1 188:16 191:6 196:13,22 224:10,12 240:6 255:6 287:13 293:11 324:7 340:20 352:24 376:5 412:23 461:2

Gregory B. Diette, M.D.

| | | | | |
|---|---|---|---|---|
| **somebody's** 394:14 465:22 | 78:14 91:18 92:21 110:8 | **spaces** 174:19 **speak** 98:6 | 231:4 233:4 235:8 261:2 | **started** 28:16 29:4,6 189:17 |
| **someone's** 191:17 | 123:16 130:20 144:16 146:15 | 113:13 **speaker** 115:11 | 314:10 430:8 435:6 | 250:14 **starts** 48:25 |
| **somewhat** 221:18 256:20 | 152:13,16 158:1,4 168:25 | **speaking** 64:19 109:20 115:9 | **speech** 37:17 98:7 114:16 | 225:20 236:9 292:10 299:20 |
| **soon** 93:17 113:25 205:5 | 175:14,15 176:10 181:23 | 142:2 207:3 213:15 260:14 | 193:6 442:1 **speeches** 37:24 | 394:9 395:9 419:21 432:23 |
| **sophisticated** 64:15 | 185:3 195:2 211:24 230:7 | 301:17 326:15 389:14 | 92:13,19 113:3 114:15,15,18 | **state** 2:17 38:3 45:19 75:23,23 |
| **sorry** 23:21 26:20 28:4 | 241:3 252:7 257:11,17 | **special** 9:9 292:12 301:1 | 115:14 **speed** 454:16 | 111:3 112:17 272:10 414:14 |
| 43:3 45:3 48:12 58:19 | 266:25 267:3 268:24 292:19 | 308:17 309:3,9 **specialist** 120:4 | **spell** 423:25 **spend** 152:2 | 432:2 472:3 **stated** 146:1,10 |
| 69:25 76:22 85:3 87:9 | 297:3 313:21 332:23 343:5 | 188:25 254:15 255:14 | 173:15 175:17 175:25 177:14 | 255:18 286:18 395:19 436:13 |
| 97:10 99:19 112:20 116:12 | 358:13 382:6 383:23 392:17 | **specialties** 194:9 **specialty** 260:24 | 183:23 **spent** 23:5 37:10 | 452:17 **statement** 8:4 |
| 126:23 131:18 139:17,19 | 405:3,20 425:2 425:5 437:5 | **specific** 68:25 118:3 123:20 | 408:2 **spill** 171:3 | 36:10 37:21 38:11 46:5,18 |
| 171:19 172:14 177:3 188:10 | 452:11,13 454:21 456:7 | 131:22 207:1 207:11 223:3 | **split** 171:5 **spoke** 168:4 | 46:24 77:7 172:25 217:2,4 |
| 210:20 227:14 237:11 243:17 | 458:14 461:22 462:4,13 468:1 | 252:1 276:7,12 276:17 277:9 | 468:12 **spontaneously** | 217:9,14 220:6 221:22,24 |
| 258:8,24 260:5 269:3,21 | 468:24 469:10 **sorted** 242:13 | 361:11 381:17 **specifically** 67:7 | 126:1 **spur** 206:2 | 222:7,16 224:17 226:1,6 |
| 279:11,12 283:22 316:4 | **sorts** 104:14 143:15 181:16 | 67:13 83:11 122:22 123:9 | **Square** 5:5 **stab** 103:20 | 226:15 235:3 235:22 236:5 |
| 324:7 327:3 330:3,14 | 223:9 **sounded** 116:16 | 146:2 182:9 236:7 324:3 | **stack** 30:9 **staff** 171:17,20 | 236:24 238:6 246:5 273:8 |
| 345:10 348:17 348:22,22 | 199:7 **sounds** 55:19 | 331:13 417:12 **specificity** | 171:21,23,24 172:10,21 | 277:9,11 278:22 282:20 |
| 351:19 364:7 365:23 366:8 | 88:11 118:14 120:13 152:4 | 270:24 **specified** 362:9 | 173:1,1 208:18 **stage** 39:17 | 291:11 292:25 293:17 295:19 |
| 368:8 370:2 373:4 379:15 | 164:14 235:12 258:8 295:11 | 362:12 **specimens** 422:2 | 40:14 46:23 115:8 454:20 | 302:17 303:20 304:2 305:3 |
| 379:25 386:21 391:20 394:10 | 301:21 313:17 344:13 390:15 | **spectrum** 451:4 **speculate** 444:9 | **stakes** 93:2 **stand** 337:4 | 306:21 420:9 425:7 432:18 |
| 397:10,11 414:4 419:25 | 445:8 447:1 **source** 126:19 | **speculation** 60:18 75:11 | **standards** 120:11 | 432:21 433:16 445:24 445:2 |
| 424:5 425:9 431:19 433:3 | 127:5 225:7 369:25 376:1 | 110:16 157:10 158:15 178:13 | **standing** 352:14 **standpoint** | 447:23 452:23 452:25 |
| 441:12 446:6,6 446:17 450:13 | **sources** 370:4 404:24 | 178:25 186:11 188:6,12 | 263:6 **start** 28:10 66:3 | **statements** 234:5 293:3 |
| 469:20 **sort** 24:3 49:12 | **South** 3:15 **space** 472:4 | 191:21 194:11 195:14 196:2 | 240:4,11 241:11 243:21 | 304:18 **states** 1:1 13:14 |
| 64:18 70:7 | **spaced** 407:16 | 229:23 230:20 | 355:1 | 36:22 97:14 |

Gregory B. Diette, M.D.

100:17 103:2
236:12 282:11
303:24 305:18
308:15 309:2
367:14 400:25
434:12 439:2
444:17
**statistical** 9:4,13
286:19 295:7
295:17,18
298:13,14,17
303:6 304:1,22
306:25 309:13
309:24,25
310:17 311:16
312:8 314:17
315:25 318:10
323:5 357:18
**statistically**
233:21 234:13
236:15 237:16
237:21 269:13
271:19 278:3
286:21 287:4,4
287:19 291:7
292:15 302:13
303:15 305:25
309:5 318:10
321:9,19,19
322:7,19
323:19 356:22
356:23 357:4
357:10 360:8
456:13
**statistician** 9:9
293:20,21
295:5 296:24
301:2 307:8,14
308:17,20
309:4
**statisticians**
301:4,10
306:23 307:16
307:17,18
**statistics** 307:10
**stats** 35:13
**status** 309:5

**stay** 299:18
355:14
**stenographic**
13:19
**stenographica...**
471:9
**Stewart** 350:17
351:4
**stick** 421:25
**sticker** 29:20
30:1 86:8
**stickies** 30:15,16
**stood** 280:19
**stop** 133:4
156:12 305:19
337:11 456:15
**stops** 48:25
**store** 50:10 53:5
**story** 254:11
410:13,17
**straight** 24:1,15
178:6
**Straighten**
155:4
**straightforward**
63:13
**strain** 438:15
**strategies** 370:8
**Street** 3:7,15
4:11,20 5:18
**strength** 269:8,8
269:17 318:9
362:7
**stress** 102:19
444:19
**strike** 42:3
46:17 47:8
63:21 64:22
72:15 89:15,19
219:21 275:22
310:6,8,9
**stringing** 273:7
**strong** 214:25
216:22,25
217:5,11
221:22 222:2
269:10 273:15

287:18 293:17
314:23 361:21
362:22 363:7,7
421:11 452:22
**strongest** 392:3
392:4
**strongly** 394:25
**struck** 256:12
257:11
**structure**
190:14
**stuck** 275:8
316:16
**studied** 77:14
150:6,12
370:24 449:1
453:17 467:9
**studies** 9:17,17
10:7 11:4
64:22,23 77:2
77:11,18
121:20 126:9
126:13 141:12
141:15,23
142:1,6,11,15
142:19 144:16
182:6 212:18
215:5 222:5,17
223:18 226:19
233:8 236:13
237:14 238:4
238:13,24
239:1,14
241:12 244:9
244:19,20
245:4,6,18,24
246:2,6,15,16
246:25 247:5
247:16 249:9
250:19 251:4
252:1,6,6,15
252:23 253:1,3
253:7,9,16
254:5 267:24
267:25 268:7,8
269:11 270:9
285:8 286:4,19

286:20 288:11
293:15 305:24
319:2 321:7,17
321:18 322:5,6
323:9,13,18,25
324:3 325:6,6
325:10,12,13
325:25 326:13
327:11 332:22
333:10 334:16
335:25 336:17
338:24 339:3
339:14 341:7,9
341:18,19,21
342:1 343:6
344:7 345:21
345:23,25
349:8,9,19
351:24 352:1
353:9 354:2
355:22 356:8
356:14,21,23
357:8,19,20,23
358:20,20
359:12,15
360:5,6,7,8,21
363:5,20,21
367:20 368:21
368:25 371:10
374:22 376:9
387:4 388:2
390:10 391:8
392:6,12,14,18
395:1,6 397:16
398:20 402:15
403:15,18,20
403:20,25
404:8 405:15
407:2 412:2
415:20 416:5
422:21 425:6
428:7 448:14
448:22,24
452:6 455:14
456:12 459:23
459:25 460:3
460:10 461:4,5

461:6,18,23
462:4,5,17,21
462:24 463:23
464:2
**study** 11:11
21:23 22:9
42:17,17 123:2
142:9 144:14
144:19 146:7
148:10,13,16
182:2,4,16
183:11 184:8
214:25 215:3
222:4,12,14
223:16 232:25
233:11,13,14
233:16 245:11
247:3,23 248:6
248:12 249:15
249:22 250:16
253:16 256:12
257:18 267:15
273:5 282:11
283:8 284:4
287:3,13
296:23 318:16
321:25 322:18
322:19 323:15
327:13,13
328:8 329:1
332:16 334:1,2
334:3 341:14
342:14 343:3
346:7 349:14
356:7 359:12
359:17 364:9
366:2,2 369:3
370:12,14
374:14 381:18
388:3,22
389:12,21
390:13,23
397:22,23
398:6,6,18,24
399:3 402:24
404:11 405:1
405:23 406:13

406:17 408:1
409:12 412:22
413:3,5,8,16
413:22 415:17
416:9,11 417:8
423:23 425:12
428:14,23
429:1 435:22
436:2 437:8
447:3 448:6
461:20 462:10
462:22 463:15
**studying** 102:18
383:5
**stuff** 30:13
70:13 108:12
108:19 181:1
183:18 198:1
200:15 277:5,6
311:13 319:25
373:24
**sturdy** 462:6
**style** 102:21
**subcommittee**
8:6 234:9
235:23
**subject** 124:17
126:19 127:5
128:14,17
472:8
**subjects** 282:13
284:3
**submitted** 21:12
21:21 236:6
262:12,15
**submitting** 23:5
**subscribed**
471:14 474:14
**subset** 286:20
**substance**
173:20 174:4
174:15 176:18
184:2 474:7
**substances**
448:21
**substantive**
183:13 184:10

468:5,7,9
470:6
**substitute**
426:25
**subtlety** 136:18
**subtypes** 417:14
**success** 316:18
**succinct** 70:12
**such-and-such**
276:25
**suddenly** 462:6
**sued** 109:8
**suffered** 250:5
**sufficient** 26:24
59:17 80:4
90:7 125:23
126:6 212:19
379:9 386:9,11
387:11 396:4
403:25 404:1,2
404:2,7 457:6
457:22
**suggest** 182:1
188:14 356:13
469:17,22
470:5
**suggested**
285:11 320:13
**suggesting**
160:25 320:11
**suggestions**
176:13 177:7
**suggests** 236:18
271:18 278:2
293:11 444:23
**Suite** 3:8 4:12
4:20 5:5
**sum** 388:9
**summaries**
165:9,20,23
167:1 168:2,9
168:16 170:6
**summarize**
165:6 309:9
343:12 356:11
**Summarizing**
236:10,12

**summary**
167:23 172:9
211:7,13
272:20 359:14
361:4 373:11
376:4
**summed** 286:24
**summer** 224:11
**super** 303:19
372:15
**superiors**
208:19
**supervision**
471:24
**supplement**
393:4
**supplemental**
6:21 19:5 20:4
20:6 21:15
34:5
**Supplementary**
9:12
**supply** 110:7
**support** 87:23
89:18,23
194:24 211:16
234:5 273:6,8
312:7 320:8
321:1 364:22
415:22 416:5
421:12 422:22
439:7 441:16
441:24,25
468:13,17,18
469:5,14
**supported**
418:15
**supportive**
246:19 418:22
436:21,21
445:21 463:4
**supports** 37:3
273:3 384:6
419:25 420:22
423:8
**supposed** 385:3
454:15

**sure** 16:2 20:14
21:7,24 24:13
26:8,10,15
30:24 32:15
39:24 41:19,22
44:6,10 46:4
47:17,24 48:2
49:1 53:8,23
63:3 64:21
65:21 68:20
71:14 76:7
79:5 81:10
86:19 88:21
91:1 92:3 93:1
93:2 103:20,22
103:23 108:12
111:12,14
113:18 116:3
117:2 118:5
122:1 135:7
141:8,19
151:11 155:21
164:16 166:23
167:15 170:5
170:16 173:3
173:23 175:4
175:10 177:4
182:6,17 199:9
201:2 211:14
213:16 226:22
227:15 230:25
243:15 245:19
281:5,10
284:24 285:10
291:23 293:8
295:1,2 296:13
299:8 300:11
301:23 303:8
315:18 326:10
331:8 333:6
347:24 349:1
350:8,17
351:21 355:2,8
355:18 358:10
361:5 364:24
373:12 375:9
375:11 377:4

382:22 390:3
400:2,15
407:15 414:2
426:11 445:11
445:11 450:15
459:8 469:22
**Surgeon** 10:21
364:3 378:4,7
379:7,24
380:18 393:4
**surgery** 63:6
412:6
**surprise** 147:7,9
198:19
**surprised** 15:13
15:17
**surveying** 407:5
407:20
**Susan** 7:6 81:9
**susceptibility**
102:22 108:5
**susceptible** 47:5
**suspected**
123:18 125:25
**swamp** 93:11
**swell** 320:8,25
**sworn** 13:23
471:6 474:14
**symptom**
104:21
**symptoms** 7:24
214:7 371:6
**system** 36:8,15
104:9,13,14
250:18
**systematic**
10:12 11:13
242:24

———————
**T**
**T** 5:16 6:1,1,8
7:1 8:1 9:1
10:1 11:1 12:1
473:2
**T-A-H-E-R**
424:2
**table** 11:4 171:5

Gregory B. Diette, M.D.

171:5 250:8,10
328:9,25
330:10 334:21
336:8,9 340:24
350:23,25
351:2 394:5
396:20,21
397:14 399:14
**tables** 257:14
**Taher** 266:25
271:17 278:1
359:12,17
423:22,23
424:5,12
**take** 23:9 41:13
42:20 44:11
56:15 82:17
92:20 99:11
103:19 136:5
139:8 153:3
154:12 183:25
190:4 203:22
204:2,12,15
209:25 213:13
216:18 255:8
257:18 263:8
263:15 268:18
282:24 298:9
299:25 300:6
300:16 308:11
320:15,17
329:13 340:5
340:17 343:15
353:21 365:7
369:15 377:8
386:18 387:15
388:2,3 416:16
426:9 430:22
431:22 434:20
439:17 440:1,1
440:3 446:17
454:21
**taken** 14:13
15:11 19:17
81:21,22
197:23 471:4
**takes** 383:20

**talc** 8:11 9:21
11:12,18 55:3
75:25 76:13,16
76:21,25 78:21
126:19 127:5
134:10 211:19
215:4,6 222:5
223:17 225:22
240:16 259:10
259:11,15,16
259:17,18,23
259:25 261:14
270:10 271:21
273:1 278:5
280:25 281:3
285:13,15,19
286:2 329:1
331:2 339:22
345:1 359:3
384:20 399:22
400:13,16
401:4,8,20,21
401:23 412:8
412:11,16,23
416:6 417:11
417:14,17
418:16,17
422:12 423:19
424:14 427:12
428:6,8,20
429:6,19 432:3
432:10 433:6
434:1 435:23
436:25 437:9
439:9,12 448:8
448:16,16,19
449:2 452:15
452:18 453:19
**talc's** 422:10
**Talc/Ovarian**
9:16
**talcs** 285:24
286:9
**talcum** 1:5
13:11 28:14,19
49:3 50:7,13
59:3,11 60:2

63:23 64:5,24
69:11 72:6,18
74:23 75:4
76:2 77:12,14
77:14 78:3,10
78:17 79:17
80:9,13 84:11
84:16,21 89:15
89:17,19,21,23
109:21 111:2,7
111:9 120:20
126:9,14,19
127:11 128:17
129:3,13,25
130:25 131:15
132:7 134:15
134:19 135:5
135:14 136:7
136:20 137:2
137:20 138:8
140:22 142:12
142:16 148:16
149:21 150:20
151:4 163:3,7
163:13,18
164:12 165:24
167:2,12 187:6
199:1,12,25
200:3,10,22
201:3,9,23
202:21 203:1
209:18 210:23
211:17 212:21
214:19,23
216:20 217:9
218:2 219:7
220:11 221:5
231:16 233:23
234:10,12,21
236:14 237:15
240:17 241:7
241:10 261:14
262:7 263:15
263:16 264:1,2
266:17 272:15
273:22 274:14
275:1 276:1

278:22 279:1
280:23 329:6
368:17 382:12
384:5,7,18
385:21,23
406:14 407:7
410:22 411:5
411:10,22
415:8,15,21,23
435:17 436:13
451:24 453:5
460:10,11,25
462:19 464:3
**talk** 24:24 31:5
31:6 34:1
40:10 44:2
46:8,9 59:15
59:20 71:12
80:19 86:20
99:9 121:1
125:6,12
151:22 156:22
163:6 177:21
184:14,16,24
184:25 211:22
216:2 219:16
238:7 239:21
243:3,5 250:25
297:13 314:19
315:18 319:15
337:13 360:19
361:8 374:20
376:21 399:20
444:11 447:2
454:25 459:14
461:22 463:7
**talk-** 28:17
**talked** 141:9
153:5 162:16
203:15 335:23
355:21,25
428:15 435:15
435:16,23
436:4,4 452:4
457:18
**talking** 28:12
40:24 47:25

58:1,11,22
69:25 72:21
73:25 74:1,4
79:25 80:6
81:3 90:4,9
99:21 111:1
117:15,17
118:7,19 135:9
136:24 163:9
167:7,9,10,15
167:16 170:7
170:19 174:16
192:13 195:8
197:19 199:25
201:3 223:2,11
241:6 244:17
245:3 246:14
247:4 262:20
263:10 276:23
280:20 299:8
303:7,11 315:1
317:22 321:3
323:4 337:14
375:23 384:23
386:10 387:5
387:23 390:7
393:7 402:5
403:21 406:8
408:10 409:23
412:4 419:7
421:25 447:24
449:12 452:5
454:5,7,8,9
455:24 456:2
459:10,13
461:13 465:14
466:7,10,14,18
**talks** 92:2
214:13 278:14
418:10
**task** 190:4 462:8
**tasks** 178:18
**Taylor** 8:22
**team** 175:18,25
**teaming** 132:24
**tear** 29:22 343:5
**technical** 196:20

| | | | | |
|---|---|---|---|---|
| 269:6 | 90:9 144:8 | 355:23 356:11 | **thereof** 304:1,23 | 463:12 468:24 |
| **Tecum** 6:13,18 | 224:22 225:9 | 356:12 407:21 | 471:11,14 | **think** 14:16 17:9 |
| **tell** 26:21 50:17 | 240:1,8,20 | 412:15 415:9 | **thing** 32:9 85:11 | 18:8 20:24 |
| 51:24 69:9 | 245:6 260:13 | 429:15 432:6 | 86:16 111:24 | 24:18 25:20 |
| 73:11 79:9 | 335:1 337:7 | 436:18 449:7 | 118:7 164:15 | 28:21 29:15 |
| 122:12 141:8 | 347:25 363:11 | 453:8 471:7 | 205:24 212:12 | 30:16,20 40:3 |
| 143:9 157:11 | 452:5 456:24 | **testing** 64:4,19 | 215:1,2 248:14 | 41:19 42:25 |
| 157:15 162:4 | **terrible** 461:25 | 69:10 70:8 | 277:3 287:18 | 43:21 46:3 |
| 179:1 183:16 | 462:1 | 74:12,22 | 299:7 309:6 | 48:8 49:13 |
| 186:2 192:24 | **Terry** 238:1 | 120:10,14,16 | 313:20 324:8 | 53:16 56:9 |
| 218:17 219:9 | 463:18,18 | 120:20 291:10 | 408:11 425:3 | 57:25 65:2 |
| 245:23 248:5 | **test** 37:9 70:18 | 292:21 302:5 | 445:8 447:4 | 67:4,6,8,18 |
| 248:11 249:8 | 71:18 207:22 | 315:11 316:11 | 456:1 469:10 | 68:12,13 70:15 |
| 249:14,21 | 424:21 | **tests** 64:17 72:17 | **things** 20:16 | 71:20 73:11,24 |
| 250:4,17 | **tested** 63:23 | **text** 265:11 | 21:3,19 52:17 | 74:4,18 75:21 |
| 273:14 277:11 | 64:24 72:7 | 331:10 | 59:15 61:11 | 77:9 79:5,7,23 |
| 283:15 320:15 | **testified** 13:24 | **thank** 19:19,20 | 64:18 69:1 | 85:18 88:12 |
| 334:4 341:24 | 159:16,17 | 19:25 35:18 | 73:2 92:3 97:7 | 90:10,17,20,21 |
| 342:3 344:18 | 177:16 206:24 | 39:2 44:24 | 104:19 116:8 | 90:22,24 93:22 |
| 387:23 389:10 | 207:9 233:19 | 45:5 54:8 58:6 | 117:3 125:22 | 97:6 106:9,12 |
| 390:2 391:7 | 234:8,11 | 63:2 74:10 | 130:19 142:2,3 | 106:23 107:25 |
| 405:17 468:16 | 384:14 428:16 | 76:23 80:23 | 143:11,16 | 109:19 112:20 |
| 469:6 | 431:21 432:1 | 87:8,22 88:25 | 144:16 146:18 | 113:5 116:9,20 |
| **telling** 160:13 | **testify** 137:1 | 89:13 100:5,11 | 158:3,6 162:11 | 117:2 118:2,16 |
| 460:15,18 | 138:3 160:11 | 101:18 119:5 | 162:12 168:22 | 120:13 121:17 |
| **tells** 434:8 | 466:18 | 127:1 139:5,9 | 168:25 169:3 | 124:25,25 |
| **temporality** | **testifying** | 147:1,2 188:12 | 170:6 171:3 | 126:21 130:7,8 |
| 269:19 270:19 | 160:24 206:3 | 210:2 215:11 | 175:15 176:10 | 131:16,21 |
| 270:19 | **testimony** 7:20 | 227:4,9 252:4 | 178:16 183:24 | 133:13 135:12 |
| **ten** 33:5 130:5 | 20:23 32:2 | 272:4 282:7 | 202:11 203:19 | 136:20 137:23 |
| 137:13 152:14 | 43:19,22 67:12 | 283:23 287:10 | 215:19 223:9 | 138:10 139:6 |
| 152:19,20 | 67:16 88:7 | 325:2,21 327:7 | 224:15 239:3 | 139:19 140:8 |
| 155:14,20,24 | 109:17 129:19 | 327:7 330:17 | 239:12 253:24 | 142:7,9 143:11 |
| 185:15 189:18 | 132:13 137:25 | 338:18 349:6 | 256:21 257:10 | 143:21 150:23 |
| 331:10 333:5 | 138:12 139:18 | 364:18 377:20 | 263:1 266:9,20 | 152:7 153:2,9 |
| 340:18 341:2 | 139:24,25 | 381:13 397:8 | 269:12 273:7 | 154:18 161:3,9 |
| 343:23 344:14 | 150:22 151:7 | 400:10,10,11 | 291:16 308:13 | 162:7,8,10,17 |
| **tend** 70:7 | 153:18 163:2 | 419:17 431:3 | 308:14 310:22 | 162:18,23 |
| **tens** 155:24 | 163:15 171:12 | 431:20 437:13 | 311:3 332:6 | 163:1,8 164:14 |
| 408:1 | 172:12 176:3 | 443:7 470:12 | 334:24 340:24 | 165:8 166:21 |
| **term** 196:20 | 191:15 205:25 | 470:13,14 | 357:23 375:2 | 167:22 170:17 |
| 269:6 447:1,6 | 206:8 232:1 | **thanks** 14:3 | 385:2 386:5 | 182:23 184:12 |
| 450:25 459:7 | 233:20 237:3 | 82:15 166:11 | 404:3 412:7,9 | 185:21 189:22 |
| **terminology** | 259:4 264:5 | 301:9 470:10 | 412:10 415:2 | 191:23 195:8 |
| 73:10 130:6 | 279:9,14 315:6 | **theory** 76:14 | 426:15 442:4 | 197:8,25 |
| **terms** 20:24 | 323:22 336:22 | 201:13,17 | 452:4,13 | 198:11 199:23 |
| 70:12 73:21 | 345:4,15 | 420:23 439:8 | 459:15 462:12 | 201:21 202:11 |

Gregory B. Diette, M.D.

205:24 206:21
210:13 211:23
217:1,3,16
218:18,25
219:18 220:7,8
221:12 223:8
223:10 224:5
226:6,8 229:18
229:25 230:16
230:17,18
237:1,3,23
238:4 240:18
243:2 244:12
245:22 246:14
252:17 253:13
253:18 254:20
255:3,5 257:25
258:8 260:1
264:15,17
270:24 272:18
273:8 276:22
276:23 278:18
278:21 279:11
279:15,18,19
280:20,22
281:9 283:7,15
287:12,15,17
293:4,14,17,17
294:16 296:9
297:11 301:20
301:21 303:10
303:12 305:1,2
306:9,9,13,15
306:19 311:11
311:12 315:20
319:16 321:24
321:25 322:10
322:13 323:3
323:14 325:19
330:7 331:6
332:17 334:8
337:1,7 340:12
340:17 342:20
343:8,19,20,22
345:12 352:12
353:16,20
355:24 356:9

358:8,11,18,22
358:23,23
361:9,12,19
362:1,11,12
364:3 371:9
372:17 374:1
374:13 375:23
380:13 386:24
387:1 388:1,8
388:16 389:21
389:22 390:6
390:22 392:2
392:10,11,13
392:18 394:11
401:19,23,24
410:10 412:3
418:14 421:11
425:11 430:15
432:6 435:9
436:1,19
447:21 451:7
451:11,12,13
452:10 456:2,9
456:10 458:15
460:24 463:14
464:10 466:7
469:1,3
**thinking** 40:1
48:16 49:10
70:1 144:7
392:21
**thinks** 361:20
434:9
**third** 8:20 48:3
64:10 101:7
236:8 290:2,14
290:18 369:22
389:21 432:22
**third-party**
176:20
**thirty** 472:12
**THOMAS** 3:13
5:16
**thoroughly**
322:1
**thought** 66:19
69:25 72:22

116:12,16
190:10 206:2
227:9,11,16
238:24 241:6
251:22 254:6
257:18 291:16
294:22 307:15
307:17 316:22
366:8,10
461:21
**thought-prov...**
301:9
**thoughts** 126:2
233:10
**thousands** 408:1
**three** 22:18 23:7
43:14 57:14
183:12 245:7,8
245:8,9 267:15
290:6 297:13
318:3 331:11
349:20 350:6,7
390:11 430:16
432:22 459:25
459:25
**threshold**
302:14 305:21
318:19 319:9
319:13 362:9
362:12
**threw** 440:14
**throw** 29:23
**Tiernan** 8:5
**tight** 44:3
**Tim** 289:12
290:14
**time** 13:6 19:10
19:13 21:1
23:1 27:13,15
27:19 42:20
44:15,18 46:13
49:12 55:24
57:11 71:12
83:3 88:20,22
89:3,6 91:2,13
114:8 117:16
128:8 151:10

151:16,19
152:2 153:2
163:17 173:15
175:17,25
176:5 177:13
177:13 178:1,7
183:23,24
185:6,12
187:17 189:25
197:24 202:19
204:5,19,22
218:22 227:22
229:25 241:15
257:24 258:9
258:21 265:13
270:20,21
280:6,10,13
282:24 299:14
301:17 314:16
315:19 320:18
320:21 338:13
338:16 349:4
349:22 374:5
376:22 377:9
377:12 381:10
387:9 426:14
426:16,19
447:10,13
464:12,15,19
464:22 470:11
470:16 471:5,6
471:8
**timeline** 29:9
**times** 14:13 28:8
57:15,24
117:21 155:17
189:6 259:3
389:6 453:23
**Timothy** 289:6
289:12
**tiny** 361:16
371:14
**TISI** 3:12 100:9
132:21,24
289:21 431:8
**tissue** 282:14
284:10

**title** 297:5
389:17,18
**Tobacco** 10:20
378:7
**today** 13:16,20
15:2,13 19:22
19:24 22:22
27:9 34:6,7
43:19 53:7
68:5 69:9
71:16 75:5
111:17 121:14
130:22 145:3
157:25 160:11
161:4 205:14
205:23 257:21
298:7 300:21
318:9 329:24
338:23 340:5
363:10 367:25
412:14 427:2
433:19 435:15
462:16 467:25
468:12 469:4
**Today's** 13:6
**Todd** 1:25 2:16
13:20 471:18
**toe** 107:11
**told** 15:14 115:6
162:11 221:1
244:16 430:9
454:18
**tolerance** 84:10
**Tom** 325:19
348:23 430:13
430:18,18,18
430:18 431:9
**ton** 373:23
**tone** 106:7,9
113:14,19
115:2
**tools** 238:23
**top** 66:7 84:1
93:9 95:23
161:15 197:10
243:8 284:16
284:18 328:8

Gregory B. Diette, M.D.

396:21 414:20
**topic** 48:15
77:10 123:22
124:13 128:25
129:3,12
131:12,24
134:15 140:21
144:13 150:3
151:4 156:3
163:23 164:11
189:9 199:14
200:3 203:1
223:3,11 232:6
240:7 245:10
303:12 313:18
315:18 408:25
448:15 453:17
**topics** 141:25
143:13,14,15
162:25 254:15
260:2
**tore** 30:3
**total** 179:23
388:9 420:25
462:20 463:3
**totality** 383:21
384:3
**totally** 204:18
**touched** 69:5
**touching** 332:5
**tough** 332:17
**Towson** 1:16 2:7
13:10 15:2
**Toxicological**
262:3,5
**toxicologist**
119:17
**Toxicology**
262:9
**toxin** 450:21
**toxins** 120:11
**Trabert** 22:9
**track** 327:10
**traction** 315:15
**traffic-related**
376:2
**trailed** 348:25

**trained** 52:15
**training** 117:5,6
230:1
**transcribed**
471:10
**transcript** 6:9
7:2 8:2 9:2
10:2 11:2 12:2
22:13 86:3
471:10,12,21
472:13,14
**transcription**
474:4
**transcripts** 60:8
167:24 231:21
**Translational**
9:8 294:14
308:16 309:21
310:12
**transport** 273:3
284:19 285:6
**transvaginal**
284:21 285:7
413:11
**traveled** 230:12
**treat** 60:14 62:1
62:1
**treatment** 61:6
63:12 115:23
116:6,25 118:9
**treats** 61:1
**trending** 352:8
**trial** 128:10
138:3 188:14
**trials** 128:4,6,12
128:16 246:21
**trick** 133:7
**tricky** 41:18
**tried** 238:12,18
238:24 239:2
240:13 245:17
245:19 246:1
246:16 247:8
251:7 333:14
338:25 358:22
359:1 447:22
461:19

**tripping** 184:24
**trouble** 87:5
**true** 41:24 90:22
90:24 103:15
108:7 121:13
218:4,25 226:6
226:6 257:24
294:25 303:3,9
314:7 381:10
383:24 384:4
388:11 418:21
418:23 436:2
437:7 455:11
458:19 465:25
466:21 471:10
**Trust** 219:17
**truth** 37:2
331:22,25
463:5 469:19
469:24 470:7
**truthful** 14:23
434:19
**truthfully** 73:19
160:11 274:18
**try** 32:19 38:5
48:3 55:20
111:25 115:10
133:6 149:11
179:21 183:24
198:12,14
216:15 266:16
310:22 352:23
408:10 463:7
**trying** 48:8 53:6
73:3 106:10,12
118:13 122:3
130:14 131:21
133:7 135:6
156:16 167:15
168:6,12
170:24 172:18
177:19,19
179:20 184:6
184:24 189:19
190:3 191:13
194:13 198:12
200:24 202:19

246:2 251:14
257:11 266:15
266:20 278:18
284:25 288:16
294:16 296:8
311:21 331:6
337:1 338:20
340:14 342:11
343:7,9,11
352:12,13
360:2 361:10
376:23 385:2
386:22 453:12
453:14 462:9
469:1
**tubal** 285:16
**tubes** 417:18
**TUESDAY** 1:17
**turn** 52:21
193:24 210:24
212:1,2 214:16
244:14 256:5
305:5 324:2
394:6 423:20
**turned** 227:2
**turns** 104:21
**twice** 245:15
345:13,18
**two** 22:18 43:15
73:2 92:25
101:3 112:21
121:24 131:4
139:7 183:11
196:25 217:17
218:25 243:7,8
256:11 258:9
285:24 305:24
306:10 308:14
312:3 313:10
314:3 321:12
323:9,18
346:11,13
349:14,20
350:6,7 351:12
351:14 354:24
354:25 360:15
388:16,17

389:22,23
432:22 441:20
**two-minute**
176:6
**two-sided** 140:8
**type** 56:7 64:8
102:1 134:25
158:6 165:24
167:1 180:18
188:2 250:4
269:16 358:4
360:24 368:3
392:18 458:5,6
458:8 469:14
**typed** 20:20
**types** 103:17
180:11 267:15
359:11 368:1
401:3 404:18
**typical** 387:7
465:16
**typically** 266:6
**typing** 20:9
91:15
**typo** 94:8
**typos** 168:24
176:9 181:17
469:7
**Tzonou** 351:23
352:15

---

**U**

**Uh** 328:21
**ultimately** 239:8
**Ultrastructural**
11:15 427:9
**Um** 344:24
379:25
**uncertain**
417:16 418:3
**uncertainty**
301:8 455:1,4
455:5
**unclear** 28:22
62:14,16
283:18 284:6
286:4

Gregory B. Diette, M.D.

uncontroverted 233:20
underbelly 360:3
undergraduate 94:23
underlying 326:13 392:13 443:11
Underneath 350:19
underpinning 72:2
underpinnings 205:20 254:2
underpowered 342:17
undersigned 471:2
understand 14:6 14:12,17,20,22 24:5 29:13 32:10,13 37:9 41:17 60:12,15 64:12 67:11,23 73:9,25 81:25 82:3,4 103:21 109:20 121:8 124:24 133:9 135:7 144:4 154:11 162:2 167:14 177:20 179:21 180:8 180:10 191:14 207:6,17 232:24 233:5 251:14 253:21 253:24 254:1 254:10 255:9 256:22 257:17 266:8 318:8 326:21 352:12 354:20 375:5 382:17,20,21 385:20 389:16 400:15 408:8 410:24 411:3

422:15 428:22 428:25 440:16 448:12 450:12 453:14 460:20
understanding 17:24 39:15 40:13,18 51:14 52:14 59:22 64:3 72:4,10 109:2,14,24 110:3,10 130:24 158:9 166:19 170:25 176:21 178:9 180:11 363:23 405:5
understandings 33:3
understands 80:21 330:7
understood 61:12 70:15 80:22 144:5 156:22 203:6 381:10
undertaken 394:2
underway 286:5
underwear 331:14
unexposed 366:21 428:16 428:16
unfortunately 237:4
uniformly 461:4
uninformative 343:24
unique 247:14
unit 104:10 105:13,23,24 105:25 106:1
United 1:1 13:14 36:22 367:14 434:12
universe 251:14 293:12

university 15:6 93:19 100:19 153:12 208:10 223:14 224:17 314:9 320:3
unprecedented 462:2
unpublished 359:22
unravel 245:16
unreliable 331:17 340:19
update 242:6
updated 213:18
updating 92:4 92:23
upper 285:1
upside 449:14 463:1,17
urgency 315:8 315:22
urgent 93:8
urging 295:20 309:23
urine 404:25 405:25
usage 50:20
use 9:21 11:9,12 46:12 51:17 54:21 59:10 71:9 75:6 76:16,21,25 78:18 80:14 84:23 93:4 119:23 149:4 154:19 168:1 195:23 198:15 211:17 214:23 216:20 217:9 218:2 219:7,22 220:11 221:5 233:23 240:13 242:18 263:12 264:2 272:15 273:21 274:14 290:24 291:9 292:20 307:10

309:5,12,24,25 311:1 316:16 316:19 317:9 317:10 329:1,5 330:11 331:2 331:13 332:24 334:18 339:22 340:8 343:25 344:14,25 345:1 346:21 361:2,18 362:13 368:12 392:2 404:9,18 413:9 414:17 417:11,15 421:17 428:6 446:25
useful 29:23 239:9
users 280:23 281:1 331:10 365:5,17 428:20
USGS 400:25
usual 14:4,11 449:14
uterine 417:18
uterus 254:9 412:7
utilize 186:23

_____

V

V 3:12
vagina 411:11 411:23 412:7 416:7 417:17 418:6 433:8 435:2 449:16
vaginal 285:11 430:3
vaginas 254:9 254:12
vague 111:23 149:24 220:5 230:11 231:4
Valentin 9:13
valid 239:15

342:5 461:14
validated 460:25
validity 239:22
Valley 2:6 13:10
value 341:1
variables 249:22
variety 203:18 359:4 363:4 404:9,24
various 165:15 171:12 242:25 341:17 455:14
vast 245:19
Venter 285:9
verbally 244:16
verify 20:16
version 213:17
versus 318:10 348:8 356:8 357:19 366:20
vertical 353:18
vice 294:6
video 13:7,8
videographer 5:23 13:3,5 14:7 19:10,13 19:23 44:15,18 44:23 89:3,6 89:10 151:16 151:19 204:19 204:22 280:10 280:13 320:18 320:21 338:13 338:16 376:25 377:9,12,22 426:16,19 447:10,13 464:12,15,19 464:22 467:13 470:16
videotaped 1:14 6:11,16 17:16 470:18
view 171:8 225:10 246:19 306:19,20

violates 160:19
violating 337:24
violative 160:21
virtually 198:19
virtue 395:21
vitae 7:9 91:3,11
  91:24 92:10
  127:10,19
  146:10 364:21
  390:10
vitro 252:1,6,14
  252:15,23
  253:15
vivo 252:14
  253:1,15
vocabulary
  447:2
voice 81:24
  115:7,8
void 471:13
volume 10:24
  195:21 296:24
  405:20
vote 455:15,25
vulnerable
  370:7

_____

**W**
wait 61:18 62:21
  68:23,23,23
  144:1 200:13
  210:17 234:17
  234:17 247:7
  258:14 270:2
  274:22 275:13
  276:13,13
  293:2 303:1,1
  318:2 335:5
  346:4 358:8
  361:25 377:6
  444:12 466:11
  467:14
walk 218:20
want 18:17
  20:14 24:6,24
  27:14 32:15,22
  42:9 62:9

65:20 73:14
86:22 93:2,11
93:16 96:15
99:5,6 103:19
114:25 122:14
140:11 151:22
152:16 159:4
160:5 161:15
162:2,4 168:8
175:24 176:7
180:8,10
183:17,19,20
183:21,22
189:8 203:20
203:21,22,25
204:2,10,11,12
204:15 217:19
241:23 251:18
252:12 254:1
276:18 279:13
293:3 316:7,18
317:3,7 319:2
319:7,8,14
320:16 326:7
326:17 331:22
331:23,24
332:2 337:6
338:6 341:11
341:12 343:24
344:11 351:6
353:4,20
358:12,25
363:17 372:15
374:4 377:3
379:6 384:12
394:6 399:24
413:25 424:16
425:9 430:21
432:15 438:15
438:18 440:19
449:21 465:13
wanted 29:21
30:2 32:25
40:1 99:16,25
190:2 194:23
251:20 253:20
275:19 313:21

346:21
wanting 172:24
wants 223:15
439:16,24
444:10
War 226:19
392:22
warmer 44:8
warning 51:16
51:24 54:18
57:2,22 58:1
58:12 75:6
295:19
warnings 51:22
56:22
Washington 3:9
4:13 5:12,19
wasn't 29:23
47:15 50:15
61:14 139:19
156:25 179:23
188:15 216:12
231:6,6 246:2
246:19 250:20
250:23 252:21
253:23 283:11
320:1 323:10
342:10,10
343:4,5,9
345:10 389:25
391:10 425:1
462:8,9
Wasserstein
298:6 309:7,22
310:15 320:12
Wassertine
310:15
waste 27:13,15
218:21 306:1
watered 221:12
way 17:9 39:9
40:5 41:19
46:4 59:15,16
69:7 71:20
73:3 74:6
75:12 105:18
107:24 108:19

146:18 165:4
172:17 183:22
190:5 196:21
198:14 201:8
207:19 211:23
215:4 217:16
219:1 222:5
223:18 229:15
230:11 238:19
244:11 258:8
263:12 275:8
283:13 301:11
342:25 371:2
375:24 377:14
382:5 401:17
404:22 405:21
415:4,16
429:13 447:1
454:14 456:9
456:10 465:19
467:24
ways 46:11
115:11 219:19
223:23 224:5
285:23 314:13
317:1 403:19
445:21
we'll 14:10 19:2
19:18 25:23
29:9 40:10
52:9 59:20
83:12 91:3
95:8 98:22
132:17 138:14
138:17,21
139:8 151:15
152:2,12 211:1
212:8 213:3,7
235:16 238:7
250:25 267:7
271:11 275:11
291:19 297:13
299:19 311:23
312:4 315:15
320:17 326:14
328:14 337:16
338:6,11,11

347:14 351:19
365:9 393:4
396:24 400:19
404:9 406:10
416:17 437:12
444:13
we're 14:9 19:11
19:14,16 27:8
28:12 32:18
33:15 34:1
37:23 44:1,16
44:23 47:24
58:1,5,22
72:21 73:25
74:1 77:24
81:3,18 82:8
85:5 86:20
89:4,7 105:18
113:5,21 114:2
118:7 130:21
136:24 151:17
156:16 163:9
167:7,9,9,15
167:16 170:7,9
172:14 183:18
197:19 199:23
201:14 204:23
209:10 213:23
216:3 223:11
229:4 245:3
246:14 247:4
263:10 280:14
280:20 289:21
294:11 299:7
304:13 311:14
311:15 317:22
320:19,22
323:3 338:5,14
338:17 342:20
350:2 359:11
365:10 372:16
376:22 377:10
377:13,14
387:21,23
408:10 412:4
419:7 426:17
426:20,24

447:11,14,24
449:12 452:5
454:8,9 455:24
459:10 463:6
464:13,16,20
464:23 465:14
466:7
**we've** 57:23
58:11 85:4
157:17 226:4
316:19 317:10
317:10 329:24
349:8 358:11
359:18,22
368:16 402:5
404:19,22,24
427:1 433:18
435:23 436:17
449:10 468:6
**weak** 269:10
360:21,22,25
361:5,22 362:3
362:22 363:11
**weaknesses**
460:10
**web-based**
238:23
**website** 7:12
95:9 96:3 98:5
100:8 101:20
101:25 188:2
223:15 224:9
224:11 225:15
316:23
**websites** 213:20
224:15
**wedded** 323:5
**week** 17:6 93:14
133:1 313:12
**weighing** 321:17
**weight** 321:8
**WEIL** 4:19
**weird** 394:12
**Weiss** 348:3,7
**welcome** 89:2
343:25
**well-** 260:8

**well-respected**
260:4
**went** 93:10
150:24 203:23
233:20 316:22
333:8 338:22
**weren't** 50:15
230:9 241:15
246:22 293:16
307:5 379:5,5
425:3 456:13
**Western** 102:21
108:4
**Western-style**
102:22
**whatsoever**
383:19
**wheelhouse**
254:25
**WHI** 232:25
233:14,16
**whisper** 226:25
**Whitnum**
388:21 391:8
457:12
**Whittemore**
285:11 351:15
**whoa** 99:10
160:9,9,9
440:23,23
**widely** 49:4,14
**widespread**
295:15
**wielding** 253:22
**wife** 229:3,8
**Wignall** 398:5
**wildly** 161:1,5
**William** 66:10
66:16,24
**wish** 274:10
299:13 319:4
330:20 334:5
340:5
**withdraw** 61:20
62:19
**witness** 2:19
15:19 16:7

18:8 20:24
21:18 22:8
23:21,23 24:18
29:3 31:8
32:21 35:9
36:1,25 39:21
40:17 41:18
42:22 43:5,21
47:11,14,24
48:13 49:7,23
51:1,10,20
55:2,17,19
56:3,9,21
57:16,25 58:15
59:6,13 60:5
60:19 61:5
62:5,15 63:25
64:8 65:2,13
69:15,21 72:10
72:20 73:9,17
73:20 74:18
75:1,9,12,18
79:1,4,23 82:3
85:7,10 86:15
86:20 87:3
88:8,19,23,25
90:3,16 96:19
97:23 98:9
99:1,12 103:19
104:3 105:11
106:8,23 107:5
107:18 108:24
109:5,19 110:2
110:17 111:12
111:24 116:1
116:16 117:12
118:2,13 119:1
120:18 124:1
124:25 125:9
125:15 127:15
127:23 128:22
129:20 130:5
130:18 131:6
131:12,18
134:22 135:25
137:12,23
139:7 140:8

141:1,14,20
143:7,21 144:6
144:21 145:9
145:18 146:15
147:1,9,19,25
148:19 149:2
149:16,25
150:23 151:8
151:12 152:12
153:19 155:2
156:13,23
157:11 159:14
159:24 160:8
167:7 168:21
169:14,21
170:16 171:17
172:14 173:23
174:7,12 175:6
175:13 176:4
178:14 179:1,9
180:7 181:1,10
182:19 183:2,8
184:20 187:14
187:22 188:7
188:10,13
189:3,23
190:23 191:22
192:6,11
193:21 194:2
194:12 195:7
195:19 196:11
197:14,18
198:8,22 199:4
200:10 201:16
202:2,10 203:9
204:7,13,17
205:11,18
206:11,20,25
207:1,19
208:21 209:4
209:11,21
210:13 215:18
216:11 218:9
218:11,24
219:12,18
220:19 221:21
222:10 223:2,8

224:4 225:4
226:3 228:9,14
229:24 230:21
231:5,20 232:8
232:19 233:5
233:16 235:9
237:1 244:3
246:1,11
247:25 248:8
248:18,25
249:12,18,25
250:7,23 251:7
255:3,16
256:19 258:24
259:12 260:11
261:3,18,25
262:20,25
263:21 264:6
265:4,22 266:2
267:20 268:3
268:13,20
272:18 274:3,5
274:20 275:7
275:16 276:17
278:13 279:10
279:15 281:9
281:16 282:22
282:25 286:11
287:11 288:2
288:10 289:3,9
289:14 291:15
293:2 299:4,13
300:7,17
301:20 302:19
303:2 304:7
305:1 306:8
307:3,8 310:21
314:11 315:7
318:14 321:12
321:23 322:10
322:22 323:23
331:5,19
333:20 334:11
334:21 336:4
336:24 339:5
339:18 340:12
342:19 343:19

Gregory B. Diette, M.D.

345:23 347:15
348:7 349:13
350:24 351:6
352:4,11
354:17 356:5
357:1,14
358:11 360:14
361:25 362:11
363:1,14 364:3
367:19 368:8
368:20 371:20
372:6,15 373:4
373:18,23
375:9,11,15,22
376:17,22
377:2,5 380:5
380:13 381:9
381:21 382:4
382:17 383:8
384:11 385:1,7
385:10,17
386:1 389:10
390:4,22 391:6
391:20 392:1
393:6,11
394:13 396:9
396:16 399:24
400:15 401:17
402:12,19
405:13 408:24
409:15 410:7,9
411:3,15,19
412:2,22
413:16 415:1
416:14 418:1
418:21 419:7
420:20 421:7
421:15 422:17
423:12,25
426:11,14
428:19 429:3
429:16,22
430:10,16
432:17 433:14
434:5,22 435:8
435:20 436:19
437:5,23 442:4

443:23 444:8
445:5,19 446:6
446:24 447:20
448:13 449:9
450:11,24
451:11 452:3
452:21 453:9
455:8,17,24
456:19 457:2,9
457:25 458:22
460:20,23
461:11 463:21
464:10 466:5
466:13 467:1
467:15 470:2,9
470:14 471:6,7
471:14 472:1
**Wolfson** 71:5
219:4 220:9,15
**woman** 63:17
115:23 116:6
116:25 117:19
118:9 119:7
152:24 175:9
**woman's** 412:17
**women** 34:25
35:6 36:21
59:2 60:14
61:1 62:1,3
215:9 226:13
234:12 236:14
236:18 237:15
250:5 280:22
282:15 283:18
284:6 285:15
286:3,3 331:16
340:18 387:8,8
388:3,22 391:8
395:1 410:18
412:5 428:17
428:19,24
449:13
**wonderful** 114:6
**wondering**
204:3,8 301:3
**Wong** 350:20,22
**word** 46:12 53:7

69:7 71:9 97:9
123:12,23
124:10,12
125:2 147:4
168:22 169:17
169:18 170:13
170:14 187:22
240:24 241:1
241:17 268:24
269:3,4,5
270:15 272:3
273:16 293:10
303:13 313:6
333:21 361:2
378:9 405:6
442:9 460:6
468:5
**worded** 221:17
**words** 70:9
91:15 119:23
147:7 149:4
167:14 169:23
170:4,17,20
194:14 240:13
240:18 270:23
320:14 360:24
360:25 361:1
**work** 33:8,12,15
37:25 38:12
48:17 56:1
63:6 92:20
104:10 128:20
128:25 129:2,6
129:6 130:20
135:8,17 136:6
152:14 154:20
156:24 157:9
158:13 159:20
160:2 163:18
163:22,24
173:19 175:2
176:16 178:23
179:6,13 180:5
181:5 185:22
185:25 186:17
187:12 189:13
189:16 190:16

191:3,3,7
192:1,2 193:11
194:23,25
195:21 198:13
199:6 200:5
225:6 230:6
231:7,9 256:25
339:5 367:7,10
378:11 407:5
407:19 408:14
408:22 409:4
450:25 452:13
467:3
**work-product**
33:10 161:25
166:13 177:10
**worked** 23:16
56:5 69:8
152:24 174:24
182:5,5 185:18
186:3,9,15,22
190:5 192:6
195:20 229:13
230:10 388:4
402:14
**worked-out**
281:17
**worker** 392:17
**working** 176:23
183:18 185:1
185:14 187:5
202:21 261:10
261:13 387:9
394:9,20,22
395:10 396:1
398:20 402:5,6
**works** 81:25
105:19 129:6
153:13 313:8
319:18 320:3
**world** 8:23 9:10
57:17 80:1
81:4 90:19
98:6 135:6
226:19 260:18
265:18 268:22
270:16,20

296:25 308:18
309:3,22 315:9
315:10,24
316:2,3,4,5,6,7
317:7 318:19
392:21 456:1
**world-renown...**
260:23
**worried** 362:18
**worries** 177:4
291:23 366:9
**worsening**
372:19 376:12
**worth** 16:8
197:24 257:11
**wouldn't** 15:13
21:18 36:17
40:7 48:22
51:22,23 56:23
56:23 57:6,7
63:4 71:9 72:1
106:14 116:23
147:9 149:16
149:17 197:23
197:23 207:21
215:18 231:5
311:5 323:11
323:11 340:24
342:3 368:11
382:4 383:18
409:23 410:14
449:17 452:19
452:21
**Wow** 446:6
**write** 145:19
149:5,9 154:23
168:18,21
206:16 219:20
240:3 243:2
311:2 316:7
409:9 437:7
468:4
**writers** 436:25
**writing** 30:21
33:19 233:7
395:24 468:1
**writings** 33:2

170:3 356:13
**written** 130:20
  130:25 134:25
  145:9 309:7
  322:11 409:24
  453:18 456:3
**wrong** 53:14
  56:21 76:20
  116:9 130:6
  153:10 222:13
  258:1 270:15
  318:2 348:3,5
  348:15
**wrote** 181:21
  206:18 257:9
  355:25 435:9
  470:6
**Wu** 351:13,14

## X

**x** 1:3,12 6:8 7:1
  8:1 9:1 10:1
  11:1 12:1
  54:12 58:12
**X-axis** 465:18

## Y

**Y-axis** 465:18
**yeah** 16:20
  26:23 28:20,20
  30:7,24 32:12
  44:23 56:3
  58:3,20,21,23
  66:13 71:20
  75:22,22 76:10
  77:5 79:14
  80:11 84:13
  85:9,20 87:9
  91:1 93:16,22
  94:1 108:17
  111:8 116:4,21
  120:25 122:18
  123:1 128:11
  131:19 132:4
  136:3 141:7
  146:15 151:15
  164:4 167:14

170:2 171:14
174:12 175:6
178:5 179:10
179:25 180:14
181:14 182:19
194:2 195:17
195:17 199:21
200:19 204:7,9
207:8 209:8,8
209:8 216:8,23
220:21 221:11
227:9,19,22
229:7 242:8
243:13 245:5
252:4,10,17
254:13 257:13
259:16 264:7
265:14 269:6
275:7 280:8
282:25 291:22
296:12,16
299:17 300:16
304:9 307:21
310:9 311:25
313:2 314:3,7
316:2,5 317:18
317:25 320:14
325:20 328:1
330:14,18
331:19 338:8
342:15 350:5
351:5 356:5
359:21 365:8
365:21 366:17
367:5,12
370:13 378:13
386:20 388:18
398:7,8,9
399:19 400:6
403:7 417:8
419:11,18
420:19 426:14
436:6 438:6
446:9 454:12
456:2
**year** 36:21 49:20
389:11,17

**years** 33:5 45:21
  46:2 51:2
  108:17 152:14
  152:19,20
  155:14 175:1
  185:15 189:18
  201:23 316:20
  391:9 418:4,9
  445:6,7,9
  457:13 458:10
  458:17,18
**yell** 113:12
  218:12
**yelling** 115:4
  218:16 219:12
  219:14,16
**yellow** 30:18,22
**yep** 204:18
  211:14 212:12
  212:15 215:3
  285:4 328:23
  367:5 417:2,4
**yes/no** 371:13
  404:6
**yesterday** 17:12
**yielded** 331:16
**yields** 340:19
**York** 5:11

## Z

**Zambelli-Wei...**
  229:11
**Zazenski** 11:25
  438:9 443:7,9
  443:16
**zero** 84:10
  305:23 328:14
  458:20,23,23
  458:24,25
  459:3,9,18,18
  459:19,20
  465:9,10,15
  466:3,7,8,8,8
  466:10,21
  467:9
**zig-zaggy** 463:1
**zillion** 311:3

## 0

**0.01** 319:12
**0.03** 351:1
**0.05** 8:23 297:1
  302:14 305:22
  308:18 309:23
  311:15 316:16
  316:17 318:20
  319:1,11 351:1
  361:8
**0.05'** 9:11
**0.40** 328:19
**0.5** 319:4
**0.7** 328:18 329:6
  329:7 330:12
  336:14 339:23
  340:25 343:15
  344:15,23
**0.70** 330:20
  332:15 333:17
  334:8 347:5
**0.8** 367:17
**0.94** 359:25
**000004999** 8:18
**000005003** 8:18
**000013131** 9:22
**07701** 3:22
**08542-3792** 4:21

## 1

**1** 6:11 11:22
  16:13,14,17
  379:9 385:13
  400:23 404:20
  443:10
**1-point** 380:7
**1.0** 346:7 347:9
  347:10,22
  348:14 349:10
  349:21,22,23
  349:25 350:2
  350:13 351:7
  352:2,18,18,22
  352:25 353:20
  359:15,25
**1.00** 347:17
  349:25 352:20

**1.01** 352:21
  361:15
**1.02** 352:21
**1.03** 352:21
**1.05** 352:16
  353:3
**1.1** 353:20
  367:17 368:3
  368:15 400:21
**1.10** 328:19
**1.16** 365:23
**1.163** 365:14
**1.17** 399:11
**1.18** 367:1
**1.2** 353:10,20,21
  354:3,10,12,13
  354:14,15,20
  354:22,23
  355:4,9 361:19
  365:6 367:17
  368:4,15
  379:16,23
**1.23** 367:3
**1.245** 365:17,21
  365:22
**1.3** 361:4,20
  379:16,23
**1.43** 399:11
**1.7** 364:4,8
**1.75** 387:18,22
**1.9** 364:5,8
**1/15/2018** 25:7
**1:52** 280:10
**10** 7:16 133:19
  133:20 134:8
  329:7 330:12
  341:1 361:14
  471:15
**10:07** 89:3
**10:20** 89:7
**100** 10:25
**100,000** 37:10
  40:3
**1001** 4:12
**100C** 259:19
  393:17
**11** 7:19 138:22

Gregory B. Diette, M.D.

138:23 139:2
**11:14** 151:17
**11:24** 151:20
**110** 172:6
**12** 7:22 8:10
213:4,4,7,9
280:22,22,23
**12/14/2018**
22:19 25:4
**12:08** 204:19
**12:43** 204:22
**127** 3:21
**12th** 231:12
236:1
**13** 8:4 235:17,18
244:7,10 246:6
247:1,16,22
248:4,10 251:4
324:4,5 325:4
325:13 326:1
**133** 7:18
**138** 7:21
**14** 6:3 8:11 33:1
68:9 69:12
71:8,19 87:11
244:7,10 246:6
247:1,16,22
248:4,11 251:4
267:7,8 324:4
324:6 325:4,11
325:13 326:2
328:24 414:11
**14,000** 36:21
**1440** 5:11
**14807-96-6** 8:13
**149** 172:7
**14th** 67:1,13
70:20,20 71:1
**15** 8:16 281:19
281:23
**16** 6:13 8:19
289:20,22
414:11
**16-2738** 1:5
**167** 121:10
147:5,12
364:20

**17** 4:20 6:18
8:22 296:19,23
297:14 298:5
298:22,23,23
298:24 299:19
299:21 308:22
309:16
**17,103.75** 25:5
**18** 6:22 9:4
140:3 297:17
297:18,21
298:3,10,11,11
305:6
**1825** 3:7
**19** 4:5 9:7 269:8
308:6,7,25
**19103-69896** 5:6
**1961** 285:9
**1976** 286:1
**1979** 285:10
**1982** 286:1
397:23 398:6
463:14
**1983** 328:6,18
**1986** 285:9
**1988** 285:11
**1990** 117:12
**1993** 117:13,16
**1995** 42:16
43:16
**1996** 281:23

---

**2**

**2** 6:14 17:18,19
17:23,25 18:19
22:3 83:11
84:2 123:15
209:23 210:25
290:1 292:9
379:14 443:2
**2.0** 380:16
**2.13** 398:10
**2.20** 398:24
**2.27** 398:24
**2.41** 398:3
**2.5** 329:6 330:11
330:21 331:16

332:15 333:18
334:9 339:24
340:16 343:16
344:14,23
347:6
**2.61** 398:15
**2.73** 398:11
**2.75** 398:2
**2.8** 11:4 394:5
396:21 397:14
399:14
**2.82** 398:15
**2/12/2019** 25:10
**2/25** 21:20 22:11
22:13
**2:04** 280:14
**2:44** 320:18
**2:53** 320:21
**20** 9:12 23:8
25:16 276:15
311:24 312:5,9
361:14 379:15
380:20 418:4,9
445:6,7,9
474:16
**20,973.75** 25:13
**200** 121:18
124:8,15
144:24 145:12
458:9,18
**2000** 5:5 361:3
394:3 463:6,9
463:16
**20004** 4:13
**20004-1454** 5:19
**20005** 5:12
**20006** 3:9
**2001** 400:25
**2003** 43:15
45:10
**2004** 11:24
438:8,25 439:4
441:10,14
**2005** 398:13
**2006** 261:13
378:5 394:3
**2007** 347:16

**399**:8
**2008** 369:8,15
390:12 398:18
425:13,14
**2009** 346:17
390:13
**201** 4:20
**2010** 259:7
**2011** 388:18
390:12
**2012** 259:19
388:15,19
389:3,14,24
390:6,14,19
**2013** 463:18
**2014** 11:22
139:13 346:15
431:23
**2015** 366:2
**2016** 295:19
296:10,12
**2017** 29:4,5
55:22 56:6,12
92:6,10 108:13
121:9,13
142:25 150:19
163:14 185:7
185:16 242:3
**2018** 8:15 67:1
67:13 68:9
69:13 70:21
71:1,8,19
197:3,6 271:17
359:23 364:13
424:4
**2019** 1:17 8:10
13:6 21:13,16
22:6 121:15
140:17 208:5
236:1 264:11
296:15,19,24
297:23 298:15
305:10 308:19
315:10 374:17
427:19 470:17
471:15
**202** 3:10 4:14

**5**:13,20
**21** 9:15 123:15
271:10,13,14
276:15 277:15
324:17,18,24
325:24 327:10
327:19 346:3,9
**21204** 2:7
**213** 7:24
**215** 5:7
**219** 400:21
**22** 9:19 233:22
234:14 236:16
237:17 327:23
327:24 328:5
**22,000** 36:20
**226** 172:8,15
**22nd** 140:17
**23** 10:4 20:19
343:3 366:11
**231** 45:13
**232-5507** 4:14
**235** 8:10
**24** 10:8 280:22
349:19 369:16
**25** 10:13 23:8
25:17 308:19
325:6,11,13
345:4,16
377:16
**253** 393:20,22
393:23 396:19
397:15
**254** 396:21
397:15
**256** 394:6
**25th** 21:13,16
22:6 208:4
264:11
**26** 10:19 377:16
393:3,10
**267** 8:15
**27** 10:23 290:22
392:25 393:1
393:14
**2738** 13:13
**28** 11:4 140:3

Gregory B. Diette, M.D.

276:15 277:14 396:25 397:1,4
**281** 8:18
**289** 8:21
**29** 11:8 413:23 414:4
**297** 8:23
**299** 9:6

---

**3**

**3** 6:19 18:15,20 18:24 20:4 21:14 22:3 76:7 123:16 325:6
**3.5** 389:6
**3/15/19** 22:20
**3/15/2019** 23:2,6
**3:09** 338:13
**3:10** 338:17
**3:50** 377:9
**30** 11:12,23 45:21 46:2 181:19 269:11 379:16 380:20 416:18,19 438:25 472:12
**30(b)(6)** 81:23
**308** 9:11
**30th** 438:8
**31** 11:15 181:20 233:22 234:14 236:16 237:17 427:4,5
**312** 9:14
**316** 3:15
**32** 11:20 349:8 431:14,17,18 437:23
**324** 9:18
**32502** 3:16
**327** 9:22
**33** 11:23 437:19 437:21,22
**34** 12:4 376:25 442:19,22
**35,375** 25:11

**36** 257:12
**36's** 86:16
**36-page** 86:17
**3600** 420:21
**366** 10:7
**369** 10:12
**37** 83:9 85:9,9,9 86:23
**371-7000** 5:13
**377** 10:18,22
**392** 10:25
**396** 11:7

---

**4**

**4** 6:23 44:20 45:2 243:6
**4:10** 377:12
**4:59** 426:16
**40** 45:21 46:2 298:17 299:11 391:9 457:12
**400** 23:13,16,24 24:19 25:17 177:22 178:7,7 458:10,18
**401** 4:11
**41** 85:8,19
**413** 11:11
**416** 11:14
**42** 256:5
**427** 11:19
**43** 301:9,16 309:10 310:14
**431** 11:22
**435-7000** 3:17
**437** 11:25
**438** 284:16,17
**439** 283:22 284:16,18 285:1
**44** 6:24
**442** 12:6
**45** 416:24,25 417:1
**46** 85:12
**463-2400** 5:20
**465** 6:4

**467** 6:5
**48** 85:1,7 87:11 257:12,13
**485** 23:13 24:2,6 177:18,23

---

**5**

**5** 7:4 35:13 52:7 52:10,11,21,25 54:4,7 122:18 243:8 349:21 433:3,3
**5,068.02** 25:8
**5:12** 426:19
**5:30** 447:10
**5:37** 447:13
**5:53** 464:12
**5:58** 464:15,19
**5:59** 464:22
**50** 156:1,2
**50,000** 197:16 197:23
**500** 458:12
**51** 170:11 172:5 212:3 336:18
**5129** 471:19
**52** 7:5
**53** 85:12
**58** 172:5

---

**6**

**6** 7:6 76:9 82:8,9 86:14 123:1 244:14 359:25
**6:04** 470:16,21
**609** 4:22
**61** 289:20

---

**7**

**7** 7:8 26:2 28:24 29:12 31:13 34:4 42:15,22 42:24 43:2,5 43:10 91:4,5 121:5 325:10 345:5,5,17
**70** 286:1

**700** 3:8
**72** 257:13
**720-1288** 4:7
**73** 296:24 400:25
**732** 3:23
**747-9003** 3:23
**783-6400** 3:10

---

**8**

**8** 7:11 95:11,13 95:14 100:9,10
**8:58** 1:18 13:7
**800** 306:22 307:17,18 312:1,6 313:23
**82** 7:7 222:14
**85** 25:18 178:1 178:10
**850** 3:17
**89** 285:21

---

**9**

**9** 1:17 7:14 98:23,24 101:20
**9:03** 19:10
**9:04** 19:13
**9:25** 44:15
**9:27** 44:18
**903** 2:6 13:9
**91** 7:10
**92** 285:21
**92660** 4:6
**94** 350:18
**949** 4:7
**95** 7:13
**975** 5:18
**98** 7:15
**986-1104** 4:22
**988-2706** 5:7
**99** 385:13
**9th** 4:11 13:6 470:17

# Exhibit 142



## The American Statistician

ISSN: 0003-1305 (Print) 1537-2731 (Online) Journal homepage: https://amstat.tandfonline.com/loi/utas20



# The ASA's Statement on *p*-Values: Context, Process, and Purpose

Ronald L. Wasserstein & Nicole A. Lazar

**To cite this article:** Ronald L. Wasserstein & Nicole A. Lazar (2016) The ASA's Statement on *p*-Values: Context, Process, and Purpose, The American Statistician, 70:2, 129-133, DOI: 10.1080/00031305.2016.1154108

**To link to this article:** https://doi.org/10.1080/00031305.2016.1154108

📄⁺ View supplementary material ↗

📅 Accepted author version posted online: 07 Mar 2016.
Published online: 09 Jun 2016.

✎ Submit your article to this journal ↗

📊 Article views: 292663

⬤ View Crossmark data ↗

🗐 Citing articles: 942 View citing articles ↗

P2.0063.1

THE AMERICAN STATISTICIAN
2016, VOL. 70, NO. 2, 129–133
http://dx.doi.org/10.1080/00031305.2016.1154108



EDITORIAL

# The ASA's Statement on *p*-Values: Context, Process, and Purpose

In February 2014, George Cobb, Professor Emeritus of Mathematics and Statistics at Mount Holyoke College, posed these questions to an ASA discussion forum:

> Q: Why do so many colleges and grad schools teach $p = 0.05$?
> A: Because that's still what the scientific community and journal editors use.
>
> Q: Why do so many people still use $p = 0.05$?
> A: Because that's what they were taught in college or grad school.

Cobb's concern was a long-worrisome circularity in the sociology of science based on the use of bright lines such as $p < 0.05$: "We teach it because it's what we do; we do it because it's what we teach." This concern was brought to the attention of the ASA Board.

The ASA Board was also stimulated by highly visible discussions over the last few years. For example, ScienceNews (Siegfried 2010) wrote: "It's science's dirtiest secret: The 'scientific method' of testing hypotheses by statistical analysis stands on a flimsy foundation." A November 2013, article in Phys.org Science News Wire (2013) cited "numerous deep flaws" in null hypothesis significance testing. A ScienceNews article (Siegfried 2014) on February 7, 2014, said "statistical techniques for testing hypotheses …have more flaws than Facebook's privacy policies." A week later, statistician and "Simply Statistics" blogger Jeff Leek responded. "The problem is not that people use P-values poorly," Leek wrote, "it is that the vast majority of data analysis is not performed by people properly trained to perform data analysis" (Leek 2014). That same week, statistician and science writer Regina Nuzzo published an article in *Nature* entitled "Scientific Method: Statistical Errors" (Nuzzo 2014). That article is now one of the most highly viewed *Nature* articles, as reported by altmetric.com (*http://www.altmetric.com/details/2115792#score*).

Of course, it was not simply a matter of responding to some articles in print. The statistical community has been deeply concerned about issues of *reproducibility* and *replicability* of scientific conclusions. Without getting into definitions and distinctions of these terms, we observe that much confusion and even doubt about the validity of science is arising. Such doubt can lead to radical choices, such as the one taken by the editors of *Basic and Applied Social Psychology*, who decided to ban *p*-values (null hypothesis significance testing) (Trafimow and Marks 2015). Misunderstanding or misuse of statistical inference is only one cause of the "reproducibility crisis" (Peng 2015), but to our community, it is an important one.

When the ASA Board decided to take up the challenge of developing a policy statement on *p*-values and statistical significance, it did so recognizing this was not a lightly taken step. The ASA has not previously taken positions on specific matters of statistical practice. The closest the association has come to this is a statement on the use of value-added models (VAM) for educational assessment (Morganstein and Wasserstein

2014) and a statement on risk-limiting post-election audits (American Statistical Association 2010). However, these were truly policy-related statements. The VAM statement addressed a key educational policy issue, acknowledging the complexity of the issues involved, citing limitations of VAMs as effective performance models, and urging that they be developed and interpreted with the involvement of statisticians. The statement on election auditing was also in response to a major but specific policy issue (close elections in 2008), and said that statistically based election audits should become a routine part of election processes.

By contrast, the Board envisioned that the ASA statement on *p*-values and statistical significance would shed light on an aspect of our field that is too often misunderstood and misused in the broader research community, and, in the process, provides the community a service. The intended audience would be researchers, practitioners, and science writers who are not primarily statisticians. Thus, this statement would be quite different from anything previously attempted.

The Board tasked Wasserstein with assembling a group of experts representing a wide variety of points of view. On behalf of the Board, he reached out to more than two dozen such people, all of whom said they would be happy to be involved. Several expressed doubt about whether agreement could be reached, but those who did said, in effect, that if there was going to be a discussion, they wanted to be involved.

Over the course of many months, group members discussed what format the statement should take, tried to more concretely visualize the audience for the statement, and began to find points of agreement. That turned out to be relatively easy to do, but it was just as easy to find points of intense disagreement.

The time came for the group to sit down together to hash out these points, and so in October 2015, 20 members of the group met at the ASA Office in Alexandria, Virginia. The 2-day meeting was facilitated by Regina Nuzzo, and by the end of the meeting, a good set of points around which the statement could be built was developed.

The next 3 months saw multiple drafts of the statement, reviewed by group members, by Board members (in a lengthy discussion at the November 2015 ASA Board meeting), and by members of the target audience. Finally, on January 29, 2016, the Executive Committee of the ASA approved the statement.

The statement development process was lengthier and more controversial than anticipated. For example, there was considerable discussion about how best to address the issue of multiple *potential* comparisons (Gelman and Loken 2014). We debated at some length the issues behind the words "a *p*-value near 0.05 taken by itself offers only weak evidence against the null

© 2016 American Statistical Association

hypothesis" (Johnson 2013). There were differing perspectives about how to characterize various alternatives to the *p*-value and in how much detail to address them. To keep the statement reasonably simple, we did not address alternative hypotheses, error types, or power (among other things), and not everyone agreed with that approach.

As the end of the statement development process neared, Wasserstein contacted Lazar and asked if the policy statement might be appropriate for publication in *The American Statistician* (*TAS*). After consideration, Lazar decided that *TAS* would provide a good platform to reach a broad and general statistical readership. Together, we decided that the addition of an online discussion would heighten the interest level for the *TAS* audience, giving an opportunity to reflect the aforementioned controversy.

To that end, a group of discussants was contacted to provide comments on the statement. You can read their statements in the online supplement, and a guide to those statements appears at the end of this editorial. We thank Naomi Altman, Douglas Altman, Daniel J. Benjamin, Yoav Benjamini, Jim Berger, Don Berry, John Carlin, George Cobb, Andrew Gelman, Steve Goodman, Sander Greenland, John Ioannidis, Joseph Horowitz, Valen Johnson, Michael Lavine, Michael Lew, Rod Little, Deborah Mayo, Michele Millar, Charles Poole, Ken Rothman, Stephen Senn, Dalene Stangl, Philip Stark and Steve Ziliak for sharing their insightful perspectives.

Of special note is the following article, which is a significant contribution to the literature about *p*-values and statistical significance.

> Greenland, S., Senn, S.J., Rothman, K.J., Carlin, J.B., Poole, C., Goodman, S.N. and Altman, D.G.: "Statistical Tests, *P*-values, Confidence Intervals, and Power: A Guide to Misinterpretations."

Though there was disagreement on exactly what the statement should say, there was high agreement that the ASA should be speaking out about these matters.

Let us be clear. Nothing in the ASA statement is new. Statisticians and others have been sounding the alarm about these matters for decades, to little avail. We hoped that a statement from the world's largest professional association of statisticians would open a fresh discussion and draw renewed and vigorous attention to changing the practice of science with regards to the use of statistical inference.

## Guide to the Online Supplemental Material to the ASA Statement on *P*-Values and Statistical Significance

Many of the participants in the development of the ASA statement contributed commentary about the statement or matters related to it. Their comments are posted as online supplements to the statement. We provide here a list of the supplemental articles.

## Supplemental Material to the ASA Statement on *P*-Values and Statistical Significance

- *Altman, Naomi:* Ideas from multiple testing of high dimensional data provide insights into reproducibility and false discovery rates of hypothesis supported by *p*-values

- *Benjamin, Daniel J, and Berger, James O:* A simple alternative to *p*-values
- *Benjamini, Yoav:* It's not the *p*-values' fault
- *Berry, Donald A:* *P*-values are not what they're cracked up to be
- *Carlin, John B:* Comment: Is reform possible without a paradigm shift?
- *Cobb, George:* ASA statement on p-values: Two consequences we can hope for
- *Gelman, Andrew:* The problems with *p*-values are not just with *p*-values
- *Goodman, Steven N:* The next questions: Who, what, when, where, and why?
- *Greenland, Sander:* The ASA guidelines and null bias in current teaching and practice
- *Ioannidis, John P.A.:* Fit-for-purpose inferential methods: abandoning/changing *P*-values versus abandoning/changing research
- *Johnson, Valen E.:* Comments on the "ASA Statement on Statistical Significance and *P*-values" and marginally significant *p*-values
- *Lavine, Michael, and Horowitz, Joseph:* Comment
- *Lew, Michael J:* Three inferential questions, two types of *P*-value
- *Little, Roderick J:* Discussion
- *Mayo, Deborah G:* Don't throw out the error control baby with the bad statistics bathwater
- *Millar, Michele:* ASA statement on p-values: some implications for education
- *Rothman, Kenneth J:* Disengaging from statistical significance
- *Senn, Stephen:* Are *P*-Values the Problem?
- *Stangl, Dalene:* Comment
- *Stark, P.B.:* The value of *p*-values
- *Ziliak, Stephen T:* The significance of the ASA statement on statistical significance and *p*-values

## References

American Statistical Association (2010), "ASA Statement on Risk-Limiting Post Election Audits." Available at *http://www.amstat.org/policy/pdfs/Risk-Limiting_Endorsement.pdf*. [129]

Gelman, A., and Loken, E. (2014), "The Statistical Crisis in Science [online]," *American Scientist*, 102. Available at *http://www.american-scientist.org/issues/feature/2014/6/the-statistical-crisis-in-science*. [129]

Johnson, V. E. (2013), "Uniformly Most Powerful Bayesian Tests," *Annals of Statistics*, 41, 1716–1741. [130]

Leek, J. (2014), "On the Scalability of Statistical Procedures: Why the *p*-Value Bashers Just Don't Get It," Simply Statistics Blog, Available at *http://simplystatistics.org/2014/02/14/on-the-scalability-of-statistical-procedures-why-the-p-value-bashers-just-dont-get-it/*. [129]

Morganstein, D., and Wasserstein, R. (2014), "ASA Statement on Value-Added Models," *Statistics and Public Policy*, 1, 108–110. Available at *http://amstat.tandfonline.com/doi/full/10.1080/2330443X.2014.956906*. [129]

Nuzzo, R. (2014), "Scientific Method: Statistical Errors," *Nature*, 506, 150–152. Available at *http://www.nature.com/news/scientific-method-statistical-errors-1.14700*. [129]

Peng, R. (2015), "The Reproducibility Crisis in Science: A Statistical Counterattack," *Significance*, 12, 30–32. [129]

Phys.org Science News Wire (2013), "The Problem With *p* Values: How Significant Are They, Really?" Available at *http://phys.org/wire-news/*



145707973/the-problem-with-p-values-how-significant-are-they-really. html. [129]

Siegfried, T. (2010), "Odds Are, It's Wrong: Science Fails to Face the Shortcomings of Statistics," *Science News*, 177, 26. Available at https:// www.sciencenews.org/article/odds-are-its-wrong. [129]

Siegfried, T. (2014), "To Make Science Better, Watch out for Statistical Flaws," *Science News Context Blog*, February 7, 2014. Available at https://www.sciencenews.org/blog/context/make-science-better-watch-out-statistical-flaws. [129]

Trafimow, D., and Marks, M. (2015), "Editorial," *Basic and Applied Social Psychology* 37, 1–2. [129]

Ronald L. Wasserstein and Nicole A. Lazar
✉ ron@amstat.org
*American Statistical Association, 732 North Washington Street,
Alexandria, VA 22314-1943.*

# ASA Statement on Statistical Significance and *P*-Values

## 1. Introduction

Increased quantification of scientific research and a proliferation of large, complex datasets in recent years have expanded the scope of applications of statistical methods. This has created new avenues for scientific progress, but it also brings concerns about conclusions drawn from research data. The validity of scientific conclusions, including their reproducibility, depends on more than the statistical methods themselves. Appropriately chosen techniques, properly conducted analyses and correct interpretation of statistical results also play a key role in ensuring that conclusions are sound and that uncertainty surrounding them is represented properly.

Underpinning many published scientific conclusions is the concept of "statistical significance," typically assessed with an index called the *p*-value. While the *p*-value can be a useful statistical measure, it is commonly misused and misinterpreted. This has led to some scientific journals discouraging the use of *p*-values, and some scientists and statisticians recommending their abandonment, with some arguments essentially unchanged since *p*-values were first introduced.

In this context, the American Statistical Association (ASA) believes that the scientific community could benefit from a formal statement clarifying several widely agreed upon principles underlying the proper use and interpretation of the *p*-value. The issues touched on here affect not only research, but research funding, journal practices, career advancement, scientific education, public policy, journalism, and law. This statement does not seek to resolve all the issues relating to sound statistical practice, nor to settle foundational controversies. Rather, the statement articulates in nontechnical terms a few select principles that could improve the conduct or interpretation of quantitative science, according to widespread consensus in the statistical community.

## 2. What is a *p*-Value?

Informally, a *p*-value is the probability under a specified statistical model that a statistical summary of the data (e.g., the sample mean difference between two compared groups) would be equal to or more extreme than its observed value.

## 3. Principles

1. ***P*-values can indicate how incompatible the data are with a specified statistical model.**

   A *p*-value provides one approach to summarizing the incompatibility between a particular set of data and a proposed model for the data. The most common context is a model, constructed under a set of assumptions, together with a so-called "null hypothesis." Often the null hypothesis postulates the absence of an effect, such as no difference between two groups, or the absence of a relationship between a factor and an outcome. The smaller the *p*-value, the greater the statistical incompatibility of the data with the null hypothesis, if the underlying assumptions used to calculate the *p*-value hold. This incompatibility can be interpreted as casting doubt on or providing evidence against the null hypothesis or the underlying assumptions.

2. ***P*-values do not measure the probability that the studied hypothesis is true, or the probability that the data were produced by random chance alone.**

   Researchers often wish to turn a *p*-value into a statement about the truth of a null hypothesis, or about the probability that random chance produced the observed data. The *p*-value is neither. It is a statement about data in relation to a specified hypothetical explanation, and is not a statement about the explanation itself.

3. **Scientific conclusions and business or policy decisions should not be based only on whether a *p*-value passes a specific threshold.**

   Practices that reduce data analysis or scientific inference to mechanical "bright-line" rules (such as "$p < 0.05$") for justifying scientific claims or conclusions can lead to erroneous beliefs and poor decision making. A conclusion does not immediately become "true" on one side of the divide and "false" on the other. Researchers should bring many contextual factors into play to derive scientific inferences, including the design of a study, the quality of the measurements, the external evidence for the phenomenon under study, and the validity of assumptions that underlie the data analysis. Pragmatic considerations often require binary, "yes-no" decisions, but this does not mean that *p*-values alone can ensure that a decision is correct or incorrect. The widespread use of "statistical significance" (generally interpreted as "$p \leq 0.05$") as a license for making a claim of a scientific finding (or implied truth) leads to considerable distortion of the scientific process.

4. **Proper inference requires full reporting and transparency**

   *P*-values and related analyses should not be reported selectively. Conducting multiple analyses of the data and reporting only those with certain *p*-values (typically those passing a significance threshold) renders the

reported p-values essentially uninterpretable. Cherry-picking promising findings, also known by such terms as data dredging, significance chasing, significance questing, selective inference, and "p-hacking," leads to a spurious excess of statistically significant results in the published literature and should be vigorously avoided. One need not formally carry out multiple statistical tests for this problem to arise: Whenever a researcher chooses what to present based on statistical results, valid interpretation of those results is severely compromised if the reader is not informed of the choice and its basis. Researchers should disclose the number of hypotheses explored during the study, all data collection decisions, all statistical analyses conducted, and all p-values computed. Valid scientific conclusions based on p-values and related statistics cannot be drawn without at least knowing how many and which analyses were conducted, and how those analyses (including p-values) were selected for reporting.

5. **A p-value, or statistical significance, does not measure the size of an effect or the importance of a result.**

Statistical significance is not equivalent to scientific, human, or economic significance. Smaller p-values do not necessarily imply the presence of larger or more important effects, and larger p-values do not imply a lack of importance or even lack of effect. Any effect, no matter how tiny, can produce a small p-value if the sample size or measurement precision is high enough, and large effects may produce unimpressive p-values if the sample size is small or measurements are imprecise. Similarly, identical estimated effects will have different p-values if the precision of the estimates differs.

6. **By itself, a p-value does not provide a good measure of evidence regarding a model or hypothesis.**

Researchers should recognize that a p-value without context or other evidence provides limited information. For example, a p-value near 0.05 taken by itself offers only weak evidence against the null hypothesis. Likewise, a relatively large p-value does not imply evidence in favor of the null hypothesis; many other hypotheses may be equally or more consistent with the observed data. For these reasons, data analysis should not end with the calculation of a p-value when other approaches are appropriate and feasible.

## 4. Other Approaches

In view of the prevalent misuses of and misconceptions concerning p-values, some statisticians prefer to supplement or even replace p-values with other approaches. These include methods that emphasize estimation over testing, such as confidence, credibility, or prediction intervals; Bayesian methods; alternative measures of evidence, such as likelihood ratios or Bayes Factors; and other approaches such as decision-theoretic modeling and false discovery rates. All these measures and approaches rely on further assumptions, but they may more directly address the size of an effect (and its associated uncertainty) or whether the hypothesis is correct.

## 5. Conclusion

Good statistical practice, as an essential component of good scientific practice, emphasizes principles of good study design and conduct, a variety of numerical and graphical summaries of data, understanding of the phenomenon under study, interpretation of results in context, complete reporting and proper logical and quantitative understanding of what data summaries mean. No single index should substitute for scientific reasoning.

### Acknowledgments

The ASA Board of Directors thanks the following people for sharing their expertise and perspectives during the development of the statement. The statement does not necessarily reflect the viewpoint of all these people, and in fact some have views that are in opposition to all or part of the statement. Nonetheless, we are deeply grateful for their contributions. Naomi Altman, Jim Berger, Yoav Benjamini, Don Berry, Brad Carlin, John Carlin, George Cobb, Marie Davidian, Steve Fienberg, Andrew Gelman, Steve Goodman, Sander Greenland, Guido Imbens, John Ioannidis, Valen Johnson, Michael Lavine, Michael Lew, Rod Little, Deborah Mayo, Chuck McCulloch, Michele Millar, Sally Morton, Regina Nuzzo, Hilary Parker, Kenneth Rothman, Don Rubin, Stephen Senn, Uri Simonsohn, Dalene Stangl, Philip Stark, Steve Ziliak.

Edited by Ronald L. Wasserstein, Executive Director
*On behalf of the American Statistical Association*
*Board of Directors*

### A Brief p-Values and Statistical Significance Reference List

Altman D.G., and Bland J.M. (1995), "Absence of Evidence is not Evidence of Absence," *British Medical Journal*, 311, 485.

Altman, D.G., Machin, D., Bryant, T.N., and Gardner, M.J. (eds.) (2000), *Statistics with Confidence* (2nd ed.), London: BMJ Books.

Berger, J.O., and Delampady, M. (1987), "Testing Precise Hypotheses," *Statistical Science*, 2, 317–335.

Berry, D. (2012), "Multiplicities in Cancer Research: Ubiquitous and Necessary Evils," *Journal of the National Cancer Institute*, 104, 1124–1132.

Christensen, R. (2005), "Testing Fisher, Neyman, Pearson, and Bayes," *The American Statistician*, 59, 121–126.

Cox, D.R. (1982), "Statistical Significance Tests," *British Journal of Clinical Pharmacology*, 14, 325–331.

Edwards, W., Lindman, H., and Savage, L.J. (1963), "Bayesian Statistical Inference for Psychological Research," *Psychological Review*, 70, 193–242.

Gelman, A., and Loken, E. (2014), "The Statistical Crisis in Science [online]," *American Scientist*, 102. Available at http://www.americanscientist.org/issues/feature/2014/6/the-statistical-crisis-in-science

Gelman, A., and Stern, H.S. (2006), "The Difference Between 'Significant' and 'Not Significant' is not Itself Statistically Significant," *The American Statistician*, 60, 328–331.

Gigerenzer, G. (2004), "Mindless Statistics," *Journal of Socioeconomics*, 33, 567–606.

Goodman, S.N. (1999a), "Toward Evidence-Based Medical Statistics 1: The P-Value Fallacy," *Annals of Internal Medicine*, 130, 995–1004.

—— (1999b), "Toward Evidence-Based Medical Statistics. 2: The Bayes Factor," *Annals of Internal Medicine*, 130, 1005–1013.

—— (2008), "A Dirty Dozen: Twelve P-Value Misconceptions," *Seminars in Hematology*, 45, 135–140.

Greenland, S. (2011), "Null Misinterpretation in Statistical Testing and its Impact on Health Risk Assessment," *Preventive Medicine*, 53, 225–228.

—— (2012), "Nonsignificance Plus High Power Does Not Imply Support for the Null Over the Alternative," *Annals of Epidemiology*, 22, 364–368.



Greenland, S., and Poole, C. (2011), "Problems in Common Interpretations of Statistics in Scientific Articles, Expert Reports, and Testimony," *Jurimetrics*, 51, 113–129.

Hoenig, J.M., and Heisey, D.M. (2001), "The Abuse of Power: The Pervasive Fallacy of Power Calculations for Data Analysis," *The American Statistician*, 55, 19–24.

Ioannidis, J.P. (2005), "Contradicted and Initially Stronger Effects in Highly Cited Clinical Research," *Journal of the American Medical Association*, 294, 218–228.

—— (2008), "Why Most Discovered True Associations are Inflated" (with discussion), *Epidemiology* 19, 640–658.

Johnson, V.E. (2013), "Revised Standards for Statistical Evidence," *Proceedings of the National Academy of Scienc*es, 110(48), 19313–19317.

—— (2013), "Uniformly Most Powerful Bayesian Tests," *Annals of Statistics*, 41, 1716–1741.

Lang, J., Rothman K.J., and Cann, C.I. (1998), "That Confounded *P*-value" (editorial), *Epidemiology*, 9, 7–8.

Lavine, M. (1999), "What is Bayesian Statistics and Why Everything Else is Wrong," *UMAP Journal*, 20, 2.

Lew, M.J. (2012), "Bad Statistical Practice in Pharmacology (and Other Basic Biomedical Disciplines): You Probably Don't Know *P*," *British Journal of Pharmacology*, 166, 5, 1559–1567.

Phillips, C.V. (2004), "Publication Bias In Situ," *BMC Medical Research Methodology*, 4, 20.

Poole, C. (1987), "Beyond the Confidence Interval," *American Journal of Public Health*, 77, 195–199.

—— (2001), "Low *P*-values or Narrow Confidence Intervals: Which are More Durable?" *Epidemiology*, 12, 291–294.

Rothman, K.J. (1978), "A Show of Confidence" (editorial), *New England Journal of Medicine*, 299, 1362–1363.

—— (1986), "Significance Questing" (editorial), *Annals of Internal Medicine*, 105, 445–447.

——- (2010), "Curbing Type I and Type II Errors," *European Journal of Epidemiology*, 25, 223–224.

Rothman, K.J., Weiss, N.S., Robins, J., Neutra, R., and Stellman, S. (1992), "Amicus Curiae Brief for the U. S. Supreme Court, *Daubert v. Merrell Dow Pharmaceuticals*, Petition for Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit," No. 92-102, October Term, 1992.

Rozeboom, W.M. (1960), "The Fallacy of the Null-Hypothesis Significance Test," *Psychological Bulletin*, 57, 416–428.

Schervish, M.J. (1996), "*P*-Values: What They Are and What They Are Not," *The American Statistician*, 50, 203–206.

Simmons, J.P., Nelson, L.D., and Simonsohn, U. (2011), "False-Positive Psychology: Undisclosed Flexibility in Data Collection and Analysis Allows Presenting Anything as Significant," *Psychological Science*, 22, 1359–1366.

Stang, A., and Rothman, K.J. (2011), "That Confounded *P*-value Revisited," *Journal of Clinical Epidemiology*, 64, 1047–1048.

Stang, A., Poole, C., and Kuss, O. (2010), "The Ongoing Tyranny of Statistical Significance Testing in Biomedical Research," *European Journal of Epidemiology*, 25, 225–230.

Sterne, J. A. C. (2002). "Teaching Hypothesis Tests—Time for Significant Change?" *Statistics in Medicine*, 21, 985–994.

Sterne, J. A. C., and Smith, G. D. (2001), "Sifting the Evidence—What's Wrong with Significance Tests?" *British Medical Journal*, 322, 226–231.

Ziliak, S.T. (2010), "The Validus Medicus and a New Gold Standard," *The Lancet*, 376, 9738, 324–325.

Ziliak, S.T., and McCloskey, D.N. (2008), *The Cult of Statistical Significance: How the Standard Error Costs Us Jobs, Justice, and Lives*, Ann Arbor, MI: University of Michigan Press.